Page 1

1              IN THE UNITED STATES COURT

2              NORTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4              ~~~~~~~~~~~~~~~~~~

5       IN RE:  NATIONAL PRESCRIPTION

6       OPIATE LITIGATION,          MDL No. 2804

7                                   Case No. 17-md-2804

8                                   Judge Dan Polster

9       This document relates to:

10      The County of Summit, Ohio et al. v.

        Purdue Pharma L.P., et al.

11      Case No. 17-OP-45004

12      The County of Cuyahoga v.

        Purdue Pharma L.P., et al.

13      Case No. 18-OP-45090

14      City of Cleveland, Ohio v.

        Purdue Pharma L.P., et al.

15      Case No. 18-OP-45132

16              ~~~~~~~~~~~~~~~~~~

17

18       VIDEOTAPED DEPOSITION OF VINCENT CARAFFI

19      Wednesday, January 23, 2019, at 9:07 a.m.

20                  Cleveland, Ohio

21

22

23      Reported by:

24      Paula Raskin, CSR-4757

25      Ref. No. 3202797

Page 2

1     -oOo-

2

3          On Wednesday, November 19, 2018,

4     commencing at approximately 9:07 a m., the

5     videotaped deposition of VINCENT CARAFFI, taken

6     by Counsel for the Defendants, was held at the

7     offices of Kelley & Ferraro, Ernst & Young

8     Tower, 950 Main Avenue, Suite 1300, Cleveland,

9     Ohio, before and stenographically reported by

10    Paula S. Raskin, CSR-4757, Notary Public.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1     APPEARANCES:

2

3     On behalf of Cuyahoga County and the Witness:

4          SCOTT ELLIOT SMITH LPA

5          5003 Horizons Drive, Suite 101

6          Columbus, Ohio 43220

7          (614) 486-4987

8          BY:  SCOTT ELLIOT SMITH, ESQ.

9

10    On behalf of Cardinal Health:

11         WILLIAMS & CONNOLLY LLP

12         725 Twelfth Street NW

13         Washington, DC 20005

14         (202) 434-5000

15         BY:  PAUL E. BOEHM, ESQ.

16         pboehm@wc.com

17         BY:  MELINDA K. JOHNSON, ESQ.

18         mkjohnson@wc.com

19

20

21

22

23

24

25

Page 4

1     APPEARANCES (Cont.):

2

3     On behalf of the Teva Defendants

4          MORGAN LEWIS & BOCKIUS LLP

5          One Oxford Centre, Floor 32

6          Pittsburgh, Pennsylvania 15219

7          (412) 560-7455

8          BY:  WENDY WEST FEINSTEIN, ESQ.

9          wendy.feinstein@morganlewis.com

10    -and-

11         MORGAN LEWIS & BOCKIUS LLP

12         77 West Wacker Drive

13         Chicago, Illinois 60601

14         (312) 324-1492

15         BY:  ZACHARY LAZAR, ESQ. (Via Phone)

16         zachary.lazar@morganlewis.com

17

18    On behalf of Johnson & Johnson and

19    Janssen Pharmaceuticals

20         TUCKER ELLIS LLP

21         950 Main Avenue, Suite 1100

22         Cleveland, Ohio 44113

23         (216) 696-3921

24         BY:  CLIFFORD MENDELSOHN, ESQ.

25         clifford mendelsohn@tuckerellis.com

Page 5

1     APPEARANCES (Cont.):

2

3     On behalf of Walmart

4          JONES DAY

5          901 Lakeside Avenue E

6          Cleveland, Ohio 44114

7          (216) 586-3939

8          BY:  ADAM HOLLINGSWORTH, ESQ.

9          ahollingsworth@jonesday.com

10

11    On behalf of Rite-Aid

12         MORGAN LEWIS & BOCKIUS LLP

13         1000 Louisiana Street, Suite 4000

14         Houston, Texas 77002

15         (713) 890-5472

16         BY:  JAMES A. NORTEY II, ESQ.

17         james.nortey@morganlewis.com

18

19    On behalf of AmerisourceBergen:

20         JACKSON KELLY PLLC

21         500 Lee Street East, Suite 1600

22         Charleston, West Virginia 25301

23         (304) 340-1018

24         BY:  JILL McINTYRE, ESQ. (Via Phone)

25         jmcintyre@jacksonkelly.com

2 (Pages 2 - 5)

Page 6

1   APPEARANCES (Cont.):

2

3   On behalf of McKesson:

4       COVINGTON & BURLING

5       One CityCenter

6       850 Tenth Street, NW

7       Washington, DC 20001

8       (202) 662-6000

9   BY:  MICHELLE L. YOCUM, ESQ. (Via Phone)

10      myocum@cov.com

11

12  Appearing on behalf of the Endo Defendants

13      BAKER & HOSTETLER LLP

14      Key Tower, 127 Public Square

15      Suite 2000

16      Cleveland, Ohio 44114

17      (216) 621-0200

18  BY:  RUTH E. HARTMAN, ESQ. (Via Phone)

19      rhartman@bakerlaw.com

20

21

22  ALSO PRESENT:

23      Gil Whitney - Video Technician

24

25

Page 8

1   EXHIBIT 7   Ohio's Drug Epidemic: Contributing      221

2       Factors and Ongoing Prevention Efforts

3   EXHIBIT 8   E-Mail String           270

4   EXHIBIT 9   E-Mail String - Subject: Heroin Action   299

5       Plan and More

6   EXHIBIT 10  Drug-Related Emergency Room Visits        316

7       January 1 - September 30, 2016

8   EXHIBIT 11  Memo - January 16th, 2018 - Meeting       333

9       between Vince Caraffi, Najeebah Shine,

10      and Annie Dunham

11

12      (Exhibits attached to transcript.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1           E X A M I N A T I O N S

2

3

4   WITNESS                     PAGE

5   VINCENT CARAFFI

6   EXAMINATION BY MR. BOEHM:                12

7   EXAMINATION BY MS. FEINSTEIN:          350

8   EXAMINATION BY MR. NORTEY:             358

9

10

11          E X H I B I T S

12

13  NUMBER        DESCRIPTION          PAGE

14  EXHIBIT 1   Caraffi Resumè          29

15  EXHIBIT 2   Cuyahoga County Board of Health     65

16      Organizational Chart

17  EXHIBIT 3   E-Mail String           138

18  EXHIBIT 4   E-Mail String - Caraffi to Delos Reyes -   150

19      Subject: Heroin Deaths and Legal

20      Prescriptions

21  EXHIBIT 5   Cuyahoga County Board of Health 2010   163

22      Annual Report

23  EXHIBIT 6   Ohio Prescription Drug Abuse Task Force -  191

24      Presented to Governor Strickland and the

25      Ohio General Assembly

Page 9

1   Cleveland, Ohio

2   Wednesday, January 23, 2019

3   9:07 a.m.

4       VIDEO TECHNICIAN:  Good morning.

5   We're going on the record at 9:07 a.m. on

6   January 23rd, 2019.

7       Please note that the microphones are

8   sensitive and may pick up whispering,

9   private conversations, and cellular

10  interference.  Please turn off all cell

11  phones or place them away from the

12  microphones, as they can interfere with the

13  deposition audio.

14      Audio and video recording will

15  continue to take place unless all parties

16  agree to go off the record.

17      This is Media Unit 1 of the

18  video-recorded deposition of Vince Caraffi

19  taken by counsel for plaintiff in the

20  matter of Re: National Prescription Opiate

21  Litigation versus United States District

22  Court -- filed in the United States

23  District Court, Northern District of Ohio,

24  Eastern Division.

25      This deposition is being held at 950

3 (Pages 6 - 9)

1    Main Avenue, Suite 1300, Cleveland, Ohio.
2        My name is Gill Whitney, and I'm from
3    Veritext and I'm the videographer.  The
4    court reporter is Paula Raskin from
5    Veritext.  I'm not related to any party in
6    this action, nor am I financially
7    interested in the outcome.
8        Counsel and all present in the room
9    and everybody attending remotely will now
10   state their appearance and affiliations for
11   the record.
12       If there are any objections to the
13   proceedings, please state them at the time
14   of your appearance, beginning with the
15   noticing attorney.
16       MR. SMITH:  For the plaintiff,
17   Cuyahoga County, Scott Elliot Smith, and
18   for Vince Caraffi, the deponent.
19       MR. BOEHM:  Paul Boehm from
20   Williams & Connolly for Cardinal.
21       And just for the record, Gil, you
22   indicated at the beginning that this was a
23   deposition taken by plaintiff, and actually
24   it's a deposition taken by defendants.
25       VIDEO TECHNICIAN:  Thank you.

1        MS. JOHNSON:  Melinda Johnson,
2    Williams & Connolly, for Cardinal.
3        MS. FEINSTEIN:  Wendy West Feinstein
4    with Morgan Lewis for the Teva defendants.
5        MR. MENDELSOHN:  Clifford Mendelsohn
6    from Tucker Ellis on behalf of Johnson &
7    Johnson and Janssen Pharmaceuticals.
8        MR. HOLLINGSWORTH:  Adam
9    Hollingsworth from Jones Day on behalf of
10   Walmart.
11       MR. NORTEY:  James Nortey with Morgan
12   Lewis on behalf of Rite-Aid.
13       VIDEO TECHNICIAN:  Please swear the
14   witness.
15       MR. BOEHM:  We want to make sure we
16   get people on the phone, do we not?
17       VIDEO TECHNICIAN:  Yes.
18       MS. MCINTYRE:  Jill McIntyre, Jackson
19   Kelly, on behalf of AmerisourceBergen Drug
20   Corporation.
21       MS. YOCUM:  Michelle Yocum from
22   Covington & Burling on behalf of McKesson.
23       MR. LAZAR:  Zachary Lazar with Morgan
24   Lewis & Bockius on behalf of the Teva
25   defendants.

1        VIDEO TECHNICIAN:  Please swear the
2    witness.
3
4            VINCENT CARAFFI,
5    was thereupon called as a witness herein,
6    and after having first been duly sworn to
7    testify to the truth, the whole truth and
8    nothing but the truth, was examined and
9    testified as follows:
10           EXAMINATION
11   BY MR. BOEHM:
12   Q.    Good morning, Mr. Caraffi.
13   A.    Good morning.
14   Q.    Thank you for being here.  We
15   introduced ourselves before we went on the
16   record, but just for the record, my name is Paul
17   Boehm.  I represent one of the defendants in
18   this matter and I'll be asking you some
19   questions today.
20       Have you ever been deposed before
21   today?
22   A.    No, I have not.
23   Q.    Plaintiff's counsel may have already
24   given you an idea of how this works, but I just
25   want to give you a few tips or rules of the

1    road.
2        One of them is that we try our very
3    best to not talk at the same time.  The most
4    important reason for that is because the court
5    reporter here is trying to write down what
6    everybody says, and if we're both speaking at
7    the same time, that becomes difficult to do.
8    Does that make sense?
9    A.    Yes.
10   Q.    Let me know if you don't understand a
11   question before you answer.  Is that fair?
12   A.    Yes.
13   Q.    And it may be, although I guess we'll
14   see, that Scott could lodge some objections to
15   form, which is a way of preserving objections
16   that a lawyer might have to be resolved at a
17   later time.  That should not stop you from
18   proceeding to answer the question.  Does that
19   make sense?
20   A.    Yes.
21   Q.    Have you done anything to prepare for
22   the deposition that you're giving here today?
23   A.    Yes.
24   Q.    What have you done?
25   A.    I met with counsel yesterday.

4 (Pages 10 - 13)

Page 14

1    Q.   Who did you meet with?
2    A.   I met with Scott and Frank Gallucci.
3    Q.   For how long did you meet?
4    A.   We met from 9 o'clock to 4:30
5  approximately.
6    Q.   Okay.  Have you only had one meeting
7  with the lawyers for the plaintiff to prepare?
8    A.   My recollection is I've had two.
9    Q.   When was the first meeting?
10    A.   I would say recollection is last
11  year, maybe in the fall, I met with Frank.
12    Q.   The fall of 2018?
13    A.   Correct.
14    Q.   And when you say Frank, you mean
15  Mr. Gallucci?
16    A.   Yes.  I'm sorry.
17    Q.   No, that's fine.  I just --
18    A.   Mr. Gallucci, yes.
19    Q.   Yeah.  For how long did you meet with
20  Frank Gallucci in the fall of 2018?
21    A.   My recollection is about 45 minutes.
22    Q.   Have you reviewed any documents to
23  prepare for your deposition?
24    A.   I have not.
25    Q.   Have you read any transcripts of

Page 15

1  depositions that other individuals have given in
2  this matter?
3    A.   I have not.
4    Q.   Have you had discussions with
5  anybody, other than the lawyers who you just
6  identified, about this case or about the fact
7  that you would be giving deposition testimony?
8    A.   I have not.
9    Q.   Have you read the written complaint
10  that Cuyahoga County prepared and submitted for
11  purposes of this lawsuit?
12    A.   I have not.
13    Q.   Have you skimmed it or even seen it?
14    A.   I have not seen it.
15    Q.   Are you aware that a written
16  complaint has been filed and submitted on behalf
17  of Cuyahoga County for this lawsuit?
18    A.   Yes.
19    Q.   Do you know the defendants in this
20  case?
21    A.   No, I do not.
22    Q.   I take it you were not consulted
23  about the content of the written complaint, is
24  that fair, before it was filed?
25    A.   I don't understand your question.

Page 16

1    Q.   It wasn't my most elegant.  I'll try
2  again.
3    A.   That's why I asked.
4    Q.   Did anybody ever ask you to consult
5  or provide your own views, opinions, or
6  perspectives about the nature of the claims
7  being made in this lawsuit on behalf of Cuyahoga
8  County?
9        MR. SMITH:  Objection; form.
10    A.   I can't answer that.  I did not read
11  the -- I didn't read the complaint.
12    Q.   Did anybody ever ask you to express
13  your views or opinions about whether to file the
14  lawsuit?
15        MR. SMITH:  Objection; form.
16    A.   I can't answer that question.
17    Q.   Why not?
18    A.   I haven't read the complaint.  I was
19  never asked to put any input on the complaint,
20  so I can't answer that question.
21    Q.   Got it.  My question's a little bit
22  different.  I'm asking whether or not anybody
23  asked your opinion about whether or not a
24  lawsuit should be filed on behalf of Cuyahoga
25  County.

Page 17

1    A.   No.
2        MR. SMITH:  Objection; form.
3    Q.   Did anybody ever ask you what factors
4  you consider to be contributing factors to
5  opioid abuse and overdose trends in Cuyahoga
6  County at any time before the County filed its
7  lawsuit in this matter?
8        MR. SMITH:  Objection; form.
9    A.   Could you ask the question again,
10  please?
11    Q.   Sure.  Did anybody ask you what
12  factors that you considered to be contributing
13  factors to trends of opioid abuse or
14  opioid-related overdoses in Cuyahoga County
15  before the lawsuit was filed on behalf of the
16  County?
17        MR. SMITH:  Objection; form.
18    A.   I can't answer that question.
19    Q.   Why not?
20    A.   You need to explain it a little
21  better to me.  You're still -- it's still
22  confusing.
23    Q.   Okay.
24    A.   I didn't read the --
25    Q.   I know you didn't read the complaint,

Page 18

1  so I'm actually trying to put the written paper
2  aside --
3      A.   Okay.
4      Q.   -- and just ask you whether or not
5  anybody came to you and asked you, before the
6  complaint was filed, "Mr. Caraffi, can you
7  please share with us what your views are about
8  what the contributing factors to the opioid
9  abuse epidemic in Cuyahoga County are," at some
10  point before the lawsuit was submitted to the
11  Court?
12      MR. SMITH:  Objection; form.
13      A.   Is this in general or pertaining to
14  the complaint?  That's what I -- the way you're
15  asking the question, I'm not -- it's so vague.
16      Q.   Pertaining to the allegations that
17  are made on behalf of the County in the lawsuit.
18      MR. SMITH:  Objection; form.
19      A.   Pertaining to the complaint, no.
20      Q.   Are you willing to share whether or
21  not you personally have ever used prescription
22  opioid medication?
23      MR. SMITH:  Objection.
24      Instruct the witness not to answer.
25      MR. BOEHM:  My question is whether or

Page 19

1  not the witness is willing to share that
2  information.  I know that you -- are you
3  flatly telling him not to answer?
4      MR. SMITH:  I guess you can ask him
5  that question, but even if he said yes, I'm
6  going to instruct him not to answer that
7  question.
8      Would you like to know if he wants to
9  share it first and then ask the question?
10      MR. BOEHM:  Yeah.  Sure.  You can --
11  let's do it that way if that's how you want
12  to --
13      MR. SMITH:  He's asking if you're
14  willing to share.
15      Q.   Are you -- would you be willing to
16  share whether or not you personally have ever
17  been prescribed a prescription opioid
18  medication?
19      A.   I can't recall if I have.
20      MR. SMITH:  Okay.  Well, I want to
21  move to strike because he didn't answer
22  your question, but he answered the second
23  question probably.
24      Q.   Have any of your close friends or
25  family members ever experienced a substance use

Page 20

1  disorder?
2      MR. SMITH:  Objection; form.
3      A.   I have a personal experience of
4  family-wise, and I have also friends who have
5  lost loved ones to prescription opioid abuse.
6      Q.   Are you willing to share the nature
7  of those circumstances?
8      MR. SMITH:  Can I have a
9  clarification --
10      MR. BOEHM:  Sure.
11      MR. SMITH:  -- just so you can ask
12  your questions?
13      MR. BOEHM:  Of course.
14      MR. SMITH:  I'm going to instruct him
15  not to answer and provide any names.
16      But if you want to give general
17  experiences, I will not object.
18      A.   I don't feel comfortable offering
19  names, but I can tell you from a personal
20  experience, family, and then I have lost friends
21  to overdose and I have friends that are
22  currently going through the cycle of
23  prescription opioid abuse with their family
24  members.
25      Q.   You said you have a family member who

Page 21

1  has --
2      A.   I'm not going to go any further into
3  that.  I explained --
4      MR. SMITH:  Well, just listen to his
5  question.
6      THE WITNESS:  Okay.
7      MR. SMITH:  He said --
8      THE WITNESS:  Sorry about that.
9      Q.   Is the family member somebody who has
10  an opioid use disorder, or is it a different
11  substance?
12      A.   It's a polypharmacy.
13      Q.   Poly...
14      A.   Pharmacy.
15      Q.   And by polypharmacy, you mean there
16  are multiple substances at issue?
17      A.   With opioids involved in that
18  multiple substance use, yes.
19      Q.   What are the other substances?
20      A.   Cocaine, alcohol, methamphetamine.
21      Q.   With respect to this particular
22  individual, do you know what was the first
23  substance that this individual developed a use
24  disorder with?
25      A.   I'm not sharing that.

6 (Pages 18 - 21)

1       (Reporter clarification.)
2       A.   I can't answer that question.
3       Q.   I think you first said "I'm not
4   sharing that."  Did I hear you right?
5       A.   I can't answer that question.
6       Q.   And is that because you don't know,
7   or is it because you just would rather not share
8   that?
9       A.   It's a personal matter.
10      Q.   Okay.  And then you indicated that
11  you have some friends as well who have
12  experienced substance use disorder?
13      A.   Yes.
14          MR. SMITH:  Objection; form.
15      Q.   And how many individuals did you have
16  in mind?
17      A.   Two individuals clearly that come to
18  mind, from my recollection.
19      Q.   What substances do those two
20  individuals have a use disorder with?
21      A.   Prescription pain medication.
22      Q.   Do they -- did those individuals
23  abuse non-prescription opioid medications?
24          MR. SMITH:  Objection; form.
25      A.   Following their abuse of prescription

1   pain pills, yes.
2       Q.   Okay.  Do you know whether or not
3   those individuals received, as an initial
4   matter, a prescription opioid from a licensed
5   physician for a legitimate medical need?
6       A.   Yes, they did.
7       Q.   What was the injury?
8       A.   I can't answer that question.
9       Q.   Because you don't know or because you
10  would rather not share that?
11      A.   I don't know what their first visit
12  to the doc was.  I don't have that information.
13      Q.   I take it you don't know who the
14  physicians were who prescribed those
15  medications?
16      A.   No, I do not.
17      Q.   Is it your understanding that in both
18  instances, medications were prescribed for a
19  legitimate medical need by the licensed
20  physicians?
21          MR. SMITH:  Objection; form.
22      A.   Through conversation, yes, legally
23  prescribed prescription medication.
24      Q.   For legitimate medical needs?
25          MR. SMITH:  Objection; form.

1       A.   Yes.
2       Q.   And you indicated that you had
3   learned that through conversations.  Did you
4   mean to say that those conversations are ones
5   you had with the individuals who are
6   experiencing the substance use disorders?
7       A.   Those individuals are no longer
8   alive, so I don't have conversations with them.
9       Q.   Did they experience an overdose?
10      A.   They both overdosed on prescription
11  pain medication.
12      Q.   Were their overdoses found to be
13  prescription opioid overdoses?
14      A.   I don't have the information on those
15  subjects.  I mean I don't have the medical
16  examiner's report to indicate, you know, what
17  was claimed on that.  I can't answer that
18  question.
19      Q.   Okay.  You don't know exactly what
20  substances were found in the toxicology report
21  for those individuals' overdoses.  Is that
22  right?
23      A.   I did not read the toxicology
24  reports, no.
25      Q.   Do you know if those individuals

1   abused heroin?
2       A.   One of them had a prescription pain
3   pill medication problem that led to heroin, yes.
4   The other one was strictly pain pills.
5       Q.   Do you know how those individuals
6   received prescription medications to -- sorry,
7   you have to wait till I'm done.
8       A.   Okay.  I'm sorry about that.
9       Q.   Do you know how those individuals
10  received their prescription pain medications, to
11  the extent they abused those medications during
12  their addiction?
13          MR. SMITH:  Objection; form.
14      A.   I cannot answer that.
15      Q.   Why can't you answer that?
16      A.   I don't -- I didn't know their daily
17  routines.  I didn't follow them on a daily basis
18  to see what their, you know, activities were.
19      Q.   Okay.  So you can't answer that
20  question because you don't know what the answer
21  is, right?
22      A.   Correct.
23      Q.   When did those individuals pass away
24  from their overdoses?
25      A.   One was last year, and the other one

1  was four years ago.
2      Q.    Did those individuals abuse any
3  substances other than opioids?
4          MR. SMITH: Objection; form.
5      A.    I think I already answered that.
6      Q.    You might have and I might have
7  misunderstood it.  I thought you had said that
8  those --
9      A.    I said one of them died from
10 prescription medication that I know of.
11         MR. SMITH:  Wait.  Wait till he asks
12 the question --
13         THE WITNESS:  Okay.  I'm sorry about
14 that.
15         MR. SMITH:  -- before you answer the
16 question.  Okay?
17         THE WITNESS:  Yes.
18     Q.    It's okay.  It's a hard thing to get
19 used to.
20     A.    Go ahead.  I'm sorry.
21     Q.    No problem.
22         You might have answered this, and I
23 apologize if I'm asking the same question again.
24         One of the individuals I know you had
25 said abused cocaine as well, right?  Or was that

1  the family member?
2          THE WITNESS:  Can I see what I said,
3  because...
4          MR. SMITH:  Use your best
5  recollection.
6      A.    My recollection is that you're mixing
7  what I told you about my personal family member
8  in addition to the two individuals that I'm
9  speaking with.
10     Q.    I think you're right, that I am doing
11 that, so just help me out.
12     A.    So if you could ask me the question
13 again, that would be helpful.
14     Q.    Sure.  My question right now is with
15 respect to the two friends that you started to
16 discuss, do you know whether or not either of
17 them abused any substances other than opioids?
18         MR. SMITH: Objection; form.
19     A.    Yes.
20     Q.    And what is the answer to that?
21     A.    The answer is one died of
22 prescription pain medication.  The other one
23 died from heroin is what I had said previously.
24     Q.    Okay.  So heroin is an opioid, right?
25         MR. SMITH:  Objection; form.

1      A.    Yes.
2      Q.    Okay.  And prescription opioid
3  medications are opioids, right?
4      A.    Correct.
5      Q.    So my question is whether or not
6  these individuals abused any substances other
7  than opioids.
8          MR. SMITH:  Objection; form.
9      A.    And I think I already answered that.
10 I said the individual who had a prescription
11 pain medication abuse problem, it's all that I
12 was aware of.  The individual who died from the
13 prescription pain abuse and heroin, that's all I
14 know for those two individuals.
15     Q.    Okay.  You don't know of any other
16 substances that they were abusing?
17     A.    No, I do not.
18     Q.    And I take it you're not willing to
19 share the names of those individuals?  Did I
20 understand that correctly?
21         MR. SMITH: Objection; form.
22     A.    I'm not sharing the names.
23         THE WITNESS:  Am I talking too soft
24 for you?
25         (Reporter clarification.)

1          THE WITNESS:  I said I'm not willing
2  to share the names of those individuals.
3  I'm sorry about that.  I'll try and speak
4  louder.
5          MR. SMITH:  Just try to keep your
6  voice up a little bit.
7          THE WITNESS:  Okay.
8          (DEPOSITION EXHIBIT 1 MARKED
9          FOR IDENTIFICATION at 9:27 a.m.)
10     Q.    Mr. Caraffi, over the course of the
11 day, I'll be marking documents as exhibits to
12 your deposition, and the first of those is in
13 front of you now.  It's been marked as Exhibit 1
14 for purposes of your deposition, and this is a
15 document that was produced to us by the lawyers
16 in the case.  It appears to be a resumé of yours
17 from some time in the past.
18         Do you see that document in front of
19 you now?
20     A.    Yes, I do.
21     Q.    Is this a resumé of yours?
22     A.    Yes, it is.
23     Q.    Your resumé indicates that you
24 received a bachelor's degree from Ohio
25 University in 1990.  Is that correct?

Page 30

1      A.   Yes.
2      Q.   What was that degree in?
3      A.   Liberal arts.  Bachelor of science
4  liberal arts.
5      Q.   And then in 2005, your resumé
6  indicates you received a master's of public
7  health from Cleveland State University, right?
8      A.   That is correct.
9      Q.   Okay.  Why did you decide to study
10 for a master's of public health?
11     A.   I think I looked at it from the
12 standpoint as a learning opportunity to better
13 myself, to get a better understanding of the
14 discipline that I was in at that point in time
15 and also hopefully provide additional
16 opportunities in the future.
17     Q.   Did you have a particular specialty
18 in mind or profession you wanted to pursue when
19 you decided to study for a master's of public
20 health?
21     A.   Prior to going in?
22     Q.   Right.  Yeah, as part of your
23 decision to --
24     A.   No.  My decision at that point in
25 time, as I stated, was to get a better

Page 31

1  understanding of what other interests or career
2  opportunities a master's of public health would
3  hold for me.  I was looking to the future.
4      Q.   Okay.  So you didn't have any
5  particular profession or objective in mind in
6  terms of the specific work you wanted to do when
7  you decided to study for a master's of public
8  health?  Is that correct?
9           MR. SMITH:  Objection; form.
10          (Reporter clarification.)
11     A.   Prior to going in, no, I did not.
12     Q.   What did you do after you graduated
13 from Ohio University in 1990?
14          MR. SMITH:  Objection; form.
15          MR. BOEHM:  What's the basis of that
16     objection?
17          MR. SMITH:  What did he do, like did
18     he walk down the street?  Did he --
19          MR. BOEHM:  Oh, I see.
20          MR. SMITH:  -- go to his apartment?
21          MR. BOEHM:  Fair enough.
22          MR. SMITH:  Did he go to another --
23          MR. BOEHM:  I'll let it stand.
24          MR. SMITH:  You get the idea.
25          MR. BOEHM:  I do, but I'll let that

Page 32

1  one stand.
2      Q.   What did you do for work after you
3  graduated from Ohio University in 1990?
4      A.   Prior to getting the job with the
5  board of health?  Is that the question?
6      Q.   Your resumé indicates that you got a
7  job as a field sanitarian in 1998.
8      A.   A filled?  Field?  Field sanitarian?
9      Q.   That's what your resumé states.
10          MR. SMITH:  That's how he pronounced
11     field.
12     A.   Okay.  I'm sorry about that.  I
13 didn't understand the way you said "field."
14          I interviewed for the Cuyahoga County
15 Board of Health position as a sanitarian.
16     Q.   In 1990?
17          My question to you --
18     A.   No, no.
19     Q.   My question right now to you,
20 Mr. Caraffi, is, what did you do after you
21 graduated from Ohio University in 1990?
22          Your resumé has a gap.  It doesn't
23 reflect anything that you did between 1990 and
24 1998.
25     A.   I understand.  I worked at a local

Page 33

1  restaurant.
2      Q.   What did you do?
3      A.   I was a part-time cook.  I also
4  worked as a landscaper.
5      Q.   For how many years did you do that?
6      A.   It was just over the summer and to
7  the fall until I started with the board of
8  health.
9      Q.   What other jobs did you have between
10 1990 and 1998?
11     A.   I worked for the board of health.
12     Q.   When did you first get a position at
13 the Cuyahoga County Board of Health?
14     A.   January 1st of 1991.
15     Q.   What position did you assume in
16 January 1991?
17     A.   I was a field sanitarian for the
18 Cuyahoga County Board of Health.
19     Q.   Why does your resumé say that you
20 were a field sanitarian from -- oh, I'm sorry.
21 I'm reading it backwards.
22          So you have it from 1998 to '91, but
23 is that transposed or is -- maybe I'm just not
24 familiar with that format.
25     A.   That was the format that I was asked

9 (Pages 30 - 33)

Page 34

1  to put it in.
2      Q.   That's my mistake.  I was seeing the
3  1998 first and that threw me off, but I see.
4          So you were hired as a field
5  sanitarian at the Cuyahoga County Board of
6  Health in 1991, right?
7      A.   Correct.
8      Q.   And you held that position until
9  1998?
10     A.   Yes.  Then I became a program
11 manager.
12     Q.   What is a field sanitarian?
13     A.   Our structure in the board of health,
14 as an entry position, you would be considered a
15 field sanitarian.
16         So depending on what your discipline
17 is -- if you're involved in water quality, you'd
18 be doing issues associated with water quality.
19 That could be stream monitoring, it could be
20 related to home sewage, it could be related to
21 EQI, it could be habitat quality index.
22         You could also be a field sanitarian
23 within the food service industry, which is
24 responsible for the inspection of food service
25 operations.  It could be involved in infectious

Page 35

1  disease control outbreaks.
2          Or you could be a district
3  sanitarian.  A district sanitarian would be
4  involved in the inspections of pools, schools.
5  It would be involved in vector control as it
6  relates to mosquitos and rabies.  It could also
7  be involved in lead poisoning.
8          And then you would have program
9  managers, are which [sic] the next field up.
10 Program managers are usually designed to oversee
11 specific programs.
12         As I mentioned to you as an example,
13 the food service industry, we have several food
14 service program managers.  And then the next
15 level up would be a supervisor, and then a
16 deputy or an assistant director -- it changes
17 every couple years -- and then a director.
18     Q.   Okay.  Did you work your way up those
19 rungs of the ladder, as it were?
20     A.   I started in the food service
21 industry at that point in time, yes.
22     Q.   And then did you kind of progress
23 into different positions during the years 1991
24 through 1998?
25     A.   Yes.

Page 36

1      Q.   In 1998, it appears that you became
2  the program manager for the solid waste program
3  for the Ohio Environmental Protection Agency.
4  Is that correct?
5      A.   That is correct.
6      Q.   Okay.  And it looks like you held
7  that position for about six or seven years,
8  right?
9      A.   Correct.
10     Q.   Did you -- in that position, did you
11 continue to have a -- were you working for the
12 Cuyahoga County Board of Health at the same
13 time, or is this an entirely different employer?
14     A.   No, this -- the whole time that --
15 I've been working for the Cuyahoga County Board
16 of Health for the past 28 years.
17     Q.   Okay.  So during the time that you
18 were a program manager for the solid waste
19 program, you were still a Cuyahoga County Board
20 of Health employee.  Is that correct?
21     A.   That is correct.
22     Q.   In 2004 you became a supervisor for
23 environmental health service area?  Is that
24 right?
25     A.   That is correct.

Page 37

1      Q.   What were your responsibilities in
2  that role?
3      A.   My recollection goes, back to that
4  point, I was responsible for supervising -- and
5  it changes pertaining to time.  Anywhere I have
6  a span of control between five and seven people.
7  Those individuals are field staff, as I
8  explained before, or program managers.  It would
9  depend on how we were structuring the
10 organization, and sometimes that would change
11 from year to year.
12     Q.   In the third full paragraph under
13 your "Supervisor, Environmental Health Service
14 Area --
15     A.   You're saying on the second page?
16     Q.   No, it's on the first page.
17     A.   Okay.
18     Q.   It says "Currently chair of the
19 Cuyahoga County initiative 'Prescription for
20 Prevention' a coalition working with the Ohio
21 Department of Health."
22         Do you see that?
23     A.   I do.
24     Q.   What is the Prescription for
25 Prevention Coalition?

10 (Pages 34 - 37)

Page 38

1      MR. SMITH:  Objection; form.
2      A.   The Prescription for Prevention
3  program was an initiative out of the Ohio
4  Department of Health.
5          Basically what they did is, there
6  were certain counties that they were looking at
7  to provide some resources to provide awareness
8  through a local -- at that point in time, it was
9  a marketing firm called Fleishman, I want to say
10 Hillard.  So the Prescription for Prevention was
11 an Ohio Department of Health initiative.
12     Q.   And what was the purpose of the
13 initiative?
14     A.   It was to create awareness about the
15 misuse and use of prescription medication,
16 primarily prescription pain medication.
17     Q.   When was that initiative launched?
18     A.   Well, my recollection takes me back
19 to probably 2009.
20     Q.   What was your role in connection with
21 the Prescription for Prevention Initiative
22 through the Ohio Department of Health?
23     A.   At that point in time, it was just
24 from a communications standpoint, a
25 representative from Cuyahoga County Board of

Page 39

1  Health.
2      Q.   When you say it was a communications
3  perspective, what do you mean by that?
4      A.   They were looking for somebody in
5  Cuyahoga County.  I had relationships with the
6  Ohio Department of Health through the Ohio
7  Injury Prevention Partnership.  So they knew me
8  from working with them in Columbus on fall
9  prevention and related issues for older adults,
10 and they were using local health departments as
11 a conduit to put out information regarding that
12 pilot project.
13     Q.   What was your role as the chair of
14 the Cuyahoga County portion of the Prescription
15 for Prevention Initiative?
16     A.   The Prescription for Prevention
17 initiative, really, I didn't have a chair at
18 that point in time.
19          What we have now is called the
20 Cuyahoga County Opiate Task Force.  That's what
21 I really chaired.
22     Q.   Okay.  So when your resumé here says
23 currently chair of the Cuyahoga County
24 initiative Prescription for Prevention, did you
25 really have in mind the Cuyahoga County Opiate

Page 40

1  Task Force?
2      A.   It would depend on -- it could be a
3  discrepancy.  It could be an error on my
4  standpoint.  It probably should say Cuyahoga
5  County Opiate Task Force if I go back and look
6  at that, yes.
7      Q.   For how long were you the chair of
8  the Cuyahoga County Opiate Task Force?
9      A.   Probably from about -- recollection
10 takes me back 2011 till this past August of
11 2017.
12     Q.   You mean 2018?
13     A.   2018, I'm sorry.
14     Q.   That's okay.
15          Was the Cuyahoga County Opiate Task
16 Force funded through the Prescription for
17 Prevention Initiative from the Ohio Department
18 of Health?
19     A.   No, it was not.
20     Q.   Okay.  Do you know how the Cuyahoga
21 County Opiate Task Force has received its
22 funding?
23     A.   I do.
24     Q.   How is that?
25     A.   Through the Ohio Department of

Page 41

1  Health, their prescription overdose grant
2  funding.
3      Q.   Is there a name for that program or
4  initiative or grant that the Ohio Department of
5  Health gave to Cuyahoga County?
6      A.   Prescription Drug Overdose Grant.
7      Q.   And that's separate from the
8  Prescription for Prevention Initiative that is
9  referenced here in your resumé?  Is that
10 correct?
11     A.   Right.  The Prescription for
12 Prevention Initiative, there was no money that
13 came to Cuyahoga County.  That was funded as
14 more of an awareness piece.  So the Prescription
15 Prevention Initiative eventually morphed into
16 the Cuyahoga County Opiate Task Force.  That is
17 the transition of that initiative through
18 Fleishman & Hillard.
19     Q.   Okay.  And then just to complete that
20 circle, the Cuyahoga County Opiate Task Force
21 then received its funding from this grant from
22 the Ohio Department of Health.
23     A.   Correct, that is the right
24 transition.
25     Q.   The next paragraph, which is just one

11 (Pages 38 - 41)

1  sentence in your resumé, says:
2       "Begin serving as chair elect of the
3  Ohio Injury Prevention Partnership in
4  2011."
5       Do you see that?
6       A.  I do.
7       Q.   And you mentioned the Ohio Injury
8  Prevention Partnership a few moments ago.  What
9  is the Ohio Injury Prevention Partnership?
10      A.  So the Ohio Department of Health
11  probably in 1998 recognized that unintentional
12  injury in Ohio was a significant source of
13  morbidity and mortality.
14      The Ohio Injury Prevention
15  Partnership is a group of individuals on a
16  statewide basis that has a focus on falls
17  amongst older adults; childhood action injury
18  group, which could be TBIs, it could be safe
19  sleep; and then the other main portion of the
20  Ohio Injury Prevention Partnership is the
21  prescription drug overdose aspect.
22      I served on the Ohio Injury
23  Prevention Partnership for several years, but my
24  initial focus through my master's was falls
25  amongst older adults.  That's how I got into the

1  injury prevention world.
2       When I began serving as the chair
3  elect for the Ohio Injury Prevention Partnership
4  was 2011, but I had been a member for several
5  years.
6       Q.   Okay.  You indicated, if I understood
7  you correctly, that the Ohio Injury Prevention
8  Partnership was launched in 1998?  Is that
9  right?
10      A.  I can't recollect when it was
11  launched.
12      Q.   Was it in the late '90s?
13      A.  I can't answer that question.
14      Q.   Okay.  I thought I heard you
15  reference 1998 as a time when it was recognized
16  that there needed to be some injury prevention
17  initiative.
18      MR. SMITH:  Objection; form.
19      Q.   Did I mishear you?
20      MR. SMITH:  Objection; form.
21      A.  I may have made a mistake.  I don't
22  recall when the specific date was when that
23  partnership was formed.
24      Q.   Did the launching of the Ohio Injury
25  Prevention Partnership, whenever that took

1  place, involve all the categories of injury
2  prevention that you just identified?
3       I think you said falls --
4       A.  Uh-huh.
5       Q.   -- or some -- children, and then you
6  indicated as one of those efforts, to address
7  prescription opioid abuse?
8       A.  Uh-huh.
9       MR. SMITH:  Objection; form.
10      Q.   Were all of those injury prevention
11  efforts a part of the initial launching of the
12  Ohio Injury Prevention Partnership?
13      A.  I can't answer that question because
14  I wasn't involved in anything to do with
15  prescription medication until probably the
16  development of the Prescription for Prevention.
17  My focus was on fall-related injuries.
18      Q.   When did the Prescription for
19  Prevention Initiative begin?
20      A.  I want to say -- I think we had
21  talked about that previously -- in 2009 or 2010,
22  if I recall correctly.
23      Q.   Do you recall when the Cuyahoga
24  County Opiate Task Force was formed?
25      A.  I recollect it was formed -- maybe

1  2011 or 2012 is when we really started building
2  a consensus of partnerships as a solid
3  coalition.
4       Q.   If I told you it was 2010, would that
5  sound correct?
6       MR. SMITH:  Objection; form.
7       A.  In 2010, if we were moving through
8  that transition from the Partnership for
9  Prevention to the Cuyahoga County Opiate Task
10  Force, I would say that may be fair, yeah.  It's
11  going back some time.
12      Q.   Were you the first chair of the
13  Cuyahoga County Opiate Task Force, or was there
14  a chair of the task force before you?
15      A.  I was the first person that was
16  deemed a chair, but it wasn't by election or
17  anything like that.
18      I mean, you have to understand that
19  from a coalition standpoint, there was very few
20  agencies or individuals that were around the
21  table, and we started to grow as a coalition at
22  probably that time period.  And I say that, you
23  know, moving towards some type of momentum, you
24  know, with key partners at the table in 2011 or
25  2012.

Page 46

1    Q.   You were the first chair of the
2  Cuyahoga County Opiate Task Force, correct?
3    A.   Yes.
4    Q.   Your resumé indicates that you, at
5  the time that this resumé was prepared, were
6  going to be the chair elect for the Ohio Injury
7  Prevention Partnership in 2011.
8        Did you become the chair of the Ohio
9  Injury Prevention Partnership in 2011?
10    A.   I served as chair elect, but was
11  elected for probably 2012.  That's the way that
12  it goes; you serve the chair elect, and -- so I
13  did eventually serve as a chair for the Ohio
14  Injury Prevention Partnership, yes.
15    Q.   And is it your understanding that you
16  were the chair of the Ohio Injury Prevention
17  Partnership in 2012?
18    A.   Correct.
19    Q.   And as chair, what were your
20  responsibilities in connection with the Ohio
21  Injury Prevention Partnership?
22    A.   Serving as chair of the Ohio Injury
23  Prevention Partnership would be a logistical
24  sense of getting information to individuals,
25  scheduling the quarterly meetings, identifying

Page 47

1  speakers for topics pertaining to those issues
2  that I mentioned earlier, working with different
3  individuals if there are questions for people
4  that are interested in joining the partnership,
5  logistics as far as an awareness day that we did
6  for legislators, and working through the data
7  collection portion of the Ohio Department of
8  Health to put together an annual book that
9  documents those injuries related to mortality
10  and morbidity in Ohio.
11    Q.   And that would include prescription
12  drug abuse and prescription drug-related
13  overdoses.  Is that correct?
14    A.   I would have to go back and look at
15  what we had in place in 2012.  I can't answer
16  that question right now.
17    Q.   So sitting here today, you don't know
18  whether or not the Ohio Injury Prevention
19  Partnership in 2011 and 2012 concerned itself
20  with prescription drug abuse trends and
21  prescription drug overdose trends?
22    A.   I was reference- --
23        MR. SMITH:  Objection; form.
24        Wait till he finishes his question,
25    then you can answer.

Page 48

1    Q.   I'm finished, so you can go ahead.
2    A.   Yes, they were.  I was going -- I was
3  trying to explain the booklet at the end of the
4  year, is what I -- yeah.
5        So in 2011 and 2012, there was
6  probably, for the state of Ohio, a recognition
7  that there was a misuse and abuse of
8  prescription medication through the Ohio Injury
9  Prevention Partnership.
10    Q.   Did the Ohio Injury Prevention
11  Partnership Initiative undertake to try and
12  understand the causes of the trends of
13  prescription drug abuse and overdoses in the
14  state of Ohio?
15        MR. SMITH:  Objection; form.
16    A.   As a collaborative, we would get
17  together and have speakers and discuss issues
18  related to the subject.
19    Q.   As I understand it, the Ohio Injury
20  Prevention Partnership is a statewide
21  initiative.  Is that correct?
22    A.   Yes, the Ohio Injury Prevention
23  Partnership is comprised of individuals
24  throughout the state.
25    Q.   Is it fair to say in your view that

Page 49

1  Ohio was experiencing worrisome trends in terms
2  of prescription drug abuse and overdose across
3  the state as of 2011 and 2012?
4        MR. SMITH:  Objection; form.
5    A.   I can't answer that.
6    Q.   Have you ever -- did you as part of
7  your role and responsibility as chair elect or
8  chair of the Ohio Injury Prevention Partnership
9  endeavor to try and understand the scope of the
10  trends of prescription drug abuse or overdose
11  during that time frame?
12        MR. SMITH:  Objection; form.
13    A.   Could you ask me that question again,
14  please?
15    Q.   Sure.  Did you in your role as chair
16  elect or chair of the Ohio Injury Prevention
17  Partnership, either on your own or as a
18  collaborative effort with those involved in this
19  initiative, undertake to try and understand the
20  scope of the trends in prescription drug abuse
21  and overdose within the state of Ohio in the
22  2011 and 2012 time frame?
23    A.   Yes, we would have.
24    Q.   And is it your view that there were
25  worrisome trends in terms of prescription drug

13 (Pages 46 - 49)

Page 50

1  abuse and overdose across the state of Ohio, or
2  were there parts of the state that in your view
3  were not experiencing trends in terms of
4  prescription drug abuse or overdose that were
5  worrisome?
6        MR. SMITH:  Objection; form.
7     A.   I think there was a recognition that
8  there were certain counties at that point in
9  time that were experiencing a significant burden
10  of prescription pain medication overdose and
11  abuse.
12     Q.   What counties in your view as of 2011
13  and 2012 were not experiencing worrisome trends
14  in terms of prescription drug abuse or overdose?
15        MR. SMITH:  Objection; form.
16     A.   I think you would have to ask the
17  Ohio Department of Health that question.  I
18  can't answer that sitting here today.
19     Q.   Do you know of any counties in Ohio
20  that were not experiencing worrisome trends in
21  terms of prescription drug abuse or overdose
22  during the 2011, 2012 time frame?
23        MR. SMITH:  Objection; form.
24     A.   I can't recall.
25     Q.   Sitting here today, you can't think

Page 51

1  of any counties in Ohio that around 2011 and
2  2012 were not experiencing worrisome trends in
3  terms of prescription drug abuse or overdose.
4  Is that correct?
5     A.   To the best of my knowledge, I cannot
6  recollect that, yes.
7     Q.   Would you agree that Cuyahoga County
8  was a county that was experiencing worrisome
9  trends in terms of prescription drug abuse and
10  overdose at least by 2011?
11        MR. SMITH:  Objection; form.
12     A.   I would say based upon my
13  conversations today with Dr. Gilson, with
14  Dr. Papp, Dr. Chris Delos Reyes, Dr. Ted Parran,
15  local law enforcement, and the DEA, that we did
16  see some percolation.  We knew that there was
17  something going on, but that's all I can
18  recollect at this point in time.
19     Q.   I just want to make sure this is
20  clear because the beginning of your answer said
21  based on your conversations today, but I'm not
22  asking you about conversations you're having
23  today.
24     A.   Rephrase that then.  What I know
25  now --

Page 52

1     Q.   I'm not asking you about what you
2  know now.
3        My question is whether or not in
4  2011, 2012 you had recognized that there
5  were worrisome trends in terms of prescription
6  drug abuse and overdose within Cuyahoga County.
7        MR. SMITH:  Objection; form.
8     Q.   And we can look at some documents,
9  but I'm just asking you without that right now.
10     A.   Yes, I would say that there were some
11  worrying trends.
12     Q.   What were the nature of those
13  worrying trends?
14        MR. SMITH:  Objection; form.
15     A.   I can't answer that question.
16     Q.   Why not?
17     A.   I'm not an expert in the field of
18  substance abuse or an epidemiologist.
19     Q.   That's fine.  I'm not asking you to
20  be something you're not, but you were the chair
21  of the Cuyahoga County Opiate Task Force and you
22  have said there were some worrying trends.
23        And I'm just asking you, in your
24  capacity as the first and longtime chair of the
25  Cuyahoga County Opiate Task Force starting in

Page 53

1  2010...
2     A.   Right.
3     Q.   What is your understanding about what
4  those worrisome trends were?
5     A.   As I said before, I'm not an expert.
6  My role as the chair was to facilitate
7  conversation based upon those other individuals
8  in the County.  I don't have the expertise to
9  answer your question.  I cannot answer your
10  question.
11     Q.   Okay.  So is it your testimony today
12  that you've never given consideration -- you,
13  not an expert, not an epidemiologist -- that you
14  have never given consideration to the nature of
15  the worrisome trends that you had identified in
16  the 2011 time frame when it comes to
17  prescription drug abuse and overdose?
18        MR. SMITH:  Objection; form.
19     A.   Could you ask me that again, please?
20     Q.   Sure.  Is it your testimony today
21  that in the -- that you sitting here today
22  cannot describe in any way the reasons why there
23  were trends in terms of prescription drug abuse
24  and overdose in the 2011 time frame that were
25  worrisome to you and others at Cuyahoga County?

14 (Pages 50 - 53)

Page 54

1     MR. SMITH: Objection; form.
2     A.   Based upon my conversations with
3  other individuals who would be able to answer
4  that question, whether it be data, whether it be
5  information based upon the increase in service
6  providers as individuals who needing treatment,
7  I can't answer that question.
8        My role as a chair of the Cuyahoga
9  County Board of Health is to facilitate a local
10  collaborative.  I do not have a background in
11  substance abuse.  I can't answer that question.
12     Q.   Mr. Caraffi, I'm not asking you to be
13  an expert.  I'm asking you factual knowledge
14  that you have had and have here today, so I want
15  to be very clear about that.
16     A.   I understand.
17     Q.   And we know that you were the chair
18  of the Cuyahoga County Opiate Task Force, right?
19     A.   Correct.
20     Q.   And you took that position in 2010,
21  right?
22     A.   Correct.
23     Q.   And over the course of the years that
24  you've been in that position, you've presented
25  on the nature and scope of the opiate -- opiate

Page 55

1  abuse and overdoses many, many times.  Fair?
2     MR. SMITH: Objection; form.
3     A.   Fair.
4     Q.   And you've tried to describe the
5  trends that you saw in Cuyahoga County as part
6  of those presentations, right?
7     MR. SMITH: Objection; form.
8     A.   Correct.
9     Q.   And you have endeavored to try and
10  understand the reasons why you were seeing those
11  worrisome trends, and you've described those as
12  part of your presentations, correct?
13     MR. SMITH: Objection; form.
14     A.   Correct.
15     Q.   So that's what we're talking about
16  here today.
17        You indicated that in the 2011
18  time frame, you saw worrisome trends in terms of
19  prescription drug abuse and overdoses, right?
20     MR. SMITH: Objection; form.
21     A.   As I said before, those worrisome
22  trends were based upon the expertise of other
23  individuals who are part of our local
24  collaborative.  I cannot answer your question.
25     Q.   Well, I'm asking you what was your

Page 56

1  understanding based on your communications and
2  work with individuals in the community about why
3  the trends were worrisome.
4     A.   Ask that question again.
5     Q.   Sure.  You worked with experts to try
6  and understand the nature of the opioid abuse
7  epidemic in Cuyahoga County.  Fair?
8     A.   Yes.
9     Q.   What did those experts say to you
10  that was worrisome about the trends in the 2011
11  time frame when it came to prescription drug
12  abuse and overdoses in 2011?
13     A.   I can answer the trends based upon
14  what you just said --
15     Q.   Go ahead.
16     A.   -- from our collaborative partners.
17        So some of the contributing risk
18  factors at that point in time would have been
19  anything from prescribing practices, change in
20  guidelines or cultural view of how we use pain
21  or view pain.  I would say stigma plays a key
22  role in that.
23        So those are just a few that I can
24  recollect off the top of my head that have been
25  shared with me with other experts, that I then

Page 57

1  shared with the community.
2     Q.   Great.  In terms of the trends that
3  you saw of prescription drug abuse or overdose,
4  what were the trends that you were seeing in the
5  late 2000s or early -- the 2010, '11, '12
6  time frame?
7     MR. SMITH: Objection; form.
8     A.   Based upon conversations with those
9  experts in the field, it would be what I had
10  just mentioned to you before: are prescribing
11  practices; stigma; I think a lack of awareness
12  to the strength of the opioid medications,
13  prescription pain pills.
14     Q.   Were you seeing trends of greater
15  amounts of prescription drug abuse in the 2010,
16  2011 time frame in Cuyahoga County?
17     A.   I cannot answer from an abuse
18  standpoint.  I think treatment data, I don't
19  have access to that.  I can't answer an abuse
20  standpoint.
21     Q.   Were you seeing trends of greater
22  numbers of prescription drug-related overdose
23  deaths in the 2010, 2011 time frame?
24     A.   I can't answer that question.
25     Q.   Is that not something you looked at

15 (Pages 54 - 57)

1    as chair of the Cuyahoga County Opiate Task
2    Force?
3        A.    I did not look at that.  I would have
4    received information from other people, as I
5    mentioned before --
6        Q.    Did you --
7        A.    -- so I would have relied on --
8        Q.    I'm sorry.
9        A.    I'm finishing the question.  I'm
10   sorry.  Did you want me to stop?
11       Q.    No, no, no.  I'm sorry, I thought you
12   were done.  Go ahead.
13       A.    Once again, as I asked you before,
14   based upon conversations with Dr. Gilson, Keith
15   Martin from the DEA, undercover law enforcement
16   officials that I work with, they would have
17   shared that information with me, and then I
18   would have been the responsible party to share
19   that with others in our task force.
20       Q.    All right, that makes sense.
21           So were those individuals, like
22   Dr. Gilson and other experts in this area,
23   telling you in the 2010 and 2011 time frame,
24   that they were seeing a trend of increasing
25   numbers of prescription drug-related overdose

1    deaths?
2           MR. SMITH:  Objection; form.
3        A.    I think we knew something was going
4    on at that point in time, but I can't give you a
5    definitive answer as to what was taking place
6    back then.
7        Q.    At that time -- and I think we're
8    talking about the 2010, 2011 time frame -- when
9    you recognized that there were worrisome trends
10   in connection with opioid abuse or overdose
11   deaths, what did the Cuyahoga County Board of
12   Health, the Cuyahoga County Opiate Task Force,
13   or others at Cuyahoga County do to investigate
14   the reasons why you were seeing those trends?
15          MR. SMITH:  Objection; form.
16       A.    I think at that point in time, I was
17   trying to build a local task force, and that
18   takes time.  That takes time in a big county.
19          So as far as our trends, you know,
20   public health is based upon prevention, so
21   trying to work with individuals who were
22   gathering information or could give us the
23   information, as I stated earlier, and put some
24   awareness out there; work with family and
25   friends, those who had lost loved ones or those

1    individuals who are currently dealing with the
2    epidemic of misuse of prescription medication;
3    and learn as we move forward.
4        I mean, it doesn't happen overnight.
5    I mean, it takes several years to build a strong
6    coalition.
7        So, you know, my recollection from
8    2011 and 2012 or 2010, you know, at that point
9    in time, it would have been focused on proper
10   disposal of prescription medication, trying to
11   work and see what educational platforms were out
12   there that we could use, if there was any
13   evidence-based programming, and really increase
14   awareness in the community to some of the
15   challenges that might be coming down the road.
16       Q.    Okay.  I do want to ask you some
17   questions about prevention efforts, mitigation
18   efforts that Cuyahoga County Board of Health
19   undertook, but right now my questions are
20   slightly different.
21           I'm trying to understand in the 2010,
22   2011 time frame when you saw these worrying
23   trends in terms of prescription drug abuse and
24   overdose, did you undertake to try and
25   understand or investigate the causes or

1    contributing factors to the trends that you were
2    seeing?
3        A.    Members of the task force, yes.
4        Q.    And did they undertake to do that at
5    that time in 2010, 2011?
6        A.    I can't recall at that point in time,
7    you know, the specifics of what we were doing
8    that I haven't already mentioned to you.  You
9    know, I think that it was -- the main job was
10   try and do the best that we could to increase
11   awareness.
12       Q.    Got the awareness part.  Asking you
13   about whether or not -- so let me just start
14   over here.
15       A.    Sure.
16       Q.    The question is this:  In 2011 and
17   2012 when you saw these worrying trends in terms
18   of prescription drug abuse and overdose, did the
19   Cuyahoga County Board of Health, the Cuyahoga
20   County Opiate Task Force, or others within
21   Cuyahoga County undertake to try and investigate
22   and understand the causes or contributing
23   factors for those trends that you were seeing?
24       A.    Yes.
25       Q.    Who undertook those efforts?

16 (Pages 58 - 61)

Page 62

1    A.   Our collaborative members.
2    Q.   Are there individuals in particular
3  who undertook the effort to try and understand
4  the causes and contributing factors that were
5  causing these trends in 2010 and 2011?
6    A.   Yeah.  My recollection would bring me
7  to individuals like Nancy Pommerening, who runs
8  Drug Awareness and Prevention; Jeff Capretto,
9  who is an undercover Westshore narcotics officer
10  who runs a youth-to-youth leaders program
11  through local high schools; I would say, you
12  know, the Drug Court that was currently going
13  on.
14      So I think collectively it's
15  difficult for me to go back in 2011 and 2010 and
16  give you specifics, but those are things that --
17  some that come to mind.
18    Q.   Anybody else come to mind as
19  individuals who in particular in the 2010
20  time frame undertook to investigate and
21  understand the causes or contributing factors to
22  these worrisome trends of prescription drug
23  abuse and overdose in Cuyahoga County?
24      MR. SMITH:  Objection; form.
25    A.   On a statewide basis, I would

Page 63

1  probably say the Ohio Department of Health.
2    Q.   Anybody in particular at the Ohio
3  Department of Health?
4    A.   I can't remember the names at that
5  point in time.
6    Q.   If you turn to Page 2 of your resumé,
7  which has been marked as Exhibit 1 for today's
8  deposition, you have a section entitled "Invited
9  Lectures."  Do you see that?
10    A.   I do.
11    Q.   These are events at which you were a
12  presenter?  Is that fair?
13    A.   That is correct.
14    Q.   Would you typically use a slide deck
15  as part of the presentations you made at these
16  invited lectures?
17      MR. SMITH:  Objection; form.
18    A.   Yes.
19    Q.   A couple of these seem to be
20  potentially relevant for our purposes here
21  today.
22      About halfway down the list, your
23  resumé references a lecture you gave at the Ohio
24  Opiate Summit on April 5th, 2011.  Do you see
25  that?

Page 64

1    A.   I do.
2    Q.   And it was in Columbus, Ohio?
3    A.   Correct.
4    Q.   What did you lecture about at the
5  Ohio Opiate Summit in April 2011?
6      MR. SMITH:  Objection; form.
7    A.   That lecture was actually a panel
8  conversation, and I don't recall the overall
9  conversation.  It was not a lecture.  It was a
10  question and answer.  You know, I can't recall
11  what was discussed from 2011.
12    Q.   Okay.  It was about the trends of
13  opiate abuse and overdoses, I take it?  Is that
14  fair?
15    A.   I would say that would be fair.
16      MR. SMITH:  Can we take a quick
17  break?
18      MR. BOEHM:  Of course.  Yeah, sure.
19    Q.   And I should let you know, if you
20  need to use the bathroom or if there's any other
21  reason why you should need to get up and walk
22  around, just let me know and we'll a break.
23      VIDEO TECHNICIAN:  Off the record.
24      (Recess taken at 10:07 a m.)
25      (Ms. Hartman entered the deposition

Page 65

1  by phone at 10:15 a.m.)
2      (DEPOSITION EXHIBIT 2 MARKED
3  FOR IDENTIFICATION at 10:21 a.m.)
4      (Back on the record at 10:21 a m.)
5      VIDEO TECHNICIAN:  On the record
6  10:21.
7      MS. HARTMAN:  Are we back on the
8  record?  I didn't hear anything.
9      MR. SMITH:  Yes, we're back on the
10  record.
11      This is Scott Smith for the
12  plaintiff.  I understand that Ruth Hartman
13  has joined from Baker Hostetler.  I think
14  Carole Rendon is now with her firm.  We
15  object to Baker Hostetler or Carole Rendon
16  or anybody from the firm participating in
17  this deposition to a -- due to a conflict
18  that we understand exists.
19      MS. HARTMAN:  In response, Baker &
20  Hostetler and the Endo defendants do not
21  believe there is a conflict, and the Endo
22  defendants would be prejudiced if they
23  weren't allowed to participate in this
24  deposition.
25  BY MR. BOEHM:

17 (Pages 62 - 65)

Page 66

1    Q.  Okay.  Welcome back from our short
2  break, Mr. Caraffi.  Before we went back on the
3  record, I had marked a document as Exhibit 2 for
4  purposes of your deposition, and I handed that
5  to you as well, correct?
6    A.  Yes, I see that.
7    Q.  This is a Cuyahoga County Board of
8  Health organizational chart.  It looks like the
9  date is June 1, 2015, correct?
10      It's in the upper left-hand corner.
11    A.  Yes.
12    Q.  And if you look all the way to the
13  left, you see your name, Caraffi, as a
14  supervisor injury prevention.  Do you see that?
15    A.  I do.
16    Q.  That's you, right?
17    A.  That is me.
18    Q.  Is this your current position at the
19  Cuyahoga County Board of Health?
20    A.  I am still a supervisor, yes.  This
21  chart is old, but yes.
22    Q.  It's from 2015, and that's why I'm
23  asking you about it.
24    A.  Yeah.
25    Q.  If we were to do an organizational --

Page 67

1    A.  Still have the same responsibilities,
2  yes.
3    Q.  Okay.  And would you still be in the
4  same box as you are on this 2015 organizational
5  chart?
6    A.  This has changed since 2015, but I'm
7  still a supervisor, yes.
8    Q.  Okay.
9    A.  If that's what you're asking.
10    Q.  Has your position changed since 2015?
11  I know there are other changes that would --
12    A.  No, my position has not changed since
13  2015 or since the time of this chart, when it
14  was created.
15    Q.  How long have you been in this role
16  as a supervisor for injury prevention?
17    A.  I'm actually a supervisor of
18  environmental health services, so injury
19  prevention is a portion of what I do, when we
20  had talked about that earlier as far as the
21  differences between who I had supervised.
22    So injury prevention, it's really I
23  supervise individuals who do injury prevention.
24  I supervise individuals who do mandated
25  programming for body art and tattoo.  I

Page 68

1  supervise individuals who do vector control as
2  it relates to the increase in vector-borne
3  disease for ticks, mosquitos; that could be West
4  Nile virus, Chikungunya, it could be Zika virus.
5    So the box, I do more than just
6  injury prevention.
7    Q.  In 2015, were you a supervisor for
8  environmental health?
9    A.  Yes.
10    Q.  But the box here says injury
11  prevention.  Do you know why?
12    A.  I can't answer that question.
13    Q.  What does the category of injury
14  prevention encompass as opposed to the broader
15  list of items you just identified as related to
16  environmental health?
17    MR. SMITH:  Objection; form.
18    A.  I think in conversations with our
19  leadership team, injury prevention could be
20  inclusive what I do for the opioids.  It may be
21  inclusive of a drowning prevention initiative
22  that I'm currently working on with the Cleveland
23  metro parks, the medical examiner's office, and
24  the Ohio Department of Health.
25    I think the word "injury prevention,"

Page 69

1  it's an anomaly.  It's just a piece or a portion
2  of what I do.  I'm still an environmental health
3  supervisor.
4    Q.  So you indicated that your injury
5  prevention responsibilities include the work
6  that you've been doing for many years on opioid
7  abuse and overdoses, correct?
8    A.  I became a supervisor in 2003.  The
9  work that I do as far as injury prevention as it
10  relates to opioids is facilitating or having
11  facilitated our local task force.
12    Q.  And having chaired that task force,
13  correct?
14    A.  Correct.
15    Q.  Is it fair to say that the injury
16  prevention category of responsibilities that you
17  have encompasses the work you've been doing on
18  opioid abuse and overdose information, or does
19  that fit into some other bucket for which you
20  have responsibility?
21    MR. SMITH:  Objection; form.
22    A.  I think based upon conversations with
23  other individuals who make up the task force, as
24  I had mentioned earlier, that collection of
25  information that comes in from those experts and

18 (Pages 66 - 69)

Page 70

1 conveying that information to the general
2 public, I would agree with you, yes.
3     Q.   It fits under injury prevention,
4 right?
5     A.   Correct.
6     Q.   In addition to the work that you've
7 been doing on opioid abuse and overdoses, are
8 there any other responsibilities that you have
9 that fit under the category of injury
10 prevention?
11     A.   Yes. As I explained in my last
12 response to you, I'm currently working on a
13 project with the metro parks, a couple of
14 private companies that work in the pool or
15 spa-related field.
16         In addition to working with the metro
17 parks is we have Lake Erie in our backyard, and
18 we've seen increase in drowning or near-drowning
19 events over the past couple years.
20         I also work with individuals that do
21 the body art and tattoo, so we would look at
22 anything related to the transfer of infectious
23 disease because of those specific practices as
24 it relates to injury.
25         But, once again, my title, the title

Page 71

1 they have down there, I'm an environmental
2 health supervisor.
3     Q.   Got it. So --
4     A.   I work for the environmental health
5 service area of the Cuyahoga County Department
6 of Health.
7         I'm sorry about -- I just -- I can't
8 see without these things, so I'm trying to clean
9 them a little better.
10     Q.   That's okay. Is that better?
11     A.   It is, thank you. You're patient.
12     Q.   So you indicated your work on
13 opioids, drowning-related initiatives, and
14 tattoos fit under the injury prevention category
15 of your responsibilities.
16         Are there any other responsibilities
17 that you've not already mentioned that fit under
18 the injury prevention category?
19     A.   Not that I'm involved with at the
20 board of health, no.
21     Q.   Is it fair to say that you have --
22 you have taken and continue to take your
23 responsibilities at the Cuyahoga County Board of
24 Health seriously?
25     A.   Yes.

Page 72

1     Q.   Is it fair to say that you have taken
2 and continue to take your responsibilities in
3 relation to opioid-related abuse and overdoses
4 seriously?
5     A.   I'm still working on some projects
6 even though I'm no longer the chair of the task
7 force, and that's what your question is.
8     Q.   Well, my question is whether or not
9 you have taken your responsibilities, insofar as
10 they concern trends of opioid abuse and
11 overdose, seriously as part of your professional
12 responsibilities at the Cuyahoga County Board of
13 Health.
14     A.   Yes.
15     Q.   And you indicated that although you
16 are no longer as of this past year the chair of
17 the Cuyahoga County Opiate Task Force, there are
18 opioid-related initiatives on which you continue
19 to work, correct?
20     A.   I still work with individuals that
21 are involved in projects with the opioids, yes.
22     Q.   Can you describe the nature of your
23 ongoing work related to opioids?
24     A.   I'm currently involved in a project
25 with some local partnerships that's funded

Page 73

1 through the CDC on what they call adverse
2 childhood experiences. Those are considered
3 ACEs scores, and the idea behind it is that
4 children with high ACEs scores also have
5 opportunities for resiliency.
6         And the focus of that is to ensure
7 that children that have high ACEs scores -- and
8 ACEs scores could be a sexual, physical,
9 emotional abuse, living in a family where there
10 is domestic violence, living in a family where
11 somebody is addicted to opioids -- puts children
12 that are experiencing those ACEs scores at a
13 higher risk for substance abuse later on in
14 life.
15         So I'm currently working with some
16 law enforcement agencies, a school resource
17 officer, and an agency that is involved in
18 mental health and treatment care for children,
19 on that project.
20         And then I currently work with
21 April Vince, as she is the program manager for
22 the Ohio Department of Health Injury Prevention
23 Grant that we're working on currently.
24     Q.   Does April Vince report to you?
25     A.   I work with April. I mean, we make

19 (Pages 70 - 73)

Page 74

1  sure that our people, you know, are autonomous
2  and have independent -- we work together on the
3  project.
4        Or she reports to me, yes, but it's
5  not -- you know, I think open thinking and
6  creativity helps people.
7        Q.  Just to be clear, does April Vince
8  report to you?
9        A.  Yes, she does.
10       Q.  And she reports to you in connection
11  with her responsibilities as the director of the
12  Ohio Department of Health Injury Prevention
13  Grant?
14       A.  Correct.
15       Q.  At the very top of the organizational
16  chart marked as Exhibit 2, do you see it says
17  "Director Novickis"?
18       A.  I do.
19       Q.  Is Mr. Novickis still the director of
20  the Cuyahoga County Board of Health?
21       A.  Yes.
22       Q.  For how long has he been in that
23  position?
24       A.  Three years.
25       Q.  Who was Mr. Novickis's predecessor?

Page 75

1        A.  John McLeod.
2        Q.  To what extent has Mr. Novickis and
3  Mr. McLeod been involved in the Cuyahoga County
4  Board of Health's efforts to understand and
5  address opioid-related abuse and overdoses?
6        MR. SMITH:  Objection; form.
7        A.  I would say in a supervisory role,
8  local efforts that are going on are shared with
9  them.  They are the director or previous
10  director of the organization, you know, whether
11  it is involved in contractual services based
12  upon a grant, inform the director of what's
13  going on, different opportunities that may have
14  come down the road as far as funding.
15       In addition, the way that we're set
16  up as a local board of health, City of Cleveland
17  has their own board of health.  So we contract
18  with individual communities on an annual basis,
19  so there could be questions that may come in
20  because of a relationship with a mayor, a
21  question that would come down to me to answer as
22  far as facilitating a task force.
23       I mean, that's the role that I
24  basically see.
25       Q.  How would you characterize the level

Page 76

1  of interest or engagement that Mr. Novickis and
2  Mr. McLeod have shown in terms of the Cuyahoga
3  County Board of Health's efforts to understand
4  and address opioid abuse in Cuyahoga County?
5        A.  I don't know.
6        Q.  Well, you've indicated that you
7  reported to them in connection with your work on
8  opioids, right?
9        A.  Correct.
10       Q.  So my question to you is, based on
11  that experience, how would you characterize the
12  level of interest and engagement that
13  Mr. Novickis and Mr. McLeod have shown in terms
14  of the Cuyahoga County Board of Health's efforts
15  to understand and address opioid abuse in the
16  county?
17       A.  I don't think it's any different than
18  any other program.  It's hard for me -- I don't
19  think it's any different than any other program
20  that I work on as far as an interest level.
21       Q.  No more, no less interest?  Is that
22  fair?
23       A.  I would say that's fair.
24       Q.  As of June 2015, it appears that the
25  deputy director position to whom you would have

Page 77

1  reported was vacant.  Is that right?
2        A.  It was -- from the way that this
3  chart shows, but I actually reported to Wallace
4  Chambers, who is on the right side of the form,
5  in the box that says "Deputy Director."
6        Q.  Okay.
7        A.  So for a span of control, you look at
8  this, it doesn't make much sense, but at that
9  point in time, I would report to Wallace.
10       Q.  For what years did you report to
11  Mr. Chambers?
12       A.  I can't recall, to be honest with
13  you, as far as time frames.
14       Q.  Do you currently report to
15  Mr. Chambers?
16       A.  I do.  I do right now.
17       Q.  Has this deputy director position
18  that was described as vacant in 2015 been
19  filled?
20       A.  It has.
21       Q.  Who filled that position?
22       A.  A gentleman by the name of John
23  Sobolewski.  And if you look at the box below,
24  deputy director, he is in a supervisory role on
25  this chart.

20 (Pages 74 - 77)

Page 78

1    Q.   Do you report to Mr. Sobolewski?
2    A.   I work with him and Wallace, both.  I
3  think that, you know, the chart is there from a
4  guide purpose standpoint, but I work with both
5  deputy directors hand in hand, I mean, as far as
6  daily activities.
7    Q.   Is it fair to say you report to both
8  deputy directors, Mr. Sobolewski and
9  Mr. Chambers?
10    A.   Yes, it would, depending on what's
11  going on.  I mean, if -- as an example, if we're
12  writing a grant, we share it with both of them
13  for content.  If there is something going on,
14  you know, they're both deputy directors, I use
15  both of their skills if needed.
16    Q.   To which of those deputy directors do
17  you report in connection with your work related
18  to opioid abuse?
19    A.   Directly, if we're looking at the
20  chart currently, it would be Wallace Chambers.
21    Q.   How would you characterize the level
22  of interest and engagement that Mr. Chambers has
23  given to the Cuyahoga County Board of Health's
24  efforts to understand and address opioid abuse
25  in the county?

Page 79

1        MR. SMITH:  Objection; form.
2    A.   I would say no different or no less
3  than Director Novickis or Former Director
4  McLeod.  I mean, it's hard to answer a question
5  when I have nothing to really base that on, I
6  guess.
7    Q.   Well, I'm just asking about your own
8  personal experience.  In working with
9  Mr. Chambers, would you say that his level of
10  interest and engagement has been no more or no
11  less on the opioid issue relative to other
12  issues about which you report to Mr. Chambers?
13        MR. SMITH:  Objection; form.
14    A.   I work with Wallace on different
15  issues.  I mean, he responds if there's interest
16  in grant writing, he responds if there's
17  opportunities that come down the road for
18  outreach and education.  So he's responsive to
19  the requests as far as what we're doing.
20    Q.   No, I understand.  But with respect
21  to Mr. Novickis and Mr. McLeod, you said their
22  level of interest and engagement was --
23    A.   I would say Walt, Mr. Chambers, is
24  the same.
25    Q.   The same, thank you.

Page 80

1        I note that under the people who
2  report to you that are identified on Exhibit 2,
3  Ms. Allisyn Leppla is identified, correct?
4    A.   Correct.
5    Q.   Ms. Leppla is no longer at the
6  Cuyahoga County Board of Health.
7    A.   She is not.
8    Q.   Ms. Leppla was the director of the
9  Ohio Department of Health Injury Prevention
10  Grant --
11    A.   She was --
12    Q.   -- correct?
13    A.   -- the coordinator of that grant.
14        MR. SMITH:  Let him finish the
15  question.
16        THE WITNESS:  I'm sorry.
17        MR. SMITH:  Take your time.
18    Q.   And that --
19    A.   Sorry.
20    Q.   That's okay.  And that's the role
21  that Ms. Vince now occupies, correct?
22    A.   That is correct.
23    Q.   Do you still have five direct
24  reports?
25    A.   I'm sorry?

Page 81

1    Q.   Do you still have five direct
2  reports?
3    A.   As staff?
4        MR. SMITH:  Objection; form.
5    Q.   Yeah.  This exhibit indicates that
6  there were five individuals as of June 2015 who
7  reported to you.  Do you see that?
8    A.   I do.
9    Q.   Do you still have five reports?
10    A.   I do not.
11    Q.   How many reports do you have?
12    A.   Seven currently.
13    Q.   Are they sanitarians?
14    A.   Three are sanitarians, three are
15  program managers.
16    Q.   How many of those seven individuals
17  are engaged in work related to opioid abuse?
18        MR. SMITH:  Objection; form.
19    A.   Only one.
20    Q.   Is that Ms. Vince?
21    A.   Correct.
22    Q.   When did Ms. Vince join the Cuyahoga
23  County Board of Health?
24    A.   I can't answer that question.
25    Q.   Do you recall roughly?

21 (Pages 78 - 81)

Page 82

1     A.   I can't answer that.  I don't know.
2     Q.   Was she already working at the
3 Cuyahoga County Board of Health when she filled
4 Ms. Leppla's role as director of the Ohio
5 Department of Health Injury Prevention Grant?
6     A.   She was.
7     Q.   Was she reporting to you at that
8 time?
9     A.   She was not.
10     Q.   So she came from a different part of
11 Cuyahoga County Board of Health.
12     A.   She was working in a different
13 service area at that time.
14     Q.   What service area was she working in?
15     A.   She was working in prevention and
16 wellness.
17     Q.   Were there any other candidates for
18 the role of director of the Ohio Department of
19 Health Injury Prevention Grant other than
20 Ms. Vince?
21     A.   It would be an injury prevention
22 coordinator.  You keep saying director, so it's
23 just throwing me off.
24        So there were other candidates that
25 applied?  Yes.

Page 83

1     Q.   Who were those other candidates?
2     A.   There was a candidate by the name of
3 Becky Karns, and I don't recall the other
4 individuals from the outside that applied for
5 the position.
6     Q.   Did Becky used to go by the name of
7 Becky Gray?
8     A.   Correct.
9     Q.   That's the same person?
10     A.   We're talking about the same person,
11 yes.
12     Q.   Why was Ms. Vince selected to run the
13 Ohio Department of Health Injury Prevention
14 Grant on behalf of Cuyahoga County Board of
15 Health?
16     A.   She went through the interview
17 process and scored the highest.
18     Q.   Was it your decision to make?
19     A.   I was involved in the interview
20 process, yes.
21     Q.   Who had the ultimate authority to
22 make the decision as to who would replace
23 Ms. Leppla as the director of the Ohio
24 Department of Health Injury Prevention Grant?
25     A.   Human resources.

Page 84

1     Q.   Who's that?
2        MR. SMITH:  You mean who -- what is
3 human resources or --
4        MR. BOEHM:  No, I know what human
5 resources is.
6     Q.   But I'm asking, who are the people?
7     A.   I don't recall.
8     Q.   Individual or individuals who had the
9 ultimate authority.
10     A.   I don't recall the individual's name
11 from our human resources.  I don't remember if
12 it was Tameka (ph) or not.  I can't recall that.
13     Q.   Is it fair to say you did not have
14 the ultimate authority to make the decision as
15 to who would replace Ms. Leppla?
16     A.   No.  There was three individuals who
17 put forth a score.
18     Q.   And your testimony today is that
19 Ms. Leppla scored the highest?
20     A.   Are we talking about Ms. Leppla or
21 Ms. Vince?
22     Q.   I'm sorry, I misspoke.  Thank you for
23 clarifying.
24        Is it your testimony today that
25 Ms. Vince scored the highest?

Page 85

1     A.   Ms. Vince went through the interview
2 process and scored the highest and was awarded
3 the position.
4     Q.   And when you say scored the highest,
5 can you tell us what you mean by that?
6     A.   She went through the interview
7 process that has three people in the room and
8 goes -- those individual are scored based upon a
9 question-and-answer series.  So each individual
10 is scored, and the highest individual receives
11 the job.
12     Q.   Were you one of the three people in
13 the room?
14     A.   I was.
15     Q.   And did you score or grade the
16 applicants?
17     A.   I graded -- I was involved in the
18 scoring procedure, yes.
19     Q.   Was Ms. Vince your personal choice
20 for this position?
21        MR. SMITH:  Objection; form.
22     Q.   Or did you favor Ms. Karns?
23        MR. SMITH:  Objection; form.
24     A.   Originally, I mean through
25 conversations, Ms. Karns scored originally

22 (Pages 82 - 85)

1  higher.  But then after my conversations with
2  Mr. Novickis and discussions with human
3  resources, we went back and looked through the
4  scoring process, and Ms. Vince was picked
5  instead of Mrs. Karns.
6      Q.   Who were the other two people in the
7  room?
8      A.   It was one of our human resources,
9  and I can't remember if it was Tameka or not,
10 and Wallace Chambers.
11     Q.   If I understand your testimony
12 correctly then, actually Ms. Karns scored higher
13 than Ms. Vince?
14         MR. SMITH:  Objection; form.
15     A.   At the end of the scoring process, we
16 went through and discussed what took place
17 amongst those three individuals, and as a human
18 resources agency, Ms. Vince was promoted to that
19 position.
20     Q.   Got that part, but I'm asking you
21 about the scoring process specifically.
22         Who scored higher; Ms. Karns or
23 Ms. Vince?
24     A.   At the end, Ms. Vince.
25     Q.   Originally Ms. Karns got a higher

1  score, and then the scoring was adjusted such
2  that Ms. Vince received a higher score?  Is that
3  correct?
4          MR. SMITH:  Objection; form.
5      A.   Through our human resources division,
6  we went through a process.  We reevaluated a
7  process, and Ms. Vince was picked as the program
8  manager.
9      Q.   Is that because the scores were
10 adjusted such that her score became higher than
11 Ms. Karns, or is it because of some other
12 reason?
13     A.   That was part of our human resources
14 process, so I followed through on that.  I don't
15 have any control over their human resources
16 process.
17     Q.   I'm asking you whether or not
18 Ms. Vince ultimately was selected for this
19 position because her scores were modified at
20 some point in the process such that her score
21 became higher than Ms. Karns.
22         MR. SMITH:  Objection; form.
23     A.   I can only tell you what I know, and
24 I'm telling you after we went through the
25 process of evaluating the candidates -- the

1  process is not over until that individual is put
2  in that position.  Once our final process was
3  over, Ms. Vince was the staff member that was
4  promoted.
5      Q.   I get where it came out.  I'm asking
6  you about the process, how you got from Point A
7  to Point Z.
8      A.   And I just explained to you that
9  through conversations with human resources and
10 Mr. Novickis, those scores, okay, were picked at
11 the end of the human resources process and
12 Ms. Vince was put in that position.
13     Q.   What happened with respect to human
14 resources that caused Ms. Vince to have her
15 score become higher than Ms. Karns?
16     A.   It was a conversation with my
17 director, Rick Novickis, and we talked about
18 both of the candidates and who would fit better,
19 and then that final decision was made.
20     Q.   Did you come to the conclusion as
21 part of your conversations with Mr. Novickis
22 that Ms. Vince would be the better candidate for
23 the position?
24     A.   I did have a conversation with
25 Mr. Novickis about that, yes.

1      Q.   And did you come to that conclusion?
2      A.   Yes.
3          MR. SMITH:  Objection; form.
4          THE WITNESS:  Sorry.
5          MR. SMITH:  That's fine.
6      A.   Yes.
7      Q.   What was the role of Mr. Chris Kippes
8  as part of the selection of Ms. Vince to replace
9  Ms. Leppla?
10     A.   Chris Kippes is the director of
11 epidemiology and surveillance.  He had no -- he
12 wasn't involved in the interview process, if
13 that's what you're asking me.
14     Q.   Did he have any impact whatsoever in
15 terms of the selection of Ms. Vince over
16 Ms. Karns?
17     A.   No, he did not.
18     Q.   Is it your view that the process by
19 which Ms. Vince was selected to replace
20 Ms. Leppla was conducted fairly?
21         MR. SMITH:  Objection; form.
22     A.   It was within our human resources
23 protocol.  That's what I followed, so I would
24 say at that point in time, yes.
25     Q.   As you sit here today, do you believe

23 (Pages 86 - 89)

Page 90

1  that the process by which Ms. Vince was selected
2  over Ms. Karns, or at that time Ms. Gray, was
3  conducted fairly?
4       MR. SMITH:  Objection; form.
5       A.   Having gone through the human
6  resources process and followed it through and
7  made that decision with April Vince, yes.
8       Q.   All right.  Let's turn back to your
9  resumé.  It's Exhibit 1.
10      We were looking at the invited
11  lectures on the back of --
12      A.   Give this back?
13      Q.   You can just keep it there next to
14  you, if you don't mind.
15      We're back to Exhibit 1, looking at
16  the invited lectures.  You indicated that you
17  had presented at the Ohio Opiate Summit and that
18  that was with a panel of other presenters,
19  correct?
20      A.   Yeah, that was a panel.
21      Q.   Who were the other panel presenters?
22      A.   I don't recall.
23      Q.   If you skip down one, you get to
24  Partnership for Prevention "Addressing Ohio's
25  Opiate Epidemic," and that was a National

Page 91

1  Association of County and City Health Officials
2  event held in Hartford, Connecticut --
3       A.   Correct.
4       Q.   -- correct?
5       A.   Uh-huh.
6       Q.   What did you lecture on at this
7  conference in Hartford, Connecticut in July
8  2011?
9       A.   It was on the current state of the
10  opiate epidemic in Ohio.
11      Q.   Did you use a slide deck?
12      A.   I did.
13      Q.   Did you talk about the contributing
14  factors to the opioid abuse epidemic in Ohio?
15      A.   Yeah.  The slide deck at that point
16  in time, a lot of the information that was
17  provided to the slide deck was from Ohio
18  Department of Health.
19      Q.   How did you receive that information
20  from the Ohio Department of Health?
21      A.   At that point in time, I want to say
22  it was through Judi Moseley, who is no longer at
23  the Ohio Department of Health.
24      Q.   Do you recall that the Ohio
25  Department of Health was issuing publicly

Page 92

1  available materials and information with respect
2  to the opioid abuse trends in Ohio?
3       MR. SMITH:  Objection; form.
4       A.   I don't know at that point in time.
5       Q.   How do you spell Moseley?
6       A.   I couldn't tell you.
7       Q.   When you say that it was through Judi
8  Moseley that you received information from the
9  Ohio Department of Health, describe the specific
10  way in which you received that information.
11      Did you reach out to her and ask for
12  it, was she sending it to you in your capacity
13  as the chair of the Cuyahoga County Opiate Task
14  Force, or was it through some other means?
15      MR. SMITH:  Objection; form.
16      A.   I don't know.
17      Q.   Why don't you know?
18      A.   I don't know.  I can't recall how she
19  sent me the information or how I gathered the
20  information from 2011.
21      Q.   Is it your testimony that you are
22  relying exclusively on information from the Ohio
23  Department of Health for purposes of your
24  presentation in 2011 at the National Association
25  of County and City Health Officials conference

Page 93

1  on the opioid epidemic, or was that just one of
2  the sources of information you had available?
3       MR. SMITH:  Objection; form.
4       A.   I can't answer that.  I don't know at
5  this point in time my recollection.  I don't
6  have any recollection to --
7       Q.   Would it help you remember if we
8  looked at your slide deck?
9       A.   Yes, it would.
10      Q.   And you've presented many times on
11  the trends of opioid abuse and overdose in Ohio
12  and in Cuyahoga County.  Fair?
13      A.   Yes.
14      Q.   To many different audiences.
15      A.   Yes.
16      Q.   Are your presentations usually
17  roughly -- do they roughly contain the same
18  materials or do they vary widely?
19      MR. SMITH:  Objection; form.
20      A.   I think the materials would change
21  based upon information provided --
22      (Outside interruption by unknown
23      speaker via phone and discussion off
24      the record at 10:53 a.m.)
25      A.   Would you be able to ask --

24 (Pages 90 - 93)

Page 94

1    Q.   I can ask it again.
2    A.   Ask it again, please.
3    Q.   Let's do that.  I had asked whether
4  or not the presentations that you've made on
5  behalf of the Cuyahoga County Board of Health
6  about trends of opioid abuse, addiction,
7  overdose to the many audiences are roughly the
8  same or if they varied widely depending on the
9  nature of the presentation.
10       MR. SMITH:  Objection; form.
11   A.   I think depending on the year,
12  depending on the programs that are currently
13  taking place -- and I'll explain -- the trends,
14  it could change.
15       An example would be when we first
16  started working collectively, as a
17  collaborative, we didn't have Project DAWN.  As
18  we progressed throughout the years, those
19  numbers had changed.
20       So depending on what our pilot
21  initiatives were, additional task force members
22  that are maybe providing information;
23  Dr. Gilson's reports, as they continued
24  throughout the years, if there was an update
25  from DEA on some things that they're seeing on

Page 95

1  the streets.
2       So the presentations would change
3  based upon trends and reflect where it is
4  what's taking place in Ohio or whether we had
5  the opportunity to really digest any information
6  locally and put that in there based upon
7  collaborative partnerships.
8    Q.   What are the material changes in
9  trends that you have seen in terms of opioid
10  abuse and overdoses during the years that you've
11  been studying and looking at and responding to
12  the opioid abuse epidemic in Cuyahoga County?
13   A.   Sure.  So based upon collaborative
14  partnerships and the professionals that are
15  offering information to me, you could see trends
16  as far as a reduction in prescribing practices
17  among physicians.  You could see the emphasis
18  and the importance in the value of understanding
19  how stigma plays a role in this epidemic.  You
20  could see a change in the way that law
21  enforcement looks at substance abuse and their
22  willingness to change some of their practices to
23  have NARCAN in place.  You could see the changes
24  in third-party consumers who have access to
25  Naloxone now with the change in House Bill 170

Page 96

1  or from that House Bill 170.
2       I think you can look at some at-risk
3  factors based upon conversations with jail
4  members, knowing that people that come out of
5  jails and into reentry are at a greater risk of
6  overdose because their tolerance is lower.
7       Those are some of the things that I
8  would probably say relates to change.
9       I would also probably incorporate the
10  connection between the misuse and abuse of
11  prescription medication as it relates to the use
12  of heroin and fentanyl trends from Dr. Gilson
13  and treatment providers that have been shared
14  with me.
15       Those are just some examples.
16   Q.   Great, thank you.  And we'll visit
17  some of those examples over the course of the
18  day, but I appreciate you setting those out.
19       What is the National Association of
20  County and City Health Officials?
21   A.   That is NACCHO.  It is our -- would
22  be public health's national organization.
23   Q.   It's a national organization?
24   A.   Yes, national organization of city
25  and county health officials.

Page 97

1    Q.   Are city and county officials from
2  other Ohio counties and municipalities members
3  of the National Association of County and City
4  Health Officials?
5    A.   I can't answer that question.
6    Q.   Do you have to apply for membership?
7    A.   Yes.
8    Q.   Do you know what the criteria are for
9  membership?
10   A.   I do not.
11   Q.   Do you know if other Ohio county or
12  city officials attended the Partnership for
13  Prevention addressing Ohio's opiate epidemic on
14  a -- attended that in Connecticut in July 2011?
15   A.   I can't recall.
16   Q.   If you skip one more on your list of
17  invited lectures, we get to a lecture you made
18  entitled "Ohio's Opiate Epidemic and
19  Medication-Assisted Treatment:  Northern Ohio
20  Trauma Systems Annual Conference,
21  October 12th-13th, 2012."  Do you see that?
22   A.   Yes, I do.
23   Q.   You gave a lecture for it looks like
24  two hours, right?
25   A.   Yes.

25 (Pages 94 - 97)

Page 98

1    Q.    What was the subject of your lecture
2    in October 2012 on Ohio's opiate epidemic in
3    northern Ohio?
4        A.    That conference is the Northern Ohio
5    Trauma Systems annual conference.  My part of
6    this with Dr. Chris was more of an overview of
7    what was taking place in Ohio.  Dr. Chris was
8    speaking about medicated-assisted treatment.
9        Q.    When this references Northern Ohio
10   Trauma Systems annual conference, what
11   jurisdictions or what region of Ohio is
12   encompassed by the northern Ohio language?
13       A.    I can't answer that.
14       Q.    Do you know if Summit County is
15   involved in the Northern Ohio Trauma Systems?
16       A.    I do not know.
17       Q.    Do you have any collaborative
18   relationship with public health officials in
19   Akron or Summit County when it comes to issues
20   related to opioids?
21       A.    I don't recall.
22       Q.    You don't recall as you sit here
23   today ever having communicated with public
24   health officials for Summit County or Akron on
25   the subject of opioid abuse?

Page 99

1        A.    It's possible, but I mean I don't
2    have anything that kind of comes straight to my
3    head, to be honest with you.
4        Q.    Do you know whether Summit County has
5    an opiate task force?
6        A.    I'm aware that Summit does, yes.
7        Q.    Has the Cuyahoga County Opiate Task
8    Force collaborated with the Summit County Opiate
9    Task Force in any respects?
10       A.    We may have collaborated from the
11   standpoint -- and this is going back from a
12   recollection standpoint -- maybe trying to get
13   information on their data dashboard, is the only
14   thing that I can think of.  I don't recall any
15   other conversations with anybody from Summit on
16   the specifics of their task force.
17       Q.    Do you recall any conversations with
18   anybody on behalf of Summit County or Akron in
19   relation to trying to understand or address
20   trends and issues related to opioid abuse and
21   overdoses?
22       A.    I may have had a conversation with
23   Donna Skoda at some point in time, who is their
24   commissioner, but I don't remember the specifics
25   of our conversation.  And that's about all that

Page 100

1    I can recall in regards to dealing with Summit.
2        Q.    What generally did you speak about
3    with Ms. Skoda?
4        A.    I can't recall what that conversation
5    would have been.
6        Q.    You recall that it was related to
7    opioid abuse?
8        A.    I can't recall.  I mean, I -- I think
9    I ran into her -- you know, I don't recall.
10       Q.    My question originally to you was
11   whether or not you can recall any conversations
12   you've had with officials on behalf of Summit
13   County or the City of Akron related to trends of
14   opioid abuse or overdoses, and you indicated in
15   response to that question that you had had a
16   conversation with Ms. Skoda.  Why did you
17   identify that conversation?
18           MR. SMITH:  Objection; form.
19       A.    Donna and I -- I recall Donna and I
20   had a conversation about Naloxone, if I recall
21   correctly.
22       Q.    Do you recall when that conversation
23   took place?
24       A.    It was in the infancy stages.  It was
25   probably -- I really -- I can't recall when that

Page 101

1    was, but...
2        Q.    When you say infancy stages, what do
3    you mean?
4        A.    It was when Naloxone was just really
5    becoming adopted in Cuyahoga County.
6        Q.    When in Cuyahoga County was Naloxone
7    starting to be used?
8        A.    2013.
9        Q.    Okay.  Do you know if any other
10   officials from Cuyahoga County attended the
11   Northern Ohio Trauma Systems annual conference
12   at which you presented and lectured on Ohio's
13   opiate epidemic?
14       A.    Could you ask that question again for
15   me?
16       Q.    Sure.  Do you know if any other
17   officials from Cuyahoga County attended the
18   Northern Ohio Trauma Systems annual conference
19   in October 2012 at which you presented and
20   lectured on Ohio's opiate epidemic?
21       A.    I do not know.
22       Q.    You've indicated earlier today --
23   what is your understanding as to why you,
24   Mr. Caraffi, were asked to lecture at the
25   conferences that are identified on your resumé,

26 (Pages 98 - 101)

1    which is Exhibit 1, on the opioid epidemic?
2         MR. SMITH:  Objection; form.
3      A.   I can't answer that question.  I
4    mean, I've been asked to speak by Steve
5    Dettelbach when he was actually the
6    United States district attorney.  He flew me
7    down to Atlanta to talk.  A lot of that had to
8    do with the information that was given me
9    through partnerships.  I've been asked to speak
10   at different events through the Department of
11   Justice when Carole Rendon was actually there.
12        I can't answer why people would ask
13   me to attend.
14     Q.   I know you can't get in their head,
15   but --
16     A.   I can't answer that question.
17     Q.   -- you accepted those invitations?
18     A.   Yes, I did.
19     Q.   Why did you agree to accept
20   invitations to talk about the opioid epidemic in
21   Cuyahoga County, northern Ohio, and Ohio overall
22   in 2011 and 2012?
23        MR. SMITH:  Objection; form.
24     A.   I think it goes back to what you
25   asked me earlier:  Having a passion for the job;

1    having a passion for what you do; understanding
2    and knowing what it's like to deal with a family
3    member that's addicted to opioids; be
4    experienced in the stigma that's involved that
5    you carry because of prescription opioids and
6    how it impacts not only a family, but a
7    community.  And I think that's why.
8         Our --
9      Q.   Did you -- I'm sorry.
10     A.   Our role as public health is to put
11   some prevention out there, to get more people to
12   talk about that.
13     Q.   Did you --
14     A.   I'm not done.
15     Q.   I'm sorry.  I keep thinking you're
16   done.  Please go ahead.
17     A.   You know, breaking down the stigma
18   that takes place is a very, very significant
19   barrier, and having a mother that carries that,
20   you know, you're fighting one battle at a time.
21        It's a horrible, horrible disease,
22   and when somebody like Steve Dettelbach, Carole
23   Rendon, or Dr. Gilson asks you to participate, I
24   think that's important, and that's why I
25   accepted Steve's invitation, Carole's

1    invitation, and other invitations across the
2    country.
3         If I have an opportunity to speak on
4    this issue on behalf of the task force, it's not
5    about me as a chair, you keep bringing up.  It's
6    about the people and the work that's going on
7    with those task force members that are educated
8    in substance abuse, that have knowledge on
9    treatment, that understand what it's like to run
10   a drug court and the challenges that they face.
11   It's not about me.
12     Q.   Is it fair to say that you felt
13   qualified to accept the invitations that you
14   received to present on the causes and scope of
15   the opioid abuse epidemic insofar as it concerns
16   Cuyahoga County, northern Ohio, and Ohio
17   overall?
18        MR. SMITH:  Objection; form.
19     A.   I'm not an expert on those things
20   that you had just mentioned earlier, but I think
21   I can carry a message.  I think I can speak on
22   behalf of some of the things that maybe Dr. Papp
23   has shared with me, with the recognition that
24   I'm not a physician, just as you can probably do
25   the same on a different subject matter.

1         I'm not an expert, and I've shared
2    that with you before.  I don't have a background
3    in substance abuse.
4         I think my role, as we've discussed
5    earlier, is really to facilitate dialogue and
6    continue to bring more people to the table that
7    may have some input, some knowledge, or some
8    expertise that can help us through this
9    prescription opioid epidemic.
10     Q.   Is it fair to say that if you had
11   felt like you were not an appropriate choice or
12   that you were unqualified to lecture on those
13   subjects, you would not have accepted those
14   invitations?
15        MR. SMITH:  Objection; form.
16     A.   I would agree with you.  And there's
17   opportunities that were presented that -- you
18   know, to speak amongst physicians and different
19   areas of this problem where I didn't feel
20   comfortable, and I would say that.
21        I can't speak on behalf of
22   medicated-assisted treatment.  Do I know what
23   that means?  Yes, but I don't know what a
24   medicated-assisted treatment program is.
25        Do I know what cognitive behavioral

Page 106

1    therapy is? Yes, but I can't administer that.
2    I can't deal with that with a client.
3         As I said before, I'm gathering
4    information from those experts in the field and
5    trying to increase awareness and knowledge for
6    maybe a mom or a dad that's dealing with this
7    because their son or daughter has an opioid
8    disorder and they want to know more: Where can
9    they get help; you know, where is there a family
10   program that they can go down to and talk about
11   this so that they can help themselves.
12       Q.   You've indicated a couple of times
13   that at some point the Cuyahoga County Board of
14   Health received a grant from the Ohio Department
15   of Health to assist with Cuyahoga County's
16   efforts to understand and address opioid abuse
17   in the county, right?
18       A.   Yes.
19       Q.   In what year did the Cuyahoga County
20   Board of Health first receive this grant from
21   the Ohio Department of Health?
22       A.   It was 2014.
23       Q.   So this was several years after
24   Cuyahoga County had already established the
25   Cuyahoga County Opiate Task Force. Is that

Page 107

1    right?
2        A.   Correct.
3        Q.   Do you know why Cuyahoga County was
4    selected as a grant recipient from the Ohio
5    Department of Health?
6        A.   I cannot answer that.
7        Q.   Do you know the source of funding --
8        A.   Excuse me. Can I get a real quick
9    glass of water?
10       Q.   Of course. You want to go off the
11   record?
12           MR. SMITH: Let's take a --
13       A.   I just need -- I wanted to just grab
14   some water and come back.
15           VIDEO TECHNICIAN: Off the record at
16   11:11.
17           (Recess taken at 11:11 a.m.)
18           (Back on the record at 11:21 a.m.)
19           VIDEO TECHNICIAN: On the record
20   11:21, Media 2, Caraffi deposition.
21   BY MR. BOEHM:
22       Q.   Mr. Caraffi, do you know the sources
23   of funding that the Ohio Department of Health
24   uses to fund the grant that it gave to the
25   Cuyahoga County Board of Health to understand

Page 108

1    and address opioid abuse in Cuyahoga County?
2        A.   That grant money comes from the
3    CDC -- Centers for Disease Control, I'm sorry.
4        Q.   From the Federal Government, right?
5        A.   Correct.
6        Q.   Is the Cuyahoga County Board of
7    Health still a recipient of the Ohio Department
8    of Health Injury Prevention Grant focused on
9    opioid abuse?
10       A.   The end of our first grant award was
11   2018, and we received an additional year this
12   year, but we did not get funded for the full
13   five-year application.
14       Q.   Does the Cuyahoga County Board of
15   Health intend to seek additional funding from
16   the Ohio Department of Health in connection with
17   that grant for years beyond 2019?
18           MR. SMITH: Objection; form.
19       A.   Yes.
20       Q.   Are the funds provided by the Ohio
21   Department of Health to the Cuyahoga County
22   Board of Health for opioid-related expenditures
23   earmarked for particular purposes, or is the
24   Cuyahoga County Board of Health free to use
25   those funds however it sees fit?

Page 109

1            MR. SMITH: Objection; form.
2        A.   It would depend on the grant
3    application.
4        Q.   Has the CCBH -- and by the way, just
5    for the record, is CCBH an acronym that you
6    understand and use to mean the Cuyahoga County
7    Board of Health?
8        A.   Yes.
9        Q.   And if I use the term "CCBH" today
10   during the deposition, will you understand it to
11   mean the Cuyahoga County Board of Health?
12       A.   Of course.
13       Q.   Has CCBH received more than one grant
14   from the Ohio Department of Health in connection
15   with addressing opioid abuse and overdoses?
16       A.   No, it has not.
17       Q.   So my question to you is whether or
18   not the funds that the Ohio Department of Health
19   has awarded to CCBH in connection with
20   addressing opioid abuse and overdose is
21   earmarked for specific purposes or whether or
22   not CCBH is free to use those funds however it
23   sees fit.
24           MR. SMITH: Objection; form.
25       A.   It's dependent upon the grant

28 (Pages 106 - 109)

Page 110

1    application.
2        Q.   What do you mean?
3        A.   The grant itself has choices.  You
4    have to choose those drop-down or pick lists as
5    part of your grant application.
6        Q.   Okay.  And what is the case with
7    respect to how CCBH has applied for and received
8    grant funds from the Ohio Department of Health?
9    Are the funds discretionary or are they
10   earmarked?
11       MR. SMITH:  Objection; form.
12       A.   The grant basically forces you to
13   choose where you're going to put your efforts
14   in.
15       Q.   I see.  So the application that CCBH
16   submits to the Ohio Department of Health for the
17   grant identifies the purposes for which the
18   money will be spent.  Is that right?
19       MR. SMITH:  Objection; form.
20       A.   The application is released with
21   choices that are available.  You have to choose
22   through a pick list and then submit the grant to
23   the Ohio Department of Health.
24       Q.   What have been the deliverables that
25   CCBH has agreed to undertake in connection with

Page 111

1    receipt of the Ohio Department of Health grant
2    funds that we've been discussing?
3        MR. SMITH:  Objection; form.
4        A.   Are you discussing this year's
5    application?
6        Q.   I'm talking about ever since CCBH
7    received grant funding from the Ohio Department
8    of Health to the present day, what have the
9    deliverables been in connection with those
10   funds?
11       MR. SMITH:  Objection; form.
12       A.   We never had a --
13       THE WITNESS:  Sorry, Scott.
14       A.   This is the first year we've ever had
15   a deliverables-based grant.  The first five-year
16   application that we applied for where we
17   received funding in 2014 was to enhance, you
18   know, awareness, build local collaborative
19   partnerships to address the opioid epidemic.
20       Q.   With respect to that first grant that
21   was used to build partnerships and a coalition,
22   were there any other purposes to which those
23   grant funds went other than building
24   partnerships and increasing awareness?
25       A.   No.

Page 112

1        Q.   In connection with CCBH's receipt of
2    Ohio Department of Health funding in connection
3    with the opioid abuse epidemic in the county,
4    did CCBH agree to formally review overdose death
5    data in connection with the office of the
6    medical examiner?
7        MR. SMITH:  Objection; form.
8        A.   Could you restate the question for
9    me?
10       Q.   Sure.  As part of the Cuyahoga County
11   Board of Health's receipt of these grant funds
12   from the Ohio Department of Health, did CCBH
13   agree to review overdose death data in
14   coordination with the Cuyahoga County office of
15   the medical examiner?
16       MR. SMITH:  Objection; form.
17       A.   Could you ask me the question again?
18   I'm trying to get a basis on how to answer this.
19       Q.   Sure.  As part of Cuyahoga County
20   Board of Health's agreement to take funds from
21   the Ohio Department of Health, this injury
22   prevention grant directed as opioid abuse, did
23   CCBH agree to review opioid-related overdose
24   death data in coordination with the Cuyahoga
25   County office of the medical examiner?

Page 113

1        MR. SMITH:  Objection; form.
2        A.   Yes, we did.
3        Q.   And who participated from Cuyahoga
4    County Board of Health in terms of the review of
5    overdose death data?
6        A.   Myself.
7        Q.   Anybody else?
8        A.   I don't recall anybody else from our
9    office doing that.
10       Q.   What was the purpose of the review of
11   the overdose death data?
12       A.   The purpose of the over- -- or the
13   overdose fatality review was to be able to
14   identify trends in the community.
15       Q.   When did that begin?  Specifically
16   when did the review of the overdose fatality
17   data --
18       A.   I can't recall.
19       Q.   -- be- -- sorry.  I paused, so that's
20   my fault.  I paused.  You probably thought I was
21   done.
22       A.   Yeah, I thought you were done.  I'm
23   sorry.
24       MR. SMITH:  Take your time.
25       Q.   That's my fault.

29 (Pages 110 - 113)

Page 114

1    A.   Okay.
2    Q.   Do you recall when the Cuyahoga
3  County Board of Health began to review overdose
4  death data with the Cuyahoga County office of
5  the medical examiner in connection with the Ohio
6  Department of Health grant funds?
7        MR. SMITH:  Objection; form.
8    A.   I do not recall when we started, off
9  the top of my head.
10    Q.   Do you know whether or not CCBH had
11  been reviewing overdose death data in any way
12  prior to receipt of the Ohio Department of
13  Health funding?
14    A.   I don't know.
15    Q.   Were you personally involved with the
16  review of overdose fatality data in Cuyahoga
17  County prior to the Ohio Department of Health
18  awarding CCBH the grant funds that we've been
19  discussing?
20    A.   I can't recall.
21    Q.   Did Cuyahoga County Board of Health
22  use any of the funds it received from the Ohio
23  Department of Health to train medical doctors or
24  medical students about the appropriate
25  prescribing of opioid medications?

Page 115

1    A.   Yes, we did.
2        MR. SMITH:  Objection; form.
3    Q.   Can you please describe CCBH's
4  efforts to train medical doctors or medical
5  students about the appropriate prescribing of
6  opioid medications?
7        MR. SMITH:  Objection; form.
8    A.   Those trainings were in conjunction
9  with information that was provided to me through
10  other sources on the task force, and we had
11  worked out a training module through Case
12  Western Reserve's fourth and fifth year
13  residency program.
14    Q.   What was the purpose of the training
15  module?
16    A.   The purpose of the training module
17  was to increase awareness to the issue that was
18  taking place or the awareness that there was
19  something taking place in Cuyahoga County and
20  the opioid abuse epidemic in Ohio.
21        As I mentioned to you before when you
22  had asked me about risk factors, prescribing
23  practices, it was intent to raise awareness to
24  young fourth and fifth-year residents,
25  physicians, before they actually got into the

Page 116

1  field.
2    Q.   Is it fair to say that the training
3  module was designed to increase future doctors'
4  awareness about the worrisome trends in terms of
5  prescription drug abuse and overdose?
6        MR. SMITH:  Objection; form.
7    A.   Yes.
8    Q.   Did the training module provide any
9  information or suggestions to these future
10  doctors about the best way to prescribe opioid
11  medications to individual patients?
12        MR. SMITH:  Objection; form.
13    A.   I can't recall.
14    Q.   Who developed the training module?
15  You said it was in coordination with Case
16  Western.  What specific individuals participated
17  in the development of the training module?
18        MR. SMITH:  Objection; form.
19    A.   We work with Dr. Melanie
20  Golembiewski.
21    Q.   Who else worked on it besides
22  Dr. Golembiewski?
23    A.   Myself and Allisyn Leppla.
24    Q.   What was your role?
25    A.   I don't recall.

Page 117

1    Q.   As part of Cuyahoga County Board of
2  Health receiving funds from the Ohio Department
3  of Health, did the CCBH agree to perform
4  systematic review of OARRS data?
5    A.   I don't recall.
6    Q.   Do you know what OARRS is?
7        MR. BOEHM:  And for the court
8    reporter, OARRS is an acronym and it's
9    spelled O-A-R-R-S.
10    Q.   Mr. Caraffi, are you familiar with
11  OARRS?
12    A.   I'm familiar with what OARRS is, yes.
13    Q.   What is OARRS?
14    A.   It's Ohio's automated prescription
15  monitoring program.
16    Q.   And what is it?
17        MR. SMITH:  Objection; form.
18    A.   It's a preventative tool that's put
19  in place to be used by physicians, from my
20  recollection.
21    Q.   When you call OARRS a preventative
22  tool, what do you mean by that?  In what way is
23  OARRS preventative?
24        MR. SMITH:  Objection; form.
25    A.   It gives physicians an idea and a

Page 118

1　history of the individuals that they are
2　prescribing opioid pain medication to, from my
3　understanding.
4　　Q.　Is it your understanding that
5　licensed physicians who prescribe controlled
6　substances have access to the OARRS database
7　here in Ohio?
8　　A.　Yes.
9　　Q.　Do you know when the OARRS system was
10　developed?
11　　A.　I don't know.
12　　Q.　Are licensed physicians who prescribe
13　controlled substances the only individuals who
14　have access to the OARRS system?
15　　A.　I don't know.
16　　Q.　CCBH has had access to the OARRS
17　system, right?
18　　A.　I don't know.
19　　Q.　Do you recall ever having had
20　conversations with other individuals at the
21　Cuyahoga County Board of Health or other
22　officials in Cuyahoga County about the
23　utilization of OARRS to try and understand the
24　causes and best response to prescription opioid
25　abuse?

Page 119

1　　A.　Could you ask that question again,
2　please?
3　　Q.　Sure. Have you ever had
4　conversations with any other individuals at the
5　Cuyahoga County Board of Health or any other
6　officials for Cuyahoga County on the subject of
7　utilizing the OARRS system to try and understand
8　the scope of opioid abuse and to respond to
9　opioid abuse in this community?
10　　MR. SMITH:  Objection; form.
11　　A.　Yes, I have.
12　　Q.　Can you please describe those
13　conversations.
14　　A.　I can't recall the conversations.
15　　Q.　Do you agree that County health
16　officials have access to data from the OARRS
17　system?
18　　A.　I can't answer that question.
19　　Q.　Because you don't know?
20　　A.　I don't work for the County.
21　　Q.　You were just making the point that
22　the Cuyahoga County Board of Health is an
23　independent entity from Cuyahoga County.  Is
24　that right?
25　　MR. SMITH:  Objection; form.

Page 120

1　　A.　I understand, sir. I'm just
2　answering your question.
3　　Q.　Right, but are you -- is it correct
4　that the Cuyahoga County Board of Health, in
5　your view, is independent from the County
6　itself?
7　　MR. SMITH:  Objection; form.
8　　A.　Yes.
9　　Q.　In what way is the Cuyahoga County
10　Board of Health separate and independent from
11　Cuyahoga County itself?
12　　MR. SMITH:  Objection; form.
13　　A.　I don't know.
14　　Q.　Well, you said you had an
15　understanding that it's independent, and I'm
16　trying to understand the basis for your
17　statement that the CCBH is independent from the
18　County.
19　　MR. SMITH:  Is there a question?
20　　Q.　What is the basis?
21　　MR. SMITH:  Objection; form.
22　　A.　From my recollection, it's through
23　Ohio revised code.
24　　Q.　The basis of your understanding that
25　the Cuyahoga County Board of Health is

Page 121

1　independent from the County is from your review
2　of the Ohio revised code?
3　　MR. SMITH:  Objection; form.
4　　A.　That was my answer, yes. Ohio
5　revised code mandates that general boards of
6　health are separate.
7　　Q.　Back to my question about OARRS, you
8　had indicated that you recall having had
9　conversations with individuals, whether they be
10　from CCBH or other county officials, on the
11　subject of utilizing the OARRS system to try and
12　understand and address trends of prescription
13　opioid abuse and overdoses.
14　　Can you please describe with whom you
15　had those conversations and what you discussed.
16　　MR. SMITH:  Objection; form.
17　　A.　I've had conversations with
18　Dr. Gilson, but I don't recall the content of
19　the conversation.
20　　Q.　Do you recall when those
21　conversations took place roughly?
22　　A.　I do not.  I don't recall when the
23　conversations took place.
24　　Q.　Do you know whether or not Cuyahoga
25　County can discern the volume of prescribed

31 (Pages 118 - 121)

Page 122

1 opioid medications prescribed in the county
2 through the OARRS system?
3     MR. SMITH:  Objection; form.
4     A.  I think anyone in Ohio can get access
5 through the Ohio Pharmacy Board to see how many
6 prescription medications have been disseminated
7 in a county.
8     Q.  In what way, in your view --
9     A.  Can we -- can I get bottled water or
10 something?
11     Q.  Of course.
12     (Off the written record.)
13     Q.  In what way does knowing the volume
14 of prescribed opioid medications in the county
15 help the County to understand the nature and the
16 causes of opioid abuse in this community?
17     MR. SMITH:  Objection; form.
18     A.  I don't know.
19     Q.  Why don't you know?
20     MR. SMITH:  Objection; form.
21     A.  I would use information from other
22 partners on a collaborative task force to answer
23 that question.
24     Q.  Is it your understanding that knowing
25 the volume of prescribed opioid medications in

Page 123

1 the county is helpful to the County in trying to
2 understand the nature and contributing factors
3 to opioid abuse in this community?
4     A.  Could you restate the question for
5 me, please?
6     Q.  Sure.  Is it your understanding that
7 having access to information about the volume of
8 prescribed opioid medications in Cuyahoga County
9 is helpful to the County's efforts to understand
10 the nature and causes of opioid abuse in this
11 community?
12     MR. SMITH:  Objection; form.
13     A.  Conversations with collaborative
14 partners through the task force whether it be
15 law enforcement, Dr. Gilson, or the medical
16 community, yes.
17     Q.  And what is your understanding based
18 on your conversations with those individuals and
19 experts as to how it is helpful to know the
20 volume of prescribed opioid medications in
21 trying to understand opioid abuse in Cuyahoga
22 County?
23     MR. SMITH:  Objection; form.
24     A.  I think it relates back to some of
25 the risk factors we had mentioned earlier when

Page 124

1 you look at the per capita rate of opioid pain
2 medications that were prescribed to people in
3 Ohio.
4     I think it also helps create a pause
5 to ensure that physicians are looking to see if
6 an individual may have a substance abuse
7 disorder or a history, and I'm speaking on
8 behalf of partners that have offered that.
9     Q.  Fair to say that using OARRS data
10 would allow an individual to determine the
11 volume of prescriptions of opioid medications on
12 a per capita basis county by county?
13     MR. SMITH:  Objection; form.
14     A.  I don't know.
15     Q.  Why don't you know that?
16     A.  I'm not in the medical field.
17     Q.  Have you had conversations with
18 experts or other individuals in the County about
19 that particular subject?
20     MR. SMITH:  Objection; form.
21     A.  Could you ask me the first question
22 before you ask me the second, please?
23     Q.  Sure.  Just to back up a little bit,
24 the question is whether you agree that
25 information provided in the OARRS system would

Page 125

1 allow the County to determine the volume of
2 prescribed opioid medications in the county on a
3 per capita basis.
4     MR. SMITH:  Is that -- I'm sorry, is
5 that a question?
6     MR. BOEHM:  Yes.
7     MR. SMITH:  Objection; form.
8     A.  I don't understand your question
9 to --
10     Q.  I'll just read it again.
11     A.  Please.  I'm not trying to be
12 difficult.
13     Q.  No, that's okay.
14     A.  I just don't understand your
15 question.
16     Q.  Of course.  Do you agree that
17 information provided in the OARRS system would
18 allow the County to determine the volume of
19 prescribed opioid medications in the county on a
20 per capita basis?
21     MR. SMITH:  Objection; form.
22     A.  I don't know.
23     Q.  Why don't you know?
24     MR. SMITH:  Objection; form.
25     A.  You'd have to ask those county

32 (Pages 122 - 125)

1 officials.  I'm not in the medical field.
2    Q.   Do you have an understanding of that
3 question based on your conversations with
4 Dr. Gilson, folks in law enforcement, or any
5 other individuals that you've interacted with
6 based on your chairmanship of the Cuyahoga
7 County Opiate Task Force?
8        MR. SMITH:  Objection; form.
9    A.   As it relates to physicians, as it
10 relates to law enforcement, it would be helpful
11 based upon my conversations with those
12 individuals that are part of the task force.
13    Q.   How has the utilization of OARRS
14 helped Cuyahoga County addressed opioid abuse
15 and addiction?
16    A.   In Cuyahoga County, it helped
17 establish patterns of abuse through partners on
18 the coalition.
19        In Cuyahoga County, I think -- in
20 Cuyahoga County through the medical examiner's
21 office, it showed a direct link between opioid
22 prescription abuse, heroin, and fentanyl.
23        And I think in the medical community,
24 partners on the task force in the medical
25 community, as we mentioned before, it creates a

1 pause or an understanding for a better working
2 relationship with their clients.
3    Q.   Okay.  Let's break that down a little
4 bit.
5        With respect to being able to discern
6 or establish patterns of abuse, how does
7 utilization of OARRS allow the County to
8 understand patterns of abuse?
9    A.   I can't answer that question.
10    Q.   You don't know the details, but
11 you've had conversations about that with others
12 in the substance abuse community?  Is that fair?
13    A.   Yes.
14    Q.   And your understanding is that
15 utilization of OARRS allows public health
16 officials to discern and establish patterns of
17 abuse.
18    A.   No.
19    Q.   Okay.  Then I'm not sure I understood
20 what you said, because you indicated that
21 utilization of OARRS allows you to establish
22 patterns of abuse, and then you talked about the
23 doctor-patient relationship as well, which I
24 want to get to in a minute.
25    A.   Uh-huh.

1    Q.   I'm trying to understand what you
2 said about the patterns of abuse that you can
3 discern or establish by utilizing OARRS.
4    A.   Your last question directly went to
5 public health, and I'm explaining that the
6 information does not come directly from public
7 health.
8        As a public health official, I get
9 information from other collaborative partners:
10 Law enforcement, Dr. Gilson, Office of Opioid
11 Safety.  That's why I responded the way that I
12 did.
13    Q.   I see, okay.  So pushing that aside
14 for just a moment, what is your understanding
15 about how the utilization of OARRS allows for
16 the discernment or establishment of patterns of
17 abuse?
18        MR. SMITH:  Objection; form.
19    A.   I can't answer that question.
20    Q.   Is that because your knowledge about
21 how the OARRS database helps establish patterns
22 of abuse comes from other individuals in the
23 community?
24    A.   I don't use the OARRS system.  I
25 don't have clients or see patients, so the only

1 information that I'm provided is members of the
2 task force that have access to OARRS to come up
3 with the trends that they share with me as my
4 role to facilitate the task force.
5    Q.   Did you know that one of Ms. Leppla's
6 duties in connection with the Ohio Department of
7 Health Injury Prevention Grant was to review
8 OARRS data?
9    A.   I don't recall that.
10    Q.   You indicated that the utilization of
11 OARRS allows to draw a link in terms of
12 prescription abuse.  What did you mean by that?
13    A.   I'm sorry?  I thought that thing was
14 moving behind me.  It was making me -- I'm
15 sorry.
16    Q.   No, it's steady as a rock now.
17    A.   Go ahead.
18    Q.   My question to you was about the
19 testimony you gave earlier on the OARRS system.
20        You had indicated that it allows
21 individuals who utilize OARRS to draw a link in
22 terms of substance abuse, and you indicated that
23 has to do with heroin and fentanyl and
24 prescription opioids, and I wanted to understand
25 what you meant by that.

33 (Pages 126 - 129)

Page 130

1        MR. SMITH:  Is there a question?
2      Q.   What did you mean by that?
3        MR. SMITH:  Objection; form.
4      A.   Can I actually go back and see the
5   question, please?
6      Q.   We don't really have the ability to
7   do that.  If you want to clarify something, then
8   you can.
9      A.   If you could restate your question.
10     Q.   Sure.
11     A.   You're going back in time, and I'm
12  having a hard time understanding what you're
13  asking me.  If I can't see it, I can't answer
14  your question.
15     Q.   That's fine.  I was just -- I didn't
16  mean to try and quote you.  I'm just trying
17  to --
18     A.   I'm just trying to be helpful too, so
19  go ahead.
20     Q.   Fair enough.
21        Is it your understanding that
22  utilization of OARRS allows officials who use it
23  to link -- to draw links in terms of substance
24  abuse trends or patterns?
25     A.   Speaking on behalf of those coalition

Page 131

1   members that have access to it?  Yes.
2      Q.   Are you able to describe how?
3        MR. SMITH:  Objection; form.
4      A.   No, I am not.
5      Q.   Do you know when officials at the
6   Cuyahoga County Office of the Medical Examiner
7   or in other divisions, departments, or programs
8   began to utilize the OARRS system?
9      A.   I don't recall the specific date.
10     Q.   Do you know if your partners from the
11  County who were working in connection with the
12  Cuyahoga County Opiate Task Force in the 2010,
13  2011 time frame were utilizing the OARRS system
14  at that time?
15     A.   I don't recall when the collaborative
16  partnerships actually had access to OARRS.
17     Q.   You also indicated that individual
18  physicians' utilization of the OARRS system can
19  help in addressing prescription opioid abuse.
20  Did I understand that correctly?
21     A.   That is correct.
22     Q.   What is your understanding about how
23  utilization of the OARRS system has helped
24  Cuyahoga County to address and respond to opioid
25  abuse?

Page 132

1        MR. SMITH:  Objection; form.
2      A.   I base it off of an article that came
3   out of Metro Hospital.  They talked about the
4   reduction in prescription medication, that they
5   have disseminated to their clients over the past
6   year.
7      Q.   What was the change that that article
8   referenced?
9      A.   A drop in the number of opioid pain
10  pills that had been prescribed by their
11  physicians.
12     Q.   What is your understanding about how
13  the utilization of the OARRS system has led to a
14  drop in the volume of opioid prescriptions that
15  licensed physicians have written at Metro
16  Health?
17        MR. SMITH:  Objection; form.
18     A.   I can't answer that question.
19     Q.   Why not?
20     A.   I don't work for Metro Health and I'm
21  not a physician.
22     Q.   Right, but I'm asking about your
23  understanding.  You said you read an article,
24  and you said the article somehow led you to
25  believe that doctors utilizing OARRS allows the

Page 133

1   County to address opioid abuse.
2        So I'm asking for your understanding
3   based on your knowledge as the head of the
4   opiate task force and having read this article
5   and whatever other information you have about
6   how that worked.
7        MR. SMITH:  Objection; form.
8      A.   Based upon our earlier conversations,
9   you had asked me about contributing risk
10  factors.  I mentioned to you prescribing
11  practices.
12        The article that came out that I read
13  indicated that based upon the use of OARRS,
14  based upon a better perception of what's going
15  on at their local hospital, they were able to
16  reduce the amount of prescription medication
17  that was prescribed to their clients offering
18  alternative methods of care.
19     Q.   Did Metro -- I'm sorry, go ahead.
20     A.   Go ahead.  I'm done.
21     Q.   Did Metro Health revise its own
22  guidelines for the prescribing of opioid
23  medications?
24        MR. SMITH:  Objection; form.
25     A.   I can't answer that.

34 (Pages 130 - 133)

Page 134

1  Q.  Because you don't know?
2  A.  I don't recall.
3  Q.  Have you ever heard of the term
4  "doctor shopping"?
5  MR. SMITH:  Objection; form.
6  A.  Yes.
7  Q.  What is your understanding as to what
8  the term "doctor shopping" means?
9  MR. SMITH:  Objection; form.
10  A.  I recall that doctor shopping is a
11  physician's office that was legally prescribing
12  a large amount of prescription opioid pain
13  medication.
14  Q.  So your understanding of the term
15  "doctor shopping" is that it refers to a
16  healthcare practitioner's office that legally
17  prescribes large volumes of opioid medications?
18  MR. SMITH:  Objection; form.
19  A.  Yes.
20  Q.  Is there evidence in your view to
21  suggest that the utilization of the OARRS system
22  reduces doctor shopping?
23  MR. SMITH:  Objection; form.
24  A.  Based upon conversations with
25  individuals that are part of the task force, law

Page 135

1  enforcement, undercover narcotics, DEA,
2  Dr. Gilson's office, that, yes, OARRS has been
3  helpful.
4  Q.  Ohio Law requires that physicians who
5  prescribe controlled substances use the OARRS
6  system before issuing any prescription to an
7  individual patient, correct?
8  MR. SMITH:  Objection; form.
9  A.  I can't answer that.
10  Q.  You don't know whether the Ohio
11  General Assembly has passed a law requiring that
12  licensed physicians in the state of Ohio use the
13  OARRS system as part of their prescribing of
14  controlled substances to individual patients?
15  MR. SMITH:  Objection; form.
16  A.  I don't recall.
17  Q.  Is that a subject you've ever heard
18  about, discussed, presented on --
19  MR. SMITH:  Objection; form.
20  Q.  -- as part of your duties and
21  responsibilities as the chair of the Cuyahoga
22  County Opiate Task Force?
23  MR. SMITH:  Objection; form.
24  A.  I have spoke on the specifics, but I
25  don't know when that date went into law.

Page 136

1  Q.  Okay.  But my question is, do you
2  know that utilization of OARRS by licensed
3  physicians prescribing controlled substances is
4  required by Ohio Law?
5  MR. SMITH:  Objection; form.
6  A.  Yes, I do.  I misunderstood your
7  question before.
8  Q.  Was one of your responsibilities in
9  connection with the Ohio Department of Health
10  Injury Prevention Grant to assist with opiate
11  task force creation in neighboring counties?
12  A.  Yes, it was.
13  Q.  Have you, in fact, assisted with the
14  creation of opiate task forces in counties that
15  neighbor Cuyahoga County?
16  A.  Yes, we have assisted counties
17  neighboring Cuyahoga County and others.
18  Q.  Which counties have you assisted in
19  establishing opiate task forces?
20  A.  We worked with Trumbull, Medina, and
21  Lorain County.
22  Q.  Any others?
23  A.  Not that I recall.
24  Q.  I asked you some questions earlier
25  today about Mr. Chris Kippes.  Do you remember

Page 137

1  that?
2  A.  I do.
3  Q.  Is Mr. Kippes somebody that you work
4  with at the Cuyahoga County Board of Health?
5  A.  Yes.  Mr. Kippes is the director of
6  environmental -- or, I'm sorry, epidemiology and
7  surveillance.
8  Q.  Has Mr. Kippes been involved in
9  Cuyahoga County's -- sorry, I'm going to start
10  over.
11  A.  No problem.
12  Q.  Has Mr. Kippes been involved with the
13  Cuyahoga County Board of Health's efforts in
14  connection with understanding and addressing
15  opioid abuse?
16  MR. SMITH:  Objection; form.
17  A.  Yes.
18  Q.  In what way?
19  MR. SMITH:  Objection; form.
20  A.  Data collection efforts.
21  Q.  What is the nature of your working
22  relationship with Mr. Kippes?
23  A.  He's a director of the office of
24  epidemiology and surveillance.
25  Q.  Do you guys get along?

35 (Pages 134 - 137)

Page 138

1           MR. SMITH:  Objection; form.
2      A.   Yes.
3           (DEPOSITION EXHIBIT 3 MARKED
4           FOR IDENTIFICATION at 12:00 p.m.)
5      Q.   Have you ever had any complaints
6   about the manner in which Mr. Kippes has
7   conducted his responsibilities at the Cuyahoga
8   County Board of Health?
9           MR. SMITH:  Objection; form.
10      A.   Does it pertain to the document you
11  put in front of me?
12      Q.   No.  I'm just asking you that
13  question.
14      A.   Could you restate the question again,
15  please?
16      Q.   Sure.  Have you ever had any
17  complaints about the manner in which Mr. Kippes
18  has conducted himself or his responsibilities at
19  the Cuyahoga County Board of Health?
20           MR. SMITH:  Objection; form.
21      A.   Yes.
22      Q.   What are the nature of the complaints
23  you've had with respect to Mr. Kippes?
24           MR. SMITH:  Objection; form.
25      A.   Mr. Kippes made some accusations

Page 139

1   about me last year -- or, I'm sorry, the year
2   before.
3      Q.   What accusations did Mr. Kippes make?
4           MR. SMITH:  Objection; form.
5      A.   He made an accusation that I sexually
6   a harassed women.
7      Q.   Did he raise that with human
8   resources at CCBH?
9           MR. SMITH:  Objection; form.
10      A.   I can't answer that.
11      Q.   Because you don't know?
12           MR. SMITH:  Objection; form.
13      A.   I can't answer that question.
14      Q.   Right, but I'm trying to understand
15  why you can't answer that question.
16           Can you not answer that question
17  because you don't know the answer, or is there
18  some other reason why you can't answer that
19  question?
20           MR. SMITH:  Objection; form.
21      A.   I don't know where the complaint came
22  from.
23      Q.   Do you know if Mr. Kippes complained
24  to the human resources department of the
25  Cuyahoga County Board of Health about the

Page 140

1   allegation that you had sexually harassed women?
2      A.   I can't answer that question.
3           MR. SMITH:  Objection; form.
4      Q.   But I'm asking -- when you say you
5   can't answer a question, it leaves open the
6   reasons why you can't answer a question.  I'm
7   always going to ask you why you can't.
8      A.   Yeah.
9      Q.   So you can short-circuit that if you
10  want to just say "I don't know."
11      A.   I don't know.
12           MR. SMITH:  Objection; form.
13      Q.   Okay.  You don't know.
14      A.   I don't know.
15      Q.   Was there an investigation conducted
16  about allegations that you had sexually harassed
17  women?
18           MR. SMITH:  Objection; form.
19      A.   I don't know.
20      Q.   You're not aware of whether or not
21  there was any investigation conducted about the
22  allegation that you had sexually harassed women?
23           MR. SMITH:  Objection; form.
24           THE WITNESS:  Can we take a break?
25           MR. SMITH:  He's got a question

Page 141

1   posed, so you answer the question and then
2   we can take a break.
3           THE WITNESS:  I'm sorry?
4      Q.   You can't take --
5           MR. SMITH:  You have to answer the
6   question, and then we'll take a break.
7           THE WITNESS:  Okay.
8      A.   Go ahead.
9      Q.   Do you remember the question, or
10  would you like --
11      A.   If you could restate it, that would
12  be helpful.
13      Q.   Do you know whether or not there was
14  an investigation conducted about Mr. Kippes's
15  allegation that you had sexually harassed women
16  at CCBH?
17           MR. SMITH:  Objection; form.
18      A.   There was.
19      Q.   Did you participate in that
20  investigation?
21           MR. SMITH:  We let you answer the
22  question and now we take a break.
23           MR. BOEHM:  I'm about done with this
24  line, but if you want to...
25           MR. SMITH:  That's what he wants to

36 (Pages 138 - 141)

Page 142

1 do. You told him he can take a break
2 whenever he wants, and you're a man of your
3 word.
4 MR. BOEHM: Right. I meant when
5 there's a need for it, not just a...
6 MR. SMITH: There's a need.
7 VIDEO TECHNICIAN: Off the record at
8 12:04.
9 (Recess taken at 12:04 p.m.)
10 (Back on the record at 12:15 p.m.)
11 VIDEO TECHNICIAN: On the record
12 12:15.
13 BY MR. BOEHM:
14 Q. Welcome back, Mr. Caraffi. When we
15 broke, I was asking you questions about the
16 investigation at CCBH into Mr. Kippes's
17 allegations of sexual harassment.
18 A. Uh-huh.
19 Q. Did you participate in that
20 investigation?
21 MR. SMITH: Objection; form.
22 A. I did.
23 Q. You were interviewed?
24 A. I was.
25 Q. Is that investigation concluded?

Page 143

1 A. It has concluded.
2 Q. What were the results of the
3 investigation?
4 MR. SMITH: Objection; form.
5 A. The results of the investigation were
6 found to be that he acted inappropriately, but I
7 am not sure what the outcome of that was through
8 our human resources department. Any actions
9 taken beyond are confidential.
10 Q. Were any actions taken as to your
11 employment in any way in connection with the
12 investigation into Mr. Kippes's allegations that
13 you had sexually harassed women?
14 MR. SMITH: Objection; form.
15 A. There was no basis. They didn't find
16 anything wrong.
17 Q. Okay. Were any -- so just to make
18 sure the question's clear, were any actions
19 taken as to your employment in connection with
20 the investigation conducted into Mr. Kippes's
21 allegation that you had sexually harassed women?
22 MR. SMITH: Objection; form.
23 A. No.
24 Q. And you don't know whether or not any
25 actions were taken with respect to Mr. Kippes?

Page 144

1 MR. SMITH: Objection; form.
2 A. No, I do not.
3 Q. This document that I've marked as
4 Exhibit 3 for purposes of your deposition is an
5 e-mail chain that involves Mr. Kippes.
6 I want to direct your attention --
7 you know how e-mail chains, when you print them
8 out, it works; you have to start at the bottom
9 and go up.
10 So if we are starting
11 chronologically, we see an e-mail that you wrote
12 on May 2nd, 2013 to somebody by the name of
13 Terry. Do you see that?
14 A. Can I read the whole document?
15 Q. Sure. I'm going to ask you some
16 specific questions, so --
17 A. Can I read through it real quick?
18 Q. Of course. It's a short document.
19 Just to be clear, how this will work is, if you
20 need to look at a part of a document to respond
21 to a question that has been asked, then you can
22 do that.
23 MR. SMITH: Well --
24 Q. So my question to you --
25 MR. SMITH: -- I'm going to have an

Page 145

1 objection.
2 MR. BOEHM: He can look -- he can
3 look --
4 MR. SMITH: He's going to look at the
5 document.
6 So go ahead and read it because he's
7 going to ask you about it.
8 Q. I'm going to ask you about certain
9 parts of documents. But right now my question
10 to you -- and you can look at whatever part of
11 the document you need to answer this question --
12 is whether or not you know who Terry is who's
13 addressed in your May 2nd e-mail.
14 Do you need to review the document?
15 MR. SMITH: Looks like he's got two
16 pages and I've got one.
17 MR. BOEHM: The second page printed
18 out, but it was blank.
19 MR. SMITH: Got it. Thank you.
20 A. Okay, Paul.
21 Q. My question is whether or not you
22 know who the Terry is who you addressed this
23 May 2nd, 2013 e-mail to.
24 A. It's Terry Allan.
25 Q. Who is Terry Allan?

37 (Pages 142 - 145)

1    A.   He's the commissioner of the Cuyahoga
2    County Board of Health.
3       Q.   Has Mr. Allan had any involvement in
4    efforts on behalf of Cuyahoga County Board of
5    Health to understand or address opioid abuse in
6    the county?
7          MR. SMITH:  Objection; form.
8       A.   Yes.
9       Q.   What has been the nature of
10   Mr. Allan's involvement in responding to opioid
11   abuse in Cuyahoga County?
12         MR. SMITH:  Objection; form.
13      A.   As a commissioner, he has
14   relationships with ODH and he has also been
15   helpful as far as building the local coalition
16   with some of his relationships.
17      Q.   In this e-mail you write that CCBH
18   had run into unforeseen snags regarding the
19   request for identified data from the Ohio Board
20   of Pharmacy.
21         MR. SMITH:  Where are you?  I'm
22   sorry.
23         MR. BOEHM:  It's the first sentence
24   of the e-mail that we've been looking at.
25         MR. SMITH:  Okay.  The bottom?  Okay.

1    A.   Right down here?
2       Q.   Yeah.  Do you see that?
3       A.   Yeah, I do.
4       Q.   Did you mean to write there
5    deidentified data or did you intend to write
6    identified data?
7          MR. SMITH:  Objection; form.
8       A.   I don't recall.
9       Q.   Well, if you look down further in
10   that same e-mail, you say:
11         "I thought it still would be
12      beneficial to request deidentified data to
13      obtain percentages of those decedents in
14      the OARRS system."
15      Do you see that?
16      A.   Yeah.  I don't recall.
17      Q.   You've had an opportunity to look at
18   this.  What does it mean to request deidentified
19   data from the OARRS system?
20         MR. SMITH:  Objection; form.
21      A.   You want to make sure that your data
22   you're collecting doesn't run into a violation
23   of HIPAA, so you always want deidentified data.
24      Q.   What does deidentified data mean?
25      A.   It would be data that you do not know

1    who the individual is.
2       Q.   So do you understand this e-mail
3    exchange to be in relation to a request that
4    CCBH had made to the Ohio Board of Pharmacy for
5    deidentified data from the OARRS system?
6          MR. SMITH:  Objection; form.
7       A.   We would only request the
8    deidentified data unless we went through an IRB.
9       Q.   Why had you requested deidentified
10   data from the OARRS system at this time?
11         MR. SMITH:  Objection; form.
12      A.   To assist with our overdose review
13   data collection efforts, is my recollection.
14      Q.   Okay.  And how would deidentified
15   data from the OARRS system assist in your review
16   of overdose data in Cuyahoga County?
17         MR. SMITH:  Objection; form.
18      A.   It would help individuals like
19   Dr. Gilson predict trends in the community.
20      Q.   Your e-mail suggests that you had ran
21   into unforeseen snags.  What did you mean by
22   that?
23      A.   I can't recall what that would have
24   been at that point in time.
25      Q.   You don't remember what complications

1    or barriers you faced?
2       A.   I do not.
3          MR. SMITH:  Objection; form.
4       Q.   The last sentence of your e-mail says
5    that you had submitted the proposal to ODH --
6    that's the Ohio Department of Health, right?
7       A.   Correct.
8       Q.   You had submitted the proposal to ODH
9    today, and hopefully this ship will sail and not
10   sink in the harbor.  Do you see that?
11      A.   I do.
12      Q.   Do you know if the Board of Pharmacy
13   did in fact provide Cuyahoga County Board of
14   Health the deidentified data that the County
15   requested at this time?
16         MR. SMITH:  Objection; form.
17      A.   I don't recall.
18      Q.   Do I understand correctly that the
19   purpose of requesting the deidentified data was
20   to share those data with the Cuyahoga County
21   Office of the Medical Examiner?
22      A.   I don't recall.
23      Q.   You indicated that Dr. Gilson could
24   use the deidentified data for purposes of his
25   review of overdose death data, right?

38 (Pages 146 - 149)

Page 150

1      A.   I did.
2      Q.   So is it your understanding that the
3   request for deidentified data was for that
4   purpose?
5          MR. SMITH:  Objection; form.
6      A.   I don't recall.
7          (DEPOSITION EXHIBIT 4 MARKED
8           FOR IDENTIFICATION at 12:25 p.m.)
9      Q.   I've marked the next document that
10  we're going to look at together as Exhibit 4.
11  It's a July 2013 e-mail exchange.
12         I want to direct your attention to
13  Mr. Gilson's e-mail that starts the chain on
14  July 2nd at 10:28 a.m. where he writes on the
15  bottom of the first page:
16         "The Board of Pharmacy provided me
17      with deidentified data from the Ohio
18      Automated Prescription Reporting System
19      (OARRS) on the Cuyahoga County 2012 heroin
20      deaths."
21         Do you see that?
22     A.   Can I read this document, Paul?
23         MR. SMITH:  Objection; form.
24     Q.   You can, but I want to ask my
25  question, and then I want you to answer the

Page 151

1   question I have.  And if you need to read the
2   document to answer my question, then you can,
3   but I want you to hear my question so that you
4   can decide whether or not reading it is helpful
5   or not.
6          Some of my questions you may need to
7   do that, and some will just be "Who's
8   Dr. Gilson."  You don't need to read the
9   document for that.  All right.  So let's take it
10  question by question.
11         MR. SMITH:  I want to note an
12  objection to your instructions.
13         MR. BOEHM:  That's fine.
14         MR. SMITH:  You've got a document.
15  He asked you a question.  Read the document
16  and --
17         MR. BOEHM:  I asked -- Scott.
18         MR. SMITH:  Let me finish, let me
19  finish.
20         MR. BOEHM:  Okay, go ahead.
21         MR. SMITH:  -- and answer his
22  question.
23     Q.   So my question right now is whether
24  or not I read correctly the language of
25  Mr. Gilson's e-mail from July 2nd, 2013 with

Page 152

1   respect to his receipt of deidentified data from
2   the OARRS system.
3          MR. SMITH:  Objection; form.
4      A.   I'm going to read the document, and
5   I'll answer your question.
6      Q.   You need to read the document, the
7   whole document, to answer that question?
8          MR. SMITH:  Objection; form.
9      Q.   So I have a question pending.  My
10  question is, do you need to read the entire
11  document to answer the question I just asked
12  you?
13     A.   I'm going to read the document, the
14  full document, before I answer your question.
15     Q.   But I have a question pending, and it
16  is whether or not you need to read the entire
17  document in order to answer the question I asked
18  you.
19     A.   Yes, I do.
20         MR. SMITH:  He said yes.
21     Q.   You do, okay.
22     A.   Okay, Paul.  Go ahead, I'm sorry.
23     Q.   Had I read that language correctly?
24     A.   Which language are we look- --
25         MR. SMITH:  Objection; form.

Page 153

1      Q.   Okay.  We'll go back to my question.
2      A.   Okay.
3      Q.   My question to you is, do you see
4   that Mr. Gilson on July 2nd, 2013 wrote:
5          "The Board of Pharmacy provided me
6      with deidentified data from the Ohio
7      Automated Prescription Reporting System
8      (OARRS) on the Cuyahoga County 2012 heroin
9      deaths."
10         MR. SMITH:  Objection; form.
11     A.   I do see that.
12     Q.   Is it your understanding that the
13  deidentified data that Mr. Gilson received in
14  July about Cuyahoga County 2012 heroin deaths is
15  in relation to the request that was being
16  discussed by you and Mr. Allan in May 2013?
17         MR. SMITH:  Objection; form.
18     A.   Yes, I recollect the conversation
19  that you linked them together.
20     Q.   Does this confirm for you that in
21  fact the County did receive the deidentified
22  data that it had requested from the Board of
23  Pharmacy?
24         MR. SMITH:  Objection; form.
25     A.   Dr. Gilson received it, not the

39 (Pages 150 - 153)

Page 154

1 County.
2     Q.    Dr. Gilson is an employee of Cuyahoga
3 County, correct?
4     A.    When you say -- are you referring to
5 CCBH or County?  Remember we talked about that
6 earlier, so that's what's -- that's...
7     Q.    So my question right now is asking
8 for confirmation that Dr. Gilson is an employee
9 of the County.
10     A.    Yes.
11     Q.    Okay.  Did Dr. Gilson share the
12 deidentified data that the Office of Medical
13 Examiner for Cuyahoga County received from the
14 OARRS system --
15         MR. SMITH:  Objection --
16     Q.    -- in the summer of 2013?
17         MR. SMITH:  Objection; form.
18     A.    I don't recall.
19     Q.    I know you've had a chance to read
20 the entire e-mail, so you saw that Mr. -- or
21 Dr. Gilson goes on to describe the OARRS system,
22 correct?
23     A.    What page are you on, Paul?
24     Q.    There are only two pages to the
25 document.

Page 155

1     A.    Okay.
2     Q.    His e-mail goes on to describe in
3 general terms the OARRS system, right?
4         MR. SMITH:  Objection; form.
5     A.    Yes.
6     Q.    And then it goes on to provide some
7 overview about the data that the medical
8 examiner's office had received from OARRS,
9 correct?
10         MR. SMITH:  Objection; form.
11     A.    Yes.
12     Q.    Do you see the paragraph about
13 two-thirds of the way down, Page 2 of Exhibit 4,
14 that begins "Sorry to throw a lot of numbers"?
15     A.    Yes, I do.
16     Q.    Dr. Gilson wrote:
17         "Sorry to throw a lot of numbers
18     around, but here is what I think this
19     means.  It has been suggested that a lot of
20     the current heroin problem is traceable
21     back to the overprescription of legal
22     painkillers."
23         Do you see that?
24     A.    I do.
25     Q.    And then he writes:

Page 156

1         "This confirms that the majority of
2     eventual heroin overdose victims are in the
3     medical system being treated for pain and
4     anxiety sedation."
5         Do you see that?
6     A.    I do.
7     Q.    What did you understand Dr. Gilson to
8 be saying when he wrote that?
9         MR. SMITH:  Objection; form.
10     A.    I can't respond to that.  I don't
11 know what Dr. Gilson was thinking when he wrote
12 the e-mail.
13     Q.    But I didn't ask you what Dr. Gilson
14 was thinking.  I asked you how you understand
15 what Dr. Gilson wrote.  If you can.
16         MR. SMITH:  Objection; form.
17     A.    I cannot at this point in time.
18     Q.    You don't understand what he wrote?
19     A.    I don't recall.
20     Q.    As you sit here today and you read
21 what Dr. Gilson wrote, do you have an
22 understanding of what he meant?
23         MR. SMITH:  Objection; form.
24     A.    Those are Dr. Gilson's words.  I
25 can't speak for him.

Page 157

1     Q.    I'm not asking you to speak for him.
2 I'm asking you to speak for you.
3         MR. SMITH:  Objection; form.
4     Q.    As you sit here today, do you have an
5 understanding about what Dr. Gilson meant when
6 he wrote the words that we just read?
7         MR. SMITH:  Objection; form.
8     A.    I don't recall.
9     Q.    I'm not asking you to recall
10 anything.
11         My question was, as you sit here
12 today, do you have an understanding about what
13 Dr. Gilson meant when he wrote the words we just
14 read?
15         MR. SMITH:  Objection; form.
16     A.    He's saying that prescription
17 medication is basically the connection for
18 heroin abuse.
19         MR. SMITH:  Objection.  Move to
20     strike.
21     Q.    When do you first recall having heard
22 that the worrisome trends related to the abuse
23 of prescription opioids and overdoses was
24 possibly being driven by increased prescribing
25 by physicians?

40 (Pages 154 - 157)

Page 158

1      MR. SMITH:  Objection; form.
2      A.   I don't recall a specific date.
3      Q.    You don't need to identify a specific
4  date.  That would be really hard, if not
5  impossible.
6          Can you generally say when you first
7  recall having heard that the worrisome trends
8  that we've talked about earlier today related to
9  abuse of opioids and overdoses might have been
10  driven by the increased prescribing by licensed
11  physicians of prescription opioid medications?
12      MR. SMITH:  Objection; form.
13      A.   2009 report from the Ohio Department
14  of Health.
15      Q.   Do you remember the name of that
16  report?
17      MR. SMITH:  Objection; form.
18      A.   I do not off the top of my head.
19      Q.   Does the Cuyahoga County Board of
20  Health prepare and issue to the public an annual
21  report?
22      MR. SMITH:  Objection; form.
23      A.   An organizational annual report, yes,
24  it does.
25      Q.   For how long has the Cuyahoga County

Page 159

1  Board of Health prepared and issued to the
2  public an organizational annual report?
3      A.   I can't answer that.
4      Q.   Has the Cuyahoga County Board of
5  Health been issuing an organizational annual
6  report since you joined the Cuyahoga County
7  Board of Health?
8      A.   I can't recall when it started, when
9  we started issuing annual reports.
10      Q.   Do you recall a time when the
11  Cuyahoga County Board of Health did not issue an
12  organizational annual report?
13      A.   I can't tell you when we started.  I
14  don't recall when we started an annual report.
15      Q.   I'm sorry, I had a different
16  question.
17          Do you recall a time when CCBH did
18  not issue an organizational annual report?
19      A.   I can't answer that question.  I
20  don't recall.
21      Q.   Respectfully, you either recall or
22  you don't recall.  So if you don't recall, the
23  answer would be, no, you don't recall.
24          So let me ask it again.
25      A.   Sure.

Page 160

1      Q.   Do you recall a time when the
2  Cuyahoga County Board of Health did not issue an
3  organizational annual report?
4      MR. SMITH:  Objection; form.  Please
5      don't instruct him what to do.  Just ask
6      the questions, please.
7      MR. BOEHM:  I'm just trying to be
8      helpful.
9      MR. SMITH:  You're not being helpful.
10      A.   I can't answer that question.
11      Q.   I'm asking you about, right now as
12  you sit here today --
13      A.   Uh-huh.
14      Q.   -- whether you recall a time when the
15  CCBH did not issue an organizational annual
16  report.
17      A.   And I'm -- I don't remember when we
18  started issuing annual reports.  I can't answer
19  that question.
20      Q.   That's not my question.  You're
21  answering a different question.
22      A.   Okay.
23      Q.   Can you, as you sit here today,
24  recall a time when CCBH did not issue an
25  organizational annual report?

Page 161

1      A.   No, I cannot.
2      Q.   Do you have any role or
3  responsibility in terms of the preparation of
4  the annual report for CCBH?
5      A.   Yes.
6      Q.   What is the nature of your role or
7  responsibility in terms of the preparation of
8  the CCBH annual report?
9      MR. SMITH:  Objection; form.
10      A.   It would be dependent upon what
11  program they were asking me to add information
12  to or one of my program managers to add
13  information to.
14      Q.   Is it fair to say that if there was a
15  program being described in the annual report
16  that fell under your area of responsibility,
17  then you would have some role, but if it was a
18  part -- if it was a program for which you did
19  not have responsibility, then you would not have
20  a role in terms of preparation of those sections
21  of the report?
22      MR. SMITH:  Objection --
23      Q.   Is that a fair summary?
24      MR. SMITH:  Objection; form.  Sorry.
25      A.   Yes.

41 (Pages 158 - 161)

Page 162

1    Q.   Do you recall when the Cuyahoga
2  County Board of Health's annual report first
3  referenced trends in terms of prescription drug
4  abuse and overdose?
5       MR. SMITH:  Objection; form.
6    A.   No, I do not.
7    Q.   Would you have had responsibility for
8  sections of the CCBH annual report that
9  reference unintentional prescription drug
10 poisonings and unused medications?
11      MR. SMITH:  Objection; form.
12   A.   I don't recall at that point in time.
13 In most cases, annual reports would be the
14 responsibility of program managers, so I don't
15 recall if I added narrative or not.
16   Q.   If an annual report had a section on
17 drug abuse or overdose data, is that an area for
18 which you would have some responsibility?
19   A.   If it had to do with data, it would
20 have been from partners, our part of the
21 coalition.
22   Q.   And would you have had the
23 responsibility of reviewing those sections of
24 the annual report before they were finalized?
25   A.   Yes.

Page 163

1    Q.   The next document I'm going to show
2  you is going to be marked as Exhibit 5.
3       (DEPOSITION EXHIBIT 5 MARKED
4        FOR IDENTIFICATION at 12:40 p.m.)
5       MR. BOEHM:  I need one back so that I
6  can give Scott a copy.
7       MR. SMITH:  Thank you.
8       MR. BOEHM:  Sure.
9    Q.   I've marked as Exhibit 5 the 2010
10 annual report from Cuyahoga County Board of
11 Health.  Do you see that?
12   A.   I do.
13   Q.   Do you recall this particular annual
14 report?
15   A.   I mean there's -- I know it's an
16 annual report.  I mean, there's nothing that
17 jumps out at me, if that's what you're asking.
18   Q.   There's a section of this report
19 that's titled "Unintentional Prescription Drug
20 Poisonings and Unused Medications."  It's on
21 Page 9.
22   A.   Okay.
23   Q.   And my question is whether you would
24 have reviewed this section of the annual report
25 before it was finalized.

Page 164

1       MR. SMITH:  You're on Page 9, you
2  said?
3       MR. BOEHM:  Correct.
4       MR. SMITH:  Thank you.
5       THE WITNESS:  Want to see it?
6       MR. SMITH:  Paul, while he's reading
7  that, we have no Bates stamps on this,
8  right?
9       MR. BOEHM:  I believe that this
10 document is publicly available on the
11 CCBH's website.
12      MR. SMITH:  Okay.  It may be, but I'm
13 just asking -- there's no Bates stamps on
14 what is provided in discovery or exchanged?
15      MR. BOEHM:  I can't say whether --
16      MR. SMITH:  -- Bates stamp?
17      MR. BOEHM:  So you're right, this
18 document does not have a Bates stamp on it.
19 Whether or not it was produced with a Bates
20 stamp in the litigation, I am not a hundred
21 percent sure about.  But I will say -- I'm
22 being told by my colleagues that there is a
23 version that is Bates stamped --
24      MR. SMITH:  Okay, great.
25      MR. BOEHM:  -- that is also available

Page 165

1  publicly.
2       MR. SMITH:  Can we just read that in
3  the record so we all have the same --
4       MR. BOEHM:  Sure.  That's fair.
5       MR. SMITH:  He's reading it, so I'm
6  just -- housekeeping.
7       MR. BOEHM:  Absolutely.  A produced
8  version of the 2010 annual report has the
9  Bates stamp Cuyahoga 000018233.
10      MR. SMITH:  Thank you.
11      MR. BOEHM:  That's the first page of
12 that particular document.
13      (Reporter clarification.)
14   Q.   Mr. Caraffi, do you remember the
15 question that I had asked you?
16   A.   If you could share that with me
17 again, I would really appreciate it, Paul.
18   Q.   No problem.  My question is whether
19 or not you would have reviewed the section of
20 the 2010 annual report on Page 9 entitled
21 "Unintentional Drug Poisonings and Unused
22 Medications" before it was finalized.
23   A.   For content, yes.  Spelling, grammar,
24 yes.
25   Q.   Well, what about -- setting aside

42 (Pages 162 - 165)

1   spelling and grammar, would you have reviewed
2   this section for substantive content and
3   accuracy?
4        MR. SMITH:  Objection; form.
5        A.   Yes.
6        Q.   This 2010 annual report indicates
7   that there was an alarming trend in Ohio -- I'm
8   looking in the very first sentence.
9        A.   Uh-huh.
10       Q.   -- in terms of an increase in
11  prescription drug abuse and overdose.  Do you
12  see that?
13       A.   I do.
14       Q.   And then it references this campaign
15  that we talked about earlier, "Prescription for
16  Prevention: Stop the Epidemic."  Do you see
17  that?
18       A.   I do.
19       Q.   Is that an Ohio Department of Health
20  campaign?
21       MR. SMITH:  Objection; form.
22       A.   Yes.
23       Q.   Did Cuyahoga County Board of Health
24  have some role with respect to the Ohio
25  Department of Health campaign entitled

1   "Prescription for Prevention: Stop the
2   Epidemic"?
3        A.   Yes.
4        Q.   What was CCBH's role with respect to
5   this particular campaign?
6        MR. SMITH:  Objection; form.
7        A.   I mentioned to you earlier it was the
8   relationship with ODH and I think it was
9   FleishmanHillard to create awareness in Cuyahoga
10  County about the possibilities or which
11  currently taking place in Ohio as it related to
12  the opioid epidemic.
13       Q.   It's obviously referenced in a 2010
14  report.
15       Do you know if this campaign had
16  already been launched prior to 2010?
17       A.   Yes.  This -- we talked about this
18  morning it was 2009 or 2010 when the
19  Prescription for Prevention came out.
20       Q.   With respect to the term "epidemic"
21  that is in the title of this campaign, what is
22  your understanding about what the word
23  "epidemic" refers to in this context?
24       A.   I would say an increase in morbidity
25  or mortality related to infectious disease or

1   unintentional injury in a community during a
2   certain time period.
3        So if we're speaking about this, if I
4   look down there, we could talk about a person
5   between opioid deaths and unintentional
6   injuries --
7        (Reporter clarification.)
8        A.   We could be talking about
9   unintentional poisonings or traffic-related
10  accidents, as it's mentioned in here.
11       Q.   Right.  But the campaign is called
12  Prescription for Prevention.  That's not related
13  to traffic accidents, right?
14       MR. SMITH:  Objection; form.
15       A.   I understand.
16       Q.   Right?
17       A.   Correct.
18       Q.   Is the epidemic that's being referred
19  to here in the 2010 CCBH annual report an
20  epidemic related to abuse of prescription
21  opioids and overdoses?
22       MR. SMITH:  Objection; form.
23       A.   Based upon information from the Ohio
24  Department of Health, yes.
25       Q.   And CCBH had partnered with the Ohio

1   Department of Health for purposes of this
2   campaign in Cuyahoga County, correct?
3        A.   Yes.
4        Q.   The first bullet point of this
5   section of the report states that in 2007,
6   unintentional drug poisonings became the leading
7   cause of injury death in Ohio.  Do you see that?
8        A.   I do.
9        Q.   Do you know when in Cuyahoga County
10  unintentional drug poisoning became the leading
11  cause of injury death?
12       MR. SMITH:  Objection; form.
13       A.   I can't recall.
14       Q.   Do you know if it was before or after
15  2007?
16       A.   I can't recall.
17       Q.   Do you see that in the next full
18  paragraph, it says Cuyahoga County is one of the
19  top five counties in Ohio for reported
20  prescription drug overdoses?
21       A.   I do.
22       Q.   For how long prior to 2010 had it
23  been true that Cuyahoga County was seeing
24  worrisome trends in terms of reported
25  prescription drug overdose?

43 (Pages 166 - 169)

Page 170

1    MR. SMITH:  Objection; form.
2    A.   I don't recall.
3    Q.   Do you recall when you first
4  determined that there was an alarming trend of
5  prescription drug abuse and overdose in Cuyahoga
6  County?
7    A.   I don't recall.
8    Q.   You indicated earlier that there were
9  certain individuals, partners, of CCBH who
10  undertook to try and understand the causes of
11  these trends of prescription drug abuse and
12  overdoses around the time of this annual report
13  in 2010.
14    Do you recall what their conclusions
15  were?
16    A.   Partners at CCBH?  I don't understand
17  the question.
18    Q.   You gave some names of people who you
19  believed to have been primarily engaged in
20  investigating and understanding the causes and
21  contributing factors to trends of opioid abuse
22  and overdoses in Cuyahoga County earlier today.
23    And my question to you right now is
24  whether or not you recall what those individuals
25  concluded about the causes and contributing

Page 171

1  factors of the trends of opioid-related abuse
2  and overdoses.
3    A.   I don't understand the question.  Are
4  you asking about partners with Cuyahoga County
5  Board of Health or partners at the task force?
6    You said CCBH, so when we talked
7  about it earlier, you said CCBH was the board of
8  health.  Are you talking about the coalition or
9  the board of health?
10    Q.   I'm talking about both.  I'm talking
11  about the individuals who you identified earlier
12  today who you had understood in the 2010 and
13  2011 time frame to have undertaken an
14  investigation of the causes of trends in
15  prescription drug abuse and overdose and whether
16  or not you know what those individuals concluded
17  as part of their investigation.
18    MR. SMITH:  Objection; form.
19    A.   I don't recall in 2010.
20    Q.   When do you recall first hearing the
21  conclusions that had been reached by experts in
22  the community about the potential causes of
23  prescription drug abuse and overdose trends?
24    MR. SMITH:  Objection; form.
25    A.   I would say collectively with

Page 172

1  partners, 2015 is we gained a general knowledge
2  of the history of the problem.
3    Q.   So the causes that you identified in
4  your lectures in 2011, where did you come up
5  with that information?
6    A.   Those would have been from members of
7  the Ohio Department of Health or other
8  individual members on the coalition.
9    Q.   Did you undertake -- well, let me
10  back up a second.
11    For purposes of your presentations
12  and discussions with members of the community
13  about the causes of opioid abuse and overdoses
14  in Cuyahoga County that go back to 2010, 2011,
15  2012, is it your testimony that the exclusive
16  source of information you had on that subject
17  was the Ohio Department of Health?
18    MR. SMITH:  Objection; form.
19    Q.   And we'll look at documents, but I
20  just want to get your honest under oath
21  testimony about that.
22    MR. SMITH:  Objection; form.
23    A.   I recall using Governor Strickland's
24  report in April of 2010 as a guide for what we
25  were looking at as a task force, and that was

Page 173

1  used through the guidance of ODH.
2    Q.   In your 2010 annual report for CCBH,
3  you wrote:
4    "Cuyahoga County is one of the top
5    five counties in Ohio for reported
6    prescription drug overdoses."
7    Do you see that?
8    A.   I do.
9    Q.   Did I read that correctly?
10    A.   Uh-huh.
11    Q.   What did Cuyahoga County do in 2010
12  to try and investigate or understand why
13  Cuyahoga County was one of the top five counties
14  in Ohio for reported prescription drug
15  overdoses?
16    MR. SMITH:  Objection; form.
17    A.   That information came from Ohio
18  Department of Health, and those were in the
19  beginning phases of building a coalition.
20    Q.   Not my question.
21    What did, if anything -- if the
22  answer is nothing, then I'll take that, but my
23  question now is this:
24    What did Cuyahoga County do in or
25  around 2010 to investigate the potential reasons

Page 174

1  why Cuyahoga County was one of the top five
2  counties in Ohio for reported prescription drug
3  overdoses?
4      MR. SMITH:  Objection; form.
5      A.   I can't recall at that point in time
6  what we did.
7      Q.   Do you know if Cuyahoga County did
8  anything to investigate the reasons why it was
9  one of the top five counties in Ohio for
10  reported prescription drug overdoses?
11      MR. SMITH:  Objection; form.
12      A.   I can't recall.
13      Q.   You don't recall anything that the
14  County or CCBH did to try and understand why
15  Cuyahoga County was one of the top five counties
16  in Ohio for reported prescription drug
17  overdoses.
18      MR. SMITH:  Objection; form.
19      A.   I don't recall.
20      Q.   You don't recall anything.
21      MR. SMITH:  Objection; form.
22      A.   I don't recall.
23      Q.   Do you recall when Cuyahoga County
24  first undertook to try and understand why it was
25  one of the top counties in Ohio for prescription

Page 175

1  drug overdoses?
2      MR. SMITH:  Objection; form.
3      A.   Could you ask that question again,
4  please?
5      Q.   Sure.  Do you recall when Cuyahoga
6  County first undertook to try and understand why
7  it was one of the top counties in Ohio for
8  prescription drug overdoses?
9      MR. SMITH:  Objection; form.
10      A.   I don't recall.
11      Q.   Is it your general recollection that
12  CCBH never did undertake to try and understand
13  the causes of why Cuyahoga County was one of the
14  top counties in Ohio for prescription drug
15  overdoses as of 2010?
16      MR. SMITH:  Objection; form.
17      A.   I can't recall the activities in
18  2010.
19      Q.   Sir, you were the head of the
20  Cuyahoga County Opiate Task Force as of 2010,
21  right?
22      A.   We were still under the Partnership
23  for Prevention.
24      Q.   You were the chair of the Cuyahoga
25  County Opiate Task Force from the first day of

Page 176

1  its formation, right?
2      A.   The Cuyahoga County Opiate Task
3  Force.  I was a member of the task force for the
4  Prescription of Prevention, which you asked me
5  earlier.
6      Q.   I'm asking you right now about the
7  Cuyahoga County Opiate Task Force.  You were the
8  chair of the Cuyahoga County Opiate Task Force
9  from the very first day of its creation, right?
10      A.   Yes.
11      Q.   Okay.  We only get a chance to talk
12  to you once, Mr. Caraffi, so my question --
13      A.   I understand.
14      Q.   And you're the only chair.
15      A.   Correct.
16      Q.   You're the only person who had that
17  role, right?
18      A.   Correct.
19      MR. SMITH:  Objection; form.
20      Q.   So my question to you is, in your
21  capacity as the chair of the Cuyahoga County
22  Opiate Task Force, do you know whether Cuyahoga
23  County or Cuyahoga County Board of Health
24  undertook to try and understand the reasons why
25  Cuyahoga County was one of the top counties in

Page 177

1  Ohio for prescription drug overdoses in 2010?
2      MR. SMITH:  Objection; form.
3      A.   I do not recall.
4      MR. SMITH:  You've asked this five
5  times.  You're starting to badger the
6  witness, and we're going to stop this right
7  now or --
8      MR. BOEHM:  Good luck with that.  I'm
9  not badgering the witness.
10      MR. SMITH:  No, you've asked him four
11  times the same question, and you don't like
12  the answer, you're getting the same answer.
13  Stop badgering him.
14      MR. BOEHM:  I'm not badgering the
15  witness at all, and it's ridiculous for you
16  to even make the suggestion.
17      MR. SMITH:  It's not ridiculous.
18      MR. BOEHM:  I'm asking my questions.
19  You're not doing anything by arguing about
20  it.
21      MR. SMITH:  No, I'm not arguing about
22  it.  And quit instructing him what to do.
23  Just ask the question.
24      MR. BOEHM:  I am asking questions.
25      Q.   When --

45 (Pages 174 - 177)

Page 178

1     MR. SMITH:  On that subject.
2     MR. BOEHM:  Can I please ask the
3  question?
4     MR. SMITH:  No.  On that subject, do
5  you guys want to break for lunch?  It's 1.
6     MR. BOEHM:  I'm about done with this
7  line, so let me just finish it up and --
8     MR. SMITH:  You've got a few minutes,
9  okay.  That's fine.
10     MR. BOEHM:  -- and then we can break
11  in just a few minutes.
12     Q.    When -- was there ever a time that
13  the Cuyahoga County Board of Health undertook to
14  investigate the potential causes for why
15  Cuyahoga County was experiencing worrisome
16  trends in prescription opioid abuse or
17  overdoses?
18     MR. SMITH:  Objection; form.
19     A.   I don't recall.
20     Q.    You don't recall sitting here today
21  there ever being a time when the Cuyahoga County
22  Board of Health undertook to try and understand
23  why the county was one of the top counties in
24  the state for prescription drug overdoses?
25     MR. SMITH:  Objection; form.

Page 179

1     A.   I don't recall.
2     Q.    Do you recall there ever being a time
3  when others in Cuyahoga County -- from outside
4  of CCBH ever undertook to try and understand why
5  Cuyahoga County was one of the top counties in
6  the state for reported prescription drug
7  overdoses?
8     MR. SMITH:  Objection; form.
9     A.   Ohio Department of Health produced
10  that data.
11     Q.   I'm asking about Cuyahoga County.
12     As you sit here today, do you recall
13  there ever being a time when officials from
14  Cuyahoga County or employees for Cuyahoga County
15  ever undertook to try and understand the reasons
16  why Cuyahoga County was one of the top counties
17  in the state for reported prescription drug
18  overdoses as of 2010?
19     MR. SMITH:  Objection; form.
20     A.   I do not recall as of 2010.
21     Q.   Do you recall any time when Cuyahoga
22  County employees, officials, or other
23  individuals on behalf of the County undertook to
24  try and understand why Cuyahoga County was one
25  of the leading counties in the state for

Page 180

1  prescription drug overdoses?
2     MR. SMITH:  Objection; form.
3     A.   Yes.
4     Q.   When was that?
5     A.   I can't give you specific dates.  I
6  don't recall specific dates for the question
7  that you're asking.
8     Q.   Can you tell me a year?
9     A.   Yes.
10     Q.   What year?
11     A.   I can tell you in 2013, the
12  development and the outreach and awareness
13  associated with Project DAWN, as an example.
14     Q.   Is it your -- as you sit here today,
15  is 2013, to the best of your recollection, the
16  first time that you're aware that officials on
17  behalf of or from Cuyahoga County began to
18  investigate the reason or reasons why this
19  county was one of the top counties in the state
20  for reported prescription drug overdoses?
21     MR. SMITH:  Objection; form.
22     A.   I can't recall the specific
23  activities of 2010 or 2011 as it relates to task
24  force activities to increase awareness.
25     Q.   And you're not aware of any

Page 181

1  activities that the County itself conducted in
2  2010 or 2011 or 2012 to try and understand why
3  the county was one of the top counties in the
4  state for prescription drug overdoses?  Is that
5  right?
6     MR. SMITH:  Objection; form.
7     A.   I don't recall.
8     Q.   But you're not disputing the fact
9  that in 2010, as you wrote in your annual
10  report, that Cuyahoga County was one of the top
11  counties in the state for reported prescription
12  drug overdoses.
13     MR. SMITH:  Objection; form.
14     A.   That information came from Ohio
15  Department of Health.
16     Q.   And that's obviously information that
17  you had in 2010 because you put it in your
18  report.  Fair?
19     MR. SMITH:  Objection; form.
20     A.   Correct.
21     Q.   What did the Cuyahoga County Board of
22  Health do in 2010 to follow up on the
23  information it had received from the Ohio
24  Department of Health that Cuyahoga County was
25  one of the top counties in the state for

46 (Pages 178 - 181)

Page 182

1  reported prescription drug overdoses?
2      MR. SMITH:  Objection; form.
3      A.  I don't recall.
4      Q.  Do you recall if the County did
5  anything to follow up on that information?
6      MR. SMITH:  Objection; form.
7      A.  I don't recall.
8      MR. BOEHM:  Okay.  Now's a fine time
9  for a break.  Thank you.
10      VIDEO TECHNICIAN:  Off the record
11  1:02.
12      (Lunch recess taken at 1:02 p.m.)
13      (Back on the record at 1:43 p.m.)
14      VIDEO TECHNICIAN:  We are back on the
15  record 1:43.  Media Number 3, Caraffi
16  deposition.
17  BY MR. BOEHM:
18      Q.  Mr. Caraffi, you indicated earlier
19  today that the Cuyahoga County Board of Health
20  had received grant funding from the Ohio
21  Department of Health for 2019, but not for any
22  years beyond 2019.  Is that correct?
23      A.  Yes.  Sorry about that.  Go ahead.
24      Q.  Do you want to go off the record?
25      A.  No, no, we're good.

Page 183

1      Q.  Do you know why the Ohio Department
2  of Health extended the injury prevention grant
3  to CCBH for only one additional year?
4      A.  Yes.
5      Q.  Why?
6      A.  We applied for a grant, a competitive
7  grant, and we did not get awarded out of the
8  seven other counties that applied.  The money
9  that they put forth was to continue some of the
10  task force activities or new ideas that are
11  generated through the State, through the pick
12  list, as I mentioned earlier, focusing on
13  specific trends related to the opioid epidemic.
14      Q.  Why was Cuyahoga County Board of
15  Health not selected for grant funding beyond
16  2019?
17      MR. SMITH:  Objection; form.
18      A.  Our grant did not score high enough
19  to be awarded.  It was a competitive cycle.
20      Q.  Do you have any understanding as to
21  why the grant application from the CCBH did not
22  score high enough?
23      A.  I did not -- or I do not, I'm sorry.
24  I do not know.
25      Q.  Were you involved in the application

Page 184

1  process?
2      A.  I was involved in writing some of the
3  application, yes.
4      Q.  Have you ever had a conversation or
5  has anybody from CCBH had a conversation with
6  anybody at the Ohio Department of Health about
7  why the CCBH grant application did not score
8  high enough?
9      MR. SMITH:  Objection; form.
10      A.  Yes.
11      Q.  Did you have that conversation or did
12  somebody else?
13      A.  I did with April Vince, and they
14  didn't feel that our grant met the scoring
15  criteria to be awarded at that point in time.
16      Q.  Who did you speak with at the Ohio
17  Department of Health about that?
18      A.  Sara Morman.
19      Q.  What did Ms. Morman say to you about
20  why?
21      MR. SMITH:  Objection; form.
22      A.  She said we did not meet the scoring
23  criteria; that three other grant applications
24  were far and above the other seven that applied.
25      Q.  Did she say what the differences were

Page 185

1  between the Cuyahoga County Board of Health
2  grant and the ones that were successful?
3      A.  She gave us some guidance on the pick
4  list, the choices, to help us for a next round
5  of funding when it becomes available.
6      Q.  What did she say?
7      A.  Focus on linkages to care for people
8  coming out of recovery or correctional
9  facilities through reentry programs, focus on
10  outreach and awareness through syringe exchange
11  programs were two of the suggested areas where
12  we needed improvement.
13      Q.  Is there anything else that you
14  recall from that conversation?
15      A.  No, not that I recall.
16      Q.  Just flipping back to this 2010
17  annual report and the reference on Page 9 to
18  Cuyahoga County being among the top counties in
19  Ohio for reported prescription drug overdoses,
20  you indicated that that information is data you
21  received from the Ohio Department of Health,
22  correct?
23      MR. SMITH:  Objection; form.
24      A.  I indicated that that information
25  came from the Ohio Department of Health.

47 (Pages 182 - 185)

1    Q.   Do you know by what means the Ohio
2 Department of Health communicated to Cuyahoga
3 County that Cuyahoga County was one of the top
4 counties in Ohio for reported prescription drug
5 overdoses?
6        MR. SMITH:  Objection; form.
7    A.   I don't recall.
8    Q.   Do you know if Ohio Department of
9 Health data about the number of prescription
10 drug overdoses on a county-by-county basis is
11 publicly available?
12   A.   It is listed on their website.
13   Q.   Was that true in 2010?
14   A.   I do not recall.
15   Q.   Do you know how Cuyahoga County Board
16 of Health learned that Cuyahoga County was one
17 of the top five counties in Ohio for reported
18 prescription drug overdoses?
19   A.   I do not recall.
20        MR. SMITH:  Objection; form.
21   Q.   Was there something that you learned
22 about the potential causes of opioid abuse and
23 overdose trends in 2015 that you did not already
24 know?
25        MR. SMITH:  Objection; form.

1    A.   I do not recall.
2    Q.   In 2012, do you recall anything that
3 you learned about the potential causes of opioid
4 abuse and overdoses in Cuyahoga County that you
5 did not already know?
6        MR. SMITH:  Objection; form.
7    A.   I do not recall.
8    Q.   In 2011, is there anything that you
9 learned about the potential causes of opioid
10 abuse and overdoses in Cuyahoga County that you
11 did not already know?
12        MR. SMITH:  Objection; form.
13   A.   I do not recall.
14   Q.   In 2010, is there anything that you
15 learned about the potential causes of opioid
16 abuse and overdoses in Cuyahoga County that you
17 did not already know?
18        MR. SMITH:  Objection; form.
19   A.   I do not recall.
20   Q.   Going back to 2015, did you learn
21 anything in 2015 about the potential causes of
22 what is referred to as the opiate epidemic in
23 Cuyahoga County that you did not previously
24 know?
25        MR. SMITH:  Objection; form.

1    A.   In 2015, based upon information from
2 Dr. Gilson, we'd seen an increase in fentanyl.
3    Q.   When you say an increase in fentanyl,
4 do you mean to say that in 2015, Dr. Gilson
5 informed you that Cuyahoga County was
6 experiencing an increase in fentanyl-related
7 overdose deaths?
8    A.   Yes.
9        MR. SMITH:  Objection; form.
10   Q.   Is there anything else that you
11 learned about the potential causes of opioid
12 abuse and overdoses in 2015 that you didn't
13 already know?
14        MR. SMITH:  Objection; form.
15   A.   I do not recall.
16   Q.   Was there anything you learned about
17 the potential causes of opioid abuse and
18 overdoses in 2014 that you did not already know?
19        MR. SMITH:  Objection; form.
20   A.   I do not recall.
21   Q.   In 2013, was there anything you
22 learned about the potential causes of opioid
23 abuse and overdose trends in Cuyahoga County
24 that you did not already know?
25        MR. SMITH:  Objection; form.

1    A.   I do not recall.
2    Q.   How about 2014?
3        MR. SMITH:  Objection; form.
4    A.   I do not recall.
5    Q.   2013?
6        MR. SMITH:  Objection; form.
7    A.   I do not recall.
8    Q.   2012?
9        MR. SMITH:  Objection; form.
10   A.   I do not recall.
11   Q.   2011?
12        MR. SMITH:  Objection; form.
13   A.   I do not recall.
14   Q.   How about in 2010?
15        MR. SMITH:  Objection; form.
16   A.   I do not recall.
17   Q.   You indicated earlier that you were
18 aware of Governor Strickland having formed a
19 prescription drug abuse task force in 2010.  Do
20 you remember that?
21   A.   Yes.
22   Q.   And you indicated that that task
23 force prepared a report?
24   A.   Yes.
25   Q.   Is it fair to say that you read the

Page 190

1    report issued by the Ohio Prescription Drug
2    Abuse Task Force that was formed by Governor
3    Strickland in 2010 when that report was
4    finalized?
5        A.    To my recollection, yes.
6        Q.    Do you recall that the final report
7    from the task force for Ohio prescription drug
8    abuse formed by Governor Strickland included a
9    section about how prescription opioid abuse and
10   overdose became an epidemic?
11           MR. SMITH:  Objection; form.
12       A.    I do not recall.
13       Q.    You don't recall sitting here whether
14   or not the report issued in 2010 by the
15   prescription drug abuse task force for Ohio
16   included a section about how an epidemic came to
17   pass?
18           MR. SMITH:  Objection; form.
19       A.    Are you talking about contributing
20   factors?
21       Q.    Yes.
22       A.    I am aware of contributing factors.
23       Q.    Okay.  And do you recall that the
24   2010 task force on prescription drug abuse that
25   was formed by Governor Strickland included a

Page 191

1    section in its final report on contributing
2    factors to the epidemic?
3            MR. SMITH:  Objection; form.
4        A.    I don't recall.
5        Q.    But you said you are aware of
6    contributing factors.
7            Did you learn about the contributing
8    factors to the opioid abuse epidemic in Cuyahoga
9    County from your review of the Ohio Prescription
10   Drug Abuse Task Force report in 2010?
11           MR. SMITH:  Objection; form.
12       A.    Yes, we used some of the information
13   provided in that report --
14       Q.    I'm going to --
15       A.    -- the Ohio Department of Health and
16   the results of that task force that offered
17   counties in Ohio or a task force in Ohio risk
18   factors.
19       Q.    Thank you.  I'm going to mark that
20   2010 Ohio Prescription Drug Abuse Task Force
21   report as Exhibit 6 for purposes of your
22   deposition here today.
23           (DEPOSITION EXHIBIT 6 MARKED
24           FOR IDENTIFICATION at 1:54 p.m.)
25       A.    Okay.

Page 192

1        Q.    And I in particular want to ask you
2    questions about the section of the report
3    entitled "How did this become an epidemic?"
4            I'm handing you Exhibit 6.
5        A.    Thank you.
6        Q.    The section "How did this become an
7    epidemic?" begins on Page 21.
8        A.    I have to read this report before you
9    ask questions.
10       Q.    Well, no, this is a long report.
11   Most of it doesn't concern the questions I have
12   to ask for you.
13           So my question right now is going to
14   be directed at the section "How did this become
15   an epidemic?" on Page 21.
16       A.    I'm going to go through the report.
17           MR. BOEHM:  Okay.  We're going to go
18   off the record.
19           MR. SMITH:  We'll stay on the record.
20       Q.    If you're going to insist on reading
21   the report from front to back -- it's a long
22   report -- when I have questions about only one
23   section of the report and my questions won't be
24   directed to sections that are not from that
25   particular section, then we're going to get on

Page 193

1    the phone right now with Special Master Cohen.
2            MR. BOEHM:  This is a 90-page report.
3    It's not appropriate to insist that the
4    witness read every page of it when my
5    questions will not be related to sections
6    other than the one I've identified.
7            MR. SMITH:  Well, we can get on
8    the --
9            MR. BOEHM:  Okay.  We're going to go
10   off the record.
11           MR. SMITH:  -- phone with the special
12   master.
13           MR. BOEHM:  Let's get on the phone.
14           VIDEO TECHNICIAN:  Off the record
15   1:56.
16           (Recess taken at 1:56 p.m.)
17           (Back on the record at 2:20 p.m.)
18           VIDEO TECHNICIAN:  On the record
19   2:20.
20           MR. BOEHM:  Okay.  We're back from a
21   break during which we spoke with Special
22   Master Cohen on the subject of whether or
23   not the witness needed to read all of this
24   document that's been marked as Exhibit 6 in
25   order to answer questions.

49 (Pages 190 - 193)

Page 194

1     The special master ruled that the
2   witness could take as long as he wanted to
3   review the document off the record such
4   that he was comfortable in responding to
5   questions.
6     My understanding is that the witness
7   has declined to do that and that we're
8   going to proceed with the questions that I
9   have to ask.
10    MR. SMITH:  That's not what happened,
11  but I will respond.  Special master said if
12  you're going to read the entire document,
13  he'll do it off the record and off the
14  clock.
15    However, according to Mr. Boehm, it's
16  only going to be three pages and it's only
17  about three pages, so Mr. Caraffi will read
18  those three pages.  And you will point out
19  the three pages, and he'll take the time to
20  read those three pages and then you can ask
21  him questions about those three pages.  And
22  then we'll go on a case-by-case or
23  question-by-question basis, and if he has
24  to go back through the rest of the
25  document, then he can do that and he can do

Page 195

1   that off the record.
2     MR. BOEHM:  Okay.
3     Q.   The special master has made it clear
4   that if there are portions of the document you
5   feel you need to review, you can, but it's going
6   to be off the record.  So you just let me know
7   if we need to go back off the record in order to
8   do that.
9     A.   Okay.
10    Q.   As I indicated earlier, the report
11  from October 2010 from the Ohio Prescription
12  Drug Abuse Task Force that you said you had
13  reviewed at the time it was published, contains
14  a section entitled "How did this become an
15  epidemic?" and that's on Page 21.
16    Do you see that section?
17    A.   I do.  I'm reading it.
18    Q.   Did you want to read that section
19  before I ask you any questions?
20    A.   Please.
21    MR. BOEHM:  Let's go off the record.
22    MR. SMITH:  No, he can stay on the
23  record reading these three pages.  It was
24  the whole document you want him to go off
25  the record on.

Page 196

1     MR. BOEHM:  That was not the special
2   master's ruling.
3     MR. SMITH:  Sure, it was.
4     MR. BOEHM:  No.  Let's go off the
5   record.
6     MR. SMITH:  No, we're going to stay
7   on the record.
8     MR. BOEHM:  Okay.  Let's go off the
9   record to call Special Master Cohen.
10    MR. SMITH:  Call him again.  It's
11  just three pages you said.
12    VIDEO TECHNICIAN:  Off the record
13  2:22.
14    (Off the record at 2:22 p m.)
15    (Back on the record at 2:24 p.m.)
16    VIDEO TECHNICIAN:  On the record
17  2:24.
18  BY MR. BOEHM:
19    Q.   Mr. Caraffi, you've had an
20  opportunity now to read the section entitled
21  "How did this become an epidemic?" correct?
22    A.   Correct.
23    Q.   And that section goes from Page 21 to
24  Page 24.  Do you see that?
25    A.   I do.

Page 197

1     Q.   Do you see at the bottom of Page 21
2   there's a graphic or a figure that identifies
3   contributing factors to prescription drug abuse
4   and overdoses?
5     A.   I do.
6     Q.   And in the middle, there's this kind
7   of circle that says the word "Epidemic" with
8   squares that contain contributing factors with
9   arrows pointing toward the "Epidemic."  Do you
10  see that?
11    A.   I do.
12    Q.   Have you seen this graphic before?
13    A.   Yes, I have.
14    Q.   You've used this or a very similar
15  graphic in your own presentations that describe
16  the contributing factors to opioid abuse and
17  overdoses in Cuyahoga County, correct?
18    MR. SMITH:  Objection; form.
19    A.   I have.
20    Q.   Do you see that this graphic
21  identifies six contributing factors to the
22  epidemic?
23    MR. SMITH:  Objection; form.
24    A.   Yes, I do.
25    Q.   Okay.  I want to ask you some

50 (Pages 194 - 197)

Page 198

1 questions about those.
2        If you turn to the next page, which
3 is Page 22 of this report, the first
4 contributing factor that this task force
5 identified was changes in clinical pain
6 management.  Do you see that?
7     A.  I do see that.
8     Q.  And do you see that in that first
9 paragraph under "Changes in Clinical Pain
10 Management" reference is made to an Ohio law
11 regarding the treatment of intractable pain.  Do
12 you see that?
13    A.  I do.
14    Q.  What is your understanding about what
15 the Ohio Intractable Pain Act did to change
16 clinical pain management in Ohio?
17        MR. SMITH:  Objection; form.
18    A.  I don't know.
19    Q.  Have you ever heard of the
20 Intractable Pain Act?
21        MR. SMITH:  Objection; form.
22    A.  I have.
23    Q.  What is your understanding of that
24 act of legislation?
25        MR. SMITH:  Objection; form.

Page 199

1     A.  I do not know.
2     Q.  You don't know anything about it?
3        MR. SMITH:  Objection; form.
4     A.  I do not know.
5     Q.  Well, my question is whether you know
6 anything about it.
7        MR. SMITH:  Objection; form.
8     A.  I do not know.
9     Q.  Have you in your own presentations
10 about the opioid abuse epidemic in Cuyahoga
11 County yourself discussed the Ohio Intractable
12 Pain Act as a contributing factor to the
13 epidemic?
14        MR. SMITH:  Objection; form.
15    A.  Yes.
16    Q.  Okay.
17    A.  It's mentioned as one of the
18 contributing factors.
19    Q.  So you yourself identified it as a
20 contributing factor to the epidemic in Cuyahoga
21 County, but your testimony here today is that
22 you don't know anything about it?
23        MR. SMITH:  Objection; form.
24    A.  Information provided by the Ohio
25 Department of Health.

Page 200

1     Q.  Well, wherever you got the
2 information, Mr. Caraffi, I'm asking what you
3 know.
4        MR. SMITH:  Is that a question or are
5 you just --
6     Q.  What is your understanding about how
7 the Ohio Intractable Pain Act was a contributing
8 factor to the opioid abuse epidemic in Cuyahoga
9 County?
10        MR. SMITH:  Objection; form.
11    A.  I do not know.
12    Q.  You yourself identified it as a
13 contributing factor in your own presentations,
14 right?
15        MR. SMITH:  Objection; form.
16    A.  From information provided by the Ohio
17 Department of Health.
18    Q.  When you present it to audiences on
19 the subject of opioid abuse, addiction, and
20 overdose in Cuyahoga County and you include it
21 in your presentations reference to the Ohio
22 Intractable Pain Act, what did you say about it?
23        MR. SMITH:  Objection; form.
24    A.  Based upon information from the Ohio
25 Department of Health, changes in guidelines as

Page 201

1 it relates to prescribing practices.
2     Q.  But what did you say to audiences
3 about that when you presented on the subject?
4     A.  What I just stated to you.
5     Q.  That's all you said?
6     A.  Yes.
7     Q.  You said to audiences "Based upon
8 information from the Ohio Department of Health,
9 changes in guidelines as it relates to
10 prescribing practices."
11    A.  Correct.
12    Q.  Did you provide any more detail or
13 information?
14        MR. SMITH:  Objection; form.
15    A.  I cannot recall.
16    Q.  Did your audiences look back at you
17 with bewilderment when you said that?
18        MR. SMITH:  Objection; form.
19    A.  I can't recall.
20    Q.  Is your testimony here today,
21 Mr. Caraffi, under oath that you don't know
22 anything about the Ohio --
23        MR. SMITH:  Objection; form.
24    Q.  -- Intractable Pain Act?
25        MR. SMITH:  Objection; form.  Now

51 (Pages 198 - 201)

1   you're harassing him.  If we have to call
2   the master again, we will.
3         MR. BOEHM:  If that's what you want
4   to do, that's --
5         MR. SMITH:  If you keep harassing
6   him, we will call the special master.
7         MR. BOEHM:  We can have him read
8   this, and I don't think he'll agree with
9   you.
10   Q.   Go ahead, Mr. Caraffi.
11   A.   What was your question again?
12   Q.   Sure.  Is your testimony here today,
13  Mr. Caraffi, under oath that you don't know
14  anything about the Ohio Intractable Pain Act?
15        MR. SMITH:  Objection; form.
16   A.   Information provided by the Ohio
17  Department of Health mentioned this as a
18  contributing factor.
19   Q.   And what did you understand the Ohio
20  Intractable Pain Act to have done to contribute
21  to opioid abuse, addiction, and overdose in
22  Cuyahoga County?
23        MR. SMITH:  Objection; form.
24   A.   A change in prescribing guidelines.
25   Q.   How did the Ohio Intractable Pain Act

1   alter prescribing guidelines for the use of
2   prescription opioid medications?
3         MR. SMITH:  Objection; form.
4    A.   I do not know.
5    Q.   What is your understanding as to when
6   clinical pain management guidelines changed in
7   Ohio?
8    A.   I don't recall.
9    Q.   Is that something you have ever
10  known, as best you can recall?
11        MR. SMITH:  Objection; form.
12   A.   I don't recall.
13   Q.   This document says:
14        "Growing recognition by professionals
15  of the undertreatment of pain in the late
16  1990s prompted needed changes in clinical
17  management guidelines at the national
18  level."
19        What do you understand that to
20  mean --
21        MR. SMITH:  Objection; form.
22   Q.   -- as head of the Cuyahoga County
23  Opiate Task Force since 2010?
24        MR. SMITH:  Objection; form.
25   A.   I don't recall what it means.

1    Q.   Mr. Caraffi, how many times would you
2   estimate you have made presentations to the
3   community or to other audiences about the
4   nature, scope, and contributing factors of the
5   opioid abuse epidemic in Cuyahoga County over
6   the course of time that you've been involved on
7   that subject?
8         MR. SMITH:  Objection; form.
9    A.   I don't know.
10   Q.   Would you say dozens?
11        MR. SMITH:  Objection; form.
12   A.   I do not know.
13   Q.   Is it possible you've presented more
14  than a hundred times to various audiences on the
15  subject of opioid abuse, opioid addiction,
16  opioid overdoses in Cuyahoga County?
17        MR. SMITH:  Objection; form.
18   A.   I don't recall how many times.
19   Q.   Is it possible that you've actually
20  presented more than 100 times on that subject?
21        MR. SMITH:  Objection; form.
22   A.   I don't recall the number of times
23  that I have presented information.
24   Q.   What is your understanding about how
25  changes in clinical pain management have

1   contributed to opioid abuse and overdoses in
2   Cuyahoga County?
3         MR. SMITH:  Objection; form.
4    A.   Based upon information from ODH, it's
5   a change in prescribing guidelines.
6    Q.   I get it, but how?  How did that
7   impact --
8         MR. SMITH:  Objection --
9    Q.   -- opioid abuse?
10        MR. SMITH:  Objection; form.
11   A.   I do not know.
12   Q.   Okay.  So your testimony, just to
13  make sure this is crystal clear, is that as you
14  sit here today, you don't have any understanding
15  as to how changes in clinical pain management
16  guidelines has or has not impacted the scope of
17  prescription opioid abuse or overdoses in the
18  county?
19        MR. SMITH:  Objection; form.
20   A.   Based upon information from Ohio
21  Department of Health, there was a change in
22  guidelines as it pertains to prescribing.
23   Q.   Just to be clear, Mr. Caraffi,
24  because I don't want this to be a barrier, I'm
25  not asking you right now about how you got the

52 (Pages 202 - 205)

1    information or how you got your understanding.
2        I may have questions about that, but
3    right now my question is, however you got that
4    understanding, however you learned, however you
5    investigated, however you gained the content to
6    be a lecturer on the subject of opioid abuse in
7    Cuyahoga County, I want to know your
8    understanding.
9        Okay.  So right now my question is,
10   based on all that you've learned, all the
11   experts you've talked to, everything you've
12   learned whether it be from the Ohio Department
13   of Health, from Dr. Gilson, from other experts
14   in this area, from talking with colleagues at
15   the many conferences you've attended on the
16   subject, from all the work you've done since
17   2010 as chair of the Cuyahoga County Opiate Task
18   Force, what is your understanding as to how
19   changes in clinical pain management guidelines
20   have contributed to opioid abuse and overdose in
21   Cuyahoga County?
22       MR. SMITH:  Objection; form.
23       A.   As I stated, information from the
24   Ohio Department of Health increased prescription
25   guidelines.  That was the Intractable Pain

1    Relief Act, is what you're asking, correct?
2        Q.   You said it increased prescription
3    guidelines.  What did you mean by increased
4    prescription guidelines?
5        A.   Changes in clinical pain management
6    guidelines, as it says in this document.  That's
7    what I'm referring to.
8        Q.   What did those changes do?
9        MR. SMITH:  Objection; form.
10       A.   I do not know.
11       Q.   What changes took place?
12       MR. SMITH:  Objection; form.
13       A.   I do not know.
14       Q.   Do you see in the second paragraph
15   under the "Changes in Clinical Pain Management
16   Guidelines" section, it says:
17       "Ohio's Intractable Pain Act provided
18       that physicians treating intractable pain
19       are not subject to disciplinary action when
20       practicing in accordance with accepted and
21       prevailing standards of care and rules
22       adopted by the medical board delineating
23       those standards."
24       Do you see that?
25       A.   I do.

1        Q.   Did I read that correctly?
2        A.   Correct.
3        Q.   What is your understanding about what
4    that means?
5        MR. SMITH:  Objection; form.
6        A.   I don't know.
7        Q.   You don't have any understanding
8    about what that means?
9        MR. SMITH:  Objection; form.
10       A.   I do not know.
11       Q.   What is the Ohio Medical Board?
12       A.   I have no idea.
13       Q.   Never heard of the Ohio Medical
14   Board?
15       A.   No, I have not.
16       MR. SMITH:  Objection; form.
17       Q.   Do you know whether the Ohio Medical
18   Board adopted revised guidelines for the
19   prescribing of prescription opioid medications
20   by licensed physicians?
21       MR. SMITH:  Objection; form.
22       A.   I do not know.
23       Q.   Do you know the role of the Ohio
24   Medical Board in connection with Ohio's
25   Intractable Pain Act that's referenced here on

1    Page 22 of the Ohio Prescription Drug Abuse Task
2    Force final report?
3        MR. SMITH:  Objection; form.
4        A.   I do not know.
5        Q.   Has anybody ever explained this to
6    you, or have you had any conversations with
7    individuals as part of your role as chair of the
8    Cuyahoga County Opiate Task Force about what
9    this means?
10       MR. SMITH:  Objection; form.
11       A.   I don't recall a conversation.
12       Q.   As you sit here today, you don't
13   recall a single conversation with anybody about
14   that?
15       A.   I do not.
16       Q.   As you sit here today -- let me start
17   over.
18       As you sit here today, do you recall
19   having given presentations and lectures on the
20   subject of changes in clinical pain management
21   guidelines and the impact that those changes had
22   on opioid abuse and overdoses in Cuyahoga
23   County?
24       MR. SMITH:  Objection; form.
25       A.   As it relates to information from the

53 (Pages 206 - 209)

Page 210

1  Ohio Department of Health, as I mentioned
2  earlier, it's in the first paragraph.
3      Q.    And what have you lectured about and
4  presented on on that subject?
5          MR. SMITH:  Objection; form.
6      A.   A change in prescribing guidelines.
7      Q.   Okay.  But what did you say about it
8  when you lectured on it?
9          MR. SMITH:  Objection; form.
10     A.   A change in prescribing guidelines.
11     Q.   What did you say about the change in
12  prescribing guidelines that impacted the opioid
13  abuse when you have lectured --
14     A.   Uh-huh.
15     Q.   -- and presented at symposia, at
16  community events, and in other settings on the
17  opioid abuse epidemic in Cuyahoga County?
18         MR. SMITH:  Objection; form.
19     A.   Management guideline changes,
20  information from Ohio Department of Health, as
21  I've stated several time already.
22     Q.   I don't even think that was a
23  complete sentence.  I don't under-- can you
24  please explain what you mean?
25     A.   Changes in clinical pain management

Page 211

1  guidelines at the national level was the
2  information that was provided by the Ohio
3  Department of Health as a risk factor.
4      Q.   My question to you, Mr. Caraffi, is,
5  when you would present at symposia and when you
6  would lecture on the subject of opioid abuse in
7  Cuyahoga County --
8      A.   Uh-huh.
9      Q.   -- you talked about change in
10  clinical pain management, and I want to know
11  what you would say when you were presenting
12  those lectures and slide presentations and
13  otherwise explaining to the community what the
14  contributing factors were of the opioid abuse
15  epidemic in the county.
16         MR. SMITH:  Objection; form.
17     A.   Changes in clinical pain management
18  guidelines were a risk factor as information
19  provided by the Ohio Department of Health.
20     Q.   Did you say anything else, or was
21  that the sum and substance of all you said on
22  that subject?
23         MR. SMITH:  Objection; form.
24     A.   I don't recall.
25     Q.   When's the last time you made a

Page 212

1  presentation on trends in opioid abuse or
2  overdoses?
3          MR. SMITH:  Objection; form.
4      A.   Last spring.
5      Q.   2018?
6      A.   Uh-huh.
7      Q.   Okay.  Would you remind me when it
8  was that you no longer were the Cuyahoga County
9  Opiate Task Force chair?
10         MR. SMITH:  Objection; form.
11     A.   August of 2018.
12     Q.   About four or five months ago?
13     A.   Uh-huh.
14     Q.   I saw you nod your head yes, but for
15  the court reporter, you have to say --
16     A.   I'm sorry.  Yes, August of 2018.
17     Q.   What were the circumstances of you no
18  longer being the chair of the opiate task force
19  for Cuyahoga County?
20         MR. SMITH:  Objection; form.
21     A.   I have personal health matters that I
22  have not been able to overcome for the past two
23  years, and it's personal information, and some
24  substance abuse issues that have hit close to
25  home.

Page 213

1      Q.   Are those your own substance use
2  issues or substance use issues of other
3  individuals you know?
4          MR. SMITH:  Objection; form.
5      A.   It's personal information.
6      Q.   All right.  So on the subject of
7  whether or not you yourself have dealt with
8  substance use disorders, is that information
9  you're not willing to share today?
10         MR. SMITH:  Are you asking if he's
11  abused substances?
12         MR. BOEHM:  I'm trying to
13  understand --
14         MR. SMITH:  Is that what you're
15  asking?
16         MR. BOEHM:  I'm trying to understand
17  his testimony in connection --
18     Q.   Mr. Caraf-- let me just ask it this
19  way: Mr. Caraffi, I heard you to say that the
20  reason why you are no longer chair of the
21  Cuyahoga County Opiate Task Force has to do with
22  some personal health issues and substance use
23  issues.  Is that right?
24         MR. SMITH:  Objection.  That's not
25  what he said at all, so...

54 (Pages 210 - 213)

1    Q.    Okay.  Go ahead and answer.
2    A.    Some personal health issues and some
3    substance abuse issues that have hit close to
4    home.
5    Q.    And my question to you is whether or
6    not the substance abuse issues that you say have
7    hit close to home are your own substance use
8    issues or those are substance use issues of
9    other individuals.
10        MR. SMITH:  Objection; form.  He's
11   not going to talk about himself, and he's
12   already went over this with you --
13        MR. BOEHM:  He didn't --
14        MR. SMITH:  -- family and friends.
15   Q.    Is that a question you will not
16   answer?
17   A.    I'm not answering that question.
18   Can we take a break?
19   Q.    Sure.
20        MR. BOEHM:  Off the record.
21        VIDEO TECHNICIAN:  Off the record
22   2:43.
23        (Recess taken at 2:43 p.m.)
24        (Back on the record at 3:03 p.m.)
25        VIDEO TECHNICIAN:  On the record

1    3:03.
2         MR. BOEHM:  Thank you.  Just for the
3    record, from defense counsel's perspective,
4    it is apparent that the witness has not
5    been forthcoming with information that he
6    knows or should know given his longtime
7    role as the Cuyahoga County Opiate Task
8    Force chair and his other responsibilities
9    and duties for the Cuyahoga County Board of
10   Health.
11        Responses to questions that fall
12   squarely within his duties and
13   responsibilities have been answered with a
14   string of "I don't knows," including with
15   respect to issues that the witness earlier
16   testified are responsibilities he takes
17   seriously and has presented about many
18   times.
19        We hope we do not have to bring a
20   motion to bring the witness back for
21   additional testimony or otherwise request
22   relief, but wanted to reserve our right to
23   do that for the record given that we have a
24   limited number of witnesses who we were
25   allowed to call for deposition testimony,

1    and will note for the record that
2    Mr. Caraffi indeed had been identified
3    early on by Cuyahoga County as a person
4    most knowledgeable, a 30(b)(6) witness, on
5    some of the subjects that we've been
6    attempting to learn about at the deposition
7    here today.
8         MR. SMITH:  Oh, gosh.  In response,
9    we disagree with your assertion.  This
10   witness has come here and answered
11   questions, some questions six, seven times.
12   You don't like the answers, you don't think
13   he's answering correctly.
14        Your questions are usually improper,
15   but he's done his best to answer these
16   truthfully under oath, and if there's a
17   problem with his answers, it may have a lot
18   to do with the questions that are posed.
19        MR. BOEHM:  Just given that you've
20   mentioned the questions, we'll just note I
21   think the record speaks for itself in terms
22   of the whether the questions are
23   objectionable.
24        I will note that virtually every
25   question has drawn an objection, some of

1    which could not remotely by any
2    interpretation be deemed to be
3    objectionable, and we don't think that's
4    appropriate and it must be designed for
5    purposes other than just preserving the
6    record.
7         MR. SMITH:  Well, it is for
8    preserving the record, and a lot of your
9    questions are objectionable based on form,
10   and that's why the objection's are posed.
11        MR. BOEHM:  Okay.
12   BY MR. BOEHM:
13   Q.    Mr. Caraffi, welcome back from our
14   break.  I'd been asking you questions about your
15   understanding of contributing factors, and we
16   had talked earlier about the fact that you have
17   many times over the course of your career at
18   CCBH and as the chair of the Cuyahoga County
19   Opiate Task Force yourself presented and
20   lectured about the causes of the opiate abuse
21   epidemic in the county.  Is that correct?
22   A.    That is correct.
23   Q.    And your presentations have involved
24   discussion about the causes of the epidemic.
25   Fair?

Page 218

1    A.   Correct.
2    Q.   Can you describe for us the process
3  by which you and others at the Cuyahoga County
4  Board of Health prepare the materials you use
5  for purposes of your lectures and presentations
6  on opioid abuse in the county?
7    A.   It would be gathered by all
8  collaborative partners, State information,
9  possibly Federal agencies if we are able to
10 obtain that data.
11   Q.   Do you have partners within Cuyahoga
12 County, setting aside the Ohio Department of
13 Health and Federal entities?
14   A.   Partners as far as part of the
15 coalition members?
16   Q.   (Nods head in the affirmative.)
17   A.   Yes.
18   Q.   And the Cuyahoga County Opiate Task
19 Force involves collaboration and partnership
20 with Cuyahoga County departments, divisions, and
21 programs.  Fair?
22       MR. SMITH:  Objection; form.
23   A.   Yes.
24   Q.   What Cuyahoga County departments,
25 divisions, and programs have been involved in

Page 219

1  the partnership of the Cuyahoga County Opiate
2  Task Force?
3        MR. SMITH:  Objection; form.
4    A.   The medical examiner's office, office
5  of emergency management, and the sheriff's
6  office have helped.
7    Q.   Any other?
8    A.   Not that I recall.
9    Q.   Do you use, for purposes of your
10 presentations and lectures on the opiate abuse
11 epidemic in Cuyahoga County, information that
12 you receive from your Cuyahoga County level
13 partners on the task force?
14   A.   I don't understand the question.
15   Q.   Well, you indicated that the content
16 of your presentations in part comes from
17 information you receive from the Ohio Department
18 of Health and from the Federal Government.
19       So my question is simple:  Does the
20 content of your presentations and lectures about
21 the Cuyahoga County opioid abuse epidemic
22 include information that you have received from
23 Cuyahoga County level departments, divisions,
24 and programs?
25   A.   Yes.

Page 220

1    Q.   When you lecture or present on the
2  contributing factors to Cuyahoga County's trends
3  of opiate-related abuse and overdose, do you do
4  your very best to be as accurate and thorough as
5  possible?
6    A.   Yes.
7    Q.   Is that something you've always tried
8  to do over the course of the time that you've
9  presented and spoke on that subject?
10   A.   Yes.
11   Q.   Before you use a particular slide
12 deck to lecture or present on opioid-related
13 abuse or overdoses, do you review the slides
14 that you're going to use?
15   A.   Yes.
16   Q.   Do you sometimes make changes to
17 them?
18   A.   Yes.
19   Q.   Do you prepare the slide decks
20 yourself, or do you have a team of people who do
21 that for you?
22   A.   Would be dependent upon what
23 information I'm looking for.
24   Q.   Okay.  So in some cases you prepare
25 the slide yourself, and in other cases your

Page 221

1  staff prepares the slides?
2    A.   It could be staff, it may be other
3  partners at the State level, it might be a
4  request from a Federal agency to use a slide or
5  information or data that they have.
6        (DEPOSITION EXHIBIT 7 MARKED
7        FOR IDENTIFICATION at 3:11 p.m.)
8    Q.   I'm going to show you a document
9  that's been marked as Exhibit 7.  It's a slide
10 presentation from the Cuyahoga County Board of
11 Health and the Cuyahoga County Opiate Task Force
12 that's entitled "Ohio's Drug Overdose Epidemic:
13 Contributing Factors and Ongoing Prevention
14 Efforts."  Do you see that?
15   A.   Yes.
16   Q.   And you've taken a moment to look
17 this over.  Is that fair?
18   A.   Yes.
19   Q.   Do you recognize this presentation?
20   A.   I do.
21   Q.   Do you use this presentation
22 yourself?
23   A.   I have.
24   Q.   Unfortunately the way these get
25 produced to us by the County, it doesn't have

56 (Pages 218 - 221)

Page 222

1    page numbers, so we're just going to have to do
2    our best to look at the slides of most interest.
3         MR. BOEHM: Oh, yours do, don't they?
4         MR. SMITH: Yeah, there are page
5    numbers on mine.
6         MR. BOEHM: Mine don't because
7    they're printed I guess in a different way.
8    Q.   But I'm looking at the slide that has
9    this graphic that we looked at from the 2010
10   report.  It says "Contributing Factors," and it
11   has the same kind of schematic that we looked at
12   in the report.
13        Can you find that slide?  It's about,
14   I don't know, five or six slides in.
15        MR. SMITH: Is it Bates stamped on
16   yours?
17        MR. BOEHM: It's your Page 7.  Do you
18   see it?
19        MR. SMITH: Are these Bates stamped?
20        MR. BOEHM: The Bates stamp of the
21   document, because this was produced
22   natively --
23        MR. SMITH: Sure.
24        MR. BOEHM: -- is just a single Bates
25   stamp number.

Page 223

1         MR. SMITH: Okay.
2         MR. BOEHM: And I think that's on
3    your --
4         MR. SMITH: The original page?
5         MR. BOEHM: Yeah, it's on the first
6    page of your document.
7         MR. SMITH: Okay.  Thank you.
8    Q.   This is the same graphic as the one
9    that we looked at in the 2010 Prescription Drug
10   Abuse Task Force report that we were looking at
11   earlier, correct?  Or essentially the same?
12   A.   There's a difference in the circle,
13   but go ahead.
14   Q.   Yeah.  The one in the 2010 report
15   just says "Epidemic."
16   A.   Correct.
17   Q.   The one in this slide deck from the
18   Cuyahoga County Opiate Task Force has a couple
19   of additional terms in the circle, right?
20   A.   Correct.
21   Q.   But the contributing factors that are
22   identified are the same, right?
23        MR. SMITH: Objection; form.
24   A.   There are some differences.
25   Q.   Are there contributing factors that

Page 224

1    the Cuyahoga County Opiate Task Force identified
2    for its purposes in presenting on what caused
3    the opiate epidemic in Cuyahoga County that were
4    not identified in the 2010 report?
5    A.   Will you ask that question again,
6    please?
7    Q.   Sure.  You said there were some
8    differences.  My question to you is whether or
9    not Cuyahoga County and its opiate task force
10   had identified causes of the opiate epidemic in
11   this county that had not been identified by the
12   Ohio State Prescription Drug Abuse Task Force
13   that issued its report in October 2010.
14   A.   I would say based upon conversations
15   with members of the task force, there are some
16   differences compared to 2010 when this report
17   came out.
18   Q.   Okay.  Well, let's go through the
19   contributing factors that the Cuyahoga County
20   Opiate Task Force had identified as causes of
21   the epidemic in the county.
22        At the very top of the page -- it's
23   Page 7 on your version of the document.
24        MR. SMITH: Are we on Exhibit 7?
25        MR. BOEHM: Yeah.

Page 225

1         MR. SMITH: Okay.  Did you go back
2    and forth?  Was it 6?
3         MR. BOEHM: No, I'm on Exhibit 7.
4    Q.   This is the Cuyahoga County Opiate
5    Task Force --
6    A.   Okay.  Go ahead.
7    Q.   -- slide deck that you used to
8    describe contributing factors of the epidemic.
9    And at the very top of that graphic, do you see
10   it says "Overall growth in prescription use"?
11   A.   Uh-huh.
12   Q.   And then it says "New and better
13   preventive drugs."  Do you see that?
14   A.   I do.
15   Q.   What does that refer to?
16   A.   I don't recall.
17   Q.   It next says "HC insurance pressure,"
18   right?
19   A.   Uh-huh.
20   Q.   You've got to say yes or no.
21   A.   Oh, I said -- I see that, yes.  I'm
22   sorry.
23   Q.   What does that refer to?
24   A.   HCAHPS scores and medical facilities.
25   Q.   What are HCAHPS scores and medical

57 (Pages 222 - 225)

Page 226

1  facilities?
2      A.   There are four questions that are
3  asked when a client and a physician are talking
4  about their visit.
5      Q.   In what way have HCAHPS scores
6  contributed to opioid abuse, addiction, and
7  overdose in Cuyahoga County?
8      A.   HCAHPS scores and Press Ganey scores
9  are a review system that's in place for medical
10  facilities, and it gives clients an opportunity
11  for them to rate their visit with their
12  physician.
13      Q.   In what way has that ability to rate
14  a physician based on the visit contributed to
15  the opioid epidemic in Cuyahoga County?
16      A.   Based upon information and
17  collaborative partners, there was a feeling that
18  people were worried about their HCAHPS scores or
19  Press Ganey scores as it relates to their end of
20  the year salary.
21      Q.   When you say people, you mean --
22      A.   Physicians.
23      Q.   -- licensed physicians?
24      A.   Licensed physicians.
25      Q.   And how did -- I still -- can you

Page 227

1  please just describe what you mean when you say
2  licensed physicians were concerned about their
3  HCAHPS scores in relation to any impact that had
4  in contributing to the opioid epidemic in
5  Cuyahoga County?
6      A.   From my understanding is physicians
7  were worried about getting negatively scored at
8  the end of the year as it related to treating
9  the pain of individuals that they were seeing.
10      Q.   Okay.  But you're not answering my
11  question, which is how did that contribute to
12  the opioid epidemic?
13          MR. SMITH:  Objection; form.
14      A.   From my conversation with physicians
15  that are part of the task force, there was an
16  overall concern that there was more medications
17  being prescribed to ensure that people would
18  receive better Press Ganey scores or HCAHPS
19  scores at the end of the year as it related to
20  hospital accreditation and finances based upon
21  conversations with the physicians.
22      Q.   Are you familiar with the concept of
23  pain as a fifth vital sign?
24      A.   Based upon personal family experience
25  and conversations with individuals that are on

Page 228

1  the task force that are medical providers, yes.
2      Q.   What is your understanding about what
3  it means to treat pain as the fifth vital sign?
4      A.   Pain was looked at as an intimate --
5  or pain is looked at as a life vital sign.  That
6  relationship would be if you went to the
7  hospital, people would ask you -- physicians
8  would ask you "What is your level of pain."
9  They would give you what they call a Wong scale,
10  which is a smiley face scale, from 1 to 10, and
11  through personal experience with my daughter,
12  when she broke her leg, I experienced that.
13          Pain is subjective compared to the
14  other vital signs, and off the top of my head, I
15  don't remember what they are.  Respiration,
16  heart rate, blood pressure.
17      Q.   In what way has the concept of
18  treating pain as the fifth vital sign
19  contributed to opioid abuse in Cuyahoga County?
20          MR. SMITH:  Objection; form.
21      A.   Based upon my conversations with
22  Dr. Gilson, members of law enforcement, and the
23  medical community, overprescribing of
24  prescription pain pills.
25      Q.   I see.  So the view of the

Page 229

1  individuals in constituencies of the Cuyahoga
2  County Opiate Task Force is that the concept of
3  treating pain as a fifth vital sign has led to
4  too much prescribing of opioid medication?  Is
5  that a fair summary?
6      A.   Yes.  I think that's why it's noted
7  as a risk factor.
8      Q.   And you also referenced
9  accreditation.  What do you mean by
10  accreditation of hospitals and individual
11  healthcare practices?
12      A.   I don't recall.  Accreditation, I'm
13  not in the medical field.
14      Q.   Well, you said it, not me, so I want
15  to know what you meant when you talked about
16  accreditation.
17      A.   And I said it based upon
18  conversations with other medical professionals.
19      Q.   Well, however you learned about it,
20  in what way do you believe that accreditation
21  standards of hospitals or individual healthcare
22  practices has contributed to opioid abuse or
23  overdoses in Cuyahoga County?
24      A.   An increase in prescribing practices,
25  as I mentioned earlier.

58 (Pages 226 - 229)

Page 230

1    Q.   What about the accreditation of
2  hospitals and individual healthcare practices
3  has led in your view to overprescribing of
4  prescription opioid medications?
5       MR. SMITH:  Objection; form.
6    A.   I don't recall.
7    Q.   As you sit here today, you're not
8  able to describe in any way what you know or
9  have known about how accreditation of hospitals
10 or individual healthcare practices has
11 contributed to trends in opioid abuse or
12 overdoses?  Is that correct?
13      MR. SMITH:  Objection; form.
14   A.   I do not know.
15   Q.   Is my summary correct, or you don't
16 know if I'm correct?
17      MR. SMITH:  Objection; form.
18   A.   I do not know.
19   Q.   You don't know what?
20   A.   What was your original question?
21   Q.   My question was whether or not as you
22 sit here today you able to indicate why it
23 has been the view of you or others on the
24 Cuyahoga County Opiate Task Force that
25 accreditation of hospitals or individual

Page 231

1  healthcare practices has been a contributing
2  factor to opioid abuse or overdose in Cuyahoga
3  County.
4    A.   I do not know.
5    Q.   Is that something that you've talked
6  about in your presentations?
7    A.   I don't recall.
8    Q.   Well, why don't we look together at
9  your speaker notes on the same page.  It's a
10 little bit small print, which is why I brought a
11 magnifying glass in case you need it.  I don't
12 know how good your eyes are.
13   A.   I need it.
14   Q.   You say you do need it?
15   A.   Yeah.
16   Q.   All right.  Here's a magnifying
17 glass.
18      On the fourth line down in your
19 speaker notes for Slide 7, it says "Press Ganey
20 scores, patient satisfaction surveys, and
21 hospital accreditation."
22   A.   Uh-huh.
23   Q.   So you have presented on how hospital
24 accreditation has contributed to opioid abuse
25 and overdose in Cuyahoga County, correct?

Page 232

1    A.   I presented on a relationship between
2  a client and a patient on Press Ganey scores and
3  HCAHPS scores.  Accreditation, my office we're
4  accredited.  I don't know who provides
5  accreditation for hospitals.  I do not know
6  that.
7    Q.   It's in your speaker notes, right,
8  hospital accreditation?  You saw that?
9    A.   I do.
10   Q.   Why is it there?
11   A.   It's an example.  It doesn't mean I
12 know how hospitals are accredited, by any means.
13 I don't work for an accreditation board for
14 hospitals.
15   Q.   It's an example of what?
16   A.   An example of a review, a hospital
17 review, but I'm not part of an accreditation
18 team for the hospitals.  I don't work for the
19 hospitals.
20      All I know is that a contributing
21 factor, like you asked me before, that those
22 systems, okay, that were built in place to
23 respond to people's pain provided opportunities
24 for more prescribing.  That's what I know.
25   Q.   Why does your speaker notes for the

Page 233

1  slide on contributing factors to opioid abuse in
2  Cuyahoga County include a reference to hospital
3  accreditation?
4    A.   I don't recall why.  I don't know.
5    Q.   Have you ever heard of the joint
6  commission?
7    A.   I'm sorry?
8    Q.   Have you ever heard of the joint
9  commission?
10   A.   I don't recall.
11   Q.   Have you ever heard of the VA?
12   A.   The VA?
13   Q.   Uh-huh.
14   A.   Could you define what VA is?
15   Q.   Veterans Administration.
16   A.   Yes, I've heard of the VA.
17   Q.   Have you ever heard of the American
18 Medical Association?
19   A.   I have.
20   Q.   You already told us you had never
21 heard of the Ohio Medical Board.
22      Have you ever heard of the Federation
23 of State Medical Boards?
24   A.   No, I have not.
25   Q.   Do you know what medical

59 (Pages 230 - 233)

Page 234

1    organizations or governmental entities adopted
2    the concept of treating pain as the fifth vital
3    sign?
4              I'm not asking you a question about
5    your notes.
6        A.   I'm just looking.
7              Could you ask that question again,
8    please?  I'm sorry.
9        Q.   Yeah.  If you need a break because
10   you need water or you're distracted, just let me
11   know.
12       A.   No.  I'm trying to -- this doesn't
13   work with the glasses, so it's just --
14       Q.   I'm not asking you to use the
15   magnifying glass.  I'm not sure why you're doing
16   that.
17             My question to you right now is
18   whether or not you know if any medical
19   organizations or governmental entities have
20   adopted the treatment of pain as a fifth vital
21   sign.
22       MR. SMITH:  Objection; form.
23       A.   Could you ask the question again?
24       Q.   Do you know whether any medical
25   organizations or governmental entities have

Page 235

1    adopted the concept of treating pain as the
2    fifth vital sign?
3        A.   In conversations with professionals
4    on the task force that are in the medical
5    community, yes, pain as a fifth vital sign is
6    used.
7        Q.   Do you --
8        A.   I explained to you that in personal
9    experience.  My daughter visited the hospital
10   because she had a broken leg.  They asked her
11   what her pain was.  They used the Wong scale, so
12   yes, I'm aware of that.
13       Q.   The Cuyahoga County Opiate Task Force
14   slide on contributing factors to the opioid
15   abuse epidemic also refers to self-medicating
16   habits of baby boomers.  Do you see that?
17       A.   I do.
18       Q.   What does that mean?
19       A.   As I explained to you before, I don't
20   have a background in substance abuse.  Members
21   of the task force -- Dr. Chris Delos Reyes,
22   Dr. Ted Parran, Kevin Smith from the VA -- we
23   talk about self-medicating habits.
24             There is some history of individuals
25   who use medication, used it in a fashion that

Page 236

1    wasn't proposed by a physician, so they were
2    self-medicating.
3              Part of the problem with the opioid
4    epidemic that people were taking these strong,
5    powerful opioid medications, didn't know the
6    strength, and an example would be that, you
7    know, I'd break my thumb.  Instead of going to
8    the physician, I'm already in the process of
9    using.  I ask my buddy, "Hey, do you have some
10   pain pills?"  "Yeah."  You start taking those
11   pain pills.  Your self-medicating habits put you
12   at a greater risk.
13             That's what the contributing factor
14   of self-medicating habits is, based upon
15   information for people that are on the task
16   force that are in treatment and substance abuse
17   programming.
18       Q.   Is it the view of the Cuyahoga County
19   Opiate Task Force that there's a cultural
20   mindset of relying on prescription medications
21   at times when perhaps that's not necessary?
22       A.   Individuals that are part of the task
23   force that have a history of treating SUD would
24   probably feel that way, yes.
25       Q.   Is that your sense of things as the

Page 237

1    chair of the task force?
2        MR. SMITH:  Objection; form.
3        A.   I would say that it -- could you ask
4    that again, please?
5        Q.   Yeah.  My question is simply whether
6    or not you share the view that you say others on
7    the Cuyahoga County Opiate Task Force have that
8    there is a cultural mindset of relying on
9    prescription medications when perhaps that's not
10   necessary, that that has contributed to trends
11   of opioid-related abuse and overdose.
12       A.   Is that exclusively to the baby
13   boomers, that contributing factor that we're
14   talking about, or is that in general?
15       Q.   Well, I ask you.  It does say -- as
16   you note, it says baby boomers here on the
17   slide.  What is your --
18       A.   But you're asking the question, so
19   that's what I'm trying to gauge; is this
20   pertaining to that risk factor of baby boomers.
21       Q.   My question right now is just
22   generally do you believe that a cultural mindset
23   of relying on prescription medications when
24   perhaps that's not necessary has contributed to
25   the opioid abuse epidemic so -- as you say some

60 (Pages 234 - 237)

Page 238

1  on the task force have indicated?
2      A.   We have a culture of quick fix in
3  this country, and I would say that is a
4  contributing factor.
5      Q.   You also mentioned stigma a couple of
6  times today as a contributing factor to the
7  opioid abuse epidemic in the county.  Did I
8  understand that correctly?
9      A.   You did.
10      Q.   Can you please describe for us what
11  you meant and what your views are with respect
12  to how stigma contributes to unfavorable trends
13  of opioid abuse.
14      A.   Stigma in general, whether you're
15  speaking about mental health or substance abuse,
16  creates barriers.
17          People don't have a general good
18  opinion of an individual who is a substance
19  abuser.  And through my conversations with
20  individuals who have been through this
21  experience, who are currently in long-term
22  recovery, there is a feeling that you're usually
23  the last in and first out when you start doing
24  things.  So stigma creates barriers.
25          People have an opinion that, you

Page 239

1  know, if you come from a good community, you
2  know, your family, a good family, that they're
3  not at risk.
4          This is a complex disease, and stigma
5  inhibits creative thought, inhibits people from
6  thinking openly, and it limits people from
7  treatment.  Stigma is -- is tough to deal with.
8      Q.   Is the stigma that you're referring
9  to as a contributing factor to opioid abuse in
10  this community something that you've discussed
11  as part of your lectures and presentations on
12  the subject?
13      A.   Yes.
14      Q.   Do you consider that to be a
15  significant contributing factor to opioid abuse?
16      A.   I do.
17          THE WITNESS:  I'm sorry, I'm not
18      talking loud enough.
19      A.   I do.  Having a personal experience
20  with it myself gives you a different perspective
21  and you think differently.
22          There's a lot of people that are
23  working towards -- working to address that.  A
24  lot of our collaborative partnerships, whether
25  it be through the justice system, judges

Page 240

1  practicing social work on the bench, law
2  enforcement officials that have adopted Project
3  DAWN, law enforcement officials that have
4  adopted Safe Passages programs, that's breaking
5  down stigma.  We still have a lot of work to do.
6      Q.   Do you know if the Cuyahoga County
7  Board of Health or the Cuyahoga County Opiate
8  Task Force at any time since you've been
9  involved in this work has ever asked the State
10  of Ohio, whether it be the Ohio Medical Board or
11  the Ohio General Assembly, to require a revision
12  to clinical pain management guidelines that are
13  believed to have contributed to the epidemic in
14  Cuyahoga County?
15          MR. SMITH:  Objection; form.
16      A.   Could you restate that for me,
17  please?
18      Q.   Sure.  Do you know whether or not the
19  Cuyahoga County Board of Health or the Cuyahoga
20  County Opiate Task Force has ever recommended to
21  any state or local governmental body a revision
22  to the clinical pain management guidelines that
23  are believed to have contributed to the opioid
24  use epidemic in Cuyahoga County?
25      A.   The Cuyahoga County task force, I do

Page 241

1  not recall, but I do remember the heroin
2  subcommittee which Carole Rendon chaired
3  discussing that specific issue at length.
4      Q.   Do you know if the Cuyahoga County
5  Opiate Task Force has ever made a recommendation
6  to any governmental body to revise clinical pain
7  management guidelines that the task force
8  believes contributed to opioid abuse in Cuyahoga
9  County?
10      A.   I do not recall that.
11      Q.   Do you know whether or not there is
12  regional variation in terms of the volume of
13  prescribing opioid medications?
14      A.   I don't recall ever gathering that
15  information or sharing that with task force
16  members.
17      Q.   In your view as the longtime chair of
18  the Cuyahoga County Opiate Task Force, do you
19  believe that licensed physicians who have
20  prescribed opioid medications in and around
21  Cuyahoga County share responsibility for opioid
22  abuse trends in the community?
23      A.   I would say they're a piece of the
24  contributing factors.
25      Q.   In what way would you say that

61 (Pages 238 - 241)

Page 242

1   licensed physicians who have prescribed opioid
2   medications in this community have contributed
3   to the epidemic?
4       A.   I think based upon my conversations
5   with the Ohio Department of Health, based upon
6   my conversations with individuals that are in
7   substance abuse treatment, that's Dr. Ted
8   Parran, Dr. Chris Delos Reyes, we had talked
9   about it here, a culture of prescribing, I think
10  it's reflected in this document, when you start
11  looking at the amount of prescription opioids
12  that were dispensed in Ohio, that information
13  can be gathered through the Ohio Pharmacy Board.
14      So I think doctors played a role,
15  yes.
16      Q.   For what years do you believe that
17  licensed physicians who prescribed opioid
18  medications in or around Cuyahoga County share
19  responsibility for opioid abuse trends in the
20  community?
21      MR. SMITH:  Objection; form.
22      A.   I do not know.
23      Q.   Is that something you've ever
24  evaluated?
25      A.   I do not know.

Page 243

1       Q.   Does that mean you don't recall ever
2   having evaluated that?
3       A.   I don't know.
4       Q.   Do you agree that no one can lawfully
5   obtain opioid medications without a prescription
6   written by a licensed physician?
7       MR. SMITH:  Objection; form.
8       A.   Can you ask me that question again,
9   please?
10      Q.   Absolutely.  Do you agree that no one
11  can lawfully obtain prescription opioids without
12  a prescription written by a licensed physician?
13      MR. SMITH:  Objection; form.
14      A.   One more time, please?
15      Q.   Sure.  Do you agree that no one can
16  lawfully obtain opioids without a prescription
17  written by a licensed physician?
18      MR. SMITH:  Objection; form.
19      A.   I would agree that individuals need
20  to get a prescription medication from a licensed
21  physician, yes.
22      Q.   Do you agree that the decision to
23  prescribe opioid medication lies with the
24  physician who evaluates the patient in person?
25      A.   I would agree.

Page 244

1       Q.   Do you agree that doctors cannot
2   write a prescription lawfully without an
3   individualized determination of medical
4   necessity for each patient?
5       A.   I would agree that's the way it
6   should be.
7       Q.   Do you agree that a doctor's decision
8   to prescribe a prescription opioid or not
9   depends on the physician's assessment of each
10  patient's medical history, condition, and
11  diagnosis?
12      A.   I would agree.
13      Q.   Do you agree that a licensed
14  physician who prescribes prescription opioids is
15  obligated to consider the risks and benefits of
16  that prescription for each individual patient?
17      A.   I would agree.
18      Q.   Do you agree that the volume of
19  prescription opioid medications kept at or
20  ordered by a pharmacy is not a factor that a
21  particular licensed physician takes into account
22  in deciding whether to issue a prescription for
23  an opioid to a particular patient?
24      MR. SMITH:  Objection; form.
25      A.   I don't know.

Page 245

1       Q.   Are you aware of any physician who
2   has issued a prescription to a particular
3   patient by taking into account how much opioid
4   medication has been ordered by a particular
5   pharmacy?
6       A.   I do not know.
7       Q.   Do you agree that using prescription
8   opioid medications under the care of a licensed
9   healthcare provider for legitimate medical needs
10  does not result in addiction for the vast
11  majority of individuals?
12      MR. SMITH:  Objection; form.
13      A.   I do not know.
14      Q.   Have you ever looked into the
15  question of how frequently using prescription
16  opioid medications under the care of a licensed
17  physician for legitimate medical needs results
18  in addiction?
19      MR. SMITH:  Objection; form.
20      A.   I may have, but I don't recall when.
21      Q.   Were you done with your answer?
22      A.   I am.
23      Q.   Do you, agree based on your work on
24  the Cuyahoga County Opiate Task Force and other
25  responsibilities and duties at the Cuyahoga

62 (Pages 242 - 245)

Page 246

1  County Board of Health, that using prescription
2  opioid medications under the care of a licensed
3  physician for a legitimate medical need does not
4  result in addiction for the vast majority of
5  patients?
6      MR. SMITH:  Objection; form.
7      A.  I don't recall such a report.
8      Q.  You don't know one way or another?
9      A.  I do not know at this point in time.
10     Q.  Do you agree that information that an
11  individual doctor has available to him or her to
12  make a particular prescribing decision is
13  protected by privacy laws?
14     A.  I agree.
15     Q.  And you agree that that information
16  is not generally accessible outside of that
17  patient-doctor relationship.
18     A.  I would agree.
19     Q.  Drug makers don't have access to that
20  information, right?
21     MR. SMITH:  Objection; form.
22     A.  I do not know.
23     Q.  You don't know one way or another
24  whether drug manufacturers have access to
25  personal health information of an individual

Page 247

1  patient insofar as it concerns that
2  doctor-patient relationship?
3      A.  I do not know.
4      Q.  Are you -- do you have any reason to
5  believe that drug manufacturers have access to
6  that information?
7      A.  I do not know.
8      Q.  No, my question is, do you have any
9  reason to believe that drug manufacturers have
10  access to that information?
11     A.  I don't know one way or another from
12  the question --
13     Q.  Not my question.  I know you don't
14  know.  My question is, do you have any reason to
15  believe that drug manufacturers have access to
16  that information?
17     MR. SMITH:  Objection; form.
18     A.  I do not know.
19     Q.  Do you have any basis, evidence, or
20  any other reason to believe that drug
21  manufacturers have access to personal health
22  information of patients and prescribing
23  decisions by their personal doctors?
24     A.  I do not know.
25     Q.  And you agree that wholesale

Page 248

1  distributors don't have access to that
2  information, correct?
3      MR. SMITH:  Objection; form.
4      A.  I do not know.
5      Q.  Do you have any reason to believe
6  that wholesale distributors have access to that
7  information?
8      A.  I do not know.
9      Q.  That's a yes or a no.  You either
10  have a reason to believe or you don't.
11     MR. SMITH:  He answered the question.
12     Q.  Do you have a reason to believe?
13     A.  I do not know.
14     Q.  You don't know if you have a reason
15  to believe?
16     A.  I do not know.
17     Q.  You don't know what?
18     A.  The first question that you asked.
19     Q.  Well, the question I asked you is
20  whether or not you have a reason to believe that
21  wholesale distributors have access to private
22  health information.
23     A.  I do not know.  Just because you
24  throw in reason, I don't know the answer to your
25  question.

Page 249

1      Q.  So your testimony is you do not
2  know --
3      A.  Correct.
4      Q.  -- whether or not you have a reason
5  to believe that wholesale drug distributors have
6  that information.
7      MR. SMITH:  Objection; form.
8      A.  I answered your question.
9      Q.  You didn't, respectfully.  I'm asking
10  whether you have some basis or reason to believe
11  that wholesale drug distributors have access to
12  that information.
13     MR. SMITH:  Objection; form.
14     A.  I do not know.
15     Q.  Okay.  When you use the term
16  "overprescribing," what do you mean by that?
17     A.  Based upon information from task
18  force members, those would be individuals that
19  are either getting excess medications within our
20  poison death review.  We had talked about that.
21     So overprescribing could be an
22  individual that is maybe gathering prescription
23  medication outside of those five or six
24  questions that you asked me regarding
25  client-patient relationship.  That's what my

63 (Pages 246 - 249)

Page 250

1 definition of overprescribing would be.
2      Q.   Well, I didn't understand what you
3 meant by outside of the five or six questions I
4 asked.  What was that caveat?
5      MR. SMITH:  Objection; form.
6      A.   You had asked me a series of
7 questions based upon my feelings as far as a
8 relationship between a doctor and a client as it
9 related to prescribing practices.  That's what
10 I'm referring to.
11      Q.   Does the Cuyahoga County Board of
12 Health have responsibility for detecting or
13 measuring overprescribing?
14      A.   No, we do not.
15      Q.   Who has that responsibility in
16 Cuyahoga County?
17      A.   I would probably -- local law
18 enforcement, federal law enforcement agencies.
19      Q.   Do you agree that without access to
20 the medical records of a specific individual,
21 it's not possible to determine if any specific
22 prescription was medically improper?
23      A.   I would agree with your statement.
24      Q.   Does the Cuyahoga County Board of
25 Health have authority or expertise to oversee or

Page 251

1 scrutinize a licensed physician's individual
2 prescribing practices?
3      A.   No, we do not.
4      Q.   Who has that authority in Cuyahoga
5 County?
6      A.   DEA.
7      Q.   Anybody else?
8      A.   DEA is the only one that I'm aware
9 of.
10      Q.   Do you agree that the overwhelming
11 majority of physicians in and around Cuyahoga
12 County who have prescribed prescription opioids
13 have done so for legitimate medical needs?
14      A.   Based upon conversations with
15 individuals at the state and local level, yes.
16      Q.   With whom have you had conversations
17 about that?
18      A.   Members of Ohio Department of Health;
19 members here locally like Dr. Chris Delos Reyes,
20 Dr. Ted Parran, both who are addictionologists
21 and experts in the field of addiction medicine.
22      Q.   You talked about those accreditation
23 standards that hospitals have a little bit
24 earlier.
25          Do you know whether or not individual

Page 252

1 physicians or hospitals have the freedom to
2 disregard accreditation standards in terms of
3 how they practice medicine?
4      A.   I do not know that.
5      MR. SMITH:  Objection; form.
6      Q.   Another of the boxes -- I'm still
7 looking at Page 7.
8      A.   No problem.
9      MR. SMITH:  Of which exhibit?
10      MR. BOEHM:  Of Exhibit 7.
11      Q.   This is the Cuyahoga County Opiate
12 Task Force slide deck that you used to present.
13      A.   Okay.
14      Q.   One of the boxes in this schematic
15 says "Widespread diversion of prescription
16 drugs."  Do you see that?
17      A.   I do.
18      Q.   And then it lists some examples of
19 diversion.  Do you see that?
20      A.   I do.
21      Q.   Let's talk about some of those
22 examples.  But, first, can you --
23      A.   Can we get a quick break and then
24 come back and dig into this?
25      Q.   Let me just finish my question so we

Page 253

1 don't have one halfway done on the record.
2      A.   Sure.  I'm sorry about that.
3      Q.   What is your understanding about what
4 diversion is in the context of controlled
5 substances and specifically prescription opioid
6 medications?
7      A.   An example of diversion would be the
8 term "doctor shopping."  Doctor shopping by the
9 Ohio Department of Health is an individual who
10 has seen more than five physicians in a year,
11 would be one example of diversion.
12      Q.   Is there a broader definition of
13 diversion that you have other than just
14 identifying examples?
15      A.   That's the definition that I'm
16 familiar with.  I don't know if there is a
17 Webster's dictionary definition of diversion.
18 That's what I have always shared or used with
19 colleagues.
20      MR. BOEHM:  Okay.  Let's go off the
21 record.
22      VIDEO TECHNICIAN:  Off the record at
23 3:56.
24      (Recess taken at 3:56 p.m.)
25      (Back on the record at 4:16 p.m.)

64 (Pages 250 - 253)

Page 254

1     VIDEO TECHNICIAN: We're on the
2 record 4:16, Media Number 4, Caraffi
3 deposition.
4 BY MR. BOEHM:
5     Q.   Mr. Caraffi, do you agree that all
6 forms of diversion are illegal?
7        Mr. Caraffi, I'm not sure what you're
8 looking at, but my question --
9     A.   I'm sorry. I thought we were still
10 on the contributing factors. My bad.
11    Q.   My question is, do you agree that all
12 forms of diversion are illegal?
13       MR. SMITH: If you need to think
14 about your answer, you're allowed to do
15 that.
16    A.   Yes, I would.
17    Q.   Do you agree that theft of
18 prescription opioid medications is illegal?
19    A.   I didn't understand what you said.
20 What?
21    Q.   Do you agree that theft of
22 prescription opioid medications is illegal?
23    A.   Yes, I would.
24    Q.   Do you agree that using a
25 prescription opioid medication that was not

Page 255

1 prescribed to you by a licensed physician is a
2 form of diversion and is not legal?
3       MR. SMITH: Objection; form.
4     A.   I would agree with that comment.
5     Q.   Are you familiar with the concept of
6 pill mills?
7     A.   I am.
8     Q.   What is a pill mill?
9     A.   My recollection of a pill mill as it
10 relates to the prescription opioid epidemic is a
11 licensed medical facility that is prescribing
12 numerous prescription medications without the
13 interaction between a patient and the client,
14 what you had asked me earlier.
15       I'm not aware of a definitive
16 definition of a pill mill, but that is my
17 recollection of what a pill mill is.
18    Q.   Has Cuyahoga County had pill mills of
19 prescription opioid medications?
20    A.   I do not know.
21    Q.   To your knowledge, has Cuyahoga
22 County had an instance of a pill mill?
23       MR. SMITH: Objection; form.
24    A.   My conversations with law enforcement
25 that are part of the task force, I don't recall

Page 256

1 a pill mill per se.
2     Q.   To what extent do you believe that
3 intentional overprescribing by unscrupulous
4 physicians is to blame for opioid abuse and
5 overdose within Cuyahoga County?
6     A.   Could you ask me that again, please?
7     Q.   Sure. To what extent do you believe
8 that intentional overprescribing by unscrupulous
9 physicians is to blame for opioid abuse and
10 overdose within Cuyahoga County?
11    A.   I don't know.
12    Q.   To what extent do you believe that
13 drug dealers are to blame for opioid abuse and
14 overdose in Cuyahoga County?
15    A.   I would say it's a part of it, but I
16 can't give you a specific number. I can't give
17 you a specific rate.
18    Q.   When you say you can't give me a
19 specific rate, what do you mean? You can't
20 quantify the level of blame?
21    A.   Correct. Is it part of the problem?
22 I would say yes.
23    Q.   We've talked about a lot of
24 contributing factors here today, and some we
25 still have yet to talk about that we'll get to.

Page 257

1     A.   I understand.
2     Q.   Are you able to quantify or rank or
3 sort by level of importance all the contributing
4 factors that the Cuyahoga County Opiate Task
5 Force has identified as contributing to the
6 epidemic in the county?
7        MR. SMITH: Objection; form.
8     A.   I do not know.
9     Q.   When you say you do not know, what do
10 you mean?
11    A.   I can give you examples, but I do not
12 know specific percentages, as you asked me, and
13 rating them from top to bottom which is the most
14 contributing factor.
15    Q.   Do you agree that the opioid epidemic
16 in Cuyahoga County is very complex and
17 multifaceted?
18    A.   Yes.
19    Q.   Some of the other contributing
20 factors of the Cuyahoga County Opiate Task Force
21 has identified -- and now I am directing your
22 attention back to Slide 7 of the deck that we've
23 marked as --
24    A.   It's 7.
25    Q.   Exhibit 7.

65 (Pages 254 - 257)

Page 258

1      A.    Okay.
2      Q.    Yes, it's Page 7 of Exhibit 7.
3      A.    Okay.
4      Q.    That identifies contributing factors
5   that the Cuyahoga County Opiate Task Force has
6   identified for the epidemic.  We've talked about
7   some of them so far, but not all of them.
8          You also talk about a direct-to-consumer
9   marketing of prescription -- that "Rx" means
10   prescription, right?
11      A.    Uh-huh.
12      Q.    In what way do you believe that
13   direct-to-consumer marketing has contributed to
14   the opioid epidemic in Cuyahoga County?
15      A.    This factor relates to a culture that
16   we have in this country where every time you
17   turn on the TV, you see a marketing aspect.
18   We're talking about opioids today.  It may be
19   Lipitor, it may be Zoloft for mental health
20   illness.
21          This contributing factor is put in
22   there based upon that, and there's only two
23   countries that I am currently aware of that have
24   direct marketing to consumers, and that's New
25   Zealand and the United States.

Page 259

1      Q.    In your view, should
2   direct-to-consumer marketing not be permitted in
3   the United States?
4      A.    I don't know.
5      Q.    Do you have an opinion about that?
6          MR. SMITH:  Objection; form.
7      A.    I don't have an opinion one way or
8   another.
9      Q.    Are you aware of any particular
10   direct-to-consumer marketing efforts with
11   respect to prescription opioid medications?
12      A.    I am not aware of any direct consumer
13   marketing from a prescription opioid
14   manufacturer.
15      Q.    Okay.  The next box here just kind of
16   going clockwise is "Availability and marketing
17   of new extended-release prescription opioids."
18   Do you see that?
19      A.    I do.
20      Q.    In what way do you and the Cuyahoga
21   County Opiate Task Force believe that
22   availability and marketing of new
23   extended-release prescription opioids has
24   contributed to levels of opioid abuse and
25   overdose in the county?

Page 260

1      A.    I think that factor relates back to
2   certain -- the strength of the opioids,
3   availability as it relates to once these
4   materials were only available for terminally ill
5   or palliative care, so the availability and
6   marketing opened up from that standpoint.  That
7   would be the contributing factor.
8      Q.    So when you talk about availability
9   and the changes in the circumstance, the
10   circumstances in which these are available, are
11   you referring to the changes in prescribing
12   guidelines for pain management?
13      A.    I'm referring to conversations that
14   I've had with collaborative members, individuals
15   for palliative care, who have explained to me
16   that these very powerful drugs that were
17   available for individuals that they used to work
18   with are now open to everybody, that that is my
19   recollection.
20      Q.    And do you know why, as you put it,
21   they're more open to others?
22          Is that -- in other words, is that
23   related to the changes in clinical pain
24   management guidelines that are -- that's also
25   referenced?

Page 261

1      A.    I do not know that.  I don't know
2   that.
3      Q.    So you don't know why there was a
4   time when prescription opioid medications were
5   available only for palliative or cancer care,
6   but subsequently became available for other
7   indications.
8      A.    I do not know.
9      Q.    We've already talked about overall
10   growth of prescription use, widespread diversion
11   of prescription drugs.
12          The next box is "Changing
13   prescription pain management guidelines."  We
14   talked about this a bit in the context of the
15   2010 report.
16      A.    ODH?
17      Q.    Right.  But we haven't talked about
18   it in the context of the Cuyahoga County Opiate
19   Task Force findings.
20          In what way does the Cuyahoga County
21   Opiate Task Force believe that changing pain
22   management guidelines for prescription opioids
23   has contributed to opioid abuse and overdose in
24   the county?
25      A.    You mean increase in prescribed

66 (Pages 258 - 261)

Page 262

1 medications -- an increase in opioid
2 medications?
3     Q.   Why has an increase in prescribed
4 medications contributed to opioid abuse and
5 overdose as the Cuyahoga County Opiate Task
6 Force understands it?
7     A.   I don't know.
8     Q.   And then it says "Perceived
9 legitimacy and safety of prescription drugs."
10 That's the final box.
11     What do you and the Cuyahoga County
12 Opiate Task Force mean when you say that the
13 perceived legitimacy and safety of prescription
14 drugs has contributed to opioid abuse,
15 addiction, or overdose in this community?
16     A.   Based upon information from the Ohio
17 Department of Health, when this epidemic was
18 noted, there were two individual populations
19 that were at greatest risk of perceived
20 legitimacy.  One was Caucasian women, and what I
21 mean by that is that mother's little helper
22 would -- "Prescribed by a physician, I can take
23 it," not knowing that it's a powerful pain
24 medication.
25     The other one we saw was adolescents,

Page 263

1 adolescents taking pills with the thought that,
2 "Well, it's legitimate, it's from a physician,
3 how could I become addicted or how could I be
4 into an overdose situation."
5     Q.   We've seen in some of the materials
6 that the County has produced to us from the
7 Cuyahoga County Opiate Task Force that the
8 opioid abuse epidemic has largely impacted the
9 Caucasian community, maybe disproportionately
10 impacted the Caucasian community, relative to
11 other abuse epidemics.  Is that your
12 understanding?
13     MR. SMITH:  Objection; form.
14     A.   Based upon information from
15 Dr. Gilson, yes.
16     Q.   Has the fact that the opioid abuse
17 epidemic in Cuyahoga County disproportionately
18 impacted Caucasians had any impact on the way
19 that Cuyahoga County Board of Health, the
20 Cuyahoga County Opiate Task Force, or any other
21 entity within the County has addressed the
22 epidemic?
23     MR. SMITH:  Objection; form.
24     A.   Examples would be working with
25 collaborative members that are in schools.  That

Page 264

1 could be law enforcement that's doing leaders,
2 young leaders.  It could be working with school
3 resource officers to address the prevention for
4 that at-risk group.
5     It may be working with different
6 individuals like Nancy Pommerening from Drug
7 Awareness and Prevention that is using a NIDA
8 program that is an evidence-based program that
9 focuses on brain power as it relates to
10 substance abuse.
11     There are other collaborative members
12 that are using HOPE's training, which is an
13 evidence-based program that is being put forth
14 by the Ohio Department of Health.
15     Q.   How have those efforts in the context
16 of the opioid abuse epidemic in Cuyahoga County
17 differed from Cuyahoga County's response to drug
18 use epidemics of past years, including, for
19 example, the abuse of crack?
20     A.   I don't recall.
21     Q.   You're not sure one way or another?
22     A.   I was at Ohio University during the
23 crack epidemic.  I can't answer that question.
24     Q.   Well, based on all that you've
25 learned about substance abuse in this community

Page 265

1 as head of the Cuyahoga County Opiate Task
2 Force, do you have any understanding about how,
3 for example, law enforcement's approach to
4 addressing the opioid abuse epidemic in Cuyahoga
5 County differs from the way law enforcement
6 approached the epidemic of crack abuse in
7 Cuyahoga County?
8     A.   No, I do not.
9     Q.   Do you know Thomas Tallman?
10     A.   I do.
11     Q.   Who is Dr. Tallman?
12     A.   Dr. Tallman is a Metro employee.
13 Metro Health employee, I'm sorry.
14     Q.   Do you know what he does?
15     A.   Dr. Tallman oversees the correctional
16 facility for Cuyahoga County.
17     Q.   Do you know Mr. Lou LaMarca?
18     A.   No, I do not.
19     Q.   We've had a lot of conversation
20 today, Mr. Caraffi, about prescription opioids,
21 and we've also talked about other forms of
22 opioids like heroin and fentanyl, right?
23     A.   I didn't know if you asked me a
24 question.  Yes.
25     Q.   Is that a fair summary?

67 (Pages 262 - 265)

Page 266

1    A.   Yes.
2    Q.   Do you understand that there's a
3  difference between prescription opioid
4  medications and illegal street substances such
5  as heroin?
6    A.   They're both opioids, but yes, I
7  understand that one is illicit and one is
8  manufactured through a company.
9    Q.   Well, prescription opioid medications
10  are not only manufactured by companies, but they
11  are approved by the United States Food and Drug
12  Administration, right?
13       MR. SMITH:  Objection; form.
14    A.   I can't -- I don't know.  I don't
15  know.
16    Q.   Okay.  So you have no knowledge one
17  way or another about whether or not prescription
18  opioid medications must be approved by the
19  United States Food and Drug Administration
20  before they're allowed for use?
21       MR. SMITH:  Objection; form.
22    A.   I may have been aware of that, but I
23  don't recall the last time.  I don't recall when
24  that was given to me or when that information
25  was passed along.

Page 267

1    Q.   Have you heard of the United States
2  Food and Drug Administration?
3    A.   I -- yes.
4    Q.   Do you know in your capacity as the
5  head of the Cuyahoga County Opiate Task Force --
6    A.   Yes.
7    Q.   -- and a longtime employee of CCBH
8  that one of the responsibilities of the Food and
9  Drug Administration is to review data and make
10  decisions about the approval of medications that
11  are available to the United States population?
12    A.   I misspoke.  Yes, I do.
13    Q.   And do you know that prescription
14  opioid medications, when they are approved by
15  the Food and Drug Administration, are approved
16  for specific purposes or specific indications?
17    A.   I do not know that.
18    Q.   Have you ever reviewed the
19  FDA-approved labeling for any prescription
20  opioid medication?
21    A.   No, I have not.
22    Q.   Do you know whether the labeling for
23  FDA-approved prescription opioid medications
24  have always identified a potential risk of
25  addiction?

Page 268

1       MR. SMITH:  Objection; form.
2    A.   No, I do not.
3    Q.   You don't know one way or another?
4       Go ahead.
5    A.   Could you ask me the question again?
6    Q.   I was just confirming you don't know
7  one way or another whether the labeling for
8  FDA-approved prescription opioid medications
9  includes and identifies a risk of possible
10  addiction.
11    A.   I don't know one way or another.
12    Q.   Do you know anything about the
13  approval process by which the Food and Drug
14  Administration reviews drug applications and
15  makes decisions?
16    A.   No, I do not.
17    Q.   Heroin, however, is not a
18  prescription opioid medication, correct?
19    A.   That is correct.
20    Q.   It's not made by any pharmaceutical
21  companies?
22    A.   That is correct.
23    Q.   It's not approved by the FDA for use?
24    A.   That is correct.
25    Q.   It's not dispensed by pharmacies?

Page 269

1    A.   That is correct.
2    Q.   And the same is true with respect to
3  carfentanil, right?
4    A.   Correct.
5    Q.   There's no legitimate medical reason
6  for an individual to have heroin or carfentanil,
7  right?
8    A.   I would agree with you.
9    Q.   And the same is true with respect to
10  illicit fentanyl or fentanyl analogs, correct?
11       MR. SMITH:  Objection; form.
12    A.   Did you say illicit fentanyl?
13    Q.   I did.
14    A.   Yes, I would agree with you.
15    Q.   And are you aware that illicit
16  fentanyl has been introduced into the drug
17  market here by drug cartels and drug dealers?
18    A.   From conversations with Dr. Gilson,
19  DEA, undercover narcotics officers, yes, I am
20  well aware of that.
21    Q.   And from those conversations, are you
22  also aware that that fentanyl that's being
23  introduced is actually made outside of the
24  United States, largely in China and Mexico?
25    A.   Through conversations with the DEA

68 (Pages 266 - 269)

Page 270

1  and undercover narcotics officers, yes, I am.
2      Q.    Based on your knowledge from having
3  had those conversations and your work on the
4  Cuyahoga County Opiate Task Force, do you have
5  an understanding about how individuals obtain
6  these illicit substances like heroin, fentanyl,
7  and carfentanil?
8      A.    Yes, I am aware of some examples.
9      Q.    How is that?  What's your
10  understanding?
11      A.    Much of this material can be
12  purchased through the black market.  It can also
13  be purchased unfortunately through the internet
14  and the U.S. Mail, and it is also purchased
15  through individuals that are working for those
16  organizations that would be considered cartels.
17      Q.    Fair to say that all of those forms
18  of obtaining those substances would be illegal
19  under the laws of the United States.
20      A.    I would agree.
21          (DEPOSITION EXHIBIT 8 MARKED
22          FOR IDENTIFICATION at 4:37 p.m.)
23      Q.    I've now marked an e-mail exchange as
24  Exhibit 8.
25          Actually, before I have you turn to

Page 271

1  this document, I had a couple questions I forgot
2  to ask you.
3          Do you know what black tar heroin is?
4      A.    I do.  From conversations associated
5  with local law enforcement, Dr. Ted Parran and
6  Dr. Chris Delos Reyes, it's a different form of
7  heroin, a sticky substance.  There's also brown.
8  Just the way that they actually would refer to
9  it on the streets, so...
10      Q.    Do you know how and when black tar
11  heroin was introduced within Cuyahoga County?
12      A.    I do not know that.
13      Q.    You don't know when or how, or is
14  it -- that's a little bit of an unfair question
15  from me because I asked you two things in the
16  same question.  So let me break it down a little
17  bit.
18      A.    Could you break that down for me,
19  please?
20      Q.    Yeah, sure thing.
21      A.    Thank you.
22          MR. SMITH:  Objection; form.
23      Q.    Do you know when black tar heroin was
24  introduced in Cuyahoga County?
25      A.    I don't recall a specific date.

Page 272

1      Q.    Can you say roughly?
2      A.    In speaking with undercover law
3  enforcement that was dedicated to heroin, I
4  would probably say about 2014.  My recollection
5  states about 2014.
6      Q.    But you're not certain one way or
7  another?
8      A.    I'm not certain one way or another
9  based upon the fact that it may have been there
10  in smaller levels prior to that date.
11      Q.    Do you know what the sources of black
12  tar heroin are?
13      A.    Primarily from Mexico, is my
14  understanding in conversations with the DEA.
15      Q.    Through drug cartels?
16      A.    Yes.
17      Q.    Have you ever heard of the Jalisco
18  drug cartel?
19      A.    I have, after reading the book called
20  "Dreamland."
21      Q.    Do you know if the Jalisco drug
22  cartel has engaged in opioid-related activities
23  within Cuyahoga County?
24      A.    I do not know.
25      Q.    Do you know if any other Mexican drug

Page 273

1  cartels have engaged in opioid-related
2  activities in Cuyahoga County?
3      A.    I do not know.
4      Q.    Who would we ask about that?
5      A.    I would say contact with Keith Martin
6  for the DEA.  He would be an advocate for that.
7  I'm sure that Justin Herdman from the United
8  States Department of Justice Northern Ohio would
9  know that.
10      Q.    All right.  Now let's turn to the
11  document that I had marked as Exhibit 8.  It's
12  an e-mail from 2017, and I expect you're going
13  to want to look at it if prologue is preface.
14          But I'll just direct your attention
15  to the fact that the e-mail chain was started by
16  you on October 10th, 2017, and you sent this
17  e-mail to quite a very long list of recipients.
18      A.    I'll read it real quick.
19          Go ahead.
20      Q.    You've had a chance to look at this
21  document now?
22      A.    I did.
23      Q.    And do you see that you started this
24  e-mail chain, as I indicated, on October 10th,
25  2017?

69 (Pages 270 - 273)

Page 274

1    A.   Are you on 2009?

2    Q.   It's on the second page of the

3  document.  You have to get to before that very

4  long list of recipients.  Do you see that?

5    A.   I'm looking at this as I referred

6  this information from Dr. Gilson, is what I see.

7    Q.   Mr. Caraffi, I'm going to ask you to

8  look at the second page of the document.

9    A.   And the bottom number is 207?

10   Q.   Correct.  About one-third of the way

11  down that page you sent an e-mail on October

12  10th, 2017.  Do you see that?

13   A.   Okay.

14   Q.   How did you select the list of

15  recipients to whom you sent this e-mail?

16   A.   These are all task force members.

17   Q.   These are all members of the Cuyahoga

18  County Opiate Task Force?

19   A.   Some active, some not, yes.

20   Q.   And you indicate in your e-mail that

21  you're passing along some information from

22  Dr. Gilson.  You say:

23       "At the April task force meeting,

24  Tom -- is that Dr. Gilson?

25   A.   It is.

Page 275

1    Q.   -- "Tom indicated local data was

2      showing an increasing trend in the number

3      of overdose fatalities in

4      heroin/fentanyl, with no history of

5      overprescribing of pain medication."

6        Do you see that?

7    A.   I do.

8    Q.   Do you recall this exchange?

9    A.   I recall the exchange.

10   Q.   Do you recall the data that

11  Dr. Gilson had passed along that reflected a

12  trend of overdose fatalities in individuals with

13  no history of abusing prescription opioid

14  medications?

15   A.   I recall sending that to him -- or

16  him sending that to me and me passing that

17  forward, yes.

18   Q.   And you indicate there that it's

19  local data.  That's in your first sentence.

20       What did you mean by local data?

21   A.   Dr. Gilson indicated.  Tom

22  indicated local data, is what I see.

23   Q.   Yeah.  Tom indicated local data was

24  showing a trend of overdose fatalities from

25  heroin and fentanyl in individuals who had no

Page 276

1  history of abusing prescription opioids, right?

2    A.   Uh-huh.

3    Q.   You've got to say yes or no.

4    A.   Yes.

5    Q.   And he indicated that the data that

6  this related to was local.  Do you know what

7  that meant?

8    A.   I do not.

9    Q.   If you look at the "Results" section

10  of your e-mail...

11       MR. SMITH:  It's Bates stamped 210?

12       MR. BOEHM:  It's Bates stamped 48210,

13   yes.

14   A.   Yes.

15   Q.   At the end there of the "Results"

16  section, it says that in 2015, heroin was an

17  initiating opioid more frequently than

18  prescription opioid analgesics.  Do you see

19  that?

20   A.   I do.

21   Q.   What is your understanding of what

22  that means?

23   A.   I didn't write that report.

24   Q.   Okay.  Well, let me ask it this way:

25  Do you know what it meant when they talk about

Page 277

1  an initiating opioid?

2    A.   The opioid that you had started your

3  substance abuse disorder on.

4    Q.   So they're saying in 2015, heroin was

5  the first opioid that an individual had abused

6  more frequently than instances where a

7  prescription opioid medication was the first

8  opioid that the individual had abused, right?

9        MR. SMITH:  Objection; form.

10   A.   Yes, that's what this...

11   Q.   Do you understand Cuyahoga County in

12  this lawsuit to somehow be claiming that the

13  defendants in this case are responsible for

14  overdoses of individuals who initiated opioid

15  abuse with heroin and did not first abuse

16  prescription opioid medications?

17   A.   I do not know.

18   Q.   Do you know whether Cuyahoga County

19  is somehow claiming that defendants are

20  responsible for individuals who overdosed who

21  didn't use a prescription opioid medication?

22       MR. SMITH:  Objection; form.

23   A.   I do not know.

24   Q.   Do you know whether the County is

25  claiming the defendants are somehow responsible

70 (Pages 274 - 277)

Page 278

1  for overdoses of individuals who have never
2  abused prescription opioid medications, but
3  instead have only abused heroin or some other
4  opiate?
5      MR. SMITH:  Objection; form.
6      A.  I do not know.
7      Q.  Can you sitting here today think of
8  any reason why defendants are responsible for
9  the overdoses of individuals who have never
10  abused prescription opioid medications?
11      MR. SMITH:  Objection; form.
12      A.  Based upon information of task force
13  members, there's a link between prescription
14  opioid medication, heroin abuse and fentanyl
15  abuse.
16      Q.  I'm asking a slightly different
17  question.
18      A.  You'll have to say it again, please.
19      Q.  My question is whether you sitting
20  here today can think of any reason why
21  defendants are responsible for individuals who
22  have overdosed --
23      A.  The defendants being who?
24      Q.  All the defendants that Cuyahoga
25  County has claimed share some responsibility.

Page 279

1  That's how I'm defining it.
2      Can you think of any reason why the
3  defendants in this lawsuit are somehow
4  responsible for the overdoses of individuals who
5  initiated their abuse of opioids with heroin or
6  some other illegal substance and have never
7  abused prescription opioid medications?
8      MR. SMITH:  Objection; form.
9      A.  Who are the defendants?
10      Q.  The defendants are the identified
11  makers of prescription opioid medications and
12  others in the supply chain of those medications.
13      MR. SMITH:  Objection; form.
14      A.  Could you ask that question one more
15  time, please?
16      Q.  Sure.  Can you sitting here today
17  think of any reason why the defendants in this
18  case are responsible for the overdose of an
19  individual who never abused prescription
20  opioids?
21      MR. SMITH:  Objection; form.
22      A.  I do not know.
23      Q.  If you go to the next e-mail up in
24  this chain...
25      A.  Are we still on Exhibit 8?

Page 280

1      Q.  Yes, we're still looking at
2  Exhibit 8.
3      Do you see that Dr. Tallman responds
4  to your e-mail on the second page of Exhibit 8?
5      A.  Yes.
6      Q.  Dr. Tallman writes:
7      "I can also add that a significant
8  number of inmates I have screened for
9  Vivitrol medication-assisted treatment did
10  not have a history of opioid addiction
11  following a prescription for Percocet,
12  OxyContin, et cetera."
13      Do you see that?
14      A.  I do.
15      Q.  What did you understand Dr. Tallman
16  to be saying?
17      A.  I don't know.
18      Q.  You didn't have any way of
19  interpreting what he had said?
20      A.  I don't know.
21      Q.  Well, isn't he simply saying that
22  there's a significant number of inmates at the
23  Cuyahoga County jail who don't -- who are
24  eligible for opioid treatment, but have no
25  history of addiction to prescription opioids?

Page 281

1      MR. SMITH:  Objection; form.
2      A.  I do not know.
3      Q.  Sitting here today, when you read the
4  plain language black and white on this document,
5  are you telling me you can't understand that?
6      MR. SMITH:  Objection; form.
7      A.  I do not know.
8      Q.  Not my question.
9      Are you telling me as you sit here
10  today and you read Dr. Tallman's response to the
11  data that you had sent to him in October 2017,
12  you can't begin to comprehend it?
13      MR. SMITH:  Objection; form.
14      A.  No, I cannot.
15      Q.  Okay.  The final e-mail in the chain
16  is from Lou LaMarca.  You indicated you don't
17  know exactly who Mr. LaMarca is, right?
18      A.  I do not know Lou LaMarca.
19      Q.  His e-mail address suggests that he
20  works at an entity called Community Assessment.
21  Do you see that?
22      A.  I do.
23      Q.  Do you know what that organization
24  is?
25      A.  No, I do not.

71 (Pages 278 - 281)

Page 282

1    Q.   In any event, he writes back in
2  response to these e-mails, and he says:
3        "This is consistent with what we are
4    seeing as well.  It is rare for one of our
5    clients to have started with a medically
6    necessary opioid prescription."
7        Do you see that?
8    A.   I do.
9    Q.   So Mr. LaMarca, who is the clinical
10  director at the Community Assessment and
11  Treatment Services entity in Cleveland,
12  indicates that from his experience, it's rare
13  for a client to have started with a medically
14  necessary opioid prescription, correct?
15   A.   That's what he's saying.
16   Q.   Do you know what percentage of
17  individuals -- well, let me ask you this.
18       Do you have any reason to believe
19  that Mr. LaMarca is incorrectly characterizing
20  the population of opioid-addicted individuals in
21  Cuyahoga County?
22       MR. SMITH:  Objection; form.
23   A.   I do not know.
24   Q.   Do you have any reason to believe
25  Mr. LaMarca is incorrectly characterizing the

Page 283

1  opioid-addicted population in Cuyahoga County?
2    A.   I do not know.
3    Q.   Do you know what percentage of
4  individuals in Cuyahoga County who have
5  developed an addiction to opioids initiated
6  their abuse of opioids through a medically
7  necessary prescription from a licensed
8  physician?
9    A.   I don't recall that information.
10   Q.   Is that information you have ever
11  known?  And I ask you because you say you cannot
12  recall.
13   A.   I don't recall ever having that
14  information.
15   Q.   Do you know what percentage of
16  individuals in Cuyahoga County who have
17  developed an addiction to opioids initiated
18  their abuse through illegally obtained
19  prescription opioids?
20   A.   I don't recall that information.
21   Q.   Do you know -- do you recall ever
22  having had that information?
23   A.   No.
24   Q.   Do you know what percentage of
25  individuals who have developed an addiction to

Page 284

1  opioids in Cuyahoga County initiated their abuse
2  through heroin, carfentanil, fentanyl, or some
3  other illegal opioid abuse?
4        MR. SMITH:  Objection; form.
5    A.   I do not know that answer.
6    Q.   Are you aware of any statistics on
7  those questions?
8        MR. SMITH:  Objection; form.
9    A.   I'm not aware of any statistics on
10  the questions that you just asked me.
11   Q.   Do you know what percentage of
12  individuals who have overdosed by abusing
13  opioids in Cuyahoga County initiated their abuse
14  through a medically necessary prescription
15  opioid medication?
16   A.   I don't have that information.
17   Q.   And for the record, you just flipped
18  through the slide deck from the Cuyahoga County
19  Opiate Task Force that you've used to describe
20  the epidemic in Cuyahoga County, a document
21  that's been marked as Exhibit 7, correct?
22   A.   That is correct.
23   Q.   Were you looking for information in
24  this slide deck that would allow you to answer
25  those questions?

Page 285

1    A.   I do recall in the past having that
2  specific information or close to it from
3  Dr. Gilson's office.
4    Q.   Okay.
5    A.   But I don't have that in this
6  specific presentation.
7    Q.   To be clear, my question to you is,
8  what percentage of individuals who overdosed on
9  opioid medications in Cuyahoga County initiated
10  their abuse through a medically necessary
11  prescription opioid?
12       Do you recall having that information
13  from Dr. Gilson?
14       MR. SMITH:  Objection; form.
15   A.   I recall that that information was
16  contained in the poison death review.
17   Q.   Do you know how Dr. Gilson or others
18  at the Cuyahoga County Office of the Medical
19  Examiner went about trying to determine what
20  percentage of individuals who overdosed on
21  opioids had initiated their abuse of opioids
22  with a medically necessary prescription?
23   A.   I recall it being part of the
24  toxicology screening that he does at an
25  overdose.

72 (Pages 282 - 285)

Page 286

1    Q.   How would a toxicology screening at
2  the time of an overdose tell you what substance
3  that individual initiated with in terms of their
4  opioid abuse?
5    A.   The medical examiner conducts a
6  thorough review, crime scene, and historical
7  background.  That's how we got some of the
8  information for our poison death review.
9    Q.   No.  My question is, how would
10  toxicology results at the time of an overdose,
11  which tells you what substance is in the blood
12  at the time of the overdose, how would that give
13  you information about what substance was the
14  initiating substance of abuse?
15    A.   It wouldn't.  I looked at it from the
16  standpoint of more of a comprehensive review
17  that takes place when an overdose victim gets
18  taken into the medical examiner's office.  So
19  I misspoke on that.
20    Q.   Okay.  So are you aware of any
21  information about what percentage of individuals
22  who have overdosed by abusing an opioid in
23  Cuyahoga County initiated their abuse of opioids
24  through a medically necessary prescription?
25    A.   I don't know.

Page 287

1    Q.   You're not aware of anything like
2  that?
3    A.   I'm not aware of that.
4    Q.   How about the percentage of
5  individuals who have overdosed on opioids who
6  initiated their abuse through prescription
7  opioid pills that were illegally obtained or
8  used?
9    A.   I'm not aware of that information.
10    Q.   And if I asked you what percentage of
11  individuals in Cuyahoga County who have
12  overdosed on opioids initiated their abuse
13  through heroin or some other illicit substance,
14  are you aware of any information about that?
15    MR. SMITH:  Objection; form.
16    A.   Dr. Gilson has information within his
17  presentation that are within this slide that
18  talks about numbers of people who have died and
19  the contributing drugs that have been found in
20  the toxicology screens.
21    Q.   But I'm asking you about the
22  initiation of opioid abuse, and you can't
23  determine that from the tox screen, correct?
24    A.   I can't answer that.
25    Q.   Okay.  Are you aware of whether or

Page 288

1  not it would be possible to try and figure out
2  in Cuyahoga County what percentage of
3  individuals who ultimately overdose using
4  opioids initiated their abuse through
5  prescriptions for a legitimate medical need?
6    A.   I cannot answer that.
7    Q.   You don't know if that would be
8  possible or not?
9    A.   I do not, no.
10    Q.   Is that something that you or others
11  at the Cuyahoga County Board of Health or the
12  Cuyahoga County Opiate Task Force have ever
13  investigated?
14    A.   Dr. Gilson, in the records that he
15  has, probably indicates some of those questions
16  that you had asked me, but I don't recall which
17  specific ones.
18    Q.   When you say Dr. Gilson probably, are
19  you aware of any data along those lines, or are
20  you just thinking that Dr. Gilson might be able
21  to do that?
22    A.   There are different variables that
23  Dr. Gilson pulls out of his death review data as
24  far as percentages of individuals who have died
25  per specific drug, historical perspective on an

Page 289

1  individual's OARRS report, if I remember
2  correctly.  So there are different factors.  I
3  just don't recall which they are at this point
4  in time.
5    Q.   Okay.  As part of your
6  responsibilities as chair of the Cuyahoga County
7  Opiate Task Force and your role at the Cuyahoga
8  County Board of Health, do you have occasion to
9  review peer reviewed medical literature?
10    A.   I do.
11    Q.   Do you have occasion to review the
12  results of -- I'm sorry.  Were you not done?
13    A.   Can you hold off on that question so
14  we can take a break?
15    Q.   Sure.
16    MR. BOEHM:  Let's go off the record.
17    VIDEO TECHNICIAN:  Off the record
18  5:02.
19    (Recess taken at 5:02 p.m.)
20    (Back on the record at 5:07 p.m.)
21    VIDEO TECHNICIAN:  On the record
22  5:07.
23  BY MR. BOEHM:
24    Q.   Welcome back, Mr. Caraffi.  We off
25  the record discussed turning back to Exhibit 7,

73 (Pages 286 - 289)

1  the Slide 7, the Cuyahoga County Opiate Task
2  Force presentation that you've used that
3  identifies contributing factors to opioid abuse
4  in the community.
5      Are there any contributing factors to
6  trends of opioid abuse or overdose in Cuyahoga
7  County that are not identified on the schematic
8  here in Exhibit 7 that we've been looking at or
9  that we have otherwise not already discussed
10  during your deposition here today?
11      A.  Yes.
12      Q.  What are those?
13      A.  We've talked about stigma.  Stigma's
14  a contributing factor.
15      Q.  Okay.  And we talked a little bit
16  about stigma earlier today, right?
17      A.  We did.  Stigma as it relates to
18  creating barriers, I think that we have a
19  historical view of substance abuse in this
20  country, and we look at it as a moral failure
21  and that stems back to many years ago.
22      So it's hard to break that stigma;
23  it's a key piece and a key contributing factor.
24      Q.  Anything else?
25      A.  Based upon Dr. Gilson's information,

1  resurgence of cocaine use, so polypharmacy could
2  also be a contributing factor.
3      Some of the other things that we are
4  looking at as prevention measures is trauma or
5  mental health as it relates to individual's
6  stepping stones to substance abuse or opioid
7  epidemic.
8      I mentioned earlier the ACEs project,
9  so when you're looking at a child that
10  experiences adverse childhood experiences,
11  there's a high relationship or a percentage that
12  those individuals will come down with some form
13  of addiction.
14      So I think that those are a few
15  additional contributing factors that are not
16  mentioned necessarily in this slide, but further
17  on.
18      Q.  Thank you.  Let's talk about a couple
19  of those.  I think we covered stigma, at least a
20  little bit, earlier today.
21      A.  Can I add one more?
22      Q.  Of course.
23      A.  I would probably say lack of
24  knowledge and understanding about substance
25  abuse in general.

1      I didn't mean to interrupt you, so...
2      Q.  Oh, not at all.  I appreciate you
3  adding that.  Is there anything else that you
4  can think of?
5      A.  Not that I can recall off the top of
6  my head today.
7      Q.  Okay.
8      A.  It's late in the day, right, and
9  talking about Eminem now.
10      Q.  In what way do you believe that
11  childhood trauma and mental illness have
12  contributed materially to the trends of opioid
13  abuse, addiction, and overdose in Cuyahoga
14  County?
15      A.  I can't give you specifics on the
16  numbers.  I know a general percentage for mental
17  health based upon information from Ohio
18  Department of Health that about a third of the
19  individuals who die from an opioid overdose do
20  have a mental health illness.
21      And I can give you an example of what
22  I'm talking about; that, you know, a stepping
23  stone to addiction may be an individual who was
24  sexually abused her whole life or his life, and
25  their stepping stone to addiction is a coping

1  mechanism.
2      ACEs scores are there.  Whether it
3  relates to substance abuse, whether it relates
4  to obesity, whether it relates to diabetes, it's
5  just a tool that's on the market to try and put
6  more preventative care towards an individual
7  before they become a substance abuser.  That's
8  an example.
9      Q.  Is it fair to say, based on
10  conversations you've had with experts on the
11  task force, that mental illness is a causal risk
12  factor for substance use disorder?
13      A.  Yeah.  For physicians who are
14  involved in substance abuse, mental health and
15  substance abuse usually goes hand in hand.
16      I think Dr. Gilson's information
17  would also reflect a number of individuals who
18  unfortunately die from an opioid overdose if
19  they have a history of mental health illness.
20      I'm sure that the ADAMHS board or
21  ADAMHS boards throughout Ohio have those numbers
22  as it relates to substance abuse and suicide and
23  mental health illness.
24      Q.  You also indicated that there's been
25  a resurgence of cocaine use in Cuyahoga County.

74 (Pages 290 - 293)

Page 294

1    In what way has the resurgence of
2  cocaine use in the county materially contributed
3  to opioid abuse and opioid overdoses?
4    A.    Based upon information from
5  Dr. Gilson and Keith Martin from the DEA and
6  Jeff Capretto of the Westshore task force, we've
7  seen an increase in deaths among African
8  American males that have a polypharmacy with
9  opioid abuse; fentanyl, opioids, a polypharmacy
10  aspect of it.
11    So we've seen a trend, an upward
12  trend, in African American males that we haven't
13  seen, and we are seeing too that that's also in
14  Caucasian based upon Dr. Gilson's information.
15  Cocaine is making a resurgence back here.
16    Conversations with DEA, that's more
17  of a business model approach that I don't
18  understand it.  You'd have to talk to Keith
19  Martin about on why the cartels are doing that
20  or Jeff Capretto.  I don't have the knowledge on
21  that.
22    Q.    Do you agree that drug cartels have
23  added fentanyl to cocaine and that that has
24  caused some overdose fatalities in the county?
25    A.    Based upon Tom's information, we do

Page 295

1  see a mixture of cocaine and fentanyl.  I can't
2  speak on what the cartels are doing.
3    Q.    Have you also seen individuals who
4  were abusing methamphetamines that had been cut
5  by fentanyl and that resulted in an overdose
6  fatality?
7    A.    I recall conversations with law
8  enforcement within Cuyahoga County.  Meth still
9  hasn't made an impact here as it has in other
10  counties in Ohio, so I can't really answer that.
11  You'd have to ask local law enforcement.
12    Q.    When you say that meth hasn't made an
13  impact, what do you mean by that?
14    A.    I think methamphetamine hasn't --
15  one, it's a different animal.  Local law
16  enforcement here hasn't seen the distribution of
17  meth in comparison to several of the other drugs
18  that we have been talking about today --
19  prescription opioids, heroin, or fentanyl --
20  within Cuyahoga County.  I can't speak upon
21  other aspects of Ohio.
22    Q.    As of 2018, do you know how numbers
23  of overdose fatalities related to cocaine
24  compare with numbers of overdose fatalities
25  related specifically to prescription opioid

Page 296

1  medications?
2    A.    Yes.  Regarding deaths?
3    Q.    Yes.
4    A.    Dr. Gilson has that information, yes.
5    Q.    And how do those compare?
6    A.    When we look at Exhibit 7 that you've
7  handed me, if we go to Page 12 -- and it's a
8  little difficult to see because it's not in
9  color, but there's a breakdown of overdose
10  deaths where you can see that there's cocaine,
11  non-fentanyl-associated heroin deaths,
12  fentanyl-related deaths, heroin, and
13  non-fentanyl.
14    There are other slides that I recall
15  Dr. Gilson having that indicate opioids outside
16  of fentanyl.  I don't recall which slide that
17  would be.
18    That's Page 12, is what I'm looking
19  at right now.
20    Q.    Page 12, and then if you -- this is
21  Page 12 of Exhibit 7, right?
22    A.    Yes, that's what I'm looking at.
23    Q.    Okay.  And if you actually look in
24  the bottom right-hand corner of the slide
25  itself, it says 18, so there's a little

Page 297

1  discordance.  Do you see that number 18 on the
2  side there?
3    A.    I have a 12 on mine for some reason.
4    Q.    Let me just make sure that I'm
5  looking at the same page you are.
6    Yeah, that's the same.  Okay.  No,
7  I'm good.  Thank you.
8    MR. SMITH:  You must have a different
9  copy.
10    MR. BOEHM:  That's okay.  It's the
11  same slide, it's the same information.
12    Q.    The cocaine line on this slide is the
13  one that's marked by the small triangle, right?
14    A.    Bear with me, folks, as I'm trying to
15  one-eye this here.
16    Cocaine only is with the triangle.
17    Q.    And that total as of 2017 is 290
18  overdose fatalities, right?
19    A.    That's correct, that's what I'm
20  looking at on Dr. Gilson's information.
21    Q.    That's 290 out of a total of 727
22  overdose fatalities for 2017 that are cocaine?
23    A.    If I remember correctly, if -- it
24  would be dependent upon other individuals that
25  he was still diagnosing.  So what you're looking

75 (Pages 294 - 297)

Page 298

1  at, if you're looking at adding these numbers
2  up, in some cases there's still toxicology
3  screens that are going on, so -- but from
4  looking at this slide, yes.
5      Q.   And then the small circle is the
6  fentanyl, right?
7      A.   Yes.
8      Q.   So in 2017 in Cuyahoga County,
9  fentanyl overdose deaths accounted for 492 of
10  the total 727 overdose fatalities, right?
11      A.   Correct, from Dr. Gilson's
12  information.
13      Q.   Do you know whether the number of
14  prescription opioid-related overdose fatalities
15  in 2017 was bigger or smaller than the 492
16  related to fentanyl?
17      A.   Within this presentation, I do not
18  know.
19      Q.   But just based on your knowledge from
20  being the chair of the opiate task force, do you
21  know the answer to that question?
22      A.   I recall that there is a slide that
23  includes opioids, non-fentanyl or heroin.  I
24  just don't -- I don't have the number in the
25  back of my head, but Dr. Gilson would have that

Page 299

1  information.
2      Q.   Do you agree that for the past
3  several years in Cuyahoga County, the number of
4  prescription opioid overdose fatalities has been
5  dropping?
6      A.   Based upon Tom's information, yes.  I
7  can't give you a specific number.
8      Q.   Do you agree that the number of
9  prescription opioid overdose fatalities over the
10  last several years has actually been smaller
11  than the number of cocaine-related overdose
12  fatalities in Cuyahoga County?
13      A.   Based upon Tom's information, I would
14  agree with you.
15          (DEPOSITION EXHIBIT 9 MARKED
16          FOR IDENTIFICATION at 5:20 p.m.)
17      Q.   I've marked the next document as
18  Exhibit 9 for purposes of your deposition.
19          You've been talking about Dr. Gilson,
20  and he is on this e-mail.
21      MR. BOEHM:  Here you go, Scott.
22      MR. SMITH:  Thank you.
23      Q.   And this e-mail, as you'll see,
24  responds to the circulation of a "New York
25  Times" article on the question of whether opioid

Page 300

1  addicts tend to transition from abusing
2  prescription opioid medications to using heroin,
3  or whether they're abusing both interchangeably.
4  But I'll give you a chance to take a look at it.
5      A.   Okay.
6      Q.   Do you see that?
7      A.   Yes.
8      Q.   Dr. Gilson writes to you and others
9  that the relationship between prescription
10  painkillers and heroin remains poorly
11  researched.  Most information is anecdotal.
12          Do you see that?
13      A.   I do.
14      Q.   Do you agree with those statements?
15      A.   I can't speak on behalf of
16  Dr. Gilson.
17      Q.   I'm not asking you to do that, by no
18  means.  My question was whether or not you agree
19  with those statements.
20      A.   I do not know.
21      Q.   You don't know whether you agree or
22  not?  How is it possible for you yourself not to
23  know whether you agree with something?
24      A.   I can't speak on behalf of what he's
25  saying.

Page 301

1      Q.   Do you agree with the statements that
2  we just read in Dr. Gilson's e-mail that the
3  relationship between prescription painkillers
4  and heroin remains poorly researched and that
5  most information is anecdotal?
6      A.   I don't recall reading the article
7  that he is referring to, so I -- I don't know.
8      Q.   Whether you've read the article or
9  not, I want to know whether or not you agree
10  with the statements that Mr. Gilson wrote in
11  this e-mail from February 12th, 2014 that the
12  relationship between prescription painkillers
13  and heroin remains poorly researched and that
14  most information is anecdotal.
15          I just want to know if you agree with
16  that or not.
17      A.   I do not know.
18      Q.   You don't know whether you agree or
19  not?
20      A.   I think there's more content to the
21  e-mail than what you're reading, so I don't --
22      Q.   Whatever the content is of the
23  e-mail, I'm just asking you whether or not you
24  agree with the statements that Dr. Gilson has
25  made here.  You can say yes or no, I just want

76 (Pages 298 - 301)

Page 302

1 to know which way it is.
2    A.    I do not know.
3    Q.    You don't have a view one way or
4 another?
5    A.    I don't have a view one way or
6 another.
7    Q.    Have you ever looked into that
8 question yourself of whether or not there's a
9 relationship between prescription painkillers
10 and the use of heroin?
11    A.    Any information I received on that
12 specific question would be in relation to
13 conversations that I've had with other
14 individuals that are on the task force.
15    Q.    Okay.  And have those conversations
16 you've had with other experts or individuals on
17 the Cuyahoga County Opiate Task Force given you
18 an opinion about whether or not the relationship
19 between prescription painkillers and heroin is
20 poorly researched?
21    A.    I don't recall ever having a
22 conversation with individuals about this being
23 poorly researched.
24    Q.    Do you agree that most information
25 about whether there is a relationship between

Page 303

1 prescription painkillers and heroin is
2 anecdotal?
3        MR. SMITH:  Objection; form.
4    A.    Based upon the relationships that I
5 have with individuals that are part of the task
6 force who have lost loved ones with the
7 connection between prescription pain medication
8 and heroin, I believe there is a connection
9 between the two.
10    Q.    That's not my question, although I'm
11 interested in that and I'm going to ask you
12 about that.
13        My question is whether or not you
14 agree that the relationship or whether there's a
15 relationship between prescription painkillers
16 and heroin is mostly based on anecdotal
17 information.
18        MR. SMITH:  Objection; form.
19    A.    I can't answer that question.
20    Q.    Why can't you answer that question?
21 Is it because you don't know the answer?
22    A.    I don't know the answer to that.  I'm
23 not an epidemiologist, nor have I ever looked at
24 that research.
25    Q.    And yet you stated that your own view

Page 304

1 is that there is a relationship between
2 prescription painkillers and heroin.
3    A.    Uh-huh.
4    Q.    So given the fact that you're not an
5 epidemiologist and you cannot answer the
6 question about whether that relationship is
7 based mostly on anecdotal information, what is
8 the basis of your belief that there is a
9 relationship between prescription painkillers
10 and heroin abuse?
11        MR. SMITH:  Objection; form.
12    A.    I think there's enough information
13 within Dr. Gilson's reports to show that.  I
14 think there's enough information from the Ohio
15 Department of Health to show that crisis
16 throughout Ohio, and also from personal
17 conversations with individuals who have lost
18 loved ones.
19    Q.    Okay.  The personal conversations
20 you've had with individuals who have lost loved
21 ones you would agree are anecdotal?
22    A.    As they speak about their dead loved
23 one?  I think it's more than anecdotal.
24    Q.    Well, you understand what the term
25 "anecdotal" means, don't you?

Page 305

1    A.    Yes.
2    Q.    So nobody's diminishing in any way
3 the tragedy of somebody losing somebody.  By no
4 means nobody is doing that.
5    A.    I --
6    Q.    But I'm asking you -- and I'm not
7 trying to play around.  I'm asking you about the
8 term "anecdotal," and you know what that means.
9        And my question is, do you agree that
10 having conversations with individuals is not a
11 rigorous way to determine whether or not there's
12 a statistically valid relationship between two
13 substances and the abuse of those substances.
14 Do you agree?
15    A.    I would agree it's anecdotal, but
16 information from the Ohio Department of Health,
17 information from Dr. Gilson's office shows a
18 clear relationship between the misuse of
19 prescription medication and heroin and fentanyl.
20    Q.    And are you talking about, when you
21 refer to Dr. Gilson's work, the County's poison
22 death review?
23    A.    I'm talking about the information
24 that he puts together on a monthly basis.  I'm
25 talking about the information that individual

77 (Pages 302 - 305)

1 conversations that I've had with Dr. Chris
2 Delos Reyes, Ted Parran, individuals who are
3 addictionologists that are experts in the field
4 that can tell you that individuals -- a stepping
5 stone to heroin addiction or fentanyl abuse,
6 there is a relationship to prescription pain
7 medication.
8    Q.    The information that Dr. Gilson and
9 his office put together on a monthly basis, is
10 that related to the County Poison Death Review
11 Committee or is that some other analysis?
12    A.    It's related to the information
13 that's contained in Exhibit Number 7 --
14    Q.    Right, but I'm asking you about the
15 Poison Death Review Committee.  Do you know what
16 that is?
17    A.    I do, and it's not necessarily a
18 committee.  Dr. Gilson actually shares his
19 monthly death data.  He shares it with, on a
20 quarterly basis, the United States Department of
21 Justice, he shared it when Steve Dettelbach was
22 there, he shared it when Carole Rendon was
23 there.  He shares it now with Justin Herdman.
24 We take that information and also share it with
25 our task force.

1        We originally started a poison death
2 review, but unfortunately the number of people
3 that were dying was taking up a large amount of
4 time.  We decided to kind of step away from
5 meeting at that point in time just because of
6 the struggles that were taking place here
7 locally.
8        So the information was still be
9 tabulated, Dr. Gilson still shares that
10 information.  We just had to step away from
11 meeting.  It took too much time.
12    Q.    Okay.  Whether you want to call it a
13 committee or not, you see that Dr. Gilson refers
14 to it as a committee, right?
15    A.    At that point in time, yes.
16    Q.    This is February 2014?
17    A.    Uh-huh.
18    Q.    Do you believe that the committee has
19 been disbanded?
20    A.    Yeah.  We have not met on a quarterly
21 basis as we did initially, but the information
22 is still shared.
23    Q.    Dr. Gilson wrote in February 2014
24 that:
25        "Information from the County Poison

1 Death Review Committee, where we are trying
2 to get good information beyond anecdotal
3 observations, supports both possibilities."
4    A.    At that point in time, we were still
5 meeting.
6    Q.    Okay.  But setting aside whether you
7 were meeting or not, you see that Dr. Gilson is
8 saying that information from the County's Poison
9 Death Review Committee supports the possibility
10 that there is a connection between prescription
11 painkillers and heroin, and it supports the
12 possibility that there is not a connection
13 between prescription opioid medications and
14 heroin.  Do you see that?
15    A.    I do see that.
16    Q.    Do you have any reason to believe
17 that Dr. Gilson messed up when he wrote that?
18        MR. SMITH:  Objection; form.
19    A.    I have no reason to believe that one
20 way or another.
21    Q.    He goes on to say that there had been
22 a dramatic rise in heroin mortality in the last
23 few years.  Do you see that?
24        It's just the next sentence.
25    A.    I put it up here.

1        Yes, I see that.
2    Q.    And that's in 2014.  So he's saying
3 that several years before 2014, Cuyahoga County
4 had seen a rise in heroin-related overdose
5 mortality, right?
6    A.    I'm not able to determine what
7 Dr. Gilson is saying.  This is his e-mail.  I
8 don't know.  I don't know the answer to that.
9    Q.    Well, as head of the opiate task
10 force for Cuyahoga County, when did Cuyahoga
11 County begin to see a dramatic rise in heroin
12 mortality?
13    A.    I think we talked about this already.
14 It was 2014 or 2015 is when we talked about
15 that.
16    Q.    You think that Cuyahoga County didn't
17 see a dramatic rise in heroin mortality until
18 2014 or 2015?  Is that your testimony?
19        And I'll just for the record remind
20 you, sir, that in February 2014, Dr. Gilson
21 stated that the county had seen a dramatic rise
22 in heroin mortality in the last few years.
23        Do you remember my question?
24    A.    I see heroin -- I think it starts
25 here with 2013, but I'm having a hard time

Page 310

1  seeing that.
2      Q.   You have turned, and so the record
3  should reflect, to Slide 7 of Exhibit 7.  I
4  didn't ask you to turn there, but you turned
5  there, and you found that the graph that is
6  reflected on that particular slide starts with
7  2013, right?
8          This graph does not reflect pre-2013
9  data, right?
10     A.   Correct.
11     Q.   Okay.  But my question is simply
12  this:  Taking into account that Dr. Gilson has
13  stated in February 2014 that there had been a
14  dramatic rise in heroin mortality in the last
15  few years, what is your view as chair of the
16  Cuyahoga County Opiate Task Force about when the
17  county began to see a dramatic rise in heroin
18  mortality?
19     A.   Based upon Tom's information, I would
20  have to say 2013 from looking at this document
21  right here.
22     Q.   So you interpret him when he says
23  "last few years" to mean one single year, or do
24  you mean -- do you interpret him to mean last
25  few years?

Page 311

1          MR. SMITH:  Objection; form.
2      A.   I can't recall.
3      Q.   Have you ever used the term "last few
4  years" to refer to one year?
5      A.   I don't recall.
6          MR. SMITH:  Objection; form.
7      Q.   Do you think a more reasonable
8  interpretation of the words "last few years" is
9  that it means at least multiple years?
10     A.   I don't recall.
11     Q.   I'm not asking you to recall
12  anything.  I'm asking you whether or not you --
13     A.   I can't answer your question one way
14  or another.
15     Q.   You've got to wait till I'm done.
16          I'm not asking you to recall
17  anything.  I'm asking you about your
18  understanding of the English language and
19  whether or not you understand that "last few
20  years" means more than one.  Do you understand
21  that?
22     A.   Ask me the question again.
23     Q.   Do you understand that the words
24  "last few years" means more than one year?
25     A.   Yes.

Page 312

1      Q.   And so do you interpret Mr. Gilson's
2  e-mail from February 2014 to mean that there had
3  been a dramatic rise in heroin mortality at
4  least as early as 2012?
5          MR. SMITH:  Objection; form.
6      A.   I can't interpret Dr. Gilson's
7  information.
8          Can we take a break real quick?
9      Q.   Of course.
10          VIDEO TECHNICIAN:  Off the record
11  5:36.
12          (Recess taken at 5:36 p.m.)
13          (Back on the record at 5:58 p.m.)
14          VIDEO TECHNICIAN:  Back on the record
15  5:58, Media 5, Caraffi deposition.
16  BY MR. BOEHM:
17     Q.   Mr. Caraffi, who are the members of
18  the Cuyahoga County Poison Death Review
19  Committee?
20     A.   From my recollection, it was
21  Dr. Gilson; Rose Allen (ph), Roseanne Allen.
22  There were some members that were on and off.  I
23  think Judge Matia sat in, Molly Leckler,
24  Dr. Delos Reyes.  There was a representative
25  from the city of Cleveland law enforcement, I

Page 313

1  don't recall the name; Jeff Capretto from WEB
2  undercover narcotics.
3          That's all I recall right now.
4      Q.   Thank you.  For what years did the
5  Cuyahoga County Poison Death Review Committee
6  meet?
7      A.   My recollection, I want to say it was
8  2012, 2013, and maybe 2014.
9      Q.   Do I understand correctly that your
10  best memory is that the Cuyahoga County Poison
11  Death Review Committee met from 2012 to 2014?
12     A.   I include in those dates the building
13  aspect of this, the conversations with
14  Dr. Gilson, conversations with members of Ohio
15  Department of Health.  I don't -- I don't recall
16  the specifics as far as dates.
17     Q.   When you say the building aspects, do
18  you mean the efforts to get the Poison Death
19  Review Committee up and running?
20     A.   I do, and I can give you examples.
21          I was working with an individual who
22  worked at the Ohio Department of Health at that
23  point in time, and this was in the infancy
24  stages of Ohio's recognition of their problem.
25  We were trying to come up with different ways

1  and means to identify the trends for the opioid
2  epidemic.
3      One of the ideas that came up is a
4  poison death review, very similar to a child
5  mortality review, which is used as a ways and
6  means to track infant mortality, unexpected
7  deaths for children that are less than one year.
8      So part of that, that building, was
9  trying to gain consensus amongst individuals who
10  had the capabilities to be there, who would have
11  knowledge on issues associated with substance
12  abuse, who would have knowledge on a historical
13  perspective on an individual if they had a
14  mental health illness, and that took time.  In
15  addition to that, trying to come up and work
16  with what criteria you're going to put on that
17  specific form as you're looking for trends so
18  that you can build some type of analysis.
19      And my recollection, what we were
20  trying to do is gather information from other
21  agencies that have done this type of work.  That
22  would mean counties like ourselves who has a
23  child fatality review, and that took time to get
24  that situated and find people with not only the
25  experience, but also had the availability of

1  working or meeting as often as we were.
2      If my recollection serves me
3  correctly, we were meeting monthly.  And we've
4  all looked at the data that surround the table.
5  Trying to fit in 700 deaths at the same time
6  while you have other responsibilities was quite
7  difficult.
8      Q.  You indicated you had had discussions
9  with somebody from the Ohio Department of
10  Health --
11      A.  Yes.
12      Q.  -- about this?
13      A.  Yes.
14      Q.  Who was that individual?
15      A.  His name is Cameron McNamee.
16      Q.  Can you spell the last name?
17      A.  I can't off the top of my head.  He
18  no longer works for the Ohio Department of
19  Health.
20      Q.  Do you know when he stopped working
21  at ODH?
22      A.  I can't recall when he stopped
23  working at ODH.
24      Q.  In what year did you have this
25  discussion that you're remembering with

1  Mr. McNamee?
2      A.  My recollection, it would have to be
3  somewhere about 2011 or 2012.
4      Q.  So this was sometime after the Ohio
5  Prescription Drug Abuse Task Force, established
6  by Governor Ted Strickland in 2010, had
7  finalized its report and recommendations,
8  correct?
9      A.  It was following the published
10  report, yes.
11      Q.  I'm going to mark as Exhibit 10 for
12  purposes of your deposition a document from the
13  Cuyahoga County Board of Health entitled
14  "Drug-Related Emergency Room Visits January 1 to
15  September 30th, 2016."
16      (DEPOSITION EXHIBIT 10 MARKED
17      FOR IDENTIFICATION at 6:04 p.m.)
18      MR. SMITH:  Thank you.
19      A.  Thank you.
20      Q.  I'll give you a second to look at the
21  document.  And when you've had a chance to do
22  that, would you just let me know whether or not
23  this document is familiar to you.
24      A.  I will.
25      (Off the written record.)

1      A.  Yes, I am familiar with this
2  document.
3      Q.  Did you help in the preparation of
4  this document?
5      A.  I can't answer that.  I don't recall
6  working on this specific document.
7      Q.  Who would have been involved in the
8  preparation of this document?
9      A.  Chris Kippes.
10      Q.  Anybody else?
11      A.  I'm trying to remember the name of
12  the -- I don't recall the name of the other
13  individual who worked for Chris, who was an
14  epidemiologist who worked on this.  That
15  individual no longer works for us.
16      Q.  Would Ms. Leppla have had any
17  involvement either in terms of the authorship or
18  review of this particular document?
19      A.  In 2016, yes.
20      Q.  And would you have reviewed this
21  document before it was finalized?
22      A.  Yes.
23      Q.  The title of the document, as I
24  indicated, is "Drug-Related Emergency Room
25  Visits from January to September 2016."

80 (Pages 314 - 317)

Page 318

1     What do you understand to be
2  encompassed by the term "drug-related emergency
3  room visits"?
4     A.   All local boards of health have
5  access to EpiCenter.  EpiCenter is a database
6  that is used to track infectious disease.  The
7  intent of EpiCenter was put in place more from
8  a -- it was put in place more from a terrorism
9  standpoint to ensure that we have massive
10  surveillance in case there's some type of
11  outbreak like anthrax.
12     But in addition to that, it also
13  gives us an opportunity to track Class A
14  reportable diseases; flu, other diseases,
15  measles, things that public health needs to
16  understand so that we can have a quick response.
17  That's what EpiCenter is.
18     So this report is based off of
19  information that comes from all emergency rooms
20  within Cuyahoga County.  That information is all
21  downloaded into EpiCenter.  Local boards of
22  health have access to EpiCenter.
23     Q.   Okay.  Thank you for that
24  explanation.
25     In your view as longtime chair of the

Page 319

1  Cuyahoga County Opiate Task Force, is the
2  utilization of data in EpiCenter useful in terms
3  of trying to understand opioid abuse or overdose
4  trends?
5     A.   I think there are pluses and minuses
6  to this document, and I can walk you through
7  that.
8     Q.   Well, let's start with my question,
9  and then --
10     A.   I'm sorry.  Go ahead.
11     Q.   -- I'll let you follow up.
12     My question right now is whether or
13  not in your view the utilization of data from
14  the EpiCenter system is useful in terms of
15  understanding the nature and scope of opioid
16  abuse and overdose in the community.
17     MR. SMITH:  Objection; form.
18     A.   Yes and no.
19     Q.   Okay.  And why do you say yes and no?
20     A.   I'll explain that to you.
21     From the value standpoint, you can
22  get good demographic information.  If you turn
23  to Page 3 of the report, demographic information
24  is always helpful.
25     If you turn to Page 2, you get a

Page 320

1  sense of when those individuals are being
2  admitted to the emergency room.  You can get a
3  percentage of which days there's more activity
4  as far as individuals being transported to the
5  emergency room.
6     You can also use the information, if
7  you go to Page 4, if you're looking at it from
8  the standpoint of zip codes.  This is considered
9  a heat map which has given us an indication of
10  which emergency rooms have the most activity
11  based upon the individuals who are being
12  presented in an overdose.
13     The problem that you get into with a
14  report like this is -- if you stay on Page 4 and
15  you go up to "Drug Category" -- this is 2016.
16  If you looked at the slides that are in the deck
17  pertaining to 2016, you're going to see that we
18  had a large increase in fentanyl as far as
19  overdose.
20     The problem with this report is
21  emergency room departments don't have the
22  capabilities to test for fentanyl.  What happens
23  is somebody may arrive, and the emergency squad
24  or the individual says this person OD'd.  Maybe,
25  you know, they see some prescription pills.

Page 321

1     When you looked at this and you look
2  at 2016, you could probably see -- you know,
3  that's when heroin, you know, we started seeing
4  some dips in heroin.
5     So the problem is when you're looking
6  at this from a data standpoint -- and I'm not an
7  epidemiologist, but if it's 2 o'clock in the
8  morning and an intake nurse, EMS comes in and
9  they say OD, that nurse is putting in OD.
10  Doesn't define what it truly is.  There is some
11  work that is going on on a statewide basis to
12  improve this.
13     When we went down the road of trying
14  to use this tool -- I'm not an epidemiologist,
15  but we had to build out the capacity to pick up
16  identifiers in that line item, so if there was
17  "opioid," "opiate," "Oxy," "OxyContin,"
18  "heroin," "cocaine," you've got to pick up
19  everything from misspelled words.
20     So it was a -- from a data
21  standpoint, if the data coming in isn't clear,
22  it's very difficult to get that data out on the
23  back end.  So there are some unique identifiers
24  that ODH is trying to put in place so that we
25  can use EpiCenter as a better ways and means of

81 (Pages 318 - 321)

Page 322

1    tracking substance abuse or opioid abuse.
2        Q.   All right.  Sticking with Page 4 of
3    the report, the "Drug Category" section that you
4    referenced describes various categories of drugs
5    that are reported to have been associated with
6    emergency room visits, correct?
7        A.   Using information from emergency
8    rooms are put into EpiCenter based upon -- and I
9    don't remember the correct data term -- those
10   indicators or qualifiers.  This is what we got
11   out of that data, yes.
12       Q.   Is it your understanding that the
13   percentages that are calculated and reflected in
14   this Cuyahoga County Board of Health document
15   from 2016 are based on actual toxicology
16   analyses that are performed in the emergency
17   room?
18       A.   No.  From my understanding, the
19   individuals -- it's -- the capabilities of an
20   emergency room to test for a fentanyl or a
21   fentanyl analog are not there.  I think those
22   are some of the difficulties.
23           I'm not aware of which emergency
24   rooms do blood draws or anything like that, so
25   what I tried to explain to you is when somebody

Page 323

1    comes in, you know, it's -- EMS drops somebody
2    off, on the bus, individual, "What happened?"
3    "They OD'd."  "Okay."  I got an OD that came in
4    on Friday night at 1:30 in the morning.
5            If that's all the information that
6    the nurse is provided or the intake individual,
7    that's all they get.  So I can't really -- I
8    can't answer your question.  I'm not an
9    emergency room intake specialist.
10       Q.   Okay.  With respect to the data
11   that's reflected here on Page 4 of this
12   document, the emergency room visits are being
13   categorized by drug, correct?
14       A.   Uh-huh.
15       Q.   Do you know how it is that -- or what
16   data are being used to classify or categorize an
17   emergency room visit on a drug-by-drug basis?
18       A.   Yeah.  As I said before, if we go
19   across fields, if you're picturing it on an
20   Excel spreadsheet, you have male, age, date of
21   birth, weight, race, and then there's a field of
22   the visit.  That field could encompass all
23   different types of variables.
24       Q.   My question I think is a little bit
25   more narrow.

Page 324

1        A.   Okay.
2        Q.   Do you know how these emergency room
3    visits are categorized on a drug-by-drug basis
4    for purposes of calculating the numbers that are
5    reflected here on Page 4 of your CCBH report?
6        A.   As I said before, we put up -- we
7    went through and we scrubbed the information
8    that we'd get from EpiCenter to go through the
9    data and pick up different things -- opiate,
10   opioid, OD, cocaine, heroin, polypharmacy --
11   that's how we got this.
12           EpiCenter itself just has -- I think
13   it's -- I want to say it's just drug abuse.
14       Q.   I see.  So when you say we went
15   through the EpiCenter data to make these
16   calculations, do you mean individuals at CCB?
17       A.   Primarily Chris Kippes and one of his
18   staff that was an epidemiologist.
19       Q.   And they looked at the records to try
20   to refine or improve the drug categorizations?
21       A.   How do I explain this for you?
22           They put together the protocols that
23   have some type of search engine that can
24   generate this data.  So what you're going to
25   get -- let's say, for instance, you might have a

Page 325

1    four-year-old child that comes in and it says OD
2    acetaminophen.  I think there are some
3    clarifying points in this towards the end that
4    give you included and excluded cases that might
5    answer your question a little bit better.
6        Q.   Here it says under the table itself
7    that "The drug category with the number and
8    corresponding percent of times, it is mentioned
9    in chief complaint data of ER visits in Cuyahoga
10   County for the time period at issue," right?
11       A.   Right.
12       Q.   So these are drugs that were
13   mentioned in the chief complaint data of the
14   emergency room visit.  Is that right?
15       A.   Correct.
16       Q.   And these data reflect that in this
17   nine-month period in 2016, heroin-only overdoses
18   amounted to 62 percent approximately of the
19   total number of drug-related emergency room
20   visits in Cuyahoga County, right?
21       A.   That's what this document says.
22       Q.   And it says that "opioid general"
23   accounts for approximately 23 percent, just shy
24   of 23 percent of total drug-related emergency
25   room visits, right?

82 (Pages 322 - 325)

Page 326

1    A.   Correct.
2    Q.   And then you get to cocaine.  That's
3  next on the list, right?
4    A.   Uh-huh.
5    Q.   Yes?
6    A.   Yes.  I said yes.  I'm sorry, I'll
7  speak louder.
8    Q.   And then polysubstance is the next on
9  the list?
10    A.   Correct.
11    Q.   And then after you get to
12  polysubstance, the next on the list is
13  prescription opioids, and that amounts to just
14  under 3 percent of the total drug-related
15  emergency room visits in Cuyahoga County from
16  January to September 2016, correct?
17    A.   That's what this document says, yes.
18    Q.   And you had indicated that perhaps
19  there was some difficulty in accounting for
20  illicit fentanyl-related emergency room visits.
21  Did I understand that correctly?
22    A.   You are correct.
23    Q.   What is the nature of the difficulty
24  in accounting for emergency room visits that are
25  related to illicit fentanyl?

Page 327

1    A.   From my conversations with
2  Dr. Gilson, I think one of the hard things to
3  determine in this crisis is if you don't have
4  the resources of technology to test for
5  fentanyl, you don't pick it up.
6        An example would be I think in the
7  state -- in the state of Ohio, your coroner
8  might not have the resources that Cuyahoga
9  County has to actually do toxicological screens
10  to indicate what analog it is, what drug it was.
11        So what I mentioned to you is when we
12  look at fentanyl, the reasons why you see
13  fentanyl in these numbers is probably a
14  statement that came in that was given to that
15  intake nurse that was put on the chief complaint
16  log.
17    Q.   We had a very short conversation
18  earlier today about the United States Drug
19  Enforcement Agency.  Do you remember that?
20        I don't mean do you remember every
21  word, but do you remember that we --
22    A.   We've had several references to the
23  DEA, yes.
24    Q.   What is your understanding about the
25  responsibilities of the United States Drug

Page 328

1  Enforcement Agency in the context of controlled
2  substances?
3    A.   I do not know.
4    Q.   You indicated that they can
5  investigate licensed physicians, correct?
6    A.   I did, from a recollection from a
7  presentation that was conducted by Keith Martin
8  and one of his staff.
9    Q.   Do you agree that the DEA has always
10  had and continues to have a legal obligation to
11  investigate the small fraction of physicians who
12  use their DEA registration to commit criminal
13  acts or otherwise violate the Controlled
14  Substances Act?
15    A.   I would agree with you.
16    Q.   Do you know whether the Drug
17  Enforcement Agency applies a greater level of
18  scrutiny to the prescribing of controlled
19  substances to treat pain as compared to the
20  treatment of other ailments?
21    A.   I do not know that.
22    Q.   Do you agree that the amount of --
23  I'm sorry, I'll say that from the start.
24        Do you agree that the amount of
25  dosage units per prescription is not itself a

Page 329

1  basis for the DEA to investigate the
2  overwhelming majority of licensed physicians?
3    A.   I do not know that.
4    Q.   Would you defer to statements from
5  the Drug Enforcement Agency itself on that
6  subject?
7    A.   I don't recall ever hearing any of
8  that within a conversation or presentations that
9  Keith did that I attended.
10    Q.   So you don't know one way or another.
11    A.   I do not.
12    Q.   Do you know what the term "aggregate
13  production quota" refers to in the context of
14  the United States Drug Enforcement Agency's
15  regulation of controlled substances?
16    A.   No, I do not.
17    Q.   Have you ever heard about the DEA
18  setting an annual quota for the amount of
19  prescription opioid medications that can be
20  manufactured in the United States?
21    A.   I don't recall ever hearing that.
22    Q.   Is sitting here today in this
23  deposition the first time you've ever heard
24  that, as far as you can recall?
25    A.   As far as I recall, yes.

83 (Pages 326 - 329)

Page 330

1    Q.  Do you know what the role of
2  wholesale drug distributors is in the delivery
3  of healthcare in the United States?
4    A.  No, I do not.
5    Q.  Do you have a view about whether or
6  not wholesale drug distributor companies are
7  responsible in any way for opioid abuse or
8  opioid overdoses in Cuyahoga County?
9    A.  I do not have --
10    MR. SMITH:  Objection; form.
11    A.  I do not have a view on that.
12    Q.  In your capacity as the chair of the
13  Cuyahoga County Opiate Task Force, in your
14  communications with the experts in this area,
15  have you ever heard anybody say to you that
16  wholesale drug distributors are somehow
17  responsible for opioid abuse or overdose trends
18  in Cuyahoga County?
19    A.  I have never heard that.
20    Q.  Have you ever heard of Cardinal
21  Health?
22    A.  I have heard of Cardinal Health.
23    Q.  Do you know anything about the
24  company?
25    A.  What I know about the company is they

Page 331

1  have offered grants to some collaborative
2  partners on the local level and also on the
3  state level as it relates to prevention
4  education.
5    They've partnered with Dr. -- I want
6  to say it's Dr. Hale from the Ohio State
7  University School of Pharmacy to set up a
8  training program as it relates to prescription
9  medication based upon individual groups --
10  seniors, middle-aged, youth -- prevention
11  programs.  That's all I know about Cardinal
12  Health.
13    Q.  Have you ever heard of McKesson?
14    A.  I have not.
15    Q.  Have you ever heard of
16  AmerisourceBergen?
17    A.  I have not.
18    Q.  Are you aware of any specific
19  misconduct on the part of Cardinal Health,
20  McKesson, or AmerisourceBergen, or any other
21  wholesale drug distributors in Cuyahoga County?
22    A.  I am not.
23    Q.  Earlier today we talked about the
24  hiring of Ms. Vince to be Ms. Leppla's
25  replacement as the director of the Ohio

Page 332

1  Department of Health Injury Prevention Grant.
2  Do you remember that?
3    A.  Injury coordinator?
4    Q.  Yeah.  Am I misstating it?  Is it not
5  the director of the grant?  How would you state
6  it?
7    A.  I say injury prevention coordinator.
8    Q.  So Ms. Leppla was the injury
9  prevention coordinator in connection with the
10  Ohio Department of Health Injury Prevention
11  Grant.  Is that a good characterization?
12    A.  Yes.
13    Q.  And Ms. Vince was hired to replace
14  Ms. Leppla when Ms. Leppla left, right?
15    A.  Correct.
16    Q.  You probably said this earlier today,
17  but I've already forgotten.
18    If you could, remind me, please, of
19  when Ms. Vince was put into that position?
20    MR. SMITH:  Objection; form.
21    A.  It was in the beginning of 2018.  My
22  recollection tells me that it wasn't a start
23  date of January 1st based upon a delay in our
24  board, which was a logistical issue.
25    Q.  Okay.

Page 333

1    (DEPOSITION EXHIBIT 11 MARKED
2    FOR IDENTIFICATION at 6:26 p.m.)
3    Q.  This is a document I've marked as
4  Exhibit 11 for purposes of our deposition today,
5  and I'll represent that this document was
6  produced to us by Cuyahoga County in connection
7  with this lawsuit.
8    And do you see that it's a
9  January 16th, 2018 memo about a meeting that you
10  had with Najeebah Shine and Annie Dunham?
11    A.  I do remember the document.
12    Q.  Have you seen this document before?
13    A.  I have.
14    Q.  This document is in relation to the
15  selection of April Vince to be the injury
16  prevention coordinator for the Ohio Department
17  of Health grant.  Is that correct?
18    A.  It's more than that, but yes, that's
19  a part of it.
20    Q.  That's part of it.
21    As I understand it, and I'm
22  interested in your perspective, the selection
23  process came down to two candidates; Ms. Vince
24  and Ms. Gray.  We referenced her earlier today,
25  and Ms. Gray has a new last name, right?

84 (Pages 330 - 333)

Page 334

1    A.   Ms. Karns.
2    Q.   Ms. Karns.  And you favored Ms. Karns
3  for the position over Ms. Vince, correct?
4    A.   What I explained to you today is our
5  human resources department is an open process.
6  When we went through the three individuals who
7  were scoring, that name was not put in place at
8  that point in time.  It wasn't sent to the
9  board.
10       My discussion with Rick Novickis, he
11  asked me to rethink the situation.  I went back,
12  thought about the situation, and came back to
13  him and made a decision to choose April over
14  Becky.
15   Q.   Was that before or after you had this
16  meeting in January 2018?
17       MR. SMITH:  Can I just have an
18   objection to this line of questioning --
19       MR. BOEHM:  Sure.
20       MR. SMITH:  -- regarding this topic.
21   We've gone over it once and I think we
22   objected before.
23       MR. BOEHM:  You can have a standing
24   objection on that.
25       MR. SMITH:  Thank you.

Page 335

1    Q.   My question was whether or not your
2  revisiting of who should be selected for the
3  position of injury prevention coordinator
4  occurred before or after your January 16th
5  meeting that's reflected in this document that's
6  marked as Exhibit 11.
7    A.   Could you restate the question for me
8  real quick?
9    Q.   Yeah.  You indicated that you had
10  rethought after talking to Mr. Novickis --
11   A.   Right.
12   Q.   -- who ought to be selected for the
13  position of injury prevention coordinator.
14       My question to you is whether or not
15  that rethinking that you did occurred before or
16  after your January 16th, 2018 meeting that is
17  reflected here in Exhibit 11.
18   A.   It was before.
19   Q.   On January 16th, 2018, you told
20  Ms. Shine and Ms. Dunham -- and if you look at
21  the second page, first full paragraph, second
22  sentence, it says:
23       "Vince stated that he picked Becky
24    for the position because her score was
25    around .5 higher than April's."

Page 336

1       Do you see that?
2    A.   I do.
3    Q.   Okay.  And then it says:
4       "Vince stated that he talked with
5  Rick Novickis about the position.  Vince
6  told Rick that he picked Becky for the
7  program manager position.  Rick told Vince
8  that Chris Kippes would be 'pissed.'"
9       Do you see that?
10   A.   I do.
11   Q.   Is this all accurate?
12   A.   Yes.
13   Q.   So was your conversation with
14  Mr. Novickis about the appropriate candidate for
15  this job of injury prevention coordinator about
16  how Mr. Kippes might react?
17   A.   From what I recall, Mr. Novickis
18  asked me to come to his office after a
19  conversation that he had with human resources.
20  That's when we had the conversation when he
21  mentioned that Mr. Kippes would be pissed.
22   Q.   What is your understanding as to why
23  Mr. Kippes would be pissed -- and I'm quoting
24  that term -- about the selection of Becky over
25  April?

Page 337

1    A.   I can't answer that.
2    Q.   Did anybody ever explain that to you?
3    A.   Not in this process, no.
4    Q.   Did Mr. Novickis?
5    A.   No, he did not.
6    Q.   Why was human resources involving
7  itself at this point?  Was that in relation to
8  the sexual harassment allegations that had been
9  made against you by Mr. Kippes?
10       MR. SMITH:  Objection; form.
11   A.   Human resource is involved in the
12  hiring of individuals, promoting individuals.
13  We went through the -- this went through the
14  human resources process.  That's why they're
15  involved.
16   Q.   Did the allegations of sexual
17  harassment against you have any impact on the
18  hiring of Ms. Vince for the position of injury
19  prevention coordinator?
20       MR. SMITH:  Objection; form.
21   A.   I don't understand your question.
22   Q.   Well, let's just look at the language
23  here.
24   A.   Go ahead and ask me the question
25  again.

85 (Pages 334 - 337)

Page 338

1    Q.   It says here in the next to last
2  paragraph on Page 2:
3        "Vince stated that 'The idea that we
4    have a professional woman and the stuff he
5    said about me outside of the sexual
6    harassment is pretty poor.  You can go back
7    to my personnel file, it is clean.'"
8        Do you see that?
9    A.   Yes.
10    Q.   And you indicated earlier today that
11  Mr. Kippes had alleged that you had sexually
12  harassed women, right?
13    A.   Correct, that's --
14        MR. SMITH:  Objection; form.
15    A.   Correct, that's what this is about.
16    Q.   But it also says that he apparently
17  said stuff about you outside of the sexual
18  harassment.
19    A.   Yes, he did.
20    Q.   What else did he say about you?
21        MR. SMITH:  Objection; form.
22    A.   I think he said that I was difficult
23  to work with.  I think he also said that I was
24  hard to get along with.  That's my
25  understanding, and I think that's contained in

Page 339

1  here.
2    Q.   What were the specific instances of
3  sexual harassment that Mr. Kippes alleged had
4  taken place?
5        MR. SMITH:  Objection; form.
6    A.   I'm not sure where he came up with
7  that.
8    Q.   You're not aware of the specific
9  instances that he alleged had taken place?
10    A.   There are none.  I don't know where
11  he came up with that.
12    Q.   Whether there were or not, I'm
13  talking about his allegations.
14        Are you aware of what specific
15  instances of sexual harassment Mr. Kippes
16  alleged?
17        MR. SMITH:  Objection; form.
18    A.   No, I am not.
19    Q.   Did you ever ask?
20    A.   I do my best to keep my relationships
21  with Chris as a working level.  I don't ask him
22  those questions.
23        I went through the process that was
24  afforded to me through human resources.  Human
25  resources basically said that between his

Page 340

1  conversation and Becky's conversation, that they
2  didn't find he met any qualifications for sexual
3  harassment.  It was his word against Becky's
4  word.
5    Q.   Which women at CCBH did Chris Kippes
6  allege you had harassed?
7    A.   I have no idea.
8    Q.   Did he allege that you had harassed
9  Becky?
10        MR. SMITH:  Objection; form.
11    A.   I don't know what he said.
12    Q.   So your testimony here under oath
13  today is that you have never known and never
14  asked which individuals Mr. Kippes alleged you
15  harassed?
16    A.   I never asked human resources that,
17  no.
18    Q.   And they never told you?
19    A.   And they never told me.  From my
20  understanding in my conversations with them
21  after they went about and did their review, that
22  anything that comes out of a human resources
23  investigation is confidential between the
24  individual and human resources.
25    Q.   It appears from this document that

Page 341

1  you also filed a human resources complaint
2  against Mr. Kippes, correct?
3    A.   I did.
4    Q.   What was the basis of your complaint
5  against Mr. Kippes?
6    A.   Was that he said that about me, and
7  that's what I just explained to you, is they
8  went through their process, whatever that
9  process is, and they felt that from the
10  information that they obtained from Becky and
11  the information that they obtained from Chris,
12  that there was no documented proof that he ever
13  really said sexual harassment.
14    Q.   You've indicated that you had never
15  asked and HR never told you which individuals
16  you allegedly had sexually harassed.
17        Did you ever ask anybody else at CCBH
18  outside of human resources?
19    A.   I -- maybe Amy Dunham.  I never -- I
20  never sexually harassed anyone at my office.
21    Q.   I understand.  I understand your
22  point on that.
23        I'm asking you about whether or not
24  you asked anybody at CCBH other than folks at
25  human resources which individuals Mr. Kippes had

86 (Pages 338 - 341)

Page 342

1  alleged you had harassed.
2           MR. SMITH:  Objection; form.
3       A.   I spoke with Becky Karns about this.
4  She approached me.
5       Q.   What did you and Becky discuss?
6       A.   I went back -- following the decision
7  on who received the position, I was responsible
8  to go back and tell Becky she didn't get the
9  job.
10          When I went back to touch base with
11  Becky, we started talking, and at that point in
12  time she became upset, as contained in here, is
13  when she told me what had happened.
14          So Becky is not a program manager.
15  Becky was interested in applying for the job.
16  Becky went to human resources.  Human resources
17  said, "Well, the way that you go about doing
18  that is you talk to your direct supervisor."
19  Her direct supervisor is Chris Kippes.  His
20  structure over in Epi and surveillance at that
21  point in time, there are no supervisors.  It's a
22  direct line between his field staff, program
23  managers, and Chris Kippes.
24          When Becky went in to tell Chris is
25  when Chris became a little bit upset and

Page 343

1  mentioned those things to Becky.  So when I went
2  to tell her that she didn't get the job and she
3  had asked me why, this all came out.
4       Q.   Okay.  So you had already made the
5  decision that April and not Becky was going to
6  get the job of injury prevention coordinator
7  before you learned that Mr. Kippes had warned
8  Becky about what it might be like to work with
9  you?
10      A.   Yes.
11      Q.   Okay.
12      A.   April had already received the
13  position before I had talked to Becky.  That's
14  why I was talking to Becky.
15      Q.   Did Becky withdraw from consideration
16  for this position?
17      A.   April had already got the position.
18      Q.   Okay.
19      A.   She couldn't withdraw.  It was
20  already posted.
21      Q.   You indicated on the next to last
22  page that you viewed this as serious enough that
23  an apology was not enough, you know what needs
24  to happen.  That's right in the middle of the
25  page.

Page 344

1           What was the result of the human
2  resources complaint that you made against
3  Mr. Kippes?
4       A.   I think I've already mentioned that.
5           So the results of their investigation
6  basically determined that from what Chris had
7  said and Becky said, that they felt that he
8  improperly treated Becky by talking to her that
9  way and preventing her from taking an
10  opportunity for a promotion, but they felt that
11  what he said about me wasn't enough to justify
12  any response.
13      Q.   Was any action taken against
14  Mr. Kippes?
15      A.   I was told that from a human
16  resources standpoint, that whatever comes out of
17  that decision is kept confidential.  I would be
18  afforded the same confidentiality.  So I'm not
19  aware what happened.  I haven't continued to
20  pursue it.  It's at this point in time water
21  underneath the bridge.
22      Q.   Got it.  On your final page, you have
23  a couple statements I wanted to ask you about.
24          First of all, in the first bullet
25  point, you say that there's awareness that Becky

Page 345

1  has filed a complaint.  Do you know against whom
2  Becky filed a complaint?
3       A.   What -- are you on the last page?
4       Q.   I'm on the very last page of the
5  document.
6       A.   My last page does not have --
7           MR. SMITH:  Here's the last page.
8       Q.   Oh, I'm so sorry.  You're right, I
9  apologize.  I missed that.
10      A.   Can you ask the question again?
11      Q.   I meant the next to last page, the
12  first bullet point.  It says awareness --
13  there's reflection of awareness that Becky had
14  filed a complaint.  Do you know against who?
15          MR. SMITH:  Objection; form.
16      A.   She filed a complaint against Chris
17  Kippes.
18      Q.   I see.  On the final page -- and this
19  is the real final page of this document -- the
20  second to last paragraph states:
21          "Vince stated that he never felt
22       there was a lot of support from the senior
23       leadership team for the opiate program."
24          Do you see that?
25      A.   I do.

87 (Pages 342 - 345)

Page 346

1    Q.   Did I read that correctly?
2    A.   You did.
3    Q.   Who is the senior leadership team
4  that you had in mind when you said that?
5    A.   I think that the comment that I felt
6  at the point in time when this was going on was
7  a little amped up.
8        The way that I look at that statement
9  is, we do a lot of programmatic activity at the
10  Cuyahoga County Board of Health, and I felt as
11  an individual who worked within that program
12  that there should have been more support from
13  senior leadership.
14    Q.   In what ways do you believe that
15  senior leadership at Cuyahoga County Board of
16  Health could have and should have shown more
17  support?
18    A.   I guess I would base it upon the
19  standpoint we always talk about it being a
20  data-driven organization, and I think there was
21  enough data out there that talked about this
22  epidemic that we maybe could have received some
23  of the support -- or same support as we did for
24  infant mortality, which is an important issue
25  for the child lead poisoning program, which are

Page 347

1  all important issues.
2        When I sit back and I reflect upon
3  this, you know, at this point in time, you know,
4  it takes time, it takes an understanding.
5  There's always room for improvement.  There's
6  always room for evaluation and improvement.
7        So the way that I look at it now
8  compared to when this was written, maybe it was
9  a little heated back when this actually took
10  place.
11    Q.   Okay.  But just in terms of the
12  substance of that statement.
13    A.   The substance of that statement came
14  out of a very difficult time.
15    Q.   You didn't make it up, though, right?
16  I mean, you believed it when you said it?
17    MR. SMITH:  Objection; form.
18    A.   As I mentioned to you before, it came
19  out of a very heated time.
20    Q.   Well, whether it came out of a heated
21  time or not, did you make it up or did you
22  believe it?
23    A.   I can't recall how I felt when I made
24  that statement.
25    Q.   Do you believe that Cuyahoga County

Page 348

1  itself, sitting here today in 2019, when you
2  look back, shares some blame for the levels of
3  opioid abuse and overdoses that have occurred
4  within the county?
5    MR. SMITH:  Objection; form.
6    A.   I think when I look -- when I look
7  back, there's a learning curve on any public
8  health issue.  Whether it's childhood lead
9  poisoning, whether it's addressing a new
10  zoonotic disease, whether it's addressing
11  obesity or childhood obesity, it all takes time.
12        I think looking back, other things
13  that maybe we could have done better I'm sure if
14  I dug into it we could find.  I think that, you
15  know, you always want to be a better person at
16  the end of the year than you were at the
17  beginning of the year.
18        We've put a lot of effort into what
19  we've done here locally, and I think you're
20  starting finally to see some of that pay off
21  with the most recent death data that's come out.
22  I think you can say that across Ohio.
23        Are we responsible?  I can't answer
24  that statement.
25        I told you before that the way I look

Page 349

1  at this as far as my role, my role as a
2  facilitator, for what I could do as a supervisor
3  from the Cuyahoga County Board of Health, and
4  that's building consensus amongst individuals
5  who had an invested stake in trying to do
6  something different.
7    Q.   I actually wanted to ask you about
8  that, just a couple last questions about the
9  Cuyahoga County Opiate Task Force and your
10  chairmanship.
11        You indicated that you had stepped
12  down in -- or you were no longer in that
13  position as of the fall of 2018 due to personal
14  health issues.
15        Were there any other factors that
16  were involved in you vacating the position of
17  chairman?
18    A.   As I mentioned to you earlier, I have
19  been battling some health issues for the past
20  two years.
21    Q.   I'm asking if there's anything else.
22  I already -- I got that part.
23    A.   No, there's nothing else.
24    Q.   Has anybody on behalf of Cuyahoga
25  County Board of Health or the task force

88 (Pages 346 - 349)

Page 350

1  suggested that you step down at any time?
2      A.  No.  That was my own personal choice.
3      Q.  Who is the chair now?
4      A.  Starting in 2018, there was a change
5  in Ohio revised code.  That Ohio revised code
6  change asked ADAMHS board in Ohio to become more
7  involved with the opioid epidemic.
8      Q.  So who's the chair now?
9      A.  I'm getting to that.  I'm trying to
10  explain it to you.
11     Q.  I just want to know who the chair is.
12     A.  There's a co-chair between Beth
13  DeJesus of the ADAMHS board and April Vince from
14  my office.
15         MR. BOEHM:  Thank you.  Let's go off
16  the record.
17         VIDEO TECHNICIAN:  Off the record
18  6:49.
19         (Recess taken at 6:49 p m.)
20         (Back on the record at 6:54 p.m.)
21         VIDEO TECHNICIAN:  On the record
22  6:54.
23             EXAMINATION
24  BY MS. FEINSTEIN:
25     Q.  Good evening, Mr. Caraffi.  I am

Page 351

1  Wendy West Feinstein.  I introduced myself to
2  you earlier.  I am going to bypass the niceties
3  because we're short on time, but I just have a
4  few questions for you from the perspective of
5  the manufacturers who are defendants in this
6  litigation.
7         You have not read the complaint.  Is
8  that right?
9      A.  I have not.
10     Q.  Do you know what pharmaceutical
11  manufacturers are named as defendants by
12  Cuyahoga County in this litigation?
13     A.  No, I do not.
14     Q.  Do you know the identity of any
15  pharmaceutical manufacturers who manufacture
16  prescription opioids?
17     A.  No, I do not.
18     Q.  Have you ever heard of Allergan?
19     A.  No, I have not.
20     Q.  Do you know whether Allergan
21  manufactures prescription opioids?
22     A.  I'm not familiar with Allergan, if
23  I'm saying that correctly.  I'm sorry, Wendy.
24     Q.  Oh, that's all right.
25         Have you ever heard of Cephalon?

Page 352

1      A.  I've never heard of Cephalon, no.
2      Q.  Do you know whether Cephalon
3  manufactures prescription opioids?
4      A.  I'm not able to tell you anything
5  about Cephalon.
6      Q.  Have you ever heard of Endo?
7      A.  No.
8      Q.  Do you know whether Endo manufactures
9  prescription opioids?
10     A.  No, I do not.
11     Q.  Have you ever heard of Insys?
12     A.  No, I have not.
13     Q.  Do you know whether Insys
14  manufactures prescription opioids?
15     A.  I've never heard of Insys.
16     Q.  Have you ever heard of Janssen?
17     A.  No, I have not.
18     Q.  Do you know whether Janssen
19  manufactures prescription opioids?
20     A.  No, I do not.
21         I'm sorry.  I'm just starting to lose
22  my voice.
23     Q.  That's all right.  Do you need some
24  water?
25     A.  No.  Let's rock and roll.

Page 353

1      Q.  Have you ever heard of Johnson &
2  Johnson?
3      A.  I have heard of Johnson & Johnson.
4      Q.  Do you know whether Johnson & Johnson
5  manufactures prescription opioids?
6      A.  I am not aware of Johnson & Johnson
7  manufacturing prescription opioids.
8      Q.  Have you ever heard of Mallinckrodt?
9      A.  I have not heard of Mallinckrodt.
10     Q.  Do you know whether Mallinckrodt
11  manufactures prescription opioids?
12     A.  I've never heard of -- I'm not aware
13  of Mallinckrodt manufacturing prescription
14  opioids.
15     Q.  Have you ever heard of Purdue?
16     A.  I have heard of Purdue.
17     Q.  Do you know whether Purdue
18  manufactures prescription opioids?
19     A.  I do recollect that I know that
20  Purdue manufactures prescription opioids.
21     Q.  Do you know which prescription
22  opioids are manufactured by Purdue?
23     A.  I do not.
24     Q.  Have you ever heard of Teva?
25     A.  I have never heard of Teva.

89 (Pages 350 - 353)

Page 354

1    Q.    And you don't know whether Teva is a
2  manufacturer of prescription opioids.  Is that
3  right?
4    A.    I'm not aware of Teva's role.
5    Q.    Are you familiar with any of the
6  claims against any of the manufacturers that I
7  just listed?
8    A.    No, I am not.
9    Q.    Do you have any personal knowledge of
10  anything that any of those manufacturers have
11  done wrong in Cuyahoga County?
12        MR. SMITH:  Objection; form.
13    A.    No, I do not.
14    Q.    Do you have any personal knowledge of
15  any misrepresentations or omissions made by any
16  of those companies that I've just listed?
17        MR. SMITH:  Objection; form.
18    A.    No, I do not.
19    Q.    Do you have any personal knowledge of
20  any agreement between or among any of those
21  manufacturers that I just listed?
22        MR. SMITH:  Objection; form.
23    A.    No, I do not.
24    Q.    My co-counsel asked you some
25  questions earlier about the FDA and the FDA's

Page 355

1  involvement with prescription opioids.  Do you
2  recall that?
3    A.    I do recall that.
4    Q.    And I believe you testified that you
5  had never seen the package insert or label that
6  comes with a prescription opioid.  Is that
7  right?
8    A.    I did say that.
9    Q.    And is that -- you've never read the
10  package insert or the label that comes with
11  prescription opioids.  Is that right?
12    A.    I don't recall doing that, no.
13    Q.    So in your position with the opiate
14  task force with Cuyahoga County, you've never
15  read the warnings that accompany prescription
16  opioids.  Is that fair?
17    A.    In my recollection, I don't think
18  that's something that we discussed as a task
19  force.  I don't recall that coming up like we
20  talk about the surgeon general's warning on
21  tobacco products, no.
22    Q.    Have you ever seen an FDA-approved
23  label with any prescription medication that
24  includes instructions for use and warnings and
25  risks?

Page 356

1    A.    I have from probably a personal
2  standpoint, personal use standpoint.
3    Q.    And you're aware that prescription
4  opioids have the risk of addiction associated
5  with them, right?
6    A.    I am aware of that.
7    Q.    And do you know whether the risk of
8  addiction is included in the FDA-approved
9  package insert or label for prescription
10  opioids?
11        MR. SMITH:  Objection; form.
12    A.    I don't recall that.
13    Q.    Have you ever heard of risk
14  evaluation and mitigation strategies, or REMS,
15  with respect to prescription opioids?
16    A.    I recall a standpoint of speaking
17  with an individual many years ago on REMS, and
18  it was a very simple conversation.  Then that's
19  all I recall, but I've heard of REMS.
20    Q.    And do you know that the REMS program
21  is FDA-approved?
22    A.    I do recall having a conversation
23  about that being an FDA program, but not with
24  enough knowledge to really discuss.  Knowledge
25  just kind of it occurs.

Page 357

1    Q.    Was it your understanding that that
2  REMS program applies to certain prescription
3  opioids?
4    A.    Yes.
5    Q.    Have you ever heard of the TIRF REMS
6  program, the TIRF REMS access program?
7    A.    I have never heard of TIRF REMS.
8    Q.    Do you know what transmucosal
9  immediate-release fentanyl is?
10    A.    No, I do not.
11    Q.    Are you aware that the FDA regulates
12  advertising for prescription medications?
13    A.    It was contained in some of the
14  documents that we went over today.
15    Q.    Was today the first time that you saw
16  anything about the FDA regulating advertising
17  for prescription medications?
18    A.    From my recollection, yes.
19    Q.    Do you know whether anyone at
20  Cuyahoga County ever reached out to the FDA
21  about any concerns related to direct-to-consumer
22  advertising of prescription medication?
23    A.    I can't answer that.
24    Q.    Can you identify any prescriptions
25  for opioids written in Cuyahoga County that were

90 (Pages 354 - 357)

Page 358

1 written on the basis of a misrepresentation made
2 by any manufacturing defendant?
3     A.  I cannot do that.
4     Q.  Are you aware of any physician in
5 Cuyahoga County who was misled by any
6 manufacturer of prescription opioids?
7     A.  I am not.
8         MS. FEINSTEIN:  Thank you.  I have no
9 further questions.  My colleague has a few.
10         EXAMINATION
11 BY MR. NORTEY:
12     Q.  Good evening, Mr. Caraffi.  I'm going
13 to go ahead and dispense with the niceties and
14 get straight to the chase.
15         Do you know whether defendants in
16 this case include any retail pharmacies?
17     A.  I'm not aware of that.
18     Q.  Do you know whether the retail
19 pharmacies played any role in the opioid crisis
20 in Cuyahoga County?
21     A.  I'm not aware of that.
22     Q.  Do you have personal knowledge about
23 any facts to support the claim of the basis of
24 the lawsuit in this case?
25     A.  No, I do not.

Page 359

1     Q.  Do you know the role of the retail
2 pharmacies in the delivery of healthcare in this
3 country?
4     A.  No, I do not.
5     Q.  Do you remember your testimony today
6 regarding pill mills?
7     A.  I'm sorry, I didn't understand your
8 question.
9     Q.  Do you remember your testimony today
10 regarding pill mills?
11     A.  I do.
12     Q.  Do you know whether any retail
13 pharmacies distribute to pill mills?
14     A.  I'm not able to answer that question.
15     Q.  Do you have any knowledge about the
16 damage incurred by Cuyahoga County as a result
17 of this case?
18         MR. SMITH:  Objection; form.
19     A.  Damages occurred would probably be
20 lives lost and resources spent on the opioid
21 epidemic.
22     Q.  Have you or anyone in your department
23 made any type of numerical calculation on those
24 damages?
25         MR. SMITH:  Objection; form.

Page 360

1         (Reporter clarification.)
2     Q.  Have you or anyone in your department
3 made any numerical calculation on the basis of
4 those damages?
5         MR. SMITH:  Objection; form.
6     A.  Within my office, no.
7         MR. NORTEY:  Okay.  I'll stop there.
8 Thank you.
9         MS. FEINSTEIN:  Anyone on the phone
10 have any questions?
11         MS. McINTYRE:  Jill McIntyre does
12 not.
13         MR. SMITH:  Defense finished?
14         There would be no redirect.  We'll
15 conclude the deposition.
16         VIDEO TECHNICIAN:  We're off the
17 record at 7:03.  This concludes today's
18 testimony of Vince Caraffi.  Total number
19 of media units is five.
20         (Deposition concluded at 7:03 p.m.)
21
22
23
24
25

Page 361

1         C E R T I F I C A T E
2
3
4
5         I, PAULA S. RASKIN, Certified
6 Shorthand Reporter and Notary Public, hereby
7 certify that this deposition was taken before me
8 on the date hereinbefore set forth; that the
9 foregoing questions and answers were recorded by
10 me stenographically and reduced to computer
11 transcription; that this is a true, full, and
12 correct transcript of my stenographic notes so
13 taken; and that I am not related, nor of
14 counsel, to either party, nor interested in the
15 event of this cause.
16
17
18
19
20
21         Paula Raskin, CSR-4757
22
23
24
25

91 (Pages 358 - 361)

**Page 362**

1         Veritext Legal Solutions
           1100 Superior Ave
2            Suite 1820
          Cleveland, Ohio 44114
3        Phone: 216-523-1313
4
January 28, 2019
5
To: Scott Smith
6
Case Name: In Re: National Prescription Opiate Litigation v
7
Veritext Reference Number: 3202797
8
Witness: Vincent Caraffi    Deposition Date: 1/23/2019
9
10 Dear Sir/Madam:
11
    Enclosed please find a deposition transcript Please have the witness
12
review the transcript and note any changes or corrections on the
13
included errata sheet, indicating the page, line number, change, and
14
the reason for the change Have the witness' signature notarized and
15
forward the completed page(s) back to us at the Production address shown
16
above, or email to production-midwest@veritext com
17
18
If the errata is not returned within thirty days of your receipt of
19
this letter, the reading and signing will be deemed waived
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

**Page 363**

1      DEPOSITION REVIEW
      CERTIFICATION OF WITNESS
2
3 ASSIGNMENT REFERENCE NO: 3202797
  CASE NAME: In Re: National Prescription Opiate Litigation v
  DATE OF DEPOSITION: 1/23/2019
4 WITNESS' NAME: Vincent Caraffi
5    In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6 my testimony or it has been read to me
7    I have made no changes to the testimony
  as transcribed by the court reporter
8
  _____
9 Date        Vincent Caraffi
10    Sworn to and subscribed before me, a
  Notary Public in and for the State and County,
11 the referenced witness did personally appear
  and acknowledge that:
12
    They have read the transcript;
13    They signed the foregoing Sworn
    Statement; and
14    Their execution of this Statement is of
    their free act and deed
15
    I have affixed my name and official seal
16
  this _____ day of_____, 20 ____
17
    _____
18    Notary Public
19
    _____
    Commission Expiration Date
20
21
22
23
24
25

**Page 364**

1      DEPOSITION REVIEW
      CERTIFICATION OF WITNESS
2
  ASSIGNMENT REFERENCE NO: 3202797
3 CASE NAME: In Re: National Prescription Opiate Litigation v
  DATE OF DEPOSITION: 1/23/2019
4 WITNESS' NAME: Vincent Caraffi
5    In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6 my testimony or it has been read to me
7    I have listed my changes on the attached
  Errata Sheet, listing page and line numbers as
8 well as the reason(s) for the change(s)
9    I request that these changes be entered
  as part of the record of my testimony
10
    I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
  that both be appended to the transcript of my
12 testimony and be incorporated therein
13  _____
  Date       Vincent Caraffi
14
    Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
  the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
    They have listed all of their corrections
18    in the appended Errata Sheet;
    They signed the foregoing Sworn
19    Statement; and
    Their execution of this Statement is of
20    their free act and deed
21    I have affixed my name and official seal
22 this _____ day of_____, 20 ____
23  _____
    Notary Public
24
    _____
25    Commission Expiration Date

**Page 365**

1      ERRATA SHEET
      VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 1/23/2019
3 PAGE/LINE(S) /    CHANGE    /REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
    _____   _____
20 Date       Vincent Caraffi
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS ____
22 DAY OF _____, 20 ____ .
23 _____
    Notary Public
24
    _____
25    Commission Expiration Date

**[& - 2015]**                                                                 Page 1

| & |
| --- |
| **&**  2:7,7 3:11 4:4 4:11,18 5:12 6:4 6:13 10:20 11:2,6 11:22,24 41:18 65:19 353:1,3,4,6 |

| 0 |
| --- |
| **000018233**  165:9 |

| 1 |
| --- |
| **1**  7:14 8:7 9:17 29:8,13 63:7 66:9 90:9,15 102:1 178:5 228:10 316:14 |

**1/23/2019**  362:8 363:3 364:3 365:2
**10**  8:6 228:10 316:11,16
**100**  204:20
**1000**  5:13
**101**  3:5
**10:07**  64:24
**10:15**  65:1
**10:21**  65:3,4,6
**10:28**  150:14
**10:53**  93:24
**10th**  273:16,24 274:12
**11**  8:8 57:5 333:1 333:4 335:6,17
**1100**  4:21 362:1
**11:11**  107:16,17
**11:21**  107:18,20
**12**  7:6 57:5 296:7 296:18,20,21 297:3
**127**  6:14
**12:00**  138:4
**12:04**  142:8,9

**12:15**  142:10,12
**12:25**  150:8
**12:40**  163:4
**12th**  97:21 301:11
**1300**  2:8 10:1
**138**  7:17
**13th**  97:21
**150**  7:18
**15219**  4:6
**1600**  5:21
**163**  7:21
**16759**  361:20
**16th**  8:8 333:9 335:4,16,19
**17**  1:7,11
**170**  95:25 96:1
**18**  1:13,15 296:25 297:1
**1820**  362:2
**19**  2:3
**191**  7:23
**1990**  29:25 31:13 32:3,16,21,23 33:10
**1990s**  203:16
**1991**  33:14,16 34:6 35:23
**1998**  32:7,24 33:10 33:22 34:3,9 35:24 36:1 42:11 43:8,15
**1:02**  182:11,12
**1:30**  323:4
**1:43**  182:13,15
**1:54**  191:24
**1:56**  193:15,16
**1st**  33:14 332:23

| 2 |
| --- |
| **2**  7:15 63:6 65:2 66:3 74:16 80:2 107:20 155:13 |

319:25 321:7 338:2
**20**  363:16 364:22 365:22
**2000**  6:15
**20001**  6:7
**20005**  3:13
**2000s**  57:5
**2003**  69:8
**2004**  36:22
**2005**  30:5
**2007**  169:5,15
**2009**  38:19 44:21 158:13 167:18 274:1
**2010**  7:21 44:21 45:4,7 53:1 54:20 57:5,15,23 58:23 59:8 60:8,21 61:5 62:5,15,19 131:12 163:9 165:8,20 166:6 167:13,16 167:18 168:19 169:22 170:13 171:12,19 172:14 172:24 173:2,11 173:25 175:15,18 175:20 177:1 179:18,20 180:23 181:2,9,17,22 185:16 186:13 188:14 189:14,19 190:3,14,24 191:10,20 195:11 203:23 206:17 222:9 223:9,14 224:4,13,16 261:15 316:6
**2011**  40:10 42:4 43:4 45:1,24 46:7 46:9 47:19 48:5

49:3,22 50:12,22 51:1,10 52:4 53:16,24 55:17 56:10,12 57:16,23 58:23 59:8 60:8 60:22 61:5,16 62:5,15 63:24 64:5,11 91:8 92:20,24 97:14 102:22 131:13 171:13 172:4,14 180:23 181:2 188:8 189:11 316:3
**2012**  45:1,25 46:11 46:17 47:15,19 48:5 49:3,22 50:13,22 51:2 52:4 60:8 61:17 97:21 98:2 101:19 102:22 150:19 153:8,14 172:15 181:2 188:2 189:8 312:4 313:8,11 316:3
**2013**  101:8 144:12 145:23 150:11 151:25 153:4,16 154:16 180:11,15 187:21 189:5 309:25 310:7,8,20 313:8
**2014**  106:22 111:17 187:18 189:2 272:4,5 301:11 307:16,23 309:2,3,14,18,20 310:13 312:2 313:8,11
**2015**  66:9,22 67:4 67:6,10,13 68:7

[2015 - 9:27]                                                    Page 2

76:24 77:18 81:6
172:1 186:23
187:1,4,12 188:20
188:21 276:16
277:4 309:14,18
**2016** 8:7 316:15
317:19,25 320:15
320:17 321:2
322:15 325:17
326:16
**2017** 40:11 273:12
273:16,25 274:12
281:11 297:17,22
298:8,15
**2018** 2:3 8:8 14:12
14:20 40:12,13
108:11 212:5,11
212:16 295:22
332:21 333:9
334:16 335:16,19
349:13 350:4
**2019** 1:19 9:2,6
108:17 182:21,22
183:16 348:1
362:4
**202** 3:14 6:8
**207** 274:9
**21** 192:7,15 195:15
196:23 197:1
**210** 276:11
**216** 4:23 5:7 6:17
**216-523-1313**
362:3
**22** 198:3 209:1
**221** 8:1
**23** 1:19 9:2 325:23
325:24
**23rd** 9:6
**24** 196:24
**25301** 5:22

**270** 8:3
**28** 36:16 362:4
**2804** 1:6,7
**29** 7:14
**290** 297:17,21
**299** 8:4
**2:20** 193:17,19
**2:22** 196:13,14
**2:24** 196:15,17
**2:43** 214:22,23
**2nd** 144:12 145:13
145:23 150:14
151:25 153:4

**3**

**3** 7:17 138:3 144:4
182:15 319:23
326:14
**30** 8:7 216:4
**304** 5:23
**30th** 316:15
**312** 4:14
**316** 8:6
**32** 4:5
**3202797** 1:25
362:7 363:2 364:2
**324-1492** 4:14
**333** 8:8
**340-1018** 5:23
**350** 7:7
**358** 7:8
**3:03** 214:24 215:1
**3:11** 221:7
**3:56** 253:23,24

**4**

**4** 7:18 150:7,10
155:13 254:2
320:7,14 322:2
323:11 324:5
**4000** 5:13

**412** 4:7
**43220** 3:6
**434-5000** 3:14
**44113** 4:22
**44114** 5:6 6:16
362:2
**45** 14:21
**45004** 1:11
**45090** 1:13
**45132** 1:15
**4757** 1:24 2:10
361:21
**48210** 276:12
**486-4987** 3:7
**492** 298:9,15
**4:16** 253:25 254:2
**4:37** 270:22

**5**

**5** 7:21 163:2,3,9
312:15 335:25
**500** 5:21
**5003** 3:5
**560-7455** 4:7
**586-3939** 5:7
**5:02** 289:18,19
**5:07** 289:20,22
**5:20** 299:16
**5:36** 312:11,12
**5:58** 312:13,15
**5th** 63:24

**6**

**6** 7:23 191:21,23
192:4 193:24
216:4 225:2
**60601** 4:13
**614** 3:7
**62** 325:18
**621-0200** 6:17
**65** 7:15

**662-6000** 6:8
**696-3921** 4:23
**6:04** 316:17
**6:26** 333:2
**6:49** 350:18,19
**6:54** 350:20,22

**7**

**7** 8:1 221:6,9
222:17 224:23,24
225:3 231:19
252:7,10 257:22
257:24,25 258:2,2
284:21 289:25
290:1,8 296:6,21
306:13 310:3,3
**700** 315:5
**713** 5:15
**725** 3:12
**727** 297:21 298:10
**77** 4:12
**77002** 5:14
**7:03** 360:17,20

**8**

**8** 8:3 270:21,24
273:11 279:25
280:2,4
**850** 6:6
**890-5472** 5:15

**9**

**9** 8:4 14:4 163:21
164:1 165:20
185:17 299:15,18
**90** 193:2
**901** 5:5
**90s** 43:12
**91** 33:22
**950** 2:8 4:21 9:25
**9:07** 1:19 2:4 9:3,5
**9:27** 29:9

**a**

**a.m.** 1:19 2:4 9:3,5
29:9 64:24 65:1,3
65:4 93:24 107:17
107:18 150:14
**ability** 130:6
226:13
**able** 54:3 93:25
113:13 127:5
131:2 133:15
212:22 218:9
230:8,22 257:2
288:20 309:6
352:4 359:14
**absolutely** 165:7
243:10
**abuse** 7:23 17:5,13
18:9 20:5,23
22:23,25 26:2
28:11,13 44:7
47:12,20 48:7,13
49:2,10,20 50:1,4
50:11,14,21 51:3,9
52:6,18 53:17,23
54:11 55:1,19
56:6,12 57:3,15,17
57:19 59:10 60:23
61:18 62:23 64:13
69:7,18 70:7 72:3
72:10 73:9,13
75:5 76:4,15
78:18,24 81:17
91:14 92:2 93:11
94:6 95:10,12,21
96:10 98:25 99:20
100:7,14 104:8,15
105:3 106:16
108:1,9 109:15,20
112:3,22 115:20
116:5 118:25
119:8,9 121:13

122:16 123:3,10
123:21 124:6
126:14,17,22
127:6,8,12,17,22
128:2,17,22
129:12,22 130:24
131:19,25 133:1
137:15 146:5,11
157:18,22 158:9
162:4,17 166:11
168:20 170:5,11
170:21 171:1,15
171:23 172:13
178:16 186:22
187:12,17,23
188:4,10,16
189:19 190:2,8,9
190:15,24 191:8
191:10,20 195:12
197:3,16 199:10
200:8,19 202:21
204:5,15 205:1,9
205:17 206:6,20
209:1,22 210:13
210:17 211:6,14
212:1,24 214:3,6
217:20 218:6
219:10,21 220:3
220:13 223:10
224:12 226:6
228:19 229:22
230:11 231:2,24
233:1 235:15,20
236:16 237:11,25
238:7,13,15 239:9
239:15 241:8,22
242:7,19 256:4,9
256:13 259:24
261:23 262:4,14
263:8,11,16
264:10,16,19,25

265:4,6 277:3,15
277:15 278:14,15
279:5 283:6,18
284:1,3,13 285:10
285:21 286:4,14
286:23 287:6,12
287:22 288:4
290:3,6,19 291:6
291:25 292:13
293:3,14,15,22
294:3,9 304:10
305:13 306:5
314:12 316:5
319:3,16 322:1,1
324:13 330:7,17
348:3
**abused** 25:1,11
26:25 27:17 28:6
213:11 277:5,8
278:2,3,10 279:7
279:19 292:24
**abuser** 238:19
293:7
**abusing** 28:16
275:13 276:1
284:12 286:22
295:4 300:1,3
**accept** 102:19
104:13
**accepted** 102:17
103:25 105:13
207:20
**access** 57:19 95:24
118:6,14,16
119:16 122:4
123:7 129:2 131:1
131:16 246:19,24
247:5,10,15,21
248:1,6,21 249:11
250:19 318:5,22
357:6

**accessible** 246:16
**accidents** 168:10
168:13
**accompany**
355:15
**account** 244:21
245:3 310:12
**accounted** 298:9
**accounting** 326:19
326:24
**accounts** 325:23
**accreditation**
227:20 229:9,10
229:12,16,20
230:1,9,25 231:21
231:24 232:3,5,8
232:13,17 233:3
251:22 252:2
**accredited** 232:4
232:12
**accuracy** 166:3
**accurate** 220:4
336:11
**accusation** 139:5
**accusations**
138:25 139:3
**aces** 73:3,4,7,8,12
291:8 293:2
**acetaminophen**
325:2
**acknowledge**
363:11 364:16
**acronym** 109:5
117:8
**act** 198:15,20,24
199:12 200:7,22
201:24 202:14,20
202:25 207:1,17
208:25 328:14
363:14 364:20

**acted** 143:6
**action** 8:4 10:6
  42:17 207:19
  344:13
**actions** 143:8,10
  143:18,25
**active** 274:19
**activities** 25:18
  78:6 175:17
  180:23,24 181:1
  183:10 272:22
  273:2
**activity** 320:3,10
  346:9
**acts** 328:13
**actual** 322:15
**adam** 5:8 11:8
**adamhs** 293:20,21
  350:6,13
**add** 161:11,12
  280:7 291:21
**added** 162:15
  294:23
**addicted** 73:11
  103:3 263:3
  282:20 283:1
**addiction** 25:12
  94:6 126:15
  200:19 202:21
  204:15 226:6
  245:10,18 246:4
  251:21 262:15
  267:25 268:10
  280:10,25 283:5
  283:17,25 291:13
  292:13,23,25
  306:5 356:4,8
**addictionologists**
  251:20 306:3
**addicts** 300:1

**adding** 292:3
  298:1
**addition** 27:8 70:6
  70:16 75:15
  314:15 318:12
**additional** 30:15
  94:21 108:11,15
  183:3 215:21
  223:19 291:15
**address** 44:6 75:5
  76:4,15 78:24
  99:19 106:16
  108:1 111:19
  121:12 131:24
  133:1 146:5
  239:23 264:3
  281:19 362:15
**addressed** 126:14
  145:13,22 263:21
**addressing** 90:24
  97:13 109:15,20
  131:19 137:14
  265:4 348:9,10
**adjusted** 87:1,10
**administer** 106:1
**administration**
  233:15 266:12,19
  267:2,9,15 268:14
**admitted** 320:2
**adolescents**
  262:25 263:1
**adopted** 101:5
  207:22 208:18
  234:1,20 235:1
  240:2,4
**adults** 39:9 42:17
  42:25
**adverse** 73:1
  291:10
**advertising** 357:12
  357:16,22

**advocate** 273:6
**affiliations** 10:10
**affirmative** 218:16
**affixed** 363:15
  364:21
**afforded** 339:24
  344:18
**african** 294:7,12
**age** 323:20
**aged** 331:10
**agencies** 45:20
  73:16 218:9
  250:18 314:21
**agency** 36:3 73:17
  86:18 221:4
  327:19 328:1,17
  329:5
**agency's** 329:14
**aggregate** 329:12
**ago** 26:1 42:8
  212:12 290:21
  356:17
**agree** 9:16 51:7
  70:2 102:19
  105:16 112:4,13
  112:23 117:3
  119:15 124:24
  125:16 202:8
  243:4,10,15,19,22
  243:25 244:1,5,7
  244:12,13,17,18
  245:7,23 246:10
  246:14,15,18
  247:25 250:19,23
  251:10 254:5,11
  254:17,21,24
  255:4 257:15
  269:8,14 270:20
  294:22 299:2,8,14
  300:14,18,21,23
  301:1,9,15,18,24

302:24 303:14
  304:21 305:9,14
  305:15 328:9,15
  328:22,24
**agreed** 110:25
**agreement** 112:20
  354:20
**ahead** 26:20 48:1
  56:15 58:12
  103:16 129:17
  130:19 133:19,20
  141:8 145:6
  151:20 152:22
  182:23 202:10
  214:1 223:13
  225:6 268:4
  273:19 319:10
  337:24 358:13
**ahollingsworth**
  5:9
**aid** 5:11 11:12
**ailments** 328:20
**akron** 98:19,24
  99:18 100:13
**al** 1:10,10,12,14
**alarming** 166:7
  170:4
**alcohol** 21:20
**alive** 24:8
**allan** 145:24,25
  146:3 153:16
**allan's** 146:10
**allegation** 140:1
  140:22 141:15
  143:21
**allegations** 18:16
  140:16 142:17
  143:12 337:8,16
  339:13
**allege** 340:6,8

**alleged** 338:11
339:3,9,16 340:14
342:1
**allegedly** 341:16
**allen** 312:21,21
**allergan** 351:18,20
351:22
**allisyn** 80:3
116:23
**allow** 124:10
125:1,18 127:7
284:24
**allowed** 65:23
215:25 254:14
266:20
**allows** 127:15,21
128:15 129:11,20
130:22 132:25
**alter** 203:1
**alternative** 133:18
**american** 233:17
294:8,12
**amerisourceberg...**
5:19 11:19 331:16
331:20
**amount** 133:16
134:12 242:11
307:3 328:22,24
329:18
**amounted** 325:18
**amounts** 57:15
326:13
**amped** 346:7
**amy** 341:19
**analgesics** 276:18
**analog** 322:21
327:10
**analogs** 269:10
**analyses** 322:16
**analysis** 306:11
314:18

**anecdotal** 300:11
301:5,14 303:2,16
304:7,21,23,25
305:8,15 308:2
**animal** 295:15
**annie** 8:10 333:10
**annual** 7:22 47:8
75:18 97:20 98:5
98:10 101:11,18
158:20,23 159:2,5
159:9,12,14,18
160:3,15,18,25
161:4,8,15 162:2,8
162:13,16,24
163:10,13,16,24
165:8,20 166:6
168:19 170:12
173:2 181:9
185:17 329:18
**anomaly** 69:1
**answer** 13:11,18
16:10,16,20 17:18
18:24 19:3,6,21
20:15 22:2,5 23:8
24:17 25:14,15,19
25:20 26:15 27:20
27:21 43:13 44:13
47:15,25 49:5
50:18 51:20 52:15
53:9,9 54:3,7,11
55:24 56:13 57:17
57:19,24 59:5
64:10 68:12 75:21
79:4 81:24 82:1
85:9 93:4 97:5
98:13 102:3,12,16
107:6 112:18
119:18 121:4
122:22 127:9
128:19 130:13
132:18 133:25

135:9 139:10,13
139:15,16,17,18
140:2,5,6 141:1,5
141:21 145:11
150:25 151:2,21
152:5,7,11,14,17
159:3,19,23
160:10,18 173:22
177:12,12 193:25
214:1,16 216:15
245:21 248:24
254:14 264:23
284:5,24 287:24
288:6 295:10
298:21 303:19,20
303:21,22 304:5
309:8 311:13
317:5 323:8 325:5
337:1 348:23
357:23 359:14
**answered** 19:22
26:5,22 28:9
215:13 216:10
248:11 249:8
**answering** 120:2
160:21 214:17
216:13 227:10
**answers** 216:12,17
361:9
**anthrax** 318:11
**anxiety** 156:4
**anybody** 15:5 16:4
16:12,22 17:3,11
18:5 62:18 63:2
65:16 99:15,18
113:7,8 184:5,6
209:5,13 251:7
317:10 330:15
337:2 341:17,24
349:24

**apartment** 31:20
**apologize** 26:23
345:9
**apology** 343:23
**apparent** 215:4
**apparently** 338:16
**appear** 363:11
364:15
**appearance** 10:10
10:14
**appearances** 3:1
4:1 5:1 6:1
**appearing** 6:12
**appears** 29:16
36:1 76:24 340:25
**appended** 364:11
364:18
**applicants** 85:16
**application** 108:13
109:3 110:1,5,15
110:20 111:5,16
183:21,25 184:3,7
**applications**
184:23 268:14
**applied** 82:25 83:4
110:7 111:16
183:6,8 184:24
**applies** 328:17
357:2
**apply** 97:6
**applying** 342:15
**appreciate** 96:18
165:17 292:2
**approach** 265:3
294:17
**approached** 265:6
342:4
**appropriate**
105:11 114:24
115:5 193:3 217:4
336:14

approval 267:10
268:13
approved 266:11
266:18 267:14,15
267:19,23 268:8
268:23 355:22
356:8,21
approximately 2:4
14:5 325:18,23
april 63:24 64:5
73:21,24,25 74:7
90:7 172:24
184:13 274:23
333:15 334:13
336:25 343:5,12
343:17 350:13
april's 335:25
area 36:23 37:14
58:22 71:5 82:13
82:14 161:16
162:17 206:14
330:14
areas 105:19
185:11
arguing 177:19,21
arrive 320:23
arrows 197:9
art 67:25 70:21
article 132:2,7,23
132:24 133:4,12
299:25 301:6,8
arts 30:3,4
aside 18:2 128:13
165:25 218:12
308:6
asked 16:3,19,23
18:5 33:25 58:13
94:3 101:24 102:4
102:9,25 115:22
133:9 136:24
144:21 151:15,17

152:11,17 156:14
165:15 176:4
177:4,10 226:3
232:21 235:10
240:9 248:18,19
249:24 250:4,6
255:14 257:12
265:23 271:15
284:10 287:10
288:16 334:11
336:18 340:14,16
341:15,24 343:3
350:6 354:24
asking 12:18
16:22 18:15 19:13
26:23 51:22 52:1
52:9,19,23 54:12
54:13 55:25 61:12
66:23 67:9 79:7
84:6 86:20 87:17
88:5 89:13 130:13
132:22 133:2
138:12 140:4
142:15 154:7
157:1,2,9 160:11
161:11 163:17
164:13 171:4
176:6 177:18,24
179:11 180:7
200:2 205:25
207:1 213:10,15
217:14 234:4,14
237:18 249:9
278:16 287:21
300:17 301:23
305:6,7 306:14
311:11,12,16,17
341:23 349:21
asks 26:11 103:23
aspect 42:21
258:17 294:10

313:13
aspects 295:21
313:17
assembly 7:25
135:11 240:11
assertion 216:9
assessment 244:9
281:20 282:10
assignment 363:2
364:2 365:2
assist 106:15
136:10 148:12,15
assistant 35:16
assisted 97:19
98:8 105:22,24
136:13,16,18
280:9
associated 34:18
180:13 271:4
296:11 314:11
322:5 356:4
association 91:1
92:24 96:19 97:3
233:18
assume 33:15
atlanta 102:7
attached 8:12
364:7
attempting 216:6
attend 102:13
attended 97:12,14
101:10,17 206:15
329:9
attending 10:9
attention 144:6
150:12 257:22
273:14
attorney 10:15
102:6
audiences 93:14
94:7 200:18 201:2

201:7,16 204:3,14
audio 9:13,14
august 40:10
212:11,16
authority 83:21
84:9,14 250:25
251:4
authorize 364:11
authorship 317:17
automated 117:14
150:18 153:7
autonomous 74:1
availability
259:16,22 260:3,5
260:8 314:25
available 92:1
93:2 110:21
164:10,25 185:5
186:11 246:11
260:4,10,17 261:5
261:6 267:11
ave 362:1
avenue 2:8 4:21
5:5 10:1
award 108:10
awarded 85:2
109:19 183:7,19
184:15
awarding 114:18
aware 15:15 28:12
99:6 140:20
180:16,25 189:18
190:22 191:5
235:12 245:1
251:8 255:15
258:23 259:9,12
266:22 269:15,20
269:22 270:8
284:6,9 286:20
287:1,3,9,14,25
288:19 322:23

331:18 339:8,14
344:19 353:6,12
354:4 356:3,6
357:11 358:4,17
358:21
**awareness** 38:7,14
41:14 47:5 57:11
59:24 60:14 61:11
61:12 62:8 106:5
111:18,24 115:17
115:18,23 116:4
167:9 180:12,24
185:10 264:7
344:25 345:12,13

**b**

**b** 7:11 216:4
**baby** 235:16
237:12,16,20
**bachelor** 30:3
**bachelor's** 29:24
**back** 37:3 38:18
40:5,10 45:11
47:14 59:6 62:15
65:4,7,9 66:1,2
86:3 90:8,11,12,15
99:11 102:24
107:14,18 121:7
123:24 124:23
130:4,11 142:10
142:14 153:1
155:21 163:5
172:10,14 182:13
182:14 185:16
188:20 192:21
193:17,20 194:24
195:7 196:15
201:16 214:24
215:20 217:13
225:1 252:24
253:25 257:22
260:1 282:1

289:20,24,25
290:21 294:15
298:25 312:13,14
321:23 334:11,12
338:6 342:6,8,10
347:2,9 348:2,7,12
350:20 362:15
**background** 54:10
105:2 235:20
286:7
**backwards** 33:21
**backyard** 70:17
**bad** 254:10
**badger** 177:5
**badgering** 177:9
177:13,14
**baker** 6:13 65:13
65:15,19
**bakerlaw.com**
6:19
**barrier** 103:19
205:24
**barriers** 149:1
238:16,24 290:18
**base** 79:5 132:2
342:10 346:18
**based** 51:12,21
53:7 54:2,5 55:22
56:1,13 57:8
58:14 59:20 60:13
69:22 75:11 76:10
85:8 93:21 95:3,6
95:13 96:3 111:15
123:17 126:3,6,11
133:3,8,13,14
134:24 168:23
187:1 200:24
201:7 205:4,20
206:10 217:9
224:14 226:14,16
227:20,24 228:21

229:17 236:14
242:4,5 245:23
249:17 250:7
251:14 258:22
262:16 263:14
264:8,13,24 270:2
272:9 278:12
290:25 292:17
293:9 294:4,14,25
298:19 299:6,13
303:4,16 304:7
310:19 318:18
320:11 322:8,15
331:9 332:23
**basically** 38:5
75:24 110:12
157:17 339:25
344:6
**basis** 25:17 31:15
42:16 62:25 75:18
112:18 120:16,20
120:24 124:12
125:3,20 143:15
186:10 194:23
247:19 249:10
304:8 305:24
306:9,20 307:21
321:11 323:17
324:3 329:1 341:4
358:1,23 360:3
**bates** 164:7,13,16
164:18,19,23
165:9 222:15,19
222:20,24 276:11
276:12
**bathroom** 64:20
**battle** 103:20
**battling** 349:19
**bear** 297:14
**becky** 83:3,6,7
334:14 335:23

336:6,24 340:9
341:10 342:3,5,8
342:11,14,15,16
342:24 343:1,5,8
343:13,14,15
344:7,8,25 345:2
345:13
**becky's** 340:1,3
**becoming** 101:5
**began** 43:2 114:3
131:8 180:17
310:17
**beginning** 10:14
10:22 51:20
173:19 332:21
348:17
**begins** 155:14
192:7
**behalf** 3:3,10 4:3
4:18 5:3,11,19 6:3
6:12 11:6,9,12,19
11:22,24 15:16
16:7,24 17:15
18:17 83:14 94:5
99:18 100:12
104:4,22 105:21
124:8 130:25
146:4 179:23
180:17 300:15,24
349:24
**behavioral** 105:25
**belief** 304:8
**believe** 65:21
89:25 132:25
164:9 229:20
237:22 241:19
242:16 247:5,9,15
247:20 248:5,10
248:12,15,20
249:5,10 256:2,7
256:12 258:12

259:21 261:21
282:18,24 292:10
303:8 307:18
308:16,19 346:14
347:22,25 355:4
**believed** 170:19
240:13,23 347:16
**believes** 241:8
**bench** 240:1
**beneficial** 147:12
**benefits** 244:15
**best** 13:3 27:4 51:5
61:10 116:10
118:24 180:15
203:10 216:15
220:4 222:2
313:10 339:20
**beth** 350:12
**better** 17:21 30:12
30:13,25 71:9,10
88:18,22 127:1
133:14 225:12
227:18 321:25
325:5 348:13,15
**bewilderment**
201:17
**beyond** 108:17
143:9 182:22
183:15 308:2
**big** 59:18
**bigger** 298:15
**bill** 95:25 96:1
**birth** 323:21
**bit** 16:21 29:6
124:23 127:4
231:10 251:23
261:14 271:14,17
290:15 291:20
323:24 325:5
342:25

**black** 270:12
271:3,10,23
272:11 281:4
**blame** 256:4,9,13
256:20 348:2
**blank** 145:18
**blood** 228:16
286:11 322:24
**board** 7:15,21
32:5,15 33:7,11,13
33:18 34:5,13
36:12,15,19 38:25
54:9 59:11 60:18
61:19 66:7,19
71:20,23 72:12
74:20 75:4,16,17
76:3,14 78:23
80:6 81:23 82:3
82:11 83:14 94:5
106:13,20 107:25
108:6,14,22,24
109:7,11 112:11
112:20 113:4
114:3,21 117:1
118:21 119:5,22
120:4,10,25 122:5
137:4,13 138:8,19
139:25 146:2,4,19
148:4 149:12,13
150:16 153:5,22
158:19 159:1,4,7
159:11 160:2
162:2 163:10
166:23 171:5,7,9
176:23 178:13,22
181:21 182:19
183:14 185:1
186:15 207:22
208:11,14,18,24
215:9 218:4
221:10 232:13

233:21 240:7,10
240:19 242:13
246:1 250:11,24
263:19 288:11
289:8 293:20
316:13 322:14
332:24 334:9
346:10,15 349:3
349:25 350:6,13
**boards** 121:5
233:23 293:21
318:4,21
**bockius** 4:4,11
5:12 11:24
**body** 67:25 70:21
240:21 241:6
**boehm** 3:15 7:6
10:19,19 11:15
12:11,17 18:25
19:10 20:10,13
31:15,19,21,23,25
64:18 65:25 84:4
107:21 117:7
125:6 141:23
142:4,13 145:2,17
146:23 151:13,17
151:20 160:7
163:5,8 164:3,9,15
164:17,25 165:4,7
165:11 177:8,14
177:18,24 178:2,6
178:10 182:8,17
192:17 193:2,9,13
193:20 194:15
195:5,21 196:1,4,8
196:18 202:3,7
213:12,16 214:13
214:20 215:2
216:19 217:11,12
222:3,6,17,20,24
223:2,5 224:25

225:3 252:10
253:20 254:4
276:12 289:16,23
297:10 299:21
312:16 334:19,23
350:15
**book** 47:8 272:19
**booklet** 48:3
**boomers** 235:16
237:13,16,20
**borne** 68:2
**bottled** 122:9
**bottom** 144:8
146:25 150:15
197:1 257:13
274:9 296:24
**box** 67:4 68:5,10
77:5,23 259:15
261:12 262:10
**boxes** 252:6,14
**brain** 264:9
**break** 64:17,22
66:2 127:3 140:24
141:2,6,22 142:1
178:5,10 182:9
193:21 214:18
217:14 234:9
236:7 252:23
271:16,18 289:14
290:22 312:8
**breakdown** 296:9
**breaking** 103:17
240:4
**bridge** 344:21
**bring** 62:6 105:6
215:19,20
**bringing** 104:5
**broader** 68:14
253:12
**broke** 142:15
228:12

**broken** 235:10
**brought** 231:10
**brown** 271:7
**bucket** 69:19
**buddy** 236:9
**build** 59:17 60:5
  111:18,21 314:18
  321:15
**building** 45:1
  111:23 146:15
  173:19 313:12,17
  314:8 349:4
**built** 232:22
**bullet** 169:4
  344:24 345:12
**burden** 50:9
**burling** 6:4 11:22
**bus** 323:2
**business** 294:17
**bypass** 351:2

**c**

**c** 361:1,1
**ca** 362:25
**calculated** 322:13
**calculating** 324:4
**calculation** 359:23
  360:3
**calculations**
  324:16
**call** 73:1 117:21
  196:9,10 202:1,6
  215:25 228:9
  307:12
**called** 12:5 38:9
  39:19 168:11
  272:19 281:20
**cameron** 315:15
**campaign** 166:14
  166:20,25 167:5
  167:15,21 168:11
  169:2

**cancer** 261:5
**candidate** 83:2
  88:22 336:14
**candidates** 82:17
  82:24 83:1 87:25
  88:18 333:23
**capabilities**
  314:10 320:22
  322:19
**capacity** 52:24
  92:12 176:21
  267:4 321:15
  330:12
**capita** 124:1,12
  125:3,20
**capretto** 62:8
  294:6,20 313:1
**caraf** 213:18
**caraffi** 1:18 2:5
  7:5,14,18 8:9 9:18
  10:18 12:4,12
  18:6 29:10 32:20
  54:12 66:2,13
  101:24 107:20,22
  117:10 142:14
  165:14 176:12
  182:15,18 194:17
  196:19 200:2
  201:21 202:10,13
  204:1 205:23
  211:4 213:19
  216:2 217:13
  254:2,5,7 265:20
  274:7 289:24
  312:15,17 350:25
  358:12 360:18
  362:8 363:4,9
  364:4,13 365:20
**cardinal** 3:10
  10:20 11:2 330:20
  330:22 331:11,19

**care** 73:18 133:18
  185:7 207:21
  245:8,16 246:2
  260:5,15 261:5
  293:6
**career** 31:1 217:17
**carfentanil** 269:3
  269:6 270:7 284:2
**carole** 65:14,15
  102:11 103:22
  241:2 306:22
**carole's** 103:25
**carries** 103:19
**carry** 103:5
  104:21
**cartel** 272:18,22
**cartels** 269:17
  270:16 272:15
  273:1 294:19,22
  295:2
**case** 1:7,11,13,15
  15:6,20 29:16
  110:6 115:11
  116:15 194:22,22
  231:11 277:13
  279:18 318:10
  358:16,24 359:17
  362:6 363:3 364:3
**cases** 162:13
  220:24,25 298:2
  325:4
**categories** 44:1
  322:4
**categorizations**
  324:20
**categorize** 323:16
**categorized**
  323:13 324:3
**category** 68:13
  69:16 70:9 71:14
  71:18 320:15

322:3 325:7
**caucasian** 262:20
  263:9,10 294:14
**caucasians** 263:18
**causal** 293:11
**cause** 169:7,11
  361:15
**caused** 88:14
  224:2 294:24
**causes** 48:12 60:25
  61:22 62:4,21
  104:14 118:24
  122:16 123:10
  170:10,20,25
  171:14,22 172:3
  172:13 175:13
  178:14 186:22
  187:11,17,22
  188:3,9,15,21
  217:20,24 224:10
  224:20
**causing** 62:5
**caveat** 250:4
**ccb** 324:16
**ccbh** 109:4,5,9,13
  109:19,22 110:7
  110:15,25 111:6
  112:4,12,23
  114:10,18 117:3
  118:16 120:17
  121:10 139:8
  141:16 142:16
  146:17 148:4
  154:5 159:17
  160:15,24 161:4,8
  162:8 168:19,25
  170:9,16 171:6,7
  173:2 174:14
  175:12 179:4
  183:3,21 184:5,7
  217:18 267:7

324:5 340:5
341:17,24
ccbh's  112:1 115:3
164:11 167:4
cdc  73:1 108:3
cell  9:10
cellular  9:9
centers  108:3
centre  4:5
cephalon  351:25
352:1,2,5
certain  38:6 50:8
145:8 168:2 170:9
260:2 272:6,8
357:2
certificate  364:11
certification  363:1
364:1
certified  361:5
certify  361:7
cetera  280:12
chain  144:5
150:13 273:15,24
279:12,24 281:15
chains  144:7
chair  37:18 39:13
39:17,23 40:7
42:2 43:2 45:12
45:14,16 46:1,6,8
46:10,12,13,16,19
46:22 49:7,8,15,16
52:20,24 53:6
54:8,17 58:1 72:6
72:16 92:13 104:5
135:21 175:24
176:8,14,21
206:17 209:7
212:9,18 213:20
215:8 217:18
237:1 241:17
289:6 298:20

310:15 318:25
330:12 350:3,8,11
350:12
chaired  39:21
69:12 241:2
chairman  349:17
chairmanship
126:6 349:10
challenges  60:15
104:10
chambers  77:4,11
77:15 78:9,20,22
79:9,12,23 86:10
chance  154:19
176:11 273:20
300:4 316:21
change  37:10
56:19 93:20 94:14
95:2,20,22,25 96:8
132:7 198:15
202:24 205:5,21
210:6,10,11 211:9
350:4,6 362:13,14
364:8 365:3
changed  67:6,10
67:12 94:19 203:6
changes  35:16
37:5 67:11 95:8
95:23 198:5,9
200:25 201:9
203:16 204:25
205:15 206:19
207:5,8,11,15
209:20,21 210:19
210:25 211:17
220:16 260:9,11
260:23 362:12
363:7 364:7,9
changing  261:12
261:21

characterization
332:11
characterize  75:25
76:11 78:21
characterizing
282:19,25
charleston  5:22
chart  7:16 66:8,21
67:5,13 74:16
77:3,25 78:3,20
chase  358:14
chicago  4:13
chief  325:9,13
327:15
chikungunya  68:4
child  291:9 314:4
314:23 325:1
346:25
childhood  42:17
73:2 291:10
292:11 348:8,11
children  44:5 73:4
73:7,11,18 314:7
china  269:24
choice  85:19
105:11 350:2
choices  110:3,21
185:4
choose  110:4,13
110:21 334:13
chris  51:14 89:7
89:10 98:6,7
136:25 235:21
242:8 251:19
271:6 306:1 317:9
317:13 324:17
336:8 339:21
340:5 341:11
342:19,23,24,25
344:6 345:16

chronologically
144:11
circle  41:20 197:7
223:12,19 298:5
circuit  140:9
circulation  299:24
circumstance
260:9
circumstances
20:7 212:17
260:10
city  1:14 75:16
91:1 92:25 96:20
96:24 97:1,3,12
100:13 312:25
citycenter  6:5
civil  363:5 364:5
claim  358:23
claimed  24:17
278:25
claiming  277:12
277:19,25
claims  16:6 354:6
clarification  20:9
22:1 28:25 31:10
165:13 168:7
360:1
clarify  130:7
clarifying  84:23
325:3
class  318:13
classify  323:16
clean  71:8 338:7
clear  51:20 54:15
74:7 143:18
144:19 195:3
205:13,23 285:7
305:18 321:21
clearly  22:17
cleveland  1:14,20
2:8 4:22 5:6 6:16

[cleveland - complications]

9:1 10:1 30:7
68:22 75:16
282:11 312:25
362:2
**client** 106:2 226:3
232:2 249:25
250:8 255:13
282:13
**clients** 127:2
128:25 132:5
133:17 226:10
282:5
**clifford** 4:24 11:5
**clifford.mendels...**
4:25
**clinical** 198:5,9,16
203:6,16 204:25
205:15 206:19
207:5,15 209:20
210:25 211:10,17
240:12,22 241:6
260:23 282:9
**clock** 194:14
**clockwise** 259:16
**close** 19:24 212:24
214:3,7 285:2
**coalition** 37:20,25
45:3,19,21 60:6
111:21 126:18
130:25 146:15
162:21 171:8
172:8 173:19
218:15
**cocaine** 21:20
26:25 291:1
293:25 294:2,15
294:23 295:1,23
296:10 297:12,16
297:22 299:11
321:18 324:10
326:2

**code** 120:23 121:2
121:5 350:5,5
**codes** 320:8
**cognitive** 105:25
**cohen** 193:1,22
196:9
**collaborated** 99:8
99:10
**collaboration**
218:19
**collaborative**
48:16 49:18 54:10
55:24 56:16 62:1
94:17 95:7,13
98:17 111:18
122:22 123:13
128:9 131:15
218:8 226:17
239:24 260:14
263:25 264:11
331:1
**colleague** 358:9
**colleagues** 164:22
206:14 253:19
**collecting** 147:22
**collection** 47:7
69:24 137:20
148:13
**collectively** 62:14
94:16 171:25
**color** 296:9
**columbus** 3:6 39:8
64:2
**come** 22:17 62:17
62:18 75:14,19,21
79:17 88:20 89:1
96:4 107:14 128:6
129:2 172:4
216:10 239:1
252:24 291:12
313:25 314:15

336:18 348:21
**comes** 53:16 69:25
98:19 99:2 108:2
128:22 219:16
318:19 321:8
323:1 325:1
340:22 344:16
355:6,10
**comfortable** 20:18
105:20 194:4
**coming** 60:15
185:8 321:21
355:19
**commencing** 2:4
**comment** 255:4
346:5
**commission** 233:6
233:9 363:19
364:25 365:25
**commissioner**
99:24 146:1,13
**commit** 328:12
**committee** 306:11
306:15,18 307:13
307:14,18 308:1,9
312:19 313:5,11
313:19
**communicated**
98:23 186:2
**communications**
38:24 39:2 56:1
330:14
**communities**
75:18
**community** 56:2
57:1 60:14 103:7
113:14 119:9
122:16 123:3,11
123:16 126:23,25
127:12 128:23
148:19 168:1

171:22 172:12
204:3 210:16
211:13 228:23
235:5 239:1,10
241:22 242:2,20
262:15 263:9,10
264:25 281:20
282:10 290:4
319:16
**companies** 70:14
266:10 268:21
330:6 354:16
**company** 266:8
330:24,25
**compare** 295:24
296:5
**compared** 224:16
228:13 328:19
347:8
**comparison**
295:17
**competitive** 183:6
183:19
**complained**
139:23
**complaint** 15:9,16
15:23 16:11,18,19
17:25 18:6,14,19
139:21 325:9,13
327:15 341:1,4
344:2 345:1,2,14
345:16 351:7
**complaints** 138:5
138:17,22
**complete** 41:19
210:23
**completed** 362:15
**complex** 239:4
257:16
**complications**
148:25

comprehend
  281:12
comprehensive
  286:16
comprised  48:23
computer  361:10
concept  227:22
  228:17 229:2
  234:2 235:1 255:5
concern  72:10
  192:11 227:16
concerned  47:19
  227:2
concerns  104:15
  247:1 357:21
conclude  360:15
concluded  142:25
  143:1 170:25
  171:16 360:20
concludes  360:17
conclusion  88:20
  89:1
conclusions
  170:14 171:21
condition  244:10
conducted  89:20
  90:3 138:7,18
  140:15,21 141:14
  143:20 181:1
  328:7
conducts  286:5
conduit  39:11
conference  91:7
  92:25 97:20 98:4
  98:5,10 101:11,18
conferences
  101:25 206:15
confidential  143:9
  340:23 344:17
confidentiality
  344:18

confirm  153:20
confirmation
  154:8
confirming  268:6
confirms  156:1
conflict  65:17,21
confusing  17:22
conjunction  115:8
connecticut  91:2,7
  97:14
connection  38:20
  46:20 59:10 74:10
  76:7 78:17 96:10
  108:16 109:14,19
  110:25 111:9
  112:1,2,5 114:5
  129:6 131:11
  136:9 137:14
  143:11,19 157:17
  208:24 213:17
  303:7,8 308:10,12
  332:9 333:6
connolly  3:11
  10:20 11:2
consensus  45:2
  314:9 349:4
consider  17:4
  239:14 244:15
consideration
  53:12,14 343:15
considered  17:12
  34:14 73:2 270:16
  320:8
consistent  282:3
constituencies
  229:1
consult  16:4
consulted  15:22
consumer  258:8
  258:13 259:2,10
  259:12 357:21

consumers  95:24
  258:24
cont  4:1 5:1 6:1
contact  273:5
contain  93:17
  197:8
contained  285:16
  306:13 338:25
  342:12 357:13
contains  195:13
content  15:23
  78:13 121:18
  165:23 166:2
  206:5 219:15,20
  301:20,22
context  167:23
  253:4 261:14,18
  264:15 328:1
  329:13
continue  9:15
  36:11 71:22 72:2
  72:18 105:6 183:9
continued  94:23
  344:19
continues  328:10
contract  75:17
contractual  75:11
contribute  202:20
  227:11
contributed  205:1
  206:20 226:6,14
  228:19 229:22
  230:11 231:24
  237:10,24 240:13
  240:23 241:8
  242:2 258:13
  259:24 261:23
  262:4,14 292:12
  294:2
contributes
  238:12

contributing  8:1
  17:4,12 18:8
  56:17 61:1,22
  62:4,21 91:13
  123:2 133:9
  170:21,25 190:19
  190:22 191:1,6,7
  197:3,8,16,21
  198:4 199:12,18
  199:20 200:7,13
  202:18 204:4
  211:14 217:15
  220:2 221:13
  222:10 223:21,25
  224:19 225:8
  227:4 231:1
  232:20 233:1
  235:14 236:13
  237:13 238:4,6
  239:9,15 241:24
  254:10 256:24
  257:3,5,14,19
  258:4,21 260:7
  287:19 290:3,5,14
  290:23 291:2,15
control  35:1,5
  37:6 68:1 77:7
  87:15 108:3
controlled  118:5
  118:13 135:5,14
  136:3 253:4 328:1
  328:13,18 329:15
conversation
  23:22 53:7 64:8,9
  88:16,24 99:22,25
  100:4,16,17,20,22
  121:19 153:18
  184:4,5,11 185:14
  209:11,13 227:14
  265:19 302:22
  327:17 329:8

| | | | |
|---|---|---|---|
| 336:13,19,20 | coroner 327:7 | 338:13,15 341:2 | 15:10,17 16:8,25 |
| 340:1,1 356:18,22 | corporation 11:20 | 361:12 | 17:6,6,14,16 18:9 |
| conversations 9:9 | correct 14:13 | correctional 185:8 | 18:17 32:14 33:13 |
| 24:3,4,8 51:13,21 | 25:22 28:4 29:25 | 265:15 | 33:18 34:5 36:12 |
| 51:22 54:2 57:8 | 30:8 31:8 34:7 | corrections 362:12 | 36:15,19 37:19 |
| 58:14 68:18 69:22 | 36:4,5,9,20,21,25 | 364:17 | 38:25 39:5,14,20 |
| 85:25 86:1 88:9 | 41:10,23 45:5 | correctly 28:20 | 39:23,25 40:5,8,15 |
| 88:21 96:3 99:15 | 46:2,18 47:13 | 43:7 44:22 86:12 | 40:21 41:5,13,16 |
| 99:17 100:11 | 48:21 51:4 54:19 | 100:21 131:20 | 41:20 44:24 45:9 |
| 118:20 119:4,13 | 54:22 55:8,12,14 | 149:18 151:24 | 45:13 46:2 51:7,8 |
| 119:14 121:9,15 | 63:13 64:3 66:5,9 | 152:23 173:9 | 52:6,21,25 53:8,25 |
| 121:17,21,23 | 69:7,13,14 70:5 | 208:1 216:13 | 54:9,18 55:5 56:7 |
| 123:13,18 124:17 | 72:19 74:14 76:9 | 238:8 289:2 | 57:16 58:1 59:11 |
| 126:3,11 127:11 | 80:3,4,12,21,22 | 297:23 313:9 | 59:12,13,18 60:18 |
| 133:8 134:24 | 81:21 83:8 87:3 | 315:3 326:21 | 61:19,20,21 62:23 |
| 209:6 224:14 | 90:19 91:3,4 | 346:1 351:23 | 66:7,19 71:5,23 |
| 227:21,25 228:21 | 107:2 108:5 120:3 | corresponding | 72:12,17 74:20 |
| 229:18 235:3 | 131:21 135:7 | 325:8 | 75:3 76:3,4,14,16 |
| 238:19 242:4,6 | 149:7 154:3,22 | counsel 2:6 9:19 | 78:23,25 80:6 |
| 251:14,16 255:24 | 155:9 164:3 | 10:8 12:23 13:25 | 81:23 82:3,11 |
| 260:13 269:18,21 | 168:17 169:2 | 354:24 361:14 | 83:14 91:1 92:13 |
| 269:25 270:3 | 176:15,18 181:20 | counsel's 215:3 | 92:25 93:12 94:5 |
| 271:4 272:14 | 182:22 185:22 | counties 38:6 50:8 | 95:12 96:20,25 |
| 293:10 294:16 | 196:21,22 197:17 | 50:12,19 51:1 | 97:1,3,11 98:14,19 |
| 295:7 302:13,15 | 201:11 207:1 | 97:2 136:11,14,16 | 98:24 99:4,7,8,18 |
| 304:17,19 305:10 | 208:2 217:21,22 | 136:18 169:19 | 100:13 101:5,6,10 |
| 306:1 313:13,14 | 218:1 223:11,16 | 173:5,13 174:2,9 | 101:17 102:21 |
| 327:1 340:20 | 223:20 230:12,15 | 174:15,25 175:7 | 104:16 106:13,17 |
| conveying 70:1 | 230:16 231:25 | 175:14 176:25 | 106:19,24,25 |
| cook 33:3 | 248:2 249:3 | 178:23 179:5,16 | 107:3,25 108:1,6 |
| coordination | 256:21 268:18,19 | 179:25 180:19 | 108:14,21,24 |
| 112:14,24 116:15 | 268:22,24 269:1,4 | 181:3,11,25 183:8 | 109:6,11 112:3,10 |
| coordinator 80:13 | 269:10 274:10 | 185:18 186:4,17 | 112:14,19,25 |
| 82:22 332:3,7,9 | 282:14 284:21,22 | 191:17 295:10 | 113:4 114:3,4,17 |
| 333:16 335:3,13 | 287:23 297:19 | 314:22 | 114:21 115:19 |
| 336:15 337:19 | 298:11 310:10 | countries 258:23 | 117:1 118:21,22 |
| 343:6 | 316:8 322:6,9 | country 104:2 | 119:5,6,15,20,22 |
| coping 292:25 | 323:13 325:15 | 238:3 258:16 | 119:23 120:4,5,9 |
| copy 163:6 297:9 | 326:1,10,16,22 | 290:20 359:3 | 120:11,18,25 |
| corner 66:10 | 328:5 332:15 | county 1:10,12 3:3 | 121:1,10,25 122:1 |
| 296:24 | 333:17 334:3 | 7:15,21 10:17 | 122:7,14,15 123:1 |

123:1,8,22 124:12
124:12,18 125:1,2
125:18,19,25
126:7,14,16,19,20
127:7 131:6,11,12
131:24 133:1
135:22 136:15,17
136:21 137:4,13
138:8,19 139:25
146:2,4,6,11
148:16 149:13,14
149:20 150:19
153:8,14,21 154:1
154:3,5,9,13
158:19,25 159:4,6
159:11 160:2
162:2 163:10
166:23 167:10
169:2,9,18,23
170:6,22 171:4
172:14 173:4,11
173:13,24 174:1,7
174:14,15,23
175:6,13,20,25
176:2,7,8,21,23,23
176:25 178:13,15
178:21,23 179:3,5
179:11,14,14,16
179:22,23,24
180:17,19 181:1,3
181:10,21,24
182:4,19 183:14
185:1,18 186:3,3
186:10,10,15,16
187:5,23 188:4,10
188:16,23 191:9
197:17 199:11,21
200:9,20 202:22
203:22 204:5,16
205:2,18 206:7,17
206:21 209:8,23

210:17 211:7,15
212:8,19 213:21
215:7,9 216:3
217:18,21 218:3,6
218:12,18,20,24
219:1,11,12,21,23
221:10,11,25
223:18 224:1,3,9
224:11,19,21
225:4 226:7,15
227:5 228:19
229:2,23 230:24
231:3,25 233:2
235:13 236:18
237:7 238:7 240:6
240:7,14,19,20,24
240:25 241:4,9,18
241:21 242:18
245:24 246:1
250:11,16,24
251:5,12 252:11
255:18,22 256:5
256:10,14 257:4,6
257:16,20 258:5
258:14 259:21,25
261:18,20,24
262:5,11 263:6,7
263:17,19,20,21
264:16 265:1,5,7
265:16 267:5
270:4 271:11,24
272:23 273:2
274:18 277:11,18
277:24 278:25
280:23 282:21
283:1,4,16 284:1
284:13,18,20
285:9,18 286:23
287:11 288:2,11
288:12 289:6,8
290:1,7 292:14

293:25 294:2,24
295:8,20 298:8
299:3,12 302:17
306:10 307:25
309:3,10,11,16,21
310:16,17 312:18
313:5,10 316:13
318:20 319:1
322:14 325:10,20
326:15 327:9
330:8,13,18
331:21 333:6
346:10,15 347:25
348:4 349:3,9,25
351:12 354:11
355:14 357:20,25
358:5,20 359:16
363:10 364:15
**county's** 106:15
123:9 137:9 220:2
264:17 305:21
308:8
**couple** 35:17
63:19 70:13,19
106:12 223:18
238:5 271:1
291:18 344:23
349:8
**course** 20:13
29:10 54:23 64:18
96:17 107:10
109:12 122:11
125:16 144:18
204:6 217:17
220:8 291:22
312:9
**court** 1:1 9:22,23
10:4 13:4 18:11
62:12 104:10
117:7 212:15
363:7

**cov.com** 6:10
**covered** 291:19
**covington** 6:4
11:22
**crack** 264:19,23
265:6
**create** 38:14 124:4
167:9
**created** 67:14
**creates** 126:25
238:16,24
**creating** 290:18
**creation** 136:11,14
176:9
**creative** 239:5
**creativity** 74:6
**crime** 286:6
**criminal** 328:12
**crisis** 304:15 327:3
358:19
**criteria** 97:8
184:15,23 314:16
**crystal** 205:13
**csr** 1:24 2:10
361:21
**cultural** 56:20
236:19 237:8,22
**culture** 238:2
242:9 258:15
**current** 66:18 91:9
155:20
**currently** 20:22
37:18 39:23 60:1
62:12 68:22 70:12
72:24 73:15,20,23
77:14 78:20 81:12
94:12 167:11
238:21 258:23
**curve** 348:7
**cut** 295:4

[cuyahoga - database]                                                              Page 15

| | | | |
|---|---|---|---|
| **cuyahoga** 1:12 3:3 | 146:1,4,11 148:16 | 236:18 237:7 | **cycle** 20:22 183:19 |
| 7:15,21 10:17 | 149:13,20 150:19 | 240:6,7,14,19,19 | **d** |
| 15:10,17 16:7,24 | 153:8,14 154:2,13 | 240:24,25 241:4,8 | |
| 17:5,14 18:9 | 158:19,25 159:4,6 | 241:18,21 242:18 | **dad** 106:6 |
| 32:14 33:13,18 | 159:11 160:2 | 245:24,25 250:11 | **daily** 25:16,17 |
| 34:5 36:12,15,19 | 162:1 163:10 | 250:16,24 251:4 | 78:6 |
| 37:19 38:25 39:5 | 165:9 166:23 | 251:11 252:11 | **damage** 359:16 |
| 39:14,20,23,25 | 167:9 169:2,9,18 | 255:18,21 256:5 | **damages** 359:19 |
| 40:4,8,15,20 41:5 | 169:23 170:5,22 | 256:10,14 257:4 | 359:24 360:4 |
| 41:13,16,20 44:23 | 171:4 172:14 | 257:16,20 258:5 | **dan** 1:8 |
| 45:9,13 46:2 51:7 | 173:4,11,13,24 | 258:14 259:20 | **dashboard** 99:13 |
| 52:6,21,25 53:25 | 174:1,7,15,23 | 261:18,20 262:5 | **data** 47:6 54:4 |
| 54:8,18 55:5 56:7 | 175:5,13,20,24 | 262:11 263:7,17 | 57:18 99:13 112:5 |
| 57:16 58:1 59:11 | 176:2,7,8,21,22,23 | 263:19,20 264:16 | 112:13,24 113:5 |
| 59:12,13 60:18 | 176:25 178:13,15 | 264:17 265:1,4,7 | 113:11,17 114:4 |
| 61:19,19,21 62:23 | 178:21 179:3,5,11 | 265:16 267:5 | 114:11,16 117:4 |
| 66:7,19 71:5,23 | 179:14,14,16,21 | 270:4 271:11,24 | 119:16 124:9 |
| 72:12,17 74:20 | 179:24 180:17 | 272:23 273:2 | 129:8 137:20 |
| 75:3 76:2,4,14 | 181:10,21,24 | 274:17 277:11,18 | 146:19 147:5,6,12 |
| 78:23 80:6 81:22 | 182:19 183:14 | 278:24 280:23 | 147:19,21,23,24 |
| 82:3,11 83:14 | 185:1,18 186:2,3 | 282:21 283:1,4,16 | 147:25 148:5,8,10 |
| 92:13 93:12 94:5 | 186:15,16 187:5 | 284:1,13,18,20 | 148:13,15,16 |
| 95:12 99:7 101:5 | 187:23 188:4,10 | 285:9,18 286:23 | 149:14,19,20,24 |
| 101:6,10,17 | 188:16,23 191:8 | 287:11 288:2,11 | 149:25 150:3,17 |
| 102:21 104:16 | 197:17 199:10,20 | 288:12 289:6,7 | 152:1 153:6,13,22 |
| 106:13,15,19,24 | 200:8,20 202:22 | 290:1,6 292:13 | 154:12 155:7 |
| 106:25 107:3,25 | 203:22 204:5,16 | 293:25 295:8,20 | 162:17,19 179:10 |
| 108:1,6,14,21,24 | 205:2 206:7,17,21 | 298:8 299:3,12 | 185:20 186:9 |
| 109:6,11 112:10 | 209:8,22 210:17 | 302:17 309:3,10 | 218:10 221:5 |
| 112:14,19,24 | 211:7 212:8,19 | 309:10,16 310:16 | 267:9 275:1,10,19 |
| 113:3 114:2,4,16 | 213:21 215:7,9 | 312:18 313:5,10 | 275:20,21,22,23 |
| 114:21 115:19 | 216:3 217:18 | 316:13 318:20 | 276:5 281:11 |
| 117:1 118:21,22 | 218:3,11,18,20,24 | 319:1 322:14 | 288:19,23 306:19 |
| 119:5,6,22,23 | 219:1,11,12,21,23 | 325:9,20 326:15 | 310:9 315:4 319:2 |
| 120:4,9,11,25 | 220:2 221:10,11 | 327:8 330:8,13,18 | 319:13 321:6,20 |
| 121:24 123:8,21 | 223:18 224:1,3,9 | 331:21 333:6 | 321:21,22 322:9 |
| 126:6,14,16,19,20 | 224:19 225:4 | 346:10,15 347:25 | 322:11 323:10,16 |
| 131:6,12,24 | 226:7,15 227:5 | 349:3,9,24 351:12 | 324:9,15,24 325:9 |
| 135:21 136:15,17 | 228:19 229:1,23 | 354:11 355:14 | 325:13,16 346:20 |
| 137:4,9,13 138:7 | 230:24 231:2,25 | 357:20,25 358:5 | 346:21 348:21 |
| 138:19 139:25 | 233:2 235:13 | 358:20 359:16 | **database** 118:6 |
| | | | 128:21 318:5 |

**date** 43:22 66:9
131:9 135:25
158:2,4 271:25
272:10 323:20
332:23 361:8
362:8 363:3,9,19
364:3,13,25
365:20,25
**dates** 180:5,6
313:12,16
**daughter** 106:7
228:11 235:9
**dawn** 94:17
180:13 240:3
**day** 5:4 11:9 29:11
47:5 96:18 111:8
175:25 176:9
292:8 363:16
364:22 365:22
**days** 320:3 362:18
**dc** 3:13 6:7
**dea** 51:15 58:15
94:25 135:1 251:6
251:8 269:19,25
272:14 273:6
294:5,16 327:23
328:9,12 329:1,17
**dead** 304:22
**deal** 103:2 106:2
239:7
**dealers** 256:13
269:17
**dealing** 60:1 100:1
106:6
**dealt** 213:7
**dear** 362:10
**death** 112:4,13,24
113:5,11 114:4,11
149:25 169:7,11
249:20 285:16
286:8 288:23

305:22 306:10,15
306:19 307:1
308:1,9 312:18
313:5,11,18 314:4
348:21
**deaths** 7:19 57:23
59:1,11 150:20
153:9,14 168:5
187:7 294:7 296:2
296:10,11,12
298:9 314:7 315:5
**decedents** 147:13
**decide** 30:9 151:4
**decided** 30:19
31:7 307:4
**deciding** 244:22
**decision** 30:23,24
83:18,22 84:14
88:19 90:7 243:22
244:7 246:12
334:13 342:6
343:5 344:17
**decisions** 247:23
267:10 268:15
**deck** 63:14 91:11
91:15,17 93:8
220:12 223:17
225:7 252:12
257:22 284:18,24
320:16
**decks** 220:19
**declined** 194:7
**dedicated** 272:3
**deed** 363:14
364:20
**deemed** 45:16
217:2 362:19
**defendant** 358:2
**defendants** 2:6 4:3
6:12 10:24 11:4
11:25 12:17 15:19

65:20,22 277:13
277:19,25 278:8
278:21,23,24
279:3,9,10,17
351:5,11 358:15
**defense** 215:3
360:13
**defer** 329:4
**define** 233:14
321:10
**defining** 279:1
**definition** 250:1
253:12,15,17
255:16
**definitive** 59:5
255:15
**degree** 29:24 30:2
**deidentified** 147:5
147:12,18,23,24
148:5,8,9,14
149:14,19,24
150:3,17 152:1
153:6,13,21
154:12
**dejesus** 350:13
**delay** 332:23
**delineating** 207:22
**deliverables**
110:24 111:9,15
**delivery** 330:2
359:2
**delos** 7:18 51:14
235:21 242:8
251:19 271:6
306:2 312:24
**demographic**
319:22,23
**department** 37:21
38:4,11,22 39:6
40:17,25 41:4,22
42:10 47:7 50:17

63:1,3 68:24 71:5
73:22 74:12 80:9
82:5,18 83:13,24
91:18,20,23,25
92:9,23 102:10
106:14,21 107:5
107:23 108:7,16
108:21 109:14,18
110:8,16,23 111:1
111:7 112:2,12,21
114:6,12,17,23
117:2 129:6 136:9
139:24 143:8
149:6 158:13
166:19,25 168:24
169:1 172:7,17
173:18 179:9
181:15,24 182:21
183:1 184:6,17
185:21,25 186:2,8
191:15 199:25
200:17,25 201:8
202:17 205:21
206:12,24 210:1
210:20 211:3,19
218:12 219:17
242:5 251:18
253:9 262:17
264:14 273:8
292:18 304:15
305:16 306:20
313:15,22 315:9
315:18 332:1,10
333:16 334:5
359:22 360:2
362:22
**departments**
39:10 131:7
218:20,24 219:23
320:21

**depend** 37:9 40:2
109:2
**dependent** 109:25
161:10 220:22
297:24
**depending** 34:16
78:10 94:8,11,12
94:20
**depends** 244:9
**deponent** 10:18
**deposed** 12:20
**deposition** 1:18
2:5 9:13,18,25
10:23,24 13:22
14:23 15:7 29:8
29:12,14 63:8
64:25 65:2,17,24
66:4 107:20
109:10 138:3
144:4 150:7 163:3
182:16 191:22,23
215:25 216:6
221:6 254:3
270:21 290:10
299:15,18 312:15
316:12,16 329:23
333:1,4 360:15,20
361:7 362:8,11
363:1,3 364:1,3
**depositions** 15:1
**deputy** 35:16
76:25 77:5,17,24
78:5,8,14,16
**describe** 53:22
55:4 72:22 92:9
115:3 119:12
121:14 131:2
154:21 155:2
197:15 218:2
225:8 227:1 230:8
238:10 284:19

**described** 55:11
77:18 161:15
**describes** 322:4
**description** 7:13
**designed** 35:10
116:3 217:4
**detail** 201:12
**details** 127:10
**detecting** 250:12
**determination**
244:3
**determine** 124:10
125:1,18 250:21
285:19 287:23
305:11 309:6
327:3
**determined** 170:4
344:6
**dettelbach** 102:5
103:22 306:21
**developed** 21:23
116:14 118:10
283:5,17,25
**development**
44:16 116:17
180:12
**diabetes** 293:4
**diagnosing** 297:25
**diagnosis** 244:11
**dialogue** 105:5
**dictionary** 253:17
**die** 292:19 293:18
**died** 26:9 27:21,23
28:12 287:18
288:24
**differed** 264:17
**difference** 223:12
266:3
**differences** 67:21
184:25 223:24
224:8,16

**different** 16:22
21:10 35:23 36:13
47:2 60:20 75:13
76:17,19 79:2,14
82:10,12 93:14
102:10 104:25
105:18 159:15
160:21 222:7
239:20 264:5
271:6 278:16
288:22 289:2
295:15 297:8
313:25 323:23
324:9 349:6
**differently** 239:21
**differs** 265:5
**difficult** 13:7
62:15 125:12
296:8 315:7
321:22 338:22
347:14
**difficulties** 322:22
**difficulty** 326:19
326:23
**dig** 252:24
**digest** 95:5
**diminishing** 305:2
**dips** 321:4
**direct** 80:23 81:1
126:21 144:6
150:12 258:8,13
258:24 259:2,10
259:12 273:14
342:18,19,22
357:21
**directed** 112:22
192:14,24
**directing** 257:21
**directly** 78:19
128:4,6

**director** 35:16,17
74:11,17,19 75:9
75:10,12 76:25
77:5,17,24 79:3,3
80:8 82:4,18,22
83:23 88:17 89:10
137:5,23 282:10
331:25 332:5
**directors** 78:5,8
78:14,16
**disagree** 216:9
**disbanded** 307:19
**discern** 121:25
127:5,16 128:3
**discernment**
128:16
**disciplinary**
207:19
**discipline** 30:14
34:16
**discordance** 297:1
**discovery** 164:14
**discrepancy** 40:3
**discretionary**
110:9
**discuss** 27:16
48:17 342:5
356:24
**discussed** 64:11
86:16 105:4
121:15 135:18
153:16 199:11
239:10 289:25
290:9 355:18
**discussing** 111:2,4
114:19 241:3
**discussion** 93:23
217:24 315:25
334:10
**discussions** 15:4
86:2 172:12 315:8

| | | | |
|---|---|---|---|
| **disease** 35:1 68:3 | **divisions** 131:7 | **documents** 14:22 | 287:16 288:14,18 |
| 70:23 103:21 | 218:20,25 219:23 | 29:11 47:9 52:8 | 288:20,23 290:25 |
| 108:3 167:25 | **doc** 23:12 | 145:9 172:19 | 293:16 294:5,14 |
| 239:4 318:6 | **doctor** 127:23 | 357:14 | 296:4,15 297:20 |
| 348:10 | 134:4,8,10,15,22 | **doing** 27:10 34:18 | 298:11,25 299:19 |
| **diseases** 318:14,14 | 246:11,17 247:2 | 61:7 69:6,17 70:7 | 300:8,16 301:2,24 |
| **disorder** 20:1 | 250:8 253:8,8 | 79:19 113:9 | 304:13 305:17,21 |
| 21:10,24 22:12,20 | **doctor's** 244:7 | 177:19 234:15 | 306:1,8,18 307:9 |
| 106:8 124:7 277:3 | **doctors** 114:23 | 238:23 264:1 | 307:13,23 308:7 |
| 293:12 | 115:4 116:3,10 | 294:19 295:2 | 308:17 309:7,20 |
| **disorders** 24:6 | 132:25 242:14 | 305:4 342:17 | 310:12 312:6,21 |
| 213:8 | 244:1 247:23 | 355:12 | 312:24 313:14 |
| **dispense** 358:13 | **document** 1:9 | **domestic** 73:10 | 327:2 331:5,6 |
| **dispensed** 242:12 | 29:15,18 66:3 | **donna** 99:23 | **dramatic** 308:22 |
| 268:25 | 138:10 144:3,14 | 100:19,19 | 309:11,17,21 |
| **disposal** 60:10 | 144:18,20 145:5 | **dosage** 328:25 | 310:14,17 312:3 |
| **disproportionately** | 145:11,14 150:9 | **downloaded** | **draw** 129:11,21 |
| 263:9,17 | 150:22 151:2,9,14 | 318:21 | 130:23 |
| **disputing** 181:8 | 151:15 152:4,6,7 | **dozens** 204:10 | **drawn** 216:25 |
| **disregard** 252:2 | 152:11,13,14,17 | **dr** 51:13,14,14,14 | **draws** 322:24 |
| **disseminated** | 154:25 163:1 | 58:14,22 94:23 | **dreamland** 272:20 |
| 122:6 132:5 | 164:10,18 165:12 | 96:12 98:6,7 | **drive** 3:5 4:12 |
| **distracted** 234:10 | 193:24 194:3,12 | 103:23 104:22 | **driven** 157:24 |
| **distribute** 359:13 | 194:25 195:4,24 | 116:19,22 121:18 | 158:10 346:20 |
| **distribution** | 203:13 207:6 | 123:15 126:4 | **drop** 110:4 132:9 |
| 295:16 | 221:8 222:21 | 128:10 135:2 | 132:14 |
| **distributor** 330:6 | 223:6 224:23 | 148:19 149:23 | **dropping** 299:5 |
| **distributors** 248:1 | 242:10 271:1 | 151:8 153:25 | **drops** 323:1 |
| 248:6,21 249:5,11 | 273:11,21 274:3,8 | 154:2,8,11,21 | **drowning** 68:21 |
| 330:2,16 331:21 | 281:4 284:20 | 155:16 156:7,11 | 70:18,18 71:13 |
| **district** 1:2 9:21 | 299:17 310:20 | 156:13,15,21,24 | **drug** 7:23 8:1,6 |
| 9:23,23 35:2,3 | 316:12,21,23 | 157:5,13 187:2,4 | 11:19 41:6 42:21 |
| 102:6 | 317:2,4,6,8,18,21 | 206:13 228:22 | 47:12,12,20,21 |
| **diversion** 252:15 | 317:23 319:6 | 235:21,22 242:7,8 | 48:13 49:2,10,20 |
| 252:19 253:4,7,11 | 322:14 323:12 | 251:19,20 263:15 | 49:25 50:4,14,21 |
| 253:13,17 254:6 | 325:21 326:17 | 265:11,12,15 | 51:3,9 52:6 53:17 |
| 254:12 255:2 | 333:3,5,11,12,14 | 269:18 271:5,6 | 53:23 55:19 56:11 |
| 261:10 | 335:5 340:25 | 274:6,22,24 | 57:3,15,22 58:25 |
| **division** 1:3 9:24 | 345:5,19 | 275:11,21 280:3,6 | 60:23 61:18 62:8 |
| 87:5 | **documented** | 280:15 281:10 | 62:12,22 104:10 |
| | 341:12 | 285:3,13,17 | 116:5 162:3,9,17 |

163:19 165:21
166:11 169:6,10
169:20,25 170:5
170:11 171:15,23
173:6,14 174:2,10
174:16 175:1,8,14
177:1 178:24
179:6,17 180:1,20
181:4,12 182:1
185:19 186:4,10
186:18 189:19
190:1,7,15,24
191:10,20 195:12
197:3 209:1
221:12 223:9
224:12 246:19,24
247:5,9,15,20
249:5,11 256:13
264:6,17 266:11
266:19 267:2,9,15
268:13,14 269:16
269:17,17 272:15
272:18,21,25
288:25 294:22
316:5,14 317:24
318:2 320:15
322:3 323:13,17
323:17 324:3,3,13
324:20 325:7,19
325:24 326:14
327:10,18,25
328:16 329:5,14
330:2,6,16 331:21
**drugs**  225:13
252:16 260:16
261:11 262:9,14
287:19 295:17
322:4 325:12
**due**  65:17 349:13
**dug**  348:14

**duly**  12:6
**dunham**  8:10
333:10 335:20
341:19
**duties**  129:6
135:20 215:9,12
245:25
**dying**  307:3

**e**

**e**  3:15 5:5 6:18 7:1
7:11,17,18 8:3,4
144:5,7,11 145:13
145:23 146:17,24
147:10 148:2,20
149:4 150:11,13
151:25 154:20
155:2 156:12
270:23 273:12,15
273:17,24 274:11
274:15,20 276:10
279:23 280:4
281:15,19 282:2
299:20,23 301:2
301:11,21,23
309:7 312:2 361:1
361:1
**earlier**  47:2 59:23
67:20 69:24
101:22 102:25
104:20 105:5
123:25 129:19
133:8 136:24
154:6 158:8
166:15 167:7
170:8,22 171:7,11
176:5 182:18
183:12 189:17
195:10 210:2
215:15 217:16
223:11 229:25
251:24 255:14

290:16 291:8,20
327:18 331:23
332:16 333:24
338:10 349:18
351:2 354:25
**early**  57:5 216:3
312:4
**earmarked**  108:23
109:21 110:10
**east**  5:21
**eastern**  1:3 9:24
**educated**  104:7
**education**  79:18
331:4
**educational**  60:11
**effort**  49:18 62:3
348:18
**efforts**  8:2 44:6,11
60:17,18 61:25
75:4,8 76:3,14
78:24 106:16
110:13 115:4
123:9 137:13,20
146:4 148:13
221:14 259:10
264:15 313:18
**either**  27:16 49:17
159:21 248:9
249:19 317:17
361:14
**elect**  42:2 43:3
46:6,10,12 49:7,16
**elected**  46:11
**election**  45:16
**elegant**  16:1
**eligible**  280:24
**elliot**  3:4,8 10:17
**ellis**  4:20 11:6
**email**  362:17
**emergency**  8:6
219:5 316:14

317:24 318:2,19
320:2,5,10,21,23
322:6,7,16,20,23
323:9,12,17 324:2
325:14,19,24
326:15,20,24
**eminem**  292:9
**emotional**  73:9
**emphasis**  95:17
**employee**  36:20
154:2,8 265:12,13
267:7
**employees**  179:14
179:22
**employer**  36:13
**employment**
143:11,19
**ems**  321:8 323:1
**enclosed**  362:11
**encompass**  68:14
323:22
**encompassed**
98:12 318:2
**encompasses**
69:17
**endeavor**  49:9
**endeavored**  55:9
**endo**  6:12 65:20
65:21 352:6,8
**enforcement**
51:15 58:15 73:16
95:21 123:15
126:4,10 128:10
135:1 228:22
240:2,3 250:18,18
255:24 264:1
265:5 271:5 272:3
295:8,11,16
312:25 327:19
328:1,17 329:5,14

enforcement's 265:3

engaged 81:17 170:19 272:22 273:1

engagement 76:1 76:12 78:22 79:10 79:22

engine 324:23

english 311:18

enhance 111:17

ensure 73:6 124:5 227:17 318:9

entered 64:25 364:9

entire 152:10,16 154:20 194:12 363:5 364:5

entirely 36:13

entities 218:13 234:1,19,25

entitled 63:8 97:18 165:20 166:25 192:3 195:14 196:20 221:12 316:13

entity 119:23 263:21 281:20 282:11

entry 34:14

environmental 36:3,23 37:13 67:18 68:8,16 69:2 71:1,4 137:6

epi 342:20

epicenter 318:5,5 318:7,17,21,22 319:2,14 321:25 322:8 324:8,12,15

epidemic 8:1 18:9 56:7 60:2 90:25

91:10,14 93:1 95:12,19 97:13,18 98:2 101:13,20 102:1,20 104:15 105:9 111:19 112:3 115:20 166:16 167:2,12 167:20,23 168:18 168:20 183:13 188:22 190:10,16 191:2,8 192:3,7,15 195:15 196:21 197:7,9,22 199:10 199:13,20 200:8 204:5 210:17 211:15 217:21,24 219:11,21 221:12 223:15 224:3,10 224:21 225:8 226:15 227:4,12 235:15 236:4 237:25 238:7 240:13,24 242:3 255:10 257:6,15 258:6,14 262:17 263:8,17,22 264:16,23 265:4,6 284:20 291:7 314:2 346:22 350:7 359:21

epidemics 263:11 264:18

epidemiologist 52:18 53:13 303:23 304:5 317:14 321:7,14 324:18

epidemiology 89:11 137:6,24

eqi 34:21

er 325:9

erie 70:17

ernst 2:7

errata 362:13,18 364:7,10,18 365:1

error 40:3

esq 3:8,15,17 4:8 4:15,24 5:8,16,24 6:9,18

essentially 223:11

establish 126:17 127:6,16,21 128:3 128:21

established 106:24 316:5

establishing 136:19

establishment 128:16

estimate 204:2

et 1:10,10,12,14 280:12

evaluated 242:24 243:2

evaluates 243:24

evaluating 87:25

evaluation 347:6 356:14

evening 350:25 358:12

event 91:2 282:1 361:15

events 63:11 70:19 102:10 210:16

eventual 156:2

eventually 41:15 46:13

everybody 10:9 13:6 260:18

evidence 60:13 134:20 247:19

264:8,13

exactly 24:19 281:17

examination 7:6,7 7:8 12:10 350:23 358:10

examined 12:8

examiner 112:6,15 112:25 114:5 131:6 149:21 154:13 285:19 286:5

examiner's 24:16 68:23 126:20 155:8 219:4 286:18

example 35:12 78:11 94:15 180:13 232:11,15 232:16 236:6 253:7,11 264:19 265:3 292:21 293:8 327:6

examples 96:15,17 252:18,22 253:14 257:11 263:24 270:8 313:20

excel 323:20

excess 249:19

exchange 148:3 150:11 185:10 270:23 275:8,9

exchanged 164:14

excluded 325:4

exclusive 172:15

exclusively 92:22 237:12

excuse 107:8

executed 364:10

execution 363:14 364:19

[exhibit - family] Page 21

exhibit 7:14,15,17
7:18,21,23 8:1,3,4
8:6,8 29:8,13 63:7
65:2 66:3 74:16
80:2 81:5 90:9,15
102:1 138:3 144:4
150:7,10 155:13
163:2,3,9 191:21
191:23 192:4
193:24 221:6,9
224:24 225:3
252:9,10 257:25
258:2 270:21,24
273:11 279:25
280:2,4 284:21
289:25 290:8
296:6,21 299:15
299:18 306:13
310:3 316:11,16
333:1,4 335:6,17
exhibits 8:12
29:11
exists 65:18
expect 273:12
expenditures
108:22
experience 20:3
20:20 24:9 76:11
79:8 227:24
228:11 235:9
238:21 239:19
282:12 314:25
experienced 19:25
22:12 103:4
228:12
experiences 20:17
73:2 291:10,10
experiencing 24:6
49:1 50:3,9,13,20
51:2,8 73:12
178:15 187:6

expert 52:17 53:5
53:13 54:13
104:19 105:1
expertise 53:8
55:22 105:8
250:25
experts 56:5,9,25
57:9 58:22 69:25
106:4 123:19
124:18 171:21
206:11,13 251:21
293:10 302:16
306:3 330:14
expiration 363:19
364:25 365:25
explain 17:20 48:3
94:13 210:24
319:20 322:25
324:21 337:2
350:10
explained 21:3
37:8 70:11 88:8
209:5 235:8,19
260:15 334:4
341:7
explaining 128:5
211:13
explanation
318:24
express 16:12
extended 183:2
259:17,23
extent 25:11 75:2
256:2,7,12
eye 297:15
eyes 231:12

f

f 361:1
face 104:10 228:10
faced 149:1

facilitate 53:6 54:9
105:5 129:4
facilitated 69:11
facilitating 69:10
75:22
facilitator 349:2
facilities 185:9
225:24 226:1,10
facility 255:11
265:16
fact 15:6 136:13
149:13 153:21
181:8 217:16
263:16 272:9
273:15 304:4
factor 198:4
199:12,20 200:8
200:13 202:18
211:3,18 229:7
231:2 232:21
236:13 237:13,20
238:4,6 239:9,15
244:20 257:14
258:15,21 260:1,7
290:14,23 291:2
293:12
factors 8:2 17:3,4
17:12,13 18:8
56:18 61:1,23
62:4,21 91:14
96:3 115:22 123:2
123:25 133:10
170:21 171:1
190:20,22 191:2,6
191:8,18 197:3,8
197:16,21 199:18
204:4 211:14
217:15 220:2
221:13 222:10
223:21,25 224:19
225:8 233:1

235:14 241:24
254:10 256:24
257:4,20 258:4
289:2 290:3,5
291:15 349:15
facts 358:23
factual 54:13
failure 290:20
fair 13:11 15:24
31:21 45:10 48:25
55:1,3 56:7 63:12
64:14,15 69:15
71:21 72:1 76:22
76:23 78:7 84:13
93:12 104:12
105:10 116:2
124:9 127:12
130:20 161:14,23
165:4 181:18
189:25 217:25
218:21 221:17
229:5 265:25
270:17 293:9
355:16
fairly 89:20 90:3
fall 14:11,12,20
33:7 39:8 44:17
215:11 349:13
falls 42:16,24 44:3
familiar 33:24
117:10,12 227:22
253:16 255:5
316:23 317:1
351:22 354:5
family 19:25 20:4
20:20,23,25 21:9
27:1,7 59:24 73:9
73:10 103:2,6
106:9 214:14
227:24 239:2,2

**far** 47:5 59:19
67:20 69:9 75:14
75:22 76:20 77:13
78:5 79:19 95:16
146:15 184:24
218:14 250:7
258:7 288:24
313:16 320:4,18
329:24,25 349:1
**fashion** 235:25
**fatalities** 275:3,12
275:24 294:24
295:23,24 297:18
297:22 298:10,14
299:4,9,12
**fatality** 113:13,16
114:16 295:6
314:23
**fault** 113:20,25
**favor** 85:22
**favored** 334:2
**fda** 267:19,23
268:8,23 354:25
355:22 356:8,21
356:23 357:11,16
357:20
**fda's** 354:25
**february** 301:11
307:16,23 309:20
310:13 312:2
**federal** 108:4
218:9,13 219:18
221:4 250:18
**federation** 233:22
**feel** 20:18 105:19
184:14 195:5
236:24
**feeling** 226:17
238:22
**feelings** 250:7

**feinstein** 4:8 7:7
11:3,3 350:24
351:1 358:8 360:9
**fell** 161:16
**felt** 104:12 105:11
341:9 344:7,10
345:21 346:5,10
347:23
**fentanyl** 96:12
126:22 129:23
187:2,3,6 265:22
269:10,10,12,16
269:22 270:6
275:4,25 278:14
284:2 294:9,23
295:1,5,19 296:11
296:12,13,16
298:6,9,16,23
305:19 306:5
320:18,22 322:20
322:21 326:20,25
327:5,12,13 357:9
**ferraro** 2:7
**field** 32:7,8,8,11
32:13 33:17,20
34:4,12,15,22 35:9
37:7 52:17 57:9
70:15 106:4 116:1
124:16 126:1
229:13 251:21
306:3 323:21,22
342:22
**fields** 323:19
**fifth** 115:12,24
227:23 228:3,18
229:3 234:2,20
235:2,5
**fighting** 103:20
**figure** 197:2 288:1
**file** 16:13 338:7

**filed** 9:22 15:16,24
16:24 17:6,15
18:6 341:1 345:1
345:2,14,16
**filled** 32:8 77:19
77:21 82:3
**final** 88:2,19 190:6
191:1 209:2
262:10 281:15
344:22 345:18,19
**finalized** 162:24
163:25 165:22
190:4 316:7
317:21
**finally** 348:20
**finances** 227:20
**financially** 10:6
**find** 143:15 222:13
314:24 340:2
348:14 362:11
**findings** 261:19
**fine** 14:17 52:19
89:5 130:15
151:13 178:9
182:8
**finish** 80:14
151:18,19 178:7
252:25
**finished** 48:1
360:13
**finishes** 47:24
**finishing** 58:9
**firm** 38:9 65:14,16
**first** 12:6 14:9
19:9 21:22 22:3
23:11 29:12 33:12
34:3 37:16 45:12
45:15 46:1 52:24
94:15 106:20
108:10 111:14,15
111:20 124:21

146:23 150:15
157:21 158:6
162:2 165:11
166:8 169:4 170:3
171:20 174:24
175:6,25 176:9
180:16 198:3,8
210:2 223:5
238:23 248:18
252:22 275:19
277:5,7,15 329:23
335:21 344:24,24
345:12 357:15
**fit** 69:19 70:9
71:14,17 88:18
108:25 109:23
315:5
**fits** 70:3
**five** 37:6 80:23
81:1,6,9 108:13
111:15 169:19
173:5,13 174:1,9
174:15 177:4
186:17 212:12
222:14 249:23
250:3 253:10
360:19
**fix** 238:2
**flatly** 19:3
**fleishman** 38:9
41:18
**fleishmanhillard**
167:9
**flew** 102:6
**flipped** 284:17
**flipping** 185:16
**floor** 4:5
**flu** 318:14
**focus** 42:16,24
44:17 73:6 185:7
185:9

**focused** 60:9 108:8
**focuses** 264:9
**focusing** 183:12
**folks** 126:4 297:14
  341:24
**follow** 25:17
  181:22 182:5
  319:11
**followed** 87:14
  89:23 90:6
**following** 22:25
  280:11 316:9
  342:6
**follows** 12:9
**food** 34:23,24
  35:13,13,20
  266:11,19 267:2,8
  267:15 268:13
**force** 7:23 39:20
  40:1,5,8,16,21
  41:16,20 44:24
  45:10,13,14 46:2
  52:21,25 54:18
  58:2,19 59:12,17
  61:3,20 69:11,12
  69:23 72:7,17
  75:22 92:14 94:21
  99:5,8,9,16 104:4
  104:7 106:25
  115:10 122:22
  123:14 126:7,12
  126:24 129:2,4
  131:12 133:4
  134:25 135:22
  136:11 171:5
  172:25 175:20,25
  176:3,3,7,8,22
  180:24 183:10
  189:19,23 190:2,7
  190:15,24 191:10
  191:16,17,20

195:12 198:4
203:23 206:18
209:2,8 212:9,18
213:21 215:8
217:19 218:19
219:2,13 221:11
223:10,18 224:1,9
224:12,15,20
225:5 227:15
228:1 229:2
230:24 235:4,13
235:21 236:16,19
236:23 237:1,7
238:1 240:8,20,25
241:5,7,15,18
245:24 249:18
252:12 255:25
257:5,20 258:5
259:21 261:19,21
262:6,12 263:7,20
265:2 267:5 270:4
274:16,18,23
278:12 284:19
288:12 289:7
290:2 293:11
294:6 298:20
302:14,17 303:6
306:25 309:10
310:16 316:5
319:1 330:13
349:9,25 355:14
355:19
**forces** 110:12
  136:14,19
**foregoing** 361:9
  363:13 364:18
**forgot** 271:1
**forgotten** 332:17
**form** 13:15 16:9
  16:15 17:2,8,17
  18:12,18 20:2

22:14,24 23:21,25
25:13 26:4 27:18
27:25 28:8,21
31:9,14 38:1
43:18,20 44:9
45:6 47:23 48:15
49:4,12 50:6,15,23
51:11 52:7,14
53:18 54:1 55:2,7
55:13,20 57:7
59:2,15 62:24
63:17 64:6 68:17
69:21 75:6 77:4
79:1,13 81:4,18
85:21,23 86:14
87:4,22 89:3,21
90:4 92:3,15 93:3
93:19 94:10
100:18 102:2,23
104:18 105:15
108:18 109:1,24
110:11,19 111:3
111:11 112:7,16
113:1 114:7 115:2
115:7 116:6,12,18
117:17,24 119:10
119:25 120:7,12
120:21 121:3,16
122:3,17,20
123:12,23 124:13
124:20 125:7,21
125:24 126:8
128:18 130:3
131:3 132:1,17
133:7,24 134:5,9
134:18,23 135:8
135:15,19,23
136:5 137:16,19
138:1,9,20,24
139:4,9,12,20
140:3,12,18,23

141:17 142:21
143:4,14,22 144:1
146:7,12 147:7,20
148:6,11,17 149:3
149:16 150:5,23
152:3,8,25 153:10
153:17,24 154:17
155:4,10 156:9,16
156:23 157:3,7,15
158:1,12,17,22
160:4 161:9,24
162:5,11 166:4,21
167:6 168:14,22
169:12 170:1
171:18,24 172:18
172:22 173:16
174:4,11,18,21
175:2,9,16 176:19
177:2 178:18,25
179:8,19 180:2,21
181:6,13,19 182:2
182:6 183:17
184:9,21 185:23
186:6,20,25 187:9
187:14,19,25
188:6,12,18,25
189:3,6,9,12,15
190:11,18 191:3
191:11 197:18,23
198:17,21,25
199:3,7,14,23
200:10,15,23
201:14,18,23,25
202:15,23 203:3
203:11,21,24
204:8,11,17,21
205:3,10,19
206:22 207:9,12
208:5,9,16,21
209:3,10,24 210:5
210:9,18 211:16

211:23 212:3,10
212:20 213:4
214:10 217:9
218:22 219:3
223:23 227:13
228:20 230:5,13
230:17 234:22
237:2 240:15
242:21 243:7,13
243:18 244:24
245:12,19 246:6
246:21 247:17
248:3 249:7,13
250:5 252:5 255:2
255:3,23 257:7
259:6 263:13,23
266:13,21 268:1
269:11 271:6,22
277:9,22 278:5,11
279:8,13,21 281:1
281:6,13 282:22
284:4,8 285:14
287:15 291:12
303:3,18 304:11
308:18 311:1,6
312:5 314:17
319:17 330:10
332:20 337:10,20
338:14,21 339:5
339:17 340:10
342:2 345:15
347:17 348:5
354:12,17,22
356:11 359:18,25
360:5
**formally** 112:4
**format** 33:24,25
**formation** 176:1
**formed** 43:23
44:24,25 189:18
190:2,8,25

**former** 79:3
**forms** 254:6,12
265:21 270:17
**forth** 84:17 183:9
225:2 264:13
361:8
**forthcoming** 215:5
**forward** 60:3
275:17 362:15
**found** 24:12,20
143:6 287:19
310:5
**four** 26:1 177:10
212:12 226:2
325:1
**fourth** 115:12,24
231:18
**fraction** 328:11
**frame** 49:11,22
50:22 53:16,24
55:18 56:11 57:6
57:16,23 58:23
59:8 60:22 62:20
131:13 171:13
**frames** 77:13
**frank** 14:2,11,14
14:20
**free** 108:24 109:22
363:14 364:20
**freedom** 252:1
**frequently** 245:15
276:17 277:6
**friday** 323:4
**friends** 19:24 20:4
20:20,21 22:11
27:15 59:25
214:14
**front** 29:13,18
138:11 192:21
**full** 37:12 108:12
152:14 169:17

335:21 361:11
**fund** 107:24
**funded** 40:16
41:13 72:25
108:12
**funding** 40:22
41:2,21 75:14
107:7,23 108:15
111:7,17 112:2
114:13 182:20
183:15 185:5
**funds** 108:20,25
109:18,22 110:8,9
111:2,10,23
112:11,20 114:6
114:18,22 117:2
**further** 21:2 147:9
291:16 358:9
**future** 30:16 31:3
116:3,9

### g

**gain** 314:9
**gained** 172:1
206:5
**gallucci** 14:2,15,18
14:20
**ganey** 226:8,19
227:18 231:19
232:2
**gap** 32:22
**gather** 314:20
**gathered** 92:19
218:7 242:13
**gathering** 59:22
106:3 241:14
249:22
**gauge** 237:19
**general** 7:25 18:13
20:16 70:1 121:5
135:11 155:3
172:1 175:11

237:14 238:14,17
240:11 291:25
292:16 325:22
**general's** 355:20
**generally** 100:2
158:6 237:22
246:16
**generate** 324:24
**generated** 183:11
**gentleman** 77:22
**getting** 32:4 46:24
177:12 227:7
249:19 350:9
**gil** 6:23 10:21
**gill** 10:2
**gilson** 51:13 58:14
58:22 96:12
103:23 121:18
123:15 126:4
128:10 148:19
149:23 151:8
153:4,13,25 154:2
154:8,11,21
155:16 156:7,11
156:13,15,21
157:5,13 187:2,4
206:13 228:22
263:15 269:18
274:6,22,24
275:11,21 285:13
285:17 287:16
288:14,18,20,23
294:5 296:4,15
298:25 299:19
300:8,16 301:10
301:24 306:8,18
307:9,13,23 308:7
308:17 309:7,20
310:12 312:21
313:14 327:2

**gilson's** 94:23 135:2 150:13 151:25 156:24 285:3 290:25 293:16 294:14 297:20 298:11 301:2 304:13 305:17,21 312:1,6

**give** 12:25 20:16 59:4,22 62:16 90:12 163:6 180:5 228:9 256:16,16 256:18 257:11 286:12 292:15,21 299:7 300:4 313:20 316:20 325:4

**given** 12:24 15:1 53:12,14 78:23 102:8 209:19 215:6,23 216:19 266:24 302:17 304:4 320:9 327:14

**gives** 117:25 226:10 239:20 318:13

**giving** 13:22 15:7

**glass** 107:9 231:11 231:17 234:15

**glasses** 234:13

**go** 9:16 21:2 26:20 31:20,22 40:5 47:14 48:1 56:15 58:12 62:15 83:6 103:16 106:10 107:10 129:17 130:4,19 133:19 133:20 141:8 144:9 145:6 151:20 152:22

153:1 172:14 182:23,24 192:16 192:17 193:9 194:22,24 195:7 195:21,24 196:4,8 202:10 214:1 223:13 224:18 225:1,6 253:20 268:4 273:19 279:23 289:16 296:7 299:21 319:10 320:7,15 323:18 324:8 337:24 338:6 342:8,17 350:15 358:13

**goes** 37:3 46:12 85:8 102:24 154:21 155:2,6 196:23 293:15 308:21

**going** 9:5 19:6 20:14,22 21:2 30:21 31:11 45:11 46:6 48:2 51:17 59:3 62:12 75:8 75:13 78:11,13 99:11 104:6 110:13 130:11 133:14 137:9 140:7 144:15,25 145:4,7,8 150:10 152:4,13 163:1,2 177:6 188:20 191:14,19 192:13 192:16,17,20,25 193:9 194:8,12,16 195:5 196:6 214:11 220:14 221:8 222:1 236:7 259:16 273:12

274:7 298:3 303:11 314:16 316:11 320:17 321:11 324:24 343:5 346:6 351:2 358:12

**golembiewski** 116:20,22

**good** 9:4 12:12,13 177:8 182:25 231:12 238:17 239:1,2 297:7 308:2 319:22 332:11 350:25 358:12

**gosh** 216:8

**government** 108:4 219:18

**governmental** 234:1,19,25 240:21 241:6

**governor** 7:24 172:23 189:18 190:2,8,25 316:6

**grab** 107:13

**grade** 85:15

**graded** 85:17

**graduated** 31:12 32:3,21

**grammar** 165:23 166:1

**grant** 41:1,4,6,21 73:23 74:13 75:12 78:12 79:16 80:10 80:13 82:5,19 83:14,24 106:14 106:20 107:4,24 108:2,8,10,17 109:2,13,25 110:3 110:5,8,12,17,22 111:1,7,15,20,23

112:11,22 114:6 114:18 129:7 136:10 182:20 183:2,6,7,15,18,21 184:7,14,23 185:2 332:1,5,11 333:17

**grants** 331:1

**graph** 310:5,8

**graphic** 197:2,12 197:15,20 222:9 223:8 225:9

**gray** 83:7 90:2 333:24,25

**great** 57:2 96:16 164:24

**greater** 57:14,21 96:5 236:12 328:17

**greatest** 262:19

**group** 42:15,18 264:4

**groups** 331:9

**grow** 45:21

**growing** 203:14

**growth** 225:10 261:10

**guess** 13:13 19:4 79:6 222:7 346:18

**guidance** 173:1 185:3

**guide** 78:4 172:24

**guideline** 210:19

**guidelines** 56:20 133:22 200:25 201:9 202:24 203:1,6,17 205:5 205:16,22 206:19 206:25 207:3,4,6 207:16 208:18 209:21 210:6,10 210:12 211:1,18

240:12,22 241:7
260:12,24 261:13
261:22
**guys** 137:25 178:5

**h**

**h** 7:11
**habitat** 34:21
**habits** 235:16,23
236:11,14
**hale** 331:6
**halfway** 63:22
253:1
**hand** 66:10 78:5,5
293:15,15 296:24
**handed** 66:4 296:7
**handing** 192:4
**happen** 60:4
343:24
**happened** 88:13
194:10 323:2
342:13 344:19
**happens** 320:22
**harassed** 139:6
140:1,16,22
141:15 143:13,21
338:12 340:6,8,15
341:16,20 342:1
**harassing** 202:1,5
**harassment**
142:17 337:8,17
338:6,18 339:3,15
340:3 341:13
**harbor** 149:10
**hard** 26:18 76:18
79:4 130:12 158:4
290:22 309:25
327:2 338:24
**hartford** 91:2,7
**hartman** 6:18
64:25 65:7,12,19

**hc** 225:17
**hcahps** 225:24,25
226:5,8,18 227:3
227:18 232:3
**he'll** 194:13,19
202:8
**head** 56:24 99:3
102:14 114:9
133:3 158:18
175:19 203:22
212:14 218:16
228:14 265:1
267:5 292:6
298:25 309:9
315:17
**health** 3:10 7:15
7:21 30:7,10,20
31:2,8 32:5,15
33:8,11,13,18 34:6
34:13 36:12,16,20
36:23 37:13,21
38:4,11,22 39:1,6
39:10 40:18 41:1
41:5,22 42:10
47:8 50:17 54:9
59:12,20 60:18
61:19 63:1,3 66:8
66:19 67:18 68:8
68:16,24 69:2
71:2,4,6,20,24
72:13 73:18,22
74:12,20 75:16,17
80:6,9 81:23 82:3
82:5,11,19 83:13
83:15,24 91:1,18
91:20,23,25 92:9
92:23,25 94:5
96:20,25 97:4
98:18,24 103:10
106:14,15,20,21
107:5,23,25 108:7

108:8,15,16,21,22
108:24 109:7,11
109:14,18 110:8
110:16,23 111:1,8
112:2,12,21 113:4
114:3,6,13,17,21
114:23 117:2,3
118:21 119:5,15
119:22 120:4,10
120:25 121:6
127:15 128:5,7,8
129:7 132:16,20
133:21 136:9
137:4 138:8,19
139:25 146:2,5
149:6,14 158:14
158:20 159:1,5,7
159:11 160:2
163:11 166:19,23
166:25 168:24
169:1 171:5,8,9
172:7,17 173:18
176:23 178:13,22
179:9 181:15,22
181:24 182:19,21
183:2,15 184:6,17
185:1,21,25 186:2
186:9,16 191:15
199:25 200:17,25
201:8 202:17
205:21 206:13,24
210:1,20 211:3,19
212:21 213:22
214:2 215:10
218:4,13 219:18
221:11 238:15
240:7,19 242:5
246:1,25 247:21
248:22 250:12,25
251:18 253:9
258:19 262:17

263:19 264:14
265:13 288:11
289:8 291:5
292:17,18,20
293:14,19,23
304:15 305:16
313:15,22 314:14
315:10,19 316:13
318:4,15,22
322:14 330:21,22
331:12,19 332:1
332:10 333:17
346:10,16 348:8
349:3,14,19,25
**health's** 75:4 76:3
76:14 78:23 96:22
112:11,20 137:13
162:2
**healthcare** 134:16
229:11,21 230:2
230:10 231:1
245:9 330:3 359:2
**hear** 22:4 65:8
151:3
**heard** 43:14 134:3
135:17 157:21
158:7 198:19
208:13 213:19
233:5,8,11,16,17
233:21,22 267:1
272:17 329:17,23
330:15,19,20,22
331:13,15 351:18
351:25 352:1,6,11
352:15,16 353:1,3
353:8,9,12,15,16
353:24,25 356:13
356:19 357:5,7
**hearing** 171:20
329:7,21

**heart** 228:16
**heat** 320:9
**heated** 347:9,19
  347:20
**held** 2:6 9:25 34:8
  36:6 91:2
**help** 27:11 93:7
  105:8 106:9,11
  122:15 131:19
  148:18 185:4
  317:3
**helped** 126:14,16
  131:23 219:6
**helper** 262:21
**helpful** 27:13
  123:1,9,19 126:10
  130:18 135:3
  141:12 146:15
  151:4 160:8,9
  319:24
**helps** 74:6 124:4
  128:21
**herdman** 273:7
  306:23
**hereinbefore**
  361:8
**heroin** 7:19 8:4
  25:1,3 27:23,24
  28:13 96:12
  126:22 129:23
  150:19 153:8,14
  155:20 156:2
  157:18 241:1
  265:22 266:5
  268:17 269:6
  270:6 271:3,7,11
  271:23 272:3,12
  275:4,25 276:16
  277:4,15 278:3,14
  279:5 284:2
  287:13 295:19

296:11,12 298:23
300:2,10 301:4,13
302:10,19 303:1,8
303:16 304:2,10
305:19 306:5
308:11,14,22
309:4,11,17,22,24
310:14,17 312:3
321:3,4,18 324:10
325:17
**hey** 236:9
**high** 62:11 73:4,7
  183:18,22 184:8
  291:11
**higher** 73:13 86:1
  86:12,22,25 87:2
  87:10,21 88:15
  335:25
**highest** 83:17
  84:19,25 85:2,4,10
**hillard** 38:10
  41:18
**hipaa** 147:23
**hired** 34:4 332:13
**hiring** 331:24
  337:12,18
**historical** 286:6
  288:25 290:19
  314:12
**history** 118:1
  124:7 172:2
  235:24 236:23
  244:10 275:4,13
  276:1 280:10,25
  293:19
**hit** 212:24 214:3,7
**hold** 31:3 289:13
**hollingsworth** 5:8
  11:8,9
**home** 34:20
  212:25 214:4,7

**honest** 77:12 99:3
  172:20
**hope** 215:19
**hope's** 264:12
**hopefully** 30:15
  149:9
**horizons** 3:5
**horrible** 103:21,21
**hospital** 132:3
  133:15 227:20
  228:7 231:21,23
  232:8,16 233:2
  235:9
**hospitals** 229:10
  229:21 230:2,9,25
  232:5,12,14,18,19
  251:23 252:1
**hostetler** 6:13
  65:13,15,20
**hours** 97:24
**house** 95:25 96:1
**housekeeping**
  165:6
**houston** 5:14
**hr** 341:15
**huh** 44:4,8 91:5
  127:25 142:18
  160:13 166:9
  173:10 210:14
  211:8 212:6,13
  225:11,19 231:22
  233:13 258:11
  276:2 304:3
  307:17 323:14
  326:4
**human** 83:25 84:3
  84:4,11 86:2,8,17
  87:5,13,15 88:9,11
  88:13 89:22 90:5
  139:7,24 143:8
  334:5 336:19

337:6,11,14
339:24,24 340:16
340:22,24 341:1
341:18,25 342:16
342:16 344:1,15
**hundred** 164:20
  204:14

**i**

**idea** 12:24 31:24
  73:3 117:25
  208:12 338:3
  340:7
**ideas** 183:10 314:3
**identification** 29:9
  65:3 138:4 150:8
  163:4 191:24
  221:7 270:22
  299:16 316:17
  333:2
**identified** 15:6
  44:2 53:15 68:15
  80:2,3 101:25
  146:19 147:6
  171:11 172:3
  193:6 198:5
  199:19 200:12
  216:2 223:22
  224:1,4,10,11,20
  257:5,21 258:6
  267:24 279:10
  290:7
**identifiers** 321:16
  321:23
**identifies** 110:17
  197:2,21 258:4
  268:9 290:3
**identify** 100:17
  113:14 158:3
  314:1 357:24
**identifying** 46:25
  253:14

| | | | |
|---|---|---|---|
| **identity** 351:14 | 233:2 313:12 | 71:12 72:15 76:6 | 292:23 293:6 |
| **ii** 5:16 | 358:16 | 90:16 100:14 | 305:25 313:21 |
| **illegal** 254:6,12,18 | **included** 190:8,16 | 101:22 106:12 | 314:13 315:14 |
| 254:22 266:4 | 190:25 325:4 | 121:8 127:20 | 317:13,15 320:24 |
| 270:18 279:6 | 356:8 362:13 | 129:10,20,22 | 323:2,6 331:9 |
| 284:3 | **includes** 268:9 | 131:17 133:13 | 340:24 346:11 |
| **illegally** 283:18 | 298:23 355:24 | 149:23 170:8 | 356:17 |
| 287:7 | **including** 215:14 | 182:18 185:20,24 | **individual's** 84:10 |
| **illicit** 266:7 269:10 | 264:18 | 189:17,22 195:10 | 289:1 291:5 |
| 269:12,15 270:6 | **inclusive** 68:20,21 | 219:15 238:1 | **individualized** |
| 287:13 326:20,25 | **incorporate** 96:9 | 273:24 275:1,21 | 244:3 |
| **illinois** 4:13 | **incorporated** | 275:22,23 276:5 | **individuals** 15:1 |
| **illness** 258:20 | 364:12 | 281:16 293:24 | 22:15,17,20,22 |
| 292:11,20 293:11 | **incorrectly** 282:19 | 315:8 317:24 | 23:3 24:5,7,21,25 |
| 293:19,23 314:14 | 282:25 | 326:18 328:4 | 25:5,9,23 26:2,24 |
| **immediate** 357:9 | **increase** 54:5 | 335:9 338:10 | 27:8 28:6,14,19 |
| **impact** 89:14 | 60:13 61:10 68:2 | 341:14 343:21 | 29:2 37:7 42:15 |
| 205:7 209:21 | 70:18 106:5 | 349:11 | 45:20 46:24 47:3 |
| 227:3 263:18 | 115:17 116:3 | **indicates** 29:23 | 48:23 53:7 54:3,6 |
| 295:9,13 337:17 | 166:10 167:24 | 30:6 32:6 46:4 | 55:23 56:2 58:21 |
| **impacted** 205:16 | 180:24 187:2,3,6 | 81:5 166:6 282:12 | 59:21 60:1 62:2,7 |
| 210:12 263:8,10 | 229:24 261:25 | 288:15 | 62:19 67:23,24 |
| 263:18 | 262:1,3 294:7 | **indicating** 362:13 | 68:1 69:23 70:20 |
| **impacts** 103:6 | 320:18 | **indication** 320:9 | 72:20 81:6,16 |
| **importance** 95:18 | **increased** 157:24 | **indications** 261:7 | 83:4 84:8,16 |
| 257:3 | 158:10 206:24 | 267:16 | 86:17 116:16 |
| **important** 13:4 | 207:2,3 | **indicators** 322:10 | 118:1,13,20 119:4 |
| 103:24 346:24 | **increasing** 58:24 | **individual** 21:22 | 121:9 123:18 |
| 347:1 | 111:24 275:2 | 21:23 28:10,12 | 124:18 126:5,12 |
| **impossible** 158:5 | **incurred** 359:16 | 75:18 84:8 85:8,9 | 128:22 129:21 |
| **improper** 216:14 | **independent** 74:2 | 85:10 88:1 116:11 | 134:25 148:18 |
| 250:22 | 119:23 120:5,10 | 124:6,10 131:17 | 170:9,24 171:11 |
| **improperly** 344:8 | 120:15,17 121:1 | 135:7,14 148:1 | 171:16 179:23 |
| **improve** 321:12 | **index** 34:21 | 172:8 229:10,21 | 209:7 213:3 214:9 |
| 324:20 | **indicate** 24:16 | 230:2,10,25 | 227:9,25 229:1 |
| **improvement** | 230:22 274:20 | 238:18 244:16 | 235:24 236:22 |
| 185:12 347:5,6 | 275:18 296:15 | 246:11,25 249:22 | 238:20 242:6 |
| **inappropriately** | 327:10 | 250:20 251:1,25 | 243:19 245:11 |
| 143:6 | **indicated** 10:22 | 253:9 262:18 | 249:18 251:15 |
| **include** 47:11 69:5 | 22:10 24:2 43:6 | 269:6 277:5,8 | 260:14,17 264:6 |
| 200:20 219:22 | 44:6 55:17 69:4 | 279:19 286:3 | 270:5,15 275:12 |

275:25 277:14,20
278:1,9,21 279:4
282:17,20 283:4
283:16,25 284:12
285:8,20 286:21
287:5,11 288:3,24
291:12 292:19
293:17 295:3
297:24 302:14,16
302:22 303:5
304:17,20 305:10
306:2,4 314:9
320:1,4,11 322:19
324:16 334:6
337:12,12 340:14
341:15,25 349:4
**industry** 34:23
35:13,21
**infancy** 100:24
101:2 313:23
**infant** 314:6
346:24
**infectious** 34:25
70:22 167:25
318:6
**inform** 75:12
**information** 19:2
23:12 24:14 39:11
46:24 54:5 58:4
58:17 59:22,23
69:18,25 70:1
91:16,19 92:1,8,10
92:19,20,22 93:2
93:21 94:22 95:5
95:15 99:13 102:8
106:4 115:9 116:9
122:21 123:7
124:25 125:17
128:6,9 129:1
133:5 161:11,13
168:23 172:5,16

173:17 181:14,16
181:23 182:5
185:20,24 187:1
191:12 199:24
200:2,16,24 201:8
201:13 202:16
204:23 205:4,20
206:1,23 209:25
210:20 211:2,18
212:23 213:5,8
215:5 218:8
219:11,17,22
220:23 221:5
226:16 236:15
241:15 242:12
246:10,15,20,25
247:6,10,16,22
248:2,7,22 249:6
249:12,17 262:16
263:14 266:24
274:6,21 278:12
283:9,10,14,20,22
284:16,23 285:2
285:12,15 286:8
286:13,21 287:9
287:14,16 290:25
292:17 293:16
294:4,14,25 296:4
297:11,20 298:12
299:1,6,13 300:11
301:5,14 302:11
302:24 303:17
304:7,12,14
305:16,17,23,25
306:8,12,24 307:8
307:10,21,25
308:2,8 310:19
312:7 314:20
318:19,20 319:22
319:23 320:6
322:7 323:5 324:7

341:10,11
**informed** 187:5
**inhibits** 239:5,5
**initial** 23:3 42:24
44:11
**initially** 307:21
**initiated** 277:14
279:5 283:5,17
284:1,13 285:9,21
286:3,23 287:6,12
288:4
**initiating** 276:17
277:1 286:14
**initiation** 287:22
**initiative** 37:19
38:3,11,13,17,21
39:15,17,24 40:17
41:4,8,12,15,17
43:17 44:19 48:11
48:21 49:19 68:21
**initiatives** 71:13
72:18 94:21
**injuries** 44:17
47:9 168:6
**injury** 23:7 39:7
42:3,7,9,12,14,17
42:20,22 43:1,3,7
43:16,24 44:1,10
44:12 46:6,9,14,16
46:21,22 47:18
48:8,10,19,22 49:8
49:16 66:14 67:16
67:18,22,23 68:6
68:10,13,19,25
69:4,9,15 70:3,9
70:24 71:14,18
73:22 74:12 80:9
82:5,19,21 83:13
83:24 108:8
112:21 129:7
136:10 168:1

169:7,11 183:2
332:1,3,7,8,10
333:15 335:3,13
336:15 337:18
343:6
**inmates** 280:8,22
**input** 16:19 105:7
**insert** 355:5,10
356:9
**insist** 192:20 193:3
**insofar** 72:9
104:15 247:1
**inspection** 34:24
**inspections** 35:4
**instance** 255:22
324:25
**instances** 23:18
277:6 339:2,9,15
**instruct** 18:24
19:6 20:14 160:5
**instructing** 177:22
**instructions**
151:12 355:24
**insurance** 225:17
**insys** 352:11,13,15
**intake** 321:8 323:6
323:9 327:15
**intend** 108:15
147:5
**intent** 115:23
318:7
**intentional** 256:3
256:8
**interacted** 126:5
**interaction** 255:13
**interchangeably**
300:3
**interest** 76:1,12,20
76:21 78:22 79:10
79:15,22 222:2

**interested** 10:7 47:4 303:11 333:22 342:15 361:14
**interests** 31:1
**interfere** 9:12
**interference** 9:10
**internet** 270:13
**interpret** 310:22 310:24 312:1,6
**interpretation** 217:2 311:8
**interpreting** 280:19
**interrupt** 292:1
**interruption** 93:22
**interview** 83:16,19 85:1,6 89:12
**interviewed** 32:14 142:23
**intimate** 228:4
**intractable** 198:11 198:15,20 199:11 200:7,22 201:24 202:14,20,25 206:25 207:17,18 208:25
**introduced** 12:15 269:16,23 271:11 271:24 351:1
**invested** 349:5
**investigate** 59:13 60:25 61:21 62:20 173:12,25 174:8 178:14 180:18 328:5,11 329:1
**investigated** 206:5 288:13
**investigating** 170:20

**investigation** 140:15,21 141:14 141:20 142:16,20 142:25 143:3,5,12 143:20 171:14,17 340:23 344:5
**invitation** 103:25 104:1
**invitations** 102:17 102:20 104:1,13 105:14
**invited** 63:8,16 90:10,16 97:17
**involve** 44:1
**involved** 21:17 34:17,25 35:4,5,7 44:14 49:18 71:19 72:21,24 73:17 75:3,11 83:19 85:17 89:12 98:15 103:4 114:15 137:8,12 183:25 184:2 204:6 217:23 218:25 240:9 293:14 317:7 337:11,15 349:16 350:7
**involvement** 146:3 146:10 317:17 355:1
**involves** 144:5 218:19
**involving** 337:6
**irb** 148:8
**issue** 21:16 79:11 104:4 115:17 158:20 159:11,18 160:2,15,24 241:3 244:22 325:10 332:24 346:24 348:8

**issued** 159:1 190:1 190:14 224:13 245:2
**issues** 34:18 39:9 47:1 48:17 79:12 79:15 98:19 99:20 212:24 213:2,2,22 213:23 214:2,3,6,8 214:8 215:15 314:11 347:1 349:14,19
**issuing** 91:25 135:6 159:5,9 160:18
**item** 321:16
**items** 68:15

**j**

**jackson** 5:20 11:18
**jacksonkelly.com** 5:25
**jail** 96:3 280:23
**jails** 96:5
**jalisco** 272:17,21
**james** 5:16 11:11
**james.nortey** 5:17
**janssen** 4:19 11:7 352:16,18
**january** 1:19 8:7,8 9:2,6 33:14,16 316:14 317:25 326:16 332:23 333:9 334:16 335:4,16,19 362:4
**jeff** 62:8 294:6,20 313:1
**jill** 5:24 11:18 360:11
**jmcintyre** 5:25
**job** 32:4,7 61:9 85:11 102:25

336:15 342:9,15 343:2,6
**jobs** 33:9
**john** 75:1 77:22
**johnson** 3:17 4:18 4:18 11:1,1,6,7 353:1,2,3,3,4,4,6,6
**join** 81:22
**joined** 65:13 159:6
**joining** 47:4
**joint** 233:5,8
**jones** 5:4 11:9
**jonesday.com** 5:9
**judge** 1:8 312:23
**judges** 239:25
**judi** 91:22 92:7
**july** 91:7 97:14 150:11,14 151:25 153:4,14
**jumps** 163:17
**june** 66:9 76:24 81:6
**jurisdictions** 98:11
**justice** 102:11 239:25 273:8 306:21
**justify** 344:11
**justin** 273:7 306:23

**k**

**k** 3:17
**karns** 83:3 85:22 85:25 86:5,12,22 86:25 87:11,21 88:15 89:16 90:2 334:1,2,2 342:3
**keep** 29:5 82:22 90:13 103:15 104:5 202:5 339:20

| | | | |
|---|---|---|---|
| **keith** 58:14 273:5 | 60:7,8 61:7,9 | 206:7 207:10,13 | 300:20,21,23 |
| 294:5,18 328:7 | 62:12 64:10,19,22 | 208:6,10,17,22,23 | 301:7,9,15,17,18 |
| 329:9 | 67:11 68:11 74:1 | 209:4 211:10 | 302:1,2 303:21,22 |
| **kelley** 2:7 | 74:5 75:10 76:5 | 213:3 215:6 | 305:8 306:15 |
| **kelly** 5:20 11:19 | 78:3,14 82:1 84:4 | 222:14 229:15 | 309:8,8 315:20 |
| **kept** 244:19 | 87:23 92:4,16,17 | 230:8,14,16,18,19 | 316:22 320:25 |
| 344:17 | 92:18 93:4 97:8 | 231:4,12 232:4,5 | 321:2,3 323:1,15 |
| **kevin** 235:22 | 97:11 98:14,16 | 232:12,20,24 | 324:2 328:3,16,21 |
| **key** 6:14 45:24 | 99:4 100:9 101:9 | 233:4,25 234:11 | 329:3,10,12 330:1 |
| 56:21 290:23,23 | 101:16,21 102:14 | 234:18,24 236:5,7 | 330:23,25 331:11 |
| **kind** 35:22 99:2 | 103:17,20 105:18 | 239:1,2 240:6,18 | 339:10 340:11 |
| 197:6 222:11 | 105:22,23,25 | 241:4,11 242:22 | 343:23 345:1,14 |
| 259:15 307:4 | 106:8,9 107:3,7,22 | 242:25 243:3 | 347:3,3 348:15 |
| 356:25 | 111:18 114:10,14 | 244:25 245:6,13 | 350:11 351:10,14 |
| **kippes** 89:7,10 | 117:6 118:9,11,15 | 246:8,9,22,23 | 351:20 352:2,8,13 |
| 136:25 137:3,5,8 | 118:18 119:19 | 247:3,7,11,13,14 | 352:18 353:4,10 |
| 137:12,22 138:6 | 120:13 121:24 | 247:18,24 248:4,8 | 353:17,19,21 |
| 138:17,23,25 | 122:18,19 123:19 | 248:13,14,16,17 | 354:1 356:7,20 |
| 139:3,23 143:25 | 124:14,15 125:22 | 248:23,24 249:2 | 357:8,19 358:15 |
| 144:5 317:9 | 125:23 127:10 | 249:14 251:25 | 358:18 359:1,12 |
| 324:17 336:8,16 | 129:5 131:5,10 | 252:4 253:16 | **knowing** 96:4 |
| 336:21,23 337:9 | 134:1 135:10,25 | 255:20 256:11 | 103:2 122:13,24 |
| 338:11 339:3,15 | 136:2 139:11,17 | 257:8,9,12 259:4 | 262:23 |
| 340:5,14 341:2,5 | 139:21,23 140:10 | 260:20 261:1,1,3,8 | **knowledge** 51:5 |
| 341:25 342:19,23 | 140:11,13,14,19 | 262:7 265:9,14,17 | 54:13 104:8 105:7 |
| 343:7 344:3,14 | 141:13 143:24 | 265:23 266:14,15 | 106:5 128:20 |
| 345:17 | 144:7 145:12,22 | 267:4,13,17,22 | 133:3 172:1 |
| **kippes's** 141:14 | 147:25 149:12 | 268:3,6,11,12 | 255:21 266:16 |
| 142:16 143:12,20 | 154:19 156:11 | 271:3,10,12,13,23 | 270:2 291:24 |
| **knew** 39:7 51:16 | 163:15 167:15 | 272:11,21,24,25 | 294:20 298:19 |
| 59:3 | 169:9,14 171:16 | 273:3,9 276:6,25 | 314:11,12 354:9 |
| **know** 13:10 15:19 | 174:7 176:22 | 277:17,18,23,24 | 354:14,19 356:24 |
| 17:25 19:2,8 | 183:1,24 186:1,8 | 278:6 279:22 | 356:24 358:22 |
| 21:22 22:6 23:2,9 | 186:15,24 187:13 | 280:17,20 281:2,7 | 359:15 |
| 23:11,13 24:16,19 | 187:18,24 188:5 | 281:17,18,23 | **knowledgeable** |
| 24:25 25:5,9,16,18 | 188:11,17,24 | 282:16,23 283:2,3 | 216:4 |
| 25:20 26:10,24 | 195:6 198:18 | 283:15,21,24 | **known** 203:10 |
| 27:16 28:14,15 | 199:1,2,4,5,8,22 | 284:5,11 285:17 | 230:9 283:11 |
| 40:20 45:23,24 | 200:3,11 201:21 | 286:25 288:7 | 340:13 |
| 47:17 50:19 51:24 | 202:13 203:4 | 292:16,22 295:22 | **knows** 215:6,14 |
| 52:2 54:17 59:19 | 204:9,12 205:11 | 298:13,18,21 | |

**l**

**l**  6:9
**l.p.**  1:10,12,14
**label**  355:5,10,23
  356:9
**labeling**  267:19,22
  268:7
**lack**  57:11 291:23
**ladder**  35:19
**lake**  70:17
**lakeside**  5:5
**lamarca**  265:17
  281:16,17,18
  282:9,19,25
**landscaper**  33:4
**language**  98:12
  151:24 152:23,24
  281:4 311:18
  337:22
**large**  134:12,17
  307:3 320:18
**largely**  263:8
  269:24
**late**  43:12 57:5
  203:15 292:8
**launched**  38:17
  43:8,11 167:16
**launching**  43:24
  44:11
**law**  51:15 58:15
  73:16 95:20
  123:15 126:4,10
  128:10 134:25
  135:4,11,25 136:4
  198:10 228:22
  240:1,3 250:17,18
  255:24 264:1
  265:3,5 271:5
  272:2 295:7,11,15
  312:25

**lawfully**  243:4,11
  243:16 244:2
**laws**  246:13
  270:19
**lawsuit**  15:11,17
  16:7,14,24 17:7,15
  18:10,17 277:12
  279:3 333:7
  358:24
**lawyer**  13:16
**lawyers**  14:7 15:5
  29:15
**lazar**  4:15 11:23
  11:23
**lead**  35:7 346:25
  348:8
**leaders**  62:10
  264:1,2
**leadership**  68:19
  345:23 346:3,13
  346:15
**leading**  169:6,10
  179:25
**learn**  60:3 188:20
  191:7 216:6
**learned**  24:3
  186:16,21 187:11
  187:16,22 188:3,9
  188:15 206:4,10
  206:12 229:19
  264:25 343:7
**learning**  30:12
  348:7
**leaves**  140:5
**leckler**  312:23
**lecture**  63:23 64:4
  64:7,9 91:6 97:17
  97:23 98:1 101:24
  105:12 211:6
  220:1,12

**lectured**  101:12,20
  210:3,8,13 217:20
**lecturer**  206:6
**lectures**  63:9,16
  90:11,16 97:17
  172:4 209:19
  211:12 218:5
  219:10,20 239:11
**led**  25:3 132:13,24
  229:3 230:3
**lee**  5:21
**left**  66:10,13
  332:14
**leg**  228:12 235:10
**legal**  7:19 155:21
  255:2 328:10
  362:1 365:1
**legally**  23:22
  134:11,16
**legislation**  198:24
**legislators**  47:6
**legitimacy**  262:9
  262:13,20
**legitimate**  23:5,19
  23:24 245:9,17
  246:3 251:13
  263:2 269:5 288:5
**length**  241:3
**leppla**  80:3,5,8
  83:23 84:15,19,20
  89:9,20 116:23
  317:16 332:8,14
  332:14
**leppla's**  82:4
  129:5 331:24
**letter**  362:19
**level**  35:15 75:25
  76:12,20 78:21
  79:9,22 203:18
  211:1 219:12,23
  221:3 228:8

251:15 256:20
  257:3 328:17
  331:2,3 339:21
**levels**  259:24
  272:10 348:2
**lewis**  4:4,11 5:12
  11:4,12,24
**liberal**  30:3,4
**licensed**  23:4,19
  118:5,12 132:15
  135:12 136:2
  158:10 208:20
  226:23,24 227:2
  241:19 242:1,17
  243:6,12,17,20
  244:13,21 245:8
  245:16 246:2
  251:1 255:1,11
  283:7 328:5 329:2
**lies**  243:23
**life**  73:14 228:5
  292:24,24
**limited**  215:24
**limits**  239:6
**line**  141:24 178:7
  231:18 297:12
  321:16 334:18
  342:22 362:13
  364:7 365:3
**lines**  288:19
**link**  126:21 129:11
  129:21 130:23
  278:13
**linkages**  185:7
**linked**  153:19
**links**  130:23
**lipitor**  258:19
**list**  63:22 68:15
  97:16 110:22
  183:12 185:4
  273:17 274:4,14

326:3,9,12

**listed** 186:12
354:7,16,21 364:7
364:17

**listen** 21:4

**listing** 364:7

**lists** 110:4 252:18

**literature** 289:9

**litigation** 1:6 9:21
164:20 351:6,12
362:6 363:3 364:3

**little** 16:21 17:20
29:6 71:9 124:23
127:3 231:10
251:23 262:21
271:14,16 290:15
291:20 296:8,25
323:24 325:5
342:25 346:7
347:9

**lives** 359:20

**living** 73:9,10

**llp** 3:11 4:4,11,20
5:12 6:13

**local** 32:25 38:8
39:10 51:15 54:9
55:23 59:17 62:11
69:11 72:25 75:8
75:16 111:18
133:15 146:15
240:21 250:17
251:15 271:5
275:1,19,20,21,22
275:23 276:6
295:11,15 318:4
318:21 331:2

**locally** 95:6
251:19 307:7
348:19

**lodge** 13:14

**log** 327:16

**logistical** 46:23
332:24

**logistics** 47:5

**long** 14:3,19 40:7
67:15 74:22
158:25 169:22
192:10,21 194:2
238:21 273:17
274:4

**longer** 24:7 72:6
72:16 80:5 91:22
212:8,18 213:20
315:18 317:15
349:12

**longtime** 52:24
215:6 241:17
267:7 318:25

**look** 40:5 47:14
52:8 58:3 66:12
70:21 77:7,23
96:2 124:1 144:20
145:2,3,4,10 147:9
147:17 150:10
152:24 168:4
172:19 201:16
221:16 222:2
231:8 273:13,20
274:8 276:9
290:20 296:6,23
300:4 316:20
321:1 327:12
335:20 337:22
346:8 347:7 348:2
348:6,6,25

**looked** 30:11
57:25 86:3 93:8
222:9,11 223:9
228:4,5 245:14
286:15 302:7
303:23 315:4

**320**:16 321:1
324:19

**looking** 31:3 38:6
39:4 78:19 90:10
90:15 95:11 124:5
146:24 166:8
172:25 220:23
222:8 223:10
234:6 242:11
252:7 254:8 274:5
280:1 284:23
290:8 291:4,9
296:18,22 297:5
297:20,25 298:1,4
310:20 314:17
320:7 321:5
348:12

**looks** 36:6 66:8
95:21 97:23
145:15

**lorain** 136:21

**lose** 352:21

**losing** 305:3

**lost** 20:5,20 59:25
303:6 304:17,20
359:20

**lot** 91:16 102:7
155:14,17,19
216:17 217:8
239:22,24 240:5
256:23 265:19
345:22 346:9
348:18

**lou** 265:17 281:16
281:18

**loud** 239:18

**louder** 29:4 326:7

**louisiana** 5:13

**loved** 20:5 59:25
303:6 304:18,20
304:22

**lower** 96:6

**lpa** 3:4

**luck** 177:8

**lunch** 178:5
182:12

### m

**m** 7:1

**madam** 362:10

**magnifying**
231:11,16 234:15

**mail** 7:17,18 8:3,4
144:5,7,11 145:13
145:23 146:17,24
147:10 148:2,20
149:4 150:11,13
151:25 154:20
155:2 156:12
270:14,23 273:12
273:15,17,24
274:11,15,20
276:10 279:23
280:4 281:15,19
299:20,23 301:2
301:11,21,23
309:7 312:2

**mails** 282:2

**main** 2:8 4:21 10:1
42:19 61:9

**majority** 156:1
245:11 246:4
251:11 329:2

**makers** 246:19
279:11

**making** 119:21
129:14 294:15

**male** 323:20

**males** 294:8,12

**mallinckrodt**
353:8,9,10,13

**man** 142:2

management
  198:6,10,16 203:6
  203:17 204:25
  205:15 206:19
  207:5,15 209:20
  210:19,25 211:10
  211:17 219:5
  240:12,22 241:7
  260:12,24 261:13
  261:22
manager 34:11
  36:2,18 73:21
  87:8 336:7 342:14
managers 35:9,10
  35:14 37:8 81:15
  161:12 162:14
  342:23
mandated 67:24
mandates 121:5
manner 138:6,17
manufacture
  351:15
manufactured
  266:8,10 329:20
  353:22
manufacturer
  259:14 354:2
  358:6
manufacturers
  246:24 247:5,9,15
  247:21 351:5,11
  351:15 354:6,10
  354:21
manufactures
  351:21 352:3,8,14
  352:19 353:5,11
  353:18,20
manufacturing
  353:7,13 358:2
map 320:9

mark 191:19
  316:11
marked 29:8,13
  63:7 65:2 66:3
  74:16 138:3 144:3
  150:7,9 163:2,3,9
  191:23 193:24
  221:6,9 257:23
  270:21,23 273:11
  284:21 297:13
  299:15,17 316:16
  333:1,3 335:6
market 269:17
  270:12 293:5
marketing 38:9
  258:9,13,17,24
  259:2,10,13,16,22
  260:6
marking 29:11
martin 58:15
  273:5 294:5,19
  328:7
massive 318:9
master 193:1,12
  193:22 194:1,11
  195:3 196:9 202:2
  202:6
master's 30:6,10
  30:19 31:2,7
  42:24 196:2
material 95:8
  270:11
materially 292:12
  294:2
materials 92:1
  93:18,20 218:4
  260:4 263:5
matia 312:23
matter 9:20 12:18
  15:2 17:7 22:9
  23:4 104:25

matters 212:21
mayor 75:20
mcintyre 5:24
  11:18,18 360:11
  360:11
mckesson 6:3
  11:22 331:13,20
mcleod 75:1,3
  76:2,13 79:4,21
mcnamee 315:15
  316:1
md 1:7
mdl 1:6
mean 14:14 21:15
  24:4,15 39:3
  40:12 45:18 60:4
  60:5 73:25 75:23
  78:5,11 79:4,15
  84:2 85:5,24 99:1
  100:8 101:3 102:4
  109:6,11 110:2
  117:22 129:12
  130:2,16 147:4,18
  147:24 148:21
  163:15,16 187:4
  203:20 207:3
  210:24 226:21
  227:1 229:9
  232:11 235:18
  243:1 249:16
  256:19 257:10
  261:25 262:12,21
  275:20 292:1
  295:13 310:23,24
  310:24 312:2
  313:18 314:22
  324:16 327:20
  347:16
means 92:14
  105:23 134:8
  155:19 186:1

203:25 208:4,8
  209:9 228:3
  232:12 258:9
  276:22 300:18
  304:25 305:4,8
  311:9,20,24 314:1
  314:6 321:25
meant 129:25
  142:4 156:22
  157:5,13 229:15
  238:11 250:3
  276:7,25 345:11
measles 318:15
measures 291:4
measuring 250:13
mechanism 293:1
media 9:17 107:20
  182:15 254:2
  312:15 360:19
medical 23:5,19
  23:24 24:15 68:23
  112:6,15,25 114:5
  114:23,24 115:4,4
  123:15 124:16
  126:1,20,23,24
  131:6 149:21
  154:12 155:7
  156:3 207:22
  208:11,13,17,24
  219:4 225:24,25
  226:9 228:1,23
  229:13,18 233:18
  233:21,23,25
  234:18,24 235:4
  240:10 244:3,10
  245:9,17 246:3
  250:20 251:13
  255:11 269:5
  285:18 286:5,18
  288:5 289:9

**medically** 250:22
282:5,13 283:6
284:14 285:10,22
286:24
**medicated** 98:8
105:22,24
**medicating** 235:15
235:23 236:2,11
236:14
**medication** 18:22
19:18 22:21 23:23
24:11 25:3 26:10
27:22 28:11 38:15
38:16 44:15 48:8
50:10 60:2,10
96:11 97:19 118:2
132:4 133:16
134:13 157:17
229:4 235:25
243:20,23 245:4
249:23 254:25
262:24 267:20
268:18 275:5
277:7,21 278:14
280:9 284:15
303:7 305:19
306:7 331:9
355:23 357:22
**medications** 22:23
23:15,18 25:6,10
25:11 28:3 57:12
114:25 115:6
116:11 122:1,6,14
122:25 123:8,20
124:2,11 125:2,19
133:23 134:17
158:11 162:10
163:20 165:22
203:2 208:19
227:16 230:4
236:5,20 237:9,23

241:13,20 242:2
242:18 243:5
244:19 245:8,16
246:2 249:19
253:6 254:18,22
255:12,19 259:11
261:4 262:1,2,4
266:4,9,18 267:10
267:14,23 268:8
275:14 277:16
278:2,10 279:7,11
279:12 285:9
296:1 300:2
308:13 329:19
357:12,17
**medicine** 251:21
252:3
**medina** 136:20
**meet** 14:1,3,19
184:22 313:6
**meeting** 8:8 14:6,9
274:23 307:5,11
308:5,7 315:1,3
333:9 334:16
335:5,16
**meetings** 46:25
**melanie** 116:19
**melinda** 3:17 11:1
**member** 20:25
21:9 27:1,7 43:4
88:3 103:3 176:3
**members** 19:25
20:24 61:3 62:1
94:21 96:4 97:2
104:7 129:1 131:1
172:6,8,12 218:15
224:15 228:22
235:20 241:16
249:18 251:18,19
260:14 263:25
264:11 274:16,17

278:13 312:17,22
313:14
**membership** 97:6
97:9
**memo** 8:8 333:9
**memory** 313:10
**mendelsohn** 4:24
11:5,5
**mental** 73:18
238:15 258:19
291:5 292:11,16
292:20 293:11,14
293:19,23 314:14
**mentioned** 35:12
42:7 47:2 57:10
58:5 61:8 69:24
71:17 104:20
115:21 123:25
126:25 133:10
167:7 168:10
183:12 199:17
202:17 210:1
216:20 229:25
238:5 291:8,16
325:8,13 327:11
336:21 343:1
344:4 347:18
349:18
**message** 104:21
**messed** 308:17
**met** 13:25 14:2,4
14:11 184:14
307:20 313:11
340:2
**meth** 295:8,12,17
**methamphetamine**
21:20 295:14
**methamphetami...**
295:4
**methods** 133:18

**metro** 68:23 70:13
70:16 132:3,15,20
133:19,21 265:12
265:13
**mexican** 272:25
**mexico** 269:24
272:13
**michelle** 6:9 11:21
**microphones** 9:7
9:12
**middle** 197:6
331:10 343:24
**midwest** 362:17
365:1
**mill** 255:8,9,16,17
255:22 256:1
**mills** 255:6,18
359:6,10,13
**mind** 22:16,18
30:18 31:5 39:25
62:17,18 90:14
346:4
**mindset** 236:20
237:8,22
**mine** 222:5,6
297:3
**minuses** 319:5
**minute** 127:24
**minutes** 14:21
178:8,11
**misconduct**
331:19
**mishear** 43:19
**misled** 358:5
**misrepresentation**
358:1
**misrepresentatio...**
354:15
**missed** 345:9
**misspelled** 321:19

misspoke 84:22
267:12 286:19
misstating 332:4
mistake 34:2
43:21
misunderstood
26:7 136:6
misuse 38:15 48:7
60:2 96:10 305:18
mitigation 60:17
356:14
mixing 27:6
mixture 295:1
mkjohnson 3:18
model 294:17
modified 87:19
module 115:11,15
115:16 116:3,8,14
116:17
molly 312:23
mom 106:6
moment 128:14
221:16
moments 42:8
momentum 45:23
money 41:12
108:2 110:18
183:8
monitoring 34:19
117:15
month 325:17
monthly 305:24
306:9,19 315:3
months 212:12
moral 290:20
morbidity 42:13
47:10 167:24
morgan 4:4,11
5:12 11:4,11,23
morganlewis.com
4:9,16 5:17

morman 184:18
184:19
morning 9:4 12:12
12:13 167:18
321:8 323:4
morphed 41:15
mortality 42:13
47:9 167:25
308:22 309:5,12
309:17,22 310:14
310:18 312:3
314:5,6 346:24
moseley 91:22
92:5,8
mosquitos 35:6
68:3
mother 103:19
mother's 262:21
motion 215:20
move 19:21 60:3
157:19
moving 45:7,23
129:14
multifaceted
257:17
multiple 21:16,18
311:9
municipalities
97:2
myocum 6:10

**n**

n 7:1,1
naccho 96:21
najeebah 8:9
333:10
naloxone 95:25
100:20 101:4,6
name 10:2 12:16
41:3 66:13 77:22
83:2,6 84:10
144:12 158:15

313:1 315:15,16
317:11,12 333:25
334:7 362:6 363:3
363:4,15 364:3,4
364:21
named 351:11
names 20:15,19
28:19,22 29:2
63:4 170:18
nancy 62:7 264:6
narcan 95:23
narcotics 62:9
135:1 269:19
270:1 313:2
narrative 162:15
narrow 323:25
national 1:5 9:20
90:25 92:24 96:19
96:22,23,24 97:3
203:17 211:1
362:6 363:3 364:3
natively 222:22
nature 16:6 20:6
52:12 53:14 54:25
56:6 72:22 94:9
122:15 123:2,10
137:21 138:22
146:9 161:6 204:4
319:15 326:23
near 70:18
necessarily 291:16
306:17
necessary 236:21
237:10,24 282:6
282:14 283:7
284:14 285:10,22
286:24
necessity 244:4
need 17:20 23:5,19
64:20,21 107:13
142:5,6 144:20

145:11,14 151:1,6
151:8 152:6,10,16
158:3 163:5 195:5
195:7 231:11,13
231:14 234:9,10
243:19 246:3
254:13 288:5
352:23
needed 43:16
78:15 185:12
193:23 203:16
needing 54:6
needs 23:24 245:9
245:17 251:13
318:15 343:23
negatively 227:7
neighbor 136:15
neighboring
136:11,17
never 16:19 53:12
53:14 111:12
175:12 208:13
233:20 278:1,9
279:6,19 330:19
340:13,13,16,18
340:19 341:14,15
341:19,20 345:21
352:1,15 353:12
353:25 355:5,9,14
357:7
new 183:10 225:12
258:24 259:17,22
299:24 333:25
348:9
niceties 351:2
358:13
nida 264:7
night 323:4
nile 68:4
nine 325:17

**nobody's** 305:2
**nod** 212:14
**nods** 218:16
**non** 22:23 296:11
296:13 298:23
**nortey** 5:16 7:8
11:11,11 358:11
360:7
**northern** 1:2 9:23
97:19 98:3,4,9,12
98:15 101:11,18
102:21 104:16
273:8
**notarized** 362:14
**notary** 2:10 361:6
362:25 363:10,18
364:15,23 365:23
**note** 9:7 80:1
151:11 216:1,20
216:24 237:16
362:12
**noted** 229:6
262:18
**notes** 231:9,19
232:7,25 234:5
361:12
**noticing** 10:15
**november** 2:3
**novickis** 74:17,19
75:2 76:1,13 79:3
79:21 86:2 88:10
88:17,21,25
334:10 335:10
336:5,14,17 337:4
**novickis's** 74:25
**now's** 182:8
**number** 7:13
132:9 182:15
186:9 204:22
215:24 222:25
254:2 256:16

274:9 275:2 280:8
280:22 293:17
297:1 298:13,24
299:3,7,8,11
306:13 307:2
325:7,19 360:18
362:7,13
**numbers** 57:22
58:25 94:19
155:14,17 222:1,5
287:18 292:16
293:21 295:22,24
298:1 324:4
327:13 364:7
**numerical** 359:23
360:3
**numerous** 255:12
**nurse** 321:8,9
323:6 327:15
**nw** 3:12 6:6

**o**

**o** 7:1 117:9
**o'clock** 14:4 321:7
**oarrs** 117:4,6,8,11
117:12,13,21,23
118:6,9,14,16,23
119:7,16 121:7,11
122:2 124:9,25
125:17 126:13
127:7,15,21 128:3
128:15,21,24
129:2,8,11,19,21
130:22 131:8,13
131:16,18,23
132:13,25 133:13
134:21 135:2,5,13
136:2 147:14,19
148:5,10,15
150:19 152:2
153:8 154:14,21
155:3,8 289:1

**oath** 172:20
201:21 202:13
216:16 340:12
**obesity** 293:4
348:11,11
**object** 20:17 65:15
**objected** 334:22
**objection** 16:9,15
17:2,8,17 18:12,18
18:23 20:2 22:14
22:24 23:21,25
25:13 26:4 27:18
27:25 28:8,21
31:9,14,16 38:1
43:18,20 44:9
45:6 47:23 48:15
49:4,12 50:6,15,23
51:11 52:7,14
53:18 54:1 55:2,7
55:13,20 57:7
59:2,15 62:24
63:17 64:6 68:17
69:21 75:6 79:1
79:13 81:4,18
85:21,23 86:14
87:4,22 89:3,21
90:4 92:3,15 93:3
93:19 94:10
100:18 102:2,23
104:18 105:15
108:18 109:1,24
110:11,19 111:3
111:11 112:7,16
113:1 114:7 115:2
115:7 116:6,12,18
117:17,24 119:10
119:25 120:7,12
120:21 121:3,16
122:3,17,20
123:12,23 124:13
124:20 125:7,21

125:24 126:8
128:18 130:3
131:3 132:1,17
133:7,24 134:5,9
134:18,23 135:8
135:15,19,23
136:5 137:16,19
138:1,9,20,24
139:4,9,12,20
140:3,12,18,23
141:17 142:21
143:4,14,22 144:1
145:1 146:7,12
147:7,20 148:6,11
148:17 149:3,16
150:5,23 151:12
152:3,8,25 153:10
153:17,24 154:15
154:17 155:4,10
156:9,16,23 157:3
157:7,15,19 158:1
158:12,17,22
160:4 161:9,22,24
162:5,11 166:4,21
167:6 168:14,22
169:12 170:1
171:18,24 172:18
172:22 173:16
174:4,11,18,21
175:2,9,16 176:19
177:2 178:18,25
179:8,19 180:2,21
181:6,13,19 182:2
182:6 183:17
184:9,21 185:23
186:6,20,25 187:9
187:14,19,25
188:6,12,18,25
189:3,6,9,12,15
190:11,18 191:3
191:11 197:18,23

| | | | |
|---|---|---|---|
| 198:17,21,25 | 340:10 342:2 | **offering** 20:18 | 40:17,25 41:4,22 |
| 199:3,7,14,23 | 345:15 347:17 | 95:15 133:17 | 42:3,7,9,10,12,14 |
| 200:10,15,23 | 348:5 354:12,17 | **office** 68:23 112:5 | 42:20,22 43:3,7,24 |
| 201:14,18,23,25 | 354:22 356:11 | 112:14,25 113:9 | 44:12 46:6,8,13,16 |
| 202:15,23 203:3 | 359:18,25 360:5 | 114:4 126:21 | 46:20,22 47:7,10 |
| 203:11,21,24 | **objection's** 217:10 | 128:10 131:6 | 47:18 48:6,8,10,14 |
| 204:8,11,17,21 | **objectionable** | 134:11,16 135:2 | 48:19,22 49:1,8,16 |
| 205:3,8,10,19 | 216:23 217:3,9 | 137:23 149:21 | 49:21 50:1,17,19 |
| 206:22 207:9,12 | **objections** 10:12 | 154:12 155:8 | 51:1 63:1,2,23 |
| 208:5,9,16,21 | 13:14,15 | 219:4,4,6 232:3 | 64:2,5 68:24 |
| 209:3,10,24 210:5 | **objective** 31:5 | 285:3,18 286:18 | 73:22 74:12 80:9 |
| 210:9,18 211:16 | **obligated** 244:15 | 305:17 306:9 | 82:4,18 83:13,23 |
| 211:23 212:3,10 | **obligation** 328:10 | 336:18 341:20 | 90:17 91:10,14,17 |
| 212:20 213:4,24 | **observations** | 350:14 360:6 | 91:20,23,24 92:2,9 |
| 214:10 216:25 | 308:3 | **officer** 62:9 73:17 | 92:22 93:11 95:4 |
| 218:22 219:3 | **obtain** 147:13 | **officers** 264:3 | 97:2,11,19 98:3,4 |
| 223:23 227:13 | 218:10 243:5,11 | 269:19 270:1 | 98:7,9,11,12,15 |
| 228:20 230:5,13 | 243:16 270:5 | **offices** 2:7 | 101:11,18 102:21 |
| 230:17 234:22 | **obtained** 283:18 | **official** 128:8 | 102:21 104:16,16 |
| 237:2 240:15 | 287:7 341:10,11 | 363:15 364:21 | 106:14,21 107:4 |
| 242:21 243:7,13 | **obtaining** 270:18 | **officials** 58:16 | 107:23 108:7,16 |
| 243:18 244:24 | **obviously** 167:13 | 91:1 92:25 96:20 | 108:20 109:14,18 |
| 245:12,19 246:6 | 181:16 | 96:25 97:1,4,12 | 110:8,16,23 111:1 |
| 246:21 247:17 | **occasion** 289:8,11 | 98:18,24 100:12 | 111:7 112:2,12,21 |
| 248:3 249:7,13 | **occupies** 80:21 | 101:10,17 118:22 | 114:5,12,17,22 |
| 250:5 252:5 255:3 | **occurred** 335:4,15 | 119:6,16 121:10 | 115:20 117:2 |
| 255:23 257:7 | 348:3 359:19 | 126:1 127:16 | 118:7 120:23 |
| 259:6 263:13,23 | **occurs** 356:25 | 130:22 131:5 | 121:2,4 122:4,5 |
| 266:13,21 268:1 | **october** 97:21 98:2 | 179:13,22 180:16 | 124:3 129:6 135:4 |
| 269:11 271:22 | 101:19 195:11 | 240:2,3 | 135:10,12 136:4,9 |
| 277:9,22 278:5,11 | 224:13 273:16,24 | **oh** 31:19 33:20 | 146:19 148:4 |
| 279:8,13,21 281:1 | 274:11 281:11 | 216:8 222:3 | 149:6 150:17 |
| 281:6,13 282:22 | **od** 321:9,9 323:3 | 225:21 292:2 | 153:6 158:13 |
| 284:4,8 285:14 | 324:10 325:1 | 345:8 351:24 | 166:7,19,24 |
| 287:15 303:3,18 | **od'd** 320:24 323:3 | **ohio** 1:2,10,14,20 | 167:11 168:23,25 |
| 304:11 308:18 | **odh** 146:14 149:5 | 2:9 3:6 4:22 5:6 | 169:7,19 172:7,17 |
| 311:1,6 312:5 | 149:8 167:8 173:1 | 6:16 7:23,25 9:1 | 173:5,14,17 174:2 |
| 319:17 330:10 | 205:4 261:16 | 9:23 10:1 29:24 | 174:9,16,25 175:7 |
| 332:20 334:18,24 | 315:21,23 321:24 | 31:13 32:3,21 | 175:14 177:1 |
| 337:10,20 338:14 | **offered** 124:8 | 36:3 37:20 38:3 | 179:9 181:14,23 |
| 338:21 339:5,17 | 191:16 331:1 | 38:11,22 39:6,6 | 182:20 183:1 |

184:6,16 185:19
185:21,25 186:1,4
186:8,17 190:1,7
190:15 191:9,15
191:17,17,20
195:11 198:10,15
198:16 199:11,24
200:7,16,21,24
201:8,22 202:14
202:16,19,25
203:7 205:20
206:12,24 208:11
208:13,17,23
209:1 210:1,20
211:2,19 218:12
219:17 224:12
233:21 240:10,10
240:11 242:5,12
242:13 251:18
253:9 262:16
264:14,22 273:8
292:17 293:21
295:10,21 304:14
304:16 305:16
313:14,22 315:9
315:18 316:4
327:7 331:6,25
332:10 333:16
348:22 350:5,5,6
362:2
**ohio's** 8:1 90:24
97:13,18 98:2
101:12,20 117:14
207:17 208:24
221:12 313:24
**okay** 14:6 17:23
18:3 19:20 21:6
22:10 23:2 24:19
25:8,19 26:13,16
26:18 27:24 28:2
28:15 29:7 30:9

31:4 32:12 35:18
36:6,17 37:17
39:22 40:14,20
41:19 43:6,14
53:11 60:16 64:12
66:1 67:3,8 71:10
77:6 80:20 88:10
101:9 110:6 114:1
125:13 127:3,19
128:13 136:1
140:13 141:7
143:17 145:20
146:25,25 148:14
151:20 152:21,22
153:1,2 154:11
155:1 160:22
163:22 164:12,24
176:11 178:9
182:8 190:23
191:25 192:17
193:9,20 195:2,9
196:8 197:25
199:16 205:12
206:9 210:7 212:7
214:1 217:11
220:24 223:1,7
224:18 225:1,6
227:10 232:22
249:15 252:13
253:20 258:1,3
259:15 266:16
274:13 276:24
281:15 285:4
286:20 287:25
289:5 290:15
292:7 296:23
297:6,10 300:5
302:15 304:19
307:12 308:6
310:11 318:23
319:19 323:3,10

324:1 332:25
336:3 343:4,11,18
347:11 360:7
**old** 66:21 325:1
**older** 39:9 42:17
42:25
**omissions** 354:15
**once** 58:13 70:25
88:2 176:12 260:3
334:21
**ones** 20:5 24:4
59:25 185:2
288:17 303:6
304:18,21
**ongoing** 8:2 72:23
221:13
**ooo** 2:1
**op** 1:11,13,15
**open** 74:5 140:5
260:18,21 334:5
**opened** 260:6
**openly** 239:6
**operations** 34:25
**opiate** 1:6 9:20
39:20,25 40:5,8,15
40:21 41:16,20
44:24 45:9,13
46:2 52:21,25
54:18,25,25 58:1
59:12 61:20 63:24
64:5,13 72:17
90:17,25 91:10
92:13 97:13,18
98:2 99:5,7,8
101:13,20 106:25
126:7 131:12
133:4 135:22
136:10,14,19
175:20,25 176:2,7
176:8,22 188:22
203:23 206:17

209:8 212:9,18
213:21 215:7
217:19,20 218:18
219:1,10 220:3
221:11 223:18
224:1,3,9,10,20
225:4 229:2
230:24 235:13
236:19 237:7
240:7,20 241:5,18
245:24 252:11
257:4,20 258:5
259:21 261:18,21
262:5,12 263:7,20
265:1 267:5 270:4
274:18 278:4
284:19 288:12
289:7 290:1
298:20 302:17
309:9 310:16
319:1 321:17
324:9 330:13
345:23 349:9
355:13 362:6
363:3 364:3
**opinion** 16:23
238:18,25 259:5,7
302:18
**opinions** 16:5,13
**opioid** 17:5,13,14
18:8,22 19:17
20:5,23 21:10
22:23 23:4 24:13
27:24 28:2 44:7
56:6 57:12 59:10
69:6,18 70:7 72:3
72:10,18 75:5
76:4,15 78:18,24
79:11 81:17 91:14
92:2 93:1,11 94:6
95:9,12 98:25

99:20 100:7,14
102:1,20 104:15
105:9 106:7,16
108:1,9,22 109:15
109:20 111:19
112:3,22,23
114:25 115:6,20
116:10 118:2,24
119:8,9 121:13
122:1,14,16,25
123:3,8,10,20,21
124:1,11 125:2,19
126:14,21 128:10
131:19,24 132:9
132:14 133:1,22
134:12,17 137:15
146:5,10 158:11
167:12 168:5
170:21 171:1
172:13 178:16
183:13 186:22
187:11,17,22
188:3,9,15 190:9
191:8 197:16
199:10 200:8,19
202:21 203:2
204:5,15,15,16
205:1,9,17 206:6
206:20 208:19
209:22 210:12,17
211:6,14 212:1
218:6 219:21
220:12 226:6,15
227:4,12 228:19
229:4,22 230:4,11
231:2,24 233:1
235:14 236:3,5
237:11,25 238:7
238:13 239:9,15
240:23 241:8,13
241:20,21 242:1

242:17,19 243:5
243:23 244:8,19
244:23 245:3,8,16
246:2 253:5
254:18,22,25
255:10,19 256:4,9
256:13 257:15
258:14 259:11,13
259:24 261:4,23
262:1,4,14 263:8
263:16 264:16
265:4 266:3,9,18
267:14,20,23
268:8,18 272:22
273:1 275:13
276:17,18 277:1,2
277:5,7,8,14,16,21
278:2,10,14 279:7
279:11 280:10,24
282:6,14,20 283:1
284:3,15 285:9,11
286:4,22 287:7,22
290:3,6 291:6
292:12,19 293:18
294:3,3,9 295:25
298:14 299:4,9,25
300:2 308:13
314:1 319:3,15
321:17 322:1
324:10 325:22
329:19 330:7,8,17
348:3 350:7 355:6
358:19 359:20
**opioids**   21:17 26:3
27:17 28:3,7
68:20 69:10 71:13
72:21,23 73:11
76:8 98:20 103:3
103:5 129:24
157:23 158:9
168:21 242:11

243:11,16 244:14
251:12 258:18
259:17,23 260:2
261:22 265:20,22
266:6 276:1 279:5
279:20 280:25
283:5,6,17,19
284:1,13 285:21
285:21 286:23
287:5,12 288:4
294:9 295:19
296:15 298:23
326:13 351:16,21
352:3,9,14,19
353:5,7,11,14,18
353:20,22 354:2
355:1,11,16 356:4
356:10,15 357:3
357:25 358:6
**opportunities**
30:16 31:2 73:5
75:13 79:17
105:17 232:23
**opportunity**   30:12
95:5 104:3 147:17
196:20 226:10
318:13 344:10
**opposed**   68:14
**order**   152:17
193:25 195:7
**ordered**   244:20
245:4
**organization**
37:10 75:10 96:22
96:23,24 281:23
346:20
**organizational**
7:16 66:8,25 67:4
74:15 158:23
159:2,5,12,18
160:3,15,25

**organizations**
234:1,19,25
270:16
**original**   223:4
230:20
**originally**   85:24
85:25 86:25
100:10 307:1
**ought**   335:12
**outbreak**   318:11
**outbreaks**   35:1
**outcome**   10:7
143:7
**outreach**   79:18
180:12 185:10
**outside**   83:4 93:22
179:3 246:16
249:23 250:3
269:23 296:15
338:5,17 341:18
**overall**   64:8
102:21 104:17
225:10 227:16
261:9
**overcome**   212:22
**overdose**   17:5
20:21 24:9 41:1,6
42:21 47:21 49:2
49:10,21 50:1,4,10
50:14,21 51:3,10
52:6 53:17,24
57:3,22 58:25
59:10 60:24 61:18
62:23 69:18 72:11
93:11 94:7 96:6
109:20 112:4,13
112:23 113:5,11
113:13,16 114:3
114:11,16 116:5
148:12,16 149:25
156:2 162:4,17

166:11 169:25 170:5 171:15,23 186:23 187:7,23 190:10 200:20 202:21 206:20 220:3 221:12 226:7 231:2,25 237:11 256:5,10 256:14 259:25 261:23 262:5,15 263:4 275:3,12,24 279:18 285:25 286:2,10,12,17 288:3 290:6 292:13,19 293:18 294:24 295:5,23 295:24 296:9 297:18,22 298:9 298:10,14 299:4,9 299:11 309:4 319:3,16 320:12 320:19 330:17

**overdosed** 24:10 277:20 278:22 284:12 285:8,20 286:22 287:5,12

**overdoses** 17:14 24:12,13,21 25:24 47:13 48:13 55:1 55:19 56:12 64:13 69:7 70:7 72:3 75:5 95:10 99:21 100:14 109:15 121:13 157:23 158:9 168:21 169:20 170:12,22 171:2 172:13 173:6,15 174:3,10 174:17 175:1,8,15 177:1 178:17,24 179:7,18 180:1,20

181:4,12 182:1 185:19 186:5,10 186:18 187:12,18 188:4,10,16 197:4 197:17 204:16 205:1,17 209:22 212:2 220:13 229:23 230:12 277:14 278:1,9 279:4 294:3 325:17 330:8 348:3

**overnight** 60:4

**overprescribing** 228:23 230:3 249:16,21 250:1 250:13 256:3,8 275:5

**overprescription** 155:21

**oversee** 35:10 250:25

**oversees** 265:15

**overview** 98:6 155:7

**overwhelming** 251:10 329:2

**oxford** 4:5

**oxy** 321:17

**oxycontin** 280:12 321:17

**p**

**p.m.** 138:4 142:9 142:10 150:8 163:4 182:12,13 191:24 193:16,17 196:14,15 214:23 214:24 221:7 253:24,25 270:22 289:19,20 299:16 312:12,13 316:17

333:2 350:19,20 360:20

**package** 355:5,10 356:9

**page** 7:4,13 37:15 37:16 63:6 145:17 150:15 154:23 155:13 163:21 164:1 165:11,20 185:17 192:7,15 193:2,4 195:15 196:23,24 197:1 198:2,3 209:1 222:1,4,17 223:4,6 224:22,23 231:9 252:7 258:2 274:2 274:8,11 280:4 296:7,18,20,21 297:5 319:23,25 320:7,14 322:2 323:11 324:5 335:21 338:2 343:22,25 344:22 345:3,4,6,7,11,18 345:19 362:13,15 364:7 365:3

**pages** 145:16 154:24 194:16,17 194:18,19,20,21 195:23 196:11

**pain** 22:21 23:1 24:11 25:2,4,10 27:22 28:11,13 38:16 50:10 56:20 56:21 57:13 118:2 124:1 132:9 134:12 156:3 198:5,9,11,15,16 198:20 199:12 200:7,22 201:24 202:14,20,25

203:6,15 204:25 205:15 206:19,25 207:5,15,17,18 208:25 209:20 210:25 211:10,17 227:9,23 228:3,4,5 228:8,13,18,24 229:3 232:23 234:2,20 235:1,5 235:11 236:10,11 240:12,22 241:6 260:12,23 261:13 261:21 262:23 275:5 303:7 306:6 328:19

**painkillers** 155:22 300:10 301:3,12 302:9,19 303:1,15 304:2,9 308:11

**palliative** 260:5,15 261:5

**panel** 64:7 90:18 90:20,21

**paper** 18:1

**papp** 51:14 104:22

**paragraph** 37:12 41:25 155:12 169:18 198:9 207:14 210:2 335:21 338:2 345:20

**parks** 68:23 70:13 70:17

**parran** 51:14 235:22 242:8 251:20 271:5 306:2

**part** 30:22 33:3 44:11 49:6 55:5 55:12,23 61:12 63:15 72:11 82:10

**[part - pertaining]**

86:20 87:13 88:21
89:8 98:5 110:5
112:10,19 117:1
126:12 134:25
135:13,20 144:20
145:10 161:18
162:20 171:17
209:7 218:14
219:16 227:15
232:17 236:3,22
239:11 255:25
256:15,21 285:23
289:5 303:5 314:8
331:19 333:19,20
349:22 364:9
**participate** 65:23
103:23 141:19
142:19
**participated** 113:3
116:16
**participating**
65:16
**particular** 21:21
30:17 31:5 62:2
62:19 63:2 108:23
124:19 163:13
165:12 167:5
192:1,25 220:11
244:21,23 245:2,4
246:12 259:9
310:6 317:18
**parties** 9:15
**partnered** 168:25
331:5
**partners** 45:24
56:16 122:22
123:14 124:8
126:17,24 128:9
131:10 162:20
170:9,16 171:4,5
172:1 218:8,11,14

219:13 221:3
226:17 331:2
**partnership** 39:7
42:3,8,9,15,20,23
43:3,8,23,25 44:12
45:8 46:7,9,14,17
46:21,23 47:4,19
48:9,11,20,23 49:8
49:17 90:24 97:12
175:22 218:19
219:1
**partnerships** 45:2
72:25 95:7,14
102:9 111:19,21
111:24 131:16
239:24
**parts** 50:2 145:9
**party** 10:5 58:18
95:24 361:14
**pass** 25:23 190:17
**passages** 240:4
**passed** 135:11
266:25 275:11
**passing** 274:21
275:16
**passion** 102:25
103:1
**patient** 71:11
127:23 135:7
231:20 232:2
243:24 244:4,16
244:23 245:3
246:17 247:1,2
249:25 255:13
**patient's** 244:10
**patients** 116:11
128:25 135:14
246:5 247:22
**patterns** 126:17
127:6,8,16,22
128:2,16,21

130:24
**paul** 3:15 10:19
12:16 145:20
150:22 152:22
154:23 164:6
165:17
**paula** 1:24 2:10
10:4 361:5,21
**pause** 124:4 127:1
**paused** 113:19,20
**pay** 348:20
**pboehm** 3:16
**peer** 289:9
**pending** 152:9,15
**pennsylvania** 4:6
**people** 11:16 37:6
47:3 58:4 74:1,6
80:1 84:6 85:7,12
86:6 96:4 102:12
103:11 104:6
105:6 124:2
170:18 185:7
220:20 226:18,21
227:17 228:7
236:4,15 238:17
238:25 239:5,6,22
287:18 307:2
314:24
**people's** 232:23
**perceived** 262:8
262:13,19
**percent** 164:21
325:8,18,23,24
326:14
**percentage** 282:16
283:3,15,24
284:11 285:8,20
286:21 287:4,10
288:2 291:11
292:16 320:3

**percentages**
147:13 257:12
288:24 322:13
**perception** 133:14
**percocet** 280:11
**percolation** 51:16
**perform** 117:3
**performed** 322:16
**period** 45:22
168:2 325:10,17
**permitted** 259:2
**person** 45:15 83:9
83:10 168:4
176:16 216:3
243:24 320:24
348:15
**personal** 20:3,19
22:9 27:7 79:8
85:19 212:21,23
213:5,22 214:2
227:24 228:11
235:8 239:19
246:25 247:21,23
304:16,19 349:13
350:2 354:9,14,19
356:1,2 358:22
**personally** 18:21
19:16 114:15
363:11 364:15
**personnel** 338:7
**perspective** 39:3
215:3 239:20
288:25 314:13
333:22 351:4
**perspectives** 16:6
**pertain** 138:10
**pertaining** 18:13
18:16,19 37:5
47:1 237:20
320:17

[pertains - poorly]

pertains 205:22
ph 84:12 312:21
pharma 1:10,12
  1:14
pharmaceutical
  268:20 351:10,15
pharmaceuticals
  4:19 11:7
pharmacies
  268:25 358:16,19
  359:2,13
pharmacy 21:14
  122:5 146:20
  148:4 149:12
  150:16 153:5,23
  242:13 244:20
  245:5 331:7
phases 173:19
phone 4:15 5:24
  6:9,18 11:16 65:1
  93:23 193:1,11,13
  360:9 362:3
phones 9:11
physical 73:8
physician 23:5
  104:24 132:21
  226:3,12,14 236:1
  236:8 243:6,12,17
  243:21,24 244:14
  244:21 245:1,17
  246:3 255:1
  262:22 263:2
  283:8 358:4
physician's 134:11
  244:9 251:1
physicians 23:14
  23:20 95:17
  105:18 115:25
  117:19,25 118:5
  118:12 124:5
  126:9 131:18

132:11,15 135:4
135:12 136:3
157:25 158:11
207:18 208:20
226:22,23,24
227:2,6,14,21
228:7 241:19
242:1,17 251:11
252:1 253:10
256:4,9 293:13
328:5,11 329:2
pick 9:8 110:4,22
  183:11 185:3
  321:15,18 324:9
  327:5
picked 86:4 87:7
  88:10 335:23
  336:6
picturing 323:19
piece 41:14 69:1
  241:23 290:23
pill 25:3 255:6,8,9
  255:16,17,18,22
  256:1 359:6,10,13
pills 23:1 25:4
  57:13 132:10
  228:24 236:10,11
  263:1 287:7
  320:25
pilot 39:12 94:20
pissed 336:8,21,23
pittsburgh 4:6
place 9:11,15 44:1
  47:15 59:5 86:16
  94:13 95:4,23
  98:7 100:23
  103:18 115:18,19
  117:19 121:21,23
  167:11 207:11
  226:9 232:22
  286:17 307:6

318:7,8 321:24
334:7 339:4,9
347:10
plain 281:4
plaintiff 9:19
  10:16,23 14:7
  65:12
plaintiff's 12:23
plan 8:5
platforms 60:11
play 305:7
played 242:14
  358:19
plays 56:21 95:19
please 9:7,10
  10:13 11:13 12:1
  17:10 18:7 49:14
  53:19 94:2 103:16
  115:3 119:2,12
  121:14 123:5
  124:22 125:11
  130:5 138:15
  160:4,6 175:4
  178:2 195:20
  210:24 224:6
  227:1 234:8 237:4
  238:10 240:17
  243:9,14 256:6
  271:19 278:18
  279:15 332:18
  362:11,11
pllc 5:20
pluses 319:5
point 18:10 30:14
  30:24 35:21 37:4
  38:8,23 39:18
  50:8 51:18 56:18
  59:4,16 60:8 61:6
  63:5 77:9 87:20
  88:6,7 89:24
  91:15,21 92:4

93:5 99:23 106:13
119:21 148:24
156:17 162:12
169:4 174:5
184:15 194:18
246:9 289:3 307:5
307:15 308:4
313:23 334:8
337:7 341:22
342:11,21 344:20
344:25 345:12
346:6 347:3
pointing 197:9
points 325:3
poison 249:20
  285:16 286:8
  305:21 306:10,15
  307:1,25 308:8
  312:18 313:5,10
  313:18 314:4
poisoning 35:7
  169:10 346:25
  348:9
poisonings 162:10
  163:20 165:21
  168:9 169:6
polster 1:8
poly 21:13
polypharmacy
  21:12,15 291:1
  294:8,9 324:10
polysubstance
  326:8,12
pommerening
  62:7 264:6
pool 70:14
pools 35:4
poor 338:6
poorly 300:10
  301:4,13 302:20
  302:23

**population** 267:11
282:20 283:1
**populations**
262:18
**portion** 39:14
42:19 47:7 67:19
69:1
**portions** 195:4
**posed** 141:1
216:18 217:10
**position** 32:15
33:12,15 34:8,14
36:7,10 54:20,24
66:18 67:10,12
74:23 76:25 77:17
77:21 83:5 85:3
85:20 86:19 87:19
88:2,12,23 332:19
334:3 335:3,13,24
336:5,7 337:18
342:7 343:13,16
343:17 349:13,16
355:13
**positions** 35:23
**possibilities**
167:10 308:3
**possibility** 308:9
308:12
**possible** 99:1
204:13,19 220:5
250:21 268:9
288:1,8 300:22
**possibly** 157:24
218:9
**posted** 343:20
**potential** 171:22
173:25 178:14
186:22 187:11,17
187:22 188:3,9,15
188:21 267:24

**potentially** 63:20
**power** 264:9
**powerful** 236:5
260:16 262:23
**practice** 252:3
**practices** 56:19
57:11 70:23 95:16
95:22 115:23
133:11 201:1,10
229:11,22,24
230:2,10 231:1
250:9 251:2
**practicing** 207:20
240:1
**practitioner's**
134:16
**pre** 310:8
**predecessor** 74:25
**predict** 148:19
**preface** 273:13
**prejudiced** 65:22
**preparation** 161:3
161:7,20 317:3,8
**prepare** 13:21
14:7,23 158:20
218:4 220:19,24
**prepared** 15:10
46:5 159:1 189:23
**prepares** 221:1
**prescribe** 116:10
118:5,12 135:5
243:23 244:8
**prescribed** 19:17
23:14,18,23
121:25 122:1,14
122:25 123:8,20
124:2 125:2,19
132:10 133:17
227:17 241:20
242:1,17 251:12
255:1 261:25

262:3,22
**prescribes** 134:17
244:14
**prescribing** 56:19
57:10 95:16
114:25 115:5,22
118:2 133:10,22
134:11 135:13
136:3 157:24
158:10 201:1,10
202:24 203:1
205:5,22 208:19
210:6,10,12 229:4
229:24 232:24
241:13 242:9
246:12 247:22
250:9 251:2
255:11 260:11
328:18
**prescription** 1:5
7:23 9:20 18:21
19:17 20:5,23
22:21,23,25 23:4
23:23 24:10,13
25:2,6,10 26:10
27:22 28:2,10,13
37:19,24 38:2,10
38:15,16,21 39:14
39:16,24 40:16
41:1,6,8,11,14
42:21 44:7,15,16
44:18 47:11,12,20
47:21 48:8,13
49:2,10,20,25 50:4
50:10,14,21 51:3,9
52:5 53:17,23
55:19 56:11 57:3
57:13,15,22 58:25
60:2,10,23 61:18
62:22 96:11 103:5
105:9 116:5

117:14 118:24
121:12 122:6
126:22 129:12,24
131:19 132:4
133:16 134:12
135:6 150:18
153:7 157:16,23
158:11 162:3,9
163:19 166:11,15
167:1,19 168:12
168:20 169:20,25
170:5,11 171:15
171:23 173:6,14
174:2,10,16,25
175:8,14 176:4
177:1 178:16,24
179:6,17 180:1,20
181:4,11 182:1
185:19 186:4,9,18
189:19 190:1,7,9
190:15,24 191:9
191:20 195:11
197:3 203:2
205:17 206:24
207:2,4 208:19
209:1 223:9
224:12 225:10
228:24 230:4
236:20 237:9,23
242:11 243:5,11
243:12,16,20
244:2,8,14,16,19
244:22 245:2,7,15
246:1 249:22
250:22 251:12
252:15 253:5
254:18,22,25
255:10,12,19
258:9,10 259:11
259:13,17,23
261:4,10,11,13,22

262:9,13 265:20
266:3,9,17 267:13
267:19,23 268:8
268:18 275:13
276:1,18 277:7,16
277:21 278:2,10
278:13 279:7,11
279:19 280:11,25
282:6,14 283:7,19
284:14 285:11,22
286:24 287:6
295:19,25 298:14
299:4,9 300:2,9
301:3,12 302:9,19
303:1,7,15 304:2,9
305:19 306:6
308:10,13 316:5
320:25 326:13
328:25 329:19
331:8 351:16,21
352:3,9,14,19
353:5,7,11,13,18
353:20,21 354:2
355:1,6,11,15,23
356:3,9,15 357:2
357:12,17,22
358:6 362:6 363:3
364:3
**prescriptions**  7:20
124:11 132:14
288:5 357:24
**present**  6:22 10:8
104:14 111:8
200:18 211:5
220:1,12 252:12
**presentation**
92:24 94:9 212:1
221:10,19,21
285:6 287:17
290:2 298:17
328:7

**presentations**  55:6
55:12 63:15 93:16
94:4 95:2 172:11
197:15 199:9
200:13,21 204:2
209:19 211:12
217:23 218:5
219:10,16,20
231:6 239:11
329:8
**presented**  7:24
54:24 90:17 93:10
101:12,19 105:17
135:18 201:3
204:13,20,23
210:4,15 215:17
217:19 220:9
231:23 232:1
320:12
**presenter**  63:12
**presenters**  90:18
90:21
**presenting**  211:11
224:2
**preserving**  13:15
217:5,8
**press**  226:8,19
227:18 231:19
232:2
**pressure**  225:17
228:16
**pretty**  338:6
**prevailing**  207:21
**preventative**
117:18,21,23
293:6
**preventing**  344:9
**prevention**  8:2
37:20,25 38:2,10
38:21 39:7,9,15,16
39:24 40:17 41:8

41:12,15 42:3,8,9
42:14,20,23 43:1,3
43:7,16,25 44:2,10
44:12,16,19 45:9
46:7,9,14,16,21,23
47:18 48:9,10,20
48:22 49:8,16
59:20 60:17 62:8
66:14 67:16,19,22
67:23 68:6,11,14
68:19,21,25 69:5,9
69:16 70:3,10
71:14,18 73:22
74:12 80:9 82:5
82:15,19,21 83:13
83:24 90:24 97:13
103:11 108:8
112:22 129:7
136:10 166:16
167:1,19 168:12
175:23 176:4
183:2 221:13
264:3,7 291:4
331:3,10 332:1,7,9
332:10 333:16
335:3,13 336:15
337:19 343:6
**preventive**  225:13
**previous**  75:9
**previously**  27:23
44:21 188:23
**primarily**  38:16
170:19 272:13
324:17
**print**  144:7 231:10
**printed**  145:17
222:7
**prior**  30:21 31:11
32:4 114:12,17
167:16 169:22
272:10

**privacy**  246:13
**private**  9:9 70:14
248:21
**probably**  19:23
38:19 40:4,9
42:11 44:15 45:22
46:11 48:6 63:1
96:8,9 100:25
104:24 113:20
236:24 250:17
272:4 288:15,18
291:23 321:2
327:13 332:16
356:1 359:19
**problem**  25:3
26:21 28:11
105:19 137:11
155:20 165:18
172:2 216:17
236:3 252:8
256:21 313:24
320:13,20 321:5
**procedure**  85:18
363:5 364:5
**proceed**  194:8
**proceeding**  13:18
**proceedings**  10:13
**process**  83:17,20
85:2,7 86:4,15,21
87:6,7,14,16,20,25
88:1,2,6,11 89:12
89:18 90:1,6
184:1 218:2 236:8
268:13 333:23
334:5 337:3,14
339:23 341:8,9
**produced**  29:15
164:19 165:7
179:9 221:25
222:21 263:6
333:6

production 329:13
362:15,17,22
products 355:21
profession 30:18
31:5
professional 72:11
338:4
professionals
95:14 203:14
229:18 235:3
program 34:10
35:8,10,14 36:2,2
36:18,19 37:8
38:3 41:3 62:10
73:21 76:18,19
81:15 87:7 105:24
106:10 115:13
117:15 161:11,12
161:15,18 162:14
264:8,8,13 331:8
336:7 342:14,22
345:23 346:11,25
356:20,23 357:2,6
357:6
programmatic
346:9
programming
60:13 67:25
236:17
programs 35:11
94:12 131:7 185:9
185:11 218:21,25
219:24 240:4
331:11
progress 35:22
progressed 94:18
project 39:12
70:13 72:24 73:19
74:3 94:17 180:13
240:2 291:8

projects 72:5,21
prologue 273:13
promoted 86:18
88:4
promoting 337:12
promotion 344:10
prompted 203:16
pronounced 32:10
proof 341:12
proper 60:9
proposal 149:5,8
proposed 236:1
protected 246:13
protection 36:3
protocol 89:23
protocols 324:22
provide 16:5
20:15 30:15 38:7
38:7 116:8 149:13
155:6 201:12
provided 91:17
93:21 108:20
115:9 124:25
125:17 129:1
150:16 153:5
164:14 191:13
199:24 200:16
202:16 207:17
211:2,19 232:23
323:6
provider 245:9
providers 54:6
96:13 228:1
provides 232:4
providing 94:22
public 2:10 6:14
30:6,10,19 31:2,7
59:20 70:2 96:22
98:18,23 103:10
127:15 128:5,6,8
158:20 159:2

318:15 348:7
361:6 363:10,18
364:15,23 365:23
publicly 91:25
164:10 165:1
186:11
published 195:13
316:9
pulls 288:23
purchased 270:12
270:13,14
purdue 1:10,12,14
353:15,16,17,20
353:22
purpose 38:12
78:4 113:10,12
115:14,16 149:19
150:4
purposes 15:11
29:14 63:20 66:4
92:23 108:23
109:21 110:17
111:22 144:4
149:24 169:1
172:11 191:21
217:5 218:5 219:9
224:2 267:16
299:18 316:12
324:4 333:4
pursue 30:18
344:20
pushing 128:13
put 16:19 18:1
34:1 39:11 47:8
59:23 84:17 88:1
88:12 95:6 103:10
110:13 117:18
138:11 181:17
183:9 236:11
258:21 260:20
264:13 293:5

306:9 308:25
314:16 318:7,8
321:24 322:8
324:6,22 327:15
332:19 334:7
348:18
puts 73:11 305:24
putting 321:9

**q**

qualifications
340:2
qualified 104:13
qualifiers 322:10
quality 34:17,18
34:21
quantify 256:20
257:2
quarterly 46:25
306:20 307:20
question 13:11,18
15:25 16:16,20
17:9,18 18:15,25
19:5,7,9,22,23
21:5 22:2,5 23:8
24:18 25:20 26:12
26:16,23 27:12,14
28:5 32:5,17,19
43:13 44:13 47:16
47:24 49:13 50:17
52:3,15 53:9,10
54:4,7,11 55:24
56:4 57:24 58:9
61:16 64:10 68:12
72:7,8 75:21
76:10 79:4 80:15
81:24 85:9 97:5
100:10,15 101:14
102:3,16 109:17
112:8,17 119:1,18
120:2,19 121:7
122:23 123:4

124:21,24 125:5,8
125:15 126:3
127:9 128:4,19
129:18 130:1,5,9
130:14 132:18
136:1,7 138:13,14
139:13,15,16,19
140:2,5,6,25 141:1
141:6,9,22 144:21
144:24 145:9,11
145:21 150:25
151:1,2,3,10,10,15
151:22,23 152:5,7
152:9,10,11,14,15
152:17 153:1,3
154:7 157:11
159:16,19 160:10
160:19,20,21
163:23 165:15,18
170:17,23 171:3
173:20,23 175:3
176:12,20 177:11
177:23 178:3
180:6 192:13
194:23,23 199:5
200:4 202:11
206:3,9 211:4
214:5,15,17
216:25 219:14,19
224:5,8 227:11
230:20,21 234:4,7
234:17,23 237:5
237:18,21 243:8
245:15 247:8,12
247:13,14 248:11
248:18,19,25
249:8 252:25
254:8,11 264:23
265:24 268:5
271:14,16 278:17
278:19 279:14

281:8 285:7 286:9
289:13 298:21
299:25 300:18
302:8,12 303:10
303:13,19,20
304:6 305:9
309:23 310:11
311:13,22 319:8
319:12 323:8,24
325:5 335:1,7,14
337:21,24 345:10
359:8,14
**question's** 16:21
143:18
**questioning**
334:18
**questions** 12:19
20:12 47:3 60:17
60:19 75:19
136:24 142:15
144:16 151:6
160:6 177:18,24
192:2,9,11,22,23
193:5,25 194:5,8
194:21 195:19
198:1 206:2
215:11 216:11,11
216:14,18,20,22
217:9,14 226:2
249:24 250:3,7
271:1 284:7,10,25
288:15 339:22
349:8 351:4
354:25 358:9
360:10 361:9
**quick** 64:16 107:8
144:17 238:2
252:23 273:18
312:8 318:16
335:8

**quit** 177:22
**quite** 273:17 315:6
**quota** 329:13,18
**quote** 130:16
**quoting** 336:23

**r**

**r** 117:9,9 361:1
**rabies** 35:6
**race** 323:21
**raise** 115:23 139:7
**ran** 100:9 148:20
**rank** 257:2
**rare** 282:4,12
**raskin** 1:24 2:10
10:4 361:5,21
**rate** 124:1 226:11
226:13 228:16
256:17,19
**rating** 257:13
**reach** 92:11
**reached** 171:21
357:20
**react** 336:16
**read** 14:25 15:9
16:10,11,18 17:24
17:25 24:23
125:10 132:23
133:4,12 144:14
144:17 145:6
150:22 151:1,8,15
151:24 152:4,6,10
152:13,16,23
154:19 156:20
157:6,14 165:2
173:9 189:25
192:8 193:4,23
194:12,17,20
195:18 196:20
202:7 208:1
273:18 281:3,10
301:2,8 346:1

351:7 355:9,15
363:5,6,12 364:5,6
364:17
**reading** 33:21
151:4 164:6 165:5
192:20 195:17,23
272:19 301:6,21
362:19
**real** 107:8 144:17
273:18 312:8
335:8 345:19
**really** 39:17,21,25
45:1 60:13 67:22
79:5 95:5 100:25
101:4 105:5 130:6
158:4 295:10
323:7 341:13
356:24
**reason** 13:4 64:21
87:12 139:18
180:18 213:20
247:4,9,14,20
248:5,10,12,14,20
248:24 249:4,10
269:5 278:8,20
279:2,17 282:18
282:24 297:3
308:16,19 362:14
364:8 365:3
**reasonable** 311:7
**reasons** 53:22
55:10 59:14 140:6
173:25 174:8
176:24 179:15
180:18 327:12
**recall** 19:19 43:22
44:22,23 50:24
61:6 64:8,10
77:12 81:25 83:3
84:7,10,12 90:22
91:24 92:18 97:15

98:21,22 99:14,17
100:1,4,6,8,9,11
100:19,20,22,25
113:8,18 114:2,8
114:20 116:13,25
117:5 118:19
119:14 121:8,18
121:20,22 129:9
131:9,15 134:2,10
135:16 136:23
147:8,16 148:23
149:17,22 150:6
154:18 156:19
157:8,9,21 158:2,7
159:8,10,14,17,20
159:21,22,22,23
160:1,14,24 162:1
162:12,15 163:13
169:13,16 170:2,3
170:7,14,24
171:19,20 172:23
174:5,12,13,19,20
174:22,23 175:5
175:10,17 177:3
178:19,20 179:1,2
179:12,20,21
180:6,22 181:7
182:3,4,7 185:14
185:15 186:7,14
186:19 187:15,20
188:1,2,7,13,19
189:1,4,7,10,13,16
190:6,12,13,23
191:4 201:15,19
203:8,10,12,25
204:18,22 209:11
209:13,18 211:24
219:8 225:16
229:12 230:6
231:7 233:4,10
241:1,10,14 243:1

245:20 246:7
255:25 264:20
266:23,23 271:25
275:8,9,10,15
283:9,12,13,20,21
285:1,12,15,23
288:16 289:3
292:5 295:7
296:14,16 298:22
301:6 302:21
311:2,5,10,11,16
313:1,3,15 315:22
317:5,12 329:7,21
329:24,25 336:17
347:23 355:2,3,12
355:19 356:12,16
356:19,22
**receipt** 111:1
112:1,11 114:12
152:1 362:18
**receive** 91:19
106:20 153:21
219:12,17 227:18
**received** 23:3 25:6
25:10 29:24 30:6
40:21 41:21 58:4
87:2 92:8,10
104:14 106:14
108:11 109:13
110:7 111:7,17
114:22 153:13,25
154:13 155:8
181:23 182:20
185:21 219:22
302:11 342:7
343:12 346:22
**receives** 85:10
**receiving** 117:2
**recess** 64:24
107:17 142:9
182:12 193:16

214:23 253:24
289:19 312:12
350:19
**recipient** 107:4
108:7
**recipients** 273:17
274:4,15
**recognition** 48:6
50:7 104:23
203:14 313:24
**recognize** 221:19
**recognized** 42:11
43:15 52:4 59:9
**recollect** 43:10
44:25 51:6,18
56:24 153:18
353:19
**recollection** 14:8
14:10,21 22:18
27:5,6 37:3 38:18
40:9 60:7 62:6
93:5,6 99:12
117:20 120:22
148:13 175:11
180:15 190:5
255:9,17 260:19
272:4 312:20
313:7 314:19
315:2 316:2 328:6
332:22 355:17
357:18
**recommendation**
241:5
**recommendations**
316:7
**recommended**
240:20
**record** 9:5,16
10:11,21 12:16,16
64:23 65:4,5,8,10
66:3 93:24 107:11

107:15,18,19
109:5 122:12
142:7,10,11 165:3
182:10,13,15,24
192:18,19 193:10
193:14,17,18
194:3,13 195:1,6,7
195:21,23,25
196:5,7,9,12,14,15
196:16 214:20,21
214:24,25 215:3
215:23 216:1,21
217:6,8 253:1,21
253:22,25 254:2
284:17 289:16,17
289:20,21,25
309:19 310:2
312:10,13,14
316:25 350:16,17
350:20,21 360:17
364:9
**recorded** 9:18
361:9
**recording** 9:14
**records** 250:20
288:14 324:19
**recovery** 185:8
238:22
**redirect** 360:14
**reduce** 133:16
**reduced** 361:10
**reduces** 134:22
**reduction** 95:16
132:4
**reentry** 96:5 185:9
**reevaluated** 87:6
**ref** 1:25
**refer** 225:15,23
271:8 305:21
311:4

**reference** 43:15
47:22 162:9
185:17 198:10
200:21 233:2
362:7 363:2 364:2
**referenced** 41:9
132:8 162:3
167:13 208:25
229:8 260:25
322:4 333:24
363:11 364:15
**references** 63:23
98:9 166:14
327:22
**referred** 168:18
188:22 274:5
**referring** 154:4
207:7 239:8
250:10 260:11,13
301:7
**refers** 134:15
167:23 235:15
307:13 329:13
**refine** 324:20
**reflect** 32:23 95:3
293:17 310:3,8
325:16 347:2
**reflected** 242:10
275:11 310:6
322:13 323:11
324:5 335:5,17
**reflection** 345:13
**regarding** 39:11
146:18 198:11
249:24 296:2
334:20 359:6,10
**regards** 100:1
**region** 98:11
**regional** 241:12
**registration**
328:12

**regulates** 357:11
**regulating** 357:16
**regulation** 329:15
**related** 8:6 10:5
17:14 34:20,20
39:9 44:17 47:9
47:12 48:18 57:22
58:25 68:15 70:15
70:22 71:13 72:3
72:18,23 75:5
78:17 81:17 98:20
99:20 100:6,13
108:22 112:23
157:22 158:8
167:11,25 168:9
168:12,20 171:1
183:13 187:6
193:5 220:3,12
227:8,19 237:11
250:9 260:23
272:22 273:1
276:6 295:23,25
296:12 298:14,16
299:11 306:10,12
309:4 316:14
317:24 318:2
325:19,24 326:14
326:20,25 357:21
361:13
**relates** 1:9 35:6
68:2 69:10 70:24
96:8,11 123:24
126:9,10 180:23
201:1,9 209:25
226:19 255:10
258:15 260:1,3
264:9 290:17
291:5 293:3,3,4,22
331:3,8
**relation** 72:3
99:19 148:3

153:15 227:3
302:12 333:14
337:7
**relationship** 75:20
98:18 127:2,23
137:22 167:8
228:6 232:1
246:17 247:2
249:25 250:8
291:11 300:9
301:3,12 302:9,18
302:25 303:14,15
304:1,6,9 305:12
305:18 306:6
**relationships** 39:5
146:14,16 303:4
339:20
**relative** 79:11
263:10
**release** 259:17,23
357:9
**released** 110:20
**relevant** 63:20
**relied** 58:7
**relief** 207:1 215:22
**relying** 92:22
236:20 237:8,23
**remains** 300:10
301:4,13
**remember** 63:4
84:11 86:9 93:7
99:24 136:25
141:9 148:25
154:5 158:15
160:17 165:14
189:20 228:15
241:1 289:1
297:23 309:23
317:11 322:9
327:19,20,21
332:2 333:11

359:5,9
**remembering**
315:25
**remind** 212:7
309:19 332:18
**remotely** 10:9
217:1
**rems** 356:14,17,19
356:20 357:2,5,6,7
**rendon** 65:14,15
102:11 103:23
241:2 306:22
**rephrase** 51:24
**replace** 83:22
84:15 89:8,19
332:13
**replacement**
331:25
**report** 7:22 24:16
24:20 73:24 74:8
77:9,10,14 78:1,7
78:17 79:12 80:2
158:13,16,21,23
159:2,6,12,14,18
160:3,16,25 161:4
161:8,15,21 162:2
162:8,16,24
163:10,14,16,18
163:24 165:8,20
166:6 167:14
168:19 169:5
170:12 172:24
173:2 181:10,18
185:17 189:23
190:1,3,6,14 191:1
191:10,13,21
192:2,8,10,16,21
192:22,23 193:2
195:10 198:3
209:2 222:10,12
223:10,14 224:4

224:13,16 246:7
261:15 276:23
289:1 316:7,10
318:18 319:23
320:14,20 322:3
324:5
**reportable**  318:14
**reported**  1:23 2:9
76:7 77:1,3 81:7
169:19,24 173:5
173:14 174:2,10
174:16 179:6,17
180:20 181:11
182:1 185:19
186:4,17 322:5
**reporter**  10:4 13:5
22:1 28:25 31:10
117:8 165:13
168:7 212:15
360:1 361:6 363:7
**reporting**  82:7
150:18 153:7
**reports**  24:24 74:4
74:10 80:24 81:2
81:9,11 94:23
159:9 160:18
162:13 304:13
**represent**  12:17
333:5
**representative**
38:25 312:24
**request**  146:19
147:12,18 148:3,7
150:3 153:15
215:21 221:4
364:9,11
**requested**  148:9
149:15 153:22
**requesting**  149:19
**requests**  79:19

**require**  240:11
**required**  136:4
362:25
**requires**  135:4
**requiring**  135:11
**research**  303:24
**researched**  300:11
301:4,13 302:20
302:23
**reserve**  215:22
**reserve's**  115:12
**residency**  115:13
**residents**  115:24
**resiliency**  73:5
**resolved**  13:16
**resource**  73:16
264:3 337:11
**resources**  38:7
83:25 84:3,5,11
86:3,8,18 87:5,13
87:15 88:9,11,14
89:22 90:6 139:8
139:24 143:8
327:4,8 334:5
336:19 337:6,14
339:24,25 340:16
340:22,24 341:1
341:18,25 342:16
342:16 344:2,16
359:20
**respect**  21:21
27:15 79:20 88:13
92:1 110:7 111:20
127:5 138:23
143:25 152:1
166:24 167:4,20
215:15 238:11
259:11 269:2,9
323:10 356:15
**respectfully**
159:21 249:9

**respects**  99:9
**respiration**  228:15
**respond**  119:8
131:24 144:20
156:10 194:11
232:23
**responded**  128:11
**responding**  95:11
146:10 194:4
**responds**  79:15,16
280:3 299:24
**response**  65:19
70:12 100:15
118:24 216:8
264:17 281:10
282:2 318:16
344:12
**responses**  215:11
**responsibilities**
37:1 46:20 67:1
69:5,16 70:8
71:15,16,23 72:2,9
72:12 74:11
135:21 136:8
138:7,18 215:8,13
215:16 245:25
267:8 289:6 315:6
327:25
**responsibility**
49:7 69:20 161:3
161:7,16,19 162:7
162:14,18,23
241:21 242:19
250:12,15 278:25
**responsible**  34:24
37:4 58:18 277:13
277:20,25 278:8
278:21 279:4,18
330:7,17 342:7
348:23

**responsive**  79:18
**rest**  194:24
**restate**  112:8
123:4 130:9
138:14 141:11
240:16 335:7
**restaurant**  33:1
**result**  245:10
246:4 344:1
359:16
**resulted**  295:5
**results**  143:2,5
191:16 245:17
276:9,15 286:10
289:12 344:5
**resumè**  7:14
**resumé**  29:16,21
29:23 30:5 32:6,9
32:22 33:19 39:22
41:9 42:1 46:4,5
63:6,23 90:9
101:25
**resurgence**  291:1
293:25 294:1,15
**retail**  358:16,18
359:1,12
**rethink**  334:11
**rethinking**  335:15
**rethought**  335:10
**returned**  362:18
**review**  112:4,13
112:23 113:4,10
113:13,16 114:3
114:16 117:4
121:1 129:7
145:14 148:12,15
149:25 191:9
194:3 195:5
220:13 226:9
232:16,17 249:20
267:9 285:16

286:6,8,16 288:23
289:9,11 305:22
306:10,15 307:2
308:1,9 312:18
313:5,11,19 314:4
314:5,23 317:18
340:21 362:12
363:1 364:1
**reviewed** 14:22
163:24 165:19
166:1 195:13
267:18 289:9
317:20
**reviewing** 114:11
162:23
**reviews** 268:14
**revise** 133:21
241:6
**revised** 120:23
121:2,5 208:18
350:5,5
**revision** 240:11,21
**revisiting** 335:2
**reyes** 7:18 51:14
235:21 242:8
251:19 271:6
306:2 312:24
**rhartman** 6:19
**rick** 88:17 334:10
336:5,6,7
**ridiculous** 177:15
177:17
**right** 22:4 24:22
25:21 26:25 27:10
27:14,24 28:3
30:7,22 32:19
34:6 36:8,24
41:11,23 43:9
47:16 52:9 53:2
54:18,21 55:6,19
58:20 60:19 66:16

70:4 76:8 77:1,4
77:16 90:8 97:24
106:17 107:1
108:4 110:18
118:17 119:24
120:3 132:22
139:14 142:4
145:9 147:1 149:6
149:25 151:9,23
154:7 155:3
160:11 164:8,17
168:11,13,16
170:23 175:21
176:1,6,9,17 177:6
181:5 192:13
193:1 200:14
205:25 206:3,9
213:6,23 215:22
223:19,22 225:18
231:16 232:7
234:17 237:21
246:20 258:10
261:17 265:22
266:12 269:3,7
273:10 276:1
277:8 281:17
290:16 292:8
296:19,21,24
297:13,18 298:6
298:10 306:14
307:14 309:5
310:7,9,21 313:3
319:12 322:2
325:10,11,14,20
325:25 326:3
332:14 333:25
335:11 338:12
343:24 345:8
347:15 351:8,24
352:23 354:3
355:7,11 356:5

**rigorous** 305:11
**rise** 308:22 309:4
309:11,17,21
310:14,17 312:3
**risk** 56:17 73:13
96:2,5 115:22
123:25 133:9
191:17 211:3,18
229:7 236:12
237:20 239:3
262:19 264:4
267:24 268:9
293:11 356:4,7,13
**risks** 244:15
355:25
**rite** 5:11 11:12
**road** 13:1 60:15
75:14 79:17
321:13
**rock** 129:16
352:25
**role** 37:2 38:20
39:13 49:7,15
53:6 54:8 56:22
67:15 75:7,23
77:24 80:20 82:4
82:18 89:7 95:19
103:10 105:4
116:24 129:4
161:2,6,17,20
166:24 167:4
176:17 208:23
209:7 215:7
242:14 289:7
330:1 349:1,1
354:4 358:19
359:1
**roll** 352:25
**room** 8:6 10:8
85:7,13 86:7
316:14 317:24

318:3 320:2,5,21
322:6,17,20 323:9
323:12,17 324:2
325:14,19,25
326:15,20,24
347:5,6
**rooms** 318:19
320:10 322:8,24
**rose** 312:21
**roseanne** 312:21
**roughly** 81:25
93:17,17 94:7
121:21 272:1
**round** 185:4
**routines** 25:17
**ruled** 194:1
**rules** 12:25 207:21
363:5 364:5
**ruling** 196:2
**run** 83:12 104:9
146:18 147:22
**rungs** 35:19
**running** 313:19
**runs** 62:7,10
**ruth** 6:18 65:12
**rx** 258:9

**s**

**s** 2:10 7:1,11 117:9
361:5 362:15
364:8,8 365:3
**safe** 42:18 240:4
**safety** 128:11
262:9,13
**sail** 149:9
**salary** 226:20
**sanitarian** 32:7,8
32:15 33:17,20
34:5,12,15,22 35:3
35:3
**sanitarians** 81:13
81:14

**sara** 184:18
**sat** 312:23
**satisfaction**
  231:20
**saw** 55:5,18 57:3
  60:22 61:17
  154:20 212:14
  232:8 262:25
  357:15
**saying** 37:15 82:22
  156:8 157:16
  277:4 280:16,21
  282:15 300:25
  308:8 309:2,7
  351:23
**says** 13:6 37:18
  39:22 42:1 68:10
  74:16 77:5 149:4
  169:18 197:7
  203:13 207:6,16
  222:10 223:15
  225:10,12,17
  231:19 237:16
  252:15 262:8
  276:16 282:2
  296:25 310:22
  320:24 325:1,6,21
  325:22 326:17
  335:22 336:3
  338:1,16 345:12
**scale** 228:9,10
  235:11
**scene** 286:6
**scheduling** 46:25
**schematic** 222:11
  252:14 290:7
**school** 73:16 264:2
  331:7
**schools** 35:4 62:11
  263:25

**science** 30:3
**scope** 49:9,20
  54:25 104:14
  119:8 204:4
  205:16 319:15
**score** 84:17 85:15
  87:1,2,10,20 88:15
  183:18,22 184:7
  335:24
**scored** 83:17
  84:19,25 85:2,4,8
  85:10,25 86:12,22
  227:7
**scores** 73:3,4,7,8
  73:12 87:9,19
  88:10 225:24,25
  226:5,8,8,18,19
  227:3,18,19
  231:20 232:2,3
  293:2
**scoring** 85:18 86:4
  86:15,21 87:1
  184:14,22 334:7
**scott** 3:4,8 10:17
  13:14 14:2 65:11
  111:13 151:17
  163:6 299:21
  362:5
**screen** 287:23
**screened** 280:8
**screening** 285:24
  286:1
**screens** 287:20
  298:3 327:9
**scrubbed** 324:7
**scrutinize** 251:1
**scrutiny** 328:18
**se** 256:1
**seal** 363:15 364:21
**search** 324:23

**second** 19:22
  37:15 124:22
  145:17 172:10
  207:14 274:2,8
  280:4 316:20
  335:21,21 345:20
**section** 63:8
  162:16 163:18,24
  165:19 166:2
  169:5 190:9,16
  191:1 192:2,6,14
  192:23,25 195:14
  195:16,18 196:20
  196:23 207:16
  276:9,16 322:3
**sections** 161:20
  162:8,23 192:24
  193:5
**sedation** 156:4
**see** 13:14 25:18
  27:2 29:18 31:19
  34:3 37:22 42:5
  51:16 60:11 63:9
  63:24 66:6,13,14
  71:8 74:16 75:24
  81:7 95:15,17,20
  95:23 97:21
  110:15 122:5
  124:5 128:13,25
  130:4,13 144:11
  144:13 147:2,15
  149:10 150:21
  153:3,11 155:12
  155:23 156:5
  163:11 164:5
  166:12,16 169:7
  169:17 173:7
  195:16 196:24
  197:1,10,20 198:6
  198:7,8,12 207:14
  207:24 221:14

  222:18 225:9,13
  225:21 228:25
  235:16 252:16,19
  258:17 259:18
  273:23 274:4,6,12
  275:6,22 276:18
  280:3,13 281:21
  282:7 295:1 296:8
  296:10 297:1
  299:23 300:6,12
  307:13 308:7,14
  308:15,23 309:1
  309:11,17,24
  310:17 320:17,25
  321:2 324:14
  327:12 333:8
  336:1,9 338:8
  345:18,24 348:20
**seeing** 34:2 55:10
  57:4,14,21 58:24
  59:14 61:2,23
  94:25 169:23
  227:9 282:4
  294:13 310:1
  321:3
**seek** 108:15
**seen** 15:13,14
  70:18 95:9 187:2
  197:12 253:10
  263:5 294:7,11,13
  295:3,16 309:4,21
  333:12 355:5,22
**sees** 108:25 109:23
**select** 274:14
**selected** 83:12
  87:18 89:19 90:1
  107:4 183:15
  335:2,12
**selection** 89:8,15
  333:15,22 336:24

**[self - slide]**

Page 53

**self** 235:15,23
236:2,11,14
**sending** 92:12
275:15,16
**senior** 345:22
346:3,13,15
**seniors** 331:10
**sense** 13:8,19
46:24 58:20 77:8
236:25 320:1
**sensitive** 9:8
**sent** 92:19 273:16
274:11,15 281:11
334:8
**sentence** 42:1
146:23 149:4
166:8 210:23
275:19 308:24
335:22
**separate** 41:7
120:10 121:6
**september** 8:7
316:15 317:25
326:16
**series** 85:9 250:6
**serious** 343:22
**seriously** 71:24
72:4,11 215:17
**serve** 46:12,13
**served** 42:22
46:10
**serves** 315:2
**service** 34:23,24
35:13,14,20 36:23
37:13 54:5 71:5
82:13,14
**services** 67:18
75:11 282:11
**serving** 42:2 43:2
46:22

**set** 75:15 331:7
361:8
**setting** 96:18
165:25 218:12
308:6 329:18
**settings** 210:16
**seven** 36:7 37:6
81:12,16 183:8
184:24 216:11
**sewage** 34:20
**sexual** 73:8 142:17
337:8,16 338:5,17
339:3,15 340:2
341:13
**sexually** 139:5
140:1,16,22
141:15 143:13,21
292:24 338:11
341:16,20
**share** 18:7,20 19:1
19:9,14,16 20:6
22:7 23:10 28:19
29:2 58:18 78:12
129:3 149:20
154:11 165:16
213:9 237:6
241:21 242:18
278:25 306:24
**shared** 56:25 57:1
58:17 75:8 96:13
104:23 105:1
253:18 306:21,22
307:22
**shares** 306:18,19
306:23 307:9
348:2
**sharing** 21:25 22:4
28:22 241:15
**sheet** 362:13 364:7
364:10,18 365:1

**sheriff's** 219:5
**shine** 8:9 333:10
335:20
**ship** 149:9
**shopping** 134:4,8
134:10,15,22
253:8,8
**short** 66:1 140:9
144:18 327:17
351:3
**shorthand** 361:6
**show** 163:1 221:8
304:13,15
**showed** 126:21
**showing** 275:2,24
**shown** 76:2,13
346:16 362:16
**shows** 77:3 305:17
**shy** 325:23
**sic** 35:9
**side** 77:4 297:2
**sign** 227:23 228:3
228:5,18 229:3
234:3,21 235:2,5
**signature** 361:20
362:14
**signed** 363:13
364:18
**significant** 42:12
50:9 103:18
239:15 280:7,22
**signing** 362:19
**signs** 228:14
**similar** 197:14
314:4
**simple** 219:19
356:18
**simply** 237:5
280:21 310:11
**sincerely** 362:21

**single** 209:13
222:24 310:23
**sink** 149:10
**sir** 120:1 175:19
309:20 362:10
**sit** 89:25 98:22
156:20 157:4,11
160:12,23 179:12
180:14 205:14
209:12,16,18
230:7,22 281:9
347:2
**sitting** 47:17 50:18
50:25 53:21
178:20 190:13
278:7,19 279:16
281:3 329:22
348:1
**situated** 314:24
**situation** 263:4
334:11,12
**six** 36:7 197:21
216:11 222:14
249:23 250:3
**skills** 78:15
**skimmed** 15:13
**skip** 90:23 97:16
**skoda** 99:23 100:3
100:16
**sleep** 42:19
**slide** 63:14 91:11
91:15,17 93:8
211:12 220:11,19
220:25 221:4,9
222:8,13 223:17
225:7 231:19
233:1 235:14
237:17 252:12
257:22 284:18,24
287:17 290:1
291:16 296:16,24

297:11,12 298:4
298:22 310:3,6
**slides** 220:13
221:1 222:2,14
296:14 320:16
**slightly** 60:20
278:16
**small** 231:10
297:13 298:5
328:11
**smaller** 272:10
298:15 299:10
**smiley** 228:10
**smith** 3:4,8 10:16
10:17 16:9,15
17:2,8,17 18:12,18
18:23 19:4,13,20
20:2,8,11,14 21:4
21:7 22:14,24
23:21,25 25:13
26:4,11,15 27:4,18
27:25 28:8,21
29:5 31:9,14,17,20
31:22,24 32:10
38:1 43:18,20
44:9 45:6 47:23
48:15 49:4,12
50:6,15,23 51:11
52:7,14 53:18
54:1 55:2,7,13,20
57:7 59:2,15
62:24 63:17 64:6
64:16 65:9,11
68:17 69:21 75:6
79:1,13 80:14,17
81:4,18 84:2
85:21,23 86:14
87:4,22 89:3,5,21
90:4 92:3,15 93:3
93:19 94:10
100:18 102:2,23

104:18 105:15
107:12 108:18
109:1,24 110:11
110:19 111:3,11
112:7,16 113:1,24
114:7 115:2,7
116:6,12,18
117:17,24 119:10
119:25 120:7,12
120:19,21 121:3
121:16 122:3,17
122:20 123:12,23
124:13,20 125:4,7
125:21,24 126:8
128:18 130:1,3
131:3 132:1,17
133:7,24 134:5,9
134:18,23 135:8
135:15,19,23
136:5 137:16,19
138:1,9,20,24
139:4,9,12,20
140:3,12,18,23,25
141:5,17,21,25
142:6,21 143:4,14
143:22 144:1,23
144:25 145:4,15
145:19 146:7,12
146:21,25 147:7
147:20 148:6,11
148:17 149:3,16
150:5,23 151:11
151:14,18,21
152:3,8,20,25
153:10,17,24
154:15,17 155:4
155:10 156:9,16
156:23 157:3,7,15
157:19 158:1,12
158:17,22 160:4,9
161:9,22,24 162:5

162:11 163:7
164:1,4,6,12,16,24
165:2,5,10 166:4
166:21 167:6
168:14,22 169:12
170:1 171:18,24
172:18,22 173:16
174:4,11,18,21
175:2,9,16 176:19
177:2,4,10,17,21
178:1,4,8,18,25
179:8,19 180:2,21
181:6,13,19 182:2
182:6 183:17
184:9,21 185:23
186:6,20,25 187:9
187:14,19,25
188:6,12,18,25
189:3,6,9,12,15
190:11,18 191:3
191:11 192:19
193:7,11 194:10
195:22 196:3,6,10
197:18,23 198:17
198:21,25 199:3,7
199:14,23 200:4
200:10,15,23
201:14,18,23,25
202:5,15,23 203:3
203:11,21,24
204:8,11,17,21
205:3,8,10,19
206:22 207:9,12
208:5,9,16,21
209:3,10,24 210:5
210:9,18 211:16
211:23 212:3,10
212:20 213:4,10
213:14,24 214:10
214:14 216:8
217:7 218:22

219:3 222:4,15,19
222:23 223:1,4,7
223:23 224:24
225:1 227:13
228:20 230:5,13
230:17 234:22
235:22 237:2
240:15 242:21
243:7,13,18
244:24 245:12,19
246:6,21 247:17
248:3,11 249:7,13
250:5 252:5,9
254:13 255:3,23
257:7 259:6
263:13,23 266:13
266:21 268:1
269:11 271:22
276:11 277:9,22
278:5,11 279:8,13
279:21 281:1,6,13
282:22 284:4,8
285:14 287:15
297:8 299:22
303:3,18 304:11
308:18 311:1,6
312:5 316:18
319:17 330:10
332:20 334:17,20
334:25 337:10,20
338:14,21 339:5
339:17 340:10
342:2 345:7,15
347:17 348:5
354:12,17,22
356:11 359:18,25
360:5,13 362:5
**snags** 146:18
148:21
**sobolewski** 77:23
78:1,8

social 240:1
soft 28:23
solid 36:2,18 45:2
solutions 362:1
  365:1
somebody 21:9
  39:4 73:11 103:22
  137:3 144:12
  184:12 305:3,3
  315:9 320:23
  322:25 323:1
son 106:7
sorry 14:16 21:8
  25:6,8 26:13,20
  29:3 32:12 33:20
  40:13 58:8,10,11
  71:7 80:16,19,25
  84:22 89:4 103:9
  103:15 108:3
  111:13 113:19,23
  125:4 129:13,15
  133:19 137:6,9
  139:1 141:3
  146:22 152:22
  155:14,17 159:15
  161:24 182:23
  183:23 212:16
  225:22 233:7
  234:8 239:17
  253:2 254:9
  265:13 289:12
  319:10 326:6
  328:23 345:8
  351:23 352:21
  359:7
sort 257:3
sound 45:5
source 42:12
  107:7 172:16
sources 93:2
  107:22 115:10

272:11
spa 70:15
span 37:6 77:7
speak 29:3 100:2
  102:4,9 104:3,21
  105:18,21 156:25
  157:1,2 184:16
  295:2,20 300:15
  300:24 304:22
  326:7
speaker 93:23
  231:9,19 232:7,25
speakers 47:1
  48:17
speaking 13:6
  27:9 98:8 124:7
  130:25 168:3
  238:15 272:2
  356:16
speaks 216:21
special 193:1,11
  193:21 194:1,11
  195:3 196:1,9
  202:6
specialist 323:9
specialty 30:17
specific 31:6 35:11
  43:22 70:23 92:9
  109:21 116:16
  131:9 144:16
  158:2,3 180:5,6,22
  183:13 241:3
  250:20,21 256:16
  256:17,19 257:12
  267:16,16 271:25
  285:2,6 288:17,25
  299:7 302:12
  314:17 317:6
  331:18 339:2,8,14
specifically 86:21
  113:15 253:5

295:25
specifics 61:7
  62:16 99:16,24
  135:24 292:15
  313:16
spell 92:5 315:16
spelled 117:9
spelling 165:23
  166:1
spent 110:18
  359:20
spoke 135:24
  193:21 220:9
  342:3
spreadsheet
  323:20
spring 212:4
squad 320:23
square 6:14
squarely 215:12
squares 197:8
staff 37:7 81:3
  88:3 221:1,2
  324:18 328:8
  342:22
stages 100:24
  101:2 313:24
stake 349:5
stamp 164:16,18
  164:20 165:9
  222:20,25
stamped 164:23
  222:15,19 276:11
  276:12
stamps 164:7,13
stand 31:23 32:1
standards 207:21
  207:23 229:21
  251:23 252:2
standing 334:23

standpoint 30:12
  38:24 40:4 45:19
  57:18,20 78:4
  99:11,12 260:6
  286:16 318:9
  319:21 320:8
  321:6,21 344:16
  346:19 356:2,2,16
start 61:13 137:9
  144:8 209:16
  236:10 238:23
  242:10 319:8
  328:23 332:22
started 27:15 33:7
  35:20 45:1,21
  94:16 114:8 159:8
  159:9,13,14
  160:18 273:15,23
  277:2 282:5,13
  307:1 321:3
  342:11
starting 52:25
  101:7 144:10
  177:5 348:20
  350:4 352:21
starts 150:13
  309:24 310:6
state 10:10,13 30:7
  48:6,14,24 49:3,21
  50:1,2 91:9
  135:12 178:24
  179:6,17,25
  180:19 181:4,11
  181:25 183:11
  218:8 221:3
  224:12 233:23
  240:9,21 251:15
  327:7,7 331:3,6
  332:5 363:10
  364:15

**[stated - suite]**

stated 30:25 59:23
201:4 206:23
210:21 303:25
309:21 310:13
335:23 336:4
338:3 345:21
statement 120:17
250:23 327:14
346:8 347:12,13
347:24 348:24
363:13,14 364:19
364:19
statements 300:14
300:19 301:1,10
301:24 329:4
344:23
states 1:1 9:21,22
32:9 102:6 169:5
258:25 259:3
266:11,19 267:1
267:11 269:24
270:19 272:5
273:8 306:20
327:18,25 329:14
329:20 330:3
345:20
statewide 42:16
48:20 62:25
321:11
statistically
305:12
statistics 284:6,9
stay 192:19 195:22
196:6 320:14
steady 129:16
stems 290:21
stenographic
361:12
stenographically
2:9 361:10

step 307:4,10
350:1
stepped 349:11
stepping 291:6
292:22,25 306:4
steve 102:4 103:22
306:21
steve's 103:25
sticking 322:2
sticky 271:7
stigma 56:21
57:11 95:19 103:4
103:17 238:5,12
238:14,24 239:4,7
239:8 240:5
290:13,16,17,22
291:19
stigma's 290:13
stone 292:23,25
306:5
stones 291:6
stop 13:17 58:10
166:16 167:1
177:6,13 360:7
stopped 315:20,22
straight 99:2
358:14
strategies 356:14
stream 34:19
street 3:12 5:13,21
6:6 31:18 266:4
streets 95:1 271:9
strength 57:12
236:6 260:2
strickland 7:24
189:18 190:3,8,25
316:6
strickland's
172:23
strictly 25:4

strike 19:21
157:20
string 7:17,18 8:3
8:4 215:14
strong 60:5 236:4
structure 34:13
342:20
structuring 37:9
struggles 307:6
students 114:24
115:5
study 30:9,19 31:7
studying 95:11
stuff 338:4,17
subcommittee
241:2
subject 7:19 8:4
48:18 98:1,25
104:25 119:6
121:11 124:19
135:17 172:16
178:1,4 193:22
200:19 201:3
204:7,15,20 206:6
206:16 207:19
209:20 210:4
211:6,22 213:6
220:9 239:12
329:6
subjective 228:13
subjects 24:15
105:13 216:5
submit 110:22
submits 110:16
submitted 15:10
15:16 18:10 149:5
149:8
subscribed 363:10
364:14 365:21
subsequently
261:6

substance 19:25
21:11,18,23 22:12
24:6 52:18 54:11
73:13 95:21 104:8
105:3 124:6
127:12 129:22
130:23 211:21
212:24 213:1,2,8
213:22 214:3,6,7,8
235:20 236:16
238:15,18 242:7
264:10,25 271:7
277:3 279:6 286:2
286:11,13,14
287:13 290:19
291:6,24 293:3,7
293:12,14,15,22
314:11 322:1
347:12,13
substances 21:16
21:19 22:19 24:20
26:3 27:17 28:6
28:16 118:6,13
135:5,14 136:3
213:11 253:5
266:4 270:6,18
305:13,13 328:2
328:14,19 329:15
substantive 166:2
successful 185:2
sud 236:23
suggest 134:21
suggested 155:19
185:11 350:1
suggestion 177:16
suggestions 116:9
suggests 148:20
281:19
suicide 293:22
suite 2:8 3:5 4:21
5:13,21 6:15 10:1

**[suite - task]**

362:2
**sum** 211:21
**summary** 161:23
  229:5 230:15
  265:25
**summer** 33:6
  154:16
**summit** 1:10 63:24
  64:5 90:17 98:14
  98:19,24 99:4,6,8
  99:15,18 100:1,12
**superior** 362:1
**supervise** 67:23,24
  68:1
**supervised** 67:21
**supervising** 37:4
**supervisor** 35:15
  36:22 37:13 66:14
  66:20 67:7,16,17
  68:7 69:3,8 71:2
  342:18,19 349:2
**supervisors**
  342:21
**supervisory** 75:7
  77:24
**supply** 279:12
**support** 345:22
  346:12,17,23,23
  358:23
**supports** 308:3,9
  308:11
**sure** 11:15 17:11
  19:10 20:10 27:14
  49:15 51:19 53:20
  56:5 61:15 64:18
  74:1 95:13 101:16
  112:10,19 119:3
  123:6 124:23
  127:19 130:10
  138:16 143:7,18
  144:15 147:21

159:25 163:8
164:21 165:4
175:5 196:3
202:12 205:13
214:19 222:23
224:7 234:15
240:18 243:15
253:2 254:7 256:7
264:21 271:20
273:7 279:16
289:15 293:20
297:4 334:19
339:6 348:13
**surgeon** 355:20
**surround** 315:4
**surveillance** 89:11
  137:7,24 318:10
  342:20
**surveys** 231:20
**swear** 11:13 12:1
**sworn** 12:6 363:10
  363:13 364:14,18
  365:21
**symposia** 210:15
  211:5
**syringe** 185:10
**system** 118:9,14
  118:17 119:7,17
  121:11 122:2
  124:25 125:17
  128:24 129:19
  131:8,13,18,23
  132:13 134:21
  135:6,13 147:14
  147:19 148:5,10
  148:15 150:18
  152:2 153:7
  154:14,21 155:3
  156:3 226:9
  239:25 319:14

**systematic** 117:4
**systems** 97:20
  98:5,10,15 101:11
  101:18 232:22

**t**

**t** 7:1,11 361:1,1
**table** 45:21,24
  105:6 315:4 325:6
**tabulated** 307:9
**take** 9:15 15:22
  23:13 28:18 64:13
  64:16 71:22 72:2
  80:17 107:12
  112:20 113:24
  140:24 141:2,4,6
  141:22 142:1
  151:9 173:22
  194:2,19 214:18
  262:22 289:14
  300:4 306:24
  312:8
**taken** 2:5 9:19
  10:23,24 64:24
  71:22 72:1,9
  107:17 142:9
  143:9,10,19,25
  182:12 193:16
  214:23 221:16
  253:24 286:18
  289:19 312:12
  339:4,9 344:13
  350:19 361:7,13
**takes** 38:18 40:10
  59:18,18 60:5
  103:18 215:16
  244:21 286:17
  347:4,4 348:11
**talk** 13:3 91:13
  102:7,20 103:12
  106:10 168:4
  176:11 214:11

235:23 252:21
256:25 260:8
276:25 291:18
294:18 342:18
346:19 355:20
**talked** 44:21 67:20
  88:17 127:22
  132:3 154:5 158:8
  166:15 167:17
  171:6 206:11
  211:9 217:16
  229:15 231:5
  242:8 249:20
  251:22 256:23
  258:6 261:9,14,17
  265:21 290:13,15
  309:13,14 331:23
  336:4 343:13
  346:21
**talking** 28:23
  55:15 59:8 83:10
  84:20 111:6 168:8
  171:8,10,10
  190:19 206:14
  226:3 237:14
  239:18 258:18
  292:9,22 295:18
  299:19 305:20,23
  305:25 335:10
  339:13 342:11
  343:14 344:8
**talks** 287:18
**tallman** 265:9,11
  265:12,15 280:3,6
  280:15
**tallman's** 281:10
**tameka** 84:12 86:9
**tar** 271:3,10,23
  272:12
**task** 7:23 39:20
  40:1,5,8,15,21

41:16,20 44:24
45:9,13,14 46:2
52:21,25 54:18
58:1,19 59:12,17
61:3,20 69:11,12
69:23 72:6,17
75:22 92:13 94:21
99:5,7,9,16 104:4
104:7 106:25
115:10 122:22
123:14 126:7,12
126:24 129:2,4
131:12 133:4
134:25 135:22
136:11,14,19
171:5 172:25
175:20,25 176:2,3
176:7,8,22 180:23
183:10 189:19,22
190:2,7,15,24
191:10,16,17,20
195:12 198:4
203:23 206:17
209:1,8 212:9,18
213:21 215:7
217:19 218:18
219:2,13 221:11
223:10,18 224:1,9
224:12,15,20
225:5 227:15
228:1 229:2
230:24 235:4,13
235:21 236:15,19
236:22 237:1,7
238:1 240:8,20,25
241:5,7,15,18
245:24 249:17
252:12 255:25
257:4,20 258:5
259:21 261:19,21
262:5,12 263:7,20

265:1 267:5 270:4
274:16,18,23
278:12 284:19
288:12 289:7
290:1 293:11
294:6 298:20
302:14,17 303:5
306:25 309:9
310:16 316:5
319:1 330:13
349:9,25 355:14
355:18
**tattoo**  67:25 70:21
**tattoos**  71:14
**tbis**  42:18
**team**  68:19 220:20
232:18 345:23
346:3
**technician**  6:23
9:4 10:25 11:13
11:17 12:1 64:23
65:5 107:15,19
142:7,11 182:10
182:14 193:14,18
196:12,16 214:21
214:25 253:22
254:1 289:17,21
312:10,14 350:17
350:21 360:16
**technology**  327:4
**ted**  51:14 235:22
242:7 251:20
271:5 306:2 316:6
**tell**  20:19 85:5
87:23 92:6 159:13
180:8,11 286:2
306:4 342:8,24
343:2 352:4
**telling**  19:3 58:23
87:24 281:5,9

**tells**  286:11 332:22
**tend**  300:1
**tenth**  6:6
**term**  109:9 134:3
134:8,14 167:20
238:21 249:15
253:8 304:24
305:8 311:3 318:2
322:9 329:12
336:24
**terminally**  260:4
**terms**  31:6 49:1,25
50:3,14,21 51:3,9
52:5 53:23 55:18
57:2 60:23 61:17
76:2,13 89:15
95:9 113:4 116:4
129:11,22 130:23
155:3 161:3,7,20
162:3 166:10
169:24 216:21
223:19 241:12
252:2 286:3
317:17 319:2,14
347:11
**terrorism**  318:8
**terry**  144:13
145:12,22,24,25
**test**  320:22 322:20
327:4
**testified**  12:9
215:16 355:4
**testify**  12:7
**testimony**  15:7
53:11,20 84:18,24
86:11 92:21
129:19 172:15,21
199:21 201:20
202:12 205:12
213:17 215:21,25
249:1 309:18

340:12 359:5,9
360:18 363:6,7
364:6,9,12
**teva**  4:3 11:4,24
353:24,25 354:1
**teva's**  354:4
**texas**  5:14
**thank**  10:25 12:14
71:11 79:25 84:22
96:16 145:19
163:7 164:4
165:10 182:9
191:19 192:5
215:2 223:7
271:21 291:18
297:7 299:22
313:4 316:18,19
318:23 334:25
350:15 358:8
360:8
**theft**  254:17,21
**therapy**  106:1
**thing**  26:18 99:14
129:13 271:20
**things**  62:16 71:8
94:25 96:7 104:19
104:22 236:25
238:24 271:15
291:3 318:15
324:9 327:2 343:1
348:12
**think**  22:3 26:5
27:10 28:9 30:11
44:3,20 50:7,16,25
57:11,18 59:3,7,16
61:9 62:14 65:13
68:18,25 69:22
74:5 76:17,19
78:3 93:20 94:11
96:2 99:14 100:8
102:24 103:7,24

104:20,21 105:4
122:4 123:24
124:4 126:19,23
155:18 167:8
202:8 210:22
216:12,21 217:3
223:2 229:6
239:21 242:4,9,14
254:13 260:1
278:7,20 279:2,17
290:18 291:14,19
292:4 293:16
295:14 301:20
304:12,14,23
309:13,16,24
311:7 312:23
319:5 322:21
323:24 324:12
325:2 327:2,6
334:21 338:22,23
338:25 344:4
346:5,20 348:6,12
348:14,19,22
355:17
**thinking** 74:5
103:15 156:11,14
239:6 288:20
**third** 37:12 95:24
274:10 292:18
**thirds** 155:13
**thirty** 362:18
**thomas** 265:9
**thorough** 220:4
286:6
**thought** 26:7
43:14 58:11
113:20,22 129:13
147:11 239:5
254:9 263:1
334:12

**three** 74:24 81:14
81:14 84:16 85:7
85:12 86:17
184:23 194:16,17
194:18,19,20,21
195:23 196:11
334:6
**threw** 34:3
**throw** 155:14,17
248:24
**throwing** 82:23
**thumb** 236:7
**ticks** 68:3
**till** 25:7 26:11
40:10 47:24
311:15
**time** 10:13 13:3,7
13:17 17:6 29:17
30:14,25 33:3
35:21 36:13,14,17
37:5 38:8,23
39:18 43:15 45:11
45:22 46:5 49:11
49:22 50:9,22
51:18 53:16,24
55:18 56:11,18
57:6,16,23 58:23
59:4,7,8,16,18,18
60:9,22 61:5,6
62:20 63:5 67:13
77:9,13 80:17
82:8,13 89:24
90:2 91:16,21
92:4 93:5 99:23
103:20 113:24
130:11,12 131:13
131:14 148:10,24
149:15 156:17
159:10,17 160:1
160:14,24 162:12
168:2 170:12

171:13 174:5
178:12,21 179:2
179:13,21 180:16
182:8 184:15
194:19 195:13
204:6 210:21
211:25 220:8
240:8 243:14
246:9 258:16
261:4 266:23
279:15 286:2,10
286:12 289:4
307:4,5,11,15
308:4 309:25
313:23 314:14,23
315:5 325:10
329:23 334:8
342:12,21 344:20
346:6 347:3,4,14
347:19,21 348:11
350:1 351:3
357:15
**times** 55:1 93:10
106:12 177:5,11
204:1,14,18,20,22
215:18 216:11
217:17 236:21
238:6 299:25
325:8
**tips** 12:25
**tirf** 357:5,6,7
**title** 70:25,25
167:21 317:23
**titled** 163:19
**tobacco** 355:21
**today** 12:19,21
13:22 47:17 50:18
50:25 51:13,21,23
53:11,20,21 54:14
55:16 63:21 84:18
84:24 89:25 98:23

101:22 109:9
136:25 149:9
156:20 157:4,12
158:8 160:12,23
170:22 171:12
178:20 179:12
180:14 182:19
191:22 199:21
201:20 202:12
205:14 209:12,16
209:18 213:9
216:7 230:7,22
238:6 256:24
258:18 265:20
278:7,20 279:16
281:3,10 290:10
290:16 291:20
292:6 295:18
327:18 329:22
331:23 332:16
333:4,24 334:4
338:10 340:13
348:1 357:14,15
359:5,9
**today's** 63:7
360:17
**told** 27:7 45:4
142:1 164:22
233:20 335:19
336:6,7 340:18,19
341:15 342:13
344:15 348:25
**tolerance** 96:6
**tom** 274:24 275:1
275:21,23
**tom's** 294:25
299:6,13 310:19
**tool** 117:18,22
293:5 321:14
**top** 56:24 74:15
114:9 158:18

[top - type]                                                                                    Page 60

169:19 173:4,13
174:1,9,15,25
175:7,14 176:25
178:23 179:5,16
180:19 181:3,10
181:25 185:18
186:3,17 224:22
225:9 228:14
257:13 292:5
315:17
**topic**  334:20
**topics**  47:1
**total**  297:17,21
298:10 325:19,24
326:14 360:18
**touch**  342:10
**tough**  239:7
**tower**  2:8 6:14
**tox**  287:23
**toxicological**
327:9
**toxicology**  24:20
24:23 285:24
286:1,10 287:20
298:2 322:15
**traceable**  155:20
**track**  314:6 318:6
318:13
**tracking**  322:1
**traffic**  168:9,13
**tragedy**  305:3
**train**  114:23 115:4
**training**  115:11,14
115:16 116:2,8,14
116:17 264:12
331:8
**trainings**  115:8
**transcribed**  363:7
**transcript**  8:12
361:12 362:11,12
363:5,12 364:5,11

364:17
**transcription**
361:11
**transcripts**  14:25
**transfer**  70:22
**transition**  41:17
41:24 45:8 300:1
**transmucosal**
357:8
**transported**  320:4
**transposed**  33:23
**trauma**  97:20 98:5
98:10,15 101:11
101:18 291:4
292:11
**treat**  228:3 328:19
**treated**  156:3
344:8
**treating**  207:18
227:8 228:18
229:3 234:2 235:1
236:23
**treatment**  54:6
57:18 73:18 96:13
97:19 98:8 104:9
105:22,24 198:11
234:20 236:16
239:7 242:7 280:9
280:24 282:11
328:20
**trend**  58:24 166:7
170:4 275:2,12,24
294:11,12
**trends**  17:5,13
47:20,21 48:12
49:1,10,20,25 50:3
50:13,20 51:2,9
52:5,11,13,22 53:4
53:15,23 55:5,11
55:18,22 56:3,10
56:13 57:2,4,14,21

59:9,14,19 60:23
61:1,17,23 62:5,22
64:12 72:10 92:2
93:11 94:6,13
95:3,9,15 96:12
99:20 100:13
113:14 116:4
121:12 129:3
130:24 148:19
157:22 158:7
162:3 169:24
170:11,21 171:1
171:14,23 178:16
183:13 186:23
187:23 212:1
220:2 230:11
237:10 238:12
241:22 242:19
290:6 292:12
314:1,17 319:4
330:17
**triangle**  297:13,16
**tried**  55:4 220:7
322:25
**true**  169:23
186:13 269:2,9
361:11
**truly**  321:10
**trumbull**  136:20
**truth**  12:7,7,8
**truthfully**  216:16
**try**  13:2 16:1 29:3
29:5 48:11 49:9
49:19 55:9 56:5
60:24 61:10,21
62:3 118:23 119:7
121:11 130:16
170:10 173:12
174:14,24 175:6
175:12 176:24
178:22 179:4,15

179:24 181:2
288:1 293:5
324:19
**trying**  13:5 18:1
48:3 59:17,21
60:10,21 71:8
99:12,19 106:5
112:18 120:16
123:1,21 125:11
128:1 130:16,18
139:14 160:7
213:12,16 234:12
237:19 285:19
297:14 305:7
308:1 313:25
314:9,15,20 315:5
317:11 319:3
321:13,24 349:5
350:9
**tucker**  4:20 11:6
**tuckerellis.com**
4:25
**turn**  9:10 63:6
90:8 198:2 258:17
270:25 273:10
310:4 319:22,25
**turned**  310:2,4
**turning**  289:25
**tv**  258:17
**twelfth**  3:12
**two**  14:8 22:17,19
27:8,15 28:14
86:6 97:24 145:15
154:24 155:13
185:11 212:22
258:22 262:18
271:15 303:9
305:12 333:23
349:20
**type**  45:23 314:18
314:21 318:10

[type - use]                                                                                    Page 61

324:23 359:23
**types**  323:23
**typically**  63:14

**u**

**u.s.**  270:14
**uh**  44:4,8 91:5
  127:25 142:18
  160:13 166:9
  173:10 210:14
  211:8 212:6,13
  225:11,19 231:22
  233:13 258:11
  276:2 304:3
  307:17 323:14
  326:4
**ultimate**  83:21
  84:9,14
**ultimately**  87:18
  288:3
**undercover**  58:15
  62:9 135:1 269:19
  270:1 272:2 313:2
**underneath**
  344:21
**understand**  13:10
  15:25 28:20 32:13
  32:25 45:18 48:12
  48:19 49:9,19
  54:16 55:10 56:6
  60:21,25 61:22
  62:3,21 65:12,18
  75:4 76:3,15
  78:24 79:20 86:11
  99:19 104:9
  106:16 107:25
  109:6,10 118:23
  119:7 120:1,16
  121:12 122:15
  123:2,9,21 125:8
  125:14 127:8
  128:1 129:24

131:20 139:14
146:5 148:2
149:18 156:7,14
156:18 168:15
170:10,16 171:3
173:12 174:14,24
175:6,12 176:13
176:24 178:22
179:4,15,24 181:2
202:19 203:19
213:13,16 219:14
238:8 250:2
254:19 257:1
266:2,7 277:11
280:15 281:5
294:18 304:24
311:19,20,23
313:9 318:1,16
319:3 326:21
333:21 337:21
341:21,21 359:7
**understanding**
  23:17 30:13 31:1
  46:15 53:3 56:1
  95:18 101:23
  103:1 118:3,4
  120:15,24 122:24
  123:6,17 126:2
  127:1,14 128:14
  130:12,21 131:22
  132:12,23 133:2
  134:7,14 137:14
  150:2 153:12
  156:22 157:5,12
  167:22 170:20
  183:20 194:6
  198:14,23 200:6
  203:5 204:24
  205:14 206:1,4,8
  206:18 208:3,7
  217:15 227:6

228:2 253:3
263:12 265:2
270:5,10 272:14
276:21 291:24
311:18 319:15
322:12,18 327:24
336:22 338:25
340:20 347:4
357:1
**understands**  262:6
**understood**  43:6
  127:19 171:12
**undertake**  48:11
  49:19 60:24 61:4
  61:21 110:25
  172:9 175:12
**undertaken**
  171:13
**undertook**  60:19
  61:25 62:3,20
  170:10 174:24
  175:6 176:24
  178:13,22 179:4
  179:15,23
**undertreatment**
  203:15
**unexpected**  314:6
**unfair**  271:14
**unfavorable**
  238:12
**unforeseen**  146:18
  148:21
**unfortunately**
  221:24 270:13
  293:18 307:2
**unintentional**
  42:11 162:9
  163:19 165:21
  168:1,5,9 169:6,10
**unique**  321:23

**unit**  9:17
**united**  1:1 9:21,22
  102:6 258:25
  259:3 266:11,19
  267:1,11 269:24
  270:19 273:7
  306:20 327:18,25
  329:14,20 330:3
**units**  328:25
  360:19
**university**  29:25
  30:7 31:13 32:3
  32:21 264:22
  331:7
**unknown**  93:22
**unqualified**
  105:12
**unscrupulous**
  256:3,8
**unused**  162:10
  163:20 165:21
**update**  94:24
**upper**  66:10
**upset**  342:12,25
**upward**  294:11
**use**  19:25 21:10,18
  21:23 22:12,20
  24:6 27:4 38:15
  56:20 60:12 63:14
  64:20 78:14 91:11
  96:11 108:24
  109:6,9,22 114:22
  122:21 128:24
  130:22 133:13
  135:5,12 149:24
  203:1 213:1,2,8,22
  214:7,8 218:4
  219:9 220:11,14
  221:4,21 225:10
  234:14 235:25
  240:24 249:15

261:10 264:18
266:20 268:23
277:21 291:1
293:12,25 294:2
302:10 320:6
321:14,25 328:12
355:24 356:2
**useful** 319:2,14
**uses** 107:24
**usually** 35:10
93:16 216:14
238:22 293:15
**utilization** 118:23
126:13 127:7,15
127:21 128:15
129:10 130:22
131:18,23 132:13
134:21 136:2
319:2,13
**utilize** 129:21
131:8
**utilizing** 119:7
121:11 128:3
131:13 132:25

| v |
|---|

**v** 1:10,12,14 362:6
363:3 364:3
**va** 233:11,12,14,16
235:22
**vacant** 77:1,18
**vacating** 349:16
**vague** 18:15
**valid** 305:12
**value** 95:18
319:21
**variables** 288:22
323:23
**variation** 241:12
**varied** 94:8
**various** 204:14
322:4

**vary** 93:18
**vast** 245:10 246:4
**vector** 35:5 68:1,2
**veritext** 10:3,5
362:1,7 365:1
**veritext.com.**
362:17
**version** 164:23
165:8 224:23
**versus** 9:21
**veterans** 233:15
**victim** 286:17
**victims** 156:2
**video** 6:23 9:4,14
9:18 10:25 11:13
11:17 12:1 64:23
65:5 107:15,19
142:7,11 182:10
182:14 193:14,18
196:12,16 214:21
214:25 253:22
254:1 289:17,21
312:10,14 350:17
350:21 360:16
**videographer** 10:3
**videotaped** 1:18
2:5
**view** 48:25 49:24
50:2,12 56:20,21
89:18 120:5 122:8
134:20 228:25
230:3,23 236:18
237:6 241:17
259:1 290:19
302:3,5 303:25
310:15 318:25
319:13 330:5,11
**viewed** 343:22
**views** 16:5,13 18:7
238:11

**vince** 8:9 9:18
10:18 73:21,24
74:7 80:21 81:20
81:22 82:20 83:12
84:21,25 85:1,19
86:4,13,18,23,24
87:2,7,18 88:3,12
88:14,22 89:8,15
89:19 90:1,7
184:13 331:24
332:13,19 333:15
333:23 334:3
335:23 336:4,5,7
337:18 338:3
345:21 350:13
360:18
**vincent** 1:18 2:5
7:5 12:4 362:8
363:4,9 364:4,13
365:20
**violate** 328:13
**violation** 147:22
**violence** 73:10
**virginia** 5:22
**virtually** 216:24
**virus** 68:4,4
**visit** 23:11 96:16
226:4,11,14
323:17,22 325:14
**visited** 235:9
**visits** 8:6 316:14
317:25 318:3
322:6 323:12
324:3 325:9,20,25
326:15,20,24
**vital** 227:23 228:3
228:5,14,18 229:3
234:2,20 235:2,5
**vivitrol** 280:9
**voice** 29:6 352:22

**volume** 121:25
122:13,25 123:7
123:20 124:11
125:1,18 132:14
241:12 244:18
**volumes** 134:17

| w |
|---|

**wacker** 4:12
**wait** 25:7 26:11,11
47:24 311:15
**waived** 362:19
**walk** 31:18 64:21
319:6
**wallace** 77:3,9
78:2,20 79:14
86:10
**walmart** 5:3 11:10
**walt** 79:23
**want** 11:15 12:25
19:11,20 20:16
38:9 44:20 51:19
54:14 58:10 60:16
91:21 106:8
107:10 127:24
130:7 140:10
141:24 144:6
147:21,23 150:12
150:24,25 151:3
151:11 164:5
172:20 178:5
182:24 192:1
195:18,24 197:25
202:3 205:24
206:7 211:10
229:14 273:13
301:9,15,25
307:12 313:7
324:13 331:5
348:15 350:11
**wanted** 30:18 31:6
107:13 129:24

[wanted - working]

194:2 215:22
344:23 349:7
**wants**  19:8 141:25
142:2
**warned**  343:7
**warning**  355:20
**warnings**  355:15
355:24
**washington**  3:13
6:7
**waste**  36:2,18
**water**  34:17,18
107:9,14 122:9
234:10 344:20
352:24
**way**  13:15 18:14
19:11 32:13 35:18
46:11 53:22 66:12
75:15 77:2 92:10
95:20 109:4
114:11 116:10
117:22 120:9
122:8,13 128:11
137:18 143:11
155:13 213:19
221:24 222:7
226:5,13 228:17
229:20 230:8
236:24 241:25
244:5 246:8,23
247:11 258:12
259:7,20 261:20
263:18 264:21
265:5 266:17
268:3,7,11 271:8
272:6,8 274:10
276:24 280:18
292:10 294:1
302:1,3,5 305:2,11
308:20 311:13
329:10 330:7

342:17 344:9
346:8 347:7
348:25
**ways**  313:25 314:5
321:25 346:14
**wc.com**  3:16,18
**we've**  70:18 105:4
111:2,14 114:18
146:24 158:8
216:5 256:23
257:22 258:6
261:9 263:5
265:19,21 290:8
290:13 294:6,11
315:3 327:22
334:21 348:18,19
**web**  313:1
**website**  164:11
186:12
**webster's**  253:17
**wednesday**  1:19
2:3 9:2
**weight**  323:21
**welcome**  66:1
142:14 217:13
289:24
**wellness**  82:16
**wendy**  4:8 11:3
351:1,23
**wendy.feinstein**
4:9
**went**  12:15 66:2
83:16 85:1,6 86:3
86:16 87:6,24
111:23 128:4
135:25 148:8
214:12 228:6
285:19 321:13
324:7,14 334:6,11
337:13,13 339:23
340:21 341:8

342:6,10,16,24
343:1 357:14
**west**  4:8,12 5:22
11:3 68:3 351:1
**western**  115:12
116:16
**westshore**  62:9
294:6
**whatsoever**  89:14
**when's**  211:25
**whispering**  9:8
**white**  281:4
**whitney**  6:23 10:2
**wholesale**  247:25
248:6,21 249:5,11
330:2,6,16 331:21
**widely**  93:18 94:8
**widespread**
252:15 261:10
**williams**  3:11
10:20 11:2
**willing**  18:20 19:1
19:14,15 20:6
28:18 29:1 213:9
**willingness**  95:22
**wise**  20:4
**withdraw**  343:15
343:19
**witness**  3:3 7:4
11:14 12:2,5
18:24 19:1 21:6,8
26:13,17 27:2
28:23 29:1,7
80:16 89:4 111:13
140:24 141:3,7
164:5 177:6,9,15
193:4,23 194:2,6
215:4,15,20 216:4
216:10 239:17
362:8,11 363:1,4
363:11 364:1,4,15

**witnesses**  215:24
**witness'**  362:14
**woman**  338:4
**women**  139:6
140:1,17,22
141:15 143:13,21
262:20 338:12
340:5
**wong**  228:9
235:11
**word**  68:25 142:3
167:22 197:7
327:21 340:3,4
**words**  156:24
157:6,13 260:22
311:8,23 321:19
**work**  31:6 32:2
35:18 56:2 58:16
59:21,24 60:11
69:5,9,17 70:6,14
70:20 71:4,12
72:19,20,23 73:20
73:25 74:2 76:7
76:20 78:2,4,17
79:14 81:17 104:6
116:19 119:20
132:20 137:3
144:19 206:16
232:13,18 234:13
240:1,5,9 245:23
260:17 270:3
305:21 314:15,21
321:11 338:23
343:8
**worked**  32:25 33:4
33:11 56:5 115:11
116:21 133:6
136:20 313:22
317:13,14 346:11
**working**  36:11,15
37:20 39:8 47:2,6

[working - zoonotic]

68:22 70:12,16
72:5 73:15,23
79:8 82:2,12,14,15
94:16 127:1
131:11 137:21
239:23,23 263:24
264:2,5 270:15
313:21 315:1,20
315:23 317:6
339:21
**works** 12:24 144:8
281:20 315:18
317:15
**world** 43:1
**worried** 226:18
227:7
**worrisome** 49:1
49:25 50:5,13,20
51:2,8 52:5 53:4
53:15,25 55:11,18
55:21 56:3,10
59:9 62:22 116:4
157:22 158:7
169:24 178:15
**worrying** 52:11,13
52:22 60:22 61:17
**write** 13:5 146:17
147:4,5 244:2
276:23
**writes** 150:14
155:25 280:6
282:1 300:8
**writing** 78:12
79:16 184:2
**written** 15:9,15,23
18:1 122:12
132:15 243:6,12
243:17 316:25
347:8 357:25
358:1

**wrong** 143:16
354:11
**wrote** 144:11
153:4 155:16
156:8,11,15,18,21
157:6,13 173:3
181:9 301:10
307:23 308:17

**x**

**x** 7:1,11

**y**

**yeah** 14:19 19:10
30:22 45:10 48:4
62:6 64:18 66:24
81:5 90:20 91:15
113:22 140:8
147:2,3,16 222:4
223:5,14 224:25
231:15 234:9
236:10 237:5
271:20 275:23
293:13 297:6
307:20 323:18
332:4 335:9
**year** 14:11 25:25
37:11,11 48:4
72:16 94:11
106:19 108:11,12
108:13 111:14,15
115:12,24 132:6
139:1,1 180:8,10
183:3 226:20
227:8,19 253:10
310:23 311:4,24
314:7 315:24
325:1 348:16,17
**year's** 111:4
**years** 26:1 33:5
35:17,23 36:7,16
42:23 43:5 54:23

60:5 69:6 70:19
74:24 77:10 94:18
94:24 95:10
106:23 108:17
182:22 212:23
242:16 264:18
290:21 299:3,10
308:23 309:3,22
310:15,23,25
311:4,8,9,20,24
313:4 349:20
356:17
**yesterday** 13:25
**yocum** 6:9 11:21
11:21
**york** 299:24
**young** 2:7 115:24
264:2
**youth** 62:10,10
331:10

**z**

**z** 88:7
**zachary** 4:15
11:23
**zachary.lazar**
4:16
**zealand** 258:25
**zika** 68:4
**zip** 320:8
**zoloft** 258:19
**zoonotic** 348:10

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.