```
 1              IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

 2                   EASTERN DIVISION

 3

     IN RE:  NATIONAL PRESCRIPTION    ) No. 17-md-2804

 4   OPIATE LITIGATION NO. 2804       )

                                      )

 5   APPLIES TO ALL CASES             ) Hon. Dan A. Polster

                                      )

 6

 7              HIGHLY CONFIDENTIAL - SUBJECT TO

 8               FURTHER CONFIDENTIALITY REVIEW

 9

            VIDEO DEPOSITION OF LISA CARDETTI

10

                   January 10, 2019

11                    7:59 a.m.

12

13

14        Reporter:  John Arndt, CSR, CCR, RDR, CRR

                  CSR No. 084-004605

15                 CCR No. 1186

16

17

18

19

20

21

22

23

24
```

Page 2

```
1       DEPOSITION OF LISA CARDETTI produced,
    sworn, and examined on January 10, 2019, at Williams
2   Dirks Dameron LLC, 1100 Main Street, Suite 2600, in the
    City of Kansas City, State of Missouri, before John
3   Arndt, a Certified Shorthand Reporter and Certified
    Court Reporter.
4
5       APPEARANCES OF COUNSEL
6
    On Behalf of Plaintiff:
7       Robbins Geller Rudman & Dowd LLP
        120 East Palmetto Park Road, Suite 500
8       Boca Raton, FL 33432
        (861) 750-3000
9   BY:  MR. MARK J. DEARMAN
         mdearman@rgrdlaw.com
10      MR. RICARDO J. MARENCO
         rmarenco@rgrdlaw.com
11
    On Behalf of Mallinckrodt:
12      Ropes & Gray LLP
        Three Embarcadero Center
13      San Francisco, CA  94111
        (415) 315-6358
14  BY:  ROCKY C. TSAI
         rocky.tsai@ropesgray.com
15
        -and-
16
        Ropes & Gray LLP
17      800 Boylston Street
        Boston, MA  02199
18      (617) 951-7000
    BY:  CASSANDRA A. LARUSSA
19       cassandra.larussa@ropesgray.com
20  On Behalf of Walmart:
        Jones Day
21      100 High Street, 21st Floor
        Boston, MA  02110
22      (617) 960-3939
    BY:  CHRISTOPHER MARKHAM
23       cmarkham@jonesday.com
24
```

Page 3

```
1       APPEARANCES OF COUNSEL (CONTINUED)
2
    On Behalf of Endo Pharmaceuticals:
3       Arnold & Porter
        601 Massachusetts Avenue, NW
4       Washington, DC  20001
        (202) 942-5000
5   BY:  MR. DAVID E. KOUBA
         david.kouba@arnoldporter.com
6
    On Behalf of Tennessee Action:
7       Branstetter, Stranch & Jennings, PLLC
        223 Rosa L. Parks Avenue, Suite 200
8       Nashville, TN  37203
    BY:  MS. TRICIA HERZFELD
9        triciah@bsjfirm.com
10  On Behalf of Cardinal Health:
        Armstrong Teasdale LLP
11      7700 Forsyth Boulevard, Suite 1800
        St. Louis, MO  63105
12      (314) 621-5070
    BY:  MR. PAUL L. BRUSATI
13       pbrusati@armstrongteasdale.com
14
    Also present:  Jacob Arndt, videographer
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1           INDEX OF INTERROGATION
2   Examination by Mr. Dearman        Page 9
    Examination by Ms. Herzfeld       Page 251
3
4           INDEX OF EXHIBITS
5   Exhibit Mallinckrodt-Cardetti-001    Page 11
    (Notice of deposition)
6
7   Exhibit Mallinckrodt-Cardetti-002    Page 16
    (Lisa Cardetti's CV)
8   (MNK-T1_0007896477 - MNK-T1_0007896478)
9   Exhibit Mallinckrodt-Cardetti-003    Page 54
    (Letter to Lisa Cardetti)
10  (MNK-T1_0007219775)
11  Exhibit Mallinckrodt-Cardetti-004    Page 78
    (Covidien Pharmaceuticals Specialty
    Generics Strategic Plan 2013-2017)
12  (MNK-T1_0002330117)
13  Exhibit Mallinckrodt-Cardetti-005    Page 107
    (McKesson sales & rebates)
14  (MNK-T1_0006435043 - MNK-T1_0006434404)
15  Exhibit Mallinckrodt-Cardetti-006    Page 110
    (E-mail)
16  (MNK-T1_0006434382)
17  Exhibit Mallinckrodt-Cardetti-007    Page 115
    (E-mail)
18  (MNK-T1_0006434566 - MNK-T1_0006434567)
19  Exhibit Mallinckrodt-Cardetti-008    Page 121
    (E-mail)
20  (MNK-T1_0000448664)
21  Exhibit Mallinckrodt-Cardetti-009    Page 130
    (E-mail)
22  (MNK-T1_0000266730)
23  Exhibit Mallinckrodt-Cardetti-010    Page 136
    (E-mail)
24  (MNK-T1_0000383314)
```

Page 5

```
1           INDEX OF EXHIBITS (CONTINUED)
2
3   Exhibit Mallinckrodt-Cardetti-011    Page 140
    (E-mail)
4   (MNK-T1_0000306449 - MNK-T1_0000306450)
5   Exhibit Mallinckrodt-Cardetti-012    Page 144
    (E-mail)
6   (MNK-T1_0000265238 - MNK-T1_0000265240)
7   Exhibit Mallinckrodt-Cardetti-013    Page 151
    (E-mail)
8   (MNK-T1_0000456392 - MNK-T1_0000456407)
9   Exhibit Mallinckrodt-Cardetti-014    Page 160
    (E-mail)
10  (MNK-T1_0000305508)
11  Exhibit Mallinckrodt-Cardetti-015    Page 162
    (E-mail)
12  (MNK-T1_0000298461)
13  Exhibit Mallinckrodt-Cardetti-016    Page 164
    (E-mail)
14  (MNK-T1_0006319432 - MNK-T1_0006319433)
15  Exhibit Mallinckrodt-Cardetti-017    Page 167
    (E-mail)
16  (MNK-T1_0006321620 - MNK-T1_0006321622)
17  Exhibit Mallinckrodt-Cardetti-018    Page 176
    (E-mail)
18  (MNK-T1_0005540821 - MNK-T1_0005540822)
19  Exhibit Mallinckrodt-Cardetti-019    Page 178
    (E-mail)
20  (MNK-T1_0001518462 - MNK-T1_0001513463)
21  Exhibit Mallinckrodt-Cardetti-020    Page 190
    (E-mail)
22  (MNK-T1_0000430882 - MNK-T1_0000430884)
23  Exhibit Mallinckrodt-Cardetti-021    Page 194
    (E-mail)
24  (MNK-T1_0000486481 - MNK-T1_0000486482)
```

Page 6

## INDEX OF EXHIBITS (CONTINUED)

Exhibit Mallinckrodt-Cardetti-022          Page 196
(E-mail)
(MNK-T1_0000510674 - MNK-T1_0000510687)

Exhibit Mallinckrodt-Cardetti-023          Page 202
(E-mail)
(MNK-T1_0000299400 - MNK-T1_0000299404)

Exhibit Mallinckrodt-Cardetti-024          Page 205
(E-mail)
(MNK-T1_0006766071 - MNK-T1_0006766072)

Exhibit Mallinckrodt-Cardetti-025          Page 206
(E-mail)
(MNK-T1_0000315946)

Exhibit Mallinckrodt-Cardetti-026          Page 208
(E-mail)
(MNK-T1_0000299509 - MNK-T1_0000299515)

Exhibit Mallinckrodt-Cardetti-027          Page 211
(MNK-T1_0006258931)

Exhibit Mallinckrodt-Cardetti-028          Page 214
(E-mail)
(MNK-T1_0006258924 - MNK-T1_0006258925)

Exhibit Mallinckrodt-Cardetti-029          Page 215
(E-mail)
(MNK-T1_0006364784 - MNK-T1_0006364786)

Exhibit Mallinckrodt-Cardetti-030          Page 221
(June monthly report)
(MNK-T1_0000607943 - MNK-T1_0000607945)

Exhibit Mallinckrodt-Cardetti-031          Page 226
(E-mail)
(MNK-T1_0002857538 - MNK-T1_0002857540)

Exhibit Mallinckrodt-Cardetti-032          Page 232
(E-mail)
(MNK-T1_0006291216 - MNK-T1_0006291217)

Page 7

## INDEX OF EXHIBITS (CONTINUED)

Exhibit Mallinckrodt-Cardetti-033          Page 233
(September monthly report)
(MNK-T1_0000610440 - MNK-T1_0000610442)

Exhibit Mallinckrodt-Cardetti-034          Page 237
(Spreadsheet)
(MNK-T1_0000464121)

Exhibit Mallinckrodt-Cardetti-035          Page 240
(E-mail)
(MNK-T1_0002910810 - MNK-T1_0002910811)

Exhibit Mallinckrodt-Cardetti-036          Page 243
(E-mail)
(MNK-T1_0004798661 - MNK-T1_0004798671)

Exhibit Mallinckrodt-Cardetti-037          Page 260
(E-mail)
(MNK-TNSTA05336605)

Exhibit Mallinckrodt-Cardetti-038          Page 263
(E-mail)
(MNK-TNSTA02527745)

Exhibit Mallinckrodt-Cardetti-039          Page 280
(E-mail)
Exhibit Mallinckrodt-Cardetti-040          Page 294
(Spreadsheet)
(MNK-TNSTA02527745)
Exhibit Mallinckrodt-Cardetti-041          Page 294
(Spreadsheet)
(MNK-TNSTA02527745)
Exhibit Mallinckrodt-Cardetti-042          Page 305
(E-mail)

Exhibit Mallinckrodt-Cardetti-043          Page 305
(Spreadsheet)
(MNK-TNSTA05117591 - MNK-TNSTA05117656)

          (Exhibits are attached.)

Page 8

1    THE VIDEOGRAPHER:  We are now on the
2  record.  My name is Jacob Arndt.  I am a videographer
3  for Golkow Litigation Services.  Today's date is
4  January 10th, 2019, and the time is 7:59 AM.  This
5  video deposition is being held in Kansas City,
6  Missouri, In Re: National Prescription Opiate
7  Litigation, for the United States District Court,
8  Northern District of Ohio, Eastern Division.  The
9  deponent is Lisa Cardetti.  Will counsel please
10  identify themselves?
11    MR. DEARMAN:  Mark Dearman and Richard
12  Marenco from Robbins, Geller, Rudman & Dowd on behalf
13  of the plaintiffs and the PEC.
14    MR. TSAI:  Rocky Tsai, Ropes & Gray, on
15  behalf of the witness, Ms. Cardetti, and Mallinckrodt
16  LLC.
17    MS. LaRUSSA:  Cassandra LaRussa, Ropes &
18  Gray, on behalf of the witness and Mallinckrodt LLC.
19    MR. MARKHAM:  Christopher Markham, Jones
20  Day, on behalf of Walmart.
21    MS. HERZFELD:  Tricia Herzfeld on behalf
22  of the Tennessee plaintiffs.
23    MR. BRUSATI:  Paul Brusati, Armstrong
24  Teasdale, on behalf of Cardinal Health.

Page 9

1    THE VIDEOGRAPHER:  The court reporter is
2  John Arndt and will now swear in the witness.
3
4    The witness, LISA CARDETTI, first having been
5  duly sworn, testified as follows:
6    QUESTIONS BY MR. DEARMAN:
7    Q.   Good morning.  My name is Mark Dearman.
8  We met before the depo started.
9    A.   Good morning.
10    Q.   I'm going to be asking you some questions
11  today.  Is this the first depo you've ever given?
12    A.   Yes.
13    Q.   Very good.  What's your -- would you state
14  your full name for the record?
15    A.   Lisa Marie Cardetti.
16    Q.   And what is your current occupation?
17    A.   I am currently occupied at Rising
18  Pharmaceuticals as associate vice-president of sales.
19    Q.   And what is your residential address?
20    A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
22    Q.   Because this is your first depo, I'm going
23  to give you some rules that we both need to follow in
24  order to get a clear record.  Like I said, I'm going to

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1  be asking you questions, which you need to answer
2  unless your counsel instructs you not to answer.  There
3  may be objections from time to time.  After counsel
4  objects, unless they instruct you not to answer, you
5  need to answer the question.  Okay?
6      A.   Understood.
7      Q.   It's important that you answer orally
8  because we all nod our head and say uh-huh and huh-uh,
9  but it doesn't give us a clear record, so if you would
10 please answer orally.  We will all remind you if it
11 happens because it's just common.
12      If you don't understand a question that I
13 ask you, say Mark, I don't understand that question,
14 and I will do my best to rephrase it because if you
15 answer my question I'm going to assume that you
16 understood the question.
17      It's also important that you wait for me
18 to ask my entire question even though you may know what
19 the question's going to be already.  It's important for
20 the record that I get my entire question out and then
21 allow you to get your entire answer out so that we have
22 a clear record.  It's also important that we don't
23 speak at the same time because if we do that a lot, our
24 court reporter's fingers may fall off.  Okay?

Page 11

1      A.   Understood.
2      Q.   And you understand those, I guess?
3      A.   Yes.  Yes.
4      Q.   Are you represented by counsel here today?
5      A.   I am.
6      Q.   And who are you represented by?
7      A.   Ropes & Gray.
8      Q.   Do you have a representation -- a written
9  representation agreement with Ropes & Gray?
10     A.   Yes, I do.
11     Q.   Do you have that with you here today?
12     A.   I personally do not.  Please address my
13 counsel.
14     Q.   But you do have a written agreement?
15     A.   I do, yes.
16     Q.   Are you being compensated for your -- for
17 appearing here today?
18     A.   No.
19     Q.   Are you compensating the attorneys from
20 Ropes & Gray for their representation of you?
21     A.   No, I am not.
22     Q.   I'm going to show you an exhibit.  I'll
23 show you what we're going to mark as Exhibit 1.
24     [Exhibit Mallinckrodt-Cardetti-001 marked

Page 12

1  for identification.]
2      MR. DEARMAN:  I've got two more copies, so
3  you all can decide how you want to share those.
4      Q.   (By Mr. Dearman)  Have you ever seen that
5  document before it was just handed to you?
6      A.   Yes, I have.
7      Q.   When was the first time that you saw it?
8      A.   I saw it yesterday.
9      Q.   Was that the first time that you saw it?
10     A.   Yes.
11     Q.   If you turn to Page 3 of the document, it
12 says Schedule A and it has your name under it.  Do you
13 see that?
14     A.   Yes.
15     Q.   Have you brought any documents with you to
16 the deposition today?
17     A.   No.
18     Q.   Have you looked in your own personal
19 papers and belongings for any documents responsive to
20 Schedule A?
21     A.   No.
22     Q.   Did you provide your counsel with any
23 documents?
24     A.   No, I did not.

Page 13

1      Q.   How many times did you meet with counsel?
2      A.   Two times.
3      Q.   When was the first time?
4      A.   Oh, I don't remember the exact date.
5  Approximately a month or so ago.
6      Q.   And where did you meet?
7      A.   In Kansas City.
8      Q.   And who was present?
9      A.   There were two members of Ropes & Gray
10 counsel present.
11     Q.   Do you know who those attorneys are?
12     A.   Rocky and I forget the other woman's name.
13     Q.   Did you understand the other participant
14 to be an attorney?
15     A.   Yes.
16     Q.   Did anyone else attend besides you and the
17 two attorneys?
18     A.   No.
19     Q.   How long did you meet for?
20     A.   Approximately four to five hours.
21     Q.   During that meeting -- I'm not asking you
22 to tell me what documents, but during that meeting, did
23 counsel show you any documents?
24     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q.   Did any of the documents which counsel
2  showed you refresh your recollection as to any issue?
3    A.   No.
4    Q.   When is the second time that you met with
5  counsel?
6    A.   Yesterday.
7    Q.   In Kansas City?
8    A.   In Kansas City.  Correct.
9    Q.   And for how long?
10    A.   Same.  About four or five hours.
11    Q.   And who was in attendance at that meeting?
12    A.   Rocky and Cassie.
13    Q.   Like my prior question, were you shown any
14  documents at that meeting?
15    A.   Yes.
16    Q.   Did any of those documents refresh your
17  recollection as to any of the issues?
18    A.   No.  No.
19    Q.   Did you bring any documents to that
20  meeting?
21    A.   I did not, no.
22    Q.   I had asked you earlier whether or not you
23  had looked through any of your belongings for any
24  documents.  Do you have an office at your home?

Page 15

1    A.   I do.
2    Q.   Do you have filing cabinets at your home?
3    A.   No, I don't have file cabinets.
4    Q.   Do you have documents that related to your
5  time at Mallinckrodt at your home?
6    A.   No, I do not.
7    Q.   And how is it that you know that you don't
8  have any documents relating to you and Mallinckrodt at
9  your house?
10    A.   I don't have any documents at my house.
11  It's a very small office.  I don't have any actual
12  paperwork or documents electronically or anything at my
13  house.
14    Q.   But just to be clear, you did not look to
15  see whether you had any documents; correct?
16    A.   I know I do not have any documents.
17    Q.   And I'm just -- I'm not trying to be
18  difficult, but I'm asking how it is you know if you
19  didn't look?
20    A.   I know what I have in my home office.
21    Q.   Are you aware that this country is
22  experiencing an opioid epidemic?
23    A.   I am aware.
24    Q.   Has this epidemic affected your community?

Page 16

1    A.   I'm not sure of the details around how
2  it's affected my community.
3    Q.   And I understand that you're not familiar
4  with the details, but are you aware as to whether or
5  not it has impacted your community?
6    A.   I am not aware.
7    Q.   Has it impacted your family?
8    A.   No, it has not.
9    Q.   Has it impacted any of your friends?
10    A.   Not that I'm aware of.
11    [Exhibit Mallinckrodt-Cardetti-002 marked
12    for identification.]
13    Q.   I'm going to show you Exhibit 2, which is
14  Bates-stamped.  So from time to time I'm going to say
15  the word Bates numbers or Bates-stamped, and that's
16  going to be the number at the bottom of the document.
17  There's not one on that.
18    A.   Oh.
19    Q.   But this document that I'm handing you,
20  which is Exhibit 2, and is Bates number
21  MNK-T1_0007896477.  Sorry about that.  Can I see that
22  one for a second?  I want to make sure I didn't
23  highlight on that one and give you one that's not
24  highlighted.  Yeah.  Sorry about that.  Are you

Page 17

1  familiar with this document?
2    A.   Yes, I am.
3    Q.   Is this a document that you prepared?
4    A.   It is.
5    Q.   Do you know when you prepared it?
6    A.   Most -- excuse me.  Most recently prior to
7  my job at Rising Pharmaceuticals, so prior to October
8  2017.
9    Q.   Is this your current résumé?
10    A.   It is.
11    Q.   Do you believe it to be accurate?
12    A.   Yes, I believe it to be accurate.
13    Q.   On Page 2 of the document it talks about
14  your education.  Do you see that?  Do you see that?
15    A.   Yes.
16    Q.   Other than the University of Missouri and
17  Webster University, have you received any other formal
18  education?
19    A.   No, I have not.
20    Q.   After you left the University of Missouri
21  in 2004, there's a -- it seems to be that there's a
22  spread between starting at Mallinckrodt in January of
23  2006.  Do you see that?
24    A.   I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  Q.  Hopefully you did something fun those two
2  years.
3  A.  I had some odd jobs.  I graduated early in
4  three-and-a-half years so I stayed in Columbia, had
5  some waitressing jobs, odd jobs around Columbia,
6  Missouri, and was trying to figure out what I wanted to
7  be when I grow up.
8  Q.  And in that two-year period did you have
9  any employment in the pharmaceutical or in the
10  pharmaceutical world?
11  A.  No.
12  Q.  You started at Mallinckrodt in January of
13  2006?
14  A.  That is correct.
15  Q.  And how is it that you ended up getting
16  connected with Mallinckrodt?
17  A.  There was a family friend who made me
18  aware of the position, and I applied, went through the
19  formal application and interview process, and got the
20  job.
21  Q.  Where were you living back in 2006?
22  A.  In St. Charles, Missouri.
23  Q.  Was the family friend a employee of
24  Mallinckrodt?

Page 19

1  A.  Yes.
2  Q.  And who was that?
3  A.  Jake Longenecker.
4  Q.  And what was Mr. Longenecker's position at
5  the time?
6  A.  I do not recall.
7  Q.  And what position did you apply for?
8  A.  Customer service representative.
9  Q.  And it indicates that you were a customer
10  service representative from January to October -- is
11  that correct -- of 2006?
12  A.  That is correct.
13  Q.  Who was your direct report?
14  A.  Sean Welsh (ph).
15  Q.  What was Sean's title?
16  A.  Manager of customer service.  I don't
17  remember the exact title, but something along those
18  lines.
19  Q.  What were your duties and responsibilities
20  as a customer service representative from January of
21  2006 to October of 2006?
22  A.  It was a very entry-level position.
23  Primarily order entry and answering the phones.
24  Q.  And when you say order entry, what is it

Page 20

1  that you mean?
2  A.  Entering orders, customer orders, into our
3  system.
4  Q.  So how is it that you would get
5  information to enter?  I'm just trying to understand a
6  little bit.
7  A.  So back then, specifically for controlled
8  substances, customers had to order on a 222 form, so it
9  was a form that had three different sheets of paper,
10  and the customer would place the NDC number and the
11  description that they wanted to order and the quantity.
12  This is a DEA official form that was
13  required to order any controlled substances.  And so I
14  would take that form along with like a PDF PO, for
15  example, compare the quantities, make sure everything
16  matched, and then would enter it into the system
17  manually.
18  Q.  And what type of system were you entering
19  it into?
20  A.  I believe it was called JDE.
21  Q.  Did you have any contact with the clients,
22  or was this information provided to you by somebody
23  else and then you just checked it and inputted it?
24  A.  They were mailed in.  The forms were

Page 21

1  mailed in from the customer.
2  Q.  At that point in time were you having any
3  contact with customers?
4  A.  Sure.  Yeah.  Absolutely.  If there was a
5  question I had about the order or something, or if it
6  wasn't ordered in case quantity, for example.  Yes.
7  Q.  And these were scheduled medications?
8  A.  That is correct.
9  Q.  And you indicated before when you were
10  talking about the 222 form that you would compare the
11  quantities and make sure everything matched and then
12  would enter it into the system.  What do you mean by
13  compare quantities to make sure that there was a match?
14  A.  Sure.  So typically in my recollection,
15  customers would send in like a PDF PO with every single
16  line item that they were wanting to order by NDC with
17  the quantity, and then the 222 forms -- I think there
18  was only like maybe 10 lines, if I remember correctly,
19  on those 222 forms, so the PO may have had, let's say,
20  30 lines on it, so there would have been, let's say,
21  three 222 forms.  So I made sure that everything
22  matched with the paper PO with the 222 forms.
23  Q.  And just when you say matched, what is --
24  what are you matching?

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1   A.   Sure.  So making sure that the NDC number
2  is correct on both and the quantity is the same on
3  both.
4   Q.   And did you receive any training in order
5  to do that?
6   A.   Yes, I did.
7   Q.   What kind of training did you receive?
8   A.   I don't remember the specifics around the
9  training.  That was a long time ago.  But I know that
10 Sean and other senior peers that have been in that role
11 for several years had trained me on what to look for
12 and how to enter those orders.
13  Q.   And what were you looking for?
14  A.   Again, to compare and make sure that
15 everything aligned -- the PO and the 222 form.
16  Q.   And when you say compared and aligned, do
17 you mean that you wanted to make certain that the PO
18 wasn't requesting additional medication over and above
19 what the 222 provided?
20  A.   No, not necessarily, no.  Again, it was
21 just trying to under -- trying to make sure that
22 whatever was entered into the system was accurate, so
23 if there was -- basically whatever the customer was
24 wanting to order.

Page 23

1   Q.   Were you looking to make sure that the PO
2  and the 222 matched, meaning the NDC numbers on the PO
3  were the same things that were on the 222 -- the same
4  NDC numbers and the same quantities?
5   A.   The same NDC numbers and the same
6  quantities.
7   Q.   And if there were a difference between
8  what the 222 provided --
9   A.   Uh-huh.
10  Q.   -- and what the PO provided such that the
11 PO would ask for different NDCs or different
12 quantities, what was your responsibility at that point?
13  A.   My responsibility -- excuse me.  My
14 responsibility would be to contact the customer and
15 if -- and understand what they were trying to order and
16 get it corrected prior to entering it into the system.
17  Q.   And if the PO asked for additional
18 quantities or different NDCs from the 222 and you
19 called the customer and the customer said the PO is
20 correct, what was the protocol at that point?
21  A.   Oh, I'm trying to remember.  Let's see.
22 We had to -- depending on the discrepancy, we may have
23 had to receive a completely new 222 form, or if it was
24 a small discrepancy -- and again, I don't remember all

Page 24

1  of the specific details -- but we could make the change
2  and then initial it on the 222 form, from what I
3  recall.
4   Q.   And do you recall what kind of changes --
5  strike that.  Do you recall what the protocol or the
6  policy was as to what discrepancies you had authority
7  or discretion to initial and rewrite?
8   A.   I do not.  That was a long time ago.
9   Q.   You've mentioned the term customers a few
10 times.  At that point in time, can you tell me --
11 define who the customer was or which -- what the
12 customer was?
13  A.   Absolutely.  The wholesaler, distributors,
14 direct retail chains primarily.  At this time I know
15 that the -- Mallinckrodt's customers were kind of
16 divided amongst the customer service representatives,
17 and AmerisourceBergen was one of my largest customers.
18  Q.   So back in 2006, Amerisource was one of
19 your biggest customers?
20  A.   That is correct.
21  Q.   And are they a wholesaler, a distributor,
22 or a retail?
23  A.   They are a wholesaler.
24  Q.   And what is your understanding or was your

Page 25

1  understanding of what a wholesaler was?
2   A.   They distributed our product to
3  pharmacies.
4   Q.   What's the difference between a wholesaler
5  and a distributor?
6   A.   That is used interchangeably.
7   Q.   And the retail would be the pharmacies?
8   A.   Retail would be the warehousing pharmacy,
9  so not an actual pharmacy on a corner.  It would be
10 their distribution centers for that retail chain.
11  Q.   So the bigger retail pharmacies?
12  A.   Yes.  Correct.
13  Q.   And you mentioned ABC was your customer.
14 Did you have some particular responsibility for
15 Amerisource?
16  A.   Order entry, and I was kind of their main
17 point of contact, but obviously we all kind of backed
18 each other up within the group.
19  Q.   Were you receiving POs and 222s from
20 specific clients, or was there a group of you that were
21 sort of splitting them up as they came in?
22  A.   They were pretty much divided up based on
23 customer.  So I mean, piles of 222 forms would come in
24 on specific days depending on the customer's order day,

Page 26

1 and again, AmerisourceBergen was my primary customer so
2 those would come to me, but we all kind of divided up
3 the work amongst the group when needed.
4    Q.   Anybody else besides AmerisourceBergen
5 that you can recall servicing as one of your customers?
6    A.   That's the biggest one.  That's the main
7 customer that I remember.
8    Q.   And what drugs were at issue?  What drugs
9 were you providing to Amerisource?
10    A.   I wasn't at that point in time providing
11 any.
12    Q.   It was a bad question.
13    A.   Okay.
14    Q.   What drugs were on the 222s and the POs --
15 scheduled drugs?
16    A.   It could have been any product that
17 Mallinckrodt was contracted with them on that we had in
18 our portfolio.
19    Q.   And back in 2006, January to October, do
20 you recall what those drugs were or any of those drugs?
21    A.   I don't remember what products at that --
22 back in 2006 what AmerisourceBergen was ordering from
23 us, no.
24    Q.   Do you remember what drugs were in

Page 27

1 Mallinckrodt's portfolio back in January -- between
2 January and October of 2006 -- scheduled drugs?
3    A.   From my recollection, the portfolio of
4 Mallinckrodt hasn't changed much over the years, so I
5 don't remember exactly the dates of when products were
6 added to the portfolio, but I know in my tenure there
7 the portfolio was pretty constant.
8    Q.   And if you would tell me -- if you'd list
9 the Schedule 2 drugs.
10    A.   List the Schedule 2 --
11    Q.   Yeah.
12    A.   Well, oxycodone, oxycodone acetaminophen,
13 methylphenidate.  Hydrocodone was not a CII back then.
14 I don't -- the Fentanyl products had not been brought
15 into the portfolio at that point in time.  I'm trying
16 to remember.  That's -- those are the ones that I
17 remember off the top of my head.
18    Q.   And was your compensation structure -- can
19 you tell me your compensation structure back then?  I'm
20 not asking you particulars, but do you recall if there
21 were bonuses, or --
22    A.   No.  It was a very, again, entry-level
23 position, base salary.
24    Q.   And did there come a time where you got a

Page 28

1 promotion at Mallinckrodt?
2    A.   I -- in October of 2006, as my résumé
3 states, I moved on to senior contract specialist.
4    Q.   Now, prior to October of 2006, did you
5 have any involvement with regard to the contracts
6 between Mallinckrodt and any of its customers?
7    A.   No, I did not.
8    Q.   In October of 2006 to November of 2007
9 you've listed on your résumé senior contract
10 specialist; correct?
11    A.   Correct.
12    Q.   Who was your direct report?
13    A.   I believe it was Cindy Cerneka at that
14 time.  I believe it changed throughout that year, but
15 senior -- excuse me -- Cindy was the one that hired me
16 into the group.
17    Q.   And what were your duties and
18 responsibilities as a senior contract specialist?
19    A.   Primarily working with sales and marketing
20 on drafting proposals to send to customers.  They would
21 provide us -- we pretty much had templates for every
22 type of offer we were going to provide and we'd input
23 the information that was given to us from sales
24 marketing and then input it into the template and

Page 29

1 provided it back to them.
2    Q.   At this point in time, as a senior
3 contract specialist, were you in the sales and
4 marketing division or department?
5    A.   No.  It was not under marketing or sales.
6    Q.   What was it under?
7    A.   If I recall, it may have been like a
8 shared services group.
9    Q.   Is that the same thing for your CSR,
10 customer service representative, position you held
11 before?
12    A.   I believe so at that time.  Again, I was
13 at Mallinckrodt for almost 12 years and there -- the
14 organization was restructured a few times, so from what
15 I recall those were both under shared services at that
16 time.
17    Q.   And those would be shared services between
18 sales and marketing and other groups?
19    A.   Shared services for the company.
20    Q.   And what were your duties and
21 responsibilities as a senior contract specialist?  I
22 know you indicated that you'd be provided templates.
23    A.   Right.
24    Q.   Did you have contact with the customers in

Page 30

1 that role?

2     A.   No, not that I recall.

3     Q.   So if you don't mind describing it in a

4 little bit more detail. You would be provided a

5 template or you had a template to do what with?

6     A.   To input whatever price we were going to

7 offer to -- into the template and send it back to the

8 appropriate salesperson to review, and if there were

9 any issues we would correct it, collaboration

10 between -- with sales prior to sending it to the

11 customer.

12     Q.   And these would be proposals with regard

13 to drug pricing?

14     A.   Yes, that is correct. There would be --

15 there were multiple -- again, multiple templates, but

16 pricing was one of the templates that we worked on,

17 yes.

18     Q.   And other than drug pricing, what were

19 other -- what were some of the other templates, if you

20 recall?

21     A.   Again, that was a long time ago. I don't

22 recall all of the templates that I worked on.

23     Q.   On your résumé under senior contract

24 specialist, one of the bullets says provide support in

Page 31

1 the resolution of price disputes assisting internal

2 personnel and external customers. That was the reason

3 that I sort of asked you about whether or not you had

4 contact with customers. What type of support did you

5 provide with regard to price disputes?

6     A.   Correcting the document.

7     Q.   And when you say correcting the document,

8 what does that mean?

9     A.   Sorry.

10     Q.   That's all right.

11     A.   So the document that was originally put

12 together, if there was any errors or anything -- let's

13 say I originally put it together, it went to the

14 salesperson, it went to the customer, other discussions

15 took place around this proposal, and then it would have

16 come back to me potentially to make any changes needed

17 as a revision. Excuse me. Sorry.

18     Q.   So you -- that's all right. So you used

19 the term disputes, but it was really to address any

20 errors that were in the documents?

21     A.   Right. That's correct.

22     Q.   And would the customer contact you or the

23 salesperson? I mean, how did that --

24     A.   The salesperson was the main point of

Page 32

1 contact. If I remember correctly, our name was on the

2 document for them to contact in needed, but I don't

3 recall having interactions with customers at that point

4 in time.

5     Q.   Who would provide you with the actual

6 pricing? Is that something that would obtain? Or how

7 would you obtain it?

8     A.   That would come from marketing and sales,

9 yeah.

10     Q.   And how would that be delivered to you?

11 Was that by e-mail, or --

12     A.   Yes, that would be delivered by e-mail.

13     Q.   And again, as it relates to compensation,

14 was there a bonus structure that was related to your

15 productivity or -- if you recall?

16     A.   The way I remember, this again was another

17 pretty entry-level position where I had just a base

18 salary.

19     Q.   And then did there come an opportunity for

20 you to get another promotion while at Mallinckrodt?

21     A.   That is correct.

22     Q.   And from November of 2007 to January of

23 2010 you were a sales and marketing analyst?

24     A.   That is correct.

Page 33

1     Q.   And who was your direct report?

2     A.   Ginger Collier throughout the majority of

3 that time. I can't --

4     Q.   And do you know what Ginger's title was?

5     A.   I don't remember her exact title, but

6 something along the lines of like a senior marketing

7 manager or something to that effect.

8     Q.   When you became a sales and marketing

9 analyst, now did you become part of a different

10 division, from shared services to something else?

11     A.   Correct. Now I was part of the marketing

12 group.

13     Q.   Did you remain part of the marketing group

14 for the rest of your tenure at Mallinckrodt?

15     A.   No. I eventually moved into the sales

16 group.

17     Q.   So were the -- at least back at this time

18 when you were in marketing, was there a separate group

19 for sales and a separate group for marketing, or was it

20 sales and marketing?

21     A.   It was -- they were two separate groups,

22 both under generics.

23     Q.   And was Ginger responsible for marketing

24 and sales, or just marketing?

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    A.    Just marketing.

2    Q.    Do you know her who counterpart at that

3  time was in sales?

4    A.    I don't remember exactly when Jane joined

5  the company, but Jane Williams led the sales team.

6  Back then I know that -- oh, gosh -- John Adams was

7  also -- ran the sales group at one point.  I don't

8  remember the exact times of when people left.

9    Q.    Fair enough.  In the sales and marketing

10 analyst position, which that was a promotion; correct?

11   A.    It was a promotion, yes.

12   Q.    Yeah.  What were your duties and

13 responsibilities in sales and marketing?

14   A.    Really primarily ad hoc reporting.  Helped

15 with creating reports and increase efficiencies and

16 processes.  Yeah.

17   Q.    And when you say reports, what kind of

18 reports were you responsible to work on?

19   A.    I ran multiple reports on a daily basis.

20 I accessed Cognos, which is a tool pretty much that

21 warehoused data for -- that I could access.

22   Q.    So let's dig into that a little bit.  What

23 type of data were you accessing back at that time?

24   A.    There was a lot of different data in

Page 35

1  there.  There was order data and quantities and sales

2  by pricing contract, is what the system referred to it

3  as.  So direct sales and indirect sales.  That was

4  primarily what I used the tool for.

5    Q.    Was this all Mallinckrodt internal data,

6  or was there any external data from other entities in

7  this system?

8    A.    In this system it was only internal

9  Mallinckrodt data.

10   Q.    And when you say direct sales and indirect

11 sales, can you explain what you mean by that?

12   A.    Sure.  So direct sales to like a direct

13 retail chain, for example, where we would be sending

14 product directly from our warehouse to their

15 distribution centers.  That would be considered a

16 direct sale, because then at that point in time they --

17 their distribution centers would send it out to the

18 pharmacies.

19          And then indirect sales were more for

20 the -- like a wholesaler, where we would send it again

21 from our distribution center to their distribution

22 center, and then we would receive a chargeback, which

23 is basically a financial true-up -- once they sold the

24 product to a pharmacy.  So that chargeback is really

Page 36

1  kind of that indirect sale.

2    Q.    In November of 2007, was that your first

3  experience with chargebacks?

4    A.    Yes, that was my first experience with

5  chargebacks.

6    Q.    Now, what was the purpose that -- in your

7  position -- in your marketing position, what was the

8  reason that you were creating these reports?  So why

9  were you looking at this pricing as it related to what

10 your job was?

11   A.    I'm sorry.  Can you rephrase?

12   Q.    Sure.

13   A.    Pricing?

14   Q.    Yeah.  You indicated that Cognos contained

15 a database which contains contract pricing information.

16 I think that's what you said.

17   A.    Con -- so contract pricing was the title

18 of the customer.  It was just a title name, contract

19 pricing, so it was mainly like the quantities and then

20 the sales, so it would take -- somehow it was related

21 to our JD system to pull in the pricing to come up with

22 the sales quantity -- sales amount.

23   Q.    While you were doing this job --

24   A.    Sure.

Page 37

1    Q.    -- ostensibly there was somebody else

2  that was doing what you were doing with 222s and POs;

3  is that correct?

4    A.    That is correct.

5    Q.    How does that get to then -- I mean, where

6  are you in that process?

7    A.    In my role as an analyst, again, I would

8  access -- I received multiple requests on a daily basis

9  for various reasons on what to run reports for.

10 Primarily it was for the sales team to -- for them to

11 understand what was going on with their customers

12 and -- yeah.

13   Q.    So is it fair to say then that the sales

14 department would be the folks that were contacting you

15 and saying I need this information?

16   A.    Again, I would get requests from various

17 departments, not only sales, not only marketing, but

18 other departments as well.

19   Q.    Did you have access to any external data?

20 So a minute ago we talked about internal data.  Did you

21 have access at this point in this job to external data?

22   A.    IMS was the only data that I recall from

23 an external purpose.  And I would very rarely access

24 that database on my own from what I recall.  There were

Page 38

1 other people in the group that would basically gather
2 the data on our -- market data on our products and put
3 it into a nice, pretty format so we can easily read it
4 rather than it just being a huge Excel spreadsheet of
5 numbers.
6    Q.   So the -- can I refer to them as Cognos
7 reports, or that's not accurate because it's just data
8 that was contained in Cognos and the report would be
9 whatever report you were running?
10   A.   It doesn't -- I mean, Cognos reports is
11 fine. However you'd like to refer to it.
12   Q.   And let's -- for example, did you have
13 specific customers at this point, or were you doing
14 this across all customers?
15   A.   I did not have any customers, no.
16   Q.   Do you know what the sales force were
17 using any of those reports for?
18   A.   Not at this time. Sales would have
19 interactions with customers, and I wasn't -- at this
20 point in time I wasn't really privy to those
21 conversations or those meetings, if you will.
22   Q.   Did you know why Mallinckrodt was keeping
23 information or data on quantities and drugs that were
24 sold to any of its customers?

Page 39

1    A.   Well, I know -- at this point in time,
2 I've been learning more and more about the industry,
3 knowing that it's a highly-regulated market. I didn't
4 know the details around necessarily anything -- any
5 details, but I knew that it was important information
6 to -- for the company to have and retain.
7    Q.   So in addition to the price --
8    A.   Uh-huh.
9    Q.    -- of an NDC, or of a drug, and in
10 addition to the quantity, could you also obtain
11 information on frequency of order?
12   A.   Yes, there was a -- it obtained a history.
13 I don't remember how far back it went.
14   Q.   And what were the analytics? What were
15 the -- what was it tracking? It was tracking price?
16   A.   Again, it didn't have price directly in
17 Cognos. It was a reporting tool. I believe it
18 connected with JDE, which JDE held the pricing, and
19 which if you remember, that's the system that I entered
20 the orders in back in customer service, so I believe
21 those two -- from my understanding, those two systems
22 were talking as far as the price on -- effective price
23 on what time frame and the dates and everything, and
24 then it correlated that information and put it into

Page 40

1 Cognos as far as sales and quantity.
2    Q.   And frequency? I mean, order history
3 included frequency?
4    A.   Well, frequency meaning that you could
5 filter down on the data based on the specific time
6 frame that you're looking for? Is that the question?
7    Q.   Yeah. Yeah.
8    A.   Yes.
9    Q.   And the -- we had talked earlier about
10 contracts and pricing within contracts; correct?
11   A.   Correct.
12   Q.   Was there -- how did chargebacks relate to
13 the contract price?
14   A.   So the contract price is the price
15 negotiated with the customer, and that's the price that
16 would get loaded into the system, and the chargeback is
17 really the difference between the WAC price and the
18 contract price, so it's really getting again a
19 financial true-up of that customer's purchase,
20 specifically to the wholesalers.
21   Q.   Does the chargeback reflect what
22 Mallinckrodt's customer actually sold the product for?
23   A.   In terms of price?
24   Q.   Yes.

Page 41

1    A.   No, it does not.
2    Q.   So there's a -- I get that there's a
3 contracted price with Mallinckrodt's customer. What
4 I'm trying to figure out is what does this chargeback
5 reflect? When you say the word true up, to me it
6 indicates that there's a difference in the contract
7 price and what the actual medication was sold for.
8    A.   No. So just for clarity purposes, the
9 wholesaler will purchase the product at a WAC price.
10   Q.   That's not a contracted price?
11   A.   That is not a contracted price. That's a
12 set price. It's a wholesaler acquisition cost. They
13 will -- so just for sake of example, let's say the WAC
14 price is $10, the negotiated contract price is $8.
15        So once the wholesaler sells that product
16 to a pharmacy, we would receive a chargeback, and it's
17 not immediate. It's on whatever cadence that specific
18 customer has agreed with Mallinckrodt, whether it's
19 daily, weekly, monthly, what have you. It's an
20 aggregated report that's sent back to Mallinckrodt as
21 far as their sales out quantity that was sold on their
22 contract, and then that $2 in that specific example
23 would be that chargeback, true-up, if you will, like I
24 was referring to, back to their negotiated $8 contract

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 price.

2 Q. Was there ever a time where the chargeback

3 would reflect a number that was less than the $8 price?

4 A. I mean, I was not in chargebacks. I was

5 not -- from my understanding, if there was a situation

6 like that then that would be a discrepancy that would

7 be discussed with the customer, but again, that was not

8 my role at this point in time nor was I involved with

9 the specific chargebacks.

10 Q. Do you know why there was a difference in

11 the WAC price and the contract price?

12 A. I don't know the general purpose -- from

13 my understanding, that is kind of how the industry

14 worked. Yeah.

15 Q. Do you know how long the contracts were

16 for? So if it was an $8 contract price, do you know

17 for what period of time that price was extended to the

18 customer?

19 A. It would vary. It was not a set price.

20 Q. Do you know how the WAC price was

21 determined?

22 A. No, not really. Not to my recollection.

23 In our markets that we were in, these products have

24 been along for several years so I wasn't really around

Page 43

1 when those WACs were determined for those specific --

2 for those products at that time.

3 Q. You mentioned IMS. What was IMS or what

4 is IMS?

5 A. IMS is a data that held market

6 information. So to get a -- you could gather

7 information about market share and quantity -- market

8 quantity, year over year, changes. Again, there was

9 someone in our team that gathered all of that data and

10 put it into like reports, if you will, so we could kind

11 of see a historical view of market share.

12 Q. Market share between Mallinckrodt and its

13 competitors?

14 A. That is correct.

15 Q. And do you know what type of detail was

16 provided with regards to IMS? Was it prescriber

17 information? How detailed was it?

18 A. Oh. It was -- so this information -- I

19 don't know the specifics, really. This is information

20 that is provided by our customers to IMS, from my

21 understanding. Yeah.

22 Q. And your customers were also buying

23 product from your competitors?

24 A. Sure. Absolutely.

Page 44

1 Q. And do you know why any of the folks at

2 Mallinckrodt were interested in looking at the IMS

3 data, at least at that time?

4 A. Well, again, at this point in time when I

5 was an analyst, I didn't really look at the data as

6 much. I ran reports, I provided the data to those that

7 requested it, and that really wasn't my role to do

8 that, so --

9 Q. Did that change later on?

10 A. Sure. Yeah.

11 Q. Did there come a time where you got a

12 promotion from sales and marketing analyst?

13 A. Yes.

14 Q. And was that to become an associate

15 product manager?

16 A. That is correct.

17 Q. And who was your direct report?

18 A. I believe it was Ginger Collier still at

19 that point in time.

20 Q. And you did that from January of 2010 to

21 August of 2011?

22 A. That is correct.

23 Q. And what were your duties and

24 responsibilities?

Page 45

1 A. So at this point in time I was kind of --

2 it was an introductory product manager position, just

3 kind of learning the roles and responsibilities of

4 product manager. I was responsible for I don't

5 remember what specific products at that point in time,

6 but it was a lot of the smaller volume, smaller

7 products in our portfolio.

8 Q. Was this outside of the marketing group?

9 A. No, this is still in the marketing group.

10 Q. And do you recall what products you were

11 responsible for?

12 A. I don't recall at that point in time, no.

13 Q. Do you know if any of them were scheduled

14 products?

15 A. I don't recall.

16 Q. And did you have responsibilities to be in

17 contact with Mallinckrodt customers in this position?

18 A. No, there was very little -- no. No.

19 Occasionally, again, just to learn more, I would sit in

20 on a call with a customer, with a sales representative

21 and a customer, just to kind of understand the

22 interactions and everything, but I did not have direct

23 contact with the customers myself.

24 Q. And one of the -- the second bullet under

Page 46

1 that --

2    A. Uh-huh.

3    Q. -- at the end of it, it says -- it uses

4 the words demand management?

5    A. Uh-huh.

6    Q. What is that?

7    A. So in the generic -- specific to

8 controlled substances, there's quota; right? So we

9 were -- we had constraints on what we could manufacture

10 as well as sell, and demand management -- excuse me --

11 was really kind of keeping an eye on the orders that

12 were coming in compared to forecasts to make -- so we

13 were responsible for forecasting for our specific

14 product families, and if there was ever a situation

15 where we were going to potentially go onto backorder

16 because of manufacturing delays or whatever the

17 situation may have been, we were in charge of

18 allocating product, if you will, so -- to specific

19 customers.

20    Q. If quotas were something you were dealing

21 with at that point in time, would that necessarily

22 implicate scheduled medications?

23    A. So I wasn't directly involved with quotas.

24 The company received annual quotas for manufacturing

Page 47

1 and selling. That was not our role. That was not our

2 responsibility. We were aware of the quotas, and

3 that's -- yeah.

4    Q. And as far as demand management, how would

5 you know -- if there were other companies that were

6 also providing medication into the quota, how would you

7 know whether or not you were exceeding the quota based

8 on what other manufacturers were doing?

9    A. I don't understand that question.

10    Q. Okay. One of the things you said you were

11 involved with was demand management and it was

12 understanding what the quota was for a specific

13 medication; correct?

14    A. Understanding -- so I knew there was a

15 quota.

16    Q. Did you know what the quota was for any

17 particular medication?

18    A. I mean, there would have potentially,

19 but -- it potentially may have been notified, but to me

20 I have no concept of how much one metric ton would be

21 in terms of bottles or anything like that. So I just

22 knew that there was a quota and another group -- the

23 corporate compliance group managed that.

24    Q. So what specifically then would you do

Page 48

1 with regard to demand management?

2    A. So demand man -- so if there was ever a

3 situation where -- okay, let me back up. So knowing

4 there is quota and there are restrictions -- or

5 constraints, so we can only sell so much -- just that's

6 kind of just in the back of our heads knowing that.

7    Q. This is bulk and dosage, or --

8    A. Bulk and -- I was only in regards to the

9 bulk -- or excuse me -- dosage.

10    Q. Okay. Sorry.

11    A. I was only responsible for the dosage

12 piece of it. I'm not familiar with the bulk at all.

13 And the demand management piece really came in as far

14 as looking at what the orders were coming in compared

15 to forecast to make sure that we were forecasting

16 appropriately.

17    There was a monthly meeting with multiple

18 groups, and the corporate compliance team was aware of

19 the forecast, and if there was ever a point where the

20 forecasts were to come close or hit that capacity

21 then -- I mean, they had to be aware of what the

22 expectation was from a forecast perspective.

23    Q. So you would provide that forecast to the

24 compliance group who would then make a determination

Page 49

1 whether there was a quota issue?

2    A. I don't remember exactly how it was given

3 to them, but I know that they were involved in that

4 process.

5    Q. And then you became a product manager in

6 August of 2011; correct?

7    A. That is correct.

8    Q. And that was another promotion?

9    A. That is correct.

10    Q. Still in the marketing department?

11    A. Yes.

12    Q. Direct report is?

13    A. Ginger Collier.

14    Q. Duties and responsibilities in product

15 manager?

16    A. Primarily the same as the associate

17 product manager. Forecasting, making sure that you're

18 hitting your forecast, working with sales on any

19 initiatives that they're working with customers on.

20 Sales and marketing was -- I mean, there was constant

21 collaboration between the two groups.

22    Q. And when you talk again about hitting

23 forecasts, does that mean -- does that relate to

24 production?

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    A.   Right.  So where we -- so our customer
2  commitments, where sales has agreed on X customer
3  contracting with us on a specific product, and they
4  expect, let's say, 100 units, and so we would forecast
5  100 units in the forecast.
6    Q.   Any customer contact as a product manager?
7    A.   I'm sorry?
8    Q.   Any customer contact?
9    A.   Customer?  Very minimal.  There would
10  be -- again, occasionally we would participate in calls
11  with the sales team and customers, but very minimal,
12  or -- yeah.
13    Q.   One of the things that it says you did
14  under product manager was create a customer analytical
15  model detailing financial productions to aid sales in
16  customer negotiations.
17    A.   Sure.
18    Q.   What does that mean?
19    A.   So again, using the reports from Cognos,
20  looking at historical sales and quantity, looking at
21  where we've forecasted, so forecasting -- using IMS
22  data to forecast.  That would provide a historical view
23  of the changes in the market, if you will, so if the
24  market's declined two percent over the past five years

Page 51

1  consecutively we can expect those to continue by
2  molecule to decline potentially, so it was -- a
3  forecast is completely assumption-based, and so really
4  would just kind of use the assumptions from the
5  forecast to help the sales team in discussions with
6  customers.
7    Q.   And consistently achieve forecast targets
8  of six percent demand variance and five percent
9  financial variance -- what does that mean?
10    A.   Variance in regards to what my forecast
11  was and how the demand came in, as well as financial,
12  with the price obviously being a factor.
13    Q.   And would the IMS data provide you price
14  data as it related to competitors?
15    A.   It had a -- not by competitor.  If I
16  recall, it had a price for the market, like an
17  aggregated price.
18    Q.   What about the chargeback data?  Were you
19  still utilizing that data?
20    A.   Sure.  I would still run reports in
21  Cognos.  Sure.
22    Q.   Did the chargeback data indicate
23  competitor pricing?
24    A.   No.  The chargeback data again was only

Page 52

1  Mallinckrodt data -- internal data.
2    Q.   Based on WAC and contract price?
3    A.   That is correct.
4    Q.   You indicate here two successful new
5  product launches.  Do you know what product launches
6  those were?
7    A.   If I recall, moving into this position,
8  these product launches were well underway in terms of
9  all of the work had already kind of been completed in
10  changes in the department and people leaving and
11  whatnot, so I was -- from what I recall, I was
12  responsible for those product families at the time of
13  launch, and if I recall they were Fentanyl lozenge and
14  Fentanyl patch, and just to clarify launches -- so in
15  the generic market, these were generic markets that had
16  already been well-established.  We were not the first
17  generic to market or anything.  The demand was already
18  created.  It was a set demand.  It kind of is what it
19  is.  It's a pie, if you will, and so we were looking to
20  get a piece of that pie.  There was no -- I mean, we
21  weren't create -- when you hear launches -- I just want
22  to make sure to clarify.
23    Q.   And would you agree that the way to
24  increase that market share was pricing?

Page 53

1    A.   Yes.  You had to be competitive on price.
2  That's generic industry.
3    Q.   And were you responsible at all for -- and
4  maybe this overlaps with some of the things we've
5  already talked about in your prior positions, but
6  responsible for communicating to customers pricing or
7  pricing changes?
8    A.   Sales was the main point of contact with
9  customers.
10    Q.   And so sales would be responsible for
11  providing information regarding pricing or changes in
12  pricing?
13    A.   That is correct.
14    Q.   October 2012 to July 2013, another
15  promotion to regional account manager?
16    A.   That is correct.
17    Q.   And who was your direct report?
18    A.   Jane Williams.
19    Q.   Are you familiar with the term annual
20  incentive plan or terms?
21    A.   Annual --
22    Q.   As it relates to Mallinckrodt's bonus
23  structure?
24    A.   Oh.  I don't remember exactly what it was

Page 54

1 called. Yeah.

2 Q. Do you know whether or not your change in

3 position from product manager to regional account

4 manager impacted your bonus structure or how bonuses

5 were paid?

6 A. I do believe -- from what I recall, I do

7 believe I was receiving -- included in some sort of

8 bonus structure at that point in time. I don't

9 remember the specifics.

10 Q. The next exhibit I'm going to show you is

11 Plaintiff's Exhibit Number 3. This is Bates range

12 MNK-T1_0007219775.

13 [Exhibit Mallinckrodt-Cardetti-003 marked

14 for identification.]

15 Q. This is a document dated August 9, 2012.

16 Could you take a look at it? And this is why I was

17 asking you about the annual incentive plan. I hadn't

18 mentioned yet the sales incentive comp plan, but this

19 is sort of what I'm asking about now -- what the

20 difference is between those, since it seems to be that

21 you're now in a position where you're moving from

22 annual incentive plan to the SICP.

23 MR. TSAI: And Mark, since it looks like

24 we'll be discussing Ms. Cardetti's personal financial

Page 55

1 information, I'd just like to designate this part

2 highly confidential.

3 Q. (By Mr. Dearman) Do you recall what the

4 annual incentive plan was?

5 A. I don't remember the details of the plan,

6 no.

7 Q. So -- and I appreciate the fact that you

8 don't recall the details. It was obviously a long time

9 ago.

10 A. Right.

11 Q. The annual incentive plan -- was that a

12 bonus plan?

13 A. Again, I don't recall.

14 Q. How about the sales incentive comp plan,

15 the SICP, which I presume was something that you were

16 involved in until you left Mallinckrodt?

17 A. Yes, from my recollection this was -- this

18 did include a bonus, but again, I don't recall the

19 details or the specifics.

20 Q. Do you know if the bonus was tied to

21 volume of sales?

22 A. The bonus was tied to various different

23 things. If I recall, we had -- on an annual basis had

24 to create -- I think there were like five or six

Page 56

1 different goals, if you will, and I think one of those

2 from what I recall was sales-based. I mean, others

3 were like personal development or it could have been

4 various things.

5 Q. But one of those factors was volume of

6 sales?

7 A. One of those factors, yes, was sales.

8 Q. And I may have asked you. Your direct

9 contact was Jane Williams, which is also reflected in

10 Exhibit 3; correct?

11 A. That is correct.

12 Q. At this point in time you received a

13 company vehicle; correct?

14 A. I believe so. Back in 2012? Let me --

15 Q. It said --

16 A. Yeah, I believe so.

17 Q. And what were your duties?

18 A. Oh. Sorry. Yeah.

19 Q. I'm sorry. I should have pointed it out.

20 What were your duties and responsibilities as a

21 regional account manager?

22 A. This is -- this was an introductory sales

23 position. I had very few small accounts just to kind

24 of learn the roles and responsibility of the sales

Page 57

1 team.

2 Q. So now you went from marketing to sales?

3 A. That is correct.

4 Q. And did you receive any formal training

5 from Mallinckrodt when you started in the sales

6 position?

7 A. I received training, yes, from various --

8 at various points in time from various people. There

9 were -- I felt like I had several mentors.

10 Q. Besides mentors, what I'm referring to --

11 was there any formal classroom-type training that you

12 received?

13 A. Classroom training?

14 Q. Didn't have to be a class, but --

15 A. No. I mean, there was training. Whether

16 it was in person or over the phone, I mean, with us

17 working remote -- yes, there was training for the

18 position.

19 Q. And what types of training from marketing

20 to sales did you receive?

21 A. I don't recall the details on the

22 training.

23 Q. Do you recall how much training you

24 received?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  A. I don't recall. I mean, I do remember
2  that not having any sales experience, Jane worked very
3  closely with me on everything at the very beginning,
4  so --
5  Q. Would you have contact with customers at
6  this point?
7  A. Yes, I would.
8  Q. And do you recall which customers you had
9  contact with?
10  A. I don't remember which customers I worked
11  with at this specific time, no.
12  Q. And what was the point of having customer
13  contact? I mean, what were you doing?
14  A. I was the main contact for the customer.
15  I was working with the customer on opportunities, on
16  existing business. Again, I was the main point of
17  contact, so if anything came up.
18  Q. And when you used the term opportunities,
19  what do you mean?
20  A. So I mean, it was a business, and we were
21  looking to grow in terms of -- again, at our restrained
22  capacity, going back to the whole quota, there were
23  situations where we lost business and we had to try to
24  work to regain the business. Yeah, I mean, there

Page 59

1  were -- you looked for opportunities to continue to
2  work with the customer.
3  Q. And when you say continue to work with the
4  customer, you mean continue to grow or increase volume?
5  A. Potentially. Again, I mean, these
6  customers were well-established customers with
7  Mallinckrodt that already had products on contract, so
8  it was my job to work with them to -- we didn't want to
9  lose the business, so yes.
10  Q. Were you responsible for negotiating
11  price -- pricing with customers in this role?
12  A. Yeah, so there was -- again, pricing was
13  collaborative between sales and marketing. It was not
14  singly decided upon. Yeah.
15  Q. In this role were you the individual who
16  would be requesting from marketing those types of
17  reports that you would had been generating earlier when
18  you were in those roles?
19  A. Potentially. With having that experience,
20  I could have gathered it myself. I still had access to
21  it, from what I recall.
22  Q. And then in July of 2013 you became the
23  director of national accounts; is that correct?
24  A. That is correct.

Page 60

1  Q. That was also a promotion?
2  A. That is correct.
3  Q. Do you know whether you were still part of
4  the SICP program, the sales incentive compensation
5  plan?
6  A. Excuse me. I believe I was, yes.
7  Q. And so one of the factors that would go
8  into your bonus was volume of sales?
9  A. Along with various other objectives as
10  well.
11  MR. DEARMAN: Move to strike that as
12  nonresponsive.
13  Q. (By Mr. Dearman) One of the factors that
14  you -- was used as a director of national accounts to
15  determine your bonus was volume of sales; correct?
16  A. Volume of sales was one of the factors
17  that was included.
18  Q. And who was your direct report as director
19  of national accounts?
20  A. Jane Williams.
21  Q. At this point did you have anyone
22  reporting to you?
23  A. No.
24  Q. So what was the difference between

Page 61

1  regional account manager then and direct national
2  accounts as it related to duties and responsibilities,
3  if any?
4  A. It was really just -- again, regional was
5  kind of an introductory sales role. It wasn't
6  technically regional. Our accounts were not
7  geographical or anything. It was by account specific,
8  so kind of graduated, if you will, to work with some of
9  the larger accounts.
10  Q. Do you recall which accounts you started
11  working with as the director of national accounts?
12  A. Sure.
13  Q. It says 16 relationships, but --
14  A. Right. So the largest ones were
15  Walgreens -- WBAD -- as it mentions here, WBAD,
16  Walgreens, AmerisourceBergen, and OptiSource were my
17  large accounts at that point in time.
18  Q. What is WBAD?
19  A. WBAD is a sourcing group for Walgreens and
20  AmerisourceBergen.
21  Q. Do you know if that was the same thing as
22  Walgreens Boots Alliance?
23  A. That is. Correct.
24  Q. And as director of national accounts, was

Highly Confidential - Subject to Further Confidentiality Review

---

Page 62

1 one of the things you were responsible for with these
2 relationships was to increase volume of sales?
3     A.   So again, we worked with customers on
4 opportunities to grow sales, but again, we were within
5 constraints due to quota, so the quota was established
6 for the company by the DEA and we were operating within
7 those constraints.
8     Q.   Was it your understanding that the quota
9 that you're referring to was directly related to
10 Mallinckrodt versus the entire market?
11     A.   Yes.  So the quota was specific to
12 Mallinckrodt.  From my understanding, each manufacturer
13 received a certain amount of quota from the DEA.
14     Q.   And in order to work on the opportunities,
15 as you had indicated within the quota, would you work
16 with marketing on those opportunities?
17     A.   Yes.  So it was a pretty collaborative
18 approach within sales and marketing on anything.  So
19 marketing didn't do anything by themselves, sales
20 didn't do anything.  I mean, there was always the
21 collaboration between the two groups.
22     Q.   Did you ever send out e-mails to any of
23 your accounts regarding opportunities?
24     A.   I mean, yeah.  There was situations where

---

Page 63

1 we were working on opportunities.  Again, and just to
2 kind of back up, not knowing the full context of -- I
3 mean, this is very generally speaking; right?  So there
4 could have been lost business, and so we were looking
5 to grow on that specific product that we had lost
6 business from another customer, so that could then
7 become an opportunity with another customer.
8     Q.   So if you lost business with one customer,
9 that would leave room in the quota to go to another
10 quota?  Is that what you mean?
11     A.   Sure.  Yes.  That's correct, yeah.
12     Q.   And how would you become aware, as the
13 regional -- as the -- sorry -- as the director of
14 national accounts, how would you become aware of room
15 in the quota?
16     A.   I would become aware of lost business, not
17 necessarily how much room we had left in the quota per
18 se, but knowing -- again, we had the monthly meetings
19 with sales, marketing, supply, planning -- I mean,
20 there were multiple people in the room to go over the
21 forecast on a monthly basis.
22     Q.   What's the distinction between -- what's
23 the distinction, if any, between lost business and room
24 in the quota?

---

Page 64

1     A.   Well, lost business is if there was a
2 product on contract with a specific customer and we
3 went from having the business to no longer having the
4 business for whatever reason.  It could have been a
5 variety of reasons.  And in terms of quota, again, I
6 wasn't really involved in what those quota limits were
7 or -- yeah.  The --
8     Q.   But one of your duties and
9 responsibilities was to replace business if possible
10 with your accounts?
11     A.   Well, sure.  We were looking to grow
12 within constraints, knowing that there were constraints
13 for the company.
14     Q.   And the constraints again are the quotas?
15     A.   The constraints would be the quotas.  Or I
16 mean, or manufacturing capabilities.  I mean, if there
17 was -- if we were constrained on a manufacturing line
18 or something.  I mean, there could have been other
19 constraints.
20     Q.   Are you aware of situations where you --
21 where Mallinckrodt wasn't able to meet whatever the
22 quota level was due to manufacturing constraints?
23     A.   I was not aware.  I mean, I didn't --
24 wasn't given that type of information as far as where

---

Page 65

1 we came in compared to quota year after year from what
2 I recall.  Again, that was not our responsibility.
3     Q.   So let's assume for a minute you lost
4 business of -- we'll just say hypothetically 100 units
5 of whatever the molecule was.
6     A.   Uh-huh.  Sure.
7     Q.   There were other account representatives,
8 right, in your group that had other customers?
9     A.   That is correct.
10     Q.   So what was the mechanism that was used
11 such that you both wouldn't offer the same opportunity
12 to a customer?
13     A.   We had weekly meetings.  Everybody was
14 aware of what was going on as a business.  Again, there
15 were monthly meetings with -- to review the forecast,
16 so the forecast -- as the product managers were
17 responsible for those particular products.  They were
18 fully aware of what was going on with that product.
19 Any opportunities or offers that were outstanding with
20 customers, any lost business -- all of that would go
21 into the forecast.  So they were kind of the manager
22 over the product family, and sales was -- kind of the
23 manager over the customers.
24         However, there was -- as I said, there was

---

Page 66

1  constant collaboration between the groups, so everybody
2  kind of was somewhat aware of what was going on, but
3  the product manager kind of held that, if you will, to
4  your question.
5      Q.  Because the product manager was
6  responsible for a specific SKU or a specific molecule?
7      A.  Product families.  It was kind of
8  designated by product families, which included several
9  SKUs in some situations.
10     Q.  And was the goal to reach the ceiling of
11 the quota?
12     A.  There was not necessarily a goal to hit
13 that.  There was just -- it was set by the DEA, and
14 just to kind of give some context with the quota, from
15 my understanding I was not involved in how those were
16 set or anything, but that was really kind of looking at
17 here's our current book of business and here's how it
18 equates to -- this is my just my layman's view of the
19 world --
20     Q.  Fair enough.
21     A.  Here's our book of business.  Here's what
22 it equates to quota.  This is the quota request that we
23 are needing -- or requesting, I guess, and then the DEA
24 would say yea or nay, they could grant us 100 percent,

Page 67

1  they could grant us 20 percent of our request.  So the
2  request would be a comprehensive view from, again, my
3  layman's perspective as far as what I'm aware.
4      Q.  Are you referring now to changes in the
5  quota?  Is that what you're referring to?
6      A.  No, I'm referring to the original request,
7  but again, I was not involved in the request, I did
8  not --
9      Q.  Understood.
10     A.  Yeah.
11     Q.  But you were involved in sales; correct?
12     A.  I was involved in sales.
13     Q.  And you were involved in offering
14 opportunities to accounts -- right -- customers?
15     A.  I was involved in working with customers.
16     Q.  And you were retained by the quota;
17 correct?
18     A.  That is correct.
19     Q.  And it was an effort in weekly meetings
20 and other meetings and collaboration to make certain
21 that if there was some lost business and the quota
22 wasn't being met, to figure out what opportunities you
23 could offer to other customers so that you could reach
24 the quota; correct?

Page 68

1      A.  Not --
2          MR. TSAI:  Object to the form.
3      Q.  (By Mr. Dearman)  Go ahead.
4      A.  Yeah.  Not necessarily.  I'm sorry.  Can
5  you repeat the question now?
6      Q.  Absolutely.  I'll ask it to you this way.
7  What was the purpose of your understanding, in your
8  role and responsibility, that there was a quota?  Why
9  did you know that?  You were a salesperson who was --
10 had specific accounts you were dealing with.
11     A.  Uh-huh.
12     Q.  Why did you have to know what the quota
13 was?
14     A.  I didn't need to know.  I mean -- and
15 again, I didn't have that detail.  I just knew that
16 there was a quota.
17     Q.  So then how is it that you determined that
18 there was an opportunity?  And when I'm using the term
19 opportunity -- you can tell me if this is your
20 understanding as well -- an opportunity is an
21 opportunity for a Mallinckrodt customer to purchase
22 more of a molecule.  Is that your understanding of an
23 opportunity?
24     A.  Opportunity is looking for products that

Page 69

1  are not on contract that could potentially be on
2  contract.  Again, knowing that there are constraints.
3  It's not like we could go out after the entire market
4  or after every customer, but yeah, there were
5  opportunities with customers.
6      Q.  And I'm trying to -- and maybe we're
7  saying the same thing, but when we're using the
8  opportunity, what you mean is an opportunity for a
9  Mallinckrodt customer to purchase more of or to start
10 purchasing a molecule from Mallinckrodt?
11     A.  Yeah, the way that I'm using opportunity
12 would be that they're not currently purchasing it and
13 there's an opportunity for them to potentially purchase
14 it.
15     Q.  Was there any opportunities to increase
16 what they were purchasing, as opposed to they weren't
17 purchasing it?
18     A.  There were -- I mean, dependent on the
19 customer.  Some customers dual-sourced, for example,
20 would give dual awards, so 50 percent to Mallinckrodt
21 and 50 percent to another manufacturer.
22     Q.  And I'm going to get to that in a second.
23     A.  Okay.
24     Q.  But back to what we were talking about,

Page 70

1  which is -- and let's just use your example, which is
2  going to an account who wasn't purchasing that molecule
3  and offering them that opportunity; correct?
4      A.   Again, the customers are the wholesaler,
5  distributors.
6      Q.   Correct.
7      A.   Direct retail chains.
8      Q.   Yes.
9      A.   But yes, that's who we would be working
10 with.
11     Q.   And when you were told that you could
12 reach out to one of your accounts to offer them an
13 opportunity -- right?
14     A.   Uh-huh.
15     Q.   The opportunity was defined in quantity;
16 correct?
17     A.   Correct --
18     Q.   And the -- what was your understanding of
19 how that quantity was set, if you had an understanding?
20     A.   I mean, there was -- again, there was
21 collaborative discussions to understand what the -- if
22 there was, for example, business that was lost in
23 another account, we lost 100 units, is there an
24 opportunity to work with another customer on this 100

Page 71

1  units?
2      Q.   And why is it that you wanted to
3  replace -- why did you want to replace the business?
4  Let's use the 100 units to one customer.  You lose that
5  business to a competitor.  What's the purpose of -- why
6  would you want to sell the 100 units to another
7  customer?
8      A.   It was a business.  I mean, we were trying
9  to, I mean, to as much as possible, again within
10 restraints.  It wasn't like we could go out to the
11 entire market or anything.  I mean, there was very --
12 it was a very regulated market, and there were a lot of
13 constraints around it.
14     Q.   And so besides quota, can you list other
15 constraints?
16     A.   As I mentioned, manufacturing constraints
17 would also be a potential where -- I don't know -- I
18 don't know the details regarding manufacturing, but if
19 there was two products that were utilizing the same
20 manufacturing line or something and that line was
21 already at capacity so we -- I don't know the details,
22 but I just know there were manufacturing constraints,
23 so --
24     Q.   So besides quota and besides manufacturing

Page 72

1  capabilities, what else went into the restraints?
2      A.   I can't recall.  I mean, those were the
3  main ones that I recall.
4      Q.   So let's assume for a second for purpose
5  of my question --
6      A.   Okay.
7      Q.   -- that you don't have any manufacturing
8  constraint, that you can manufacture it.  That's not a
9  problem.  That would lead then to the only restraint or
10 constraint being the quota; correct?
11     MR. TSAI:  Object to the form.  Go ahead.
12     Q.   (By Mr. Dearman)  You can answer the
13 question.
14     A.   I mean, again, knowing that there was
15 quota that the company had to operate under and we
16 couldn't go above that quota, we weren't -- I wasn't
17 involved in establishing that quota, but again, knowing
18 that there was quota for the company, there were
19 constraints on what we could sell.
20     Q.   I appreciate that answer, and I'm asking
21 for you a yes or no, and you can explain it any way
22 you'd like, but I'm looking for a yes or no.  If we
23 take out a constraint of manufacturing capability, then
24 the only other constraint is quota; correct?

Page 73

1      MR. TSAI:  Object to the form.
2      A.   Quota would have been --
3      Q.   (By Mr. Dearman)  It's a yes or a no.
4      MR. TSAI:  Object to the form.
5      A.   Yes.
6      Q.   (By Mr. Dearman)  You were a director of
7  national accounts from July of 2013 through October of
8  2017; correct?
9      A.   That is correct.
10     Q.   Created monthly compliance reporting for
11 forecast accuracy, which was incorporated by the entire
12 sales team.  Am I reading the right thing?
13     A.   I'm sorry.  Where are you?
14     Q.   I'm sorry.  I'm -- that's fair.  I'm at
15 your last -- the bottom bullet, under director of
16 national accounts.  Can you please tell me what
17 compliance reporting is?
18     A.   Sure.  So if -- going back to that
19 example, if a customer contracted a specific product
20 with us and they told us that their demand -- a lot of
21 times it was complete estimate on their behalf, but an
22 estimated demand was 100 units, then it was really kind
23 of -- for forecasting purposes, we would review on a
24 monthly basis if we were -- if that 100 units was

Page 74

1 coming in or not. Again, for forecasting purposes we
2 needed to have that information accurate.
3    Q.   Going back to your example where you said
4 that they could be buying 50/50 -- they could be buying
5 from Mallinckrodt and buying from a competitor -- how
6 would you know whether or not they were buying from a
7 competitor?
8    A.   If the customer was willing to share
9 that -- or let's say that they -- it was an RFP put out
10 for 100 units one month and then the next RFP comes out
11 and it only is for 50 units, and looking back you know
12 that their full demand is 100 units; right? So if only
13 50 percent of that is going out to bid now, they -- I
14 mean --
15    Q.   How do you confirm the accuracy of what
16 their full demand is? Did you?
17    A.   We can't confirm that information from the
18 customer -- I mean, we wouldn't have that information.
19 The customer typically would provide again what their
20 estimated usages would be.
21    Q.   We talked about IMS data before. Would
22 IMS data give you a glimpse into what that customer did
23 the month before?
24    A.   No. The IMS data was by manufacturer and

Page 75

1 not by our customers, at least the data that I am
2 familiar with and saw.
3    Q.   Are you aware of whether there was any
4 data that Mallinckrodt had access to which would allow
5 to you look and see what other competitors were selling
6 to your customers or what other -- what other
7 competitors were selling to your customers?
8    A.   No, we wouldn't have that information.
9    MR. TSAI: Mark, we've been going about an
10 hour-and-a-half.
11    MR. DEARMAN: Yeah.
12    MR. TSAI: Take a quick break?
13    MR. DEARMAN: Absolutely.
14    THE VIDEOGRAPHER: We are going off the
15 record at 9:28 AM.
16    [A brief recess was taken.]
17    THE VIDEOGRAPHER: We are back on the
18 record at 9:43 AM.
19    Q.   (By Mr. Dearman) I might have asked you
20 this, but with regards to your position as a director
21 of national accounts, would you also be participating
22 in the SICP bonus program?
23    A.   Yes, I recall being part of that program
24 in that position.

Page 76

1    Q.   And one of the factors to determine what
2 your bonus would be is volume of sales; correct?
3    A.   One of the factors -- again, there were
4 multiple factors that were -- that went into that
5 program.
6    Q.   Again, one of the factors would be the
7 volume of sales?
8    A.   One of the factors would be volume of
9 sales that went into the program, along with several
10 others.
11    Q.   We can -- I can ask this question 500
12 times if you'd like, and I appreciate you providing
13 additional information, but my question was is it
14 correct that one of the factors in determining your
15 bonus as a director of national accounts is volume of
16 sales? And I'm asking you for a yes or no, and then
17 you can explain it any way you want.
18    MR. TSAI: Object to the form. Go ahead.
19    A.   One of the factors included sales. Yes,
20 that is correct.
21    Q.   (By Mr. Dearman) It says you were
22 nominated by management to participate in product
23 pipeline team?
24    A.   That is correct.

Page 77

1    Q.   What is the product pipeline team?
2    A.   It was a -- from what I recall, it was a
3 team of various roles looking into -- R & D kind of led
4 this team from my recollection, looking at items that
5 we could potentially bring to our portfolio.
6    Q.   And when you say items, what is it that
7 you mean when you refer to the term items as it related
8 to your duties and responsibilities?
9    A.   I'm sorry. Items meaning the products?
10 Is that --
11    Q.   Is that what you were referring to?
12    A.   Yes, products. Yeah, so R & D team looked
13 to grow our portfolio, and there was a team established
14 with various roles to look at those products as
15 potential items in our pipeline.
16    Q.   And would you be referring to -- then to
17 generic medications that were not already in your
18 pipeline?
19    A.   I don't recall what products or anything,
20 but they were -- there may have been some that were
21 already in the pipeline that were being reevaluated,
22 potentially. New ones, I don't recall. Yeah.
23    Q.   It indicates that you won the 2016
24 manufacturer of the year award from PBA. Do you see

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 that?
2     A.   I do.
3     Q.   What is the 2016 manufacturer of the year,
4 and who is PBA?
5     A.   PBA is a wholesaler located in Kansas
6 City, and they were a customer of mine that year.  I
7 don't know the specific details as to how they
8 determined the manufacturer of the year.
9     Q.   Did you get a plaque?
10     A.   I believe there was a plaque that
11 Mallinckrodt was provided.
12         [Exhibit Mallinckrodt-Cardetti-004 marked
13          for identification.]
14     Q.   I'm marking as Exhibit Number 4 a document
15 that is Bate-ranged 0117 -- I'm sorry --
16 MNK-T1_002330117.  Are you familiar, if you turn to the
17 page before it, where it says Covidien Pharmaceuticals
18 specialty generics, strategic plan?  Are you familiar
19 with these type plans?  These something you've seen
20 before?
21     A.   Strategic plans, yes, I'm familiar -- I'm
22 familiar with.
23     Q.   And it says Covidien Pharmaceuticals.
24 What's that?

Page 79

1     A.   Covidien Pharmaceuticals at this time was
2 the parent company of Mallinckrodt.
3     Q.   Was Covidien Pharmaceuticals the parent of
4 Mallinckrodt the entire time you were with
5 Mallinckrodt?
6     A.   No.
7     Q.   When did that change?
8     A.   I don't remember the specific date.
9     Q.   If you turn to the second page, there's an
10 organizational chart.  Are you familiar with that term?
11     A.   Organizational chart?
12     Q.   Yes.
13     A.   Yes.
14     Q.   And it says specialty generics, FY, full
15 year 2013.  I assume that's what that means?
16     A.   Fiscal year.
17     Q.   Fiscal year 2013?  Okay.  Specialty
18 generics.  What does that refer to at Mallinckrodt, if
19 you know?
20     A.   Just the name of our group, generics.
21     Q.   Was there also a group for branded drugs?
22     A.   There was another group for branded, yes.
23     Q.   And do you know whether or not branded
24 drugs that were sold by Mallinckrodt included scheduled

Page 80

1 drugs?
2     A.   I'm not familiar with the branded
3 business.
4     Q.   Would that have been important for you to
5 know as a salesperson at Mallinckrodt?
6         MR. TSAI:  Object to the form.  Go ahead.
7     A.   I was responsible for generic
8 pharmaceuticals.  Did not have any responsibility for
9 brands.
10     Q.   (By Mr. Dearman)  So looking at this
11 organizational chart and -- do you see where you're
12 located on this chart?
13     A.   I do.
14     Q.   I'm glad you do.  Where are you?
15     A.   At the very bottom on the left, under Jane
16 Williams's column.
17     Q.   And so we talked about your position while
18 you were working for Jane Williams; correct?
19     A.   Yes.
20     Q.   Is that the position you would have been
21 in until the time that you departed from Mallinckrodt?
22     A.   No.  So this notes RAM, which would have
23 been the regional account manager, between October 2012
24 and July of 2013.

Page 81

1     Q.   And then when you moved to director of
2 national accounts, is that -- would that be on this org
3 chart?
4     A.   It would have still been with -- under
5 Jane's team.
6     Q.   But you wouldn't have been a RAM?  You
7 would have been --
8     A.   A director of national accounts, so an
9 NAD, if you will.
10     Q.   I see it.  Where Steve Becker is?
11     A.   That's correct.
12     Q.   And again, in your role as a director of
13 national accounts, did anyone directly report to you?
14     A.   No.
15     Q.   And if you turn the page to the third page
16 of the document, it lists folks' names at the top, Pete
17 Romer, Bonnie New, open territory -- I assume that's
18 not a name of somebody -- Steve Becker and Lisa
19 Cardetti?
20     A.   Yes.
21     Q.   And if you look at the names underneath on
22 the list underneath your name, Bartell Drugs, Bashas,
23 Bi-Mart.  Do you see that?
24     A.   I do.

Page 82

1    Q.   What is that referring to, if you know?

2    A.   Those are customers -- again, customers of

3  Mallinckrodt would have been wholesaler, distributors,

4  direct retail, for example.

5    Q.   And does this refresh your recollection as

6  to when you were in the regional manager spot that

7  these would have been your accounts?

8    A.   Not exactly.  I mean, yes, it looks like

9  this is what I was responsible for at that time, but it

10  doesn't refresh any specific memories.

11   Q.   Are you familiar with the term diversion?

12   A.   I am.

13   Q.   And what is your understanding of that

14  term?

15   A.   Diversion could take place at several --

16  there could be several different types of diversion.

17  Diversion could be in this business at the

18  manufacturer, like a break-in at the distribution plant

19  or the distribution or at any facility, for that

20  matter.

21      Diversion could be when we were -- are

22  shipping product and the carrier of that product --

23  product is stolen from the transportation carrier.  It

24  could be diversion at the -- our customers' facilities,

Page 83

1  in terms of burglary or break-ins, obtaining the

2  product illegally that way.  It could be at the

3  pharmacy level.  I mean, there's various different

4  types of diversion.

5    Q.   Any others that you can think of?

6    A.   Diversion in the sense a patient acquires

7  product that was not his or hers by whatever form.

8    Q.   Do you believe that diversion can result

9  in abuse -- abuse of opioids?

10   A.   Sure, diversion could have an impact.

11  Yeah.

12   Q.   Are you familiar with the term suspicious

13  order?

14   A.   Yes, I'm very familiar with suspicious

15  orders.

16   Q.   And what is your understanding of a

17  suspicious order?

18   A.   So specifically at Mallinckrodt, there was

19  a compliance team that again, I know very high-level as

20  far as what their -- what they did on a day-to-day

21  basis, but I do know that they -- it was a very -- in

22  my eyes, it was a very robust program where they looked

23  at detailed information, just -- specific to chargeback

24  data, again, where the purpose of that was for true-up

Page 84

1  financials, but utilizing that data to ensure that we

2  were doing the right thing in terms of shipping to

3  customers of ours that -- ensuring that we were being a

4  responsible manufacturer and supplier of the product

5  and working with customers that were responsible as

6  well.

7    Q.   You say that there was a very robust

8  program where they looked at detailed information just

9  specific to chargeback data.  What were they looking

10  specifically at chargeback data for, if anything?

11   A.   Yeah.  So chargebacks would include,

12  again, only internal Mallinckrodt information in terms

13  of what -- we go back to the -- my original kind of

14  definition, if you will, of the wholesaler selling out

15  to the pharmacy, the bottle quantity that the

16  wholesaler sold to the pharmacy.

17      That is the end of the information that we

18  had as far as where our product was going.  So the

19  chargeback would come from the wholesaler,

20  again in an aggregated format, depending on how that

21  customer provided that, whether it be daily, weekly,

22  monthly, and it was aggregated, and the team utilized

23  that data.

24   Q.   Utilized that data to do what?

Page 85

1    A.   I was not in the suspicious order

2  monitoring group.  I would -- Karen Harper managed that

3  group, so I would recommend contacting Karen in regards

4  to the specific -- what they did specifically with that

5  data.

6    Q.   And so you can't tell me specifically.

7  Can you tell me generally?

8    A.   Generally, from -- again, from my

9  perspective in my roles at Mallinckrodt, I was aware

10  generally that they were looking at orders coming in,

11  comparing it to historical demand, making sure that

12  anything -- if an order looked suspicious, looking at

13  that.  But again, for the specifics I would recommend

14  contacting Karen.

15   Q.   While at Mallinckrodt, did you have any

16  responsibility to approve a shipment to a customer?

17   A.   That was not my responsibility, so

18  suspicious order monitoring gave the approvals in terms

19  of what orders should or should not ship.

20   Q.   And you did not; correct?

21   A.   I did not give the approvals.

22   Q.   From the time that you started in January

23  of 2006 to the time that you departed in October of

24  2017, are you aware of a single order that was

Page 86

1  determined to be suspicious at Mallinckrodt?

2      A.   I don't remember specific orders.  I do

3  remember that that team looked at it on a regular basis

4  and did the diligence to ensure that they felt

5  comfortable.  In my eyes, that team was very

6  conservative and wanted to ensure that what we were

7  shipping out was validated.

8      Q.   Do you know, from the time that you

9  started at Mallinckrodt until the time that you left

10 Mallinckrodt, whether or not there was a single order

11 that was determined to be suspicious?

12     A.   I don't -- I would not have had that

13 information in terms of what orders -- I mean, again,

14 the suspicious order monitoring team reviewed all of

15 that.  I don't know a specific order that was

16 considered suspicious during that --

17     Q.   So you were not aware -- you are not aware

18 of a single order that was determined to be suspicious

19 while you were at Mallinckrodt; correct?

20     A.   There were orders that were determined to

21 be suspicious during that time.  I don't know the

22 specifics of those orders.

23     Q.   Was there more than -- were there less

24 than 10?

Page 87

1      A.   I don't know the -- I don't know the --

2      Q.   Was there more than 10?

3      A.   I don't know the details around the number

4  of orders that were considered suspicious or were not

5  considered suspicious.  Again, that was a suspicious

6  order monitoring team that was responsible for all of

7  that, and I would recommend contacting that group.

8      Q.   And I appreciate your recommendation, and

9  I'm not asking you how many weren't suspicious.  I'm

10 asking you if you know how many were suspicious.

11 Actually, my question is do you know whether any were

12 deemed suspicious?  Yes or no?

13     A.   There were abs --

14     MR. TSAI:  Object to the form.  Go ahead.

15     A.   There were absolutely orders that were

16 considered suspicious.

17     Q.   (By Mr. Dearman)  Do you know how many?

18     A.   I do not know how many.

19     Q.   Do you know who Mr. Rausch is?

20     A.   I believe there were a few Rausches that

21 worked at Mallinckrodt.  A couple, I believe.  A father

22 and a son, if I remember correctly.

23     Q.   Did either of them work in the SOM

24 program?

Page 88

1      A.   I don't know.

2      Q.   In your roles at Mallinckrodt that we had

3  previously discussed, did you understand that

4  Mallinckrodt was legally required to provide effective

5  controls and procedures to guard against theft and

6  diversion of controlled substances?

7      A.   We were trained that there were rules and

8  regulations, again, that -- knowing that this is a

9  highly-regulated market, in terms of what our legal

10 responsibility was.  That was the suspicious order

11 monitoring and legal and regulatory teams'

12 responsibilities.

13     Q.   So did you have an understanding that

14 Mallinckrodt was legally required to provide effective

15 controls and procedures to guard against theft and

16 diversion of controlled substances?

17     A.   Yes, generally speaking.  I knew that

18 there were regulations and rules.

19     Q.   What were your -- what was the source of

20 that understanding?

21     A.   Training that Mallinckrodt had provided.

22     Q.   Can you tell me about any training that

23 you received as it relates to diversion or

24 anti-diversion?

Page 89

1      A.   I don't remember the specifics around the

2  training.  Again, this was a long time ago.  But I do

3  know that from my recollection, every employee was

4  required to do training, and again, I don't remember

5  the specifics, though.

6      Q.   And did the training include

7  anti-diversion training?

8      A.   From my recollection -- I believe so.

9      Q.   When did you leave Mallinckrodt?

10     A.   In October 2017.

11     Q.   In October 2017, did you receive any

12 training regarding anti-diversion efforts?

13     MR. TSAI:  Object to the form.  Go ahead.

14     A.   In that specific month?

15     Q.   (By Mr. Dearman)  Yeah.

16     A.   I don't recall.

17     Q.   How about the year 2017?

18     A.   I do remember that it was regular training

19 that we had -- Mallinckrodt had several pieces of

20 material that the employees were to be trained on a

21 regular basis.  I don't remember the cadence of any

22 specific training, no.  And we had to complete the

23 training within a certain amount of time.

24     Q.   So can you tell me in 2017 whether or not

Page 90

1  you received any such training?
2      A.  Again, I don't remember the timing of --
3      Q.  The training -- did it require some sort
4  of a either webinar or some other materials that would
5  be utilized for purposes of training?
6      A.  I do remember there were -- yeah, like an
7  online type of training.
8      Q.  Where you would log in and you would spend
9  your time to receive whatever training you were
10 required to receive?
11     A.  That is correct.  That was part of the
12 training.
13     Q.  Were there policies and procedures that
14 you were provided to -- that you were provided with
15 that explained to you how often you had to train or
16 when you had to train?
17     A.  We would get notifications on login --
18 there's a new training out there that needs to be
19 completed by X date, for example.
20     Q.  Who would provide -- was that by e-mail?
21     A.  That was by e-mail.
22     Q.  And who would provide those notifications
23 to you?  Was there a training group or somebody else?
24     A.  I don't remember who sent those -- it --

Page 91

1  from what I recall it may have been a very general
2  Mallinckrodt e-mail -- communication.  I don't know.
3      Q.  But you would log in and you would receive
4  whatever the training was?
5      A.  Yes.
6      Q.  And you believe that some of that training
7  included discussion about diversion or anti-diversion?
8      A.  Yeah, from what I recall, that would have
9  been included in those trainings.
10     Q.  Did you have an understanding that
11 Mallinckrodt had a duty to report suspicious orders?
12     A.  A very general understanding, and pretty
13 much that's the extent of it.
14     Q.  Did you ever report any suspicious orders?
15     A.  Did I report it to who?
16     Q.  Anybody?
17     A.  Not that I recall.  Again, depending on
18 what -- I mean, if you're referring to July 2013
19 through 2017, I wouldn't really have access to the
20 orders coming in or anything like that.
21     Q.  I'm referring to anytime you were with
22 Mallinckrodt.
23     A.  Yeah, no, I don't recall.  I mean, again,
24 specific orders -- the only time that I would have seen

Page 92

1  specific orders from customers was in my customer
2  service representative days, and again, that was not my
3  responsibility.  It was simply to enter the orders into
4  the system.
5      Q.  Were you aware whether or not Mallinckrodt
6  had a responsibility to avoid filling suspicious
7  orders?
8      A.  Sure.  Again, I knew that there were rules
9  and regulations around suspicious orders and I know
10 that the suspicious order monitoring team was doing the
11 diligence looking at all of that, and I do know that
12 orders were deemed to be suspicious.
13     Q.  When you use the term diligence that you
14 just used --
15     A.  Uh-huh.
16     Q.   -- or due diligence, what is it you mean
17 by that?
18     A.  Kind of like what I referred to before, I
19 guess.  So looking at the orders coming in, looking at
20 historical volume.  Again, this is my layman's
21 perspective of what that team was doing.  I don't know
22 the specifics as to what they were doing.  I just know
23 that there was a process that was followed by that team
24 to look at orders.

Page 93

1      Q.  And when you say that team, can you --
2      A.  Sorry.  Suspicious order monitoring team.
3      Q.  And do you know who was part of that team?
4  Can you name anyone?
5      A.  Karen Harper, and at one point I
6  believe -- or Jen Buist.  Those are the two names that
7  come to mind.
8      Q.  And I understand that was the
9  responsibility of that team, and what I'm asking you
10 now as a director of national accounts, what was
11 your responsibility as it related to the suspicious
12 order monitoring, if any?
13     A.  I was not involved in the suspicious order
14 monitoring process, from what I recall.
15     Q.  And that would be true of your entire time
16 at Mallinckrodt?
17     A.  Yeah, the suspicious order monitoring
18 team -- that was their responsibility in terms of
19 reviewing and making those decisions.  They were the
20 decision makers.
21     Q.  So I want to make sure we're not splitting
22 hairs here.
23     A.  Sure.
24     Q.  When you say they were responsible, I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 wondering what your role, if any, in the department
2 that you were in -- did that intersect with the SOM
3 program or the SOM team?
4    A.   Again, kind of going back to my analyst
5 days, I ran reports.  There may have been -- I don't
6 remember specifically, but there may have been a time
7 where I was asked to run a report for the suspicious
8 order monitoring team, for example.  Yeah.
9    Q.   Let me see if I can make it a little bit
10 easier for you.  From the time that you were a product
11 manager in 2011 and forward till the time that you
12 left -- when was the first time that you got into the
13 sales department?  Let's start -- let me ask you that
14 question.
15    A.   Sales was regional account manager.
16    Q.   So let's talk about that.
17    A.   Okay.
18    Q.   So in your tenure in the sales department
19 at Mallinckrodt, can you tell me what role, if any, you
20 had in regards to the suspicious order monitoring
21 process at Mallinckrodt?
22    A.   Okay.  Thank you for specifying the time
23 frame.
24    Q.   You're welcome.

Page 95

1    A.   So during -- as sales -- so if an order
2 came in, was deemed suspicious by the suspicious order
3 monitoring team, they didn't have any backup
4 documentation of a new award or anything like that,
5 they would reach out to the salesperson that was
6 responsible for that customer -- again, wholesaler,
7 distributor, direct retail chain primarily -- and ask
8 for additional insight in terms of this order that
9 looked suspicious.
10        So we were kind of the middleman, if you
11 will, between suspicious order monitoring and the
12 customer, relaying information from the SOM team to the
13 customer and back from the customer to the SOM team.
14 And that was done over e-mail.
15    Q.   And what training did you receive for that
16 role or that responsibility?
17    A.   I vaguely recall Karen -- I don't remember
18 specifics, but Karen giving us training regarding --
19 that they needed this information in order to release
20 orders or to potentially release orders.
21    Q.   Anything else?
22    A.   Anything else in regards to the training
23 that I remember?
24    Q.   That is correct.

Page 96

1    A.   I don't remember specifics around the
2 training, no.
3    Q.   Anything else with regard to generalities?
4    A.   Not that I can recall.
5    Q.   Did your -- in sales, did your intended --
6 who was your intended customer while you were in sales,
7 and did that change while you were in sales?
8    A.   The intended customer were the wholesaler,
9 distributor, direct retail chains.  Like our direct
10 relationships that we had with those wholesalers,
11 distributors, direct retail chains.
12    Q.   What was your understanding, if any, as to
13 whether or not -- once the product was received by
14 whoever the intended customer was, whether or not
15 Mallinckrodt had a further responsibility as it related
16 to anti-diversion?
17    A.   So the responsibility was held in the
18 suspicious order monitoring team, and that is exactly
19 what, from my perspective, Mallinckrodt did.  They
20 looked at the data that was provided by those customers
21 of ours -- again, the wholesaler, distributors, direct
22 retail chains -- in terms of the pharmacies that they
23 were selling to.
24        All of that information was integrated

Page 97

1 into the chargeback data.  The suspicious order
2 monitoring team used that data to make decisions, from
3 my understanding, and decisions were made based on
4 having that.  Again, that is just internal Mallinckrodt
5 data.  It doesn't give you the whole picture on those
6 pharmacies or anything, but from my understanding
7 decisions were made based on that data, and I know that
8 pharmacies were cut off.
9        We -- the suspicious order monitoring team
10 cut off specific pharmacies, and notifications went out
11 to the wholesalers and distributors that we will not
12 accept chargebacks for these pharmacies.  I mean, I
13 feel like that was -- the diligence was done with that
14 team.
15    Q.   So you would agree that Mallinckrodt had
16 some further responsibility once it delivered the
17 product to its intended customer, and that was the
18 SOM -- the suspicious order monitoring team's
19 responsibility?
20    A.   Suspicious order monitor --
21        MR. TSAI:  Object to the form.  Go ahead.
22    A.   Sorry.  Can you repeat the question?
23    Q.   (By Mr. Dearman) Yeah.  Once a product
24 was received by whoever the intended customer was,

Page 98

1  whether it was a retail chain or it was a distributor,
2  do you know or do you believe that Mallinckrodt had any
3  further responsibility as it related to making sure
4  that diversion did not occur?
5       MR. TSAI:  Object to the form.  Go ahead.
6       A.   So again, diversion can happen in many
7  forms, and --
8       Q.   (By Mr. Dearman)  And I'm referring to all
9  of the forms.
10       A.   Right.  So we can't affect or we can't
11  control all of the forms of diversion.  We can control
12  what we sold to the customer and the information -- we
13  can use the data that was provided to us for
14  Mallinckrodt-specific products on who those pharmacy --
15  who those wholesalers sold product to, utilize that
16  information in a responsible manner to make decisions
17  on how -- who received our product, who meaning the
18  pharmacies.  And again, that is the end of the chain as
19  far as the information that we had.
20       Q.   Are you familiar with the saying know your
21  customer's customer?
22       A.   I am familiar with that saying.
23       Q.   And what does that mean?
24       A.   Just what I explained.  Just the

Page 99

1  wholesaler is our customer, the pharmacy is the
2  wholesaler's customer.  So knowing your customer's
3  customer is really that chargeback data that
4  Mallinckrodt had and utilized.
5       Q.   Do you also believe that it included
6  looking at IMS data?
7       A.   To know your customer's customer?
8       Q.   Yes.
9       A.   I don't see the correlation with that.
10       Q.   Are you familiar with the term peculiar
11  order?
12       A.   Yes.
13       Q.   What is a peculiar order?
14       A.   It's an order that the suspicious order
15  monitoring team has deemed to be suspicious and needed
16  additional information to make a decision.  That's my
17  interpretation of peculiar order.
18       Q.   Is there any difference to you then
19  between a peculiar order and a suspicious order?
20       A.   I don't know how they were used with that
21  team, so not necessarily in my opinion -- from my
22  perspective.  I mean, it may have been that they needed
23  more information.  Again, I don't know.  That would
24  probably best be described by the SOM team.

Page 100

1       Q.   So you don't know whether there's a
2  difference or what the differences are between the
3  peculiar order and a suspicious order?
4       A.   Not necessarily.  Not that I recall.
5       Q.   Do you know whether or not -- while you
6  were at Mallinckrodt, whether or not any peculiar
7  orders were ever shipped to a customer?
8       A.   So again, my understanding of a peculiar
9  order is one that the suspicious order monitoring team
10  may have needed additional information, and for an
11  example, if we recently won business with this specific
12  customer, there was no history of that customer
13  purchasing that product, so based on whatever the
14  algorithm that that team had determined -- that team
15  meaning the suspicious order monitoring team had
16  determined, it was considered a peculiar order, and
17  then they reached out to the sales and market team --
18  market -- excuse me -- marketing team, for example, to
19  get additional information.
20       We would have potentially provide -- this
21  is just a hypothetical example -- that we would have
22  provided that information on the new award and the
23  expected volumes, and then that order could have
24  potentially been released based on that additional

Page 101

1  information for the SOM team.
2       Q.   Are you aware of whether any peculiar
3  orders were flagged to your attention and were
4  subsequently shipped?
5       A.   Potentially, yeah.  I mean, there could
6  have been orders that were -- again, from that exact
7  same example.  That may have been a new award, and that
8  would have been okay to ship because of the new award.
9       Q.   Are you aware of any peculiar orders that
10  were flagged to you that were not shipped?
11       A.   Again, there could have been situations.
12  I don't remember specific orders or anything, but there
13  could have been situations where, based on the
14  information provided back to the SOM team, they felt
15  that it wasn't appropriate to still -- to ship that
16  order based on whatever details that they were
17  provided, so sure.  Yes.
18       Q.   Do you recall any of those orders?
19       A.   Do I recall any of those -- I do not
20  recall a specific order that was -- I do know that
21  there were -- again, the process that took place, and
22  there would have -- there could have potentially been
23  orders that shipped and there could have potentially
24  been orders that didn't ship depending on the

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  information that the SOM team received and whether they
2  deemed it appropriate.
3      Q.   So there are a lot of things that could
4  happen, and so I'm asking you what your knowledge is as
5  to whether they wanted. So I'm going to ask you
6  again --
7      A.   Sure.
8      Q.   -- with regard to a peculiar order, are
9  you aware of a peculiar order that was brought to your
10  attention, you did whatever diligence you were supposed
11  to do in the sales group, and the order was not
12  shipped?
13      A.   I recall there were situations where
14  orders were not shipped, and I mean, vaguely.
15      Q.   Do you know how many?
16      A.   Absolutely not.
17      Q.   Is the same true for suspicious orders?
18      A.   Yes. I mean, again, I kind of use that
19  interchangeably from my perspective.
20      Q.   Do you agree with the following statement?
21  During your tenure at Mallinckrodt, there was not a
22  single order that was deemed peculiar that was not
23  eventually shipped?
24      A.   Say that again, please.

Page 103

1      Q.   Sure. Do you agree with the following
2  statement? During your tenure at Mallinckrodt, there
3  was not a single order that was deemed peculiar that
4  was not eventually shipped?
5      A.   Can you rephrase? There's kind of a
6  double negative in there.
7      Q.   There is. That's correct. All right.
8  Are you aware of any orders that were deemed peculiar;
9  okay?
10      A.   Okay.
11      Q.   Which were not subsequently shipped to a
12  customer?
13      A.   Any orders that were --
14      Q.   Deemed peculiar?
15      A.   -- deemed peculiar that were not shipped.
16      Q.   But not -- that were not shipped?
17      A.   Yes, there could have been orders that
18  were deemed -- I mean, I don't remember specifics
19  around any orders or anything like that. Again, that
20  was the suspicious order monitoring team. I do know
21  that they reached out for additional information, and
22  if an order was deemed not to ship that would have been
23  their decision.
24      Q.   Maybe I'll ask it to you this way as a

Page 104

1  true-or-false question. True or false? Every order
2  that the SOM group deemed peculiar was eventually
3  shipped?
4      MR. TSAI: Object to the form.
5      Q.   (By Mr. Dearman) Is that false or is that
6  true?
7      MR. TSAI: Object to the form.
8      A.   Please repeat it.
9      Q.   (By Mr. Dearman) Sure. True or false?
10  Every order that the SOM group deemed peculiar was
11  eventually shipped to the customer?
12      MR. TSAI: Object to the form.
13      Q.   (By Mr. Dearman) It's true or false. Do
14  you think it's true or do you think it's false?
15      A.   I don't --
16      MR. TSAI: Object to the form. Go ahead.
17      A.   I don't agree with that statement because,
18  again, there were orders that were shipped and there
19  were orders that were not shipped.
20      Q.   (By Mr. Dearman) And would that be true
21  also if I used suspicious orders instead of peculiar
22  orders in the same --
23      A.   I don't know how the suspicious order
24  monitoring team defined the difference between peculiar

Page 105

1  and suspicious, so I don't -- I can't answer that
2  question.
3      Q.   All right. Unfortunately I have to ask
4  the question again now.
5      A.   Okay.
6      Q.   And I'm going to ask it to you -- instead
7  of as it relates to a peculiar order, I'm going to ask
8  it to you as it relates to a suspicious order. It's a
9  true-or-false question. Every order that the SOM group
10  deemed suspicious was eventually shipped to the
11  customer? True or false?
12      MR. TSAI: Object to the form.
13      A.   Again, I do not agree with that statement
14  because there were situations in which the suspicious
15  order monitoring team may have deemed an order to be
16  approved to ship, and there may have been situations
17  where the suspicious order monitoring team deemed it
18  not appropriate to ship based on the information that
19  they had, and that was again not my decision. The
20  suspicious order monitoring team was responsible for
21  that.
22      Q.   (By Mr. Dearman) So you believe my
23  statement was false?
24      MR. TSAI: Object to the form.

Highly Confidential – Subject to Further Confidentiality Review

Page 106

1    A.   Can you repeat the question?

2    Q.   (By Mr. Dearman) I can.  We can do this

3  as many times as you'd like.  I'm going to ask now

4  again about the suspicious order, and I'm going to ask

5  you whether or not you agree that this is a true

6  statement or a false statement.

7    A.   Okay.

8    Q.   Any order that the SOM group determined

9  was suspicious, they deemed it to be suspicious, was

10  eventually cleared to be sent or shipped to a customer?

11    A.   I don't -- I do not agree with that.

12    Q.   Is that -- so you think it's false?

13    A.   Because the --

14    Q.   You think it's false?  You told me the

15  reason why.  I'm just asking you.  You think it's

16  false?

17        MR. TSAI:  Object to the form.  Go ahead.

18    A.   I don't agree with that statement

19  personally.

20    Q.   (By Mr. Dearman) Do you think it's false?

21  Do you personally think it's false?

22    A.   I --

23        MR. TSAI:  Object to the form.

24    A.   I personally think that that is false,

Page 107

1  that the suspicious order monitoring team -- that the

2  suspicious order monitoring team made the decision

3  based on the information that they had to ship or not

4  ship.

5        [Exhibit Mallinckrodt-Cardetti-005 marked

6        for identification.]

7    Q.   (By Mr. Dearman) I'm going to show you

8  what is marked as Exhibit 5.

9        MR. DEARMAN:  Can I see one of those for a

10  second?  Sorry about that.  Thanks.

11    Q.   (By Mr. Dearman) This is Bates range 5043

12  through -- it's native, so that's the only Bate range,

13  but it's a one -- it's a two-page document attached to

14  the native format slip sheet.  Have you had a chance to

15  look at these two pages?

16    A.   I'm trying.  They're little.

17    Q.   Sorry.

18    A.   Okay.

19    Q.   Are you familiar with these type of

20  documents?

21    A.   Not necessarily.  I mean, I don't know who

22  created this or when or what the purpose was, or

23  there's no context around either of these documents,

24  so --

Page 108

1    Q.   Have you ever created a document for sales

2  and rebates for any of your accounts?

3    A.   Potentially.  I mean, I --

4    Q.   If you turn to the next page --

5    A.   Uh-huh.

6    Q.   -- in that chart -- just at the top; I'm

7  not asking you about the other ones.  MI contract

8  title -- do you know what that is?

9    A.   MI contract title.  I don't recall what

10  that would -- MI -- what's that for?

11    Q.   Do you know what rebate fee frequency --

12  and again, I'm just in the top of that chart.

13    A.   Uh-huh.

14    Q.   Do you know what that refers to?

15    A.   Sure.  So from my recollection, that would

16  be based on how often those rebates would be paid.

17    Q.   And I don't think we've talked about

18  rebates yet, so what is a rebate?

19    A.   A rebate is -- it could be many different

20  types of rebates negotiated with customers.  Every

21  account would be different from my recollection.

22    Q.   Were you ever involved while at

23  Mallinckrodt in negotiating rebates with customers?

24    A.   During my sales position, rebates were

Page 109

1  discussed.  That is correct, yes.

2    Q.   And would rebates be part of the written

3  contract with the customer?

4    A.   They would, yes.

5    Q.   What is the purpose of a rebate?  Does

6  that benefit the customer?  Does that benefit

7  Mallinckrodt?  Does it benefit both of you?

8    A.   It's just how you come about the end

9  price.  Yeah.

10    Q.   What's the difference between a rebate and

11  a chargeback?

12    A.   So the chargeback is getting you back to a

13  contract price, so if you remember they purchase at a

14  WAC price.  Get you down to the contract price.  And a

15  rebate would be going from contract to a net price,

16  whatever was negotiated.

17    Q.   So before we used a WAC price of 10, I

18  think, dollars, we used a contract price of $8?

19    A.   Correct.

20    Q.   What is the net price?  What does that

21  mean?

22    A.   It could have been different for every

23  single customer.  Contract could have meant net with

24  some customers.  There could have been zero rebates.

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 Again, it was dependent on the customer, and -- yeah.

2     Q.   What was the purpose of the rebate?

3     A.   It was just a negotiated -- I mean, to get

4 the customer to a negotiated price.

5     Q.   Would the chargeback information be used

6 to determine what the rebate was?

7     A.   No, the chargeback was -- no.

8     Q.   Did the rebate -- was there actually a

9 payment made to the customer for the rebate, or was it

10 a credit that was put to a future -- if you know?

11     A.   Every customer could have been different

12 on how that was paid.  I don't know the specifics on

13 any of that.

14     [Exhibit Mallinckrodt-Cardetti-006 marked

15     for identification.]

16     Q.   I'm going to show you a document which is

17 marked Exhibit Number 6.  It is Bate ranged 4382

18 through 4404.

19     A.   Thank you.

20     Q.   You see the first page there is an e-mail?

21 Who is Lisa Lundergan?

22     A.   That is me.

23     Q.   And was that your maiden name?

24     A.   Yes.

Page 111

1     Q.   Do you see that there's an e-mail down at

2 the bottom from Cindy Cerneka, who I think was one of

3 your supervisors that we talked about, to you --

4     A.   Yeah.

5     Q.   -- on June 9, 2018?

6     A.   Yes, I do see that.

7     Q.   Do you have any reason to believe that you

8 did not receive this e-mail in the ordinary course of

9 your business at Mallinckrodt?

10     A.   Do I have any reason to believe I did not

11 receive it?

12     Q.   That you did not receive it?

13     A.   No, based on what I'm looking at.

14     Q.   Please let me know when this has been

15 updated.  You -- that was from you to Cindy.

16     A.   Uh-huh.

17     Q.   What was it that you were trying to figure

18 out what was updated?

19     A.   So the -- from my recollection, back in

20 2008, as you can see here, this rebate metrics -- it

21 was just an internal report that was used as reference

22 as needed to -- based on --

23     Q.   What are you referring to when you say

24 rebate metrics?

Page 112

1     A.   I'm sorry.  The --

2     Q.   That's okay.

3     A.   What you gave me.

4     Q.   Is there a -- can you just refer to the

5 number down at the bottom just so --

6     A.   I'm sorry.

7     Q.   That's okay.  Just --

8     A.   MNK-T1_0006434399.

9     Q.   And if you just -- in the future, if you'd

10 just refer to the last four we'll find it.

11     A.   Sure.  Okay.

12     Q.   So 4399?

13     A.   4399.  Correct.  So this was a report that

14 I recall was for reference only based on what was --

15 based on based on our contractual agreements with our

16 customers, and so it appears that Cindy was asking me

17 to update it -- or no, wait, I was asking Cindy to

18 update it.

19     Q.   Right.  And why would you have been doing

20 that?  What were you going to use this matrix for, if

21 you know?

22     A.   So again, this is, from my recollection,

23 just a report that was utilized to know what was

24 contracted like in our agreements with our customers.

Page 113

1     Q.   So the first one -- on that rebate

2 matrix -- ABC ProGenerics Primary, and it says that

3 they're an indirect customer, and it says the rebate is

4 13 percent.  13 percent of what?

5     A.   I don't know the details of that contract

6 at this time, so I can't answer that question.  I don't

7 have the contract of AmerisourceBergen back in 2008.

8     Q.   It says -- it uses the term -- it uses the

9 number 13 percent.  I'm not asking you what the

10 contract says.  I'm asking you what that 13 percent is

11 supposed to represent.

12     A.   That's what the contract would specify --

13 how that 13 percent is paid.

14     Q.   And what were the options as to how that

15 13 percent could be paid?

16     A.   Off of -- contract price would have been

17 an option.

18     Q.   And the purpose of looking at this to know

19 that ABC ProGenerics Primary had a rebate of 13

20 percent -- how did that inform you as to what you did

21 in sales at Mallinckrodt?

22     A.   So at this point in time, I was a market

23 analyst back in 2008, so this was really just a report

24 that was provided to, again, know what was on

Page 114

1  contract -- what was our contractual obligations that
2  was negotiated with the customer and the terms and
3  conditions that was referenced as needed.
4      Q.   If you go back to the beginning of the
5  e-mail -- back to the beginning of the document --
6      A.   Uh-huh.
7      Q.   -- you have the e-mail page, and then the
8  next document is 4384.  Do you see that?
9      A.   I do.
10     Q.   And we can start with any of these.  It
11 doesn't matter.  Cardinal, access, acute.  Do you see
12 that?
13     A.   I do.
14     Q.   And it says morphine sulfate ER 15
15 milligrams tab, bottle of 100.  What is that referring
16 to?
17     A.   So this is what it appears, the -- based
18 on that contract with Cardinal at this time these it
19 were rebates and the item number, the NDC with a
20 specific product that was in the contract.
21     Q.   So the 18.5 percent rebate was in
22 reference to that specific item?
23     A.   That specific item on that specific
24 contract.  Correct.  At that time.

Page 115

1      Q.   Understood.
2      A.   Yeah.
3           [Exhibit Mallinckrodt-Cardetti-007 marked
4            for identification.]
5      Q.   I'm going to show you Exhibit 7 which is
6  Bate ranged 34 -- I'm sorry -- 4566 through 4567, and
7  then there's a spreadsheet -- a native spreadsheet
8  attached.  Thank you.  That e-mail is a one-page
9  document, 4566.  This was back in 2008, so you were in
10 the marketing department at that point; is that
11 correct?
12     A.   As an analyst.
13     Q.   Right.
14     A.   Correct.
15     Q.   You can see on the bottom of the e-mail
16 it's an e-mail from you to Bonnie New?
17     A.   Yes.
18     Q.   Who's Bonnie New?
19     A.   Bonnie New was in sales.
20     Q.   Do you have any reason to believe that you
21 didn't send this e-mail in the ordinary course of your
22 business at Mallinckrodt?
23     A.   No, I do not.
24     Q.   If you read the e-mail to Bonnie -- read

Page 116

1  it to yourself.  You say that you don't have projected
2  usages for all of the products awarded to Costco.  Do
3  you see that?
4      A.   I do.
5      Q.   And in order to make this report useful in
6  tracking their compliance, could you provide the
7  projected usages for the items that were awarded on the
8  attached spreadsheet?  When you say to make this report
9  useful, what did you mean?
10     A.   If -- to be able to do the calculations.
11 If you don't have what their expected usages are,
12 there's no data.
13     Q.   And if you take a look at the spreadsheet
14 itself, is there -- you have the -- I don't know what
15 035701 is at the top.  Is that a SKU or an item number?
16     A.   Yes.
17     Q.   You have an item description, you have an
18 indirect price and a direct price.  What's the
19 distinction between those prices, if you know?
20     A.   So for some customers that didn't
21 warehouse product that needed to go through the
22 wholesalers, they would be purchasing the product
23 through the wholesaler but would have a contract with
24 Mallinckrodt, so the price that they purchased it --

Page 117

1  the indirect price and then the direct price would have
2  been the negotiated price, if you will.  It looks like
3  it's all the same in this -- from what I'm looking
4  here, so indirect is equal to direct, but it was really
5  just a contract that was loaded at the wholesalers for
6  indirect customers.
7      Q.   So back to the e-mail.  In order to make
8  this report useful in tracking their compliance --
9  tracking their compliance with what, or for what?
10     A.   So again, compliance tracking kind of like
11 what we were discussing earlier on my résumé was
12 really -- again, if it was a new award -- newly-awarded
13 item with a customer, they estimated the usage to be
14 100 bottles, for forecasting purposes that hundred
15 bottles would be put into our forecast, and then this
16 was really to kind of track if we were getting that 100
17 bottles, that business as -- with that newly-awarded
18 contract.
19     Q.   That compliance had nothing to do with the
20 SOM program, or did it?
21     A.   No, I mean it was more a sales and
22 marketing tool for forecasting.  Yeah.
23     Q.   And if you go back to the chart again
24 where we were talking about the item 035701, and we

Page 118

1 looked at the price of 343, the direct price of 343,
2 what's the effective date and the expiration date?
3     A.  If we can go back to the previous
4 question.
5     Q.  Sure.
6     A.  So I mean, again, suspicious order
7 monitoring could have used that information as far as
8 newly-awarded volumes in making their decisions, so it
9 could have -- yeah.
10    Q.  Is that what you were referring to when
11 you said compliance?
12    A.  No.  So compliance in terms of --
13    Q.  Sale?
14    A.  -- the volume that was provided to us, an
15 estimate from the customer on the expected usage that
16 would be on their contract, and then we would compare
17 that.  This would be kind of comparing that volume to
18 what was purchased on contract for forecasting
19 purposes, but if you remember our discussion earlier, I
20 referenced kind of the same situation, where if there
21 was an order that came in from suspicious order
22 monitoring and there was no history from -- of the
23 customer purchasing it -- purchasing that product and
24 that product -- or excuse me -- that order would have

Page 119

1 been named peculiar or suspicious, that then they could
2 have -- that the suspicious order monitoring team at
3 that point in time could have reached out to get more
4 information to ensure that they felt comfortable with
5 releasing that order.  So just to clarify.
6     Q.  If we go to usage, because you indicated
7 that you needed projected usages; correct?
8     A.  Projected usages.  Again, what was
9 contracted and estimated -- provided from the customer,
10 yes.
11    Q.  So if we go back to that spreadsheet again
12 and look at the first item.
13    A.  Uh-huh.
14    Q.  Under usage, there's nothing there.  Is
15 that the number -- is that some number or percentage
16 that you were looking for?
17    A.  I don't recall.  I mean, it looks like
18 this -- I don't recall this specific e-mail.
19    Q.  Well, I'm just trying to figure out --
20 where would the projected usage show up on this
21 document, if it would?
22    A.  So I reference profit model here, and so
23 that is -- that was another tool utilized by sales, and
24 the customer's estimated usages would be put into that

Page 120

1 Excel file.  It was an Excel spreadsheet.  So the
2 usages would be put into there for any newly-awarded
3 item.
4     Q.  If we turn back to the report again --
5     A.  Uh-huh.
6     Q.  -- it says usage.  Do you see that at the
7 top?
8     A.  I do.
9     Q.  Do you see there's nothing underneath
10 usage?  Or is there and I'm missing it?
11    A.  There are some items with usage.
12    Q.  Oh, okay.  So I see.  So it's to the side,
13 under the zeros, there's 3,000 down there and 12,000?
14    A.  Yeah.  Yeah, there's --
15    Q.  Okay.  All right.
16    A.  I mean, I don't know what was -- what were
17 the newly-awarded products other than this -- I don't
18 have any additional context to know what the
19 newly-awarded products were in regards to what products
20 I was looking for usage on.
21    Q.  Okay.  That's fair.  But if you drop down
22 to that line under usage where there's a number 30,000?
23    A.  Uh-huh.
24    Q.  What is that referring to?

Page 121

1     A.  Again, that's the estimated usage provided
2 by the customer on their demand and the expected usage
3 that was contracted.
4     Q.  Does that mean 30,000 of those specific
5 tablets or pills?
6     A.  30 --
7     Q.  Or is it by pill or by bottle or what is
8 it?
9     A.  30,000 would have been by bottle.  But I
10 don't -- I mean, I don't know if this is annual.  I
11 don't know any other context.  Yeah.
12    Q.  That's fine.  I'm just trying to figure
13 out what it is.
14    A.  Sure.
15        [Exhibit Mallinckrodt-Cardetti-008 marked
16        for identification.]
17    Q.  I'm going to show you Exhibit 8, which is
18 86664 (sic).  It's an e-mail, and then attached to it
19 is a spreadsheet that is produced in native format as
20 well.  You see this e-mail to you on August 6th, 2009,
21 from Kate Muhlenkamp?
22    A.  I do.
23    Q.  2009, you were in the sales -- you were
24 still an analyst; correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    A.   That is correct.

2    Q.   Who is Kate?

3    A.   Kate was a product manager at that time.

4    Q.   Do you have any reason to believe that you
5  didn't receive this e-mail in your ordinary course of
6  business at Mallinckrodt?

7    A.   No, I do not.

8    Q.   Who is Victor Borelli?

9    A.   Victor Borelli was a salesperson at that
10  time.

11    Q.   Did you know who Victor Borelli was?

12    A.   Yes.

13    Q.   Did you know him?

14    A.   Yes, I worked with him.  He was in sales
15  and I was in marketing.

16    Q.   And when you got into sales was he still
17  in sales, if you know?

18    A.   I don't remember when he left.

19    Q.   On the -- so then if you go up to the top,
20  it's from you to -- back to Kate, and you CCed Victor,
21  do you see that?  And it says subject, Sunrise reports.

22    A.   I do.

23    Q.   And then under the attachments, it says
24  some numbers -- CY-08, CY-09, Q12-2.  Do you know what

Page 123

1  any of those numbers refer to?

2    A.   CY would have been calendar year 2008.

3    Q.   Okay.  Yeah.

4    A.   CY-09 -- calendar year 2009, January
5  through June.  So it was six months of sales in 2008
6  and six months of sales in 2009, so Q1 and Q2 meaning
7  January through March and Q2 through June.

8    Q.   Do you know why Victor was asking for this
9  information?

10    A.   I do not.

11    Q.   Were you familiar with who Sunrise
12  Wholesalers were before receiving this e-mail?

13    A.   I was aware of them as -- I don't know if
14  they were a customer of ours at this point in time, but
15  from my understanding or recollection I believe so,
16  yes.

17    Q.   There anything else you know about Sunrise
18  Wholesalers as you sit here today?

19    A.   That they're a wholesaler that was
20  eventually cut off and that account was closed at
21  Mallinckrodt due to -- throughout the SOM team and the
22  suspicious order monitoring.  That's about it, yeah,
23  that I recall.

24    Q.   Was Sunrise ever your customer?

Page 124

1    A.   No.

2    Q.   If we turn the page back to the actual
3  chargeback spreadsheet, I guess, I'll refer to this.

4    A.   Sure.

5    Q.   Are you familiar with this type of a
6  report?

7    A.   Yes, I remember these types of reports.
8  Sure.

9    Q.   The first thing is DEA number, and what
10  does that refer to, if you know?

11    A.   DEA number is the actual facility's DEA
12  registration number with the DEA.  Facility meaning the
13  pharmacy.

14    Q.   It says ship to customer name, Enrique
15  Gonzalez-Pujol, M.D., under ship to customer name.
16  Under pricing contract, it says Sunrise Wholesalers and
17  it gives their ID number; correct?

18    A.   Correct.

19    Q.   It gives a SKU of 853001.  It gives a
20  product description of oxycodone with some of the other
21  dosing information; correct?

22    A.   That's not dosing information.  That's the
23  strength.

24    Q.   The milligrams?

Page 125

1    A.   Yes.

2    Q.   The pricing quality -- quantity?

3    A.   Quantity.

4    Q.   And the net sales?  All right.

5    A.   Correct.

6    Q.   So the DEA number is the number of --
7  whose number -- whose DEA number is that, if you know?

8    A.   That's the pharmacy's DEA number.

9    Q.   Who is Enrique Gonzalez-Pujol, M.D., as
10  the customer?

11    A.   That is the customer that Sunrise
12  Wholesaler shipped to.

13    Q.   The SKU would be the same SKU, would be
14  Mallinckrodt SKU?

15    A.   Yes, that's our SKU -- NDC number, SKU.
16  Uh-huh.

17    Q.   And pricing quantity and net sales --
18  what's the significance of that to Mallinckrodt as it
19  relates to the chargeback?

20    A.   So again, I don't know the purpose of this
21  report, why Victor was requesting it.  My role as an
22  analyst was to run the data and provide the report.  I
23  don't know the purpose of the request, what they were
24  looking for.

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1     All I know is what I looked -- this is
2 what I ran, apparently, according to this e-mail, so I
3 ran a report based on what was requested -- Sunrise
4 Wholesalers and who they shipped to and how much during
5 this specific time frame.
6     Q.   When you say how much -- if we look at
7 that first DEA number and the Enrique Gonzalez, it says
8 quantity 2,400.  Does that mean 2,400 pills or bottles?
9     A.   That's bottles.
10    Q.   And how many are in a bottle -- how many
11 pills?
12    A.   On this specific one -- so if you look at
13 the SKU, 853001, 01 at the end refers to a 100-count at
14 Mallinckrodt, so that would have been a 100-count
15 oxycodone 30-milligram bottle.
16    Q.   So that was 2,400 bottles of 100 pills in
17 each bottle?
18    A.   That is correct.
19    Q.   And the net sale -- what is that referring
20 to?
21    A.   That's referring to whatever the
22 negotiated price was with Sunrise, like our pricing
23 with Sunrise, like our account with Sunrise.
24    Q.   Can you tell from this how much Sunrise

Page 127

1 charged Dr. Pujol?
2     A.   No.  This is all -- again, chargebacks was
3 all internal Mallinckrodt data.
4     Q.   Would you then refer to that net sale
5 number as a chargeback from Sunrise Wholesaler?
6     A.   So not this specific number, because that
7 wouldn't have been the price.  This is a report based
8 on a specific time frame for those quantities, so no,
9 not that net sales price.  I mean, that's a net sales
10 measure or whatever.
11    Q.   Could you have included additional
12 information on this report as it related to the
13 contract price and other things?  I mean, was that
14 available to do if it was asked for?
15    A.   Not in Cognos that I recall.  I mean, the
16 pricing could have changed within this time period, so
17 it's not exact -- unless you knew the full context of
18 that have contract during these time periods, no, you
19 couldn't correlate directly net sales with pricing
20 quantity unless you knew that there was no pricing
21 change -- I mean, again, I don't have any context as
22 far as what the Sunrise Wholesale contract was at that
23 time.
24    Q.   And again, using this first -- Enrique

Page 128

1 Gonzalez-Pujol and this pricing quantity of 2,400,
2 that's 2,400 bottles of 100 pills over what period of
3 time based on the e-mail and the -- can you tell me
4 that?
5     A.   It looks like attached are the chargeback
6 reports for calendar year 2008 and calendar year 2009,
7 January through June, according to the e-mail, 8664
8 document.
9     Q.   And do you know why -- is this in a
10 specific order?  Is it in order of -- in any specific
11 order?
12    A.   It looks like what I did was -- I can't
13 tell.  It doesn't appear to be -- excuse me --
14    Q.   How about pricing quantity?  It looks to
15 me like it might be in order of the most net sales to
16 the least net sales.  I could be making that up.
17    A.   It doesn't appear to be descending based
18 on pricing quantity.
19    Q.   It does or does not?
20    A.   Does not.  I mean, if you look at -- it
21 goes from the -- no, it doesn't.  I'm trying to see
22 here.  Okay.  So it looks like there are -- are there
23 multiple tabs?  What am I looking at here?
24    Q.   Yeah, I'm not sure either.  This is how it

Page 129

1 was produced to us, so I don't know.
2     A.   Okay.  So what it looks like is that this
3 first section -- and I don't know if this is -- I don't
4 know specifically.
5     Q.   No, no.  You're -- it doesn't; you're
6 right.  But it stops -- Sunrise Wholesaler stops, and
7 then it goes to another group of people like HD Smith,
8 et cetera.
9     A.   Right.
10    Q.   Do you see that?
11    A.   I do, yeah.  So the first group for
12 Sunrise, it appears that it's --
13    Q.   It's going from -- oh.
14    A.   -- descending -- plain net sales, yes.
15    Q.   And the other, which appears to be for
16 different customers but it's the same type of a
17 spreadsheet?  It's reflecting chargeback information?
18    A.   Right.  Right.  Yeah.  Was this the one
19 attachment that's referenced in this e-mail?
20    Q.   I think it was just the Sunrise because
21 that's all that was asked for, so I'm assuming that it
22 was just the Sunrise chart.
23    A.   Okay.
24    Q.   But the numbers aren't as important to me

Highly Confidential – Subject to Further Confidentiality Review

Page 130

1  as just understanding what the --
2      A.  Sure.
3      Q.  I don't know how long we've been on or
4  whether --
5          MR. TSAI:  It's been about an hour and 15
6  minutes.
7          MR. DEARMAN:  Do you want to take a break,
8  a short break?
9          MR. TSAI:  Yeah.
10         MR. DEARMAN:  All right.
11         MR. TSAI:  Let's aim for seven again.
12         THE VIDEOGRAPHER:  We are going off the
13 record at 10:56 AM.
14         [A brief recess was taken.]
15         THE VIDEOGRAPHER:  We are back on the
16 record at 11:07 AM.
17         [Exhibit Mallinckrodt-Cardetti-009 marked
18         for identification.]
19     Q.  (By Mr. Dearman)  I'm showing you a
20 document marked Exhibit Number 9, which is Bates number
21 6730.  This is an e-mail from Jim Rausch to you on May
22 5th, 2010.  Do you have any reason to believe that you
23 didn't receive this in your ordinary course of
24 business?

Page 131

1      A.  No.
2      Q.  Do you know who Jim Rausch is?
3      A.  I do remember Jim Rausch.
4      Q.  Who is he?
5      A.  I remember him working at Mallinckrodt.
6      Q.  His signature block underneath the e-mail
7  that he sent you on May 5th indicates he's customer
8  service manager of finished goods.  Do you know what
9  finished goods group is?
10     A.  Finished -- I'm not familiar with that
11 title, but finished goods would have been the generics
12 group, I assume.  Yeah.  I don't know.
13     Q.  So you don't know?
14     A.  Well, customer service manager of finished
15 goods.  I don't know for a fact, I mean, no.
16     Q.  Do you know who Excel is?
17     A.  Excel Rx?
18     Q.  Yeah.
19     A.  Yes.
20     Q.  Back in May of 2010 you were a associate
21 product manager at that point?  You need to refer to
22 your résumé?
23     A.  I got to refer to remember.
24     Q.  I am as well.

Page 132

1      A.  May 2010.  Associate product manager, yes.
2      Q.  So you're still in marketing but you're in
3  a product manager role?
4      A.  That is correct.
5      Q.  Do you know why Jim Rausch in finished
6  goods would be asking you about an order that Excel
7  placed?
8      A.  I don't know the interaction between
9  customer service and suspicious order monitoring.  I
10 don't know why he would have been asking that.
11     Q.  He refers to 44,208 bottles of morphine
12 oral and it's like three times more than they've ever
13 placed before?
14     A.  Uh-huh.
15     Q.  Do you know what the significance of three
16 times more than they've ordered, if any?
17     A.  Well, this is Jim's e-mail, but --
18     Q.  It was to you, though; right?
19     A.  But in looking at this e-mail, it looks
20 like he was -- yes, this was to me, to answer your
21 question.  It looks like he's looking at historical
22 orders.
23     Q.  What's the significance, if any, of three
24 times as it relates to historical orders?

Page 133

1      A.  So he's looking at a specific order that
2  Excel Rx placed for 44,208 bottles of morphine oral
3  compared -- it appears that he's comparing it to what
4  they've historically placed orders for for that
5  product.
6      Q.  And so do you have any idea, as it related
7  to your role in receipt of this e-mail, as to what the
8  significance of three times more than they've ever
9  placed before is?
10     A.  It would be a simple calculation as far as
11 what they -- their historical orders looked like.
12     Q.  Do you know whether there was a formula as
13 it related to historical orders when an order would be
14 suspicious or peculiar?
15     A.  I mean, I know that there was an algorithm
16 or calculation.  I don't know what that was, though.
17     Q.  Do you know whether it was three times?
18     A.  I do not what that was -- that calculation
19 was, no.
20     Q.  Do you know whether it included anything
21 else other than historical ordering?
22     A.  I do not know what suspicious order
23 monitoring reviewed in order to consider an order
24 suspicious or peculiar.

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    Q.   Why would Jim be asking you this question?
2    A.   I was probably -- associate product
3 manager -- I was probably responsible for morphine oral
4 during this time.
5    Q.   Do you know whether you were or you
6 weren't?
7    A.   I mean, based upon this, that would be my
8 recollection, that I managed that product during that
9 time, yes.
10    Q.   And you responded to Mr. Rausch; correct?
11    A.   Yes, it appears so.
12    Q.   And what did you tell him?
13    A.   Yes, we are offering them the remainder of
14 our inventory for morphine order since it is being
15 discontinued.  Thank you for checking.
16    Q.   Do you know whether the order was shipped?
17    A.   I do not know if the order was shipped.  I
18 don't recall.
19    Q.   Are you aware of whether or not sending
20 them the -- are you aware of whether or not the fact
21 that you discontinued a product in your portfolio is a
22 reason to ship a product that was indicated to be three
23 times earlier orders?
24    A.   So I know that -- just in context of this

Page 135

1 e-mail and knowing that customer, Excel Rx, they were a
2 Hospice provider, so -- and they had these -- I forget
3 the name of it -- these kits, if you will, that were
4 like take-home kits for Hospice.
5       You're probably all familiar with Hospice
6 in terms of keeping the patient comfortable in their
7 own home more often.  So morphine oral from my -- from
8 what I remember, was included in that kit, if you will,
9 so it was -- Excel Rx -- it was a big product for them
10 in terms of there was a lot of usage due to the nature
11 of their business being in Hospice, so they -- this
12 is -- from what I vaguely remember of this particular
13 situation is that it appeared that we were partnering
14 with Excel Rx for this product, knowing that we were
15 getting out of that business and they warehoused the
16 product in their distribution center so they were able
17 to hold inven -- additional inventory knowing that they
18 were getting out of that product.
19    Q.   So Jim mentioned that he saw something
20 that was peculiar or suspicious and you responded
21 here's why they're getting that much?
22    A.   Right.  So this is an example as to why
23 marketing would have been asked for additional
24 information.

Page 136

1    Q.   Understood.
2    A.   Yeah.
3    Q.   Is it your understanding that if there
4 were other questions or other issues that would have
5 stopped him, stopped Jim from allowing this to ship,
6 that he would have asked you?
7    A.   Sure.  Yeah.
8    Q.   So is it your understanding that this
9 likely order was sent to this Hospice group?
10    A.   It likely was, yeah, unless you have other
11 e-mails in this chain to make us think otherwise.
12    Q.   I don't.  I don't.
13    A.   Okay.
14       [Exhibit Mallinckrodt-Cardetti-010 marked
15       for identification.]
16    Q.   And I'm going to show you a document now
17 which is Bates range 3314 through 3318, and this is
18 Exhibit Number 10.
19    A.   Thank you.
20    Q.   You might want to start at the end because
21 that's the beginning of the e-mail family.
22    A.   Sure.
23    Q.   Just to start, this was from Brenda
24 Rehkop.  Do you know who Brenda was or is?

Page 137

1    A.   I'd like to read the full e-mail.
2    Q.   Take your time.
3    A.   Okay.  Thank you.
4    Q.   We've got all day.
5    A.   Till 5:30.
6    Q.   Take your time.
7       MR. DEARMAN:  Okay, I can tell you we'll
8 never finish this depo by 5:30 if these e-mails are
9 going to be read in full in this way, so I just want
10 you to know that I've got at least 20 or 30 more of
11 them.  There's no way we'll get that done, but I just
12 want to put that out there.
13       MR. TSAI:  Yeah, well, we're not going to
14 have a situation where the witness can't read an
15 exhibit, so --
16       MR. DEARMAN:  Absolutely.  I completely
17 understand.
18       MS. HERZFELD:  I'm also a bit concerned
19 with the 5:30 deadline, that I'm not going to have time
20 to do my questioning.  Is the witness available to go
21 tomorrow if we need to continue?
22       MR. TSAI:  I actually think we can
23 accommodate the schedule.  We started at 8:00 for that
24 reason.  I mean, we can manage the breaks to be able to

Page 138

1 accommodate her schedule.
2     MS. HERZFELD:  Just as long as we're clear
3 on the record that I still reserve my two hours.  I
4 don't anticipate that I'll take it all, but I don't
5 want to be shut out of this because of some time
6 restraints.
7     MR. TSAI:  Well, let's proceed.
8     Q.  (By Mr. Dearman)  You reviewed it?
9     A.  I'm ready.
10    Q.  Okay.  Brenda Rehkop -- I'm sure I'm
11 butchering her name.  Who is Brenda?
12    A.  Brenda was in customer service.
13    Q.  Do you have any reason to believe that you
14 didn't receive this e-mail in the ordinary course
15 of your business at Mallinckrodt?
16    A.  No, I do not.
17    Q.  On June 10, 2010, again you are in the
18 product manager group, you received this e-mail from
19 Brenda, and what is the subject of the e-mail?
20    A.  Peculiar order from McKesson for
21 methylphenidate.
22    Q.  And what is your understanding of what
23 Brenda is telling you, if anything?
24    A.  She -- in reading the e-mail, she's

Page 139

1 learning to monitoring the peculiar orders and she has
2 a question about a specific order.
3     Q.  And then the e-mail which you've read goes
4 through conversations between some of these folks about
5 the specific order?
6     A.  Uh-huh.
7     Q.  Correct?
8     A.  Correct.
9     Q.  And what was the net result?  Was the
10 peculiar order shipped, or was it not shipped?  I can
11 direct you to 3315, which is the second page.  And it's
12 from Brenda to Jim.  Brenda, go ahead and release the
13 order.  After talking to Tim, we don't see any issue
14 sending this product.  Do you see that?
15    A.  Oh.  Yes.  Sorry.
16    Q.  Do you know who Marc is?
17    A.  Marc Montgomery, yes.
18    Q.  Who is he?
19    A.  He was in marketing -- a product manager
20 at that time.
21    Q.  So he was a product manager like you were?
22    A.  I was an associate product manager at this
23 time, yes, in marketing.
24    Q.  So you see where Marc tells Brenda to go

Page 140

1 ahead and release the order.
2     A.  I do see that.
3     Q.  Then if you turn the page to the first
4 page of the e-mail chain.  There are some additional
5 e-mails about the order, but the result was that it was
6 shipped to the customer; correct?
7     A.  It appears so.
8     Q.  Let's go to 5238, please.  One of the
9 this -- when we had talked about your bonus, one of the
10 factors in -- one of the factors that went into bonus
11 was volume of sales; correct?
12    A.  Sales.  Correct.
13    Q.  Was there a factor that went into your
14 bonus -- the number of peculiar or suspicious orders
15 that you caught?
16    A.  No.  No.
17    [Exhibit Mallinckrodt-Cardetti-011 marked
18    for identification.]
19    Q.  Exhibit Number 11, which is a e-mail chain
20 Bate range 6449 through 6550.  Two pages.  Can you tell
21 me when you're ready to talk about the e-mail, ma'am?
22    A.  Okay.
23    Q.  This e-mail came from Brenda again to you
24 and Marc, correct, CCed to Jim Rausch?

Page 141

1     A.  Correct.
2     Q.  Do you have any reason to believe that you
3 didn't receive this in the ordinary course of business
4 at Mallinckrodt?
5     A.  I do not.
6     Q.  It's asking you to please confirm that
7 these HD Smith orders are within normal limits;
8 correct?
9     A.  Correct.
10    Q.  Are these numbers order numbers, or are
11 they amounts, or do you know?
12    A.  They appear to be order numbers.
13    Q.  Both are printed on a peculiar order
14 report, and I just need to follow up.  What is a
15 peculiar order report?
16    A.  It appears that it was a report that
17 customer service was running.
18    Q.  Are you familiar with the report?
19    A.  No, I never have a recollection of running
20 the report nor receiving the report, as it's pretty
21 apparent in this e-mail that I am not familiar with the
22 report either at this time.
23    Q.  And if we go back to -- if we go to the
24 first page of that, you're indicating that you're not

Page 142

1  familiar because of why?
2      A.  Gosh.  Back in two thousand -- I mean,
3  this is probably a fairly new process at this point in
4  time from what I recall.  I don't know.
5      Q.  Well, you respond to Brenda and say all of
6  these orders are fine.  What is the criteria for orders
7  hitting this report?
8      A.  Uh-huh.
9      Q.  These quantities are much lower than their
10  normal demand, so just curious; correct?
11      A.  Right.  Correct.
12      Q.  And Brenda responds to you; correct?
13      A.  Correct.
14      Q.  And in her response, she tells you what
15  the report is looking at; correct?
16      A.  Correct.
17      Q.  So when you received this e-mail and you
18  asked Brenda what generated the report, she provided
19  you with the information that's at the top of this
20  e-mail dated 7-28-2010; right?
21      A.  That is correct.
22      Q.  Did you know this information prior to
23  7-28-2010?  And this information I'm referring to is
24  what Brenda told you with regard to the report looking

Page 143

1  at the previous 18 months order multiplied by three,
2  the target average quantity.  Did you know that before
3  that?
4      A.  No, I'm clearly asking on July 28th what
5  the criteria is, so I'm clearly not familiar with that
6  information.
7      Q.  But then you were provided it; correct?
8      A.  That is correct.
9      Q.  Is it your understanding that Jim Rausch
10  was in the suspicious order monitoring group, if you
11  know?
12      A.  I remember him being in customer service;
13  however, I don't know what his interactions were with
14  the suspicious order monitoring group.
15      Q.  Other than Karen Harper, whose name you
16  used before --
17      A.  Uh-huh.
18      Q.  -- can you tell me anybody else who was
19  in the suspicious ordering group?
20      A.  Yeah, as I mentioned before, I remember
21  Jen Buist.
22      Q.  Okay.  Right.  Anybody else?
23      A.  Those are the two that I remember the most
24  interaction with.  I don't remember anyone else, no.

Page 144

1      Q.  I'm going to show you now Exhibit Number
2  12, which is 5238 through 5240.
3          [Exhibit Mallinckrodt-Cardetti-012 marked
4          for identification.]
5      A.  Thanks.
6      Q.  Please let me know when you're ready to
7  talk about the e-mail.
8      A.  I'm ready.
9      Q.  All right.  So the prior e-mail, the prior
10  exhibit was July 28, 2010, and that's where Brenda told
11  but the formula.  Now we're looking at e-mail that is
12  dated August 17th, 2010 --
13      A.  Uh-huh.
14      Q.  -- and it's from Jim to you; correct?
15      A.  Correct.
16      Q.  Any reason to believe that you didn't
17  receive this in your ordinary course of your business
18  at Mallinckrodt?
19      A.  No.
20      Q.  Jim is asking you about an unusual order
21  quantity.  Do you see that?
22      A.  I do.
23      Q.  For AmerisourceBergen; correct?
24      A.  Correct.  Yes.

Page 145

1      Q.  So this is 2010 and you are an associate
2  product manager still?
3      A.  Correct.
4      Q.  Does that mean that Amerisource was one of
5  your accounts?
6      A.  Associate product manager.  Product
7  manager, manages products, not marketing.
8      Q.  You're right.  I'm sorry.  I'm sorry.
9  You're right.
10      A.  Yeah.
11      Q.  Do you know what product this is?
12      A.  Oh, man.  You're really making me
13  remember.  No, I don't.
14      Q.  Okay.  That's all right.  The fact that
15  he's pointing out -- that Jim's pointing out to you
16  that there's an unusual order quantity would you agree
17  means that this is a scheduled drug?
18      A.  I don't know what products they were
19  looking at.
20      Q.  Did you --
21      A.  I mean, it's a potential, but --
22      Q.  Were you an account manager for
23  nonscheduled drugs as well?
24      A.  I don't remember.  We did have

Page 146

1  nonscheduled drugs. Again, I don't remember exactly at
2  this time what product I was managing, but I did manage
3  nonscheduled drugs at one point; correct.
4      Q.   And did you receive e-mails from folks
5  like Jim Rausch asking you about unusual orders for
6  nonscheduled drugs?
7      A.   I don't recall.
8      Q.   Do you see your response to Jim on August
9  17, 2010, where you say hi, Jim. Monthly average
10 demand is around 1,800 bottles so it's okay to release?
11     A.   I do see that, yes.
12     Q.   So what algorithm or formula or analysis
13 did you use to determine that because their monthly
14 average demand is around 1,800 bottles, it was okay to
15 release?
16     A.   I don't remember any of the specifics
17 around the analysis or anything that I did to --
18 regarding this specific order.
19     Q.   So you don't know?
20     A.   I don't remember what information was
21 looked at for this order, no.
22     Q.   And it says hi, Lisa. Is 1,800 bottles
23 the average for the Corona, California, location. Do
24 you see that?

Page 147

1      A.   I do.
2      Q.   And do you know what the Corona,
3  California, location is?
4      A.   That's just one of their distribution
5  centers.
6      Q.   And then you respond no, that is ABC's
7  total demand; correct?
8      A.   Correct.
9      Q.   And then Jim asks you to find out why
10 Corona, California, is ordering such a large quantity?
11     A.   Correct.
12     Q.   And on the first page of this e-mail you
13 respond to Jim; correct?
14     A.   Correct.
15     Q.   And you indicate that the location has an
16 average of 512 bottles a month, including this order,
17 the August demand was 840 bottles. It appears their
18 orders are trending up because in June they ordered 720
19 bottles. We can continue to monitor; however, I feel
20 comfortable releasing this order. Correct?
21     A.   I do see that, yes.
22     Q.   Other than what was in -- what's in this
23 e-mail, what gave you the comfort to release this
24 order?

Page 148

1      A.   Again, I don't remember the context; what
2  was going on with AmerisourceBergen at this time with
3  this specific product. During this time -- I don't
4  remember the specifics around any of that information,
5  so --
6      Q.   This is an example of another unusual
7  order that was brought to your attention which was
8  shipped to a client; correct?
9      A.   I don't know -- I don't see confirmation
10 on whether or not it was shipped or not. I don't
11 see --
12     Q.   Do you have any reason to believe it was
13 not shipped?
14     A.   I don't know. I don't have any other -- I
15 don't know.
16     Q.   How about this question? This is another
17 example of an order that was brought to your attention
18 as being unusual which you felt comfortable releasing;
19 correct?
20     A.   Correct. That's what it appears to, yeah.
21 But again, I mean, just to reiterate, it was not my
22 final decision on whether or not the product shipped or
23 not. So this is -- this was kind of the process with
24 it looks like customer service, suspicious order

Page 149

1  monitoring. Again, I don't know what discussions took
2  place between customer service and suspicious order
3  monitoring, but this just kind of to me shows that we
4  were doing diligence, that there were multiple
5  departments involved in this process to make sure that
6  we were doing the right thing.
7      Q.   And based on your training and your
8  experience and your role, you felt that you could tell
9  Mr. Rausch that you were comfortable in releasing this
10 order to this customer; correct?
11     A.   From my perspective and in my role, based
12 on whatever context I had at that time back in August
13 of 2010, and the information I knew about Amerisource
14 and that customer, yes, it appears that I was
15 comfortable; however, again, that -- I did not have the
16 ultimate decision on whether or not products shipped --
17     Q.   I'm not asking you whether you had the
18 ultimate decision.
19     A.   Okay.
20     Q.   That's not my question.
21     A.   Sure.
22     Q.   So we'll ask the question again and we can
23 try again.
24     A.   Sure. Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 Q. You felt comfortable, based on the
2 experience and training that you had, to -- based on
3 the information you had, to release this to the
4 customer; correct?
5 A. Yes, that's what the e-mail states.
6 Q. And three weeks before this is when Brenda
7 Rehkop told you about the formula that she used for the
8 peculiar reports; correct?
9 A. Right. That's the formula that customer
10 service used, yes.
11 Q. And that you used as a result?
12 A. That was the formula that customer service
13 used. Again, I don't know what additional information
14 I looked at or had at that time to make those
15 decisions.
16 Q. But the e-mail says specifically that the
17 location has an average of 512 bottles a month.
18 Including this order, their August demand is 840
19 bottles. It appears their orders are trending up
20 because in June they ordered 720 bottles. We can
21 continue to monitor; however, I feel comfortable
22 releasing this order. Please let me know if you need
23 any further information. Right?
24 A. That is what it says, yes.

Page 151

1 Q. Are you aware of him asking you for any
2 additional information?
3 A. I don't remember back in August of 2010.
4 There may have been phone conversations. Again, there
5 may have been additional information that I don't --
6 there may have been other context.
7 Q. But as of the date of this e-mail, you
8 were comfortable releasing the order?
9 A. Yes, that's what it states.
10 [Exhibit Mallinckrodt-Cardetti-013 marked
11 for identification.]
12 Q. Let me show you another document which is
13 marked Exhibit Number 13, which is Bates range 6392 --
14 6392 through 6407. Sorry. I ripped your first page
15 off. Tell me when you're ready to discuss this e-mail
16 chain. There may be two pages at the end of this that
17 don't apply. I don't know. Can I see the exhibit
18 again?
19 A. Sure.
20 Q. Just to -- no, that's right.
21 A. Okay.
22 Q. Sorry.
23 A. Sure. Okay.
24 Q. If you go back and look at the prior

Page 152

1 exhibit that I showed you, under the subject, it was
2 order 70175100. Am I right about that, under the
3 subject line?
4 A. I'm sorry. Where -- oh, the order number?
5 Q. Yeah.
6 A. 70175100? Yes.
7 Q. And does that match up then with any of
8 these orders from this e-mail?
9 A. It does not appear. No.
10 Q. Are you -- we already talked about who
11 Kate is; correct?
12 A. Correct.
13 Q. And Kate -- you were sending -- I'm sorry.
14 It looks like Brenda was sending an e-mail to you and
15 to Kate and CCed Jim about Cardinal. Do you see that?
16 A. Correct.
17 Q. I don't know how this got butchered, but
18 the e-mail indicates that it's to Kate. Can you take a
19 look at Cardinal order, and it gives an order number
20 for multiple oxy SKUs. Please confirm, Brenda, and
21 then hi, Lisa, Cardinal NLC, and several of the
22 floating DCs placed -- oh, I guess it's to both of you.
23 Okay. So first she says to Kate take a look at the
24 Cardinal order?

Page 153

1 A. Uh-huh.
2 Q. And then to you, Cardinal NLC and several
3 of the floating DCs has placed orders for morphine.
4 Here are the order numbers they kicked out of the PEC
5 order report. Is that peculiar order report?
6 A. Yes, that would be my assumption as well.
7 Yes.
8 Q. And then you sent an e-mail to Natalie.
9 Who's Natalie Kayich?
10 A. Natalie was an analyst at that time.
11 Q. So you were trying to get some reporting
12 from her?
13 A. Yes.
14 Q. And you asked for a report on Cardinal
15 days on hand at the SKU level?
16 A. Yes.
17 Q. What is the SKU level?
18 A. NDC item level. Yeah. SKU and NDC is
19 kind of used interchangeably.
20 Q. And you're indicating that you wanted to
21 see if any of the morphine SKUs that they are ordering
22 more than normal are one of the products in which they
23 were increasing their on-hand inventory; correct?
24 A. Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    Q.    And attached to this is a spreadsheet?
2    A.    Yes.
3    Q.    Can you tell me whether or not the SKUs
4  that they were ordering were more than the norm from
5  looking at the spreadsheet?
6    A.    So the spreadsheet is what Natalie
7  attached; correct?
8    Q.    Correct.  Right.
9    A.    So this is their days on hand inventory.
10   Q.    Okay.  And what is that?
11   A.    The amount of inventory that the
12  wholesaler has in their warehouse.
13   Q.    From Mallinckrodt?
14   A.    Of Mallinckrodt product, correct.  So
15  that's another piece of data that the wholesaler
16  provides Mallinckrodt as far as their on-hand
17  inventory.
18   Q.    Which you would know as well from
19  chargebacks; right?
20   A.    Chargebacks is what the wholesaler sold to
21  the pharmacies, so it's a completely separate set of
22  information.
23   Q.    If you sell to the wholesaler and the
24  wholesaler does not end up selling the product to a

Page 155

1  pharmacy, do you get a chargeback when it stays in
2  their inventory?
3    A.    That -- no.  A chargeback is generated
4  when they sell to it a pharmacy.
5    Q.    Right.  So if it wasn't in a chargeback
6  form, you would assume it was still in their inventory;
7  correct?
8    A.    That is correct.
9    Q.    Do you know -- did you interpret these
10  reports at any point; do you know?
11   A.    Well, it appears that I was asking for
12  more information to do -- to dig deeper, so this is, in
13  my opinion, another example as to how and why -- and
14  how the process was kind of working.  Everyone was kind
15  of digging into the detail to make sure that we felt
16  comfortable to release the order.
17   Q.    Do you know if you felt comfortable to
18  release this order?
19   A.    I don't.  Do you have any additional
20  e-mails from this?  I don't know if this order was
21  released or not.
22   Q.    If you look at 6394, which is the first
23  page of the spreadsheet, and we start with Item Number
24  2, which is SKU 035701 -- do you see that?  Hydrocodone

Page 156

1  APAP 5 500 tabs?
2    A.    I do.
3    Q.    May 31st, 2010, it says 936.  What does
4  that reflect?
5    A.    936 bottles.  And again, this is -- is
6  this the first tab?  Does it --
7    Q.    It's the first tab I have.
8    A.    The first tab of the attachment?
9    Q.    Yeah.
10   A.    Because there -- it references two tabs,
11  days on hand.
12   Q.    Well, if you take a look at the next page,
13  which is 6395, I think that is the -- it starts with
14  tab -- it goes from A to N.  No?
15   A.    Okay.  I see that.  Yes.
16   Q.    Right?
17   A.    Yes.
18   Q.    If you just turn one page.  Just one page.
19   A.    Yeah.  Yeah, yeah, yeah.
20   Q.    So under Tab A it gives you the SKU.
21   A.    Uh-huh.
22   Q.    B it gives you the description of the
23  item.
24   A.    Right.

Page 157

1    Q.    C it tells you May 31st, 2010, it says
2  936.  So what is 936 again?
3    A.    It appears that that is 936 bottles of
4  that item on hand at this customer -- at Cardinal.
5    Q.    And that is Mallinckrodt product that's on
6  hand in their inventory; right?
7    A.    Yes, that's the only information we would
8  have access to.
9    Q.    If we go to D, which is June 7th, it shows
10  2,808 on hand; right?
11   A.    Correct.
12   Q.    And you can go across and it continues to
13  show the amounts?
14   A.    Correct.
15   Q.    Do you know why there was an increase from
16  May of 936 to June of 2,808?
17   A.    No, I do not.  And I did not manage
18  hydrocodone either.
19   Q.    Did you manage any of the items that are
20  on this chart?
21   A.    I don't remember at what point in time --
22  the products that I managed.
23   Q.    Well, morphine oral is one that you did
24  mention; right?

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    A.   Yes, so it appears that the morphine
2  products where Brenda was referencing was directed to
3  me, yes.
4    Q.   Is there a specific line item here that
5  you were directed to?  I mean, I see morphine starting
6  at 73.
7    A.   Right.  So again, this is just a report
8  that Natalie ran based on Cardinal's inventory.
9    Q.   Right, but what generated the question was
10 multiple oxy SKUs; right?  Please okay -- please
11 confirm if this order is okay or not.  Thanks, Brenda;
12 right?
13   A.   That was directed to Kate.
14   Q.   Right.  Cardinal NLC and several of the
15 floating DCs have placed orders for morphine.  Here are
16 the order numbers that kicked out on the peculiar order
17 report.  So if we look at 70174595, is there a way to
18 track that on this form or not?
19   A.   So just to clarify --
20   Q.   Please.
21   A.   This 70174595 -- that was an internal
22 order number.
23   Q.   Okay.
24   A.   Okay?  So this report is reflective of

Page 159

1  Cardinal's inventory on hand at their distribution
2  center.
3    Q.   Right.  Right.  But if we talk about
4  morphine --
5    A.   Uh-huh.
6    Q.   -- they're telling you that Cardinal NLC
7  and several of the forwarding DCs -- what's a DC?
8    A.   Distribution center.
9    Q.   Placed orders for morphine.  Here are the
10 order numbers that kicked out on the peculiar order
11 report.  So you're being told that these orders kicked
12 as peculiar based on one of the factors that were being
13 used; right?
14   A.   Correct.  But then if you read further
15 down in the e-mail, it says I would assume the
16 individual DCs have printed because they rarely order
17 directly and would not have enough history in the
18 system to calculate an accurate average.  However, with
19 these individual DCs and the NLC ordering a large
20 quantity I am obligated to check into it.
21        So the NLC -- so based on this e-mail, we
22 were regularly shipping to the NLC, so the national
23 distribution center, so some of the larger wholesalers
24 have a national distribution center that you can ship

Page 160

1  to and then they send it out to the FDCs is the forward
2  DCs.
3        So if these orders were the forward DC
4  orders to what Brenda has mentioned in the e-mail,
5  there wouldn't have been a historical view of shipping
6  to those forward DCs, which appears to be why it has
7  kicked out on this report.
8    Q.   So in the situation where you are sending
9  it to someone's main order and then they're going to
10 ship it out to their local places, do you have
11 information on the -- on both the NLC and the DC?
12   A.   Yes.  So that's the information that I had
13 requested from Natalie on the on-hand -- their on-hand
14 inventory.
15   Q.   All right.  I got it.  Thank you.
16   A.   Okay, sure.
17        [Exhibit Mallinckrodt-Cardetti-014 marked
18        for identification.]
19   Q.   And I'm going to show you Exhibit 14,
20 which is one page, Bates 5508.
21   A.   Thank you.
22   Q.   Ready when you are.
23   A.   I -- oh, I'm sorry.  I'm ready.
24   Q.   That's all right.  This is dated September

Page 161

1  21st, 2010, from Jim to you.  Do you see that?
2    A.   Yes.
3    Q.   And then you responded to him.  Do you
4  have any reason to believe this wasn't in the ordinary
5  course of your business?
6    A.   No.
7    Q.   You were now a product manager at this
8  time?  Oh, maybe not --
9    A.   Associate.
10   Q.   Still an associate product manager.  Okay.
11 And Jim sent you an e-mail about Amerisource and a
12 specific order.  Do you see that?
13   A.   I do.
14   Q.   And then did you respond to it?
15   A.   Yes.
16   Q.   And you indicated the increase is very
17 small and they have ordered amounts equal to or larger
18 than those listed below so you're fine with releasing
19 them; correct?
20   A.   Yes.
21   Q.   So Jim pointed out to you an order which
22 was unusual that he thought, and you responded that you
23 were fine with releasing the order?
24   A.   Yes, that's what it appears.

Highly Confidential – Subject to Further Confidentiality Review

Page 162

1    Q.   Do you have any reason to believe that the
2  order was not released?
3    A.   I don't -- I don't know if this order was
4  released or not because I don't know what else -- other
5  conversations took place between customer service and
6  suspicious order monitoring.
7    Q.   So the answer is you don't know?
8    A.   I don't know.  Yeah, that's the answer.
9    Q.   I don't know is fine.
10   A.   Okay.
11   Q.   Let me show you --
12       [Exhibit Mallinckrodt-Cardetti-015 marked
13        for identification.]
14   Q.   Show you what's been marked as Exhibit 15.
15  It's one page, Bates 8461.  Let me know when you're
16  ready to discuss the e-mail.
17   A.   I'm ready.
18   Q.   This is an e-mail September 10th, 2010.
19  You're still an associate product manager; correct?
20   A.   Correct.
21   Q.   It's from Jim to you; correct?
22   A.   Correct.
23   Q.   And then you responded again.  Do you have
24  any reason to believe you didn't receive this e-mail or

Page 163

1  send this e-mail in the ordinary course of your
2  business?
3    A.   No.
4    Q.   It's regarding a Cardinal Health order.
5  Do you see that?
6    A.   Correct.  Yes.
7    Q.   And it asks to you look at the increased
8  order quantity for a specific code that they have
9  placed as compared to an average order quantity.  Do
10  you see that?
11   A.   I do.
12   Q.   Did you respond?
13   A.   I did.
14   Q.   And what was your response?
15   A.   We have seen an increase on majority of
16  morphine sulfate SKUs due to Watson's NDC change.
17  There has been some confusion in the market; therefore,
18  customers that typically purchase Watson product have
19  been purchasing ours.  I do not expect this to continue
20  much longer.  Please let me know if you have any
21  questions.
22   Q.   What is Watson's NDC change?
23   A.   So Watson was a -- from what I recall,
24  Watson was a competitor of ours at that time, and NDC

Page 164

1  change is where they changed the SKU -- the NDC of
2  their product.
3    Q.   And so you provided Jim with the reason
4  that you believed that they were increasing the order
5  quantity; correct?  That was the point of your
6  response; right?
7    A.   That we have seen an increase; correct.
8  Yes.
9    Q.   Right.  And now you were saying why you
10  think you were seeing the increase; correct?
11   A.   Oh, correct.  Yes.
12   Q.   And do you know whether this order
13  shipped?
14   A.   I do not know.
15   Q.   Let me show you --
16       [Exhibit Mallinckrodt-Cardetti-016 marked
17        for identification.]
18   Q.   Exhibit 16 is two pages, 9432, 9433.
19   A.   Okay.
20   Q.   This is an e-mail from Ginger Collier.  In
21  November 2010 are you still a product manager?
22   A.   2010 associate product manager, yes.
23   Q.   Associate product manager.  Okay.  And
24  Ginger is sending this to Natalie, to you, to Marc

Page 165

1  Montgomery, and to Kate, also to Penny Myers.  Who's
2  Penny Myers?
3    A.   I don't remember penny's exact role.  She
4  may have been in product management or associate
5  product -- I can't remember exactly.  She was in the
6  marketing group.
7    Q.   And do you have any reason to believe that
8  you didn't receive in this in your ordinary course of
9  business?
10   A.   No.
11   Q.   Ginger -- the subject is quota issues.  Do
12  you see that?
13   A.   I do.
14   Q.   And do you know what was it that Ginger
15  was telling you?
16   A.   Do I -- excuse me.  Do I --
17   Q.   What was Ginger telling you?
18   A.   I'll read it.  I just wanted to advise you
19  that we have heard about API issue -- API quota issues
20  with some of our competitors, and then it goes into
21  detail, so --
22   Q.   What is API?
23   A.   Active pharmaceutical ingredient.
24   Q.   How is that different from SKU, or --

Page 166

1      A.    The SKU is the actual bottle, the finished
2  dosage product.  The API is the active pharmaceutical
3  ingredient that is used in manufacturing the finished
4  dosage, so you don't -- yeah.
5      Q.    Do you know why she was telling you
6  about Endo having a problem getting quota on morphine
7  and Roxanne having a problem getting quota on
8  methadone?
9      A.    This is Ginger's e-mail.  I would ask
10  Ginger that question.  Yeah.
11      Q.    Okay.  Do you know why you were copied on
12  this e-mail?
13      A.    I was on Ginger's team.
14      Q.    If you go up to Kate's e-mail in response
15  to Ginger above --
16      A.    Uh-huh.
17      Q.     -- Kate says can we communicate below to
18  the sales team?  I think it might make them feel better
19  to know that they're not alone.  Do you know what she
20  meant by that?
21      A.    I do not.
22      Q.    So when I had -- earlier we had talked
23  about IMS data; right?
24      A.    (Nodding "yes.")

Page 167

1      Q.    Do you know whether IMS data includes end
2  purchaser information?
3      A.    End purchaser information?  So IMS data is
4  based on the market and the --
5      Q.    Do you know whether it shows purchase data
6  from distributor to pharmacy?
7      A.    No, not to my knowledge.  Nothing that I
8  ever saw.
9          [Exhibit Mallinckrodt-Cardetti-017 marked
10              for identification.]
11      Q.    I'll show you Exhibit 17, which starts at
12  1620 and goes to 1622 with a native spreadsheet
13  attached.
14      A.    Thank you.
15      Q.    And would you let me know when you're
16  ready to discuss it?
17      A.    Okay.  Okay.  I am ready.
18      Q.    Ready?
19      A.    I am ready.
20      Q.    Okay.  This -- these documents are
21  attached to an e-mail which are from you to Jeremy
22  Stamer.  Do you see that?
23      A.    I do.
24      Q.    On November 19th, 2010?

Page 168

1      A.    Yes.
2      Q.    Still an associate product manager.  Who
3  is Jeremy Stamer?
4      A.    I don't remember what group Jeremy was in.
5      Q.    Do you have any reason to believe that you
6  didn't send this or receive this e-mail in the ordinary
7  course of your business at Mallinckrodt?
8      A.    No.
9      Q.    It says Jeremy, please find attached the
10  oxycodone data by COT and distributor from Kate.  Do
11  you see that?
12      A.    I do.
13      Q.    What is COT?
14      A.    Class of trade.
15      Q.    And what does that mean?
16      A.    So a wholesaler, retail, long-term care --
17  those are classes of trade.
18      Q.    And distributor is the actual distributor;
19  correct?
20      A.    Correct.
21      Q.    And Jeremy asks you a question on November
22  19th in his e-mail.  See that?
23      A.    I do see that, yes.
24      Q.    He asked you to rerun the data from

Page 169

1  January 2010 through September of 2010?
2      A.    Yes.
3      Q.    He further says the IMS NSP data that we
4  have only goes through November and I'd like to cut the
5  data for an apples-to-apples comparison.  What is IMS
6  NSP?
7      A.    IMS is the market data I was referring to.
8  I don't know what NSP stands for.  It's an IMS term.  I
9  don't know what that stands for, though.
10      Q.    And you responded to Jeremy saying you
11  updated the data, right, including only January through
12  September; correct?
13      A.    Correct.
14      Q.    And you say the report includes total end
15  purchaser sale, distributor to end purchaser, and MI to
16  end purchaser.  Distributor to end purchaser -- who
17  would that be?
18      A.    The pharmacy.
19      Q.    So that would be from the distributor to
20  the actual pharmacy?
21      A.    Correct.
22      Q.    And what is MI to end purchaser?
23      A.    Oh.  MI, Mallinckrodt, Inc., at that time.
24  Yeah.  MI to end pur -- yeah, so direct sale, so --

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  Q.  So indirect and direct?
2  A.  Correct.  Right, right.
3  Q.  And if we take a look at this document,
4  the spreadsheet or the report --
5  A.  Uh-huh.
6  Q.  -- it shows you class of trade and it
7  gives you business total, institutional total, retail
8  total, repackagers, other total, domestic total;
9  correct?
10  A.  Correct.
11  Q.  And if you turn the page, it appears to
12  provide the class of trade, the family, the SKU, the
13  description; correct?
14  A.  Correct.
15  Q.  And if you turn two pages from that, on
16  the top it says doses, MGS, distributor to end
17  purchaser, MI to end purchaser, total end purchaser.
18  Do you see that, and doses?
19  A.  I do.
20  Q.  Do you know what all that refers to?
21  A.  MGS would be the milligrams.  Distributor
22  to end pur -- I mean, I don't recall this --
23  Q.  Do you know whether this information
24  contains information other than for Mallinckrodt?

Page 171

1  A.  I don't recall.  I'm trying to decipher
2  the information here.
3  Q.  Well, maybe this will help you.  If you
4  turn the page to 1623, which is another spreadsheet
5  that is attached, and you see customer?
6  A.  Yes.
7  Q.  Does that help or does that give you any
8  additional information?
9  A.  I don't know where this information was
10  pulled.  It appears that this was just Mallinckrodt
11  data.  I don't know where this data was pulled, but
12  just looking at the customer and that first column, it
13  appears that this is internal data.
14  Q.  So this -- for that period of time that
15  you talked about in your e-mail would be how many
16  doses -- if we look at customer, which is
17  AmerisourceBergen Health -- doses of something for that
18  period of time?
19  A.  Doses of -- this is kind of hard to
20  decipher.  I don't know if --
21  Q.  I mean, it talks about oxy kilograms sold,
22  so --
23  A.  Again, I don't know what this is telling
24  us.

Page 172

1  Q.  Well, if you look at the -- go to the
2  attachment of the e-mail, the first page, the first --
3  the e-mail that you sent to Jeremy and Jeremy sent to
4  you.
5  A.  Okay.  Yes.
6  Q.  Bates 1620.  You see attachment, oxy
7  kilograms sold year to date?
8  A.  Yes.
9  Q.  You -- does that help you interpret what
10  doses are or what any of this is?
11  A.  Well, doses would be the actual dose, so a
12  pill or tablet in the bottle.  So that's what doses is.
13  Q.  Do you know why you referred to -- because
14  Jeremy sends you an e-mail to rerun data, you send him
15  an attachment, and you call it oxy kilograms sold year
16  to date.  See that?  That was your e-mail.
17  A.  Yeah, but it appears that --
18  Q.  So that's what I'm trying to figure out --
19  what that is.
20  A.  Yeah, it appears that this was originally
21  ran from Kate from the original e-mail.  Please find
22  attached the oxycodone data from Kate, and he was
23  asking me to update it.  So this appears to be Kate's
24  original report that I was updating.

Page 173

1  Q.  So any idea why or what the purpose of
2  tracking the doses is or was?
3  A.  I don't know the reason for this request.
4  Q.  But you believe these to be doses that
5  were sold from Mallinckrodt to like, for example, on
6  the first customer, AmerisourceBergen?  That's what
7  your understanding is?
8  A.  That's my understanding, yeah.
9  Q.  Were you aware of any contracts that
10  Mallinckrodt had with distributors where the per-unit
11  price is reduced due to some sort of a volume discount
12  or a volume purchase?
13  A.  There -- I do recall volume incentives
14  that Mallinckrodt had with customers.
15  Q.  Do you know whether any of the contracts
16  that you were familiar with at Mallinckrodt provided
17  for profit sharing with any of the distributors?
18  A.  Profit sharing with the distributors?
19  Q.  Uh-huh.
20  A.  No.
21  Q.  Were you aware of whether or not
22  Mallinckrodt had any what was labeled preferred
23  distributors?
24  A.  Preferred distributors?  No, I'm not

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 familiar.
2    Q.   Other than storage of drugs and
3 distribution, what other services did distributors
4 provide to Mallinckrodt?
5       MR. TSAI:  Object to the form.  Go ahead.
6    A.   I mean, again, from my very small
7 perspective of the whole suspicious order monitoring
8 program, we only had one small piece of the big
9 picture; right?  So we were only familiar with what
10 Mallinckrodt product was sold into those wholesalers
11 and distributors.
12       From my understanding, there was
13 discussions with the SOM team and our wholesalers,
14 distributors, because we had information as far as what
15 the wholesalers sent to specific pharmacies, again, for
16 just Mallinckrodt product; however, the wholesaler had
17 visibility to what was sent to those pharmacies with
18 Mallinckrodt product and additional manufacturers'
19 product, so from my understanding, there was -- and
20 again, I wasn't privy to those conversations or
21 discussions or anything, but I believe that there was
22 discussions around that just to try to understand the
23 full picture.
24    Q.   In any of your roles or at your time at

Page 175

1 Mallinckrodt, were you aware of whether or not
2 Mallinckrodt analyzed the number of opioid
3 prescriptions filled by any individual pharmacy
4 relative to the population of the pharmacy's community?
5    A.   I do not know what their algorithms or
6 anything were with the suspicious order monitoring
7 team.
8    Q.   I'm asking you whether you're aware
9 whether or not that was analyzed?
10    A.   I am not aware.  I was not included in
11 that department.
12    Q.   How about increase in opioid sales year
13 over year?
14    A.   If I -- I'm sorry -- if I was aware --
15    Q.   Whether or not you're aware that
16 Mallinckrodt analyzed that factor for --
17    A.   That opioid -- so we had access to that
18 data throughout IMS as far as any molecule growth or
19 decline.
20    Q.   So you believe that Mallinckrodt did
21 analyze opioid sales from year to year?
22    A.   Yeah, I would agree with that.  There was
23 information pulled again from IMS to evaluate what was
24 going on in the market in terms of just growth or

Page 176

1 decline for forecasting purposes.
2    Q.   How about the number of opioid
3 prescriptions filled relative to other drugs?
4    A.   Other drugs?  Again, that was probably
5 done with the suspicious order monitoring team.  That
6 was not in the -- my -- in my tenure at Mallinckrodt.
7       [Exhibit Mallinckrodt-Cardetti-018 marked
8       for identification.]
9       MR. DEARMAN:  Lunch is here, so I just
10 want everybody to know that.
11       MR. TSAI:  Okay.
12    Q.   (By Mr. Dearman)  Exhibit 18.  You get
13 some free highlighting.  Please let me know when you're
14 ready to discuss this.
15    A.   Okay.
16    Q.   So it appears -- do you know who Steven
17 Cochrane is?
18    A.   Yes, he was at KeySource.
19    Q.   So he sends an e-mail to Victor in sales
20 on the 3rd of February, and then Victor forwards where
21 he asks you a question, correct, about OxySource --
22 sending OptiSource any oxy 30 in the past
23 three-and-a-half months?
24    A.   Correct.

Page 177

1    Q.   And then you forward that on to Jane and
2 to Ginger; correct?
3    A.   Correct.
4    Q.   What was the point of forwarding it on to
5 Jane and Ginger?
6    A.   Well, it appears to make them aware of the
7 situation.
8    Q.   And when you say situation, what -- I'm
9 trying to understand what situation.
10    A.   Sure.  So as it notes in the e-mail, there
11 were orders that were shipped Smith Drug, who was an
12 OptiSource member at the time, and it looks like that
13 was done in error, so I guess -- were they on the other
14 e-mail?  No.  So yeah, just to make management aware of
15 that situation.
16    Q.   I guess my question really is -- and I'm
17 trying to understand -- how does the backorder process
18 work?  What creates a backorder?  Why is there a back
19 order?
20    A.   So -- gosh, if I remember -- so the -- if
21 there's -- there could be multiple reasons as far as
22 why a product would be put on allocation, if you will,
23 so -- meaning that all orders would be held up in the
24 system until they are released and approved.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    So in regards to backorders, if we didn't
2  have the quota, for example, then that product would
3  be -- then that -- excuse me -- that order would be on
4  backorder -- basically, if we didn't have the product
5  to ship customers, there's going to be a backorder, to
6  simplify the answer.
7    Q.   As a product manager, you were responsible
8  for products, but were you responsible for any
9  geographic areas?
10   A.   As an associate product manager at this
11 time, I was responsible for products, not for
12 customers. I'm sorry. Is that what you asked?
13   Q.   Yeah. I mean, just geographic areas.
14   A.   Okay. Geographic -- no. No. It was for
15 that product.
16   Q.   Did there come a time while you were at
17 Mallinckrodt that you became responsible for specific
18 geographic areas?
19   A.   No.
20   Q.   Whether it be Florida or anywhere else?
21   A.   No.
22        [Exhibit Mallinckrodt-Cardetti-019 marked
23        for identification.]
24   Q.   I'll show you Exhibit 19, which is Bate

Page 179

1  ranged 3462 through 3463. Let me know when you're
2  ready to discuss this.
3    A.   Okay. Okay, ready.
4    Q.   If you look at 3463, the first e-mail is
5  from Karen Harper to you; correct?
6    A.   Yes.
7    Q.   Karen Harper was in the suspicious order
8  monitoring group?
9    A.   Controlled substance compliance,
10 suspicious order monitoring, yes.
11   Q.   Okay. That's the formal name?
12   A.   Right. Uh-huh.
13   Q.   And do you have any reason to believe that
14 in March of 2011 you didn't receive this in the
15 ordinary course of business?
16   A.   No.
17   Q.   Still an associate product manager?
18   A.   Correct.
19   Q.   And Karen is e-mailing you regarding
20 reminder, marketing info request around oxycodone
21 Florida sales?
22   A.   Yes.
23   Q.   Do you know why -- she said reminder. Do
24 you know -- had you been involved in any information

Page 180

1  regarding oxycodone sales in Florida prior to this
2  time?
3    A.   I don't recall why it was a reminder.
4    Q.   And what was Karen asking you to do?
5    A.   Per Ginger's approval yesterday, no hurry,
6  but please summarize actions we have taken to prevent
7  oxycodone diversion in Florida especially such as
8  walked away from blank percentage of oxy 30-milligram
9  business. We discontinued doing business with blank
10 number of distributors, if applicable. No volume
11 incentives on customer contracts for oxycodone to
12 Florida.
13   Q.   What is a volume incentive?
14   A.   A volume incentive was one type of program
15 that we worked with customers on.
16   Q.   I appreciate that. And what was the
17 specifics of the program? What --
18   A.   So there could have -- not every program
19 was the same, but it was a program again focusing on
20 driving business and looking at opportunities to work
21 with the customer.
22   Q.   Did it provide an incentive to the
23 customer if they sold more volume of product?
24   A.   So yes, it was -- there was -- again,

Page 181

1  everyone was structured a little differently, but based
2  on sales and a specific rebate amount, for example.
3    Q.   Based on the volume of sales?
4    A.   Volume of sales; correct.
5    Q.   And do you know why Karen was saying to --
6  why Karen was saying that if -- no volume incentives on
7  customer contracts for oxycodone in Florida would be an
8  action to prevent oxycodone diversion in Florida?
9    A.   Yeah, so from what I remember about this
10 time, there was -- this is -- we knew that something
11 was happening in Florida, but -- and we were trying to
12 dig into the details to try to understand more specific
13 to Mallinckrodt sales in Florida and volume, et cetera,
14 so one of the actions that was taken by the company was
15 to remove oxycodone from any volume incentives with
16 customers.
17   Q.   What other information did you know about
18 Florida at that time?
19   A.   Really little. Really just that there was
20 issues down in the State of Florida. I know that Kate
21 managed this product prior to myself, and that's kind
22 of when -- from what I recall, that's when all of this
23 kind of started bubbling up and we -- in looking at the
24 chargeback data, again kind of giving kudos to the

Page 182

1 company in the sense that the process was working,
2 that -- in looking at chargeback data because it was
3 available -- the chargeback data did include the
4 pharmacy location, so they were able to drill into the
5 geographical location of those sales. So again, from
6 what I recall of this, we knew that there was an issue
7 in Florida and -- yeah.
8      Q.   Oxycodone was the product that you were
9 responsible for?
10      A.   I believe at this time after Kate left,
11 as -- I was still an associate project manager but I
12 believe I was kind of helping -- filling that void in
13 the department, from what I remember.
14      Q.   How would you have determined that you
15 weren't providing volume incentives on customer
16 contracts for oxycodone to Florida?
17      A.   So --
18      Q.   Where would you have gotten that
19 information from?
20      A.   Yeah, sure. So that's in our contracts
21 with customers.
22      Q.   Is there a database that you would go into
23 and see whether or not there's a box checked volume
24 incentive?

Page 183

1      A.   So if you remember that -- I forget what
2 it's called -- rebate matrix or something, so that was
3 kind of a reference where -- that the contracts
4 department updated based on our contractual agreements
5 with customers on what programs and things were
6 included in the contract.
7      Q.   If you can pull out that exhibit.
8      A.   Sure.
9      Q.   And show me where there would be some
10 reference that you would know that.
11      A.   Sure. Oh, gosh.
12      Q.   It might be Exhibit 4.
13      A.   Okay. Yeah. Got it. Yes, if you look at
14 3499, the very first customer, ABC ProGenerics program,
15 additional incentives, comments, new VIP. So it's
16 dated right there. So this is again just an internal
17 report that could be used for reference as needed, so
18 when Karen requested that information of me I could
19 come in here and determine who had a VIP with us and if
20 there were any exclusions.
21      Q.   So let's -- what is a new VIP? What does
22 that mean?
23      A.   A new volume incentive program.
24      Q.   And then if you look underneath, new VIP

Page 184

1 signed 11-16-07, it says $16 million to $19 million,
2 $19.9 million, five percent, 20 to $29.9 million, seven
3 percent, $30 million-plus, 10 percent; right?
4      A.   Correct.
5      Q.   So does that indicate that if they sold
6 between $16 and $19.5 million of product they got a
7 five percent incentive, between 20 and 29.9 they got a
8 seven percent, and if they sold over $30 million, they
9 got a 10 percent incentive?
10      A.   Yes, that is correct.
11      Q.   And if you drop down to where it says Opt
12 A, what is Opt A? Option A?
13      A.   Option A. Option A.
14      Q.   And then there's an Option B?
15      A.   Uh-huh.
16      Q.   What is HBAPAP incentive?
17      A.   HBAPAP was an abbreviation for hydrocodone
18 acetaminophen.
19      Q.   And so there was an incentive related to a
20 specific molecule?
21      A.   It appears so.
22      Q.   And if you turn the page to 4400, under
23 Cardinal preferred source A.
24      A.   Uh-huh.

Page 185

1      Q.   Recurring November to October, all
2 contract and noncontract sales. It shows you a scale
3 for incentive payments; correct?
4      A.   Correct.
5      Q.   What would be a noncontract sale?
6      A.   I don't recall.
7      Q.   If you drop down to CVS Caremark, it says
8 distribution service fee on that same 4,400. What is
9 distribution service fee?
10      A.   So there were some customer -- so this is,
11 again, just another fee that was either required or
12 negotiated by customers -- a distribution service fee,
13 so -- that we paid to CVS to distribute our product
14 is -- yeah, based on my recollection of what that type
15 would be.
16      Q.   Again, that was another incentive?
17      A.   I wouldn't consider that incentive. So I
18 mean, if you think about a wholesaler, they have costs
19 associated with pick -- packing and ship your product,
20 so it's -- in my opinion that's more of a -- like it
21 says, a service fee.
22      Q.   And if you go to Health Trust on the next
23 page, 4401, admin fee. What is that?
24      A.   Administrative fee.

Page 186

1      Q.   And how would that -- who would pay who
2  for an administrative fee?
3      A.   So Mallinckrodt would pay Health Trust
4  a -- in this situation a three percent administrative
5  fee.
6      Q.   And three percent on volume, or total
7  sales?
8      A.   Three -- no.  Three percent --
9      Q.   Of the total order?
10     A.   Three percent of -- again, I don't know
11 how this specific contract was written, but typically
12 it would be three percent on contract price.
13     Q.   If you drop down to 44 -- down to Kerr
14 Drug, Inc., WHL DIFF only.  Do you know what that is?
15     A.   I'm sorry.  Where are you?
16     Q.   I am -- if you go down from admin fee that
17 we were just talking about.
18     A.   Oh, okay.
19     Q.   And you go down about another five or six
20 to Kerr Drug.
21     A.   Right.
22     Q.   WHL DIFF only?
23     A.   That is a wholesaler differential only.
24     Q.   What does that mean?

Page 187

1      A.   So a wholesaler differential is a price
2  that is -- a price loaded at the wholesaler for this --
3  for example, would have been an indirect contract, so
4  that customer would have purchased a price at that
5  wholesaler differential price.
6         If it was different than their direct
7  price, then they -- we would provide a differential
8  payment back to them between the indirect price and
9  their direct price.  So -- yeah.
10     Q.   If you turn to 4404, please, and you look
11 under Supervalu Pharmacies?
12     A.   Yes.
13     Q.   Does that mean that every time they opened
14 up a new store they got a free bottle of some sort of
15 scheduled opioid?
16     A.   I do not know the -- I don't know -- I'm
17 not familiar with that agreement, nor do I remember
18 working on Supervalu as an account ever, so I do not
19 know the context of that.
20     Q.   Thank you for that clarification.
21     A.   Sure.
22     Q.   So we're going back now to Exhibit Number
23 19, and the e-mail from Karen to you.
24     A.   Sure.

Page 188

1      Q.   So now I can see where you'd figure out
2  whether there were no volume incentives on customer
3  contracts for oxycodone in Florida.  We discontinue
4  doing business with blank number of distributors if
5  applicable.
6      A.   Uh-huh.
7      Q.   How would you make the determination how
8  many distributors in the State of Florida that you
9  discontinued doing business with?
10     A.   So distributors in general -- so not
11 necessarily only in the State of Florida, but -- so
12 this is part of -- again, part of the process where the
13 suspicious order monitoring team would review the
14 chargeback data and do whatever they did in determining
15 whether or not we wanted to work with a specific
16 distributor.  So Sunrise, for example, which we
17 discussed earlier -- I know that that was one customer
18 that we cut off doing business with.
19     Q.   They were in Florida; right?
20     A.   I don't know where they -- I never worked
21 with them.  And so this is kind of an example of that,
22 so she's asking to -- as far as that specific number of
23 distributors that we discontinued.
24     Q.   And where would you get that information?

Page 189

1  Would you push a button and it would appear?
2      A.   Unfortunately I did not have a magic
3  button at that time, but --
4      Q.   Do you know whether or not -- or when you
5  actually provided this to Karen?
6      A.   I don't remember, no.
7      Q.   Walked away from blank percentage of oxy
8  30-milligram business.  Same thing.  How would you come
9  to that conclusion?
10     A.   Working with -- trying to gather as
11 much -- I don't remember how I gathered that
12 information, but working with contracts, if we
13 discontinued contracts, sales.  To gather the
14 information, probably various number of sources.
15     Q.   If Karen asked you to do this, would you
16 have done it in the ordinary course of your role at
17 Mallinckrodt?
18     A.   Yes.  Yes.
19     Q.   And the reason I'm asking you is because I
20 don't have an e-mail or anything indicating that you
21 did it.
22     A.   Okay.
23     Q.   So do you recall doing it?
24     A.   I don't remember the specific request.  I

Page 190

1 got several requests on a daily basis, but it's not
2 like me to just not respond.
3     MR. DEARMAN: Okay. It's 12:30. I have
4 to eat lunch now --
5     MR. TSAI: Okay.
6     MR. DEARMAN: -- so we're going to have
7 to take a break.
8     THE VIDEOGRAPHER: We are going off the
9 record at 12:31 PM.
10    [A recess was taken.]
11    THE VIDEOGRAPHER: We are back on the
12 record at 1:00 PM.
13    MR. DEARMAN: Back on?
14    Q.   (By Mr. Dearman) Did any distributors
15 provide Mallinckrodt with promotional and marketing
16 services to assist in product sales?
17    A.   Not that I can recall.
18    [Exhibit Mallinckrodt-Cardetti-020 marked
19        for identification.]
20    Q.   I'll show you Exhibit Number 20, which is
21 Bates range 0882 to 0884. Let me know when you're
22 ready to discuss.
23    A.   Okay.
24    Q.   This e-mail starts from a July 26th, 2011,

Page 191

1 e-mail from Julie DePriest to Steven Becker, Ginger
2 Collier, and Jane Williams, and you're CCed, correct,
3 along with some others?
4    A.   Correct.
5    Q.   Do you have any reason to believe you
6 didn't receive this in the ordinary course of business?
7    A.   No.
8    Q.   Who is Julie DePriest?
9    A.   Julie DePriest, if I recall correctly, was
10 managing contracts potentially at that time. I don't
11 recall.
12    Q.   One of the things that Julie says is that
13 they're offering a special lower price on the Fentanyl
14 patch for new business. Was Fentanyl patch -- was that
15 one of your products?
16    A.   I don't recall what I managed at this
17 time.
18    Q.   This is July of 2011. You're still an
19 associate product manager?
20    A.   That is correct.
21    Q.   If you weren't responsible for the
22 Fentanyl patch, why would you be receiving an e-mail
23 like this about Masters?
24    A.   I don't -- if the person managing it may

Page 192

1 have been on vacation. I don't know.
2    Q.   Was there, I mean, like an org chart? Was
3 there a list of the products that you were responsible
4 at any specific time?
5    A.   During this time, from what I remember,
6 there was a lot of movement. Even in my résumé, as it
7 says, product responsibilities to fill void in the
8 department. So like I said, I don't remember what
9 dates and what products I managed when.
10    Q.   In that same e-mail from Julie in the last
11 or second paragraph, it says customer, Super Rx
12 Pharmacy, and it gives an account number, was submitted
13 for a contract for a transaction invoiced on June 11th,
14 2011, but they have not been preapproved to access this
15 contract. Do you know what that means?
16    A.   I do not.
17    Q.   If you turn the page to 0883, it's an
18 e-mail from you to Julie in response.
19    A.   Uh-huh.
20    Q.   Do you see that?
21    A.   I do see that.
22    Q.   It says I agree, Julie. Per the
23 agreement, only approved customers should be accessing
24 this pricing. Is that referring to the special low

Page 193

1 price on the Fentanyl patch?
2    A.   I don't recall this e-mail. I don't
3 recall this situation. I don't recall anything
4 regarding this at all.
5    Q.   And I get that, so now I'm asking you
6 whether or not this e-mail refreshes your recollection.
7 There's an e-mail from Julie DePriest to others,
8 including you, you're copied on it, and then you
9 respond to it and send it to Julie and copy the others
10 and say I agree, Julie. Per the agreement, only
11 approved customers should be accessing this price. So
12 what are you agreeing to?
13    A.   So to answer your question, no, this does
14 not bring any recollection back to me. I don't recall
15 this agreement. I don't recall this --
16    Q.   What were you agreeing to here? It says I
17 agree, Julie.
18    A.   I don't recall this -- I agreed -- again,
19 I don't remember anything about this. Per the
20 contract, we're offering a special lower price, and the
21 accounts must be preapproved and added to the contract
22 prior to submissions. Per the -- then my response is I
23 agree. Per the agreement, only approved customers
24 should be accessing this pricing, so according to this

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1 e-mail that's what I'm agreeing to.
2     [Exhibit Mallinckrodt-Cardetti-021 marked
3     for identification.]
4     Q. I'm showing you Exhibit 21. It's a
5 two-page e-mail, 6481, 6482, page range.
6     A. Okay.
7     Q. On September 16th, 2011, Stephanie Pellham
8 sent you an e-mail. Who is Stephanie?
9     A. According to this e-mail, senior contract
10 administrator.
11     Q. Do you know her as you sit here today?
12     A. Yes, I remember Stephanie.
13     Q. Do you have any reason to believe you
14 didn't receive this in the ordinary course of business?
15     A. No.
16     Q. Stephanie's asking you about something
17 that popped up on a peculiar order summary report;
18 correct?
19     A. Correct.
20     Q. And if you turn the page, at the beginning
21 of the e-mail you inquire as to the customer; correct?
22     A. Correct.
23     Q. And then at the top you respond to
24 Stephanie. You see that?

Page 195

1     A. Yes.
2     Q. And you say you spoke with Victor, and
3 they placed an additional month's worth of orders this
4 month. What does it mean that they placed an
5 additional order that month?
6     A. So this is a good example as to where I'm
7 kind of the middleman here; right? So Stephanie's
8 reach out to me for additional information per the
9 process, that this order is peculiar, we can't release
10 it until we have more information. I reached out to
11 that salesperson. Victor apparently was managing
12 Walgreens at that time, which was the customer in
13 question here, and he provi -- it looks like he
14 provided all of this information in the e-mail which I
15 was referring -- or sending back to Stephanie.
16     Q. And the customer -- the information that
17 you got from Victor was that the customer was wondering
18 if they should be placing a one-time buy with one of
19 our competitors to make sure they're taken care of, but
20 Vic said not to do that and to go ahead and place the
21 orders; correct?
22     A. That's -- yes.
23     Q. And that was the information that you
24 provided?

Page 196

1     A. That is correct.
2     Q. Okay. Thank you.
3     [Exhibit Mallinckrodt-Cardetti-022 marked
4     for identification.]
5     Q. I'll show you Exhibit 22, which goes from
6 0674 to 0687.
7     A. Okay.
8     Q. Okay. I'd like to direct your attention
9 to Page 0675, which is the first page of the -- or the
10 second page of the e-mail from you to Lou Ann Randall
11 on August 3rd, 2011. Do you see that?
12     A. I do.
13     Q. Do you have any reason to believe that you
14 didn't send this in the ordinary course of business?
15     A. No.
16     Q. If you turn the page from there, there's a
17 sheet, 0676, which says contract overview. Do you see
18 that?
19     A. I do.
20     Q. It is Sunrise Wholesale. You see that?
21     A. Yes.
22     Q. Contract name? Payment terms -- if you go
23 down there a little bit, two percent, 30, net 31?
24     A. Yes.

Page 197

1     Q. And then under rebates, do you see it
2 shows a 12 percent rebate?
3     A. I do see that.
4     Q. And that's to be paid quarterly?
5     A. I see that, yes.
6     Q. If you turn the page to 0681, which says
7 at the top term sheet, Mallinckrodt, Inc., dosage
8 pharmaceuticals.
9     A. Yes.
10     Q. Are you familiar with these term sheets?
11     A. Yeah. So we had a standard template for
12 our terms agreements.
13     Q. And does this appear to be one of those
14 standard?
15     A. Yes.
16     Q. If you go down to pricing.
17     A. Yes.
18     Q. The last sentence of that paragraph,
19 Mallinckrodt will credit customer the difference
20 between the invoice price and current contract price
21 upon receipt and verification of chargeback submissions
22 from customer on a contract number to be established.
23 Do you see that?
24     A. I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1    Q.    And then if you turn the page to Exhibit
2  A, which is 0683 --
3    A.    Okay.
4    Q.    We see here -- well, let's look at the
5  first one, which is NDC 0358-01.  It's hydrocodone --
6  I'm not even going to try to say that.  And it shows --
7  so it shows the product description, it says the size,
8  hundreds.  Does that mean a bottle of 100?
9    A.    Yes, it does.
10   Q.    Invoice price per bottle.
11   A.    Uh-huh.
12   Q.    So now we have something that in the --
13  this is in the actual term sheet of the contract, it
14  lists the invoice price of $6.41; right?
15   A.    Correct.
16   Q.    The contract price is $4.89 and the net
17  price is $4.30; correct?
18   A.    Correct.
19   Q.    Right?  Okay.  What is the -- besides the
20  difference in the numbers, what's the difference
21  between the invoice price per bottle and the contract
22  price per bottle?
23   A.    The invoice price is the same as the WAC
24  price that I was referring to earlier.

Page 199

1    Q.    And WAC stands for?
2    A.    Wholesaler acquisition cost.
3    Q.    So here it's what Sunrise as a wholesaler
4  was acquiring it at?
5    A.    Correct.  That's what they would -- yes.
6    Q.    And then the contract price is?
7    A.    The negotiated price.
8    Q.    And then the net price per bottle --
9  what's the difference between the -- why is there a
10  difference between the contract price and the net
11  price?
12   A.    If there were any rebates that were
13  negotiated as part of the contract, that takes you from
14  the contract to the net.
15   Q.    And that might be that 15 or 12 percent
16  that we -- 15 -- 12 percent rebate that we saw on the
17  contract overview?
18   A.    That is correct.
19   Q.    Now, can you from this -- can we have
20  another conversation about chargebacks, and give me an
21  idea what a customer such as Sunrise here would tell
22  you in order to process a chargeback?
23   A.    I'm sorry.  What the customer would tell
24  us?

Page 200

1    Q.    What would you expect -- the term sheet
2  requires a verification of chargeback submission?
3    A.    Correct.
4    Q.    So if we go to that page that I was just
5  talking about, on 0683 --
6    A.    Uh-huh.
7    Q.     -- and we look at those numbers, what is
8  it you would require to be included in a proper
9  chargeback submission?
10   A.    Okay.  So just to set the stage, this
11  document, these term sheets, were drafted by our legal
12  department, so I did not create these term sheets.
13  However, this is part of the chargebacks process that
14  we've been referring to all day.
15        So the wholesaler purchases it at WAC, or
16  invoice price.  It's used interchangeably.  We have a
17  negotiated contract price.  Anytime they sell a product
18  out to a pharmacy, that's a chargeback, if you will.
19  So however it was negotiated with or however we
20  received that information from Sunrise -- whether
21  daily, weekly, monthly, like we've said all along -- so
22  then that would be aggregated chargeback data on who
23  they sold -- what pharmacy they sold our inventory to.
24   Q.    So if we look at this first line of

Page 201

1  bottles of hundreds and they sold it to a pharmacy for
2  $4.89; okay?
3    A.    No, that's not correct.
4    Q.    Okay.  That's what I'm trying to figure
5  out.
6    A.    So the chargeback data is the quantity
7  that they sold.  It doesn't -- and I believe you've
8  asked this question before.
9    Q.    I might have.
10   A.    They -- it does not include the price that
11  they sold our product to the pharmacy.  This is the
12  contract price with Sunrise, so again, that $10, $8
13  situation.  They buy it at $10, their contract price is
14  $8, we get the chargeback data, the aggregated
15  chargeback data, we give them a chargeback of $2.  So
16  that's this -- and this is a standard terms and
17  conditions agreement where this is the pricing.
18   Q.    And so I'm trying to figure out what's the
19  purpose of the chargeback?  Why not just sell it to
20  them for $2 less in the first instance?
21   A.    The purpose of the chargeback -- I mean,
22  so it's -- the WAC price is a wholesaler acquisition
23  cost so they purchase the price at WAC.
24   Q.    I got it.  Yeah.

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    A.   So what's the purpose of that? Why do
2  they --
3    Q.   No. What's the purpose of submitting the
4  chargeback?
5    A.   Well, I mean, to get it back to the
6  negotiated contract price. I mean, as far -- that's --
7  when I entered the industry, that was kind of -- that
8  was what was done with wholesalers. However, we took
9  it a step further and utilized that chargeback data, as
10 referenced multiple times already today, with our
11 suspicious order monitoring team to get into more
12 detailed information to try to understand our
13 customer's customer. So it was utilized -- chargebacks
14 were utilized above and beyond what the purpose of --
15 in regards to the pricing.
16    Q.   And that was my point. It provided you
17 additional data?
18    A.   Well, yeah. We had the data. Yeah, we
19 had the chargeback data.
20       [Exhibit Mallinckrodt-Cardetti-023 marked
21       for identification.]
22    Q.   Exhibit Number 23 is an e-mail that goes
23 from 9,400 to 9404.
24    A.   Okay.

Page 203

1    Q.   This is an e-mail that you sent to several
2  people on October 10th, 2011. Do you see that?
3    A.   I do, yes.
4    Q.   You're a product manager now?
5    A.   I am.
6    Q.   Okay. Congratulations. Do you have any
7  reason to believe that you didn't send this in the
8  ordinary course of your business?
9    A.   No.
10    Q.   Do you know what letters that you're
11 referring to here in this e-mail, when it says we are
12 sending letters to customers?
13    A.   So anytime that there was supply
14 constraint and we had to put a product on allocation,
15 we would notify customers so they -- to set
16 expectations with them.
17    Q.   When you say supply constraint, are you
18 talking about a quota?
19    A.   Well, as it states in this e-mail on the
20 first bullet point -- or the second set of bullets, the
21 first one -- it says this interruption in supply is not
22 due to an API shortage but instead due to quota
23 constraints.
24    Q.   So it's quota?

Page 204

1    A.   It is quota.
2    Q.   It also indicates that you submitted a
3  request to the DEA for more quota. Is that something
4  that you did?
5    A.   No.
6    Q.   How did you find out that that was
7  something that was done?
8    A.   Again, through our monthly forecasting
9  meetings, the -- Karen Harper and her team were -- from
10 my recollection, were involved in that to an extent to
11 understand our -- the forecast, and so communication --
12 I mean, communications were happening all the time
13 between the various departments, so marketing was
14 apparently made aware that we would have requested more
15 quota. I don't remember who sent that notification or
16 anything like that, so --
17    Q.   Was that a usual process, for Mallinckrodt
18 to request additional quote?
19    A.   Usual? I know it happened. I don't know
20 how frequently.
21    Q.   You indicated that there would be an
22 allocation -- was there an allocation report or an
23 allocation list? Does that ring a bell to you?
24    A.   So it appears that there was a list --

Page 205

1  what it states is direct customers with their monthly
2  allocation would have been included in the letters.
3  Does that answer your question?
4    Q.   Yeah, it does. I'm going to show you
5  Exhibit Number 24, which goes from 6071 to 6072, and
6  I'm just trying to figure out if you know what these
7  allocation -- what the purpose of this allocation list
8  is.
9       [Exhibit Mallinckrodt-Cardetti-024 marked
10       for identification.]
11       MR. TSAI: Sorry.
12    A.   Oh.
13    Q.   (By Mr. Dearman) And is this a report or
14 a list that you're familiar with?
15    A.   Okay. First of all, this is not an e-mail
16 that I would have -- that I'm on -- or included on.
17    Q.   I didn't say that it was.
18    A.   Sure. I don't know what this report is.
19    Q.   Okay. That's fine. So maybe use the term
20 allocation letter. Is that something you're familiar
21 with, when we were talking about those letters?
22    A.   So we're going back to 9400?
23    Q.   Not really. I'm asking --
24    A.   Oh. Got you.

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    Q.    -- you if you're just in general familiar
2  with the terms allocation letter as it related to
3  customers and Mallinckrodt?
4    A.    Yeah, anytime -- what comes to mind from
5  our -- is anytime that -- that situation that I
6  referred to earlier where we had supply constraints and
7  had to put a product on allocation, we would send a
8  letter to customers considered an allocation letter, if
9  you will, to notify them and set expectations.
10   Q.    Let me show you --
11         [Exhibit Mallinckrodt-Cardetti-025 marked
12         for identification.]
13   A.    Okay.
14   Q.    Is that your handwriting?
15   A.    That is my handwriting.
16   Q.    So this was from you to Victor saying you
17 received his voicemail, you're asking him to please
18 send you oxy 15 and 30 usage?
19   A.    Correct.
20   Q.    And he does send you that?
21   A.    Yes.
22   Q.    Any reason to believe you didn't receive
23 that in the ordinary course of business?
24   A.    No.

Page 207

1    Q.    He tells you in Florida they had the
2  largest oxy 15 and 30 dispensers and currently use
3  Actavis for both SKUs; correct?
4    A.    Yes.
5    Q.    What data would you use to determine that
6  Actavis is the one that is providing them with those
7  SKUs?
8    A.    I wouldn't have any data to confirm that.
9    Q.    So you don't know how he came up with that
10 statement?
11   A.    I don't know where he came up with that
12 information.
13   Q.    (By Mr. Dearman) Do you know why you
14 indicated willing to write letter to the DEA as it
15 related to this?
16   A.    What I can think of is -- I don't recall
17 this specific situation, first of all, but if there
18 were a situation where this quantity were to put our
19 forecast well above our capacity constraints, with --
20 quota -- in regards to quota, and we wouldn't be able
21 to supply them, we would have to go pack to the DEA.
22        Again, that was not me doing that but the
23 compliance team, Karen Harper and her team, would put
24 together a pack of information in terms of why we were

Page 208

1  requesting additional quota, whether it was approved or
2  not -- I don't -- but in terms of -- it appears that
3  Walgreens was willing to write a letter.  But yeah.
4    Q.    The next bullet there says wanting favor
5  as to where we would price them to make sure Actavis is
6  pricing them right.  Do you know what they're asking
7  you?  Are they asking you for a quota?
8    A.    I don't remember specifically on this
9  situation, but the way it reads is that they're wanting
10 to -- because it looks like that Actavis can't supply
11 them for whatever reason, and they have a certain
12 price, and they're wanting to stay at that price.
13 That's what it appears to be.
14   Q.    All right.  Thank you.  I'm going to show
15 you Exhibit Number 26, which is Bates range 9509 to
16 9515.
17         [Exhibit Mallinckrodt-Cardetti-026 marked
18         for identification.]
19         [Discussion off the record.]
20   A.    Okay.
21   Q.    Do you know what Hazelwood operations is?
22   A.    It was from what I recall a automated
23 e-mail from our system, so an automated e-mail that was
24 set to run, for example, at a certain time or

Page 209

1  something.
2    Q.    Do you have any reason to believe you
3  didn't receive this e-mail in the ordinary course?
4    A.    No.
5    Q.    And then you forwarded something on to --
6  and I think it's probably the attachment -- to Ginger
7  and to others?
8    A.    That is correct.
9    Q.    Who is George Saffold?
10   A.    George Saffold?  I remember the name but I
11 do not remember his role.
12   Q.    All right.  No problem.  Your e-mail, you
13 indicate you've eliminated back orders on oxycodone IR
14 but future-dating orders.  What does that mean?
15   A.    So it's just a system, so when an order is
16 generated or in our system it would have an order date,
17 and so this report was generated based on that order
18 date, and so in order to -- I mean, we would change
19 that date to -- so it wasn't considered a backorder for
20 internal purposes.  I don't know.
21        I mean, mainly because from -- I mean,
22 this is just an assumption based on what I was going on
23 at this time, again knowing that product was put on
24 allocation from this prior e-mail in October 2011.

Page 210

1 This is November 2011, so we had communicated per 9400
2 document.
3    Q.   Per the allocation letters?
4    A.   Per the allocation letters that we
5 communicated to customers on their amount that we were
6 able to ship them.  Some customers followed that
7 letter, some customers didn't, so we would have orders
8 in house, and per our prior communication we would only
9 be able to ship X amount during X amount of time.
10    Q.   So if you didn't put this date in the
11 future it would generate another allocation letter?
12    A.   No.  The allocation was like a manual
13 letter, PDF, if you will, so that was sent to
14 customers, and that allocation didn't change.
15    Q.   So put --
16    A.   I mean, from the --
17    Q.   Right.  I guess the allocation didn't
18 change.
19    A.   Sure.
20    Q.   But once you send the allocation letter
21 out, do you expect the customer send you another order
22 immediately?
23    A.   Well, they'll order as needed, so we're
24 telling them -- like let's say X customer normally

Page 211

1 orders 1,000 bottles a month.  We're telling them as
2 part of this allocation process we can only ship you
3 100 bottle as to month.
4         Now, whether or not they comply with that
5 notification or not differed; right?  So that customer
6 may have continued to place 1,000 bottles every month,
7 knowing that we've already communicated to them that we
8 can only supply them 100.
9    Q.   And how does that then tie into
10 future-dating the order?
11    A.   So as I've mentioned before, so the order
12 in the system would have an order date, so basically
13 when the customer places the order.  And if we have
14 communicated to them we're not going to ship you this
15 product until next month, for example, we future-dated
16 those orders.
17    Q.   Okay.  That's what --
18    A.   Yeah.  To follow the allocation.
19    Q.   Okay.  That's what I meant.  All right.
20    A.   Yeah.
21        [Exhibit Mallinckrodt-Cardetti-027 marked
22         for identification.]
23    Q.   I'm going to show you what is marked as
24 Exhibit Number 27, Bates range 8931.

Page 212

1        MR. DEARMAN:  You got three of those.
2    A.   Okay.
3    Q.   (By Mr. Dearman)  All right, we finally
4 have an e-mail with Jennifer Buist on it; right?
5    A.   There she is.
6    Q.   She exists.  So this e-mail is sent from
7 Jennifer to you on 3-12-2012.  Any reason to believe
8 that you didn't get it?
9    A.   No.
10    Q.   Do you know remove who Eileen Spalding is?
11    A.   Eileen worked in -- I believe it -- was
12 she part of the -- she was up in -- she was located up
13 in our manufacturing facility in New York.  She may
14 have been part of Karen Harper's team at the time.  I
15 don't recall the specifics, though, regarding her
16 position at that time.
17    Q.   So she is telling you about an
18 AmerisourceBergen order.  Do you see that?
19    A.   I do.
20    Q.   She also indicates that it exceeds our
21 Tier 1 limit.  Do you know what that is?
22    A.   I'm not familiar with -- I mean, it states
23 monthly allocation plus 10 percent in the e-mail, but
24 again, I'm not familiar with any of the tiers or

Page 213

1 algorithms from the suspicious order monitoring team.
2    Q.   So when you received this e-mail, did you
3 ask anybody what the Tier 1 limit meant?
4    A.   I don't remember what conversations took
5 place back in March of 2012 regarding this e-mail.
6    Q.   So did you ever know what the Tier 1 limit
7 was?
8    A.   Well, I was clearly given that
9 notification in this e-mail.
10    Q.   Do you know how the tiers were selected?
11    A.   No.  Again, I don't know how the details
12 regarding the tiers or the algorithms or any of that
13 was determined other than what I'm seeing in front of
14 me.
15    Q.   So when you receive an e-mail like this
16 that asks you to provide insight, what is it that you
17 would have done in your normal course of business?
18    A.   So again, at this point in time in March
19 of 2012, I was a product manager, so if I had any
20 additional insight as to what was going on with
21 AmerisourceBergen, their contract changes, new awards
22 or anything, I could have provided that information.
23        If I wasn't aware of anything myself, I
24 would have reached out to the salesperson responsible

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1 for AmerisourceBergen at that time. If they were not
2 aware, then they would reach out to AmerisourceBergen.
3 So again, kind of the middleman, just trying to provide
4 information going back to the suspicious order
5 monitoring process to validate orders.
6     [Exhibit Mallinckrodt-Cardetti-028 marked
7     for identification.]
8     Q.   I'm going to show you Exhibit 28, which is
9 8924 and 8925.
10    A.   Okay.
11    Q.   This is an e-mail that looks to be from
12 Jennifer to you and Karen Harper as well as others;
13 correct?
14    A.   Correct.
15    Q.   This was sent on March two thousand --
16 March 13th, 2012?
17    A.   Correct.
18    Q.   So you're still a product manager at that
19 point in time?
20    A.   Correct.
21    Q.   Any reason to believe you didn't get this
22 in the ordinary course of business or send these
23 e-mails?
24    A.   No.

Page 215

1     Q.   It's says Lisa, we have an order on Tier 2
2 hold which is exhibiting an unusual pattern. What's a
3 Tier 2 hold?
4     A.   Again, I was not familiar with the
5 suspicious order monitoring tiers; however, as it
6 states, the quantity order exceeds their 18-month
7 average by more than 3X, so that's pretty much all I
8 know about Tier 2 that I can recall.
9     Q.   You sent this onto Jennifer Bullerdick.
10 What was Jennifer's position?
11    A.   She was also a product manager.
12    Q.   And then she forwarded it directly to
13 Jennifer and indicated that we've been on back order so
14 it seems like a feasible quantity?
15    A.   Yes.
16    Q.   But your only experience with Tier 2 is
17 what you just read right here?
18    A.   From I recall, yeah. I --
19     [Exhibit Mallinckrodt-Cardetti-029 marked
20     for identification.]
21    Q.   I'll show you Exhibit 29, which is 4784 to
22 4786. Let me know when you're ready to discuss it.
23    A.   Okay.
24    Q.   So on the bottom of the first page, you're

Page 216

1 sending an e-mail to Cheryl Nelson. Do you know who
2 Cheryl Nelson is?
3     A.   At the bottom of the first --
4     Q.   4784.
5     A.   Oh. Cheryl Nelson? Yes. Customer
6 service.
7     Q.   Do you know why Hazelwood is next to her?
8 Or is that a separate -- no, it's the same e-mail
9 address, it looks like.
10    A.   I'm sorry. Where do you see this?
11    Q.   Well, I see from Cardetti, Lisa M.
12 Lundergan, sent Monday, March 26th, 2012 --
13    A.   Okay.
14    Q.   -- to Nelson, Cheryl, Hazelwood.
15    A.   I don't know.
16    Q.   Okay. Who is Rose Adams?
17    A.   Rose Adams managed the distribution center
18 up in Hobart, New York.
19    Q.   Clay Sanders -- Saunders?
20    A.   Clay Saunders was the buyer at
21 AmerisourceBergen.
22    Q.   And then you indicate please allocate
23 these orders to ship. Are you referring to the orders
24 on Page 4785?

Page 217

1     A.   That's what it appears, yes.
2     Q.   And if you move up on that Page 4784
3 from -- it's from Dosage Products Division
4 Pharmaceuticals to you. Do you know who Dosage
5 Products Division is?
6     A.   If I recall, that was a generic customer
7 service e-mail.
8     Q.   And it refers you to the order numbers
9 below, and it says I am unable to allocate, and there's
10 a problem with these having been on D1 and D2 hold. Do
11 you know what D1 and D2 hold is?
12    A.   I believe those were suspicious order
13 monitoring holds. I don't recall 100 percent, but I
14 believe those were the SOM holds.
15    Q.   Do you know how the holds relate to the
16 tiers, if they do?
17    A.   The holds was an auto -- like a system
18 generated, so I don't know how all of that was
19 correlated systemically, to answer your question, no.
20    Q.   Do you know whether there were other holds
21 besides a D1 or D2?
22    A.   Yes, there were other customer service
23 holds or system holds, yes.
24    Q.   So like a D3 hold?

Page 218

1    A.    I don't remember all the holds.

2    Q.    Was there a list of the holds and what the

3 holds meant that you had access to at some point in

4 time?

5    A.    Customer service had that list, yeah.

6 Yeah.

7    Q.    If you go to the last sentence there, it

8 says but I am unable to remove the PM hold and/or

9 allocate.  What is a PM hold?

10    A.    Again, I don't remember all the specifics

11 on what the holds --

12    Q.    Do you have a general understanding what

13 PM hold means?

14    A.    I do not.  It could have been a variety of

15 different reasons why that was on hold.

16    Q.    Now, when you became a regional account

17 manager, that's when you left marketing and went to

18 sales; correct?

19    A.    Regional account manager?

20    Q.    Do I have that right?

21    A.    No.  No.  So I was -- regional account

22 manager was sales.

23    Q.    It was sales?

24    A.    Yes.

Page 219

1    Q.    It was the first time you were in sales?

2    A.    Correct.  Yes.

3    Q.    So the answer is yes?

4    A.    Yeah.  Sorry.

5    Q.    That's all right.

6    A.    But I didn't leave sales after that.

7    Q.    No, no.

8    A.    Was that your question?  I'm sorry.

9    Q.    No, no.  My question was when you started

10 as a regional account manager, were you now in the

11 sales department?

12    A.    Yes.  Yes.

13    Q.    And your compensation in the sales

14 department was -- one of the factors was related to

15 volume; right?  Correct?

16    A.    One of the factors related to sales.

17    Q.    Sales, which was volume of product?

18    A.    Price obviously goes into sales.

19    Q.    So price and the volume of the product?

20    A.    The way that I remember the compensation

21 was based on sales, so how you come up with sales is

22 volume and price.

23    Q.    Did you set the price?

24    A.    Throughout -- kind of as we've discussed

Page 220

1 today, sales had the discussions with customers.  It

2 was not a single -- like I did not decide the price

3 single-handedly.  It was a collaborative discussion

4 between sales and marketing.  Management approved all

5 of the pricing that was -- went into any offer or

6 contract.

7    Q.    What went into an offer as it related to

8 pricing?  What was the process that was utilized?

9    A.    Yeah, so if you remember, the terms and

10 conditions was the meat and potatoes of the agreement

11 with the customer, and so if you remember there was an

12 Exhibit A, so this is just an example, so when that

13 agreement was put into place with that customer, those

14 are the prices at that time, so --

15    Q.    The WAC price, the net price, the cost?

16    A.    Right.  Right.  So anytime that there was

17 a change to that price, there would basically be an

18 amended to that agreement, to that exhibit.  Every --

19 some customers even had their own terms, templates, so

20 I don't want to say that every single one looked

21 exactly like by any means, but that was the general

22 concept, so it was typically a one-page document that

23 included the product and the price that was being

24 offered.

Page 221

1    Q.    I'm going to show you Exhibit 30, which is

2 7943 to 7945, and more of the compensation-type

3 questions that I was just asking.

4        [Exhibit Mallinckrodt-Cardetti-030 marked

5        for identification.]

6    A.    Sure.  Okay.

7    Q.    Are you familiar with this document?

8    A.    Yes.

9    Q.    What is it?

10    A.    So we would provide Jane Williams, who I

11 reported to at this time, just a monthly report on

12 activity of my accounts and my territory.

13    Q.    What was your territory?

14    A.    My territory was account-based.

15    Q.    What do you mean by that?

16    A.    By customer.

17    Q.    So it wasn't geography; it was by

18 customer?

19    A.    Correct.

20    Q.    From this document can you tell who your

21 customers were?

22    A.    I can.

23    Q.    And who were your customers?

24    A.    If you look at 7944 under customer

Page 222

1 updates, they're bulleted.
2    Q.    So NC Mutual, Premier Group, FW Care,
3 Harvard Drug, Meijer, Price Chopper, Omnicare, Excel
4 Rx, ABC, and AHP?
5    A.    This is that is correct.
6    Q.    What's AHP?
7    A.    AHP is a packaging division of
8 AmerisourceBergen.
9    Q.    If we go back to the first page of this
10 document, 7943, territory sales summary based on fiscal
11 months, territory, and it lists your name, measures
12 gross sales?
13    A.    Yeah.
14    Q.    And then it lists fiscal year 2012 and
15 fiscal year 2013; correct?
16    A.    Yes.  Yes.
17    Q.    And what is the -- what's the VAR?  What
18 is that?
19    A.    Variance.
20    Q.    And that's a negative variance?
21    A.    Yes.  So as you can see, fiscal year 2012
22 was $91.5 million and fiscal year 2013 was $72.396
23 million, which leaves a seven -- or excuse me -- 19.178
24 variance.

Page 223

1    Q.    And it shows you the units, the spread
2 between 2012 and 2013 as well; correct?
3    A.    Correct.
4    Q.    Is P & L profit and loss?
5    A.    Yes.
6    Q.    Including methylphenidate ER?
7    A.    Methylphenidate, yes.
8    Q.    Yeah.  That's a Schedule 2, or is it not?
9    A.    I believe so.  It was for ADHD.  It was --
10 yeah.  I believe that was a Schedule 2, though.
11    Q.    It wasn't; right?  It was?
12    A.    I believe it was a Schedule 2, but it was
13 for ADHD.
14    Q.    If we look at the -- excluding the ADHD
15 drug, then we're talking about all opioids; right?
16    A.    Not necessa -- I mean, we had other
17 products in our portfolio.
18    Q.    That you were responsible for with your
19 accounts?
20    A.    I was -- I mean, when you're in sales you
21 have responsibility for the customer, but I mean, you
22 could have been selling opioids and non-opioids.
23    Q.    And can you tell me in 2013 what
24 non-opioids you were responsible for selling?

Page 224

1    A.    I don't remember.
2    Q.    Could you name one?
3    A.    Well, methylphenidate is a product.
4    Q.    How about besides methylphenidate?
5    A.    Temazepam, maybe.  I don't recall.  I know
6 that we had non-opioid products.
7    Q.    And if you look at the P & L excluding the
8 ADHD drug?
9    A.    Yes.
10    Q.    Under rebates and fees, is that showing
11 how much was paid in rebates and fees in your territory
12 for this period of time?
13    A.    Yes, that is what that's showing.
14    Q.    And that is showing that -- okay.  And
15 then if you go down to net sales for the prior rolling
16 12 months and then the rolling 12 months, there's a
17 variance, and that variance is 49 percent between the
18 last 12 months; right?
19    A.    Yes.
20    Q.    So do you know how that number is up but
21 if you go to the top box that we talked about those
22 numbers are down?
23    A.    Well, clearly it's driven from
24 methylphenidate ER.

Page 225

1    Q.    Okay.  That answers the question.  Thank
2 you.
3    A.    Yeah.
4    Q.    And if you turn the page and you look at
5 the top of 7944, what is hydro APAP 325 business?
6    A.    Hydrocodone acetaminophen, 325 milligram.
7    Q.    Do you know -- were you -- did you -- were
8 you responsible for any other opioid product besides --
9 were you selling any other product besides the
10 325-milligram hydro?
11    A.    Sure.  Yeah.  I mean, I was selling
12 various products.
13    Q.    Why do you have a box for that specific
14 molecule?
15    A.    I'm trying to remember.  When was this?
16 July.  I don't recall.  I don't remember.
17    Q.    Do you know why -- if you look under
18 customer it says Omnicare, Omnicare, and then there's a
19 black line that goes across.  Do you see that?
20    A.    Yes.
21    Q.    Do you know what that black line was --
22 was that something you put into the document?
23    A.    Yeah, it was just a way for me to
24 distinguish between customers.  It was just a format

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1 that I did.
2    Q.   Do you know who Thomas Brown is?
3    A.   Thomas Brown?  I don't remember a Thomas
4 Brown.
5    Q.   Are you familiar with the red flags video?
6    A.   The red flags video?  I do vaguely
7 remember that video.
8    Q.   What was it?
9    A.   If I recall correctly, it was a video in
10 regards to how pharmacists could kind of recognize
11 potential diversion, I mean, in regard -- like at the
12 pharmacy, if I am remembering the correct video.
13         [Exhibit Mallinckrodt-Cardetti-031 marked
14         for identification.]
15    Q.   I'm going to show you Exhibit 32 (sic),
16 which is 7538 through 7540.
17         MR. TSAI:  Sorry.
18    Q.   (By Mr. Dearman)  Let me know when you're
19 ready to --
20    A.   Okay.
21    Q.   If you look at the initial e-mail, which
22 is June 6th, 2014, from you to Walt Kaczmarek.  Who is
23 Walt?
24    A.   He was the president.

Page 227

1    Q.   The president of?
2    A.   Of generics.
3    Q.   Jay Williams, Ginger Collier, and Jacob
4 Longenecker, who we talked about.  Do you have any
5 reason to believe that you didn't send this in the
6 ordinary course of business?
7    A.   No, I do not.
8    Q.   The 5/325 items -- what are 5/325s?
9    A.   Well, we had some product -- 5/325 is a
10 milligram.  Based on the context of this e-mail, it
11 appears that I'm referring to hydrocodone 5/325, just
12 knowing that on the second page, on 7540, how it states
13 7.5/325 and 10/325, I just remembered that those were
14 the strengths of that product.
15    Q.   If you look at Page 7540, the last page.
16    A.   Yes.
17    Q.   Do you see above thank you and Lisa it
18 says Qualitest?
19    A.   I do.
20    Q.   What is that?
21    A.   Qualitest is a manufacturer.
22    Q.   So do you know why you had dot, dot, dot,
23 dot, Qualitest, exclamation, exclamation, exclamation,
24 exclamation, happy face?

Page 228

1    A.   I do not remember why I put Qualitest.
2    Q.   And Qualitest was a manufacturer of what?
3    A.   They manufactured many products.  They
4 were a competitor.
5    Q.   Who is Alvogen?
6    A.   Alvogen is another manufacturer.
7    Q.   So if we look at Number 1 under that first
8 e-mail on Page 7539, the 5/325 items removed to the
9 base VIP.
10    A.   Uh-huh.
11    Q.   What are the purpose of the tiers that
12 you're setting forth here?
13    A.   So this is a volume incentive program, a
14 VIP that we've discussed previously, and these are the
15 tiers set for AmerisourceBergen.
16    Q.   So the 85,000 to 94,000 -- that's pills or
17 bottles?
18    A.   That's dollars.
19    Q.   I'm sorry.  Dollars.  Dollars.  Right.
20 And so each of those tiers -- that's the incentive
21 price that's paid?
22    A.   The -- yeah, depending on where their
23 sales were, that's what the rebate percentage.
24    Q.   So what's the point of showing the seven

Page 229

1 percent and then the $6 million number?
2    A.   That's simply a calculation of what that
3 rebate would be.
4    Q.   If they hit that mark?
5    A.   If they hit that.  Correct.
6    Q.   And then two talks about oxy APAP, VIP, so
7 is that a different molecule?
8    A.   That is.
9    Q.   And that is another incentive program?
10    A.   It appears that it's a separate program,
11 yes.
12    Q.   So it doesn't say rebate, though, but it
13 shows a percentage under the first line, which is $20
14 million to twenty -- almost $25 million?
15    A.   Uh-huh.
16    Q.   Four percent, and then minimum tier
17 compliant?  What does that mean, 40 percent?  Do you
18 know?
19    A.   I don't remember what that would have
20 been.
21    Q.   But this is on oxy, and instead of it
22 being -- it's an annual tier program; right?
23    A.   On oxy APAP.  It's an oxy and
24 acetaminophen combination product.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    Q.   And it shows you annual tiers and
2  quarterly tiers.  If you turn the page to Number 3, it
3  says we are not decreasing price as ABC requested, but
4  the VIP quarterly payout should help them with
5  decreasing their sales-out price compared to the other
6  manufacturer, Alvogen; right?
7    A.   Yes.
8    Q.   If you then go to the first page of this
9  e-mail, this is an e-mail from you to these -- to some
10 of these people which is now referring to this pricing;
11 correct?
12   A.   It looks like it is discussing the VIP
13 program.
14   Q.   And it says the VIP percent is passed
15 directly on to 40 percent of their customers, therefore
16 those customers would see the value and we could expect
17 to see the volume back up.  So that's 40 percent of
18 ABC's customers?
19   A.   Yes, that is -- that's how I read that;
20 correct.
21   Q.   Earlier you indicated we're not decreasing
22 the price, but here in Bullet 2, it says if we do not
23 decrease the price there is no additional benefit to
24 ABC; only those large customers would see the benefit.

Page 231

1  What do you mean by that?
2    A.   So as noted in the first bullet, only 40
3  percent of their customers get additional rebates from
4  ABC, and so that leaves 60 percent of their customers
5  that do not.  So as it states, if we don't decrease the
6  price, there's no additional benefit to ABC, so that 60
7  percent of those customers, I mean, wouldn't see any
8  change in their end because typically if you were to
9  decrease your price -- we have no control over how the
10 wholesaler set their sell prices nor did we know what
11 their sell prices were with their customers.  But you
12 can just make the assumption that they're -- if you
13 don't do anything with the price, that the price would
14 stay constant.
15   Q.   And so the next one says in order to drive
16 the volume back up for all customers, that additional
17 60 percent, we would need to drop the price?
18   A.   Yes.  Yes.
19   Q.   And down at the bottom, in that
20 second-to-last paragraph it says -- it says a lot, but
21 one of the things it says is since Rich would be the
22 final decision-maker on the margin issue.  Who is rich?
23   A.   Rich was at AmerisourceBergen.
24   Q.   What was Rich's last name?

Page 232

1    A.   Rich -- gosh.  Rich, Rich.  It's on the
2  tip of my tongue.  Hang on.  Tremonte.
3    Q.   Thank you.  Are you familiar with the term
4  key opinion leader?
5    A.   Key opinion?  Vaguely.  Key opinion
6  leader?
7    Q.   What is your understanding of that
8  terminology?
9    A.   Key opinion leader -- a decision-maker,
10 potentially.
11   Q.   Did you ever work with doctors in order to
12 speak to any of your clients about any of your
13 products?
14   A.   No.
15   Q.   What was that last number?
16   A.   32?  31?  I don't know what --
17   Q.   I don't know.
18        [Discussion off the record.]
19        [Exhibit Mallinckrodt-Cardetti-032 marked
20        for identification.]
21   Q.   Let me show you Exhibit Number 32, which
22 is Bate range 1216 and 1217.
23        [Discussion off the record.]
24   A.   Okay.

Page 233

1    Q.   1216 is an e-mail from you to you dated
2  9-30-2014.  I assume you BCCed some customers with
3  this?
4    A.   Yes, that's -- yeah.
5    Q.   Do you know what the purpose of this
6  teleconference was?
7    A.   It appears to discuss the DEA's ruling on
8  rescheduling hydrocodone combination products.
9    Q.   As a Schedule 2; correct?
10   A.   I'm sorry.  As a Schedule 2.  Yes.  And
11 inviting customers to participate if they were
12 interested.
13   Q.   And the moderator, Bob Twillman -- how did
14 you find Mr. Twillman?
15   A.   I did not facilitate this.  This would
16 have been from another group.  And this is a good
17 example of an e-mail where legal or corporate
18 compliance would have drafted this and then sent this
19 to sales to say okay --
20   Q.   Send it to your customers?
21   A.   -- send it to your customers.
22        [Exhibit Mallinckrodt-Cardetti-033 marked
23        for identification.]
24   Q.   Exhibit 33, 0440 through 0442.

Page 234

1    A.   Okay.

2    Q.   If you look at the -- so this is on

3  October 2nd, 2014 -- it's your September monthly report

4  to Jane Williams about territory sales summary;

5  correct?

6    A.   Correct.

7    Q.   It looks like your sales from 2013 to 2014

8  went up 52 percent.  Do you see that?

9    A.   I do.

10   Q.   And you sold less units?  Is that

11 accurate?

12   A.   Yes, that's what it appears.

13   Q.   So how do you account for that?

14   A.   I don't know the specifics, but it appears

15 that there was a price increase.

16   Q.   Were these documents used for purposes of

17 determining your compensation; do you know?

18   A.   Not that I am aware of.  I don't -- I

19 mean, from my perspective Jane used this just to

20 keep -- I mean, there were obviously a lot going on

21 with each account, so just so she was aware of kind of

22 all the -- everything going on.

23   Q.   How would you receive bonuses?

24   A.   How?

Page 235

1    Q.   Yeah.  Somebody give you a box of cash?

2    A.   No, it would be in a paycheck.

3    Q.   And would the check indicate to you what

4  bonus?  What made up the bonus?

5    A.   What --

6    Q.   And would it indicate based on sales?

7  What would it tell you, if anything?

8    A.   We would have an annual review with the

9  manager, so in this case Jane, to review the year, what

10 my goals were, if I accomplished those goals, any

11 personal development things that -- so it would be a

12 comprehensive review of the year, and at that point in

13 time from what I recall, they would provide feedback on

14 where the sales hit throughout -- where the sales came

15 in for my customers.  Yeah.

16   Q.   And so would there be -- was there a name

17 to that form?

18   A.   That was like a meeting.

19   Q.   Was there some sort of an evaluation that

20 was provided to you or that you --

21   A.   I believe the evaluation was all done

22 online.  Yeah.

23   Q.   And when you say done online -- the two of

24 you sitting in front of a computer, or --

Page 236

1    A.   No.  So all of the goals from -- that were

2  determined at the beginning of the year were put

3  online.  We could go in throughout the year to type in

4  notes on, okay, if one of my goals as a personal

5  development was to take an Excel class, for example, I

6  could go in there and say okay, that goal has been

7  completed and this is the class I took, these are the

8  learnings from that class, et cetera.

9         So we had access to that portal to kind of

10 update along the year -- excuse me -- throughout the

11 year, and then at the end of the year, prior to that

12 one-on-one meeting that I was referring to, I would go

13 in and update and make comments on each specific goal,

14 and Jane -- the manager at that point in time would

15 also make comments.

16   Q.   And do you remember what that portal was

17 called?

18   A.   I do not.

19   Q.   Was volume of sales one of the items that

20 were on your goal list?

21   A.   Yeah, typically sales would be part of

22 that bonus structure.  Yeah.

23   Q.   And that would be set forth at the

24 beginning so you knew what you were supposed to reach?

Page 237

1    A.   Right.  And there was always, from what I

2  remember, like verbiage in the agreement that those

3  could be changed from management or whatever, but

4  generally speaking, yes, you knew what those goals

5  were.  Not necessarily at the beginning of the year,

6  because sometimes those targets didn't even come until

7  midyear, so --

8    Q.   But the targets were listed someplace for

9  you to see?

10   A.   Yeah.  Yeah.  Yeah.

11   Q.   Did you ever go on any trips with any of

12 your customers?

13   A.   Trips?

14   Q.   Yeah.

15   A.   No.

16   Q.   Conferences or seminars or --

17   A.   There were national -- like there were

18 industry trade shows where they attended and I would

19 attend, but I didn't go with them.

20   Q.   Were there any trips that Mallinckrodt

21 would sponsor where they would take ABC or some of its

22 principals on a trip with the sales department?

23   A.   I don't recall any trips that we -- no.

24       [Exhibit Mallinckrodt-Cardetti-034 marked

Page 238

1    for identification.]

2    Q.  I'm going to hand you what's marked as

3  Exhibit 34, which is 4121, and it's a spreadsheet. And

4  this is how it was produced to us.

5    A.  Okay.

6    Q.  Any of this familiar to you?

7    A.  This is -- there's a lot of reports in

8  this. I don't know if I ran these. I mean, these --

9    Q.  I don't know if you did either.

10    A.  Yeah.

11    Q.  If you look at the first page of this, it

12  says row labels, values.

13    A.  Yes.

14    Q.  Sum of shelf stock estimate, sum of annual

15  savings. Any idea what a shelf stock estimate is?

16    A.  So sometimes customers would request or

17  require a shelf stock payment if it's like a new award

18  if they've never stocked the product before. Yeah,

19  that's what that is.

20    Q.  If you turn the page to price comparison,

21  have you seen a report like this?

22    A.  This does not look familiar. It looks

23  like an ad hoc report that was put together.

24    Q.  If you turn the page two pages to where it

Page 239

1  says fiscal year 2011 up in the top?

2    A.  Yes.

3    Q.  EDI distributor data analysis. Do you

4  know what that is?

5    A.  So EDI is an electronic data feed when --

6  like the chargebacks, for example, would typically be

7  transmitted EDI from the wholesaler to Mallinckrodt.

8    Q.  So this is how the chargebacks would come

9  to Mallinckrodt?

10    A.  No. No. From my understanding, it would

11  be coming in a monster data feed electronically. I

12  don't know. I never saw what the raw data looked like,

13  but this appears to have come out of our -- like a tool

14  that we used to gather data, to pull data.

15    Yeah. I don't know. Oh -- okay, so

16  now -- sorry. That was really hard to see. Quantity

17  on hand. More inventory quantity on order. It looks

18  like that may be from their 852 data, which is like

19  inventory, like what the wholesaler stocked.

20    Q.  From Mallinckrodt?

21    A.  Mallinckrodt's product. Yeah, yeah, yeah.

22  So quantity on hand, the first AmerisourceBergen, their

23  inventory levels it looks like.

24    Q.  And then the next -- if you go a few pages

Page 240

1  it says new WAC table. Any idea what that is?

2    A.  I don't. I --

3    Q.  I mean, other than it's setting the WAC

4  price for certain SKUs?

5    A.  That's what it appears, yeah. I have no

6  other context. I can't --

7    Q.  Are you familiar with what prompt pay is?

8    A.  It's a cash discount. So two percent, 30,

9  net 31.

10    Q.  And that would be whatever the contractual

11  terms were?

12    A.  Absolutely, yes.

13    Q.  We're getting close, though.

14    A.  Thanks. I feel like time has stopped.

15  Anyone else?

16    Q.  I only have one more binder, and half of

17  this one. Exhibit 35. This is 0810 to 0811, with a

18  spreadsheet attached. The subject is Lisa's

19  allocations.

20    [Exhibit Mallinckrodt-Cardetti-035 marked

21    for identification.]

22    A.  Yes.

23    Q.  Any reason to believe that you didn't send

24  this on September 28, 2011?

Page 241

1    A.  No.

2    Q.  Why were you sending Lisa's allocations to

3  the folks that you sent Lisa's allocations to?

4    A.  Yeah, so the majority of these people on

5  here are customer service, which is who released the

6  orders from backorder or whatever hold status there

7  were to ship.

8    Q.  So this was an instruction to somebody to

9  ship something to somebody?

10    A.  This was a file to release shipments --

11  uh-huh -- based on allocation. So again, if you

12  remember the allocation conversation from earlier,

13  where we had, for example, a quota constraint

14  communicated to customers, you would be shipped X

15  amount of inventory on a monthly basis.

16    This is an example of a report that would

17  be sent to -- so all those orders would go on hold.

18  This is an example of a report that -- because I would

19  be managing the allocations from that perspective,

20  knowing what we had communicated to customers telling

21  them what we could ship, so this is a report on --

22  based on like that type of communication to customers,

23  for example, on releasing shipments, and customer

24  service would manually do that.

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    Q.   And if you look at -- the third page, I
2  think, is where it gives you order number, item number,
3  item description, quantity ordered, backorder quantity.
4    A.   Yes.
5    Q.   So the quantity ordered -- the top order,
6  70208636 -- it shows the quantity ordered is 120, and
7  it shows that the whole backorder was 120?
8    A.   Correct.
9    Q.   And now, were you -- so what is the next
10 step -- marketing -- do you know what that is?
11   A.   Comments, is what it looks like.
12   Q.   Oh.  Okay.  And then if you go two pages
13 past it, it talks about product manager, order date,
14 request date.  I assume this is one spreadsheet?
15   A.   Yeah, I would assume that.
16   Q.   It shows you a weekly forecast total?
17   A.   Uh-huh.
18   Q.   What is a W through M weekly usage?
19   A.   Oh.  From what I remember, that was
20 Walmart's weekly usage.
21   Q.   Was Walmart one of your accounts?
22   A.   At this point I think I was in product
23 management.  Yeah.  In 2011, so yeah.
24   Q.   Oh, okay.  So it was just the product that

Page 243

1  you were talking about?
2    A.   Right.  Right.  So I was -- it looks like
3  I was releasing allocations for oxy APAP, oxycodone.
4  That's what it appears, yes.
5    MR. DEARMAN:  Can I take 10 minutes to see
6  what I've got?
7    THE VIDEOGRAPHER:  We are going off the
8  record at 2:42 PM.
9    [A brief recess was taken.]
10   THE VIDEOGRAPHER:  We are back on the
11 record at 2:51 PM.
12   [Exhibit Mallinckrodt-Cardetti-036 marked
13   for identification.]
14   Q.   (By Mr. Dearman) I'm going to show you
15 Exhibit 36, which is Bates 8661 through 8663.  And I'm
16 going to direct your attention to the attachment, which
17 appears to be a PowerPoint or some sort of
18 presentation, and ask you if you're familiar with this.
19   A.   I did many presentations in my tenure at
20 Mallinckrodt.  I don't remember this specific
21 presentation.
22   Q.   Do you have any reason to believe that you
23 didn't prepare this document in the ordinary course of
24 your business?

Page 244

1    A.   No.
2    Q.   This says fiscal year 2014, generic
3  business review?
4    A.   Uh-huh.
5    Q.   Do you know whether you did a fiscal year
6  2013 generic business review?
7    A.   I don't recall.  I don't even remember the
8  audience for this specific presentation.
9    Q.   What position would you have been in at
10 the point in time that you did this fiscal year 2014
11 review?
12   A.   Director of national accounts.
13   Q.   As a director of national accounts, was
14 one of your responsibilities to prepare fiscal year
15 generic business reviews?
16   A.   Hold on one second.
17   Q.   Take your time.
18   A.   Let me just scroll through this real
19 quick.  Okay.  Sorry.  Go ahead.  So what this looks
20 like is that it was an internal presentation, so we
21 would meet with the sales team -- so sales and
22 marketing teams would get together.  I can't remember
23 the cadence.  I don't remember how often it was, but
24 just to review accounts, products, just to review the

Page 245

1  business together.  It would be -- yeah.
2    Q.   As part of your compensation, did you
3  receive any stock in Mallinckrodt?
4    A.   I'm trying to remember.  At one point in
5  time I did have Mallinckrodt stock.
6    Q.   That wasn't my question, but that answers
7  it.
8    A.   No, I know.  I'm trying to remember.
9    Q.   That's okay.  Do you have any Mallinckrodt
10 stock as we sit here today?
11   A.   I do not, no.
12   Q.   Why did you leave Mallinckrodt?
13   A.   I had another opportunity at Rising
14 Pharmaceuticals, where I am currently.
15   Q.   So -- I'm sorry.  So did you quit?
16   A.   Yes.  I left voluntarily.
17   Q.   If you look at the first page of this
18 presentation, it says to the multi-source team.  Who is
19 the multi-source team?
20   A.   I was questioning that myself reading it.
21 I don't recall.  I don't recall.
22   Q.   And if you turn to Page 5 of the document,
23 it says -- it might it say on another pages, but this
24 is Cognos, the C-O-G-N-O-S thing that we had talked

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1  about earlier?

2      A.  Correct.

3      Q.  So you still had access to Cognos all the

4  way through?

5      A.  Yes, I recall -- yeah.

6      Q.  And if we look at Page 5, which has

7  territory net sales, dollars by customer, these were

8  the customers that you were responsible for?

9      A.  At this time.  Yes, it appears so.

10     Q.  If you turn to Page 8, it talks about

11  territory tracking to budget by customer.  How is the

12  budget determined?  What is the budget, if you know?

13     A.  I don't recall what the budget was.  From

14  what I recall, the territory, meaning by customer, was

15  broken -- yeah, I don't remember the specifics of the

16  budget.  Sorry.

17     Q.  That's all right.  And if you go to Page

18  10, it says -- it shows the fiscal year 2013 and 2014

19  and shows territory net sales by product family?

20     A.  Yes.

21     Q.  And the oxy combination drug is the

22  highest sales by product family?

23     A.  Yes, it appears so.

24     Q.  Do you know whether you did one of these

Page 247

1  in 2015 and 2016?

2      A.  I don't recall.

3      Q.  There's another attachment which says WB

4  FY14.  Do you see that?  No, it's attached.

5      A.  Oh.

6      Q.  You just got to keep going.  It looks to

7  be part of the same thing.

8      A.  Does it have a page number?  No.

9      Q.  It does not.

10     A.  Sorry.  As I flip through here, just going

11  back to that question before.  It appears that net

12  sales --

13     Q.  What page are you on?

14     A.  Page 10 that you were referring to.

15     Q.  Okay.  Yeah.

16     A.  Oxy APAP does have the highest sales but

17  if you flip two pages lower, it has significantly lower

18  sales than the prior year in terms of quantity.

19     Q.  So wait.  So Page 12 you're saying is

20  looking at a different year?

21     A.  No, I'm saying that the quantity compared

22  to the previous year is significantly lower.  I just

23  wanted to --

24     Q.  And if you look at the oxy non-combination

Page 248

1  product next to it, it's actually a higher quantity

2  than it was the year before.

3      A.  No, it's a lower quantity.

4      Q.  If you look at Page 10.

5      A.  Oh, I'm sorry.  I thought you were looking

6  at 12.

7      Q.  Yeah.  The net sales is lower; correct?

8      A.  The net -- I'm sorry.  What product family

9  are you speaking of?

10     Q.  Just oxy.

11     A.  Oxy?  The product sales for FY14 are

12  slightly higher than 2013.

13     Q.  That's what I meant.  It was higher.

14     A.  But if you look at the quantity, it is

15  significantly higher.

16     Q.  On Page 12?

17     A.  On Page 12.  Okay.  WB.  Got there.  I'm

18  here.

19     Q.  What is WB?

20     A.  It appears that it's WBAD, Walgreens Boots

21  Alliance.  I think this was -- it appears this was at

22  the beginning of this group.

23     Q.  So there's one of these for Walgreens

24  Boots Alliance, there's another one for Amerisource?

Page 249

1  This is for each of your customers?

2      A.  It appears it looks like -- just the top

3  ones.  I don't think there's one for every single one.

4      Q.  And if you go to the AmerisourceBergen

5  fiscal year 2014 overview --

6      A.  Uh-huh.

7      Q.   -- and you turn to Page 24 --

8      A.  Yes.

9      Q.  It says -- under the top, it says goal,

10  increase net sales and net margin by 50 percent.  You

11  see that?

12     A.  I do.

13     Q.  So is that one of your goals for the next

14  year?  Is that what that is, or is that talking about a

15  goal that you already met, or do you know?

16     A.  I don't remember the context of this goal.

17  These are not -- these are customer-specific goals, it

18  appears that I kind of had set just arbitrarily.

19     Q.  So these are goals that you would have

20  set?

21     A.  Potentially.  That's what it appears to

22  be.

23     Q.  It's a fiscal 2014 overview?

24     A.  Uh-huh.

Page 250

1    Q.   So ABC goals for fiscal year 2014.  Is
2  this something that you met?  Is the blue the goal and
3  the green what you met, do you know?
4    A.   So when was this put together, again?
5  April -- so our fiscal year began in October, so it
6  wouldn't -- the year wouldn't have been over.  So this
7  was probably an estimate as of April.
8    Q.   Which would have been an estimate that you
9  would have sent?
10   A.   An estimate based on the actual --
11   Q.   To date?
12   A.   To date, yeah.
13   Q.   You are currently at Rising
14 Pharmaceuticals?
15   A.   Yes, that is correct.
16   Q.   And what do you do there?
17   A.   Associate vice-president of sales.
18   Q.   How did you find out about that position?
19   A.   How did I find out about the position?
20 They contacted me to see if I was interested.
21   Q.   And what type of products do you sell?
22   A.   Wide variety of generic products.
23   Q.   Any opioids?
24   A.   No.

Page 251

1       MR. DEARMAN:  I don't have any other
2  questions.
3       MS. HERZFELD:  Do you want to take a short
4  break before we switch?
5       MR. TSAI:  We can go ahead and keep going.
6       MS. HERZFELD:  You're good?
7    A.   Yeah.
8       [Discussion off the record.]
9       THE VIDEOGRAPHER:  We are going off the
10 record at 3:04 PM.
11      [Discussion off the record.]
12      THE VIDEOGRAPHER:  We are back on the
13 record at 3:06 PM.
14      QUESTIONS BY MS. HERZFELD:
15   Q.   Okay, Ms. Cardetti.  My name is Tricia
16 Herzfeld, and I'm an attorney at law firm of
17 Branstetter, Stranch & Jennings in Nashville,
18 representing the Tennessee plaintiffs.  Do you know
19 anything about the Tennessee litigation?
20   A.   No, I do not.
21   Q.   Has anybody told you that there's separate
22 Tennessee state litigation?
23   A.   Yes, I am aware that there's a separate
24 litigation.

Page 252

1    Q.   And what is your understanding of the
2  nature of that litigation?
3    A.   Very vague understanding that it's a
4  similar context regarding opioids.
5    Q.   And what else?  Similar context regarding
6  opioids meaning what?
7    A.   Meaning -- so there's claims against
8  Mallinckrodt and many others about the sale and
9  marketing of opioids.
10   Q.   And where did you learn that understanding
11 about the Tennessee litigation?
12   A.   Just I mean, in speaking with counsel and
13 just -- yeah.
14      MS. HERZFELD:  Before we really get
15 started, I'm just going to lodge our usual objections
16 that we've lodged in every single Mallinckrodt
17 deposition thus far about production deadlines and
18 compliance with the order in this case.  I'm assuming
19 you want your usual response?
20      MR. TSAI:  Go ahead.
21      MS. HERZFELD:  Great.
22   Q.   (By Ms. Herzfeld)  Have you ever been to
23 Tennessee, Ms. Cardetti?
24   A.   No, I have not.

Page 253

1    Q.   Not --
2    A.   That I recall.
3    Q.   And not for business or for pleasure?
4    A.   No, not that I recall.
5    Q.   And when you were testifying a little bit
6  earlier, you talked about knowing about the opioid
7  crisis or hearing about it in this country; is that
8  correct?
9    A.   That's correct.
10   Q.   And do you know if it's -- have you heard
11 if it's worse in some areas of the country than others?
12   A.   The only state that I have heard about in
13 the past is Florida specifically.
14   Q.   Have you ever heard about the opioid
15 crisis being particular bad in Appalachia, the
16 Appalachia region of the country?
17   A.   No, I'm not familiar with that.
18   Q.   What about in Tennessee?  Have you heard
19 about the opioid abuse problems being worse in
20 Tennessee?
21   A.   No, not specific, no.
22   Q.   Have you heard generally?
23   A.   I'm sorry.  No.
24   Q.   What is your definition of a pill mill?

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    A.   A pill mill? Again -- oh, gosh. Very
2  general understanding regarding a pharmacy that
3  dispensed a lot of products, a lot of opioids,
4  specifically. That's kind of my very general --
5    Q.   And when do you think you came to that
6  understanding?
7    A.   Oh, gosh. Several years ago. Yeah.
8    Q.   While you were employed at Mallinckrodt?
9    A.   Yeah. That's what I recall. Uh-huh.
10    Q.   And did you ever have any discussion with
11  anyone at Mallinckrodt about pill mills?
12    A.   No, not specifically about pill mills.
13  Just -- I just knew of them.
14    Q.   And how do you think you learned of them?
15    A.   I don't have -- I don't recall.
16  Potentially reading articles in the industry, or -- I
17  don't recall how I learned about them.
18    Q.   And if I understand your testimony
19  correctly, you never had any discussions with anybody
20  at Mallinckrodt about pill mills?
21    A.   I don't want to say never had any
22  discussions. I know that -- I know of them, and I
23  don't know what -- I don't remember any specific
24  discussions around pill mills.

Page 255

1    Q.   Do you remember any general discussions
2  around pill mills?
3    A.   I don't recall any general discussions
4  around pill mills.
5    Q.   So as you sit here today, you don't recall
6  any discussions specifically or generally about pill
7  mills with anyone at Mallinckrodt?
8    A.   That is correct.
9    Q.   Have you ever heard of something called
10  the oxy express?
11    A.   Oxy express? I don't remember that.
12  No --
13    Q.   Have you ever -- go ahead.
14    A.   I said no. Sorry.
15    Q.   Have you ever heard about a particular
16  highway, I-75, going from Florida up north, a lot of
17  oxycodone was trafficked on?
18    A.   I'm not familiar with that highway, no.
19    Q.   And in your years at Mallinckrodt, you
20  never had a discussion with anybody about the oxy
21  express?
22    A.   No, not that I recall.
23    Q.   You're aware that opioids are sold in
24  illegal drug markets; is that correct?

Page 256

1    A.   Say -- I'm sorry. Say that again.
2    Q.   You're aware that opioid products are sold
3  in illegal drug markets; is that correct?
4    A.   Sold in illegal drug market -- I don't
5  understand that question.
6    Q.   Sure. In order for people to lawfully
7  have oxycodone, for example, they would have to have a
8  prescription or a DEA registration number? Is that
9  your understanding?
10    A.   Say that again.
11    Q.   In order for someone to lawfully have
12  oxycodone, to have possession of oxycodone --
13    A.   Uh-huh.
14    Q.   -- they would have to have either a
15  prescription --
16    A.   Uh-huh.
17    Q.   -- or a DEA number; is that correct?
18    A.   Yes, that's my understanding.
19    Q.   And so if someone doesn't have a lawful
20  prescription or a DEA number --
21    A.   Uh-huh.
22    Q.   -- would their possession, to your
23  understanding, of oxycodone be illegal?
24    A.   Yeah, that makes sense to me.

Page 257

1    Q.   Is that something that was discussed at
2  Mallinckrodt with regards to diversion?
3    A.   Not that I recall, no. I mean --
4    Q.   And you're aware that people sell
5  oxycodone illegally on the street?
6    A.   Yes, I am aware that that occurs.
7    Q.   And were you aware of that at the time
8  that you worked at Mallinckrodt?
9    A.   Vaguely.
10    Q.   Do you know how you became aware of that?
11    A.   No, I do not.
12    Q.   Did you ever have any discussions with
13  anyone at Mallinckrodt about oxycodone being illegally
14  sold on the street?
15    A.   Not that I recall, no.
16    Q.   Have you ever heard about oxycodone being
17  purchased at pharmacies in Florida and taken to
18  Tennessee to the illegal drug market?
19    A.   No, no -- I don't recall.
20    Q.   You don't recall, or you haven't had that
21  discussion?
22    A.   What was the question?
23    Q.   Let me -- have you ever heard about
24  oxycodone being purchased at pharmacies in Florida and

Page 258

1  taken to Tennessee to the illegal drug market?
2      A.   So no, I do not recall.
3      Q.   You don't recall or --
4      A.   Hearing that -- the question was did I
5  hear?
6      Q.   Yes, ma'am.
7      A.   No, I do not recall hearing that.
8      Q.   Were you involved in a discussion about
9  that ever?
10     A.   No, not that I recall.
11     Q.   During your entire tenure at Mallinckrodt,
12 did you ever have any discussions about shipments of
13 opioids to Tennessee?
14     A.   No, not that I recall.
15     Q.   What about during your tenure at
16 Mallinckrodt did you ever have any discussion about the
17 diversion of opioids in Tennessee?
18     A.   No, not that I recall.
19     Q.   In your entire tenure at Mallinckrodt, did
20 you have any discussion about diversion of opioids to
21 Tennessee?
22     A.   No, not that I recall.
23     Q.   During your entire tenure at Mallinckrodt,
24 did you ever have any discussions about problem

Page 259

1  pharmacies in Tennessee?
2      A.   No, not that I recall.
3      Q.   During your entire tenure at Mallinckrodt,
4  did you ever have any discussions about problem
5  physicians in Tennessee?
6      A.   No, not that I recall.
7      Q.   What about pain clinics in Tennessee?
8      A.   Not that I recall, no.
9      Q.   Did you ever have any discussions during
10 your tenure at Mallinckrodt about the diversion of
11 opioids from Florida to other states?
12     A.   No, not that I recall.  Yeah, no.
13     Q.   In the variety of positions that you had
14 at Mallinckrodt, did you ever monitor customers that
15 shipped to Tennessee specifically?
16     A.   I did not do that in my roles, no.
17     Q.   Do you know if anyone else did?
18     A.   Suspicious order monitoring that was
19 discussed multiple times today that they reviewed the
20 data.
21     Q.   Do you know if they reviewed that data
22 specifically in regards to Tennessee?
23     A.   I do not know what they reviewed.
24     Q.   So you don't know if they specifically

Page 260

1  reviewed that data in regards to Tennessee?
2      A.   I do not know.
3      Q.   In your entire time at Mallinckrodt in the
4  variety of positions that you had, did you ever monitor
5  customers that shipped to specific ZIP codes?
6      A.   No, I did not do that that I recall.
7      Q.   Do you know if anyone else did?
8      A.   Again, that may have been suspicious order
9  monitoring, but I'm not familiar with exactly what they
10 did.
11         [Exhibit Mallinckrodt-Cardetti-037 marked
12         for identification.]
13     Q.   I'm going to hand you what we're going to
14 mark as Plaintiff's Exhibit 37.  And I don't see a
15 Bates number on it.  I'm not sure why that is.  Fine
16 time for me to notice that, isn't it?  Here.  Okay, Ms.
17 Cardetti.  What I've -- are you Lundergan now or
18 Cardetti?
19     A.   Cardetti.
20     Q.   You are Cardetti?  Okay.  Ms. Cardetti,
21 what I've handed you here -- it looks like an
22 appointment invitation from you to Karen Harper dated
23 September 5th, 2011.  Do you see that?
24     A.   I do.

Page 261

1      Q.   And it looks like for a meeting that you
2  were to have with Karen for September 6th, 2011,
3  from 3:30 to 4:30; is that correct?
4      A.   That is correct.
5      Q.   In the subject, it says review chargeback
6  and sales gross margin oxy 1530 source data for
7  suspicious order monitoring distributor initiative.
8  Did I read that correctly?
9      A.   Yes.
10     Q.   What was the suspicious order monitoring
11 distributor initiative?
12     A.   I do not recall this.  I do not recall.
13     Q.   Did you have meetings with Karen Harper
14 often?
15     A.   I don't know -- I don't remember the
16 cadence, but I wouldn't say often.
17     Q.   Did you have a regularly-scheduled meeting
18 with Karen Harper --
19     A.   No.
20     Q.    -- at any time during your employment
21 with Mallinckrodt?
22     A.   No.  I did not, that I recall.
23     Q.   How many time would you say that you met
24 one-on-one with Karen Harper?

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1  A.  I don't recall how many times I met with
2  Karen Harper.
3  Q.  Two?  100?
4  A.  Again, I don't remember how many times.
5  Q.  Was it part of your job to meet with Karen
6  Harper on a regular basis?
7      MR. TSAI:  Objection.  Vague as to time.
8  Go ahead.
9  Q.  (By Ms. Herzfeld)  During any of your
10 positions --
11 A.  Uh-huh.
12 Q.  -- was it ever part of your job to meet
13 with Karen Harper to discuss anything?
14 A.  No, it wasn't part of my job to meet with
15 Karen Harper.
16 Q.  Okay.  Thank you.
17 A.  But I would comply.  If she needed to meet
18 with me, I would meet with her.
19 Q.  Do you recall what was discussed at this
20 meeting?
21 A.  No, I do not.
22 Q.  Do you have any memory of this meeting at
23 all?
24 A.  No, I do not.

Page 263

1  Q.  Do you know if the meeting occurred?
2  A.  I have no idea.
3  Q.  I'm going to hand you the next exhibit,
4  which I believe is 38.
5      MS. HERZFELD:  And for those on the phone,
6  this is a Tennessee state Bates number,
7  MNK_TNSTA05336605.
8  Q.  (Ms. Herzfeld)  Because we have limited
9  time and it's a really big document, I won't ask you to
10 review the entire thing.  I'll just kind of guide you
11 through it and if you need time to look at something
12 just let me know; okay?
13     [Exhibit Mallinckrodt-Cardetti-038 marked
14     for identification.]
15 A.  Okay.
16 Q.  So looking at this document, it's an
17 e-mail sent on May 31st, 2011, from Debbie Digby to a
18 whole bunch of people; is that correct?
19 A.  That is correct.
20 Q.  Have you seen this e-mail before?
21 A.  I don't remember this e-mail.
22 Q.  You've -- do you remember ever looking at
23 or seeing information, reports about customer sourcing
24 on -- of oxy 15 or 30 for more than two distributors?

Page 264

1  A.  I don't recall.  I mean, it appears that I
2  was on this e-mail.
3  Q.  Yes, ma'am.
4  A.  But I don't recall those specific reports,
5  no.
6  Q.  Do you have any reason to think that you
7  didn't receive this e-mail?
8  A.  No.
9  Q.  So let's just go through this pretty
10 quickly if we can for a second.  It says customer
11 sourcing oxy 15 and 30 from more than two distributors.
12 Do you know why it is that the number of distributors
13 customers were sourcing from was being monitored?
14 A.  This is an e-mail from Debbie Digby to
15 multiple people.  I don't know why I was included on
16 this.  To me this seems like a suspicious order
17 monitoring -- something that should have just been sent
18 to them, so I don't know why I was on this e-mail or
19 really the context behind the purpose of this report.
20 Q.  Do you know if you did anything in
21 response to receiving this e-mail?
22 A.  I do not know.
23 Q.  Did you review it at all?
24 A.  I don't know.

Page 265

1  Q.  Did you have any discussions with Karen
2  Harper or anyone from the suspicious order monitoring
3  team about customers that were sourcing from more than
4  two distributors?
5  A.  Not that I recall.
6  Q.  Do you know if before this e-mail
7  Mallinckrodt was monitoring customers that were
8  sourcing from two or more two distributors?
9  A.  It's my understanding that the suspicious
10 order monitoring team was reviewing data at the
11 pharmacy level from the chargebacks, which would
12 include where -- the wholesaler, where they sourced the
13 product from.
14 Q.  And do you know when they began doing
15 that?
16 A.  I do not recall the timing of that, no.
17 Q.  And what are you basing that knowledge on?
18 A.  My memory.
19 Q.  So do you know if they were looking
20 specifically -- this is specifically for customers that
21 were sourcing from more than two distributors.  Is this
22 a report that had been run for all the time that you've
23 known, or was this a new report at this point?
24 A.  I have no idea.  Again, this is a report

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1 that I did not run -- Debbie Digby ran it -- regarding
2 suspicious order monitoring.
3    Q.   Did you request Debbie Digby to run this
4 report?
5    A.   No, not that I recall.
6    Q.   And Debbie Digby -- who is she?
7    A.   I remember the name.  It looks like she
8 was an analyst.
9    Q.   And an analyst would be in what
10 department?
11    A.   I don't remember what department Debbie
12 was in.
13    Q.   And do you know what they would base this
14 information on?  Is this chargeback data?
15    A.   Again, I didn't run the reports.  I don't
16 know the source of the data.
17    Q.   If you could look with me at the -- it
18 looks like the first page that's got the yellow
19 highlighting at the top.  It says customer sourcing oxy
20 15 and 30 from all distributors, April 2011 data, and
21 it's highlighted in yellow at the top.  Do you see
22 where I'm at?
23    A.   I do.
24    Q.   So I'm trying to make some sense out of

Page 267

1 this data, and I was hoping maybe you could help me a
2 little bit.  Looking at the top here, it says -- the
3 third one down, the one that says 225 -- it says Riggs
4 Drugs, 502 West Central Avenue, LaFollette, Tennessee,
5 37766.  Do you see where I'm at?
6    A.   I do see where you're at.  Uh-huh.
7    Q.   And then it says -- where it says sold via
8 parent customer name, Cardinal Health.  Does that mean
9 Cardinal Health would have been the distributor?
10    A.   That's what it appears, but again, I did
11 not run this report.
12    Q.   But you received this report?
13    A.   I was on the e-mail, but that doesn't mean
14 that I read the report.
15    Q.   And it doesn't mean that you didn't
16 either, does it?
17    A.   I don't remember.
18    Q.   And so looking at it here where it says
19 gross sales, it says 10,855.84.  Do you know what that
20 represents?  If that's dollars, hundreds of dollars,
21 thousands of dollars?
22    A.   I do not know anything about this report.
23    Q.   And it says dis -- units, 38,000.  Do you
24 know what that means?

Page 268

1    A.   Again, I don't know anything about this
2 report.
3    Q.   Do you know what a dispensing unit is for
4 oxy 15 or 30?
5    A.   A dispensing unit?
6    Q.   Or a dispense unit?  A unit?  What is a
7 unit?
8    A.   Well, dispense unit means what was
9 dispensed at a pharmacy.
10    Q.   So when you talk about dispensed units
11 that dispensed at a pharmacy, is that typically bottles
12 or tablets?
13    A.   That's my assumption.  Again, I did not
14 run this report.  I don't know where this data came
15 from.
16    Q.   That's great, but this was sent to you and
17 you don't remember if you received it or not, so I'm
18 asking for your help because you said you understand
19 the numbers here.  I haven't worked for Mallinckrodt.
20    A.   No, I don't understand the numbers.
21 That's what I'm saying.
22    Q.   Oh, you don't understand the numbers?
23    A.   Again, I've never -- I don't recall this
24 report.  This report was from May of 2011.

Page 269

1    Q.   Yes, ma'am.
2    A.   I received the report.
3    Q.   Yes, ma'am.
4    A.   I did not request the report, from my
5 recollection.
6    Q.   Yes, ma'am.
7    A.   And I do not remember seeing this report.
8    Q.   Okay.  But my question wasn't if you
9 remember receiving this report.
10    A.   Uh-huh.
11    Q.   I'm asking you to go through it with me.
12 So dispensing units.  You worked for Mallinckrodt.
13 What is dispensing units?
14    A.   I can't comment on this report.  I didn't
15 run the report.  I don't know anything about this
16 report.
17    Q.   Okay.  So let's just keep going through it
18 then.  So it says here Riggs, dispensing units 38,000.
19 Do you see where I'm at?
20    A.   I do.
21    Q.   And gross sales is 10,855.94.  Do you see
22 that?
23    A.   I do.
24    Q.   And you don't know what that means for

Page 270

1 Riggs in LaFollette, Tennessee?

2     A. I do not.

3     Q. But this is titled customers sourcing oxy

4 15 and 30 from all distributors; is that correct?

5     A. That's the title of the report.

6     Q. And do you know where LaFollette,

7 Tennessee, is?

8     A. No, I do not.

9     Q. Do you have any idea how many people live

10 in LaFollette, Tennessee?

11     A. No, I do not.

12     Q. Let's look at the next one, Riggs Drug

13 located in Jacksboro, Tennessee. It's about a quarter

14 of the way down. 616. Do you see where I'm at?

15     A. Oh. Yes.

16     Q. So it says Riggs Drug, 604 East Emory Road

17 in Jacksboro, Tennessee, 37757. Do you see where I'm

18 at?

19     A. I'm sorry. What line?

20     Q. The same one.

21     A. 616?

22     Q. 6-5 -- I'm sorry. 657.

23     A. Okay. I do see 657.

24     Q. Okay. So Riggs Drug, Jacksboro.

Page 271

1 Jacksboro Pike.

2     A. Uh-huh.

3     Q. Do you see that?

4     A. I do. Yes.

5     Q. And so taking that through, which is hard

6 because it's very small -- 37757. Do you see that?

7     A. I do.

8     Q. And it says sold via parent customer name,

9 and what customer name is there?

10     A. Cardinal Health.

11     Q. So Cardinal Health would be the

12 distributor here?

13     A. That's what it appears.

14     Q. And then it says gross sales, 5,034.72.

15 Is that correct?

16     A. That is correct.

17     Q. And dispensing units, we're guessing

18 that's what that means, 16,800. Is that correct?

19     A. That's what it says.

20     Q. Have you ever been to Jacksboro,

21 Tennessee?

22     A. No, I have not.

23     Q. Do you know how many people live there?

24     A. No, I do not.

Page 272

1     Q. Let's go on to the next one. Jellico

2 Drugs, 1298. Just a little bit more than halfway down

3 your page. Do you see it?

4     A. Okay. Yes.

5     Q. So 1298, it has a sold-to customer number,

6 52008184; is that correct?

7     A. Yes.

8     Q. And did you have customer numbers for each

9 of the downstream customers?

10     A. I don't recall. Customer -- no, I don't

11 recall.

12     Q. When chargeback data being collected from

13 each individual pharmacy --

14     A. Uh-huh. Uh-huh.

15     Q. -- that you were giving chargebacks to,

16 were they assigned a number?

17     A. Good question. I don't know.

18     Q. So this one says -- where were we --

19 Jellico Drugs, and that's 203 South Main Street; is

20 that correct?

21     A. That is correct.

22     Q. And that's Jellico, Tennessee, 37762. Do

23 you see that where I'm at?

24     A. Yes.

Page 273

1     Q. And it says here sold via parent customer

2 name AmerisourceBergen Health. And AmerisourceBergen

3 was your primary client; is that right?

4     A. Let's see here. This was --

5     Q. In 2011?

6     A. -- in May 2011, which is when I was not

7 in sales. This is when an associate product manager.

8     Q. And so did you have dealings with

9 AmerisourceBergen at that time?

10     A. Again, as product managers we were

11 responsible for products, not customers.

12     Q. But did you have dealings with

13 AmerisourceBergen at that time?

14     A. No, not that I recall.

15     Q. Had you up to that point?

16     A. Had I up to that point in my --

17     Q. Career at Mallinckrodt. Yes, ma'am.

18     A. I worked -- as I mentioned earlier, I

19 worked in customer service with AmerisourceBergen.

20     Q. And so that would have been prior to this

21 date in 2011?

22     A. That was January 2006 through October

23 2006.

24     Q. Okay. Great. Okay. And so what were you

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1 reviewing there?
2     A. My résumé.
3     Q. Oh, your résumé? Okay. That was Exhibit
4 2. Okay. So then here it says gross sales, 3,896.26.
5 Do you see where I'm at?
6     A. I do.
7     Q. And it says 11,200 for dispensing units.
8 Do you see that?
9     A. I see that.
10     Q. And do you know how many people live in
11 Jellico, Tennessee?
12     A. No, I do not.
13     Q. Have you ever been there?
14     A. No, I have not.
15     Q. Have you ever heard anybody at
16 Mallinckrodt talk about Jellico, Tennessee?
17     A. No, not that I recall.
18     Q. What about Jacksboro, Tennessee? Have you
19 ever heard anybody at Mallinckrodt talk about
20 Jacksboro, Tennessee?
21     A. Not that I recall.
22     Q. What about LaFollette, Tennessee? Have
23 you ever heard anybody at Mallinckrodt talk about
24 LaFollette, Tennessee?

Page 275

1     A. No, not that I recall.
2     Q. Do you know if anyone at Mallinckrodt ever
3 monitored opioid prescription rates by state?
4     A. I would recommend contacting the
5 suspicious order monitoring team. They were the group
6 that did the monitoring.
7     Q. I understand that, but my question is do
8 you know if anyone at Mallinckrodt ever monitored
9 opioid prescription rates by state?
10     A. Yeah, it was my understanding that they
11 looked at -- I mean, specifically as I recall Florida I
12 know was looked at.
13     Q. What about besides Florida?
14     A. I don't recall. I don't recall.
15     Q. And what is your information -- what are
16 you basing your information about yes, they monitored
17 it for Florida? What is that based on?
18     A. Just what I recall.
19     Q. And do you recall specific conversations
20 with Karen Harper or anybody from the suspicious order
21 monitoring team about Florida?
22     A. No, I do not recall.
23     Q. Have you ever heard of the term M's?
24     A. I'm sorry.

Page 276

1     Q. M's? M's?
2     A. M's?
3     Q. M's.
4     A. Not that I recall, no.
5     Q. Have you ever heard Mallinckrodt oxy
6 products described as M's?
7     A. Oh. Ooh, very vaguely. Yeah.
8     Q. When do you think you've heard
9 Mallinckrodt oxy products described as M's?
10     A. I don't recall when I would have heard
11 that. I don't remember.
12     Q. Do you know what context you heard that?
13     A. I don't.
14     Q. Did you hear that when you were still
15 employed by Mallinckrodt?
16     A. It's way back in my memory, so potentially
17 back when I was working for Mallinckrodt.
18     Q. And what is your understanding of the term
19 M's for Mallinckrodt opioids?
20     A. From what I recall, I mean, our -- and
21 what I remember of our products, our product had an M
22 embedded in the like tablet, for example.
23     Q. And what about that would have it termed
24 M's? What's the linkage between the term and what it

Page 277

1 looked like?
2     A. That's vaguely what I remember about, I
3 mean, M's, and -- I mean, the linkage was that the
4 product had an M on it.
5     Q. And do you know who used the term M's?
6     A. M's? I don't remember how I heard of the
7 term M's, no.
8     Q. Had you heard that people who abused
9 opioids would often call them M's, Mallinckrodt
10 opioids?
11     A. I vaguely remember hearing that.
12     Q. What about the term blues?
13     A. No, I do not remember blues.
14     Q. You haven't heard Mallinckrodt opioids
15 referred to as blues?
16     A. No, not that I recall.
17     Q. Were any of Mallinckrodt's opioid products
18 blue?
19     A. I don't remember.
20     Q. You don't remember the color?
21     A. I don't remember the colors of -- no.
22     Q. You worked with the product for how many
23 years?
24     A. Almost 12 years.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    Q.    And you don't remember the color of the
2  product?
3    A.    I never actually saw the product.
4    Q.    You didn't?
5    A.    No.  I never had any possession of any
6  opioids.  I mean, our product catalog had of pictures
7  of it.  I never had seen it myself.
8    Q.    Have you ever taken them?
9    A.    No, I have not.
10    Q.    What about the term roxies?  Have you ever
11  heard the term roxies to describe a Mallinckrodt
12  product?
13    A.    Vaguely.
14    Q.    And what do you think roxies refers to?
15    A.    Roxies?  From what I recall, Roxicodone
16  was a brand name of oxycodone.  Yeah, that's what I
17  recall.
18    Q.    And when did you learn about the nickname
19  roxies?
20    A.    I have -- I don't remember.
21    Q.    While you were still employed at
22  Mallinckrodt?
23    A.    To my recollection, yes.
24    Q.    And was Roxicodone part of your portfolio

Page 279

1  at Mallinckrodt?
2    A.    As I've mentioned several times today,
3  I've managed multiple products.  At one point in time I
4  did manage oxycodone.
5    Q.    And so I asked about Roxicodone and then
6  you mentioned oxycodone.  So are those the same thing?
7    A.    Oxycodone is a generic.  From my
8  recollection, the Roxicodone was the branded product,
9  so I would have never managed a branded product.  I
10  managed the generic portfolio, and oxycodone was one of
11  my product families that I managed.
12    Q.    And so what oxycodone generic is
13  Roxicodone?
14    A.    I'm sorry.  Say --
15    Q.    Which generic like specifically is the
16  generic for Roxicodone?
17    A.    From what I remember it's oxycodone.
18    Q.    15 or 30?  Doesn't matter?
19    A.    It's the product family.
20    Q.    Have you ever heard that people that
21  abused opioids would call Mallinckrodt opioids roxies?
22    A.    I don't recall.
23    Q.    In all of your years at Mallinckrodt, did
24  anybody ever educate you on the abuse of Mallinckrodt

Page 280

1  opioids throughout the country?
2    A.    As I've mentioned, we had training if we
3  ever came into a situation where we were notified of
4  that, that we would report it.
5    Q.    Did you ever come into a situation where
6  you reported an abuse of -- or suspected abuse of a
7  Mallinckrodt opioid?
8    A.    No, not that I recall.
9    Q.    Were you ever in a situation where you
10  reported suspected diversion of a Mallinckrodt opioid?
11    A.    No, not that I recall.
12        [Exhibit Mallinckrodt-Cardetti-039 marked
13        for identification.]
14    Q.    I'm going to hand you what we've marked as
15  Plaintiff's Exhibit 39.  And I'll start on the second
16  page, but first do you recognize this as an e-mail
17  chain that culminates in an e-mail from a person named
18  Don to you dated October 18th, 2016?
19    A.    Yes, I do see that this is an e-mail from
20  Don to myself.
21    Q.    So let's start from the back.  It looks
22  like this is an e-mail you initially had sent to a
23  person named Chad on October 18th, 2016.  Is that
24  correct?

Page 281

1    A.    That's correct.
2    Q.    And you believe you sent this e-mail?
3    A.    I have no reason to believe otherwise.
4    Q.    And so here you say hi, Chad.  As a
5  manufacturer of controlled substances, Mallinckrodt is
6  required by the DEA, Drug Enforcement Administration,
7  regulations to monitor orders of controlled substances
8  as part of its anti-diversion program.  Did I read that
9  correctly?  So then you go --
10    A.    Yes.
11    Q.    So then you go on to say that the order
12  listed below has been flagged for additional review,
13  and it looks like there's a customer order number; is
14  that correct?
15    A.    Yes.
16    Q.    And I think you said before what an NDC
17  was but I forget.  What is an NDC?
18    A.    It's the item number.
19    Q.    Item number; okay?
20    A.    Uh-huh.
21    Q.    And this is for oxycodone HCl 30-milligram
22  tablets three?
23    A.    HCL.
24    Q.    Oh, HCL.  Okay.  And then USP.  What does

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  that mean?

2      A.  I don't know what USP stands for.  It was

3  a system-driven description.

4      Q.  And then it says quantity, 672.

5      A.  Yes.

6      Q.  Is that correct?

7      A.  That is correct.

8      Q.  Do you know what about this particular

9  order was suspicious?

10     A.  No, I do not.  So this is a perfect

11  example of what I was referring to throughout the day

12  where I was the middleman, if you will, from --

13  suspicious order monitoring had identified this order

14  as peculiar, needed additional information.  The --

15  even the body of the e-mail would have been provided

16  from the suspicious order monitoring team to myself to

17  copy and paste into a new e-mail to send to the

18  customer to gather additional information.

19     Q.  Okay, great.  And do you know who this

20  Chad is?

21     A.  I vaguely remember a Chad.

22     Q.  Do you know what his last name was?

23     A.  No.

24     Q.  And it looks like he was at Louisiana

Page 283

1  Wholesale Drug Company.  Does that refresh your memory

2  at all as to who Chad --

3      A.  No, but I do recognize the e-mail LWD, so

4  Louisiana Wholesale.  I agree that that was for them.

5      Q.  And so then it looks like Chad forwards

6  your e-mail to a person named Don, can you answer

7  Lisa's question.  Do you see where I'm at?

8      A.  I'm -- yes.

9      Q.  And Don, if you look at the signature

10  line, looks like it's Don Couvillon.  I don't know if

11  I'm saying that right.  Do you know who Don Couvillon

12  is?

13     A.  I don't know if you're saying it right

14  either.  I know of the name.

15     Q.  So then Don Couvillon writes back to you

16  at 7:30 at night, 7:31 at night, about his on-hold

17  order.  Lisa -- and then this is in all caps; right --

18  we have expanded our customer base into Texas,

19  Oklahoma, MS -- that's Mississippi, right -- and

20  Alabama due to our fully-automated warehouse.  Did you

21  typically receive e-mails in all caps?

22     A.  No, not typically that I recall.

23     Q.  And do you know what he's referring to

24  when he's referring to a fully-automated warehouse?

Page 284

1      A.  I don't know what he's referring to.

2      Q.  Do you know what a fully-automated

3  warehouse is?

4      A.  A fully-automated warehouse -- no.  I

5  could make assumptions, but no, I'm not familiar with

6  that terminology.

7      Q.  And it says they're expanding their

8  customer base into one, two, three, four additional

9  states.  Do you know how big this organization was --

10  Louisiana Wholesale Drug?

11     A.  No, I don't recall.

12     Q.  It wasn't one of your top three

13  distributors; right?

14     A.  From what I recall, they were part of the

15  OptiSource group.  So to answer your question, no, they

16  were not a large customer of mine.

17     Q.  We have been growing by double digits for

18  the last three years.  Do you consider that significant

19  growth?

20     A.  In what context?  I mean, significant

21  compared to -- I don't have any other context to their

22  business or their customer base or anything.

23     Q.  Could it be significant?

24         MR. TSAI:  Object to the form.

Page 285

1      A.  Again, there's -- I would need additional

2  context, and I mean --

3      Q.  (By Ms. Herzfeld)  But with the right

4  context, it's possible that double-digit growth year

5  after year for three years could be a significant

6  factor in evaluating this customer; is that right?

7          MR. TSAI:  Object to the form.

8      Q.  (By Ms. Herzfeld)  With more information,

9  it's possible?

10     A.  Depends on what -- how significant is

11  defined.

12     Q.  Did all of your customers grow double

13  digits year after year?

14     A.  I don't recall.

15     Q.  And you were in sales for quite a while,

16  so is double-digit growth -- I mean, that's a minimum

17  of 10; right?  Double digit?  That's a minimum of 10.

18  Is that a lot of growth?

19     A.  I don't know.  Every customer's different,

20  and they're acquiring different customer -- I mean,

21  every customer's different.  I can't answer that

22  question.

23     Q.  So this customer is expanding into four

24  states, he's telling you he has a fully-automated

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1 warehouse, is answering you in all caps, has misspelled
2 digits; is that correct?
3    A.   Oh. Yes.
4    Q.   D-I-D-I-T-S.  Is that correct?
5    A.   That's what it reads.
6    Q.   For the last three years, and they hope
7 for that to continue; is that right?
8    A.   Yes.
9    Q.   And then that last sentence says also,
10 most of our customers want the Mallinckrodt product.
11 What did that mean to you?
12    A.   Again, I was the middleman here, and I
13 would have passed this information back to whoever
14 requested it.
15    Q.   Do you know if you did that?
16    A.   I would have done it.  I would be very
17 surprised if that did not go on.
18    Q.   And do you know if this order indeed
19 shipped?
20    A.   I have no idea.
21    Q.   And would you consider those things --
22 that information that you have there, expanding into
23 four states, a fully-automated warehouse, an e-mail
24 that's in all caps with a pretty significant

Page 287

1 misspelling, and that their customers want the
2 Mallinckrodt product -- almost all of our customers
3 want the Mallinckrodt product -- putting those things
4 together, does that seem like something that might have
5 been suspicious to you?
6       MR. TSAI:  Object to the form.
7    A.   So again, the -- my assumption is that
8 this request came from suspicious order monitoring, so
9 this information would have gone back to suspicious
10 order monitoring, and it was not my job to determine
11 whether an order was suspicious or not.  That was that
12 team.
13    Q.   (By Ms. Herzfeld)  Okay.  I understand
14 what you think the parameters of your job were or were
15 not, but my question is, you worked at Mallinckrodt for
16 a very long time and you were pretty intimately
17 involved in these processes.  So in your opinion, do
18 you believe that these factors would make this order
19 suspicious?
20    A.   I wouldn't consider my involvement
21 intimate.  Again, in this situation I was a middleman.
22 The suspicious order monitoring team was requesting me
23 to get additional information so they could make an
24 educated decision based on this specific order, and I

Page 288

1 did as requested, as instructed, to get that
2 information back to the suspicious order monitoring
3 team.
4    Q.   But my question is, did you find this
5 information to flag this order suspicious?
6    A.   Again, that was the role of suspicious
7 order monitoring team to flag orders as suspicious.
8    Q.   I'm going to ask the question as a yes or
9 no.  Did the information provided in this e-mail make
10 this order suspicious to you or not?
11       MR. TSAI:  Object to the form.
12    Q.   (By Ms. Herzfeld)  Yes or no?
13    A.   So again, the role of me at this point in
14 time in October 2016 --
15       MS. HERZFELD:  Move to strike.
16 Nonresponsive.
17    Q.   (By Ms. Herzfeld)  We can sit here all
18 day.  I'm asking you in your opinion, with this
19 information that was provided to you in this e-mail,
20 did you consider this to be suspicious?
21       MR. TSAI:  Completely improper motion to
22 strike because you didn't even let her provide her
23 answer, but I object to the form.  Go ahead.
24    A.   Again, it was not my position to -- or

Page 289

1 responsibility -- to determine whether an order was
2 suspicious or not.  I was providing that information
3 back to the suspicious order monitoring team.
4    Q.   (By Ms. Herzfeld)  You still haven't
5 answered my question.  Based on the information that
6 was provided to you in this e-mail, did you consider
7 this information to flag as this suspicious?
8    A.   I wouldn't have --
9       MR. TSAI:  Object to the form.  I --
10    A.   I wouldn't --
11    Q.   (By Ms. Herzfeld)  Okay, I'll back up.
12 Okay?  Based on the e-mail that you've received --
13 you've gone back and forth -- you've been the
14 middleman, as you said, between suspicious ordering and
15 your customers; is that right?
16    A.   That is correct.
17    Q.   So you pass information to them and you
18 get information back; is that right?
19    A.   That is correct.
20    Q.   And so you know if your clients end up
21 getting their orders flagged and held; is that correct?
22    A.   Yes, I would be made aware if they
23 needed -- if the suspicious order monitoring team
24 needed additional information, that's when I would

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1  become aware that they needed more information. If I
2  didn't have it, I would reach out to the customer to
3  get that information.
4      Q.  So I want to make sure I understand that.
5  So you were only a middleman?
6      A.  In this situation, yes.
7      Q.  So the information that was provided back
8  and forth between suspicious order monitoring and your
9  customer was of no importance to you?
10         MR. TSAI:  Object to the form.
11     Q.  (By Ms. Herzfeld) If you were just the
12 middleman?
13     A.  I did not say that it was not important to
14 me. I said that it was not my responsibility to make
15 the determination on whether that order would ship or
16 not.
17     Q.  So let's back up again. Say Don here had
18 written back and said you know what, Lisa? We are just
19 expanding like crazy because we have all these pain
20 clinics and we have thousands of people lining up
21 outside of these pain clinics and we need to supply
22 them. Would you have an opinion then if it was a
23 suspicious order?
24         MR. TSAI:  Objection. Improper

Page 291

1  hypothetical.
2      A.  That -- exactly. That's a hypothetical
3  question.
4      Q.  (By Ms. Herzfeld) And I'm asking you to
5  answer it.
6          MR. TSAI:  Same objection.
7      A.  It wasn't my position to make those types
8  of calls. This was the responsibility of the
9  suspicious order monitoring, to determine whether or
10 not they felt it was -- the response from customers was
11 valid or not or --
12     Q.  (By Ms. Herzfeld) So you would take no
13 position on that?
14     A.  It wasn't my job -- it wasn't my
15 responsibility to do that. No. Why would I take a
16 position when it's no responsibility or obligation or
17 that SOM wasn't requesting my opinion on this?
18     Q.  And if you had an opinion would you share
19 it?
20         MR. TSAI:  Objection.
21     Q.  (By Ms. Herzfeld) With SOM?
22         MR. TSAI:  Objection to the form.
23     A.  Again, it was SOM's -- SOM was the
24 ultimate decisionmaker on whether orders shipped or

Page 292

1  not.
2      Q.  (By Ms. Herzfeld) So I just want to be
3  clear. So in this e-mail in particular you're not
4  going to tell me if you had an opinion of whether this
5  was suspicious. But if you had somebody write back and
6  say -- the hypothetical I gave you before -- we have
7  five pill mills with 1,000 people out the door, you
8  would take no action on that regarding SOM because that
9  wasn't your job?
10         MR. TSAI:  Objection. Assumes facts not
11 in evidence.
12     A.  I do not -- sorry.
13         MR. TSAI:  Improper hypothetical. Calls
14 for speculation. Go ahead.
15     A.  I absolutely do not agree with that
16 statement at all. So we were trained if anything were
17 to -- we were trained if anything looked odd or
18 suspicious to report it back to suspicious order
19 monitoring team, again, who had the authority to make
20 decisions.
21         So this is a situation where even if --
22 and this point in time that I felt that it was
23 suspicious, whether -- which I don't recall whether I
24 had those feelings or not back in 2016, but either way,

Page 293

1  as we were trained, this information was getting to the
2  appropriate place, in suspicious order monitoring, who
3  was making those decisions.
4      Q.  (By Ms. Herzfeld) And did you follow up
5  with suspicious order monitoring to see if your client
6  continued to receive Mallinckrodt oxycodone products?
7      A.  I don't recall.
8      Q.  And what if it wasn't flagged by
9  suspicious order monitoring? Would you go advocate to
10 suspicious order monitoring and say, hey, I think this
11 client of mine potentially is engaging in diversion or
12 has something suspicious? Would you go advocate for
13 that, or was that all on them?
14         MR. TSAI:  Objection. Improper,
15 incomplete hypothetical. Go ahead.
16     A.  Exactly. It's a hypothetical. I wouldn't
17 have received this e-mail if SOM hadn't made me aware
18 of the situation because I wouldn't have reached out to
19 them.
20     Q.  (By Ms. Herzfeld) Did you reach out to
21 SOM for this e-mail?
22     A.  No, I said SOM reached out to me, so -- to
23 get more information; right? I then reached out to the
24 customer, which is how I obtained this response. If

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1 SOM hadn't reached out to me, I wouldn't have ever
2 received this knowledge or this e-mail from Don because
3 I wouldn't have known about this suspicious order.
4      Q.   Did you ever report any of your customers
5 to SOM?
6      A.   I don't recall.
7      Q.   You don't recall ever, in your entire
8 time, if you reported one of your customers to SOM?
9      A.   I don't recall the detail.  I don't
10 recall, no.
11      Q.   Okay.  I am going to mark the next two
12 exhibits and give them to you at the same time because
13 I think that's going to make it a little bit easier.
14         [Exhibit Mallinckrodt-Cardetti-040 marked
15          for identification.]
16         [Exhibit Mallinckrodt-Cardetti-041 marked
17          for identification.]
18      Q.   Okay.  I'm going to hand you what I've
19 marked as Exhibit 40, which is Bates number
20 MNK_TNSTA02527745, and Exhibit 41, which is Bates
21 number MNK_TNSTA02527745.  I guess those are the same.
22 They're from the same spreadsheet.  I will represent to
23 you that we have pulled one county in Tennessee from
24 chargeback data contained in that gigantic share file.

Page 295

1         MR. TSAI:  Can I get copies, please?
2         MS. HERZFELD:  Oh, sorry.  Here.  For me.
3 Here you go.  For everybody else.  15, 30.  15, 30.
4      Q.   (By Ms. Herzfeld)  If you'll look at the
5 first one on -- it's labeled oxy 30 on the top.  I
6 think that's Exhibit 40.  Is that right?
7      A.   Yes.
8      Q.   And if you look at the second page -- we
9 just put the first page on there so I knew what it was.
10 Okay.  If you look at the second page there, do you
11 recognize that as being chargeback data?
12      A.   Again, I did not run this report, but
13 it -- yeah -- DEA number.  It appears that this is
14 based on chargebacks.
15      Q.   So if you can just go through it with me a
16 little bit so I can make sure I understand it.  The
17 ship-to customer number -- is that the number for the
18 actual end user pharmacy, or is that for the
19 distributor?  Do you know?
20      A.   So -- I don't know.  So it says ship-to
21 customer number and then ship-to customer name right
22 next to it.
23      Q.   Right.
24      A.   Again, I don't recall end users, meaning

Page 296

1 the pharmacy level, having ship-to numbers, but that's
2 what it appears.
3      Q.   So looking at this first one, this is for
4 Campbell County in Tennessee.  You've got Riggs Drug,
5 which I think we talked about before on Central Avenue
6 in LaFollette, Tennessee.  Is that right?
7      A.   Yes.
8      Q.   And this chargeback data I'll represent to
9 you was pulled from a sheet that is January 2015 to
10 December 2015.  Looking at this data, it says postal
11 code 37766 and then DEA number.  Do you know if that
12 DEA number is for the parent customer or the pharmacy
13 customer?
14      A.   I do not know.
15      Q.   And then it says sold via parent customer
16 and then there's a number there, right, 472645?
17      A.   472645.  Correct.
18      Q.   And that appears to be the number for
19 Cardinal Health; is that right?
20      A.   That's what it appears, yes.
21      Q.   And then it says at the top there sales
22 quantity government UOM.  Is that unit of measure?
23      A.   Yes.
24      Q.   And do you know what a unit of measure is

Page 297

1 in this context?
2      A.   Unit of measure -- again, I didn't run
3 this report, but if I -- unit of measure could
4 potentially be doses.
5      Q.   And back when you used to run chargeback
6 reports, was the unit of measure doses?
7      A.   Chargeback reports, from what I recall,
8 was reported in bottle quantity.
9      Q.   In bottle quantity?  Okay.
10      A.   Yeah.
11      Q.   So do you know if at some point it changed
12 from bottle quantity to doses?
13      A.   Not that I recall.  I don't know.
14      Q.   So looking at this, it would say for Riggs
15 Drugs at LaFollette, Tennessee, it says CM2015MO2
16 February.  Does the CM or MO2 meaning anything to you?
17      A.   Calendar month, month three.
18      Q.   Oh, I get it.  Month two, month three?
19      A.   Correct.
20      Q.   So when it says month two, it's 3,600
21 governments units of measure; is that right?
22      A.   That's what it says, yes.
23      Q.   And then the next month it goes to 7,000;
24 is that correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    A.   That's correct.

2    Q.   And then in April 9,000?

3    A.   That's correct.

4    Q.   Do you know if Riggs Drug was ever flagged

5   for a suspicious order?

6    A.   I do not know.

7    Q.   In May it's 5,600; is that right?

8    A.   Just to go back.

9    Q.   Yes, ma'am.

10    A.   So again, Riggs Drug is ordering through

11   Cardinal, as it states here.  They wouldn't have been

12   ordering directly from Mallinckrodt.  So just to

13   clarify.

14    Q.   I understand that, ma'am.  They're the

15   customer of your customer?

16    A.   Right.  So the question was in regards to

17   an order being flagged.

18    Q.   Yes, ma'am.  So if their orders -- if you

19   were getting that chargeback information -- right --

20   Mallinckrodt was getting the chargeback information

21   about each pharmacy; is that correct?

22    A.   That's correct.

23    Q.   And so when you got that chargeback

24   information, we have it here in this handy chart.  So

Page 299

1   did this handy chart cause anyone, to you knowledge, to

2   flag Riggs Drug for a suspicious order?

3    A.   I don't know.

4    Q.   Do you know if Riggs Drug was ever put on

5   a chargeback restriction?

6    A.   I don't know.  There were multiple

7   pharmacies that were put on chargeback restrictions.

8    Q.   So carrying along here.  Then May of 2015,

9   it's 5,600 government units of measure; is that

10   correct?

11    A.   I'm sorry.  Where are you?  Five -- in

12   May?

13    Q.   Yes, ma'am.

14    A.   5,600.  Yes.

15    Q.   And then it goes to 9,800 in June; is that

16   right?

17    A.   Yes.

18    Q.   And then 5,400 in July, 9,000 in August,

19   5,200 in September; is that right?

20    A.   Correct.

21    Q.   It goes on and on, and then here at the

22   back it says total in 12 months; is that correct?

23    A.   Correct.

24    Q.   It says 69,000.  Is that right?

Page 300

1    A.   Yes.

2    Q.   And then we could belabor the point and go

3   through each one of these, but I know you're kind of in

4   a hurry to get out of here.  So to shortcut it a little

5   bit -- and the rest of them also show the same thing,

6   right, with differing numbers for each different month;

7   is that correct?

8    A.   Yeah, some months have zero, some months

9   have numbers, so it's not the same as that first, but

10   yes.  Yes.

11    Q.   And it looks like with the exception of

12   Food City and Rite Aid, they were all done by Cardinal?

13   The distributor was Cardinal?

14    A.   That's correct.

15    Q.   And for Food City and Rite Aid, the

16   distributors were McKesson; is that correct?

17    A.   Correct.

18    Q.   And did you ever have any discussion with

19   anyone at Mallinckrodt about Food City Pharmacies?

20    A.   No, not that I recall.

21    Q.   And so then going here through the

22   numbers, the total then is 69,000 for Riggs Drug in

23   LaFollette and then 27,900 for Riggs Drug in Jacksboro;

24   is that correct?

Page 301

1    A.   That is correct.

2    Q.   And then if you keep going down, the next

3   one is Terry's Pharmacy in Jacksboro, and that's 27,100

4   units, and Family Drug Center in Jellico is 24,300

5   units; is that correct?

6    A.   Yes.

7    Q.   And then Riggs Drug in Jacksboro was

8   16,100 units, Food City in LaFollette is 13,300 units,

9   and then Rite Aid in Jellico is 3,000 units.  Did I

10   read all that correctly?

11    A.   Yes.

12    Q.   And do you know what the total number of

13   government units of measure of Mallinckrodt oxy 30 were

14   that went into Campbell County in the year 2015?

15    A.   No, I do not.

16    Q.   Do you know what the population of

17   Campbell County is?

18    A.   No, I do not.

19    Q.   If you add it up, it looks like the total

20   is 27 -- no.  180,700 units of oxy 30 into Campbell

21   County for the year 2015.  Does that number mean

22   anything to you?

23    A.   I'll take your word that you just added

24   those up.

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    Q.   Now, looking at the next one, which is
2    Exhibit 41.  Okay.  We'll go through this one
3    relatively quickly because the questions should be
4    relatively the same.
5         This one is for oxy 15, and I will
6    represent to you that we've sorted it according to
7    these same pharmacies that are in Campbell County.  So
8    not to belabor the point, but it looks like for the oxy
9    15s, we have kind of a different order.
10        So the first one is Terry's Pharmacy in
11   Jacksboro, who looks like they're serviced by Cardinal
12   Health with a total of 34,100 government units of
13   measure for the oxy 15.  Do you see where I'm at?
14        A.   I do see that.
15        Q.   And then Family Drug Center in Jellico,
16   who's also serviced by Cardinal Health, has 22,600
17   government units of measure.  Do you see that?
18        A.   Yes.
19        Q.   And Riggs Drug in Jacksboro has -- also
20   serviced by Cardinal Health -- 10,800 governments of
21   units of measure of oxy 15 for 2015.  Do you see that?
22        A.   I do see that.
23        Q.   Terry's pharmacy is also Cardinal Health,
24   and their total is 8,600.  Do you see that?

Page 303

1    A.   Yes.
2    Q.   Then Riggs Drug in Jacksboro, Cardinal
3    Health, 8,000.  Do you see that?
4    A.   Yes.
5    Q.   Riggs Drug in LaFollette, 4,000, Cardinal.
6    Do you see that?
7    A.   Yes.
8    Q.   Rite Aid of Tennessee, McKesson, 1,500.
9    Do you see that?
10   A.   Yes.
11   Q.   And then CVS 7794, LaFollette, Cardinal
12   Health, 1,000.  Do you see that?
13   A.   Yes.
14   Q.   Is it common -- was it commonplace that
15   people would source oxy -- or that pharmacies would
16   source oxy 15 from one distributor and oxy 30 from
17   another distributor?
18   A.   How customers sourced product varied by
19   customer.
20   Q.   But the two -- the 15 and the 30 weren't
21   necessarily always bundled?
22   A.   Not necessarily.
23   Q.   Did you typically see those bundled
24   together more together than separate, or was there

Page 304

1    really no rhyme or reason?
2    A.   It varied, yeah.
3    Q.   So if you look at the total for oxy 15 on
4    this chart, I'll represent to you that that adds up to
5    90,600 oxy 15s for 2015 in Campbell County.  Do you see
6    that?
7    A.   Again, I'll take your word on that
8    calculation.
9    Q.   And again, you don't know the population
10   of Campbell County?
11   A.   No, I do not.
12   Q.   So if the total of oxy 15s and oxy 30s
13   that Mallinckrodt supplied into Campbell County in
14   2015 was 271,600 government units of measure, would
15   that number be concerning to you?
16   A.   I have no other context around that
17   number.
18   Q.   What if I told you Campbell County is
19   pretty rural?
20   A.   Again, I have no other context that I
21   could answer that question on.
22        MS. HERZFELD:  If we could go off the
23   record just for one second.
24        THE VIDEOGRAPHER:  We are going off the

Page 305

1    record at 4:08 PM.
2         [Discussion off the record.]
3         THE VIDEOGRAPHER:  We are back on the
4    record at 4:09 PM.
5    Q.   (By Ms. Herzfeld)  Okay.  I'm going to
6    mark the next exhibit for you, Ms. Cardetti, as Exhibit
7    42, I think.  Yeah.  It's Exhibit 42, which for some
8    reason also doesn't seem to have a Bates number on it.
9    I'll just do these separately.
10        [Exhibit Mallinckrodt-Cardetti-042 marked
11        for identification.]
12   Q.   Okay.  And then we'll do this one as 43.
13        [Exhibit Mallinckrodt-Cardetti-043 marked
14        for identification.]
15        MR. DEARMAN:  Is this exhibit more than
16   one page?
17        MS. HERZFELD:  Oh, it's two different
18   exhibits.
19        MR. DEARMAN:  Oh.
20        MS. HERZFELD:  So the first one is the
21   e-mail.  Did you guys get that?
22        MR. DEARMAN:  We got the e-mail.
23        MS. HERZFELD:  You got the e-mail?  You
24   didn't get the chart?

Page 306

1      MR. DEARMAN: No.
2      MS. HERZFELD: How many copies do you guys
3  have?
4      MR. TSAI: I have one.
5      MS. HERZFELD: You -- there you go. You
6  want to pass that one down? Perfect. Thank you.
7      Q.   (By Ms. Herzfeld) Okay, Ms. Cardetti. If
8  you'll look with me at Exhibit 42. This appears to be
9  an e-mail sent from Karen Harper to you dated September
10 6th, 2011. Is that correct?
11     A.   That is correct.
12     Q.   Do you have any reason to think that this
13 e-mail was not sent to you at your Covidien e-mail
14 address?
15     A.   No.
16     Q.   And you believe you received it?
17     A.   I believe so.
18     Q.   And the subject is top 20 and top 150.
19 There's an attachment, top 150 pharmacies, 30-milligram
20 only, by year, by distributor, KH edits, and the second
21 one is top 20 pharmacies by distributor. Do you see
22 where I'm at?
23     A.   Yes.
24     Q.   And do you recall ever having any

Page 307

1  conversation with Karen Harper about the top pharmacies
2  for distributing oxycodone -- Mallinckrodt's oxycodone?
3      A.   No, I don't recall.
4      Q.   And do you know where the majority of --
5  there was a particular region where the top pharmacies
6  of Mallinckrodt opioids were located?
7      A.   No, I don't recall.
8      Q.   Do you know if there was a
9  concentration -- many of those in Florida?
10     A.   I do know that there was focus on Florida.
11     Q.   And I will have you look, please, at
12 Exhibit 43. I will submit to you that you've taken the
13 attachment here that was the top 150 pharmacies and
14 modified that just to show you Tennessee just so you
15 don't have to go through the whole thing. I have the
16 whole thing if you'd prefer to look at it.
17     A.   No, this is fine.
18     Q.   Okay, great. So looking at this one, on
19 Page 2 it appears that on this list for these top
20 pharmacies there are one, two, three, four, five, six,
21 seven -- 17 that are in Tennessee; is that right?
22     A.   I didn't count, but it looks about that,
23 yes.
24     Q.   This list?

Page 308

1      A.   Yes. I didn't count, but -- do you want
2  me to count? Here.
3      Q.   No, it's okay.
4      A.   17, yes.
5      Q.   And do you know how large Maryville,
6  Tennessee, is?
7      A.   No, I do not.
8      Q.   And here we have Lowe's Drug on East
9  Broadway having gross sales it looks like twice here of
10 $144,338.39, and then -- for 2011, but in 2010, the
11 gross sales were $180,602.98. Do you know what the
12 difference for that was?
13     A.   Are you asking me to subtract 180,602.98
14 to 144,338.39?
15     Q.   No, it was really a bad question. I'm
16 going to withdraw that question.
17     A.   Okay.
18     Q.   And so --
19     A.   Because I can't do that math.
20     Q.   That's okay. Neither can I. Okay. And
21 so looking at Maryville, Tennessee, you don't have any
22 idea how large that community is?
23     A.   No, I do not.
24     Q.   And then -- you've heard of Knoxville,

Page 309

1  Tennessee?
2      A.   I've heard of Knoxville, yes.
3      Q.   So let's flip down here then to Rippetoe,
4  Inc., in Morristown, Tennessee. Do you see where I'm
5  at?
6      A.   Yes.
7      Q.   And it is serviced by AmerisourceBergen
8  Health; is that correct?
9      A.   Yes.
10     Q.   And it looks like the total sales are
11 $116,734.80; is that correct?
12     A.   Correct.
13     Q.   With 320,700 units; is that right?
14     A.   320,700 UOMs.
15     Q.   Units of measure?
16     A.   Yes, that's what it states. Yeah.
17     Q.   And do you know where Morristown,
18 Tennessee is?
19     A.   No, I do not.
20     Q.   Do you have any idea how big it is?
21     A.   No, I do not.
22     Q.   Seymour, Tennessee, here for Food City.
23 Do you know how large Seymour, Tennessee, is?
24     A.   No, I do not.

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1    Q.   Do you know where it's located?

2    A.   No, I do not.

3    Q.   We've already talked about Morristown. I

4 think I've already asked you about LaFollette,

5 Tennessee. Do you know where that is?

6    A.   No, I do not.

7    Q.   What about Newport, Tennessee?

8    A.   No.

9    Q.   Do you know what the population is of

10 Newport, Tennessee?

11    A.   No.

12    Q.   Do you know if it's located near a city?

13    A.   Again, I do not know where Newport is

14 located in Tennessee, no.

15    Q.   What about Seymour -- or I already asked

16 you about Seymour. What about Strawberry Plains,

17 Tennessee? Do you know where Strawberry Plains,

18 Tennessee is?

19    A.   No, I do not.

20    Q.   Do you know what part of Tennessee it's

21 in?

22    A.   No, I do not.

23    Q.   Do you know what the population is of

24 Strawberry Plains, Tennessee?

Page 311

1    A.   No, I do not.

2    Q.   So looking here at the pharmacy in

3 Strawberry Plains, East Tennessee Discount Drug in

4 Strawberry Plains -- it's the second from the bottom --

5 it says it's serviced by AmerisourceBergen Health; is

6 that correct?

7    A.   Yes, that is correct.

8    Q.   And it looks like the gross sales from

9 2011 were $60,824.40; is that correct?

10    A.   Yes.

11    Q.   And then government units of measure,

12 which for this chart is oxy 30, is 167,100 government

13 units of measure; is that correct?

14    A.   That is correct.

15    Q.   And do you -- have you ever known what the

16 population of Strawberry Plains, Tennessee is?

17    A.   No, not --

18    Q.   Do you know that in 2010, the U.S. census

19 showed the population of Strawberry Plains, Tennessee,

20 at 4,667 residents?

21    A.   No, I do not know that.

22    Q.   Do you think a pharmacy that's located in

23 a town with 4,667 residents should be one of

24 Mallinckrodt's top customers?

Page 312

1    MR. TSAI: Objection. Lacks foundation.

2    A.   I have --

3    MR. TSAI: It's not one of its

4 customers -- go ahead.

5    Q.   (By Ms. Herzfeld) I'll rephrase the

6 question.

7    A.   Okay.

8    Q.   Do you think a pharmacy that is located in

9 a town with 4,667 people should be one of

10 Mallinckrodt's indirect top customers?

11    MR. TSAI: Objection. Lacks foundation.

12 Objection to form. Go ahead.

13    A.   Can you repeat the question?

14    Q.   (By Ms. Herzfeld) Sure. I'll back up a

15 little bit. So Mallinckrodt has its direct customers,

16 which are the wholesalers or the distributors; is that

17 correct?

18    A.   That's correct.

19    Q.   And then there are people that those

20 wholesalers and distributors sold to, which are

21 oftentimes pharmacies; is that correct?

22    A.   That is correct.

23    Q.   And the pharmacies are known as an

24 indirect customer of Mallinckrodt?

Page 313

1    A.   No, they're considered the wholesaler's

2 customers.

3    Q.   The wholesaler's customer? Okay. But you

4 have a -- Mallinckrodt has a relationship with those

5 pharmacies in the sense that you have negotiated

6 chargeback contracts with those pharmacies; is that

7 right?

8    A.   No, that is not correct.

9    Q.   And so you never have anything to do with

10 that pharmacy?

11    A.   The only information we would receive from

12 that pharmacy is through chargebacks from the

13 wholesaler. Everything negotiated is with the

14 wholesaler.

15    Q.   But if the drugs -- if the oxy just went

16 to the distributor and it didn't go anywhere else,

17 there wouldn't be much business; right? It has to go

18 somewhere?

19    A.   Exactly. It would be sitting on the

20 shelf.

21    Q.   And so you monitor the chargeback

22 information as to where it is that each of these oxy

23 shipments go to; is that correct?

24    A.   I did not. Suspicious order monitoring

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1 team monitored that.

2 Q. But you had access to it -- the chargeback

3 information?

4 A. Yes, I had access to chargebacks.

5 Q. And so looking at those chargebacks, it

6 looks like there was a creation here of top 150

7 pharmacies for oxy 30. That's what the chart says; is

8 that right?

9 A. Yes.

10 Q. And it's listed by distributor; is that

11 right?

12 A. It has pharmacy and distributor

13 information.

14 Q. Then it says after -- if you keep looking

15 here in the note -- each pharmacy could have received

16 oxy 30 from other distributors; is that right?

17 A. Yes, that's what it says.

18 Q. And they also could have received oxy 30

19 from other manufacturers; is that right?

20 A. That's correct.

21 Q. And so my question is, do you think it's

22 appropriate that a town with 4,667 people are receiving

23 167,100 government units of measure of oxy 30 a year?

24 MR. TSAI: Objection to form. Lacks

Page 315

1 foundation. Go ahead.

2 A. I know nothing about those counties or

3 what kind of facilities are in those counties, what

4 types of clinics or doctors. I have zero context to

5 answer that question.

6 Q. (By Ms. Herzfeld) But those -- that's all

7 information you'd want to know in order to be able to

8 form an opinion?

9 A. Again, the suspicious order monitoring

10 team would -- in my understanding, would try to gather

11 as much information to make educated decisions on what

12 pharmacies would be cut off, and that was part of their

13 process, from my understanding.

14 Q. (By Ms. Herzfeld) But you don't have an

15 opinion as to whether 167,100 government units of

16 measure of oxy 30 going to one small town -- whether it

17 be Strawberry Plains or anything else -- if that could

18 be a problem?

19 MR. TSAI: Objection to form. Lacks

20 foundation.

21 A. Again, I have no context of what is in

22 that small town, so --

23 Q. (By Ms. Herzfeld) You'd want to know

24 that?

Page 316

1 THE WITNESS: I would need more

2 information.

3 MS. HERZFELD: Okay. Okay. We can take a

4 break now.

5 THE VIDEOGRAPHER: We are going off the

6 record at 4:20 PM.

7 [Whereupon the proceedings were

8 concluded.]

Page 317

1 C E R T I F I C A T E

2

3 I, JOHN ARNDT, a Certified Shorthand

4 Reporter and Certified Court Reporter, do hereby

5 certify that prior to the commencement of the

6 examination, LISA CARDETTI was sworn by me to testify

7 the truth, the whole truth and nothing but the truth.

8 I DO FURTHER CERTIFY that the foregoing is a

9 true and accurate transcript of the proceedings as

10 taken stenographically by and before me at the time,

11 place and on the date hereinbefore set forth.

12 I DO FURTHER CERTIFY that I am neither a

13 relative nor employee nor attorney nor counsel of any

14 of the parties to this action, and that I am neither a

15 relative nor employee of such attorney or counsel, and

16 that I am not financially interested in this action.

17

18

19 _____

20 JOHN ARNDT, CSR, CCR, RDR, CRR

21 CSR No. 084-004605

22 CCR No. 1186

23

24

Page 318

1
2      I, LISA CARDETTI, the witness herein,
3  having read the foregoing testimony of the pages of
4  this deposition, do hereby certify it to be a true and
5  correct transcript, subject to the corrections, if any,
6  shown on the attached page.
7
8
9
10                _____
11            LISA CARDETTI
12
13
14  Sworn and subscribed to before me,
15  This _____ day of _____, 201_.
16
17
18  _____
19      Notary Public
20
21
22
23
24

Page 319

1      DEPOSITION ERRATA SHEET
2
3  Page No._____Line No._____Change to:_____
4  _____
5  Reason for change:_____
6  Page No._____Line No._____Change to:_____
7  _____
8  Reason for change:_____
9  Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21
22  SIGNATURE:_____DATE:_____
23      LISA CARDETTI
24