1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION

 3   IN RE:  NATIONAL      :  MDL No. 2804
     PRESCRIPTION OPIATE   :
 4   LITIGATION            :  Case No. 17-md-2804
                           :
 5   APPLIES TO ALL CASES  :  Hon. Dan A. Polster
                           :
 6                         :

 7

 8                  HIGHLY CONFIDENTIAL

 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                      - - - -

12                  JANUARY 8, 2019

13                      - - - -

14        VIDEOTAPED DEPOSITION OF GREGORY CARLSON,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on Tuesday,

20   January 8, 2019, commencing at 9:06 a.m.

21                      - - - -

22             GOLKOW LITIGATION SERVICES
          877.370.3377 phone | 917.591.5672 fax
23                  deps@golkow.com

24

25
```

2

```
 1                A P P E A R A N C E S

 2   On behalf of Plaintiffs

 3            WAGSTAFF & CARTMELL, LLP
              BY:  TOM ROTTINGHAUS, ESQUIRE
 4            4740 Grand Avenue, Suite 300
              Kansas City, Missouri  64112
 5            816.701.1100
              trottinghaus@wcllp.com

 6

 7   On behalf of Defendant AmerisourceBergen Drug
     Corporation

 8
              (By Phone/Livestream)
 9            REED SMITH LLP
              BY:  SHANA E. RUSSO, ESQUIRE
10            136 Main Street, Suite 250
              Princeton Forrestal Village
11            Princeton, New Jersey  08540
              609.514.5959
12            srusso@reedsmith.com

13
     On behalf of Defendant Cardinal Health, Inc.
14
              PIETRAGALLO GORDON ALFANO BOSICK &
15            RASPANTI, LLP
              BY:  JENNIFER BOURIAT, ESQUIRE
16            One Oxford Centre, 38th Floor
              301 Grant Street
17            Pittsburgh, Pennsylvania  15219
              412.263.2000
18            jhb@pietragallo.com

19
     On behalf of Defendants Endo Pharmaceuticals, Endo
20   Health Solutions and Par Pharmaceuticals

21            (By Phone/Livestream)
              ARNOLD & PORTER KAYE SCHOLER LLP
22            BY:  ERICA I. GUTHRIE, ESQUIRE
              601 Massachusetts Avenue, NW
23            Washington, DC  20001-37453
              202.942.5743
24            erica.guthrie@arnoldporter.com

25
```

3

```
 1              A P P E A R A N C E S (Continued)

 2   On behalf of Defendant HBC Service Company

 3           MARCUS & SHAPIRA, LLP
             BY:  JOSHUA KOBRIN, ESQUIRE
 4               ROBERT M. BARNES, ESQUIRE
             One Oxford Centre, 35th Floor
 5           Pittsburgh, Pennsylvania  15219
             412.471.3490
 6           jkobrin@marcus-shapira.com
             rbarnes@marcus-shapira.com
 7

 8   On behalf of Defendant McKesson Corporation

 9           COVINGTON & BURLING, LLP
             BY:  AMBER CHARLES, ESQUIRE
10           One CityCenter
             850 Tenth Street, NW
11           Washington, DC  20001-4956
             202.662.5807
12           acharles@cov.com

13
     On behalf of Defendant Walmart
14
             (By phone/Livestream)
15           JONES DAY, LLP
             BY:  CHRISTOPHER MARKHAM, ESQUIRE
16           100 High Street
             21st Floor
17           Boston, Massachusetts 02110-1781
             617.960.3939
18           cmarkham@jonesday.com

19
     On behalf of Deponent
20
             DICKIE MCCAMEY & CHILCOTE, P.C.
21           BY:  JEFFREY J. WETZEL, ESQUIRE
             Two PPG Place, Suite 400
22           Pittsburgh, Pennsylvania  15222
             412.392.5617
23           jwetzel@dmclaw.com

24   Also present

25           Frank Stanek, legal videographer
```

4

```
 1                        * I N D E X *

 2   GREGORY CARLSON                                 PAGE

 3     EXAMINATION BY MR. ROTTINGHAUS        8, 246, 252
       EXAMINATION BY MR. BARNES               217, 251

 4


 5              * INDEX OF HBC-CARLSON EXHIBITS *

 6   NO.                 DESCRIPTION              PAGE
     Exhibit 1   Greg Carlson LinkedIn profile      13
 7
     Exhibit 2   Giant Eagle Retail Operations -    45
 8               Pharmacy Operations org chart
                 as of November 13, 2014
 9               HBC_MDL00002216

10   Exhibit 3   CFR Part 1301.74 from DEA website   52
                 P1.47 - P1.47.2
11
     Exhibit 4   DEA Dear Registrant 6/12/12,        89
12               6/12/12, 12/27/07, 2/7/07, 9/27/06
                 letters
13               ABDCMDL00269683 - 00269694

14   Exhibit 5   Ohio State Board of Pharmacy       101
                 Meeting Minutes November 2-4, 2009
15
     Exhibit 6   Ohio State Board of Pharmacy       101
16               Meeting Minutes December 5-7, 2011

17   Exhibit 7   Email chain, 1/30/12, from A.      107
                 Zelaski to G. Carlson, et al.,
18               subject: RE: HBC phone number
                 HBC_MDL00090001 - 00090004
19
     Exhibit 8   Meeting invitation for 5/24/13,    110
20               from J. Millward to G. Carlson,
                 et al., subject: CSMP Questionnaire
21               Complete Response
                 HBC_MDL00144314 - 00144322
22
     Exhibit 9   Email, 8/22/13, from S. Voyten to  114
23               J. Millward, et al., subject: FW:
                 CVS News Story
24               HBC_MDL00154265 - 00154266


25
```

5

1          * INDEX OF HBC-CARLSON EXHIBITS (Continued) *

2     NO.                    DESCRIPTION               PAGE
      Exhibit 10  Email chain, 4/18/14, from M. Bianco   116
3                 to G. Carson, subject: Re: 35 missing
                  tote
4                 HBC_MDL00135668 - 00135670

5     Exhibit 11  Email chain, 4/23/14, from TammySSD   118
                  to B. Snider, subject: Re: Missing
6                 HBC Tote
                  MCKMDL0059574 - 0059578
7

      Exhibit 12  Email chain, 8/11/15, from R.          121
8                 Shaheen to G. Carlson, subject: RE:
                  Procedural inconsistency
9                 HBC_MDL00063991 - 00063992

10    Exhibit 13  Email chain, 11/25/13, from T.         128
                  Roahrig to J. Millward, subject:
11                FW: Daily HBC Suspicious Purchasing
                  Report - 11/13/13
12                HBC_MDL00094599 - 0094600

13    Exhibit 14  Email chain, 8/20/15, from G.          134
                  Carlson to J. Jenson, et al.,
14                subject: FW: Thrifty White Notes
                  HBC_MDL00069566 - 00069571
15

      Exhibit 15  Email chain, 10/23/08, from S.         153
16                Cook to G. Carlson, subject: Giant
                  Eagle CSMP Thresholds
17                MCKMDL00628660 - 00628673

18    Exhibit 16  Email chain, 2/23/09, from S. Cook     157
                  to D. Gustin, subject: RE: Giant
19                Eagle CSMP Thresholds
                  MCKMDL00628614 - 00628616
20

      Exhibit 17  Daily HBC Controls report, 10/31/13    160
21                HBC_MDL00002348

22    Exhibit 18  Email chain, 7/30/13, from 1217        166
                  Pharmacy Team Leader to G. Carlson,
23                subject: RE: Oxycodone Threshold
                  HBC_MDL000174163
24


25

6

```
1          * INDEX OF HBC-CARLSON EXHIBITS (Continued) *

2     NO.                     DESCRIPTION              PAGE
      Exhibit 19  Email chain, 9/19/13, from G.
3                 Carlson to A. Lowther, subject: RE:   168
                  Controls at HBC
4                 HBC_MDL00135579 - 00135580

5     Exhibit 20  Email chain, 9/9/13, from G.          168
                  Carlson to K. Remas, subject: RE:
6                 Controls at HBC
                  HBC_MDL00135022 - 00135024
7
8     Exhibit 21  HBC Service Company's Responses to    175
                  Plaintiffs' (First) Set of Combined
9                 Discovery Requests

10    Exhibit 22  Email, 1/22/14, from J. Millward to   176
                  G. Carlson, et al., subject: FW:
11                Wholesale Distributor Questionnaire,
                  attaching Qualitest Wholesale
12                Distributor/Chain Distribution
                  Center Questionnaire
13                HBC_MDL00135570 - 00135574

14    Exhibit 23  Giant Eagle Pharmacy Fiscal Year      187
                  2015 AOP/Business Plan, 6/24/14
15                HBC_MDL00034115 - 00034149

16    Exhibit 24  Giant Eagle Inventory Control -       191
                  Suspicious Order Policies with
                  various effective dates
17                HBC_MDL00078638 - 00078639
                  HBC_MDL00004386 - 00004387
18                HBC_MDL00045916 - 00078918
                  HBC_MDL00051908
19                HBC_MDL00043414
                  HBC_MDL00010092 - 00010093
20

21    Exhibit 25  2009-2014 Hydrocodone Dosage Unit     209
                  Distribution to Giant Eagle
22                Pharmacies in Cuyahoga County,
                  Summit County, and all of Ohio
23                P-HBC-0017

24                         - - - -

25
```

7

```
 1                    P R O C E E D I N G S

 2                         - - - -

 3            MR. ROTTINGHAUS:  We are now on the

 4       record.  My name is Frank Stanek.  I'm the

 5       videographer for Golkow Litigation Services.

 6       Today's date is January 8, 2019, and the time is

 7       9:06 a.m.

 8            This video deposition is being held in

 9       Pittsburgh, Pennsylvania, In Re: National

10       Prescription Opiate Litigation, for the United

11       States District Court, for the Northern District

12       of Ohio, Eastern Division.

13            The deponent is Greg Carlson.

14            Will counsel please identify themselves.

15            MR. ROTTINGHAUS:  Tom Rottinghaus on

16       behalf of plaintiff.

17            MS. BOURIAT:  Jennifer Bouriat on behalf

18       of Cardinal.

19            MS. CHARLES:  Amber Charles on behalf of

20       McKesson.

21            MR. KOBRIN:  Josh Kobrin, Marcus &

22       Shapira, on behalf of HBC Service Company.

23            MR. WETZEL:  Jeffrey Wetzel for

24       Mr. Carlson personally.

25            MR. BARNES:  Robert Barnes, Marcus &
```

8

1    Shapira, for Mr. Carlson.

2              MR. ROTTINGHAUS:  Then do we have

3    anybody participating by telephone?

4              MR. MARKHAM:  Chris Markham on behalf of

5    Walmart.

6              MS. RUSSO:  Shana Russo on behalf of

7    Amerisource Bergen Drug Corporation, of Reed

8    Smith.

9              MS. GUTHRIE:  Erica Guthrie of Arnold &

10   Porter on behalf of the Endo and Par defendants.

11                   GREGORY CARLSON,

12        having been first duly sworn, was examined

13              and testified as follows:

14                      EXAMINATION

15   BY MR. ROTTINGHAUS:

16       Q.   Good morning, Mr. Carlson.

17       A.   Good morning.

18       Q.   My name is Tom Rottinghaus.  We met

19   right before the deposition; correct?

20       A.   Yes.

21       Q.   Thank you for coming here today.  You

22   understand you are here to give a deposition in a

23   case involving your involvement, I guess, at Giant

24   Eagle and HBC warehouse between, as I understand

25   it, 2007 and 2016?

1       A.   Yes.

2       Q.   I'm going to be asking you a series of

3    questions today about your involvement or your

4    capacity in those institutions.  There are going

5    to be several documents we're going to talk about

6    as well.  I've taken the liberty of marking a few

7    documents that we will be talking about that I

8    think you have in front of you.

9       You understand you've just taken an oath to

10   tell the truth?

11      A.   Yes.

12      Q.   And this is the same type of testimony

13   you would give as if you were in a courtroom;

14   correct?

15      A.   Yes.

16      Q.   It's my understanding you may not be

17   able to be present at the time of trial, so you

18   understand that this testimony you give today is

19   being videotaped and may be played for a jury at

20   the time of trial if you are not available to be

21   there in person?

22      A.   Yes.

23      Q.   It's going to be very important for me

24   to make sure that you and I understand each other

25   today.  If I ask you any questions that you don't

1    understand, I want you to please stop me, let me

2    know you don't understand it, and I'll do my best

3    to rephrase that question.  Okay?

4         A.   Okay.

5         Q.   Similarly, it won't be my intention to

6    interrupt you before you finish an answer.

7    However, if I do so unintentionally, please let me

8    know you have not finished your answer.  We'll

9    stop.  We'll give you a chance to finish your

10   answer.  Okay?

11        A.   Okay.

12        Q.   You're doing a great job of audiblizing

13   you answers.  One thing I may ask you to do at

14   times is to give an audible answer because

15   sometimes in conversations, we just nod our heads

16   or say "uh-huh" or "huh-uhn," but I may need to

17   ask you to give me a "yes" or "no" answer at

18   times.  Okay?

19        A.   Okay.

20        Q.   I don't intend to be rude to you if I do

21   that.  It's just that we need to have a clear

22   record.  Okay?

23        A.   Okay.

24        Q.   It's my understanding you at this time,

25   point in time, no longer work for the Giant Eagle

1    HBC system; is that correct?

2        A.   Correct.

3        Q.   However, you are here with counsel for

4    HBC; is that correct?

5        A.   Correct.

6        Q.   Now, I don't get to find out and I'm not

7    asking you what you have talked with counsel about

8    in preparation for this deposition, but I would

9    like to know or get a general understanding of

10   what you have reviewed irrespective of

11   correspondence from your counsel in preparation

12   for the deposition.

13       For instance, I'm wondering if you've looked

14   at prior emails from your time at the company or

15   any other documents.

16       A.   I have.

17       Q.   Let's kind of break it down.  First of

18   all, you've had some time to prepare to give your

19   testimony today; correct?

20       A.   Yes.

21       Q.   And I'm assuming that in preparation for

22   your testimony, you did want to look at some

23   documents that went back to the timeframe in which

24   you were involved at HBC?

25       A.   Yes.

1       Q.   And you had a chance to do that?

2       A.   Yes.

3       Q.   I suspect that some of those documents

4   we will be talking about today.  It won't be my

5   intention to put anything in front of you that's

6   not, to the best of my understanding, a genuine

7   document that was given to us by the company.  But

8   if at any point in time you don't understand what

9   a document is or you need to take a few more

10  minutes to look at it, you let us and we'll give

11  you a chance to do that.  Okay?

12      A.   Okay.

13      Q.   Can you give us an approximation as to

14  how much time in terms of hours you have spent

15  getting ready for this testimony today?

16      A.   I would say roughly eight hours.

17      Q.   I don't get to hear what you talked

18  about.  But you obviously had a chance to talk to

19  your attorney and meet with your attorney?

20      A.   Uh-huh.

21      Q.   "Yes"?

22      A.   Yes.  I met with the attorneys.

23      Q.   And have you also had the opportunity or

24  taken time to try to speak to anyone who is still

25  at Giant Eagle with respect to any questions or

13

1    thoughts you may have had as you got ready for the

2    deposition?

3        A.    I've not spoken with anybody at Giant

4    Eagle about the deposition.

5        Q.    And I know sometimes they're thought of

6    interchangeably, but the same question with

7    respect to anyone who worked at the HBC warehouse,

8    have you spoken to them in preparation for this

9    deposition?

10       A.    Not in preparation for this deposition.

11            (HBC-Carlson Exhibit 1 was marked.)

12   BY MR. ROTTINGHAUS:

13       Q.    Let's take a look for a minute at

14   Exhibit 1, which I have passed out to your counsel

15   as well.  I will represent to you that this was

16   not given to me by the company, but I actually

17   went to LinkedIn, a source that a lot of us use

18   these days; right?

19       A.    Correct.

20       Q.    And I typed in your name, and Exhibit 1

21   is a document that came up.  The first thing I

22   would like to do is make sure that Exhibit 1 --

23   and, if we could, I might ask if we can split the

24   page so we can get the second page of Exhibit 1 on

25   the screen as well for you.  It may be on the

14

1    screen right in front of you.  You can look at the

2    hard copy or any screen you'd like to look at.

3    They should all be the same thing.

4        Take a minute, if you need to, to look at

5    this, but does Exhibit 1 appear to you to be a

6    document that indeed reflects you, Greg Carlson,

7    personally and some of the background you have had

8    in various capacities in your career?

9        A.   Yes.

10       Q.   Is Exhibit 1, to the best of your

11   knowledge, a document you prepared and then in

12   some way uploaded or submitted to LinkedIn?

13       A.   Yes.

14       Q.   Tell us a little bit about what LinkedIn

15   is.

16       A.   LinkedIn, I guess it would be considered

17   a social media site but more geared towards

18   business, businesspeople and ways to connect with

19   them, find other people at other companies.  I

20   just kind of look at it more as a social media

21   source.

22       Q.   Some of us probably still refer to

23   documents with our background as r sum s.  And in

24   some ways, does the LinkedIn social media site

25   allow you to submit your r sum  or your past work

1  experience?

2      A.   Yes.  Most people kind of lay their page

3  out as a r sum , which is kind of how mine is laid

4  out.

5      Q.   Do you recall how long ago you prepared

6  Exhibit 1?

7      A.   Laying it out -- I've been on LinkedIn

8  for, I would say, over five years, probably closer

9  to ten.  I'm not sure exactly when.  And I've made

10  edits along the way.  The most recent formatting

11  was probably -- I added the UPMC position.  So it

12  was probably right around that time when I made

13  the most recent adjustment.

14      Q.   In looking at the first page of

15  Exhibit 1, under experience for UPMC, I believe it

16  says from March 2017 to the present, and then it

17  says one year, 11 months.

18      So it would appear to reflect at least from

19  the time you last put information in here up to

20  the present day; is that correct?

21      A.   Correct.

22      Q.   And is it correct that you still do hold

23  the title of director of pharmacy MTM services at

24  UPMC Health Plan?

25      A.   Yes.

1        Q.    Do you work in the Pittsburgh area?

2        A.    Yes.  I work in downtown Pittsburgh.

3        Q.    If we could go to the second page of

4    this document, I'm going to start where it says

5    Director of Pharmacy Sourcing.  Actually, forgive

6    me.  I'm going to go kind of towards the bottom.

7        First of all, the education section, it

8    appears that you obtained your Pharm.D. degree in

9    1998?

10        A.    Yes.

11        Q.    And then from 1998 until 2007, tell us

12    what you did.

13        A.    So in 1998 -- actually, in '97 I

14    received my bachelor's degree in pharmacy.  So I

15    was a pharmacist, went on for another year.  So

16    from '97 I worked as a pharmacist for Osco Drug in

17    Chicago, part of the Jewel-Osco chain, as a staff

18    pharmacist.

19        And in 1999 I moved to Pittsburgh.  I think

20    the end of March of 1999 moved to Pittsburgh and

21    started working with Giant Eagle at that point in

22    time as a pharmacist in the stores, in a role that

23    they called floater pharmacist where you would

24    work at any store that needed help covering

25    vacation times, maternity leaves, anything like

1    that.  So I kind of worked all through the south

2    region of Pittsburgh as a pharmacist.

3         Q.   To make sure I understand, that would be

4    in the retail Giant Eagle stores if someone came

5    to the pharmacy with a prescription or needed one

6    filled, you would be the person we usually refer

7    to as the pharmacist in the store?

8         A.   Correct.  And in 2000 I started a role

9    as pharmaceutical care coordinator -- it's more of

10   a clinical role -- out of the stores, office

11   based, corporate office based, and would go out

12   and visit with patients at their store that they

13   shopped at to review their medications.

14        So it was more of a sit-down typically in the

15   cafeteria area of the store, and we would review

16   their medications, looking for any kind of drug

17   interactions, drugs they don't need, making

18   recommendations to the physician based on their

19   profile and educate them on their disease states.

20        So I did that for roughly about a year or so.

21   At that point, there was a position open for

22   manager of pharmacy services, and that role -- I

23   applied for that role, and I got it.  It was a

24   promotion.  And that role consisted of

25   manufacturer relations, vendor relations,

18

1   wholesaler relationship, and also dealt with

2   marketing and other just tasks at corporate level.

3        Q.   Do you recall what year you took that

4   position?

5        A.   2001.  At some point in 2001 is when I

6   started that role and was in that role until the

7   one that is listed on LinkedIn as district leader,

8   pharmacy district leader.  At the time I was in

9   that role, it was called pharmacy specialist.

10  It's the same thing as the pharmacy district

11  leader today.

12       Q.   When you had the position as pharmacy

13  specialist, which is now known as pharmacy

14  district leader, did you work in the corporate

15  office?

16       A.   It was more on the road based.  So I

17  covered a region.  So I was responsible for

18  anywhere from 25 to 35 stores at any given time.

19  So I was assigned a region and was responsible for

20  all the operations of the pharmacies for those

21  stores.

22       Q.   Did you at any point in time have a

23  region of Ohio as part of your region?

24       A.   No.  I never covered any Ohio stores.

25       Q.   And from 2001 to 2007, you held that

19

1    title?

2        A.   2005 to 2007 I was the pharmacy district

3    leader.  So I was the manager of pharmacy services

4    from 2001 to 2005.

5        Q.   And then on Exhibit 1, where pharmacy

6    district leader is listed from September 2005 to

7    March 2007, there appear to be about five bullet

8    point summaries of what your position entailed.

9        A.   Yes.

10       Q.   Is that correct?  You don't have to go

11   through this in any particular order, but, again,

12   I'm particularly interested in what you were doing

13   in terms of monitoring pharmacy practices at that

14   point in time.

15       A.   Well, we would do inspections of the

16   pharmacies on a regular basis.  We'd come in and

17   we had a checklist, and we would go through that

18   to make sure that the pharmacies were following

19   proper procedure, all their paperwork was in line,

20   the record keeping was in line.

21           We would monitor the stores' sales, their

22   labor spend and look at all of that, and we'd

23   review that with the pharmacy leader at that

24   store.

25       Q.   You mentioned that you would use a

1   checklist.  Is that something you prepared or was

2   that something that was prepared at corporate?

3       A.   There was a corporate checklist that you

4   would follow.

5       Q.   This may sound like a silly question,

6   but why does it make sense to have a checklist

7   when you're going to various stores and going

8   through --

9       A.   It just gave you something to, you

10  know -- it created a routine for you to do.

11      Q.   Created a routine for you as the PDL or

12  the pharmacy rep at that time?

13      A.   Yeah, yes.

14      Q.   And also for the pharmacies to

15  understand what the expectations were for them as

16  well?

17      A.   Yes.

18      Q.   And that's typical in most businesses;

19  is that correct?

20      A.   Yes.

21      Q.   And then you, I think, mentioned that

22  you wanted to make sure they were up to date and

23  correctly doing their record keeping.

24      A.   Yes.

25      Q.   In a pharmacy it's important to keep

1    accurate records?

2        A.   Yes.

3        Q.   Why is that?

4        A.   Well, certain requirements are in place

5    for state and federal laws.  So I was just

6    checking in on that.

7        Q.   And then you mentioned, I think, that

8    along the checklist, you wanted to check and make

9    sure they were following proper procedures.

10        A.   Yes.  We would look at things like their

11    workflow, how they were set up, were they

12    following what we recommended for the workflow of

13    the store.  We would monitor the lines, how long

14    were the lines.  It could indicate whether or not

15    they were following proper workflow procedures.

16    It was a multitude of things.

17        Q.   Again, we don't need to get into the

18    details of them.  But these workflow procedures

19    you're talking about, I assume those were

20    procedures that were somewhere written in writing

21    to give guidance to your pharmacists?

22        A.   I'm not certain.  I can't remember as

23    far as what was in writing or not back in the 2005

24    timeframe.  I can't really answer that one.

25        Q.   Was it -- and if you can't tell us,

1   that's fine.  Was it your experience that when you

2   worked with Giant Eagle, there were indeed some

3   policies that the company expected their

4   pharmacists to follow?

5        A.   Yes.

6        Q.   And some of those policies were actually

7   written in writing to give guidance to the

8   pharmacists?

9        A.   Yes.

10        Q.   And not only for the pharmacists, but

11   it's your understanding and memory at the time

12   that there were also policies or procedures, if

13   that's what you would prefer to call them, that

14   were in writing that dealt not only with pharmacy

15   services, but other aspects of the company as

16   well?

17        A.   Yes.  There were many policies in place

18   across the whole organization.

19        Q.   That's been consistent with your entire

20   career.  You've seen companies that have policies

21   in place; correct?

22        A.   Yes.

23        Q.   And policies help provide guidance to

24   employees of the company?

25        A.   Generally, yes.  There's policies.  We

1   have procedures.  We have guidelines.  So there's

2   different classifications of what I would kind of

3   consider a policy versus a guideline.

4       Q.   Sure.  How do you differentiate between

5   a policy and a guideline?

6       A.   Policies tend to be more HR driven.  You

7   know, they're meant from an HR perspective to be

8   utilized versus guidelines.  Within the profession

9   of pharmacy, you provide guidelines to the

10  pharmacists on how we would like them to operate.

11  But there are, you know, professional judgment

12  that will kind of supersede some of that.

13      Q.   Because any pharmacist who practices may

14  have gone to school for a long time and learned a

15  lot of information to help them develop expertise

16  as a pharmacist?

17      A.   Yes.

18          MR. BARNES:  Object to the form to the

19  extent you're asking him to speculate as to any

20  pharmacist.

21  BY MR. ROTTINGHAUS:

22      Q.   I don't want you to speculate.  We'll

23  focus on what you know.  It's your understanding

24  you personally went to school for a long time to

25  earn the degree that you have in pharmacy;

1      correct?

2          A.   Yes.

3          Q.   And it's hard work?

4          A.   It wasn't easy.

5          Q.   Any pharmacist, as you said I think, is

6      expected to use clinical judgment at times when

7      they practices as a pharmacist.

8          A.   Yes.

9          Q.   However, I think you also said that

10     there are times where guidelines might be written.

11     They could be procedures.  And you correct me if

12     I'm wrong, but guidelines might be written to

13     allow a pharmacist who is using his or her

14     professional judgment to also understand what some

15     basic expectations are for any particular

16     scenario?

17              MR. BARNES:  Object to form.

18              THE WITNESS:  I would just need more

19     specific on the question.

20     BY MR. ROTTINGHAUS:

21         Q.   Well, you tell me what type of

22     guidelines you remember being in place for

23     pharmacists between 2005 and 2007.

24              MR. BARNES:  Tom, I'd just remind you

25     that HBC didn't distribute any controlled

1    substance before November 2009.

2            MR. ROTTINGHAUS:  I'm just trying to

3    build a little foundation.  I understand the

4    objection.

5            THE WITNESS:  I can't recall.  I mean,

6    over the years I was with Giant Eagle, I know we

7    had different procedures in place.  This year

8    particular, I couldn't tell you what exactly was

9    in place.  It's a very difficult question to

10   answer looking back that far.

11   BY MR. ROTTINGHAUS:

12       Q.   Now, you just used the term procedures,

13   and I really want to just make sure we're on the

14   same page with what we're talking about.

15       I think you mentioned that you consider

16   policies to typically be HR, which I assume you

17   mean human resources, driven.

18       A.   Yes.

19       Q.   Then you mentioned procedures and

20   guidelines.  Do you differentiate between

21   procedures and guidelines?

22       A.   I mean, they're similar.  I mean, some

23   documents may call it one thing, one may call it

24   another.

25       Q.   In your role as pharmacy district leader

```
 1    up through March of 2007, and, again, when we talk

 2    about part of your role being monitor of pharmacy

 3    practices, in any way did you have responsibility

 4    to review any written practices, whether they be

 5    called policies, procedures or guidelines, that

 6    were in writing for the pharmacists at that point

 7    in time?

 8               MR. BARNES:  Object to the form.  Lack

 9    of relevance.

10               THE WITNESS:  Can you ask the question

11    again?

12    BY MR. ROTTINGHAUS:

13         Q.   Sure.  It may help if I just make sure

14    we know where we're looking.  I'm still looking on

15    Exhibit 1 in your role as pharmacy district leader

16    from September 2005 to March of 2007.

17         A.   Yes.

18         Q.   And I'm looking at the last I'll call it

19    bullet point where it says, "Visit pharmacies

20    within region regularly to monitor pharmacy

21    practices."  I just want to make sure I completely

22    understand.

23         When you talk about monitoring the pharmacy

24    practices, I think you mentioned that you would go

25    over record keeping, that you would have a
```

27

1    checklist or go through checklists with the

2    pharmacy teams; is that correct?

3        A.    Yeah.  That's a very generic term.  It

4    was just in there basically to say I would

5    oversee -- make sure they're following the process

6    that we want them to, their customer service is up

7    to par, their quality is up to par.  So that

8    encompasses really everything under pharmacy

9    practices.

10       Q.    And during that timeframe, were you also

11   in any way responsible for reviewing written

12   policies, procedures or guidelines that existed

13   for the pharmacies?

14              MR. BARNES:  Same objection.

15              THE WITNESS:  When you say review, do

16   you mean read?  Because, I mean, reading, yes.

17   Formulating at this time, no.

18   BY MR. ROTTINGHAUS:

19       Q.    That's a good point.  It's my

20   understanding you were not responsible all the way

21   up to 2007 for formulating any policies,

22   procedures or guidelines.

23       A.    Correct, in that position.

24       Q.    However, I think what you're saying is

25   you may have at times reviewed certain written

```
 1    policies, procedures or guidelines, but sitting

 2    here today, you couldn't tell us exactly what you

 3    did?

 4         A.   No.

 5         Q.   And sitting here today, is it fair to

 6    say that you can't really even recall what

 7    specific policies, procedures or guidelines were

 8    in writing up through March of 2007 for Giant

 9    Eagle?

10              MR. BARNES:  Same objection.

11              THE WITNESS:  Yeah.  I couldn't tell you

12    specific policies from 2005 or through 2007.

13    BY MR. ROTTINGHAUS:

14         Q.   We're going to jump forward here in just

15    a second to your new position you took in April of

16    2007.

17         Do you feel like we have covered all of the

18    responsibilities and duties you fulfilled for

19    Giant Eagle as a pharmacy district leader from

20    September 2005 through March 2007 just generally?

21              MR. BARNES:  Are you saying in addition

22    to what's written on his LinkedIn profile?

23              MR. ROTTINGHAUS:  Yeah.

24    BY MR. ROTTINGHAUS:

25         Q.   I mean, obviously, we're looking at your
```

29

```
 1    LinkedIn profile.  I'm not asking for details.  I
 2    understand it was several years ago and you
 3    probably don't remember every detail of every day,
 4    and I certainly don't expect that.
 5         A.   Yeah.  I mean, generally speaking, yes,
 6    there were other things that would pop up day to
 7    day.  If anything happened at the store, it was
 8    something I had to deal with.
 9         Q.   And correct me if I'm wrong.  I think
10    you said there were maybe, give or take, but
11    around 25 to 35 stores you were responsible for
12    during that timeframe?
13         A.   Yes.
14         Q.   Were they in the greater Pittsburgh
15    area?
16         A.   Most of them were in the southern region
17    of Pittsburgh, and that actually extended down to
18    Morgantown, West Virginia.  But then there were
19    times where I would cover other regions if there
20    was a leave of absence.  I do recall one time I
21    had the Beaver Valley area.  But it was generally
22    around the Pittsburgh market.
23         Q.   It's my understanding that Giant Eagle
24    during the timeframe when you worked there had
25    pharmacies in five different states.
```

30

 1       A.   Yeah, up to five at the time I worked

 2   there.

 3       Q.   Pennsylvania?

 4       A.   Ohio, West Virginia, Maryland and

 5   Indiana.

 6       Q.   During this timeframe we've been talking

 7   about, 2005 to 2007, you were primarily covering

 8   stores in Pennsylvania but maybe some stores in

 9   West Virginia?

10       A.   Yeah, West Virginia as well.

11       Q.   Any other states?

12       A.   No.

13       Q.   Let's move right above this area to your

14   title of director of pharmacy sourcing from

15   April 2007 to April 2012.  If it's hard to read on

16   that hard copy, again, it's on the screen if

17   that's helpful to you.

18       I see that you have also kind of listed some

19   bullet points that give a general summary for what

20   you did during that timeframe.

21       A.   Yes.

22       Q.   If you can just in your own words

23   describe for us what your position entailed as

24   director of pharmacy sourcing from April of 2007

25   to April of 2012.

1      A.    In that role, the primary role was to

2   find cost savings through sourcing.  So it was

3   including anything that the pharmacy would

4   purchase.  It could include supplies such as bags,

5   vials, anything like that, or medications.  So it

6   could be through our wholesaler contract.  There

7   was pricing established within each contract.  So

8   I was involved in those negotiations as well as

9   finding any other ways to save money on any

10  product.

11     Q.    I see that -- first of all, the point

12  you mentioned that you negotiated the wholesaler

13  contract to save $16 million annually, was that as

14  part of a team, or was that just you individually

15  who was involved in that negotiation?

16     A.    There were people involved other than

17  myself.  I was kind of like the point person, but

18  we did have a team working on that.

19     Q.    Do you recall whether that contract

20  entailed, among other things, controlled

21  substances?

22     A.    With the wholesaler we were purchasing

23  controlled substances.  So it would entail that,

24  nothing broken out specifically for that.

25     Q.    We're going to be talking about

1    controlled substances at various times obviously

2    today.  Specifically, I'm going to be talking

3    about hydrocodone combination products.  Is that a

4    term that's familiar with you?

5         A.   Yes.

6         Q.   Sometimes they're referred to, I think,

7    as HCPs for short; is that correct?

8         A.   Yeah.  I mean, I never referred to it

9    that way, but I guess you could go there.

10        Q.   I'll try not to use that term.  If I do,

11   feel free to remind me you don't know what I'm

12   talking about.  But I'm probably going to be --

13        A.   HCP meaning hydrocodone combination

14   products?

15        Q.   Yes, or combination products.

16        A.   Combination products.  Okay.

17        Q.   I think it's probably the same thing

18   we're talking about.

19        In April 2007 when you negotiated this

20   wholesaler contract, do you know whether that also

21   entailed hydrocodone combination products?

22        A.   It would have been included in the

23   general pricing structure.

24        Q.   I should have told you.  You probably

25   know this.  At times people may have a concern

33

1    about a question I ask, and it may be well

2    founded, but nobody is trying to interrupt us, but

3    I'll try to let them finish their objection.  If

4    you can, let them try to get their objection in as

5    well.

6         A.    Okay.

7         Q.    I see in the second bullet you state

8    that you at that time at least, it says, opened

9    generic prescription drug warehouse for pharmacy

10   with estimated annual savings of over $20 million

11   by purchasing direct from the manufacturer.

12        I'm assuming, and I could be incorrect, but

13   I'm assuming this is the HBC warehouse.

14        A.    Yes.  That would be the HBC warehouse.

15        Q.    Were you involved in starting that

16   warehouse from the ground up?

17        A.    Yes.

18        Q.    Who else at the company was involved?

19        A.    Well, there were several people

20   involved.  It was kind of a team project to get it

21   up and running.

22        MR. BARNES:  Excuse me.  Tom, for

23   clarification, you mean as a brand new warehouse

24   opening for the first time and doing any business

25   whatsoever or just with respect to

34

 1   pharmaceuticals?

 2            MR. ROTTINGHAUS:  That's a good

 3   question.  Let's clarify.

 4   BY MR. ROTTINGHAUS:

 5        Q.   When did HBC warehouse open, not just

 6   with respect to controlled substances or

 7   pharmaceuticals, but when did that warehouse open

 8   up?

 9        A.   I don't know the specific dates.  It

10   goes back.  It predates me.  We purchased actually

11   FoxMeyer.  My understanding, it was a FoxMeyer

12   warehouse that McKesson acquired.  And we ran it

13   from there as HBC at that point.  I think that was

14   pre-2000.  I don't have specific dates.

15        So I know HBC had been operating for a while

16   before.  All we did -- when I say open generic

17   warehouses, we isolated a spot within the

18   warehouse, secured it and utilized that.  It was

19   just an add-on to the warehouse.

20        Q.   And when you say secured it, you're

21   talking about putting security controls in place

22   because, among other things, some of the

23   medications that were going to be coming into and

24   out of that warehouse were controlled substances?

25        A.   Not at this time.  When we opened it, it

1    was really finding a location that was isolated

2    because even prescription drugs need to be

3    isolated securely, whether it's Amoxicillin or

4    Simvastatin, cholesterol medications.  So it was

5    really just finding a location that had secure

6    walls, doors, that we could have security access

7    to so we knew who was going to go in that specific

8    room.  At the time we opened, that was our

9    thought.

10       Q.   Do you recall when HBC first started

11   distributing hydrocodone combination products?

12       A.   I believe, from recollection, it was

13   2009.  It was towards the end of 2009.  So it was

14   either the end of 2009 or early 2010 after we

15   received our DEA license.

16       Q.   And then it continued to do so until

17   2014 as I understand it.

18       A.   Correct.

19       Q.   So when you were first involved in

20   starting the HBC warehouse, it predated the DEA

21   license to distribute hydrocodone combination

22   products, among other things?

23       A.   Yes.

24       Q.   Let's go to that last bullet under your

25   title of director of pharmacy sourcing from 2007

36

1    to 2012.  It states that you negotiated with brand

2    drug manufacturers to secure funding for

3    pharmacist education, in-store promotions and

4    patient compliance programs.

5         Do you remember what patient compliance

6    programs you were involved in?

7         A.   I'm trying to remember.  It probably

8    didn't happen that much in that timeframe.  That

9    was more we would do medication adherence letters.

10   We call them refill reminder letters.  That was

11   probably more towards the manager pharmacy

12   services role.  That bullet may be a little bit

13   misplaced there as far as that goes.

14        The only compliance programs were we would

15   send letters on behalf of -- the manufacturers

16   would help, you know, fund the cost of the letter

17   going out, but it was really for the patients'

18   behalf.  It was typically like maintenance

19   medications, like a cholesterol medication,

20   something like that.

21   ████████████████████████████████████████████

22   ████████████████████████████████████████

23   ████████████████████████████████████████

24   ██████████████████

25   ████████████████████████████████████████





39



20 Q. Did you personally go into the HBC

21 warehouse physically on a regular basis between

22 2007 and 2012?

23 A. I visited I couldn't say regularly.  I

24 couldn't answer specifically, but I definitely

25 would visit from time to time.

40

1       Q.   When you went to work each day, you

2  weren't going into that warehouse every day?

3       A.   No.

4       Q.   Are you able to tell us approximately

5  how many times you visited the HBC warehouse

6  during your entire tenure with the Giant Eagle

7  company?

8            MR. BARNES:  Object to form to the

9  extent it asks for anything prior to 2009.

10            THE WITNESS:  I can't give you a number,

11  an accurate number.  I probably couldn't even

12  estimate it at this point.

13  BY MR. ROTTINGHAUS:

14       Q.   Let's focus between 2009 and 2014.  Do

15  you think you visited the HBC warehouse on at

16  least a yearly basis one time a year?

17       A.   I would say a yearly basis, yes.

18       Q.   What would be the purpose for going

19  physically to the warehouse?

20       A.   Sometimes it was just to meet with the

21  team there to see how things were going, to see if

22  anything needed to be changed.  Anything could

23  have come up as far as do we need additional

24  shelving, do we need new shelving, are we going to

25  try new processes at the warehouse and they wanted

1   to either show us or talk to us about it.

2       So it could have been any kind of meeting

3   such as that.

4       Q.  Do you remember any particular

5   individuals who you considered to be a part of the

6   team at HBC warehouse?

7       A.   Yes.  I do recall some folks there that

8   were -- that I would just talk to on a regular

9   basis.  Andy Zalewski was early on one of the team

10  members I would talk to.  I don't remember when he

11  left.  Christy Hart was one of the main people

12  there, too, that I would talk to.  And then Walt

13  Durr and Matt Rogos.  At another point in time,

14  Matt Rogos was another individual.

15      Q.  Do you remember between 2009 and 2014

16  what Walter Durr's title was for HBC?

17      A.   I don't know specifically during that

18  time because I know Walt had moved.  There were

19  some changes in the wholesale or the warehouse

20  level team members where they -- I know Walt got

21  additional responsibilities at one point in time.

22  So I don't remember at that time what Walt's

23  position was.  I'm assuming he was in charge of

24  HBC, but I can't answer that accurately.

25      Q.   What about Mr. Rogos, do you remember

42

1    what he did at HBC?

2        A.    There was a point in time where he came

3    in after Andy left.  Again, timeline-wise, I'm a

4    little fuzzy on when Matt was there.  So he was in

5    charge of the facility at one point in time, the

6    HBC facility.  And then, you know, Christy kind of

7    reported to him.

8        Q.    I understand Giant Eagle was a big

9    company, and it looks like you wore different hats

10   for the company, for lack of a better term, at

11   different points in time.

12       I'm not trying to make you an expert in

13   something you don't feel like you have the

14   expertise to tell us about.  So if I ask you

15   questions about HBC or some aspect of HBC that you

16   don't feel like you're the right person to answer

17   it, I respect that.  Just let us know.

18       A.    Okay.

19       Q.    Having said that, I'm going to ask you

20   some questions to see if you do know.

21       Between 2009 and 2014, do you believe you

22   were the person who overall oversaw operations at

23   HBC?

24       A.    I did not oversee operations at HBC.

25       Q.    At any point in time all the way up to

43

1    2016, do you believe you were the person who

2    oversaw operations at HBC?

3        A.   Not at an operations level, no.

4        Q.   At any level?

5        A.   I was involved with decision making

6    regarding HBC but not from an operational

7    standpoint.

8        Q.   Correct me if I'm wrong, but as I

9    understand it, because you were involved in

10   contracts that were being executed with various

11   vendors or manufacturers, you would have been

12   involved at least indirectly with what HBC had

13   coming into its warehouse and going out of its

14   warehouse?

15       A.   Yes.  As far as product choice, yeah, it

16   would come from me or my team as far as that goes.

17       Q.   But in terms of day-to-day operations,

18   were you the person who someone at HBC would call

19   if they needed supervisory authority to do

20   something?

21       A.   If there was a question regarding

22   something related to the store level, then it

23   could come up through me.

24       Q.   What if it related to HBC as the

25   distributor at that level, were you the person

44

1    someone would contact with a question about, hey,

2    can we distribute this medication to store number

3    whatsoever?

4        A.   There were times where questions would

5    come up about a specific order and it was asked.

6    So they could ask me that question.

7        Q.   I'm trying in my mind to get a better

8    understanding of, for lack of a better term, a

9    chain of command if there was one.  Let me ask you

10   this.  If you can tell me, great.  If you can't,

11   just let me know.

12       Between 2009 and 2012, do you believe there

13   was an individual at Giant Eagle who was in charge

14   and had the ultimate supervisory authority at HBC?

15       A.   Yes.  There was somebody in charge at

16   HBC.

17       Q.   Was it you?

18       A.   From a supervisory perspective?

19       Q.   Yes.

20       A.   No.  I did not do any team member

21   reviews for anybody at HBC.  I wouldn't be

22   involved in disciplining anybody at HBC.  Nobody

23   reported to me from an organizational structure.

24       Q.   You said it better than I asked it.  I

25   appreciate that.

45

1       Who was the individual who would review

2  performance of individuals at HBC?

3       A.   I can't answer that question.  I'm not

4  certain.

5       Q.   With respect to if there was a need to

6  discipline someone at HBC warehouse for any

7  particular reason, do you know who that person

8  would be?

9       A.   It would have gone up through their

10  chain of command at HBC, the org chart at any date

11  in time.  So it would depend on who was in charge

12  of the facility.  Like I said, who was in charge

13  did change a couple times through the years, but I

14  couldn't tell you when or who exactly.  So I think

15  it would have to be -- I don't think I can answer

16  that one for you accurately.

17       Q.   That's fine.  I have to confess to you I

18  don't have an org chart for HBC.  I do have one, I

19  think, for at least as of 2014 for Giant Eagle.

20  And maybe that's the same.

21            (HBC-Carlson Exhibit 2 was marked.)

22  BY MR. ROTTINGHAUS:

23       Q.   That's Exhibit 2, and we'll look at that

24  in a minute, but if you want to look at that to

25  answer any of these questions, you can feel free

1    to do so.  We'll come back to it though.

2         Were you the individual who oversaw HBC's

3    compliance as a distributor of controlled

4    substances between 2009 and 2014?

5         A.   Well, the compliance did fall under me

6    as far as we did have a team looking at compliance

7    also, but, I mean, ultimately, as far as the -- if

8    you want to refer to an exhibit at all.  But at

9    this point in time, compliance would have fallen

10   under me.

11        Q.   Between 2009 and 2014?

12        A.   This is '14, but yes.

13        Q.   And you can feel free to look at an

14   organizational chart if you need to, but I'm not

15   asking you to go off that.  I'm really wanting to

16   know what Mr. Carlson remembers.  If you need to

17   look at that again, that's fine.

18        So let me make sure I understand because

19   compliance is kind of a general term, isn't it?

20        A.   Right.

21        Q.   What does compliance mean to you?

22        A.   Well, following all the rules and

23   regulations put in place, whether it's federal

24   government laws or state laws.

25        Q.   So as I understand it, whatever state a

47

1    warehouse that distributes medications is in, it

2    has to comply with that state's laws?

3         A.   Correct.

4         Q.   And then as you mentioned, there are

5    also often laws at a federal level or regulations

6    at a federal level that must be followed as well?

7         A.   Yes.

8         Q.   And you probably have some familiarity

9    with what's known as the Controlled Substances

10   Act?

11        A.   Yes.

12        Q.   And is it your understanding that the

13   Controlled Substances Act has some requirements

14   that distributors of controlled substances must

15   follow regardless of what state they're practicing

16   in?

17        A.   Yes.

18        Q.   You probably got some of the basic

19   background about the Controlled Substances Act in

20   pharmacy school.

21        A.   Yes.

22        Q.   And then you probably learned some of

23   that on the job as well?

24        A.   Yes.

25        Q.   Have you individually ever attended any

48

1   conferences that, to the best of your

2   understanding, focused primarily on the duties of

3   a distributor of controlled substances to comply

4   with the Controlled Substances Act?

5       A.   I attended many conferences.  I don't

6   recall a specific one regarding that topic.

7       Q.   When we talk about compliance, are you

8   in part referencing the duty of HBC warehouse to

9   comply with the Controlled Substances Act?

10      A.   Yes.









1  ███████████████████████████████

2  ████████████████████████████

3  ███████

4             (HBC-Carlson Exhibit 3 was marked.)

5  BY MR. ROTTINGHAUS:

6         Q.   I have a hard time with that word.

7  Let's refer for a minute to Exhibit 3, but we're

8  going to come back to Exhibit 1.  Okay?

9         A.   Okay.

10        Q.   Let's look at Exhibit 3, which is

11  general number 010.  So that you know,

12  Mr. Carlson, I'm going to reference sometimes

13  general numbers.  It's really just for the person

14  who's putting all of these up on the screen for

15  us.  Okay?

16        Do you have Exhibit 3 in front of you?

17        A.   Yes.

18        Q.   I think this is a portion, not the

19  entirety, of the Code of Federal Regulations

20  dealing with registration of manufacturers,

21  distributors and dispensers of controlled

22  substances, and the specific section that

23  Exhibit 3 references is a section you've probably

24  heard of or referred to before, Section 1301.74.

25        Are you familiar with this section?

1       A.   I'm sure I've read it at some point in

2   time.

3       Q.   Specifically I'd like to direct your

4   attention to subsection (b) of 1301.74.

5            MR. BARNES:  Tom, for the record, I'm

6   going to object to this exhibit as being just one

7   subpart of the security requirement in the Code of

8   Federal Regulations.  Not only have you just taken

9   one part.  You haven't given him the 1301.71 and

10  the other regs of which this is a part of.

11  BY MR. ROTTINGHAUS:

12      Q.   Are you with me?

13      A.   Yes.

14      Q.   I'm going to read subsection (b).  You

15  tell me if I've read it incorrectly.  "The

16  registrant shall design and operate a system to

17  disclose to the registrant suspicious orders of

18  controlled substances.  The registrant shall

19  inform the field division office of the

20  Administration in his area of suspicious orders

21  when discovered by the registrant.  Suspicious

22  orders include orders of unusual size, orders

23  deviating substantially from a normal pattern and

24  orders of unusual frequency."

25          Did I read that correctly?

54

1      A.   Yes.

2      Q.   And have you seen this provision or

3   requirement before?

4      A.   Like I said, I've read this before in

5   the past.  So, yes, I have seen it.



55





























69









73



74



75















82







1   BY MR. ROTTINGHAUS:

2      Q.  Is it ever a good idea to put policies

3   in writing, in your opinion?

4        MR. BARNES:  Same objection.

5        THE WITNESS:  I don't think there's

6   anything wrong with putting a policy in place.

7   BY MR. ROTTINGHAUS:

8      Q.  You think sometimes it's a good idea?

9        MR. BARNES:  Object to form.

10        THE WITNESS:  I think it depends on your

11   organization.  If the organization runs off

12   policies, then that's what they would put

13   together.

14   BY MR. ROTTINGHAUS:

15      Q.  Did HBC run off policies between 2009

16   and 2014?

17      A.  We ran off of procedures.

18      Q.  Some of those procedures were put in

19   writing in the form of a policy; correct?

20      A.  If you could point to one, I can say yes

21   or no.  I don't know.

22      Q.  If you don't know, that's fine.

23      A.  Yeah.  I don't know.

24      Q.  And you don't know sitting here today as

25   the person responsible for making sure the company

86

1    was complying with the Controlled Substances Act

2    between 2009 and 2014 whether HBC had any policies

3    in writing during that timeframe?

4              MR. BARNES:  Object to form.

5              THE WITNESS:  They had procedures in

6    writing.

7    BY MR. ROTTINGHAUS:

8         Q.   Now you're using procedures, not

9    policies.  So I want to make sure I'm not getting

10   confused.

11        A.   It's a definition from a Giant Eagle

12   definition standpoint.  So you can define policies

13   and procedures however you want.  We had

14   procedures documented.

15        When we went to get our DEA license, we had

16   to have procedures documented.  Otherwise, they

17   would not have approved.  The DEA approved our

18   facility to be licensed.  We had to have the

19   required documentation and procedures put together

20   on paper, and we showed them to the DEA officers

21   who came in and inspected the facility prior to

22   using it.  And all of our procedures matched up

23   with the Controlled Substances Act.

24        Q.   And these are in writing?

25        A.   They were in writing.





89





91

























103



















112



113



114

























126







129







132



133









137

1          THE WITNESS:  Can you restate the

2    question?

3    BY MR. ROTTINGHAUS:

4          Q.   Sure.  Let me back it up.  We've been

5    looking at an email from August of '15.  But I'm

6    going to kind of focus a little bit off of that

7    date.

8          From 2009 to 2014, at some point in time, did

9    you become aware that relying on thresholds of

10   shipments of hydrocodone combination products from

11   the HBC warehouse was not sufficient to satisfy

12   the duties of a distributor under the Controlled

13   Substances Act?

14          MR. BARNES:  Object to form.

15          THE WITNESS:  I mean, there's nothing in

16   the regulations, to my knowledge, that

17   specifically say thresholds.  I can't answer that

18   question because my thought process wasn't like

19   that.  Our system didn't only rely on thresholds

20   anyway.  It included other safeguards and

21   measures.  So I would say nothing was new to my

22   knowledge of the process.

23   BY MR. ROTTINGHAUS:

24          Q.   Let's talk about what your system did

25   use.  You said it didn't just rely on thresholds.

1    Tell us what your system did rely on to identify

2    any suspicious orders between 2009 and 2014.

3        A.   We have a number of systems, had a

4    number of systems in place at the time.  Some of

5    those are around general reporting and monitoring

6    movement reports on a daily basis.  Some included

7    safeguards where unusual quantities were caught

8    prior to going out.

9        So if anything was a large order, outside of

10   the norm, it was immediately stopped and red flags

11   were thrown out.  Questions were asked as far as

12   the validity of that order, and it wasn't released

13   until it was investigated.

14       The stores had a process to check in the

15   orders bottle by bottle.  They had other

16   safeguards in place around safe dispensing of

17   controlled substances to the patients, looking for

18   other red flags as far as the dispensing process.

19   So those are some of the things.  I can't recall

20   every piece of it.

21       Q.   I wrote down a couple of things that I

22   want to ask you about in follow-up.

23       First of all, are you talking about the

24   timeframe of 2009 to 2014 when you're referencing

25   these different processes in place?

139

1      A.   Yes.  We always had processes in place

2   from the beginning.  It was mainly modifications

3   along the way to the process.

4      Q.   And these processes as you described

5   them, were they put in place in an attempt to make

6   sure that HBC warehouse was complying with its

7   responsibilities as a distributor under the

8   Controlled Substances Act?

9        MR. BARNES:  Object to form.

10       THE WITNESS:  We were always complying

11   with the rules.  We were trying to make our

12   process better, more efficient.  So it wasn't a

13   matter of are we compliant.  It was a matter of is

14   our process working the most efficient way it can.

15   Examples of that is removing some of the manual

16   components to that, automating it with reporting

17   or other systems.

18   BY MR. ROTTINGHAUS:

19      Q.   Were these processes you've just talked

20   about, monitoring movement reports, managing

21   unusual quantities, stopping them, those processes

22   we were just talking about, were they put in place

23   as part of an effort to design and operate a

24   system to disclose orders of controlled substances

25   that might end up being suspicious orders?

 1           MR. BARNES:  Object to form.

 2           THE WITNESS:  My answer would be that

 3      they were put in place to meet the requirements of

 4      the Act.  So if that's what was in the Act, that's

 5      part of the reason why they were put in place.

 6      BY MR. ROTTINGHAUS:

 7           Q.   When you say the Act, you're talking

 8      about the Controlled Substances Act?

 9           A.   Controlled Substances Act, yes.

10           Q.   Do you know -- well, first of all, let

11      me ask you this with respect to that.  You said

12      monitoring movement reports?

13           A.   Yes.

14           Q.   In preparing for this deposition, have

15      you seen one of those reports?

16           A.   I mean, I saw them years ago, but I have

17      not seen any movement reports in preparation for

18      this.

19           Q.   Are these the reports that are also

20      called daily control reports?

21           A.   I don't believe those were -- I mean, we

22      had -- basically we had buyer reports, for

23      example.  So they were just reports that were

24      printed out daily.  I might have a stack of them

25      on my desk.  It would show you daily movement,

141

1   weekly movement, monthly movement, things like

2   that.

3       Q.   Were you personally tasked with the

4   responsibility to review the daily movement

5   reports to identify any movements of suspicious

6   quantities of substances, or was there some other

7   place to assist you in that?

8           MR. BARNES:  Object to form.

9           THE WITNESS:  There were other systems.

10  I can't remember which reports that would flag

11  certain things.  The one I was speaking of was

12  just a general second level safeguard where I can

13  see if any movements were out of line from

14  previous history.

15      But there were other reports -- I can't think

16  of the names of those reports -- that were out

17  there that would look at movements of therapeutic

18  categories of drugs specifically.

19  BY MR. ROTTINGHAUS:

20      Q.   So you at this point in time, from 2009

21  to 2014, sometime during that timeframe, you

22  became a senior director of pharmacy?

23      A.   Yes.

24      Q.   And when you became the senior director

25  of pharmacy, were you overseeing all 200 something

1    Giant Eagle stores?

2        A.   No, not the stores.  I was overseeing

3    all of corporate functions at that point.  So

4    Anthony Mollica was still in charge of the

5    operations of the stores.  I was responsible for

6    the contract management of any vendors, the

7    managed care side, which is the insurance

8    contracting piece of it kind of rolled up

9    underneath me as well.  So it was more at that

10   level.

11       Q.   And I just want to make sure I

12   understand.  During this timeframe from 2009 to

13   2014, you're telling us that one of the processes

14   in place was you would get a sheet of daily

15   movement of all of your medications, including

16   controlled substances, and you would personally

17   look through that to try to identify any orders

18   that seemed out of the ordinary?

19       A.   We had buyers.

20       Q.   First of all, am I correct in what I

21   said?  If I'm not, just correct me.

22       A.   Oh, no, I mean, I didn't daily look at

23   those reports.  We had buyers in place at that

24   time.  We had a category manager in place at the

25   time.  So they would use that to generate their --

143

```
 1    as part of their reordering process.  So when we
 2    reviewed that, they could also see any out of the
 3    norm patterns in that process.
 4         Q.   And you're saying you're one of the
 5    individuals that was reviewing and tasked and
 6    responsible for reviewing for any out of the norm
 7    patterns?
 8         A.   I didn't.  When you mentioned senior
 9    director of pharmacy, no, I was not reviewing the
10    reports at that time.
11         Q.   And that would have been between 2005 --
12         A.   Right.
13         Q.   I'm sorry.  2007 and 2012.
14         A.   No senior director of pharmacy.
15         Q.   2012 to 2014.
16         A.   Correct.
17         Q.   You were not doing so?
18         A.   I was not reviewing the daily reports
19    back at that point.
20         Q.   Who was reviewing the daily reports at
21    that time, if anyone?
22         A.   Kris Remas would have been reviewing
23    reports as part of -- again, our daily process was
24    to review the reports.
25         Q.   Now, when those reports would get
```









148



1          THE WITNESS:  Not necessarily.

2    BY MR. ROTTINGHAUS:

3          Q.   So you don't think it would be a good

4    idea?

5          A.   I don't think -- looking back, I don't

6    know if it would be a good idea or a bad idea.  We

7    didn't have any issue with it.  We were very good

8    with the process.  Never had any large orders slip

9    through.  So I think the procedure that we had in

10   place was sufficient.

11         Q.   You say you never had any large orders

12   slip through.  What did you consider to be a large

13   order?

14         A.   It depended on the product.  You

15   couldn't make a determination broadly.  It was

16   what's the normal for this.  That would kind of

17   classify as, you know, whatever the

18   classifications are as far as a large order.

19         Q.   You understood that as early as 2008,

20   some companies, some distributors were using

21   thresholds at least to help them identify some

22   orders that might be out of the ordinary?

23              MR. BARNES:  Object to form.  Lack of

24   relevance.

25              THE WITNESS:  Timeline-wise I'm not

1   certain, but I do remember threshold emails coming

2   from McKesson.

3   BY MR. ROTTINGHAUS:

4       Q.   And actually threshold criteria started

5   to get set for HBC as of 2013; is that right?

6       A.   There was a report created, an automated

7   report created at that time.

8       Q.   Whose idea was it to create that report?

9       A.   I'm not sure who came up with the idea,

10   but it was a team that kind of worked on how do we

11   come up with a process to do that.

12       Q.   Why was the team trying to come up with

13   a process to identify thresholds at HBC warehouse?

14       A.   We were trying to enhance and improve

15   our process along the way.

16       Q.   The process of identifying orders that

17   might be in excess of ordinary?

18       A.   It would be targeting not orders

19   specifically.  Thresholds don't catch one order.

20   Thresholds capture patterns of orders.  So one

21   large is not, unless it exceeds the threshold, is

22   not going to be caught by the threshold.

23       Q.   What if it exceeded the threshold, what

24   did you expect to happen?

25       A.   The order would be investigated.

151

1       Q.    How would it be investigated?

2       A.    There would be a number of people that

3   would find out what was going on with that store

4   in particular that would do -- down at the PDL

5   level, district leader level investigating what

6   was going on at that particular store.

7       Q.    So this level started below you where

8   the investigation would start?

9       A.    Below me and the operations department

10  would go and look at what's going on in the store.

11      Q.    That's what I want to understand, is

12  what your system was, who the people were that

13  were eyeing these threshold reports and then

14  reporting to whoever they reported to if there

15  were orders exceeding thresholds and then what due

16  diligence was done.

17      A.    So the overall security efforts of the,

18  you know -- to meet the needs of this particular

19  act or regulation encompassed many different parts

20  of the whole process.  So it would be -- we looked

21  at ourselves as a self distributor.  We had owned

22  the product, and we're basically handing it off to

23  another location within our chain.

24          Unlike a wholesaler, which is selling to a

25  new customer, a different customer, self

152

1    distribution, we knew our customers because they

2    were us.  So we were very familiar with our

3    customers.  We knew exactly what was going on.

4    Each of these prescriptions were dispensed with a

5    valid prescription.  So those were kind of the

6    added security measures that met the needs of the

7    requirement.

8        Q.   Are you able to sit here under oath

9    today and tell us that every one of the

10   prescriptions that HBC warehouse filled were

11   filled with a valid prescription?

12           MR. BARNES:  Object to form.

13           THE WITNESS:  The HBC warehouse filled?

14   BY MR. ROTTINGHAUS:

15       Q.   Yes.

16       A.   You mean the product coming from HBC

17   warehouse?

18       Q.   Yes.

19       A.   I can't state, you know, something like

20   that.

21       Q.   I thought I heard you say that.  I

22   understand that you can't say that.  I'm just

23   wondering -- if you're able to say it, I wonder

24   how.

25       A.   We act under the guise that our process





155







158









162



163



164





166







169





171









175





176



178

















186



187



188











193



194



195





1       A.   No.

2       Q.   You don't think written documentation of

3    an investigation is required or a good idea for a

4    store?

5            MR. BARNES:  Object to form.

6            THE WITNESS:  We followed whatever the

7    requirement of the DEA was in place.  So there was

8    no record keeping requirements as part of the

9    provision.  So it wasn't something that we had

10   done.

11   BY MR. ROTTINGHAUS:

12       Q.   Do you think it's a good idea for a

13   company like HBC to document what steps it's

14   taking to attempt to comply with the law?

15           MR. BARNES:  Object to form.

16           THE WITNESS:  I haven't really thought

17   about it.  I don't have an opinion on that.

18   BY MR. ROTTINGHAUS:

19       Q.   So between 2009 and 2014, you never gave

20   any thought to whether if there is an

21   investigation taking place for an order that's

22   exceeding a threshold limit, we should document in

23   some way what steps we are taking to make sure

24   that it's not a suspicious order?

25       A.   We had tight controls in place that

198

```
 1    followed the full security measures of this, not

 2    just 1301.74, but all of 1301.  So this one small

 3    subset was not our entire process.

 4         So we were very confident and comfortable

 5    that we had one of the best systems in place to

 6    monitor it.

 7         Q.   What were the tight controls in place to

 8    on a daily basis follow up and make sure that any

 9    orders that were deemed to be in excess of

10    thresholds were not suspicious orders before they

11    got shipped?  Tell me about that tight process.

12         A.   So when you say they were suspicious

13    orders --

14         Q.   Nope, I didn't.  Let's listen to my

15    question.  If I did, I apologize.  I didn't mean

16    to.

17         What was this tight process you've just told

18    us about?  Well, let me ask it this way:  Would

19    you agree that in order for this process to be

20    tight, whenever there was an order that exceeded

21    the threshold limits, someone at HBC needed to

22    take some steps to find out why that order was

23    exceeding threshold limits?

24              MR. BARNES:  Object to form.  Calls for

25    speculation.
```

1          THE WITNESS:  You're asking if someone

2     at HBC had to find out if it was a suspicious

3     order based on thresholds?

4     BY MR. ROTTINGHAUS:

5          Q.   Do you believe they should have?

6          MR. BARNES:  HBC or Giant Eagle?

7          MR. ROTTINGHAUS:  HBC.

8          THE WITNESS:  Well, HBC was -- the

9     reporting was all done at corporate level.

10    BY MR. ROTTINGHAUS:

11         Q.   Well, wherever, let me ask you this:  Do

12    you believe that in order to keep a tight process

13    in place -- I think you used the term we had a

14    tight process.

15         A.   Um-hum.

16         Q.   In order to maintain a tight process

17    between 2009 and 2014, don't you agree that it

18    would have been a good idea to document what steps

19    were being taken to follow up on any orders that

20    exceeded thresholds for hydrocodone combination

21    products?

22         MR. BARNES:  Object to form.  Asked and

23    answered.

24         THE WITNESS:  I don't think -- I don't

25    see the benefit of documentation.

200

1    BY MR. ROTTINGHAUS:

2        Q.   Would one benefit of the documentation

3    be the ability to show any regulatory body that

4    HBC did indeed take steps to maintain a system, to

5    implement, design and operate a system to disclose

6    the presence of suspicious orders?

7        A.   When we opened HBC, we received our DEA,

8    we were inspected by the DEA.  They came in.  They

9    looked at all of our security features related to

10   this Controlled Substances Act, looked at all of

11   our processes.

12       Our security, according to them, fit all

13   requirements, all the needed necessary steps.  We

14   were acting upon that.  There was nothing in the

15   provision that said we had to keep documentation

16   for any period of time on any investigation.

17       We did our process.  If there was any

18   suspicion come up, we investigated it thoroughly,

19   made our decision.  And I can't even think of a

20   time where we -- maybe there was a couple, but not

21   that I can recall, an example when there was a

22   suspicious order that we actually defined.  I'm

23   not saying it didn't happen, but I can't recall an

24   example.

25            MR. ROTTINGHAUS:  Object and move to

1    strike as nonresponsive.

2    BY MR. ROTTINGHAUS:

3        Q.   I'm going to ask you a question, and if

4    you can tell me "yes" or "no," I would appreciate

5    it.  And if you can't, that's fine.  Just let me

6    know that you can't.  Okay?

7        A.   Okay.

8        Q.   And then you can explain why you can't.

9        Don't you think it would have been a good

10   idea between 2009 and 2014 for someone at either

11   Giant Eagle or HBC to document any steps that were

12   taken to follow up on any orders that exceeded

13   thresholds and to show what due diligence was done

14   to determine that they were not indeed suspicious

15   orders?

16           MR. BARNES:  Objection.  Asked and

17   answered I think at least twice.

18   BY MR. ROTTINGHAUS:

19       Q.   "Yes" or "no," if you can.  If not --

20       A.   Do I think it would be a good idea?

21       Q.   Yes.

22       A.   No.

23       Q.   If we look at this policy, Exhibit 24,

24   if we can go to the second page of it -- actually,

25   forgive me.  Let's go back to the first page, the





204



205













210



212











217



```
1
2
3
4
5
6
7
8
9
```

10          MR. ROTTINGHAUS:  That's all I have.

11          MR. BARNES:  Then I'll just jump right

12   in.

13          THE VIDEOGRAPHER:  The time is 2:21.

14          (Recess from 2:21 p.m. to 2:27 p.m.)

15          THE VIDEOGRAPHER:  On the record 2:27.

16                    EXAMINATION

17   BY MR. BARNES:

18       Q.   Good afternoon, Mr. Carlson.  I have

19   some follow-up questions.

20       You were asked a lot questions today by

21   plaintiffs' counsel about the so-called suspicious

22   order regulation 1301.74(b).

23       A.   Yes.

24       Q.   But you were never shown the 1301.71,

25   which is the security -- I'll tell you it's the

218

1    security requirement regulation.

2         Are you familiar with that regulation?

3         A.   I have reviewed it before.

4         Q.   That regulation requires applicants and

5    registrants to provide effective controls and

6    procedures to guard against theft and diversion of

7    controlled substances.

8         Does that refresh your recollection?

9         A.   Yes.

10        Q.   Did Giant Eagle in the entire time that

11   you were there meet this regulation?

12            MR. ROTTINGHAUS:  Objection.  Form;

13   insufficient foundation.

14            THE WITNESS:  Yes.

15   BY MR. BARNES:

16   ████████████████████████████████████

17   ██████████████████████████

18   █████████████

19   █████████████████████████████████████

20   █████████████████████

21   ███████████████████████████

22   ████████

23   ████████████████████

24   ███████████

25   ██████████████████████████████████

219



220





221

222

```
 1    did you understand that to include an overall

 2    evaluation of the adequacy of the controls at the

 3    HBC and store levels?

 4         A.   Yes.

 5         Q.   Do you understand that the regulation

 6    that you were shown by plaintiffs' counsel is just

 7    one small aspect of the overall security

 8    requirement?

 9         A.   Correct, yes.

10         Q.   And do you understand that 1301.74

11    requires that HBC operated a system to disclose

12    suspicious orders?

13         A.   Yes.

14         Q.   Did you ever understand it to require

15    any type of formulaic or threshold system?

16         A.   No.

17         Q.   At the warehouse level, I just want to

18    explore what you do understand.  You mentioned

19    cages, things of that nature.

20         Were these control IIIs, IVs, and Vs kept in

21    locked cages?

22         A.   Yes, per the DEA requirements of

23    specifically around the cage.

24         Q.   You said the DEA actually reviewed the

25    HBC security system before it opened and started
```

223

```
 1    distributing control IIIs, IVs, and Vs?

 2         A.   Yes, before they approved our DEA

 3    license.

 4         Q.   And did they come in from time to time

 5    to reaudit and inspect?

 6         A.   Yes.

 7              MR. ROTTINGHAUS:  Objection.  Leading.

 8    BY MR. BARNES:

 9         Q.   At any time, did the DEA ever advise HBC

10    that there was anything lacking in their control

11    system?

12              MR. ROTTINGHAUS:  Objection.

13    Foundation.

14              THE WITNESS:  There was nothing pointed

15    out within our security measures that didn't meet

16    the requirements.

17    BY MR. BARNES:

18         Q.   Did Giant Eagle ever distribute to

19    internet pharmacies?

20         A.   No.

21         Q.   By Giant Eagle I'm including HBC.

22         A.   No, we did not.

23         Q.   But you've also told us that you don't

24    really know the details -- you said the pickers

25    were regulated in terms of access to the cages; is
```

224

1    that right?

2         A.   Yes.

3         Q.   But the detailed procedures of how they

4    actually did their picking and the forms they

5    filled out, that wasn't part of your job?

6         A.   No, it was not.

7         Q.   Were inventories conducted at HBC?

8         A.   Yes.

9         Q.   Regular inventories?

10        A.   Yes.

11        Q.   Was the HBC warehouse overseen by Giant

12   Eagle's internal audit and accounting department?

13             MR. ROTTINGHAUS:  Objection.  Leading.

14             THE WITNESS:  Yes.

15   BY MR. BARNES:

16        Q.   You were asked a lot of questions today

17   about the development of a so-called SOM system in

18   2013 or 2014.  Do you recall that?

19        A.   Yes.

20        Q.   Was that threshold system I'll call it,

21   was that developed because there was any view that

22   the currently existing controls that you describe

23   were viewed as inadequate in any way?

24        A.   No.  They were put together as an

25   enhancement to the current process.

225

1      Q.    And that process, that threshold process

2    began in or about 2013?

3      A.    About per my recollection.

4      Q.    And were enhancements made to that

5    process over time?

6      A.    Yes.

7      Q.    Are you familiar with the CSOS system?

8      A.    Yes.

9      Q.    Is that one of the enhancements?

10     A.    CSOS was a system that just assisted in

11   ordering CII through at the time it was the

12   wholesaler process, but it was -- it helped us --

13   it was an enhancement for ordering CIIs, so from

14   that perspective.

15     Q.    Are you familiar with Supply Logics?

16     A.    Yes.

17     Q.    Was that an enhancement to the threshold

18   system?

19     A.    Yes.

20     Q.    What did Supply Logics allow you to do?

21     A.    Supply Logics had a couple components to

22   it that could allow us to audit and monitor.  So

23   it would -- I can't remember.  I'm trying to

24   visualize what this report looked like, but it

25   would -- it basically would pull out -- allow us

226

1   to evaluate, investigate stores that were -- you

2   know, that stuck out in some fashion.

3       Q.   At the pharmacy level you talked a

4   little bit about some of the controls at that

5   level.

6       I just want to ask you generally.  Were all

7   of the pharmacies staffed by licensed and trained

8   pharmacists?

9       A.   Yes.

10      Q.   Were they staffed by trained

11  technicians?

12      A.   Yes.

13      Q.   Were all of those individuals trained

14  with respect to diversion?

15      A.   There was a component of the training --

16  I don't know specifically, but I know there were

17  some discussions in the training around that.

18      Q.   Were there policies and procedures,

19  written policies and procedures in place at the

20  pharmacy level that assisted the pharmacists and

21  technicians with respect to filling appropriate

22  prescriptions?

23      A.   Yes.

24      Q.   Are you familiar with the DEA pharmacist

25  manual?

227

1           MR. ROTTINGHAUS:  Objection.  Relevance.

2           THE WITNESS:  I may have seen it.  I

3     can't recall.

4     BY MR. BARNES:

5          Q.   Do you recall if that was located at the

6     pharmacies or accessible by the pharmacies?

7          A.   Yeah.  That should have been at each

8     location, I believe.

9          Q.   Did Giant Eagle have controlled

10    substance dispensing guidelines?

11         A.   There were guidelines around controlled

12    substances, yes.

13         Q.   Did it include things like red flags,

14    things to look out for before dispensing and

15    filling a prescription?

16         A.   Yes.

17           MR. ROTTINGHAUS:  Are you talking about

18    at the pharmacy level or HBC level?

19           MR. BARNES:  Pharmacy level.

20    BY MR. BARNES:

21         Q.   Are you familiar with the so-called

22    OARRS system?

23         A.   Yes.

24         Q.   What is that?

25         A.   It's an Ohio system to monitor

228

1    prescription dispensing across the whole state.

2        Q.   Is that something to your knowledge the

3    Giant Eagle pharmacists would access when filling

4    a prescription as necessary?

5        A.   Yes, as required.

6            MR. ROTTINGHAUS:  I didn't want to

7    interrupt.  I'm interposing an objection on

8    relevance grounds.

9    BY MR. BARNES:

10       Q.   Did the pharmacists or do the pharmacies

11   report their transactions to the DEA?  I think you

12   already testified to that concerning the ARCOS

13   system.

14       A.   The ARCOS was one way.  We also reported

15   dispensings through like the OARRS system and all

16   that.  That was done at corporate level, but all

17   that information about the stores came from

18   corporate that was provided.

19       Q.   Did Giant Eagle have written fraud,

20   waste and abuse guidelines and procedures that

21   were at the pharmacies?

22       A.   Yes.

23       Q.   The record keeping at the pharmacies,

24   are you familiar with the term controlled

25   substance boxes that maintain records?

1      A.    Yes.

2      Q.    Is that something when you were a PDL

3   you had to make sure every pharmacy complied with?

4      A.    The boxes either came out like right

5   when I was going onto my other position, the

6   physical boxes that you're talking about.  It

7   was -- I didn't physically do that as a PDL.  I

8   think it came out just as I went on to my next

9   position.

10     Q.    But in your next position, did you learn

11  what those were?

12     A.    Yes.

13     Q.    What were they for generally?

14     A.    Just to kind of keep everything in one

15  place around controlled substances.

16     Q.    Would those include DEA forms, records

17  of invoices and transactions on controlled

18  substances?

19     A.    DEA 222 forms, invoices, anything

20  regarding controlled substances.

21     Q.    At the pharmacy level, were the

22  controlled substances handled any differently than

23  any other drug?

24     A.    Were they handled differently?  Yes.

25     Q.    Were they kept in a secure location?

230

1      A.   Any of the Schedule II were kept in a

2    locked location that only the pharmacist had

3    access to.

4      Q.   And who could fill a controlled

5    substance II level prescription at the pharmacies?

6    Could a tech do it, or was it a pharmacist

7    required?

8           MR. ROTTINGHAUS:  Objection.  Relevance.

9           THE WITNESS:  A pharmacist was required

10    to do that process.

11    BY MR. BARNES:

12      Q.   And how were incoming orders of

13    controlled substances handled?  Were there special

14    procedures for those?

15      A.   Yeah.  We had formalized processes or

16    procedures drawn up on how to receive an order,

17    and it even broke out controlled substances and

18    how to handle those orders specifically.

19      Q.   Were those orders checked against

20    invoices and immediately logged into inventory?

21      A.   Yes.

22      Q.   Were there regular and then perpetual

23    inventories of all controlled substances?

24      A.   Yes.  There were Schedule IIIs through

25    Vs were part of our perpetual.  The CIIs were done

1    in a manual fashion.  So we're talking 2009 to

2    '14.  It became part of the perpetual throughout

3    that time period.

4         Q.    You mentioned monthly narc audits.  Was

5    that for all controlled substances?

6         A.    Yes.

7         Q.    And were there also annual controlled

8    substance inventories on top of the monthly narc

9    audits?

10            MR. ROTTINGHAUS:  Objection.  Leading.

11            THE WITNESS:  I'm sorry.  Say that

12    again.

13    BY MR. BARNES:

14         Q.    In addition to the monthly narc audits,

15    were there regular annual inventories?

16            MR. ROTTINGHAUS:  Same objection.

17            THE WITNESS:  Yeah.  We were required to

18    do an every two-year inventory.  We actually did

19    ours on an annual basis.

20    BY MR. BARNES:

21         Q.    While controlled substance prescriptions

22    were being filled, were there special accounting

23    procedures employed to maintain control over every

24    pill?

25         A.    Yes.

232

```
 1              MR. ROTTINGHAUS:  Objection.  Leading.

 2    BY MR. BARNES:

 3         Q.   Did the Ohio -- not only Ohio, but did

 4    the state Boards of Pharmacy come into the

 5    pharmacies on a random and unannounced basis and

 6    perform surprise inspections on a routine basis?

 7         A.   Yes.

 8         Q.   Were there ever any problems that you

 9    can recall involving controlled substances or

10    opioids?

11         A.   Nothing specific to an inspection

12    regarding those products.

13         Q.   And you were a PDL for a while?

14         A.   Yes.

15         Q.   And you had a region where you regularly

16    visited all your stores?

17         A.   Yes.

18         Q.   Were all of the pharmacies supervised by

19    a PDL in some way?

20         A.   Yes.

21         Q.   And did they regularly visit the store

22    and conduct audits from time to time?

23         A.   Yes.

24         Q.   And did that include controlled

25    substance procedures?
```

1      A.   Yes.

2      Q.   Did the PDL supervise training at the

3 pharmacies?

4      A.   Not directly supervise, but ensure that

5 all team members within that unit were trained.

6      Q.   Did the PDLs work with law enforcement

7 and the Board of Pharmacy to deter diversion and

8 prosecute criminals?

9           MR. ROTTINGHAUS:  Objection.  Leading.

10          THE WITNESS:  Yes.

11 BY MR. BARNES:

12      Q.   Did the PDLs exercise red flag awareness

13 training in the pharmacies?

14      A.   Yes.

15      Q.   Would the PDLs have an opportunity to

16 observe while in these pharmacies suspicious

17 activity, such as long lines out the door, things

18 of that nature?

19      A.   Yes.

20      Q.   And I think you said when you were a

21 PDL, you would assist from time to time with

22 threshold increases if the stores needed them;

23 right?

24      A.   When I was a PDL -- that was after I was

25 a PDL when I was actually having the PDLs do the

234









238





240



241



242









246











251

```
 1                      RE-EXAMINATION
 2    BY MR. BARNES:
 3        Q.   Just one follow-up question.  After the
 4    threshold daily report was instituted in or about
 5    October of '13, did it reveal anything with
 6    respect to the adequacy of the controls that were
 7    already in place?
 8        A.   Based on --
 9             MR. ROTTINGHAUS:  Let me make a quick
10    objection.  Insufficient foundation.
11        But go ahead.
12             THE WITNESS:  Based on the limited
13    number of suspicious orders that were generated
14    afterwards, I would say, no, it didn't really add
15    a whole lot to the process.  But, again, we looked
16    at it as an enhancement to what we had in place,
17    an extra stopgap.
18    BY MR. BARNES:
19        Q.   Did it indicate one way or the other
20    whether the controls in place were adequate?
21        A.   I would evaluate it --
22             MR. ROTTINGHAUS:  Objection.  Leading.
23             THE WITNESS:  I would evaluate it to
24    show that we did have adequate controls in place
25    from the beginning.
```

252

```
 1    BY MR. BARNES:
 2         Q.   Even after you instituted -- you
 3    enhanced it with the threshold system?
 4         A.   Yes.
 5              MR. BARNES:  Nothing further.
 6                   RE-EXAMINATION (Continued)
 7    BY MR. ROTTINGHAUS:
 8         Q.   Prior to 2014, was there ever a system
 9    in place where anyone at HBC was instructed when
10    they had an order that exceeded thresholds to ask
11    any particular questions of the pharmacy to find
12    out and do a little more due diligence as to why
13    the order was exceeding threshold?
14         A.   When you say threshold, HBC wasn't
15    looking at threshold information.  They would look
16    at unusual orders, being a large size, and that's
17    where they would ask the questions from.
18         Q.   And was there ever at any point in time
19    to your knowledge any documented instruction to
20    anyone at or on behalf of HBC as to what specific
21    questions they should be asking of pharmacies when
22    they have an order that they thought was
23    extraordinarily large?
24         A.   Their process was to notify myself or
25    someone else at corporate to do the investigation
```

253



17         MR. ROTTINGHAUS:  Thank you.

18         MR. BARNES:  Thank you.

19         THE VIDEOGRAPHER:  Off the record 3:04.

20         (Whereupon, at 3:04 p.m., the taking of

21    the instant deposition ceased.)

254

1   COMMONWEALTH OF PENNSYLVANIA  )

2   COUNTY OF ALLEGHENY            )      SS:

3                   C E R T I F I C A T E

4          I, Ann Medis, Registered Professional

5   Reporter, Certified Livenote Reporter and Notary

6   Public within and for the Commonwealth of

7   Pennsylvania, do hereby certify:

8              That GREGORY CARLSON, the witness whose

9   deposition is hereinbefore set forth, was duly

10  sworn by me and that such deposition is a true

11  record of the testimony given by such witness.

12             I further certify the inspection,

13  reading and signing of said deposition were not

14  waived by counsel for the respective parties and

15  by the witness.

16             I further certify that I am not related

17  to any of the parties to this action by blood or

18  marriage and that I am in no way interested in the

19  outcome of this matter.

20             IN WITNESS WHEREOF, I have hereunto set

21  my hand this 11th day of January, 2019.

22

23          _____
                        Notary Public

24

25

255

```
 1   COMMONWEALTH OF PENNSYLVANIA   )   E R R A T A
     COUNTY OF ALLEGHENY            )   S H E E T
 2

 3        I, GREGORY CARLSON, have read the foregoing
     pages of my deposition given on January 8, 2019,
 4   and wish to make the following, if any,
     amendments, additions, deletions or corrections:
 5

 6   Page  Line   Change and reason for change:

 7   ____  ____   _____

 8   ____  ____   _____

 9   ____  ____   _____

10   ____  ____   _____

11   ____  ____   _____

12   ____  ____   _____

13   ____  ____   _____

14   ____  ____   _____

15   ____  ____   _____

16   ____  ____   _____

17   ____  ____   _____

18

19   In all other respects, the transcript is true and
     correct.
20

21               _____

22               GREGORY CARLSON

23   _____ day of _____, 2019.

24   _____
                 Notary Public
25
```