```
 1    UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF OHIO
 2    EASTERN DIVISION
 3   IN RE: NATIONAL          )   MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION               )   Case No.
                              )   1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )   Hon. Dan A. Polster
 6   ALL CASES                )
                              )
 7
 8
 9                  __ __ __
10           Friday, January 25, 2019
                    __ __ __
11
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12             CONFIDENTIALITY REVIEW
                    __ __ __
13
14
15
16       Videotaped Deposition of EUGENE G.
     CAVACINI, held at Winstead PC, 2728 North
17   Harwood, Suite 500, Dallas, Texas, commencing
     at 9:01 a.m., on the above date, before
18   Michael E. Miller, Fellow of the Academy of
     Professional Reporters, Registered Diplomate
19   Reporter, Certified Realtime Reporter and
     Notary Public.
20
21
22
                    __ __ __
23
24           GOLKOW LITIGATION SERVICES
        877.370.3377 ph | fax 917.591.5672
25              deps@golkow.com
```

```
 1    A P P E A R A N C E S:
 2       LEVIN PAPANTONIO THOMAS MITCHELL
         RAFFERTY & PROCTOR PA
 3       BY:  BRANDON L. BOGLE, ESQUIRE
                 bbogle@levinlaw.com
 4       316 South Baylen Street
         Suite 600
 5       Pensacola, Florida 32502-5996
         (850) 435-7000
 6       Counsel for MDL Plaintiffs
 7
 8       COVINGTON & BURLING LLP
         BY:  EMILY JOHNSON HENN, ESQUIRE
 9              ehenn@cov.com
         3000 El Camino Real
10       5 Palo Alto Square
         10th Floor
11       Palo Alto, California 94306-2112
         (650) 632-4715
12       Counsel for McKesson Corporation and
         The Witness
13
14       COVINGTON & BURLING LLP
         BY:  MARINA F. DALIA-HUNT, ESQUIRE
15              mdaliahunt@cov.com
         3000 El Camino Real
16       10th Floor
         Palo Alto, California 94306-2112
17       (650) 632-4700
         Counsel for McKesson Corporation and
18       The Witness
19
20       JONES DAY
         BY:  RICHARD M. BRODSKY, ESQUIRE
21              rbrodsky@jonesday.com
         150 West Jefferson Avenue
22       Suite 2100
         Detroit, Michigan 48226
23       (313) 733-3939
         Counsel for Walmart Corporation
24
25
```

```
 1    A P P E A R A N C E S:
 2         REED SMITH LLP
           BY:  MARY M. BALASTER, ESQUIRE
 3              mbalaster@reedsmith.com
           811 Main Street
 4         Suite 1700
           Houston, Texas 77002-6110
 5         (713) 469-3842
           Counsel for AmerisourceBergen
 6
 7         BAKER HOSTETLER LLP
           BY:  MATTHEW RALEY, ESQUIRE
 8              mraley@bakerlaw.com
           811 Main Street
 9         Suite 1100
           Houston, Texas 77002
10         (713) 646-1392
           Counsel for Cardinal Health
11
12         MARCUS & SHAPIRA LLP
           BY:  SCOTT D. LIVINGSTON, ESQUIRE
13              livingston@marcus-shapira.com
           One Oxford Center
14         35th Floor
           Pittsburgh, Pennsylvania 15219
15         (412) 471-3490
           Counsel for HBC Services
16
17         ARNOLD & PORTER KAYE SCHOLER LLP
           BY:  KAREN RIGBERG, ESQUIRE
18              (via teleconference)
           777 South Figueroa Street
19         Los Angeles, California 90017-5844
           Counsel for Endo Health Solutions
20         Inc., Endo Pharmaceuticals Inc., Par
           Pharmaceutical, Inc. and Par
21         Pharmaceutical Companies, Inc.
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2        ALLEGAERT BERGER & VOGEL LLP
          BY:  LAUREN J. PINCUS, ESQUIRE
 3             lpincus@abv.com
               (via teleconference)
 4        111 Broadway
          20th Floor
 5        New York, New York 10006
          (212) 571-0550
 6        Counsel for Rochester Drug
          Cooperative Inc.
 7
 8        COLLINSON DAEHNKE INLOW & GRECO
          BY:  AMANDA E. ROSENTHAL, ESQUIRE
 9             amanda.rosenthal@cdiglaw.com
               (via teleconference)
10        2110 East Flamingo Road
          Suite 305
11        Las Vegas, Nevada 89119
          (702) 979-2132
12        Counsel for C&R Pharmacy
13
14    ALSO PRESENT:
15        SANDRA ZAMORA, ESQUIRE
          McKesson Corporation
16
17    VIDEOGRAPHER/TRIAL TECHNICIAN:
18        RICHARD RIENSTRA,
          Golkow Litigation Services
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       INDEX
 2
       APPEARANCES                          2
 3
       PROCEEDINGS                         10
 4
 5
       EXAMINATION OF EUGENE G. CAVACINI:
 6
            BY MR. BOGLE                    12
 7
            BY MS. HENN                    353
 8
            BY MR. BOGLE                   364
 9
10
       CERTIFICATE                        370
11
       ERRATA                             372
12
       ACKNOWLEDGMENT OF DEPONENT         372
13
       LAWYER'S NOTES                     374
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review









Highly Confidential - Subject to Further Confidentiality Review

```
 1                    PROCEEDINGS

 2            (January 25, 2019 at 9:01 a.m.)

 3            THE VIDEOGRAPHER:  We are now

 4     on the record.  Today's date is

 5     January 25th, 2019, and the time is

 6     approximately 9:01 a.m.

 7            This video deposition is being

 8     held in Dallas, Texas in the matter of

 9     In re National Prescription Opiate

10     Litigation, Case No. 1:17-MD-2804.

11            The deponent today is Mr. Gene

12     Cavacini.

13            The court reporter is Mr. Mike

14     Miller.

15            Would counsel like to identify

16     yourselves for the record, starting

17     with counsel on the telephone, please.

18            THE REPORTER:  Counsel on the

19     phone, please identify.

20            MS. PINCUS:  Lauren Pincus from

21     Allegaert Berger & Vogel, on behalf of

22     Rochester Drug Cooperative Inc.

23            MS. RIGBERG:  Karen Rigberg

24     with Arnold & Porter in Los Angeles

25     for the Endo and Par defendants.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. ROSENTHAL:  Amanda

 2        Rosenthal from Collinson Daehnke

 3        Inlow & Greco for C&R Pharmacy.

 4              (Telephone interruption.)

 5              MS. HENN:  Any other counsel on

 6        the phone?

 7              MR. BOGLE:  Brandon Bogle on

 8        behalf of the MDL plaintiffs.

 9              MR. RALEY:  Matt Raley with

10        BakerHostetler on behalf of Cardinal

11        Health.

12              MS. ZAMORA:  Sandra Zamora,

13        McKesson in-house legal.

14              MR. LIVINGSTON:  Scott

15        Livingston on behalf of HBC.

16              MS. BALASTER:  Mary Balaster

17        with Reed Smith on behalf of

18        AmerisourceBergen Drug Corporation.

19              MR. BRODSKY:  Richard Brodsky

20        from Jones Day on behalf of Walmart.

21              MS. DALIA-HUNT:  Marina

22        Dalia-Hunt from Covington for McKesson

23        and the witness.

24              MS. HENN:  Emily Henn from

25        Covington & Burling on behalf of
```

```
 1              McKesson and the witness.

 2                   THE VIDEOGRAPHER:  Would the

 3              court reporter please swear in the

 4              witness.

 5                   (Witness sworn by the

 6              reporter.)

 7                EUGENE G. CAVACINI,

 8               having been duly sworn,

 9               testified as follows:

10                    EXAMINATION

11      BY MR. BOGLE:

12           Q.    Good morning.

13           A.    Good morning.

14           Q.    Can I get your full name,

15      please?

16           A.    Eugene Gregory Cavacini.

17           Q.    And I understand you've been

18      deposed once during your lifetime; is that

19      right?

20           A.    Yes, correct.

21           Q.    And that was about a little

22      less than a year ago.  Does that sound right?

23           A.     I believe it was last May.

24           Q.     Okay.  Just to kind of reorient

25      you to the basics of a deposition, my name is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Brandon Bogle.  I'm going to be asking you

 2    some questions today.  I'll do my best when

 3    I'm asking you questions to let you finish

 4    your answer before I get to my next question.

 5              I would ask sort of the same

 6    from you, meaning wait until I finish my

 7    question before you answer.  It makes the

 8    record a little clearer and, quite frankly,

 9    it makes sure you understand what I'm asking

10    you.  Is that fair?

11         A.    Yes, thank you.

12         Q.    And if you need a break at any

13    point in time in the deposition, just let me

14    or your counsel know.  We have no problem

15    doing that.  It's not an endurance contest in

16    that regard.  Okay?

17         A.    Thank you.

18         Q.    And the last thing is, if I ask

19    you a question that you don't hear or don't

20    understand, please ask me to repeat or

21    rephrase and I will do my best to do so.

22    Otherwise, I will assume you understand or

23    heard my question.  Is that fair?

24         A.    It is.

25         Q.    Okay.  You are currently
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    employed with McKesson; is that right?

 2         A.     Correct.

 3         Q.     Okay.  And you've been there

 4    since 2002; is that right?

 5         A.     Correct.

 6         Q.     Okay.  And I just want to run

 7    through the positions you've held since 2002,

 8    make sure I'm understanding correctly.

 9              I understand that from 2002

10    through 2005 you worked as a sales executive

11    at McKesson.  Does that sound right?

12         A.     It does.  I thought I was in

13    that role a little bit longer, but could be.

14         Q.     Okay.  Let's do this maybe to

15    make it a little smoother.

16              You have a LinkedIn page

17    online; is that correct?

18         A.     I probably do, yes.

19         Q.     Do you recall ever drafting

20    one?

21         A.     Yes.  I don't currently manage

22    it, but --

23         Q.     All right.  Let's take a look

24    at that and I just want to walk through again

25    some of your roles at McKesson over time.
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yep.

2    Q.    I'm going to hand you what's

3    marked as Exhibit 1 to your deposition, which

4    is also 1.2131.  This is a public document,

5    so no Bates stamp.

6         (McKesson-Cavacini Deposition

7         Exhibit 1 marked.)

8    BY MR. BOGLE:

9    Q.    Okay.  Mr. Cavacini, you see at

10   the top here there's your name; is that

11   right?

12   A.    Correct.

13   Q.    Okay.  Just looking at this,

14   and it's just one page, does this seem to

15   correspond with what you understand to be

16   your LinkedIn page?

17   A.    It does.

18   Q.    Okay.

19   A.    Yes.

20   Q.    Okay.  And so, for example, if

21   we walk through going from bottom to top,

22   it's noted to be a sales executive from

23   January 2002 through November 2005.

24        Does that seem accurate to you?

25   A.    It does.

```
1        Q.    Okay.  And what were your job

2   functions generally as a sales executive at

3   McKesson?

4        A.    I was a sales executive for our

5   retail independent business, and I described

6   that role as a business development role.  I

7   was tasked with targeting non-McKesson

8   customers and trying to identify if there was

9   a fit for them to become McKesson customers.

10       Q.    So trying to bring in new

11  business; is that fair?

12       A.    Yes.

13       Q.    Okay.  And was there a specific

14  geographic region you focused on during that

15  time period in that job?

16       A.    There was.  I was responsible

17  for the markets serviced by our Delran

18  distribution center, which would have been

19  primarily eastern Pennsylvania, the state of

20  New Jersey, a little bit of Maryland and

21  Delaware, and the boroughs of New York City.

22            During the course of my tenure

23  in that role, I also had some

24  responsibilities for our New Castle markets

25  that would have been western Pennsylvania,
```

Highly Confidential - Subject to Further Confidentiality Review

1  pieces of eastern Ohio, the northwest corner

2  of West Virginia.

3        Q.    Okay.  In your responsibility

4  for the New Castle market, did that cover the

5  entire three and a half years that you had

6  that role?

7        A.    No.  I started primarily in the

8  Delran market and then over time expanded

9  into the New Castle market.

10       Q.    So in that, again, sort of

11 three-and-a-half-year time period, do you

12 have a recollection as to how much time you

13 spent sort of trying to get new business in

14 the New Castle market?

15       A.    I would say the primary focus

16 was in the New York City area.  That's where

17 most of our opportunity was.  As far as time,

18 I don't recall when exactly I got

19 responsibility for the New Castle market.  I

20 was living outside of Philadelphia and

21 focusing most of my time in the Delran

22 market.

23       Q.    Okay.  And going back to your

24 LinkedIn page, the next job that's listed

25 there is a district sales manager from

Highly Confidential - Subject to Further Confidentiality Review

1    November 2005 to March 2009.

2                Does that time frame and that

3    job title sound accurate to you?

4         A.     It does seem accurate, yes.

5         Q.     Okay.  And so as district sales

6    manager, let's start again:  What were your

7    general tasks in that position?

8         A.     I've described that role as a

9    front line sales manager role.  I led a team

10   of retail sales managers whose primary

11   responsibilities were the management of

12   existing McKesson accounts, taking care of

13   our relationship, making sure that we were

14   providing good service and working with those

15   accounts to sell our value proposition and

16   services.

17        Q.     Approximately how many people

18   did you supervise during that time period?

19        A.     It did move from time to time,

20   based on the market needs, and again, my

21   responsibilities, but I would say on average

22   ten, you know, maybe a max of 15.

23        Q.     Okay.  And was there a specific

24   geographic region you covered in that

25   position?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      It was similar to the sales

2    executive role.  Started with the Delran

3    distribution center, so which would have been

4    that eastern Pennsylvania, New Jersey

5    New York markets.

6            During that tenure, I also had

7    responsibility for the New Castle markets,

8    which came later.

9      Q.      Okay.  You say it came later.

10   Do you recall the specific time period that

11   the New Castle responsibilities came?

12     A.      I don't remember exactly when

13   they expanded the responsibilities to cover

14   New Castle.  There was another sales manager

15   that retired, I believe, and they gave me

16   that territory at that time.

17     Q.      Okay.  What was the sales

18   manager's name that retired?

19     A.      Jim Gavatorta.

20     Q.      Then looking at your LinkedIn

21   page, you're noted to be vice president of

22   sales, March 2009 to January 2012.  So again,

23   does that job title and time period seem

24   accurate to you?

25     A.      It does, yes.

1      Q.      And again, any specific

2   geographic region you have responsibility for

3   with that position?

4      A.      It was the same markets as the

5   district sales manager; had responsibility

6   for the Delran distribution center and the

7   New Castle distribution center.

8      Q.      Okay.  Did you take on any new

9   geographic responsibilities or did it remain

10   those two distribution centers during that

11   roughly three-year period of time?

12      A.      It was those two distribution

13   centers.

14      Q.      Okay.  And can you give me a

15   high-level description of your job

16   responsibilities with that position?

17      A.      I would say it was very similar

18   to the district sales manager role, leading a

19   team of retail sales managers responsible for

20   the maintenance and growth of existing

21   McKesson accounts, very similar job.

22      Q.      Okay.  Did you take on a larger

23   group of people that you supervised with that

24   position versus the district sales manager

25   position?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     No.  We were experiencing some
 2   growth in the New York City market and we had
 3   added people over time.  My recollection is
 4   we had kind of restructured the organization
 5   at that time.  We created a new role called a
 6   general manager role and retitled the
 7   organization.
 8                I ended up hiring a district
 9   sales manager under me to cover the Eastern
10   parts of the market and was given the title
11   of vice president of sales.
12          Q.     Okay.  What was the name of the
13   district sales manager you hired that you
14   referenced there?
15          A.     I'm trying to think.  I
16   remember it being Sam Ha.
17          Q.     And then moving up your
18   LinkedIn page, you're noted to be vice
19   president/general manager from January 2012
20   to March 2015.
21                Again, does that job title and
22   that time period seem accurate to you?
23          A.     It does, yes.
24          Q.     Okay.  And it looks like you
25   moved locations there to Memphis so what
```

1    geographic region were you responsible for

2    with that position?  Was it different?

3         A.     It was, yes.

4         Q.     Okay.

5         A.     My family and I physically

6    moved to a suburb of Memphis and I was

7    responsible for the Memphis DC, the

8    distribution center that serviced the markets

9    of eastern Tennessee, Arkansas, Mississippi,

10   a little bit of Louisiana, a little bit of

11   Missouri.

12              And again, just for

13   clarification, went to that role with simple

14   responsibility for the Memphis DC.  Into my

15   tenure I also assumed responsibility for our

16   Oklahoma City distribution center, which

17   would have serviced the markets of Oklahoma

18   and Texas, a little bit of Kansas.

19        Q.     Do you know when you got -- and

20   a rough time frame is fine -- when you got

21   the responsibilities that were added in

22   Oklahoma City?

23        A.     I think roughly a year into my

24   tenure, so I would say 2013, but...

25        Q.     Okay.  Yeah, an approximation

Highly Confidential - Subject to Further Confidentiality Review

```
1    is fine.

2          A.      Thank you.

3          Q.      All right.  Let's go -- moving

4    up the LinkedIn page, you're listed next as a

5    senior vice president - NER, from April 2015

6    to August 2017.

7                  Do you see that there?

8          A.      I do, yes.

9          Q.      Okay.  Does that position in

10   that time period -- is that accurate --

11         A.      Yes.

12         Q.      -- based on your recollection?

13         A.      Yes.

14         Q.      Okay.  And NER, is that

15   northeast region?

16         A.      It is, yes.

17         Q.      Okay.  And as the senior vice

18   president, again, can you give me a

19   high-level understanding of what you did in

20   that position?

21         A.      I had full operating

22   responsibility for our distribution centers

23   that serviced our northeast region as well as

24   revenue or sales responsibility for our

25   retail independent business and our hospital
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    business in those markets.

 2         Q.    Okay.  What geographic area did

 3    the northeast region cover in that time

 4    frame?

 5         A.    Approximately Virginia to Maine

 6    and west to Ohio, the eastern parts of Ohio.

 7    A little bit of North Carolina.

 8         Q.    And when you say Virginia to

 9    Maine, you're talking south to north,

10    basically straight up the Eastern seaboard?

11         A.    Straight up the Eastern

12    seaboard, south to north, and then west to

13    the eastern parts of Ohio.

14         Q.    Did your territory at that

15    point in time include any portions of West

16    Virginia?

17         A.    It would have.  Our

18    distribution center in Virginia and our

19    distribution -- our New Castle distribution

20    center serviced parts of West Virginia.

21         Q.    Okay.  All right.  Now, moving

22    up to the last position you have noticed --

23    noted here is SVP/COO McKesson, U.S. Pharma.

24    It says August 17th to present.

25              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I do.

 2          Q.      Okay.  Now, just so the

 3   acronyms are clear, SVP, would that be senior

 4   vice president?

 5          A.      Senior vice president.

 6          Q.      COO is chief operating officer?

 7          A.      Correct.

 8          Q.      Okay.  For McKesson U.S.

 9   Pharma.  Are you still holding that position?

10          A.      I am, yes.

11          Q.      Okay.  And does that seem

12   accurate as far as the time frame that you

13   took that role over?

14          A.      I do.  There was some overlap

15   with my predecessor.  He left the

16   organization in July, so I assumed.

17          Q.      Who was your predecessor?

18          A.      Frank Starn.

19          Q.      Okay.  So as COO and senior

20   vice president, can you give me again a

21   high-level understanding of what your role is

22   in those positions?

23          A.      Absolutely.  So I'm responsible

24   for our distribution network, our 26 what we

25   refer to as forward DCs that pick, pack and
```

Highly Confidential - Subject to Further Confidentiality Review

1    ship the orders for our hospital as well as

2    our pharmacy customers.

3              I lead the organizations that

4    provide our customer service and customer

5    care teams as well as our sales

6    effectiveness, and I have sales or revenue

7    responsibility for our retail independent

8    business, our hospital business and our

9    government business.

10        Q.     Okay.  Approximately how many

11   people report to you at McKesson as a COO?

12        A.     I believe approximately 6,000.

13   The majority of those are our hourly

14   associates that work in the distribution

15   centers.

16        Q.     Okay.  And department-wise,

17   which departments at McKesson report up

18   through you?

19        A.     I mean, functions, I've got

20   customer care, sales effectiveness, our

21   contracting teams, our distribution ops teams

22   that lead the distribution center operations,

23   our retail sales teams for independent

24   customers, our hospital sales teams that call

25   on our hospital partners.

```
 1                    I have a few of our -- what I

 2     would call our strategic business units, our

 3     masters, which is a generics business, our

 4     blood and plasma business that services our

 5     hospital channels with specialty products.

 6                    And I have our responsibility

 7     for our packaging business in Memphis,

 8     compliance packaging for manufacturers.

 9          Q.     Okay.  Does the regulatory

10     affairs department or anyone in the

11     regulatory affairs department report up to

12     you as COO?

13          A.     They do not.

14          Q.     Who do they report up to?

15          A.     Currently it would be the

16     president of our business unit.  That would

17     be --

18          Q.     Who is that?

19          A.     Brian Tyler is our interim

20     president.

21          Q.     You said Tyler?

22          A.     Tyler.

23          Q.     Okay.  And as COO, would I

24     understand correctly that you serve on the

25     board of directors as well?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      I do not.

 2            Q.      You do not.  Okay.

 3                    And as far as the hierarchy at

 4    McKesson, approximately how many people are

 5    higher up in the organizational structure

 6    than the COO position at McKesson,

 7    U.S. Pharma-wise?  Let's focus on

 8    U.S. Pharma.

 9            A.      I don't know.  I've never -- in

10    U.S. Pharma?

11            Q.      Yes, sir.

12            A.      I mean, I report directly to

13    the president of the business unit, so one.

14            Q.      Okay.  And the role as COO of

15    U.S. Pharma is a role of significant

16    responsibility, true?

17            A.      I believe I see a

18    significant -- I take my role as having

19    significant responsibility.  I take it

20    seriously, yeah.

21            Q.      I mean, it's a high-ranking

22    role at the company, true?

23            A.      It's a senior leadership role.

24            Q.      Right.

25                    Now, the McKesson U.S. Pharma
```

1    sales force, from the time that you joined

2    the company to present, what would you

3    approximate is the average size of the U.S.

4    Pharma sales force for McKesson during that

5    time frame?

6         A.    Across both of our segments for

7    retail, independent and health systems, I

8    think the field sales organization is

9    approximately 200 people.

10        Q.    Okay.  When you say field

11   sales, what does that mean?

12        A.    Those that are in the primary

13   selling relationships that hold the title of

14   retail sales manager for independent or

15   account manager for our health systems and

16   hospital business.

17        Q.    Okay.  So those 200, would that

18   also include the district sales managers and

19   the vice presidents positions?

20        A.    No, I think including sales

21   management, probably closer to 250.

22        Q.    Okay.  When you took over the

23   role as COO in 2017, did you have to undergo

24   any sort of specific training for that role?

25        A.    As I mentioned earlier, there

Highly Confidential - Subject to Further Confidentiality Review

1   was, I would say, an overlap with my

2   predecessor, where we spent time talking

3   about the role and responsibilities and how

4   he spent his time and where he would like to

5   spend his time and what he thought I should

6   focus mine on, especially in the short term.

7

20          Q.     Okay.  Did you have any sort of

21   formalized training before taking over as --

22   or as you took over the role of COO?

23          A.     By formalized training --

24          Q.     Right.  Did you have any sort

25   of, you know, sit-down training sessions

Highly Confidential - Subject to Further Confidentiality Review

1   where there's an agenda that's reviewed where

2   you're taught certain aspects of the

3   position?

4        A.    No, I don't remember a

5   classroom or formal training as you describe.

6        Q.    Okay.  Now, when you took over

7   the role as COO, did you undertake any sort

8   of historical analysis to understand how the

9   sales department at U.S. Pharma has worked

10   for the company over time?

11         MS. HENN:  Objection to form.

12        A.    I've been a part of the sales

13   organization for U.S. Pharma in one role or

14   another for the better part of my career.  I

15   think -- I don't remember that being a

16   conversation I had with Frank.

17   BY MR. BOGLE:

18        Q.    Okay.  So if I'm understanding

19   you correctly, it's something you felt like

20   you were already knowledgeable about when you

21   took over the role?

22        A.    I believe I have a pretty good

23   understanding.

24        Q.    Okay.  How about on the

25   operations side, did you undertake any sort

1    of analysis as to how the operations side of

2    the business at U.S. Pharma at McKesson has

3    worked historically prior to you taking over

4    that role?

5              MS. HENN:  Objection to form.

6         A.    You know, my two prior roles as

7    vice president and general manager and senior

8    vice president had operating responsibilities

9    for distribution centers, so, no, I don't

10   remember specific training or conversations

11   relative to the DC operations.  I believe I

12   had a pretty good understanding.

13   BY MR. BOGLE:

14        Q.    Okay.  And that's -- I'm just

15   trying -- that's fine.  I just want to make

16   sure I understood.

17              So again, just sort of similar

18   to the sales aspect, you felt when you took

19   over the position of COO in 2017, given your

20   time with the company, you had a good

21   understanding of how the operations side of

22   the company worked; is that true?

23        A.    I think I continue to learn

24   ever day but I believe I have a good

25   understanding.  I competed for the role and

1    was selected, so I believe others had

2    confidence in my understanding as well.

3         Q.    When you say you competed for

4    the role, what do you mean?

5         A.    There was an interview process.

6    I believe probably others had interest in the

7    role and were considered, and I was selected.

8         Q.    Okay.  How did you find out the

9    role was available to be filled?

10        A.    Conversations with leadership

11   at U.S. Pharma.

12        Q.    Okay.  Do you recall who

13   informed you of that initially?

14        A.    It was probably Mark Walchirk.

15   Frank had decided not to come with the

16   company to Dallas and there was going to be

17   an opening.

18        Q.    And you work in the Dallas

19   area; is that true?

20        A.    I do.  I'm officed here in Las

21   Colinas.

22        Q.    So now at your time in the

23   last -- I guess it's almost 18 years at the

24   company, have you developed an understanding

25   as to McKesson's practices as far as

1    distribution of opioids?

2             MS. HENN:  Objection to form.

3        A.    I've been part of U.S. Pharma

4    for 17 years.  I actually believe I just

5    crossed my 17th anniversary with the company.

6    BY MR. BOGLE:

7        Q.    Okay.

8        A.    And, yeah, through my

9    experience and time, I'm familiar with our

10   responsibility and ability to distribute

11   controlled substances.

12       Q.    Okay.  Including opioids?

13       A.    I believe opioids are a

14   controlled substance, yes.

15       Q.    Right.  And during your time at

16   the company, do you feel like you've gained

17   knowledge as to the sales practices of

18   McKesson as it relates to opioids in the last

19   17 years?

20             MS. HENN:  Objection to form.

21       A.    I think I have a good

22   understanding of our sales practices, the

23   responsibilities of our sales teams, what we

24   ask our sales teams to do and how we expect

25   them to perform.

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. BOGLE:

2        Q.    Okay.  Do you agree that there

3   is an epidemic ongoing, an opioid epidemic

4   ongoing in this country?

5        A.    I am acutely aware of the

6   epidemic as it's been well documented and

7   described.

8        Q.    Okay.  When you say acutely

9   aware, what do you mean by that?

10        A.    I'm very aware.

11        Q.    Okay.  The term "diversion,"

12   have you heard of that term before?

13        A.    I have.

14        Q.    What do you understand that

15   term to mean as it applies to controlled

16   substances?

17        A.    I would say, you know, people

18   acquiring, using, dispensing prescription

19   medications, controlled substances, including

20   opioids, in a way that's not consistent with

21   how they're intended.

22        Q.    Do you agree that diversion of

23   opioids has contributed to the opioid

24   epidemic?

25             MS. HENN:  Objection to form.

```
 1        A.     I'm not sure of the connection.
 2   BY MR. BOGLE:
 3        Q.     Okay.  Is that something you've
 4   ever looked at for yourself?
 5             MS. HENN:  Objection to form.
 6        A.     No, I'm not aware that I've
 7   done any specific research on the connection.
 8   BY MR. BOGLE:
 9        Q.     Okay.  You would agree that
10   protecting the health and safety of the
11   public is the most important role for a
12   pharmaceutical distributor like McKesson,
13   right?
14        A.     I think we have an important
15   responsibility to play in our part of the
16   supply chain, and that we have very clear
17   responsibilities under the Controlled
18   Substances Act and making sure that we uphold
19   those responsibilities is important.
20        Q.     Okay.  And the responsibilities
21   under the Controlled Substances Act
22   specifically, those are important
23   responsibilities.
24             You would agree with that,
25   right?
```

1      A.     I believe all of our regulatory

2    responsibilities are important, yes.

3          Q.     Okay.  To include

4    responsibilities under the Controlled

5    Substances Act, true?

6                 MS. HENN:  Objection to form.

7          A.     All of our responsibilities,

8    including our responsibilities under the

9    Controlled Substances Act, we take them very

10   seriously.

11   BY MR. BOGLE:

12         Q.     Okay.  And McKesson, during the

13   17 years you've been with the company, has

14   distributed opioid products, right?

15         A.     We have distributed

16   prescription medications of all kinds,

17   including controlled substances, and yes,

18   including opioids.

19         Q.     Okay.  And you understand that

20   opioids are narcotics?  That's the class of

21   drug they're in, right?

22         A.     I believe I have heard them

23   referred to that way, yes.

24         Q.     And you referenced the

25   Controlled Substances Act a minute ago.  You

Highly Confidential - Subject to Further Confidentiality Review

1  have an understanding that the Controlled

2  Substances Act is, by design, intended to

3  assist in preventing diversion, right?

4  　　　　　MS. HENN:  Objection to form.

5  　　A.　　I'm -- I have an awareness and

6  an understanding of our responsibilities

7  under the Controlled Substances Act.  I

8  understand our responsibilities to guard

9  against diversion.

10  BY MR. BOGLE:

11  　　Q.　　Okay.  And do you understand

12  why those responsibilities exist as to

13  McKesson, to guard against diversion?  What's

14  the purpose of them?

15  　　　　　MS. HENN:  Objection to form.

16  　　A.　　I believe I do.  I believe the

17  responsibilities that we have, as well as

18  other partners in the supply chain, are meant

19  to be collaborative and corresponding and

20  build on each other to make sure that there's

21  effective checks and balances from physicians

22  to pharmacies to distributors to

23  manufacturers, to have effective controls

24  that guard against diversion.

25  BY MR. BOGLE:

1       Q.      Okay.  In those checks and

2   balances you referred to, do you have an

3   understanding as to why those would be

4   important to have in place?

5              MS. HENN:  Objection to form.

6       A.      I think because the supply

7   chain is complex and every part of it has a

8   role, and, you know, our responsibility is

9   equally important.

10  BY MR. BOGLE:

11      Q.      Okay.  And you agree that

12  McKesson has a role in attempting to prevent

13  diversion of controlled substances, right?

14      A.      Again, my understanding is to

15  have effective controls to guard against

16  diversion.

17      Q.      Okay.  In your mind, is there a

18  difference between guarding against diversion

19  and attempting to prevent it, and if so,

20  what's the difference?

21      A.      You know, I'm not a lawyer, and

22  the technical differences there, you know,

23  it's always been explained to me that

24  guarding against diversion is our

25  responsibility, and that's how we see it.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  I'm not asking you as a

2    lawyer.  I'm just asking -- making sure I

3    understand what you understand the

4    responsibilities to be.

5         So do you think there's a

6    distinction in your mind as to guarding

7    against diversion versus attempting to

8    prevent diversion?

9    A.    I guess the distinction for me

10   is that preventing is, you know, very

11   difficult, you know, with the complexity of

12   our supply chain and that we're doing our

13   best to prevent, to guard against, is our

14   responsibility.

15   Q.    And whether it's difficult or

16   not, it's an important thing to -- for

17   McKesson to do its best to accomplish, right?

18   A.    We work incredibly hard at it.

19   That's been my experience.

20   Q.    Okay.  And so because it's an

21   important thing to try to accomplish, right?

22        MS. HENN:  Objection to form.

23   A.    Our responsibilities under the

24   Controlled Substances Act are important, yes.

25   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You mentioned having effective

2    controls against diversion.  What do you

3    understand that to include?  What's

4    encompassed within that?

5              MS. HENN:  Objection to form.

6    A.    I think there are several

7    components that we understand our

8    responsibilities to be, and they range from

9    knowing our customer to having systems in

10   place to identify orders that could

11   potentially deviate in frequency, size or

12   pattern.

13   BY MR. BOGLE:

14   Q.    Okay.  You understand that one

15   of McKesson's responsibilities is to monitor

16   for suspicious controlled substance orders,

17   correct?

18   A.    A part of our program to guard

19   against diversion is that we monitor orders

20   to see if they deviate, like I said, pattern,

21   size, frequency.  That is a component of the

22   program.

23   Q.    And you also understand that

24   there is an obligation of McKesson to report

25   suspicious orders when they are detected,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   right?
 2        A.     Under the Controlled Substances
 3   Act, I believe we have a responsibility to
 4   report orders that we deem -- I'm sorry.
 5        Q.     Yeah.  Were you done?  I'm
 6   sorry.
 7        A.     Yes.
 8        Q.     Okay.  And under the Controlled
 9   Substances Act, McKesson also has an
10   obligation to halt the shipment of suspicious
11   orders when they're detected, true?
12             MS. HENN:  Objection to form,
13        lacks foundation.
14        A.     I believe our responsibility is
15   to have effective controls to guard against
16   diversion.
17   BY MR. BOGLE:
18        Q.     Okay.  I think my question was
19   more specific than that.  Let me reask it
20   just to make sure.
21             Under the Controlled Substances
22   Act, McKesson also has an obligation to halt
23   the shipment of suspicious orders when
24   they're detected, true?
25             MS. HENN:  Objection to form,
```

Highly Confidential - Subject to Further Confidentiality Review

1          lacks foundation.

2          A.      I'm not sure.  I think in

3  our -- our practice is to stop orders that we

4  deem -- I would like to maybe see the

5  regulations again -- I don't have them.  To

6  stop the order?  I'm not sure.

7               I mean, to identify orders and

8  to report them, to have effective controls.

9  BY MR. BOGLE:

10

15               MS. HENN:  Objection to form.

16

23               MS. HENN:  Objection to form.

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1              MS. HENN:  Objection to form,

2          asked and answered.

3      BY MR. BOGLE:

4          

20             MS. HENN:  Objection to form.

21

Highly Confidential - Subject to Further Confidentiality Review

1

10       Q.     Okay.  I'm going to hand you

11  what I'm marking as Exhibit 2 to your

12  deposition, which is also 1.1464.  Bates

13  number is MCKMDL00478906.

14              And, Mr. Cavacini, I have to

15  read off the numbers.  You don't have to

16  worry about that part, I just have to do it.

17              (McKesson-Cavacini Deposition

18       Exhibit 2 marked.)

19  BY MR. BOGLE:

20       Q.     Okay.  To orient you to

21  Exhibit 2 here, you see at the top is a

22  letter from the U.S. Department of Justice,

23  Drug Enforcement Administration, dated

24  September 27, 2006?

25              Do you see that, top of the

```
 1    first page?

 2         A.      September 27th, 2006, yes.

 3         Q.      Have you ever seen this letter

 4    before?

 5         A.      I believe I have, yes.

 6         Q.      Do you recall about when you

 7    first saw this letter?

 8         A.      I can't say for certain when I

 9    first saw it.  I do know I've seen it.

10         Q.      Okay.  I want to take a look at

11    a couple of aspects of this letter here.  The

12    first paragraph says:  This letter is being

13    sent to every commercial entity in the United

14    States registered with the Drug Enforcement

15    Administration (DEA) to distribute controlled

16    substances.  The purpose of this letter is to

17    reiterate the responsibilities of controlled

18    substance distributors in view of the

19    prescription drug abuse problem our nation

20    currently faces.

21              Do you see that?

22         A.      I do, yes.

23         Q.      Okay.  And given your 17 years

24    at the company, do you have an understanding

25    at this point in time in 2006 that there was
```

1    a prescription drug abuse problem in the

2    United States that was ongoing?

3            MS. HENN:  Objection to form.

4        A.    It's hard for me to say exactly

5    what I knew in 2006.  I think my awareness

6    was probably growing and developing at that

7    time, but I can't say exactly what I knew.  I

8    do see that in the next sentence, you know.

9    BY MR. BOGLE:

10       Q.    Okay.  Let me ask it to you

11   this way then.

12           Do you understand as you sit

13   here today that there was a prescription drug

14   abuse problem that our nation was facing in

15   2006?

16           MS. HENN:  Objection to form,

17       asked and answered.

18   BY MR. BOGLE:

19       Q.    Do you have that knowledge

20   today?

21           MS. HENN:  Same objection.

22       A.    I mean, I -- the next sentence

23   of the letter says that the abuse of

24   controlled prescription drugs is a serious

25   and growing healthcare problem in the

1    country; so in 2006, that was the position of

2    the DEA.

3    BY MR. BOGLE:

4         Q.    Okay.  I guess what I'm asking

5    you though is:  As you sit here today, do you

6    have any disagreement that there was a

7    prescription drug abuse problem that dates

8    back to at least 2006?

9              MS. HENN:  Objection to form,

10         asked and answered.

11        A.    I don't know.  And my awareness

12   of it, you know, grew over time, and when it

13   exactly started to take hold is hard for me

14   to say.  We've covered -- its existence today

15   is very well documented.

16   BY MR. BOGLE:

17        Q.    I want to look at the third

18   paragraph on the first page here.  It says:

19   The CSA was designed by Congress to combat

20   diversion by providing for a closed system of

21   drug distribution, in which all legitimate

22   handlers of controlled substances must obtain

23   a DEA registration and, as a condition of

24   maintaining such registration, must take

25   reasonable steps to ensure that their

1    registration is not being utilized as a

2    source of diversion.

3                Do you see that?

4        A.    I do.

5        Q.    Okay.  The concept of a closed

6    system of drug distribution, that's a concept

7    you're familiar with as it pertains to

8    controlled substances, right?

9                MS. HENN:  Objection to form.

10       A.    It's a term I've heard before,

11   and I think in an earlier answer of what I

12   was trying to describe with the different

13   members of the supply chain that have equal

14   and corresponding responsibility.

15   BY MR. BOGLE:

16       Q.    And by having a closed system

17   of distribution, that means that not every

18   distributor out there can distribute

19   controlled substances; you have to actually

20   have a registration that's granted by the

21   DEA, right?

22                MS. HENN:  Objection to form,

23        compound.

24       A.    I believe to be a distributor

25   of controlled substances you need to have a

Highly Confidential - Subject to Further Confidentiality Review

1    registration that's granted by the DEA, and

2    I've referred to that as a privilege that we

3    have.

4    BY MR. BOGLE:

5        Q.    And the next sentence says:

6    Distributors are, of course, one of the key

7    components of the distribution chain.

8              Do you agree with that?

9        A.    I would, yes.

10       Q.    Okay.  It says:  If the closed

11   system is to function properly as Congress

12   envisioned, distributors must be vigilant in

13   deciding whether a prospective customer can

14   be trusted to deliver controlled substances

15   only for lawful purposes.

16             Do you see that sentence?

17       A.    I do.

18       Q.    Do you agree with that?

19             MS. HENN:  Objection to form,

20        calls for speculation.

21       A.    I agree that as I stated

22   earlier, knowing our customers and having an

23   understanding of their business is a

24   responsibility we have and is a core

25   component of the program we have in place

1    today.

2          Q.     Okay.  And that responsibility

3    has existed the entire time you've been with

4    the company, right?

5                MS. HENN:  Objection to form.

6          A.     I believe that our

7    responsibilities under the Controlled

8    Substances Act have existed during my entire

9    time with the company.

10   BY MR. BOGLE:

11         Q.     Okay.  The next sentence says:

12   This responsibility is critical as Congress

13   has expressly declared that the illegal

14   distribution of controlled substances has a

15   substantial and detrimental effect on the

16   health and general welfare of the American

17   people.

18               Do you see that?

19         A.     I do see that.

20         Q.     Okay.  If you go to the second

21   page of the letter here, and I'm about

22   three-quarters of the way down the page, the

23   paragraph that starts "Thus, in addition."

24               Do you see where I'm at?

25         A.     I do.

```
 1          Q.      Okay.

 2          A.      Third paragraph up from the

 3     bottom.

 4          Q.      That's correct, sir.

 5                  It says there:  Thus, in

 6     addition to reporting all suspicious orders,

 7     a distributor has a statutory responsibility

 8     to exercise due diligence to avoid filling

 9     suspicious orders that might be diverted into

10     other than legitimate medical, scientific,

11     and industrial channels.

12                  Do you see that reference?

13          A.      I do.

14          Q.      Okay.  Is that consistent with

15     what your understanding was in 2006 that

16     distributors like McKesson had a statutory

17     responsibility to avoid filling suspicious

18     orders?

19                  MS. HENN:  Objection to form,

20          lacks foundation.

21          A.      In my responsibility -- my

22     understanding of our responsibility under the

23     Controlled Substances Act is to have an

24     effective program to guard against diversion.

25     BY MR. BOGLE:
```

1    Q.    Okay.  Does that include

2  avoiding filling suspicious orders once

3  they're detected?

4          MS. HENN:  Objection to form.

5    A.    I think I stated earlier that

6  I'm not clear on how our responsibility to

7  stop or prevent filling is specifically

8  called out in the controlled substance

9  regulations, but to identify orders that

10  deviate, to report those orders, and to have

11  an effective program that guards against

12  diversion is.

13  BY MR. BOGLE:

14    Q.    Okay.  So from this letter in

15  September 27th, 2006, do you think there's

16  anything unclear about the sentence I just

17  read which indicates that distributors should

18  avoid filling suspicious orders that might be

19  diverted into other than legitimate medical,

20  scientific and industrial channels?

21          MS. HENN:  Objection to form.

22    A.    Nothing unclear about the

23  letter.  What is unclear to me is how, if

24  any, this relates to the actual statute, the

25  Controlled Substances Act.

Highly Confidential - Subject to Further Confidentiality Review

 1    BY MR. BOGLE:

 2         Q.    Okay.  The sentence I read

 3    here, though, indicates that at least in 2006

 4    it was DEA's view that that was part of a

 5    statutory responsibility, correct?

 6              MS. HENN:  Objection to form.

 7         A.    I see where in this letter it

 8    states that they believe, in addition to

 9    reporting, the distributor has a statutory

10    responsibility to exercise due diligence.

11    BY MR. BOGLE:

12         Q.    Do you have any independent

13    knowledge as you sit here today that that was

14    not part of McKesson's statutory

15    responsibilities during the entire time

16    you've been with the company?

17              MS. HENN:  Objection to form,

18         calls for a legal conclusion.

19         A.    Could you repeat the question.

20    BY MR. BOGLE:

21         Q.    Sure.

22              Do you have any independent

23    knowledge as you sit here today that the

24    responsibility to avoid filling suspicious

25    orders was not part of McKesson's statutory

Highly Confidential - Subject to Further Confidentiality Review

1   responsibilities for the entire time you've

2   been with the company?

3           MS. HENN:  Objection to form,

4       calls for a legal conclusion.

5       A.    I'm not sure, and I think -- I

6   keep coming back to what my understanding of

7   our responsibilities are, and that's to have

8   an effective program to guard against

9   diversion.

10  BY MR. BOGLE:

11      Q.    Okay.  But to my question as to

12  whether you have any independent knowledge

13  that McKesson lacked the statutory

14  responsibility to avoid filling suspicious

15  orders during the entire time you were with

16  the company, can you speak to that?

17          MS. HENN:  Objection to form,

18      lacks foundation and calls for a legal

19      conclusion.

20

Highly Confidential - Subject to Further Confidentiality Review

 1

 6          MS. HENN:  Objection to form,

 7     lacks foundation, calls for a legal

 8     conclusion, asked and answered.

 9          A.    And I'm unclear if this

10  statement of statutory responsibility is in

11  the regulations today, so -- or if it was in

12  the regulations at that time.  That's where

13  my understanding of the Controlled

14  Substances -- I'm not familiar with that

15  term.

16  BY MR. BOGLE:

17          Q.    Okay.  So I guess going back to

18  my question:  Do you have any independent

19  knowledge as you sit here today that at any

20  point in time you were at the company, that

21  was not McKesson's responsibility?

22          MS. HENN:  Objection, asked and

23     answered, lacks foundation, calls for

24     a legal conclusion.

25          A.    Do I have any...

Highly Confidential - Subject to Further Confidentiality Review

1                     I don't know.

2     BY MR. BOGLE:

3          Q.     Okay.  Let me ask it to you a

4     different way.

5                 The concept of being a good

6     corporate citizen, that's something that's

7     important at McKesson, right?

8          A.     I believe we have, you know, a

9     deep commitment to being part of the

10    communities we serve and being good stewards

11    of them.

12         Q.     And as a company aiming to be a

13    good corporate citizen, do you think in that

14    regard that it's important that when the

15    company detects suspicious orders, that they

16    not fill them when it comes to controlled

17    substances like opioids?

18                 MS. HENN:  Objection to form.

19

Highly Confidential - Subject to Further Confidentiality Review



1

2

3            MS. HENN:  Objection --

4      BY MR. BOGLE:

5

6            MS. HENN:  Objection to form.

7

Highly Confidential - Subject to Further Confidentiality Review



1

          MS. HENN:  Objection to form,

          calls for speculation.

Highly Confidential - Subject to Further Confidentiality Review

1  

2               MS. HENN:  Objection to the

3       form, asked and answered.

4  

BY MR. BOGLE:

9       Q.    Okay.  Well, you understand

10 that McKesson as a distributor of, as you

11 said, many different types of products and

12 items, that you guys have a choice to decide

13 to ship or not ship any sort of product that

14 a company orders, right?

15               MS. HENN:  Objection to form,

16       lacks foundation.

17       A.    I don't -- I don't know that I

18 necessarily agree with the premise of the

19 question, the way the question is structured.

20 BY MR. BOGLE:

21       Q.    Okay.  So do you -- is it your

22 view that McKesson, as it pertains to any

23 product that it sells, lacks the opportunity

24 to deny the customer the product if they

25 think it's not appropriate to give it to

1    them?

2              MS. HENN:  Objection to form,

3         compound, lacks foundation.

4         A.    I think about our

5    responsibility as a distributor to make sure

6    that legitimate medical products, medicines,

7    durable medical equipment, are available to

8    healthcare providers at the time that they

9    need it, and, you know, I don't know that

10   we're in a position to deny access to

11   products that are ordered by pharmacists for

12   their needs pursuant to a prescription.

13             We have some influence and

14   ability of who we do business with.  I mean,

15   I agree with that, but reviewing every order

16   for any product and determining if it's

17   appropriate or needed, I don't know that I

18   would agree that we're in that position.

19        Q.    Okay.  So take this as an

20   example.

21             McKesson is, first of all, a

22   for-profit business, right?

23        A.    We're a publicly traded

24   healthcare compare.

25        Q.    Right.  So you guys, for

Highly Confidential - Subject to Further Confidentiality Review

1    example, are not in the practice of providing

2    pharmacies medications if they told you that

3    there's no way we can ever pay you for any

4    medications that we order, right?

5           A.    I think when I referenced we

6    have some choice of who we do business with,

7    who we open up accounts with, yeah, I mean,

8    reasonable to assume that if an account had

9    no ability or willingness to pay, we probably

10   wouldn't knowingly enter into a business

11   relationship.

12          Q.    And if you already had a

13   relationship with them and they came to you

14   at some point thereafter and said we can't

15   pay you for any product any further going

16   forward, but will you still do business with

17   us, can you think of an instance where

18   McKesson has said, yes, we'll, in perpetuity,

19   do business with you despite the fact you

20   can't pay?

21             MS. HENN:   Objection to form.

22          A.    No.  No, if we were knowing and

23   a customer had expressed their ability to not

24   pay and depending on our contractual

25   relationships with that customer, I mean, I

Highly Confidential - Subject to Further Confidentiality Review

```
1    am aware of some that we are obligated to

2    keep shipping even if they don't pay, state

3    governments, for example; as a matter of due

4    practice, if they didn't have the ability to

5    continue to pay us, we probably would not

6    continue to do business with them.

7
```



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1              MS. HENN:  Objection to form,

2         lacks foundation.

3

15         Q.     Okay.  Backing up, you do know

16    there was a settlement agreement entered

17    between McKesson and the DEA regarding

18    violations of the Controlled Substances Act,

19    correct?

20              MS. HENN:  Objection to form,

21         lacks foundation.

22         A.     I'm aware that there were

23    allegations made by the DEA that the company

24    entered into a settlement in 2008.

25    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     Okay.  Have you seen that

2    agreement?

3          A.     I believe I have, yes.

4          Q.     About when did you see it, do

5    you recall?  Just a year would be fine.

6                 MS. HENN:  Objection to form.

7          A.     I can't say for certain when I

8    first saw it.

9    ████████████

    ██    ██    █████    ███████████████

    ██    ████████████████████████████

    ██    ████████████████████████████

    ██    █████████████████████

14                MS. HENN:  Objection to form,

15          calls for speculation.

16    ██    ██████████████████

    ██    ███████████████████████

    ██    ████████████

    ██    ██    █████    ███████████

    ██    █████████████    ████████████

    ██    █████████████████████████

    ██    ████████████████████

23                MS. HENN:  If this is -- if

24          we're about to start some lengthy

25          questions, we've been going about an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        hour.  Is this a good time for a

 2        five-minute break?

 3             MR. BOGLE:  That's fine.  I'll

 4        give it to you after the break.

 5             THE VIDEOGRAPHER:  We're off

 6        the record at 10:01 a.m.

 7             (Recess taken, 10:01 a.m. to

 8        10:10 a.m.)

 9             THE VIDEOGRAPHER:  We are back

10        on the record at 10:10 a.m.

11   BY MR. BOGLE:

12
```



Highly Confidential - Subject to Further Confidentiality Review



1

2          Do you recall that question?

3          MS. HENN:   Objection to form.

4

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11    BY MR. BOGLE:

12          Q.    Just to orient you on the first

13    page, if you need to look at anything, let me

14    know, but I just kind of want to orient you

15    to the document first, if you don't mind.

16                The first page says:

17    Settlement and Release Agreement and

18    Administrative Memorandum of Agreement, and

19    in the first paragraph there's a date of

20    May 2nd, 2008.

21                Do you see that there?

22          A.    I do, May 2nd, 2008.

23          Q.    Okay.  Do you recognize this as

24    the settlement agreement you reviewed

25    previously?

```
 1            A.      It looks like the same

 2    document, yes.

 3            Q.      Okay.  And you do understand

 4    from having reviewed this previously that the

 5    settlement that was entered into in May of

 6    2008 between the DEA and McKesson involved

 7    allegations by the DEA of violations of the

 8    Controlled Substances Act, many of which

 9    included opioid distribution, right?

10                 MS. HENN:  Objection to form.

11            A.      As I get refamiliarized with

12    the allegations that are documented here,

13    they seem to focus around failing to maintain

14    effective controls and alleges failed to

15    report suspicious orders, controlled

16    substances.

17    BY MR. BOGLE:

18            Q.      Okay.  And the allegations

19    specifically involve, many of them, opioids,

20    right?

21                 For example, if you go to

22    Appendix B of the document, on the second

23    page there, there's a section that talks

24    about covered conduct.  I think it's 13 pages

25    in, it looks like.
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Is there a point number at the

2     top?

3          Q.      It should be, I think, .13.

4          A.      .13?

5          Q.      Yeah.  Do you see where I'm at

6     generally here, the section in the middle of

7     the page titled:  The covered conduct shall

8     mean the following alleged conduct?

9          A.      I do.

10          Q.      Okay.  I'm not going to read

11     all the stuff hereafter, but, for example,

12     there's conduct in the District of Maryland

13     involving the distribution of 3 million

14     dosage units of hydrocodone to

15     NuCare Pharmacy in Baltimore from

16     January 2005 to October 2006 the DEA contends

17     McKesson failed to report as suspicious.

18               Do you see that?

19          A.      I do see that in the document.

20          Q.      Okay.  And hydrocodone is an

21     opioid product, right?

22          A.      I believe.  I'm not 100% sure.

23          Q.      Okay.  You don't know if

24     hydrocodone is an opiate?

25          A.      I can't say for certain.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  If you look down in

 2    letter B, talking about conduct in the Middle

 3    District of Florida, there's a reference to,

 4    in October 2005, McKesson-Lakeland sold

 5    approximately 2.1 million dosage units of

 6    hydrocodone to seven pharmacies in the Tampa

 7    area, and then it lists the pharmacies, and

 8    failed to report these sales as suspicious

 9    orders to DEA when discovered.

10               Do you see that?

11          A.    I do see where the document

12    says that, yes.

13          Q.    Okay.  And then it goes on.

14    There's conduct also outlined in Texas,

15    Colorado, Utah and California.

16               Do you see that?

17          A.    Colorado, Utah, California,

18    yes.

19          Q.    Okay.  So we're talking about

20    conduct that occurred in multiple

21    distribution centers, right?  You can see

22    that from the document?

23               MS. HENN:  Objection to form,

24          lacks foundation.

25          A.    I can see where the document
```

Highly Confidential - Subject to Further Confidentiality Review

1    calls out allegations by the DEA in several

2    of our distribution centers.

3    BY MR. BOGLE:

4         Q.    Right.  For example, the

5    Maryland conduct talks about

6    McKesson-Landover, right?

7         A.    It does yes.

8         Q.    The Florida conduct refers to

9    McKesson-Lakeland, right?

10        A.    It does.

11        Q.    The Texas conduct refers to

12   McKesson-Conroe, right?

13        A.    It does.

14        Q.    The Colorado conduct refers to

15   McKesson-Aurora, right?

16        A.    It does, yes.

17        Q.    The Utah conduct refers to

18   McKesson-Salt Lake City, right?

19        A.    Yes, agreed.

20        Q.    And the California conduct

21   refers to McKesson-West Sacramento, right?

22        A.    Yes, correct.

23        Q.    Those are all different

24   distribution centers that would have existed

25   at McKesson at that point in time, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      I believe so, yes.

 2              Q.      Okay.  So when you reviewed

 3     this settlement agreement, when it references

 4     these allegations regarding hydrocodone,

 5     oxycodone, fentanyl, methadone, did you not

 6     have an understanding that those were all

 7     opioid products?

 8                   MS. HENN:  Objection to form.

 9              A.      I'm aware that they're all

10     controlled substances.  I don't know that I'm

11     aware that they're all opioids.

12     BY MR. BOGLE:

13              Q.      Okay.  Are you aware of any

14     base chemicals that are in the opiate family?

15              A.      I believe so, yes.

16              Q.      Which ones?

17              A.      Oxycodone.

18              Q.      Okay.  Any others?

19              A.      I believe fentanyl is as well.

20     The question earlier about hydrocodone, I'm

21     just not 100% sure that...

22              Q.      Okay.  So -- and again, I

23     didn't intend to read all the covered conduct

24     here, but you can if you want to to answer my

25     question.
```

```
 1                   These allegations that are made

 2       here by the DEA in this settlement agreement

 3       related to hydrocodone, fentanyl, oxycodone,

 4       methadone distribution by various McKesson

 5       distribution centers, these are serious

 6       allegations, right?

 7                   MS. HENN:  Objection to form.

 8            A.     I would describe them as

 9       serious obligations -- allegations, yes.

10       BY MR. BOGLE:

11            Q.     Okay.  And you understand as

12       part of this settlement agreement, McKesson

13       agreed to pay a $13.25 million fine, right?

14                   MS. HENN:  Objection to form.

15            A.     I am aware that as a result of

16       the settlement, McKesson did agree and I

17       believe we paid a fine.

18       BY MR. BOGLE:

19            Q.     It's page .5 if that helps.

20            A.     The 13.25, yes, 13.25.

21            Q.     You see that?  Okay.

22                   In your experiences at 17 years

23       at McKesson, if there are allegations made of

24       wrongdoing by the company, when the company

25       disagrees with those allegations, do they
```

```
 1    contest them?

 2               MS. HENN:  Objection to form,

 3         calls for speculation.

 4         A.    I'm not sure in every

 5    circumstance.  I would -- so the question is

 6    if McKesson disagrees with the allegations,

 7    do they contest them?

 8    BY MR. BOGLE:

 9         Q.    Right.  Allegations as serious

10    as the ones we're looking at here related to

11    distribution of various controlled

12    substances, including opioids.

13               MS. HENN:  Objection to form.

14         A.    I'm not sure, but --

15    BY MR. BOGLE:

16         Q.    Okay.

17         A.    I'm not sure.

18         Q.    Okay.  Well, can -- first of

19    all, $13.25 million is a lot of money, right?

20         A.    I think that's relative.  To me

21    that's a lot of money.

22         Q.    Okay.  And do you think for

23    McKesson that's not a lot of money?

24         A.    I don't -- I guess it depends

25    in the context of what it is, you know.  I
```

Highly Confidential - Subject to Further Confidentiality Review

1    would say generally it's a material sum.

2         Q.    Okay.  And during your 17 years

3    with the company, can you think of an

4    instance where McKesson has paid a fine of

5    $10 million or more for conduct that it

6    disagreed that it actually committed?

7              MS. HENN:  Objection to form.

8         A.    I'm not sure.

9    BY MR. BOGLE:

10        Q.    I'm just asking if you're aware

11   of any circumstance that you could advise our

12   jury about.

13             MS. HENN:  Objection, asked and

14        answered.

15             MR. BOGLE:  You can answer.

16             THE WITNESS:  I'm sorry, could

17        you repeat the question?

18             MR. BOGLE:  Yeah.

19   BY MR. BOGLE:

20        Q.    Are you aware of any

21   circumstance that you could advise our jury

22   about of McKesson disagreeing with

23   allegations of wrongdoing yet paying a fine

24   of more than $10 million, while you've been

25   at the company?

1          MS. HENN:  Objection to form,

2      asked and answered.

3      A.    I'm not sure that I understand

4   the question, but I think companies settle

5   disputes through a number of ways, and I'm

6   not familiar with or was involved in any of

7   the conversations that led up to this

8   settlement.

9   BY MR. BOGLE:

10      Q.    Okay.  Yeah, I'm not talking

11   about other companies.  I'm just talking

12   about McKesson.  I'm not asking you to talk

13   about other companies.

14          I'm just asking you, in the

15   17 years you've been with McKesson, can you

16   think of a single instance where the company

17   has paid a fine exceeding $10 million for

18   conduct it disagreed that it actually was

19   involved in?

20          MS. HENN:  Objection to form,

21      asked and answered, calls for

22      speculation.

23      A.    I'm not sure, but my

24   understanding of this settlement is that we

25   did not admit liability to any of the

Highly Confidential - Subject to Further Confidentiality Review

1    allegations.  The agreement is neither an

2    admission by McKesson of liability of any of

3    the allegations made by the DEA in the orders

4    and investigations, nor a concession by the

5    DEA that its allegations were not well

6    founded.

7              MR. BOGLE:  Move to strike as

8         nonresponsive.

9    BY MR. BOGLE:

10        Q.    My question was simply whether

11   you can think of a single instance in the

12   last 17 years where McKesson has paid a fine

13   exceeding $10 million for something it

14   believed it did not do?

15             MS. HENN:  Objection, calls for

16        speculation, asked and answered

17        numerous times.

18        A.    I'm not sure.  I'm not involved

19   in those discussions.

20   BY MR. BOGLE:

21        Q.    Okay.  When you read this

22   settlement agreement, did you ever reach out

23   to anybody at McKesson and ask whether the

24   company believed or didn't believe it

25   committed the conduct outlined in the

```
 1    settlement agreement?

 2              MS. HENN:  I'll just object and

 3         instruct the witness that to the

 4         extent your question is asking for

 5         information and conversations that he

 6         may have had with attorneys, that he

 7         shouldn't answer; but otherwise, he

 8         may.

 9              MR. BOGLE:  Yeah, that's fine.

10    BY MR. BOGLE:

11         Q.    So carving out conversations

12    with legal counsel, you ever talk to anybody

13    at McKesson about whether there was a view

14    that the company did or did not do the things

15    outlined in the settlement agreement as it

16    pertained to controlled substances reporting

17    and shipping?

18         A.    I don't recall specific

19    conversations to this settlement, and if -- I

20    don't know that I -- in what period of time?

21         Q.    Anytime after you read it.

22         A.    I'm not sure.  I don't recall

23    those conversations.

24         Q.    Okay.  Meaning you don't recall

25    whether they occurred, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     If I -- again, if I proactively

2    reached out and asked anybody if -- was that

3    the question?

4          Q.     Yeah, so I'll rephrase it for

5    you just so we're clear.

6               We looked at the covered

7    conduct section here, which outlines covered

8    conduct in one, two, three, four, five, six

9    different McKesson distribution centers.

10              My question is simply, after

11   you read that covered conduct in the

12   settlement agreement, when you read it while

13   you were at McKesson, did you ever reach out

14   to anybody and say, did we actually do that?

15   Did we do those things they're alleging we

16   did?

17              MS. HENN:  And I'll make the

18        same objection.

19              MR. BOGLE:  Yeah, except with

20        counsel.  I'm not asking about

21        counsel.

22              MS. HENN:  If I can just make

23        sure to issue the same instruction to

24        the witness about not revealing any

25        conversations you may have had with

attorneys.

A. Outside of conversations with attorneys, part of our leadership team, maybe -- I don't recall, no.

BY MR. BOGLE:

Q. Okay. And without revealing the substance of the conversations, did you speak to any attorneys within McKesson about whether the company committed these acts?

MS. HENN: Objection to form, vague as to time.

A. I don't recall asking that question.

BY MR. BOGLE:

[redacted]

Case: 1:17-md-02804-DAP Doc #: 1975-19 Filed: 07/24/19 86 of 374. PageID #: 216925
Highly Confidential - Subject to Further Confidentiality Review

[redacted]

MS. HENN: Objection to form, compound.

[redacted]

Golkow Litigation Services Page 86

Highly Confidential - Subject to Further Confidentiality Review



14          MS. HENN:  Objection to form,

15      lacks foundation.

16          THE WITNESS:  Can you repeat

17      the question again?

18          MR. BOGLE:  Sure.

19  BY MR. BOGLE:

20

Highly Confidential - Subject to Further Confidentiality Review



8            MS. HENN:  Objection to form,

9       lacks foundation.

10

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6          Q.     Do you want to look at it for a

7    second?  I just want to make sure you're

8    focused on my question, so if you want to

9    look at it, just let me know.

10         A.     I'm just taking a second to --

11         Q.     Sure.  Just let me know when

12   you're ready to talk about it.

13         A.     Okay.

14         Q.     Okay.  I want to look at the

15   e-mail first.  Mr. Walker says:  Paul -- I

16   think that refers to a Paul Julian.

17                What was Mr. Julian's role at

18   that point in time at McKesson?

19         A.     I can't say for sure what his

20   role was in 2008.  For the most of my career,

21   I knew Paul as our executive vice president

22   and president of our distribution businesses.

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



1

25          Q.     Okay.  And then this is a --

1    we're talking about a settlement here.  This

2    is around the same time as the settlement

3    agreement we just reviewed, right?

4                MS. HENN:  Objection to form,

5        asks for speculation.

6        A.    It's around the same time of

7    the settlement we just reviewed, so I can't

8    say for certain if it's referencing the same

9    one.

10   BY MR. BOGLE:

11       Q.    Okay.  Are you aware of any

12   other settlements in or around early 2008

13   other than the one we just looked at,

14   McKesson was involved in?

15       A.    Don't know that I'm aware of

16   any.

17

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



        18              MS. HENN:   Objection to form,

        19         lacks foundation.

        20

Highly Confidential - Subject to Further Confidentiality Review



1

2          MS. HENN:  Objection to form,

3      lacks foundation.

Highly Confidential - Subject to Further Confidentiality Review



20          MS. HENN:  Objection to form.

21          Go ahead.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



20        MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review



15            MS. HENN:   Objection to form,

16      asked and answered.

17

Highly Confidential - Subject to Further Confidentiality Review



24          MS. HENN:  Objection to form,

25      lacks foundation.

Highly Confidential - Subject to Further Confidentiality Review



19          MS. HENN:  Objection to form.

20

Highly Confidential - Subject to Further Confidentiality Review



8        MS. HENN:   Objection to form.

19        MS. HENN:   Objection to form.

Highly Confidential - Subject to Further Confidentiality Review



 7              MS. HENN:  Let's make sure the

 8       court reporter --

 9              MR. BOGLE:  Yeah.  Either read

10       to yourself --

11       A.     I'm reading the second

12   paragraph there.

13              MS. HENN:  You can read it out

14       loud.  I just want to make sure the

15       court reporter can catch what you're

16       saying.

17

Highly Confidential - Subject to Further Confidentiality Review



```
 1

11            MS. HENN:  Objection to form.

12   BY MR. BOGLE:

13

14            MS. HENN:  Mischaracterizes the

15   document.

16
```

Highly Confidential - Subject to Further Confidentiality Review



1

5          MS. HENN:  Objection to form,

6     calls for speculation.

7     A.    I don't know.  I didn't write

8     the document.  Again, I don't remember this

9     document going out in this form.  I can't say

10    if it did or it didn't, if further changes

11    were made.  It's hard for me to say why it

12    was drafted this way.

13    BY MR. BOGLE:

14    Q.    Prior to the implementation of

15    the CSMP in 2008, did you -- actually, strike

16    that.

17

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17    Q.    Okay.  And in 2011, August 2011

18 specifically, you would have been part of the

19 McKesson U.S. Pharma sales force, right?

20    A.    I believe I was a vice

21 president of sales at that time, yes.

22    Q.    Right.  Okay.

23

Highly Confidential - Subject to Further Confidentiality Review



```
 1
       ▮
       ▮
       ▮
       ▮
       ▮
       ▮
       ▮
 9              MS. HENN:  Objection to form,
10         lacks foundation.
11
       ▮
       ▮
       ▮
       ▮
       ▮
       ▮
       ▮
       ▮
       ▮
       ▮
       ▮
       ▮
       ▮
       ▮
```

Highly Confidential - Subject to Further Confidentiality Review



1

13          MS. HENN:   Objection, asked and

14     answered.

15

Highly Confidential - Subject to Further Confidentiality Review



20        Q.     Okay.  So let me make sure I

21   understand then.

22             So while you were -- as part of

23   the McKesson sales force, which really

24   extended all the way until 2017, right?  2002

25   to 2017?

```
1           A.      I lead large parts of our
2    organization now, but I don't have a
3    full-time selling responsibility.
4           Q.      Right.  Let me rephrase the
5    question because I think we're agreeing with
6    each other.
7                   So from 2002 to 2017, to
8    August 2017, you were part of the sales
9    organization at McKesson, right?
10          A.      My responsibilities as
11   senior -- I had operating responsibility, I
12   had responsibilities beyond sales in my
13   senior vice president role, my VP/GM role.
14   They were leaders of salespeople, but I
15   wouldn't consider it part of the sales
16   organization.
17          Q.      Okay.  Let me ask you this:
18   2002 to 2005 as a sales executive, you're
19   part of the sales force at McKesson
20   U.S. Pharma, correct?
21          A.      Correct.
22          Q.      November 2005 to March 2009 as
23   district sales manager, you're part of the
24   McKesson U.S. Pharma sales force, correct?
25          A.      I had selling responsibilities
```

1    as a district sales manager, correct.

2         Q.    Vice president of sales,

3    March 2009 to January 2012, you're part of

4    the McKesson overall sales force, correct?

5         A.    I had selling responsibility,

6    was part of the sales force.  The number I

7    gave you earlier about 250 people, I'm

8    including vice presidents of sales.

9         Q.    Sure.  And I think what you

10   were referencing here was your time in

11   Memphis when you were vice president and

12   general manager as being less involved in the

13   sales process, true?

14        A.    I would say that's where I

15   began to take on additional responsibilities

16   outside of sales operating responsibility and

17   I would not include that number in the number

18   I gave you earlier for the sales

19   organization.

20        Q.    Okay.

21        A.    But I led salespeople; they

22   reported to me or up through me.

23        Q.    Understood.

24              And then from April 2015 to

25   August 2017 when you were senior vice

Highly Confidential - Subject to Further Confidentiality Review

```
 1    president in the northeast region, you were

 2    overseeing a sales force then too, right?

 3         A.     Similar to the general manager.

 4    I had broad responsibilities, including

 5    overseeing the sales organization.

 6

13              MS. HENN:  Objection to form,

14         vague.

15

23    BY MR. BOGLE:

24         Q.     Because oftentimes the sales

25    representative responsible for a customer
```

1    would be the most knowledgeable about that

2    customer's business, right?

3              MS. HENN:  Objection to form.

4         A.    I think they would have a

5    perspective.

6    BY MR. BOGLE:

7         Q.    Okay.  Because they're the

8    people who frequently actually meet with the

9    customers in person, right?

10        A.    That's one of our expectations,

11   yeah, that they are out meeting with the

12   customers.

13        Q.    Right.  That's how you make

14   sales, right?  You go out and talk to people

15   and you meet with people and you try to close

16   a deal, right?

17        A.    I think our salespeople have

18   broad responsibilities.  We believe that a

19   face-to-face interaction is often a way to

20   help advance some of our joint initiatives,

21   things that we might want to do with our

22   customers, the value of our sales force.

23        Q.    Right.  And that's how you keep

24   customers too, right, is you continue to

25   interact with them over time as a sales force

Highly Confidential - Subject to Further Confidentiality Review

1    to make sure that you are actively involved

2    in meeting their needs, right?

3         A.    It's a component.  I think we

4    keep customers by providing world-class

5    service and meeting their expectations every

6    day.  We talk about we earn our customers'

7    business every day.

8

13              MS. HENN:  Objection to form.

14

Highly Confidential - Subject to Further Confidentiality Review





1

                    MS. HENN:  Objection to form,

          compound.

Highly Confidential - Subject to Further Confidentiality Review

1              MS. HENN:  Objection to form,

2       vague.

3



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5          Q.      And we're going to talk about

6     this a little more in a few minutes, but

7     there have been bonus and incentive plans in

8     place at McKesson for the entire time you

9     were involved in the sales force, and

10    including up to today, right?

11              MS. HENN:  Objection to form.

12         A.      We have a sales incentive plan

13    for our field sales teams.  Different members

14    of the team have been covered by that

15    differently at points in time, but there is a

16    sales incentive plan.

17    BY MR. BOGLE:

18         Q.      Right.  Which components of

19    that are commissions that can be made,

20    portions of that are additional bonuses that

21    can be received, right?

22              MS. HENN:  Objection to form,

23         lacks foundation.

24         A.      There are parts of the

25    incentive plan that are tied to different

Highly Confidential - Subject to Further Confidentiality Review

```
1    components.  Some is for products and
2    services; some is for account performance.
3    BY MR. BOGLE:
4
```



Highly Confidential - Subject to Further Confidentiality Review



6          MS. HENN:  Objection to form.

7     A.    I don't agree necessarily, no.

8  BY MR. BOGLE:

17          MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

1

4      Q.     When you see significant acts

5  of integrity, is that rewarded in any way for

6  your sales force?

7      A.     We have other areas of

8  recognition.  You know, when people go above

9  and beyond, I've personally sent a

10  handwritten note.

11      Q.     Any other way that they're

12  compensated for showing significant

13  integrity?

14      A.     It's a core expectation.  I

15  don't believe we have to provide financial

16  incentive to do that.

17      Q.     Okay.  Well, for example, with

18  the sales incentive plans, the time you've

19  been in the company, 2002 to present, has

20  there ever been an incentive provided to

21  sales -- the sales force to report suspicious

22  activity of customers as it relates to

23  controlled substances?  Has that ever been a

24  component of the plan?

25           MS. HENN:  Objection to form,

1    compound, vague.

2        A.    I'm not aware that it's been a

3    specific segment of our sales incentive

4    plans.  I think it's been a component of some

5    performance documents.

6    BY MR. BOGLE:

7        Q.    What specific incentives would

8    you refer me to that the sales force has been

9    provided for reporting suspicious activity

10   related to controlled substances?

11           MS. HENN:  Objection to form,

12       lacks foundation.

13       A.    I don't know that I -- I think

14   I stated that I'm not aware that there's ever

15   been a specific component of our incentive

16   plan that called out an expectation to report

17   suspicious activity of controlled substances.

18   BY MR. BOGLE:

19       Q.    Okay.  So, for example, let me

20   give you this as an example.

21           Can you -- has there ever been

22   a time where the sales force has been

23   instructed, hey, if you report suspicious

24   activity of a customer related to controlled

25   substances and we confirm that it was

1    suspicious, we're going to give you a $500

2    bonus?  Anything like that you can think of?

3         A.      No.

4         Q.      Okay.

5         A.      But I have written a

6    performance document that, under workforce

7    behaviors, adhering to and supporting our

8    regulatory responsibilities is a clear

9    expectation.

10        Q.      When did you draft that?

11        A.      I would say during my period of

12   time as a vice president of sales and a

13   general manager.  I can't say specifically.

14   I'm pretty confident it was a component of

15   mine from time to time, and if it wasn't, I

16   knew clearly the expectation, and I shared

17   that with my team.

18        Q.      And that component you're

19   saying included reporting suspicious activity

20   related to controlled substances?

21        A.      Again, I believe I phrased it

22   as executing our regulatory responsibilities.

23        Q.      Okay.  So going back, because

24   McKesson does provide financial incentives to

25   sales representatives, for example, when they

Highly Confidential - Subject to Further Confidentiality Review

1    increase profitability for the company,

2    right?

3         A.    You know, our compensation plan

4    today, you know, it's a complex plan.  There

5    are components that could be tied to customer

6    profitability.  I don't think a core

7    component of our plan today is directly tied

8    to profitability.

9              At different periods of time

10   we've had different measurements that were

11   attempting to get at that, but...

12        Q.    Okay.  In -- all right.  We'll

13   look at the plans here in a minute.

14        A.    Okay.

15             MS. HENN:  And we've been going

16        another hour, so this might be a good

17        time for a five-minute break.

18             MR. BOGLE:  That's fine.

19             THE VIDEOGRAPHER:  We're off

20        the record at 11:13 a.m.  This

21        concludes Disc 1.

22             (Recess taken, 11:13 a.m. to

23        11:25 a.m.)

24             THE VIDEOGRAPHER:  We are back

25        on the record, 11:25 a.m., beginning

1       of Disc 2.

2    BY MR. BOGLE:

3

9                   (McKesson-Cavacini Deposition

10       Exhibit 7 marked.)

11   BY MR. BOGLE:

12       Q.     Okay.  Mr. Cavacini, see here

13   there's an e-mail on the first page titled

14   RSM Compensation Call.

15               Do you see that at the top?

16       A.     I do.

17       Q.     Okay.  And sent from a Brian

18   Ferreira on March 26th, 2006.

19               Do you see that?

20       A.     I do.

21       Q.     I'm not going to go through all

22   the recipients here, but you see that you're

23   in the cc line, correct?

24       A.     Yes, I do.

25

Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5

 6

 7

 8          Q.      Okay.  And FY07, would that be

 9    fiscal year?

10          A.      Correct.

11          Q.      Okay.  And retail sales

12    manager, that's one of the positions within

13    the McKesson U.S. Pharma sales force at this

14    point in time in 2006, right?

15          A.      Yes.

16

17

18

19

20

21

22                  MS. HENN:  Objection to form,

23          lack foundation.

24

25
```

[redacted]

MS. HENN: Objection to form, vague.

[redacted]

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

1

19          MS. HENN:   Objection to form.

20

Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4                MS. HENN:  Objection to form,

5          calls for speculation.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review



16            MS. HENN:   Objection to form.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



10              MS. HENN:  Objection to form,

11        lacks foundation.

19              MS. HENN:  Objection to form,

20        lacks foundation.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1      Q.      The McKesson OneStop Generic

2   program, what is that?  Can you give me a

3   general description of what that program is?

4      A.      I would describe it as our

5   source program for generics, generics that we

6   might have under contract, and offer those to

7   our customers.

8      Q.      So sort of the ordering portal

9   for a customer is the OneStop Generics

10  portal?

11     A.      No, I would refer to the portal

12  as McKesson Connect.

13

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21          MS. HENN:  Objection to form.

22

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18              MS. HENN:  Objection to form,

19        asked and answered.

20

Highly Confidential - Subject to Further Confidentiality Review



23          MS. HENN:  Objection to form,

24       asked and answered.

25

Highly Confidential - Subject to Further Confidentiality Review



1

22              MS. HENN:  Objection to form,

23      asked and answered, mischaracterizes

24      testimony.

25

Highly Confidential - Subject to Further Confidentiality Review



1

7            MS. HENN:  Objection to form,

8        asked and answered.

9

12           MS. HENN:  Same objections.

13

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5          Q.     When it comes to the sales

6     force, U.S. Pharma-wise at McKesson, is the

7     largest group of that sales force the retail

8     sales manager group?

9          A.     As far as numbers, like --

10          Q.     Sure.  Yeah, exactly.

11          A.     Yeah, I believe they are the

12     largest field sales organization we have,

13     numbers.

14          Q.     Right.

15          A.     The number I gave you earlier,

16     120 of the 200 are probably retail sales

17     managers roughly.

18          Q.     Understood.

19

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
21          MS. HENN:  Objection to form,
22     lacks foundation.
23     A.    I think by practice, I would
24  prefer that we let our regulatory affairs
25  team make independent judgments based on the
```



Highly Confidential - Subject to Further Confidentiality Review

1    information they have and their view of the

2    account.

3

13              MS. HENN:  Objection, asked and

14       answered.

15

Highly Confidential - Subject to Further Confidentiality Review



17          MS. HENN:  Objection to form.

18

Highly Confidential - Subject to Further Confidentiality Review



17          MS. HENN:  Objection to form.

18

25          MS. HENN:  What page is it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     And I'm sorry, I put the
 2  document away again.   It was .6?
 3  BY MR. BOGLE:
 4          Q.     Yes, sir, you're correct about
 5  that.
 6          A.     Okay.
 7          Q.     This is Exhibit 9, .6 is the
 8  page.
 9          MS. HENN:   Thank you.
10  BY MR. BOGLE:
11          Q.     So you know, for example, in
12  2010, 2011, many of the opioid products
13  available on the market were generics, right?
14          A.     You know, hard for me to say
15  what I knew in FY10, when I came to that
16  awareness.   I am aware that many controlled
17  substances are offered generically.
18
23          MS. HENN:   Objection to form,
24      mischaracterizes the document.
25
```

Highly Confidential - Subject to Further Confidentiality Review



15          MS. HENN:  Objection to form,

16     lacks foundation.

17

25          MS. HENN:  Objection to form,

Highly Confidential - Subject to Further Confidentiality Review

1         lacks foundation.



Highly Confidential - Subject to Further Confidentiality Review



```
 1
11              MS. HENN:  Objection to form,
12        calls for speculation.
13
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9              MS. HENN:  Objection to form.
10              THE WITNESS:  I'm sorry.
11              MS. HENN:  Go ahead.
12
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



 1

 4          MS. HENN:  Objection to form.

 5

16          MS. HENN:  Objection to form,

17     lacks foundation.

18

21          MS. HENN:  Counsel, I just note

22     that Exhibit 10 looks like it was

23     printed without the normal

24     confidentiality stamp.  I'm not sure

25     why that would be.



```
 1              MR. BOGLE:  That was

 2       unintentional if it was.  I'm happy to

 3       have you say it's confidential.

 4              MS. HENN:  I would just ask the

 5       court reporter to note that Exhibit 10

 6       should have a confidential and

 7       potentially highly confidential stamp

 8       on it.

 9              MR. BOGLE:  That's fine.  That

10       was unintentional, I can assure you of

11       that part.

12              MS. HENN:  Understood.

13    BY MR. BOGLE:

14
```

Highly Confidential - Subject to Further Confidentiality Review



 1

 2

 3

 4

 5

 6

 7

 8            MS. HENN:  Objection to form,

 9       vague.

10

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2          MS. HENN:  Objection to form.

3

22          MS. HENN:  Objection,

23      mischaracterizing testimony.

24

Highly Confidential - Subject to Further Confidentiality Review



       24            MS. HENN:  Objection to form.

       25        Mischaracterizing the testimony.

Highly Confidential - Subject to Further Confidentiality Review



3   BY MR. BOGLE:

4        Q.     Okay.  So the region that

5   would -- Ohio would fit within, who would

6   that be within the last five years?

7        A.     For a period of time it was me

8   and then since to me -- the eastern part of

9   Ohio serviced by New Castle would have fallen

10  into the northeast region, which from the

11  period of 2015 to 2017 was me.  After that it

12  was Chris Smith, who's no longer with the

13  company.  We've since restructured the

14  regions.

15

18            MS. HENN:  Objection, lacks

19        foundation.

20

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          MR. BOGLE:  I'm about to shift

17     gears a little bit.  I don't know if

18     it's a decent lunch break time.  I can

19     shift gears if you want.  It doesn't

20     matter.

21          MS. HENN:  Let's go ahead and

22     break for lunch.

23          THE WITNESS:  Whatever you

24     think is best.

25          THE VIDEOGRAPHER:  We're off

Highly Confidential - Subject to Further Confidentiality Review

```
 1            the record at 12:27 p.m.  This

 2            concludes Disc 2.

 3                   (Recess taken, 12:27 p.m. to

 4            1:04 p.m.)

 5                   THE VIDEOGRAPHER:  We are back

 6            on the record at 1:04 p.m., beginning

 7            of Disc 3.

 8     BY MR. BOGLE:

 9            Q.     Mr. Cavacini, we had stopped

10     before lunch talking about the bonus or sales

11     incentive plans over time.  Do you recall

12     that discussion generally?

13            A.     I do, yes.

14            Q.     Okay.  Now, in addition to

15     motivating sales representatives with those

16     sales incentive plans, you also personally

17     would send e-mails sort of encouraging your

18     sales representatives over time to be as

19     aggressive as possible in their sales tactics

20     to get and keep new customers, right?

21                   MS. HENN:  Objection to form.

22            A.     I think it's reasonable to

23     assume that I would communicate with my team

24     to try and reinforce behaviors and motivate.

25                   ///
```

1    BY MR. BOGLE:

2

8    BY MR. BOGLE:

9         Q.    You see here, Mr. Cavacini, you

10   have an e-mail from you dated February 8,

11   2010 to a group of individuals.

12             Do you see that?

13        A.    I do.

14        Q.    This group of individuals,

15   would this generally be the sales force you

16   were supervising at that point in time?

17        A.    Looks to be the team of RSMs,

18   yes.

19        Q.    Okay.  And the subject is Time

20   Magazine on CAH.  CAH being Cardinal Health

21   in this instance, right?

22        A.    That's how I would take it.

23        Q.    For example, if you see on the

24   second page there's an e-mail from a Bill

25   Roehl and the body of that says:  Time

Highly Confidential - Subject to Further Confidentiality Review

1    Magazine article on changes at Cardinal

2    referred to on today's call.

3              Do you see that?

4         A.    I do.

5         Q.    And Cardinal Health is one of

6    your main competitors at McKesson when it

7    comes to distribution, right?

8         A.    They're another competitive

9    distributor.

10        Q.    And a large one at that, right?

11   They're one of your most significant

12   competitors, right?

13        A.    I think they're a significant

14   player in the market, and depending on

15   market, I mean, that relevance might be

16   different in different geographies, but they

17   are a significant player.

18        Q.    Okay.  If you look at this

19   e-mail you sent, you say:  Team, interesting

20   article on CAH.  Looks like they feel they

21   have their house in order and are ready to

22   get back in the fight.

23              When you say they have their

24   house in order, what are you referring to?

25        A.    I don't know.  The original

Highly Confidential - Subject to Further Confidentiality Review

1    article isn't here.  I don't remember the

2    2010 Time Magazine, or I'd be speculating as

3    to what my thought process was back then.

4

13        Q.    I'm going to get to that.  I'm

14   going one by one.

15            The New Castle market covers

16   portions of Ohio, correct?

17        A.    New Castle would ship eastern

18   Ohio.

19        Q.    Including Summit and Cuyahoga

20   Counties, true?

21            MS. HENN:  Objection to form,

22        lacks foundation.

23        A.    I'm not sure of the specific

24   geographies of Ohio.  I would say, you know,

25   the Cleveland area and suburbs.

Highly Confidential - Subject to Further Confidentiality Review



1     BY MR. BOGLE:

2          Q.     Right.

3          A.     Eastern Ohio.

Highly Confidential - Subject to Further Confidentiality Review



1

8                  MS. HENN:  Objection to form.

9

Highly Confidential - Subject to Further Confidentiality Review

11    A.    I mean, they were a team of

12    independent contributors.  I think they're --

13    was individual and varied from time to time

14    and maybe not as much as I would have liked,

15    but I do think they took my directions and

16    input seriously.

17    Q.    Okay.  John Kuczynski, that was

18    one of your individuals you supervised on the

19    sales force around this time in 2010, right?

20    A.    John is an RSM in our New

21    Castle markets primarily.

22    Q.    Right.  So during, for example,

23    this e-mail we were looking at is from 2010,

24    and he's listed as one of the recipients,

25    right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yeah.  I was the vice president

 2     of sales and during that period of time had

 3     responsibility for the New Castle market and

 4     John was copied on the e-mail.

 5          Q.      Is he an employee at McKesson

 6     that, during your time working with him, you

 7     felt listened to your directives and took

 8     them to heart?

 9          A.      I think John always tried to do

10     his best to represent McKesson and serve his

11     customers in the territory.

12
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      What was Patrick's role,
2    Patrick Soos?  Is that how you say that?
3          A.      Correct, Soos.  I believe at
4    this time he was the district sales manager
5    for Buffalo and New Castle.
6          Q.      Okay.  So you would have been
7    Patrick's boss at this point in time?
8          A.      Yes, Patrick reported to me.
9
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6           MS. HENN:  Objection to form.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23           MS. HENN:  Objection to form,

24      calls for speculation.

25              ///

Highly Confidential - Subject to Further Confidentiality Review



1    BY MR. BOGLE:

2

3                    MS. HENN:   Same objection.

4

8                    MS. HENN:   This is --

9                    MR. BOGLE:   Go ahead.

10

25                   MS. HENN:   Objection to form.

Highly Confidential - Subject to Further Confidentiality Review



22          MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
1
```

```
5    BY MR. BOGLE:

6         Q.     When it comes to opioid

7    products that McKesson sells, is it the

8    practice of McKesson to only sell opioid

9    products that are FDA approved?

10        A.     I'm not sure.  We sell 20,000s

11   of -- over 20,000 different products in our

12   distribution centers.  I'm not sure of how we

13   decide what to stock and what not to stock.

14        Q.     Okay.  Let me ask you this.

15   Let me back up.

16               You understand, first of all,

17   that opioids in all forms are only available

18   via prescription, right, in this country at

19   least?

20        A.     I mean, my understanding is

21   that all prescription medications, including

22   controlled substances and opioids, are

23   available by prescription.

24        Q.     Right.  And that all substances

25   that are available only via prescription in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    this country have to be FDA approved.

 2              Do you understand that?

 3        A.    That's my general

 4    understanding.

 5        Q.    Okay.  So then I go back to my

 6    earlier question, which is -- and I'll

 7    rephrase it a different way:  Do you ever

 8    recall any periods in time where McKesson was

 9    selling opioid products that were not FDA

10    approved?

11        A.    I'm not aware.

12        Q.    Okay.  Do you understand the

13    purpose behind, when it comes to opioids

14    specifically, only selling those that are FDA

15    approved?

16        A.    My understanding that all

17    medications need to be approved by the FDA

18    before they're commercially available to

19    patients and prescribers, so I think it's to

20    protect the population.

21
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7              MR. RALEY:  Is there a Bates
 8      stamp?
 9
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24        Q.        And McKesson OneStop Generics,

25        I think we talked about that a little bit

Highly Confidential - Subject to Further Confidentiality Review

```
1    before, that's the sort of ordering program

2    for generic products at McKesson, right?

3          A.    Just to be clear, it's our

4    source program or our proprietary generics

5    program.  The ordering program that we talked

6    about, how customers interface with us was

7    called McKesson Connect.

8          Q.    You're right, you did make that

9    distinction.

10
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24          MS. HENN:  Objection to form,

25      compound.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1
```

```
15         MS. HENN:  Asked and answered,
16    objection.
17         Go ahead.
18
25         MS. HENN:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review



15              MS. HENN:   Objection to form.

Highly Confidential - Subject to Further Confidentiality Review



1                      MS. HENN:   Objection to form.

2

12                     MS. HENN:   Objection to form.

13

19                     MS. HENN:   Objection, asked and

20          answered.

21

Highly Confidential - Subject to Further Confidentiality Review



13        Q.      Okay.   In 2010, Pennsylvania

14   would have been within your sales region,

15   right?

16        A.      Yes.   I mean, the eastern half

17   of Pennsylvania, absolutely during 2010.

18   Yeah, all of 2010, I would have had -- I'm

19   sorry, I would have had responsibility for

20   Pennsylvania, coming out of both New Castle

21   and Delran.





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

16                    MS. HENN:   Objection to form,

17          lacks foundation.

18

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2        Q.      Right.  And so just kind of

3   understanding how e-mails work, once you get

4   that one, you get to see all the e-mails in

5   the chain below it, right?

6        A.      I mean, I would -- I -- it

7   appears these two e-mails were linked

8   together, if that's the chain you're

9   referencing.

10

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 4

 8            MS. HENN:  Objection to form,

 9        lacks foundation.

10

19            MR. BOGLE:  Move to strike as

20        nonresponsive.

21     BY MR. BOGLE:

22
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1
 
 
 
 
 
 
 
 
10              MS. HENN:  Objection to form.
11    BY MR. BOGLE:
12
 
 
15              MS. HENN:  Objection to form.
16
```

Highly Confidential - Subject to Further Confidentiality Review



1

2          MS. HENN:  Objection to form,

3     lacks foundation.

4

18          MS. HENN:  Objection, asked and

19     answered.

20

Highly Confidential - Subject to Further Confidentiality Review



1          MS. HENN:  Objection to form,

2      lacks foundation.

3

21          MS. HENN:  Objection to form,

22      lacks foundation.

23

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19          Q.      Now, this customer, Martella's,

20    are you aware that just in the past few

21    months the owner of that pharmacy was

22    indicted for diversion of opioids?

23          A.      I'm not aware of the specific

24    timing of when I became aware, but I am aware

25    that the store is facing action and has some

Highly Confidential - Subject to Further Confidentiality Review

```
1    charges against it, yes.
2         Q.    Right.  And you know those
3    charges are specifically related to
4    allegations that they've been, for years,
5    diverting opioids, right?
6         A.    I would like to see a copy of
7    the complaint and allegations against the
8    store.
9         Q.    Okay.
10        A.    I'm not --
11        Q.    Okay.  Let's look at a couple
12   of things on this then.  I'm going to hand
13   you first what I'm marking as Exhibit 18,
14   which is 1.1905.  This is a public document,
15   so no Bates number.
16             (McKesson-Cavacini Deposition
17        Exhibit 18 marked.)
18   BY MR. BOGLE:
19        Q.    There you go, sir.
20        A.    Thank you.
21        Q.    You see here this is a press
22   release from November 2nd, 2018 from the
23   Department of Justice.
24             Do you see that?
25        A.    I do, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Okay.  And the title is

 2    Johnstown Pharmacist Charged in 109-Count

 3    Indictment with Illegally Creating Bogus

 4    Prescriptions and then Dispensing the Drugs.

 5                   Do you see that reference?

 6            A.     Is that -- I don't.  I'm sorry.

 7            Q.     Yeah.  It's the title.  It's

 8    sort of the bolded title there.

 9            A.     Oh, I'm sorry.

10            Q.     I was just reading the bolded

11    title to you.

12            A.     Oh, bogus prescriptions and

13    then dispensing them.

14            Q.     Yeah.  And so it goes on to

15    say:  A Johnstown, PA pharmacist has been

16    indicted by a federal grand jury in

17    Pittsburgh on charges of dispensing and

18    distributing controlled substances and

19    conspiring to distribute and dispense

20    controlled substances, United States Attorney

21    Scott W. Brady announced today.

22                   Then skipping down to the third

23    paragraph, it says:  According to the

24    indictment presented to the court, Martella

25    owned and operated Martella's Pharmacy
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1    located on Franklin Street in Johnstown.

 2

15         Q.     Okay.  The indictment alleges

16    that Martella, a pharmacist, conspired with

17    Dr. Peter James Ridella, who previously

18    pleaded guilty, and an individual named as

19    J.R., to create and submit unlawful

20    prescriptions for oxycodone; oxycodone and

21    acetaminophen, also known as Percocet;

22    oxymorphone, also known as Opana; morphine

23    sulfate, also known as MS Contin; and

24    hydrocodone and acetaminophen, also known as

25    Vicodin, and then unlawfully dispensed those
```

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substances to other persons.

2              Do you see that?

3         A.    I do.

4         Q.    It says:  The law provides for

5    a maximum per count sentence of 20 years in

6    prison and a fine of a million dollars or

7    both.

8              Do you see that there?

9         A.    I do.

10

14              MS. HENN:  Objection, lack of

15         foundation.

16

20    BY MR. BOGLE:

21         Q.    All right.  I'm going to hand

22    you what I'm marking as Exhibit 19, which is

23    1.1904, and again, this is a nonproduction

24    document so no Bates number.

25              (McKesson-Cavacini Deposition

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Exhibit 19 marked.)

 2   BY MR. BOGLE:

 3        Q.      So what I have for you here is

 4   the actual indictment for Mr. Martella.  You

 5   see this is -- the stamp filed date on this

 6   is October 30, 2018.  Do you see that kind of

 7   in the right-hand side of the page?

 8        A.      10/30/18.

 9        Q.      Yeah.  Either spot says the

10   same thing.

11        A.      Fine.

12        Q.      So getting to the issue of how

13   long this conduct had been ongoing per the

14   indictment, if you can go to the last page of

15   the document, page 10.

16            You see here in the second

17   paragraph it indicates that the illegal

18   dispensing of all the opioid products I just

19   read to you occurred from April 2011 and

20   continued thereafter to in or around

21   June 2016.

22            You see that?

23        A.      I do see where it says from in

24   and around April 11 to June 2016.

25
```

Highly Confidential - Subject to Further Confidentiality Review



1

2          MS. HENN:  Objection, lacks

3     foundation.

4

13          MS. HENN:  Objection, lacks

14     foundation.

15

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

13          MS. HENN:  Objection to form,

14      calls for speculation.

15

Highly Confidential - Subject to Further Confidentiality Review

1

7        Q.       Okay.   And we've talked about

8    sales activities from the sales force itself

9    in selling McKesson as a company and the

10   products they offer, but there's another

11   component to sales and marketing at McKesson

12   that includes marketing manufacturers'

13   products to customers, right?  Specific

14   marketing of manufacturers' products to

15   pharmacy customers, right?

16       A.       I mean, I'm aware of programs

17   where we work with manufacturers to provide

18   information and access to our pharmacy

19   customers, deliver messaging.  So if that's

20   marketing, yes.

21       Q.       Yeah.   And you're aware that

22   over the time you've been with the company,

23   there have been various deals struck for

24   opioid products for the sales and marketing

25   arms of McKesson to market for manufacturers'

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opioid products, right?
 2              MS. HENN:  Objection to form.
 3         A.      You know, I don't recall, and I
 4    don't know that I've been involved in the
 5    negotiations of those specific programs and
 6    what programs might be involved, what
 7    products might be involved in those programs.
 8    BY MR. BOGLE:
 9         Q.      Yeah.  And we'll get to the
10    specific marketing arrangements.  I just want
11    to just start with the preface that you
12    understand that these sort of marketing
13    agreements have been made for opioid products
14    while you've been at the company, right?
15              MS. HENN:  Objection --
16    BY MR. BOGLE:
17         Q.      You've been privy to that
18    information, haven't you?
19              MS. HENN:  Objection to form,
20         vague and compound.
21         A.      I'm not sure that I could list
22    any of the products that were ever included
23    in any of the campaigns that we did with our
24    pharmacy customers.
25              ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      BY MR. BOGLE:

2      ████    ██████    ███████████████

       █  █████████████  ██████████████████████

       █  ███████████████████████

       █               ████████████████████████

       █      ██████████████████

7                MS. HENN:  And we're again at

8         an hour, so if you want to take a

9         break.

10               MR. BOGLE:  I'm on a new

11        subject.  That's fine.

12               MS. HENN:  Yeah.

13               THE VIDEOGRAPHER:  Okay.  We're

14        off the record at 2:06 p.m.

15               (Recess taken, 2:06 p.m. to

16        2:15 p.m.)

17               THE VIDEOGRAPHER:  Back on the

18        record at 2:15 p.m.

19     BY MR. BOGLE:

20        Q.    Okay.  Mr. Cavacini, we had

21     left off, as I recall it, starting a

22     discussion about McKesson's activity in

23     marketing opioid products for manufacturers.

24               Do you recall us talking about

25     that generally?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      I remember you asking questions

2    along that line.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17          Q.      Okay.  And your job as of that

18    time frame would have been as vice president,

19    general manager in Memphis, right?

20          A.      Correct.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



11      Q.      And the ISMs are the

12   independent pharmacies, is that right,

13   independent, small-mediums?

14      A.      Well, ISMC, right, would be

15   independent small-medium chains, our

16   community pharmacy customers.

Highly Confidential - Subject to Further Confidentiality Review



1

5      Q.     So on this -- well, first off,
6   Susan Petrus, what was her job role at this
7   time?
8      A.     Susan currently leads, you
9   know, our sales effectiveness and customer
10  care groups.  I believe she had the same role
11  at the time.  I don't believe her
12  responsibilities have changed much in the
13  last five to six years.
14

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 8          MS. HENN:  Objection, asked and

 9     answered.

10          Go ahead.

11

16

20          MS. HENN:  Objection, lacks

21     foundation.

22

25          ///
```

Highly Confidential - Subject to Further Confidentiality Review



1

10          MS. HENN:  Objection to form.

11

17  BY MR. BOGLE:

18      Q.    Were you aware that well prior

19  to 2013 the DEA had a longstanding view that

20  promotion of controlled substances should not

21  be done by distributors?

22          MS. HENN:  Objection to form,

23      lacks foundation.

24      A.    I'm not aware of the DEA's

25  position, no.

Highly Confidential - Subject to Further Confidentiality Review

1

4          MS. HENN:  Same objection.

5

9    BY MR. BOGLE:

10         Q.    Does McKesson currently engage

11   in promotional activities for opioid

12   manufacturers?

13         A.    I don't know.

14         Q.    Is that not under your umbrella

15   as COO?  Would the people doing that not

16   report up to you ultimately?

17         A.    No.  Our brand management teams

18   and our marketing teams do not report up

19   through me.

20         Q.    Who do they report up through?

21         A.    Marketing, our U.S. Pharma

22   marketing team reports to Wendy Brauner, and

23   I believe brand and product management

24   currently reports to Chris Dimos.

25         Q.    Can you spell that last name on

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that one?
 2         A.    Dimos, D-I-M-O-S.
 3         Q.    Are you familiar with the
 4    concept of chargebacks?
 5         A.    Generally, yes.  Not an expert.
 6         Q.    Okay.  I'm sorry.  Make sure
 7    you're finished with your answer.
 8               What is your working
 9    understanding of what a chargeback is?
10         A.    That there can be a list price
11    and a contract price for a product, and then
12    the chargeback reconciles the difference
13    between the list price and what is actually
14    paid.
15
19               MS. HENN:  Objection to form,
20         vague.
21               THE WITNESS:  Could you repeat
22         the question.
23               MR. BOGLE:  Yeah.
24    BY MR. BOGLE:
25         Q.    So, for example -- let me back
```

Highly Confidential - Subject to Further Confidentiality Review



1     up and start from a different spot.

2          A.     Okay.

3

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8        Q.    Okay.  We had talked a little

9  earlier in general terms about the opioid

10  epidemic, and I wanted to talk more

11  specifically with you about that.

12          Do you have an awareness that

13  more than 350,000 people have died due to

14  opioid overdoses since 1999?

15         MS. HENN:  Objection, lacks

16      foundation.

17        A.    I don't know that I'm familiar

18  with that specific number.

19  BY MR. BOGLE:

20        Q.    Okay.  I'm going to hand you

21  what I'm marking as Exhibit 22, which is

22  1.2060.  This is a public document, so no

23  Bates number.

24          (McKesson-Cavacini Deposition

25      Exhibit 22 marked.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. BOGLE:  Sorry.  They tell
 2          me to bring a certain number, so I'm
 3          trying to comply.
 4                    MS. HENN:  You can take that
 5          back to Florida.
 6                    MR. BOGLE:  I'm trying to
 7          comply.
 8   BY MR. BOGLE:
 9          Q.    Okay.  Mr. Cavacini, what I
10   just handed you is titled Red Flags and
11   Warning Signs Ignored:  Opioid Distribution
12   and Enforcement Concerns in West Virginia
13   prepared by the Energy and Commerce
14   Committee, Majority Staff, of the House of
15   Representatives in Congress.
16                    Do you see that?
17          A.    I do.
18          Q.    Okay.  And it's dated
19   December 19, 2018.  Do you see that at the
20   bottom?
21          A.    I do.
22          Q.    Have you seen this report?
23          A.    I don't believe I have, no.
24          Q.    Okay.  Is there any system at
25   McKesson for individuals like yourself,
```

1    high-ranking senior individuals, to receive

2    information related to opioid-related news as

3    it comes out?

4         A.    Not a structured or formal

5    process that I'm aware of, no.

6         Q.    Okay.  I guess what I'm asking

7    is:  Do you guys have any service that you

8    sign up for that flags new articles or

9    publications like this related to opioids

10   that are then sent up to senior management?

11        A.    Not that I'm aware of.

12        Q.    Okay.  Let's go to page .5 of

13   this document.  There's an executive summary

14   here on this page.  The first line says:  The

15   opioid epidemic is the worst drug crisis in

16   America's history.  According to the Centers

17   for Disease Control and Prevention, more than

18   351,000 lives have been lost to opioid

19   overdoses since 1999, with no signs of

20   abating.  Far more people die from the misuse

21   of opioids in the United States each year

22   than from road traffic accidents or violence.

23   Public health officials are alarmed that the

24   opioid problem has helped drive a decline in

25   U.S. life expectancy at a time frame when

Highly Confidential - Subject to Further Confidentiality Review

```
 1     life expectancy is improving in many places

 2     around the world.

 3               Do you see that?

 4          A.     I do.

 5          Q.     Okay.  So let's handle these

 6     sort of one by one.  The stat of more than

 7     350,000 people having died from drug opioid

 8     overdoses since 1999, is that a statistic you

 9     were aware of prior to today?

10          A.     I don't know that I could have

11     quoted that number prior to seeing it here.

12          Q.     How about that more people die

13     from opioids every year than traffic

14     accidents or violence, is that something you

15     were familiar with?

16          A.     I don't believe I had heard

17     that statement before.

18          Q.     How about that the opioid

19     epidemic has helped drive a decline in U.S.

20     life expectancy, is that something you were

21     aware of?

22          A.     Again, I don't believe I had

23     heard that stated that way.

24          Q.     Okay.  But you are aware that,

25     for example, since 1999, there has been a
```

Highly Confidential - Subject to Further Confidentiality Review

 1    consistent increase in opioid deaths in this

 2    country, right?

 3              MS. HENN:  Objection, lacks

 4         foundation.

 5         A.    I'm not 100% sure of the exact

 6    timeline of the studies I have seen, but I

 7    have seen statistics that indicate opioid

 8    abuse and deaths are rising.

 9    BY MR. BOGLE:

10         Q.    Okay.  And have you taken a

11    look at any of the McKesson sales information

12    of opioids, for example, in the last eight to

13    ten years as to whether that number has been

14    going down, steady, increasing over time?

15         A.    I haven't.

16         Q.    Okay.  Is that information that

17    McKesson collects to look at by anyone that

18    you're aware of?

19              MS. HENN:  Objection to form.

20         A.    I'm not sure.  I haven't seen

21    our sales broken out and categorized that

22    way.

23    BY MR. BOGLE:

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16          MS. HENN:  Objection, lacks

17     foundation.

18

25          MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review



1    BY MR. BOGLE:

2

4              MS. HENN:  Lacks foundation.

5

14             MS. HENN:  Objection, lacks

15       foundation.

16

Highly Confidential - Subject to Further Confidentiality Review



```
 1
 
 3              MS. HENN:  Objection, lacks
 4         foundation.
 5
23              MS. HENN:  Objection to form,
24         lacks foundation.
25
```

Highly Confidential - Subject to Further Confidentiality Review



15      Q.      Has there ever been any

16  discussion that you've been privy to at

17  McKesson of capping the number of opioid

18  shipments made to the customers in this

19  country at a certain level every year?

20              MS. HENN:  Objection to form.

21      A.      That McKesson cap it?

22  BY MR. BOGLE:

23      Q.      Uh-huh.  Right.  That you set a

24  certain quota at which you don't exceed under

25  any circumstances in a given year for

Highly Confidential - Subject to Further Confidentiality Review

```
 1   opioids.  Has that ever been discussed?

 2        A.     My understanding is that the

 3   DEA sets the quota for the number of products

 4   that can be manufactured, and they adjust

 5   that number each year.  I don't recall that

 6   I've ever been part of a conversation in

 7   McKesson to set a quota or a cap.

 8        Q.     Yeah, so I'm not talking with

 9   the DEA; I'm talking about McKesson.  I'm

10   talking about are you aware of any discussion

11   within McKesson of saying, listen, we

12   understand the opioid epidemic is getting

13   worse and worse and worse out there.  One way

14   that we can help that is to ship less

15   opioids, and we're going to set a cap on

16   ourselves to make sure in a given year we

17   don't ship over a certain number.

18             Are you aware of any

19   discussions like that?

20             MS. HENN:  Objection to form.

21        A.     I think about these products,

22   and these are, you know, FDA-approved

23   medications that provide a legitimate medical

24   purpose for patients that are in need, and

25   our job is to fill orders from pharmacies
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    that are theoretically pursuant to
2    prescriptions that were written by doctors
3    and presented in a pharmacy.
4              No, I've never been part of a
5    conversation around a cap and would be
6    concerned about the impact of patient care
7    and relationship between a doctor and a
8    patient and a pharmacist and a patient.
9    BY MR. BOGLE:
10        Q.    Do you have any understanding
11   of whether there's even legitimate efficacy
12   as far as pain and pain reduction for
13   opioids?
14             MS. HENN:  Objection.
15   BY MR. BOGLE:
16        Q.    Have you ever seen any efficacy
17   profile of the drug?
18             MS. HENN:  Objection to form,
19        lacks foundation.
20        A.    I'm not a physician or a
21   pharmacist.  Those are decisions that are
22   made between healthcare professionals.
23   BY MR. BOGLE:
24        Q.    Right.  And that's what --
25   you're talking about patient care and making
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sure patients get what they need.  I'm just

 2    asking what you know about the efficacy of

 3    the drug -- class of drugs.

 4         A.     My understanding is that these

 5    are legitimate, legal, approved medicaions

 6    and many patients, you know, benefit from

 7    them.

 8

19         A.     No, I said clearly I'm not a

20
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3               MS. HENN:  Objection --

4      BY MR. BOGLE:

5

6

7               MS. HENN:  Objection to form,

8          lacks foundation.

9      BY MR. BOGLE:

10

11

12               MS. HENN:  Same objections.

13

14

15

16

17

18

19

20

21

22          Q.    Okay.  But you -- McKesson --

23      when I say you, I don't mean you,

24      Mr. Cavacini.  You, the McKesson Corporation,

25      can make decisions on how much of any product

Highly Confidential - Subject to Further Confidentiality Review

1    they are willing to ship, right?  That's

2    within the company's purview to decide,

3    right?

4              MS. HENN:  Objection to form,

5         asked and answered.

6         A.    But I think it is a balance

7    between making sure that these products are

8    available to patients who need them when they

9    need them, all the medications that we

10   provide.

11             You know, we are a distributor

12   and a logistics company that see orders from

13   pharmacies and pharmacists pursuant to

14   prescriptions.  I don't think we should be

15   making clinical decisions.  Under the --

16   BY MR. BOGLE:

17        Q.    Well -- go ahead.  Go ahead.

18   No.

19        A.    Under the Controlled Substances

20   Act, we have a responsibility to make sure

21   that we have an effective program to guard

22   against controls and that we have a system to

23   alert orders that deviate in size, pattern

24   and frequency.

25        Q.    Okay.  And do you dispute that

```
 1    McKesson has done a poor job over the last 10

 2    to 15 years of ensuring it complies with the

 3    Controlled Substances Act in that regard?

 4              MS. HENN:  Objection to form,

 5         lacks foundation.

 6         A.    I don't agree that we've done a

 7    poor job.

 8    BY MR. BOGLE:

 9         Q.    Okay.  Now, you're aware that

10    the state of Ohio specifically has been hit

11    hard by the opioid epidemic, right?

12         A.    I'm aware of reports about the

13    impact on communities all over the country,

14    specifically parts of Ohio and West Virginia

15    and Kentucky and Tennessee where I used to

16    live, yes.

17         Q.    And are you aware that the --

18    Ohio has ranked in the top ten in diversion

19    of opioids over time?

20              MS. HENN:  Objection to form,

21         lacks foundation.

22         A.    I don't believe I'm aware of

23    that statistic.

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5          THE WITNESS:  It's stapled

6     funny.

7          MR. BOGLE:  Yeah, I don't know

8     why they stapled it that way.  Sorry.

9  BY MR. BOGLE:

10         Q.    If you go to page -- I want to

11    look at this PowerPoint deck that's attached

12    to this e-mail, so if you go to page --

13         A.    If I could just have a quick

14    second.  I just want to read it.

15         Q.    Yeah.  Just let me know when

16    you're ready.

17         A.    Okay.  Thank you.

18              (Document review.)

19         A.    Okay.

20  BY MR. BOGLE:

21

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

```

```
13              MS. HENN:  Objection to form,

14         lacks foundation.

15
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4                MS. HENN:  Objection to form,

5          lacks foundation and mischaracterizes

6          the document.

7

8

9    BY MR. BOGLE:

10         Q.     Are you aware that in Ohio the

11   epidemic has reached a state where the state

12   of Ohio has had to purchase death trailers

13   for people who have suffered opioid overdoses

14   and deaths?

15         A.     I believe I became aware of

16   that recently.

17         Q.     Okay.  How did you become aware

18   of that?

19         A.     I was shown a document in prep

20   for today.

21         Q.     Okay.  So I'm going to hand you

22   what's marked as Exhibit 25 which is 1.1453,

23   no Bates number because it's a public

24   document.

25         A.     Thank you.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (McKesson-Cavacini Deposition

 2          Exhibit 25 marked.)

 3    BY MR. BOGLE:

 4          Q.    Do you recognize this as the

 5    document you've recently seen in preparation

 6    for the deposition?

 7          A.    Appears to be, yes.

 8          Q.    Okay.  And the document's from

 9    an article dated March 14, 2017, and it's

10    titled Too Many Bodies in Ohio Morgue, so

11    Coroner Gets Death Trailer.

12                Do you see that?

13          A.    Appears to be the title of the

14    article.

15          Q.    Okay.  Did you actually read

16    the article in its totality?

17          A.    I believe I became familiar

18    with it.  I don't believe I read every part

19    of the document, no.

20          Q.    Okay.  Well, you see on the

21    first page there's a trailer that says

22    Disaster Response, Ohio Department of Health.

23                Do you see that on the first

24    page there?

25          A.    There's a picture of a trailer,
```

```
 1   yes.

 2          Q.     And in the first paragraph in

 3   the letter -- or in the article it says:

 4   It's mute testimony to the opioid addiction

 5   plague that has been ravaging Ohio - a

 6   20-foot long air conditioned trailer with

 7   room for 18 bodies.

 8                  Do you see that?

 9          A.     I do, yes.

10          Q.     And then on page .4, looking at

11   the fourth sort of paragraph here where it

12   says:  Coroners in the counties of.

13                  Do you see that?

14          A.     I do.

15          Q.     It says:  Coroners in the

16   counties of Ashtabula and Cuyahoga (which is

17   where Cleveland is located) have had to

18   deploy the trailers when their morgues became

19   too jammed, he said.

20                  The medical examiner in Summit

21   County (where Akron is located) asked the

22   Ohio Health Department to send one over last

23   summer when there was a spike in drug

24   overdoses, the Akron Beacon Journal reported.

25                  Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I do.

 2          Q.      And then if you look down, the

 3     next-to-the-last paragraph on that page says:

 4     But the situation in rust belt states like

 5     Ohio, where the drug overdose rate in 2015

 6     (the most recent federal figures available)

 7     was 29.9 per 100,000 people, is especially

 8     dire.

 9                  Do you see that?

10          A.      I do, yes.

11          Q.      So when you read this, did this

12     cause you some concern?

13          A.      How can you not feel concerned

14     and pain when you read about addiction and

15     the consequences of it.

16

22                  MS. HENN:  Objection to form,

23          lacks foundation.

24
```

Highly Confidential - Subject to Further Confidentiality Review



1

8            MS. HENN:   Same objection.

9

17

Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10          MS. HENN:   Objection to form,

11     lacks foundation.

12

Highly Confidential - Subject to Further Confidentiality Review



      6          MS. HENN:  Objection, lacks

      7      foundation.

     18          MS. HENN:  Objection, lacks

     19      foundation.

Highly Confidential - Subject to Further Confidentiality Review



 1

 ▪

 ▪

 4    BY MR. BOGLE:

 5

 ▪

 ▪

 ▪

 9            MS. HENN:  Objection to form,

10        vague.

11

 ▪

 ▪

 ▪

 ▪

 ▪

 ▪

18            MS. HENN:  Objection to form.

19

 ▪

 ▪

 ▪

 ▪

 ▪

 ▪

Highly Confidential - Subject to Further Confidentiality Review



  6                    MS. HENN:  Objection to form.

 21                    MS. HENN:  Objection to form,

 22            asked and answered, vague.

Highly Confidential - Subject to Further Confidentiality Review



15          MS. HENN:  Objection to form,

16      asked and answered.

17

Highly Confidential - Subject to Further Confidentiality Review



```
 1

 6                      MS. HENN:  Objection to form,

 7              calls for a legal conclusion.

 8

17
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1                    MS. HENN:  Objection to form.

 2

 9                    MS. HENN:  Objection to form.

10

18          Q.     Do you have a sense that people

19     in the United States have a greater need for

20     opioids than anybody else in the country --

21     or anybody else in the world?

22                  MS. HENN:  Objection to form,

23          calls for speculation.

24          A.     I'm not aware.

25                  ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. BOGLE:
2         Q.     But you do know that almost all
3    the opioids utilized in the world are
4    utilized in the United States though, right?
5              MS. HENN:  Objection, lacks
6         foundation.
7         A.     Again, I don't know the
8    specifics.  I've heard trends around
9    dispensing and prescribing patterns in the
10   U.S. relative to other markets.
11   BY MR. BOGLE:
12        Q.     If we can go back to
13   Exhibit 1.2060.  I don't have the
14   cross-reference number.  It's the big
15   document I gave you the -- that one, the E&C
16   document.
17              MS. HENN:  It's Exhibit 22.
18              MR. BOGLE:  Exhibit 22, okay.
19   BY MR. BOGLE:
20        Q.     All right.  So I'm going to
21   page .22 here in this document.  So this is
22   under section Origins of the Modern Opioid
23   Epidemic.
24              Do you see that?
25        A.     I do.
```

1     Q.     Okay.  Second paragraph there

2   says:  The dramatic growth in opioid

3   consumption is unique to the United States.

4   In a 2017 technical report, published in

5   accordance with Article 15 of the Single

6   Convention on Narcotic Drugs of 1961, the

7   International Narcotics Control Board wrote,

8   "In 2016, the country with the highest

9   consumption of hydrocodone continued to be

10  the United States, with 33.4 tons, equivalent

11  to 99.1% of total global consumption."  The

12  report also noted "consumption of oxycodone

13  was concentrated in the United States (72.9%

14  of the world total)."

15          Do you see that?

16     A.     I do see where that's stated in

17  the document.

18     Q.     So based on these findings, is

19  it your understanding that only people in the

20  United States need opioids?

21          MS. HENN:  Objection to form.

22     A.     I don't know that I can say

23  with any certainty why these statistics are

24  listed the way they are.

25          ///

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. BOGLE:
2         Q.     Yeah.  I'm just asking whether
3    it's your understanding that only people in
4    the United States have a legitimate medical
5    need for opioids.
6              MS. HENN:  Objection to form.
7         A.     I think the document says that
8    they're used in other parts of the world, 72%
9    is in the U.S., and why doctors prescribe the
10   way they do here and what happens, I don't --
11   I don't know.
12   BY MR. BOGLE:
13        Q.     It's actually 99% for
14   hydrocodone.  Do you see that?
15        A.     I'm sorry, the 72.9 number is
16   the number that --
17        Q.     Yeah, the prior -- sorry.
18        A.     Prior?
19        Q.     The prior sentence says:  In
20   2016, the country with the highest
21   consumption --
22        A.     I'm sorry, you're correct,
23   99.1%.
24        Q.     So if there is such a
25   significant medical need for hydrocodone, for
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    example, in the United States, can you

2    explain why that significant medical need

3    doesn't exist in other developed countries in

4    the world?

5         A.    No.

6              MS. HENN:  Objection to form,

7         calls for speculation.

8    BY MR. BOGLE:

9         Q.    I want to look at one more

10   thing here and then we can take a break.

11             But you don't dispute that

12   McKesson has great power to control the

13   downstream flow of opioids to pharmacy

14   customers around the country, do you?

15        A.    I don't know that I agree.

16        Q.    Okay.  Do you know an

17   individual at McKesson name of Gary Boggs?

18        A.    I do, yes.

19        Q.    Okay.  He's in your regulatory

20   department, right?

21        A.    He is.

22        Q.    He's also a pretty senior level

23   in the regulatory department as well, right?

24             MS. HENN:  Objection to form.

25        A.    I believe he's a vice president
```

Highly Confidential - Subject to Further Confidentiality Review

1    of the regulatory department and has had

2    different roles, but I would call him a

3    senior member of our regulatory team.

4    BY MR. BOGLE:



Highly Confidential - Subject to Further Confidentiality Review



1

13          MS. HENN:  Objection to form,

14      lacks foundation.

15

Highly Confidential - Subject to Further Confidentiality Review



```
22            MS. HENN:  Objection, calls for
23       speculation.
24
```

Highly Confidential - Subject to Further Confidentiality Review

1

BY MR. BOGLE:

6          Q.      Right.

7                  And as far as product goes,

8    McKesson supplies, I think the website

9    currently says one out of every three pills

10   filled in the United States, right?

11                 MS. HENN:  Objection to form,

12          lacks foundation.

13         A.      I think I've seen statistics,

14   and I have shared with great pride that we

15   are responsible for roughly a third of the

16   nation's medication supply.

17   BY MR. BOGLE:

18         Q.      Right.  So you've seen that

19   statistic before, right?

20         A.      I have.

21                 MR. BOGLE:  All right.  We can

22          take a quick break.

23                 MS. HENN:  Sure.

24                 THE VIDEOGRAPHER:  We're off

25          the record at 3:13 p.m.  This

Highly Confidential - Subject to Further Confidentiality Review

1    concludes Disc 3.

2            (Recess taken, 3:13 p.m. to

3    3:24 p.m.)

4            THE VIDEOGRAPHER:  We're back

5    on the record at 3:24 p.m., beginning

6    of Disc 4.

7    BY MR. BOGLE:

8        Q.    Mr. Cavacini, West Virginia is

9    another state that's been ravaged by the

10   opioid epidemic, right?

11       A.    I'm aware of the issue in

12   West Virginia.

13       Q.    Okay.  And the issue being that

14   it's been extremely hard hit by the opioid

15   epidemic, right?

16       A.    I've heard it described the

17   same way.

18       Q.    And in 2018, there was actually

19   a congressional investigation into McKesson

20   and other distributors as to their conduct in

21   West Virginia as it related to opioid

22   distribution, right?

23       A.    I believe there was an inquiry

24   and investigation that I'm aware.

25       Q.    Right.  And, for example, the

Highly Confidential - Subject to Further Confidentiality Review

1    CEO of McKesson, Mr. Hammergren, actually was

2    called by Congress to testify in a hearing,

3    correct?

4         A.    I am aware of the testimony.

5         Q.    Okay.  Have you read the

6    testimony?

7         A.    I don't believe I've read the

8    whole transcript.  I've seen the testimony on

9    C-SPAN.

10        Q.    Okay.  The whole -- all of his

11   testimony or just portions of it?

12        A.    I believe I've seen the entire

13   testimony at one time, and then I've also

14   seen portions of it.

15        Q.    Okay.  Were you involved in any

16   way in assisting Mr. Hammergren to testify

17   before Congress?

18        A.    No.

19        Q.    Were you involved, for example,

20   in collecting any information for him to

21   testify?

22        A.    No.

23        Q.    I'm going to hand you what I'm

24   marking as Exhibit 28 to your deposition, and

25   that's 1.44, a public document, so no Bates

Highly Confidential - Subject to Further Confidentiality Review

```
 1    numbers.

 2              (McKesson-Cavacini Deposition

 3         Exhibit 28 marked.)

 4    BY MR. BOGLE:

 5         Q.    Okay.  And this is a letter

 6    from the House of -- Congress of the United

 7    States, House of Representatives, Committee

 8    on Energy and Commerce from February 15,

 9    2018.

10              Do you see that?

11         A.    I do.

12         Q.    And the letter is addressed to

13    McKesson's CEO, John Hammergren, right?

14         A.    Agreed.

15         Q.    Okay.  And have you ever seen

16    this letter?

17         A.    I believe I have, yes.

18         Q.    As part of preparation or at

19    some time in your work at McKesson?

20         A.    I believe I saw it during prep.

21         Q.    Okay.  Have you ever seen it as

22    part of your daily job at McKesson?

23         A.    I don't believe so, no.

24         Q.    Okay.  And if you look at the

25    second paragraph here in this letter, it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    says:  As parts of our investigation, the

 2    Committee wrote you -- to you on May 8, 2017,

 3    regarding your distribution practices

 4    generally, and in particular with respect to

 5    West Virginia.  As we mentioned in that

 6    letter, the opioid epidemic has been

 7    particularly devastating to West Virginia.

 8    For example, in 2015, West Virginia had the

 9    highest opioid overdose death rate in the

10    nation.

11              And then the last sentence in

12    that paragraph says:  Court filings also

13    indicate that between 2007 and 2012, McKesson

14    distributed 46,179,600 doses of hydrocodone

15    and 54,304,980 doses of oxycodone, meaning

16    that McKesson shipped a total of 100,484,580

17    doses to West Virginia during this time

18    period.

19              Do you see that?

20        A.    I do see that.

21        Q.    Are you familiar with those

22    statistics as far as how much hydrocodone and

23    oxycodone McKesson distributed to

24    West Virginia during that five-year time

25    frame?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.      I mean, I see the statistics
 2    listed here in the letter and I'm familiar
 3    with the numbers now.
 4         Q.      Okay.  But prior to your
 5    preparation for deposition, had you seen any
 6    numbers like that as it pertained to
 7    West Virginia and the company's distribution
 8    of hydrocodone and oxycodone?
 9         A.      I don't recall seeing any
10    statistics.
11         Q.      All right.  Let's go back to
12    Exhibit 22, which is the other congressional
13    publication we were looking at.  All right.
14              Let's start on page .5.  And
15    looking in the second paragraph of the
16    executive summary, the second sentence that
17    starts with "In early 2017."
18              Do you see where I'm at?
19         A.      I believe I do.
20         Q.      It says:  In early 2017, the
21    Committee became interested in allegations of
22    "opioid-dumping," a term to describe
23    inordinate volumes of opioids shipped by
24    wholesale drug distributors to pharmacies
25    located in rural communities, such as those
```

```
 1    in West Virginia.
 2              And then in the next paragraph
 3    it says:  In May 2017, the Committee opened a
 4    bipartisan investigation into the
 5    allegations.  From press reports and this
 6    investigation, the Committee learned of
 7    opioid shipments in West Virginia that
 8    shocked the conscience.
 9              And then there's three bullet
10    points noting some description of the
11    shipments.
12              Do you see that?
13        A.    I do.
14        Q.    First bullet point says:  Over
15    10 years, 20.8 million opioids were shipped
16    to pharmacies in the town of Williamson, home
17    to approximately 3,000 people.
18              Do you see that?
19        A.    I do, yes.
20        Q.    You agree with me that just
21    common sense, that's an inordinate amount of
22    opioids for that size town?
23              MS. HENN:  Objection to form.
24        A.    I don't agree.
25              ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BOGLE:
 2         Q.    You don't agree?  Okay.
 3               The next bullet point says:
 4    Another nearly 9 million opioids were
 5    distributed in just two years to a single
 6    pharmacy in Kermit, West Virginia, population
 7    406.
 8               Do you see that?
 9         A.    I do.
10         Q.    Do you agree that that's an
11    inordinate amount of opioids to be delivered
12    in a two-year period given the size of that
13    city?
14         A.    I don't know.  And it's hard to
15    make determinations of, you know, where --
16    pharmacies' orders and markets and
17    prescribers.  I don't know if it's inordinate
18    as you described or not.
19         Q.    Okay.  You certainly at your
20    time at McKesson have been, from a geographic
21    perspective, had responsibility for portions
22    of West Virginia, right, from a sales
23    perspective?
24         A.    I was never a direct
25    salesperson in West Virginia, but during the
```

Highly Confidential - Subject to Further Confidentiality Review

1    period of time that I had responsibility for

2    New Castle, the northwestern part of

3    West Virginia, and during the period of times

4    that I had responsibility for our Virginia

5    DC, other parts of West Virginia.

6         Q.    During your time at McKesson,

7    did you ever develop an understanding of the

8    makeup population-wise of West Virginia?

9         A.    No.

10        Q.    Any concept that it's largely a

11   rural-based state as far as population goes?

12             MS. HENN:  Objection to form.

13        A.    I never sought out or

14   researched, but generally aware that parts of

15   West Virginia are considered rural.

16   BY MR. BOGLE:

17        Q.    Okay.  The third bullet point

18   going back to this says:  Between 2007 and

19   2012, drug distributors shipped more than

20   780 million hydrocodone and oxycodone pills

21   to West Virginia.

22             Do you see that?

23        A.    I do.

24        Q.    So you hold the same view on

25   that, that you have no opinion as to whether

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that five-year period of time, that's an

 2    inordinate amount of opioids to this single

 3    state?

 4            A.    I don't know if it is or it

 5    isn't.

 6            Q.    You know McKesson was one of

 7    the companies being investigated by Congress

 8    as part of this proceeding, right?

 9                 If you don't know, maybe I can

10    just point you to the spot on here to move

11    things along.

12            A.    Yeah, I believe that to be

13    true.  I'm just trying to make sure I

14    absolutely know it to be true.

15            Q.    Okay.  If you look on page .5,

16    further down, I'm in the last paragraph in

17    the middle, where it says:  The companies

18    whose distribution was reviewed.

19            A.    Okay.

20            Q.    You see it lists several

21    distributors, and McKesson's on that list,

22    right?

23            A.    I mean, you described it as an

24    investigation.  This says it was -- I'm

25    really not trying to be difficult.  I just
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    don't know.  I haven't read this whole
2    document.  I don't know if it's described as
3    an investigation, an inquiry.
4              I understand that it says that
5    it was -- we were one of the companies that
6    was reviewed.
7         Q.    Okay.  Well, I think the
8    passage I just read to you a moment ago,
9    Congress describes it itself as an
10   investigation.  For example, if you go back
11   to the third paragraph --
12        A.    Opened a bipartisan
13   investigation into the allegations, and I
14   guess as a result of that, the companies
15   reviewed included McKesson.
16        Q.    Right.  So again, I'm only
17   asking you at this point:  Do you understand,
18   do you see here that McKesson was one of the
19   companies reviewed as part of this
20   investigation, right?
21        A.    It appears to be, yes.
22        Q.    Okay.  Were you not aware of
23   that prior to today, that there was an
24   investigation that had just been completed by
25   Congress last month and published regarding
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    McKesson and other distributors and their

 2    conduct in West Virginia?

 3          A.     I guess, you know, there's --

 4    I'm a little unclear on the letter from

 5    earlier 2018, and I believe we referenced the

 6    letter that was dated in 2017, if that's all

 7    part of the same matter, if the energy

 8    commerce -- but to answer your question, I

 9    mean, I am aware now that it concluded on

10    December 19th and apparently this report was

11    issued.

12          Q.     Right.  But prior to starting

13    this deposition and me showing you this

14    today, this is something you were unaware of,

15    true?

16          A.     I was aware of the inquiry

17    and -- if these are all related, I'm just not

18    clear on that, sir.

19          Q.     Okay.  But the findings in this

20    report from December 19, 2018 are findings

21    you are unfamiliar with prior to us talking

22    about it today, right?

23          A.     I have not reviewed this

24    document in detail prior to us talking about

25    it today.
```

```
 1              Q.      Okay.  Let's go to page .6
 2    here.  The first full paragraph says:  This
 3    report presents case studies of opioid
 4    distribution to southwestern West Virginia
 5    pharmacies over the last decade.  The
 6    findings from these individual case studies
 7    are not necessarily generalizable of the
 8    conduct of the distributors more broadly.
 9    However, the case studies - taken together
10    with the sheer number of opioids sent to
11    these small towns - raise sufficient concerns
12    as to whether these companies fulfilled their
13    legal obligations to prevent drug diversion.
14              Do you see that?
15         A.      I do see that.
16         Q.      Did you understand that part of
17    the investigation -- I know you haven't seen
18    this publication, but did you understand that
19    part of this investigation by Congress would
20    include assessing whether distributors like
21    McKesson fulfilled their legal obligations to
22    prevent drug diversion in West Virginia?
23              MS. HENN:  Object to form.
24         A.      I don't know that I was aware
25    what the objectives of the committee's
```

Highly Confidential - Subject to Further Confidentiality Review

1    investigation was prior to seeing it here.

2    BY MR. BOGLE:

3        Q.    If the committee concluded that

4    there were widespread failures as it

5    pertained to preventing diversion of opioids

6    by McKesson and other distributors, would you

7    disagree with that finding from Congress?

8            MS. HENN:  Objection to form,

9        calls for speculation.

10       A.    I haven't reviewed the whole

11   document.  I'm not sure what the conclusions

12   were.  But I think I would -- if you could

13   repeat the last part of the question again.

14   BY MR. BOGLE:

15       Q.    Right.  If the committee as

16   part of this report concluded that there were

17   widespread failures to prevent diversion of

18   opioids by distributors, including McKesson,

19   would you disagree with those findings?

20           MS. HENN:  Objection, calls for

21       speculation.

22       A.    If those were the conclusions,

23   I would disagree.

24   BY MR. BOGLE:

25       Q.    Okay.  Give me just one second.

```
 1    All right.

 2              Let's go to page .26.  You see

 3    here it says:  The Opioid Epidemic's Impact

 4    in West Virginia.

 5              Do you see that?

 6    A.    It's the opening sentence, yes.

 7    Q.    Yep.  It says there:  The

 8    opioid epidemic's impact has been

 9    particularly acute in West Virginia,

10    beginning with the influx of OxyContin to the

11    state during the late 1990s.  The sudden

12    influx of prescription opioids, leading to

13    the resulting increases in abuse and

14    addiction, has had profound effects on

15    West Virginia.  Between 1999 and 2004, the

16    number of lives lost to accidental drug

17    overdoses in West Virginia increased 550%,

18    giving West Virginia the highest

19    unintentional drug overdose death rate in the

20    United States at the time.  A study published

21    in the Journal of the American Medical

22    Association in December 2008 found that, in

23    2006, 93% of unintentional overdose deaths

24    attributable to prescription drugs in

25    West Virginia involved opioids.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    And the next paragraph

 2    continues:  In 1917, West Virginia continued

 3    to have the highest overdose death rate in

 4    the country, and a report issued by the

 5    West Virginia Department of Health and Human

 6    Services found that the number of overdose

 7    deaths in the state increased by more than

 8    316% between 2001 and 2016, with most

 9    overdose deaths involving at least one

10    opioid.

11                    You see that?

12         A.     I do.

13         Q.     Those statistics, you're

14    familiar with any of those prior to today?

15                    MS. HENN:  Objection to form,

16         lacks foundation.

17         A.     I don't believe I had seen the

18    specific statistics relative to West Virginia

19    as outlined here.

20    BY MR. BOGLE:

21         Q.     Okay.  So this time frame here

22    that's being discussed, and specifically

23    talking about 2006 to 2016, as the deaths are

24    increasing from opioid overdoses in

25    West Virginia, do you have an understanding
```

Highly Confidential - Subject to Further Confidentiality Review

1    of what was happening as far as the amount of

2    opioids that were being supplied from

3    McKesson to West Virginia?

4        A.    I just want to be clear.  It

5    says from 2001 to -- there's a bunch of dates

6    in the different paragraphs that we read.

7        Q.    Yeah.

8        A.    I thought you said 2006, but

9    2001 to 2016, do I know McKesson shipments?

10       Q.    Yeah.  So anytime during the

11   time frame -- let's do that time frame.  I'll

12   strike the previous question.

13             From 2001 to 2016, do you have

14   any sense as to what was happening with

15   McKesson's shipment of opioids to

16   West Virginia as far as whether they're going

17   up, down or staying the same?

18       A.    I do not, no.

19       Q.    Okay.  Well, if we go to

20   page .242 -- 242.  You see there's two charts

21   here towards the middle of the page?  You see

22   those?

23       A.    I do.

24       Q.    Okay.  The sentence before

25   those charts describes them.  It says:  The

Highly Confidential - Subject to Further Confidentiality Review

1    chart below details the number of suspicious

2    order reports submitted to DEA regarding

3    West Virginia pharmacies as well as the

4    amount of oxycodone and hydrocodone doses

5    shipped to the state each year.

6              Do you see that?

7       A.    I do.

8       Q.    Okay.  And if you look, for

9    example, at the number of doses that McKesson

10   shipped in millions of oxycodone and

11   hydrocodone in 2006, was at 17.07 million

12   doses.

13             Do you see that?

14             MS. HENN:  Objection to form,

15        lacks foundation.

16      A.    I do see where the document

17   says under 2006, 17.07.

18   BY MR. BOGLE:

19      Q.    Okay.  If you go -- and you see

20   there, the numbers here, there's a citation

21   923 at the end of that sentence.

22             Do you see that?

23      A.    I do.

24      Q.    Okay.  If you go down to the

25   bottom of the page, it indicates that this

Highly Confidential - Subject to Further Confidentiality Review

```
1    shipment data came from McKesson, right?  See

2    that last sentence under 923?

3         A.    It says:  McKesson produced

4    shipment data from 2006 to the end of 2016.

5         Q.    Right.  Which is -- coincides

6    with the chart we're looking at here, right,

7    time period-wise?

8         A.    It appears to, yes.

9         Q.    Okay.  And, for example, you go

10   to 2007, there's 25.63 million doses of

11   oxycodone and hydrocodone shipped to

12   West Virginia from McKesson.

13             You see that figure?

14        A.    I do.

15        Q.    And then if we kind of go on

16   through, by the time we get to 2015, we're at

17   40.71 million doses of hydrocodone and

18   oxycodone shipped by McKesson into

19   West Virginia in that year.

20             Do you see that figure?

21        A.    I do.

22        Q.    And in 2016, 36.53 million

23   doses in that year shipped by McKesson.

24             Do you see that?

25        A.    I do.
```

1        Q.      So in looking at these figures,

2    we can agree that looking at 2006-2007 time

3    frame, the numbers substantially increase

4    when compared to 2015 and 2016, right?

5                MS. HENN:  Objection to form,

6        lacks foundation.

7        A.      The numbers here from 2006 to

8    '16 approximately doubled.

9    BY MR. BOGLE:

10       Q.      Right.

11               And so based on your prior

12   testimony, I would assume you attribute that

13   to just more business for McKesson, right?

14       A.      I don't know how to attribute

15   it.

16       Q.      Okay.  Do those numbers concern

17   you at all that in the state of West Virginia

18   that's the amount of pills that were shipped

19   of oxycodone and hydrocodone in 2015 and

20   2016, especially compared to what happened in

21   2006 and 2007?

22               MS. HENN:  Objection to form.

23       A.      Again, without the context

24   relative to our overall business in

25   West Virginia and the customers we served, I

Highly Confidential - Subject to Further Confidentiality Review

```
1    don't know that I can answer that.  I mean, I

2    think there's more context needed around --

3    BY MR. BOGLE:

4
```



```
8               MS. HENN:  Objection to form,

9        calls for speculation.

10
```

```
24              MS. HENN:  Objection to form.

25              ///
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BOGLE:

2

4              MS. HENN:  Lacks foundation.

5              Go ahead.

6

12             MS. HENN:  Objection to form,

13   vague.

14

20             Let's go to page .106.  In

21   the -- there's the third paragraph there,

22   "The scope of the Committee's review."

23             Do you see that?

24   A.    I do.

25   Q.    It says:  The scope of the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Committee's review of the distributors'

 2    conduct was limited.  The investigation

 3    focused only on distributors' shipments to

 4    certain areas of West Virginia and individual

 5    pharmacies located in those rural regions.

 6    Accordingly, much of this section is

 7    comprised of the case studies.

 8              While the Committee cannot draw

 9    comprehensive, nationwide conclusions from

10    this review, the findings ares astonishing

11    and concerning.  They also raise questions

12    about the effectiveness of distributors'

13    anti-diversion efforts outside West Virginia,

14    as the same policies were implemented across

15    the country.

16              Do you see that?

17    A.     I do, yes.

18
```

Highly Confidential - Subject to Further Confidentiality Review



15          MS. HENN:  Objection to form,

16     calls for speculation.

17

Highly Confidential - Subject to Further Confidentiality Review



1            MS. HENN:  Objection, calls for

2       speculation.

3

8            MR. BOGLE:  Okay.  Move to

9       strike as nonresponsive.

10   BY MR. BOGLE:

11

15            MS. HENN:  Objection to form,

16       asked and answered.

17

21

Highly Confidential - Subject to Further Confidentiality Review



10          MS. HENN:  Objection to form,

11     calls for speculation.

12

Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
```

4                MS. HENN:  Objection, form,

5         asked and answered.

6    BY MR. BOGLE:

7         Q.    I'm not asking you about

8    effort.  I'm asking you about execution.

9                MS. HENN:  Same objection.

10        A.    No, I don't believe there's

11   reason to be concerned.

12   BY MR. BOGLE:

13        Q.    Okay.  Let's take a look at one

14   of the pharmacies that was investigated here

15   as far as McKesson.  Let's go to .131.

16   There's a section (i) there, McKesson's

17   Initial Engagement with Family Discount

18   Pharmacy.

19                Do you see that?

20        A.    I do.

21        Q.    Have you ever heard of Family

22   Discount Pharmacy?

23        A.    I believe I have relating to

24   these letters and the investigation

25   referenced here.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Had you heard of them prior to

2    reading these letters?

3      A.      I don't believe I had.

4      Q.      It says here:  Family Discount

5    Pharmacy in Mount Gay-Shamrock,

6    West Virginia, was McKesson's biggest

7    purchaser of hydrocodone and oxycodone in

8    West Virginia between 2006 and 2017.

9    McKesson supplied Family Discount Pharmacy

10   with more than 5.91 million doses of

11   hydrocodone and oxycodone during six years

12   between 2006 and 2014.  Between 2006 and 2007

13   alone, McKesson provided Family Discount

14   Pharmacy with more than 3.82 million doses of

15   hydrocodone.  As will be described below,

16   McKesson terminated this pharmacy prior to

17   2008 for "compliance reasons" but elected to

18   onboard the customer again two times

19   thereafter.

20              Do you see those references?

21     A.      I do.

22     Q.      Okay.  Let's go to page .136.

23   You see there's a finding at the top here --

24   this is again related to Family Discount

25   Pharmacy -- that says:  McKesson did not

1    consider its prior relationship with Family

2    Discount Pharmacy when evaluating the

3    pharmacy's new customer application in 2010,

4    with a member of McKesson's regulatory

5    affairs division at one point stating, "I

6    cannot see any reason we should be hesitant"

7    with respect to the pharmacy.

8              Do you see that?

9         A.    I do see where that's listed

10   and highlighted in blue.

11        Q.    Okay.  And then what's

12   discussed below that are two e-mails from

13   McKesson sales staff.  So I want to take a

14   look at those and ask you about those

15   e-mails.

16             It says:  The e-mails provided

17   by McKesson suggest that the company viewed

18   itself as being in competition with other

19   distributors to obtain Family Discount's

20   account.  For example, in an e-mail to a

21   McKesson Vice President and General Manager

22   referencing a pricing proposal for Family

23   Discount Pharmacy, a member of McKesson's

24   sales division noted the pharmacy had a,

25   quote/unquote, very aggressive buy plan with

Highly Confidential - Subject to Further Confidentiality Review

1    Cardinal.  I would approve this based on

2    where we have to be to have an opportunity.

3              Do you see that?

4         A.    I do see that.

5    

11             MS. HENN:  Objection, lacks

12   foundation.

13

25             MS. HENN:  Objection to form,

Highly Confidential - Subject to Further Confidentiality Review

```
1        lacks foundation, calls for

2        speculation.

3
```

14   BY MR. BOGLE:

15        Q.    You think Family Discount

16   Pharmacy was a pharmacy that was aligned with

17   McKesson's goals as it pertains to either of

18   those?

19            MS. HENN:  Objection to form,

20        calls for speculation, lacks

21        foundation.

22        A.    I don't know.  I'm not familiar

23   with the account or the history.

24   BY MR. BOGLE:

25        Q.    Okay.  In the text that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    continues below these e-mails, it says:  In

 2    another e-mail, a member of McKesson's sales

 3    division said that he was sure either

 4    H.D. Smith or Cardinal Health would offer to

 5    be Family Discount's secondary distributor if

 6    McKesson were to, quote/unquote, win Family

 7    Discount's business.

 8                Do you see that?

 9        A.    I do.

10        Q.    Okay.  Is that -- in your mind,

11    should be the goal of the sales staff is to

12    be worried about just winning business at all

13    costs?

14                MS. HENN:  Objection, lacks

15           foundation, mischaracterizes the

16           document.

17        A.    This is one sentence out of an

18    e-mail, and I don't read it that way.  It

19    said that another competitor would also be

20    willing to service this customer in a

21    secondary relationship if we were to win the

22    account.  I don't know what that means.

23    BY MR. BOGLE:

24        Q.    Okay.  Well, getting a new

25    account, certainly in 2010, would have
```

1     resulted in the sales rep winning him or

2     herself, right, as far as a bonus goes,

3     wouldn't it?

4                MS. HENN:  Objection to form,

5           lacks foundation, calls for

6           speculation.

7

12    BY MR. BOGLE:

13          Q.    Okay.  Let's go to the next

14    page, .137.  The first full paragraph says:

15    According to documents produced to the

16    Committee, McKesson onboarded Family Discount

17    and set the pharmacy's hydrocodone ordering

18    threshold at 155,000 dosage units a month - a

19    level 31 times more than what McKesson

20    determined warranted supplementary

21    documentation on its new questionnaire --

22    customer questionnaire.

23                Do you see that?

24          A.

Highly Confidential - Subject to Further Confidentiality Review

4    hydrocodone is high, very high, right?

5         A.    It states here that -- I don't

6    know how it relates to other pharmacies and

7    if it would be high or not for this specific

8    pharmacy.

9         Q.    Okay.  If we can go to

10   page .140, we're now into 2012, some

11   additional e-mails, again, referring to

12   Family Discount Pharmacy.

13            In the first line under the

14   e-mail it says:  In a separate e-mail, a

15   member of McKesson's sales division

16   characterized the pharmacy as a,

17   quote/unquote, real opportunity and requested

18   that the scheduling of the visit be

19   expedited.  This e-mail is reproduced below.

20            So the visit being a visit

21   to -- you visit customers when you onboard

22   them, right, as a new customer?

23        A.    I'm aware that, you know,

24   customers will be visited often by a member

25   of the regulatory affairs team when coming

Highly Confidential - Subject to Further Confidentiality Review

```
 1    onboard.

 2         Q.    And per the discussion here,

 3    the sales member at McKesson asked for that

 4    to be expedited as it pertained to Family

 5    Discount Pharmacy in 2012, right?

 6         A.    Again, I see where it states

 7    that, and I see the e-mail where it says:

 8    Please expedite, thanks.

 9         Q.    All right.  I'm just making

10    sure you're done with your answer.  I didn't

11    want to launch into another question.

12         A.    Yeah, I was.

13         Q.    Okay.  Let's go finally on this

14    point to page .142.  First -- the second

15    paragraph there says:  As noted above, during

16    McKesson's three engagements with Family

17    Discount Pharmacy, it supplied more than

18    5.91 million doses of hydrocodone and

19    oxycodone, making the pharmacy McKesson's

20    biggest customer in West Virginia between

21    2006 and 2017.  Had McKesson maintained

22    robust due diligence files for Family

23    Discount Pharmacy and consulted these files

24    when it was considering the pharmacy's

25    applications in 2010 and 2012, it would have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    been aware that it terminated the pharmacy

 2    for compliance reasons on at least one prior

 3    occasion.  In addition, conducting a

 4    retrospective review of the due diligence

 5    files would have also alerted McKesson to the

 6    pharmacy's failure to disclose its previous

 7    termination by McKesson on its 2010 and 2012

 8    new customer applications, with the pharmacy

 9    seemingly providing the company with a

10    misrepresentation on its 2010 application in

11    particular.  Such information may have

12    prompted McKesson to deny Family Discount's

13    applications on multiple occasions.  Instead,

14    McKesson accepted Family Discount as a

15    customer a total of at least three times,

16    only to ultimately restrict its ability to

17    purchase controlled substances again in 2014.

18                Do you see that?

19         A.    I do.

20

25                MS. HENN:  Objection to form,
```

Highly Confidential - Subject to Further Confidentiality Review

1    lacks foundation.

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮

5    BY MR. BOGLE:

6         Q.    All right.  Let's go to

7    page .244.  I want to look at the second full

8    paragraph there on that page, where it says:

9    McKesson did not report suspicious orders for

10   West Virginia customers until 2013.  Since it

11   began doing so, the company submitted upwards

12   of 10,000 suspicious order reports to the

13   DEA.  By not reporting suspicious orders when

14   they were discovered, McKesson failed to meet

15   its responsibilities under the CSA.  In

16   addition, the failure to report suspicious

17   orders deprived the DEA of timely information

18   that could have alerted the agency to

19   potential controlled substance diversion,

20   which the agency could have used to act

21   against registrants that were illegally

22   diverting controlled substances.

23             You see that?

24        A.    I do see that.

25   ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

Highly Confidential - Subject to Further Confidentiality Review



1

3          MS. HENN:  Objection to form,

4      lacks foundation.

5

16          MS. HENN:  Objection to form,

17     lacks foundation and calls for

18     speculation.

19

Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4                    MS. HENN:   Objection to form,

5            mischaracterizes the testimony.

6

7

8

9

10

11

12

13

14                    MS. HENN:   Objection to form,

15           lacks foundation.

16

Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4          MS. HENN:  Objection to form,

5      lacks foundation and calls for a legal

6      conclusion.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21          MS. HENN:  Same objections.

22      Objection to form, lacks foundation

23      and calls for a legal conclusion.

24      Also, asked and answered.

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



12      Q.      Okay.  Do you agree or disagree

13   that from 2006 through the present day,

14   McKesson has experienced breakdowns in its

15   due diligence related to opioids?

16              MS. HENN:  Objection to form,

17        lacks foundation.

18      A.      I'm not sure I would

19   characterize them the way you had.  I am

20   aware that we had accepted responsibility for

21   failing to report some orders for some

22   customers during specific periods of time.

23   BY MR. BOGLE:

24      Q.      And that's outlined in the 2017

25   settlement agreement, right?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      I believe so, yes.

2          Q.      Which have you also read that

3    agreement?

4          A.      I've reviewed parts of the

5    agreement.  I can't say that I've read the

6    entire document.

7          Q.      Okay.  Have you reviewed parts

8    of that agreement as part of your employment

9    at McKesson or in preparation for deposition

10   or both?

11         A.      I remember reviewing it as part

12   of the prep for this discussion today.

13         Q.      Did you ever read the 2017

14   agreement or any parts of it as part of your

15   just day-to-day work at McKesson?

16         A.      I had received summaries of the

17   document --

18                 MS. HENN:  I'm just going to

19         object that if you're starting to talk

20         about things you heard from lawyers,

21         you shouldn't do that, but go ahead

22         and if you could repeat the question.

23   BY MR. BOGLE:

24         Q.      Yeah, let me rephrase my

25   question because I don't think I'm asking
```

Highly Confidential - Subject to Further Confidentiality Review

 1     that at all.

 2               I'm just asking whether, as

 3     part of your day-to-day work at McKesson, you

 4     ever personally read any portion off the 2017

 5     settlement agreement.  I don't want to know

 6     what anybody told you.  I want to know if you

 7     read it.

 8          A.    I don't -- I can't say that I

 9     pulled out the document and read the

10     document, but as part of my role and

11     responsibilities, I had received summaries

12     and our responsibilities under that

13     settlement.

14          Q.    Did you ever ask to see the

15     whole agreement as part of your job

16     responsibilities at McKesson?

17          A.    No, I don't recall that I did.

18          Q.    Okay.  I'm going to mark

19     Exhibit 29 for you, which is 1.88.  Also,

20     it's MCKMDL00355350.

21               (McKesson-Cavacini Deposition

22          Exhibit 29 marked.)

23     BY MR. BOGLE:

24          Q.    All right.  So this is, first

25     of all, the top of the first page states

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Administrative Memorandum of Agreement.

 2              Do you see that?

 3    A.      I do, yes.

 4    Q.      And if you go to the last page,

 5    there are signatures, January 5th, 2017 by

 6    Mark Walchirk at McKesson, and then also

 7    signatures from members of DEA.

 8              Do you see that on the last

 9    page?

10    A.      I do, yes.

11    Q.      And Mark Walchirk, as noted

12    here, at that time was president of

13    U.S. Pharma at McKesson, right?

14    A.      Correct.

15    Q.      Okay.  So I want to look at a

16    couple of aspects of this settlement

17    agreement here in 2017.

18              If you go first to page .2.

19    You see there under number 7 it says:  On or

20    about November 14, 2014, McKesson received a

21    letter (dated November 4, 2014) from the DEA

22    Office of Chief Counsel, Diversion Regulatory

23    and Litigation Section, stating that DEA was

24    separately pursuing administrative action

25    against McKesson-Aurora for the conduct
```

Highly Confidential - Subject to Further Confidentiality Review

1    outlined in the August 13, 2014 letter.

2              DEA also stated that the

3    allegations regarding McKesson's failure to

4    maintain effective controls against diversion

5    of particular controlled substances -- and it

6    cites to 21 U.S.C. 823(b)(1) -- and failure

7    to design and operate a system to disclose to

8    the registrant suspicious orders of

9    controlled substances -- and it cites to

10   21 CFR 1301.74(b) -- was national in scope,

11   and that DEA was also pursuing administrative

12   investigations of such alleged failures at

13   McKesson -- and it lists multiple

14   distribution centers at McKesson, right?

15        A.    It does, yes.

16        Q.    Okay.  Now, have you ever

17   reviewed any of these letters that are

18   outlined here in this paragraph?

19        A.    I would like to see the letters

20   to make sure I have.  I'm not sure what the

21   November 14, 2014 letter is.

22

Highly Confidential - Subject to Further Confidentiality Review

1

2

3            MS. HENN:  Objection to form,

4       lacks foundation.

5       A.    I don't recall.

6  BY MR. BOGLE:

7       Q.    Okay.  Well, you would agree

8  with me that what's outlined here concerns of

9  the DEA outlined about --

10           MS. HENN:  I think your finger

11      is in the shot.

12           MR. BOGLE:  Oh.  Sorry.

13 BY MR. BOGLE:

14

15

16

17

18

19

20

21

22

23

24           MS. HENN:  Objection to form,

25      lacks foundation.

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5    Q.    Okay.  Let's go to .3.  You see

6    under number 2, you referenced this a little

7    bit earlier, is the acceptance of

8    responsibility provision.

9              Do you see that?

10   A.    I do.

11   Q.    Okay.  It says there:  On or

12   about September 27, 2006, February 7, 2007,

13   and December 27, 2007, DEA's Deputy Assistant

14   Administrator, Office of Diversion Control,

15   sent letters to every entity in the United

16   States that was registered with DEA to

17   manufacture or distribute controlled

18   substances, including McKesson.

19              And it references the DEA

20   letters.

21              The DEA letters contained,

22   among other things, guidance for the

23   identification and reporting of suspicious

24   orders to DEA -- and it references the CFR.

25              Then it says:  McKesson

1    acknowledges that, at various times during

2    the time period -- during the period from

3    January 1, 2009 up through and including the

4    effective date of this agreement (the Covered

5    Time Period), it did not identify or report

6    to DEA certain orders placed by certain

7    pharmacies which should have been detected by

8    McKesson as suspicious based on the guidance

9    contained in the DEA letters about the

10   requirements set forth in -- and then it

11   lists the CFR and U.S.C.

12              Do you see that?

13        A.    I do.

14        Q.    This is the acceptance of

15   responsibility provision that you were

16   talking to me about a few minutes ago, right?

17        A.    I believe so, yes.

18        Q.    Okay.  And we looked at the

19   execution or effective date of this agreement

20   is in January 2017, right?  You see that on

21   the last page, right?  Do you see that on the

22   last page?

23        A.    Yeah.  It was signed in January

24   of --

25        Q.    Executed.  Yeah.

```
 1                    So the acceptance of

 2    responsibility for the failure to identify

 3    and report suspicious orders over an

 4    eight-year time frame, that's very

 5    significant, isn't it?

 6                    MS. HENN:  Objection to form,

 7           mischaracterizing the document, lacks

 8           foundation.

 9           A.    I don't know, but I think we

10    take our obligations under the Controlled

11    Substances Act and under this memorandum of

12    agreement very seriously.

13    BY MR. BOGLE:

14           Q.    The obligation -- once this

15    agreement was executed, is that what you're

16    referring to?

17           A.    No, I think I said under the

18    Controlled Substances Act.

19           Q.    Okay.  Do you think that this

20    acceptance of responsibility that I just read

21    is consistent with a company who's taken

22    these responsibilities seriously?

23                    MS. HENN:  Objection to form,

24           the prior question had misstated the

25           contents of the document.
```

1          A.     I'm not aware of all the

2     specifics that went into reaching this

3     settlement with the DEA, and I think it

4     states clearly that at various times during

5     the period we accepted responsibility because

6     we did not identify or report certain orders

7     placed by certain pharmacies which should

8     have been detected by McKesson.

9     BY MR. BOGLE:

10          Q.     Okay.  And this is now the

11     second settlement agreement we've seen.

12     There's also one in 2008 we looked at earlier

13     today.

14               Do you recall that?

15          A.     I do.

16          Q.     Okay.  And so do you think that

17     the entering into two separate settlement

18     agreements nine years apart for essentially

19     the same exact conduct is consistent with a

20     company that takes their due diligence

21     responsibility seriously?

22               MS. HENN:  Objection to form,

23          lacks foundation, mischaracterizes the

24          settlements.

25          A.     I think we do have and have

1  always taken our responsibilities seriously.

2  BY MR. BOGLE:

3       Q.    Okay.  Well, do you dispute

4  that McKesson had a widespread failure to

5  investigate and report suspicious orders from

6  2009 to 2017?

7       A.    I wouldn't agree with that.  I

8  think we acknowledged that for certain

9  pharmacies during a certain period of time.

10       Q.    But a very substantial fine was

11  paid this time around in 2017, right, even

12  for a company like McKesson?

13       A.    I believe we paid a substantial

14  fine.

15       Q.    $150 million, right?

16       A.    That's the number I remember,

17  yes.

18       Q.    Okay.  And I'll ask you kind of

19  like I asked you before:  Can you name for

20  our jury any instance since you've been at

21  the company that McKesson has paid a fine

22  even approaching $150 million for something

23  the company believed it did not do?

24            MS. HENN:  Objection to form,

25       calls for speculation.

```
 1              A.     I wasn't involved in the
 2     decision-making leading up to this
 3     settlement.  It says here:  In order to avoid
 4     the uncertainty and expense of litigation,
 5     and in furtherance of the parties' belief
 6     that a settlement is in the public interest.
 7              MR. BOGLE:  Yeah, move to
 8          strike as nonresponsive.
 9     BY MR. BOGLE:
10              Q.     I'm just asking, in the time
11     you've been at the company, can you name for
12     us a specific instance where McKesson has
13     paid anything approaching a $150 million fine
14     for something that it didn't do?  I'm just
15     looking for one example.
16              MS. HENN:  Objection to form,
17          calls for speculation.
18              A.     I'm not -- I'm not aware of our
19     teams that come to those decisions.  I'm not
20     part of those teams that come to those
21     decisions or why -- what might influence our
22     decisions to enter into a settlement or not.
23     BY MR. BOGLE:
24              Q.     You think you guys shouldn't
25     have settled in 2017?  You should have fought
```

Highly Confidential - Subject to Further Confidentiality Review

1    it?

2         A.      Again, I don't know what

3    discussions took place between the company

4    and the DEA leading up to this settlement.  I

5    believe the company made a decision that he

6    felt was in its best interest and the DEA

7    agreed that it was in the best interest of

8    the public to settle.

9         Q.      So, yeah.  I'm just asking

10   whether at your time at McKesson it was your

11   personal opinion that this should not have

12   been settled the way it was in 2017,

13   especially with this acceptance of

14   responsibility we just read?

15            MS. HENN:  Objection to form.

16        A.      I don't know and I don't have

17   enough information to draw a conclusion.

18   BY MR. BOGLE:

19        Q.      Okay.  On this same page,

20   bottom of .3, carrying over to .4, it lists a

21   total of 12 McKesson distribution centers

22   covered by this agreement as having failed to

23   maintain effective controls against

24   diversion.

25            Do you see that?

```
 1              MS. HENN:  Objection to form,
 2         mischaracterizing the document.
 3         A.      I do see where the 12
 4    pharmacies are listed, and I'm unclear if
 5    this is the allegations against the company.
 6    BY MR. BOGLE:
 7         Q.      You say 12 pharmacies.  These
 8    are all distribution centers.
 9         A.      I'm sorry, 12 distribution
10    centers.  I'm sorry, you are correct, 12
11    distribution centers.
12         Q.      Okay.  Let me look at one last
13    thing here and I think I'm done.  Page .4
14    now.  In letter (c) it says:  McKesson failed
15    to follow the procedures and policies set
16    forth in the McKesson CSMP to detect and
17    disclose suspicious orders of controlled
18    substances.  Among other things, McKesson
19    failed to conduct adequate due diligence of
20    its customers, failed to keep complete and
21    accurate records in the CSMP files maintained
22    for many of its customers, and bypassed
23    suspicious order reporting procedures set
24    forth in the McKesson CSMP.
25              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.      I do see where it says that.
2            Q.      Do you think that conduct I
3     just read in this paragraph here is
4     consistent with a company that undertook
5     great efforts to minimize diversion of
6     opioids?
7                    MS. HENN:  Objection to form.
8            Objection to form, lacks foundation.
9            A.      Again, it's my understanding
10    that these were parts of the allocations made
11    by the DEA, but what we accepted
12    responsibility for was clearly outlined here.
13    BY MR. BOGLE:
14           Q.      Okay.  I'm asking -- this
15    document was ultimately signed by Mark
16    Walchirk, right?
17           A.      It appears to be, yes.
18           Q.      What I just read to you in
19    letter (c), do you believe that that's
20    consistent -- that conduct is consistent with
21    a company who takes great effort in
22    minimizing diversion?
23                   MS. HENN:  Objection to form,
24           lacks foundation.
25           A.      I don't know if that statement
```

Highly Confidential - Subject to Further Confidentiality Review

1    is true or not.  I believe it was an

2    allegation against the company that we agreed

3    and accepted responsibility for something

4    very different.

5    BY MR. BOGLE:

6        Q.    Oh, you think that McKesson

7    accepted responsibility for something very

8    different than what I just read in letter

9    (c)?

10       A.    McKesson accepted

11   responsibility for failing to report certain

12   orders for certain customers.

13       Q.    Yeah.  I'm asking if in letter

14   (c), that you think that's substantially

15   different than what McKesson accepted

16   responsibility for.

17       A.    I'm not a lawyer, but there are

18   components of (c) that aren't listed in the

19   acceptance of responsibility section.

20       Q.    Okay.  So when Mark Walchirk,

21   president of U.S. Pharma, signed this, he's

22   signing something that contained a bunch of

23   allegations that you think are completely

24   unfounded, right?

25       A.    I don't know, but that's not my

1    understanding of what we accepted

2    responsibility for.

3         Q.    Well, I'm asking, though:  Do

4    you think that this agreement should have

5    been signed by anyone at McKesson that

6    contains the language that's read in letter

7    (c)?

8              MS. HENN:  Objection to form.

9         A.    I don't know that I'm in a

10   position to second-guess the decisions of

11   Mark and our teams that decided to enter into

12   this agreement with the DEA.  I think what

13   I'm focused on now is making sure that we

14   meet our obligations under it and continue to

15   exercise our responsibilities appropriately

16   and to the satisfaction of supply chain

17   stakeholders and the DEA.

18   BY MR. BOGLE:

19        Q.    How about satisfaction of the

20   patients who might be impacted by these

21   drugs?

22        A.    I think I have a balanced and

23   shared responsibility to make sure that

24   these -- all medications, prescription and

25   otherwise, are available to patients when

1    they need them so they can pick them up at

2    their pharmacy and use them as prescribed,

3    while maintaining effective controls to

4    prevent them from getting in the hands that

5    have -- of people that might have less than

6    good intentions with them.

7         Q.    But you would agree the most

8    important responsibility that you have as COO

9    of McKesson at this point in time is making

10   sure that what's outlined in the 2008 and

11   2000 [sic] settlement agreements as far as

12   the failures and due diligence of McKesson

13   don't continue within the company, true?

14            MS. HENN:  Objection to form,

15        lacks foundation and mischaracterizes

16        the document.

17        A.    I disagree with the framing of

18   the question.

19   BY MR. BOGLE:

20        Q.    We reviewed both agreements.

21   Do you think that your obligations as it

22   stands today are to make sure that the things

23   like that are outlined in those two

24   agreements don't occur again?

25            MS. HENN:  Same objections,

Highly Confidential - Subject to Further Confidentiality Review

```
 1              lacks foundation.
 2         A.    I think one of my
 3    responsibilities, along with our regulatory
 4    teams, is to make sure that we continue to
 5    evolve our program, respond to changing
 6    dynamics and trends in the market and have
 7    the most effective program to execute our --
 8    execute our responsibilities and guard
 9    against diversion.  And we're committing to
10    doing it.
11    BY MR. BOGLE:
12         Q.    To make sure that things like
13    the allegations we read in the 2008 and 2017
14    settlement agreement do not occur again,
15    right?
16              MS. HENN:  Objection, lacks
17         foundation.
18         A.    I don't know that the
19    allegations happened or not, but, yeah, I
20    would like to have the best program that
21    nobody could question so there aren't
22    allegations again.
23    BY MR. BOGLE:
24         Q.    Right.  These were all very
25    serious allegations that all resulted in
```

Highly Confidential - Subject to Further Confidentiality Review

1    substantial settlements, right?

2        A.    I believe I take the

3    allegations seriously and they were

4    substantial settlements and we responded

5    appropriately.

6        Q.    You say you responded

7    appropriately.  In the 2017 settlement

8    agreement, it's noted that, in fact, starting

9    in 2009, immediately after the 2008

10   settlement agreement, that you guys didn't

11   react appropriately, right?

12               MS. HENN:  Objection --

13   BY MR. BOGLE:

14       Q.    Can you take away the

15   acceptance of responsibility paragraph as

16   meaning anything other than that?

17               MS. HENN:  Objection to form.

18       A.    I focus on paragraph 2 that

19   says:  McKesson has taken steps to prevent

20   such conduct from occurring in the future,

21   including the measures delineated in the

22   Compliance Addendum.

23   BY MR. BOGLE:

24       Q.    Oh, so after this agreement was

25   entered in 2017, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. HENN:  Objection to form,
 2         mischaracterizing the testimony.
 3         A.    I think we have taken steps
 4    during our entire time with my time with the
 5    company to evolve our program.
 6    BY MR. BOGLE:
 7         Q.    But the failures and due
 8    diligence that McKesson accepted
 9    responsibility for began within months after
10    the settlement agreement was executed in
11    2008.  True or not true?
12              MS. HENN:  Objection to form,
13         lacks foundation and mischaracterizes
14         the document.
15         A.    The time period outlined here
16    starts in January 1, 2009.
17              MR. BOGLE:  Okay.  I don't have
18         anything further at this time.
19              MS. HENN:  I think we'll want
20         to go off the record.
21              THE VIDEOGRAPHER:  Okay.  We're
22         off the record at 4:31 p.m.
23              (Recess taken, 4:31 p.m. to
24         4:43 p.m.)
25              THE VIDEOGRAPHER:  We're back
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              on the record at 4:43 p.m.
 2                     EXAMINATION
 3       BY MS. HENN:
 4              Q.      Good afternoon, Mr. Cavacini.
 5              A.      Good afternoon.
 6              Q.      Mr. Cavacini, what's your
 7       current title at McKesson?
 8              A.      Senior vice president and chief
 9       operating officer for our U.S. pharmaceutical
10       business.
11              Q.      And when did you take on the
12       role of senior vice president and chief
13       operating officer?
14              A.      Roughly August of 2017.
15              Q.      Prior to taking on your current
16       role, how long did you work for McKesson?
17              A.      I've been with the company a
18       little over 17 years.  Just celebrated my
19       17th anniversary, I believe.
20              Q.      Let's talk about your
21       background.  First, where did you go to
22       college?
23              A.      I graduated from a small
24       liberal arts school outside of Philadelphia
25       called Ursinus College.
```

1    Q.    When did you graduate from

2  Ursinus College?

3    A.    1993.

4    Q.    After graduating from college

5  what was your first job?

6    A.    My first job out of school was

7  selling Yellow Pages advertising.

8    Q.    How long did you work in your

9  job selling Yellow Pages advertising?

10    A.    I believe about three years,

11  maybe a little less.

12    Q.    After you stopped working in

13  the Yellow Pages advertising position, what

14  job did you take after that?

15    A.    I actually went to go work for

16  a customer that I met through my employment

17  at the Yellow Pages that owned a mail order

18  diabetes pharmacy called Advantage Health

19  Services.

20    Q.    How did you come to join

21  McKesson in 2002?

22    A.    Advantage was actually a

23  customer of McKesson at different periods of

24  time.  The company was sold roughly halfway

25  through my tenure to Sun Healthcare.  I

1    stayed for a number of years.  Unfortunately,

2    that company actually went through a Chapter

3    11 bankruptcy and at that point in time I

4    began looking for opportunities.  I was

5    familiar with McKesson and came to McKesson

6    in 2002.

7         Q.     What was your position when you

8    joined McKesson?

9         A.     My first role was a retail

10   sales executive.

11        Q.     What were your responsibilities

12   as a retail sales executive?

13        A.     The primary responsibilities of

14   a retail sale executive were business

15   development, trying to work with non-McKesson

16   customers to understand their needs and see

17   if there was a fit with McKesson.

18        Q.     How did you identify potential

19   customers when you were working as a retail

20   sales executive?

21        A.     I think through a variety of

22   sources, back to that time.  Believe it or

23   not, the Yellow Pages was one of them that we

24   used, but there were also lists of

25   pharmacies.  I remember the Hayes Directory

1    being a list of pharmacies.  A lot of my time

2    was spent in New York City where in that

3    market you can literally just park your car

4    and walk and find pharmacies.

5          Q.    How long did you serve as a

6    retail sales executive at McKesson?

7          A.    I believe about four years.

8          Q.    And your next position I think

9    you testified earlier was as a district sales

10   manager?

11         A.    Correct, a district sales

12   manager for our Delran distribution center.

13         Q.    What were your responsibilities

14   as a district sales manager?

15         A.    I was a frontline sales

16   manager, leading a team of, you know, seven

17   to probably 15 retail sales managers at

18   different periods of time that maintained the

19   relationships that we had with our existing

20   McKesson distribution customers.

21         Q.    And what territory did you

22   cover as a district sales manager?

23         A.    It changed a little bit during

24   my tenure there.  I initially started with

25   just the Delran distribution center, which

1    would have been the eastern half of

2    Pennsylvania, New Jersey, New York City, a

3    little bit of Maryland and Delaware, and was

4    later expanded to our New Castle distribution

5    in addition, which would have been the

6    western half of Pennsylvania, eastern Ohio, a

7    little bit of West Virginia.

8        Q.    What was your next position at

9    McKesson after you served as a retail sales

10   manager?

11       A.    I was promoted to a vice

12   president of sales for the same markets.

13       Q.    And how long did you have that

14   position?

15       A.    A little over three years, I

16   believe.

17       Q.    What was your next position at

18   McKesson?

19       A.    I was promoted again to vice

20   president and general manager for our

21   facility in Memphis, Tennessee, so I had

22   sales and operations responsibility for the

23   markets served by that distribution center.

24   Made a move from New Jersey at the time to

25   Collierville, Tennessee.

```
 1          Q.      And what was your next position
 2    at McKesson?
 3          A.      I believe about three years
 4    later had a chance to go back to the
 5    northeast region and lead our northeast
 6    region operations as the senior vice
 7    president for that market.
 8          Q.      And that was your position
 9    before you assumed your current position; is
10    that correct?
11          A.      Correct, up until August of
12    '17.
13          Q.      Mr. Cavacini, how would you
14    describe your level of familiarity with the
15    sales team's operations at McKesson's
16    U.S. Pharma division?
17          A.      I think I have a pretty deep
18    understanding.  For the better part of my
19    17-year career, I've been part of that team
20    in one fashion or another, as an individual
21    contributor and sales manager and now leader
22    of an organization.
23          Q.      Based on your experience, how
24    would you describe the goal of the sales team
25    at McKesson in relation to prospective
```

 1    customers?

 2              MR. BOGLE:  Object to form.

 3         A.    I've heard it described and

 4    I've described it to my teams that we want to

 5    have long-term customers that value the

 6    services and solutions we provide.  For the

 7    better part of my career, our health system's

 8    partners, as well as our retail independent

 9    customers, have been under intense pressure,

10    reimbursement pressure.  Clinical therapies

11    have become more complex.  They're constantly

12    being asked to do more.

13              And we talk about the customers

14    choose us not only for the value and the

15    services we provide today, but because we

16    share a common vision for the future of

17    pharmacy.  And I think that is what we're

18    trying to pursue.

19    BY MS. HENN:

20         Q.    And again, based on your

21    experience, how would you describe the goal

22    of the sales team at McKesson in relation to

23    existing customers?

24              MR. BOGLE:  Object to form.

25         A.    I think it's to build mutually

1    beneficial and rewarding relationships.  I

2    spoke earlier about our ICARE shared

3    principle "C," and that is customer centered

4    where we think about our business through our

5    customers' eyes and try to make sure that,

6    where we can, we're aligned around where

7    healthcare is going and how we can perform

8    our part to serve the pharmacies that are our

9    customers as well as the communities they

10   serve and that we live in and work out.

11   BY MS. HENN:

12        Q.    Based on your experience over

13   your 17 years at McKesson, describe the

14   typical relationship between a retail sales

15   manager and a customer.

16              MR. BOGLE:  Object to form.

17        A.    I do think it varies, but my

18   experience has been that more often than not,

19   that that is a deep relationship.  In many of

20   our -- the business relationships that we

21   have with our customers, we are probably

22   their largest vendor and have significant

23   impact on their business and their abilities

24   to perform for their communities.

25              One of the things that I'm most

Highly Confidential - Subject to Further Confidentiality Review

1    proud of, if you walk into one of our

2    distribution centers, not only will you see

3    ICARE, but you will see a slogan that "It's

4    not a package, it's a patient."

5              We hammer home to our

6    associates in the DC, as well as our sales

7    teams, that at the end of every one of our

8    processes is a patient; somebody's mother,

9    child, that's in need and waiting for the

10   medications we provide.  And we take that

11   responsibility very seriously in working with

12   our customers.

13             We've also had customers come

14   into our distribution center to share that

15   same message and the impact that we have on

16   their businesses and their communities.

17   BY MS. HENN:

18        Q.    How does the sales team

19   interact with the regulatory affairs team at

20   McKesson?

21             MR. BOGLE:  Object to form.

22        A.    In a variety of ways.  I mean,

23   I've heard it described and I've described it

24   myself that our sales team is an important

25   part of our Controlled Substance Monitoring

Highly Confidential - Subject to Further Confidentiality Review

```
1    Program, been described as our first line of
2    defense.  They spend the most time with our
3    customers.
4              And our new customer
5    onboarding, they're working with the customer
6    to complete the questionnaire.  The customer
7    fills out that questionnaire and signs it,
8    hopefully in presence of the sales rep, and
9    the sales rep is making observations about
10   what he sees -- he or she sees and observes
11   relative to what's being represented by the
12   customer on the questionnaire.
13             That's shared with our
14   regulatory affairs team who has the ultimate
15   decision.  I mean, they are supportive and
16   collaborative, but independent.
17   BY MS. HENN:
18        Q.    What, if any, training do
19   sales -- does the sales team receive in the
20   area of controlled substances monitoring?
21             MR. BOGLE:  Object to form as
22        to time.
23        A.    During my career I've been a
24   part of and witnessed, you know, several
25   different sales trainings.  As part of our
```

Highly Confidential - Subject to Further Confidentiality Review

1    National Sales Conference, on a number of

2    years we've had annual refreshers for our

3    sales teams around the controlled substance

4    monitoring, our responsibilities under it.

5              As part of our new hire

6    orientation, when new associates join the

7    company, they go through a training and

8    onboarding process which includes education

9    and review on our CSMP and their

10   responsibilities.

11   BY MS. HENN:

12        Q.    Could you describe McKesson's

13   culture in the area of controlled substances

14   monitoring compliance?

15              MR. BOGLE:  Object to form.

16        A.    I would say diligent.  We take

17   our responsibilities very seriously.  We have

18   worked and invested significantly to try to

19   develop the best program that we can have to

20   execute our responsibilities.

21              I spoke earlier about the

22   commitment that we have to all our customers

23   and that we communicate to our associates

24   that the license that we have is critical to

25   our business in order to meet the full

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pharmaceutical needs of the customers we

 2    serve, and I would rather make hard decisions

 3    around individual customers than potentially

 4    risk my relationship with, you know, all the

 5    other ones, including major health systems

 6    and trauma centers and our government and DOD

 7    business.  We try to be as diligent as we

 8    can.

 9              MS. HENN:  I have no further

10         questions.

11              Would you like to go off the

12         record and switch?

13              MR. BOGLE:  Let's go off the

14         record just a second and let me think

15         for like 30 seconds.

16              THE VIDEOGRAPHER:  We're off

17         the record at 4:54 p.m.

18              (Recess taken, 4:54 p.m. to

19         4:55 p.m.)

20              THE VIDEOGRAPHER:  Back on the

21         record at 4:55 p.m.

22                   EXAMINATION

23    BY MR. BOGLE:

24         Q.    Mr. Cavacini, just to follow up

25    on one point here:  You just talked about
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    McKesson's culture as it pertains to
2    controlled substance monitoring.  I think one
3    of the things you said was you take it very
4    seriously, right?
5         A.    I believe we do, yeah.
6
11              MS. HENN:  Objection to form.
12
16    BY MR. BOGLE:
17
21              MS. HENN:  Objection to form,
22    vague.
23
```

Highly Confidential - Subject to Further Confidentiality Review



6            MS. HENN:  Objection to form,

7        lacks foundation.

Highly Confidential - Subject to Further Confidentiality Review



1

21          MS. HENN:   Objection to form.

22

Highly Confidential - Subject to Further Confidentiality Review

1

2

3          MS. HENN:  Same objection.

4

5

6

7

8

9          MR. BOGLE:  Okay.  No further

10    questions.

11         MS. HENN:  Before we go off the

12    record, I would just like to ask that

13    the -- pursuant to the protective

14    order, the transcript and all exhibits

15    be designated highly confidential

16    pending review and designation.

17         And I would also ask that the

18    witness have the opportunity to read

19    and sign.

20         MR. RALEY:  Cardinal will

21    reserve its questions for the time of

22    hearing or trial.

23         THE VIDEOGRAPHER:  Anyone on

24    the phone?  Off the record?

25         MS. HENN:  Thanks.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE VIDEOGRAPHER:  We're off

 2          the record at 4:59 p.m.  This

 3          concludes Disc 4.

 4                (Proceedings recessed at

 5          4:59 p.m.)

 6                      --o0o--

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2            I, MICHAEL E. MILLER, Fellow of
     the Academy of Professional Reporters,
 3   Registered Diplomate Reporter, Certified
     Realtime Reporter, Certified Court Reporter
 4   and Notary Public, do hereby certify that
     prior to the commencement of the examination,
 5   EUGENE G. CAVACINI was duly sworn by me to
     testify to the truth, the whole truth and
 6   nothing but the truth.
 7            I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10
             I DO FURTHER CERTIFY that pursuant
11   to FRCP Rule 30, signature of the witness was
     requested by the witness or other party
12   before the conclusion of the deposition.
13            I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor attorney
14   nor counsel of any of the parties to this
     action, and that I am neither a relative nor
15   employee of such attorney or counsel, and
     that I am not financially interested in the
16   action.
17
18   _____
     MICHAEL E. MILLER, FAPR, RDR, CRR
19   Fellow of the Academy of Professional Reporters
     NCRA Registered Diplomate Reporter
20   NCRA Certified Realtime Reporter
     Certified Court Reporter
21
     Notary Public in and for the
22   State of Texas
     My Commission Expires:  7/9/2020
23
     Dated: January 29, 2019
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the

 6   appropriate space on the errata sheet for any

 7   corrections that are made.

 8              After doing so, please sign the

 9   errata sheet and date it.

10              You are signing same subject to

11   the changes you have noted on the errata

12   sheet, which will be attached to your

13   deposition.

14              It is imperative that you return

15   the original errata sheet to the deposing

16   attorney within thirty (30) days of receipt

17   of the deposition transcript by you.  If you

18   fail to do so, the deposition transcript may

19   be deemed to be accurate and may be used in

20   court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        ERRATA

 2      PAGE   LINE   CHANGE

 3      _____  _____  _____

 4             REASON: _____

 5      _____  _____  _____

 6             REASON: _____

 7      _____  _____  _____

 8             REASON: _____

 9      _____  _____  _____

10             REASON: _____

11      _____  _____  _____

12             REASON: _____

13      _____  _____  _____

14             REASON: _____

15      _____  _____  _____

16             REASON: _____

17      _____  _____  _____

18             REASON: _____

19      _____  _____  _____

20             REASON: _____

21      _____  _____  _____

22             REASON: _____

23      _____  _____  _____

24             REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, EUGENE G. CAVACINI, do hereby
        certify that I have read the foregoing pages
 4      and that the same is a correct transcription
        of the answers given by me to the questions
 5      therein propounded, except for the
        corrections or changes in form or substance,
 6      if any, noted in the attached
        Errata Sheet.

 7

 8

 9

10

11      _____

        EUGENE G. CAVACINI                    DATE
12

13

14      Subscribed and sworn to before me this

15      _____ day of _____, 20 _____.

16      My commission expires: _____

17

18      _____

19      Notary Public

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2

 3      PAGE      LINE

 4      _____     _____     _____

 5      _____     _____     _____

 6      _____     _____     _____

 7      _____     _____     _____

 8      _____     _____     _____

 9      _____     _____     _____

10      _____     _____     _____

11      _____     _____     _____

12      _____     _____     _____

13      _____     _____     _____

14      _____     _____     _____

15      _____     _____     _____

16      _____     _____     _____

17      _____     _____     _____

18      _____     _____     _____

19      _____     _____     _____

20      _____     _____     _____

21      _____     _____     _____

22      _____     _____     _____

23      _____     _____     _____

24      _____     _____     _____

25
```