```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
 3   IN RE: NATIONAL        )   MDL No. 2804
     PRESCRIPTION OPIATE    )
 4   LITIGATION,            )   Case No.
                            )   1:17-MD-2804
 5                          )
     THIS DOCUMENT RELATES TO )  Hon. Dan A.
 6   ALL CASES              )   Polster
                            )
 7
 8                    __ __ __
 9           Wednesday, January 9, 2019
                      __ __ __
10
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11              CONFIDENTIALITY REVIEW
                      __ __ __
12
13
14
15        Videotaped Deposition of GEORGE
     CHAPMAN, held at 4206 South J.B. Hunt Drive,
16   Rogers, Arkansas, commencing at 9:00 a.m., on
     the above date, before Debra A. Dibble,
17   Certified Court Reporter, Registered
     Diplomate Reporter, Certified Realtime
18   Captioner, Certified Realtime Reporter and
     Notary Public.
19
20
21
                      __ __ __
22
            GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | fax 917.591.5672
                 deps@golkow.com
24
25
```

Page 2

```
 1   A P P E A R A N C E S:
 2   CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY
     & AGNELLO
 3   BY:  MICHAEL A. INNES, ESQUIRE
        minnes@carellabyrne.com
 4      JOHN PETROZZINO
        jpetrozzino@carellabyrne.com
 5      ZACHARY BOWER, ESQUIRE
        zbower@carellabyrne.com
 6   5 Becker Farm Road
     Roseland, New Jersey 07068-1739
 7   (973) 994-1700
     Counsel for Plaintiffs
 8
 9   JONES DAY
     BY:  JASON VARNADO, ESQUIRE
10      jvarnado@jonesday.com
        SCOTT B. ELMER, ESQUIRE
11      selmer@jonesday.com
     717 Texas
12   Houston, Texas  77002- 2712
     832-239-3939
13   Counsel for Walmart
14
15   MARCUS & SHAPIRA, LLP
     (appearing telephonically)
16   BY:  DARLENE NOWAK, ESQUIRE
        dnowak@marcus-shapira.com
17   301 Grant Street
     35th Floor
18   Pittsburgh, Pennsylvania 15219-6401
     (412) 338-4690
19   Counsel for HBC
20
     WRIGHT, LINDSEY & JENNINGS, LLP
21   BY:  CALEY B. VO, ESQUIRE
        cvo@wlj.com
22   3333 Pinnacle Hills Parkway
     Suite 510
23   Rogers, Arkansas 72758-8498
     (479) 986-0888
24   Counsel for McKesson
25
```

Page 3

```
 1   ARNOLD & PORTER KAYE SCHOLER, LLP
     (appearing telephonically)
 2   BY:  WREDE SMITH
        wrede.smith@arnoldporter.com
 3   601 Massachusetts Avenue, NW
     Washington, DC 20001-3743
 4   (202) 942-5000
     Counsel for Endo Health Solutions Inc.;
 5   Endo Pharmaceuticals Inc.; Par
     Pharmaceuticals, Inc.; Par
 6   Pharmaceutical Companies, Inc. formerly
     known as Par Pharmaceutical Holdings,
 7   Inc.
 8
 9   WILLIAMS & CONNOLLY, LLP
     BY:  EMILY RENSHAW PISTILLI, ESQUIRE
10      epistilli@wc.com
        (appearing telephonically)
11   725 Twelfth Street, N.W.
     Washington, DC 20005
12   (202) 434-5331
     Counsel for Cardinal Health, Inc.
13
     JACKSON KELLY, PLLC
14   BY:  ANDREW N. SCHOCK, ESQUIRE
        anschock@jacksonkelly.com
15   50 South Main Street
     Suite 201
16   Akron, Ohio 44308
     (330) 252-9060
17   Counsel for AmerisourceBergen
18
19   ALSO PRESENT:
20   Jennifer B. Bechet
     Senior Associate Counsel
21   Walmart, Inc.
22   THE VIDEOGRAPHER:
23   Chris Ritona
     GOLKOW TECHNOLOGIES, INC.
24
25            — — —
```

Page 4

```
 1
 2           I N D E X
 3   GEORGE CHAPMAN              PAGE
 4   DIRECT EXAMINATION BY MR. INNES      7
 5        E X H I B I T S
 6   No.      Description        Page
 7   Walmart   6-5-13 email from Donna    179
     Chapman 1  Auldridge.  Subj: FW: May
 8      405-1. WMT_MDL_000009437,
     with attachment.
 9
10   Walmart   Practice Compliance update  181
     Chapman 2  PowerPoint deck slide.
11      WMT_MDL_000053017 with
     attachment
12   Walmart   Wal-Mart Pharmacy DC 6045   206
     Chapman 3  August Review of the July
13      2010 ordering practices of
     Wal-Mart Pharmacies.
14      WMT_MDL_000046008-46051.
15   Walmart   October 2014 email chain.   215
     Chapman 4  Subj: RE: SOM Deck Review.
16      WMT_MDL_000011128-11129
     with attachment
17
18   Walmart   June 2014 email chain.      283
     Chapman 5  Subj: FW: SOM ask for
19      FYE16.
        WMT_MDL_00004826-47828
20      with attachment.
21
     CERTIFICATE          364
22
     ERRATA               366
23
     ACKNOWLEDGMENT OF DEPONENT      367
24
     LAWYER'S NOTES           368
25
```

Page 5

```
 1        PROCEEDINGS
 2     (January 9, 2019 at 9:00 a.m.)
 3     THE VIDEOGRAPHER:  We are now
 4   on the record.  My name is
 5   Chris Ritona.  I am videographer for
 6   Golkow Litigation Services.
 7     Today's date is January 9,
 8   2019, and the time is 9:00 a.m.  This
 9   video deposition is being held in
10   Rogers, Arkansas, at Mitchell
11   Williams, 4206 South J.B. Hunt Drive,
12   in the matter of National Prescription
13   Opiate Litigation, MDL No. 2804,
14   Case No. 17-MD-2084, United States
15   District Court, Northern District of
16   Ohio, Eastern Division.
17     The deponent today is
18   George Chapman.
19     Will counsel please identify
20   themselves for the record.
21     THE WITNESS:  Here.
22     Sorry.
23     MR. INNES:  No problem.  Good
24   morning.  This is Michael Innes of
25   Carella Byrne for plaintiffs in the
```

Page 6

1 MDL.
2 MR. PETROZZINO: Good morning.
3 This is John Petrozzino from
4 Carella Byrne for plaintiffs in the
5 MDL.
6 MR. VO: Caley Vo of Wright
7 Lindsey & Jennings on behalf of
8 McKesson.
9 MS. BECHET: Jennifer Bechet,
10 Associate General Counsel, Walmart
11 Inc.
12 MR. ELMER: Scott Elmer from
13 Jones Day on behalf of defendant
14 Walmart.
15 MR. VARNADO: Jason Varnado
16 from Jones Day on behalf of Walmart
17 and the witness.
18 THE WITNESS: George Chapman,
19 Senior Director, Walmart.
20 THE VIDEOGRAPHER: The court
21 reporter today is Debbie Dibble, and
22 she will now please swear in the
23 witness.
24 COURT REPORTER: Would you get
25 attendance on the phone for me,

Page 7

1 please?
2 THE VIDEOGRAPHER: Could the
3 attendants on the phone please
4 announce themselves for the record as
5 well?
6 MS. PISTILLI: This is Emily
7 Pistilli from Williams & Connolly on
8 behalf of Cardinal Health.
9 MR. SMITH: This is Wrede Smith
10 from Arnold & Porter on behalf of Endo
11 and Par.
12 MR. SCHOCK: And Andrew Schock
13 from Jackson Kelly on behalf of
14 AmerisourceBergen Drug Corporation.
15 MS. NOWAK: And Darlene Nowak
16 from Marcus & Shapira on behalf of HBC
17 Services.
18 GEORGE CHAPMAN,
19 having first been duly sworn, was examined
20 and testified as follows:
21 DIRECT EXAMINATION
22 BY MR. INNES:
23 Q. Good morning, Mr. Chapman. As
24 I just said, my name is Michael Innes. I'm
25 with the law firm of Carella Byrne out of

Page 8

1 Roseland, New Jersey, and I represent the
2 plaintiffs in the MDL. Thank you very much
3 for being here this morning.
4 You understand that you're
5 under oath; is that right?
6 A. I do.
7 Q. And you might have to speak up
8 so folks on the phone can hear you today.
9 Have you ever testified under
10 oath before?
11 A. I'm sorry, will you repeat
12 that?
13 Q. Have you ever testified under
14 oath before?
15 A. Yes.
16 Q. So you understand that even
17 though you're in a law office today, the
18 testimony that you give under oath here is
19 subject to the same penalties of perjury as
20 if you were giving testimony in a court of
21 law?
22 A. I do.
23 Q. I'm going to assume that you
24 understand the questions that I ask you
25 unless -- excuse me. I'm going to -- excuse

Page 9

1 me -- I have a cold here.
2 I'm going to assume that you
3 understand the questions I ask you, and if
4 you don't understand them, let me know; is
5 that fair?
6 A. Yes.
7 Q. Is there anything that would
8 prevent you from thinking clearly or
9 testifying truthfully today?
10 A. No.
11 Q. What did you do to prepare for
12 today's deposition?
13 A. I met with our in-house legal
14 and outside.
15 Q. On how many occasions did you
16 meet with them?
17 A. Three.
18 Q. And on those occasions, was
19 it -- were all three occasions with both
20 outside and in-house counsel?
21 A. Yes.
22 Q. And who attended from outside
23 counsel?
24 A. Representatives from Jones Day,
25 and I don't know the names of the other folks

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1 that would have attended.
2     Q.    And who were the
3 representatives from Jones Day?
4     A.    Jason, and I'm not sure who
5 else was on the phone.
6     Q.    And were all three meetings on
7 the telephone?
8     A.    First was a telephone call.
9     Q.    And what date did that happen?
10     A.    I don't remember the date.  It
11 was in December.
12     Q.    Beginning of December?
13     A.    I believe it was the end of
14 December, toward the end of December.
15     Q.    And approximately how long was
16 that meeting?
17     A.    Oh, around two hours.
18     Q.    And were -- was anyone from
19 Walmart, other than yourself, present on that
20 phone call?
21     A.    There was Walmart legal on the
22 phone.
23     Q.    Anyone other than Walmart
24 legal -- any other employee from Walmart who
25 is not in the legal division?

Page 11

1     A.    No.
2     Q.    So that's the first call.
3          The second meeting, was that
4 telephone or in person?
5     A.    In person.
6     Q.    And when did that occur?
7     A.    Monday of this week.
8     Q.    And for how many -- how long
9 was that meeting?
10     A.    Five hours.
11     Q.    Okay.  Who attended that
12 meeting?
13     A.    It was myself, Jason, Jennifer,
14 Jones Day -- I'm sorry.  I don't have -- I
15 don't know everybody's name.
16          MR. ELMER:  Scott.
17          THE WITNESS:  Oh, yeah.  Scott.
18          And another Walmart legal.  I
19 can't remember.
20     Q.    (BY MR. INNES)  And the Scott
21 that you're referring to is Scott Elmer, and
22 he's --
23     A.    Yes, Scott.
24     Q.    And he's off camera today --
25     A.    Yes.

Page 12

1     Q.    -- but he's present in the
2 room, just for the record.
3          And the third meeting, when did
4 that occur?
5     A.    Yesterday.
6     Q.    Okay.  And for how long was
7 that?
8     A.    Roughly eight hours.
9     Q.    And who was present at that?
10     A.    The same.
11     Q.    And that was --
12     A.    It was the Monday meeting.
13     Q.    And to be clear, that was an
14 in-person meeting?
15     A.    Yes.
16     Q.    Did you review any documents in
17 preparation for today's testimony?
18     A.    I reviewed documents that have
19 been part of my tenure in this position.
20     Q.    Tenure in which position are
21 you --
22     A.    Senior director.
23     Q.    And what was the tenure of that
24 senior director position?
25          MR. VARNADO:  Objection, form.

Page 13

1          THE WITNESS:  2012 until
2 current.
3     Q.    (BY MR. INNES)  So in
4 preparation for today's testimony -- I just
5 want to make sure I have this correct.  You
6 reviewed documents in your possession during
7 your tenure as senior director, and that
8 began in 2012?
9          MR. VARNADO:  Object to the
10 form.
11          THE WITNESS:  Since 2 -- since
12 I was senior director of practice
13 compliance and regulatory affairs.
14     Q.    (BY MR. INNES)  And you did not
15 review any documents prior -- in any prior
16 positions at Walmart?
17     A.    I believe my evaluation.
18     Q.    Okay.
19          How far back were your -- do
20 your evaluations go?
21     A.    I've been with Walmart for
22 27 years.  So I actually don't remember the
23 date of the first evaluation that we went
24 through.
25     Q.    Okay.  I noticed that you were

Page 14

1 at Walmart for 27 years. We're not going to
2 cover that entire time period, so don't worry
3 about that. We're going to focus on a very
4 particular time period.
5          Did you review any deposition
6 testimony that's been taken in this case? As
7 part of your preparation?
8      A.    No.
9      Q.    Did you read any expert reports
10 that have been -- as part of this case?
11     A.    No.
12     Q.    Did you read any court
13 documents in preparation for today's --
14     A.    No.
15     Q.    Have you read any publications
16 in preparation for today's testimony?
17     A.    No.
18     Q.    Did you review any electronic
19 records such as emails in preparation for
20 today?
21     A.    Yes.
22     Q.    And those emails would have
23 been sometime in the time period of 2012 and
24 forward?
25     A.    Yes.

Page 15

1      Q.    No emails reviewed prior to
2 2012?
3      A.    No.
4      Q.    Did you review any databases in
5 preparation for today's testimony?
6      A.    No.
7      Q.    In preparation for today's
8 testimony, did you do any investigation on
9 your own pertaining to documents that you
10 might have in your possession that might help
11 you with your testimony today?
12     A.    No.
13     Q.    Did you speak -- strike that.
14          Are you familiar with the
15 complaint in this case?
16     A.    Can you repeat that?
17     Q.    Are you familiar with the
18 allegations in the complaint in this case?
19     A.    I have -- I have some
20 knowledge.
21     Q.    Have you reviewed that
22 complaint?
23     A.    I have not.
24     Q.    What is your knowledge of the
25 complaint based on?

Page 16

1          MR. VARNADO: Objection to
2 form.
3          THE WITNESS: That it's based
4 off of multistate litigation for
5 opioids.
6      Q.    (BY MR. INNES) Is that the
7 entire extent of your knowledge?
8      A.    Yes.
9      Q.    In preparation for today, did
10 you speak with any representatives for any of
11 the co-defendants in this case?
12     A.    No.
13     Q.    Did you speak with -- other
14 than the folks that we discussed in those
15 three meetings, did you speak with anyone
16 else in preparation for today's deposition?
17     A.    No.
18     Q.    Have you spoken with anyone
19 else at any time about the allegations in the
20 complaint?
21     A.    No.
22     Q.    You never spoke with any
23 colleagues at Walmart regarding the
24 allegations in the complaint?
25     A.    No.

Page 17

1      Q.    So, Mr. Chapman, you just -- I
2 think you said you've been with Walmart for
3 27 years; is that right?
4      A.    Yes.
5      Q.    So I want to do a brief
6 overview of the positions you held during
7 that time period. I can focus your attention
8 in certain areas, but I would like to go back
9 in time so many years.
10          What positions, if any, did you
11 hold at Walmart between the years 1994 and
12 2004?
13     A.    1994 to 2004, I would have
14 been -- in 1994, I would have been a pharmacy
15 manager for Walmart.
16          Somewhere in 1995, 1996, I
17 would have been promoted to a pharmacy
18 district manager. And which I would have
19 relocated to Dublin, Ohio, to manage several
20 locations in that market.
21          Then by 2000 -- I would have
22 been relocated to -- sometime in probably
23 1999, I would have taken another market
24 director or district manager responsibility
25 in North Carolina.

Page 18

1   Then in 2001, I would have
2 moved to Bentonville, Arkansas, to come into
3 the home office in a support role.
4   Q.   Okay.
5   A.   From 2000 -- probably 2002 or
6 '3, I would have been promoted to a regional
7 manager for Walmart -- had responsibilities
8 for Walmart and Sam's Club pharmacies.
9   Q.   Did you hold the position of
10 senior manager ISD at any point in time?
11   A.   I did.
12   Q.   Okay.  What does ISD stand for?
13   A.   It's information systems
14 division.
15   Q.   And what were your -- when did
16 you hold that role?
17   A.   It would have been probably
18 around 2007 -- around that time period to
19 2009.
20   Q.   Can you give me just a brief
21 description of what your responsibilities
22 were in that role?
23   A.   I was responsible for managing
24 one of the pharmacy coding teams that had
25 responsibility for the back-end reporting,

Page 19

1 billing, that occurred in our pharmacies.
2   Q.   What exactly is back-end
3 reporting?
4   A.   It is the -- in the pharmacy
5 fulfillment itself, there's the front-end
6 user interface that people use to fill
7 prescriptions.  My team had responsibility
8 for all the things that happened in the
9 background as far as reporting, billing,
10 transmitting of claims.
11   Q.   And when you say "in the front
12 end" -- bear with me.  It's an evolving
13 transcript, and I'm reading it now.
14     Just so you know, this screen
15 is -- it's LiveNote.  I don't know if you
16 have that in front of you.
17     So when I'm reading this, I am
18 paying attention, but ...
19     So when I'm reading this, I am
20 paying attention to what you're saying.  I'm
21 just trying to know exactly what you are
22 saying.  I'm not checking my email.
23   A.   Yeah.
24   Q.   So in the fulfillment itself,
25 you said there is the front-end interface

Page 20

1 that people use to fill prescriptions.  Who
2 are those people?
3   A.   It would be our --
4     MR. VARNADO:  Object to the
5 form.
6     THE WITNESS:  It would be our
7 pharmacists and our technicians.
8   Q.   (BY MR. INNES) Okay.  I'll
9 take an opportunity.  I failed to give one
10 instruction.  When I ask a question, if you'd
11 just pause and let your counsel interpose an
12 objection if he wants to.  Once he does that,
13 you can answer.  It just keeps the transcript
14 clean.  I'm probably going to be the largest
15 offender of talking over people today.  So
16 I'll try to keep that to a minimum.
17   A.   Okay.

Page 21





Page 22

Page 23

17        What role did you take on, if
18 any, at Walmart after 2009?
19     A.   In 2009, I came back over to
20 the business side from our information
21 systems division, and became a member of the
22 regulatory affairs group at the -- for health
23 and wellness.
24     Q.   What was your title in the
25 regulatory affairs group for health and

Page 24

1 wellness at that time?
2     A.   It was director of regulatory
3 affairs.
4     Q.   Can you briefly describe your
5 responsibilities in that role at that time?
6     A.   I had responsibility as a
7 director for an area of the country which was
8 probably 15 states that we helped support our
9 stores in the practice of pharmacy.  And
10 dealt with boards of pharmacies, regulatory
11 changes that would have to be implemented
12 within our processes and procedures.
13     Q.   Which 15 states exactly were
14 you in charge of?
15        MR. VARNADO:  Object to the
16 form.
17        THE WITNESS:  I could not --
18 because that has changed, I can't
19 remember all of the states.  But it
20 was -- I can tell you that it was
21 South Carolina, North Carolina,
22 Florida and Georgia, but then I don't
23 remember the other states.
24     Q.   (BY MR. INNES)  Okay.  At any
25 time did you have responsibility for the

Page 25

1 state of Ohio?
2     A.   In the role of director?
3     Q.   That's right.
4        MR. VARNADO:  Object to the
5 form.
6        THE WITNESS:  I don't believe
7 that I did.
8     Q.   (BY MR. INNES)  Okay.  Is there
9 something that could refresh your
10 recollection as to that?
11     A.   I would have to see an email or
12 an alignment map if I had responsibility for
13 Ohio.

24     Q.   (BY MR. INNES)  And you said an
25 alignment map shows who has responsibilities

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 for which state. At any given point in
2 time -- strike that.
3 I just want to be clear that
4 we're talking about the same point in time.
5 We're now in 2010 time period; is that right?
6 A. That would be 2010.
7 Q. Okay. In 2010, approximately
8 how many other directors of regulatory
9 affairs were at Walmart?

23 Q. So you said there was four. I
24 have Tim Koch as one, you, Mr. Chapman as the
25 other. I think if my math is correct,

Page 27

1 there's two more.
2 A. Yes.
3 Q. Who were those folks?
4 A. Debbie Mack and Dadrion Gaston.
5 Q. Your prior testimony is that
6 you were responsible for 15 states. Did the
7 other three directors share the balance of
8 the country?
9 A. Yeah, the two directors would
10 have shared the balance of the country.
11 Q. And the other two directors
12 would be Debbie Mack and Mr. Gaston?
13 A. Debbie Mack and Ms. -- Dadrion,
14 yes.
15 Q. Do you know which states
16 Ms. Mack was responsible for?
17 MR. VARNADO: Object to the
18 form.
19 THE WITNESS: Debbie has
20 typically held responsibility for the
21 western part of the U.S.
22 Q. (BY MR. INNES) And then would
23 Ms. Gaston have responsibility for the
24 Midwest?
25 MR. VARNADO: Object to the

Page 28

1 form.
2 THE WITNESS: Dadrion would
3 have had the Midwest to Northeast.
4 Q. (BY MR. INNES) Would that have
5 included Ohio?
6 MR. VARNADO: Object to the
7 form.
8 THE WITNESS: I don't know.
9 Q. (BY MR. INNES) But the way we
10 could figure that out would potentially be by
11 reviewing an alignment map for that period of
12 time?
13 A. Yes.
14 Q. How long did you hold the role
15 of director of pharmacy regulatory affairs?
16 A. That would have been from when
17 I came back over in 2009 until I believe
18 January of -- January or February of 2012.
19 Q. Okay. You testified that as
20 part of your role as director of regulatory
21 affairs, part of your responsibilities is the
22 practice of pharmacies?
23 MR. VARNADO: Objection, form.
24 THE WITNESS: Yes.
25 Q. (BY MR. INNES) And could you

Page 29

1 explain that a little bit more fully?
2 Exactly what the practice of pharmacy would
3 be?
4 A. It would be around
5 state-specific practice act for our
6 pharmacies.
7 Q. And by "state-specific practice
8 act," what do you mean by that?
9 A. Each state is going to have, in
10 the practice act, different regulations
11 around what prescriptions can be filled.
12 There may be even limitations on how many can
13 be given at any one time, how records are
14 maintained, how counseling needs to be done,
15 if it needs to be done on different
16 medications. Various -- various regulations.
17 Q. Did you -- in that role, did
18 you have any responsibility over compliance
19 with federal regulations?
20 A. Yes.
21 Q. And which regulations were
22 those specifically?
23 MR. VARNADO: Object to form.
24 THE WITNESS: It would be any
25 regulations that pertained to the

Page 30

1  practice of pharmacy.
2      Q.    (BY MR. INNES)  Controlled
3  Substances Act would be an example?
4      A.    Yes.
5      Q.    And to be clear, the
6  responsibilities you just described were the
7  same over your entire tenure as senior
8  director?
9              MR. VARNADO:  Objection, form.
10     Q.    (BY MR. INNES)  I'm sorry, as
11  director of regulatory affairs?
12     A.    As director of regulatory
13  affairs, yes.
14     Q.    And you said sometime in 2012,
15  you obtained a new title.  What title was
16  that?
17     A.    I became senior director for --
18  it was either regulatory affairs or the name
19  changed to practice compliance, and I don't
20  remember when that happened.
21     Q.    Was this -- did you move to an
22  entirely new division or was this simply a
23  change in title?
24     A.    We had someone that used to be
25  the director, and I was promoted into that

Page 31

1  position.
2      Q.    Okay.  How did your
3  responsibilities change?
4              MR. VARNADO:  Object to the
5      form.
6              THE WITNESS:  Responsibilities
7      became the oversight and coordination
8      among all of the directors for the
9      overseeing of the states and the
10     practice.
11     Q.    (BY MR. INNES)  And how many
12  directors did you oversee during that time
13  period?
14     A.    It would have been three.
15     Q.    Three.
16          So you were promoted out of the
17  director level when there were four, and then
18  did that leave Ms. Mack, Ms. Gaston, and
19  Mr. Koch as the directors?
20     A.    It did.
21     Q.    Okay.
22          And this is in 2012; is that
23  correct?
24     A.    Yes.
25     Q.    And how long did you hold that

Page 32

1  title?
2      A.    I was senior director for
3  regulatory affairs, as a Senior Director I,
4  until some point it was changed to a
5  different level position.  I did basically
6  the same role.
7      Q.    Sir, in your role as the senior
8  director, when you were overseeing the
9  directors, what were your responsibilities in
10  that oversight?
11             MR. VARNADO:  Object to form.
12             THE WITNESS:  I had a
13     responsibility to make sure that our
14     corporate policies were consistent
15     across all of the different director
16     areas.
17     Q.    (BY MR. INNES)  Which corporate
18  policies specifically?
19             MR. VARNADO:  Object to the
20     form.

Page 33



Page 34

Page 36

Page 35

Page 37

3    Q.    (BY MR. INNES) So from the
4    point in time when you took the senior
5    director compliance role at Level 1, were you
6    promoted to another level at any point in
7    time?
8        A.    The job code changed to a
9    Level 2, and at the same time the -- at the
10   time directors, their job -- their job role
11   changed as well.  It was an up-sourcing of
12   the job role.  So they became senior
13   directors.
14       Q.    So at that point in time,
15   you're Senior Director Level 2?
16       A.    2.
17           MR. VARNADO:  Object to the
18   form.
19       Q.    (BY MR. INNES) The folks who
20   you were overseeing as directors were now
21   senior directors Level 1s?
22       A.    Yes.
23       Q.    And are those the same folks as
24   before?  Mr. Koch, Ms. Gaston, and --
25       A.    No.  At some point Ms. Gaston

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 left our department and went to another
2 department.
3        Q.    Okay.  Was her role backfilled?
4        A.    Yes.
5        Q.    And who took that position?
6        A.    Rick Irby.
7        Q.    Do you know approximately the
8 date that Ms. Gaston left and Mr. Irby took
9 over?
10       A.    I don't know the exact date,
11 but it would probably be 2013, maybe.
12       Q.    And in 2013, you're still
13 overseeing three senior directors?
14       A.    Yes.
15       Q.    And were there any other senior
16 directors added?
17       A.    There were no senior directors
18 added.
19       Q.    Who took on the role of
20 director at that point?
21       A.    I'm sorry, can you repeat that?

Page 39

Page 40

Page 41

24       Q.    I want to focus on the
25 adherence to state laws and adherence to



Page 42

1 federal law, as it relates to your position
2 during this time.
3     What was your role as it
4 related to these senior directors and
5 directors vis-à-vis state and federal law
6 compliance regarding opioids at that point in
7 time?
8     MR. VARNADO: Object to the
9 form.
10     THE WITNESS: If there were --
11 if there was a change and a particular
12 state may reclassify a drug from
13 non-schedule to a schedule, that
14 individual senior director would have
15 responsibility with a director to make
16 sure all the current processes and
17 everything was followed. My role was
18 more of an oversight for all of the
19 activities that would happen across
20 all of our stores.
21    Q. (BY MR. INNES) What do you
22 mean by "activities"?
23    A. Any law changes, any changes
24 that we would need to make to policies,
25 procedures, enhancements to systems, to go

Page 43

1 from manual processes to systematic
2 processes.



Highly Confidential - Subject to Further Confidentiality Review



Page 46

Page 48

17    MR. INNES:  Counsel, can you
18  articulate why exactly you believe
19  that the name of a law firm is
20  privileged?
21    MR. VARNADO:  Well, yes.  First
22  off, it's irrelevant, and second off,
23  it's work product, protected privilege
24  as to the identity of who the company
25  engages to obtain legal advice.

Page 47

Page 49

1      I think that in and of itself
2  is a privileged item.
3      MR. INNES:  So your first
4  objection is relevancy.
5      MR. VARNADO:  No, I'm objecting
6  on privilege grounds.
7      MR. INNES:  So you're
8  withdrawing your relevancy objection.
9      MR. VARNADO:  I'll allege that
10  as well, but I'll stand on the
11  privilege.
12      MR. INNES:  You're objecting on
13  relevancy, yes or no?
14      MR. VARNADO:  Yes.
15      MR. INNES:  And you're
16  objecting on privilege, yes or no?
17      MR. VARNADO:  Yes.
18      MR. INNES:  We might have to
19  address that at a later date.  I think
20  it -- hopefully the case law is on
21  your side on that one, but we can move
22  on for now.  Or I'll just reserve my
23  right to move -- to compel an answer
24  on that question.
25      MR. VARNADO:  And we'll object







Page 58

Page 60

Page 59

Page 61

**Page 60**

19    MR. VARNADO:  Mike, we've been
20  going about an hour.  Is this a good
21  time for a break?  Or do you want to
22  keep going?
23    MR. INNES:  Let me just ask two
24  more questions, and then actually this
25  is a perfect time for a break.

**Page 61**

1    We're going to come back to
2  NACDS later today.
3    Q.    (BY MR. INNES)  Let me seal
4  off -- if I can just take you through the
5  rest of your roles in a time period, and then
6  that will seal off our chapter and we can
7  keep a clean record.
8    So I think we left off in 2013,
9  where you were the Senior Director I of
10  health and wellness.  Is that right?
11    A.    That sounds right.
12    Q.    You held that role through --
13  well, through present day?  Is that right?
14    A.    The Senior Director II role,
15  yes, is to present day.
16    Q.    And Senior Director II role --
17  and I know you said this earlier, just
18  refresh me.  When did you take on the Senior
19  Director II role?
20    A.    It would be --
21    Q.    Approximately?
22    A.    2013?  2014?





Page 66

6       MR. INNES:  All right.  Do you
7   want to take a 10-, 15-minute break?
8       MR. VARNADO:  10 minutes.
9   Thank you.
10       THE VIDEOGRAPHER:  10:08.  We
11   are off the video record.
12       (Recess taken, 10:08 a.m. to
13   10:26 a.m.)
14       THE VIDEOGRAPHER:  10:27.  We
15   are on video record.
16   Q.    (BY MR. INNES)  Okay.
17   Mr. Chapman, welcome back.

Page 68

Page 67

Page 69



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Page 82

23      It's quite warm in here, isn't
24 it?
25      THE WITNESS: I'm sorry?

Page 84

Page 83

1      MR. INNES: Is it quite warm in
2 here, or is it me?
3      THE WITNESS: No, it's warm.
4      MR. INNES: Scott, do you think
5 we could prop that door open a little
6 bit?
7      MR. ELMER: Sure.
8      MR. INNES: Thanks.
9      If it gets too loud for the
10 videographer or for the court
11 reporter, please let me know. I don't
12 want this to be considered a
13 deposition tactic that I'm making the
14 witness uncomfortable. It's quite
15 warm in here.

Page 85

Highly Confidential - Subject to Further Confidentiality Review



Page 86

Page 88

Page 87

Page 89

Highly Confidential - Subject to Further Confidentiality Review





Page 94

20    Q.    (BY MR. INNES)  And when did
21  that understanding change to your current
22  understanding?
23    A.    I can't remember an exact date,
24  but it would be after conversations began
25  around the opioid crisis.

Page 95

1    Q.    When did the opioid crisis
2  begin?
3        MR. VARNADO:  Object to the
4  form.
5        THE WITNESS:  I first became
6  aware of when everyone was using the
7  term around -- "opioid crisis" --
8  probably 2014, 2015.
9    Q.    (BY MR. INNES)  So is that
10  around the time your understanding changed?
11    A.    My understanding of?
12    Q.    Diversion.
13    A.    I'm sorry?
14    Q.    Diversion.
15    A.    Yes.
16    Q.    End of 2014, beginning of 2015,
17  you came to a different understanding of
18  diversion?  Your current understanding of
19  diversion?
20    A.    That a suspicious order could
21  be considered as diversion.

Page 96

Page 97



Page 98

Page 99

Page 100

```
1   I'm getting glare off the computer
2   screen, so we're all on an even
3   playing field.
4       MR. VARNADO:  All in it
5   together now.
6       MR. INNES:  I just want the
7   record to be clear now.
8       THE WITNESS:  The sun is
9   terrible.
10      (Discussion off the record.)
11      THE VIDEOGRAPHER:  Let's go off
12  the record for one second, if that's
13  okay.
14      MR. INNES:  Sure.
15      THE VIDEOGRAPHER:  11:08.  We
16  are off video record.
17      (Recess taken, 11:08 a.m. to
18  11:17 a.m.)
19      THE VIDEOGRAPHER:  11:17.  We
20  are on the video record.
21  Q.   (BY MR. INNES)  Mr. Chapman,
22  let me continue on this same vein for a
23  little while.
```

Page 101

25      MR. INNES:  For the record, now



Page 104

3    MR. INNES:  Scott's going to
4    close the door.  Thanks, Scott.



Page 106

Page 108

Page 107

1  Q.  Sorry, I chuckled because
2  there's a chain saw going on outside.  These
3  things comes in threes, so I don't know
4  what's coming next.  This is the sun, the
5  heat, and the chain saw, and the reflection
6  off that, so four.

Page 109

9  Q.  (BY MR. INNES)  Are you having
10  a tough time hearing me or are you not
11  understanding the question?
12  A.  It's hard to hear you, but I
13  didn't understand the question.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 130

Page 131

Page 132

Page 133

21    MR. INNES:  Okay.  I'm going to
22  move to strike the first sentence, the
23  beginning of "logistics," ending with
24  "responsibility" as nonresponsive.
25  Q.    (BY MR. INNES)  Okay.  I want

Page 134

1 to know if you -- if, in your role as the
2 senior director of health and wellness
3 compliance, you agree that the following
4 circumstances might be indicative of
5 diversion, warranting further investigation.
6    A.    Again, you would have --
7         MR. VARNADO:  Hold on.
8         Let him ask a question.
9         THE WITNESS:  What's that?  I'm
10 sorry.
11        MR. INNES:  Sorry, it wasn't a
12 question yet.  But if you want to say
13 something, go right ahead.
14        THE WITNESS:  No.
15        MR. INNES:  Okay.
16   Q.    (BY MR. INNES)  So in your role
17 as the senior director of health and wellness
18 compliance, I want to know if you agree if
19 the following circumstances are indicative of
20 diversion warranting further investigation of
21 an order from a Walmart pharmacy regarding
22 Schedule II opiates.
23        Ordering a limited variety of
24 oxycodone in quantities disproportionate to
25 the quantity of non-controlled medications.

Page 135

1         MR. VARNADO:  Object to the
2 form.
3    Q.    (BY MR. INNES)  Would that
4 warrant further investigation by Walmart?





Highly Confidential - Subject to Further Confidentiality Review







Page 150

[text redacted]

Page 151

14       MR. VARNADO: We've been going
15 about another hour. Is that right?
16       MR. INNES: Let's go off the
17 record for one second.
18       THE VIDEOGRAPHER: 12:18. We
19 are off video record.
20       (Recess taken, 12:18 p.m. to
21 1:04 p.m.)
22       THE VIDEOGRAPHER: 1:04. We
23 are on the video record.
24   Q.   (BY MR. INNES) Good afternoon,
25 Mr. Chapman. We're back from lunch.

Page 152

1       I'm going to hand you what's
2 been marked already as Exhibit 1 from
3 Ms. Johnson's deposition.
4       MR. INNES: Some copies for you
5 folks.
6       MR. VARNADO: Thank you.
7       And you're just looking at
8 what's under tab 1?
9       MR. INNES: So, yeah, let me
10 explain what this is.
11   Q.   (BY MR. INNES) We're going to
12 look at the whole thing, I think, over the
13 course of the rest of the afternoon, so we'll
14 just keep this one handy.
15       I'll represent to you that this
16 is Walmart's responses to plaintiffs' first
17 combined discovery request. It is national
18 retail pharmacy defendants.
19       We have attached as Exhibits 2
20 through 9 the documents that are listed in
21 the chart on page 3 of tab 1.
22       MR. VARNADO: We have 2 to 8.
23       MR. INNES: Fair point. Tab 9
24 is missing, but tab 9 is there. It's
25 just that you don't have the actual

Page 153

1 tab.
2   Q.   (BY MR. INNES) So it's the
3 penultimate page begins tab 9.
4       MR. VARNADO: I see.
5 Understood.
6       MR. INNES: Sorry about that.
7 If you need a Post-It note to make
8 that easier.
9       So, Mr. Chapman, if you want to
10 give that a look. And when you're
11 done, we can start.
12       What I will say is, again,
13 we're going to be using this
14 throughout the course of the
15 afternoon, so I can direct you to the
16 specific sections I want to look at.
17 I can give you time to review this.
18 And then we can begin the questions,
19 or you can spend some time right now
20 reviewing the entire document. It's
21 entirely up to you.
22       MR. VARNADO: Why don't I open
23 it and see what it is.
24       MR. INNES: I would suggest the
25 first option is probably the most

Page 154

1　efficient.
2　　　MR. VARNADO: But your option
3　is?
4　　　MR. INNES: I'm going to
5　discuss these in sequence over the
6　balance of my time, essentially. And
7　I'll address each document for a
8　particular, you know, set of
9　questions.
10　　　So I can say, I'm going to
11　begin my questions on tab 1 now.
12　Review that and let me know and so on
13　and so forth through tab 9.
14　　　MR. VARNADO: Sounds fine.
15　　　MR. INNES: Does that make
16　sense?
17　　　MR. VARNADO: Mm-hmm.
18　Q.　(BY MR. INNES) So if you're --
19　I'm going to look at tabs 1 and 2 first, so
20　if you want to give a look at those. And
21　then let me know when you're ready, we can
22　dive in.
23　　　[Document review.]
24　　　THE WITNESS: You said 1 and 2?
25　Q.　(BY MR. INNES) And that's

Page 155

1　correct.
2　A.　Okay.
3　Q.　Good to go? Okay. Great.
4　　　So by way of brief explanation,
5　again, this is Walmart's responses to
6　plaintiffs' -- my discovery. It provides a
7　narrative response for one section, and it
8　provides documents for another section.
9　　　So I want to direct your
10　attention to -- back in time, time period '94
11　to 2004, we discussed earlier today where you
12　had various titles. The -- if you can turn
13　to the fourth page of tab 1. You'll see a
14　series of forwarded paragraphs.
15　A.　Fourth page of what?
16　　　MR. VARNADO: Yeah. It's one
17　more.
18　　　THE WITNESS: Oh. Okay.



Highly Confidential - Subject to Further Confidentiality Review



Page 158

Page 160

Page 159

Page 161

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Page 198

19    Q.    (BY MR. INNES)  At this point
20  in time, you're well aware of the opioid
21  crisis that is going on in October of 2015;
22  is that right?
23    A.    At this time period, the opioid
24  crisis was a topic of conversation around the
25  U.S.

Page 199

1    Q.    Was it a topic of conversation
2  at Walmart?
3    A.    Yes, we would have been having
4  conversations that this was a national issue.
5    Q.    And now your department is
6  taking the mantle on Walmart's efforts to
7  make sure that the opioid crisis can be
8  abated; is that right?
9    MR. VARNADO:  Object to the
10  form.
11    THE WITNESS:  We would have
12  been responsible for -- in 2015, of
13  taking over the suspicious order
14  monitoring.





Page 206

6      MR. ELMER:  We've produced
7  responsive documents.
8      MR. VARNADO:  Yeah, we've
9  produced responsive documents that I
10  believe include -- contain that
11  information.
12      Now that we have the blower
13  back, maybe this is a good time for a
14  break.  We've been going like an hour
15  and 15.
16      THE VIDEOGRAPHER:  2:24.  We
17  are off the video record.
18      (Recess taken, 2:24 p.m. to
19  2:45 p.m.)
20      THE VIDEOGRAPHER:  2:45.  We
21  are on the video record.
22      (Walmart-Chapman Deposition
23  Exhibit 3 was marked for
24  identification.)

Page 207

Page 208

Page 209

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review







Page 242

3       MR. INNES:  Can we take a
4  five-minute break?
5       MR. VARNADO:  Sure.
6       THE VIDEOGRAPHER:  3:30.  We
7  are off the video record.
8       (Recess taken, 3:30 p.m. to
9  3:51 p.m.)
10       THE VIDEOGRAPHER:  3:51.  We
11  are on the video record.
12  Q.   (BY MR. INNES)  Okay,
13  Mr. Chapman, we are back.



Case: 1:17-md-02804-DAP Doc #: 1975-20 Filed: 07/24/19 64 of 93. PageID #: 217277



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



MR. VARNADO: I'll just object
on the grounds of privilege.
MR. INNES: What's the basis

Highly Confidential - Subject to Further Confidentiality Review



Page 270

1  for that privilege?
2      MR. VARNADO:  That the
3  deliberations and minutes and notes
4  from that panel are privileged, and
5  that's the material you're going to
6  get into.
7      MR. INNES:  I think it's
8  material that we can get into based on
9  the rulings by Judge Polster in this
10  case.
11      MR. ELMER:  We can take that up
12  offline unless you want to have the
13  discussion here.

Page 271

Page 272

Page 273



Page 274

3     MR. VARNADO:  I'm going to
4   object on the grounds that those
5   meetings are privileged.  They're
6   governed by attorney-client privilege
7   and instruct you not to answer.
8     Q.    (BY MR. INNES) I'm sorry, it's
9   formality, but are you taking the advice of
10  counsel and refusing to answer that question?
11    A.    Yes.
12      MR. INNES:  Counsel, I think
13  it's clear in this case that these
14  types of meetings and these types of
15  communications are not covered by
16  privilege.  We can take this up at a
17  later date.  We'll hold the deposition
18  open to discuss that, and if we get a
19  ruling on it or if we reach an
20  agreement, we can come back and ask
21  Mr. Chapman questions about this.
22      We don't have to do that if
23  you're willing to allow him to answer
24  the questions.
25      MR. VARNADO:  We're not going

Page 275

1   to hold the deposition open.  He's --
2   we've made our position clear that
3   these meetings are protected by
4   privilege, and what's discussed there
5   is off limits, and I'm going to
6   instruct him not to answer.

Highly Confidential - Subject to Further Confidentiality Review



Page 278

Page 279

Page 280

10    MR. VARNADO:  Again, I'll just
11  object to the -- I let you get into it
12  a little bit, but the deliberations
13  and functioning of the panel, I object
14  on a privilege basis.
15    Q.    (BY MR. INNES)  Would you like
16  me to repeat the question?
17    A.    No.
18    Q.    Do you want to respond to my
19  question?
20    A.    On the advice of counsel, I
21  would say no.
22    Q.    I don't think that advice has
23  actually been given.
24    MR. VARNADO:  Well, I'll go
25  ahead and give it, then.

Page 281

1    I'm instructing you not to
2  respond concerning --
3    THE WITNESS:  I heard you say
4  that.  I'm sorry.
5    MR. VARNADO:  -- the
6  deliberative process of the panel, on
7  a privilege basis.

Page 282

Page 284

1  marked as Exhibit 5, I believe.



Page 283

Page 285

6      MR. INNES:  I've only got one
7  more year of policies to get through,
8  and then I think we're sort of closing
9  down.  So let's take a break now and
10  maybe I can make one final push
11  through policies and procedures.
12      MR. VARNADO:  Okay.
13      MR. ELMER:  Sure.
14      THE VIDEOGRAPHER:  4:42.  We
15  are off video record.
16      (Recess taken, 4:42 p.m. to
17  4:59 p.m.)
18      THE VIDEOGRAPHER:  4:59.  We
19  are on the video record.
20      (Walmart-Chapman Deposition
21  Exhibit 5 was marked for
22  identification.)
23  Q.    (BY MR. INNES) Okay.
24  Mr. Chapman.  We are back.
25      You've been handed what's been

Highly Confidential - Subject to Further Confidentiality Review



Page 286

Page 288

Page 287

Page 289

19    MR. INNES:  Can we go off the
20  record for one second?
21    THE VIDEOGRAPHER:  Stand by.
22  5:06.  We are off the video record.
23    (Recess taken, 5:06 p.m. to
24  5:06 p.m.)
25    THE VIDEOGRAPHER: 5:06.  We

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 294

Page 295

Page 296

Page 297

Case: 1:17-md-02804-DAP Doc #: 1975-20 Filed: 07/24/19 76 of 93. PageID #: 217289



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Case: 1:17-md-02804-DAP Doc #: 1975-20 Filed: 07/24/19 81 of 93. PageID #: 217294



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 338

Page 340

14        MR. VARNADO:  How much time do
15   we have left?
16        THE VIDEOGRAPHER:  18.
17        MR. VARNADO:  Thank you.
18        MR. INNES:  Why don't we take
19   five, and I'll run through my notes
20   just to make sure I haven't missed
21   anything.
22        Go off the record.
23        THE VIDEOGRAPHER:  6:02.  We
24   are off the video record.
25        (Recess taken, 6:02 p.m. to

Page 339

Page 341

1   6:28 p.m.)
2        THE VIDEOGRAPHER:  6:28.  We
3   are on the video record.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 346

Page 348

Page 347

Page 349

Page 350



Page 352

4    MR. INNES:  Thank you.
5    MR. VARNADO:  All right.
6    MR. ELMER:  Cool.
7    MR. VARNADO:  Thank you.
8    THE VIDEOGRAPHER:  6:39 p.m.
9  We're off the video record.  This
10  concludes the video deposition of
11  George Chapman.
12    MR. INNES:  I want to make one
13  statement for the record.
14    You guys don't have any
15  recross; right?
16    MR. VARNADO:  No.
17    MR. INNES:  All right.  So
18  the -- last night, we got a production
19  volume from you.  I think it's
20  Volume 25.
21    On the heels of that came an
22  email from Kelly Bonovich, your
23  colleague, that came just to me.  And
24  that came at, I think, 11:53 p.m.  I
25  don't know if that is some of the time

Page 351

Page 353

1  difference in my phone, but it seemed
2  like it came about midnight.
3    It purported to attach a
4  custodial file for -- that was
5  relevant to today's deposition.
6  Right?  It was eight pages.
7    I believe the entire volume
8  that was produced was somewhere in
9  the -- the range I can give you is
10  55935 to 57263.
11    Clearly there was custodial
12  production in that file.
13    MR. ELMER:  The volume?
14    MR. INNES:  Yeah, clearly there
15  were custodial documents in Volume 25
16  that pertained to Mr. Chapman's
17  deposition.
18    As I said this morning, we're
19  going to hold the deposition open so
20  we can verify whether or not the eight
21  pages of documents that were provided
22  by Kelly at 11:53 are the only
23  custodial files that are associated
24  with Volume 25.
25    MR. VARNADO:  So we'll just

| Page 354 |
|---|

1 object to holding the deposition open.
2 We mentioned this morning we waited
3 30 minutes for you to review the
4 documents. We delayed our start by
5 that time. I feel like that's
6 sufficient time to analyze the eight
7 pages --
8     MR. BOWERS: You just took a
9 break for 30 minutes and we had five
10 minutes left on the record. So I
11 don't think that --
12     MR. INNES: What does that
13 matter?
14     MR. BOWERS: You don't think
15 waiting 30 minutes justifies --
16     MR. INNES: This probably
17 doesn't matter as much as your
18 statement just mattered.
19     MR. VARNADO: Really? Delaying
20 for you --
21     MR. BOWERS: A production at
22 midnight for 2,000 pages doesn't
23 matter? That's absurd.
24     MR. VARNADO: He specifically
25 said he needed 30 minutes to review

| Page 355 |
|---|

1 ten pages.
2     MR. INNES: I needed 30 minutes
3 to review the ten pages. Right?
4     MR. VARNADO: Or eight pages,
5 or whatever it is.
6     MR. ELMER: We're discussing
7 the assumption that there's something
8 in the volume --
9     MR. INNES: There's no --
10     MR. ELMER: -- that would be
11 relevant or that is custodial. And I
12 think if that assumption is not
13 correct, then you have no basis to
14 make the statement you're making. Is
15 that a fair restatement of the issue?
16     MR. INNES: No, because I have
17 a basis to make the statement.
18     MR. ELMER: Well, no. The point
19 you're trying to make is there may be
20 materials in that volume that relate
21 to his -- that are from his custodial
22 file.
23     MR. INNES: There very well
24 could be. And here's the additional
25 problem.

| Page 356 |
|---|

1     MR. ELMER: But if there
2 aren't.
3     MR. INNES: If there aren't,
4 then we will go to our second issue,
5 which is that we had an opportunity to
6 review them for 30 minutes, which is
7 enough to read those documents, but
8 not enough to digest them in the
9 context of Mr. Chapman's entire
10 custodial file. Okay? So that's our
11 second argument.
12     The other argument I'm making
13 is that a courtesy copy at 11:53 is
14 not a courtesy copy, and it's
15 definitely not a courtesy copy when
16 it's sent to one counsel on a team of
17 at least ten that we normally exchange
18 emails with.
19     I appreciate that it was late
20 at night and maybe Kelly left people
21 off unintentionally, but the fact
22 remains that there is a protocol in
23 place where emails between counsel
24 related to the discovery, there are
25 listservs that are copied and team

| Page 357 |
|---|

1 members that are copied, and that
2 wasn't done.
3     So I'm left to wake up this
4 morning and see, with my morning
5 coffee, a production of 2,000
6 documents that I'm left to do I don't
7 know what with because none of my
8 colleagues could cover for me if they
9 were up at that hour. So that's
10 frustrating to begin with.
11     The other issue is the
12 privilege issues. We clearly believe
13 that privilege does not attach to SOM
14 program documents. You can't hide
15 behind the attorney-client privilege
16 regarding SOM. Right? That's a clear
17 order in this case.
18     If you guys want to discuss
19 that further, we can. And we're
20 holding the deposition open to get
21 answers to the questions that you
22 directed your client inappropriately
23 not to answer.
24     MR. VARNADO: Okay.
25     MR. INNES: And that's the

Page 358

1  basis for that.  That's enough.  I'll
2  hear -- I'll take it in writing or
3  I'll take it now.  All right?
4       MR. VARNADO:  So you were not
5  prohibited from inquiring into the SOM
6  program, the policies --
7       MR. INNES:  I know.
8       MR. VARNADO:  -- and
9  procedures.
10      MR. INNES:  That's why I asked
11 the questions.
12      MR. ELMER:  Let him respond.
13      MR. VARNADO:  You were not
14 prohibited in this examination from
15 questioning Mr. Chapman about the SOM
16 programs.
17      MR. INNES:  I was prohibited
18 from getting answers.
19      MR. VARNADO:  He answered your
20 questions.
21      MR. INNES:  He did not.  You
22 directed him not to answer the
23 questions.
24      MR. VARNADO:  Well, when you
25 ask for deliberative process

Page 359

1  specifically --
2       MR. INNES:  We asked multiple
3  questions.  If you want to focus on
4  that one, go ahead.
5       MR. ELMER:  Do you want a
6  response or not?
7       MR. INNES:  I want a cogent
8  response, yeah.
9       MR. ELMER:  Allow me to provide
10 a cogent response.
11      You were able to ask questions
12 about the SOM program.
13      MR. INNES:  Correct.
14      MR. ELMER:  You were not
15 permitted to ask questions about
16 privileged communications or
17 privileged deliberations.  If you want
18 to make a cogent argument that those
19 are not privileged, you can do so and
20 we'll respond in the normal course of
21 this back-and-forth, but we're not --
22      MR. BOWER:  Can I ask this
23 question?  Were those documents that
24 would relate to those issues that he
25 was not allowed to answer also

Page 360

1  withheld?
2       MR. ELMER:  I'm not in a
3  position, Jason is not in a position
4  to do this on the fly.  I'm suggesting
5  that if you want to make your
6  argument, make it.  We'll respond
7  with, you know, our response, and then
8  we'll -- it'll sort itself out.
9       MR. INNES:  Fair.  I think
10 we're cool with that.  I think what
11 Zach was suggesting and what I'm
12 suggesting now is that the purpose of
13 that order was to avoid having to go
14 through that process.
15      MR. ELMER:  I understand.  And
16 I also think that it's not -- it is
17 simply not the case that there is no
18 privilege when we're talking about
19 communications with counsel or
20 deliberations with counsel.
21      MR. INNES:  As a general
22 matter, I hear you.  Not in this case,
23 as it relates to SOMs.  But we can
24 battle it out.
25      MR. ELMER:  No, I understand

Page 361

1  that.  Let's sort that out in writing.
2  I just don't think that now is the
3  time to sort that out because we
4  strongly disagree, and I understand
5  your argument.
6       MR. BOWER:  We disagree with
7  that because we believe that that's a
8  point where counsel wouldn't have to
9  come back, the witness wouldn't have
10 to come back and do all that stuff.
11 And I imagine that will be one of your
12 objections, that we don't have to
13 bring the witness back.  And we would
14 ask that you don't raise that
15 objection, because you are the one who
16 are making that necessary.
17      MR. ELMER:  No.  Point taken.
18 Understood.  Your arguments are made.
19 We're going to respond to whatever you
20 send us.  And I understand that you
21 think that it's something that we can
22 resolve right now, that that would
23 save you the hassle of doing this or
24 we could reopen, or whatever else.
25      The point is that we are not in

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1  a position to resolve this issue right
2  now.
3       MR. BOWER:  I don't know why
4  you just don't want to get the truth
5  out there; right?
6       MR. ELMER:  Don't -- don't --
7  don't.
8       MR. BOWER:  Well --
9       MR. ELMER:  You can be --
10  Can we go off the record?  Why
11  do we need your --
12       MR. BOWER:  Because that's what
13  this is about; right?  That's what the
14  Court wanted us to do.
15       MR. ELMER:  All right.  We're
16  done.
17  Can we go off the record?
18  Do you want your soliloquy
19  about --
20       MR. BOWER:  Absolutely.  We
21  just want testimony.
22       MR. ELMER:  Can we go off the
23  record?
24       THE VIDEOGRAPHER:  6:45.  We're
25  off the record.

Page 363

1       (Proceedings recessed at
2  6:46 p.m.)
3           --o0o--
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 364

1           CERTIFICATE
2       I, DEBRA A. DIBBLE, Registered
Diplomate Reporter, Certified Realtime
3  Reporter, Certified Realtime Captioner,
Certified Court Reporter and Notary Public,
4  do hereby certify that prior to the
commencement of the examination, GEORGE
5  CHAPMAN was duly sworn by me to testify to
the truth, the whole truth and nothing but
6  the truth.
7       I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
ability.
10
       I DO FURTHER CERTIFY that pursuant
11  to FRCP Rule 30, signature of the witness was
not requested by the witness or other party
12  before the conclusion of the deposition.
13       I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
14  nor counsel of any of the parties to this
action, and that I am neither a relative nor
15  employee of such attorney or counsel, and
that I am not financially interested in the
16  action.
17
18
19
20  DEBRA A. DIBBLE, RDR, CRR, CRC
NCRA Registered Diplomate Reporter
21  NCRA Certified Realtime Reporter
Certified Court Reporter
22
23  Dated: 14 January 2019
24
25

Page 365

1       INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8       After doing so, please sign the
9  errata sheet and date it.
10       You are signing same subject to
11  the changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14       It is imperative that you return
15  the original errata sheet to the deposing
16  attorney within thirty (30) days of receipt
17  of the deposition transcript by you.  If you
18  fail to do so, the deposition transcript may
19  be deemed to be accurate and may be used in
20  court.
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

| | Page 366 |
|---|---|
| 1 | ERRATA |
| 2 | PAGE  LINE  CHANGE |
| 3 | \_\_\_\_ \_\_\_\_ _____ |
| 4 | REASON: _____ |
| 5 | \_\_\_\_ \_\_\_\_ _____ |
| 6 | REASON: _____ |
| 7 | \_\_\_\_ \_\_\_\_ _____ |
| 8 | REASON: _____ |
| 9 | \_\_\_\_ \_\_\_\_ _____ |
| 10 | REASON: _____ |
| 11 | \_\_\_\_ \_\_\_\_ _____ |
| 12 | REASON: _____ |
| 13 | \_\_\_\_ \_\_\_\_ _____ |
| 14 | REASON: _____ |
| 15 | \_\_\_\_ \_\_\_\_ _____ |
| 16 | REASON: _____ |
| 17 | \_\_\_\_ \_\_\_\_ _____ |
| 18 | REASON: _____ |
| 19 | \_\_\_\_ \_\_\_\_ _____ |
| 20 | REASON: _____ |
| 21 | \_\_\_\_ \_\_\_\_ _____ |
| 22 | REASON: _____ |
| 23 | \_\_\_\_ \_\_\_\_ _____ |
| 24 | REASON: _____ |
| 25 | |

| | Page 368 |
|---|---|
| 1 | LAWYER'S NOTES |
| 2 | |
| 3 | PAGE  LINE |
| 4 | \_\_\_\_ \_\_\_\_ _____ |
| 5 | \_\_\_\_ \_\_\_\_ _____ |
| 6 | \_\_\_\_ \_\_\_\_ _____ |
| 7 | \_\_\_\_ \_\_\_\_ _____ |
| 8 | \_\_\_\_ \_\_\_\_ _____ |
| 9 | \_\_\_\_ \_\_\_\_ _____ |
| 10 | \_\_\_\_ \_\_\_\_ _____ |
| 11 | \_\_\_\_ \_\_\_\_ _____ |
| 12 | \_\_\_\_ \_\_\_\_ _____ |
| 13 | \_\_\_\_ \_\_\_\_ _____ |
| 14 | \_\_\_\_ \_\_\_\_ _____ |
| 15 | \_\_\_\_ \_\_\_\_ _____ |
| 16 | \_\_\_\_ \_\_\_\_ _____ |
| 17 | \_\_\_\_ \_\_\_\_ _____ |
| 18 | \_\_\_\_ \_\_\_\_ _____ |
| 19 | \_\_\_\_ \_\_\_\_ _____ |
| 20 | \_\_\_\_ \_\_\_\_ _____ |
| 21 | \_\_\_\_ \_\_\_\_ _____ |
| 22 | \_\_\_\_ \_\_\_\_ _____ |
| 23 | \_\_\_\_ \_\_\_\_ _____ |
| 24 | \_\_\_\_ \_\_\_\_ _____ |
| 25 | |

Page 367

1  ACKNOWLEDGMENT OF DEPONENT
2
3
4      I, GEORGE CHAPMAN, do hereby
   certify that I have read the foregoing pages
5  and that the same is a correct transcription
   of the answers given by me to the questions
6  therein propounded, except for the
   corrections or changes in form or substance,
7  if any, noted in the attached
   Errata Sheet.
8
9
10
11
12
   _____
   GEORGE CHAPMAN            DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 \_\_\_\_\_.
17  My commission expires: _____
18
19  _____
20  Notary Public
21
22
23
24
25