IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | : MDL NO. 2804 |
| THIS DOCUMENT RELATES TO ALL CASES | : CASE NO. 1:17-MD-2804 : Hon. Dan A. Polster |

- - -

Friday, January 4, 2019

- - -

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of DEBRA CHASE, taken pursuant to notice, was held at the law offices of Morgan Lewis & Bockius, 1111 Pennsylvania Avenue, NW Washington, DC 20004, beginning at 10:17 a.m., on the above date, before Amanda Dee Maslynsky-Miller, a Certified Realtime Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

APPEARANCES:

BARON & BUDD, P.C.
BY: WILLIAM POWERS, ESQUIRE
EMMA KABOLL, PARALEGAL
600 New Hampshire Avenue NW
Suite 10A
Washington, DC 20037
Wpowers@baronbudd.com
Representing the Plaintiffs

MORGAN, LEWIS & BOCKIUS LLP
BY: JOHN P. LAVELLE, JR., ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-4824
John.lavelle@morganlewis.com

- and -

BY: JOHN M. MALOY, ESQUIRE
101 Park Avenue
New York, New York 10178
(212) 309-6682
John.maloy@morganlewis.com
Representing the Defendant,
Rite Aid Corporation

COVINGTON & BURLING LLP
BY: ALISON DICURCIO, LAW CLERK
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
Adicurcio@cov.com
Representing the Defendant,
McKesson Corporation

APPEARANCES: (Continued)

VIA TELEPHONE/LIVESTREAM:

ARNOLD & PORTER KAYE SCHOLER LLP
BY: ZENO HOUSTON, ESQUIRE
250 West 55th Street
New York, New York 10019
(212) 836-8000
Zeno houston@arnoldporter.com
Representing the Defendant,
Endo Pharmaceuticals, Endo Health,
and Par Pharmaceuticals

REED SMITH, LLP
BY: LUKE PORTER, ESQUIRE
101 Second Street
Suite 1800
San Francisco, California 94105
(415) 543-8700
Representing the Defendant,
AmerisourceBergen Corporation

JONES DAY
BY: PATRICK J. BEISELL, ESQUIRE
77 West Wacker
Chicago, Illinois 60601
(312) 782-3939
Pbeisell@jonesday.com
Representing the Defendant,
Walmart

ALSO PRESENT:
Daniel Holmstock, Videographer

\- - -
INDEX
\- - -

Testimony of: DEBRA CHASE

By Mr. Powers 7

\- - -
EXHIBITS
\- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| RiteAid-Chase Exhibit-1 | Rite_Aid_OMDL_0016495-498 | 40 |
| RiteAid-Chase Exhibit-2 | Rite_Aid_OMDL_0016297-329 | 85 |
| RiteAid-Chase Exhibit-3 | Rite_Aid_OMDL_0012503-505 | 104 |
| RiteAid-Chase Exhibit-4 | Rite_Aid_OMDL_0049994-50031 | 112 |
| RiteAid-Chase Exhibit-5 | Rite_Aid_OMDL_0016955-956 | 115 |
| RiteAid-Chase Exhibit-6 | Rite_Aid_OMDL_0003641 | 129 |
| RiteAid-Chase Exhibit-7 | Rite_Aid_OMDL_0014379-452 | 149 |

\- - -
DEPOSITION SUPPORT INDEX
\- - -

Direction to Witness Not to Answer
Page Line Page Line Page Line
None

Request for Production of Documents
Page Line Page Line Page Line
None

Stipulations
Page Line Page Line Page Line
6 1

Question Marked
Page Line Page Line Page Line
None

- - -

(It is hereby stipulated and agreed by and among counsel that sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

VIDEO TECHNICIAN: We are now on the record. My name is Daniel Holmstock. I'm the videographer for Golkow Litigation Services. Today's date is January 4th, 2019. The time on the video screen is 10:17 a.m.

This video deposition is being held at the law offices of Morgan Lewis, at 1111 Pennsylvania Avenue, Northwest, in Washington, D.C. in the matter of In Re National Prescription Opiate Litigation.

The case is pending before

the United States District Court for the Northern District of Ohio, Eastern Division. The deponent is Debra Chase. Counsel will be noted on the stenographic record for appearances. The court reporter is Amanda Miller, who will now administer the oath.

- - -

DEBRA CHASE, after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. POWERS:

Q. Good morning, Ms. Chase.

A. Good morning.

Q. My name is Will Powers, and I represent the plaintiffs in this litigation.

Before we get going, can you please state your full name and spell it for the record?

A. Yes. Debra Ann Chase.

Q. Can you spell it, please?

A. D-E-B-R-A, A-N-N, C-H-A-S-E.

Q. And we've got a couple of people listening on the phone and in the room, so I'd ask you to just keep your voice up, so everyone can hear.

Is that all right?

A. Uh-huh.

Q. And that -- your answer there leads me into one of my further instructions.

Because we do have a court reporter taking down the testimony here today, I just ask that all of your answers that you give are verbal answers, a yes or no, something like that, as opposed to nods of the head, uh-huhs, uh-uh, things like that.

Is that all right?

A. Okay.

Q. If, for any reason, you don't understand a question I'm asking today or require any sort of

clarification, explanation of the words I'm using or anything like that, you have to tell me and we'll get that matter resolved before you answer the question.

Is that okay?

A. Yes.

Q. So, then, if you answer a question, I'm going to go ahead and assume that you understand it.

Is that okay?

A. Yes.

Q. Are you currently suffering from any medical disease or illness that in any way interferes with your ability to answer truthfully and completely my questions here today?

A. No.

Q. Do you understand that the court reporter has sworn you in and you're under oath here just as you would be in a courtroom at trial?

A. Yes.

Q. And because you're under oath, if you lie or provide an

Page 10

intentionally misleading answer, you may be subject to criminal or civil penalties.
Do you understand that?
A. Yes.
Q. And as we go today, we can take breaks if you need them, but I just ask that if there's a question pending, that you answer the question pending before we take the break.
Is that all right?
A. Yes.
MR. LAVELLE: The witness will consult with -- I reserve the right to consult with counsel if there's a privilege issue.
BY MR. POWERS:
Q. That gets to my next instruction.
Your counsel, from time to time, may object to my questions. But I'm still entitled to an answer, unless your counsel specifically instructs you not to answer.

Page 11

Do you understand that?
A. Yes.
Q. Okay, Ms. Chase, I want to start by going over your educational background.
Did you ever complete high school?
A. Yes.
Q. Where did you go to high school?
A. Parkdale High in Riverdale, Maryland.
Q. And when did you graduate?
A. 1983.
Q. Do you have any education beyond high school?
A. I have some college.
Q. Where did you do your "some college"?
A. Harford Community College.
Q. And when was that?
A. In between '84, '86 -- 1984, 1986.
Q. Did you ever receive a

Page 12

degree from college?
A. I did not.
Q. Do you have any other education beyond high school, besides the classes you took at Harford Community College?
MR. LAVELLE: Object to form.
THE WITNESS: Could you repeat that again?
BY MR. POWERS:
Q. Any education -- did you have any education beyond high school, besides the -- some community college at Harford Community College?
MR. LAVELLE: Same objection.
THE WITNESS: I've had some other education through the military.
BY MR. POWERS:
Q. What is the nature of that education?
A. I'm sorry?

Page 13

Q. What is the nature of that education?
A. It pertained to the job that I had in the military.
Q. Let me back up here.
When were you in the military?
A. From 1983 to 1992.
Q. And what branch of the military were you in?
A. I was in the Army.
Q. During that time period when you were in the military, where were you located?
A. Starting from the beginning or --
Q. Sure.
A. I was -- started in the Army. I went to Fort Jackson for basic training. And then I went to Fort Benjamin, Harrison, Indiana for my advanced training.
And after that, I was stationed at Aberdeen Proving Ground.

And then I went to Augsburg, Germany, and back to Aberdeen Proving Ground. And my last station was in Kaiserslautern, Germany.

Q. And you mentioned that you got some education while you were in the Army.

What was the education you got while you were in the Army?

A. All the education I got was pertaining to the particular job that I had.

Q. What was the particular job you had?

A. It was called personnel information systems.

Q. And what -- can you describe what personnel information systems was?

A. It actually entailed quite a few things. Mainly, like, data entry information.

Q. Then you said you left the military in 1992, right?

A. Correct.

Q. Where -- what did you do after you left the military in 1992?

A. So forgive me, that kind of goes back to the education.

I did go to school again and took a couple of classes at Harford Community.

But then I was employed by Northeast Foods in Baltimore.

Q. And what did you do for Northeast Foods?

A. I was a payroll clerk and data entry clerk.

Q. When did you first start working at Rite Aid?

A. In 1998.

Q. Between '92 and '98, when you first started working at Rite Aid, did you work anywhere else besides Northeast Foods?

A. Not full time. I had part-time jobs.

Q. Was your job with Northeast Foods a full-time job?

A. Yes.

Q. What were the part-time jobs you had in addition to your full-time job at Northeast Foods during the time period of '92 to '98?

A. I worked for Rite Aid pharmacy, the store, for a brief period.

And what else?

I worked for Riley Mortgage Company part time in Columbia, Maryland as well.

Q. The Rite Aid store you worked at part time before 1998, what were you doing at the store?

A. I was a cashier.

Q. Was cashier your only job you had, before joining Rite Aid full time in '98, at Rite Aid?

A. Yes.

Q. When you first started working at Rite Aid in 1998, what was the position that you had?

A. When I first started, I was hired as the order fulfillment partner.

Q. And where were you working at that time as an order fulfillment partner?

A. In the Rx area, pharmacy area.

Q. When you say "the Rx area," are you referring to a physical area or a topic area?

MR. LAVELLE: Object to form.

THE WITNESS: I'm sorry?

BY MR. POWERS:

Q. You said that you worked in the Rx area.

Are you talking about a physical area or, like, a topic area?

A. It was --

MR. LAVELLE: Object to form.

THE WITNESS: It was the department.

BY MR. POWERS:

Q. Where were you physically located when you started working at Rite

Aid in '98 as an order fulfillment partner?
A. In the Rx department.
Q. But was that in Maryland? Was that --
A. I'm sorry.
Yes, in --
MR. LAVELLE: Object to form.
Please let the attorney finish his question before you start answering.
THE WITNESS: I'm sorry.
Could you repeat that, please?
BY MR. POWERS:
Q. Sure.
In 1998 when you started working at Rite Aid full time, where, physically, was the office you were working at?
A. That was in Aberdeen -- Perryman, Maryland.
Q. And is that the distribution

center Rite Aid has in Perryman, Maryland?
A. Yes.
Q. What were your job responsibilities as an order fulfillment partner in -- starting in 1998?
A. I started off in the Rx department, and I was responsible for running the A-frames.
Q. What are the A-frames?
A. A-frames was a machine that was set up to dispense -- to dispense the product into the totes for the stores.
Q. How long were you an order fulfillment partner?
A. As long as you're there, you actually are an order fulfillment partner the whole time, so --
Q. Are you still with Rite Aid today?
A. Yes, I am.
Q. So are you still an order fulfillment partner today?
A. My title is considered an

order fulfillment partner, yes.
Q. When you started in 1998, did you have any other titles besides order fulfillment partner?
A. At that time, no.
Q. So you testified that your first responsibilities were working with the A-frames.
Did you ever switch responsibilities or change responsibilities during your -- after you started in 1998 at Rite Aid?
MR. LAVELLE: Object to form.
THE WITNESS: Yes, I did.
BY MR. POWERS:
Q. When was that? When was the first time that happened?
A. Approximately six months to a year, I switched to another position.
Q. So that would have been some time in 1999, probably, then?
A. Approximately. I'm not exactly sure.

Q. And what was the position you switched into?
A. At that time, I was moved into the Rx control cage.
Q. And what is the Rx control cage?
A. The Rx control cage is the area where controlled drugs were held.
Q. And that's also at the Perryman distribution center in Aberdeen?
A. Yes.
Q. Did your title change when you were moved into the Rx control cage?
A. The added title was control cage partner.
Q. And how long were you a control cage partner for?
A. The -- up until currently, now.
Q. And what are the job responsibilities of a control cage partner at the Aberdeen facility?
A. It included several different jobs within that cage, and that

consisted of a paperwork person or a picker or a receiver or a replenisher.
Q. Anything else besides a paperwork person, picker, receiver or replenisher?
A. Not as an actual control cage associate, no.
Q. And just so we're clear, when you -- when we talk about the control cage, is that the area within the distribution center that the controlled substances are held?
A. Yes.
Q. So you mentioned four responsibilities of the control cage partner.
The first one you mentioned was paperwork person.
Can you describe what you mean by that?
A. The paperwork person was responsible for recording the tote numbers and store numbers onto a log for the totes that were picked for the

stores.
Q. Did the log have a name?
A. Yes, it has a name. Right now it kind of slips my mind.
Q. Okay. Any other responsibilities of the paperwork person?
A. After they log the information onto the sheet, then they would palletize the totes after they were strapped and tied, according to that log.
Q. Anything else?
A. And run reports.
Q. What kind of reports did the paperwork control cage partner run?
A. The pick list that listed the -- all the drugs that the store was supposed to get on that paper.
Q. So the pick list was a list of all the drugs that any particular Rite Aid store was supposed to get in a shipment?
A. On that particular order, yes.
Q. On that particular order,

okay.
Any other kind of reports that the paperwork control cage partner ran besides the pick list?
MR. LAVELLE: Object to form.
THE WITNESS: Yes, they did.
BY MR. POWERS:
Q. What were those reports?
A. They were -- what did we call them? Sorry, right now it just kind of slipped my mind, the actual name of it.
Q. Can you describe it?
A. It was a list of the -- all the stores that printed for a wave, what they called a wave.
Q. What is a wave?
A. The wave is set up by transportation, and all the stores that would be picked in that one area -- in that one section, shall I say.
I'm sorry, and going back to the other question you asked me, what was

the name of the -- it was actually called a tote list. The --
Q. So the wave you're talking about, is that like a wave of shipments that would go out to a particular set of stores, or is that a wave inside the distribution center itself?
MR. LAVELLE: Object to form.
THE WITNESS: I'm sorry, could you ask that again?
BY MR. POWERS:
Q. Sure.
You described a wave before when you were talking about the pick list.
Can you describe what the wave means when you say "wave"?
MR. LAVELLE: Object to form.
THE WITNESS: Each wave had the stores set up the way transportation had them to be picked.

Page 26

BY MR. POWERS:
Q. When -- you're saying "transportation," so does that have to do with the shipping of the orders to the stores?
A. I'm not quite sure how they set it up. But each wave had a separate number to it so you knew which tote, so which stores, went together.
Like, if there was a wave 10, you knew not to put a store from wave 20 on that pallet.
Q. So the waves would have numbers and those numbers would correspond to a particular group of stores that were being shipped to?
A. Correct.
MR. POWERS: We need to go off the record for a second.
VIDEO TECHNICIAN: The time is 10:36 a.m. We are going off the record.
- - -
(Whereupon, a brief recess

Page 27

was taken.)
- - -
VIDEO TECHNICIAN: The time is 10:44 a.m. And we're back on the record.
BY MR. POWERS:
Q. Before we took the break, Ms. Chase, we were talking about the duties of a control cage partner.
Before I go further into that, were the control cage partners ever called control cage clerks?
A. That was a different position.
Q. Okay. The control cage clerk is a different position than control cage partner?
A. Yes.

Page 28

Page 29

Page 30
Page 32
Page 31
Page 33

Q. When were you a control cage associate?
A. The whole time I was there I was considered a control cage associate.
Q. Is control cage associate the same thing as control cage partner, then?
A. Yes.
Q. When did you become a control cage clerk?
A. I can't remember the actual date.
Q. Can you give me an approximate date?
A. I'm not for sure. I would say within about a year after working there.
Q. So some time before 2000?
A. Yes.
Q. How long were you a control

cage clerk for?
A. That, I don't remember the exact date either.
Q. Are you still a control cage clerk?
A. I am not.
Q. What is your current position?
A. My current position is a control cage associate.
Q. Did you have any other positions besides control cage associate or control cage clerk?
A. Yes.
Q. What were those positions?
A. After the control cage clerk, I became the DEA coordinator.
Q. Do you know when you became the DEA coordinator?
A. I'm sorry?
Q. When did you become the DEA coordinator?
A. I don't remember the exact dates. Approximately 2002.

Q. Do you know how long you were a DEA coordinator for?
A. Approximately five years.
Q. So you were a DEA coordinator from about 2002 to about 2007; is that right?
A. Yes.
Q. And after you stopped being the DEA coordinator, what was your position?
A. I went back to the DEA clerk.
Q. When you say you went back to DEA clerk, were you ever a DEA clerk before?
A. Yes. I was a DEA clerk before I became a coordinator.
Q. So is control cage clerk the same as DEA clerk?
A. I'm sorry. Yes, it is.
Q. I'm just trying to get a handle on the different titles.
A. Yes, I apologize.
When we say it, it is sort

of interchangeable.
Q. So after being DEA coordinator, you went back to being a DEA clerk.
How long did you remain a DEA clerk after approximately 2007?
A. I can't quite remember. I believe it was less than a year, because they changed the position -- they kind of got rid of the position as the clerk.
Q. Did you transition to a new position at that point when they got rid of the DEA clerk position?
A. Yes. Then I became the control cage lead.
Q. And how long were you a control cage lead?
A. Up until currently -- I'm sorry, excuse me, until 2014.
Q. And then after 2014, what was your position?
A. Then I just pretty much became the DEA associate again, or partner.

Page 38

Q. And that -- is that what you referred to earlier as the control cage associate?
A. Correct.
Q. Okay. I want to go back to the control cage clerk before you became DEA coordinator.
What were your job responsibilities in that position?
A. If I remember, most of the responsibilities were to monitor the billing report and different correspondences with other people within the building, and helping out in the control cage with whatever was needed from the other associates, and assisting the DEA clerk with whatever -- I mean, a DEA coordinator with whatever she needed.
Q. Who was the DEA coordinator?
A. At the time --
MR. LAVELLE: Object to form.
BY MR. POWERS:
Q. Yeah. At the time you were

Page 39

a control cage clerk, before becoming a DEA coordinator.
A. I'm sorry, if you could just repeat that.
Q. Sure.
So you said one of your job responsibilities as a control cage clerk, when you were in that position before you became a DEA coordinator in approximately 2002 was to assist the DEA coordinator, right?
A. Correct.
Q. Who was the DEA coordinator you were assisting?
A. That was Marian Wood.
Q. Do you know how long Ms. Wood has been in that position as DEA coordinator?
MR. LAVELLE: Object to form.
THE WITNESS: No.
BY MR. POWERS:
Q. Has she been the DEA coordinator at the Aberdeen facility your

Page 40

entire time there?
A. No.
Q. When you moved on to the position of DEA coordinator in around 2002, what were your job responsibilities there?
A. My main responsibilities were to make sure that the associates in the cage were adhering to different procedures and policies within the cage and to maintain the inventory, and it included correspondence with DEA agents and Board of Pharmacy agents, and other clerical things.

- - -

(Whereupon, Exhibit RiteAid-Chase Exhibit-1, Rite_Aid_OMDL_0016495-498, was marked for identification.)

- - -

MR. POWERS: I'll hand you what I marked as Exhibit-1. For the record it's Bates stamped Rite_Aid_OMDL_0016495. And it's

Page 41

an e-mail with the included attachments.
BY MR. POWERS:
Q. Just take a second and look over the e-mail, and just let me know when you've had a chance to review it.
MR. LAVELLE: Are you using any prefix for the exhibit? Are you just calling it Exhibit-1?
MR. POWERS: I'll just refer to it as Exhibit-1.
MR. LAVELLE: Okay.
MR. POWERS: I think on the stickers it says Chase as the witness.
MR. LAVELLE: So it's Chase-1. Thank you.
BY MR. POWERS:

Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 12 of 41. PageID #: 217318
Highly Confidential - Subject to Further Confidentiality Review

Page 42
Page 44
Page 43
Page 45

Golkow Litigation Services Page 12 (42 - 45)





Q. And the corporate office is where?

A. In Harrisburg, Pa.

Q. And Marian Wood was located in Maryland?

A. Yes.

Q. Did she work out of the Perryman distribution center?

A. Yes.

Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 14 of 41. PageID #: 217320
Highly Confidential - Subject to Further Confidentiality Review

Page 50
Page 52
Page 51
Page 53

Golkow Litigation Services Page 14 (50 - 53)



Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 15 of 41. PageID #: 217321
Highly Confidential - Subject to Further Confidentiality Review

Page 54
Page 56
Page 55
Page 57

Golkow Litigation Services Page 15 (54 - 57)



Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 16 of 41. PageID #: 217322
Highly Confidential - Subject to Further Confidentiality Review

Golkow Litigation Services Page 16 (58 - 61)



Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 17 of 41. PageID #: 217323
Highly Confidential - Subject to Further Confidentiality Review

Page 62
Page 64
Page 63
Page 65

Golkow Litigation Services Page 17 (62 - 65)



Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 18 of 41. PageID #: 217324
Highly Confidential - Subject to Further Confidentiality Review

Page 66

Page 67

Page 68

Page 69

Q. Are you familiar with the term "diversion" in the context of controlled substances?

A. Yes.

Q. What does diversion mean, in your own words?

A. In my own words, diversion means something that is taken and used for other than what is the purpose.

Golkow Litigation Services Page 18 (66 - 69)

MR. LAVELLE: Counsel, are you finished with Chase-1?
MR. POWERS: Yes.
MR. LAVELLE: I'll give it to the court reporter. She needs to keep all the exhibits.
Thank you.
BY MR. POWERS:
Q. Does Rite Aid have an obligation to prevent diversion?
A. Yes.
MR. LAVELLE: Object to form.
BY MR. POWERS:
Q. Why does Rite Aid have an obligation to prevent diversion?
MR. LAVELLE: Object to form.
THE WITNESS: Could you repeat that? I'm sorry.
BY MR. POWERS:
Q. Why does Rite Aid have an obligation to prevent diversion?
MR. LAVELLE: Object to

form.
THE WITNESS: As a distributor, they would have an obligation to make sure their items aren't going other than where they're supposed to go.
BY MR. POWERS:
Q. Any other reason besides by virtue of being a distributor?
MR. LAVELLE: Same objection.
THE WITNESS: Not that I can necessarily think of right now.
BY MR. POWERS:
Q. Are you familiar with the concept -- are you familiar with the concept of a suspicious order in the context of controlled substance distribution?
A. Yes.
Q. What does that mean to you?
A. To me, that means that there's an order that we have a question about, that is possibly not what it

should be.
Q. When you say "we," in an order that we have a question about, do you mean Rite Aid?
A. Yes. In the context of who was working with me.
Q. And you said that it's an order that is possibly not what it should be.
What do you mean by that?
A. As in if we thought something was going to happen to -- other than what was supposed to, other than going to the pharmacist, or if we thought something was happening with it.
Q. We talked a little bit before about sort of how the operations worked at the DC, and I want to just get clarity on a couple of points.
The Rite Aid distribution centers only distributes to Rite Aid stores, correct?
A. Yes.
Q. And the Rite Aid

distribution centers only distributed controlled substances up until 2014, right?
A. Yes.
Q. How often would orders for controlled substances be received at the distribution center?
A. Like --
Q. Like, would an order come in daily? Weekly? Every hour? How did that work?
MR. LAVELLE: Object to form.
THE WITNESS: Oh, I'm sorry.
The orders came -- they came through daily.
BY MR. POWERS:
Q. And once the orders came through, what happened next?
A. I was not in a position to -- how can I put it? The way they came through the building, I didn't have access to that. That wasn't part of my job.

Page 74

I didn't see it until it actually came to the control cage and when they downloaded what we called the wave, as I explained earlier.

Q. So you would see a wave come through.

And was that electronic on a computer or was it on a hardcopy document? How would that come through to you?

MR. LAVELLE: Object to form.

THE WITNESS: Could you repeat it for me, please?

BY MR. POWERS:

Q. Sure.

So you said that you would get the orders through the waves in the control cage, right?

A. Correct.

Q. How would you receive those waves? Would it be electronic? Hardcopy? Verbal? What?

MR. LAVELLE: Object to form.

Page 75

THE WITNESS: Computer, electronic.

BY MR. POWERS:

Page 76

Page 77

Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 21 of 41. PageID #: 217327
Highly Confidential - Subject to Further Confidentiality Review

Page 78
Page 80
Page 79
Page 81

Golkow Litigation Services Page 21 (78 - 81)





Page 82

[redacted]

Page 83

[redacted]

Page 84

[redacted]

MR. LAVELLE: Counsel, we've been going about an hour. When we get to a convenient spot for a break, I'd like to take one.

MR. POWERS: We can do it right now. That's fine.

VIDEO TECHNICIAN: The time is 11:43 a.m. We are going off the record.

\- - -

(Whereupon, a brief recess was taken.)

\- - -

VIDEO TECHNICIAN: The time is 11:58 a.m. We are back on the record.

BY MR. POWERS:

Page 85

Q. Welcome back, Ms. Chase.

MR. POWERS: I'm going to hand you what has been marked as Exhibit-2. And the beginning Bates on this exhibit is Rite_Aid_OMDL_0016297.

And, once again, it's an e-mail with a bunch of attachments that are also included in this exhibit. It's somewhat lengthy, the number of exhibits on here. I'm going to tell you to take a look at it, but I'm going to tell you that I'm going to direct your attention to a couple particular pages in the exhibit. So maybe that will help move things along a little quicker.

\- - -

(Whereupon, Exhibit RiteAid-Chase Exhibit-2, Rite_Aid_OMDL_0016297-329, was marked for identification.)

\- - -

Page 86

THE WITNESS: Okay.

BY MR. POWERS:

Page 87

BY MR. POWERS:

Page 88

Page 89

Page 90

Page 92

Page 91

Page 93

Q. Were there any orders that were -- that came to the distribution center above the threshold that you did not ship any part of the order?

A. I do recall we had some. I don't recall specifics, but I have had some.

Q. Do you remember why the orders were not shipped at all?

A. Most of the time, that phone call, the pharmacist would say they didn't understand why they even ordered it, and then they would say we don't need that so you don't have to ship it to us.

Q. Did you ever ask any questions beyond just verifying whether they needed that particular amount?

MR. LAVELLE: Object to form.

THE WITNESS: No.

BY MR. POWERS:

Q. Let me be clear.

We're talking about when you're calling the pharmacies when they

Page 94

place orders above threshold, right?
MR. LAVELLE: Object to form.
BY MR. POWERS:
Q. So let me ask it this way --
A. Okay.
Q. -- when you called the pharmacists or the pharmacies about orders that came in that were above the threshold, you did not ask any other questions besides whether or not the pharmacy needed that particular amount, right?
MR. LAVELLE: Object to form.
THE WITNESS: I would only ask them if that order was correct.
BY MR. POWERS:
Q. Looking at the page in Exhibit-2 that we've been looking at, ending in Bates 16305, in the second full paragraph there, it says, If the store verifies the quantity is correct, the

Page 95

Page 96

Page 97



Page 98
Page 100
Page 99
Page 101





Page 102

Page 104

MR. POWERS: You can put aside Exhibit-2.

MR. LAVELLE: Let's give this to the court reporter.

- - -

(Whereupon, Exhibit RiteAid-Chase Exhibit-3, Rite_Aid_OMDL_0012503-505, was marked for identification.)

- - -

MR. POWERS: I'm going to hand you what's been marked as Exhibit-3. It is another e-mail, and the starting Bates number is Rite_Aid_OMDL_0012503. And the e-mail has an attachment which is included in Exhibit-3.

THE WITNESS: Okay.

BY MR. POWERS:

Page 103

Page 105

Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 28 of 41. PageID #: 217334
Highly Confidential - Subject to Further Confidentiality Review

Page 106
Page 108
Page 107
Page 109

Golkow Litigation Services Page 28 (106 - 109)



Page 110

Page 112

MR. LAVELLE: Are you finished with Exhibit-3?

MR. POWERS: Yes, we're finished with that exhibit.

- - -

(Whereupon, Exhibit RiteAid-Chase Exhibit-4, Rite_Aid_OMDL_0049994-50031, was marked for identification.)

- - -

MR. POWERS: I'm going to hand you what's been marked as Exhibit-4. It's Bates number Rite_Aid_OMDL_0049994.

Page 111

Page 113



Page 114

Page 116

Page 115

MR. POWERS: We're done with that one.

- - -

(Whereupon, Exhibit RiteAid-Chase Exhibit-5, Rite_Aid_OMDL_0016955-956, was marked for identification.)

- - -

MR. POWERS: I'm going to hand you what's been marked as Exhibit-5, which is Bates numbered Rite_Aid_OMDL_0016955.

BY MR. POWERS:

Page 117

Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 31 of 41. PageID #: 217337
Highly Confidential - Subject to Further Confidentiality Review

Page 118
Page 120
Page 119
Page 121

Golkow Litigation Services Page 31 (118 - 121)

Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 32 of 41. PageID #: 217338
Highly Confidential - Subject to Further Confidentiality Review

Page 122
Page 124
Page 123
Page 125

Golkow Litigation Services Page 32 (122 - 125)





Page 126

Page 127

Page 128

Page 129

- - -

(Whereupon, Exhibit RiteAid-Chase Exhibit-6, Rite_Aid_OMDL_0003641, was marked for identification.)

- - -

MR. POWERS: I'm going to hand you what's been marked as Exhibit-6. This is Bates number Rite_Aid_OMDL_0003641.

THE WITNESS: Okay.

BY MR. POWERS:

Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 34 of 41. PageID #: 217340
Highly Confidential - Subject to Further Confidentiality Review

Page 130
Page 132
Page 131
Page 133

Golkow Litigation Services Page 34 (130 - 133)



Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 35 of 41. PageID #: 217341
Highly Confidential - Subject to Further Confidentiality Review

Page 134
Page 136
Page 135
Page 137

Golkow Litigation Services Page 35 (134 - 137)



Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 36 of 41. PageID #: 217342
Highly Confidential - Subject to Further Confidentiality Review

Page 138
Page 140
Page 139
Page 141

Golkow Litigation Services Page 36 (138 - 141)



Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 37 of 41. PageID #: 217343
Highly Confidential - Subject to Further Confidentiality Review

Page 142
Page 144
Page 143
Page 145

Golkow Litigation Services Page 37 (142 - 145)

Page 146

Page 148

MR. LAVELLE: Counsel, it's about five minutes after 1:00.

MR. POWERS: Yes. I think I may be done, so do you want to take a quick ten-minute break and we may be done for the day.

MR. LAVELLE: That's fine.

VIDEO TECHNICIAN: The time is 1:04 p.m. We are going off the record.

\- - -

(Whereupon, a brief recess was taken.)

\- - -

VIDEO TECHNICIAN: The time is 1:17 p.m. We are back on the record.

BY MR. POWERS:

Q. Welcome back, Ms. Chase.

I just have a couple of

Page 147

Page 149

follow-up questions, and then I think I'll be done.

\- - -

(Whereupon, Exhibit RiteAid-Chase Exhibit-7, Rite_Aid_OMDL_0014379-452, was marked for identification.)

\- - -

Case: 1:17-md-02804-DAP Doc #: 1975-21 Filed: 07/24/19 39 of 41. PageID #: 217345
Highly Confidential - Subject to Further Confidentiality Review

Page 150

Page 152

Page 151

Page 153

Golkow Litigation Services Page 39 (150 - 153)



MR. POWERS: That's all I have.

MR. LAVELLE: Any other questions?

We have no questions for the witness. The witness reserves the right to read and sign.

VIDEO TECHNICIAN: The time is 1:23 p.m., January 4th, 2019. Going off the record, completing the videotape deposition.

\- - -

(Whereupon, the deposition concluded at 1:23 p.m.)

\- - -

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

Amanda Maslynsky-Miller
Certified Realtime Reporter
Dated: January 7, 2019

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

------
ERRATA
------

PAGE LINE CHANGE/REASON

ACKNOWLEDGMENT OF DEPONENT

I,____________________, do hereby certify that I have read the foregoing pages, 1 - 155, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

______________________________________
DEBRA CHASE DATE

Subscribed and sworn to before me this _____ day of ______________, 20____.

My commission expires:______________

________________________________
Notary Public

LAWYER'S NOTES

PAGE LINE