# EXHIBIT 293 – A

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                     -  -  -
 5
            IN RE:  NATIONAL       :   HON. DAN A.
 6          PRESCRIPTION OPIATE     :   POLSTER
            LITIGATION              :
 7                                  :
            APPLIES TO ALL CASES    :   NO.
 8                                  :   1:17-MD-2804
                                    :
 9
                - HIGHLY CONFIDENTIAL -
10
        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                        -  -  -
12
                   November 9, 2018
13
                        -  -  -
14
15              Videotaped deposition of
        ERIC CHERVENY, taken pursuant to notice,
16      was held at the law offices of Reed
        Smith, LLP, 1717 Arch Street,
17      Philadelphia, Pennsylvania, beginning at
        9:50 a.m., on the above date, before
18      Michelle L. Gray, a Registered
        Professional Reporter, Certified
19      Shorthand Reporter, Certified Realtime
        Reporter, and Notary Public.
20
                        -  -  -
21
22          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
23              deps@golkow.com
24
```

<table>
<tr><td>

Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY: MARK P. PIFKO, ESQ.
BY: STERLING CLUFF, ESQ.
Encino Plaza
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
(818) 839-2333
Mpifko@baronbudd.com
Scluff@baronbudd.com
  - and -
BARON & BUDD, P.C.
BY: WILLIAM G. POWERS, ESQ.
600 New Hampshire Avenue, NW
The Watergate, Suite 10-A
Washington, D.C. 20037
(202) 333-4562
Wpowers@baronbudd.com
  - and -
BLASINGAME, BURCH, GARRARD,
ASHLEY, P.C.
BY: ALEXANDRIA HUGHES, ESQ.
440 College Avenue, Suite 320
Athens, Georgia 30601
(706) 354-4000
ahughes@bbga.com
Representing the Plaintiffs

</td><td>

Page 4

APPEARANCES: (Cont'd.)

COVINGTON & BURLING, LLP
BY: MEGHAN MONAGHAN, ESQ.
850 Tenth Street, NW
Suite 586N
Washington, D.C. 20001
mmonaghan@cov.com
(202) 662-5110
Representing the Defendant, McKesson
Corporation

WILLIAMS & CONNOLLY, LLP
BY: COLLEEN MCNAMARA, ESQ.
725 12th Street, NW
Washington, D.C. 20005
(202) 434-5148
Cmcnamara@wc.com
Representing the Defendant, Cardinal
Health

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: JOHN CELLA, ESQ.
601 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 942-6771
john.cella@arnoldporter.com
Representing the Defendants, Endo
Health Solutions; Endo
Pharmaceuticals, Inc.; Par
Pharmaceutical Companies, Inc. f/k/a
Par Pharmaceutical Holdings, Inc.

</td></tr>
<tr><td>

Page 3

APPEARANCES: (Cont'd.)

REED SMITH, LLP
BY: ROBERT A. NICHOLAS, ESQ.
BY: LOUIS W. SCHACK, ESQ.
BY: JOSEPH J. MAHADY, ESQ.
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8226
rnicholas@reedsmith.com
lschack@reedsmith.com
jmahady@reedsmith.com
Representing the Defendant,
AmerisourceBergen Drug Corporation
and the Witness

JONES DAY
BY: TAYLOR A. GOODSPEED, ESQ.
555 California Street, 26th Floor
San Francisco, California 94104
(415) 875-5804
tgoodspeed@jonesday.com
Representing the Defendant, Walmart

PELINI CAMPBELL & WILLIAMS, LLP
BY: ERIC T. WILLIAMS, ESQ.
8040 Cleveland Avenue NW, Suite 400
North Canton, Ohio 44720
(330) 305-6400
Ejwilliams@pelini-law.com
Representing the Defendant,
Prescription Supply, Inc.

MARCUS & SHAPIRA, LLP
BY: ERIN GIBSON ALLEN, ESQ.
One Oxford Centre, 35th Floor
Pittsburgh, Pennsylvania 15219
(412) 338-4683
allen@marcus-shapira.com
Representing the Defendant, HBC
Service Company

</td><td>

Page 5

TELEPHONIC APPEARANCES: (Cont'd.)

REED SMITH, LLP
BY: ANNE E. ROLLINS, ESQ.
BY: ABIGAIL M. PIERCE, ESQ.
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8226
arollins@reedsmith.com
abigail.pierce@reedsmith.com
Representing the Defendant,
Amerisource Bergen Drug Corporation

BARTLIT BECK HERMAN PALENCHAR &
SCOTT LLP
BY: SHARON DESH, ESQ.
Courthouse Place
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
(312) 494-4440
Sharon.desh@bartlit-beck.com
Representing the Defendant,
Walgreens

KIRKLAND & ELLIS, LLP
BY: TUCKER HUNTER, ESQ.
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-2595
Tucker.hunter@kirkland.com
Representing the Defendant, Allergan

ROPES & GRAY LLP
BY: FEIFEI (ANDREA) REN, ESQ.
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9303
Andera.ren@ropesgray.com
Representing the Defendant,
Mallinckrodt

</td></tr>
</table>

Page 6

1  APPEARANCES: (Cont'd.)
2
   ALSO PRESENT:
3
4  VIDEOTAPE TECHNICIAN:
5    David Lane
6
   LITIGATION TECHNICIAN:
7
     Zach Hone
8
9  ALSO PRESENT:
10   Elizabeth Campbell, Esq.
     Drew Schnizel, Esq.
11   (AmerisourceBergen)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 8

1            - - -
2      E X H I B I T S  (Cont'd.)
3            - - -
4
5  NO.      DESCRIPTION      PAGE
6  AmerisourceBergen
   Cherveny-3  E-mail Thread      360
7    2/21/18
     Subject, DNS List
8    ABDCMDL00162810-13
9  AmerisourceBergen
   Cherveny-4, E-mail, 8/25/15    371
10   Subject, Time Sensitive
     Feedback Requested
11   ABDCMDL00137146-47
12
   AmerisourceBergen
13 Cherveny-5  E-mail Thread,     374
     7/12/17
14   Subject, Agenda for
     RAC Conference Call
15   ABDCMDL00047022-23
16 AmerisourceBergen
   Cherveny-6  E-mail Thread      367
17   2/26/13
     Subject, Proposed Meeting
18   With Barbara Bookholdt
     ABDCMDL00145773-74
19
20
21
22
23
24

Page 7

1            - - -
2        I N D E X
3            - - -
4
   Testimony of:      ERIC CHERVENY
5
6    By Mr. Cluff        11
7    By Mr. Pifko        199
8
9
10           - - -
11      E X H I B I T S
12           - - -
13
14 NO.      DESCRIPTION      PAGE
15 AmerisourceBergen
   Cherveny-1  E-mail, 12/11/13    261
16   Subject, Memo of
     Understanding
17   4/20/2000
     ABDCMDL00146183-86
18
   AmerisourceBergen
19 Cherveny-2  Security &      312
     Regulatory Update
20   VP/DCM Meeting
     Dallas, Texas
21   8/28/07
     ABDCMDL00269291
22
23
24

Page 9

1            - - -
2      DEPOSITION SUPPORT INDEX
3            - - -
4
5  Direction to Witness Not to Answer
6  PAGE  LINE
   290   7
7  290   14
8
   Request for Production of Documents
9
   PAGE  LINE
10 None.
11
   Stipulations
12
   PAGE  LINE
13 None.
14
   Questions Marked
15
   PAGE  LINE
16 None.
17
18
19
20
21
22
23
24

Page 10

1         - - -
2         THE VIDEOGRAPHER:  We are
3    now on the record.  My name is
4    David Lane, videographer for
5    Golkow Litigation Services.
6         Today's date is November 9,
7    2018.  Our time is 9:50 a.m.
8         This deposition is taking
9    place in Philadelphia,
10   Pennsylvania, in the matter of
11   National Opioid Litigation MDL.
12        Our deponent today is Eric
13   Cherveny.
14        Counsel will be noted on the
15   stenographic record.
16        The court reporter is
17   Michelle Gray and will now swear
18   in our witness.
19        - - -
20        ... ERIC CHERVENY, having
21   been first duly sworn, was
22   examined and testified as follows:
23        - - -
24        THE VIDEOGRAPHER:  Please

Page 11

1    begin.
2         MR. CLUFF:  Thank you.
3         - - -
4         EXAMINATION
5         - - -
6    BY MR. CLUFF:
7         Q.   Mr. Cherveny, before we get
8    started, can you just spell your first
9    and last name on the record to make sure
10   it's clear?
11        A.   Yeah.  Eric, E-R-I-C.  Last
12   name Cherveny, C-H-E-R-V-E-N-Y.
13        Q.   Okay.  Thank you.
14        And you understand that
15   you're here as a fact witness today to
16   give a deposition, correct?
17        A.   Yes.
18        Q.   Okay.  And have you ever
19   given a deposition before?
20        A.   Yes.
21        Q.   When was that?
22        A.   A few years ago in New York.
23        Q.   Okay.  And was that in
24   connection with litigation where you were

Page 12

1    a named party?
2         A.   No.
3         Q.   Who were you testifying --
4    let me back up.
5         What was the -- what was the
6    litigation about?
7         A.   I believe it was one of our
8    customers.
9         Q.   Okay.  Customer, and you
10   said "we."  Who is the "we"?
11        A.   AmerisourceBergen.
12        Q.   AmerisourceBergen is a large
13   corporation.  When you say
14   AmerisourceBergen, do you mean the parent
15   company or some subsidiary of that
16   entity?
17        A.   I believe it was -- when I
18   just answered that, it was for
19   AmerisourceBergen Drug Corp.
20        Q.   Okay.  So today, if we refer
21   to AmerisourceBergen Drug Corp., could we
22   abbreviate that as ABDC?
23        A.   Yes, of course.
24        Q.   And if we are talking about

Page 13

1    its parent company, AmerisourceBergen
2    Corp., we can call that ABC.  Is that
3    good?
4         A.   Yes.
5         Q.   Okay.  And so in that New
6    York case, do you remember when it was
7    filed?
8         A.   No.
9         Q.   Okay.  But you recall giving
10   a deposition approximately a year ago?
11        A.   No, no.  It was several
12   years ago.
13        Q.   Oh, I'm sorry.  Several
14   years ago, thank you.
15        Within the last five years?
16        A.   No.  I believe it was longer
17   than that.
18        Q.   Okay.  So maybe between five
19   and ten?
20        A.   Yes.
21        Q.   All right.  And you said
22   that you believed it was one of ABDC's
23   customers.  What -- do you have a
24   recollection of what the allegation was?

Page 14

```
1      A.    Absolutely no recollection
2   at all.
3      Q.    Absolutely no recollection.
4   Okay.
5           Do you know if it was in
6   state court or federal court?
7      A.    It was Eliot Spitzer's team
8   that was deposing me, so...
9      Q.    So since it's been a while
10  since you've given a deposition, I wanted
11  to go over some things called
12  admonitions, just so you can understand
13  again.  I mean, I'm sure your lawyer has
14  prepared you for today's deposition.
15          One of the things that we
16  like to do, though, just to make sure
17  everybody is on the same page on the
18  record.
19          So I'm entitled to have your
20  best understanding and your best
21  recollection to all of my questions
22  today.  Your attorney is entitled to
23  object to my questions.  But unless your
24  attorney specifically instructs you not
```

Page 15

```
1   to answer a question, I'm entitled to an
2   answer.  Okay?
3      A.    Yes.
4      Q.    I'm not going to ask you to
5   guess ever.  But I am entitled to, as I
6   said earlier, your best recollection.
7   Sometimes I may ask you for an estimate
8   or your best attempt at getting to the
9   information that I'm asking.
10          At times, I may ask you
11  questions to which you may not know the
12  answer.  I'm entitled to know, though,
13  whether you knew the answer to that
14  question at the time, and you just can't
15  recall, or whether you never knew.
16          Do you understand the
17  difference?
18     A.    Yes.
19     Q.    Right.  So for an example,
20  this New York litigation, at some point
21  in time you knew something about the
22  allegations, correct?
23     A.    Yeah, at some time I did,
24  yeah.
```

Page 16

```
1      Q.    But today you don't recall?
2      A.    That's correct.
3      Q.    Makes perfect sense.
4           I may ask you questions that
5   touch on issues that you may have
6   discussed with your attorneys.  I'm never
7   asking you to disclose what we call
8   attorney/client privilege.  And your
9   attorney may at times interject an
10  objection to clarify that you can answer
11  the question, but caution you not to
12  reveal communications that you had with
13  your attorneys.
14          But I am entitled to know
15  information that's within your own
16  personal knowledge, aside from what you
17  learned from them.  Does that make sense?
18     A.    Yes.
19     Q.    Okay.  Great.  I want to
20  stay with this New York litigation a
21  little bit.
22          Are you aware of any other
23  litigation that was filed by
24  AmerisourceBergen customers against ABDC?
```

Page 17

```
1      A.    No.
2      Q.    Never?
3      A.    Not that I -- not that comes
4   to mind right now.
5      Q.    Not that comes to mind.
6   Okay.
7           Is there any other
8   litigation that AmerisourceBergen has
9   been involved in that you can recall
10  aside from the litigation here today?
11          MR. NICHOLAS:  Object to the
12     form.
13          THE WITNESS:  I mean,
14     there's litigation that's
15     happening, but it's really not a
16     part of my direct job
17     responsibilities.  So I might be
18     generally aware of it.  But it's
19     not something that I know any
20     detail.
21  BY MR. CLUFF:
22     Q.    What litigation are you
23  generally aware of?
24          MR. NICHOLAS:  Object to the
```

Page 18

1 form.
2     THE WITNESS:  I couldn't
3 even -- I couldn't even state.  I
4 can't tell you anything at this
5 point.
6 BY MR. CLUFF:
7     Q.   But you said that you're
8 generally aware of litigation.  What is
9 your general awareness?
10     MR. NICHOLAS:  Object to the
11 form.
12     THE WITNESS:  I'll see
13 e-mails from time to time.  But,
14 again, it's something that I'll
15 see in passing.  But I have a very
16 busy job.  So it's not something
17 that I spend any time reviewing.
18 BY MR. CLUFF:
19     Q.   Okay.  This New York
20 lawsuit, do you know who was suing who at
21 the time?
22     A.   It was so long ago that it's
23 something that I couldn't even -- I
24 wouldn't feel comfortable answering that.

Page 19

1 I don't know.
2     Q.   You mentioned the name Eliot
3 Spitzer and their team.  Do you know if
4 it was an action brought by a
5 governmental entity?
6     A.   No.
7     Q.   You don't know if it was an
8 Attorney General?
9     A.   I don't know.
10     Q.   Is there anything else that
11 you remember at all?
12     A.   I remember absolutely
13 nothing about it.
14     Q.   Okay.  You don't remember if
15 it was resolved by way of a settlement?
16     A.   No.
17     Q.   No judgment entered?
18     A.   No.
19     Q.   What were you called on to
20 testify about?
21     MR. NICHOLAS:  Objection.
22     THE WITNESS:  I don't
23 recall.
24 BY MR. CLUFF:

Page 20

1     Q.   And you don't know -- you
2 mentioned earlier that it was about a
3 customer.  You don't know which specific
4 customer, right?
5     A.   No.
6     Q.   We're going to talk later
7 about your job responsibilities in a
8 little more detail.  But do you have any
9 familiarity in your role at
10 AmerisourceBergen or ABDC about the kinds
11 of complaints that customers might have
12 against ABDC that would lead to
13 litigation?
14     MR. NICHOLAS:  Object to the
15 form.
16     Go ahead.
17     THE WITNESS:  Not in any
18 detail.
19 BY MR. CLUFF:
20     Q.   Okay.  But do you have a
21 general understanding?
22     A.   I know that lawsuits are
23 filed against the company.  But I don't
24 really spend time going into it in any

Page 21

1 detail.  Like I said, I have a different
2 set of job responsibilities.  It doesn't
3 really include that.
4     Q.   I understand that your job
5 responsibilities might include other
6 aspects of ABDC's business.  But if
7 you're telling me that you have a general
8 understanding, I'm entitled to understand
9 your understanding.
10     So aside from the fact that
11 you can't give me any particular detail,
12 what general understanding do you have of
13 the lawsuits that get filed against ABDC?
14     MR. NICHOLAS:  Object to the
15 form.
16     THE WITNESS:  Very little.
17 Like I said, it doesn't really
18 come into play with my direct
19 responsibilities with the company
20 at this time.
21 BY MR. CLUFF:
22     Q.   But what little do you
23 understand?  That's what I'm asking you
24 to explain to me.

Page 22

1      MR. NICHOLAS:  Object to the
2   form.  Asked and answered.
3      THE WITNESS:  I mean, it's
4   going to vary depending on
5   lawsuit, from lawsuit to lawsuit.
6   I'm not going -- - I'm sure they
7   have a case against the company
8   for whatever reasons, you know,
9   that they have.  But I don't know
10  anything -- any details about the
11  litigation beyond that.
12  BY MR. CLUFF:
13     Q.   When you say "they," do you
14  mean customers?
15     A.   It could be customers.  It
16  could be government entities.
17     Q.   What kind of cases do
18  government entities file against ABDC?
19     MR. NICHOLAS:  Objection to
20  form.  Asked and answered.
21     THE WITNESS:  I think I've
22  answered the question.  I don't
23  have anything more than a basic
24  understanding that the company has

Page 23

1   lawsuits placed against it.  I
2   don't have any detailed knowledge
3   about anything about the lawsuits
4   that are placed against it other
5   than what I've told you.
6   BY MR. CLUFF:
7      Q.   Sure.  So your lawyer just
8   objected "asked and answered."  And your
9   response was "I think I've answered the
10  question."
11     So your lawyer, like I said,
12  is entitled to object.  But I'm entitled
13  to the answer that you were going to give
14  me prior to the objection unless you're
15  instructed not to answer.
16     So if you hear an objection
17  like asked and answered, I'm still
18  entitled to my answer.  You can't just
19  change your answer to say that you've
20  answered the question.
21     Sometimes my questions are
22  going to be slightly different than the
23  ones that I've previously asked.  Does
24  that make sense?

Page 24

1      A.   Yes.
2      Q.   Okay.  So going forward I
3   think we'll understand that, and there
4   won't be an issue.
5      All right.  We might come
6   back to these lawsuits a little bit
7   later.  But I think let's talk about your
8   experience and your job.  Does that make
9   sense?
10     A.   Yes.
11     Q.   Okay.  So are you employed
12  by ABDC?
13     A.   No.
14     Q.   Okay.  So who are you
15  employed by?
16     A.   I'm employed by the parent
17  company, ABC.
18     Q.   Okay.  How does your
19  relationship to ABDC work out then?
20     MR. NICHOLAS:  Object to the
21  form.
22     THE WITNESS:  Subsidiary
23  company of ABC.
24  BY MR. CLUFF:

Page 25

1      Q.   Okay.  And so what
2   responsibilities as an employee of ABC do
3   you have towards ABDC?
4      A.   I'm the director of
5   diversion control and security for the
6   company.
7      Q.   Is diversion control the
8   same thing as security?
9      A.   No.
10     Q.   So you have kind of two
11  responsibilities then, it sounds like,
12  diversion control and then security
13  separate from diversion control?
14     A.   The formal title has some
15  security components to it.  But it's
16  primarily diversion that I'm responsible
17  for.
18     Q.   Okay.  How long have you
19  been an employee of ABC?
20     A.   Going on 22 years.
21     Q.   22 years.  So that's
22  sometime in the '90s, maybe '96?
23     A.   Yes.
24     Q.   Okay.  And when you started

Highly Confidential — Subject to Further Confidentiality Review

Page 26

1 with -- when you started working in '96,
2 did you join ABC or some prior iteration
3 of that entity?
4     A.   The company I joined at the
5 beginning was Bergen Brunswick
6 Corporation.
7     Q.   And what was your title when
8 you joined Bergen Brunswick?
9     A.   I was a security officer.
10    Q.   What were your -- what were
11 your job responsibilities as a security
12 officer?
13    A.   Basic security functions,
14 conducting patrols, conducting escorts,
15 transporting executives.
16    Q.   What are basic security
17 functions?
18    A.   Dealing with security
19 issues, if a fight occurs, if
20 unauthorized personnel enter the
21 property.
22    Q.   So, basically, making
23 sure --
24        MR. NICHOLAS:  He wasn't --

Page 27

1     he wasn't finished.
2 BY MR. CLUFF:
3     Q.   I'm sorry.  I didn't mean to
4 interrupt you.  Sorry.
5     A.   Basically just related
6 duties.
7     Q.   Okay.  So if I'm
8 understanding you correctly, it sounds
9 like that aspect of your job was to just
10 make sure that the physical location
11 where you were employed was safe and
12 secure.  Would you agree with that?
13        MR. NICHOLAS:  Object to the
14    form.
15        THE WITNESS:  Yes, I would.
16 BY MR. CLUFF:
17    Q.   Okay.  You also mentioned
18 conducting controls.  What does it mean
19 to conduct a control?
20    A.   I'm not --
21        MR. NICHOLAS:  I think he
22    said patrol.
23        MR. CLUFF:  Okay.  Patrol.
24    My fault.  There's a typo in the

Page 28

1     record.  We'll get it corrected.
2 BY MR. CLUFF:
3     Q.   What do you mean by
4 conducting a patrol?
5     A.   We could -- we could conduct
6 detect patrols.  We had a wand and --
7 that had little readers throughout the
8 building and would document that a
9 security patrol was done and when it was
10 done.
11    Q.   You said had a wand that
12 helped you document when the patrols were
13 conducted.  But what were the patrols?
14    A.   To walk through the entire
15 building, all floors, and just monitor
16 the building to make sure that there was
17 no dangers, that there was no fire, that
18 there was nothing -- nothing going on
19 from a security nature that would be
20 concerning.
21    Q.   Okay.  And you mentioned
22 that you were responsible for conducting
23 escorts.  What would you be escorting?
24    A.   Associates to their cars, if

Page 29

1     they had a spousal dispute, executives to
2 the airport, executives from the airport
3 and related duties.
4     Q.   So it sounds like there was
5 some overlap with the conducting escorts
6 and transporting executives that you
7 mentioned, right?
8     A.   Yes.
9     Q.   Okay.  So when you were with
10 Bergen Brunswick, there was -- there was
11 no diversion control responsibilities, it
12 sounds like, correct?
13    A.   That's correct.
14    Q.   Okay.  And how long did you
15 hold this title of security officer at
16 Bergen Brunswick?
17    A.   I don't recall exactly.
18 Approximately two years.
19    Q.   Two years.  So maybe like
20 '96 to '98-ish?
21    A.   Yes.
22    Q.   Before you joined Bergen
23 Brunswick, did you -- what level of
24 education did you complete?

Page 30

1    A.   Just high school and some
2  college.
3    Q.   Okay.  High school and some
4  college.  And where did you do the
5  college?
6    A.   Golden West College in
7  Huntingdon Beach, California.
8    Q.   Oh, yeah.  I know it.
9        So are you originally from
10 west coast?
11   A.   Yes.
12       MR. CLUFF:  It's time to
13       wake up for somebody.
14 BY MR. CLUFF:
15   Q.   When you were working with
16 Bergen Brunswick, did you work with Chris
17 Zimmerman?
18   A.   Yes.  He was with the
19 company when I joined.
20   Q.   Okay.  And what was his
21 position at that time?
22   A.   I don't recall his exact
23 title.
24   Q.   Okay.  But you stayed with

Page 31

1  the company as it merged up into
2  eventually becoming ABC, correct?
3    A.   That's correct.
4    Q.   When you were at Golden
5  West, what kind of classes did you take?
6    A.   General education, mainly.
7    Q.   Okay.  Anything specialized
8  towards security?
9    A.   No.
10   Q.   Did you complete an
11 Associate's degree?
12   A.   No, I did not.
13   Q.   Did you have any law
14 enforcement-type classes?
15   A.   No, I did not at that time.
16   Q.   So you'd agree with me that
17 none of your college classes overlapped
18 with the security responsibilities you
19 had at Bergen Brunswick, right?
20       MR. NICHOLAS:  Object to the
21       form.
22       THE WITNESS:  Yes, I would
23       agree.
24 BY MR. CLUFF:

Page 32

1    Q.   So we said that -- or you
2  said that from '96 to '98 you were a part
3  of the security office or group at Bergen
4  Brunswick, right?
5        And was that at a facility
6  in Southern California?
7    A.   Yes, it was.
8    Q.   Do you know where it was?
9    A.   4000 Metropolitan Boulevard,
10 Orange, California.
11   Q.   I know it.
12       Okay.  And what did you do
13 after you were a security officer?
14   A.   Well, they were looking for
15 a volunteer to type confidential
16 transcriptions of interrogations that our
17 investigators conducted.  I type fast.  I
18 typed about 60 words a minute back then
19 accurately.  So I volunteered and I
20 listened to recordings for eight hours a
21 day, five days a week, and typed
22 transcriptions of those investigations
23 they never used, and after about six
24 months of doing that, I got noticed by

Page 33

1  the executives upstairs and I got
2  promoted to -- to upstairs.
3    Q.   I want to go back to Golden
4  West just for a second.  How long -- how
5  long were you attending classes at Golden
6  West?
7    A.   What time period?
8    Q.   Yeah.  Like in terms of
9  months, years, weeks?
10   A.   I think it was about one
11 year.
12   Q.   About a year.
13       And were you a full-time
14 student?
15   A.   I don't know if I was
16 formally full-time, but I was taking a
17 pretty full load.
18   Q.   Okay.  And so were you
19 taking a full load for two semesters
20 or -- what was your workload while you
21 were at Golden West?
22   A.   It was -- I think it was
23 close to a full load.  I think I was
24 taking about five classes per semester.

Page 34

1    Q.   Per semester.  How come you
2 decided not to pursue a further education
3 at Golden West?
4    A.   I decided to join the Navy.
5    Q.   Awesome.  When were you in
6 the Navy?
7    A.   I was in the United States
8 Navy from -- from '86 to '91.
9    Q.   Were you on a boat?
10   A.   Yes.
11   Q.   Or ship, excuse me?
12   A.   Yes, I was assigned to the
13 USS Nimitz.
14   Q.   What -- what was your
15 responsibility in the Navy?
16   A.   I was a radar air traffic
17 controller.  I was a final, final
18 controller on board the Nemitz from '87
19 to '91.
20   Q.   So no, no security
21 responsibilities there though, right?
22   A.   I volunteered for shore
23 patrol pretty much every time I had duty.
24 So in that capacity I had -- I had

Page 35

1 security experience.
2    Q.   Makes sense.  The
3 interrogations that you were typing, I
4 believe that's the word you used, right?
5    A.   Yes.
6    Q.   Okay.  Those were from
7 investigations that Bergen Brunswick
8 employees were conducting?
9    A.   Yes, that's correct.
10   Q.   What kind of investigations
11 were they?
12   A.   They were various
13 investigations.  But per my recollection,
14 they primarily involved internal thefts
15 of controlled substances.
16   Q.   In the six months that you
17 were transcribing those interrogations
18 how many investigations do you think were
19 ongoing at that time?
20   A.   I have no idea.
21   Q.   Could you give me a
22 ballpark, maybe like more than 10, more
23 than 20?
24   A.   I mean there were three or

Page 36

1 four investigators, and I would type
2 transcriptions for their individual
3 investigations as per their request.  So
4 given the time period that's passed, I
5 wouldn't feel comfortable answering how
6 many investigations were conducted, you
7 know, at one time, or during the entire
8 six months.  I just have no recollection
9 of that.
10   Q.   The investigators that
11 worked at that time, were they full-time?
12   A.   Yes.  I believe so.
13   Q.   Okay.  And were they
14 employed by Bergen Brunswick, or were
15 they outside consultants?
16   A.   No.  They were Bergen
17 Brunswick associates.
18   Q.   So Bergen Brunswick -- is it
19 fair to say that Bergen Brunswick had a
20 serious concern about internal theft at
21 that time?
22        MR. NICHOLAS:  Object to the
23   form.
24        THE WITNESS:  Yes.  We've

Page 37

1 always taken that very seriously
2 as a company.
3 BY MR. CLUFF:
4    Q.   In 1998 was there -- what --
5 what were the drugs being stolen, or what
6 products were being stolen?
7    A.   I mean I would say generally
8 it would have been controlled substances.
9 Also Viagra was a -- was a product that
10 was commonly stolen from our distribution
11 centers.
12   Q.   Any particular category of
13 controlled substances that were being
14 stolen at that time?
15   A.   No, they spanned all
16 categories.  We had vault products as
17 well as caged products that would be
18 Schedule II, as well as Schedule III
19 through V products.
20   Q.   Okay.  What is a vault
21 product?
22   A.   The vaults are maintained to
23 hold Schedule II narcotics, and that's
24 per federal regulations.

Page 38

1   Q.   Okay.  Are all narcotics
2 Schedule II narcotics or is there some
3 variation in that group?
4   A.   Narcotics are broken into
5 Schedule II and II-N.  There'd be two,
6 Schedule II narcotics and non-narcotics.
7   Q.   Okay.  And then what's a
8 caged product?
9   A.   Those are products
10 categorized in Schedule IIIs, IVs and Vs.
11   Q.   What's the difference
12 between a cage and a vault?
13   A.   Well, a vault is pretty much
14 what you would see in a bank.  It's got
15 steel walls and it's constructed in
16 accordance with federal regulations to
17 hold controlled substances, specifically
18 narcotics.
19       The cage is really just
20 exactly the way it's indicated.  It's a
21 cage that's chain-link fence that
22 generally has five sides, four sides plus
23 a ceiling.  That's basically -- and it's
24 all constructed within federal

Page 39

1 regulation, regulatory requirements.
2   Q.   Sure.  So if I understand
3 you correctly, the cage products, they go
4 inside this fence enclosure, and those
5 are Schedule IIIs -- or III, IV and Vs,
6 correct?
7   A.   That's correct.
8   Q.   It would seem like maybe
9 less security is necessary around those
10 products is -- is what is happening,
11 because there's a cage, not a vault?
12   A.   Yes, per federal regulation.
13   Q.   Okay.  In your experience
14 was there less likelihood of theft of the
15 Schedule IIIs versus Schedule IIs?
16   A.   No.  No, pretty much it was
17 all stolen pretty -- pretty -- I mean
18 based on my recollection I think it was
19 pretty common negative inventories for
20 the cage and the vault product.
21   Q.   Mm-hmm.  And then so the
22 vault products, those were the Schedule
23 IIs, correct?
24   A.   Yes.

Page 40

1   Q.   And it sounds like what
2 you're saying is per the DEA regulations,
3 those needed to be more secure than the
4 Schedule IIIs, correct?
5   A.   That's correct.
6   Q.   And what is your
7 understanding of why they needed to be
8 more secure?
9   A.   Generally speaking, per, per
10 federal regulations, the more powerful
11 the drug family, you know, the higher the
12 regulatory requirement for storage.
13   Q.   What do you mean when you
14 say a more powerful?
15   A.   Well, controlled substances
16 are broken into Schedule I through Vs.
17 Is, Schedule I products have no medicinal
18 value like LSD.  It's used for like in a
19 research and laboratories.
20       Schedule IIs generally are
21 from the opiate pop, either it's
22 basically narcotics, opium.  Generally
23 used for cancer patients, pain
24 medications.  Schedule IIIs, IVs and Vs,

Page 41

1 as you move up that number, the lesser
2 control it has.  Like Schedule V would be
3 children's NyQuil with codeine.  It still
4 has the codeine in it so it has to be
5 categorized as a control.  But has very
6 little potential for abuse because it's
7 in a lower quantity.
8   Q.   Is it your opinion that
9 children's NyQuil with codeine does not
10 have a likelihood of abuse?
11       MR. NICHOLAS:  Object to the
12   form.
13       Go ahead.
14       THE WITNESS:  I would say
15   that it has less likelihood of
16   abuse than -- than some other
17   products, yeah.
18 BY MR. CLUFF:
19   Q.   I'm going to circle back to
20 my question because you gave me a lot of
21 information.  I'm not sure if -- if I
22 understand the answer to the answer to my
23 question.
24       You earlier testified that,

Page 42

1 per federal regulations, the more
2 powerful the drug family the higher the
3 regulatory requirement.  My question was,
4 what do you mean when you say the more
5 powerful the drug is it needs more
6 security.
7         What would you describe as a
8 more powerful effect that one drug has
9 versus another?
10         MR. NICHOLAS:  Object to the
11 commentary before the question.
12 Go ahead.
13         THE WITNESS:  Well, our DEA
14 categorizes these drugs.  And they
15 determine the -- the higher
16 propensity for diversion and
17 abuse, and they are the ones that
18 basically set where they are to be
19 stored.
20         So we just follow those
21 regulations.  I'm not a
22 pharmacist.  I don't have, you
23 know, I don't have detailed
24 knowledge of -- of the actual

Page 43

1         chemical breakdown of those drugs,
2         so I would just leave it at that.
3         But the DEA pretty much sets
4         the requirements and we follow
5         that requirement.
6 BY MR. CLUFF:
7     Q.   That makes sense.  Okay.  So
8 I just want to make sure I understand.
9 I'm not trying to rehash anything here.
10 Earlier you said more powerful, and then
11 I asked for a little more of an
12 explanation.  And then you followed up
13 with this explanation that the DEA sets
14 these lists or categories.
15         Does that make sense at that
16 point?
17         MR. NICHOLAS:  Object to the
18 form.
19         THE WITNESS:  Yes.
20 BY MR. CLUFF:
21     Q.   And that the -- that the
22 lists or categories are based on
23 likelihood of abuse and diversion.  Did I
24 get that correct?

Page 44

1         MR. NICHOLAS:  Object to the
2 form.  Go ahead.
3         THE WITNESS:  Yes, I would
4 agree with that.
5 BY MR. CLUFF:
6     Q.   Okay.  So I'm just wondering
7 if in your head there's a connection
8 between a drug being more prone to
9 diversion and abuse and a drug being more
10 powerful?
11         MR. NICHOLAS:  Object to the
12 form.
13         THE WITNESS:  Not always.
14 BY MR. CLUFF:
15     Q.   But sometimes?
16     A.   Yes.
17     Q.   Okay.  So like the drugs in
18 Schedule II, you mentioned narcotics and
19 opium-based products, those are more
20 powerful than some drugs in Schedule III,
21 correct?
22     A.   Yes.
23     Q.   Okay.  And based on your
24 testimony earlier, drugs in Category 2

Page 45

1 would be as determine -- would have been
2 determined by the DEA to be more prone to
3 diversion and abuse, correct?
4         MR. NICHOLAS:  Object to the
5 form.
6         THE WITNESS:  Well, they are
7         more powerful.  Not all Schedule
8         IIs are as prone for abuse as --
9         as other -- other Schedule IIs.
10         But I would say DEA makes those
11         determinations and we follow that
12         like I said.
13 BY MR. CLUFF:
14     Q.   Okay.  I'm confused though.
15 So you said that in your head there is a
16 connection between the power of a drug
17 and its -- its likelihood of diversion
18 and abuse, right?
19     A.   Based on DEA.  Because based
20 on DEA's findings and their -- and their
21 analysis of those drugs, yes.
22     Q.   Okay.  So then it's your --
23 it's your opinion that the DEA has
24 categorized the more powerful drugs as

Page 46

1  you've referred to them as drugs that are
2  more prone to diversion and abuse, right?
3      MR. NICHOLAS: Object to the
4  form.
5      THE WITNESS: Yes.
6  BY MR. CLUFF:
7      Q. Okay. And C-IIs are higher
8  than C-IIIs, right?
9      A. That's correct.
10     Q. Let me back up. I used an
11 abbreviation. I said C-II and C-III. If
12 I say C-II, do you understand that I'm
13 talking to Schedule II drugs, right?
14     A. Yes.
15     Q. And if I say C-III we are
16 talking about Schedule III drugs?
17     A. Yes.
18     Q. Okay. So C-IIs -- backing
19 up again -- they're more powerful than
20 C-III?
21     A. Yes, they are.
22     Q. So as a general category
23 they are more likelihood -- more likely
24 to be diverted and subject to abuse than

Page 47

1  C-III, right?
2      MR. NICHOLAS: Object to the
3  form.
4      THE WITNESS: Well, not
5  always. I mean, prometh with
6  codeine is a Schedule V, and it's
7  highly abused in the United
8  States, in many cases more so than
9  narcotics.
10     So I would say that the DEA
11 breaks down those drug categories,
12 and they tell us where we are
13 supposed to store them. So
14 generally the DEA considers them
15 more likely to be abused.
16 BY MR. CLUFF:
17     Q. Okay. Understood. So I
18 think we'd agree then that the higher you
19 go on the schedule, right, C-V, C-IV,
20 C-III, C-II, there's a higher likelihood
21 of abuse?
22     MR. NICHOLAS: Object to the
23 form.
24     THE WITNESS: I mean, I

Page 48

1  think that's what -- yes. That's
2  what DEA -- that's what DEA
3  determines.
4  BY MR. CLUFF:
5      Q. Okay. I think earlier you
6  talked about that AmerisourceBergen is
7  committed to -- and I don't want to put
8  words in your mouth. So if I get this
9  wrong, please help me understand -- is
10 committed to making sure that they follow
11 DEA direction regarding C-IIs and C-IIIs,
12 right?
13     A. I'm sorry. Can you restate
14 that?
15     Q. Sure. When we were talking
16 about how the DEA classifies drugs into
17 the schedules, right, Schedule I,
18 Schedule II, Schedule III, I recall you
19 answering to the effect that
20 AmerisourceBergen or ABDC is committed to
21 following DEA direction about the
22 classification of drugs, right?
23     A. We're committed to following
24 direction as per the regulation as to

Page 49

1  where they are stored.
2      Q. As to where they're stored.
3  Okay.
4      So then that means
5  AmerisourceBergen's commitment only
6  extends as far as the cages and the
7  vaults are concerned; is that right?
8      MR. NICHOLAS: Object to the
9  form.
10     THE WITNESS: Yes.
11 BY MR. CLUFF:
12     Q. All right. I'd like to go
13 back to the investigations for a second.
14     Do you recall any of the
15 outcome of these investigations that you
16 were transcribing?
17     A. No. I wasn't involved in
18 that at all.
19     Q. Do you know if Bergen
20 Brunswick ever uncovered any internal
21 thefts of C-II or C-III?
22     A. Based on my experience as a
23 regional director, yes, I can tell you
24 that we have identified internal thefts

Page 50

1 and we have -- we have -- through the
2 investigation, we identified who -- who
3 the theft was happening -- or who was
4 conducting the theft.
5     Q.   Okay.  Maybe our -- maybe
6 our lines got crossed there, because you
7 answered about your experience as a
8 regional director.  And you said that
9 you -- that we -- I'm using the "we" that
10 you used -- have identified thefts.  Were
11 you answering about your current
12 responsibilities as a regional director
13 for ABC?
14     A.   No.
15     Q.   Oh, okay.  So you were
16 talking about Bergen Brunswick at the
17 time?
18     A.   Well, I'm not currently --
19 I'm not currently regional director.
20 That was my previous role before I took
21 over diversion.
22     Q.   Okay.
23     A.   But you asked sort of a
24 broad question.  So, yes, we have as a

Page 51

1 company identified internal thefts.
2     Q.   Okay.  What was stolen?  If
3 you want to categorize what's been stolen
4 I'm okay with that.
5         MR. NICHOLAS:  Object to the
6     form.
7         THE WITNESS:  I mean over
8     the course of 22 years, the
9     various drugs, I couldn't give you
10     specifics.
11         Everywhere -- everything
12     from non-controlled prescription
13     drugs like Viagra to controlled
14     substances in all categories.
15 BY MR. CLUFF:
16     Q.   Okay.  What kinds of
17 controlled substances were stolen?
18     A.   Like I said, all categories.
19     Q.   Anabolic steroids?
20     A.   All categories.  I don't
21 recall specific investigation for a theft
22 of anabolic steroids.  But I wouldn't be
23 surprised if it happened.
24     Q.   Okay.  Do you recall any

Page 52

1 specific investigations about thefts of
2 prescription opioids?
3     A.   Yes.  That was a -- that was
4 a category of drug that we conducted
5 investigations on.
6     Q.   Okay.  What is your earliest
7 recollection of an investigation of a
8 theft of a prescription opioid?
9     A.   I don't remember.
10     Q.   Okay.  You worked for the
11 company for 22 years.  Would you have
12 become aware of an investigation
13 regarding the theft of prescription
14 opioids when you were transcribing
15 investigations between -- or after '98?
16     A.   Yes.  I mean, that's --
17 that's when I would have been exposed to
18 those kinds of investigations.
19     Q.   Okay.  So that's maybe a
20 reasonable beginning point on when you
21 became aware of investigations, correct?
22     A.   Yes.
23     Q.   Do you know when
24 prescription opioids first hit the

Page 53

1 market?  And by the market, I mean to be
2 written for use by everyday consumers.
3     A.   No.
4     Q.   If I told you that OxyContin
5 was first approved for use in 1999, would
6 that jog your recollection?
7     A.   No.
8     Q.   Okay.  Do you recall
9 investigations about prescription opioids
10 anytime after 2000?
11     A.   Yes.  I was exposed to
12 investigations post 2000 time frame.
13     Q.   Okay.  When would that have
14 been?
15     A.   Post 2000.
16     Q.   Okay.  Coming back to your
17 responsibilities today as a director for
18 ABC, when is the most recent
19 investigation that you can recall
20 regarding the theft of a prescription
21 opioid?
22     A.   In my current role, we don't
23 conduct investigations of internal
24 thefts.  That's handled by a different

Page 54

1 team.
2     Q.    Sure.  That's fair.  It's
3 not the question I asked you though.  I
4 asked you when was the most recent
5 investigation that you were aware of?
6          MR. NICHOLAS:  Object to the
7     form and the commentary.  No need
8     for that.
9          Go ahead.
10          THE WITNESS:  I don't
11     recall.
12 BY MR. CLUFF:
13     Q.    Anytime in the last year?
14     A.    My job is extremely busy.
15 And it takes up all of my time.  So I
16 really don't pay attention to internal
17 thefts.  If that comes up, it's
18 transferred to a different team.  My job
19 is to operate and run the diversion
20 program.  I don't really get involved in
21 internal thefts at our distribution
22 center level.
23     Q.    So internal thefts are not
24 investigated as part of the diversion

Page 55

1 program?
2          MR. NICHOLAS:  Object to the
3     form.
4          THE WITNESS:  Not by my
5     team.
6 BY MR. CLUFF:
7     Q.    Whose team investigates
8 them?
9     A.    It would be probably a joint
10 effort between the regulatory team and
11 the investigative team.
12     Q.    Okay.  And who, who are
13 responsible for those teams?
14     A.    Steve Mays for regulatory
15 and Bruce Gundy for investigations.
16     Q.    So those two teams would be
17 investigating internal thefts, correct?
18     A.    That's correct.
19     Q.    Okay.  Is that part of
20 AmerisourceBergen's diversion control
21 program?
22          MR. NICHOLAS:  Object to the
23     form.
24          THE WITNESS:  I can't recall

Page 56

1 if internal theft is considered a
2 component of the overall diversion
3 control program.  It might touch
4 on that.  But it's certainly not
5 something that my team handles
6 directly.
7 BY MR. CLUFF:
8     Q.    Okay.  All right.  So it
9 sounds like the investigations thing is
10 pretty well outside your area of
11 expertise.  Would you agree with that?
12     A.    At this time, yes.
13     Q.    Okay.  So you said that you
14 typed up these investigations for six
15 months.  Was that still in California?
16     A.    Yes.
17     Q.    And that was at the Orange,
18 the City of Orange address, right?
19     A.    Correct.
20     Q.    Okay.  And then you made a
21 comment earlier that while you were doing
22 that, you got noticed by the executives.
23 Did I get that right?
24     A.    Yes.

Page 57

1     Q.    Okay.  Who would the
2 executives have been and what did they
3 notice?
4          MR. NICHOLAS:  Object to the
5     form.
6          THE WITNESS:  They noticed
7     that I broke -- that I was pretty
8     good at English, and I was able to
9     break down the -- the interview
10     interrogations into paragraphs.  I
11     was able to break -- break the
12     grammar down properly in the
13     interrogation report that I
14     transcribed.  So basically, they
15     just noticed the reports that I
16     was generating for them.
17 BY MR. CLUFF:
18     Q.    And who would the executives
19 have been?
20     A.    Chris Zimmerman and the
21 investigators that I was conducting the
22 transcriptions for.
23     Q.    Who would the investigators
24 have been?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    A.    John Bruce, John Gibson,
2 Greg Madsen.  There might have been more,
3 but that's the three that come to mind.
4    Q.    When you were doing these --
5 the transcriptions, were you still a
6 security officer?
7    A.    Yes.
8    Q.    Who were you reporting to at
9 that time?
10    A.    Leo Schmock.
11    Q.    Can you spell that for me?
12    A.    Leo, L-E-O.  Schmock,
13 S-C-H-M-O-C-K, I believe.
14    Q.    That was between '96 and
15 roughly the middle of 1998, correct?
16    A.    Yes.
17    Q.    All right.  And do you know
18 what Leo Schmock's position was?
19    A.    I think it evolved, but when
20 I was hired I believe he was the manager
21 of security services.
22    Q.    And after you got noticed by
23 the executives, was there a change in
24 your job responsibilities?

Page 59

1    A.    Yes.
2    Q.    What was the change?
3    A.    I was moved upstairs.  And I
4 was given the responsibility of taking
5 over subpoenas, information requests from
6 state and federal agencies, as well as
7 licensing.
8    Q.    Subpoenas, information
9 requests from state and federal agencies
10 and licensing.  Okay.
11        And what department was that
12 that you were involved in then?
13    A.    I don't remember exactly
14 what -- what our department was called
15 under Bergen.
16    Q.    Okay.  And who were you
17 reporting to at that time?
18    A.    I believe I was reporting
19 to -- directly to Chris Zimmerman.
20    Q.    And so you would be
21 assisting the company in responding to
22 subpoenas?
23    A.    Correct.
24    Q.    And were those civil and

Page 60

1 governmental subpoenas?
2    A.    Yes.
3    Q.    Okay.  What kind of
4 information requests would you be
5 receiving?
6    A.    It varied.  Across the board
7 mostly sales requests, request for sales
8 data from our customers.  But it -- it
9 was on various subject matters.
10    Q.    What kind of information
11 were you providing to state and federal
12 agencies?
13    A.    Sales reports and other --
14 other information, per the subpoena.
15 Like I said they pretty much -- the
16 subpoenas that we received, you know,
17 were on an array of subject matters.
18    Q.    Okay.  How long did you work
19 in this department?
20    A.    I worked there until the
21 merger in 2001.
22    Q.    But your responsibilities in
23 that department, would you agree with me,
24 had no diversion control overlap at all,

Page 61

1 right?
2        MR. NICHOLAS:  Object to the
3    form.
4        THE WITNESS:  That's
5    correct.
6 BY MR. CLUFF:
7    Q.    Okay.  So you said there was
8 a merger in 2001?
9    A.    Yes.
10    Q.    Okay.  And that was between
11 Bergen Brunswick and who?
12    A.    Amerisource Health.
13    Q.    Was there any change in your
14 responsibilities at the time of the
15 merger?
16    A.    Yes.
17    Q.    And what was that?
18    A.    I was relocated from Orange,
19 California, to Chesterbrook,
20 Pennsylvania, and I continued to conduct
21 the licensing and information requests
22 for a period of time, but -- but shortly
23 thereafter I took over the east region as
24 a regulatory manager.

Page 62

1  Q.  Okay.  Did you have a job
2  title when you were in the department
3  that handled the subpoenas and other
4  information requests?
5  A.  I did.  I don't recall what
6  it was though.
7  Q.  Okay.  And what years would
8  you have been working in that group, you
9  said it was 1998 to 2001?
10  A.  Roughly.
11  Q.  Okay.  And that was -- that
12  was the job you held before the merger,
13  right?
14  A.  Yes.
15  Q.  Okay.  Did you have any
16  other job responsibilities during that
17  time?
18  A.  We were asked to do --
19  conduct, you know, duties, you know, on
20  various different -- on various subject
21  matters.  But I think that's pretty much
22  what all my responsibilities entailed.
23  That pretty much took all my time.  I was
24  busy.  I was one person doing subpoena

Page 63

1  information requests and handling
2  licensing for all their distribution
3  centers.  That took up -- that took up
4  almost all my time.
5  Q.  Okay.  That's fine.  And
6  then you said after the merger you were
7  relocated from Orange County, California,
8  to Chesterbrook, Pennsylvania, right?
9  A.  Yes.
10  Q.  Okay.  And you said you
11  continued to conduct the licensing and
12  information requests?
13  A.  For a period of time, yes.
14  Q.  Okay.  Do you remember if
15  the department you were working in at
16  that time after the merger had a name?
17  A.  Yeah.  Post merger we became
18  the corporate security regulatory affairs
19  department.
20  Q.  And did you have a job title
21  when you switched over to the new
22  company?
23  A.  At that time, I think I
24  stated before, I think they switched me

Page 64

1  to manager of regulatory compliance.
2  Either manager or supervisor.  I can't
3  remember what the exact title was.
4  Q.  Okay.  So prior to the
5  merger, you don't recall having a job
6  title.  Or you just don't recall what it
7  was.
8  A.  I had a title.  I just don't
9  recall what it was.
10  Q.  Okay.  And you were working
11  in information requests essentially,
12  right?
13  A.  And licensing was a big part
14  of my job as well.
15  Q.  What do you mean by
16  licensing?
17  A.  So I -- I coordinated all
18  licensing for each of our distribution
19  centers.  So we had, I believe, 26
20  distribution centers on the Bergen side
21  and I handled that up to the merger.  And
22  then post merger we picked up another 26
23  distribution centers, I believe, that
24  Amerisource had, for a total of 52

Page 65

1  distribution centers.  So I was
2  responsible for bringing those divisions
3  together, conducting name changes on the
4  licensing, and a lot of other related
5  work, related to that merger.
6  There was a lot of work that
7  was involved when you merge two
8  distribution centers from two different
9  companies.  So I was involved with that
10  for probably the first six months to a
11  year after the merger.  And that was --
12  that was the reason, because I was pretty
13  much the licensing expert for our -- for
14  our company, Bergen Brunswick, and so I
15  coordinated all that.
16  Q.  So it sounds like you -- you
17  bled between two time periods there.  I
18  just want to make sure I understand what
19  we were talking about.
20  So from '98 to 2001, when
21  the company was Bergen Brunswick, in
22  addition to the information requests that
23  you handled, you also managed the
24  licensing for all 26 of Bergen

Page 66

1   Brunswick's distribution centers, right?
2       A.   That's correct.
3       Q.   Okay.  And what did that
4   entail?
5       A.   Renewing the -- the DEA
6   registrations.  I was responsible for
7   bringing Bergen Brunswick distribution
8   centers into a batch renewal, which was a
9   new project that the DEA rolled out in
10  that time frame.
11          And also all the state
12  licenses that the distribution centers --
13  each distribution center held a number of
14  state licenses, maybe, you know, five to
15  ten state licenses that they distributed
16  into.  So -- so basically, all licenses
17  that the distribution centers held,
18  federal and state.
19      Q.   Okay.  And in your job
20  responsibilities where you were handling
21  the information requests and the
22  licensing of distribution centers, you
23  reported directly to Chris Zimmerman?
24      A.   I don't recall who I

Page 67

1   reported to post merger, but at some
2   point I transferred to Steve Mays.
3       Q.   I'm talking about
4   pre-merger.  I'm sorry.
5       A.   I'm sorry.  Pre-merger I
6   believe I was reporting directly to Chris
7   Zimmerman for that entire period.
8       Q.   Understood.  So in 2001 the
9   merger happened, correct?
10      A.   Correct.
11      Q.   And then Bergen Brunswick
12  merged with Amerisource Health, right?
13      A.   Correct.
14      Q.   Do you know what the name of
15  that entity was?
16      A.   The post merger name?
17      Q.   Yeah.
18      A.   That is when
19  AmerisourceBergen Corporation was
20  created.
21      Q.   Okay.  So that is the
22  beginning of ABC then?
23      A.   That's correct.
24      Q.   And when the merger

Page 68

1   occurred, there was a combination of
2   Bergen Brunswick's distribution centers
3   and Amerisource Health's distribution
4   centers, correct?
5       A.   Yes.
6       Q.   Okay.  And you were
7   responsible for integrating the licensing
8   of those two groups of distribution
9   centers?
10      A.   That's correct.
11      Q.   All right.  And that was
12  part of your responsibility as either the
13  manager or supervisor of regulatory
14  compliance?
15      A.   No.  I wasn't -- I don't
16  think it was included in that -- in that
17  job title.  But I kept -- I kept that
18  previous responsibility for a period of
19  time, then it was subsequently
20  transferred to a member of the legal
21  department after -- after I took over my
22  new role as -- I believe it was
23  supervisor of regulatory compliance.
24      Q.   Okay.  So you handled the

Page 69

1   licensing until it moved to legal,
2   correct?
3       A.   Yes.
4       Q.   Do you recall when that was?
5       A.   No.  I think it was -- it
6   was post -- obviously it was post 2001.
7   I think it took us about a year to
8   transfer the licenses to the new name.
9       Q.   Okay.  So at the time of the
10  merger I think you referenced that a new
11  department in ABC was created called the
12  corporate security and regulatory affairs
13  department, correct?
14      A.   That's correct.
15      Q.   Did an entity similar to
16  that exist at Bergen Brunswick prior to
17  the merger?
18      A.   Yes.
19      Q.   And what was that called?
20      A.   Yeah, that was what I don't
21  recall.
22      Q.   Got it.  Do you know if an
23  entity like that existed at Amerisource
24  Health prior to the merger?

Page 70

1    A.   Yes, it did.
2    Q.   Okay.  Do you know what that
3 was called?
4    A.   No, I don't recall that
5 either.
6    Q.   But out of the merger came
7 the CSRA, correct?
8    A.   That's correct.
9    Q.   All right.  And you became a
10 supervisor of compliance?
11    A.   I think it was the
12 supervisor of regulatory compliance, yes.
13    Q.   And what were your
14 responsibilities as a supervisor of
15 regulatory compliance?
16    A.   I was assigned the east
17 region.  So I basically was responsible
18 for all regulatory and security
19 requirements for my distribution centers.
20 And I also conducted audits of my
21 distribution centers, as well as
22 distribution centers outside of my
23 region.
24    Q.   What -- what states were in

Page 71

1 the east region if you can recall?
2    A.   The breakdown of each region
3 has shifted over the -- over that period
4 of time.  So I don't recall what the
5 region consisted of when I was initially
6 assigned it.
7    Q.   What was involved in being
8 responsible for regulatory requirements
9 for your distribution centers?
10    A.   Basically all of security
11 requirements.  We also conducted OSHA
12 audits.  So it really entailed everything
13 the DEA would do if they came into our
14 distribution center and conducted an
15 audit.  And so we would basically oversee
16 all of the state and federal requirements
17 from a regulatory and security
18 standpoint.  And we would conduct an
19 audit and we would just do internal
20 audits and -- and we would correct any
21 deficiencies that we identified.
22    Q.   What time period were you
23 employed as the regulatory compliance
24 supervisor?

Page 72

1    A.   I don't recall the exact
2 dates.
3    Q.   Can you give me a ballpark
4 on how long you were that -- were in that
5 position?
6    A.   Well, the regions changed
7 and shifted over time, and my title
8 shifted over time.  But I basically held
9 that general responsibility from
10 approximately 2002 until 2015.
11    Q.   Okay.  Can you name any
12 states that were in the east region in
13 2001?
14    A.   Pretty much as far northeast
15 as you can go.  Maine, Massachusetts,
16 Rhode Island, New York, Rhode Island, New
17 Jersey, Pennsylvania, certainly North
18 Carolina.
19    Q.   How about Florida?
20    A.   No, I don't believe that was
21 included.  That was part of the south
22 region I believe.
23    Q.   South region.
24        What about Ohio?

Page 73

1    A.   I don't recall.
2    Q.   How many regions were there
3 at the time?
4    A.   That also shifted over time.
5    Q.   How about in 2001?  How many
6 regions were there?
7    A.   I don't recall.
8    Q.   Okay.  How many regions are
9 there today?
10    A.   Again, it's outside of my
11 area.  I believe there's four regions.
12 But I could be -- I could be mistaken.
13 Again, it's not really something that I
14 focus on in my current responsibilities.
15    Q.   Were there ever more than
16 four regions?
17    A.   I believe there was five at
18 one time.
19    Q.   So at some point there may
20 have been five.  Now there are four?
21    A.   I'm not sure about that.
22 But I think that may be accurate.
23    Q.   Okay.  Do you know who was
24 responsible for the south region in 2001?

Page 74

1    A.   No.
2    Q.   Do you know who would know
3  that information?
4        MR. NICHOLAS:  Object to the
5    form.
6        Go ahead.
7        THE WITNESS:  I'm sure it's
8    in our files.  I'm sure that --
9    I'm sure we could find it in our
10   documentation.  Steve Mays would
11   know I think.
12 BY MR. CLUFF:
13   Q.   Do you know if Steve Mays
14 was responsible for the Florida -- for
15 the south region in 2001?
16   A.   No.  When I took over the
17 east region, he was the director that I
18 reported to.  So he wouldn't have been
19 directly responsible for the south
20 region.
21   Q.   Do you know how many
22 distribution centers there were in the
23 east region when you took over
24 responsibility for it?

Page 75

1    A.   No, I don't recall that.
2    Q.   Do you remember the names of
3  any of the distribution centers that you
4  were responsible for?
5    A.   I know some of them.
6    Q.   Which ones?
7    A.   Thorofare, New Jersey;
8  Mansfield, Massachusetts; Bethlehem came
9  on after I took over that region.  It's
10 changed -- it shifted so many times in
11 that -- in that multiple-year period.  I
12 just don't recall.
13   Q.   I want to go back to your
14 job responsibilities.  You said you were
15 in charge of regulatory and security and
16 then audits.  Did I get that right, as
17 the supervisor of regulatory compliance?
18   A.   Yes.
19   Q.   Okay.  So what did it mean
20 to be in charge of regulatory compliance
21 for the distribution centers?
22   A.   Well, as I stated, we
23 oversaw all state and federal
24 requirements from a security and

Page 76

1  regulatory standpoint and audited for
2  that.
3        Q.   So that -- does that mean
4  that you were essentially responsible for
5  the cages and the vaults?
6    A.   We had on-site management
7  that were responsible for day-to-day
8  functionality.  But I would go in
9  periodically and audit, you know, for the
10 federal requirements and the state
11 requirements for their day-to-day
12 operations.
13   Q.   Which kind of requirements
14 for day-to-day operations were you
15 auditing?
16   A.   Ensuring the inventories
17 were conducted properly.  We keep
18 perpetual inventories for our controlled
19 substances to ensure that there's no
20 daily or internal theft.  Again, we did
21 OSHA audits.  We would ensure that proper
22 training was conducted.  We could ensure
23 that the procedures were being followed
24 with regards to shipment and receiving of

Page 77

1  controlled substances and prescription
2  drugs, and similar requirements that we
3  maintained.
4    Q.   What do you mean by ensuring
5  that the procedures were being followed
6  with regard to shipments and receiving
7  controlled substances and prescription
8  drugs?
9    A.   Well, our distribution
10 centers have a lot of internal
11 requirements with regard to shipment of
12 controlled substances.

Page 78



16    Q.    Sounds like those are about
17 the security of the product, though,
18 correct?
19    A.    Yes.
20    Q.    Okay.  So what you were
21 auditing as the supervisor of the
22 regulatory compliance -- as a supervisor
23 of the regulatory compliance was really
24 just about, is the distribution center

Page 79

1 following the security regulations for
2 controlled substances in the distribution
3 center, correct?
4       MR. NICHOLAS:  Object to the
5    form.
6       THE WITNESS:  Not just
7    security.  Regulatory as well.  I
8    mean, most of our distribution
9    centers back then were using paper
10    222 forms for shipment and
11    receiving of narcotics.
12       So there's a whole array of
13    federal requirements on a
14    regulatory standpoint that we had
15    to ensure that the distribution
16    centers were following as well.
17       Not all of that specifically
18    covers security.  There's a lot of
19    regulatory requirements that we're
20    required to follow as a
21    wholesaler.
22 BY MR. CLUFF:
23    Q.    Like what?
24    A.    222 forms, making sure that

Page 80

1 they're properly completed.  Receiving of
2 narcotics, we have to make sure that
3 those -- those forms are completed
4 properly.
5       Customer returns, we have to
6 look at the product and make sure that
7 the product, you know, wasn't opened.
8       There was a lot of OSHA
9 requirements that we followed from a
10 security -- safety standpoint.
11       There's a lot of -- there's
12 a lot of state requirements that we have
13 to follow for prescription drugs as well
14 since that is not on a federal
15 jurisdiction.  That's more state
16 jurisdiction.
17       So there's a whole array of
18 state-specific regulations that we also
19 have to follow with regard to
20 prescription drugs.  So we have a very
21 long audit checklist that we follow at
22 that level.
23       So it takes about a full
24 week to conduct those audits.  There's a

Page 81

1 lot of requirements that we have to
2 follow.
3       Q.    So you talked about a number
4 of different regulatory requirements.  Is
5 that all of the regulatory requirements
6 that you were overseeing as a supervisor
7 at that point in time?
8       MR. NICHOLAS:  Object to the
9    form.
10       THE WITNESS:  Yeah, during
11    that period of time, we audited to
12    ensure the distribution centers
13    were following all state and
14    federal regulations.
15 BY MR. CLUFF:
16    Q.    Okay.  At that -- you said
17 during that period of time.  So when you
18 say that period of time, you mean from
19 approximately 2001 until when?
20    A.    Until I was transferred to
21 diversion in 2015.
22    Q.    So in 2015 is the first time
23 that you start doing any diversion work?
24       MR. NICHOLAS:  Object to the

Page 82

1   form.
2        THE WITNESS:  Yes.
3   BY MR. CLUFF:
4        Q.   Okay.  So at the
5   distribution centers, when you were the
6   supervisor, your only focus is the
7   regulatory requirements that you've
8   described to me so far?
9        A.   Well, I --
10       MR. NICHOLAS:  Object to the
11   form.
12       THE WITNESS:  I didn't
13   describe all the requirements.  I
14   gave you an overview of a lot of
15   requirements.  But I said there
16   was a lot of other related
17   responsibilities that we audited
18   for.
19  BY MR. CLUFF:
20       Q.   Okay.  Are there any other
21  regulatory requirements that are more
22  important than the ones you've described
23  to me?
24       MR. NICHOLAS:  Object to the

Page 83

1   form.
2        THE WITNESS:  I wouldn't
3   put -- I wouldn't categorize
4   regulatory requirements as
5   important and non-important.
6   They're all important.
7   BY MR. CLUFF:
8        Q.   Are there any additional
9   regulatory requirements that stand out to
10  you that you haven't described to me yet?
11       A.   There could be.  None that
12  come to mind right now.
13       MR. CLUFF:  Why don't we
14   take a quick break.  We've been
15   going about an hour.  We can all
16   stretch our legs and we'll come
17   back and pick up again, like five,
18   10 minutes.
19       THE VIDEOGRAPHER:  Going off
20   the record.  10:49 a.m.
21       (Short break.)
22       THE VIDEOGRAPHER:  Back on
23   record at 11:15 a.m.
24  BY MR. CLUFF:

Page 84

1        Q.   Mr. Cherveny, you understand
2   that you're still under oath, right?
3        A.   Yes.
4        Q.   Okay.  Great.
5             When we broke last time, we
6   were talking about your responsibilities
7   as the supervisor of regulatory
8   compliance at the newly formed ABC
9   entity, correct?
10       A.   Yes.
11       Q.   Okay.  You said that you
12  held that position from approximately
13  2001-2002 to 2015?
14       A.   Correct.
15       Q.   Okay.  And when you first
16  stepped into that role, you were
17  responsible for the east region, correct?
18       A.   Correct.
19       Q.   Okay.  And did your
20  responsibilities ever increase as a
21  supervisor of regulatory compliance at
22  any time between 2002 and 2015?
23       A.   No.
24       Q.   So you essentially held the

Page 85

1   same job for 13 years?
2        A.   Correct.
3        Q.   And during that entire time,
4   you were responsible for a region of
5   AmerisourceBergen's distribution centers?
6        A.   Correct.
7        Q.   And those responsibilities
8   covered all things related to regulatory
9   compliance and security compliance and
10  audits?
11       MR. NICHOLAS:  Is that -- is
12   it a question?
13  BY MR. CLUFF:
14       Q.   Did I get that right?
15       A.   Well, we would audit
16  according to the audit checklist.  But,
17  yes, it entailed security and regulatory
18  compliance.
19       Q.   So you were responsible for
20  regulatory and security compliance.  And
21  then as part of that responsibility, you
22  would audit the distribution centers,
23  correct?
24       A.   Correct.

Page 86

1    Q.   Okay.  So as the person who
2  was overseeing the regulatory and
3  security compliance, you had to have, I'm
4  assuming, a very thorough understanding
5  of the regulatory requirements for the
6  distribution centers, correct?
7        MR. NICHOLAS:  Object to the
8     form.
9        THE WITNESS:  Yes, I had an
10    understanding of the regulations.
11 BY MR. CLUFF:
12    Q.   And where do those
13 regulations come from?
14       MR. NICHOLAS:  Object to the
15    form.
16       THE WITNESS:  Depending on
17    the jurisdiction, state and
18    federal.
19 BY MR. CLUFF:
20    Q.   Okay.  And for the federal
21 jurisdiction, what is the -- is there a
22 governing statute?
23       MR. NICHOLAS:  Object to the
24    form.

Page 87

1        THE WITNESS:  There are a
2     lot of regulations that -- that
3     apply to what we do as a
4     wholesaler.
5  BY MR. CLUFF:
6     Q.   Okay.  Is there a governing
7  statute?
8     A.   I'm not sure what you mean
9  by governing statute.
10    Q.   Okay.  Is there a statute at
11 the federal level that creates the
12 regulatory requirements you're referring
13 to?
14       MR. NICHOLAS:  Object to the
15    form.
16       THE WITNESS:  I know there
17    was Title 21 that the regulations
18    are contained in.
19 BY MR. CLUFF:
20    Q.   What's Title 21?
21       MR. NICHOLAS:  Object to the
22    form.  No lawyer.  Go ahead.
23       THE WITNESS:  It's the --
24    it's the regulation that the --

Page 88

1     that the -- it's the title that
2     the regulations that we follow are
3     basically under.
4  BY MR. CLUFF:
5     Q.   Is the Controlled Substance
6  Act part of Title 21?
7     A.   I'm not sure.
8     Q.   Are you familiar with the
9  term "Code of Federal Regulations"?
10    A.   Yes.
11    Q.   What's your understanding of
12 the Code of Federal Regulations?
13       MR. NICHOLAS:  Object to the
14    form.
15       THE WITNESS:  The Code of
16    Federal Regulations is what the
17    DEA utilizes to -- to outline what
18    we're required to do from a
19    federal regulatory standpoint.
20 BY MR. CLUFF:
21    Q.   Have you ever heard of the
22 Controlled Substances Act?
23    A.   Yes.
24    Q.   Where have you heard of it?

Page 89

1     A.   I don't recall.
2     Q.   You don't recall.
3        You understand that
4  AmerisourceBergen sells controlled
5  substances, right?
6     A.   Yes.
7     Q.   And you don't recall when
8  you've heard the term "Controlled
9  Substances Act" before?
10    A.   I don't recall the initial
11 time that I heard that.
12    Q.   Is it something that you're
13 familiar with in your work though?
14    A.   More of its existence, yes.
15    Q.   So from 2002 to 2015, you
16 described the regulatory and security
17 compliance responsibilities as
18 essentially making sure that the
19 regulations regarding vault security and
20 cage security were being followed,
21 correct?
22       MR. NICHOLAS:  Object to the
23    form.
24       THE WITNESS:  Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 90

BY MR. CLUFF:

1   Q.   Okay.  You also mentioned
2   Form 222; is that right?
3       A.   Yes.
4       Q.   Okay.  What's a Form 222?
5       A.   It's a narcotic order form.
6       Q.   And what was your regulatory
7   compliance responsibility regarding order
8   forms?
9       MR. NICHOLAS:  Object to the
10      form.  Go ahead.
11      THE WITNESS:  We would -- we
12      would review a number of 222 forms
13      as part of the audit.
14  BY MR. CLUFF:
15      Q.   So you weren't doing
16  anything with them on a daily basis.  You
17  interacted with them while you were
18  auditing distribution centers?
19      A.   I'm not sure what you mean
20  by interacted with them.
21      Q.   Did you ever fill out a
22  Form 222?
23      A.   Never.

Page 91

1       Q.   Except for when you were
2   conducting an audit, were you ever
3   required to review Form 222s?
4       A.   Yes, we reviewed Form 222
5   forms.
6       Q.   As a part of audits or as
7   part of your regular responsibilities?
8       A.   As part of the audit.
9       Q.   Okay.  Aside from vault and
10  cage security, and Form 222s, I think you
11  also mentioned just like physical
12  security of -- physical security of the
13  distribution centers.  Did I get -- is
14  that correct?
15      MR. NICHOLAS:  Object to the
16      form.
17      Are you talking about
18      throughout his entire testimony or
19      just --
20  BY MR. CLUFF:
21      Q.   From 2002 to 2015 when you
22  were the supervisor of regulatory
23  compliance, I'm just trying to understand
24  the scope of your regulatory compliance

Page 92

1   responsibilities.  I'm just trying to
2   make sure I understand what you've
3   explained to me as being the scope of
4   your duties.  Does that make sense?
5       A.   Yes.
6       Q.   Okay.  So again, we talked
7   about the vault and cage security,
8   Form 222, and now I'm asking about
9   physical security at the distribution
10  centers.  That was another area of your
11  responsibility?
12      A.   Yeah, to audit for that.
13      Q.   To audit for that.
14      A.   Yes.
15      Q.   So you were not in charge of
16  security.  You just audited security?
17      A.   Well, I audited the
18  distribution centers.  The compliance
19  manager reported to me and they were
20  responsible for it, for the distribution
21  centers within my region.
22      Q.   And I also recall that --
23  that you were responsible for auditing
24  receipts of shipments and shipments that

Page 93

1   went out to customers, right?
2       A.   That procedures were
3   followed regarding those operations, yes.
4       Q.   What procedures were you
5   auditing?
6       A.   There's various procedures.
7       Q.   Can you describe some to me?
8       A.   As I stated before, receipts
9   of controlled substances have to be
10  identified upon receipt.  They have to be
11  verified and they have to be maintained
12  under constant supervision.  There's
13  multiple requirements we had internally
14  that I don't have in front of me.  So
15  that's just the basic requirements that
16  they have.
17      Q.   You were the guy that was
18  responsible for auditing these practices,
19  right?
20      MR. NICHOLAS:  Object to the
21      form.  Go ahead.
22      THE WITNESS:  Yes.
23  BY MR. CLUFF:
24      Q.   So I'm just trying to

Page 94

1  understand what you know about the
2  procedures that you were auditing.  Does
3  that make sense?
4       MR. NICHOLAS:  Object to the
5  form.
6       THE WITNESS:  Yes.
7  BY MR. CLUFF:
8       Q.   Okay.  So you said shipments
9  and receipts.  So you audited the
10 procedures to make sure they were being
11 followed, correct?
12      A.   Yes.
13      Q.   Okay.  And then I believe
14 another area that you talked about
15 auditing was order filling; is that
16 correct?
17      A.   Well, order filling was,
18 yeah, the -- the process of -- of filling
19 an order that's going to be shipped.  So
20 we had limited responsibility.  That was
21 mostly operations.  But there were some
22 things that tied to regulatory.
23      Q.   Okay.  So you would have
24 audited the regulatory compliance of the

Page 95

1  order-filling process, essentially making
2  sure that the pills that were on the
3  shelves in the vaults or the -- the
4  cages, got onto the order pallet
5  correctly and got to the customer, right?
6       A.   Yeah, in accordance with our
7  internal policy.
8       Q.   Okay.  What internal policy
9  was that?
10      A.   Policies and procedures with
11 regard to regulatory compliance.
12      Q.   Can you describe what the
13 policy or procedure was around filling an
14 order out of the cages or vaults?
15      A.   It was so long ago, I
16 wouldn't feel comfortable talking about
17 the regulation without it being in front
18 of me.
19      Q.   Would you --
20      A.   Or the policy rather.
21      Q.   You were in charge of
22 auditing that policy between 2002 and
23 2015, correct?
24      A.   Yes.

Page 96

1       Q.   So you worked with that
2  policy for 13 years?
3       A.   Yes, I did.
4       Q.   And you can't recall it?
5       MR. NICHOLAS:  Object to the
6  form.
7  BY MR. CLUFF:
8       Q.   You can answer my question.
9       A.   I recall it in a general
10 sense, but without having that in front
11 of me, those policies evolve over time.
12 So I wouldn't feel comfortable, you know,
13 discussing that as it might not be the
14 same as it was when I was doing it.  Plus
15 it was years ago.
16      Q.   It was three years ago,
17 correct?
18      A.   Yes.
19      Q.   I'm entitled to understand
20 your general sense of it that you just
21 testified to having.  So please explain
22 to me your general sense of that policy
23 and procedure.
24      A.   With regards to what

Page 97

1  specific operation?
2       Q.   The filling of orders out of
3  the cages and vaults.
4       A.   So the -- the cage and the
5  vault has order fillers that -- that --
6  whose responsibility is that they -- that
7  they take the product, they put them in
8  the totes according to customer orders.
9  And depending on if it's cage or vault,
10 they will -- they'll fill the order.
11 There's, in some cases, a double-check to
12 make sure that the order is accurate.
13 And then at some point those orders get
14 strapped and transferred to the shipping
15 dock for shipment.  There's a lot of
16 internal components to that.
17      Q.   Sure.  So as the supervisor
18 of regulatory compliance, your job was to
19 make sure that the distribution center
20 employees were going through that process
21 correctly, right?
22      A.   Correct.
23      Q.   Okay.  So I've got this list
24 down.  You let me know if there's

Page 98

1 anything else you want to add to it.
2        As the supervisor of
3 regulatory compliance, your
4 responsibility was to essentially ensure
5 that the distribution centers were
6 following all of the regulations, the
7 regulatory regulations that govern the
8 distribution of controlled substances,
9 right?
10        MR. NICHOLAS:  I'm going to
11     object to the form.  Are you
12     reading him a list or what?
13        MR. CLUFF:  I'm asking him a
14     question, Bob.
15        MR. NICHOLAS:  Right.
16        Object to the form.  Go
17     ahead.
18        THE WITNESS:  I mean, we --
19     we followed our internal policies
20     and procedures and we had an audit
21     checklist that was, I think,
22     spanned over 200 questions and
23     multiple sections.  So what I've
24     covered here is just a general

Page 99

1     overview.  But, you know, without
2     having that audit checklist in
3     front of me, I mean I can't really
4     determine that there's -- you
5     know, I haven't covered every
6     single component to the program.
7 BY MR. CLUFF:
8     Q.    But some of the ones that
9 you've highlighted are vault and cage
10 security, correct, correct order forms,
11 physical security, shipping and receiving
12 controlled substances, and order filling.
13        Were there any other areas
14 of that audit checklist that you felt
15 were significant in your role as a
16 supervisor in relation to
17 AmerisourceBergen distributing controlled
18 substances?
19        MR. NICHOLAS:  Object to the
20     form.
21        THE WITNESS:  Yeah, there
22     were a lot of other components.
23     They were all -- they are all
24     significant.

Page 100

1 BY MR. CLUFF:
2     Q.    So all 200 questions on that
3 form are significant?
4        MR. NICHOLAS:  Object to the
5     form.
6        THE WITNESS:  Yeah, I would
7     agree with that.
8 BY MR. CLUFF:
9     Q.    But you can't recall what
10 they are today?
11     A.    Well, there's return
12 procedures, there's PDMA requirements,
13 there's physical security.  There's a
14 number of sections that we audited for.
15     Q.    Physical security is one we
16 talked about already though, correct?
17 Okay.
18        What other internal
19 procedures were you auditing?
20     A.    Other than what I've
21 covered?
22     Q.    Yeah.
23     A.    There were like -- there was
24 multiple sections that we covered.

Page 101

1     Q.    What were some of the
2 sections?
3     A.    Other than what I've
4 covered?
5     Q.    Yes.
6     A.    Well, diversion is one
7 section.
8     Q.    What's diversion?
9     A.    What do you mean by that
10 question, what's diversion?  You want a
11 definition?
12     Q.    I've been talking to you
13 about the audit that you performed on
14 distribution centers in your role as the
15 supervisor of the regulatory compliance
16 department, or supervisor of regulatory
17 compliance.
18        And we've gone through a
19 number of responsibilities that the
20 distribution centers had that you were
21 auditing.  And we've gone through a list.
22 And I asked you if there were any others.
23 You then told me that diversion was one.
24        So it's the first time that

Page 102

1 I heard that word referred to in your job
2 responsibilities today. I'm asking you,
3 what is diversion?
4     MR. NICHOLAS: I'll object
5 to the form of the question.
6     MR. CLUFF: Do not coach
7 this witness.
8     MR. NICHOLAS: All I'm going
9 to do is object to the form of the
10 question.
11     Long speech before the
12 question.
13     Go ahead.
14     THE WITNESS: So you're
15 asking me what diversion is?
16 BY MR. CLUFF:
17   Q. Yeah.
18   A. Diversion is the transfer of
19 controlled substances into illegal
20 channels.
21   Q. Okay. So you were
22 responsible for auditing diversion at the
23 distribution centers?
24   A. We --

Page 103

1     MR. NICHOLAS: Object to the
2 form.
3     Go ahead.
4     THE WITNESS: We completed
5 the audit checklist that covered
6 diversion. That's correct.
7 BY MR. CLUFF:
8   Q. Who's "we"?
9   A. The auditors.
10   Q. Okay. Who were the
11 auditors?
12   A. They varied over the time
13 that I held that job.
14   Q. What are some of their
15 names?
16   A. Greg Madsen, Cathy Marcum.
17 Today or during the time that I held the
18 job?
19   Q. During the time that you
20 held the job.
21   A. Erica Burwell. That was it.
22 There was four of us.
23   Q. What area was Greg Madsen
24 responsible for?

Page 104

1   A. Like me, his region shifted,
2 I think, over the period of the time that
3 we held that job. Generally over the
4 west region, I believe.
5   Q. West region?
6   A. I think for a large part of
7 the time.
8   Q. Was he ever responsible for
9 the region that included Florida?
10   A. I don't believe so.
11   Q. What about Cathy Marcum?
12 What regions was she responsible for?
13   A. I don't recall over that
14 period of time. They shifted.
15   Q. Is Cathy Marcum still
16 responsible for a region at
17 AmerisourceBergen?
18   A. She works for Steve Mays.
19 I'm not sure what her specific
20 responsibilities are at this time.
21   Q. What about Erica Burwell?
22 Do you know what region she was
23 responsible for?
24   A. Again, it shifted over a

Page 105

1 period of years.
2   Q. Can you tell me which
3 regions?
4   A. I believe she was
5 responsible for the south region at one
6 time.
7   Q. So she would have been
8 responsible for Florida?
9   A. At one time, yeah.
10   Q. Okay. Do you know when Ms.
11 Burwell began working for
12 AmerisourceBergen?
13   A. No, I don't recall that.
14   Q. Is she still employed at
15 AmerisourceBergen?
16   A. No.
17   Q. Do you know when she left
18 the company?
19   A. No, I don't recall.
20   Q. Do you know if anyone else
21 has been responsible for the south region
22 in the time that you've been employed by
23 AmerisourceBergen from 2002 to the
24 present?

Page 106

1　　A.　I'm not really sure who is
2　responsible for it now.  Like I said, it
3　shifted.
4　　Q.　Do you know if anybody
5　besides Erica Burwell were responsible
6　for it during the time that you were a
7　supervisor?
8　　A.　Over the roughly 13 years
9　that I held that job, I don't recall
10　anybody else who had the south region
11　other than Erica Burwell.  It could have
12　been some other people that took over
13　Orlando, but I don't recall.
14　　Q.　So we got to those names
15　because you mentioned that "we," the
16　regional supervisors, audited diversion
17　at the distribution centers.
18　　　　What were they looking at
19　when they audited the distribution
20　centers about diversion?
21　　A.　There were questions on the
22　audit checklist that covered that
23　component of the program.
24　　Q.　Do you remember what some of

Page 107

1　the questions were?
2　　A.　I think there was a daily
3　activity report that the compliance
4　manager had to complete and sign.
5　　Q.　So you would have been
6　looking at those reports?
7　　A.　Yes, as the auditor.
8　　Q.　Just to double-check that
9　they were being filled out?
10　　A.　Yeah, and they were filled
11　out properly.
12　　Q.　Okay.  So making sure they
13　were complete?
14　　A.　Yes.
15　　Q.　And that they had, what,
16　accurate information?
17　　A.　Yes.  We would -- we would
18　audit them to make sure that they were
19　completed per policy.
20　　Q.　What are some of the other
21　things that you were looking at in terms
22　of diversion at the distribution centers
23　while you were conducting audits?
24　　A.　Another component was

Page 108

1　training.
2　　Q.　What were you looking at
3　about training?
4　　A.　Just ensure that it was
5　completed per policy.
6　　Q.　So based on that question,
7　there was an AmerisourceBergen policy
8　about training distribution center
9　associates about diversion?
10　　　　MR. NICHOLAS:  Object to the
11　　form.
12　　　　Go ahead.
13　　　　THE WITNESS:  Yes, I believe
14　　there was.
15　BY MR. CLUFF:
16　　Q.　And you would have been
17　responsible for auditing the training
18　processes for approximately 13 years,
19　correct?
20　　A.　Yes.
21　　Q.　Do you recall, based on your
22　13 years of experience auditing training,
23　what the training policy was?
24　　A.　Well, there was different

Page 109

1　training for different personnel.  So we
2　would ensure that the appropriate
3　training was conducted in the time period
4　that it was required for the correct
5　associates.
6　　Q.　Were there different time
7　periods for different associates?
8　　A.　I don't recall.  I believe
9　it was an annual requirement.
10　　Q.　So generally distribution
11　center associates were required to be
12　trained annually, right?
13　　A.　I believe so.
14　　(Brief interruption.)
15　　　　MR. CLUFF:  Off the record
16　　for a second.
17　　　　THE VIDEOGRAPHER:  Going off
18　　the record, 11:36 a.m.
19　　(Brief pause.)
20　　　　THE VIDEOGRAPHER:  Back on
21　　record, 11:36 a.m.
22　BY MR. CLUFF:
23　　Q.　I want to go back to the
24　other regional supervisors who were in

Highly Confidential - Subject to Further Confidentiality Review

Page 110

charge of auditing.  You said that you
believed that Erica Burwell was
responsible for the Florida -- the south
region until some other people took over.
Do you know who would have taken over?
        A.   I don't recall.  I believe
Erica was in charge of that region for --
for the majority of the time, if not all
of the time.
        Q.   Is there any reason that the
south region stands out to you as
somebody taking over?
        A.   No.  It would just be a
normal shift in the -- in the regional
break down.  Obviously when she left the
company somebody else took over that
region.
        Q.   Do you recall who that is?
        A.   I don't recall.
        Q.   Is there any reason that the
south region would stand out to you
compared to any other region?
        A.   Not from an audit
standpoint, no.

Page 111

        Q.   There were no significant
events in the south region from an
auditing standpoint that would concern
you?
            MR. NICHOLAS:  Object to the
        form.
            Could you put a time period
        on this?
BY MR. CLUFF:
        Q.   You can answer my question.
        A.   Yeah, I would ask you to
rephrase the question with a little more
detail.
        Q.   We talked earlier about the
fact that you're not entitled to change
your answer based on objections that your
attorney makes unless you're specifically
instructed not to answer my question.
        I'm going to put a time
frame on this question, but I think you
understand that I'm talking about your
time as supervisor of regional
compliance -- of regulatory compliance.
You told me that was between 2002 and

Page 112

2015.  So we can use your dates for your
job responsibilities, and I would ask you
during that time, was there any reason
that the south region stood out to you
from a -- from an audit standpoint?
        A.   No.  From an audit
standpoint I can't really think of
anything that would have impacted me as
an auditor.
        Q.   Is there anything that would
have impacted AmerisourceBergen from your
standpoint as an auditor in the south
region between 2002 and 2015?
            MR. NICHOLAS:  Object to the
        form.
            THE WITNESS:  I can't speak
        to what the corporation would
        have -- would have thought
        regarding -- regarding audit
        standpoint.
BY MR. CLUFF:
        Q.   Okay.  I don't think that's
the question that I asked.  You had
experience as an auditor looking at a

Page 113

number of different aspects of the
distribution center business, correct?
        A.   Correct.
        Q.   One of them was diversion,
right?
        A.   Yes.
        Q.   Okay.  You also have a long
history with AmerisourceBergen regarding
licensing of the distribution centers,
correct?
        A.   Yes.
        Q.   Would you agree with me that
you are very fluent in the licensing
requirements for a distribution center?
        A.   Yes, I would agree with
that.
        Q.   And based on your auditing
of regulatory compliance at the
distribution centers, would you also
agree with me that you're very familiar
with the regulatory requirements the
distribution centers have?
        A.   Yes.  I am very familiar
with that.

Page 114

```
1    Q.   Are you aware of any events
2  in the south region from a licensing or
3  regulatory compliance point of view that
4  would concern you?
5       MR. NICHOLAS:  Object to the
6  form.
7       THE WITNESS:  Yes.  Events
8  did occur that impacted the south
9  region.
10 BY MR. CLUFF:
11   Q.   What events?
12   A.   I recall that in 2007 the
13 Orlando distribution center had their DEA
14 license suspended.
15   Q.   So previously I asked you if
16 there was anything that happened in that
17 region that concerned you from an
18 auditing standpoint.  And you said no.
19   A.   That's correct.
20   Q.   So is your answer that the
21 suspension of a distribution center's
22 license doesn't concern you?
23       MR. NICHOLAS:  Objection.
24 It's just arguing.
```

Page 115

```
1       MR. CLUFF:  It's a question,
2  Bob.
3       MR. NICHOLAS:  Go ahead.
4  It's just arguing.  Stalling.
5       MR. CLUFF:  Bob, I'm allowed
6  to ask argumentative questions.
7  It's a deposition.  Don't coach
8  this witness.
9       MR. NICHOLAS:  I'm not --
10 that's not coaching.  I just said
11 you're arguing.  Period.
12 Objection.
13      Go ahead.
14      THE WITNESS:  I don't think
15 that the -- that the action taken
16 against that distribution center
17 affected my -- from an audit
18 standpoint.  So that's the
19 question that I was answering.
20      My audits -- my audits were
21 conducted regardless of what
22 action is taken on a distribution
23 center.
24 BY MR. CLUFF:
```

Page 116

```
1    Q.   Have there ever been any
2  actions against registrations of
3  distribution centers in the regions that
4  you were responsible for between 2002 and
5  2015?
6    A.   Yeah.  Various actions were
7  taken on my distribution centers through
8  that period.
9    Q.   Okay.  What actions were
10 taken against your distribution centers?
11   A.   Over a 13-year period?
12   Q.   Yes, please.
13   A.   We had multiple DEA audits
14 during -- during that period of time,
15 multiple state audits during that time.
16 I couldn't give you specifics on actions
17 that were taken in all distribution
18 centers that spans such a long period of
19 time.  I don't recall.
20   Q.   Were there ever any
21 suspensions of a distribution center's
22 license in your regions?
23   A.   Not that I recall.
24   Q.   Were there any
```

Page 117

```
1  investigations of diversion at any of the
2  distribution centers within your regions
3  between 2002 and 2015?
4       MR. NICHOLAS:  Object to the
5  form.
6       THE WITNESS:  Yes.
7  BY MR. CLUFF:
8    Q.   What were some of those?
9    A.   I can't speak to them in
10 detail.  Diversion, internal thefts,
11 in-route thefts were investigations that
12 we routinely conducted through that
13 period.
14   Q.   So would you agree with me
15 that if a theft occurs inside of
16 AmerisourceBergen, that would constitute
17 diversion?
18   A.   Yes, that would qualify as
19 diversion.
20   Q.   So AmerisourceBergen was
21 essentially investigating diversion
22 within its own company while you were
23 working as a regional supervisor from
24 2002 to 2015?
```

Page 118

1   MR. NICHOLAS: Object to the
2   form.
3   THE WITNESS: Yes. Internal
4   theft was a common occurrence that
5   we investigated for.
6   BY MR. CLUFF:
7   Q. What happened to those pills
8   that were stolen?
9   MR. NICHOLAS: Object to the
10  form. Go ahead.
11  THE WITNESS: In many cases
12  they were recovered. If they
13  weren't recovered, there's no way
14  for us to know what -- what
15  happened to them.
16  BY MR. CLUFF:
17  Q. Do you think they ended up
18  in the illegal market?
19  MR. NICHOLAS: Object to the
20  form.
21  THE WITNESS: There's no way
22  for me to speculate what -- what
23  happened to those products that
24  were stolen.

Page 119

1   BY MR. CLUFF:
2   Q. What do people usually do
3   with products that they steal?
4   MR. NICHOLAS: Object to the
5   form of the question.
6   THE WITNESS: There's no way
7   I could speculate as to what
8   happens to products that are
9   stolen.
10  BY MR. CLUFF:
11  Q. Do you understand that
12  AmerisourceBergen has a regulatory
13  obligation to maintain systems to prevent
14  diversion?
15  MR. NICHOLAS: Object to the
16  form.
17  THE WITNESS: Per the
18  regulation, we're required to
19  monitor customer orders and
20  identify suspicious orders and
21  treat them accordingly. So
22  there's no way for us as a
23  wholesaler to specifically prevent
24  diversion which follow regulation.

Page 120

1   BY MR. CLUFF:
2   Q. You said that "per the
3   regulation we're required to monitor
4   customer orders and identify suspicious
5   orders."
6   And then you said "there's
7   no way for a wholesaler to specifically
8   prevent diversion."
9   Did I get your testimony
10  correctly?
11  MR. NICHOLAS: Object to the
12  form.
13  THE WITNESS: I mean
14  diversion, there's just not enough
15  information that we have. But I
16  would say that the overall goal of
17  our program is to prevent
18  diversion. But specifically we --
19  we monitor for suspicious orders
20  and that's the limit of what we do
21  within my program.
22  BY MR. CLUFF:
23  Q. You said you're familiar
24  with the Controlled Substance Act, right?

Page 121

1   A. I'm familiar with its
2   existence, yeah.
3   Q. Have you ever read it?
4   A. I'm sure at one point I've
5   read it.
6   Q. Are you aware that the
7   Controlled Substance Act imposes upon
8   registrants a regulatory obligation to
9   maintain systems to prevent diversion?
10  MR. NICHOLAS: Object to the
11  form.
12  THE WITNESS: We -- we
13  follow the regulation that
14  requires us to have a system in
15  place to identify suspicious
16  orders. And to prevent those from
17  being shipped and to report them
18  accordingly.
19  BY MR. CLUFF:
20  Q. So then you agree with me
21  that there is a regulatory obligation for
22  wholesalers as registrants to maintain
23  systems to prevent diversion?
24  MR. NICHOLAS: Object to the

Page 122

```
1    form.
2        THE WITNESS:  No, I wouldn't
3    agree with that at all.  We don't
4    have enough information as a
5    wholesaler to identify if
6    diversion is happening.  There's
7    no way for us to know if a
8    possibly suspicious order, if it
9    was shipped, if it was diverted or
10   not.  We're shipping only to
11   licensed entities.  So we just
12   don't have sufficient information
13   to agree with that.
14   BY MR. CLUFF:
15       Q.   I'm asking a different
16   question.  I'm asking about the existence
17   of something, not whether or not you can
18   comply with it as AmerisourceBergen.
19       The question is:  Is there a
20   regulatory obligation that exists in the
21   Controlled Substance Act for registrants
22   to maintain systems designed to prevent
23   diversion.  Yes or no?
24       MR. NICHOLAS:  Object to the
```

Page 123

```
1    form.
2        THE WITNESS:  The regulation
3    might state that the regulation
4    that we follow is designed to
5    prevent diversion, but I'm not
6    familiar enough with the
7    regulation to -- to agree with
8    that or not.  I know that we
9    identify suspicious orders.
10   BY MR. CLUFF:
11       Q.   But it was also, I think,
12   your testimony that said wholesalers just
13   cannot prevent diversion, can they?
14       MR. NICHOLAS:  Object to the
15   form.  Go ahead.
16       THE WITNESS:  No.  As a
17   wholesaler, I would not say that
18   it's our responsibility to prevent
19   diversion.  I would say that we
20   are one component of a closed
21   system for the distribution
22   center -- for the distribution of
23   controlled substance.
24       So when you bring the
```

Page 124

```
1    definition of diversion in, we do
2    the best we can to identify
3    suspicious orders and to block
4    them and report them to the DEA.
5    So I would -- I would stipulate
6    that.
7        It's the DEA's
8    responsibility to -- to look at
9    diversion.  It's our job to -- to
10   identify suspicious orders and to
11   treat them accordingly.
12   BY MR. CLUFF:
13       Q.   So it's a wholesaler's job
14   to identify suspicious orders and treat
15   them accordingly?
16       MR. NICHOLAS:  Object to the
17   form.  Go ahead.
18       THE WITNESS:  Yeah.  If we
19   identify a suspicious order, we
20   would -- we would reject it and
21   report it.
22   BY MR. CLUFF:
23       Q.   All suspicious orders that
24   are identified are rejected?
```

Page 125

```
1        MR. NICHOLAS:  Object to the
2    form.
3        THE WITNESS:  If the order
4    is found to be suspicious, we
5    would reject it and report it.
6    BY MR. CLUFF:
7        Q.   Based on your experience
8    auditing diversion control practices at
9    distribution centers, what constitutes a
10   suspicious order?
11       A.   Okay.  The definition of a
12   suspicious order is an order of unusual
13   size, frequency or deviating from the
14   normal pattern.
15       Q.   Is that a definition you
16   understand from reading federal
17   regulations?
18       A.   Yes.
19       Q.   On a day-to-day basis, if
20   you were auditing a distribution center's
21   practice of identifying suspicious
22   orders, what would you be looking at?
23       A.   I'm sorry, repeat that?
24       Q.   Sure.
```

Page 126

1    So you conducted audits of
2 distribution centers, right?
3    A.   Under that role, yes.
4    Q.    And distribution centers are
5 engaged in diversion control work?
6    MR. NICHOLAS:  Object to the
7    form.
8    THE WITNESS:  In a limited
9    capacity at the distribution
10    center level, yes.
11 BY MR. CLUFF:
12    Q.   Are they looking for
13 suspicious orders?
14    A.   What time period are you
15 talking about?
16    Q.   Between 2002 and 2015.
17    A.   During that period of time,
18 I would say that the -- they were
19 managing their responsibilities under the
20 audit program.
21    But when you say that they
22 were monitoring for suspicious orders, I
23 believe during that period of time the
24 determination of an order to be

Page 127

1 suspicious would be handled by a
2 different group.
3    Q.   So I didn't say that they
4 were monitoring suspicious orders.  I
5 asked you if they are monitoring for
6 suspicious orders at the distribution
7 center level between 2002 and 2015.
8    MR. NICHOLAS:  Object to the
9    form and the commentary.  Go
10    ahead.
11    THE WITNESS:  Yeah, they
12    were -- they were performing
13    responsibilities that were related
14    to diversion identification.
15 BY MR. CLUFF:
16    Q.   What are those?
17    A.   Over that period of time, I
18 wasn't directly responsible for the
19 diversion program.  So -- and it's
20 evolved.  For a period of time it was --
21 it spanned over years, so I couldn't tell
22 you specifically how that changed over
23 the years or specifically what
24 responsibilities they had.  It's been so

Page 128

1 many years that I was doing that.
2    Q.   Let's back up for a second.
3    You were in charge of
4 auditing the regulatory compliance of
5 distribution centers in the east region
6 between 2002 and 2015.  Does that sound
7 right?
8    A.   Yes.
9    Q.   And one of the areas you
10 audited at the distribution center level
11 was diversion control, right?
12    A.   Yes.
13    Q.   Does diversion control
14 involve monitoring for suspicious orders?
15    MR. NICHOLAS:  Object to the
16    form.
17    THE WITNESS:  Yes, it does.
18 BY MR. CLUFF:
19    Q.   Were distribution centers
20 monitoring for suspicious orders as part
21 of their diversion control
22 responsibilities?
23    A.   During that period of time
24 they were.

Page 129

1    Q.   What were they doing to
2 monitor for suspicious orders?  Actually,
3 strike that.
4    What portion of their
5 activities monitoring for suspicious
6 orders did you audit?
7    A.   I audited to make sure that
8 the -- and again, this is something
9 that -- that was a long time ago and it's
10 evolved over time.  Those questions
11 changed from 2002 to 2015, so those
12 responsibilities evolved.  So I wouldn't
13 feel comfortable going into specific
14 responsibilities that the distribution
15 centers had with regards to that.
16    Q.   Okay.  When you say a long
17 time ago, your responsibility as a
18 regional supervisor or regional director
19 ended three years ago, right?
20    A.   Yes.
21    Q.   Is that a long period of
22 time to you?
23    MR. NICHOLAS:  I'll object
24    to the form.

| Page 130 |
|---|
| 1    THE WITNESS:  Three years is |
| 2  a long period of time. |
| 3  BY MR. CLUFF: |
| 4    Q.   Compared to 13 years that |
| 5  you were responsible for these jobs? |
| 6    MR. NICHOLAS:  Object to the |
| 7  form. |
| 8    THE WITNESS:  Yes. |
| 9  BY MR. CLUFF: |
| 10    Q.   So the time you spent doing |
| 11  the job is essentially four times as long |
| 12  as it's been since you've stopped doing |
| 13  the job, right? |
| 14    MR. NICHOLAS:  Object to the |
| 15  math.  Go ahead. |
| 16    THE WITNESS:  Yes. |
| 17  BY MR. CLUFF: |
| 18    Q.   Let's break it up though. |
| 19  Maybe that will be easier. |
| 20    So you started as the |
| 21  regional supervisor over regulatory |
| 22  affairs, or regulatory compliance in |
| 23  2001, right? |
| 24    A.   I think it was after 2001. |

| Page 131 |
|---|
| 1    Q.   You're right.  I'm sorry, |
| 2  2002? |
| 3    A.   Roughly. |
| 4    Q.   So how about between 2002 |
| 5  and 2005, that's a three-year period. |
| 6  Were distribution centers during that |
| 7  period of time monitoring for suspicious |
| 8  orders? |
| 9    A.   It was too long ago.  I just |
| 10  don't recall. |
| 11    Q.   Do you recall auditing |
| 12  distribution centers between 2001 and |
| 13  2005? |
| 14    A.   I believe I audited |
| 15  distribution centers during that time. |
| 16    Q.   Do you recall ever auditing |
| 17  diversion control of a distribution |
| 18  center between 2001 and 2005? |
| 19    A.   No, I don't recall auditing. |
| 20  I don't recall what the audit checklist |
| 21  entailed then. |
| 22    Q.   So you don't know one way or |
| 23  the other today as you sit here whether |
| 24  you audited diversion control between |

| Page 132 |
|---|
| 1  2001 and 2005? |
| 2    A.   I'm not saying it didn't |
| 3  happen.  I just don't recall.  It was too |
| 4  long ago. |
| 5    Q.   Understood.  2005 to 2007, |
| 6  do you recall performing audits during |
| 7  that period of time? |
| 8    A.   I was performing audits |
| 9  during that period of time. |
| 10    Q.   And that would still have |
| 11  been in the east -- the east region |
| 12  approximately? |
| 13    A.   I performed audits |
| 14  throughout the country. |
| 15    Q.   Understood.  So you didn't |
| 16  necessarily audit only the region that |
| 17  you were responsible for? |
| 18    A.   That's correct. |
| 19    Q.   Was that -- between 2001 and |
| 20  2015, you conducted audits.  During that |
| 21  period of time would you have conducted |
| 22  audits outside of your region for the |
| 23  entire period of time or for some |
| 24  specified period of time? |

| Page 133 |
|---|
| 1    A.   I would say for the entire |
| 2  period I conducted audits outside of my |
| 3  region. |
| 4    Q.   Did you ever conduct any |
| 5  audits in the south region? |
| 6    A.   Yes. |
| 7    Q.   When? |
| 8    A.   On and off throughout the |
| 9  whole period. |
| 10    Q.   Between 2001 and 2005? |
| 11    A.   I believe it started in |
| 12  2002. |
| 13    Q.   You're right.  I keep saying |
| 14  2002.  My fault. |
| 15    How about between 2002 and |
| 16  2005?  Did you conduct audits in the |
| 17  south region? |
| 18    A.   I don't recall what the |
| 19  schedule was, but I would assume. |
| 20    Q.   So it's likely that you |
| 21  conducted audits in the south region |
| 22  between 2002 and 2005? |
| 23    A.   Yeah, I would assume that I |
| 24  conducted audits in the south region. |

Page 134

1 Q. How about between 2005 and
2 2007? Would you have conducted audits in
3 the south region between 2005 and 2007?
4 A. I don't recall.
5 Q. Earlier when I asked you if
6 you had performed audits in the south
7 region between 2002 and 2005, you said
8 you didn't recall the schedule.
9 There was a schedule for
10 audits?
11 A. Yes.
12 Q. Who was in charge of that
13 schedule?
14 A. I believe Steve Mays.
15 Q. And was it a written
16 schedule?
17 A. Yes.
18 Q. Was it a schedule that Steve
19 Mays created?
20 A. I believe he did during that
21 period of time. It was a long time ago.
22 Q. Okay. And it would have
23 been circulated to auditors somehow?
24 A. Yes.

Page 135

1 Q. Would that have been by
2 e-mail?
3 A. I don't recall.
4 Q. Was there another way that
5 Steve Mays communicated scheduling of
6 audits to auditors?
7 A. It was communicated to us
8 during team meetings. I believe the
9 e-mail probably would have been utilized.
10 Q. So there were meetings about
11 audits as well?
12 A. We would have periodic team
13 meetings.
14 Q. So you would have discussed
15 the schedules at team meetings. Would
16 you have received the paper copy of an
17 audit during the team meeting? Excuse
18 me, a paper copy of a schedule during a
19 team meeting?
20 A. I assume so.
21 Q. And you said e-mail would
22 have been utilized as well, right?
23 A. I would assume so.
24 Q. So those should exist

Page 136

1 somewhere in the world of
2 AmerisourceBergen's documents, correct?
3 MR. NICHOLAS: Object to the
4 form.
5 THE WITNESS: I would
6 assume.
7 MR. NICHOLAS: Go ahead.
8 THE WITNESS: I would
9 assume.
10 BY MR. CLUFF:
11 Q. You don't have any reason to
12 believe that they would have been
13 destroyed, right?
14 A. No.
15 Q. From that schedule of
16 audits, I would be able to determine who
17 audited distribution centers in the south
18 region in any given period of time,
19 correct?
20 A. Yeah, I would assume so.
21 Q. And the same thing would be
22 true for the north region, right?
23 A. Yes.
24 Q. And the south region and the

Page 137

1 west region?
2 A. Yes.
3 Q. Were those an important
4 documents in your work as an auditor?
5 A. Well, they laid out our
6 audit schedule for the next year.
7 Q. So it was a yearly schedule?
8 A. To my recollection it was.
9 Q. Do you recall, based on your
10 work as an auditor working under Steve
11 Mays, how the schedule was set up?
12 That's a bad question.
13 Do you recall in your work
14 as an auditor working under Steve Mays,
15 how he prioritized which distribution
16 centers should be audited?
17 MR. NICHOLAS: Object to the
18 form.
19 Go ahead.
20 THE WITNESS: No, I don't
21 recall how he formulated his audit
22 schedules.
23 BY MR. CLUFF:
24 Q. Are you aware of any

Page 138

1 policies or procedures that dictated the
2 frequency with which audits should
3 happen?
4     A.   No, I don't recall.
5     Q.   Do you know if one ever
6 existed?
7     A.   If what existed?
8     Q.   A policy about the frequency
9 of audits.
10        MR. NICHOLAS:  Object to the
11 form.
12        THE WITNESS:  I don't recall
13     if a specific policy existed
14     regarding the frequency of audits.
15     It may have.
16 BY MR. CLUFF:
17     Q.   Can you give me an estimate
18 on how frequently distribution centers
19 were audited?
20     A.   It would vary.
21     Q.   What would it vary based on?
22        MR. NICHOLAS:  Object to the
23     form.
24        THE WITNESS:  What period of

Page 139

1     time are we talking about?
2 BY MR. CLUFF:
3     Q.   Let's do 2002 to 2005.
4     A.   I have no recollection.
5     Q.   You couldn't say whether it
6 was yearly?
7     A.   No.
8     Q.   How about from 2005 to 2007?
9 How frequently were audits conducted?
10     A.   Again, I don't recall.
11     Q.   How about after 2007, say
12 2007 to 2012?
13     A.   I believe during that period
14 it was normally an annual audit.
15     Q.   Is there some reason that
16 you recall why, after 2007, that it was
17 an annual audit but you don't recall any
18 schedule of audits before 2007?
19     A.   The most recent years that I
20 was regional director, we were generally
21 conducting annual audits of our
22 distribution centers.  I don't recall
23 what it was, when you go back that far --
24 I just don't recall what the schedule was

Page 140

1 during that -- over that period of time.
2     Q.   When did you become the
3 regional director?
4     A.   Title changed to director
5 from supervisor at some point.  I don't
6 recall.
7     Q.   The job responsibilities
8 didn't change?
9     A.   No.
10     Q.   And then when did you become
11 the regional director?
12     A.   Again, I don't recall.
13     Q.   Sometime in the last five
14 years?
15     A.   I don't recall.
16     Q.   Did your job
17 responsibilities change?
18     A.   From the time that I became
19 a director versus prior to that?  I'm not
20 sure I understand the question.
21     Q.   You were a supervisor
22 originally and then became a director,
23 you said, right?
24     A.   Correct.

Page 141

1     Q.   And there was no change in
2 your job responsibilities?
3     A.   No.
4     Q.   Okay.  And then from a
5 director you became a regional director.
6 Was there any change in your
7 responsibilities at that point in time?
8     A.   No.  We were always -- we
9 were regional manager, I think, and then
10 we became -- I think it was either
11 manager or supervisor, and then we became
12 a regional director.  So no change in
13 responsibilities to my recollection based
14 on that title change.
15     Q.   And so your work as a
16 regional director takes you through the
17 end of 2015 or some time in 2015?
18     A.   Takes me to February 2015.
19     Q.   Okay.  And then what was
20 your job in February of 2015?
21     A.   I was reassigned to director
22 of diversion control.
23     Q.   We'll pick up there in a
24 little bit.  Let's go back to this audit

Page 142

1 schedule.
2          Was there a policy or
3 procedure in 2007 that you can recall
4 about the frequency of audits at
5 distribution centers?
6      A.   In the 2007 time frame, I
7 don't remember what the policy contained
8 with regards to frequency of audits.  It
9 was too long ago.  It was a lot of years
10 ago.
11     Q.   But there was a policy about
12 audits?
13         MR. NICHOLAS:  Object to the
14     form.
15         THE WITNESS:  There were
16     general policies that were related
17     to audits, yes.
18 BY MR. CLUFF:
19     Q.   Do you remember any of the
20 numbers of the policies, like 5.1?
21     A.   No.
22     Q.   Isn't that a document that
23 you would have worked with pretty
24 frequently?

Page 143

1      A.   5.1?
2      Q.   No.  Just the policies and
3 procedures governing audits.
4      A.   Yes.
5      Q.   And you don't recall the
6 number of the policy or procedure?
7      A.   We had a lot of policies and
8 procedures.  So I don't recall specific
9 numbers of the policies.
10     Q.   Do you recall if there was a
11 policy or procedure after 2007 that
12 governed the frequency of audits?
13     A.   I believe at some point post
14 2007 a policy was created that was
15 related to the frequency of audits.  But
16 I don't remember when that was created.
17     Q.   So after 2007 your
18 recollection is that a policy was created
19 about the frequency of audits?
20         MR. NICHOLAS:  Object to the
21     form.
22         THE WITNESS:  I believe so.
23 BY MR. CLUFF:
24     Q.   So before that it didn't

Page 144

1 exist?
2      A.   No, I didn't say that.
3      Q.   So it existed before 2007
4 and then it was created in 2007?
5         MR. NICHOLAS:  Object to the
6     form.
7         THE WITNESS:  I would assume
8     that it existed, you know, from a
9     very early point.  But I don't
10     know when it became -- you know,
11     when it was created.  I have no
12     idea.  It was too long ago.  I
13     wasn't responsible for writing
14     policies at that period of time.
15 BY MR. CLUFF:
16     Q.   I just asked you.  Do you
17 recall if there was a policy or procedure
18 after 2007 that governed the frequency of
19 audits.  And I'm reading from the live
20 feed here, and your answer is, "I believe
21 at some point post 2007 a policy was
22 created."
23         Did a policy exist before it
24 was created sometime after 2007?

Page 145

1         MR. NICHOLAS:  Object to the
2     tone and the bickering.
3         Go ahead.
4         THE WITNESS:  I would
5     stipulate that I don't recall when
6     that policy that governed
7     frequency of audits was created.
8     I just know that it existed post
9     2007, because I don't remember
10     prior to that.
11 BY MR. CLUFF:
12     Q.   And you don't recall it's
13 existence before that?
14     A.   I'm not saying it didn't
15 exist.  I just don't remember the audit
16 process during that period of time.  That
17 was a long time ago.
18     Q.   So you don't recall it
19 existing?
20         MR. NICHOLAS:  Object to the
21     form and the bickering.
22         Go ahead.
23         THE WITNESS:  I just don't
24     recall.

Page 146

BY MR. CLUFF:

Q. Do you have a general recollection of this policy that you now recall sometime after 2007 about the frequency of audits, what did it specify about the frequency of audits? How often should they happen?

MR. NICHOLAS: Object to the form.

THE WITNESS: I recall there was generally an annual requirement for a distribution center to be audited.

BY MR. CLUFF:

Q. Was that the same all the way through the end -- or from 2000 -- let me back up. That was poorly worded.

Was that policy consistent from the time that you can recall it existing through 2015?

MR. NICHOLAS: Object to the form.

THE WITNESS: Yeah, I remember that policy existed up to

Page 147

the time I left that position.

BY MR. CLUFF:

Q. Excuse me. Are you aware of any changes to that policy regarding the frequency since you left that position?

A. No.

Q. So it's your best understanding today that distribution centers are still audited on an annual basis?

A. That responsibility has transitioned to a different team. So I can't really speak to how often distribution centers are audited today. Lots of changes have been made to that program.

Q. But your general understanding is that the policy calls for them to be audited annually?

MR. NICHOLAS: Object to the form. Make it a question. You are just making statements. Go ahead.

BY MR. CLUFF:

Page 148

Q. Do you understand my question?

A. I would say at the time I left the position, I believe there was a policy that governed annual audits of distribution centers.

Q. So before we started talking about the frequency, we were talking about diversion control and your audit of diversion control. And also the distribution centers that you recall auditing.

So from 2002 to 2005 you said you recall -- well, you don't specifically recall. But that you assume you audited distribution centers in the south region, correct?

A. For what period of time?

Q. 2002 to 2005.

A. I assume during that period I audited the south region at some point.

Q. How about 2005 to 2007. Would you have audited distribution centers in the south region?

Page 149

A. I would assume.

Q. Do you recall at any point between 2002 and 2015 auditing distribution centers in Florida?

A. Yes. I've audited the Orlando distribution center during that period of time.

Q. Do you recall the date that you audited the Orlando distribution center?

A. No, I don't.

Q. Do you recall auditing your Orlando distribution center between 2002 and 2005?

A. No, not specifically.

Q. Between 2005 and 2007?

A. Nope.

Q. 2007 to 2012?

A. I don't remember specific dates that I may have audited the Orlando DC.

Q. 2012 to 2015?

A. (Gesturing.)

Q. So the only record --

Page 150

1    THE COURT REPORTER: I
2  didn't get an answer, I'm sorry.
3    MR. NICHOLAS: Yeah, let him
4  answer. You are making
5  statements. Let him answer some
6  questions.
7    THE WITNESS: No. No, I
8  don't recall specific dates during
9  that 13-year period that I audited
10  the Orlando distribution center.
11 BY MR. CLUFF:
12   Q.   So the only record of your
13 audit of the Orlando distribution center
14 would come from the audit schedule,
15 correct?
16   MR. NICHOLAS: Object to the
17  form. Go ahead.
18   THE WITNESS: Well, there
19  would be a scheduling that would
20  be the corresponding report that
21  was generated as a result of the
22  audit.
23 BY MR. CLUFF:
24   Q.   Do you recall writing a

Page 151

1  report about your audit of the Orlando
2  distribution center?
3    MR. NICHOLAS: I'm going to
4  interpose an objection to this
5  continuing line of questioning to
6  the extent that we are starting to
7  get clearly outside of the scope.
8    MR. CLUFF: Well, he is a
9  fact witness. There's no scope.
10  I'm asking about his recollection.
11   MR. NICHOLAS: I -- I --
12  I've explained my -- that's fine.
13   MR. CLUFF: I know, I
14  understand that you didn't finish.
15  I'm interrupting you because
16  you're making an improper
17  objection.
18   MR. NICHOLAS: Well, this is
19  not --
20   MR. CLUFF: He's here today
21  to talk about his recollection of
22  facts. He just said that there
23  are two ways that we could figure
24  out whether he had, and when,

Page 152

1  audited the Orlando distribution
2  center.
3    MR. NICHOLAS: Do you want
4  to excuse him so that he's not --
5  you don't -- so you don't feel
6  he's hearing anything that he
7  shouldn't hear --
8    MR. CLUFF: No.
9    MR. NICHOLAS: -- because we
10  can do that if we want to have an
11  argument.
12   Do you want to do that?
13   MR. CLUFF: Bob, he said
14  that the two ways that we could
15  find that out was from the audit
16  schedule and from his report of
17  the audit.
18   And I asked him a
19  foundational question regarding
20  his recollection about whether he
21  wrote a report. That's a purely
22  foundational factual question.
23   MR. NICHOLAS: You don't
24  know what my objection is.

Page 153

1    MR. CLUFF: Okay. Make your
2  objection.
3    MR. NICHOLAS: Do you know
4  what it is? Maybe if you knew --
5  if you know what it --
6    MR. CLUFF: You said outside
7  of the scope. He's not a 30(b)(6)
8  witness.
9    MR. NICHOLAS: Why don't
10  you -- no -- well, that wasn't
11  going to be the nature of my
12  objection, Sterling.
13   MR. CLUFF: You said outside
14  of the scope, Bob. What else is
15  the nature of a scope objection?
16   MR. NICHOLAS: We are
17  talking about Ohio. We are
18  talking about -- we're talking
19  about -- he is a fact witness and
20  at some point you are just moving
21  into -- into a different case with
22  different facts. Okay.
23   So I'm just saying that
24  you're getting to the point where

Page 154

1  you are starting to ask about
2  things that are unrelated to this
3  particular lawsuit. That's all.
4      Had nothing to do with
5  30(b)(6) or facts, so if you can
6  at least -- you can agree or
7  disagree, Sterling, but you have
8  to at least let me complete my
9  objection. Then you can respond.
10      MR. CLUFF: Great.
11      MR. NICHOLAS: Now you can
12  respond.
13 BY MR. CLUFF:
14      Q.   So if I understood your
15  testimony correctly, there are two ways
16  we could figure out when you audited the
17  Orlando distribution center, one is from
18  the audit schedule, right?
19      And then you said, "Or a
20  report."
21      Do you recall writing a
22  report about an audit of the Orlando
23  distribution center?
24      A.   At some point I completed a

Page 155

1  report regarding -- with regards to the
2  audit of the Orlando DC.
3      Q.   Was it a regular practice
4  for auditors to write reports about their
5  audit of distribution centers?
6      A.   Yes, that was -- that was
7  part of the audit process. They would --
8  we would generate reports as a result of
9  the audit.
10      Q.   We talked with Steve Mays,
11  and he -- he said that there was an audit
12  checklist, and you've mentioned an audit
13  checklist. I think you said there's
14  something like 200 questions?
15      A.   Over 200.
16      Q.   That would have been a big
17  stack of paper, correct?
18      Is the report you're talking
19  about, is that different than the
20  checklist that you would have gone
21  through while you were at a distribution
22  center?
23      A.   Yes.
24      Q.   How long did it take to

Page 156

1  write up those audit reports?
2      A.   After the audit was over, it
3  wouldn't take too long. We had to
4  provide a preliminary report pretty quick
5  at the conclusion of the audit. Within a
6  couple days. Within -- within one day of
7  the audit concluding.
8      Q.   And what -- what kind of
9  information would you put into a report?
10      A.   The preliminary report would
11  contain all of the findings that were
12  associated with that audit.
13      Q.   What kind of findings would
14  you include?
15      A.   There were two audits that
16  we would conduct: The security
17  regulatory audit and the OSHA audit. So
18  it would have separate findings for each
19  of those areas.
20      Q.   The OSHA audit would be like
21  workplace safety stuff?
22      A.   Correct.
23      Q.   And then the regulatory
24  audit, that would have been for the

Page 157

1  regulations that govern the distribution
2  of controlled substances, correct?
3      A.   As well as prescription
4  drugs, correct.
5      Q.   Do you think you may have
6  audited the Orlando distribution center
7  more than once?
8      MR. NICHOLAS: Object to the
9  form. Go ahead.
10      THE WITNESS: I recall
11  that -- that I did not audit the
12  Orlando DC too many times. I
13  remember one time specifically
14  that I audited. But I don't
15  remember -- I don't think I
16  audited that division too many
17  times.
18 BY MR. CLUFF:
19      Q.   So more than once?
20      A.   I'm not sure.
21      Q.   You said many times.
22      MR. NICHOLAS: He said he
23  didn't think it was --
24      MR. CLUFF: Bob, I don't

Page 158

1  need you to testify for him.  If
2  he wants to clarify his
3  statement --
4          MR. NICHOLAS:  I'm just --
5          MR. CLUFF:  Bob, it's not
6  your job to clarify his statement
7  for him.  That's his job.
8          MR. NICHOLAS:  You have to
9  stop asking misleading questions.
10         MR. CLUFF:  Bob, I did not
11  ask a misleading question.  I
12  asked a question based on my
13  understanding.
14  BY MR. CLUFF:
15      Q.   If it was an incorrect
16  understanding, sir, please clarify it for
17  me.  And your lawyer is not allowed to
18  testify for you.
19         MR. CLUFF:  Do you
20  understand that today?
21         MR. NICHOLAS:  Most of the
22  testimony today has been by you.
23         MR. CLUFF:  Bob.
24         MR. NICHOLAS:  Go ahead.

Page 159

1  BY MR. CLUFF:
2      Q.   I misspoke.
3          You said you recall one
4  specific instance, if I'm remembering
5  your testimony accurately, of auditing
6  the Orlando distribution center, correct?
7  And I asked you if you remembered more.
8  Do you remember more?
9      A.   There might -- there might
10  have been between one and three times
11  that I audited.  I know for a fact I
12  audited the Orlando DC one time.  I
13  remember that specifically.  There may
14  have been other instances, but I couldn't
15  confirm that here.  Like I said, it was a
16  long period of time.  And I audited many
17  distribution centers.
18      Q.   So definitely one time.
19  Possibly one to three times.
20      A.   Correct.
21      Q.   We have to do that.  We have
22  to get an audible answer from you.  Thank
23  you.
24          So you seem to very

Page 160

1  specifically recall one instance.  When
2  was that?
3      A.   I don't recall.
4      Q.   Was it between 2002 and
5  2005?
6      A.   I have no recollection of
7  when that occurred.
8      Q.   But you very specifically
9  recall it?
10         MR. NICHOLAS:  Object to the
11  form.
12         THE WITNESS:  I recall
13  auditing the -- the Orlando
14  distribution center at one point.
15  I don't remember if there were
16  more.
17  BY MR. CLUFF:
18      Q.   So you -- do you recall
19  going there to the Orlando distribution
20  center any other times when you weren't
21  conducting an audit?
22      A.   I think I went there once
23  for a system conversion.
24      Q.   What's a system conversion?

Page 161

1      A.   We -- we changed systems
2  from time to time.  I believe that it was
3  a transition from Distrack to Metastorm.
4  So that's a system conversion systems
5  used to operate the distribution center,
6  maintain inventories.  I believe I spent
7  a week there as the security responsible
8  individual during that conversion.
9      Q.   When would that have been?
10     A.   I don't recall.
11     Q.   Was it after 2007?
12     A.   I really can't remember.
13     Q.   Is the Metatrack system
14  still in use?
15     A.   It was Distrack to
16  Metastorm.  And no, it's no longer in
17  use.
18     Q.   So med -- okay.  So is
19  Metastorm still in use?
20     A.   No.
21     Q.   Do you know when it was
22  retired?
23     A.   We transitioned from
24  Metastorm to SAP.  I don't recall the --

Page 162

1 the specific schedule that that occurred.
2     Q.  Do you recall that that
3 happened in 2012?
4     A.  I don't recall.
5     Q.  Do you recall if your audit
6 was before or after this conversion from
7 Distrack to Metastorm?
8     A.  No.
9     Q.  Do you recall if it was
10 before or after the conversion from that
11 system to SAP?
12     A.  Well, the -- the conversion
13 from Metastorm to SAP occurred after
14 that. So it was definitely before the
15 conversion to SAP.
16     Q.  So if we could pinpoint on a
17 calendar when the conversion from
18 Metastorm to SAP was, we could narrow
19 down the time period that you audited the
20 Orlando distribution center, right?
21     A.  We can state it would have
22 been before that period.
23     Q.  But you have no recollection
24 when the SAP system went into effect?

Page 163

1     A.  No, not specifically.
2     Q.  Do you -- do you know if it
3 was before 2015?
4     A.  Yes, it was before 2015.
5     Q.  So you audited it, audited
6 the Orlando distribution center before
7 2015?
8     A.  That's correct.
9     Q.  This audit of the Orlando
10 distribution center that you so
11 specifically recall, why do you
12 specifically recall it?
13     MR. NICHOLAS:  Object to the
14     form.
15     THE WITNESS:  I just
16     remember being there.
17 BY MR. CLUFF:
18     Q.  What do you remember about
19 being there?
20     A.  I remember being in Orlando.
21     Q.  That's it?
22     A.  That's it.
23     Q.  Do you remember filling out
24 an audit checklist while you were there?

Page 164

1     A.  I'm sure that one was filled
2 out since I conducted an audit.
3     Q.  Do you remember if it was
4 before or after the license was suspended
5 in Orlando?
6     A.  I don't recall.
7     Q.  Do you remember if there
8 were any specific procedures or policies
9 that Orlando was faulting -- following
10 during that audit that were implemented
11 as a result of the settlement with the
12 DEA in 2007?
13     A.  No.
14     Q.  Is that something you would
15 have audited if they had been in place?
16     MR. NICHOLAS:  Object to the
17     form.
18     THE WITNESS:  If a change
19     was made to the audit protocol
20     then I would have followed it
21     during the audit.
22 BY MR. CLUFF:
23     Q.  If there were policies or
24 procedures that the Orlando distribution

Page 165

1 center was following as a result of the
2 settlement with the DEA, would you have
3 audited those?
4     MR. NICHOLAS:  Object to the
5     form.
6     THE WITNESS:  It would
7     depend if it was part of the audit
8     checklist.
9 BY MR. CLUFF:
10     Q.  Are you familiar with why
11 the Orlando distribution center lost its
12 DEA license?
13     A.  I have a general
14 understanding that the DEA suspended the
15 license because they made the allegation
16 that we were not following the
17 regulation.
18     Q.  Which regulation?
19     A.  To report and identify
20 suspicious orders.
21     Q.  Where did you obtain that
22 general understanding?
23     A.  During the occurrence.
24     Q.  So during the suspension of

Page 166

1 the Orlando distribution center's license
2 you became aware why the registration was
3 suspended?
4        MR. NICHOLAS:  Object to the
5    form.
6        THE WITNESS:  Yeah, I recall
7    the general allegation.
8 BY MR. CLUFF:
9    Q.   Where did you hear about
10 that from?
11    A.   I don't recall.  Big news
12 back then.
13    Q.   It was big news.  People
14 talking about it in the halls?
15        MR. NICHOLAS:  Object to the
16    form and the commentary.
17        Go ahead.
18        THE WITNESS:  There was a
19    lot of discussions surrounding it.
20 BY MR. CLUFF:
21    Q.   Were there meetings about
22 it?
23    A.   Yes.
24    Q.   Were reports written about

Page 167

1 it?
2    A.   None that I'm specifically
3 aware of.
4    Q.   Do you understand that
5 reports may have been written about it?
6        MR. NICHOLAS:  Well, I'll
7    object to the form of that
8    question.
9        Go ahead.
10        THE WITNESS:  I assume so.
11    None that I was directly involved
12    in -- involved with.
13 BY MR. CLUFF:
14    Q.   You wouldn't have
15 participated in discussing the suspension
16 in your role as an auditor?
17        MR. NICHOLAS:  Object to the
18    form.
19        THE WITNESS:  You know,
20    right when that happened, my
21    father passed away, and I had to
22    take a leave of absence.  So when
23    I got back, a lot of that -- a lot
24    of those changes had been -- had

Page 168

1 been completed or were in process,
2 and I was not part of that -- that
3 process.
4 BY MR. CLUFF:
5    Q.   When I asked you if reports
6 were written about the suspension, you
7 said you assume so.
8        Why do you assume that they
9 would have been written?
10        MR. NICHOLAS:  Object to the
11    form.  And of course, Mr. Cluff
12    will be the first to tell you that
13    you shouldn't assume in an answer
14    to a question.
15        So go ahead.
16        THE WITNESS:  When you have
17    an occurrence like that, I would
18    assume that it would, you know,
19    involve a chain reaction and a lot
20    of different departments would be
21    involved in handling the
22    suspension.
23        So I would assume, as a
24    previous auditor, that reports

Page 169

1 would have been generated as a
2 result of the action taken against
3 us.
4 BY MR. CLUFF:
5    Q.   So based on your 13 years of
6 experience as an auditor, your
7 understanding is that an event like the
8 suspension of a distribution center's
9 license would result in the creation of
10 reports about why the suspension
11 occurred?
12        MR. NICHOLAS:  Is that a
13    question?
14        MR. CLUFF:  I'm exploring
15    his understanding, Bob.
16        MR. NICHOLAS:  I just want
17    to hear it in the form of a
18    question.  You're making a
19    statement.
20        MR. PIFKO:  Just say "is
21    that correct."
22 BY MR. CLUFF:
23    Q.   Is that correct?
24        MR. NICHOLAS:  Yeah, say "is

Page 170

1    that correct?"  Okay.  And now I
2    can say object to the form of the
3    question.
4         THE WITNESS:  Yeah, I would
5    assume that a lot of documentation
6    has generated as a result of the
7    suspension.  Not necessarily in
8    report form, but a lot of general
9    documentation.  I wasn't a part of
10   it.  It was all handled above me.
11   So I can't really speak
12   specifically about what
13   documentation was generated.
14   BY MR. CLUFF:
15        Q.   What kind of documentation
16   are we talking about -- or are you
17   talking about?
18        MR. NICHOLAS:  I'll object
19   to the form of the question and
20   caution the witness not to make
21   assumptions.  He should answer
22   questions --
23        MR. CLUFF:  Bob, you've
24   really got to stop coaching his

Page 171

1    witness.  He already testified
2    based on his work experience as an
3    auditor -- it's in the testimony.
4    You can read it -- that he
5    understands that reports like this
6    or documentation about a situation
7    like this would have been created.
8         I get to explore his
9    understanding of that, Bob.  You
10   can make your objection.  You can
11   say form.  You can say foundation.
12   You can say whatever you want.
13   But don't tell this witness that
14   he's not allowed to assume.
15   That's coaching.
16        MR. NICHOLAS:  You have to
17   stop asking misleading questions.
18        Go ahead.  Answer the
19   question if you can.
20   BY MR. CLUFF:
21        Q.   Let me ask this question a
22   different way.
23        You previously said, "Yeah,
24   I would assume that a lot of

Page 172

1    documentation was generated as a result
2    of the suspension."
3         Based on your experience,
4    13 years as an auditor at
5    AmerisourceBergen, what kind of
6    documentation would you have been
7    referring to when you testified to that?
8         MR. NICHOLAS:  Object to the
9    form.
10        THE WITNESS:  To clarify, I
11   wasn't exposed to documentation or
12   at least I don't recall
13   documentation that I was
14   specifically exposed to.  So I'm
15   assuming that documentation was
16   generated.  But I can't speak to
17   any detailed documentation that I
18   was exposed to.
19   BY MR. CLUFF:
20        Q.   I'm not asking about a
21   detailed distribution of documentation.
22   I'm asking, based on your experience as
23   an auditor for 13 years at
24   AmerisourceBergen, what kind of

Page 173

1    documentation you understand would have
2    been created about the suspension in
3    Orlando?
4         A.   I have no idea.
5         Q.   But you anticipate, based on
6    your experience, 13 years at
7    AmerisourceBergen, that documentation
8    would have existed?
9         MR. NICHOLAS:  Hold on.
10   Could you ask it in the form of a
11   question?  It's not Jeopardy.  You
12   just made a statement.  Ask him a
13   question.  Say "is that correct"
14   or "do you agree."
15        MR. CLUFF:  I appreciate the
16   coaching, Bob.  I really do.
17   Thank you.
18        MR. NICHOLAS:  Well, your
19   own guy told you you have to ask
20   in a form of a question.
21        MR. CLUFF:  Bob, seriously?
22   Stop.  Just stop, Bob.  Make your
23   objection for the record.  And I
24   will clarify my question if I need

Page 174

1   to.
2         MR. NICHOLAS:  Objection.
3   Objection.  No question has been
4   stated.
5   BY MR. CLUFF:
6         Q.   Do you anticipate based on
7   your experience as an auditor at
8   AmerisourceBergen for 13 years that
9   documentation would have been created
10  about the suspension?
11        A.   I would assume that
12  documentation was generated as a result
13  of the suspension.
14        Q.   Do you have an
15  understanding, based on your 13 years of
16  experience at AmerisourceBergen, which
17  departments at AmerisourceBergen would
18  have been creating that documentation?
19        A.   The departments that were
20  responsible for regulatory compliance and
21  action like that would have been legal
22  and corporate security regulatory
23  affairs.
24        Q.   Setting legal aside, what --

Page 175

1   what aspects of the regulatory affairs
2   and corporate security department would
3   have been responsible for documenting or
4   producing documentation about the
5   suspension?
6         A.   I don't know.  Like I said
7   it was happening over my head, and I
8   wasn't directly involved in it.  So I
9   can't really state any specific
10  documentation was generated or who
11  generated it or who was involved in it.
12        Q.   Do you know if your boss,
13  Steve Mays, ever participated in any
14  discussions about the suspension in
15  Orlando?
16        A.   I don't recall.
17        Q.   Did you ever talk to Greg
18  Madsen about the suspension in Ohio?
19        A.   I don't recall.
20        Q.   Do you not recall or did it
21  not happen?
22        A.   I think I answered the
23  question.  I don't remember.  It was a
24  long time ago.

Page 176

1         Q.   Did you ever discuss the
2   suspension with Cathy Marcum?
3         A.   Same answer.  I have no
4   recollection of it.
5         Q.   Did you ever discuss
6   suspension with Erica Burwell?
7         A.   No recollection.
8         Q.   Do you know if anybody
9   discussed the suspension with Erica
10  Burwell?
11        A.   Not that I recall.
12        Q.   So you previously
13  testified -- and I want to make sure I
14  understand your testimony correctly --
15  that the suspension was a big event for
16  AmerisourceBergen?
17        MR. NICHOLAS:  Objection.
18  No --
19  BY MR. CLUFF:
20        Q.   Is that correct?
21        MR. NICHOLAS:  Good.
22        THE WITNESS:  Yes, it was.
23  BY MR. CLUFF:
24        Q.   Is it also your testimony

Page 177

1   that you can't recall whether or not
2   anybody talked about the suspension at
3   your level in 2007?
4         MR. NICHOLAS:  Object to the
5   form.
6         THE WITNESS:  I'm sure there
7   was discussion, but I just don't
8   recall any specific conversations
9   during that period of time.
10  BY MR. CLUFF:
11        Q.   Do you know whether or not
12  anybody looked at the audit history for
13  Orlando after the suspension occurred?
14        A.   No.
15        MR. NICHOLAS:  Object to the
16  form.
17  BY MR. CLUFF:
18        Q.   Do you know whether or not
19  anybody looked at the reports that were
20  written about Orlando after the
21  suspension occurred?
22        MR. NICHOLAS:  Object to the
23  form.
24        THE WITNESS:  No.

Highly Confidential - Subject to Further Confidentiality Review

| Page 178 |
|---|

BY MR. CLUFF:

Q.   Do you know whose responsibility it was to review audit reports after they were created in general between 2002 and 2005?

A.   I believe that would have been Steve Mays during that period.

Q.   How about between 2005 and 2007?

A.   Well, it was several people that were involved.  Steve Mays would have been the one responsible for the audit, assigning the audit.  He would have been the first one that we would have discussed it with.

Q.   So Steve Mays was responsible for assigning the audit.  Did I get that correct?

A.   Yes.

Q.   And there were a number of people involved, I think you said, correct?

A.   Yeah, in the -- in the review process there was, yes.

| Page 179 |
|---|

Q.   But he would have been ultimately responsible for reviewing them, because he assigned them; is that right?

A.   Well, he would have been the first step above the auditor that we would have covered the findings with initially concluding that.  But then we would have -- we would run through those findings with the DC as well, so -- from the CSRA standpoint, he was the one that we immediately worked with.

Q.   Do you know if there was anybody else above Steve Mays that was responsible for reviewing audit reports?

A.   I don't remember what the structure was back then.

Q.   Do you recall who Steve Mays reported to during 2005 -- between 2005 and 2007?

A.   I don't recall.

Q.   Do you know if Chris Zimmerman would have reviewed audit reports between 2005 and 2007?

| Page 180 |
|---|

A.   Well, Chris was our VP over CSRA, so I can't confirm, but he certainly was concerned about the audit findings.

Q.   You started working with Chris Zimmerman in '96 at Bergen Brunswick, correct?

A.   Yes.

Q.   So you've worked with him through your entire career?

A.   That's a correct statement.

Q.   Are you pretty familiar with his work habits?

MR. NICHOLAS:  Object to the form.

THE WITNESS:  I don't know what you mean by work habits.

BY MR. CLUFF:

Q.   Does he check his e-mails regularly?

A.   Yes.

Q.   Does he document the things that he's concerned about?

MR. NICHOLAS:  Object to the

| Page 181 |
|---|

form.

THE WITNESS:  Yes.

BY MR. CLUFF:

Q.   Does he like to create a paper trail on things that are happening during his work?

MR. NICHOLAS:  Object to the form.

THE WITNESS:  I don't know if he likes to create paper trails.  We document what we do generally.

BY MR. CLUFF:

Q.   So there was a practice of documenting things that happened at the company?

A.   Yes.

Q.   Do you know, based on your long history of working with Chris Zimmerman, whether or not he would have documented his review of a report about the Orlando distribution center?

MR. NICHOLAS:  Object to the form.

Page 182

1      THE WITNESS:  I have no idea
2   what Chris did with regards to
3   that.
4  BY MR. CLUFF:
5      Q.   After an event like the
6  Orlando suspension, do you know, based on
7  your history of working with Chris, what
8  he would have wanted to review to figure
9  out what the problem was?
10      MR. NICHOLAS:  Object to the
11   form.
12      THE WITNESS:  I wouldn't --
13   I wouldn't want to speculate on
14   that.
15  BY MR. CLUFF:
16      Q.   Would he have written
17  e-mails to people about the distribution
18  center suspension or would he have called
19  people about it?
20      MR. NICHOLAS:  Object to the
21   form.
22      THE WITNESS:  Again, I
23   wouldn't want to speculate on what
24   Chris did with regard to that,

Page 183

1   with regards to that.
2  BY MR. CLUFF:
3      Q.   When Chris had concerns
4  about your work product did he e-mail you
5  about it or did he call you about it?
6      A.   Both.
7      Q.   Do you think he would have
8  responded any differently about the
9  Orlando distribution center suspension?
10      MR. NICHOLAS:  Object to the
11   form.
12      THE WITNESS:  Again, I
13   wouldn't speculate.
14  BY MR. CLUFF:
15      Q.   Do you have any reason to
16  believe that he would have acted
17  differently?
18      MR. NICHOLAS:  Object to the
19   form.
20      THE WITNESS:  Again, I
21   wouldn't speculate how he would
22   react to that.
23  BY MR. CLUFF:
24      Q.   Did you ever receive any

Page 184

1  e-mails about the Orlando suspension?
2      A.   I don't recall.
3      Q.   If there were, they would be
4  in your files, correct?
5      A.   They would be within our
6  system, yes.
7      Q.   Do you recall ever reviewing
8  any memorandums about -- or memoranda
9  about the Orlando suspension?
10      A.   No specific recollection.
11      Q.   Did you ever write a memo
12  about the Orlando suspension?
13      A.   I don't recall.
14      Q.   Did your responsibilities as
15  an auditor change because of the
16  suspension?
17      A.   Again, you know, our audit
18  is governed by internal policy and the
19  audit checklist evolves over time.  So
20  whatever the checklist evolved to would
21  have been what I would have done
22  differently from -- from pre to
23  post-Orlando suspension.
24      Q.   So you were conducting

Page 185

1  audits between 2002 and 2015 as either a
2  manager or supervisor of regulatory
3  compliance, a director and a regional
4  director.  Did I get all the titles
5  right?
6      MR. NICHOLAS:  Object to the
7   form.
8      THE WITNESS:  It would have
9   been regional supervisor, regional
10   manager, regional director.
11  BY MR. CLUFF:
12      Q.   Got it.  And during that
13  time when you conducted audits, you
14  basically just filled out a checklist,
15  right?
16      MR. NICHOLAS:  Object to the
17   form.
18      THE WITNESS:  We would
19   conduct the audit and we would
20   complete the checklist, you know,
21   pursuant to the policy at that
22   time.
23  BY MR. CLUFF:
24      Q.   And then write a report?

Page 186

1    A.    The report would contain any
2   findings that we had on the audits that
3   we conducted, yes.
4    Q.    You had no responsibility
5   for identifying or reporting suspicious
6   orders, right?
7    A.    During -- during 2000 --
8    Q.    2002 to 2015.
9    A.    I would say that's a true
10  statement, yes.
11   Q.    You were just filling out
12  audit checklists?
13       MR. NICHOLAS:  Object to the
14       form.  Asked and answered.
15       THE WITNESS:  I would say
16       that, yeah, we were conducting the
17       audit and we were documenting
18       findings that we had pursuant to
19       that audit checklist.
20  BY MR. CLUFF:
21   Q.    It's kind of like the job
22  you had when you were at Bergen
23  Brunswick, right, you were documenting
24  the investigations?

Page 187

1        MR. NICHOLAS:  Object to the
2        form.
3        THE WITNESS:  Under Bergen
4        Brunswick I wasn't documenting
5        investigations.  I was conducting
6        licensing and subpoena work.
7   BY MR. CLUFF:
8    Q.    You said that you were
9   typing up interrogations and
10  investigations between, you know, sort of
11  the beginning of '98 and the middle of
12  '98, right?
13   A.    Yeah, I was -- I was typing
14  transcriptions, that's correct.
15   Q.    Recording information?
16   A.    Correct.
17   Q.    So you were still just kind
18  of recording information when you
19  performed these checklists, right?
20       MR. NICHOLAS:  Well, I'll
21       object to the form.
22       THE WITNESS:  Yeah, we were
23       conducting the audit.  We were
24       identifying deficiencies and then

Page 188

1   documenting them on the report,
2   yes.
3   BY MR. CLUFF:
4    Q.    So you said in 2015 you
5   became the director of diversion control,
6   and that was approximately February 2015?
7    A.    Yes.
8    Q.    Was that a step up from your
9   role as a regional director or was that a
10  lateral step?  I'm just trying to
11  understand the hierarchy.
12   A.    It was considered a lateral
13  move.
14   Q.    Did you lateral out of
15  regulatory and security compliance?
16   A.    Well, it was a -- the
17  diversion team was a unit within CSRA.
18  So it was just a little subunit of the
19  entire CSRA department.
20       MR. NICHOLAS:  Sterling, if
21       you're transitioning, do you think
22       it's a good time for a break?
23       I -- I don't want to stop your
24       flow here, but it's been --

Page 189

1        MR. CLUFF:  No, I appreciate
2        that.  Let's just finish up your
3        responsibilities as the director
4        of diversion control, and then
5        we'll break for lunch.  How is
6        that?
7        MR. NICHOLAS:  Perfect.
8   BY MR. CLUFF:
9    Q.    Okay.  So this was a lateral
10  move, and was there a change in
11  responsibilities?
12   A.    Yeah.  Somebody took over my
13  old job.
14   Q.    And then did your -- like
15  your area of responsibility change?
16   A.    I'm not sure I understand
17  your question.
18   Q.    Were you still conducting
19  audits when you became the director of
20  diversion control in 2015?
21   A.    No, sorry.  Yes.  During the
22  time I transitioned from regional
23  director to director of diversion
24  control, my duties did change at that

Page 190

1  point.
2      Q.   And what, what was that
3  change?
4      A.   Well, I gave up my region
5  and I -- and I assumed the responsibility
6  of director of diversion control for ABC.
7      Q.   What is your responsibility
8  as the director of diversion control?
9      A.   I manage the program.  The
10  investigators, my analysts report to me,
11  so I work directly with our pharmacist
12  director to run the program and we report
13  up to David May.
14      Q.   Is the pharmacist director,
15  is that Sharon Hartman?
16      A.   Yes.
17      Q.   Okay.  So you said that you
18  gave up your region and you became the
19  director of diversion control.  And then
20  you were responsible for overseeing the
21  entire diversion control program for
22  AmerisourceBergen?
23      MR. NICHOLAS:  Object to the
24  form.

Page 191

1      THE WITNESS:  Yes.  We -- we
2      operate the day-to-day management
3      of the program.
4  BY MR. CLUFF:
5      Q.   So now you operate the
6  day-to-day diversion control program for
7  AmerisourceBergen.  I just want to
8  understand the scope.
9      A.   That's correct.
10      Q.   And you and Sharon Hartman,
11  did I get that right?
12      A.   Yes.
13      Q.   You manage the investigators
14  and the analysts and run the entire
15  program?
16      MR. NICHOLAS:  Object to the
17      form.
18  BY MR. CLUFF:
19      Q.   Is that right?
20      A.   I wouldn't say -- I mean,
21  it's all a shared responsibility.  David
22  May handles a lot of the -- the higher
23  level elements of the program.  I manage
24  the day-to-day operation of the order

Page 192

1  monitoring program and -- and the due
2  diligence collection, yes.
3      Q.   But prior to February of
4  2015, you had never held a position where
5  you were responsible for diversion
6  control at all, correct?
7      A.   Other than in a very limited
8  capacity as a regional director and I --
9      Q.   I'm sorry, I interrupted
10  you.
11      A.   As part of the -- as part of
12  the conducting the audits of the
13  distribution centers.
14      Q.   So your limited
15  responsibility for diversion control
16  prior to becoming the director of
17  diversion control was to audit diversion
18  control procedures at a distribution
19  center, right?
20      MR. NICHOLAS:  Object to the
21      form.
22      THE WITNESS:  Yeah, prior to
23      taking over the diversion program
24      as director of diversion control,

Page 193

1      prior to that I was responsible
2      for, you know, completing the
3      audit checklist and that portion
4      of the audit checklist that
5      pertained to diversion and
6      control, yes.
7  BY MR. CLUFF:
8      Q.   So prior to becoming the
9  director of diversion control, you never
10  had any responsibility for managing
11  anybody who was identifying or detecting
12  suspicious orders?
13      MR. NICHOLAS:  Object to the
14      form.
15      THE WITNESS:  Other than in
16      a very limited manner with my
17      compliance managers that reported
18      to me and they had
19      responsibilities at the
20      distribution center level, again
21      in a limited capacity.  So they
22      reported up to me.  So just to
23      clarify that.
24  BY MR. CLUFF:

Page 194

1    Q.   And that was in your
2  responsibility as an auditor though,
3  correct?
4    A.   As an auditor and a regional
5  director for my region.  So I was only
6  responsible for those compliance matters
7  within my region with regards to that
8  responsibility.
9    Q.   Those compliance managers,
10 were those called RPICs?
11   A.   No.
12   Q.   Is there an abbreviation for
13 compliance managers at all?
14   A.   Just compliance manager.
15   Q.   What's an RPIC?
16   A.   RPIC stands for responsible
17 person in charge.
18   Q.   And who would that have
19 been?
20     MR. NICHOLAS:  Object to the
21   form.
22 BY MR. CLUFF:
23   Q.   At a distribution center?
24   A.   So there are a number of

Page 195

1  distribution center associates who -- who
2  were specially trained and had
3  responsibility to review the first line
4  order when it went into a hold.
5    Q.   Would --
6    A.   And per procedure they would
7  look at it, they would assess it and they
8  would either release it or escalate it to
9  the corporate diversion team.
10   Q.   But you didn't have
11 responsibility for them, did you?
12   A.   No, they -- they reported to
13 operations.
14   Q.   Okay.  So between 2002 and
15 2015, I just want to get the time periods
16 correct, you were responsible for
17 overseeing compliance managers, correct?
18   A.   No, that's not correct.
19   Q.   Okay.
20   A.   Prior to 2007 the compliance
21 managers didn't report up to us.
22   Q.   Who did they report to?
23   A.   The -- the distribution
24 center manager for the DC.

Page 196

1    Q.   So between 2002 and 2007,
2  you had no diversion control
3  responsibility then, correct?
4    A.   I wouldn't say that's true.
5  The compliance managers didn't report to
6  us, but we still conducted audits and
7  I -- and I conducted investigations for a
8  period of time.
9    Q.   So from 2007 -- 2002 to
10 2007, your only responsibility for
11 diversion was to audit diversion at the
12 distribution centers?
13     MR. NICHOLAS:  Object to the
14   form.  It's not a question.
15     THE WITNESS:  We conducted
16   the -- the distribution center
17   audits during that period of time.
18   So in the capacity of a -- back
19   then I guess I was a regional
20   supervisor, I believe.  So I
21   would -- I would -- I would
22   monitor the distribution centers
23   for the -- for the diversion
24   program.

Page 197

1  BY MR. CLUFF:
2    Q.   You were monitoring --
3  strike that.
4      And then after 2007 you
5  accepted responsibility for managing the
6  compliance managers at the distribution
7  centers, right?
8      MR. NICHOLAS:  Object to the
9    form.
10     THE WITNESS:  They began
11   reporting to us post 2007.
12 BY MR. CLUFF:
13   Q.   And they had a limited
14 diversion control responsibility, if I
15 understand it correctly?
16   A.   Yes.
17   Q.   So you had a limited
18 responsibility for diversion control
19 because you oversaw them?
20     MR. NICHOLAS:  Object to the
21   form.
22     THE WITNESS:  We oversaw
23   them with regards to their
24   responsibilities within the policy

Page 198

1    procedures for diversion control.
2 BY MR. CLUFF:
3    Q.   And the only other
4 responsibility for diversion control
5 between 2007 and 2015 you had was
6 auditing, correct?
7         MR. NICHOLAS:  Object to the
8    form.
9         THE WITNESS:  Yeah.  I was
10   responsible for my region, and I
11   audited other divisions.
12 BY MR. CLUFF:
13   Q.   And then in 2015 you took
14 over shared responsibilities with Sharon
15 Hartman under David May for the entire
16 diversion control program at
17 AmerisourceBergen?
18        MR. NICHOLAS:  Object to the
19   form asked and answered.  Go
20   ahead.
21        THE WITNESS:  That's
22   correct.
23        MR. CLUFF:  I think that's a
24   good place to break.

Page 199

1         THE VIDEOGRAPHER:  Going off
2    the record.  12:40 p.m.
3         (Lunch break.)
4         THE VIDEOGRAPHER:  Back on
5    the record.  1:23 p.m.
6         MR. NICHOLAS:  For the
7    record, counsel has switched
8    questioners.  I'm assured that
9    this is permitted by the rules,
10   and I believe them.  So you may
11   proceed.
12        MR. PIFKO:  All right.
13   Thank you.
14        - - -
15        EXAMINATION
16        - - -
17 BY MR. PIFKO:
18   Q.   My name is Mark Pifko.  I
19 also represent the plaintiffs in this
20 matter.  I'm going to be asking you some
21 questions.  Okay?
22   A.   Yes.
23   Q.   Do you understand that
24 you're still under oath?

Page 200

1    A.   Yes, I do.
2    Q.   All right.  Before the
3 break, you mentioned that you had some
4 investigative responsibilities as well
5 after you moved to Philadelphia, or
6 Pennsylvania, correct?
7    A.   In the form of -- yeah, I
8 was a regional director, you know, during
9 that period of time.  And I did have some
10 investigative responsibilities.
11   Q.   Okay.  What specifically
12 were your investigative responsibilities
13 at that time?  And let's be clear about
14 dates.  So when was the first time that
15 you took on investigative
16 responsibilities?
17   A.   I conducted various
18 investigations throughout my tenure as a
19 regional director, supervisor, manager
20 throughout that period.
21   Q.   And that was from 2002 to
22 2015?
23   A.   Yes.
24   Q.   Okay.  So when you took the

Page 201

1 job in 2002, we talked about that
2 earlier, that was a new job, correct?
3    A.   It was new --
4    Q.   New responsibilities?
5    A.   Yes.
6    Q.   And among those
7 responsibilities was performing or
8 supervising investigations; is that
9 correct?
10   A.   Well, I didn't really
11 supervise investigations.  I conducted
12 investigations as part of my role of
13 being a regional director.
14   Q.   Okay.  You conducted all
15 the -- to the extent an investigation was
16 conducted while you were regional
17 director, it was conducted exclusively by
18 you?
19        MR. NICHOLAS:  Object to the
20   form.
21        THE WITNESS:  I would
22   conduct my own investigations.  I
23   also worked with our investigative
24   team on certain investigations

Page 202

1    depending on what we were
2    investigating.
3  BY MR. PIFKO:
4    Q.   Okay.  Let's talk about the
5  nature and scope of the investigations
6  that you conducted.  Were there different
7  types of investigations that you
8  conducted?
9    A.   Yes, a whole array.
10   Q.   All right.  Can you name
11 some of them today?
12   A.   As a regional director, I
13 did a lot of theft investigations.  I
14 think that would be the lion's share of
15 the investigation types that I conducted.
16   Q.   And --
17   A.   In --
18   Q.   I'm sorry.  Continue.  I
19 don't want to interrupt you.
20   A.   In addition to that, I did
21 construct investigations from 2005 to
22 2007.  I would review what we call the
23 possible suspicious order reports.  And
24 this was a function that was assigned to

Page 203

1  me as a collateral duty outside of my
2  responsibility as regional director.
3    Q.   Did you ever interact with
4  anyone from the DEA when you became a
5  regional director?
6    A.   Yeah.  I had a lot of
7  interaction with DEA, special agents as
8  well as diversion investigators.
9    Q.   Again, I want to make sure
10 we're talking about a clear time period,
11 but over your tenure as a regional
12 director, can you name some of the names
13 of DEA agents that you interacted with?
14   A.   Scott Davis, Philadelphia
15 DEA, was one.
16        There were so many.  He's
17 really the guy that comes to mind right
18 now.
19   Q.   So Scott Davis was the
20 primary DEA agent who was visiting
21 facilities that you had responsibility
22 for; is that correct?
23   A.   No, I wouldn't say that.
24 He -- he is one of the investigators with

Page 204

1  the Philadelphia DEA office.  I worked
2  with him closely on an investigation when
3  I was in the middle of transitioning from
4  Orange, California to Philadelphia.  It
5  was a long -- a nearly two-year
6  investigation I worked very closely with
7  him on.
8    Q.   What was the nature of the
9  investigation?
10   A.   It was Highland Park
11 Pharmacy.  We were working with him from
12 the beginning of that investigation, and
13 we were giving him sales reports for the
14 customer that was being investigated.
15 Like I said, it was an in-depth, long
16 investigation, and during that period of
17 time I became pretty friendly with Scott.
18 He's a personal friend today.  We
19 actually got awarded as a result of that.
20 I have a plaque in my office from the DEA
21 and the contributions to the field of law
22 enforcement in the drug distribution
23 industry.
24        So that -- I worked with him

Page 205

1  a lot on the local distribution centers,
2  Thorofare, New Jersey; Bethlehem
3  Pennsylvania.
4    Q.   Highland Park Pharmacy,
5  that's a pharmacy in Philadelphia?
6    A.   They're located in a suburb
7  of Philadelphia.  I believe they were
8  near Newtown Square or in that general
9  area.
10   Q.   Do you know what the outcome
11 of that investigation was?  Was there an
12 action taken against that pharmacy?
13   A.   Yes.  That owner went to
14 prison.
15   Q.   Do you know what the basis
16 of the charges was?
17   A.   It was I believe diversion
18 of narcotics.
19   Q.   What specifically?  Opioids?
20   A.   Yeah, I don't remember the
21 specific drug families but it was
22 certainly opioids.
23   Q.   And do you know what the
24 nature of the conduct specifically was

1 with respect to the diversion, what
2 was -- what was occurring at that
3 pharmacy?
4     A.   The DEA doesn't share
5 specifics of their investigations with
6 industry. So we pretty much worked with
7 him on providing him sales reports for
8 that extended period of time. But, just
9 the way law enforcement works, they don't
10 share specific information due to its
11 confidential nature.
12     Q.   Based on the information
13 that you provided to Mr. Davis, was the
14 pharmacy selling high volumes of
15 controlled substances?
16      MR. NICHOLAS: Object to the
17     form.
18      THE WITNESS: Yes, they
19     were -- they were buying very high
20     volumes of narcotics.
21 BY MR. PIFKO:
22     Q.   Do you remember estimating
23 the proportion of opioids versus their
24 total sales from AmerisourceBergen?

1     A.   I don't recall the
2 specifics.
3     Q.   Okay. Have you heard the
4 concept of a red flag?
5     A.   Yes, it's a general term we
6 use.
7     Q.   Okay. Have you heard that
8 one of the red flags of diversion is the
9 proportionality of controlled substances
10 to a customer's total substances they
11 purchase from a distributor, have you
12 heard that before?
13     A.   Yes, I have.
14     Q.   Okay. Regardless of whether
15 you remember the specific number that
16 this pharmacy was buying, do you recall
17 that -- proportionality being one of the
18 red flags of diversion for that pharmacy?
19     A.   I don't recall. It was too
20 long ago. This was almost -- this was
21 18 years ago. So it's just too long ago
22 for me to remember specifics about that
23 particular investigation.
24     Q.   Do you recall how that

1 investigation, how you came to be
2 involved with -- did someone at the
3 company call you and say we need you to
4 work with this DEA agent or did they call
5 you directly?
6     A.   That -- that investigation
7 started when I was working for Bergen
8 Brunswick in a capacity of regulatory
9 specialist I think my title was.
10      So I was responsible for
11 subpoenas for the company as I had
12 indicated previously. So Scott contacted
13 me or his request gravitated to me and I
14 began working with him I believe around
15 the 2000 time frame and through my
16 promotion to becoming a regional
17 supervisor when I moved to Pennsylvania.
18     Q.   Okay. Did the company --
19 the -- the company, so, when you -- what
20 was that title you said that you had when
21 you were -- so you said you were a
22 security officer when you started and
23 then you moved into this other job?
24     A.   I believe it was a

1 regulatory specialist --
2     Q.   Okay.
3     A.   -- but I'm not sure about
4 that. It is just something that seems to
5 ring a bell.
6     Q.   Did the company have a
7 database where they kept subpoenas and
8 investigative requests of that nature
9 that you were responsible for responding
10 to in a centralized location?
11     A.   Yeah. In that time period
12 we had, we had a system.
13     Q.   Okay. What was the name of
14 that system?
15     A.   I believe it was law -- Law
16 Track or Law Pack. I think it
17 transitioned from one to the other, but
18 again, that was a long time ago.
19     Q.   Okay. So then when -- after
20 the merger occurred, do you know what the
21 system that would have been used to
22 centralize this request was?
23     A.   I think we moved it into Law
24 Track.

Page 210

1    Q.   Okay.
2    A.   I think the previous system
3 was Law Pack.
4    Q.   Do you know the period for
5 how long those kinds of investigations
6 and requests would be maintained on that
7 system?
8    A.   Well, they were maintained
9 from that point all the way until, you
10 know, roughly in the last year or two
11 when we switched systems.
12   Q.   Okay.  And then when you
13 switched systems, what -- what did you do
14 with the data, do you know?
15   A.   The data was transferred to
16 another system for maintenance, and it's
17 still there.  It's still retrievable by
18 us.
19   Q.   Okay.  Is that -- from time
20 to time do you ever go back and, for
21 business reasons, look at that data?
22   A.   I do.  I don't do it as much
23 as my investigators do.  They are the
24 ones that are doing the day-to-day

Page 211

1 investigations for the most part.  But
2 they do go in there readily.  I mean,
3 that's where all the old information is
4 so...
5    Q.   Okay.  You said you do from
6 time -- you have on occasion?
7    A.   Yes.
8    Q.   Okay.  Is there like a --
9 how do you access that, is there like a
10 portal you have to log into?
11   A.   Yes.
12   Q.   Okay.  And when you log into
13 that, and you can keyword search it or
14 something, how does it work?
15        Yeah?
16   A.   Yeah.  There's two systems.
17 There's Matter Management that we put our
18 new information into.  And then that --
19 the other system, I'm -- I'm sorry, the
20 name escapes me what it's called.  But
21 we -- we have ready access to both
22 systems.
23   Q.   Okay.  What are the types of
24 occasions on which you would -- you would

Page 212

1 seek to obtain information from that
2 historic system?
3    A.   During any investigation.
4 If we're looking into a customer and we
5 want to see their background, what we
6 have in their due diligence file, we
7 would go into either system to see what
8 we have on them.  So that would be a
9 result of investigations or subpoenas,
10 any number of reasons.
11   Q.   Okay.  And as far as you
12 know, the -- the subpoenas, investigative
13 reports, and the company's responses to
14 those reports, are maintained
15 indefinitely on that system?
16   A.   I believe so.
17   Q.   Okay.  So do you recall any
18 other -- other than Scott Davis, any
19 other DEA agents that you interacted
20 with?
21   A.   Yeah, there were a lot of
22 them.  Doug Crawford in the -- in the
23 Columbus area.  I dealt with him.  A lot
24 of groups of advisors, a lot of

Page 213

1 investigators.  There's so many of them.
2 I don't really deal with them very often
3 anymore, so this is -- you know, years
4 ago that I was dealing with these people,
5 so...
6    Q.   I understand we're talking
7 about a time period that was earlier and
8 maybe there's a lot of names.  But it
9 just -- it would help if you can remember
10 any other names.  I know it's kind of an
11 odd question.
12        But so you remember Scott
13 Davis, Doug Crawford.  Any other names?
14   A.   I didn't really prepare for
15 this question, so no, none -- none of
16 those come to my mind right now.
17   Q.   Mr. Crawford in Columbus, is
18 there -- is there a reason why you
19 remember his name?
20   A.   He's conducted audits of our
21 distribution center.
22   Q.   Okay.  And he conducted
23 audits of distribution centers for which
24 you had responsibility?

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    A.   I'm not sure if I had
2  responsibility at the Columbus
3  distribution center when he audited us.
4  I may have.  I'd have to check the
5  records for that.
6    Q.   That was my -- my next
7  question.  Did you have any
8  responsibility for distribution centers
9  in Ohio?
10    A.   Yes, at one time.
11    Q.   Okay.  And what time was
12  that?
13    A.   I don't recall.  I'd have to
14  check, check the -- the system for the
15  time period that I had the -- I had the
16  Chicago and the Columbus distribution
17  centers within my region, but I don't
18  recall the exact dates.
19    Q.   When you say check the
20  system, what would you check?
21    A.   I'm sure that within the
22  system there would be documentation that
23  indicates the assignments that we had and
24  which distribution centers were, you

Page 215

1  know, located within the region that I
2  had responsibility for.
3    Q.   Is there like a name of a
4  document that would say who was assigned
5  to what, that you can think of?
6    A.   I don't recall what the name
7  of the document would be.
8    Q.   Okay.  But there's some sort
9  of document that says, these are the
10  distribution centers within this person's
11  responsibility, these are the ones within
12  this person's responsibility; is that
13  correct?
14    A.   Yeah.  It should be usually
15  a United States map and it breaks down
16  which investigators had responsibility
17  for which DCs.
18    Q.   Okay.  And how was that
19  maintained in the company's files?
20    A.   I would say that it's kept
21  in general correspondence.  Steve Mays
22  assigned it.  And a lot of times we -- it
23  was based on sales region and then we
24  broke away from that.

Page 216

1    Q.   If you wanted to access it,
2  how would you go to find that?
3    A.   It's a good question.  I'm
4  not really sure where it would be.  We'd
5  have to search for it.
6    Q.   Do you have -- do you have
7  network drives on your system, does that
8  mean anything to you?
9    A.   Not sure.
10    Q.   You understand that you can
11  save something onto your computer, right,
12  like on the C drive.  But do you have
13  like a shared drive where you save
14  certain -- certain documents that you
15  would look at or other people can save
16  documents to?
17    A.   Yes, we have a shared drive.
18    Q.   Okay.  What's the name of
19  it?
20    A.   I call it the S drive.
21    Q.   Okay.  And to your knowledge
22  how long has that been in use?
23    A.   A long time.  I don't
24  remember when it started.

Page 217

1    Q.   So dating back to like 2002
2  when you were regional director, do you
3  believe you would access the S drive at
4  that time?
5    A.   I don't think so.
6    Q.   Okay.  So some time after
7  that?
8    A.   I'm not sure but I would
9  think that it was -- it's so long ago, I
10  don't recall.
11    Q.   Okay.  Well, do you recall
12  accessing documents or saving documents
13  to the S drive when you were a regional
14  director at any point?
15    A.   Yes.
16    Q.   Okay.  Is that a way that
17  you would have shared information
18  among -- so obviously there's a region,
19  so there's other people would you need to
20  interact with.  You might need to
21  interact with your boss.  Is that a way
22  that you would have saved documents so
23  that you could communicate with each
24  other?

Page 218

1     A.   Yeah, we called it a shared
2 file.  So it was a -- it was a file that
3 everybody had access to, so we could put
4 documents on there, and everybody had
5 access to them.  So that's a correct
6 statement.
7     Q.   Okay.  So from time to time
8 you might have a meeting and someone
9 could say, oh, pull up the document, and
10 everyone could open it and see what was
11 there?
12     A.   Yes.
13     Q.   Okay.  So we would be able
14 to know the -- the distribution centers
15 for which you were responsible by
16 accessing these historical records?
17     A.   Yes.
18     Q.   Okay.  And you -- you --
19 what was the distribution center in
20 Columbus, was it in the Columbus proper
21 or was it in a suburb outside of
22 Columbus?
23     A.   I'm trying to remember the
24 town that it's -- that it's in.  I can't

Page 219

1 think of the town that it's in.  It's a
2 suburb of Columbus.
3     Q.   I believe it seems to have
4 been Lockbourne.  Is that --
5     A.   Yes.
6     Q.   Is that the facility that --
7     A.   That's it.
8     Q.   So when you refer to
9 Columbus, that's the facility you're
10 thinking of?
11     A.   That's correct.
12     Q.   Okay.  Any other -- so -- so
13 Doug Crawford conducted some audits of
14 the Lockbourne facility and that's how
15 you remember interacting with him?
16     A.   I remember one that he
17 conducted recently.  I don't know any --
18 any of the -- I can't confirm any audits
19 that he conducted other than the one I'm
20 thinking of.
21     Q.   And that was recently, you
22 said?
23     A.   I would say in the last five
24 years.  I can't really pinpoint beyond

Page 220

1 that.
2     Q.   Have you ever heard of Mike
3 Mapes?
4     A.   Yes.
5     Q.   Okay.  He was a DEA agent,
6 correct?
7     A.   Yes, he was.
8     Q.   And he was also a consultant
9 that was hired by the company, correct?
10     A.   Yes, he was.
11     Q.   Okay.  Did you ever interact
12 with Mr. Mapes when he was a DEA agent?
13     A.   A lot, yes.
14     Q.   Okay.  What was the --
15     A.   I'm sorry, when he was an
16 agent?
17     Q.   Yeah.
18     A.   Yeah, I worked with him when
19 we transitioned our renewal process from
20 individual DEA license renewals to the
21 batch renewal.  He was chief of
22 E-commerce back then.  So I worked
23 closely with him in -- in transitioning.
24 I think we were the first large

Page 221

1 wholesaler that transitioned to the batch
2 renewal system, and so they used us sort
3 of as a -- as a model to try it out first
4 and then the other -- the other rest of
5 the industry followed us.  So I believe
6 that's my recollection, that we were the
7 first to do that.  So I did have a lot of
8 discussions with -- with Mike.
9     Q.   Do you recall a rough time
10 period when that occurred?
11     A.   I want to say pre-2000.
12 Probably '95 -- or probably '98.
13     Q.   Okay.
14     A.   Maybe around '98.  It was
15 pre -- pre me moving to Pennsylvania.
16     Q.   And then did you continue to
17 interact with Mr. Mapes on other
18 occasions after moving to -- away from
19 California?
20     A.   Yeah.  Several different
21 occurrences where I spoke to him.
22     Q.   Okay.  Can you name some of
23 the issues that you worked on with him?
24     A.   Well, he was chief of

Page 222

1  e-commerce, so we had to get
2  clarification from him quite a few times
3  on regulations.  We transitioned to the
4  CSOS program at one point.  And I headed
5  up that transition.  And so I worked
6  closely with Mike.  In that -- same thing
7  with the batch renewal.  We were one of
8  the first distribution centers in the
9  industry to transition to CSOS.  So I
10  worked closely with him during that
11  period of time regarding that transition.
12      Q.   Do you have an understanding
13  of the timing, about when that was?
14      A.   It started pre -- pre me
15  starting with the company.  I think CSOS
16  started around '95.  And I think we
17  transitioned -- I don't recall exactly.
18  I think it was the early 2000s.
19      Q.   What does CSOS stand for?
20      A.   Controlled Substance
21  Ordering System.
22      Q.   Okay.  And can you tell me
23  what that is?
24      A.   So for years DEA had the

Page 223

1  paper 222 form, narcotic order form.
2  It's in triplicate.  It has ten line
3  items that a customer could fill in to
4  receive narcotics.  So they finally
5  switched over to an electronic 222
6  program that took away the paper form
7  that's printed in triplicate and allowed
8  customers to place orders electronically
9  through encryption.  And a lot of DEA
10  technology involved, so that can be
11  completed, you know, without the paper
12  forms.  So that's really the next
13  generation of the narcotic paper order
14  forms.
15      Q.   And so that's the way that
16  customers place an order with the
17  company, using that system?
18      A.   Not all customers.  A lot of
19  customers are still on the old paper 222
20  forms, a lot of the old pharmacists that
21  are not really technology savvy.  But all
22  the new customers pretty much
23  transitioned to the CSOS program, yes.
24      Q.   And this started in the

Page 224

1  early 2000 period?
2      A.   I can't remember the date.
3  But it was right around that -- it might
4  have been the late '90s.
5      Q.   If a customer uses a paper
6  order form, they have to -- how do they
7  send it to you?  Fax it or mail it?
8      A.   Yeah, they could -- they
9  could send it any number of ways.  They
10  could mail it.  They could send it with
11  the driver who delivers their shipment,
12  and then give it to them in an envelope,
13  and then it goes back with the driver.
14  They can fax it to us.  There's a lot of
15  ways that we -- that we receive paper 222
16  forms from our customers.
17      Q.   And then when customers use
18  the electronic ordering system, they have
19  some sort -- they have a computer in
20  their store or whatever, and they access
21  some sort of portal to enter their order?
22  How does that work?
23      A.   Yeah.  They -- they have to
24  get approved by the DEA.  They have to

Page 225

1  complete a form, and then the DEA issues
2  them a certificate, and they receive a
3  paper authentication number and then one
4  via e-mail.  And then they authenticate
5  that digital certificate.  And then once
6  they receive the digital certificate,
7  it's embedded into a computer that they
8  use to access that certificate using what
9  they call the -- I think it's dual
10  credentials that they use.
11          And then once that digital
12  certificate is in the customer's
13  computer, they can use that to build an
14  order using our system, and then shoot it
15  out electronically.
16      Q.   And then it's received on
17  the other end electronically as well?
18      A.   Yeah, it goes through the
19  CRL.  It's called the certificate
20  revocation list.  It's a daily transfer
21  that we receive as the wholesaler to
22  verify that that digital certificate is
23  valid.  And then once it passes that
24  test, it reaches our system.  And then it

Page 226

1  goes through all of our checks, credit,
2  licensing, diversion, you know, order
3  monitoring program.  And then if it
4  passes that, it goes right into pick,
5  pack, and ship.
6      Q.  Okay.  So is there like a
7  terminal inside the distribution center
8  where people see the order that comes in?
9  How does that work?
10     A.  It's been a while.  I don't
11 remember specifically how they look at
12 it.  If it hits a hold, like a credit
13 hold or a -- you know, there's license
14 hold or there's a million different kinds
15 of holds that it can go into it, it will
16 hit a screen that the associate has to
17 look at and determine why it's not going
18 through.
19         So it might be kicked back
20 to the customer if it -- if it fails one
21 of the tests.  If it doesn't fail a test,
22 it goes right into the PKMS system where
23 it's picked, packed, and shipped.
24     Q.   So there's someone whose job

Page 227

1  it is to sit at a computer terminal and
2  monitor the orders that are getting
3  flagged for various failures?
4          MR. NICHOLAS:  Object to the
5      form.
6          THE WITNESS:  Yeah.  It's --
7      I think in most cases it's the
8      processing manager of the
9      distribution center.  He kind of
10     runs brains of the distribution
11     center.
12 BY MR. PIFKO:
13     Q.   So did you say the data
14 processing manager?  Is that what you
15 said?
16     A.   DP manager.  Data
17 processing.
18     Q.   Okay.  And so one of the
19 things could be like the license is
20 expired in the system, so it's rejecting
21 the order, or there's an issue like you
22 said with the credit, maybe the payment
23 is not going to process so that gets
24 rejected.

Page 228

1        You also mentioned the order
2  monitoring program.  If it exceeds the
3  parameters of the order monitoring
4  program, that's another reason?
5          MR. NICHOLAS:  Object to the
6      form.
7  BY MR. PIFKO:
8      Q.   Is that correct?
9      A.   Absolutely.  It's one of
10 the -- it's one of the filters that it
11 has to go through in order to go through
12 the system.  It has to hit that -- hit
13 that parameter.



Page 230



12  Q.   When you were a regional
13  manager -- director, I guess -- well, you
14  had all those different kinds of titles,
15  right?
16  A.   Yes.
17  Q.   That responsible person in
18  charge, is that someone who you would --
19  I understand they didn't report to you,
20  but is that someone who you would have
21  input into whether they were performing
22  their functions with respect to the order
23  monitoring program?
24      MR. NICHOLAS:  Object to the

Page 231

1   form.
2       THE WITNESS:  We would look
3   at, you know, what they were doing
4   during our audits.  The compliance
5   manager who reported up to the
6   regional director had
7   responsibility of all the RPICs
8   within that distribution center.
9       So -- so there would be sort
10  of an extended responsibility from
11  the director if it was the
12  directors distribution center that
13  he or she was auditing.
14  BY MR. PIFKO:
15  Q.   And that compliance manager,
16  that's someone that you would interact
17  with in the audit process, correct?
18  A.   Yes.
19  Q.   Okay.  And would you ask
20  them questions about their compliance
21  with overseeing the responsible people in
22  charge as part of your audit?
23  A.   If we had reason to ask them
24  as part of the audit.  I mean, we -- we

Page 232

1   performed a very detailed audit during
2   these -- during these periods.  So we
3   would -- we would cover the questions as
4   it was indicated on the audit checklist.
5       And depending on -- they
6   would -- generally part of that process
7   would be for the compliance manager to
8   explain how they manage their RPICs for
9   their distribution center.  And if there
10  were questions, we would ask them at that
11  time.  But we would -- we would ask
12  detailed questions about how it was being
13  managed when we did the audits.
14  Q.   About how many RPICs would a
15  particular distribution center have at
16  any one time?
17  A.   It would depend on the
18  distribution center.  Anywhere from three
19  or four to maybe ten depending on the
20  size of the distribution center and how
21  busy they were.  We have some
22  distribution centers that are very small
23  and they service a very small area.  Some
24  are big.  So it would depend.

Page 233

1   Q.   How does the Lockbourne
2   facility fare in the size, comparative
3   size that you were just describing?
4   A.   Larger.
5   Q.   Okay.  That's a place that
6   would have more like ten RPICs?
7   A.   That's just a -- just a
8   general --
9   Q.   Estimate?
10  A.   -- idea.  Probably, yeah.  I
11  mean, average for larger divisions,
12  probably maybe between six and eight.
13  But it's hard to say.  They vary from DC
14  to DC, but yes.
15  Q.   Okay.  Is there -- as part
16  of your audit keeping, are you familiar
17  with records that would describe who was
18  holding those roles at any particular
19  time?
20  A.   Yes.  I believe there was a
21  list of the RPICs at the distribution
22  center.
23  Q.   Okay.  Do you know what the
24  name of that list was called?

Page 234

1    A.   No.  I don't remember what
2  it was called.
3    Q.   Would that be kept in some
4  central file at the distribution center?
5    A.   Yes.  It would.  I think we
6  used the training documents as the list
7  as who was trained and who was performing
8  that function.
9    Q.   What do you mean by that?
10  There was a training?
11    A.   Yeah.  The RPICs were
12  required to undergo training, so we
13  would -- you know, I think it was an
14  annual training requirement that they all
15  had to go through.  So we would use that
16  as the document.
17    Q.   So when you are conducting
18  the audit, you look at the records of who
19  was trained and when?
20    A.   That was one of several
21  things that we looked at, yes.
22    Q.   Was there a way to tell if
23  someone was an RPIC but they weren't
24  being trained?

Page 235

1    A.   Yes.  That's one of the
2  things that we audited for.
3    Q.   Okay.  And there was
4  documentation of who those people were
5  and their training history?  That would
6  be kept at the distribution center?
7    A.   Yes.
8    Q.   Is there like -- were these
9  on paper files or electronic files?
10    A.   We used paper files.  When
11  training is conducted at the distribution
12  center, they would have to sign that they
13  were trained, and they show the date of
14  the training and the details of the
15  training.  So we would use that as the
16  basis.
17    Q.   In your experience as an
18  auditor, were the training files, or --
19  and general compliance files that you
20  would be looking at, were they all kept
21  in a central location, like go to this
22  room and that's generally where the
23  compliance files are kept?
24    MR. NICHOLAS:  Object to the

Page 236

1  form.
2    THE WITNESS:  They vary from
3    DC to DC, how they maintain their
4    files.  But when we audited them,
5    they would bring all the files to
6    us.
7  BY MR. PIFKO:
8    Q.   Okay.  And you were just --
9  they knew the types of files that you
10  wanted when you came because you had done
11  these audits before?
12    A.   Yeah, there's a document
13  that indicates -- that we would give them
14  at the onset of the audit that would
15  indicate everything that we needed.
16    Q.   Okay.  So to your knowledge,
17  what -- as an auditor, what was the
18  period for how long back they kept those
19  records?
20    A.   It would depend on the
21  document and the record.  We had a
22  record -- what do we call it?  A
23  retention policy.  And it would depend.
24  You know, different records had different

Page 237

1  retention policies.
2    Q.   Okay.  Was that -- the
3  retention policy, is that part of the
4  audit checklist?
5    A.   No.  That's laid out by the
6  legal department, I believe.
7    Q.   Okay.  But it's a document
8  that, like Form 222 should be kept this
9  long, training documents should be kept
10  this long, is that -- that's kind of what
11  it would look like?
12    A.   Yeah, it would -- that would
13  be identified in the audit checklist, how
14  far back they are required to have those
15  documents and we would verify that.
16    Q.   Okay.  And then when you
17  filled out these audit reports, would you
18  save them to some centralized drive?
19    A.   Yes.  They would be kept
20  electronically.
21    Q.   On the S drive?
22    A.   I don't recall putting them
23  on the S drive.  I know that they were
24  filed in our -- in our -- in our system,

1 which would be Law Track. And that's
2 updated. So that server is maintained
3 for -- for that use.
4 Q. You mentioned that from time
5 to time you go back and access or
6 investigators go back and access
7 historical records. Are those audit
8 reports something that people access and
9 you've accessed?
10 A. Yes. That would be part of
11 our due diligence documentation that
12 would be readily retrievable and used
13 from time to time as necessary.
14 Q. Okay. And so this day you
15 can still access them and use them?
16 A. Yes.
17 Q. So I know we've gone a
18 little branch of the tree there. But I
19 was asking you still about DEA agents
20 that you interacted with. And we had
21 talked about Mr. Mapes.
22 So you mentioned that you
23 interacted with him on licensing
24 procedures and on the CSOS program. How

1 about any other types of issues that you
2 interacted with Mr. Mapes?
3 A. As an agent?
4 Q. Yes.
5 A. When he was with DEA.
6 Q. Yes.
7 A. Other than just other
8 miscellaneous requests for clarification
9 of regulations. There was probably two
10 or three instances with that that I can
11 vaguely recall, but I don't remember
12 specifics. But it would really pretty
13 much -- that would pretty much cover
14 the -- the instances that I interacted
15 with Mike.
16 Q. So requests for
17 clarification or regulation, what was the
18 protocol, how would that -- and the
19 occasions that you remember kind of
20 generally, how would that interaction
21 with Mr. Mapes occur?
22 MR. NICHOLAS: Object to the
23 form.
24 THE WITNESS: Well, I'm the

1 principal CSOS coordinator for
2 ABC, which means I'm the main --
3 I'm the main liaison between the
4 DEA and CSOS. So I worked with
5 them a lot regarding CSOS
6 regulations and drafting our
7 policies regarding the CSOS
8 program. So that was a lot of
9 interaction.
10 And beyond that would be the
11 renewal process earlier on.
12 Renewing the batch renewals. And
13 above and beyond that would have
14 been just -- he was a good contact
15 for us so we would use him as a
16 contact for a lot of regulatory
17 clarification.
18 BY MR. PIFKO:
19 Q. So you just felt you had a
20 good relationship with him, so if you had
21 a question you would just pick up the
22 phone and -- and call him or something,
23 is that kind of what you're telling me?
24 A. Exactly.

1 Q. Okay. How about e-mails,
2 did you e-mail with him when you had
3 questions?
4 A. No. The DEA don't like
5 e-mails too much. They -- they have a
6 firewall. So we would get -- once in a
7 while they would respond via written
8 form, but usually we would get verbal
9 clarification on regulations.
10 Q. Okay. So you have -- the
11 nature of your relationship with
12 Mr. Mapes was such that you could just
13 pick up the phone and -- if you had a
14 question and talk to him and get an
15 answer?
16 A. Yeah, he knew who I was so
17 he would take my call.
18 Q. Okay. And then did you take
19 notes of these calls ever?
20 A. God, I don't recall.
21 Q. Okay.
22 A. With clarification of
23 regulation, we would -- we would use
24 his -- his -- his input certainly within

Page 242

1  the documentation that we were
2  completing, yeah.
3      Q.   That's what I was going.  So
4  if you're working on some sort of
5  regulatory question that you had, and you
6  called him up, would you write down,
7  okay, I talked to him and he said this,
8  and put that in a file somewhere, so that
9  everybody else could see?
10     A.   I don't recall specifics
11 when I interacted with Mike.  But yes,
12 generally with CSOS regulations, we would
13 use his input as the basis of our -- of
14 our policy.
15     Q.   Okay.  So you would be
16 working on some sort of policy and then
17 maybe you would write something in there
18 on the basis of the conversation that you
19 had?
20         MR. NICHOLAS:  Object to the
21     form.
22         THE WITNESS:  Yeah.  We
23     would document that he -- that he
24     clarified, you know, specific

Page 243

1      regulation and what it meant and
2      how we were to interpret that.  So
3      that's -- that's usually the way
4      we used his input.
5  BY MR. PIFKO:
6      Q.   Okay.  And is there like a
7  format for a document where you would put
8  that kind of information in?
9      A.   I'm trying to remember my
10 interaction with him.  I don't think
11 there was any specific format.  I think
12 we just clarified, you know, within our
13 correspondence that he clarified, you
14 know, this is the interpretation that we
15 should use.
16     Q.   Okay.  So maybe you'd sent
17 him a follow-up letter after the call, is
18 that what you're saying?
19         I'm just trying to
20 understand, I'm trying to visualize what
21 you would do.
22         MR. NICHOLAS:  Object to the
23     form.
24         THE WITNESS:  It's been so

Page 244

1  many years since I've interacted
2  with him.  It's hard for me to
3  really state specifically how we,
4  you know, maintained the
5  information received from Mike.  I
6  don't recall.  It would be -- it
7  would vary depending on what we
8  were asking him.  Sometimes it was
9  a very minor issue, sometimes it
10 was a more important issue.
11 BY MR. PIFKO:
12     Q.   Okay.  And then would you
13 save, like if you sent him a letter,
14 would that get saved on the S drive or
15 something like that?
16     A.   Yes.  Any written
17 correspondence to the DEA would generally
18 be kept in a -- in a form, in a
19 retrievable, you know, format.
20     Q.   If you took notes on a
21 discussion with him and put it into some
22 sort of memo or, you know, something like
23 that, would that be saved on the S drive?
24     A.   It would depend.  Maybe not

Page 245

1  always.
2      Q.   Okay.  Depending on the
3  significance of maybe the discussion, is
4  that what you're getting at with me?
5          MR. NICHOLAS:  Object to the
6      form.
7          THE WITNESS:  Yeah.  It
8      would depend on what we were
9      calling him about.
10 BY MR. PIFKO:
11     Q.   Okay.
12     A.   I mean I had multiple
13 discussions with Mike over years.  So it
14 would just -- it would cover the gamut.
15 BY MR. PIFKO:
16     Q.   Right.  But if it was a more
17 significant issue, you would be more
18 likely to write that down than if it was
19 a minor thing, you know, you would just
20 leave that be without documenting it, is
21 that what you're telling me?
22     A.   I can speak for myself.
23 Yes, I would -- I would be likely -- it
24 would be likely that I would maintain it

Page 246

1 in a written form.
2     Q.   Okay.  If it was a more
3 significant issue?
4     A.   Yes.
5     Q.   Okay.  You are aware that at
6 some point, we already talked about it,
7 Mr. Mapes became a consultant for the
8 company, correct?
9     A.   Yes, he did.
10     Q.   Are you familiar with how he
11 came to be a consultant?
12     A.   I don't recall.  And that
13 was -- that happened over my head.
14     Q.   So that's -- that was going
15 to be my question, if you were involved
16 in the discussions at all.
17     A.   Not that I recall.
18     Q.   Okay.  You testified that
19 you felt like you had a close
20 relationship with him, correct?
21     A.   Yeah.  We worked closely.
22     Q.   Okay.  Were there other
23 people at the company who had a close
24 relationship with Mr. Mapes?

Page 247

1     MR. NICHOLAS:  Object to the
2   form.
3     THE WITNESS:  Yeah, he
4   worked with us on all the team
5   members pretty closely.
6 BY MR. PIFKO:
7     Q.   Mr. Mays, did he have a
8 close relationship with him too?
9     MR. NICHOLAS:  Object to the
10   form.
11     THE WITNESS:  I can't really
12   speak to how David Mays'
13   relationship, what it was with
14   Mike.  I think -- I know he worked
15   with him.
16 BY MR. PIFKO:
17     Q.   Okay.  How about
18 Mr. Zimmerman?
19     MR. NICHOLAS:  Same
20   objection.
21     THE WITNESS:  Same answer.
22   I can't really speak to how he,
23   you know, worked with Mike.
24 BY MR. PIFKO:

Page 248

1     Q.   Were you close with
2 Mr. Zimmerman?
3     A.   Well, I've worked with him
4 for the -- the entire time that I've been
5 with the company, so I know Chris well.
6     Q.   Okay.  And you moved -- you
7 both shared moving from California to
8 here, correct?
9     A.   That's correct.
10     Q.   Okay.  Do you interact with
11 Mr. Zimmerman outside of work?
12     MR. NICHOLAS:  Objection.
13   But go ahead.
14     THE WITNESS:  On occasion.
15 BY MR. PIFKO:
16     Q.   Okay.  Not often though?
17     MR. NICHOLAS:  Same
18   objection.  Go ahead.
19     THE WITNESS:  I would say
20   not often.
21 BY MR. PIFKO:
22     Q.   Okay.  How about Kyle
23 Wright, another DEA agent.  Have you
24 heard of him?

Page 249

1     A.   The name rings a bell, but I
2 cannot put his name to a face.
3     Q.   Okay.  Do you feel like
4 you've heard the name before though?
5     MR. NICHOLAS:  Object to the
6   form.
7     THE WITNESS:  Yeah, vaguely.
8 BY MR. PIFKO:
9     Q.   Okay.  We talked about --
10 you mentioned that in 2005, you took on
11 some role as performing investigations
12 for the company, correct?
13     A.   That's correct.
14     Q.   Okay.  Do you remember how
15 you came to -- you said that that was an
16 additional responsibility that you took
17 on.  Do you remember saying that?
18     A.   Yes, I do.
19     Q.   Okay.  Do you remember how
20 you came on to take on that additional
21 responsibility?
22     A.   It was so long ago.  It was
23 13 years ago.  I know it was assigned to
24 me as a collateral duty in addition to my

Page 250

1 audit responsibilities and my
2 responsibilities for my region. But I
3 don't remember how it actually came to
4 me.
5    Q.   Are you aware that Mr. Mays
6 had a meeting with Mr. Mapes and Kyle
7 Wright in August of 2005?
8    A.   No.
9    Q.   Mr. Mays traveled to D.C. to
10 meet with them to discuss internet
11 pharmacies. Do you remember hearing
12 about that meeting?
13    A.   I don't recall that.
14    Q.   Okay. Do you recall
15 Mr. Mays coming to you and -- and saying
16 the -- the DEA was interested in
17 increasing the level of due diligence
18 that distributors should be conducting on
19 their customers as a result of internet
20 pharmacy concerns?
21    A.   No, I don't recall that.
22    Q.   Mr. Mays received a
23 presentation from the DEA at that time
24 concerning due diligence and regulatory

Page 251

1 requirements and internet pharmacies. Do
2 you know if he shared that with you at
3 that time in 2005?
4    MR. NICHOLAS:  Object to the
5    form.
6    THE WITNESS:  If he did, I
7    don't remember it.
8 BY MR. PIFKO:
9    Q.   Okay. You said that from
10 time to time you had in-person meetings
11 with members of your team, the other
12 regional directors and managers?
13    A.   Yes.
14    Q.   How frequently did you meet?
15    A.   We would have annual
16 meetings. I don't remember when they
17 started. But I know we did that for a
18 long period of time.
19    Q.   And those were in person?
20    A.   Yeah. They would all come
21 to Chesterbrook.
22    Q.   Okay. And then how many
23 people would attend those meetings?
24    MR. NICHOLAS:  Object to the

Page 252

1    form. Go ahead.
2    THE WITNESS:  It would just
3    be the lead team, regional
4    directors, our senior director,
5    and Chris would be involved in
6    those meetings.
7 BY MR. PIFKO:
8    Q.   So you said at any
9 particular time there would be four to
10 five regional directors?
11    A.   Yes.
12    Q.   Okay. So -- and then your
13 boss, and then Mr. Zimmerman might attend
14 as well?
15    A.   Yes.
16    Q.   So maybe seven or eight
17 people?
18    A.   Yeah. It seemed like --
19 yeah, it would mainly be the regional
20 directors, Steve, Chris, and I think the
21 investigations team would sometimes sit
22 in on those meetings. But generally
23 speaking, yeah, that would be the core
24 group that would meet.

Page 253

1    Q.   The investigations team,
2 that's Bruce Gundy's team?
3    A.   Yes.
4    Q.   And how many people were on
5 that team?
6    A.   It varied over the years. I
7 don't recall exactly. We had
8 investigators that worked for him for a
9 number of years. I don't remember the
10 number.
11    Q.   So in addition to these
12 in-person meetings, did you have
13 telephone conversations regularly with
14 the team?
15    A.   Yes. We would -- we would
16 communicate regularly with each other.
17    Q.   Just informally or did you
18 have like a formal weekly or monthly
19 telephone call?
20    A.   I think we had a formal team
21 call. It might have been weekly. It
22 might have been biweekly. It might have
23 been monthly. I think it changed over a
24 period of years. So that's really --

Page 254

1 have a formal meeting, and then we would
2 talk to each other, you know, on an
3 informal basis as well.
4     Q.   So did you guys e-mail with
5 each other as well?
6     A.   Yes.
7     Q.   Very often?
8         MR. NICHOLAS:  Object to the
9     form.
10        THE WITNESS:  Pretty
11    regularly.
12 BY MR. PIFKO:
13    Q.   If there was a new thing
14 that was being rolled out, would you guys
15 discuss that over e-mail?
16        MR. NICHOLAS:  Object to the
17    form.
18        THE WITNESS:  It would
19    depend.  But we communicated
20    regularly.
21 BY MR. PIFKO:
22    Q.   Okay.  So you don't recall
23 Mr. Mays ever coming back and telling any
24 members of the team -- I know you said

Page 255

1 you specifically, but my question is, do
2 you recall whether Mr. Mays had a meeting
3 with the team at any point saying the DEA
4 is concerned about suspicious order
5 requirements and internet pharmacies and,
6 you know, they want us to take on some
7 additional due diligence efforts?
8         MR. NICHOLAS:  Object to the
9     form.
10        THE WITNESS:  It's been so
11    many years.  I just don't recall.
12 BY MR. PIFKO:
13    Q.   Okay.  Who were some of the
14 other counterparts that you interacted
15 with who held these positions, regional
16 director positions?
17    A.   The names?
18    Q.   Yeah.
19    A.   I think I named them before.
20 There was Greg Madsen, Erica Burwell,
21 Cathy Marcum.  There was a guy named John
22 Gibson, who has since left the company.
23 More recently Tony Droz is one of the
24 newer directors that I worked with a lot.

Page 256

1         So when we would audit
2 their -- excuse me.  When we would audit
3 their distribution centers, obviously we
4 would work with them closely on the
5 results.
6     Q.   You held your role for
7 13 years.  Did the other people in the
8 other regions have a long tenure in their
9 positions as well?
10    A.   Yeah, for the most part.
11 Yeah.  Everybody with AmerisourceBergen
12 generally stays for a long time.  There's
13 very little attrition with our company.
14    Q.   When we talk about
15 interacting with people over the e-mail
16 and telephone and these annual in-person
17 meetings, it's -- the people involved
18 were the names that you just listed for
19 the most part?
20        MR. NICHOLAS:  Object to the
21    form.
22        THE WITNESS:  For the most
23    part.  There were other people
24    that came and left.  But those

Page 257

1     were the main people that were
2     there the long-term.
3 BY MR. PIFKO:
4     Q.   Okay.  I'm going to hand you
5 a document.
6         So you recall also that you
7 said that one of your jobs was to --
8 after the Amerisource and Bergen
9 corporation merger, was to get the
10 licensing and regulatory filings of all
11 the distribution centers in order; is
12 that correct?
13        MR. NICHOLAS:  Object to the
14    form.
15        Go ahead.
16        THE WITNESS:  Yeah.
17 BY MR. PIFKO:
18    Q.   Okay.
19    A.   Yeah, the licensing portion
20 of my responsibility which ended shortly
21 thereafter.  But yes.
22    Q.   Okay.  And as part of that
23 effort you had to look into the files of
24 the other distribution centers to get

Page 258

1  everything together?
2      A.   Yeah, we maintained all the
3  licensing in electronic format for all
4  the distribution centers.
5      Q.   And that was something that
6  you reviewed as part of that effort?
7      A.   Well, I renewed them.
8      Q.   Right, but in order to
9  perform the renewal, you had to look
10 at --
11         MR. NICHOLAS:  I think he
12     thought -- I thought -- I think he
13     thought you said renewed.  And it
14     was renewed/reviewed thing.
15 BY MR. PIFKO:
16     Q.   Okay.  Okay.  So all I was
17 asking is if you reviewed the records
18 when you were renewing the licenses.
19     A.   Well, we had the licenses.
20 There wasn't much to review.  We just --
21 we knew that they expired, generally
22 speaking, once a year.  So we would have
23 to renew those -- those licenses, you
24 know, periodically.  So that was a lot of

Page 259

1  work involved in that.
2      Q.   Okay.  What's the -- what
3  was the nature of the work that goes --
4  involved -- into a renewal of a license?
5      A.   Mainly filling out the
6  application.  Those applications would
7  have various questions on them.  We would
8  have to fill them out one at a time.  You
9  know, the states have their own renewal
10 application.  The DEA switched over to
11 batch renewal, so that was a lot easier.
12         Just -- just really
13 completing the application and cutting
14 the checks.
15     Q.   Batch renewal, that's the
16 way that a company that is that has
17 multiple licenses can renew them all in
18 one -- in one setting?
19     A.   Exactly.
20     Q.   So you use one application,
21 maybe it has discussions about the
22 various registrations, but a centralized
23 way of submitting it?
24     A.   Yeah, instead of having 26

Page 260

1  separate checks, we had one big check and
2  one big application, yes.
3      Q.   Okay.  What kind of -- do
4  you remember the kinds of information
5  that are called for on the application?
6      A.   The DEA batch renewal was
7  pretty straightforward.  There was only
8  about five questions on there.  The state
9  applications would vary from state to
10 state.  They were -- they spanned from
11 little to big.  So -- and again, that was
12 so long ago.  You know, the questions
13 varied.
14     Q.   When you're renewing a
15 license, is there any discussion of
16 compliance activities that occurred at
17 the facility as far as whether the
18 license should be renewed?
19         MR. NICHOLAS:  Object to the
20     form.
21         THE WITNESS:  Yeah, I think
22     some -- some applications ask
23     questions about previous
24     discipline.

Page 261

1  BY MR. PIFKO:
2      Q.   Okay.  Do you remember
3  looking into that when you were in charge
4  of renewing the licenses?
5      A.   Yeah.  That was one of
6  the -- one of the things that we -- that
7  we reviewed as part of completing it,
8  yeah.
9         (Document marked for
10     identification as Exhibit
11     AmerisourceBergen-Cherveny-1.)
12 BY MR. PIFKO:
13     Q.   So I'm handing you what's
14 marked as Exhibit 1.  For the record,
15 it's a few-page document, Bates-labeled
16 ABDCMDL00146183 through 146186.  And it's
17 an e-mail attaching a memorandum of
18 understanding from April 20th, 2000.  And
19 the e-mail is dated December 11, 2013,
20 from the witness to Bruce Gundy.  It
21 talks about a Columbus MOU.
22         Take a minute to review
23 that, and let me know when you're -- when
24 you're done.

Page 262

1    A.   Okay.
2    Q.   Do you remember discussing
3  this MOU with Mr. Gundy?
4    A.   No, I do not.
5    Q.   Okay.  Do you have any
6  reason to dispute that you had the
7  discussion with Mr. Gundy about this MOU?
8        MR. NICHOLAS:  Object to the
9    form.
10       THE WITNESS:  No.  The
11   document indicates that I
12   forwarded this document to him.
13   So I wouldn't dispute that.
14 BY MR. PIFKO:
15   Q.   Okay.  Do you remember
16 looking into what this MOU was about?
17   A.   No.
18   Q.   The title of the document as
19 referenced in the first page,
20 ABDCMDL146183 it has the attachment, the
21 subject is "Columbus MOU."
22       Do you see that?
23   A.   Yes, I do.
24   Q.   Do you have an understanding

Page 263

1  about whether this was specific to a
2  facility in Columbus?
3    A.   Yes.  It looks like it was
4  an -- it was an MOU for our Columbus
5  distribution center.
6    Q.   Okay.  It's got here --
7  going to MDL -- ABDCMDL00146184, it tells
8  -- it says, "The notice of hearing allege
9  that prohibited acts occurred in
10 violation of the Comprehensive Drug
11 Enforcement Administration Abuse
12 Prevention and Control Act of 1970 and
13 the regulations promulgated thereunder,
14 namely that the respondent, Amerisource
15 Corporation has" -- and then it's got
16 four issues here.
17       Do you see that?
18   A.   Yes.
19   Q.   Okay.  And one of them is,
20 "Failed to provide effective controls and
21 procedures to guard against the theft and
22 diversion of controlled substances
23 required by 21 C.F.R. 1301.71(a)."
24       Do you see that?

Page 264

1    A.   Yes, I do.
2    Q.   Do you have an understanding
3  about what that alleged prohibited act
4  was about?
5    A.   With regard to this
6  particular MOU?
7    Q.   Yes.
8    A.   It happened in 2000.  It's
9  just so long ago.  I don't recall this
10 particular occurrence.
11   Q.   Okay.  Item 4 here says,
12 "Failed to adequately supervise employees
13 having access to storage areas resulting
14 in a breach of confidentiality concerning
15 criminal investigation required by 21
16 C.F.R. 1301.71(b)11."
17       Do you see that?
18   A.   Wait, which -- which
19 section, which --
20   Q.   4.
21   A.   Number 4.  Yes, I see that.
22   Q.   Okay.  Do you have an
23 understanding about that -- what that
24 alleged prohibited act was about?

Page 265

1    A.   No.  April 2000.  That was a
2  long time ago.  I don't recall this.
3    Q.   You, as part of your job,
4  we've talked, you've had some
5  responsibilities for discharging the
6  company's compliance with certain
7  controlled substances laws, correct?
8    A.   Yes.
9    Q.   Okay.  Do you have a
10 familiarity with what 21 C.F.R. 1301.71
11 (b)11 is?
12       MR. NICHOLAS:  Object to the
13   form.
14       THE WITNESS:  Reference to
15   Item 4?
16 BY MR. PIFKO:
17   Q.   Yeah.  That citation, is
18 that --
19   A.   No, I --
20   Q.   -- something that you're
21 familiar with?
22   A.   Unless I had it in front of
23 me, I wouldn't -- I wouldn't want to
24 speculate what that regulation states

Page 266

1  exactly.
2      Q.   Okay.  How about 1301.71(a),
3  do you know what that's about?
4          MR. NICHOLAS:  Same
5      objection.
6          THE WITNESS:  I would want
7      to see the regulations before I
8      comment on it.
9  BY MR. PIFKO:
10     Q.   As part of your working to
11 put all the facilities together and
12 applying for the licenses, do you recall
13 uncovering this when you were doing the
14 transition?
15         MR. NICHOLAS:  Objection.
16     Object to the form.
17         THE WITNESS:  No.
18 BY MR. PIFKO:
19     Q.   No?
20         Do you know if any money was
21 paid in connection with this?
22     A.   It states anything here --
23 no, I don't know.
24     Q.   It says here at the 146185,

Page 267

1  "The respondents having been fully
2  advised of the prohibited acts which have
3  occurred have agreed to comply with the
4  provisions of the comprehensive Drug
5  Enforcement Administration Abuse,
6  Prevention and Control Act of 1970 and
7  the regulations issued thereunder
8  hereafter set forth."  And then it's got
9  four items.
10         Do you see that?
11     A.   Yes.
12     Q.   Okay.  It says, "Respondent
13 will provide effective controls and
14 procedures to guard against theft and
15 diversion of controlled substances
16 required by 21 C.F.R. 1301.71(a)."
17         Do you see that?
18     A.   Yes.
19     Q.   Do you have any
20 understanding about what steps were taken
21 to comply with that?
22     A.   No.  Having been so long
23 ago, you know, 18 years ago, I don't
24 recall this at all.  So I don't know what

Page 268

1  steps were taken.
2      Q.   Do you recall anything
3  unique to the Columbus facility as far as
4  how they were performing their duties or
5  procedures when you first came into the
6  role as regional director?
7      A.   No.
8      Q.   It's got some names here of
9  people who, quote, appear -- "appearing
10 on behalf of the respondent."  Do you see
11 that at the top of the page?
12     A.   Yes.
13     Q.   Okay.  Do you know who
14 Rodney Bias is?
15     A.   Yes, I knew Rodney.
16     Q.   Okay.  What was his role?
17     A.   He was, I believe, director
18 of regulatory compliance for Amerisource
19 at the time of the merger.
20     Q.   And do you know what
21 happened to him after -- after the
22 merger?
23     A.   He subsequently left the
24 company.  I don't remember when exactly.

Page 269

1      Q.   Did you interact with him
2  regularly, or he wasn't someone that you
3  worked with?
4      A.   No, I worked with him pretty
5  regularly when he was with the company.
6      Q.   Okay.  Do you have an
7  estimate about when he left the company?
8      A.   No.
9      Q.   How about Brent Wilheim of
10 the Columbus operations manager.  Do you
11 know who that is?
12     A.   Yeah, vaguely.  It was a
13 long time ago.
14     Q.   Was that someone that you
15 interacted with?
16     A.   Not as much as Rodney.
17 Rodney was a member of the corporate
18 regulatory team.  And Brent was an
19 operations manager of the DC, so I would
20 have a lot less interaction with him.
21     Q.   Any of these people, John
22 Briney, Frieda Hein, did you interact
23 with any of them?
24     A.   Yeah, Frieda was the

Page 270

¹ compliance office, she was the compliance
² manager, I worked with her.
³      Q.    Okay.
⁴      A.    I don't remember John
⁵ Briney.
⁶      Q.    Frieda, how long did you --
⁷ over your tenure do you recall working
⁸ with her?
⁹      A.    Several years.  I don't
¹⁰ remember specific dates.
¹¹      Q.    At some point she left the
¹² company?
¹³      A.    I believe so, yeah.
¹⁴      Q.    Have you talked to Rodney or
¹⁵ Frieda in -- at any time in the last few
¹⁶ years?
¹⁷      A.    No.
¹⁸      Q.    It's got some people who are
¹⁹ identified as appearing on behalf of the
²⁰ DEA below that.  Do you see that?
²¹      A.    Yes.
²²      Q.    Do you know who any of those
²³ people are?
²⁴      A.    I remember Helen Kaupang.

Page 271

¹ She was the group supervisor of the
² Columbus office I believe, so I did work
³ with her.
⁴      Q.    Okay.  You worked with her
⁵ somewhat regularly?
⁶      A.    She was the group supervisor
⁷ for the -- for the DEA that held
⁸ jurisdiction for our distribution center.
⁹ So I worked with her several times
¹⁰ throughout my tenure while I had that
¹¹ distribution center.
¹²      Q.    She was in that position as
¹³ long as you could remember while you
¹⁴ were -- you had your role?
¹⁵      A.    Yeah, I don't remember what
¹⁶ years.  But I remember -- I remember the
¹⁷ name and I remember working with her.
¹⁸      Q.    When you say group
¹⁹ supervisor, that's what it says here on
²⁰ the page, what -- what does that -- what
²¹ is your understanding of what that
²² entailed?
²³      A.    The group supervisors are in
²⁴ charge of the -- of the field office, and

Page 272

¹ they report up to a program manager.  So
² they would be sort of the equivalent of
³ a -- of a -- like our distribution
⁴ center.  And then, you know, the program
⁵ manager would be equivalent to like a
⁶ regional director.  So within DEA, that's
⁷ the way I would -- I would explain their
⁸ roles.  So she was in charge of that DEA
⁹ office that had that jurisdiction over --
¹⁰ over that geographic area.
¹¹      Q.    You talked about your
¹² closeness with Mr. Mapes.  Did you feel
¹³ that you had a closeness with her?
¹⁴           MR. NICHOLAS:  Object to the
¹⁵      form.
¹⁶           THE WITNESS:  No, not as
¹⁷      much.
¹⁸ BY MR. PIFKO:
¹⁹      Q.    Okay.  Did you ever pick up
²⁰ the phone and ask her compliance
²¹ questions?
²²      A.    Not that I recall.
²³      Q.    Do you recall if you ever
²⁴ sent her any letters or e-mails asking

Page 273

¹ her compliance questions?
²      A.    No.  She was a -- she was a
³ group supervisor and Mike was at
⁴ headquarters.  So Mike would have been a
⁵ more appropriate person because he was --
⁶ he was in charge of the programs.  So I
⁷ did not have as much interaction with her
⁸ as I had with Mike.
⁹      Q.    So you knew that if you
¹⁰ wanted guidance from the DEA, it would be
¹¹ more appropriate to ask someone at
¹² headquarters than someone at a regional
¹³ level?
¹⁴      A.    Yeah.  Their -- their
¹⁵ opinion would carry more weight from our
¹⁶ standpoint as a wholesaler.
¹⁷      Q.    Let's go back to
¹⁸ the additional investigation
¹⁹ responsibility that you took on in 2005.
²⁰ What -- I asked you if you remembered how
²¹ you kind of came to take that on.  You
²² said you didn't really have a clear
²³ direct remembrance of the meeting or
²⁴ specific thing.  But you just remember

Page 274

1 that you took it on, correct?
2    A.   That's correct.
3    Q.   Okay.  So, what specifically
4 were these additional investigation
5 responsibilities that you took on at that
6 time?
7    A.   So the report that I
8 reviewed that generated periodically was
9 called the possible suspicious order
10 report.  So that report was generated
11 based on pre-set parameters, and it would
12 come to my office.  I would separate it
13 by customer, and I would conduct separate
14 investigations pursuant to that report,
15 to those customers.
16    Q.   Do you know how that report
17 was generated?
18    A.   I don't recall.  I don't
19 recall the parameters and I don't recall
20 how it was generated.  I just know that
21 it was generated and it came to my
22 office.
23    Q.   Do you know if that was a
24 report that was generated prior to you

Page 275

1 having the involvement with it and then
2 you were just a new person that was
3 reviewing it and it had been produced
4 before and others had reviewed it?
5        MR. NICHOLAS:  Object to the
6    form.
7        THE WITNESS:  I honestly
8    don't recall.  It was so long ago.
9 BY MR. PIFKO:
10    Q.   Do you -- that was kind of a
11 longwinded question.  Do you understand
12 my question?
13        Did you understand -- I
14 think -- I think I know what you're going
15 to say but I'll just ask it for clarity.
16        Do you understand that that
17 report existed before you became involved
18 with interacting with that report?
19    A.   I can't confirm knowledge
20 that that report existed prior to my
21 taking on that investigative
22 responsibility.
23    Q.   How frequently would this
24 report get sent to you?

Page 276

1    A.   I know it was periodic.  I
2 don't remember the frequency.
3    Q.   Who told you that your new
4 responsibility was to look at this
5 report?
6    A.   I believe it was Steve Mays.
7    Q.   And you know it was in 2005?
8    A.   I believe it was within that
9 two-year period, from 2005 to 2007.  But
10 again that was a long time ago.  That's
11 just my recollection.
12    Q.   How would this report come
13 to you, by -- by e-mail?
14    A.   No, it would come in
15 hardcopy.
16    Q.   Okay.  Through like
17 interoffice mail?
18    A.   Yeah, I don't know where it
19 was generated from.  But I know that it
20 was -- it would end up on my desk at the
21 predesignated time, you know, at the
22 frequency that it was established for.
23    Q.   Okay.  So if it was like
24 every week on a Friday when that would

Page 277

1 come, or once a month, whatever, it came
2 with that regularity and someone would
3 deliver it to you?
4        MR. NICHOLAS:  Object to the
5    form.
6        Go ahead.
7        THE WITNESS:  Yes.
8 BY MR. PIFKO:
9    Q.   Okay.  And then it was your
10 job to look at the -- the I'm sorry if I
11 didn't -- if I didn't hear you, the
12 orders or the customers that were on this
13 list?
14    A.   It was -- it was orders and
15 it was broken down by customers.
16    Q.   Okay.  So it was your job to
17 look at all the orders on this list?
18    A.   Yes.
19    Q.   And how did you know, did
20 someone train you about what you were
21 supposed to look for when you were
22 looking at this?
23    A.   I don't remember
24 specifically how I was instructed to --

Page 278

1 to review the report. I don't remember
2 how I was instructed.
3     Q.   Do you know who would have
4 given you the instructions?
5     A.   I believe Steve would have
6 done that.
7     Q.   Okay. And so tell me what
8 your recollection of what you were
9 supposed to look at on this report was.
10     A.   So the report contained
11 sales data for customers. And I believe
12 it was Oxycodone and hydrocodone
13 products. If they breached a parameter,
14 it would trigger this report to be
15 generated. So I got the report
16 periodically and it may have been, you
17 know, I don't remember how much it was,
18 but I would separate it by customer,
19 because it would be, I believe
20 alphabetical or it might have been by DEA
21 number. But it would basically be, you
22 know, one customer, then another
23 customer, and it would just be -- it
24 would span multiple customers in

Page 279

1 grouping. So I would group them in
2 separate -- in separate files and then I
3 would conduct the investigation of those
4 customers.
5     Q.   Okay. And then what -- what
6 things would you do to conduct the
7 investigation of those customers?
8     A.   I had a couple support staff
9 within the CSRA department that I used to
10 assist me with this, that I would work
11 with those individuals to contact the
12 sales executive, to contact the customer
13 to inquire as to why they were buying,
14 you know, that quantity of controlled
15 substances. We would collect all the
16 information on the customer. We would
17 take their responses to our questions and
18 our follow-up questions, and we would
19 complete an investigation of each
20 customer.
21     Q.   Would there be some sort of
22 document that you would create at the
23 culmination of your investigation?
24     A.   Yeah. It would be an

Page 280

1 investigation report.
2     Q.   Okay. And then would you
3 save that somewhere?
4     A.   Yeah. I believe it was
5 maintained in Law Track.
6     Q.   And then was there a goal of
7 the investigation that you were trying to
8 determine something?
9     MR. NICHOLAS:  Object to the
10 form.
11     THE WITNESS:  We were trying
12 to determine if any improprieties
13 were happening with regard to
14 those orders. I would -- I would
15 collect all the information that
16 I -- that I could from the
17 customer to explain, you know, the
18 reasoning as to why they were
19 buying that quantity of controls,
20 and I would take the findings and
21 I would, you know, provide it to
22 Steve Mays. And what he did with
23 it, you know, I'm not sure.
24     Because at that point the

Page 281

1 decision -- the decisionmaking
2 regarding my investigation that I
3 completed was conducted, you know,
4 outside of my realm. So I'm not
5 sure what the -- what the -- what
6 the results of those -- those
7 investigations entailed.
8 BY MR. PIFKO:
9     Q.   Did you make any
10 recommendations for actions in the
11 report?
12     A.   You know, it's been so long
13 ago, I don't recall.
14     Q.   Do you recall if one of the
15 things that you were evaluating was
16 whether to fill the order?
17     A.   Well, keep in mind this was
18 a system that we operated that was
19 prior -- prior to the system that held
20 orders.
21     Q.   Okay.
22     A.   So this was investigations
23 that occurred after the shipment was
24 already completed.

Page 282

1    Q.   Okay.  So it's your
2  understanding that all these orders and
3  in the possible suspicious order report
4  had already been shipped; is that
5  correct?
6    A.   Yes.  Those were -- those
7  were orders that have already been
8  shipped.  That's correct.
9    Q.   Okay.  And you would look at
10 it to evaluate whether there were
11 concerns, and you would generate a
12 report, but you didn't make any
13 recommendations for a course of action
14 going forward; is that correct?
15   A.   That's correct.
16   Q.   You provided that to Steve
17 Mays, the report?
18   A.   Yes.  I believe I give it
19 directly to Steve Mays.
20   Q.   Did you send it by e-mail?
21   A.   I don't recall.  We may have
22 just put it in the Law Track system and
23 he retrieved it from there.  I don't
24 recall how I gave it to him.

Page 283

1    Q.   Do you recall about how long
2  it would take you to conduct an
3  investigation of a customer that was
4  identified in this report?
5    A.   I don't recall.
6    Q.   Is it like -- put me in your
7  shoes.  I'm sitting -- I'm sitting at
8  your desk.  Is it like a thing that takes
9  a week, and you're kind of doing it off
10 and on?  Is it something that you sit
11 down and do in a few hours?  Do you do it
12 all day?  Can you explain to me how long
13 the process took in that regard?
14      MR. NICHOLAS:  Object to the
15 form.
16      You can go ahead and answer.
17      Can we a break soon, Mark,
18 maybe after this question?
19      MR. PIFKO:  Yeah.
20      MR. NICHOLAS:  Okay.  Go
21 ahead.
22      THE WITNESS:  Yeah, the --
23 it would depend on how quickly we
24 got the information that we asked

Page 284

1  for.  Sometimes we would contact
2  the customer, and it would take
3  them time to respond to us.  So it
4  would depend on the investigation,
5  anywhere from, you know, best case
6  scenario, a couple days to maybe a
7  couple weeks, just off the top of
8  my head.  But I -- it's been so
9  long I don't recall.
10      MR. PIFKO:  Okay.  Thank
11 you.  We'll take a break.
12      THE VIDEOGRAPHER:  Going off
13 the record.  2:32 p.m.
14      (Short break.)
15      THE VIDEOGRAPHER:  Back on
16 record, 3:07 p.m.
17 BY MR. PIFKO:
18   Q.   Welcome back.
19   A.   Thank you.
20   Q.   I want to talk about your
21 educational background and training for a
22 little bit.  Okay?
23   A.   Yeah.
24   Q.   All right.  So earlier we

Page 285

1  talked that you -- let me make sure I
2  have a clear understanding.  You went to
3  high school, graduated high school.  Then
4  you went to Golden West College for a
5  year, and then you decided to join the
6  Navy, and did that, and then you got a
7  job with Amerisource -- or with the
8  Bergen Corporation, correct?
9    A.   Yes.
10   Q.   How long were you in the
11 Navy?
12   A.   Five years.
13   Q.   And you had the same
14 controller job during the entire duration
15 of your service?
16   A.   Yes.
17   Q.   Okay.  So when you got to
18 the Bergen Corporation, you started as a
19 security guard, you said, correct?
20   A.   Security officer.  Yes.
21   Q.   Okay.  And then when you
22 moved into the regional manager director
23 position, did you get any specific
24 training?

Page 286

1      A.   Yes.  I basically
2  accompanied other auditors on audits, and
3  those people that had been with the
4  company ran through the audit checklist
5  with me and all related duties that I
6  would have.
7      Q.   So when you first took on
8  that role, your primary job was
9  conducting the audits?
10      A.   Conducting the audits and
11  managing my region.
12      Q.   Okay.  What else -- what
13  else do you mean by managing your region?
14      A.   Well, the compliance
15  managers would report up to me.  So any
16  day-to-day occurrences that needed
17  attention, you know, I would have to
18  handle that.  So that had a whole array
19  of areas that I had to -- had to respond
20  to.
21      Q.   Okay.  So how many -- how
22  many compliance managers would be at a
23  particular distribution center?
24      A.   Only one.

Page 287

1      Q.   So those people reported to
2  you.  Anyone else who reported to you?
3      A.   No.
4      Q.   And then, sorry, I know we
5  had discussed it may be a bit, but how
6  many distribution centers would you have
7  under your wing at any one time?
8      A.   Anywhere between five and
9  eight, I think --
10      Q.   Okay.
11      A.   -- depending on which time
12  period it was.
13      Q.   So you had about five and
14  eight compliance managers who had to
15  report to you?
16      A.   Correct.
17      Q.   And so in addition to
18  conducting the audits, you had to deal
19  with any issues they raised to you, any
20  personnel issues, and things like that as
21  well?
22      A.   Yes.
23      Q.   Anything else that was part
24  of your job at that time?

Page 288

1      A.   Nope, I think that was it.
2      Q.   And then 2005, you added the
3  investigation slate to your plate, as we
4  discussed before the break, correct?
5      A.   Correct.
6      Q.   And then you conducted those
7  investigations for how long?
8      A.   I believe it was from 2005
9  and 2007.
10      And I would like to make a
11  correction to my previous testimony.
12      Q.   Okay.  Is that based on a
13  discussion that you had during the break?
14      A.   Just --
15      MR. NICHOLAS:  Objection.
16  Objection.  I don't think you're
17  allowed to ask about any
18  conversation --
19      MR. PIFKO:  If he's going to
20  make a correction to his
21  testimony, I am.
22      MR. NICHOLAS:  Where does it
23  say -- I mean, where does it say
24  that?  Hold on.  Let me just

Page 289

1  find -- let me just find the order
2  so we can be clear on --
3      MR. PIFKO:  Well, he's
4  making a correction.
5      MR. NICHOLAS:  What does
6  that have to do with this order?
7  BY MR. PIFKO:
8      Q.   What's the basis of your
9  correction, sir.
10      MR. PIFKO:  I don't need the
11  order.
12      MR. NICHOLAS:  Wait a
13  minute.
14      Go ahead.
15      MR. PIFKO:  No, if he's
16  going to make a correction, I'm
17  asking him a question.
18      THE WITNESS:  The correction
19  was the report -- what the report
20  was called that I reviewed.
21  BY MR. PIFKO:
22      Q.   Okay.  And what was the
23  basis for wanting to make that
24  correction?

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    A.   Just to correct the record.

2    Q.   No, but why did it come to
3  you that you needed to correct the
4  record?  Did someone tell you at the
5  break that the report had a different
6  name?

7        MR. NICHOLAS:  I'm going to
8    instruct him not to answer, based
9    on this order.

10 BY MR. PIFKO:

11   Q.   Did AmerisourceBergen's
12 lawyer tell you that the report had a
13 different name during the break?

14       MR. NICHOLAS:  I'll instruct
15   him not to answer based on this
16   order.

17       THE WITNESS:  I'll take my
18   attorney's advice.

19 BY MR. PIFKO:

20   Q.   Okay.  The reason that you
21 want to change the name of the order, is
22 there a way that you can answer that
23 question without revealing conversations
24 with your lawyer?

Page 291

1        MR. NICHOLAS:  I'm going to
2    instruct him not to answer based
3    on the order.  The order is pretty
4    clear.  You can't inquire about
5    any conversations during the
6    break.  Period.

7        MR. PIFKO:  I can, because
8    it's clear that a change was
9    required as a result of something
10   that occurred during the break.

11       MR. NICHOLAS:  That's not --
12   that's not true that anything is
13   clear.  I know what the order
14   says.  You've not allowed to
15   inquire about a conversation --
16   about any conversations at all
17   during the break having to do with
18   attorney -- between the attorneys
19   and the witness.  So just don't do
20   it.  Just ask him your --

21 BY MR. PIFKO:

22   Q.   How did you come to -- how
23 did you come to realize that you wanted
24 to make a change to the name to the

Page 292

1  report?

2        MR. NICHOLAS:  You can
3    answer only to the extent that it
4    doesn't -- you know, you can't
5    talk about any conversations on
6    the break.

7        THE WITNESS:  I just want to
8    make a correction to the name of
9    the report that I reviewed.

10 BY MR. PIFKO:

11   Q.   I hear you, but that's not
12 my question.

13       My question is:  How did you
14 come to decide that you wanted to make a
15 change to the name of the report?

16       MR. NICHOLAS:  Same
17   instruction.

18       THE WITNESS:  I'll follow my
19   attorney's advice and not answer
20   that.

21 BY MR. PIFKO:

22   Q.   You can't answer that
23 question without talking about a
24 communication that you had with your

Page 293

1  lawyer?

2        MR. NICHOLAS:  Same
3    objection.

4        THE WITNESS:  Yes.

5        MR. PIFKO:  Okay.  Well,
6    obviously we'll deal with that.
7    The record is what it is.

8  BY MR. PIFKO:

9    Q.   What's the correction that
10 you would like to make that obviously
11 your counsel told you to make?

12       MR. NICHOLAS:  Hold on.
13   Hold on.  I'll object to the
14   snarky comment --

15       MR. PIFKO:  It's the
16   reality.

17       MR. NICHOLAS:  -- which
18   is -- which is --

19       MR. PIFKO:  Bob, you've got
20   a problem.  We're already in the
21   process of raising it to the
22   court.  You have a problem out of
23   every other lawyer in this whole
24   case of your coaching of

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  witnesses.  We're building the
2  record.  But the transcripts are
3  very clear about your coaching and
4  your improper conduct.
5      And I'm dead serious right
6  now.  I will seek to have your pro
7  hac vice revoked from the case if
8  you can't comply with the rules.
9  That is a remedy that is
10  appropriate.  And if you can't
11  comply with the rules, then that's
12  where we're going to go.
13      I hope that we don't need
14  that.  I think you're a nice
15  enough guy.  But you really got to
16  tone it down.  Okay?  So that's
17  the end of this.
18      MR. NICHOLAS:  No, wait,
19  wait, wait.  I want to wait till
20  you complete your statement before
21  I respond.
22      MR. PIFKO:  We're having --
23  you're not responding.  I'm
24  taking --

Page 295

1      MR. NICHOLAS:  Well, bring
2  your --
3      MR. PIFKO:  -- a deposition
4  and you're interrupting the
5  deposition.  Okay?  We're not
6  doing this.
7      MR. NICHOLAS:  I didn't
8  interrupt the deposition.
9      MR. PIFKO:  Yeah, you did.
10      MR. NICHOLAS:  I
11  interposed --
12      MR. PIFKO:  You did.
13      MR. NICHOLAS:  -- an
14  objection.
15      MR. PIFKO:  Okay.  And you
16  clearly -- you clearly coached the
17  witness to change the nature of
18  his testimony during the break.
19  It's very obvious from the record
20  that that's what occurred.
21      That's obviously improper.
22  Everybody knows that.  Okay.  And
23  that's what you did.  And we're
24  going to have to live with it.

Page 296

1      But that's the reality of the
2  situation.
3  BY MR. PIFKO:
4      Q.    So what's the correction
5  that you want to make?
6      MR. NICHOLAS:  Before you
7  answer -- and you can answer.  I
8  just want the record to be clear
9  that it is my view that there have
10  been extensive improper and
11  misleading questions asked
12  throughout the depositions that
13  I've been involved in.
14      I only object when there is
15  a need to correct something which
16  is clearly misleading and
17  improper.
18      MR. PIFKO:  There's a way to
19  make objections.  And you go
20  beyond what the way is.
21      MR. NICHOLAS:  That's your
22  opinion.
23      MR. PIFKO:  No, it's
24  obvious.  When you state facts in

Page 297

1  your objection, you're going above
2  and beyond what you're supposed to
3  do when you make an objection.  I
4  told you this at the last
5  deposition.
6      MR. NICHOLAS:  Have I done
7  it today?
8      MR. PIFKO:  No.  You were
9  better until now.  And you're
10  coaching the witness during the
11  break.
12      MR. NICHOLAS:  Well, that --
13  okay.  There's no basis for your
14  saying that.
15      MR. PIFKO:  There is.
16      MR. NICHOLAS:  If you want
17  to hear what he has to say, fine.
18  If you don't want to hear --
19      MR. PIFKO:  I'm trying to
20  get it out of him --
21      MR. NICHOLAS:  -- what he
22  has to say, fine.  That's up to
23  you.
24      MR. PIFKO:  -- but you're

Page 298

1 obstructing me from getting it out
2 of him right now.
3 BY MR. PIFKO:
4 Q. Okay. With that said,
5 what's the correction that you would like
6 to make?
7 A. The report that I reviewed,
8 the periodic report that I referenced
9 earlier, I indicated that it was a
10 possible suspicious order report. It's
11 actually called the possible excessive
12 purchase report.
13 Q. Okay.
14 A. That's the correction.
15 Q. But you remember it being
16 called the suspicious order report
17 because you were evaluating the
18 suspicious natures of the orders; is that
19 correct?
20 MR. NICHOLAS: Object to the
21 form.
22 THE WITNESS: No. We're
23 just talking multiple years since
24 I reviewed the report. So I just

Page 299

1 misunderstood -- I misremembered
2 what it was called.
3 BY MR. PIFKO:
4 Q. Okay. Why did you think it
5 was called a possible suspicious order
6 report?
7 A. I don't know. I just didn't
8 remember.
9 Q. Do you have an understanding
10 what an order that exceeds the threshold
11 is?
12 A. Well, it would depend.
13 Q. Well, before 2007, are you
14 aware that the company reported all
15 orders that exceeded thresholds as
16 suspicious to the DEA?
17 A. No. I don't know how those
18 reports were submitted and what was
19 submitted.
20 Q. Are you aware that the
21 company reported suspicious orders to the
22 DEA before 2007?
23 A. I did not know that. I
24 didn't know when it started. I didn't

Page 300

1 know when that happened or how it
2 happened.
3 Q. Are you aware that the
4 company has a duty to identify and report
5 suspicious orders?
6 A. Yes. We have a
7 responsibility to report suspicious
8 orders.
9 Q. And to identify them as
10 well?
11 A. Well, I think reporting it
12 would be identifying them, wouldn't it?
13 Q. Okay. Well, I just want to
14 make sure we are using the correct words
15 here.
16 Okay. So you are aware that
17 that's a requirement that the company
18 has, correct?
19 A. Yes, to review orders and
20 identify suspicious orders and block them
21 and report them.
22 Q. Okay. Is that a new
23 requirement?
24 A. No.

Page 301

1 Q. Okay. That's something that
2 you've always been required to do,
3 correct?
4 MR. NICHOLAS: Object to the
5 form. Go ahead.
6 THE WITNESS: Yes.
7 BY MR. PIFKO:
8 Q. As long as your tenure with
9 the company going back to the late '90s,
10 correct?
11 A. Yes.
12 Q. Okay.
13 A. Well, the regulation has
14 been -- has stated that since the early
15 '90s, yes.
16 Q. So we were going -- we
17 were -- before we went into that sidebar,
18 we were discussing your training and some
19 of your responsibilities as the regional
20 manager.
21 So you supervised about
22 eight compliance managers, five to eight,
23 depending on the time, and you were
24 responsible for conducting the audits,

Page 302

1 correct?

2     A.    Some of the audits, yeah.

3     Q.    Okay.  Based on the schedule

4 that was provided to you, correct?

5     A.    Yes.

6     Q.    And you said that when you

7 took over that role, you got sort of

8 on-the-job training with people who had

9 already had experience conducting the

10 audits; is that correct?

11     A.    Yes, that's correct.

12     Q.    Did you have any formal

13 training sessions, went through a

14 presentation at the company, or online

15 training or anything like that?

16     A.    I don't recall.

17     Q.    And we were talking about

18 your job responsibilities in that you

19 added this investigations in 2005, and

20 then you stopped doing them in 2007.

21 That -- that was taken off your plate,

22 did I hear you correctly?

23     A.    Yes.

24     Q.    Okay.  And then from 2007 to

Page 303

1 2015, your job was to manage the

2 compliance managers and to conduct the

3 audits?

4     A.    Yes.

5     Q.    Any other responsibilities?

6     A.    No.  That pretty much took

7 all my time.

8     Q.    Okay.  And did you get any

9 other specific training at that time?

10     A.    At what time?

11     Q.    After 2007.

12     A.    No, not that I recall.

13     Q.    Did you attend -- was there

14 like any regular annual training or

15 anything you attended?

16     A.    We would conduct annual

17 conferences with the entire CSRA

18 department.  So training sessions were

19 conducted during -- during those

20 sessions.

21     Q.    Who gave those trainings?

22     A.    Various associates.

23     Q.    Managers, or people under

24 you, or?

Page 304

1     A.    A combination.

2     Q.    Okay.  These were annual

3 meetings, you said?

4     A.    Yes.

5     Q.    How many people would attend

6 them?

7     A.    A lot of people.  All of the

8 compliance managers with the company.

9 And the corporate CSRA associates.

10     Q.    About how many people would

11 that be at a particular time?

12     A.    It would depend on the

13 number of distribution centers we had at

14 that period.

15     Q.    Okay.  Can you give me a

16 range?

17     A.    Well, when we first merged

18 we had 52 distribution centers.  We

19 merged those down to 26, and I think it

20 stayed right in that level.  So 26

21 compliance managers along with corporate

22 associates which would -- which would

23 vary over time.

24     Q.    Did you interact with -- so

Page 305

1 your -- you were under the CSRA

2 department, correct?

3     A.    Yes.

4     Q.    Okay.  But your area was

5 just one area of the CSRA, correct?

6     A.    Well, I had a region, but

7 there were other responsibilities that

8 the CSRA department handled.  But I was

9 regulatory.

10     Q.    Right.  So that's kind of

11 what I'm trying to get at.  So there

12 was an -- was there an investigation

13 group that was part of the CSRA that was

14 Bruce Gundy's group?

15     A.    Yes.

16     Q.    Okay.  Were there other

17 groups -- and then there -- there was

18 your group that Steve Mays was in charge

19 of; is that correct?

20     A.    Yes.

21     Q.    Okay.  Was there another --

22 any other groups that you're aware of?

23     A.    There was a physical

24 security manager.

Page 306

1  Q.  Okay.  And what -- just one
2 person?
3  A.  He may have had somebody
4 that worked under him.  I don't recall.
5  Q.  Okay.  And what was his
6 role?
7  A.  To oversee all the physical
8 security of the distribution centers,
9 alarm components and such.
10  Q.  So from time to time would
11 you confer with him if you had an issue
12 of physical security at one of the
13 distribution centers under your audit
14 responsibility?
15  A.  Yes, I would.
16  Q.  What was his name?
17  A.  Bob Crow.
18  Q.  Was he in the -- that
19 position the whole time?
20  A.  Most of the time.
21  Q.  Do you remember who took
22 over his role?
23  A.  It was reassigned I believe
24 to -- to the distribution centers,

Page 307

1 possibly the district directors.  I don't
2 remember -- recall exactly who got that
3 role when he -- when he left.
4  Q.  Other than the on-the-job
5 initial kind of training you did working
6 with other auditors and these annual
7 meetings, were there any other kinds of
8 trainings that you attended?
9  A.  When I -- I believe before I
10 took over the director role I was sent to
11 Reid Interrogation School.
12  Q.  What's that?
13  A.  It's a school that teaches
14 you how to interrogate, conduct
15 interviews and interrogations.
16  Q.  And that was -- what time
17 period did you do that?
18  A.  I don't recall.
19  Q.  Have an estimate of a range
20 of the years you think it might have
21 occurred?
22  A.  Early 2000s.
23  Q.  Okay.  How long was that
24 program?

Page 308

1  A.  It was a week long, I think.
2  Q.  Okay.  So you did that
3 full-time for that week for the -- it
4 wasn't like you were going to work and
5 then you'd go at night or something.  You
6 went to that program for the week and
7 finished the course?
8  A.  Correct.
9  Q.  Okay.
10  A.  Took my whole time for that
11 week.
12  Q.  Where was that located?
13  A.  It was in the city, here in
14 Philadelphia.
15  Q.  Any other training that you
16 were provided?
17  A.  We would go to conferences
18 from time to time, but nothing beyond
19 that.
20  Q.  What kind of conferences?
21  A.  DEA conferences.  They have
22 a chemical conference, they have a
23 controlled substance conference, some
24 state conferences.

Page 309

1  Q.  Did you go to more than one
2 of those conferences a year?
3  A.  No.
4  Q.  Did you go to one every year
5 or just some years?
6  A.  Just some years.
7  Q.  How were you invited to
8 those?  Just someone said you should go,
9 or was it a regular schedule?
10  A.  No.  I was assigned by my
11 senior director.
12  Q.  Okay.  To go to a specific
13 conference that occurred or just they
14 would say, I want you to go to this
15 conference next month?
16  A.  He would instruct me which
17 conferences he wanted me to go to.
18  Q.  Okay.  And that was Steve
19 Mays?
20  A.  Yes.
21  Q.  Any other training that you
22 took that you can think of?
23  A.  Possibly, but nothing that
24 comes to mind right now.

Page 310

1    Q.   We talked about the 2007
2  situation where the Orlando facility got
3  its registration revoked and -- do you
4  recall that?
5    A.   Suspended.
6    Q.   Suspended, correct.  Sorry.
7      Do you recall that?
8    A.   Yes.
9    Q.   Okay.  And you are aware
10 that there was some sort of settlement
11 agreement that was entered into between
12 the company and the DEA?
13     MR. NICHOLAS:  Object to the
14     form.
15     THE WITNESS:  Yeah, I'm
16     aware of some sort of agreement we
17     had.
18 BY MR. PIFKO:
19   Q.   Okay.  To your knowledge,
20 did that result in a substantial change
21 in the policies and procedures for the
22 CSRA?
23     MR. NICHOLAS:  Object to the
24     form.

Page 311

1      THE WITNESS:  Changes
2      resulted as a result of the
3      action.
4  BY MR. PIFKO:
5    Q.   But did you feel that -- you
6  know, you had already been in your role
7  for quite a few years at that time.  Did
8  you feel there was like a sea change of
9  how the company was looking at diversion
10 control after that?
11   A.   A what change.
12   Q.   A sea change, like a
13 dramatic shift in how the company saw its
14 regulatory responsibilities after that
15 happened?
16     MR. NICHOLAS:  Object to the
17     form.
18     THE WITNESS:  I would say
19     changes were implemented as a
20     result of that action, yes.
21 BY MR. PIFKO:
22   Q.   And I believe you testified
23 earlier that there was a lot of internal
24 discussion as a result of that action,

Page 312

1  correct?
2      MR. NICHOLAS:  Object to the
3      form.
4      THE WITNESS:  I think I
5      stated I assumed there was, yes.
6  BY MR. PIFKO:
7    Q.   Okay.  You had a personal --
8  a loss in the family around that time?
9    A.   That's correct.
10   Q.   Okay.  Did you take a leave
11 from the company as a result of that?
12   A.   Yes, I did.
13   Q.   Okay.  For about how long?
14   A.   I think it was just over two
15 weeks.
16   Q.   And do you have a rough
17 estimate about when that was?
18   A.   It was in the 2006-2007 time
19 frame.
20   Q.   Okay.  I'm going to hand you
21 another document.
22     (Document marked for
23     identification as Exhibit
24     AmerisourceBergen-Cherveny-2.)

Page 313

1  BY MR. PIFKO:
2    Q.   I'm handing you what's been
3  marked as Exhibit 2.  It is a PowerPoint.
4  It doesn't have a Bates number on it
5  because it was a native printout that we
6  had.  But the Bates number is
7  ABDCMDL00269291.
8      Take a minute to review it
9  and let me know when you're done.
10     MR. NICHOLAS:  Just for the
11     record, there's no stamp on it.
12     MR. PIFKO:  Yeah, that's
13     what I was just saying.  It was
14     produced natively.  So it's
15     ABDCMDL00269291.
16     MR. NICHOLAS:  Can you just
17     for the record tell us whether
18     there was a confidentiality
19     designation on the document?
20     MR. PIFKO:  I assume it was
21     designated.  We can go forward as
22     if it is.  If it's not, we'll
23     correct the record later.
24     THE WITNESS:  Okay.

Page 314

BY MR. PIFKO:

1  Q.  All right.  Have you seen
this document before?

4  A.  Not that I recall.

5  Q.  Do you know what a DCM is if
you look at the first page here?

7  MR. NICHOLAS:  I think you
need to --

9  MR. PIFKO:  It's
double-sided, I think.

11  MR. NICHOLAS:  Where are
you?  On the upper page?

13  MR. PIFKO:  Yeah, the
very -- very first page.  Yeah,
right there.

16  THE WITNESS:  VP/DCM
meeting?  Yes.

18  BY MR. PIFKO:

19  Q.  What is a DCM?

20  A.  That's an acronym for
distribution center manager.

22  Q.  Okay.  Those are people that
you would have interacted with when you
were conducting the audit?

Page 315

1  A.  Yes.

2  Q.  The date here, August 28,
2007, do you see that?

4  A.  Yes.

5  Q.  Based on your memory of
events, is that consistent with the time
on or around when the company had this
enforcement action in Orlando?

9  A.  Yes, right in that time
period.

11  Q.  Okay.  You just spent a few
minutes looking at the document.  Would
you agree that this is a discussion of
some changes that occurred as a result of
the suspension of the Orlando
registration?

17  MR. NICHOLAS:  Object to the
form.

19  THE WITNESS:  Yes, I would.

20  BY MR. PIFKO:

21  Q.  Let's go to the second page
here.  Do you see it says, "DEA's
internet pharmacy initiative, suspicious
order monitoring"?

Page 316

1  Do you see that?

2  A.  Yes.

3  Q.  Do you have an understanding
about what that is?

5  A.  I don't remember what DEA's
initiative was with regard to that.  That
was a long time ago.

8  Q.  Okay.  You don't recall ever
being asked to do anything as a result of
the initiative?

11  A.  No.

12  Q.  You don't recall ever being
told to do anything specific with respect
to concerns about internet pharmacies?

15  A.  I don't recall anything that
I was instructed to do specific, no.

17  Q.  Do you remember a discussion
about any specific concerns about
internet pharmacies in general?

20  A.  We were aware that internet
pharmacies existed.

22  Q.  Do you remember them being a
cause for concern?

24  A.  Yes.  That was a focus of

Page 317

1  our reviews.

2  Q.  Okay.  When do you remember
that being a focus of your reviews?

4  A.  That general time period.

5  Q.  In 2007?

6  A.  Yes.

7  Q.  And why did they become a
focus of your reviews at that time?

9  A.  It was a lot of information
in the media about internet pharmacies.
We knew that it was a problem within the
country.  We knew DEA had an initiative
to try to -- try to address it.

14  Q.  Diversion was occurring more
at these pharmacies; is that correct?

16  MR. NICHOLAS:  Objection.
Object to the form.

18  THE WITNESS:  According -- I
would say according to DEA.  Yes.

20  BY MR. PIFKO:

21  Q.  And you said you saw media
reports?

23  A.  Yeah.  There was a lot --
there was a lot of information out in the

Page 318

1  media regarding internet pharmacies back
2  then.
3      Q.    What kind of information?
4      A.    Just general information.
5      Q.    Like discussing problems and
6  violations that were occurring at
7  internet pharmacies?  Is that what you
8  mean?
9      A.    Generally a problem within
10 the industry that was resulting in -- in
11 diversion according to the DEA, yes.
12     Q.    Okay.  And specifically
13 diversion of opioids?
14     A.    Controlled substances in
15 general.
16     Q.    Okay.  But that includes
17 opioids?
18     A.    Yes, controlled substance
19 includes opioids.
20     Q.    You talked about you
21 understood this was a concern of
22 something that was being discussed at the
23 company, correct?
24     A.    We were aware of it, yes.

Page 319

1      Q.    Okay.  What steps did the
2  company take to address those concerns?
3      A.    I don't recall.  It was too
4  long ago.  I don't remember specific
5  steps that we took.
6      Q.    Do you remember people
7  talking about taking any steps or just
8  being concerned?
9      A.    Again, we're talking
10 11 years ago.  I don't remember specific
11 steps that were taken.
12     Q.    Do you remember if anyone
13 took any effort to take any steps?
14     A.    I don't recall.
15           MR. PIFKO:  Sterling is
16     telling me that this is marked
17     highly confidential.  We can act
18     accordingly with this for the
19     record.
20           MR. NICHOLAS:  Okay.
21 BY MR. PIFKO:
22     Q.    Let go to -- Page -- there
23 are page numbers on here -- 4.  Tell me
24 when you're there.

Page 320

1      A.    Okay.
2      Q.    It says, "DEA summary."
3           Do you see that?
4      A.    Yes.
5      Q.    Okay.  It's got a timeline
6  of events here.
7           Do you see that?
8      A.    Yes, I do.
9      Q.    Okay.  Is this consistent
10 with your understanding of the events
11 that occurred in connection with the
12 registration of the Orlando facility
13 being suspended?
14     A.    Well, the fact that it's on
15 a PowerPoint that we produced, I would
16 assume this information is accurate.
17     Q.    Okay.  Did anyone contact
18 you when the Orlando facility first got
19 the order to show cause?
20     A.    I don't remember who
21 contacted me.
22     Q.    At some point, someone
23 contacted you about this issue, the fact
24 that the Orlando registration had been

Page 321

1  suspended, correct?
2      A.    I would say that I became
3  aware of it.
4      Q.    Okay.  How do you believe
5  you first became aware of it?
6      A.    I have no idea.
7      Q.    You were conducting audits
8  at that time, correct?
9      A.    Yes.
10     Q.    Did anyone tell you that
11 there should be changes in the way the
12 company conducts its audit process to
13 prevent things like this from happening?
14     A.    No, not that I recall.
15     Q.    Do you recall having any
16 meetings about the fact that this was
17 happening and what the company was going
18 to do?
19     A.    No.  Like I said, as soon as
20 it happened -- it was bad timing.  My
21 father passed away.  So I had to leave
22 for, you know, a period of time.  It
23 might have been more than two and a half
24 weeks.  I think I stated that before.

Page 322

1 And when I got back, a lot of these
2 changes had already been made. So I was
3 sort of out of pocket when a lot of this
4 occurred.
5 Q. Okay. When you got back, do
6 you recall there being changes to the way
7 you were supposed to perform your job
8 functions?
9 A. I don't recall specifics.
10 Q. How about in general?
11 A. I don't recall.
12 Q. So you don't recall whether
13 there were any changes in how you had to
14 conduct your job functions after the
15 suspension occurred?
16 A. Not specifically.
17 Q. Or generally either, I'm
18 asking.
19 A. I know that the diversion
20 program was changed. I know that the
21 change resulted in the compliance
22 managers reporting to the regional
23 directors. I know those two changes
24 occurred. I don't remember exactly when

Page 323

1 those changes occurred following the
2 suspension. But I know that that those
3 were two changes that occurred.
4 Q. And you were one of the
5 regional directors, correct?
6 A. Yes.
7 Q. So the compliance managers
8 weren't reporting to you prior to that
9 time?
10 A. That's correct.
11 Q. They just reported up to the
12 distribution center managers? I believe
13 that's what you said.
14 A. That's correct.
15 Q. Do you have an understanding
16 as to why that change was made for the
17 compliance managers to report directly to
18 people like you?
19 A. I'm not sure what factors
20 played into that change, no.
21 Q. Then did you have the
22 ability to hire and fire them?
23 A. What, after they began
24 reporting to us?

Page 324

1 Q. Yeah.
2 A. Yeah, they reported to us.
3 Q. And do you know if their job
4 performance was measured on how
5 effectively they managed a distribution
6 center's compliance?
7 A. I don't recall.
8 Q. If violations occurred at a
9 facility, would there be disciplinary
10 action taken against a compliance
11 manager?
12 MR. NICHOLAS: Object to the
13 form.
14 THE WITNESS: We would
15 manage the compliance managers,
16 and they would be -- they would
17 be -- their performance would be
18 reviewed as a result of how
19 successful they were with regard
20 to their audit scores. So yes, it
21 played a direct role.
22 BY MR. PIFKO:
23 Q. So at the end of an audit,
24 there's an audit score?

Page 325

1 A. That's correct.
2 Q. Okay. So you as one of the
3 audits -- auditors, when you fill out the
4 audit report, you put a score at the end
5 of it?
6 A. Yes.
7 Q. What was the range of scores
8 that one could get?
9 A. I don't recall back then.
10 But I know when I left the audit findings
11 would accumulate and a score of 25 or
12 less was a passing score. Anything above
13 that would have been considered a failing
14 score.
15 Q. Did you ever discipline any
16 compliance managers who reported to you?
17 MR. NICHOLAS: Object to the
18 form.
19 THE WITNESS: You know, I
20 believe -- I can't remember
21 specifically. But I believe that
22 I -- I would put compliance
23 managers on a program if they --
24 if they were underperforming.

Page 326

BY MR. PIFKO:

1  Q.  What was the program?

2  A.  It's a performance program.

3  They would -- they would be reviewed, you

4  know, for a period of time after the

5  audit occurred that resulted in the plan.

6  I don't remember specifics.  It's too

7  long ago.  But that's generally how we

8  would handle compliance managers that

9  consistently had high scores or failing

10  audits.

11  Q.  Do you believe you ever

12  terminated anyone who was a compliance

13  manager as a result of poor performance?

14  MR. NICHOLAS:  Object to the

15  form.

16  THE WITNESS:  Yes.

17  BY MR. PIFKO:

18  Q.  You can -- on how many

19  occasions?

20  A.  I terminated our compliance

21  manager in our Bellco distribution

22  center.  In our Bethlehem distribution

23  center as well.

Page 327

1  Q.  When did those terminations

2  occur?

3  A.  I can't recall the specific

4  dates.

5  Q.  In the last five years or

6  longer ago?

7  A.  Oh, it was longer ago.

8  Q.  The Bellco distribution

9  center, was that -- that was under your

10  purview?

11  A.  Yes, it was.

12  Q.  Are you aware that they had

13  a settlement with the Attorney General?

14  MR. NICHOLAS:  Object to the

15  form.

16  THE WITNESS:  I knew they

17  had action that was being taken

18  against them.  I can't recall the

19  specifics of that action.

20  BY MR. PIFKO:

21  Q.  Do you understand that that

22  action concerned diversion control

23  issues?

24  MR. NICHOLAS:  Same

Page 328

1  objection.

2  THE WITNESS:  I can't

3  remember specifics.

4  BY MR. PIFKO:

5  Q.  Do you have any

6  understanding about what the action was

7  about?

8  A.  I did --

9  MR. NICHOLAS:  Same

10  objection.

11  THE WITNESS:  I just don't

12  recall it right now.  I didn't

13  really prepare for that.

14  BY MR. PIFKO:

15  Q.  Is there something that you

16  would look at to refresh your

17  recollection?

18  MR. NICHOLAS:  Same

19  objection.  Object to the form.

20  THE WITNESS:  Not here.

21  BY MR. PIFKO:

22  Q.  Did you ever see a

23  settlement agreement between the Bellco

24  distribution center and the government?

Page 329

1  MR. NICHOLAS:  Object to the

2  form.

3  THE WITNESS:  I believe I

4  did.

5  BY MR. PIFKO:

6  Q.  Would that have been

7  provided to you around the time that it

8  was executed?

9  MR. NICHOLAS:  Object to the

10  form.

11  THE WITNESS:  Yes, I believe

12  it would.

13  BY MR. PIFKO:

14  Q.  Do you remember changing

15  anything about the operations at that

16  center as a result of the Attorney

17  General's action there?

18  MR. NICHOLAS:  Same

19  objection.

20  THE WITNESS:  I have a

21  general recollection that some

22  changes occurred as a result of

23  that action.

24  BY MR. PIFKO:

Page 330

1   Q.   But you don't know what
2  changes were made?
3      A.   There were a number of
4  changes.  I can't remember specifics.  It
5  was too long ago.
6      Q.   Did it affect diversion
7  control activities?
8         MR. NICHOLAS:  Same
9      objection.
10        THE WITNESS:  Possibly.  I
11     don't recall.
12  BY MR. PIFKO:
13     Q.   Who was the manager of that
14  facility?
15     A.   It transitioned over several
16  years to multiple people.  I believe it
17  may have been Mike Lawlor at that time.
18  But I can't be certain.
19     Q.   Were there -- are you aware
20  of whether there were any personnel
21  changes as a result of the Attorney
22  General's action concerning that
23  facility?
24        MR. NICHOLAS:  Object to the

Page 331

1      form.
2         THE WITNESS:  Don't remember
3      specifics with regards to
4      personnel changes resulting from
5      that.
6  BY MR. PIFKO:
7      Q.   Did you personally interact
8  with anyone from the government in
9  connection with that action?
10        MR. NICHOLAS:  Objection.
11  BY MR. PIFKO:
12     Q.   The AG action concerning the
13  Bellco facility?
14        MR. NICHOLAS:  Object to the
15     form.  Scope.
16        THE WITNESS:  I worked with
17     the distribution center to -- to
18     make corrections, but again it was
19     a long time ago.  I don't remember
20     specifics.
21  BY MR. PIFKO:
22     Q.   Is there a name of anyone
23  besides the manager of that distribution
24  center that you remember interacting with

Page 332

1  at that time?
2      A.   Karen Girillo was my
3  compliance manager at that facility.
4      Q.   Is there anything different
5  about that facility compared to other
6  distribution centers?
7         MR. NICHOLAS:  Object to the
8      form.
9         THE WITNESS:  Yeah.  Bellco
10     had two divisions.  They had one
11     full line wholesale operation that
12     serviced a Tri-State area and they
13     also had a division called Bellco
14     Generics that shipped products
15     nationwide.
16  BY MR. PIFKO:
17     Q.   What -- how did the generics
18  business different from other types of
19  businesses that occurred at distribution
20  centers, AmerisourceBergen's distribution
21  centers?
22        MR. NICHOLAS:  Objection.
23  Form and scope.  Go ahead.
24        THE WITNESS:  Bell Generics

Page 333

1      specialized in low cost products,
2      limited products that were more
3      competitive than other
4      distribution centers and other
5      wholesalers.  So they -- they had
6      a market across the United States.
7      They had customers in all 50
8      states.
9  BY MR. PIFKO:
10     Q.   And then the -- the
11  Tri-State regional distribution, was that
12  more similar to the types of business
13  that the other distribution centers did?
14        MR. NICHOLAS:  Same
15     objection.
16        THE WITNESS:  Yes, that's
17     correct.
18  BY MR. PIFKO:
19     Q.   Let's go back to Exhibit 2,
20  Slide 5.  Do you see that?
21     A.   Yes.
22     Q.   Okay.  It talks about
23  enhancements for the diversion control
24  program.  Do you see that?

Page 334

1    A.    Order monitoring program?

2    Q.    Well, where it says,

3 "48-hour reporting to DEA, know your

4 customer"?

5    A.    Yeah.

6    Q.    All those things, do you see

7 that?

8    A.    Yeah.

9    Q.    Okay.  Are you familiar with

10 what those enhancements were?

11    A.    Not in a detailed way, no.

12    Q.    Do you know what "know your

13 customer" means?

14    A.    Yes.  I understand the DEA's

15 "know your customer" component.

16    Q.    What is that, what is your

17 understanding of what that means?

18    A.    That we should have a good

19 understanding of what their business

20 model is so we have a better

21 understanding of the orders that they are

22 placing with -- with our distribution

23 centers.

24    Q.    And when you say "they," you

Page 335

1 mean your customer?

2    A.    Correct.

3    Q.    Did you -- have you -- other

4 than the investigations that you

5 conducted between 2005 and 2007, did you

6 ever conduct any due diligence

7 investigations concerning customers?

8    A.    When you say --

9        MR. NICHOLAS:  Object to the

10    form.

11        THE WITNESS:  When you say

12    due diligence investigations, I

13    was -- I was conducting

14    investigations of a possible

15    excessive purchase report.  So if

16    you would classify that as a due

17    diligence, then I would say yes.

18 BY MR. PIFKO:

19    Q.    This is after 2007 is what

20 I'm asking.

21    A.    Post 2007?

22    Q.    Yeah.

23    A.    No.  My responsibilities

24 ceased after 2007 regarding that.

Page 336

1    Q.    Okay.  So did you -- did you

2 have any involvement with conducting this

3 "know your customer" due diligence that's

4 discussed here that was implemented in

5 2007?

6    A.    No, I don't believe so.

7 That was handled by a different team.

8    Q.    Do you know the team that

9 handled that?

10    A.    That was the diversion

11 control team under corporate.

12    Q.    Who -- who was on that team?

13    A.    I don't recall the specific

14 individuals.  I know it was headed by Ed

15 Hazewski.

16    Q.    Anyone else that you can

17 think of?

18    A.    Those investigators

19 transitioned in and out.  I don't recall.

20 Scott Kirsch was one investigator.

21    Q.    Anyone else?

22    A.    I can't remember.

23    Q.    Order monitoring program.

24 Next thing down here.  It's got establish

Page 337

1 thresholds.  Do you know what a threshold

2 is?

3    A.    Yes, I have a basic

4 understanding of what a threshold is.

5    Q.    Okay.  What's your

6 understanding?

7    A.    I don't know exactly what

8 went into those thresholds.  I know it's

9 a level at which, you know, purchase

10 activity would draw a flag and hold the

11 order until it could be investigated.

12    Q.    And then it says, "Review at

13 distribution centers."  Is that what it

14 says?

15    A.    Yes.

16    Q.    Okay.  What does that mean,

17 do you know what that means?

18    A.    I believe that's when the

19 RPICs were implemented at the DC level.

20    Q.    And before that what was the

21 process?

22    A.    Prior to 2007 orders weren't

23 held when investigation -- or when a

24 suspicious order was flagged.  We would

Page 338

1 conduct those investigations after the
2 fact.
3      Q.   And so was there a personnel
4 change?  I believe we -- we talked about
5 that under the computer ordering system,
6 there are other reasons for an order to
7 be flagged like if there was a payment
8 credit issue -- I forget, there was some
9 other reason that you said for an order
10 to be held.  So there was already someone
11 whose job it was to be doing that prior
12 to 2007; is that correct?
13      MR. NICHOLAS:  Object to the
14      form.  Go ahead.
15      THE WITNESS:  Yeah.  There
16      were -- there were other hold
17      codes that did not include the
18      order monitoring program hold
19      code.  So there was a number of
20      hold codes that would hold an
21      order, like licensing, credit and
22      that kind of thing.
23 BY MR. PIFKO:
24      Q.   Okay.  And so there was

Page 339

1 already someone's job who it was to deal
2 with those holds, correct?
3      A.   Yes.  I believe so.
4      Q.   Okay.  Were -- were those
5 same people then added this
6 responsibility of reviewing the order
7 monitoring program holds?
8      A.   Back in that time frame, I
9 don't recall who was handling those kinds
10 of holds at the distribution center
11 level.
12      Q.   You don't know who the RPICs
13 were when this program was initiated?
14      A.   No.
15      Q.   Okay.  I believe you
16 testified earlier that the -- the data
17 manage -- data management people, I
18 forget what the term you used?
19      A.   It was just one of -- they
20 were usually an RPIC.
21      Q.   Okay.
22      A.   But there were other people
23 at the division -- at the -- at the DC
24 level who had that responsibility as

Page 340

1 well.
2      Q.   Who else had that
3 responsibility?
4      A.   A number of -- a number of
5 associates held that responsibility
6 including the warehouse managers,
7 compliance clerks.
8      Q.   The order -- we talked about
9 the filling of orders earlier.  Do you
10 recall that?  It comes in from the
11 computer.  They put it in the totes,
12 things like that?
13      A.   Yes.
14      Q.   That occurs at night,
15 correct?
16      A.   Depending on the
17 distribution center.  Some of those
18 happen during the day as well.
19      Q.   Okay.  Does it primarily
20 occur at night?
21      A.   Yes.
22      Q.   The investigation thing here
23 on Page 5.  Do you see that?
24      A.   Yes.

Page 341

1      Q.   Do you know what that's
2 referring to?
3      A.   It states, "Report to DEA."
4 I can't state specifically what they are
5 referring to in that bullet point.
6      Q.   The next section, on Page 6,
7 it says, "Audits, investigations, and
8 regulatory activity."
9      That's -- that was --
10 includes activities in your purview as
11 the regional director, correct?
12      A.   Yes.
13      Q.   Go to the next page.  It's
14 got a summary of DEA audits.
15      Do you see that?
16      A.   Yes.
17      Q.   Are you familiar with these
18 statistics?
19      A.   Not for this particular
20 PowerPoint.  But I would take this
21 information as being accurate.
22      Q.   These are -- concern audits
23 and inspections at AmerisourceBergen's
24 facilities?

| | |
|---|---|
| Page 342 | Page 344 |

**Page 342**

1    A.    Yes.

2    Q.    It mentions this MOU here.

3  Do you see that, in 2006?

4    A.    Yes.

5    Q.    Do you know what that was?

6    A.    No, I don't recall.

7    Q.    It says here, "Not good."

8        Do you see that?

9    A.    Yes.

10    Q.    You agree with -- that an

11  MOU is not -- not good?

12    A.    From a regulatory --

13        MR. NICHOLAS:  Object to --

14        THE WITNESS:  Sorry.

15        MR. NICHOLAS:  Object to the

16    form.

17        THE WITNESS:  Yeah, from a

18    regulatory standpoint we don't

19    like MOUs.

20  BY MR. PIFKO:

21    Q.    Why is that?

22    A.    Because we were doing

23  something wrong, according to DEA.

24    Q.    When there's an MOU, do you

**Page 343**

1  try to change what's going on at the

2  facility so you don't -- so it doesn't

3  happen again?

4    A.    Yes.

5    Q.    It's a serious event?

6        MR. NICHOLAS:  Object to the

7    form.

8        THE WITNESS:  Yes, it is.

9  BY MR. PIFKO:

10    Q.    How about a letter of

11  admonition?  Do you see that?  Just above

12  that?

13    A.    Yes.  Yes, I do.

14    Q.    Is that a significant event?

15    A.    Yes.

16        MR. NICHOLAS:  Object to the

17    form.

18        THE WITNESS:  Yes.

19  BY MR. PIFKO:

20    Q.    Do you recall what that's

21  referring to in 2006?

22    A.    No, I don't.

23    Q.    It talks about 2007

24  activities, the registration suspension.

**Page 344**

1  That's for the Orlando facility?

2    A.    Yes.

3    Q.    And then it says, "Six

4  distribution center inspections for order

5  monitoring program compliance."

6        Is that correct?

7    A.    Yes.

8    Q.    Do you know what those were?

9    A.    I believe they were the six

10  distribution centers that the DEA audited

11  as a precursor to get our registration

12  back in active status for the Orlando

13  distribution center.

14    Q.    Okay.  So the Orlando

15  distribution center had issues that led

16  to the suspension, and then the DEA went

17  to inspect other facilities as a result

18  of that?

19        MR. NICHOLAS:  Object to the

20    form.

21        THE WITNESS:  That's my

22    understanding of the chronology,

23    yes.

24  BY MR. PIFKO:

**Page 345**

1    Q.    How did you come to that

2  understanding?

3        MR. NICHOLAS:  Same

4    objection.

5        THE WITNESS:  Based on this

6    report.

7  BY MR. PIFKO:

8    Q.    Did you talk to anyone at

9  the company about that?

10    A.    I don't recall back in that

11  time period.

12    Q.    Okay.  But looking at that,

13  you're able to tell the chronology?

14        MR. NICHOLAS:  Same

15    objection.

16        THE WITNESS:  I very vaguely

17    recall, you know, what transpired

18    in the 2007 time frame.  I

19    remember there was audits from the

20    DEA in order to get the

21    registration back in active

22    status.

23  BY MR. PIFKO:

24    Q.    Would you have attended any

Page 346

1 of those audits if the DEA conducted an
2 audit?
3         MR. NICHOLAS:  Object to the
4     form.
5         THE WITNESS:  I don't recall
6     if I attended any of those.  I may
7     have attended one.  I don't
8     recall.
9 BY MR. PIFKO:
10     Q.   As an auditor, was that
11 something that you would do from time to
12 time if the DEA wanted to audit the
13 facility, would they -- would you
14 accompany them on such an audit?
15         MR. NICHOLAS:  Object to the
16     form.
17         THE WITNESS:  Not routinely.
18     Normally the DEA would conduct
19     unannounced audits, and the audit
20     was initiated at one of our
21     distribution centers.  We would
22     work with the compliance manager.
23     But we wouldn't travel there to
24     conduct the audit with the DEA.

Page 347

1 BY MR. PIFKO:
2     Q.   Okay.  So DEA arrives at a
3 facility on such an occasion.  The
4 compliance manager might call you to ask
5 for advice?
6         MR. NICHOLAS:  Object to the
7     form.
8         THE WITNESS:  Per internal
9     policy, if the DEA walks in to
10     initiate an audit, they're
11     required to notify their regional
12     director immediately.
13 BY MR. PIFKO:
14     Q.   The compliance manager is
15 required to notify you?  Is that what
16 you're saying?
17     A.   Yes, correct.
18     Q.   And so you would interact
19 with them on the phone and maybe by
20 e-mail, but you wouldn't show up in
21 person?
22         MR. NICHOLAS:  Object to the
23     form.
24         THE WITNESS:  That's

Page 348

1     correct.  Not routinely.
2 BY MR. PIFKO:
3     Q.   Going to Slide 8, it's got a
4 list of different audits of different
5 facilities.  Are these all facilities
6 that the company had around 2007?
7     A.   Yes, that appears to be the
8 information on this page.
9     Q.   It's consistent with what
10 your understanding is about the
11 facilities based on your experience with
12 the company?
13     A.   I'm not sure I understand
14 your question.
15     Q.   I'm just -- well, you said
16 this is what's on the page.  But I'm
17 asking you, you worked there.  Is this --
18 these names of these places, is this
19 consistent with facilities that the
20 company had at the time?
21     A.   Yes, I would agree with
22 that.
23     Q.   Okay.  And these would be
24 months and years when the facilities had

Page 349

1 audits?
2     A.   Yeah.  This would be the
3 most recent DEA audit for these subject
4 distribution centers.
5     Q.   Okay.  Some of these have a
6 letter G after it.  Do you know what that
7 refers to?
8         MR. NICHOLAS:  Object to the
9     form, and no foundation.
10         THE WITNESS:  That's a
11     designation for Greenfield
12     distribution centers.
13 BY MR. PIFKO:
14     Q.   What?
15     A.   I believe the G is a
16 designation for Greenfield distribution
17 centers.
18     Q.   Okay.  What does that mean?
19     A.   Those facilities were larger
20 than a standard facility.  They had a
21 common footprint.  They had a common
22 blueprint.  And we mimicked that
23 blueprint and footprint in multiple
24 distribution centers throughout the

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1  company. So it's just a -- designates a
2  larger distribution center.
3      Q.  Okay. They're like clones
4  of each other, essentially?
5          MR. NICHOLAS: Object to the
6      form.
7          THE WITNESS: Not exactly.
8      But generally they have the common
9      footprint and blueprint, yeah.
10 BY MR. PIFKO:
11     Q.  And these were the largest
12 facilities?
13         MR. NICHOLAS: Same
14     objection.
15         THE WITNESS: Within the ABC
16     network, yes.
17 BY MR. PIFKO:
18     Q.  You visited all these
19 facilities over your tenure as an
20 auditor?
21     A.  Yes, I visited all of them.
22     Q.  In the copy that was
23 produced in its actual -- as we call it,
24 native format, you can see up on the

Page 351

1  screen it's in color. The facilities on
2  the right are in red.
3          Do you have an understanding
4  about why those are in red? Is there
5  something different about those
6  facilities as it concerns audit history
7  versus the other facilities?
8          MR. NICHOLAS: Objection.
9      Form. Foundation.
10         THE WITNESS: No, I don't
11     recall what that designates.
12 BY MR. PIFKO:
13     Q.  Go to Slide 10, please.
14 State agencies would audit your
15 facilities from time to time as well; is
16 that correct?
17     A.  That's correct.
18     Q.  Okay. Seeing these
19 statistics here, Board of Pharmacy,
20 Department of Health inspections from
21 2004 to 2007, is that consistent with
22 your understanding of the number of
23 inspections that would have occurred by
24 state agencies?

Page 352

1      A.  Yes. This looks -- this
2  looks routine for those years.
3      Q.  Let's go to Slide 11. It
4  talks about audit results.
5          Do you see this?
6      A.  Yes.
7      Q.  Do you have an understanding
8  about what's being communicated here?
9          MR. NICHOLAS: Objection.
10     Form. Foundation.
11         THE WITNESS: Yes.
12 BY MR. PIFKO:
13     Q.  Can you tell me what's being
14 communicated here?
15     A.  It's showing CSRA audits
16 that were conducted in the years 2005,
17 2006, 2007, and 2008 with the high level
18 results of those audits.
19     Q.  What does that mean? The
20 results there, how do I understand that?
21 Level 1, Level 2, Level 3, and it's got
22 some percentages.
23     A.  As I indicated before, I
24 don't remember exactly the audit score

Page 353

1  requirements to be a passing audit in
2  2005, 2006, 2007, during those years.
3  But I believe 25 was the audit score that
4  would be considered a passing score. So
5  that would be considered a Level 1 audit.
6          There was a subsequent score
7  of Level 2 that was a range above 25, and
8  then that was a Level 2. And if it went
9  above that level two and it became a
10 Level 3 audit. So it was just degrees
11 above a passing audit that was, you know,
12 different degrees of failing the audit.
13     Q.  Okay.
14     A.  So that's basically what
15 you're seeing here. 25 had a passing
16 audit. One had a Level 2 audit, which
17 was a low -- low level fail, and then one
18 had a Level 3 audit which was a higher
19 level fail.
20     Q.  And it looks like, if I go
21 to 2006, you can have a Level 4 failure,
22 which is even higher?
23     A.  Yes.
24     Q.  So this is reflecting the

Page 354

1 number of facilities and how they fell
2 into the passing rates?
3    A.   Yes.
4    Q.   Go to Slide 13.  Are you
5 there?
6    A.   Yes.
7    Q.   It talks about
8 investigations.  Are you familiar what
9 this slide is reflecting?
10       MR. NICHOLAS:  Objection.
11    Form.  Foundation.
12       THE WITNESS:  It indicates
13    the number of investigations that
14    were conducted in each year, it
15    looks like.
16 BY MR. PIFKO:
17    Q.   Okay.  It talks about
18 projecting a 1,500 percent increase from
19 2004 to 2007.
20       Do you see that?
21    A.   Yes.
22    Q.   Do you have an understanding
23 about why there was a projection that it
24 would increase to that degree?

Page 355

1       MR. NICHOLAS:  Same
2    objection.  Form.  Foundation.
3       THE WITNESS:  No, I don't
4    have a -- I don't have a detailed
5    recollection of what these
6    investigations entailed or what
7    type of investigations they were.
8    So I -- I don't recall.
9 BY MR. PIFKO:
10    Q.   Do you have an understanding
11 about why they were projecting a
12 substantial increase in investigations in
13 2007?
14       MR. NICHOLAS:  Same
15    objection.  Form.  Foundation.
16       THE WITNESS:  I don't
17    recall.
18 BY MR. PIFKO:
19    Q.   Go to Slide 16.  It talks
20 about the impact to AmerisourceBergen
21 Corporation.  Do you see that?
22    A.   Yes.
23    Q.   One of them is financial
24 impact.  Do you see that?

Page 356

1    A.   Yes.
2    Q.   Is it your understanding
3 there's a financial impact when there's
4 regulatory action taken against a
5 AmerisourceBergen facility?
6       MR. NICHOLAS:  Object to the
7    form and to foundation.
8       THE WITNESS:  Not always.
9 BY MR. PIFKO:
10    Q.   Do you agree with the --
11       MR. PIFKO:  Can people on
12    the phone mute their phone?
13 BY MR. PIFKO:
14    Q.   Do you have an understanding
15 about what this is referring to here when
16 it talks about the financial impact?
17       MR. NICHOLAS:  Objection to
18    the form and to the foundation.
19       THE WITNESS:  Well, if it
20    relates to the action in Orlando,
21    we had to take a lot of steps to
22    service our customers from
23    distribution centers other than
24    Orlando DC.  So that obviously

Page 357

1    would have a financial impact.
2    Beyond that, I couldn't really
3    speak to it.
4 BY MR. PIFKO:
5    Q.   When you say you had to take
6 steps to serve your customers from other
7 distribution centers, what do you mean?
8    A.   Well, those accounts were
9 set up under the Orlando distribution
10 center.  And if we have to change the
11 system to ship these products from other
12 distribution centers, then that took a
13 lot of work.
14    Q.   So when that distribution
15 center was shut down, you serviced its
16 accounts through other distribution
17 centers; is that correct?
18    A.   Yes, that's correct.
19    Q.   Do you know if any accounts
20 were terminated as a result of the
21 suspension and the activities that
22 occurred at that facility?
23    A.   I don't know.  That would
24 not have been in my area at that time.

Page 358

1  Q.  Have you ever heard of
2  something called the do-not-ship list?
3  A.  Yes, I'm familiar with that.
4  Q.  What does that mean if
5  somebody is on the do-not-ship list?
6  A.  It's a list that indicates
7  customers that the company has terminated
8  so we just have kept a record of it over
9  years.
10  Q.  Are you supposed to be
11  shipping controlled substances to a
12  facility or a customer who is on the
13  do-not-ship list?
14  A.  Well, the list indicates a
15  documented history of customers that were
16  blocked.  So it didn't indicate that we
17  couldn't reactivate them at a later date
18  based on current information that we had
19  on them.  So just to clarify that answer.
20  Q.  Okay.  But --
21  A.  While they were on there we
22  would not ship to that customer.
23  Q.  Okay.  But if they are on
24  the do-not-ship list and they haven't

Page 359

1  been reactivated, you shouldn't be
2  shipping controlled substances to them;
3  is that correct?
4  A.  Yeah, unless they were on
5  there in error, I would agree with that.
6  Q.  Okay.  It would violate the
7  company's policy to do so, correct?
8  MR. NICHOLAS:  Object to the
9  form.  Go ahead.
10  THE WITNESS:  I'm not sure
11  how the -- the do-not-ship list
12  was documented in policy.  But I
13  would agree generally that, yeah,
14  unless they are on there in error,
15  they shouldn't be receiving
16  controlled substances.
17  MR. NICHOLAS:  Before you
18  get to the next document, if
19  you're going to be a while, can we
20  get a break?
21  MR. PIFKO:  It'll be quick.
22  MR. NICHOLAS:  Is this the
23  last -- are you close to the end
24  of the examination?

Page 360

1  MR. PIFKO:  Yeah, but --
2  just this document will be quick.
3  I guess we don't -- we can take a
4  quick break.
5  MR. NICHOLAS:  How much
6  longer do you think you have,
7  Mark?
8  MR. PIFKO:  I'll give you a
9  better estimate when we come back.
10  THE VIDEOGRAPHER:  Going off
11  the record at 4:09 p.m.
12  (Short break.)
13  THE VIDEOGRAPHER:  Back on
14  record.  The time is 4:20 p.m.
15  (Document marked for
16  identification as Exhibit
17  AmerisourceBergen-Cherveny-3.)
18  BY MR. PIFKO:



Highly Confidential - Subject to Further Confidentiality Review



Page 362

Page 364

Page 363

Page 365



Page 366

Page 368

1 the regulatory section of the DEA that
2 oversees suspicious order investigations
3 and DEA audits.  Do you see that?
4      A.   Yeah, I don't know.  I
5 didn't know who Barbara was based on
6 this.  But are you stipulating that
7 it's --
8      Q.   Well, it says in the middle
9 here:  "All, we have a tentative
10 agreement from the chief of the
11 regulatory section that oversees..."
12           Do you see that?
13      A.   Yes.
14      Q.   Okay.  She is someone at the
15 DEA as far as you know?
16      A.   Yeah, I don't know who
17 Barbara Bookholdt is, yeah.
18      Q.   Do you recall discussing a
19 meeting with the DEA to go over the
20 issues that are reflected on 145774?
21      A.   No, I don't remember this --
22 this meeting being conducted.
23      Q.   Do you remember these --
24 these e-mails?

Page 367

7      Q.   Handing you what's been
8 marked as Exhibit 6.
9           (Document marked for
10      identification as Exhibit
11      AmerisourceBergen-Cherveny-6.)
12 BY MR. PIFKO:
13      Q.   For the record it's a
14 two-page document Bates labeled
15 ABDCMDL00145773 and 774.
16           Your name is at the top
17 sending an e-mail to Steve Mays dated
18 February 26, 2013.  Subject, proposed
19 meeting.  Barbara Bookholdt.
20           Let me know when you're
21 ready to discuss.
22      A.   Okay.
23      Q.   So this is talking about
24 setting up a meeting with the chief of

Page 369

1      A.   No.
2      Q.   It says here, you write at
3 the top, you say:  I'm not sure how
4 specific we want to get with the CSOS
5 issues given our current setup."
6           Do you see that?
7      A.   Yes.
8      Q.   Do you know what that's
9 referring to?
10      A.   I don't recall.
11      Q.   Do you remember having
12 concerns?
13           MR. NICHOLAS:  Object to the
14      form.
15           THE WITNESS:  I don't think
16      it was a concern.  I think it was
17      regarding CSOS.  The DEA largely
18      doesn't understand their own CSOS
19      program.  And then we have to
20      explain it to them in more times
21      than not.  So I think that's
22      probably where I was going here.
23      But I don't recall this e-mail.
24 BY MR. PIFKO:

Page 370

1  Q.  So is there something unique
2  about your -- the way your system is set
3  up compared to other members of the
4  industry as far as you know?
5        MR. NICHOLAS:  Object to the
6  form.  Lack of foundation.
7        THE WITNESS:  Not that I
8  recall, no.
9  BY MR. PIFKO:
10  Q.  It talks about on 145774 the
11  settlement agreement expiring.  Do you
12  see that?
13  A.  Yes.
14  Q.  Do you have an understanding
15  about that?
16  A.  Yeah.  That's -- I think
17  that's an error.  I know it expired at
18  one point.  But it was renewed subsequent
19  to that.  So I don't think that's --
20  that's an accurate statement.  But I do
21  see where they state that in the e-mail.
22  Q.  What's your basis for
23  understanding that there was a renewal?
24  A.  General, my general

Page 371

1  understanding of where we currently are
2  with the agreement with the DEA resulting
3  from the 2007 action.
4  Q.  Do you recall discussing
5  that with anyone specifically?
6  A.  No.
7        MR. NICHOLAS:  Object to the
8  form.
9        (Document marked for
10  identification as Exhibit
11  AmerisourceBergen-Cherveny-4.)
12  BY MR. PIFKO:
13  Q.  I'm handing you what's
14  marked as Exhibit 4.
15        For the record, this is a
16  two-page document, Bates labeled
17  ABDCMDL001731146 and 147.
18  A.  Okay.
19  Q.  Okay.  You were in your
20  diversion control function at this point,
21  correct?
22  A.  Yeah.  I was just -- it was
23  in my first six months, yeah.
24  Q.  Okay.  Did you have any

Page 372

1  involvement with -- did you take on
2  serving on the regulatory affairs
3  committee at the HDA when you took on
4  that role?
5  A.  No, I did not.
6  Q.  Do you now have any
7  involvement with the HDA?
8  A.  No, none.
9  Q.  Okay.  The -- the second
10  page, I don't know if you understand when
11  a document is produced in litigation, if
12  you imagine like in your -- on your
13  desktop, if you click on a document it
14  carries with it that it was created by
15  someone or you know that it's connected
16  to someone's computer.  So the data that
17  accompanied this file shows that it came
18  from your files, the second page here.
19        And so my question to you
20  is, do you remember looking at or
21  drafting redlines of this bill that was
22  being discussed here?
23  A.  No, I don't.
24  Q.  Okay.  Do you know what this

Page 373

1  discussion is about?
2  A.  It looks like HDMA having a
3  discussion with regards to regulation.
4  Q.  Well, they are talking about
5  a Senate Bill 483, DEA enforcement bill,
6  do you see that?
7  A.  Yes.  Yeah.
8  Q.  Do you have any knowledge
9  about what that is?
10        MR. NICHOLAS:  Objection.
11  Lack of foundation.  And object to
12  the form.
13        THE WITNESS:  No, I had
14  nothing to do with any review of
15  this document.
16  BY MR. PIFKO:
17  Q.  Did you have any
18  understanding about why your name would
19  be linked to the -- the attached language
20  on this document?
21        MR. NICHOLAS:  Objection.
22  Lack of foundation, and object to
23  the form of the document and -- go
24  ahead.

Page 374

1    THE WITNESS: No. It might
2  have been on the distribution
3  list. It might have come to me.
4  BY MR. PIFKO:
5    Q.  Have you heard of the
6  Ensuring Patient Access to Care Act?
7    A.  No.
8    Q.  Are you aware that through
9  the HDA, certain members of the
10  pharmaceutical industry were trying to
11  change laws and regulations that the DEA
12  enforced?
13    MR. NICHOLAS: Objection to
14  the lack of foundation as well as
15  to the form.
16    THE WITNESS: No, I don't
17  recall this.
18    (Document marked for
19  identification as Exhibit
20  AmerisourceBergen-Cherveny-5.)
21  BY MR. PIFKO:
22    Q.  I'm handing you what's been
23  marked as Exhibit 5.
24    For the record Exhibit 5 is

Page 375

1  Bates-labeled ABDCMDL0047022 through
2  47078. It's an e-mail dated July 12,
3  2017. David May is asking you to listen
4  on this call on his behalf.
5    Do you see that?
6    A.  Yes.
7    Q.  Do you recall that
8  occurring?
9    A.  I do not.
10    Q.  Did David from time to time
11  ask you to sit in on had calls for him?
12    A.  Very seldom.
13    Q.  But on occasions, certain
14  occasions you did?
15    A.  Like I said, very seldom.
16  This may have been the only time.
17    Q.  And do you recall the
18  discussion being reflected here?
19    A.  Not at all.
20    Q.  Do you believe that you
21  would have dialed into this call?
22    A.  Unless he subsequently told
23  me that he had it covered by somebody
24  else. But I don't recall attending this

Page 376

1  specific conference call.
2    Q.  Do you know what the Masters
3  decision is? Do you see that reflected
4  here?
5    A.  I have a basic understanding
6  of the Masters decision.
7    Q.  What's your understanding of
8  it?
9    A.  Masters was a wholesale
10  distributor, and they were cited by the
11  DEA for not following internal policy
12  with regards to the regulation.
13    Q.  That's all of your
14  understanding?
15    A.  They didn't follow internal
16  regulations, and they were cited as a
17  result of that. That's basically my
18  understanding of it. I don't -- I don't
19  get too involved in litigation like this.
20  That really is handled by David May. I
21  spend all of my time with managing our
22  day-to-day operation of our diversion
23  program. So I really don't get into the
24  analysis too much of things like this.

Page 377

1    Q.  Did anyone discuss the
2  Masters decision with you or talk about
3  any changes that need to be made to the
4  company because of it?
5    A.  No. Those kinds of
6  discussions happened over my head.
7    Q.  Okay. How about the
8  Mallinckrodt settlement? You see that's
9  referenced there?
10    A.  Yes.
11    Q.  Do you know what that is?
12    A.  I don't even recall exactly
13  what the Mallinckrodt settlement
14  entailed.
15    Q.  Okay. Do you know who
16  Mallinckrodt is?
17    A.  Yes.
18    Q.  What are they?
19    A.  They are a manufacturer.
20    Q.  Okay. You're aware that
21  they had some sort of issue that led to a
22  settlement?
23    A.  Yes. I'm generally aware of
24  it.

Page 378

1  Q.  Okay.  What were you aware
2  of?
3  A.  Generally that they had an
4  issue that resulted in a settlement.
5  Q.  Okay.  Do you know if it
6  concerned diversion control issues?
7  A.  I don't remember to what
8  degree diversion was involved in that
9  settlement cited.
10  Q.  Do you know if anyone at the
11  company was concerned about the company's
12  activities as a result of that
13  settlement?
14  MR. NICHOLAS:  Object to the
15  form.  Lack of foundation.
16  THE WITNESS:  I don't know.
17  BY MR. PIFKO:
18  Q.  Do you feel that you had
19  adequate resources to perform your job
20  functions?
21  A.  Under what job title?
22  Q.  When you were -- from -- in
23  the job you held from -- as the regional
24  manager from 2002 to 2015?

Page 379

1  MR. NICHOLAS:  Object to the
2  form.
3  THE WITNESS:  Yes.  I had
4  adequate resources to do my job.
5  BY MR. PIFKO:
6  Q.  Did you feel that -- you
7  said it took all your time.  Do you feel
8  like you had too much to do?
9  MR. NICHOLAS:  Object to the
10  form.  Go ahead.
11  THE WITNESS:  It was a very
12  demanding job, a lot of putting
13  out of fires.  But yes, I had
14  adequate sources to do the job
15  adequately.
16  BY MR. PIFKO:
17  Q.  When you took the job of
18  managing the RPICs, did that add to your
19  workload?
20  A.  I don't know what you mean
21  by when I took my job to manage the
22  RPICs.  Meaning when -- I don't know
23  what--
24  Q.  When the -- when the

Page 380

1  compliance managers had to -- I'm sorry,
2  compliance managers, not the RPICs.  That
3  add to your workload?
4  MR. NICHOLAS:  Object to the
5  form.
6  THE WITNESS:  I'm not sure I
7  understand.  You mean at the point
8  that they started reporting to me?
9  BY MR. PIFKO:
10  Q.  Yes.
11  A.  Yes, that added -- that
12  added work to our -- to our positions.
13  Q.  Did you get any additional
14  staffing to help you with that?
15  A.  No.
16  MR. PIFKO:  I don't have any
17  further questions.
18  MR. NICHOLAS:  Just give me
19  one minute.
20  THE VIDEOGRAPHER:  Going off
21  the record.  4:47 p.m.
22  (Short break.)
23  MR. NICHOLAS:  We have no
24  questions.

Page 381

1  MR. PIFKO:  I think -- we
2  may meet and confer with you in
3  the future.  But I think there's
4  some issues with documents, and
5  we'll discuss it, but to the
6  extent that that affects this
7  deposition, we hold it open for
8  that.
9  (Excused.)
10  (Deposition concluded at
11  approximately 4:50 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 382

1
2    CERTIFICATE
3
4
5        I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6    deposition is a true record of the
    testimony given by the witness.
7
        It was requested before
8    completion of the deposition that the
    witness, ERIC CHERVENY, have the
9    opportunity to read and sign the
    deposition transcript.
10
11
12
        _____
        MICHELLE L. GRAY,
13      A Registered Professional
        Reporter, Certified Shorthand
14      Reporter, Certified Realtime
        Reporter and Notary Public
15      Dated: November 14, 2018
16
17
18        (The foregoing certification
19    of this transcript does not apply to any
20    reproduction of the same by any means,
21    unless under the direct control and/or
22    supervision of the certifying reporter.)
23
24

Page 383

1    INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4    over carefully and make any necessary
5    corrections. You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8        After doing so, please sign
9    the errata sheet and date it.
10        You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14        It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you. If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

Page 384

1        - - - - - -
        E R R A T A
2        - - - - - -
3
4    PAGE  LINE  CHANGE
5    _____ _____ _____
6    _____ _____ REASON: _____
7    _____ _____ _____
8    _____ _____ REASON: _____
9    _____ _____ _____
10   _____ _____ REASON: _____
11   _____ _____ _____
12   _____ _____ REASON: _____
13   _____ _____ _____
14   _____ _____ REASON: _____
15   _____ _____ _____
16   _____ _____ REASON: _____
17   _____ _____ _____
18   _____ _____ REASON: _____
19   _____ _____ _____
20   _____ _____ REASON: _____
21   _____ _____ _____
22   _____ _____ REASON: _____
23   _____ _____ _____
24   _____ _____ REASON: _____

Page 385

1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I,_____, do
5    hereby certify that I have read the
6    foregoing pages, 1 - 386, and that the
7    same is a correct transcription of the
8    answers given by me to the questions
9    therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16   ERIC CHERVENY            DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20____.
21   My commission expires:_____
22
23   _____
     Notary Public
24

Page 386

```
         LAWYER'S NOTES
 1
 2  PAGE  LINE
 3   ____  ____  _____
 4   ____  ____  _____
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
```