1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION

3   IN RE:  NATIONAL        :  MDL No. 2804
    PRESCRIPTION OPIATE     :
4   LITIGATION              :  Case No. 17-md-2804
                            :
5   APPLIES TO ALL CASES    :  Hon. Dan A. Polster
                            :
6                           :

7

8                  HIGHLY CONFIDENTIAL

9      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                    - - - -

12               JANUARY 16, 2019

13                    - - - -

14     VIDEOTAPED DEPOSITION OF GEORGE CHUNDERLIK,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on

20   Wednesday, January 16, 2019, commencing at 9:04 a.m.

21                    - - - -

22            GOLKOW LITIGATION SERVICES
         877.370.3377 phone | 917.591.5672 fax
23                 deps@golkow.com

24

25

2

1                    A P P E A R A N C E S

2    On behalf of Plaintiffs

3            WAGSTAFF & CARTMELL, LLP
             BY:  THOMAS ROTTINGHAUS, ESQUIRE
4            AND  TYLER HUDSON, ESQUIRE
             4740 Grand Avenue, Suite 300
5            Kansas City, Missouri  64112
             816.701.1100
6            trottinghaus@wcllp.com
             thudson@wcllp.com

7

8    On behalf of Defendant AmerisourceBergen Drug
     Corporation

9            (By Phone/Livestream)
10           REED SMITH LLC
             BY:  BRIAN HIMMEL, ESQUIRE
11           Reed Smith Centre
             225 Fifth Avenue
12           Pittsburgh, Pennsylvania 15222
             412.288.3131
13           bhimmel@reedsmith.com

14
     On behalf of Defendant Cardinal Health, Inc.
15
             PIETRAGALLO GORDON ALFANO BOSICK &
16           RASPANTI, LLP
             BY:  JENNIFER BOURIAT, ESQUIRE
17           One Oxford Centre, 38th Floor
             301 Grant Street
18           Pittsburgh, Pennsylvania  15219
             412.263.2000
19           jhb@pietragallo.com

20
     On behalf of Defendants Endo Pharmaceuticals, Endo
21   Health Solutions and Par Pharmaceuticals

22           (By phone/Livestream)
             ARNOLD & PORTER KAYE SCHOLER LLP
23           BY:  SEAN MCCORMICK, ESQUIRE
             601 Massachusetts Avenue, NW
24           Washington, DC  20001-37453
             202.942.5743
25           sean.mccormick@arnoldporter.com

3

```
 1              A P P E A R A N C E S (Continued)

 2    On behalf of Defendant HBC Service Company

 3              MARCUS & SHAPIRA, LLP
               BY:  JOSHUA A. KOBRIN, ESQUIRE
 4              AND  ROBERT M. BARNES, ESQUIRE
               One Oxford Centre, 35th Floor
 5              Pittsburgh, Pennsylvania  15219
               412.471.3490
 6              jkobrin@marcus-shapira.com
               rbarnes@marcus-shapira.com
 7

 8    On behalf of Defendant McKesson Corporation

 9              COVINGTON & BURLING, LLP
               BY:  RAJ PAUL, ESQUIRE
10              One CityCenter
               850 Tenth Street, NW
11              Washington, DC  20001-4956
               202.662.5807
12              rpaul@cov.com

13

      On behalf of Defendant Walmart
14
               (By phone/Livestream)
15              JONES DAY
               BY:  ALEXANDRA J. WOLTER, ESQUIRE
16              555 South Flower Street
               Fiftieth Floor
17              Los Angeles, California  90071
               213.243.2651
18              awolter@jonesday.com

19
      Also present
20
               Adam Balenciaga, legal videographer
21

22

23

24

25
```

4

1                        * I N D E X *

2      GEORGE CHUNDERLIK                                PAGE

3         EXAMINATION BY MR. ROTTINGHAUS                   8
          EXAMINATION BY MR. HUDSON          163, 284, 305
4         EXAMINATION BY MR. KOBRIN               254, 301

5            * INDEX OF HBC-CHUNDERLIK EXHIBITS *

6      NO.                    DESCRIPTION            PAGE
       Exhibit 1   George Chunderlik LinkedIn profile   11
7
       Exhibit 2   Giant Eagle Retail Operations -       18
8                  Pharmacy Operations 11/13/14
                   org chart
9                  HBC_MDL00002216

10     Exhibit 3   CFR Part 1301.74 from DEA website     85
                   P1.47 - P1.47.2
11
       Exhibit 4   DEA Dear Registrant 6/12/12,          78
12                 6/12/12, 12/27/07, 2/7/07, 9/27/06
                   letters
13                 ABDCMDL00269683 - 00269694

14     Exhibit 5   Meeting invitation for 5/24/13,       88
                   from J. Millward to G. Carlson,
15                 et al., subject: CSMP Questionnaire
                   Complete Response
16                 HBC_MDL00144314 - 00144322

17     Exhibit 6   Email, 8/22/13, from S. Voyten to     94
                   J. Millward, et al., subject: FW:
18                 CVS News Story
                   HBC_MDL00154265 - 00154266
19
       Exhibit 7   Email, 12/13/13, from J. Millward     96
20                 to J. Hurley, et al., subject:
                   Compliance Issues HBC Whse, attaching
21                 presentations given at DEA Distributor
                   Conference
22                 HBC_MDL00136141 - 000136213

23     Exhibit 8   Email, 5/1/12, from A. Mollica       109
                   to G. Chunderlik, subject: FW:
24                 2012 Anda Supply Chain Symposium
                   HBC_MDL00064379 - 00064441

25

5

1    * INDEX OF HBC-CHUNDERLIK EXHIBITS (Continued) *

2   NO.                  DESCRIPTION              PAGE
    Exhibit 9   Email, 1/9/13, from G. Chunderlik   115
3               to F. Bencivengo, et al., subject:
                Narcotic Audit Application, with
4               attachments
                HBC_MDL00041837 - 000041850
5
                Exhibit 10   Email chain, 8/20/15, from G.    119
6               Carlson to J. Jenson, et al.,
                subject: FW: Thrifty White Notes
7               HBC_MDL00069566 - 00069571

8   Exhibit 11   20131030_Daily_HBC_Controls        131
                HBC_MDL00002348
9
    Exhibit 12   Email chain, 11/25/13, from T.      149
10              Roahrig to J. Millward, subject: FW:
                Daily HBC Suspicious Purchasing
11              Report
                HBC_MDL00094599 - 00094600
12
    Exhibit 13   Email chain, 1/10/14, from T.       157
13              Roahrig to J. Millward, subject: RE:
                Daily HBC Suspicious Purchasing
14              Report - 01/09/14
                HBC_MDL00039223
15
    Exhibit 14   Email, 8/28/15, from J. Millward to  158
16              E. Hart, et al., subject: 30-010 -
                Inventory Control - Suspicious Order
17              Policy FINAL.docx, attaching 30-010 -
                Inventory Control - Suspicious Order
18              Policy FINAL.docx
                HBC_MDL00169475 - 00169477
19
    Exhibit 15   Email chain, 1/15/16, from G.       161
20              Chunderlik to J. Millward, subject:
                FW: Daily HBC Suspicious Purchasing
21              Report - 01/14/16, attaching
                20160114_Daily_HBC_Controls_W7.xlsx
22              HBC_MDL00057182 - 0057186

23

24

25

6

1      * INDEX OF HBC-CHUNDERLIK EXHIBITS (Continued) *

2    NO.                  DESCRIPTION            PAGE
     Exhibit 16  Email chain, 1/22/14, from J.      163
3               Millward to G. Carlson, et al.,
                subject: FW: Wholesale Distributor
4               Questionnaire, attaching Wholesale
                Distributor Questionnaire
5               HBC_MDL00135570 - 0013557

6    Exhibit 17  HBC Service Company's Responses     172
                to Plaintiffs' (First) Set of
7               Combined Discovery Responses
                P-HBC-0011 - 0011.20
8
     Exhibit 18  Giant Eagle Inventory Control -     174
9               Suspicious Order Policies with
                various effective dates
10              HBC_MDL00078638 - 00078639
                HBC_MDL00078636 - 00078637
11              HBC_MDL00045916 - 00078918
                HBC_MDL00051908
12              HBC_MDL00043414
                HBC_MDL00010092 - 00010093
13
     Exhibit 19  Email, 9/28/15, from R. McClune to  186
14              J. Millward, et al., subject:
                Control Blocking Policy and Procedure
15              HBC_MDL00005466 - 00005467

16   Exhibit 20  Email chain, 4/14/16, from G.       189
                Chunderlik to E. Hart, subject: RE:
17              USL Questionnaire, attaching Controlled
                Substance Handling Questionnaire_
18              Upsher Smith.doc
                HBC_MDL00030064 - 00030069
19
     Exhibit 21  Email, 11/21/16, from P. Raub to    204
20              M. Doerr, et al., subject: RE:
                Suspicious Order Monitoring (SOM)
21              HBC-MDL00046220 - 00046228

22   Exhibit 22  Email, 1/27/17, from G. Chunderlik  228
                to M. Doerr, subject: SOM Process -
23              High Level, attach SOM Policy
                Procedure_v4.doc
24              HBC_MDL00046143 - 00046145

25                      - - - -

7

```
 1                    P R O C E E D I N G S

 2                         - - - -

 3            THE VIDEOGRAPHER:  We are now on the

 4    record.  My name is Adam Balenciaga for Golkow

 5    Litigation Services.  Today's date is January 16,

 6    2019, and the time is 9:04 a.m.

 7         This video deposition is being held at

 8    Marcus & Shapira, LLP, One Oxford Centre, 35th

 9    Floor, Pittsburgh, PA 15219, in the matter of

10    National Prescription Opiate Litigation,

11    MDL No. 2804, for the United States District Court

12    for the Northern District of Ohio, Eastern

13    Division.

14         The deponent is George Chunderlik.

15         All counsel will be noted on the stenographic

16    record.  Will all counsel identify themselves.

17            MR. ROTTINGHAUS:  This is Tom

18    Rottinghaus and Ty Hudson on behalf of the

19    plaintiffs.

20            MS. BOURIAT:  Jennifer Bouriat from

21    Pietragallo on behalf of Cardinal.

22            MR. PAUL:  Raj Paul of Covington &

23    Burling on behalf of McKesson.

24            MR. BARNES:  Robert Barnes, Marcus &

25    Shapira, on behalf of HBC Service Company.
```

1          MR. KOBRIN:  Josh Kobrin, also Marcus &

2     Shapira, on behalf of HBC Service Company.

3          MR. ROTTINGHAUS:  Is anyone appearing by

4     telephone?

5          MR. MCCORMICK:  Good morning.  This is

6     Sean McCormick from Arnold & Porter for the Endo

7     and Par defendants.

8          MR. HIMMEL:  This is Brian Himmel from

9     Reed Smith for Amerisource Bergen Drug Company.

10          MR. ROTTINGHAUS:  Anyone else?

11          MS. WOLTER:  This is Alexandra Wolter

12     from Jones Day for Walmart, Inc.

13          THE VIDEOGRAPHER:  The court reporter is

14     Ann Medis and will now swear in the witness.

15               GEORGE CHUNDERLIK,

16        having been first duly sworn, was examined

17               and testified as follows:

18                  EXAMINATION

19     BY MR. ROTTINGHAUS:

20       Q.   Sir, my name is Tom Rottinghaus.  I'm

21     here with my colleague, Ty Hudson.  We're going to

22     be asking you some questions today about your

23     involvement primarily in the HBC warehouse for

24     Giant Eagle.  Okay?

25       A.   Okay.

9

1      Q.   Would you please go ahead and introduce

2   yourself for us.

3      A.   Yes.  My name is George Chunderlik.

4      Q.   Mr. Chunderlik, you currently still work

5   for what's known as Giant Eagle?

6      A.   I do, yes.

7      Q.   We're going to be probably sitting here

8   for a few hours today, and our goal is not to

9   harass you in any respect, but we're going to have

10   a lot of documents we're going to be asking you to

11   look at at various points in time.

12      It's going to be very important for us to

13   make sure that we are communicating.  In other

14   words, I want you to make sure you're

15   understanding my questions I ask you today, and

16   certainly I want to make sure I give you an

17   opportunity to completely respond to any questions

18   I ask.

19      So if I interrupt you at any point in time

20   before you're finished, I want you to please stop

21   me and let me know you're not finished so that I

22   can give you an opportunity to finish your answer.

23   Okay?

24      A.   Okay.

25      Q.   You understand that you have just taken

1    an oath to tell the truth just like the oath you

2    would take if you were in a courtroom when this

3    case goes to trial?

4        A.   Right.

5        Q.   It's my understanding that you may not

6    be available at the time of trial to come testify

7    live, so I assume you also understand that you're

8    being videotaped here today in case you're unable

9    to testify live so that, if necessary, portions of

10   your testimony can be played to the court and jury

11   at the time of trial.

12       A.   I do.

13       Q.   There are going to be times when I

14   probably ask you if you can give me a "yes" or

15   "no" answer to a question.  You may not be able to

16   do that all the time.  That's fine.  If you're

17   able to, I want you to do so.  But if not, just

18   tell me why you can't.  And I'm going to certainly

19   give you a chance to explain.  Okay?

20       A.   Okay.

21       Q.   Now, you're here with counsel today?

22       A.   I am, yes.

23       Q.   We don't get to hear what you and your

24   attorneys talked about.  So my question isn't

25   intended to delve into that issue.  But I'm

1    wondering how much time approximately have you

2    spent getting ready for your deposition?

3          A.    Approximately two days, 8-hour, 9-hours

4    days getting prepared.

5          Q.    And then I assume that you've taken an

6    opportunity to at least look at some of the

7    documents that you might get asked about today?

8          A.    I have, yes.

9                (HBC-Chunderlik Exhibit 1 was marked.)

10   BY MR. ROTTINGHAUS:

11         Q.    One of the first things I want to ask

12   you about is your background with the company.  We

13   have marked as Plaintiffs' Exhibit No. 1 a

14   document that I believe is in front of you.  And I

15   will represent to you this is not a document that

16   was provided to us by Giant Eagle or HBC

17   warehouse.  It's a document we pulled off of the

18   internet through a site called LinkedIn, which I'm

19   assuming you are familiar with.

20         A.    I am familiar with LinkedIn, yes.

21         Q.    Those of us here who are old enough

22   probably used to refer to someone's background as

23   their CV or resum .

24         A.    Correct.

25         Q.    On LinkedIn it's my understanding that

1  someone is allowed to basically put their resum

2  online for individuals to see if they wish to do

3  so.

4        A.   Yes.

5        Q.   And that's what you have done

6  voluntarily?

7        A.   Yes.

8        Q.   It's my understanding from looking at

9  Exhibit 1 that you have been employed by the Giant

10  Eagle or HBC entity for at least, I guess, 11

11  years now.

12        A.   Yes; that's correct.

13        Q.   Under experience on Exhibit 1, it says

14  manager, pharmacy training and compliance.

15        A.   That's correct.

16        Q.   Let's kind of back up to before Giant

17  Eagle.  I see that you went to college and

18  finished with a bachelor of science in pharmacy in

19  approximately 1980.

20        A.   That is correct, yes.

21        Q.   Tell us from 1980 until 2008 what you

22  did.

23        A.   From 1980, starting in 1980, my first

24  job in pharmacy as a pharmacist was with People's

25  Drug in Maryland, Langley Park, Maryland.  For

1    People's I managed one store.  I was a staff

2    pharmacist at the first store that I was employed

3    with People's.  Then I moved to a pharmacy

4    management position.

5        I left People's in -- I believe it was

6    February of 1982, and I actually went to work for

7    Giant Eagle as a pharmacist at that point in time.

8    So from 1982 up until 1990, I was a pharmacist

9    working at the store.  I managed three different

10   pharmacies for Giant Eagle during that period of

11   time.

12       In 1990 I did take a position, an

13   office-based position in our pharmacy services

14   area where I started out doing training.  We were

15   putting in a new software program, and I was doing

16   training of pharmacists and pharmacy personnel on

17   that program.

18       And then in 1992 after the rollout was

19   finished, I stayed in the corporate office and was

20   mainly in an administrative position in support in

21   the pharmacy services area, support for managed

22   care, support for our retail pharmacists, did a

23   lot of computer training as we had new pharmacists

24   and new team members come on.  So I was in that

25   position until March of 2003.

14

1          At that point in time, I did leave Giant

2     Eagle, and I took a job with a consulting firm in

3     Pittsburgh called Pharmacy Healthcare Solutions.

4     It was a company that performed consulting

5     services in the retail pharmacy industry, in the

6     pharmaceutical industry and in the managed care

7     industry.

8          I was with PHSI for approximately five years.

9     And that brought me to my current position with

10    Giant Eagle.  I actually left PHSI in June of 2008

11    when I came back to Giant Eagle.

12         At that time I was in a training capacity.  I

13    was managing some of our pharmacy trainers that

14    were responsible for training new pharmacy

15    technicians that came on with Giant Eagle at that

16    point.  That's where in my LinkedIn profile where

17    manager of pharmacy training came into being.  It

18    wasn't really until -- and I really haven't

19    updated my LinkedIn profile with my official title

20    that I have right now as senior manager of

21    pharmacy compliance.

22         Q.   What year did you take on the senior

23    manager of pharmacy compliance?

24         A.   I actually became the senior manager of

25    pharmacy compliance in -- I believe it was about

15

```
 1    the May or June timeframe of 2016.  And that
 2    official role was senior manager of pharmacy
 3    compliance.
 4         Q.   I'm going to have some follow-up
 5    questions about that general background.  Are you
 6    finished with your general background?
 7         A.   Yes, yes.
 8         Q.   I appreciate it.  So it's my
 9    understanding you actually worked in the State of
10    Maryland as a staff pharmacist when you first got
11    out of school.
12         A.   That's correct.
13         Q.   Before I forget, have you ever worked as
14    a pharmacist in the State of Ohio?
15         A.   I do not have a license.
16         Q.   And I assume you have worked as a staff
17    pharmacist or had a license as a pharmacist in the
18    State of Pennsylvania?
19         A.   Yes.
20         Q.   Any other states?
21         A.   Maryland.  I still maintain my Maryland
22    license.
23         Q.   Those two states?
24         A.   Yes.
25         Q.   Let me ask you a couple of questions
```

16

1    about your position as a consultant between 2003

2    and 2008.  I believe you said it was -- the

3    initials are PHSI?

4         A.   Yes, PHSI, Pharmacy Healthcare

5    Solutions.

6         Q.   Thank you.  In that role, did you

7    provide any consulting expertise in the area of

8    compliance?

9         A.   No.

10        Q.   You probably understand, but we should

11   probably make sure we're communicating when I use

12   the word compliance.  I assume you agree that any

13   pharmacist has to comply with certain laws in

14   order to be a pharmacist.

15        A.   Yes.

16             MR. KOBRIN:  Object to form.

17   BY MR. ROTTINGHAUS:

18        Q.   And similarly, HBC warehouse as a

19   distributor between 2009 and 2014 also had an

20   obligation to comply with certain laws and

21   regulations?

22        A.   Yes.

23        Q.   Between 2009 and 2014, did you have any

24   role in managing compliance for HBC warehouse?

25        A.   I didn't manage compliance, but I was

17

1    involved in some compliance activities during that

2    period of time.

3        Q.   We'll be talking about some of those,

4    and we'll come back to that then.

5        So would it be fair to say that prior to

6    coming back to Giant Eagle in 2008, you did not

7    have any role in overseeing or managing compliance

8    for any entity or company?

9        A.   I did not.

10       Q.   Let's talk a little bit about what you

11   have been doing for Giant Eagle and the HBC

12   warehouse since coming back to Giant Eagle in

13   2008.  And I appreciate the fact that you had been

14   with them before, but my questions now are going

15   to be focusing on that timeframe, from 2008 until

16   the present.  And then I might even limit it a

17   little bit more than that at times.  Okay?

18       Can you tell us what year you believe you

19   started to provide some role for HBC warehouse in

20   the realm of compliance?

21           MR. KOBRIN:  Object to form.

22           THE WITNESS:  My recollection would be

23   somewhere in the latter quarter, calendar quarter

24   of 2012.

25

18

```
1    BY MR. ROTTINGHAUS:

2         Q.   And what was it in the latter part of

3    2012, to the best of your memory, that caused you

4    to take on some role in compliance for HBC

5    warehouse?

6         A.   It was just part of my role with Giant

7    Eagle, because I did have some knowledge of

8    business operations and those types of things.

9         Q.   You certainly had some familiarity with

10   what a pharmacist individually has to do to comply

11   with laws and keep his or her license for being a

12   pharmacist?

13        A.   Yes.

14        Q.   At some point in time in 2012, did you

15   undergo additional training or some type of

16   education to allow you to gain a better

17   understanding of what laws or regulations from a

18   state or federal level that HBC warehouse as a

19   distributor needed to follow?

20        A.   Nothing, no formal education in that

21   area.

22             (HBC-Chunderlik Exhibit 2 was marked.)

23   BY MR. ROTTINGHAUS:

24        Q.   Let's look for a minute at what's been

25   marked as Exhibit 2.  You'll see we've got little
```

1    stickers.  And I apologize.  Some of them are a

2    little hard to see probably, but I think on the

3    bottom right-hand corner, you'll see what we

4    marked as Exhibit 2.

5        A.   Yes.

6        Q.   We've also got it up on the screen for

7    you, I think.  Do you see it on the screen?

8        A.   Yes.

9        Q.   I want you to know we're trying to make

10   sure we have the same document on that screen for

11   everyone to see as the same hard copy that's in

12   front of you.  And you're welcome to look at

13   either one.  Okay?

14       A.   Okay.

15

16

17

18

19

20

21

22

23

24

25















27

1

2

3

4

5

6

7

8      Q.   You understand that as a distributor of

9  hydrocodone combination products or controlled

10  substances between 2009 and 2014, that HBC

11  warehouse had an obligation to comply with the

12  Controlled Substances Act and all of its

13  provisions?

14      A.   Yes.

15      Q.   Did you ever undergo any training or

16  seminars or education either at or prior to the

17  latter part of 2012 to help you better understand

18  what obligations HBC warehouse might have in order

19  to comply with the Controlled Substances Act?

20      A.   Nothing specific.

21      Q.   When you say nothing specific, it causes

22  me as an attorney to want to ask:  Was there

23  anything more general then that you received in

24  terms of training or knowledge?

25      A.   I did a lot of reading.

28

1      Q.   At the office you would try to read up?

2      A.   Correct.

3      Q.   Did the company make available to you

4  any consultants or experts to help you better

5  understand what the obligations would be for HBC

6  warehouse in order to comply with the Controlled

7  Substances Act when you became the manager of

8  compliance in the latter part of 2012?

9      A.   No.

10      Q.   Did you ask for any additional resources

11  or training?

12      A.   I knew that I could rely on other

13  individuals to help me if I had any questions in

14  those areas.

15      Q.   You say you did a lot of reading.  Do

16  you remember what it was you decided you should

17  read in order to better acquaint yourself with the

18  obligations to comply with the Controlled

19  Substances Act in the latter part of 2012?

20      A.   The DEA pharmacists manual.

21      Q.   I'm sorry.  I'm going to stop you, and I

22  don't mean to interrupt, but I lost you when you

23  gave me that abbreviation.

24      A.   The DEA pharmacists manual, and I also

25  reviewed the distributor manual as well.

1       Q.   Do you remember who published the

2    distributor manual that you're talking about?

3       A.   It would have been the Drug Enforcement

4    Agency, the DEA.

5       Q.   And is it the best of your memory that

6    you became more interested in acquainting yourself

7    with those obligations when you did agree to take

8    on the role of manager of compliance for the HBC

9    warehouse in the latter part of 2012?

10      A.   Yes.

11      Q.   Because you knew it was important that

12   HBC warehouse comply with the law?

13      A.   Yes.

14      Q.   Do you remember attending any seminars

15   or continuing education classes or any meetings to

16   in any way educate yourself or better acquaint

17   yourself with the obligations of HBC warehouse to

18   comply with the Controlled Substances Act at or

19   near the time you took over as manager of

20   compliance?

21      A.   Not at that point in time.

22      Q.   At at some point in time you did do

23   that?

24      A.   I did.

25      Q.   Do you remember when?

                                                                    30

1        A.    The early part -- well, the mid 2016

2   timeframe.

3        Q.    Would it be fair to say that prior to

4   the mid 2016 timeframe, you had not gone to any

5   specific conferences or DEA meetings or any

6   educational seminars or something similar to

7   better acquaint yourself or better educate

8   yourself about the obligations of HBC warehouse to

9   comply with the Controlled Substances Act?

10       A.    Repeat the first part.

11       Q.    Sure.  Would it be fair to say that

12  prior to 2016, you had not gone to any

13  conferences, meetings or seminars to better

14  acquaint yourself with the obligations of HBC

15  warehouse to comply with the Controlled Substances

16  Act?

17       A.    Yes.

18            MR. KOBRIN:  Object to form.  Don't say

19  anything with regard to any meetings you may have

20  had or any conferences you may have discussed or

21  anything that might be privileged you had with

22  counsel or anything like that.

23  BY MR. ROTTINGHAUS:

24       Q.    I want you to listen to your attorney

25  certainly, but just to make sure I understand, I

31

1    don't want you to tell me what it entailed.

2        But at any point in time between 2012 and

3    2016 when you took on the role of manager of

4    compliance for HBC warehouse, do you recall

5    meeting with any individuals, whether it be

6    attorneys or consultants, to discuss the

7    obligations of HBC warehouse to comply with the

8    Controlled Substances Act?

9        A.   No.









35



10      Q.   Let me back up.  Just to make sure --

11   you probably have figured this out.  I'm not a

12   pharmacist.

13      From that 2008 to 2012 timeframe, when you

14   were overseeing and had supervisory responsibility

15   for pharmacy training, ultimately, that's training

16   individuals who were working in the Giant Eagle

17   retail pharmacies; correct?

18      A.   Yes.

19      Q.   This is not training individuals who

20   were working in the HBC warehouse?

21      A.   That is correct.

22      Q.   And I think you told me and I didn't

23   quite catch it, but I think you told me between

24   2008 and 200- -- up to the present time, you were

25   working -- your office was in the corporate

36

1    headquarters for Giant Eagle.

2         A.   That is correct.

3         Q.   How much time were you spending in the

4    HBC pharmacy, the actual physical location?  I'm

5    sorry.

6         How much time were you spending between 2012

7    and 2016 at the actual HBC warehouse?

8         A.   I made occasional visits to the

9    warehouse.

10        Q.   Help me understand what an occasional

11   visit means.

12             MR. KOBRIN:  Object to form.

13             THE WITNESS:  Maybe once or twice a

14   year.

15   BY MR. ROTTINGHAUS:

16        Q.   How far drive-wise is the HBC warehouse

17   from the Giant Eagle headquarters where you

18   officed?

19        A.   I would say approximately 40 miles.

20        Q.   Let's focus the timeframe a little bit

21   tighter now.  Let's talk about from mid 2012 until

22   October of 2014.

23        Can you say here today with confidence that

24   you had actually visited the HBC warehouse during

25   that timeframe?

1      A.    Yes.

2      Q.    Do you know how many times?

3      A.    My recollection would be once or twice.

4      Q.    Between mid 2012 and October of 2014,

5    your best recollection is you visited the HBC

6    warehouse two times?

7      A.    Once or twice.  I can't recall exactly.

8      Q.    Do you remember why you went there on

9    that one or two occasions?

10      A.    On one occasion we were trying to become

11    VAWD accredited for our HBC warehouse and we had

12    to -- had actually two meetings with those folks

13    in preparation for VAWD accreditation.

14      Q.    It's my understanding -- and remind me

15    what VAWD stands for.  I know it's an acronym.

16      A.    Yes.  It's Vendor Accredited Wholesale

17    Distribution.

18      Q.    And it's my understanding from speaking

19    with Mr. Carlson in his deposition that it was not

20    required for HBC warehouse to be VAWD accredited

21    in order to distribute controlled substances to

22    some of the states where it had retail pharmacies.

23      A.    That's correct.

24      Q.    But the State of Maryland, if my memory

25    is correct, at some point in time required VAWD

38

```
 1    accreditation?

 2         A.   At some point in time, they did.

 3              MR. HUDSON:  Can you just make sure I

 4    get a moment to object to form.

 5    BY MR. ROTTINGHAUS:

 6         Q.   Regardless of when that took place, is

 7    it your best memory that you visited the HBC

 8    warehouse whenever Giant Eagle was working on

 9    making sure it could continue to distribute

10    medications to the State of Maryland?

11              MR. KOBRIN:  Object to form.

12    BY MR. ROTTINGHAUS:

13         Q.   I don't want to confuse you.  Let me

14    back up.

15         At some point in time, Maryland required VAWD

16    accreditation?

17         A.   Yes.

18         Q.   That's the best of your memory; right?

19         A.   Best of my memory, yes.

20         Q.   And that's when HBC warehouse decided it

21    wanted to get the VAWD accreditation; correct?

22         A.   Yes.

23         Q.   And that's the timeframe in which you

24    remember visiting the HBC warehouse?

25         A.   Yes.
```

1      Q.   It was some reason you visited in order

2  to assist in making sure the VAWD accreditation

3  process took place?

4      A.   Yes.

5      Q.   Let's talk about VAWD accreditation for

6  just a minute.  It's my understanding that VAWD

7  provides accreditation to distributors if they

8  fulfill certain criteria for VAWD.

9      A.   Correct.

10      Q.   Is one of those criteria that

11  distributors enact certain policies, procedures or

12  protocols to be followed?

13           MR. KOBRIN:  Object to form.  If you

14  know.

15           THE WITNESS:  Correct.

16  BY MR. ROTTINGHAUS:

17      Q.   That's one of the things when you were

18  managing compliance, you had to at some point find

19  out.  If we want to become VAWD accredited so that

20  we can continue distributing to the State of

21  Maryland, I need to figure out or have somebody

22  figure out what we need to do to get accredited;

23  correct?

24      A.   Correct.

25      Q.   At some point in time it sounds as if

1    you personally tried to make sure you understood

2    what the accreditation criteria were.

3         A.   That is correct.

4         Q.   And indeed you did find out that in

5    order to become accredited, HBC warehouse had to

6    have certain policies and procedures in writing in

7    place?

8         A.   Correct.

9         Q.   Now, at the time you remember visiting

10   HBC warehouse on that one or two occasions between

11   2012 and 2014, is it your memory that you were

12   visiting the warehouse to make sure that certain

13   policies or procedures were being followed?

14        A.   Not at that point in time.

15        Q.   What do you recall going to the

16   warehouse for?

17        A.   It was the initial stages of looking

18   over the requirements to determine even if this

19   was something that we would want to pursue.

20        Q.   Ultimately, you decided it would be

21   worthwhile to do so?

22        A.   At some point we did, yes.

23        Q.   And you did ultimately -- after 2014 you

24   did obtain VAWD accreditation for the HBC

25   warehouse?

41

1           MR. KOBRIN:  Object to form.

2           THE WITNESS:  No, we did not.

3    BY MR. ROTTINGHAUS:

4      Q.   You did for the new Giant Eagle

5    distribution center?

6      A.   Yes.

7      Q.   Actually, the HBC warehouse never did

8    obtain VAWD accreditation; is that correct?

9      A.   That's correct.

10     Q.   We'll probably come back to that in a

11   little bit.  Let's talk for a minute just about

12   policies and procedures in general.  I think I

13   told you we had the opportunity to ask

14   Mr. Millward some questions.  It was probably a

15   few weeks ago now.  And I've had an opportunity to

16   rereview the testimony he gave under oath when he

17   gave his deposition.

18       It's my understanding that according to

19   Mr. Millward, he was one of the individuals who

20   had responsibility for making sure that policies

21   or procedures would get drafted and ultimately

22   approved for the HBC warehouse.

23       Is that your memory as well?

24     A.   That's correct.

25     Q.   Were you also an individual who along

1    with Mr. Millward had responsibility for making

2    sure that certain policies and procedures got

3    drafted for the HBC warehouse?

4              MR. KOBRIN:  Object to form.

5              THE WITNESS:  That's correct.

6    BY MR. ROTTINGHAUS:

7         Q.   Was there anyone else who had

8    responsibility for doing so besides you and

9    Mr. Millward?

10        A.   Not direct responsibility.

11        Q.   When I use the word policies and

12   procedures, I understand or I've been told those

13   can mean different things to different people.  I

14   don't mean to really use them interchangeably, but

15   I'm not trying to be confusing either.

16        Do you in your mind distinguish between a

17   written policy and a written procedure?

18        A.   At times I do.

19        Q.   I want to make sure I understand how you

20   classify a policy and how you classify a procedure

21   so that we can make sure we're communicating well.

22   I'm talking about policies that are in writing and

23   procedures that are in writing.  Okay?

24        Let me ask you this:  What might be a reason

25   to put -- well, first of all, let me ask you:

43

1    What do you or how do you define a policy, a

2    written policy for a company?

3          A.    I look at written policies as being

4    things that have to be followed 100 percent of the

5    time.

6          Q.    Can you give us an example?

7          A.    Just in general, if a policy is written,

8    and I use an example of if the policy says you

9    cannot bring a weapon to work, if you bring a

10   weapon to work, you would be automatically

11   dismissed.

12         Q.    What about a procedure?

13         A.    A procedure could entail there's many

14   different ways to get to the same point.  A

15   procedure in my mind is sometimes a standard

16   operating procedure because there's many different

17   ways that things can be done in certain

18   situations.  I look at a procedure as to be

19   something that can be followed to get to a certain

20   point.

21         Q.    Let me ask you this:  If and when HBC

22   warehouse wanted to draft a policy -- let me ask

23   it this way instead.  Let's back up.

24         Certainly there are certain things that the

25   law required HBC warehouse to do; correct?

44

1          A.    Correct.

2          Q.    If, and I'm saying if, HBC elected to

3     draft a policy to provide guidance to its

4     employees and personnel about following that law,

5     you would indeed call it a policy and not a

6     procedure?

7                MR. KOBRIN:  Object to form.

8                THE WITNESS:  I'm not quite sure.

9     BY MR. ROTTINGHAUS:

10         Q.    Let me ask it a little differently.  If

11    HBC wanted to provide information to its personnel

12    about certain laws that must be complied with as a

13    distributor of controlled substances, would you as

14    the person who had some responsibility for

15    drafting policies and procedures elect to call

16    that a policy or a procedure?

17               MR. KOBRIN:  Object to form.

18               THE WITNESS:  I don't know if there were

19    any hard and fast rules as to how we would

20    determine that.

21    BY MR. ROTTINGHAUS:

22         Q.    Would you agree that if you were

23    providing information to your personnel on how to

24    follow the law, you would expect them to try to

25    follow the law?

45

1          A.   Yes.

2          Q.   And if you elected to put that

3   information down in a written policy, you would

4   expect your personnel to follow the policy?

5          A.   If it was in a written policy.

6          Q.   What might be the benefit of putting

7   information down in writing either in a policy or

8   a procedure for employees of HBC warehouse?

9          A.   To make sure that -- a reason for -- if

10  a certain law or policy is not followed, there's a

11  little bit more of a level of progressive

12  discipline that may take place.

13         Q.   If something -- if a policy is put down

14  in writing or if a procedure is put down in

15  writing, it might facilitate better communication

16  among individuals at the company who are expected

17  to follow the policy or procedure?

18              MR. KOBRIN:  Object to form.  Assumes

19  facts not in evidence.

20              THE WITNESS:  I would suppose so.

21  BY MR. ROTTINGHAUS:

22         Q.   It provides some guidance clearly in

23  writing for individuals on what the company

24  expects; correct?

25         A.   I would suppose, yes.

46

1      Q.   And that's in part why you sometimes

2   decided to draft policies or procedures for

3   individuals at HBC warehouse; isn't that right?

4           MR. KOBRIN:  Object to form.

5           THE WITNESS:  There would be a couple,

6   you know, maybe reasons because of an

7   accreditation.

8   BY MR. ROTTINGHAUS:

9      Q.   Sure.  But you're trying to educate the

10  individuals who work at the company to help them

11  understand what the expectation is; correct?

12     A.   Correct.

13     Q.   Also, it provides hopefully for more

14  consistent application of any guidance that the

15  company wants to provide for its employees if it

16  puts it down in a policy or procedure; correct?

17     A.   I would suppose it does.

18     Q.   Ultimately, it allows the company to

19  operate a little more efficiently if everybody is

20  on the same page and understands what the

21  expectation is in writing in terms of a policy or

22  a procedure?

23          MR. KOBRIN:  Object to form.  Don't

24  speculate about the efficiency of the company.

25          THE WITNESS:  I can't speculate on that.

47

 1   BY MR. ROTTINGHAUS:

 2       Q.   That's fine.  Certainly by putting or

 3   putting in writing a policy or a procedure, to the

 4   extent it talks or discusses compliance with the

 5   law, it allows the company to make sure that it

 6   has clearly communicated to its employees what the

 7   law requires of the company; is that right?

 8            MR. KOBRIN:  Object to form.

 9            THE WITNESS:  I would suppose.

10   BY MR. ROTTINGHAUS:

11       Q.   I mean, you actually have drafted

12   policies or procedures at times that in some way

13   reflect what the law is and what the company

14   expects its employees to do in order to follow the

15   law; correct?

16            MR. KOBRIN:  Object to form.

17            THE WITNESS:  In many cases, if it's

18   part of law, we would expect our employees to be

19   following the law.

20   BY MR. ROTTINGHAUS:

21       Q.   But to the extent it's -- let me back

22   up.  You've drafted policies for your retail

23   pharmacies?

24       A.   Yes.

25       Q.   You drafted procedures for your retail

                                                                          48

1    pharmacies?

2         A.   Yes.

3         Q.   Did some of those policies and

4    procedures reflect the obligations of those retail

5    pharmacies under the law, whether it be state law

6    or federal law?

7         A.   We write policies for internal use, the

8    way we would want to see things done.  I can't

9    honestly say that we write policies whenever it is

10   part of law.

11        Q.   I think you said it better than I could

12   have.  You said you write policies to reflect the

13   way you want things done; correct?

14        A.   The way the company would want things

15   done.

16        Q.   The way the company would want things

17   done and want its employees to act; is that right?

18        A.   I would say yes.

19        Q.   And by putting them in writing, it

20   clearly communicates that expectation to

21   employees; is that right?

22        A.   As much as possible.

23        Q.   And hopefully allows for a more

24   consistent application of whatever the company

25   wants done?

49

```
 1        A.   I would say yes.

 2        Q.   Because if there's a question in

 3   somebody's mind, they have a document they can go

 4   to and say what is the policy on this; is that

 5   right?

 6             MR. KOBRIN:  Object to form.

 7             THE WITNESS:  Occasionally.

 8   BY MR. ROTTINGHAUS:

 9        Q.   Versus just going down the hallway and

10   asking somebody what they normally do, they can go

11   to a book or a manual or a policy and say this is

12   what the company expects; is that right?

13             MR. KOBRIN:  Object to form.

14             THE WITNESS:  At times, yes.

15   BY MR. ROTTINGHAUS:

16
17
18
19
20
21
22
23
24
25
```











54



55





57



58















65







68

































84



1      

2

3

4

5

6

7

8

9

10

11              (HBC-Chunderlik Exhibit 3 was marked.)

12    BY MR. ROTTINGHAUS:

13        Q.    I'm going to show you what's been marked

14    Exhibit 3.  I think it was already in front of

15    you.  I'm going to be focusing on subparagraph

16    (b), which is the second full paragraph there.

17    Are you with me?

18        A.    I am, yes.

19        Q.    It's a little hard to read.  I apologize

20    the text is kind of small.  So we've also put it

21    on the screen if it's easier for you to read

22    there.

23        First of all, I want to read this subsection

24    and make sure I'm reading it correctly.  Okay?

25    According to this subsection, it states, "The

1    registrant shall design and operate a system to

2    disclose to the registrant suspicious orders of

3    controlled substances."

4         Have I read it right so far?

5         A.   Yes.

6         Q.   It then says, "The registrant shall

7    inform the field division office in his area of

8    suspicious orders when discovered by the

9    registrant."  Correct?

10        A.   Yes.

11        Q.   And then it goes on to describe

12   suspicious orders and how they can include orders

13   of unusual size, orders deviating substantially

14   from a normal pattern and orders of unusual

15   frequency; correct?

16        A.   Yes.

17        Q.   Do you remember if you read at any point

18   in time this provision of the Code of Federal

19   Regulations between 2012 and 2014 when you were

20   manager of compliance and, in part, oversaw

21   compliance for HBC warehouse?

22        A.   I do recall that, yes.

23        Q.   In fact, when you told us that you went

24   and did some reading when you first took on the

25   position of manager of compliance, is this section

87

```
 1   of the Code of Federal Regulations one of the

 2   sections you went and read, to the best of your

 3   memory?

 4        A.   I do recall that, yes.
```





89



90







93





















103













109



20          (HBC-Chunderlik Exhibit 8 was marked.)

21   BY MR. ROTTINGHAUS:

22          Q.    I'm going to show you now what we have

23   marked Exhibit 8.  It's, again, one of those

24   documents I'm going to ask you just a couple of

25   things, but it's fairly large.

1           MR. ROTTINGHAUS:  I think before we get

2    into this, we're going to go off the record real

3    quick because we have to change the videotape.

4           MR. KOBRIN:  Take a break?

5           MR. ROTTINGHAUS:  If you guys want to or

6    you want to keep moving for a little bit, I'll get

7    through this.

8           THE VIDEOGRAPHER:  The time is

9    11:13 a.m.  We're going off the video record.

10          (Recess from 11:13 a.m. to 11:38 a.m.)

11          THE VIDEOGRAPHER:  The time is

12   11:38 a.m.  We are now back on the video record.

13   BY MR. ROTTINGHAUS:

14      Q.  Mr. Chunderlik, right before we took a

15   break, I think I may have referred to a document

16   we have marked as Exhibit No. 8.  Do you have that

17   in front of you?

18      A.  I do, yes.

19      Q.  Let's look at the first page of that

20   document.  This appears to be either an email or

21   some type of forward from Anthony Mollica to you

22   on May 1, 2012; is that correct?

23      A.  That's correct.

24      Q.  And it references the Anda Supply Chain

25   Symposium.

1       A.   Yes.

2       Q.   Do you recall whether you personally had

3  attended the Anda Supply Chain Symposium?

4       A.   I did not attend this symposium.

5       Q.   Now, in May of 2012, it's my

6  understanding that you had not yet become the

7  manager of compliance; is that correct?

8       A.   To the best of my recollection, that is

9  correct, yes.

10      Q.   If we could now, let's go to -- there

11 are lengthy numbers in the bottom right-hand

12 corner of each of these documents.  I may have

13 referred your attorney to the page I'm going to

14 reference.  There's also a number five at the

15 bottom right-hand corner.  Do you see that?

16      A.   Yes.

17           MR. ROTTINGHAUS:  The Bates numbers are

18 4413.

19 BY MR. ROTTINGHAUS:

20      Q.   Before I actually ask you any questions

21 about this, do you know whether you ever looked at

22 this document back in May of 2012?

23      A.   I have a recollection that I may have

24 reviewed it, yes.

25      Q.   So at least as of 2012 when this was

1   forwarded to you, you believe you did see some of

2   this document, if not all of it?

3       A.   Yes.

4       Q.   Let's look at what I had just referred

5   to as this page 5, which appears to be a

6   PowerPoint slide.  Does it appear to you as well?

7       A.   It does.

8       Q.   And I understand this is not a document

9   that was prepared by Giant Eagle or HBC, but this

10  is a document that Mr. Mollica brought back with

11  him from the supply chain symposium; correct?

12      A.   I believe so, yes.

13          MR. KOBRIN:  Object to form.

14  BY MR. ROTTINGHAUS:

15      Q.   That's your understanding?

16      A.   That's my understanding.

17      Q.   And that's your memory from 2012?

18      A.   Yes.

19      Q.   Now, at least on this slide it appears

20  to be, again, referencing some of the duties of a

21  distributor of controlled substances; is that

22  right?

23      A.   Yes.

24      Q.   And it specifically is referencing

25  Section 1301.74(a) and (b) of the Code of Federal

113

1    Regulations.

2         A.   Yes.

3         Q.   Let's look for a second at subsection

4    (b) of this document.  Once again, we're going to

5    see language that you have seen before; correct?

6         A.   Yes.

7         Q.   And this is, again, restating what the

8    Code of Federal Regulations says, and that is that

9    the registrant shall design and operate a system

10   to disclose to the registrant suspicious orders of

11   controlled substances; correct?

12        A.   Correct.

13        Q.   And then it goes on.

14        If you'll go to the next page of this, in

15   bold face it says SOM Measurements; correct?

16        A.   Yes.

17        Q.   Do you believe SO stands for suspicious

18   orders?

19        A.   I believe so, yes.

20        Q.   Now, as you look at the different topics

21   on this slide, the first thing we see is

22   controlled versus noncontrolled.  Then we see cash

23   payment versus third-party payment; correct?

24        A.   Yes.

25        Q.   Is it your understanding that this slide

114

```
1    is conveying a belief, for lack of a better term,

2    that a potential red flag might be when

3    individuals are paying for controlled substances

4    with cash?

5            MR. KOBRIN:  Object to form.

6    BY MR. ROTTINGHAUS:

7        Q.   Rather than through insurance.

8            MR. KOBRIN:  Object to form.

9            THE WITNESS:  I'm not sure what the

10   intent of the person who put this presentation

11   together -- if that was the intent or not.

12   BY MR. ROTTINGHAUS:

13       Q.   Does that make sense to you, that that

14   could be a red flag when people are paying with

15   cash versus third-party payments?

16       A.   It could be.

17       Q.   That's something you were aware of back

18   in 2012; correct?

19       A.   Yes.

20       Q.   A potential red flag?

21       A.   Correct.

22       Q.   And then it goes on to list other

23   measurements as well; does it not?

24       A.   It does.

25           ██████████████████████████████
```







118











123





125











130

























142



143













149





151





153







156



157

















165



166







169









172

173



174



175







178





180



181





183





185

1          A.    A copy -- I don't know if was a

2     formalized policy as on Exhibit 18.  My

3     recollection is that we would have provided a

4     summary of our program versus a written policy as

5     shown in Exhibit 18.

6          Q.    And what is your recollection of -- at

7     this time in January of 2014, what was the system

8     or what was the suspicious order monitoring?  What

9     was happening at that time?

10         A.    At that point in time, as we've seen, we

11    had daily reports based upon stores that may have

12    exceeded the threshold that we had set up, and if

13    stores flagged on those reports, they were

14    followed up on, and that was part of the

15    explanation in this document.

16         Q.    So at this point in time in January of

17    2014, to the best of your recollection, the system

18    that was in place was the daily threshold reports

19    that you've talked about; correct?

20         A.    Correct, yes.

21         Q.    Now, at some point in 2015, did Giant

22    Eagle take steps to open a new distribution

23    facility where Giant Eagle was going to become a

24    distributor of Schedule II controlled substances?

25         A.    Yes.  We began processes.  We began the







189



190

























202















[1/16/2019] Chunderlik011619





211



1      Q.    Did Giant Eagle have dynamic threshold

2    management at this time in November of 2016?

3      A.    I'm not exactly sure what is meant by

4    dynamic threshold management.  We had a threshold

5    management process that we've already discussed.

6    Whether I would term it dynamic, I don't know what

7    is meant by that dynamic part of threshold

8    management.

9      Q.    This is indicating that there needs to

10    be some change to the threshold, the way in which

11    the threshold management is being operated, right,

12    from his point of view at least?

13      A.    Maybe some improvement.

14      Q.    And then the second bullet point is

15    "Re-engineering and formalizing the current

16    investigative process."  Right?

17      A.    That's what he says here, yes.

18      Q.    We've talked about the investigative

19    process earlier in the day.  You and

20    Mr. Rottinghaus did; correct?

21      A.    Yes.

22      Q.    And I believe you testified that there

23    was no formal -- up until this point in 2016,

24    there was no formal process for documenting the

25    investigations as they were concurring; correct?

213

1       A.   We had a process to do the

2  investigations.  Actually, not in all cases

3  documenting.  A lot of the investigation took

4  place through communication with the PDL, the

5  pharmacy district leader, the stores, the

6  warehouse and so on.

7       Q.   But as you sit here today, you can't

8  personally recall a specific investigation that

9  you undertook; correct?

10          MR. KOBRIN:  Object to form.

11          THE WITNESS:  I participated in some

12  investigations.  I'm not sure if you mean if I led

13  an investigation.

14  BY MR. HUDSON:

15       Q.   As you sit here today, do you have a

16  recollection of specific investigations of

17  specific stores that you led?

18       A.   Not necessarily that I led, but I

19  participated in.

20       Q.   That you participated in?

21       A.   Yes.

22       Q.   Which store was it of the 200?

23          MR. KOBRIN:  Object to form.

24          THE WITNESS:  I'm sure I had some

25  involvement in the store number 8 that we've

214

1   already discussed.

2   BY MR. HUDSON:

3       Q.   Other than store number 8, any other

4   investigations you recall?

5       A.   There were some.  I can't remember

6   specific stores.

7       Q.   Do you remember who you talked to at

8   those stores?

9       A.   I would talk to the pharmacy manager.

10      Q.   Do you remember the names of anybody in

11  particular that you talked to between 2009 and

12  2014?

13           MR. KOBRIN:  Object to form.

14           THE WITNESS:  I would have talked to the

15  pharmacy manager.  Whether they've changed from

16  that point in time, I'm not sure, but I don't

17  recall the specific pharmacist that I talked to.

18  When I make a call to the pharmacy, I always ask

19  for the pharmacist in charge or the pharmacy

20  manager.

21  BY MR. HUDSON:

22      Q.   What particular information did you ask

23  for when you made those calls?

24           MR. KOBRIN:  Object to form.

25           THE WITNESS:  I would ask about if there

1    is any -- some of the questions that we had on

2    our -- on one of the previous forms that we

3    discussed that had some of those six questions on

4    there.

5    BY MR. HUDSON:

6        Q.   Did you ask the same questions every

7    time, or did they change?

8        A.   They may have change a little bit.

9        Q.   As you sit here today, can you remember

10   any specific questions that you asked any

11   pharmacist at any particular store between 2009

12   and 2014?

13       A.   Some of the things that I was most

14   interested in when I asked were information on

15   pain clinics, if there were any new physicians in

16   the area.

17       Q.   Anything else that you asked?

18       A.   There may have been, but I can't recall

19   specifically.

20       Q.   Did you ever uncover that there were

21   ever pain clinics or new physicians in the area?

22       A.   Yes.

23       Q.   And would that cause you to have a

24   suspicion that there would be a heightened risk

25   for diversion?

216

1        A.    I wouldn't necessarily say a heightened

2    risk.  I knew that there were probably going to be

3    more prescriptions coming from those facilities.

4    We look to fill prescriptions, legitimate

5    prescriptions.  I had no reason to believe that if

6    a physician has written a prescription, that the

7    pharmacy was going to do their due diligence to

8    determine if that was a legitimate prescription or

9    not.

10        Q.    Other than asking the pharmacist whether

11   there were new physicians or pain clinics in the

12   area, anything else that you can recall doing your

13   due diligence to investigate flagged orders?

14            MR. KOBRIN:  Object to form.  Asked and

15   answered.

16            THE WITNESS:  Other than that, there may

17   have been situations where I had asked about

18   specifically what types of prescriptions that they

19   were seeing from the pain clinic or from the

20   physician's offices and if there was any reason

21   why they had a reason -- if there weren't any pain

22   clinics or new offices being opened, what the

23   pharmacy would have thought was a reason for the

24   increase in purchases in prescriptions.

25







220



221



222











227





229









232

1          MR. KOBRIN:  And I move to strike the

2     testimony as being misled by the prior question.

3     We can talk about it at a break if you want.  But

4     we're going to limit you on redirect to the time

5     that we've taken on redirect.  So if you want to

6     clean something up later, you're not going to have

7     that opportunity.

8     BY MR. HUDSON:

9          Q.   Mr. Chunderlik, here in the next

10    paragraph is a discussion of the scope of the new

11    policy; right?

12         A.   Yes.

13         Q.   It says, "This procedure applies to the

14    Giant Eagle order monitoring system team which

15    consists of members of pharmacy administration,

16    pharmacy operations, pharmacy compliance, pharmacy

17    merchandising, pharmacy technology, Giant Eagle RX

18    distribution center teams and loss prevention."

19    Right?

20         A.   Yes.

21         Q.   Was this policy more comprehensive than

22    previous policies in terms of who was involved in

23    the process?

24         A.   It's written to appear to be, but in all

25    areas whenever we had our previous programs in

234

1     place, any one of these individuals could be

2     involved as well.  It wasn't meant to add any

3     extra individuals.

4         Q.   So the contemplation was that this same

5     group of individuals would have been previously

6     involved in the process?

7         A.   Yes.

8         Q.   In here it says the policy is the order

9     monitoring system team monitors pharmacy orders to

10    prevent possible diversion of controlled

11    substances; right?

12        A.   Yes.

13        Q.   And then the procedure, we've got 14

14    bullet points; correct?

15             MR. KOBRIN:  Object to form.

16             THE WITNESS:  Yes.

17    BY MR. HUDSON:

18        Q.   And the first bullet point is just

19    indicating that controlled substances are supplied

20    to the pharmacies from McKesson, Anda and the new

21    Giant Eagle RX distribution center; right?

22        A.   Yes.

23        Q.   And the second bullet point is Schedule

24    II controlled substances are generated using the

25    controlled substance ordering system.  In

235

1    parentheses it says CSOS.  Right?

2        A.   Yes.

3        Q.   When was the CSOS system implemented, if

4    you know?

5        A.   At the retail location, my recollection

6    is around April of 2015.

7        Q.   Then the next bullet point is the OMS.

8    Is that a reference to the order monitoring

9    system?

10       A.   Yes.

11       Q.   Is that the new system that's going to

12   be implemented --

13       A.   Yes.

14       Q.   -- in conjunction with this policy?

15       A.   Yes.

16       Q.   The OMS uses algorithms to identify

17   controlled substance orders that require

18   investigation and documentation before releasing

19   the order for distribution.

20       Then there's a sub-bullet there.  The OMS

21   algorithm generates limits based on monthly

22   thresholds and ordering characteristics specific

23   to the following.  Then it lists pharmacy

24   location, chemical, generic product indicater,

25   National Drug Code and ordering pattern; correct?

236

1      A.    Yes.

2      Q.    If you could, just compare for me how

3  comprehensive these algorithms are for monitoring

4  orders compared to the previous daily threshold

5  reports that we talked about.

6      A.    I think we modified the algorithm to --

7  we modified the algorithm that we were using to

8  identify any type of suspicious order or any type

9  of order.

10     Q.    So now the monitoring is going to be

11 specific to the actual pharmacy location; right?

12     A.    Yes.

13     Q.    That was not something that -- the daily

14 threshold reports that were implemented in October

15 of 2013, not something they were able to do;

16 right?

17     A.    That's correct.

18     Q.    And then here it also indicates that

19 this monitoring is going to involve not just

20 monthly thresholds, but also ordering

21 characteristics; correct?

22     A.    That's correct.

23     Q.    That's something that the prior daily

24 threshold reports were not able to do; right?

25     A.    Which bullet are you referring to?

237

1       Q.   The clear bullet, the first.

2       A.   I wouldn't necessarily say that our

3   previous system was not able to do some of these

4   things as well.

5       Q.   We've looked at the reports before, but

6   the daily threshold reports that began being

7   generated in October of 2013, those were monthly

8   or those were thresholds of orders based upon

9   monthly rolling data; right?

10      A.   Right, but they were chemical, generic

11  product indicator, National Drug Code as well.  I

12  kind of want to make that distinction there.  We

13  have bullets that look like we've added these

14  types of things, but they were part of the

15  original one as well.

16      Q.   The original one in October of 2013

17  created thresholds based on GPI; right?  The

18  generic product indicator was --

19      A.   At the GPI 10 level.

20      Q.   Right.  And then it was specific that

21  thresholds were company-wide, but not store or

22  location specific; right?

23      A.   Correct.

24      Q.   And then the daily threshold reports,

25  those didn't include -- there was no data that was

238

1    being mined to create algorithms to flag or

2    monitor ordering characteristics, right, or

3    ordering patterns?

4            MR. KOBRIN:  Object to form.

5            THE WITNESS:  We have those reports

6    where we could -- I mean, they do show pattern.

7    They have the potential to show patterns.

8    BY MR. HUDSON:

9        Q.    They show a pattern as it relates to

10   orders, but only the subset of orders that would

11   be exceeding a threshold; right?

12       In other words, the only thing being flagged

13   in the daily threshold reports that were in

14   existence from October of 2013 were orders that

15   were exceeding the threshold; right?

16           MR. KOBRIN:  Object to form.

17           THE WITNESS:  Those are the orders.

18   When a store -- the first time a store went over

19   the threshold, they would flag on the report, and

20   they could have the potential to stay on that

21   report till the end of the month, yes.

22   BY MR. HUDSON:

23       Q.    Right.  But if there wasn't an order

24   going from HBC to a pharmacy that tripped over the

25   threshold, that order would not be on those daily









243







246



247



248







251







1

2

3          MR. KOBRIN:  Object to form.  Misstates

4   the evidence.

5          THE WITNESS:  That's correct.

6          MR. HUDSON:  I don't have any further

7   questions.

8          MR. KOBRIN:  Go off the record real

9   quick.

10          THE VIDEOGRAPHER:  The time is 4:15 p.m.

11   We're going off the video record.

12          (Recess from 4:15 p.m. to 4:39 p.m.)

13          THE VIDEOGRAPHER:  The time is 4:39 p.m.

14   We're now back on the video record.

15                    EXAMINATION

16   BY MR. KOBRIN:

17     Q.   Mr. Chunderlik, do you remember being

18   asked questions about the so-called suspicious

19   order regulation at Section 1301.74(b) this

20   morning?

21     A.   Yes.

22     Q.   And that is, I believe, Exhibit 3, if

23   you want to look at that.  During any time during

24   your deposition, were you shown the security

25   regulation, which is at 1301.71 of the Code of

1    Federal Regulations?

2         A.   No.

3         Q.   Sitting here today, what do you

4    understand the security regulation to be?

5         A.   The security regulation, it's a system

6    of controls to put in place to protect the

7    integrity and the safety of medication and to help

8    prevent diversion into illicit markets.

9         Q.   Do you understand that to be the main

10   requirement that distributors are supposed to meet

11   under the Controlled Substances Act?

12             MR. HUDSON:  Object to the form.

13             THE WITNESS:  That is a section of it

14   and it is -- there are multiple pieces that go

15   along with that.

16   BY MR. KOBRIN:

17        Q.   Is that the overarching requirement to

18   your understanding?

19        A.   Yes, yes.

20        Q.   Did HBC meet that requirement at all

21   times --

22             MR. HUDSON:  Object to the form.

23   BY MR. KOBRIN:

24        Q.   -- that are relevant to this litigation,

25   so starting in 2009 and running all the way to the

256

1      present?

2          A.   Yes.

3

4

5

6

7

8

9

10

11

12

13         Q.   Looking back at 1301.74, it says, "The

14     registrant must design and operate a system to

15     disclose to the registrant suspicious orders of

16     controlled substances."

17         Do you understand that to be the only factor

18     that's taken into consideration for the security

19     requirement?

20         A.   No.  That's a subsection of the entire

21     requirement.

22         Q.   Can you think of any other factors?  For

23     example, is the physical security of the warehouse

24     one of the factors?

25         A.   Yes, it is.

257

1         Q.   Is record keeping one of the factors?

2         A.   Record keeping is one of the factors,

3    yes.

4         Q.   Are controls on the way that the

5    controlled substances are distributed, is that one

6    of the factors?

7         A.   Yes.

8         Q.   Is security at the warehouse one of the

9    factors?

10        A.   Yes.

11        Q.   Is the type of drugs being distributed

12   one of the factors?

13        A.   Yes.

14        Q.   Is to whom the drugs are being

15   distributed to one of the factors?

16        A.   Yes.

17        Q.   Did HBC or was HBC ever a registered

18   distributor of Schedule II controlled substances?

19        A.   No.

20        Q.   Are opioids generally under Schedule II?

21        A.   Generally, yes.

22        Q.   Is there an exception?  Was there ever a

23   time when opioids were not Schedule II or any kind

24   of particular opioid was not a Schedule II?

25        A.   Yes.  Prior to October of 2014,

258

```
 1    hydrocodone and hydrocodone combination products

 2    were in Schedule III.

 3         Q.   And after October of 2014, what were

 4    they reclassified as?

 5         A.   All hydrocodone and hydrocodone

 6    combination products were rescheduled as Schedule

 7    II controlled substances.
```



1    over the receipt of controlled substances it was

2    handling when it determined it was in compliance

3    with the security requirements?

4        A.   Yes.

5        Q.   Did HBC consider the physical security

6    features of its facility --

7        A.   Yes.

8        Q.   -- when it determined it was in

9    compliance with the security requirements?

10       A.   Yes.

11       Q.   Did HBC get frequent visits from the

12   DEA?

13       A.   They got visits from the DEA, yes.

14       Q.   What was the purpose of those visits?

15       A.   To do reconciliation audits to see if we

16   were also complying with the security requirements

17   that were required as part of the Act and that we

18   had controls in place.

19       Q.   Did the DEA ever tell HBC that they were

20   not meeting the security requirements under the

21   regulations, under the regulation related to the

22   Controlled Substances Act?

23       A.   Not that I know of, no.

24       Q.   With respect to the HBC warehouse that

25   you visited, do you recall whether it had a locked

260



261



262





264



265



266



267

BY MR. KOBRIN:

1

2    Q.   When a pharmacist fills a controlled

3    substance prescription, is the store inventory

4    immediately updated for outgoing prescriptions?

5    A.   Yes.

6    Q.   At the end of the day, is there a check

7    of remaining balances of the controlled substance

8    at the stores?

9    A.   In controlled substances and Schedule II

10   items, the pharmacy does a perpetual back count of

11   what should be remaining on the shelf after they

12   dispense a prescription.

13   Q.   What does that mean, a perpetual back

14   count?

15   A.   After each time a prescription goes

16   through the filling process, the pharmacist is

17   required to go back and count the remaining

18   inventory that's in the -- for that product and

19   log it into the electronic database within our

20   pharmacy data management system.

21   Q.   Are you familiar with the term monthly

22   narc audit?

23   A.   I am, yes.

24   Q.   What is a monthly narc audit?

25   A.   The monthly narc audit is a program that

268

1   was developed by Giant Eagle to reconcile

2   inventory.  It will show the purchases for a given

3   time period as to when the audit was conducted and

4   show all dispensing.  And at the end of doing that

5   calculation, there is an actual -- there is an

6   expected on-hand count that is shown to the

7   pharmacy.

8        They do the count, and then they update it

9   with the actual count that is remaining in

10  inventory.

11       Q.   Do you also have annual audits of

12  inventories at Giant Eagle pharmacies?

13       A.   We do annual inventory counts at each

14  pharmacy, yes, of all controlled substances.

15       Q.   Can you tell me what a PDL is?

16       A.   PDL is an acronym at Giant Eagle for

17  pharmacy district leader.

18       Q.   What do the PDLs do?

19       A.   The PDLs -- each PDL has roughly 29 to

20  33 stores that they are responsible for business

21  oversight of a particular region.

22       Q.   Do they regularly visit the stores?

23       A.   They do regularly visit the stores, yes.

24       Q.   When the compliance team did due

25  diligence on any orders that flagged or any orders

269

```
1   that they wanted to investigate further, would the
2   PDLs be a good source of information as to what
3   was going on --
4        A.   The PDL is a very good source of
5   information, yes.
6        Q.   Did you and others at Giant Eagle
7   corporate office utilize the PDLs when doing due
8   diligence at stores and on orders?
9        A.   Yes, sir; yes.
10       Q.   Do PDLs conduct audits or inquiries
11  concerning procedures at the stores?
12       A.   They do.
13       Q.   Do they supervise the training of
14  pharmacists at all?  Are they involved in the
15  supervising and training of pharmacists?
16       A.   They do have a part in supervising the
17  training.  As part of their audit, they would look
18  to see if required training was being conducted by
19  the pharmacist or that team members were doing
20  some computer-based training programs that had
21  been assigned to them.
22       Q.   That would be like continuing education?
23       A.   Possibly, yes.
24       Q.   Do the stores, do the Giant Eagle
25  pharmacy stores work with local law enforcement?
```

270



271



272





274



275



276



277



278



279









283





285





287























298

















306

```
1      ████████████████████████████████████
2      ██████████████████████████
3              MR. HUDSON:  No further questions.
4              THE VIDEOGRAPHER:  The time is 5:38 p.m.
5      This concludes this video deposition.
6              (Whereupon, at 5:38 p.m., the taking of
7      the instant deposition ceased.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

307

```
 1    COMMONWEALTH OF PENNSYLVANIA  )

 2    COUNTY OF ALLEGHENY          )       SS:

 3                  C E R T I F I C A T E

 4            I, Ann Medis, Registered Professional

 5    Reporter, Certified Livenote Reporter and Notary

 6    Public within and for the Commonwealth of

 7    Pennsylvania, do hereby certify:

 8            That GEORGE CHUNDERLIK, the witness

 9    whose deposition is hereinbefore set forth, was

10    duly sworn by me and that such deposition is a

11    true record of the testimony given by such

12    witness.

13            I further certify the inspection,

14    reading and signing of said deposition were not

15    waived by counsel for the respective parties and

16    by the witness.

17            I further certify that I am not related

18    to any of the parties to this action by blood or

19    marriage and that I am in no way interested in the

20    outcome of this matter.

21            IN WITNESS WHEREOF, I have hereunto set

22    my hand this 21st day of January, 2019.

23

24            _____
                         Notary Public

25
```

308

```
 1   COMMONWEALTH OF PENNSYLVANIA   )   E R R A T A
     COUNTY OF ALLEGHENY            )   S H E E T
 2

 3        I, GEORGE CHUNDERLIK, have read the foregoing
     pages of my deposition given on January 16, 2019,
 4   and wish to make the following, if any,
     amendments, additions, deletions or corrections:
 5

 6   Page  Line   Change and reason for change:

 7   ____  ____   _____

 8   ____  ____   _____

 9   ____  ____   _____

10   ____  ____   _____

11   ____  ____   _____

12   ____  ____   _____

13   ____  ____   _____

14   ____  ____   _____

15   ____  ____   _____

16   ____  ____   _____

17   ____  ____   _____

18

19   In all other respects, the transcript is true and
     correct.
20

21                    _____
                      GEORGE CHUNDERLIK
22

23   _____ day of _____, 2019.

24   _____
                    Notary Public
25
```