## Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

-----------------------------x
IN RE: NATIONAL PRESCRIPTION  ) Case No
OPIATE LITIGATION            ) 1:17-MD-2804
APPLIES TO ALL CASES         ) Hon  Dan A  Polster
-----------------------------x

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW
VIDEOTAPED DEPOSITION OF MICHAEL R  CLARKE

SANDSTON, VIRGINIA

FRIDAY, DECEMBER 7, 2018

9:13 A M

Reported by: Leslie A  Todd

## Page 2

1    Deposition of MICHAEL R. CLARKE, held in the
2  conference room of the:
3
4
5            HILTON GARDEN INN
6            RICHMOND AIRPORT
7            441 International Center Drive
8            Sandston, Virginia 23150
9
10
11
12
13
14    Pursuant to notice, before Leslie Anne Todd,
15  Court Reporter and Notary Public in and for the
16  Commonwealth of Virginia, who officiated in
17  administering the oath to the witness.
18
19
20
21
22
23
24

## Page 3

1        A P P E A R A N C E S
2
3  ON BEHALF OF PLAINTIFFS:
4      MATTHEW S  MELAMED, ESQUIRE
5      KELLI BLACK, ESQUIRE
6      ROBBINS GELLER RUDMAN & DOWD LLP
7      Post Montgomery Center
8      One Montgomery Street
9      Suite 1800
10     San Francisco, California 94104
11     (415) 288-4545
12
13  ON BEHALF OF THE ALLERGAN DEFENDANTS AND THE
14  WITNESS:
15     JENNIFER G  LEVY, ESQUIRE
16     CATIE VENTURA, ESQUIRE
17     KIRKLAND & ELLIS LLP
18     655 Fifteenth Street, N W
19     Washington, D C  20005
20     (202) 879-5211
21
22
23
24

## Page 4

1  APPEARANCES (Continued):
2
3  ON BEHALF OF WATSON PHARMACEUTICALS, INC.:
4      STEVEN A. LUXTON, ESQUIRE
5      MORGAN LEWIS BOCKIUS, LLP
6      1111 Pennsylvania Ave, N.W.
7      Washington, D.C. 20004-2541
8      (202) 739-5452
9
10  ON BEHALF OF McKESSON CORPORATION:
11     SARA SUNDERLAND, ESQUIRE (Telephonically)
12     COVINGTON & BURLING, LLP
13     One Front Street
14     San Francisco, California 94111-5356
15     (415) 591-6000
16
17  ON BEHALF OF ENDO PHARMACEUTICALS, INC. and
18     ENDO HEALTH SOLUTIONS, INC.:
19     JOHN CELLA, ESQUIRE (Telephonically)
20     JOANNA PERSIO, ESQUIRE (Telephonically)
21     ARNOLD & PORTER KAYE SCHOLER, LLP
22     601 Massachusetts Ave, N.W.
23     Washington, D.C. 20001-3743
24     (202) 942-5000

Page 5

```
1    APPEARANCES (Continued):
2
3    ON BEHALF OF WALMART:
4        SHIRLETHIA V. FRANKLIN, ESQUIRE
5        JONES DAY
6        51 Louisiana Avenue, N.W.
7        Washington, D.C. 20001-2113
8        (202) 879-3939
9
10   ON BEHALF OF AMERISOURCEBERGEN:
11       JILL McINTYRE, ESQUIRE (Telephonically)
12       JACKSON KELLY, PLLC
13       500 Lee Street East
14       Suite 1600
15       Charleston, West Virginia 25301-3202
16       (304) 340-1018
17
18   ON BEHALF OF CARDINAL HEALTH:
19       JULI ANN LUND, ESQUIRE (Telephonically)
20       WILLIAMS & CONNOLLY LLP
21       725 Twelfth Street, N.W.
22       Washington, D.C. 20005
23       (202) 434-5000
24
```

Page 6

```
1    APPEARANCES (Continued):
2
3    ON BEHALF OF MALLINCKRODT PHARMACEUTICALS:
4        PHILLIP KRAFT, ESQUIRE (Telephonically)
5        ROPES & GRAY, LLP
6        1211 Avenue of the Americas
7        New York, New York  10036-8704
8        (212) 596-9150
9
10   ALSO PRESENT:
11       CHRIS RITONA (Videographer)
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 7

```
1              C O N T E N T S
2    EXAMINATION OF MICHAEL R CLARKE          PAGE
3      By Mr Melamed              12
4
5
6              E X H I B I T S
7         (Attached to transcript)
8    ALLERGAN-CLARKE DEPOSITION EXHIBITS      PAGE
9    No 1    Plaintiffs' Notice of Oral
10          Videotaped Deposition of Michael
11          Clarke [Corrected]       18
12   No 2    Letter to Michael Clarke from
13          Actavis, dated December 5, 2011,
14          Bates ALLERGAN_MDL_SUPP_00000339
15          to 00000394           33
16   No 3    Michael R Clarke LinkedIn
17          Profile               60
18   No 4    Brief Historical Overview - Legacy
19          Actavis SOM Program, Bates
20          ALLERGAN_MDL_03302398        74
21   No 5    Napoli conversation notes -
22          9/12/1013, Bates ALLERGAN_MDL_
23          03302580             121
24
```

Page 8

```
1              E X H I B I T S (Continued)
2         (Attached to transcript)
3    ALLERGAN-CLARKE DEPOSITION EXHIBITS      PAGE
4    No 6    E-mail string re SOM Project Team
5          Status/Upcoming Steering Committee
6          Meeting, Bates ALLERGAN_MDL_01729077
7          to 01729081
8    No 7    E-mail string re Suspicious Order
9          Monitoring, Bates ALLERGAN_MDL_
10         02872193 to 02872194       149
11   No 8    E-mail string re Business Week
12         Article, Bates ALLERGAN_MDL_
13         00131633 to 00131645       155
14   No 9    E-mail re Drug Abuse, Bates
15         ACTAVIS0717304 to 0717038    165
16   No 10   E-mail string re DEA Action,
17         Bates ALLERGAN_MDL_01026090 to
18         01026093             169
19   No 11   Effective Controls Against
20         Diversion of Controlled Substances
21         Meeting with Actavis Elizabeth,
22         LLC, September 12, 2012, Bates
23         ALLERGAN_MDL_03302011 to 03302319  172
24
```

Page 9

```
1              E X H I B I T S (Continued)
2                 (Attached to transcript)
3    ALLERGAN-CLARKE DEPOSITION EXHIBITS      PAGE
4    No 12   E-mail string re DEA follow up to
5          09/12/12 Suspicious Order
6          Monitoring Presentation, Bates
7             ALLERGAN_MDL_03382548 to 03382549  198
8    No 13   E-mail re SOM, Bates ALLERGAN_MDL_
9          01729059                   203
10   No 14   E-mail string re 2007 letter, Bates
11            ALLERGAN_MDL_03525593 to 03525596  210
12   No 15   E-mail string re SOM meeting, Bates
13            ALLERGAN_MDL_01641955 to 01641956  223
14   No 16   E-mail string re Jupiter, FL
15          Distribution Center, Bates Acquired_
16          Actavis_00761668 to 00761671    239
17   No 17   E-mail string re SOM, Bates
18            ALLERGAN_MDL_03380592 to 03380593  243
19   No 18   E-mail re [blank], Bates
20            ALLERGAN_MDL_03382700 to 03382702  247
21
22
23
24
```

Page 10

```
1              E X H I B I T S (Continued)
2                 (Attached to transcript)
3    ALLERGAN-CLARKE DEPOSITION EXHIBITS      PAGE
4    No 19   Suspicious Order Monitoring
5          Partnership Meeting,
6          AmerisourceBergen, Chesterbrook,
7          PA, October 22, 2012, Bates
8             ALLERGAN_MDL_03302607 to 03302621  251
9    No 20   Suspicious Order Monitoring
10          Partnership Meeting,
11          AmerisourceBergen, Chesterbrook,
12          PA, October 22, 2012, Bates
13            ALLERGAN_MDL_03302890 to 03302904  252
14   No 21   E-mail string re Suspicious Order
15          Letters - Update, Bates
16            ALLERGAN_MDL_01796473 to 01796474  272
17   No 22   E-mail re Direct and Indirect SOP's
18          Actavis, Bates ALLERGAN_MDL_03382709
19          to 03382719               276
20   No 23   E-mail string re Anti-Diversion
21          Industry Working Group February
22          Meeting, Bates ALLERGAN_MDL_02187686
23          to 02187692               291
24
```

Page 11

```
1              E X H I B I T S (Continued)
2                 (Attached to transcript)
3    ALLERGAN-CLARKE DEPOSITION EXHIBITS      PAGE
4    No 24   E-mail string re Pharmacy buying
5          through multiple wholesalers, Bates
6          Acquired_Actavis_01621005 to
7          01621006                  293
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 12

```
1                P R O C E E D I N G S
2               -------------------
3          THE VIDEOGRAPHER:  We are now on the
4    record.  My name is Chris Ritona.  I am a
5    videographer for Golkow Litigation Services.
6    Today's date is December 7, 2018, and the time is
7    approximately 9:13 a m.
8          This video deposition is being held in
9    Richmond, Virginia, at the Hilton Garden Inn in
10   the matter of National Prescription Opiate
11   Litigation, MDL No. 2804, Case No. 1:17-md-20 --
12   2804, I'm sorry, United States District Court,
13   Northern District of Ohio, Eastern Division.
14          The deponent today is Michael Clarke.
15          And counsel will be noted upon the
16   stenographic record.
17          The court reporter, Leslie Todd, will
18   please swear in the witness.
19          MICHAEL R. CLARKE,
20       and having been first duly sworn,
21       was examined and testified as follows:
22          (Witness affirmed.)
23          DIRECT EXAMINATION
24   BY MR. MELAMED:
```

Page 13

1  Q  Good morning.
2  A  Good morning.
3  Q  My name is Matt Melamed.  I'm at Robbins
4  Geller Rudman & Dowd, and I represent plaintiffs
5  in this action.
6     Can you state your full name for the --
7  and your current address for the record, please.
8
9
10  Q  And what is your current occupation?
11  A  I am VP, corporate compliance --
12  vice president, corporate compliance for Indivior,
13  Inc.
14  Q  And where is your business address?
15  Where do you work?
16  A  Indivior is located in North
17  Chesterfield, New Jersey, a suburb of Richmond.
18  Q  And do you work in New Jersey?
19  A  I'm sorry, North Chesterfield, Virginia,
20  which is a suburb of Richmond, Virginia.
21  Q  We'll get to New Jersey later.
22     You understand you're under oath,
23  correct?
24  A  Yes.

Page 14

1  Q  And have you had your deposition taken
2  before?
3  A  Yes.
4  Q  And so you're familiar generally with
5  how a deposition goes?
6  A  Yes.
7  Q  Are you taking any medication that would
8  interfere with your ability to answer my questions
9  truthfully and fully today?
10  A  No.
11  Q  Any other reason you have -- may have a
12  problem answering fully and truthfully today?
13  A  No.
14  Q  If I ask a question you don't
15  understand, please ask me to clarify it, and I'll
16  do so.
17  A  Okay, I will.
18  Q  You're doing a very good job of
19  listening until my question is complete before
20  answering.  I will try and do you the same
21  courtesy with your answers.  Let's try not to
22  speak over each other so that we have a clear
23  record.  Okay?
24  A  Yes.

Page 15

1  Q  Have you -- how many other times have
2  you been deposed?
3  A  Two or three.
4  Q  Can you describe generally the three --
5  the two or three matters in which you've been
6  deposed previously?
7  A  They related to prior positions, prior
8  jobs that I had -- work that I did at prior jobs,
9  investigations as a compliance officer.
10  Q  Which prior employers did those
11  depositions concern?
12  A  I believe -- well, one was at the
13  University of Medicine and Dentistry of New
14  Jersey, which is now part of Rutgers University,
15  and the other one related to, I believe, my work
16  at Biomet -- EBI Biomet, a medical device company.
17  Q  Were those investigations conducted
18  by -- let me withdraw that.
19     Were those depositions conducted by
20  government agencies?
21  A  No.
22  Q  Private actions?
23  A  Yes.
24     And if I can, there was another one

Page 16

1  related to my work at Medco Health Solutions.  So
2  there were three depositions.
3  Q  And each of them were private actions;
4  is that correct?
5  A  That's correct.
6  Q  Did any of them concern opioids in any
7  way?
8  A  No.
9  Q  Who are the other people seated with you
10  today?
11  A  To my right are lawyers with two law
12  firms that are representing me.
13  Q  Do you know those lawyers?
14  A  I met them before today.
15  Q  Okay.  Can you tell me when you met
16  them?
17  A  Earlier this week and a few weeks ago.
18  Q  Okay.  So they are your attorneys for
19  purposes of this deposition?
20  A  They're representing me for purposes of
21  this deposition, yes.
22  Q  Do you know their names?
23     MS. LEVY:  Objection.  This shouldn't be
24  a quiz.

Page 17

1    But go -- you may answer.
2    THE WITNESS:  Yes and no.  I know some
3  of the first names.  I don't know all of their
4  last names, but we have met, and we are familiar
5  with each other.
6  BY MR. MELAMED:
7    Q   Okay.  Can you tell me their first
8  names, the ones that you know?  Understanding --
9    A   Catie --
10    Q   Sorry, understanding that this is not a
11  quiz.
12    A   There's Catie, Jenny.  Sorry, I don't
13  recall the other two.
14    MR. LUXTON:  Steve Luxton from Morgan
15  Lewis.
16    Counsel, while we're on the record, can
17  we have a stipulation that, as to Ms. Levy and I,
18  since we both represent Mr. Clarke, an objection
19  for one is an objection for the other in terms of
20  our objections so I don't have to say "Same
21  objection" and muddy up your record the whole day?
22    MR. MELAMED:  Let's go off the record
23  for a second.
24    THE VIDEOGRAPHER:  9:18 a.m., we are off

Page 18

1  the video record.
2    (A discussion was held off the record.)
3    THE VIDEOGRAPHER:  9:21 a.m., we are on
4  the video record.
5    MR. MELAMED:  Apologies for going off
6  the record.
7    (Clarke Exhibit No. 1 was marked
8    for identification.)
9  BY MR. MELAMED:
10    Q   I've handed you what's been marked as
11  Exhibit 1, which is the notice of -- Notice of
12  Oral Videotaped Fact Deposition of Michael Clarke.
13    Have you seen this document before?
14    A   I don't believe so.
15    Q   Okay.  You understand you're here to
16  give testimony in the case reflected in the
17  caption of Exhibit 1; is that correct?
18    A   Yes.
19    Q   Did you bring any documents with you
20  today related to -- to your testimony?
21    A   No.
22    Q   Did you bring any documents related at
23  all to your employment at Actavis?
24    A   No.

Page 19

1    Q   Did you provide any documents to your
2  attorneys prior to your testimony today?
3    A   No.
4    Q   You can put that aside, Exhibit 1 aside.
5    What did you do to prepare for today's
6  deposition?
7    A   I met with counsel from the two firms
8  that are representing me for purposes of today's
9  deposition.
10    Q   When did you first meet with counsel in
11  preparation for today's deposition?
12    A   Perhaps three or four weeks ago.
13    Q   And approximately how many times have
14  you met in those -- in the three or four weeks
15  since?
16    A   I believe we've met twice.
17    Q   Twice total?
18    A   I believe so.
19    Q   Approximately how long each time?
20    A   A few hours each time is the best I can
21  say.
22    Q   Did you review documents with counsel?
23    A   Yes.
24    Q   Approximately how many documents, if

Page 20

1  you -- if you recall?
2    A   I don't recall how many.
3    Q   Okay.  Was it more than a hundred?
4    A   I don't recall.  It was a lot of
5  documents.  I don't recall the number.
6    Q   Okay.  Have you reviewed any deposition
7  testimony in preparation for today's deposition?
8    A   No.
9    Q   Any expert reports?
10    A   No.
11    Q   Any publications, articles, journal --
12  journal articles, newspaper articles, et cetera?
13    A   No.
14    Q   Any court documents?
15    A   No.
16    Q   Any databases?
17    A   No.
18    Q   Did you look in your own personal files
19  to review documents that might be relevant to the
20  opioid litigation today?
21    A   I don't have any personal files relevant
22  to the opioid litigation.
23    Q   Now, those meetings with -- with counsel
24  that you discussed that -- I believe you said two,

Page 21

1  correct?
2      A   I believe it was two meetings.
3      Q   Were those in person?
4      A   There were two in-person meetings and
5  one phone call.
6      Q   Do you know who participated in the one
7  phone call other than yourself?
8      A   All the lawyers that are here today
9  that are representing me in this litigation.
10     Q   Thanks for the clarification.
11         Was there anybody else on the call that
12  you're aware of?
13     A   I'm not aware.
14     Q   In your -- during your in-person
15  meetings, who did you meet with?
16     A   The lawyers on this side of the table
17  representing me today.
18     Q   Okay.  Was there anybody else present
19  during those meetings?
20     A   No.
21     Q   Was there anybody else present by phone
22  during those meetings?
23     A   No.
24     Q   Did you speak with any representative of

Page 22

1  any defendant in this action in preparation for
2  your deposition?
3      A   I had a short phone call with John Duff,
4  who is a litigation attorney for Allergan, when I
5  was contacted by, I believe, Kirkland & Ellis to
6  find out what this was about.
7      Q   Did you speak to Mr. Duff before you
8  meet with attorneys at Kirkland & Ellis in
9  preparation for your deposition today?
10     A   Yes.
11     Q   Does Mr. Duff represent you in this
12  action?
13     A   No.
14     Q   What did you talk about with Mr. Duff?
15     A   I asked John what this was about.
16     Q   And what -- what did he say?
17     A   He told me that this related to the
18  litigation that we're here for today.
19     Q   Did he say anything else to you?
20     A   He probably did, but I don't recall the
21  specifics of the conversation.
22     Q   Okay.  You didn't take notes in the
23  conversation?
24     A   No.

Page 23

1      Q   About how long do you think that call
2  lasted?
3      A   Less than 10 minutes.
4      Q   Did he -- did Mr. Duff make any factual
5  statements about -- let me withdraw that and
6  restate it.
7          Did Mr. Duff make any statements about
8  the facts of this lawsuit?
9      A   I don't believe so, but I really don't
10  recall.
11     Q   Did he say anything to you that was
12  inconsistent with what you remembered about your
13  time at Actavis?
14     A   No.
15     Q   Did he say anything that helped refresh
16  your recollection as to events that had occurred
17  that are relevant to this action?
18     A   No.
19     Q   Have you spoken to anybody else
20  concerning your deposition today?
21         You mentioned -- and by "anybody else,"
22  let me talk about the people you've mentioned.
23  You mentioned the attorneys who represent you here
24  and who you met with previously, and you've talked

Page 24

1  to Mr. Duff.
2          Other than those individuals, have you
3  spoken with anybody about your deposition today?
4      A   No.
5      Q   No current -- you haven't told your
6  current employer about the deposition?
7      A   I told my current employer about the
8  deposition since I'll be out of work today.
9      Q   But you haven't had any discussions
10  about the -- the substance of the deposition; is
11  that correct?
12     A   I told my current employer that I was
13  being deposed related to litigation that had
14  nothing to do with my current position.  So I
15  wanted to assure them that this had nothing to do
16  with the work that I was currently doing.
17     Q   Did you tell him anything further about
18  what the deposition concerned?
19     A   Just generally about it being a lawsuit
20  by, I believe, governmental entities against a
21  number of opioid manufacturers.  I didn't know --
22  I hadn't read the complaint.  I didn't know the
23  details, but I wanted to assure him this didn't
24  have anything to do with my current work at

Page 25

1    Indivior.
2        Q   Have you read the complaint by this
3    point?
4        A   No.
5        Q   Has anybody summarized the complaint --
6    the allegations in the complaint for you?
7        A   I believe the allegations were
8    summarized to some extent.
9        Q   And those were by one of the attorneys
10   representing you today?
11       A   I believe so.
12       Q   Have you spoken to any family members
13   about your deposition today?
14       A   I mentioned it to my wife when she asked
15   why I was wearing the tie.
16       Q   My wife asked me the same thing.
17           Did you talk about the substance of the
18   deposition with your wife at all?
19       A   I told her what the case was about, to
20   my understanding.
21       Q   Did you tell her anything about your
22   personal opinion of the case?
23       A   I don't have a personal opinion of the
24   case.

Page 26

1        Q   So -- so you didn't tell her anything
2    about it then?
3        A   There was nothing to tell.
4        Q   Are you being reimbursed by anyone for
5    expenses in connection with today's deposition?
6        A   I'm not incurring any expenses.
7        Q   Are you being compensated by anyone for
8    your time in connection with your attendance at
9    this deposition?
10       A   No.
11       Q   Are you being compensated by anyone or
12   have you been compensated by anyone for your time
13   in preparation for this deposition?
14       A   No.
15       Q   Other than from Actavis, have you ever
16   received compensation from any opioid
17   manufacturer, distributor or pharmacy?
18       A   Compensation for what?
19       Q   Have you ever received any type of
20   compensation from any opioid manufacturer other
21   than Actavis where you were previously employed?
22       A   Well, my current employer makes a
23   product that contains an opioid, and I work for
24   them, so I receive compensation from my current

Page 27

1    employer.
2        Q   And that's Indivior, correct?
3        A   Correct.
4        Q   Anyone aside from Indivior?
5        A   No.
6        Q   Never from a distributor who distributes
7    opioid and other pharmaceutical medications?
8        A   No.
9        Q   Never from any of the other defendants
10   in this case?
11       A   No.
12       Q   And you're aware of the other defendants
13   in this case; is that correct?
14       A   I'm not sure if I know all of them.  I
15   think I've heard a few names that are familiar to
16   me.
17       Q   What are -- what are the names that
18   you're familiar with?
19       A   I believe I heard Mallinckrodt.
20   Obviously I'm aware of Teva.  Those two come to
21   me -- come to mind right now.
22       Q   Have you ever received compensation for
23   speaking on compliance matters as they relate to
24   opioids?

Page 28

1        A   No.
2        Q   Have you ever received compensation for
3    speaking on compliance matters from anybody?
4        A   I wish I did.  I've spoken but I've
5    never been compensated.
6        Q   Where have you spoken?  What types of
7    events?
8        A   I'm a member of a number of compliance
9    organizations or in-house bar associations, and
10   I've spoken at either regional or national or
11   local conferences.
12       Q   What organizations are you -- are you
13   talking about?
14       A   I've been a member of ACC, the
15   Association of Corporate Counsel.  I've
16   participated in panels -- one or two panels for
17   that organization.
18           I used to be a member of the ABA,
19   American Bar Association.  The Business Law
20   Section, Corporate Compliance Committee.  I was
21   chair of the Corporate Compliance Committee for
22   about five or six years, and I've spoken at
23   Business Law Section, Corporate Compliance
24   Committee events until I let my membership lapse a

Page 29

1    couple of years ago.
2         I am a member of -- or I participated in
3    events that have been put on by CBI, which is the
4    Center for Business Intelligence.  They have an
5    annual PCC, Pharmaceutical Compliance Congress,
6    usually in the spring.  I've been participating in
7    that for probably the last three or four years as
8    a panelist.
9         My company is a member of PCF, the
10   Pharmaceutical Compliance Forum, which is another
11   association of obviously pharmaceutical compliance
12   professionals.  I've been a member of that for
13   probably three or four years, and I've
14   participated in the last two years of spring
15   meetings and fall meetings.
16        There have been one or two other
17   organizations that have had compliance panels that
18   I've participated on, but those come to mind.
19        Q   Okay.  If you remember the others during
20   the course of today's deposition, please just stop
21   me and let me know.
22        A   Sure.  I know one other organization is
23   ACI.  I think it's called the American Conference
24   Institute.  I believe I've been on one or two

Page 30

1    panels for them related to compliance issues,
2    probably related to ABAC or FCPA, things like
3    that.  ABAC is Anti-Bribery, Anti-Corruption,
4    A-B-A-C.  And FCPA is the Foreign Corrupt
5    Practices Act.
6         Q   Do you recall whether any of the
7    presentations you've given have concerned
8    compliance with the Controlled Substances Act?
9         A   I don't recall specifically, but there
10   may have been a topic in one of the presentations
11   that related to adherence to the Controlled
12   Substances Act.  That may have been one of the
13   subtopics, but I don't recall specifically.
14        Q   And you mentioned that you let your ABA
15   membership lapse, correct?
16        A   Yes.
17        Q   For what reason?
18        A   Well, I'm a member of a number of
19   organizations, some of which my company pays for,
20   some of which I pay for, and so I simply do a
21   risk-benefit analysis or cost-benefit analysis.
22   And I wasn't participating in ABA events for the
23   last three or four years, so I thought I'd let it
24   lapse.

Page 31

1         Q   Other than from Actavis, have you ever
2    received -- let me restate that.
3         Other than from Actavis, have you ever
4    participated in a sponsored training session from
5    any manufacturer, distributor or pharmacy
6    concerning opioids?
7         A   I don't understand that question at all.
8         Q   Have you participated in any sponsored
9    training sessions?  Have -- has your company ever
10   paid for you to participate in training sessions
11   concerning the roles and duties of your job?
12        A   I don't understand when you say has my
13   company paid for me or sponsored training.  I'm
14   not sure what that means.
15        Q   Have you participated in training
16   specific to your jobs?
17        A   When you say "participated" --
18        Q   As a -- as an employee.
19        A   -- have I received or have I delivered
20   training?  Which one are you referring to?
21        Q   That's a good question.  Have you
22   received training?
23        A   On how to do my job?
24        Q   Yes.

Page 32

1         A   I'm always learning.  In terms of formal
2    training, I probably participated in formal
3    training -- formal compliance training earlier in
4    my career.  I have participated in webinars to
5    learn about specific items and topics, if that's
6    what you're talking about.
7         Q   That's more what I'm talking about.
8    Thanks for clarity -- for helping me clarify my
9    question.
10        Has any of that formal training been
11   sponsored by any manufacturer of opioids at all,
12   any manufacturer, including Actavis?
13        A   I really don't know, and the reason I
14   don't know is that the organizations that may have
15   delivered or provided this training may have been
16   sponsored by industry, but I don't know who the
17   individual industry sponsors for the events or for
18   these training activities were.
19        Q   Did you receive any formal training on
20   the Controlled Substances Act at any point in your
21   career?
22        A   I haven't received formal training on
23   it.  I have researched it and I've read it, but I
24   wouldn't say I've received formal training on it.

## Page 33

1    Q   Have you participated in any working
2  groups or other less formal structured discussion
3  groups concerning the requirements of the
4  Controlled Substances Act?
5    A   I participated in a working group of
6  other lawyers or compliance professionals when I
7  was at Actavis, but it was related to DEA issues
8  and SOM issues, to the extent that those are
9  driven by the CSA.
10   Q   What -- what was the name of that group,
11 if you recall?
12   A   I don't recall.
13   Q   Do you recall which other companies were
14 represented in that working group?
15   A   I don't know all of them.  I know
16 Mallinckrodt participated, and I believe a couple
17 of distributors participated.  ABC,
18 AmerisourceBergen.  I believe Cardinal.  I know
19 there were others, but I don't recall now.
20       (Clarke Exhibit No. 2 was marked
21        for identification.)
22 BY MR. MELAMED:
23   Q   I'm handing you what's been marked as
24 Exhibit 2, and though it's somewhat voluminous,

## Page 34

1  I'm going to point to -- you very directly to a
2  couple of pages.
3    A   I don't need this any more, so --
4    Q   Yeah, just keep these aside because
5  these will go back to the -- the marked exhibits
6  will go back to the court reporter at the end of
7  the day.
8        For the record, Exhibit 2 is a packet of
9  documents starting at Bates number
10 ALLERGAN_MDL_SUPP, Bates number ending in 339
11 through Bates number ending in 394.
12       I want to direct your attention to the
13 pages starting at Bates 352.
14       And you see the document -- when you get
15 to 352, 353 and 354, please let me know.
16   A   Yes, 352.
17   Q   Yes.  That is a version of your resume
18 up until the time you worked at Biomet Spine and
19 Bone Healing Technologies; is that correct?
20   A   Yeah, this is -- this was my resume as
21 of the time I worked at EBI, Biomet Spine and Bone
22 joint -- Biomet Spine and Bone Healing.
23   Q   You went to -- you attended Brown
24 University for undergraduate, correct?

## Page 35

1    A   Yes.
2    Q   And then Cornell Law School, correct?
3    A   Yes.
4    Q   And after leaving Cornell, you worked at
5  a law firm called Hannoch Weisman in Roseland, New
6  Jersey; is that correct?
7    A   Yes.
8    Q   And what was your role at Hannoch
9  Weisman?
10   A   I was an associate in the corporate
11 department at Hannoch Weisman.
12   Q   And after Hannoch Weisman, you worked at
13 the office of the public defender in the Essex
14 Adult Region in Newark, New Jersey, correct?
15   A   Yes.
16   Q   And you were an assistant deputy public
17 defender there, correct?
18   A   Yes.
19   Q   You were there approximately two years,
20 a little bit less than two years; is that right?
21   A   Yes.
22   Q   And you left the Public Defender's
23 Office to go to a law firm called Scarinci &
24 Hollenbeck in Secaucus; is that right?

## Page 36

1    A   The firm is called Scarinci & Hollenbeck
2  in Secaucus, New Jersey.  Now it's in Lyndhurst,
3  New Jersey.
4    Q   And you were -- again, you were a
5  litigation associate there; is that right?
6    A   That's correct.
7    Q   And you left Scarinci -- Scarinci &
8  Hollenbeck to go to Shanley & Fisher in
9  Morristown, New Jersey?
10   A   That's correct.
11   Q   And you started there as an associate
12 and then were elevated to partner, correct?
13   A   That's correct.
14   Q   And at Shanley & Fisher you defended
15 pharmaceutical and industrial product
16 manufacturers.  Is that correct?
17   A   I represented one pharmaceutical
18 manufacturer and a number of other industry
19 manufacturers.
20   Q   Who was the pharmaceutical manufacturer
21 you represented?
22   A   The firm represented Merck.  It
23 represented others, but I only worked on cases for
24 Merck.

Page 37

1    Q    And do you recall the subject matter of
2 the case you worked on at Shanley & Fisher for
3 Merck?
4    A    I do not.
5    Q    And then Shanley & Fisher was acquired
6 by Drinker, Biddle & Reath, and you continued
7 working at Drinker, correct?
8    A    That's correct.
9    Q    After that you went to Medco Health
10 Solutions as an ethics officer and assistant
11 counsel, correct?
12    A    That's right.
13    Q    What was your understanding of your role
14 as the ethics officer and assistant counsel?
15    A    It was to -- I reported to the, I guess
16 it was called, the corporate compliance officer at
17 that time, and it was really to enhance Medco's
18 compliance program.  That entailed helping to
19 develop policy or policies, providing training on
20 those policies, conducting internal
21 investigations, doing monitoring or conducting
22 monitoring activities, such as it were for that
23 type of entity, participating in audits, and
24 anything else that comprises an ethics and

Page 38

1 compliance program.
2    So we had a -- a large compliance
3 department with five divisions, and my role as the
4 ethics officer was really to deal with the core
5 bread and butter ethics and compliance issues,
6 build out that -- the ethics and compliance
7 functionality of the Medco compliance program.
8    Q    Before we get into that a little bit, I
9 just want to go back for your previous jobs.
10    Was each transition from one job to
11 another by choice?  Did you choose to leave
12 Hannoch Weisman and go to the Office of Public
13 Defender?
14    A    Yes.
15    Q    Did you choose to leave the Office of
16 Public Defender and go to Scarinci?
17    I don't know why I'm having so much
18 trouble.  It seems quite easy to pronounce.
19    A    Hard C.  Just think hard C, think
20 scared.
21    Yes, I -- it was voluntary moves from, I
22 think, all of my positions with one or two
23 exceptions.
24    Q    Which are the exceptions?

Page 39

1    A    The -- there's an exception which is not
2 on that resume, so I don't know how you want to
3 deal with this.
4    Q    Is that your departure from Actavis?
5    A    Yes.
6    Q    Okay.  We'll get to that in a minute,
7 but -- were each of the other moves reflected in
8 this resume voluntary?
9    A    Yes.
10    Q    And by choice, you elected to leave
11 where you were currently employed to work
12 somewhere else?
13    A    Yeah, it was a voluntary departure.  I
14 learned of an opportunity or I was recruited and I
15 moved to the next opportunity.
16    Q    Okay.  So the ethics and compliance
17 issues you were working on at Medco, did they
18 concern any particular aspect of Medco's business?
19    A    I don't think it was really focused on
20 any aspect.  I mean, Medco was a PBM, pharmacy
21 benefits manager, which is an extremely
22 complicated business.  It may not seem so, but it
23 is.  So we dealt with -- you know, the compliance
24 team dealt with compliance areas in all aspects of

Page 40

1 Medco's business operations.  It wasn't limited to
2 any particular aspect.  And it broadened or
3 evolved over time.
4    Q    In that job were you in communication
5 with any companies concerning opioids, concerning
6 formulary decisions or benefits decisions as they
7 relate to opioids?
8    A    That wasn't my role, so no.
9    Q    Thank you.
10    You left Medco to join Edison Schools in
11 New York, correct?
12    A    Yes.
13    Q    Why did you leave the world of
14 litigation and then corporate compliance for
15 pharmacy -- for a pharmacy -- pharmaceutical
16 benefits manager -- pharmacy benefits manager to
17 go to a -- an educational institution?
18    A    I'll give you the high level version
19 because it's a very long story.  But essentially
20 there wasn't any advancement opportunity at Medco.
21 The department was flat, and I wanted to move into
22 a leadership role that wasn't available to me.  So
23 I saw the -- I learned of or maybe I was recruited
24 for the role at Edison as a VP of corporate

Page 41

```
 1    compliance, or something to that effect, to create
 2    and run their corporate compliance department.
 3    That's why I left.
 4        Q   And you were at Edison for approximately
 5    three months; is that correct?
 6        A   Approximately, yes.
 7        Q   Why did you depart Edison?
 8        A   I was recruited by the University of
 9    Medicine and Dentistry to get -- so it was two
10    reasons:  To get back into healthcare, get back to
11    New Jersey.  UMDNJ was under a deferred
12    prosecution agreement, so for a compliance
13    professional that's an opportunity to create some
14    significant change, which is what I wanted to do.
15    So I decided to leave Edison, come back to New
16    Jersey, get back into healthcare and work at
17    UMDNJ.
18        Q   What was the deferred prosecution
19    agreement that the University of Medicine and
20    Dentistry was under?  What -- what did that
21    concern?
22            MS. LEVY:  And I think these questions
23    are fine so far.  I'm just going to object to the
24    extent that this question or others go toward
```

Page 42

```
 1    privileged information.
 2            And instruct you only to answer with
 3    non-privileged information.
 4            MR. LUXTON:  Counsel, I'll make the same
 5    objection, but can I have a stipulation as I
 6    requested previously so I don't have to
 7    continually join Ms. Levy in her objections?
 8            MR. MELAMED:  Yes, if Ms. Levy objects,
 9    I can understand it's also for you.
10            MR. LUXTON:  Thank you very much.
11    BY MR. MELAMED:
12        Q   So what did that DPA concern?
13        A   As a general matter -- I haven't looked
14    at it in years obviously -- it related to
15    healthcare practices that implicated federal
16    healthcare programs and billing against federal
17    healthcare programs.
18        Q   False billing against federal healthcare
19    programs?
20        A   Inappropriate, inaccurate, excess
21    billing against federal healthcare programs.
22        Q   Was that DPA entered into as a result of
23    a False Claims Act action?
24        A   I believe so.  But I don't recall
```

Page 43

```
 1    specifically.
 2        Q   Did it have anything to do with opioids?
 3        A   I don't believe that it did.
 4        Q   And then you left University of Medicine
 5    and Dentistry to join Biomet Spine and Bone
 6    Healing, correct?
 7        A   Yes.
 8        Q   And you -- at Biomet Spine and Bone
 9    Healing, you were vice president and compliance
10    officer from June 2008 until approximately 2000 --
11    beginning of 2012; is that correct?
12        A   Yes.
13        Q   What was your primary responsibility as
14    vice president and compliance officer at Biomet?
15        A   EBI, Biomet Bone Healing was the -- was
16    a division of Biomet, the orthopedics company, and
17    that division was located in New Jersey.  My role
18    was to build out the compliance program for that
19    division of Biomet.
20        Q   In that role at Biomet, did you address
21    any issues related to opioids?
22        A   No.  Biomet was an orthopedic device
23    company.
24        Q   And after leaving Biomet, you joined
```

Page 44

```
 1    Actavis, correct?
 2        A   Yes.
 3        Q   And you were at Actavis for three and a
 4    half years approximately; is that correct?
 5        A   I know I was at Actavis from early 2012
 6    until the middle of 2015.
 7        Q   What was the name of the position you
 8    held at Actavis?  And if it was more than one, the
 9    name of the positions.
10        A   I believe the title remained the same.
11    I believe I was vice president of compliance for
12    the Americas or something like that.
13        Q   And what were your responsibilities as
14    vice president of compliance for the Americas?
15        A   My role at Actavis was again to build
16    out the compliance program for that division of
17    the company.  Actis evolved -- Actavis evolved
18    over time into a different sort of company.  So it
19    started off as a regional role for the Americas
20    and then became something else.
21        Q   How did -- when you said "Actavis
22    evolved over time," what do you mean by that?
23        A   Actavis was acquired by Watson, and then
24    the combined company acquired other companies
```

## Page 45

1    until the time I left.

2         Q    And throughout the time that you were

3    there, you were working on compliance issues in

4    Actavis, and then Actavis was acquired by Watson,

5    and then in the subsequent companies as well where

6    there were acquisitions?

7         A    Yes.

8         Q    What department were you in at Actavis?

9         A    I was in the compliance department.

10        Q    And who was -- who did you report to in

11   the compliance department?

12        A    When I first joined the company, I

13   reported to Kirsten Schmal (phonetic), who was

14   the, I believe, the chief compliance officer at

15   what I'll call Swiss Actavis, and he resided -- or

16   the company's headquarters was in Zug,

17   Switzerland -- for about a year.

18             And then after the Watson acquisition, I

19   reported to Deborah Penza, who was the compliance

20   officer resident at that point in the Parsippany

21   office, and I reported to Deb Penza until the

22   close of the Allergan acquisition, at which point

23   I still reported to Deb while she was there, but

24   then I had an indirect report to JK, John

## Page 46

1    Kellerman, who became the Allergan global

2    compliance officer.

3         Q    Did Deb Penza work at Watson prior to

4    its acquisition of Actavis?

5         A    Yes.  Deb was the Watson compliance

6    officer.

7         Q    Prior to the acquisition, were you the

8    highest ranking member of the compliance team in

9    the United States, if you know?

10        A    Prior to the Watson acquisition?

11        Q    Yes.

12        A    I was the highest ranking member of the

13   compliance team at Actavis in the U.S. because I

14   was the only member of the compliance team at

15   Actavis in the U.S.

16        Q    Do you know if prior to January 2012

17   when you started at Actavis whether there was a

18   compliance team for Actavis in the United States?

19        A    There were people managing the

20   compliance function prior to me starting at

21   Actavis.  It was managed by lawyers on the Actavis

22   team or different lawyers on the Actavis team, and

23   there was also a contract group at Adventive.

24   Well, Adventive was a contract sales organization,

## Page 47

1    and there was a compliance officer in Adventive

2    who managed compliance for the contract function

3    that supported Actavis at that time.

4         Q    Who were the Actavis lawyers who managed

5    compliance before your arrival?

6         A    John LaRocca and Beth Zelnick-Kaufman.

7         Q    And who were the people at Adventive who

8    managed their compliance vis-à-vis their

9    relationship with Actavis?

10        A    Scott Miller.

11        Q    Were each of those individuals lawyers?

12        A    John and Beth are lawyers.  I don't know

13   if Scott is a lawyer or not.

14        Q    You mentioned that you -- earlier that

15   you did not leave Actavis voluntarily; is that

16   correct?

17        A    That's correct.

18        Q    What are the circumstances under which

19   you left Actavis?

20        A    With the Actavis-Allergan acquisition,

21   there was a reorganization of a number of

22   different business functions within the combined

23   company, and a number of commercial and financial

24   and other functions, some legal functions and the

## Page 48

1    compliance function were reorganized, and certain

2    people in each of those functions and others left

3    the company.

4         Q    Were you asked to leave the company?

5         A    Yeah.  Yes.

6         Q    Was that -- did that request have

7    anything to do with an evaluation of the quality

8    of your work?

9         A    No.  It had to do with business

10   operations, a reorganization of the company under

11   the Allergan -- after the Allergan combination,

12   and a desire that certain people in certain

13   functions were no longer needed, and hence, we

14   were reorganized out of the company.

15        Q    Once -- while you were at Actavis and it

16   was acquired by Allergan, do you know the name of

17   the company you worked for?

18        A    Well, the company --

19        Q    I'm sorry.  Let me -- I --

20        A    Okay.

21        Q    I jumped over a few steps there.  Sorry

22   about that.

23             When you were at Actavis and it was

24   acquired by Watson, do you know the name of the

## Page 49

1   company you worked for after the acquisition?

2     A  Yes.

3     Q  And what was that?

4     A  The company name remained Actavis.

5     Q  And who -- what was the corporate entity

6   that employed you at that time after the Watson

7   acquisition?

8     A  It was Actavis, I believe, after the

9   Watson -- excuse me, after the Watson acquisition,

10   it became Actavis PLC, because I believe Watson

11   was headquartered in the UK.

12     Q  Prior to the acquisition, when you first

13   started at Actavis, what was the name of the

14   corporate entity that employed you?

15     A  Well, before the Watson acquisition, we

16   were what I call Swiss Actavis, so I believe we

17   were Actavis, Inc., which was headquartered in

18   Switzerland.  It might have even been incorporated

19   in Iceland.  There was an Iceland connection and a

20   Switzerland connection, but it was based in

21   Central Europe.

22     Q  And -- and then once Allergan came into

23   the picture and acquired Actavis, what was the

24   corporate entity you worked for prior to the time

## Page 50

1   you departed?

2     A  I know the corporate name changed to

3   Allergan at some point.  So it was still Actavis

4   after the deal closed, and it became Allergan at

5   some point.  I think, as I was leaving, the

6   corporate name changed to Allergan.  I don't know

7   if it was Inc. or PLC or anything else, but it

8   changed from Actavis to Allergan at some point in

9   the spring of 2015.

10     Q  And then when you left Actavis, you,

11   after a couple of months, secured employment at

12   Indivior, correct?

13     A  I left Actavis-Allergan in June of 2015.

14   I started working at Indivior in August of 2015.

15     Q  And you still work at Indivior, correct?

16     A  Yes, I do.

17     Q  And what's your title at Indivior?

18     A  My current title is vice president,

19   corporate compliance.

20     Q  Has that been your title the entire time

21   you've been there?

22     A  Yes.

23     Q  And what's your responsibility?

24     A  I -- up until the beginning of October,

## Page 51

1   I was the global compliance officer for Actavis --

2   I'm sorry, for Indivior.

3     Q  I'll do the same.

4     A  So I managed the global compliance

5   program for Indivior.

6     Q  And then what happened in October?

7     A  In October, the corporate compliance

8   function moved out of legal, because it sat within

9   the legal department, and it became its own

10   freestanding department, and we hired a chief

11   compliance officer who sits on our executive

12   management team, whom I now report to.

13     Q  And are you in the legal department

14   currently at Indivior?

15     A  No, I'm in the integrity and compliance

16   department at Indivior.

17     Q  What is Indivior's business?

18     A  Indivior is a specialty pharmaceutical

19   company.

20     Q  Do they manufacture pharmaceuticals?

21     A  Yes, we manufacture specialty

22   pharmaceuticals.

23     Q  And sell those pharmaceuticals, correct?

24     A  We distribute those pharmaceuticals,

## Page 52

1   yes.

2     Q  What pharmaceuticals?

3     A  We have a couple of products --

4   actually, more than a couple of products, but we

5   manufacture pharmaceuticals in the OUD space, the

6   opioid use disorder space, as well as in the

7   behavioral health space dealing with

8   schizophrenia.

9     So the products are buprenorphine-based

10   products, Suboxone sublingual film; Sublocade, a

11   long-acting injectable; and Perseris, an

12   anti-schizophrenic long-acting inject --

13   injectable.

14     Q  You talked about the long-acting

15   injectable.  Can you repeat that -- the name of

16   that product?

17     A  Which one?  I talked -- I mentioned two.

18     Q  One -- one is for opioid use disorder,

19   correct?

20     A  Yes.

21     Q  And what -- what is the name of that?

22     A  Sublocade, S-U-B-L-O-C-A-D-E.

23     Q  How did you come to -- let me withdraw

24   that.

Page 53

1          Why did you choose to work at Indivior
2   after leaving Actavis?
3       A   I was recruited.  I looked at a number
4   of opportunities that would be as a -- the
5   equivalent of a chief compliance officer.  I was
6   interested in staying in the life sciences
7   industry.  I would have preferred to stay in New
8   Jersey.  The opportunities were elsewhere.  So out
9   of the three opportunities I looked at, I chose
10  Indivior.
11      Q   What were the other two opportunities?
12      A   They were companies I can't recall the
13  names of.  One was a device company in North
14  Carolina.  One was a specialty pharma company out
15  in California.
16      Q   Did either of the other companies have
17  anything to do with opioids?
18      A   No.
19      Q   Was any of the motivation in taking the
20  job at Indivior the fact that it made substance
21  use disorder drugs and distributed them?
22      A   Well, part of my motivation for taking
23  the position was the fact that it was addressing
24  opioid use disorder and was providing a treatment

Page 54

1   to opioid use disorder.  So that was appealing to
2   me as addressing an issue or a concern.
3          But it was also a very interesting
4   position at an interesting company.  What I
5   described was the business of the company, but it
6   was also a global position.  It was a chance to
7   have an impact -- compliance impact on a global
8   scale, which is something that I had been moving
9   forward -- moving towards in my career.
10      Q   Why was providing a treatment to opioid
11  use disorder appealing to you?
12      A   There's -- you know, it's a health --
13  OUD is a health concern, and to address it with
14  another pharmaceutical product I think is a good
15  thing.
16      Q   Were you aware of that health concern,
17  at least in part, due to your work at Actavis?
18      A   I was aware of that health concern, in
19  part, due to my work at Actavis, but also based on
20  my reading of the press.
21      Q   And just to clarify, as we go forward in
22  the deposition, I'm using Actavis to refer to each
23  of the companies you worked at from Actavis to
24  when it was acquired by Watson, to when it was

Page 55

1   acquired by Allergan.  Do you share that
2   understanding?
3       A   I understand what you mean.
4       Q   Okay.  Thank you.
5          How did -- what did you become aware of
6   concerning opioid use disorder during your time at
7   Actavis?
8       A   I mean that's a very broad question.
9       Q   How -- how -- how did you become aware
10  of opioid use disorder at Actavis?  What -- what
11  came to your attention?
12      A   The best way to answer that is -- and it
13  wasn't driven by my work at Actavis.  I mean, I --
14  I try to stay aware of what's going on from a
15  health perspective but also from a general
16  perspective, so I read.  So to the extent that
17  there are health issues or health concerns that
18  may affect the work that I do, the communities
19  that I live in or the communities that I service
20  through volunteer things, I try to stay aware of
21  those.
22          So coming from New York, I'm aware of
23  substance use disorder issues based on the
24  neighborhoods I've lived in.  So those are things

Page 56

1   that I'm aware of and try to maintain some level
2   of awareness.  And to the extent that a substance
3   disorder gets a lot more press than it used to,
4   based on communities that have not historically
5   been affected by these, those are the kind of
6   things that I read about and try to stay abreast
7   of.
8       Q   Did you gain any insight into opioid use
9   disorder, causes of it and the prevalence of it
10  due to your employment at Actavis?
11      A   No.  I became much more aware of the
12  causes and the science behind it since my
13  employment at Indivior.
14      Q   Since you've become aware or more aware
15  of the causes and science behind it at Indivior,
16  what have you become aware of?  What are -- what
17  would you say are the basic causes of opioid use
18  disorder?
19      A   Well, opioid use disorder is a chronic
20  relapsing brain disease.  There are a number of
21  causes that we haven't got enough time to talk
22  about, and I'm not a scientist, so I wouldn't do
23  justice to it.
24          There are -- there are a number of

Page 57

1   different reasons that, you know, someone can
2   lapse into opioid use disorder.  Some of them are
3   environmental, some of them are genetic, some of
4   them are a combination of the two.  So I've
5   learned about some of those from the training
6   sessions, medical sessions, advisory boards that
7   I've attended, and just reading -- reading our
8   materials from Indivior.
9       Q   Would you agree that the prevalence and
10  availability of prescription opioids contribute to
11  the prevalence of opioid use disorder?
12      A   That's possible.
13      Q   You can't say either way.
14      A   Well, I'm not a scientist, so I can't
15  say either way.  I am aware of some of the causes.
16  I'm aware of some of the indications.  But, you
17  know, I can't speak beyond that because I'm not a
18  scientist.  I'm not an epidemiologist, so I can't
19  speak to that definitive --
20      Q   You're --
21      A   -- definitively.
22      Q   Sure.  You said you followed, you know,
23  publicly available literature, newspaper articles,
24  et cetera, about opioid use disorder in various

Page 58

1   communities, correct?
2       A   Yes, I have.
3       Q   And you've seen --
4       A   Not comprehensively, but I have.
5       Q   Fair enough.
6           You've seen that a number of those
7   articles link the prevalence of opioid use
8   disorder to the availability of prescription
9   opioids; is that correct?
10      A   There are articles that link it to the
11  availability of prescription opioids.  There also
12  are articles that link it to the availability of
13  inexpensive illicit opioids.
14      Q   And you --
15      A   So it's not one or the other.
16      Q   And you've seen that those two are --
17  articles that link those two as well, that the use
18  of prescription opioids has led to a use of
19  illicit opioids.
20          MS. LEVY:  Objection.
21  BY MR. MELAMED:
22      Q   Is that correct?
23          MS. LEVY:  Mischaracterizes his
24  testimony.

Page 59

1           THE WITNESS:  There are articles that
2   indicate that, but there are articles that
3   indicate other things as well.
4   BY MR. MELAMED:
5       Q   And you have -- sitting here today, you
6   have no opinion either way about the extent to
7   which the prevalence of prescription opioids
8   contributes to the circumstances leading to
9   substance use -- opioid use disorder.
10      A   I don't have an informed opinion.  Like
11  I said, I'm not an epidemiologist, so, no, I
12  don't.
13      Q   Do you have -- you said you don't have a
14  formal opinion.  Do you have any personal opinion
15  about it?
16      A   No, I said I don't have an informed
17  opinion.
18      Q   Thank you.
19          When you left Actavis, did you sign a
20  non-disparagement agreement?
21      A   I don't recall if I did or not.
22      Q   You understand that if you did, that
23  would not apply here during this deposition; is
24  that correct?

Page 60

1       A   I'm not aware of that.  I haven't
2   received advice to that effect.
3           (Clarke Exhibit No. 3 was marked
4           for identification.)
5   BY MR. MELAMED:
6       Q   I'm going to hand you what's been marked
7   as Exhibit 3.  I'll represent to you that
8   Exhibit 3 is a printout of your LinkedIn profile.
9   We're not going to spend much time on it unless
10  your answers are different than what I expect they
11  will be.
12          I just want you to look through this and
13  state whether you have any reason to believe that
14  this is not an accurate reflection of your current
15  LinkedIn profile.
16      A   (Peruses document.)  This looks like a
17  copy of my LinkedIn profile.
18      Q   Okay.  And your LinkedIn profile
19  represents an accurate depiction of your -- of
20  your work history; is that correct?
21      A   Yes, it does.
22      Q   Okay.  You can put that aside.
23      A   Thank you.
24      Q   I know you want to spend more time with

Page 61

1    that.
2        A   No, I don't.
3        Q   So you were talking about the effect of
4    the -- you were aware generally of the effect of
5    the opioid crisis; is that correct?
6        A   I don't believe I spoke to that term.
7        Q   Okay.  Are you aware of a current opioid
8    crisis in this country?
9        A   I know that OUD is a public health
10   concern.
11       Q   And OUD is -- you can use it, I just
12   want to be clear it's opioid use disorder,
13   correct?
14       A   That's correct.
15       Q   And you spoke about your awareness of
16   OUD in your community; is that correct?
17       A   I'm aware of OUD as a public health
18   concern.
19       Q   How, if at all, has it affected your
20   community?
21       A   Can you define "your community"?
22       Q   Sure.  How has it affected where you
23   live, if at all, the neighborhood in which you
24   live?

Page 62

1        A   I don't see any direct effects on my
2    specific neighborhood.
3        Q   What about the city in which you live?
4        A   OUD, opioid use disorder is a public
5    health concern in Richmond.  It's a public health
6    concern in New Jersey, where I came from.  I think
7    it's a public health concern in many areas of the
8    country, but I can't speak to the specific impacts
9    in any place where I've lived.
10       Q   Okay.  And I apologize for the
11   sensitivity --
12       A   Mm-hmm.
13       Q   -- that this question is going to get
14   at, but how has it, if at all, affected you or
15   your family?
16       A   OUD has not, but other diseases for
17   companies that I've worked for have.
18       Q   Again, apologies for the sensitivity,
19   can you talk about those diseases, please?
20       A   I cannot.
21       Q   You can't talk about the diseases that
22   have affected members of your family?
23       A   No.
24       Q   Do any of them have to do with any --

Page 63

1    anything related to opioids?
2        A   No.
3        Q   Have any of your family members or you
4    been prescribed opioids?
5        A   I was prescribed an opioid about eight
6    or nine years ago when I suffered an injury, a
7    sports injury.
8        Q   Do you recall which opioid you were
9    prescribed?
10       A   Either oxycodone or oxy -- either
11   oxycodone or hydrocodone, one of the two.
12       Q   And you took that opioid for the purpose
13   of pain associated with that injury and no longer;
14   is that correct?
15       A   I took three tablets and then I stopped.
16       Q   What did you do with the -- were you
17   prescribed more than three tablets?
18       A   Yes.
19       Q   What did you do with the remainder of
20   your tablets?
21       A   I destroyed them.
22       Q   During your time at Actavis, were you
23   aware of any Actavis employees that had OUD?
24       MS. LEVY:  Objection.  To the extent

Page 64

1    that this calls for Mr. Clarke to disclose other
2    people's confidential health information, I think
3    I will instruct you not to answer their
4    identities.  You can answer the question only
5    generally.
6        THE WITNESS:  I don't know of anyone who
7    had OUD during my time at Actavis.
8    BY MR. MELAMED:
9        Q   Do you have any ill will predis- --
10   predisposition towards any entity involved in this
11   litigation that you know of?
12       A   Could you repeat that?
13       Q   Sure.
14       Do you harbor any ill will towards any
15   entity in this -- in this litigation -- involved
16   in this litigation?
17       A   Meaning any of the entities that are
18   either plaintiff or defendant in this lawsuit?
19       Q   Correct.  Yes.
20       A   No.
21       Q   During your time at Actavis, the company
22   was required by the Controlled Substances Act to
23   provide effective controls and procedures to guard
24   against theft and diversion of controlled

Page 65

1    substances; is that correct?
2        A   I believe that's correct.
3        Q   And Actavis had a duty under the
4    Controlled Substances Act to report suspicious
5    orders to the DEA; is that correct?
6        A   I believe that's the case.
7        Q   And when you're saying you believe -- I
8    believe that's correct -- "I believe that's the
9    case," what is the reason for that qualifier to
10   your answers?
11       A   Because I'm not looking at the
12   Controlled Substances Act as to what its specific
13   requirements may have for manufacturers such as
14   Actavis.
15       Q   You don't recall as you sit here today,
16   without documents in front of you, whether Actavis
17   had a duty to report suspicious orders of
18   controlled substances under the Controlled
19   Substances Act?
20       A   Without seeing the language of the
21   statute, I can't say that definitively.  That's
22   why I believe there was such a responsibility, but
23   in terms of how you phrase the question, I can't
24   answer that definitively.

Page 66

1        Q   Do you recall the Controlled Substances
2    Act -- Act's reference to the importance of a
3    closed system?
4        A   I recall a reference, but I don't recall
5    the specific language.
6        Q   Can you describe the system that Actavis
7    used to keep track of its sales of prescription
8    drugs while you were there?  And if it changed,
9    describe those changes as well, please.
10       A   I can't describe it.  I know we had a
11   system for distribution of our controlled
12   substances, but I can't describe it in any general
13   or specific detail.
14       Q   Is that because you no longer recall it
15   or because you didn't know it at the time?
16       A   I don't -- I no longer recall it.
17       Q   You didn't -- you believe you would have
18   known at the time, you just don't recall it
19   sitting here today?
20       A   Yeah, I believe I had some familiarity
21   with it at the time that I worked there.
22       Q   Did Actavis have a system to monitor
23   suspicious orders of opioids when you were there?
24       A   Yes, it did.

Page 67

1        Q   Did that system change during the time
2    you were there?
3        A   I believe it did.
4        Q   Did Actavis have a system to monitor
5    publicly available data regarding opioid sales
6    from other companies while you were there?
7        A   I believe it did in connection with
8    other companies that were in the distribution
9    stream for Actavis's controlled substances.
10       Q   Do you recall what systems Actavis used
11   to get that information.
12       A   I don't.  Without seeing a reference to
13   the materials that describe the process, I don't
14   recall.
15       Q   Do you recall if Actavis had any systems
16   to report suspicious activity concerning the sales
17   of opioids during the time you were there?
18       A   I believe it did.
19       Q   Do you know if that changed during the
20   time that you were there?
21       A   I'm not sure that it did change during
22   the time that I was there.
23       Q   And without looking at the documents,
24   are you able to describe any of those systems, the

Page 68

1    systems for monitoring suspicious orders or
2    reporting suspicious activity or monitoring
3    publicly available data concerning opioids?
4        A   I would need to see the materials to
5    fully and accurately answer those questions.
6        Q   During your time at Actavis, who was the
7    person -- the point person responsible for the
8    systems used to prevent diversion of opioids?
9        A   During the time that I was there, there
10   was a working group, at least at Swiss Actavis and
11   Watson -- sorry, Swiss Actavis, which was prior to
12   the Watson combination, there was a working team
13   that oversaw the suspicious order monitoring
14   process.  So there were individuals who worked
15   more directly with it.  I can't tell you what
16   their names were.
17       Q   Were you a part of that working group?
18       A   Yes, I was.
19       Q   Do you know if that working group
20   existed prior to your arrival at Actavis?
21       A   I don't know what happened prior to my
22   arrival at Actavis.
23       Q   I assume when you joined Actavis and you
24   joined that working group, you made some effort to

Page 69

1    understand the systems that were in place before
2    your arrival; is that right?
3        A   I made some effort, but I was more
4    concerned with looking at what we had and making
5    sure that it operated consistent with any legal or
6    regulatory requirements.
7        Q   Do you recall whether you believed --
8    when you looked at what you had, do you recall
9    whether you believed that it did operate
10   consistent with legal and regulatory requirements?
11       A   I believe it did.
12       Q   That's fun feedback.
13           Was the same group of individuals
14   primarily responsible for reporting suspicious
15   activity concerning sales or distribution of
16   opioids to the DEA?
17       A   When you say "the same group of
18   individuals" --
19       Q   The working group that you described
20   earlier.
21       A   Yeah, I believe so.
22       Q   How many employees at Actavis when you
23   arrived were involved in implementing systems to
24   prevent diversion of opioids?

Page 70

1        A   I'd be guessing.  I really couldn't tell
2    you specifically.
3        Q   You don't -- within a ballpark, you
4    don't recall?
5        A   The best I could tell you was 20 or
6    fewer, but I can't be more specific than that.
7        Q   So when you say -- just to be clear for
8    the record, when you're saying 20 or fewer but you
9    couldn't be certain, it could have been five, it
10   could have been ten, it could have been twenty; is
11   that accurate?
12       A   It was more than five, but I'm not sure
13   that it was more than twenty.
14       Q   Were you ever trained on how to detect
15   suspicious orders for prescription medications
16   distributed by Actavis?
17       A   I wasn't an operations person, so I
18   wouldn't have been trained on it.  The best I did
19   was, you know, obviously at that point read the
20   CSA and read the SOM regulation to be familiar
21   with what was required.  And any other materials,
22   whether it's publicly available materials,
23   communications from DEA, things like that.
24       Q   Do you recall whether Actavis provided

Page 71

1    its employees, its operations employees any
2    training on how to detect and report suspicious
3    orders?
4        A   I don't recall specifically.  I mean I
5    could tell you I assume so, but I don't recall
6    specifically.
7        Q   Do you know whether employees were
8    provided incentives to report internally the
9    existence of a suspicious order of opioids?
10       A   I don't know.
11       Q   Same question, do you know whether --
12   but externally.  Do you know whether employees
13   were provided any incentives to report to the DEA
14   the existence of any suspicious orders of Actavis
15   drugs?
16       A   I don't know.
17           THE WITNESS:  Excuse me.  Can I get a
18   water break?
19           THE VIDEOGRAPHER:  Stand by.  10:22,
20   we're off the video record.
21           (Recess.)
22           THE VIDEOGRAPHER:  10:33, we are on the
23   video record.
24   BY MR. MELAMED:

Page 72

1        Q   You joined Actavis in early 2012,
2    correct?  We established that.
3        A   Yes.
4        Q   Okay.  Do you recall how many suspicious
5    orders of opioids Actavis recorded in 2011, the
6    year before you arrived?
7        A   I don't know how many were recorded
8    before I arrived.
9        Q   Do you know how many in 2012,
10   approximately?
11       A   I don't remember.  I don't recall.
12       Q   Do you -- could you estimate, give a
13   reasonable estimate for the number in 2012?
14       A   I could not.
15       Q   2013?
16       A   I don't recall how many suspicious
17   orders were recorded or reported during the time
18   that I was there.
19       Q   Who would be the person to ask if I
20   wanted to find out that information?  Who should I
21   ask?
22       A   There's a team -- at least at that time
23   there were a team of people that were dealing with
24   it.  You know, I guess after the Watson

Page 73

1   acquisition, probably Tom Napoli and whoever
2   worked for him.  And prior to the Watson
3   acquisition, Nancy Baran and whoever worked with
4   her.  They would be closer to the reporting, and
5   the board of interest and suspicion order --
6   excuse me, suspicious order process.
7        Q   Do you know whether there were any
8   regularly kept documents that recorded suspicious
9   orders?
10       A   I'm sure there were, but I can't speak
11  to the specifics of what they are and what they
12  look like.
13       Q   So you don't know what they would be
14  named, for instance?
15       A   Oh, I wouldn't -- I don't know what they
16  would be named, no.
17       Q   And do you know where they would have
18  been kept, in what corporate file system or
19  database?
20       A   I'm sure they were in a database.  I
21  can't tell you that I recall what the database
22  was, where it was located or what it was called.
23       Q   Did you yourself use that database?  Do
24  you recall using that database?

Page 74

1        A   No.
2            (Clarke Exhibit No. 4 was marked
3            for identification.)
4   BY MR. MELAMED:
5        Q   I'm handing you what's been marked as
6   Exhibit 4.
7            Exhibit 4 is a one-page outline titled
8   "Brief Historical Overview, legacy Actavis SOM
9   Program."  It's Bates number ALLERGAN_MDL_
10  03302398.
11           Now, it's not reflected on the face of
12  this document, but I'll represent to you that this
13  was -- the custodian for this document as it was
14  produced to was Michael Clarke.
15           Do you recall this document?
16       A   I don't recall this document, but I was
17  smiling because I see it has my initials, which is
18  how I sometimes refer to myself if I'm involved in
19  something that I'm taking notes on.  So...
20       Q   And that's in the -- the first bullet
21  point where it says "Prior to MRC"?
22       A   Yes.
23       Q   So do you have any reason to believe you
24  did not create this document?

Page 75

1        A   I mean this looks like something I may
2   have created, but I don't specifically recall
3   this.
4        Q   Okay.  And this is -- this document
5   concerns your employment at Actavis, the scope --
6   it's within the scope of your employment to be
7   creating a document like this at Actavis, right?
8        A   I wouldn't quite go there.  I mean, I --
9   you know, I'm a notetaker, have been, and
10  sometimes if I'm trying to learn something or to
11  recall something, I'll put down -- put notes down
12  on an outline.
13           So this may have been something that
14  there was a meeting, there was a discussion, I may
15  have been informed about something and I wanted to
16  capture it so that I could use it in whatever I
17  was going to be doing going forward.
18       Q   Okay.
19       A   This looks like something like that just
20  based on the breadth -- the brevity of it.
21       Q   The subject matter of the notes concerns
22  topics within the scope of your employment, right?
23       A   I'm not sure I understand what you mean.
24       Q   I mean this -- your -- the --

Page 76

1   understanding the legacy Actavis SOM program was
2   something that was within your responsibilities at
3   Actavis.  Is that correct?
4        A   Well, what I mentioned before, I was on
5   the working team that was dealing with the SOM
6   program or overseeing the SOM program.  So I'm
7   sure that I was briefed or given some information
8   about what may have occurred prior to beginning
9   there, and I captured -- it looks like I captured
10  that in these -- in this -- in these notes.
11       Q   I'll also represent to you that the
12  metadata for this document says it was created
13  August 14th, 2013.
14       A   Okay.
15       Q   Do you have any idea why -- can you
16  recall any reason why you may have been making
17  these notes on that date or around that date?  Was
18  there something going on in August 2013?
19       A   I don't recall.
20       Q   SOM in this document refers to
21  suspicious order monitoring, correct?
22       A   Yes.
23       Q   And the first header says "Legacy
24  Actavis Beginnings."  Do you see that?

Page 77

1    A   Yes.

2    Q   And you see the first phrase says

3  "Customer service on generic side." Do you see

4  that?

5    A   Yes.

6    Q   Do you recall whether there was a

7  suspicious order monitoring program prior to your

8  arrival concerning brand name opioids at Actavis?

9    A   I don't recall.

10   Q   If you had been told about it, do you

11 think you would have recorded that on this

12 document?

13   A   If I had been told about it, I would

14 have recorded it.  Not necessarily on this

15 document.

16   Q   Continuing the first bullet point, it

17 says: "Customer service on generic side started

18 in late 2011."  Do you see that?

19   A   I see that.

20   Q   Is that your understanding of when the

21 suspicious order monitoring program at Actavis

22 commenced for its generic opioids?

23   A   That's what I wrote, so I'm sure I

24 learned that or was told that at some point in

Page 78

1  time.

2    Q   Do you have any reason to believe as you

3  sit here today that there existed a suspicious

4  order monitoring program on the generic side prior

5  to 2011?

6    A   I don't know one way or the other.

7    Q   Okay.  And we discussed this, but the

8  "prior to MRC" means before you came aboard at

9  Actavis, right?

10   A   Yes.

11   Q   And the next two sub-bullet points seem

12 to indicate the two individuals primarily

13 responsible for the suspicious order monitoring

14 program on the generic side that started in late

15 2011.  Is that -- does that appear to be correct?

16   A   I wouldn't quite say that.  It mentions

17 Nancy Baran installed to oversee and manage.

18   Q   Mm-hmm.

19   A   And it says John Duff from legal.  So

20 those are two names of people that I knew and

21 worked with that were involved.  I -- the reason

22 I'm not sure that they were primarily responsible,

23 like I believe you said, I just know that they

24 were involved.

Page 79

1    Q   You don't think they were involved?  I'm

2  sorry.

3    A   No, I said I don't know that they were

4  primarily responsible, which is what I believe

5  what you asked.  I just know that they were

6  involved.

7    Q   Okay.  Thanks for the clarification.

8        In the bullet point about Nancy Baran,

9  it says that she was installed to oversee and

10 manage.

11   A   Right.

12   Q   You agree that that makes her, you know,

13 colloquially at least, she was the point person at

14 that point on the suspicious order monitoring

15 program being described in this bullet point?

16   A   Well, it says she was installed to

17 oversee and manage.

18   Q   Do you know who created the suspicious

19 order monitoring program on the generic side that

20 commenced in late 2011?

21   A   I don't know specifically who created

22 it.

23   Q   Do you believe that Nancy Baran was

24 involved in its creation?

Page 80

1    A   Based on this and based on what I

2  recall, she was probably involved in its creation

3  or management.

4    Q   Do you believe that John Duff was

5  involved in its creation and management?

6    A   I mean based on this, it looks like he

7  was.

8    Q   And then the next bullet point says that

9  you, MRC, were pulled in at the start of your

10 tenure in January 2012.

11   A   That's what it says.

12   Q   Do you recall being pulled in and having

13 this as part of your responsibilities --

14   A   Yes.

15   Q   -- at Actavis?

16   A   Sorry.  Yes.

17   Q   I hesitated.  It's totally

18 understandable that you spoke over me.

19       Do you recall an initial meeting where

20 you discussed the suspicious order monitoring

21 program at Actavis?

22   A   I don't recall a specific meeting.  I

23 know that I had initial conversations probably

24 with John Duff and John LaRocca, but I can't

Page 81

1  recall the specific, you know, back and forth.
2       And then at some point, one of these
3  conversations mentioned putting together or
4  expanding this working group -- because it may
5  have existed already; they asked me to join.  When
6  they explained what it was that we were trying to
7  do in terms of suspicious orders and the DEA
8  regulation, and, you know, I said, I'm happy to
9  pitch in, happy to help.
10      Q   Who was John -- you just mentioned John
11 LaRocca.  What was his role at Actavis?
12      A   I believe John LaRocca was the senior
13 lawyer or general counsel for the Americas, which
14 was a division of Actavis that I worked for at the
15 time.
16      Q   Did you report directly to him?
17      A   Since I had gotten involved with this,
18 I'm trying to recall if I reported to John or
19 reported to Doug Boothe, and I just don't recall.
20 I mean John signed my hiring letter, but I don't
21 think I reported to John.
22      Q   Doug Boothe was the CEO, correct?
23      A   I believe CEO and president of Actavis
24 Americas.

Page 82

1       Q   And you did not report to John Duff; is
2  that right?
3       A   Oh, I did not report to John Duff.
4       Q   Were you --
5       A   We were colleagues.
6       Q   Were you in the same working group, same
7  organizational group?
8       A   I mean John was legal; I was compliance.
9  So our offices were two doors down from each other
10 and we were colleagues.  So...
11      Q   Okay.  You mentioned recalling generally
12 conversations with John Duff or John LaRocca about
13 joining the effort to -- joining the suspicious
14 order monitoring group or having some
15 responsibility regarding suspicious order
16 monitoring, right?
17      A   Yeah.  I had maybe one or two
18 conversations with John LaRocca, and then I had
19 more conversations with John Duff about joining
20 this working group, working team.
21      Q   Other than just the prospect of joining
22 the group and being asked to join the group, do
23 you recall any of the content generally of those
24 discussions?

Page 83

1       A   No.
2       Q   You don't recall whether there was any
3  commentary about the suspicious order monitoring
4  system in place not being up to snuff?
5       A   No.
6       Q   The final bullet point under -- the
7  final bullet point with any text under "Legacy
8  Actavis Beginnings" states: "Use of ValueTrak
9  Safe and Secure program to monitor retail level
10 purchases."
11      A   I see that.
12      Q   Do you know what ValueTrak Safe and
13 Secure program is?  Do you recall what that is?
14      A   I don't recall specifically.  It was
15 some sort of data tool, but beyond that, I can't
16 tell you.
17      Q   Who would be best positioned to talk
18 about what the ValueTrak Safe and Secure data tool
19 was?
20      A   Whatever individuals were managing or
21 operating the ValueTrak Safe and Secure system,
22 but I don't know who that was.  I really don't
23 recall.
24      Q   Okay.  And it mentions that that program

Page 84

1  was used to monitor retail level purchases.
2       A   That's what I wrote.
3       Q   Do you recall how that tool was used
4  to -- to monitor retail level purchases?
5       A   I really don't recall at this point.
6       Q   Do you know what information that tool
7  monitored concerning retail level purchases?
8       A   I mean I may have known back then, but I
9  don't recall at this point.
10      Q   Do you know who at Actavis made use of
11 that information, the information being the retail
12 level purchases measured by the ValueTrak Safe and
13 Secure program?
14      A   Whoever the employers at the operational
15 level that managed the ValueTrak system would
16 know, but I don't recall who those were.
17      Q   You've referenced the operational level
18 a couple of times.  I just want to make sure I
19 understand what you're talking about.
20      A   Okay.
21      Q   So can you describe what the operational
22 level or operations side of the company is when
23 you're using it in this instance?
24      A   I mean, I think of in operations as -- I

Page 85

1    mean, you can think of it as a structural thing or
2    an employee level thing.  So, you know, I'm a
3    lawyer, I'm in compliance.  I'm in shared
4    services; I'm a support function.  If I was in
5    sales or marketing or manufacturing, and I was the
6    person who was operating the machines or who was
7    interacting with the physicians, that's more of an
8    operational function.  You know, operational
9    transaction, doing the things that, you know --
10   but I -- I don't do those sort of things.  I'm not
11   a salesperson.  I'm not a machine operator.  I'm
12   not even a machine operator supervisor or
13   that's -- when I say "operational," it's just who
14   was actually doing certain work versus a support
15   person or someone who is overseeing or managing or
16   giving guidance.
17        Q   So you under-- -- so the division -- and
18   I'm not trying to put words in your mouth.  If
19   this is incorrect, just tell me it's wrong.
20        A   Mm-hmm.
21        Q   You understood your role and the role of
22   your peers to be looking at establishing guidance
23   for the way operations carried out certains of --
24   certain of its tasks?

Page 86

1        A   At best.
2        Q   What do you mean "at best"?
3        A   I mean, it wouldn't be -- we wouldn't go
4    beyond that.  I -- you know, I wouldn't, you know,
5    be telling -- I wouldn't tell, you know, the
6    operational folks what to do in terms of specific
7    data analysis or things like that beyond just,
8    This may be what the law requires, this may be
9    what the regulation requires, and then I might
10   talk to the managers to say, Make sure that
11   whatever they do is consistent with law and
12   regulation and policy.
13        Q   The next header on Exhibit 4 is labeled
14   "DEA Meetings."  Do you see that?
15        A   Yes.
16        Q   Do you see the first bullet point says:
17   "D.C. meeting with SOM team in September 2012."
18        A   Yes.
19        Q   Do you recall that meeting?
20        A   I do.
21        Q   Did you attend that meeting?
22        A   I did.
23        Q   And D.C. is Washington, D.C., correct?
24        A   Yes.

Page 87

1        Q   Do you recall who attended that meeting?
2    All of the -- as many attendees as you can
3    remember and where they were from.
4        A   Well, all I could tell you is out in the
5    Actavis side, I was there, John Duff was there, I
6    believe Nancy Baran was there.  I know there were
7    probably -- I think there were four or five of us
8    on the Actavis side, and I'm missing one or two
9    names, someone more operational was probably
10   there.  But I believe there were four or five of
11   us on the Actavis side.
12           On the DEA side, they had people -- and
13   I don't remember the names of anyone on the DEA
14   side, but there were -- it was like a two-part
15   meeting, meaning that there were folks on -- there
16   were two women I remember who dealt with quotas,
17   manufacturing quotas, and they were there either
18   at the very beginning or the very end.  You know,
19   so that was part 1 or part 2 of the meeting.  But
20   the bulk of the meeting dealt with the, I guess,
21   the folks on the enforcement unit.  There were
22   three or four of them there, but there was only
23   two people talking.
24        Q   For quotas, you're talking about quotas

Page 88

1    for the manufacture and sale of certain drugs?
2        A   Certain controlled drugs, yes.
3        Q   Certain controlled drugs.
4           Do you recall the purpose of this
5    meeting?
6           Well, let's start out, do you recall who
7    requested this meeting?  Whose idea was it?
8        A   Well, the DEA requested the meeting.
9        Q   Do you recall why they requested it?  Do
10   you have an understanding of why?
11        A   I don't know why they requested it
12   because I wasn't in those discussions.  I just
13   know we received a request from the DEA to meet
14   with us.  I guess someone scheduled it, it was set
15   up, and then the Actavis folks went down.
16        Q   Other than the government side, the
17   individuals in different government agencies and
18   the individuals from Actavis, was there anybody
19   else in attendance at the meeting?
20        A   I know -- I believe we had talked about
21   whether we should bring counsel, but -- if it
22   was -- I believe we did, I just don't remember
23   specifically, but we decided not to.  I don't
24   think there was a need for it.

Page 89

1    So on the Actavis side, it was just
2 internal Actavis folks, from what I remember.  And
3 then, like I said, different divisions or
4 departments within the DEA, the enforcement folks
5 and then the quota folks.
6    Q   It was just a bilateral meeting between,
7 generally speaking, the DEA side and the Actavis
8 side; is that correct?
9    A   That's what I remember, yes.
10    Q   Do you recall the purpose of the meeting
11 generally?
12    A   I think as a general matter, it was a
13 meeting for -- ostensibly for the DEA to talk to
14 us about our anti-diversion efforts.
15    Q   And you say "ostensibly."  Why -- why do
16 you qualify it in that way?
17    A   I qualify it that way based on how the
18 meeting went, the tone and the tenor of the
19 meeting, meaning that it was less productive than
20 it could have been, and it could have -- the
21 purpose to discuss anti-diversion efforts could
22 have been achieved in a different way, with a
23 different tone and a different type of
24 presentation, and looking and talking to us as --

Page 90

1 who were on the manufacturing side, as
2 professionals as opposed to street dealers.
3    Q   Am I correct -- reading between the
4 lines of your answer, am I correct that the DEA
5 was critical of Actavis's anti-diversion efforts
6 in that meeting?
7         MR. LUXTON:  Objection.
8         THE WITNESS:  I wouldn't put it that
9 way.  I think -- the way I looked at it -- the
10 way -- and, you know, we talked afterwards.  It
11 wasn't so much as just being critical of our
12 anti-diversion efforts.  The undertone of the
13 meeting was an implicit criticism of the fact that
14 we were making these products in the first place,
15 and we were -- and when I say "we," I mean Actavis
16 was at that meeting, but they referred to one or
17 two other companies that were also making generic
18 opioid products as not being responsible.  And in
19 a sense that they described it, without using
20 these specific words, but in a way that we would
21 just manufacture, put the product out on the
22 street, and not have a care as to where it went.
23         Because they described their efforts
24 at -- you know, whatever enforcement efforts they

Page 91

1 were engaged in, they described finding or seeing
2 or obtaining product, you know, opioid products
3 that seemed to be diverted relatively easily, I
4 guess is the way to describe it.
5         So it was -- you know, and they were
6 haranguing us about certain things.  So it just
7 was not the most productive conversation about
8 anti-diversion efforts, about manufacturing of
9 these products, things like that.
10 BY MR. MELAMED:
11    Q   You mentioned that they mentioned -- the
12 DEA mentioned during this meeting one or two other
13 manufacturers of generic opioids, correct?
14    A   Yes.
15    Q   Do you recall who they -- who the DEA
16 mentioned?
17    A   I know they mentioned more than one, but
18 Mallinckrodt was one name that came up that I
19 recall.
20    Q   And you don't recall any other names?
21    A   I don't remember at this point.
22    Q   Do you see the sub-bullet point --
23 returning to Exhibit 4, the sub-bullet point that
24 says:  "Discussion of likely diversion of

Page 92

1 oxycodone in FL and other high risk states"?
2    A   Yes.
3    Q   FL stands for Florida, right?
4    A   That's right.
5    Q   Do you recall which other high risk
6 states were discussed?
7    A   I believe -- I mean, the discussions
8 seemed to focus mostly on the East Coast.  So it
9 was Florida, I remember that specifically, and
10 they spent most of the time on Florida, so the
11 other states were almost secondary, tertiary.
12 They might have mentioned Virginia or West
13 Virginia.  I know they mentioned other states, but
14 I -- I would be guessing, and I don't want to do
15 that.  I don't recall specifically.
16    Q   Do you remember whether the DEA had
17 anything to say about Actavis's suspicious order
18 monitoring program during that meeting?
19    A   Yeah, I mean, ultimately the discussion
20 came over to that because, you know, that's what
21 we were prepared -- the Actavis team was prepared
22 to talk about.  And without knowing -- because I'm
23 not sure if there was an agenda, without knowing,
24 you know, a list we're going to, you know, talk --

Page 93

1    discuss these items or these topics, we came
2    prepared to talk about our SOM program.
3            We may have had a presentation deck that
4    we were either going to give or present on a
5    screen.  I don't recall the logistics, but I know
6    we were prepared to talk about that, and we had a
7    deck prepared to go through and explain what it
8    was that we were doing, and hopefully engage in a
9    dialogue about whether -- you know, to what extent
10   we were -- you know, we believed we were meeting
11   the requirements of the CSA and the SOM
12   regulations, if there was any concern that the DEA
13   had about whether we were not going far enough in
14   certain regards, we could make adjustments.  We
15   were hoping to have that type of dialogue, that
16   these are the things that we're doing.  We think
17   it meets or exceeds the standards of the law and
18   the regulations.
19           And as the DEA, as the enforcement
20   agency, responsible for this, we would hope that
21   they would give us some level of guidance,
22   informal, at a meeting to say, you know, That's
23   great, that's fine, maybe you can do this better.
24   We were looking for that sort of interchange, and

Page 94

1    it wasn't that.
2        Q   You mentioned a PowerPoint deck that was
3    prepared by Actavis for purposes of this meeting,
4    correct?
5        A   I believe we brought it down with us.  I
6    know there was a PowerPoint that we used
7    internally, and I believe that we modified it to
8    present to the DEA.
9        Q   Were you involved in the creation or
10   modification of that PowerPoint --
11       A   I was involved in the modification of
12   that PowerPoint.  Sorry to interrupt.
13       Q   No, I didn't finish.
14           PowerPoint deck was what I was going to
15   say.
16           Do you recall what it was named?
17       A   I don't recall what it was named.
18       Q   Okay.  And you don't recall whether it
19   was actually provided to or presented to the DEA
20   during that September meeting?
21       A   I feel like it was given to them in some
22   fashion.  I just don't recall specifically whether
23   we e-mailed it to them, gave them a hard copy or
24   something else, but I know we were prepared to

Page 95

1    present it to them.
2        Q   Now, you said that you had hoped that
3    the meeting would be about Actavis's suspicious
4    order monitoring efforts and a discussion of -- a
5    discussion of what the company was doing, and
6    feedback from the DEA about potential improvements
7    or compliance.
8            Is that -- am I restating generally --
9    I'm not holding --
10       A   I mean, as a general matter, that's what
11   we were looking for.  We knew that it was going to
12   be, you know, obviously information provided by
13   the DEA to us.  We didn't know the scope, at least
14   I didn't, but we thought there would be, like I
15   said, some interchange in terms of these are --
16   from the DEA's perspective, for example, these are
17   what we see as the requirements.  We have the
18   regulation; we have the law.  There may have been
19   some court cases or some enforcement actions that
20   had either been underway or maybe broke in the
21   news later, I don't recall.  And so based on the
22   panoply of information that's out there, these are
23   what the requirements are for a suspicious order
24   monitoring program or for manufacturing

Page 96

1    anti-diversion efforts.
2            So we expected that.  And then we
3    figured that based on what our program looked
4    like, how -- what our framework was, what we were
5    doing, we would present that to them and say,
6    Look, we believe that this meets or exceeds the
7    legal and the regulatory requirements based on the
8    law, based on the regulation, based on any sort of
9    settlements or court cases that were out there.
10   If you disagree based on what you've seen, give us
11   some guidance on what we can improve or change.
12   That's what we were looking for or hoped or
13   expected.
14       Q   During the September 2012 meeting, did
15   the DEA express any opinion as to the sufficiency
16   of your suspicious order monitor -- order
17   monitoring efforts?
18       A   I don't recall that they did.  It was, I
19   believe, a three-hour meeting, and from what I
20   remember, the DEA consumed more than two and a
21   half hours of the meeting with a hundred -- a
22   hundred-plus slide deck, a hundred-plus slide
23   PowerPoint presentation about, you know, diversion
24   issues, high risk states, presence of oxycodone,

Page 97

1    diversion of oxycodone and other opioids.
2        So that there wasn't much time left to
3    have the sort of interchange that I just described
4    with them in terms of a description of our
5    program, an analysis of our program, discussion
6    about our program, things like that.  There wasn't
7    much time for that.
8        Q   Is it fair to say that they were -- that
9    the DEA during this meeting was identifying
10   what -- to you what they saw as a problem
11   concerning the diversion of oxycodone,
12   specifically in Florida but also in other states?
13       A   Yeah, they spent two and a half hours
14   outlining what they thought the problem was and
15   how all manufacturers were supposedly responsible
16   for.
17       Q   And they included Actavis in the group
18   of manufacturers that it believed -- the DEA
19   believed was responsible for the diversion of
20   oxycodone in Florida and other high risk states?
21       MR. LUXTON:  Objection.
22       THE WITNESS:  They mentioned -- I mean,
23   we were down there, so, yeah, I think it was
24   pretty clear that they believed that we were one

Page 98

1    of the manufacturers that led to whatever problem
2    they identified related to diversion of opioids.
3    BY MR. MELAMED:
4        Q   And Malling- -- excuse me, Mallinckrodt
5    was another, correct?
6        A   Mallinckrodt was mentioned in our
7    meeting.
8        Q   Mentioned as another --
9        A   As another --
10       Q   -- contributing -- company contributing
11   to the problem of diversion of opioids.  Is that
12   correct?
13       A   Mallinckrodt was mentioned as another
14   company that somehow contributed to the diversion
15   of opioids in the states, the high risk states
16   that they mentioned.
17       Q   And others were mentioned too, and you
18   just can't recall their names, correct?
19       A   That's correct.
20       Q   The next bullet point mentions a local
21   DEA meeting in late -- late October.  Do you --
22       A   Yes, I see that.
23       Q   Do you -- and that's late October 2012;
24   is that right?

Page 99

1        A   That's correct.
2        Q   Do you recall that meeting?
3        A   Yeah -- yeah, I do.  Yes, I do.
4        Q   Did you participate in that meeting?
5        A   Yes, I did.
6        Q   Where did that meeting take place; do
7    you recall?
8        A   It took place at Actavis's U.S.
9    headquarters in Morristown.
10       Q   Do you recall who was at that meeting
11   from Actavis?
12       A   I believe there were three of us.  I
13   believe John Duff was there, I was there, and one,
14   maybe two others, but one other person.  I think
15   possibly Nancy Baran, but I don't want to say
16   specifically I recall her being there.
17       Q   Do you recall who was there from the
18   DEA?
19       A   Yeah, there were two DEA field
20   representatives from the New Jersey office in
21   Newark.  I can't recall their names.  It was two
22   men.
23       Q   Okay.  Do you recall who requested that
24   meeting?

Page 100

1        A   The local DEA field office requested the
2    meeting.  They reached out to us after the D.C.
3    meeting with the DEA.
4        Q   And do you recall what the purpose of
5    that October meeting was?
6        A   Well, I listed down here what I recall.
7    All I recall is what I wrote here, that it was a
8    meeting in late October, and we thought that -- I
9    believe we thought from our prior discussions that
10   it was a follow-up to the D.C. DEA meeting where
11   perhaps this was going to be the chance to talk
12   about our specific anti-diversion efforts and
13   perhaps specifically our SOM program, and see if
14   we can get some feedback from the DEA about
15   whether it needed improvement, whether it's going
16   in the right direction, if there are any other
17   things that we needed to keep in mind with respect
18   to SOM, suspicious order monitoring, or other
19   anti-diversion efforts.  We thought that perhaps
20   the local guys, the local field office
21   representatives would then -- would be reaching
22   out to talk to us in more detail that perhaps the
23   D.C. office of the DEA wasn't able to or was not
24   interested in doing.  That's what we expected.

Page 101

1    It didn't turn out to be that case at
2    all. There was some discussion about our
3    suspicious order monitoring process, our
4    anti-diversion efforts, and -- but we didn't get
5    very far with that, that topic was waved off. And
6    like I mention here, ultimately it became a
7    request for a reduction in quota, meaning a
8    reduction in our manufacturing quota. And I know
9    there were numbers that were talked about, which I
10   guess came out to a 30 to 40 percent reduction in
11   quota.
12       Q   Who -- what's your understanding of who
13   decided on that quota? Who set that quota?
14       A   I believe the DEA sets manufacturing
15   quotas for all controlled substance manufacturers.
16       Q   And then the -- after the semicolon in
17   that bullet point you were just referencing, it
18   says that that reduction quota was declined.
19       A   Yes.
20       Q   Do you recall whose decision it was to
21   decline that reduction?
22       A   Well --
23       Q   Sorry, to decline the request for -- for
24   a reduction.

Page 102

1        A   Yeah, I mean, it was -- the quotas that
2    I believe, and I believe the quotas are set every
3    year, either at the end of the prior year or the
4    beginning of the current year. If I recall
5    correctly, and I may not be accurate in this, but
6    they're set for manufacturers with different
7    schedules of drugs.
8        So once they're set, then, you know,
9    manufacturers will, you know, adhere to those
10   quotas. Any adjustment below those essentially
11   are voluntary by the manufacturer.
12       So the two field office representatives
13   were essentially asking us to voluntarily reduce
14   our manufacturing quota, in my opinion, for the
15   purpose of reducing the amount of opioids or
16   controlled products that we made that would get
17   into the market, and then ultimately potentially
18   be diverted in their view.
19       So it was us essentially reducing what
20   we were making so that there would be less product
21   out there as opposed to DEA stepping up its
22   enforcement efforts for, you know, that level of
23   criminal activity related to diversion of
24   controlled substances.

Page 103

1        So when they asked us to voluntarily
2    reduce our quota, which means that we're reducing
3    the amount of product that we're manufacturing,
4    that's obviously going to have a financial impact.
5    So when we brought that to our, I guess, chief
6    legal officer or general counsel and to our
7    president and CEO, they were -- unless there was
8    something else that was going to be discussed or
9    something else in the package, just unilaterally
10   reducing our manufacturing of the product wasn't
11   acceptable.
12       Q   So it was the -- those individuals,
13   maybe the chief -- you said the chief legal
14   officer or general counsel and then also the
15   president and CEO who -- who rejected the request
16   for the reduction in quota of manufacturing
17   certain drugs of oxycodone?
18       A   Yeah. After this DEA field office
19   meeting, we spoke to John LaRocca and we spoke to
20   Doug Boothe, and it was ultimately Doug Boothe's
21   decision after consulting with some other folks,
22   but, you know, he wasn't interested in voluntarily
23   reducing our quota, particularly by 30 or 40
24   percent, without understanding that there was

Page 104

1    something else to be had.
2        You know, we weren't getting any
3    guidance on our suspicious order monitoring
4    program. We weren't getting any guidance on
5    whether there were certain other things that we
6    could do or should do to justify that. It was
7    just a single unilateral reduction of
8    manufacturing.
9        Q   And you also mentioned that that
10   unilateral reduction would have had a financial
11   impact. What would the financial impact have
12   been?
13       A   What would it have been?
14       Q   Mm-hmm. And not -- not quantifiably --
15   not in terms of quantity, but qualitatively.
16       A   I mean, qualitatively, if you reduce how
17   much you manufacture, you're distributing less,
18   you're selling less, and you're reducing your
19   revenue.
20       Q   Continue to going down Exhibit 4, the
21   next header is "Customer Follow-ups," and there's
22   one bullet point with text that says "Legacy
23   Actavis Meeting with AmerisourceBergen in October
24   2012."

## Page 105

1        Do you recall that meeting?

2    A  Generally, yes.

3    Q  Were you involved in that meeting?

4    A  Yes, I was.

5    Q  Do you remember who else from Actavis

6 was involved in that meeting?

7    A  I believe it was just John Duff and me.

8 I think it was just the two of us.

9    Q  Do you recall who from AmerisourceBergen

10 was involved in that meeting?

11    A  I don't remember their names, but I know

12 there was a short guy with glasses and a taller

13 guy with glasses.

14    Q  That's very helpful.

15        Do you recall their roles at

16 AmerisourceBergen?

17    A  I mean, you know, AmerisourceBergen is a

18 distributor, so I know -- I believe one of the

19 people there was on the operations side,

20 meaning -- well, on the operations side,

21 commercial distribution.

22        I think one of them may have been a

23 lawyer, but may not have been functioning in that

24 role. May have been in compliance or something

## Page 106

1 like that. So, I mean, that's all I recall.

2    Q  Do you recall where that meeting was?

3    A  It believe it was at the ABC offices

4 somewhere in Pennsylvania. I think Fort

5 Washington or something like that.

6    Q  Do you remember the -- why that meeting

7 was convened?

8    A  We may have -- Actavis may have asked

9 for it. Because I know that as part of our

10 efforts, we wanted to communicate with our key

11 distributors or probably our largest distributors.

12 I think ultimately all of them, but I know we

13 wanted to start talking to our largest ones.

14        So I know we reached out -- I don't know

15 if we reached out to the other ones, I don't

16 remember, but I do remember reaching out to ABC,

17 AmerisourceBergen Corporation, to set up a meeting

18 to just talk about suspicious order monitoring and

19 anti-diversion efforts on the manufacturing side,

20 which would have been Actavis, and on the

21 distribution side, which would have been ABC, and

22 how we could coordinate to make sure we are either

23 meeting or exceeding DEA requirements, both in the

24 law and in the regulation.

## Page 107

1    Q  Do you recall the substance of what was

2 discussed during that meeting?

3    A  Not specifically. I just know we talked

4 about -- you know, SOM programs, how we could work

5 together. Beyond just analyzing data, and then

6 flagging things internally, and then making

7 decisions, you know, let's set up communication

8 lines so that if there's something going on that

9 is concerning on the distribution front, we would

10 hope that you as a distributor would inform us as

11 a manufacturer, and then if we see certain things,

12 then we would communicate with you, and then

13 coordinate in some fashion beyond just making

14 product, selling product, distributing product.

15    Q  Did that meeting lead to the

16 coordination you are describing?

17    A  I believe it did.

18    Q  Do you want to describe how Actavis and

19 AmerisourceBergen coordinated their anti-diversion

20 efforts after October 2012?

21    A  I don't recall specifically. Because I

22 know we communicated after that. Not in

23 in-person meetings, but there were communication

24 lines -- I mean, there are going to be

## Page 108

1 communication lines between a manufacturer and a

2 distributor anyway, but I know there were more

3 open lines of communication on anti-diversion

4 efforts after that, but I can't tell you

5 specifically what that entailed. How frequently,

6 who talked, what they talked about, I can't tell

7 you that.

8    Q  Now, if there had been other follow-ups

9 in addition to the Actavis follow-up with

10 AmerisourceBergen that happened up until the date

11 you drafted this memo, those would -- you would

12 have included those here as well; is that right?

13    A  Not necessarily.

14    MS. McINTYRE:  Object to form.

15 BY MR. MELAMED:

16    Q  Do you recall any follow-ups between

17 October 2012 -- well, let me withdraw that.

18        Do you recall any other follow-ups with

19 other distributors from fall of 2012 or after?

20    A  I don't recall any, but that doesn't

21 mean they didn't happen. Just so you know, I

22 mean, this is called "Brief Historical Overview,"

23 so I really was just hitting highlights of things

24 that occurred, either, you know, to refresh my

Page 109

1    recollection or just to capture what the program
2    or at least my involvement in the program was.
3        Q    And you don't remember the purpose of
4    recording this other than to make your own notes;
5    is that right?
6        A    I really don't remember.
7        Q    Okay.  The next header is "Government
8    Inquiries."
9        A    Yes.
10       Q    And the first bullet says:  "DEA
11   informal request about orders received in November
12   2012."
13           Do you remember that informal request?
14       A    Very vaguely.
15       Q    Do you remember anything about the
16   substance of that request?  What was the DEA
17   seeking about orders?
18       A    I don't remember the details.  I
19   remember coming in, I remember us talking about
20   it, but I don't remember the details because it
21   was -- it was -- it felt concerning because it
22   came soon after the October meeting that we had
23   where they asked us to voluntarily reduce quota,
24   and we said we just can't unilaterally reduce

Page 110

1    quota without understanding what the purpose would
2    be, and understanding whether -- how that would
3    impact or how that would play into our
4    anti-diversion or SOM efforts.
5            And then we told them that we couldn't
6    do that, but we were willing to talk about other
7    things that could be done.  And then we got this
8    request about orders a month or so later.
9        Q    And then the next bullet point
10   references a DOJ subpoena, returnable January 2013
11   that was issued in December 2012.
12       A    Yes.
13       Q    Do you know if that subpoena related to
14   the same subject matter as the informal requests
15   from the DEA that was received in November 2012?
16       A    I don't recall.
17       Q    Do you recall -- let me withdraw that.
18           The next sub-bullet point about -- talks
19   about the DOJ subpoena, correct?
20       A    Yeah, the next sub-bullet is more or
21   less a description of what I remember the DOJ
22   subpoena was seeking.
23       Q    Okay.  And it sought documents related
24   to legacy Actavis suspicious order monitoring and

Page 111

1    communications with AmerisourceBergen about
2    suspicious orders or pharmacies.
3            Do you see that?
4        A    Yeah, I do see that.
5            Can I add something?  I mean, you may
6    already know this, but I'm just -- I'm remembering
7    that when I make a reference to legacy Actavis,
8    you know I'm referring to Swiss Actavis, right?
9        Q    And by Swiss Actavis, you mean Actavis
10   prior to its acquisition by Watson.
11       A    That's correct.  I just recall that, you
12   know.  But in any event, that's -- that's what
13   that references.  It's not about this is the
14   legacy of what Actavis did.  This was legacy
15   Actavis as a term of art.
16       Q    Do you recall producing documents --
17   let -- let me restate that.
18           Do you recall whether Actavis produced
19   documents in response to the DOJ subpoena?
20       A    I don't recall whether we did.  I'm
21   assuming that we did, but, again, I don't want to
22   guess.  I wasn't involved directly in document
23   production.  But, you know, if it's a subpoena,
24   I'm assuming that we complied with the subpoena,

Page 112

1    but I don't have specific knowledge of whether we
2    produced it, what we produced, and when we
3    produced it.  I don't have that recollection.
4        Q    Do you recall whether there was any
5    further follow-up from the DOJ related to the
6    subject matter covered by the December 2012
7    subpoena?
8        A    I don't recall.
9        Q    And by the legacy Actavis suspicious
10   order monitoring -- let me -- let me withdraw
11   that.
12           Earlier when we first started looking at
13   this document, we talked about the very first
14   bullet point that described the legacy Actavis
15   beginnings and the commencement in late 2011 of a
16   suspicious order monitoring program by customer
17   service on the generic side.
18           Do you recall that?
19       A    I mean, the first bullet says:
20   "Customer service on generic side started in late
21   2011 prior to MRC."
22       Q    Returning to the DOJ subpoena where it
23   says, "Seeking documents related to the legacy
24   Actavis suspicious order monitoring," and then I

Page 113

```
 1    assume it means program, do you know if you are
 2    referring there to the same suspicious order
 3    monitoring program that is described at the
 4    beginning of this document in the first bullet
 5    point?
 6        A   I mean, the best I could tell you, it's
 7    possible.  And the reason I'm -- I appear to be
 8    hedging is because it would help if I knew why I
 9    created this to know what exactly my references
10    were.  It looks like that may have been the case,
11    but, you know -- but I -- I can't tell you that
12    with certainty, even though I created this.
13        Q   Okay.  The final bullet point says:
14    "Recent Developments," and it appears -- in the
15    first bullet point, it appears that there is some
16    collection of documents that was being undertaken
17    in response to the DOJ subpoena.
18            Is that how you read that as well?
19        A   I believe so, yeah.  It talks about
20    document discovery in response to the January 2013
21    subpoena.
22        Q   And again, just -- sorry if I'm asking
23    you a question you've answered already, but you
24    don't recall whether the documents were produced
```

Page 114

```
 1    in response to that subpoena.
 2        A   I know I was not involved -- directly
 3    involved in document production.  That would have
 4    been handled specifically by or directly by legal.
 5    If I had documents, I would have produced them.  I
 6    don't specifically recall whether I did.
 7        Q   Presumably Mr. Gilbert of Hyman Phelps
 8    would have some knowledge, is that -- as reflected
 9    by that bullet point; would you agree?
10        A   If he was the lawyer at the firm that
11    worked with us on this document discovery related
12    to the subpoena, he would have knowledge.
13        Q   The second major bullet point under
14    "Recent Developments" talks about industry
15    anti-diversion working group meeting in Chicago on
16    August 20th.
17        A   Right.
18        Q   Do you know -- what was the -- was there
19    a name for that industry anti-diversion working
20    group?
21        A   Yeah, there was.  I just can't remember
22    the name.
23        Q   Do you recall whether you did meet on
24    August 20th, and this is -- I assume this means
```

Page 115

```
 1    2013?
 2        A   I know I met with the group.  I don't
 3    remember if I met at this August 20th, 2013
 4    meeting.
 5        Q   Do you know -- oh, I'm sorry.
 6        A   Yeah, I just know that I remember being
 7    part of this group and attending regular meetings,
 8    which may have been every two or three months.  I
 9    just don't recall if I went to Chicago.
10        Q   Do you recall who -- let me withdraw
11    that.
12            Do you recall what companies were
13    represented in that group?
14        A   I don't remember them all.  I know that
15    there were three or four manufacturers:
16    Mallinckrodt, which I mention in the memo;
17    Actavis -- I know that there was -- I'm not sure
18    if it was Endo, but there was a J&J affiliated or
19    subsidiary company, the name which escapes me
20    right now, and there was -- I believe there was a
21    fourth manufacturer.
22            And then there were at least two or
23    three distributors.  I believe ABC,
24    AmerisourceBergen was involved.  I believe
```

Page 116

```
 1    Cardinal was involved.  I don't remember whether
 2    McKesson was involved or not, but I know that
 3    there was another distributor that was involved in
 4    the group.  I don't know if that is the universe
 5    of the group, but those are the names that I
 6    recall were involved.
 7        Q   And by J&J, you mean Johnson & Johnson,
 8    correct?
 9        A   Yes, Johnson & Johnson.
10        Q   And is the second sub-bullet point,
11    which states, "To get DEA perspective, view
12    anti-diversion regulatory framework and provide
13    industry recommendations to DEA," does that
14    reflect the purpose of this working group?
15        A   Pretty much, yeah.  That's what we were
16    trying to, do because, you know -- yeah, it was
17    clear that, you know, those of us that
18    manufactured opioids and had suspicious order
19    monitoring or were interested in anti-diversion
20    efforts were operating off the Controlled
21    Substances Act and the SOM regulation, I think
22    it's 21 CFR, whatever it is.  And -- but the
23    regulation hadn't been updated, and there wasn't
24    any guidance from DEA on interpreting that
```

Page 117

1   regulation or laying out what our anti-diversion
2   efforts should be beyond the words in the
3   regulation.
4        So we were -- and the regulation had to
5   have been 20 years old, 30 years old at that
6   point.  So we were just looking for additional
7   guidance on what else we can do beyond the
8   anti-diversion efforts we were currently engaged
9   in.  And the best source of that would have been
10  DEA, so we were brainstorming on things that we
11  can do to try and, first of all, collaborate with
12  the DEA, open up lines of communication with the
13  DEA with the purpose of seeking guidance from
14  them, formally or otherwise, on what else we could
15  do to enhance our suspicious order monitoring or
16  anti-diversion efforts.
17       Q   Do you recall this group -- the efforts
18  of this group leading to any results, leading to
19  any communications with the DEA or proposed
20  universal approaches to suspicious order
21  monitoring or the like?
22       A   When we started, you know, the kernels
23  of some openings started in terms of -- you know,
24  because oftentimes you would reach out to a DEA

Page 118

1   person, probably in D.C., and you would
2   communicate, make a request, and you'd just get,
3   "Thank you for your communication, we'll get back
4   to you" kind of response, you know.  And I'm being
5   euphemistic.  It wouldn't be an engagement with,
6   Let's sit down, let's talk, let's figure some
7   things out, and let's -- even if it's informal and
8   it's not written down, let's just have a
9   communication about things that either side can do
10  better.  You wouldn't get that.
11       But then I was involved with this for
12  maybe a year or two -- a year, year and a half,
13  two years.  Towards the end of the time that I was
14  there, because there was a certain time where I
15  stopped my involvement -- I don't know if it was
16  when I left the company or once the Watson
17  acquisition took deeper hold, I don't recall --
18  but as I was leaving the group, I remember hearing
19  either in a meeting or on a phone call that we're
20  getting some feedback from the DEA through some of
21  our efforts that they want to talk to us or
22  they're open to collaborating with us, things like
23  that.
24       So the -- it started.  I don't know how

Page 119

1   much it took root, but the seeds were planted, and
2   they seemed like they were starting to sprout a
3   bit, but it's just not really clear.
4        Q   And you don't recall one way or the
5   other why you stopped your involvement in this
6   group?  You said --
7        A   I don't recall.  I mean, I know that as
8   I got deeper into, you know, Watson-Actavis and
9   the other acquisitions, we started thinking more
10  about brands.  Opioids became less of what I was
11  concerned about, even though, you know, we still
12  manufactured them, but -- sorry, I'm just getting
13  a note -- but it could have been just, you know, a
14  change in my role, expansion of my role.  That's
15  my guess, but I really don't recall specifically.
16       Q   I don't want to pry, but the note you
17  just referred to has nothing to do with your
18  testimony; is that correct?
19       A   No, it's my work phone.  I'm getting a
20  text from my direct report about something I was
21  supposed to be doing.
22       MS. LEVY:  Do you need to take a break?
23       THE WITNESS:  No.  No.  I can get back
24  to her at lunchtime.

Page 120

1   BY MR. MELAMED:
2        Q   You were not involved -- you described
3   that the lines of communication appeared to be
4   opening between this working group and the DEA
5   around the time you were stepping away from the
6   working group, right?
7        A   I vaguely recall that happening or I
8   vaguely recall receiving some communications to
9   that effect.
10       Q   Do you recall anything else about the --
11  any continued communications between the working
12  group and DEA or the results of any of those
13  communications?
14       A   Nothing beyond what I just indicated.
15       Q   Okay.  And then the final main bullet
16  point under "Recent Developments" says:  "Need for
17  legal ethics presence in restructuring."
18       Can you describe what that means?
19       A   I'm not really sure what this means.
20  I'm reading the words, but I don't know what this
21  means because some of this refers to internal
22  stuff and some of this refers to external stuff.
23  So --
24       Q   Mm-hmm.

Page 121

1      A   I mean, it says:  "Need for legal ethics
2   presence in restructuring," but I don't know if
3   they mean restructuring the working group or
4   restructuring our internal process.  Because it
5   says:  "Scope is up to Swanton and Napoli," and
6   those are two Actavis employees.
7           But then the next section says:
8   "Industry group is so-called," quote, "run by
9   lawyers."  So I have no idea what that statement
10  means.
11          And then it says, the next bullet:
12  "Only offering guidance and advice, not management
13  of program."  So it looks like we're referring to
14  something we're doing internally, but I really
15  don't know what these two bullets are about.
16      Q   Napoli is Tom Napoli, correct?
17      A   That's correct, Tom Napoli.
18      Q   And who is Swanton?
19      A   I really don't remember who Swanton is.
20      Q   Do you remember what department Swanton
21  was in?
22      A   I don't remember who Swanton is.
23          (Clarke Exhibit No. 5 was marked
24            for identification.)

Page 122

1   BY MR. MELAMED:
2      Q   You can put Exhibit 4 aside.
3          I'm going to hand you what's been marked
4   as Exhibit 5.  Exhibit 5 is titled "Napoli
5   conversation notes - 9/12/2013.  It's Bates
6   numbered ALLERGAN_MDL_03302580.
7          Do you recognize this document?
8      A   (Peruses document.)  Yes, I do.
9      Q   You created it, right?
10     A   It looks like something I created.
11     Q   And this appears to reflect the contents
12  of a discussion you had with Tom Napoli on or
13  around September 12th, 2013; is that right?
14     A   That's what it looks like, yes.
15     Q   Do you recall a conversation with Tom
16  Napoli around that time?
17     A   I -- sitting here today, I don't
18  specifically recall the conversation.
19     Q   Did you speak to Mr. Napoli frequently
20  around September of 2013?
21     A   I mean I spoke with him relatively
22  frequently as a general matter.  So, I mean, I
23  can't -- I don't recall specifically a
24  September 12th conversation, but Tom and I had

Page 123

1   conversations periodically.
2      Q   And when you -- when you -- when you're
3   using the word "periodically," about how
4   frequently are you talking?
5      A   A couple times a month.
6      Q   And the first header states "SOM
7   Resource - Will Simmons."
8          Do you see that?
9      A   Yes, I see that.
10     Q   Will Simmons was an Actavis employee --
11     A   Yes.
12     Q   -- is that right?
13     A   Yes, he was.
14     Q   And he was a compliance auditor and
15  investigator in DEA affairs; is that correct?
16     A   I believe that was his -- either his
17  role or his title.
18     Q   Did you work with Will Simmons on the
19  suspicious order monitoring program?
20     A   Well, he was one of the -- from what I
21  remember, one of -- he was one of the key players
22  or employees involved in -- directly involved in
23  managing our SOM process.  I believe that Will
24  reported to Tom, or maybe he may have been two

Page 124

1   levels below Tom.  So even though I knew who Will
2   was and I had maybe a couple of conversations with
3   him, I didn't manage him or I didn't deal with him
4   directly.  I would just deal with Tom.
5      Q   Going back to the division you set forth
6   before between people in operations --
7      A   Yes.
8      Q   -- and then people who were in your
9   position, non-operations --
10     A   Yes.
11     Q   -- was Will Simmons in operations?
12     A   He would have been more of an operations
13  resource, yes.
14     Q   You reference -- it appears that you
15  reference that he was legacy Actavis with former
16  regulatory responsibilities in Elizabeth.  Do you
17  see that?
18     A   I see that.
19     Q   Do you recall what his former regulatory
20  responsibilities in Elizabeth were?
21     A   I don't.  I didn't know him prior to --
22  after the Watson-Actavis combination.  So if I'm
23  writing this down, he must have been -- I guess if
24  I wrote this down, I had heard or learned that he

Page 125

1    may have worked for Actavis as opposed to Watson,
2    but I didn't know him at Actavis -- at legacy
3    Actavis.
4        Q   As a general matter, these notes being
5    taken are concerning conversations about the
6    integration of Watson and Actavis after the
7    acquisition?
8        A   Possibly.  I mean, you know, I -- I take
9    notes of conversations, you know, because, you
10   know, it helps with whatever work that you're
11   trying to do, just to capture what it is that you
12   met about or talked about or learned.
13       So, you know, this was -- I mean, if
14   this conversation was in September 2013, that was
15   after the integration was complete, which I
16   believe occurred sometime between February and
17   April of 2013, if I -- if my memory serves.  So we
18   were having conversations about SOM, and Will
19   Simmons' name came up as to what he was going to
20   be doing and what his background was, so I just
21   memorialized it.
22       Q   And in the final bullet point under this
23   section, you say that: "Simmons is willing to
24   answer questions and review the SOM process at any

Page 126

1    time.  MRC to make appointment for late September
2    or October."
3        Do you recall making an appointment to
4    speak to Will Simmons in late September or
5    October?
6        A   I don't remember when.  I know I spoke
7    with Will at some point after this, but I can't
8    tell you exactly when it was.
9        Q   Do you recall -- did that conversation
10   concern the suspicious order monitoring process?
11       A   Yeah, it must have.  That's all we had
12   to talk about.
13       Q   Do you recall what you talked about
14   with -- with Will about the suspicious order
15   monitoring process?
16       A   I don't recall specifically.  I know --
17   I mean, it would have been what his
18   responsibilities were and maybe a little bit about
19   his background, but I don't recall the specifics
20   of the discussion.
21       Q   Do you know if you discussed the DEA
22   meetings that had happened in 2012 with him?
23       A   I don't remember whether we discussed
24   that.

Page 127

1        Q   The next heading says "Actual SOM System
2    Status."
3        A   I see that.
4        Q   And the first bullet says: "In the
5    final stages of construction, to be completed by
6    the end of 2013."
7        What was in -- what suspicious order
8    monitoring system existed prior to the completion
9    of the one being discussed here that was projected
10   for the end of 2013?
11       A   Well, it was a system -- I mean, Watson
12   had a system in place, which I don't recall what
13   it was, but they had a system in place.  And this
14   is what I'm saying, legacy Actavis and legacy
15   Watson.  So prior to the acquisition, and
16   Actavis -- legacy Actavis, Swiss Actavis had a
17   system in place, as well, prior to the
18   acquisition, and even after the acquisition prior
19   to the integration or the close of the merger,
20   which is what I mean when I say "integration."
21       So when the two companies came together,
22   the question became how to address SOM when the
23   companies were coming in, and I believe from
24   slightly different perspectives.  So there's --

Page 128

1    there's always in my view usefulness in enhancing
2    what you do, looking at ways to improve what you
3    do.  So in addition to figuring out how to
4    integrate these two separate systems, I recall
5    there being discussions about enhancements that we
6    could make to our system, possibly because there
7    was other technologies out there or something to
8    that effect.  So I recall vaguely some discussions
9    to that effect.
10       So -- but I can't tell you legacy Watson
11   system was this in terms of using this
12   manufacturer or this technology tool compared to
13   what legacy -- legacy Watson versus legacy
14   Actavis, I can't recall that.
15       Q   So that the system you're discussing
16   here that is in its final stages of construction
17   is referencing an integrated system post-merger of
18   Watson and Actavis; is that right?
19       A   That's correct, an integrated system,
20   and even I know there was discussion about
21   enhancement of what both of us -- both companies
22   were doing.
23       Q   And the legacy Actavis system that you
24   just referred to in your response, the Swiss

Page 129

1    Actavis or legacy Actavis is the one we discussed
2    in -- in -- when we were looking at your set of
3    notes in Exhibit 4; is that correct?
4        A    That's -- that's correct.
5        Q    Okay.  And the second sub-bullet under
6    "Actual SOM System Status," you wrote:  "Using" --
7    and I don't want to mispronounce this, I'm going
8    to try -- "Cegedim."
9        A    Cegedim.
10       Q    Thank you.
11       A    Cegedim.
12       Q    -- "Cegedim system, and recently had
13   presentation by ValuCentric software system, which
14   is likely to be used."
15           Can you describe the Cegedim system?
16       A    I don't recall how it worked.  I know
17   that Cegedim was a vendor that had a software data
18   analysis system.  ValuCentric was another vendor
19   or was the name of another software system.  I
20   can't tell you how they worked in terms of what
21   the distinctions were.  I would have known back
22   then, but I can't recall the details of them now.
23       Q    Is there anybody you worked with at the
24   time who would be the person most likely to retain

Page 130

1    knowledge about how Cegedim and ValuCentric
2    systems worked?
3        A    I mean, Will Simmons and Tom Napoli,
4    they would know.
5        Q    And those two systems were under
6    consideration and being -- in the case of Cegedim,
7    being used to assist in the suspicious order
8    monitoring process?
9        A    That's what I recall.
10       Q    The next bullet says:  "The system has
11   moved from a threshold-based system to an
12   algorithm."
13           Can you describe the difference between
14   a threshold-based system and an algo -- algorithm?
15   Sorry for my tongue getting tied.
16       A    I know there's a difference, but I -- I
17   couldn't describe it now.  I mean, I was more
18   familiar with it then, I mean, in terms of, you
19   know, threshold may have to do with certain limits
20   and certain values, and algorithm is formulaic
21   based.  But beyond that, I can't tell you what the
22   details or the distinctions between the two
23   systems are.
24       Q    Do you have any idea what went into the

Page 131

1    algorithm, what factors were considered?
2        A    I can't remember now.
3        Q    And do you recall any communications
4    with the DEA about the insufficiency of a
5    threshold-based system?
6        A    I don't recall any communications to
7    that effect.
8        Q    I'm going to go to the bottom of
9    Exhibit 5.  There's a header that says "External
10   Meetings," and the first bullet says:  "Napoli to
11   attend IWG meeting on October 8 in Chicago."
12       A    I see that.
13       Q    Do you recall what the IWG meeting was,
14   the purpose of the meeting?
15       A    I don't recall the purpose of the
16   meeting.
17       Q    Do you recall what IWG stands for?
18       A    I do not.  I'm wondering whether that
19   refers to this working group.  But that's the only
20   thing I could think of that I would have put in a
21   note from a conversation with Tom, but it also
22   could have been some sort of external vendor
23   having a meeting about anti-diversion or opioid
24   distribution or something like that.  So it could

Page 132

1    be a number of things.  But I'm just wondering
2    whether the WG refers to working group, but I
3    specifically don't know.
4        Q    And then --
5        A    I mean, Tom obviously would know these
6    things.
7        Q    Sorry to cut you off.
8        A    Mm-hmm.
9        Q    The second bullet says:  "Mentioned a
10   one-day DEA conference in D.C. on October 22nd."
11       A    Right.
12       Q    Do you recall whether anyone from
13   Actavis attended the DEA conference referenced in
14   this bullet point?
15       A    I remember going to a DEA conference.  I
16   don't know if it was this one.
17       Q    Do you remember the year you attended a
18   DEA conference?
19       A    I don't.
20       Q    Do you recall whether you were an
21   Actavis employee when you attended a DEA
22   conference?
23       A    Yes, I would have been an Actavis
24   employee, but I don't recall if it was legacy

1   Actavis versus Watson-Actavis.
2       Q   Understood.
3           Do you recall the subject matter of the
4   DEA conference?
5       A   Not specifically.
6       Q   Do you recall any discussion of
7   suspicious order monitoring at the DEA conference?
8       A   That would have come up, but I can't
9   specifically recall what was said about SOM.
10      Q   Do you recall any other meetings with
11  the DEA other than the -- the two we discussed in
12  the prior exhibit, Exhibit 4 --
13      A   Mm-hmm.
14      Q   -- and then this conference in Exhibit 5
15  in which you personally were involved during your
16  time at Actavis?
17      A   In terms of formal meetings, there was a
18  D.C. meeting that we talked about earlier, and
19  then there was the local field office meeting,
20  which followed the D.C. meeting in the fall of, I
21  guess that's, 2012.
22          I remember participating in a couple of
23  phone calls with one or more of the field office
24  employees.  I don't recall any in-person meetings

1   after that.
2       Q   Those phone calls that you mentioned, do
3   you remember the approximate timing of those
4   relative to the in-person meetings?
5       A   They were after, but I can't tell you
6   how much after.
7       Q   Okay.  Do you recall whether anybody
8   else from Actavis also participated in those phone
9   calls?
10      A   Yes, other people did.  I'm assuming
11  John Duff.  I can't tell you who else.
12      Q   Do you remember --
13      A   I mean it would have been a -- I'm
14  sorry.
15      Q   No, please.
16      A   It would have been a group call or
17  conference call, four or five people on the phone,
18  but I can't tell you exactly who participated and
19  how many of them there were and when they
20  occurred.
21      Q   Do you recall anything about the
22  substance of any of those phone calls?
23      A   No, I don't.
24      Q   You're -- do you know whether they

1   concerned suspicious order monitoring?
2       A   That likely would have been the topic of
3   discussion, because the DEA's focus would have
4   been on anti-diversion efforts and risk mitigation
5   efforts by the manufacturers.  So as a broad
6   matter, that would likely have been the topic, but
7   I can't tell you specifically what any of those
8   phone calls were about.
9       Q   And the suspicious order monitoring
10  process fell under the broad umbrella of
11  anti-diversion efforts.  Is that your
12  understanding?
13      A   That's the way I'm describing it.  Yes.
14          MR. MELAMED:  Why don't we go off the
15  record.
16          THE VIDEOGRAPHER:  Stand by.  11:42,
17  we're off the video record.
18          (Recess.)
19          THE VIDEOGRAPHER:  11:56, we're on the
20  video record.
21          (Clarke Exhibit No. 6 was marked
22          for identification.)
23  BY MR. MELAMED:
24      Q   I've handed you what's been marked

1   Exhibit 6, which is an e-mail string from -- the
2   most recent in time on the first page from Nancy
3   Baran on April 25th, 2012.  It starts at Bates
4   number ALLERGAN_MDL_01729077 and ends at 9081.
5           And there's a -- so there are two --
6   this document contains two e-mail strings, the
7   first -- most recent in time starts on the first
8   page.  The one, it also includes an e-mail sent by
9   Nancy Baran on March 30th, which is on the page
10  with the Bates stamp 079.
11          Do you see that?
12      A   I see that.
13      Q   Okay.  These appear to be notes from
14  meetings concerning suspicious order monitoring at
15  Actavis; is that right?
16      A   Yes, they're labeled "SOM Project Team
17  Status and Recap of SOM Meeting" on respective
18  dates.  So it could be a summary of either the
19  meetings or -- or the follow-ups.
20      Q   Okay.  And you are a recipient of both
21  these e-mails, correct?
22      A   Yes.
23      Q   And do you have any reason to believe
24  you did not receive these e-mails at the -- at or

## Page 137

1  around the time they were sent?

2  A    I mean, they were sent to me, so I don't

3  have any reason to believe I didn't get them.

4  Q    You spoke earlier this morning about a

5  working group, a suspicious order monitoring

6  working group.

7  A    Yes.

8  Q    Do these -- the participants or the

9  recipients of these e-mails reflect the working

10  group you were describing when you spoke about the

11  working group earlier?

12  A    I think this is the working group.

13  Q    So the -- the list of individuals on the

14  March 30th and April 25th e-mails reflect the

15  working group?

16  A    I believe it does.

17  Q    Okay.  If you'd turn to the page

18  Bates-stamped 079.

19  A    Yes.

20  Q    This is the first in the -- in the

21  string, and it was sent Friday, March 30th, do you

22  see -- 2012.  Do you see that?

23  A    Yes.

24  Q    And then turn to the second page of

## Page 138

1  that, which is on 080.

2  A    Yes.

3  Q    There's a header "Know" -- "Know Your

4  Customer."  Do you see that?

5  A    Yes.

6  Q    Do you know what the "Know Your

7  Customer" -- do you know what that's referring to?

8  A    I mean, "know your customer" is a term

9  of art, and I just don't recall whether that was

10  part of the SOM process, like a distinct part of

11  the SOM process or just simply a description.

12  Q    Okay.  What does that term -- to what

13  does that term of art refer?

14  A    It refers to -- I mean, it kind of

15  speaks to itself.  "Know your customer," meaning

16  perform some level of diligence on your customer

17  who you're selling or distributing product to.

18  Q    And you see down at the bottom of the

19  section titled "Know Your Customer," the last

20  arrow concerns a site visit tour being planned

21  with Cardinal?

22  A    Yes.

23  Q    Do you know why that site tour -- site

24  visits or tour was being planned with Cardinal?

## Page 139

1  A    Well, that's part of the "know your

2  customer" process.  So earlier we had talked about

3  an ABC meeting, AmerisourceBergen meeting, and

4  AmerisourceBergen was a distributor, so that was a

5  customer, as was/is Cardinal.  So in addition to,

6  you know, analysis, you want to have conversations

7  and do assessments of your customer.  So that's --

8  that's part of the process.

9  Q    At this point in time, so being

10  March 2012 and earlier, how frequently were site

11  visits or tours of customers undertaken?

12  A    As of March 2012?

13  Q    Mm-hmm.

14  A    I really couldn't tell you.  I don't

15  know how frequently they occurred before I got to

16  the company in January of 2012.  I know that we

17  had started doing them, I guess around this time,

18  including the ABC and maybe others.  So we had

19  them, but I can't tell you how frequently they

20  were occurring, and I can't tell you when they

21  started.

22  Q    Do you know if Cardinal was -- a site

23  visit or tour with Cardinal occurred more than

24  once in 2012?

## Page 140

1  A    I really don't recall.

2  Q    Do you know if the site visit or tour

3  being referenced in this e-mail occurred in late

4  April or early May?

5  A    I don't recall when it occurred.  I

6  remember that a site visit did occur.  And -- and

7  actually it was Cardinal coming to Actavis.  We

8  didn't go to Cardinal, wherever it was located.

9  So I remember Cardinal folks came, I believe, to

10  the Elizabeth manufacturing site.

11  Q    Did you participate in that meeting?

12  A    I did.

13  Q    Do you recall the substance of that

14  meeting?

15  A    I don't recall the substance.  You know,

16  we chatted and talked about anti-diversion

17  efforts.  We chatted about, you know, the

18  distribution process and risk mitigation.  That --

19  I can tell you those were the subjects, but I

20  can't tell you the specifics of the discussion.

21  Q    Do you recall anything Cardinal told you

22  about its efforts to prevent diversion?

23  A    I know they mentioned them, they talked

24  about them and described them, but I can't tell

Page 141

1    you what they were.  I don't recall the details.
2         Q    Do you know whether Cardinal described
3    to you its process for monitoring suspicious
4    orders?
5         A    It did, but I can't recall the details.
6         Q    You know that it did discuss --
7         A    Yes.
8         Q    -- suspicious order monitoring, but you
9    don't recall what about suspicious order
10   monitoring Cardinal discussed?
11        A    Yeah.  I know they talked about it,
12   because that really was the purpose of the
13   meeting, anti-diversion, suspicious ordering, risk
14   mitigation.  So we described what we were doing,
15   how it was -- it worked in tandem with what
16   Cardinal would have been doing.  So they would
17   have told us what they were doing.  I just don't
18   recall the details.
19        Q    The next header references "DEA Visit,"
20   and it says:  "No change since last meeting."
21        The bullet point below that says:
22   "Kelly has reached out to the DEA and let them
23   know we are interested in meeting with them."
24        Do you know why Kelly reached out to the

Page 142

1    DEA and let the DEA know Actavis was interested in
2    meeting with the DEA?
3         A    Well, this is all part of the effort to
4    open up lines of communication to the DEA.  So
5    like I think I mentioned earlier, you want to get
6    feedback from them about the efforts that you're
7    undertaking to -- you know, your anti-diversion
8    diversion efforts, your suspicious order
9    monitoring efforts.
10        And I know we communicated with them.  I
11   know at some point we got feedback from the DEA
12   about how our efforts were -- I mean, ultimately
13   our efforts were viewed as industry leading.  You
14   know, we had a robust system in place.  We
15   ultimately did get that sort of feedback.
16        But this was early in my tenure, and we
17   were trying to reach out to the DEA to get, you
18   know, information, get guidance, and get an
19   assessment from them as to how well we were doing,
20   how robust our system was, and whether there were
21   any adjustments that needed to be made.  So this
22   was all part of, you know, a multi-pronged effort,
23   internally and through this external working
24   group.

Page 143

1         Q    You -- you said that you ultimately
2    received feedback that Actavis did have a robust
3    system in place.
4         A    Yes.
5         Q    Do you recall around what date you
6    received that feedback from the DEA?
7         A    I don't recall the specific date.  I
8    believe it was sometime in 2013, but I don't
9    recall specifically.
10        Q    And --
11        A    I mean, I'm sure there's a document that
12   would help me, but I just don't recall it as we
13   sit here.
14        Q    Let's turn to the first page of this
15   exhibit, which again is Bates number ending in
16   077.
17        The first bullet point concerns
18   "Compliance Agreement."  Do you know what that
19   compliance agreement is describing?
20        A    I know that we had put together a -- a
21   communication, and I believe a one or
22   one-and-a-half-page agreement or certification
23   document that we were asking our distributors to
24   sign, essentially indicating that they were going

Page 144

1    to adhere to SOM requirements similar to what we
2    were doing.
3         You know, we had policy, we had a
4    regulation, and we wanted to make sure that
5    everyone in the distribution stream was aligned;
6    you know, that our customers aligned with our
7    requirements or our program.
8         Q    Prior to the compliance agreement being
9    discussed in Exhibit 6, had Actavis required its
10   customers to execute a compliance agreement
11   stating it's -- it's outlining the expectations
12   that it comply with the Controlled Substances Act?
13        A    I don't recall that we did.  I'm not
14   familiar with what was done in detail before I got
15   there.  This was all in 2012 based on the date of
16   this e-mail, and I know we had discussions about
17   that after I got there with the working team, and
18   put a plan in place to have this agreement or this
19   certification sent to our distributors, and then
20   signed and returned back to us.
21        Q    When you say you -- you started your
22   response by saying, "I don't recall that we did."
23   Do you -- you don't believe that you did or you
24   don't know either way that you did have such an

Page 145

1    agreement prior to this?
2        A   I don't know what was done before I got
3    there, but I know that we -- after I got to
4    Actavis and started on the working team, we put
5    this in place to create this agreement or
6    certification and get our distributors to sign it.
7        Q   The -- next bullet point says
8    "Direct and Indirect SOPs and Flowchart."
9            Does SOP stand for standard operating
10   procedure?
11       A   I believe it does.
12       Q   And so this is talking about the direct
13   and indirect standard operating procedures for
14   suspicious order monitoring; is that right?
15       A   Without seeing it, I really couldn't
16   answer definitively.  I believe so, because this
17   is an SOM summary, but I would need to see it to
18   be definitive that -- to know whether this is an
19   SOP on direct or indirect SOM process.
20       Q   The first bullet point talks about an
21   indirect SOP completed during the 4/17 meeting.
22   Do you know if there was an indirect SOP prior to
23   the version that was completed during the April
24   2017 -- or, I'm sorry, the April 17th, 2012

Page 146

1    meeting?
2        A   I don't know.  I really don't recall.  I
3    would have to see whatever documents exist to
4    know.
5        Q   The next bullet point mentions a Cegedim
6    conference.
7        A   Yes, I see that.
8        Q   And it mentions that Nancy and Kelly
9    were scheduled to attend, and then it says --
10   follows up by saying:  "In the meantime, a few
11   points of confirmation/validation were received."
12           And this e-mail is written by Nancy
13   Baran.  Do you know from whom she received
14   confirmation and validation?
15       A   I do not.
16       Q   The second checkmark in this section --
17   we're still on the first page Bates-stamped 077 --
18   states:  "We are" -- "Among the things that were
19   confirmed or validated was that:  "We are
20   absolutely on the right track with our indirect
21   SOM initiative, also referred to as 'Knowing your
22   customers' customer.'  The same question was asked
23   repeatedly by manufacturers:  Will manufacturers
24   be held accountable for who their customers are

Page 147

1    selling to?  The answer was yes."
2            Do you know who provided that answer?
3        A   She's referring to a Cegedim conference,
4    and I -- and, you know, Cegedim is a contractor or
5    consultant, at least it was, and I remember back
6    then that many of the Cegedim employees or
7    consultants were former industry, FDA, DEA
8    employees, so they would have a sense of what
9    governmental expectations would be.
10           So based on what she has listed here and
11   what she's describing, this would be feedback from
12   the conference, either from Cegedim consultants or
13   employees or current or former government
14   employees, about -- you know, from different --
15   obviously different manufacturers as to comparing
16   SOM programs, anti-diversion efforts, et cetera.
17       Q   And if you continue to the end of that
18   checkmark section, which turns on to the next page
19   on 7 -- ending 078, it concludes:  "Therefore, we
20   are on the right track.  We have a plan in place.
21   All we need to do now is execute."
22           So is it correct to say that the
23   indirect SOM initiative that was being undertaken
24   at Actavis was one that had yet to be enacted but

Page 148

1    was about to be enacted -- there were plans to
2    enact that indirect SOM initiative?
3        A   I mean, that's what she's saying.  I
4    remember talking about that.  You know, some of
5    the details escape me, but I do remember talking
6    about, you know, the direct or the indirect
7    process, and, you know, direct distributors and
8    then maybe going a level below.  Know your
9    customer, who was your direct distributor, and
10   then know your customers' customer, a level below
11   that.
12           So that's -- we talked about going a
13   level below just the direct customer, and then
14   implementing a system that would look at not just
15   our direct distributors or the direct entities in
16   the distribution chain but then, you know, a level
17   below.
18       Q   Do you know why Actavis was talking
19   about knowing its customers' customers at that
20   point?
21       A   I mean, just as a due diligence matter,
22   it's a good thing to do.  I mean, there's a
23   distribution stream, and, you know, to the extent
24   you're looking at risk mitigation for diversion,

Page 149

1    it does make sense to go more than just the level
2    below the initial distributor that you're selling
3    to.
4        Q    If you go to the bottom of the page with
5    Bates number ending 78, there's a "Miscellaneous"
6    category.
7        A    Yes, I see that.
8        Q    Point 3 says:  "Upcoming DEA visit."  Do
9    you know what DEA visit that's referencing?
10       A    I don't know specifically what DEA visit
11   this is referencing.
12       Q    Do you recall a DEA visit between April
13   2012 and the D.C. meeting with the DEA that
14   occurred in September 2012?
15       A    I don't recall specifically, but it
16   doesn't mean one didn't occur.  I just don't
17   remember that.
18           MR. MELAMED:  Why don't we go off the
19   record.
20           THE VIDEOGRAPHER:  12:13, we're off the
21   video record.
22           (Lunch recess.)
23           (Clarke Exhibit No. 7 was marked
24           for identification.)

Page 150

1            THE VIDEOGRAPHER:  1:12, we're on the
2    video record.
3    BY MR. MELAMED:
4        Q    I just handed you what's been marked
5    Exhibit 7.  Exhibit 7 is an e-mail string, two
6    pages, the most recent in time being from Doug
7    Boothe to Michael Clarke on May 2nd, 2017.  It
8    starts at ALLERGAN_MDL_02872193 and goes to 2194.
9            Do you recognize this document?
10       A    Yeah, I've seen this.
11       Q    And this reflects an e-mail conversation
12   between you and Doug Boothe on May 2nd, correct?
13       A    That's what it looks like, yes.
14       Q    You reference -- in your initial e-mail
15   to Mr. Boothe, you reference the need -- you'd
16   like to talk to him about resources for suspicious
17   order monitoring, correct?
18       A    Yes.
19       Q    And you want additional FTEs for
20   suspicious order monitoring; is that correct?
21       A    Yes.
22       Q    And FTEs are full-time employees --
23       A    Correct.
24       Q    -- or full-time equivalents?

Page 151

1        A    Yes.
2        Q    Which one of those?
3        A    It's either one.
4        Q    Okay.  And then you also reference the
5    need for additional full-time employees and the
6    question of what department those employees should
7    be located in, correct?
8        A    Yes.
9        Q    And the question about or the concern
10   about the department in which the resources are
11   located, the individuals being the resources,
12   concerns avoiding the perceived conflict between
13   sales/marketing.
14           Do you see that?
15       A    I see that.
16       Q    What is the perceived conflict with
17   sales and marketing?
18       A    Well, I stated it as perceived, not
19   actual.  That there can be a perception that if
20   either sales or marketing, which we can talk about
21   the distinction, is running an SOM program, that
22   there may be an inclination not to do things in a
23   certain way that would affect revenue.  So it
24   might make more sense for an SOM program to sit in

Page 152

1    an operations function outside of a commercial
2    function.
3        Q    Okay.  And the effects -- the potential
4    for the effect on revenue that you're describing
5    would be because held orders under the suspicious
6    order monitoring program and orders that needed to
7    be cancelled under the suspicious order monitoring
8    program would negatively affect sales and revenue;
9    is that correct?
10       A    I mean, I would say it differently.
11   That, you know, held orders, cancelled orders may
12   reduce revenue, and there might be a perception of
13   a conflict.  That wasn't going on in our case, but
14   there's a perception that that might be the case.
15       Q    And --
16       A    Well, let's just say the government may
17   have a perception that that's the case.
18       Q    Is it true that at least some
19   individuals in the sales department were paid
20   incentive compensation based on the number -- the
21   amount of product they sold?
22       A    I don't know whether that was occurring
23   because this was legacy Actavis or what I call
24   Swiss Actavis, and it was primarily -- not

Page 153

1    exclusively -- primarily a generic company.  So
2    there was a market -- compensation, I believe, was
3    different for generic sales versus -- I'm sorry,
4    generic marketing versus brand sales.  I don't
5    know what the distinctions were, but I understand
6    that there are distinctions, and I don't know what
7    was going on here.
8       Q   Okay.  So you don't know either way
9    whether individuals in the sales and marketing
10   departments at legacy Actavis were receiving any
11   comp- -- incentive-based compensation based on the
12   amount of Actavis product that they sold?
13      A   I don't know.  I wasn't familiar with
14   whether those formulas existed, and if they did,
15   what they were.
16      Q   And then the last sentence in your
17   e-mail -- I'm sorry, the last part of the last
18   sentence in your e-mail references the current
19   corporate situation.
20          What is that a reference to?
21      A   The Watson -- Watson acquisition had
22   been announced in, I believe, February of that
23   year.  It was going to close the following year.
24   So you have to be cautious about expending

Page 154

1    resources, which are probably limited, while an
2    acquisition is pending.
3       Q   Okay.
4       A   And Doug referred to that in his e-mail.
5       Q   Where -- where does he refer to that in
6    his e-mail?
7       A   Third line, where he says: "I think it
8    depends on the depth of the request and the
9    implications as part of the expected combined
10   organization."
11      Q   Okay.
12      A   He was responding to what I was raising.
13      Q   And he continues to say:  "I guess -- I
14   would guess the bar will be high to get
15   incremental new approvals."
16          Is that also a response to the
17   corporate -- the current corporate situation?
18      A   Correct.
19      Q   Do you know the end result of your
20   request?  Did you receive additional FTEs?
21      A   I believe we did.  I can't tell you what
22   or how many, but I know that we expanded what we
23   were doing in terms of the resources that were
24   devoted to SOM.

Page 155

1       Q   And that occurred -- that expansion
2    occurred in response to this May 2012 exchange?
3       A   I mean, it occurred after this exchange.
4    This exchange may have triggered it.  I can't say
5    directly in response to.  But it occurred after
6    this May exchange between Doug and myself.
7       Q   All right.  You can put that aside.
8          (Clarke Exhibit No. 8 was marked
9          for identification.)
10   BY MR. MELAMED:
11      Q   So I'm handing you what's been marked
12   Exhibit 8.  Exhibit 8 is an e-mail and an
13   attachment.  They're to -- the e-mail is from Doug
14   Boothe, dated June 8, 2012, to a group of
15   recipients, including Michael Clarke.  It
16   starts -- the initial Bates number is
17   ALLERGAN_MDL_131633.  The e-mail string is two
18   pages, and then it attaches a series of articles
19   that end on Bates number ending 1645.
20          Do you recognize this e-mail string and
21   the attachments thereto?
22      A   Independently, I do not.
23      Q   You recognize that you are cc'd on the
24   e-mail and the attachment?

Page 156

1       A   Yeah, I'm listed as a cc on the e-mail.
2       Q   Okay.  Do you have any reason to believe
3    you did not receive this in the ordinary course of
4    business?
5       A   I have no reason to believe it, no.
6       Q   Now, do you -- there are two articles
7    attached.  I want to draw your attention primarily
8    to the one that commences on 1637.  The article is
9    titled "American Pain:  The Largest U.S. Pill
10   Mill's Rise and Fall."
11      A   I'm sorry, could you tell me -- oh, I
12   found it.  Thank you.
13      Q   So 1637?
14      A   Mm-hmm.
15      Q   Do you recall reviewing this article?
16      A   No, I don't.
17      Q   Okay.  It represents a -- it discusses a
18   pill mill established in 2008 and then became
19   subject to an investigation called Operation Oxy,
20   O-X-Y, Alley, A-L-L-E-Y, in 2010, and that's
21   reflected at the bottom of 1638.
22          As a general matter, is it your
23   understanding that the purpose of suspicious order
24   monitoring is to prevent sales such as those

Page 157

1    referenced in this article?
2        A   I haven't read the article, so should I
3    read it?
4        Q   I can represent to you that the article
5    reflects a pill mill that was in operation in
6    Florida that was referred to as the "Largest U.S.
7    Pill Mill's Rise and Fall" that's --
8        MS. LEVY:  I think if you're going to
9    ask him questions about this, let's give him
10   minute to read it.
11       MR. MELAMED:  But I just --
12       MS. LEVY:  Take your time to read it.
13   BY MR. MELAMED:
14       Q   I'm happy to give you the time.
15       I just want to know, based on the title
16   of the article, do you think that -- is it fair to
17   say that the purpose of suspicious order
18   monitoring programs is to prevent sales to
19   entities such as the largest U.S. pill mill?
20       MS. LEVY:  I'm sorry.  Do you mind
21   rephrasing the question?
22   BY MR. MELAMED:
23       Q   Is it fair to say that the purpose of
24   suspicious order monitoring programs, as you

Page 158

1    understand them, and specifically -- let me
2    rephrase.
3        Is it your understanding that the
4    purpose of Actavis's suspicious order monitoring
5    program was to prevent sales to entities such as
6    the one identified in this article?
7        MS. LEVY:  Okay.  I'm going to object
8    and give him a minute to answer the question, and
9    then you can respond.
10       THE WITNESS:  (Peruses document.)
11       The purpose of suspicious order
12   monitoring programs is to reduce the risk of
13   diversion of controlled substances manufactured by
14   controlled substance manufacturers.  There are a
15   number of ways that they could be diverted, but
16   that's essentially one of the key purposes of an
17   SOM.
18   BY MR. MELAMED:
19       Q   And is one of the ways that the
20   controlled substances could be diverted is through
21   pill mills, what are referred to here in this
22   article as pill mills?
23       A   I mean, this is a long article.
24       Q   Mm-hmm.

Page 159

1        A   I mean, I know euphemistically what pill
2    mills are -- refer to, but you're going to have to
3    be more specific as to -- I mean, I haven't read
4    this.  I've gotten through about two pages of the
5    eight pages, and I'm not going to -- I don't feel
6    comfortable answering the question without knowing
7    exactly what is referred to in this article beyond
8    the two pages that I've read so far.
9        Q   Let me direct your attention to a
10   paragraph on 1643.
11       A   163?
12       Q   1643.  I'm sorry.  Bates number ending
13   1643.
14       MS. LEVY:  So I'm going to object.  If
15   you're going to ask specific questions about the
16   article, let's take a break and let the witness
17   read the whole article.
18       MR. MELAMED:  I just want to have him
19   read the whole paragraph.  If -- you can have your
20   objection.
21       MS. LEVY:  Yeah, I'm not going -- I'm
22   not going to let him answer questions about a
23   specific piece of an article without giving him a
24   chance --

Page 160

1        MR. MELAMED:  Are you going to --
2        MS. LEVY:  Yeah, hang on.
3        -- without giving him a chance to review
4    the whole article.  So --
5        MR. MELAMED:  Are you going to object on
6    privilege grounds that he can't answer?
7        MS. LEVY:  Am I?  I'm instructing you to
8    read the entire article before you answer
9    questions.
10   BY MR. MELAMED:
11       Q   That's -- Mr. Clarke, you're an
12   attorney, correct?
13       A   I'm a nonpracticing lawyer.
14       Q   And you've testified that you've been in
15   depositions before, correct?
16       A   Yes.
17       Q   So you know that if you need to read the
18   whole article, you can ask for that, and you don't
19   need your counsel to answer the question for you
20   and instruct you to read an article, correct?
21       A   Yes.
22       Q   Okay.  So --
23       A   And I'd like to read the article.
24       Q   Okay.  Let's put this aside.  And we may

## Page 161

1    return to it later.

2         Actually, let -- let me change that.

3         I want to read one paragraph to you, and

4    if you choose to say you need more, then that's

5    your choice.

6         On 16 --

7         MS. LEVY:  I instruct the witness to

8    read the document before you answer questions

9    about it.

10        MR. MELAMED:  That's an improper

11   instruction.

12        MS. LEVY:  Okay.  Feel free to --

13        MR. MELAMED:  -- to raise that with the

14   special master?

15        MS. LEVY:  -- with the special master.

16        MR. MELAMED:  Okay.

17   BY MR. MELAMED:

18     Q   On 1463, there's a paragraph that

19   states:  "The George brothers operated downmarket

20   from all that.  They bought and sold the

21   generics."

22        This is in reference to generic

23   hydrocodone and oxycodone.

24        "Their customers paid in cash.  At his

## Page 162

1    clinics, doctors typically prescribed around 180

2    30-milligram painkillers per patient at $2 a piece

3    plus a small amount of generic antianxiety

4    medication, such as alprazolam.  George says the

5    wholesalers usually sold him generic roxies for,

6    on average, around 70 cents per pill.  Thus, each

7    sale netted roughly $1.30 profit per pill or about

8    $235 for every prescription they filled on site.

9    For brand opioids, on the other hand, says George,

10   'Wholesalers charged about $3 a pill.'"  Quote,

11   "'Nobody buys brands,' says George," quote,

12   "'Especially when it comes to roxies.  I don't

13   even know who makes the brand Roxicodone.'"

14        Based on your understanding of the

15   paragraph, do you believe that suspicious order

16   monitoring protocols existed to prevent diversion

17   of opioids such as -- such as the sales described

18   in that paragraph?

19        MS. LEVY:  Again, we are not going to

20   have the depo- -- the deposition this way.  So if

21   you're going to ask specific articles --

22        MR. MELAMED:  Just I'm -- I'm not

23   asking --

24        MS. LEVY:  Don't interrupt me in the

## Page 163

1    middle of --

2         MR. MELAMED:  No, this is not an

3    objection.  This is a lecture.  Stop.

4         MS. LEVY:  -- in the middle -- we are

5    not going to --

6         MR. MELAMED:  Stop.

7         MS. LEVY:  -- conduct the record this

8    way.

9         MR. MELAMED:  You can't do this.

10        MS. LEVY:  If you are going to ask --

11        MR. MELAMED:  You can't continue to do

12   this.

13        MS. LEVY:  -- questions about a

14   document, then we're going to take a break, the

15   witness is going to read the document --

16        MR. MELAMED:  He can answer --

17        MS. LEVY:  -- and then you may ask him

18   questions.

19        MR. MELAMED:  He can answer the

20   questions.

21        MS. LEVY:  But we're not going to have

22   the deposition --

23        MR. MELAMED:  Let him answer the

24   question.  He's a lawyer.

## Page 164

1         MS. LEVY:  Okay.

2    BY MR. MELAMED:

3      Q   Please answer the question, if you

4    can --

5         MS. LEVY:  Do not answer the question.

6    Just a minute.  I'm going to make my record on

7    this.  Go ahead, you finish, and then I'm going to

8    make my record.

9         MR. MELAMED:  Make your record.

10        MS. LEVY:  We are not going to conduct

11   this deposition this way.  If you would like to

12   ask this witness a question about a document, you

13   must give the witness time to read the document,

14   and then ask your question.  And after you do

15   that, the witness will answer the question.  And

16   that's what we're going to do with respect to this

17   question and all the rest of the questions in the

18   dep.

19        MR. MELAMED:  Okay.  That is an improper

20   objection/instruction.

21   BY MR. MELAMED:

22      Q   I'm going to ask you the question:  Do

23   you understand -- do you have an understanding of

24   the paragraph?  Do you think you understand what's

## Page 165

1    being talked about in that paragraph?
2        A   No, I don't.  I need --
3        Q   Okay.  That's fair enough.
4        A   I need context in order to answer it,
5    which means I need to read the entire article.
6        Q   Fair enough.  That is an -- you can
7    answer that way.
8            MR. MELAMED:  You may not object that
9    way.  You are not conducting the deposition.
10           MS. LEVY:  I -- I may put anything I
11   want on the record --
12           MR. MELAMED:  That's true.
13           MS. LEVY:  -- whether you like it or
14   not.
15           MR. MELAMED:  That -- that is true.
16   BY MR. MELAMED:
17       Q   You can put that -- that document aside.
18           (Clarke Exhibit No. 9 was marked
19           for identification.)
20   BY MR. MELAMED:
21       Q   This is Exhibit 9.  Exhibit 9 is an
22   e-mail and an attachment.  The e-mail is from
23   Gerard Farrell to several individuals, including
24   Michael Clarke, dated July 9th, 2012.  It starts

## Page 166

1    at Bates number ALLERGAN_MDL_01026090.
2            Whoop, I'm sorry, I handed you the wrong
3    document.  Just give me a sec.  No, we can keep
4    this.  Good.
5            I'm sorry, it's an e-mail exchange
6    between Michael Clarke and Doug Boothe.  I was
7    describing the wrong document.  It starts at
8    ALLERGAN_MDL -- whoop, no.  Do I have the correct
9    document?  I did have the correct document before.
10   Thank you.  You can have yours back.
11           Exhibit 9 is a Gerald Farrell e-mail,
12   Actavis_0717304, and it continues through 17308.
13           Do you recognize this document?
14       A   I do not.
15       Q   Do not.  Do you have any reason to
16   believe that you did not receive this document at
17   your e-mail -- through your e-mail address on or
18   around July 9th, 2012?
19       A   I don't know.  I mean, it's -- reflects
20   that I'm a recipient of it, so presumably I
21   received it, but I don't recall this at all.
22       Q   Okay.  You can turn to the page that
23   starts 7306, which is an attachment.  It appears
24   to be a memorandum from Hill and Knowlton

## Page 167

1    Strategies dated July 9th, 2012.
2            Do you see that?
3        A   I see this page, yes.
4        Q   And do you see that you are one of the
5    three individuals to whom this memo was addressed?
6        A   I see that.
7        Q   Do you recognize this memo?
8        A   I do not.
9        Q   Do you have any reason to doubt that you
10   received this as attached to the e-mail at 17304?
11       A   I mean, I'm one of the recipients listed
12   on the memo and on the e-mail, so I assume I
13   received it, but it's not familiar to me.
14       Q   Okay.  On the first page of the memo, in
15   the second paragraph, it states:  "The most widely
16   abused prescription medications fall into three
17   therapeutic categories, of which one is opioid
18   pain relievers."
19           And then the next sentence says:
20   "Actavis currently manufactures or distributes at
21   least six products in these three categories for
22   the U.S. market," and then mentions, among others,
23   oxycodone and fentanyl.
24           Do you see that?

## Page 168

1        A   I see that.
2        Q   Were you aware prior to the -- this
3    memorandum that Actavis manufactured and/or
4    distributed opioid pain relievers that were
5    amongst the most widely abused prescription
6    medications in the United States?
7        A   No.  I knew that we made certain
8    products that fit within these therapeutic
9    categories, but I -- beyond that, I don't have any
10   knowledge of the rest of your question.
11       Q   Okay.  And if you go down four
12   paragraphs, there's a paragraph starting
13   "Additionally."
14           Were you aware prior to receiving this
15   memo that the Actavis name had become part of the
16   lexicon of a subset of the music industry in which
17   performers glorified, romantified -- romanticized
18   abuse of its drugs?
19       A   I do remember hearing something about
20   that.
21       Q   What do you remember hearing about that?
22       A   The second line of the fourth paragraph
23   refers to promethazine-codeine syrup.
24       Q   Mm-hmm.

## Page 169

1    A   So I remember hearing about that.

2    Q   What do you remember hearing about that

3  in the -- in pop culture?

4    A   That was some sort of concoction that

5  was popular among certain, I guess, music industry

6  types and their hangers-on.

7    Q   Had you heard of the person referred to

8  here as DJ Actavis?

9    A   No, I had not.

10    Q   Or had you heard of a song called "Cream

11  Soda and Actavis"?

12    A   No, I did -- have not.

13    Q   And -- or had you heard of the -- what's

14  referred to here as an apparent distribution

15  company called Actavis Music?

16    A   No.

17    Q   You can put that aside.

18       (Clarke Exhibit No. 10 was marked

19       for identification.)

20       MR. MELAMED:  Is that Exhibit 11?  Am I

21  correct?

22       MS. LEVY:  That was 9.

23       MR. MELAMED:  Nine?  Okay.  Thank you.

24  BY MR. MELAMED:

## Page 170

1    Q   I'm handing you what's been marked as

2  Exhibit 10.

3       Exhibit 10 is an e-mail string

4  between -- well, the most recent in time being

5  from Michael Clarke to Doug Boothe, "Re:  DEA

6  Action," dated September 12th, 2012.  It starts at

7  ALLERGAN_MDL_01026090 and continues through 6093.

8       So if you turn to the page ending 6091,

9  it's the second page of the exhibit.

10    A   Yes.

11    Q   And you see there's a series of

12  forwards, and then it ends up with an e-mail from

13  Doug Boothe to a series of individuals, of which

14  you're included, September 12th at 10:28 a.m.

15    A   Yes, I see that.

16    Q   Is the Michael -- it says:  "Michael,

17  how are you planning on leading the

18  discussion/review with the DEA?"

19       Is this -- is the "discussion/review"

20  being referred to here the meeting we discussed

21  earlier this morning that occurred in September

22  2012 -- September 12th, 2012, in D.C.?

23    A   I believe it's referring to the

24  September 2012 meeting at DEA headquarters in

## Page 171

1  Arlington, Virginia.

2    Q   Oh, in -- thank you.  In Arlington,

3  Virginia.

4       Do you see the second line of Doug

5  Boothe's e-mail says:  "We can't afford any

6  backward steps here"?

7    A   Yes, I see that.

8    Q   Do you have any understanding what he

9  meant?

10    A   At this point in time, I don't.

11    Q   You believe you understood at that point

12  in time or you may have understood?

13    A   I may have.  I just don't recall whether

14  I did or not.

15    Q   And then the last line says:  "What

16  exactly is the agenda and what are we presenting?"

17       Do you recall whether you presented

18  anything at that meeting with the DEA?

19    A   Well, like I mentioned earlier, our plan

20  was to have a discussion, an interchange with

21  them, and we had hoped to present some version of

22  the slides we had created on our suspicious order

23  monitoring program.  That was our plan.  I'm not

24  sure that we did present that, but that was our

## Page 172

1  plan.

2    Q   Okay.

3    A   Which I refer to in my e-mail, now that

4  I see it.

5    Q   Yeah, the -- and what you're referring

6  to is the line at the top of 6091 where it says,

7  "We plan to present," and it goes on to say what

8  you planned to present; is that correct?

9    A   Yeah.  My September 12th e-mail at

10  10:30, where I describe the focus of the DEA

11  meeting, and then the sentence starts on the prior

12  page:  "To the extent the DEA staffers ask us what

13  we are doing, we plan to present a very high level

14  discussion of our SOM efforts, especially our

15  awareness of potential diversion in the

16  distribution stream and our more recent

17  enhancements of our monitoring efforts."  That was

18  our plan.

19    Q   All right, you can put that aside.

20       (Clarke Exhibit No. 11 was marked

21       for identification.)

22  BY MR. MELAMED:

23    Q   I'm going to hand you what's been marked

24  as Exhibit 11.

Page 173

1    Exhibit 11 is a document with the front
2    page titled "Effective Controls Against Diversion
3    of Controlled Substances.  Meeting with Actavis
4    Elizabeth, LLC, September 12, 2012."
5        Do you see that?
6    A   I see that.
7    Q   And just for the record, it starts at
8    ALLERGAN_MDL_03302011 and continues through 2319.
9    Is this --
10       MS. LEVY:  Take your time and look
11   through this --
12       THE WITNESS:  Mm-hmm.  Yes, I will.
13   Thank you.  (Peruses document.)
14   BY MR. MELAMED:
15   Q   Were these materials presented to you
16   and others from Actavis by the DEA at the
17   September 12th, 2012 meeting to which we've been
18   referring?
19   A   I need to look at it to be sure.
20   Q   I can help walk you through maybe.
21       So if you look at 2011 through 2029, it
22   seems to reflect a unitary PowerPoint
23   presentation.
24   A   I'm not sure that this was the totality

Page 174

1    of what was presented.  The reason I say that is
2    because -- I haven't read the entire document, but
3    this looked like a compilation of different
4    materials.  One, there's a PowerPoint deck in the
5    beginning, which probably is what you just
6    referred to.  There are cases, court cases behind
7    that, and some other materials, I think
8    regulations and laws and stuff that I haven't read
9    yet.
10       The reason I'm concerned is that the
11   PowerPoint presentation that the DEA presented to
12   us was over a hundred slides, and without counting
13   them, I don't think this is a hundred slide deck.
14   Q   Okay.  If you turn to 2237.  This is in
15   the same document.  And I'm referring -- there's
16   two sets of Bate numbers -- Bates numbers on this.
17   I'm referring to the --
18   A   The bottom one.
19   Q   -- smaller bottom one.
20   A   2237?
21   Q   Correct.
22   A   Okay.
23   Q   And that's is titled "Actavis Top 50
24   Pharmacy Sales 2010 to 2012."

Page 175

1    A   I see that.
2    Q   And if you turn the page and you flip --
3    take a few minutes to flip through virtually the
4    end of this document -- do these seem to reflect
5    the slides that you remember being presented to
6    you at the September 2012 meeting?
7    A   (Peruses document.)
8    Q   Obviously, I don't have you -- expect
9    you to have perfect recall of the information that
10   was presented to you, but you referenced
11   approximately 90 slides --
12   A   No, it was over a hundred slides.
13   Q   Over a hundred slides.  Thank you.
14   A   For some reason, the number 112 sticks
15   out in my head.  But I know it was well over a
16   hundred slides that they presented to us.
17   Q   As you're looking through this, I just
18   want to know whether you believe this -- this is
19   the information that was presented to you.
20   A   I don't know.  This looks like data that
21   was contained in the presentation.  I don't know
22   that this was the presentation, and I clearly
23   don't know that this was the entirety of the
24   presentation, not having counted the slides and

Page 176

1    not seeing a clear numerical system.
2    Q   Do you know whether the entirety of the
3    presentation was maintained by anybody at Actavis?
4    A   I don't know if it was maintained.  I
5    believe all of us received copies of it.  If I
6    recall correctly, the Actavis team had received at
7    least two or three, you know, three-ring binders
8    about the size of the one that's in front of you
9    now with the slide deck in it in, you know, paper
10   form.
11       But it was one slide per page, not the
12   two slides per page on yours.  So we had had paper
13   copies of it and we took it back to our offices,
14   and then after I left the company, I don't know
15   what happened to it.
16   Q   Turn to the page ending 2014.  And this
17   is back toward the beginning in this first
18   PowerPoint presentation titled "Effective Controls
19   Against Diversion of Controlled Substances."
20   A   Yes.
21   Q   Do you see the first slide?  There are
22   two slides on that page -- sorry, I think that's
23   the wrong page.  One more back, 014.  Sorry.  This
24   one is double-sided because it's so lengthy.  I

Page 177

1    should have mentioned that before.  Sorry.
2         The second bullet point on the first
3    page says: "Each registrant within this closed
4    system of distribution has defined privileges and
5    responsibilities in which they must operate."
6    Correct?
7         A    That's what it says.
8         Q    Yeah.  And during your time at Actavis,
9    it was a registrant within this closed system of
10   distribution, correct?
11        A    Actavis?
12        Q    Yes.
13        A    I believe it was.
14        Q    The next slide down, the first bullet
15   says: "When a registrant fails to adhere to their
16   responsibilities, those violations represent a
17   danger to the public and jeopardize the closed
18   system of distribution."
19        Do you agree with that point?
20        A    Not exactly.
21        Q    Can you explain?
22        A    Well, the point states that when a
23   registrant fails to adhere to their
24   responsibilities, and then the next part of that

Page 178

1    says that that's a violation, and -- and failure
2    to adhere to its responsibility necessarily is not
3    a violation.  It may be, but it's not necessary.
4    So -- and it's a small point, I get that.  But,
5    you know, just in terms of my interpretation,
6    that's where I would start.
7         Q    Okay.  Are you aware of any
8    responsibilities that, were Actavis to have failed
9    to adhere to that responsibility, would not have
10   constituted a violation of the Drug Abuse
11   Prevention and Control Act of 1970, as amended in
12   '90 and '94?
13        A    Well, as far as I'm aware, from the time
14   that I was there, Actavis didn't violate any
15   responsibilities under statute or regulation.  As
16   far as I'm aware, Actavis didn't engage in any
17   activities that would have posed a danger to the
18   public or jeopardize the closed system of
19   distribution.
20        Q    My question is, can you think of any
21   responsibilities that if a registrant violated --
22   or, I'm sorry, did not follow that -- did not
23   abide by that responsibility would not constitute
24   a violation within the statute?

Page 179

1         MS. LEVY:  Object to the form.
2    BY MR. MELAMED:
3         Q    And I'm -- the only reason I'm asking
4    this is you were drawing a distinction before
5    between the difference between -- that the failure
6    to abide by one's responsibilities under the act
7    may not represent a violation.
8         I'm trying to figure out --
9         A    I can't think --
10        Q    -- where the room is between those.
11        A    Sorry.  I can't think of a specific
12   distinction.  The only reason I mentioned that is
13   because the things that I deal with currently,
14   which I know have nothing to do with this
15   litigation, you can have deviations of policy and
16   law, you can have violations, and, you know,
17   activity can be a deviation which doesn't rise to
18   the level of violation.  That's -- that's the
19   distinction I was drawing, but I can't think of a
20   specific example.  Because you can have
21   intentional conduct, non-intentional conduct.
22        So that's why it's a broad statement
23   which I can't agree with.  I understand the intent
24   of it, but I can't necessarily agree with the

Page 180

1    statement.
2         Q    Concerning the diversion of opioids into
3    an illicit market, do the dangers to the
4    public differ if the diversion is the result of a
5    purposeful violation of the statute versus due to
6    a -- a non-knowing violation of the statute?
7         MS. LEVY:  Object to the form.
8         THE WITNESS:  Well, I think there's a
9    lot of premise in that question.  And my answer is
10   not indicating that I believe that there may not
11   be public health -- or adverse impact on public
12   health from diversion.  But certain activities may
13   lead to diversion, which like I -- may be
14   intentional and unintentional, and then there are
15   consequences from those actions which may have an
16   impact on public health or may not.  So broad
17   statements like this make me uncomfortable,
18   particularly if I'm asked if I agree with them.
19   And because of the way they're phrased, I can't.
20   BY MR. MELAMED:
21        Q    Regardless of whether diversion happens
22   as a result of intentional or unintentional
23   behavior, the risks resulting from those specific
24   drugs that are diverted into illicit markets is

Page 181

1    the same to the public; is that correct?
2         MS. LEVY:  Object to the form of the
3    question.
4         THE WITNESS:  You're going to have to
5    repeat that.  I'm not sure that I can -- I can
6    answer it.  If you can repeat it.
7    BY MR. MELAMED:
8      Q   So you were talking about the difference
9    between intentional and unintentional diversion.
10   That was one of the things you were --
11     A   Right.
12     Q   -- just speaking about, correct?
13         Let's say there is a -- a numerical set
14   of opioids that are diverted, the same number in
15   each of these scenarios.  One scenario it's
16   diverted through purposeful action; the other it's
17   diverted through unintentional action.
18         Is there any difference in the dangers
19   posed to the public, the risks posed to the public
20   by those two instances of diversion?
21         MS. LEVY:  Object to form.
22         THE WITNESS:  Yes.  And I'll give you an
23   example, which is not exactly what you're getting
24   at, but I can give an example.

Page 182

1         There can be a situation where a
2    prescriber can intentionally or unintentionally
3    divert opioids where he or she may prescribe an
4    excess amount to a patient, who then provides a
5    portion of that amount to a family member who
6    doesn't have insurance coverage and needs or
7    desires the therapeutic treatment.  That's
8    diversion, but it may be for a non-malicious
9    purpose.
10        There can also be a situation where a
11   prescriber prescribes opioids or other controlled
12   substances in excess of a necessary amount,
13   whatever that is, gets it to a patient, who then
14   sells it to another individual for a profit, which
15   is more of a malicious purpose.  It could be the
16   same exact conduct by the prescriber, two
17   different results.  One has a public health --
18   negative public health impact; one has less of a
19   public health impact because it's going to a
20   family member.  That's why I don't agree with
21   broad statements like this.
22   BY MR. MELAMED:
23     Q   Understood.  The public health impact,
24   and I understand you've set out two scenarios, one

Page 183

1    of which may have a lesser public health impact
2    than the other, correct?
3      A   Yes, in my view.
4      Q   In your view.
5          The relative harm associated with those
6    two public health impacts is independent of the
7    purposeful or nonpurposeful motive of the
8    prescriber; isn't that true?
9      A   No.
10     Q   No.
11     A   You may have a situation where there's a
12   prescriber who -- in my situation, the prescribers
13   prescribe the same amount, an excessive amount,
14   let's say 90 days of an opioid, okay, when maybe
15   only 30 days was warranted, hypothetically.
16         In one situation, there may be -- one --
17   the first scenario there may be a situation where
18   there's lack of coverage.  The family member needs
19   or desires the medication.  In the other
20   situation -- so that's, you know, perhaps an
21   intentional action by the prescriber for what may
22   be a beneficial purpose for that ultimate
23   recipient potentially.
24         In the other situation, there may be a

Page 184

1    prescriber who doesn't -- who is less interested
2    in what's going on, simply prescribes the excess
3    amounts of opioids, not caring what the patient is
4    going to do with it, and then the patient may then
5    sell it on the gray market or the black market for
6    malicious or, you know, purposes.
7      Q   Okay.  Can you turn to the page with the
8    Bates stamp ending 016.
9          Now, this -- this refers to distributor
10   responsibilities, the second slide on 2016.
11         Was Actavis ever classified as a
12   distributor under the Controlled Substances Act?
13     A   Not to my knowledge.  We were just a
14   manufacturer.
15     Q   Okay.  Did you understand that as a
16   manufacturer, Actavis was required to maintain
17   effective controls against diversion of particular
18   controlled substances into other than legitimate
19   medical channels?
20     A   I believe I was aware at the time.
21     Q   And you -- were you aware at the time
22   included in the set of particular controlled
23   substances for which Actavis was required to
24   maintain effective controls was its opioid

Page 185

1   products?
2       A   I'm sorry.  You're going to have to
3   repeat that question.
4       Q   Sure.
5           Were you aware at -- were you aware that
6   included in the set of what -- what is referred to
7   in this slide as "particular controlled
8   substances," included in the set of particular
9   controlled substances for which Actavis was
10  required to maintain effective controls were its
11  opioid products?
12      A   Can I -- I'm sorry, but I think you're
13  referring me to Bates No. 2016 --
14      Q   Mm-hmm.
15      A   -- and this is the slide that refers to
16  distributor responsibilities --
17      Q   Correct.
18      A   -- not manufacturer registrant
19  responsibilities.
20      Q   Correct.
21      A   So that's why I'm hesitating because I
22  don't see anything with respect to manufacturer
23  registrant responsibilities.
24      Q   Do you recall whether Actavis had the

Page 186

1   responsibilities, in the second bullet point of
2   the bottom slide on 2016, which is maintenance of
3   effective controls?
4       A   I don't recall what the specific
5   requirements were because you'd have to show me
6   the statute.
7       Q   Okay.  If you turn to the page with the
8   Bates stamp 2020.  We're going to look at the
9   bottom slide on that page.
10          And you see it sets forth two
11  requirements associated with 21 CFR 1301.74?
12      A   I see that.
13      Q   So that regulation required Actavis to
14  design and operate a system to identify suspicious
15  orders, correct?
16      A   That's what it says.  That's what the
17  slide says.
18      Q   And is it your understanding that
19  Actavis was required to design such a system and
20  maintain such a system?
21      A   Yes.
22      Q   It also -- 21 CFR 1301.74 also required
23  Actavis to report suspicious orders at the time
24  they were discovered, correct?

Page 187

1       A   Yes.
2       Q   And not at a later date.  Correct?
3       A   If I recall correctly, the -- I don't
4   know if this is an actual quote from the
5   regulation.  I -- I remember having some sort of
6   understanding that there was a certain limited
7   time frame under which you had to report
8   suspicious orders once you identified them.  I
9   don't know if it was a specific time frame.  So...
10      Q   Do you recall whether that time frame
11  was in the -- on the order of a day or a week or a
12  month?
13      A   It may have been something along the
14  order of a day, but like I said, I don't recall
15  specifically.  Because this -- like I said, I
16  don't know if this is a quote from the statute --
17  I'm sorry, from the regulation.  But the way it's
18  highlighted here, "when discovered" makes it seem
19  like it's immediate, and I don't believe the
20  regulation says that you have to report this
21  immediately.  You have some sort of time frame,
22  within a reasonable time or a day or something to
23  that effect.  That's what I recall.
24      Q   Now, I want you to go ahead to the Bates

Page 188

1   number ending 2182.  It's going to be past this
2   deck.
3       A   2182?
4       Q   2182, and it's the beginning of an
5   article.  It's titled "Opioid treatment
6   guidelines" -- "Clinical guidelines for the use of
7   chronic opioid therapy in chronic noncancer pain."
8       A   Right.
9       Q   Do you see that?
10      A   I see this.
11      Q   Do you recall discussing this article
12  during your meeting with the DEA on September 12,
13  2012?
14      A   I don't recall discussing this.
15      Q   Do you recall reviewing this article at
16  any time before today?
17      A   I do not.
18      Q   Okay.  If you can turn to the Bates
19  stamp ending 2237, so skipping ahead quite a bit
20  again.
21          Okay.  And that says "Actavis Top 50
22  Pharmacy Sales 2010 to 2012."  Do you see that?
23      A   I see that.
24      Q   And then what follows are several

Page 189

1   spreadsheets that appear to reflect that -- that
2   information. If you go -- you know, flip
3   forward -- and I'm not asking you for the exact
4   document at this point, but you see the next page
5   says "Top 50 Pharmacies Sales of Oxycodone 15
6   Milligrams," there's an NDC number, and it says
7   for 2010.
8       A   Right.
9       Q   Do you understand this to indicate the
10  top 50 pharmacies for sales of Actavis oxycodone
11  15 milligrams in 2010?
12      A   I mean, that's what the document says.
13      Q   Okay.  Does that -- do you -- do you
14  have any reason to doubt that interpretation of
15  what it says?
16      A   I wouldn't know.  And I'm not being
17  difficult, but --
18      Q   No.
19      A   -- just because a list is put together
20  doesn't mean I have to accept what it says.  But
21  that's what the document says.
22      Q   That's what it appears to reflect.
23      A   Right.
24      Q   Okay.  And a number of my questions --

Page 190

1   remaining questions about this document are along
2   those lines.
3       A   Okay.
4       Q   We can do a couple and we'll see -- you
5   know, we'll see if you recall differently as to
6   some of the other slides.
7       A   Okay.
8       Q   If you turn to 2240, it lists the Top 50
9   Pharmacies Sale of Oxycodone 30 Milligram," again
10  there's an NDC number and then 2010.
11          Is it your understanding that this
12  reflects Actavis -- top 50 pharmacists for sales
13  of Actavis oxycodone 30 milligrams in 2010?
14      A   I mean that's what the document says.
15  That's what the page says.
16      Q   Okay.
17      A   I mean I have no way of verifying --
18      Q   Okay.
19      A   -- currently or if this was what the DEA
20  gave us at the time.
21      Q   And you don't recall whether this is --
22  specifically whether this is what the DEA gave you
23  at the time?
24      A   I don't recall specifically, no.  I

Page 191

1   remember they gave us a list or lists, and this
2   could be that, but I don't recall specifically.
3       Q   Okay.  Let's skip ahead to 2257.
4       A   Yes.
5       Q   Okay.  And this -- this document
6   explains the source or the first paragraph seems
7   to explain the source for the slides that follow.
8   Do you see that?
9           "The following charts and graphs have
10  been compiled from ARCOS reports your firm has
11  previously submitted to DEA."
12      A   Yes, I see that.
13      Q   Did Actavis have access to ARCOS
14  reports?
15      A   I believe a certain function within
16  Actavis had -- had access to ARCOS reports.
17      Q   Do you know which function within
18  Actavis had that access?
19      A   I do not.
20      Q   Do you know whether the ARCOS reports to
21  which Actavis had access included competitors'
22  sales of certain drugs?
23      A   I don't know.  That's something I never
24  knew.

Page 192

1       Q   If you turn to the next page, it's 2258.
2   And there's a -- the rest -- the majority of the
3   rest of this presentation is charts that look
4   something like this.  They describe -- they appear
5   to describe different information.
6           The title says "UPS Supply Chain Top
7   Customer Sales in Dosage Units of Oxycodone 15
8   Milligrams," NDC numbers, and for the year -- for
9   the years 2010 and 2011.
10          Do you see that?
11      A   I see that.
12      Q   Do you know why you were being presented
13  information about the UPS supply chain top
14  customer sales?
15      A   As we sit here today, I can't recall
16  why.
17      Q   Did Actavis have a relationship with UPS
18  concerning the sale of its drugs into the supply
19  chain?
20      A   Yes, we did.  I know we utilized UPS for
21  shipment of therapeutic products.
22      Q   Do you remember anything further about
23  that relationship between UPS and Actavis?
24      A   There was a contract.  We had a

Page 193

1    relationship.  We used them to ship therapeutic
2    products.
3         Q    And among the therapeutic products that
4    UPS shipped were opioids such as oxycodone?
5         A    I would have to assume that, but I don't
6    know that specifically.
7         Q    All right.  And let's just turn to 2263.
8    And actually 2262, which you can look at in
9    conjunction, appears to be a header that goes with
10   2263.  2262 says "2010 to 2012 Oxycodone 15
11   Milligrams by State."
12        Do you see that?
13        A    I see that.
14        Q    Okay.  And then the next page says
15   "Actavis Elizabeth LLC," and you see a number,
16   "Oxycodone 15 Milligrams Sales in Dosage Units by
17   State from January 1, 2010, to December 31, 2010."
18        MR. LUXTON:  2263?
19        MR. MELAMED:  Yes, there you go.
20   BY MR. MELAMED:
21        Q    Do you recall reviewing documents like
22   this with the DEA?
23        A    I don't recall the specific document,
24   but -- actually, I don't recall this document.

Page 194

1         Q    Okay.
2         A    It's not to say they didn't present it.
3    I simply don't recall this.
4         Q    Fair enough.
5         This document appears to -- do you agree
6    that this document appears to reflect what the
7    title states it reflects, which is "Actavis
8    Oxycodone 15 Milligram Sales in Dosage Unit by
9    State" for a one-year period for the calendar year
10   2010?
11        A    I really don't know.  These are bars on
12   a chart.  I have no way of knowing whether this
13   is, in fact, sales of oxycodone at a particular
14   time in particular states.  I have no way of
15   knowing that.
16        Q    Do you have any independent reason as
17   you sit here today to doubt that the information
18   contained in the chart reflects the information
19   described in the title?
20        A    I have no idea whether it does or it
21   doesn't.
22        Q    You have no specific reason as you sit
23   here today -- I understand you don't know that it
24   does reflect the information in the title, but you

Page 195

1    have no specific reason as you sit here today to
2    state that it does not reflect the information --
3         MS. LEVY:  Objection.  He's --
4    BY MR. MELAMED:
5         Q    -- described in the title; is that
6    correct?
7         MS. LEVY:  -- asked and answered that
8    question.
9         THE WITNESS:  I really don't know.  I
10   mean I'm not trying to be difficult, but at this
11   point in time I have no idea whether this reflects
12   what -- these bars and these values reflect what
13   the title indicates.  I really don't know.
14   BY MR. MELAMED:
15        Q    Do you know if Actavis ever sold opioids
16   directly to any pharmacy?
17        A    I'm not aware of whether it did or it
18   didn't.
19        Q    So is it -- is it correct to say that
20   the majority, if not all, of Actavis's opioid
21   sales were to distributors?
22        MR. LUXTON:  Objection.
23        THE WITNESS:  I -- at this point, I
24   really don't recall.  I know that we had

Page 196

1    distributor relationships, but beyond knowing that
2    we had distributor relationships and who they
3    might have been, I really don't know the relative
4    value of what was sold to distributors versus what
5    was sold through some other means.  At this point
6    in time, I really don't recall.
7    BY MR. MELAMED:
8         Q    So you don't recall either way whether
9    Actavis sold to pharmacies that dispensed opioids?
10        MR. LUXTON:  Same objection.
11        THE WITNESS:  I don't.  I don't recall.
12   BY MR. MELAMED:
13        Q    All right.  Do you recall any internal
14   meetings following the September 12th, 2012
15   meeting with the DEA concerning the contents of
16   that meeting?
17        A    I know we did have meetings following
18   that September meeting with the DEA.
19        Q    Do you recall what was discussed at
20   those meetings?
21        A    I mean, not specifically.  I mean, I
22   know we -- we had follow-ups.  In fact, we had a
23   follow-up meeting right after that meeting.  I
24   think we went to a diner or a restaurant or a

Page 197

1    hotel room or something and talked about it while
2    we were in D.C.  And then we had a follow-up
3    debriefing meeting with the team back in -- excuse
4    me -- back in New Jersey.
5           And then we would have had follow-up
6    strategy meetings with -- probably with the SOM
7    team, with other leaders, maybe Doug Boothe, maybe
8    John LaRocca and others, to think about what the
9    approach would be next.
10       Q    You stated you remember a follow-up
11   meeting right after the meeting, and you said you
12   weren't sure whether -- where it occurred.
13       A    Yeah.
14       Q    Who was in that meeting with you?
15       A    I don't recall specifically.  It was
16   probably John Duff and -- I mean, I think four or
17   five of us went down.  I think all of us may have
18   convened afterwards.  Maybe one person may have
19   left because it was D.C., people had to get planes
20   or something.  So whoever could stay, we probably
21   had a debriefing right after.
22       Q    Do you remember what you discussed
23   during your -- during the debriefing?
24       A    Not specifically.

Page 198

1         Q    And then you said you had a follow-up
2    meeting back in New Jersey on your return?
3         A    Once we got back, I'm sure we had
4    follow-up meetings.
5         Q    Okay.  Without --
6         A    I can't tell you when and I can't tell
7    you who, but it -- we would have had follow-up
8    meetings to talk about what just happened and what
9    we should do.
10        Q    Do you recall -- I know you can't say
11   when or with whom, but do you recall what was
12   discussed at those meetings?
13        A    I don't recall specifically.  But like I
14   said, there would have been follow-up meetings to
15   debrief whoever wasn't there about what happened,
16   and to think about and strategize what next steps
17   would be.
18            (Clarke Exhibit No. 12 was marked
19             for identification.)
20   BY MR. MELAMED:
21        Q    I'm going to hand you what's been marked
22   as Exhibit 12.
23        A    Are you done with this?
24        Q    You can put that aside unless you want

Page 199

1    to read it later.
2         A    No.  This could hurt somebody, so...
3         Q    Exhibit 12 is an e-mail string, the most
4    recent in time being from John Kaldes to Jason
5    Chung and Michael Clarke on September 20th, 2012.
6    It's two pages starting at ALLERGAN_MDL_03382548.
7            And I want to start with the first
8    e-mail in time, which starts at the bottom of the
9    first page on September 19th.  Do you see that?
10        A    Yes, I see that.
11        Q    Okay.  And Jason Chung states that he
12   received a call from New Jersey diversion
13   investigator Michael Smilek.
14            Do you see that?
15        A    Yes, I see that.
16        Q    Who is Jason Chung?
17        A    Jason Chung was an employee -- I mean,
18   he's listed on the e-mail as DEA manager, and I
19   know he had an office or a workspace in the
20   Elizabeth plant.  So he had some sort of DEA
21   responsibility within the manufacturing operation
22   of Actavis in Elizabeth.
23        Q    And so in his e-mail, the second
24   sentence which starts all the way at the end of

Page 200

1    the first page and continues onto the second,
2    referring to Michael Smilek says:  "He is
3    requesting a meeting with Actavis to review our
4    action items as a result of the meeting."
5            Do you see that?
6         A    I saw that.
7         Q    Do you recall anything about the action
8    items being referenced?
9         A    I know that there were action items
10   coming out of the DEA meeting, but I don't
11   remember what they were.  I know one of them had
12   to do with quota, which was different than the
13   quota discussion that we had with the field
14   office, but I can't recall what that was.  But
15   there were others as well.
16        Q    I'm not clear what you mean by different
17   from the quota discussion you had with the field
18   office.
19        A    So I mentioned in one of the e-mail
20   exhibits that you presented to me earlier today
21   referred to a so-called voluntary 30 to 40 percent
22   reduction in manufacturing quota.
23        Q    Yes.
24        A    That came out of the meeting with -- I

1    think one of them may have been Mike Smilek, and
2    another field DEA representative from the Newark
3    office in New Jersey.  That was -- that I believe
4    came out of the October meeting in 2012.
5              At the September meeting at DEA
6    headquarters in Arlington, most of the discussion
7    had to do with this Orwellian deck titled
8    "Effective control against diversion of controlled
9    substance" meeting, and SOM efforts and risk
10   mitigation efforts and anti-diversion efforts, but
11   there was a piece that dealt with quota.  That was
12   an action item, but there were others as well.
13       Q   Did you just refer to the title of
14   the -- the previous -- the slide deck in the
15   previous exhibit, which was "Effective Controls
16   Against Diversion of Controlled Substances" as
17   Orwellian, or did I mishear that?
18       A   You heard that.
19       Q   But why --
20       A   I was being glib.
21       Q   Okay.  What --
22       A   I apologize.
23       Q   No, no, that's -- I just want to
24   understand what you meant by that.

1        A   I was being glib.  I meant nothing by
2    it.
3        Q   Because Orwellian usually -- in this
4    context, I understand it means something that is
5    titled almost the opposite of what it seeks to
6    have.  For instance, in 1984 the "Ministry of
7    Peace" was about war.  Understood?
8        A   Oh, I understand that.  I was thinking
9    about it more in the context of the political
10   times that we're living in now.  That was my
11   thinking.  But I meant nothing by it.  So, you
12   know, I was being glib, and I apologize.
13       Q   You're permitted to be glib.  I just
14   wanted to understand the -- the meaning behind, it
15   if there was any.
16             And then the remainder of the e-mail
17   string in Exhibit 12 concerns attempts at
18   scheduling a follow-up meeting with Mr. Smilek,
19   correct?
20       A   Yes, I believe that's what the purpose
21   was.
22       Q   Okay.  And just returning to the action
23   items, those were action items -- let me state
24   that as a question.

1              Do you recall whether the action items
2    being referenced in Mr. Chung's e-mail were action
3    items proposed by the DEA?
4        A   I'm struggling to recall.  Because I
5    don't recall if we had asked them for anything.  I
6    know that we wanted, like I've been saying most of
7    the day, guidance from them, interaction with
8    them, interface from them about whether there were
9    any other things we could do to even further
10   strengthen our suspicious order monitoring program
11   or our anti-diversion efforts, other than the
12   regulation that hadn't been updated or provided
13   guidance on.
14             So that may have been an ask or there
15   may have been specific asks.  I just don't recall.
16       Q   You don't recall either way whether the
17   action items were -- the proposal for action items
18   came from the DEA or came from Actavis?
19       A   I do not.  I do not.  I know that --
20   like I said, there was something having to do with
21   quota that came out of that meeting, and that was
22   just a very small piece of the meeting, but other
23   than that, I don't recall what action items were
24   identified.

1              (Clarke Exhibit No. 13 was marked
2              for identification.)
3    BY MR. MELAMED:
4        Q   You can put that aside.
5              I'm going to hand you what's been marked
6    Exhibit 13, which is a refreshingly short,
7    one-page e-mail exchange.  It's an e-mail from
8    Michael Clarke to Mary Hutchinson, and several
9    others cc'd, on September 20th at Bates stamp
10   ALLERGAN_MDL_01729059.
11             Do you recognize this e-mail?
12       A   This is from me.  I don't recall it
13   specifically, but that -- that is me.
14       Q   And you believe --
15       A   That's my style of writing.
16       Q   So you believe you sent this during your
17   employment at Actavis?
18       A   Yes.
19       Q   And the e-mail concerns the need to
20   schedule an hour-long, in-person meeting in
21   Morristown for Monday afternoon on suspicious
22   order monitoring responsibilities, correct?
23       A   Yes.  Yes.
24       Q   Do you recall this meeting?

Page 205

1      A   Not specifically.
2      Q   Do you recall whether there were any
3   materials prepared for the purpose of the Monday
4   afternoon meeting that you were writing to
5   schedule?
6      A   I don't remember.
7      Q   Do you recall what the purpose of the
8   meeting was?
9      A   Well, I indicate that it's supposed to
10  be about suspicious order monitoring
11  responsibilities.  This is after the DEA meeting
12  in September, so it had to have been some sort of
13  follow-up from that or strategy about that
14  concerning who was there.  But other than that, I
15  can't tell you specifically what was presented,
16  what was discussed.
17     Q   You don't remember whether or not you
18  presented during the meeting?
19     A   I don't remember if I did.  I know that
20  it wouldn't have been just me.
21     Q   Do you recall whether there were any
22  deliverables as a result of the meeting?
23     A   I don't remember the specific content of
24  the meeting, so I don't recall what the -- if

Page 206

1   there were deliverables, what they would have
2   been.
3      Q   Okay.  And can we go over the -- or not
4   can we -- I would like to go over the roles and
5   responsibilities of each of the individuals
6   listed.
7      A   I wish I could help you with that.
8      Q   Nancy Baran we've talked about before.
9      A   Right.
10     Q   Rachelle Galant.
11     A   Rachelle Galant.
12     Q   Thank you.  Rachelle Galant.  What is
13  her -- what was her responsibility?
14     A   I remember her, I can picture her, but I
15  can't recall what her function was.
16     Q   Okay.  You don't recall why she was
17  invited to this meeting?
18     A   I mean, she had a key role in this based
19  on her title, but I don't want to guess and tell
20  you what department she was in, you know.  But I
21  remember her very vividly, but I just can't recall
22  what her function was.
23     Q   What about Doug Plassche?
24     A   Doug Plassche was engineering.  I

Page 207

1   believe he was head of or second in command of the
2   Elizabeth plant, the Elizabeth manufacturing
3   plant.  So obviously it manufactured a number of
4   different products, including controlled
5   substances.
6      Q   And Jason Chung, we just spoke about.
7      A   Yes.
8      Q   Who -- what was Omar Plaza's role and
9   responsibility?
10     A   Omar Plaza had -- I don't recall if it
11  was his title, but he had SOM responsibilities --
12  he also worked at the Elizabeth plant, and he had
13  SOM responsibilities, which I think may have been
14  limited to contacting the DEA when there was an
15  issue of concern at the plant.  And we wanted to
16  make sure that the left hand and the right hand
17  were speaking together.
18     Q   When you're talking about the left hand
19  and the right hand, on one hand you're talking
20  about manufacturing and the responsibilities for
21  manufacturers, and on the other, you're speaking
22  about responsibilities of selling controlled
23  substances into the stream of commerce?
24     A   More or less, and that probably was

Page 208

1   a less-than-apt metaphor.  So, yes, he worked in
2   the manufacturing plant at Elizabeth.  As part of
3   its controls at that plant put in place by the
4   plant leadership, DEA would be informed of certain
5   things that it needed to be informed of, whether
6   it's opioid issues or something else.
7          And since the SOM project was being
8   overseen at headquarters, we wanted to make sure
9   that anything we were doing was working consistent
10  with the process that we put in place for
11  anti-diversion, which was being run out of
12  headquarters in Morristown, and that it was
13  coordinated with the Elizabeth plant and any place
14  else where opioids may have been present,
15  manufactured, distributed, warehoused, et cetera.
16     Q   John Duff was in legal, correct?
17     A   Yes.
18     Q   John LaRocca as well?
19     A   Yes, John LaRocca was head of legal for
20  the Americas.
21     Q   And John Duff reported to John LaRocca?
22     A   Yes.
23     Q   And that was a separate -- we've
24  established this before, I just want to be

Page 209

1  clear -- that was a separate group from the group
2  you were in, which was the compliance group?
3      A   Yeah.  I don't think -- compliance was
4  separate from legal at that point.  Yeah, so they
5  were partners but separate departments.
6      Q   Who was -- what was the role and
7  responsibility of John Kaldes?
8      A   John Kaldes was an engineer.  I believe
9  he reported to the fellow near the bottom, Chris
10 Young, who was our head of engineering or chief
11 engineering or chief operations officer or
12 something like that.  So John Kaldes had -- I kept
13 referring to operational, like pure true
14 operational responsibilities.  I can't recall what
15 his title was, but it was some sort of engineering
16 operations role.
17     Q   And when you're talking about
18 engineering, are you talking about the physical
19 engineering of the medication -- of the
20 prescription medications?
21     A   Yes.  Yes.
22     Q   Okay.  And Michael Perfet- -- Mike
23 Perfetto?
24     A   Mike Perfetto was, I guess, head of

Page 210

1  commercial, which would be marketing for the
2  generic.
3      Q   And why were Perfetto and Young optional
4  invitees?
5      A   Possibly because of the senior status of
6  their roles.  Nobody here, except for John
7  LaRocca, was on the, I'll call it, the executive
8  leadership team.  So, Nancy Baran reported into
9  Mike Perfetto, so she was more hands on.  John
10 Kaldes reported into Chris Young.  So it would be
11 good if they were informed of what we were doing,
12 but they both had deputies that would be involved
13 in this meeting, whatever the purpose of it was.
14     Q   You can put that aside.
15         MS. LEVY:  When you reach a convenient
16 stopping point, can we take a restroom break?  It
17 doesn't have to be right this second, but whenever
18 you're --
19         MR. MELAMED:  Sure.  Let me do one more
20 document --
21         MS. LEVY:  Sure.
22         MR. MELAMED:  -- and then we can do
23 that.
24         (Clarke Exhibit No. 14 was marked

Page 211

1          for identification.)
2  BY MR. MELAMED:
3      Q   I'm handing you what's been marked
4  Exhibit 14.
5          Exhibit 14 is an e-mail and attachment.
6  The top of the e-mail is from Michael Clarke,
7  Tuesday, September 25th, 2012, at Bates stamp
8  ALLERGAN_MDL_3 -- 03525593.
9          And then there's an attachment which
10 is -- starts at 5595 and ends at 5596, that's a
11 letter from the United States Department of
12 Justice, Drug Enforcement Administration, dated
13 December 27th, 2007.
14         Do you recall asking Nancy Baran for a
15 copy of the attached DOJ letter?
16     A   I remember asking for a copy of the
17 letter.  I don't recall specifically asking Nancy
18 for it, but that must have been who I asked.
19     Q   Do you recall why you asked for a copy
20 of the December 27th, 2007 letter in September
21 2012?
22     A   I don't know that I asked for it in
23 September two -- 2012.  I knew that this letter
24 existed.  I remember having discussions about it,

Page 212

1  and I recall just -- well, I recall looking for,
2  you know, interpretative guidance on the SOM
3  regulation, which -- and hearing that there was
4  none other than this letter -- or other than a
5  letter.  So I simply asked who can get me the
6  letter so I can see what sort of communication
7  there was in terms of guidance or anything else
8  from the DEA.
9      Q   Do you recall whether you had seen this
10 letter before you received it in September 2012?
11     A   I don't know.  I know that I got it.  If
12 this -- I don't know if this was the first time I
13 received it or if I had gotten it before.
14     Q   Do you recall reviewing it in 2012 -- in
15 September 2012?
16     A   I reviewed it.  It could have been
17 earlier.  Whenever I got it, I would have reviewed
18 it, and like I said, I don't know if this is the
19 first time I received it was in September.  It may
20 have been earlier.
21     Q   And this letter does constitute -- or
22 let me phrase that as a question.
23         Does this letter constitute guidance
24 from the DEA about suspicious order monitoring?

## Page 213

1    A   Not guidance in the sense of FDA

2  guidance or other regulatory guidance, but it does

3  inform -- like it says, "Registration" -- I'm

4  sorry, "To reiterate the responsibilities as

5  controlled substance manufacturers and

6  distributors." It doesn't really interpret the

7  reg. It lists what the reg says.

8       And when you think about guidance, like

9  an FDA guidance which can be 12 or 20 pages long,

10  it's usually, you know, much more detailed about

11  what you can and can't do, gives some examples,

12  and things like that.

13    Q   Do you see that there's a, what appears

14  to be, a highlight or a partial rectangular drawn

15  around the bottom paragraph on 5595?

16    A   This geographic figure on the left-hand

17  side --

18    Q   Yeah.

19    A   -- on the bottom paragraph?

20    Q   It looks like somebody was drawing a --

21  drawing some sort of attention to that paragraph.

22  I'm not positive that that was the intent.

23    A   I mean, I see the -- I see the marking.

24    Q   Okay. Do you know who drew that?

## Page 214

1    A   I don't know who drew that.

2    Q   Do you recall whether it was you?

3    A   Oh, it wouldn't have been me. I

4  highlight; I don't make geographic figures like

5  that.

6    Q   Do you have any understanding why this

7  letter was sent by Joseph Rannazzisi to -- it says

8  "Dear Registrant," so to a registrant, presumably

9  Actavis, in December -- on December 27th, 2007?

10    A   I can't answer that. All I could do is

11  speculate, and I don't want to do that because

12  it's -- this was five years before I joined the

13  company. The company was a DEA registrant. There

14  could be conclusions drawn from that, but I -- I

15  can't state that.

16    Q   Did you have any discussions with

17  anybody when you were employed at Actavis about

18  the circumstances -- their understanding of the

19  circumstances that led to this letter?

20    A   I don't remember having conversations

21  like that.

22    Q   Do you see the third paragraph in the

23  letter states, first sentence: "The regulation

24  also requires that the registrant inform the local

## Page 215

1  DEA division office of suspicious orders when

2  discovered by the registrant." And "when

3  discovered" is underlined.

4    A   I see that.

5    Q   When you arrived at Actavis, did the

6  company have a process for reporting suspicious

7  orders to the DEA when discovered?

8    A   I believe we did.

9    Q   And what was that process?

10    A   That if an order of interest was flagged

11  and it was determined to be suspicious, we would

12  report that suspicious order to the DEA.

13    Q   Do you know whether you did report any

14  suspicious orders to the DEA prior to the

15  September 2012 meeting with the DEA?

16    A   I don't recall whether we did or not.

17    Q   Do you know the frequency -- well, you

18  don't know whether -- I'm sorry. If -- given that

19  you don't know whether you reported any, you're

20  not going to know the frequency of any reports

21  that happened. Is that --

22    A   I wouldn't know the frequency of

23  whatever reports we made, no.

24    Q   Okay. Earlier you described the legacy

## Page 216

1  suspicious order monitoring process as having had

2  thresholds. Do you remember that?

3    A   I think you showed me a document that

4  talked about thresholds versus algorithms.

5    Q   Yes. And that document, I believe, and

6  we can look back, but it was reflecting your notes

7  taken at the time. Do you recall that?

8    A   Was this one of those outlines that I

9  prepared?

10    Q   Yes, I believe it was the first of the

11  two exhibit -- this isn't a quiz. I'm just --

12    A   No, no, no.

13    Q   We can drag it back out.

14    A   I just -- I remember the language. I

15  was just trying to remember if it was an e-mail or

16  one of my outlines, but...

17    Q   When you were talking -- when you wrote

18  "thresholds" in that context, do you -- can you

19  explain to me what you meant by "thresholds"?

20    MS. LEVY: Objection. Are you referring

21  to a particular document?

22    MR. MELAMED: Yeah, it's Exhibit 4. You

23  can look at it. I'm not trying to --

24    THE WITNESS: Do I still have it?

Page 217

1    MS. LEVY:  Yes.
2    THE WITNESS:  Yeah, I don't think I
3  have 4 anymore.
4  BY MR. MELAMED:
5    Q  I'm sorry, it was Exhibit 5.  My
6  mistake.  It is one of the notes.  It's the second
7  of those two.  It's in the middle of the page on
8  Exhibit 5.  There is a sub-bullet point that says:
9  "System has moved from a threshold-based system to
10  an algorithm."
11    Do you see that?
12    A  I see that, yes.
13    Q  Do you have any understanding of what
14  was meant when you wrote "threshold-based system"?
15  Can you describe what you mean by a "threshold-
16  based system"?
17    A  I mean, I don't recall specifically.  I
18  mean, the best I can tell you is that it had to do
19  with numeric thresholds compared to algorithmic
20  formulas.
21    Q  Just for the record, I wrote Exhibit 5
22  on the one that I'm going to put on the ELMO.
23  There's no other change to it.
24    By numeric thresholds, you mean

Page 218

1  something like if -- there would be a number of
2  sales that were set, and then beyond that, that
3  would be -- beyond that number, one would have to
4  review to determine whether the orders were
5  suspicious?
6    A  I mean it might be a limit or it might
7  be a range.  It could be one or the other, or it
8  could be something else, but there was some sort
9  of numeric threshold or limit or range, and then
10  once you're -- if you're within that -- below that
11  limit or within that range, it's acceptable, but
12  if you're outside of that, then certain actions
13  would have to be taken.  Likely if it was outside
14  of a threshold or a pattern or numeric volume of
15  orders, we would flag it as something of interest,
16  and then if -- upon due diligence, whatever
17  investigation we had to do, if it then rose to the
18  level of being suspicious, we would report it to
19  the DEA.
20    So that's a very simplified version of
21  what the process was, but it -- you know,
22  thresholds had to do with either number -- numeric
23  limits, upper or lower or ranges.
24    Q  Returning to Exhibit 14, the 2007 DEA

Page 219

1  letter.
2    A  Yes.
3    Q  The same paragraph we were -- where we
4  were -- I was just -- I was reading previously.
5    There's a sentence in the middle that
6  states:  "Registrants must conduct an independent
7  analysis of suspicious orders prior to completing
8  a sale to determine whether the controlled
9  substances are likely to be diverted from
10  legitimate channels."
11    When you arrived at Actavis, was the
12  company acting in compliance with that sentence?
13    A  Yes, as far as I recall, it was.
14    Q  How -- what was the process for
15  conducting an independent analysis of suspicious
16  orders?
17    A  Well, I think I just described it a few
18  minutes ago in a very high level fashion.  That we
19  would look at these orders.  Like I said, I
20  believe it was a threshold-based system, and if
21  you were within the thresholds where there was a
22  limit, upper or lower limit, or where there was a
23  range, if you were outside of the acceptable
24  threshold, whether it was an upper or lower limit

Page 220

1  or a range, that would flag the order as something
2  of interest.  You would do the investigation,
3  whether it's data analysis, communicating with a
4  distributor or some other -- someone else in the
5  distribution chain, and determine the rationale
6  for the order being outside of the acceptable
7  threshold, and then if the rationale given was
8  acceptable, we would move forward.  If it was not,
9  we would support it -- raise it to the level of
10  being suspicious, and report it to the DEA.
11    Q  Who was responsible for conducting that
12  review, the review of -- of suspicious orders
13  prior to completing sales?
14    A  Prior to --
15    Q  Completing a sale of a potentially
16  suspicious order.
17    A  There was an operations team within the
18  marketing function that was doing that when I got
19  there, and I know at some point that changed.  I
20  know that there was the e-mail to Doug Boothe
21  about adding FTEs, maybe moving it out of
22  commercial, things like that, which started to
23  happen before the close of the Watson sale, and
24  then once the Watson sale closed, things moved in

## Page 221

1  a different direction in terms of where that
2  operation was housed, who was responsible, things
3  like that.
4      Q   Do you recall who the individuals
5  were -- within the marketing function, who were
6  the people primarily responsible for reviewing
7  orders flagged as suspicious orders before
8  releasing them for sale?
9      A   I mean, all I can remember is that Nancy
10  Baran and Rachelle Galant had some level of
11  responsibility.  There were others, but I don't
12  recall who other than those two.
13      Q   When you started at Actavis, did the
14  then-existing suspicious order monitoring
15  protocols include numeric thresholds concerning
16  orders of an unusual size?
17      A   Yes.
18      Q   Did the then-existing protocols include
19  numeric thresholds concerning orders deviating
20  substantially from a normal pattern?
21      A   Yes.
22      Q   And did the then-existing protocols
23  include numeric thresholds concerning orders of an
24  unusual frequency?

## Page 222

1      A   Yes.
2      Q   Did they concern anything else?
3      A   Those were the three key elements of the
4  regulation, which is articulated or at least
5  described in this letter.  So the SOM program
6  before I got there covered those three key
7  elements, and we wanted to make sure that it met
8  those key three elements in however we enhanced it
9  during the time that I was there.
10      Q   You see that in the second sentence of
11  the fourth paragraph on 5595, the letter says:
12  "These criteria are disjunctive and are not
13  all-inclusive"?
14      A   I see that sentence, yes.
15      Q   Do you know whether the protocols
16  existing when you arrived at Actavis included any
17  other factors aside from those three to capture
18  what the 2007 letter refers to as -- for the
19  reason that the 2007 letter refers to those three
20  categories as not all-inclusive?
21      A   I'm sure there were, but as we sit here
22  today, I can't tell you what other factors may
23  have been considered and what other processes were
24  in place to make sure we mitigated risk of

## Page 223

1  suspicious orders.
2      Q   Who would know what other things, other
3  than those three --
4      A   Who would know?
5      Q   Yes.
6      A   I mean, the team that was operationally
7  responsible for it.  So whoever was being managed
8  by either Rachelle or Nancy would have a better
9  sense of that than I would.
10          I think we requested a break a few
11  minutes ago.
12      Q   Yeah, let me just finish this document,
13  and then I'll be happy to let you go.
14      A   Oh, okay.
15          MR. MELAMED:  We can go off the record.
16          THE VIDEOGRAPHER:  2:36, we're off the
17  video record.
18          (Recess.)
19          THE VIDEOGRAPHER:  2:55 p.m., we're on
20  the video record.
21          (Clarke Exhibit No. 15 was marked
22          for identification.)
23  BY MR. MELAMED:
24      Q   I'm handing you what's been marked

## Page 224

1  Exhibit 15.
2      A   Mm-hmm.
3      Q   Exhibit 15 is an e-mail from Michael
4  Clarke to a list of recipients dated September 25,
5  2012.  Subject:  "SOM meeting."  It starts at
6  Bates number ALLERGAN_MDL_01641955 and concludes
7  on 1956.
8          Do you recognize this document?
9      A   I mean it's vaguely familiar to me.  I
10  mean this is my e-mail.  This is the style of my
11  writing, and I -- my signature or signature box
12  appears on the bottom.  So...
13      Q   This is something you sent as part of
14  the SOM working group.  Does that appear to be
15  correct?
16      A   Yeah, it looks like it.  This looks like
17  the working group.  With the addition of John
18  LaRocca, who I would have informed of things, but
19  I don't think John LaRocca was an active member of
20  the group.  I think John Duff was the legal
21  representative on the internal working group.
22      Q   Everybody else was a member of the
23  working group?
24      A   I believe so, yes.

Page 225

1      Q    And then the e-mail summarizes -- I'm
2   sorry, it's your notes memorializing a meeting --
3   an SOM meeting from the day before, correct?
4      A    That's what this looks like, yes.
5      Q    So number 1 states: "Status of SOM
6   direct and indirect process."  And the sub (a)
7   under number 1 says: "The internal team received
8   training last week and has been monitoring direct
9   customer orders.  The expectation is that the
10  process will go live," in quotes, "between
11  October 15 and 20."
12         Do you see that?
13     A    I see that.
14     Q    Is that the transition to a new SOM
15  direct monitoring process?
16     A    I'm not sure.
17     Q    So you don't know what process was set
18  to go live between October 15 and 20?
19     A    Yeah, at this point I don't recall what
20  it was that was going live.
21     Q    Okay.  And are you able -- do you recall
22  the SOM direct process that was going -- was set
23  to go live between October 15 and 20?
24     A    At this point, no.

Page 226

1      Q    If you wanted to find out what that
2   process involved, who would you ask?
3      A    If I wanted to find out today?
4      Q    Correct.  Thank you for clarifying.
5      A    I think almost anyone else on the e-mail
6   chain would know.
7      Q    Now, 1 sub (b) says: "The indirect
8   process will include phone calls and visits to
9   distributor customers," and then it goes on.
10         Is that a new indirect SOM process?
11     A    Was this new at the time?
12     Q    Yes.  So this is written September 25th,
13  and it states that "the indirect process will
14  include," which suggests to me that going forward
15  it will include phone calls and visits.  I just
16  want to confirm my understanding or have you
17  correct it if it's -- if it's wrong.
18     A    No, I believe that was the case.
19     Q    And if I wanted you -- could you walk me
20  through the indirect process other than phone
21  calls and visits to distributor customers?
22     A    Oh, I couldn't walk you through that.
23     Q    Okay.  And if -- if you were to ask
24  somebody today to walk you through it, who would

Page 227

1   you ask?
2      A    Almost any of the recipients of the
3   e-mail chain.
4      Q    Any -- are there any recipients who you
5   would not ask?
6      A    Who I would not ask?
7      Q    Yes.
8      A    I probably wouldn't ask John LaRocca,
9   because he wasn't as close to it.  John Duff was
10  closer from legal, and the others, Rachelle, Mike,
11  Doug, Jason, John Kaldes.
12     Q    In the second sentence of 1(b), you're
13  talking about discussions with distributor
14  customers, and it says: "The discussions will
15  include an overview of our indirect SOM process
16  and the need for some level of secondary sales or
17  distribution information from our customers about
18  where Actavis product is going, and may touch on
19  termination of orders that cannot be justified as
20  legitimate."
21         Do you see that?
22     A    Right.
23     Q    Had you had discussions about those
24  topics prior to enacting this new indirect

Page 228

1   process?
2      A    Had I had discussions?
3      Q    Had Actavis had any such discussions
4   that you know of?
5      A    With customers?
6      Q    With distributor customers about the
7   need for some level of secondary sales or
8   distribution information about where the Actavis
9   product is going prior to the institution of what
10  appears to be a new indirect SOM process.
11         MS. LEVY:  Object to form.
12         THE WITNESS:  I believe we did, but I
13  can't tell you today specifically that -- that we
14  did and who specifically we may have had
15  discussions with.
16  BY MR. MELAMED:
17     Q    Okay.  Did Actavis have any access to
18  information concerning where the Actavis product
19  was going when it left distributors absent such
20  discussions?
21     A    I'm sorry.  You'll have to repeat that,
22  please.
23     Q    Sure.
24         So you're talking about -- if I am

Page 229

1  understanding this correctly, you're talking about
2  the need to have discussions with the
3  distributor -- Actavis distributor customers about
4  where Actavis product is going once it leaves
5  those distributor customers.
6      A   Right.
7      Q   Is that correct?
8      A   I believe so, yes.
9      Q   Okay.  Absent those conversations, did
10  Actavis have access to any information about where
11  its product was going after it left the
12  distributor customers?
13      A   I believe we had data which indicated
14  that.
15      Q   And what was the source of that data?
16      A   It may have been ARCOS data or something
17  else.  There was -- there are databases which
18  indicate that, but I don't recall specifically.
19      Q   Do you know if Actavis had access to
20  that type of data prior to your arrival at the
21  company?
22      A   I believe so.
23      Q   Do you know when that access commenced
24  approximately?

Page 230

1      A   I couldn't know that.
2      Q   Now, if you look at (b), sub (i), it
3  says:  "There will be -- there will need to be an
4  advance review of our distributor contracts to
5  determine whether any revision will be necessary
6  to get secondary customer information and to
7  terminate suspicious orders."
8      A   I see that.
9      Q   Did you review distributor contracts to
10  that end -- to those ends?
11      A   I believe someone did.  When I say
12  "someone," I'm not being, you know, evasive, but
13  it would likely have been legal, but I can't sit
14  here today and tell you who actually did.
15      Q   Do you recall whether prior to that --
16  the review discussed here on September 25th, 2012,
17  Actavis had the contractual ability to terminate
18  suspicious orders?
19      A   I --
20      THE VIDEOGRAPHER:  We're getting phone
21  interference.  Sorry.
22      THE WITNESS:  Oh, sorry.
23      I don't know.  I really don't remember.
24  BY MR. MELAMED:

Page 231

1      Q   Do you know who would know that today?
2      A   Anyone else on the e-mail channel might
3  know -- on the e-mail chain.
4      Q   Right.  I understood.  The transcript
5  may not have.
6          You're not certain that they'd know, but
7  they would be the people you would be most likely
8  to ask?
9      A   Yes.  Anyone on -- all of the e-mail
10  recipients I believe preceded me as an employee of
11  Actavis, so they would know more than I did about
12  what information, what contracts language there
13  existed, and what efforts we made before January
14  of 2012.
15      Q   Okay.  If you look at item number 3, you
16  write:  "Summary of phone call with Michael Smilek
17  of the DEA Newark office."
18          Do you recall the call that you were
19  referring to?
20      A   I think I mentioned earlier that we had
21  had calls with the Newark office.  So whatever
22  I've listed here is a summary of the call.  I
23  can't tell you I specifically remember what we
24  engaged in on the phone call.

Page 232

1      THE VIDEOGRAPHER:  Can we go off for a
2  second?
3      MR. MELAMED:  Off the record.
4      THE VIDEOGRAPHER:  3:05 we're off the
5  video record.
6      (Brief pause.)
7      THE VIDEOGRAPHER:  3:08, we're on the
8  video record.
9  BY MR. MELAMED:
10      Q   I wanted to -- we're still on
11  Exhibit 15.  I want to return to the item number 3
12  in your e-mail.
13      A   Right.
14      Q   If you look at sub (b), you talk about
15  Michael Smilek, again of the DEA Newark office,
16  wanting to proceed with an October meeting, and
17  then you discuss what it will cover, and sub (i)
18  is an overview of the revised Actavis SOM process.
19          Do you see that?
20      A   Yes.
21      Q   Were any of the revisions made in
22  response to discussions that you had with the DEA
23  at the September meeting?
24      A   I really don't remember.

Page 233

1     Q   Do you remember whether the DEA
2  requested that you make any revisions during the
3  September 2012 meeting?
4     A   I'm almost sure they did not.
5     Q   Do you recall how Mr. Smilek became
6  aware that there was a revised Actavis SOM
7  process?
8     A   We were in touch with the DEA, less so
9  the D.C. office, more so the Newark office -- the
10 Newark field office.  So we communicated with them
11 on a more or less regular basis about what we were
12 doing or trying to do with respect to
13 anti-diversion efforts.
14     So if we were on one of those
15 communications, we would have indicated that we're
16 perhaps making some adjustments, continuing our
17 enhancements, changing our policy, things like
18 that.  We would have mentioned that in the
19 discussions we had with Mike Smilek and the others
20 at the Newark field office.
21     Q   How frequently did those conversations
22 with people at the Newark field office occur?
23     A   I mean, I wasn't involved in all of
24 them, so I can't tell you how frequently they

Page 234

1  occurred.  I would only be involved with certain
2  ones related to SOM or anti-diversion.  They would
3  have other discussions about things I had nothing
4  to do with those efforts, so I can't tell how
5  many -- how often those calls occurred.
6     Q   Do you recall how -- approximately how
7  frequently you had calls with anyone from the
8  DEA's Newark office about suspicious order
9  monitoring?
10     A   I mean, I recall maybe two or three
11 phone calls.  I mean, there's this one, maybe two
12 or three others that I can generally recall.  I
13 can't tell you what the content was, but I
14 generally recall being on the phone with Mike
15 Smilek and some others -- one or two others at DEA
16 and one or two others from Actavis.
17     Q   And when you say two or three other
18 phone calls, and I'm not holding you to the exact
19 number --
20     A   Mm-hmm.
21     Q   -- you're talking during the pendency of
22 your employment at Actavis?
23     A   Yes.  Yes.
24     Q   Was this call being discussed

Page 235

1  specifically in response -- to follow-up from the
2  September 2012 DEA meeting in D.C.?
3     A   Was this call about a follow-up to the
4  September meeting?
5     Q   Was this call a follow-up?  Was the call
6  that you were discussing with Michael Smilek
7  specifically a follow-up to the DEA September 12,
8  2012 meeting?
9     A   Somewhat, yes.
10     Q   What do you mean by "somewhat"?
11     A   I mean it followed the DEA meeting.
12 There were -- I mean, the Newark office was aware
13 of it, of what had happened.  I don't recall if
14 anybody from the Newark office was there or not, I
15 don't remember, but they were aware of our D.C.
16 meeting and they wanted to follow up.  Well,
17 either they or we or both wanted to follow up.
18     Q   In 3 sub (c) -- well, let me withdraw
19 that.  I'm sorry.
20     In 3 sub (d), you mention that Smilek
21 told you he wants Actavis to be, quote, ahead of
22 the curve, unquote, an industry model on diversion
23 prevention.
24     And then you continue and you say:

Page 236

1  "Part of what the DEA is seeking is for us to take
2  the lead by reducing our quota while keeping
3  legitimate sales."
4     Is this the quota reduction you spoke
5  about first during our -- during your deposition
6  today, which was the request that you reduce by
7  approximately 30 to 40 percent that --
8     A   That's -- sorry.  That's correct.
9     Q   And that was the quota -- that was the
10 request that Actavis rejected, correct?
11     A   Yeah, I think we had an in-person
12 meeting, and they had requested that we reduce
13 voluntarily -- supposedly voluntarily reduce our
14 quota by 30 or 40 percent.  They didn't give us
15 any additional guidance on specific things that we
16 could do in connection with our SOM efforts.  We
17 did get feedback from Mike about, you know -- I
18 have quotes in here about being ahead of the
19 curve, and he liked what we were doing.  He said
20 that on the phone and he said that when we met in
21 person.  He thought we were doing -- because we
22 had provided him with information.  He thought we
23 were, you know, some sort of industry leader, or
24 words to that effect.

Page 237

1    So it was good things to hear, but we
2  also would want to know what else can we do.  What
3  else are you, DEA, thinking about in terms of what
4  else you see in the industry that we can further
5  enhance?  It's nice that you're giving us these
6  things, we think that we're doing well, we think
7  we're going beyond the requirements, but give us
8  some informal guidance as to things that you're
9  seeing that we can even consider or do better.
10    And that would have made it more
11  palatable to consider negotiating quota
12  adjustments, but it ended up going just the one
13  way.
14    Q    And did you understand his reference to
15  you being the industry leader to mean that your
16  peers, who also manufacture and sell opioids, were
17  not -- did not have SOM processes in place that
18  were as good as those in place at Actavis?
19    A    I understood that, you know, referring
20  to us as an industry leader meant that our program
21  was more robust than at least others that he was
22  aware of.  He didn't mention companies.  He didn't
23  mention specific programs, but he said that we
24  were doing more so than most others were -- more

Page 238

1  than most others were doing.
2    Q    And did his comments that he saw you --
3  your belief that he saw you as an industry leader
4  reflect your conveying to him the substantial work
5  that had gone into revising your SOM processes in
6  2012 since you had arrived at the company?
7    A    I mean we provided him with a
8  presentation.  We provided him -- I think I list
9  here that we were giving him SOPs, or something to
10  that effect.  So we gave him a description of our
11  program or provided him with something that was a
12  demonstration of our program on more than one
13  occasion.  So he understood what we were doing
14  from the materials that we presented, discussions
15  that we had, so he had plenty of information to
16  understand what we were trying to do to make our
17  program even more robust than it was when I got
18  there.
19    Q    And so his comment -- I just want to
20  understand the timing of when he's referring to.
21  His comment reflected the information you had
22  given him about the improvements that were being
23  made since your arrival --
24    A    Oh, yeah.

Page 239

1    Q    -- during the calendar year 2012.
2    A    That's correct.  That's correct, yes.
3    Q    All right.  You can put that aside.
4    A    Mm-hmm.
5    (Clarke Exhibit No. 16 was marked
6    for identification.)
7  BY MR. MELAMED:
8    Q    I'm handing you what's been marked
9  Exhibit 16.
10    Exhibit 16 is an e-mail string, the
11  most recent in time being from Michael Clarke to
12  Nancy Baran on September 26, 2012.  "Re: Jupiter
13  Florida Distribution Center."  It starts at Bates
14  number Acquired_Actavis_00761668 and concludes on
15  671.
16    A    (Peruses document.)
17    Q    Do you recall this e-mail exchange?
18    MS. LEVY:  Give him just a minute to
19  read it.
20    THE WITNESS:  Yeah, I just want to
21  finish reading it.
22  BY MR. MELAMED:
23    Q    Sure.
24    A    (Peruses document.)  I mean, I see it,

Page 240

1  but I don't remember it.
2    Q    Do you see the second to the last
3  e-mail, so the -- on the first page, there's an
4  e-mail from Nancy Baran to you.
5    A    Yes.
6    Q    And the first line says -- from Nancy to
7  you says: "I am getting pressure to ship, but do
8  not feel that Walgreens has supplied us a
9  sufficient amount of documentation."
10    A    I see that.
11    Q    She's referring to pressure to ship the
12  order described earlier in the e-mail string,
13  correct?
14    A    I believe so, but I don't know that with
15  certainty.  There's -- you know, the earlier
16  e-mail string is going through commercial folks,
17  it makes its way to her, and then she sends
18  something to me.
19    Q    Okay.  And the earlier e-mail string
20  references a request for the shipment of oxycodone
21  and oxymorphone and methylphen and oxycodone HCL.
22    Does that -- am I reading that
23  correctly?
24    A    I mean the September 24th e-mail, which

Page 241

1    I think is the -- if not the first, maybe the
2    second, and it's to Michael Dorsey from someone at
3    Walgreens, "Following up on the communication
4    relating to our products," and it lists the
5    expected volume for Florida and Georgia, which is
6    to be serviced by Cardinal through its Knoxville,
7    Greensboro and Jackson DCs.  I guess that's
8    distribution centers.  And then it lists some
9    products.
10       Q.   Okay.  Now, is it your understanding
11   that, going back to Nancy Baran's e-mail to you on
12   the first page, when she says that she does not
13   feel that Walgreens has supplied us a sufficient
14   amount of documentation, is she -- do you
15   understand that to mean that the information
16   Walgreens provided in that e-mail to Michael
17   Dorsey is not a sufficient amount of documentation
18   to ship the order that Walgreens has -- has
19   requested?
20            MS. LEVY:  Object to form.
21            THE WITNESS:  Well, in her e-mail to
22   David and Bill, and I guess this is Bill Groth of
23   Walgreens and David Reiter of Walgreens, which
24   starts on the second page, she lays out what it is

Page 242

1    that she needs.  So, you know, there's a
2    discussion about shifting C-II products from one
3    place to another place, and she mentions
4    exceptions for stores located in Puerto Rico
5    serviced by the Jupiter, Florida facility, and she
6    wants to know how these quantities were -- the
7    usage and the quantities outlined in the early
8    e-mail were calculated, historic averages, for
9    what time period, whether it includes any
10   anticipated decrease in light of the DEA action,
11   because I know Walgreens had been subject to some
12   sort of DEA enforcement action sometime in 2012,
13   and Walgreens obviously is a pharmacy chain in the
14   distribution chain.  And then she wants to know
15   how to confirm shifting volumes to
16   AmerisourceBergen.
17            So as a result of this DEA enforcement
18   action, there was some shifting of product from
19   a -- I believe a Walgreens facility that was shut
20   down.  So she is asking certain questions, and
21   apparently, at least at the time she wrote to me,
22   she hadn't gotten responses to the questions that
23   I summarized from her e-mail.
24   BY MR. MELAMED:

Page 243

1        Q.   Now, when she says she is -- "I am
2    getting pressure to ship," do you -- do you have
3    any understanding where that pressure came from?
4        A.   I do not.
5        Q.   Do you know if this order shipped?
6        A.   As we sit here today, I do not.
7        Q.   Okay.  You can put that aside.
8            (Clarke Exhibit No. 17 was marked
9             for identification.)
10   BY MR. MELAMED:
11       Q.   I'm handing you what's been marked as
12   Exhibit 17.
13            Exhibit 17 is an e-mail string, the most
14   recent in time being from Nancy Baran to Noemi
15   Rebeco, Michael Clarke, John Duff and Doug
16   Plassche, cc'ing others, on October 3rd, 2012.
17   "Re:  SOM."  Bates stamp starts at
18   ALLERGAN_MDL_03380592 and concludes on 0593.
19       A.   (Peruses document.)  I see this.
20       Q.   Okay.  Do you recognize this e-mail
21   exchange?
22       A.   Yeah, I vaguely remember this.
23       Q.   So it starts with an e-mail from Nancy
24   Baran on October 3rd saying:  "The plan of the SOM

Page 244

1    team was to discontinue 7.17.5 suspicious order
2    report after we have gone live with our enhanced
3    SOM model."
4        Q.   Do you know what the 7.17.5 suspicious
5    order report was?
6        A.   There was some sort of, I believe it
7    was, an Excel spreadsheet type document that was
8    created in the Elizabeth plant, and without
9    recalling all of the specific details, it had
10   something to do with amounts of controlled
11   substances that were manufactured or shipped out
12   or -- and depending on some threshold that I did
13   not understand, if it exceeded certain thresholds,
14   they would provide -- "they" meaning the Elizabeth
15   plant, Noemi and I believe Omar Plaza would
16   provide information to the DEA.
17            So they called it a suspicious order
18   report, but it wasn't really consistent with the
19   suspicious order regulations.  It had to do with
20   either manufacturing levels or shipment levels,
21   but it didn't have to do with orders that deviated
22   from historic patterns or, you know, the three
23   criteria listed in the SOM regulations.
24            So we found out that they were sending

Page 245

1   this, and in this -- it wasn't a problem, but when
2   you call it a suspicious order report, when we had
3   a suspicious order monitoring process run at
4   headquarters that was tied to the regulation and
5   the statute, we were concerned about confusion in
6   terms of the nomenclature that -- information we
7   were providing to DEA.  So that's why we said you
8   want to stop this report, and Noemi said, Let's
9   call it something else.
10      Q   Now, is it your understanding that prior
11  to what Nancy Baran referred to as "our enhanced
12  SOM model," this is in the final e-mail --
13      A   Yes.
14      Q   -- or, I'm sorry, the first in time
15  e-mail --
16      A   Yeah.
17      Q   -- that the 7.17.5 suspicious order
18  report was an element of Actavis's suspicious
19  order monitoring process?
20      A   It was not.
21      Q   It had nothing to do with --
22      A   No, it had nothing to do --
23      Q   -- suspicious ordering process?
24      A   Sorry.  This 7.17.5 suspicious order

Page 246

1   report had nothing to do with our SOM process.  It
2   was something that was dated, that was generated
3   by the Elizabeth plant.  And like I said, I don't
4   recall what they were tracking, but it was
5   something about order levels or manufacturing
6   levels that they would send to the DEA.  And they
7   called it suspicious order report, but it wasn't a
8   suspicious order monitoring report pursuant to the
9   regulation.
10      Q   Do you know if anybody at Actavis prior
11  to your time at the company used this report as
12  part of the company's suspicious order monitoring
13  processes?
14      A   I don't know.
15      Q   Who do you think would know that?  Who
16  would be the best person to ask today about that?
17      A   Today, the best person to ask would be
18  everyone on Nancy Baran's e-mail except for me.
19  So that would be John, Noemi, Doug Plassche, not
20  Doug Boothe, Rachelle Galant, and Umesh Solanki.
21      Q   That is very inconvenient for me.
22      MS. LEVY:  It's good that you're
23  deposing many of those people.
24      MR. MELAMED:  We are deposing several of

Page 247

1   them.  It would be nice to have some of the
2   answers before.
3   BY MR. MELAMED:
4       Q   So in -- going now forward in time to
5   Nancy Baran's e-mail on the first page --
6       A   Mm-hmm.
7       Q   -- the last one that was sent, she says:
8   "Given the criteria and logic this report is built
9   on, I'm very surprised that it is so valuable from
10  an inventory planning perspective."
11          Do you understand -- do you have any
12  understanding of what the criteria and logic the
13  7.17.5 suspicious order report was built on?
14      A   I do not.
15      Q   You can put that aside.
16          (Clarke Exhibit No. 18 was marked
17          for identification.)
18  BY MR. MELAMED:
19      Q   I'm handing you what's been marked
20  Exhibit 18.  And take your time to read it and
21  finish chewing.
22      A   They go together.
23      Q   I promise we won't designate that as
24  part of my instruction.

Page 248

1       A   (Peruses document.)
2       Q   So Exhibit 18 is an e-mail and
3   attachments.  The e-mail is from Michael Clarke to
4   Lynn Baxter on October 8th, 2012.  It's
5   ALLERGAN_MDL_03382770, and it attaches what appear
6   to be two separate one-page documents at 2701 and
7   2702.  One -- 2701 is a cover letter to somebody
8   at Discount Drug Mart, and 2702 is a compliance
9   acknowledgment form filled out by Discount Drug
10  Mart.
11      A   Yes, I see that.
12      Q   Do you recognize this document and the
13  attachments?
14      A   Yes, I do.
15      Q   Is this -- this is the compliance
16  acknowledgment form that became part of the
17  indirect SOM processes instituted during 2012?
18      A   Yes.  Or at least this is one copy of
19  them.  We sent out a number of them --
20      Q   Right.
21      A   -- and received a number of them back.
22      Q   This is an example.
23      A   Exactly.
24      Q   Do you recall whether there were any

Page 249

1  compliance acknowledgment forms required from
2  Actavis's distributor customers prior to September
3  or October 2012?
4      A   I don't know.  I don't recall whether
5  there were or not.  I know that we had put this in
6  place and created the -- well, the letter is a
7  cover letter explaining what it is that we're
8  doing, and the acknowledgment form is a form that
9  we asked the customers' customers to sign and
10  return.  So I don't know if there was anything
11  similar in place prior to this time frame.
12      Q   I just want to clarify something you
13  just said.  I think you said that this is
14  something Actavis was requiring its customers'
15  customer -- customers' customers to sign.
16          My understanding is that Discount Drug
17  Mart itself was a customer of Actavis.  Is that
18  incorrect?
19      A   I don't recall.  It's -- I think you
20  made a reference to, and it's probably in one of
21  the e-mails, about the indirect process.
22      Q   Yes.
23      A   So I thought when I heard that, and I
24  was trying to recall, I thought indirect had to do

Page 250

1  with the second level in the distribution chain.
2      Q   To my understanding, and take your time
3  to review the document, and then I appreciate you
4  telling me whether I -- I'm misunderstanding or
5  understanding correctly, is that this compliance
6  acknowledgment form was something that Actavis's
7  direct customers were filling out to talk -- to
8  talk about their compliance with Controlled
9  Substances Act requirements vis-à-vis their
10  customers.  So that's the indirect part, but that
11  the compliance form itself is filled out by
12  Actavis's customers.
13      A   I think you're correct.
14      Q   Okay.  Do you recall whether Actavis's
15  indirect suspicious order monitoring processes
16  went beyond ensuring that its direct customers
17  executed this compliance acknowledgment form?
18      A   I believe that the indirect process
19  included data analysis.  But I can't tell you the
20  specifics of what that entailed.
21      Q   Do you recall whether that data analysis
22  you're referring to was data that Actavis itself
23  acquired as opposed to data it acquired from its
24  customers?

Page 251

1      A   I believe it was the former.
2      Q   So it was data analysis of data within
3  Actavis -- that Actavis itself could access
4  without going to its customers; is that correct?
5      A   I believe so.
6      Q   Okay.  Do you know if Actavis lost any
7  customers due to its new indirect suspicious order
8  monitoring processes?
9      A   I really don't recall whether we did.
10      Q   Do you recall whether Actavis lost any
11  orders pursuant to its new direct or indirect
12  suspicious order monitoring processes?
13      A   I don't recall specifically.  I'm almost
14  sure we did based on what the requirements are,
15  but I can't tell you specifically whether we did.
16      Q   And if you did, those are the types of
17  orders that would have been required to be
18  reported to the local DE -- DEA office
19  immediately, correct?
20      A   Only if they rose to the level of
21  suspicious based on the criteria in the law and in
22  the regs.
23      Q   Okay, you can put that aside.
24          (Clarke Exhibit No. 19 was marked

Page 252

1          for identification.)
2  BY MR. MELAMED:
3      Q   I'm going to hand you what's been marked
4  as Exhibit 19 and 20 at the same time in a minute.
5          Exhibit 19 is a PowerPoint with the
6  Actavis logo on it titled "Suspicious order
7  Monitoring Partnership Meeting,
8  AmerisourceBergen," in Chesterbrook, Pennsylvania,
9  October 22nd, 2012.  And it's Bates-stamped
10  ALLERGAN_MDL_03302607 through 2621.
11          And please review that while I'm marking
12  the other exhibit.
13      A   (Peruses document.)
14          (Clarke Exhibit No. 20 was marked
15          for identification.)
16  BY MR. MELAMED:
17      Q   Exhibit 20 appears to be, and I'll ask
18  you questions about this in a second, the same
19  presentation.  It is at Bates number
20  ALLERGAN_MDL_03302890 to 2904.
21          So I first want to draw your attention
22  to Exhibit 20 on the slide that's labeled slide
23  number 3, which is at 2892.
24          MS. McINTYRE:  I'm having trouble

Page 253

1 hearing over the shuffling.
2      MR. LUXTON: 2892 is what?
3      MR. MELAMED: 20.
4      Whoever made the comment on the call, we
5 heard you. We're not ignoring you.
6 BY MR. MELAMED:
7      Q  If you look at Exhibit 20, slide
8 number 3 -- first of all, backing up.
9      Does it appear that Exhibit 19 and
10 Exhibit 20 reflect the same PowerPoint
11 presentation?
12      A  The first three or four pages do. I
13 haven't read the whole thing yet.
14      Q  Okay. Fair enough.
15      Slide number 3 of Exhibit 20 --
16      A  Yes.
17      Q  -- appears to reflect somebody's notes
18 of the attendees from AmerisourceBergen at this
19 meeting. Correct?
20      A  Yes.
21      Q  And so there's a -- the only reason
22 Exhibit 20 is here is to try to determine if you
23 recall whether this reflects the attendants -- the
24 attendees from AmerisourceBergen at this meeting.

Page 254

1      So it indicates that Ed Hazewski
2 attended. Correct?
3      A  Yes.
4      Q  And that Steve Mays attended?
5      A  Yes.
6      Q  And that Elizabeth Campbell attended?
7      A  Yes.
8      Q  And that Chris Casalenuovo --
9      A  Casalenuovo. Casalenuovo.
10      Q  -- Casalenuovo attended.
11      A  Yes.
12      Q  And that Rita Nepley (phonetic) or
13 Knepley did not. Correct?
14      A  Yeah, I believe that's the case.
15      Q  And that Nisha Patel did?
16      A  Yes.
17      Q  Okay. Did you attend this meeting?
18      A  Yes, I did.
19      Q  Do you recall the meeting?
20      A  Yes, I do. That was the meeting I
21 referred to earlier at ABC where I mentioned the
22 tall guy and the short guy, and obviously other
23 people were there as well.
24      Q  So either Ed or Steve or Elizabeth or

Page 255

1 Chris or Nisha are the -- comprise the tall guy
2 and the short guy?
3      A  Steve is the short guy; Ed is the tall
4 guy.
5      Q  Thank you.
6      Does the list of attendees we just went
7 through from AmerisourceBergen reflect your
8 recollection of -- of the attendees from
9 AmerisourceBergen at the meeting?
10      A  Yes.
11      Q  Okay. You can put that exhibit, which
12 is Exhibit 20, aside.
13      It will be easier to look at Exhibit 19,
14 I think.
15      A  Yes. Okay. I actually like this
16 version better. It's easier to turn. But I'll do
17 what you say.
18      Q  This will be easier for others to see,
19 if not you. I'm sorry to --
20      A  No worries.
21      Q  -- make your life tough.
22      Do you recall giving a similar
23 presentation to other distributors?
24      A  I recall having a meeting with Cardinal.

Page 256

1 I believe we gave a similar presentation to
2 Cardinal.
3      I believe there was another meeting with
4 another distributor that I may have not have been
5 able to attend because of a conflict in my
6 schedule, but I can't recall who that was, whether
7 it was McKesson or somebody else.
8      Q  Do you recall approximately how many
9 distributor customers you had in the fall of 2012?
10      A  I do not recall.
11      Q  Is it accurate to say that there were
12 more than three?
13      A  Yes, I believe there were more than
14 three.
15      Q  Like multiples of three?
16      A  I'm not willing to go with multiples. I
17 know there --
18      Q  Do you think -- do you think there were
19 more than ten customers?
20      A  Ten customers?
21      MS. LEVY: Objection to form.
22 BY MR. MELAMED:
23      Q  Do you recall in the fall of 2012
24 whether Actavis had more than ten distributor

Page 257

1  customers?
2      A   I believe so.
3      Q   Could you turn to page 2 of Exhibit 19,
4  which is at Bates number ending 2608.  It reflects
5  the agenda for the meeting, correct?
6      A   This looks like it, yes.
7      Q   Okay.  And the -- do you -- did you
8  participate in preparing this document?
9      A   I had some role in preparing the
10  document.  Probably just reviewing all of -- you
11  know, reviewing, editing.
12      Q   And did you have any role in the
13  presentation of this material to
14  AmerisourceBergen?
15      A   Somewhat.  I can't recall what I said
16  versus what Nancy said versus what John said, but
17  we were all three there.
18      Q   Do you recall -- do you have any
19  understanding as you sit here today what was meant
20  by the "SOM initiative" that's referred to in the
21  first bullet point on slide 2?
22      A   That was our SOM program, and how it had
23  been enhanced and made more robust during the
24  course of 2012.

Page 258

1      Q   And then the second bullet point
2  references "Review of ARCOS Data Specific to Oxy
3  15 milligram and Oxy 30 milligram."
4          That's oxycodone, correct?
5      A   Yes.
6      Q   And is that data -- not the specific
7  data but that type of data -- the type of data
8  that was discussed during your meeting with the
9  DEA in September of 2012?
10      A   I believe so.
11      Q   Turn to slide 5.  This is -- the header
12  says "SOM Pitfalls."
13      A   Right.
14      Q   And the "System Challenges and
15  Responses" conclude that "'Threshold' based
16  systems are not sufficient.  'Cutting' orders to a
17  volume that puts the order under a threshold is
18  not acceptable."  And a comment by the DEA, that
19  doing so is like saying a little bit of diversion
20  is okay.
21          Do you see that?
22      A   Right, I see that.
23      Q   Okay.  Is that something that the DEA
24  told you during the September 2012 meeting?

Page 259

1      A   I don't remember that.
2      Q   Do you recall where that quote from the
3  DEA came from when -- when they said it?
4      A   I don't remember where that came from.
5      Q   Do you know whether AmerisourceBergen's
6  suspicious order monitoring processes sufficiently
7  addressed these items?
8      A   Which items?
9      Q   The thresh- -- the threshold-based
10  systems -- did -- did you know if
11  AmerisourceBergen at this point in time was using
12  a threshold-based suspicious order monitoring
13  system?
14      A   I really don't recall at this point.
15      Q   Do you know if Actavis and
16  AmerisourceBergen had engaged in transactions
17  where AmerisourceBergen had cut the order to a
18  volume that put it under a threshold so as to
19  permit Actavis to make the sale without it being
20  suspicious?
21          MS. McINTYRE:  Object to form.
22          MR. LUXTON:  Objection.
23          MS. McINTYRE:  Object to form.  Jill
24  McIntyre.

Page 260

1  BY MR. MELAMED:
2      Q   A couple of objections there.  You can
3  answer.
4      A   I don't know.
5      Q   Do you know anything -- do you recall
6  any -- sorry, that wasn't -- staying with the
7  question.
8      A   I was almost being glib, but I didn't do
9  it.
10      Q   No, you -- the smile was good.
11          Do you recall anything about
12  the suspicious order -- your understanding of the
13  suspicious order monitoring program in place at
14  AmerisourceBergen at this time?
15      A   At this point in time, I don't recall
16  what AmerisourceBergen had in place.  I know the
17  meeting was to discuss what Actavis did and what
18  ABC did, but I can't recall the details at this
19  point.
20      Q   Do you recall learning at any point --
21  at any later point about the systems that
22  AmerisourceBergen had in place?
23      A   I'm sure I learned about it at this
24  meeting.  I don't know if there was preview

1    materials, but the meeting was to talk about it,
2    so I know I learned it then.  And there was
3    probably -- I'm sure there was subsequent
4    communications, but I don't recall what those
5    were.
6        Q    And you don't recall what you learned
7    about AmerisourceBergen's suspicious order
8    monitoring processes during this meeting?
9        A    I don't recall, no.
10           MS. McINTYRE:  Object to form.
11   This is Jill McIntyre.
12   BY MR. MELAMED:
13       Q    If you'd turn to slide 11 from
14   Exhibit 19.
15       A    So we're done with 20, I can put that
16   away?
17       Q    Yes, you can put 20 away.
18           Slide 11 is a chart, and it says "Top 50
19   Pharmacies, Sales of Oxycodone 30 Milligrams,
20   January 1, 2012, to June 2012."  There's a caveat
21   that not all of June has been reported, and it
22   provides the NDC number.
23           Do you see that?
24       A    I see that.

1        Q    And if you turn to the -- just very
2    quickly turn to page 14.  I'm sorry to ask you to
3    flip back and forth.  But page 14 states the
4    previous charts were compiled with -- from ARCOS
5    reports submitted to the DEA.
6        A    I see that.
7        Q    Do you see that?
8        A    I see that.
9        Q    So is it your understanding that the
10   chart on page 11 is one of the charts being
11   addressed there by the comment that this
12   information comes from ARCOS data previously
13   submitted to the DEA?
14       A    That's what the document says.  I can't
15   independently verify that.
16       Q    Okay.  You have no reason to dispute --
17   to doubt that at this point as you sit here today?
18           MS. LEVY:  Objection to form.
19           MS. McINTYRE:  Objection to form.
20           THE WITNESS:  I mean, I have no way of
21   confirming or doubting it, but that's what the
22   document says, so...
23   BY MR. MELAMED:
24       Q    Okay.  Now, do you understand the

1    information that the chart reflects as a general
2    matter?
3        A    I have to read it.
4        Q    Sure.
5        A    (Peruses document.)  I mean, it looks
6    like -- well, I read page 11.  I haven't read the
7    other two, but --
8        Q    Just -- just page 11 right now.
9        A    Page 11 looks like levels of oxycodone
10   sales to a number of different pharmacies at a
11   particular point in time.
12       Q    Okay.
13       A    And who the wholesaler was that I guess
14   distributed -- distributed to these pharmacies at
15   this particular point in time.
16       Q    Okay.  I just want to go through one row
17   to -- to see whether you agree with my
18   interpretation, and if you don't, obviously please
19   tell me.
20           We'll leave the "Rank" column behind for
21   a second.
22       A    Mm-hmm.  Sure.
23       Q    And we'll read the row that's associated
24   with rank number 1, just so we're on the same row.

1        A    Okay.
2        Q    The "DEA number" is a specific DEA
3    identifier for the buyer; is that correct?  Is
4    that your understanding?
5        A    I know that there are DEA registration
6    numbers, so I don't know if this is that or not.
7        Q    Okay.  The "Buyer's Name" appears to
8    identify the individual pharmacy buyer that's
9    being discussed in that row.
10           Is that -- is that your understanding?
11       A    That's what it looks like.
12       Q    Okay.  And then the "Buyer City" lists
13   the city in which that buyer is located.  Does
14   that look correct?
15       A    That's what it looks like.
16       Q    And "State and ZIP Code" similarly
17   reflect the buyer's location, correct?
18       A    That's what it looks like.
19       Q    Okay.  "Total pills" appears to reflect
20   the total number of oxycodone 30 milligram pills
21   purchased by the individual buyer.  So here it's
22   628,100 purchased by Food City Pharmacy No. 674
23   between January 1st, 2012, and most or all or some
24   part of June 2012.

Page 265

```
 1          Does that -- do you understand total
 2   pills to reflect that information?
 3      A   That's what it looks like.
 4      Q   Okay.  And then the total -- do you know
 5   what "Total bottles" indicates?  So here for Food
 6   City Pharmacy No. 674, it lists 6,281 total
 7   bottles.
 8      A   I don't know with certainty.  I could
 9   guess, but I'm not going to.
10      Q   Well, can you give me your -- you know,
11   what do you suspect?  And obviously, you know,
12   what you suspect is just that.
13      A   I don't know --
14          MS. LEVY:  Object.
15          THE WITNESS:  Sorry.
16          MS. LEVY:  Object.  It's improper to
17   speculate, as you know.
18          MR. MELAMED:  That's not true.
19   BY MR. MELAMED:
20      Q   Will you speculate, please, as to what
21   you think that means?
22          MS. LEVY:  Same objection.
23          MR. LUXTON:  Objection.
24          THE WITNESS:  Yeah, I'm not comfortable
```

Page 266

```
 1   speculating.
 2   BY MR. MELAMED:
 3      Q   Do you have -- you -- you -- when you
 4   started this answer, you said you didn't know with
 5   certainty, which suggested that you had some
 6   belief, you knew something relating to what that
 7   information pertained to.
 8          Can you tell me what that -- what that
 9   belief is?
10      A   No, I said I could --
11          MS. LEVY:  Objection.  Calls for
12   speculation.
13          THE WITNESS:  Yeah, I said I could
14   guess.  I said I didn't know.
15   BY MR. MELAMED:
16      Q   Okay.
17      A   And I don't want to guess.
18      Q   Well, I'll just quote it back to you.
19   You said:  "I don't know with certainty."  And
20   then you said:  "I could guess, but I'm not going
21   to."
22          Do you -- you have no -- no idea, it
23   could -- you have no idea what 6,281 total bottles
24   reflects?
```

Page 267

```
 1          MS. LEVY:  Same objection.
 2          THE WITNESS:  I don't know with
 3   certainty what it is.
 4   BY MR. MELAMED:
 5      Q   Do you have any idea?
 6          MS. LEVY:  Same objection.
 7          MR. LUXTON:  Objection.
 8   BY MR. MELAMED:
 9      Q   And I'm not -- I'm not trying to put you
10   on the stand here and -- and criticize you for not
11   knowing.  I'm just trying to get and -- see if you
12   have any understanding.  I can follow up later to
13   see if that understanding is correct.
14          MS. LEVY:  He's not going to speculate,
15   and he's told you that.  So you can move on or you
16   can ask him again and again, and he can give you
17   the same answer.
18          MR. MELAMED:  You told me he wasn't
19   going to speculate.
20          MS. LEVY:  And so did he, multiple
21   times.
22          MR. MELAMED:  That's not proper for you
23   to tell me he's not going to speculate.
24          THE WITNESS:  I -- I -- I don't want to
```

Page 268

```
 1   speculate and I don't want to guess.  I just want
 2   to answer questions that I'm certain about the
 3   answers to.  That's my preference.
 4   BY MR. MELAMED:
 5      Q   Okay.  But you understand that in a
 6   deposition you sometimes have to answer questions
 7   that you're not certain about?
 8          MS. LEVY:  Objection.  No, you don't.
 9          MR. MELAMED:  That's -- show me the
10   federal rules.
11   BY MR. MELAMED:
12      Q   Do you -- do you understand that or
13   don't you, and then I'll --
14      A   I don't understand that, and I would
15   rather not guess an answer.  I would rather be
16   sure.
17      Q   For the "Wholesaler" column, for row
18   number 1, it lists "ABC Birmingham."  Do you
19   believe that to reflect that the sale of the
20   6,200 -- 628,100 total pills to Food City Pharmacy
21   674 during the time period reflected on this sheet
22   was made by AmerisourceBergen Birmingham?
23      A   That's what it looks like.
24      Q   Okay.  Do you know what the column
```

Page 269

1    "Actavis CB Jan 1 to June 30, 2012," which for
2    row 1 reflects "6,905" means?
3        A    I do not know what that means.
4        Q    Do you know what "Quantity of oxy 30
5    milligram 100 count - 867 data," which for row 1
6    reflects "5,177" means?
7        A    I do not.
8        Q    The next column says "Disproportionate
9    oxy activity," and it reflects "89 percent."
10       Do you know what that -- how that
11   percent is calculated or what that percent
12   references?
13       A    I do not know how that was calculated,
14   and I do not know what "disproportionate oxy
15   activity" means.
16       Q    Okay.  And then you see the "Comments"
17   column?
18       A    I see the "Comments" column.
19       Q    And in row 1, there are comments for
20   2010 and 2011.  Do you see that?
21       A    Yes, I see that.
22       Q    And the comment for 2010 says:  "Ranked
23   number 1 oxy 15 milligram and oxy 30 milligram for
24   2010."  Do you see that?

Page 270

1        A    Yeah, I see that.
2        Q    Is your understanding of that that the
3    pharmacy listed in row number 1 was the top
4    pharmacy for sales of oxycodone 15 milligram and
5    oxycodone 30 milligram by Actavis in 2010?
6        A    I mean, it looks like this is saying
7    that the highest number of sales were made to this
8    particular pharmacy in row 1.  That's what it
9    looks like to me.
10       Q    Okay.  And the "highest number of sales"
11   meaning the highest number of sales of Actavis
12   oxycodone in the specified strengths; is that
13   correct?
14       A    Yeah, highest number of sales of oxy 15
15   and oxy 30, it looks like, was made to this
16   pharmacy in the time frame mentioned in this
17   report.  That's what it looks like to me.
18       Q    And if we just briefly look at slides 12
19   and 13.  We can go to 12.
20       The chart on page 12 reflects similar
21   information.  Would you agree?  For -- it's a
22   different -- different drug.  It's oxy
23   15 milligram.  And it does not have a "Comments"
24   column.  And it has an additional column or two.

Page 271

1        But would you agree that the buyer's DEA
2    number has the same meaning as on the prior page?
3        A    I wouldn't know.  I mean, it says
4    that -- the column is titled the same.
5        Q    Okay.
6        A    I don't know if that refers to the DEA
7    registration number or not.
8        Q    Okay.
9        A    But both columns on both pages say
10   "Buyer's DEA number."
11       Q    And is the buyer's name -- do you
12   understand "Buyer's Name" to reference the same as
13   what you understood "Buyer's Name" to reference on
14   page 11?
15       A    I guess it's the name of the pharmacy.
16       Q    Okay.  And I assume that "Buyer City,"
17   you share my understanding that that's the city
18   where this pharmacy -- each pharmacy is located?
19       A    That's what it seems to indicate.
20       Q    And "State and ZIP Code" the same?
21       A    Right.
22       Q    And "Total Pills" reflects the total
23   number of pills sold during the designated time
24   period to that pharmacy from Actavis?

Page 272

1        A    That's what it seems to state.
2        Q    Okay.  And then the wholesalers, again,
3    seem to state the distributor who -- who provided
4    those pills directly to the pharmacy after
5    acquiring them from Actavis.
6        Is that your understanding?
7        A    That's what it seems to state.
8        Q    All right, you can put that aside.
9        (Clarke Exhibit No. 21 was marked
10       for identification.)
11   BY MR. MELAMED:
12       Q    I'm going to hand you what's been marked
13   as Exhibit 21.
14       Exhibit 21 is an e-mail from Nancy
15   Baran -- the most recent in time being from Nancy
16   Baran to Michael Clarke and Michael Perfetto dated
17   November 14th, 2012.  The subject is "Forward:
18   Suspicious Order Letters Update."  Bates number
19   ALLERGAN_MDL_01796473 and concludes at 474.
20       Do you recognize this e-mail exchange?
21       A    Yes.
22       Q    What -- do you remember independent --
23   independent of -- let me withdraw that.
24       Before looking at this now, do you

Page 273

1   recall the last time you saw this e-mail exchange?
2       A.  No.
3       Q.  Do you recall the circumstances for why
4   this was sent at the time?  Do you recall anything
5   about discussions that were happening at the time?
6       A.  No.
7       Q.  In Nancy Baran's e-mail at the top of
8   Exhibit 21, it indicates that 30 customers out of
9   the 48 that were selling controlled drugs is not a
10  great response rate.
11          Is your understanding that only 30
12  customers out of the 48 to whom Actavis was
13  selling controlled drugs had not responded -- had
14  not submitted the suspicious order -- no, let me
15  withdraw that and find the document I'm referring
16  to.
17          Is your understanding of that that 30
18  customers -- I'm sorry, that 18 customers out of
19  48 to whom Actavis was selling controlled
20  substances had not submitted compliance
21  acknowledgment forms like the one we had looked at
22  before from Discount Drug Mart?
23      A.  Not exactly.  I don't have any
24  independent knowledge.  But Lynn's e-mail says

Page 274

1   that 78 received it, 30 signed it and sent it
2   back, five had issues related to the attached
3   spreadsheet that we don't have here in front of
4   me, and 43 haven't sent it in.  So 48 have not
5   replied, 30 have replied.
6           So I think it may have been a mistake in
7   Nancy's numbers.  That's my guess.
8       Q.  Okay.
9       A.  Based on what Lynn said, and Lynn was
10  the recipient of these materials.
11      Q.  Thanks for --
12      A.  She was our contract administrator, so
13  any contracts went back to Lynn.
14      Q.  Thanks for the clarification.
15          And you see that two out -- Nancy's
16  e-mail continues that "Two out of our three top
17  wholesalers have not even responded."
18      A.  Yes.
19      Q.  Do you see that?
20      A.  I see that.
21      Q.  And that "our largest chains have not
22  responded."
23      A.  I see that.
24      Q.  And those -- just so the record is

Page 275

1   clear, the top wholesalers, the two out of the
2   three that have not responded are
3   AmerisourceBergen and McKesson, correct?
4       A.  That's what it says, yes.
5       Q.  And the largest chains were Walgreens
6   and Walmart, right?
7       A.  Those were the largest pharmacy chains
8   according to Nancy.
9       Q.  Do you know whether those entities ever
10  completed compliance acknowledgment forms and
11  returned them to Actavis?
12      A.  I don't recall.  I know that we got more
13  back, but as I sit here today, I can't tell you
14  who else responded and when.
15      Q.  Do you know whether Actavis halted sales
16  to any distributors who did not complete the
17  compliance acknowledgment form and --
18      A.  I don't know.
19      Q.  Do you know that -- whether all of
20  Actavis's customers completed and returned the
21  compliance acknowledgment form?
22      A.  As we sit here today, I don't remember.
23      Q.  And would subsequent updates to these
24  numbers, to the number of companies that had

Page 276

1   submitted compliance acknowledgment forms be
2   reflected in Lynn Baxter's -- would Lynn Baxter
3   have been the person tracking that?
4       A.  Yes.
5           (Clarke Exhibit No. 22 was marked
6           for identification.)
7   BY MR. MELAMED:
8       Q.  I'm handing you what's been marked
9   Exhibit 22.
10          Exhibit 22 is an e-mail and two
11  attachments.  The e-mail is from Nancy Baran dated
12  October 26, 2012, to Michael Clarke and John Duff.
13  Subject:  "Direct and indirect SOPs Actavis."  The
14  e-mail is at ALLERGAN_MDL_03382709.
15          The first attachment, which at the top
16  says "Business Procedure, Actavis Suspicious Order
17  Monitoring Direct Customer Sales SOP" is at
18  ALLERGAN_MDL_03382710.
19          And the second attachment just titled
20  "Business Procedure, Actavis Suspicious Order
21  Monitoring Indirect Customer Sales SOP" is at
22  ALLERGAN_MDL_03382715.
23          Do you recognize this e-mail and these
24  attachments?

Page 277

1      A   I don't recall them independently, but
2   the documents look somewhat familiar.
3      Q   Okay.  If you look at the title of
4   the -- if you look at the first page of the e-mail
5   and the attachment lines, the names of the two
6   attachments are -- the first one is "SOM, SOP and
7   business procedure direct final.doc" or .docx, and
8   the second is "SOM, SOP and business procedure
9   indirect final.docx."
10      Do you see that?
11      A   I see that.
12      Q   Were these the final updated standard
13   operating procedures for direct and indirect
14   suspicious order monitoring procedures that
15   were -- that you worked on and completed in 2012?
16      A   It looks like it, but -- it looks like
17   it.
18      Q   Would the -- if you turn to the first --
19   the first page of the first attachment, which is
20   at 710, and the box at the top --
21      A   Mm-hmm, yes.
22      Q   -- there are a lot of blank fields.
23   There's a blank field for "Number of Revision" and
24   for "Effective Date" and for "Reference to

Page 278

1   corporate procedure" and for "Prepared by," and
2   "Issued by," and "Reviewed or approved by," and
3   then "Invalidated by."
4      Would those boxes, other than
5   "Invalidated by," have been filled in in order --
6   required to have been filled in for these two to
7   have been active?
8      A   From what I recall, yes.  In order for
9   them to have been finally approved, these would
10   have been -- most of these would have had to have
11   been completed, and I know that SO-- I believe
12   that our SOPs required a wet signature.
13      Q   Do you recall who would have been the
14   person responsible for providing the wet signature
15   on these two SOPs?
16      A   I do not.
17      Q   Would it have been you?
18      A   It's possible, but I don't recall.
19      Q   Is it your belief that these do
20   accurately reflect the SOPs for direct and
21   indirect suspicious order monitoring?
22      A   I'll have to read them.  I haven't read
23   them.
24      Q   Go ahead.  Why don't you take a few

Page 279

1   minutes to read them.
2      A   (Peruses document.)  The first document
3   with Bates number ending 710 looks like a
4   description of our process for direct -- or SOM
5   direct customer process.
6      There are a couple of language choices
7   that I would not have selected, so that's why I'm
8   wondering whether it's the final version or not.
9   If I had reviewed this, I would have made those
10   changes, but as a general matter, this looks
11   similar to what our process was.
12      Q   What are the language choices you would
13   have chosen to alter?
14      A   It's small stuff.  Where is it?  I mean,
15   there's a reference to "3.3 pend," and that really
16   talks about orders of interest.  I would have
17   called it "order of interest" rather than "pend,"
18   but that could have been a business term.
19      There is -- on page, "26.1 New
20   Accounts," there is -- you know, there's a
21   description, it's a long paragraph.  On the fourth
22   line.  It has a parenthetical with an example and
23   it talks about sales potential, et cetera.
24   Whenever I have a formal document, I never put in

Page 280

1   "et cetera."  That's just a peeve of mine.  You
2   just list it and then you stop.
3      So things like that when people are
4   creating documents for me, I take those out.
5      Q   You should talk to the people I work
6   with about this.
7      A   My dad was an English teacher, so
8   certain things I just don't like.
9      Q   Okay.
10      A   Things like that.
11      Q   Other than -- and you don't know --
12   again, you don't know whether you were ultimately
13   the person who provided the wet signature that
14   declared -- that would have the effect of making
15   these active.
16      A   I don't know.
17      Q   Okay.  Other than those meritorious
18   stylistic changes, is there any reason for you to
19   think that these are not -- actually, let me
20   withdraw this.
21      Is there any reason for you to think at
22   all that these were not -- these did not reflect
23   the final enacted SOPs for direct suspicious order
24   monitoring?

Page 281

```
 1        MS. LEVY:  Object to the form.
 2        THE WITNESS:  I mean, I don't know if
 3   these are final.  This looks like they reflect our
 4   process.  That's the best I can tell you.
 5   BY MR. MELAMED:
 6        Q   Where were the final SOPs for suspicious
 7   order monitoring kept when you were at Actavis?
 8        A   I think policies and SOPs, we had -- I
 9   believe we had -- excuse me, I believe we had --
10   actually, I don't know.  We had -- there's a
11   repository.  I can't remember if it was web-based
12   or something else, but I can't tell you what the
13   name of it was or anything.
14        Q   Was it an electric -- electric --
15   electronic repository?
16        A   I believe it was, but I don't recall the
17   name of it.  People use SharePoint now, but we
18   weren't using SharePoint back then, so I don't
19   recall what it was.
20        Q   Okay.  Can you turn to the indirect
21   sales --
22        A   Yes.
23        Q   -- SOP, which starts at 2715.
24        A   Yes.
```

Page 282

```
 1        Q   And review that and tell me if that
 2   reflects what you believe to be ultimately the
 3   final enacted version of the indirect sales SOP.
 4        A   (Peruses document.)  I mean, my comment
 5   on this one would be similar to the first one.  It
 6   looks like it substantially describes our process.
 7   I'm not clear that this is a final version for the
 8   similar reasons that I had for the first one,
 9   maybe certain stylistic things.
10        And page 2 has a big blank.  So
11   formatting, I would not have stood for that.  But
12   it seems to generally describe our process.
13        Q   And these processes were the culmination
14   or the almost culmination, absent the wet
15   signature, of the work you had done with the
16   suspicious order monitoring working group during
17   2012; is that correct?
18        A   You're say--- asking me whether this
19   describes the work that the working group --
20        Q   Is this the culmination?  Is this the
21   final product or -- or one of the final products
22   of the suspicious order working group?
23        A   I wouldn't say that.  I mean, the
24   work -- this is a cliché, but the work continued.
```

Page 283

```
 1   So we would put process together, we would
 2   purchase systems or technology, we would look at
 3   how we were analyzing data, and we would create
 4   policy or SOP that would memorialize what we were
 5   doing.
 6        But to the extent that we needed to
 7   continue to enhance, if there was a change in the
 8   regulation or a change in the law or a case such
 9   as Walmart or Cardinal, or more recently McKesson
10   and Masters, that would have changed what we were
11   doing, then we would have continued to enhance
12   what we were doing.
13        Q   How would Masters have changed what you
14   were doing?
15        A   I'm not sure that it would have changed
16   much.  Masters was a distributor case as opposed
17   to a manufacturer case, but, you know, there's a
18   lot of language in there that is useful in terms
19   of how you look at these orders and what you're
20   supposed to do.
21        Q   So you would have -- were you to have
22   been at Actavis at the time Masters was issued,
23   you would have considered the content of Masters
24   and looked -- and reflected on your SOPs to
```

Page 284

```
 1   determine whether the SOPs covered what Masters
 2   was discussing?
 3        A   We may have.
 4        MR. LUXTON:  Form.
 5        THE WITNESS:  I'm sorry.
 6        MR. LUXTON:  It's okay.
 7        THE WITNESS:  We may have.
 8   BY MR. MELAMED:
 9        Q   Did Masters change anything about your
10   individual understanding of the requirements of
11   suspicious order monitoring programs?
12        A   Well, Masters came out after I left
13   Actavis, so it would have nothing to do with what
14   I did at Actavis.
15        Q   Looking at Masters -- you clearly read
16   Masters, correct?
17        A   I read Masters about a year ago.
18        Q   And did you discuss it with other
19   people?
20        A   I discussed it with lawyers at my
21   current company.  But let me caveat, I'm not
22   familiar with the details of it.  I know the case
23   came out.  I know -- I guess there was a McKesson
24   order or something like that, so I'm familiar with
```

Page 285

1    those in a very general sense --
2       Q   Do you recall --
3       A   -- but not in great detail.  So...
4       Q   I'll phrase the question a little
5    differently, and -- do you recall anything about
6    your understanding of Masters that changed your
7    understanding of the suspicious order requirements
8    of the Controlled Substances Act?
9       A   At this point I really don't remember.
10   Because I know the two cases or the two issues,
11   and I don't recall what was in Masters versus what
12   was in McKesson, and I know -- it felt like there
13   were some additional requirements that the court
14   was imposing, but I can't tell you what those
15   were.  At least the commentators and the articles
16   that I read that talked about the cases may have
17   talked about additional requirements or additional
18   obligations.
19      Q   And you're unsure whether those
20   additional -- the discussion of those additional
21   requirements derived from Masters or from McKesson
22   or from both?
23      A   Yeah, I really don't recall at this
24   point.

Page 286

1       Q   Okay.  What are the additional
2    requirements or obligations that you recall being
3    discussed that were a result of one or both of
4    those opinions?
5       A   Yeah, at this point I don't recall.
6    Like I say, it's been about a year or so since I
7    read those cases or those -- the case and the
8    order.
9       Q   You said you reviewed communications
10   about those cases and their effects on suspicious
11   order monitoring; is that right?
12      A   Yeah.
13      Q   What communications, from what groups
14   or what sources, do you recall?
15      A   Law firms publish articles when things
16   like this come out, and they either send them to
17   lawyers directly or they get published in some
18   sort of blog.  You know, an FDA type blog, a DEA
19   type blog, or the law firms may publish them
20   themselves and distribute them on their own blog.
21   So I'm sure I saw it in one of the blogs that I
22   get in my e-mail box, FDLI, AHLA, something like
23   that.
24      Q   If you turn to the -- to the page ending

Page 287

1    716, which is part of the indirect customer sales
2    SOP for suspicious order monitoring, and there's
3    the blank, large blank.
4          The sentence above that blank says:
5    "Actavis will commit to monitoring indirect
6    customers who purchase an average quantity of
7    50,000 units of a C-II controlled substance on a
8    year -- yearly basis."
9          Do you see that?
10      A   I see that.
11      Q   Was that -- is that an accurate
12   reflection of the SOP that was ultimately enacted?
13      A   I don't recall.  I would have to see the
14   SOP that was ultimately enacted or adopted to know
15   whether that's accurate.
16      Q   Do you know why the threshold of the
17   average quantity of 50,000 units was used here?
18      A   I do not.
19      Q   Do you know who would?
20      A   Nancy Baran might know.  Rachelle Galant
21   might know.
22      MS. LEVY:  Just a reminder, Matt, that
23   Michael has a call shortly.
24      MR. MELAMED:  Okay.

Page 288

1       MR. MELAMED:  I think there is a -- an
2    outside shot that we may be able to finish before
3    your call.
4       THE WITNESS:  Okay.
5       MR. MELAMED:  So can somebody give me a
6    flag before -- you or somebody else let me know --
7       MS. LEVY:  Are you needing lead time
8    or --
9       THE WITNESS:  No, I can finish up at
10   4:25 for a 4:30 call.
11      MR. MELAMED:  Okay.  So let's see
12   what --
13      MR. LUXTON:  The document or finish?
14      MR. MELAMED:  I'm hopeful we'll get to
15   there, and if we don't, then we'll take a break.
16      MR. LUXTON:  Finish the document or for
17   the day?
18      MR. MELAMED:  Finish for the day.
19      MR. LUXTON:  Oh, all right.
20      MR. MELAMED:  I assume people will be
21   happy about that.
22   BY MR. MELAMED:
23      Q   Can you turn to the page ending 718,
24   which is page 4 of 5 of the indirect SOP.

Page 289

1    A   Mm-hmm.
2    Q   9.2 -- paragraph 9.2 says:  "If any
3  substantial change in product mix purchases is
4  observed."
5        Do you -- was there any guidance
6  provided for the definition of "substantial
7  change" in that paragraph?
8    A   Any guidance?
9    Q   What -- what does "substantial change"
10  mean there?
11    A   Here, I can't tell you what it means.
12    Q   Okay.  Do you know if "substantial
13  change" was defined elsewhere for purposes of this
14  document?
15    A   I don't know.  I really don't recall.
16    Q   I will represent to you that it's not
17  part of the definitions in Section 3.
18    A   Yeah, I see that.
19    Q   In paragraph 11 on page 5 of 5, it
20  says -- or section -- paragraph 11.1 states:
21  "Depending on the frequency and severity of the
22  indirect individual customer ordering, Actavis can
23  reserve the right to stop sending the product of
24  interest to the point of sale wholesaler and will

Page 290

1  notify the DEA of the suspicious activity of the
2  indirect customer and the point of sale
3  wholesaler."
4        Is it your understanding that Actavis
5  was not required to stop sending the product of
6  interest in these circumstances?
7    A   I would have to read the reg to know
8  with certainty.  I'm not sure whether we were
9  required to stop.  I know there was a reporting
10  requirement, but in terms of the shipping
11  requirement, I'm not -- I don't recall.
12    Q   Okay.  And we talked before about the
13  statistical algorithm that was being used for the
14  direct SOP --
15    A   Yes.
16    Q   -- suspicious order monitoring, correct?
17    A   Yes, we -- we mentioned it before.
18    Q   And your testimony is you don't recall
19  what that algorithm concerned, what -- what
20  factors went into it?
21    A   Oh, no.  I don't remember that.
22    Q   Do you recall who designed that
23  statistical algorithm?
24    A   As we sit here today, I don't.

Page 291

1    Q   Okay.  You can put that document aside.
2        (Clarke Exhibit No. 23 was marked
3        for identification.)
4  BY MR. MELAMED:
5    Q   I'm going to hand you what's been marked
6  Exhibit 23, which is an e-mail chain ending with a
7  January 14th, 2014 e-mail from Tom Napoli to
8  Michael Clarke.  Subject:  "Re:  Anti-diversion
9  industry working group February meeting."
10        MS. LEVY:  What number is on this
11  document?
12        MR. MELAMED:  The exhibit number is --
13  thank you -- 23.
14        THE WITNESS:  23.
15        MR. MELAMED:  Thanks.
16  BY MR. MELAMED:
17    Q   Very -- I have very limited questions
18  about this document.
19    A   Okay.
20    Q   It's a fairly extensive e-mail chain,
21  but it discusses a pharmacist video that has been
22  proposed by the working group.
23        Do you recall discussions about that
24  video?

Page 292

1    A   Yes, I do.
2    Q   Do you recall whether that video was
3  ever made?
4    A   I believe it was, because I believe I
5  recall discussions about -- at least reviewing a
6  rough version of it, and then finalizing it for
7  some sort of conference that was coming up.
8    Q   That was my next question.
9        Do you recall where the video was
10  presented, in what formats, and how people could
11  access viewing it?
12    A   I just remember that the plan was to
13  display it at a conference, I guess, to a
14  pharmacist, I believe.  I can't tell you the name
15  of the organization, but I believe it was being
16  presented to a pharmacist or a pharmacy trade
17  association, and then it was going to be used
18  elsewhere.  But I can't tell you the name, I can't
19  tell you the date, but I believe that's what the
20  plan was.
21    Q   Were you at that -- the conference where
22  the video was presented?
23    A   No.
24    Q   Do you know anybody who was?  Can you

Page 293

1    identify anybody who was?
2        A   I don't know who was there.
3        Q   Okay.  You can put that aside.
4        (Clarke Exhibit No. 24 was marked
5          for identification.)
6    BY MR. MELAMED:
7        Q   I'm going to hand you what's been marked
8    as Exhibit 24.
9        Exhibit 24 is an e-mail string ending
10   with a -- an October 12th, 2012 e-mail from
11   Michael Clarke to Nancy Baran and Rachelle Galant.
12       A   Rachelle.
13       Q   I'm sorry.  Thank you.  Rachelle Galant.
14       "Re:  Pharmacy buying through multiple
15   wholesalers."  And I want to draw your attention
16   to the -- Rachelle's e-mail at the bottom of the
17   page.
18       Rachelle writes that:  "We have a
19   pharmacy purchasing oxy IR through three different
20   wholesalers.  I'm advising that we should address
21   this pharmacy buying pattern with the three
22   wholesalers.  It appears to be consistent," and
23   names the wholesalers.  And it identifies the
24   pharmacy as Dao Pharmacy in Pennsylvania, and

Page 294

1    says:  "This is not the first time this pharmacy
2    has come up on a multiple wholesalers report."
3        A   I see that.
4        Q   Okay.  Why would Actavis continue to
5    sell oxycodone to a pharmacy that has repeatedly
6    come up on a multiple wholesalers report?
7        A   I don't know.
8        Q   What is the multiple wholesalers report?
9        A   I do not recall as we sit here today.
10       Q   Okay.  Do you think you once knew and
11   you just don't remember now?
12       A   Do I think --
13       Q   -- that you once knew what that referred
14   to, and you just don't remember that as you sit
15   here now?
16       A   I may have.
17       Q   Do you know whether Actavis completed
18   this sale, the sale that's being referred to?
19       A   As we sit here, I don't remember.
20       Q   Okay.
21       A   Because I asked that they keep me
22   posted, so I hope they did.
23       MR. MELAMED:  I don't have any other
24   questions for you.  I hope that you'll be able to

Page 295

1    make your call.
2        MS. LEVY:  I have just a couple of
3    questions, and I can be quick.
4        CROSS-EXAMINATION
5    BY MS. LEVY:
6        Q   You testified earlier --
7        THE VIDEOGRAPHER:  If you could put the
8    mic on.
9    BY MS. LEVY:
10       Q   You testified earlier throughout the day
11   that Actavis had frequent communications with the
12   DEA during your time there, correct?
13       A   Yes.
14       Q   In any of your communications with the
15   DEA during your time at Actavis, did anyone from
16   the DEA suggest to you that Actavis's suspicious
17   order monitoring system was insufficient?
18       A   No.  Quite the contrary.  I mean, we had
19   a -- we had a system before I got there that at a
20   minimum, you know, went beyond the requirements of
21   the reg.  We enhanced it and made it more robust,
22   and we were informed that, in fact, we were, if
23   not the lead, one of the industry leads in terms
24   of the efforts that we were undertaking for our

Page 296

1    suspicious order monitoring.  So we were doing --
2    we were well ahead of the pack, I thought, from
3    what the DEA told us.
4        Q   Did anybody from DEA during your time at
5    Actavis ever suggest in any form or fashion that
6    Actavis's suspicious order monitoring system was
7    violating the Controlled Substances Act?
8        A   No, we never were told that.
9        Q   Did any --
10       A   We had no indication of that.
11       Q   During your time at Actavis, did anyone
12   from the DEA ever make any specific or general
13   suggestions of anything different that Actavis
14   should have been doing in its suspicious order
15   monitoring system?
16       MR. MELAMED:  Object to form.
17       Go ahead.
18       THE WITNESS:  No.
19       MS. LEVY:  Okay.  I don't have anything
20   further.
21       MR. MELAMED:  All right.  Just note for
22   the record there are a few documents that I'm not
23   sure we have.  It's not our intent to call you
24   back, but we're going to reserve our right to do

## Page 297

1  so based on those documents that I'm not sure we
2  have, but I would like to --
3            MS. LEVY:  Does anybody on the phone
4  have any follow-up?
5            MS. McINTYRE:  No.
6            MS. LEVY:  Okay.  We reserve his right
7  to read and sign.  Thank you.
8            MR. MELAMED:  Off the record.
9            THE VIDEOGRAPHER:  4:27 p.m., we're off
10 the video record.  This concludes the video
11 deposition of Michael Clarke.
12            (Whereupon, the deposition of
13            MICHAEL R. CLARKE was concluded
14            at 4:27 p.m.)
15
16
17
18
19
20
21
22
23
24

## Page 298

1       CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2       The undersigned Certified Shorthand Reporter
3  does hereby certify:
4       That the foregoing proceeding was taken before
5  me at the time and place therein set forth, at
6  which time the witness was duly sworn; That the
7  testimony of the witness and all objections made
8  at the time of the examination were recorded
9  stenographically by me and were thereafter
10 transcribed, said transcript being a true and
11 correct copy of my shorthand notes thereof; That
12 the dismantling of the original transcript will
13 void the reporter's certificate
14      In witness thereof, I have subscribed my name
15 this date:  December 11, 2018
16
17      _____
18      LESLIE A TODD, CSR, RPR
19      Certificate No  5129
20 (The foregoing certification of
21 this transcript does not apply to any
22 reproduction of the same by any means,
23 unless under the direct control and/or
24 supervision of the certifying reporter )

## Page 299

1            INSTRUCTIONS TO WITNESS
2       Please read your deposition over carefully and
3  make any necessary corrections.  You should state
4  the reason in the appropriate space on the errata
5  sheet for any corrections that are made.
6       After doing so, please sign the errata sheet
7  and date it.
8       You are signing same subject to the changes
9  you have noted on the errata sheet, which will be
10 attached to your deposition.  It is imperative
11 that you return the original errata sheet to the
12 deposing attorney within thirty (30) days of
13 receipt of the deposition transcript by you.  If
14 you fail to do so, the deposition transcript may
15 be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24

## Page 300

1       - - - - - -
2            E R R A T A
3       - - - - - -
4  PAGE LINE CHANGE
5  ___ ___ _____
6  REASON: _____
7  ___ ___ _____
8  REASON: _____
9  ___ ___ _____
10 REASON: _____
11 ___ ___ _____
12 REASON: _____
13 ___ ___ _____
14 REASON: _____
15 ___ ___ _____
16 REASON: _____
17 ___ ___ _____
18 REASON: _____
19 ___ ___ _____
20 REASON: _____
21 ___ ___ _____
22 REASON: _____
23 ___ ___ _____
24 REASON: _____

Page 301

```
 1            ACKNOWLEDGMENT OF DEPONENT
 2      I,_____, do hereby
 3   certify that I have read the foregoing pages, and
 4   that the same is a correct transcription of the
 5   answers given by me to the questions therein
 6   propounded, except for the corrections or changes
 7   in form or substance, if any, noted in the
 8   attached Errata Sheet
 9
10   _____
11   MICHAEL R  CLARKE            DATE
12
13
14   Subscribed and sworn to
15   before me this
16   _____day of_____,20____
17   My commission expires:_____
18   _____
19   Notary Public
20
21
22
23
24
```