Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
 3  IN RE NATIONAL PRESCRIPTION   |   MDL No. 2804
                                  |
 4  OPIATE LITIGATION             |   Case No. 17-MD-2804
                                  |
 5  This Document Relates to:     |   Hon. Dan A. Polster
                                  |
 6  The County of Summit, Ohio,   |
    et al., v.                    |
 7  Purdue Pharma L.P., et al.    |
    Case No. 17-op-45004          |
 8                                |
    The County of Cuyahoga v.     |
 9  Purdue Pharma L.P., et al.    |
    Case No. 18-op-45090          |
10                                |
    City of Cleveland, Ohio v.    |
11  Purdue Pharma L.P., et al.    |
    Case No. 18-op-45132          |
12                                |
13
                 TUESDAY, JANUARY 15, 2019
14
                          - - -
15
          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16
                  CONFIDENTIALITY REVIEW
17
                          - - -
18
          Videotaped deposition of MICHAEL COCHRANE,
19      held at Foley & Lardner LLP, One Biscayne Tower,
        2 Biscayne Boulevard, Suite 1900, Miami, Florida,
20      commencing at 9:11 a.m., on the above date,
        before Kelly J. Lawton, Registered Professional
21      Reporter, Licensed Court Reporter, Certified
        Court Reporter.
22                        - - -
23              GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:

 2    WEITZ & LUXENBERG, P.C.

      BY:  PAUL NOVAK, ESQUIRE

 3         TIFFANY ELLIS, ESQUIRE

      3011 West Grand Boulevard, Suite 2150

 4    Detroit, Michigan 48202

      (313) 800-4170

 5    tellis@weitzlux.com

      pnovak@weitzlux.com

 6    Representing the Plaintiffs

 7

 8    FOLEY & LARDNER LLP

      BY:  JAMES W. MATTHEWS, ESQUIRE

 9    111 Huntington Avenue

      Boston, Massachusetts 02199

10    (617) 342-4000

      kkoski@foley.com

11    Representing Anda, Inc., and the witness

12

13    REED SMITH LLP

      BY:  M. CRISTINA CÁRDENAS, ESQUIRE

14    1001 Brickell Bay Drive, Suite 900

      Miami, Florida 33131

15    (786) 747-0207

      ccardenas@reedsmith.com

16    Representing AmerisourceBergen Corporation and

      AmerisourceBergen Drug Corporation

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:

 2       JONES DAY
         BY:  ABIGAIL G. URQUHART, ESQUIRE
 3       555 South Flower Street
         Fiftieth Floor
 4       Los Angeles, California 90071
         (213) 489-3939
 5       aurquhart@jonesday.com
         Representing Walmart

 6

 7       ARNOLD & PORTER KAYE SCHOLER, LLP
         BY:  KAREN RIGBERG, ESQUIRE
 8       44th Floor
         777 South Figueroa Street
 9       Los Angeles, California 90017-5844
         (213) 243-4006
10       karen.rigberg@arnoldporter.com
         Representing Endo Health Solutions Inc., Endo
11       Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
         Par Pharmaceutical Companies, Inc.,
12       (f/k/a Par Pharmaceutical Holdings, Inc.)

13
         COVINGTON & BURLING LLP
14       BY:  PAUL F. DOWNS, ESQUIRE
         The New York Times Building
15       620 Eighth Avenue
         New York, NY 10018-1405
16       (212) 841-1083
         pdowns@cov.com
17       Representing McKesson Corporation

18

19
20       ALSO PRESENT:
21       ANTHONY BARBARO, Videographer
22       MICHAEL PIGGINS, Weitz & Luxenberg

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        - - -
 2                   I N D E X
 3                        - - -
 4   Testimony of:  MICHAEL COCHRANE              PAGE
        DIRECT EXAMINATION BY MR. NOVAK...............  5
 5                                                  16
 6     CROSS-EXAMINATION BY MR. MATTHEWS............. 262
 7     REDIRECT EXAMINATION BY MR. NOVAK............. 314
 8
 9
10                   E X H I B I T S
11              (Attached to transcript)
12
13   MICHAEL COCHRANE DEPOSITION EXHIBITS          PAGE
14   Anda -      May 18, 2010 E-mail - Subject: Thing  23
     Cochrane    - Bates Numbered
15   Exhibit 1   Anda_Opioids_MDL_0000110043 to
                 Anda_Opioids_MDL_0000110044
16
     Anda -      Notice of Videotaped Deposition of   29
17   Cochrane    Michael Cochrane
     Exhibit 2
18
     Anda -      September 27, 2006 Letter from the    37
19   Cochrane    U.S. Department of Justice Drug
     Exhibit 3   Enforcement Administration - Bates
20               Numbered Anda_Opioids_MDL_0000540738
                 to Anda_Opioids_MDL_0000540741
21
     Anda -      Defendant Anda, Inc.'s Supplemental   42
22   Cochrane    Response to Plaintiffs' (First)
     Exhibit 4   Combined Discovery Requests to
23               Distributor Defendants
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     E X H I B I T S
 2                 (Attached to transcript)
 3    MICHAEL COCHRANE DEPOSITION EXHIBITS          PAGE
 4   Anda -        Anda, Inc. Standard Operating      43
     Cochrane      Procedure Number 028 - Customer Due
 5   Exhibit 5     Diligence - Bates Numbered
                   Anda_Opioids_MDL_0000144398 to
 6                 Anda_Opioids_MDL_0000144401
 7   Anda -        Standard Operating Procedure Number 45
     Cochrane      OPS-028-00 - Information Needed to
 8   Exhibit 6     Set Up a New Account - Bates
                   Numbered Anda_Opioids_MDL_0000271410
 9                 to Anda_Opioids_MDL_0000271411
10   Anda -        Anda, Inc. Standard Operating      48
     Cochrane      Procedure Number 040 - Suspicious
11   Exhibit 7     Order Monitoring - Bates Numbered
                   Anda_Opioids_MDL_0000144378 to
12                 Anda_Opioids_MDL_0000144380
13   Anda -        Standard Operating Procedure Number 54
     Cochrane      OPS-000-40 - Controlled Substance
14   Exhibit 8     Monthly Override % - Bates Numbered
                   Anda_Opioids_MDL_0000276963 to
15                 Anda_Opioids_MDL_0000276964
16   Anda -        E-mail Chain - Subject: Distributor 67
     Cochrane      Notification - Bates Numbered
17   Exhibit 9     Anda_Opioids_MDL_0000038787 to
                   Anda_Opioids_MDL_0000038794
18
     Anda -        E-mail Chain - Subject: Distributor 71
19   Cochrane      Notification - Bates Numbered
     Exhibit 10    Anda_Opioids_MDL_0000274531 to
20                 Anda_Opioids_MDL_0000274532
21   Anda -        E-mail Chain - Subject: Distributor 73
     Cochrane      Notification - Bates Numbered
22   Exhibit 11    Anda_Opioids_MDL_0000276197 to
                   Anda_Opioids_MDL_0000276199
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S
 2          (Attached to transcript)
 3   MICHAEL COCHRANE DEPOSITION EXHIBITS          PAGE
 4   Anda -      November 5, 2008 E-mail - Subject:   81
     Cochrane    Doug Towle - Bates Numbered
 5   Exhibit 12  Anda_Opioids_MDL_0000153642
 6   Anda -      December 14, 2011 E-mail - Subject:  83
     Cochrane    DEA Meeting - Bates Numbered
 7   Exhibit 13  Anda_Opioids_MDL_0000133096 to
                 Anda_Opioids_MDL_0000133097
 8
     Anda -      December 7, 2005 E-mail - Subject:   92
 9   Cochrane    Excessive Order Reports November
     Exhibit 14  2005 - Bates Numbered
10               Anda_Opioids_MDL_0000271895 to
                 Anda_Opioids_MDL_0000271896
11
     Anda -      July 2, 2007 E-mail - Subject:       96
12   Cochrane    Excessive Order Report June 2007 -
     Exhibit 15  Bates Numbered
13               Anda_Opioids_MDL_0000013481 to
                 Anda_Opioids_MDL_0000013482
14
     Anda -      October 10, 2005 E-mail - Subject:   97
15   Cochrane    Suspicious Orders Week Ending
     Exhibit 16  10-9-05 - Bates Numbered
16               Anda_Opioids_MDL_0000271912 to
                 Anda_Opioids_MDL_0000271914
17
     Anda -      August 6, 2007 E-mail - Subject:     99
18   Cochrane    Suspicious Orders Week Ending 8-5-07
     Exhibit 17   - Bates Numbered
19               Anda_Opioids_MDL_0000271616 to
                 Anda_Opioids_MDL_0000271618
20
     Anda -      Summary of the DEA-HDMA Meeting on   105
21   Cochrane    Suspicious Orders Meeting Date:
     Exhibit 18  Sept. 7, 2007 - Bates Numbered
22               Anda_Opioids_MDL_0000280939 to
                 Anda_Opioids_MDL_0000280940
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S
 2          (Attached to transcript)
 3   MICHAEL COCHRANE DEPOSITION EXHIBITS          PAGE
 4   Anda -      September 13, 2007 E-mail - Subject:  114
     Cochrane    HDMA Update and RAC Conference Call
 5   Exhibit 19  Cancellation Notice - Bates Numbered
                 Anda_Opioids_MDL_0000194634 to
 6               Anda_Opioids_MDL_0000194636
 7   Anda -      September 26, 2007 E-mail and        115
     Cochrane    DEA/Industry Conference Report -
 8   Exhibit 20  Bates Numbered
                 Anda_Opioids_MDL_0000276207 to
 9               Anda_Opioids_MDL_0000276212
10   Anda -      November 14, 2007 E-mail - Subject:  118
     Cochrane    FMC ACCT 400212 - Bates Numbered
11   Exhibit 21  Anda_Opioids_MDL_0000274287 to
                 Anda_Opioids_MDL_0000274288
12
     Anda -      November 9, 2007 E-mail - Subject:   123
13   Cochrane    Approval - Bates Numbered
     Exhibit 22  Anda_Opioids_MDL_0000258572
14
     Anda -      December 11, 2007 E-mail - Subject:  125
15   Cochrane    Distributor Notification - Bates
     Exhibit 23  Numbered Anda_Opioids_MDL_0000272213
16               to Anda_Opioids_MDL_0000272215
17   Anda -      E-mail Chain - Subject: Daily        128
     Cochrane    Submissions - Bates Numbered
18   Exhibit 24  Anda_Opioids_MDL_0000276122 to
                 Anda_Opioids_MDL_0000276129
19
     Anda -      E-mail Chain - Subject:              141
20   Cochrane    Suspicious/Daily Reports - Bates
     Exhibit 25  Numbered Anda_Opioids_MDL_0000276111
21               to Anda_Opioids_MDL_0000276113
22   Anda -      May 6, 2008 E-mail - Subject: Kyle   147
     Cochrane    Wright - SOMS - Bates Numbered
23   Exhibit 26  Anda_Opioids_MDL_0000276096 to
                 Anda_Opioids_MDL_0000276097
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S
 2          (Attached to transcript)
 3   MICHAEL COCHRANE DEPOSITION EXHIBITS          PAGE
 4   Anda -       June 17, 2008 E-mail - Subject: SOMs  149
     Cochrane     to DEA HQ - Bates Numbered -
 5   Exhibit 27   Anda_Opioids_MDL_0000276927
 6   Anda -       February 9, 2010 E-mail - Subject:    151
     Cochrane     Suspicious Orders - Bates Numbered
 7   Exhibit 28   Anda_Opioids_MDL_0000078286 to
                  Anda_Opioids_MDL_0000078288
 8
     Anda -       E-mail Chain - Subject: DEA Meeting   154
 9   Cochrane     - Bates Numbered
     Exhibit 29   Anda_Opioids_MDL_0000281694 to
10                Anda_Opioids_MDL_0000281696
11   Anda -       Standard Operating Procedure Number   158
     Cochrane     OPS-040-00 - Suspicious Order
12   Exhibit 30   Monitoring/Order Monitoring System -
                  Bates Numbered
13                Anda_Opioids_MDL_0000056015 to
                  Anda_Opioids_MDL_0000056016
14
     Anda -       E-mail Chain - Subject: Suspicious    159
15   Cochrane     Hold - Bates Numbered
     Exhibit 31   Anda_Opioids_MDL_0000079269 to
16                Anda_Opioids_MDL_0000079274
17   Anda -       Anda, Inc. - Standard Operating       165
     Cochrane     Procedure  - Suspicious Order
18   Exhibit 32   Monitoring/Order Monitoring System -
                  Bates Numbered
19                Anda_Opioids_MDL_0000082105 to
                  Anda_Opioids_MDL_0000082107
20
     Anda -       E-mail Chain - Subject: Account       173
21   Cochrane     #476453 - Bates Numbered
     Exhibit 33   Anda_Opioids_MDL_0000076476 to
22                Anda_Opioids_MDL_0000076479
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  E X H I B I T S
 2              (Attached to transcript)
 3     MICHAEL COCHRANE DEPOSITION EXHIBITS          PAGE
 4   Anda -        October 19, 2011 E-mail - Subject:   177
     Cochrane      798 Total Product Usage 3 Mo - Bates
 5   Exhibit 34    Numbered Anda_Opioids_MDL_0000070701
                   to Anda_Opioids_MDL_0000070702
 6
     Anda -        E-mail Chain - Subject: Customer     179
 7   Cochrane      40008 - Pile Drug Store - Bates
     Exhibit 35    Numbered Anda_Opioids_MDL_0000082857
 8                 to Anda_Opioids_MDL_0000082858
 9   Anda -        December 13, 2011 E-mail - Subject:  183
     Cochrane      Acct #206406 - Bates Numbered
10   Exhibit 36    Anda_Opioids_MDL_0000082864
11   Anda -        E-mail Chain - Subject: Customer     185
     Cochrane      40008 - Pile Drug Store - Bates
12   Exhibit 37    Numbered Anda_Opioids_MDL_0000726938
                   to Anda_Opioids_MDL_0000726939
13
     Anda -        E-mail Chain - Subject: Approval -   186
14   Cochrane      Bates Numbered
     Exhibit 38    Anda_Opioids_MDL_0000282942
15
     Anda -        E-mail Chain - Subject: Ltr of       189
16   Cochrane      Admonition Response for DEA - Bates
     Exhibit 39    Numbered Anda_Opioids_MDL_0000276293
17                 to Anda_Opioids_MDL_0000276299
18   Anda -        June 17, 2008 E-mail - Subject:      192
     Cochrane      Approval - Bates Numbered
19   Exhibit 40    Anda_Opioids_MDL_0000273585 to
                   Anda_Opioids_MDL_0000273586
20
     Anda -        E-mail Chain - Subject: QCP Business 194
21   Cochrane      Increase and Allocation - Bates
     Exhibit 41    Numbered Anda_Opioids_MDL_0000079605
22                 to Anda_Opioids_MDL_0000079606
23   Anda -        April 21, 2010 E-mail - Subject:     196
     Cochrane      Approval - Bates Numbered
24   Exhibit 42    Anda_Opioids_MDL_0000283178
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2              (Attached to transcript)
 3    MICHAEL COCHRANE DEPOSITION EXHIBITS          PAGE
 4   Anda -        March 29, 2011 E-mail - Bates      197
     Cochrane      Numbered Anda_Opioids_MDL_0000133445
 5   Exhibit 43    to Anda_Opioids_MDL_0000133446
 6   Anda -        E-mail Chain - Subject: FL HB 7905 - 199
     Cochrane      Bates Numbered
 7   Exhibit 44    Anda_Opioids_MDL_0000079594 to
                   Anda_Opioids_MDL_0000079595
 8
     Anda -        February 21, 2006 E-mail - Subject:  204
 9   Cochrane      DEA CSOS Report Request - Bates
     Exhibit 45    Numbered Anda_Opioids_MDL_0000155184
10
     Anda -        Letter to Albert Paonessa III from   211
11   Cochrane      the U.S. Department of Justice Drug
     Exhibit 46    Enforcement Administration - Re: DEA
12                 Registration Number RA0180733 -
                   Bates Numbered
13                 Anda_Opioids_MDL_0000001208 to
                   Anda_Opioids_MDL_0000001209
14
     Anda -        December 6, 2011 Letter to Gayle     217
15   Cochrane      Lane from Albert Paonessa III -
     Exhibit 47    Bates Numbered
16                 Anda_Opioids_MDL_0000001210 to
                   Anda_Opioids_MDL_0000001212
17
     Anda -        E-mail and Letter - Subject: Draft   217
18   Cochrane      Response to DEA LOA - Bates Numbered
     Exhibit 48    Anda_Opioids_MDL_0000082872 to
19                 Anda_Opioids_MDL_0000082874
20   Anda -        E-mail Chain - Subject: Draft        219
     Cochrane      Response to DEA LOA -
21   Exhibit 49    Anda_Opioids_MDL_0000133111 to
                   Anda_Opioids_MDL_0000133113
22
     Anda -        E-mail and The Detroit News Article  223
23   Cochrane      - Bates Numbered
     Exhibit 50    Anda_Opioids_MDL_0000281678 to
24                 Anda_Opioids_MDL_0000281680
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2              (Attached to transcript)
 3    MICHAEL COCHRANE DEPOSITION EXHIBITS           PAGE
 4    Anda -        June 17, 2010 E-mail - Subject: Mass  225
      Cochrane      Update Customer Master # - Bates
 5    Exhibit 51    Numbered Anda_Opioids_MDL_0000281703
 6    Anda -        July 17, 2007 E-mail - Subject:       228
      Cochrane      Internal and External Communications
 7    Exhibit 52    - Bates Numbered
                    Anda_Opioids_MDL_0000275725 to
 8                  Anda_Opioids_MDL_0000275729
 9    Anda -        E-mail Chain - Subject: 2Record       229
      Cochrane      Request - Bates Numbered
10    Exhibit 53    Anda_Opioids_MDL_0000078355 to
                    Anda_Opioids_MDL_0000078363
11
      Anda -        June 14, 2012 E-mail - Subject:       235
12    Cochrane      Actavis Brand CII Launch Review -
      Exhibit 54    MoxDuo - Bates Numbered
13                  Anda_Opioids_MDL_0000086469 to
                    Anda_Opioids_MDL_0000086470
14
      Anda -        E-mail Chain - Subject: 210582        237
15    Cochrane      Neighborcare CII Order Snafu - Bates
      Exhibit 55    Numbered Anda_Opioids_MDL_0000109243
16                  to Anda_Opioids_MDL_0000109245
17    Anda -        E-mail Chain - Subject: Attached      240
      Cochrane      Controlled Info 2nd Attempt - Bates
18    Exhibit 56    Numbered Anda_Opioids_MDL_0000086482
                    to Anda_Opioids_MDL_0000086487
19
      Anda -        E-mail, Letter and Report - Subject:  246
20    Cochrane      Revised Report - Bates Numbered
      Exhibit 57    Anda_Opioids_MDL_0000539140 to
21                  Anda_Opioids_MDL_0000539150
22    Anda -        E-mail Chain - Subject: WH/Freight    249
      Cochrane      Hold ORR890 - Bates Numbered
23    Exhibit 58    Anda_Opioids_MDL_0000084233 to
                    Anda_Opioids_MDL_0000084237
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     E X H I B I T S
 2               (Attached to transcript)
 3     MICHAEL COCHRANE DEPOSITION EXHIBITS           PAGE
 4     Anda -        September 11, 2012 - Subject:     257
       Cochrane      Calculation Example - Bates Numbered
 5     Exhibit 59    Anda_Opioids_MDL_0000085935
 6     Anda -        E-mail Chain - Subject: Actavis   260
       Cochrane      Brand CII Launch Review - MoxDuo -
 7     Exhibit 60    Bates Numbered
                     Anda_Opioids_MDL_0000090905 to
 8                   Anda_Opioids_MDL_0000090907
 9     Anda -        March 7, 2012 E-mail - Subject: RA - 260
       Cochrane      Top Products for Top 100 Stores
10     Exhibit 61    Review (Combined with Misc Random
                     Research) - Bates Numbered
11                   Anda_Opioids_MDL_0000081549 to
                     Anda_Opioids_MDL_0000081571
12
       Anda -        U.S. Department of Justice Drug    273
13     Cochrane      Enforcement Administration -
       Exhibit 62    Diversion Control Division - Title
14                   21 United States Code (USC)
                     Controlled Substances Act
15
       Anda -        U.S. Department of Justice Drug    273
16     Cochrane      Enforcement Administration -
       Exhibit 63    Diversion Control Division - Part
17                   1301 - Registration of
                     Manufacturers, Distributors, and
18                   Dispensers of Controlled Substances
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

 1                    - - -

 2              THE VIDEOGRAPHER:  We are now on the record.

 3         My name is Anthony Barbaro.  I am a videographer

 4         for Golkow Litigation Services.  Today's date is

 5         January 15th, 2019, and the time is 9:11 a.m.

 6         This video deposition is being held in Miami,

 7         Florida, at 2 South Biscayne Boulevard, Suite

 8         1900, Miami, Florida 33131 In Re:  The National

 9         Prescription Litigation for the United States

10         District Court, Northern District of Ohio,

11         Eastern Division.  The deponent is Michael

12         Cochrane.

13              Counsel, would you please announce your

14         appearances for the record.

15              MR. NOVAK:  Paul Novak of Weitz & Luxenberg

16         on behalf of the plaintiffs.  Also from Weitz &

17         Luxenberg today are Tiffany Ellis and

18         Michael Piggins.

19              MR. MATTHEWS:  James Matthews for the

20         defendant Anda, Inc., and for the witness,

21         Michael Cochrane.

22              MS. CARDENAS:  Cristina Cardenas from Reed

23         Smith on behalf of AmerisourceBergen.

24              MR. NOVAK:  And can we have appearance of

Highly Confidential - Subject to Further Confidentiality Review

```
1        counsel who are attending telephonically?

2             Don't all jump in at once.

3             MS. URQUHART:  Hello.  My name is Abigail

4        Urquhart, counsel for Walmart.

5             MR. DOWNS:  This is Paul Downs for

6        Covington & Burling, counsel for McKesson.

7             MS. RIGBERG:  Karen Rigberg of Arnold and

8        Porter appearing on behalf of the Endo & Par

9        defendants.

10            THE VIDEOGRAPHER:  Okay.  The court reporter

11       is Kelly Lawton, and she will now swear in the

12       witness.

13            THE COURT REPORTER:  Sir, would you please

14       raise your right hand.

15            Do you swear or affirm the testimony you're

16       about to give will be the truth, the whole truth,

17       and nothing but the truth?

18            THE WITNESS:  I do.

19            THE COURT REPORTER:  Thank you.

20            MICHAEL COCHRANE, called as a witness by the

21       Plaintiffs, having been first duly sworn, testified

22       as follows:

23       ///

24       ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1                     DIRECT EXAMINATION

  2    BY MR. NOVAK:

  3    ████████████████████████████████████████████████████

  4    ████████████████████████████████████████████████████

  5    ████████████████████████████████████████████████████

  6    ████████████████████████████████████████████████████

  7    ████████████████████████████████████████████████████

  8         Q.    Okay.  Have you had your deposition taken

  9    before?

 10         A.    No.

 11         Q.    Okay.  Let me go through a couple just kind

 12    of ground rules.

 13              The first is make sure to try to provide your

 14    answers orally rather than just through a head nod or

 15    other gestures.

 16              If you don't understand one of my questions,

 17    let me know and I'll try to repeat it or rephrase it

 18    so that hopefully it's understandable.

 19              And if at any time over the course of the

 20    deposition you feel like you need a break, let me

 21    know and I'll try to accommodate you as quickly as

 22    possible.

 23              Can you provide for me what your last title

 24    was at Anda?
```

```
 1        A.    Executive director of regulatory compliance.

 2        Q.    How long were you with the company?

 3        A.    Just over 19 years.

 4        Q.    Okay.  Before you started with the company,

 5   can you give me just a very brief description of your

 6   education and your prior employment history?

 7        A.    High school diploma.

 8        Q.    Okay.  And employment history after high

 9   school?

10        A.    Was Anda.

11        Q.    Okay.  So Anda was your first job out of high

12   school?

13        A.    Correct.

14        Q.    Okay.  And when did you start with the

15   company?

16        A.    March of 1997.

17        Q.    And was it Anda that you started with or

18   Andrx?

19        A.    Anda.

20        Q.    Okay.  And what was your initial position

21   starting in March of '97 with Anda?

22        A.    Warehouse operator.

23        Q.    Where was that?

24        A.    In Davie, Florida.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    How long did you serve as a warehouse

 2   operator?

 3        A.    Don't really remember.  Several years.

 4        Q.    What position did you hold -- by the way, you

 5   said 19 years at Anda.  Was that continuous

 6   employment?

 7        A.    Yes.

 8        Q.    Okay.  You never stopped and worked somewhere

 9   else?

10        A.    No.

11        Q.    Okay.  After the warehouse operator position,

12   what was the next position you held at the company?

13        A.    I was the team leader of the controlled

14   substance cage.

15        Q.    When you say controlled substance cage, are

16   you talking about a portion of the warehouse facility

17   in Davie, Florida?

18        A.    Yes.

19        Q.    And can you give me a brief description of

20   your responsibilities as a team leader of the

21   controlled substance cage at that facility?

22        A.    Running the pick, pack, and ship operation as

23   well as our inventory control and warehouse

24   management functions.
```

1       Q.    Roughly what time did you hold the position

2   of controlled substances cage team leader?

3       A.    Sometime in 1999 probably through 2001.

4       Q.    Okay.  When you described one of your

5   functions in that position as inventory control, can

6   you give me a brief description as to what your

7   duties as it related to inventory control entailed?

8       A.    Counting the products and doing inventory

9   reconciliation in the event there were any variances

10  or any shipping -- potential shipping issues.

11      Q.    Okay.  What position did you hold after the

12  controlled substance cage team leader?

13      A.    I don't remember.  I think it may have been

14  compliance manager.

15      Q.    And during what time did you hold the

16  position of compliance manager at the company?

17      A.    I don't remember the dates.

18      Q.    It would have started sometime after 2001?

19      A.    Yes.

20      Q.    And approximately when did you -- well, let

21  me ask a different question.

22            What position did you hold at the company

23  after compliance manager?

24      A.    Maybe it was DEA compliance manager prior to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    compliance manager.  Then it was compliance manager.

 2        Q.   So from the controlled substance cage team

 3    leader, you became DEA compliance manager and then

 4    compliance manager after that?

 5        A.   I believe so, yes.

 6        Q.   Okay.  And what time did you become

 7    compliance manager?

 8        A.   I don't remember the dates.

 9        Q.   Roughly.

10        A.   2003 potentially.

11        Q.   How long did you hold that position?

12        A.   I don't remember.

13        Q.   What position did you have after compliance

14    manager?

15        A.   Maybe compliance logistics manager.  I can't

16    remember all of my titles dating back that far.

17        Q.   Sure.

18             Do you have the approximate time frame for

19    the compliance logistics manager?

20        A.   I don't.

21        Q.   By the way, for the positions of DEA

22    compliance manager and then compliance manager, were

23    the duties roughly the same or did they change?

24        A.   They changed somewhat.
```

```
 1        Q.   Okay.  Why don't you describe first the DEA

 2   compliance manager and what your duties were in that

 3   position.

 4        A.   It was the pick, pack, and ship operation

 5   from a logistical standpoint.  Inventory control,

 6   receiving, anything from a warehouse function.

 7        Q.   Did you have any duties as it related to

 8   reporting to the Drug Enforcement Administration?

 9        A.   Eventually, yeah.  I was doing our ARCOS

10   reporting, which was a monthly submission of

11   controlled substances transactions.

12        Q.   Anything other than ARCOS report in terms of

13   duties that entailed communications with the DEA?

14             MR. MATTHEWS:  Can you clarify just the time

15        period?

16             MR. NOVAK:  I think he testified

17        approximately 2001 to 2003.

18             MR. MATTHEWS:  Okay.  So limited to when he

19        was DEA compliance manager?

20             MR. NOVAK:  Yes.

21             MR. MATTHEWS:  Thank you.

22             THE WITNESS:  Not that I recall, no.

23   BY MR. NOVAK:

24        Q.   Okay.  And how about when the position
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    switched to just general compliance -- or just the

 2    term "compliance manager"?  Did you have expanded

 3    responsibilities for reporting to the DEA at that

 4    time?

 5        A.   Not that I recall, no.

 6        Q.   Okay.  How did your duties change when you

 7    shifted from DEA compliance manager to compliance

 8    manager?

 9        A.   I also took over the licensing aspect of our

10    facilities and the duties of compliance as far as the

11    Department of Health was concerned.

12        Q.   Is that the Florida Department of Health?

13        A.   Yes.

14        Q.   I may have touched on this, but do you recall

15    approximately when you switched from compliance

16    manager to compliance logistics manager?

17        A.   I do not.

18        Q.   Roughly how long did you serve as a

19    compliance logistics manager?

20        A.   I don't remember.

21        Q.   What were the duties that you had as a

22    compliance logistics manager?

23        A.   I still had -- I still oversaw the pick,

24    pack, and ship operation of the controlled substance
```

Highly Confidential - Subject to Further Confidentiality Review

1   area as well as following Florida Department of

2   Health and the newer pedigree regulations that

3   started in 2003, I believe, 2004, maybe.

4       Q.   Is that the sum and substance of your duties

5   as a compliance logistics manager?

6       A.   Yes.

7       Q.   What position did you hold after that?

8       A.   I don't remember.  Director of compliance,

9   maybe.

10      Q.   And approximately when did you become

11  director of compliance?

12      A.   I'm not sure.  Sometime between 2005 and

13  2010, I would think.

14      Q.   Is when you started in that position?

15      A.   I believe so.

16      Q.   Okay.  And can you give me a description of

17  your duties in that position?

18      A.   It all encompassed the same thing.  The pick,

19  pack, and ship operation of the controlled substance

20  area as well as prescription drug pedigree

21  regulation.  And at some point through there I also

22  took over the licensure of our facilities, but I

23  can't remember the specific dates.

24      Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
1              (Anda - Cochrane Exhibit 1 was marked for

2     identification.)

3     BY MR. NOVAK:

4     [REDACTED]

5

6

7

8

9

10

11

12

13              MS. RIGBERG:  Excuse me.  This is Karen.  Is

14       there a Bates Number for this document?

15              MR. NOVAK:  Oh, thanks.  The document bears

16       the Bates Number 11 -- 110043 and 44.

17              MS. RIGBERG:  Okay.  Good.  Thanks.

18     BY MR. NOVAK:

19       Q.   Have you had a chance to review the document,

20     Mr. Cochrane?

21       A.   Yeah.

22     [REDACTED]

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



18      Q.    And you were the one responsible to review

19   and determine as of this time in 2010 what those

20   limits were for each customer?

21      A.    In 2010, I believe we had a baseline of

22   either 5,000 or 1,000.  I'm not sure.  And then we

23   would adjust accordingly from there.

24      Q.    Okay.

1    A.    I can't remember at that specific date what

2    the specific numbering or limits were from a starting

3    standpoint.

4    Q.    Right.

5          Did you receive the title of executive

6    director around this time in 2010?

7    A.    I don't remember.  If it wasn't around this

8    time, it was shortly after, I would think.

9    Q.    Okay.  And was your title executive director

10   of compliance?

11   A.    I believe it was executive director of

12   regulatory compliance.

13   Q.    And that is the position that you held at

14   Anda for the remainder of your time there?

15   A.    Yes.

16   Q.    And you received that title in approximately

17   2010?

18   A.    I believe so.

19   Q.    Can you give me a description of what your

20   responsibilities were as the director -- the

21   executive director of regulatory compliance?

22   A.    Yeah.  I was the certified designated

23   representative.  I managed all of our customer

24   licensing, the review and determined the control

Highly Confidential - Subject to Further Confidentiality Review

1     limits, ensuring the company's DEA regulatory state

2     and federal compliance, OSHA, EPA, PDMA, DEA,

3     everything that's listed on this form.

4          Q.   Okay.  Did your duties expand at any time

5     from 2010 until your departure from the company?

6               And when did you leave the company?  2016?

7          A.   '16, yes.

8          Q.   Did your duties expand from the period of

9     2010 to 2016?

10         A.   Yeah.  I took over sales training for a short

11    period of time, and that was it.

12         Q.   Okay.  Who did you work with in performing

13    the sales training function?

14         A.   There was a department that was already

15    assembled prior to me inheriting it after a reorg

16    that was done sometime in 2014, 2015, maybe.  There

17    was already a team of maybe five people or so that

18    were part of that department that I ended up taking

19    over.

20         Q.   Okay.  Who were those individuals back in

21    2014 or '15 that reported to you when you took over

22    the sales training requirements?

23         A.   Specific names?

24         Q.   Yeah.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Margaret Haines, Abby Pratter, Chuck

 2   Brooks -- he was the -- he was the sales training

 3   manager at that point -- Dezzy Perez, Leann Brenham.

 4   There might have been two other ones.  I can't

 5   remember their names.

 6        Q.   Okay.  You also had a regulatory compliance

 7   staff that reported to you?

 8        A.   I did, yes.

 9        Q.   And at this roughly 20 -- well, let's go back

10   to approximately 2005 when you were the director of

11   compliance.

12        A.   Okay.

13        Q.   Who was it that reported to you at that time?

14        A.   In 2005, I had Miguel Palma, a team of

15   warehouse operators under him that ran the actual

16   pick, pack, and ship operation of the controlled

17   substance area.  I had Emily Schultz, Vivian Harvey,

18   maybe one or two others that I can't remember right

19   now.

20        Q.   Okay.  When you began to review and determine

21   control limits of accounts, who was it that assisted

22   you in performing that function?

23        A.   Emily Schultz to start, and then from there

24   we expanded the department sometime after 2010.
```

```
 1        Q.    Okay.  And who else in addition to

 2    Emily Schultz when you got into 2010 and later?

 3        A.    After 2010, it was Sabrina Solis, then

 4    Mary Barber.  For a short period of time, we had

 5    someone named Howard Davis.  Latoya Samuels after

 6    that.  Before I left, John Kincaide, Robert Brown,

 7    and one other I can't remember.

 8        Q.    Okay.

 9        A.    That's stretching from after 2010 through --

10    through '16.

11        Q.    Okay.  By the way, for purposes of preparing

12    for this deposition, what did you do?

13        A.    What did I do?

14        Q.    Yes.

15        A.    I met with James and Katie.

16        Q.    When was that?

17        A.    Yesterday.

18        Q.    Without telling me the substance of any

19    documents, did you review documents in your meeting

20    with James and Katie?

21        A.    I did.

22        Q.    Okay.  Now, for purposes of all of these

23    different responsibilities and titles that you

24    performed over your 19 years at Anda, did the
```

1   documents that you reviewed yesterday assist in

2   jogging your memory on some of the details?

3       A.   For some, yes.

4       Q.   Okay.  Did they assist in refreshing your

5   recollection about particular facts or events as it

6   related to the performance of your responsibilities?

7       A.   For some of them, yes.

8       Q.   Okay.  When you say for some of them, you

9   mean for some of the facts and events?

10      A.   Yes.

11      Q.   Okay.

12           (Anda - Cochrane Exhibit 2 was marked for

13   identification.)

14   BY MR. NOVAK:

15      Q.   We have had marked as Anda - Cochrane

16   Deposition Exhibit 2 a document that is the Notice of

17   Videotaped Deposition of Michael Cochrane for today.

18           Have you seen this document before right now?

19      A.   No, sir.

20      Q.   Okay.  The documents that you mentioned that

21   you reviewed in preparation of your deposition, were

22   those solely documents that you reviewed yesterday?

23      A.   Yes.

24      Q.   Okay.  Quantity-wise, roughly how many

Highly Confidential - Subject to Further Confidentiality Review

1    documents were there?

2        A.   Oh, I don't remember.

3        Q.   Is there a stack of them that you reviewed?

4        A.   No, not specifically a stack.  I'd say

5    several.

6        Q.   Were they something that you reviewed on a

7    conference table here in the office?

8        A.   Yeah.

9        Q.   Okay.  About how thick of a pile of documents

10   were they?

11       A.   They were one at a time.  There was no

12   specific pile that we went through.  I couldn't give

13   you a size or a stack or height.

14       Q.   Okay.  Over what period of time or how long

15   did you meet yesterday with counsel to prepare for

16   the deposition?

17       A.   I'd say approximately four to five hours.

18       Q.   Okay.  And it was over that period of time

19   here in this office that you looked at those

20   documents?

21       A.   Yes.

22       Q.   Okay.  Now, the notice of deposition

23   exhibit -- notice of deposition states in the second

24   paragraph:  Pursuant to federal rule, Mr. Cochrane is

Highly Confidential - Subject to Further Confidentiality Review

1    requested to produce on or before January 15, 2019,

2    copies of all documents, data, or information

3    reviewed in connection with his preparation for the

4    deposition.

5         MR. NOVAK:  I'll ask counsel:  Are you

6         willing to provide the documents that are

7         requested as indicated in that paragraph of

8         Exhibit 2?

9         MR. MATTHEWS:  No, we're not.

10         MR. NOVAK:  Okay.

11         MR. MATTHEWS:  I don't think you have laid

12         the foundation.

13         MR. NOVAK:  We'll come back to that issue in

14         a little bit.

15    BY MR. NOVAK:

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10     Q.    How were those goals set?

11     A.    They were set by our direct managers

12  specifically.  I can't remember what they were.

13     Q.    When you say by direct managers, who was your

14  direct manager during the time period that you were

15  the executive director of regulatory compliance?

16     A.    Albert Paonessa, III.

17     Q.    Did you leave your position at roughly the

18  same time that Mr. Paonessa left his, or was there a

19  period of time when you reported to his successor?

20     A.    I reported to his successor.

21     Q.    Okay.  And that was?

22     A.    Chip Phillips.

23     Q.    So during the time that you performed as the

24  executive director of regulatory compliance, those

Highly Confidential - Subject to Further Confidentiality Review

 1    goals were set either by Mr. Paonessa and then later

 2    by Mr. Phillips?

 3        A.   Yes, sir.

 4        Q.   Did any of those bonuses was a factor -- I'll

 5    start over.

 6             There came a point in time when Anda was

 7    purchased by Watson.  Is that your understanding?

 8        A.   Yes.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20          MR. MATTHEWS:  Objection.  I'm not going to

21      let him answer that question unless you can lay a

22      foundation for the actual amount he was paid is

23      relevant to the claims and issues in this

24      lawsuit.
```

```
 1            MR. NOVAK:  Okay.  All right.  We've got two

 2       issues now.  One is your instruction of the

 3       witness not to answer with respect to

 4       compensation of the specific amounts and also

 5       the -- the refusal to provide documents that the

 6       witness has testified refreshed his recollection

 7       as to the performance of his responsibilities at

 8       the company.

 9            I think what I would like to do is call the

10       special master with respect to those two discrete

11       items to see if we can get a determination on the

12       production of the documents as well as whether he

13       should be allowed to testify on compensation.

14            MR. MATTHEWS:  It's your prerogative.  If you

15       want to do that, feel free to do it.

16            MR. NOVAK:  And just so you know in advance,

17       the primary basis for my position that the

18       documents should be produced is that the witness

19       has testified that they assisted in refreshing

20       his recollection as to the performance of his

21       responsibilities and some facts and events.

22            MR. MATTHEWS:  Would you like to give me an

23       opportunity to examine the witness on that so we

24       have a record -- a clear record?
```

```
 1              MR. NOVAK:  Well, he's already provided

 2         testimony on that.

 3              MR. MATTHEWS:  He has testified in vague and

 4         ambiguous ways that some issues were had -- his

 5         memory was refreshed as to some issues and not

 6         tied it to any specific document he reviewed.  So

 7         on the record as it exists, it is not clear what

 8         document, if any, he reviewed was a document that

 9         refreshed his recollection, and as to which you

10         might be able to overcome the otherwise

11         rock-solid privilege on attorney work product,

12         okay.

13              Those documents were selected by me as part

14         of my job representing this company to show this

15         witness.  They are subject to the attorney work

16         product doctrine, and it's your burden to

17         overcome that.  And if you think that the record

18         you have now overcomes that, fine, we can go in

19         front of the special master and argue it.

20              But I don't believe it does.  And to the

21         extent it's not clear on the record that you

22         haven't asked about specific documents and that

23         he hasn't testified about specific documents, I

24         would like the opportunity to make it clear on
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          the record so that when we are before the special

 2          master I can make representations based on

 3          evidence and record rather than just my

 4          representations of what happened.  That's all.

 5          It's up to you how you want to proceed.

 6               MR. NOVAK:  Okay.  Well, I'm assuming that

 7          the particular content of the documents that you

 8          showed him are something that you will also

 9          instruct him not to answer.  So it's difficult

10          for me to go particularly further in providing a

11          more detailed evidentiary foundation.

12               MR. MATTHEWS:  You know, I'm not -- I'm not

13          your lawyer.  So you have to do it however you

14          want to do it, Mr. Novak.

15               MR. NOVAK:  So I think we'll -- do you have

16          the phone number?

17               THE VIDEOGRAPHER:  Off the record?

18               MR. NOVAK:  Yes.

19               THE VIDEOGRAPHER:  Off the record at 9:49.

20                (Recess from 9:49 until 9:51 a.m.)

21               THE VIDEOGRAPHER:  We're now back on the

22          video record at 9:51 a.m.

23               (Anda - Cochrane Exhibit 3 was marked for

24        identification.)
```

```
 1    BY MR. NOVAK:

 2        Q.   Mr. Cochrane, do you recognize the name

 3    Joseph Rannazzisi?

 4        A.   Yeah, I have heard it.

 5        Q.   What is your understanding as to who Joseph

 6    Rannazzisi is?

 7        A.   I believe at one point he was in charge of

 8    the DEA.  I don't remember his specific title.

 9        Q.   Okay.  We have had marked a document that was

10    previously marked as Anda Versosky Deposition Exhibit

11    Number 1 and will be marked in this proceeding -- or

12    in this deposition as Anda - Cochrane Deposition

13    Exhibit 3.

14             Mr. Cochrane, is this a document that you

15    would have seen prior to today?

16        A.   I believe so.  I don't remember it

17    specifically, though.

18        Q.   Okay.  Generally, do you recall reference to

19    a Rannazzisi letter or letters that issued in the

20    2006 and 2007 time frame to various wholesalers and

21    distributors around the country?

22        A.   Yes.

23        Q.   And do you understand that Anda - Cochrane

24    Deposition Exhibit 3 was such a letter that would
```

1     have been received by Anda during that time frame?

2         A.   Yes.

3              MS. RIGBERG:   Is there a Bates Number for

4         this?

5              MR. NOVAK:   Yes.  Anda - Cochrane Deposition

6         Exhibit Number 3 bears the Bates

7         Number Anda540738 through 540741.

8              And I'll note someone probably has a copy

9         that may have my notes on it.  Maybe not.

10             MR. MATTHEWS:   Not me.

11             MR. NOVAK:   Okay.

12    BY MR. NOVAK:

13        Q.   I would like to direct your attention to the

14    third page of Anda - Cochrane Deposition Exhibit

15    Number 3 that states or sets forth circumstances that

16    might be indicative of diversion.  And there are a

17    series of factors that are set forth in the

18    Rannazzisi letter of 2006.

19             Have you reviewed these different factors

20    before?

21             MR. MATTHEWS:   Objection.

22             THE WITNESS:   Not that I remember, no.

23    BY MR. NOVAK:

24        Q.   Okay.  By the way, for purposes -- and we'll

1    set the letter to the side for the moment.

2         For the purposes of performing your

3    responsibilities as executive director of regulatory

4    compliance or the prior position of director of

5    regulatory compliance, how did you prepare yourself

6    for becoming aware of what different regulatory

7    obligations as it related to controlled substance

8    were?

9         A.    We were active HDMA members.  I worked for

10   Jay Spellman for a number of years before moving

11   under Dan Movins, who was also somebody who was in

12   the industry for a substantial amount of time.  I

13   don't know if you would call them my mentors, but I

14   worked with them for long periods of time.

15        Q.    Okay.  You made reference to HDMA membership?

16        A.    Yes.

17        Q.    Were there conferences that you would go to

18   that were sponsored by HDMA or other organizations?

19        A.    There were a couple, yeah.

20        Q.    And those conferences gave you training on

21   what different factors were -- that assisted you in

22   the performance of your responsibilities as it

23   related to controlled substances?

24        A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  Do you recall the Rannazzisi letters

 2   being identified at those conferences as articulating

 3   some of the things that you would evaluate for

 4   determining whether particular customers of Anda

 5   should be eligible to buy controlled substances?

 6        A.   I don't remember them specifically being at

 7   conferences dating back that far.

 8        Q.   Okay.  Let's go through some of the

 9   circumstances that are identified in Anda - Cochrane

10   Deposition Exhibit 3 on the third page.

11             And the heading states:  "Circumstances that

12   might be indicative of diversion."

13             And the first one articulated there is:

14   Ordering excessive quantities of a limited variety of

15   controlled substances (e.g., ordering only

16   phentermine, hydrocodone, and alprazolam) while

17   ordering few, if any, other drugs.

18             Do you see that reference?

19        A.   Yeah.

20        Q.   Is that one of the factors that Anda

21   evaluated in making a determination as to whether a

22   particular controlled substance customer of the

23   company should be authorized to receive controlled

24   substances?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yeah.

 2      Q.    Okay.  When was it that Anda began to

 3   evaluate the quantity of controlled substances as

 4   compared to other drugs?

 5      A.    2005, maybe.

 6      Q.    Okay.  Now, in order to make that evaluation,

 7   Anda would need to review both what they were

 8   ordering in terms of controlled substances and also

 9   what they were ordering for noncontrolled substances,

10   correct?

11      A.    Yeah.  But I don't remember if we were doing

12   a specific comparison back in 2005.

13      Q.    Okay.  That might have come later?

14      A.    I think -- I believe it did.

15      Q.    Okay.  In fact, I think I'll go to a

16   different document and then come back to this one.

17      A.    Okay.

18            (Anda - Cochrane Exhibit 4 was marked for

19   identification.)

20   BY MR. NOVAK:

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1  ████████████████████████████████████████

 2         MR. MATTHEWS:  Objection.

 3   BY MR. NOVAK:

 4      Q.   Correct?

 5         MR. MATTHEWS:  Objection.

 6         THE WITNESS:  Yes.

 7   BY MR. NOVAK:

 8  ████████████████████████████████████████

 9  ████████████████████████████████████████

10  ████████████████████████████████████████

11  ████████████████████████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████████████████

14  ████████████████████████████████████████

15  ████████████████████████████████████████

16  ████████████████████████████████████████

17  ████████████████████████████████████████

18  ████████████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████████████████

21  ████████████████████████████████████████

22      Q.   Okay.

23         (Anda - Cochrane Exhibit 7 was marked for

24   identification.)
```

1

2

3         MR. NOVAK:  Oh, sorry, sorry, sorry.

4         MR. MATTHEWS:  Do you want to take that back?

5         MR. NOVAK:  Did we already have it marked?

6         Well, we'll leave it as 7.

7         MR. MATTHEWS:  Okay.  And let me see if I can

8     find the --

9         MR. NOVAK:  Was it 7 or 6?

10         MR. MATTHEWS:  The court reporter is the best

11     official --

12         MR. NOVAK:  The best evidence.

13         MR. MATTHEWS:  -- of where we are.  I will

14     often get it wrong, as you know.

15         MR. NOVAK:  Why don't we take five minutes.

16         THE VIDEOGRAPHER:  Off the record at 10:12.

17         (Recess from 10:12 until 10:34 a.m.)

18         THE VIDEOGRAPHER:  We are now back on the

19     record at 10:34.

20   BY MR. NOVAK:

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



22        Q.    Now, when we look at Anda - Cochrane

23    Deposition Exhibit 3, the third page of it, a number

24    of the different factors that are identified there

1    under "Circumstances That Might Be Indicative of

2    Diversion" make reference to an analysis of what is

3    being dispensed from the -- from the retailer.

4             Is that a fair characterization?

5             MR. MATTHEWS:  Objection.

6             THE WITNESS:  Yeah.

7    BY MR. NOVAK:

8       Q.   Okay.  So, for example, you wouldn't be able

9    to determine whether a retailer was ordering

10   excessive quantities of a limited variety of

11   controlled substances while ordering few, if any,

12   other drugs without -- well, actually, I won't ask

13   about that one.

14            But an additional factor, the other Number 1

15   on that page, is the percentage of the pharmacy's

16   business that dispensing controlled substances

17   constitutes.

18            You wouldn't be able to figure that out

19   unless you had the retailer's dispensing data,

20   correct?

21            MR. MATTHEWS:  Objection.

22            THE WITNESS:  Yeah.

23   BY MR. NOVAK:

24      Q.   And some of these other factors -- for

1    example, the disproportionate share of the

2    prescriptions for controlled substances being filled

3    by the pharmacy -- again, you need the dispensing

4    data for that to figure out whether there was a

5    disproportionate share being dispensed by the

6    retailers?

7          THE WITNESS:  Yes.

8          MR. MATTHEWS:  Objection.

9    BY MR. NOVAK:

10     Q.   In fact, a whole array of those different

11   factors that the FDA identifies really require you to

12   have a good set of dispensing data from your customer

13   in order to evaluate them.

14          Is that -- is that a fair characterization?

15          MR. MATTHEWS:  Objection.

16          THE WITNESS:  Yes.  You mean the DEA, not the

17     FDA.

18          MR. NOVAK:  Thank you.

19   BY MR. NOVAK:

20     Q.   With that qualification, it's a fair

21   characterization?

22          MR. MATTHEWS:  Objection.

23   BY MR. NOVAK:

24     Q.   Correct?

1        A.    Yes.

2        Q.    And at some point, Anda started collecting

3    the customer or potential customer's dispensed data

4    to evaluate the different factors that are identified

5    on Page 3 of Anda - Cochrane Deposition Exhibit 3,

6    the Rannazzisi letter, correct?

7        A.    Yes.

8        Q.    When was it that Anda began collecting

9    dispensed data from its customers for performing that

10   type of review?

11       A.    Sometime in 2007.

12       Q.    Okay.  What was it --

13       A.    It may have been early 2007, I think.

14       Q.    Okay.

15       A.    Maybe mid.

16       Q.    And what was it that caused Anda to change

17   its policy to begin collecting and reviewing that

18   type of information?

19            MR. MATTHEWS:  I'm going to object to the

20        question and instruct the witness not to answer

21        to the extent answering that question requires

22        you to reveal communications between the company

23        and you and any company attorney, whether inside

24        or outside.

Highly Confidential - Subject to Further Confidentiality Review

```
 1               To the extent you can answer without

 2        revealing any such conversations, you can answer

 3        the question.

 4               THE WITNESS:  I honestly don't remember.

 5   BY MR. NOVAK:

 6        Q.   Okay.  At any rate, you think it was '07 when

 7   the company started, as a matter of policy,

 8   collecting dispensed data --

 9        A.   Yes.

10               MR. MATTHEWS:  Objection.

11   BY MR. NOVAK:

12        Q.   -- to determine whether they were going to

13   sell controlled substances to particular customers?

14               MR. MATTHEWS:  Objection.

15               THE WITNESS:  I don't -- I think we were

16        going after existing customers at that point in

17        time that were already doing business with us and

18        collecting questionnaires and collecting

19        dispensing data as well as for newer customers.

20   BY MR. NOVAK:

21        Q.   Okay.

22               (Anda - Cochrane Exhibit 8 was marked for

23   identification.)

24   ///
```

1    BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
```

10      Q.    Okay.  And your testimony is that it was the

11   DEA who made the suggestion to set a 5,000 dosage

12   unit cap?

13      A.    Yes, I believe they did suggest that in 2007.

14      Q.    Okay.  Who at the DEA made that suggestion?

15      A.    Michael Mapes, Kyle Wright.  I'm not sure who

16   else was there for that meeting.

17      Q.    Okay.  And you're talking about a specific

18   meeting that occurred in July of 2007?

19      A.    I don't remember the exact date of the

20   meeting, but I'm pretty sure it was in 2007, yeah.

21      Q.    Who all attended the meeting?

22      A.    It was me, Al Paonessa, Tracey Hernandez,

23   Dianne Miranda, Michael Mapes, Kyle Wright, Barbara

24   McGrath.  Maybe a couple of other folks from DEA.  I

Highly Confidential - Subject to Further Confidentiality Review

```
1    don't remember their names.

2         Q.   Okay.  Ms. McGrath, where was she from?

3         A.   She was the Florida diversion program

4    manager.

5         Q.   At DEA?

6         A.   Yeah.

7         Q.   Okay.  Who was Tracey Hernandez?

8         A.   Tracey Hernandez was a DEA compliance person

9    for Watson -- Watson Pharma.

10        Q.   Okay.  At the time, Watson owned Anda?

11        A.   Yes.

12        Q.   Okay.  Did Ms. Hernandez sometimes give you

13   instruction about the performance of your

14   responsibilities at Anda?

15        A.   No, not specifically that I can remember.

16        Q.   You don't remember her ever providing

17   guidance on how compliance functions at Anda should

18   be performed?

19        A.   Yeah, I'm sure we discussed it since she was

20   part of the same organization.  I don't remember

21   anything specific, though.

22        Q.   Okay.  What do you remember about this

23   July 2007 meeting with the DEA representatives, the

24   Watson representatives, and the Anda people?
```

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  I think Michael Mapes reached

 3         out to Tracey Hernandez inquiring about Anda and

 4         whether or not Watson owned Anda.  From there,

 5         she explained that through an acquisition we were

 6         part of Watson at that point, and he wanted us to

 7         all come up and discuss controlled substance

 8         distribution.

 9    BY MR. NOVAK:

10         Q.   Did Mr. Mapes or any of the other DEA

11    representatives express concern about the manner in

12    which Anda had been distributing controlled

13    substances prior to the time of the meeting?

14              MR. MATTHEWS:  Objection.

15              THE WITNESS:  Yeah.

16    BY MR. NOVAK:

17         Q.   What particularly did he express concern

18    about?

19         A.   Some specific customers that Anda had that we

20    were distributing product to.

21         Q.   Do you recall which customers?

22         A.   I don't.

23         Q.   Okay.  And what was it about your

24    distribution to those customers that DEA was
```

1    concerned about?

2       A.   Pretty sure it was the quantity of certain

3    products.

4       Q.   Okay.  From DEA's perspective, they were

5    concerned that Anda was providing too large a

6    quantity of controlled substances to particular

7    customers?

8       A.   Yes.

9            MR. MATTHEWS:  Objection.

10   BY MR. NOVAK:

11      Q.   And what types of quantities was he

12   identifying?

13           MR. MATTHEWS:  Objection.

14           THE WITNESS:  I don't remember the exact

15      numbers.

16   BY MR. NOVAK:

17      Q.   Okay.  Did he identify a particular customer

18   for whom Anda was providing 279,000 units of

19   hydrocodone?

20           MR. MATTHEWS:  Objection.

21           THE WITNESS:  I don't remember that

22      specifically.

23           MR. NOVAK:  Okay.  How about 179,000 units of

24      hydrocodone to a different customer?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  I don't remember that number

 3         specifically either.

 4    BY MR. NOVAK:

 5         Q.   Were those -- irrespective of whether you

 6    recall the exact number, were those the rough numbers

 7    that were being communicated by Mr. Mapes to the Anda

 8    representatives at the meeting?

 9              MR. MATTHEWS:  Objection.

10              THE WITNESS:  I -- I don't remember specific

11         numbers.

12    BY MR. NOVAK:

13         Q.   I understand you don't remember specific

14    numbers.  But were they in that ballpark?

15              MR. MATTHEWS:  Objection.

16              THE WITNESS:  I don't remember.

17    BY MR. NOVAK:

18         Q.   Okay.  You don't remember at all the volume

19    or the quantity --

20         A.   I don't remember if it was 50,000 or 300,000.

21         Q.   All right.  At any rate -- well, let me ask a

22    different question.

23              Were you aware of the Southwood Compliance

24    Action that DEA had taken back in the summer of 2007?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   I believe I was, yes.

2        Q.   Okay.  And what was your understanding as to

3   what the DEA did as it related to Southwood?

4        A.   I don't remember if they fined Southwood or

5   issued an immediate suspension, but it was something

6   along those lines, I believe.

7        Q.   Okay.  As part of the performance of your

8   responsibilities at Anda, you tried to keep abreast

9   as to what DEA was doing from an enforcement

10  perspective against other distributors, correct?

11       A.   Yeah.  The whole industry did.

12       Q.   And Southwood was a particular action that

13  the DEA took that got the attention of the rest of

14  the industry?

15            MR. MATTHEWS:  Objection.

16            THE WITNESS:  Yeah.

17  BY MR. NOVAK:

18       Q.   Okay.  Why?

19       A.   Because they either fined them or issued an

20  immediate suspension.  I don't remember the exact

21  circumstances for Southwood, given the fact that it

22  was that long ago.

23       Q.   Sure.

24       A.   But it was -- it was an issue that the
```

1    industry all knew of.

2         Q.   What was it that Southwood was doing that was

3    of concern?

4              MR. MATTHEWS:  Objection.

5              THE WITNESS:  I don't remember.

6    BY MR. NOVAK:

7         Q.   Okay.  Was there also pending enforcement

8    action by DEA against AmerisourceBergen?

9              MR. MATTHEWS:  Objection.

10             THE WITNESS:  I'm not sure.

11   BY MR. NOVAK:

12        Q.   You don't recall whether that was brought up

13   by Mr. Mapes or some of the other DEA representatives

14   at this meeting in July of '07?

15             MR. MATTHEWS:  Objection.

16             THE WITNESS:  Yeah, I don't remember them

17        bringing that up.

18   BY MR. NOVAK:

19        Q.   Okay.  Do you remember them bringing up --

20             (Conferring with co-counsel.)

21             MR. NOVAK:  We're going off the record.

22             THE VIDEOGRAPHER:  Off the record at 10:51.

23             (Recess from 10:51 until 11:18 a.m.)

24             THE VIDEOGRAPHER:  We're now back on the

Highly Confidential - Subject to Further Confidentiality Review

1          record.   The time is 11:18.

2     BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review



19        Q.    Okay.  Did -- when you -- by the way, are

20    there any documents -- never mind.

21            When you initially started in the 2005 and

22    '06 time frame, in the performance of your regulatory

23    compliance functions at the company, did Anda have a

24    number of physician customers to whom they sold

```
 1    controlled substances?

 2        A.   Yes.

 3        Q.   Okay.  How many, if you know?

 4        A.   I don't know.

 5        Q.   Hundreds, thousands?

 6        A.   Probably somewhere in the thousands, I would

 7    think.

 8        Q.   Okay.  How was it that Anda would establish a

 9    relationship directly with physician customers for

10    controlled substances?

11             MR. MATTHEWS:  Objection; foundation.

12             THE WITNESS:  We had a specific group of

13        sales reps that were dedicated to physician

14        accounts.

15    BY MR. NOVAK:

16        Q.   They would actually visit their physician

17    offices?

18        A.   No, no.  It was all over the phone.

19        Q.   Okay.  They'd actually issue cold calls to

20    physicians' offices?

21        A.   I believe they would.

22        Q.   Okay.  And inquire as to whether they were

23    interested in opening account to purchase controlled

24    substances?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. MATTHEWS:  Objection.

2              THE WITNESS:  I don't think the lead-in was

3         controlled substances.  The lead-in was to

4         establish a business relationship.  There are

5         numerous other products that a physician's office

6         would have been able to purchase through us.

7    BY MR. NOVAK:

8         Q.   And many of them would also purchase

9    controlled substances?

10             MR. MATTHEWS:  Objection.

11             THE WITNESS:  I'm not sure what the

12        percentage was.

13   BY MR. NOVAK:

14        Q.   Okay.  Was part of your regulatory compliance

15   function an evaluation of the appropriateness of

16   physician purchases of controlled substances?

17             MR. MATTHEWS:  Objection.

18             THE WITNESS:  Eventually, we ended up

19        discontinuing sales to physician customers as far

20        as controlled substances.  I'm not sure what

21        evaluation process there was dating that far back

22        on the -- on the physician side.

23   BY MR. NOVAK:

24   ███████████████████████████████████████████████
```

Highly Confidential - Subject to Further Confidentiality Review



10      Q.   Okay.  Anda wouldn't perform any detailed

11   review of the product mix that the physician was

12   purchasing?

13           MR. MATTHEWS:  Objection.

14           THE WITNESS:  Not that I recall, no.

15   BY MR. NOVAK:

16      Q.   Okay.  And were there instances where Anda

17   would receive notifications from the DEA that other

18   distributors had decided to cut off particular

19   physicians?

20      A.   Yeah.  It wasn't limited to just physicians.

21   It was physicians and pharmacies, I believe.

22      Q.   Okay.

23           (Anda - Cochrane Exhibit 9 was marked for

24   identification.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Anda - Cochrane Exhibit 10 was marked for

 2       identification.)

 3       BY MR. NOVAK:
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12          MR. NOVAK:  Okay.

13          THE WITNESS:  Or why they would sound

14    familiar.

15  BY MR. NOVAK:

16    Q.  Did Tracey Hernandez ever inquire as to why

17  Anda's suspicious order monitoring program weren't

18  picking up on these physicians and cutting them off?

19          MR. MATTHEWS:  Objection.

20          THE WITNESS:  Not that I recall, no.

21  BY MR. NOVAK:

22    Q.  Did Ms. Hernandez give direction to you to

23  make sure that these customers were cut off?

24          MR. MATTHEWS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
1              THE WITNESS:  Not that I remember, no.  We
2         were already doing it if an e-mail came out from
3         Kyle like this.  But I don't remember her
4         specifically saying Anda should do it or telling
5         us that we need to, but it looks like she was
6         clearly doing the same thing that we were.
7              (Anda - Cochrane Exhibit 11 was marked for
8    identification.)
9    BY MR. NOVAK:
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3

 4

 5

 6

 7

 8

 9    BY MR. NOVAK:

10        Q.   Okay.   Was there a concern at Anda in the

11    2007 time frame as to whether sales to physicians

12    directly from Anda of opioid products would

13    contribute to the diversion of opioid products?

14             MR. MATTHEWS:   Objection.

15             THE WITNESS:   Al -- Al and I were called up

16        to the Florida Department of Health at one point

17        to specifically discuss controlled substance

18        sales to physicians.   So, yeah, there was a

19        concern.

20             And we met with the Department of Health at

21        their request in Tallahassee to talk about

22        potential drug diversion and physician sales.

23    BY MR. NOVAK:

24        Q.   Okay.   Who was that conversation with?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   It was Al and I, and I'm not a hundred

 2   percent sure who from the Department of Health was

 3   there.  It was the existing compliance manager for --

 4   her name was Rebecca -- I can't remember her last

 5   name -- and then one other gentleman.

 6        Q.   Okay.  Did they express concern about the

 7   volume of Anda's business selling opioids directly to

 8   physicians?

 9             MR. MATTHEWS:  Objection.

10             THE WITNESS:  Yes.

11   BY MR. NOVAK:

12        Q.   What was it that they expressed concern about

13   specifically?

14        A.   I think they identified the fact that

15   dispensing physicians were becoming more of a

16   problem.  I'm not sure if it was an application flow

17   thing for them.  There was a one-page document that a

18   physician could fill out to become a dispensing

19   physician or practitioner, and eventually, after

20   meeting with the Department of Health, we decided to

21   discontinue sales to physicians entirely as far as

22   controlled substances were concerned.

23             I don't remember the exact time frame of us

24   doing that, but it was sometime potentially around
```

Highly Confidential - Subject to Further Confidentiality Review

1    2007 or 2008.

2       Q.   In the course of performing your

3    responsibilities in the regulatory compliance areas

4    of Anda, did you become aware of particular employees

5    within Anda who were a concern to the company as it

6    related to overly aggressive sales of controlled

7    substances?

8            MR. MATTHEWS:  Objection.

9            THE WITNESS:  I believe there were a few

10       sales reps on the -- on the Anda side that

11       targeted specific physicians and groups,

12       specifically pain management clinics.

13   BY MR. NOVAK:

14      Q.   What were the names of the employees that you

15   became aware of that were overly aggressive as it

16   related to those types of sales?

17           MR. MATTHEWS:  Objection.

18           THE WITNESS:  Oh, man.  Maybe some of them --

19       maybe one with a first name of Raphael -- no --

20       last name Schaefer, maybe.  And -- I can't

21       remember.

22   BY MR. NOVAK:

23      Q.   Okay.  How was it that you became aware of

24   Raphael Schaefer being overly aggressive in the

Highly Confidential - Subject to Further Confidentiality Review

 1    promotion of controlled substances to customers?

 2              MR. MATTHEWS:  Objection.

 3              THE WITNESS:  I don't remember.  It could

 4         have been just from 222 forms coming in since

 5         it's a triplicate form that was required to even

 6         be able to order those products.  They're

 7         serialized forms that are issued by the DEA to

 8         registrants specifically for the ordering of

 9         certain classes of product.

10    BY MR. NOVAK:

11         Q.   Okay.  Were there particular classes of

12    product -- or, I'm sorry.  Different question.

13              Were there particular classes of trade --

14    I'll start over again.

15              Are you familiar with the term "classes of

16    trade" as it relates to different types of Anda

17    customers for controlled substances?

18         A.   Yes, somewhat.

19         Q.   Can you tell me what different classes of

20    trade were back in the 2007 time frame for opioids?

21         A.   2007, I would say physicians, retail

22    independents, there could have been some national

23    chains, potentially some repackagers, some

24    distributors.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    How about pain management clinics?

2    A.    I'm not sure if they were under a specific

3    class of trade that was just labeled physician.  I

4    don't remember there being a specific designation.

5    Q.    How about Internet pharmacies?

6    A.    Yeah, we had Internet pharmacies prior to

7    2004 or '05, I believe.  We discontinued sales to

8    anybody that we identified as an Internet pharmacy, I

9    believe, in 2005.

10    Q.    Did you have particular sales employees at

11    Anda who were identified by government regulatory

12    agencies as being part of the problem that was

13    created with Internet pharmacies?

14           MR. MATTHEWS:  Objection.

15           THE WITNESS:  The only one that comes to mind

16        is Doug Towle.  I believe he is -- I believe the

17        Miami DEA office asked about him specifically.

18    BY MR. NOVAK:

19    Q.    Okay.  What did they -- what was -- first of

20    all, who in the Florida DEA office did you converse

21    with on that?

22    A.    I do not remember.  I remember they sent a

23    request that we ended up having to send to HR because

24    they wanted personnel information on him at one

Highly Confidential - Subject to Further Confidentiality Review

1    point.  I don't remember what year it was or who I

2    spoke to.  At some point in 2005.

3              (Anda - Cochrane Exhibit 12 was marked for

4    identification.)

5    BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



    20        Q.    Okay.  Had you had conversations with other

    21   governmental regulatory individuals who identified

    22   Mr. Towle as part of what caused the problem with

    23   respect to the opioid epidemic in Florida?

    24              MR. MATTHEWS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  No, not that I remember.

2   BY MR. NOVAK:

3       Q.    Who is Emily Schultz?

4       A.    She was an Anda employee that worked for me

5   in the compliance department.

6              (Anda - Cochrane Exhibit 13 was marked for

7   identification.)

8   BY MR. NOVAK:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16    BY MR. NOVAK:

17        Q.    And did you discuss how the 5,000 dosage unit

18    cap could be exceeded for particular customers?

19        A.    With?

20        Q.    With the DEA.

21        A.    Yes.  They understood there would be

22    instances where there are pharmacies that would

23    require more than 5,000 dosage units.

24        Q.    Okay.  What specifically was said on that

```
1    topic?

2         A.    I don't remember exactly what was said.  But

3    when we brought up 5,000 as a -- when they brought up

4    5,000 as a number, we did discuss the fact that there

5    would be pharmacies that actually would require and

6    need more than that, more than that specific

7    hard-fast number.

8         Q.    Okay.

9         A.    And they agreed.

10        Q.    And did you discuss at all how you would

11   evaluate a particular pharmacy to make a decision as

12   to whether they should get more than 5,000 units of,

13   say, OxyContin?

14        A.    Yeah.  We specifically -- I want to say every

15   single approval over 5,000 had to be approved by --

16   by Al Paonessa, who was the president and chief

17   operating officer of Anda.

18        Q.    Okay.  So if a particular retail customer

19   wanted to buy more than 5,000 units of OxyContin, in

20   order to get their limit raised above that, you would

21   need to seek approval from Al Paonessa?

22        A.    Correct.  And we would collect information to

23   justify the actual increase.

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23        Q.   Okay.   When you say SKUs, you are referring

24     to the term S-K-U?

Highly Confidential - Subject to Further Confidentiality Review

1       A.   Yes.

2       Q.   And that is a specific storekeeper unit?

3       A.   Yeah.  It's a unit of measure.

4       Q.   So you are adding up all of the different

5  sales of -- of different products that are all

6  related to, say, hydrocodone --

7       A.   Correct.

8       Q.   -- as one family?

9       A.   Yes.

10      Q.   Oxycodone would be a separate family?

11      A.   Yes.

12      Q.   What other opioid families would there be?

13      A.   On the opioid side, I'm not sure.  Every

14  specific chemical from a controlled substance

15  perspective had its own family.  I don't remember

16  specifically which ones were opioids and which ones

17  weren't.

18      Q.   Would morphine be a different family for

19  applying this standard operating procedure?

20      A.   Yes, it would.

21      Q.   How about fentanyl?

22      A.   Yes, it would.

23      Q.   We have identified four separate opioid

24  families.  Is it conceivable that a retail customer

Highly Confidential - Subject to Further Confidentiality Review

```
1    of Anda would be able to buy 4999 units in each of

2    those four separate policies before they had to worry

3    about complying with this standard operating

4    procedure?

5              MR. MATTHEWS:  Objection.

6              PHONE:  Objection.

7              THE WITNESS:  Yeah, it was a different

8         family.

9              THE VIDEOGRAPHER:  The time is 12:04.  We are

10        going off the record.

11             (Recess from 12:04 until 12:10 p.m.)

12             (Anda - Cochrane Exhibit 14 was marked for

13    identification.)

14    BY MR. NOVAK:

15       Q.   Mr. Cochrane, the next topic I'm going to go

16    into a little bit are some of the reports that were

17    provided by Anda to the DEA.

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



17          MR. MATTHEWS:  So, for the record, I'll note

18      my objection to using an electronic version of

19      the copy what is produced on the record as an

20      exhibit, but I assume that we're going to proceed

21      along the same arrangement we have had with these

22      kind of electronic documents that have been used

23      at depositions previously.

24          MR. NOVAK:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

1              MR. MATTHEWS:  Okay.  Thank you.



Highly Confidential - Subject to Further Confidentiality Review

 8      Q.   Okay.  So there was an automated function in

 9   TPS that, on a monthly basis, would run the excessive

10   reports that were then submitted to the Drug

11   Enforcement Administration?

12          MR. MATTHEWS:  Objection.

13          THE WITNESS:  I don't think it was automated.

14      I think there were -- there was actual user

15      function to create them --

16          MR. NOVAK:  Okay.

17          THE WITNESS:  -- and generate them.  It

18      wasn't just a standing auto-generated report.

19      There was a user interface to a certain extent.

20   BY MR. NOVAK:

21      Q.   So there was someone at Anda who would

22   perform a query in the system that would generate the

23   report?

24      A.   Yes.

1        Q.    And that query would be based upon a

2    particular calculation of the customer's order that

3    would determine that it was excessive?

4        A.    Yes.

5             MR. MATTHEWS:  Objection.

6    BY MR. NOVAK:

7        Q.    But as to how that calculation was performed,

8    you -- you don't know?

9        A.    I don't remember, no.

10        Q.    Okay.  Do you have even a general

11    understanding as to how it was calculated that you

12    could provide?

13        A.    On the Excessive Order Report, I don't -- I

14    don't -- I really don't remember what the calculation

15    was.

16        Q.    Okay.

17             (Anda - Cochrane Exhibit 15 was marked for

18    identification.)

19    BY MR. NOVAK:

20    

21    

22    

23    

24

Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9          MS. RIGBERG:  Is there a Bates Number for the
10     document?
11          MR. NOVAK:  Oh, thanks for reminding me when
12     I forget.  It was Anda MDL 13481 and 13482.
13          MS. RIGBERG:  Thanks.
14          (Anda - Cochrane Exhibit 16 was marked for
15     identification.)
16     BY MR. NOVAK:
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19        Q.   Did Anda have in place in 2005 a suspicious

20    order monitoring system?

21             MR. MATTHEWS:  Objection.

22             THE WITNESS:  We had a report that would --

23        that we would generate, and if the customer

24        ordered more than 5,000 dosage units, we reported
```

```
 1        it to the local office as suspicious.

 2   BY MR. NOVAK:

 3        Q.   Okay.  Was there any analysis of those

 4   particular customer's orders as part of the

 5   evaluation as to whether it should be submitted to

 6   the DEA as a suspicious order?

 7             MR. MATTHEWS:  Objection.

 8             THE WITNESS:  Not that I recall.

 9   BY MR. NOVAK:

10        Q.   Okay.

11             (Anda - Cochrane Exhibit 17 was marked for

12   identification.)

13   BY MR. NOVAK:

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3

 4        Q.    Do you know if suspicious order reports in

 5   this format were sent to the DEA after August 5th of

 6   2007?

 7        A.    I don't remember specifically when we would

 8   have stopped sending these.

 9

10

11

12

13

14        Q.    Okay.

15        A.    We -- we revamped the system and put the

16   5,000 dosage unit maximum from ordering perspective

17   in place at that point after discussions with -- with

18   DEA in 2007.

19        Q.    Okay.  So when --

20        A.    Prior -- the prior reporting criteria was if

21   it exceeded 5,000 dosage units, we would report the

22   order to them.

23        Q.    Okay.  And once you instituted the policy of

24   restricting customers to 5,000 dosage units in July
```

Highly Confidential - Subject to Further Confidentiality Review

1    of 2007, did that coincide with roughly the time that

2    you stopped sending the suspicious order reports in

3    this format?

4            MR. MATTHEWS:  Objection.

5            THE WITNESS:  I believe it would.

6    BY MR. NOVAK:

7        Q.   Okay.  And I'll represent to you this was the

8    last one we were able to find --

9        A.   Okay.

10       Q.   -- in this format.

11           So when the format for reporting suspicious

12   orders in this manner changed, what took its place?

13       A.   The customer review process, the

14   questionnaires going out, the approval process for

15   more than 5,000 dosage units.  We were capturing

16   dispense data at that point from -- from customers.

17           A slew of things, I would say.

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

13       Q.   Okay.  At some point in time did the

14    regulatory compliance program at Anda determine that

15    if they were going to report a suspicious order to

16    the DEA, they had better not ship it?

17              MR. MATTHEWS:  Objection.

18              THE WITNESS:  I don't remember exactly when

19         we instituted the no-ship policy.  I want to say

20         it was sometime after 2010, potentially.

21    BY MR. NOVAK:

22       Q.   So what happened with suspicious orders

23    between 2007 and 2010 when the no-ship policy was

24    implemented?

1          MR. MATTHEWS:  Objection.

2          THE WITNESS:  We were doing a more robust

3     review based on our communication and advice and

4     suggestions from the local DEA people, the

5     Washington DEA people, our meetings with them.

6          We worked together with them to develop a

7     more robust review process of customers that we

8     were selling to.  We took their advice from a

9     threshold standpoint.  We did a different review

10    process in the event they needed more than 5,000.

11  BY MR. NOVAK:

12    Q.   In that answer, you stated:  We took their

13  advice from a threshold standpoint.

14          When you say their advice, do you mean the

15  DEA?

16    A.   I do.  And the 5,000 dosage units on the

17  families and how we were categorizing products as far

18  as the families were concerned, the limits put in

19  place, these were all things that were discussed with

20  DEA.

21    Q.   Now, in your view during that time period,

22  would it be possible for a suspicious order to be

23  placed by a customer with Anda that was less than

24  5,000 units --

```
 1              MR. MATTHEWS:  Objection.

 2    BY MR. NOVAK:

 3        Q.   -- of a particular control family?

 4              MR. MATTHEWS:  Objection.

 5              THE WITNESS:  I guess anything is possible.

 6    BY MR. NOVAK:

 7        Q.   Did Anda have in place policies to restrict

 8    distribution of controlled substances other than what

 9    we were looking at in Standard Operating Procedure 28

10    to suspend any orders of less than 5,000 units?

11              MR. MATTHEWS:  Objection.

12              THE WITNESS:  I do not believe we did, no.

13              MR. NOVAK:  Okay.  Why don't we stop there

14        for lunch.

15              THE VIDEOGRAPHER:  Off the record at 12:31.

16              (Recess from 12:31 until 1:39 p.m.)

17              THE VIDEOGRAPHER:  We're now back on the

18        record at 1:39.

19    BY MR. NOVAK:

20        Q.   Mr. Cochrane, before I forget, are you

21    related to the other Mr. Cochrane who's in Anda?

22        A.   I am.

23        Q.   Okay.  Brother?

24        A.   Yup.  He's my older brother.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Patrick?

 2        A.    That's right.

 3        Q.    Just so we're clear.

 4              Earlier today in testimony, you indicated

 5   that one of the ways that you educated yourself on

 6   compliance issues was to attend industry seminars.

 7              And some of those were HDMA seminars?

 8        A.    Yeah.

 9        Q.    By the way, did you participate on any HDMA

10   committees?

11        A.    I think I was on the DSCSA committee for

12   federal pedigree and maybe regulatory affairs

13   committee.

14        Q.    Okay.  What is it that the regulatory affairs

15   committee did?

16        A.    They have, I think, quarterly conference

17   calls just regarding industry issues as far as

18   regulation changes.  A lot of it, I think, was really

19   geared toward prescription drug pedigree because of

20   counterfeit products that were potentially out in the

21   marketplace and different states changing different

22   regs as far as that's concerned.

23              (Anda - Cochrane Exhibit 18 was marked for

24   identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 1

 2

 3          So does that answer the question or --

 4     Q.    If I understand your testimony correctly,

 5     it's that at this point in time Anda's process was to

 6     perform the evaluations of customer orders that

 7     exceeded 5,000 units of any particular controlled

 8     substance family and the processes that you have

 9     testified as it relates to that as Anda's method of

10     addressing potentially suspicious orders.

11          MR. MATTHEWS:  Objection.

12     BY MR. NOVAK:

13     Q.    Is that a fair characterization?

14          MR. MATTHEWS:  Objection.

15          THE WITNESS:  We were going after collecting

16          information from a due diligence perspective on

17          customers across the board, not only -- not

18          only -- not the only ones that were ordering

19          5,000 or more.  If they needed 5,000 or more,

20          it's definitely something that we addressed prior

21          to increasing the limit.

22          But we had sent out questionnaires to our

23          entire controlled substance customer base to

24          gather information on them from a due diligence

Highly Confidential - Subject to Further Confidentiality Review

1          perspective even if they were at 5,000 and not

2          above that.

3     BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



7     Q.    Was Anda performing site inspections of

8     pharmacies at this time?

9     A.    No.

10    Q.    Had they incorporated into Standard Operating

11    Procedure 28 the Google search as part of the steps

12    that regulatory compliance personnel at Anda were

13    required to perform?

14    A.    I do not believe so.

15    Q.    How about gathering information from the

16    State?

17    A.    We would gather State licensure as far as the

18    customer was concerned that was issued by the State.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19    BY MR. NOVAK:

20        Q.    So for purposes of constructing and operating

21    a suspicious order monitoring system program, how

22    that was ultimately constructed to determine if an

23    order was suspicious was up to you?

24        A.    It was up to us as an organization, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.   Okay.  That's all I have from that document.

2               (Anda - Cochrane Exhibit 19 was marked for

3      identification.)

4      BY MR. NOVAK:
```

Highly Confidential - Subject to Further Confidentiality Review



20          MR. MATTHEWS:  Objection.

21          (Anda - Cochrane Exhibit 20 was marked for

22     identification.)

23     BY MR. NOVAK:

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 1

 2

 3              MR. MATTHEWS:  Objection.

 4              THE WITNESS:  I can't remember.

 5        Department of Health definitely brought it up to

 6        us.  I just don't remember when.

 7     BY MR. NOVAK:

 8        Q.   Okay.  How about industry officials?  Were

 9     other folks in the industry warning that the next

10     area that we should be looking at in terms of

11     distribution of opioid products are these Internet

12     distributors?

13        A.    Internet distributors?

14        Q.    I'm sorry.  Pain management clinics?

15        A.    When you -- when you say "other officials" --

16        Q.    Other folks in the industry.  For example,

17     other members of the regulatory affairs committee

18     that you sat on.

19        A.    I don't remember off the top of my head.

20        Q.    Okay.  Was Anda, in this fall of 2007 time

21     frame, evaluating whether it should be more

22     restrictive on its sales of opioid products to pain

23     management clinics?

24              MR. MATTHEWS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  I don't remember specifically

2       back to 2007.

3              MR. NOVAK:

4              (Anda - Cochrane Exhibit 21 was marked for

5       identification.)

6       BY MR. NOVAK:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24      Q.   Was Anda in the business in 2007 of selling

 1    product to other wholesale distributors?

 2         A.    I believe so.  I'm not sure when we cut off

 3    wholesalers and distributors.

 4         Q.    Okay.

 5         A.    It would have happened around the same time

 6    we did the physicians, so I just don't have a

 7    specific date.  I'm going to assume yes back in 2007,

 8    but I don't remember.

 9         Q.    Okay.  We can go later into what I think the

10    date for that is.

11         A.    Okay.

12         Q.    But it's still a couple years out yet?

13         A.    What's that?

14         Q.    Well, we'll get there.

15               Now --

16         A.    Well, I guess the answer is, yes, we were

17    selling to distributors in 2007.

18         Q.    Okay.  How is it that you would have known

19    that what they really wanted was hydrocodone?

20         A.    Probably looking at the past purchasing

21    history, but I'm not sure.

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



19    Q.   Okay.  So as you have modified the policy

20    coming out of the July 2007 meeting to restrict

21    distribution for 5,000 units for any particular

22    controlled substance, were there a lot of these

23    requested modifications to increase the limits above

24    5,000 by different customers?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yeah.  There were quite a few, I would say.

 2        Q.    Particularly at the early onset of that

 3   change?

 4        A.    Correct.  Eventually, it kind of dwindled

 5   down as we reviewed customers on a case by case

 6   basis.

 7             (Anda - Cochrane Exhibit 22 was marked for

 8   identification.)

 9   BY MR. NOVAK:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12     Q.  What evaluation did you perform for purposes

13   of proposing that the threshold limits be increased

14   to 200,000 dosage units per month for each of these

15   different opioid classes?

16     A.  I would probably resort back to SOP

17   Number 40.  It's not necessarily going to be dispense

18   data from them since they are a distributor that's

19   always selling to pharmacies and physicians but

20   probably some kind of a sales history as far as what

21   products they were distributing and the quantities.

22     Q.  Okay.  But it would not evaluate who they

23   were selling the product to?

24     A.  No.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  Because they were another distributor?

 2          A.    Correct.

 3          Q.    Okay.  And would that similarly have been the

 4     case in your evaluation of the immediately prior one

 5     that we looked at, FMC?

 6          A.    Yes.

 7                MR. MATTHEWS:  Objection.

 8     BY MR. NOVAK:

 9          Q.    Similarly, you would not have reviewed who

10     FMC was selling to?

11          A.    No.  Other distributors aren't going to share

12     information as far as their customer base is

13     concerned.

14          Q.    Okay.

15                (Anda - Cochrane Exhibit 23 was marked for

16     identification.)

17     BY MR. NOVAK:

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5

 6        Q.   Do you recall ever reporting New Choice

 7   Pharmacy as having placed suspicious orders with

 8   Anda?

 9        A.   No.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        (Anda - Cochrane Exhibit 24 was marked for
```

Highly Confidential - Subject to Further Confidentiality Review

1    identification.)

2    BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



23          (Anda - Cochrane Exhibit 25 was marked for

24    identification.)

1     BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11      Q.    Now, from the time that the old reporting

12   format of sending suspicious order reports to the DEA

13   from Jay Spellman had ended in September of -- in

14   August or September of 2008, there had not been any

15   actual suspicious order reports submitted by Anda to

16   the DEA between then and April of '08, correct?

17      A.    Correct.

18      Q.    That question -- it's been pointed out to me,

19   when I said the Jay Spellman reports, I need to

20   clarify this.  I think I said August or September of

21   '08.  They actually stopped in August or September of

22   '07.

23          Is that what you understood?

24      A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Okay.  So between that time and April of

2  2008, no suspicious order reports have been submitted

3  to the DEA?

4      A.   Correct.

5      Q.   And it is your view that there were no

6  suspicious orders that had been placed with Anda

7  during that time period?

8      A.   Yes.

9      Q.   And just so we're on the same wavelength for

10  purposes of that answer, when you say yes, you mean

11  that your view is that no suspicious orders had been

12  placed with Anda between August of 2007 and

13  April 2008?

14      A.   Yes.

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



3      Q.   By the way, do you recall this process of

4   going back and forth on trying to figure this out,

5   back from this time period in 2008?

6      A.   Vaguely.

Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5          (Anda - Cochrane Exhibit 26 was marked for

 6     identification.)

 7     BY MR. NOVAK:

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2    BY MR. NOVAK:

3        Q.   Okay.  At this point in time, had Anda

4    developed the alternative criteria that it would use

5    to determine what type of suspicious order should be

6    reported to DEA?

7             MR. MATTHEWS:  Objection.

8             THE WITNESS:  I don't remember.

9    BY MR. NOVAK:

10       Q.   Okay.

11            (Anda - Cochrane Exhibit 27 was marked for

12   identification.)

13   BY MR. NOVAK:

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

 1

 2

 3

 4

 5

 6       Q.   So you still had not made arrangements with

 7   John Bossert at DEA as it related to the submission

 8   of the daily transactional information that had been

 9   discussed in July of '07?

10       A.   Correct.

11       Q.   And --

12       A.   I think Tracey had multiple calls in to him,

13   though, that were talked about in the previous

14   e-mails.

15       Q.   Right.  Okay.

16            MR. NOVAK:  A quick five-minute break.

17            THE VIDEOGRAPHER:  Off the record at 2:52.

18            (Recess from 2:52 until 3:06 p.m.)

19            THE VIDEOGRAPHER:  The time is 3:06 p.m.  We

20      are now back on the video record.

21   BY MR. NOVAK:

22       Q.   Mr. Cochrane, we had been speaking about

23   development of alternative criteria for a suspicious

24   order monitoring system.

1                    (Anda - Cochrane Exhibit 28 was marked for

2        identification.)

3        BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



3    BY MR. NOVAK:

4        Q.    Okay.  And the whole purpose of creating this

5    is to create some type of system that would detect

6    orders that require additional review to determine

7    whether they are suspicious under the applicable

8    regulatory requirements or whether they can be

9    shipped?

10       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



21      Q.   Okay.  Now, from the period of August of 2007

22   when the old method of reporting suspicious orders to

23   the DEA through the monthly Spellman submissions had

24   ceased, had Anda reported any suspicious orders?

```
 1        A.   I do not believe so.

 2        Q.   Okay.  And the company was evaluating what

 3   criteria would appropriately be employed to identify

 4   suspicious orders?

 5        A.   From a systematic approach, yes.

 6        Q.   And had been evaluating that issue from

 7   September of '07 through June of 2010?

 8        A.   Yes, in addition to our due diligence,

 9   customer questionnaire, dispense data, correct.

10

11

12

13

14

15

16             MR. MATTHEWS:  Objection.

17             I'm going to ask the witness again just to

18        pause between the question and your answer to

19        give me an opportunity to pose an objection.

20             Thank you.

21             MR. NOVAK:  If it assists, I can ask the

22        court reporter to put the objection in before his

23        "yes."

24             MR. MATTHEWS:  Let the record reflect who
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          made that suggestion.  I was -- it's Mr. Novak,

 2          counsel for the plaintiffs and the deposing

 3          lawyer at this time, not Mr. Matthews for the

 4          defendant.

 5               MR. NOVAK:  Just trying to help.

 6               I'm also just going to state for the record

 7          that -- well, and this is really more for

 8          purposes of cross-referencing the depositions.

 9               (Anda - Cochrane Exhibit 30 was marked for

10      identification.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          (Anda - Cochrane Exhibit 31 was marked for

16     identification.)

17     BY MR. NOVAK:

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 9        Q.    One method would be to compare the order

10    based upon what that specific customer has averaged

11    on a monthly basis; the second would be comparing the

12    order against what the customer's average order is;

13    and the third would be comparing it to all the

14    different customers in the same class of trade,

15    correct?

16        A.    Yes.

17        Q.    Okay.  Were all of those different methods of

18    evaluating orders things that Anda was evaluating for

19    purposes of trying to create a -- a new suspicious

20    order monitoring system?

21        A.    Yes.

22        Q.    Okay.  And during this time, June -- or, I'm

23    sorry, October of 2011, the existing system that is

24    in place for performing due diligence on any orders
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    that are received by Anda for controlled substances

2    is the 5,000 per unit threshold method that Anda

3    developed back in August of 2007?

4              MR. MATTHEWS:  Objection.

5              THE WITNESS:  I don't think so.  At this

6         point in time, I think we had dropped the limits

7         to 1,000 dosage units.

8    BY MR. NOVAK:

9         Q.   Okay.

10        A.   Since we're in late 2011.

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Prior to December of 2011?

 2      A.   Yes.

 3      Q.   Okay.  Would that be reflected in an actual

 4   modification of the written standard operating

 5   procedure that we had reviewed that was -- that you

 6   created in August of 2007?

 7           MR. MATTHEWS:  Objection.

 8           THE WITNESS:  I'm not sure.

 9   BY MR. NOVAK:

10      Q.   Okay.  And maybe this is a good point to talk

11   about more generally how these different standard

12   operating procedures are modified.

13           Are all of the modifications that are made to

14   procedures during the time that you performed your

15   responsibilities at Anda modifications that are made

16   in writing?

17      A.   I can't recall if we documented the changes

18   to any of the procedures.

19      Q.   Okay.  The review process for modification of

20   standard operating procedures typically will include,

21   as part of the modified procedure, dates for when

22   they are reviewed and dates for when they are

23   revised, correct?

24           MR. MATTHEWS:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Correct.

 2    BY MR. NOVAK:

 3
```



```
20       Q.   Okay.  So the company had -- and when you say

21    the previous Version 40, you are referring to Anda

22    Deposition Exhibit 8?

23       A.   Yes.

24
```

```
 1

 2

 3

 4

 5

 6

 7

 8    BY MR. NOVAK:

 9        Q.   Okay.  Now, that new method uses a different

10    procedure to identify whether a particular order

11    should be held by Anda and investigated further

12    before it's released to the customer, correct?

13        A.   Yes.

14             MR. MATTHEWS:  Are you done with 31?

15             MR. NOVAK:  Yes.

16             (Anda - Cochrane Exhibit 32 was marked for

17    identification.)

18    BY MR. NOVAK:

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



```
 1
 2
 3
 4
 5
 6
 7        Q.   Okay.  If you were attempting to find the
 8   version of standard operating procedure that was
 9   created and in effect in December of 2011, where
10   would you look if you were still at the company?
11        A.   I'm not sure.  I think there was a shared
12   drive that all of us had access to where we would
13   keep up-to-date documents.
14        Q.   And would that shared drive also keep prior
15   iterations of those documents if they had been
16   modified over time?
17        A.   I'm not sure.
18
19
20
21
22
23
24        Q.   Would you be able to determine when those new
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    obligations were placed into Standard Operating

 2    Procedure 28 by -- by going to the shared drive that

 3    you're referencing and looking at the different

 4    versions?

 5         A.   I'm not sure.

 6         Q.   Okay.  Who would know the answer to that at

 7    Anda as of the time that you had left?

 8         A.   I'm not sure.  I would have to say Robert

 9    Brown, potentially; Emily Schultz.  I really don't

10    know.

11         Q.   Okay.  Going back to Anda - Cochrane

12    Deposition Exhibit Number 31, this reflects some

13    testing of a method for identifying orders that would

14    be held to determine whether they were suspicious or

15    not, correct?

16         A.   Yes.
```



```
17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



19    BY MR. NOVAK:

20         Q.    Okay.  You think that the threshold had

21    switched from 5,000 down to 1,000?

22         A.    At some point in time, yes, it did.

23         Q.    And when that switch was made, was there also

24    a multiplier that was selected to evaluate orders

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that come in?

 2            MR. MATTHEWS:  Objection.

 3            THE WITNESS:  I don't remember.

 4    BY MR. NOVAK:

 5       Q.   Okay.  Is the system that was put in place to

 6    evaluate orders that replaced the 5,000 unit process

 7    that you created in August of 2007 contained anywhere

 8    in writing?

 9       A.   I'm not sure.

10       Q.   Okay.  Can you describe for me the

11    circumstances that resulted in the initial threshold

12    of 5,000 control units per controlled substance

13    family being lowered to 1,000 units?

14       A.   I believe that was the outcome of an

15    inspection by DEA in our Weston location from some

16    point in 2010 when I was out of the office on a

17    medical leave.

18       Q.   Okay.  So there was a point in time in 2010

19    where DEA officials came in and performed an

20    inspection of Anda's distribution center in Weston?

21       A.   Yes.

22       Q.   And they indicated that they were no longer

23    comfortable with a 5,000 unit per family threshold?

24            MR. MATTHEWS:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I'm not sure.  I wasn't there

 2         for that.  I was out of the office --

 3              MR. NOVAK:  Okay.

 4              THE WITNESS:  -- for several months at that

 5         point.

 6    BY MR. NOVAK:

 7         Q.   I don't want to get into the personal

 8    details, but there was an issue that had you take

 9    a -- a leave of absence or otherwise not perform your

10    functions for a period of time at the company?

11         A.   Correct.

12         Q.   Okay.  And that was from when to when?

13         A.   I do not remember the exact dates.  It was

14    several months towards the end of 2010 though.

15         Q.   Okay.  And during that time period, who was

16    it who filled in for the performance of your

17    responsibilities at the company?

18         A.   It was a joint effort between Emily Schultz,

19    Patrick Cochrane, Jay Spellman, and Albert

20    Paonessa, III.

21         Q.   Okay.  How many months, roughly, was it?

22         A.   I'm not sure.  I believe it was at least

23    three.

24         Q.   Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't remember, though.

 2        Q.   And did you work part time during that time

 3   period, or were you out altogether?

 4        A.   Altogether.

 5        Q.   Okay.  Now, at some point in time, a new

 6   suspicious order monitoring system was implemented by

 7   Anda, correct?

 8        A.   Yes.

 9        Q.   And the effect of that new system was to

10   identify orders that would be held for additional

11   review to determine whether they were suspicious and

12   should thus be reported to the DEA?

13             MR. MATTHEWS:  Objection.

14             THE WITNESS:  Yes.

15   BY MR. NOVAK:

16        Q.   Let me go through a few documents to develop

17   an understanding as to how they would relate to that

18   system of identifying orders and determining whether

19   they should be reported as suspicious.

20             (Anda - Cochrane Exhibit 33 was marked for

21   identification.)

22   BY MR. NOVAK:

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6          Q.    Why would it be that the primary dispense

7     products of alprazolam, carisoprodol, and hydrocodone

8     could lead you to the conclusion that you should deny

9     sales of controlled substances to this customer?

10         A.    Because that was their top products.  No

11    regular noncontrolled prescription drugs, as far as

12    their data was concerned, were -- were in their -- in

13    their top products.

14         Q.    Okay.

15         A.    They were all controlled substances for the

16    most part, or at least these specific ones.

17         Q.    And the fact that these were the top products

18    was a red flag for you to make a decision that this

19    is a customer that would be a risky one to sell

20    product -- controlled substance products to?

21         A.    Yes.

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
```

10     BY MR. NOVAK:

11         Q.   Okay.  Is this the type of customer that

12     would have been reported by Anda to the DEA in 2010?

13             MR. MATTHEWS:  Objection.

14             THE WITNESS:  I'm not sure if we were

15         reporting customers that we were denying business

16         to.

17             MR. NOVAK:  Okay.

18             THE WITNESS:  I think that started at a later

19         date.

20     BY MR. NOVAK:

21         Q.   So the mere fact that this company was asking

22     for the opportunity to purchase controlled substances

23     would not have resulted in you reporting them to the

24     DEA as suspicious in December of 2010?

Highly Confidential - Subject to Further Confidentiality Review

1        A.   I do not believe so.

2            (Anda - Cochrane Exhibit 34 was marked for

3    identification.)

4    BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



18    Q.    Okay.  And as a result --

19         MS. RIGBERG:  Do you have the Bates?  Sorry.

20         MR. NOVAK:  What?

21         MR. MATTHEWS:  She wants the Bates Number.

22         MR. NOVAK:  Oh, I'm sorry.  The Bates

23    Number for Anda Exhibit 34 is 70701 through --

24    and 2.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. RIGBERG:  Thank you.

 2   BY MR. NOVAK:

 3       Q.   Do you know if this customer was reported as

 4   having submitted a suspicious order?

 5       A.   I'm not sure.

 6            (Anda - Cochrane Exhibit 35 was marked for

 7   identification.)

 8   BY MR. NOVAK:

 9

10

11

12

13

14

15

16

17

18

19

20

21       Q.   Okay.  And Howard Davis at this point in time

22   was the regulatory compliance manager for Anda?

23            MR. MATTHEWS:  Objection.

24            THE WITNESS:  I can't remember what his title
```

Highly Confidential - Subject to Further Confidentiality Review

1          was.  I think he was a director of compliance.

2      BY MR. NOVAK:

3          Q.   Okay.  He reported to you?

4          A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



1

2    Q.   Okay.

3    A.   He was a retired DEA agent that was a

4  diversion program manager.

5    Q.   Mr. Davis was?

6    A.   He was, yes.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1              Susan Langston and Gayle Lane knew him
 2     personally when he was part of the DEA and knew that
 3     he was working with us.  If it was reported, I don't
 4     know that there's any record of it in writing.
 5     That's not to say that he didn't make a phone call
 6     and reach out to Gayle or someone at the local office
 7     and let them know.  I don't remember.
 8         Q.   Okay.  You don't know, sitting here today,
 9     whether Pile Drug Store was reported by Anda to the
10     DEA, correct?
11         A.   I don't know.
12         Q.   All right.
13              MR. MATTHEWS:  There's somebody on the phone
14         who is rustling papers and making banging noises.
15         Could you please mute your phone so that we can
16         hear here at the deposition?  Thank you.
17              (Anda - Cochrane Exhibit 36 was marked for
18     identification.)
19     BY MR. NOVAK:
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2
 3
 4
 5
 6        Q.    Okay.  Do you know if there was a submission
 7    of a Suspicious Order Report as it relates to
 8    Trillion Enterprises in Pinellas Park, Florida?
 9        A.    No, I don't.
10        (Anda - Cochrane Exhibit 37 was marked for
11    identification.)
12    BY MR. NOVAK:
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3

 4

 5

 6

 7

 8
```

 9        Q.    Okay.

10              MR. NOVAK:  Let's take a break.

11              THE VIDEOGRAPHER:  Off the record at 4:15.

12              (Recess from 4:15 until 4:35 p.m.)

13              THE VIDEOGRAPHER:  The time is 4:35.  We are

14        now back on the record.

15    BY MR. NOVAK:

16        Q.    Mr. Cochrane, are you familiar with a

17    customer of Anda during your time there known as Lake

18    Erie Medical?

19        A.    It sounds familiar.

20              (Anda - Cochrane Exhibit 38 was marked for

21    identification.)

22    BY MR. NOVAK:

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2    BY MR. NOVAK:

3        Q.   Okay.  You mentioned a repackager.  How do

4    you evaluate a repackager customer of Anda's to

5    determine whether they are engaging in appropriate

6    distribution of the product to make you feel

7    comfortable selling opioids to them?

8        A.   At that point in time, we probably had all

9    their policies and procedures on hand as part of the

10   due diligence packet of information that we would

11   have gathered from them since they weren't, you know,

12   our typical pharmacy customer, so to speak.  They

13   were a distributor or a repackager.

14       Q.   You wouldn't have dispensing data for a

15   repackager, correct?

16       A.   No, I don't think we would.

17       Q.   Would you have any identification of who

18   their customers were?

19       A.   I'm not sure if we did or not.

20       Q.   Okay.  Typically, for a repackager, would you

21   obtain that type of information?

22       A.   We may have requested it, but most of the

23   distributor/repackager customers couldn't divulge

24   that information.  It's trade secret and proprietary

Highly Confidential - Subject to Further Confidentiality Review

1    to their business.  If we requested it, I'm not sure

2    we received it or not.

3              (Anda - Cochrane Exhibit 39 was marked for

4    identification.)

5    BY MR. NOVAK:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16          (Anda - Cochrane Exhibit 40 was marked for

17    identification.)

18    BY MR. NOVAK:

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13    BY MR. NOVAK:

14        Q.    Did you continue to increase the limits for

15    Lake Erie after that?

16        A.    I'm not sure.

17            MS. RIGBERG:  What was the Bates Number on

18        that Document 40 -- Exhibit 40?

19            MR. NOVAK:  I'm sorry.  It was Anda 273585.

20        And thanks for catching me on that.

21            MS. RIGBERG:  No problem.

22            (Anda - Cochrane Exhibit 41 was marked for

23    identification.)

24    ///

Highly Confidential - Subject to Further Confidentiality Review

1     BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          (Anda - Cochrane Exhibit 42 was marked for

16      identification.)

17      BY MR. NOVAK:

18          Q.   Now, we've had marked Anda - Cochrane

19      Deposition Exhibit 42, which is a --

20              MS. RIGBERG:  Sorry.  One sec.  We need the

21          Bates for 41.

22              MR. NOVAK:  Oh, did I skip that one, too?

23          I'm sorry.  It was Anda 79605 and 606.

24      ///

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



24          Q.    Okay.  During the time that you served in

Highly Confidential - Subject to Further Confidentiality Review

1    your compliance role at Anda, did the company have a

2    change in policy as to selling controlled substances

3    to repackagers?

4        A.    Yes.  At some point we discontinued sales to

5    distributors and repackagers with apparently the

6    exception of two.

7        Q.    Okay.  And why was it you changed your policy

8    as it related to selling controlled substances to

9    repackagers?

10       A.    It coincided with us discontinuing sales to

11   physicians in the years prior and not wanting the

12   distributor or repackager customer base touching

13   physicians that we potentially weren't going to

14   distribute to.



24            MR. MATTHEWS:  Objection.  Asked and

Highly Confidential - Subject to Further Confidentiality Review

```
1         answered.  Clearly argumentative.

2              Go ahead.

3              You've asked all about the thresholds that

4         existed at a variety of periods of time.  You

5         spent hours.  We're at 5:04 p.m. in the

6         afternoon.  The only reason to ask that question

7         at this time is because you want to badger the

8         witness about what he's testified about this

9         morning.

10             MR. NOVAK:  James, that -- it's -- that's in

11        violation of the Court's speaking objection.  If

12        you think the record is clear as to what

13        thresholds exists at different points in time,

14        feel free to enlighten me as to where in the

15        earlier portion of the deposition that statement

16        was made.

17             MR. MATTHEWS:  Thirty minutes ago, he

18        testified as of 2011 the baseline limit was 1,000

19        units per dosage per product family per month.

20        Thirty minutes ago.  He probably testified about

21        seven times over the course of this day.

22             So don't lecture me about whether the record

23        is clear or not.  You know, I'm trying to be

24        patient here.  It is 5:04 p.m.  You -- you know,
```

```
 1        are wearing out the witness, and you are asking

 2        questions that were answered for no other reason

 3        than to create the impression -- you know, to

 4        badger this witness about this particular line of

 5        questions about this particular client.

 6             You don't need to ask it.  We are wasting

 7        time.  Let's move on.

 8   BY MR. NOVAK:

 9        Q.   Is it your testimony, Mr. Cochrane, that as

10   of this time in 2011 that the threshold control limit

11   for Anda customers is 1,000 units per controlled

12   substance family?

13        A.   Yes.  At some point in 2010, we dropped the

14   limits to 1,000 dosage units for new customers that

15   were opening an account with Anda.

16        Q.   Can you give a general description of what

17   the process is to submit an order for a customer of

18   Anda's to the company?

19        A.   There were numerous ways orders could be

20   submitted.  Some used our online ordering system.  We

21   had sales reps that received inbound phone calls.  We

22   had customers that were using the CSOS platform for

23   the electronic ordering of controlled substances in

24   the Schedule II form.  Sales reps could key orders
```

1   based on phone conversations with customers.  They

2   could either be inbound or outbound.

3          I believe we had some orders that came

4   through EDI, depending on the size of the customer

5   and what their business primarily focused on.  I

6   think some of the stuff that was EDI may have been

7   chain-oriented for some of our larger customer

8   groups.

9          That's pretty much all I can think of right

10  now.

11      Q.   Okay.  And which of those different orders

12  does -- did Anda apply its process for or -- or its

13  suspicious order monitoring system to in order to

14  evaluate whether they were suspicious orders?

15          MR. MATTHEWS:  Objection.

16          THE WITNESS:  All of them.  All of the orders

17      funneled into one main warehouse operating

18      system.

19  BY MR. NOVAK:

20      Q.   Is that after the orders were placed into

21  TPS?

22      A.   Correct.

23      Q.   Okay.

24          (Anda - Cochrane Exhibit 45 was marked for

Highly Confidential - Subject to Further Confidentiality Review

1     identification.)

2     BY MR. NOVAK:

3

4

5

6

7          Who is Jerry Cazzell?

8     A.    Jerry Cazzell was the VP of IT.

9          MR. NOVAK:  I misspoke.  This is Anda -

10    Cochrane Exhibit 45?

11         THE COURT REPORTER:  It's 45.

12         MR. NOVAK:  Okay.  45.

13         MS. RIGBERG:  Bates Number, please.

14         MR. NOVAK:  Anda 155184.

15    BY MR. NOVAK:

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7      Q.    Okay.  Is -- are there instances after an

8   order has been received in CSOS where they are not

9   placed into TPS to be processed?

10      A.    Not that I'm aware of.

11      Q.    Okay.  How about orders that come in in the

12   other methods that you referenced an answer or two

13   ago?  Say, for example, a telephonic order that comes

14   in to one of the sales representatives.  Are all of

15   those orders placed into TPS?

16          MR. MATTHEWS:  Objection.

17          THE WITNESS:  I'm not sure.  I would assume.

18   BY MR. NOVAK:

19      Q.    Okay.  Are there instances where orders are

20   not placed into TPS because they exceed a control

21   limit?

22      A.    There's a -- I believe there's a hard stop on

23   the limit where it won't let them place the order.

24      Q.    Okay.  So in those instances, an order would

Highly Confidential - Subject to Further Confidentiality Review

1   be received by a customer but they would be unable to

2   place it into the TPS system?

3           MR. MATTHEWS:  Objection.

4           THE WITNESS:  I'm not sure.  I believe it

5       would go into the TPS system, but it would zero

6       the line out or give them whatever allocation

7       they had left against their monthly limit.

8   BY MR. NOVAK:

9       Q.   In those instances where it is zeroed out,

10  what does that mean?

11      A.   It means it just didn't go through the

12  allocation process to relieve inventory, but there's

13  a record of the order coming in is what I believe to

14  have -- is what I believe to happen.

15      Q.   Okay.  At that point, is an order that is

16  zeroed out evaluated by the company's suspicious

17  order monitoring system?

18      A.   I believe they were, because the hold process

19  was prior to inventory allocation.  So whether or not

20  the line item was going to ship, if it came in and

21  was keyed, it should have gone on hold.  And all that

22  happened before the inventory allocation process is

23  what I believe to -- is what I believe -- is what I

24  think how the system worked.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Okay.

2     A.    Since they put -- we were put on hold before

3    allocation, it didn't relieve inventory.  But you

4    would have to ask an IT person.

5     Q.    Okay.  Have you heard the term "the bucket"

6    as it relates to the performance of the

7    responsibilities in the compliance department at

8    Anda?

9     A.    Yeah, I do believe I have heard of that.

10     Q.    Okay.  And what does that mean to you?

11     A.    There were several types of different hold

12    statuses in our system.  Our bucket was just a

13    different type of a hold in the system, meaning

14    orders that were up for review were placed in a

15    bucket, so to speak.

16     Q.    And how does an order get placed in the

17    bucket?

18          MR. MATTHEWS:  I'm sorry, were you finished

19          with your answer?  It was not clear to me you

20          were finished with your answer.

21          THE WITNESS:  The system -- the specific

22          things that we've programmed into the system

23          warrant whether or not it would go on our hold --

24          in our hold bucket.  Our hold bucket was the last

```
 1        one before allocation.

 2            I believe there was a user hold bucket where

 3        a sales rep could have an order that's pending

 4        and he's waiting for a response from a customer.

 5        There was a credit hold bucket, so to speak,

 6        where if customers had specific credit issues,

 7        they go into the credit hold bucket.  And so on.

 8            I don't remember specifically how many there

 9        were, what all their titles were, but we had one,

10        and it was our bucket, so to speak, from a hold

11        standpoint.  The last things that goes through

12        from a checks and blanks thing were -- was our

13        bucket in the hierarchy of the orders being held.

14    BY MR. NOVAK:

15        Q.   Okay.  If I understand that correctly, what

16    you're suggesting is there is almost a sequence --

17        A.   Yes, they have a sequence.

18        Q.   -- of buckets that an order will go through

19    prior to being filled by the company?

20        A.   Yes, I believe that's how it worked.

21        Q.   And the last bucket in the sequence is the

22    allocation bucket where inventory is drawn down to

23    fill the order?

24        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  The bucket before that is your bucket

2    that relates to whether the order passes under the

3    company's suspicious order monitoring system?

4      A.    I believe so.

5      Q.    Okay.  Before that, there are also buckets

6    related to credit and buckets related to sales?

7      A.    Yeah.  I believe those -- I believe a rep

8    could put an order on hold if he was waiting for a

9    response from a customer.

10     Q.    Okay.  And is it possible that some orders

11   never get to the compliance evaluation process that

12   is in the suspicious order monitoring system because

13   they have been stopped in the sales bucket or in the

14   credit bucket?

15     A.    I guess there's a potential for that.

16     Q.    Okay.  Do you know if those orders are ever

17   evaluated for a determination as to whether they are

18   suspicious?

19          MR. MATTHEWS:  Objection.

20          THE WITNESS:  No, I don't.

21          THE VIDEOGRAPHER:  The time is 5:19 p.m.  We

22      are going off the record.

23         (Recess from 5:18 until 5:32 p.m.)

24         (Anda - Cochrane Exhibit 46 was marked for

Highly Confidential - Subject to Further Confidentiality Review

 1    identification.)

 2              THE VIDEOGRAPHER:  Time is 5:32 p.m.  We are

 3        now back on the record.

 4    BY MR. NOVAK:

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3

 4

 5

 6          (Anda - Cochrane Exhibit 47 was marked for

 7     identification.)

 8     BY MR. NOVAK:

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23          (Anda - Cochrane Exhibit 48 was marked for

24     identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

1     BY MR. NOVAK:



18          Q.    Okay.  Were you involved in hiring Howard

19     Davis?

20          A.    Yes.

21          Q.    How long was he at Anda?

22          A.    I don't remember.  Approximately three

23     months, maybe.

24          Q.    Okay.  What were the circumstances

```
 1    surrounding his departure?

 2        A.    Howard, even though he had multiple years of

 3    experience and was a diversion program manager at one

 4    point for four different states, he had zero to add

 5    to the program that we had put together from a

 6    suspicious orders system as far as due diligence was

 7    concerned.  One of his responses to Al and I were --

 8    was that he is baffled that DEA is even breathing

 9    down our neck I think is the words -- are the words

10    that we used with all that we have in place right now

11    and what we're doing.

12            From a contribution standpoint, there was

13    really no value there.

14        Q.    Was he ultimately terminated by the company?

15        A.    Yes.

16            MR. MATTHEWS:  Can I ask a question?  Is this

17        one exhibit or two exhibits?

18            MR. NOVAK:  One.

19            MS. RIGBERG:  Could we please get that Bates

20        Number?

21            MR. NOVAK:  Yes.  The last one was Anda 82872

22        through 82874.

23            MS. RIGBERG:  Thank you.

24            (Anda - Cochrane Exhibit 49 was marked for
```

Highly Confidential - Subject to Further Confidentiality Review



1      identification.)

2      BY MR. NOVAK:

16            MR. NOVAK:  I should have noted that it bears

17         the Anda MDL Bates Number 133111 through 113.

18      BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3

 4

 5        Q.   Okay.  And was it in response to the DEA's

 6   letter of violation to Anda that the -- the 5,000

 7   threshold was lowered to 1,000?

 8             MR. MATTHEWS:  Objection.

 9             THE WITNESS:  I don't know if it was -- it

10        may be in this response, but it was done prior to

11        us receiving this letter that came, I think,

12        approximately 17 months after the inspection.

13   BY MR. NOVAK:

14        Q.   That's all I have on that exhibit.

15             Now, it was a while ago, but do you recall

16   from this morning's testimony you had identified that

17   pain management clinics were one of the next

18   frontiers that the DEA was warning about in 2007 at

19   the HDMA and industry conferences?

20             MR. MATTHEWS:  Objection.

21             THE WITNESS:  I don't specifically remember

22        that from this morning but -- is there an exhibit

23        or -- yeah, the HDMA memo?

24             MR. NOVAK:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Yes.

 2     BY MR. NOVAK:

 3          Q.    When did Anda make a determination to reduce

 4     its sales to pain management clinics?

 5                MR. MATTHEWS:  Objection.

 6                THE WITNESS:  I'm not sure.  I think it was

 7          in 2008, 2009.  I can't remember the exact year.

 8          (Anda - Cochrane Exhibit 50 was marked for

 9     identification.)

10     BY MR. NOVAK:

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1
2
3
4
5
6
7
8
9
10
11
12          (Anda - Cochrane Exhibit 51 was marked for

13    identification.)

14    BY MR. NOVAK:

15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

 9       Q.   And distributors.

10            Was there discussion in the meetings that

11   Anda held with the DEA in or about this June of 2010

12   time frame regarding the discontinuation of those

13   sales?

14       A.   Yes.  We made DEA aware of what we were doing

15   before we did it.

16       Q.   When you say you made DEA aware of it, had

17   DEA representatives expressed their concern about the

18   volume of Anda sales to pain management clinics,

19   physicians, and distributors?

20       A.   At that point in time, I do not believe they

21   did.

22       Q.   Okay.  But they did just shut off your

23   customer, Harvard Drug Group?

24            MR. MATTHEWS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Yes.

 2   BY MR. NOVAK:

 3        Q.   Two days before?

 4              MR. MATTHEWS:  Objection.

 5              THE WITNESS:  Yes.

 6   BY MR. NOVAK:

 7        Q.   In your discussions with Al Paonessa and

 8   Patrick Cochrane, is one of the factors that was

 9   discussed -- was one of factors that was discussed

10   that motivated your suggestion that all of these

11   different customers be terminated that you didn't

12   want the DEA to present a similar enforcement action

13   against Anda to the one that they had just brought

14   against Harvard Drug Group?

15              MR. MATTHEWS:  Objection.

16              THE WITNESS:  More than likely, yes.

17   BY MR. NOVAK:

18        Q.   And so you quickly moved, within two days, to

19   cut off all of those customers?

20              MR. MATTHEWS:  Objection.

21              THE WITNESS:  Correct.

22              MR. NOVAK:  I'm going to take a quick break.

23              THE VIDEOGRAPHER:  Off the record at

24        6:00 p.m.
```

Highly Confidential - Subject to Further Confidentiality Review

1              (Recess from 6:00 until 6:14 p.m.)

2              (Anda - Cochrane Exhibit 52 was marked for

3         identification.)

4              THE VIDEOGRAPHER:  The time is 6:14.  We're

5         now back on the record.

6    BY MR. NOVAK:

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



14          (Anda - Cochrane Exhibit 53 was marked for

15     identification.)

16     BY MR. NOVAK:

17          Q.    We've next had marked Anda - Cochrane

18     Exhibit 53.

19          A.    Just one second.

20          Q.    Uh-huh.

21          A.    Back to the -- the previous exhibit.

22               I think I misspoke earlier on orders coming

23     in through all of the different mechanisms as far as

24     order entry is concerned, whether they be electronic

Highly Confidential - Subject to Further Confidentiality Review

```
1    or sales reps phoning, you know, taking phone orders.

2    There was a hard stop where the system wouldn't allow

3    you to key something that was going to go over the

4    5,000, and it wouldn't allow you to key the order.

5        Q.    Okay.

6        A.    And just another point of clarity is CII

7    orders were never keyed by sales reps.  Those were

8    either done through CSOS or through a triplicate 222

9    form that the customer would mail in that would then

10   be processed by distribution personnel that had

11   access to the CIIs that were in the vault.  And those

12   orders were specifically keyed by administrative

13   assistants that had access to enter a CII order.  The

14   sales reps don't and never had access to that.

15       Q.    Okay.  What you are providing clarification

16   on is some of your earlier testimony --

17       A.    Yes.

18       Q.    -- as it relates to the submission of orders

19   and the manner in which those orders are placed into

20   TPS?

21       A.    Yes.

22       Q.    Okay.

23       A.    There would be a hard stop on -- before an

24   order could get into the system if it exceeded the
```

Highly Confidential - Subject to Further Confidentiality Review

1    number of dosage units that were allowed for that

2    customer.

3         Q.   Okay.  So in those instances where there is a

4    hard stop --

5         A.   Yes.

6         Q.   -- is the order allowed to be placed into the

7    TPS system?

8         A.   No, I don't believe it was.

9         Q.   Okay.  And if it is not placed into the TPS

10   system, would it be flagged as a -- under the

11   company's operation of its suspicious order

12   monitoring system?

13        A.   No.

14        Q.   Okay.  So to the extent an Anda customer

15   submitted an order that was stopped by virtue of the

16   hard stop --

17        A.   Yes.

18        Q.   -- that you have identified, it would never

19   be flagged for reporting as a suspicious order to the

20   DEA?

21             MR. MATTHEWS:  Objection.

22             THE WITNESS:  I don't think so, no.

23             Sorry.

24   ///

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 8    BY MR. NOVAK:

 9        Q.   Is it your position that there was not a

10    single suspicious order submitted to Anda by one of

11    its customers during that time period that Anda

12    detected?

13            MR. MATTHEWS:  Objection.

14            THE WITNESS:  Yes.

15    BY MR. NOVAK:

16        Q.   Now, you had been working on some alternative

17    methods of identifying suspicious orders still into

18    2012, correct?

19            MR. MATTHEWS:  Objection.

20            THE WITNESS:  We had a system in place prior

21        to 2012 as far as customer due diligence and

22        order monitoring was concerned that was in place.

23        I can't remember the date.  We talked about the

24        testing of a system in 2011, I believe, where

Highly Confidential - Subject to Further Confidentiality Review

```
 1          orders were flagged; they would go on hold.  We

 2          talked about our bucket.  That was prior to 2012.

 3     BY MR. NOVAK:

 4          Q.   During the time that Anda was owned by Watson

 5     or Actavis, was it involved in the launch of branded

 6     products by those companies?

 7               MR. MATTHEWS:  Objection.

 8               THE WITNESS:  I can't remember the specific

 9          branded product launches that we did for Watson

10          or Actavis.

11          (Anda - Cochrane Exhibit 54 was marked for

12     identification.)

13     BY MR. NOVAK:

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



20    BY MR. NOVAK:

21        Q.    Okay.  Are there any particular pricing

22    advantages that you are aware of that Anda would be

23    able to extend for products by the company that owns

24    Anda that it wouldn't be able to extend for other

```
 1    companies' opioid products?

 2              MR. MATTHEWS:  Objection.  Foundation.

 3              THE WITNESS:  I was never involved in the

 4         pricing of products or anything of that nature.

 5         I have no idea.

 6    BY MR. NOVAK:

 7      Q.   Okay.  How about the rebates?  Are they any

 8    different from a branded product that is marketed by

 9    Actavis as opposed to some other manufacturer that

10    doesn't own Anda?

11              MR. MATTHEWS:  Objection; foundation.

12              THE WITNESS:  I have no idea.

13              MR. NOVAK:  Okay.  Bear with me for a second.

14              MR. MATTHEWS:  Take your time.

15    BY MR. NOVAK:

16      Q.   Mr. Cochrane, when you perform a review of

17    particular retailers and their orders of controlled

18    substances, does the size of the retailer ever factor

19    into your analysis as to whether the order should be

20    filled?

21              MR. MATTHEWS:  Objection.

22              THE WITNESS:  No, not that I can remember.

23         (Anda - Cochrane Exhibit 55 was marked for

24    identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 1

 2

 3          Q.    Okay.

 4               (Anda - Cochrane Exhibit 56 was marked for

 5     identification.)

 6     BY MR. NOVAK:

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    BY MR. NOVAK:

23        Q.    Okay.  And at this time in 2012, you could

24    authorize a multiple of that initial 1,000 unit

```
 1    dosage after they had an established track record?

 2         A.   We could, yeah, after we had done a review of

 3    them and received dispense data on them on an ongoing

 4    basis, yeah.

 5         Q.   Okay.  Was there any multiple that the

 6    company used of the average monthly purchases by a

 7    company in 2012 before it would trigger a hold on the

 8    order as a suspicious order?

 9              MR. MATTHEWS:  Objection.

10    BY MR. NOVAK:

11         Q.   Or a potentially suspicious order?

12              MR. MATTHEWS:  Objection.

13              THE WITNESS:  I believe there was, yeah.  I

14         don't remember off the top of my head what it

15         was, though.

16    BY MR. NOVAK:

17         Q.   You don't know what the multiple number was?

18         A.   Correct.

19         Q.   Was it a fixed number?

20         A.   Yes.

21         Q.   Okay.  Do you know if it was a multiple of

22    eight?

23         A.   Not sure.

24         Q.   Okay.  Was there a point in time when Anda
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    applied a multiple of eight to the average monthly

2    order before it would hold an order for a customer?

3              MR. MATTHEWS:  Objection.

4              THE WITNESS:  Possibly.

5    BY MR. NOVAK:

6         Q.   Okay.  Do you know how the eight times

7    multiplier was selected by Anda?

8         A.   No.

9              MR. MATTHEWS:  Objection.

10             THE WITNESS:  Don't remember.

11   BY MR. NOVAK:

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1

2

3       Q.   Has Anda ever communicated to the DEA that it

4   used an eight times multiplier in its Standard

5   Operating Procedure 40 for purposes of implementing a

6   suspicious order monitoring system?

7          MR. MATTHEWS:  Objection.

8          THE WITNESS:  I'm not sure, but I would

9      assume that it was communicated.

10  BY MR. NOVAK:

11      Q.   Who typically would have communicated those

12  items to the company?

13      A.   Oh, it could have been a number of people.

14  It could have been me; it could have been Robert

15  Brown; it could have been -- depending on when it

16  was, it could have been Howard Davis; Emily Schultz.

17      (Anda - Cochrane Exhibit 57 was marked for

18  identification.)

19  BY MR. NOVAK:

20      Q.   We have had marked as Anda - Cochrane 57 a

21  document that was previously marked as Anda - Brown

22  Exhibit 10 during the deposition of Robert Brown.

23      First let me ask:  Was there a point in time

24  of which you are aware where Anda contracted with

Highly Confidential - Subject to Further Confidentiality Review

```
1      Buzzeo to perform a suspicious order monitoring

2      system assessment on behalf of the company?

3          A.   Yes.

4               MR. MATTHEWS:  Objection.

5      BY MR. NOVAK:

6          Q.   And were you one of the individuals at Anda

7      who was interviewed by Buzzeo for purposes of their

8      performance of that suspicious order monitoring

9      assessment?

10         A.   Yeah, but I don't know if I was present for

11     the whole -- the whole meeting when they were here.

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

```
 1     BY MR. NOVAK:
```



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9    BY MR. NOVAK:

10        Q.    Those are pretty significant increases on a

11    month-to-month basis.  Would a suspicious order

12    monitoring system, in your view, appropriately flag

13    increases that are -- are less significant than the

14    ones presented here?

15            MR. MATTHEWS:  Objection.

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    BY MR. NOVAK:

22         Q.    Okay.  And a system that uses six months of

23    dispensed data would average out those six months

24    worth of data to create the flag that's going to be

Highly Confidential - Subject to Further Confidentiality Review

1    used to determine whether an order is suspicious or

2    not, correct?

3              MR. MATTHEWS:  Objection.

4              THE WITNESS:  I believe so.

5    BY MR. NOVAK:

6         Q.   Does using six months or a year of data have

7    the effect of potentially masking increases in the

8    amount of dosage units that a company would -- would

9    potentially buy from Anda -- or, for that matter,

10   from any distributor -- as a result of averaging the

11   data?

12             MR. MATTHEWS:  Objection.

13             THE WITNESS:  I don't believe there's any

14        masking going on.

15   BY MR. NOVAK:

16        Q.   Let me have you look for a moment at a

17   different example.

18             (Anda - Cochrane Exhibit 59 was marked for

19   identification.)

20             MR. MATTHEWS:  This is two pages, but it's

21        one exhibit?

22             MR. NOVAK:  Yes.

23   BY MR. NOVAK:

24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7       Q.   So if the controlled substance monitoring

8    program is constructed with the right variables, you

9    could have a massive increase in the amount of

10    product that a customer could order simply based on

11    stretching out the averages over the year's time.

12           MR. MATTHEWS:  Objection.

13           THE WITNESS:  Yeah.  I was just --

14           MS. URQUHART:  Objection.

15

16

17

18

19

20

21

22           MR. NOVAK:  Okay.  Let me take a quick break.

23           THE VIDEOGRAPHER:  Off the record at 7:09.

24           (Recess from 7:09 until 7:16 p.m.)

Highly Confidential - Subject to Further Confidentiality Review

```
1              (Anda - Cochrane Exhibit 60 was marked for

2      identification.)

3              (Anda - Cochrane Exhibit 61 was marked for

4      identification.)

5              THE VIDEOGRAPHER:  The time is 7:16.  We're

6         now back on the record.

7      BY MR. NOVAK:

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



19          Hold on.

20          I'm concerned that these documents are not

21     appropriately combined, because looking at the top of

22     it, they appear to be involving different subject

23     matters.

24          Okay.  I apologize.  There's a different

Highly Confidential - Subject to Further Confidentiality Review

1    cover page for the last part of Anda Exhibit 61.

2              MR. MATTHEWS:  What are we doing here?

3              MR. NOVAK:  Could we correct the marking of

4       Anda Exhibit 61?

5              MR. MATTHEWS:  How are you trying to correct

6       it?

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11          MR. MATTHEWS:  Okay.  For the record, you are

12      now over your time limit.  I'll give you one

13      question to the witness on this document, and I'm

14      going to cut off any questions after that.

15  BY MR. NOVAK:

16

17

18

19      A.   I don't have the cover page with the exhibit

20   on it.

21          MR. MATTHEWS:  Just so the record is clear,

22      by "this," you mean what you have marked as

23      Exhibit 61?

24          MR. NOVAK:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  There's two that are marked 61,

 2        though.  I think maybe this one goes with that

 3        letter.
```

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

```
16              MR. MATTHEWS:  One question for the witness.

17              MR. NOVAK:  And I think I already have one

18        pending.

19              MR. MATTHEWS:  Why don't you ask it again.

20     BY MR. NOVAK:
```

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2          MR. MATTHEWS:  Are you finished?

3          MR. NOVAK:  I'm out of time.

4          MR. MATTHEWS:  So you are passing the

5     witness?

6          MR. NOVAK:  Yes.

7          MR. MATTHEWS:  Before we continue, I would

8     just like to ask on the record if you can tell me

9     where the last page of Exhibit 61 originated from

10    since it doesn't bear Bates numbers, so I don't

11    know what it is or where it came from.

12         MR. NOVAK:  I -- I don't know what explains

13    that.  I assume it was produced with the

14    remainder of the document but for some reason

15    does not include a Bates Number.

16         MR. MATTHEWS:  Since it doesn't bear any

17    objective indications of its -- where it came

18    from and since the witness didn't identify that

19    page in particular, I object to its use in the

20    deposition because we don't know anything about

21    its authenticity or what it is.

22         MR. NOVAK:  I believe we have a substitute

23    page that -- yeah.  I understand your objection.

24    I'll have to go back to the production at some

```
 1          point and see if there's a Bates number that can

 2          be attached to it.  I understand.

 3              MR. MATTHEWS:  That's always -- it's

 4          always -- I'm ready, willing, and able to talk

 5          with you about ways we can solve issues that

 6          arise during the deposition.  So bring it to me

 7          and we will consider it.

 8              MR. NOVAK:  Thanks.

 9              MR. MATTHEWS:  I'm going to have some

10          questions.  I need a few minutes to splash some

11          water on my face and see if the witness is okay,

12          all right?  And then we will be right back.

13              MR. NOVAK:  Thank you.

14              THE VIDEOGRAPHER:  The time is 7:27 p.m.  We

15          are going off the record.

16              (Recess from 7:27 until 7:34 p.m.)

17              THE VIDEOGRAPHER:  The time is 7:34 p.m.  We

18          are now back on the record.

19                      CROSS-EXAMINATION

20     BY MR. MATTHEWS:

21         Q.  Good evening, Mr. Cochrane.  As you know, my

22     name is James Matthews.  I represent Anda in this

23     litigation, and today I have been representing you.

24              I have a few questions for you.  I know it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    late in the day.  I appreciate very much the time

 2    that you have been willing to testify today.

 3              I want to take you way back to the beginning

 4    of the day and just make sure some certain things are

 5    clear on the record.

 6              To begin with, you aren't currently employed

 7    by Anda; is that right?

 8         A.   No, I'm not.

 9         Q.   And you haven't been employed by Anda since

10    sometime in 2016, correct?

11         A.   Correct.

12         Q.   And your appearance here today is voluntary;

13    is that correct?

14         A.   Yes.

15         Q.   I want to focus on a time when you were

16    employed by Anda and responsible for DEA compliance,

17    okay?

18         A.   Okay.

19         Q.   And just so we're sure between us what I mean

20    by DEA compliance, I mean the process of maintaining

21    and being responsible for the system that Anda

22    devised to detect, identify suspicious orders, all

23    right?

24         A.   Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    But DEA compliance involves a lot more than

2    that, right?

3      A.    Correct.

4      Q.    But today we are going to be limited to that,

5    all right?

6      A.    Okay.

7

8

9

10

11

12

13

14

15

16

17

18

19      Q.    And in what areas of the country did Anda

20    distribute products?

21      A.    All across the United States.

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1  ████████████████████████████████████████

2       Q.    Okay.  Did that change at some time?

3       A.    As to how many customers there were?

4       Q.    Independent retail pharmacies approved for

5  purchasing controlled substances.  Did that number

6  change at some time?

7       A.    Yes.

8       Q.    How did it change after 2010?

9       A.    Drastically.  Fewer customers through our due

10  diligence process and customer review process.

11       Q.    When did that customer review and due

12  diligence process occur?

13       A.    It started back in 2007.

14       Q.    And when did it sort of end, in your view?

15       A.    It's ongoing.

16  ████████████████████████████████████████

17  ████████████████████████████████████████

18  ████████████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████████████████

21       Q.    Okay.  I want to ask you to refer back to --

22       A.    Actually, it would go back to 2005.

23  ████████████████████████████████████████

24  ████████████████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2      Q.   Was that accurate as of 2015 to the best of
 3   your recollection?
 4      A.   I believe it was.
 5      Q.   At the beginning of -- let me ask you another
 6   question -- sort of background question:  At or
 7   around 2010, how many SKUs did Anda distribute?
 8      A.   More than 10,000, potentially 15,000.
 9      Q.   Just so the record is clear, what is an SKU?
10      A.   It's an individual selling unit of product.
11      Q.   Okay.  And there was some testimony about
12   controlled substances and SKUs earlier in the day.
13           Do you remember that?
14      A.   Yes.
15      Q.   Let me ask you this:  At or around the period
16   2005 to 2010, about how many individual SKUs for the
17   product oxycodone did Anda distribute?
18      A.   Twenty-five to 40, maybe more.
19      Q.   Okay.  And so it's clear, why would there be
20   that many SKUs that Anda distributed for oxycodone?
21      A.   Different bottle counts, different
22   milligrams, different manufacturers,
23   different national drug code numbers.  Every national
24   drug code had its own SKU and item number.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Let me ask you the same question for

 2   hydrocodone:  During the period 2005 to 2010, about

 3   how many SKUs for hydrocodone did Anda distribute if

 4   you have a memory?

 5        A.   It could have been as many as a hundred.

 6        Q.   And how about hydromorphone?

 7        A.   Hydromorphone wasn't as popular.  Probably

 8   ten, if I had to put a number on it.

 9        Q.   Mr. Novak asked you some questions about what

10   you did when you first had -- got the position as

11   head of regulatory compliance to familiarize yourself

12   with the company's obligations.

13            I'm going to ask you:  What was the -- from

14   your perspective as head of the compliance -- DEA

15   compliance during the time that you had the job, what

16   was the source of the legal obligations that you

17   turned to to understand what those legal obligations

18   were?

19        A.   The code of --

20            MR. NOVAK:  Objection.

21   BY MR. MATTHEWS:

22        Q.   You can answer the question.

23        A.   The Code of Federal Regulations, United

24   States Code.
```

```
 1        Q.   Let me show you what's been marked for

 2   identification as Exhibit 62.

 3            (Anda - Cochrane Exhibit 62 was marked for

 4   identification.)

 5   BY MR. NOVAK:

 6        Q.   Can you take a look at Exhibit 62 and tell me

 7   if you know what that is?

 8        A.   Yes.

 9        Q.   What is it?

10        A.   21 United States Code, the Controlled

11   Substances Act.

12        Q.   When you testified that you looked at the

13   United States Code to -- as the source of your legal

14   obligations with respect to DEA compliance, is that

15   the section of code you were referring to?

16        A.   Yes.

17        Q.   Let me hand you what the court reporter has

18   marked as Exhibit 63.

19            (Anda - Cochrane Exhibit 63 was marked for

20   identification.)

21   BY MR. MATTHEWS:

22        Q.   Look at 63 and tell me if you know what that

23   is.

24        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    What is it?

 2        A.    Title 21, the Code of Federal Regulations.

 3        Q.    When you testified earlier that you looked at

 4   the regulations as the source of the legal

 5   obligations for DEA compliance at Anda, is that what

 6   you were referring to?

 7        A.    Yes.

 8        Q.    You've had a lot of questions today about a

 9   lot of different topics, and I'd like to sort of

10   orient them to the United States Code and the Code of

11   Federal Regulations, if I could.

12             So starting first with the code, which is

13   Exhibit 62, could you take a look at it and tell me

14   what, if anything, it says about knowing your

15   customers?

16             MR. NOVAK:  Objection.

17             THE WITNESS:  There is nothing.

18   BY MR. MATTHEWS:

19        Q.    Could you take a look at Exhibit 62 and tell

20   me, what, if anything, it says about dispensing data?

21             MR. NOVAK:  Objection.

22             THE WITNESS:  There is nothing.

23   BY MR. MATTHEWS:

24        Q.    Could you take a look at Exhibit 62 and tell
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    me what, if anything, it says about Internet

 2    pharmacies?

 3              MR. NOVAK:  Objection.

 4              THE WITNESS:  There is nothing.

 5    BY MR. MATTHEWS:

 6        Q.   Could you look at Exhibit 62 and tell me

 7    what, if anything, it says about physicians?

 8              MR. NOVAK:  Objection.

 9              THE WITNESS:  There is nothing.

10    BY MR. MATTHEWS:

11        Q.   Could you look at Exhibit 62 and tell me,

12    what, if anything, it says about pain clinics?

13              MR. NOVAK:  Objection.

14              THE WITNESS:  There is nothing.

15    BY MR. MATTHEWS:

16        Q.   Can you look at Exhibit 62 and tell me what,

17    if anything, it says about shipping suspicious

18    orders?

19              MR. NOVAK:  Objection.

20              THE WITNESS:  There is nothing.

21    BY MR. MATTHEWS:

22        Q.   Can you look at Exhibit 62 and tell me what,

23    if anything, it says about cutting off customers?

24              MR. NOVAK:  Objection.
```

```
 1              THE WITNESS:  There is nothing.

 2   BY MR. MATTHEWS:

 3       Q.   From your perspective as you read the

 4   applicable code -- let me ask you this:  Can you look

 5   at Exhibit 62 and tell me, what, if anything, it says

 6   about site inspections?

 7              MR. NOVAK:  Objection.

 8              THE WITNESS:  There is nothing.

 9   BY MR. MATTHEWS:

10       Q.   And can you look at Exhibit 62 and tell me

11   what, if anything, it says about Google searches?

12       A.   There is nothing.

13              MR. NOVAK:  Objection.

14   BY MR. MATTHEWS:

15       Q.   If you could look at Exhibit 63, please,

16   which is a copy of the Code of Federal Regulations,

17   could you look at Exhibit 63 and tell me what it

18   says, if anything, about knowing your customer?

19              MR. NOVAK:  Objection.

20              THE WITNESS:  There is nothing.

21   BY MR. MATTHEWS:

22       Q.   Looking at Exhibit 63, can you tell me what,

23   if anything, it says about dispensing data?

24              MR. NOVAK:  Objection.
```

```
 1                  THE WITNESS:  There is nothing.

 2       BY MR. MATTHEWS:

 3            Q.   Can you look at Exhibit 63 and tell me, what,

 4       if anything, it says about Internet pharmacies?

 5                  MR. NOVAK:  Objection.

 6                  THE WITNESS:  There is nothing.

 7       BY MR. MATTHEWS:

 8            Q.   Can you look at Exhibit 63 and tell me what,

 9       if anything, it says about physicians?

10                  MR. NOVAK:  Objection.

11                  THE WITNESS:  There is nothing.

12       BY MR. MATTHEWS:

13            Q.   Can you look at Exhibit 63 and tell me what,

14       if anything, it says about pain clinics?

15                  MR. NOVAK:  Objection.

16                  THE WITNESS:  There is nothing.

17       BY MR. MATTHEWS:

18            Q.   Can you look at Exhibit 63 and tell me what,

19       if anything, it says about not shipping suspicious

20       orders?

21                  MR. NOVAK:  Objection.

22                  THE WITNESS:  There is nothing.

23       BY MR. MATTHEWS:

24            Q.   Can you look at Exhibit 36 and tell me what,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    if anything, it says about cutting off customers?

 2              MR. NOVAK:  Objection.

 3              THE WITNESS:  There is nothing.

 4    BY MR. MATTHEWS:

 5        Q.  Can you look at Exhibit 63 and tell me what,

 6    if anything, it says about site inspections?

 7              MR. NOVAK:  Objection.

 8              THE WITNESS:  There is nothing.

 9    BY MR. MATTHEWS:

10        Q.  Can you look at Exhibit 36 and tell me, what,

11    if anything, it says about Google search?

12              MR. NOVAK:  Objection.

13              THE WITNESS:  There is nothing.

14    BY MR. MATTHEWS:

15        Q.  In fact, would you agree with me that

16    Exhibit 63 doesn't contain any of the words that I

17    just asked you about in any of the previous

18    questions?

19              MR. NOVAK:  Objection.

20              THE WITNESS:  Yes.

21    BY MR. MATTHEWS:

22        Q.  Would you also agree with me that Exhibit 62

23    doesn't contain any of the words that I asked you

24    about in the previous questions about that exhibit?
```

```
 1      A.   Yes.

 2           MR. NOVAK:  Objection.

 3   BY MR. MATTHEWS:

 4      Q.   Besides the statute and the regulation, were

 5   there other sources of information that you relied

 6   upon in thinking about how to meet your obligations

 7   under the statute?

 8      A.   Sure.

 9           MR. NOVAK:  Objection.

10   BY MR. MATTHEWS:

11      Q.   And what were those sources?

12      A.   Local field investigators, industry groups,

13   Department of Health, DEA, numerous different

14   advisors or regulators.

15      Q.   All right.  So have you heard the term

16   "guidance" in relation to your DEA compliance duties?

17      A.   Yes.

18      Q.   How do you understand that term, "guidance,"

19   in that context?

20      A.   A lot of the things you described are

21   guidance mechanisms.  Not necessarily

22   statute-related, but a lot of the things that you

23   have asked me, we have discussed with our local field

24   offices, DEA in Washington, and things along those
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    lines.

2        Q.   All right.  When is the first time anyone

3    gave you guidance about Internet pharmacies?

4             MR. NOVAK:  Objection.

5             THE WITNESS:  2005.

6    BY MR. MATTHEWS:

7        Q.   Can you describe what that guidance was and

8    who you got it from?

9        A.   Yes.  We were called to Washington D.C. to

10   meet with Michael Mapes.  Internet pharmacies were

11   apparently a growing problem that they had seen and

12   were -- were watching.  We had some customers that

13   fit that criteria and they wanted to discuss us

14   distributing controlled substances to them.

15       Q.   Okay.  And what was the guidance you

16   received?

17            MR. NOVAK:  Objection.

18            THE WITNESS:  Not to do it.

19   BY MR. MATTHEWS:

20       Q.   Okay.  What did you do after you received

21   that guidance?

22       A.   Immediately stopped doing it.

23       Q.   And by "stopped doing it," what do you mean?

24       A.   We eliminated all of those customers from
```

```
1    being able to purchase controlled substances from us.

2         Q.   When is the first time that you received

3    guidance from any government agency about

4    distributing opioids to physicians or pain clinic?

5              MR. NOVAK:  Objection.

6              THE WITNESS:  At some point 2008, maybe,

7         Department of Health.

8    BY MR. MATTHEWS:

9         Q.   Okay.  What is the Department of Health you

10   are referring to?

11        A.   Florida Department of Health.

12        Q.   And what were the circumstances under which

13   you received that guidance?

14             MR. NOVAK:  Objection.

15             THE WITNESS:  We were called to Tallahassee

16        to specifically discuss a number of growing

17        dispensing practitioners and physicians within

18        the state of Florida itself.

19   BY MR. MATTHEWS:

20        Q.   Okay.  And what did you understand was their

21   view about Internet -- I'm sorry, physicians and pain

22   clinics at that time?

23             MR. NOVAK:  Objection.

24             THE WITNESS:  That it wasn't something that
```

```
 1        we wanted to be involved in.

 2   BY MR. MATTHEWS:

 3        Q.   And how did Anda respond to receiving that

 4   guidance?

 5        A.   We discontinued sales to dispensing

 6   physicians.  It may have been after 2008 that we were

 7   called up there.  I don't -- I don't remember that

 8   specifically but . . .

 9        Q.   When you say you ceased sales to dispensing

10   physicians, does that category also include pain

11   clinics?

12        A.   Yes.

13        Q.   I didn't ask you this so I want to go back to

14   it.

15             With respect to 62, the United States Code,

16   is there anything in that document about electronic

17   order monitoring systems?

18             MR. NOVAK:  Objection.

19             THE WITNESS:  Yes.  That you have to develop

20        a system.

21   BY MR. MATTHEWS:

22        Q.   Okay.  Can you look at 62, Exhibit 62, and

23   find for us where it says that you are required to

24   develop an electronic order monitoring system?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. NOVAK:  Objection.

2              THE WITNESS:  Oh, I misunderstood the

3         question.  It's not -- it doesn't have to be

4         electronic.

5    BY MR. MATTHEWS:

6         Q.   And if you look at Exhibit 63, which is the

7    code of regulations -- let me just draw your

8    attention to -- I have to find it; sorry -- Section

9    1301.74(b).

10             I'll read this to you:  The registrant shall

11   design and operate a system to disclose to the

12   registrant suspicious orders of controlled

13   substances.

14             Did I read that correctly?

15        A.   Yes.

16        Q.   What, if anything, does the regulation say

17   about an electronic order monitoring system?

18             MR. NOVAK:  Objection.

19             THE WITNESS:  It doesn't.

20   BY MR. MATTHEWS:

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



19    Q.   Could you explain the peculiar or the

20   particular circumstances that are unique for

21   secondary suppliers in the marketplace?

22    A.   It's a niche for out of stock products,

23   products that are in short supply, things along those

24   lines, as a backup.

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.    So in terms of ordering patterns from your

2   customers, what does that mean?

3       A.    The majority of their orders are sporadic.

4   There's -- there's not the same consistency as there

5   would be with their primary supplier.

6       Q.    And when you say sporadic, do you mean that

7   they vary in quantity?

8       A.    It could vary in quantity, specific products.

9   It doesn't have to be necessarily controlled,

10  noncontrolled.  It could be over the counter.

11      Q.    Do they vary in terms of timing?

12      A.    Yes.

13      Q.    How -- what do you mean by that?

14      A.    It all depends on the situation with their

15  primary supplier.  That kind of dictates when they're

16  going to order something from us and what they're

17  going to order.  It could be a product availability

18  issue.  There's some different circumstances.

19      Q.    So in terms of timing, was it your experience

20  when you were the head of the DEA compliance that

21  customers ordered at random -- often ordered at

22  random intervals?

23      A.    Yeah.

24      Q.    Now I would like you to turn back to what we
```

```
 1    marked as Exhibit 63.  And -- which is the Code of

 2    Federal Regulations, and I would like for you to read

 3    into record the last sentence of Section 1301.74,

 4    subparagraph B, which beginning with "Suspicious

 5    orders."

 6        A.   Suspicious orders include orders of unusual

 7    size, orders deviating substantially from a normal

 8    pattern, and orders of unusual frequency.

 9        Q.   How does that definition of suspicious orders

10    relate to your experience as a compliance -- head of

11    compliance at a secondary supplier of pharmaceutical

12    products?

13            MR. NOVAK:  Objection.

14            THE WITNESS:  Based on that, you could

15        consider every controlled substance order

16        suspicious to a certain extent.

17    BY MR. MATTHEWS:

18        Q.   Right.

19            Now, a lot of the testimony today -- or a lot

20    of the questions you were asked today focused upon

21    the implementation of Anda's electronic order

22    monitoring system.

23            Do you remember those questions?

24        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    I want to clarify something right up front.

 2              From time to time, do you refer to your --

 3    first of all, let me ask you this:  What is an

 4    electronic order monitoring system?

 5        A.    It's a system that encompasses multiple

 6    facets of data and information.

 7        Q.    Is the purpose of an electronic order

 8    monitoring system to analyze orders received in real

 9    time as they're received electronically?

10        A.    Yes.

11        Q.    And from time to time did you refer to the

12    electronic order monitoring system that Anda put in

13    place as a SOM system?

14        A.    Yes.

15        Q.    In your view, was the electronic order

16    monitoring system the total sum and substance of

17    Anda's suspicious order monitoring system?

18              MR. NOVAK:  Objection.

19              THE WITNESS:  No.

20    BY MR. MATTHEWS:

21        Q.    Could you describe for the record your view

22    of what Anda's system for detecting suspicious orders

23    was in place during the time that you were there?

24        A.    It included collecting customers' information
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    as far as our customer questionnaire is concerned;

 2    their licensing; the fact that we were reviewing

 3    dispense data; the fact that we were reviewing

 4    products; potential doctors that they were even using

 5    from a script-filling perspective.

 6        Q.   Was there any period of time during your

 7    employment at Anda as head of DEA compliance that

 8    Anda didn't have in place a system for detecting

 9    suspicious orders?

10        A.   No.

11             MR. NOVAK:  Objection.

12    BY MR. MATTHEWS:

13        Q.   What, if any, time while you were employed as

14    DEA compliance head at Anda did Anda not have a

15    system in place for detecting suspicious orders?

16             MR. NOVAK:  Objection.

17             THE WITNESS:  No.

18    BY MR. MATTHEWS:

19        Q.   By that, you mean none?

20        A.   Yeah, none.

21        Q.   Okay.  So one purpose -- when you -- I'll

22    withdraw that.

23             At some point in time, Anda implemented an

24    electronic order monitoring system; is that correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   When was that, to the best of your

 3    recollection?

 4        A.   2007?

 5        Q.   If I -- well, if I say 2011, does that

 6    refresh your recollection?

 7             MR. NOVAK:  Objection.

 8             THE WITNESS:  20 -- yeah, 2010 to 2011.

 9    BY MR. MATTHEWS:

10        Q.   Having refreshed your recollection, what was

11    the period of time that Anda implemented electronic

12    order monitoring system to the best of your

13    recollection?

14        A.   2011.

15        Q.   Okay.  Was the electronic order monitoring

16    system that was implemented designed to detect

17    changes in patterns of ordering by your customers?

18        A.   Yes.

19        Q.   Would you explain, in light of the problems

20    that secondary suppliers have, what problems you had

21    with respect to electronic order monitoring systems?

22        A.   The problems?  Well, we reviewed hundreds of

23    thousands of orders based on customers' purchasing

24    history from us and the fact that we were a secondary
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    supplier.  It was -- the system could create a lot of

 2    false positives.

 3         Q.   There was some testimony earlier today about

 4    the particular algorithm that the system used to flag

 5    orders.

 6              Do you recall that testimony?

 7         A.   Yes.

 8         Q.   Without regard to whatever the algorithm was,

 9    after you implemented the electronic order monitoring

10    system, how many orders approximately were being

11    flagged by the system on a month-to-month basis?

12         A.   I'm not sure.  I don't remember, but it was

13    thousands.

14         Q.   And were all of those orders reviewed by the

15    compliance department?

16         A.   Yes.

17         Q.   And how many of those orders did you

18    determine could be shipped?

19         A.   The majority of them.

20         Q.   And what was the basis on which you made the

21    decision that, although the orders had been flagged

22    by the electronic order monitoring system, they could

23    be shipped?

24         A.   The data that we have collected from the
```

Highly Confidential - Subject to Further Confidentiality Review

 1    customer as far as our customer questionnaire and

 2    dispensing information.

 3         Q.   What was your view of the accuracy of the

 4    electronic order monitoring system in identifying

 5    orders that ultimately were suspicious?

 6         A.   Not very accurate.

 7         Q.   And why?

 8         A.   Because of the volume and the amount of

 9    orders and the sporadic nature of our secondary

10    business model.

11         Q.   And so was that a problem, in your view, that

12    could be fixed by changing the algorithm?

13         A.   I'm not sure.

14         Q.   Given the problems of applying an electronic

15    order monitoring system to the business that Anda was

16    engaged in, what was it you, as head of compliance at

17    DEA, relied upon to be the best evidence or the best

18    method for detecting, identifying, and preventing

19    shipment of orders that you believed were suspicious?

20              MR. NOVAK:  Objection.

21              THE WITNESS:  Say that one again.

22    BY MR. MATTHEWS:

23         Q.   Given the problems --

24         A.   I'm getting really tired.

1    Q.   Yeah, I apologize.

2         Given the problems that you've described in

3    using the electronic order monitoring system in

4    connection with a business such as Anda which has

5    irregular patterns of ordering from its customers

6    because it's a secondary supplier, what was it you

7    believed, as head of DEA compliance at Anda, was the

8    best method for identifying potentially suspicious

9    orders?

10        MR. NOVAK:  Objection.

11        THE WITNESS:  Reviewing customers' data that

12    was submitted.

13   BY MR. MATTHEWS:

14    Q.   Okay.  I have you testified earlier that --

15   well, let me ask it this way:  What is your best

16   recollection of when you first received guidance from

17   anyone about knowing your customer?

18        MR. NOVAK:  Objection.

19        THE WITNESS:  Maybe 2007.

20   BY MR. MATTHEWS:

21    Q.   Okay.  And from your perspective, what does

22   it mean to know your customer?

23    A.   Having background information on them from a

24   business perspective.  Basically what was outlined in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    our customer questionnaire.

 2        Q.   Does that include information about the mix

 3    of products they dispensed?

 4        A.   Sure.  Percentage of cash business, you know,

 5    versus credit card or insurance, things along those

 6    lines; having a list of primary physicians that they

 7    would dispense for from a script standpoint.

 8            There's a lot of different things in the

 9    customer questionnaire.  I haven't looked at one for

10    several years but . . .

11        Q.   Okay.  After you received that guidance in

12    2007 about knowing your customer, what did you do?

13    What did Anda do?

14        A.   We -- we sent out the first version of our

15    customer questionnaire to all of the customers that

16    we had in our database that were purchasing

17    controlled substances.  I believe in that first

18    version we also asked for dispense data.

19            It wasn't -- it was an evolving process.  The

20    questionnaire is different now than it was -- well,

21    it was different in '16, you know, based on what it

22    was in 2007, but I'm pretty sure that was in there as

23    well.

24        Q.   All right.  There was some testimony earlier
```

1    today about the reports that were called monthly --

2    or were called excessive order reports and suspicious

3    order reports that Anda filed with the DEA in some

4    period of time.

5          Do you recall that testimony?

6    A.    Yes.

7    Q.    Prior to 2005, what feedback did you receive

8    from DEA about the suspicious order and excessive

9    order reports you were submitting on a monthly and

10   weekly basis?

11         MR. NOVAK:  Objection.

12         THE WITNESS:  None that I can recall.

13   BY MR. MATTHEWS:

14   Q.    Was there ever a time that they asked you to

15   submit them in a particular format?

16   A.    Yes.  Originally, we were faxing them

17   documents, and they requested at some point -- I'm

18   not sure of the date -- for us to export them in

19   Excel and e-mail it so there was an electronic

20   version of it rather than a faxed paper copy to their

21   fax number.

22   Q.    There were -- sorry.

23         There were a series of questions about

24   e-mails you received from DEA about customers who

Highly Confidential - Subject to Further Confidentiality Review

1    other distributors had ceased doing business with.

2         Do you remember those questions?

3    A.   Yup.

4    Q.   Could you find in your pile of exhibits

5    Exhibit Number 10, please.

6         Do you have it in front of you, Mr. Cochrane?

7    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



16    Q.    Thank you.

17          Could you take a look at Exhibit 13, please.

18          MS. RIGBERG:  Excuse me.  This is Karen

19    Rigberg.  The live feed with the text has

20    stopped, so could you get closer to the

21    microphone?

22          MR. MATTHEWS:  Everybody had their microphone

23    on their ties or their blouses.

24          MS. RIGBERG:  Okay.  That's pretty close.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. MATTHEWS:  I'm not sure about the live

 2         feed.

 3                THE VIDEOGRAPHER:  Do you want to go off the

 4         record real quick?

 5                MR. MATTHEWS:  Okay.

 6                THE VIDEOGRAPHER:  Off the record at 8:11.

 7                 (Recess from 8:11 until 8:14 p.m.)

 8                THE VIDEOGRAPHER:  Back on the video record

 9         at 8:14.

10      BY MR. MATTHEWS:

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1
2
3
4
5
6
7
8
```

9          MR. NOVAK:  Objection.

10    BY MR. MATTHEWS:

11         Q.   Do you know what Mr. Towle did after he left

12    Anda?

13              MR. NOVAK:  Objection.

14              THE WITNESS:  I'm not sure.

15    BY MR. MATTHEWS:

16         Q.   Did he continue to be in the industry?

17         A.   Yes.  I just don't know where he ended up.

18         Q.   What was your understanding of what he was

19    doing?

20         A.   Yes, he was still within the pharmaceutical

21    industry.

22              MR. NOVAK:  Objection.

23    BY MR. MATTHEWS:

24         Q.   And what was -- in what capacity?  What

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was --

 2         A.   Sales.

 3         Q.   -- his responsibility?

 4         A.   Sales.

 5         Q.   Thank you.
```



```
 1        Q.    Okay.  What, if anything -- I'll withdraw

 2   that.  Never mind.

 3              Could you turn to what was marked as

 4   Exhibit 25, please.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23      Q.   Is it your view that you had a suspicious

24   order monitoring system in place in April of 2008?

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.   With our 5,000 dosage unit limits and our --

2   beginning the collection of due diligence data, we

3   had something in place, yes.

4       Q.   What about an electronic order monitoring

5   system?  Did you have that in place at that time?

6       A.   No.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3      Q.    Would you turn to Exhibit 35, please.

4            Before we talk about Exhibit 35 in

5      particular, Mr. Cochrane, I want to ask a question

6      generally about compliance -- or the compliance

7      function at Anda while you were head of DEA

8      compliance.

9            What kind of -- while you were head of DEA

10     compliance -- I'll withdraw that.

11           Let's take a look at Exhibit 35.

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review

1     Q.   Do you remember that testimony?

2     A.   Yes.



Highly Confidential - Subject to Further Confidentiality Review



18          Q.    What information about the status of the --

19                (Telephone interruption.)

20                MR. MATTHEWS:  Excuse me a second.  Can we go

21          off the record.

22                THE VIDEOGRAPHER:  Off the record at 8:38.

23                (Recess from 8:38 until 8:39 p.m.)

24                THE VIDEOGRAPHER:  Back on the record at

Highly Confidential - Subject to Further Confidentiality Review

1        8:39.

2    BY MR. MATTHEWS:



Highly Confidential - Subject to Further Confidentiality Review



18    BY MR. MATTHEWS:

19        Q.   Okay.  Was there any other basis that they

20    ever told you of?

21            MR. NOVAK:  Objection.

22            THE WITNESS:  No.

23    BY MR. MATTHEWS:

24        Q.   Was that something you had discussed with

```
 1      agents at DEA on multiple occasions between 2007 and

 2      2011?

 3              MR. NOVAK:  Objection.

 4              THE WITNESS:  Yes.

 5      BY MR. MATTHEWS:

 6         Q.   Was DEA, from your perspective -- what -- was

 7      DEA, from your perspective, aware of the fact that

 8      you were selling volumes of oxycodone in excess of

 9      5,000 dosage units per month to certain customers

10      during this time period?

11         A.   Yes.

12              MR. NOVAK:  Objection.

13      BY MR. MATTHEWS:

14         Q.   When you met with DEA about this letter,

15      did -- or at any time before you received this

16      letter, did any agent of DEA ever actually identify

17      any specific order that DEA believed was a suspicious

18      order?

19         A.   No.

20              MR. NOVAK:  Objection.

21      BY MR. MATTHEWS:

22         Q.   During a period of time between the 2010

23      inspection and this 2011 order, what orders, if any,

24      did DEA identify to you as specific orders which it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    believed were suspicious that Anda had failed to

 2    report?

 3              MR. NOVAK:  Objection.

 4              THE WITNESS:  None.

 5    BY MR. MATTHEWS:

 6         Q.   Could you look at Exhibit 52, please.

 7              Before I move on, while you were head of DEA,

 8    what, if any, enforcement actions did DEA bring

 9    against Anda in connection with your DEA compliance?

10         A.   None.

11         Q.   While you were head of compliance at Anda,

12    what, if any, suspension orders did DEA issue to Anda

13    in connection with your DEA compliance?

14         A.   None.

15         Q.   While you were head of DEA compliance at

16    Anda, was there any period of time when your license

17    and your registration to distribute controlled

18    substances was withdrawn by DEA or by any enforcement

19    action?

20         A.   No.

21         Q.   Looking at Exhibit 52, Mr. Novak asked you

22    about this.

23

24
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

1

2

3

4

5

6

7

8

9

10

11

12

13

14      Q.    All right.  The time is 8:50 p.m.

15            What time did you wake up this morning,

16    Mr. Cochrane?

17      A.    5:15.

18      Q.    I appreciate your willingness to testify at

19    length.  At this time I don't have any further

20    questions for you.  Thank you.

21            THE VIDEOGRAPHER:  The time is 8:49 p.m.  We

22        are going off the record.  This marks the end of

23        the deposition -- sorry.

24            MR. NOVAK:  The protocol in this case gives

Highly Confidential - Subject to Further Confidentiality Review

```
 1        me an opportunity to requestion.  I don't think I

 2        have much, if anything.  I just want to confer

 3        with my colleagues for a minute.

 4              (Recess from 8:49 until 8:53 p.m.)

 5              THE VIDEOGRAPHER:  The time is 8:53.  We are

 6        now back on the record.

 7              MR. NOVAK:  I'm going to try to keep this

 8        short.

 9                    REDIRECT EXAMINATION

10   BY MR. NOVAK:

11        Q.   But, Mr. Cochrane, you were asked some

12   questions by Mr. Matthews regarding Anda's

13   implementation of its monitoring programs during the

14   time period you were a compliance manager.

15              You are aware of instances where Anda did not

16   follow its own procedures as it related to screening

17   of customers for the sale of controlled substances,

18   are you not?

19              MR. MATTHEWS:  Objection.  Outside the scope.

20              THE WITNESS:  Specifically?

21   BY MR. NOVAK:

22        Q.   For example, instances where you approved

23   sales to controlled -- of controlled substances to

24   customers without having dispense data that would be
```

Highly Confidential - Subject to Further Confidentiality Review

     1   called for in your own protocols?

     2       A.   We didn't start collecting dispense data

     3   until 2007, and we had existing customers that were

     4   buying controlled substances from us prior to that

     5   and after 2007, yes.

     6       Q.   And in addition to not having dispensing data

     7   for some of those customers, you did not have

     8   customer questionnaires for all the customers that

     9   you provided controlled substances to after 2007, did

    10   you?

    11           MR. MATTHEWS:  Objection.

    12           THE WITNESS:  Correct.

    13           MR. NOVAK:  Okay.  That's all I have.

    14           THE VIDEOGRAPHER:  The time is 8:54 p.m.

    15       This marks the end of the deposition.  We are now

    16       off the record.

    17           (Whereupon, the deposition concluded at

    18   8:54 p.m.)

    19

    20

    21

    22

    23

    24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E

 2

 3          I, KELLY J. LAWTON, Registered Professional

 4     Reporter, Licensed Court Reporter, and Certified

 5     Court Reporter, do hereby certify that, pursuant to

 6     notice, the deposition of MICHAEL COCHRANE was duly

 7     taken on January 15, 2019, at 9:11 a.m. before me.

 8          The said MICHAEL COCHRANE was duly sworn by

 9     me according to law to tell the truth, the whole

10     truth and nothing but the truth and thereupon did

11     testify as set forth in the above transcript of

12     testimony.  The testimony was taken down

13     stenographically by me.  I do further certify that

14     the above deposition is full, complete, and a true

15     record of all the testimony given by the said

16     witness.

17

18          _____

19          KELLY J. LAWTON, RPR, LCR, CCR

20

21          (The foregoing certification of this

22     transcript does not apply to any reproduction of the

23     same by any means, unless under the direct control

24     and/or supervision of the certifying reporter.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1                    INSTRUCTIONS TO WITNESS

  2

  3

  4            Please read your deposition over carefully

  5     and make any necessary corrections.  You should state

  6     the reason in the appropriate space on the errata

  7     sheet for any corrections that are made.

  8

  9            After doing so, please sign the errata sheet

 10     and date it.  It will be attached to your deposition.

 11

 12            It is imperative that you return the original

 13     errata sheet to the deposing attorney within thirty

 14     (30) days of receipt of the deposition transcript by

 15     you.  If you fail to do so, the deposition transcript

 16     may be deemed to be accurate and may be used in

 17     court.

 18

 19

 20

 21

 22

 23

 24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     - - - - - -

 2                   E R R A T A

 3                     - - - - - -

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6       REASON: _____

 7    _____  _____  _____

 8       REASON: _____

 9    _____  _____  _____

10       REASON: _____

11    _____  _____  _____

12       REASON: _____

13    _____  _____  _____

14       REASON: _____

15    _____  _____  _____

16       REASON: _____

17    _____  _____  _____

18       REASON: _____

19    _____  _____  _____

20       REASON: _____

21    _____  _____  _____

22       REASON: _____

23    _____  _____  _____

24       REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, MICHAEL COCHRANE, do hereby acknowledge

 4     that I have read the foregoing pages, 1 to 327, and

 5     that the same is a correct transcription of the

 6     answers given by me to the questions therein

 7     propounded, except for the corrections or changes in

 8     form or substance, if any, noted in the attached

 9     Errata Sheet.

10

11

12     _____        _____

13     MICHAEL COCHRANE                               DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     ____ day of _____, 20___.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____    _____

 4    _____   _____    _____

 5    _____   _____    _____

 6    _____   _____    _____

 7    _____   _____    _____

 8    _____   _____    _____

 9    _____   _____    _____

10    _____   _____    _____

11    _____   _____    _____

12    _____   _____    _____

13    _____   _____    _____

14    _____   _____    _____

15    _____   _____    _____

16    _____   _____    _____

17    _____   _____    _____

18    _____   _____    _____

19    _____   _____    _____

20    _____   _____    _____

21    _____   _____    _____

22    _____   _____    _____

23    _____   _____    _____

24    _____   _____    _____
```