```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3   IN RE NATIONAL PRESCRIPTION   |   MDL No. 2804
                                   |
 4   OPIATE LITIGATION             |   Case No. 17-MD-2804
                                   |
 5   This Document Relates to:     |   Hon. Dan A. Polster
                                   |
 6   The County of Summit, Ohio,   |
     et al., v.                    |
 7   Purdue Pharma L.P., et al.    |
     Case No. 17-op-45004          |
 8                                 |
     The County of Cuyahoga v.     |
 9   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45090          |
10                                 |
     City of Cleveland, Ohio v.    |
11   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45132          |
12                                 |
13
                  THURSDAY, JANUARY 24, 2019
14
                          - - -
15
           HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16
                   CONFIDENTIALITY REVIEW
17
                          - - -
18
           Videotaped deposition of PATRICK COCHRANE,
19     held at Foley & Lardner LLP, One Biscayne Tower,
       2 Biscayne Boulevard, Suite 1900, Miami, Florida,
20     commencing at 9:13 a.m., on the above date,
       before Kelly J. Lawton, Registered Professional
21     Reporter, Licensed Court Reporter, Certified
       Court Reporter.
22                        - - -
23              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    WEITZ & LUXENBERG, P.C.
      BY:  PAUL NOVAK, ESQUIRE
 3    3011 West Grand Boulevard, Suite 2150
      Detroit, Michigan 48202
 4    (313) 800-4170
      pnovak@weitzlux.com
 5    Representing the Plaintiffs
 6
 7    FOLEY & LARDNER LLP
      BY:  JAMES W. MATTHEWS, ESQUIRE
 8        GRAHAM D. WELCH, ESQUIRE
      111 Huntington Avenue
 9    Boston, Massachusetts 02199
      (617) 342-4000
10    jmatthews@foley.com
      gwelch@foley.com
11    Representing Anda, Inc., and the witness
12
13    REED SMITH LLP
      BY:  M. CRISTINA CÁRDENAS, ESQUIRE
14    1001 Brickell Bay Drive, Suite 900
      Miami, Florida 33131
15    (786) 747-0207
      ccardenas@reedsmith.com
16    Representing AmerisourceBergen Corporation and
      AmerisourceBergen Drug Corporation
17
18    ARNOLD & PORTER KAYE SCHOLER, LLP
      BY:  ELISEO R. PUIG, ESQUIRE
19    370 Seventeenth Street, Suite 4400
      Denver, Colorado 80202
20    (303) 863-2373
      eliseo.puig@arnoldporter.com
21    Representing Endo Health Solutions Inc., Endo
      Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
22    Par Pharmaceutical Companies, Inc.,
      (f/k/a Par Pharmaceutical Holdings, Inc.)
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:
 2      WEITZ & LUXENBERG, P.C.
        BY:  TIFFANY ELLIS, ESQUIRE
 3      3011 West Grand Boulevard, Suite 2150
        Detroit, Michigan 48202
 4      (313) 800-4170
        tellis@weitzlux.com
 5      Representing the Plaintiffs
 6
        JONES DAY
 7      BY:  PAIGE E. ZIELINSKI, ESQUIRE
        555 California Street, 26th Floor
 8      San Francisco, California 94104
        (415) 875-5788
 9      pzielinski@jonesday.com
        Representing Walmart
10
11      COVINGTON & BURLING LLP
        BY:  RYAN R. ROBERTS, ESQUIRE
12      3000 El Camino Real
        5 Palo Alto Square, 10th Floor
13      Palo Alto, CA 94306-2112
        (650) 632-4700
14      rroberts@cov.com
        Representing McKesson Corporation
15
16      KIRKLAND & ELLIS, LLP
        BY:  TUCKER HUNTER, ESQUIRE
17      300 North LaSalle Drive
        Chicago, Illinois 60654
18      (312) 862-2000
        tucker.hunter@kirkland.com
19      Representing Allergan Finance LLC
20
        TUCKER ELLIS LLP
21      BY:  JAMES R. SHULTZ, ESQUIRE
        233 South Wacker Drive, Suite 6950
22      Chicago, Illinois 60606
        jay.shultz@tuckerellis.com
23      Representing Janssen and Johnson & Johnson
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     ALSO PRESENT:

 2        ANTHONY BARBARO, Videographer

 3        MICHAEL PIGGINS, Weitz & Luxenberg

 4        CASSANDRA SUDER, Weitz & Luxenberg

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        - - -

 2                   I N D E X

 3                        - - -
```

```
 4   Testimony of:  PATRICK COCHRANE                    PAGE

 5       DIRECT EXAMINATION BY MR. NOVAK................ 13

 6       CROSS-EXAMINATION BY MR. MATTHEWS............. 251
```

```
 7

 8

 9                   E X H I B I T S

10             (Attached to Transcript)
```

```
11    PATRICK COCHRANE DEPOSITION EXHIBITS              PAGE

12   Anda-Cochrane  Notice of Videotaped 30(b)(6)       14
     Exhibit 1      Deposition of Anda
13

     Anda-Cochrane  Defendant Anda, Inc.'s              74
14   Exhibit 2      Supplemental Response to
                    Plaintiffs' (First) Combined
15                  Discovery Requests to Distributor
                    Defendants
16

     Anda-Cochrane  OPS-028-00 - Standard Operating     77
17   Exhibit 3      Procedure - Information Needed to
                    Set Up a New Account - Bates
18                  Numbered
                    Anda_Opioids_MDL_0000271410 to
19                  Anda_Opioids_MDL_0000271411

20   Anda-Cochrane  Anda, Inc. Standard Operating       79
     Exhibit 4      Procedure - SOP #28 - Customer Due
21                  Diligence - Bates Numbered
                    Anda_Opioids_MDL_0000144398 to
22                  Anda_Opioids_MDL_0000144401
```

```
23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     E X H I B I T S
 2     PATRICK COCHRANE DEPOSITION EXHIBITS          PAGE
```

```
 3   Anda-Cochrane    Anda, Inc. - Standard Operating    81
     Exhibit 5        Procedure - SOP 040- Suspicious
 4                    Order Monitoring - Bates Numbered
                      Anda_Opioids_MDL_0000144378 to
 5                    Anda_Opioids_MDL_0000144380
 6   Anda-Cochrane    E-mail and Attachment from Michael  82
     Exhibit 6        Cochrane to Al Paonessa - Subject:
 7                    Rough Draft - Bates Numbered
                      Anda_Opioids_MDL_0000276962 to
 8                    Anda_Opioids_MDL_0000276964
 9   Anda-Cochrane    June 22, 2010 E-mail and            94
     Exhibit 7        Attachment - Subject:  DEA Meeting
10                    - Bates Numbered
                      Anda_Opioids_MDL_0000281704 to
11                    Anda_Opioids_MDL_0000281706
12   Anda-Cochrane    July 14, 2010 E-mails and           95
     Exhibit 8        Attachments - Subject:  Discussion
13                    Strategy Document - Bates Numbered
                      Anda_Opioids_MDL_0000408116 to
14                    Anda_Opioids_MDL_0000408119
15   Anda-Cochrane    Standard Operating Procedure -     116
     Exhibit 9        OPS-035-01 - Bates Numbered
16                    Anda_Opioids_MDL_0000277385 to
                      Anda_Opioids_MDL_0000277386
17
     Anda-Cochrane    Standard Operating Procedure -     123
18   Exhibit 10       OPS-028-03 - Bates Numbered
                      Anda_Opioids_MDL_0000277387 to
19                    Anda_Opioids_MDL_0000277389
20   Anda-Cochrane    December 13, 2011 E-mail and       126
     Exhibit 11       Attachment - Subject:  Anda's DEA
21                    Inspection - Requested Information
                      - Urgent - Bates Numbered
22                    Anda_Opioids_MDL_0000112251 to
                      Anda_Opioids_MDL_0000112259
23
24
```

```
 1                      E X H I B I T S
 2    PATRICK COCHRANE DEPOSITION EXHIBITS          PAGE
 3   Anda-Cochrane   Anda, Inc. Standard Operating   130
     Exhibit 12      Procedure - Information Needed to
 4                   Set-up a New Account - Bates
                     Numbered
 5                   Anda_Opioids_MDL_000084434 to
                     Anda_Opioids_MDL_000084437
 6
     Anda-Cochrane   Anda, Inc. Standard Operating   134
 7   Exhibit 13      Procedure - Information Needed to
                     Set-up a New Account - Bates
 8                   Numbered
                     Anda_Opioids_MDL_000036519 to
 9                   Anda_Opioids_MDL_000036521
10   Anda-Cochrane   Anda, Inc. Standard Operating   135
     Exhibit 14      Procedure - Customer Due Diligence
11                   - Bates Numbered
                     Anda_Opioids_MDL_000398204 to
12                   Anda_Opioids_MDL_000398207
13   Anda-Cochrane   September 9, 2016 E-mail and      136
     Exhibit 15      Attachment - Subject:  Current
14                   Suspicious Order SOPs - Bates
                     Numbered
15                   Anda_Opioids_MDL_000527935 to
                     Anda_Opioids_MDL_000527938
16
     Anda-Cochrane   E-mail Chain - Subject:  Anda,   145
17   Exhibit 16      Inc. (Corporate) - 1st P&P Review
                     Report - Bates Numbered
18                   Anda_Opioids_MDL_000140430 to
                     Anda_Opioids_MDL_000140497
19
     Anda-Cochrane   February 7, 2007 Letter from U.S.  146
20   Exhibit 17      Department of Justice Drug
                     Enforcement Administration - Bates
21                   Numbered
                     Anda_Opioids_MDL_000571720 to
22                   Anda_Opioids_MDL_000571723
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       E X H I B I T S
 2     PATRICK COCHRANE DEPOSITION EXHIBITS              PAGE
 3   Anda-Cochrane   December 27, 2007 Letter from U.S.   147
     Exhibit 18      Department of Justice Drug
 4                   Enforcement Administration - Bates
                     Numbered
 5                   Anda_Opioids_MDL_000276156 to
                     Anda_Opioids_MDL_000276157
 6
     Anda-Cochrane   May 4, 2012 E-mail and Attachment    150
 7   Exhibit 19      - Mallinckrodt CDA - Bates
                     Numbered
 8                   Anda_Opioids_MDL_001222751 to
                     Anda_Opioids_MDL_001222758
 9
     Anda-Cochrane   E-mail Chain - Subject:  Rite Aid    153
10   Exhibit 20      - Bates Numbered
                     Anda_Opioids_MDL_000086344 to
11                   Anda_Opioids_MDL_000086345
12   Anda-Cochrane   March 7, 2012 E-mail and             165
     Exhibit 21      Attachment - Subject:  RA - Top
13                   100 Products for Top 100 Stores
                     Review (Combined with Misc Random
14                   Research) - Bates Numbered
                     Anda_Opioids_MDL_0000081549 to
15                   Anda_Opioids_MDL_0000081587
16   Anda-Cochrane   Spreadsheet - Bates Numbered         177
     Exhibit 22      Anda_Opioids_MDL_0000993524
17
     Anda-Cochrane   June 15, 2010 E-mails and            185
18   Exhibit 23      Attachment - Subject:  Scanned
                     Image from MX-5500N - Bates
19                   Numbered
                     Anda_Opioids_MDL_0000281678 to
20                   Anda_Opioids_MDL_0000281680
21   Anda-Cochrane   June 17, 2010 E-mail - Subject:      188
     Exhibit 24      Mass Update Customer Master # -
22                   Bates Numbered
                     Anda_Opioids_MDL_0000281703
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

| 1 | | E X H I B I T S | |
|---|---|---|---|
| 2 | PATRICK COCHRANE DEPOSITION EXHIBITS | | PAGE |
| 3 | Anda-Cochrane Exhibit 25 | July 13, 2010 E-mail and Attachment - Subject: Continuing Education Documents - Controlled Substances - Bates Numbered Anda_Opioids_MDL_0000104946 to Anda_Opioids_MDL_0000104960 | 191 |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | Anda-Cochrane Exhibit 26 | E-mail Chain - Subject: Suspicious Customer's Cut Off - Bates Numbered Anda_Opioids_MDL_0000134998 | 203 |
| 8 | | | |
| 9 | Anda-Cochrane Exhibit 27 | May 10, 2011 E-mail - Subject: Customer Cut Off - Bates Numbered Anda_Opioids_MDL_0000286549 | 205 |
| 10 | | | |
| 11 | Anda-Cochrane Exhibit 28 | E-mail Chain - Subject: 2Record Request - Bates Numbered Anda_Opioids_MDL_0000105695 to Anda_Opioids_MDL_0000105698 | 208 |
| 12 | | | |
| 13 | | | |
| 14 | Anda-Cochrane Exhibit 29 | E-mail Chain and Attachment - Subject: 2Record Request - Bates Numbered Anda_Opioids_MDL_0000086181 to Anda_Opioids_MDL_0000086233 | 212 |
| 15 | | | |
| 16 | | | |
| 17 | Anda-Cochrane Exhibit 30 | Defendant Anda, Inc.'s Second Supplemental Response to Plaintiffs' (First) Combined Discovery Requests to Distributor Defendants | 216 |
| 18 | | | |
| 19 | | | |
| 20 | Anda-Cochrane Exhibit 31 | 2007 Standard Operating Procedures (SOP) for Anda Pharmacy, AndaMeds, and VIP Commissioned Employees Compensation - Bates Numbered Anda_Temporary_Compensation_001 to Anda_Temporary_Compensation_072 | 250 |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Highly Confidential - Subject to Further Confidentiality Review

```
  1                    E X H I B I T S

  2    PATRICK COCHRANE DEPOSITION EXHIBITS              PAGE

  3   Anda-Cochrane  July 31, 2007 E-mail - Subject:    252

      Exhibit 32     DEA Teleconference Re:   CS

  4                  Distribution/Anda - Bates Numbered

                     Anda_Opioids_MDL_0000275627

  5

      Anda-Cochrane  E-mail Chain and Attachment -       255

  6   Exhibit 33     Subject:  Final Questionnaire and

                     Cover Letter - Bates Numbered

  7                  Anda_Opioids_MDL_0000275445 to

                     Anda_Opioids_MDL_0000275455

  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24
```

```
 1                      - - -

 2           THE VIDEOGRAPHER:  We are now on the record.

 3      My name is Anthony Barbaro.  I'm a videographer

 4      for Golkow Litigation Services.  Today's date is

 5      January 24th, 2019, and the time is 9:13 a.m.

 6           This video deposition is being held at

 7      2 South Biscayne Boulevard, Suite 1900, Miami,

 8      Florida 33131, in Re:  National Prescription

 9      Opioid Litigation for the United States District

10      Court, Northern District of Ohio, Eastern

11      Division.  The deponent is Patrick Cochrane.

12           And, counsel, would you please identify

13      yourselves.

14           MR. NOVAK:  Paul Novak and Michael Piggins,

15      both of Weitz & Luxenberg, on behalf of the

16      plaintiffs.

17           MR. MATTHEWS:  James Matthews for the

18      defendant Anda.

19           MR. WELCH:  Graham Welch for the defendant

20      Anda.

21           MR. PUIG:  Eliseo Puig, Arnold & Porter, for

22      the Endo & Par entities.

23           MS. CARDENAS:  Cristina Cardenas for

24      AmerisourceBergen.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  Counsel on the phone,

 2       please identify.

 3              MR. SHULTZ:  James Shultz at Tucker Ellis for

 4       Johnson & Johnson.

 5              MR. ROBERTS:  Ryan Roberts of Covington &

 6       Burling on behalf of McKesson.

 7              MR. HUNTER:  Tucker Hunter from Kirkland &

 8       Ellis on behalf of Allergan Finance, LLC.

 9              MS. ZIELINSKI:  Paige Zielinski from Jones

10       Day on behalf of Walmart.

11              THE VIDEOGRAPHER:  The court reporter is

12       Kelly Lawton, and she will now swear in the

13       witness.

14              THE COURT REPORTER:  Sir, would you please

15       raise your right hand.

16              Do you swear or affirm the testimony you're

17       about to give will be the truth, the whole truth,

18       and nothing but the truth?

19              THE WITNESS:  I do.

20              THE COURT REPORTER:  Thank you.

21              PATRICK COCHRANE, called as a witness by the

22       Plaintiffs, having been first duly sworn, testified

23       as follows:

24       ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DIRECT EXAMINATION

 2    BY MR. NOVAK:
```



```
 7         Q.    Okay.  Can you briefly describe for me --

 8    well, let's start with your present position at Anda.

 9         A.    My present position at Anda is vice president

10    of operations and logistics.

11         Q.    And can you provide to me a listing of your

12    responsibilities as vice president --

13         A.    Sure.

14         Q.    -- of operations and logistics?

15         A.    So the main responsibilities are distribution

16    and compliance.  I also lead the customer service

17    group, the project management office, and I serve as

18    a liaison for our parent company's activities related

19    to security and facilities management.

20         Q.    Okay.  I'd like to start with your initial

21    employment at Anda and work forward.

22              MR. MATTHEWS:  Can I just interrupt and

23         object.  Can we get on the record that today is

24         the 30(b)(6) deposition of Anda, not the personal
```

1       deposition of Mr. Cochrane so it's clear.

2            MR. NOVAK:  Yes.  And that's fine.

3            We have marked for identification Deposition

4       Exhibit 1, which is the Notice of Videotaped

5       30(b)(6) Deposition of Anda.

6            (Anda Exhibit 1 was marked for

7       identification.)

8    BY MR. NOVAK:

9       Q.   Mr. Cochrane, have you seen the notice of

10   videotaped deposition prior to today?

11      A.   No.

12      Q.   Okay.  You understand that there are certain

13   topics that have been designated for which you have

14   been designated by the company to appear and provide

15   testimony?

16      A.   Yes.

17      Q.   And that you're providing that testimony on

18   behalf of Anda?

19      A.   Yes.

20      Q.   Okay.

21      A.   Quick clarification.

22           I had not seen these first two pages.  This

23   first notice, I had seen; and this second notice

24   piece, I had seen.

```
 1        Q.    Okay.   What did you do for purposes of

 2   preparing to testify today?

 3        A.    We reviewed two to three dozen documents in

 4   addition to discussions about my 24-year career at

 5   Anda.

 6        Q.    When you say -- when you say that "we"

 7   reviewed, who was the "we" to whom you were

 8   referring?

 9        A.    James Graham.

10        Q.    Have you had, for purposes of preparing to

11   testify today, discussions with other Anda employees?

12        A.    No.

13        Q.    Okay.   In addition to the two to three dozen

14   documents that you have identified, have you accessed

15   any of the company's computer systems or files?

16        A.    Sure.

17        Q.    And -- and which of those systems did you

18   access for purposes of preparation for the

19   deposition?

20        A.    E-mail and Anda's system of record, which is

21   TPS.

22        Q.    Okay.   As to the e-mail that you are

23   referencing, that's in addition to the two to three

24   dozen documents that you reviewed?
```

```
 1        A.   No.  Inclusive.

 2        Q.   Okay.  Is that e-mail, to your knowledge,

 3   that has been produced in the litigation?

 4        A.   Yes.

 5        Q.   Okay.  As to the TPS system, what is it that

 6   you reviewed on the TPS -- well, we'll start with a

 7   more fundamental question.

 8             Can you provide for the record an explanation

 9   of what the TPS system at Anda is?

10        A.   TPS is our warehouse management call,

11   resource management, order entry system, purchasing

12   system.  It's the backbone of our company.

13        Q.   Okay.  And what types of information are

14   maintained in Anda's TPS system?

15        A.   Inventory, sales, all transactions.

16        Q.   Okay.  Is there compliance information that

17   is also maintained within that system?

18        A.   Yes, there is.

19        Q.   Okay.  What was it within the TPS system that

20   you reviewed for purposes of preparing for today's

21   deposition?

22        A.   Customer transaction history.

23        Q.   Can you describe for me within the TPS system

24   what customer transaction history is?
```

```
 1      A.   What transaction history is?

 2      Q.   Yes.

 3      A.   Orders, line items, items, quantities, DEA

 4    numbers, registration numbers, customer name,

 5    address.

 6      Q.   Are limits that are placed upon a customer's

 7    ability to order controlled substances also

 8    maintained in the TPS system?

 9      A.   Yes, they are.

10      Q.   And is that part of what you reviewed for

11    purposes of preparing for today's deposition?

12      A.   No, it's not.

13      Q.   Okay.  Are histories with respect to

14    modification of control limits contained within the

15    TPS system?

16           MR. MATTHEWS:  Objection.

17           THE WITNESS:  No.

18    BY MR. NOVAK:

19      Q.   Okay.  Now, just to get a context, can you

20    provide a description of the different positions that

21    you have held with Anda over the time that you have

22    been employed with the company?

23      A.   Sure.  Start at the beginning or the end?

24      Q.   The beginning.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    1995, I was hired as a warehouse operator.

 2    Late '95 or early '96, I was promoted to a warehouse

 3    lead person.  In '98 or '99, I was moved to oversee

 4    the commercial distribution of Andrx Pharmaceuticals

 5    manufactured product in addition to holding onto some

 6    responsibilities related to the native Anda product.

 7          In 1999, I was promoted to shipping --

 8    operating system analyst/shipping supervisor.  In the

 9    2000 time frame, I was promoted to manager --

10    operations manager.  Later in 2000, distribution

11    center manager.

12          In 2001 or early 2002, we began a project

13    related to opening a second distribution center in

14    Groveport, Ohio, in which I participated on that.

15    And after that facility opened, I was promoted to

16    national distribution manager where now both DCs

17    reported to me.

18          After that, there was an inline promotion to

19    director of logistics.  I held that position until

20    late 2005.  In late 2005, I was promoted to vice

21    president of operations.

22        Q.    The 2005 promotion to vice president of

23    operations, is that essentially the same position

24    that you have held ever since?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.   There have been additional

 2   responsibilities flexed in and flexed out, but the

 3   core of that position has been the distribution

 4   activities of our facilities.

 5        Q.    Okay.  Do you have an understanding as to

 6   what the term "suspicious order" means?

 7        A.    Yes, I do.

 8        Q.    What is your understanding of that term?

 9        A.    A suspicious order is something that deviates

10   from what the norm is.

11        Q.    Now, I asked you whether you had an

12   understanding.

13              For purposes of company operations, what

14   is -- does Anda have a working understanding of what

15   the term "suspicious order" is?

16        A.    Anda does.

17        Q.    Okay.  And what is that definition?

18        A.    On order that deviates from the norm.

19        Q.    Okay.  Does Anda, for purposes of its

20   day-to-day working policies, also utilize a

21   functional definition of the term "suspicious order

22   monitoring system"?

23        A.    Yes.

24        Q.    And what is the definition that the company
```

1    uses for suspicious order monitoring system?

2        A.   A suspicious ordering monitoring system

3    relates to the entire program of work, policies,

4    procedures, either system or manual, related to

5    handling and distributing controlled substances.

6        Q.   In that answer, you included the term "either

7    system or manual."

8             What did you mean by that?

9        A.   There are system procedures in place and

10   system -- system work that is performed.  And there's

11   manual work, and there are manual procedures.

12       Q.   In the context of Anda's implementation of

13   suspicious order monitoring system work, can you give

14   me an example of both the system procedure and the

15   manual procedure?

16       A.   Sure.

17            The system procedures would be around

18   validating orders, around checking eligibility of a

19   customer, upon checking eligibility of a limit,

20   checking current access and purchases towards that

21   limit.

22            The manual aspects of it would include all

23   aspects of controlled substance handling from

24   receiving to put-away to physical security to

```
 1    physical inventories performed on said inventory to

 2    the pick, pack, and ship operations.

 3         Q.   I'd like to first focus on what you have

 4    identified as the manual procedures that Anda

 5    utilizes as part of its suspicious order monitoring

 6    system.

 7              Can you describe for me the manner in which

 8    orders for controlled substances are received by

 9    Anda?

10         A.   The manner in which they are received?

11         Q.   Yes.

12              MR. MATTHEWS:  Objection.

13              Is there a time period?

14              MR. NOVAK:  I appreciate that, because --

15              let's say 2006 to now.  And to the extent that

16              the answer differs over that part -- that time

17              period, we can talk about those differences.

18              THE WITNESS:  Orders can be received by Anda

19              via telephone, via Internet, via EDI, via paper

20              222 Form.

21    BY MR. NOVAK:

22         Q.   Are all of those ways in which the company

23    received orders for controlled substances?

24         A.   Yes.
```

```
 1        Q.    Have there been differences between 2006 and

 2    the present in the manner in which those orders are

 3    recorded by Anda?

 4        A.    No.

 5        Q.    At some point between 2006 and the present,

 6    did Anda implement a CSOS system?

 7        A.    2005.

 8        Q.    Oh, okay.

 9              Let me go through some of those different

10    types of -- of receiving an order.

11        A.    Sure.

12        Q.    When orders are received for controlled

13    substances by telephone, who is it within Anda that

14    receives them?

15        A.    It's either a sales rep or a sales admin.

16        Q.    And what is it that the sales representative

17    or the sales admin does upon receiving an order for a

18    controlled substance?

19        A.    They key it into TPS.

20        Q.    Can you describe for me the process of keying

21    an order into TPS between 2006 and the present?

22        A.    A customer record is accessed.  There's a

23    number of customer attributes on the screen,

24    including the address and where the customer is
```

Highly Confidential - Subject to Further Confidentiality Review

1    shipping from, which warehouse, which distribution

2    center at Anda it's shipping from, the carrier

3    method, whether it's FedEx Air or second day or

4    ground, et cetera, is on that first screen.

5           The second order entry screen allows the

6    individual to key in an item number and a quantity or

7    search or a description of a product and enter a --

8    select a line item and a quantity.  If the product is

9    a CII, it will not let the rep proceed.  If the

10   products are CIII through V or noncontrolled or

11   nonRX, it will allow the sales reps to key and accept

12   that order.

13   Q.   Now, you indicated in -- well, let me start

14   with a different question.

15          I think you described two different screens

16   within the Turning Point System that Anda maintains

17   in that answer.

18          Can you describe for me what is the first

19   screen?

20   A.   The first screen is the one that I described

21   a couple seconds ago related to the address

22   information and the customer routing information, the

23   carrier method, the shipping warehouse.

24   Q.   Is the customer's eligibility to purchase

Highly Confidential - Subject to Further Confidentiality Review

 1    controlled substances contained on that first screen?

 2       A.   No, it is not.

 3       Q.   Any other information with respect to the

 4    customer contained on the first screen?

 5       A.   Those are the highlights.  I'm not aware of

 6    anything else.

 7       Q.   And then the second screen that you

 8    described -- first of all, how would an individual

 9    receiving a controlled substance order get from the

10    first screen to the second screen?

11       A.   Pressing enter.

12       Q.   Okay.  And then describe for me what is

13    contained on the second screen.

14       A.   The second screen has order header

15    information related to that customer on the top of

16    the screen.  The middle of the screen, when you first

17    enter, it will be largely blank.  The bottom of the

18    screen has fields that you are able to search upon:

19    item number, description.

20       Q.   Okay.  What information is contained on the

21    header in that second screen of the TPS system?

22       A.   The customer number, the customer name, maybe

23    the city and state.

24       Q.   Is the DEA number assigned to the customer

Highly Confidential - Subject to Further Confidentiality Review

1     also contained there?

2         A.    I don't believe so.  I'm not familiar with it

3     on that level of detail.

4         Q.    Okay.  Now, you indicated that a sales

5     representative would not be able to input an order

6     for a control -- a Schedule II controlled

7     substance --

8         A.    That's correct.

9         Q.    -- into the TPS system.

10        A.    That's correct.

11        Q.    Has that been the case from 2006 to the

12    present?

13        A.    Yes.

14        Q.    In what manner is an order for a Schedule II

15    controlled substance input into TPS?

16        A.    There's two ways.  There's one way in TPS

17    that is for a manual 222 Form.  There is a select

18    group of sales administrators that have access to key

19    those CII orders in.  The first screen that I

20    described earlier of the order entry requires the

21    222 Form Number to be input within -- within that

22    order header before it allows you to proceed.

23            The other method of taking CII orders

24    unrelated to TPS order entry is CSOS via the web.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Okay.  Sticking with TPS for the moment --

 2      A.    Sure.

 3      Q.    -- you said that it's a select group of sales

 4   administrators?

 5      A.    That's correct.

 6      Q.    Under what group within Anda are those sales

 7   administrators housed?

 8      A.    Which group?

 9      Q.    Yes.  Which division of the company?

10      A.    The pharmacy has, I believe, two, and the

11   national accounts group has at least one.

12      Q.    Do you know who today is the sales

13   administrator with authority to enter a control -- a

14   Schedule II controlled substance order into the TPS

15   system?

16      A.    I know of one.

17      Q.    And who is that?

18      A.    Ms. Gina Quayto.

19      Q.    Over the years, who else had the

20   authorization to submit controls -- controlled

21   substance Schedule II orders into TPS?

22      A.    Her -- her predecessors.  Other people that

23   held that same possession.

24      Q.    And who was Ms. Quayto's predecessor?
```

```
 1        A.    There was Rosalie Rudees, R-u-d-e-e-s.  There

 2    was another woman named Jeanette.  Her last name

 3    escapes me.

 4        Q.    Okay.  How does the information get --

 5    when -- when a -- I'll start with a new question.

 6              When a controlled substance -- a Schedule II

 7    controlled substance is ordered telephonically --

 8        A.    They are not ordered telephonically.

 9        Q.    Okay.  So that is not an available method

10    of --

11        A.    No, sir.

12        Q.    -- entering an order for a controlled -- a

13    Schedule II controlled substance?

14        A.    No, it is not.

15        Q.    Okay.  When we talked about different methods

16    of ordering, I think you identified a paper

17    222 Form --

18        A.    That is correct.

19        Q.    -- that is available for a Schedule II

20    controlled substance.

21        A.    That's correct.

22        Q.    Via the Internet?

23        A.    A paper form?  No.  A paper form comes in

24    either via mail or FedEx.
```

```
1        Q.    No.  But another method --

2        A.    Oh.  Another method.

3        Q.    -- that you identified of submitting an order

4   was via the Internet?

5        A.    Sure.

6        Q.    And is that a method that is accessible if a

7   customer were to enter a -- an order for a

8   Schedule II controlled substance?

9        A.    Yes, via CSOS.

10       Q.    Okay.  Now, other than the paper 222 Form and

11  via the Internet through CSOS, are there other

12  methods of entering a -- an order for a Schedule II

13  controlled substance that are available to Anda

14  customers?

15       A.    No, there is not.

16       Q.    Okay.  And for orders of controlled

17  substances that are Schedule III or lower, may they

18  also enter those orders telephonically?

19       A.    IIIs, IVs, and Vs can be ordered

20  telephonically.  IIIs, IVs, and Vs can be ordered via

21  the Internet.

22       Q.    So let's stick with Schedule II controlled

23  substances for the moment.

24             How are the CSOS orders that are submitted by
```

Highly Confidential - Subject to Further Confidentiality Review

1    Anda customers placed into TPS?

2        A.    It's an electronic transfer from the CSOS

3    application into the TPS order entry.

4        Q.    Okay.  And the paper 222 Forms that you

5    referenced a moment ago would have to be manually

6    input into the TPS system?

7        A.    After a series of checks by the distribution

8    center employees that received those forms.

9        Q.    Okay.  Can you describe for me what those

10   systems of checks or series of checks from the

11   distribution center employees are?

12       A.    On the paper 222 Forms, there is the initial

13   screening and validation that is an authentic order.

14   There are a series of fields that need to be

15   completed a certain way in order to accept that

16   order.

17             For instance, the line items need to be

18   clear.  The quantities need to be clear.  The

19   descriptions need to be clear.  The NDC is optional,

20   but if it is written in by the customer, it needs to

21   be clear and legible.

22             The last line completed on the form needs to

23   be accurate.  So the order form allows up to ten line

24   items to be ordered.  If the customer fills out three

1    line items, they must indicate that they only ordered

2    three line items in a specific box.

3           The form must be dated.  The supplier must be

4    written in by the -- by the customer.

5      Q.   When you say "the supplier," are you

6    referring to Anda?

7      A.   Correct.

8      Q.   Okay.  In the paper 222 Forms that you are

9    describing, is a specific manufacturer identified for

10   the controlled substance that's being ordered?

11     A.   No.  There's no field for manufacturer.

12   There is a field for description, and then there is

13   optional fields of NDC.  If a specific NDC is written

14   into that line item, we will attempt to fill that

15   specific NDC.

16     Q.   Okay.  And the NDC will relate to a specific

17   manufacturer?

18     A.   That's correct.

19     Q.   Okay.  Now, all of this information is placed

20   for paper 222 Forms into the TPS system by an actual

21   human being.

22           MR. MATTHEWS:  Objection.

23   BY MR. NOVAK:

24     Q.   Correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MR. MATTHEWS:  Objection.

 2            THE WITNESS:  Which information?

 3    BY MR. NOVAK:

 4       Q.   The different information that -- that you

 5    described in your last answer:  the initial

 6    authenticity screen, the series of fields that need

 7    to be entered --

 8       A.   None of that goes into TPS.

 9       Q.   Oh, I'm sorry.  I --

10       A.   The items and quantities go -- and the form

11    number would go into TPS.

12       Q.   Okay.  When you were describing these various

13    fields, were those simply fields that are contained

14    on the 222 Form itself?

15       A.   That's correct.

16       Q.   Okay.  How is it that the paper 222 Form is

17    received by someone at Anda and input into the TPS

18    system?

19       A.   They normally are received via FedEx or the

20    U.S. Mail.

21       Q.   And who -- and who is it at Anda that

22    actually does the entry of those orders into the TPS

23    system?

24       A.   The sales admins that I described earlier.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  And those are the -- the

 2   administrators designated either in pharmacy or in

 3   the national accounts group?

 4        A.    Correct.

 5        Q.    Okay.  Any other individuals that have the

 6   authority to submit a paper 222 Form into the TPS

 7   system at Anda?

 8        A.    No.

 9              MR. MATTHEWS:  Objection.

10              Just remind you to give me a moment to object

11         before you answer.

12   BY MR. NOVAK:

13        Q.    We've talked about the manual processes for

14   receiving and entering orders as it relates to

15   222 Forms.

16              Can you describe for me how CSOS orders

17   for --

18        A.    We haven't described all of the process.

19        Q.    Oh, okay.  Can you continue?

20              What else does a -- an administrator, in,

21   say, the national accounts group do --

22        A.    There are steps before the administrator that

23   are still happening in the warehouse.

24        Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    The form is received at the warehouse.  The

2    DEA employees, the cage employees or vault employees

3    are the ones fielding those and doing that initial

4    screen on those orders.  So they are verifying the

5    actual physical 222 Form.

6          If it passes all of those checks we described

7    earlier, they can then go through a series of checks

8    to check to make sure that the license is available

9    and accurate and they can check that the address on

10   the form matches the address on the shipping record

11   that we have in TPS.

12   Q.    Is there anything else done for purposes of

13   handling the 222 Forms at the warehouse --

14   A.    At that point --

15   Q.    -- stage?

16   A.    At that point, once those checks are also

17   validated and the addresses match and the form is

18   authentic, the warehouse people can then look up and

19   cross-reference what is actually being ordered by the

20   customer, whether just based on a description or

21   based on an NDC or both.  They can then write up what

22   is going to be keyed against that order.

23   Q.    When you say "write up what is going to be

24   keyed against that order," what do you mean?

1     A.   There is an order load form that the

2   warehouse personnel fill out that gets attached to

3   that 222 Form.  It's basically an instruction of what

4   the admin is going to key in.

5     Q.   Are there any specific tasks as part of the

6   order entry process at the warehouse --

7     A.   There's no entry.  They're writing it up on a

8   sheet.

9     Q.   Okay.  A sheet that is separate from the

10  222 Form?

11    A.   That's correct.

12    Q.   Okay.  And that sheet will indicate whether

13  the customer has a valid DEA license number?

14    A.   It does not.

15    Q.   Okay.

16    A.   The form comes in.  The 222 Form is a DEA

17  form.  It's not an Anda form.  It's not a customer

18  form.  It doesn't have Anda's customer record number

19  on it.

20         So one of the -- those checks that they are

21  doing is validating that we actually have that

22  customer set up.  And we check his license expiration

23  date and his license is valid and his address

24  information.

1          The customer number is then attached to this

2     load sheet, and then the quantities and item numbers

3     in which they ordered are then also attached to that

4     load sheet.

5        Q.   Okay.  So there are a initial set of steps to

6     verify -- that are performed at the warehouse to --

7     to verify that this is a -- an existing customer of

8     Anda?

9        A.   Correct.

10       Q.   And once that is verified and the DEA

11    registration number is verified to match that of the

12    customer, the warehouse employees take the next step

13    of beginning to enter information into a load sheet?

14       A.   Write up the information on a load sheet.

15       Q.   Okay.  This is still a paper process?

16       A.   Yes, it is.

17       Q.   Okay.  And the information that the warehouse

18    employee at Anda will write into the load sheet is

19    what?

20       A.   Customer number, the quantities, and the Anda

21    item numbers associated with the items that were

22    ordered on the paper 222.

23       Q.   Okay.  Once the warehouse employee at Anda

24    completes the initial steps that we've discussed as

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it relates to the paper Form 222 and enters the --

 2    I'm sorry -- writes the information on a load sheet,

 3    what else does the warehouse employee at Anda do for

 4    purposes of submitting a paper 222 order?

 5        A.   They make a copy of that load sheet with the

 6    222 Form visible on the front of it.  And they --

 7    there's -- I'm unsure if they e-mail it to the

 8    administrator or they use a shared drive to transfer

 9    that data to the person who's going to key the order

10    into TPS.

11        Q.   Okay.  So the --

12        A.   The paper 222 Form stays within the

13    warehouse.

14        Q.   The completed 222 Form is then submitted to

15    the national account --

16        A.   The completed load sheet.

17             MR. MATTHEWS:  Objection.

18    BY MR. NOVAK:

19        Q.   The completed load sheet is then submitted to

20    an administrator in national accounts?

21        A.   One of the two sides.  It's either the

22    pharmacy side or --

23        Q.   Or pharmacy.

24             Okay.  Can you describe for me what the
```

 1    individual, either at pharmacy or national accounts,

 2    does once they receive the load sheet that has been

 3    submitted by the warehouse?

 4        A.    They go into TPS, into the customer record

 5    that we described earlier, and they enter the

 6    quantities and the item numbers associated with the

 7    222 Form order.

 8        Q.    All right.  At the point in time that the

 9    administrator enters that information into TPS, is

10    an -- is an order number assigned to the order?

11        A.    If the order is accepted, an order number

12    would be assigned.

13        Q.    Okay.  And assuming that the order is

14    accepted and an order number is assigned, what

15    happens next for purposes of evaluating the order for

16    a controlled substance?

17            MR. MATTHEWS:  Objection.

18            THE WITNESS:  The order would go through a --

19        a series of system checks related to controlled

20        substance usage and controlled substance orders

21        previously against those products or those

22        product families and that customer.

23            If all of those checks were passed, the order

24        would move on to the next administrative holds,

```
1          which would be related to credit; could be

2          related to weight or size of the order; related

3          to the shipping method that was selected.

4               If all of those are passed, it will be

5          released to the distribution center and a pick

6          ticket and ship label would print.

7     BY MR. NOVAK:

8          Q.   Okay.  I want to focus on the first half of

9     your answer where you state the order would go

10    through a series of system checks related to

11    controlled substance usage and controlled substance

12    orders previously against those products or those

13    product families and that customer.

14              Can you describe in greater detail what the

15    system checks you referred to in that answer are?

16         A.   They're the same things that I described.

17    It's looking at the product families.  It's looking

18    at the customer history.  And if it deems something

19    outside of the norm as we know it at that point, it

20    could put the order on hold.

21         Q.   Okay.  In that answer, you said:  It's

22    looking at the product families.  It's looking at the

23    customer history.

24              What is the "it" to which you are referring
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in that answer?

 2        A.   TPS.

 3        Q.   Okay.  So TPS has embedded within it an

 4    automated evaluation of factors such as the product

 5    family and the customer history?

 6        A.   Yes.

 7             MR. MATTHEWS:  Objection.

 8             Time.

 9    BY MR. NOVAK:

10        Q.   And over -- and -- and --

11             MR. NOVAK:  James, I appreciate you pointing

12        this out from time to time.  I -- I understand

13        that the nature of those checks are going to vary

14        at different points, and we'll try to do what

15        they looked like in 2006 and then go forward.

16    BY MR. NOVAK:

17        Q.   Can you describe for me in 2006 what the

18    nature of the system checks that are embedded within

19    TPS are as it relates to a controlled substance

20    order?

21        A.   There would be checks against the syntax of

22    the DEA registration.  There would be checks against

23    the expiration date of the DEA registration number.

24    There would be checks against the state license
```

Highly Confidential - Subject to Further Confidentiality Review

1    expiration date number.  There would be credit

2    checks.

3           There's a number of administrative pieces

4    that we -- the order would look at.

5       Q.   Are any of -- I'll ask a different question.

6           In 2006, were there any quantity limits

7    embedded within TPS that would automatically apply to

8    a -- an evaluation of a controlled substance order?

9       A.   Not -- not at the order entry portion.

10      Q.   In 2006, is there any automated evaluation of

11   the controlled substance family that existed within

12   TPS?

13          MR. MATTHEWS:  Objection.

14          THE WITNESS:  No.

15   BY MR. NOVAK:

16      Q.   All right.  Anything else about the automated

17   TPS evaluation of a controlled substance that

18   occurred in 2006 other than the steps that you've

19   already identified?

20      A.   No.

21      Q.   Okay.  In 2006, for a controlled substance

22   order, what would be the next steps in evaluating

23   whether the order should be fulfilled by Anda?

24      A.   There were none.

```
 1        Q.   Okay.  Was there anything in 2006 that

 2   addressed whether the customer -- that evaluated

 3   whether the customer was eligible to purchase

 4   controlled substances?

 5             MR. MATTHEWS:  Objection.

 6             THE WITNESS:  The validation of their

 7        license, the validation of their schedules that

 8        they were allowed to purchase per that license.

 9   BY MR. NOVAK:

10        Q.   If they were eligible to purchase a

11   controlled substance by virtue of holding a -- a

12   current DEA and state registration licenses, those

13   were the only factors that the TPS system used in

14   evaluating whether the order could be filled?

15             MR. MATTHEWS:  Objection.

16             THE WITNESS:  There could also be contractual

17        checks related to product eligibility for a

18        customer for a specific manufacturer.

19   BY MR. NOVAK:

20        Q.   Okay.  Those relate more to commercial

21   considerations about what type of product they -- a

22   particular customer wanted to purchase as opposed to

23   their eligibility to purchase controlled substances?

24             MR. MATTHEWS:  Objection.
```

```
 1                THE WITNESS:  You said two things there.

 2     BY MR. NOVAK:

 3          Q.   Okay.  Well, let me look at your answer for a

 4     second.

 5                When you say there could be contractual

 6     checks related to a project -- product eligibility

 7     for a customer for a specific manufacturer, what do

 8     you mean?

 9          A.   Certain manufacturers may restrict certain

10     products in their portfolio to only ship to certain

11     classes of trade or types of customers.

12          Q.   This is in 2006?

13          A.   Sure.

14          Q.   And Anda maintains those contractual

15     limitations on particular customers within its TPS

16     system?

17          A.   Yes.

18          Q.   Are any of those contractual limitations

19     restrictions that emanate from a manufacturer's

20     suspicious order monitoring system?

21          A.   No.

22          Q.   Do any of those contractual restrictions that

23     you identified relate to the eligibility of a

24     customer to purchase controlled substances?
```

Highly Confidential - Subject to Further Confidentiality Review

 1       A.    No.

 2       Q.    Now, you said that in 2006 after the various

 3    system checks that the TPS system performed on an

 4    automated basis were completed, there would be no

 5    other steps in evaluating the eligibility of the

 6    customer to purchase a controlled substance.

 7             Is that correct?

 8       A.    Correct.

 9       Q.    At that point, is there any other step that

10    Anda would take to prevent the -- the sale of a

11    controlled substance, or at that point, would it

12    simply go through?

13             MR. MATTHEWS:  Objection.

14             THE WITNESS:  Yes, there are additional

15        checks.

16             So when the order allocates and is released

17        to the TPS distribution side of the system, the

18        pick ticket and the ship label are printed by DEA

19        cage or vault personnel.  They are then

20        cross-checked against the order form and the load

21        sheet that was written up to check the accuracy.

22    BY MR. NOVAK:

23       Q.    So an order that has been placed and passed

24    the system checks within TPS for a controlled

Highly Confidential - Subject to Further Confidentiality Review

1    substance would still go through a pick, pack, and

2    ship accuracy validation at the end of the process?

3           MR. MATTHEWS:  Objection.

4           THE WITNESS:  There's -- there's two

5        processes.  Specific to CII orders from paper

6        form or a CSOS order, those manual checks are

7        cross-referenced against the official order form.

8    BY MR. NOVAK:

9        Q.   Okay.  And those manual checks are performed

10   for all controlled substance orders or only CII?

11       A.   The specific check that I'm referring to is

12   for CIIs.

13       Q.   Okay.  So we have discussed the process as it

14   relates to the processing of an -- of a paper 222

15   order for a controlled substance.

16           In what manner does the receipt of an

17   electronic order through -- well, let -- let me -- is

18   there any -- is there anything else that we haven't

19   covered for purposes of fulfilling a Paper 222 Form

20   Schedule II controlled substance order as that

21   process existed in 2006?

22       A.   The point that I've gotten you to now is

23   right about to pick the order within the vault.

24       Q.   Okay.  And can you describe for me the

Highly Confidential - Subject to Further Confidentiality Review

1    process of picking the order within the vault?

2        A.    The pick ticket is used to find the location

3    in which the product is held inside the vault.  The

4    items and quantities are picked in accordance with

5    what information is on that pick ticket.  They are

6    placed into a box.  They are taken to an assembly

7    area.

8            The pick ticket, which contains the order

9    information, the TPS order information, as well as

10   the DEA Schedule 222 Form number is then scanned into

11   a TPS script that enters into that order.  The

12   contents of said order are then scanned.  A function

13   key is then pressed to check for errors and request

14   an invoice.

15           If there's no errors, the invoice prints.

16   The invoice documentation is again cross-checked

17   against the shipping label, which has already been

18   cross-checked against the order load sheet, which has

19   been cross-checked to the order form.

20           So now we have a series of checks to make

21   sure this product is going to the correct address.

22       Q.    Okay.

23       A.    The box is sealed, and it's placed in a

24   staging area.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  The process that we've just

 2   painstakingly gone through, as it relates to the

 3   submission of an electronic order under CSOS, can you

 4   describe for me the manner in which that process

 5   differs once the electronic order has been submitted?

 6            MR. MATTHEWS:  Objection.

 7            THE WITNESS:  So there's obviously no

 8        physical receipt of a paper form order from the

 9        warehouse side.  There's no write-up onto a load

10        sheet.  There's no transferring of that write-up

11        load sheet to an admin.

12            The order is in the CSOS system, at which

13        point there is an indicator or an -- a queue in

14        which those order amass, in which the DEA vault

15        personnel will enter into those orders and look

16        at them.

17            It brings up, for lack of a better

18        comparison, an electronic 222 Form.  It is a

19        sheet that was designed within the CSOS

20        administration system to very closely resemble

21        the 222 Form.  The data elements contained on a

22        paper form are the data elements contained on

23        this electronic form.

24            That becomes the basis from which that order
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      is worked.

 2   BY MR. NOVAK:

 3      Q.   Did there come a point in time after 2006

 4   when additional steps were embedded into the TPS

 5   system for purposes of evaluating the eligibility of

 6   a controlled substance order?

 7      A.   Yes, there are.

 8      Q.   When after 2006 did the first such change

 9   occur?

10      A.   Likely in 2007.

11      Q.   Okay.  And what was that change?

12      A.   There was a change to not accept orders over

13   a specific dosage unit number at the item level.

14      Q.   What do you mean by the term "at the item

15   level"?

16      A.   At the item -- at the item product family

17   level.

18      Q.   Okay.  For purposes of that answer, can you

19   describe for me how Anda defined the term "product

20   family level"?

21      A.   Products that rolled up into a common

22   chemical.

23      Q.   In the context of opioid products, what are

24   the product family levels that existed in 2007?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.   There was the alprazolam family, the

2    hydrocodone families, the oxycodone fentanyl, a

3    number of other items.  I'm not familiar with all the

4    names, nor can I pronounce them.

5       Q.   Morphine an additional?

6       A.   Sure.  Hydromorphone.

7       Q.   Was morphine a separate family level from

8    hydromorphone?

9       A.   I believe it was.

10       Q.   So in 2007, there were specific quantity

11    levels embedded within the TPS system as it related

12    to these different product families?

13            MR. MATTHEWS:  Objection.

14            THE WITNESS:  That's correct.

15    BY MR. NOVAK:

16       Q.   And what were those quantity level

17    restrictions?

18       A.   Generally, they were 5,000 dosage units per

19    pharmacist.

20       Q.   When in 2007 was the 5,000 dosage unit limit

21    embedded into the TPS system?

22       A.   It was -- it was probably the back half of

23    the year.

24       Q.   Okay.  If an order was received that exceeded

1    the 5,000 dosage unit family limit that was embedded

2    in TPS from a customer, what would happen to that

3    order?

4              MR. MATTHEWS:  Objection.

5              THE WITNESS:  It depends how it was received.

6    BY MR. NOVAK:

7         Q.   An additional question about the family

8    levels:  How are those kept within the TPS system?

9         A.   I don't understand.

10        Q.   Okay.  Are they based on unit codes or NDC

11   codes?  Or how is it that, from a programming

12   perspective, the TPS system knows that an order

13   containing different products is -- is within the

14   same family?

15        A.   The family name is a field in one of the item

16   attribute screens within the item master file.  So an

17   individual item number within TPS would correspond to

18   a description, strength, size, NDC of a specific item

19   or SKU, and it's part of the item setup.

20        Q.   Okay.  Now, we were talking about the 5,000

21   family dosage unit limit that was embedded into the

22   TPS system and what happens to orders that exceed

23   that 5,000 dosage unit limit.

24              What is done with those?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MR. MATTHEWS:  Objection.

 2            THE WITNESS:  Again, it depends on what the

 3        order entry method was.

 4   BY MR. NOVAK:

 5        Q.   Okay.  When you say it depends on the order

 6   entry method, are you referring to whether it was

 7   entered paper-wise in a 222 Form or electronically

 8   through CSOS?

 9            MR. MATTHEWS:  Objection.

10            THE WITNESS:  Or electronically through the

11        Internet.

12   BY MR. NOVAK:

13        Q.   Okay.  Electronically through the Internet,

14   by making reference to that form of order entry, you

15   are talking about entry of an order in a process that

16   differs from CSOS?

17            MR. MATTHEWS:  Objection.

18            THE WITNESS:  Are you speaking specifically

19        about Schedule IIs, or are you speaking about all

20        controlled substances?

21            MR. NOVAK:  Okay.  That's a fair -- and I

22        appreciate it if you're going to address these

23        different points, identifying circumstances where

24        it differs.
```

```
 1    BY MR. NOVAK:

 2        Q.    I think earlier you testified controlled

 3    Schedule IIs could not be submitted via the Internet,

 4    correct?

 5        A.    That's correct.

 6        Q.    Okay.

 7        A.    That's still correct.

 8        Q.    So let's talk about the entry for

 9    Schedule III opioid products as the process existed

10    in 2007 after the family limits were imposed.

11             What would happen to orders that exceed the

12    5,000 family dosage unit limit?

13             MR. MATTHEWS:  Objection.

14             THE WITNESS:  Via which order entry method?

15             MR. NOVAK:  Internet.

16             THE WITNESS:  Internet --

17             MR. MATTHEWS:  Objection.

18             THE WITNESS:  -- it would not allow the

19        customer to order over that limit.

20    BY MR. NOVAK:

21        Q.    So what would -- what would happen in terms

22    of -- how would the customer become aware that they

23    were not allowed to enter an order?

24        A.    Likely via a message on the screen that says
```

Highly Confidential - Subject to Further Confidentiality Review

1    you can't order that quantity.

2        Q.   Okay.  There was a portal available to

3    customers for entry of orders via the Internet?

4            MR. MATTHEWS:  Objection.

5            THE WITNESS:  A portal?  I'm not --

6    BY MR. NOVAK:

7        Q.   A customer submitting a -- an order via the

8    Internet would log onto a specific site at Anda?

9        A.   Sure.

10       Q.   Okay.  And that site would instruct them if

11   they exceeded a 5,000 dosage unit for a family with

12   their order?

13           MR. MATTHEWS:  Objection.

14           THE WITNESS:  I'm not sure of the specific

15       messaging.

16   BY MR. NOVAK:

17       Q.   Okay.  At any rate, they would not be able to

18   file an order if it exceeded the 5,000 family unit

19   restriction via the Internet?

20       A.   Correct.

21       Q.   What would happen if the same customer

22   attempted to submit that order via CSOS?

23       A.   It would be the same result.

24       Q.   In either of those two instances --

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   It wouldn't be the same order, though.

 2        Q.   The order that similarly exceeded 5,000 --

 3        A.   It would have to be for a different product

 4   to be on the two different systems, though.  You

 5   can't do -- you can't do a Schedule III on CSOS.

 6        Q.   Oh.  Okay.  Thank you.

 7             And then what would happen to the order if it

 8   had been submitted via a paper 222 Form?

 9        A.   It would be --

10             MR. MATTHEWS:  Objection.

11             THE WITNESS:  It would be caught at the order

12        entry method by the sales administrator and a

13        message would flash on the screen that there was

14        exceeding of the limit.

15   BY MR. NOVAK:

16        Q.   Okay.  For Control II orders that exceeded

17   the 5,000 family unit level in 2007 that were

18   submitted via CSOS, would there be any prompt or

19   electronic notification to the customer that they had

20   exceeded a limit?

21        A.   I don't have details of what that prompt

22   would be.

23        Q.   Okay.

24        A.   But it wouldn't accept the order.
```

 1          Q.   Okay.  Would it assign an order number to the

 2     order?

 3          A.   No, it would not.

 4          Q.   And if the order that is in excess of the

 5     5,000 dosage unit family limit in 2007, if it was

 6     submitted via paper 222 Form, would an order number

 7     be assigned to such an order?

 8          A.   No.

 9               MR. MATTHEWS:  Objection.

10     BY MR. NOVAK:

11          Q.   And for a Control III -- a Schedule III

12     controlled substance that was submitted via the

13     Internet to Anda in the 2007 time frame, if it

14     exceeded the 5,000 dosage unit family limit, would an

15     order number be assigned to that type of order?

16               MR. MATTHEWS:  Objection.

17               THE WITNESS:  No, it wouldn't.

18     BY MR. NOVAK:

19          Q.   Okay.  When a customer in this 2007 time

20     frame -- and maybe to be more precise, we're talking

21     about the latter half of 2007 for purposes of these

22     questions.

23               Is that what you understood?

24          A.   (Nodding head.)

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    You have to give verbal answers.

2     A.    Yes.

3     Q.    Okay.  If a customer became aware of their

4     inability to submit an order, either because they

5     were unable to do so on CSOS or via the Internet, but

6     they nonetheless wanted additional product, what

7     steps were available to such a customer to seek a

8     higher volume of a controlled substance in 2007?

9           MR. MATTHEWS:  Objection.  Outside the scope.

10          THE WITNESS:  They could contact their sales

11    rep and initiate a conversation about it.

12          MR. NOVAK:  First break?

13          MR. MATTHEWS:  Sure.

14          THE VIDEOGRAPHER:  The time is 10:23 a.m.

15    We're going off the record.

16          (Recess from 10:23 until 10:35 a.m.)

17          THE VIDEOGRAPHER:  The time is 10:35 a.m.  We

18    are now back on the record.

19    BY MR. NOVAK:

20    Q.    Mr. Cochrane, we have been talking about the

21    institution of a 5,000 dosage unit per family for

22    controlled substances in approximately August of

23    2007.

24          What were the circumstances at Anda that led

```
 1    to the institution of that 5,000 unit limit to begin

 2    with?

 3        A.    Oh, that was post some conversations and a

 4    meeting with DEA.

 5        Q.    When did that -- well, start with the

 6    conversations that you referenced.

 7              Who were the participants in the

 8    conversations that you identified?

 9        A.    DEA personnel at Washington headquarters,

10    along with a compliance director at our parent,

11    Watson Pharmaceuticals.

12        Q.    Was that individual Tracey Hernandez?

13        A.    Yes, it was.

14        Q.    And did Ms. Hernandez convey to

15    representatives of Anda the content of the

16    conversations that she had with representatives of

17    the DEA?

18              MR. MATTHEWS:  Objection.

19              THE WITNESS:  Yes, she did.

20    BY MR. NOVAK:

21        Q.    And what is your understanding of the content

22    of the discussion that they had?

23        A.    The content was based around quantities of

24    controlled substances that Anda was shipping to
```

```
 1    registrants.

 2         Q.   Is it Anda's understanding that DEA officials

 3    had expressed concern to Ms. Hernandez that in some

 4    instances Anda was shipping too large a volume of

 5    controlled substances to particular customers?

 6              MR. MATTHEWS:  Objection.

 7              THE WITNESS:  I don't know that those words

 8         were used, "too large a volume," but there was --

 9         it warranted a discussion from their part to

10         reach out.

11    BY MR. NOVAK:

12         Q.   Did you have an understanding as to whether

13    DEA officials identified particular quantities of

14    controlled substances that were concerning to them?

15              MR. MATTHEWS:  Objection.

16              THE WITNESS:  No, I didn't.

17    BY MR. NOVAK:

18         Q.   Do you know if any suggestions were made by

19    DEA officials in their conversation with

20    Ms. Hernandez regarding modifications to the manner

21    in which Anda should perform its business?

22         A.   I don't know if there were suggestions made

23    with the initial conversation with Tracey.  There

24    were suggestions made from DEA in some later
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    conversations that DEA had with Anda representatives.

 2         Q.   Okay.  Even before those later meetings

 3    occurred, as a result of the initial conversations

 4    between the DEA and Ms. Hernandez, did Anda implement

 5    any steps that modified the manner in which it sold

 6    controlled substances?

 7              MR. MATTHEWS:  Objection.

 8              THE WITNESS:  Yes, they did.

 9    BY MR. NOVAK:

10         Q.   And what were those steps?

11         A.   There was an immediate halt on large bottle

12    size formats of products being available so that we

13    could review some data and make appropriate changes

14    in accordance with what the initial conversation was

15    with the DEA representative and Ms. Hernandez.

16         Q.   When you say review some data and make

17    appropriate changes in accordance with what the

18    initial conversation was with the DEA representative

19    and Ms. Hernandez, what do you mean?

20         A.   There was a general conversation that

21    Ms. Hernandez had with representatives from DEA that

22    was talking about concern about quantities of

23    controlled substances that Anda was shipping into the

24    marketplace to DEA registrants.
```

```
 1                We ceased selling 500- and 1,000-count

 2      bottles for a period of time, a couple of days, so

 3      that we could begin to look at our own data and what

 4      our shipping history was so that we could assess and

 5      try to understand where the commentary from DEA was

 6      coming from.

 7          Q.   I'm not sure I heard the quantity correctly.

 8      Was it 500-count bottles were ceased?

 9          A.   500- and 1,000-count.  We continued to sell

10      100-count bottles.  There may have been 90s and 30s

11      as well, but the idea was to cease shipping the large

12      quantity bottles.

13          Q.   Were the prospects of an enforcement action

14      by DEA against Anda discussed in the initial

15      telephone communications that Ms. Hernandez had with

16      DEA officials?

17                MR. MATTHEWS:  Objection.

18                THE WITNESS:  I wasn't part of that

19           conversation.  I'm not sure of what was exactly

20           said from DEA.

21      BY MR. NOVAK:

22          Q.   Okay.  In terms of Ms. Hernandez referring

23      the -- or -- or communicating the content of that

24      initial discussion to officials at Anda, did
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Ms. Hernandez indicate that DEA officials had

 2      suggested a potential enforcement action against

 3      Anda?

 4              MR. MATTHEWS:  Objection.

 5              THE WITNESS:  Yes, she did.

 6      BY MR. NOVAK:

 7        Q.   And what did she say?

 8        A.   I wasn't part of that conversation, but she

 9      contacted our then-president, Mr. Al Paonessa, and

10      let her -- let him know that she had received a call

11      from Washington headquarters.

12        Q.   Okay.  And she communicated what DEA

13      officials had communicated to her as it relates to

14      potential enforcement actions against Anda?

15              MR. MATTHEWS:  Objection.

16              THE WITNESS:  Yes.

17      BY MR. NOVAK:

18        Q.   Did Mr. Paonessa subsequently have

19      conversations with you regarding these initial

20      communications between Ms. Hernandez and DEA?

21        A.   Yes, he did.

22        Q.   And what did he tell you?

23        A.   He told us that DEA called Tracey Hernandez

24      at Watson and said there's a concern about the
```

1    quantities of controlled substances that we are

2    shipping to DEA registrants.

3        Q.   Okay.  At that point in time, had the 5,000

4    dosage unit limit been discussed between Mr. Paonessa

5    and Ms. Hernandez?

6        A.   There was talk about the 5,000 unit dosage

7    limit that we had previously in place related to line

8    item level orders, yes.

9        Q.   Okay.  In that answer, you said there was

10   talk about the 5,000 dosage limit that we had

11   previously in place.

12       A.   Yeah.

13       Q.   Is it your understanding that that 5,000

14   dosage limit was instituted prior to the

15   communications that existed between DEA officials and

16   Ms. Hernandez at Watson?

17       A.   Yes, it was.

18       Q.   When was it instituted?

19       A.   2005, perhaps.  Maybe before.

20       Q.   When we discussed earlier this morning the

21   fulfillment of controlled substance orders in 2006,

22   we identified, I think, a few different limitations

23   or screens that TPS engaged -- applied for purposes

24   of determining whether the order should be fulfilled,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2        A.    That's right.

3        Q.    Okay.  Was there a screen in 2006 that

4    applied a 5,000 dosage limit embedded within TPS?

5        A.    At the line item level, yes, it did.

6        Q.    Okay.

7        A.    It wasn't at a family level.  The family

8    level came later in 2007.

9        Q.    Okay.  All right.  I now -- now I think I

10    understand.

11          So going back to the discussions between

12    representatives of the DEA and Ms. Hernandez, based

13    upon the recounting of information to you from

14    Mr. Paonessa, did you have an understanding as to

15    whether the 5,000 dosage unit limit on a family level

16    was something that the DEA had requested?

17            MR. MATTHEWS:  Objection.

18            THE WITNESS:  I don't know that they

19        requested it, but that was part of our response

20        to -- to the conversation and to -- the ask of

21        DEA.

22    BY MR. NOVAK:

23        Q.    Okay.  What other steps did Anda take in

24    response to the conversations that Ms. Hernandez had

```
 1    with the DEA?

 2        A.   It addition to the ceasing of the 500- and

 3    1,000-count bottles?

 4        Q.   Yes.

 5        A.   Over those days, reviewing data, we made some

 6    programming changes to institute the family level

 7    limits to a DEA registration number, which was a

 8    pretty large change from where we had been with the

 9    5,000 dosage unit limit at the line-item level.

10             And that was implemented within a few days

11    and was reported back to DEA.

12        Q.   Okay.  Subsequent to the communications

13    between DEA, Ms. Hernandez at Watson, and

14    Mr. Paonessa at Anda, was there a follow-on meeting

15    directly between representatives --

16        A.   There was at least one --

17        Q.   Let me finish the question.

18             -- between representatives of Anda and the

19    DEA?

20        A.   Yes.  There was at least one additional call

21    with representatives from Anda and DEA, and

22    Ms. Hernandez, I believe, was on that call as well.

23    And then there was a face-to-face meeting in

24    Washington.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.   Okay.  When approximately was the additional

2   call?

3       A.   Within days.

4       Q.   Okay.  July of 2007?

5       A.   That's accurate, yeah.

6       Q.   Were you a participant on that call?

7       A.   I was a participant on one of the calls, for

8   sure.

9       Q.   Who, in addition to you, participated?

10       A.   Michael Cochrane and Tracey Hernandez.

11       Q.   Did Mr. Paonessa participate?

12       A.   I don't believe he was on that call.

13       Q.   Okay.  And what did you discuss with DEA in

14   this July 2007 call?

15       A.   We revisited the commentary that DEA gave to

16   Ms. Hernandez; we talked about the changes that we

17   took and made in the days following Ms. Hernandez's

18   initial communication; and we talked about a

19   face-to-face meeting to be scheduled in the coming

20   days or weeks.

21       Q.   Okay.  In the 2007 July telephone call, did

22   DEA representatives communicate a concern about the

23   quantity of orders for controlled substances that

24   Anda was fulfilling?
```

Highly Confidential - Subject to Further Confidentiality Review

 1      A.   Yes, they did.

 2      Q.   Did it identify particular drugs that were of

 3   concern to them?

 4      A.   I don't recall specific drugs or customers

 5   mentioned.

 6      Q.   Okay.  Do you recall whether they

 7   specifically referenced orders in excess of 100,000

 8   or 200,000 units of OxyContin?

 9      A.   I don't recall the exact quantities, but

10   there were large -- larger than 5,000 quantities

11   conveyed.

12      Q.   Okay.  And Anda was at that time in 2007

13   fulfilling orders that were orders of magnitude

14   larger than 5,000 dosage units for a family --

15           MR. MATTHEWS:  Objection.

16   BY MR. NOVAK:

17      Q.   -- of controlled substances, weren't they?

18           MR. MATTHEWS:  Objection.

19           THE WITNESS:  At the order level, yes, it was

20       possible to send more than 5,000 dosage units of

21       a family.

22   BY MR. NOVAK:

23      Q.   Okay.

24      A.   The limits were applied to the line-item

Highly Confidential - Subject to Further Confidentiality Review

```
 1    level at that point.

 2        Q.   After the follow-on telephone call in July of

 3    2007 that you participated in, did you also

 4    participate in the face-to-face meeting?

 5        A.   I did not.

 6        Q.   Okay.  By the way, we've been talking about

 7    Ms. Hernandez and her participation, both in the

 8    initial communication with DEA and then the follow-on

 9    telephone call from -- that you participated in.

10             What is your understanding as to

11    Ms. Hernandez's position at that time at Watson?

12             MR. MATTHEWS:  Objection.  Outside the scope.

13             THE WITNESS:  She -- she was a compliance

14        director for the Watson Manufacturing Company,

15        which was our parent at the time.

16    BY MR. NOVAK:

17        Q.   Okay.  At the time that Watson acquired Anda,

18    were there any changes instituted in the manner that

19    Anda handled its controlled substances?

20             MR. MATTHEWS:  Objection.  Beyond the scope.

21             THE WITNESS:  Operationally?

22             MR. NOVAK:  Yes.

23             THE WITNESS:  No.

24    ///
```

```
 1    BY MR. NOVAK:

 2        Q.   In terms of who within Anda had the authority

 3    to make determinations about controlled substance

 4    handling, did any of those individuals have to report

 5    to Ms. Hernandez at Watson?

 6             MR. MATTHEWS:  Objection.

 7             THE WITNESS:  Controlled substance handling

 8        how?

 9    BY MR. NOVAK:

10        Q.   For instance, the maintenance or creation of

11    a suspicious order monitoring system.

12             MR. MATTHEWS:  Objection.  Beyond the scope.

13             THE WITNESS:  No.

14    BY MR. NOVAK:

15        Q.   Were you provided instruction from

16    Mr. Paonessa as to what role Ms. Hernandez should

17    play in devising a suspicious order monitoring system

18    at Anda?

19             MR. MATTHEWS:  Objection.

20             THE WITNESS:  No, I was not.

21    BY MR. NOVAK:

22        Q.   How would you describe Ms. Hernandez's role

23    as it relates to the operation of a suspicious order

24    monitoring system at Anda?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MATTHEWS:  Objection.  Outside the scope.

 2              THE WITNESS:  She had no influence on that.

 3    BY MR. NOVAK:

 4         Q.   Now, you indicated at the follow-on meeting

 5    with DEA officials and Anda in the summer of 2007,

 6    you were not present?

 7         A.   The face-to-face, I was not present.

 8         Q.   Okay.  Is it your understanding that Anda

 9    made commitments in that meeting as to limitations

10    that it would place on the sale of controlled

11    substances?

12              MR. MATTHEWS:  Objection.

13              THE WITNESS:  No, I don't believe there were

14         any commitments made to limitations.

15    BY MR. NOVAK:

16         Q.   Okay.  Were any limitations discussed at the

17    face-to-face meeting?

18         A.   Yes.

19         Q.   And what is your understanding as to what was

20    discussed?

21         A.   DEA indicated to Michael and Al that a normal

22    pharmacy doesn't usually need more than 5,000 dosage

23    units of an item on a monthly basis.

24         Q.   Is that dosage units of an item on a monthly
```

Highly Confidential - Subject to Further Confidentiality Review

1    basis or 5,000 dosage units of a family on a monthly

2    basis?

3        A.   At that point it was understood that it was

4    family.  We had already made the modifications to our

5    systems to allow for limits by family to a specific

6    registrant.

7        Q.   Okay.  Had you implemented the 5,000 dosage

8    unit per family limit prior to the face-to-face

9    meeting with the DEA?

10       A.   Yes, we had.

11       Q.   That was on approximately August 1?

12       A.   I believe it was still in July.

13       Q.   Okay.  Are there other modifications to the

14   sale of controlled substances that Anda made coming

15   out of the face-to-face meeting that was held with

16   DEA representatives?

17       A.   Other than limit checking at the family

18   level?

19       Q.   Correct.

20       A.   I don't believe so.

21       Q.   Okay.  How about of the types of customers

22   that Anda would sell opioids to?

23       A.   Nothing specific.

24       Q.   Any restrictions on the classes of trade that

Highly Confidential - Subject to Further Confidentiality Review

1    Anda would sell opioids to that came out of the 2007

2    meeting?

3         A.    No, I don't believe so.

4         Q.    Okay.  By the way, when we talk about classes

5    of trade, as of this time in 2007, were there

6    particular classes of trade for whom Anda refused to

7    sell controlled substances?

8         A.    For customers that were identified as

9    Internet pharmacy, we were not selling to Internet

10   pharmacies.

11        Q.    Was there a point in time that Anda imposed

12   the limitation of not selling controlled substances

13   to Internet pharmacies?

14        A.    It was years prior to that.  It was probably

15   in 2004 or -5.

16        Q.    Okay.  Did the DEA discuss in the

17   face-to-face meeting with representatives of Anda

18   that there were particular classes of trade that they

19   viewed as problematic as it related to the sale of

20   controlled substances?

21        A.    I -- I wasn't at the meeting.  I don't -- I

22   don't recall specifics.  But I knew they -- I know

23   they had issues with Internet pharmacies, and there

24   was dialogue prior to the 2007 meeting with

Highly Confidential - Subject to Further Confidentiality Review

1    Washington related to their Internet pharmacies.

2        Q.    Okay.  We have been using the term class of

3    trade without really defining it.  As it relates to

4    the sale of controlled substances, what were the

5    different types of class of trade to which Anda sold

6    in the summer of 2007?

7        A.    Retail pharmacies, doctors, hospitals,

8    wholesalers, warehousing chain customers.

9        Q.    How about repackagers?

10       A.    Repackagers, yes.

11       Q.    Would pain clinics be a separate class of

12   trade?

13       A.    I think those would be together with either

14   the Internet pharmacies and/or the doctors,

15   potentially.

16       Q.    But as of this time in 2007, the only class

17   of trade that Anda would not sell controlled

18   substances to was Internet pharmacies.

19            Is that correct?

20       A.    I believe that.

21            MR. MATTHEWS:  Objection.

22   BY MR. NOVAK:

23       Q.    Okay.  Now, once the 5,000 dosage unit per

24   control family limitation on opioids was instituted

1    in the summer of 2007, did Anda devise policies under

2    which a customer could seek to purchase more than

3    5,000 units --

4         MR. MATTHEWS:  Objection.

5    Q.    -- for a particular control family?

6    A.    Yes, we did.

7    Q.    Okay.  What, if you can describe them, was

8    the process of allowing a customer to purchase more

9    than 5,000 units of, say, OxyContin in August of

10   2007?

11   A.    There was a review of that customer's

12   business, a review of that customer's usage of

13   product, the number of prescriptions they served, the

14   demographics of the customer's location.

15   Q.    For purposes of evaluating the customer's

16   usage of product, what information did Anda collect

17   in August of 2007?

18   A.    Dispensing information from their pharmacy

19   and sometimes purchasing information from that

20   pharmacy from . . .

21   Q.    Did there come a point in time where the --

22   I'll ask a different question.

23        At this point in time in 2007, were the

24   limitations placed on the sale of controlled

Highly Confidential - Subject to Further Confidentiality Review

1    substance -- substances part of what you considered

2    to be Anda's suspicious order monitoring system?

3        A.   It was part of our entire compliance program

4    as it related to controlled substances.

5        Q.   Okay.  Were there -- in addition to the

6    family unit limitations imposed upon the sale of

7    controlled substances, what were the other elements

8    of Anda's suspicious order monitoring system in

9    August of 2007?

10       A.   Our entire compliance program consisted of

11   procedures related to the handling of the controlled

12   substances, the physical security of the controlled

13   substances, the clearances in which we obtained to

14   allow employees to have access to work with

15   controlled substances, the procedures we had in place

16   to pick and pack controlled substances, the inventory

17   and security aspects of the controlled substances,

18   the cycle counts, daily counts, as well as the

19   accreditation of a customer from the licensure to the

20   customer setup to the address checks.  All of those

21   elements.

22       Q.   Okay.  Were there particular policies in

23   place as of this time in August of 2007 that related

24   to an evaluation of the appropriateness of a

Highly Confidential - Subject to Further Confidentiality Review

1    particular customer buying controlled substances?

2          MR. MATTHEWS:  Objection.

3          THE WITNESS:  The appropriateness?

4          MR. NOVAK:  Yes.

5          THE WITNESS:  Yes.

6    BY MR. NOVAK:

7       Q.   And which of the policies in effect related

8    to that evaluation of the customer's appropriateness?

9       A.   There was a policy related to the information

10   needed to set up an account.  There was controlled

11   substance handling.  There were cycle count pieces.

12          (Anda Exhibit 2 was marked for

13   identification.)

14   BY MR. NOVAK:

15      Q.   We have marked for identification purposes

16   Anda Exhibit -- Anda-Cochrane Exhibit 2.

17          MR. NOVAK:  You know, it just --

18          MR. MATTHEWS:  You should call this Anda, and

19      you can call it Pat Cochrane tomorrow.

20          MR. NOVAK:  Right.

21          MR. MATTHEWS:  That's the way I noted it on

22      the top of mine.

23          MR. NOVAK:  Okay.  What did we call Number 1?

24      Did we call it Anda 1?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  It's got my name on it.

 2                MR. NOVAK:  Okay.  I think the -- for today's

 3           purposes, they will just be labeled as Anda

 4           exhibits without the witness name.  And then when

 5           we do this tomorrow, we'll have to make it

 6           Patrick Cochrane to distinguish between those and

 7           the Michael Cochrane ones.

 8   BY MR. NOVAK:

 9      Q.   So we've had marked Anda-Cochrane Exhibit 2,

10   which also was previously marked as Anda Spellman

11   Deposition Exhibit 6, which are the defendant

12   Anda Inc.'s Supplemental Response to Plaintiff's

13   First Refined Discovery Request to Distributor

14   Defendants.

15                And the particular page of these that I would

16   like to draw your attention to start at, Page 8.
```

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



```
 9          (Anda Exhibit 3 was marked for

10    identification.)

11          MR. NOVAK:  Are these going on the screen?

12          THE VIDEOGRAPHER:  Yes.  Do you want to see

13      it?

14          MR. NOVAK:  Yeah.

15   BY MR. NOVAK:
```

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



15          (Anda Exhibit 4 was marked for

16      identification.)

17      BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



15              (Anda Exhibit 5 was marked for

16      identification.)

17      BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review

3      Q.    Okay.  Do you know where you would go to

4    obtain the prior versions of Standard Operating

5    Procedure 40 that existed prior to March of 2017?

6      A.    I would go to our compliance department.

7      Q.    Okay.  Do you understand that they have the

8    prior versions of the Standard Operating Procedure 40

9    on file?

10     A.    I don't know that.

16          (Anda Exhibit 6 was marked for

17    identification.)

24          By the way, we've made reference to

Highly Confidential - Subject to Further Confidentiality Review

    1    Mr. Paonessa a number of times today.  I'm not sure

    2    if we've ever articulated.  At this time in 2007, was

    3    Mr. Paonessa the president of Anda?

    4        A.   Yes, he was.

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



```
19        Q.   -- as of this time in 2007?

20        A.   I'm not aware of that.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



13    BY MR. NOVAK:

14       Q.   Okay.  Now, as this procedure was implemented

15    in the fall of 2007, there were customers of Anda's

16    that were allowed to buy more than 5,000 units of

17    OxyContin or fentanyl or other controlled substance

18    families, correct?

19       A.   Adjustments to families could be made at the

20    family level.

21       Q.   When you say -- if I understand you

22    correctly, that means that the individual making

23    adjustments would make them on a family-by-family

24    basis?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I don't understand the question.

 2        Q.    Okay.  I'll ask a completely different one.

 3              As we go into the fall of 2007 and these new

 4    procedures are being implemented as it relates to the

 5    sale of opioid families to Anda's customers, who is

 6    it that's making the decision about whether a

 7    customer can buy more than 5,000 units of a family?

 8        A.    The compliance department.

 9        Q.    Okay.  And so when the compliance department

10    employee is making those decisions to adjust a limit

11    for a customer, do they make it on a family-by-family

12    basis?

13        A.    Yes, they can.

14        Q.    Okay.  Do they typically, or do they

15    typically modify it upwards or downwards of -- for

16    every family?

17              MR. MATTHEWS:  Objection.

18              THE WITNESS:  It would depend on the usage

19         and whether the data warranted it.

20    BY MR. NOVAK:

21        Q.    Okay.  So depending on the data, a compliance

22    department employee might modify the limit for

23    OxyContin, allowing a customer to buy more of that,

24    but still maintain them at 5,000 family units for
```

Highly Confidential - Subject to Further Confidentiality Review

1    fentanyl?

2              MR. MATTHEWS:  Objection.

3              THE WITNESS:  That's possible.

4    BY MR. NOVAK:



12        Q.   I want to leap ahead a couple of years.

13             In the summer of 2010, do you have an

14   understanding that Anda met with compliance

15   individuals at the Drug Enforcement Administration to

16   discuss their suspicious order monitoring system?

17             MR. MATTHEWS:  Objection.

18             THE WITNESS:  I believe the DEA met at our

19        location.

20   BY MR. NOVAK:

21        Q.   Okay.  Did you participate in those meetings?

22        A.   Yes.  It was a physical inspection.

23        Q.   Okay.  And in addition to the physical

24   inspection, did DEA officials meet with

Highly Confidential - Subject to Further Confidentiality Review

1    representatives of Anda to discuss modifications in

2    how their controlled substances were being sold?

3            MR. MATTHEWS:  Objection.

4            THE WITNESS:  I don't remember discussing

5        specifics about modifications.

6            (Anda Exhibit 7 was marked for

7    identification.)

8    BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review

3           MR. MATTHEWS:  Objection.

4      BY MR. NOVAK:

5           Q.   -- in 2010?

6           MR. MATTHEWS:  Objection.

7           THE WITNESS:  A meeting with Gayle Lane

8        happened some many weeks, if not a couple months,

9        after this e-mail request.

10     BY MR. NOVAK:

11          Q.   Okay.  And did you participate in the

12     subsequent meeting that was held with Gayle Lane?

13          A.   Yes, I did.

14          Q.   Did you also participate in the preparation

15     of the different individuals at Anda for that

16     meeting?

17          MR. MATTHEWS:  Objection.

18          THE WITNESS:  I'm not sure what you mean.

19          (Anda Exhibit 8 was marked for

20     identification.)

21     BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

3          MR. NOVAK:  This is something we can talk

4       about off the record.  You have made your

5       clarifying comments.

6          I -- I can tell you, we haven't found SOP 35,

7       but we -- we can discuss it at a break.

8    BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22        Q.    Okay.  You understand that Mr. Spellman

23    ceased providing the periodic reports in that fashion

24    after the 2007 meeting?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. MATTHEWS:  Objection.

2          THE WITNESS:  Yes, I do.

3     BY MR. NOVAK:



12     Q.   Okay.  We haven't spoken much yet today about

13     Anda's practices of submitting suspicious order

14     reports to the DEA at different points in time.

15          Can you describe for me, starting in 2006,

16     what the practice of -- of submitting suspicious

17     order reports to the DEA entailed?

18     A.   There were weekly suspicious order reports,

19     and I believe there were monthly excessive order

20     reports, both that had mathematical formulas looking

21     at what that customer's purchase history had been in

22     either a rolling 3-month period or a rolling 12-month

23     period respectively to the suspicious and/or

24     excessive reports.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.  For the suspicious -- and these were

2    reports that were submitted to the DEA in 2006 and

3    -7, correct?

4        A.    To the local offices, yes.
```



```
20       Q.    Okay.  Do you know what the multiples were

21   that would have flagged an order as suspicious for

22   purposes of reporting it in those documents in the

23   '06/'07 time frame?

24       A.    Not exactly, no, I don't.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Okay.  And then reports in that form ceased

 2   in the summer of '07, correct?

 3        A.   They did.  After the discussions that we had

 4   with Washington headquarters and the guideline of

 5   5,000 dosage units per month was given to us by the

 6   DEA, we deemed that we no longer had suspicious

 7   orders so long as we kept them underneath there

 8   and/or we could justify why a customer would get more

 9   based on his business practices and his data.

10        MR. NOVAK:  Why don't we take a break.  And

11        I'm thinking a lunch break.

12        THE VIDEOGRAPHER:  The time is 12:12.  We're

13        going off the record.

14        (Recess from 12:12 until 1:05 p.m.)

15        MR. MATTHEWS:  Before we start, we had a

16        discussion about whether OPS was in the

17        production.

18        Yes, 35 was contained in the production of

19        this case.  I have found and printed for

20        Mr. Novak's use at this deposition documents

21        bearing Bates numbers Anda_Opioids_MDL_000277385

22        through 386.  It is OPS 35, which was produced

23        roughly five months ago, I believe.

24        MR. NOVAK:  Might as well mark it now.
```

Highly Confidential - Subject to Further Confidentiality Review

1          (Anda Exhibit 9 was marked for

2     identification.)

3     BY MR. NOVAK:

4        Q.   We've had marked as Anda Exhibit 9 the

5     document that Mr. Matthews just identified with the

6     Bates Number, and I'll ask a couple follow-up

7     questions with respect to it.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

 5          Q.   Okay.  And in the exercise of their

 6     discretion, if they thought that a percentage ratio

 7     of controlled substance sales to noncontrolled

 8     substance sales was too high, then they would send a

 9     customer questionnaire to the customer to have them

10     fill it out?

11          A.   Perhaps.  It might not be the only reason

12     they sent a questionnaire.  There may have been a

13     questionnaire already on file.

14          Q.   Okay.  That's all I have for -- for that.

15               Going back to Anda Exhibit 8, however --

16          A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

4        Q.    Okay.  The EDI orders that you referenced,

5    that is relegated to the context of large orders from

6    wholesalers or other entities, or can anyone place an

7    EDI order?

8             MR. MATTHEWS:  Objection.

9             THE WITNESS:  No, that is not correct.  It's

10        not in relationship necessarily to large orders.

11        It could be referencing large customers,

12        customers that have large systems.  It's not

13        necessarily just a wholesale order.

14    BY MR. NOVAK:

15        Q.    Okay.

16        A.    For example, Walgreens transmits orders to us

17    from the store level to Anda via EDI.  There are

18    thousands of them per day.

19        Q.    Okay.  How many of Anda's customers typically

20    order their controlled substances through the EDI

21    ordering --

22             MR. MATTHEWS:  Objection.

23    BY MR. NOVAK:

24        Q.    -- process?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Very few customers.

2    Q.    Okay.

3    A.    I mean, aggregate, Walgreens is a customer.

4    Their individual locations have the ability to order

5    Schedules III through V via EDI.

6    Q.    All right.  In addition to Walgreens, who

7    else orders controlled substances from Anda through

8    EDI?

9    A.    There are various other retail customers.

10    Q.    Okay.

11    A.    I can't think of any names specifically.

12    Q.    Okay.

13    A.    There are some chains.  Thrifty White orders

14    via EDI.  It's usually the chain customers that have

15    central purchasing systems.



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NOVAK:

2        Q.    Okay.

3             (Anda Exhibit 10 was marked for

4    identification.)

5    BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



6          (Anda Exhibit 12 was marked for

7      identification.)

8      BY MR. NOVAK:

21          Q.   Okay.  Well, let's talk more generally about

22      the use of revision histories at the end of standard

23      operating procedures at Anda.

24              In instances where modifications to Anda's

Highly Confidential - Subject to Further Confidentiality Review

```
1    procedures are made, are those modifications

2    reflected in the change description column of the

3    revision history?

4         A.   I can't say that they always are.

5         Q.   Okay.  So there are instances where there may

6    be a modification to the -- to the standard operating

7    procedure and it is not reflected in the change

8    description column?

9         A.   That could be incorporated into the review

10   description.
```



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

1          (Anda Exhibit 13 was marked for

2     identification.)

3     BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



14        Q.    Is there a period of -- well . . .

15              (Anda Exhibit 14 was marked for

16        identification.)

17        BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



17          MR. NOVAK:  I think that's all I have for

18      SOP 28.

19          Why don't we take a quick break so I can get

20      the next batch of documents.

21          THE VIDEOGRAPHER:  Off the record at 1:51.

22          (Recess from 1:51 until 1:58 p.m.)

23          (Anda Exhibit 15 was marked for

24      identification.)

Highly Confidential - Subject to Further Confidentiality Review

1               THE VIDEOGRAPHER:   The time is 1:58 p.m.   We

2          are now back on the record.

3     BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



2    Q.  Okay.  I'm saying prior to this version that

3    existed in April of 2012, was there an automated

4    version of a suspicious order monitoring system

5    embedded within into TPS?

6    A.  Yes.  I believe it went into effect in

7    December of '11.

15    Q.  Okay.  Can you explain for me in your own

16    words how the suspicious order monitoring system

17    embedded within TPS as of April of 2012, when this

18    document was created, how it would suspend or hold

19    orders for review?

20          MR. MATTHEWS:  Objection.

21          THE WITNESS:  The mechanics of how it would

22    do it?

23    BY MR. NOVAK:

24    Q.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   After the order was entered in TPS, it would

 2    go against these -- the programming that was put in

 3    place to monitor those four bullets.  If one of those

 4    or more of those triggers were hit, the order would

 5    go on hold.

 6        Q.   Okay.  And once it went on hold, what would

 7    the process for reviewing the order to make a

 8    determination as to whether it could be released to

 9    the customer, how was that process performed?

10        A.   It was performed by compliance analysts

11    within the compliance departments, as outlined in

12    this document.

13        Q.   Okay.  What were the steps -- once an order

14    was held as an order of interest, what were the steps

15    that someone in the compliance department would

16    undertake in order to determine whether to ship the

17    order to the customer or suspend it?

18             MR. MATTHEWS:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

12      Q.   Okay.  So a compliance employee would

13   determine whether the order had been stopped based

14   on -- or -- or figure out which of the metrics was

15   the basis for holding the order to begin with.

16           MR. MATTHEWS:  You have to say "yes" or "no."

17           THE WITNESS:  Yes.

18   BY MR. NOVAK:

22      Q.   Okay.  And the information that they were

23   looking at in TPS was first to pay attention to what

24   city or state the request from the customer came

Highly Confidential - Subject to Further Confidentiality Review

1    from, and then also to determine if a customer

2    questionnaire was on file?

3        A.    Yes.



10       Q.    Is it your understanding that Anda had

11   customers as of this time who had been grandfathered

12   into control eligibility?

13            MR. MATTHEWS:  Objection.

14            THE WITNESS:  It is not, but it is certainly

15       possible depending on what their history had been

16       and whether or not we had questionnaire or data

17       on file.

18   BY MR. NOVAK:

19       Q.    Did you have an understanding as to a

20   grandfathering process that existed for old customers

21   of Anda?

22       A.    Generally, a grandfathered customer would be

23   someone who had access to controls prior to one of

24   the events that were outlined as part of our evolving

Highly Confidential - Subject to Further Confidentiality Review

1    process of eligibility for customers to have control

2    access.

Highly Confidential - Subject to Further Confidentiality Review



20      Q.    That's all I have for 15.

21            (Anda Exhibit 16 was marked for

22      identification.)

23      BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



20          (Anda Exhibit 17 was marked for

21     identification.)

22     BY MR. NOVAK:

23          Q.   We've had marked next Anda Exhibit 17, which

24     is a document bearing the Bates numbers Anda 571720

Highly Confidential - Subject to Further Confidentiality Review

```
 1    through 723, and I only have one question, I think,

 2    with respect to Anda Exhibit 17.

 3          Is this a document that Anda received as a

 4    registrant under the Controlled Substances Act on or

 5    about February 7th of 2007?

 6       A.   Yes, I believe everybody received this --

 7    every registrant received it.

 8       Q.   Okay.

 9          (Anda Exhibit 18 was marked for

10    identification.)

11    BY MR. NOVAK:

12       Q.   We have next marked Anda Exhibit 18, which is

13    a document bearing the Bates Number Anda 276156

14    through 276157 and is a two-page document from Joseph

15    Rannazzisi at the Department of Justice Drug

16    Enforcement Administration to -- addressed to Anda.

17          Is this a document that Anda received from

18    the Department of Justice Drug Enforcement

19    Administration on or about December 27th of 2007?

20       A.   Yes.

21       Q.   Do you know if Anda Exhibits 17 and 18 were

22    reviewed by the individuals in Anda's compliance

23    program for purposes of administering their

24    suspicious order monitoring system?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  Yes, I can confirm that they

 3         were reviewed.  I don't know to what end and for

 4         what purposes.

 5    BY MR. NOVAK:

 6         Q.   Mr. Cochrane, do you have a basic

 7    understanding of how rebates or chargebacks work at

 8    Anda?

 9         A.   Yes, I do.

10         Q.   Can you describe for me first what a

11    chargeback is?

12         A.   A chargeback is a transaction between a

13    wholesaler and a manufacturer to adjust cost based on

14    what the sale price was of the said product,

15    depending on the type of customer that the product

16    went to.

17         Q.   Okay.  When you say "a transaction between a

18    wholesaler and a manufacturer to adjust cost," whose

19    cost is being adjusted?

20         A.   The wholesaler's.

21         Q.   Are you aware of instances where

22    manufacturers provide a chargeback payment or a

23    rebate payment to a wholesaler in exchange for

24    receiving certain information from the wholesaler?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  Yes, but I wouldn't describe

 3         that as a chargeback or a rebate.

 4    BY MR. NOVAK:

 5         Q.   How would you describe that?

 6         A.   There are specific clauses in vendor

 7    manufacturer contracts that allow for payment of

 8    money specific to data.

 9         Q.   Okay.

10         A.   Commonly referred to as DSA fees.

11         Q.   In terms of how those DSA fees are

12    administered, are they sometimes, in terms of the

13    revenue flow, managed in the same manner as a

14    chargeback?

15              MR. MATTHEWS:  Objection.

16              THE WITNESS:  I'm not sure if it's the exact

17         same manner.  There's a separate transaction for

18         it.  I don't believe that they're blended

19         together.

20    BY MR. NOVAK:

21         Q.   Are you aware of whether Anda maintains or

22    receives rebate payments from Mallinckrodt?

23         A.   I couldn't say for sure.  I don't know the

24    structure of our deal with Mallinckrodt at that level
```

Highly Confidential - Subject to Further Confidentiality Review

1    of detail.

2            (Anda Exhibit 19 was marked for

3    identification.)

4    BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review

4    BY MR. NOVAK:

5       Q.   Okay.  Has Anda at different times considered

6    the use of or requested access to information about

7    customers from different manufacturers to be utilized

8    as part of the operation of Anda's suspicious order

9    monitoring system?

10      A.   I don't have specific knowledge about that.

11   I know that there was a request for data and

12   purchases directly to DEA post the 2007 meetings that

13   we had with them.

14      Q.   Okay.

15      A.   I don't know about specifics to

16   manufacturers.

17      Q.   Are you aware of whether Anda has requested

18   information from the parent companies that have owned

19   it at various times for purposes of implementing

20   Anda's suspicious order monitoring system?

21      A.   I don't believe specifically to implementing

22   a system.  I believe there have been requests for

23   information about customers that we may have had in

24   common with our parent manufacturer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Where you would obtain information about the

 2    customer you had in common from Watson or Actavis or

 3    Teva?

 4        A.   Correct.

 5        Q.   In those instances, were you able to access

 6    information from Watson or Actavis or Teva for

 7    purposes of assisting the implementation of Anda's

 8    suspicious order monitoring system?

 9             MR. MATTHEWS:  Objection.

10             THE WITNESS:  We have never had access to any

11        system or data at the parent.

12    BY MR. NOVAK:

13        Q.   Have the parent -- I'm sorry.

14             Well, that answers it as to the parent.

15             How about for other manufacturers?

16        A.   We don't have access to other manufacturers'

17    data.
```



20          (Anda Exhibit 20 was marked for

21      identification.)

22      BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



15    Q.    Okay.  Can you explain to me what information

16    would be available to Mallinckrodt by virtue of their

17    chargeback process with Anda that would assist them

18    in analyzing 15- and 30-milligram oxycodone

19    utilization?

20          MR. MATTHEWS:  So I'm going to object to this

21          as outside the scope of the 30(b)(6) notice.

22          There's nothing in your notice that purports to

23          require us to educate a witness to talk about

24          Mallinckrodt's information.

Highly Confidential - Subject to Further Confidentiality Review

```
1            I'll also object on the ground that to the

2       extent you have purported to ask us -- ask him

3       based on his personal knowledge, there is no

4       foundation that he has any information about what

5       was in Mallinckrodt's mind, what Mallinckrodt

6       understood.

7            But if you want to go ahead and speculate for

8       Mr. Novak, please feel free to do so.

9            MR. NOVAK:  Well, James, that one was a

10      whopper of a speaking objection that violates the

11      protocols that are in place in this proceeding.

12           And there is a category within the 30(b)(6)

13      requests with respect to rebate programs.  It's

14      Number 11.

15           MR. MATTHEWS:  The information that

16      Mallinckrodt obtained from other distributors and

17      wholesalers about chargebacks has nothing to do

18      with any rebate agreement between Anda and

19      Mallinckrodt or anybody else.

20           I understand that you guys are interested in

21      rebates and chargebacks and how they work, but

22      you should ask Mallinckrodt what its knowledge is

23      about what information it obtained from

24      chargebacks and rebates.  You shouldn't be asking
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        my witness what Mallinckrodt got.  It's -- you

 2        want to talk about patently beyond the scope of

 3        the reasonable rules, that is that.

 4   BY MR. NOVAK:

 5        Q.  As part of the 30(b)(6) notice of deposition

 6   today, Mr. Cochrane, did you understand that one of

 7   the topics you were to be prepared to testify about

 8   is the rebate process between -- or chargeback

 9   process, as we've called it, as between manufacturers

10   and Anda?

11            MR. MATTHEWS:  You know, if we are going to

12        get into a lawyer's fight on the record, that's

13        not what your notice says.  It doesn't say the

14        chargeback process generally.  There's one topic

15        that relates to rebate agreements between Anda

16        and any manufacturers.  You want to ask him about

17        rebate agreements between Anda and manufacturers,

18        he is prepared to answer.  Go ahead.

19            But asking him about what Mallinckrodt

20        understood in connection with chargeback

21        information it may or may not have obtained from

22        other wholesalers is, you know, not within that

23        topic and not within his personal knowledge.

24        There is no foundation for him to offer that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          testimony unless you can ask him and he says he
 2          talked to Mallinckrodt individuals personally and
 3          that's what they told him.
 4                MR. NOVAK:  Somewhere in the record I have to
 5          find the actual pending question.
 6    BY MR. NOVAK:
 7          Q.   Okay.  The question -- and I'll rephrase
 8    it -- is:  Can you explain to me what information
 9    would be available to Mallinckrodt by virtue of
10    their chargeback process with Anda that would assist
11    in analyzing 15- and 30-milligram oxycodone
12    utilization?
13          A.   The process related to chargebacks is not
14    specific to oxycodone.  It's not specific to
15    controlled substances.  It's specific to how the
16    rules of engagement are with the manufacturer and the
17    wholesaler.
18                If the manufacturer sells that product to us
19    at a price and there are indirect contracts or there
20    are different price concessions offered to certain
21    classes of trade and/or customers within certain
22    classes of trade, Anda invoices at that price.
23                Chargeback transaction is created back to the
24    manufacturer to make us whole on what we paid for the
```

Highly Confidential - Subject to Further Confidentiality Review

1    product versus what we sold it out at.  That would be

2    line item detailed data to the registrant to the

3    location that Anda shipped the product to.

4        Q.   When you say "line item detailed data" as

5    part of that answer, what type of data would that be

6    for purposes of administering the chargebacks?

7        A.   The date of the transaction, a specific order

8    or invoice reference number that was Anda's number,

9    the customer that we shipped it to, the distribution

10   center that we shipped it from, the item number, the

11   item description possibly, and the quantity.

12       Q.   Okay.

13       A.   And of course the price.



Highly Confidential - Subject to Further Confidentiality Review

5    BY MR. NOVAK:

6        Q.   In fact, in 2012, wasn't Rite Aid the

7    largest, if not one of the largest, customers of

8    controlled substances of Anda?

9        A.   Yes, they were.  We had a specific program

10   designed to allow them access to products that they

11   otherwise were not receiving appropriate access to

12   via the wholesale model.

13            We were their primary supplier on those

14   products.

15       Q.   Were controlled substances some of the

16   products for which you were a primary supplier to

17   Rite Aid?

18       A.   Yes.

19       Q.   In 2012?

20       A.   Yes.

21       Q.   All of their stores or only some?

22       A.   Many of their stores.  I can't say all of

23   them.

Highly Confidential - Subject to Further Confidentiality Review

5       Q.   Okay.  Was there any type of alternative

6    system that was put in place as it related to Rite

7    Aid?

8            MR. MATTHEWS:  Objection.

9            THE WITNESS:  System how?

10   BY MR. NOVAK:

11      Q.   In terms of evaluating the eligibility of

12   Rite Aid stores for the purchase of controlled

13   substances.

14      A.   There was extensive data review of Rite Aid

15   usage.

16      Q.   More so than -- than other chains?

17           MR. MATTHEWS:  Objection.

18           THE WITNESS:  Rite Aid was -- was a chain.

19      More so than other chains?  Not necessarily.

20   BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



```
 8        Q.   Do you know whether there were any Rite Aid

 9    stores such as this one in Tennessee that Anda

10    determined they would not supply controlled

11    substances to?

12        A.   There were definitely Rite Aid stores that

13    Anda did not supply controlled substances to.

14    Whether or not it was determined based on criteria

15    like that or other, I'm not sure of.

16        Q.   Okay.  When you say you're definitely --

17    there were definitely Rite Aid stores that Anda did

18    not supply controlled substances to, was that based

19    on a determination that they were declined for

20    eligibility to purchase controlled substances, or for

21    some other reasons?

22        A.   Yes, there were stores that were declined.
```

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



16            (Anda Exhibit 21 was marked for

17      identification.)

18      BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



12    BY MR. NOVAK:

13        Q.    Okay.  When Anda performed review of

14    dispensed data, what were the factors that they

15    looked to to make a determination as to whether a

16    particular retail store was appropriately eligible

17    for controlled substance purchases in Anda's mind?

18        A.    There were a number of factors.  A lot of it

19    came down to number of prescriptions, number of

20    items, the types of items, the ranking of said items,

21    the number of overall dispensed units, the quantity

22    of dispensed units as a relationship to prescription

23    size.

24        Q.    I'd like to direct your attention to the page

Highly Confidential - Subject to Further Confidentiality Review

1    of Anda Exhibit 21 that bears the Bates range 81568.

2        A.   81568?

3        Q.   Yes.



15              MR. MATTHEWS:  I'm going to object on the

16        record at this point.  And I'm going to give you

17        some leeway here, but as you well know from the

18        responses we filed and the meet and confers we

19        had, we objected to preparing a witness to talk

20        about any specific customers or transactions on

21        the ground that to do so would be unduly

22        burdensome given that it's about 12 years of

23        history.

24              And we told you we weren't going to prepare a

Highly Confidential - Subject to Further Confidentiality Review

```
 1        witness to do that, and we have not prepared a

 2        witness to do that.

 3             I appreciate that you want to put a document

 4        in front of Mr. Cochrane to ask him about the

 5        document, but to the extent you are purporting to

 6        ask him about the transactions, we told you in

 7        advance that if you told us which transactions

 8        you wanted to ask him about, we would prepare

 9        him.  You chose not to do that with the exception

10        of two customers.  This was not one of them.

11             So I'll give you a little leeway, but I'm

12        going to cut you off pursuant to our objections

13        at some point.

14             MR. NOVAK:  Okay.

15             He answered the last question, right?

16             MR. MATTHEWS:  He did.  He did.  I did let

17        him answer the question.

18             MR. NOVAK:  Okay.

19             MR. MATTHEWS:  And then I asserted my

20        objection.

21   BY MR. NOVAK:

22        Q.   Let me just talk or inquire generally.

23             If a particular retailer has four or five

24   different opioid products as the top ten products
```

Highly Confidential - Subject to Further Confidentiality Review

1    that they dispense, does that raise any red flags for

2    the compliance personnel at Anda who are performing

3    the review of whether a particular customer should be

4    eligible for purchasing controlled substances?

5            MR. MATTHEWS:  Objection.

6            THE WITNESS:  Yes, it would.

7    BY MR. NOVAK:

8        Q.   Okay.  And why is that?

9        A.   That is part of the program that we put

10   together is to evaluate their data and see what

11   products they're dispensing.

12       Q.   And the higher the number of opioid products

13   that are in their top ten, so to speak, the greater

14   concern there is for Anda in terms of determining

15   whether they are or should be eligible to purchase

16   controlled substances?

17       A.   Yes.  It's a greater concern, and it's a

18   trigger for receiving more information.

19       Q.   What type of additional information would

20   Anda seek to receive if they already have the

21   customer's dispensing data?

22       A.   Location demographics related to the

23   surrounding areas.  Are they servicing nursing homes?

24   Are they servicing hospitals?  Are they servicing

Highly Confidential - Subject to Further Confidentiality Review

 1    outpatient care centers?  What is the proximity to

 2    other locations of pharmacies?  And so on.

 3        Q.   Okay.  So if a particular retail store had a

 4    high number of opioid products in its top ten

 5    dispensed products, would you expect Anda to approve

 6    the store absent performing the additional type of

 7    due diligence that you just described?

 8            MR. MATTHEWS:  Objection.

 9            THE WITNESS:  I'm not sure.  I'm not sure

10        what other due diligence would be done before

11        that.

12            MR. NOVAK:  Okay.

13    BY MR. NOVAK:

14        Q.   The other forms of due diligence that would

15    be performed by a compliance staff member at Anda in

16    evaluating a -- a retail store that has a large

17    number of opioid products in its top ten dispensing

18    data, would you expect that additional due diligence

19    to be located or recorded somewhere in the compliance

20    department files?

21            MR. MATTHEWS:  Objection.

22            THE WITNESS:  I would.  I'm not sure where it

23        would be memorialized, whether in a combination

24        of the customer file or TPS or both.

```
 1    BY MR. NOVAK:

 2        Q.   Okay.  So the information or the due

 3    diligence would be contained in the TPS files as well

 4    as the customer files?

 5        A.   Yes.

 6             MR. MATTHEWS:  Objection.

 7             MR. NOVAK:  Okay.  Let's take a quick break,

 8        and then I'm going to move on to another batch of

 9        documents.

10             THE VIDEOGRAPHER:  The time is 2:58.  We are

11        off the record.

12             (Recess from 2:58 until 3:15 p.m.)

13             THE VIDEOGRAPHER:  The time is 3:15 p.m.  We

14        are now back on the record.

15    BY MR. NOVAK:

16        Q.   Mr. Cochrane, are you aware of any instances

17    where Anda shipped what it identified as suspicious

18    orders into either Summit or Cuyahoga Counties?

19        A.   Yes, I am.

20        Q.   And what examples are you aware of?

21        A.   Examples prior to 2007 -- to the 2007 DEA

22    meeting when we were submitting suspicious excessive

23    reports to the DEA on a weekly or monthly basis,

24    there were some transactions on some of those
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reports.

 2         Q.   Okay.  Would one of those transactions have

 3    been for New Choice Pharmacy?

 4         A.   Yes, it would.

 5         Q.   What were the circumstances under which Anda

 6    decided to ship a transaction for New Choice Pharmacy

 7    that it had identified as suspicious?

 8              MR. MATTHEWS:  Objection.

 9              THE WITNESS:  It was captured on a report of

10         suspicious orders for -- for a weekly time period

11         related to fentanyl patches.

12    BY MR. NOVAK:

13         Q.   Okay.  The fentanyl patches that were ordered

14    by New Choice exceeded a number that would have

15    identified the order as suspicious under the criteria

16    being utilized by Anda prior to the summer of 2007?

17         A.   Correct.  I believe the threshold for patches

18    was ten patches.

19         Q.   Okay.  Are you aware of -- after the change

20    in handling controlled substances that arose out of

21    Anda's meeting with the DEA in 2007, are you aware of

22    whether New Choice purchased controlled substances in

23    an amount that exceeded the 5,000 unit per family

24    threshold?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.   No, I'm not.

2       Q.   Do you know if adjustments were made for New

3   Choice that would enable them to purchase controlled

4   substances in an amount greater than 5,000 units per

5   controlled substance family per month after --

6       A.   No, I'm not.

7       Q.   -- after the summer of 2007?

8       A.   No, I'm not.

9       Q.   Are you aware of whether Anda at one point

10  terminated controlled substance authorization to New

11  Choice?

12      A.   Yes, we did.

13      Q.   What was the reason that you terminated them?

14      A.   Their termination was part of a review of

15  customers that was performed in the summer or fall of

16  2007.

17      Q.   And what was the factor associated with --

18  hold on.

19           Well, let me -- let me start with a different

20  question.

21           The review of customers that was performed in

22  the summer or fall of 2007, was that associated with

23  your implementation of the restrictions that Anda had

24  committed to with the DEA?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  Yes, it would have been.

 3     BY MR. NOVAK:

 4        Q.   What was it about New Choice that was -- that

 5     would have made them ineligible to purchase controls

 6     based upon the restrictions that Anda had committed

 7     to with the DEA?

 8              MR. MATTHEWS:  Objection.

 9              THE WITNESS:  I'm not sure of the specifics

10         or what the final reason was to cut them off, but

11         the compliance department made that decision as

12         part of their evaluation.

13     BY MR. NOVAK:

14        Q.   Okay.  For preparing for this deposition, did

15     you review any of the TPS entries for New Choice?

16        A.   I reviewed their last ship date, and I

17     reviewed their location.

18        Q.   And their last ship date was when?

19        A.   It was in 2007.

20        Q.   December of 2007?

21        A.   It might -- it may have been.  It was the

22     second half of 2007.  It was after the changes were

23     implemented.

24        Q.   The report that was submitted to DEA as it
```

Highly Confidential - Subject to Further Confidentiality Review

1    related to a suspicious order for New Choice, do you

2    know when that was submitted to the DEA?

3        A.   It was early 2007.

4        Q.   In what form would it have been submitted?

5        A.   Excel.

6        Q.   Now, after the New Choice suspicious order

7    report and the termination of -- of the method of

8    reporting that Anda had periodically done in roughly

9    August of 2007, when was the next suspicious order

10   report that was submitted to the DEA?

11            MR. MATTHEWS:  Objection.

12            THE WITNESS:  After the changes in 2007 where

13        we had specific limits of 5,000 dosage units,

14        we -- we did not submit any more of those

15        suspicious reports.

16   BY MR. NOVAK:

17       Q.   Okay.  I'll ask the question a little

18   differently.

19            Do you have an understanding as to the next

20   time Anda actually reported an order as being

21   suspicious to the DEA?

22       A.   There were customers and specific orders that

23   were reported to DEA in August of 2007.

24       Q.   Subsequent to August of 2007, when was the

Highly Confidential - Subject to Further Confidentiality Review

1    next time that Anda reported a suspicious order to

2    the DEA?

3        A.   We were continuously reporting customers that

4    we denied to do business with or customers that we

5    ceased doing business with as they arose.

6        Q.   Do you understand -- and let's talk about

7    terminology for a second.

8             Does Anda have an understanding that

9    reporting a suspicious order to the DEA is something

10   different than reporting a suspicious customer?

11       A.   Yes, we do.

12       Q.   Okay.  So my question related not to the

13   reporting of suspicious customers but the reporting

14   of suspicious orders.

15            Do you know after August of 2007 when the

16   next time Anda reported a suspicious order to the

17   DEA?

18       A.   I'm unsure of the specific dates.

Highly Confidential - Subject to Further Confidentiality Review



4                (Anda Exhibit 22 was marked for

5         identification.)

6                MR. MATTHEWS:  22?

7         BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

5    Q.   And what would be the factors leading to Anda

6    reporting customers that were cut off to the DEA?

7         MR. MATTHEWS:  Objection.

8         THE WITNESS:  Review of their dispensing

9         data, a review of their history with Anda, a

10        review of their questionnaire, whether or not we

11        had a questionnaire, and other item and customer

12        attributes.

13   BY MR. NOVAK:

14   Q.   Okay.  Did -- did the determination to cut

15   off a customer -- how were -- how did Anda compliance

16   staff know that that was not based upon a particular

17   order?

18        MR. MATTHEWS:  Objection.

19        THE WITNESS:  I'm not sure.

20   BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



5        Q.    Okay.   When was the next suspicious order

6     that you reported in 2010 or sometime thereafter?

7        A.    At the conclusion of this DEA inspection, we

8     began open communication with group supervisor

9     Gayle Lane.   I personally had communication with her

10    via e-mail and the first iteration of the report that

11    we were looking at a few minutes ago, and that first

12    report had orders and customers that we refused to

13    fill.

Highly Confidential - Subject to Further Confidentiality Review



```
 6    BY MR. NOVAK:

 7         Q.    Okay.  So you provided reports to the DEA

 8    starting in 2010 that identified suspicious -- or

 9    that identified customers who had been cut off?

10         A.    Correct.

11         Q.    When was the first time you identified a

12    suspicious order as such in a report to the DEA?

13              MR. MATTHEWS:  Objection.

14              THE WITNESS:  It was done in conjunction with

15         the first iteration of the report of customers

16         that we cut off.

17    BY MR. NOVAK:
```

Highly Confidential - Subject to Further Confidentiality Review



```
 2      Q.   Okay.  Did Anda, in submitting its report to

 3   DEA, use the words "suspicious order," quote/unquote,

 4   in their characterization of what was being submitted

 5   to the DEA?

 6      A.   I don't have the specific e-mail in front of

 7   me.  I wouldn't know what the exact writing was.

 8      Q.   Okay.  I'd like to switch emphasis now to

 9   2010.  Was there a point in 2010 -- well, I will get

10   this marked first.

11           (Anda Exhibit 23 was marked for

12   identification.)

13   BY MR. NOVAK:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.   Okay.  They were a customer of Anda's?

2       A.   I don't know that Harvard was a customer of

3    Anda's.  Harvard was a competitor of Anda's.

4       Q.   Do you know whether Anda sold OxyContin to

5    Harvard Drug?

6       A.   I'm unaware of any OxyContin being sold to

7    Harvard Drug.
```



```
21      A.   That's correct.

22      Q.   He was the director of regulatory compliance

23   at the time he wrote this at Anda?

24      A.   That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review



11          MR. MATTHEWS:  You are asking him in his

12     personal capacity?

13          MR. NOVAK:  No.

14   BY MR. NOVAK:

15     Q.  What was Anda's reaction to this suggestion?

16          MR. MATTHEWS:  Objection.

17          THE WITNESS:  I believe by the end of June we

18     had ceased selling to pain management clinics and

19     doctors.

20   BY MR. NOVAK:

21     Q.  Was Anda concerned that the same type of

22   enforcement action that had been brought against

23   Harvard Drug would be brought by the DEA against

24   Anda?

```
 1              MR. MATTHEWS:  Objection.

 2              THE WITNESS:  That was a factor.  There was

 3         also a move for the State of Florida to disallow

 4         doctors from dispensing meds in the office

 5         setting that I believe took effect later that

 6         fall.

 7              So there was already other indicators that

 8         that business was already being looked at for us

 9         to discontinue.

10    BY MR. NOVAK:

11         Q.   Now, the determination to cut off particular

12    accounts that was made in the summer of 2010 included

13    more than just physicians, did it not?

14         A.   It did.

15         Q.   Okay.  What other types of customers did Anda

16    decide should be cut off at that time?

17         A.   We also ceased doing business with

18    wholesalers/distributors and some hospitals as well.

19              (Anda Exhibit 24 was marked for

20    identification.)

21    BY MR. NOVAK:
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

2          MR. NOVAK:  Bear with me.  I'm looking for a

3      particular document.

4          Can we take a quick five-minute break?  I

5      have to find a document that's escaped me at the

6      moment.

7          THE VIDEOGRAPHER:  Off the record at 3:55.

8          (Recess from 3:55 until 3:58 p.m.)

9          THE VIDEOGRAPHER:  The time is 3:58.  We are

10     now back on the record.

11         (Anda Exhibit 25 was marked for

12     identification.)

13     BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

7      Q.    Okay.  At the time that you were selling to

8   repackagers, did you have any type of customer

9   questionnaire or know your customer procedures as it

10  related to that channel of trade?

11     A.    Yes.  I believe we did have information

12  related to the repackagers and who they were

13  repackaging product on behalf of.

14     Q.    Did you have anything that was the equivalent

15  of dispensing data for repackagers?

16           MR. MATTHEWS:  Objection.

17           THE WITNESS:  I'm not sure of that.

18  BY MR. NOVAK:

19     Q.    Okay.  How about for wholesalers?

20           MR. MATTHEWS:  Objection.

21           THE WITNESS:  I'm not sure of that either.

22  BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 9       Q.   Okay.  This is solely for illustrative

10    purposes?  Because I see there's a limit on aspirin.

11    There wasn't a limit on aspirin in real life at Anda,

12    was there?

13       A.   No.

14       Q.   Okay.  But the way it would work in TPS is if

15    you were looking at the control limits for a

16    particular product and a particular customer, you

17    would see a column for the product type, and then a

18    limit, and then there month-to-date purchase, and

19    that would give the amount that was still available

20    for them to purchase in the month?

21       A.   Yes, but these screens were not visible to

22    the customer, nor to the rep.
```

Highly Confidential - Subject to Further Confidentiality Review



```
 3       Q.   Did the sales representative at Anda even

 4    know what control limit was set for a particular

 5    customer for an opiate product at this point in time

 6    in 2010?

 7       A.   I don't believe they could see it realtime.

 8    However, if they knew they started with the 5,000

 9    baseline limit and they had interacted with their

10    customer in compliance to deem an increase

11    appropriate, they could possibly know what their

12    customer's limit was.
```

Highly Confidential - Subject to Further Confidentiality Review



24          Q.    Okay.  From the time period of September of

Highly Confidential - Subject to Further Confidentiality Review

1    2007 through those inspections in the summer of 2010,

2    had there been any reports submitted by Anda to the

3    DEA regarding its customers and their eligibility to

4    purchase controlled substances?

5         MR. MATTHEWS:  Objection.

6         THE WITNESS:  Not to my knowledge.

7    BY MR. NOVAK:

8    Q.   Okay.  So in the summer of 2010, when Anda

9    began discussing the prospect of submitting reports

10   to the DEA, were those discussions in the context of

11   the meetings surrounding the inspection of Anda

12   facilities?

13   A.   They were after the meetings for the

14   inspection.

15   Q.   In what time frame approximately?

16   A.   In the days and weeks after.

17   Q.   Okay.  Would this have been approximately

18   August of 2010?

19   A.   Yes.

20   Q.   And at that time, what was communicated by

21   the DEA to Anda as it related to the submission of

22   suspicious order monitoring reports?

23   A.   Group supervisor Gayle Lane reached out to us

24   after the inspection had concluded, and she wanted to

Highly Confidential - Subject to Further Confidentiality Review

1    open the lines of communication with the local office

2    because, previous to that and since 2007, our

3    compliance department had been dealing with

4    Washington headquarters and not reporting to the

5    local office and not communicating as much with the

6    local office.

7           We had frequent phone calls, and we scheduled

8    an on-site at DEA field office visit.

9       Q.   Okay.  And in conjunction with that DEA field

10   office visit, was it communicated by DEA to Anda that

11   they needed to resume the submission of suspicious

12   order monitoring reports?

13      A.   They were --

14           MR. MATTHEWS:  Objection.

15           THE WITNESS:  They were quite pleased with

16       what we were sending them as far as customers

17       being cut off and customers being denied, and

18       they asked that that continue.

19   BY MR. NOVAK:

20      Q.   Now, in that answer, you indicated that the

21   DEA was quite pleased with what Anda was sending them

22   as far as customers being cut off and customers being

23   denied.  This is in the summer of 2010?

24      A.   This is August and September of 2010.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  Now, a moment ago, you testified --

 2    and I'm just going to quote your testimony:  Okay.

 3    From the time period -- this is my question to you:

 4    From the time period of September of 2007 through

 5    those inspections in the summer of 2010, had there

 6    been any reports submitted by Anda to the DEA

 7    regarding its customers and eligibility to purchase

 8    controlled substance.

 9          Your counsel objected.

10          And then you said:  Not to my knowledge.

11          If I'm understanding that testimony

12    correctly, there were no reports submitted to the DEA

13    up through the summer of 2010, were there?

14          MR. MATTHEWS:  Objection.

15          THE WITNESS:  There were no reports up until

16       the communication lines reopened after the

17       inspection we had in the summer in 2010.  With

18       specificity, it was July of 2010 that we had the

19       inspection.  It was after that inspection in

20       August and September that we began sending them

21       the detailed spreadsheet of the customers that we

22       cut off and/or denied.

23    BY MR. NOVAK:

24          Q.    Okay.  So the -- the spreadsheets that you
```

Highly Confidential - Subject to Further Confidentiality Review

1    were conveying to DEA that you said they were pleased

2    with were the ones that began after the July of 2010

3    inspection?

4        A.    Correct.

5        Q.    Okay.  Now, at some point, DEA requested that

6    you add additional information to your submissions,

7    correct?

8        A.    I'm not aware of what you are looking at.

9             (Anda Exhibit 26 was marked for

10   identification.)

11   BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



 9       Q.   Okay.

10            (Anda Exhibit 27 was marked for

11       identification.)

12       BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



11          MR. MATTHEWS:  I'll put in place here my

12      standard objection to the use of spreadsheets

13      that are not produced in physical form at the

14      deposition and so can't be marked as exhibits.

15      And subject to our agreement to work this out at

16      a later time for all of these, I will assume you

17      are going to go forward, right?

18          MR. NOVAK:  Yes.  I, also, by the way,

19      checked.  There are picture and picture video

20      that will actually present the portions of the

21      spreadsheet that we are reviewing in realtime

22      during the deposition transcript as it plays.

23          MR. MATTHEWS:  Okay.  That's a start.

24          MR. NOVAK:  Yes.

1    BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review

21          All right.  That's all I have for 27.

22          (Anda Exhibit 28 was marked for

23     identification.)

24     ///

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NOVAK:



18        Q.   Was he responsible for communications with

19    the DEA as it related to any controlled substance

20    distribution questions that emanated from the

21    Groveport, Ohio, distribution center?

22             MR. MATTHEWS:  Objection.

23             THE WITNESS:  Ultimately, he was the highest

24        ranking person at the site and literally the

Highly Confidential - Subject to Further Confidentiality Review

1        first office inside the door.  So if the DEA

2        served them with questions or came in for an

3        inspection, he fielded the inspections.

4            There was also a DEA compliance manager there

5        by the name of Debra Mooney that oversaw the

6        operations of the cages involved.

7    BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

6          (Anda Exhibit 29 was marked for

7     identification.)

8     BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



15          MR. NOVAK:  Why don't we take a break.

16          THE VIDEOGRAPHER:  4:45 p.m.  We are going

17     off the record.

18              (Recess from 4:45 until 5:09 p.m.)

19          THE VIDEOGRAPHER:  The time is 5:09 p.m.  We

20     are now back on the record.

21          (Anda Exhibit 30 was marked for

22     identification.)

23     BY MR. NOVAK:

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 8        A.    I do.

 9              MR. MATTHEWS:  Objection.

10              THE WITNESS:  But can you expand it,

11        possibly, enlarge it, and maybe show the column

12        headings?  I think some of those filters are

13        blocking what those field descriptions are.

14   BY MR. NOVAK:

15        Q.    And I'm with you on expanding the size of it.

16   That's why I try to use electronic exhibits to begin

17   with.

18        A.    It's only in the last year, but okay.

19        Q.    I feel your pain.
```

Highly Confidential - Subject to Further Confidentiality Review



9    Q.   Okay.  Does the TPS database include not only

10   the customer's current control approval status, but

11   does it include information as to the history of the

12   customer's status in terms of when it has changed

13   from eligible for controls to noneligible?

14   A.   Not within those fields, no.

Highly Confidential - Subject to Further Confidentiality Review

2      Q.   Okay.  And as to whether a query could

3   provide the full control eligibility status over

4   time, do you know one way or another whether it

5   could?

6      A.   I don't know that those fields and the files

7   that those fields relate to have history.

8      Q.   Right.

9           Are -- I'll ask a different question.

10          Are there fields within the TPS system that

11  provide information of historically the different

12  control eligibility statuses that each particular

13  customer has over time?

14     A.   No.  As far as I know, those fields are the

15  current status.



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



18      Q.    Okay.  That is a good question.

19            Do you know if chains are treated as a

20      separate class of trade when an individual pharmacy

21      location is being evaluated on a controlled substance

22      order than an independent retail pharmacy?

23      A.    They could be classified as a different class

24      of trade.  I'm not sure if there are differences in

Highly Confidential - Subject to Further Confidentiality Review

1    the parameters for which -- one pharmacy versus the

2    other.

3        Q.    Sitting here today, do you know one way or

4    the other whether a chain pharmacy has a different

5    class of trade for purposes of applying the

6    suspicious order monitoring system than an

7    individual -- an independent retail pharmacy?

8        A.    No, I do not.



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NOVAK:

2         Q.    Okay.   That's all I have as to that exhibit.

3              MR. NOVAK:   Take a quick break.

4              THE VIDEOGRAPHER:   The time is 5:46.   We're

5         off the record.

6              (Recess from 5:46 until 5:58 p.m.)

7              THE VIDEOGRAPHER:   The time is 5:58.   We are

8         now back on the record.

9    BY MR. NOVAK:



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



22          MR. MATTHEWS:  I think that's it.  I think

23      you are over your time.

24          MR. NOVAK:  I just have one last question.

Highly Confidential - Subject to Further Confidentiality Review

1           MR. MATTHEWS:  You are over your time.

2           MR. NOVAK:  It's not an offensive one.

3           MR. MATTHEWS:  I'll give you one more

4      question.

5   BY MR. NOVAK:



12      Q.   Okay.

13           THE VIDEOGRAPHER:  We're going off the

14      record.  The time is 6:23.

15           (Recess from 6:23 until 6:26 p.m.)

16           THE VIDEOGRAPHER:  The time is 6:26.  We're

17      now back on the record.

18                  CROSS-EXAMINATION

19   BY MR. MATTHEWS:

20      Q.   Good evening, Mr. Cochrane.  I know you know

21   me, but I will introduce myself for the record.  I'm

22   James Matthews.  I represent Anda this evening, and I

23   have a few questions to just clarify some of the

24   answers you have given over the course of the day.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Is that okay?

2       A.   That's fine.

3       Q.   I know that you have been here for a very

4    long time.  I believe we began at 9:00 a.m. and it is

5    now 6:30 -- or 6:26 p.m.

6       A.   Correct.

7       Q.   So we'll try to get through this as quickly

8    as we can, and we appreciate the time you have given

9    us.

10             Way back at the beginning of the day,

11   Mr. Novak asked you some questions about

12   conversations that you had or that you participated

13   in with Tracey Hernandez of Watson and some

14   individuals at DEA in the summer of 2007.

15             Do you remember that line of questioning?

16      A.   Yes, I do.

17             (Anda Exhibit 32 was marked for

18   identification.)

19   BY MR. MATTHEWS:

20      Q.   I'm going to hand you what's been marked by

21   the court reporter as Exhibit 32 for identification.

22             I will ask you to take a look at that and

23   tell me if you know what that is.

24             ATTORNEY VIA TELEPHONE:  Excuse me, could you
```

Highly Confidential - Subject to Further Confidentiality Review

1          please provide the Bates numbers for that

2          document.

3                    MR. MATTHEWS:  Anda_Opiods_MDL 275627.

4                    THE WITNESS:  Yes, I'm familiar with this.

5        BY MR. MATTHEWS:

Highly Confidential - Subject to Further Confidentiality Review



17     Q.   Okay.  Was there any discussion about Anda's

18   reporting practices on that phone call?

19     A.   Yes, there was.

20     Q.   What was that discussion about?

21     A.   They were talking about receiving

22   consolidated data in an ARCOS format at a more

23   frequent interval than what was previously being

24   provided.

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.    Was there discussion about where that data

 2   should be provided?

 3       A.    Directly to Washington, directly to the

 4   gentleman that we were working with, Mike Mapes, and

 5   I believe Kyle Wright was involved as well.

 6       Q.    What kind of data was discussed?

 7       A.    Transactional data of Anda shipments.

 8       Q.    Was there anything in addition to simply

 9   transactional data?

10       A.    I don't -- I'm not sure.

11       Q.    Okay.  Do you recall at one point in the

12   morning Mr. Novak asked you a series of questions

13   about how and when customer questionnaires were used

14   by Anda in connection with its suspicious order

15   monitoring system.

16           Do you remember those questions?

17       A.    Yeah.

18       Q.    I'm going to hand you what's been marked for

19   identification as Exhibit 33, which is document

20   bearing Bates numbers Anda_Opioid_MDL_275445 through

21   275455.

22           (Anda Exhibit 33 was marked for

23   identification.)

24   ///
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. MATTHEWS:



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



6          Q.    Mr. Cochrane, to whom was this mailing sent

7    on or about August 10th, 2007?

8          A.    Pharmacy customers of Anda.

9          Q.    Okay.  And what kind of pharmacy customers?

10         A.    All of the independent pharmacies and the one

11   serviced by the pharmacy floor.

12         Q.    Did that include everyone whether or not they

13   purchased controls?

14         A.    It did.

15         Q.    So as of August 10th, 2007, is it fair to say

16   that Anda had sent customer questionnaires to all of

17   its -- controlled substance customer questionnaires

18   to all of its independent pharmacy customers?

19         A.    Yes, it did.

20         Q.    And was it the case that from that point

21   forward it was the policy and procedure of the

22   company to send questionnaires to customers who

23   sought to obtain controlled substances from Anda?

24         A.    Yes.  The questionnaire was a vehicle for us

Highly Confidential - Subject to Further Confidentiality Review

1    to get information about the pharmacy.

2        Q.   I'd like you, if you could, to turn back to

3    Exhibit 3, which Mr. Novak showed you earlier today.

4        A.   Okay.

5        Q.   I'll withdraw that.  I'm sorry.



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



16        Q.   By 2011, what information about every

17    customer to whom Anda sold controlled substances had

18    Anda obtained without regard to whether a customer

19    had been with it for a long period of time?

20             MR. NOVAK:  Objection.

21             THE WITNESS:  At that point, by 2011, there

22        was a large return of customer questionnaires by

23        our customer base.  And as, you know, some of the

24        notes had shown, there were customers that had

Highly Confidential - Subject to Further Confidentiality Review

1       control eligibility removed and had references to

2       no questionnaire on file or request for DD and

3       CQ.

4   BY MR. MATTHEWS:

5       Q.   Right.

6            And when was it that the first request to all

7   existing customers went out to provide answers to

8   customer questionnaire?

9       A.   August of 2007.

10      Q.   How many years before the standard operating

11  procedure was adopted?

12      A.   Over four.

13      Q.   Thank you.

14           If you could, could you look at Exhibit 23.

15      A.   Okay.



Highly Confidential - Subject to Further Confidentiality Review



 7      Q.   Could you explain, what information did you

 8   have from DEA at that time, if any, that DEA was

 9   considering bringing an enforcement action against

10   Anda?

11      A.   At that time, we did not have any.

12      Q.   So when you told Mr. Novak that there was

13   concern, what did you -- what did you mean by that?

14      A.   We were evaluating the channels in which we

15   were shipping drugs into.

16      Q.   Right.

17           Was there any basis for you to believe at

18   that time that Anda would -- was under investigation

19   for the kind of conduct that Harvard was found to

20   have been subject to an enforcement action for?

21           MR. NOVAK:  Objection.

22           THE WITNESS:  No, there was not.

23   BY MR. MATTHEWS:

24      Q.   I wanted to just ask you a question or two

1    about Remedy Senior Care, the pharmacy in Ohio that

2    Mr. Novak asked you about towards the end of his

3    examination.

4            Do you recall those questions?

5        A.   I do.



13       Q.   And you told Mr. Novak at that time that you

14   had -- that Anda had quite a lot of information about

15   Remedy Senior Care.

16           Do you recall that?

17       A.   I do.

18       Q.   Could you explain what information Anda had

19   had about Remedy Senior Care at the time that the

20   decisions were made to ship products to Remedy?

21           MR. NOVAK:  Objection.

22           THE WITNESS:  Yes.  So Remedy Senior Care is

23       a large customer of Anda's.  They primarily

24       service the elderly in a closed-door pharmacy

```
 1        type network where they service nursing homes and

 2        facilities.

 3            The specific location in Ohio services over

 4        13,000 beds, so they have a very large pharmacy

 5        operation taking care of those elderly patients.

 6   BY MR. MATTHEWS:

 7        Q.   What is a close-door pharmacy?

 8        A.   It's a pharmacy that only dispenses within

 9   the confines of their business.  So they don't

10   service off-the-street patients.

11        Q.   And what's the significance of the fact that

12   it is a 13,000 bed long-term care center for the

13   elderly in terms of evaluating appropriateness for

14   sales of controlled substances?

15        A.   There are certain types of products that are

16   used with great frequency in long-term care assisted

17   live type facilities, mainly due to the age and the

18   nature of the patients that they are serving.

19        Q.   And what -- what kinds of products would you

20   normally expect to see dispensed in those

21   environments?

22        A.   It's -- it's a cornucopia of everything.  You

23   know, you will have all of your heart medications,

24   you'll have your breathing treatment medications, you
```

Highly Confidential - Subject to Further Confidentiality Review

 1    will have your pain meds.  There's a lot of

 2    everything.  High blood pressure medication,

 3    triglycerides reducers, your Crestors.  There's a lot

 4    of drugs.

 5        Q.   What information about the senior -- sorry --

 6    about Remedy Senior Care of Ohio does Anda --

 7    about -- let me withdraw that and try again.

 8             What information about Remedy Senior Care of

 9    Ohio's dispensing practices is maintained by Anda in

10    its files?

11        A.   We have detailed files related to their

12    purchases and dispensed -- dispensed drugs.

13        Q.   Have you reviewed that information?

14        A.   Yes.

15        Q.   What does it show?

16        A.   It shows a --

17             MR. NOVAK:  Objection.

18             THE WITNESS:  It shows a low overall

19        percentage of controlled substances.  It's very

20        highly skewed towards maintenance-type drugs.

21    BY MR. MATTHEWS:

22        Q.   At the beginning of the day, Mr. Novak asked

23    you if Anda had an understanding of the -- what was

24    a, quote, suspicious order.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Do you remember that?
 2      A.    Yes, I do.
 3      Q.    Do you recall what your answered?
 4      A.    Yes, I do.
 5      Q.    What did you answer?
 6      A.    I answered orders that deviate from the norm.
 7      Q.    Could you explain that answer a little bit?
 8      A.    It's -- it's orders that we would hold,
 9   review, and otherwise determine were not for
10   legitimate purposes.
11      Q.    Okay.  Now, from time to time, Anda reported
12   suspicious orders to DEA, right?
13      A.    Yes, we did.
14      Q.    How did Anda determine what orders to report?
15      A.    In the beginning or --
16      Q.    From 2011 onward.
17      A.    From 2011 onward, it would be based on the
18   reviews that we did of individual orders that were
19   held or pended within one of our two systems that we
20   were using.  And if a thorough review of that order
21   and customer and any other information that we had
22   deemed it that the possibility for elicit purposes
23   were going to be applied to that order, we would
24   report it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   From time to time, did Anda have

 2     conversations with DEA agents in the field and in

 3     Washington, D.C. about what their expectation was in

 4     terms of suspicious order reporting?

 5          MR. NOVAK:  Objection.

 6          THE WITNESS:  Yes, we did.

 7     BY MR. MATTHEWS:

 8          Q.   What were those conversations?

 9          MR. NOVAK:  Same objection.

10          THE WITNESS:  Chronologically?

11     BY MR. MATTHEWS:

12          Q.   In general, what was the sum and substance of

13     those conversations?

14          MR. NOVAK:  Objection.

15          THE WITNESS:  In general, they didn't want

16          too many orders.  We could go back to a time

17          where the local office was cc'd on every order

18          that had controlled substance -- substances on it

19          back to the earlier years when I became employed

20          at Anda, to them telling us to stop that

21          practice.

22          And then we devised a suspicious and

23          excessive reporting cadence that was happening

24          that was an after-the-fact system.  And then, you
```

Highly Confidential - Subject to Further Confidentiality Review

1       know, in 2007, we had Washington asking us to

2       send them all of our transactions again,

3       directly.

4   BY MR. MATTHEWS:

5       Q.   Okay.  Do you recall that Mr. Novak asked you

6   some questions about interactions between you and DEA

7   agent Gayle Lane in the 2010/2011 time period?

8       A.   Yes.

9       Q.   And those interactions were about the

10  submission of customer cutoff reports.

11          Do you remember that?

12      A.   Among other things, yes.

13      Q.   What is your memory of those -- of the

14  substance of those conversations?

15      A.   The conversations started --

16          MR. NOVAK:  Objection.

17          THE WITNESS:  -- with Gayle wanting to have

18      more frequent communication between her and Anda

19      locally.  She -- she was appreciative of the

20      customers that we were advising her of that we

21      were ceasing to do business with and otherwise

22      cutting off.

23          She -- she was -- was happy with the format

24      of the customer cutoff spreadsheet that we had

1    devised and worked with her on a couple of

2    drafts.

3   BY MR. MATTHEWS:

4       Q.   How frequently did you interact with her

5   during this period of time?

6       A.   Immediately after the inspection, it was a

7   couple to three times a week, usually in the

8   evenings.  And as we, you know, developed the

9   spreadsheet and the customer listing of cutoffs, it

10   became a little less frequent as we went into the

11   rest of the year, but it was still very regularly.

12       Q.   I would like you to look at Exhibit 26 if you

13   would.

14       A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Highly Confidential - Subject to Further Confidentiality Review



18      Q.   Were you ever told to stop submitting reports

19   of customer cutoffs?

20           MR. NOVAK:  Objection.

21           THE WITNESS:  No.

22   BY MR. MATTHEWS:

23      Q.   That was your view of how DEA -- I'll

24   withdraw that question.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. MATTHEWS:  I don't have any further

2     questions at this time.  Thank you, Mr. Cochrane.

3          THE VIDEOGRAPHER:  Going off the record.  The

4     time is 7:06.

5          (Recess from 7:06 until 7:06 p.m.)

6          THE VIDEOGRAPHER:  The time is 7:06 p.m.  We

7     are now going off the record.  This marks the end

8     of the deposition.

9          (Whereupon, the deposition concluded at

10    7:06 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
  1                C E R T I F I C A T E

  2

  3          I, KELLY J. LAWTON, Registered Professional

  4     Reporter, Licensed Court Reporter, and Certified

  5     Court Reporter, do hereby certify that, pursuant to

  6     notice, the deposition of PATRICK COCHRANE was duly

  7     taken on January 24, 2019, at 9:13 a.m. before me.

  8          The said PATRICK COCHRANE was duly sworn by

  9     me according to law to tell the truth, the whole

 10     truth and nothing but the truth and thereupon did

 11     testify as set forth in the above transcript of

 12     testimony.  The testimony was taken down

 13     stenographically by me.  I do further certify that

 14     the above deposition is full, complete, and a true

 15     record of all the testimony given by the said

 16     witness.

 17

 18          _____

 19          KELLY J. LAWTON, RPR, LCR, CCR

 20

 21          (The foregoing certification of this

 22     transcript does not apply to any reproduction of the

 23     same by any means, unless under the direct control

 24     and/or supervision of the certifying reporter.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5    and make any necessary corrections.  You should state

 6    the reason in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10    and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty

14    (30) days of receipt of the deposition transcript by

15    you.  If you fail to do so, the deposition transcript

16    may be deemed to be accurate and may be used in

17    court.

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4   PAGE   LINE   CHANGE

 5   _____  _____  _____

 6     REASON: _____

 7   _____  _____  _____

 8     REASON: _____

 9   _____  _____  _____

10     REASON: _____

11   _____  _____  _____

12     REASON: _____

13   _____  _____  _____

14     REASON: _____

15   _____  _____  _____

16     REASON: _____

17   _____  _____  _____

18     REASON: _____

19   _____  _____  _____

20     REASON: _____

21   _____  _____  _____

22     REASON: _____

23   _____  _____  _____

24     REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, PATRICK COCHRANE, do hereby acknowledge

 4    that I have read the foregoing pages, 1 to 282, and

 5    that the same is a correct transcription of the

 6    answers given by me to the questions therein

 7    propounded, except for the corrections or changes in

 8    form or substance, if any, noted in the attached

 9    Errata Sheet.

10

11

12    _____    _____

13    PATRICK COCHRANE                             DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    _____ day of _____, 20___.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____   _____

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____
```