```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3    IN RE: NATIONAL          )   MDL No. 2804
      PRESCRIPTION OPIATE      )
 4    LITIGATION,              )   Case No.
                               )   1:17-MD-2804
 5                             )
      THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6    ALL CASES                )   Polster
                               )
 7
 8                    __ __ __
 9           Thursday, December 13, 2018
                      __ __ __
10
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11               CONFIDENTIALITY REVIEW
                      __ __ __
12
13
14
15         Videotaped Deposition of JOLYNN
      COLEMAN, held at 4206 South J.B. Hunt Drive,
16    Rogers, Arkansas, commencing at 8:15 a.m., on
      the above date, before Debra A. Dibble,
17    Certified Court Reporter, Registered
      Diplomate Reporter, Certified Realtime
18    Captioner, Certified Realtime Reporter and
      Notary Public.
19
20
21
                      __ __ __
22
             GOLKOW LITIGATION SERVICES
23        877.370.DEPS | fax 917.591.5672
                  deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
 1
 2   A P P E A R A N C E S:
     CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY
 3   & AGNELLO
     BY: DONALD ECKLUND, ESQUIRE
 4      decklund@carellabyrne.com
        MICHAEL A. INNES, ESQUIRE
 5      minnes@carellabyrne.com
     5 Becker Farm Road
 6   Roseland, New Jersey 07068-1739
     (973) 994-1700
 7
     Counsel for Plaintiffs
 8
     JONES DAY
 9   BY: EDWARD M. CARTER, ESQUIRE
        emcarter@jonesday.com
10      CHRISTINE D. PROROK, ESQUIRE
        cbprorok@jonesday.com
11   77 West Wacker Drive, Suite 3500
     Chicago, Illinois 60601-1692
12   312-782-1692
     Counsel for Walmart
13
     MORGAN, LEWIS & BOCKIUS, LLP
14   (appearing telephonically)
     BY: MATTHEW R. LADD, ESQUIRE
15      matthew.ladd@morganlewis.com
     101 Park Avenue
16   New York, New York 10178-0060
     (212) 309-6141
17   Counsel for Teva Pharmaceutical USA,
     Inc.; Cephalon, Inc.; Watson
18   Laboratories, Inc.; Actavis, LLC;
     Actavis Pharma, Inc.; f/k/a Watson
19   Pharma, Inc.
20
     MARCUS & SHAPIRA, LLP
21   (appearing telephonically)
     BY: DARLENE M. NOWAK, ESQUIRE
22      nowak@marcus-shapira.com
     301 Grant Street
23   One Oxford Centre, 35th Floor
     Pittsburgh, Pennsylvania 15219-6401
24   (412) 338-4690
     Counsel for HBC
25
```

Page 3

```
 1   WRIGHT, LINDSEY & JENNINGS, LLP
     BY: CALEY B. VO, ESQUIRE
 2      cvo@wlj.com
     3333 Pinnacle Hills Parkway
 3   Suite 510
     Rogers, Arkansas 72758-8498
 4   (479) 986-0888
     Counsel for McKesson
 5
     ARNOLD & PORTER KAYE SCHOLER, LLP
 6   (appearing telephonically)
     BY: RYAN Z. WATTS, ESQUIRE
 7      ryan.watts@arnoldporter.com
     601 Massachusetts Avenue, NW
 8   Washington, DC 20001-3743
     (202) 942-5000
 9      (202) 942-5999 (Fax)
     Counsel for Endo Health Solutions Inc.;
10   Endo Pharmaceuticals Inc.; Par
     Pharmaceuticals, Inc.; Par
11   Pharmaceutical Companies, Inc. formerly
     known as Par Pharmaceutical Holdings,
12   Inc.
13
     BARBER LAW FIRM, LLP
14   (appearing telephonically)
     BY: J. CARTER FAIRLEY, ESQUIRE
15      cfairley@barberlawfirm.com
     425 West Capitol Avenue
16   Suite 3400
     Little Rock, Arkansas 72201
17   (501) 707-6175
     Counsel for Cardinal Health, Inc.
18
19
     ALSO PRESENT:
20
     Paul D. Morris
21   Senior Associate Counsel
     Commercial & Class Action
22
     THE VIDEOGRAPHER:
23
     James Arndt
24   GOLKOW LITIGATION SERVICES
25
                  _  _  _
```

Page 4

```
 1
 2             I N D E X
 3   JOLYNN COLEMAN            PAGE
 4   DIRECT EXAMINATION BY MR. ECKLUND     9
     CROSS EXAMINATION BY MR. CARTER     366
 5   REDIRECT EXAMINATION BY MR. ECKLUND   372
 6          E X H I B I T S
 7   No.      Description        Page
     Walmart   NACDS Appointment      25
 8   Coleman   Schedule.
     Exhibit 1  ENDO_OPIOID_MDL-04920265
 9            through 04920270.
10
     Walmart   July 2017 email chain.    30
11   Coleman   Subj: RE: Relay
     Exhibit 2  Health/Walmart Top to Top.
12            MCKMDL00650092-650094.
13   Walmart   8-31-07 letter from      151
     Coleman   Mallinckrodt to Jo Lynn
14   Exhibit 3  Coleman, R. Ph.
              MNK-T1-0004758254-4758260.
15
     Walmart   11-3-06 letter from      168
16   Coleman   Mallinckrodt to David
     Exhibit 4  Badeen, R. Ph.
17            MNK-T1-0000367627-367629.
18   Walmart   5-2-07 letter from       178
     Coleman   Mallinckrodt to Jo Lynn
19   Exhibit 5  Coleman, R. Ph.
              MNK-T1-0000367674-367675.
20
     Walmart   9-17-10 letter from      187
21   Coleman   Mallinckrodt to Jo Lynn
     Exhibit 6  Coleman, R. Ph.
22            MNK-T1-0000367655-376657.
23   Walmart   11-14-07 letter from     196
     Coleman   Mallinckrodt to Jo Lynn
24   Exhibit 7  Coleman, R. Ph.
              MNK-T1-000036766-376666.
25
```

Page 5

```
 1   Walmart    12-4-07 letter from     204
     Coleman    Mallinckrodt to Jo Lynn
 2   Exhibit 8  Coleman, R. Ph.
              MNK-T1-0000367648-367651.
 3
     Walmart    12-14-07 letter from    213
 4   Coleman    Mallinckrodt to Jo Lynn
     Exhibit 9  Coleman, R. Ph.
 5            MNK-T1-0000367691-367692.
 6   Walmart    Humana Walmart PowerPoint   232
     Coleman    deck.
 7   Exhibit 10
 8   Walmart    3-31-10 Endo letters     265
     Coleman    ENDO-OPIOID_MDL-04183970
 9   Exhibit 11 through 4183972.
10   Walmart    1-27-10 email with       269
     Coleman    attached 1-29-10 ENDO
11   Exhibit 12 letters.
              ENDO-OPIOID_MDL-02380063
12            through 2380065.
13   Walmart    1-7-11 email with attached  272
     Coleman    1-7-11 ENDO letters.
14   Exhibit 13 ENDO-OPIOID_MDL-02384297
              through 2384299.
15
     Walmart    1-3-12 email with attached  272
16   Coleman    1-3-12 ENDO letters.
     Exhibit 14 ENDO-OPIOID_MDL-02389777
17            through 2389779.
18   Walmart    12-28-06 email with      287
     Coleman    12-27-06 Ethex letter
19   Exhibit 15 attachment.
              WMT_MDL_000038419-38420.
20
     Walmart    3-2-10 FBI article titled  288
21   Coleman    Ethex Corporation, a
     Exhibit 16 Subsidiary of K V
22            Pharmaceutical, Pleads
              Guilty to two Felonies and
23            Agrees to Pay United
              States $27,568,921 for
24            Fine, Restitution, and
              Forfeiture.
25
```

Page 6

1    Walmart   Removing Costs from the      296
     Coleman   Health Care Supply Chain:
2    Exhibit 17 Lessons from Mass Retail.
3
4
5
6    REPORTER'S CERTIFICATE          376
     ERRATA                    378
7    WITNESS SIGNATURE PAGE          379
     ATTORNEY NOTES            380
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          PROCEEDINGS
2        (December 13, 2018 at 8:17 a.m.)
3          THE VIDEOGRAPHER:  We are now
4    on the record.  My name is
5    James Arndt.  I'm the videographer
6    from Golkow Litigation Services.
7    Today's date is December 13, 2018, and
8    the time is 8:18 a.m.  This video
9    deposition is being held in Rodgers,
10   Arkansas in the matter of the National
11   Prescription Opiate Litigation for the
12   United States District Court for the
13   Northern District of Ohio, Eastern
14   Division.  The deponent is
15   JoLynn Coleman.  Will counsel please
16   identify themselves.
17        MR. ECKLUND:  Good morning.
18   Don Ecklund from the law firm Carella
19   Byrne on behalf of plaintiffs in the
20   MDL.
21        MR. INNES:  Good morning.
22   Michael Innes on behalf of plaintiffs
23   in the MDL.
24        MR. CARTER:  Edward Carter,
25   Jones Day on behalf of Walmart and the

Page 8

1    witness.  Also with me are
2    Christine Prorok from Jones Day, and
3    Paul Morris from Walmart.
4          MR. FAIRLEY:  Carter Fairley
5    for Cardinal Health.
6          MR. VO:  Caley Vo on behalf of
7    McKesson.
8          THE VIDEOGRAPHER:  Will counsel
9    on the phone please identify
10   themselves?
11        MS. NOWAK:  Darlene Nowak from
12   Marcus & Shapira for HBC Services.
13        MR. LADD:  Matthew Ladd of
14   Morgan Lewis & Bockius on behalf of
15   defendant Rite Aid.
16        MR. WATTS:  Ryan Watts from
17   Arnold & Porter Kaye Scholer, LLP on
18   behalf of Endo Health Solutions Inc.,
19   Endo Pharmaceuticals Inc., Par
20   Pharmaceutical, Inc., and Par
21   Pharmaceutical Companies, Inc.
22        VIDEOGRAPHER:  The court
23   reporter is Debbie Dibble.  She will
24   now swear in the witness.
25        JOLYNN COLEMAN,

Page 9

1    having first been duly sworn, was examined
2    and testified as follows:
3
4          DIRECT EXAMINATION
5    BY MR. ECKLUND:
6        Q.    Good morning, Ms. Coleman.  As
7    I introduced myself this morning, my name is
8    Don Ecklund, and I represent the plaintiffs
9    in this multidistrict litigation which is
10   currently pending in the Northern District of
11   Ohio.  Moments ago you took an oath.  It is
12   the same oath you would take in court.
13        Do you understand that
14   everything you say here today needs to be the
15   truth and you need to testify as completely
16   and fully as you can?
17        Do you understand that?
18        A.    Yes.
19        Q.    Have you ever been deposed
20   before?
21        A.    Yes.
22        Q.    How many times?
23        A.    Twice.
24        Q.    Were those in your professional
25   capacity or were those personal matters?

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    A.    Professional.
2    Q.    Can you describe those two
3 matters?
4    A.    One was a litigation around a
5 hire, practice of hiring an associate, and
6 others was specific to an immunization
7 program that I oversee, support.
8    Q.    Did you testify at trial for
9 the HR matter?
10    A.    No.
11    Q.    Did you testify at trial for
12 the immunization matter?
13    A.    No.
14    Q.    Is the immunization matter
15 still pending?
16    A.    Yes.
17    Q.    Federal court or state court?
18    A.    I'm uncertain.
19    Q.    So you've generally been
20 deposed twice and you've gotten some sense of
21 how the process works.  Today I'll be asking
22 you a series of questions.  You'll be
23 answering those questions.  And we'll try to
24 keep it a fairly swift conversation.
25 Everyone is trying to catch flights today.

Page 11

1 If we can try to maintain some breaks between
2 my questions and your answers, that will help
3 the court reporter who is trying to keep up
4 with us and get a complete and clean
5 transcript.
6        Do you understand she's typing
7 everything you say?
8    A.    Yes, sir.
9    Q.    Okay.  Great.
10        Importantly, she can't take
11 down shrugs of the shoulders, utterances,
12 "uh-huh," and "huh-uhs," headshakes.  So
13 please answer verbally.  Even though we do
14 have a video, everyone is going to be relying
15 on the transcript that she's taking today.
16        Do you understand that?
17    A.    Yes.
18    Q.    Your counsel has probably also
19 gone over this as well, but if you can pause
20 between the questions to allow him an
21 opportunity to interpose any objections he
22 may have, that would be, I'm sure,
23 appreciated by him.  And unless he instructs
24 you not to answer a question, you should
25 answer the question after he's interposed the

Page 12

1 objection  unless you don't understand my
2 question.
3        Do you understand that?
4    A.    Yes.
5    Q.    Okay.  If you don't hear me,
6 let me know.  If you don't understand a
7 question, let me know that.  I'll try to
8 change the question; maybe I'll try to
9 explain myself.  Okay?
10    A.    Okay.
11    Q.    If you answer, I'm going to
12 assume you understood the question.  Is that
13 fair?
14    A.    Yes.
15    Q.    If at any time you need to take
16 a break during the deposition, please let me
17 know.  Now, we may finish the line of
18 questioning, but I'll try to accommodate you
19 as best as I can.
20        If you need to stretch your
21 legs, you need to stand up, feel free.  We
22 don't need to take a break for that.  Okay?
23 If you need a glass of water, please ask
24 someone.  There are several people in the
25 room who would be happy to get you one.

Page 13

1 Okay?
2    A.    Okay.
3    Q.    If at any point in the
4 deposition you need a document in order to
5 answer a question because you can't recall
6 it, I'd like you to try and tell me about the
7 document, describe the document.  There is a
8 chance we might have it in this box.  There's
9 a chance that someone else might be able to
10 arrange for it to be provided to you during a
11 break.  Okay?
12    A.    Okay.
13    Q.    And as you see, I have a
14 computer in front of me, so if there's an
15 electronic file that you think you may need,
16 chances are I can probably accommodate you on
17 that as well.  We can put it up on the ELMO.
18 We can put it up on the screen.  So if
19 there's an Excel, an Access database or
20 anything else you think you may need, you let
21 us know and we'll try to get it for you.
22 Okay?
23    A.    Okay.
24    Q.    If you don't recall the answer
25 to a question or can't remember the answer,

Page 14

1  just say so. It's important, though, that
2  you remember, you need to try and testify as
3  completely and fully as you can. Okay?
4       Will you agree to that?
5       A.   Yes.
6       Q.   Is there anything that would
7  prevent you from thinking clearly today?
8       A.   No.
9       Q.   No medical conditions.
10  Anything that would prevent you from
11  testifying truthfully today?
12      A.   No.
13      Q.   And there's nothing that would
14  prevent you from talking and testifying
15  completely today?
16      A.   No.
17      Q.   What did you do generally to
18  prepare for your deposition today?
19      A.   Met with Walmart legal
20  representatives for roughly about two days.
21      Q.   And when you say "two days," do
22  you mean you met on two separate days for a
23  few hours each day, or do you mean --
24      A.   Yes.
25      Q.   -- you met for two solid days?

Page 15

1       A.   Two days, about six to eight
2  hours.
3       Q.   Six to eight hours each day?
4       A.   Six to eight, yes.
5       Q.   Okay. Where did those meetings
6  take place?
7       A.   At Walmart.
8       Q.   Did you have any telephonic
9  meetings with Walmart's counsel --
10      A.   No.
11      Q.   -- prior to those meetings?
12           Did you receive any video
13  training materials or anything else you
14  needed to review, gave you some ground rules
15  on depositions?
16      A.   No.
17      Q.   Okay. Aside from materials
18  that your counsel may have provided you, did
19  you review any materials in your files to
20  prepare for your deposition here today?
21      A.   No.
22      Q.   When did you graduate high
23  school?
24      A.   '81.
25      Q.   What did you do after high

Page 16

1  school?
2       A.   Went to college.
3       Q.   Where did you go?
4       A.   First I went to Summit Junior
5  College and played basketball for a year, and
6  then went to the University of Louisiana at
7  Monroe after that first year and started --
8  decided I wanted to go to pharmacy school.
9  So I completed the BS at pharmacy school at
10  Northeast and graduated in '86.
11      Q.   Okay. So you initially went to
12  Summit Junior College, played basketball for
13  one year. You then transferred to Louisiana
14  Monroe, and you were there for one year?
15      A.   I was there for the remainder,
16  until I graduated as a pharmacist.
17      Q.   Okay. So you completed your
18  degree in pharmacy at Louisiana at Monroe?
19      A.   Yes.
20      Q.   And you're a -- what type of
21  pharmaceutical degree do you have?
22      A.   I have a BS.
23      Q.   BS. Do you have any
24  licensures?
25      A.   I have a licensure in Louisiana

Page 17

1  and Missouri, and in Texas.
2       Q.   Okay. You graduated in 1986.
3  Have you gone back to graduate school?
4       A.   I have not.
5       Q.   Any certifications?
6       A.   No.
7       Q.   Additional training?
8       A.   No.
9       Q.   What did you do between 1986
10  and 1987?
11      A.   I worked for K&B, which was a
12  regional chain in New Orleans, Louisiana, for
13  a year as a pharmacist.
14      Q.   And how long did you stay at
15  K&B?
16      A.   Right about a year.
17      Q.   And what did you do then?
18      A.   Moved -- transferred, and an
19  opportunity came up for a Walmart in my
20  hometown where I grew up, and I opened up a
21  pharmacy there for Walmart.
22      Q.   So you joined Walmart in 1987?
23      A.   Yes.
24      Q.   And have you continued to work
25  for Walmart since 1987?

Page 18

1    A.    Yes, I have.
2    Q.    You said you opened up a
3 pharmacy for Walmart.
4        Were you a dispensing
5 pharmacist?
6    A.    Yes, I was.
7    Q.    And how long were you a
8 dispensing pharmacist for Walmart?
9    A.    Right about ten years.
10    Q.    So approximately 1987 to 1997?
11    A.    Approximately.
12    Q.    What did you do after 1997?
13    A.    Went into a market director
14 role, which was more of an oversight of
15 pharmacies across stores within a market. It
16 was about 12 to 15 stores in the central
17 Louisiana area.
18    Q.    And how long were you in that
19 market director role?
20    A.    About two years.
21    Q.    Until 1999?
22    A.    Yes.
23    Q.    What position did you take in
24 1999?
25    A.    I went to a general manager

Page 19

1 position for our mail order pharmacy in
2 Carrollton, Texas. And I was there for
3 roughly six to seven years.
4    Q.    Okay. So approximately
5 2005ish, 2006ish?
6    A.    Yes.
7    Q.    That's -- okay.
8        And when you left the position
9 as a general manager for the mail order
10 pharmacy group in Carrollton, Texas, what did
11 you do?
12    A.    I went to the -- took an
13 opportunity to be a buyer for Walmart for Rx.
14 And stayed in that role for about six years.
15    Q.    When you say you were "a buyer
16 for Walmart for Rx," do you mean you were a
17 buyer for the prescription buying group?
18    A.    Yes.



Page 20

15    Q.    Did your title change over time
16 from pharmacy buyer?
17    A.    I moved to a senior buyer. I
18 can't recall exactly the day.
19    Q.    Do you have an approximation?
20    A.    It was probably my last year
21 and a half as a buyer.
22    Q.    Which was when?
23    A.    So I was in the role probably
24 about five years, four years, four and a half
25 years as a buyer, and then moved to a senior

Page 21

1 buyer.

Highly Confidential - Subject to Further Confidentiality Review



Page 22

Page 24

Page 23

Page 25

Highly Confidential - Subject to Further Confidentiality Review



Page 26

Page 28

Page 27

Page 29

7   Q.   (BY MR. ECKLUND) So your
8  current role is -- what's your current title?
9       A.    My current title is director of
10 clinical services.  So I support the
11 immunizations program and the health
12 screenings program for our pharmacies.  And I
13 have been in that position for five years,
14 almost six years.
15      Q.    So approximately 2013?  Or
16 2012?
17      A.    Since I took this position,
18 about in 2013.

Highly Confidential - Subject to Further Confidentiality Review



Page 30

Page 32

Page 31

Page 33

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Page 46

Page 48

5      Q.      Ms. Coleman, do you have
6  children?
7      A.      Yes.
8      Q.      Okay.  How old?
9      A.      Soon to be 28 and 23.
10     Q.      Did they enjoy Halloween when
11 they were children?
12     A.      Yes.
13     Q.      Do you also enjoy Halloween?
14     A.      I do.  With my grandkids.

Page 47

Page 49

Highly Confidential - Subject to Further Confidentiality Review



Page 50

Page 52

Page 51

```
10      Q.    Do you know whether the $4
11  generic program included controlled
12  substances?
13      A.    It did not.
14      Q.    Do you know whether the $9
15  program included?
16      A.    To my knowledge, it did not.
17      Q.    Okay.  Was there a reason why
18  it wasn't included?
19      A.    Just in general, in my career
20  with the company, we've never promoted
21  controlled substances to the customer or to a
22  physician.
```

Page 53











Page 70

Page 72

5    MR. ECKLUND:  Let's take our
6  first break.
7    THE VIDEOGRAPHER:  We are going
8  off the record at 9:25 a.m.
9    (Recess taken, 9:25 a.m. to
10  9:44 a.m.)
11    THE VIDEOGRAPHER:  We are back
12  on the record at 9:44 a.m.
13    MR. ECKLUND:  Welcome back,
14  Ms. Coleman.
15    THE WITNESS:  Thank you.

Page 71

Page 73



Page 74

Page 76

1 Q. What's the difference between
2 an opioid epidemic and an opioid crisis?
3 A. I'm not a -- someone who can
4 define what an epidemic is, but, you know, I
5 will say one way or the other.
6 Q. When did you become aware of
7 the opioid crisis?
8 A. Probably in the last five years
9 or so. Six years.
10 Q. How did you become aware of the
11 opioid crisis in 2012? Or 2013?
12 A. Just what's in the news or what
13 I hear being at the office.
14 Q. So at the office you have
15 discussions about the opioid crisis between
16 2012 and 2013?
17 A. I can't recall when.
18 Q. Do you have a recollection of
19 any of those discussions?
20 A. I don't recall specific
21 discussions around the opioid crisis.
22 Q. Would those have been formal
23 meetings or informal watercoolers?
24 A. Just informal.
25 Q. Just conversations around the

Page 75

Page 77

1 coffee pot or the watercooler around the
2 office?
3 A. I really don't recall where
4 they were.
5 Q. Do you recall having any
6 conversations with anyone in particular?
7 A. No.
8 Q. You mentioned news. Are you
9 talking about written news? Like a
10 newspaper? Online internet? Or television
11 news?
12 A. Either.
13 Q. Both?
14 A. Both.
15 Q. When you watch television news,
16 what channels do you most often watch?
17 A. I don't really specifically
18 watch any one over the other.
19 Q. So local news?
20 A. Yeah.
21 Q. CNN?
22 A. Possibly.
23 Q. Fox News?
24 A. Possibly.
25 Q. CNBC?

12 Q. Are you familiar generally with
13 the defendants that are named in this case,
14 beyond Walmart?
15 A. No.
16 Q. Are you familiar with the
17 plaintiffs?
18 A. No.
19 Q. Do you know whether they're
20 individuals or public entities?
21 A. I do not.
22 Q. Can we agree that there is an
23 opioid epidemic in the United States today?
24 A. I believe there's a crisis, an
25 opioid crisis.

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    A.    Yes.
2    Q.    MSNBC?
3    A.    I'm not --
4    Q.    You're completely open to
5 whatever newscaster is on. You're open to
6 listening and paying attention --
7    A.    I don't watch a lot of news
8 personally, but yeah.
9    Q.    So television news is not a big
10 part of your life?
11    A.    Correct.
12    Q.    How about reading the
13 newspaper? Is it a habit?
14    A.    No.
15    Q.    What about reading online news?
16 Is that a habit?
17    A.    Online news? No.
18 Occasionally.
19    Q.    Once or twice a week?
20    A.    Yes.
21    Q.    But not daily?
22    A.    Not daily.
23    Q.    Okay. When you say "crisis,"
24 what do you mean by crisis?
25    A.    Just that -- crisis is that

Page 79

1 there's a -- just an opportunity with a
2 product, or -- I don't really know the
3 definition of a crisis, but ...
4    Q.    That's okay. Let's see if we
5 can reach agreement.
6        So I looked up on
7 Merriam-Webster's Dictionary the word
8 "crisis."
9        And there are a few definitions
10 available. We've got definition of crisis A:
11 "The turning point for better or worse in an
12 acute disease or fever?"
13        And you can see it on the
14 screen now. Correct? Ms. Coleman, you can
15 see the Merriam-Webster's website on the
16 large screen in the room?
17    A.    Yes.
18    Q.    Okay. And you can see it says
19 "Merriam-Webster since 1828," and you can see
20 I looked up the word "crisis"?
21    A.    Yes.
22    Q.    And I'm going to read it. If I
23 misread it, just stop me.
24        Definition of crisis.
25        "The turning point for better

Page 80

1 or worse in an acute disease or fever."
2        B: "a paroxysmal attack of
3 pain, distress, or disordered function."
4        C: "an emotionally significant
5 event or radical change of status in a
6 person's life." And then there's -- midlife
7 crisis is an example.
8        Following below, we have
9 definition 2, "the decisive moment, as in a
10 literary plot."
11        And 3A and 3B: "An unstable or
12 crucial time or state of affairs in which a
13 decisive change is impending, especially one
14 with the distinct possibility of a highly
15 undesirable outcome." Examples being a
16 financial crisis, or the nation's energy
17 crisis.
18        And then B: "a situation that
19 has reached a critical phase." The
20 environmental crisis, and the unemployment
21 crisis being examples.
22        When you used the word
23 "crisis," do any of those definitions fit
24 your understanding of the word "crisis" as
25 you were using it when we talked about the

Page 81

1 opioid crisis?
2    A.    Yes.
3    Q.    Which one?
4    A.    Several of them.
5    Q.    Why don't you identify the ones
6 that do.
7    A.    "A turning point for better or
8 worse."
9    Q.    Okay. So --
10    A.    "A decisive moment."
11    Q.    1A, 2. Okay.
12        What about 3A or 3B?
13    A.    I would say both of them.
14    Q.    Okay. So when you use the word
15 "crisis" today, I'm going to keep your
16 understanding of that word in mind; is that
17 fair?
18    A.    That's fair.
19    Q.    I want to make sure we have an
20 understanding of what each other -- of what
21 I'm saying to you and what you're saying to
22 me. And if there's a word that I used today
23 and you want me to look it up and you want a
24 dictionary --
25    A.    Okay.

Page 82

1    Q.    -- totally fine.  Okay?
2         Can we agree that over the past
3  year the opioid crisis has gained visibility
4  in our society?
5    A.    Yes.
6    Q.    Are you aware that
7  President Trump has identified the opioid
8  epidemic as he referred to it as a "public
9  health emergency"?
10   A.    Yes.
11   Q.    Do you agree with that
12 characterization by President Trump that the
13 opioid crisis or opioid epidemic is a "public
14 health emergency"?
15   A.    I think it's a public health
16 concern, personally, my personal opinion.
17   Q.    Okay.  That's all right.  You
18 don't have to agree or disagree with the
19 President.  I'm just asking your opinion.
20   A.    Yeah.
21   Q.    Are you aware that a national
22 commission and a commission of state
23 governors have issued recommendations for
24 action to address the opioid epidemic?
25   A.    I'm not aware of that.

Page 83

1    Q.    Are you aware that many of the
2  concerns that have been raised by elected
3  officials stem from the fact that in 2016,
4  more than 11 million Americans misused
5  prescription opioids?
6         MR. CARTER:  Object to the
7    form.
8         MR. WATTS:  Object to the form.
9         MR. ECKLUND:  Are you aware?
10        THE WITNESS:  Can you restate
11   that?
12        MR. ECKLUND:  Sure.
13   Q.    (BY MR. ECKLUND)  Are you aware
14 that in 2016, more than 11 million Americans
15 misused prescription opioids?
16        MR. CARTER:  Object to the
17   form.
18        THE WITNESS:  I don't
19   specifically know that number.
20   Q.    (BY MR. ECKLUND)  Are you aware
21 that the number of opioid-related deaths have
22 more than quadrupled since 1999?
23        MR. CARTER:  Object to the
24   form.
25        THE WITNESS:  I don't know the

Page 84

1  details on that.
2    Q.    (BY MR. ECKLUND)  It's not
3  something that you're aware of in your role
4  as a purchaser or buyer of pharmaceutical
5  drugs including prescription opioids for
6  Walmart?
7         MR. CARTER:  Same objection.
8         THE WITNESS:  I'm not aware of
9    the details of that, no.
10        MR. ECKLUND:  Okay.

Page 85

4    Q.    That's okay.  We'll get there.
5         If I wanted to go into a store
6  today and buy 50 pills, prescription pills,
7  but I don't have a prescription, I can't do
8  it.  Is that right?  Without a prescription,
9  I can't purchase prescription drugs?
10   A.    Correct.
11   Q.    But I can go in and buy a dozen
12 eggs from Walmart if they're available for
13 sale?
14   A.    Correct.
15   Q.    And I could buy blue jeans?
16   A.    Correct.
17   Q.    Or a book?
18   A.    Yes.
19   Q.    Anything else in the store that
20 has restrictions that you're aware of?
21   A.    Probably firearms.
22   Q.    Firearms.
23   A.    Alcohol.
24   Q.    Okay.  Does that make sense to
25 you?  Firearms should be --

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    A.    I don't have one way --
2    Q.    No, I'm saying does it make
3  sense that firearms might be something where
4  there would be additional restrictions on
5  purchase and sales?
6    A.    Yes.
7    Q.    Anything besides firearms and
8  prescription drugs come to mind?
9    A.    Alcohol.
10   Q.    Alcohol.  Does that one make
11 sense to you as well?
12   A.    I don't -- I just know there
13 are restrictions as a purchaser.
14   Q.    Okay.
15   A.    That's really all I have to add
16 there.
17   Q.    And tobacco as well?
18   A.    Yes.
19   Q.    Okay.  Now, you mentioned
20 firearms, alcohol, and I mentioned tobacco to
21 you.
22         So let's talk about those, and
23 then we'll talk about prescription drugs.
24         Most individuals who purchase
25 alcohol purchase alcohol to consume the

Page 87

1  alcohol because they enjoy the alcohol.  Is
2  that basically consistent with your
3  understanding of why people might buy
4  alcohol?
5    A.    I don't know why people buy
6  alcohol.  I don't know.  I mean ...
7         MR. CARTER:  I didn't have the
8    time at the break, but I would object
9    to the form of that question.
10        MR. ECKLUND:  That's fine.
11   Q.    (BY MR. ECKLUND)  Tobacco, most
12 people purchase it for personal use.  They
13 enjoy smoking tobacco.  They enjoy chewing
14 tobacco.  Maybe they're addicted, but they
15 use tobacco themselves?
16        MR. CARTER:  Same objection.
17   Q.    (BY MR. ECKLUND)  What's your
18 understanding of why people purchase
19 prescription drugs?  You're a pharmacist.
20 Why do people most often buy prescription
21 drugs?  Is it because they like ingesting
22 pills or is it because they're looking for a
23 health benefit?
24   A.    They likely have a diagnosed
25 health condition and are seeking treatment of

Page 88

1  that condition.
2    Q.    Okay.  So they're looking to
3  treat a health condition.  They're looking to
4  improve their quality of life?
5         MR. CARTER:  Object to the
6    form.
7         THE WITNESS:  Possibly.
8    Q.    (BY MR. ECKLUND)  Possibly?
9  Perhaps a little longer life?  Maintain or
10 manage a condition so that you can live a
11 full and complete life?
12        MR. CARTER:  Form.
13        THE WITNESS:  Possibly.
14   Q.    (BY MR. ECKLUND)  Possibly?
15        So consumers purchase and
16 ingest pharmaceuticals most often because of
17 the role they can play in improving or
18 maintaining their health.  Is that fair?
19   A.    Yes.

Page 89

Page 90



11 Q. We talked about one of the key
12 differences between prescription drugs and
13 other drugs, which is by definition a
14 prescription only. You need a prescriber to
15 write a prescription in order to obtain that
16 medication; correct?
17 A. Correct.
18 Q. Okay. Let's talk about another
19 difference in prescriptions.
20 Let's talk about insurance.
21 Many consumers who purchase
22 prescription drugs, they have insurance
23 coverage; correct?
24 A. Correct.
25 Q. And many elderly individuals in

Page 91

1 America today enjoy benefits provided by
2 Medicare. Is that consistent with your
3 understanding?
4 A. Yes.
5 Q. And you're aware of Medicaid
6 programs as well?
7 A. Yes.
8 Q. Okay. Are you familiar with
9 formulary lists?
10 A. Yes.
11 Q. What's a formulary list?
12 A. It's generally a list of
13 products that the insurance plan covers.
14 Q. Okay. Are you familiar with
15 tiers for prescription drugs benefits?
16 A. Brand or generic tiers.
17 Q. Okay. One type. Specialty
18 pharmaceutical might be another tier?
19 A. I'm not familiar with those
20 types of tiers.
21 Q. Again, a somewhat unique
22 circumstance for prescription drugs is that
23 the transactions themselves don't just
24 involve the consumer. They can involve an
25 insurance provider. They can involve

Page 92

1 Medicare. They can involve Medicaid. They
2 can involve formulary lists. That all true?
3 MR. CARTER: Object to the
4 form.
5 THE WITNESS: They can, yes.



15 Q. Insurance will not pay for your
16 blue jeans.
17 Medicare and Medicaid won't
18 cover blue jeans; right?
19 A. I'm not a -- not that I know
20 of.
21 Q. Okay. And formulary lists,
22 while they restrict which drugs you may get
23 or the order in which you may receive them,
24 there's no one in the shoe department at
25 Walmart that says you can't buy the Nikes

Page 93

1 until you've tried the Reeboks; right? You
2 can choose what you want to buy without
3 involvement by another party.
4 A. Correct.



Highly Confidential - Subject to Further Confidentiality Review



Page 94

Page 95

Page 96

8  Q.    We talked in part on your
9  familiarity with controlled substances.
10 Let's get a little more detailed on
11 controlled substances.
12      What is a controlled substance?
13 A.    It is a product that has
14 limitations as far as refills is considered,
15 depending on the state law, what you can
16 dispense, you know, how many refills,
17 et cetera.

Page 97



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 110

Page 112

Page 111

Page 113

Page 114

Page 116

6    Q.    (BY MR. ECKLUND)  And you're
7  aware that prescription opioids have been
8  sold on the street illicitly?
9    A.    I am aware of that.
10    Q.    When did you become aware that
11  prescription opioids were being sold on the
12  street?
13    A.    I can't recall exactly.
14    Q.    More than five years ago?
15    A.    Yes.
16    Q.    More than six years ago?
17    A.    I really can't --
18    Q.    That's okay.
19    A.    I don't -- I don't know.
20    Q.    I'm not trying to like pinpoint
21  you.  Will you agree it's between five and,
22  say, eight years ago?
23    A.    Possibly.
24    Q.    Possibly?  We'll stick with
25  five.  Is that fair?

Page 115

Page 117

1    A.    Yes.  That's fair.

Highly Confidential - Subject to Further Confidentiality Review



Page 118

Page 120

Page 119

Page 121

Highly Confidential - Subject to Further Confidentiality Review



Page 122

Page 123

18    Q.    We talked earlier about your
19  familiarity with specialty pharmaceutical
20  manufacturers.  And again, as I understand
21  those, those are often biotech companies,
22  biotechnology drugs.  But it can include
23  traditionals typically administered by
24  injection or infusion.
25          Is that consistent with your

Page 124

1  understanding as a pharmacist?
2          MR. CARTER:  Object to the
3    form.
4          THE WITNESS:  In most cases,
5    yes.
6    Q.    (BY MR. ECKLUND)  In most
7  cases.
8          Okay.  So as an injection or
9  infusion, they're different than pills and
10  tablets?
11    A.    They are.
12    Q.    Okay.  Method of ingestion, how
13  you get the medicine you need differ?
14    A.    Correct.
15    Q.    Okay.  And as the name implies,
16  specialty products are often intended for
17  special therapeutic situations.  I'll run
18  down a list of a few that I'm aware of.
19  We've got oncologics.  Are you aware of
20  specialty pharmaceuticals in the context of
21  oncology?
22    A.    Yes.
23    Q.    Antivirals?
24    A.    Yes.
25    Q.    Immunosuppressants?

Page 125

1    A.    Yes.
2    Q.    Immunostimulants?
3    A.    Yes.
4    Q.    Autoimmune modulators?
5    A.    Possibly.


Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Page 146

Page 147

Page 148

Page 149

```
 6        MR. CARTER:  No particular
 7   urgency, but if you get to a good
 8   breaking point, if we could take one
 9   more before lunch.
10        MR. ECKLUND:  Sure.  Let's take
11   one right now.
12        THE VIDEOGRAPHER:  We are going
13   off the record.  The time is
14   10:55 a.m.
15        (Recess taken, 10:55 a.m. to
16        11:07 a.m.)
17        THE VIDEOGRAPHER:  We are back
18   on the record at 11:07 a.m.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 182

Page 184

Page 183

Page 185

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Page 194

Page 196

Page 195

Page 197

Highly Confidential - Subject to Further Confidentiality Review



Case: 1:17-md-02804-DAP Doc #: 1976-3 Filed: 07/24/19 52 of 96. PageID #: 218558







Page 210

Page 211

Page 212

Page 213

14    MR. WATTS:  If I could please
15 request that we read the Bates numbers
16 of the exhibits in the record.  That
17 would be helpful for us on the phone.
18 We'd appreciate it.
19    MR. ECKLUND:  Okay.
20    Are you hungry?  Are you ready
21 to eat?
22    THE WITNESS:  I wouldn't -- you
23 said around 12:00?  I'm okay right
24 now.
25    MR. ECKLUND:  You waved your

Page 214

1   hand.
2        THE WITNESS:  I don't know when
3   the food is here.
4        MR. ECKLUND:  Just wave your
5   hand when you want to break for lunch
6   and we'll break for lunch.  Okay?
7        THE WITNESS:  Okay.



Highly Confidential - Subject to Further Confidentiality Review



Page 218

Page 220

Page 219

Page 221





Page 230

Page 231

Page 232

2    MR. ECKLUND:  Again, please let
3  me know when you want to take lunch.
4    THE WITNESS:  Probably in a few
5  minutes.  I need a break.
6    MR. ECKLUND:  Do you want to do
7  this one and then we'll take a break?
8    THE WITNESS:  Yeah.
9    MR. ECKLUND:  That's fine.
10    (Walmart Coleman Deposition
11  Exhibit 10 was marked for
12  identification.)
13    Q.   (BY MR. ECKLUND)  So,
14  Ms. Coleman, I've handed you a document that
15  I found online.  And it's from a presentation
16  that was -- I'll say it was jointly offered
17  by Walmart and Humana.  And came out in
18  connection with announcements and press
19  releases.
20    And you can peruse the document
21  if you want.  And let me know if you remember
22  listening in to the media teleconference or
23  reading any materials about this particular
24  venture.  And you can see that there are
25  press contacts, and there's a date.

Page 233

1    MR. ECKLUND:  And just for
2  counsel on the record, there is no
3  Bates stamp on this document.
4    Q.   (BY MR. ECKLUND)
5  September 30th, 2010.  Do you see that on the
6  third slide?
7    When you get there, you let me
8  know.
9    A.   Okay.
10    Q.   So you've had a chance to
11  quickly peruse the slide deck?
12    A.   Yes.
13    Q.   If you'd turn to the -- what
14  includes the 3 at the bottom.  Do you see
15  there's a numbering on the slides?
16    A.   Uh-huh.
17    Q.   So it appears that the media
18  teleconference was going to be held on or
19  around September 30th, 2012.
20    Do you see that?
21    A.   Yes.
22    Q.   And if you go to the next
23  slide, you have a picture of a gentleman,
24  William Fleming, vice president, Humana
25  Pharmacy Solutions.





Page 234

4    Q.    Go to the next slide.  There's
5 an announcement.  Today's announcement.
6 "Beginning with this fall's Medicare
7 enrollment period, November 15th to
8 December 31, 2010, Humana will offer an
9 innovative Medicare Part D plan co-branded
10 with Walmart that provides significant
11 savings on certain prescription medicines for
12 Medicare beneficiaries."
13         Do you see that?
14    A.    Yes.
15    Q.    If you go to the next page.  It
16 talks a little bit about Medicare Part D.
17         Medicare Part D.  Prescription
18 plan supported by the Medicare program.
19 Started in 2006.  18 million people enrolled
20 in a stand-alone Medicare Part D plan.  And
21 that's based on information available to the
22 Henry J. Kaiser Family Foundation as of
23 April 2010.  Do you see that?
24         So --
25    A.    Yes.

Page 235

1    Q.    The reference number at the
2 bottom of the page?
3    A.    Yes.
4    Q.    And it furthers breaks out the
5 numbers.  14.3 million Americans 65 years old
6 or older, and 3.7 million people with
7 disabilities under the age of 65.
8         So those would be the
9 individuals in our society that are
10 participating in the stand-alone Medicare
11 Part D plan.  Do you see that?
12    A.    Yes.
13    Q.    One-third of all prescriptions
14 filled in the U.S.  Typical senior fills 42
15 prescriptions per year.  So 1/3 of
16 prescriptions filled in the U.S. covered by
17 this new Medicare program.  Do you see that?
18    A.    Yes.
19    Q.    Is that consistent with your
20 understanding?
21    A.    Based off of what's on here,
22 yes.
23    Q.    You don't have any different
24 understanding?
25    A.    I don't have any different

Page 236

1 understanding.
2    Q.    Okay.  Just in connection with
3 clinical services, immunizations, you don't
4 have any reason to dispute that number?
5 Okay.
6         MR. CARTER:  Object to the
7    form.
8    Q.    (BY MR. ECKLUND)  There's a
9 prediction, 26 million by 2015.  Do you know
10 whether that came about or if it's slightly
11 lower or slightly higher than the actual
12 number?
13    A.    I don't.
14    Q.    You don't?  Okay.
15         I'll direct your attention to
16 the ninth slide.  Top of the page.  "An
17 innovative solution the Humana Walmart
18 Preferred Rx Plan."
19         PDP.
20         And that's -- "PDP" stands for
21 prescription drug plan; correct?
22    A.    I don't know that for certain,
23 but ...
24    Q.    You don't know.  Okay.
25         If you'd look at the bottom of

Page 237

1 the page, you can see references to
2 calculations based in part on industry
3 average, PDP premium.  Spotlight Medicare
4 prescription drug plans 2010.
5         Do you see that?
6    A.    Yes.
7    Q.    Okay.  So fair to assume -- and
8 we don't like assumptions during depositions,
9 but fair to presume for purposes of this
10 slide that they were talking about a
11 prescription drug plan?
12    A.    Yes.
13    Q.    Okay.  References one low
14 national monthly plan premium of $14.80 a
15 month.

[redacted]
Q. Okay. And towards the bottom of the page, it mentions that there's a list of medicines available, Humana.Medicare.com. So that at the time would have included all the medications covered by this preferred prescription plan?
MR. CARTER: Object to the form.
THE WITNESS: Yep.
Q. (BY MR. ECKLUND) It also references a broad competitive formulary comparable to other plans. And again, we talked about formulary lists earlier. That's a list of drugs that might be approved by a particular provider of an insurance benefit.
A. Correct.
Q. Okay. This document also mentions home delivery mail order co-payments as low as $0 for generic medications and prescriptions filled using the plan's preferred mail order pharmacy.
[redacted]

[redacted]

[redacted]

[redacted]
Q. There's a reason why I'm asking.
If you'd go to the slide that has the number 13 at the bottom. It says, "Why Walmart? Uniquely positioned to help lower the cost of prescription medications. Hugely successful $4 prescription program sparked new thinking." And then "Saved Americans $3.4 billion since 2006."
Mentions that those on Medicare are often hit hard with rising healthcare costs because again, many of the individuals on Medicare are retirees living on fixed incomes.
And you have "High drug costs cause many Medicare Part D beneficiaries to take less medication than prescribed or forego basic needs to pay for medicines."
And then there's a reference that no one should have to choose between groceries and buying medications.

Highly Confidential - Subject to Further Confidentiality Review



Page 242

1    So it's talking about Walmart
2  and, in particular, the, quote/unquote,
3  hugely successful $4 prescription program.
4    After lunch, we're going to
5  start talking about that. Okay?
6    A.    Okay.
7    Q.    Do you want to turn your
8  attention to slide 15 at the bottom.
9    It says, "The plan provides
10  other great ways to save." And you can see
11  there are three columns beyond drug tier.
12    Do you see that's the drug tier
13  again. That consists of the formulary list
14  or tiering system to control pharmaceutical
15  drug costs. Right? Do you see that?
16    A.    Yes.
17    Q.    And it's got preferred
18  generics, generics, non-preferred generics
19  and preferred brands and then non-preferred
20  brands.
21    And the non-preferred brands
22  might include specialty pharmaceuticals.
23  It's also possible that preferred brands and
24  non-preferred generic. Right?
25    MR. CARTER: Form.

Page 243

1    THE WITNESS: It's possible.
2    Q.    (BY MR. ECKLUND) Okay. All
3  right. So let's go through this list.
4    $310 annual deductible for all
5  tiers. And it's got what you pay for a $30
6  prescription supply. If you go to a
7  preferred pharmacy, like Walmart, Sam's Club
8  or your neighborhood market, table suggests
9  that for the preferred generic, you'd add a
10  $2 co-pay. Do you see that?
11    A.    Yes.
12    Q.    And then for the tier 2
13  generic, you've got a $5 co-pay.
14    Do you see that?
15    A.    Yes.
16    Q.    And then for the third tier
17  you've got 20 percent co-insurance.
18    Do you see that?
19    A.    Yes.
20    Q.    What is co-insurance?
21    A.    I'm not certain I understand
22  that terminology, what that means.
23    Q.    Okay.

Page 245

10    MR. ECKLUND: All right. Let's
11  take a lunch break.
12    THE VIDEOGRAPHER: We are going
13  off the record. 12:43 p.m.
14    (Recess taken, 12:43 p.m. to
15  1:19 p.m.)
16    THE VIDEOGRAPHER: We are back
17  on the record at 1:19 p.m.
18    Q.    (BY MR. ECKLUND) Welcome back
19  from lunch.
20    I hear you clearing your
21  throat. If you need to get up and get some
22  water, hot tea, coffee the folks that have
23  hosted this deposition have been tremendously
24  gracious throughout. I'm sure they would
25  accommodate any of the folks who have a



Highly Confidential - Subject to Further Confidentiality Review

Page 246

1  request for tea or coffee.
2     A.   Okay.

Page 248

Page 247

Page 249

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Page 258

Page 260

Page 259

Page 261



Page 262

Page 264

Page 263

Page 265



Highly Confidential - Subject to Further Confidentiality Review



Page 270

Page 271

Page 272

MR. ECKLUND: Let's go off the
record.

THE VIDEOGRAPHER: We're going
off the record. The time is 1:48.

(Recess taken, 1:48 p.m. to
1:50 p.m.)

THE VIDEOGRAPHER: We are back
on the record at 1:50 p.m.

Page 273

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Page 286

Page 288



18       (Walmart Coleman Deposition
19    Exhibit 16 was marked for
20    identification.)
21       MR. ECKLUND:  For the folks
22    following along on the phone, we're
23    looking at a document that was
24    obtained from the archives of the FBI
25    website from the St. Louis office.  It

Page 287

Page 289

1    concerns a press release dated
2    March 2nd, 2010 that was downloaded on
3    December 10th, 2018.
4       Q.    (BY MR. ECKLUND) Title of which
5    is "Ethex Corporation, a subsidiary of KV
6    Pharmaceutical, pleads guilty to two felonies
7    and agrees to pay the United States
8    $27,568,921 for fine, restitution, and
9    forfeiture."
10       Ms. Coleman, I'd like to direct
11    your attention to the paragraph -- second
12    paragraph talking about certain prescription
13    drugs.
14       It says, "According to
15    documents filed with the Court, Ethex and KV
16    were collectively engaged in the development,
17    manufacturing and sale of prescription drugs,
18    including dextroamphetamine sulfate, a drug
19    used to treat attention deficit disorder in
20    children, propafenone, a heart medication.
21    On May 7th and 8th of 2008, KV and Ethex
22    received two complaints reporting the
23    discovery of oversized morphine sulfate
24    tablets.  During this timeframe, KV
25    manufactured numerous types of drugs with BB2

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1  tablet presses including morphine sulfate,
2  propafenone HCL -- that's a hydrochloride,
3  and dextroamphetamine sulfate.  These tablet
4  presses have been used by the company for a
5  number of years, and by May 2008 these
6  machines lacked some of the safety and
7  automation features that more modern tablet
8  press machines currently have."



Highly Confidential - Subject to Further Confidentiality Review



Page 294

Page 296

17    (Walmart Coleman Deposition
18    Exhibit 17 was marked for
19    identification.)
20    Q.    (BY MR. ECKLUND) So,
21    Ms. Coleman, I've handed you an article.  It
22    was downloaded from healthaffairs.org on
23    December 10th, 2018.  It was initially
24    published on or about September or October of
25    2009, as evidenced by the footer on the

Page 295

Page 297

1    document which may have been covered by the
2    sticker that indicates the exhibit.
3        A.    It's there.
4        Q.    You'll see at the top it
5    references Dr. Agwunobi, who we talked about
6    earlier today.
7        A.    Correct.
8        Q.    Within the document it
9    describes what the two authors, Mr. --  or
10   Dr. Agwunobi and -- I'm not sure whether it's
11   Dr. or Mr. Paul London, perceived to be
12   "opportunities to remove costs from the
13   healthcare supply chain, and how to apply
14   lessons from mass retail."
15        You're free to read the entire
16   article, if you want.  It's not necessary.
17        I wanted to just talk to you a
18   little bit about what was described within
19   the article.
20        Importantly, in the bottom of
21   the first page they talk about
22   commoditization of products.  The elimination
23   of middlemen, purchasing in bulk,
24   volume-based cost discounts, embracing price
25   competition whenever possible.  Mass

Page 298

1 retailers price standardized everyday
2 products and services as commodities.
3 　　It says, "For a mass retailer
4 any item that can be commoditized, that is
5 made into something that is not distinguished
6 by brand is a product that can be purchased
7 in bulk and offered at a reduced price?"
8 　　Do you see that?
9 　A.　Yes.
10 　Q.　Okay.  If you'd turn to the
11 next page.
12 　　"Streamlining the healthcare
13 supply chain.  It describes the health system
14 is beginning to benefit from the application
15 of cost control models from mass retail."
16 　　And it goes on.  At the bottom
17 you could see, "For example, low cost
18 generics today are offered in some cases for
19 as little as $4 for a 30-day supply, at
20 commonly prescribed doses."  And it's Endo
21 reference 15, and they're talking about
22 Walmart's $4 drug program.
23 　　If you were to turn to the last
24 page, you'd see that.
25 　　Towards the top quarter of the

Page 299

1 page.  Article by Robertson.  Walmart.  $4
2 drug program saves $26.8 million in
3 California, Sacramento Business Times 2008
4 March 14th.
5 　　Do you see that?
6 　A.　Yes.
7 　Q.　So they're describing Walmart's
8 program.
9 　　And it continues, "By forgoing
10 high profit margins in exchange for volume
11 growth, mass retailers have created a
12 competitive cascade that has begun to affect
13 overall healthcare costs."
14 　　Do you see that?
15 　A.　Where are you?
16 　Q.　If you were to look at the
17 bottom of the page, it bears the number 1338
18 in the bottom left-hand corner.
19 　　MR. CARTER:  He's reading after
20 footnote 16.
21 　　THE WITNESS:  Okay.
22 　　MR. ECKLUND:  Yep, exactly.
23 　Q.　(BY MR. ECKLUND)  Do you see
24 that?
25 　A.　Yes.

Page 300

1 　Q.　Okay.  So this article was
2 published in 2009.  We talked very briefly
3 this morning about Medicare Part D benefits,
4 and we also talked a little bit about the $4
5 30-day generic prescription plan announced by
6 Walmart in 2006.  Do you recall when that
7 program began in 2006?
8 　A.　I don't.
9 　Q.　September 2006 sound about
10 right?
11 　A.　Possibly.



Page 301





Page 306

20  Q.   (BY MR. ECKLUND) Okay.  What
21  would make a generic drug unique among other
22  generic drugs?
23      A.   I mean, personally, I mean,
24  maybe the different diseases that they treat.
25      Q.   Okay.  So if there were two

Page 307

1  drugs that were intended to treat the same
2  condition -- they're both generic versions of
3  the same drug -- would you view those as
4  essentially interchangeable or would you view
5  them as in some way unique?
6      A.   I don't know that I'm
7  following.
8      Q.   Okay.
9      A.   I mean, there are substitution
10 rules in what products can be dispensed for
11 what conditions.  And I'm not certain what
12 specifically you mean by "substitution."
13     Q.   Let's use ibuprofen as an
14 example.
15     A.   Okay.
16     Q.   So you've got brand-name
17 ibuprofen.  You're familiar with that; right?
18     A.   Motrin?
19     Q.   Motrin?  Okay.
20         Advil?
21     A.   Mm-hmm.
22     Q.   Other pain relievers are out
23 there.  You've also probably seen a store
24 brand of ibuprofen.
25     A.   Yes.

Page 308

1      Q.   Okay.  I want you to imagine
2  that they have similar coatings, okay?  One
3  doesn't have a gel cap and the other one
4  doesn't have some kind of buffering.  They're
5  equivalent coatings, same dosage size,
6  50 milligrams.  Do you as a pharmacist view
7  the generic and Motrin different --
8  differently?
9      A.   As a pharmacist?
10     Q.   Yeah.
11     A.   It's a generic version of a
12 brand.
13     Q.   Do you view them as different?
14 Are they interchangeable?
15     A.   Yes.
16     Q.   You do?
17     A.   As a pharmacist I do.
18     Q.   Okay.  Why?
19     A.   Because they're AB-rated to one
20 another.  They're substitutable for one
21 another by law, Motrin to ibuprofen.
22     Q.   Okay.
23         MR. ECKLUND:  Okay.  Let's take
24 a break.
25         THE VIDEOGRAPHER:  We are going

Page 309

1  off the record at 2:32 p.m.
2         (Recess taken, 2:32 p.m. to
3  2:47 p.m.)
4         THE VIDEOGRAPHER:  We are back
5  on the record at 2:47 p.m.
6         MR. ECKLUND:  Welcome back,
7  Ms. Coleman.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review





Page 322

Page 324

21          MR. CARTER:  Hold on one
22    second.
23          Folks that are on the phone,
24    and not on hold for us, we're going to
25    hang up and just redial back in.  So

Page 323

Page 325

1    if you guys can -- if you guys can do
2    the same thing, then we'll get rid of
3    this hold music.
4          THE VIDEOGRAPHER:  Going off
5    the record at 3:02 p.m.
6          (Recess taken, 3:02 p.m. to
7    3:04 p.m.)
8          THE VIDEOGRAPHER:  We are back
9    on the record at 3:04 p.m.
10          MR. ECKLUND:  So, Ms. Coleman,
11    we went off the record briefly to
12    address some hold music.
13          We'll probably hear another
14    "beep beep" as that person rejoins us
15    when they realize they got hung up on.



Page 326

Page 328

Page 327

Page 329

Highly Confidential - Subject to Further Confidentiality Review



Page 334



Page 336

1 to summarize and explain the basic
2 requirements with prescribing, administering,
3 and dispensing controlled substances under
4 the Controlled Substances Act and DEA
5 regulations."

23     Q.     Okay.  Now, at the bottom it
24 references a 2010 edition of the pharmacist's
25 manual to assist you in understanding the

Page 335

11          So I've put up on the screen a
12 PDF from the Department of Justice DEA,
13 Diversion Control Division.  And this is from
14 the resources section on their website, from
15 the publications and manuals portion, in a
16 subfolder manual, in a subfolder pharmacist's
17 manual, Sections I through VIII.
18          Do you see that, Ms. Coleman?
19     A.     Yes.
20     Q.     And if you need it to be zoomed
21 in upon, I believe our tech-savvy
22 videographer will be able to help you out
23 with that.
24          The "Section I, Introduction,"
25 it describes pharmacist's manual.  "Intended

Page 337

1 provisions of the Controlled Substances Act.
2          Do you see that?  "Message from
3 the administrator?"
4          "The Drug Enforcement
5 Administration is pleased to provide you with
6 the 2010 edition of the pharmacist's manual
7 to assist you in understanding the provisions
8 of the Controlled Substances Act."
9          Do you see that?
10     A.     Yes, I see it.
11     Q.     And at that time, in 2010, you
12 were still a pharmacy buyer for Walmart?
13     A.     I think -- during the -- yes.
14 Possibly.

Page 338

Page 340

Page 339

Page 341

4     Q.    (BY MR. ECKLUND)  Do you see at
5  the bottom of the page, "How should providers
6  use the total daily opioid dose in clinical
7  practice?  Use caution when prescribing
8  opioids of any dosage and prescribe the
9  lowest effective dose.  Use extra precautions
10  when increasing to greater than or equal to
11  50 morphine milligram equivalents per day."
12        And then asterisk.  "These
13  dosage thresholds are based on overdose risk
14  when opioids are prescribed for pain and
15  should not be guide dosing of
16  medication-assisted treatment for opioid use
17  disorders."
18        "Three factors:  Monitor and
19  assess pain function more frequently.
20  Discuss reducing dose or tapering and
21  discontinuing opioids if benefits do not
22  outweigh harms.  Consider offering naloxone.
23  Avoid or carefully justify increasing dosage
24  to" less than or greater -- sorry, "greater
25  than or" less -- greater than or "equal to





Page 342

1 90 milligrams equivalent a day."
2   I apologize. I have text
3 messages coming across from my wife hounding
4 me to catch my flight.
5   Do you see that?
6 A. I see that.
7 Q. Okay. Good.

Highly Confidential - Subject to Further Confidentiality Review



Page 346

17      Are you familiar with the HDMA?
18      A.   I am not.
19      Q.   Okay.  So you're not a member
20  of the HDMA?
21      A.   I am not.
22      Q.   And you don't attend the HDMA
23  meetings?
24      A.   I do not.

Page 348

Page 347

Page 349

5      Q.   I've put up on the screen
6   "Press Release.  McKesson and Walmart
7   announce sourcing agreement for generic
8   pharmaceuticals."
9           Issued May 16, 2016.
10          Are you familiar with this
11  agreement?
12      A.   I'm not.
13      Q.   Okay.
14          I should clarify this.  This
15  isn't a document.  It's a website.
16          Were you aware that the FDA
17  requested removal of Opana Extended Release
18  for risks related to abuse in June of 2017?
19      A.   I am not.
20      Q.   Okay.
21          MR. WATTS:  Object to the form.
22          MR. ECKLUND:  Let's go off the
23  record.
24          THE VIDEOGRAPHER:  We are going
25  off the record at 3:31 p.m.)

Highly Confidential - Subject to Further Confidentiality Review



Page 350

1      (Recess taken, 3:32 p.m. to
2      3:42 p.m.)
3          THE VIDEOGRAPHER:  We are back
4      on the record at 3:42 p.m.

Page 352

Page 351

Page 353



Page 354

2    Q.    So I've put up on the screen --
3    it's an article that I found online.
4    topbusiness.net, and it describes the "drug
5    crisis," using your word, within Arkansas.
6    The title of the article is "Arkansas
7    Prescription Drug Crisis Worsens.
8    President Trump addresses national opioid
9    epidemic." It's dated August 8, 2017.
10          I just want to ask you a couple
11   of questions.
12          Were you aware at the time that
13   this article was published there was a study
14   that showed that Arkansas prescription drug
15   problem was so serious that there were enough
16   pills in the street for each of Arkansas'
17   almost 3 million citizens to have a full
18   bottle?
19   A.    I was not aware.
20   Q.    Were you aware that the CDC had
21   released a report that shows all but nine of
22   Arkansas' 75 counties have had overall opioid
23   prescribing rates higher than the national
24   average?
25   A.    I was not aware of that either.

Page 355

1    Q.    Were you aware that as a state,
2    Arkansas has an opioid prescription rate of
3    114.6 per 100, which is second only to
4    Alabama?  In 2016?
5    A.    I'm not aware of that either.
6    Q.    Are you familiar with Greene
7    County?
8    A.    I am not.
9    Q.    Okay.  Do you know where Greene
10   County is located in Arkansas?
11   A.    I do not.
12   Q.    Are you familiar with Garland
13   and Sebastian Counties in Arkansas?
14   A.    I am not.
15   Q.    Howard County?
16   A.    No.
17   Q.    Jackson County?
18   A.    I'm not from Arkansas.  I just
19   live here.  I don't know the specific
20   counties, no, I don't.
21   Q.    Okay.  All right.
22          The article talks about a
23   number of counties within the state of
24   Arkansas which have per capita orders far in
25   excess of the national averages.  177.8 pills

Page 356

1    dispensed per capita, 176, 169, 150, and then
2    some with far, far lower.
3          For example, Newton and
4    Cleveland Counties have rates of opioid
5    prescriptions with an average of 0.8 and 1.1
6    dispensed for every 100 citizens.
7          We talked earlier about how the
8    data you looked at was national data.  And we
9    talked about how perhaps if you had looked at
10   more localized data at a county level, at a
11   state level, a city level, that there may
12   have been opportunities to change the ways in
13   which Walmart purchased pharmaceutical drugs,
14   particularly prescription opioids.

Page 357



Page 358

7    Q.    (BY MR. ECKLUND)  The article
8  follows, "Arkansas Legislative Focus."  And
9  the author wrote, "Some of that sobering data
10  was brought to the attention of Arkansas
11  policymakers nearly a month ago when Arkansas
12  health department director Nate Smith gave a
13  presentation to the Joint Interim Committee
14  on Public Health at the state capitol."
15        "According to Smith's report,
16  'Large amounts of opioids are being sold in
17  Arkansas, enough for every man, woman, and
18  child to take 80 pills each over the course
19  of a year.  All together, 235.9 million pills
20  were sold across Arkansas in 2016,' Smith
21  said, citing the most up-to-date data from
22  the CDC."

Page 359

Page 360

4    Q.    (BY MR. ECKLUND)  In the
5  article it talks about quarterly data.  It
6  says, "New quarterly data released Tuesday by
7  the CDC's National Center For Health
8  Statistics shows that drug overdose deaths
9  reached an all-time high in the first three
10  quarters of 2016 of 57,900."
11        And we talked about those
12  numbers earlier.  I think I remember I talked
13  about 1999, the quadrupling, and I talked
14  about these numbers this morning.
15        If you'd look at those numbers,
16  it also talks about the rise.
17        "Earlier this year, the CDC
18  reported that more than 52,000 people died
19  from a drug overdose in 2015."
20        So you can see, between 2015,
21  you have 52,000, 2016, there's 57,900 being
22  associated with drug overdoses, or --
23        Do you see that?  The two
24  numbers, Ms. Coleman?
25    A.    Yes.

Page 361

1    Q.    And it continues, "Of those,
2  33,091 involved a prescription or illicit
3  opioid.  63.1 percent.  And since 2000, more
4  than 300,000 Americans have lost their lives
5  to an opioid overdose."

24    Q.    The article continues, "In
25  Arkansas 1,067 people died from a drug

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1  overdose between 2013 to 2015, putting
2  Arkansas in the top 20 percent of states that
3  prescribed the most painkillers per capita.
4        "By definition, legal
5  prescriptions for opioid painkillers can be
6  written by doctors to treat moderate to
7  severe pain but can also have serious risks
8  and side effects. Common types are oxycodone
9  or Oxycontin, hydrocodone, Vicodin, morphine
10 and methadone."

Page 363

12       Q.   Okay. Do you agree that
13 prescription opioids have serious risks and
14 side effects?
15       MR. WATTS: Object to the form.
16       THE WITNESS: To some patients,
17 they can.
18       Q.   (BY MR. ECKLUND) There is the
19 difference between a risk and a manifestation
20 of a problem. Right?
21       I mean, cigarettes carry a risk
22 of lung cancer. Doesn't necessarily mean
23 that every person who smokes a cigarette will
24 develop lung cancer. Right?
25       I mean, drunk driving is risky

Page 364

1  behavior. Drunk driving is dangerous. You
2  shouldn't drive drunk. Not every person that
3  drives drunk gets injured. Not every person
4  that drives drunk hurts somebody else. Not
5  everyone that drives drunk gets pulled over.
6  Right? It's risky behavior, but it's not
7  always dangerous.
8        Can we agree that opioid
9  painkillers, opioid painkillers have serious
10 risks?
11       MR. WATTS: Object to the form.
12       THE WITNESS: They're
13 FDA-approved products. And as a
14 pharmacist, I would use professional
15 judgment, follow the law, determine if
16 it's appropriate therapy. That's how
17 I can answer that.
18       Q.   (BY MR. ECKLUND) Well, an
19 FDA-approved drug can have risks and
20 benefits, though; correct?
21       A.   Whether it's an opioid or not,
22 there are risks to medications.
23       Q.   Okay. So can we agree that
24 prescription opioids, while FDA-approved,
25 could also have serious risks?

Page 365

1        MR. WATTS: Objection to form.
2        THE WITNESS: They could.
3        MR. ECKLUND: Okay.
4        Q.   (BY MR. ECKLUND) Do you recall
5  when you attended pharmacy school learning
6  about morphine as a drug?
7        A.   I'm sure I did. I don't
8  remember the specifics.
9        Q.   Do you recall studying or
10 learning about heroin?
11       A.   I recall studying and learning
12 about all drugs.
13       Q.   Okay. So you recall studying
14 all drugs, and that would include morphine,
15 heroin, cold medications, the whole panoply
16 of drugs that are available?
17       A.   In general, yes.
18       Q.   Okay. Do you recall learning
19 about prior opioid crises in U.S. history?
20       A.   I don't recall.
21       Q.   Those in the early 1900s, those
22 in the 1960s, those that predated the
23 implementation and development of the
24 Controlled Substances Act in the 1970s?
25       A.   I really don't recall

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1  specifics.
2       MR. ECKLUND:  I have no
3  additional questions for you today.  I
4  really do appreciate you taking the
5  time, and I hope you get home safe.
6       THE WITNESS:  Thank you.
7       MR. CARTER:  I just have a few
8  quick questions.  We can keep our
9  seats and I won't make anyone miss a
10  flight.
11       CROSS EXAMINATION
12  BY MR. CARTER:
13  Q.    So we'll start with where we
14  just left off.  You were asked some questions
15  about an Arkansas online news article.
16       Do you recall that?
17  A.    No.
18       Do I recall seeing it?  Yes.
19  Q.    Okay.  And, yes, had you ever
20  seen that article when it actually came up?
21  A.    I did not.



Page 370



Page 371

23    MR. CARTER:  I have no further
24  questions.  Thank you.
25         *  *  *

Page 372

            REDIRECT EXAMINATION
2  BY MR. ECKLUND:
3       Q.    Just a few to clean up.
4            The morphine milligram
5  equivalent calculation, whether on the CDC
6  charts or found anywhere else, that's a
7  conversion based upon chemistry; correct?
8       A.    Correct.
9       Q.    And that conversion has not
10  changed based upon publication or the
11  issuance of the CDC's guidance or any other
12  publication.  It's something that has been
13  and will remain for all days the same.
14  Hydrocodone relative to oxymorphone is so
15  strong.  Oxymorphone is so strong relative to
16  morphine.  These are conversions.  It's based
17  on mathematics.  Is that fair?
18       A.    That's correct.
19       Q.    So there's nothing about that
20  CDC chart that you couldn't have incorporated
21  in an arithmetic row and column on an Excel
22  chart?

Page 373

18       Q.    The article that I showed you
19  from the internet from Arkansas, I didn't
20  represent on the record that you had read it.
21  But I did want to show you numbers specific
22  to Arkansas.
23            Do you have any reason to
24  believe that any of the numbers found in that
25  article are inaccurate and incorrect?

Page 374

1    MR. CARTER:  Form.
2    THE WITNESS:  I don't have any
3  reason.  I don't have -- one way or
4  the other.
5    Q.    (BY MR. ECKLUND)  Would it make
6  you feel more comfortable if I went on to
7  another website and pulled the original
8  source materials from the CDC to show you the
9  same numbers?
10    A.    I don't really understand what
11  you're asking.
12    MR. WATTS:  Object to the form.
13    Q.    (BY MR. ECKLUND)  When the
14  document referenced this many people losing
15  their lives in 2016, or that many number in
16  2015, or this many per capita prescribed
17  pills for a county within a given year, are
18  you in any -- for any reason at all concerned
19  about the numbers as reflected in that
20  article being inaccurate?  Do you need some
21  assurance that they're accurate?
22    A.    There were references, I
23  believe, on where that information came from.

Page 375

17    MR. ECKLUND:  Thank you.  No
18  further questions.
19    MR. CARTER:  We'll read and
20  sign.
21    THE VIDEOGRAPHER:  We are going
22  off the record at 4:11 p.m.
23    (Proceedings recessed at 4:11
24  p.m.)
25    --o0o--

Page 376

1    CERTIFICATE
2  STATE OF UTAH    )
   ) ss
3  COUNTY OF SALT LAKE )
4    THIS IS TO CERTIFY that the
   testimony of JOLYNN COLEMAN, the witness in
5  the foregoing cause named, was taken before
   me, DEBRA A. DIBBLE, a Registered Merit
6  Reporter and Certified Realtime Reporter and
   Notary Public in and for the State of Utah,
7  residing at Woodland, Utah.
8    That the said witness was by me,
   before examination, duly sworn to testify the
9  truth, the whole truth, and nothing but the
   truth in said cause and the testimony of said
10  witness was reported by me in Stenotype, and
   thereafter caused by me to be transcribed
11  into typewriting, and that a full, true and
   correct transcription of said testimony so
12  taken and transcribed is set forth in the
   foregoing pages numbered from 4 to page
13  inclusive, and said witness was examined and
   said as in the foregoing annexed transcript.
14
   I further certify that I am not of
15  kin or otherwise associated with any of the
   parties to said cause of action, and that I
16  am not interested in the event thereof.
17  I further certify review of the transcript
   was requested.
18
   IN WITNESS WHEREOF, I have
19  hereunto set my hand this 18th day of
   December, 2018.
20
21
22
23    Debra A. Dibble; RDR, CRR, CRC
24
25

Page 377

1    INSTRUCTIONS TO WITNESS
2
3    Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8    After doing so, please sign the
9  errata sheet and date it.
10    You are signing same subject to
11  the changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14    It is imperative that you return
15  the original errata sheet to the deposing
16  attorney within thirty (30) days of receipt
17  of the deposition transcript by you.  If you
18  fail to do so, the deposition transcript may
19  be deemed to be accurate and may be used in
20  court.
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

| | | Page 378 |
|---|---|---|
| 1 | | ERRATA |
| 2 | Page | LINE CHANGE |
| 3 | \_\_\_\_ | \_\_\_\_ _____ |
| 4 | | REASON: _____ |
| 5 | \_\_\_\_ | \_\_\_\_ _____ |
| 6 | | REASON: _____ |
| 7 | \_\_\_\_ | \_\_\_\_ _____ |
| 8 | | REASON: _____ |
| 9 | \_\_\_\_ | \_\_\_\_ _____ |
| 10 | | REASON: _____ |
| 11 | \_\_\_\_ | \_\_\_\_ _____ |
| 12 | | REASON: _____ |
| 13 | \_\_\_\_ | \_\_\_\_ _____ |
| 14 | | REASON: _____ |
| 15 | \_\_\_\_ | \_\_\_\_ _____ |
| 16 | | REASON: _____ |
| 17 | \_\_\_\_ | \_\_\_\_ _____ |
| 18 | | REASON: _____ |
| 19 | \_\_\_\_ | \_\_\_\_ _____ |
| 20 | | REASON: _____ |
| 21 | \_\_\_\_ | \_\_\_\_ _____ |
| 22 | | REASON: _____ |
| 23 | \_\_\_\_ | \_\_\_\_ _____ |
| 24 | | REASON: _____ |
| 25 | | |

| | | Page 380 |
|---|---|---|
| 1 | | LAWYER'S NOTES |
| 2 | | |
| 3 | page | LINE |
| 4 | \_\_\_\_ | \_\_\_\_ _____ |
| 5 | \_\_\_\_ | \_\_\_\_ _____ |
| 6 | \_\_\_\_ | \_\_\_\_ _____ |
| 7 | \_\_\_\_ | \_\_\_\_ _____ |
| 8 | \_\_\_\_ | \_\_\_\_ _____ |
| 9 | \_\_\_\_ | \_\_\_\_ _____ |
| 10 | \_\_\_\_ | \_\_\_\_ _____ |
| 11 | \_\_\_\_ | \_\_\_\_ _____ |
| 12 | \_\_\_\_ | \_\_\_\_ _____ |
| 13 | \_\_\_\_ | \_\_\_\_ _____ |
| 14 | \_\_\_\_ | \_\_\_\_ _____ |
| 15 | \_\_\_\_ | \_\_\_\_ _____ |
| 16 | \_\_\_\_ | \_\_\_\_ _____ |
| 17 | \_\_\_\_ | \_\_\_\_ _____ |
| 18 | \_\_\_\_ | \_\_\_\_ _____ |
| 19 | \_\_\_\_ | \_\_\_\_ _____ |
| 20 | \_\_\_\_ | \_\_\_\_ _____ |
| 21 | \_\_\_\_ | \_\_\_\_ _____ |
| 22 | \_\_\_\_ | \_\_\_\_ _____ |
| 23 | \_\_\_\_ | \_\_\_\_ _____ |
| 24 | \_\_\_\_ | \_\_\_\_ _____ |
| 25 | | |

**Page 379**

1  ACKNOWLEDGMENT OF DEPONENT
2
3
4      I, JOLYNN COLEMAN, do hereby
    certify that I have read the foregoing pages
5  and that the same is a correct transcription
    of the answers given by me to the questions
6  therein propounded, except for the
    corrections or changes in form or substance,
7  if any, noted in the attached
    Errata Sheet.
8
9
10
11
12
    _____
    JOLYNN COLEMAN                    DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 \_\_\_\_\_.
17  My commission expires: _____
18
19  _____
20  Notary Public
21
22
23
24
25