```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3

     IN RE: NATIONAL       )
 4   PRESCRIPTION          )  MDL No. 2804
     OPIATE LITIGATION     )
 5   _____ )  Case No.
                           )  1:17-MD-2804
 6                         )
     THIS DOCUMENT RELATES )  Hon. Dan A.
 7   TO ALL CASES          )  Polster

 8

                TUESDAY, JANUARY 8, 2019
 9

        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10               CONFIDENTIALITY REVIEW
11                    - - -
12           Videotaped deposition of Ginger
13   Collier, held at the offices of STINSON
14   LEONARD STREET LLP, 7700 Forsyth Boulevard,
15   Suite 1000, St. Louis, Missouri, commencing
16   at 9:10 a.m., on the above date, before
17   Carrie A. Campbell, Registered Diplomate
18   Reporterand Certified Realtime Reporter.
19

20

21

22                    - - -
23

              GOLKOW LITIGATION SERVICES
24       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
25
```

Page 2

```
 1        A P P E A R A N C E S :
 2
 3   KELLER ROHRBACK LLP
     BY:  GARY GOTTO
 4       ggotto@kellerrohrback.com
         GABE VERDUGO
 5       gverdugo@kellerrohrback.com
     1201 Third Avenue, Suite 3200
 6   Seattle, Washington 98101
     (206) 623-1900
 7   Counsel for Plaintiffs
 8
 9   BRANSTETTER STRANCH & JENNINGS, PLLC
     BY:  TRICIA HERZFELD
10       triciah@bsjfirm.com
     223 Rosa L. Parks Avenue, Suite 200
11   Nashville, Tennessee 37203
     (615) 254-8801
12   Counsel for the Tennessee Action
13
14   ARMSTRONG TEASDALE
     BY:  SARAH E. HARMON
15       sharmon@armstrongteasdale.com
     7700 Forsyth Boulevard, Suite 1800
16   St. Louis, Missouri 63105
     (314) 621-5070
17   Counsel for Cardinal Health, Inc.
18
19   COVINGTON & BURLING LLP
     BY:  FREDERICK BENSON
20       fbenson@cov.com
     850 Tenth Street, NW
21   Washington, DC 20001-4956
     (202) 662-6000
22   Counsel for McKesson Corporation
23
24
25
```

Page 3

```
 1   JACKSON KELLY
     BY:  SYLVIA WINSTON NICHOLS
 2       sylvia.winston@jacksonkelly.com
         (VIA TELECONFERENCE)
 3   150 Clay Street, Suite 500
     Morgantown, West Virginia 26501
 4   (304) 284-4138
     Counsel for AmerisourceBergen
 5
 6
 7   JONES DAY
     BY:  LAURA JANE DURFEE
 8       ldurfee@jonesday.com
     2727 North Harwood Street
 9   Dallas, Texas 75201
     (214) 220-3939
10   Counsel for Walmart
11
12   ROPES & GRAY, LLP
     BY:  ANDREW O'CONNOR
13       Andrew.O'connor@ropesgray.com
         CASSANDRA A. LARUSSA
14       Cassandra.LaRussa@ropesgray.com
     800 Boylston Street
15   Boston, Massachusetts 02199-3600
     (617) 951-7000
16   Counsel for Mallinckrodt
17
18   FOX ROTHSCHILD LLP
     BY:  EILEEN OAKES MUSKETT
19       EMuskett@foxrothschild.com
         (VIA TELECONFERENCE)
20   1301 Atlantic Avenue, Suite 400
     Atlantic City, New Jersey 08401
21   (609) 572-2355
22   Counsel for Validus Pharmaceuticals
23
24
25
```

Page 4

```
 1        ARNOLD & PORTER
          BY:  DAVID HIBEY          09:11:42
 2            david.hibey@arnoldporter.com
              (VIA TELECONFERENCE)
 3        601 Massachusetts Avenue, NW
          Washington, DC 20001-3743
 4        (202) 942-5000
          Counsel for Endo Pharmaceuticals
 5        Inc., and Endo Health Solutions Inc.
 6
 7   VIDEOGRAPHER:
          JAMES ARNDT,
 8        Golkow Litigation Services
 9            – – –
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                    INDEX
 2                                     PAGE
 3   APPEARANCES.................................   2
 4   EXAMINATIONS
 5     BY MR. GOTTO...............................  12
 6     BY MS. HERZFELD........................... 268
 7     BY MR. GOTTO.............................. 334
 8
 9             EXHIBITS
10   No.    Description              Page
11   Mallinckrodt  Plaintiffs' Notice of Oral    16
     Collier 1    Videotaped Deposition of
12                Ginger Collier and Requests
                  for Production of Documents
13
     Mallinckrodt  July 17, 2009 Covidien        43
14   Collier 2    employment letter to
                  Virginia Collier,
15                MNK-T1_0007277843 -
                  MNK-T1_0007277847
16
     Mallinckrodt  Director of Marketing -       59
17   Collier 3    Specialty Generics,
                  MNK-T1_0007277883 -
18                MNK-T1_0007277885
19   Mallinckrodt  Specialty Generics Marketing 106
     Collier 4    Roles & Responsibilities,
20                MNK-T1_0004881300
21   Mallinckrodt  Covidien Pharmaceuticals:    129
     Collier 5    Specialty Generics Strategic
22                Business Update December 2,
                  2009,
23                MNK-T1_0004881300
24   Mallinckrodt  E-mail(s),                   136
     Collier 6    MNK-T1_0006305472
25
```

Page 6

| | | |
|---|---|---|
| Mallinckrodt Collier 7 | Covidien Pharmaceuticals Specialty Generics Business Review, January 6, 2010, MNK-T1_0003305472 | 136 |
| Mallinckrodt Collier 8 | Covidien Pharmaceuticals Specialty Generics Business Review, April 7, 2010, MNK-T1_0002236317 | 145 |
| Mallinckrodt Collier 9 | Specialty Generics Hobart Business Review, February 21, 2011, MNK-T1_0002337098 | 154 |
| Mallinckrodt Collier 10 | October 11, 2011 letter from Ginger Collier to Hal Harrison, MNK-T1_0002738887 - MNK-T1_0002738888 | 159 |
| Mallinckrodt Collier 11 | Covidien S&OP Management Business Review - November Cycle, MNK-T1_0007289278 - MNK-T1_0007289283 | 164 |
| Mallinckrodt Collier 12 | Mallinckrodt Pharmaceuticals Specialty Generics Overview, Intern Initiation, Ginger Collier, June 2014, MNK-T1_0000661013 - MNK-T1_0000661037 | 167 |
| Mallinckrodt Collier 13 | Covidien Pharmaceuticals Specialty Generics Strategic Plan 2013-2017, MNK-T1_0000607429 - MNK-T1_0000607538 | 173 |
| Mallinckrodt Collier 14 | Mallinckrodt Pharmaceuticals Specialty Generics Strategic Plan 2014-2019, MNK-T1_0000663716 - MNK-T1_0000663788 | 187 |
| Mallinckrodt Collier 15 | E-mail(s), MNK-T1_0000418885 | 190 |

Page 7

| | | |
|---|---|---|
| Mallinckrodt Collier 16 | "Summary" Worksheet, MNK-T1_0000418886 | 190 |
| Mallinckrodt Collier 17 | E-mail(s), MNK-T1_0000483766 - MNK-T1_0000483769 | 205 |
| Mallinckrodt Collier 18 | Suspicious Order Monitoring Team Charter, Updated 4/7/11, MNK-T1_0000496062 | 215 |
| Mallinckrodt Collier 19 | E-mail(s), MNK-T1_0000262709 | 221 |
| Mallinckrodt Collier 20 | Mallinckrodt Controlled Substance Suspicious Order Monitoring Program, Presentation for Marketing Group, March 2, 2011, MNK-T1_0000496098 - MNK-T1_0000496124 | 228 |
| Mallinckrodt Collier 21 | November 10, 2010 letter to KeySource Medical, MNK-T1_0000484112 - MNK-T1_0000484113 | 233 |
| Mallinckrodt Collier 22 | November 12, 2010 letter to Cardinal Health and others, MNK-T1_000048414156 | 234 |
| Mallinckrodt Collier 23 | E-mail(s), MNK-T1_000558202 | 236 |
| Mallinckrodt Collier 24 | E-mail(s), MNK-T1_0005905204 - MNK-T1_0005905205 | 239 |
| Mallinckrodt Collier 25 | E-mail(s), MNK-T1_0004951225 - MNK-T1_0004951228 | 242 |
| Mallinckrodt Collier 26 | October 1, 2010 - September 30, 2011 chart of conventions, MNK-T1_0000384634 - MNK-T1_0000384651 | 244 |

Page 8

| | | |
|---|---|---|
| Mallinckrodt Collier 27 | Chart of advertising expenditures, MNK-T1_0006714382 | 246 |
| Mallinckrodt Exhibit 28 | E-mail(s), MNK-T1_0005964786 - MNK-T1_0005964790 | 248 |
| Mallinckrodt Collier 29 | "The nuances and complexities of opioid rotation, MNK-T1_0001553927 - MNK-T1_0001553928 | 252 |
| Mallinckrodt Collier 30 | E-mail(s), MNK-T1_0004673096 | 254 |
| Mallinckrodt Collier 31 | Mallinckrodt Fentanyl Transdermal System, MNK-T1_0004673097 | 254 |
| Mallinckrodt Collier 32 | E-mail(s), MNK-T1_000925331 - MNK-T1_000925332 | 257 |
| Mallinckrodt Collier 33 | E-mail(s), MNK-T1_0000660532 - MNK-T1_0000660534 | 260 |
| Mallinckrodt Collier 34 | 2014 GCC Approved Grants (Jan '14 - Present) (updated 9.5.14), MNK-T1_0000661003 | 262 |
| Mallinckrodt Collier 35 | E-mail(s), MNK-T1_0000558153 - MNK-T1_0000558154 | 264 |
| Mallinckrodt Collier 36 | NACDS Meetings, April 20 - 23, 2013, Customer Meetings, MNK-T1_0000609142 - MNK-T1_0000609155 | 267 |
| Mallinckrodt Collier 37 | E-mail(s), MNK_TNSTA05202063 - MNK_TNSTA05202064 | 274 |
| Mallinckrodt Collier 38 | E-mail(s), MNK_TNSTA0520176 | 277 |

Page 9

| | | |
|---|---|---|
| Mallinckrodt Collier 39 | SOM Steering Committee Meeting Agenda 6/23/11, MNK_TNSTA05296154 | 295 |
| Mallinckrodt Collier 40 | E-mail(s), MNK-T1_0007251678 | 297 |
| Mallinckrodt Collier 41 | Customers Sourcing Oxy 15 & 30 from more than 2 distributors - Apr 2011.xlsx, 5/31/11, MNK-T1_0007251679 | 297 |
| Mallinckrodt Collier 42 | State Concentration Oxy 15 & 30 - Apr 2011.xlsx, 5/31/11, MNK-T1_0007251680 | 312 |
| Mallinckrodt Collier 43 | State Concentration Hydro-Apap - Apr 2011.xlsx, 5/31/11, MNK-T1_0007251681 | 315 |
| Mallinckrodt Collier 44 | Top 150 Pharmacies, Oxy 30 mg only, 2009-2011 data combined, MNK_TNSTA05098003 - MNK_TNSTA05098012 | 323 |
| Mallinckrodt Collier 45 | E-mail(s), MNK_TNSTA05299706 - MNK_TNSTA05299707 | 326 |
| Mallinckrodt Collier 46 | E-mail(s), MNK-T1_0000368477 - MNK-T1_0000368480 | 336 |
| Mallinckrodt Collier 47 | Total $ & Units by Dist., MNK-T1_0000273249 - MNK-T1_0000273258 | 338 |
| Mallinckrodt Collier 48 | Oxy 15 & 30 versus Total Gross Sales - October 2010 Data - Sorted by Units, MNK-T1_0005557439 | 339 |

(Exhibits attached to the deposition.)

Page 10

1     VIDEOGRAPHER:  We are now on       08:47:29
2  the record.  My name is James Arndt.     09:10:34
3  I'm a videographer for Golkow          09:10:37
4  Litigation Services.            09:10:39
5       Today's date is January 8,      09:10:39
6  2019, and the time is 9:10 a m.         09:10:42
7       This video deposition is being   09:10:44
8  held in St. Louis, Missouri, in the     09:10:46
9  matter of the National Prescription     09:10:47
10 Opiate Litigation for the United        09:10:49
11 States District Court for the Northern  09:10:52
12 District of Ohio, Eastern Division.     09:10:54
13      The deponent is Ginger Collier.   09:10:56
14      Will counsel please identify     09:10:58
15 themselves.                     09:10:59
16      MR. GOTTO:  Gary Gotto, Keller   09:11:00
17 Rohrback, LLP, for the plaintiffs.      09:11:03
18      MR. VERDUGO:  Gabe Verdugo,      09:11:07
19 Keller Rohrback, LLP, also for the      09:11:07
20 plaintiffs.                     09:11:09
21      MR. BENSON:  Fred Benson,        09:11:11
22 Covington Burling, LLP, for McKesson    09:11:12
23 Corporation.                    09:11:15
24      MS. HARMON:  Sarah Harmon with   09:11:17
25 Armstrong Teasdale for Cardinal         09:11:17

Page 11

1  Health.                         09:11:19
2       MS. DURFEE:  Laura Jane Durfee   09:11:20
3  with Jones Day for Walmart.            09:11:20
4       MS. LARUSSA:  Cassandra         09:11:20
5  Larussa, Ropes & Gray, for            09:11:24
6  Mallinckrodt, LLC, SpecGx and Ginger    09:11:25
7  Collier.                        09:11:28
8       MR. O'CONNOR:  Andrew O'Connor   09:11:28
9  from Ropes & Gray for Mallinckrodt,     09:11:30
10 LLC, SpecGx and Ginger Collier.         09:11:34
11      VIDEOGRAPHER:  Will counsel on   09:11:34
12 the phone please identify themselves?    09:11:35
13      MR. HIBEY:  David Hibey of       09:11:42
14 Arnold & Porter on behalf of the Endo   09:11:43
15 defendants.                     09:11:45
16      MS. WINSTON:  Sylvia Winston     09:11:45
17 Nichols on behalf of AmerisourceBergen  09:11:49
18 Drug Corporation.               09:11:49
19      MS. MUSKETT:  Eileen Muskett of  09:11:52
20 Fox Rothschild on behalf of Validus.    09:12:03
21      MS. WINSTON:  Yes, this is       09:12:20
22 Sylvia Winston.                 09:12:22
23      MS. HERZFELD:  Tricia Herzfeld   09:12:25
24 on behalf of the Tennessee plaintiffs.  09:12:26
25      VIDEOGRAPHER:  The court         09:12:31

Page 12

1  reporter is Carrie Campbell, and she    09:12:31
2  will now swear in the witness.          09:12:33
3
4       GINGER COLLIER,
5  of lawful age, having been first duly sworn
6  to tell the truth, the whole truth and
7  nothing but the truth, deposes and says on
8  behalf of the Plaintiffs, as follows:
9                               09:12:39
10      DIRECT EXAMINATION            09:12:39
11 QUESTIONS BY MR. GOTTO:               09:12:40
12   Q.   Good morning, Ms. Collier.       09:12:42
13   A.   Good morning.             09:12:43
14   Q.   How are you?             09:12:43
15   A.   Very good, thank you.          09:12:44
16   Q.   Great.                 09:12:45
17      As you just heard, my name is     09:12:45
18 Gary Gotto.  I'm one of the lawyers     09:12:47
19 representing the plaintiffs in this     09:12:49
20 litigation.                     09:12:50
21      Could you please state your       09:12:52
22 business address, please?             09:12:56
23   A.   My business address?  I do not   09:12:57
24 have a business address.  My home address?  09:13:00
25   Q.   Sure, home address is fine.      09:13:02

Page 13

1    A.   Okay.  ███████████           09:13:07
2  ██ ████████████████████████          09:13:07
3    Q.   Okay.  And are you currently    09:13:11
4  employed?                       09:13:11
5    A.   Yes, I am.              09:13:12
6    Q.   By whom?               09:13:12
7    A.   Hisun Pharmaceutical.         09:13:13
8    Q.   Okay.  And what's your position  09:13:15
9  at Hisun?                       09:13:18
10   A.   Vice president, national        09:13:19
11 accounts.                       09:13:21
12   Q.   Okay.  And when did you join     09:13:22
13 Hisun?                          09:13:24
14   A.   In 2017.                09:13:25
15   Q.   Where is Hisun located?         09:13:28
16   A.   New Jersey.             09:13:29
17   Q.   Where in New Jersey?           09:13:30
18   A.   Bridgewater.  Sorry, we just     09:13:31
19 moved from Princeton, so I'm still thinking  09:13:35
20 Princeton.                      09:13:41
21   Q.   Okay.  Great.            09:13:41
22      Have you ever given a           09:13:42
23 deposition before?              09:13:43
24   A.   No.                  09:13:44
25   Q.   Okay.  Have you ever testified   09:13:45

Page 14

1  under oath in any setting?                    09:13:46
2       A.   Not that I can recall.              09:13:47
3       Q.   Okay.  And you understand           09:13:51
4  you're under oath today?                      09:13:52
5       A.   Yes.                                09:13:53
6       Q.   Okay.  And I'm sure your            09:13:54
7  counsel has given you a preview of how        09:13:55
8  depositions proceed generally, but I'll just  09:13:59
9  give you a few ground rules.                  09:14:01
10      I will do my best not to talk            09:14:03
11 over you, and if you could reciprocate that,  09:14:06
12 that'll make for the court reporter to be     09:14:10
13 able to take down a good, clean transcript so 09:14:11
14 folks can understand what we're saying here   09:14:14
15 today if they ever choose to look at it down  09:14:16
16 the road.                                     09:14:19
17      I will try to make my questions          09:14:19
18 as clear as I can.  If they're in any way     09:14:21
19 unclear to you, please let me know, and I'll  09:14:26
20 try to clarify them.                          09:14:29
21      If you -- you know, if you               09:14:30
22 answer a question, I'll assume you understand 09:14:30
23 it and thought it was reasonably clear to     09:14:32
24 you.                                          09:14:35
25      Is that fair?                            09:14:35

Page 15

1       A.   Yes.                                09:14:35
2       Q.   If you need a break at any          09:14:36
3  point, just let me know, and we'll find a     09:14:39
4  convenient breaking spot.  We will take       09:14:42
5  regular breaks, approximately every hour or   09:14:44
6  so, in any event.                             09:14:46
7       The court reporter is here, of           09:14:47
8  course, making a transcript.  We also have    09:14:53
9  this on video.  There are various purposes in 09:14:56
10 the litigation that your testimony could be   09:14:59
11 used for in the future.  And if you have      09:15:00
12 any -- any questions regarding procedure at   09:15:07
13 all today, just feel free to let me know at   09:15:14
14 any point.                                    09:15:16
15      Today is not a memory test.              09:15:18
16 Many of the events we're going to be talking  09:15:20
17 about happened several years ago, and I       09:15:23
18 understand that, you know, your memory may     09:15:25
19 not be as clear on certain things as on       09:15:29
20 others.  That's perfectly natural, to be      09:15:31
21 expected.                                     09:15:35
22      In the course of the day you             09:15:35
23 may find that an answer that you gave         09:15:37
24 earlier, later on in the day you realize was  09:15:39
25 perhaps incomplete or could stand some        09:15:42

Page 16

1  embellishment.  If that's the case, please    09:15:46
2  let me know, and we'll be happy to            09:15:49
3  accommodate that as well.                     09:15:50
4       Okay?                                    09:15:52
5       A.   Okay.                               09:15:52
6       Q.   Are you taking any medications      09:15:53
7  that could impair your memory or ability to   09:15:54
8  testify accurately here today?                09:15:57
9       A.   No.                                 09:15:58
10      Q.   Great.                              09:16:00
11      And you're represented by                09:16:00
12 counsel here today, correct?                  09:16:03
13      A.   Yes, I am.                          09:16:05
14      Q.   And are you paying your counsel     09:16:05
15 for today's representation?                   09:16:08
16      A.   No, I am not.                       09:16:09
17      Q.   Okay.  Do you know who is           09:16:10
18 paying them?                                  09:16:12
19      A.   I assume Mallinckrodt.             09:16:12
20      Q.   Okay.  Let's go ahead and          09:16:14
21 mark...                                       09:16:22
22      (Mallinckrodt-Collier Exhibit 1         09:16:22
23      marked for identification.)             09:16:29
24 QUESTIONS BY MR. GOTTO:                       09:16:29
25      Q.   We've marked as Exhibit 1 the      09:16:41

Page 17

1  notice we served for today's deposition.      09:16:47
2       Have you seen this document             09:16:52
3  before?                                       09:16:52
4       A.   Yes, I did.                         09:16:52
5       Q.   Okay.  And when do you recall      09:16:53
6  seeing it for the first time?                 09:16:54
7       A.   Yesterday.                          09:16:54
8       Q.   Okay.  When did you first          09:16:55
9  become aware that there was a request to take 09:16:56
10 your deposition in this matter?               09:16:58
11      A.   About two months ago.              09:16:59
12      Q.   Did you undertake personally       09:17:05
13 any effort to locate documents that would be  09:17:08
14 responsive to the document request that's     09:17:15
15 included in the deposition notice?            09:17:17
16      A.   No, I don't recall having any      09:17:18
17 documents in my possession.  I retired when I 09:17:21
18 left Mallinckrodt.                            09:17:23
19      Q.   Okay.  And when did you leave      09:17:24
20 Mallinckrodt?                                 09:17:25
21      A.   February of 2015.                  09:17:25
22      Q.   Okay.  And at that point did       09:17:27
23 you take with you any of your -- any files    09:17:30
24 that you had maintained while you were at     09:17:33
25 Mallinckrodt?                                 09:17:35

Page 18

```
 1    A.   No.                        09:17:35
 2    Q.   Okay.  Any computer records,    09:17:36
 3  laptop, anything of that nature?    09:17:38
 4    A.   No.                        09:17:39
 5    Q.   Okay.  Did you -- while you    09:17:40
 6  were at Mallinckrodt, did you maintain    09:17:46
 7  personally any files -- and when I say    09:17:48
 8  "personally," I mean independent of your    09:17:51
 9  place of work.                     09:17:52
10        Did you maintain any files that    09:17:53
11  pertained to your work at Mallinckrodt?    09:17:55
12    A.   No, there were occasions when I    09:17:57
13  would do work from home on my computer, but I    09:18:01
14  would transfer it to my work computer and    09:18:03
15  send it to myself in e-mail or transfer it to    09:18:05
16  my work computer via USB hub.       09:18:07
17    Q.   Okay.  Great.              09:18:12
18        Did you ever use -- while you    09:18:12
19  were at Mallinckrodt, did you use any    09:18:13
20  personal e-mail accounts to communicate with    09:18:15
21  respect to professional activities?    09:18:19
22    A.   No.                        09:18:20
23    Q.   Did you use your phone to send    09:18:21
24  text messages that pertained to Mallinckrodt    09:18:28
25  business while you were at Mallinckrodt?    09:18:30
```

Page 19

```
 1    A.   I had a Mallinckrodt phone at    09:18:32
 2  the time, so I may have.           09:18:35
 3    Q.   Okay.  When you say "a      09:18:37
 4  Mallinckrodt phone," what do you mean by    09:18:38
 5  that?                            09:18:38
 6    A.   A company-issued phone that I    09:18:40
 7  returned.  It was company property.    09:18:42
 8    Q.   Okay.  Do you know who the    09:18:44
 9  cellular carrier was on that -- for that    09:18:46
10  phone?                           09:18:49
11    A.   Possibly AT&T, I think is who    09:18:50
12  was doing it.                    09:18:53
13    Q.   Okay.  It was an account that    09:18:53
14  Mallinckrodt handled, though, paid for, et    09:18:55
15  cetera?                          09:18:56
16    A.   Correct.                  09:18:56
17    Q.   Okay.  So you don't have any    09:18:57
18  records from that account; is that right?    09:18:58
19    A.   No, I do not.             09:19:00
20    Q.   Okay.  Do you know who at    09:19:01
21  Mallinckrodt would have any records that    09:19:08
22  exist today with respect to your    09:19:12
23  Mallinckrodt-issued phone account?    09:19:14
24    A.   No.                        09:19:16
25        MR. GOTTO:  Counsel, we would    09:19:21
```

Page 20

```
 1  ask if there are documents that    09:19:22
 2  pertain to Ms. Collier's           09:19:23
 3  Mallinckrodt-issued phone account,    09:19:26
 4  text messages, et cetera, that those    09:19:28
 5  be produced.                     09:19:30
 6        MR. O'CONNOR:  I understand the    09:19:30
 7  request.                         09:19:31
 8        MR. GOTTO:  Thank you.       09:19:32
 9  QUESTIONS BY MR. GOTTO:           09:19:32
10    Q.   Okay.  Ms. Collier, I'd like to    09:19:35
11  know what you did to prepare for today's    09:19:38
12  deposition.  I don't want you to divulge the    09:19:40
13  communications you had with any of your    09:19:43
14  counsel in giving me that description, but    09:19:47
15  perhaps you can tell me generally what you    09:19:50
16  did to prepare.                  09:19:52
17    A.   I had two meetings with general    09:19:52
18  counsel, one in October and another one just    09:19:55
19  yesterday.                       09:19:58
20    Q.   Okay.  And who was present at    09:19:59
21  those meetings?                  09:20:01
22    A.   Bill was the first meeting.  I    09:20:02
23  don't remember his last name.  And Andrew    09:20:05
24  O'Connor and Cassandra were at the second    09:20:07
25  meeting yesterday.               09:20:11
```

Page 21

```
 1    Q.   And Bill is an attorney?     09:20:11
 2    A.   Yes.                      09:20:12
 3    Q.   Okay.  A Ropes & Gray lawyer    09:20:13
 4  or --                            09:20:16
 5    A.   He's at Ropes & Gray, yes.    09:20:16
 6    Q.   Okay.  Great.              09:20:19
 7        Approximately how long did each    09:20:20
 8  one of those meetings last?        09:20:21
 9    A.   The first one was about six    09:20:22
10  hours, and yesterday was seven and a half.    09:20:24
11    Q.   Okay.  Independent of the    09:20:31
12  meetings with counsel, did you do anything    09:20:33
13  else to prepare for today's deposition?    09:20:35
14    A.   No, sir.                  09:20:37
15    Q.   Didn't review any documents?    09:20:37
16    A.   I don't have any to review.    09:20:39
17    Q.   Okay.  Have you spoken with    09:20:41
18  anyone who has given testimony in this    09:20:42
19  litigation with respect to the litigation?    09:20:48
20    A.   No, I have not.            09:20:49
21    Q.   Okay.  Have you reviewed any    09:20:51
22  transcripts of any depositions or any other    09:20:52
23  proceedings --                   09:20:55
24    A.   No.                        09:20:55
25    Q.   -- pertaining to -- okay --    09:20:56
```

Page 22

1    pertaining to this litigation?         09:20:58
2        A.    (Witness shakes head.)       09:21:00
3        Q.    In your meetings with counsel,   09:21:01
4    did you review any documents?          09:21:07
5        A.    Yes, I did.                   09:21:09
6        Q.    Okay.  Did any of those       09:21:10
7    documents refresh your recollection in any   09:21:11
8    regard?                                 09:21:14
9        A.    On some issues, yes.          09:21:14
10       Q.    What issues can you recall your   09:21:16
11   recollection being refreshed on?        09:21:18
12       A.    Some memos that were sent in   09:21:21
13   e-mail.                                 09:21:26
14       Q.    In terms of subject matter of   09:21:26
15   the nature of the issues that you were   09:21:28
16   refreshed on, do you have a recollection of   09:21:29
17   what those were?                        09:21:31
18       MR. O'CONNOR:  Objection.  I'm      09:21:32
19   going to instruct the witness not to    09:21:33
20   answer to the extent this is getting    09:21:34
21   into attorney-client communications     09:21:36
22   and work product.                       09:21:38
23       MR. GOTTO:  Well, I think if        09:21:39
24   they refreshed her recollection, we're   09:21:41
25   entitled to know the subject matter on   09:21:45

Page 23

1    which they refreshed her recollection,   09:21:46
2    which is --                             09:21:48
3        MR. O'CONNOR:  You can answer       09:21:48
4    at a very high level.                   09:21:49
5        THE WITNESS:  Sure.  Specific       09:21:50
6    customer meetings or specific customer   09:21:52
7    communication.                          09:21:54
8    QUESTIONS BY MR. GOTTO:                 09:21:55
9        Q.    Okay.  Do you remember what   09:21:55
10   customers?                              09:21:57
11       A.    Yes, I do.                    09:21:57
12       Q.    Which were they?              09:21:59
13       A.    KeySource and Masters were    09:22:00
14   mentioned in them.                      09:22:05
15       Q.    Okay.  Well, we'll be looking   09:22:05
16   at some documents today on each of those --   09:22:07
17       A.    Okay.                         09:22:09
18       Q.    -- and we can get into that in   09:22:10
19   some more detail at that point.         09:22:12
20       So the two -- the two meetings      09:22:14
21   you had with counsel were personal meetings,   09:22:17
22   not telephonic; is that right?          09:22:19
23       A.    They were personal.           09:22:21
24       Q.    Okay.  And did you have any    09:22:22
25   other telephonic meetings or conferences with   09:22:23

Page 24

1    counsel in preparation for the deposition?   09:22:29
2        A.    Not in preparation for the    09:22:30
3    deposition, no.                         09:22:31
4        Q.    Okay.  Have you reviewed the --   09:22:33
5    any of the complaints on file in this   09:22:38
6    litigation?                             09:22:41
7        A.    No, I knew that there was a    09:22:42
8    lawsuit.  I was aware there was a lawsuit,   09:22:45
9    but I haven't reviewed any of the materials.   09:22:46
10       Q.    Okay.  When did you first      09:22:49
11   become aware that this litigation was    09:22:50
12   pending?                                09:22:52
13       A.    I can't remember.  And I can't   09:22:53
14   remember how I found out either.        09:22:57
15       Q.    Okay.  Do you have an         09:22:59
16   understanding of the nature of the claims   09:23:03
17   that are asserted in the litigation?    09:23:05
18       A.    Yes, I do.                    09:23:07
19       Q.    And what's that understanding?   09:23:08
20       A.    My understanding is that      09:23:09
21   federal facilities and counties and states   09:23:13
22   are suing to -- because they believe there is   09:23:16
23   lack of diligence or something on behalf of   09:23:24
24   the companies and that they want to sue on   09:23:28
25   behalf of the counties for cost, for opioid   09:23:32

Page 25

1    abuse.                                  09:23:37
2        Q.    Do you have any personal       09:23:38
3    opinion as to the merits of any of those   09:23:40
4    claims?                                 09:23:43
5        A.    Yes, I do.                    09:23:44
6        Q.    What are those opinions?       09:23:46
7        A.    I think they're probably      09:23:48
8    overreaching and misguided.             09:23:53
9        Q.    Okay.  What do you base that   09:23:55
10   on?                                     09:23:57
11       A.    My knowledge of the industry.   09:23:57
12   And I don't have explicit knowledge about   09:24:00
13   abuse and how abuse occurs, but it's    09:24:02
14   basically on my knowledge of the industry and   09:24:05
15   some of the assertions that have been made.   09:24:07
16       Q.    Okay.  Are you being          09:24:10
17   compensated in any way for your testimony   09:24:19
18   here today?                             09:24:21
19       A.    No, I'm not.                  09:24:22
20       Q.    Are you being reimbursed for   09:24:23
21   any of your expenses?                   09:24:25
22       A.    For my $12 parking today, I    09:24:26
23   assume, yes.                            09:24:28
24       Q.    Okay.  Travel expense or hotel   09:24:29
25   or anything?                            09:24:32

Page 26

```
 1    A.   I live here, so there's no        09:24:34
 2  expense involved.                        09:24:36
 3    Q.   Okay.  Great.                      09:24:37
 4         I'd like to ask you just a         09:24:38
 5  little bit about your background.         09:24:43
 6         Could you describe generally       09:24:44
 7  your post-high school education?          09:24:45
 8    A.   Yes.  I have a master's --         09:24:46
 9  yeah, a master's in business administration, 09:24:48
10  a bachelor's in management, and those are my 09:24:53
11  two levels of education.                  09:24:58
12    Q.   Okay.  And from what              09:25:00
13  institutions did you receive those degrees? 09:25:02
14    A.   University of Phoenix in          09:25:04
15  Fountain Valley, California.              09:25:07
16    Q.   And approximately when did you     09:25:08
17  receive your degrees?                     09:25:09
18    A.   It's been a while.  23 years       09:25:11
19  ago I received my bachelor's, and 20 years  09:25:17
20  ago I received my master's.               09:25:21
21    Q.   Okay.  Great.                      09:25:23
22         Beyond your bachelor's and         09:25:24
23  master's programs, have you received any   09:25:29
24  other -- or participated in any other formal 09:25:37
25  post-high school courses of study?         09:25:40
```

Page 27

```
 1    A.   Well, I've attended other         09:25:42
 2  sessions on management and, you know,      09:25:46
 3  certification programs, but it's more      09:25:50
 4  continuing education for management and     09:25:53
 5  brushing up on skill sets, like that.      09:25:56
 6    Q.   Okay.  So apart from the           09:25:59
 7  bachelor's and master's programs, are those 09:26:02
 8  the -- were there any other times when you  09:26:05
 9  were -- considered yourself to be a full- or 09:26:08
10  part-time student --                       09:26:10
11    A.   No.                                09:26:11
12    Q.   -- post-high school?               09:26:11
13         Okay.  Do you hold any             09:26:13
14  professional licenses or certifications?    09:26:18
15    A.   No, I do not.                       09:26:19
16    Q.   Have you at any time?              09:26:20
17    A.   No.                                09:26:22
18    Q.   Okay.  And I'm sorry, you may      09:26:22
19  have already told me this, but what was your 09:26:28
20  undergraduate major?                       09:26:30
21    A.   Bachelor of arts in management.     09:26:31
22    Q.   Okay.  In either your             09:26:35
23  undergraduate or master's degree programs,  09:26:37
24  did you take any courses that dealt with the 09:26:41
25  Controlled Substances Act?                 09:26:47
```

Page 28

```
 1    A.   No.                                09:26:48
 2    Q.   Did you take any courses          09:26:49
 3  related to pharmaceuticals more generally?  09:26:53
 4    A.   No.                                09:26:57
 5    Q.   When you were pursuing your        09:26:57
 6  bachelor's or master's degrees, did you have 09:27:02
 7  an intent to pursue a career in the        09:27:06
 8  pharmaceutical industry?                    09:27:10
 9    A.   I was already in the              09:27:10
10  pharmaceutical industry.  I just was pursuing 09:27:12
11  my degree to round out my education and to be 09:27:15
12  a better manager.                           09:27:18
13    Q.   Okay.  Well, then let's go         09:27:20
14  back.  Tell me when you first became involved 09:27:21
15  in any position in the pharmaceutical       09:27:23
16  industry.                                   09:27:25
17    A.   That was all the way back to       09:27:25
18  1975.  I worked in a drugstore.  From the   09:27:29
19  drugstore, I worked for a drug wholesaler,  09:27:34
20  and from the drug wholesaler, I went to work 09:27:36
21  for a pharmaceutical company.               09:27:38
22         And so I stayed in the            09:27:39
23  pharmaceutical company, went back to work for 09:27:40
24  a drug wholesaler, then worked for another   09:27:42
25  pharmaceutical company.                     09:27:47
```

Page 29

```
 1    Q.   Okay.  So fair to say that when    09:27:48
 2  you were pursuing your bachelor's and       09:27:51
 3  master's degrees, you were anticipating     09:27:52
 4  future employment in the pharmaceutical     09:27:56
 5  industry?                                   09:27:57
 6    A.   I was anticipating staying in      09:27:59
 7  the pharmaceutical industry.                09:28:02
 8    Q.   Okay.  So were you continued --    09:28:03
 9  were you employed while you were pursuing    09:28:07
10  your degrees?                               09:28:08
11    A.   Yes, I was.                         09:28:09
12    Q.   I see.  Okay.  Okay.  Thank        09:28:10
13  you.                                        09:28:11
14         So by whom were you employed at    09:28:11
15  that time?                                  09:28:15
16    A.   When I finished my degree, I       09:28:15
17  was employed with Schein Pharmaceutical.     09:28:16
18    Q.   And what position did you have?    09:28:20
19    A.   Product manager and national       09:28:22
20  account manager.                            09:28:24
21    Q.   Okay.  So product manager, what    09:28:25
22  does that mean in the pharmaceutical        09:28:28
23  industry?                                   09:28:30
24    A.   For a generic drug company,        09:28:30
25  it's a little bit different.  For generics,  09:28:32
```

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  product management means forecasting, pricing   09:28:34
2  strategy, working with the national account   09:28:43
3  managers on customer strategy.   09:28:45
4      Q.    And when you said it's a little   09:28:46
5  different in generics, did you mean that you   09:28:51
6  were in a branded manufacturer at the time?   09:28:52
7      A.    No, I was always with the   09:28:57
8  generic side.   09:28:59
9      Q.    Okay.  Okay.  Including at   09:29:00
10  Mallinckrodt?   09:29:01
11      A.    Correct.   09:29:02
12          At Elan, I did one branded   09:29:03
13  product that was nonpromoted, and so there   09:29:06
14  was one brand product in my background.   09:29:09
15      Q.    Okay.  And so you indicated you   09:29:12
16  were both a product manager and a national   09:29:15
17  account manager.   09:29:16
18          What is a national account   09:29:17
19  manager responsible for, typically, in the   09:29:20
20  generic industry?   09:29:22
21      A.    A national account manager   09:29:22
22  works with key accounts, largest accounts,   09:29:24
23  national accounts, and negotiates contracts,   09:29:27
24  works on behalf of the customer to ensure   09:29:30
25  that they're getting all that they need taken   09:29:33

Page 31

1  care of, and it also -- they also would   09:29:34
2  negotiate pricing and determine who the   09:29:38
3  incumbent competitor is and try and displace   09:29:41
4  the incumbent competitor.   09:29:44
5      Q.    Okay.  So in your career in the   09:29:49
6  pharmaceutical industry, when did you -- when   09:29:54
7  were you first in a position that involved   09:29:58
8  responsibilities with respect to   09:30:04
9  pharmaceuticals that were scheduled under the   09:30:06
10  Controlled Substances Act?   09:30:09
11      A.    When I was working at Schein   09:30:10
12  Pharmaceutical, we sold some narcotics, and I   09:30:14
13  was product manager for them and sold them as   09:30:16
14  a national account manager.   09:30:17
15      Q.    Okay.  So when did you start at   09:30:19
16  Schein?   09:30:20
17      A.    I believe it was 1980, early   09:30:21
18  1980s.   09:30:29
19      Q.    Okay.  And did you have   09:30:30
20  occasion to become familiar with any aspect   09:30:32
21  of the regulatory requirements imposed under   09:30:36
22  the Controlled Substances Act while you were   09:30:40
23  at Schein?   09:30:42
24      A.    No.   09:30:43
25      Q.    Did Schein have a compliance   09:30:45

Page 32

1  department or other division that was   09:30:52
2  responsible for regulatory compliance?   09:30:54
3      A.    I don't know that.  It's not   09:30:56
4  anyone I interacted with or remember   09:30:59
5  interacting with.   09:31:02
6      Q.    Okay.  You were aware, though,   09:31:03
7  that the narcotics that Schein was   09:31:04
8  distributing were scheduled under the   09:31:06
9  Controlled Substances Act?   09:31:10
10      A.    That, I don't know.   09:31:10
11      Q.    Okay.  You know it now, but you   09:31:12
12  don't know if you were aware of it then?   09:31:15
13      A.    Correct.   09:31:17
14      Q.    Okay.  Did you stay at Schein   09:31:18
15  after you got your master's degree?   09:31:24
16      A.    Yes, I did.   09:31:26
17      Q.    And for how long?   09:31:26
18      A.    For a brief period.  And I got   09:31:27
19  promoted during that time and moved into the   09:31:30
20  home office.  That's when I became a product   09:31:33
21  manager, right after graduation, and I worked   09:31:36
22  there for a brief period.   09:31:38
23          Then they were acquired by   09:31:41
24  Watson, and then I stayed with Watson for a   09:31:43
25  brief period and left there.   09:31:46

Page 33

1      Q.    Okay.  And during the period   09:31:47
2  you were at Watson, did you continue to be a   09:31:48
3  product manager?   09:31:51
4      A.    Yes.   09:31:51
5      Q.    Okay.  And when you left   09:31:52
6  Watson, where did you go from there?   09:31:54
7      A.    I went to Baxter -- oh,   09:31:55
8  actually, excuse me, I went to Elan for a   09:32:01
9  very brief period, only six months or seven   09:32:04
10  months.  I went to Elan; they were a business   09:32:06
11  partner of Watson.  I went to work for them   09:32:09
12  in a specialty position, in product   09:32:11
13  management, basically, but it was more   09:32:13
14  working with their business partners.  So I   09:32:15
15  didn't manage the products, per se, but I   09:32:18
16  worked with them on that side of the   09:32:19
17  business.   09:32:22
18      Q.    And so what was the nature of   09:32:22
19  your responsibilities in this specialty   09:32:25
20  product manager position?   09:32:28
21      A.    It was any products that they   09:32:29
22  were not promoting for generics and -- that   09:32:32
23  became genericized, I would help them figure   09:32:37
24  out a strategy.   09:32:40
25          The other thing that I would do   09:32:42

Page 34

1    is I worked with -- did the analytics on      09:32:43
2    business partners to make sure that Elan was   09:32:46
3    correctly getting the amount owed to them in   09:32:48
4    the alliance, because we had profit share      09:32:53
5    arrangements, and so I had to review.          09:32:55
6    Because as a -- in a generic sector, if        09:32:57
7    you've doing this a little while, you realize  09:32:59
8    it's very complicated in the pricing.  So I    09:33:01
9    had to help them analyze the pricing and make  09:33:03
10   sure that they -- the rebates, discounts and   09:33:05
11   allowances were being calculated properly.     09:33:07
12       Q.    And after you left Elan, where       09:33:13
13   did you go?                                     09:33:15
14       A.    I went to Baxter.                     09:33:16
15       Q.    Okay.  And what was your             09:33:17
16   position at Baxter?                             09:33:18
17       A.    Director of marketing.               09:33:19
18       Q.    How long were you at Baxter?         09:33:21
19       A.    I was at Baxter two years.           09:33:25
20       Q.    What was your reason for            09:33:26
21   leaving Elan and joining Baxter?               09:33:28
22       A.    Elan terminated my position.        09:33:30
23       Q.    And do you know the reason for      09:33:32
24   that?                                          09:33:33
25       A.    They were moving the                09:33:34

Page 35

1    facilities.  They were selling off the entire  09:33:36
2    facility, and everybody was let go.            09:33:38
3        Q.    Okay.  So you went to Baxter         09:33:40
4    and you were director of marketing?            09:33:43
5        A.    Correct.                             09:33:46
6        Q.    So tell me generally what your       09:33:46
7    responsibilities were as director of           09:33:48
8    marketing at Baxter.                           09:33:50
9        A.    Again, it was a generic              09:33:52
10   division of Baxter.  It sold -- we sold        09:33:54
11   injectables, and so it was working with        09:33:56
12   customers on the contracts.  The NAMs would    09:33:59
13   come up with contracts, and I would review     09:34:02
14   the contracts and adjust any terms and         09:34:04
15   conditions that I didn't think that we could   09:34:06
16   honor or that were too costly for the          09:34:09
17   company.                                       09:34:12
18          And my team was responsible for       09:34:12
19   forecasting any programs that we had to        09:34:14
20   ensure the compliance to the contracts, and   09:34:18
21   then forecasting and pricing.                  09:34:22
22       Q.    Okay.  And you used the acronym      09:34:26
23   NAMs.  Is that national account manager?       09:34:29
24       A.    National account manager, I'm        09:34:32
25   sorry.                                         09:34:35

Page 36

1        Q.    Great.  Thank you.                   09:34:35
2          You indicated Baxter sold              09:34:38
3    injectables.  What type of medication?         09:34:40
4        A.    Anesthesia products primarily,       09:34:43
5    and things used in the operating room or       09:34:47
6    surgical procedures.                           09:34:50
7        Q.    Okay.                                 09:34:52
8        A.    Post and preop.                       09:34:52
9        Q.    Okay.  So these were not             09:34:53
10   Controlled Substances Act scheduled            09:34:55
11   materials, correct?                            09:34:56
12       A.    We had some schedule drugs, but      09:34:57
13   I'm not sure which fell under the purview of   09:35:03
14   the Controlled Substances Act.                 09:35:06
15       Q.    Okay.  So while you were at          09:35:07
16   Baxter, did you have occasion to become        09:35:08
17   familiar with any of the regulatory            09:35:10
18   requirements imposed by the Controlled         09:35:13
19   Substances Act?                                09:35:15
20       A.    No.                                   09:35:15
21       Q.    Okay.  And you were at Baxter        09:35:16
22   for a couple of years; is that what you        09:35:19
23   indicated?                                     09:35:21
24       A.    Yes.                                  09:35:21
25       Q.    Okay.  And where did you go          09:35:21

Page 37

1    from Baxter?                                   09:35:22
2        A.    I went to Baxter, then I moved       09:35:24
3    to Virginia, and I went to work for McKesson  09:35:29
4    medical/surgical.                              09:35:33
5        Q.    And what was your reason for         09:35:34
6    leaving Baxter and going to McKesson?          09:35:35
7        A.    My husband retired, and I got        09:35:36
8    an opportunity at McKesson med/surg.           09:35:39
9        Q.    And what position did you have       09:35:43
10   at McKesson?                                   09:35:45
11       A.    Director of marketing.               09:35:45
12       Q.    Okay.  Were your                      09:35:46
13   responsibilities at McKesson similar to the   09:35:49
14   responsibilities you had at Baxter?            09:35:52
15       A.    No, McKesson's different.  They      09:35:53
16   work with the vendors, so my job there was to 09:35:55
17   work with various vendors to negotiate         09:35:58
18   contracts, bring in new products, help the    09:36:02
19   team.  Because it was different than the way   09:36:10
20   McKesson operated because they're a little     09:36:13
21   more independent, and then worked with them    09:36:15
22   on understanding how contracts work and        09:36:17
23   contract administration and chargebacks and   09:36:20
24   everything else.                               09:36:22
25          So I worked -- I helped the           09:36:23

Page 38

1  team work on their programs to improve what      09:36:25
2  they were doing in Virginia.                     09:36:27
3      Q.  Okay.  You've used the term              09:36:29
4  "chargebacks" a couple of times.                 09:36:31
5          What do you mean by chargeback?          09:36:32
6      A.  Well, in the industry, in order          09:36:33
7  to sell to everybody at a certain price --       09:36:35
8  everybody has different prices based on          09:36:39
9  different terms that they have and what value    09:36:42
10 they can bring to the company, so you            09:36:44
11 negotiate with them on pricing.                  09:36:45
12         So CVS and Rite Aid might have           09:36:47
13 two different prices.  Well, McKesson's not      09:36:50
14 going to know what that pricing -- they're       09:36:53
15 not going to sell -- we're not going to sell     09:36:55
16 to McKesson at that.  We have to have a          09:36:57
17 threshold.  So wholesale acquisition cost is     09:36:59
18 that threshold.  So everybody buys at one        09:37:01
19 price for which we can administer contracts.     09:37:04
20         After that, if we sell to CVS            09:37:07
21 for a certain price, then -- McKesson might      09:37:10
22 have paid $20, but the contract price that       09:37:12
23 they sell it to CVS for might be 7.50, so        09:37:14
24 they have to issue a chargeback.  They charge    09:37:18
25 us back for the difference between the list      09:37:21

Page 39

1  price of WAC, we call it, and the contract       09:37:22
2  price.                                           09:37:25
3      Q.  Okay.  And when you were using           09:37:25
4  the pronoun "us" in sitting, "charge us          09:37:27
5  back," "us" is the manufacturer?                 09:37:32
6      A.  Yes, sir.                                09:37:33
7      Q.  Okay.  And McKesson was not a            09:37:34
8  manufacturer when you were there; is that        09:37:37
9  correct?                                         09:37:37
10     A.  Correct.                                 09:37:38
11     Q.  Okay.  They were a distributor?          09:37:38
12     A.  However, McKesson had to issue           09:37:43
13 chargebacks, so we had to set up the system      09:37:55
14 so that when the vendors needed to get their     09:37:47
15 money back, we could do that.  So we were        09:37:49
16 working through getting that system set up.      09:37:51
17     Q.  Okay.  How long were you at              09:37:57
18 McKesson?                                        09:38:01
19     A.  I think I was there two years.           09:38:02
20     Q.  And during your time at                  09:38:06
21 McKesson, did you have occasion to become        09:38:10
22 familiar with any of the regulatory              09:38:13
23 requirements under the Controlled Substances     09:38:15
24 Act?                                             09:38:16
25     A.  No, we weren't distributing any          09:38:16

Page 40

1  controlled substances there.                     09:38:19
2      Q.  Okay.                                    09:38:20
3      A.  That I remember.                         09:38:20
4      Q.  Okay.  So approximately, just            09:38:21
5  so we have some dates -- and I realize -- you    09:38:23
6  know, they don't have to be precise.             09:38:25
7  Approximately when you were at Baxter and        09:38:27
8  then at McKesson?                                09:38:29
9      A.  I was at McKesson from 1997 --           09:38:31
10 wait a minute -- 2007, excuse me, 2007 to        09:38:36
11 2000 -- let me back up.  I have to work          09:38:43
12 backwards.  I'm sorry.                           09:38:47
13         Do you happen to have my                 09:38:48
14 résumé?  Because that would help.                09:38:50
15     Q.  I have your -- your offer               09:38:52
16 letter from Mallinckrodt.                        09:38:54
17     A.  Yes.                                     09:38:57
18     Q.  And I believe it's in 2009, if          09:38:57
19 that helps.                                      09:38:59
20     A.  Right.  I started at                     09:38:59
21 Mallinckrodt in 2009, and I was with            09:39:01
22 GeneraMedix from 2004.  That's it.  So I was    09:39:03
23 with McKesson from 2002 to 2004, and with       09:39:06
24 Baxter about 2000 to 2002.                       09:39:15
25     Q.  Okay.  Great.                            09:39:19

Page 41

1          And so when you left McKesson,           09:39:20
2  you went where?                                  09:39:23
3      A.  To GeneraMedix.                          09:39:24
4      Q.  And what position did you hold           09:39:27
5  there?                                           09:39:31
6      A.  Vice president of marketing.             09:39:31
7      Q.  And just describe generally             09:39:33
8  what your responsibilities were at              09:39:41
9  GeneraMedix.                                    09:39:43
10     A.  GeneraMedix was a startup               09:39:44
11 company.  It was an injectable company          09:39:44
12 started by the president -- former president    09:39:46
13 of Baxter, and so I was helping him set         09:39:47
14 strategy for the company, what products would   09:39:51
15 we want to bring in, what customers would we    09:39:53
16 work with, and, again, reviewing contracts,     09:39:57
17 setting strategy, pricing, and then mostly      09:40:01
18 managing the portfolio.                         09:40:05
19     Q.  Okay.  And how long were you at         09:40:07
20 GeneraMedix?                                     09:40:12
21     A.  Five years.                             09:40:13
22     Q.  Okay.  Until you went to                09:40:14
23 Mallinckrodt?                                    09:40:17
24     A.  Correct.                                 09:40:17
25     Q.  Okay.  What was your reason for         09:40:17

Page 42

1  leaving McKesson and joining GeneraMedix?   09:40:20
2      A.   Because the former president of   09:40:21
3  Baxter called me and asked me if I would be   09:40:23
4  interested with working with him, and it was   09:40:27
5  a startup company, so I had options available   09:40:28
6  to me, which was desirable.   09:40:31
7      Q.   Okay.  During your time at   09:40:32
8  GeneraMedix, did you have occasion to become   09:40:34
9  familiar with any of the regulatory   09:40:36
10 requirements under the Controlled Substances   09:40:37
11 Act?   09:40:38
12     A.   No, we didn't sell any   09:40:38
13 controlled substances.   09:40:40
14     Q.   Okay.  And in 2009, you left   09:40:42
15 GeneraMedix and joined Mallinckrodt, correct?   09:40:46
16     A.   Correct.   09:40:48
17     Q.   What was your reason for making   09:40:48
18 that move?   09:40:49
19     A.   GeneraMedix sold as a startup,   09:40:50
20 that's what we do, and so I got the   09:40:53
21 company.  I'm from St. Louis, so I got the   09:40:55
22 opportunity to move home and work with   09:40:57
23 Mallinckrodt with my former boss.   09:40:59
24     Q.   Okay.  Great.   09:41:01
25         (Mallinckrodt-Collier Exhibit 2   09:41:35

Page 43

1         marked for identification.)   09:41:36
2  QUESTIONS BY MR. GOTTO:   09:41:36
3      Q.   Ms. Collier, we've marked as   09:41:37
4  Exhibit 2 what I believe is a copy of your   09:41:38
5  offer letter from Mallinckrodt.  It's a   09:41:45
6  multipage document that begins at   09:41:47
7  MNK-T1_0007277843.   09:41:51
8         If you could take a moment and   09:41:55
9  look through that document and tell me if you   09:41:56
10 recognize it.   09:42:01
11     A.   Yes, I recognize this.   09:42:01
12     Q.   Okay.  And this was your offer   09:42:06
13 letter when you joined Mallinckrodt?   09:42:07
14     A.   Yes.   09:42:08
15     Q.   Okay.  This indicates your   09:42:09
16 starting salary was an annual salary of   09:42:20
17 $▓▓▓▓▓ when you began.   09:42:23
18         Is that consistent with your   09:42:25
19 recollection?   09:42:26
20     A.   Yes.   09:42:26
21     Q.   Okay.  And you were also   09:42:27
22 eligible to participate in an annual   09:42:30
23 incentive plan, correct?   09:42:33
24     A.   Correct.   09:42:34
25     Q.   And as well as the company's   09:42:34

Page 44

1  long-term incentive plan, correct?   09:42:38
2      A.   Correct.   09:42:40
3      Q.   How long did you stay at   09:42:40
4  Mallinckrodt?   09:42:44
5      A.   Five years.   09:42:44
6      Q.   Okay.  And I say   09:42:46
7  "Mallinckrodt."  I see that the letterhead   09:42:49
8  actually says "Covidien."  In 2009, was there   09:42:50
9  a distinction in your mind between   09:42:53
10 Mallinckrodt and Covidien?   09:42:55
11     A.   No.  Covidien owned   09:42:56
12 Mallinckrodt, and we kept the Mallinckrodt   09:43:00
13 name on the product.   09:43:02
14     Q.   Okay.  During your period at   09:43:03
15 Mallinckrodt, did your compensation change?   09:43:10
16     A.   Yes, it did.   09:43:12
17     Q.   And can you describe for me   09:43:13
18 approximately how -- the manners in which it   09:43:15
19 changed?   09:43:18
20     A.   Well, I got an increase when I   09:43:18
21 became a senior director of marketing.   09:43:21
22 They -- Mallinckrodt reviewed all the   09:43:23
23 employees and corrected salaries for those   09:43:25
24 that were started at a lower base, and I got   09:43:29
25 moved to be called a senior director.  And my   09:43:32

Page 45

1  salary eventually, when I left, was 203,000 a   09:43:35
2  year.   09:43:39
3      Q.   Okay.  When did you become a   09:43:40
4  senior director?   09:43:42
5      A.   That had to be probably in   09:43:43
6  2010, 2011 time frame.   09:43:47
7      Q.   Were you a corporate officer?   09:43:49
8      A.   No, I was not.   09:43:53
9      Q.   Were you at any time a member   09:43:54
10 of any committees at Mallinckrodt for any   09:44:01
11 period of time?   09:44:13
12         MR. O'CONNOR:  Object to form.   09:44:13
13         THE WITNESS:  Probably -- they   09:44:15
14 had a lot of committees, so I guess I   09:44:16
15 would need to understand what   09:44:18
16 specifically you're looking for.   09:44:19
17 QUESTIONS BY MR. GOTTO:   09:44:20
18     Q.   Sure.  Sure.   09:44:20
19         Any formal committee that met   09:44:21
20 on a regular schedule with agendas,   09:44:26
21 maintained minutes, that sort of thing?   09:44:30
22     A.   Most of them were informal   09:44:33
23 committees, and I don't remember them having   09:44:35
24 a lot of committees with minutes.  We're kind   09:44:38
25 of not as well-coordinated as we should have   09:44:43

Page 46

```
 1   been in that effect, but there were        09:44:46
 2   committees.                                 09:44:48
 3           I remember being on the             09:44:49
 4   committee, for example, we were doing       09:44:51
 5   serialization. It's a new regulation that's 09:44:56
 6   come up, and so they asked me to be part of 09:44:59
 7   that from a customer representative         09:45:01
 8   perspective.                                09:45:03
 9           So I didn't participate in all      09:45:03
10   the meetings, even when I was on committees, 09:45:05
11   because I was very busy, and so I asked only 09:45:08
12   to be included when it was absolutely       09:45:10
13   necessary to include me.                    09:45:11
14       Q.   Okay. Do you recall being on       09:45:13
15   any committees, formal or informal, that had 09:45:15
16   any responsibilities with respect to        09:45:19
17   compliance with any requirements under the  09:45:23
18   Controlled Substances Act?                  09:45:26
19       A.   I was on an SOM committee,          09:45:26
20   which was about the development of the      09:45:30
21   suspicious order monitoring, as a peripheral 09:45:33
22   partner on that.                            09:45:38
23       Q.   And what do you mean by that?       09:45:39
24       A.   It means that I offered advice      09:45:41
25   on customer reporting, customer information, 09:45:44
```

Page 47

```
 1   but I was not part of the establishment of  09:45:48
 2   rules, policies, things of that nature.     09:45:52
 3       Q.   Okay. And do you recall            09:45:55
 4   approximately when you were on that         09:45:57
 5   committee?                                  09:45:58
 6       A.   Probably 2012 or 2013.             09:45:59
 7       Q.   Okay. For approximately what       09:46:05
 8   period of time, if you recall?             09:46:08
 9       A.   I don't recall.                     09:46:09
10       Q.   Okay. Did you attend meetings      09:46:11
11   of that committee?                          09:46:13
12       A.   Yes.                                09:46:14
13       Q.   Okay. And you indicated you        09:46:16
14   offered advice on customer reporting and    09:46:18
15   customer information.                       09:46:20
16           What sort of advice can you         09:46:21
17   recall offering?                            09:46:24
18       A.   Well, we would get IMS data,        09:46:24
19   which is industry reporting, so we could pull 09:46:29
20   industry reporting data in certain formats. 09:46:31
21   I understood how the chargeback            09:46:35
22   process worked. Not necessarily had        09:46:38
23   responsibility for the chargebacks, but I   09:46:40
24   understood how the process worked. So I     09:46:43
25   would offer guidance on that on why we would 09:46:45
```

Page 48

```
 1   receive a chargeback or not receive a       09:46:47
 2   chargeback in certain instances.            09:46:49
 3       Q.   Okay. And did you have an          09:46:51
 4   understanding as to the interplay between   09:46:54
 5   chargebacks and the suspicious order        09:47:00
 6   monitoring program?                         09:47:03
 7           MR. O'CONNOR:  Object to form.      09:47:03
 8           THE WITNESS:  Yes.                  09:47:05
 9   QUESTIONS BY MR. GOTTO:                     09:47:06
10       Q.   And what was that?                 09:47:07
11       A.   What was -- I'm sorry, please      09:47:08
12   explain your question.                      09:47:12
13       Q.   Sure.                              09:47:13
14           You mentioned in terms of --        09:47:13
15   part of the information you provided to the 09:47:16
16   SOM committee that you were part of related 09:47:18
17   to the chargeback process, and so my question 09:47:21
18   was what your understanding was of the      09:47:24
19   interplay between the chargeback process and 09:47:26
20   the SOM process.                            09:47:28
21           MR. O'CONNOR:  Same objection.      09:47:30
22           THE WITNESS:  I honestly don't      09:47:30
23       know, because I would explain to them   09:47:32
24       how it worked and what we could         09:47:34
25       possibly -- information we could pull,  09:47:36
```

Page 49

```
 1   and then it was up to the SOM team to       09:47:38
 2   decide how to use that data and what        09:47:40
 3   to look at.                                 09:47:42
 4   QUESTIONS BY MR. GOTTO:                     09:47:43
 5       Q.   Okay. And so did you provide       09:47:43
 6   that information with respect to the        09:47:45
 7   chargeback process pursuant to a request you 09:47:46
 8   received from the committee?                09:47:51
 9       A.   No, actually one of that was       09:47:52
10   volunteered earlier on.                     09:47:54
11       Q.   Okay. And what was your           09:47:57
12   reasoning for volunteering that information 09:47:58
13   to the SOM committee?                       09:48:00
14       A.   Because during the Sunrise         09:48:01
15   Medical -- there were rumors that Sunrise   09:48:06
16   Medical had a problem with the DEA, and one 09:48:10
17   of my employees was able to -- I don't want 09:48:11
18   to say it's a backdoor, but she got into the 09:48:16
19   system, or hacked, I don't know how you say 09:48:20
20   it, but she figured out a way to get into the 09:48:21
21   contract admin system and pull reports and  09:48:26
22   look for specific -- very specific data     09:48:27
23   related to Sunrise.                         09:48:29
24           And so when we showed that to       09:48:30
25   the compliance team, they asked us, how can 09:48:35
```

Page 50

1  we do this on a regular basis, what      09:48:40
2  information you get, how do we pull      09:48:42
3  information.      09:48:44
4      And so we provided them      09:48:44
5  guidance because we certainly couldn't do it   09:48:46
6  ourselves on a regular basis. It was just   09:48:48
7  too much data.      09:48:51
8      Q.   And so which employee was it   09:48:51
9  who got this Sunrise data?      09:48:53
10     A.   Kate Neely. Kate Muhlenkamp at   09:48:55
11 the time.      09:49:02
12     Q.   Okay. That's the same person,   09:49:02
13 Kate Neely?      09:49:03
14     A.   Yes.      09:49:06
15     Q.   Okay. Great.      09:49:07
16     So Ms. Neely -- you used the   09:49:09
17 word "hacked." I'm sure you didn't mean to   09:49:12
18 suggest she did anything improper?   09:49:15
19     A.   Not illegal, but, yeah, just   09:49:16
20 outside company norms.      09:49:18
21     Q.   So the information that   09:49:20
22 she obtained was information that   09:49:22
23 Mallinckrodt maintained internally, correct?   09:49:24
24     A.   It was -- yes, it was in the   09:49:26
25 system.      09:49:27

Page 51

1      Q.   And do you know how she --   09:49:28
2  well, did you instruct her to attempt to   09:49:32
3  access that information?      09:49:37
4      MR. O'CONNOR: Object to form.   09:49:38
5      THE WITNESS: No.      09:49:39
6  QUESTIONS BY MR. GOTTO:      09:49:39
7      Q.   Do you know -- go ahead.   09:49:40
8      A.   No, I did not instruct her.   09:49:40
9      Q.   Okay. Was it her idea?   09:49:43
10     A.   Yes.      09:49:44
11     Q.   Okay. Do you know how she --   09:49:45
12 how she came to believe that that information   09:49:47
13 might be accessible in some fashion?   09:49:51
14     A.   She may have told me --   09:49:53
15     MR. O'CONNOR: Objection.   09:49:53
16     THE WITNESS: Oh, I'm sorry.   09:49:54
17     She may have told me, and I   09:49:55
18 would not remember --      09:49:57
19 QUESTIONS BY MR. GOTTO:      09:49:58
20     Q.   Okay.      09:49:58
21     A.   -- what she did because it was   09:49:59
22 over my head.      09:50:00
23     Q.   Okay. Did she -- before   09:50:01
24 seeking to access the information, did she   09:50:04
25 discuss that with you at all?      09:50:06

Page 52

1      A.   Yes.      09:50:08
2      Q.   Okay. And what can you recall   09:50:10
3  about her raising that with you?   09:50:13
4      A.   She said, well, I can pull   09:50:14
5  their chargeback data, but we wouldn't know   09:50:17
6  what to look for because chargeback data is   09:50:20
7  voluminous. There's so much information,   09:50:25
8  unless you're looking specifically for   09:50:26
9  something at a specific point in time, you're   09:50:27
10 not going to be able to tease it out.   09:50:30
11     So she told me this, that she   09:50:33
12 could get that, but we didn't know what to   09:50:37
13 look for. So we decided to look for specific   09:50:39
14 words and query the system for that.   09:50:43
15     Q.   Okay. What types of words did   09:50:45
16 you look for?      09:50:47
17     A.   "Doctor" or "MD."      09:50:47
18     Q.   Okay. And why did you choose   09:50:49
19 those words to look for?      09:50:55
20     A.   Because from what we were   09:50:56
21 reading, it sounded as if Sunrise Medical was   09:50:58
22 in trouble for selling to doctors in Florida.   09:51:01
23 And if that's a problem, then we need to   09:51:08
24 understand that and why.      09:51:10
25     Q.   Okay. And when you say   09:51:11

Page 53

1  "reading," do you mean in press accounts?   09:51:13
2      A.   Yes. I don't remember exactly   09:51:15
3  where the information came from, but I do   09:51:17
4  remember seeing that they were in trouble for   09:51:19
5  that.      09:51:21
6      Q.   Okay. Do you recall how the   09:51:22
7  Sunrise issues with the DEA first came to   09:51:32
8  your attention?      09:51:34
9      MR. O'CONNOR: Object to form.   09:51:35
10     THE WITNESS: I believe they   09:51:37
11     came from Victor Borelli, one of our   09:51:39
12     national account managers.      09:51:44
13 QUESTIONS BY MR. GOTTO:      09:51:45
14     Q.   Okay. So the chargeback data   09:51:48
15 that Ms. Muhlenkamp was able to access,   09:51:50
16 what's the nature of the information that's   09:51:56
17 contained there?      09:51:58
18     A.   From what I know, because it's   09:52:00
19 limited in the amount of information that I   09:52:04
20 get, but there's standard forms that are   09:52:07
21 transferred back and forth between the   09:52:09
22 wholesaler/distributor and the vendor. And   09:52:11
23 so from what I've seen, it contains the   09:52:14
24 customer name, the pharmacy or physician, in   09:52:16
25 the cases there's a physician dispensing, the   09:52:21

Page 54

1  address to which it was shipped, the state,    09:52:30
2  you know, obviously, in the address, and the    09:52:33
3  quantity that they purchased and the amount    09:52:34
4  of the debit memo that they're requesting.    09:52:35
5  So if there were ten units, then the    09:52:40
6  chargeback amount was $10 per unit, then it's    09:52:43
7  a hundred dollars.    09:52:45
8      Q.   Okay.  And again, the "they" in    09:52:46
9  this context would be the distributor that    09:52:48
10 was --    09:52:49
11     A.   And the wholesaler, yes.    09:52:49
12     Q.   Okay.  And so it would be data    09:52:51
13 that would show -- so Mallinckrodt -- let me    09:52:53
14 back up.  Strike that.    09:52:55
15         So Mallinckrodt's customer in    09:52:56
16 this setting is a distributor or a    09:52:57
17 wholesaler, correct?    09:52:59
18     A.   Correct.    09:53:00
19     Q.   And then the chargeback data    09:53:00
20 would have information regarding whom the    09:53:03
21 ultimate customer of that wholesaler or    09:53:07
22 distributor was, correct?    09:53:10
23         MR. O'CONNOR:  Objection.    09:53:11
24         MS. DURFEE:  Objection.    09:53:13
25         THE WITNESS:  I want to be    09:53:14

Page 55

1  clear:  You don't always know who the    09:53:15
2  ultimate customer is, so it would    09:53:18
3  contain information about who    09:53:20
4  purchased that particular product on    09:53:23
5  that date.    09:53:25
6  QUESTIONS BY MR. GOTTO:    09:53:25
7      Q.   Okay.  So strike the word    09:53:26
8  "ultimate" from my question.    09:53:28
9         The chargeback information    09:53:30
10 would include information regarding the    09:53:31
11 identity of the -- of the customer of    09:53:34
12 Mallinckrodt's customer, correct?    09:53:37
13         MS. DURFEE:  Objection.  Form.    09:53:39
14         THE WITNESS:  Yes.    09:53:41
15 QUESTIONS BY MR. GOTTO:    09:53:41
16     Q.   Okay.  And I think we'll look    09:53:42
17 at some documents in a bit regarding Sunrise.    09:53:49
18         Do you have a recollection of    09:53:53
19 the approximate time frame when    09:53:56
20 Ms. Muhlenkamp accessed this information?    09:53:59
21     A.   I believe it was around 2010.    09:54:01
22 It was probably in the first half of 2010.    09:54:03
23     Q.   Okay.  And do you know if prior    09:54:06
24 to Ms. Muhlenkamp accessing that information,    09:54:09
25 do you know if anyone at Mallinckrodt had    09:54:14

Page 56

1  previously used chargeback data in connection    09:54:17
2  with any suspicious order monitoring program?    09:54:20
3      A.   I was not --    09:54:23
4         MR. O'CONNOR:  Object to form.    09:54:23
5         THE WITNESS:  I was not aware    09:54:24
6  of that.    09:54:25
7  QUESTIONS BY MR. GOTTO:    09:54:25
8      Q.   Do you know if there came to be    09:54:29
9  a time when Mallinckrodt regularly used    09:54:33
10 chargeback data as part of its suspicious    09:54:36
11 order monitoring?    09:54:40
12     A.   I was not aware of what    09:54:40
13 information was used by the SOM team.    09:54:42
14     Q.   Okay.  At any time?    09:54:44
15     A.   Right.    09:54:45
16     Q.   Okay.  Including when you were    09:54:47
17 on the committee that you were describing    09:54:48
18 earlier?    09:54:49
19     A.   Right.  They did ask me for    09:54:50
20 information, but I didn't know if they --    09:54:52
21 after that, I gave them guidance, but I don't    09:54:55
22 know if they used it and I don't -- they    09:54:57
23 would ask me sometimes for information, but I    09:54:59
24 don't know what they were using to make    09:55:02
25 decisions.    09:55:05

Page 57

1      Q.   Okay.    09:55:06
2      A.   If that makes sense.    09:55:06
3      Q.   Okay.  Back on to your offer    09:55:08
4  letter, Exhibit 2.  You described how your    09:55:12
5  salary changed over time while you were at    09:55:17
6  Mallinckrodt.    09:55:19
7         Did the bonus structure change    09:55:20
8  over time at all as well?    09:55:25
9      A.   My bonus percentage remained    09:55:27
10 the same, and it fluctuated.    09:55:29
11     Q.   The dollar amount fluctuated?    09:55:32
12     A.   Correct.    09:55:34
13     Q.   Okay.  And what were the --    09:55:35
14     A.   Well, can I correct?    09:55:37
15     Q.   Please.    09:55:38
16     A.   Okay.  The dollar amount    09:55:39
17 fluctuated depending on the overall company    09:55:41
18 performance.  And there was a percentage of    09:55:44
19 the company performance, but there were other    09:55:46
20 metrics for --    09:55:48
21     Q.   Okay.  What were the metrics    09:55:50
22 that came into play in determining your    09:55:51
23 bonus?    09:55:54
24     A.   Forecast accuracy; the team's    09:55:54
25 participation in different programs, if we    09:56:01

Page 58

1  developed good programs that worked well for  09:56:07
2  the customer; allocation process, if we  09:56:09
3  developed processes that worked well for the  09:56:11
4  customers and for Mallinckrodt.  09:56:13
5  Q.  Okay.  Were total sales an  09:56:16
6  element of the bonus determination?  09:56:22
7  A.  Yes.  09:56:24
8  Q.  Okay.  And during your six or  09:56:25
9  so years at Mallinckrodt, apart from the  09:56:33
10  annual incentive plan and the long-term  09:56:36
11  incentive plan, were there any other bonus  09:56:38
12  programs that you were eligible to  09:56:41
13  participate in?  09:56:42
14  A.  I received stock options and  09:56:43
15  stock grants, but they were not related to  09:56:46
16  the team's performance.  09:56:50
17  Q.  Okay.  And what was the basis  09:56:52
18  for the stock grants that you received, or  09:56:53
19  options?  09:56:57
20  A.  Honestly, I could never figure  09:56:57
21  that out.  09:57:00
22  Q.  Okay.  Okay.  You can set that  09:57:01
23  aside.  09:57:06
24  A.  Okay.  09:57:06
25  (Mallinckrodt-Collier Exhibit 3  09:57:14

Page 59

1  marked for identification.)  09:57:14
2  QUESTIONS BY MR. GOTTO:  09:57:14
3  Q.  Ms. Collier, we have marked as  09:57:37
4  Exhibit 3 three pages from your personnel  09:57:38
5  file beginning at MNK-T1_0007277883.  09:57:44
6  The first page appears to be a  09:57:51
7  job description with respect to the director  09:57:54
8  of marketing position for specialty generics.  09:57:57
9  Second page is blank, and the third page is  09:58:00
10  an organizational chart.  09:58:03
11  Would you take a moment and  09:58:05
12  look, and let me know if you recognize those  09:58:06
13  documents.  09:58:10
14  A.  I remember this.  09:58:10
15  Q.  Okay.  If we could just start  09:58:47
16  on the third page on the organizational  09:59:04
17  chart.  09:59:06
18  On this chart, the director of  09:59:09
19  marketing position is indicated as open.  I  09:59:15
20  take it this was before you joined the  09:59:18
21  company.  09:59:20
22  Can you otherwise review the  09:59:21
23  chart and tell me if this is consistent with  09:59:24
24  your recollection of the organization of the  09:59:26
25  generic sales and marketing department at the  09:59:28

Page 60

1  time you joined Mallinckrodt?  09:59:30
2  MR. O'CONNOR:  Object to form.  09:59:31
3  THE WITNESS:  Yes.  Yes, it is.  09:59:32
4  QUESTIONS BY MR. GOTTO:  09:59:34
5  Q.  Okay.  And so when you joined  09:59:34
6  as director of marketing, did the individuals  09:59:37
7  that are listed in the far right column,  09:59:41
8  beginning with Kate Muhlenkamp and the names  09:59:43
9  under hers, report to you?  09:59:46
10  A.  Yes, they did.  09:59:48
11  Q.  Okay.  And you reported to  09:59:49
12  Mr. Gunning; is that right?  09:59:52
13  A.  Yes, I did.  09:59:53
14  Q.  Okay.  When you started as  09:59:54
15  director of marketing at Mallinckrodt, did  09:59:59
16  anyone else report to you other than the  10:00:00
17  individuals who are identified in this org  10:00:03
18  chart?  10:00:06
19  A.  I cannot remember because the  10:00:06
20  team changed considerably over time, but I  10:00:10
21  can't remember at the time when I started if  10:00:14
22  it was the same team.  10:00:15
23  Q.  Okay.  Tell me what you can  10:00:17
24  recall about the team changing under -- team  10:00:19
25  in terms of people who reported to you,  10:00:22

Page 61

1  directly or indirectly, how that changed over  10:00:24
2  time, any particular personnel changes.  10:00:27
3  And again, I realize it's a  10:00:29
4  several-year period and there were probably  10:00:32
5  multiple changes, so I'm not expecting a  10:00:34
6  complete and comprehensive list, but whatever  10:00:36
7  comes to your mind in terms of changes in the  10:00:39
8  team over time, if you could describe those.  10:00:41
9  A.  Okay.  10:00:43
10  MR. O'CONNOR:  Object to form.  10:00:43
11  THE WITNESS:  Kate ended up  10:00:43
12  leaving the company, and she was the  10:00:47
13  product manager.  At one point she had  10:00:48
14  another employee, Lisa Lundergan,  10:00:50
15  reporting to her, who is now Lisa  10:00:54
16  Cardetti.  10:00:56
17  We added analytical people to  10:00:57
18  the team, and I terminated Penny and  10:01:04
19  Margie and moved their products to  10:01:12
20  other people.  10:01:16
21  QUESTIONS BY MR. GOTTO:  10:01:17
22  Q.  What was the reason for those  10:01:18
23  terminations?  10:01:20
24  A.  Ineffective.  10:01:20
25  Q.  And do you recall when  10:01:21

Page 62

1  Ms. Muhlenkamp left Mallinckrodt?    10:01:25
2     A.  It was probably 2012 or 2013.    10:01:27
3     Q.  Okay.  And did someone else    10:01:33
4  take her position after she left?    10:01:34
5     A.  Yes.  Lisa Cardetti.    10:01:37
6     Q.  Okay.  So -- and Ms. Cardetti    10:01:39
7  had previously reported to Ms. Muhlenkamp?    10:01:41
8     A.  Correct.    10:01:44
9     Q.  Okay.  Do you recall what the    10:01:45
10  reasons were for Ms. Muhlenkamp -- or at    10:01:47
11  least what your understanding was as for the    10:01:50
12  reasons for her leaving?    10:01:52
13     MR. O'CONNOR:  Object to form.    10:01:52
14     THE WITNESS:  The reason she    10:01:53
15    told us is that she wanted to move up    10:01:56
16    in an organization, and she left for a    10:01:59
17    better opportunity.    10:02:02
18  QUESTIONS BY MR. GOTTO:    10:02:03
19     Q.  Okay.  Did you perform any    10:02:03
20  periodic evaluation or review of the job    10:02:09
21  performance of the individuals that reported    10:02:12
22  to you?    10:02:14
23     A.  Yes, I did.    10:02:18
24     Q.  And you indicated that you    10:02:19
25  terminated some individuals from being    10:02:21

Page 63

1  ineffective.    10:02:22
2     Apart from them, do you recall    10:02:23
3  any other situations in which you felt that    10:02:24
4  the job performance of any of the individuals    10:02:30
5  that reported to you was unsatisfactory?    10:02:33
6     A.  I can't recall that because    10:02:37
7  this is an incomplete list.    10:02:44
8    Oh, yes, actually, I do    10:02:46
9  remember one.  Thomas Brown.    10:02:47
10     Q.  Okay.  What can you recall    10:02:49
11  about that?    10:02:52
12     A.  Thomas Brown was hired as the    10:02:52
13  communications support to work for -- with us    10:02:54
14  on trade shows and the programs that I said    10:02:57
15  that we developed for customers, and just    10:03:00
16  take some of the pressure off the product    10:03:03
17  managers for any materials, any support that    10:03:06
18  he could provide, and he did not provide that    10:03:10
19  level of support.    10:03:12
20     Q.  Okay.  Any other examples that    10:03:14
21  come to your mind of individuals who felt    10:03:17
22  their job performance was unsatisfactory?    10:03:19
23     A.  No.    10:03:22
24     Q.  Okay.  How about    10:03:23
25  Ms. Muhlenkamp, did you -- what was your    10:03:24

Page 64

1  general opinion of her job performance?    10:03:26
2     A.  She was an excellent employee    10:03:28
3  and very, very bright.    10:03:30
4     Q.  Okay.  And judging from this    10:03:32
5  org chart, she had been at Mallinckrodt    10:03:35
6  before you joined, correct?    10:03:37
7     A.  Yes.    10:03:38
8     Q.  Do you know how long she had    10:03:38
9  been there?    10:03:40
10     A.  No.    10:03:40
11     Q.  Okay.  And I take it    10:03:40
12  Ms. Cardetti joined Mallinckrodt sometime    10:03:47
13  after you did, judging from her absence on    10:03:50
14  this org chart; is that right?    10:03:52
15     A.  No, she was working in another    10:03:54
16  department.    10:03:56
17     Q.  Okay.    10:03:57
18     A.  And we brought her over for    10:03:57
19  analytics.    10:03:59
20     Q.  Okay.  And then she took    10:04:00
21  Ms. Muhlenkamp's position when Ms. Muhlenkamp    10:04:02
22  left.    10:04:05
23    And did she stay in that    10:04:05
24  position for the balance of your tenure at    10:04:07
25  Mallinckrodt?    10:04:09

Page 65

1     A.  No, she went into a national    10:04:10
2  account manager role.    10:04:12
3     Q.  Okay.  And who took that    10:04:13
4  position, her position, under you at that    10:04:16
5  point?    10:04:19
6     A.  We had hired another product    10:04:19
7  manager, Jennifer Block, to work for us at    10:04:22
8  the time.  And so Jennifer was also another    10:04:25
9  product manager that worked during that    10:04:28
10  period, so we just realigned the products.    10:04:29
11     Q.  Okay.  And approximately when    10:04:32
12  did Ms. Cardetti leave your team?    10:04:33
13     A.  Probably 2014 -- 2015.    10:04:38
14     Q.  Okay.    10:04:43
15     A.  2014, 2015, sometime there.    10:04:43
16     Q.  Okay.  Did there come to a    10:04:45
17  time when Mr. Vorderstrasse was on your team?    10:04:47
18     A.  Yes.    10:04:51
19     Q.  When was that?    10:04:51
20     A.  I don't recall when he came on    10:04:53
21  board. I'm sorry, I barely remember my own    10:04:59
22  dates, let alone all the employees.    10:05:01
23     Q.  I understand.    10:05:03
24    What position did he hold?    10:05:04
25     A.  Kevin was in charge of the    10:05:06

Page 66

1  analytical team, and he helped -- because he     10:05:09
2  was a big data mining person, so he could do     10:05:13
3  that.  He also helped with business               10:05:17
4  development, which meant deciding what            10:05:20
5  products to go pursue if we wanted to             10:05:23
6  continue our pipeline growth.                     10:05:25
7      Q.   Okay.  So --                              10:05:25
8      A.   And he also launched a drug for          10:05:27
9  us, so...                                          10:05:29
10     Q.   Okay.  What drug was that?               10:05:30
11     A.   Methylphenidate.  It's a                 10:05:31
12 Concerta.                                          10:05:34
13     Q.   Okay.  So looking back at the            10:05:35
14 org chart, this part of Exhibit 3,                 10:05:38
15 Ms. Muhlenkamp is identified as a product          10:05:43
16 manager, as is Marock Montgomery?                  10:05:45
17     A.   It's actually Marc.                      10:05:51
18     Q.   Marc?                                     10:05:51
19     A.   That's a typo.                           10:05:52
20     Q.   Okay.  How were -- how were              10:05:58
21 the -- how did their responsibilities differ?     10:06:00
22     A.   They each had different                  10:06:03
23 products that they were responsible for.           10:06:05
24     Q.   Okay.  And what products do you          10:06:06
25 recall Ms. Muhlenkamp being responsible for?      10:06:10

Page 67

1      A.   Oxycodone, oxy APAP.  Marc had           10:06:11
2  hydrocodone at the time.  We had mixed salts,      10:06:17
3  and I know Marc was responsible for that, but      10:06:26
4  I don't remember exactly how the products          10:06:30
5  lined up after that.                               10:06:31
6      Q.   Okay.  And then you indicated            10:06:33
7  Mr. Vorderstrasse had particular                   10:06:39
8  responsibility for analytics.                      10:06:42
9           Was there any similar division           10:06:43
10 of responsibilities before he joined the           10:06:45
11 team, where one of the product managers had a      10:06:48
12 particular responsibility for analytics?           10:06:51
13         MR. O'CONNOR:  Object to form.            10:06:53
14         THE WITNESS:  That is a very              10:06:54
15     broad question because they each --           10:06:56
16     everyone on the team has to do some           10:07:00
17     form of analytics, so I'm not sure            10:07:05
18     what you're asking for.                       10:07:07
19 QUESTIONS BY MR. GOTTO:                            10:07:08
20     Q.   Okay.  I was just trying to              10:07:08
21 understand if the nature of the -- let me ask      10:07:10
22 the question this way.                             10:07:11
23         Throughout your time as                   10:07:12
24 director of marketing at Mallinckrodt, was it      10:07:13
25 the case that you had one or more product          10:07:16

Page 68

1  managers -- well, multiple product managers       10:07:24
2  reporting to you throughout your time,             10:07:26
3  correct?                                           10:07:27
4      A.   Correct.                                 10:07:27
5      Q.   And did each of them have               10:07:28
6  responsibility for discrete products?             10:07:32
7      A.   Yes.                                     10:07:34
8      Q.   Okay.  And so did                        10:07:36
9  Mr. Vorderstrasse, for example, have              10:07:39
10 responsibility for discrete products?            10:07:41
11     A.   Yes, he did.                             10:07:42
12     Q.   Now, when you came to                   10:07:44
13 Mallinckrodt -- well, let's look at page 1        10:07:52
14 of -- the first page, rather, of Exhibit 3,       10:07:56
15 which the top-half of the page has eight          10:07:59
16 numbered items which appear to be a              10:08:05
17 description of the role and responsibility of     10:08:08
18 the -- of the director of marketing for          10:08:10
19 specialty generics.  So I'd like to go            10:08:13
20 through those with you and understand if, in      10:08:15
21 fact, those were your roles and                    10:08:20
22 responsibilities and what you did in these        10:08:22
23 regards.                                          10:08:24
24         Let me begin by asking what --           10:08:24
25 specialty generics, what did you understand        10:08:32

Page 69

1  that phrase to means?                              10:08:34
2      A.   It means different things to            10:08:35
3  different people.  At Mallinckrodt they meant     10:08:36
4  that it was just a niche, that not everyone        10:08:39
5  can produce and sell in a certain area.           10:08:42
6      Q.   Okay.  Did Mallinckrodt               10:08:43
7  manufacture other generic drugs that it did      10:08:46
8  not categorize as specialty generics?            10:08:49
9      A.   No, because they use that as an        10:08:51
10 umbrella comment.                                 10:08:57
11     Q.   Okay.  So specialty generics,          10:08:57
12 in the Mallinckrodt setting, anyway, meant        10:08:58
13 all generics that Mallinckrodt was               10:09:00
14 manufacturing?                                     10:09:00
15     A.   Correct.                                 10:09:01
16     Q.   Okay.  So I take it when you            10:09:05
17 became director of marketing, you needed to       10:09:09
18 become familiar with Mallinckrodt's product       10:09:12
19 line in the generic area, correct?                10:09:14
20     A.   Correct.                                 10:09:16
21     Q.   And so what did you do to              10:09:16
22 become familiar with what Mallinckrodt            10:09:17
23 manufactured and sold, the generics that they     10:09:21
24 manufactured and sold?                            10:09:24
25     A.   Met with the product managers          10:09:25

Page 70

1  to understand their products, looked at IMS   10:09:27
2  data to understand the sales, the           10:09:30
3  competitors. I sat with different team      10:09:34
4  members in different parts of the           10:09:36
5  organization, such as logistics, to         10:09:38
6  understand how products were being shipped,  10:09:41
7  and did a tour of our warehouse -- not      10:09:43
8  warehouse -- manufacturing site up in Hobart 10:09:47
9  at one point.                                10:09:49
10     Q.   Okay. Before we get into the        10:09:50
11 individual items listed in paragraphs 1 to 8 10:09:59
12 here, when you joined Mallinckrodt, were     10:10:03
13 there aspects of the director of marketing   10:10:05
14 job that you were taking that you felt were  10:10:11
15 different from the responsibilities you had  10:10:17
16 had at prior employers?                      10:10:20
17        MR. O'CONNOR: Object to form.         10:10:23
18        THE WITNESS: Not really. The          10:10:23
19    responsibilities are similar across       10:10:28
20    any company. They were the same type      10:10:30
21    of job.                                   10:10:35
22 QUESTIONS BY MR. GOTTO:                      10:10:35
23     Q.   Okay. Now, Mallinckrodt            10:10:36
24 obviously was engaged in the manufacture and 10:10:40
25 sale of a variety of scheduled               10:10:43

Page 71

1  pharmaceuticals under the Controlled         10:10:47
2  Substances Act, correct?                     10:10:48
3     A.   Correct.                             10:10:49
4     Q.   And that was somewhat different      10:10:49
5  from your prior experience, correct?         10:10:51
6     A.   Yes.                                 10:10:53
7     Q.   And did you undertake any            10:10:54
8  effort to become familiar with any of the    10:10:57
9  regulatory requirements imposed by the       10:11:00
10 Controlled Substances Act when you joined    10:11:03
11 Mallinckrodt?                                10:11:04
12        MR. O'CONNOR: Object to form.         10:11:04
13        THE WITNESS: My familiarity           10:11:06
14    ran to that I knew things had to be       10:11:08
15    ordered using a 222 form. Customers       10:11:11
16    couldn't just place an order and          10:11:13
17    expect to get it like any other drug      10:11:14
18    product. So there were some things        10:11:16
19    that I was already familiar with.         10:11:18
20        I'm not familiar with the             10:11:21
21    regulations of the Controlled             10:11:23
22    Substances Act, so I have no idea of      10:11:26
23    them. I'm not a specialist in that.       10:11:28
24 QUESTIONS BY MR. GOTTO:                      10:11:29
25     Q.   Okay.                               10:11:30

Page 72

1     A.   So I can't say if I understood       10:11:30
2  any of that or not.                          10:11:32
3     Q.   Okay. So when you say you were       10:11:32
4  already familiar with, for example, the 222  10:11:34
5  form, that was from prior employment you were 10:11:36
6  familiar with that?                          10:11:37
7     A.   Correct.                             10:11:38
8     Q.   Okay. Although in your prior         10:11:39
9  employment I think you had indicated you had  10:11:43
10 little --                                    10:11:45
11     A.   At Schein, I did.                    10:11:45
12     Q.   I'm sorry?                           10:11:46
13     A.   At Schein Pharmaceutical.            10:11:48
14     Q.   Okay. So going back to your         10:11:48
15 time at Schein, you developed that           10:11:50
16 familiarity?                                 10:11:52
17     A.   Uh-huh.                             10:11:52
18     Q.   Was there any training that you     10:11:53
19 received at Mallinckrodt with respect to     10:11:58
20 the -- any requirements under the Controlled  10:12:02
21 Substances Act?                              10:12:04
22     A.   Not that I recall.                  10:12:04
23     Q.   Okay. And you indicated a           10:12:07
24 little earlier that -- go ahead.             10:12:09
25     A.   Well, I'm sorry. Are you           10:12:10

Page 73

1  referring to when I was being hired?         10:12:12
2     Q.   Well, let's start with that,         10:12:15
3  and then you can tell me also in the future   10:12:17
4  whether you received any such training.      10:12:21
5     A.   Okay. When I was hired, I did       10:12:22
6  not receive any training specific to here's  10:12:24
7  the Controlled Substances Act, here's what it 10:12:29
8  is. I had familiarity with it as far as like  10:12:31
9  222 forms and that you can't just be shipping 10:12:35
10 product anywhere to anybody.                 10:12:37
11        The -- I gained additional            10:12:40
12    knowledge while I worked at Mallinckrodt   10:12:44
13    through Karen Harper giving sessions to the 10:12:46
14    team about what it is and -- not what the Act 10:12:50
15    is in particular, but what we should be doing 10:12:53
16    from our end.                             10:12:57
17     Q.   Okay. You had indicated a           10:12:59
18 little earlier today in terms of your general 10:13:04
19 education that you had occasion to           10:13:06
20 participate in various types of continuing   10:13:07
21 education programs over the years.           10:13:09
22        Did any of those programs             10:13:11
23 address in any way requirements under the    10:13:14
24 Controlled Substances Act?                   10:13:17
25     A.   No.                                 10:13:19

Page 74

```
1      Q.   Okay.  But Ms. Harper conducted    10:13:20
2   programs from time to time, I take it, at   10:13:24
3   Mallinckrodt that addressed certain aspects  10:13:26
4   of the Controlled Substances Act?          10:13:28
5      A.   From how it impacted the           10:13:29
6   commercial aspect of the business and what we  10:13:32
7   needed to do, yes.                         10:13:34
8         MR. GOTTO:  Okay.  All right.        10:13:37
9   Well, why don't we take a break.           10:13:37
10  We've been going for about an hour.        10:13:40
11        VIDEOGRAPHER:  We are going off      10:13:41
12  the record at 10:13 a.m.                   10:13:42
13  (Off the record at 10:13 a.m.)             10:13:44
14        VIDEOGRAPHER:  We are back on        10:30:20
15  the record at 10:30 a.m.                   10:30:22
16  QUESTIONS BY MR. GOTTO:                    10:30:23
17     Q.   Welcome back, Ms. Collier.         10:30:27
18     A.   Thank you.                         10:30:28
19     Q.   Before the break, we had marked    10:30:28
20  as Exhibit 3 a document that included the job  10:30:31
21  description director of marketing.  I'd like  10:30:36
22  to go through some of those items in some   10:30:39
23  more detail.                               10:30:41
24        Before I do, who had been your       10:30:42
25  predecessor at Mallinckrodt as director of  10:30:46
```

Page 75

```
1   marketing; do you know?                    10:30:49
2      A.   Jeff Burd.                          10:30:50
3      Q.   And did Mr. Burd leave             10:30:51
4   Mallinckrodt?                              10:30:54
5      A.   Yes, he did.                        10:30:54
6      Q.   And did you -- was there any       10:30:56
7   sort of transition from Mr. Burd to you in  10:31:01
8   terms of any meetings or transfer of       10:31:03
9   information from him to you?                10:31:07
10     A.   No, he was gone before I was       10:31:09
11  hired.                                     10:31:11
12     Q.   Okay.  Did you have access to      10:31:11
13  any materials that he had prepared to assist  10:31:15
14  the incoming director of marketing in      10:31:18
15  transition?                                10:31:21
16     A.   Most of his files were -- I        10:31:22
17  don't remember seeing any of his files.  They  10:31:26
18  probably weren't going to be relevant to me  10:31:27
19  because it was old data.                   10:31:29
20        But I mostly got my information      10:31:31
21  from working with the product managers in  10:31:33
22  what the process had been about product    10:31:35
23  forecasting and product management.        10:31:37
24     Q.   Okay.  And you started at          10:31:40
25  Mallinckrodt in mid-2009; is that right?   10:31:41
```

Page 76

```
1      A.   July 29, 2009.                      10:31:43
2      Q.   Okay.  Okay.  Well, let's look     10:31:47
3   at Exhibit 3 for a moment under the heading  10:31:48
4   of director of marketing, specialty generics.  10:31:50
5         Item Number 1 is "oversee the        10:31:53
6   management of generic products by developing  10:31:56
7   financially sound business plans."         10:31:58
8         Tell me what -- well, first of       10:32:01
9   all, during your time as director of       10:32:09
10  marketing, did you develop business plans for  10:32:10
11  the generic products?                      10:32:12
12     A.   Yes, I did.                         10:32:13
13     Q.   Were there separate plans for      10:32:14
14  different products, or how did that work?   10:32:15
15     A.   Each product had a separate        10:32:18
16  plan, separate market share, because each had  10:32:20
17  different competitors.                     10:32:22
18     Q.   Okay.  And so the components of    10:32:24
19  the business plan for a generic product would  10:32:26
20  consist of what?                           10:32:30
21     A.   It would consist of reviewing      10:32:31
22  historical sales, what sales projections    10:32:33
23  there are, what new products we anticipated  10:32:35
24  to launch, any additional customer programs  10:32:38
25  we intended to implement, any problems we had  10:32:40
```

Page 77

```
1   within the past year regarding such thing as  10:32:43
2   quota allocation, inventory management      10:32:45
3   issues, manufacturing issues, and how do we  10:32:49
4   address those going forward.               10:32:52
5      Q.   Okay.  When you say "quota         10:32:54
6   allocation," what do you mean by that?     10:32:57
7      A.   The DEA allots quota based on      10:32:58
8   some criteria, and we may not get everything  10:33:02
9   we need to supply our customers throughout  10:33:05
10  the year.                                  10:33:07
11     Q.   Okay.  And do you -- were you      10:33:08
12  involved in the process of applying for or  10:33:12
13  requesting quota from the DEA from time to  10:33:17
14  time?                                      10:33:20
15     A.   The only aspect that I was         10:33:20
16  involved in is occasionally they would ask if  10:33:23
17  we picked up new business, and the customers  10:33:26
18  had to provide a letter saying that it was  10:33:28
19  new business that we secured from a        10:33:29
20  competitor, and therefore the DEA would    10:33:31
21  switch the quota from the competitor to us.  10:33:33
22        I'm not sure of the process or       10:33:35
23  how the request was made.  I just was      10:33:37
24  supplied the information by the customer.  10:33:39
25     Q.   Okay.  And who would request       10:33:42
```

Page 78

1 that information from you regarding the    10:33:43
2 customer?                                   10:33:45
3    A.    Karen Harper.                      10:33:45
4    Q.    And so in formulating the          10:33:47
5 business plans for the different products,  10:33:56
6 one of the -- one of the issues you had to  10:33:58
7 deal with was quota allocation, correct?    10:34:03
8    A.    Correct.                           10:34:05
9    Q.    And so the DEA quota, did you       10:34:06
10 have an understanding as to how that quota  10:34:09
11 was granted in terms of its applicability to 10:34:13
12 various of the products?                    10:34:21
13         MR. O'CONNOR: Object to form.      10:34:23
14         THE WITNESS: The only thing I      10:34:24
15    was aware of is that they would give     10:34:27
16    quota based on historical sales. I      10:34:28
17    have no idea how that was derived or     10:34:30
18    who set that quota or how Mallinckrodt  10:34:33
19    played a role in that.                  10:34:36
20 QUESTIONS BY MR. GOTTO:                     10:34:37
21    Q.    Okay. And so the quota, did       10:34:38
22 you understand it to be -- to be applicable 10:34:39
23 to each particular molecule of controlled   10:34:42
24 substance?                                  10:34:45
25    A.    Correct.                          10:34:45

Page 79

1    Q.    And did you understand -- did      10:34:46
2 you have an understanding as to whether there 10:34:49
3 was quota for a particular dosage of that    10:34:51
4 molecule?                                    10:34:54
5         MR. O'CONNOR: Object to form.       10:34:55
6         THE WITNESS: No.                    10:34:56
7 QUESTIONS BY MR. GOTTO:                      10:34:57
8    Q.    Okay. You didn't have an          10:34:58
9 understanding one way or the other on that?  10:35:00
10    A.    I'm sorry, no, I do not believe   10:35:01
11 that it was per molecule.                   10:35:03
12    Q.    Okay.                             10:35:05
13    A.    It was just to the molecule,     10:35:05
14 not to the dosage form or the strength.     10:35:08
15    Q.    Okay. And so in terms of         10:35:11
16 formulating business plans for the different 10:35:13
17 products, did you have a different business  10:35:15
18 plan for different dosage and strength of the 10:35:18
19 same molecule?                              10:35:22
20    A.    Not typically. Typically you     10:35:23
21 would have it just for the molecule itself. 10:35:26
22    Q.    Okay. So, for example, with      10:35:28
23 oxycodone, when you -- when you joined       10:35:35
24 Mallinckrodt, would you have a single        10:35:38
25 business plan for oxycodone?                 10:35:39

Page 80

1    A.    Yes. The exception in            10:35:41
2 oxycodone is that we had a 5 milligram and   10:35:44
3 not everyone had that. Not all competitors   10:35:46
4 had it, so that would call out for something 10:35:49
5 different.                                   10:35:51
6    Q.    So you had a separate business    10:35:51
7 plan on the 5 milligram?                     10:35:53
8    A.    Right. A separate projection     10:35:54
9 of market share percentage, because obviously 10:35:56
10 there were fewer competitors.               10:35:58
11    Q.    Okay. But in terms of the        10:36:00
12 quota from the DEA, your understanding was   10:36:02
13 there was a single quota that Mallinckrodt   10:36:05
14 had for oxycodone in whatever dosage and     10:36:07
15 strength it chose to manufacture and sell,   10:36:10
16 correct?                                     10:36:12
17    A.    Correct.                          10:36:13
18         MR. O'CONNOR: Object to form.      10:36:13
19         THE WITNESS: Correct.             10:36:14
20 QUESTIONS BY MR. GOTTO:                      10:36:15
21    Q.    Okay. So, for example,          10:36:22
22 oxycodone 15 milligram versus 30 milligram,  10:36:23
23 were there separate business plans for those 10:36:27
24 two dosages?                                 10:36:29
25    A.    I don't recall doing separate    10:36:30

Page 81

1 business plans for them.                     10:36:32
2    Q.    Okay. When you -- when you        10:36:33
3 started at Mallinckrodt, did you review the  10:36:41
4 then existing business plans for the various 10:36:46
5 products that were within the specialty      10:36:49
6 generics umbrella?                           10:36:51
7    A.    When I started, they did not     10:36:52
8 have a formal business plan. They continued  10:36:55
9 doing what they were doing as far as product 10:36:58
10 forecasting and pricing and customer         10:37:02
11 strategy.                                    10:37:04
12    Q.    Okay. So Exhibit 3, when         10:37:05
13 there's a reference to developing financially 10:37:07
14 sound business plans, was that a new         10:37:10
15 initiative for the director of marketing when 10:37:14
16 you joined compared to what Mallinckrodt had 10:37:17
17 done historically?                           10:37:18
18    A.    I think that was the            10:37:19
19 expectation; it's just that I brought a      10:37:20
20 formal level to it.                          10:37:22
21    Q.    Okay. Item Number 2, "direct    10:37:23
22 and lead the creation and development of     10:37:30
23 marketing plans, promotional literature,     10:37:32
24 product messages/identity and product-related 10:37:35
25 activities."                                 10:37:39

Page 82

1  Does that accurately describe   10:37:41
2  an aspect of your responsibilities while you   10:37:45
3  were director of marketing?   10:37:49
4      A.   It's a little vague, but, yes.   10:37:52
5      Q.   Okay.  Well, let's break it   10:37:55
6  down a little bit.   10:37:56
7      First of all, it makes   10:37:57
8  reference to marketing plans.  Tell me what   10:37:59
9  you understand it to mean -- what you   10:38:03
10 understand a marketing plan to mean in this   10:38:05
11 context.   10:38:07
12     A.   A marketing plan would be   10:38:08
13 developing the pricing strategy, what target   10:38:09
14 customers we wanted, what market share, who   10:38:12
15 were the competitors and who would we   10:38:15
16 displace in selling product if we wanted to   10:38:17
17 gain share.   10:38:20
18     Q.   Okay.  So in terms of gaining   10:38:21
19 market share, since it's -- you're in a   10:38:24
20 generic industry here, what techniques were   10:38:31
21 available to you as a marketing director to   10:38:34
22 develop strategies for gaining market share   10:38:39
23 with respect to a particular product?   10:38:41
24     MR. O'CONNOR:  Object to form.   10:38:44
25     THE WITNESS:  I'm not sure what   10:38:45

Page 83

1  you mean by "techniques."  It would be   10:38:46
2  evaluating the market, so I'm going to   10:38:49
3  answer just what I'm thinking you   10:38:51
4  might mean.   10:38:54
5  QUESTIONS BY MR. GOTTO:   10:38:55
6      Q.   Okay.   10:38:55
7      A.   It would be evaluating the   10:38:56
8  market, see who the competitors are, who   10:38:58
9  might be entering based on market   10:39:00
10 intelligence provided by the national account   10:39:02
11 managers or anything we read online from the   10:39:05
12 FDA site.  So evaluating who might be   10:39:08
13 potential threats and who make take our   10:39:12
14 business, and if we wanted to retain the   10:39:14
15 business or let it go.   10:39:15
16     Q.   Okay.  So in general, generic   10:39:16
17 pharmaceuticals, to expand market share -- I   10:39:25
18 mean, I'm not in the business, so I'm   10:39:29
19 obviously asking you as someone who has spent   10:39:31
20 many years at this -- it would seem to be one   10:39:32
21 of the things you can do is develop   10:39:36
22 strategies to compete on price, correct?   10:39:38
23     A.   Correct.   10:39:40
24     Q.   Okay.  Apart from competing on   10:39:41
25 price, what other strategies are available to   10:39:45

Page 84

1  you to implement to attempt to increase   10:39:48
2  market share on a given product?   10:39:51
3      A.   Well, one of the biggest things   10:39:53
4  you would do is differentiate yourself as a   10:39:55
5  company, provide better customer service, be   10:39:57
6  responsive to customer needs.  Communication   10:40:00
7  is the biggest, letting them know what's   10:40:02
8  going on if there's a product issue, new   10:40:05
9  entrants coming, you know, advising them of   10:40:08
10 what's going on.  So just providing good   10:40:11
11 customer service is the bottom line.   10:40:14
12     Q.   Okay.  So when you say   10:40:16
13 communicating, letting them know "if there's   10:40:26
14 a product issue," are there types of product   10:40:28
15 issues you can recall arising during your   10:40:31
16 time at Mallinckrodt that you communicated   10:40:34
17 with customers on?   10:40:36
18     MR. O'CONNOR:  Object to form.   10:40:38
19     THE WITNESS:  Sure.  There's   10:40:39
20 always problems with supply.  Either   10:40:40
21 there's a manufacturing issue, it's   10:40:42
22 delayed, a raw material issue.   10:40:44
23 Advising them on anything that you can   10:40:47
24 see might be a long term versus a   10:40:49
25 short term and when you can supply the   10:40:52

Page 85

1  product again.   10:40:54
2  QUESTIONS BY MR. GOTTO:   10:40:55
3      Q.   Okay.  So back to my question   10:40:55
4  on, you know, techniques to increase market   10:41:04
5  share, competing on price being one,   10:41:08
6  excellent customer service of the type you   10:41:11
7  described being another.   10:41:13
8      Are there other approaches   10:41:14
9  available to you as a director of marketing   10:41:18
10 to try to increase market share with respect   10:41:20
11 to a given product?   10:41:23
12     A.   Sure.  There's -- the customers   10:41:24
13 have incentive programs in place, and so   10:41:28
14 participating in their incentive programs   10:41:30
15 that help them achieve their corporate goals   10:41:33
16 is one.  So it still goes back to price,   10:41:35
17 because you're still going to price them   10:41:38
18 appropriately for the market.   10:41:40
19     And just -- again, just   10:41:44
20 differentiating yourself as the vendor, as   10:41:48
21 the manufacturer.  Providing consistency of   10:41:51
22 supply is really important to customers so   10:41:55
23 that they don't have to have the pharmacies   10:41:59
24 constantly switching product.  So that's   10:42:01
25 another thing that's important.   10:42:03

Page 86

1    Q.   Okay. When you joined          10:42:04
2  Mallinckrodt, what was your understanding as   10:42:07
3  to Mallinckrodt's market share with respect   10:42:12
4  to its various generic products?          10:42:17
5         MR. O'CONNOR: Object to form.      10:42:19
6         THE WITNESS: Mallinckrodt had      10:42:20
7    strong market share on some products.    10:42:24
8    We're trailing on other products.       10:42:27
9  QUESTIONS BY MR. GOTTO:               10:42:28
10    Q.   Okay. When you first joined,       10:42:29
11  were there any products that you can        10:42:30
12  recall -- as to which you can recall any     10:42:32
13  particular effort to increase market share?   10:42:37
14    A.   Well, frankly, when you launch      10:42:38
15  a product, you obviously want to get some    10:42:45
16  market share. I don't remember particular    10:42:47
17  strategies where we wanted to gain more     10:42:52
18  share, because in some instances the more    10:42:53
19  share we gained, the more the price came down  10:42:55
20  and we actually got diminished returns. So   10:42:57
21  there were instances when I remember that we   10:43:01
22  would say we would surrender share because   10:43:03
23  somebody else entered.                10:43:05
24         But as far as gaining share,        10:43:06
25  there might be cases that we did it for a    10:43:08

Page 87

1  particular customer because we wanted a full   10:43:10
2  line with that customer, but other than that,  10:43:12
3  that wasn't our target, other than launching   10:43:16
4  products.                         10:43:18
5    Q.   Okay. So putting aside product      10:43:19
6  launches for a moment, during your time at    10:43:22
7  Mallinckrodt, as a general matter, is it your   10:43:27
8  recollection that in terms of market share,   10:43:34
9  again, apart from launching new products, the  10:43:37
10  emphasis was on maintaining existing market   10:43:43
11  share?                          10:43:46
12         MR. O'CONNOR: Object to form.      10:43:46
13         THE WITNESS: Our emphasis was     10:43:47
14    more on sales margin and maintaining     10:43:49
15    margin, so we did more things in line    10:43:54
16    with pricing adjustments in order to     10:43:57
17    achieve our objectives, and we        10:44:00
18    actually shed products because they      10:44:03
19    were not profitable. So I remember      10:44:05
20    culling out products instead of        10:44:09
21    looking to gain share.              10:44:11
22         I don't remember specifically     10:44:13
23    anything along that line, but that's     10:44:14
24    typical that you would try and gain      10:44:15
25    share from competitors during bid      10:44:17

Page 88

1  cycles. But I don't remember a           10:44:20
2    specific instance where we said, oh,      10:44:21
3    we really want to go after this         10:44:23
4    product, and we're going to cut         10:44:25
5    everybody out of the market.           10:44:26
6  QUESTIONS BY MR. GOTTO:               10:44:27
7    Q.   Okay. What are examples of        10:44:27
8  products you can recall shedding because of    10:44:29
9  nonprofitability?                    10:44:32
10    A.   There was methylphenidate, one      10:44:33
11  of the methylphenidates, it wasn't making any  10:44:37
12  money. It was a difficult product to make,   10:44:40
13  and so we were losing money on it, and we    10:44:42
14  decided not to sell it anymore.           10:44:45
15    Q.   Okay. Any others?              10:44:47
16    A.   None that I can recall, but I       10:44:48
17  know we did terminate several products, but I  10:44:51
18  can't remember the names of them at this     10:44:54
19  point.                          10:44:56
20    Q.   Okay. What product launches       10:44:56
21  can you recall during your period at        10:44:58
22  Mallinckrodt?                      10:44:59
23    A.   We launched fentanyl lozenge,      10:45:00
24  fentanyl patch and methylphenidate ER, the   10:45:06
25  generic for Concerta.                10:45:09

Page 89

1    Q.   From -- in terms of your         10:45:11
2  position as director of marketing, what were   10:45:19
3  your responsibilities associated with a     10:45:21
4  product launch?                     10:45:23
5    A.   To establish the market base      10:45:25
6  that we were going to target, who -- what    10:45:30
7  customers did we want to pursue, what       10:45:33
8  incentives were involved, what would be the   10:45:37
9  margin be if we targeted those customers, and  10:45:38
10  who would we take the market share from.     10:45:41
11    Q.   And so how did you go about       10:45:44
12  performing the analysis pertinent to those    10:45:46
13  types of issues with respect to, for example,  10:45:49
14  a fentanyl lozenge launch?             10:45:52
15    A.   We would look at -- that one      10:45:57
16  was a little bit easier; there was limited   10:45:58
17  competition. It's a really difficult product  10:46:00
18  to make; very few companies have the       10:46:03
19  machinery. So we knew we would be taking it   10:46:06
20  from -- I believe it was Teva at the time.    10:46:08
21  So we were going to be taking a product away   10:46:10
22  from Teva, and so we knew we were strong in a  10:46:11
23  particular customer, so we'd better -- we     10:46:14
24  would be better suited to align with that    10:46:17
25  customer. We knew their incentive programs   10:46:20

Page 90

1  and what their contract said about what we'd     10:46:21
2  have to offer, so we would determine pricing     10:46:24
3  based on that.  And we knew what share we        10:46:26
4  needed to hit and did that with a couple of      10:46:30
5  customers.                                       10:46:34
6      Q.   Okay.  How about the fentanyl          10:46:35
7  patch?                                           10:46:38
8      A.   The fentanyl patch had a little         10:46:39
9  bit different in that Mylan had a good           10:46:42
10 product out there.  They had -- the customers    10:46:46
11 liked it.  It's -- because, again, it's --       10:46:49
12 that one's a little bit differentiated in        10:46:51
13 taking the tablet because it's got a tear        10:46:54
14 factor.  So Mylan's product was                  10:46:56
15 well-received, so it was a little bit            10:46:59
16 difficult because pharmacists knew the           10:47:01
17 patients liked that.                             10:47:04
18      So we struggled to find our                 10:47:05
19 share and our footing on that at first, but      10:47:08
20 we had a good product also.  So once patients    10:47:09
21 started using our product, they liked it and     10:47:12
22 they were -- they stayed on it.                  10:47:14
23      Q.   Okay.  So as director of              10:47:15
24 marketing, what steps can you recall taking      10:47:19
25 to deal with -- for example, in the fentanyl     10:47:24

Page 91

1  patch example, to deal with the fact Mylan      10:47:30
2  already had a well-received product and          10:47:33
3  Mallinckrodt would be a new entrant into that    10:47:36
4  market?                                          10:47:38
5      A.   We would pursue other customers         10:47:39
6  that were more about price and they weren't      10:47:42
7  as concerned about customer -- patient           10:47:45
8  feedback.  So that's part of it.                 10:47:47
9      So -- and then we also pursued               10:47:49
10 customers that we knew could work with the       10:47:52
11 pharmacies in messaging, I guess, to them.       10:47:55
12 They don't really -- like the wholesalers        10:47:57
13 don't message.  They list the product in         10:48:00
14 their catalogs and they list it on their         10:48:02
15 website so they don't send a message behind      10:48:05
16 it.  So it was kind of a challenge, frankly,     10:48:07
17 to get our share on that at first.               10:48:11
18      Q.   And when you say "message" in         10:48:13
19 that setting, what do you mean by that?          10:48:16
20      A.   You can't tell -- you can't say        10:48:16
21 that we have a better tear factor or we have     10:48:18
22 a better -- our product's better in any way.     10:48:21
23 They're equivalent.  The FDA declared them       10:48:24
24 equivalent so they're the same, no matter        10:48:26
25 which product you're looking at.                 10:48:29

Page 92

1      So the challenge we had with               10:48:31
2  messaging on fentanyl patch is that we           10:48:32
3  couldn't say anything about we had a good        10:48:34
4  tear factor, too, or that we had anything        10:48:36
5  that was better about our product, the size      10:48:39
6  of it.  And that's the one thing.  Once they     10:48:41
7  did see the size of ours, because it was a       10:48:43
8  little bit smaller, they liked that because a    10:48:46
9  patient didn't want it to be as obvious.  And    10:48:48
10 easy to tear off, you know, after they're        10:48:53
11 done using it for three days.                    10:48:55
12      So the only -- that was one          10:48:56
13 campaign that we did advertising, to show        10:48:59
14 that the size of our patch was relatively        10:49:02
15 small.  And it had the strength on the patch     10:49:04
16 itself so the patients could tell.  And it       10:49:07
17 was color-coded so it made it easier.  So we     10:49:10
18 did some trade journal advertising in that       10:49:13
19 case so pharmacies could see why it was a        10:49:15
20 good product.                                    10:49:18
21      Q.   Okay.  And when you say "we"          10:49:18
22 did that, that was Mallinckrodt advertising?     10:49:23
23      A.   Yes.  Yes.                            10:49:26
24      Q.   Were there similar or -- strike      10:49:26
25 "similar."                                       10:49:35

Page 93

1      Were there other messaging            10:49:36
2  initiatives with respect to other generic       10:49:40
3  products that you can recall during your        10:49:43
4  period as director of marketing?               10:49:47
5      A.   Sure.  We made a product              10:49:49
6  announcement in trade journals, goes to         10:49:50
7  pharmacists, to announce that we had fentanyl   10:49:53
8  lozenge.  And fentanyl patch was the same,      10:49:57
9  and methylphenidate ER was the same.           10:49:59
10      Q.   Okay.  And how about with the        10:50:04
11 existing product line, were there any           10:50:04
12 messaging initiatives that you can recall?      10:50:07
13      A.   I know we did some advertising.       10:50:10
14 We changed some of our labeling, so we          10:50:13
15 announced that the labels had changed so the    10:50:15
16 customers could see that.                       10:50:19
17      I don't remember any other            10:50:21
18 advertising that we did around our core         10:50:22
19 products.                                       10:50:25
20      Q.   Okay.  All right.  Back on          10:50:25
21 Item 2 on Exhibit 3, there's reference to,      10:50:30
22 you know, "direct and lead the creation and     10:50:35
23 development of marketing plans" and then        10:50:36
24 promotional literature.                         10:50:39
25      Is promotional literature          10:50:40

Page 94

1  something that was part of your          10:50:42
2  responsibilities?                       10:50:44
3      A.  Yes.                            10:50:46
4      Q.  So tell me what sorts of         10:50:47
5  promotional literature you oversaw.     10:50:49
6      A.  The advertising for the product  10:50:50
7  launch products in the trade journals.  We  10:50:54
8  developed several programs to better connect  10:50:57
9  with the customers, so we had advertising --  10:50:59
10  or not advertising, but we send information  10:51:02
11  out to the customers.  If there was a product  10:51:06
12  change or a product announcement, we would  10:51:12
13  send information to the customers.       10:51:14
14      So my team oversaw that and         10:51:15
15  messaged the message about the product's now  10:51:18
16  available, here's the wholesaler order entry  10:51:20
17  numbers to the wholesalers.  You know, here's  10:51:24
18  all the information we have.  If -- we have  10:51:27
19  to fill out a form that tells them everything  10:51:29
20  from what the list price is to the packaging  10:51:31
21  weights, dimensions, so we'd -- it's not  10:51:33
22  really promotional material, but we had to  10:51:36
23  send all that material, too.            10:51:37
24      Q.  Okay.  In terms of material you  10:51:39
25  would think of as promotional material,   10:51:42

Page 95

1  approximately -- was that a regular process  10:51:47
2  or was that an occasional process when there  10:51:51
3  was, say, a new development with respect to a  10:51:54
4  product?                                 10:51:56
5      A.  It was an occasional process.    10:51:57
6  As products go, the only thing we really did  10:52:00
7  was announce when products were available,  10:52:03
8  again, if there was some change to a product.  10:52:05
9      Q.  The next item under heading 2    10:52:08
10  is product messages/identity.  I guess it's  10:52:14
11  creation and development of product      10:52:19
12  messages/identities.                    10:52:24
13      Is that something that you          10:52:25
14  viewed as part of your responsibility as  10:52:26
15  director of marketing?                  10:52:28
16      A.  Yes.                            10:52:29
17      Q.  And tell me what that consisted  10:52:29
18  of.                                     10:52:30
19      A.  That was what I was just         10:52:31
20  explaining about trying to get across a  10:52:34
21  message to the pharmacists that our product  10:52:35
22  was available, that -- you know, you couldn't  10:52:36
23  talk about we had a smaller size; you could  10:52:39
24  show, basically.  You had to -- we couldn't  10:52:41
25  compare it to a Mylan product or any other  10:52:44

Page 96

1  competitor.  You had to show that -- you  10:52:46
2  know, we showed the hand and showed how small  10:52:51
3  it was next to somebody's hand.          10:52:53
4      Our fentanyl lozenge, I know we      10:52:54
5  advertise.  I think that in the trade    10:52:58
6  journals we would simply show that we had the  10:53:01
7  four sizes, strengths, and just the color of  10:53:03
8  the packaging because that helped, because  10:53:09
9  the pharmacists could quickly identify which  10:53:10
10  strength they were pulling from the shelf if  10:53:12
11  they were taking care of a patient and      10:53:14
12  filling a prescription.                  10:53:16
13      And methylphenidate, just to        10:53:19
14  announce that it was available.          10:53:21
15      Q.  Okay.  Item Number 4 on          10:53:23
16  Exhibit 3 is "identify new product/growth  10:53:34
17  areas, including new dosage forms of existing  10:53:37
18  products, preparing the necessary analyses to  10:53:40
19  support same, which includes working with R&D  10:53:43
20  on potential product line extensions and  10:53:46
21  working with new product group and business  10:53:48
22  development to develop strategies and tactics  10:53:51
23  resulting in additions to Mallinckrodt's  10:53:53
24  product portfolio."                     10:53:57
25      Does Item 4 describe an aspect      10:53:59

Page 97

1  of what you understood to be your        10:54:06
2  responsibilities as director of marketing?  10:54:08
3      A.  Yes, it does.                    10:54:09
4      Q.  And tell me what you did to go    10:54:10
5  about identifying new product and growth  10:54:11
6  areas in the matter described in Item 4 here.  10:54:14
7      A.  The easiest path we had for new  10:54:17
8  products would be to do line extensions.  For  10:54:22
9  example, oxycodone had 5, 10, 15, 20 and  10:54:23
10  30 milligrams.  We did not have the 10 or the  10:54:28
11  30 milligram to launch those.            10:54:30
12      We looked at solutions.  If we       10:54:32
13  had the finished dosage form in an oral  10:54:33
14  solid, can we launch it in a solution form.  10:54:36
15      We looked at other products         10:54:39
16  like methylphenidate ER; should we continue  10:54:40
17  filing for a patent challenge.  And if so, I  10:54:44
18  would be involved in those discussions with  10:54:49
19  legal about what would be the implications if  10:54:51
20  we want a patent challenge versus not.  So  10:54:53
21  there was many things like that.         10:54:56
22      And then there were other           10:54:58
23  products that were in the pipeline portfolio  10:55:01
24  when I started, and we killed some of those,  10:55:05
25  too, and said they're not worth launching  10:55:06

Page 98

1  because the market would dwindle before we        10:55:09
2  even got to market, so there wasn't anything       10:55:12
3  of value there.                                    10:55:14
4      Q.   Okay.  And so were there any              10:55:16
5  new products you can recall during your time       10:55:17
6  at Mallinckrodt that were developed where          10:55:20
7  the -- where the impetus for that development       10:55:26
8  came from the marketing department?                10:55:28
9      A.   None that they took on that I             10:55:30
10 can remember.                                       10:55:40
11     Q.   Okay.  And so in terms of the             10:55:40
12 new products, it was -- marketing                   10:55:41
13 department's involvement was essentially            10:55:44
14 responding to ideas that came out of other --       10:55:49
15 other parts of the company?                         10:55:50
16     A.   Right.                                     10:55:51
17     Q.   Okay.  Item Number 5.  And I              10:55:53
18 won't read the whole paragraph, but at the --       10:56:08
19 toward the end it talks about compliance with       10:56:11
20 associated product-related dimensions as far        10:56:16
21 as working with the regulatory and legal            10:56:19
22 departments.                                         10:56:23
23          Who did you work with -- who              10:56:23
24 did the folks in the marketing department           10:56:24
25 under you, as part of your team, work with in       10:56:27

Page 99

1  the regulatory and legal departments to            10:56:30
2  ensure compliance as it's described in this        10:56:32
3  paragraph?                                          10:56:35
4      A.   Primarily -- oh.                           10:56:36
5          MR. O'CONNOR:  Object to form.             10:56:36
6          THE WITNESS:  Primarily we                 10:56:37
7      worked with Stu Kim on regulatory and         10:56:39
8      Don Lohman on compliance.                      10:56:43
9  QUESTIONS BY MR. GOTTO:                             10:56:45
10     Q.   Okay.  And when you say "on              10:56:45
11 regulatory" in this setting, what do you            10:56:48
12 mean?  What sorts of things did you work on?        10:56:51
13     A.   Again, I'll go back to the                10:56:53
14 methylphenidate ER.  Stu Kim was working on a       10:56:55
15 strategy on some of the products, like how we       10:56:59
16 would respond to the FDA on some of our             10:57:03
17 filings.  Methylphenidate ER, should we             10:57:05
18 continue filing a paragraph IV challenge.           10:57:09
19 Even though other people were ahead of us,          10:57:10
20 should we continue doing that.  What value          10:57:12
21 would it bring to the company if we won.  And       10:57:13
22 so -- because it's an expense, obviously, to        10:57:15
23 hire external lawyers to do that, so was it         10:57:18
24 worth it to hire them to do that.                    10:57:20
25          And just if there were                    10:57:22

Page 100

1  regulatory issues like the changes in              10:57:26
2  hydrocodone.  It moved from a Schedule III to       10:57:28
3  a Schedule II.                                      10:57:30
4      Q.   Okay.  Item 8 is "work closely           10:57:31
5  with sales to ensure business plans are met."       10:57:43
6          Was that part of your                      10:57:46
7  responsibility as director of marketing?            10:57:48
8      A.   Yes.                                       10:57:49
9      Q.   And so who did you work with in          10:57:50
10 the sales department to ensure business plans       10:57:53
11 are met?                                             10:57:55
12     A.   Primarily I worked with John             10:57:57
13 Adams in the beginning, and then John left,        10:57:58
14 and then I worked with Jane Williams.               10:58:00
15     Q.   Okay.  Do you recall when                10:58:03
16 Mr. Adams left?                                      10:58:04
17     A.   Not really.  I think it was              10:58:05
18 around 2011 or 2012.                                10:58:08
19     Q.   Okay.  And in terms of working           10:58:10
20 with those individuals, what was -- describe        10:58:12
21 for me the types of things you would interact       10:58:15
22 with them on.                                        10:58:18
23     A.   Marketing would interact with            10:58:19
24 sales on a regular basis.  Sales would be --        10:58:23
25 would bring customer requests to us such as         10:58:28

Page 101

1  the customer wants this incentive, they want       10:58:33
2  this pricing, here's the contract.  So I           10:58:35
3  constantly worked with them on the contract        10:58:39
4  terms, incentives that the customers were          10:58:43
5  receiving, any value that the customer got,         10:58:45
6  because we did the analytics in my team on         10:58:47
7  what the real net margin was for that              10:58:49
8  particular customer, those product mix or          10:58:52
9  whatever was in the mix with that.  And then       10:58:54
10 we also worked with them on forecasting.            10:58:58
11     Q.   Okay.  In terms of contract              10:59:02
12 terms, pricing, et cetera, incentives and the      10:59:04
13 like, who made the ultimate decision on            10:59:08
14 whether to offer a particular term or              10:59:13
15 incentive to a customer?                            10:59:15
16     A.   If we were in conflict, if I             10:59:17
17 was in conflict with the vice president of         10:59:20
18 sales, it would roll up to our president of        10:59:21
19 generics.                                           10:59:25
20     Q.   Okay.  And that was?                     10:59:25
21     A.   Mike Gunning at one time and             10:59:26
22 then David Silver for an interim then then         10:59:29
23 Walt Kaczmarek.                                     10:59:35
24     Q.   Do you recall that occurring            10:59:38
25 from time to time?                                  10:59:39

Page 102

```
 1    A.   Yes.                    10:59:40
 2    Q.   Okay.  When can you recall that   10:59:41
 3  occurring?                      10:59:42
 4    A.   There were several instances   10:59:43
 5  when we would not give an incentive, and then  10:59:46
 6  sales would push back.  And either I would  10:59:52
 7  refer to the contract and they would comply  10:59:58
 8  with the contract, or if we came to a     11:00:01
 9  disagreement about what we should do as far  11:00:05
10  as should we offer an incentive, then that  11:00:09
11  would roll up to our boss.  And I do remember  11:00:11
12  that happening with a particular customer one  11:00:13
13  time with Jane Williams.          11:00:16
14    Q.   And who was -- what was that   11:00:18
15  occasion?                      11:00:19
16    A.   It was -- we were looking at a  11:00:19
17  smaller customer that wanted a price in order  11:00:20
18  to secure their business away from a     11:00:24
19  competitor, and by offering that, we would  11:00:26
20  have to offer a really big customer that same  11:00:31
21  discount, which would devalue the entire  11:00:33
22  product line.                   11:00:35
23    Q.   I see.                 11:00:35
24         Do you recall what the product  11:00:36
25  line was?                      11:00:36
```

Page 103

```
 1    A.   No.  I just remember the     11:00:37
 2  moment.                        11:00:40
 3    Q.   Okay.  Did you personally    11:00:41
 4  interact with any of the national account  11:00:47
 5  managers?                      11:00:49
 6    A.   Yes, I did.               11:00:49
 7    Q.   And with whom can you recall   11:00:50
 8  interacting?                   11:00:52
 9    A.   I would generally interact with  11:00:53
10  all of them at some point.        11:00:54
11    Q.   Okay.  And what was the -- what  11:00:55
12  were the types of issues you would interact  11:00:57
13  with them on?                   11:00:59
14    A.   Again, it would go back to the  11:01:00
15  contract terms, the incentives, the customer  11:01:03
16  earned their incentive.  Because the contract  11:01:07
17  admin team would come to me and say, "This  11:01:10
18  customer wants this payment and it's not --  11:01:12
19  they didn't reach their goal."     11:01:16
20         And so I would say, "yes, they  11:01:17
21  deserve it" or "they don't," based on doing  11:01:20
22  market research on what they've done.  So  11:01:21
23  that would happen on occasion.  The NAMs  11:01:24
24  would come to me.               11:01:27
25         Or the NAMs would come to me   11:01:27
```

Page 104

```
 1  and tell me that a customer wasn't agreeing  11:01:28
 2  to something in the terms, do we want to just  11:01:32
 3  quit negotiating, or what do we want to do.  11:01:34
 4    Q.   Okay.  It appears to me from   11:01:36
 5  some of the documents I've seen that you and  11:01:41
 6  Mr. Borelli had some difficulties in your  11:01:43
 7  relationship from time to time; is that fair?  11:01:46
 8         MR. O'CONNOR:  Object to form.  11:01:48
 9         THE WITNESS:  I would agree   11:01:48
10    with that.                   11:01:49
11  QUESTIONS BY MR. GOTTO:           11:01:49
12    Q.   Okay.  Can you recall the     11:01:50
13  circumstances that gave rise to those  11:01:51
14  difficulties?                   11:01:53
15    A.   Yes.  Victor would campaign on  11:01:53
16  behalf of the customer oftentimes to gain  11:02:02
17  business or to give incentives, and I would  11:02:07
18  do analytics around it because I'm a numbers  11:02:11
19  person.  So I would say, no, we don't want to  11:02:13
20  do that.  And he and I had business     11:02:15
21  challenges.  We did not see the business the  11:02:17
22  same way.                      11:02:20
23    Q.   Okay.  Do you recall how those  11:02:21
24  issues were resolved from time to time?  11:02:24
25         MR. O'CONNOR:  Object to form.  11:02:29
```

Page 105

```
 1         THE WITNESS:  Victor --      11:02:30
 2    sometimes they escalated, and     11:02:33
 3    sometimes Victor said, okay, he -- he  11:02:36
 4    wouldn't pursue it anymore.  It just  11:02:40
 5    depended on the situation and how   11:02:43
 6    strongly he felt about it.        11:02:45
 7  QUESTIONS BY MR. GOTTO:           11:02:46
 8    Q.   Do you recall anyone at the    11:02:48
 9  company ever communicating to you anything to  11:02:50
10  the effect that Mr. Borelli would say  11:02:54
11  anything to make a sale?           11:02:58
12         MR. O'CONNOR:  Object to form.  11:02:59
13         THE WITNESS:  I don't recall   11:03:01
14    that.                      11:03:03
15  QUESTIONS BY MR. GOTTO:           11:03:03
16    Q.   Okay.  Did you interact with   11:03:03
17  Ms. Stewart from time to time?     11:03:04
18         MR. O'CONNOR:  Object to form.  11:03:11
19         THE WITNESS:  I know the name,  11:03:11
20    but I don't remember who she is or  11:03:14
21    what she did.                11:03:15
22  QUESTIONS BY MR. GOTTO:           11:03:15
23    Q.   Okay.  Then I guess you didn't  11:03:16
24  interact with her very much, if at all?  11:03:17
25    A.   Yeah, probably not.          11:03:20
```

Page 106

1    Q.   Okay.  How about Mr. Rausch?    11:03:21
2    A.   Jim?    11:03:23
3    Q.   Uh-huh.    11:03:23
4    A.   Rausch?  Yes.    11:03:24
5    Q.   Okay.  In what context did you    11:03:26
6    interact with him?    11:03:29
7    A.   Occasionally orders would be    11:03:29
8    held up and -- because we were allocating, or    11:03:31
9    a customer issue might come up, and they    11:03:34
10   would contact my department.    11:03:36
11   Q.   Okay.    11:03:38
12   A.   Or he's in customer service, so    11:03:41
13   the customer service team would contact my    11:03:44
14   department or me personally.    11:03:47
15       (Mallinckrodt-Collier Exhibit 4    11:04:12
16   marked for identification.)    11:04:12
17   QUESTIONS BY MR. GOTTO:    11:04:12
18   Q.   Okay.  Let's mark another    11:04:12
19   document here.    11:04:13
20   We've marked as Exhibit 4 a    11:04:14
21   document bearing Bates MNK-T1_0004887323, and    11:04:30
22   it's a two-page document.  One page is blank,    11:04:40
23   indicating that it was produced in native    11:04:44
24   format.  The second page is another    11:04:45
25   organizational chart relating to specialty    11:04:50

Page 107

1    generic marketing goals and responsibilities    11:04:59
2    as of 1/12/2010.    11:04:55
3        Take a moment to look at this    11:05:00
4    chart and tell me if that -- if this chart is    11:05:02
5    consistent with your recollection of those    11:05:05
6    roles and responsibilities at this time.    11:05:07
7    A.   Yes.    11:05:09
8    Q.   Okay.  And I think you've    11:05:10
9    already indicated Lisa Lundergan, that's --    11:05:17
10   she changed her name to Cardetti at some    11:05:19
11   point?    11:05:22
12   A.   Correct.    11:05:22
13   Q.   Okay.  And at this point she    11:05:22
14   was an associate.    11:05:25
15       Did she report to    11:05:25
16   Ms. Muhlenkamp at this point?    11:05:26
17   A.   Yes.    11:05:28
18   Q.   Okay.  And so for -- there are    11:05:29
19   various products listed under each of the    11:05:37
20   product managers, and to the best of your    11:05:40
21   recollection, is that allocation of products    11:05:45
22   among those product managers as of January    11:05:49
23   2010 accurate?    11:05:51
24   A.   Yes.    11:05:52
25   Q.   Okay.  When you joined    11:05:54

Page 108

1    Mallinckrodt -- so this -- this chart that    11:06:07
2    we're looking at from January 2010, this is    11:06:08
3    about six months after you joined the    11:06:11
4    company, correct?    11:06:13
5    A.   Right.    11:06:13
6    Q.   And so when you joined the    11:06:14
7    company, were you aware of the existence of a    11:06:16
8    suspicious order monitoring program at the    11:06:23
9    company at that time?    11:06:25
10       MR. O'CONNOR:  Object to form.    11:06:26
11       THE WITNESS:  I don't    11:06:27
12   understand what you mean was I aware    11:06:29
13   of a suspicious order monitoring    11:06:31
14   program.    11:06:32
15       Oh, in 2010, did I know that    11:06:34
16   they had one?    11:06:35
17   QUESTIONS BY MR. GOTTO:    11:06:36
18   Q.   Yes, when you joined in 2009,    11:06:36
19   into early 2010.    11:06:39
20   A.   Yes, I was aware that there was    11:06:41
21   a compliance team.    11:06:42
22   Q.   Okay.  And who was involved in    11:06:45
23   the compliance team?    11:06:47
24   A.   I remember Don Harper -- I    11:06:47
25   mean, Don Lohman, Karen Harper, and then --    11:06:53

Page 109

1    those were the only two I interacted with.    11:06:54
2    Q.   Okay.  So you knew there was a    11:06:57
3    compliance team.    11:06:59
4        Did you --    11:07:00
5    A.   Right.    11:07:01
6    Q.   Did you have any understanding    11:07:02
7    of how the suspicious order monitoring    11:07:03
8    process worked at Mallinckrodt at that time?    11:07:07
9    A.   No.  I just knew they would    11:07:09
10   call on occasion about high orders.    11:07:11
11   Q.   Okay.  Were you familiar with    11:07:15
12   the term "peculiar order" at that time?    11:07:17
13   A.   I don't remember them calling    11:07:20
14   it that.    11:07:22
15   Q.   Okay.  When you say they would    11:07:23
16   call from time to time with high orders, what    11:07:29
17   do you recall them calling and asking about?    11:07:33
18   A.   On occasion they would call my    11:07:35
19   department and say that a customer ordered    11:07:37
20   more than their usual amount; did we know    11:07:39
21   why.  Did we just win a contract award where    11:07:43
22   we took the business from a competitor.  Is    11:07:46
23   the customer buying an inventory for the end    11:07:49
24   of the year.  Sometimes they'd do that for    11:07:52
25   inventory purposes.  So they would ask those    11:07:55

Page 110

```
1   kinds of questions.                11:07:58
2      Q.   Okay.  And would they ask that  11:07:59
3   directly of you or would they ask that of the  11:08:01
4   product managers?               11:08:04
5      A.   They would sometimes ask it of  11:08:06
6   the product managers, and then if the product  11:08:08
7   managers didn't know, they'd ask me, and I'd  11:08:10
8   work with the NAMs to find out what was going  11:08:12
9   on.                           11:08:15
10     Q.   Okay.  Can you remember     11:08:15
11  specific examples where you worked with one  11:08:15
12  or more of the national account managers  11:08:18
13  responding to an inquiry you had received in  11:08:20
14  this regard?                    11:08:22
15     A.   Not a specific example, no.   11:08:22
16     Q.   Okay.  But you recall that it  11:08:24
17  did happen?                    11:08:25
18     A.   Yes.                   11:08:26
19     Q.   And do you recall the       11:08:26
20  approximate frequency with which that would  11:08:28
21  happen?                       11:08:30
22     A.   I don't remember it being very  11:08:30
23  frequent.  It did happen.  I don't remember  11:08:34
24  the frequency.                  11:08:36
25     Q.   Okay.  Do you recall any of the  11:08:37
```

Page 111

```
1   feedback you received from the national  11:08:41
2   account managers when you were personally  11:08:43
3   involved in responding to an inquiry in this  11:08:48
4   regard?                       11:08:49
5      A.   No.  The national account    11:08:50
6   managers obviously wouldn't be happy if an  11:08:55
7   order was cut off, but I don't even remember  11:08:57
8   the outcomes because I was not involved in  11:09:00
9   the decision about whether -- I would just  11:09:03
10  report the information, and I was not    11:09:04
11  responsible for the outcome of shipping or  11:09:07
12  not shipping.                   11:09:09
13     Q.   Okay.  Do you recall from whom  11:09:10
14  the inquiry would come?           11:09:14
15     A.   Karen Harper's office.       11:09:15
16     Q.   Okay.  And am I understanding  11:09:17
17  you correctly that generally the inquiry  11:09:20
18  would be along the lines that we've received  11:09:23
19  a large order and we're trying to ascertain  11:09:26
20  the reasons for this increased size in order?  11:09:30
21        MR. O'CONNOR:  Object to form.  11:09:33
22        THE WITNESS:  It could be for   11:09:33
23     any number of reasons that they    11:09:37
24     flagged the order, but they would tell  11:09:38
25     us, "We've got an issue, and can you  11:09:41
```

Page 112

```
1   help us find out more information."    11:09:41
2   QUESTIONS BY MR. GOTTO:           11:09:43
3      Q.   Okay.  So apart from just the  11:09:43
4   size of the order, what other sorts of issues  11:09:45
5   can you recall them flagging an order about?  11:09:47
6      A.   Frequency.  The customer      11:09:50
7   ordered more than -- most of the customers  11:09:52
8   order once a week, or even some of the small  11:09:55
9   guys once a month, and they might have  11:09:59
10  ordered more often than usual and did we know  11:10:00
11  why.                          11:10:03
12     Q.   Okay.  And when you would      11:10:03
13  receive such an inquiry, would it come   11:10:06
14  through an e-mail typically?      11:10:09
15     A.   Yes.                   11:10:10
16     Q.   Okay.  So to the extent you    11:10:11
17  received -- you personally received any such  11:10:14
18  inquiries, they would be reflected in -- to  11:10:16
19  the best of your knowledge, they'd be    11:10:18
20  reflected in your e-mails, correct?    11:10:20
21        MR. O'CONNOR:  Object to form.  11:10:21
22        THE WITNESS:  Yes.  There may   11:10:21
23     have been phone calls, but I don't    11:10:25
24     recall, you know, if it was phone call  11:10:28
25     or e-mail only.                11:10:29
```

Page 113

```
1   QUESTIONS BY MR. GOTTO:           11:10:30
2      Q.   Okay.  And when you inquired --  11:10:30
3   and so when you personally received an   11:10:31
4   inquiry, you indicated you would inquire of  11:10:33
5   the national account managers, correct?  11:10:36
6      A.   Yes.                   11:10:37
7      Q.   Did you take any other steps    11:10:37
8   other than inquiring of the national account  11:10:39
9   managers?                     11:10:41
10     A.   Yes.  We would look at the     11:10:41
11  customer historical volume on -- overall and  11:10:44
12  find out if they did indeed award us a new  11:10:50
13  product, if we got a new contract with them.  11:10:54
14  If they were in fair share for the market, if  11:10:56
15  they were oversized share for the market,  11:10:59
16  that would be a concern.           11:11:02
17     Q.   What does that mean, "fair     11:11:03
18  share" versus "oversized share"?   11:11:06
19     A.   For example, if you had a small  11:11:07
20  distributor that ordered 30 percent of the  11:11:10
21  total market value, that's a concern.   11:11:11
22     Q.   Okay.  And when you responded  11:11:13
23  back to Ms. Harper's department to respond to  11:11:23
24  the inquiry, would that be in an e-mail form  11:11:26
25  that you would have responded?      11:11:27
```

Page 114

1      MR. O'CONNOR: Object to form.      11:11:29
2      THE WITNESS: Possibly.      11:11:29
3   QUESTIONS BY MR. GOTTO:      11:11:30
4      Q.   In what other forms might you      11:11:30
5   have responded?      11:11:33
6      A.   Phone call.      11:11:34
7      Q.   Do you recall if there was any      11:11:34
8   requirement in place at Mallinckrodt at      11:11:40
9   time that a response to any such inquiry from   11:11:42
10  Ms. Harper's department be in writing?      11:11:46
11     A.   I don't recall that.      11:11:49
12     Q.   Do you know if any order as to      11:11:51
13  which you personally received an inquiry from   11:12:00
14  Ms. Harper's department was ultimately      11:12:02
15  determined to be a suspicious order and      11:12:05
16  reported to the DEA?      11:12:07
17     A.   Honestly, I never got that      11:12:08
18  information, so I wouldn't know.      11:12:11
19     Q.   Okay.  Do you know if the      11:12:14
20  product managers who reported to you received   11:12:22
21  inquiries from Ms. Harper's department with   11:12:27
22  respect to potentially suspicious orders?      11:12:31
23     A.   I don't know that for a fact.   11:12:34
24     Q.   Okay.  Do you recall any      11:12:37
25  situation or occasion in which      11:12:45

Page 115

1   Ms. Muhlenkamp, for example, informed you      11:12:47
2   that she had received an inquiry from      11:12:51
3   Ms. Harper's department with respect to a      11:12:56
4   potentially suspicious order?      11:12:58
5      A.   I don't remember any of that.   11:12:59
6      Q.   Okay.  Did you perform periodic   11:13:02
7   evaluations of the performance of the product   11:13:12
8   managers who reported to you?      11:13:14
9      A.   Yes, I did.      11:13:14
10     Q.   And so did that evaluation      11:13:15
11  include in any regard their activities in      11:13:18
12  responding to inquiries they had received      11:13:24
13  with respect to potentially suspicious      11:13:26
14  orders?      11:13:29
15     A.   I don't recall ever having that   11:13:29
16  in anybody's review.  It would be more around   11:13:33
17  forecasting accuracy.      11:13:37
18     Q.   Okay.  With respect to      11:13:39
19  Ms. Muhlenkamp in particular, do you recall   11:13:42
20  being aware at any point of any -- well,      11:13:44
21  strike that.      11:13:48
22         You've already testified with      11:13:48
23  regard to activities Ms. Muhlenkamp took when   11:13:51
24  the Sunrise issues came up and accessing the   11:13:53
25  chargeback data.  Apart from that example, do   11:13:58

Page 116

1   you recall other circumstances in which you      11:14:04
2   were aware that Ms. Muhlenkamp was conducting   11:14:06
3   any review of a potentially suspicious order?   11:14:11
4      A.   No, I don't recall that.  You'd   11:14:15
5   have to ask Kate.      11:14:18
6      Q.   Okay.  How about      11:14:19
7   Mr. Montgomery?      11:14:23
8      A.   I doubt that he would be      11:14:24
9   involved.  He was not strong on analytics.      11:14:26
10     Q.   Okay.  And how about Ms. Myers?   11:14:29
11     A.   No.      11:14:34
12     Q.   Or Ms. Lundergan?      11:14:36
13     A.   I'm not sure about Lisa either.   11:14:39
14     Q.   Okay.  So in -- so when the      11:14:44
15  compliance department had a question      11:15:01
16  regarding a potentially suspicious order, was   11:15:02
17  there a procedure in place at Mallinckrodt      11:15:06
18  under which they would refer that question to   11:15:16
19  any particular person in the marketing      11:15:19
20  department?      11:15:22
21     MR. O'CONNOR: Object to form.      11:15:22
22     THE WITNESS: I'm not sure what      11:15:23
23  you're asking.  Could you rephrase the      11:15:24
24  question?      11:15:26
25

Page 117

1   QUESTIONS BY MR. GOTTO:      11:15:26
2      Q.   Sure.      11:15:26
3         If someone in the compliance      11:15:27
4   department had a question regarding whether   11:15:31
5   an order was a suspicious order and they      11:15:35
6   wanted to refer that to the marketing      11:15:38
7   department for further information, was there   11:15:40
8   a procedure in place at Mallinckrodt whereby   11:15:43
9   they would know what person at the -- in the   11:15:45
10  marketing department was the appropriate      11:15:48
11  person to refer that question to?      11:15:49
12     MR. O'CONNOR: Object to form.      11:15:51
13     THE WITNESS: I'm not sure a      11:15:51
14  procedure, per se.  Karen Harper might      11:15:57
15  be able to tell you that if she had a      11:16:00
16  process in which she followed, but I'm      11:16:02
17  not aware of a specific procedure that      11:16:03
18  was taught to my team.      11:16:05
19  QUESTIONS BY MR. GOTTO:      11:16:06
20     Q.   Okay.  So in terms of -- within   11:16:06
21  the marketing department, from your      11:16:08
22  standpoint, there wasn't any formal procedure   11:16:11
23  in place that stated that inquiries from the   11:16:17
24  compliance department with respect to      11:16:24
25  potentially suspicious orders that were made   11:16:26

Page 118

1  to the marketing department should be handled  11:16:28
2  by person A, person B, person C, anything  11:16:31
3  like that; is that fair?  11:16:33
4        MR. O'CONNOR:  Objection.  11:16:36
5        THE WITNESS:  I would say  11:16:37
6  that's fair.  They understood who  11:16:38
7  managed which products, so they might  11:16:41
8  go to that specific product manager.  11:16:42
9        But I'm still not clear on  11:16:44
10 where you're going with this because  11:16:50
11 it -- it wasn't a formal policy that  11:16:52
12 I'm aware of.  Karen might have had  11:16:54
13 something in place, but I don't  11:16:57
14 remember us ever being educated on  11:16:58
15 something about this is exactly how  11:17:00
16 you handle it.  11:17:01
17 QUESTIONS BY MR. GOTTO:  11:17:02
18      Q.   Okay.  And so when you say  11:17:02
19 "they" knew who handled which products, you  11:17:07
20 mean the compliance department knew which --  11:17:09
21 which product manager handled which product;  11:17:11
22 is that fair?  11:17:14
23      A.   Correct.  11:17:14
24      Q.   Okay.  And certain inquiries  11:17:15
25 you became involved in personally.  11:17:24

Page 119

1        Are you aware of any inquiries  11:17:28
2  that were referred to anyone in the market  11:17:30
3  department -- marketing department, you know,  11:17:32
4  inquiries regarding potentially suspicious  11:17:36
5  orders, other than the inquiries that you  11:17:39
6  personally became involved in?  11:17:41
7       A.   I'm not aware unless they  11:17:43
8  involved me.  11:17:45
9       Q.   Okay.  11:17:47
10      A.   They may have made other  11:17:47
11 inquiries and I would not be aware.  11:17:49
12      Q.   Okay.  Was it your expectation  11:17:53
13 that if a product manager received an inquiry  11:17:56
14 from the compliance department with respect  11:18:00
15 to a potentially suspicious order that the  11:18:02
16 product manager would inform you of that  11:18:05
17 inquiry?  11:18:07
18      A.   The product managers were  11:18:07
19 generally good about informing me of things  11:18:11
20 going on with their products, so I may have  11:18:14
21 known, but they may not have always advised  11:18:16
22 me.  If they didn't tell me, I don't know.  11:18:19
23      Q.   Sure.  11:18:21
24        But as the -- as their -- the  11:18:21
25 person to whom they reported, was it your  11:18:27

Page 120

1  expectation that they would inform you of  11:18:29
2  their receipt of an inquiry from the  11:18:31
3  compliance department with respect to a  11:18:33
4  potentially suspicious order?  11:18:36
5       A.   I didn't have that expectation.  11:18:36
6  They are responsible product managers, and I  11:18:42
7  expect them to answer the question.  They  11:18:44
8  were not making the final decision.  So they  11:18:45
9  would supply the information needed, and I  11:18:47
10 knew they knew how to supply the correct  11:18:48
11 information.  So it was not my expectation  11:18:50
12 they would provide it to me.  11:18:52
13      Q.   Okay.  And so there was no --  11:18:54
14 is it fair to say that there was no  11:18:56
15 requirement in place within the marketing  11:18:59
16 department that a product manager report to  11:19:01
17 you when they received a -- an inquiry from  11:19:05
18 the compliance department as to a potentially  11:19:09
19 suspicious order?  11:19:12
20      A.   That would be a good  11:19:12
21 assumption.  11:19:14
22      Q.   Okay.  Okay.  Focusing back on  11:19:14
23 exhibit -- what are we on, 4?  I realize  11:19:22
24 you've testified that the composition of your  11:19:29
25 team changed over time as folks left.  11:19:33

Page 121

1        In terms of the particular  11:19:36
2  products that are set forth on Exhibit 4,  11:19:39
3  when Ms. Muhlenkamp left, did Lisa  11:19:45
4  Lundergan/Cardetti -- Cardetti, is it?  11:19:54
5       A.   Yes.  11:19:57
6       Q.   Thank you.  11:19:57
7        Did she assume responsibility  11:19:57
8  for those products?  11:19:58
9       A.   Actually, they -- I split them  11:19:59
10 out between Lisa, Marc, and hired a new  11:20:01
11 product manager, Jennifer Block.  11:20:05
12      Q.   Okay.  All right.  And  11:20:06
13 Mr. Montgomery, was he a product manager  11:20:09
14 through your tenure at Mallinckrodt?  11:20:13
15      A.   No, he got promoted to senior  11:20:14
16 product manager while I was there.  11:20:16
17      Q.   Okay.  And so senior product  11:20:18
18 manager was -- did he still report to you --  11:20:20
19      A.   Yes, he did.  11:20:22
20      Q.   Okay.  Were there other senior  11:20:23
21 product managers?  11:20:28
22      A.   No, he was the only one at the  11:20:29
23 time.  11:20:31
24      Q.   Okay.  And who took his spot as  11:20:31
25 product manager when he was promoted?  11:20:33

Highly Confidential - Subject to Further Confidentiality Review

| Page 122 | |
|---|---|

1    A.   Jake Longenecker.            11:20:36
2    Q.   Okay.  The particular products    11:20:38
3  that are listed under Mr. Montgomery's name    11:20:41
4  on Exhibit 4, did they -- were they taken by    11:20:45
5  Mr. Longenecker when he took Mr. Montgomery's    11:20:48
6  position?                    11:20:52
7    A.   No, those were taken over by    11:20:52
8  Jennifer Block.                11:20:57
9    Q.   Okay.                11:20:57
10    A.   And Lisa Lundergan left, so    11:20:58
11  Jake took over Lisa's products and some of    11:21:01
12  Kate's.  So it was mixed on who was managing    11:21:04
13  what.                    11:21:08
14    Q.   And I'm sorry, when you say    11:21:09
15  Lisa Lundergan left, I thought -- did I    11:21:14
16  misunderstand?  I thought she had taken --    11:21:17
17    A.   She had gotten a NAM position,    11:21:19
18  yeah --                    11:21:22
19    Q.   Okay.                11:21:23
20    A.   -- when she left my department.    11:21:23
21  Sorry.                    11:21:26
22    Q.   Okay.  Great.  Okay.  You can    11:21:26
23  set that document aside.            11:21:27
24       When you joined Mallinckrodt in    11:21:29
25  mid-2009, did you have any awareness at that    11:21:54

| Page 123 | |
|---|---|

1  time of circumstances that have come to be    11:22:05
2  known as the opioid epidemic in this country?    11:22:11
3       MR. O'CONNOR:  Object to form.    11:22:13
4       THE WITNESS:  I was not aware    11:22:13
5    of the opioid epidemic, as they call    11:22:17
6    it today, no.                11:22:19
7  QUESTIONS BY MR. GOTTO:            11:22:20
8    Q.   Okay.  When did you become    11:22:21
9  aware of that, do you think?            11:22:22
10    A.   Probably in 2010 when I started    11:22:23
11  hearing about Sunrise and then started --    11:22:28
12  then started doing a little bit of background    11:22:31
13  on what was going on.            11:22:33
14    Q.   Okay.  What kind of background    11:22:37
15  did you do?                11:22:39
16    A.   Just looked to see about    11:22:39
17  Florida, the state of Florida, and how many    11:22:41
18  pills were being dispensed in the state of    11:22:43
19  Florida.                    11:22:47
20    Q.   Okay.  And how did you go about    11:22:47
21  doing that?                11:22:48
22    A.   Pulling IMS data and looking at    11:22:48
23  the population of Florida versus the rest of    11:22:53
24  the country, and the percent of pills that    11:22:54
25  were being dispensed in Florida versus the    11:22:56

| Page 124 | |
|---|---|

1  rest of the country.                11:22:58
2    Q.   Okay.  And what did you    11:22:59
3  discover?                    11:23:01
4    A.   It was higher in Florida, but    11:23:01
5  there was no -- we had no cause and effect.    11:23:03
6  We had no causal understanding of why there    11:23:08
7  was greater dispensing down there.        11:23:13
8    Q.   Okay.  When you say "we," do    11:23:14
9  you mean Mallinckrodt?            11:23:17
10    A.   Yeah.                11:23:17
11    Q.   Okay.                11:23:17
12    A.   Yeah.                11:23:17
13    Q.   So this effort of looking into    11:23:18
14  Florida distribution in particular, was this    11:23:25
15  something that you were -- did anyone else at    11:23:27
16  Mallinckrodt ask you to undertake this    11:23:34
17  inquiry?                    11:23:35
18       MR. O'CONNOR:  Object to form.    11:23:35
19       THE WITNESS:  No.  It was Kate    11:23:36
20    Neely in part of the -- looking into    11:23:39
21    Sunrise Medical.  We said, "They're    11:23:43
22    selling into the state of Florida.    11:23:46
23    What else is going into Florida that    11:23:49
24    we don't know about," because they    11:23:51
25    said it was physician prescribing down    11:23:52

| Page 125 | |
|---|---|

1    there.  So we were trying to    11:23:54
2    understand that.                11:23:55
3  QUESTIONS BY MR. GOTTO:            11:23:55
4    Q.   Okay.  And when you said "they    11:23:55
5  said," these are press accounts you were --    11:23:57
6    A.   Yeah, I'm sorry.            11:23:59
7    Q.   Okay.  And so -- so were you    11:24:02
8  looking into distribution in Florida of    11:24:04
9  product that Mallinckrodt had originally    11:24:09
10  manufactured, or were you looking more    11:24:11
11  generally at the entire industry?        11:24:13
12       MR. O'CONNOR:  Object to form.    11:24:14
13       THE WITNESS:  That I remember,    11:24:15
14    I think we were looking at    11:24:17
15    Mallinckrodt specifically.        11:24:20
16  QUESTIONS BY MR. GOTTO:            11:24:22
17    Q.   Okay.  And what did you do with    11:24:22
18  that information after you -- after you    11:24:25
19  developed it?                11:24:28
20    A.   Turned it over to the    11:24:29
21  compliance team.                11:24:31
22    Q.   Okay.  And was it to    11:24:32
23  Ms. Harper, or do you remember who in    11:24:35
24  particular --                11:24:37
25    A.   I don't remember specifically.    11:24:37

Page 126

| | |
|---|---|
| 1 | Q. Okay. Do you remember the 11:24:38 |
| 2 | format in which you turned it over? 11:24:39 |
| 3 | A. In a spreadsheet. 11:24:41 |
| 4 | Q. Okay. And did you receive back 11:24:44 |
| 5 | from the compliance department any requests 11:24:49 |
| 6 | for follow-up information or analysis? 11:24:51 |
| 7 | A. Not that I recollect. I 11:24:54 |
| 8 | believe another department started running 11:24:59 |
| 9 | reports. 11:25:01 |
| 10 | Q. Okay. Do you know which other 11:25:02 |
| 11 | department? 11:25:04 |
| 12 | A. David Silver's department. 11:25:04 |
| 13 | So we didn't pull any data. No 11:25:07 |
| 14 | one -- I don't recollect anybody asking me 11:25:09 |
| 15 | for more data. 11:25:11 |
| 16 | Q. Okay. And in terms of when you 11:25:13 |
| 17 | pulled this data, this was in the 2010 time 11:25:16 |
| 18 | frame? 11:25:19 |
| 19 | A. Correct. 11:25:19 |
| 20 | Q. And it was triggered by the 11:25:20 |
| 21 | Sunrise DEA issues you became aware of? 11:25:23 |
| 22 | A. Uh-huh. 11:25:25 |
| 23 | Q. Do you know if as a result of 11:25:27 |
| 24 | the compilation of that data there were any 11:25:35 |
| 25 | changes in Mallinckrodt's approach to the 11:25:40 |

Page 127

| | |
|---|---|
| 1 | sale of any of the opioid products? 11:25:47 |
| 2 | MR. O'CONNOR: Object to form. 11:25:49 |
| 3 | THE WITNESS: I don't. 11:25:49 |
| 4 | QUESTIONS BY MR. GOTTO: 11:25:50 |
| 5 | Q. Did you have occasion -- well, 11:25:55 |
| 6 | strike that. 11:25:59 |
| 7 | Part of your job responsibility 11:25:59 |
| 8 | was preparing forecasts and reviewing sales 11:26:01 |
| 9 | results, et cetera, right, on a regular 11:26:05 |
| 10 | basis; is that fair? 11:26:07 |
| 11 | A. Correct. 11:26:07 |
| 12 | Q. So after you compiled the data 11:26:08 |
| 13 | in 2010, as you prepared sales forecasts or 11:26:11 |
| 14 | reviewed sales results going forward, did you 11:26:20 |
| 15 | make any effort to evaluate whether the sales 11:26:22 |
| 16 | patterns going forward were different in any 11:26:29 |
| 17 | way from what had predated the period during 11:26:33 |
| 18 | which you compiled this information about the 11:26:39 |
| 19 | Florida sales? 11:26:41 |
| 20 | MR. O'CONNOR: Object to form. 11:26:42 |
| 21 | THE WITNESS: Yes. 11:26:43 |
| 22 | QUESTIONS BY MR. GOTTO: 11:26:45 |
| 23 | Q. And what did you find? 11:26:45 |
| 24 | A. We projected lower sales. 11:26:46 |
| 25 | Q. And is that what actually 11:26:50 |

Page 128

| | |
|---|---|
| 1 | happened, or is that what you projected 11:26:53 |
| 2 | and -- 11:26:56 |
| 3 | A. It's what actually happened. 11:26:56 |
| 4 | Q. Okay. And do you know what 11:26:57 |
| 5 | caused that to happen, for the sales to be 11:27:02 |
| 6 | lower? 11:27:05 |
| 7 | MR. O'CONNOR: Object to form. 11:27:06 |
| 8 | THE WITNESS: I'm not exactly 11:27:07 |
| 9 | sure, but we projected that some 11:27:10 |
| 10 | customers would not be able to ship 11:27:12 |
| 11 | into the state of Florida and 11:27:14 |
| 12 | estimated their sales. 11:27:16 |
| 13 | QUESTIONS BY MR. GOTTO: 11:27:17 |
| 14 | Q. Okay. And mechanically, how 11:27:17 |
| 15 | did you go about estimating what the 11:27:23 |
| 16 | consequences would be of certain customers 11:27:26 |
| 17 | not being able to ship into Florida? 11:27:28 |
| 18 | A. We would look at what the 11:27:31 |
| 19 | customer's historical sales were. And there 11:27:33 |
| 20 | were certain distribution centers that we 11:27:36 |
| 21 | shipped to, so we could tell which -- the 11:27:38 |
| 22 | wholesaler distributor centers they went to, 11:27:40 |
| 23 | and so we would know that that distributor 11:27:43 |
| 24 | was not going to be able to ship in that 11:27:44 |
| 25 | area. And if we had that business, we knew 11:27:47 |

Page 129

| | |
|---|---|
| 1 | that we lost that business. It may have been 11:27:48 |
| 2 | picked up by a competitor in a region, but we 11:27:50 |
| 3 | knew that it would not be our business 11:27:54 |
| 4 | because we were aligned with a particular 11:27:56 |
| 5 | customer. 11:27:57 |
| 6 | (Mallinckrodt-Collier Exhibit 5 11:28:44 |
| 7 | marked for identification.) 11:28:44 |
| 8 | QUESTIONS BY MR. GOTTO: 11:28:44 |
| 9 | Q. We've marked as Exhibit 5 a 11:28:45 |
| 10 | document that was produced in native format 11:28:47 |
| 11 | under MNK-T1_0004881300. 11:28:48 |
| 12 | And the document is a strategic 11:28:53 |
| 13 | business update for Covidien Pharmaceuticals 11:28:58 |
| 14 | Specialty Generics dated December 2, 2009. 11:29:03 |
| 15 | Could you take a moment and 11:29:06 |
| 16 | look through that document and tell me if you 11:29:07 |
| 17 | recognize it? 11:29:10 |
| 18 | A. Okay. 11:29:11 |
| 19 | Q. Do you recognize that document? 11:30:27 |
| 20 | A. I don't remember it, but I 11:30:29 |
| 21 | recognize it. 11:30:32 |
| 22 | Q. Okay. 11:30:33 |
| 23 | A. You know, the business review. 11:30:33 |
| 24 | Q. Okay. Did -- would you have 11:30:35 |
| 25 | participated in the preparation of any of the 11:30:40 |

Page 130

| | | |
|---|---|---|
| 1 | materials that are contained in this | 11:30:43 |
| 2 | document? | 11:30:44 |
| 3 | A. Yes. | 11:30:44 |
| 4 | Q. Which ones? | 11:30:45 |
| 5 | A. My team might have actually | 11:30:45 |
| 6 | pulled information on the business, the | 11:30:50 |
| 7 | units, and all the financials and, on | 11:30:53 |
| 8 | slide 12, the pipeline -- | 11:31:02 |
| 9 | Q. Okay. | 11:31:05 |
| 10 | A. -- in REMS. | 11:31:06 |
| 11 | Q. What are REMS? | 11:31:07 |
| 12 | A. Risk evaluation and mitigation | 11:31:09 |
| 13 | strategy. They're put in place for | 11:31:13 |
| 14 | particular products so that it requires an | 11:31:16 |
| 15 | additional patient insert and more | 11:31:18 |
| 16 | monitoring. | 11:31:22 |
| 17 | Q. Okay. So it's a regulatory | 11:31:22 |
| 18 | requirement? | 11:31:23 |
| 19 | A. Yes. | 11:31:24 |
| 20 | Q. Okay. So turning to the slides | 11:31:24 |
| 21 | 1 and 2, on slide 2, it refers to meeting | 11:31:31 |
| 22 | participants, yourself and three other | 11:31:38 |
| 23 | Covidien/Mallinckrodt folks, and then four | 11:31:41 |
| 24 | AmerisourceBergen folks, correct? | 11:31:47 |
| 25 | A. Correct. | 11:31:49 |

Page 131

| | | |
|---|---|---|
| 1 | Q. Was this a regular type of | 11:31:49 |
| 2 | meeting that was held between Mallinckrodt | 11:31:55 |
| 3 | and AmerisourceBergen? | 11:31:58 |
| 4 | MR. O'CONNOR: Object to form. | 11:32:00 |
| 5 | THE WITNESS: I would not say | 11:32:01 |
| 6 | it was regular. It was not regular. | 11:32:02 |
| 7 | QUESTIONS BY MR. GOTTO: | 11:32:05 |
| 8 | Q. Okay. Do you recall if there | 11:32:06 |
| 9 | was any particular reason for this -- this | 11:32:09 |
| 10 | meeting and this strategic business update to | 11:32:10 |
| 11 | be prepared? | 11:32:13 |
| 12 | A. No, I don't. I don't. | 11:32:13 |
| 13 | Q. Okay. Do you recall | 11:32:15 |
| 14 | participating in similar strategic meetings | 11:32:18 |
| 15 | with other customers of Mallinckrodt from | 11:32:25 |
| 16 | time to time? | 11:32:28 |
| 17 | MR. O'CONNOR: Object to form. | 11:32:28 |
| 18 | THE WITNESS: I don't recall | 11:32:29 |
| 19 | any specific meetings, no. | 11:32:30 |
| 20 | QUESTIONS BY MR. GOTTO: | 11:32:31 |
| 21 | Q. Okay. Do you recall if -- I | 11:32:32 |
| 22 | realize this -- this is from December of '09, | 11:32:41 |
| 23 | which was your first year at Mallinckrodt. | 11:32:44 |
| 24 | Do you recall if there had been | 11:32:46 |
| 25 | prior meetings with AmerisourceBergen of this | 11:32:48 |

Page 132

| | | |
|---|---|---|
| 1 | type prior to the time you joined | 11:32:51 |
| 2 | Mallinckrodt? | 11:32:53 |
| 3 | A. I would have no knowledge of | 11:32:53 |
| 4 | that. | 11:32:54 |
| 5 | Q. Okay. On slide 7, it says "VIP | 11:32:54 |
| 6 | update" at the top. | 11:33:12 |
| 7 | What does VIP mean in this | 11:33:16 |
| 8 | context? | 11:33:17 |
| 9 | A. Volume incentive plan -- or | 11:33:18 |
| 10 | program. | 11:33:20 |
| 11 | Q. And what is that? | 11:33:20 |
| 12 | A. That is an incentive plan put | 11:33:20 |
| 13 | in place for customers to reach certain | 11:33:22 |
| 14 | volume hurdles on dollars and so that they | 11:33:24 |
| 15 | can be paid a rebate in addition. And they | 11:33:29 |
| 16 | pass that along to the pharmacies, oftentimes | 11:33:33 |
| 17 | either a portion or all of it, on to the | 11:33:35 |
| 18 | pharmacies for complying with their programs. | 11:33:37 |
| 19 | Q. Okay. Is this separate from | 11:33:40 |
| 20 | the chargeback program that you discussed | 11:33:41 |
| 21 | earlier? | 11:33:44 |
| 22 | A. Yes, it is. | 11:33:44 |
| 23 | Q. Okay. And so slide 7 is | 11:33:45 |
| 24 | showing us the volume-based rebate. Is that | 11:33:48 |
| 25 | the VIP rebate? | 11:33:51 |

Page 133

| | | |
|---|---|---|
| 1 | A. Correct. | 11:33:53 |
| 2 | Q. Okay. And so | 11:33:53 |
| 3 | AmerisourceBergen, from April of '09 through | 11:33:57 |
| 4 | October of '09, had total sales of a little | 11:34:03 |
| 5 | bit more than 29 million, correct? | 11:34:06 |
| 6 | A. Correct. | 11:34:07 |
| 7 | Q. And then the numbers below the | 11:34:08 |
| 8 | table, what do those numbers indicate? | 11:34:10 |
| 9 | A. Those numbers are the volume | 11:34:14 |
| 10 | that if they reached -- to the right is the | 11:34:18 |
| 11 | amount of the rebate that they would receive, | 11:34:20 |
| 12 | AmerisourceBergen -- | 11:34:23 |
| 13 | Q. Okay. | 11:34:24 |
| 14 | A. -- for reaching those dollar | 11:34:24 |
| 15 | amounts. | 11:34:28 |
| 16 | Q. Okay. So if Amerisource -- | 11:34:28 |
| 17 | since AmerisourceBergen had 29 million and | 11:34:31 |
| 18 | change during this period, am I reading this | 11:34:34 |
| 19 | correctly they would have received 5 percent | 11:34:36 |
| 20 | of 17.6 million and then 7 percent of the | 11:34:38 |
| 21 | difference between 17.6 -- well, I guess 15 | 11:34:43 |
| 22 | million more on top of that 17.76, to 32.6, | 11:34:46 |
| 23 | and then 8 percent -- well, they didn't get | 11:34:52 |
| 24 | to 32.6. | 11:34:53 |
| 25 | So they would have gotten | 11:34:54 |

Page 134

```
 1   5 percent of the first 17.6 and 7 percent of   11:34:55
 2   the balance; is that correct?                  11:34:58
 3       A.   No, they would have gotten            11:34:58
 4   7 percent of the entire sale.                  11:35:00
 5       Q.   I see.                                11:35:01
 6            So it ratchets it up for the          11:35:02
 7   entire thing if you reach the -- the next      11:35:03
 8   tier?                                          11:35:06
 9       A.   Correct.                              11:35:07
10       Q.   Okay.  And was that volume --         11:35:08
11   were those volume thresholds, were those six   11:35:16
12   months?  One year?  How were they set out?     11:35:20
13       A.   One year.                             11:35:23
14       Q.   Okay.  So here we have six --         11:35:24
15   one, two, three, four, five -- these are       11:35:32
16   seven months, actually, of results that we're  11:35:32
17   seen on this chart, correct, from April        11:35:36
18   through October?                               11:35:37
19       A.   Correct.                              11:35:38
20       Q.   So if AmerisourceBergen had           11:35:38
21   additional sales over the remaining five       11:35:43
22   months, their rebate would be determined       11:35:46
23   based on the table -- the figures below the    11:35:49
24   table, ultimately, correct?                    11:35:52
25       A.   Correct.                              11:35:53
```

Page 135

```
 1       Q.   Okay.  On slide 9, there's           11:35:54
 2   reference to scorecard service levels.         11:36:12
 3            What does "scorecard" mean in         11:36:14
 4   this setting?                                  11:36:16
 5       A.   This would be on                      11:36:16
 6   AmerisourceBergen-driven grading of how        11:36:19
 7   Mallinckrodt delivered product over time:  if  11:36:25
 8   we delivered on time, didn't deliver at all,   11:36:28
 9   how did we perform.                            11:36:31
10       Q.   Okay.  So on the table, there's       11:36:33
11   COV, raw service level and PRO raw service     11:36:37
12   level.                                         11:36:42
13            What are those showing us?            11:36:42
14       A.   Covidien means what we shipped        11:36:44
15   to the customer, and the blue line represents  11:36:46
16   what ABC was allowed to ship to their          11:36:49
17   customer.  So even though we declined in       11:36:52
18   sales, they had enough inventory to cover it   11:36:54
19   during that period to ship to their customers  11:36:56
20   with a slight dip.                             11:36:59
21       Q.   Okay.                                 11:37:00
22       A.   That's my understanding.  I           11:37:00
23   mean, AmerisourceBergen, it's their data, so   11:37:03
24   it might be better to ask them.                11:37:04
25       Q.   Okay.  All right.  We can set         11:37:06
```

Page 136

```
 1   that document aside.                           11:37:15
 2            MR. GOTTO:  Actually, before we       11:37:47
 3   get into this, maybe it would be a             11:37:48
 4   good time to take a break.  So why             11:37:51
 5   don't we go off the record.                    11:37:52
 6            VIDEOGRAPHER:  We're going off        11:37:54
 7   the record at 11:19 a.m. {sic}.                11:37:55
 8            (Off the record at 11:37 a.m.)        11:37:58
 9            VIDEOGRAPHER:  We are back on         11:52:26
10   the record at 11:52 a.m.                       11:52:36
11            (Mallinckrodt-Collier Exhibits        11:52:37
12   6 and 7 marked for identification.)            11:52:38
13   QUESTIONS BY MR. GOTTO:                        11:52:38
14       Q.   Ms. Collier, we've marked as          11:52:45
15   Exhibits 6 and 7 an e-mail and attachment      11:52:47
16   from 2009.                                     11:52:57
17            Exhibit 6 is Bates                    11:52:57
18   MNK-T1_0006305472, and Exhibit 7 is a          11:53:00
19   document that was produced in native format    11:53:05
20   under MNK-T1_0006305473.                       11:53:07
21            Would you take a moment to look       11:53:13
22   at those materials and tell me if you          11:53:16
23   recognize them.                                11:53:18
24            Do you recognize those               11:56:59
25   materials?                                     11:57:00
```

Page 137

```
 1       A.   Yes, I do.                            11:57:00
 2       Q.   Okay.  And it appears that the        11:57:02
 3   attachment is the beginnings of the business   11:57:04
 4   review that you referred to in your 11/20/09   11:57:10
 5   e-mail, correct?                               11:57:13
 6       A.   Correct.                              11:57:14
 7       Q.   Okay.  So did you compile the         11:57:14
 8   information that's included in Exhibit 7?      11:57:17
 9       A.   My team did, yes.                     11:57:22
10       Q.   Okay.  If you would turn to           11:57:23
11   slide 5 in Exhibit 7, there's a term           11:57:29
12   "Covidien modified gross" with an asterisk.    11:57:36
13   It's -- slide 5 it would be.  I believe        11:57:40
14   you're looking at 6.                           11:57:43
15       A.   Oh, I'm looking at 6.  Okay.          11:57:44
16       Q.   There you go.                         11:57:46
17            There's a reference to Covidien       11:57:47
18   modified gross with an asterisk, and then the  11:57:50
19   asterisk explains how modified gross is        11:57:53
20   determined.                                    11:57:56
21            Is that a metric that had been        11:57:57
22   used at Mallinckrodt at the time that you      11:58:01
23   joined, modified gross?                        11:58:05
24       A.   Yes.                                  11:58:06
25       Q.   Okay.  And do you know why that       11:58:08
```

Page 138

1  metric was used?                          11:58:12
2      A.   Because if we used WAC sales,    11:58:13
3  that would greatly increase the value of the  11:58:15
4  products without having actual value.      11:58:18
5      Q.   Okay.                            11:58:21
6      A.   So it would -- it would inflate  11:58:21
7  the value of the product.                  11:58:24
8      Q.   Okay.  And when you say "WAC      11:58:25
9  sales," you mean if you were not calculating  11:58:26
10  in the chargebacks?                        11:58:28
11      A.   Correct.                          11:58:30
12      Q.   Okay.  And what's -- in the       11:58:30
13  footnote there's a reference to wholesaler  11:58:32
14  differentials.                             11:58:34
15          What is that?                      11:58:35
16      A.   Correct.  We sometimes would      11:58:36
17  give a rebate or a discount on a given      11:58:39
18  product, for example, if we wanted to not   11:58:42
19  deflate the total market.  And so we would  11:58:45
20  offer the customer one price, but we would  11:58:49
21  give them a discount -- oh, excuse me,      11:58:51
22  differentials is different.                11:58:56
23          Differentials is that, for         11:58:57
24  example, we would price a particular        11:58:59
25  customer, a chain store, higher and then give  11:59:02

Page 139

1  them a rebate or discount down to the actual  11:59:06
2  contract price because we didn't want the   11:59:08
3  wholesaler to be able to see their actual   11:59:11
4  contract price.                            11:59:12
5      Q.   Okay.  And then to get to          11:59:13
6  modified gross, you're also backing out the  11:59:16
7  oxycodone ER, fentanyl lozenge and fentanyl  11:59:20
8  patch.                                     11:59:25
9          What's the reason for taking        11:59:26
10  those out?                                 11:59:27
11      A.   Because we hadn't launched them   11:59:27
12  yet, so we were looking forward and saying  11:59:28
13  that we don't include those -- the oxy ER was  11:59:30
14  discontinued.  We had it for a period of time  11:59:33
15  before I arrived at the company.  Part of a  11:59:34
16  paragraph IV filing against the branded     11:59:39
17  product, so we had exclusivity for a period.  11:59:41
18      Q.   What do you mean when you say      11:59:44
19  "a paragraph IV filing"?                   11:59:46
20      A.   You've challenged the patent      11:59:47
21  that the brand has and say that you should be  11:59:49
22  able to launch before they -- before the    11:59:51
23  patent expires.  And so that's what         11:59:55
24  Mallinckrodt had done, and so they negotiated  11:59:57
25  with the brand company that we would have an  11:59:59

Page 140

1  exclusivity period before the patent expired.  12:00:03
2      Q.   Okay.  On slide 6, under the       12:00:08
3  pie chart there's a reference to four key    12:00:14
4  product families represent 82 percent of     12:00:16
5  total modified gross sales.                 12:00:19
6          Do you see that?                    12:00:20
7      A.   Correct.                           12:00:21
8      Q.   And do you recall that being       12:00:21
9  the case back in fiscal '09?               12:00:24
10      A.   Yes.                              12:00:27
11      Q.   And do you recall if that         12:00:27
12  metric changed over time in terms of those   12:00:37
13  four product families and the percentage    12:00:40
14  total modified gross sales that they        12:00:43
15  represented?                               12:00:45
16      A.   Yes, it changed significantly.    12:00:45
17      Q.   And how did it change?            12:00:47
18      A.   We launched new products which    12:00:48
19  contributed to the modified gross, and that  12:00:52
20  changed -- because one of the products we    12:00:55
21  launched, methylphenidate ER, was a sizeable  12:00:58
22  product, so that made all these numbers look  12:01:02
23  smaller, and some of our smaller products    12:01:05
24  contributed, so we had a bigger contribution  12:01:07
25  from other products.                       12:01:09

Page 141

1      Q.   Okay.  All right.  If you would    12:01:10
2  turn back to slide 38, under the assumptions  12:01:23
3  under the table, one of the assumptions is   12:01:38
4  market growth rate 7 percent.              12:01:40
5          Do you recall what the basis       12:01:43
6  was for that assumption?                   12:01:45
7      A.   That would be historical          12:01:47
8  trends, what you see in historical trends,   12:01:49
9  that it was -- the market had been growing   12:01:51
10  over time.                                 12:01:53
11      Q.   The next bullet item says,        12:01:55
12  "COV" -- I assume that's Covidien or        12:02:00
13  Mallinckrodt -- "will increase compliance at  12:02:02
14  McKesson."                                 12:02:05
15          Do you see that?                    12:02:06
16      A.   Yes.                              12:02:06
17      Q.   What does that phrase mean,       12:02:06
18  "increase compliance" in this setting?     12:02:10
19      A.   Anytime that we get a contract   12:02:11
20  with a customer, we ask them for how many   12:02:13
21  units they'll sell.  And then we set our    12:02:15
22  pricing and incentives based on what they say  12:02:17
23  they're going to sell, and they may not come  12:02:19
24  in at that level.                          12:02:21
25          Then we offered them additional    12:02:22

Page 142

1  value for the value that they said they were    12:02:24
2  going to deliver, and that drives production    12:02:26
3  at the plant and everything, so we expect    12:02:28
4  them to buy as much as they said they were    12:02:30
5  going to.    12:02:33
6      And in this particular case,    12:02:33
7  McKesson was not buying what they said they    12:02:35
8  would.    12:02:38
9  Q.  So the word "compliance" in    12:02:38
10 this setting means compliance with what their    12:02:42
11 sales or purchasing forecast had been?    12:02:44
12 A.  No, it's what they said they    12:02:47
13 could -- what they were buying from another    12:02:49
14 company, and we would gain their business.    12:02:51
15 And they said, for example, that we can sell    12:02:53
16 a hundred thousand tablets, and they might    12:02:56
17 have been buying 90,000 instead of a hundred    12:02:58
18 thousand, or whatever the variance is.    12:03:01
19     And so we needed to ask them,    12:03:02
20 "why were you not buying at the level you said    12:03:04
21 you would," and try and drive and find out    12:03:06
22 why there was an issue, and get them to buy    12:03:09
23 at the level they said they would.    12:03:12
24 Q.  Okay.  I'm just trying to    12:03:13
25 understand the meaning of the word    12:03:15

Page 143

1  "compliance" in this setting.    12:03:16
2      Is compliance with what they    12:03:17
3  had forecast they would be buying?    12:03:21
4  A.  What they told us they had been    12:03:22
5  purchasing from the competitor.  So it could    12:03:24
6  be that either their demand had dropped off,    12:03:26
7  even though they switched from the other    12:03:28
8  competitor, so we needed to find out why.    12:03:29
9  And if it was a reason -- compliance is not    12:03:31
10 like a contractual term.  It's just a term,    12:03:34
11 this is what you committed to.  So this is    12:03:38
12 what you said you were going to buy; we want    12:03:41
13 you to buy that much.  And find out why they    12:03:43
14 were not, and if they could not meet the    12:03:46
15 original number that they provided.    12:03:48
16 Q.  Okay.  If you turn to the next    12:03:50
17 slide, slide 30 -- I'm sorry, 39, under the    12:03:56
18 assumptions, there's a -- market growth rate    12:04:02
19 is 15 percent here.    12:04:06
20     Would that also be based on    12:04:08
21 historical data?    12:04:09
22 A.  Correct.    12:04:11
23 Q.  Okay.  And would that be --    12:04:12
24 various of these products had a market growth    12:04:13
25 rate assumption on the different slides.    12:04:16

Page 144

1      Is that always the case, it's    12:04:18
2  based on historical data that you had?    12:04:20
3  A.  Yes, it is.    12:04:22
4  Q.  Okay.  Under slide 40, or on    12:04:23
5  slide 40, under Assumptions, the second    12:04:33
6  bullet item says, "COV will recover 2009 lost    12:04:35
7  market share that resulted from backorders."    12:04:39
8      Do you see that?    12:04:43
9  A.  Correct.    12:04:44
10 Q.  Do you know what that's    12:04:44
11 referring to?    12:04:45
12 A.  That means that we were not    12:04:46
13 able to supply our customers with what they    12:04:47
14 needed at the time, so we think that we'll    12:04:50
15 pick up that business in the coming year.    12:04:52
16 Q.  Slide 44, Actions to Improve    12:04:55
17 Performance, the bullet item says, "Secure    12:05:13
18 Walgreens business."    12:05:16
19     Do you recall if that occurred?    12:05:18
20 A.  I know we had a good    12:05:20
21 partnership with Walgreens. I'm not exactly    12:05:25
22 sure what this is referring to.    12:05:27
23 Q.  Okay.    12:05:29
24 A.  If it's a particular product or    12:05:29
25 if it's in general.    12:05:31

Page 145

1  Q.  Okay.  Okay.  We can set those    12:05:33
2  documents aside.    12:05:35
3      (Mallinckrodt-Collier Exhibit 8    12:06:02
4  marked for identification.)    12:06:03
5  QUESTIONS BY MR. GOTTO:    12:06:03
6  Q.  We've marked as Exhibit 8 a    12:06:23
7  document produced in native format under    12:06:25
8  Bates MNK-T1_0002236317, and it's a    12:06:28
9  PowerPoint deck that's -- first slide    12:06:39
10 indicates Covidien Pharmaceuticals Specialty    12:06:43
11 Generics Business Review, April 7, 2010.    12:06:45
12     Could you take a look and tell    12:06:49
13 me if you recognize that document?    12:06:51
14 A.  Okay.    12:06:52
15 Q.  Do you recognize that document?    12:10:08
16 A.  Yes, I do.    12:10:09
17 Q.  And what is it?    12:10:10
18 A.  It is our business review    12:10:11
19 document explaining the generic and our    12:10:13
20 budget and forecast for the year.    12:10:17
21 Q.  And did you participate in the    12:10:18
22 preparation of this document?    12:10:20
23 A.  Yes, I did.    12:10:21
24 Q.  Okay.  And is this a document    12:10:22
25 that you would prepare on an annual basis?    12:10:25

Page 146

1    A.   Yes.  It changed over time,        12:10:27
2    but, yes, something similar.            12:10:29
3    Q.   If you turn to slide 4, it         12:10:32
4    indicates Fiscal Year 2010 Specialty Generics   12:10:44
5    Objectives.  First one is "rebuild customer     12:10:48
6    confidence."                            12:10:51
7         Do you recall why the objective    12:10:53
8    was to rebuild customer confidence at this   12:10:57
9    time?                                   12:10:59
10   A.   Because we had supply issues.      12:10:59
11   Q.   And what were those supply         12:11:01
12   issues?                                 12:11:03
13   A.   We had -- they were various,       12:11:03
14   but some of it was having problems out of our   12:11:06
15   API site, active pharmaceutical ingredients,    12:11:09
16   which are the raw materials, their inability    12:11:12
17   to supply enough product to the manufacturing   12:11:14
18   site in Hobart.  Or Hobart had issues    12:11:18
19   supplying product.  They couldn't produce to   12:11:18
20   the commitment -- the forecast, so they   12:11:23
21   sometimes would not have inventory readily   12:11:27
22   available when we needed it.            12:11:29
23   Q.   Okay.  And so was that a           12:11:32
24   problem that existed at the time you joined   12:11:35
25   Mallinckrodt?                           12:11:37

Page 147

1    A.   Yes, it was.                       12:11:38
2    Q.   Okay.  Do you know if the          12:11:38
3    company had experienced similar supply     12:11:39
4    problems historically?                  12:11:42
5    A.   I don't know for sure before       12:11:43
6    me, but it obviously happened before my time,   12:11:47
7    so I don't know when --                 12:11:50
8    Q.   Sure.                              12:11:51
9    A.   -- how -- the frequency.           12:11:52
10   Q.   Okay.  In terms of the problems    12:11:53
11   that were experienced in fiscal '09, do you   12:11:55
12   know if it was the result of an increase in   12:11:58
13   demand for the products?                12:12:00
14   A.   In 2009, I'm not sure what the      12:12:02
15   problem was.                            12:12:05
16   Q.   Okay.  And you indicated part       12:12:07
17   of the problem was some difficulty in    12:12:10
18   obtaining sufficient raw materials.     12:12:15
19        Do you know if in 2009 the --      12:12:17
20   Mallinckrodt was seeking to obtain raw    12:12:21
21   materials at a greater level than it had   12:12:23
22   historically?                           12:12:26
23        MR. O'CONNOR:  Objection.          12:12:26
24   Form.                                   12:12:27
25        THE WITNESS:  It wasn't about      12:12:27

Page 148

1    obtaining sufficient raw materials.     12:12:28
2    It's about our ability to manufacture   12:12:30
3    the raw material, that it's a           12:12:32
4    difficult process and sometimes they    12:12:34
5    had failures.  And so we couldn't get   12:12:36
6    enough product, API, up to Hobart in    12:12:38
7    order to manufacture the finished       12:12:42
8    dosage form.                            12:12:45
9    QUESTIONS BY MR. GOTTO:                 12:12:45
10   Q.   Okay.  So it's Mallinckrodt        12:12:45
11   manufacture of the raw materials for Hobart   12:12:46
12   that was the issue?                     12:12:49
13   A.   Correct.                           12:12:49
14   Q.   I see.  Okay.                      12:12:50
15        And do you know if the -- if       12:12:50
16   the manufacturing level -- or if the target   12:12:53
17   manufacturing level in 2009 was a higher   12:12:56
18   level than the company had historically   12:12:58
19   engaged in?                             12:13:01
20        MR. O'CONNOR:  Object to form.     12:13:01
21        THE WITNESS:  I don't know         12:13:02
22   that.                                   12:13:02
23   QUESTIONS BY MR. GOTTO:                 12:13:02
24   Q.   On slide 4, second bullet item     12:13:05
25   is "control price erosion."             12:13:08

Page 149

1         Do you see that?                   12:13:10
2    A.   Correct.                           12:13:11
3    Q.   And what's that referring to?      12:13:11
4    A.   That means that we do not want     12:13:13
5    to have our products erode in the       12:13:16
6    marketplace, so we balance our market share   12:13:19
7    against the additional prices that we need to   12:13:21
8    price -- concessions we need to give or   12:13:24
9    incentives we need to give in order to gain   12:13:27
10   that additional business.               12:13:31
11   Q.   Okay.  Was price erosion a         12:13:32
12   problem at the time that you were       12:13:35
13   particularly focused on addressing?     12:13:38
14   A.   Yes.                              12:13:39
15   Q.   And do you know what was           12:13:40
16   causing that problem in fiscal '09?     12:13:42
17   A.   In the generic industry in        12:13:46
18   general, that is just additional competitors,   12:13:48
19   fierce competition among competitors, people   12:13:51
20   taking business from each other, trying to   12:13:53
21   gain share.  Or companies taking business,   12:13:55
22   not people.                             12:13:57
23   Q.   Okay.  Turn if you would to        12:13:58
24   slide 51, which is a pie chart showing the   12:14:01
25   specialty generic expenses.             12:14:11

Page 150

| | |
|---|---|
| 1 | One of the items in the pie    12:14:15 |
| 2 | chart is seminars, meetings, conferences.    12:14:20 |
| 3 | Do you see that?    12:14:22 |
| 4 | A.   Yes.    12:14:23 |
| 5 | Q.   What types of seminars,    12:14:23 |
| 6 | meetings, conferences would Mallinckrodt    12:14:24 |
| 7 | participate in that gave rise to this    12:14:29 |
| 8 | expense?    12:14:33 |
| 9 | A.   We would attend conferences or    12:14:33 |
| 10 | trade shows with -- sometimes with the    12:14:35 |
| 11 | executives, so the buyers from the    12:14:40 |
| 12 | warehousing chains, the wholesalers or their    12:14:43 |
| 13 | executives.  And sometimes we would attend    12:14:47 |
| 14 | like a -- there's a hospital pharmacy buyer    12:14:49 |
| 15 | meeting, so we would attend a buyer meeting    12:14:52 |
| 16 | to talk to the pharmacy buyers to find out    12:14:54 |
| 17 | what they're doing as far as their trends and    12:14:56 |
| 18 | going forward.    12:14:59 |
| 19 | And some were educational, some    12:15:01 |
| 20 | were -- like, for example, the Wholesale    12:15:06 |
| 21 | Distributor Manufacturer Association, HDMA at    12:15:08 |
| 22 | the time, we would attend that to find out    12:15:11 |
| 23 | industry trends like on the REMS regulations    12:15:14 |
| 24 | or what was going on with other regulations    12:15:17 |
| 25 | with serialization.  And that often would be    12:15:18 |

Page 151

| | |
|---|---|
| 1 | somebody on my team to get an education    12:15:20 |
| 2 | around some of this.    12:15:22 |
| 3 | Q.   Okay.  And so down below I see    12:15:23 |
| 4 | COND, which I assume is conventions and    12:15:28 |
| 5 | exhibits.    12:15:30 |
| 6 | Is that a different type of    12:15:30 |
| 7 | event from what you've just described?    12:15:32 |
| 8 | A.   Correct.  That would include    12:15:35 |
| 9 | the conventions, you know, attending some of    12:15:37 |
| 10 | the educational shows to learn, but also the    12:15:39 |
| 11 | cost of the exhibits when we had to display.    12:15:44 |
| 12 | Q.   Okay.  Who made the    12:15:47 |
| 13 | determination as to what seminars and    12:15:53 |
| 14 | meetings Mallinckrodt would participate in    12:15:57 |
| 15 | that give rise to the expenses that are shown    12:16:00 |
| 16 | on this slide?    12:16:02 |
| 17 | A.   That often was the sales leader    12:16:04 |
| 18 | would decide which sales meeting -- which    12:16:07 |
| 19 | customer meetings they would attend.  And    12:16:10 |
| 20 | then for educational purposes, I would decide    12:16:12 |
| 21 | who on my team should go to learn a little    12:16:14 |
| 22 | bit more about a category or an area.    12:16:17 |
| 23 | Q.   And how about the conventions    12:16:20 |
| 24 | and exhibits?  Who would decide what -- which    12:16:21 |
| 25 | of those to participate in?    12:16:23 |

Page 152

| | |
|---|---|
| 1 | A.   Some of them are general    12:16:24 |
| 2 | national conventions, so that was just    12:16:27 |
| 3 | standard industry attendance.  So it was    12:16:30 |
| 4 | expected that we would attend those, but    12:16:32 |
| 5 | ultimately that would be decided by the    12:16:35 |
| 6 | president of the team.    12:16:36 |
| 7 | Q.   Okay.  Take a look at slide 54,    12:16:38 |
| 8 | if you would, please.  There's a reference to    12:16:48 |
| 9 | unapproved products deletions -- unapproved    12:16:56 |
| 10 | products deletion.    12:17:01 |
| 11 | Do you know what that's    12:17:03 |
| 12 | referring to?    12:17:04 |
| 13 | A.   Yes.  At one point products    12:17:04 |
| 14 | that were before the -- I don't know the    12:17:06 |
| 15 | regulation or the ruling, but before generics    12:17:11 |
| 16 | had proved that they were safe and effective,    12:17:14 |
| 17 | these products were already in the market so    12:17:18 |
| 18 | they didn't have to go through that process.    12:17:20 |
| 19 | And so they were grandfathered, and you could    12:17:21 |
| 20 | sell grandfathered products.    12:17:24 |
| 21 | And Mallinckrodt was selling    12:17:26 |
| 22 | these products long ago, and so we were    12:17:28 |
| 23 | excluded.  So -- but we were going to have to    12:17:32 |
| 24 | discontinue them because the government    12:17:34 |
| 25 | wanted everyone -- the FDA wanted everyone to    12:17:35 |

Page 153

| | |
|---|---|
| 1 | issue a new FDA -- I mean an ANDA to prove    12:17:37 |
| 2 | that they were safe and effective.    12:17:42 |
| 3 | Q.   Okay.  And on the right-hand    12:17:44 |
| 4 | column there's identity of the products that    12:17:47 |
| 5 | fall under this category, correct?    12:17:50 |
| 6 | A.   Correct.    12:17:50 |
| 7 | Q.   Okay.  Turn, if you would, to    12:17:51 |
| 8 | slide 59.    12:18:01 |
| 9 | A.   (Witness complies.)    12:18:03 |
| 10 | Q.   Improve Customer Confidence.    12:18:03 |
| 11 | The second bullet item is "narcotic story."    12:18:09 |
| 12 | Do you see that?    12:18:12 |
| 13 | A.   Yes.    12:18:12 |
| 14 | Q.   What does that refer to?    12:18:13 |
| 15 | A.   That was an active    12:18:14 |
| 16 | pharmaceutical ingredient initiative.  It    12:18:17 |
| 17 | showed everything from how -- because our    12:18:20 |
| 18 | customers didn't understand how the products    12:18:22 |
| 19 | were actually made from raw opium, so it was    12:18:24 |
| 20 | just giving them information on -- and I    12:18:28 |
| 21 | don't know that we used it, so I'll start    12:18:31 |
| 22 | that off.  But it was intended to show them    12:18:33 |
| 23 | how the product goes from raw opium into a    12:18:35 |
| 24 | finished dosage tablet.    12:18:39 |
| 25 | Q.   Okay.  And was -- since that's    12:18:40 |

Page 154

```
1   under the heading "Improve Customer        12:18:46
2   Confidence," was there a belief that there  12:18:48
3   was some failure of customer confidence with 12:18:53
4   respect to Mallinckrodt's manufacturing     12:18:55
5   process, or what gave rise to that being    12:18:58
6   something that you'd address to deal with   12:19:01
7   customer confidence?                        12:19:03
8       A.   Supply.  It was a supply issue.    12:19:05
9   And to explain to them -- and it went all the 12:19:07
10  way back to India where we secured the opium, 12:19:10
11  and then we had our manufacturing in        12:19:13
12  St. Louis and in Hobart.  So just to explain 12:19:14
13  to them that we are thoroughly knowledged in 12:19:19
14  the process of converting it from raw       12:19:21
15  material to finished dosage form.           12:19:23
16      Q.   Okay.  You can set that            12:19:26
17  document aside.                             12:19:30
18      A.   Okay.                              12:19:56
19           (Mallinckrodt-Collier Exhibit 9   12:19:56
20  marked for identification.)                 12:19:57
21  QUESTIONS BY MR. GOTTO:                     12:19:57
22      Q.   We've marked as document -- as     12:20:05
23  Exhibit 9 a document produced in native     12:20:09
24  format under Bates MNK-T1_0002237098.       12:20:11
25           Would you take a moment to take    12:20:19
```

Page 155

```
1   a look at that document, please?            12:20:20
2       A.   Okay.                              12:20:20
3       Q.   Do you recognize that document?    12:22:03
4       A.   Yes, I do.                         12:22:04
5       Q.   And what is it?                     12:22:04
6       A.   It is a business review that       12:22:05
7   was presented to our manufacturing site in  12:22:11
8   Hobart.                                     12:22:12
9       Q.   Okay.  Was that a regular          12:22:13
10  process, to present a business review to    12:22:16
11  Hobart?                                     12:22:18
12      A.   No, it was not.                    12:22:18
13      Q.   Was there a reason this            12:22:19
14  particular presentation was made when it was? 12:22:21
15      A.   To help them understand why        12:22:23
16  consistent supply was important in what they 12:22:26
17  were doing and why we came up with our      12:22:28
18  forecast numbers.                           12:22:30
19      Q.   Okay.  And so who made this        12:22:31
20  presentation?                               12:22:33
21      A.   My team.                           12:22:33
22      Q.   And you participated in that?      12:22:35
23      A.   Yes, I did.                        12:22:37
24      Q.   And participated in compiling      12:22:38
25  the information that's contained in this    12:22:40
```

Page 156

```
1   package?                                    12:22:42
2       A.   Yes, I did.                        12:22:42
3       Q.   Okay.  If you turn to slide 2,     12:22:44
4   you'll see it's an org chart, and this -- the 12:22:48
5   spot that previously had been occupied by   12:22:52
6   Ms. Muhlenkamp is identified as vacant.     12:22:55
7            So is that consistent with your    12:22:58
8   recollection, by February 2011 Ms. Muhlenkamp 12:23:00
9   had left?                                   12:23:04
10      A.   Yes.                               12:23:04
11      Q.   And ultimately -- ultimately,      12:23:05
12  who took that spot?                         12:23:10
13      A.   Jennifer Bullerdick, and then I    12:23:11
14  hired Jake Longenecker from the API site.   12:23:14
15      Q.   Okay.  Great.                      12:23:26
16           On slide 3, Ranking of Generic     12:23:26
17  Companies, Covidien/Mallinckrodt is indicated 12:23:35
18  MAT September 2010 rank.                     12:23:38
19           What is MAT?                        12:23:41
20      A.   Moving annual total.               12:23:42
21      Q.   Okay.  And scripts are             12:23:44
22  prescriptions; is that right?               12:23:47
23      A.   Correct.                           12:23:47
24      Q.   Okay.  And share of generics,      12:23:49
25  do you know how that's calculated?          12:23:51
```

Page 157

```
1       A.   It's the total number of          12:23:53
2   prescriptions.  For example, on Teva, it    12:23:57
3   would be their number of prescriptions by the 12:23:59
4   total number that were provided in the      12:24:01
5   Wolters Kluwer study.                       12:24:03
6       Q.   Okay.  So it's not a dollar        12:24:04
7   determination?                              12:24:06
8       A.   No.                                12:24:06
9       Q.   It's a number of prescriptions    12:24:06
10  determination?                              12:24:08
11      A.   Correct.                           12:24:08
12      Q.   Okay.  And again -- so here the    12:24:08
13  company is identified Covidien/Mallinckrodt,  12:24:13
14  but there was no separate product line that  12:24:16
15  was Covidien versus Mallinckrodt, correct?   12:24:18
16      A.   Correct.                           12:24:19
17      Q.   Okay.                              12:24:20
18      A.   Not for the generics.             12:24:22
19      Q.   Yeah.                              12:24:24
20           Was that the case with branded    12:24:24
21  product, that there was --                   12:24:25
22      A.   I don't know.                      12:24:26
23      Q.   Okay.  If you turn to             12:24:28
24  slide 12 -- I'm sorry, 11.  11 says "FY '11  12:24:42
25  overall goal:  Preserve, maintain but grow,  12:24:50
```

Page 158

1  underscore, the generic core business."          12:24:50
2          So the reference here to the          12:24:53
3  generic core business, what would that be          12:24:56
4  referring to?                                   12:24:58
5      A.   Our portfolio products.  And so       12:24:58
6  we would work on initiatives to either gain     12:25:01
7  additional share or increase prices or          12:25:06
8  maintain the current business of customers.     12:25:12
9      Q.   Okay.  Okay.  And turn to            12:25:16
10 slide 12, please.                               12:25:18
11     A.   Yes.                                   12:25:19
12     Q.   Slide 12, one of the fiscal          12:25:19
13 year '11 objectives is "reinforce               12:25:23
14 Covidien/Mallinckrodt as pain management        12:25:28
15 experts."                                       12:25:30
16         Do you see that?                        12:25:30
17     A.   Yes.                                   12:25:30
18     Q.   And what steps were taken to          12:25:31
19 reinforce Covidien/Mallinckrodt as pain         12:25:33
20 management experts?                             12:25:37
21     A.   I can only remember having            12:25:38
22 discussions with Karen about customers that     12:25:39
23 were trying to set up their own warehouse,      12:25:43
24 and she could help them do that.                12:25:46
25         I don't think anything came to         12:25:49

Page 159

1  fruition of this, but I don't remember for     12:25:50
2  sure.  I don't remember developing any         12:25:52
3  materials around this particular program.      12:25:54
4      Q.   Okay.  When you say "Karen," is      12:25:55
5  that Karen Harper?                             12:25:57
6      A.   Karen Harper.                        12:25:57
7      Q.   So in terms of pain management,      12:25:58
8  I mean, that would -- your recollection is     12:26:05
9  to -- that meant storing and warehousing       12:26:09
10 product?                                       12:26:13
11     A.   That's our portfolio of             12:26:13
12 products, is pain management, so schedule      12:26:14
13 drugs would be another name.                   12:26:17
14     Q.   But the expertise that is being     12:26:20
15 reinforced here, what expertise is that, as   12:26:25
16 best you can recall?                           12:26:29
17     A.   Well, it would be the expertise    12:26:30
18 that Karen offered in the compliance because  12:26:31
19 she could -- in the past they had helped      12:26:35
20 other people with DEA inspections, how do you 12:26:37
21 work with the DEA and things like that.       12:26:42
22     Q.   Okay.  All right.  You can set     12:26:43
23 that document aside.                           12:26:50
24         (Mallinckrodt-Collier Exhibit       12:27:06
25 10 marked for identification.)                12:27:07

Page 160

1  QUESTIONS BY MR. GOTTO:                        12:27:07
2      Q.   We've marked as Exhibit 10 a        12:27:28
3  single-page -- two-page document, sorry,      12:27:31
4  beginning at Bates MNK-T1_0002738887.  It     12:27:37
5  appears to be a letter that you sent out      12:27:43
6  October 11, 2011.                              12:27:47
7          Please take a look and tell me       12:27:48
8  if you recognize it.                           12:27:50
9      A.   Okay.                                12:27:51
10     Q.   Do you recognize that letter?       12:28:27
11     A.   Yes, I do.                           12:28:30
12     Q.   And do you recall sending this      12:28:31
13 letter out in October of 2011?                 12:28:34
14     A.   I don't recall the date, but,      12:28:36
15 yes, it's on the letter, so I assume that's   12:28:39
16 it.                                            12:28:42
17     Q.   Okay.  Did you send a series of    12:28:42
18 similar letters out to other customers?       12:28:44
19     A.   Yes.                                12:28:45
20     Q.   Okay.  And this letter, the        12:28:46
21 first paragraph says, "Mallinckrodt, LLC,     12:28:47
22 continues to experience supply challenges     12:28:51
23 related to our oxycodone immediate release    12:28:54
24 tablets in 15-milligram and 30-milligram      12:28:57
25 strengths.  The supply issue is driven by     12:28:59

Page 161

1  unexpected quota shortfalls from the US Drug   12:29:03
2  Enforcement Administration, with no firm       12:29:06
3  answer at this point as to when that           12:29:07
4  situation will improve."                       12:29:09
5          Do you recall that circumstance      12:29:11
6  back in 2011?                                  12:29:12
7      A.   Yes, I do.                           12:29:13
8      Q.   So you had testified earlier       12:29:14
9  back in 2009 there were some supply issues    12:29:18
10 relating to some manufacturing constraints or 12:29:21
11 difficulties, correct?                         12:29:26
12         In 2011, now there's supply          12:29:28
13 issues resulting from quota shortfalls.  Do    12:29:31
14 you know what cause or -- well, strike that.  12:29:36
15         There's a reference here to         12:29:39
16 unexpected quota shortfalls.  Did you ever    12:29:41
17 come to have an understanding as to the       12:29:45
18 reasons for those quota shortfalls?           12:29:49
19         MR. O'CONNOR:  Object to form.      12:29:51
20         THE WITNESS:  No, I don't           12:29:51
21 recall why, because I did not interact        12:29:54
22 with the DEA.                                  12:29:55
23 QUESTIONS BY MR. GOTTO:                        12:29:56
24     Q.   Okay.  So when you use the         12:29:56
25 phrase "quota shortfalls" in this letter,    12:29:59

Page 162

1  what do you mean by that exactly?          12:30:03
2       A.   My understanding was at the      12:30:04
3  time Mallinckrodt expected to have additional  12:30:06
4  quota, or enough quota to meet their annual    12:30:09
5  needs.  And we did not receive that approval   12:30:13
6  from the DEA, and so we didn't have enough     12:30:18
7  inventory to allow that.                       12:30:21
8       I honestly don't even know if            12:30:23
9  it was an API or finished dosage form quotas.  12:30:24
10      Q.   Okay.  And do you know if           12:30:28
11 the -- if the quota that Mallinckrodt          12:30:29
12 received for the year was less than prior      12:30:32
13 year quota, or do you have any understanding   12:30:37
14 of that at all?                                12:30:39
15      A.   I don't remember.                    12:30:40
16      Q.   In the third paragraph you say,     12:30:42
17 "You were one of our valued partners, and it   12:30:50
18 is our goal to meet as much of your demand as  12:30:52
19 possible.  The impact this supply reduction    12:30:55
20 could have on your business is well            12:30:58
21 understood.  We have developed a supply plan,  12:31:00
22 attached, to maximize the amount of oxycodone  12:31:03
23 we can ship to you in the coming months that   12:31:05
24 are helping you to meet the needs of your      12:31:08
25 customers and their patients," correct?        12:31:10

Page 163

1       A.   Correct.                            12:31:12
2       Q.   How did you go about developing     12:31:12
3  the supply plan and allocating the available  12:31:14
4  quota among the existing customers?           12:31:21
5       A.   First, we evaluated who had         12:31:23
6  intercontractual obligation of failure to     12:31:27
7  supply, which is a penalty for not supplying,  12:31:29
8  so that could be very costly, so they were     12:31:31
9  prioritized.  Other customers that had more   12:31:33
10 of our portfolio in their line were           12:31:35
11 prioritized over others.  If it was a         12:31:39
12 customer that we knew we could supply their   12:31:43
13 full amount, we'd try and take care of them.  12:31:46
14      But it was based on primarily            12:31:48
15 the failure to supply and the impact it'd     12:31:49
16 have on our business.                         12:31:52
17      Q.   Do you recall receiving            12:31:53
18 responses from various customers to this and  12:31:59
19 other similar letters that went out at this   12:32:01
20 time?                                         12:32:03
21      A.   I recall many customers were        12:32:05
22 not happy about receiving this kind of        12:32:07
23 information.                                   12:32:09
24      Q.   Did you have any direct contact     12:32:09
25 with any of those customers?                  12:32:11

Page 164

1       A.   I don't recall any specific        12:32:12
2  situations, but I'm sure I did.               12:32:14
3       Q.   Did you -- were there any          12:32:16
4  modifications made to the proposed           12:32:18
5  allocations as a result of any feedback      12:32:22
6  received from customers?                      12:32:25
7       A.   No.                                 12:32:26
8       Q.   Okay.  You can set that aside.      12:32:31
9       A.   Not that I'm aware of.              12:32:32
10      Q.   Okay.  And is that something        12:32:33
11 that would have been a decision you would     12:32:34
12 have been involved in?                        12:32:37
13      A.   Yes.                                 12:32:38
14      Q.   Okay.  You can set that aside.      12:32:39
15      (Mallinckrodt-Collier Exhibit           12:32:49
16 11 marked for identification.)                12:32:50
17 QUESTIONS BY MR. GOTTO:                        12:32:50
18      Q.   We've marked as Exhibit 12         12:33:11
19 {sic} a multipage document beginning at Bates  12:33:14
20 MNK-T1_0007289278.  Appears to be minutes and  12:33:16
21 action item from a November 23, 2011 business  12:33:23
22 review meeting.                                12:33:30
23      MR. O'CONNOR:  Just for                   12:33:31
24 clarity, this is marked 11.                    12:33:32
25      MR. GOTTO:  Is it 11?  Oh,               12:33:36

Page 165

1  that's because I was looking at 12           12:33:38
2  over here that we hadn't used yet.           12:33:39
3       Thank you.                              12:33:41
4       MR. O'CONNOR:  No problem.              12:33:41
5  QUESTIONS BY MR. GOTTO:                       12:33:42
6       Q.   If you could take a moment and     12:33:42
7  look at that document, Ms. Collier.  I just   12:33:43
8  have a question for you on the third page.    12:33:45
9       A.   Page 3.                            12:35:51
10      Q.   Yes, page 3, please.               12:35:52
11      First of all, do you recognize          12:35:53
12 what this document is?                        12:35:54
13      A.   Yes, I do.                          12:35:55
14      Q.   And what is it?                     12:35:57
15      A.   This is from our sales and         12:35:58
16 operations planning meeting that we would     12:36:01
17 have with the leaders of each business unit   12:36:03
18 and manufacturing.                            12:36:06
19      Q.   Okay.  So turn to the third        12:36:08
20 page, please, and the table in the middle of  12:36:09
21 the page, the second line that begins with    12:36:14
22 "oxymorphone/oxycodone constraint."           12:36:19
23      Do you see that?                         12:36:21
24      A.   Yes.                                 12:36:22
25      Q.   It says, "Favor oxymorphone        12:36:22

Page 166

1  production at the expense of oxycodone for    12:36:25
2  generics."                          12:36:27
3        Do you know why that decision    12:36:28
4  was made?                          12:36:30
5    A.    The St. Louis plant -- I    12:36:31
6  believe this was an incidence where the    12:36:34
7  St. Louis plant was having a hard time    12:36:36
8  manufacturing enough materials on a    12:36:38
9  consistent basis due to the complexity, and I  12:36:41
10  think that they -- we were reducing the    12:36:43
11  amount of oxycodone we were producing because  12:36:46
12  we lost some sales, and so they had to make a  12:36:48
13  decision: Should they make more oxymorphone  12:36:50
14  and -- at the expense of oxycodone for our    12:36:53
15  business.                          12:36:56
16    Q.    Okay. And then the next    12:36:57
17  paragraph in that -- in that box on the table  12:37:00
18  says, "Need to know impact of further    12:37:03
19  oxycodone reduction for the generics business  12:37:05
20  in order to manage demand to the appropriate  12:37:07
21  levels."                          12:37:09
22        Do you see that?            12:37:10
23    A.    Oh, I see, in that same --    12:37:11
24  okay. "Need to know" the further -- yes.    12:37:16
25    Q.    And my question is: The    12:37:18

Page 167

1  reference to manage demand to appropriate    12:37:20
2  levels, how would you -- what steps would --  12:37:22
3  as marketing director, what steps would you  12:37:25
4  take to try to manage demand to appropriate  12:37:28
5  levels?                          12:37:30
6    A.    We could slow down shipping    12:37:30
7  some orders to customers. We could ask    12:37:32
8  customers, do not load inventory. We could    12:37:35
9  not have as much safety stock. So there were  12:37:38
10  a lot of things we could do to reduce the    12:37:41
11  amount of inventory that was required for the  12:37:43
12  year.                          12:37:45
13    Q.    Okay. And that -- you'd view    12:37:46
14  those steps as managing demand?    12:37:48
15    A.    Yes.                  12:37:51
16    Q.    Okay. You can set that aside.    12:37:51
17        (Mallinckrodt-Collier Exhibit    12:38:05
18    12 marked for identification.)    12:38:06
19  QUESTIONS BY MR. GOTTO:            12:38:06
20    Q.    Ms. Collier, we have now marked  12:38:26
21  as Exhibit 12 a document, a multipage    12:38:27
22  document, beginning at Bates    12:38:30
23  MNK-T1_0000661013. It appears to be an    12:38:33
24  intern initiation prepared in June of 2014.    12:38:39
25        If you could take a look at    12:38:44

Page 168

1  that and tell me if you recognize that    12:38:45
2  document.                          12:38:46
3    A.    (Witness nods head.)    12:38:46
4    Q.    Do you recognize that document?    12:39:57
5    A.    Yes, I do.                  12:39:58
6    Q.    And what is it?            12:39:58
7    A.    It is to work with interns to    12:39:59
8  explain to them who Mallinckrodt is, what our  12:40:04
9  product looks like, our product line looks    12:40:06
10  like, and educate them a little bit about the  12:40:08
11  industry.                          12:40:10
12    Q.    Okay. And did you prepare this  12:40:10
13  document?                          12:40:12
14    A.    I was one of the people. My    12:40:13
15  team did it.                      12:40:14
16    Q.    Okay. If you would turn to    12:40:15
17  slide 4, which is Mallinckrodt Generics    12:40:22
18  Business Overview, our key products in order  12:40:33
19  of sales value, and then it lists a series of  12:40:36
20  products.                          12:40:40
21        Best of your recollection, is    12:40:41
22  this an accurate depiction of the key    12:40:43
23  products Mallinckrodt generics offered in    12:40:46
24  fiscal 2014?                      12:40:49
25    A.    Yes.                  12:40:50

Page 169

1    Q.    Okay. And turn, if you would,    12:40:51
2  to slide 17.                      12:40:56
3    A.    (Witness complies.)    12:41:07
4    Q.    Products driving net sales. It  12:41:11
5  says, "FY '14 net sales LE."        12:41:14
6        What does the LE refer to in    12:41:17
7  this setting?                      12:41:19
8    A.    Latest estimate.            12:41:19
9    Q.    Okay. And FY '13 net sales,    12:41:20
10  those are actuals, I take it?        12:41:24
11    A.    Correct. It's an overlay, so    12:41:25
12  it's hard to see.                  12:41:27
13    Q.    Okay. And to the best of your    12:41:29
14  knowledge, the data depicted on this pie    12:41:33
15  chart for fiscal '13 and '14 is accurate?    12:41:36
16    A.    Yes.                  12:41:39
17    Q.    Okay. And turn, if you would,    12:41:41
18  to slide 20.                      12:41:51
19    A.    (Witness complies.)    12:41:53
20    Q.    And it's current market model,    12:41:57
21  revised market model. And under current    12:42:02
22  market model it says, "Products are pushed    12:42:03
23  out to customers through pricing and    12:42:05
24  incentive programs."                12:42:06
25        And then under revised market    12:42:08

Page 170

1  model, "Customers add products through  12:42:10
2  pricing incentive programs and preferred  12:42:11
3  service."  12:42:13
4  Could you elaborate on the  12:42:14
5  distinction that's being drawn there and what  12:42:17
6  steps were taken at Mallinckrodt to move from  12:42:20
7  current model to revised model?  12:42:23
8  MR. O'CONNOR:  Object to form.  12:42:25
9  THE WITNESS:  Sure.  Sure.  12:42:26
10  Previously we had the product,  12:42:29
11  we launched it.  We went and talked to  12:42:32
12  customers and said, "Okay, you've got  12:42:33
13  Mylan product, you've got Teva  12:42:36
14  product, and we'd like you to switch  12:42:39
15  to our product."  12:42:40
16  And what we decided that we  12:42:40
17  needed to do was put the customer at  12:42:41
18  the center of our focus.  12:42:43
19  So our drug wholesalers,  12:42:44
20  warehousing chains and distributors,  12:42:46
21  mostly the drug wholesalers and the  12:42:47
22  warehousing chains, they had formed a  12:42:50
23  consortium, so we had to align better  12:42:51
24  with them and meet their needs rather  12:42:55
25  than us going to them and asking them  12:42:56

Page 171

1  to meet our needs.  12:42:58
2  So we came up with initiatives  12:43:00
3  to focus more on providing better  12:43:01
4  customer service than we had in the  12:43:05
5  past, better communication about  12:43:05
6  supply issues.  And that's what this  12:43:07
7  was about, was how do we communicate  12:43:11
8  better than what we've been doing in  12:43:13
9  the past.  12:43:15
10  Because they had -- for  12:43:15
11  example, a huge customer might call in  12:43:18
12  and ask about where their order is.  12:43:20
13  They might get a voicemail because  12:43:24
14  they got bounced around on the phone  12:43:25
15  call for several people, so we gave  12:43:27
16  them dedicated people to work with.  12:43:29
17  We had -- we informed people in  12:43:31
18  contract admin, "If this particular  12:43:34
19  customer calls, make sure you answer  12:43:35
20  their call and address their issues.  12:43:37
21  They're a priority.  Don't think that  12:43:40
22  everybody in your basket is as  12:43:41
23  important.  There's 11 customers  12:43:43
24  driving all of our business, and you  12:43:46
25  need -- most of our business, and you  12:43:47

Page 172

1  need to address their issues first."  12:43:49
2  So that's what we were doing,  12:43:51
3  was changing the way the company  12:43:52
4  looked at the customers.  12:43:56
5  QUESTIONS BY MR. GOTTO:  12:43:57
6  Q.  Okay.  Turn to slide 22, if you  12:43:57
7  would.  There's a reference to customer  12:44:05
8  connectivity initiative, which sounds like it  12:44:09
9  may be part of what you were just talking  12:44:11
10  about.  12:44:12
11  A.  Exactly.  12:44:12
12  Q.  If you could just describe to  12:44:13
13  me what's meant by a customer connectivity  12:44:14
14  initiative.  12:44:16
15  A.  That's exactly what it was.  It  12:44:16
16  was to get our internal groups to understand  12:44:18
17  who the important customers were.  So we  12:44:21
18  taught them, like, these are the customers  12:44:23
19  driving the value for the business, and  12:44:24
20  that's who's really paying your paycheck.  12:44:27
21  And then we empowered them to  12:44:30
22  make their own decisions to resolve issues.  12:44:33
23  So if there was a chargeback issue and they  12:44:36
24  thought that the customer was entitled to  12:44:38
25  that chargeback but we deducted it for some  12:44:39

Page 173

1  reason, they were now saying that they could  12:44:43
2  resolve that issue themselves.  12:44:44
3  And we actually surveyed  12:44:46
4  customers on what was important to them, and  12:44:47
5  that's how we came up with what we needed to  12:44:51
6  do.  12:44:53
7  MR. GOTTO:  Okay.  You can put  12:44:53
8  that aside.  12:44:55
9  Why don't we take our lunch  12:44:55
10  break.  12:44:58
11  VIDEOGRAPHER:  We are going off  12:44:59
12  the record at 12:44 p.m.  12:45:00
13  (Off the record at 12:44 p.m.)  12:45:01
14  VIDEOGRAPHER:  We are back on  13:26:47
15  the record at 1:33 p.m.  13:33:43
16  (Mallinckrodt-Collier Exhibit  13:33:44
17  13 marked for identification.)  13:33:45
18  QUESTIONS BY MR. GOTTO:  13:33:45
19  Q.  Welcome back, Ms. Collier.  13:33:46
20  A.  Thank you.  13:33:48
21  Q.  We've marked as Exhibit 13 a  13:33:48
22  multipage document beginning with Bates  13:33:51
23  MNK-T1_0000607429.  Appears to be a specialty  13:33:52
24  generic strategic plan, 2013 to 2017.  It's  13:34:03
25  quite a lengthy document.  I just have a few  13:34:07

Page 174

1  questions for you on it.          13:34:09
2       If you could just look at it    13:34:10
3  just briefly to confirm that -- or ascertain  13:34:11
4  if you're familiar with it.         13:34:15
5       A.   Yes, I'm familiar with it.   13:34:37
6       Q.   And what is it?          13:34:38
7       A.   It is a STRAT plan, a strategic  13:34:39
8  plan, about how our sales will project in the  13:34:44
9  future.                     13:34:48
10      Q.   Okay.  And did you participate  13:34:48
11 in the preparation of this?          13:34:50
12      A.   Yes, I did.          13:34:52
13      Q.   Okay.  If you would turn to   13:34:53
14 slide 20.  And this is an industry trends   13:34:56
15 retail slide.                13:35:07
16      And the bottom two bullet      13:35:08
17 items, one says, "Our focus here will    13:35:12
18 continue to diminish as C-IIs become less of  13:35:15
19 an opportunity."              13:35:18
20      Do you know what's meant by     13:35:22
21 that?                     13:35:24
22      A.   I'm not clear what this meant   13:35:24
23 in the context, no.             13:35:26
24      Q.   Okay.  How about the next    13:35:27
25 bullet, "Need to implement SOM monitoring for  13:35:28

Page 175

1  HB/APAP for this class of customers in    13:35:31
2  addition to the wholesalers."         13:35:34
3       Do you know what's meant there?   13:35:36
4       A.   Hydrocodone APAP was going from  13:35:38
5  a Schedule III to a Schedule II, so that   13:35:39
6  means it was included in the suspicious order  13:35:43
7  monitoring program.             13:35:45
8       Q.   Okay.  All right.  If you'd    13:35:46
9  turn to slide 28, please.  This is a slide  13:35:55
10 entitled "Customer Initiatives."       13:36:05
11      Toward the middle of the slide,   13:36:09
12 there's a reference to "compliance      13:36:11
13 initiatives based on growing more profitable  13:36:13
14 product families."             13:36:16
15      What would be examples of      13:36:17
16 compliance initiatives?           13:36:20
17      A.   That would be, again, ensuring  13:36:21
18 that the customers, when they gave us the   13:36:24
19 volume, that they were buying at that volume  13:36:26
20 level.  And then we would worry more about  13:36:28
21 the profitable products than the less    13:36:31
22 profitable ones, because before we were just  13:36:32
23 kind of focusing on everything.  We needed to  13:36:35
24 change our focus.             13:36:37
25      Q.   So in terms of the initiative,  13:36:38

Page 176

1  though, what sorts of things would you do   13:36:41
2  to -- to -- as it says, "Growing more     13:36:44
3  profitable product families through a     13:36:46
4  compliance initiative"?           13:36:48
5       A.   That means -- so, for example,  13:36:49
6  if one of the drug wholesalers was not    13:36:51
7  purchasing the volume that we thought they   13:36:55
8  would, we would, again, work with them, find  13:36:56
9  out why they weren't purchasing, were they  13:36:59
10 buying from somebody else, too, because they  13:37:01
11 could do that.  They didn't have a commitment  13:37:03
12 in their contract to buy any certain volumes.  13:37:06
13      And because we didn't have a    13:37:09
14 commitment from them that we would change   13:37:09
15 your pricing, the only thing we could do was  13:37:11
16 ask them specifically why were they were not  13:37:13
17 buying.                    13:37:16
18      And if they were buying off of   13:37:16
19 another program because somebody was offering  13:37:17
20 at a lower price or if it was something    13:37:19
21 that -- pharmacist's preference, anything   13:37:22
22 like that, then we would try and uncover that  13:37:23
23 and find out what we needed to do differently  13:37:25
24 at our company in order to ensure that    13:37:27
25 they're buying our product.         13:37:29

Page 177

1       Q.   Okay.  Turn to slide 54,     13:37:31
2  please.  This is the SWOT analysis.      13:37:38
3       Under Strengths, the first --    13:37:55
4       A.   It must be the wrong page, I'm  13:37:57
5  sorry.                     13:37:58
6       Q.   I'm sorry, it's slide 54.     13:37:58
7       A.   I was on 64.  Even with my    13:38:00
8  glasses I'm having a hard time reading those  13:38:02
9  numbers.                   13:38:04
10      Q.   These are a little tiny.      13:38:04
11      A.   Yes, they are.  Thank you.    13:38:06
12      Q.   Okay.  So the SWOT analysis for  13:38:07
13 Mallinckrodt, under Strengths, the first    13:38:10
14 bullet item is, "Recognized as leader in   13:38:11
15 narcotics."                 13:38:15
16      Do you see that?           13:38:16
17      A.   Yes.               13:38:16
18      Q.   And what's the basis for that,   13:38:16
19 that Mallinckrodt is recognized as a leader  13:38:19
20 in narcotics?                13:38:20
21      A.   Partly due to our market share.  13:38:21
22 It was a 150-year-old company that started   13:38:24
23 out making the raw materials in narcotics and  13:38:27
24 grew from -- growing our -- making narcotics  13:38:30
25 all the way through to having a finished   13:38:33

Page 178

1  dosage form, so they also sold tablets and      13:38:35
2  everything.                                      13:38:37
3         And anytime you're vertically            13:38:38
4  integrated like that in the industry, that's    13:38:40
5  really widely appreciated because there         13:38:42
6  should be some consistency of supply behind     13:38:44
7  that.                                            13:38:46
8     Q.   Okay.  Under Strengths, the             13:38:47
9  bottom bullet item says, "Lobbyists engaged     13:38:52
10 in legislation."                                13:38:54
11        Do you recall at this time if            13:38:57
12 there were any particular legislative           13:38:58
13 initiatives that lobbyists were engaged in?     13:39:00
14    A.   I can't remember the specific           13:39:03
15 initiative.  I remember working with one of     13:39:09
16 our lobbyists at that time.  We were at a       13:39:12
17 meeting in Washington, DC, and I can't          13:39:16
18 remember specifically what that was around.     13:39:18
19 It might have had to do with REMS, because of   13:39:19
20 the cost of REMS.                               13:39:22
21    Q.   Under Weaknesses there's               13:39:23
22 "prolonged supply issues," and that's          13:39:25
23 something we've touched on here today,         13:39:28
24 correct?                                       13:39:29
25    A.   Correct.                               13:39:30

Page 179

1     Q.   And it appears that that              13:39:30
2  continued to be a problem up till the time     13:39:32
3  this document was prepared, correct?           13:39:36
4     A.   Correct.                               13:39:37
5     Q.   Under Threats, first bullet          13:39:37
6  item is "pill mill legislation."              13:39:42
7         Why was pill mill legislation a        13:39:45
8  threat?                                        13:39:47
9         MR. O'CONNOR:  Objection.              13:39:47
10        THE WITNESS:  It wouldn't be           13:39:48
11    considered a threat.  It would mean --      13:39:51
12    a threat would be anything that would       13:39:53
13    adjust our business, so we had to           13:39:54
14    consider it.  So I wouldn't say it's a      13:39:58
15    threat, per se, that it's a reduction       13:40:00
16    in our business, so it's going to           13:40:02
17    impact the overall value of our             13:40:04
18    portfolio.                                  13:40:06
19 QUESTIONS BY MR. GOTTO:                        13:40:06
20    Q.   Okay.  Do you know if there was       13:40:08
21 specific pending or proposed legislation       13:40:15
22 related to pill mills at this time that was    13:40:20
23 of particular interest?                        13:40:22
24    A.   I really don't remember what          13:40:23
25 that was around.                               13:40:28

Page 180

1     Q.   Okay.  Turn to slide 95,             13:40:30
2  please.  If it's easier, it's -- the Bates     13:40:46
3  number ends in 523 in the lower right-hand     13:40:47
4  corner.                                        13:40:52
5     A.   Perfect.  Thank you.                  13:40:52
6     Q.   This slide is on promotional         13:40:53
7  positioning.                                   13:40:57
8         What's meant by that phrase,           13:40:57
9  "promotional positioning"?                     13:41:01
10    A.   It means how are we different        13:41:02
11 than Mylan, Teva and other competitors at      13:41:04
12 that time.                                      13:41:07
13    Q.   Okay.  And the second bullet         13:41:07
14 bullet item says, "Primary focus is           13:41:12
15 Mallinckrodt is a leader in pain management."  13:41:14
16        Do you see that?                        13:41:17
17    A.   Yes.                                   13:41:17
18    Q.   And under that, the bullet item      13:41:17
19 is "committed to education."                   13:41:19
20        What's that referring to,              13:41:21
21 "committed to education"?                       13:41:24
22    A.   At one time there -- and I'm --      13:41:25
23 and I'm sorry if I misstate this, but I        13:41:29
24 believe that there was a program intended to   13:41:31
25 educate about pain management, and there were  13:41:34

Page 181

1  alternative therapies such as medication and   13:41:38
2  things like that.                              13:41:41
3         And I'm not sure -- we never           13:41:42
4  launched that program.  But I'm not sure what  13:41:45
5  it means in this context, what all we          13:41:48
6  intended to do.                                13:41:50
7     Q.   Okay.  Two bullet items below        13:41:51
8  that, there's a bullet item "education about   13:41:57
9  the proper use of medication and therapeutic   13:41:58
10 category."                                     13:42:00
11        Do you see that?                        13:42:01
12    A.   Yes.                                   13:42:01
13    Q.   Any more insight into education      13:42:02
14 in that context?                               13:42:05
15    A.   Well, and it seems that we did       13:42:05
16 run a CE article, continuing education         13:42:08
17 article, about proper use, and I do know that  13:42:10
18 we looked at proper disposal of products,      13:42:13
19 especially with the launch of fentanyl patch,  13:42:16
20 so it was probably around that.                13:42:19
21    Q.   Okay.  And the next bullet           13:42:22
22 item, "Sponsor CE article in drug topics."     13:42:25
23        Do you know what that article          13:42:28
24 pertained to?                                  13:42:29
25    A.   I can't remember the specific        13:42:31

Page 182

1  topic.                                    13:42:32
2      Q.    Okay.   Next bullet item says,   13:42:33
3  "Our primary vehicles for getting out our  13:42:36
4  messages will be direct mail, Pharm/alert and  13:42:39
5  PDQ."                                     13:42:43
6          Direct mail in this setting,      13:42:44
7  what is that referring to?               13:42:46
8      A.    That would be send it out --    13:42:48
9  send information out -- there's two levels:  13:42:51
10 One is our buyers, our customers, which are  13:42:53
11 the warehousing chains, wholesalers and   13:42:55
12 distributors, or send something out to the  13:42:59
13 retail pharmacies, which is downstream a  13:43:01
14 little bit further.  And so we -- so       13:43:04
15 Pharm/alert goes to retail pharmacies.  They  13:43:07
16 can't sell them to hospital pharmacies, so  13:43:11
17 the pharmacists get information that way.  13:43:12
18     Q.    When you said "they can't sell  13:43:16
19 to hospital pharmacies," who is the "they"  13:43:39
20 you're referring to there?               13:43:41
21         Maybe I just didn't understand   13:43:45
22 your answer.  You were talking in terms of a  13:43:46
23 direct mail to pharmacies.               13:43:47
24     A.    It can go to hospital          13:43:50
25 pharmacies, hospital pharmacists.        13:43:53

Page 183

1      Q.    Okay.                          13:43:55
2      A.    So we did sell to pharmacies   13:43:55
3  through the wholesalers.                 13:43:58
4      Q.    Okay.  And so direct mail could  13:43:59
5  go to retail pharmacies and hospital     13:44:02
6  pharmacies?                              13:44:03
7      A.    Correct.                       13:44:03
8      Q.    Okay.  And how often -- well,   13:44:04
9  who was in charge of any kind of direct mail  13:44:12
10 program that you engaged in from time to  13:44:19
11 time?                                    13:44:21
12         MR. O'CONNOR:  Object to form.   13:44:21
13         THE WITNESS:  In charge of and   13:44:21
14     actually --                          13:44:23
15 QUESTIONS BY MR. GOTTO:                   13:44:23
16     Q.    Who decided what was going to  13:44:24
17 get sent out to whom?                    13:44:25
18     A.    Well, that would be generated  13:44:27
19 out of my department, and usually instructed  13:44:28
20 by me and with approval of the president of  13:44:32
21 the division.                            13:44:35
22     Q.    Okay.  And so in terms of      13:44:35
23 direct mail to retail pharmacy or to hospital  13:44:38
24 pharmacy, what sort of information would you  13:44:40
25 provide to them in a direct mailing?     13:44:42

Page 184

1      A.    We would do a direct mail on   13:44:45
2  new products and tell them what product is  13:44:47
3  now available.  For example, I -- earlier I  13:44:49
4  spoke to that we had fentanyl patch, fentanyl  13:44:51
5  lozenge and methylphenidate, so we would give  13:44:51
6  them information if the product's available  13:44:56
7  so that they were aware.  Because they may  13:44:59
8  have been continuing to order -- even though  13:45:02
9  we might have gotten the award on a contract,  13:45:04
10 they may have continued to order from the  13:45:06
11 competitor, not knowing that we were now  13:45:08
12 available.                               13:45:10
13     Q.    Okay.  What is PDQ?            13:45:12
14     A.    PDQ is a pharm -- like         13:45:22
15 Pharm/alert or any other mail.  It's a    13:45:24
16 collection of pieces from different       13:45:26
17 manufacturers, and it comes in a big mailing  13:45:28
18 packet, you know, like some of the junk mail  13:45:30
19 you get, and so the pharmacists receive that.  13:45:32
20 And they get a whole packet of information  13:45:34
21 about new products and whatever other      13:45:36
22 information that other companies might want  13:45:40
23 to put out.                              13:45:43
24     Q.    Okay.  The next bullet item    13:45:43
25 says, "Other vehicles will be webinars, our  13:45:44

Page 185

1  website and e-mails."                    13:45:48
2          What types of webinars were      13:45:49
3  conducted?                              13:45:51
4      A.    I don't remember what webinars  13:45:52
5  we may or -- may have even done them, if we  13:45:56
6  did them at all.                         13:46:01
7      Q.    Who would have coordinated     13:46:02
8  webinar activity?                        13:46:03
9      A.    That would have been within    13:46:04
10 promotion -- within the promotional group,  13:46:07
11 which was in my team.                    13:46:10
12     Q.    Okay.  But you don't recall if  13:46:10
13 that actually was done?                  13:46:12
14     A.    No, I don't recall that.       13:46:12
15     Q.    Turn to slide 97, please, two  13:46:14
16 after the one you're on.  It's a slide about  13:46:27
17 other promotional activities.            13:46:34
18         And there's a bullet, "advisory  13:46:36
19 boards, question mark, topics, value,     13:46:39
20 potential participants."                 13:46:42
21         Do you recall if Mallinckrodt    13:46:43
22 became involved in any advisory boards?   13:46:48
23     A.    No, we did not.               13:46:51
24     Q.    Was there a decision made not  13:46:52
25 to do that, or is it just something that  13:46:54

Page 186

1  didn't come together?                    13:46:56
2      A.   It was a decision not to do it.   13:46:57
3      Q.   Do you know why?                 13:46:59
4      A.   My input was that there were     13:47:00
5  challenges in trying to decide who would be   13:47:04
6  on the board and what would even be the topic   13:47:06
7  that we wanted to discuss.  We couldn't   13:47:10
8  perceive it to be something that we were   13:47:11
9  having the customers do to give the customers   13:47:13
10  a day out of the office.                 13:47:16
11         It needed to be something that     13:47:17
12  was constructive for the company.  We     13:47:18
13  couldn't come up with what would be value for   13:47:20
14  the company.                             13:47:22
15      Q.   And if you turn to the next     13:47:23
16  slide, slide 98, it's Generic Business    13:47:35
17  Expenses, and the first line, which says,   13:47:45
18  "Product Manager Collier."  And there's some   13:47:47
19  prior year, fiscal '12 and fiscal '13    13:47:52
20  figures, which show a significant increase in   13:47:56
21  fiscal year '13 budget versus the prior   13:47:58
22  years.                                   13:48:00
23         Do you know what the reason for    13:48:00
24  that is?                                 13:48:02
25      A.   I think this was with the       13:48:03

Page 187

1  launch -- this may have been that we were   13:48:05
2  preparing for the launch of -- one, I had   13:48:10
3  more people on my staff to do more analytics,   13:48:12
4  and this may have had to do something with   13:48:15
5  the launch of methylphenidate, that we needed   13:48:18
6  to increase the staffing prior to launch, and   13:48:21
7  just better analytics around all of our sales   13:48:24
8  numbers.                                 13:48:27
9      Q.   Okay.  You can set that aside.   13:48:27
10      A.   Okay.                           13:48:38
11         (Mallinckrodt-Collier Exhibit      13:49:10
12      14 marked for identification.)        13:49:10
13  QUESTIONS BY MR. GOTTO:                   13:49:10
14      Q.   Ms. Collier, Exhibit 14 is a    13:49:18
15  multipage document beginning at Bates     13:49:21
16  MNK-T1_0000663716.  Appears to be a strategic   13:49:28
17  plan for the years 2014 through '19.  Again,   13:49:30
18  I just have a couple of questions for you on   13:49:35
19  the document.                            13:49:37
20      A.   Okay.                           13:49:37
21      Q.   But if you can look through it   13:49:37
22  briefly just to familiarize yourself and   13:49:39
23  confirm that you are familiar with it.    13:49:41
24      A.   Okay.                           13:49:43
25      Q.   Are you familiar with this      13:51:02

Page 188

1  document?                                13:51:03
2      A.   Yes, I am.                       13:51:03
3      Q.   And what is it?                  13:51:04
4      A.   It's a strategic plan developed   13:51:05
5  by the generics group, generics marketing   13:51:07
6  group, for periods 2014 to 2019.         13:51:10
7      Q.   Okay.  And did you participate   13:51:12
8  in the preparation of this document?      13:51:13
9      A.   Yes, I did.                      13:51:15
10      Q.   Okay.  If you would turn to     13:51:16
11  slide 8, please.  The Bates number ends in   13:51:18
12  723.                                     13:51:25
13      A.   (Witness complies.)             13:51:28
14      Q.   This is a trends slide, and the   13:51:29
15  bottom half, there's a bullet item talking   13:51:35
16  about "abuse-deterrent legislation."      13:51:37
17         Do you see that?                  13:51:40
18      A.   Yes.                            13:51:40
19      Q.   What was abuse-deterrent        13:51:41
20  legislation as used in this slide?       13:51:44
21      A.   There was consideration by      13:51:46
22  several states to have products that if there   13:51:47
23  was an abuse-deterrent product available,   13:51:49
24  that they would give preference to that drug   13:51:53
25  over other nonabuse-deterrent drugs.      13:51:57

Page 189

1      Q.   Okay.  And the very last bullet   13:51:59
2  item on this slide says, "Mallinckrodt and   13:52:00
3  GPHA are opposed to this."               13:52:03
4         Is that the abuse-deterrent        13:52:06
5  legislation that Mallinckrodt was opposed to?   13:52:09
6         MR. O'CONNOR:  Object to form.     13:52:09
7         THE WITNESS:  Yes, I would        13:52:11
8      assume based where it's placed in the   13:52:12
9      slide, yes.                          13:52:15
10  QUESTIONS BY MR. GOTTO:                   13:52:15
11      Q.   And do you know why            13:52:15
12  Mallinckrodt was opposed to abuse-deterrent   13:52:16
13  legislation?                             13:52:21
14      A.   No, but I -- I could speculate,   13:52:21
15  but I would think that it would be better   13:52:23
16  placed with the lobbyists that were working   13:52:25
17  on the program.                          13:52:28
18      Q.   Okay.  All right.  And if you   13:52:28
19  would turn to the Bates -- Bates number 768   13:52:31
20  at the end, toward the back of the document.   13:52:35
21  It's slide 53.  It's the SWOT analysis.   13:52:38
22         And this is similar to the SWOT    13:52:50
23  analysis we looked at in the prior exhibit.   13:52:52
24         Under Threats, though, I had a     13:52:54
25  question on the last item:  "Continued    13:52:58

Page 190

1  attempts by government to restrict access in   13:53:00
2  an effort to reduce abuse or misuse which   13:53:02
3  affects pain patients."   13:53:06
4      Do you know what continued   13:53:07
5  attempts by the government are being referred   13:53:11
6  to in that bullet item?   13:53:14
7      A.   Yes. It would have been   13:53:16
8  switching -- for here, for example,   13:53:20
9  hydrocodone APAP to a C-II to restrict access   13:53:22
10 so patients were getting fewer pills. So we   13:53:26
11 would have to accommodate the new request by   13:53:28
12 the government, and what would that mean in   13:53:31
13 our total volume.   13:53:33
14     Q.   Okay. And that was a threat to   13:53:35
15 Mallinckrodt for what reason?   13:53:36
16     A.   It just would be a reduction in   13:53:38
17 our overall volume of units and sales,   13:53:40
18 obviously.   13:53:44
19     Q.   Okay. You can set that aside.   13:53:44
20     (Mallinckrodt-Collier Exhibits   13:54:19
21     15 and 16 marked for identification.)   13:54:20
22 QUESTIONS BY MR. GOTTO:   13:54:20
23     Q.   We've marked as Exhibit 15 a   13:54:53
24 single-page e-mail bearing Bates   13:54:57
25 MNK-T1_0000418885, and as Exhibit 16 what I   13:55:00

Page 191

1  believe is one of the attachments to that   13:55:08
2  e-mail, a multipage document that was   13:55:12
3  produced in native form under Bates   13:55:17
4  MNK-T1_0000418886.   13:55:21
5      Take a look at those documents,   13:55:25
6  if you would, and tell me if you recognize   13:55:29
7  them.   13:55:31
8      A.   Yes, I do recognize them.   13:55:32
9      Q.   And what are they?   13:55:38
10     A.   This is a sales report that was   13:55:39
11 pulled to indicate if some of our customers   13:55:44
12 were buying from more than one distributor,   13:55:48
13 because we did not typically look at that.   13:55:49
14 We just would get chargebacks from individual   13:55:52
15 wholesalers or distributors and never looked   13:55:55
16 across the channel to see if they were   13:55:57
17 possibly buying from other distributors.   13:55:59
18     Q.   And why was that of interest to   13:56:01
19 you, whether they were buying from other   13:56:03
20 distributors?   13:56:04
21     MR. O'CONNOR: Object to form.   13:56:05
22     THE WITNESS: It was my thought   13:56:06
23 that our distributors may not know   13:56:10
24 that -- distributors and wholesalers   13:56:14
25 each have a limit, too, in which   13:56:15

Page 192

1  they'll sell to the customer. They   13:56:17
2  may not know that that particular   13:56:18
3  customer is buying from other   13:56:19
4  distributors or wholesalers.   13:56:21
5      So because of the issue in   13:56:22
6  Florida, we looked at Florida and   13:56:24
7  pulled those customers that we thought   13:56:27
8  were possibly buying from other   13:56:29
9  distributors.   13:56:33
10 QUESTIONS BY MR. GOTTO:   13:56:34
11     Q.   Okay. So is this the work   13:56:34
12 product that you were referring to earlier   13:56:37
13 today when you talked about analysis that you   13:56:39
14 and Ms. Muhlenkamp did after the Sunrise   13:56:41
15 issues surfaced?   13:56:46
16     A.   Correct.   13:56:47
17     Q.   Okay. So the attachment --   13:56:48
18 just to be sure I understand the -- what's   13:56:52
19 depicted here. Customer name -- the customer   13:56:57
20 in the context of Exhibit 16 is   13:57:00
21 Mallinckrodt's customer's customer, correct?   13:57:03
22     MR. O'CONNOR: Object to form.   13:57:07
23     THE WITNESS: Well, I want to   13:57:08
24 be clear I'm not sure, because what   13:57:11
25 could happen is one of our customers   13:57:12

Page 193

1  could sell to another pharmacy, and   13:57:14
2  that pharmacy, in turn, sold to other   13:57:16
3  pharmacies. So it's never really   13:57:19
4  clear unless we get chargeback data   13:57:21
5  back on where it went.   13:57:26
6  QUESTIONS BY MR. GOTTO:   13:57:27
7      Q.   Okay. So is the customer   13:57:28
8  that's listed on Exhibit 16 the entity that   13:57:29
9  would be identified as a customer in the   13:57:32
10 chargeback report that Mallinckrodt   13:57:34
11 maintained?   13:57:37
12     A.   Correct.   13:57:37
13     Q.   Okay. And that may be the   13:57:38
14 direct customer of Mallinckrodt's customer or   13:57:45
15 may be an indirect customer of Mallinckrodt's   13:57:48
16 customer; is that fair?   13:57:51
17     MR. O'CONNOR: Object to form.   13:57:52
18     THE WITNESS: Correct.   13:57:52
19 QUESTIONS BY MR. GOTTO:   13:57:53
20     Q.   And this report is for the   13:58:04
21 September 2010 time period; is that correct?   13:58:07
22     A.   Yes. It appears to be.   13:58:09
23     Q.   Is this the first time that you   13:58:15
24 and Ms. Muhlenkamp gathered this information;   13:58:33
25 do you know?   13:58:36

Page 194

```
 1    A.   Yes.                    13:58:37
 2    Q.   Okay.                   13:58:38
 3    A.   That I remember it is.        13:58:38
 4    Q.   Okay.  Did you engage in this   13:58:40
 5  data gathering process again in the future?   13:58:44
 6         MR. O'CONNOR:  Object to form.   13:58:47
 7         THE WITNESS:  Not that I      13:58:48
 8    recall.                     13:58:51
 9  QUESTIONS BY MR. GOTTO:              13:58:51
10    Q.   Okay.  So according to        13:58:52
11  Exhibit 15, your cover e-mail, you sent this   13:58:56
12  to Mr. Becker, Mr. Borelli and Ms. Williams,   13:58:58
13  correct?                       13:59:04
14    A.   Correct.                13:59:04
15    Q.   And did you have further      13:59:05
16  discussions with them regarding the data or   13:59:06
17  any further evaluation of this data?      13:59:09
18         MR. O'CONNOR:  Object to form.   13:59:13
19         THE WITNESS:  Yes, we did.    13:59:13
20  QUESTIONS BY MR. GOTTO:              13:59:14
21    Q.   What can you recall?          13:59:14
22    A.   I recall having a discussion    13:59:15
23  with them that they needed to talk to their   13:59:18
24  distributors and wholesalers and advise them   13:59:20
25  that these might be problem customers and    13:59:23
```

Page 195

```
 1  that we would no longer issue chargebacks --   13:59:26
 2  or pay them chargebacks for these customers   13:59:28
 3  if they continued selling to them.        13:59:30
 4    Q.   Okay.  And so would that be the   13:59:32
 5  case as to any of your customers' customers   13:59:36
 6  if they were buying from multiple        13:59:38
 7  distributors, you would not pay chargebacks   13:59:40
 8  to your -- to Mallinckrodt's distributor?    13:59:42
 9         MR. O'CONNOR:  Object to form.   13:59:44
10         THE WITNESS:  No, it was       13:59:45
11    specific to these customers that we    13:59:48
12    identified, and that was all.        13:59:50
13  QUESTIONS BY MR. GOTTO:              13:59:52
14    Q.   Okay.                   13:59:52
15    A.   I don't know if anybody else     13:59:52
16  took action later.                 13:59:55
17    Q.   Okay.  But the rationale was    13:59:57
18  because they were buying from multiple      13:59:58
19  distributors, Mallinckrodt wouldn't pay     14:00:00
20  chargebacks to the distributor who was buying   14:00:03
21  from Mallinckrodt, correct?            14:00:05
22    A.   Correct.                14:00:06
23         MR. O'CONNOR:  Object to form.   14:00:06
24  QUESTIONS BY MR. GOTTO:              14:00:06
25    Q.   Okay.  And the second entry on   14:00:13
```

Page 196

```
 1  the list, the Tru-Valu Drugs customer, that   14:00:15
 2  was buying from six distributors, correct?   14:00:19
 3    A.   Yes.                    14:00:22
 4    Q.   How did you ascertain how many   14:00:23
 5  different distributors a customer was buying   14:00:26
 6  from?                         14:00:30
 7    A.   Kate Neely, Kate Muhlenkamp,    14:00:30
 8  pulled this, and I'm not sure exactly, but    14:00:36
 9  I'm sure in a query you can develop this and   14:00:38
10  then have what distributor or wholesaler    14:00:41
11  issued the chargeback.  So she would be able   14:00:46
12  to ascertain from that.              14:00:48
13    Q.   So the number of distributors    14:00:50
14  here -- so, for example, Tru-Valu Drugs     14:00:57
15  buying from six different distributors, are   14:01:01
16  those six different Mallinckrodt         14:01:03
17  distributors?                    14:01:06
18    A.   Correct.                14:01:06
19    Q.   Okay.  So it's possible they     14:01:08
20  could have been buying from other parties as   14:01:11
21  well, correct?                    14:01:13
22    A.   Correct.                14:01:13
23    Q.   Okay.  Is there -- what would    14:01:14
24  be a business reason why a party identified   14:01:31
25  as a customer on this list would buy from    14:01:35
```

Page 197

```
 1  multiple Mallinckrodt distributors?      14:01:37
 2    A.   I'm not sure why they would do   14:01:40
 3  that.  I don't know if you need me to      14:01:45
 4  speculate, but I'm not sure that I know why   14:01:50
 5  each individual customer did that.        14:01:53
 6    Q.   Okay.  When you gathered this    14:01:57
 7  information, was it surprising to you to     14:02:01
 8  learn how many distributors these customers   14:02:04
 9  were buying from?                  14:02:08
10         MR. O'CONNOR:  Object to form.   14:02:09
11         THE WITNESS:  Yes.          14:02:10
12  QUESTIONS BY MR. GOTTO:              14:02:11
13    Q.   Would your expectation have      14:02:12
14  been that they would have been buying from    14:02:13
15  just one distributor?               14:02:16
16    A.   Yes.                    14:02:18
17    Q.   And in the month of September,   14:02:18
18  if I'm reading this correctly, it's        14:02:32
19  approximately a million and a half dollars of   14:02:35
20  gross sales to these various customers; is    14:02:38
21  that correct?                     14:02:40
22    A.   Yes.                    14:02:40
23    Q.   Do you have any estimate of the   14:02:41
24  percentage of sales of Mallinckrodt product   14:02:51
25  in September of 2010 that went to the state   14:02:56
```

Page 198

1  of Florida, what percentage of those sales    14:02:59
2  are reflected on Exhibit 16?    14:03:02
3      MR. O'CONNOR:  Object to form.    14:03:05
4      THE WITNESS:  I don't know.    14:03:06
5  QUESTIONS BY MR. GOTTO:    14:03:06
6      Q.    Was any effort made to    14:03:08
7  ascertain that?    14:03:10
8      A.    I'm sure that we knew    14:03:11
9  somewhere, but I didn't know for a fact based    14:03:13
10  on this.    14:03:14
11      Q.    Do you know if the chargeback    14:03:16
12  database that Mallinckrodt maintained would    14:03:27
13  have been a source for that information?    14:03:30
14      MR. O'CONNOR:  Object to form.    14:03:31
15      THE WITNESS:  Could you repeat    14:03:32
16  the question?    14:03:35
17  QUESTIONS BY MR. GOTTO:    14:03:35
18      Q.    Yeah.    14:03:36
19      My question about the    14:03:36
20  percentage of sales into Florida that these    14:03:37
21  Exhibit 16 sales reflect, do you know if the    14:03:42
22  chargeback data that Mallinckrodt maintained    14:03:44
23  could have been queried to ascertain the    14:03:48
24  answer to that question?    14:03:51
25      MR. O'CONNOR:  Object to form.    14:03:51

Page 199

1      THE WITNESS:  I would assume    14:03:52
2  so, because we did it here.    14:03:53
3  QUESTIONS BY MR. GOTTO:    14:03:55
4      Q.    And I think you indicated    14:04:00
5  earlier that when you spoke to Mr. Becker and    14:04:06
6  Borelli and Ms. Williams about this data,    14:04:14
7  part of the idea was to let the distributors    14:04:17
8  know what you had discovered.    14:04:20
9      Do you know if that's -- if    14:04:24
10  that information would otherwise have been    14:04:27
11  available to Mallinckrodt's distributor    14:04:30
12  customers?    14:04:33
13      MR. O'CONNOR:  Object to form.    14:04:33
14  QUESTIONS BY MR. GOTTO:    14:04:34
15      Q.    In other words, would they have    14:04:34
16  had any independent way of ascertaining which    14:04:36
17  of their customers were buying from other    14:04:40
18  Mallinckrodt distributors?    14:04:41
19      MR. O'CONNOR:  Same objection.    14:04:42
20      THE WITNESS:  I wouldn't know    14:04:43
21  what their systems could do.    14:04:45
22  QUESTIONS BY MR. GOTTO:    14:04:47
23      Q.    Okay.  And I think you've    14:04:47
24  already testified you performed this analysis    14:04:55
25  just this one time that's reflected on    14:04:57

Page 200

1  Exhibit 16, correct?    14:04:59
2      A.    Correct.    14:05:00
3      MR. O'CONNOR:  Object to form.    14:05:01
4  QUESTIONS BY MR. GOTTO:    14:05:01
5      Q.    Do you know if any similar    14:05:02
6  analysis was ever conducted with respect to    14:05:05
7  sales in states other than Florida?    14:05:08
8      A.    I believe there were other    14:05:11
9  states listed in here.  Well, I know there    14:05:15
10  are, so I don't know if it was just run for    14:05:19
11  all states or if there was a limited    14:05:22
12  population that we were looking for.    14:05:25
13      Q.    Well, it appears that the    14:05:28
14  significant -- the substantial majority of    14:05:32
15  the states -- of the customers on here are    14:05:36
16  identified as Florida, although there were    14:05:38
17  multiple other states listed as well.    14:05:47
18      Do you know -- is it your    14:05:42
19  understanding that this list, Exhibit 16, is    14:05:45
20  a list of all of the parties identified as    14:05:48
21  customer in Mallinckrodt's chargeback data    14:05:52
22  for September 2010 who were indicated to have    14:05:55
23  bought from multiple distributors?    14:05:59
24      A.    To my knowledge, this was the    14:06:01
25  list.    14:06:03

Page 201

1      Q.    Okay.    14:06:03
2      A.    This is the entire list.    14:06:04
3      Q.    For all states?    14:06:05
4      A.    And I want to be clear, too.    14:06:07
5  It says September 2010.  I don't know the    14:06:09
6  time frame on this.    14:06:12
7      Q.    Okay.  Do you have an    14:06:12
8  understanding of what the reference to    14:06:16
9  September 2010 in the title of the document    14:06:19
10  means?    14:06:21
11      A.    That's when the query was    14:06:22
12  pulled for the September -- in 2010.  She    14:06:24
13  does not have a specific date on here.  We    14:06:28
14  normally would have documented that    14:06:32
15  somewhere.    14:06:33
16      Q.    Do you --    14:06:33
17      A.    But --    14:06:35
18      Q.    Go ahead.    14:06:36
19      A.    Okay.  It was run on    14:06:36
20  11/19/2010, but she doesn't even say there if    14:06:38
21  it's just one month or -- I don't know the    14:06:41
22  time frame, sorry.    14:06:43
23      Q.    Okay.  So you don't know if the    14:06:44
24  data -- if the sales that are reflected on    14:06:45
25  Exhibit 16 occurred in September 2010 or at    14:06:49

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1  some other point?                    14:06:52
2      A.   Right.                       14:06:53
3      Q.   Presumably it would have     14:06:54
4  included September 2010, but it might have  14:06:56
5  extended beyond that?                14:06:59
6      A.   Correct.                     14:07:00
7      Q.   You just don't know?         14:07:00
8      A.   Correct.                     14:07:02
9      Q.   Okay.  And so if it's the case  14:07:03
10 that Exhibit 16 reflects all of the customers  14:07:11
11 buying from multiple Mallinckrodt    14:07:16
12 distributors for whatever time period is  14:07:18
13 applicable here, it would appear to be the  14:07:20
14 case that that phenomenon of customers buying  14:07:23
15 from multiple distributors was highly  14:07:28
16 concentrated, if not exclusive, to the state  14:07:32
17 of Florida.                          14:07:34
18      It was at least highly          14:07:35
19 concentrated in Florida, correct?   14:07:37
20      MR. O'CONNOR:  Object to form.  14:07:38
21      THE WITNESS:  This would        14:07:39
22 reflect only those customers or      14:07:40
23 pharmacies that were issued a        14:07:42
24 chargeback as part of a contract.    14:07:43
25      So I cannot speak to that,       14:07:45

Page 203

1  because I don't know who purchased the  14:07:47
2  product at this price from the       14:07:49
3  wholesaler or at some other -- on    14:07:50
4  other various contracts or various   14:07:54
5  pharmacy names.  So it could be      14:07:56
6  misleading if I tell you yes.        14:07:58
7  QUESTIONS BY MR. GOTTO:             14:08:00
8      Q.   Okay.  But certainly among the  14:08:00
9  universe of customers whose purchases gave  14:08:03
10 rise to a chargeback claim that a distributor  14:08:05
11 made to Mallinckrodt, it's the case that this  14:08:08
12 phenomenon of purchases from multiple  14:08:11
13 distributors was heavily concentrated in  14:08:13
14 Florida?                             14:08:15
15      MR. O'CONNOR:  Object to form.  14:08:15
16      THE WITNESS:  It appears so,     14:08:16
17 yes.                                 14:08:20
18 QUESTIONS BY MR. GOTTO:             14:08:20
19      Q.   And on page 3, the David's  14:08:21
20 Pharmacy line is highlighted.        14:08:25
21      Do you have any idea why that    14:08:26
22 is?  Is it because it's the average?  14:08:28
23      A.   Correct.                    14:08:30
24      Q.   And that percent to average  14:08:31
25 column, what is that reflecting?     14:08:35

Page 204

1      A.   It's the percent of the total  14:08:38
2  units.  And so she had to divide where --  14:08:43
3  where was the units, who was the average, who  14:08:48
4  was the median, the most frequent number, and  14:08:51
5  so the total dispensed units.        14:08:54
6      Q.   Okay.  So it's a comparison.  14:08:57
7      So, for example, West Coast        14:08:58
8  Pharmacy on the first page, 499.7 percent is  14:09:00
9  a comparison of the 173,900 to the 34,800 for  14:09:05
10 David's Pharmacy?                    14:09:11
11      A.   Yes, that would be the --   14:09:13
12 they're 499 percent to the average purchaser.  14:09:17
13      Q.   Okay.  Thank you.           14:09:20
14      At the time of the preparation   14:09:43
15 of the analysis or the compilation that's  14:09:44
16 reflected on Exhibit 16, did you make any  14:09:50
17 attempt to evaluate the magnitude of sales  14:09:53
18 from Mallinckrodt to any of the particular  14:10:03
19 distributors who -- whose customers, direct  14:10:06
20 or indirect, are reflected on Exhibit 16?  14:10:11
21      A.   I do remember knowledge of --  14:10:14
22 that there were certain distributors or  14:10:19
23 wholesalers in the list.             14:10:21
24      Q.   And whom do you recall being in  14:10:23
25 that category?                       14:10:25

Page 205

1      A.   I remember Smith Drug was one  14:10:25
2  of them.                             14:10:28
3      Q.   Okay.  Do you remember if there  14:10:29
4  was any particular analysis of KeySource?  14:10:32
5      MR. O'CONNOR:  Object to form.  14:10:39
6      THE WITNESS:  I don't.           14:10:40
7  QUESTIONS BY MR. GOTTO:             14:10:41
8      Q.   Okay.  And how about Sunrise?  14:10:41
9      MR. O'CONNOR:  Object to form.  14:10:42
10      THE WITNESS:  I don't remember   14:10:44
11 that either.                         14:10:44
12      At that time I'm not sure if     14:10:45
13 they were still in our sales, because  14:10:46
14 I'm not sure when the DEA took       14:10:49
15 enforcement action on them.          14:10:52
16 QUESTIONS BY MR. GOTTO:             14:10:54
17      Q.   Okay.  You can set those aside.  14:10:54
18      (Mallinckrodt-Collier Exhibit   14:11:26
19 17 marked for identification.)       14:11:26
20 QUESTIONS BY MR. GOTTO:             14:11:26
21      Q.   We have marked as Exhibit 17 a  14:11:26
22 multipage e-mail thread beginning at  14:11:30
23 MNK-T1_0000483766, and it's an e-mail  14:11:33
24 exchange from June of 2010 concerning  14:11:41
25 oxycodone sales in Florida.          14:11:45

Page 206

1     Take a moment to look at those     14:11:47
2 and -- those e-mails. Let me know after     14:11:50
3 you've reviewed them.     14:11:53
4     A.   Okay.     14:11:55
5     Q.   Do you recognize those e-mails?     14:12:56
6     A.   Yes, I do.     14:12:58
7     Q.   Okay. So turning to the     14:13:00
8 earliest in time in the thread, from     14:13:03
9 Ms. Muhlenkamp on June 18th, e-mail from her     14:13:08
10 to a number of people and copying you, she     14:13:13
11 talks about Harvard Drug's license being     14:13:21
12 suspended. She then goes on to mention that     14:13:26
13 Sunrise wholesaler's DEA license was     14:13:30
14 suspended.     14:13:34
15     And then she says, "The two     14:13:34
16 wholesaler distributor license suspensions     14:13:36
17 led us to do a more in-depth analysis of     14:13:38
18 Covidien's oxycodone sales in the state of     14:13:42
19 Florida. We specifically focused on doctors'     14:13:44
20 offices and pain clinics."     14:13:49
21     And is that the initiative that     14:13:51
22 we discussed this morning --     14:13:53
23     A.   Yes, it is.     14:13:54
24     Q.   -- where she queried the     14:13:54
25 chargeback database?     14:13:57

Page 207

1     A.   Yes.     14:13:58
2     Q.   Okay. She says, "It appears     14:13:59
3 that Harvard and Sunrise were the dominant     14:14:04
4 players in this market, with over 50 percent     14:14:06
5 of their total sales coming from this market.     14:14:08
6 HD Smith, KeySource and McKesson Onestop are     14:14:11
7 next, with only 3 percent to their total     14:14:15
8 sales coming from doctors' offices and pain     14:14:17
9 clinics."     14:14:19
10     She goes on to say, "Karen     14:14:20
11 Harper and team, parens, internal Covidien     14:14:22
12 investigators, paren, will be working closely     14:14:25
13 with the DEA regarding their investigation of     14:14:28
14 the distribution of oxycodone in Florida, and     14:14:32
15 we will keep you apprised of further     14:14:34
16 happenings, period."     14:14:37
17     You then -- you responded to     14:14:41
18 that e-mail by saying, "It was excellent.     14:14:44
19 You may want to send this to Karen Harper,     14:14:46
20 too."     14:14:48
21     Correct?     14:14:49
22     A.   Yes.     14:14:49
23     Q.   And so before Ms. Muhlenkamp     14:14:50
24 sent her e-mail, her June 18th e-mail, had     14:14:58
25 she discussed with you the results of the     14:15:00

Page 208

1 investigatory work she had done?     14:15:05
2     A.   Yes, she did.     14:15:07
3     MR. O'CONNOR: Object to form.     14:15:07
4 QUESTIONS BY MR. GOTTO:     14:15:08
5     Q.   Okay. And she sent her     14:15:10
6 e-mail -- I just would like to understand who     14:15:13
7 the folks are that she sent it to.     14:15:15
8     Who was Dave Irwin?     14:15:17
9     A.   Dave Irwin was a national     14:15:19
10 account manager.     14:15:21
11     Q.   Okay. As was Mr. Becker,     14:15:22
12 correct?     14:15:24
13     A.   Correct.     14:15:24
14     Q.   And how about Tim Berry?     14:15:25
15     A.   National account manager.     14:15:28
16     Q.   And Bonnie New?     14:15:29
17     A.   Correct, national account     14:15:30
18 manager.     14:15:33
19     Q.   As was Mr. Borelli and Dan     14:15:33
20 Sanders?     14:15:37
21     A.   Yes.     14:15:38
22     Q.   Also a national account     14:15:38
23 manager?     14:15:39
24     A.   Yes, for hospital accounts.     14:15:39
25     Q.   And Rich McKendrick?     14:15:40

Page 209

1     A.   Yes, he was for government     14:15:43
2 accounts.     14:15:45
3     Q.   And Alex McGregor?     14:15:45
4     A.   National account manager for     14:15:47
5 hospital accounts.     14:15:49
6     Q.   Okay. And on the cc line, who     14:15:50
7 was Robert Lesnak?     14:15:52
8     A.   Robert Lesnak led the hospital     14:15:53
9 institutional sales team and addiction     14:15:56
10 treatment team. He's a sales leader.     14:15:59
11     Q.   And so when you and     14:16:03
12 Ms. Muhlenkamp discussed the results of her     14:16:10
13 work before she sent the e-mail out, did you     14:16:13
14 instruct her who to forward the information     14:16:15
15 to?     14:16:19
16     A.   Yes. I would have been     14:16:19
17 included in the conversation. I don't think     14:16:22
18 I instructed her, but I think I was included     14:16:24
19 in the conversation to copy everyone.     14:16:27
20     Q.   Okay. And what was the reason     14:16:28
21 for providing this information to the     14:16:29
22 national account managers?     14:16:33
23     A.   To apprise them that there was     14:16:33
24 a problem with accounts and to be aware of     14:16:35
25 who might be targeted next and who they     14:16:38

Page 210

1   should be watching; if there was any issues          14:16:44
2   going on with the account, that they should          14:16:46
3   be aware of it.                                      14:16:49
4       Q.   Okay.  And so the analysis that             14:16:49
5   Ms. Muhlenkamp did here regarding doctors'           14:16:52
6   offices and pain clinics, that's a separate          14:16:56
7   analysis from the multi-distributor analysis         14:16:58
8   we looked at a few minutes ago, correct?             14:17:01
9           MR. O'CONNOR:  Object to form.               14:17:02
10          THE WITNESS:  Yes.                            14:17:03
11  QUESTIONS BY MR. GOTTO:                              14:17:04
12      Q.   And you then suggested to                   14:17:11
13  Ms. Muhlenkamp that she send her e-mail to           14:17:14
14  Karen Harper.                                        14:17:16
15          What was your reason for that?               14:17:16
16      A.   I think Karen Harper, as the                14:17:18
17  lead of the suspicious order monitoring or           14:17:21
18  the compliance team, that she needed to be           14:17:22
19  fully aware of what we uncovered in case she         14:17:25
20  gets questions herself, that she could be            14:17:29
21  fully informed.                                      14:17:32
22      Q.   So at this time you had been at             14:17:33
23  Mallinckrodt about nine or ten -- about 10 or        14:17:34
24  11 months, correct?                                  14:17:37
25      A.   Correct.                                    14:17:38

Page 211

1       Q.   Had you -- as of the time of               14:17:39
2   Ms. Muhlenkamp's e-mail, had you dealt with          14:17:42
3   Ms. Harper at all?                                   14:17:45
4       A.   Yes, I had.                                 14:17:45
5       Q.   In what context?                            14:17:47
6       A.   Conversations and some                      14:17:48
7   educational materials around suspicious order        14:17:53
8   monitoring because I was not as familiar with        14:17:56
9   it as I needed to be.                                14:17:58
10          And I went with her to -- she                14:18:00
11  was doing site visits to a couple of                 14:18:06
12  facilities, and I went with her to do site           14:18:08
13  visits.                                              14:18:10
14      Q.   Okay.  Where can you remember               14:18:10
15  going for site visits?                               14:18:11
16      A.   Masters Drug and Masters                    14:18:14
17  Wholesale and KeySource.                             14:18:17
18      Q.   Are those in Cincinnati?                    14:18:18
19      A.   Masters?  Yes.                              14:18:20
20      Q.   Okay.  And about when did those             14:18:22
21  site visits occur, if you can recall?                14:18:26
22      A.   I can't.  It was fairly early              14:18:29
23  in my tenure --                                      14:18:30
24      Q.   Okay.                                       14:18:33
25      A.   -- with Mallinckrodt.                       14:18:33

Page 212

1       Q.   And what was your reason for               14:18:34
2   making those site visits?                            14:18:35
3       A.   I had not dealt with some of               14:18:37
4   these distributors in the past, and I was not        14:18:38
5   familiar with them, so I was curious as to           14:18:41
6   what they were about and how they did                14:18:43
7   business.                                            14:18:44
8       Q.   Did you ever express to anyone             14:18:45
9   at Mallinckrodt at this time period, early in        14:18:53
10  your tenure, any sentiments that would               14:18:59
11  indicate a skepticism of the distributors in        14:19:02
12  any regard?                                          14:19:06
13          MR. O'CONNOR:  Object to form.               14:19:07
14          THE WITNESS:  I think my                     14:19:08
15      skepticism on dealing with most of              14:19:10
16      these distributors is that they --              14:19:12
17      their value was driving down the price          14:19:14
18      in the market, and as a business --             14:19:15
19      sound business practice, that's not             14:19:18
20      good.  You're driving down the value            14:19:20
21      of your own business because you're             14:19:22
22      selling to them, they're underselling           14:19:24
23      the wholesalers that actually provide           14:19:26
24      a value in a marketplace, and so they           14:19:28
25      were undermining the marketplace.  And          14:19:31

Page 213

1   I was concerned about that.                          14:19:33
2           On my tour to Masters, I do                  14:19:36
3   remember that was a little bit taken                 14:19:38
4   aback about their sales practice.                    14:19:41
5   That's not something I had normally                  14:19:42
6   seen in the pharmaceutical industry.                 14:19:44
7   And that they were selling on price                  14:19:45
8   and shouting out deals, and that was                 14:19:47
9   very shocking to me.                                 14:19:49
10  QUESTIONS BY MR. GOTTO:                              14:19:51
11      Q.   Okay.  And when you say                     14:19:51
12  "selling on price and shouting out deals,"           14:19:52
13  what -- in what sort of setting do you mean          14:19:55
14  that?                                                14:19:57
15      A.   They had someone at the front              14:19:58
16  would say, "Now we're selling acetaminophen          14:20:00
17  for two dollars a bottle from this company,"         14:20:05
18  and that is not how I normally saw it; that          14:20:08
19  they typically would call the customer and           14:20:10
20  ask them what they needed.                           14:20:13
21          This one was that they were                  14:20:14
22  doing calls out and driving sales to                 14:20:15
23  particular products based on pricing.                14:20:18
24      Q.   Huh.                                        14:20:20
25          And in your experience, that                 14:20:21

Page 214

1  was not something you were familiar with in   14:20:24
2  the industry?                                  14:20:27
3      A.   I had not seen it done that           14:20:27
4  way, no.                                       14:20:29
5      Q.   On the second page of the             14:20:29
6  exhibit, there's an e-mail from                14:20:44
7  Ms. Muhlenkamp to Karen Harper, copying you,   14:20:46
8  saying, "We communicated the bullet to our     14:20:50
9  sales team.  We tried to word it carefully as  14:20:54
10  to not overstep any actions you are taking."  14:20:56
11       Do you know what actions               14:20:58
12  Ms. Harper may have been taking that          14:21:00
13  Ms. Muhlenkamp was being careful not to       14:21:04
14  overstep?                                     14:21:07
15      A.   Right.  Our role in marketing        14:21:08
16  was not to be a compliance team.  That was    14:21:10
17  not what we did.  So we were very sensitive   14:21:13
18  to that Karen had her job, she dealt with the 14:21:17
19  DEA, she had to deal with the customers on    14:21:21
20  these issues.  So that's why I was a little   14:21:23
21  uncomfortable about us sending out            14:21:25
22  communication that Karen was not aware of,    14:21:26
23  because she needed to be aware of everything  14:21:28
24  that was being said.                          14:21:29
25       So that's -- that's where it            14:21:30

Page 215

1  is.  We don't want -- we want to be careful    14:21:32
2  not to overstep our boundary as marketing      14:21:34
3  people.  That's not what we do.                14:21:37
4       She drives compliance and tells          14:21:39
5  us what we need to do, and we follow her       14:21:40
6  direction.  We don't provide the direction.    14:21:44
7      Q.   Okay.  You can set that aside.        14:21:46
8       (Mallinckrodt-Collier Exhibit            14:22:12
9  18 marked for identification.)                 14:22:12
10  QUESTIONS BY MR. GOTTO:                       14:22:12
11      Q.   Exhibit 18 is a single-page          14:22:19
12  document, MNK-T1_0000496062, suspicious order 14:22:21
13  monitoring team charter, updated April 7th of 14:22:28
14  2011.                                         14:22:33
15       Take a look at that, if you             14:22:33
16  would, and let me know if you recognize that  14:22:35
17  document.                                     14:22:36
18      A.   I'm not familiar with it, but I      14:22:36
19  recognize it.                                 14:22:56
20      Q.   Okay.  You're shown as a member      14:22:57
21  of the SOM steering committee, correct?       14:23:03
22      A.   Correct.                             14:23:04
23      Q.   And were you a member of that        14:23:05
24  committee throughout your tenure at           14:23:07
25  Mallinckrodt?                                 14:23:09

Page 216

1      A.   Yes.                                  14:23:09
2      Q.   Okay.  And this indicates that        14:23:11
3  committee met once per quarter.  Is that       14:23:13
4  consistent with your recollection?             14:23:17
5      A.   I don't remember the frequency        14:23:18
6  of the meetings.                               14:23:19
7      Q.   Okay.  Do you remember the            14:23:21
8  topics that would be discussed at those        14:23:22
9  meetings?                                      14:23:26
10      A.   I do remember one meeting, a         14:23:27
11  meeting with the committee, in discussing     14:23:30
12  chargeback reports and what's contained in    14:23:34
13  them and how they might possibly be used to   14:23:37
14  monitor what we found.  You know, you could   14:23:39
15  find multiple distributors in the chargeback  14:23:41
16  report, and if you know what you're looking   14:23:44
17  for, you can possibly do that.                14:23:47
18      Q.   Okay.  Do you recall               14:23:49
19  approximately when that meeting occurred?     14:23:50
20      A.   No, I don't.  It would be after      14:23:52
21  we ran the report, obviously.                 14:23:54
22      Q.   Okay.  Do you recall                 14:23:56
23  approximately how long a steering committee   14:24:01
24  meeting would typically last?                 14:24:03
25      A.   No.                                  14:24:04

Page 217

1      Q.   Were there materials provided        14:24:05
2  before the meeting for use at the meeting?     14:24:07
3      A.   Not that I can recall.               14:24:10
4      Q.   Do you recall if minutes were        14:24:12
5  maintained of the meetings of the committee?  14:24:16
6      A.   I don't remember.                    14:24:17
7      Q.   Apart from the discussion about      14:24:19
8  chargeback data, any other particular         14:24:25
9  recollection of anything discussed at any of  14:24:27
10  the steering committee meetings?             14:24:31
11      A.   I remember one meeting that was      14:24:32
12  vivid to me is that Karen Harper showed a     14:24:37
13  video of what they called the OxyContin       14:24:40
14  Express, and it was about a bunch of patients 14:24:45
15  outside a pharmacy or pain clinic, I can't    14:24:47
16  remember which it was, in Florida just        14:24:52
17  waiting to get drugs.  And they were showing  14:24:53
18  they were from all around the country.  So I  14:24:55
19  just remember that.                           14:24:57
20      Q.   Okay.  And do you recall             14:24:58
21  approximately when that occurred?             14:24:59
22      A.   It was sometime in 2011, 2010,       14:25:01
23  2011 time frame.                              14:25:07
24      Q.   Okay.  And was there a               14:25:08
25  discussion you can recall occurring around    14:25:10

Page 218

1   that presentation?                14:25:12
2       A.   Yes, that there was a serious    14:25:14
3   problem in Florida around pain clinics and   14:25:19
4   the abuse, and that they were getting    14:25:22
5   dispensed product and taking it up I-95 and   14:25:25
6   reselling it.                     14:25:30
7       Q.   Do you recall any subsequent    14:25:31
8   meetings where there was any update or   14:25:40
9   follow-up on that presentation to monitor how   14:25:45
10  the situation was developing over time?    14:25:47
11          MR. O'CONNOR:   Object to form.    14:25:51
12          THE WITNESS:   I can't remember    14:25:52
13      specifically what was discussed in    14:25:55
14      future -- in the future or at any of    14:25:57
15      the meetings.   To be honest, it's    14:26:00
16      like -- it would be just another    14:26:02
17      meeting to me to go to.          14:26:03
18  QUESTIONS BY MR. GOTTO:               14:26:05
19      Q.   Okay.   Do you recall any    14:26:07
20  discussions of any proposed enhancements to    14:26:16
21  the suspicious order monitoring program that   14:26:20
22  Mallinckrodt had in place?            14:26:22
23      A.   The only thing I remember is    14:26:24
24  that they were going to use different    14:26:26
25  algorithms than what had been used in the    14:26:29

Page 219

1   past.                         14:26:34
2       Q.   Okay.   Do you remember anything    14:26:34
3   about the algorithms that had been used    14:26:35
4   previously?                   14:26:36
5       A.   No, I didn't have anything to    14:26:36
6   do with developing that.             14:26:38
7       Q.   Okay.   Anything -- any    14:26:39
8   description of the reasons for changing from   14:26:40
9   the prior algorithms to the subsequent    14:26:44
10  algorithms?                   14:26:46
11          MR. O'CONNOR:   Object to form.    14:26:46
12          THE WITNESS:   I just know it    14:26:47
13      was to enhance the information they    14:26:49
14      were receiving.               14:26:53
15  QUESTIONS BY MR. GOTTO:               14:26:53
16      Q.   And do you know who had    14:26:56
17  ultimate responsibility for implementing the   14:27:00
18  suspicious order monitoring program?    14:27:05
19          MR. O'CONNOR:   Object to form.    14:27:07
20          THE WITNESS:   Karen Harper was    14:27:08
21      my contact in compliance, so she's the    14:27:12
22      one that I knew, and I knew Don    14:27:14
23      Lohman.                   14:27:17
24  QUESTIONS BY MR. GOTTO:               14:27:17
25      Q.   Okay.   Down toward the bottom    14:27:19

Page 220

1   of this page there are some subcommittees    14:27:20
2   listed.                       14:27:23
3          Were you a member of the    14:27:24
4   director order monitoring subcommittee?    14:27:25
5       A.   I have no idea, because I don't    14:27:29
6   even know what that is.               14:27:35
7       Q.   Yeah.                   14:27:36
8          How about the --              14:27:37
9       A.   Oh, that's probably direct    14:27:37
10  order monitoring.                 14:27:40
11      Q.   I suspect so.               14:27:41
12      A.   Yeah.                   14:27:42
13          And indirect customer review.    14:27:44
14  They might have included me in discussions or   14:27:45
15  might have included me to ask me for data out   14:27:48
16  of my team --                     14:27:50
17      Q.   Uh-huh.                   14:27:50
18      A.   -- but I wasn't directing any    14:27:51
19  meetings or anything like this.          14:27:52
20      Q.   Do you recall participating in    14:27:54
21  any meetings of any of these subcommittees?    14:27:56
22      A.   I'm sure I did, but I don't    14:28:00
23  remember the content.               14:28:02
24      Q.   Okay.   And do you remember    14:28:02
25  which of the subcommittees it would have been   14:28:05

Page 221

1   that you would have participated in?    14:28:07
2       A.   It would have been anything    14:28:08
3   involving the customer, like direct or the    14:28:12
4   monitoring, indirect customer review and the   14:28:14
5   customer checklist.               14:28:16
6       Q.   Okay.   You can set that aside.    14:28:17
7       A.   Okay.                   14:28:18
8          (Mallinckrodt-Collier Exhibit    14:28:20
9          19 marked for identification.)    14:28:21
10  QUESTIONS BY MR. GOTTO:               14:28:21
11      Q.   We've marked as Exhibit 19 a    14:28:45
12  single-page e-mail thread, Bates    14:28:47
13  MNK-T1_0000262709.   It appears to be an    14:28:51
14  e-mail exchange between you and Karen Harper.   14:28:58
15          Take a look at it, if you    14:29:01
16  would, please, and let me know if you    14:29:02
17  recognize it.                 14:29:04
18      A.   Okay.                   14:29:05
19      Q.   Do you recognize these e-mails?    14:29:31
20      A.   Yes.                   14:29:32
21      Q.   Okay.   So the initial e-mail    14:29:34
22  from Ms. Harper on August 7th, subject,    14:29:38
23  Friday suspicious order monitoring meeting,    14:29:42
24  says to you that she "shared your frustration   14:29:46
25  during Friday's meeting.   We realize the    14:29:49

Page 222

1  group could have been much more focused by        14:29:52
2  making sure only the right people were            14:29:54
3  brought to the table and having a published       14:29:57
4  agenda that we adhered to."                       14:29:58
5       Do you remember the meeting                  14:29:59
6  that Ms. Harper is referring to here?             14:30:00
7       A.  I don't recall this specific             14:30:02
8  meeting.  I recall the tenor of the issue         14:30:03
9  here.                                             14:30:08
10      Q.  Okay.  What do you recall of             14:30:08
11 the issue?                                        14:30:10
12      A.  We had another group that was            14:30:11
13 involved that was developing a CARES              14:30:15
14 Alliance, a Covidien acting responsibly or        14:30:18
15 something like that, along the lines of pain      14:30:21
16 management enacting responsibility, and I         14:30:24
17 remember they kept jumping in with things         14:30:28
18 thinking it was about CARES Alliance.             14:30:32
19      What we wanted to do was                     14:30:33
20 evaluate what we were supposed to be doing to     14:30:35
21 be in compliance with the DEA and what            14:30:37
22 reports could we bring to the table so that       14:30:38
23 they knew -- so that Karen Harper's team          14:30:41
24 could know what information we had access to.      14:30:43
25      Q.  Okay.  So this is in August             14:30:47

Page 223

1  of 2010, which I think the analysis of the        14:30:53
2  Florida doctor and pain clinic orders was         14:30:58
3  shortly before this, correct?                     14:31:01
4       A.  Uh-huh.                                  14:31:02
5       MR. O'CONNOR:  Objection.                    14:31:02
6  Form.                                             14:31:03
7       THE WITNESS:  Yes.                           14:31:03
8  QUESTIONS BY MR. GOTTO:                           14:31:04
9       Q.  And so at this meeting, is it            14:31:05
10 your general recollection that there was --       14:31:10
11 that it was -- from your standpoint, the          14:31:12
12 intention was to discuss potential                14:31:15
13 information that could be brought to bear on      14:31:18
14 the suspicious order monitoring process?          14:31:21
15      A.  Yes.                                     14:31:23
16      Q.  Okay.  And sounds like the               14:31:25
17 discussion got somehow side-railed by folks       14:31:28
18 who were there wanting to talk about the          14:31:31
19 CARES initiative, correct?                        14:31:35
20      A.  Correct.                                 14:31:36
21      Q.  And explain to me again what             14:31:37
22 the CARES initiative was?                         14:31:38
23      A.  It was -- they were trying to            14:31:40
24 develop an initiative -- and this goes back       14:31:42
25 to the lobbying.  Now I remember -- now that      14:31:43

Page 224

1  I saw the CARES Alliance, it all comes back       14:31:46
2  to me.                                            14:31:49
3       The CARES Alliance was an                    14:31:49
4  initiative to be a responsible opioid            14:31:53
5  supplier in a marketplace.  So we would talk      14:31:56
6  about things like proper disposal.  We           14:31:58
7  supported opioid groups, you know, that were     14:32:01
8  helping either with abuse deterrence or          14:32:07
9  things likes that.  So that's what the CARES     14:32:11
10 Alliance was.                                     14:32:15
11      And that is not what we were                 14:32:15
12 trying to accomplish.  We were trying to          14:32:16
13 understand what the DEA suspicious order         14:32:17
14 monitoring requirements were and if there        14:32:19
15 were materials that some of the team members,    14:32:21
16 not only in my group, from other groups like     14:32:23
17 Jeremy's, that they could provide.               14:32:25
18      Q.  Okay.  Do you recall in any of           14:32:28
19 the suspicious order monitoring steering         14:32:37
20 committee meetings that you attended any         14:32:38
21 discussion of the extent to which               14:32:44
22 Mallinckrodt should be monitoring -- or          14:32:48
23 should be familiar with not only its            14:32:55
24 customer, but it's customers' customers?         14:32:57
25      MR. O'CONNOR:  Object to form.               14:33:00

Page 225

1       THE WITNESS:  I've heard that               14:33:00
2  phrase before.                                    14:33:02
3  QUESTIONS BY MR. GOTTO:                           14:33:03
4       Q.  Did you hear it in the context          14:33:04
5  of any of the SOM steering committee             14:33:05
6  meetings?                                         14:33:08
7       A.  I'm not sure what context I              14:33:09
8  heard it in.  I just remember hearing that        14:33:12
9  the DEA had the belief or the thought process    14:33:15
10 that we should know our customer's customer.     14:33:19
11      Q.  Okay.  Do you recall in the,             14:33:21
12 again, the SOM steering committee context,       14:33:23
13 any discussion of ways to obtain information     14:33:27
14 regarding Mallinckrodt's customers'              14:33:31
15 customers?                                        14:33:34
16      A.  That was discussed, yes.                 14:33:34
17      Q.  Okay.  And what sort of                  14:33:35
18 information was discussed?                         14:33:36
19      A.  Chargeback data.  How could we           14:33:37
20 get chargeback data and find out what            14:33:39
21 customers are purchasing downstream from         14:33:41
22 different wholesalers and distributors.          14:33:44
23      Q.  Okay.  Anything apart from the           14:33:46
24 chargeback data?                                  14:33:48
25      MR. O'CONNOR:  Object to form.               14:33:50

Page 226

1    THE WITNESS: Not that I          14:33:50
2    recall. Not from my group. There      14:33:52
3    were other groups that possibly had    14:33:54
4    information, but not from my group.    14:33:55
5    QUESTIONS BY MR. GOTTO:               14:33:57
6    Q.   Okay. All right. Back on       14:33:57
7    Exhibit 19, your response to Ms. Harper, in  14:34:00
8    your first paragraph you say, "I truly hoped  14:34:05
9    Carol could have brought more positive   14:34:07
10   feedback and seen the big picture."    14:34:09
11       Do you know who Carol is that    14:34:12
12   you're referring to in that sentence?   14:34:13
13   A.   No, I don't.               14:34:14
14   Q.   Okay. The next sentence you    14:34:15
15   say, "I also think Sherice is making this too  14:34:17
16   encompassing."                    14:34:21
17       Do you know who Sherice is?    14:34:22
18   A.   Sherice was someone in Art     14:34:23
19   Morelli's group that was part of the   14:34:26
20   initiative for the CARES Alliance.     14:34:27
21   Q.   Okay. And you went on to say,  14:34:29
22   "If we go with her scope, we will monitor  14:34:30
23   hundreds of thousands of transactions and get  14:34:33
24   nowhere."                         14:34:35
25       Do you recall what her scope   14:34:36

Page 227

1    was that you're referring to there?    14:34:39
2    A.   I don't remember that, but she  14:34:40
3    was thinking really high level, I think  14:34:43
4    across the entire industry, and she just was  14:34:46
5    not focused in the meeting on what we were  14:34:52
6    trying to accomplish.             14:34:54
7    Q.   She was thinking across the    14:34:54
8    industry in terms of order monitoring?  14:35:00
9    A.   Yes.                      14:35:01
10   Q.   Okay.                     14:35:01
11   A.   And involving other suppliers.  14:35:05
12   Q.   Okay. The next paragraph you   14:35:08
13   say, "Jeremy is your best bet."        14:35:11
14       Who is Jeremy that you're      14:35:14
15   referring to there?               14:35:16
16   A.   Jeremy worked in an analytical  14:35:16
17   team that mostly focused on brand products,  14:35:22
18   but he was very good at getting huge sets of  14:35:25
19   data and distilling it down into very strong  14:35:28
20   content and material. So just taking a bunch  14:35:35
21   of data, eliminating the noise and making it  14:35:37
22   see what we need to see to it.         14:35:41
23       Because as I keep saying, it's  14:35:42
24   really difficult that Kate looked for   14:35:44
25   something very minor or very minute in all of  14:35:47

Page 228

1    the data sets that we get, and so she was  14:35:50
2    looking specifically for something. Jeremy  14:35:52
3    could do that much easier than our group.  14:35:54
4    Q.   Okay. Okay. You can set that  14:35:57
5    aside.                            14:36:01
6        (Mallinckrodt-Collier Exhibit  14:36:03
7        20 marked for identification.)  14:36:03
8    QUESTIONS BY MR. GOTTO:               14:36:03
9    Q.   We have marked as Exhibit 20 a  14:36:27
10   multipage document beginning at Bates   14:36:30
11   MNK-T1_0000496098. It appears to be a 2011  14:36:32
12   presentation concerning the suspicious order  14:36:40
13   monitoring program.                14:36:43
14       If you could take a look at     14:36:44
15   that and tell me if you're familiar with that  14:36:45
16   document.                         14:36:48
17       Do you recognize that document?  14:40:26
18   A.   Yes, I do.                 14:40:27
19   Q.   And is it a presentation that   14:40:28
20   was made to the marketing group in 2011?  14:40:30
21   A.   Yes.                      14:40:32
22   Q.   Do you recall the presentation?  14:40:32
23   A.   This is the one where I        14:40:33
24   recalled having the OxyContin Express video.  14:40:37
25   Q.   Okay. Great.                14:40:40

Page 229

1        So on the -- on slide 5,       14:40:41
2    there's a reference here to the suspicious  14:40:48
3    order monitoring subcommittee -- I'm sorry,  14:40:53
4    suspicious order monitoring steering    14:40:55
5    committee that convenes once per month.  14:40:56
6        I think in the prior document    14:41:00
7    we just looked at indicated it was a    14:41:01
8    quarterly meeting.                 14:41:03
9        Do you recall that committee    14:41:04
10   meeting monthly?                   14:41:07
11       MR. O'CONNOR: Object to form.   14:41:07
12       THE WITNESS: The steering      14:41:08
13   committee, it said it meets once a     14:41:08
14   month. Quarterly was the other         14:41:11
15   members. There was a core group and    14:41:13
16   then peripheral members.           14:41:15
17   QUESTIONS BY MR. GOTTO:               14:41:16
18   Q.   I see. Okay.               14:41:18
19       You were not a member of the    14:41:18
20   steering committee; is that correct?   14:41:19
21   A.   I was a peripheral member.     14:41:20
22   Q.   Okay. And on page -- I'm       14:41:21
23   sorry, slide number -- slide number 13,  14:41:29
24   there's a description of the pre-June of 2010  14:41:35
25   SOM program.                      14:41:40

Page 230

1    Do you see that?    14:41:41
2    A.    Yes.    14:41:41
3    Q.    And do you recall becoming    14:41:42
4  familiar at this time with what the SOM    14:41:44
5  program consisted of prior to June of 2010?    14:41:48
6    A.    Yes.    14:41:51
7    Q.    Okay.  And you see in the one,    14:41:52
8  two, three, four, five, sixth bullet    14:42:01
9  there's -- I'm sorry, the fifth bullet    14:42:06
10  "Customer accounts or orders that appear,    14:42:08
11  quote, peculiar, close quote, based on    14:42:09
12  customer checklist results, credit check, CSR    14:42:13
13  interaction or order entry system flags are    14:42:15
14  reviewed by customer service -- customer    14:42:18
15  service manager."    14:42:19
16    Do you see that?    14:42:20
17    A.    Yes.    14:42:21
18    Q.    Okay.  And do you recall    14:42:22
19  learning at this time that that was part of    14:42:24
20  the SOM program?    14:42:26
21    A.    Yes.    14:42:27
22    Q.    Okay.  Two pages after that, on    14:42:28
23  slide 15 there's a slide concerning the DEA    14:42:36
24  St. Louis conversation, July 20th of 2010.    14:42:42
25    Do you recall learning of this    14:42:50

Page 231

1  St. Louis conversation at this presentation?    14:42:53
2    A.    Yes.    14:42:54
3    Q.    And the third entry on that    14:42:55
4  slide, "Mallinckrodt viewed as the kingpin    14:42:57
5  within the drug cartel."    14:43:00
6    Do you recall hearing that at    14:43:02
7  the time of this presentation?    14:43:04
8    MR. O'CONNOR:  Object to form.    14:43:04
9    THE WITNESS:  Yes.    14:43:05
10  QUESTIONS BY MR. GOTTO:    14:43:05
11    Q.    Did that surprise you?    14:43:07
12    A.    Yes, it did.    14:43:09
13    Q.    If you look on slide 17, is    14:43:10
14  that a still from the video that you were    14:43:19
15  recalling seeing, the one outside the pain    14:43:21
16  clinic?    14:43:25
17    A.    Yes.    14:43:25
18    Q.    Okay.  And if you turn to    14:43:25
19  slide 20, SOM distributor audit next steps,    14:43:35
20  the first entry is "ongoing review of    14:43:45
21  chargeback data to select other distributors    14:43:48
22  to be audited."    14:43:50
23    Do you see that?    14:43:51
24    A.    Yes.    14:43:51
25    Q.    So this is March of 2011.    14:43:52

Page 232

1    You testified a little earlier    14:43:59
2  recalling a meeting where there was    14:44:00
3  discussion about use of chargeback data as    14:44:02
4  part of the SOM program.    14:44:04
5    Do you know if that was -- if    14:44:06
6  that discussion was in the context of    14:44:09
7  selection of distributors to be audited, or    14:44:13
8  was it for some other part of the SOM    14:44:15
9  program?    14:44:19
10    MR. O'CONNOR:  Object to form.    14:44:19
11    THE WITNESS:  I'm not clear on    14:44:20
12  when that was discussed.  Obviously,    14:44:22
13  it was used with -- the information we    14:44:24
14  had was used, but I don't remember    14:44:27
15  exactly what -- if this was what they    14:44:29
16  were intending to use.    14:44:32
17    MR. GOTTO:  Okay.  Okay.  You    14:44:33
18  can set that aside.  Why don't we take    14:44:40
19  a short break.    14:44:43
20    VIDEOGRAPHER:  We were going    14:44:44
21  off the record at 2:44 p.m.    14:44:45
22    (Off the record at 2:44 p.m.)    14:44:47
23    VIDEOGRAPHER:  We were back on    14:57:20
24  the record at 2:57 p.m.    14:57:21
25    (Mallinckrodt-Collier Exhibit    14:57:27

Page 233

1    21 marked for identification.)    14:57:28
2  QUESTIONS BY MR. GOTTO:    14:57:28
3    Q.    We've marked as Exhibit 21 a    14:57:52
4  letter dated November 10, 2010, beginning at    14:57:56
5  Bates MNK-T1_0000484110, and it appears to be    14:57:58
6  a letter from Karen Harper to KeySource    14:58:07
7  Medical on which you were bcc'ed.    14:58:12
8    If you'd take a look at that    14:58:15
9  and tell me if you recognize that document.    14:58:17
10    A.    Okay.    14:58:19
11    Q.    Do you recall -- are you    14:59:37
12  familiar with this letter?    14:59:39
13    A.    Yes, I am.    14:59:40
14    Q.    Okay.  And do you recall    14:59:41
15  receiving a copy of it back in November    14:59:42
16  of 2010?    14:59:45
17    A.    Yes.    14:59:45
18    Q.    Now, in this letter, Ms. Harper    14:59:45
19  transmits various information regarding    14:59:52
20  KeySource orders into the state of Florida.    14:59:56
21    Was the source of the    15:00:01
22  information for Ms. Harper's letter, at least    15:00:04
23  in part, the multi-distributor analysis we    15:00:06
24  looked at earlier today?    15:00:09
25    MR. O'CONNOR:  Object to form.    15:00:10

Page 234

1    THE WITNESS: Yes. Yes.    15:00:11
2    QUESTIONS BY MR. GOTTO:    15:00:14
3    Q.    And in this letter, Ms. Harper    15:00:14
4    requested various information from KeySource.    15:00:18
5    Do you have any knowledge as to    15:00:20
6    what KeySource's response to this letter was?    15:00:23
7    A.    No, I do not.    15:00:26
8    Q.    Okay.  Did you or anyone on    15:00:28
9    your team, to your knowledge, conduct any    15:00:30
10   subsequent analysis or inquiry with respect    15:00:32
11   to ongoing orders from KeySource?    15:00:36
12   A.    I don't recall.    15:00:38
13   Q.    Do you know if the information    15:00:40
14   contained in this letter was ever provided to    15:00:42
15   the DEA?    15:00:45
16   A.    I don't know.  That would be    15:00:47
17   Karen Harper's responsibility.    15:00:49
18   Q.    Okay.  All right.  You can set    15:00:50
19   that aside.    15:00:51
20   (Mallinckrodt-Collier Exhibit    15:00:53
21   22 marked for identification.)    15:00:53
22   QUESTIONS BY MR. GOTTO:    15:00:53
23   Q.    We've marked as Exhibit 22 a    15:01:29
24   series of letters, Bates MNK-T1_0000484145    15:01:32
25   through 156, from November 12th of 2010.    15:01:43

Page 235

1    You're indicated as a bcc on the first    15:01:49
2    letter, and I don't know if you were bcc'ed    15:01:51
3    on the balance of the letters in that    15:01:56
4    package.    15:01:59
5    But if you could take a look at    15:02:00
6    those letters and tell me if you recognize    15:02:02
7    them.    15:02:04
8    A.    Yes.    15:02:05
9    Q.    Do you recall receiving copies    15:02:44
10   of these letters back in November of 2010?    15:02:45
11   A.    Yes, I do.    15:02:47
12   Q.    Okay.  And again, each of these    15:02:47
13   letters contains information regarding    15:02:50
14   Florida purchasers who were purchasing from    15:02:56
15   multiple distributors.    15:02:58
16   Do you understand that    15:02:59
17   information to be based on the    15:03:01
18   multi-distributor information we looked at a    15:03:04
19   little earlier today?    15:03:05
20   A.    Yes.    15:03:06
21   Q.    And that analysis of multiple    15:03:07
22   distributors that you and Ms. Muhlenkamp did,    15:03:10
23   what triggered performing that analysis?    15:03:12
24   A.    I'm not sure if in the pulling    15:03:15
25   of the data for the state of Florida that she    15:03:20

Page 236

1    might have identified that there were a few    15:03:23
2    repeat pharmacies in there, and so we said,    15:03:28
3    well, wait a minute, there's repeat    15:03:31
4    pharmacies from different distributors.    15:03:33
5    Let's pull and see if we can bring this into    15:03:35
6    a better picture --    15:03:38
7    Q.    I see.    15:03:40
8    A.    -- of what's going on.    15:03:41
9    Q.    Okay.  So it may have grown out    15:03:42
10   of the original inquiry in terms of MD and    15:03:43
11   pain clinic purchasers in Florida?    15:03:47
12   A.    Yes.    15:03:50
13   Q.    Okay.  And do you know if the    15:03:50
14   information contained in the letters included    15:03:52
15   in Exhibit 22 was ever provided to the DEA?    15:03:54
16   A.    I didn't report to the DEA.  I    15:03:57
17   have no idea.    15:03:59
18   Q.    Okay.  You can set that aside.    15:04:01
19   A.    Okay.    15:04:03
20   (Mallinckrodt-Collier Exhibit    15:04:04
21   23 marked for identification.)    15:04:04
22   QUESTIONS BY MR. GOTTO:    15:04:04
23   Q.    We've marked as Exhibit 23 a    15:04:48
24   single-page e-mail thread, Bates    15:04:50
25   MNK-T1_0000558202.  Take a moment and look at    15:04:53

Page 237

1    those e-mails, if you would, and tell me if    15:04:59
2    you recognize them.    15:05:02
3    A.    Yes.    15:05:27
4    Q.    And the earlier e-mail in the    15:05:28
5    thread is from a Debbie Digby.    15:05:31
6    Who is that?    15:05:34
7    A.    She was a senior financial    15:05:35
8    analyst.  I'm not sure who she reported to or    15:05:38
9    what her role was.  I did not interact with    15:05:40
10   her very often.    15:05:43
11   Q.    Okay.  And her e-mail went to    15:05:43
12   Ms. Harper, to Susan Moore.    15:05:45
13   Who was Susan Moore?    15:05:47
14   A.    I do not remember.    15:05:49
15   Q.    How about Pat Duft?    15:05:53
16   A.    Pat was in logistics.    15:05:56
17   Q.    Okay.  And how about Carol    15:05:57
18   Svejkosky?    15:06:00
19   A.    She was in customer service.    15:06:01
20   Q.    Okay.  And Ms. Digby indicates,    15:06:03
21   here are -- "attached are the March monthly    15:06:06
22   SOM reports."  And there are three reports:    15:06:09
23   a customer sourcing greater than two    15:06:11
24   distributors, a state concentration report,    15:06:15
25   and a summary report by distributor compared    15:06:17

Page 238

1   to all products distributing.                15:06:20
2         Do you recall that you would        15:06:22
3   receive this package of reports monthly?     15:06:25
4      A.   I don't recall receiving it         15:06:29
5   monthly, but apparently it was.              15:06:32
6      Q.   Okay.  Do you know what the          15:06:34
7   state concentration report, what information 15:06:37
8   was contained on that?                       15:06:39
9      A.   I do remember that was a report      15:06:40
10  that showed sales by state.  I can't recall  15:06:42
11  if -- there were two different reports, and I 15:06:47
12  can't recall if this would have been         15:06:50
13  Mallinckrodt sales by state.                 15:06:51
14     Q.   Okay.  And the report by             15:06:54
15  distributor compared to all products         15:06:57
16  distributed, do you recall what information  15:07:00
17  was contained in that report?                15:07:02
18     A.   I remember specifically that we      15:07:04
19  were looking at seeing if they were only     15:07:08
20  purchasing oxycodone or were they purchasing 15:07:10
21  all products.  And if they were purchasing   15:07:12
22  just oxycodone, that was something we        15:07:17
23  evaluated and sent on to suspicious order    15:07:20
24  monitoring.                                  15:07:24
25     Q.   Okay.  And so in terms of your       15:07:24

Page 239

1   personal involvement with the SOM process,   15:07:27
2   did you review these reports when you        15:07:30
3   received them?                               15:07:33
4      A.   I looked at them, but I didn't       15:07:34
5   make any direction on the SOM, so I probably 15:07:36
6   didn't really dig into them too much.        15:07:40
7      Q.   Okay.  Do you recall ever            15:07:43
8   taking any action based on any information   15:07:45
9   that was contained in any of those reports?  15:07:48
10     A.   No, that was outside the scope       15:07:51
11  of my responsibility.                        15:07:52
12     Q.   Do you ever recall                   15:07:53
13  calling to anyone else's attention at        15:07:56
14  Mallinckrodt any information that was        15:07:59
15  contained in any of those reports?           15:08:00
16     A.   I may have, but I don't recall       15:08:02
17  it.                                          15:08:05
18     Q.   Okay.  Okay.  You can set that       15:08:05
19  aside.                                       15:08:07
20        (Mallinckrodt-Collier Exhibit         15:08:08
21     24 marked for identification.)            15:08:09
22  QUESTIONS BY MR. GOTTO:                       15:08:09
23     Q.   Exhibit 24 is a two-page e-mail      15:08:41
24  thread starting at MNK-T1_0005905204.  Take a 15:08:44
25  look at those e-mails, if you would, and tell 15:08:53

Page 240

1   me if you recall them.                       15:08:55
2      A.   Okay.                                15:08:57
3      Q.   Do you recall these e-mails          15:09:29
4   from 2013?                                   15:09:30
5      A.   I don't recall them, but I           15:09:31
6   recognize them.                              15:09:33
7      Q.   Okay.  On the bottom of the          15:09:34
8   first page, Mr. Longenecker's e-mail says, "I 15:09:37
9   just met with Karen and Jennifer.  Prior to  15:09:42
10  removing the current allocation model,       15:09:45
11  they're going to take some time to review the 15:09:47
12  algorithms for the SOM."                      15:09:49
13        Do you recall what the -- what         15:09:51
14  the interplay was between the SOM algorithms  15:09:55
15  and the allocation model?                    15:09:58
16        MR. O'CONNOR:  Object to form.          15:10:00
17        THE WITNESS:  In the allocation        15:10:01
18     model, we would look at who had           15:10:03
19     failure to supply and how much            15:10:06
20     inventory we had available and when       15:10:08
21     the next production schedule would        15:10:09
22     happen and how much we could release      15:10:10
23     to specific customers.                    15:10:12
24        The algorithms that they were          15:10:13
25     doing for SOM was entirely different,     15:10:16

Page 241

1      and they would stop orders or release    15:10:18
2      orders through that process.  That was    15:10:21
3      separate from what we were doing.         15:10:25
4   QUESTIONS BY MR. GOTTO:                       15:10:26
5      Q.   Okay.  And so Mr. Longenecker        15:10:26
6   goes on to say, "This should take about two  15:10:27
7   weeks.  They would like us to delay sending a 15:10:29
8   letter until they have completed this."       15:10:32
9         Do you know why the letter on         15:10:34
10  the allocation model or the allocation --    15:10:37
11  yeah, the allocation model would be delayed  15:10:40
12  waiting for the SOM algorithms?              15:10:42
13        MR. O'CONNOR:  Objection to            15:10:45
14     form.                                     15:10:46
15        THE WITNESS:  It's likely --           15:10:46
16     it's likely that they would have          15:10:48
17     said -- that we would have gotten         15:10:51
18     information from Karen or Jen Buist in    15:10:52
19     compliance that they didn't want          15:10:56
20     certain customers to get product at       15:10:57
21     all.                                      15:10:59
22  QUESTIONS BY MR. GOTTO:                       15:10:59
23     Q.   Okay.  Okay.  You can set that       15:10:59
24  aside.                                       15:11:06
25        (Mallinckrodt-Collier Exhibit         15:11:07

Page 242

```
1    25 marked for identification.)         15:11:07
2    QUESTIONS BY MR. GOTTO:                 15:11:07
3        Q.   Exhibit 25 is a multipage     15:11:32
4    e-mail thread beginning at MNK-T1_0004951225.  15:11:34
5    Take a look at those and tell me if you  15:11:43
6    recognize these e-mails.               15:11:48
7            The only one I have a question  15:11:49
8    for you on is the very last one, the e-mail  15:11:50
9    from you to Jane Williams on October 23rd.   15:11:53
10       A.   Okay.                         15:11:57
11           MR. O'CONNOR:  Counsel, while   15:12:40
12   reading this document, it looks like    15:12:41
13   the top two e-mails might be subject    15:12:42
14   to a clawback.                         15:12:45
15           Are you planning to ask about   15:12:46
16   either of those top two e-mails?        15:12:48
17           MR. GOTTO:  Do you mean the     15:12:48
18   October 23rd?                          15:12:49
19           MR. O'CONNOR:  Yes.  From       15:12:50
20   Ginger to Jane at 1:50.                15:12:52
21           MR. GOTTO:  I was going to ask  15:12:56
22   about that one.                        15:12:57
23           MR. O'CONNOR:  Okay.  Yeah, we  15:12:57
24   would assert privilege over the         15:13:00
25   references to the discussion she had    15:13:03
```

Page 243

```
1    with Don, who I believe is Don Lohman,  15:13:05
2    who is counsel at Mallinckrodt.  It     15:13:09
3    appears this was inadvertently          15:13:11
4    produced.                              15:13:13
5            MR. GOTTO:  Okay.  Well, I'll   15:13:14
6    ask her one question and see if it --   15:13:15
7    if it is okay with you or if you have   15:13:17
8    a problem with it.                     15:13:21
9            MR. O'CONNOR:  Okay.            15:13:24
10           MR. GOTTO:  After she's --      15:13:24
11   once --                                15:13:26
12   QUESTIONS BY MR. GOTTO:                 15:13:26
13       Q.   Have you been through the      15:13:26
14   document?                              15:13:27
15       A.   I focused more up here.        15:13:28
16       Q.   Okay.                         15:13:30
17       A.   So I'm familiar with what's -- 15:13:30
18       Q.   Here's the one question.       15:13:32
19           MR. O'CONNOR:  And be sure to   15:13:32
20   let me chime in before you answer.      15:13:33
21   QUESTIONS BY MR. GOTTO:                 15:13:35
22       Q.   Yeah.  Here's the one question  15:13:35
23   I had on that October 23 e-mail.  You make  15:13:38
24   reference to "the DEA views these programs as  15:13:41
25   driving the wrong type of behavior."    15:13:45
```

Page 244

```
1            And my question for you is:     15:13:47
2    What programs are you referring to, and what  15:13:50
3    type of behavior did you understand the DEA  15:13:52
4    viewing them as driving?               15:13:55
5            MR. O'CONNOR:  Okay.  And you   15:13:57
6    can answer the question.  Just do not   15:13:59
7    discuss anything you said to or from    15:14:01
8    Don.                                   15:14:03
9            THE WITNESS:  Then I cannot     15:14:03
10   discuss that.                          15:14:07
11   QUESTIONS BY MR. GOTTO:                 15:14:09
12       Q.   Okay.  All right.  You can put  15:14:10
13   that aside.                            15:14:12
14           (Mallinckrodt-Collier Exhibit   15:14:14
15   26 marked for identification.)         15:14:42
16           MR. O'CONNOR:  Counsel, just    15:14:42
17   for the record, we'll be making a       15:14:43
18   clawback request and objecting on the   15:14:45
19   basis of attorney-client privilege on   15:14:47
20   the document.                          15:14:48
21           MR. GOTTO:  Okay.  Very good.   15:14:48
22   QUESTIONS BY MR. GOTTO:                 15:14:49
23       Q.   Exhibit 26 is a multipage      15:14:52
24   document beginning with MNK-T1_0000384634.  15:14:54
25   It's a printout of a spreadsheet.       15:15:03
```

Page 245

```
1            If you can take a look at that  15:15:04
2    document and tell me if you're familiar with  15:15:06
3    it.                                    15:15:08
4        A.   Yes, I am.                     15:15:08
5        Q.   What is it?                    15:15:18
6        A.   This is a list of various trade  15:15:18
7    shows, conventions and conferences for the  15:15:20
8    generic team.                          15:15:23
9        Q.   Okay.  And is this a list the   15:15:24
10   marketing department maintained from time to  15:15:27
11   time?                                  15:15:29
12       A.   Marketing and sales, yes.      15:15:29
13       Q.   Okay.  And we talked a little   15:15:30
14   earlier today about conventions, and you  15:15:34
15   indicated that I think many of the      15:15:39
16   conventions are sort of industry-wide that  15:15:41
17   Mallinckrodt would attend or participate in  15:15:45
18   regularly.                             15:15:48
19           Are those the types of          15:15:49
20   conventions that are listed on this exhibit?  15:15:51
21           MR. O'CONNOR:  Object to form.  15:15:53
22           THE WITNESS:  Yes.              15:15:53
23   QUESTIONS BY MR. GOTTO:                 15:15:56
24       Q.   If you turn to the page that --  15:16:18
25   where the Bates number ends in 638 in the  15:16:21
```

Page 246

```
 1  lower right-hand corner.              15:16:23
 2       In column F on that page, there   15:16:37
 3  are references to things like briefcase, 10   15:16:40
 4  by 30, et cetera.                     15:16:42
 5       Can you tell me what that        15:16:44
 6  column is describing?                 15:16:45
 7  A.   Those are displays.              15:16:46
 8  Q.   The displays that would be used  15:16:48
 9  at the convention?                    15:16:51
10  A.   Yes.                             15:16:52
11  Q.   Okay.  You can set that aside.   15:16:52
12       (Mallinckrodt-Collier Exhibit    15:16:56
13  27 marked for identification.)        15:16:58
14  QUESTIONS BY MR. GOTTO:               15:16:58
15  Q.   Exhibit 27 is a one-page         15:17:26
16  document produced in native format,   15:17:35
17  MNK-T1_00006714382, and appears to be certain  15:17:38
18  advertising expenditures.             15:17:48
19       Can you tell me what the         15:17:50
20  information on this document is?       15:17:52
21       MR. O'CONNOR:  Object to form.   15:17:56
22       THE WITNESS:  It relates to      15:17:56
23  materials that we would -- programs or 15:17:59
24  advertising that we spend on          15:18:02
25  particular products, our programs that 15:18:04
```

Page 247

```
 1  we had.                               15:18:08
 2  QUESTIONS BY MR. GOTTO:               15:18:08
 3  Q.   Okay.  And this is for the       15:18:08
 4  years 2011 through 2015?              15:18:09
 5  A.   Yes.                             15:18:10
 6  Q.   Okay.  In terms of budgeting     15:18:12
 7  for advertising expenses of these types, was  15:18:18
 8  this something that fell within your  15:18:21
 9  responsibility?                       15:18:24
10  A.   Yes.                             15:18:25
11  Q.   Okay.  And how did you go about  15:18:26
12  making the determination of what sorts of  15:18:28
13  journals or other publications were   15:18:33
14  appropriate ones to be spending money on  15:18:35
15  advertising in?                       15:18:38
16  A.   It depended on which magazines   15:18:38
17  or trade -- they were all trade journals, so  15:18:41
18  they went to pharmacists.  And it depended on  15:18:45
19  specific to the product, if it was used in  15:18:47
20  more hospitals or if it was used in retail  15:18:48
21  pharmacies and what the messaging was trying  15:18:51
22  to be about.  You know, if the fentanyl patch  15:18:54
23  size was a good size, we would try and  15:18:57
24  demonstrate that, or if we were launching a  15:18:59
25  new product, we would try and capture that  15:19:01
```

Page 248

```
 1  audience.                             15:19:03
 2  Q.   Okay.  You can set that aside.   15:19:05
 3       (Mallinckrodt-Collier Exhibit    15:19:07
 4  28 marked for identification.)        15:19:08
 5  QUESTIONS BY MR. GOTTO:               15:19:08
 6  Q.   Exhibit 28 is a multipage        15:19:51
 7  e-mail thread beginning with          15:19:54
 8  MNK-T1_0005964786.  Take a look at those  15:19:56
 9  e-mails, if you would, and tell me if you  15:20:03
10  recognize them.                       15:20:05
11  A.   Okay.                            15:20:06
12  Q.   Do you recognize those e-mails?  15:22:29
13  A.   Yes, I do.                       15:22:31
14  Q.   And if you turn to the second    15:22:31
15  page, your e-mail at the bottom of that page  15:22:36
16  dated September 29th, it appears that you  15:22:38
17  were making adjustments to VIP tiers to  15:22:47
18  remove oxy 30 milligrams; is that correct?  15:22:50
19  A.   Yes.                             15:22:53
20  Q.   And what was the reason for      15:22:53
21  that?                                 15:22:54
22  A.   Because the oxy 30 milligram we  15:22:54
23  didn't want to appear to be promoting 15:22:57
24  increasing value of volume on products, so we  15:23:00
25  didn't want to provide incentives for that.  15:23:04
```

Page 249

```
 1       And most of them, obviously,     15:23:08
 2  came -- some of them fell off with the 15:23:10
 3  Florida issues that were going on at the  15:23:12
 4  time.                                 15:23:15
 5  Q.   When you say "fell off," what    15:23:15
 6  do you mean?                          15:23:17
 7  A.   Many of their sales of some of   15:23:17
 8  our customers fell off, so the customers  15:23:19
 9  weren't selling into the state of Florida.  15:23:21
10  So it -- we just advised them that the best  15:23:24
11  thing to do was just remove it from their  15:23:27
12  agreement so that they wouldn't have volume  15:23:29
13  incentive program for it.             15:23:32
14  Q.   Okay.  In the second paragraph   15:23:34
15  of your e-mail you say, "Sounds as if we  15:23:43
16  didn't have pushback from Steve's     15:23:45
17  perspective."                         15:23:47
18       Who is Steve in that sentence?   15:23:47
19  A.   Steve Becker was the sales       15:23:49
20  representative.                       15:23:53
21  Q.   Okay.  On the first page         15:23:53
22  there's an October 6th e-mail from Jane  15:24:05
23  Williams to you talking about a January  15:24:08
24  target date for removal of oxy 15 and 30 from  15:24:12
25  all volume incentive programs.        15:24:16
```

Page 250

1    And then in the second        15:24:18
2  paragraph she says, "It's also my        15:24:23
3  recommendation that we consider a change in   15:24:26
4  strategy for customers requesting trade show   15:24:29
5  buys on our products by providing a trade    15:24:31
6  show allowance equal to what we might      15:24:33
7  normally offer in discounted product costs or  15:24:36
8  possibly an educational giveaway to be     15:24:38
9  determined in order to keep this consistently  15:24:40
10  managed."                  15:24:43
11    And then you respond, "This is     15:24:44
12  the direction we discussed.  I would like to   15:24:46
13  stop paying the trade show rebates and fees   15:24:48
14  for our products when the contracts come    15:24:50
15  due."                    15:24:52
16    Are the trade show rebates      15:24:52
17  related to the -- to the oxy 15 and oxy 30   15:24:55
18  sales, or is that a separate issue?       15:25:00
19    MR. O'CONNOR:  Objection to     15:25:01
20  form.                   15:25:02
21    THE WITNESS:  Are the trade     15:25:02
22  show rebates related to the oxy -- no.      15:25:04
23  The customers gets trade show rebates,     15:25:06
24  just a standard percentage of all        15:25:11
25  sales.                   15:25:12

Page 251

1  QUESTIONS BY MR. GOTTO:          15:25:13
2    Q.  Okay.  And that would -- were   15:25:13
3  those rebates being suspended with respect to  15:25:15
4  oxy 15 and 30 sales?             15:25:22
5    A.  I wanted them suspended for all  15:25:23
6  products.                 15:25:25
7    Q.  Okay.  Did that happen?      15:25:25
8    A.  I believe we did.         15:25:27
9    Q.  Okay.  And what was the reason  15:25:28
10  for that?                 15:25:32
11    A.  I just didn't think that     15:25:33
12  Mallinckrodt had value in offering an     15:25:34
13  additional discount to some of these      15:25:36
14  customers.  They would just get additional   15:25:39
15  rebate for doing nothing, basically.  So we   15:25:42
16  just didn't see that there was value in doing  15:25:47
17  that.                   15:25:49
18    Q.  Okay.  And then in the top     15:25:49
19  e-mail on the first page from Lisa Cardetti,  15:25:56
20  she says, "Originally we were going to     15:25:56
21  exclude all oxycodone.  Just wanted to verify  15:26:01
22  that we will only be excluding 15 and 30."   15:26:02
23    Now, do you understand her      15:26:05
24  there to be talking about excluding from the  15:26:08
25  VIP program?                15:26:13

Page 252

1    A.  Yes.            15:26:14
2    Q.  Okay.  And which was it?  Was   15:26:14
3  it excluding all oxycodone or just 15 and 30;  15:26:17
4  do you know?                15:26:20
5    MR. O'CONNOR:  Object to form.   15:26:20
6    THE WITNESS:  I believe it     15:26:21
7  became only the 15 and 30.  We       15:26:23
8  remained with the 5 milligram.       15:26:25
9  QUESTIONS BY MR. GOTTO:          15:26:29
10    Q.  Okay.  You can set that aside.  15:26:29
11    (Mallinckrodt-Collier Exhibit    15:26:30
12  29 for identification.)           15:26:59
13  QUESTIONS BY MR. GOTTO:          15:26:59
14    Q.  Exhibit 29 is a two-page      15:26:59
15  document beginning at Bates          15:27:01
16  MNK-T1_0001553297.  It appears to be a mailer  15:27:08
17  concerning a CME presentation.        15:27:14
18    Do you recognize this document?  15:27:22
19    A.  No, I do not.           15:27:24
20    Q.  Do you recall having any      15:27:25
21  familiarity with any CME presentations     15:27:37
22  concerning opioid rotation?          15:27:42
23    A.  Not the specific CE.  We did   15:27:45
24  discuss doing continuing education.      15:27:51
25    Q.  On this topic?           15:27:52

Page 253

1    MR. O'CONNOR:  Object to form.   15:27:53
2    THE WITNESS:  I don't remember.   15:27:54
3  QUESTIONS BY MR. GOTTO:          15:27:55
4    Q.  Okay.  Do you know what opioid  15:27:55
5  rotation means in the context of this mailer?  15:27:57
6    A.  No, I do not.           15:28:00
7    Q.  Okay.  And down toward the    15:28:02
8  bottom of the mailer it says, "This activity  15:28:04
9  is funded through an educational grant from  15:28:06
10  Mallinckrodt/Covidien."           15:28:11
11    Do you see that?          15:28:12
12    A.  Yes.             15:28:13
13    Q.  And educational grants of that  15:28:13
14  type, is that something that was handled by   15:28:17
15  the marketing department?          15:28:20
16    A.  Not in my group, because this  15:28:21
17  is targeting physicians.  We don't target   15:28:25
18  physicians at all.  We don't even talk to    15:28:27
19  them.                   15:28:29
20    Q.  Okay.  So whatever educational  15:28:29
21  grant underlay this presentation would have  15:28:33
22  been something that someone else handled?   15:28:35
23    A.  Correct.            15:28:37
24    Q.  Okay.  All right.  You can set  15:28:37
25  that aside.                15:28:41

Page 254

```
 1        (Mallinckrodt-Collier Exhibits    15:28:55
 2     30 and 31 marked for identification.)    15:28:56
 3   QUESTIONS BY MR. GOTTO:         15:28:56
 4     Q.    We've marked as Exhibit 30 a     15:29:23
 5   single-page document, MNK-T1_0004673096, and    15:29:54
 6   as Exhibit 31, a single-page document bearing    15:30:01
 7   the next succeeding Bates number.       15:30:06
 8        Could you take a look at those    15:30:08
 9   materials and tell me if you recognize them?    15:30:09
10     A.    I recognize this.          15:30:11
11     Q.    The attachment?           15:30:20
12     A.    I do.              15:30:21
13     Q.    Okay.  So in Exhibit 30,      15:30:21
14   Mr. Vorderstrasse sends you an e-mail saying    15:30:26
15   that "working on ideas for McKesson, who was    15:30:28
16   looking for information to show that we were    15:30:33
17   accepted in the market and to give them ideas    15:30:37
18   of selling techniques that have proven       15:30:38
19   successful."              15:30:42
20        And then Exhibit 31 appears to    15:30:42
21   be the attachment to the e-mail; is that    15:30:44
22   right?                 15:30:49
23     A.    Uh-huh.              15:30:49
24     Q.    And so Exhibit 31 has some     15:30:50
25   information about Mallinckrodt historical    15:30:53
```

Page 255

```
 1   market share and then "available sales     15:30:55
 2   materials, parens, we will likely need PARC,   15:30:59
 3   P-A-R-C, approval to send examples."      15:31:02
 4        What is PARC in this setting?    15:31:06
 5     A.    Promotional material review    15:31:07
 6   meeting.  Promotional advertising review    15:31:10
 7   committee.               15:31:13
 8     Q.    Okay.  And that was a        15:31:13
 9   Mallinckrodt committee?            15:31:15
10     A.    Yes.               15:31:15
11     Q.    Were you on the committee?     15:31:15
12     A.    No, I submitted materials to     15:31:16
13   them --                 15:31:18
14     Q.    Okay.              15:31:19
15     A.    -- for approval.           15:31:19
16     Q.    Who was on the committee; do    15:31:19
17   you know?                15:31:21
18     A.    I didn't think I'd ever forget    15:31:21
19   his name, but, no, I don't remember the name.   15:31:26
20     Q.    Do you remember what his --     15:31:29
21     A.    The key gentleman.          15:31:30
22     Q.    Do you remember what         15:31:34
23   his position was?            15:31:35
24     A.    He was the lead at PARC, and so    15:31:35
25   he reviewed all communications.        15:31:37
```

Page 256

```
 1     Q.    Okay.  Do you remember what     15:31:40
 2   division in Mallinckrodt he worked in?     15:31:42
 3     A.    He wasn't brand or generic.  He    15:31:44
 4   actually -- both of us had to report our     15:31:47
 5   materials through him.  I remember his first    15:31:49
 6   name is Dennis.  That's all I can remember.    15:31:53
 7     Q.    Okay.  So there are available    15:31:55
 8   sales material -- materials that are listed    15:31:57
 9   on the attachment, a sell sheet and a      15:32:01
10   tri-fold sell sheet with "think Mallinckrodt"   15:32:07
11   focus.                  15:32:10
12        Do you know what those        15:32:10
13   materials are?              15:32:11
14     A.    The tri-fold sell sheet was     15:32:12
15   something that we were thinking of doing.    15:32:15
16   It's a folder.  So if you go into Excedrin,    15:32:17
17   it's folded three times, and it opens up and    15:32:21
18   it gives you information.  So it was       15:32:23
19   something we were thinking of doing, and the    15:32:24
20   pharmacy said they couldn't use it because    15:32:26
21   they didn't put anything on their shelves    15:32:28
22   anymore, on their counters for patients to    15:32:30
23   pick up.                15:32:32
24        The sell sheet would be just a    15:32:32
25   sell sheet explaining -- with a copy of the    15:32:34
```

Page 257

```
 1   ad, the package insert, and all the      15:32:37
 2   information about the risks of the product.    15:32:39
 3   And then it just showed, like I said, the    15:32:46
 4   size of our patch.            15:32:48
 5        And then we were going to      15:32:49
 6   enclose a sample patch that was inactive so    15:32:51
 7   they could see the size of the patch, because    15:32:55
 8   we felt that was our biggest advantage.    15:32:56
 9     Q.    Okay.  Okay.  All right.  You    15:32:58
10   can set that aside.            15:33:01
11        (Mallinckrodt-Collier Exhibit    15:33:33
12     32 marked for identification.)      15:33:33
13   QUESTIONS BY MR. GOTTO:         15:33:33
14     Q.    Exhibit 32 is a two-page e-mail    15:33:41
15   thread beginning at Bates MNK-T1_0000925331.   15:33:43
16   Please take a look at those e-mails and tell    15:33:49
17   me if you recognize them.          15:33:51
18     A.    Okay.              15:34:48
19     Q.    Do you recognize those e-mails?   15:34:48
20     A.    Yes, I do.             15:34:49
21     Q.    Okay.  On the first page, the    15:34:50
22   bottom half, e-mail from you to Leah LaRue    15:34:53
23   and others.               15:34:58
24        First of all, who was Leah     15:34:58
25   LaRue?                 15:35:01
```

Page 258

1    A.    She was part of the CARES    15:35:01
2  Alliance team.    15:35:05
3    Q.    And how about Dan Brague?    15:35:05
4    A.    He was in brands. I don't    15:35:07
5  remember what his role was.    15:35:11
6    Q.    Okay. Chris Wagner?    15:35:12
7    A.    Not familiar with him.    15:35:13
8    Q.    Okay. In your e-mail you say,    15:35:15
9  "For generics we need more educational and    15:35:22
10 communication materials for pharmacies,    15:35:24
11 including how to identify a patient that may    15:35:25
12 be at risk, how to handle a patient that    15:35:27
13 comes in too soon for a refill," and then you    15:35:31
14 have several other bullet items under that.    15:35:34
15        How did you develop that list    15:35:36
16 of information that you felt needed more    15:35:37
17 education and communication materials for?    15:35:40
18    A.    At trade shows we had asked    15:35:42
19 customers what they thought was lacking and    15:35:46
20 what kind of information would they need from    15:35:48
21 a company like Mallinckrodt.    15:35:50
22    Q.    Okay. At the end of your    15:35:51
23 e-mail you say, "I am sure I will think of    15:35:58
24 more once I dig into the SOM program more."    15:36:00
25        So this is in -- you send the    15:36:03

Page 259

1  e-mail in February 2013.    15:36:08
2        Do you recall what digging into    15:36:12
3  the SOM program you were doing at this time?    15:36:15
4    A.    I don't recall.    15:36:18
5    Q.    Do you recall if you did come    15:36:19
6  up with additional proposed items for    15:36:23
7  education for pharmacies?    15:36:26
8    A.    I don't remember if we did.    15:36:28
9    Q.    Okay. Do you recall if -- do    15:36:31
10 you recall participating in preparing any    15:36:36
11 educational and communication materials of    15:36:39
12 the type you describe in your e-mail?    15:36:41
13    A.    The only thing I remember that    15:36:43
14 we did was information on safe disposal.    15:36:44
15    Q.    Okay. The last bullet item in    15:36:47
16 your e-mail you say, "There was a poster we    15:36:55
17 handed out showing the most widely abused    15:36:58
18 drugs. It would be good to have that again."    15:37:01
19        Do you recall that poster?    15:37:04
20    A.    I do recall seeing that poster.    15:37:05
21    Q.    And in what context do you    15:37:07
22 remember seeing it?    15:37:09
23    A.    There was a closet full of all    15:37:09
24 promotional materials, and I happened to see    15:37:13
25 something in there.    15:37:15

Page 260

1    Q.    Okay. And do you recall if you    15:37:16
2  were ever able to locate that poster again?    15:37:22
3    A.    They never developed it again.    15:37:25
4    Q.    Okay. You can set that aside.    15:37:26
5        (Mallinckrodt-Collier Exhibit    15:37:27
6        33 marked for identification.)    15:38:01
7  QUESTIONS BY MR. GOTTO:    15:38:01
8    Q.    Exhibit 33 is a multipage    15:38:01
9  e-mail thread beginning MNK-T1_0000660532.    15:38:03
10 Take a look at those, and tell me if you    15:38:09
11 recognize those e-mails.    15:38:11
12        Do you recognize those e-mails?    15:39:16
13    A.    Yes.    15:39:19
14    Q.    And your e-mail on the bottom    15:39:19
15 part of the first page lists a series of    15:39:21
16 grants that had been funded the prior year,    15:39:24
17 correct?    15:39:27
18    A.    Correct.    15:39:27
19    Q.    And the funding of these    15:39:27
20 grants, is that -- who was responsible for    15:39:30
21 making the decision to fund grants of this    15:39:32
22 type?    15:39:35
23    A.    That actually would have been    15:39:35
24 the president of our team.    15:39:37
25    Q.    And Mr. Gunning?    15:39:38

Page 261

1    A.    Yes.    15:39:40
2    Q.    Okay.    15:39:41
3    A.    At this time it might have been    15:39:43
4  David Silver because Mr. Gunning had passed    15:39:45
5  away.    15:39:47
6    Q.    Oh, I see. Okay.    15:39:47
7        Did you have input into -- or    15:39:49
8  did you make recommendations as to grant --    15:39:52
9  you personally make recommendations as to    15:39:55
10 which grants you thought were worthwhile?    15:39:57
11        MR. O'CONNOR: Object to form.    15:40:00
12        THE WITNESS: Sometimes I did,    15:40:00
13 yes.    15:40:01
14 QUESTIONS BY MR. GOTTO:    15:40:01
15    Q.    And what criteria did you    15:40:02
16 employ in making that determination?    15:40:03
17    A.    Relationship to Mallinckrodt.    15:40:05
18 Their relationship to Mallinckrodt.    15:40:09
19    Q.    And what sorts of -- when you    15:40:11
20 say "relationship to Mallinckrodt," what do    15:40:16
21 you mean by that?    15:40:17
22    A.    For example, AATOD is a big    15:40:18
23 organization about opioid dependence, and    15:40:25
24 they do a lot of education on methadone, and    15:40:27
25 we actually sold methadone, too. So it would    15:40:29

Page 262

1    be that relationship, that they were very     15:40:31
2    important in the industry for methadone     15:40:33
3    treatment, so you want to make sure that they   15:40:36
4    continued doing work that they were doing.     15:40:38
5        Q.   Okay.  Are there any other of     15:40:40
6    these organizations in particular that you     15:40:44
7    can recall recommending Mallinckrodt make the   15:40:45
8    grant?                  15:40:48
9        A.   American Pharmacists     15:40:49
10   Association.  American Society Health System   15:41:01
11   Pharmacists Research and Education     15:41:03
12   Foundation.  And the two customer requests     15:41:05
13   for Kroger and Cardinal would have come from   15:41:10
14   the sales team.              15:41:13
15       Q.   And in terms of the two     15:41:14
16   pharmacists associations that you mentioned,   15:41:18
17   what was the reason for recommending those     15:41:20
18   grants?                  15:41:22
19       A.   They provide educational     15:41:22
20   materials for pharmacies, and they help     15:41:24
21   provide programs and services to independent   15:41:30
22   pharmacies which we don't have reach to.     15:41:32
23       Q.   Okay.  You can set that aside.   15:41:35
24       (Mallinckrodt-Collier Exhibit     15:41:49
25       34 marked for identification.)     15:41:50

Page 263

1    QUESTIONS BY MR. GOTTO:         15:41:50
2        Q.   I'll apologize in advance for     15:41:53
3    the small type on this document.     15:41:54
4        A.   Oh, boy.             15:41:57
5        Q.   Exhibit 34 is a multipage --     15:41:58
6    well, actually it's a document that was     15:42:02
7    produced in native at MNK-T1_0000661003, and   15:42:03
8    it appears to be a list of grants.     15:42:11
9            And perhaps I can just ask you     15:42:14
10   a general question about the very first line   15:42:17
11   where it says, "GCC approved grants     15:42:20
12   January 14 to present."         15:42:25
13           Do you know what GCC means in   15:42:26
14   this setting?              15:42:28
15       A.   No, I don't.           15:42:29
16       Q.   Okay.  Do you know if the     15:42:31
17   grants and contributions that are contained   15:42:35
18   in this document were grants and     15:42:38
19   contributions that Mallinckrodt made, or is   15:42:40
20   it some other compilation of grants and     15:42:43
21   contributions?              15:42:45
22       A.   I don't know if these are     15:42:45
23   grants that -- specifically that Mallinckrodt   15:42:48
24   made.  It looks as if many of them would have   15:42:50
25   been funded either through CARES Alliance or   15:42:53

Page 264

1    another initiative, so they wouldn't have     15:42:55
2    been in my area.             15:42:57
3        Q.   Okay.  Okay.  So in terms of     15:42:58
4    grants that the marketing department made a   15:43:01
5    determination on, those would be reflected on   15:43:07
6    the -- the prior exhibit we just looked at?     15:43:08
7        MR. O'CONNOR:  Object to form.     15:43:10
8        THE WITNESS:  Correct.         15:43:11
9    QUESTIONS BY MR. GOTTO:         15:43:11
10       Q.   Okay.  All right.  You can set     15:43:12
11   that aside.                15:43:13
12       (Mallinckrodt-Collier Exhibit     15:43:14
13       35 marked for identification.)     15:43:15
14   QUESTIONS BY MR. GOTTO:         15:43:15
15       Q.   Exhibit 35 is a two-page e-mail   15:43:51
16   thread beginning at Bates MNK-T1_0000558153.   15:43:55
17   Please take a look at that and let me know if   15:44:01
18   you recognize those e-mails.         15:44:03
19       A.   Yes, I recognize it.         15:44:04
20       Q.   The bottom e-mail on the     15:44:10
21   first page from Debbie Digby is another     15:44:14
22   e-mail transmitting monthly SOM reports     15:44:17
23   similar to a document we looked at a little   15:44:21
24   earlier this afternoon.         15:44:23
25           You recall?           15:44:27

Page 265

1        A.   Yes.               15:44:27
2        Q.   And then the top e-mail is an     15:44:27
3    e-mail from you to, well, a number of folks,   15:44:29
4    but in the body of the e-mail you say     15:44:33
5    "Karen."                  15:44:35
6            I assume that means Karen     15:44:35
7    Harper?                  15:44:37
8        A.   I would assume so.         15:44:37
9        Q.   Okay.  And you indicate that     15:44:44
10   you took highest volume pharmacies ran by     15:44:50
11   distributor, et cetera, and compiled the data   15:44:53
12   that's in the table on the e-mail, correct?     15:44:55
13       A.   Correct.             15:44:58
14       Q.   And what was your reason for     15:44:59
15   doing that?                15:45:00
16       A.   I guess so that -- to inform     15:45:01
17   Karen of what the wholesalers' sales are.     15:45:07
18       Q.   And why did you think that     15:45:12
19   would be something that she should be     15:45:21
20   informed of?              15:45:23
21       A.   I'm trying to understand what   15:45:24
22   I'm even saying here.           15:45:26
23           Okay.  Well, I guess in the     15:45:42
24   process we continued to monitor what some of   15:45:43
25   the wholesalers were doing in their sales.     15:45:47

Page 266

1    Q.   And monitoring it for what      15:45:50
2  purpose?                              15:45:57
3    A.   To see if there's any high     15:45:57
4  concentration by some of these smaller   15:46:00
5  distributors.                        15:46:03
6    Q.   And high concentration meaning   15:46:03
7  what in this setting?                 15:46:09
8    A.   So, for example, if Masters     15:46:11
9  would have 15 percent share, that would be   15:46:12
10 concerning because we have large volume   15:46:15
11 customers on here. Or if KeySource was high.  15:46:17
12   Q.   And do you recall if you        15:46:22
13 performed this analysis on other occasions,   15:46:34
14 or was this a one-time thing that you did?   15:46:38
15        MR. O'CONNOR: Object to form.   15:46:41
16        THE WITNESS: I'm not sure if    15:46:42
17   it was done on a frequent basis. I --   15:46:44
18   I just said I just took this, so I   15:46:50
19   assume that possibly from the data   15:46:52
20   that was provided by Debbie, I twisted   15:46:53
21   it a little bit further, you know, to   15:46:55
22   look at the numbers in a different   15:46:57
23   way.                              15:46:58
24 QUESTIONS BY MR. GOTTO:               15:46:58
25   Q.   Do you know if you had any       15:46:58

Page 267

1  particular reason for performing that   15:46:59
2  analysis in March of 2011?            15:47:02
3    A.   I don't recall.                15:47:03
4    Q.   Okay. You can put that aside.   15:47:06
5        (Mallinckrodt-Collier Exhibit   15:47:11
6        36 marked for identification.)   15:47:12
7  QUESTIONS BY MR. GOTTO:               15:47:12
8    Q.   Exhibit 36 is a multipage       15:47:33
9  document beginning at MNK-T1_0000609142. It   15:47:36
10 appears to be NACDS meeting notes from April   15:47:42
11 of 2013.                             15:47:48
12        Are you familiar with what the   15:47:49
13 NACDS meetings were?                  15:47:53
14   A.   Yes.                          15:47:55
15   Q.   And what were they?            15:47:55
16   A.   They were National Association   15:47:57
17 of Chain Drugstores, and it was meeting --   15:47:59
18 this particular meeting was with executives   15:48:03
19 from the big wholesalers and big chains   15:48:05
20 and -- with the executives from the   15:48:09
21 manufacturers.                       15:48:11
22   Q.   Okay. And did you participate   15:48:11
23 in those meetings?                    15:48:13
24   A.   I participated, yes.           15:48:13
25   Q.   Okay. Did you prepare these     15:48:15

Page 268

1  notes?                               15:48:17
2    A.   No, I did not.                 15:48:17
3    Q.   Do you know who did?           15:48:18
4    A.   This would have been someone in   15:48:19
5  sales, possibly Jane.                15:48:21
6    Q.   Okay. Did you have any input    15:48:23
7  into what she put into the notes?     15:48:26
8    A.   I don't recall putting anything   15:48:28
9  in, adding any comments.             15:48:30
10   Q.   Were these meetings held        15:48:32
11 regularly?                           15:48:35
12   A.   Annually, yes.                 15:48:35
13   Q.   And did you participate each    15:48:37
14 year?                                15:48:39
15   A.   Yes, I did.                    15:48:39
16        MR. GOTTO: Okay. All right.    15:48:46
17   Why don't we go off the record.     15:48:47
18        VIDEOGRAPHER: We're going off   15:48:49
19   the record at 3:48 p.m.            15:48:50
20   (Off the record at 3:48 p.m.)      15:48:52
21        VIDEOGRAPHER: We are back on   15:53:10
22   the record at 3:52 p.m.            15:53:11
23        CROSS-EXAMINATION              15:53:12
24 QUESTIONS BY MS. HERZFELD:            15:53:13
25   Q.   Good afternoon, Ms. Collier.    15:53:14

Page 269

1  My name is Tricia Herzfeld. I'm an attorney   15:53:15
2  representing the plaintiffs in the Tennessee   15:53:17
3  state court litigation.              15:53:19
4        How are you doing this          15:53:20
5  afternoon?                           15:53:21
6    A.   Very good, thank you.          15:53:21
7    Q.   Good.                         15:53:22
8        Are you familiar at all with    15:53:22
9  the Tennessee litigation?            15:53:23
10   A.   No, I'm not.                   15:53:24
11   Q.   Okay.                         15:53:25
12        MS. HERZFELD: Well, before we   15:53:26
13   get on the record, I'm just going to   15:53:27
14   make our standard objection, which   15:53:28
15   we've made in every deposition we've   15:53:30
16   had thus far, so I won't repeat all   15:53:32
17   the specifics.                     15:53:35
18        MR. O'CONNOR: And we'll make    15:53:35
19   our standard objection to your       15:53:36
20   objection.                         15:53:37
21        MS. HERZFELD: Excellent.        15:53:38
22   Wonderful. Moving on.              15:53:39
23 QUESTIONS BY MS. HERZFELD:            15:53:41
24   Q.   Ms. Collier, have you ever been   15:53:42
25 to the state of Tennessee?           15:53:42

Page 270

1    A.    Yes, I have.          15:53:44
2    Q.    And for business or pleasure?    15:53:44
3    A.    Both.              15:53:45
4    Q.    Okay.  When for business?    15:53:46
5    A.    When for business?      15:53:47
6    Q.    Yes, ma'am.          15:53:50
7    A.    I believe I was there for a    15:53:50
8    conference in Nashville, and doing business    15:53:52
9    in Memphis with McKesson.        15:53:54
10    Q.    Okay.  And when was the    15:53:59
11    conference in Nashville?        15:54:00
12    A.    I have no idea.        15:54:00
13    Q.    Okay.  Do you know who you were    15:54:01
14    working for when you attended the conference?  15:54:03
15    A.    Probably Baxter.        15:54:04
16    Q.    Okay.  And when you said "in    15:54:08
17    Memphis," was that for your time with    15:54:11
18    McKesson?            15:54:12
19    A.    No.  It was calling on      15:54:13
20    McKesson.            15:54:15
21    Q.    Oh, calling on McKesson.    15:54:16
22    A.    They have a warehouse there.    15:54:18
23    Q.    Okay.              15:54:18
24    A.    They had a warehouse there.    15:54:20
25    Q.    And who were you employed by    15:54:21

Page 271

1    when you were calling on McKesson?    15:54:23
2    A.    Baxter.              15:54:24
3    Q.    Okay.  In your capacity as an    15:54:25
4    employee of Mallinckrodt, did you ever visit    15:54:27
5    Tennessee?            15:54:31
6    A.    Yes.              15:54:31
7    Q.    Okay.  And when was that?    15:54:32
8    A.    I don't recall.        15:54:33
9    Q.    Okay.  And what were you doing    15:54:39
10    in Tennessee?          15:54:40
11    A.    Visiting the McKesson      15:54:41
12    warehouse.            15:54:43
13    Q.    Okay.  So you visited the    15:54:43
14    McKesson warehouse in Memphis during your job  15:54:45
15    at Baxter as well as your job at    15:54:49
16    Mallinckrodt; is that correct?    15:54:52
17    A.    Correct.            15:54:52
18        MR. O'CONNOR:  Object to form.    15:54:52
19    QUESTIONS BY MS. HERZFELD:      15:54:53
20    Q.    Okay.  Any other times that you    15:54:53
21    visited Tennessee in your capacity as an    15:54:56
22    employee of Mallinckrodt?        15:54:58
23    A.    Not that I remember.      15:54:59
24    Q.    Okay.  And you've gone      15:55:01
25    personally for vacation or something?    15:55:05

Page 272

1    A.    Yes.              15:55:07
2    Q.    Okay.  And which cities did you    15:55:07
3    visit?              15:55:09
4    A.    Memphis.            15:55:09
5    Q.    Oh, okay.            15:55:11
6        Did you get to go to the Civil    15:55:13
7    Rights Museum?          15:55:14
8    A.    No.              15:55:16
9    Q.    Graceland?            15:55:16
10    A.    Yes.              15:55:18
11    Q.    Did you like it?        15:55:18
12    A.    No.              15:55:19
13    Q.    Okay.  It's a little different    15:55:19
14    than people think.        15:55:21
15        Okay.  And does that pretty    15:55:22
16    much close out your visits to Tennessee, just  15:55:24
17    Memphis and Nashville?        15:55:27
18    A.    Yes.              15:55:28
19    Q.    Okay.  Have you ever been to    15:55:29
20    the Appalachian region of Tennessee?    15:55:31
21    A.    Possibly driven through it.    15:55:34
22    Q.    Okay.              15:55:36
23    A.    I'm not really sure where it    15:55:37
24    is.                15:55:39
25    Q.    Okay.  You've heard of the    15:55:39

Page 273

1    Smoky Mountains?          15:55:42
2    A.    Yes.              15:55:42
3    Q.    Okay.  Do you know there's an    15:55:43
4    area of Tennessee that's like up northeast of  15:55:44
5    the Smoky Mountains?  It's almost in    15:55:47
6    Kentucky, West Virginia?        15:55:49
7    A.    Then I might have driven      15:55:51
8    through it.            15:55:52
9    Q.    Okay.  Do you know where you    15:55:53
10    were going?            15:55:55
11    A.    From New Jersey to St. Louis.    15:55:55
12    Q.    Okay.  Okay.  I'm going to go    15:55:57
13    through just a couple of e-mails with you    15:56:11
14    quickly, hopefully.  I don't think they've    15:56:13
15    been previously added as exhibits, so if they  15:56:17
16    have, if somebody will stop me and hopefully    15:56:21
17    we won't repeat it.        15:56:23
18        If we could mark this one as    15:56:24
19    Exhibit -- are we on 29?        15:56:26
20        COURT REPORTER:  36.      15:56:32
21        MS. HERZFELD:  36.        15:56:32
22        MR. O'CONNOR:  I think I have a  15:56:32
23    36 already.  So 37.        15:56:32
24        MS. HERZFELD:  37.  Okay.    15:56:47
25        (Mallinckrodt-Collier Exhibit  15:56:47

Page 274

```
 1    37 marked for identification.)       15:56:48
 2    QUESTIONS BY MS. HERZFELD:           15:56:48
 3         Q.   Okay.  If you'd take a moment    15:56:51
 4    and look at this e-mail, please.     15:56:52
 5         A.   Okay.                       15:56:53
 6              MR. HIBEY:  If there's a Bates    15:56:53
 7    number for the document, could you   15:56:53
 8    please read it for us?               15:57:13
 9              MS. HERZFELD:  Sure.  But it's    15:57:13
10    been produced in the Tennessee state    15:57:14
11    litigation, so I don't have a Bates    15:57:17
12    number for the MDL.                  15:57:18
13              MR. HIBEY:  Well, I guess I'd    15:57:20
14    take that Bates number as well, just    15:57:21
15    some kind of identifier.             15:57:22
16              MS. HERZFELD:  Sure.        15:57:25
17              Who is it on the phone?     15:57:25
18              MR. HIBEY:  This is David Hibey    15:57:28
19    from Arnold & Porter.                15:57:29
20              MS. HERZFELD:  Okay.  And    15:57:31
21    you're representing whom?            15:57:31
22              MR. HIBEY:  Endo and Par.   15:57:33
23              MS. HERZFELD:  Okay.  So the    15:57:35
24    Tennessee state litigation number is    15:57:36
25    MNK_TNSTA05202063.  And I have no idea    15:57:37
```

Page 275

```
 1    if this was produced in the MDL.     15:57:45
 2    QUESTIONS BY MS. HERZFELD:           15:57:55
 3         Q.   Ma'am, you've had an       15:57:56
 4    opportunity to review it?            15:57:57
 5         A.   Yes.  I'm still reviewing the    15:57:57
 6    top.  I'm sorry.                     15:57:59
 7         Q.   That's okay.               15:58:00
 8              Okay.  Are you finished    15:58:01
 9    reviewing it?                        15:58:23
10         A.   Yes, ma'am.                15:58:24
11         Q.   Okay.  Do you recognize this    15:58:24
12    document?                           15:58:25
13         A.   Yes, I do.                 15:58:25
14         Q.   Okay.  Does it appear to be an    15:58:26
15    e-mail that was sent to you and Kate Neely    15:58:28
16    from Karen Harper?                   15:58:32
17         A.   The top one is.  The bottom one    15:58:33
18    started with Kate Neely sending something to    15:58:36
19    Karen Harper and me -- and copying me.    15:58:39
20         Q.   Okay.  And then it looks like a    15:58:41
21    response on the top?                 15:58:44
22         A.   Correct, from Karen.       15:58:45
23         Q.   Okay.  Great.             15:58:46
24              And so looking at this e-mail,    15:58:47
25    Kate Neely asks about the audits of    15:58:51
```

Page 276

```
 1    distributors, stating, "Have we ever asked    15:58:53
 2    them to provide written protocol for how they    15:58:56
 3    vet the customers that they sell to?"    15:58:58
 4              Do you see where I'm at?    15:59:00
 5         A.   Yes, I do.                 15:59:02
 6         Q.   And did I read that correctly?    15:59:02
 7         A.   Yes, you did.              15:59:04
 8         Q.   Okay.  And then, "Can we start    15:59:05
 9    making it a requirement that they provide us    15:59:07
10    with written standard operating practices as    15:59:09
11    to how they confirm that an account is okay?"    15:59:12
12              Do you see that?           15:59:16
13         A.   Yes.                       15:59:16
14         Q.   Okay.  And then Karen Harper    15:59:16
15    responds, "The question whether our customers    15:59:18
16    monitor their customers was removed from the    15:59:22
17    questionnaire by the Mallinckrodt suspicious    15:59:24
18    order monitoring team because there is no    15:59:25
19    {sic} actual regulatory obligation to monitor    15:59:28
20    customers' customers."               15:59:32
21              Do you see where I'm at?    15:59:35
22         A.   Yes.                       15:59:36
23         Q.   Okay.  Was that your       15:59:37
24    understanding of the DEA requirements?    15:59:38
25         A.   I did not know the DEA     15:59:39
```

Page 277

```
 1    requirements.  That's why we were requesting.    15:59:40
 2         Q.   Okay.  And were you part of the    15:59:43
 3    decision to take that off the questionnaire?    15:59:44
 4         A.   No, I was not.             15:59:46
 5         Q.   Okay.  And were you part of the    15:59:48
 6    decision to not require distributors to    15:59:50
 7    provide their written policies?      15:59:52
 8         A.   No, I was not.             15:59:53
 9         Q.   Okay.  That was my only     15:59:54
10    questions on that document.  Thank you,    15:59:57
11    ma'am.                              15:59:58
12         A.   Okay.                      15:59:58
13              (Mallinckrodt-Collier Exhibit    16:00:08
14    38 marked for identification.)       16:00:09
15              MS. HERZFELD:  For those on the    16:00:09
16    phone, this is MNK_TNSTA05202176.    16:00:27
17    QUESTIONS BY MS. HERZFELD:           16:00:34
18         Q.   Okay.  You've had an       16:01:09
19    opportunity to read it?              16:01:10
20         A.   Yes, I have.               16:01:11
21         Q.   Okay.  And what does this    16:01:11
22    e-mail appear to be to you?          16:01:14
23         A.   This appears that we were    16:01:16
24    requested to provide an average on    16:01:17
25    OxyContin -- I mean, oxycodone units    16:01:24
```

Page 278

1 dispensed at the pharmacy level by state.  16:01:26
2     Q.    Okay.  And it's an e-mail from  16:01:28
3 you to Michael Gunning; is that correct?  16:01:30
4     A.    Correct.  16:01:31
5     Q.    Okay.  And it's dated  16:01:32
6 4/18/2011?  16:01:35
7     A.    Correct.  16:01:35
8     Q.    Okay.  And do you have any  16:01:36
9 reason to think you didn't receive this  16:01:37
10 e-mail?  16:01:38
11     A.    No, I have no reason.  16:01:38
12     Q.    Okay.  And so who is Michael  16:01:40
13 Gunning?  16:01:43
14     A.    He was the president -- or the  16:01:43
15 general manager of the generics division.  16:01:46
16     Q.    Okay.  And do you have any  16:01:48
17 specific memory of him requesting this  16:01:51
18 information from you?  16:01:53
19     A.    No.  16:01:53
20     Q.    Okay.  And do you know why he  16:01:55
21 requested it from you?  16:01:56
22     A.    I'm not sure that he did  16:01:58
23 request it.  16:02:00
24     Q.    Okay.  Might it have been  16:02:01
25 something that you just came up with to send?  16:02:03

Page 279

1     A.    It might have been a discussion  16:02:05
2 and I decided -- I could have acted  16:02:07
3 proactively, or it could have been at a  16:02:09
4 request.  16:02:12
5     Q.    And from the testimony that  16:02:12
6 we've received a little bit earlier, it looks  16:02:13
7 like sometimes you acted proactively and  16:02:15
8 crunched numbers in a way and would pass that  16:02:17
9 on to someone; is that correct?  16:02:19
10     A.    Correct.  16:02:20
11         MR. O'CONNOR:  Objection.  16:02:21
12 QUESTIONS BY MS. HERZFELD:  16:02:22
13     Q.    Okay.  So looking at this  16:02:23
14 e-mail, it says, "Based on the report we get  16:02:24
15 for suspicious order monitoring, below are  16:02:26
16 the averages -- are the average pharmacy  16:02:32
17 dispensing units for the 15-milligram and  16:02:32
18 30-milligram combined."  16:02:35
19         Do you see where it says that?  16:02:36
20     A.    Yes.  16:02:37
21     Q.    Okay.  And then kind of moving  16:02:38
22 forward, it says, "By any standard it appears  16:02:40
23 5,000 tablets is too low."  16:02:42
24         What did you mean by that?  16:02:44
25     A.    When I'm looking at this, the  16:02:45

Page 280

1 average is well above 5,000 units, so I  16:02:50
2 assume that they were probably trying to set  16:02:53
3 a standard.  And I was saying that 5,000 is  16:02:54
4 too low based on that standard.  16:02:57
5     Q.    Okay.  So I'm going to back up  16:02:58
6 a little bit and just make sure that I fully  16:03:00
7 understand it because I'm struggling just a  16:03:02
8 tiny bit.  16:03:05
9         Okay.  So when you're looking  16:03:05
10 at the -- it's dispensing units, is that  16:03:08
11 right, DISP?  16:03:10
12     A.    Right.  16:03:11
13     Q.    Okay.  And so does that stand  16:03:12
14 for tablets or bottles, or what is a  16:03:13
15 dispensing unit?  16:03:15
16     A.    In this --  16:03:16
17         MR. O'CONNOR:  Objection to the  16:03:16
18     form.  16:03:16
19         THE WITNESS:  In this context I  16:03:16
20     would think that it's tablets.  It  16:03:21
21     doesn't say, but I refer to tablets  16:03:22
22     later on.  In looking at these  16:03:23
23     numbers, it looks like it could refer  16:03:25
24     to the tablets.  16:03:27
25

Page 281

1 QUESTIONS BY MS. HERZFELD:  16:03:28
2     Q.    Okay.  And so when you're  16:03:28
3 looking here, this looks like it is for, what  16:03:30
4 is it, a month?  For a year?  Do you know  16:03:34
5 what the time period is?  16:03:35
6     A.    No, I do not.  16:03:36
7     Q.    Okay.  And so looking at this,  16:03:37
8 it looks like it's oxy 15 and oxy 30,  16:03:39
9 according to your e-mail here; is that right?  16:03:42
10     A.    Yes.  16:03:44
11     Q.    Okay.  And it's for pharmacies  16:03:45
12 purchasing from two or more distributors; is  16:03:47
13 that right?  16:03:49
14     A.    Yes.  16:03:49
15     Q.    Okay.  And it says, "I will ask  16:03:51
16 if they can expand the report to include all  16:03:54
17 oxy sales."  16:03:56
18         What other oxy sales would be  16:03:58
19 included that are not included here?  16:04:00
20     A.    Oxy 5 milligram.  16:04:02
21     Q.    Okay.  Is that what you're  16:04:04
22 referring to that's excluded?  16:04:05
23     A.    Yes.  16:04:06
24     Q.    Okay.  "And so by any standard  16:04:07
25 it appears that 5,000 tablets is too low."  16:04:11

Page 282

1    So do you know what the goal    16:04:14
2  was of this chart?    16:04:15
3    MR. O'CONNOR: Objection to    16:04:18
4  form.    16:04:19
5    THE WITNESS: I don't recall.    16:04:19
6  QUESTIONS BY MS. HERZFELD:    16:04:20
7    Q.  Okay.  And you said before -- I    16:04:20
8  think you said something about setting    16:04:21
9  standards.    16:04:23
10    What did you mean by that?    16:04:23
11    A.  Setting standards on -- it says    16:04:25
12  "by any standard."  I don't know what    16:04:28
13  standard they were looking for, but it says    16:04:30
14  in here looking at -- if they're looking at    16:04:31
15  5,000 to make that a benchmark, that's below    16:04:34
16  most of these numbers.    16:04:37
17    Q.  Okay.  And when you say    16:04:38
18  "benchmark," I guess I'm trying to figure out    16:04:39
19  a benchmark for what.  A benchmark for sales?    16:04:42
20    A.  I don't recall.    16:04:45
21    Q.  Target sales?    16:04:46
22    A.  I have no idea.  I don't know    16:04:48
23  if this is in relation to setting any -- the    16:04:49
24  suspicious order monitoring baseline to    16:04:52
25  trigger part of their algorithms.  Because    16:04:54

Page 283

1  they were looking at changing how they were    16:04:56
2  doing their algorithms, so it could have been    16:04:58
3  part of that.  It could have been part of    16:04:59
4  sales.  It could have been anything.    16:05:01
5    Q.  Okay.  And Michael Gunning,    16:05:02
6  what did you typically communicate with him    16:05:04
7  about?  Was it suspicious order monitoring or    16:05:06
8  sales?    16:05:08
9    A.  Typically I would communicate    16:05:09
10  with him about forecast and employee issues.    16:05:11
11    Q.  Forecast and employee issues.    16:05:15
12  Okay.    16:05:15
13    So when you say "forecast,"    16:05:15
14  that would be sales; is that right?    16:05:17
15    A.  Yes.    16:05:18
16    Q.  Okay.  So if you were sending    16:05:19
17  something to Michael Gunning in your    16:05:21
18  position, and typically you dealt with him    16:05:24
19  about sales, it's likely that this chart here    16:05:26
20  would have to do with sales; is that right?    16:05:29
21    MR. O'CONNOR: Objection.    16:05:31
22  Form.    16:05:32
23    THE WITNESS: That's a reach.    16:05:32
24  QUESTIONS BY MS. HERZFELD:    16:05:34
25    Q.  That's a reach.  Okay.    16:05:34

Page 284

1    Do you have any specific    16:05:36
2  knowledge of communicating with him about    16:05:36
3  suspicious order monitoring target numbers?    16:05:38
4    A.  Well, this relates to a    16:05:39
5  suspicious order monitoring report that we    16:05:44
6  received.    16:05:46
7    Q.  Okay.    16:05:46
8    A.  And so it's referring to    16:05:46
9  dispensing units.    16:05:48
10    Q.  Okay.    16:05:49
11    A.  When I'm looking at sales, I'm    16:05:49
12  not looking at dispensing units.  I'm usually    16:05:53
13  look at dollars --    16:05:55
14    Q.  Okay.    16:05:56
15    A.  -- and units sold to    16:05:56
16  wholesalers --    16:05:57
17    Q.  Okay.    16:05:58
18    A.  -- and distributors.    16:05:58
19    Q.  Okay.  So based on that, you    16:06:00
20  think this is based on suspicious order    16:06:01
21  monitoring levels?    16:06:02
22    MR. O'CONNOR: Object to form.    16:06:05
23    THE WITNESS: I cannot say    16:06:07
24  definitively, yes, it is.  That would    16:06:08
25  be drawing a conclusion, and I don't    16:06:11

Page 285

1  know, and I don't recollect.    16:06:12
2  QUESTIONS BY MS. HERZFELD:    16:06:13
3    Q.  Okay.  But if you had to guess,    16:06:14
4  do you think that's what it is?    16:06:17
5    MR. O'CONNOR: Objection to    16:06:18
6  form.    16:06:19
7    THE WITNESS: I would think    16:06:20
8  that it might have something to do    16:06:21
9  with that.    16:06:22
10  QUESTIONS BY MS. HERZFELD:    16:06:23
11    Q.  Okay.  Very good.    16:06:23
12    Looking at this, it says on    16:06:24
13  state average, right?  California average,    16:06:30
14  Florida average, Georgia average; is that    16:06:32
15  right?    16:06:34
16    A.  Yes.    16:06:34
17    Q.  Okay.  And do you know if those    16:06:35
18  are pharmacy-level oxy units per month?    16:06:36
19    MR. O'CONNOR: Objection to    16:06:39
20  form.    16:06:41
21    THE WITNESS: There's no way to    16:06:41
22  tell without some context.    16:06:42
23  QUESTIONS BY MS. HERZFELD:    16:06:43
24    Q.  Okay.  And it says,    16:06:43
25  "Tennessee's average here is 14,100 tablets";    16:06:44

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1  is that correct?                          16:06:51
2     A.   Yes.                              16:06:51
3     Q.   Okay.  And could you tell from    16:06:51
4  that, from this chart, if Tennessee was   16:06:52
5  considered high or low?                   16:06:56
6          MR. O'CONNOR:  Objection to       16:06:57
7     form.                                  16:06:57
8          THE WITNESS:  I cannot tell       16:06:58
9     that because I wouldn't know what the  16:06:58
10    medical needs or the population was of 16:07:03
11    Tennessee --                           16:07:05
12 QUESTIONS BY MS. HERZFELD:                16:07:06
13    Q.   Okay.                             16:07:06
14    A.   -- so I wouldn't know that.       16:07:07
15    Q.   And are those things that are     16:07:08
16 important for you to determine if someone's 16:07:09
17 oxy numbers are high or low, is           16:07:11
18 population or -- what was the other thing you 16:07:16
19 said?                                     16:07:17
20    A.   Or medical needs.                 16:07:17
21    Q.   Medical needs?                    16:07:18
22         MR. O'CONNOR:  Objection.         16:07:18
23    Form.                                  16:07:19
24         THE WITNESS:  I wouldn't have     16:07:19
25    any way to know that, so I couldn't    16:07:20

Page 287

1     use that in any decision-making       16:07:23
2     anyway.                               16:07:24
3  QUESTIONS BY MS. HERZFELD:               16:07:25
4     Q.   Okay.  But is that some -- is    16:07:25
5  that information you would like to know, the 16:07:27
6  population of a particular area?         16:07:29
7          MR. O'CONNOR:  Objection to      16:07:30
8     form.                                 16:07:31
9          THE WITNESS:  It wouldn't help,  16:07:31
10    so, no, I wouldn't need to know that. 16:07:35
11 QUESTIONS BY MS. HERZFELD:               16:07:37
12    Q.   Okay.  It wouldn't help what?    16:07:38
13    A.   I'm sorry.  It wouldn't help     16:07:39
14 why?                                     16:07:43
15    Q.   Yes, ma'am.                      16:07:44
16    A.   Oh.  It wouldn't help because I  16:07:44
17 have no idea why the prescriptions are being 16:07:46
18 dispensed or being written for, so I cannot 16:07:49
19 make a judgment on somebody's medical    16:07:51
20 condition that I do not know and that I have 16:07:54
21 not seen come into a pharmacy.  I'm not there 16:07:55
22 physically in a pharmacy, so I have no idea 16:07:58
23 what's going on in that region.          16:07:59
24         And I also have no idea does it   16:08:01
25    border next to another state that they -- 16:08:04

Page 288

1  there's a higher population in that      16:08:06
2  concentration, in that area, and so there's 16:08:10
3  more people coming to that pharmacy or that 16:08:12
4  area because it's a higher population and it 16:08:14
5  borders on other states.                 16:08:16
6     Q.   Okay.  And so you've just given  16:08:17
7  two different examples of information that 16:08:19
8  you don't know when assessing the number of 16:08:22
9  oxy that are going to a particular area. 16:08:25
10         Why did you choose those two?    16:08:28
11    A.   Those are the first two that     16:08:30
12 come to mind.                            16:08:33
13    Q.   Okay.  And where did you --      16:08:33
14 where did you develop that knowledge of  16:08:35
15 things you should look for in oxy        16:08:36
16 prescriptions going to a specific area?  16:08:39
17         MR. O'CONNOR:  Objection to      16:08:40
18    form.                                 16:08:41
19         THE WITNESS:  I didn't develop   16:08:41
20    that knowledge.  You asked me a       16:08:42
21    question, and I responded to your     16:08:44
22    question, so with what I would think  16:08:45
23    top of mind.                          16:08:47
24 QUESTIONS BY MS. HERZFELD:               16:08:48
25    Q.   Okay.  So you came up with that  16:08:48

Page 289

1  information on your own.  You didn't have 16:08:50
2  that in a discussion in like a suspicious 16:08:52
3  order monitoring team meeting or anyplace 16:08:55
4  else?                                    16:08:57
5          MR. O'CONNOR:  Objection.        16:08:57
6     Form.                                 16:08:58
7          THE WITNESS:  Not that I'm       16:08:58
8     aware of.                             16:08:58
9  QUESTIONS BY MS. HERZFELD:               16:08:58
10    Q.   Okay.  Do you recall ever being  16:08:59
11 in a suspicious order monitoring team meeting 16:09:00
12 where factors relating to the volume of oxy 16:09:03
13 prescriptions going to a particular area were 16:09:09
14 discussed?                               16:09:10
15    A.   We had discussions about         16:09:11
16 Florida.                                 16:09:16
17    Q.   Okay.                            16:09:17
18    A.   I do remember that discussion.   16:09:17
19    Q.   Okay.  And what types of things  16:09:19
20 were discussed in relation to Florida?   16:09:21
21    A.   That Florida had a problem with  16:09:24
22 pain clinics and that they hadn't implemented 16:09:26
23 any legislation to shut down the pain    16:09:30
24 clinics.                                 16:09:35
25    Q.   Okay.  Anything else that you    16:09:35

Page 290

1 recall?                                     16:09:37
2       A.    That's all -- that's all I      16:09:37
3 remember.                                   16:09:39
4       Q.    Okay.  Do you recall ever being 16:09:39
5 involved in a conversation with anyone during 16:09:42
6 your time at Mallinckrodt where anyone       16:09:43
7 mentioned that oxy from Florida were going to 16:09:45
8 Tennessee?                                   16:09:47
9       MR. O'CONNOR:  Objection to           16:09:48
10 form.                                       16:09:49
11      THE WITNESS:  I don't remember         16:09:50
12 specifically them saying any state.  I       16:09:51
13 do remember them saying they would           16:09:53
14 come up Highway 95.  And I have no           16:09:55
15 idea if that even goes through               16:09:57
16 Tennessee or not.                           16:09:59
17 QUESTIONS BY MS. HERZFELD:                   16:10:00
18      Q.    Okay.  Could it have been        16:10:00
19 Highway 75?                                  16:10:01
20      MR. O'CONNOR:  Objection.             16:10:02
21 Form.                                       16:10:02
22      THE WITNESS:  I thought they           16:10:02
23 said 95, but I don't remember.               16:10:04
24 QUESTIONS BY MS. HERZFELD:                   16:10:05
25      Q.    And did you ever hear about a    16:10:05

Page 291

1 particular problem with oxy in West Virginia  16:10:07
2 or Appalachia region?                        16:10:10
3       MR. O'CONNOR:  Objection to           16:10:13
4 form.                                        16:10:14
5       THE WITNESS:  I remember seeing        16:10:14
6 something about there was a problem in        16:10:15
7 the coal mining town.                        16:10:17
8 QUESTIONS BY MS. HERZFELD:                   16:10:18
9       Q.    Okay.  Do you remember where     16:10:19
10 you saw that?                               16:10:20
11      A.    On -- I believe it was a news    16:10:21
12 show.                                       16:10:25
13      Q.    Okay.  And do you think that     16:10:25
14 was during your time of employment at        16:10:26
15 Mallinckrodt?                                16:10:28
16      A.    Yes.                             16:10:29
17      Q.    Okay.  And did you do anything   16:10:30
18 in response to learning that information?    16:10:32
19      A.    No.                              16:10:34
20      Q.    Okay.  Okay.  Marking the next   16:10:36
21 document here.  I'm not sure this one --     16:10:51
22      A.    I think -- but wait a minute.    16:10:54
23 I think I should clarify.  What did you mean, 16:10:55
24 did I do anything in response to that        16:10:57
25 information?  Because I could have done a lot 16:10:58

Page 292

1 of things.                                   16:11:00
2       But did you mean did I do              16:11:00
3 anything at Mallinckrodt, go back to         16:11:02
4 Mallinckrodt and talk to them about the show 16:11:03
5 that I saw?                                  16:11:04
6       Q.    Did you do anything in response  16:11:05
7 to that?  Did watching that show or learning 16:11:07
8 that information, did that make you take any  16:11:10
9 steps in your personal or professional life? 16:11:13
10      MR. O'CONNOR:  Object to form.         16:11:17
11      THE WITNESS:  In my personal or        16:11:20
12 professional life?                           16:11:22
13 QUESTIONS BY MS. HERZFELD:                   16:11:22
14      Q.    Yes, ma'am.                      16:11:23
15      A.    I don't recall if it did.        16:11:23
16      Q.    Okay.  So you thought it was     16:11:24
17 important to clarify that point, so I just   16:11:25
18 want to --                                  16:11:26
19      A.    Okay.                            16:11:26
20      Q.    I want to be clear, okay?        16:11:27
21       So let's kind of back up, and        16:11:28
22 I'll try to make sure I'm understanding you. 16:11:30
23      A.    Okay.                            16:11:30
24      Q.    So you said you'd seen a show    16:11:33
25 that had talked about -- somewhere on coal   16:11:34

Page 293

1 mining, problems with OxyContin or oxycodone 16:11:35
2 in a coal mining area, in a coal mining town. 16:11:38
3       Am I right on that?                    16:11:41
4       MR. O'CONNOR:  Objection to the       16:11:42
5 form.                                        16:11:44
6       THE WITNESS:  I don't remember         16:11:44
7 about it being any specific products.        16:11:44
8 I remember that there was a problem in        16:11:46
9 coal mining towns with drug abuse.           16:11:47
10 QUESTIONS BY MS. HERZFELD:                   16:11:49
11      Q.    Okay.  Do you remember it being  16:11:50
12 opioid abuse?                                16:11:51
13      A.    I don't remember.                16:11:51
14      Q.    Okay.  And so based on that      16:11:53
15 show that you saw at the time that you were  16:11:55
16 employed at Mallinckrodt, did you take any   16:11:57
17 steps in your job at Mallinckrodt to focus on 16:11:59
18 coal mining areas?                           16:12:04
19      A.    No, I did not.                   16:12:06
20      Q.    Okay.  Did you talk to anybody   16:12:07
21 at Mallinckrodt about that show you saw?     16:12:09
22      A.    No, I did not.                   16:12:11
23      Q.    Did you send any e-mails?        16:12:11
24      A.    No, I did not.                   16:12:13
25      Q.    Did you take any steps as part   16:12:14

Page 294

1  of your position in the suspicious order        16:12:15
2  monitoring team to monitor coal mining areas    16:12:18
3  for prescription abuse?                         16:12:21
4          MS. HERZFELD: Objection to              16:12:22
5  form.                                           16:12:23
6          THE WITNESS: My role in the             16:12:23
7  suspicious order monitoring team was            16:12:25
8  peripheral. I was not part of the               16:12:27
9  core team that established the policy            16:12:28
10 or understood the government acts.              16:12:30
11 QUESTIONS BY MS. HERZFELD:                      16:12:33
12     Q.   Okay. My question is: Did you          16:12:33
13 take any steps in your role as being even on    16:12:34
14 the periphery of the suspicious order           16:12:37
15 monitoring team to monitor coal mining areas    16:12:39
16 for prescription abuse?                         16:12:41
17     A.   No.                         16:12:43
18     Q.   Okay. What about in your               16:12:44
19 personal life? Did you send anybody an          16:12:46
20 e-mail about, "Hey, I saw this show"?           16:12:48
21     A.   No.                         16:12:51
22     Q.   Okay. Did you have any                 16:12:51
23 discussions with anybody about the show?        16:12:52
24     A.   Not that I recall.                     16:12:54
25     Q.   Okay. Did you take any steps           16:12:55

Page 295

1  because you saw that show?                      16:12:57
2      A.   Not that I recall.                     16:12:58
3      Q.   Okay. So we're moving on to            16:13:01
4  the next document here. This one may already    16:13:03
5  be an exhibit. I'm not 100 percent positive,    16:13:06
6  so I apologize if I'm doubling up.              16:13:08
7          (Mallinckrodt-Collier Exhibit          16:13:10
8      39 marked for identification.)              16:13:10
9          MS. HERZFELD: For those on the          16:13:20
10     phone, it's MNK_TNSTA05296154.              16:13:20
11 QUESTIONS BY MS. HERZFELD:                      16:13:29
12     Q.   Do you recognize this document,        16:13:42
13 ma'am?                                          16:13:44
14     A.   No, I do not.                          16:13:44
15     Q.   Okay. What does it appear to           16:13:47
16 be?                                  16:13:53
17     A.   It appears that the people that        16:13:53
18 are core members of the SOM team, this was      16:13:57
19 the meeting and they were -- this was the       16:13:59
20 agenda for the meeting.                         16:14:01
21     Q.   Okay. And this would have been         16:14:02
22 for the core team, not for people on the        16:14:03
23 periphery?                                      16:14:06
24     A.   I would assume so.                     16:14:07
25     Q.   Okay. You didn't attend this          16:14:10

Page 296

1  meeting?                             16:14:12
2      A.   Not that I recall.                     16:14:12
3      Q.   Okay. Very good. Moving on.            16:14:13
4          Okay. And I think before, we           16:14:18
5  talked about you were involved in the          16:14:23
6  indirect customer review subteam; is that       16:14:26
7  correct?                             16:14:29
8          MR. O'CONNOR: Objection to              16:14:29
9  form.                                           16:14:30
10         THE WITNESS: Yes.                       16:14:30
11 QUESTIONS BY MS. HERZFELD:                      16:14:31
12     Q.   Okay. And what did the                 16:14:31
13 indirect customer review subteam do?            16:14:33
14     A.   That was the team that -- which        16:14:36
15 we were providing additional information        16:14:40
16 about chargebacks, if they wanted to know how   16:14:41
17 were chargebacks run or generated.              16:14:44
18     Q.   Okay. And you were providing           16:14:46
19 that information to whom?                        16:14:50
20     A.   To the suspicious order                16:14:52
21 monitoring team.                                16:14:55
22     Q.   And that would be the core             16:14:56
23 folks on that team?                             16:14:58
24     A.   Correct.                    16:14:59
25     Q.   Okay. So you were kind of the          16:15:00

Page 297

1  number crunchers explaining things to the       16:15:01
2  team that was the core part of the suspicious   16:15:04
3  order monitoring team?                          16:15:06
4          MR. O'CONNOR: Objection to              16:15:06
5  form.                                           16:15:08
6          THE WITNESS: Correct.                   16:15:08
7  QUESTIONS BY MS. HERZFELD:                      16:15:09
8      Q.   Okay. And do you know who else         16:15:09
9  was a member of the indirect customer review   16:15:12
10 subteam?                             16:15:14
11     A.   I don't recall.                        16:15:15
12     Q.   Okay.                       16:15:29
13         (Mallinckrodt-Collier Exhibits         16:15:29
14     40 and 41 marked for identification.)      16:15:37
15 QUESTIONS BY MR. GOTTO:                         16:15:37
16     Q.   Okay. I'm going to hand you           16:15:37
17 two different documents, but I will submit to   16:15:38
18 you that one is an e-mail and the other one     16:15:41
19 is an attachment to the e-mail. Okay? Just      16:15:42
20 so everybody knows what I'm doing here.         16:15:44
21         MS. HERZFELD: The e-mail is            16:15:55
22     MNK-T1_0007251678.                          16:15:56
23         And we're separately going to          16:16:14
24     mark the next one, which is                16:16:16
25     MNK-T1_0007251679.                          16:16:26

Page 298

1  QUESTIONS BY MS. HERZFELD:              16:16:49
2      Q.   Okay.  If you'll take a look at  16:16:49
3  the e-mail for me, please, ma'am, Exhibit 40.  16:16:51
4          This appears to be an e-mail     16:16:58
5  from Debbie Digby to Karen Harper, you and  16:16:59
6  some other folks; is that correct?        16:17:03
7      A.   Correct.                         16:17:05
8      Q.   Okay.  And the subject is       16:17:06
9  "forward April indirect suspicious order   16:17:09
10 monitoring reports."                       16:17:11
11         Did I read that correctly?        16:17:12
12     A.   Yes.                             16:17:13
13     Q.   Okay.  And then the date it was  16:17:14
14 sent was May 31, 2011; is that right?      16:17:16
15     A.   Correct.                         16:17:18
16     Q.   Okay.  And on -- I think we      16:17:19
17 already talked about who Debbie Digby was.  16:17:22
18 Karen Harper has been discussed.           16:17:25
19         Who is Suzanne Pea?               16:17:27
20     A.   I believe Suzanne Pea was        16:17:30
21 involved in chargebacks.                   16:17:37
22     Q.   Okay.  Was there a specific      16:17:38
23 department for chargebacks?                16:17:39
24     A.   There was a contract admin       16:17:40
25 team.                                      16:17:42

Page 299

1      Q.   Okay.                            16:17:42
2      A.   Contract administration.         16:17:42
3      Q.   And do you know who was part of  16:17:44
4  that team?                                 16:17:47
5      A.   Carol actually was.  I thought   16:17:47
6  she was customer service, but she was part of  16:17:53
7  the contract administration team.         16:17:56
8      Q.   Okay.  Do you recall anybody     16:17:57
9  else who was a member of that team?        16:17:58
10     A.   No.                              16:17:59
11     Q.   Okay.  And so here it looks      16:18:00
12 like "all attached are the April monthly SOM  16:18:02
13 reports."                                  16:18:05
14         SOM there stands for suspicious   16:18:07
15 order monitoring; is that right?           16:18:13
16     A.   Yes.                             16:18:13
17     Q.   And then it looks like there's   16:18:13
18 customer service -- or I'm sorry.  Number one  16:18:16
19 is customer sourcing of greater than two   16:18:18
20 distributors; two, state concentration     16:18:21
21 report; and three, summary report by       16:18:23
22 distributor compared to all products       16:18:25
23 distributed, one for oxy and one for hydro  16:18:27
24 APAP.                                      16:18:29
25         Did I read that correctly?        16:18:30

Page 300

1      A.   Yes.                             16:18:31
2      Q.   Okay.  And if you'll turn with   16:18:31
3  me then to the attachment, the one that ended  16:18:33
4  Bates number 1679 on the top.             16:18:37
5          Okay.  Now looking at the top     16:18:40
6  of this it says, "Customer sourcing oxy 15  16:18:49
7  and 30 from more than two distributors."   16:18:52
8          Did I read that correctly?        16:18:55
9      A.   Yes.                             16:18:57
10     Q.   Right there.  Yeah, and right     16:18:58
11 here at the top, if you look right there.  16:18:59
12     A.   It says, "Customer sourcing oxy  16:19:01
13 15, 30 from all distributors."             16:19:05
14     Q.   Oh, you're right.  It does.      16:19:06
15 That is correct.                           16:19:07
16         Did you create this document?     16:19:08
17     A.   No, I did not.                    16:19:09
18     Q.   Okay.  And were you responsible  16:19:11
19 for maintaining it?                        16:19:12
20     A.   No, I was not.                    16:19:13
21     Q.   Okay.  Did you use the           16:19:14
22 information that was contained within this  16:19:16
23 document to assist you with your -- to assist  16:19:20
24 you with your job duties?                  16:19:25
25     A.   No, I did not.                    16:19:27

Page 301

1      Q.   Okay.  And why did you receive   16:19:28
2  this information?                          16:19:29
3      A.   Just so I had general            16:19:30
4  knowledge.                                 16:19:33
5      Q.   Okay.  And why was it important  16:19:34
6  for you to have general knowledge?         16:19:36
7          MR. O'CONNOR:  Objection to       16:19:38
8      form.                                 16:19:38
9          THE WITNESS:  Most items that     16:19:39
10     affected the customers or the         16:19:41
11     products, I was part of the           16:19:45
12     information trail.                     16:19:46
13 QUESTIONS BY MS. HERZFELD:                 16:19:47
14     Q.   Okay.  And what do you mean,     16:19:47
15 "information trail"?                       16:19:49
16     A.   If there was any communication   16:19:49
17 about the customers or the products, so that  16:19:51
18 I wouldn't be blindsided, I would have that  16:19:55
19 information at some point.  They would share  16:19:57
20 that information with me.                   16:19:58
21         I also was part of the            16:19:59
22 peripheral that helped them understand     16:20:01
23 chargebacks, and so it may have been that  16:20:04
24 they need me to have knowledge of this report  16:20:06
25 in case they had further questions on it.  16:20:08

Page 302

1 But I was at that point no 16:20:10
2 longer involved in doing any assistance on 16:20:12
3 this level. This was Debbie. 16:20:14
4 Q. Okay. When you say "assistance 16:20:17
5 on this level," what do you mean? 16:20:19
6 A. Running these types of reports. 16:20:20
7 Q. Okay. Debbie was doing that? 16:20:22
8 A. Yes. 16:20:23
9 Q. Okay. And what was Debbie's 16:20:23
10 position? 16:20:25
11 A. She was a senior analyst. 16:20:25
12 Q. Okay. And so if you were 16:20:28
13 forwarded these reports, would you read them 16:20:30
14 and crunch the numbers? 16:20:32
15 MR. O'CONNOR: Objection to 16:20:34
16 form. 16:20:35
17 THE WITNESS: I have no idea 16:20:36
18 what I'd do with them, if I ever did 16:20:38
19 that. 16:20:41
20 QUESTIONS BY MS. HERZFELD: 16:20:41
21 Q. Okay. Do you know if someone 16:20:42
22 was responsible for looking at these reports 16:20:42
23 to make a determination if an order appeared 16:20:44
24 suspicious? 16:20:47
25 A. That would be suspicious order 16:20:47

Page 303

1 monitoring team. 16:20:52
2 Q. Okay. And so nobody ever told 16:20:52
3 you the purpose as to why you received this 16:20:54
4 report? 16:20:56
5 A. For information. 16:20:57
6 Q. Okay. And the information that 16:20:59
7 I have says you're the custodian of this 16:21:01
8 report. 16:21:03
9 Do you know why it's in your 16:21:03
10 custodian file? 16:21:04
11 A. I have no idea. I don't know 16:21:06
12 what they meant by that. 16:21:07
13 Q. Okay. Do you know when 16:21:10
14 Mallinckrodt began monitoring customers that 16:21:12
15 sourced from more than one distributor? 16:21:17
16 MR. O'CONNOR: Objection to the 16:21:20
17 form. 16:21:21
18 THE WITNESS: That was stated 16:21:21
19 earlier, that it was after Sunrise 16:21:24
20 Medical. 16:21:26
21 QUESTIONS BY MS. HERZFELD: 16:21:26
22 Q. Okay. But that didn't occur 16:21:26
23 before Sunrise Medical; is that correct? 16:21:28
24 A. No. 16:21:29
25 Q. Okay. 16:21:31

Page 304

1 A. Not within my group, it was 16:21:32
2 not. 16:21:35
3 Q. Okay. But you're familiar with 16:21:35
4 how to read chargeback data; is that correct, 16:21:36
5 ma'am? 16:21:41
6 A. It is not my expertise, but I 16:21:41
7 am familiar with it, yes. 16:21:43
8 Q. Okay. So if you'll switch with 16:21:44
9 me to the -- I'm sorry, there's no page 16:21:45
10 numbers here. 16:21:47
11 A. You can give me the line number 16:21:49
12 on the left. 16:21:51
13 Q. 2352 is the very bottom. This 16:21:52
14 one, actually, believe it or not, says 16:22:00
15 page 1. Right here it says page 1. Yep, 16:22:02
16 right there. 16:22:04
17 A. Here? Okay. 16:22:04
18 Q. Yep. 16:22:05
19 Okay. Do you see where I'm at? 16:22:06
20 A. Yes. 16:22:07
21 Q. Okay. So I will represent to 16:22:08
22 you that we've sorted this database that 16:22:11
23 we've received, this spreadsheet by 16:22:13
24 Tennessee, so I would let you know that this 16:22:15
25 has been sorted by Tennessee. 16:22:17

Page 305

1 Okay? 16:22:18
2 A. Okay. 16:22:19
3 Q. So looking at this, I just want 16:22:19
4 to go through and look at some of the numbers 16:22:22
5 here for Tennessee to see if I can understand 16:22:24
6 it. 16:22:27
7 If you could go with me, 16:22:28
8 please -- okay. So the first one on this 16:22:42
9 spreadsheet appears to be Lowe's Drug in 16:22:44
10 Maryville, Tennessee; is that correct? 16:22:48
11 A. Yes. 16:22:50
12 Q. Okay. And it has a ZIP code 16:22:51
13 there, and it says that it sold the apparent 16:22:53
14 customer name Cardinal Health. 16:22:57
15 Would that be the distributor? 16:22:58
16 A. Yes. 16:22:59
17 Q. Okay. And then it says, "gross 16:22:59
18 sales, 19,934.4." 16:23:01
19 Do you know if that's meant to 16:23:06
20 be dollars or units? 16:23:08
21 A. That's dollars. 16:23:09
22 Q. That's dollars. Okay. 16:23:11
23 And then it says, "DISP 16:23:12
24 units" -- I'm guessing that's dispensing 16:23:15
25 units -- "62,000." 16:23:19

Page 306

1  Do you know what the dispensing   16:23:19
2  units are here?   16:23:21
3      A.   That would be tablets.   16:23:21
4      Q.   Tablets. Okay.   16:23:22
5      And do you happen to know the   16:23:24
6  population of Maryville, Tennessee?   16:23:26
7      A.   I have no clue.   16:23:28
8      Q.   Okay. And then looking at the   16:23:31
9  next one, Food City in Knoxville, Tennessee,   16:23:34
10 DBS Trading, that's Masters Pharmaceuticals,   16:23:38
11 and then gross sales there at 8,068 and then   16:23:41
12 dispensing units 40,000; is that correct?   16:23:44
13     A.   Correct.   16:23:47
14     Q.   Okay. And so I guess I want to   16:23:48
15 make sure I really understand the chargeback   16:23:50
16 data.   16:23:52
17     Gross sales, is that how much   16:23:52
18 money Mallinckrodt gets after the chargeback?   16:23:56
19     A.   That is the sale -- yes, after   16:24:00
20 the chargeback, but not including any   16:24:04
21 rebates, fees, discounts or allowances.   16:24:07
22     Q.   Okay. Okay. So then if you'll   16:24:10
23 go with me the third one that is labeled 225,   16:24:13
24 Riggs Drugs in La Follette, Tennessee.   16:24:16
25 Cardinal Health, $10,855.84, and 38,000 DISP   16:24:19

Page 307

1  units, dispensing units.   16:24:27
2      Did I read that correctly?   16:24:29
3      A.   Yes.   16:24:30
4      Q.   Okay. Do you know what the   16:24:31
5  population is of La Follette, Tennessee?   16:24:33
6      A.   No.   16:24:36
7      Q.   Okay. And do you know if   16:24:38
8  someone was responsible for looking at the   16:24:38
9  population of these various locations?   16:24:41
10     MR. O'CONNOR: Objection to   16:24:43
11     form.   16:24:44
12     THE WITNESS: I don't know   16:24:44
13     anybody that would do that, that would   16:24:45
14     have time to do that.   16:24:49
15 QUESTIONS BY MS. HERZFELD:   16:24:50
16     Q.   Okay. Was that anything that   16:24:50
17 was ever discussed in a suspicious order   16:24:52
18 monitoring team meeting when you were   16:24:56
19 present?   16:24:59
20     A.   Not when I was --   16:24:59
21     MR. O'CONNOR: Objection.   16:25:00
22     Form.   16:25:01
23     THE WITNESS: Oh, I'm sorry.   16:25:01
24     Not when I was present.   16:25:01
25 QUESTIONS BY MS. HERZFELD:   16:25:01

Page 308

1      Q.   Okay. Did you ever hear of   16:25:02
2  anybody talking about, "Hey, maybe we should   16:25:03
3  be looking at different population numbers   16:25:06
4  for where pills are going"?   16:25:07
5      MR. O'CONNOR: Objection.   16:25:08
6      THE WITNESS: Not that I'm   16:25:09
7      aware of.   16:25:10
8  QUESTIONS BY MS. HERZFELD:   16:25:10
9      Q.   Okay. At any point in your   16:25:10
10 time at Mallinckrodt were you trained to   16:25:17
11 recognize various signs of diversion?   16:25:19
12     A.   The only thing that we were   16:25:21
13 made aware of is that -- if there were   16:25:24
14 unusually large orders or peculiar orders.   16:25:26
15     Q.   Okay. And how can you tell if   16:25:28
16 something is an unusually large order,   16:25:30
17 according to your training?   16:25:32
18     A.   From what -- I wouldn't have   16:25:34
19 visibility to the orders, so I wouldn't know   16:25:37
20 if something was an unusually large order or   16:25:39
21 suspicious -- I say "peculiar" only because   16:25:43
22 we used the word "peculiar" today. But it   16:25:46
23 would be if something was -- they were   16:25:49
24 ordering too frequently, too often, compared   16:25:50
25 to what they usually did. They were ordering   16:25:52

Page 309

1  too much. They were ordering not to the   16:25:54
2  levels that they said they used to purchase.   16:25:58
3      Q.   Okay. And that wasn't within   16:26:00
4  the purview of your responsibility to look   16:26:02
5  for those things?   16:26:03
6      A.   Correct.   16:26:04
7      Q.   Okay. Okay. Did they -- were   16:26:05
8  you taught while you were at Mallinckrodt   16:26:13
9  any other potential signs of diversion other   16:26:15
10 than frequency, I think you said, and volume?   16:26:17
11     MR. O'CONNOR: Objection to   16:26:20
12     form.   16:26:21
13     THE WITNESS: It wasn't in my   16:26:22
14     job, so they didn't need to teach me   16:26:25
15     that.   16:26:28
16 QUESTIONS BY MS. HERZFELD:   16:26:29
17     Q.   Okay. And I guess I would have   16:26:29
18 expected perhaps there would have been some   16:26:30
19 discussion of signs of diversion at the   16:26:32
20 suspicious order monitoring team meetings.   16:26:35
21     Did that not occur?   16:26:36
22     MR. O'CONNOR: Objection to   16:26:37
23     form.   16:26:38
24     THE WITNESS: I don't recall   16:26:38
25     everything that was discussed in the   16:26:40

Page 310

1    meetings. So I'm sure there was some   16:26:41
2    discussion; otherwise, I wouldn't have   16:26:43
3    recalled two items.   16:26:45
4    QUESTIONS BY MS. HERZFELD:   16:26:45
5    Q.   Okay.  Do you recall anybody   16:26:46
6    talking about potential signs of diversion   16:26:47
7    being a percentage of cash sales?   16:26:50
8    A.   No, I don't recall that.   16:26:53
9    Q.   Okay.  What about on a   16:26:56
10    concentration of pharmacies in a particular   16:26:59
11    area that are all high prescribing oxy   16:27:00
12    pharmacies, did anybody ever discuss that?   16:27:05
13    MR. O'CONNOR:  Objection.   16:27:07
14    Form.   16:27:08
15    THE WITNESS:  We wouldn't have   16:27:08
16    that information, nor would we have   16:27:09
17    the information about cash sales.   16:27:10
18    QUESTIONS BY MS. HERZFELD:   16:27:12
19    Q.   Okay.  And when you say "we   16:27:12
20    wouldn't have that information," who do you   16:27:14
21    mean by "we"?   16:27:16
22    A.   The marketing team.   16:27:17
23    Q.   The marketing team.  Okay.   16:27:18
24    But somebody else in   16:27:20
25    Mallinckrodt may have that information?   16:27:21

Page 311

1    A.   I have no idea.   16:27:22
2    Q.   Okay.   16:27:22
3    A.   I don't know how they would get   16:27:23
4    it.   16:27:24
5    Q.   Okay.  Okay.  Going back to our   16:27:24
6    chart here.  Okay.  So I think the last one   16:27:31
7    we talked about was the one in La Follette.   16:27:50
8    That's Riggs.   16:27:53
9    And then at 334 we have   16:27:53
10    Ripptoe, Inc., in Morristown, Tennessee. And   16:27:56
11    there it says, sold the apparent customer   16:27:59
12    number AmerisourceBergen Health 11,144.4,   16:28:02
13    dispensing units, 31,200.   16:28:08
14    Do you see where I'm at?   16:28:11
15    A.   Yes.   16:28:12
16    Q.   Okay.  And so that would be   16:28:12
17    gross sales, $10,855.84, and the units are   16:28:14
18    38,000; is that correct?   16:28:20
19    A.   Correct.   16:28:20
20    Q.   Okay.  And do you know what the   16:28:21
21    population of Morristown, Tennessee, is?   16:28:22
22    A.   I have no idea.   16:28:25
23    Q.   Okay.   16:28:26
24    A.   I don't even know what the   16:28:26
25    population of St. Louis is, so...   16:28:27

Page 312

1    (Mallinckrodt-Collier Exhibit   16:29:28
2    42 marked for identification.)   16:29:29
3    QUESTIONS BY MS. HERZFELD:   16:29:29
4    Q.   Okay.  Okay.  We'll mark the   16:29:29
5    next exhibit 42.  This is Bates   16:29:30
6    MNK-T1_0007251680.  Okay.  If you'll take a   16:29:42
7    look at this document for me, please.   16:29:56
8    Okay.  Do you recognize this   16:30:10
9    document?   16:30:11
10    A.   No, I do not.   16:30:12
11    Q.   Okay.  Do you think you've ever   16:30:13
12    seen it before?   16:30:14
13    A.   I may have.   16:30:15
14    Q.   Okay.  Do you know if you were   16:30:16
15    involved in creating it?   16:30:18
16    A.   I doubt that I was involved   16:30:19
17    creating it.   16:30:23
18    Q.   Okay.  Do you think perhaps you   16:30:24
19    had input into the chart at all?   16:30:25
20    A.   Possibly.  Someone on my team   16:30:27
21    might have had it.   16:30:34
22    Q.   Okay.  And this chart is   16:30:34
23    labeled "State concentration, oxy 15 and 30,   16:30:36
24    April 2011"; is that correct?   16:30:39
25    A.   Yes.   16:30:40

Page 313

1    Q.   Okay.  And so with this chart,   16:30:46
2    would this show that Mallinckrodt was   16:30:49
3    monitoring the percentage of each distributor   16:30:52
4    shipments going to the various states; is   16:30:55
5    that right?   16:30:57
6    MR. O'CONNOR:  Objection to   16:30:57
7    form.   16:30:58
8    THE WITNESS:  At this   16:30:58
9    particular -- on this particular   16:30:59
10    report, yes.   16:31:00
11    QUESTIONS BY MS. HERZFELD:   16:31:01
12    Q.   Okay.  And so included within   16:31:01
13    that question is, Mallinckrodt was monitoring   16:31:06
14    the percentage of each distributor's   16:31:08
15    shipments going to Tennessee, at least in   16:31:11
16    April of 2011, according to this chart; is   16:31:14
17    that correct?   16:31:16
18    MR. O'CONNOR:  Objection to   16:31:16
19    form.   16:31:19
20    THE WITNESS:  Correct.   16:31:20
21    QUESTIONS BY MS. HERZFELD:   16:31:21
22    Q.   Okay.  And how was this   16:31:21
23    document used by the indirect customer review   16:31:22
24    team, if at all?   16:31:23
25    A.   I'm not sure.   16:31:25

Page 314

1    Q.   Okay.  Do you know if          16:31:30
2  Mallinckrodt was seeking to reduce the    16:31:35
3  concentration of oxycodone in Florida?    16:31:37
4    A.   Yes.                   16:31:40
5    Q.   Okay.  Do you know if          16:31:42
6  Mallinckrodt was seeking to reduce the    16:31:45
7  concentration of oxycodone in Tennessee?   16:31:47
8    A.   I do not remember that being a    16:31:50
9  topic of discussion.              16:31:53
10    Q.   Okay.  Other than Florida, do   16:31:55
11  you recall any other states being a topic of  16:31:57
12  discussion for the target of the reduction of  16:31:59
13  oxycodone concentration by state?        16:32:03
14    A.   I don't recall that.           16:32:04
15    Q.   Okay.  Okay.  And in this       16:32:07
16  chart, do you know if population was       16:32:13
17  considered at all?                16:32:15
18        MR. O'CONNOR:  Objection to    16:32:17
19    form.                     16:32:19
20        THE WITNESS:  Most likely not,   16:32:20
21    because we wouldn't know the         16:32:21
22    population.                 16:32:23
23  QUESTIONS BY MS. HERZFELD:           16:32:23
24    Q.   You wouldn't know the          16:32:24
25  population of a state?             16:32:24

Page 315

1    A.   Yeah.  At any given time, no.    16:32:25
2        (Mallinckrodt-Collier Exhibit    16:32:36
3    43 marked for identification.)        16:32:36
4  QUESTIONS BY MS. HERZFELD:           16:32:36
5    Q.   Okay.  The next one is 43.      16:32:37
6        For those on the phone, it's     16:32:51
7    MNK-T1_0007251681.             16:32:55
8        The type is very small, so my    16:32:58
9    apologies for that.             16:33:22
10        Okay.  And so is this the --     16:33:42
11    what I've handed you, is this the -- the  16:33:43
12    similar type of chart, a state concentration  16:33:46
13    chart?                    16:33:50
14        MR. O'CONNOR:  Objection to    16:33:50
15    form.                     16:33:52
16        THE WITNESS:  Yes.          16:33:53
17  QUESTIONS BY MS. HERZFELD:           16:33:53
18    Q.   Okay.  And so looking at this    16:33:54
19  title here it says, "State concentration     16:33:55
20  hydro APAP, April 2010 data."          16:33:58
21        Did I read that correctly?       16:34:02
22    A.   Yes.                   16:34:03
23    Q.   Okay.  And hydro APAP is what?   16:34:03
24    A.   It's a Schedule II pain med --    16:34:06
25  a Schedule III pain medication at this time.   16:34:10

Page 316

1    Q.   Okay.  And so hydro APAP, is    16:34:11
2  that also hydrocodone?             16:34:14
3    A.   Yes.                   16:34:15
4    Q.   Okay.  And so looking at this    16:34:16
5  chart, is this a chart that you would have    16:34:18
6  had input in creating or maintaining?       16:34:22
7    A.   I would not have created this.    16:34:25
8  I might have had input, but I'm not sure I    16:34:28
9  did.                      16:34:31
10    Q.   Okay.                  16:34:31
11    A.   Because this was taken over by    16:34:32
12  suspicious order monitoring.           16:34:34
13    Q.   Okay.  But you were employed by   16:34:35
14  Mallinckrodt in April of 2010; is that      16:34:37
15  correct?                    16:34:38
16    A.   Yes, I was.               16:34:38
17    Q.   Okay.  And if you'll take a     16:34:39
18  look with me here, do you know if this chart  16:34:41
19  is created using chargeback data?        16:34:48
20    A.   I would assume so --          16:34:50
21    Q.   Okay.                  16:34:56
22    A.   -- yes.                 16:34:56
23    Q.   And so looking at this chart    16:34:56
24  here, if you go down with me to the line for  16:34:59
25  Tennessee, which is 51?             16:35:03

Page 317

1    A.   Yes.                   16:35:08
2    Q.   Okay.  And then you see the     16:35:08
3  various percentages.  I know it's kind of    16:35:09
4  hard to line up.                16:35:12
5        What are the -- do you know      16:35:13
6  what the percentages are indicating?       16:35:14
7    A.   My -- I don't know.  I'd have    16:35:18
8  to look at this more carefully because I'm    16:35:23
9  not sure.                   16:35:26
10    Q.   Okay.  But the percentages are   16:35:27
11  indicating something regarding each one of    16:35:29
12  these distributors; is that correct?       16:35:33
13        MR. O'CONNOR:  Objection to    16:35:35
14    form.                     16:35:36
15        THE WITNESS:  Yes.          16:35:37
16  QUESTIONS BY MS. HERZFELD:           16:35:39
17    Q.   It's broken out by distributor;   16:35:40
18  is that right?                 16:35:42
19    A.   Yes.                   16:35:42
20    Q.   Okay.  And so you have it      16:35:42
21  broken down by state and you have it broken  16:35:44
22  down by distributor in dealing with hydro    16:35:46
23  APAP in April of 2010; is that correct?     16:35:51
24    A.   Correct.                16:35:52
25    Q.   And it says based on units; is    16:35:52

Page 318

```
1   that right?                    16:35:55
2      A.   Yes.                    16:35:55
3      Q.   Okay.  And so if you look with   16:35:55
4   me at Tennessee, I want you to go over to   16:35:57
5   McKesson.  If you look at Tennessee and    16:35:59
6   McKesson in this itty-bitty little line, it   16:36:04
7   says 10.7 percent.                16:36:08
8      Do you see where I'm at?        16:36:09
9      A.   I don't see a 10.7.  I see    16:36:11
10  McKesson.                        16:36:17
11     Q.   Okay.  You see McKesson.     16:36:17
12     A.   Oh, I see it now.  I'm sorry, I   16:36:18
13  was on the wrong line.            16:36:20
14     Q.   Do you see it?            16:36:21
15     A.   Yes.                    16:36:21
16     Q.   Okay.  Do you know what that   16:36:22
17  10.7 represents for McKesson?        16:36:23
18        MR. BENSON:  Object to form.   16:36:23
19        THE WITNESS:  No, I do not,    16:36:24
20  because I don't know what those      16:36:25
21  percentages represent.            16:36:28
22        MS. HERZFELD:  I'm sorry, who   16:36:28
23  objected?                        16:36:30
24        MR. BENSON:  (Hand gestures.)   16:36:30
25        MS. HERZFELD:  Who are you?    16:36:31
```

Page 319

```
1         MR. BENSON:  Fred Benson for   16:36:33
2   McKesson.                        16:36:33
3         MS. HERZFELD:  You're from     16:36:34
4   McKesson.  Okay.                16:36:35
5         But I don't think you          16:36:35
6   cross-noticed this deposition, so I'm   16:36:36
7   going to object to your objection.   16:36:38
8   Okay?  You're not a party in our case.   16:36:40
9         MR. BENSON:  Fair enough.      16:36:43
10  QUESTIONS BY MS. HERZFELD:          16:36:44
11     Q.   Okay.  So 10.7.  Do you know   16:36:44
12  what that is in relation to McKesson, what   16:36:45
13  that 10.7 represents?              16:36:47
14     A.   No, because I don't know what   16:36:51
15  the percentages represent.          16:36:53
16     Q.   Could it be that that's      16:36:53
17  10.7 percent of McKesson's hydrocodone APAP   16:37:03
18  of April 2010 going to the state of   16:37:06
19  Tennessee?                      16:37:09
20        MR. O'CONNOR:  Objection to    16:37:09
21  form.                            16:37:10
22        THE WITNESS:  That would ask me   16:37:10
23  to guess, and I would make the       16:37:12
24  assumption you do not want me        16:37:14
25  guessing.                        16:37:16
```

Page 320

```
1   QUESTIONS BY MS. HERZFELD:          16:37:17
2      Q.   Okay.  But I would like to have   16:37:17
3   your guess because I think it's probably more   16:37:18
4   educated than mine in this matter.  I've   16:37:20
5   never seen these charts before.      16:37:22
6         So can you guess what you think   16:37:23
7   that these -- I'm just trying to understand   16:37:25
8   what it is.                      16:37:27
9         MR. O'CONNOR:  Objection to    16:37:28
10  form.                            16:37:29
11        THE WITNESS:  Okay.  Give me a   16:37:30
12  minute.  I'll calculate what these   16:37:33
13  percentages add up to --          16:37:34
14  QUESTIONS BY MS. HERZFELD:          16:37:36
15     Q.   Great.                  16:37:37
16     A.   -- and I might be able to come   16:37:38
17  up with something.                16:37:39
18     Q.   I might be able to shortcut it   16:37:40
19  for you a little bit.              16:37:41
20        If you look all the way at the   16:37:42
21  bottom, it has a grand total.  And it looks   16:37:45
22  like the bottom of every one is totaled up to   16:37:49
23  100 percent.                    16:37:52
24        Do you see?                16:37:52
25     A.   Yes.  Okay.              16:37:53
```

Page 321

```
1      Q.   So if you look at McKesson and   16:37:54
2   you look at Tennessee, and if you add all   16:37:57
3   those up, it gets to a hundred percent.   16:38:02
4         So I'm looking at this and      16:38:04
5   saying, is it that McKesson is 10.7 percent   16:38:07
6   of their sales of hydro APAP in April 2010   16:38:14
7   were in Tennessee based on this chart?   16:38:21
8         MR. O'CONNOR:  Object to form.   16:38:23
9         THE WITNESS:  That seems to be   16:38:24
10  the case.                        16:38:29
11  QUESTIONS BY MS. HERZFELD:          16:38:31
12     Q.   Okay.  Thank you.          16:38:31
13     A.   Uh-huh.                  16:38:32
14     Q.   Do you know anything          16:38:33
15  specifically or -- I'm going to back up.   16:38:45
16  Strike that.                    16:38:47
17        Do you know anything about the   16:38:48
18  sales of Mallinckrodt products to the VA?   16:38:49
19        MR. O'CONNOR:  Objection to    16:38:51
20  form.                            16:38:51
21        THE WITNESS:  No, I don't      16:38:52
22  recall.                          16:38:55
23  QUESTIONS BY MS. HERZFELD:          16:38:55
24     Q.   Okay.  Were you ever involved   16:38:55
25  in the sales of Mallinckrodt products to the   16:38:57
```

Page 322

```
 1   VA?                           16:38:59
 2       A.   No, I didn't have anything to    16:38:59
 3   do with sales.                 16:39:02
 4       Q.   Okay.  And when I say "VA," I    16:39:03
 5   mean Veterans Administration.        16:39:05
 6          Do you understand that?     16:39:06
 7       A.   Yes, I understood that.     16:39:07
 8       Q.   Do you know who would have been    16:39:08
 9   the person in charge of selling Mallinckrodt   16:39:10
10   products to the VA?            16:39:14
11       A.   Yes.  Rich McKendrick.     16:39:15
12       Q.   Okay.  And do you know if Rich    16:39:19
13   McKendrick is still employed by Mallinckrodt?  16:39:22
14       A.   No, he is not.          16:39:24
15       Q.   Okay.  Do you know where he --    16:39:25
16   if he is employed now?          16:39:27
17       A.   I don't know.           16:39:28
18       Q.   Okay.  Do you know if he        16:39:29
19   retired?                       16:39:37
20       A.   I don't know.           16:39:38
21       Q.   Okay.  Are you in touch with    16:39:39
22   Mr. McKendrick?                16:39:43
23       A.   Probably if I was, I would know   16:39:44
24   what he was doing.             16:39:46
25       Q.   Okay.                   16:39:47
```

Page 323

```
 1       A.   No.                     16:39:47
 2       Q.   Okay.  Very good.  Okay.     16:39:47
 3          If you give me just one second,   16:40:24
 4   I think I'm almost finished.        16:40:27
 5          Were you involved at all in      16:41:11
 6   creating a list of the 150 top pharmacies for   16:41:12
 7   Mallinckrodt?                  16:41:15
 8       MR. O'CONNOR:  Objection to       16:41:17
 9   form.                          16:41:18
10       THE WITNESS:  I don't know what    16:41:18
11   you're talking about, so I'd need to    16:41:19
12   see what you're discussing.         16:41:22
13       (Mallinckrodt-Collier Exhibit    16:41:23
14   44 marked for identification.)         16:41:23
15       MS. HERZFELD:  Okay.  I'm not     16:41:25
16   sure if we have made this one an    16:41:26
17   exhibit or not yet.  44.           16:41:32
18          For those on the phone, this is   16:41:44
19   MNK_TNSTA05098003.            16:41:47
20   QUESTIONS BY MS. HERZFELD:            16:41:47
21       Q.   So the title of this document    16:42:02
22   is "Top 150 pharmacies, oxy 30-milligram    16:42:04
23   only, 2009 to 2011 data combined."     16:42:07
24          Did I read that correctly?     16:42:10
25       A.   Yes.                    16:42:10
```

Page 324

```
 1       Q.   Okay.  And did you create this    16:42:12
 2   document?                      16:42:14
 3       A.   I did not.               16:42:14
 4       Q.   Okay.  Did you have any input    16:42:16
 5   in this document?                16:42:18
 6       A.   I did not.               16:42:18
 7       Q.   Okay.  This document is in your   16:42:20
 8   custodian file.                16:42:22
 9          Have you seen this document      16:42:22
10   before?                        16:42:23
11       A.   I do not remember seeing this.    16:42:24
12       Q.   Okay.  Well, you're listed as a    16:42:28
13   custodian for it, so do you know who would    16:42:29
14   have been the person who created this       16:42:32
15   document?                      16:42:33
16       A.   I'm not sure where this came     16:42:34
17   from, so, no.                  16:42:37
18       Q.   Okay.  Do you know if there was    16:42:38
19   routinely a list of top 150 pharmacies that    16:42:41
20   was kept?                      16:42:44
21       A.   No.                     16:42:44
22       Q.   Okay.                   16:42:46
23       A.   I don't know that either.       16:42:46
24       Q.   Okay.                   16:42:48
25       A.   If it was outside my area, I      16:42:48
```

Page 325

```
 1   wouldn't know if somebody was doing this on a   16:42:51
 2   regular basis.                 16:42:52
 3          And what does it mean that it's    16:42:54
 4   in my custodian?               16:42:55
 5       MS. HERZFELD:  There -- maybe I    16:42:58
 6   should have your lawyer explain that    16:43:00
 7   to you.                        16:43:01
 8       MR. O'CONNOR:  It simply means     16:43:02
 9   that it was identified as being in    16:43:04
10   your e-mail or electronic files.        16:43:06
11       THE WITNESS:  But not           16:43:10
12   necessarily generated by me?        16:43:11
13       MR. O'CONNOR:  Exactly right.     16:43:12
14   QUESTIONS BY MS. HERZFELD:            16:43:13
15       Q.   Okay.  But you've potentially    16:43:13
16   seen this e-mail before -- or this list    16:43:16
17   before?                        16:43:18
18       A.   Possibly.                16:43:18
19       MR. O'CONNOR:  Objection.        16:43:19
20       THE WITNESS:  Possibly.         16:43:19
21   QUESTIONS BY MS. HERZFELD:            16:43:20
22       Q.   Okay.  Do you know what this     16:43:20
23   was used for in your capacity at     16:43:21
24   Mallinckrodt?                  16:43:23
25       A.   I do not remember the document,   16:43:24
```

Page 326

1   so I would not remember what it was used for.  16:43:26
2     Q.   Okay.  Are you disputing that   16:43:36
3   you've ever received this document?   16:43:37
4     A.   No.    16:43:38
5     Q.   Okay.    16:43:40
6     A.   I just don't recall it.   16:43:40
7     Q.   Okay.  Okay.  Exhibit 45.   16:43:43
8       (Mallinckrodt-Collier Exhibit   16:44:10
9   45 marked for identification.)   16:44:10
10  QUESTIONS BY MS. HERZFELD:   16:44:10
11    Q.   Okay.  If you'll look at the   16:45:00
12  first page, do you recognize this document?   16:45:01
13    A.   I recognize it as being an   16:45:03
14  e-mail from Lisa Cardetti to me, yes.   16:45:08
15    Q.   Okay.  And is it dated   16:45:11
16  August 30, 2011?   16:45:13
17    A.   Yes.    16:45:13
18    Q.   Okay.  And in the e-mail it   16:45:14
19  says, "Ginger, as requested, I've looked at   16:45:16
20  past six months compared to the prior six   16:45:19
21  months of oxy sales by state."   16:45:21
22       Did I read that correctly?   16:45:22
23    A.   Yes.    16:45:23
24    Q.   Do you recall asking Lisa to do   16:45:23
25  this project?   16:45:27

Page 327

1     A.   I don't recall asking her to do   16:45:28
2  it, no.   16:45:31
3    Q.   Okay.  But she's clearly   16:45:32
4  responding to something, right?   16:45:33
5    A.   Right.    16:45:34
6       MR. O'CONNOR:  Objection.   16:45:35
7  QUESTIONS BY MS. HERZFELD:   16:45:36
8    Q.   And so looking at that, it   16:45:36
9  looks like -- if you look at the charts that   16:45:38
10  are attached here, the next couple, there are   16:45:40
11  various charts that are broken down by state;   16:45:45
12  is that correct?   16:45:47
13    A.   Yes.    16:45:47
14    Q.   Okay.  And it has to do with   16:45:48
15  prior six months and the past six months and   16:45:51
16  the percentage of change for oxy sales; is   16:45:53
17  that right?   16:45:56
18    A.   Yes.    16:45:56
19    Q.   Okay.  And so at least as of   16:45:58
20  the date of this e-mail, during this time,   16:46:01
21  Mallinckrodt was looking at the percentage   16:46:06
22  change of oxy sales state by state; is that   16:46:08
23  right?   16:46:11
24       MR. O'CONNOR:  Objection.   16:46:11
25  Form.   16:46:11

Page 328

1       THE WITNESS:  Maybe not state   16:46:12
2  by state.  The data were pulled.  That   16:46:13
3  does not mean that that's what we were   16:46:15
4  reviewing.   16:46:17
5  QUESTIONS BY MS. HERZFELD:   16:46:18
6    Q.   Okay.  I don't think I   16:46:18
7  understand your answer.   16:46:20
8       I'll back up.   16:46:20
9    A.   Okay.  Can you ask the question   16:46:21
10  a different way then?   16:46:22
11    Q.   Sure.    16:46:24
12       Okay.  So looking at this, it's   16:46:24
13  oxy -- it says attachments are sales by   16:46:26
14  state, August 30, 2011; is that right?   16:46:32
15    A.   Yes.    16:46:34
16    Q.   Okay.  And then, "Ginger, as   16:46:35
17  requested, I've looked at the past six months   16:46:39
18  compared to the prior six months of oxy sales   16:46:40
19  by state."   16:46:43
20       Did I state that correctly?   16:46:46
21    A.   Yes.    16:46:47
22    Q.   Okay.  And so looking at these   16:46:48
23  charts, it was looking at oxy sales by state;   16:46:49
24  is that right?   16:46:52
25    A.   Yes.    16:46:52

Page 329

1     Q.   Okay.    16:46:54
2    A.   That's what's in the chart.   16:46:54
3    Q.   Okay.  And the charts seem to   16:46:55
4  measure prior six months, past six months,   16:46:59
5  and then column F says percentage change.   16:47:01
6       I'm on the page ahead of you.   16:47:04
7  This one right here.   16:47:06
8    A.   Yes.    16:47:12
9    Q.   And so my question is actually   16:47:12
10  pretty simple.  So as of the date this e-mail   16:47:14
11  was sent, August 30, 2011, Mallinckrodt   16:47:18
12  monitored oxy sales by state?   16:47:22
13       MR. O'CONNOR:  Objection to   16:47:25
14  form.   16:47:26
15       THE WITNESS:  We pulled data by   16:47:26
16  state.  I wouldn't say we necessarily   16:47:29
17  monitored it because Lisa -- if she   16:47:31
18  referred to this, she wasn't looking   16:47:33
19  at many states.  She was looking at   16:47:35
20  Ohio, California, New York and   16:47:37
21  Florida, which were flagged for SLM.   16:47:40
22  QUESTIONS BY MS. HERZFELD:   16:47:41
23    Q.   Okay.  So then I will back up.   16:47:42
24  I will rephrase my question.   16:47:43
25    A.   Okay.    16:47:44

Page 330

1    Q.   So as of August 2011 when these   16:47:44
2  charts were sent to you from Lisa,        16:47:47
3  Mallinckrodt had the capability of monitoring   16:47:53
4  oxy sales by state?                       16:47:55
5         MR. O'CONNOR:  Objection to        16:47:56
6  form.                                      16:47:57
7         MS. HERZFELD:  What's the          16:47:58
8  objection?                                 16:47:59
9         MR. O'CONNOR:  Vague.  What        16:48:00
10  monitoring means, the capability.         16:48:02
11  QUESTIONS BY MS. HERZFELD:                16:48:07
12    Q.   Do you understand what            16:48:08
13  "capability" means, ma'am?                16:48:09
14    A.   The ability.                      16:48:10
15    Q.   Okay.  And do you understand      16:48:10
16  what "monitoring" means?                  16:48:11
17    A.   Well, it could mean any number    16:48:12
18  of things.  In the context of suspicious  16:48:15
19  order monitoring?  Or were we monitoring  16:48:18
20  those sales?  Which we were not.          16:48:19
21    Q.   Okay.  But my question wasn't     16:48:22
22  "were you."  That was my question before.  16:48:24
23         You said you only knew you were   16:48:26
24  monitoring some, right?                   16:48:28
25         So my question now is:  Did you   16:48:29

Page 331

1  have -- did Mallinckrodt have the         16:48:31
2  capability -- which we've determined you  16:48:32
3  understand what capability means.         16:48:33
4         Did Mallinckrodt have the          16:48:35
5  capability of monitoring -- let's use a   16:48:36
6  different word -- tracking sales of oxy by  16:48:39
7  state?                                     16:48:43
8         MR. O'CONNOR:  Objection to        16:48:44
9  form.                                      16:48:44
10         MS. HERZFELD:  What is the        16:48:45
11  objection?                                 16:48:45
12         MR. O'CONNOR:  Compound.          16:48:47
13  Vague.                                     16:48:49
14         MS. HERZFELD:  Okay.  We'll       16:48:50
15  back up and ask it again.                 16:48:51
16  QUESTIONS BY MS. HERZFELD:                16:48:53
17    Q.   I'm going to ask it in smaller    16:48:53
18  parts so we don't get a compound objection.  16:48:55
19  Okay?                                      16:48:57
20         Looking at this chart,            16:48:57
21  Mallinckrodt, here, according to this chart,  16:48:59
22  was monitoring sales -- I won't say       16:49:01
23  monitoring -- tracking sales by state; is  16:49:04
24  that correct?                              16:49:07
25         MR. O'CONNOR:  Objection to       16:49:07

Page 332

1  form.                                      16:49:08
2         MS. HERZFELD:  Okay.  I'm going    16:49:09
3  to back up one more time.                 16:49:10
4         MR. O'CONNOR:  Do you want to      16:49:11
5  just try that question again?  It was     16:49:12
6  because you stopped in the middle.        16:49:14
7         MS. HERZFELD:  You're objecting    16:49:16
8  because I stopped in the middle?          16:49:16
9         MR. O'CONNOR:  Because it          16:49:18
10  became unclear what the question was.    16:49:20
11         MS. HERZFELD:  Okay.  We'll be    16:49:22
12  really clear this time.                  16:49:23
13  QUESTIONS BY MS. HERZFELD:                16:49:24
14    Q.   As of the date that this e-mail   16:49:25
15  was sent to you, August 30, 2011,         16:49:28
16  Mallinckrodt was capable of tracking oxy  16:49:34
17  sales by state; is that correct?         16:49:37
18    A.   Mallinckrodt was capable of      16:49:40
19  running a report by state, yes.          16:49:42
20    Q.   Okay.  Do you not understand      16:49:45
21  what I mean when I say "tracking"?        16:49:47
22    A.   Tracking, to me, would indicate  16:49:49
23  it could be any number of things of what you  16:49:51
24  were asking.                              16:49:53
25    Q.   Okay.  So you don't understand   16:49:54

Page 333

1  the term "monitoring" because it can mean a  16:49:56
2  lot of things, and tracking seems like it  16:49:58
3  means a lot of things.                    16:50:01
4         So I just want to know:            16:50:01
5  According to this chart, there's 50 states on  16:50:03
6  this chart, correct?                      16:50:04
7    A.   Correct.                           16:50:06
8    Q.   And also the Virgin Islands, it   16:50:07
9  appears, and Puerto Rico, right?          16:50:10
10    A.   Yes.                              16:50:12
11    Q.   So looking at this, the data is  16:50:12
12  broken down by state; is that correct?   16:50:14
13    A.   Correct.                          16:50:15
14    Q.   Okay.  And the percentage        16:50:16
15  change of oxy sales is broken down per state;  16:50:17
16  is that correct?                          16:50:21
17    A.   Yes.                              16:50:21
18    Q.   Okay.  And this information       16:50:22
19  could have been pulled every month if    16:50:24
20  Mallinckrodt wanted to pull it as of August  16:50:26
21  2011; is that correct?                    16:50:29
22    A.   Yes.                              16:50:29
23         MS. HERZFELD:  Okay.  Take a      16:50:33
24  break.                                     16:50:34
25         VIDEOGRAPHER:  We are going off   16:50:34

Page 334

```
1    the record at 4:50 p.m.          16:50:35
2        (Off the record at 4:50 p.m.)    16:50:37
3        VIDEOGRAPHER:  We are back on    16:58:30
4    the record at 4:58 p.m.          16:58:31
5        REDIRECT EXAMINATION          16:58:36
6    QUESTIONS BY MR. GOTTO:          16:58:37
7        Q.   Ms. Collier, just a few    16:58:38
8    follow-up questions.              16:58:38
9        If you could look back at      16:58:39
10   Exhibit 45, the document you were just    16:58:40
11   looking at with Ms. Herzfeld.        16:58:44
12       A.   Oh, yes.                16:58:47
13       Q.   The e-mail.              16:58:48
14       My question -- the final        16:58:49
15   sentence of the first paragraph says, "The    16:58:53
16   other states that are increasing are    16:58:54
17   highlighted, Ohio, California and New York,    16:58:55
18   which are the same states that SOM    16:58:56
19   highlighted."                    16:58:59
20       Do you know what Ms. Cardetti    16:59:00
21   meant when she said those were the same    16:59:02
22   states that SOM highlighted?        16:59:04
23       A.   I'm not clear, but it's    16:59:05
24   possible that there was a discussion during    16:59:08
25   an SOM meeting about those particular states.    16:59:09
```

Page 335

```
1        Q.   Okay.  Was Ms. Cardetti part of    16:59:13
2    the SOM committee or any subcommittee?    16:59:18
3        A.   She was part of pulling data    16:59:19
4    for the meetings, for some of the meetings,    16:59:24
5    early on.  She was the one that helped with    16:59:27
6    some of the analytics --            16:59:29
7        Q.   Okay.                  16:59:34
8        A.   -- along with Kate Neely.    16:59:34
9        Q.   Okay.  And you've testified    16:59:36
10   about an indirect purchaser subcommittee of    16:59:37
11   the SOM committee.                16:59:39
12       Who else was on that          16:59:40
13   subcommittee; can you recall?        16:59:45
14       A.   I don't remember.          16:59:45
15       Q.   You don't remember anyone at    16:59:46
16   all?                          16:59:47
17       A.   No, I don't remember who was in    16:59:47
18   that.  It would have been people like the    16:59:49
19   Carol that was mentioned because she was in a    16:59:52
20   chargeback contract admin team, and so she    16:59:55
21   would have known about chargebacks.    16:59:58
22       Q.   Okay.  Do you recall there    16:59:59
23   being a time when the SOM function was moved    17:00:00
24   to a group known as CDIG?          17:00:02
25       MR. O'CONNOR:  Objection to    17:00:05
```

Page 336

```
1    form.                        17:00:07
2        THE WITNESS:  I don't remember    17:00:07
3    what CDIG stood for.  I thought that    17:00:09
4    was an acronym for sales reporting.    17:00:13
5    QUESTIONS BY MR. GOTTO:          17:00:15
6        Q.   Okay.  So you're not familiar    17:00:15
7    with CDIG as a function at Mallinckrodt?    17:00:16
8        A.   No, I don't remember.  And I    17:00:18
9    know that there was -- CDIG was used in some    17:00:20
10   of the memos, but I don't know what it stood    17:00:25
11   for.                          17:00:27
12       Q.   Okay.  Okay.  I just have a    17:00:27
13   couple more questions for you on some    17:00:29
14   documents.                    17:00:31
15       (Mallinckrodt-Collier Exhibit    17:00:40
16   46 marked for identification.)        17:00:40
17   QUESTIONS BY MR. GOTTO:          17:00:40
18       Q.   Exhibit 46 is a multipage    17:00:58
19   e-mail thread beginning at Bates    17:01:00
20   MNK-T1_0000368477, and it's a several-page    17:01:06
21   document.                      17:01:10
22       My only question for you        17:01:10
23   concerns your e-mail to Ms. Lundergan on    17:01:11
24   February 9th, the very top e-mail on the    17:01:15
25   second page.                  17:01:23
```

Page 337

```
1        A.   Okay.                  17:01:59
2        Q.   In your e-mail -- well, first,    17:02:00
3    the e-mail thread concerns resuming shipments    17:02:04
4    to KeySource, correct?            17:02:07
5        A.   Correct.                17:02:08
6        Q.   And this is in February      17:02:09
7    of 2011.                      17:02:12
8        On February 8th, Ms. Lundergan    17:02:12
9    asks you if you agree with the resumption,    17:02:20
10   and you say, "Yes, Karen Harper said we can    17:02:22
11   ship all of our approved distributors because    17:02:25
12   they performed the audits, and the      17:02:26
13   distributors complied with our requests.  We    17:02:28
14   are cutting off the suspicious pharmacies."    17:02:32
15       What did you mean by that when    17:02:34
16   you said, "we are cutting off the suspicious    17:02:38
17   pharmacies"?                  17:02:39
18       A.   That probably refers to where    17:02:40
19   we had pharmacies that were ordering from    17:02:42
20   more than one distributor, and we were    17:02:45
21   uncomfortable with them buying from multiple    17:02:48
22   distributors, and so we wouldn't allow    17:02:50
23   chargebacks anymore.              17:02:52
24       So basically we didn't cut off    17:02:52
25   the pharmacies; we cut off the payment    17:02:54
```

Page 338

1  mechanism for the wholesaler/distributor to   17:02:56
2  get their money back.                          17:02:58
3      Q.   Okay.  And when you said "they        17:02:59
4  performed the audits and the distributors      17:03:04
5  complied with our requests," who is the        17:03:06
6  "they" you're referring to in that sentence?   17:03:09
7      A.   Karen Harper and the SOM team.        17:03:10
8      Q.   Okay.  Okay.  You can put that        17:03:13
9  aside.                                         17:03:16
10         (Mallinckrodt-Collier Exhibit          17:03:17
11     47 marked for identification.)             17:03:18
12  QUESTIONS BY MR. GOTTO:                        17:03:18
13     Q.   Exhibit 48 {sic} is a multipage       17:03:52
14  document beginning at Bates                    17:03:58
15  MNK-T1_0000273249, and it appears to be a     17:04:05
16  spreadsheet that compiles information          17:04:07
17  concerning oxy 15 and 30 gross sales in        17:04:10
18  January 2011 time frame.                       17:04:17
19         Do you recognize this document?         17:04:18
20     A.   I recognize the content, yes.         17:04:21
21     Q.   Okay.  Is it a document that          17:04:24
22  you had involvement in preparing?              17:04:27
23     A.   Not that I recollect.                 17:04:29
24     Q.   Okay.  Or anyone on your team?        17:04:31
25     A.   Someone on my team might have         17:04:33

Page 339

1  done this.                                     17:04:35
2      Q.   Okay.  Do you know the purpose        17:04:36
3  of compiling this data back in early 2011?     17:04:37
4      A.   Just to understand, this might        17:04:42
5  have been part of removing it from their VIP   17:04:45
6  programs and understand what each of the       17:04:48
7  wholesalers were purchasing.                   17:04:50
8      Q.   Okay.  And the column A on the        17:04:51
9  first page, sold via parent/customer name,     17:05:02
10 what does that phrase mean, "parent/customer   17:05:05
11 name," in this context?                         17:05:10
12     A.   That's our customer that we          17:05:11
13 sold to, so it pulls the -- someone pulled     17:05:14
14 the chargeback data by who it was shipped      17:05:16
15 through.                                        17:05:18
16     Q.   Okay.  Okay.  You can set that       17:05:19
17 aside.                                          17:05:23
18     A.   Okay.                                 17:05:32
19         (Mallinckrodt-Collier Exhibit          17:05:32
20     48 marked for identification.)             17:05:32
21 QUESTIONS BY MR. GOTTO:                         17:05:32
22     Q.   Okay.  So to correct, the prior      17:05:51
23 document was Exhibit 47.                        17:05:56
24         This is Exhibit 48, which was a        17:05:57
25 document produced native under Bates           17:06:01

Page 340

1  MNK-T1_0000557439.                             17:06:03
2      If you can take -- this appears           17:06:10
3  to be an October 2010 compilation of           17:06:11
4  information regarding oxy 15 and 30 sales?     17:06:14
5      Do you recognize this document?           17:06:19
6      A.   I recognize the content, yes.        17:06:22
7      Q.   Okay.  And again, similar to         17:06:24
8  the Exhibit 47 we just looked at, is this      17:06:26
9  data that you or someone on your team          17:06:30
10 participated in compiling?                      17:06:33
11     A.   It appears it would be.              17:06:34
12     Q.   Okay.  And again, any insight        17:06:36
13 into the reason for the compilation of this    17:06:41
14 data?                                           17:06:43
15     A.   I'm not sure why we were             17:06:44
16 running this data on a regular basis, but it   17:06:49
17 was to understand who was selling most of our  17:06:51
18 product.                                        17:06:54
19     MR. GOTTO:  Okay.  I have no              17:07:02
20 further questions.  Thank you for your         17:07:02
21 time.                                          17:07:04
22     THE WITNESS:  Okay.  Thank you.           17:07:04
23     MR. O'CONNOR:  I have no                  17:07:06
24 questions.                                     17:07:07
25     MR. GOTTO:  All right.                    17:07:07

Page 341

1      VIDEOGRAPHER:  We are going off           17:07:08
2  the record at 5:07 p.m.                        17:07:10
3  (Deposition concluded at 5:07 p.m.)           17:07:11
4         - - - - - - -

| Page 342 |
| --- |

**CERTIFICATE**

1
2
3      I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
4   Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
5   of the examination, Ginger Collier was duly
sworn by me to testify to the truth, the
6   whole truth and nothing but the truth.
7      I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
8   testimony as taken stenographically by and
before me at the time, place and on the date
9   hereinbefore set forth, to the best of my
ability.
10
11      I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
12   nor counsel of any of the parties to this
action, and that I am neither a relative nor
13   employee of such attorney or counsel, and
that I am not financially interested in the
action.
14
15
16
17   CARRIE A, CAMPBELL, _____
NCRA Registered Diplomate Reporter
18   Certified Realtime Reporter
Notary Public
19   Dated: January 14, 2019
20
21
22
23
24
25

| Page 343 |
| --- |

**INSTRUCTIONS TO WITNESS**

1
2
3      Please read your deposition over
4   carefully and make any necessary corrections.
5   You should state the reason in the
6   appropriate space on the errata sheet for any
7   corrections that are made.
8      After doing so, please sign the
9   errata sheet and date it. You are signing
10   same subject to the changes you have noted on
11   the errata sheet, which will be attached to
12   your deposition.
13      It is imperative that you return
14   the original errata sheet to the deposing
15   attorney within thirty (30) days of receipt
16   of the deposition transcript by you. If you
17   fail to do so, the deposition transcript may
18   be deemed to be accurate and may be used in
19   court.
20
21
22
23
24
25

| Page 344 |
| --- |

**ACKNOWLEDGMENT OF DEPONENT**

1
2
3
4      I,_____, do
hereby certify that I have read the foregoing
5   pages and that the same is a correct
transcription of the answers given by me to
6   the questions therein propounded, except for
the corrections or changes in form or
7   substance, if any, noted in the attached
Errata Sheet.
8
9
10
11
12   _____
13   Ginger Collier          DATE
14
15   Subscribed and sworn to before me this
16   _____ day of _____, 20 _____.
17   My commission expires: _____
18
19   Notary Public
20
21
22
23
24
25

| Page 345 |
| --- |

1      _ _ _ _ _ _ _
       **ERRATA**
2      _ _ _ _ _ _ _
3   PAGE  LINE  CHANGE/REASON
4   _____ _____ _____
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____
25  _____ _____ _____

Page 346

```
 1          _ _ _ _ _ _ _
                LAWYER'S NOTES
 2          _ _ _ _ _ _ _
 3     PAGE  LINE
 4     ____  ____  _____
 5     ____  ____  _____
 6     ____  ____  _____
 7     ____  ____  _____
 8     ____  ____  _____
 9     ____  ____  _____
10     ____  ____  _____
11     ____  ____  _____
12     ____  ____  _____
13     ____  ____  _____
14     ____  ____  _____
15     ____  ____  _____
16     ____  ____  _____
17     ____  ____  _____
18     ____  ____  _____
19     ____  ____  _____
20     ____  ____  _____
21     ____  ____  _____
22     ____  ____  _____
23     ____  ____  _____
24     ____  ____  _____
25
```