```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4                      - - -

 5   IN RE:  NATIONAL            :

     PRESCRIPTION               :   MDL No. 2804

 6   OPIATE LITIGATION          :

     _____ :   Case No.

 7                              :   1:17-MD-2804

     THIS DOCUMENT RELATES      :

 8   TO ALL CASES               :   Hon. Dan A. Polster

 9                      - - -

10              HIGHLY CONFIDENTIAL

11      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12

                        - - -

13

14       Videotaped deposition of  ERIN M. COX, held at

15   the offices of Spangenberg Shibley & Liber LLP,

16   1001 Lakeside Avenue, Suite 1700, Cleveland, Ohio

17   44114, on January 17, 2019, commencing at

18   8:58 a.m., before Carol A. Kirk, Registered Merit

19   Reporter and Notary Public.

20

21                      - - -

22

23           GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

24               deps@golkow.com
```

| | Page 2 |
|---|---|

A P P E A R A N C E S:

On behalf of the Plaintiffs:
ROBBINS GELLER RUDMAN & DOWD LLP
BY: MARK J. DEARMAN, ESQUIRE
  mdearman@rgrd.com
  RICARDO J. MARENCO, ESQUIRE
  rmarenco@rgrd.com
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
561-750-3000

On behalf of Cardinal Health, Inc.
PORTER WRIGHT MORRIS & ARTHUR LLP
BY: JILL G. OKUN, ESQUIRE
  jokun@porterwright.com
950 Main Avenue, Suite 500
Cleveland, Ohio 44113
216-443-9000

On behalf of AmerisourceBergen Corporation:
JACKSON KELLY PLLC
BY: JILL MCINTYRE, ESQUIRE
  jmcintyre@jacksonkelly.com
500 Lee Street East, Suite 1600
Charleston, West Virginia 25301
304-340-1018

On behalf of Walmart:
JONES DAY
BY: CASTEEL BORSAY, ESQUIRE
  cborsay@jonesday.com
325 John H. McConnell Boulevard, Suite 600
Columbus, Ohio 43215-2673
614-469-3939

| | Page 3 |
|---|---|

On behalf of Endo Pharmaceuticals, Inc.,
Endo Health Solutions, Inc., Par Pharmaceutical, Inc.,
and Par Pharmaceutical Companies, Inc.:
ARNOLD & PORTER KAYE SCHOLER, LLP
BY: RYAN Z. WATTS, ESQUIRE
  ryan.watts@arnoldporter.com
601 Massachusetts Avenue, NW
Washington, DC 20001
202-942-5000

On behalf of Mallinckrodt:
ROPES & GRAY LLP
BY: ROCKY C. TSAI, ESQUIRE
  rocky.tsai@ropesgray.com
  ELISSA C. REIDY, ESQUIRE
  elissa.reidy@ropesgray.com
800 Boyleston Street
Boston, Massachusetts 02199
614-951-7000

ALSO PRESENT:
Frank Stanek, Videographer

| | Page 4 |
|---|---|

VIDEOTAPED DEPOSITION OF ERIN M. COX

INDEX TO EXAMINATION

| WITNESS | PAGE |
|---|---|
| ERIN M. COX | |
| CROSS-EXAMINATION BY MR. DEARMAN: | 9 |

| | Page 5 |
|---|---|

VIDEOTAPED DEPOSITION OF ERIN M. COX
INDEX TO EXHIBITS

| MALLINCKRODT-COX | DESCRIPTION | PAGE |
|---|---|---|
| Mallinckrodt-Cox 1 | Plaintiffs' Notice of Oral Videotaped Fact Depositions of Jane Williams, Susan Joliff, Erin Cox, and Kevin Becker, and Requests for Production of Documents | 18 |
| Mallinckrodt-Cox 2 | Resume for Erin M. Dunford, Bates-stamped MNK-T1_0007918544 through 7918547 | 28 |
| Mallinckrodt-Cox 3 | Letter to Ms. Dunford from Ms. LaPlante, dated April 5, 2010, Bates-stamped MNK_T1_0007918510 through 7918515 | 41 |
| Mallinckrodt-Cox 4 | Letter to Ms. Cox from Ms. Jordan, dated March 24, 2014, Bates-stamped MNK_T1_0007918506 and 7918507 | 52 |
| Mallinckrodt-Cox 5 | E-mail to Ms. Cox from Ms. Terp, dated 5/10/2013, with attached 50602-Rx Push Report, Bates-stamped MNK-T1_0002403648 and 2403649 | 74 |
| Mallinckrodt-Cox 6 | Excel spreadsheets, Bates-stamped MNK-T1-0000090455 | 78 |

Page 6

INDEX TO EXHIBITS (CONT'D)

MALLINCKRODT-COX DESCRIPTION PAGE

Mallinckrodt-Cox 7  E-mail chain ending with an e-mail to Ms. Dunford from Ms. Dunford, dated 3/17/2011, with attached 30305_E4217981_1 report attached, Bates-stamped MNK-T1_0048114994   88

Mallinckrodt-Cox 8  Report dated from 10/1/2013 through 6/5/2014, Bates-stamped MNK-T1-0000089991   93

Mallinckrodt-Cox 9  E-mail to Mr. Boehms and others from Mr. Becker, dated 10/18/2013, with attached One Mallinckrodt workshop slides attached, Bates-stamped MNK-T1_0001014384   102

Mallinckrodt-Cox 10  E-mail to Mr. Dress from Ms. Cox, dated 8/22/2014, with attached updated TAP-Lorain report, Bates-stamped MNK-T1_0002078593 and 2078594   113

Mallinckrodt-Cox 11  E-mail to Mr. Breseman and others from Mr. Dress, dated 5/5/2014, Bates-stamped MNK-T1_0004748035   116

Mallinckrodt-Cox 12  E-mail to Ms. Cox from Mr. Dress, dated 5/30/2014, with attached 2014 Mid-Year Performance Discussion Guide, Bates-stamped MNK-T1_0001013251 through 1013254   120

Page 7

INDEX TO EXHIBITS (CONT'D)

MALLINCKRODT-COX DESCRIPTION PAGE

Mallinckrodt-Cox 13  E-mail to Mr. Becker from Ms. Cox, dated 11/20/2013, Bates-stamped MNK-T1_0004800768 and 4800769   131

Mallinckrodt-Cox 14  Document titled "Pain Management pocketcard Set," Bates-stamped MNK-T1_0002183040 through 2183043   136

Mallinckrodt-Cox 15  E-mail chain ending with an e-mail to Mr. Burd from Mr. Wessler, dated 5/29/2008, with attachment, Bates-stamped MNK-T1_002248914 through 2248926   138

Page 8

---

P R O C E E D I N G S

---

THE VIDEOGRAPHER:  We are now on the record.  My name is Frank Stanek.  I am a videographer for Golkow Litigation Services.  Today's date is January 17, 2019, and the time is 8:58 a.m.

This deposition is being held in Cleveland, Ohio in Re of National Prescription Opiate Litigation for the United States District Court, Northern District of Ohio, Eastern Division.  The deponent is Erin Cox.

Will counsel please identify themselves.

MR. DEARMAN:  Mark Dearman, Ricardo Marenco, from Robbins Geller for Plaintiffs.

MR. TSAI:  Rocky Tsai, Ropes & Gray, for the witness, Ms. Cox, and for Mallinckrodt LLC.

MS. REIDY:  Elissa Reidy, Ropes & Gray, for the witness Erin Cox and for

Page 9

Mallinckrodt LLC.

MS. OKUN:  Jill Okun for Cardinal Health.

MS. BORSAY:  Casteel Borsay from Jones Day on behalf of Walmart.

THE COURT REPORTER:  On the phone?

MS. McINTYRE:  Jill McIntyre, Jackson Kelly, for AmerisourceBergen.

MR. WATTS:  And this is Ryan Watts with Arnold & Porter on behalf of Endo Health Solutions, Inc., Endo Pharmaceuticals, Inc., Par Pharmaceutical, Inc., and Par Pharmaceutical Companies, Inc.

THE VIDEOGRAPHER:  The court reporter is Carol Kirk and will now swear in the witness.

---

ERIN M. COX

being by me first duly sworn, as hereinafter certified, deposes and says as follows:

CROSS-EXAMINATION

BY MR. DEARMAN:

Q.  Good morning.

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1     A.   Good morning.

2     Q.   My name is Mark Dearman. We met

3 before the depo started. I'm going to ask you

4 some questions today.

5     What is your full name?

6     A.   My name is Erin Marie Cox.

7     Q.   Okay. And what is your business

8 address?

9     A.   ████████████████████

10   ████

11     Q.   Is that also your residential

12 address?

13     A.   It is.

14     Q.   Okay. What is your current

15 occupation?

16     A.   I am a territory manager.

17     Q.   For whom?

18     A.   BioDelivery Sciences.

19     Q.   Have you ever testified at a

20 deposition or other proceeding?

21     A.   I have not.

22     Q.   Okay. So although your counsel

23 probably explained some of this to you, I'm

24 going to give you some of the ground rules. I'm

Page 11

1 going to ask you questions, which you need to

2 answer orally. From time to time we shake our

3 head yes or no or we go "mm-hmm" or "huh-uh,"

4 but that won't give us a clear record. So if

5 you would answer orally and out loud, I would

6 appreciate it.

7     If you answer a question that I

8 ask you, I'm going to assume that you understood

9 it. So if you don't understand one of my

10 questions, which is likely to happen, just say,

11 "Mark, I don't understand the question," and

12 I'll go ahead and rephrase it, okay?

13     A.   Okay.

14     Q.   There will be some -- there

15 possibly will be some objections from your

16 counsel during the deposition, and so unless

17 your counsel instructs you not to answer a

18 question, after the objection, you're required

19 to answer the question. Okay?

20     A.   Okay.

21     Q.   Is there any reason that you can't

22 give your full and accurate testimony today?

23     A.   There is not.

24     Q.   Okay. Are you represented at this

Page 12

1 deposition?

2     A.   I am.

3     Q.   And by who?

4     A.   Rocky Tsai and Elissa Reidy from

5 Ropes & Gray.

6     Q.   And do you have a representation

7 agreement with Ropes & Gray?

8     A.   I do.

9     Q.   Okay. And is that a written

10 representation agreement?

11     A.   It is.

12     Q.   Okay. And do you have a copy of

13 that with you here today?

14     A.   I do not.

15     Q.   Okay. Are you familiar with the

16 term "diversion"?

17     A.   I am.

18     Q.   And what is your understanding of

19 the term "diversion"?

20     A.   The misuse of a product taken or

21 distributed for unintended purposes.

22     Q.   How about "suspicious order

23 monitoring," have you heard that term? SOM?

24     A.   I've never heard that term.

Page 13

1     Q.   Okay. How about "suspicious

2 order"?

3     A.   I've never heard that term.

4     Q.   "Peculiar order"?

5     A.   Again, I've never heard that term.

6     Q.   "Order of interest"?

7     A.   Never heard that term.

8     Q.   How about the terms "educate and

9 inform"?

10     A.   Yes, I'm familiar.

11     Q.   Okay. Can you please give me your

12 familiarity with the terms, together, "educate"

13 and "inform"?

14     A.   Educate and inform in relation to

15 what?

16     Q.   You tell me.

17     A.   My current role, as it stands, is

18 to educate and inform healthcare providers of

19 the benefits of my current product. I get -- my

20 job is to stay compliant and ethically on label

21 and provide my accounts with information to the

22 best of my ability.

23     Q.   Would you say that educate and

24 inform is an important part of your current job?

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1     A.   It is, yes.

2     Q.   Okay. And would you, at your

3 current job, have received training with regard

4 to how to educate and inform?

5     A.   Yes, I do.

6     Q.   And in what format did that

7 training come, at your current position?

8     A.   My current position with

9 BioDelivery?

10     Q.   Yes, ma'am.

11     A.   Webinars, conference calls, live

12 in-person training.

13     Q.   Were you provided -- from your

14 current employer, were you provided with any

15 materials that would instruct you and assist you

16 in how to properly educate and inform?

17     A.   Yes.

18     Q.   Okay. So the terms "educate" and

19 "inform" are familiar to you?

20     A.   They are.

21     Q.   And those terms were familiar to

22 you -- they're familiar to you in your current

23 job as a territory manager, correct?

24     A.   They are, correct.

Page 15

1     Q.   Are you familiar with what a pain

2 card is?

3     A.   A pain card? No, I'm not.

4     Q.   How about a pocket card?

5     A.   I've never heard of pocket card.

6     Q.   Pocket guide?

7     A.   A pocket guide? No, I've never

8 heard that.

9     Q.   You current -- do you currently

10 interact with doctors or physicians, healthcare

11 professionals in your current position?

12     A.   Yes, I currently do.

13     Q.   And previous to this position, did

14 you do that?

15     A.   I did, yes.

16     Q.   And did you do that at

17 Mallinckrodt?

18     A.   I did, yes.

19     Q.   Okay. Have you ever told a doctor

20 that opioids aren't addictive?

21     A.   I've never told a doctor an opioid

22 is not addictive.

23     Q.   Have you ever told doctors that

24 you targeted that -- that addiction rarely

Page 16

1 occurs unless there's a history of abuse?

2     A.   No, I have never made a comment

3 like that.

4     Q.   Did you ever tell doctors, that

5 you were dealing with, to always ask about a

6 patient's pain and to accept the patient's

7 report of pain?

8     A.   Not that I can recall have I ever

9 had that type of dialogue with a provider.

10     Q.   Have you ever provided any doctors

11 that you were dealing with with information,

12 written information, indicating that opioids

13 aren't addictive?

14     A.   I was never instructed or had a

15 conversation with a doctor to talk about the --

16 how an opioid can -- is not addictive, no.

17     Q.   Okay. Did you ever talk to

18 doctors about opioids being addictive?

19     A.   I've always talked to doctors

20 about the risks associated with opioids, as

21 stated in the black box on all of my products.

22     Q.   All right. And my question was a

23 little bit different. I'm not asking you

24 whether you actually verbally told a doctor

Page 17

1 that. I'm asking you whether or not you had

2 ever provided a doctor with a written material

3 provided by your current employer or any

4 employer, which indicated that addiction rarely

5 occurs unless there's a history of abuse.

6     A.   I've never -- no, that's not --

7 no.

8     Q.   Ever provided documents, written

9 documents or materials, to doctors telling them

10 that -- to always ask a patient about pain and

11 to accept the patient's report of pain?

12     A.   That -- that type of dialogue has

13 never -- that was never part of my current

14 training or my previous training. That would --

15 that type of conversation would not have come

16 up. That is not a common dialogue we would have

17 had.

18     Q.   Okay. And you would not have

19 provided written materials to that extent to any

20 of the doctors that you were dealing with,

21 correct?

22     A.   As far as I can recall, I've never

23 provided any written materials.

24        - - -

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    (Mallinckrodt-Cox Exhibit 1 marked.)
2         - - -
3  BY MR. DEARMAN:
4      Q.   I'm going to show you what we're
5  going to mark as Exhibit Number 1, which is the
6  notice.
7           Have you seen this document before
8  today?
9      A.   I have, yes.
10     Q.   Okay.  When is the first time
11 you've seen this document?
12     A.   Yesterday.
13     Q.   Where did you see this document?
14     A.   At Hahn Loeser.
15     Q.   Where?
16     A.   At another law firm.
17     Q.   Okay.  What did you do to prepare
18 for this deposition?
19     A.   I met with my attorneys.
20     Q.   And when did you do that?
21     A.   The end of November and yesterday.
22     Q.   So two times?
23     A.   Two times.
24     Q.   In addition to meeting with your

Page 19

1  attorneys, have you spoken to your attorneys by
2  telephone?
3      A.   I have not.
4      Q.   Okay.  The end of November, where
5  was it that you met?
6      A.   At Hahn Loeser.
7      Q.   And who did you meet with?
8      A.   Rocky and Elissa.
9      Q.   Was there anybody else present at
10 that meeting?
11     A.   There was not.
12     Q.   How long did that meeting go for?
13     A.   Four to five hours.
14     Q.   Okay.  Did you bring any documents
15 to that meeting?
16     A.   I did not.
17     Q.   Were any documents provided to you
18 at that meeting?
19     A.   They were.
20     Q.   Okay.  Did any of those documents
21 refresh your recollection as to any of the
22 issues?
23     A.   Yes.
24     Q.   Which documents or what type of

Page 20

1  documents refreshed your recollection as to any
2  of the issues?
3           MR. TSAI:  I'll just instruct the
4      witness not to reveal any specific
5      documents that were compiled and
6      discussed with counsel.  You can talk
7      about general categories.  Go ahead.
8      Q.   And again, to be clear, I'm only
9  asking you about -- I'm not asking you about all
10 the documents you looked at, just the ones that
11 refreshed your recollection.
12          MR. TSAI:  Same instruction.
13     A.   General sales aids.
14     Q.   What is a "sales aid"?
15          (Reporter clarification.)
16          THE WITNESS:  Sales aids.
17     A.   The standard marketing piece that
18 we used in the field.  It had been almost ten
19 years since I had seen it, so, of course, it
20 refreshed my memory a bit of the products.
21     Q.   And were there more than one
22 marketing piece, or when you refer to
23 "standard," there was sort of one?
24     A.   Really only one that stands out.

Page 21

1      Q.   And what was that document called?
2      A.   I don't remember.
3      Q.   Was it a PowerPoint?  Was it an
4  e-mail?  What kind of document was it?
5      A.   Not a PowerPoint.  It was just a
6  photocopy of our aids that we used.
7      Q.   Okay.  And what were the purpose
8  of the aids?
9      A.   What were the purpose of the aids
10 during my employment with Mallinckrodt?
11     Q.   Yeah.
12     A.   To have a visual when speaking
13 with providers on education.
14     Q.   Is it something that you would
15 bring with you to meetings with doctors or
16 healthcare professionals?
17     A.   It was, yes.
18     Q.   Is it a document that you would
19 provide to healthcare professionals?
20     A.   No.  These weren't things we left
21 behind.
22     Q.   Okay.  Was this in paper format or
23 was it on an iPad or --
24     A.   It was on both.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 22

1    Q.   Okay.  Any other documents that
2  you looked at that refreshed your recollection?
3    A.   Not in particular, no.
4    Q.   Did you review any e-mails?
5       MS. McINTYRE:  I'm sorry to
6    interrupt, but we don't have realtime,
7    and we can't hear the witness.
8       (Pause in proceedings.)
9       THE VIDEOGRAPHER:  On the record,
10   9:31.
11 BY MR. DEARMAN:
12   Q.   When we took a break, we were
13 talking about what you did to prepare for the
14 deposition, and you talked about that first
15 meeting with your attorneys at the end of
16 November.  Was there a second meeting?
17   A.   Yes, yesterday.
18   Q.   Okay.  And where did that occur?
19   A.   Hahn Loeser.
20   Q.   And how long did that occur --
21 take place for?
22   A.   About four hours.
23   Q.   And who was present?
24   A.   Elissa and Rocky.

Page 23

1    Q.   Okay.  And, again, were you -- did
2  you bring any documents to that meeting?
3    A.   No, I did not.
4    Q.   Were you shown documents?
5    A.   I was, yes.
6    Q.   Okay.  And did any of those
7  documents refresh your recollection relating to
8  any of the issues in the case?
9    A.   They did not.
10   Q.   Going back to Exhibit 1, which is
11 the notice of taking deposition, I believe you
12 testified that you saw this yesterday for the
13 first time?
14   A.   I did, yes.
15   Q.   If you turn to page 5 of the
16 document and you look at the bottom where it
17 says "Documents to be produced," did you bring a
18 current copy of your resumé with you today?
19   A.   I did not.
20   Q.   If you look at request number 2,
21 did you search for -- we'll start with, did you
22 look for "documents, including electronic data,
23 e-mail in your possession related any way to any
24 Defendants' manufacture, marketing, sale,

Page 24

1  distribution, suspicious order monitoring and
2  lobbying efforts in connection with its opioid
3  business"?
4    A.   I did not.
5    Q.   You currently work out of your
6  house?
7    A.   Yes.  Theoretically, out of my
8  car, but yes.
9    Q.   Okay.  But do you have an office
10 in your house?
11   A.   I do.
12   Q.   And just so the record is clear,
13 did you look at -- did you look through any of
14 your documents or computers or any of your
15 electronic devices to see whether you had any
16 materials responsive to number 2?
17   A.   I did not have any materials from
18 my previous employer.
19   Q.   And how do you know that?
20   A.   I looked -- I -- everything was
21 destroyed and given back once I resigned.
22   Q.   Okay.  Did you look for them,
23 though?
24   A.   I did look for them knowing that

Page 25

1  there -- to double check there was nothing
2  there.
3    Q.   Okay.  When did you do that?
4    A.   In November.
5    Q.   Why did you do that?
6    A.   I believe my attorneys told me if
7  I had anything, to hold on to it, and I did not
8  have anything pertaining to the case.
9    Q.   Did you speak with any other
10 Mallinckrodt current or former employees about
11 this deposition?
12   A.   I did.
13   Q.   Who?
14   A.   Susan Jolliff.
15   Q.   When did you speak to Susan?
16   A.   Before the holidays.
17   Q.   Was that after or before her
18 deposition?
19   A.   Before, I believe.
20   Q.   Did she call you?  Did you call
21 her?  How did that come to be?
22   A.   I don't remember.  She's a friend
23 of mine.  We speak regularly.
24   Q.   Did you talk to her about this

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  deposition?
2      A.   I did not.
3      Q.   Did she talk to you about the
4  deposition?
5      A.   She did not.
6      Q.   Okay.  Do you know -- did you know
7  that she was deposed in this case?
8      A.   I did.
9      Q.   How did you find that out?
10     A.   I saw her name on this document.
11     Q.   So you noted that yesterday?
12     A.   No.  I learned it a few weeks ago.
13     Q.   Okay.
14     A.   And confirmed it yesterday.
15     Q.   And how did you learn it a few
16  weeks ago?
17     A.   I think I had asked her if she
18  was -- if she got called from the Mallinckrodt
19  attorneys.
20     Q.   And what did she say?
21     A.   She did, but that was -- we ended
22  the conversation.
23     Q.   Why did you end the conversation?
24     A.   Because we figured we shouldn't be

Page 27

1  talking about it.
2      Q.   Why not?
3      A.   My husband is an attorney and told
4  me not to talk about it.
5      Q.   Did you talk to your husband about
6  the --
7      A.   I did not.
8      Q.   So one of the other rules, which I
9  forgot to mention, is that you may know a
10  question that I'm going to ask.  It may be
11  predictable --
12     A.   Sure.
13     Q.   -- and you may know, but it's
14  important, again, for us to get a clear record
15  that you let me ask the entire question and I'll
16  let you give your entire answer, okay?
17     A.   Okay.
18     Q.   All right.  It's completely
19  natural in conversation, but for the depo we
20  just need to get a clear record.
21     A.   Okay.
22     Q.   Did you have any conversation with
23  your husband about the depo today?
24     A.   I did not.

Page 28

1      Q.   Okay.  Does he know you're at a
2  depo today?
3      A.   He does.
4      Q.   Okay.  And when did he tell you
5  that you shouldn't talk to Susan about the depo?
6      A.   As soon as I got a call from
7  Mallinckrodt.
8      Q.   And was that before or after you
9  spoke to Susan?
10     A.   I don't recall.
11     Q.   Okay.  Do you keep in touch with
12  anybody else from Mallinckrodt?
13     A.   I do not.
14     Q.   And did you work with Susan?
15     A.   I did.
16     Q.   In what --
17     A.   We were just on the same team.  I
18  only saw her a few times a quarter, if that, but
19  our territories were separate.
20             - - -
21     (Mallinckrodt-Cox Exhibit 2 marked.)
22             - - -
23  BY MR. DEARMAN:
24     Q.   I'm going to show you what I'm

Page 29

1  going to mark as Exhibit 2.  Some of the
2  documents are going to have numbers at the
3  bottom called Bates numbers.
4      A.   Okay.
5      Q.   So I may refer to those numbers,
6  but it's just to clarify what pages I'm looking
7  at.  And this is 8544 through 8547.
8             Have you seen this document
9  before?
10     A.   I have.
11     Q.   What is it?
12     A.   This is an old copy of my resumé.
13     Q.   With the exception of adding your
14  experience at Mallinckrodt and your current
15  employer, is there any information that's
16  missing off of this resumé?
17     A.   No, not that I can tell.
18     Q.   Okay.  If you turn to the -- to
19  page 8546 -- and there may be some blank pages,
20  but that's just the way it was introduced to us.
21  I don't know if you -- but if you turn to the
22  bottom -- it doesn't have a page number but
23  where it says "8546" at the bottom.
24     A.   Yeah.

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  Q.   Your education is listed there?
2  A.   It is.
3  Q.   Where did you go to college?
4  A.   Kent State.
5  Q.   And what did you study there?
6  A.   Health science.
7  Q.   Other than the education, which is
8  reflected in this document, did you -- have you
9  received any formal education elsewhere?
10  A.   I have not.
11  Q.   After you graduated from college,
12  talking now about work experience, what did you
13  do?
14  A.   I worked for Lincare for a little
15  over a year.  I sold respiratory devices.
16  Q.   And what were your duties and
17  responsibilities selling those devices?
18  A.   Cultivating relationships with
19  healthcare professionals, educating them on the
20  respiratory devices.
21  Q.   Did you receive training at
22  Lincare?
23  A.   I did.
24  Q.   In what format?

Page 31

1  A.   Sales training.  It was called --
2  a two-week sales training.
3  Q.   And what was the course called?
4  A.   I think it was called -- it began
5  with a C.  It might be on there.  CPQ or
6  something.  I don't really recall.
7  Q.   Okay.  And --
8  A.   QP3.  That was it, QP3.
9  Q.   Is that reflected here or you just
10  recall it?
11  A.   It is, yeah.  No.  It's right
12  there.
13  Q.   Okay.  What is QP3?
14  A.   I don't remember.
15  Q.   Okay.  And what was your territory
16  while at Lincare?
17  A.   The west side of Cleveland.
18  Q.   Anywhere else?
19  A.   No.  I don't remember.  I don't --
20  I think it was just the west side of Cleveland.
21  Q.   Why did you leave Lincare?
22  A.   I was offered another position.
23  Q.   So you voluntarily left?
24  A.   I did.

Page 32

1  Q.   Who was your direct report at
2  Lincare, if you know?
3  A.   I believe it was Robin Rawlings.
4  Q.   On the bullet points, it indicated
5  that you achieved monthly sales goals for
6  medical devices and respiratory medications.  So
7  were there goals that were provided to you by
8  Lincare?
9  A.   I believe there were goals.  I
10  don't recall.
11  Q.   Were there any scheduled
12  medications while you were at Lincare that you
13  were responsible for?
14  A.   No.  I only sold respiratory
15  devices.
16  Q.   Okay.  It says "and respiratory
17  medications," so ...
18  A.   Yeah.  It -- that was just part of
19  the -- we didn't have any direct sale with --
20  and any -- you needed our device in order to
21  access the medication.
22  Q.   In one of the bullets, the third
23  one says, "Develop new relationships with
24  potential referral sources."

Page 33

1  What does that mean?
2  A.   Worked with hospitals and
3  respiratory therapists to increase referrals for
4  our product.
5  Q.   Referrals to whom or --
6  A.   To Lincare and then they would set
7  the patient up with the device.
8  Q.   Okay.  The next one is, "Hosted
9  informational lunches with physicians, hospital
10  staff and other decision makers about Lincare's
11  products and services."
12  A.   Mm-hmm.
13  Q.   What does that mean?
14  A.   It's a lunch and learn to go over
15  the features and benefits of the products,
16  answer any questions.
17  Q.   Is lunch and learn a -- is that a
18  term of art?
19  A.   Yeah.
20  Q.   Okay.
21  A.   It's a common term.
22  Q.   At those luncheons, did you ever
23  have other physicians or speakers?
24  A.   No.  It would just be myself and,

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 you know, the physician who would be attending
2 learning about the product.
3     Q.   Are you familiar with the term
4 "key opinion leader"?
5     A.   I am.
6     Q.   What is your familiarity with that
7 term?
8     A.   It's a physician or well-respected
9 PharmD who works in collaboration with the
10 company to provide expert opinion, clinical
11 information, peer-to-peer discussions.  Real
12 life patient discussions.
13     Q.   Did you ever work with any key
14 opinion leaders?
15     A.   In what context?
16     Q.   At Mallinckrodt.
17     A.   I did.
18     Q.   Okay.  And do you recall the names
19 of the key opinion leaders?
20     A.   Dr. Bharat Shah.
21     Q.   Anybody else?
22     A.   He's the only one I worked with in
23 my territory.
24     Q.   Okay.

Page 35

1     A.   He was in Lorain County, which was
2 the bulk of my territory, so ...
3     Q.   Okay.  And then you left Lincare
4 to go to where?
5     A.   JSJ Pharmaceuticals.
6     Q.   And why did you leave Lincare?
7     A.   I was looking for a different
8 opportunity and I was offered it at this
9 company.
10     Q.   Okay.  And where was it that you
11 worked for JSJ?
12     A.   I covered the Cleveland, Akron,
13 Canton, Toledo, Columbus market, Youngstown, I
14 believe, yeah.
15     Q.   And who was your direct report
16 while there?
17     A.   Karen Savage.
18     Q.   And how long were you there?  It
19 says 2008 to --
20     A.   Yeah, 2010.
21     Q.   Okay.  And were your duties and
22 responsibilities pretty much the same between
23 2008 and 2010?
24     A.   They were.

Page 36

1     Q.   And what were your duties and
2 responsibilities?
3     A.   Promoted the products to
4 dermatologists and podiatrists, educated and
5 informed healthcare professionals on the variety
6 of products we carried.  Yeah.  Managed -- I was
7 a territory manager.  All of the products we had
8 were dermatology.
9     Q.   Okay.
10     A.   Everything was a topical.  I
11 didn't sell a pill.  Everything was a topical
12 component.  There was a topical lotion, film,
13 things like that.
14     Q.   Did you receive training?
15     A.   I did.
16     Q.   And what would that -- what did
17 that training consist of?
18     A.   A one-week training in Charleston.
19     Q.   And what was the point of the
20 training?  What was it you learned?
21     A.   To learn the features and benefits
22 of the different products.
23     Q.   You used the term "educate and
24 inform."  Was that also the terminology that you

Page 37

1 used while at JSJ?
2     A.   Sure.  Yes.
3     Q.   And would they also have provided
4 you with materials that talked about education
5 and -- educate and inform?
6     A.   They would, yes.
7     Q.   And were those materials to be
8 provided to the healthcare professionals you
9 dealt with or just for you?
10     A.   It was always, as far as I can
11 recall, for my own information and training, not
12 to be shared with providers.
13     Q.   Was that the first time that the
14 terminology -- that you became familiar with
15 that terminology, "educate and inform"?
16     A.   I believe so.
17     Q.   Would that have been the first
18 time, at least, that you had received actual
19 written materials from an employer that talked
20 about educating and informing?
21     A.   As far as I can recall, yes.
22     Q.   And would the materials that you
23 had received from JSJ, would those have been
24 similar -- not the content, but the types of

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  materials that you would have received from
2  Mallinckrodt with regards to educate and inform?
3        MR. TSAI: Object to the form.
4        Go ahead.
5     A.  That's apples and oranges. These
6  were skin conditions. It was vastly different.
7     Q.  Okay. But to be clear, you would
8  have received written materials from
9  Mallinckrodt during your term there which talked
10 about educate and inform, correct?
11    A.  That's correct.
12    Q.  Your compensation at JSJ, was
13 there a salary?
14    A.  There was a salary.
15    Q.  Was there a bonus program?
16    A.  There was.
17    Q.  Okay. And how was the bonus
18 computed?
19    A.  We were paid on a draw, so it was
20 a quarterly draw depending on what you brought
21 into the territory. I don't remember the
22 specifics. It was a convoluted bonus program, I
23 think by design.
24    Q.  Yeah. Let me ask you this way.

Page 39

1  If the healthcare professionals that you were --
2  if I say "targeting," do you -- are you familiar
3  with that?
4     A.  I am.
5     Q.  All right. If it was -- if the
6  healthcare professionals that you were targeting
7  purchased more product, more JSJ product, would
8  you receive more of a bonus?
9     A.  The physicians never purchased any
10 product from us.
11    Q.  Okay. If the physicians who you
12 targeted wrote prescriptions to patients who
13 filled prescriptions for JSJ products, would
14 that reflect in your bonus?
15    A.  It depended on -- the answer is
16 yes, however, there was more to it. It had to
17 do with attainment to goal and things like that.
18 And truly, I don't remember the specifics of
19 this bonus plan. I remember it being
20 complicated.
21    Q.  Okay. If doctors that you had
22 been targeting your territory wrote less
23 prescriptions month over month over month, would
24 you -- would your bonus increase?

Page 40

1     A.  It would not.
2     Q.  Okay. Why is it you left JSJ?
3     A.  They went out of business. We all
4  left JSJ.
5     Q.  Okay. And then from JSJ, where
6  did you go?
7     A.  I went to Mallinckrodt, which was
8  then Covidien.
9     Q.  Okay. I'm going to refer to it as
10 Mallinckrodt; is that okay?
11    A.  That's fine.
12    Q.  All right. And how long were you
13 at Mallinckrodt?
14    A.  A month after I left JSJ. So I
15 think it was April 2010 until September --
16 August, September of 2014.
17    Q.  All right. Did you know anybody
18 at Mallinckrodt before going over there?
19    A.  I didn't know anyone.
20    Q.  How is it that you became aware of
21 a position at Mallinckrodt?
22    A.  A recruiter. I submitted my
23 resumé as I was looking for a job, and a
24 recruiter contacted me about an opening in

Page 41

1  Cleveland.
2     Q.  Okay. And what position were you
3  hired in?
4     A.  I was hired in the Cleveland west
5  territory.
6        - - -
7     (Mallinckrodt-Cox Exhibit 3 marked.)
8        - - -
9  BY MR. DEARMAN:
10    Q.  I'm going to show you what I'm
11 going to mark as Exhibit 3, which is Bates range
12 8510 through 8515.
13       Are you familiar with this
14 document?
15    A.  I am, yeah.
16    Q.  Okay. It indicates that you were
17 offered, back in April of 2010, a pharmaceutical
18 sales specialist position --
19    A.  Mm-hmm.
20    Q.  -- in the specialty
21 pharmaceuticals business. Does that sound
22 accurate?
23    A.  It is.
24    Q.  Okay. It refers to your salary of

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 ▮▮▮ annualized?

2     A.  Mm-hmm.

3     Q.  Underneath that first paragraph it

4 talks about "variable compensation," and it says

5 you that -- it says that you will be eligible to

6 participate in the sales incentive compensation

7 program, the SICP?

8     A.  Yes.

9     Q.  The SCIP, was that the bonus

10 program?

11     A.  As far as I can remember, yes.

12     Q.  What were your duties and

13 responsibilities as a -- well, first, who did

14 you report to when you started as a

15 pharmaceutical sales specialist?

16     A.  Kevin Becker, the re -- district

17 manager, I think, at the time was his title.

18     Q.  Were there other sales specialists

19 that reported to Kevin?

20     A.  There was probably a team of ten.

21     Q.  Okay.  What was your -- I know you

22 probably mentioned it already, but what was your

23 territory when you started?

24     A.  My territory when I started was --

Page 43

1 and it remained the same throughout my tenure

2 there, Cleveland west, which was mostly Lorain

3 County, and parts of Cuyahoga County.  The

4 Lorain County portion would have been Lorain,

5 Elyria, Oberlin, Avon, Avon Lake.  And Cuyahoga

6 County would have been Westlake and a portion of

7 Cleveland.

8     Q.  Did your territories change from

9 2010 to 2014?

10     A.  My territory never changed.

11     Q.  Did your duties and

12 responsibilities, while you were at Mallinckrodt

13 from 2010 to 2014, change during that period of

14 time or did they remain the same?

15     A.  They remained the same.

16     Q.  Okay.  And what were your duties

17 and responsibilities?

18     A.  I was responsible for the

19 promotion of Pennsaid and Exalgo mostly.

20     Q.  And when you say "mostly," were

21 there other --

22     A.  Yeah.  We had two products,

23 Sumavel DosePro and Duexis, that we promoted for

24 a very short period of time.  Part of it was

Page 44

1 when I was on maternity leave, so I didn't have

2 much -- it was a very short period of time.

3     Q.  What kind of attorney is your

4 husband?

5     A.  A corporate capital markets

6 attorney.

7     Q.  Does he litigate, if you know?

8     A.  He does not.

9     Q.  Was this the first time that

10 you -- well, when you got to Mallinckrodt, were

11 you involved with products that were controlled

12 substances?

13     A.  I was, yes.

14     Q.  And which of the products that you

15 were responsible for were controlled substances?

16     A.  I was responsible for Exalgo and

17 Pennsaid.  Exalgo was the Schedule II

18 medication.

19     Q.  That was the only Schedule II

20 medication that you were responsible for?

21     A.  It was.

22     Q.  What was Pennsaid?

23     A.  Oh, I'm sorry.  And Xartemis.

24     Q.  Okay.

Page 45

1     A.  I was only there for a few months

2 during Xartemis and then I left and went to a

3 different company.

4     Q.  Okay.

5     A.  I usually -- I forget that I

6 even -- was even a part of that.

7     Q.  All right.  So Exalgo and XXR were

8 the two Schedule IIs?

9     A.  They were.

10     Q.  All right.  What was Pennsaid?

11     A.  A topical NSAID for osteoarthritis

12 of the knee.

13     Q.  Would you agree that there is an

14 opioid epidemic in this country?

15     A.  I would agree there is an opioid

16 epidemic.

17     Q.  Would you agree that there has

18 been an opioid epidemic for some time in this

19 country?

20     A.  There has, yes.

21     Q.  How far back would you say that

22 there's been an opioid epidemic, in your

23 opinion?

24     A.  I can't really say.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 46

1    Q.   Okay.  Would you say 2000?
2    A.   Probably 2000- -- probably 2005.
3    Q.   Are you familiar with the term
4  "CSA"?
5    A.   CS -- I am not familiar with that
6  term.
7    Q.   Are you familiar with the term
8  "Controlled Substances Act"?
9    A.   Not really, no.
10   Q.   Okay.  What -- "not really" leads
11  me to believe that maybe --
12   A.   I may have heard it, but I don't
13  know what it is, yeah.
14   Q.   Okay.  Did you receive any
15  training at Mallinckrodt regarding the
16  Controlled Substances Act?
17   A.   We received a lot of training at
18  Mallinckrodt.  I really can't -- it would have
19  been during -- the bulk of my training would
20  have been in 2010.  I'm sure it included the
21  CSA.  I can't really remember what any of that
22  is, though.
23   Q.   Okay.  Why are you sure that your
24  training back in 2010 would have included the

---

Page 47

1  CSA?
2    A.   We had a two-week very
3  comprehensive training program with PharmDs,
4  along with a national sales meeting that was
5  very comprehensive.  We received a lot of
6  training.
7    Q.   I asked you earlier if you were
8  familiar with the Controlled Substances Act and
9  you said "not really, no."  So again,
10  notwithstanding your current answer, what was it
11  that leads you to believe -- or what is it that
12  leads you to believe that back in 2010 you would
13  have received training on the Controlled
14  Substances Act?
15   A.   We received a lot of training, a
16  lot of different training.  There were a lot of
17  things going on.  REMS programs, Cares Alliance
18  programs.  I can't recall specifically CSA, but
19  we were -- we were well trained.
20   Q.   Okay.  And so I appreciate your
21  response, but, again, do you know whether or not
22  you received training on the Controlled
23  Substances Act back in 2010?
24   A.   I can't recall it.

---

Page 48

1    Q.   Okay.  Did you ever become aware
2  while you were at Mallinckrodt that Mallinckrodt
3  had a duty to monitor and implement a system to
4  identify suspicious orders?
5    A.   No.  I was not part of that.  I
6  was only the commercial side.  We had no part in
7  ordering of any type of product.
8    Q.   So you were not aware of that
9  duty?
10   A.   I was not aware of that duty.
11   Q.   Were you aware of a duty to
12  maintain effective controls against diversion?
13   A.   I was not.  That's not -- that was
14  not part of my job responsibilities.
15   Q.   Was detecting diversion part of
16  your job responsibility?
17   A.   It was not.
18   Q.   Are you aware there's a case
19  pending against pharmaceutical manufacturers and
20  distributors involving the opioid crisis?
21   A.   Just from what my attorneys have
22  shared with me.  That's all I know.
23   Q.   Okay.  Other than what your
24  attorneys provided you, do you have any

---

Page 49

1  knowledge of the existence of the litigation?
2    A.   I don't, no.
3    Q.   We talked about the training that
4  you received.  So there was training when you
5  started at Mallinckrodt?
6    A.   There was.
7    Q.   And where did that training take
8  place?
9    A.   St. Louis, Missouri.
10   Q.   And how long was that training?
11   A.   I believe the first round was two
12  weeks, maybe a week.  I can't really specify,
13  but it was over a week.
14   Q.   Okay.  And how about -- since you
15  said "first round," I'm assuming there was a
16  second round?
17   A.   Yeah.  We had training throughout,
18  which was another week, and then every time we
19  got together at national sales meetings, a --
20  the bulk of that -- that week would be spent
21  reviewing and retraining and updating us on
22  different themes in the industry, making sure
23  we're staying informed, compliant.  Yeah.
24   Q.   And when you say "themes," what do

---

Page 50

1 you mean by "themes"?

2     A. If there had been any changes to,

3 you know -- if there were certain medications

4 that were no longer available, we would be, you

5 know, informed of, you know, why they weren't

6 available or things like that.

7     Q. And that would be referred to as a

8 theme?

9     A. I mean, not -- they would

10 probably -- I'm just calling it a theme. That's

11 just sort of ...

12     Q. The first week training that you

13 received, was it classroom-type training?

14     A. It was.

15     Q. Did you receive materials from

16 Mallinckrodt?

17     A. A binder, I believe, yes.

18     Q. Do you know who performed the

19 training?

20     A. The training department.

21     Q. Okay. Were there other

22 pharmaceutical sales specialists in that

23 training?

24     A. There were.

Page 51

1     Q. Were there other employees other

2 than pharmaceutical sales, or was this just for

3 pharmaceutical sales?

4     A. It was just for the sales team,

5 new sales members.

6     Q. Future training that you

7 mentioned, additional training after that first

8 week, was there any training that would be done

9 on a computer or a Mallinckrodt portal, like a

10 website where you'd sign in?

11     A. There were. There were

12 different -- there were lots of different

13 opportunities to engage us in training. I do

14 believe there was a portal. I can't recall the

15 specifics of it, but there were opportunities

16 to, you know, gain our commitment to staying on

17 label, refreshing our memory, just making sure

18 that we're staying compliant with what was on

19 label for both products.

20     Q. Do you own any Mallinckrodt stock?

21     A. I do not.

22     Q. Does your husband own any

23 Mallinckrodt stock?

24     A. He does not.

Page 52

1     Q. Did your position ever change

2 from -- I understand your duties and

3 responsibilities were constant, but did your

4 position change from that initial position?

5     A. I think I was given like a

6 different title. I went from like sales

7 representative to sales specialist, something

8 like that, over a period of time, but my duties

9 and responsibilities never changed.

10     - - -

11     (Mallinckrodt-Cox Exhibit 4 marked.)

12     - - -

13     Q. Let me show you Exhibit Number 4,

14 which is Bates range 8506, 8507.

15     It mentions -- this letter -- are

16 you familiar with this letter, March 24, 2014?

17     A. Yeah, I'm -- sure.

18     Q. All right. Do you know who Tamara

19 Jordan is?

20     A. I don't.

21     Q. Okay. Field sales specialist,

22 would that have been your second title at

23 Mallinckrodt?

24     A. I believe so, yes.

Page 53

1     Q. Again, duties and responsibilities

2 are the same?

3     A. Correct.

4     Q. You were reporting to Kevin Becker

5 before. Are you still reporting to Kevin Becker

6 at this point?

7     A. I am.

8     Q. Who's Tim Dress?

9     A. Tim Dress is -- he was a colleague

10 of mine and he was the district manager. I

11 would have reported to him for a short period of

12 time before I left Mallinckrodt.

13     Q. Okay. Currently it's still Kevin

14 Becker, though?

15     A. At my new company, it's Kevin

16 Becker, yes. Currently, yeah, my current

17 company.

18     Q. Okay. So the company that you're

19 at now, the new company, Kevin Becker is your --

20     A. Yes.

21     Q. Okay. But while you were a field

22 sales specialist, it was also Kevin Becker?

23     A. It was.

24     Q. Okay. And here it talks about

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 your salary of $████ and you were also
2 participating in the bonus program as well?
3     A.   I was.
4     Q.   Now, you worked in the -- for the
5 sales group, correct?
6     A.   I do.
7     Q.   Was there a marketing group?
8     A.   I believe there was, yes.
9     Q.   Did you have any interaction with
10 the marketing group?
11     A.   No.
12     Q.   And was one of your
13 responsibilities in this sales group to know who
14 your competitors were?
15     A.   It was.
16     Q.   And why was that one of your
17 responsibilities?
18     A.   Our -- we were responsible for
19 knowing the competitive landscape so we could,
20 you know, stay informed and, you know, know who
21 the competition was, what they offered, and how
22 they were different from our products.
23     Q.   Would you agree that OxyContin CR
24 and Opana ER were your main competitors?

Page 55

1     A.   I would say our main competitor
2 was Opana ER.
3     Q.   Was there any generic competition?
4     A.   Not that I can recall.
5     Q.   Do you know whether -- you're
6 familiar with Purdue?
7     A.   Vaguely.  I just know that they're
8 the maker of OxyContin.
9     Q.   Did you become aware that they
10 were forced to withdraw that product?
11     A.   At some point, I do know they
12 withdrew from the market.
13     Q.   Do you know why?
14     A.   I don't.  And I -- I do -- and
15 then I'm aware they reentered with a
16 reformulation.  But that's really the extent.
17     Q.   During your time at Mallinckrodt,
18 and with respect to the generic product line,
19 are you aware of what Mallinckrodt's market
20 share was?
21     A.   I have no idea.  I had no
22 knowledge of the generic market at all.
23     Q.   How about the branded?
24     A.   As far as market share, that

Page 56

1 wasn't something that was shared to us -- shared
2 with us.
3     Q.   Are you familiar with the term
4 "abuse deterrents"?
5     A.   I am.
6     Q.   How would you describe that or
7 explain that?
8     A.   An abuse deterrent medication, to
9 me, would be a medication that would be
10 difficult to compromise the integrity of the
11 chemical in order to use it for unintended
12 purposes.
13     Q.   Were you aware that -- while you
14 were at Mallinckrodt, were you aware that
15 opioids were being used for unintended purposes?
16     A.   I was.
17     Q.   How did you become aware of that?
18     A.   Physicians would tell me.
19     Q.   Healthcare professionals that you
20 dealt with?
21     A.   Yes, nurses -- yeah, nurses,
22 doctors.
23     Q.   Are you aware what the -- then let
24 me ask you, tamper resistant, are you familiar

Page 57

1 with that term?
2     A.   I am, yes, yes.
3     Q.   So what's the -- what is "tamper
4 resistant"?
5     A.   Again, it would be, to me, a
6 product that would be more difficult for a
7 patient to have unintended consequences.
8     Q.   So what's the difference, then,
9 between abuse deterrents and tamper resistant,
10 if you know?
11     A.   I don't really know.
12         MR. WATTS:  Objection to form.
13     Q.   Did any of the products that you
14 were responsible for at Mallinckrodt have any
15 embedded type components within the drug that
16 would not allow a euphoric result?
17     A.   No.  No.  That was -- the -- it
18 was -- Exalgo, from what I remember, had a black
19 box warning, stated very clearly that it wasn't
20 a product that could be abused.  The only way we
21 could market it was the PK graph that showed the
22 steady plasma levels in the blood, and, you
23 know, the doctor could go, you know, and make
24 their own conclusions from that data.

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    Q.   Were you aware as to whether or
2 not any of Mallinckrodt's competitors had an
3 opioid that had a component within it, a drug
4 within the opioid that would not permit
5 extraction or to produce a euphoria?
6    A.   I believe Embeda had a product
7 like that.
8    Q.   Okay.  During your time at
9 Mallinckrodt, did you become aware that some of
10 the healthcare professionals became concerned
11 with diversion and how pills could be diverted?
12    A.   Yeah.  I mean, doctors would
13 sometimes share concerns with them -- with us,
14 yes.
15    Q.   All right.  And who at
16 Mallinckrodt would you report those concerns to,
17 if anyone?
18    A.   So I can only speak for my
19 territory.
20    Q.   Understood.
21    A.   I didn't have any providers that,
22 you know, mentioned to me that they believe
23 their patients were, you know, taking the drug
24 not as intended.  I do believe there was a --

Page 59

1 there was a system in place that you could
2 report these things.  But, again, my territory,
3 the majority of it was the Cleveland Clinic,
4 who's very above board, and that was never
5 something I encountered.
6    Q.   So when you said sometimes doctors
7 would share concerns with us, you didn't mean
8 with you?
9    A.   You know, it would -- it would be
10 a concern, but it was not -- nothing to the
11 point where I would -- they would say, "I need
12 to do something about it."  It was never like
13 that.
14    Q.   So they would share concerns but
15 those were not concerns that you felt were
16 necessary to report?
17    A.   Correct.  And it never pertained
18 to my drug.  It would be to, you know, their
19 patient population.
20    Q.   What do you mean by that?
21    A.   If they were concerned about
22 short-acting medications or -- you know, I was
23 only selling a long-acting medication, which
24 operates very differently than a short-acting.

Page 60

1 They felt -- and it still is believed -- that
2 short-acting medications provide more
3 opportunity for abuse.
4    Q.   Part of your training, did it
5 include how to report things like that, should
6 one of your doctors have a concern about
7 diversion in one of your products?
8    A.   Yes.
9    Q.   Okay.  And what was the process in
10 place?
11    A.   I do remember every quarter we
12 would have a spreadsheet where we could input
13 the physician information and we could then
14 submit it and we could -- we had -- essentially
15 report physicians that we didn't believe were
16 doing the right thing.
17        Again, I didn't have that in my
18 territory.  And it should be noted, I mean, my
19 territory -- when we started selling these
20 products, the goal was balanced selling, half
21 Exalgo, half Pennsaid.  I had a very small
22 territory.  As it went on, there was not a large
23 Exalgo market for me.  At one point I was
24 selling Pennsaid 70/30 to Exalgo.

Page 61

1        I was deemed a Pennsaid territory.
2 I had a lot of orthopedic surgeons, a lot of
3 sports management providers.  My bonus was often
4 composed of my Pennsaid sales.  I was never
5 forced to seek out this Exalgo business, because
6 it just didn't exist in this part of the
7 territory.
8    Q.   Okay.  Were you aware, though,
9 that it existed in other territories?
10    A.   Was I aware that what existed?
11    Q.   The Exalgo business.
12    A.   Yes, other territories that had
13 more of a 50/50, yes.
14    Q.   Do you know why your territory was
15 more Pennsaid?
16    A.   Territory dynamics.  I just -- the
17 way the territory was cut.  I had a lot of
18 people that, you know -- we were running a
19 business, and from -- you know, it was -- in
20 order for me to keep my job, I needed to sell
21 the product that I had the most opportunity to
22 do so, and that was Pennsaid.
23    Q.   Did you remain a field sales
24 specialist until the time that you left?

Highly Confidential - Subject to Further Confidentiality Review

---

Page 62

1    A.   I did.

2    Q.   Are you familiar with the term

3 "pseudo addiction"?

4    A.   I am not, no.

5    Q.   "Opioid phobia"?

6    A.   No, I've never heard that.

7    Q.   What was the primary role -- or

8 your primary role as a sales rep?

9    A.   My primary role was to educate and

10 inform healthcare professionals and their staff

11 on the use, the risk, the benefit, and the

12 safety of our products.

13    Q.   Would you also agree that it is to

14 educate doctors and position the product versus

15 competitors' products?

16    A.   We were to educate them on our

17 product.  We were not -- we did not have the

18 liberty to talk about the competition.  It was

19 for our own personal knowledge.

20    Q.   So had you ever told any of the

21 healthcare professionals the differences between

22 your product and competitors' products?

23    A.   I did not, no.  Not that I can

24 ever recall.

---

Page 63

1    Q.   Was your primary responsibility or

2 one of your primary responsibilities to grow

3 your market or your territory?

4    A.   My responsibility was to increase

5 prescriptions of Pennsaid and Exalgo.

6    Q.   As a sales rep, did you have an

7 understanding of the number of pills being

8 prescribed to patients?

9    A.   In relation to what?  Exalgo or

10 standard prescriptions?

11    Q.   Well, we can start with Exalgo.

12    A.   It would have been a 30-day

13 prescription, so it would be 30 pills.

14    Q.   Okay.  So you were aware?

15    A.   Yes, mm-hmm.

16    Q.   While at Mallinckrodt -- do you

17 currently sell Schedule II medications?

18    A.   No.  I currently sell a Schedule

19 III medication.

20    Q.   Okay.  Did you ever become

21 concerned, while you were at Mallinckrodt, with

22 the number of prescriptions that were being

23 written by healthcare professionals?

24    A.   No.  I was never concerned.

---

Page 64

1    Q.   Did you ever receive e-mails from

2 Mallinckrodt with regard to current news on

3 pharmaceutical-related issues?

4    A.   Not that I can recall.

5    Q.   Okay.  Would you agree with me --

6 and I'm going to -- I'm moving to sort of

7 compensation, but would you agree with me that

8 in general, the more prescriptions for

9 Mallinckrodt products that were written in your

10 territory, the less prescriptions that a

11 competitor would have in that territory?

12        MR. WATTS:  Object to form.

13    A.   I think it just -- it depends on

14 the patient and the doctor.  I don't really

15 know.  I'm not equipped to answer that question.

16    Q.   Why not?

17    A.   I -- you know, doctors prescribe

18 medications for a variety of reasons.  Just

19 because they choose one doesn't mean they're not

20 still going to write another one at some point.

21    Q.   Were you aware of the number of

22 prescriptions that some of your doctors were

23 writing for your products?

24    A.   I was.

---

Page 65

1    Q.   Were you aware of the number of

2 prescriptions that doctors that you were

3 targeting were writing for a competitor's

4 products?

5    A.   I was.

6    Q.   And why did you keep track of

7 that?

8    A.   So I could see if my educational

9 efforts were having any return.

10    Q.   And how would you judge whether

11 your educational efforts were having any return

12 based on the number of prescriptions that a

13 healthcare professional was writing for your

14 product versus a competitor's product?

15    A.   Yeah.  The more time I would spend

16 with the staff -- we would do a lunch and learn

17 maybe once a month -- if that was having an

18 impact on them, if they were seeing value for

19 their patient, if they were -- you know, I can

20 only promote our product, what's on label.

21        I can't -- I'm not in the exam

22 room.  That's between the doctor and the

23 patient.  So it's a good way for me to know if

24 what I'm doing is having any effect.

---

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    Q.  So if they're writing more of
2 prescriptions for your product and less
3 prescriptions for a competitor's product, do you
4 believe, then, that your effort is -- you
5 believe that that's a result of your effort?
6    A.  I think that's safe to say, yes.
7    Q.  Okay.  The more prescriptions that
8 were written in your territory, the bigger your
9 bonus.
10       Do you agree with that?
11    A.  Not necessarily.  It would depend
12 on your goal.
13    Q.  Okay.  Well, let's talk about
14 goals then.  During your time at Mallinckrodt,
15 Exalgo, what were your goals?
16    A.  I have -- I could not provide you
17 with any -- I have no idea.  It varied from
18 month -- from quarter to quarter.  And like I
19 said before, I had a Pennsaid-heavy territory.
20 70 percent of my compensation was based on a
21 topical NSAID, 30 percent, at times, was based
22 on Exalgo.
23       I -- you could compare -- it was
24 all relative to my territory.  There was a small

Page 67

1 amount to work with, so the goal would be quite
2 low.  I wouldn't be asked to do something that
3 wasn't attainable.  I would be asked to provide
4 information to the appropriate doctors for the
5 appropriate patients, you know, and go from
6 there.  There was --
7    Q.  Were you aware of other reps in
8 other territories that were being asked to do
9 something that wasn't attainable?
10    A.  I was never aware of that.
11    Q.  So are you agreeing with me, then,
12 that one of the things that went into your bonus
13 were whether or not more prescriptions were
14 written in your territory over the last month?
15    A.  I'm sorry.  Can you repeat that?
16    Q.  Sure.  Would you agree with me
17 that one of the components of your bonus was
18 whether or not more prescriptions were written
19 in your territory?
20    A.  Yes.
21    Q.  Would you agree with me that one
22 of the components for your bonus was measuring
23 your market share in your territory versus a
24 competitor's market share?

Page 68

1    A.  No, that was never part of the
2 bonus.  There was never market share
3 discussions, from what I can recall.
4    Q.  Okay.  Well, we talked about the
5 fact that you and Mallinckrodt had information
6 as to how many prescriptions were written in
7 your territory for a specific period of time for
8 you and for competitors.
9    A.  Mm-hmm.
10    Q.  Was that metric utilized for
11 purposes of determining your bonus, "Hey, we
12 have a bigger market share than X, Y, Z this
13 month"?
14    A.  They wouldn't -- there was never a
15 market share discussion.  We never discussed --
16 we never used the term "market share" or
17 anything.  I was never penalized or rewarded
18 based on how much or how little my competitor
19 was being utilized.
20    Q.  Okay.  Would you agree with me
21 that one of the strategies in the sales
22 department, relating to one of your roles, was
23 to take share -- market share away from
24 competitors?

Page 69

1    A.  Did you say "one of the goals"?
2    Q.  Yeah.
3    A.  One of the goals was to take share
4 away?
5    Q.  Yeah.
6    A.  Yeah.  We were selling a product.
7    Q.  Okay.  Why did you leave
8 Mallinckrodt?
9    A.  I left shortly after the launch of
10 Xartemis.  I didn't see that as a product that
11 would -- had much longevity and decided to
12 pursue other opportunities.  And the right one
13 came, so I resigned and left.
14    Q.  What do you mean, you didn't see
15 Xartemis having longevity?
16    A.  It was not -- in my opinion, not a
17 good product.  It just -- it didn't, to me, seem
18 like a product that had any sustainability.  I
19 didn't want to sell it.  Basically I had no
20 interest in that product.
21    Q.  Did you feel Exalgo was a good
22 product?
23    A.  Yes, I did.
24    Q.  Did you feel Exalgo had

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  sustainability?
2      A.   I did.
3      Q.   And did you want to sell Exalgo?
4      A.   I did.
5      Q.   All right.  Why was Xartemis not a
6  good product?
7      A.   There -- in my opinion, I don't --
8  not that it wasn't a good product.  It was -- to
9  me, it would have been a very tough sell.  There
10  were a lot of other products on the market
11  similar to it, and I -- it just came down to I
12  didn't want to sell a Schedule II, short-acting
13  medication.
14      Q.   And at what -- this was in
15  2000- --
16      A.   '14.
17      Q.   When did you find out that
18  Mallinckrodt would be selling a short-acting
19  Schedule II?
20      A.   Maybe nine to twelve months prior
21  to the launch.
22      Q.   And was it at that point in time
23  that you realized that you didn't want to sell
24  it?

Page 71

1      A.   No.  I hung with it.  I figured
2  I'd just, you know, see how it goes, see what
3  happens.  Yeah.
4      Q.   And what happened?
5      A.   Nothing.  It didn't go anywhere.
6  It was a dead duck.  It was not fun to sell.
7      Q.   Why wasn't it fun to sell?
8      A.   There was very little interest in
9  it.  There were a lot of other competitors to
10  it.  It was expensive.  It had no place in the
11  market.  I -- it really boiled down to I just
12  wanted to go somewhere else.
13      Q.   Okay.  But you said you didn't
14  want to sell short-term --
15      A.   Yeah, short-acting medications.
16      Q.   Short-acting medications.
17      A.   I just had no -- my experience was
18  with long acting, and I didn't want to sell -- I
19  didn't have any desire to sell in a surgery
20  center type environment.  So I left.  I never
21  even -- I didn't stay long enough to even
22  receive any type of bonus from Xartemis.  We
23  launched in April or May of 2014.  I resigned
24  that summer.

Page 72

1      Q.   Any other reasons you resigned?
2      A.   No.  I just wanted a better -- a
3  different job.
4      Q.   Was one of the things that you
5  wanted to do when you went to another company
6  was look for a company that did not sell
7  Schedule II medications?
8      A.   Not necessarily.  I just -- I
9  didn't want to be in that short-acting market.
10  It didn't necessarily have to be a Schedule II.
11  I just -- I didn't like that kind of sell.
12      Q.   Did you think that the
13  short-acting product was more addictive?
14      A.   No, not at all.
15      Q.   Do you think that now?
16      A.   No, not necessarily.
17      Q.   I had mentioned some of the
18  reports that maybe you had received when I had
19  asked you about looking to the number of
20  prescriptions.  Would you receive reports from
21  time to time at Mallinckrodt regarding the
22  number of prescriptions in your territory --
23      A.   Yes.
24      Q.   -- for your products?

Page 73

1      A.   Yes.
2      Q.   The number of prescriptions for
3  competitors in your territory?
4      A.   Yes.
5      Q.   Would you receive reports that
6  talked about doctors that you should target in
7  your territory?
8      A.   There would be -- yeah, there
9  would be suggestions of physicians based on
10  their prescribing habits which led us to, you
11  know, conclude that they had experience with
12  these medications and that they could safely and
13  effectively treat their patients.
14      Q.   What about their prescribing
15  habits would tell you that they had experience
16  and could safely and effectively prescribe these
17  medications?
18      A.   If they -- if they wrote a variety
19  of Schedule II long actings and they were board
20  certified in pain management, that would be a
21  good indication that they had knowledge of the
22  risks and the safety components of those
23  medications.  So they would be a viable
24  customer.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Q.   Are you familiar with what a push
2  report is?
3    A.   A push report?  No, I'm not.
4        MR. TSAI:  Mark, we've been going
5  about an hour since the last break.  Do
6  you want to take a quick break?
7        MR. DEARMAN:  I'd like to ask a
8  question about this exhibit, and then we
9  can take a break.
10       MR. TSAI:  Okay.
11           - - -
12   (Mallinckrodt-Cox Exhibit 5 marked.)
13           - - -
14  BY MR. DEARMAN:
15   Q.   I'm going to show you what we're
16  going to mark as Exhibit Number 5, which is an
17  e-mail that is 3648 to 3649.  And attached to it
18  is a 50602 Rx push report.
19       Do you know who Jennifer Terp is?
20   A.   I don't.
21   Q.   Okay.  Do you see that Jennifer
22  Terp sent you an e-mail on May 10, 2013?
23   A.   I see that, yes.
24   Q.   Do you have any reason to believe

Page 75

1  you didn't receive this in the ordinary course
2  of your business?
3    A.   I don't remember it, but I'm sure
4  I received it.
5    Q.   Okay.  Do you see where it says
6  "Attachment:  Push report"?
7    A.   Yes.
8    Q.   And it says, "Attached is your
9  push report with product and market scripts for
10  Exalgo, Pennsaid and Duexis."
11   A.   Mm-hmm.
12   Q.   What's Duexis?
13   A.   Duexis was a ibuprofen and Pepcid
14  product that we co-promoted with another company
15  for a very short period of time.
16   Q.   All right.  And it says it's for
17  the "April 19 data week based upon Q3 alignment
18  and target list" --
19   A.   Sure.
20   Q.   -- "as indicated by territory
21  numbers."
22       What is an "alignment and target
23  list"?
24   A.   Well, alignment would be the

Page 76

1  physicians that fall within our territory, and
2  the target list would be the doctors that were
3  vetted as appropriate doctors for our products.
4    Q.   And do you see in the second
5  paragraph, "In this report you will find your
6  Exalgo targets eligible for the SPIF identified
7  with an asterisk"?
8    A.   Yes.
9    Q.   What is the "SPIF"?
10   A.   I don't know SPIF.
11   Q.   Do you know what "IMS ID" is?
12   A.   I -- oh, IMS ID?  Yes.
13   Q.   What is that?
14   A.   Just the set of numbers that are
15  next to the provider in the IMS data.
16   Q.   If you turn to the actual
17  spreadsheet that's attached to this document,
18  are you familiar with any of the prescribers?
19   A.   I am.
20   Q.   Okay.  Were any of these
21  prescribers in your territory?
22   A.   They were.
23   Q.   All right.  And did you understand
24  that this was providing you with information on

Page 77

1  Exalgo prescriptions versus competitor or market
2  prescriptions?  Let me strike that.
3        What was the purpose of you
4  receiving this report?
5    A.   It's probably just -- it looks --
6  from looking at this e-mail, there was probably
7  some realignment to certain territories.  I
8  never had, you know, a realignment, and some
9  targets may have changed from one territory to
10  another.  So she was probably sending out just a
11  list of providers that are in our territories.
12   Q.   Okay.  Well, if you look at that
13  first name, Timothy Ko?
14   A.   Mm-hmm.
15   Q.   1100 Euclid Ave.?
16   A.   Yes.
17   Q.   13-week total Exalgo?
18   A.   Yes.
19   Q.   Do you know what that 24.1
20  reflects?
21   A.   I'm assuming over 13 weeks he
22  wrote 24.1 prescriptions.
23   Q.   Okay.  Do you know what the
24  13-week total market is?

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1   A.   I have no idea what that would
2   entail.
3       Q.   Okay.  Are you aware that the
4   market was defining other competitors' products?
5       A.   Yeah.  I mean, looking at this, it
6   obviously did, but I don't remember any of that.
7       Q.   Right.  But this goes -- this is
8   consistent with you saying that you had an idea
9   of number of prescriptions --
10      A.   Yeah.
11      Q.   -- versus competitor
12  prescriptions?
13      A.   Sure.
14      Q.   Okay.
15              - - -
16      (Mallinckrodt-Cox Exhibit 6 marked.)
17              - - -
18  BY MR. DEARMAN:
19      Q.   I'll show you another document.
20      MR. TSAI:  Are we on to a new --
21      MR. DEARMAN:  Now we can take a
22  break.  I'm sorry.
23      THE VIDEOGRAPHER:  Off the record,
24  10:35.

Page 79

1       (Recess taken.)
2       THE VIDEOGRAPHER:  On the record,
3   10:48.
4   BY MR. DEARMAN:
5       Q.   I'm going to show you a document
6   we're going to mark as Exhibit Number 6, which
7   is Bates range 0455, and then it's got -- it's a
8   spreadsheet that looks like it goes through --
9   it's the same number all the way across because
10  it was natively produced.  I tabbed it here
11  because that's the page I'm going to talk about,
12  so ...
13          Take a look at the document and
14  tell me if you're familiar with this.
15          Do you know what the President's
16  Club is?
17      A.   Yes.
18      Q.   What is that?
19      A.   A year-long contest for
20  high-performing salespersons.
21      Q.   Were you a high-performing
22  salesperson?
23      A.   I was, but it looks like during
24  this time period, I was on maternity leave.  I

Page 80

1   don't --
2       Q.   Okay.  If you'd take a look at --
3       MR. DEARMAN:  I tabbed it on
4   yours, Rocky, because I don't know how
5   many pages it's in.
6   BY MR. DEARMAN:
7       Q.   But it looks like it's one, two,
8   three -- it looks like it's four pages in or
9   five pages into the spreadsheet.
10      A.   Yeah.
11      Q.   Your name appears there.  It's a
12  current rank -- current ranking is 192.  Maybe
13  that's the best way to use it to look.
14      A.   Yeah.  So that was the --
15  following the year that I was out for a good
16  portion of it.
17      Q.   Okay.  So current year-to-date
18  rank is what?  And it says 192, but what does
19  that mean?
20      A.   Current year-to-date rank 192 out
21  of 211.
22      Q.   Okay.  And your current QTD rank,
23  do you know what "QTD" is?
24      A.   Quarter-to-date.

Page 81

1       Q.   Okay.
2       A.   162.
3       Q.   All right.  And then there's some
4   other fields and it's got your name.
5           Do you see that?
6       A.   I do.
7       Q.   Region, is that your region,
8   5000 -- or 50,000?
9       A.   It looks like it, yeah.
10      Q.   Well, had you -- are you familiar
11  with any of those numbers?  Region --
12      A.   I am not.  They changed a lot
13  for -- the region numbers changed.
14      Q.   Okay.  How about district number?
15      A.   That all changed as well.
16      Q.   Territory?
17      A.   Territory was always Cleveland
18  west.
19      Q.   Okay.  Which it does reflect that
20  under territory name, right?
21      A.   It does.
22      Q.   And then you see where it says
23  "Frozen Quarter's Final Rank"?
24      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1  Q.  And next to that it says "P/E
2  Product Weight % (E/S/N)"?
3  A.  Sure.
4  Q.  What is "P/E product"?
5  A.  I think that would mean
6  Pennsaid/Exalgo.
7  Q.  Okay.  And "weight percentage
8  E/S/N," what does that mean?
9  A.  I have no idea.
10  Q.  All right.  Do you know what the
11  60/20/20 means?
12  A.  I have no -- probably 60 Pennsaid,
13  20 Exalgo and 20 -- I don't know -- maybe
14  Sumavel.
15  Q.  Well, the E -- the E could be --
16  see where it says "E/S/N"?
17  A.  Yes.
18  Q.  Do you know what the "E" stands
19  for?
20  A.  Exalgo.
21  Q.  Okay.  Do you know what the "S"
22  stands for?
23  A.  Sumavel.
24  Q.  And how about the "N"?

Page 83

1  A.  Probably NSAID --
2  Q.  Okay.
3  A.  -- for Duexis and -- if we had all
4  four products.
5  Q.  Okay.  So do you see here where
6  under the "E" it's 60, under the "S" it's 20 and
7  under the "N" it's 20?
8  A.  Sure.
9  Q.  So does that mean 60 percent --
10  A.  Was --
11  Q.  -- Exalgo?
12  A.  60 percent Exalgo, the other
13  40 percent was the other products.
14  Q.  Okay.
15  A.  That makes sense, yeah.  And
16  that's pretty consistent throughout my time
17  there.
18  Q.  Was 60/40?
19  A.  Sometimes 70/30.  This -- at this
20  point it was 60/40 because we had two other
21  products, but the majority of my time was just
22  Pennsaid and Exalgo.  And, again, at one point
23  it was -- like I said, it was 70/30.  It was
24  largely due to the way that the territory was

Page 84

1  cut.  I had a lot of orthopedic surgeons that
2  were good targets for the NSAID market.
3  And the other way they would
4  figure this is, the commercial -- the payer --
5  the insurance payer mix was very poor in my
6  area.  BWC, CareSource, they didn't pay for
7  Exalgo.  I couldn't move business that an
8  insurer wouldn't pay for.
9  Q.  Why wouldn't they pay for it?
10  A.  It was too expensive.
11  Q.  In 2013, though, this shows that
12  your year -- for that year it was 60 percent
13  Exalgo and 40 percent the other products,
14  correct?
15  A.  Sure.
16  Q.  All right.  "Budget attainment,"
17  do you know what that is, which is a couple of
18  columns over.  It says 95 percent.
19  A.  Yes.  I don't recall what like
20  that actually meant, though.
21  Q.  Okay.  How often -- did you
22  receive one of these every year?
23  A.  Yes, but it didn't always look
24  like this.

Page 85

1  Q.  Understood.  This one you were 192
2  out of 211?
3  A.  Right.
4  Q.  Do you recall finishing higher
5  than 192?
6  A.  That year?
7  Q.  Any year.
8  A.  Oh, sure, yes.
9  Q.  Okay.
10  A.  Like I said, this was -- I believe
11  I was out a portion of the year due to having a
12  baby.
13  Q.  2010, do you know where you were,
14  where you fell in the --
15  A.  No, there were so many rank
16  reports, I don't remember.
17  Q.  Okay.
18  A.  Certain quarters I did really
19  well.  Certain -- it just ebbs and flows.
20  Q.  And just to get clarity, sometimes
21  you would be responsible for two medications,
22  sometimes three; is that correct?
23  A.  Very -- yes.  The majority of the
24  time it was two.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Q.   Okay.
2    A.   And then for a small -- I don't
3 know how many -- it was months maybe.  Maybe a
4 year.  Sumavel and Duexis.
5    Q.   Do you believe that 2013 was your
6 highest percentage of Exalgo over your other
7 drugs?
8    A.   No, when we launched it was 50.
9 Yeah, so, yeah, that probably is right.  Yeah,
10 this might of -- this was probably the highest,
11 60.  You're right.
12    Q.   You don't believe you were ever
13 higher than 60 percent versus your other
14 product?
15    A.   No, no.  I wouldn't have been.
16    Q.   Okay.
17    A.   The territory was just not made up
18 like that.
19    Q.   What was your expectation of
20 whether physicians relied on a sales
21 representative in deciding whether to prescribe
22 a drug?
23    A.   I didn't have any expectation from
24 the physician.

Page 87

1    Q.   You didn't have an expectation one
2 way or the other?
3    A.   No.
4    Q.   Do you think that they ever relied
5 on any of the things that you told them during
6 your meetings?
7    A.   My job was to educate and inform
8 them on the risks, the safety, the benefits, the
9 PK profile of our product within label.  What
10 happened in the exam room was between them and
11 the patient.
12        MR. DEARMAN:  Move to strike as
13      nonresponsive.
14 BY MR. DEARMAN:
15    Q.   What was your expectation of
16 whether physicians relied on you in deciding
17 whether to prescribe any of the drugs that you
18 were presenting?
19    A.   I don't believe a physician would
20 ever -- they would -- they would expect me to
21 provide accurate information, but they would
22 never rely on me.
23    Q.   Did you ever have a conversation
24 with a physician as to whether or not they rely

Page 88

1 on any of the information that you provided?
2    A.   I can't recall having that
3 conversation with a physician on whether they
4 relied on that.  They would have to -- they
5 trusted that when I came in, I stayed compliant
6 on our message, spoke to the indication for the
7 appropriate patient, but ultimately the decision
8 is theirs.
9        - - -
10      (Mallinckrodt-Cox Exhibit 7 marked.)
11        - - -
12 BY MR. DEARMAN:
13    Q.   I'm going to show you Exhibit
14 Number 7 which is 1994, 1995.  And it's got a
15 report attached to it that's three pages.  The
16 e-mail, which is 1994, 199 -- 1994, it's just
17 one page.  That's from you to you.
18        Do you see that?
19    A.   Sure.
20    Q.   Now, is -- was your Gmail your --
21 was that your personal e-mail?
22    A.   It was.
23    Q.   Okay.  Is that still your Gmail?
24    A.   It is.

Page 89

1    Q.   It is, okay.
2        And have you searched your Gmail
3 for any documents relating to your time at
4 Mallinckrodt?
5    A.   I have not.
6    Q.   Well, here's one e-mail where you
7 sent it from your work address to your home
8 address, correct?  To your personal e-mail
9 address, correct?
10    A.   Yes.
11    Q.   Okay.
12    A.   It probably had to do with the
13 computer I was trying to look at it on.
14    Q.   Okay.  Were there times that it
15 was easier to look at reports on your other
16 computer?
17    A.   Yes.  This was probably one of
18 them.
19    Q.   Okay.  This is an Xponent weekly
20 report.  Do you see that?
21    A.   I see that, yes.
22    Q.   Okay.  Any reason -- well, you
23 sent it to yourself.  Any reason to believe you
24 didn't receive this Xponent weekly report?

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    A.   No, I got it.  Yeah.
2    Q.   And it says "weekly."  So this
3  would have been something that you received
4  weekly?
5    A.   I guess, yes.
6    Q.   Okay.  Do you have any reason to
7  believe you didn't receive a report like this
8  weekly?
9    A.   I don't remember anything called
10 an Xponent weekly report, but I mean, I
11 obviously got one, so ...
12   Q.   Okay.
13   A.   I'm trying to even figure out what
14 it is.
15   Q.   All right.  Well, take a look at
16 the report, if you don't mind, which is the
17 spreadsheet.
18   A.   Okay.
19        Oh.  This is just the IMS data.
20   Q.   Yeah.  Do you know any of the
21 physicians on this?
22   A.   On this one page, no, I don't.
23   Q.   Okay.  And do you see at the top
24 of this where it says "Products"?

Page 91

1    A.   Yes.
2    Q.   Avinza total?
3    A.   Yes.
4    Q.   Do you know what that is?
5    A.   Yeah.
6    Q.   What is it?
7    A.   A morphine product.
8    Q.   Okay.  A competitor product?
9    A.   It is.
10   Q.   Dilaudid?
11   A.   Yes.
12   Q.   Competitor product?
13   A.   Mm-hmm.
14   Q.   Duragesic?
15   A.   Yes.
16   Q.   Competitor?
17   A.   Yes.
18   Q.   Embeda?
19   A.   Yes.
20   Q.   Competitor?
21   A.   It was.
22   Q.   Okay.  Then we see your Exalgo?
23   A.   Yes.
24   Q.   Kadian, competitor product?

Page 92

1    A.   Yes.
2    Q.   MS Contin?
3    A.   Yes.
4    Q.   Opana?
5    A.   Mm-hmm.
6    Q.   Oramorph?
7    A.   Yeah.  I've never heard of that.
8    Q.   All right.  And the OxyContin?
9    A.   Yes.
10   Q.   And so it talks -- it shows you
11 information by week for Mallinckrodt's products
12 and for competitor products?
13   A.   Right.  This is, I'm assuming, my
14 territory?
15   Q.   Yeah, I think it is.  I don't
16 know.  And I'm not sure that that provides you
17 with information because you didn't recognize
18 any of the doctors, and I only have the As, so I
19 didn't bring B through Z.
20   A.   I don't know any of these doctors.
21   Q.   Right, right.
22   A.   Yeah.
23   Q.   I'm going to show you another
24 document.

Page 93

1            - - -
2        (Mallinckrodt-Cox Exhibit 8 marked.)
3            - - -
4  BY MR. DEARMAN:
5    Q.   And this is Bates 8 -- this is
6  Bates 9991, and attached to it is a spreadsheet
7  that is a lot of pages.  This report says, at
8  the top, it's from October 1, 2013 to June 5,
9  2014.
10        Do you see that?
11   A.   Mm-hmm.
12   Q.   All right.  Are you familiar with
13 this report?
14   A.   Not at all.  This is -- looks like
15 doctors from all over the country, and maybe the
16 type of samples that were given to them.
17   Q.   Can I see the exhibit for a
18 second.  Thanks.
19        If I just tab that page or -- but
20 I just turned it sideways just so you can see
21 that your name appears on one of the things
22 going across -- not that.  That.  If you look
23 down there.
24   A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1     Q.   So do you know what the -- and if
2 you then -- if you're looking at the first page
3 next to it so you can see the columns --
4     A.   Mm-hmm.
5     Q.   -- do you know what "MENDCDP" is?
6     A.   I believe it refers to the
7 physicians' NDC number.
8     Q.   Okay. You see where it says "Call
9 date"? You're going to see that again on the
10 first page.
11     A.   Yeah.
12     Q.   Right. So is this something that
13 would -- did you keep track of the calls that
14 you made?
15     A.   Yes. Well, yes, especially if
16 there was a sample event -- given.
17     Q.   Okay. And so would you explain
18 that?
19     A.   So we had samples of Pennsaid, and
20 this provider, Kevin Masterson, was someone who
21 I called on during that time, and he has to sign
22 for the samples, so it would be time stamped.
23     Q.   Did you ever provide any samples
24 of Exalgo?

Page 95

1     A.   No.
2     Q.   Okay. Did you ever provide
3 samples of any Schedule II medications?
4     A.   No, that's -- it wasn't available.
5 It's not legal.
6     Q.   Did you ever provide any coupons
7 for Schedule II medications?
8     A.   Copay cards, yes.
9     Q.   Okay. What's a copay card?
10     A.   Something that the patient could
11 use for their commercial insurance to help
12 offset the high cost of the prescription.
13     Q.   Did you provide any copay cards
14 which provided free medication, Schedule II
15 medications?
16     A.   We had a free trial program where
17 the patient could -- if the doctor wrote the
18 prescription for Exalgo, they thought that the
19 patient was a good candidate for the product,
20 the free trial program, I don't remember the
21 specifics of it, allowed them to get three to
22 five days of medication without any copay.
23 After that, their insurance would be adjudicated
24 and they would need to -- if there was a copay,

Page 96

1 you know, pay for that.
2     Q.   Did you make a record of all of
3 the calls that you made every day?
4     A.   I was supposed to.
5     Q.   Okay. What do you mean by that?
6     A.   Sometimes we'd just forget. Like
7 I went in this office and talked to the doctor
8 briefly and --
9     Q.   Well -- okay. So instead of
10 talking about what you did, what was the policy
11 and procedures, while you were with
12 Mallinckrodt, relating to what you should record
13 with regard to calls?
14     A.   So we were to record samples
15 given, but that was easy because it had to be,
16 you know, inputted how many samples you gave.
17 So there was a record.
18     Q.   Okay.
19     A.   And we also had to --
20     Q.   Let's assume we're not -- no
21 samples. What is it that you were going to
22 record, if anything?
23     A.   For Exalgo?
24     Q.   Okay.

Page 97

1     A.   For anything? Yeah, the type of
2 message we delivered, dosing. It was a type of
3 message.
4     Q.   Okay. And what were the types of
5 messages that you would deliver with Exalgo?
6     A.   I don't remember. I mean, they
7 were -- they were standard dosing, safety.
8     Q.   And those were supposed to be
9 recorded as part of your call notes?
10     A.   They weren't always recorded, no,
11 and we were not allowed to type in call notes.
12 We were not -- that was not even an option on
13 our system.
14     Q.   Okay. Why not?
15     A.   That system just didn't -- it
16 was -- we always -- every time we were -- if we
17 were there and we left a piece of information,
18 it always had the product insert with the black
19 box on it. So that's assumed.
20     Q.   Okay. Okay.
21     A.   Even coupons -- even copay cards
22 have a PI on them and have a black box. So that
23 wouldn't have been something we would have noted
24 on every call. It was expected.

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    Q.   Okay.  So was the policy and
2  procedure that if it was on the black box, you
3  didn't have to record it on the call note?
4    A.   We didn't have to record that on
5  the call note, no.
6    Q.   That was the policy and procedure?
7    A.   I don't know if that was like the
8  set policy or procedure, but ...
9    Q.   Was that your policy and
10  procedure?
11    A.   I always made sure I left a PI on
12  calls.
13    Q.   Okay.  Again, and I appreciate
14  that, but I'm asking you about policies and
15  procedures that the company had with regard to
16  recording the calls that you made.
17    A.   Yeah.
18    Q.   And I'm even limiting it, at this
19  point, to Exalgo, and I'm asking you with regard
20  to the message that you provided, was that
21  information recorded?
22    A.   Yes, that information was
23  generally recorded.
24    Q.   Okay.  And that would be

Page 99

1  handwritten?
2    A.   No.
3    Q.   Okay.
4    A.   There would be a series of
5  drop-down boxes.
6    Q.   Okay.  And you would check
7  something off?
8    A.   Correct.
9    Q.   And would this be on like an iPad?
10    A.   A laptop, yes.
11    Q.   Okay.  And would you do this after
12  the call?
13    A.   Yes.
14    Q.   Would you indicate how long the
15  call lasted?
16    A.   Not usually, no.
17    Q.   Okay.  Was there a place for that?
18    A.   I don't -- I've looked at so many
19  different interfaces over the -- I believe so.
20  I don't think it was on there.
21    Q.   You do or you don't?
22    A.   I don't.
23    Q.   Okay.  So the amount of time that
24  you spent was not part of that process?

Page 100

1    A.   No, no.
2    Q.   All right.  Was there a place to
3  put the comments, any comments?
4    A.   There was no place to put any
5  comments.
6    Q.   If the doctor asked you a question
7  about something, was there a place to put that
8  in there?
9    A.   If the doctor asked us a question
10  that was on label and we could answer it, I
11  would verbally answer it.  If the doctor asked
12  us a question that was off label or they had a
13  question about a certain patient type, there was
14  a place where we could go right in that
15  interface called a MIRF request --
16    Q.   A who?
17    A.   A MIRF, M-I-R-F, medical
18  information request form.  It directed us to an
19  online portal.  I typed in the question.  The
20  physician then had to sign for the question, and
21  it went to our Medical Affairs team where they
22  would then contact the doctor privately.
23       I was never privy.  I never was
24  cc'd on any e-mail or phone call or anything.  I

Page 101

1  would even have to follow up to make sure it was
2  completed.
3    Q.   You would or would not?
4    A.   I would.  It always was, but ...
5    Q.   Okay.
6    A.   Then they would have a scientific
7  discussion on label with the provider.  We were
8  never allowed to talk off label about the
9  product outside of the guidelines.  If they had
10  a question that was outside of the black box or
11  outside of the PI, it needed to be addressed
12  with the Medical Affairs team.
13       And, yes, that's the only place
14  where we could put any comments, and it was just
15  a box where we could type out their question and
16  how the doctor would like to receive the
17  information, via phone or whatever.
18    Q.   If a doctor talked to you about
19  his concern with diversion, is that something
20  you would put into that --
21    A.   Sure.
22    Q.   And that never happened in your
23  territory, correct?
24    A.   No.  I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    Q.   Are you familiar with the terms
2  "influence selling process"?
3    A.   I am, yes.
4    Q.   And what is that?
5    A.   It was like a model we used to,
6  you know, sell to our customers.  It was a
7  short-lived theory that we tried out for a bit
8  of time.
9    Q.   Do you know what period of time?
10   A.   I think 2013, maybe.  I'm not sure
11 exactly.
12   Q.   Let me show you a document which
13 we're going to mark as Exhibit 9.
14            - - -
15   (Mallinckrodt-Cox Exhibit 9 marked.)
16            - - -
17 BY MR. DEARMAN:
18   Q.   You see the e-mail from Kevin
19 Becker to a number of people on 10/18/2013?
20   A.   Yes.
21   Q.   Do you see your name in that
22 recipient list?
23   A.   Yes.
24   Q.   Do you have any reason to believe

Page 103

1  you didn't receive this in the ordinary course
2  of your business?
3    A.   I'm sure I did.
4    Q.   Okay.  Can you take a look at the
5  attachment, which is a "One Mallinckrodt
6  workshop slides final"?
7    A.   Yes.
8    Q.   And are you familiar with this
9  document?
10   A.   I'm not familiar with it.  I
11 remember this was a topic.
12   Q.   If you turn to the third page of
13 the document, under "Influence Selling Is
14 "Win-Win."  Would you from time to time have
15 either meetings or trainings regarding sales
16 techniques?
17   A.   Yes, we would from -- yes.  A
18 couple a year.
19   Q.   Okay.  And would something like
20 this be something that you would receive at one
21 of those type of programs?
22   A.   Sure.  Yeah.
23   Q.   Okay.  Under "Influence Selling is
24 Win-Win," it says, "Provoke and Challenge.  Tell

Page 104

1  the HCP."
2            "HCP" is healthcare professional?
3    A.   Yes.
4    Q.   -- to focus on your agenda.
5    A.   Mm-hmm.
6    Q.   It says "Shuts down thinking."
7            What does that mean?
8    A.   I don't know what they mean by
9  that.  This was not something I did.  I mean, I
10 was supposed to.  I think I did it -- you know,
11 tried it out.  This is a selling technique.  In
12 my territory, again, it was just -- it was not
13 one where this was sort of a -- I didn't spend a
14 lot of time influence selling.
15            At this point I had been in the
16 territory for three years.  I knew my targets
17 and, you know, this was something they were
18 putting out there for us to try and, you know,
19 maybe have deeper conversations with our providers.  So I -- when
20 discussions with our providers.  So I -- when
21 they say "shuts down thinking," I don't really
22 know.
23   Q.   But you said you did try this
24 technique for a while?

Page 105

1    A.   I was instructed to give it a
2  shot, yeah.
3    Q.   Okay.  Do you know whether others
4  were using this technique?
5    A.   I don't know.
6    Q.   You specifically mentioned your
7  territory and in regards to whether or not this
8  was going to be effective in your territory.
9    A.   Yeah.
10   Q.   Did you think it was going to be
11 effective in other territories maybe more than
12 yours?
13   A.   I don't know.  I'm not in -- I --
14 I didn't have a position that took me into other
15 territories.  I can only speak for my own.
16   Q.   Would you agree, though, this
17 applied to Exalgo as well as whatever other
18 drugs?
19   A.   Sure.  Yes.
20   Q.   Okay.  Are you familiar with what
21 an emotional transition is?
22   A.   No.
23   Q.   If you turn the page --
24 unfortunately, these are not numbered, so if you

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 turn past the influence selling, the next page,
2 you'll see at the top it says "Exercise Example:
3 Emotional Transitions"?
4     A.   Mm-hmm.
5     Q.   Did you use any of these
6 transitions with any of your HCPs?
7     A.   I can't recall ever using any of
8 these.
9     Q.   Okay.  If you turn about four more
10 pages or five more pages, it goes, "What does
11 your customer think and why?"
12     A.   Sure.
13     Q.   Do you see that?
14     A.   Mm-hmm.
15     Q.   So your customer is the HCP,
16 correct?
17     A.   Yes.
18     Q.   And do you see the picture in the
19 middle of the screen?
20     A.   Yes.
21     Q.   Is that supposed to be a brain?
22     A.   It would appear to.
23     Q.   Okay.  And there are some bubbles
24 in the brain.  What do those bubbles say?

Page 107

1     A.   OxyContin, Opana ER, and Exalgo.
2     Q.   And it says, "How big is the
3 bubble?  Why?"
4          Do you see that?
5     A.   Yes.
6     Q.   Do you know what the purpose of
7 this picture is and why they're showing you
8 these other -- these drugs?
9     A.   I have no idea.
10     Q.   All right.  Would you agree that
11 Exalgo is -- that was a Mallinckrodt product?
12     A.   It was.
13     Q.   The other two products were
14 competitor products?
15     A.   Yes.
16     Q.   "How big is the bubble?"  Do you
17 know what that's referring to?
18     A.   I have no idea.
19     Q.   If you turn the page about five
20 more pages from there, at the top it says
21 "Influence Questions."
22     A.   Yeah.
23     Q.   And it says -- it's got a picture
24 of a -- go -- keep going from there.  Sorry.

Page 108

1 Keep going.  Keep going.  Keep going.  Keep
2 going.  That's it.
3          Do you see this -- I don't know if
4 this is a product insert or what it is.  Are you
5 familiar with this?  The document -- it says,
6 "Now may be the time for a switch?"
7     A.   Yes.
8     Q.   Okay.  Is this a type of material
9 that you would have provided to an HCP?
10     A.   Yes, I believe so.
11     Q.   Are you -- as you sit here today,
12 do you recall this?
13     A.   I recall, like, seeing this
14 before.  I don't ever recall having this out in
15 the field with me, but I do remember, like, this
16 picture.
17     Q.   Okay.  If you turn the page, the
18 next one says, "Once daily Exalgo may help
19 reduce pill burden"?
20     A.   Yes.
21     Q.   All right.  What is -- and so if
22 you were going to provide something like this to
23 the doctor, why would you -- why would you do
24 it?  A document that says, "Once daily Exalgo

Page 109

1 may help reduce pill burden."
2     A.   So it would be to -- you would
3 show this to show that instead of taking
4 multiple pills of other products, one pill of
5 Exalgo would -- would hopefully be sufficient to
6 managing their pain instead of many patients --
7 instead of patients taking a pill every four,
8 six, eight hours, this illustrated --
9          Now, this is just one piece, but
10 there would also be -- it might be on here -- a
11 PK graph to show that Exalgo stayed in the blood
12 system for 24 hours.  It was just -- this was
13 another way to illustrate -- illustrate the PK's
14 data.
15     Q.   Okay.
16     A.   And you mentioned here, is this a
17 PI on the back.  That's not a PI.  A PI would
18 have been attached to it.
19     Q.   What's a "PI"?
20     A.   A product insert, the black and
21 white fold with all of the chemical makeup.
22     Q.   Yeah, that -- I wasn't asking
23 about that.  I was asking about whether or not
24 this would be a type of advertising promotional

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 material --
2     A.   Yeah.  I don't know if we left
3 this with them, but I'm sure we had it either on
4 a visual aid that we kept or on our iPads.
5     Q.   Okay.  Can you show me -- and if
6 you need to go through this entire document,
7 please do it -- anywhere where it talks about
8 "educate and inform," or uses those terms?  If
9 you want to put it back in order so it's not out
10 of order, that's fine.
11         MR. TSAI:  Object to the form of
12 the question.
13         Go ahead.
14     A.   I can answer the question.
15     Q.   Yes.
16     A.   So to answer your question about
17 educating and informing --
18     Q.   Yeah.
19     A.   -- this was just a tool to teach
20 us how to use influence selling, not how to sell
21 Exalgo.  There were examples of Exalgo and how
22 we can implement it, but this was a new sales
23 technique, so they were rolling this out.  This
24 wouldn't have been -- this was a probing -- a

Page 111

1 probing mechanism that we used to gain
2 information, to try to understand, you know, the
3 thought process of the physician and to engage
4 them into a deeper -- a deeper dialogue.
5         The education component and the
6 information always goes hand-in-hand with
7 something like this.  But this looks like it
8 came from, you know, the marketing department
9 where they studied influence selling and were
10 rolling that out to us.
11     Q.   So it's not there?
12     A.   It's not in this packet, but
13 I'm --
14     Q.   That's correct.
15     A.   It's not in this packet.
16     Q.   I'm going to show you another
17 document.  While we're pulling that out, how
18 much time would the -- are you aware of any
19 industry suggestions on how long the typical
20 interaction would be between a sales rep and a
21 physician?
22     A.   An indus- -- I'm sorry?
23         MR. WATTS:  Object to form.
24     Q.   Industry suggestion or industry

Page 112

1 standard.  Are you aware of that?
2     A.   There's no -- I'm not aware of
3 that, no.
4     Q.   Okay.  How long would a typical
5 visit last?
6     A.   It depended on the type of visit.
7 If it was a lunch and learn, 10, 20 minutes.  If
8 it was a, you know -- a standard, you know,
9 office call, five minutes.
10     Q.   Do you know what chronic opioid
11 therapy is?
12     A.   Chronic opioid therapy?
13     Q.   Mm-hmm.
14     A.   I've never heard that term, but I
15 know people that take opiates for long periods
16 of time.
17     Q.   Okay.  Did you discuss the risks
18 of addiction from chronic opioid therapy with
19 any of your HCPs?
20     A.   We did not, no, not that I can
21 remember.  However, on every piece, the black
22 box states that there is a risk for addiction
23 with Schedule II medications.
24     Q.   Are you familiar with any of the

Page 113

1 promotional materials that indicated that risk
2 addiction was low?
3     A.   I'm not familiar with that, no.
4         MR. DEARMAN:  Thank you.
5     Q.   Do you know what a territory
6 action plan is?
7     A.   Territory action plan?  I don't.
8             - - -
9     (Mallinckrodt-Cox Exhibit 10 marked.)
10             - - -
11 BY MR. DEARMAN:
12     Q.   I'm going to show you a document
13 which is -- we're going to mark as Exhibit
14 Number 10.  It's Bates 8593 through 8954, and
15 there's a report attached to it.
16         This is an e-mail from you to Tim
17 Dress on August 22, 2014.  Any reason to believe
18 you didn't send this to Mr. Dress in the
19 ordinary course of business?
20     A.   No.
21     Q.   Was this the point in time that
22 you were reporting to Mr. Dress?
23     A.   It would have been, yes.
24     Q.   Okay.  And this report that's

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 attached to it, it says "Xartemis Territory
2 Action Plan"?
3     A.   Yes.
4     Q.   Why would you be sending this to
5 Mr. Dress?
6     A.   He probably asked for it, but --
7 I'm sure he needed it from each territory, but I
8 know this is about the week I resigned, so ...
9     Q.   Okay.  Do you know what the --
10 what was the point of a territory action plan?
11    A.   He probably just wanted an update
12 on, you know, the accounts going forward since I
13 was leaving.
14    Q.   And so I understand that.  Were
15 these your customers?
16    A.   From what I can tell.  I only sold
17 that product for such a short period of time.
18 These names are familiar.
19    Q.   Did you work on these territory
20 action plans for -- with Exalgo?
21    A.   I don't think so.  I don't even
22 remember doing this.
23    Q.   Okay.  So do you know who these
24 customers are?

Page 115

1     A.   I recognize the names of a few of
2 them.
3     Q.   Number -- can you go to 65 and
4 tell me -- take a look at that one.  A Lawrence
5 Bruno.  Do you know who that is?
6     A.   I think he's a surgeon.  Yes.
7     Q.   So if you go all the way to the
8 other end under "Comments," it says, "Need to
9 spend time with staff where his outpatient
10 surgery is done."
11    A.   Sure.
12    Q.   Do you know why those comments
13 would be part of this report?
14    A.   Yeah.  I think that's where he --
15 he would make decisions on what medication the
16 patients would get would be in the outpatient
17 surgery center.
18    Q.   If you go to the last page of this
19 document, it says, "XXR Territory Action Plan
20 Data Field Key."
21    A.   Yes.
22    Q.   It looks like this (indicating).
23    A.   Mm-hmm.
24    Q.   Do you know what the "data field

Page 116

1 key" is?
2     A.   I don't.
3     Q.   And had you seen something like
4 this with regard to Exalgo?
5     A.   Possibly.  I don't -- I mean, I --
6 possibly.  I really don't -- I don't remember
7 but I'm sure there was something like this.
8         - - -
9     (Mallinckrodt-Cox Exhibit 11 marked.)
10        - - -
11    Q.   I'm going to show you what's
12 marked as Exhibit 11, and it's an e-mail, 8035,
13 from Tim Dress to multiple people, including
14 yourself.  Any reason to believe you didn't
15 receive that in the ordinary course of your
16 business?
17    A.   No.  I'm sure I did.
18    Q.   I'm trying to find my copy of that
19 document.  That's why it's taking me so long.
20        Can I see that document, that
21 exhibit for a second?
22        Do you see the -- in the third
23 bullet point where it talks about shared
24 accounts?

Page 117

1     A.   Yes.
2     Q.   Do you know what that was in
3 reference to and why they were going to shared
4 accounts at that point in time?
5     A.   I don't remember this, but I -- I
6 don't remember actually executing this, but I do
7 remember that the representative and their DM
8 were going to work together on account to -- you
9 know, to help grow and educate the staff on
10 Xartemis.  I don't think we ever put it into
11 place.  I can't remember doing that with Tim,
12 but maybe we did.  It just seemed to be like a
13 collaborative thing that we were working on.
14    Q.   Do you see the last bullet point,
15 "When approaching orthos, you need to know the
16 following"?
17    A.   Yes.
18    Q.   "What type of surgeries they do
19 and where"?
20    A.   Yes.
21    Q.   "Which of these surgeries do they
22 use Percocet for acute pain"?
23    A.   Yes.
24    Q.   Do you know why it was important

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 to know what type of surgeries they do and which
2 they use Percocet for?
3     A.   Well, Percocet would have been the
4 competitor, so I think it was important for us
5 to know what type of surgery they did so we
6 could see if Xartemis was an appropriate option
7 for their patient.
8     Q.   You see where it says further down
9 in that paragraph, "If you have buy-in and
10 closed them for business, you must ask them to
11 look at their schedule to identify patients for
12 XXR that day"?
13     A.   Yes.
14     Q.   "There is no reason to wait.  We
15 are not looking for 1 TRx."
16     A.   Mm-hmm.
17     Q.   What does that mean?
18     A.   He -- again, I didn't write -- I
19 didn't write this e-mail but I can speculate
20 that he is asking us to encourage the physician
21 to look for places in their schedule where
22 Xartemis would be an appropriate option.
23     Q.   And where they can write more than
24 one prescription?

Page 119

1     A.   Yes.
2     Q.   Okay.  And you received this
3 e-mail?
4     A.   I did.
5     Q.   All right.  And did you send -- do
6 you recall sending Tim an e-mail that you didn't
7 understand that, or do you understand it?
8     A.   I understand it, yeah.
9     Q.   Okay.
10     A.   It doesn't mean I did it, but ...
11     Q.   Did you do it?
12     A.   I doubt it.
13     Q.   Okay.  Why?
14     A.   Again, at this point I was looking
15 for a new job.  I didn't want to be selling in
16 this space.  I didn't want to be calling on
17 surgery centers.  So I'm sure I didn't do it.
18     Q.   And I know you mentioned some of
19 the reasons, but is it because you didn't want
20 to ask them to write more than one prescription?
21     A.   No.  I didn't have a problem
22 asking them to write more than one prescription.
23 This medication was very expensive, and the
24 competition was very inexpensive.  It didn't

Page 120

1 make sense, and providers knew that.
2         - - -
3     (Mallinckrodt-Cox Exhibit 12 marked.)
4         - - -
5 BY MR. DEARMAN:
6     Q.   Let me show you Exhibit 12.
7 There's a -- let me have that exhibit back.
8 There's an exhibit -- there's another page which
9 I, for some reason have, that I think goes with
10 that document that we should mark, but I only
11 have one copy of it.
12     A.   Do you want this back?
13     Q.   Yeah.  Let me see it.  Let me see
14 both pages back.  Sorry about that.
15         Yeah.  They're the same numbers.
16         I'm writing 12 at the bottom of
17 it.  I'm showing you a document which is
18 Exhibit 12 still but it's got an e-mail 3521,
19 and it goes through 3254 with a document
20 attached, and you can -- the e-mail only says
21 "See attached."
22         Any reason to believe you didn't
23 receive this e-mail in the ordinary course of
24 your business?

Page 121

1     A.   No.  I'm sure I received it.
2     Q.   Okay.  It says, "2014 Mid-Year
3 Performance Discussion Guide."
4     A.   Okay.
5     Q.   Are you familiar with this type of
6 a document?
7     A.   Yes.
8     Q.   Okay.  What was this used for?
9     A.   Just tracking -- tracking our
10 development and our performance midyear.
11     Q.   Okay.  And is it -- then at the
12 bottom is it setting additional goals for 2014?
13     A.   Is it setting -- it looks like it.
14 I don't know.
15     Q.   Okay.  If you look at the first
16 section, "Leader's assessment of progress
17 towards goal (On/Off Track)."
18     A.   Yes.
19     Q.   It says that you're -- it says
20 "Off Track"?
21     A.   Yes.
22     Q.   Do you know what that means?
23     A.   I don't know.  I'm off track.  I
24 can't recall that.

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    Q.   All right.  In regard to
2  performance, you finished quarter one
3  141 percent to goal for Exalgo and 92 percent
4  for Pennsaid?
5    A.   Yes.
6    Q.   You finished quarter 2, January,
7  139 percent to goal for Exalgo --
8    A.   Yes.
9    Q.   -- and 77 for Pennsaid?
10   A.   Yes.
11   Q.   And for Pennsaid, 1.5 percent?
12   A.   Yes.
13   Q.   What does that mean, by the way,
14 when it's --
15   A.   That was the dose.
16   Q.   Okay.  So when it says
17 "139 percent to goal for Exalgo," what does that
18 mean?
19   A.   So whatever my goal was for that
20 quarter --
21   Q.   Okay.
22   A.   -- which would have probably --
23 you know, it was -- it's relative to my
24 territory.  So ...

Page 123

1    Q.   Understood.
2    A.   You know, maybe it was -- I don't
3  know.  I'm speculating, 20 prescriptions.
4    Q.   I'm not asking you to do that.
5  I'm just saying, so it relates to whatever your
6  goal was?
7    A.   Yeah, and a percentage over it.
8    Q.   So you were 139 percent over your
9  goal for Exalgo?
10   A.   Correct.
11   Q.   Okay.  And it says, "You are
12 ranked fifth in the nation per the January rank
13 report, nice job."
14   A.   Yeah, mm-hmm.
15   Q.   Do you know what the realignment
16 was that caused changes to your geography?
17   A.   I didn't have any -- yes.  We
18 added a whole contract sales team.  So we added,
19 I believe, like 100 or so more people in the
20 field.  So that caused a lot of geographies to
21 change.  Mine didn't really change.
22   Q.   Was the fact that they added those
23 additional folks one of the reasons that you
24 left?

Page 124

1    A.   No.
2    Q.   On the second page, it says, "List
3  any barriers that stand in the way of goal
4  accomplishment based on discussion."
5        Do you have any idea whether there
6  were issues with pharmacy stocking?
7    A.   There were issues with pharmacy
8  stocking, yes.
9    Q.   Was that as -- was that in regards
10 to Xartemis or Exalgo?
11   A.   Xartemis.
12   Q.   Xartemis.  Thank you.
13   A.   That's okay.  People say it both
14 ways.
15   Q.   XXR, how's that?
16   A.   That's fine.
17   Q.   It says, "Nobody calling on this
18 territory affects your pharmacy stocking and
19 Xartemis XR awareness in general for your
20 territory," under the "barriers" paragraph.
21   A.   Yeah.  "Nobody calling on this
22 territory affects your pharmacy ..."
23        Yeah, I see that, yes.
24   Q.   What does that mean?

Page 125

1    A.   "Nobody calling on this territory
2  affects your pharmacy ..." there must have been
3  a vacancy somewhere in the district and maybe I
4  picked up part of it.  I'm not really sure.
5    Q.   If you drop down under "Leader's
6  assessment of employee demonstrating
7  Mallinckrodt's Cultural Hallmarks."
8    A.   Mm-hmm, yes.
9    Q.   One of them is you're engaged.  Do
10 you see that?
11   A.   Yes.
12   Q.   There's another that's
13 "Collaborative"?
14   A.   Yes.
15   Q.   "Competitive"?
16   A.   Yes.
17   Q.   "You follow up daily with
18 physicians who have given their commitment to
19 writing.  You always make the total office
20 call" --
21   A.   Yes.
22   Q.   -- "to ensure the script does not
23 get lost and are focused on driving business
24 every day"?

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1    A.   Yes.
2    Q.   You agree you were focused on
3 driving business every day?
4    A.   I was.
5    Q.   Okay.  And you were high
6 performing.  You were ranked fifth in the nation
7 in January, correct?
8    A.   Yes.
9    Q.   If you go to the next page under
10 "Comments," it says, "You got off to a great
11 start" -- this is under "Additional Comments."
12    A.   Mm-hmm.
13    Q.   "You got off to a great start in
14 FY '14 and are in the hunt for Presidents Club."
15        What does that mean?
16    A.   I was tracking to finish the year
17 in the top percentage that would be -- that
18 would meet the president's club requirement.
19    Q.   And one of the things that he
20 tells you is you're going to need to accelerate
21 your Xartemis XR business to have a chance in
22 the second half.
23    A.   Yes.
24    Q.   You left before having a chance in

Page 127

1 the second half, correct?
2    A.   Yes.
3    Q.   Okay.  We talked about target
4 reports where it would have lists of doctors.
5        Do you recall that?
6    A.   Yes.
7    Q.   Do you know whether or not there
8 were ever changes made to targets for reasons,
9 meaning that a target would come off of one of
10 the lists?
11    A.   So I can only speak to my
12 territory.
13    Q.   Fair enough.
14    A.   I didn't have any that I can
15 remember pulling off of the target list for any
16 reason, but there always was a -- it was a
17 process where we could remove physicians from
18 time to time.
19    Q.   And do you know why a -- what were
20 the reasons why doctors would be removed from
21 target lists?
22    A.   If they were dead, jailed,
23 retired, or whereabout -- what we call WAUNK,
24 whereabouts unknown, fled, or if they were an

Page 128

1 inappropriate target.
2    Q.   Okay.  And what is an
3 "inappropriate target"?
4    A.   It would be a target that we
5 would -- if they were -- if we witnessed them
6 overprescribing any medication or giving a
7 patient too much medication and we were there to
8 witness it, then we would have the ability to
9 remove them from our target list.
10    Q.   Okay.  That would be the
11 inappropriate target?
12    A.   Yes.
13    Q.   What type of training did you
14 receive, if any, to make that determination?
15    A.   I don't recall the training.  I
16 just know that it was often presented as an
17 option to remove targets that were
18 inappropriate.
19    Q.   Do you know who Dr. Akhtar-Zaidi,
20 Z-a-i-d-i, is?
21    A.   Dr. Zaidi.
22    Q.   Yeah.
23    A.   I do know who he is.  He was not
24 on my call list.

Page 129

1    Q.   Okay.
2    A.   He was part of the Cleveland East
3 territory.
4    Q.   Okay.  How do you know him?
5    A.   Just as a -- he -- I know he's one
6 of the physicians who lost his license.
7    Q.   Okay.
8    A.   But, again, not my territory.
9    Q.   Understood.  Do you know who
10 Rosemary Polomano is?
11    A.   I do not, no.
12    Q.   Early on I asked you about a key
13 opinion leader and you gave me the name of
14 somebody.  Do you recall who that was?
15    A.   Dr. Bharat Shah.
16    Q.   Yeah.  What kind of doctor was he?
17    A.   Pain management, anesthesiology.
18 He -- yeah.  He had a private practice in Lorain
19 County.
20    Q.   Okay.  So he was one of the HCPs
21 that was one of your targets?
22    A.   Yes.
23    Q.   And he also agreed to serve as a
24 key opinion leader?

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    A.   He did.
2    Q.   Would he be compensated for that?
3    A.   He was.
4    Q.   Okay.  And what would be the
5  reason that you would want to use a key opinion
6  leader?
7    A.   He was credentialed through, you
8  know, the American Academy of Pain Management.
9  He was a private practice owner and was a -- one
10 of the only pain management physicians in Lorain
11 County with a large pool of patients, treated a
12 variety of pain issues.  He was well respected,
13 well trained.
14   Q.   Did he write Exalgo prescriptions?
15   A.   He did.  He wrote all of the
16 products.
17   Q.   Was he your largest writer of
18 Exalgo prescriptions?
19   A.   I don't remember, but he was one
20 of them.
21   Q.   Okay.
22   A.   I don't know if he was necessarily
23 the largest.  Maybe from -- during certain
24 points.  But, again, he had the largest

Page 131

1  practice, so he would have had the largest
2  patients to treat -- the largest amount of
3  patients to treat.
4        Another reason I chose him as a
5  KOL is he took care of a lot of very poor
6  patients and workers' comp, so he had very
7  complex cases and had a lot of -- a lot of
8  experience.
9            - - -
10   (Mallinckrodt-Cox Exhibit 13 marked.)
11           - - -
12   Q.   I'm going to hand you what is
13 marked as Exhibit 13 now, which is Bates range
14 0768 through 0769.  This is dated 11/20/2013
15 from you to Kevin Becker.
16   A.   Mm-hmm.
17   Q.   Subject "Q3 Performance."
18   A.   Yes.
19   Q.   If you start at the second page
20 0769, which was the -- actually, I'm sorry.  The
21 e-mail actually begins -- it's one string.  It's
22 just a long one.  0768.  You were forwarding to
23 Kevin an e-mail from Jay and Gavin.
24        Do you know exactly what this --

Page 132

1  who Jay and Gavin are?
2    A.   I do.
3    Q.   Who --
4    A.   They were transitioning, but they
5  were the regional managers, the regional
6  directors, one level above my boss.
7    Q.   Okay.  Do you see underneath it
8  where it says, "Cleveland West was originally
9  designed as a Pennsaid territory"?
10   A.   Yes.
11   Q.   "Nobody has fought harder for
12 every Exalgo script than Erin"?
13   A.   Correct.
14   Q.   "She is one of the most talented
15 representatives I've ever worked with."
16   A.   Mm-hmm.
17   Q.   And then it goes on to talk about
18 "Exalgo potential in Cleveland West"?
19   A.   Right.
20   Q.   So is it accurate that your
21 territory was originally a Pennsaid territory
22 but then changed to an Exalgo territory?
23   A.   It never changed and it was never,
24 you know, one or the other.  Based on the

Page 133

1  demographics, the opportunity mostly would lie
2  within Pennsaid.  I was still responsible for
3  Exalgo, either 30 percent, 40 percent, initially
4  50 percent.  So I had to, you know, call on the
5  pain management physicians that were in the
6  territory.  There was a lack -- it says right
7  there "a lack of pain management physicians."
8    Q.   Yeah.  I'm going to get to that.
9  And I'll get to that.
10       So you see the 1, 2, 3, 4 numbers
11 under "Exalgo potential in Cleveland West?"
12   A.   Yes.
13   Q.   Do you know what any of that is?
14 "0 decile 10 targets, 1 decile 9 Exalgo target,
15 and this physician practices at the main campus
16 of the Cleveland Clinic, no access"?
17   A.   Yes.  I see -- yes.
18   Q.   Yeah.  Okay.  So what does
19 those -- what does that -- what does that mean?
20 What's that telling you?
21   A.   The "0 decile 10 targets"?
22   Q.   Yeah.
23   A.   That means -- I don't know what
24 the "decile" means -- actually, I don't know

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  what either of those means.
2      Q.   Well, is "decile" the number of
3  prescriptions that are written?
4      A.   No, no.  It wouldn't have anything
5  to do with that.  I don't know what they -- what
6  they included as a decile.  Yeah, I'm not really
7  sure.  I mean -- I have no idea.
8      Q.   All right.  So now if we go to the
9  paragraph that you were referring to before,
10 "With a lack of pain management physicians in
11 your territory, you've done a tremendous job of
12 finding Exalgo business in other places, which
13 has been mostly primary care."
14         What does that mean?
15     A.   I had an office that treated a lot
16 of pain.  They were a group of family practice
17 physicians, and they -- they treated the pain
18 without referring out.  They also had a lot of
19 workers' comp patients.  So it was just easier
20 for them to keep everything in-house.
21     Q.   Okay.  It says, "As a result of
22 Ohio HB 93, 2 of her top Exalgo writers (primary
23 care) had to stop practicing pain management."
24     A.   That's correct.

Page 135

1      Q.   What does that mean?
2      A.   House Bill 93 limited writing of
3  opioids to only -- long-acting opioids to only
4  board certified pain management physicians.
5      Q.   So that impacted the number of
6  targets you had in your territory?
7      A.   It did, yes.
8          MR. DEARMAN:  Okay.  Can we take a
9  break?  I don't know where we are in the
10 scheme of things, but ...
11         MR. TSAI:  Well, we've been going
12 over an hour since the last break.  It's
13 around noon.
14         MR. DEARMAN:  Yeah.
15         MR. TSAI:  Do you want to go a
16 little bit more and -- I don't know.
17 It's up to everyone.
18         THE VIDEOGRAPHER:  Off the record,
19 11:55.
20         (Recess taken.)
21         MR. DEARMAN:  On the record,
22 12:06.
23         - - -
24         (Mallinckrodt-Cox Exhibit 14 marked.)

Page 136

1          - - -
2  BY MR. DEARMAN:
3      Q.   I'm going to show you what I'm
4  going to mark as Exhibit Number 17 [sic], which
5  is Bates numbers 3040 --
6          MR. DEARMAN:  14.  Am I wrong?
7          MS. OKUN:  You said 17.
8          MR. DEARMAN:  I did?  All right.
9  I meant 14.  Thank you very much.  I'm
10 glad you know what I mean.
11         (Discussion held off the record.)
12 BY MR. DEARMAN:
13     Q.   Exhibit Number 14, which says
14 "Pain Management pocketcard Set."  Have you ever
15 seen a document like this before.
16     A.   I have never seen a document like
17 this before.
18     Q.   Have you ever provided a document
19 like this to a HCP?
20     A.   Not that I can recall.
21     Q.   If you look at the first page of
22 the document where it says, "Ask, Assess, Treat
23 and Monitor."
24         Do you see that?

Page 137

1      A.   Yes.
2      Q.   Under "Ask" it says, "Always ask
3  patient about the presence of pain and accept
4  the patient's report of pain."
5          Do you recall that?
6      A.   I don't recall any of this.
7      Q.   Would that be the same thing for
8  under -- if you look under "Monitor" where it
9  says, "Most opioid agonists have no analgesic
10 ceiling dose."
11         You don't recall that either?
12     A.   Analgesics have no -- I -- I --
13 that is a statement I remember, yes.
14     Q.   Okay.  So is that a statement that
15 you would have discussed with an HCP?
16     A.   I would have only talked to
17 Exalgo's analgesic ceiling dose, not other
18 analgesic ceiling doses.
19     Q.   Okay.  In that same box under
20 "Monitor" it says, "Addiction rarely occurs
21 unless there's an hx, history, of abuse."
22         Do you see that?
23     A.   I see that.
24     Q.   Is that something that you would

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1  have also discussed?

2      A.   I would have never discussed that.

3      Q.   Okay.

4      A.   That would have been inappropriate

5  to discuss.

6      Q.   Okay.  And why is that?

7      A.   That's a false statement.

8      Q.   Okay.  How do you know that's a

9  false statement?

10     A.   I mean, I guess I don't know that

11  it's a false statement, but if you had ten

12  doctors in here, I'm sure all ten of them would

13  tell you that's a false statement.

14     Q.   Okay.  So you believe it's false?

15     A.   I believe it's a false statement,

16  yes.

17              - - -

18  (Mallinckrodt-Cox Deposition Exhibit 15 marked.)

19              - - -

20     Q.   Okay.  Let me show you a document

21  which we're going to mark as Exhibit 15.  This

22  is an e-mail with some attachments.  Sorry about

23  that.  We need to clip that to the back of that

24  because that's together.

Page 139

1          It's an e-mail, which is 8914 to

2  8918, and then attached to it is the Magnacet or

3  guidelines, I guess.  Attached to it is

4  something that says "Guidelines.  Managing:

5  Pain," which is 8919 through 8926.

6          I'm going to direct your attention

7  to 8919 where -- the guideline document that I

8  provided you with.

9      A.   Okay.

10     Q.   Are you familiar with this

11  document?

12     A.   I am not.

13     Q.   If you turn to the second page,

14  which is 8920, under Table 5, "Principles of

15  Pain Management with Opioids."

16     A.   Yes.

17     Q.   Do you see where it says, "Risk of

18  addiction rare (see Table 7)"?

19          The last bullet point.

20     A.   Table 7.

21     Q.   It's up at the top, top right, it

22  says "Table 5, Principles" --

23     A.   Oh, I see it, yes.  Okay.

24  "Risk" --

Page 140

1      Q.   Do you see the last bullet point,

2  "Risk of addiction rare"?

3      A.   Sure.

4      Q.   Do you believe that that's a false

5  statement?

6      A.   I believe that's a false

7  statement.

8          MR. DEARMAN:  I don't have any

9      other questions for the witness at this

10     time.

11          THE VIDEOGRAPHER:  Off the record,

12     12:12.

13      (Signature not waived.)

14              - - -

15          Thereupon, at 12:12 p.m., on Thursday,

16  January 17, 2019, the deposition was concluded.

17              - - -

Page 141

1          CERTIFICATE

2  STATE OF OHIO       :

                        SS:

3  COUNTY OF _____ :

4

5      I, ERIN M. COX, do hereby certify that I

6  have read the foregoing transcript of my

7  cross-examination given on January 17, 2019; that

8  together with the correction page attached hereto

9  noting changes in form or substance, if any, it is

10  true and correct.

11      _____

          ERIN M. COX

12

13      I do hereby certify that the foregoing

14  transcript of the cross-examination of ERIN M. COX was

15  submitted to the witness for reading and signing; that

16  after she had stated to the undersigned Notary Public

17  that she had read and examined her cross-examination,

18  she signed the same in my presence on the _____ day

19  of _____, 2019.

20

21      _____

          NOTARY PUBLIC - STATE OF OHIO

22

23  My Commission Expires:

24  _____, _____.

Page 142

```
 1              CERTIFICATE
 2  STATE OF OHIO      :
                   SS:
 3  COUNTY OF FRANKLIN  :
 4        I, Carol A. Kirk, a Registered Merit
    Reporter and Notary Public in and for the State of
 5  Ohio, duly commissioned and qualified, do hereby
    certify that the within-named ERIN M. COX was by me
 6  first duly sworn to testify to the truth, the whole
    truth, and nothing but the truth in the cause
 7  aforesaid; that the deposition then given by her was
    by me reduced to stenotype in the presence of said
 8  witness; that the foregoing is a true and correct
    transcript of the deposition so given by her; that the
 9  deposition was taken at the time and place in the
    caption specified and was completed without
10  adjournment; and that I am in no way related to or
    employed by any attorney or party hereto or
11  financially interested in the action; and I am not,
    nor is the court reporting firm with which I am
12  affiliated, under a contract as defined in Civil Rule
    28(D).
13
14        IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my seal of office at Columbus, Ohio
    on this 21st day of January 2019.
15
16
17
18
             _____
             CAROL A. KIRK, RMR
19           NOTARY PUBLIC - STATE OF OHIO
20  My Commission Expires:  April 9, 2022.
21        - - -
22
23
24
```

Page 143

```
 1        DEPOSITION ERRATA SHEET
 2  I, ERIN M. COX, have read the transcript
    of my deposition taken on the 17th day of January
 3  2019, or the same has been read to me.  I request that
    the following changes be entered upon the record for
 4  the reasons so indicated.  I have signed the signature
    page and authorize you to attach the same to the
 5  original transcript.
 6  Page  Line  Correction or Change and Reason Therefor:
 7  ___  ____  _____
 8  ___  ____  _____
 9  ___  ____  _____
10  ___  ____  _____
11  ___  ____  _____
12  ___  ____  _____
13  ___  ____  _____
14  ___  ____  _____
15  ___  ____  _____
16  ___  ____  _____
17  ___  ____  _____
18  ___  ____  _____
19  ___  ____  _____
20  ___  ____  _____
21  ___  ____  _____
22  ___  ____  _____
23  ___  ____  _____
24  Date _____ Signature _____
```