Page 1

1              UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF OHIO
3                  EASTERN DIVISION
4              ~~~~~~~~~~~~~~~~~~~~~
5   IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
    OPIATE LITIGATION
6                              Case No.
                               17-md-2804
7
                               Judge Dan Aaron
8                              Polster
9   This document relates to:
10  The County of Cuyahoga v. Purdue Pharma, et
    al., Case No. 17-OP-45004
11
    City of Cleveland, Ohio v. Purdue Pharma L.P.,
12  et al., Case No. 18-OP-45132
13  The County of Summit, Ohio, et al. v. Purdue
    Pharma L.P., et al., Case No. 18-OP-45090
14
                ~~~~~~~~~~~~~~~~~~~~~
15
16
                Videotaped Deposition of
17                   GERALD CRAIG
18                 January 11, 2018
                     9:12 a.m.
19
20                    Taken at:
21               Jackson Kelley, PLLC
            50 South Main Street, Suite 201
22                   Akron, Ohio
23
24
              Stephen J. DeBacco, RPR

Page 2

1  APPEARANCES:
2
3  On behalf of the City of Akron, Summit
   County, and the Witness:
4
   Motley Rice LLC, by
5  ANNE MCGINNESS KEARSE, ESQ.
   JODI WESTBROOK FLOWERS, ESQ.
6  ANNIE E. KOUBA, ESQ.
   DANIELLE M. SALERNO, ESQ.
7  28 Bridgeside Boulevard
   Mt. Pleasant, South Carolina 29464
8  (843) 216-9140
   akearse@motleyrice.com
9  (843) 216-9163
   jflowers@motleyrice.com
10 (843) 216-9225
   akouba@motleyrice.com
11 (843) 216-9461
   dsalerno@motleyrice.com
12
13
   On behalf of Cardinal Health:
14
   Williams & Connolly, by
15 PAUL E. BOEHM, ESQ.
   MELINDA JOHNSON, ESQ.
16 Williams & Connolly LLP
   725 Twelfth Street Northwest
17 Washington, D.C. 20005
   (202) 434-5366
18 pboehm@wc.com
   (202) 434-5181
19 mkjohnson@wc.com
20    ~ ~ ~ ~ ~
21
22
23
24
25

Page 3

1  APPEARANCES, Continued:
2
   On behalf of Cephalon, Inc.; Teva
3  Pharmaceuticals USA, Inc.; Actavis, LLC;
   Actavis Pharma, Inc. f/k/a Watson Pharma,
4  Inc.; and Watson Laboratories, Inc.:
5  Morgan, Lewis & Bockius LLP, by
   WENDY WEST FEINSTEIN, ESQ.
6  One Oxford Centre, 32nd Floor
   Pittsburgh, Pennsylvania 15219-6401
7  (412) 560-7455
   wendy.feinstein@morganlewis.com
8
9  On behalf of Endo Health Solutions, Inc.,
   and Endo Pharmaceuticals, Inc.:
10
   Baker Hostetler, by
11 CAROLE S. RENDON, ESQ.
   Key Tower
12 127 Public Square, Suite 2000
   Cleveland, Ohio 44114-1214
13 (216) 861-7420
   crendon@bakerlaw.com
14
15 On behalf of Johnson & Johnson and
   Janssen Pharmaceuticals, Inc.:
16
   Tucker Ellis, LLP, by
17 BRENDA A. SWEET, ESQ.
   950 North Main Avenue, Suite 1100
18 Cleveland, Ohio 44113
   (216) 696-2493
19 brenda.sweet@tuckerellis.com
20    ~ ~ ~ ~ ~
21
22
23
24
25

Page 4

1  APPEARANCES, Continued:
2
3  On behalf of CVS Rx Services, Inc., and
   CVS Indiana, LLC:
4
   Zuckerman Spaeder LLP, by
5  DANIEL P. MOYLAN, ESQ.
   100 East Pratt Street, Suite 2440
6  Baltimore, Maryland 21202-1031
   (410) 949-1159
7  dmoylan@zuckerman.com
8
   On behalf of Walmart, Inc.:
9
   Jones Day, by
10 MEREDITH C. KINCAID, ESQ.
   1420 Peachtree Street Northeast
11 Suite 800
   Atlanta, Georgia 30309-3053
12 (404) 581-8043
   mkincaid@jonesday.com
13
14 On behalf of Cardinal Health, via
   Teleconference:
15
   Williams & Connolly, LLP, by
16 BRAD MASTERS, ESQ.
   725 Twelfth Street Northwest
17 Washington, D.C. 20005
   (202) 434-5182
18 bmasters@wc.com
19    ~ ~ ~ ~ ~
20
21
22
23
24
25

Page 5

1  APPEARANCES, Continued:
2
   On behalf of Cephalon, Inc.; Teva
3  Pharmaceuticals USA, Inc.; Actavis, LLC;
   Actavis Pharma, Inc. f/k/a Watson Pharma,
4  Inc.; and Watson Laboratories, Inc., via
   teleconference:
5
   Morgan, Lewis & Bockius LLP, by
6  PAMELA HOLLY, ESQ.
   101 Park Avenue
7  New York, New York 10178-0060
   (212) 309-6864
8  pamela.holly@morganlewis.com
9
   On behalf of AmerisourceBergen Drug
10 Corporation, via teleconference:
11 Reed Smith LLP, by
   KELLY H. HIBBERT, ESQ.
12 1301 K Street Northwest, Suite 1000
   East Tower
13 Washington, D.C., 20005
   (202) 414-9226
14 khibbert@reedsmith.com
15
   On behalf of McKesson Corporation:
16
   Covington & Burling LLP, by
17 PATRICK R. CAREY, ESQ.
   One Front Street
18 San Francisco, California 94111-5356
   (415) 591-7093
19 pcarey@cov.com
20    ~ ~ ~ ~ ~
21 ALSO PRESENT:
22    Kurt Henschel, Legal Videographer
23    ~ ~ ~ ~ ~
24
25

2 (Pages 2 - 5)

Page 6

1           TRANSCRIPT INDEX
2
3   APPEARANCES.............................    2
4
5   INDEX OF EXHIBITS .......................    7
6
7   EXAMINATION OF GERALD CRAIG
8   By Mr. Boehm.............................    20
9   By Ms. Feinstein.........................   404
10  By Mr. Moylan............................   412
11  By Mr. Kearse............................   428
12  By Mr. Boehm.............................   429
13  By Ms. Kearse............................   429
14  By Mr. Boehm.............................   429
15
16  REPORTER'S CERTIFICATE...................   432
17
18  EXHIBIT CUSTODY
19  EXHIBITS RETAINED BY THE COURT REPORTER
20
21
22
23
24
25

Page 7

1           INDEX OF EXHIBITS
2   NUMBER        DESCRIPTION        MARKED
3   Exhibit 1   5/3/2018 E-Mail Chain Re: ....  73
        Meeting, SUMMIT_001104515 to
4       001104516
5   Exhibit 2   11/2/2017 E-Mail Chain .......  97
        Between Jerry Craig and
6       Cheri Walter Re: Opiate
        Lawsuit, SUMMIT_001090134 to
7       001090135
8   Exhibit 3   Web Printout, Jerry Craig ....  106
        LinkedIn Profile
9
    Exhibit 4   Document Titled, "Continuity .  116
10      of Operations Plan Calling
        Tree," SUMMIT_001122421
11
    Exhibit 5   Ohio Department of Health, ...  134
12      Violence and Injury
        Prevention Program Document,
13      First Heading "Epidemic of
        Prescription Drug Overdose
14      in Ohio"
15  Exhibit 6   Document Titled "Community ...  145
        Play Guidelines for SFY 2012
16      - 2013," SUMMIT_001170991 to
        001171802
17
    Exhibit 7   7/22/2011 Document Titled ....  152
18      "Craig's List,"
        SUMMIT_001233373 to
19      001233374
20  Exhibit 8   Summit County ADM Board 2012 .  169
        Budget, SUMMIT_001147357 to
21      001147365
22  Exhibit 9   Summit County ADM Board 2013 .  169
        Budget, SUMMIT_001220716 to
23      001220731
24  Exhibit 10  Summit County ADM Board 2014 .  170
        Budget, SUMMIT_001018649 to
25      001018665

Page 8

1   Exhibit 11  Summit County ADM Board 2015 .  170
        Budget, SUMMIT_001113145 to
2       001113162
3   Exhibit 12  Summit County ADM Board 2016 .  170
        Budget, SUMMIT_001024592 to
4       001024609
5   Exhibit 13  Summit County ADM Board 2017 .  170
        Budget
6
    Exhibit 14  Summit County ADM Board 2018 .  171
7       Budget - SUMMIT_001080804 to
        001080819
8
    Exhibit 15  ADM Board Document Titled ....  200
9       "Report on Opiate Epidemic
        Impact"
10
    Exhibit 16  10/1/2010 Document Titled ....  223
11      "Ohio Prescription Drug
        Abuse Task Force: Final
12      Report Task Force
        Recommendations
13
    Exhibit 17  ADM Slide Deck Titled ........  253
14      "Summit County Opiate Task
        Force: Key Stakeholders
15      Meeting"
16  Exhibit 18  Document Titled "Opioid ......  262
        Painkiller Prescribing:
17      Where You Live Makes a
        Difference,"
18      Summit_001112390 to
        001112393
19
    Exhibit 19  Ohio House of ................  290
20      Representatives Prescription
        Drug Addiction and
21      Healthcare Reform
        Legislative Study Committee
22      Chairman's Report,
        SUMMIT_001017850 to
23      001017865
24
25

Page 9

1   Exhibit 20  Federation of State Medical ..  315
        Boards Model Policy on the
2       Use of Opioid Analgesics in
        the Treatment of Chronic
3       Pain, July 2013,
        SUMMIT_001233672 to
4       001233700
5   Exhibit 21  3/22/2016 E-Mail Re: The .....  321
        Recorder: Missing Mark on
6       Addiction, SUMMIT_001039666
        to 001039667
7
    Exhibit 22  10/10/2017 E-Mail Chain Re: ..  326
8       Update from Dr. Gilson,
        CUYAH_002049206 to 002048210
9
    Exhibit 23  ADM Slide Deck Titled "The ...  332
10      Opiate Epidemic: Our
        Community Response"
11
    Exhibit 24  1/21/2011 Document Titled ....  338
12      "Craig's List,"
        SUMMIT_001233282 to
13      001233283
14  Exhibit 25  10/22/2013 E-Mail Re: OARRS .  346
        Quarterly Statistics for
15      Summit County, with
        Attachment, SUMMIT-001017988
16
    Exhibit 26  10/26/2015 E-Mail Chain Re: .  358
17      CDC Health Advisory -
        Fentanyl-Related Overdose
18      Fatalities, SUMMIT_001029476
        to 001029477
19
    Exhibit 27  March 2018 E-Mail Chain Re: .  361
20      Plan - Progressive Opioid
        Event, with Attachment,
21      SUMMIT_001102842 to
        001102843
22
    Exhibit 28  OSAM Document Titled "Drug ...  370
23      Abuse Trends in the
        Akron-Canton Region,"
24      Summit_001103531 to
        001103554
25

Page 10

1  Exhibit 29  Ohio Department of Health .... 376
          Document Titled "2016 Ohio
2          Drug Overdose Data: General
          Findings," SUMMIT_001085401
3          to 001085408
4  Exhibit 30  ADM Board Document Titled .... 389
          "Summit County Quick
5          Response Team,"
          SUMMIT_001793050 to
6          001793051
7  Exhibit 31  June 2015 E-Mail Chain ....... 395
          between Kim McMahan and
8          Jerry Craig Re: Prescribing,
          SUMMIT_001022445 to
9          001022447
10  Exhibit 32  9/15/2016 E-Mail Chain ....... 421
          between Douglas Smith and
11          Jerry Craig Re: Pharmacies
          with Naloxone,
12          SUMMIT_000870043 to
          000870044
13

    Exhibit 33  3/29/2016 E-Mail Re: Very .... 422
14          Important Invitation and New
          Information," etc., with
15          Attachment, SUMMIT_001040139
          to 001040146
16
17
18
19
20
21
22
23
24
25

Page 11

1          INDEX OF VIDEO OBJECTION
2  OBJECT                    PAGE
3  object............................  25
    objection......................  29
4  object............................  30
    object............................  31
5  object............................  32
    object............................  36
6  object............................  38
    object............................  38
7  object............................  39
    object............................  39
8  object............................  40
    object............................  41
9  object............................  42
    object............................  42
10  object............................  43
    object............................  44
11  object............................  44
    object............................  44
12  objection......................  45
    object............................  45
13  object............................  47
    object............................  47
14  object............................  48
    object............................  49
15  object............................  49
    object............................  51
16  object............................  52
    object............................  52
17  object............................  53
    object............................  54
18  object............................  58
    object............................  58
19  object............................  58
    object............................  60
20  object............................  60
    object............................  61
21  object............................  61
    objection......................  62
22  object............................  62
    object............................  63
23  object............................  66
    object............................  67
24  object............................  69
    object............................  69
25  object............................  70

Page 12

1  object............................  71
    object............................  72
2  object............................  72
    object............................  72
3  object............................  74
    object............................  75
4  object............................  75
    object............................  76
5  objection......................  77
    object............................  78
6  object............................  79
    object............................  81
7  object............................  81
    object............................  81
8  object............................  83
    object............................  84
9  object............................  84
    object............................  84
10  object............................  85
    object............................  85
11  object............................  86
    object............................  86
12  object............................  86
    object............................  87
13  object............................  89
    object............................  89
14  objection......................  89
    object............................  90
15  object............................  90
    objection......................  90
16  objection......................  90
    object............................  93
17  objection......................  94
    objection......................  95
18  object............................  95
    object............................  96
19  object............................  102
    object............................  103
20  object............................  109
    object............................  110
21  object............................  111
    object............................  114
22  object............................  116
    object............................  117
23  object............................  121
    object............................  122
24  object............................  122
    object............................  122
25  objection......................  123

Page 13

1  object............................  124
    objection......................  124
2  object............................  130
    object............................  130
3  object............................  131
    object............................  131
4  object............................  133
    object............................  137
5  object............................  138
    object............................  139
6  object............................  142
    object............................  142
7  object............................  142
    object............................  144
8  object............................  144
    objection......................  147
9  object............................  148
    object............................  148
10  object............................  149
    object............................  151
11  objection......................  152
    objection......................  153
12  object............................  154
    object............................  155
13  object............................  157
    object............................  158
14  object............................  159
    object............................  159
15  object............................  161
    object............................  161
16  object............................  162
    object............................  163
17  objection......................  164
    objection......................  165
18  objection......................  167
    objection......................  167
19  objection......................  167
    objection......................  168
20  objection......................  168
    object............................  168
21  object............................  185
    object............................  186
22  object............................  191
    object............................  196
23  object............................  197
    object............................  198
24  object............................  199
    object............................  206
25  object............................  206

4 (Pages 10 - 13)

Page 14

1 object................................. 210
  object................................. 211
2 object................................. 214
  object................................. 216
3 object................................. 218
  object................................. 218
4 object................................. 219
  object................................. 219
5 object................................. 220
  object................................. 221
6 object................................. 222
  object................................. 223
7 object................................. 226
  object................................. 226
8 object................................. 229
  object................................. 229
9 object................................. 231
  object................................. 235
10 object................................ 237
  object................................. 238
11 object................................ 241
  object................................. 242
12 object................................ 244
  object................................. 245
13 object................................ 246
  object................................. 248
14 object................................ 248
  object................................. 249
15 objection............................ 250
  object................................. 250
16 object................................ 250
  object................................. 251
17 object................................ 251
  object................................. 252
18 object................................ 252
  object................................. 255
19 object................................ 257
  object................................. 257
20 objection............................ 258
  object................................. 258
21 object................................ 261
  object................................. 263
22 object................................ 264
  object................................. 265
23 object................................ 266
  object................................. 267
24 object................................ 269
  object................................. 270
25 object................................ 270

Page 15

1 object................................. 270
  object................................. 272
2 object................................. 277
  object................................. 278
3 object................................. 279
  object................................. 281
4 object................................. 283
  object................................. 284
5 object................................. 284
  object................................. 285
6 objection............................. 286
  objection............................. 286
7 object................................. 286
  object................................. 287
8 object................................. 287
  object................................. 287
9 object................................. 288
  object................................. 288
10 object................................ 289
  object................................. 294
11 object................................ 296
  object................................. 297
12 object................................ 297
  object................................. 298
13 object................................ 299
  object................................. 300
14 object................................ 300
  object................................. 304
15 object................................ 306
  object................................. 306
16 object................................ 307
  object................................. 307
17 object................................ 307
  object................................. 308
18 object................................ 308
  object................................. 310
19 object................................ 310
  object................................. 311
20 object................................ 312
  object................................. 313
21 object................................ 313
  object................................. 314
22 object................................ 314
  object................................. 315
23 objection............................ 317
  object................................. 317
24 object................................ 318
  object................................. 320
25 object................................ 321

Page 16

1 object................................. 322
  object................................. 322
2 objection............................. 322
  object................................. 323
3 object................................. 324
  object................................. 325
4 object................................. 328
  object................................. 329
5 object................................. 329
  object................................. 334
6 object................................. 335
  object................................. 336
7 object................................. 337
  object................................. 339
8 object................................. 339
  objection............................. 340
9 object................................. 341
  object................................. 342
10 object................................ 344
  object................................. 347
11 object................................ 348
  object................................. 352
12 object................................ 361
  object................................. 361
13 object................................ 363
  object................................. 363
14 object................................ 364
  object................................. 365
15 object................................ 365
  object................................. 366
16 object................................ 366
  object................................. 368
17 object................................ 368
  object................................. 369
18 object................................ 373
  object................................. 373
19 object................................ 374
  objection............................. 374
20 object................................ 377
  object................................. 378
21 object................................ 381
  object................................. 381
22 object................................ 381
  object................................. 385
23 object................................ 386
  object................................. 387
24 object................................ 388
  objection............................. 389
25 object................................ 395

Page 17

1 object................................. 402
  object................................. 403
2 object................................. 403
  objection............................. 403
3 Object................................. 406
  object................................. 406
4 object................................. 407
  object................................. 408
5 object................................. 408
  object................................. 408
6 object................................. 408
  object................................. 412
7 object................................. 412
  object................................. 416
8 object................................. 416
  object................................. 416
9 object................................. 416
  object................................. 420
10 object................................ 420
  objection............................. 424
11 object................................ 425
  objection............................. 426
12 object................................ 426
  object................................. 427
13
14
15
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions

Page 18

1  THE VIDEOGRAPHER:  Today's date is
2  January 11, 2019.  We're on the record at 9:12.
3  We're here in the matter of the
4  National Prescription Opiate Litigation.
5  This deposition is taking place in
6  Akron, Ohio.
7  Will counsel please identify
8  themselves for the record.
9  MR. BOEHM:  Paul Boehm --
10  MS. KEARSE:  Anne --
11  MR. BOEHM:  I'm sorry.  Go ahead,
12  Anne, please.
13  MS. KEARSE:  Anne Kearse, County of
14  Summit, City of Akron, and Jerry Craig with
15  ADM.
16  MS. KOUBA:  Annie Kouba with Motley
17  Rice on behalf of the County of Summit, the
18  City of Akron, and Jerry Craig, the witness.
19  MS. FLOWERS:  Jodi Flowers on
20  behalf of Summit County, City of Akron, and the
21  witness.
22  MS. SALERNO:  Danielle Salerno with
23  Motley Rice on behalf of City of Akron, Summit
24  County, and the witness.
25  MR. BOEHM:  Paul Boehm for Williams

Page 19

1  & Connolly for Cardinal.  I'm joined by my
2  colleague Melinda Johnson.  We're from Williams
3  & Connolly.
4  MS. FEINSTEIN:  Wendy West
5  Feinstein with Morgan Lewis for the Teva
6  Defendants.
7  MS. RENDON:  Carole Rendon, Baker
8  Hostetler, for the Endo Defendants.
9  MR. MOYLAN:  Daniel Moylan,
10  Zuckerman Spaeder, for the CVS Defendants.
11  MS. KINCAID:  Meredith Kincaid with
12  Jones Day for Walmart.
13  MS. SWEET:  Brenda Sweet of Tucker
14  Ellis, LLP, for Janssen Pharmaceuticals and
15  Johnson & Johnson.
16  THE VIDEOGRAPHER:  And by
17  telephone?
18  MR. MASTERS:  Brad Masters for
19  Cardinal Health.
20  MS. HOLLY:  Pam Holly with Morgan
21  Lewis on behalf of Teva Defendants.
22  MS. HIBBERT:  Kelly Hibbert of Reed
23  Smith on behalf of AmerisourceBergen Drug
24  Corporation.
25  MR. CAREY:  Patrick Carey of

Page 20

1  Covington & Burling on behalf of McKesson
2  Corporation.
3  GERALD CRAIG, of lawful age, called for
4  examination as provided by the Federal Rules of
5  Civil Procedure, being by me first duly sworn,
6  as hereinafter certified, deposed and said as
7  follows:
8  EXAMINATION OF GERALD CRAIG
9  BY MR. BOEHM:
10  Q.  Good morning, Mr. Craig.
11  A.  Good morning.
12  Q.  Thank you for being here.  My name
13  is Paul Boehm.  I represent one of the
14  Defendants, and I'll be asking you some
15  questions today.
16  We introduced ourselves before we
17  went on the record, and just wanted to do that
18  again on the record.
19  Have you ever been deposed before
20  today?
21  A.  Yes.
22  Q.  When was that?
23  A.  Probably back in the mid-'80s.
24  Q.  Have you been deposed more than
25  once?

Page 21

1  A.  No.
2  Q.  What was the matter in which you
3  were deposed in the mid-1980s?
4  A.  It was a civil litigation on an HR
5  issue.
6  Q.  Were you a party in the litigation?
7  A.  Yes, I was.
8  Q.  Were you a plaintiff or a
9  defendant?
10  A.  I was the defendant.
11  Q.  What was the nature of the claims?
12  What were the nature of the claims in that
13  litigation?
14  A.  It -- it was a civil rights
15  complaint that I was unfairly promoted.
16  Q.  Who was the plaintiff?
17  A.  The individual who was not
18  promoted.
19  Q.  And what was the outcome of that
20  litigation?
21  A.  I believe we prevailed.
22  Q.  Did it go to trial?
23  A.  No, it did not.
24  Q.  When you say you prevailed, what do
25  you mean by that?

6 (Pages 18 - 21)

Page 22

1     A.    I mean that there -- there was --
2  it was found that there was no basis for the
3  claim.
4     Q.    A judge found that?
5     A.    To be honest, I didn't -- I --
6  it's -- I don't recall.  I don't recall exactly
7  how that -- how that was brought to conclusion.
8     Q.    Were you accused of some kind of
9  misconduct?
10    A.    No.
11    Q.    Have you ever testified in any
12 other context?
13    A.    Yes.  I was -- I was a
14 representative at the organization I was
15 working at the time, Community Support
16 Services, in a civil matter related to the
17 murder of a resident of a group home.
18    Q.    Did you testify in a deposition or
19 in a courtroom?
20    A.    I testified in a courtroom.
21    Q.    When was that?
22    A.    That was in the early 2000s.
23    Q.    Other than the two instances that
24 you've now described, have you ever given any
25 other sworn testimony?

Page 23

1     A.    Not that I can recall.
2     Q.    Okay.  You may recall from your
3  prior occasions of having to testify, and
4  particularly in the context of the deposition,
5  there are some basic ground rules that we try
6  to follow.  So far I think we've both been
7  doing a pretty good job.
8           But as the day wears on, we'll want
9  to make sure that we're not talking at the same
10 time, and that is so you hear my question and
11 so that I can hear all of your answer.  And it
12 also helps Stephen, who is our court reporter
13 today, who needs to be writing everything down
14 that we say.
15          Does that make sense?
16    A.    Fair enough.
17    Q.    If -- if your lawyer says
18 "objection," as she might today --
19          MS. KEARSE:  You think?
20          MR. BOEHM:  I hope not, but we'll
21 see.  I left open the possibility you wouldn't.
22          MS. KEARSE:  We've been three
23 minutes into it.  Okay.
24    Q.    -- you understand that you should
25 continue to answer the question?

Page 24

1     A.    Yes.
2     Q.    Okay.
3           MS. KEARSE:  Unless I instruct him
4  not to answer.
5     Q.    Right.  I'm talking about just an
6  objection to a question.  You do understand
7  that?
8     A.    Excuse me.  Yes, I do.
9     Q.    What have you done to prepare for
10 your deposition here today?
11    A.    We've had a series of meetings with
12 our attorneys.
13    Q.    When you say "we," tell me what you
14 mean.
15    A.    Representatives from our
16 organization, and myself included.
17    Q.    Who are the people from your
18 organization that have had these meetings with
19 your attorneys?
20    A.    I'm not aware of -- of all of them,
21 but I can -- I can state that Kim Patton --
22          MS. KEARSE:  Can I ask for
23 clarification?  And I'm done interrupting, but
24 I believe that the question was in preparation
25 of your deposition?

Page 25

1     Q.    Go ahead.  Yeah, go ahead.
2     A.    In -- in preparation -- okay.
3     Q.    Go ahead.
4     A.    Can you ask the question again,
5  then, please?
6     Q.    Can you just go ahead and finish,
7  and then I'll ask my next -- my next question.
8           MS. KEARSE:  I think he just asked
9  for you to the question.
10    A.    Could you repeat the question so
11 that I understand what you're asking?
12    Q.    You had -- you had said that there
13 had been meetings that I understood you to be
14 saying you have participated in?
15    A.    There have been meetings that I
16 have participated in, yes --
17    Q.    Okay.  And -- and who --
18    A.    -- with our -- with our attorneys.
19    Q.    Okay.  And who participated in
20 those meetings?
21          MS. KEARSE:  I'm going to object to
22 the -- I want to make sure he's answering your
23 initial question, so I would ask the court
24 reporter to make sure we're answering the
25 question you initially asked.

7 (Pages 22 - 25)

Page 26

1    If you asked him a new question and
2 you don't want him to finish that, that's fine.
3    Q.   Okay.  Let's just -- let's back up
4 for a minute.
5        My first question was what have
6 you -- what have you done to prepare for your
7 deposition here today, and you indicated that
8 you had participated in a series of meetings
9 with others.
10    A.   I've participated in a series of
11 meetings with the attorneys from Motley Rice.
12    Q.   Who participated in those meetings?
13    A.   In preparation for my deposition,
14 just me.
15    Q.   Okay.  So you -- you've -- you're
16 indicating, I think, that you've met with the
17 attorneys for other purposes, but for purposes
18 of your preparation for a deposition, the
19 meetings have just involved you and lawyers
20 from Motley Rice; is that --
21    A.   Those --
22    Q.   -- right?
23    A.   I'm sorry.  Those meetings that
24 were specific to my deposition, only me and the
25 attorneys.

Page 27

1    Q.   Okay.  When did you meet with your
2 attorneys to prepare for your deposition here
3 today?
4    A.   On several occasions over the past
5 four months or so.
6    Q.   How many times?
7    A.   If I had to guess, I would say
8 maybe five times.
9    Q.   For how long have you met?
10    A.   Generally for several hours at a
11 stretch.
12    Q.   Half a day?  A full day?
13    A.   Most of the time it's been roughly
14 three or four hours.
15    Q.   When did you most recently meet
16 with your attorneys here to prepare for your
17 deposition?
18    A.   Yesterday.
19    Q.   How long did you meet yesterday?
20    A.   About four hours.
21    Q.   And before that, when had you last
22 met with the lawyers for Motley Rice to prepare
23 for your deposition?
24    A.   On Monday.
25    Q.   How about before that?

Page 28

1    A.   Before that, I'm not sure I could
2 give you a date.
3    Q.   Okay.  Did anybody other than
4 attorneys from Motley Rice attend the meetings
5 that you've had to prepare for your deposition?
6    A.   No.
7    Q.   Have you talked with anybody other
8 than the attorneys for Motley Rice about the
9 fact that you would be giving deposition
10 testimony today?
11    A.   I may have, yes.
12    Q.   Who have you spoken with about
13 that?
14    A.   My wife.  Possibly one of my
15 children.
16    Q.   Anybody else?
17    A.   No one who I can recall
18 specifically, but I may have mentioned it.
19    Q.   Have you spoken with any of your
20 professional work colleagues about the fact
21 that you'd be giving a deposition?
22    A.   Oh, yes.
23    Q.   Who have -- who have you talked
24 with?
25    A.   On Tuesday mornings I have a

Page 29

1 meeting with all of my staff, and I go over my
2 schedule with them.  And so one of the -- one
3 of the things that I mentioned is that this is
4 the week that I would be giving my deposition.
5    Q.   Have you discussed with your work
6 colleagues in any way the questions you might
7 be asked or the testimony you might give in
8 response to the questions that you are asked
9 during today's deposition?
10    A.   No.  No.  I may have spoken to them
11 about some information that would help me
12 prepare a little bit for a deposition.
13    Q.   What information did you discuss
14 with your colleagues might help you prepare for
15 your deposition?
16    A.   Some information about our
17 financial -- some of our finances related to
18 the opiate epidemic.
19    Q.   What?
20    A.   Just general --
21        MS. KEARSE:  Objection.
22    A.   Just general --
23        MS. KEARSE:  Just to the form.
24    A.   -- general -- general questions
25 about methodology that -- that we utilized in

8 (Pages 26 - 29)

Page 30

1 order to come up with the damages or the cost
2 associated with the opiate epidemic.
3    Q.   And I'm asking you for the
4 particulars of those conversations.  Not just
5 for the high-level, had a conversation about
6 it.  I want to know what you discussed.
7       MS. KEARSE:  Object to form.
8    A.   I don't have -- I don't have
9 a recollection of the exact nature of the
10 conversations.  I think part of those
11 conversations had to do with whether or not we
12 covered all of the -- all of the expenses
13 related to the opiate epidemic in -- in the
14 different domains, including the treatment
15 services, prevention services, our work with
16 the Opiate Task Force, and also the time that
17 our staff had been spending to respond to
18 opiate-related community requests.
19    Q.   What did you determine about that?
20    A.   Well, we were -- we were able to --
21 we were able to kind of clarify, you know, a
22 methodology that we were -- we would all be
23 able to use.
24    Q.   What was the methodology you -- you
25 decided you would use for that?

Page 31

1    A.   Just that we were covering all of
2 the -- all topics and all of the
3 activities.
4    Q.   No, I'm asking about the
5 methodology that you would use.
6    A.   Perhaps that wasn't the best way to
7 state it.
8       It was more or less whether or not
9 we had covered all the different activities
10 related to our response to the opiate epidemic.
11    Q.   And what did you conclude?
12    A.   Our conclusion was that we were
13 satisfied at the end of the -- at the end of
14 this -- this conversation, that we had covered
15 everything that we could think of collectively
16 to address any costs associated with the opiate
17 epidemic.
18    Q.   And when you say that you had
19 covered all the categories that you thought
20 were associated with the opiate abuse epidemic
21 in Summit County --
22       MS. KEARSE:  Object to form.
23 Mischaracterizes his testimony.
24       MR. BOEHM:  I'm sorry.  I'm not
25 even halfway done with my question.

Page 32

1       MS. KEARSE:  All right.  Well, you
2 just --
3       MR. BOEHM:  So just wait until I'm
4 done and then you can object.
5    Q.   So I believe you testified that you
6 had had a conversation about whether or not the
7 Summit County ADAMHS Board had accounted for
8 all the categories of expenses that you have
9 incurred in connection with the opioid abuse
10 epidemic in the county; is that right?
11       MS. KEARSE:  Object to form.
12 Misstates his testimony.
13    A.   I'm -- you're -- you're going to
14 need to ask that question with a little bit
15 more clarity, because I'm not sure I follow
16 you.
17    Q.   Okay.  We can do this the hard way,
18 I guess.
19       You indicated, you told me, that
20 you had had conversations with people on your
21 staff about whether or not you had accounted
22 for the various categories of expenditures for
23 the ADAMHS Board, right?
24    A.   That's correct.
25    Q.   Okay.  And you said you concluded

Page 33

1 that you had accounted for all those
2 categories, right?
3    A.   To the best of our knowledge, yes.
4    Q.   Did you write those down?
5    A.   We did collect that information,
6 yes.
7    Q.   Where is that information right
8 now?
9    A.   We provided that information to our
10 attorneys.
11    Q.   Okay.  Did you send it -- did you
12 discuss that with your work colleagues by
13 e-mail?
14    A.   I don't believe we did, no.
15    Q.   What are all the categories of
16 expenditures that you -- you believe that the
17 Summit County ADAMHS Board has incurred in
18 connection with the opioid abuse epidemic?
19    A.   Well, as I said before, the
20 activities of the Opiate Task Force, our
21 education and community involvement and
22 engagement, our support services, staff time.
23       Trying to remember if there are any
24 others that I may have forgotten.
25    Q.   I'll give you --

9 (Pages 30 - 33)

Page 34

1     A.    And -- and claims --
2     Q.    I'll give you a minute.
3     A.    And claims -- and claims
4  information, of course.  Claims information on
5  funds that were utilized to pay for people who
6  were diagnosed with a substance use disorder,
7  primarily with an opioid diagnosis.
8     Q.    Anything else?
9     A.    I think that covers -- I think that
10  covers it.
11     Q.    When did you have these
12  conversations with your staff?
13     A.    This has been a series of
14  conversations probably over several months.
15     Q.    When have you most recently had
16  conversations with your staff about these
17  categories?
18     A.    Earlier this week I had a
19  conversation with my chief clinic -- or my
20  chief operating officer to clarify the process
21  by which our agencies were paid.
22     Q.    When you say "your agencies," you
23  mean the agencies -- the contracting agencies
24  that the ADAMHS Board funds?
25     A.    Yes, the contract agencies.

Page 35

1     Q.    Have you performed a calculation or
2  a computation of what you believe to be the
3  expenditures the Summit County ADAMHS Board has
4  made in -- with respect to each of the
5  categories you just identified?
6     A.    I did not personally, but our
7  organization did create a -- a document.
8     Q.    Who did that?
9     A.    It was under the -- it was under
10  the stewardship of our chief operating officer,
11  Jen Peivich.
12     Q.    When did Jen do that?
13     A.    I can't tell you specifically when.
14  I don't -- I can't assign a month or -- but it
15  was several months ago.
16     Q.    Was it in the last six months?
17     A.    Yes.
18     Q.    What was the total amount that
19  Ms. Peivich determined the ADAMHS Board here in
20  Summit County had incurred in terms of
21  expenditures specifically related to the opioid
22  abuse epidemic?
23         MS. KEARSE:  And I'm just going to
24  counsel the witness if anything was done at the
25  advice of counsel or for counsel with

Page 36

1  litigation there, that is privileged
2  information, to the extent that's what we're
3  talking about.
4     A.    I don't recall the total.  The --
5  the total, I could not -- I could not give you
6  that number with any degree of certainty.
7     Q.    Could you give me a rough ballpark
8  of what that number was?
9     A.    No, because we looked at so many
10  iterations of the numbers, I don't remember
11  exactly what we finally arrived at.
12     Q.    Do you know what methodology
13  Ms. Peivich used in computing what she believed
14  to be the expenditures the Summit County ADAMHS
15  Board had incurred in connection with the
16  opioid abuse epidemic --
17         MS. KEARSE:  Object to --
18     Q.    -- in this county?
19         MS. KEARSE:  Object to form.
20     A.    Generally, I -- I -- she and I
21  discussed methodology.  She proposed some
22  methodologies, and we selected what we felt
23  would be conservative and defendable, those
24  expenditures that we could best track directly
25  to expenditures of funds; and for those that we

Page 37

1  could not -- and those were nominal, such as
2  staff time -- we did our best estimate.
3     Q.    Do I understand correctly that you
4  considered a variety of different methodologies
5  for calculating your costs?
6     A.    Yes.
7     Q.    And then you sel- -- you selected
8  among those options, one?
9     A.    No.  It depended on the source of
10  the data.  For example, we -- one methodology
11  we used was to pull claims data that listed
12  individuals who had a substance use disorder
13  who also were -- were diagnosed with an opiate
14  dependence.  So that would be one methodology
15  for one aspect of what we collected information
16  for.
17         We also collected information
18  around the expenditures for our marketing and
19  community relations specifically targeted to
20  the opiate epidemic.
21         We also -- we also looked at
22  invoices and other payments that we made
23  related -- for any activity related to the
24  opiate epidemic outside of the Opiate Task
25  Force.  And, of course, any expenditures that

10 (Pages 34 - 37)

Page 38

1 we made to agencies to capitalize startup for
2 programs and services.  We -- and -- and
3 probably others that I'm not -- that I'm not
4 necessarily capturing.
5      But there -- there were various
6 methodologies for various ways of collecting
7 data, depending on where those activities
8 were -- were funded or tracked within our
9 system.
10     Q.   So you used a variety of
11 methodologies depending on the category of the
12 expenditure or the particular nature of it, an
13 expenditure, to calculate what you believed to
14 be a total amount of money that the Summit
15 County ADAMHS Board spent in connection with
16 the opioid abuse epidemic here in this county.
17     Did I summarize that fairly?
18     MS. KEARSE:  Object to form.
19     A.   I would say that would be accurate.
20     Q.   Okay.  And did you keep a record of
21 the methodologies that you used to perform
22 these computations and calculations?
23     MS. KEARSE:  Object to form.
24     A.   I did not keep a record of the
25 methodology.  Most of this was -- was were

Page 39

1 conversations.  It's -- it's possible, but --
2 but I don't know for certain that our chief
3 operating officer did.  But I don't -- but I
4 can't say that with any degree of certainty.
5      Q.   You don't know whether Ms. Peivich
6 kept a record of the methodologies that you all
7 used to perform these computations?
8      MS. KEARSE:  Object to form.
9      A.   That's correct.
10     Q.   Okay.  Did you ask her to keep a --
11 the methodology -- keep a record of the
12 methodologies that were used?
13     A.   I did not ask her to keep a record
14 of the methodologies she used.
15     Q.   So if somebody were to look at the
16 number that she arrived at, would it be
17 possible to reverse engineer that to try and
18 understand exactly how you all came to the
19 conclusions you reached?
20     MS. KEARSE:  Object to form.
21     A.   It would be possible.
22     Q.   How would one go about that?  Would
23 they have to talk to you, or would there be
24 some other manner by which they could see your
25 number and then reverse engineer it to make

Page 40

1 sure there weren't any mistakes along the way?
2      MS. KEARSE:  Object to form.
3      A.   If we were asked about a specific
4 expenditure, I'm relatively confident that we
5 could replicate that number through -- through
6 the information that we have available.
7      Q.   Okay.  And you broke those
8 expenditures down category by category,
9 correct?
10     A.   That's correct.
11     Q.   And expense by expense?
12     A.   Yes.
13     Q.   And I think you indicated you
14 provided that to your lawyers, right?
15     A.   That's correct.
16     Q.   When did you do that?
17     A.   Again, we -- we provided this
18 information on a number of occasions.  I think
19 we provided it prior to the -- to entering the
20 litigation.  We provided that information to
21 the -- through the County Executive's Office,
22 and then later we provided some updated
23 information as we provided a little bit more
24 thoughtful list of -- of expenditures.
25     Q.   Is it fair to say that a lot of the

Page 41

1 work that the Summit County ADAMHS Board
2 performs involves a variety of different
3 substance abuse disorders, not just one?
4      MS. KEARSE:  Object to form.
5      A.   That would be accurate.
6      Q.   So, for example, some of the
7 services the ADAMHS Board funds go toward
8 treatment of a variety of different addictions
9 to a variety of different substances, fair?
10     A.   And to a variety of different
11 mental health disorders.
12     Q.   Right.  And indeed, isn't it also
13 true that some of the -- the funds that are
14 used by service contracting agencies funded by
15 the Summit County ADAMHS Board devote those
16 monies to individuals who suffer from a variety
17 of different substance abuse disorders and
18 mental health disorders?
19     A.   That would be correct.
20     Q.   Given the complexity of that, how
21 did you and -- or Ms. Peivich and whoever else
22 was involved in this process go about teasing
23 out opioid-specific expenditures from
24 expenditures that involved perhaps
25 polysubstance abuse disorders, mental health

11 (Pages 38 - 41)

Page 42

1 disorders, or addictions to a variety of other
2 substances?
3        MS. KEARSE:  Object to form.
4    A.    So our organization acts as an
5 insurance company.  We have -- we have claims
6 that are submitted by our agencies that -- that
7 document the services that they provide.  As
8 part of the claims process, they have to
9 identify the diagnosis of the individual for
10 whom they're providing services.
11        Because those claims go into a
12 centralized system for payment, we can run
13 reports against those claims, and we can
14 identify by diagnosis precisely the individuals
15 that we're paying for, to the extent that that
16 information is available.
17        If that information is not
18 available in claims, we -- we are not able to
19 render a payment; therefore, they have to have
20 that information in those claims.
21    Q.    Okay.  But you indicated that in
22 some cases your claimed expenditures don't fit
23 very nicely into claims-related data, right?
24        MS. KEARSE:  Object to form.
25    A.    That our claims data does not --

Page 43

1    Q.    Well, you had indicated that you
2 had to use different methodologies for
3 different categories of expenditures, and I
4 thought you said that to the extent there's
5 claims data, you can rely on the claims data,
6 but where there's not claims data, you had to
7 use different methodologies to try and
8 calculate your expenditures --
9        MS. KEARSE:  Object to --
10    Q.    -- right?
11        MS. KEARSE:  Object to form.
12    A.    For purposes of providing treatment
13 to individuals with a substance use disorder,
14 through our agencies, in order for agencies to
15 get reimbursed, they have to bill us for those
16 services.  For expenditures related to
17 developing programming, those -- those --
18 those expenditures do not go through our claims
19 processing system.
20        But my understanding is your
21 question was related to the treatment of those
22 individuals, and specific to that, those
23 interactions are -- are compensated through
24 claims.
25    Q.    Did you include in your computation

Page 44

1 of damages --
2        MS. KEARSE:  Object to form.  Well,
3 go ahead.  Finish.
4        MR. BOEHM:  Wow.
5        MS. KEARSE:  Well, I didn't -- go
6 ahead.
7    Q.    Did you and Ms. Peivich include in
8 your computation of damages funds that were
9 devoted through the claims data -- claims
10 submission process, treatment of individuals
11 who were experiencing polysubstance abuse
12 disorders?
13        MS. KEARSE:  I'm going to object to
14 the form.  Calls for a legal conclusion when
15 you're calling it "computation of damages."
16    A.    It's possible, yes.
17    Q.    Okay.  Is it -- is it possible, or
18 did you?
19        MS. KEARSE:  Object to form.
20    A.    I know that it's -- I know that
21 agencies can submit claims.  Am I aware of
22 claims specifically?  I don't look at the
23 claims, so I don't know.
24    Q.    Well, my question is -- let's back
25 up a second.

Page 45

1        You're aware that many people who
2 suffer from substance abuse disorders can be
3 addicted to more than one substance, right?
4        MS. FLOWERS:  Objection.  Lack of
5 foundation.
6    A.    Substance abuse disorders?  There's
7 substance use disorders.  I don't know about
8 any substance abuse disorders.
9    Q.    Okay.  I don't -- I don't want to
10 get into a semantics fight with you about it,
11 but somebody who has a substance abuse disorder
12 is typically abusing a substance, right?
13        MS. KEARSE:  I'm going to object to
14 that --
15        MS. FLOWERS:  Foundation.
16        MS. KEARSE:  -- question as well.
17        MR. BOEHM:  I'm sorry.
18        MS. KEARSE:  Okay.
19        MR. BOEHM:  I'm sorry.  How many --
20 did I just hear two people object?
21        MS. FLOWERS:  I'm sorry.  It just
22 popped out.
23        MR. BOEHM:  Okay.  I'll accept the
24 apology and ask that it not happen again.
25        MS. KEARSE:  Well, actually --

12 (Pages 42 - 45)

Page 46

1  MS. FLOWERS:  I can't guarantee you
2  that.
3  MS. KEARSE:  -- under the protocol
4  we have, two people can --
5  MR. BOEHM:  I've got the protocol
6  here.  And I know you made that claim on
7  Friday.  It's not going to -- or last Monday.
8  It's not going to happen again today.  If you
9  want to point me in -- where in the protocol
10  you think that's true, I'm happy to hear it,
11  but if not --
12  MS. KEARSE:  I will at a break on
13  there, too.
14  MR. BOEHM:  Okay.
15  MS. KEARSE:  There's two people
16  allowed.
17  MR. BOEHM:  You got it.
18  Q.  Are you ready to answer the
19  question?
20  A.  I'm not sure I remember the
21  question now.
22  Q.  Yeah.  It's hard when you've got a
23  lot of people talking.
24  MS. KEARSE:  And --
25  Q.  Isn't it true that many people who

Page 47

1  suffer from addiction are addicted to more than
2  one substance?
3  MS. KEARSE:  Object to form.
4  A.  I'm -- I'm not -- I'm not able to
5  make that determination.  I don't -- I don't
6  know.  I -- I don't have that -- the question
7  you're asking is whether -- I don't know.  I
8  don't know.
9  Q.  You've been the head of the Summit
10  County ADAMHS Board since 2007, right?
11  A.  Yes.
12  Q.  You've never heard of polysubstance
13  use disorder?
14  A.  I have heard of polysubstance use
15  disorder, yes.
16  Q.  What does that mean?
17  A.  It means that individuals use a
18  variety of substances.
19  Q.  Okay.  And they're addicted to a
20  variety of substances, right?
21  MS. KEARSE:  Object to form.
22  Q.  They're abusing more than one
23  substance, right?
24  A.  So addiction is a disease, and an
25  individual who -- if -- if you -- if you

Page 48

1  understand the disease of addiction, any
2  substance can raise -- it can satisfy an
3  addiction.  And so whether you could claim that
4  somebody is addicted to a specific substance, I
5  think that there are substance -- I'm working
6  through this in my own mind.  I guess it would
7  be fair to -- to say that a person could be
8  addicted to many substances.
9  Q.  And you know that happens, right?
10  A.  Yes.
11  Q.  That's actually quite common,
12  right?
13  MS. KEARSE:  Object to form.
14  A.  I can tell you that when we look at
15  some of the reports from people who have died
16  as a result of overdoses, that there are
17  typically more than one substance on board.
18  Q.  And in those instances where
19  somebody's being treated for polysubstance use
20  disorder by one of your contract service
21  agencies here in Summit County, and you are
22  seeing that in the claims data, is it possible
23  that you included in your computation of
24  damages, along with Ms. Peivich, treatment for
25  somebody who had a variety of mental health

Page 49

1  and/or substance use disorders?
2  MS. KEARSE:  Object to form.
3  A.  It is possible.
4  Q.  Okay.  And in those instances, did
5  you then break it down to try and identify and
6  account for the specific slice that you believe
7  was related directly to opioids as opposed to
8  the other mental health challenges or other
9  substances that that individual was abusing?
10  MS. KEARSE:  Object to form.
11  A.  No, I did not.
12  Q.  Has anybody ever asked you to try
13  and break it down that specifically?
14  A.  Not until today.
15  Q.  Has the ADAMHS County -- I'm sorry,
16  has the Summit County ADAMHS Board ever
17  attempted to calculate its expenditures in
18  connection with the opioid abuse epidemic in
19  this county, independent of any request that
20  you received from Motley Rice?
21  A.  No.  From Motley Rice, I -- I --
22  the request that we received initially was from
23  the county executive, so I guess I would answer
24  yes.
25  Q.  Are you talking about Ms. Shapiro?

13 (Pages 46 - 49)

Page 50

1    A.   Yes, or -- or her staff.
2    Q.   Did the county executive's office
3  reach out directly to you and request a
4  calculation of expenditures in connection with
5  the opioid abuse epidemic in Summit County?
6    A.   Yes.
7    Q.   When did they make that request?
8    A.   It was August of -- I'm not sure
9  what year.  Six- -- '17?  '16?  I guess it
10  would be -- well, what is this?  This is '19.
11  Probably '17.
12    Q.   Did you provide an answer to the
13  request from the county executive's office?
14    A.   Yes, we did.
15       MS. KEARSE:  And I'm going to
16  counsel the witness, as well, if it's an
17  attorney for the county executive's office as
18  well, that would -- if it --
19    Q.   Who from the county executive's
20  office reached out to you to make that request?
21    A.   Jason Dodson, who is the chief of
22  staff.
23    Q.   Did you respond to the county
24  executive's office request for the calculation
25  of opioid epidemic-related expenditures from

Page 51

1  the Summit County ADAMHS Board?
2       MS. KEARSE:  I'm going to direct
3  the witness if there's conversations you had
4  with the County attorney regarding this, that
5  that would be privileged information.
6    A.   Yes, I did.
7    Q.   Okay.  Who did you talk with?
8    A.   From the county executive's office?
9    Q.   Actually, let me -- let me back up
10  and make it more clear.  You said you responded
11  to the request, right?
12    A.   That is correct.
13    Q.   Did you perform the computation
14  that had been requested?
15    A.   Myself and my staff, yes.
16    Q.   Okay.  And did you come to a
17  conclusion about what the appropriate number
18  was?
19       MS. KEARSE:  Object to form.
20    A.   Yes, we did.
21    Q.   And did you communicate that number
22  to the county executive?
23    A.   I did not specifically, but my
24  chief operating officer, Jen Peivich, did.
25    Q.   Okay.  What was the number that you

Page 52

1  arrived at for purposes of the request you
2  received from the county executive?
3       MS. KEARSE:  I'm going to object to
4  that question if the -- if you were provided
5  information in -- in response to Jason Dodson,
6  who is the attorney for the City, the Executive
7  County.
8    A.   I -- I don't remember any numbers.
9    Q.   Do you remember roughly what it
10  was?
11    A.   No.
12    Q.   Do you remember how the number that
13  you arrived at for purposes of the County
14  Executive's request compares with the number
15  that you all arrived at more recently in
16  response to the request you got from the
17  lawyers?
18       MS. KEARSE:  Object to form.  And
19  miscalculates the testimony.
20       MR. BOEHM:  Object to form is
21  enough to maintain the -- the objection.
22    Q.   Go ahead.
23    A.   I -- I believe it was a larger
24  number the second time we did the -- we went --
25  we went through the process.

Page 53

1    Q.   It got bigger?
2    A.   It got bigger.
3    Q.   Why did it get bigger?
4    A.   Because we were more careful and
5  more intentional about capturing everything
6  that we could think of that would -- we -- that
7  we could justify as an expenditure that was
8  related to the opiate epidemic and our response
9  to that.
10    Q.   Were there some close calls that
11  you had to consider?  Say, "I'm not sure if
12  this should be counted or not"?
13       MS. KEARSE:  Object to form.
14    A.   There weren't -- there weren't
15  necessarily close calls because we wanted to be
16  as conservative as possible yet as thorough as
17  possible.  But we also provided updated
18  information because time had passed since our
19  initial -- our initial estimate and our updated
20  estimate.
21    Q.   You said you recently had
22  conversations with your staff about these
23  calculations, right?
24    A.   Just the recent conversations --
25  we've not had conversations since I submitted

14 (Pages 50 - 53)

Page 54

1  that to the county executive's office or
2  through to our attorneys.
3       I did have conversation with our
4  chief operating officer just around how
5  agencies -- just clarifying how agencies were
6  paid through claims.
7       Q.   Did you discuss -- when you say
8  your -- who did you speak with most recently
9  about that?
10      A.   Jen Peivich.
11      Q.   Did you discuss recently with
12  Ms. Peivich the total amount of expenditures
13  that you believed you had -- you had made in
14  connection with the opioid abuse epidemic in
15  Summit County?
16      MS. KEARSE:  Object to form.
17      A.   No, we did not discuss that.  We
18  essentially discussed process, the process by
19  which claims were paid.
20      Q.   Did you review any materials with
21  Ms. Peivich in connection with your preparation
22  for the deposition today?
23      A.   No.
24      Q.   Or for purposes of refreshing your
25  recollection about those computations?

Page 55

1       A.   No.
2       Q.   Have you reviewed any documents in
3  preparation for your deposition here today?
4       A.   I looked at depositions.
5       Q.   You read somebody's depositions?
6       A.   I read a portion of Bill Harper's
7  deposition and a portion of Doug Smith's
8  deposition.
9       Q.   Why did you do that?
10      A.   To get an idea of what sort of
11  questions might be asked.
12      Q.   Why did you want to have an idea of
13  what the questions would be?
14      A.   Because I knew that many of those
15  questions would be deferred to me.
16      Q.   You said -- did you review those
17  deposition transcripts from front to back, or
18  only parts of them?
19      A.   I started the front and start --
20  and very quickly began to skim.  I -- both --
21  both depositions I maybe got through half of.
22      Q.   Were there any excerpts from those
23  deposition transcripts that you thought were
24  particularly helpful in terms of your
25  preparation for your deposition here today?

Page 56

1       A.   I think just -- just having a
2  general sense of the -- of the line of
3  questionings for those individuals prepared me
4  for the -- for the idea that some of those
5  questions may be directed to me.
6       Q.   What questions do you mean when you
7  say questions that would be directed to you?
8       A.   Questions about costs associated
9  with the -- with the epidemic and our -- and
10  our investment in those services.  Some of the
11  financial questions in particular.
12      I was hoping that potentially I
13  could gain some information about that,
14  although their -- the questions were general
15  and were not helpful in that regard because
16  Dr. Smith did not know -- you know, he did not
17  have access to a lot of the financial
18  information.
19      The -- Bill Harper's
20  characterization of his time at the board and
21  what he had learned about -- about the opiate
22  epidemic in his time at the board.
23      Q.   Why was that helpful?
24      A.   Because I -- I assumed that there
25  may be questioning around the same lines for

Page 57

1  me.
2       Q.   Okay.  So you anticipate that that
3  will be helpful?
4       A.   I anticipated that it might be
5  helpful for me to remember.
6       Q.   Did you learn something from
7  reading those depositions that you didn't
8  already know?
9       A.   No, no.
10      Q.   Was there anything that you read in
11  those deposition transcripts with which you
12  disagreed?
13      A.   Nothing -- nothing material.
14      Q.   What about immaterial?
15      A.   Possible.  Possibly.
16      Q.   What do you recall that you
17  disagreed with?
18      A.   I -- I don't have a recollection.
19  I just remember that I -- I sort of registered
20  that maybe Bill got this wrong in a -- in -- in
21  his recollection of an event.
22      Q.   What event do you think Bill got
23  wrong in terms of his description?
24      A.   I -- I don't -- I honestly don't
25  remember.

15 (Pages 54 - 57)

Page 58

1    Q.   Anything besides that one event
2  that you think was incorrect when you read
3  those transcripts?
4        MS. KEARSE:  Object to form.
5    A.   No, no.
6    Q.   Everything else you read you felt
7  was accurate?
8        MS. KEARSE:  Object to form.
9    Q.   Is that fair?
10   A.   I think it was accurate in the
11 context of -- of Bill's experience, yes.
12   Q.   What about with respect to
13 Dr. Smith's testimony?  Was there anything that
14 you read from Dr. Smith's deposition transcript
15 that you thought was inaccurate?
16   A.   No.
17   Q.   You agreed with everything you read
18 there?
19   A.   Generally, yes.
20   Q.   When you say "generally," is that
21 meant to be a caveat?
22       MS. KEARSE:  Object to form.
23   A.   I -- I don't remember disagreeing
24 with anything that I read.
25   Q.   Did you review any other materials

Page 59

1  in preparation for your deposition here today
2  other than the deposition transcripts that
3  you've just identified?
4    A.   No.
5    Q.   Did you look at any documents?
6    A.   No, no.
7    Q.   Have you had conversations with
8  anybody other than Ms. Peivich about the
9  content or substance of the deposition
10 testimony you would provide here today?
11   A.   No.  Just with Ms. Peivich.
12   Q.   And what specifically did you
13 discuss with Ms. Peivich in terms of the
14 content or substance of the testimony that you
15 would provide here today?
16   A.   Well, Ms. Peivich approached me and
17 offered to sit down with me to talk about any
18 questions related to -- that I might have
19 related to our -- our computation of -- of
20 expenditures related to the opiate epidemic.
21       At the time that she approached me,
22 I told her that I really didn't have a sense of
23 what I would need to know, and, therefore, I
24 didn't really -- didn't feel like that kind of
25 conversation would be helpful.

Page 60

1        So I've never had -- we've never
2  had, then, an opportunity to talk about that
3  since.
4    Q.   Did you bring with you here today
5  any materials?
6    A.   No.
7    Q.   Do you have a copy of the
8  computation that you and Ms. Peivich prepared
9  in terms of these expenditures and the
10 computation you did?
11       MS. KEARSE:  Object to form.
12   A.   I -- I do believe I have a copy of
13 it, yes.
14   Q.   You have one on your computer?
15   A.   It may have -- I may have received
16 a copy of it in -- in an e-mail.
17   Q.   Is there any reason you would be
18 unwilling to provide that to those of us who
19 are working on this litigation?
20       MS. KEARSE:  I'm going to object to
21 form.  And again I'm going to advise counsel if
22 it was done at the advice of counsel, there may
23 be a reason why he's not -- and I don't know,
24 but I think that's an inappropriate question.
25   Q.   Is there any reason you can think

Page 61

1  of why, from your perspective, you would not be
2  willing to share the content of the computation
3  and the methodologies that were employed to
4  perform the computation that you and
5  Ms. Peivich --
6        MS. KEARSE:  Object --
7    Q.   -- put together?
8        MS. KEARSE:  Object to form.
9    A.   My concern about releasing that
10 information is that we released -- that we
11 pro-- that we collected this information and
12 we provided this information as an exercise for
13 our attorneys and, therefore, consider it to be
14 privileged.
15   Q.   Okay.  But setting aside the
16 privilege, is there any substantive reason?  Is
17 there anything -- any other reason that you can
18 think of why you would not be willing to share
19 that information?
20       MS. KEARSE:  I'm going to object to
21 the form.  I'm going to object to you telling
22 him to -- not to abide by privilege that he
23 just claimed.
24       MR. BOEHM:  Well, you're -- you're
25 making a caricature of what I said, but that's

Page 62

1 fine.
2     Q.    Go ahead.
3     A.    I -- I would have no objection to
4 releasing that information.
5         MS. KEARSE:  And I'm going to --
6     Q.    Have you read --
7         MS. KEARSE:  -- enter an objection
8 to the extent that it's privileged information.
9         MR. BOEHM:  I think you've said
10 that four or five times now.  I'm not sure
11 that's true, but I understand that that's the
12 claim you're making.
13     A.    May -- may I clarify?
14     Q.    Sure.
15     A.    What I am -- what I am say- --
16 saying is that if -- if I was asked to provide
17 this information to justify our expenditures, I
18 would be -- I would be comfortable with being
19 able to defend that document.
20     Q.    But you're not able to justify
21 those expenditures because you don't have them
22 here with you today and we don't have them,
23 right?
24         MS. KEARSE:  Object to form.
25     A.    We do not have them here today.

Page 63

1     Q.    So I couldn't sit down and go with
2 you -- go through with you the expenditures
3 that you claim you've made or ask you about
4 them because we don't have them, right?
5         MS. KEARSE:  Object to form.
6     A.    That's correct.
7     Q.    Have you read the written complaint
8 that Summit County prepared and submitted for
9 purposes of this lawsuit?
10     A.    I've flipped through it.
11     Q.    Okay.  So when I ask you -- when
12 did you do that?
13     A.    Several weeks ago.
14     Q.    Did you do that in preparation for
15 the deposition here today, or did you just do
16 that on your own?
17     A.    I -- mostly out of curiosity.
18     Q.    Is that the first time you had done
19 that?
20     A.    Yes.
21     Q.    Why did you decide to do that?
22     A.    Because I -- wanted to have a
23 better understanding of the -- the claims that
24 were being made against the -- the opiate
25 manufacturers and the distributors.

Page 64

1     Q.    Okay.  Did you feel like reading
2 the complaint assisted you in that regard?
3     A.    There was too much material to
4 cover, and I didn't have the time to go through
5 it.
6     Q.    Did you learn things that you
7 didn't already know from reading the complaint?
8     A.    I learned that reading legal
9 language is not fun.
10     Q.    Anything else?
11     A.    No.
12     Q.    Were you asked to review the
13 complaint that Summit County filed in this
14 matter before the County brought the lawsuit?
15         THE WITNESS:  I'm sorry.  I'm -- I
16 might need a break.  I'm just having trouble
17 focusing.
18         MR. BOEHM:  Sure.  Of course.
19         THE WITNESS:  Okay.
20         MR. BOEHM:  Let's go off the
21 record.
22         THE VIDEOGRAPHER:  Off the record,
23 9:58.
24         (A recess was taken.)
25         THE VIDEOGRAPHER:  We're on the

Page 65

1 record, 10:18.
2 BY MR. BOEHM:
3     Q.    Hi, Mr. Craig.  We are back from a
4 short break.  And when we broke, actually I had
5 a question pending, and typically we don't take
6 breaks when there's a question pending, but I
7 gave you an exception because it seemed like
8 you needed one.  But -- but the rule generally
9 is if there's a question pending, you can
10 answer the question, then we can do a break if
11 you need one.
12         The other thing I wanted to make
13 sure you understood is that you have taken an
14 oath to tell the truth today?  Do you
15 understand that?
16     A.    Yes, sir.
17     Q.    And you know that -- you've heard
18 the term "the truth, the whole truth, and
19 nothing but the truth"?
20     A.    Yes.
21     Q.    And you understand that that's the
22 standard that you're being held to here today?
23     A.    Yes.
24     Q.    Okay.  It's the same standard that
25 you'd be held to if a judge was sitting here

17 (Pages 62 - 65)

Page 66

1 watching you, right? Do you understand that?
2    A.   Yes.
3    Q.   Okay. The question that I had
4 pending for you was whether or not you were
5 asked to review the written complaint that was
6 filed in this lawsuit by Summit County before
7 the lawyers actually filed it.
8    A.   No, I was not.
9    Q.   Before the complaint was filed by
10 Summit County, did anybody consult with you
11 about the nature of the allegations?
12    A.   I'm not sure what you mean by
13 consult with me.
14    Q.   Did anybody come to you and say
15 something along the lines of, "Mr. Craig, we're
16 considering filing a lawsuit, and given that
17 you have been the head of the Summit County
18 ADAMHS Board since 2007, we'd like to get your
19 thoughts and input before we complete and file
20 this lawsuit"? Did anybody do that?
21       MS. KEARSE: Object to form.
22    A.   No.
23    Q.   Did anybody consult with you in any
24 way about the content of the written complaint
25 before it was filed?

Page 67

1    A.   No.
2    Q.   Did anybody ask you what factors
3 you considered to be contributing elements to
4 the opioid abuse epidemic in Summit County
5 before the written complaint was filed?
6    A.   By "anybody," you mean anybody
7 anywhere?
8    Q.   In connection with the lawsuit
9 that's been brought, did anybody come to you
10 and say, "Mr. Craig" -- say something along the
11 lines of, "Mr. Craig, what do you consider to
12 be the contributing factors to the opioid abuse
13 epidemic in Summit County"?
14       MS. KEARSE: Object to form.
15    A.   Again, I'm not -- I'm just not
16 following you.
17       And let me explain. I've done
18 presentations in the community where those
19 kinds of questions get asked, so when you ask
20 me whether anybody has asked me, certainly
21 somebody has asked me those questions at
22 various times during my presentations.
23       Therefore, if you're asking me
24 about specif-- -- specific -- if you --
25       So it's just -- it's just too

Page 68

1 general for me to be able to answer --
2    Q.   I understand.
3    A.   -- with any kind of --
4    Q.   No. That -- that's fair.
5    A.   -- legitimacy.
6    Q.   I'm sorry. That's fair. I
7 understand what you're saying.
8       You've given a lot of thought to
9 the opioid abuse epidemic in Summit County by
10 virtue of your position as the head of the
11 ADAMHS Board here. Is that fair?
12    A.   I've -- I've given a lot of thought
13 to the opiate epidemic, yes.
14    Q.   And you've given a lot of thought
15 to what might be done to help, right?
16    A.   Yes, I have.
17    Q.   You've given a lot of thought to
18 what are the factors that have caused the
19 epidemic, fair?
20    A.   Yes, I have.
21    Q.   My question to you is in the
22 context of the filing of the Summit County
23 lawsuit, did anybody come to you -- given the
24 amount of thought that you've given to the
25 scope and causes of the epidemic in Summit

Page 69

1 County, did anybody come and ask you to provide
2 any feedback about what factors you considered
3 to be causing the epidemic in Summit County
4 before the lawsuit was filed?
5       MS. KEARSE: Object to form.
6    A.   I'll say that nobody has consulted
7 with me about the factors leading up to the
8 opiate epidemic.
9    Q.   To your -- to the best of your
10 knowledge, was anybody, other than yourself,
11 from or on behalf of the Summit County ADAMHS
12 Board consulted about the content of the
13 written complaint before it was filed by Summit
14 County?
15       MS. KEARSE: Object to form.
16    A.   No.
17    Q.   Do you know why not?
18    A.   At the time that the lawsuit was
19 filed, I believe that there was an assumption
20 by the county executive's office that we were
21 part of the County under -- under the county
22 executive's -- as part of -- as part of the
23 County, when in reality we're a -- a division
24 of -- of government separate from the County
25 with our own board of directors. I don't

18 (Pages 66 - 69)

Page 70

1 believe that the County felt it was necessary
2 to consult with us.
3     Q.  Okay.  Well, setting aside just for
4 a moment whether or not it was necessary for
5 the County to consult with the ADAMHS Board,
6 why do you think they didn't consult with the
7 ADAMHS Board, given the nature of the work that
8 you all do here in the county?
9         MS. KEARSE:  Object to form.
10     A.  I don't know that our input would
11 have materially affected their decision to move
12 forward with the lawsuit.
13     Q.  Well, okay.  Let's go to that for
14 just a second.
15         Why not?
16     A.  Because I believe that the county
17 executive had already considered that this
18 would be an appropriate course of action.
19     Q.  And when you say "the county
20 executive," you mean Ms. Shapiro?
21     A.  Yes.
22     Q.  Is it your understanding that
23 Ms. Shapiro is the individual who made the
24 ultimate decision to bring a lawsuit on behalf
25 of Summit County?

Page 71

1     A.  That would be my understanding.
2     Q.  Have you ever had any conversations
3 with Ms. Shapiro about the opioid abuse
4 epidemic within Summit County?
5         MS. KEARSE:  Object to form.
6     A.  I've -- I've had conversations with
7 Ms. Shapiro about the opioid epidemic, yes.
8     Q.  What have the nature of your
9 conversations with Ms. Shapiro been on that
10 subject?
11     A.  There have been times when
12 individuals have approached the County who
13 wanted to do something to address the needs of
14 individuals affected by the opiate epidemic.
15 And -- and Ms. Shapiro would bring me into
16 those meetings to talk about resources and
17 whether or not we might be able to assist or
18 evaluate the -- the merits of the proposal.
19     Q.  Now, you indicated that you didn't
20 think feedback from the ADAMHS Board would have
21 impacted Ms. Shapiro's decision to bring the
22 lawsuit.
23         But I was actually asking just a
24 slightly different question, and that is
25 whether or not -- or why not -- why didn't the

Page 72

1 county executive communicate with the ADAMHS
2 Board about the content of the written
3 complaint filed by Summit County?
4         MS. KEARSE:  Object to form.
5     A.  I don't know.  You'd have to ask
6 her that.
7     Q.  Have you ever asked her that?
8     A.  I have not asked her that.
9     Q.  Have you ever expressed any concern
10 about the fact that neither you nor anybody
11 from the Summit County ADAMHS Board was
12 consulted about the content of the written
13 complaint submitted by the County before it was
14 filed?
15         MS. KEARSE:  Object to form.
16     A.  No.
17     Q.  Have you ever expressed any concern
18 about the role that the ADAMHS Board for Summit
19 County would play with respect to participation
20 in the County's lawsuit?
21         MS. KEARSE:  Object to form.
22     A.  I'm sorry.  Could you read the
23 question back?
24     Q.  Sure.  Have you ever expressed any
25 concern about the role that the Summit County

Page 73

1 ADAMHS Board would play with respect to
2 participation in the County's lawsuit?
3     A.  No.
4     Q.  Do you have any such concerns?
5     A.  I -- I don't have any concerns, no.
6     Q.  Have you ever had such concerns?
7     A.  Not with regard to our role.
8         - - - - -
9         (Thereupon, Deposition Exhibit 1,
10         5/3/2018 E-Mail Chain Re: Meeting,
11         SUMMIT_001104515 to 001104516, was
12         marked for purposes of
13         identification.)
14         - - - - -
15     Q.  All right.  I'm marking a document
16 that has been designated as Exhibit 1 for
17 purposes of your deposition.
18         And this is an e-mail chain from
19 May of 2018.  A little bit earlier in the chain
20 there's an e-mail from you --
21     A.  Uh-huh.
22     Q.  -- to Ms. Cheri Walter.  Do you see
23 that?
24     A.  Uh-huh.
25     Q.  And you write, "I continue to have

19 (Pages 70 - 73)

Page 74

1  concerns about the role the boards have with
2  regard to participation as a County entity in
3  our County's lawsuit."
4      A.   Right.
5      Q.   Do you see that?
6      A.   Yes.
7      Q.   So here's an instance where you
8  were expressing concern, right?
9      A.   Yes.
10         MS. KEARSE:  Object to form.
11     Q.   What concerns did you have about
12  the role of the Summit County ADAMHS Board and
13  what it -- and what that role would be in
14  connection with Summit County's lawsuit?
15     A.   When the county executive announced
16  the lawsuit and we were named as a -- a
17  plaintiff in the lawsuit, we had not yet gone
18  through our board of directors to authorize our
19  participation in the lawsuit and was feeling as
20  though our participation was assumed by the
21  county executive without acknowledging or
22  understanding that we had our own board of
23  directors and that we were not authorized to
24  participate in the lawsuit without the
25  board's -- without the board's permission.

Page 75

1      Q.   Your view is that the ADAMHS Board
2  is independent of County government, right?
3         MS. KEARSE:  Object to form.
4      A.   I wouldn't say that we're
5  independent of County government, but we are
6  not under the control or -- or supervision of
7  the County government.
8      Q.   Do you consider the Summit County
9  ADAMHS Board to be an organ of Summit County
10  government?
11     A.   An organ?
12     Q.   Yeah.
13     A.   I'm sorry.  We are -- we are an
14  affiliated organization, yes.
15     Q.   Okay.  And you were worried that
16  the ADAMHS Board was being dragged into the
17  lawsuit, right?
18         MS. KEARSE:  Object to form.
19     A.   We were concerned that the county
20  executive had not -- had not followed the
21  proper protocol to include us in the lawsuit.
22     Q.   You write here to Ms. Walter, "I'm
23  concerned we are being dragged into this
24  lawsuit."
25         Do you see that?

Page 76

1      A.   Yes.
2      Q.   And that was a concern that you
3  expressed in May 2018, right?
4      A.   Right.
5      Q.   Is that a concern that you still
6  have here today?
7      A.   It was -- the concern was less
8  about being dragged in as to the fact that we
9  were included in the lawsuit without going
10  through the proper protocol.
11     Q.   Well, "dragged in," that -- those
12  are the words you chose, not me, right?
13     A.   Correct.  Correct.  That is --
14     Q.   I'm just --
15     A.   -- a characterization.  I -- I
16  didn't feel as though we were being dragged in.
17  I felt as though we were being included in
18  the -- in the lawsuit without -- without us
19  having done our part to make sure that that was
20  an authorized participation.
21     Q.   Just to make sure the record is
22  clear, I'm reading the words on the page
23  correctly, right?
24         MS. KEARSE:  Object to form.
25     A.   Yes.  I -- I did write those words.

Page 77

1      Q.   Okay.  When you said -- you didn't
2  say, "I'm not concerned about being dragged
3  into the lawsuit.  You said, "I'm concerned
4  about being dragged into the lawsuit," right?
5         MS. KEARSE:  Objection.
6  Argumentative.
7      A.   I -- that is what I wrote.
8      Q.   And my question to you is, is that
9  how you feel here today?
10     A.   No.
11     Q.   What has changed, in your
12  understanding, to have alleviated the concerns
13  that you expressed in May 2018?
14     A.   Our board of directors, along with
15  the representatives from the county -- county
16  executive's office and the attorneys that
17  represent us in this matter had an opportunity
18  to review the pros and cons of our
19  participation and also to -- to understand a
20  little bit more about -- about what's at stake.
21     Q.   Okay.  What -- what is it that
22  you're referring to specifically?
23     A.   What -- if we -- we wanted to -- we
24  wanted to be very careful to look at, if we
25  chose to participate in -- in the lawsuit,

20 (Pages 74 - 77)

1 that -- you know, what protections would we
2 have from a financial perspective, because we
3 were -- we were concerned about that.  We were
4 concerned about the discovery process and what
5 that might entail and the cost associated with
6 that.  We were concerned about making sure that
7 our board of directors had an appreciation for
8 what this would entail, from a staff
9 perspective.
10     Q.   Anything else?
11     A.   And -- and the other component was
12 what would -- what would be our recourse if we
13 chose not to participate in the lawsuit.
14     Q.   As I understood it, the county
15 executive told you that you didn't have a
16 choice whether to participate?
17          MS. KEARSE:  Object to form.
18 Q.   Did I --
19          MS. KEARSE:  Mischaracterizes --
20 Q.   Did I --
21          MS. KEARSE:  -- testimony.
22     Q.   Did I misunderstand that?
23     A.   I don't believe that the county
24 executive ever told me whether I had a choice
25 or I did not have a choice.  My -- you know, we

1 were included in the lawsuit.
2     Q.   Okay.  Did you ever have any
3 conversations with anybody about whether or not
4 the Summit County ADAMHS Board had a choice to
5 participate in the lawsuit?
6          MS. KEARSE:  Object to form.
7     A.   I don't -- I -- it's my belief that
8 we had a choice in the matter.  That we could
9 have excused ourselves from the lawsuit because
10 it would not have been authorized for -- if our
11 board of directors decided that they did not --
12 they did not want to participate in the
13 lawsuit, that that would be an option.
14     Q.   What's the basis of your
15 understanding of -- of what you just said?
16     A.   Because I'm not able to enter into
17 litigation without the approval of my board of
18 directors.
19     Q.   You said that you understood you
20 had a choice, that you could have withdrawn
21 from the lawsuit.
22     A.   By I -- we -- I have a choice,
23 meaning my organization --
24 Q.   Uh-huh.
25     A.   -- would have had a choice.

1     Q.   Do you believe that the ADAMHS
2 Board for Summit County is a party in this
3 litigation?
4     A.   Yes, I do.
5     Q.   Okay.  What's the basis of your
6 understanding with respect to that question?
7     A.   We're named in the suit.
8     Q.   Named as a party?
9     A.   Yes.
10     Q.   And do you understand that
11 ADAMHS -- the ADAMHS Board for Summit County is
12 named as a party, independent of the Summit
13 County government; is that right?
14     A.   I don't -- I don't know whether we
15 are named as a party independent of the County.
16 I don't know that that's necessarily
17 specifically stated in the lawsuit.
18     Q.   Uh-huh.  You indicated that you had
19 some concerns about financial protections,
20 right?
21     A.   Yes.
22     Q.   What do you mean by that?
23     A.   Whether the costs of our
24 participation in the lawsuit would be -- would
25 be recoverable.

1     Q.   Were you concerned about who would
2 get the money in the event there was some kind
3 of financial recovery in connection with this
4 lawsuit?
5          MS. KEARSE:  Object to form.
6     A.   I have been concerned about whether
7 we would have received dollars come from
8 this -- from this litigation.
9     Q.   And have you been assured that to
10 the extent there is a financial recovery on the
11 part of Summit County, that the ADAMHS Board
12 will receive funds in connection with such a
13 recovery?
14          MS. KEARSE:  Object to form.  And
15 to the extent there's anything that's
16 privileged information, I would direct you not
17 to answer.
18     A.   I -- I don't know that I've been
19 promised any compensation for participation.
20     Q.   You don't know?
21     A.   I don't.  I don't recall having a
22 conversation about that.
23     Q.   That's been something that you've
24 been wondering about though, right?
25          MS. KEARSE:  Object to form.

21 (Pages 78 - 81)

1    A.   Certainly it is something that
2 would -- that I would be concerned about, yes.
3    Q.   And have you ever discussed that
4 with anybody in the County, that particular
5 concern about whether or not the ADAMHS Board
6 was going to get the compensation it would like
7 in connection with the lawsuit?
8    A.   I may have, yes.
9    Q.   Who have you talked with about
10 that?
11    A.   I don't recall.
12    Q.   Do you recall having had
13 conversations along those lines?
14    A.   Yes.
15    Q.   But you don't remember with whom?
16    A.   You know, I've had conversations
17 about the opiate litigation in a variety of
18 different venues, generally speaking; that
19 the -- the pros and cons of participation with
20 my colleagues at the State level, with
21 individuals within the County, but I can't
22 specifically -- I can't specifically recall any
23 of those conversations.
24    Q.   You thought that it might be
25 prudent to consult with legal counsel on behalf

1 of the Summit County ADAMHS Board, separate and
2 apart from the County, to ensure that you were
3 properly represented?
4    A.   That's correct.
5    Q.   Did you ever, in fact, engage such
6 counsel?
7    A.   Yes, we did.
8    Q.   Separate from the lawyers for the
9 County?
10    A.   Yes.
11    Q.   Who did you engage?
12    A.   Christina Shaynak Diaz.
13    Q.   Is -- is that attorney still
14 representing Summit County ADAMHS Board in
15 connection with the opioid abuse epidemic in
16 any way?
17       MS. KEARSE:  Object to form.
18    A.   We have not -- since we've made the
19 decision to -- since our board has made the
20 decision to participate in the lawsuit, we have
21 not engaged Christina Shaynak Diaz as a -- as
22 our attorney.
23    Q.   Do you have an informed view about
24 whether the specific allegations that are made
25 in the written lawsuit filed by Summit County

1 in its complaint are accurate?
2       MS. KEARSE:  Object to form.
3    A.   Not in total, no.
4    Q.   And why do you say, no, not in
5 total?
6    A.   Because the lawsuit encompasses
7 many parts of the County that I don't have
8 direct knowledge about.
9    Q.   You understand that the written
10 complaint states allegations, right?
11       MS. KEARSE:  Object to form.  Calls
12 for a legal term that you're using as well, so.
13    Q.   Do you know what allegations are?
14    A.   Yes, generally.  I -- I'm aware
15 that there are allegations in the lawsuit, yes.
16    Q.   With respect to the allegations
17 that are made by Summit County in the written
18 complaint, do you have an informed view about
19 whether or not those allegations are accurate?
20       MS. KEARSE:  Object to form.
21    A.   I do not.
22    Q.   Why not?
23    A.   Because there are parts of the
24 County that I don't touch or that I don't have
25 interaction with that are named in this

1 lawsuit.
2    Q.   Any other reason?
3    A.   No.
4    Q.   When you -- you said you read part
5 of the complaint, right?
6    A.   Yes.
7    Q.   You didn't read the whole thing?
8    A.   No, I did not.
9    Q.   You thought it was boring?
10       MS. KEARSE:  Object to form.
11    A.   I didn't say that it was boring.  I
12 said that it was just too much material for me
13 to be able to cover.
14    Q.   I didn't mean to be flippant.  I --
15 I was reading between the lines.  I thought you
16 were kind of suggesting that it was hard to
17 read.
18       MS. KEARSE:  And I'm going to
19 object to form.  And I think you are being
20 flippant, so I ask you to just ask --
21    Q.   Isn't that what you were --
22       MS. KEARSE:  -- him straight
23 questions.
24    Q.   -- suggesting earlier this morning?
25 That you didn't -- I'm not being critical of

1 it. It's a long document, right?

2     MS. KEARSE: Object to form. Just

3 ask a question. No commentary.

4     MR. BOEHM: I did just -- I did

5 just ask a question.

6     A.   It is a long document, yes.

7     Q.   And -- and you said that you

8 struggled to read the whole thing, right?

9     MS. KEARSE: Object to form.

10     A.   As I said, I -- I started to read

11 it, and then I started to skim it.

12     Q.   And you said the thing that you

13 learned about it is that you didn't like

14 reading legalese, right?

15     MS. KEARSE: Object to form.

16     A.   There was way more information in

17 there than I could assimilate in the short time

18 that I had to review it.

19     Q.   How much time did you spend

20 reading -- reading the written complaint filed

21 by Summit County in this matter?

22     A.   Probably no more than 10 minutes.

23     Q.   Has a licensed physician ever

24 written you a prescription for an opioid

25 medication?

1     MS. KEARSE: I'm going to object to

2 form. And I'm going to instruct the witness to

3 answer if you want to answer, or not. If not,

4 you've got, you know, your own protections on

5 whether or not you disclose your medical

6 information.

7     A.   I don't know. I don't know.

8     Q.   Do you recall that ever happening?

9     A.   I -- I don't know. It's possible,

10 back in the '70s, that I had -- I had a

11 surgical procedure, and it's possible that

12 opiates were used, but I do not know.

13     Q.   Do you know if any of your

14 family's -- family members -- sorry. Let me

15 just start over.

16     Have any of your family members, to

17 your knowledge, ever used a prescription opioid

18 medication?

19     MS. KEARSE: And I'm going to

20 advise the witness just again, these are your

21 family members' and yourself's medical

22 information there. You're not obligated to

23 disclose that information. You've got your own

24 protections on that.

25     MR. BOEHM: I think it's relevant.

1     Q.   Go ahead.

2     MS. KEARSE: I -- I'm -- you're not

3 going to --

4     MR. BOEHM: You said it. You said

5 it, and now he gets to answer it if he wants

6 to.

7     MS. KEARSE: All right. You're not

8 going to set the relevancy standard here as

9 well, so --

10     Q.   Go ahead.

11     MS. KEARSE: -- if you want to

12 answer, you can answer; if you don't, you have

13 your own protections to discuss your or your

14 family's --

15     MR. BOEHM: That's --

16     MS. KEARSE: -- medical issues.

17     Q.   Go ahead.

18     A.   I don't feel comfortable talking

19 about the medications that were prescribed to

20 my family members or disclosing their personal

21 health information.

22     Q.   Have you ever expressed to any of

23 your family members or close friends or given

24 to them advice that they should not use a

25 prescription opioid medication that was

1 prescribed to them by a licensed physician?

2     MS. KEARSE: I'm going to object to

3 the form. The same objection I had before.

4     A.   I have, yes.

5     Q.   Who have you expressed that to?

6     A.   My son.

7     Q.   Did your son actually receive a

8 prescription from a licensed physician --

9     MS. KEARSE: Objection.

10     Q.   -- for an opioid medication?

11     MS. KEARSE: Objection. Same line

12 of objections and advice to the couns- -- to my

13 client.

14     A.   And again, I really don't want to

15 talk about the medical issues of my family's...

16     Q.   Okay. Did you tell your son that

17 he should not take a prescription opioid

18 medication that had been prescribed by a

19 licensed physician?

20     MS. KEARSE: Objection.

21     A.   I've -- I've talked to family

22 members about the dangers of using opiate

23 medications.

24     Q.   Understood. My question is, have

25 you ever instructed any of your friends, close

Page 90

1 friends, or family members that they should not
2 take a prescription opioid medication?
3          MS. KEARSE: Object --
4     A.   I have not. I have not.
5          THE WITNESS: I'm sorry.
6          MS. KEARSE: That's okay.
7     Q.   You -- you've -- you've discussed
8 with them risks --
9          MS. KEARSE: Objection.
10    Q.   -- right?
11    A.   Yes, I have discussed risks.
12    Q.   But not told them they should not
13 take the medication, right?
14         MS. KEARSE: Objection.
15    A.   I believe I have answered that.
16    Q.   Did I summarize that correctly?
17    A.   Yes, you have.
18    Q.   Have any of your close friends or
19 family members ever suffered from a substance
20 use disorder?
21         MS. KEARSE: Objection to form.
22 I'm going to advise my client the same area of
23 testimony that if you do not want to disclose
24 medical information of your family.
25    Q.   I'm not asking for anybody's name.

Page 91

1 I'm just curious, given that you're the head of
2 the Summit County ADAMHS Board, and that may
3 inform your views.
4          MS. KEARSE: And he's here in
5 his -- as a fact witness --
6          MR. BOEHM: Exactly.
7          MS. KEARSE: -- for the -- for the
8 ADAMHS Board, not his personal information --
9          MR. BOEHM: He's not a 30(b) --
10         MS. KEARSE: -- and his family's.
11         MR. BOEHM: He's not a 30(b)(6)
12 witness.
13         MS. KEARSE: He's not even a
14 30(b)(6). He's here as a --
15         MR. BOEHM: I'm asking about his
16 personal knowledge and experience.
17         MS. KEARSE: Counsel -- Counsel,
18 let me just say, Mr. Craig has appeared at
19 the -- at the request of counsel as a fact
20 witness in this litigation --
21         MR. BOEHM: Exactly.
22         MS. KEARSE: -- regarding his work
23 at the ADAMHS Board. Nothing about his
24 personal family -- his friends and family
25 regarding their personal use of opioids and --

Page 92

1 and nor his. So that's just not an issue.
2          MR. BOEHM: May or may not be true.
3 I'm just asking the questions.
4          MS. FLOWERS: And he's indicated to
5 you that he doesn't want to answer. So why --
6          MR. BOEHM: No. No, he hasn't.
7          MS. FLOWERS: -- don't you move on?
8          MR. BOEHM: He hasn't had any
9 response because you guys have been talking
10 ever since I asked the question.
11         MS. KEARSE: Well, he does- --
12         MR. BOEHM: Stop trying to put
13 words in the witness's mouth.
14         MS. FLOWERS: That's -- that's not
15 fair at all.
16         MS. KEARSE: Counsel --
17         MR. BOEHM: I'm going to ask the
18 question. You can make an objection to form,
19 and then we can see what the witness is going
20 to say.
21         MS. KEARSE: Okay.
22         MR. BOEHM: But I'm not going to
23 hear testimony from you.
24         MS. KEARSE: No. I'm just saying
25 he's here at your request for a fact witness

Page 93

1 regarding the ADAMHS --
2          MR. BOEHM: You've already said it.
3 Why are you saying that again? I've already
4 heard that.
5          MS. KEARSE: Because you seem to be
6 very argumentative.
7          MR. BOEHM: I want to ask my
8 question and get on with it.
9          MS. KEARSE: Really.
10         MR. BOEHM: Stop being obstructive.
11 BY MR. BOEHM:
12    Q.   My question to you, Mr. Craig, is
13 whether any of your close friends or family
14 members have suffered from a substance use
15 disorder.
16         MS. KEARSE: The same objection and
17 advice.
18    A.   I'm not -- I'm not going to answer
19 that question.
20    Q.   Why not?
21    A.   Because it's not -- because I don't
22 feel comfortable disclosing my family members'
23 personal health information.
24    Q.   Have you had any personal
25 experiences with close friends or family

24 (Pages 90 - 93)

Page 94

1 members that have informed your understanding
2 about substance use disorders, and in
3 particular with respect to addiction to
4 opioids?
5　　　MS. KEARSE:  Objection.
6　A.　Yes.
7　Q.　And what are those?
8　A.　Again, I don't feel comfortable
9 disclosing personal health information of -- of
10 friends or family members.
11　Q.　To be clear, I'm not asking
12 about -- you to identify anybody or what the
13 specific situations were.  But to the -- my
14 question to you is, given that you are the head
15 of the Summit County ADAMHS Board, which has
16 responsibility for expending funds through
17 contracting agencies on substance abuse
18 treatment, and you have experiences that inform
19 your views about that subject, I'm asking you
20 about that.  And this is my chance to do it,
21 unless we go back to a judge and ask for
22 another round of this.
23　　　MS. KEARSE:  I'm going --
24　Q.　To the extent your views have been
25 informed, your professional views are informed

Page 95

1 by your personal experiences, I'm believe I'm
2 entitled to that.  That's what I'm asking.
3　　　I'm not asking about names.  I'm
4 not asking about personal health identifying
5 information.  I'm asking about the personal
6 experiences that have informed your
7 professional views.
8　　　MS. KEARSE:  I'm going to -- my
9 same running objection and advice.
10　A.　There's a lot of material you
11 covered just now, and so I'd like to get back
12 to the root of the question.  So could you ask
13 that question again?
14　Q.　Sure.  You indicated that you have
15 had personal experiences of close friends or
16 family members that have impacted your own
17 views about substance use disorders.
18　　　MS. KEARSE:  Object to form.
19 Mischaracterizes his testimony.
20 Mischaracterizes --
21　Q.　Did I misunderstand that?
22　A.　I don't remember the question that
23 I responded to, so maybe --
24　Q.　Was that -- was that fair?  Is that
25 fairly accurate?

Page 96

1　A.　I don't know that.  I don't
2 remember the question that I responded to.
3　Q.　Okay.  Did I hear you correctly say
4 that you've had personal experiences with close
5 friends or family members that have impacted
6 your own views about substance use disorders,
7 and specifically with respect to opiate abuse?
8　　　MS. KEARSE:  Objection to form.
9　A.　I guess the part of your question
10 that I'm not clear about is -- is what you mean
11 by impacted my views.  Certainly I'm aware of
12 individuals who've had experience with opiates
13 in -- in my family and in my personal
14 friendships.
15　Q.　How have those experiences impacted
16 your views about substance use disorder?
17　A.　I -- I believe that they've
18 reinforced some of my empathy towards
19 individuals suffering from a substance abuse
20 disorder.  It's helped me to have a better
21 understanding of families and the way that
22 families are affected by substance use
23 disorders.
24　　　There's probably a lot of different
25 ways that individuals, families who've been

Page 97

1 affected by opiates have characterized --
2 have -- have -- have been affected.
3　　　- - - - -
4　　　(Thereupon, Deposition Exhibit 2,
5　　　11/2/2017 E-Mail Chain Between Jerry
6　　　Craig and Cheri Walter Re: Opiate
7　　　Lawsuit, SUMMIT_001090134 to
8　　　001090135, was marked for purposes
9　　　of identification.)
10　　　- - - - -
11　　　MS. KEARSE:  Counsel, I'd just --
12 can he -- can he finish his -- answering his
13 question before you put another document?  I
14 think you are distracting when you are moving
15 on to your next thought and he's still
16 answering a question.  I also think it's
17 disrespectful to do that.
18　　　MR. BOEHM:  That's the craziest
19 thing I've heard, that it's disrespectful to
20 set a document down when I'm moving on to the
21 next doc- -- the next --
22　　　MS. KEARSE:  He was still answering
23 the question, Counsel, and you're putting
24 another document in front of him.  So I do
25 think --

25 (Pages 94 - 97)

1        MR. BOEHM:  I'm getting the next
2  document ready.
3        MS. KEARSE:  I -- I would ask --
4        MR. BOEHM:  You're just trying to
5  stall -- you're just trying to stall and delay.
6        MS. KEARSE:  Counsel, I simply
7  asked, let him finish his question before you
8  pro- -- provide him another exhibit.
9        MR. BOEHM:  Well, I'm offended by
10  your suggestion --
11        MS. KEARSE:  And it's distracting.
12        MR. BOEHM:  I'm -- I'm offended by
13  your suggestion there's been anything improper
14  about me putting a sticker on the next exhibit
15  in the deposition.
16        MS. KEARSE:  I didn't -- initially
17  I didn't say it was improper.  I asked you
18  politely to not put another document in front
19  of him until the witness is actually done
20  answering his question.
21        MR. BOEHM:  I'm not --
22        MS. KEARSE:  I think it's rude.
23        MR. BOEHM:  I'm not going to -- I'm
24  not going to play your games.
25    Q.    This is Exhibit 2 --

1        MS. KEARSE:  Well, I actually just
2  played the --
3    Q.    Mr. Craig, this is --
4        MS. KEARSE:  -- the -- the proper
5  protocol for a deposition.
6        MR. BOEHM:  Stop it, please.
7        MS. KEARSE:  Let him finish his --
8  answering his question, and then you can move
9  on to your next question and provide him the
10  next exhibit.
11        MR. BOEHM:  I want the record -- I
12  think it speaks for itself, but Ms. Kearse has
13  been interrupting, giving long speaking
14  objections, really trying to obstruct the way
15  this deposition proceeds.
16        I don't understand the purpose of
17  it.  I don't think it's helping the witness.
18  The most it might be doing is just delaying and
19  running out the clock.  It's not appropriate.
20  The objections have been -- especially this
21  last one -- improper and -- and achieve
22  nothing, and I'm just going to ask for it to
23  stop.
24        MS. KEARSE:  And the record will
25  reflect itself.

1    Q.    Mr. Craig, I have given you what
2  has been marked as Exhibit 2 for purposes of
3  your deposition.  Do you see that?
4    A.    I see it.
5    Q.    It's an e-mail from November 2017.
6        Do you recall expressing concerns
7  about whether or not you and the ADAMHS Board
8  would receive a fair share of any potential
9  settlement or proceeds from Summit County's
10  lawsuit?
11    A.    Can I read through this before you
12  ask your question?
13    Q.    Sure.  But -- but I'm asking just
14  as a preliminary matter, do you ever -- do you
15  ever recall expressing concerns about receiving
16  a fair share?
17        MS. KEARSE:  And I'm going to let
18  the witness -- he said he'd like to review the
19  document that you've just handed to him and
20  asking questions about.
21        MR. BOEHM:  We're doing just fine
22  without you, Ms. Kearse.  You're just getting
23  in the way.
24        MS. KEARSE:  Would you like me to
25  leave?

1        MR. BOEHM:  Go ahead.
2        MS. KEARSE:  You can -- you can
3  read the document that you wanted -- that you
4  were handed that you're being --
5    A.    Have --
6        MS. KEARSE:  -- asked a question
7  about.
8    Q.    Go ahead, Mr. Craig.
9    A.    Have I ever -- have I ever
10  expressed concern -- can you repeat the
11  question, sir?
12    Q.    Yeah.  Sure.  My -- my question was
13  whether or not you recall having expressed
14  concerns about receiving a fair share for you
15  and the ADAMHS Board of any potential
16  settlement or proceeds from Summit County's
17  lawsuit.
18    A.    I have expressed concerns about the
19  ADM Board -- not myself, but the ADM Board
20  receiving a fair share of the settlement.
21    Q.    Why were you concerned about that?
22    A.    Because I'm aware that in other
23  lawsuits of this type, when there was a
24  settlement, the funds weren't necessarily
25  distributed to boards or in a manner that I

26 (Pages 98 - 101)

Page 102

1 felt was -- was appropriate, I guess, or
2 sufficient.
3     Q.    What other litigations do you have
4 in mind?
5     A.    Am -- am I supposed to read this?
6     Q.    In a second.  I'm going to --
7     A.    Okay.
8     Q.    I'm going to ask you a couple
9 questions about it.
10     A.    What other litigation?  Like the --
11 the tobacco settlement.
12     Q.    Uh-huh.  I see.  Anything else?
13     A.    No.
14     Q.    Your understanding is the tobacco
15 settlement, the funds didn't always end up in
16 the right place?  Is that what you're saying?
17         MS. KEARSE:  Object to form.
18     A.    My understanding -- and, of course,
19 this is not direct understanding, but from
20 conversations with many of my colleagues was
21 that the funds that came as a result of the
22 tobacco settlement didn't necessarily live up
23 to the promises that were made.
24     Q.    And when you say "didn't live up to
25 the promises that were made," what do you mean

Page 103

1 by that?
2     A.    That funds that were supposed to go
3 to treatment agencies through boards did not
4 actually land at boards.
5     Q.    Okay.  In Exhibit 1, we saw that as
6 of May 2018 you believed that the lawsuit by
7 Summit County was proceeding without any
8 consultation or agreement on the part of the
9 ADAMHS Board, right?
10     A.    That is --
11         MS. KEARSE:  Object to form.
12     A.    -- right.
13     Q.    Did you suggest also that sometime
14 after May 2018 the board of directors for the
15 Summit County ADAMHS Board formally approved
16 participation in the lawsuit?
17     A.    Did I suggest that who?
18     Q.    The board of directors for the
19 ADAMHS Board formally approved participation in
20 the lawsuit brought by Summit County.
21     A.    I did not, because I was not
22 immediately aware that the ADM Board was named
23 as a party to those -- the suit.
24     Q.    I'm not sure I followed that.  Can
25 you explain?

Page 104

1     A.    When -- when I was first aware that
2 the county executive was going to file a
3 lawsuit, I thought there would be a process to
4 involve us or include us in the -- in the
5 lawsuit to only -- only to discover that our
6 name was in the lawsuit at some point down the
7 road.  So that was when I realized that our
8 board of directors hadn't been involved in this
9 to the extent that they needed to be.
10     Q.    Do you believe, sitting here today,
11 that the board of directors for the Summit
12 County ADAMHS Board has approved the ADAMHS
13 Board participation in the lawsuit?
14     A.    Yes.
15     Q.    And in what way has the board of
16 directors approved that?
17     A.    By resolution.
18     Q.    Okay.  And when did that happen?
19     A.    I don't remember the month that we
20 had our board meeting.  Was in September or
21 October.
22     Q.    Of the -- of 2018?
23     A.    Yes.
24     Q.    And do you -- is it your
25 understanding that by way of that resolution in

Page 105

1 the fall of 2018, the board opted in to
2 participation in this lawsuit?
3     A.    Yes.
4     Q.    Would that be reflected in meeting
5 minutes of the ADAMHS county board of
6 directors?
7     A.    The resolution is incorporated into
8 our board of directors minutes, yes.
9     Q.    Are you a recipient of the minutes
10 of the board of director meetings for the
11 Summit County ADAMHS Board?
12     A.    Yes, I am.
13     Q.    How often does the board of
14 directors meet?
15     A.    Our board of directors meets
16 approximately 10 times a year.
17     Q.    I think we established earlier that
18 you joined the Summit County ADAMHS Board in
19 2007, right?
20     A.    That's correct.
21     Q.    Did you become the executive
22 director in 2007?
23     A.    I did not.
24     Q.    What position did you assume in
25 2007?

27 (Pages 102 - 105)

1    A.   I was hired to the ADM Board under
2  the position of manager of clinical services.
3    Q.   When did you become the executive
4  director of the Summit County ADAMHS Board?
5    A.   In July -- the board appointed me
6  as an interim director in July of 2010, and
7  subsequently I was -- I was appointed as a
8  full-time or the permanent.  I was offered a
9  contract, a three-year contract, in March of
10  2011, I believe.
11       - - - - -
12       (Thereupon, Deposition Exhibit 3,
13       Web Printout, Jerry Craig LinkedIn
14       Profile, was marked for purposes of
15       identification.)
16       - - - - -
17    Q.   Okay.  We -- we think we found your
18  LinkedIn profile, which is publicly available
19  on that website.
20    A.   Uh-huh.
21    Q.   And I've marked a printout of that
22  as Exhibit 3.  Is this, in fact, your LinkedIn
23  profile?
24    A.   It is my LinkedIn profile.
25    Q.   Do you maintain this profile

1  yourself, or does somebody do it on your
2  behalf?
3    A.   I maintain it on my -- my -- by
4  myself.
5    Q.   This indicates that you're now the
6  executive director of the Summit County Alcohol
7  Drug Addiction and Mental Health Services
8  Board, right?
9    A.   That's correct.
10    Q.   And for the record, when we use the
11  term "ADAMHS," that's an acronym that stands
12  for Alcohol Drug Addiction and Mental Health
13  Services Board, right?
14    A.   Yes.
15    Q.   This doesn't list other positions
16  that you've held at the ADAMHS Board, other
17  than executive director, right?
18    A.   That's correct.
19    Q.   Are there any other positions that
20  you've not listed here in LinkedIn?
21    A.   Yes.
22    Q.   What are the other positions?
23    A.   I was a paper boy.
24    Q.   No, I'm talking about at the ADAMHS
25  Board.

1    A.   At the ADAMHS Board?
2    Q.   Uh-huh.
3    A.   I was the manager of clinical
4  services.
5    Q.   For what years were you the manager
6  of clinical services?
7    A.   From 2007 -- May of 2007 until I
8  was appointed in July of 2010.
9    Q.   Okay.  Any -- any other positions
10  you've not identified --
11    A.   No.
12    Q.   -- at the ADAMHS Board?
13    A.   No.
14    Q.   Before you joined the ADAMHS Board,
15  you spent nearly 20 years at an entity named
16  Community Support Services, Incorporated,
17  right?
18    A.   Yes.
19    Q.   What is that?
20    A.   Community Support Services is a
21  contract agency of the Summit County ADM Board
22  serving individuals with severe and persistent
23  mental illnesses.
24    Q.   Did -- did your work at Community
25  Support Services, Incorporated involve

1  treatment of any individuals who suffered from
2  substance use disorders?
3    A.   Yes.
4    Q.   In what way?
5    A.   In every way you could imagine.
6    Q.   Can you help us for those of us who
7  didn't live with you for those 20 years at the
8  Community Services -- I'm sorry -- Community
9  Support Services, Incorporated, just understand
10  a bit more about how treatment of -- of
11  substance use disorders played into what you
12  all were doing at that entity?
13       MS. KEARSE:  Object to form.
14    A.   So at Community Support Services,
15  our mission was to provide services to people
16  with severe and persistent mental illnesses,
17  many of whom had co-occurring disorders.
18  Probably up to 70 percent of those individuals
19  had some sort of substance use disorder.  So
20  that would run the gamut from alcohol to any --
21  any type of illicit substance and prescription
22  pain medication.
23    Q.   Are mental health issues associated
24  with substance use disorders?
25    A.   Substance -- a substance use

Page 110

1 disorder is a mental health condition.
2     Q.   Okay.  Well, let me ask it if --
3 let me ask you whether or not that relationship
4 is bidirectional.  In other words, do you know
5 whether or not the scientific literature
6 supports the view that mental health disorders
7 are more likely to result in substance use
8 disorders?
9     A.   I'm not aware of any -- any
10 information that -- that would allow me to
11 respond to that one way or the other.
12     Q.   You don't know one way or the
13 other?  $
14     A.   I don't know.
15     Q.   Have you ever looked into that?
16     A.   As to whether or not --
17     Q.   Whether or not mental health
18 illness --
19     A.   Uh-huh.
20     Q.   -- is -- has a causal relationship
21 with substance use disorders?
22         MS. KEARSE:  Object to form.
23     A.   Again, I'm still not sure what
24 you're asking me.  Whether mental illness
25 causes substance use disorders, or whether

Page 111

1 substance use disorders cause mental illness?
2     Q.   Well, so let me -- let me back up.
3 I thought --
4     A.   Okay.
5     Q.   -- it was clear, but maybe it's
6 not.
7         I think you said that substance use
8 disorder, in your view, is a form of a mental
9 health disorder, right?
10     A.   Right.
11     Q.   So my question to you is whether or
12 not you know whether individuals who have
13 mental health disorders are more likely -- from
14 an epidemiological, population-based
15 perspective, are more likely to suffer from
16 substance abuse disorders?
17         MS. KEARSE:  Object to form.
18     Q.   Relative to the population overall?
19     A.   I don't know.  I don't know.
20     Q.   And you've never really looked into
21 that question?
22     A.   Not that I can recall.
23     Q.   When in your career did you start
24 seeing individuals who had developed addiction
25 to prescription opioids?

Page 112

1     A.   Most of my career at Community
2 Support Services, I was an administrator, so I
3 did not see clients directly.
4         However, I was involved in case
5 consultations and discussions involving people
6 who are in state hospitals and also to assist
7 our -- some of our staff in resolving complex
8 clinical cases where some of these
9 conversations occurred.
10     Q.   In the context of your case
11 consultations and complex clinical
12 consultations while you were at Community
13 Support Services, Incorporated, did you see
14 individuals or were you aware of individuals in
15 Summit County who had an addiction to
16 prescription opioids?
17     A.   I don't have -- I -- I can't -- I
18 can't have -- I don't -- I don't recall whether
19 I've, specifically opiates.
20     Q.   What were the most common forms of
21 substance use disorders that you recall knowing
22 about during the time that you were an
23 associate director at Community Support
24 Services, Incorporated?
25     A.   Well, in the -- you know, during my

Page 113

1 time at Community Support Services, we saw a
2 lot of marijuana, alcohol, benzodiazepine
3 abuse, crack cocaine and cocaine, and -- and
4 methamphetamine.
5     Q.   So you remember instances of all of
6 those substances.  Do you remember instances of
7 opiate use disorders during your time at
8 Community Support Services, Incorporated?
9     A.   Not specifically.  What I -- I can
10 recall instances of people with a dependence on
11 painkillers.  Whether they were characterized
12 as opiates, I don't know.
13     Q.   What other types of painkillers do
14 you think those might have been, besides
15 opioids?
16     A.   I don't know.  I'm not a physician,
17 and I don't know what all the -- the full range
18 of painkillers is.
19     Q.   What about heroin?  Did you see, in
20 your work at Community Support Services,
21 Incorporated, individuals in Summit County who
22 were experiencing addiction to heroin?
23     A.   I had no direct contact with --
24 with anybody who mentioned heroin.
25     Q.   Let -- you just said that you --

29 (Pages 110 - 113)

Page 114

1 you knew about these occasions of crack and
2 meth and marijuana --
3     A.   Right.
4     Q.   -- and benzodia- -- all the other
5 substances.
6     A.   Sure.
7         MS. KEARSE:  Object to form.
8     Q.   I'm asking if you're familiar
9 with -- with respect to similar instances with
10 heroin during the time that you were with the
11 Community Support Services, Incorporated
12 entity.
13     A.   And I said, no, I don't.
14     Q.   You don't.
15     A.   No.
16     Q.   Based on your understanding as head
17 of the ADAMHS Board since 2007, when do you
18 believe Summit County started to see an
19 increase in the number of individuals with an
20 addiction to prescription opioids?
21     A.   First of all, I was not the
22 director of the ADM Board in 2007.
23     Q.   Fair enough.  Let me -- let me --
24     A.   Okay.
25     Q.   -- revise the question --

Page 115

1     A.   Okay.
2     Q.   -- and make sure it's clear.
3         As somebody who's been at the
4 ADAMHS Board since 2007 and the executive
5 director since -- I think you said 2010?
6     A.   Correct.
7     Q.   -- what is your understanding about
8 when Summit County started seeing an increase
9 in the number of individuals with an addiction
10 to prescription opioids?
11     A.   I can remember towards the latter
12 part of the first decade of 2000 where we were
13 getting some reports through our court system,
14 through some of our treatment agencies.  And --
15 and we had a staff person who worked primarily
16 with our substance -- our -- our addiction
17 treatment agencies who really had her finger on
18 the pulse of -- of a lot of that.
19     Q.   Who was that individual?
20     A.   Paula Rabinowitz.
21     Q.   When you joined the ADAMHS Board in
22 2007, were you aware, at that time, of Summit
23 County's seeing an increase in the number of
24 individuals with an addiction to prescription
25 opioids?

Page 116

1         MS. KEARSE:  Object to form.
2     A.   Not immediately, no.
3     Q.   Okay.  What about within the first
4 year?  Did that come to your attention within
5 the first year that you were at ADAMHS Board?
6     A.   I don't recall.  I mean, we're
7 talking about 12 -- you know, almost 12 years
8 ago.
9     Q.   And you don't have any memory one
10 way or another.
11     A.   I have -- I don't remember when I
12 first became aware.  I could -- I couldn't say
13 that, "As of this date, I became aware."
14     Q.   Okay.
15         - - - - -
16         (Thereupon, Deposition Exhibit 4,
17         Document Titled, "Continuity of
18         Operations Plan Calling Tree,"
19         SUMMIT_001122421, was marked for
20         purposes of identification.)
21         - - - - -
22     Q.   I think you said sometime in the
23 late -- first decade of the 2000s you became
24 aware that there was an uptick in individuals
25 in Summit County with an addiction to

Page 117

1 prescription opioids.
2         Did I understand that correctly?
3         MS. KEARSE:  Object to form.  I
4 think you just mischaracterized his testimony.
5         MR. BOEHM:  Don't speak, please.
6 You can make your objection to form, but I
7 don't need a speaking objection.  No --
8         MS. KEARSE:  Well, Counsel, I would
9 advised you to keep that --
10     Q.   Go ahead.
11     A.   If I had to -- if I had to guess,
12 that would be --
13         MS. KEARSE:  And I'm going to
14 advise the witness not to guess as well.
15         MR. BOEHM:  Don't interrupt the
16 witness in the middle of the answer.  You know
17 that's not appropriate.  I don't want that to
18 happen again today.  Do not do that.  That's
19 never appropriate.  There's never an occasion
20 where it's okay for you to interject in the
21 middle of a witness's answer.  Do not do that.
22         MS. KEARSE:  I can advise my client
23 not to guess at a question.
24         MS. FLOWERS:  Stop the lectures.
25     Q.   Go ahead, Mr. Craig, please.

30 (Pages 114 - 117)

1    You're under oath today.  You
2  understand that, right?
3    A.  Sure.
4    Q.  And -- and you're under an oath to
5  tell the truth, the whole truth, and nothing
6  but the truth.  Do you understand that?
7    A.  Yes.
8    Q.  That's what I'm asking for.
9    A.  And -- and I don't have a
10  recollection of when.  Specifically, there's
11  nothing that I can pair my -- the first time
12  I've heard about opiates with any other event
13  that would allow me to establish a time when I
14  first learned about it.
15    Q.  Is your testimony here today that
16  certainly by the end of the first decade of
17  the -- of -- of the first decade of the 2000s,
18  you understood there was an increasing number
19  of individuals in Summit County with addiction
20  problems with prescription opioids?
21    A.  Yes, roughly.
22    Q.  I've just put in front of you a
23  document marked as Exhibit 4, and this is an
24  organizational chart of the Summit County
25  ADAMHS Board.

1    Do you see that?
2    A.  Yes, I do.
3    Q.  And you're at the top, right?
4    A.  Yes.
5    Q.  And that's because you're the head
6  of the ADAMHS Board?
7    A.  Yes.
8    Q.  Is this organizational chart up to
9  date?  If you just look -- let's just start
10  with that top row, beneath you.  Are there any
11  individuals who have left and been replaced?
12    A.  Yes.
13    Q.  Can you identify those for us,
14  please?
15    A.  You're talking about what's here
16  versus what is here today?
17    Q.  Correct, yes.
18    A.  Okay.  John Ellis is no longer at
19  the organization.  Mary Alice Sonnhalter is no
20  longer at the organization.  Tom Leffler is no
21  longer at the organization, nor is Jackie
22  Steward.
23    Q.  Who has taken the position of
24  manager of clinical services?
25    A.  Aimee Wade.

1    Q.  When did Mr. Ellis leave?
2    A.  Probably around 2016.
3    Q.  Is that when Ms. Wade came in to
4  take Mr. Ellis's place?
5    A.  Yes.
6    Q.  What do you rely on Doug Smith to
7  do in the role of chief clinical officer?
8    A.  Dr. Smith is a psychiatrist and has
9  a lot of knowledge around mental health issues,
10  particularly as it relates to forensic; those
11  involved in the criminal justice system, which
12  is some of his past work experience.
13    He has developed the -- he has --
14  he has -- also has a pretty -- a good
15  understanding of the state hospital system,
16  having arrived from the state hospital system,
17  and we utilize the state hospitals.  And he
18  provides a lot of clinical input in evaluating
19  treatment and -- and also helping us to
20  identify gaps in services and addressing --
21  addressing the needs of our client populations.
22    Q.  What are your basic
23  responsibilities as the head of the ADAMHS
24  County -- I'm sorry, the Summit County ADAMHS
25  Board?

1    A.  My responsibility is it's -- as
2  it's laid out in statute, is to assess
3  community needs for mental health and addiction
4  treatment; to -- to address those needs through
5  contracts with providers, since we're not able
6  to provide direct services; and to evaluate the
7  impact of those services.
8    Q.  Is it fair to say that you consider
9  yourself to have a duty to the people of Summit
10  County?
11    MS. KEARSE:  Object to form.
12    A.  That would be -- that would be
13  accurate.
14    Q.  What do you understand your duty to
15  the people of Summit County to be?
16    A.  To the extent that our funding
17  would allow us, to -- to identify and address
18  the mental health and addiction issues
19  encountered by people in our community.
20    Q.  Is it fair to say that you take
21  your duty and responsibilities as the head of
22  the Summit County ADAMHS Board seriously?
23    A.  Yes, I do.
24    Q.  One of your responsibilities and
25  duties has been to understand the nature and

1 the scope of the opioid abuse epidemic as it
2 concerns Summit County; is that fair?
3        MS. KEARSE:  Object to form.
4     A.   One of my duties is to understand
5 the scope and impact of our -- of our opiate
6 epidemic, yes.
7     Q.   Have you undertaken to understand
8 the nature and scope of the opioid abuse
9 epidemic within Summit County?
10        MS. KEARSE:  Object to form.
11     A.   I'm sorry.  You -- you keep saying
12 "opiate abuse epidemic," and it's not an opiate
13 abuse epidemic.  It's an opiate epidemic.  So
14 you lose me when you use that, and I'm not able
15 to focus on the rest of what you're asking me.
16 So if you could ask me the question again, I'd
17 appreciate it.
18     Q.   You do -- well, let's just back up
19 for a second --
20     A.   Okay.
21     Q.   -- because I don't want semantics
22 to get in the way.
23     A.   Sure.
24     Q.   You understand that --
25        MS. KEARSE:  Object to form and

1 characterization of that.
2     Q.   You -- you understand that there
3 are people who are abusing opioids in Summit
4 County, right?
5     A.   There are people who are addicted
6 to opiates in Summit County.
7     Q.   Do you disagree with the term
8 "abuse"?
9     A.   I disagree with the broad
10 characterization.
11     Q.   Do you disagree -- you wanted to
12 change my language, so I just want to
13 understand what part you disagree with.
14        Do you agree that there are
15 individuals in Summit County who are abusing
16 opioids?
17        MS. KEARSE:  Objection.
18     A.   I believe that there are people who
19 are abusing opiate medications; however, I do
20 not believe that the abuse is an epidemic.  I
21 think that the addiction and the dependence
22 is -- is an epidemic.
23     Q.   So when you use the term
24 "epidemic," what exactly are you talking about?
25 What -- what specific measure are you using

1 when you use the term "epidemic"?
2     A.   I'm --
3        MS. KEARSE:  Object to form.
4        Go ahead.
5     A.   I'm saying that if you want to
6 characterize an epidemic as the majority of the
7 people that -- that present to us for treatment
8 services, these are people who are addicted.
9 They're no -- no longer abusing medications.
10 They're dependent on those medications.
11     Q.   Well, in many instances people
12 actually are abusing heroin, right?
13        MS. KEARSE:  Objection.
14     A.   I don't know how -- I don't know
15 how you define "abuse."
16     Q.   Okay.  Well, heroin is not a
17 medication, right?
18     A.   I don't know.  I -- I --
19     Q.   You're not sure?
20     A.   It could -- it could be -- I don't
21 know that it couldn't be used as a medication.
22     Q.   Okay.  So you don't know whether or
23 not licensed physicians can prescribe heroin to
24 patients to treat a legitimate medical need?
25 You're not sure one way or another?

1     A.   So by "medication," you're --
2 you're saying a medication that's approved by
3 the FDA?
4     Q.   Do you consider heroin a
5 medication?
6     A.   There's -- there are lots of -- of
7 substances that people use for medication that
8 don't go through FDA or aren't prescribed my
9 medic- -- by medical doctors.
10     Q.   Do you consider cocaine to be a
11 medication?
12     A.   Do I consider -- consider cocaine
13 to be medication?  No, I -- I don't consider
14 them to be medication.
15     Q.   Do you consider crack to be a
16 medication?
17     A.   I don't consider crack to be a
18 medication.
19     Q.   Do you consider heroin to be a
20 medication?
21     A.   I don't consider heroin to be a
22 medication.
23     Q.   You can't go to a doctor and say,
24 "I have an injury," and the doctor is going to
25 prescribe heroin, right?

32 (Pages 122 - 125)

Page 126

1     A.   No doctor that I would want to go
2 to.
3     Q.   Okay.  And you can't go to a
4 pharmacy and have them fill a prescription for
5 heroin, right?
6     A.   Not that I'm aware of, no.
7          MS. KEARSE:  Counsel, I think --
8     Q.   And do you know --
9          MS. KEARSE:  -- we've been going
10 for an hour.  Can we go ahead and -- I think we
11 said we'd break at every hour.  I -- I didn't
12 know you were going to go right into another
13 question.
14          MR. BOEHM:  I don't know if we said
15 that, but --
16          MS. KEARSE:  I was -- I was trying
17 to find a good time because we've been going
18 for an hour.
19          MR. BOEHM:  We can take a break.
20 Okay.
21          THE VIDEOGRAPHER:  Off the record,
22 11:16.
23          (A recess was taken.)
24          THE VIDEOGRAPHER:  We're on the
25 record, 11:31.

Page 127

1 BY MR. BOEHM:
2     Q.   I think where we left off,
3 Mr. Craig, is you -- we were talking about one
4 of your duties and responsibilities being to
5 understand the nature and scope of the opioid
6 epidemic, as you call it, in Summit County,
7 right?
8     A.   That's correct.
9     Q.   And you have undertaken to
10 understand the nature and scope of the opioid
11 epidemic in Summit County?
12     A.   Yes, I have.
13     Q.   How have you gone about that?
14     A.   In a variety of ways.  I've -- I've
15 tried to read as much information as -- as I am
16 able to as I -- as I run across it.  I've
17 received some education and information through
18 our board association.  I've talked with
19 families and individuals who are affected.  Our
20 Opiate Task Force has a number of individuals
21 who've touched this issue from a variety of
22 perspectives, whether it be criminal justice,
23 health care, and -- and others.
24          So there's just been a very broad
25 specter of -- spectrum of people that I've been

Page 128

1 invol- -- involved with.
2     Q.   Have your efforts to understand the
3 nature and scope of the opioid epidemic in
4 Summit County included an effort to understand
5 and investigate what factors have contributed
6 to the opioid epidemic within Summit County?
7     A.   Yes.
8     Q.   Have you read reports from state
9 and federal governments about that?
10     A.   Yes, I have.
11     Q.   Has the ADAMHS Board issued its own
12 reports on that subject?
13     A.   The ADM Board has published some
14 reports, yes.
15     Q.   And you indicated that you
16 sometimes go around and speak to groups about
17 the nature and scope of the opioid epidemic in
18 Summit County, right?
19     A.   Yes.
20     Q.   Do your presentations and
21 discussions include a discussion about what you
22 believe to be the contributing factors to the
23 epidemic?
24     A.   Yes.  That's -- really sets the
25 table for the whole conversation in educating

Page 129

1 the community.
2     Q.   Before we move on from this
3 document that's been marked as Exhibit 4, the
4 organizational chart, you indicated that
5 Mr. Tom Leffler is no longer at the ADAMHS
6 Board, right?
7     A.   That's correct.
8     Q.   Has that position now been filled
9 by Ms. Peivich?
10     A.   Yes, although I did some
11 reorganization after -- after Tom Leffler left,
12 and so I only have four individuals who are
13 direct reports now.
14     Q.   Okay.  But is Ms. Peivich now in
15 the position that Mr. Leffler vacated?
16     A.   In -- in part, yes.  One of her
17 duties is to be the manager of finance.
18     Q.   Okay.  And she has other duties on
19 top of that?
20     A.   That's correct.
21     Q.   Okay.  What other duties does she
22 have on top of that?
23     A.   She's -- she's the operations
24 manager, so she oversees our IT department.
25 She oversees our administration, our HR, and

33 (Pages 126 - 129)

Page 130

1  all the -- all the operational and payment side
2  of our business.
3      Q.   Got it.  And you indicated that
4  you've had conversations with Ms. Peivich about
5  the computations.  We discussed those earlier,
6  right?
7          Have you had conversations with
8  individuals other than Ms. Peivich at the
9  ADAMHS Board about the calculations and
10  computations of expenditures that we discussed
11  at the beginning of today's deposition?
12      MS. KEARSE:  Object to form.
13      A.   Generally, yes.
14      Q.   Who else have you communicated at
15  the ADAMHS Board about those computations?
16      A.   Aimee Wade, Christine Gashash, Doug
17  Smith, and Jen Peivich.
18      Q.   Have any of those individuals --
19  other than Ms. Peivich, about whom we've
20  already talked -- assisted in the computation
21  of those expenditures as we discussed earlier
22  today?
23      MS. KEARSE:  Object to form.
24      A.   No, they haven't assisted in the
25  computation of those forms because the -- the

Page 131

1  purpose of our conversation was to make sure
2  that we included all activities that we needed
3  to include.
4      Q.   When did you first begin trying to
5  investigate and understand the causes of the
6  opioid epidemic in Summit County?
7      MS. KEARSE:  Object to form.
8      A.   So it's my responsibility to
9  understand all the issues that affect Summit
10  County residents.  And I can't say that I began
11  at any point in time.  I think I was presented
12  with information or opportunities to learn
13  about various aspects of the issues and
14  problems that occurred in our community, and so
15  over time I became more and more aware.
16      Q.   Understand.  But I understand that
17  your -- your knowledge and investigation,
18  naturally, would -- would develop over a course
19  of time.
20          My question is, if you can, when
21  did that process begin for you and for the
22  ADAMHS Board for Summit County?
23      MS. KEARSE:  Object to form.
24      A.   It began as soon as I had the
25  responsibility for understanding the needs of

Page 132

1  our community, so that would be when I joined
2  the ADM Board.
3      Q.   In 2007?
4      A.   Yes.
5      Q.   Are you aware that the ADAMHS Board
6  prepares an annual budget?
7      A.   I am aware, yes.
8      Q.   Do you have responsibility for that
9  budget as the executive director for Summit
10  County's ADAMHS Board?
11      A.   Yes, I do.
12      Q.   And the budget includes revenue
13  that you all have for purposes of the services
14  you provide, right?
15      A.   Yes.
16      Q.   And it has a summary of the
17  expenditures that you make?
18      A.   That is correct.  That we propose,
19  not necessarily that we make.
20      Q.   Right.  And then, of course, you --
21  you track the actual expenditures?
22      A.   We do track the actual
23  expenditures.
24      Q.   How do you go about tracking the
25  actual expenditures?

Page 133

1      A.   We -- we run reports that -- of --
2  of all the financial information that -- that
3  runs through our agency.
4      Q.   What -- do you use some sort of
5  software?
6      A.   Yes.
7      Q.   What's the software?
8      A.   I don't know what.  I don't know
9  what it's called.
10      Q.   Do you have access to it?
11      A.   I don't.  My -- my -- Jen Peivich
12  runs that for me.
13      Q.   Has anybody ever asked you to
14  collect data from that software in terms of
15  your expenditures?
16      A.   Has anybody asked?  Our board of
17  directors does, yes.
18      Q.   Okay.  Did you use information from
19  that database for purposes of performing the
20  computations and calculations that you
21  described earlier today?
22      MS. KEARSE:  Object to form.
23      A.   Yes, we do use information from
24  that database.
25      MR. BOEHM:  I'm going to mark this

34 (Pages 130 - 133)

Page 134

1 next document here as Exhibit 5 for purposes of
2 your deposition.
3          - - - - -
4          (Thereupon, Deposition Exhibit 5,
5          Ohio Department of Health, Violence
6          and Injury Prevention Program
7          Document, First Heading "Epidemic of
8          Prescription Drug Overdose in Ohio",
9          was marked for purposes of
10         identification.)
11         MR. BOEHM:  And I'm handing a copy
12 to you and a copy to your counsel.
13     Q.   This is a report from the Ohio
14 Department of Health.  It's available on their
15 website.  And it's entitled "Epidemic of
16 Prescription Drug Overdose in Ohio."
17         Do you see that?
18     A.   I do see it.
19     Q.   This refers back, in the first
20 bullet point, to 2007.  Do you see that, in
21 2007?
22     A.   Yes.
23     Q.   "Unintentional drug poisoning
24 became the leading cause of injury/death in
25

Page 135

1 Ohio."
2          Do you see that?
3     A.   I do see that.
4          MS. KEARSE:  And, Counsel, he's
5 reviewing the document.
6          MR. BOEHM:  That's fine.
7     Q.   And you can review the document as
8 much as you need to answer my questions.  I'm
9 going to try and keep it relatively targeted.
10         You see at the end of that first
11 bullet point, it says, "This trend continued in
12 2009"?
13     A.   No.
14     Q.   It's in the -- the first bullet.
15     A.   Okay.  Yes.
16     Q.   See --
17     A.   I do see that.
18     Q.   Is that consistent with your
19 understanding of what was taking place in
20 Summit County?
21     A.   I don't know that I necessarily, at
22 that point in time, was focused enough to be
23 able to say whether this was true for Summit
24 County or not.
25     Q.   Do you know when in Summit County

Page 136

1 drug overdoses became the leading cause of
2 injury/death in Summit County?
3     A.   I do not know.
4     Q.   Did you ever ask that question of
5 anybody?
6     A.   No, because our organization was
7 primarily responsible for providing treatment,
8 not necessarily to look at the causes or the
9 patterns of this.
10    Q.   As head of the ADAMHS Board for
11 Summit County, do you get reports about drug
12 overdose deaths in Summit County?
13    A.   Yes, I do.
14    Q.   Who do you get those reports from?
15    A.   We get the reports from the medical
16 examiner's office.
17    Q.   How often does the medical
18 examiner's office provide the ADAMHS Board for
19 Summit County reports on drug overdose deaths?
20    A.   We worked out an arrangement with
21 the medical examiner's office that she sent
22 this information over whenever a death occurred
23 that had -- that had -- where an overdose was
24 involved.
25    Q.   Since you've been employed at the

Page 137

1 ADAMHS Board for Summit County, has the ADAMHS
2 Board always had access to data about overdose
3 deaths from the medical examiner's office?
4     A.   No.
5     Q.   Why not?
6     A.   Because that was not information
7 that we sought at that time.
8          We began -- we identified the
9 deaths from overdoses as a metric that we would
10 be able to utilize as part of our Opiate Task
11 Force as a measure of the extent of the
12 problem, and also as to whether or not we
13 were establishing some baseline information so
14 we could see what sort of progress was being
15 made as a result of our efforts.
16    Q.   When did that happen?
17    A.   So I would guess it would have to
18 have been around March of 2014.
19    Q.   So your testimony here today is
20 that prior to March 2014, the Summit County
21 ADAMHS Board did not have access to drug
22 overdose death information from the Summit
23 County Medical Examiner's Office?
24         MS. KEARSE:  Object to form.
25    A.   That's -- that's not what I said.

35 (Pages 134 - 137)

Page 138

1 I said that --
2    Q.   Well, my question to you is whether
3 or not the ADAMHS Board had access to --
4    A.   Okay.
5    Q.   -- drug overdose death data from
6 the medical examiner's office since the time
7 you joined the ADAMHS Board in 2007.
8    A.   I was -- my understanding is that
9 we had access to that information; however, at
10 the time I was not aware that this information
11 was available publicly and that the medical
12 examiner's office would share it.  It only
13 became known to us as a result of our Opiate
14 Task Force that these -- this data was
15 available.
16    Q.   So your testimony here today is
17 that the ADAMHS Board for Summit County didn't
18 know that it had access to drug overdose data
19 from the medical examiner's office until 2014?
20       MS. KEARSE:  Object to form.
21    A.   That would be -- that would be
22 generally accurate, yes.
23    Q.   Okay.  And it's -- and -- and no
24 one from the ADAMHS Board, as far as you know,
25 ever asked the medical examiner's office for

Page 139

1 information about drug overdose deaths prior to
2 2014.  Is that your testimony?
3       MS. KEARSE:  Object to form.
4    A.   I don't know if anybody had ever
5 asked that information from our -- our medical
6 examiner's office, because I never asked to --
7 to see it.
8    Q.   Okay.  Look at Figure 1, if you
9 would, on the first page of this exhibit.
10       Do you see that graph?
11    A.   I do see that graph.
12    Q.   It compares numbers of deaths in
13 motor -- from motor vehicle traffic accidents
14 to drug overdose deaths.  Do you see that?
15    A.   Yes, I do.
16    Q.   And do you see that there's an
17 increase, really starting, on this graph, from
18 1999 all the way up, in terms of drug overdose
19 deaths; do you see that?
20    A.   I do see that.
21    Q.   And then it looks like the motor
22 vehicle traffic deaths are actually going down
23 a little bit; do you see that?
24    A.   Yes, I do see that.
25    Q.   And it looks like right around 2006

Page 140

1 or so, the number of drug overdose deaths
2 catches up with and then passes the number of
3 deaths for motor vehicle accidents.
4       Do you see that?
5    A.   Yes, I do see that.
6    Q.   Did -- were you aware of those
7 trends?
8    A.   I was not aware of those trends
9 until at some point that I saw this -- this
10 data presented by somebody at the State.
11    Q.   When was that?
12    A.   I don't recall when.
13    Q.   In the third bullet point on the
14 first page, it says that from 1999 to 2009 this
15 increase in drug overdose deaths was, quote,
16 "driven largely by prescription drug
17 overdoses."
18       Do you see that?
19    A.   Yes.
20    Q.   Do you agree with that with respect
21 to Summit County?
22    A.   I don't know.
23    Q.   You don't know --
24    A.   I don't know.  I can't -- I can't
25 state that with any degree of certainty.

Page 141

1    Q.   Okay.  So sitting here today, you
2 don't know whether from 1999 to 2009 the rate
3 of unintentional drug poisonings -- in other
4 words, drug overdoses -- and the increase in
5 that rate was driven largely by prescription
6 drug overdoses?
7    A.   No, I don't know that.
8    Q.   Have you ever looked into that?
9    A.   There was a point in time where
10 we -- John Ellis, who is our manager of
11 clinical services, had pulled some information
12 from one of our providers that looked at the
13 individuals -- individuals receiving services
14 from our detox program, and how many of the
15 folks that were there reported their addiction
16 to substance -- substances other than -- how
17 many of them had reported their addiction to
18 pain medication versus other illicit
19 substances.
20    Q.   Let me see if I can simplify this.
21    A.   Okay.
22    Q.   Do you agree that the increase in
23 drug overdose deaths in Ohio from 1999 to 2009,
24 thought to be driven largely by prescription
25 drug overdoses, was already being publicly

36 (Pages 138 - 141)

Page 142

1 discussed by the time you joined the ADAMHS
2 Board in 2007?
3      MS. KEARSE: Object to form.
4   A. Would I agree that it's already
5 been discussed?
6   Q. That it was already being publicly
7 discussed by that time.
8      MS. KEARSE: Object to form.
9   A. To be honest with you, I -- I don't
10 know when it was -- how -- how long it had been
11 publicly discussed.
12   Q. I'm not asking whether or not you
13 know the specific day. My question is a little
14 bit different. Let me ask it again.
15   A. Okay.
16   Q. Okay. Do you agree that the
17 increase in drug overdose deaths that, as
18 described here by the Ohio Department of
19 Health, was thought to be driven largely by
20 prescription drug overdoses, was already a
21 publicly known and discussed phenomenon by the
22 time you joined the ADAMHS Board in 2007?
23      MS. KEARSE: Object to form.
24   A. And again, I don't know.
25   Q. You don't know whether it was

Page 143

1 publicly known and discussed or not?
2   A. I don't. I don't know.
3   Q. Do you -- has there been an
4 increase in drug overdose deaths in Summit
5 County during the time that you've been the
6 head of the ADAMHS -- I'm sorry -- during the
7 time that you've been employed by the Summit
8 County ADAMHS Board?
9   A. Yes, there have been.
10   Q. What, in your view, has driven the
11 increase in drug overdose deaths during the
12 time that you've been at the ADAMHS Board?
13   A. What has been the --
14   Q. What has driven that increase?
15   A. There's a lot of factors.
16 There's -- there's, you know, the diversion of
17 prescription pain medications, the prescribing
18 practices of physicians, the -- the fact that
19 when a lot of the pill mills were shut down
20 that it left a void in the community that the
21 dealers of the illicit substances were more
22 than willing to fill, and the fact that there
23 was the introduction of substances that were so
24 potent that many people didn't know what they
25 were getting and ended up dying as a result

Page 144

1 of -- of using them.
2   Q. Do you agree that by September 2010
3 in Summit County, the increase in individuals
4 addicted to opioids had been identified by the
5 County?
6      MS. KEARSE: Object to form.
7   A. Do I agree with that? I -- I don't
8 agree -- I -- I don't know that -- I don't know
9 when that was identified in Summit County.
10   Q. Your testimony is -- here today,
11 under oath --
12   A. Uh-huh.
13   Q. -- that as the head of the Summit
14 County ADAMHS Board --
15   A. Right.
16   Q. -- you don't know whether, by 2010,
17 Summit County had identified an increase in
18 opiate addiction and its implications within
19 the County?
20      MS. KEARSE: Object to form.
21   Q. Do I understand that correctly?
22   A. I don't know that by 2010, I -- I
23 don't know with any degree of certainty that by
24 October 2010 that we had identified this as to
25 what you said.

Page 145

1   Q. Okay. Let's see if we can refresh
2 your recollection just a little bit.
3   A. Okay.
4      - - - - -
5     (Thereupon, Deposition Exhibit 6,
6     Document Titled "Community Play
7     Guidelines for SFY 2012 - 2013,"
8     SUMMIT_001170991 to 001171802, was
9     marked for purposes of
10     identification.)
11      - - - - -
12   Q. This is a document from the Ohio
13 Department of Mental Health during the time
14 when Ted Strickland was the governor of Ohio.
15     Do you remember Governor
16 Strickland?
17   A. I do remember Governor Strickland.
18   Q. He's not the governor anymore,
19 right?
20   A. No, I don't believe he is.
21   Q. Hasn't been the governor for a
22 while, right?
23   A. That's correct.
24   Q. This is a document from September
25 29, 2010. Do you see that?

37 (Pages 142 - 145)

1    A.    Yes, I do.
2    Q.    Okay.  If you turn to page 50,
3  there's a specific reference to Summit County.
4  Do you see the -- the page numbers?
5    A.    Yes, I do.
6    Q.    Very bottom of page 50, this --
7    A.    Let me get to page 50 first.
8    Q.    Sure.  Sure.  This document --
9    A.    Okay.
10    Q.    -- from the Ohio Department of
11  Mental Health has a reference to the rise in
12  the opiate population, specifically in Summit
13  County.  It's at the very bottom of the page.
14    A.    Uh-huh.
15    Q.    Do you see that?
16    A.    I do see that.
17    Q.    Certainly the Ohio Department of
18  Mental Health knew that in Summit County there
19  was a rise in the opiate population --
20    A.    Uh-huh.
21    Q.    -- by September 2010, fair?
22    A.    Evidently.
23    Q.    But -- but you don't know whether
24  or not Summit County's own ADAMHS Board was
25  aware of this information that the Ohio

1  Department of Mental Health knew?
2        MS. KEARSE:  Objection.  Asked and
3  answered.
4    A.    That's correct.
5    Q.    Did you know that in 2010 the
6  governor set up a task force to address the
7  issue of opiate abuse and addiction in the
8  state of Ohio?
9    A.    I guess what I am saying is that I
10  don't know what year specifically we became
11  aware --
12    Q.    Just --
13    A.    -- or what year that the
14  governor's --
15    Q.    Just answer my question, if you
16  don't mind.
17        MS. KEARSE:  Counsel, he is
18  answering your question.
19    A.    -- or -- or what year that the
20  governor's put out his report or any of those
21  things.  I don't know.  I don't have a memory
22  that would allow me to pinpoint the date at
23  which we were aware of these things.
24    Q.    What did Summit County do in 2010
25  or before 2010 to investigate the causes of the

1  opioid epidemic within Summit County?
2    A.    Can you say that again, please?
3    Q.    What did Summit County do in or
4  before 2010, which is the year of this document
5  I've --
6    A.    Uh-huh.
7    Q.    -- just shown to you, to
8  investigate the causes of the opioid epidemic
9  in Summit County?
10        MS. KEARSE:  Object to form.
11    A.    What did we do to investigate the
12  causes?  We didn't -- we didn't spend a lot of
13  energy on investigating the causes.  We spent a
14  lot of energy on addressing the needs that
15  people presented at our -- at our -- at our
16  organizations.
17    Q.    Do you agree that understanding the
18  cause of an epidemic is actually quite
19  important to being able to address it
20  appropriately?
21    A.    It's --
22        MS. KEARSE:  Object to form.
23    A.    It's certainly part of it, yes.
24    Q.    It's important, right?
25    A.    It can be important, yes.

1    Q.    Do you agree with res- -- that with
2  respect to the opioid epidemic, it is important
3  to be able to understand the causes in order to
4  address -- and try and address the problems
5  that exist; is that fair?
6    A.    That became more and more clear
7  over time, yes.
8    Q.    Okay.  Did Summit County do
9  anything in 2010, the date of this document
10  marked as Exhibit 6, or before 2010 to
11  investigate the causes of the opioid epidemic
12  within Summit County?
13        MS. KEARSE:  Objection to form.
14  Mischaracterizes the testimony.
15    A.    I -- I don't remember if there was
16  anything specific that we did in 2010.  Again,
17  that was the -- the year that Bill Harper left
18  and I was appointed as director.  At that point
19  in time in our community, we were struggling
20  with methamphetamines and bath salts, I believe
21  were -- was two of the most significant issues
22  that -- that took up a lot of our attention.
23        But we were getting information
24  from our providers that would indicate that --
25  that there was an increased demand for services

Page 150

1 specific to people who are opiate involved.
2    Q.   By 2010, right?
3    A.   Yes.
4    Q.   And did you undertake to try and
5 understand -- do you agree -- do you have a
6 view as to whether or not, by 2010, Summit
7 County was experiencing an opioid epidemic?
8    A.   Do I agree or do I understand --
9    Q.   Do you have a view as to whether or
10 not, by 2010, Summit County was experiencing an
11 opioid epidemic?
12    A.   Based on -- based on some
13 information that was provided to us from one of
14 our providers, we were investigating.
15    Q.   You hadn't made a determination by
16 2010 as to whether or not you had an opioid
17 epidemic on your hands?
18    A.   We were not so much concerned about
19 whether there was an opiate epidemic as we were
20 about whether or not there was a need for
21 increased capacity for services.
22    Q.   Do you have a view, Mr. Craig, as
23 the head of the Summit County ADAMHS Board
24 since 2010, as to whether or not by that year,
25 2010, Summit County was experiencing an opioid

Page 151

1 epidemic?
2         MS. KEARSE:  Counsel, I'm going to
3 object to this continued line of questioning.
4 Asked and answered.
5         MR. BOEHM:  No, no, no, no.
6         MS. KEARSE:  It's speculation.
7         MR. BOEHM:  Please don't.  Stop.
8         MS. KEARSE:  There's testimony in
9 the document itself.
10    Q.   Go ahead.  It's a simple question.
11    A.   I don't know that I was aware in
12 2010.  I don't know if I wasn't aware.  I don't
13 know if I was aware.
14    Q.   How about by 2011?
15    A.   And again, I'm -- I -- I cannot
16 pinpoint a date by which I went, ding, I'm
17 aware of it.
18    Q.   I'm not looking for a specific
19 date.  I'm asking you about years.
20    A.   That's -- I understand that.
21    Q.   What about by 2007?
22         MS. KEARSE:  Asked and answered.
23    A.   What I -- what I know is that I
24 needed -- as part of -- as part of the -- so in
25 2010 I was appointed as the executive director

Page 152

1 on an interim basis, and I wanted to fill the
2 position, once I was appointed full-time as the
3 executive director with somebody with
4 information -- with addiction -- with an
5 addiction background.  I had mostly a mental
6 health background.  I wanted somebody with an
7 addiction background, because I was aware that
8 we had some issues related to substance use
9 disorders that -- that we needed to address in
10 our system.
11         - - - - -
12         (Thereupon, Deposition Exhibit 7,
13         7/22/2011 Document Titled "Craig's
14         List," SUMMIT_001233373 to
15         001233374, was marked for purposes
16         of identification.)
17         - - - - -
18    Q.   My question to you is, I think,
19 pretty simple.  If you don't want to answer it,
20 you can just tell me, but it's simple.
21         MS. KEARSE:  Objection.
22    Q.   As the head of the ADAMHS Board for
23 Summit County since the year 2010, do you have
24 a view as to whether or not Summit County was
25 experiencing an opioid epidemic by the year

Page 153

1 200- -- let's say 7.
2         MS. KEARSE:  Objection to form.
3    A.   I knew that there was an
4 increased -- or there were reports of an
5 increased demand for services for people who
6 were opiate involved.
7    Q.   By 2007, correct?
8    A.   By 2010 is what your question
9 asked.
10    Q.   Well, let's start with 2007.  Did
11 you know that by 2007?
12    A.   I did not know in 2007.
13    Q.   Did you know it by 2008?
14    A.   As I said, I'm not aware of the
15 date by which I first became aware of it.
16    Q.   Okay.  But certainly you say by
17 2010 you knew that there was an increase in
18 individuals who were experiencing opiate abuse
19 disorder and seeking services for that,
20 correct?
21    A.   I can -- again, I don't know
22 exactly when I first became aware of it, sir.
23    Q.   By 2010 --
24         MS. KEARSE:  Counsel, I'll just
25 add --

39 (Pages 150 - 153)

Page 154

```
 1    Q.   -- as the head of the --
 2         MS. KEARSE:  -- I -- I --
 3         MR. BOEHM:  I'm asking a very
 4 simple question.
 5         MS. KEARSE:  And I'm also going to
 6 object to your eye rolling and your pounding
 7 your head and doing things that the camera --
 8         MR. BOEHM:  Listen.
 9         MS. KEARSE:  -- cannot see that
10 you're doing --
11         MR. BOEHM:  Listen.  I --
12         MS. KEARSE:  -- to the witness.  I
13 object to that.
14         MR. BOEHM:  I'm asking a simple
15 question.
16         MS. KEARSE:  If you want to ask a
17 question -- ask -- he's asked and answered it.
18 And just ask your question.  We don't need
19 your --
20    Q.   I want you -- you said you had a
21 duty --
22         MS. KEARSE:  -- thea- -- theatrics
23 here.
24    Q.   -- to the people of the county,
25 right?  You said that?
```

Page 155

```
 1    A.   I'm sorry.  Are you talking to me?
 2    Q.   I'm talking to you.
 3    A.   Okay.
 4    Q.   You had a -- you said you have a
 5 duty to the people of the county, right?
 6    A.   I do have a duty to the people of
 7 the county.
 8    Q.   You're on the record right now
 9 under oath.
10         MS. KEARSE:  I don't think you need
11 to keep reminding him of that, Counsel.
12    Q.   And -- and my question to you --
13         MS. KEARSE:  He knows his
14 obligations under the oath that he took.
15    Q.   You're on the record.
16         As the head of the ADAMHS Board
17 since 2010, do you have a view as to whether or
18 not Summit County was experiencing an opioid
19 epidemic by the year 2010?
20         MS. KEARSE:  Object to form.  Asked
21 and answered.
22    A.   What I can tell you is that I may
23 have been aware and I may not have been aware.
24 I can't tell you when I first became aware that
25 this was an epidemic.
```

Page 156

```
 1    Q.   Do you believe at some point it
 2 became an epidemic?
 3    A.   I may have -- without guessing, I
 4 could -- I can say that retrospectively I may
 5 have known earlier, but I can't say that with
 6 any degree of certainty.  So if you want me to
 7 answer you as to when I first became aware, it
 8 would be impossible for me to tell you.
 9    Q.   Okay.  My question to you is
10 whether or not you believe that at some point,
11 in Summit County, opiate use disorder became an
12 epidemic?
13    A.   Yes.
14    Q.   Okay.  And what is it that made you
15 come to that conclusion?
16    A.   There was a point in time when I
17 became aware.  There was a point in time
18 when obviously there had to have been.
19    Q.   What happened that made you believe
20 that to be the case?
21    A.   There was a whole series of -- of
22 presentations and information that I had looked
23 at over time that -- that likely led me to that
24 conclusion.
25    Q.   You don't know when?
```

Page 157

```
 1    A.   I -- sorry.  I -- I've already
 2 answered this I don't know how many different
 3 ways.
 4    Q.   Well, the problem is you haven't
 5 answered it, but let me ask you a different
 6 question.
 7         MS. KEARSE:  Counsel, he has
 8 answered your question.
 9    Q.   How --
10         MS. KEARSE:  I suggest you move on.
11    Q.   You indicated that there was some
12 computations of damages that were made:  one
13 set in 2017, then another set that got bigger
14 with the lawyers' involvement in 2018.
15         MS. KEARSE:  Object to form.
16    Q.   Right?
17    A.   They didn't get bigger with the
18 lawyers' involvement.  They got bigger with the
19 passage of time.
20    Q.   Okay.  How far back did you go?
21 How -- to -- how far back in time did you go
22 when you decided you wanted to com- -- compute
23 the expenditures the Summit County ADAMHS Board
24 made in connection with the opiate epidemic in
25 the county?
```

40 (Pages 154 - 157)

Page 158

1          MS. KEARSE:  Object to form.
2     A.    How many times did I look at this,
3 or how far back did I go?
4     Q.    How far back in time did you go?
5     A.    Okay.  I went back -- it was --
6 we -- we were asked to provide information for
7 a period of time.  I believe it went back to
8 2012, and I think that we later were asked to
9 provide information for a longer time period.
10 And, again, I don't know specifically how many
11 years.
12    Q.    You don't know how far back it
13 went?
14    A.    I don't remember.
15    Q.    Do you know roughly?
16    A.    I don't know.  Five or six years.
17    Q.    With respect to the analysis you
18 were -- you performed in 2018, how far back in
19 time did that analysis go?  In terms of your
20 computation of expenditures in connection with
21 ADAMHS Board costs in -- in relation to the
22 opioid epidemic in the county?
23    A.    I don't know.  Because we were
24 asked for so much information with different
25 time frames identified in -- in these requests

Page 159

1 for information that I really couldn't tell
2 you.
3     Q.    I've put in front of you a document
4 that's been marked as Exhibit 7 for purposes of
5 the deposition.  It's a July 22, 2011, document
6 that starts with the words "Craig's List."
7          Do you see that?
8     A.    I see that.
9     Q.    This is something that you put out
10 on a regular basis, or at least have in the
11 past?
12    A.    Yes, I have.
13    Q.    Do you still do this?
14    A.    No, I don't.
15    Q.    Okay.  And I guess the "Craig's
16 List," you're not selling used furniture or
17 giving away parrots or anything like that,
18 right?
19         MS. KEARSE:  Object to form.
20    Q.    Right?  This is just a play off
21 of -- of the website?  Is that what this is?
22    A.    Yes.  It's the name of my
23 newsletter.
24    Q.    Right.  And here in July 2011, in
25 the second to last paragraph, you write, "We

Page 160

1 know that the opiate population is burgeoning,
2 and we need to explore how we can expand
3 services to all populations while making sure
4 that these funds result in adequate
5 evidence-based programs," right?
6     A.    That's correct.
7     Q.    So certainly by July 2011, you say
8 you were already aware that the opiate
9 population is burgeoning.
10    A.    Evidently, yes.
11    Q.    And when you said that the opiate
12 population is burgeoning, what did you mean?
13    A.    That we were seeing more and more
14 requests for services; that we were getting
15 more and more reports from our -- our crisis
16 center that people who are opiate involved
17 were -- were presenting for services.
18    Q.    Do you believe that as of July 2011
19 you, here in Summit County, had an opiate
20 epidemic happening?
21         MS. KEARSE:  Object to form.
22    A.    In -- in retrospect, we -- we
23 were -- you know, I used the term "burgeoning,"
24 so I would -- I would say that we were
25 experiencing a wave of need.

Page 161

1     Q.    For how long prior to July 2011 had
2 the opiate population in Summit County been
3 burgeoning?
4     A.    At the time I don't know how -- at
5 the time that I was looking at this, I don't
6 know what information that I used, but it was
7 likely the information that I had been
8 receiving over time.
9     Q.    Over years, right?
10         MS. KEARSE:  Object to form.
11    A.    I don't know over what period of
12 time.  But I was involved at the state level,
13 mostly, the first couple years of my term as
14 executive director, so I was exposed to more
15 data and information at that point in time.
16    Q.    Okay.  But you -- you had been
17 receiving information for years, prior to July
18 2011, about the growing opiate population in
19 Summit County?
20         MS. KEARSE:  Object --
21    Q.    Is that fair?
22         MS. KEARSE:  Object to form.
23    A.    I -- I don't know what I received
24 and what I didn't receive and when, but I was
25 receiving information.

41 (Pages 158 - 161)

1   Q.   That's not my question.
2   A.   You asked me about whether --
3   whether I had been receiving information before
4   2011.  I had been receiving information before
5   2011, but I don't know how much.  And -- and,
6   you know, your characterization that -- that I
7   had received lots and lots of information is --
8   is not necessarily what I -- what I --
9   Q.   I didn't characterize that at all.
10  A.   -- would agree -- what I would
11  agree with.
12  Q.   I said that you had been receiving
13  information about the opiate population in
14  Summit County burgeoning for years --
15      MS. KEARSE:  Object --
16  Q.   -- prior to 2011.  Is that fair?
17      MS. KEARSE:  Object to form.  Asked
18  and answered.
19  Q.   It's a simple question.
20  A.   Well, I'm looking to see whether
21  that's -- I don't know where you -- where
22  you're -- how -- I don't know the -- how you're
23  saying that that --
24      I don't understand how you're
25  saying that I have received lots and lots of

1   information prior to that.  I don't know if
2   we -- I don't know how much information I've
3   received.
4   Q.   Do you agree, Mr. Craig, that you
5   had been receiving, as head of the ADAMHS Board
6   for Summit County --
7   A.   Uh-huh.
8   Q.   -- information about the burgeoning
9   opiate population in Summit County for years
10  prior to 2011?
11      MS. KEARSE:  Object to form.  Asked
12  and answered.
13      I think you should move on,
14  Counsel, instead of asking the same question.
15      MR. BOEHM:  Stop.
16  A.   I may have received information.  I
17  just don't -- I -- I just can't say to my
18  recollection, from the year 2010, back, that I
19  can -- you know, if I received information I --
20  I likely saw it.  I -- I tried to -- I tried to
21  review whatever information I -- that was sent
22  to me.
23  Q.   You said that as the interim head
24  of the ADAMHS Board in 2010 --
25  A.   Uh-huh.

1   Q.   -- that you had wanted someone with
2   an addiction background, right?
3   A.   That's correct.
4   Q.   Why did you want somebody with an
5   addiction background?
6   A.   Because we saw a need to, in a more
7   intentional way, focus our addiction efforts.
8   Q.   Was that in connection with the
9   burgeoning opiate population in Summit County?
10      MS. KEARSE:  Objection.
11  A.   It was in relation to the bath
12  salts incidents, with the methamphetamine, with
13  alcohol and -- and drug.  All across the
14  spectrum.
15  Q.   In 2- -- I'm sorry.  I didn't mean
16  to stop you if you weren't done.  Go ahead.
17  A.   We just -- we just wanted to make
18  sure that we -- that we were adequately
19  equipped.  And I felt as though having one
20  person being the point person with that
21  knowledge wasn't sufficient, and that my -- my
22  duties as the executive director would not
23  allow me to get into the weeds, if you will, on
24  those issues.
25  Q.   Do you believe that as of 2010,

1   addiction to bath salts was a bigger problem
2   than addiction to opioids in Summit County?
3   A.   I don't know if it was a bigger
4   problem in Summit County.  It certainly was
5   more visual.  It was -- it was impacting our
6   community.  It was impacting some communities
7   fairly significantly.
8   Q.   Is it your view that in Summit
9   County the impact of bath salts addiction was
10  more significant in terms of its impact on the
11  county than opioid addiction?
12      MS. KEARSE:  Objection.
13  A.   I just know that the -- we -- we
14  became much more aware of what was going on
15  with bath salts because we --
16  Q.   I need you to answer my question.
17  A.   Okay.
18  Q.   I know you want to talk.
19      MR. BOEHM:  Can you, kindly --
20      MS. KEARSE:  Counsel, I'm going --
21  I'm going --
22      MR. BOEHM:  -- Court Reporter,
23  would you mind reading back my question?
24      MS. KEARSE:  -- I'm going to ask
25  you to stop interrupting the witness when he is

42 (Pages 162 - 165)

Page 166

1 attempting to ask -- answer your questions with
2 that.
3        So I -- I -- we're going to break
4 for lunch in a minute if you're going to
5 keep --
6        MR. BOEHM:  Go ahead.  If you --
7        MS. KEARSE:  -- harassing the
8 witness.
9        MR. BOEHM:  -- don't mind just
10 reading back the question that I had asked.
11        (Record read.)
12     A.   No, I don't.  I -- I believe that
13 it was more impactful in some communities than
14 in others.
15     Q.   But not in Summit County?
16     A.   It -- bath salts really hit --
17 impacted certain communities.
18     Q.   That's not an answer to my
19 question, respectfully.
20        MS. KEARSE:  Counsel, he's doing
21 the best to answer your questions.  Maybe you
22 need to ask better questions.
23        MR. BOEHM:  No, it's a pretty good
24 question.
25        MS. KEARSE:  If you do say so

Page 167

1 yourself.
2     A.   The issues with bath salts only
3 impacted certain communities within our county.
4     Q.   Overall, is it your view that the
5 impact of bath salt addiction was greater than
6 the impact on -- than the impact of opioid
7 addiction in Summit County?
8        MS. KEARSE:  Objection.  Asked and
9 answered.
10     Q.   Because you keep raising bath salts
11 and methamphetamines.
12     A.   Ret- -- retrospectively, no.
13     Q.   At the time, did you think that
14 bath salt addiction was a bigger problem for
15 Summit County than opioid addiction?
16        MS. KEARSE:  Objection to form.
17     A.   Bath salts, at that time, were a
18 crisis.  The opiates were an epidemic.
19     Q.   As of 2010, fair?
20        MS. KEARSE:  Objection.
21     A.   Opiates -- opiates -- the problem
22 with bath salts was episodic, I guess may be a
23 better way of putting it; whereas we were
24 seeing the problem with opiates as sort of a --
25 like you said, a burgeoning issue.

Page 168

1     Q.   At that time, right?  Talking 2010,
2 2011?
3        MS. KEARSE:  Objection.
4     A.   Generally within the 2010 to 2013
5 time frame.
6     Q.   And you indicated earlier today
7 that even in the late years of the first decade
8 of the 2000s, you were aware that there was a
9 burgeoning opioid problem, right?
10        MS. KEARSE:  Objection.
11     A.   I don't remember what I -- what I
12 said.  Like I said, we were -- I was getting a
13 lot of information about the opiate epidemic.
14     Q.   From the beginning of your time at
15 ADAMHS, right, you were getting a lot of
16 information about the burgeoning opiate
17 epidemic, fair?
18        MS. KEARSE:  Object to form.
19     A.   I was -- when I first started at
20 the board, I wasn't necessarily connected to a
21 lot of the information, but over time I became
22 more and more connected and received more and
23 more information.  So gradually, yes, I was
24 receiving more information, and as a
25 consequence of that became more aware.

Page 169

1     Q.   Right.  And I'm just trying to
2 understand if that increasing amount of
3 information was coming to you as of the later
4 years of the first decade of the 2000s, as you
5 indicated earlier today, or not.
6     A.   Again, I -- I don't know.  I -- we
7 keep dancing around this when I became aware.
8 I don't know when I became aware.
9        MS. KEARSE:  Counsel, we're going
10 to break for lunch now.
11        MR. BOEHM:  Okay.
12        THE VIDEOGRAPHER:  Off the record,
13 12:13.
14        (Luncheon recess.)
15        - - - - -
16     (Thereupon, Deposition Exhibit 8,
17        Summit County ADM Board 2012 Budget,
18        SUMMIT_001147357 to 001147365, was
19        marked for purposes of
20        identification.)
21        - - - - -
22     (Thereupon, Deposition Exhibit 9,
23        Summit County ADM Board 2013 Budget,
24        SUMMIT_001220716 to 001220731, was
25        marked for purposes of

43 (Pages 166 - 169)

Page 170

1    identification.)
2         - - - - -
3    (Thereupon, Deposition Exhibit 10,
4    Summit County ADM Board 2014 Budget,
5    SUMMIT_001018649 to 001018665, was
6    marked for purposes of
7    identification.)
8         - - - - -
9    (Thereupon, Deposition Exhibit 11,
10   Summit County ADM Board 2015 Budget,
11   SUMMIT_001113145 to 001113162, was
12   marked for purposes of
13   identification.)
14        - - - - -
15   (Thereupon, Deposition Exhibit 12,
16   Summit County ADM Board 2016 Budget,
17   SUMMIT_001024592 to 001024609, was
18   marked for purposes of
19   identification.)
20        - - - - -
21   (Thereupon, Deposition Exhibit 13,
22   Summit County ADM Board 2017 Budget,
23   was marked for purposes of
24   identification.)
25        - - - - -

Page 171

1    (Thereupon, Deposition Exhibit 14,
2    Summit County ADM Board 2018 Budget
3    - SUMMIT_001080804 to 001080819, was
4    marked for purposes of
5    identification.)
6         - - - - -
7         THE VIDEOGRAPHER:  On the record,
8    1:20.
9    BY MR. BOEHM:
10   Q.   Okay.  We are back.  I hope you
11   enjoyed your lunch.  It sounds like it wasn't
12   that good?
13   A.   It was fine.  Thank you.
14   Q.   Fine?  Okay, good.
15        I have actually marked and placed
16   in front of you --
17        MR. BOEHM:  And I have copies for
18   you, Anne, as well.
19   Q.   -- a series of documents.  They are
20   the ADM budgets from the years 2012 through
21   2018.  And those have been marked, I'll say for
22   the record, as Exhibits 18 [sic] through 14.
23        Do you see that stack of documents?
24   A.   I do see it.
25        MS. KEARSE:  Exhibits 18 or 8?  8?

Page 172

1         MR. BOEHM:  8 --
2         MS. KEARSE:  8.
3         MR. BOEHM:  -- through 14.
4         MS. KEARSE:  So each individual.
5    Okay.
6         MR. BOEHM:  Yeah.  I've marked each
7    of --
8         MS. KEARSE:  Okay.
9         MR. BOEHM:  -- those yearly budgets
10   as a separate exhibit.
11        MS. KEARSE:  Okay.
12   Q.   Make sense?  Okay.
13   A.   Yes.
14   Q.   Now, my -- I have just a couple of
15   preliminary questions for you.
16   A.   Okay.
17   Q.   First of all, are these budgets
18   that we've marked as Exhibit 8 through 14 for
19   years 2012 through 2018, budgets that you have
20   the opportunity to review and approve as head
21   of ADAMHS Board?
22   A.   Yes, they are.
23   Q.   What is the nature of your
24   involvement with respect to the preparation of
25   the annual ADAMHS budget for Summit County?

Page 173

1    A.   Well, there's two components to the
2    budget.  One is the actual assignment of the --
3    of the dollars towards the activities that the
4    ADM Board engages in.
5         The second part of that is the
6    narrative portion of our budget, which
7    describes the activities that the ADM Board and
8    its agencies are engaged in.
9    Q.   Okay.  If you take, for example,
10   Exhibit 8, which is the 2012 budget --
11   A.   Uh-huh.
12   Q.   -- I don't actually see much of a
13   narrative.  Am I missing it, or is it not --
14   A.   What --
15   Q.   -- not --
16   A.   Well, this is not --
17   Q.   -- included in this?
18   A.   This is not our budget, per se.
19   This is a presentation of budget information
20   that we give to our board of directors.
21   Q.   Got it.
22        So would it be -- the document
23   itself says "2012 Budget," but maybe it would
24   be more accurate to say this is a slide deck of
25   a presentation about the 2012 budget?

44 (Pages 170 - 173)

Page 174

1    A.   That's correct, yes.
2    Q.   Okay.  What input does the county
3 council or the county executive have in terms
4 of the ADAMHS Board annual budget?
5    A.   Very little.
6    Q.   Do they have some, or is it none at
7 all?
8    A.   They may be a -- a planning input.
9 For example, if they were to draw something to
10 our attention that was a need in the community,
11 we would fold that into our planning.
12    Q.   Okay.  With respect -- sorry.  Let
13 me start over.
14        With respect to the opioid epidemic
15 in Summit County, has there ever been an
16 occasion where the county executive or somebody
17 from the county council has come to you as head
18 of the Summit County ADAMHS Board to discuss
19 with you expenditures related to the opioid
20 epidemic in the county?
21    A.   No one -- to my recollection,
22 there's been nobody from the County who's come
23 to me with -- with respect to input into our
24 budgeting process.
25    Q.   Okay.  If you take Exhibit 8, do

Page 175

1 you see on the bottom right-hand corner that
2 there are some numbers?  Do you see that in the
3 bottom right-hand corner?
4    A.   Yes.
5    Q.   Just -- I don't know if you're
6 familiar with this or not, but -- but these are
7 numbers that get stamped onto the document by
8 the lawyers so that we can kind of keep track
9 of them.  Because this slide deck is not
10 otherwise numbered, I'm going to use the
11 numbers, and particularly the final numbers --
12    A.   Okay.
13    Q.   -- at the bottom right-hand page to
14 kind of --
15    A.   Reference?
16    Q.   -- help us flip through it.
17    A.   Okay.
18    Q.   And the first page I'd like to look
19 at with you is the page with the number 7364 at
20 the end, which is toward the back.
21    A.   Okay.
22    Q.   And do you see this is the section
23 of the presentation about the 2012 budget that
24 describes the contractual expenditures by the
25 ADAMHS Board?

Page 176

1    A.   Yes.
2    Q.   Okay.  It seems to be broken up
3 into two parts.  One is the mental health
4 services part, and the other is the substance
5 abuse part; is that right?
6    A.   Yes.
7    Q.   Okay.  So if you look at the
8 subtotals as between those two sections, first
9 mental health and then substance abuse, it
10 appears that the mental health contractual
11 expenditure for 2012 is nearly $25 million,
12 right?
13    A.   Yes.
14    Q.   And for substance abuse, the number
15 is just over $13 million, right?
16    A.   That's correct.
17    Q.   Okay.  Why is it that most -- well,
18 let me actually back up and set the foundation
19 for this question.
20        Is it true today that the ADAMHS
21 Board budgets more money for mental health
22 services relative to the substance abuse
23 component of the annual budget?
24    A.   Yes, that would be the case.
25    Q.   Has that always been the case since

Page 177

1 you've been at ADAMHS?
2    A.   Yes, it has been.
3    Q.   Okay.  If you look at that subtotal
4 for substance abuse services, that's the $13.1
5 million.  Do you see that?
6    A.   I see it.
7    Q.   Okay.  How much of the total 2012
8 expenditures on substance abuse services was
9 directed specifically at opiate use disorder?
10    A.   I couldn't tell you.
11    Q.   Why not?
12    A.   Because I don't catalog that kind
13 of information.
14    Q.   Does the ADAMHS Board -- do other
15 individuals on behalf of the ADAMHS Board
16 catalog that type of specific information?
17    A.   No.  We -- when we make an
18 allocation towards an agency, it's either to
19 serve an individual who has a substance use
20 disorder or a mental health disorder.  Back
21 in -- in the time that this budget was
22 developed, that would be the case.
23    Q.   Would the contracting agency be
24 required to track what particular substances
25 were being abused or what substance use

45 (Pages 174 - 177)

Page 178

1 disorders were being addressed in terms of how
2 they allocated the money provided to them by
3 the ADAMHS Board?
4     A.   No.  We -- we fund substance --
5 services to address substance use disorders,
6 but we don't catalog them.  We want the agency
7 to be able to address whatever needs come
8 before them in that domain.
9     Q.   Okay.  Did the ADAMHS Board request
10 additional funds from Summit County
11 specifically for the purpose of addressing
12 opiate use disorders for the fiscal year of
13 2012?
14    A.   We've never requested funds from
15 Summit County.
16    Q.   What do you mean when you say
17 you've never requested funds --
18    A.   You --
19    Q.   -- from Summit County?
20    A.   You asked me if this -- if the ADM
21 Board has ever sought funds from Summit County,
22 and we don't seek funds from Summit County.
23    Q.   Okay.  What --
24    A.   Summit County is not a funder.
25    Q.   What are the funding sources for

Page 179

1 the ADAMHS Board for Summit County?
2     A.   For Summit County our -- our budget
3 is -- is levy, from the property tax levy.  We
4 have state funding and federal funding.  And
5 much of the state and federal funding is
6 targeted for specific needs and issues.
7     Q.   When you say "targeted," does
8 that -- is that sometimes referred to as
9 earmarked?  I'm familiar with that term.  Is
10 that what you mean by that?
11    A.   Earmarked or restricted might be a
12 fair way to state it.
13    Q.   Does that mean when you get the
14 money, you have specific requirements and
15 guidelines that you have to follow in terms of
16 how you spend the money?
17    A.   That would be fair.
18    Q.   Okay.  Now, the levy category that
19 you referenced, what levy are you referring to?
20    A.   The ADM Board has a 3.28 mil, I
21 believe, operating levy that we -- that is paid
22 by Summit County property owners.
23    Q.   Is that 3.28 mil operating levy,
24 does that go through county government before
25 it gets directed to ADAMHS Board, or is that

Page 180

1 designated specifically for the Summit County
2 ADAMHS Board?
3     A.   The funding -- the funding that --
4 that's yielded from the levy is collected by
5 the County and held at the County, but it's
6 restricted for ADM Board use.
7     Q.   And do the voters of Summit County
8 vote on whether or not there would be such a
9 levy for the ADAMHS Board?
10    A.   Yes.
11    Q.   Okay.  So -- and that's why you
12 said my question didn't quite make sense when
13 I -- when I said has the ADAMHS Board went to
14 the Summit County and requested funds for the
15 opiate epidemic, because you get your funds
16 from that levy, right?
17    A.   Right.  Well, when you say "Summit
18 County," I was -- I was of the understanding
19 you were -- you were referring to the County as
20 an agency.
21    Q.   Right.
22    A.   Not as the population of the
23 county.
24    Q.   Got it.  Thank you.
25         Now, I have marked these other

Page 181

1 budgets just for the record.  2013 budget
2 slides are Exhibit 9.
3         The 2014 budget slides are Exhibit
4 10.
5         The 2015 budget slides are
6 Exhibit 11.
7         The 2016 budget slides are Exhibit
8 12.
9         The 2017 budget slides are
10 Exhibit 13.
11        And the 2018 budget slides are
12 Exhibit 14.
13        I'm sorry.  That was a little
14 tedious.  I just wanted to do that --
15    A.   Uh-huh.
16    Q.   -- so it was clear for the record
17 and for those who aren't sitting with us in the
18 room how we've done this.
19        If I were to ask you the same
20 question I asked you about the 2012 budget --
21 that is how much of the substance use subtotal
22 for each year is directed specifically at
23 opiate use disorder -- would your answer be the
24 same for each of these years?
25    A.   Not necessarily.

46 (Pages 178 - 181)

Page 182

1    Q.    Okay.  Can you help me understand
2 how it might be different from year to year?
3    A.    Sure.  Let me look at this for a
4 moment.
5         This is '12.  Okay.
6         So there were some dynamics that --
7 that occurred within the state when Medicaid
8 expansion became a reality.  And more and more
9 of the services that the ADM Board funded,
10 particularly those services for people with
11 substance use disorders, were picked up my
12 Medicaid.
13    Q.    What were the implications of that
14 development for purposes of funds available to
15 the ADAMHS Board in Summit County?
16    A.    The implications of that were that
17 we were able to use those dollars that we had
18 formerly used to fund programs and services for
19 treatment for other types of services.
20    Q.    Do I understand, basically, that
21 the expansion of Medicaid freed up more money
22 for you to use in a variety of different ways?
23    A.    That would be fair.
24    Q.    Okay.  When did that happen?  Is
25 that -- is that what is referred to as the

Page 183

1 Affordable Care Act?
2    A.    Yes.
3    Q.    Okay.
4    A.    So roughly 2014.
5    Q.    Okay.  So if we were to go through
6 each of these budgets -- and, look, every --
7 every of these budgets, I'll represent -- or
8 these slides reflecting the annual budget has a
9 page that talks about the contractual
10 expenditures by agency.  It has a mental health
11 subtotal.  It has a substance abuse subtotal.
12        Does that sound right?
13    A.    Yes.
14    Q.    And if we were to go through the
15 substance abuse subtotal for each of these
16 years, would you be able to tell me how much,
17 in any given year, of the substance abuse
18 subtotal was directed specifically toward
19 opiate use disorder expenditures?
20    A.    Not entirely, no.  Not by looking
21 at these documents.
22    Q.    Would you be able to tell me that
23 for any of the years by looking at these
24 documents?
25    A.    I would not.

Page 184

1    Q.    Is there some other way by which
2 you would be able to answer the question for
3 any of these years how much of the substance
4 abuse subtotal was specifically directed
5 towards opiate use disorder treatment?
6    A.    No, I would not be able to tell
7 from any -- in any of those documents
8 prospectively.
9    Q.    I'm sorry.  And --
10    A.    I'm sorry.  That -- we did not
11 budget funds.  We could tell after the fact how
12 the funds were expended -- expended, but we
13 could not tell prospectively.
14    Q.    Okay.  Okay.  So I think you -- I
15 think we're on the right track here.  Let me
16 just make sure I have my question clear and you
17 understand it.
18    A.    Uh-huh.
19    Q.    So what I'm asking as -- is really
20 not necessarily just what's on the document,
21 but whether or not you would be able to
22 determine, looking back at each year, how much
23 of the substance use expenditures for any given
24 year were directed specifically at services for
25 opiate use disorder.

Page 185

1         MS. KEARSE:  Object to form.
2    Q.    Are you -- is that something you
3 know?
4    A.    I do not.  Not in total.
5    Q.    And -- and would you have data
6 available at the ADAMHS Board that would allow
7 you to perform that kind of calculation?
8    A.    No, I would not.
9    Q.    And why not?  What would you need
10 that you don't have.
11    A.    A crystal ball.
12    Q.    I'm -- I'm sure you're -- you're
13 kind of saying that tongue in cheek.  I'm just
14 not sure what you mean.
15    A.    No.  I mean that we would be -- we
16 would have to be able to predict with some
17 level of clarity who's going to come to us for
18 treatment services and what the nature of their
19 issue is, and we don't have the ability to do
20 that.
21    Q.    You're talking about looking into
22 the future?
23    A.    Yes.
24    Q.    Okay.  So what I'm asking you right
25 now -- well, let's actually wrap that part up

47 (Pages 182 - 185)

Page 186

1 and then we can come back to this.
2        You're saying that if -- in terms
3 of predicting what your future expenditures
4 might be with respect to opiate -- the opiate
5 epidemic in Summit County, you would not have
6 any data-based credible way to calculate
7 exactly what those expenditures would be, fair?
8        MS. KEARSE:  Object to form.
9    A.   That's correct.
10    Q.   Okay.  Now, looking back -- because
11 I think that's where we got a little confused,
12 and it's probably my fault.
13        What I'm asking you about right now
14 is with respect to these past years whether or
15 not you would be able to tell us of the
16 subtotal for substance use expenditures by the
17 ADAMHS Board in any given year, how much of
18 that subtotal was directed specifically to
19 address opiate use disorder treatment and
20 services.
21    A.   In total?
22    Q.   On an annual basis.  So, for
23 example, in 2012 this -- the projected
24 expenditures was just over 13 million for
25 substance abuse in total, right?

Page 187

1    A.   Correct.
2    Q.   And that includes alcohol services,
3 right?
4    A.   Right.
5    Q.   Methamphetamines?
6    A.   Right.
7    Q.   Cocaine?
8    A.   Correct.
9    Q.   And we could go right down the
10 list.  That's for all substance abuse-related
11 services, right?
12    A.   That's correct.
13    Q.   Okay.  So what I'm asking you is
14 whether or not you can identify how much of
15 that substance abuse subtotal was directed
16 specifically to expenditures for opiate use
17 disorder treatment and services in any given
18 year.
19    A.   I can go back and do that
20 retrospectively through our claims data.
21    Q.   That's what you would use.  That's
22 what you were referring to earlier today?
23    A.   Yes.
24    Q.   Okay.  But sitting here today, I
25 take it, you're not able to look at any of

Page 188

1 these numbers in these annual budgets and tell
2 me how much each year of the subtotal for
3 substance use treatment went specifically to
4 opiate use disorder treatment and services.  Is
5 that fair?
6    A.   Well, in the 2017 and 2018 budget,
7 I believe there were some -- some funds that
8 were identified specifically for that purpose.
9    Q.   Okay.  Let's set those aside --
10    A.   Okay.
11    Q.   -- for just a second, and then
12 we'll go back to that.
13    A.   But aside from that, no.
14    Q.   Okay.  Perfect.  Now let's go to
15 those.
16        You said 2017 and 2018?
17    A.   I believe so.
18    Q.   Okay.  So those are Exhibits 13 and
19 14.
20        If you look at Exhibit 13, can you
21 find the page that has the 2017 contract
22 expenditures by agency?
23    A.   Yes, I believe so.
24        MS. KEARSE:  For some reason, this
25 doesn't have a Bates stamp on it.

Page 189

1        MR. BOEHM:  I know.  I -- I noticed
2 that, too.  And I don't know --
3        THE WITNESS:  It's numbered page 9
4 at the top right-hand corner.
5        MR. BOEHM:  Yeah.  Thank you.
6        And, Anne, I -- I noticed that too.
7 And I -- I apologize, because I'm not certain
8 whether or not we could not find a produced
9 version of this and so we found it on a
10 website, or if we --
11        MS. KEARSE:  Okay.  I --
12        MR. BOEHM:  I'm not sure what
13 happened.
14        MS. KEARSE:  Okay.  I understand,
15 yeah.
16        MR. BOEHM:  If you'd like, we can
17 go back and replace the --
18        MS. KEARSE:  No.  I was -- I was
19 just going to say what page -- I was going to
20 use the page number.  Says page 9 versus a
21 Bates stamp number.
22        MR. BOEHM:  Yes.  Thank you.
23 That's helpful.
24        MS. KEARSE:  Yeah.
25    Q.   So page 9 has the 2017 contract

48 (Pages 186 - 189)

Page 190

1 expenditures by agency for 2017, right?
2     A.   Yes.
3     Q.   Okay.  And, again, just like every
4 year, there's a subtotal for the substance
5 abuse expenditures, and that is just over 13
6 mil- -- $13.2 million, right?
7     A.   Yes.
8     Q.   And you indicated that in 2017 and
9 2018 there were funds that were dedicated
10 specifically to addressing opiate use disorder?
11     A.   Yes.
12     Q.   Okay.  And is that reflected in the
13 "Targeted solutions, opiate epidemic" line
14 that's almost at the very bottom --
15     A.   Yes.
16     Q.   -- of page 9?
17          And that looks like that line item
18 comes to about $3.2 million?
19     A.   That's correct.
20     Q.   Okay.  Where is that money from?
21     A.   These are funds that come from our
22 local -- or from our levy.  So these are levy
23 funds that are pulled from our fund balance and
24 allocated for the specific purpose of
25 addressing unmet needs related to the opiate

Page 191

1 epidemic.
2     Q.   Okay.  And was 2017 the first time
3 you had this targeted solutions line item to
4 address the opiate use epidemic in Summit
5 County?
6     A.   Yes.
7     Q.   For this year or for any prior
8 year, when you refer to the claims data as a
9 way where you could go back and look to see how
10 the funds were spent, are you able to subdivide
11 those expenditures as between prescription
12 opioids versus illicit opioids such as heroin?
13     A.   No.
14          MS. KEARSE:  Object to form.
15     A.   No, we're not able to do that.
16     Q.   Why aren't you able to do that?
17     A.   Because we use codes that are
18 provided to us that are standard billing codes,
19 and there's not -- there's not a process for us
20 to identify a problem based on whether it's an
21 illicit substance or a prescription pain
22 medication.
23     Q.   Okay.  And you indicated that this
24 line item for targeted solutions for the opiate
25 epidemic in Summit County was maintained in

Page 192

1 2018; is that right?
2     A.   It was established in 2016, and
3 as -- has been --
4     Q.   Did you mean 2017 or 2016?
5     A.   It's -- it's the -- it's the 2016
6 for '17.
7     Q.   For -- for the 2017 --
8     A.   Correct.
9     Q.   -- budget.
10     A.   And has -- and we have done that
11 all the way through our 2019 budget.
12     Q.   Okay.  Got it.  Do you anticipate
13 doing that beyond 2019?
14     A.   I don't know yet.
15     Q.   What will be the factors that
16 determine whether or not that continues beyond
17 2019?
18     A.   The sustainability of -- of those
19 funds and our ability to -- our ability to
20 continue to fund programs that we've -- that
21 we've already funded based on our funds
22 available.
23     Q.   Okay.  When you had additional
24 funds become available to you through the
25 changes in Medicaid coverage that you described

Page 193

1 in connection with the Affordable Care Act, did
2 any of the newly available funds that you had
3 available to you get specifically directed to
4 services and treatment for opiate use disorder?
5     A.   Yes.
6     Q.   Okay.  Can you identify those for
7 us, please?
8     A.   I can say that aside from what we
9 had allocated to our agencies, we had some
10 funds set aside to develop some additional
11 capacity to provide medication-assisted
12 treatments which are generally used for opiate
13 use disorders.
14          So we created with three -- for
15 three of our agencies, we established a pilot
16 to introduce them to medication-assisted
17 treatment, particularly use -- with the use of
18 Suboxone, buprenorphine.
19     Q.   Do you remember how much money was
20 dedicated to the purpose that you just
21 described?
22     A.   I'm not sure.  I'm not sure.
23 $300,000 comes to mind, but I'm not sure if
24 that was a total or if that was how much per
25 pilot.

49 (Pages 190 - 193)

1     Q.   Is that something that Ms. Peivich
2   could look in to her database and figure out?
3     A.   Yes, or I could look back
4   retrospectively through records.  I just don't
5   recall.
6     Q.   Okay.  Now, with respect to this
7   targeted solutions for the opiate epidemic in
8   Summit County, that gets its own line item in
9   2017.  Was that money that was being directed
10  from the existing ADAMHS levy, or was there
11  some new levy or some other new source of funds
12  that you all were using to add that -- that
13  expenditure?
14    A.   These were funds that were in our
15  fund balance that were unexpended, so -- so we
16  were able to direct those funds towards these
17  opiate solutions.
18    Q.   For those of us who may not be
19  certified public accountants, when you talk
20  about a fund balance --
21    A.   Uh-huh.
22    Q.   -- can you just give a little bit
23  more information about what you mean by that
24  and what it means that you took money from the
25  fund balance to create this line item?

1     A.   In 2007, Summit County requested it
2   and was approved to seek an increase in our
3   levy.  So we actually reduced the millage of
4   our levy, but the net effect of that was that
5   it actually earned us more money.
6          And so we brought in more money
7   that we spent at the beginning of our levy --
8   at the beginning of our levy cycle, and what we
9   didn't spend went into our fund balance.  And
10  each year we had some -- we had plans for how
11  we wanted to increase our expenditures to
12  address the needs that presented in our
13  community.
14    Q.   Since the ADAMHS Board -- well, let
15  me back up.
16          Since you've been at the ADAMHS
17  Board, in other words since 2007, has there
18  ever been a year where the ADAMHS Board has
19  operated without the surplus that you were just
20  referring to?
21    A.   No.
22    Q.   Do you have a surplus for 2019 as
23  well?
24    A.   Yes.  We are required by the County
25  to carry a fund balance of at least 90 days of

1   operating funds.  And that -- and that -- and
2   that fund balance is at the end of our -- that
3   is projected to be at the end of our -- the
4   requirement is at the end of our levy cycle, we
5   should be projected to have at least 90 days
6   funding in our -- in our fund balance.
7     Q.   You referred to this computation
8   that -- that you and Ms. Peivich prepared in
9   connection with the litigation earlier today.
10         Do the computations that you and
11  Ms. Peivich prepared in connection with the
12  lawsuit include amounts that you computed --
13  sorry, let me start over.  Hope this isn't too
14  long of a question.  I'm going to try to
15  simplify it for you.
16         With respect to the computation
17  that -- that you referenced earlier today that
18  you and Ms. Peivich prepared in connection with
19  this lawsuit, is it correct that those
20  computations included amounts and expenditures
21  for illicit as well as prescription opiate use
22  disorders?
23         MS. KEARSE:  Object to form.
24    A.   These were -- the compu- -- the
25  information that we gathered to respond to

1   the -- to respond to the county executive's
2   requests was anything opiate related,
3   irrespective of whether it was prescription or
4   synthetic opioids.
5     Q.   Got it.  And I apologize if you
6   already said this.
7          Is that in part because you don't
8   have the coding, in terms of the claims data,
9   in order to separate those out?
10    A.   That's correct.
11    Q.   Okay.  Do the computations of
12  expenditures for the ADAMHS Board that you and
13  Ms. Peivich prepared in connection with this
14  lawsuit go back further in time than when, in
15  your view, Summit County began to experience an
16  opioid epidemic?
17         MS. KEARSE:  Object to form.
18    A.   I don't know.  I don't know.  I
19  don't know how -- how I would be able to
20  characterize this as an epidemic.  So -- and I
21  don't know exactly how far back we went in
22  our -- in our computation.
23         Like I said before, we were asked
24  for information for a variety of time frames
25  for a variety of purposes, so I'm not -- I'm

Page 198

1 not completely sure.
2    Q.   I noticed that these slides for the
3 annual budgets for ADAMHS also referenced cost
4 for just the running of the board,
5 administrative costs, right?
6    A.   Yes.
7    Q.   And I thought you indicated earlier
8 today that your computations with Ms. Peivich
9 in connection with this lawsuit endeavored to
10 include the amount of time that your staff
11 spent focused on opiate-related issues.
12         Did I understand your earlier
13 testimony correctly in that regard?
14      MS. KEARSE:  Object to form.
15    A.   Yes.  We tried to -- we tried to
16 estimate the amount of time by staff position
17 if they were involved in any way in the opiate
18 epidemic, or in our Opiate Task Force, or any
19 of the activities related to those -- those
20 programs, we -- we tried to get an estimate of
21 what their time would be.
22    Q.   Got it.  How did you go about
23 getting an estimate of what their time would
24 have been spent on opiate epidemic-related
25 issues?

Page 199

1    A.   It was -- it was less than
2 scientific.  It was pretty much a perception of
3 time that they spent.  Because there's no --
4 because we don't track our staff by activities
5 going back, or we don't ask staff to classify
6 their time depending -- you know, about which
7 program -- which -- which problem
8 they're addressing.
9    Q.   Okay.  So given that it was less
10 than scientific, what -- what was the best you
11 could do in terms of trying to reach an
12 estimate?
13      MS. KEARSE:  Object to form.
14    A.   We would essentially take what
15 we -- what we estimated to be the percentage of
16 their time spent on these activities and took
17 that as a percentage of their total costs.
18    Q.   How did you reach a rough estimate
19 of their time spent on opioid epidemic-related
20 activities?
21    A.   Based on their -- their attendance
22 or their assignment to specific committees.
23 For example, we had some staff who were
24 assigned to staff certain Opiate Task Force
25 committees, individuals who were working with

Page 200

1 our Quick Response Teams who were -- dedicated
2 a significant part of their time to stand up
3 these programs, and also to any other
4 initiative that was related to our opiate
5 response.
6    Q.   Okay.
7       - - - - -
8       (Thereupon, Deposition Exhibit 15,
9       ADM Board Document Titled "Report on
10       Opiate Epidemic Impact", was marked
11       for purposes of identification.)
12       - - - - -
13    Q.   Is that recorded anywhere, how --
14 how you went about reaching those estimates in
15 terms of staff time?
16    A.   The methodology was not recorded
17 anywhere.  I think that that was really on the
18 basis of a conversation.
19    Q.   When you say a "basis of a
20 conversation," do you mean a conversation with
21 each individual staff member?
22    A.   With -- with individual staff
23 members or -- with -- you know, we had staff
24 who were -- had left the board, so there were
25 some individuals that we wanted to -- who had a

Page 201

1 significant role in the past before they left
2 the board, so part of that was sort of my
3 guesstimate.
4       MR. BOEHM:  Okay.  I've -- I've
5 marked the next document as an exhibit.  It's
6 now Exhibit 15 that we're at.
7       MS. KEARSE:  Does this have a Bates
8 stamp number?
9       MR. BOEHM:  It does.  Does yours
10 not -- is yours not Bates-stamped?
11       MS. KEARSE:  No, mine's not.
12       MR. BOEHM:  I apologize.  I'm not
13 sure how that happened.  But I will just say
14 for the record that I -- for some reason my
15 copy does have one, so I'll just say it for the
16 record.
17       THE WITNESS:  Am I finished with
18 these?
19       MR. BOEHM:  Yeah.
20       THE WITNESS:  Okay.
21       MR. BOEHM:  The document that's
22 been marked as Exhibit 15 is SUMMIT_001952555.
23 I apologize.  I don't know.
24       MS. KEARSE:  I just want to make
25 sure it's not a clawback or anything like that.

51 (Pages 198 - 201)

Page 202

1    Can -- can I just -- I --
2        MR. BOEHM: Yeah, take a minute
3  sure.  It's -- there's nothing priv- -- but go
4  ahead and take a look.
5        MS. KEARSE:  Well, I want to make
6  sure of that.
7        You just indicated earlier that you
8  didn't have any of these, so.
9        MR. BOEHM:  It's not on your
10  privilege log, if that's what you're wondering.
11        MS. KEARSE:  That's what I'm just
12  inquiring --
13        MR. BOEHM:  Yeah, it's not.
14        MS. KEARSE:  -- so if you'll just
15  give me one second --
16        MR. BOEHM:  I'll represent that
17  it's not.
18        MS. KEARSE:  Okay.
19        MR. BOEHM:  Is that not good
20  enough?
21        MS. KEARSE:  Actually, it usually
22  is, so -- but I just want to check.
23        MS. RENDON:  Why don't we go off
24  the record while they do that?
25        MR. BOEHM:  Okay.  Let's go off the

Page 203

1  record.
2        THE VIDEOGRAPHER:  Off the record,
3  1:53.
4        (A recess was taken.)
5        THE VIDEOGRAPHER:  On the record,
6  2:06.
7        MS. KEARSE:  And this is Anne
8  Kearse.  I'll just put on the record, this --
9  this is -- my understanding it's Exhibit No. --
10        MR. BOEHM:  15.
11        MS. KEARSE:  -- 15.  We have Bates
12  stamp No. 001952555, and we'll allow you to
13  question the witness about the document, but
14  it's not -- it's not a public document on that
15  too, so.
16        MR. BOEHM:  Okay.  But you're not
17  representing that it's privileged or work
18  product, right?
19        MS. KEARSE:  I'm not -- this
20  particular document, I'm not -- I know I
21  suggested I was not, but this particular -- I'm
22  not waiving any privilege to the extent there's
23  another document.  This document itself, we're
24  not claiming privilege on this.
25        MR. BOEHM:  Okay.

Page 204

1        MS. KEARSE:  To the extent there's
2  any conversations between the lawyers and the
3  client, that may be privileged information, but
4  the document itself speaks for itself.
5        MR. BOEHM:  Okay.
6    Q.    Mr. Craig, you have in front of you
7  a document that's been marked as Exhibit 15 for
8  purposes of your deposition, and you see that
9  it's entitled "Report on Opiate Epidemic
10  Impact"?
11    A.    Yes.
12    Q.    Who prepared this document?
13    A.    This -- this report was -- was
14  created by Jen Peivich with input from several
15  other staff at the ADM Board, including myself.
16    Q.    When was this document prepared?
17    A.    That I'm not really sure of.  I was
18  looking for a date that would give me some
19  clue, but I don't -- I don't remember
20  specifically when.
21    Q.    Okay.  Do you know if it was in
22  2018?
23    A.    It looks like from the -- it may
24  have been 2017 or 2018.  I'm not sure.
25    Q.    Okay.  Do you see the second

Page 205

1  sentence of the document states, "This past
2  decade has witnessed a tremendous increase in
3  opioid use disorder."
4        Do you see that?
5    A.    Yes.
6    Q.    And do you agree with that
7  statement?
8    A.    Yes.
9    Q.    Does that statement refer to Summit
10  County?
11    A.    Yes, it does.
12    Q.    If you go to the next to last page
13  of this document, do you see there's a chart
14  that's titled "Opioid Use Disorder Treatment
15  Cost"?
16    A.    Yes.
17    Q.    Okay.  How did you go about
18  calculating the figures that are reflected in
19  this chart?  It's on Bates 25557.  That's the
20  bottom -- oh, you don't have it, but just for
21  the record that's the Bates number.
22    A.    Okay.  The -- these are any funds
23  that came through our system that were used to
24  provide treatment for individuals with an
25  opiate use disorder.

52 (Pages 202 - 205)

Page 206

1    Q.    What was the methodology that you
2    used in terms of calculating these figures?
3          MS. KEARSE:  Object to form.
4    A.    These -- these costs were computed
5    based on claims data.
6    Q.    Are these costs calculated
7    exclusively based on claims data, or were other
8    data inputs included for purposes of this
9    computation?
10   A.    This is strictly treatment costs,
11   so I believe it all came from claims data.
12   Q.    Okay.  Is the computation that is
13   reflected here on this chart in Exhibit 15 the
14   same computation that you referred to having
15   done with Ms. Peivich in connection with this
16   lawsuit?
17   A.    I'm not sure what you mean by
18   "computation."
19   Q.    Well, we've been talking about it
20   all day.  I don't -- I'm not sure what else to
21   say.  We've been talking about a computation
22   that you did with Ms. Peivich all day, right?
23   A.    What I -- what I -- so the --
24         MS. KEARSE:  I'm going to object to
25   that.  I think he's entitled to ask a few -- if

Page 207

1    he has a question about what your terminology
2    means, he can ask it.
3          MR. BOEHM:  I'm -- I'm sure you --
4    you --
5    A.    The information that we used to --
6    to identify those costs were claims that ran
7    through the board.
8    Q.    You recall earlier today -- let me
9    just back up for a second --
10   A.    Sure.
11   Q.    -- see if we can figure this out.
12   A.    Okay.
13   Q.    Earlier today you described a
14   calculation or a computation that you performed
15   together with Ms. Peivich in connection with
16   the claims in the lawsuit.  And you said you
17   didn't know what the total number was, and you
18   didn't have the information with you today --
19   A.    Right.
20   Q.    -- to be able to describe the
21   methodologies.  Do you remember that?
22   A.    Yes.
23   Q.    Okay.  My question to you is
24   whether or not the information reflected here
25   on the third page of Exhibit 15 is the same

Page 208

1    calculation and computation that you did with
2    Ms. Peivich that we've been discussing earlier
3    today, or if this is a separate calculation
4    that you all performed at the ADAMHS Board.
5    A.    This is the same information I was
6    referring to earlier.
7    Q.    And the chart here on the third
8    page of Exhibit 15 seems to differentiate
9    between what you've called local funds and
10   other funds.
11         Do you see that?
12   A.    Yes.
13   Q.    How are you defining, quote, "local
14   funds"?
15   A.    Local funds would be levy.
16   Q.    The ADAMHS levy?
17   A.    Yes.  And any other funds are
18   identified as any funds that were not levy.
19   Q.    And do you see that on this
20   particular chart of Exhibit 15 the treatment
21   costs that you all have calculated at the
22   ADAMHS Board between 2008 and 2015 kind of goes
23   up and down a little bit, but it's -- kind of
24   roughly the same in 2008 as it is in 2015.
25         Do you see that?

Page 209

1    A.    Yes.
2    Q.    And then in 2016 it goes up by, it
3    looks like, a million and a half dollars or so;
4    is that right?
5    A.    Yes.
6    Q.    And then in 2017 it goes up another
7    half million or so?
8    A.    Yes.
9    Q.    What are the source of the funds
10   that were used for opioid use disorder
11   treatment costs on top -- in 2016 and 2017 on
12   top of the costs that -- or expenditures that
13   you were making in previous years?
14         Did my question make sense to you?
15   A.    No, it didn't.  I'm sorry.
16   Q.    I'm not sure it made sense to me.
17         MS. KEARSE:  And I didn't even have
18   to object.
19         MR. BOEHM:  That was -- that was an
20   agreed-upon objection.
21   Q.    Okay.  But so my basic point is you
22   see that there's a difference between -- based
23   on your computations -- the total amount of
24   costs for opiate use disorder treatment in 2015
25   versus 2016 --

53 (Pages 206 - 209)

Page 210

1    A.   Yes.
2    Q.   -- right?
3         What was the source of the
4  additional funds expended on opioid use
5  disorder treatment between 2015 versus 2016?
6  Is it the levy, or is it some other source?
7    A.   So I'm still trying to make sure I
8  understand your question.
9    Q.   Or is it from the surplus?  I guess
10 that's another possibility.
11       MS. KEARSE:  Object to form.  Just
12 not knowing what the --
13   A.   In -- in 2016 and 2017 we were
14 building out a lot of capacity for treatment
15 services, so there could be -- so some of this
16 may have been attributed to the fact that there
17 was additional capacity to serve more
18 individuals; therefore, our expenses went up,
19 and those expenses were -- were covered either
20 by local funds or other funds.
21   Q.   Did you -- for purposes of spending
22 more money on opiate use -- opiate -- opioid --
23 sorry.
24       For purposes of spending more money
25 on opioid use disorder treatment, did you pull

Page 211

1  funds from areas -- other areas existing in
2  previous budgets, or did you find some
3  additional kind of extraordinary funds above
4  what you ordinarily would have for purposes of
5  those additional expenditures?
6        MS. KEARSE:  Object to form.
7    A.   This reflects -- this reflects the
8  treatment costs for people with opiate use
9  disorder.  So if in 2015 I served more people
10 with alcohol use disorders, and in '16 I served
11 fewer people with alcohol use disorders, it's
12 possible that some of those funds would have
13 gone towards opiate use disorder.
14   Q.   Right.
15   A.   So -- so it could be the same funds
16 that we had already allocated that were just
17 used by people with different diseases.  But
18 there were -- there were also some additional
19 investments in building out capacity for
20 services.
21   Q.   Okay.  So I got the first part of
22 your answer.  The second part where you
23 referred to building out additional capacity,
24 what do you mean by that?
25   A.   Our -- our agencies, in particular

Page 212

1  Interval Brotherhood Home and -- and our detox
2  program at -- that -- that Oriana House
3  operates, we expanded the number of beds that
4  were available there.  Those beds and those
5  services are not Medicaid eligible, therefore
6  would have a more significant draw on our local
7  funds.
8    Q.   Okay.  And in order to direct
9  resources toward opioid use disorder treatment
10 costs in 2016 and 2017, did you take funds from
11 other services in order to pay for the
12 additional opioid use disorder treatment costs?
13   A.   We did not, not in -- not in -- in
14 total.  We may have in part.  But again, this
15 is the -- this -- these numbers are computed as
16 a result of claims, so agencies who serviced
17 people with substance use disorders fund --
18 funded -- billed us for whatever diagnosis they
19 were treating.  So this is reflective of more
20 people with substance use disorders, with
21 opiate-related disorders coming through our
22 system.
23   Q.   And were people with substance
24 abuse disorders for other substances, was that
25 number going down as the number for -- of

Page 213

1  individuals with opioid use disorders went up?
2    A.   I don't know if the incidences of
3  those disorders were going down, but the
4  opportunity to serve those individuals may have
5  been diminished because the capacity was
6  being -- the demand for services was being --
7  was being -- was more focused on -- was by
8  individuals with opiate use disorders.
9    Q.   Okay.  So with respect to the
10 difference between 2008 -- and I think that
11 it's supposed to say 2009 on this chart, but
12 that's probably a typo; is that right?
13       You see on the chart it says 2006,
14 2007, then there's an increase in 2008?
15   A.   That would be reasonable.
16   Q.   Do you see that?
17   A.   Yes.
18   Q.   And then there was an increase in
19 2009?
20   A.   Uh-huh.
21   Q.   Between 2008 and 2009, how is --
22 how did the ADAMHS Board go about covering the
23 additional costs for opioid use disorder
24 treatment?
25   A.   Well, there are two ways that we

Page 214

1  would be able to do that.  One is by allocating
2  more funds towards agencies to build more
3  capacity, and the other way for us to do that
4  is -- is to serve more people with that
5  disorder.
6      Q.  Has the ADAMHS Board ever asked the
7  citizens of Summit County to pass a levy that
8  would generate more funds than it already does
9  in connection with the opioid epidemic in
10 Summit County?
11     A.  Your question is not clear to me.
12     Q.  Let me try it again.
13     A.  Okay.
14     Q.  Have you or anybody else at the
15 ADAMHS Board ever proposed to the public
16 overall or to other people within county
17 government that the ADAMHS levy that you use in
18 large part to cover your expenditures should be
19 increased in order to generate additional funds
20 available to you to spend specifically on the
21 opioid epidemic in the county?
22         MS. KEARSE:  Object to form.
23     A.  We did not.  We did not.
24     Q.  Have you ever done that?
25     A.  No, we have never done that.

Page 215

1      Q.  With respect to the claims data
2  that you referred to, do you know if the ADAMHS
3  county claims data that you and Ms. Peivich
4  have used to perform these computations have
5  been provided to lawyers in the litigation?
6  They've been collected?
7      A.  We've provided information to the
8  attorneys, yes.
9      Q.  Well, you said you've provided
10 information --
11     A.  Yes.
12     Q.  -- but I -- I didn't ask you
13 generically about information.
14     A.  Okay.
15     Q.  My question is specific to the
16 claims data.  Have you provided the specific
17 underlying claims data that inform your
18 computations here on the third page of Exhibit
19 15 to the lawyers in the case?
20     A.  I don't know specifically.  I know
21 that we -- I know that we provided information
22 that was de-identified and -- and some
23 aggregate data, but I don't believe that we
24 provided actual claims.
25     Q.  Not the actual claims data.

Page 216

1      When you talk about aggregate data,
2  what do you mean by that?
3      A.  We can run reports with specific
4  queries that would identify individuals that
5  carried a specific diagnosis that would give
6  them that information.
7      Q.  Where is the aggregation of the
8  data stored right now?
9      A.  Our -- our claims -- our claims
10 system serves also as a -- as a database, and
11 we run reports against that.
12     Q.  Okay.  Going back just for a moment
13 to the ADAMHS levy that we discussed, you
14 indicated you've not requested that the ADAMHS
15 levy be adjusted in order to specifically
16 address the opioid epidemic in the county,
17 right?
18     A.  That's correct.
19     Q.  So the amount of funds available to
20 the ADAMHS Board, setting aside how the funds
21 get spent, would be the same regardless of the
22 existence or non-existence of the opioid
23 epidemic, correct?
24         MS. KEARSE:  Object to form.
25     A.  So the last time we had an

Page 217

1  opportunity to go to the taxpayers and ask for
2  more money was in 2013, which was the year
3  before Medicaid expansion was scheduled to
4  occur.  So, no, we did not ask the county
5  taxpayers for additional funds because we
6  already knew that with Medicaid expansion, that
7  there would be money freed up in order for us
8  to direct those funds towards system
9  priorities.
10     Q.  Great.  That's helpful.  Thank you.
11        MR. BOEHM:  Mr. Court Reporter,
12 would you mind just going back up to my
13 question?
14     Q.  I -- I -- I would just like you to
15 hear my question again one more time --
16     A.  Okay.
17     Q.  -- the last question --
18     A.  Sure.
19     Q.  -- and see if that helps you.
20        Okay.  Notwithstanding the
21 circumstances of the 2003 -- I'm sorry -- 2013
22 levy vote, is it true that the ADAMHS levy
23 would generate the same amount of revenue for
24 the ADAMHS Board in Summit County as it's
25 currently constituted, regardless of the

55 (Pages 214 - 217)

Page 218

1 existence or the non-existence of the opioid
2 epidemic?
3        MS. KEARSE:  Object to form.
4        Q.   Does my question make sense to you?
5 I'm happy to try again if that doesn't make
6 sense.
7        A.   You might want to try one more
8 time, because I think I know what you're
9 asking, but I'm not sure.
10       Q.   I think you probably do, too.  I'm
11 just trying to make sure I understand the way
12 the levy works.
13       So the levy -- the ADAMHS levy
14 funds that are available to the ADAMHS Board to
15 spend for whatever purposes you decide to spend
16 them on have not changed in terms of the total
17 amount of the revenue generated by that levy
18 because of the existence of an opioid epidemic
19 in the county; is that right?
20       MS. KEARSE:  Object to form.
21       A.   So the amount of money collected
22 through our levy has changed, but not as a
23 result of the opiate epidemic.
24       Q.   Okay.  And when you say it has
25 changed, you mean because of the Medicaid

Page 219

1 expansion?
2        A.   Because there are certain taxes
3 that were collected that are no longer being
4 collected because of some changes that were
5 made in the legislature.  Tangible personal
6 property tax, that sort of thing.
7        Q.   Got it.
8        And that's independent of the
9 existence of an opioid epidemic in the county,
10 right?
11       MS. KEARSE:  Object to form.
12       A.   That's correct.
13       Q.   Okay.  Let's move along to the next
14 document.
15       Do you recall that in 2010 Governor
16 Ted Strickland formed an Ohio Prescription Drug
17 Abuse Task Force?
18       A.   Yes.  I'm -- I'm familiar that the
19 governor formed the Opiate Task Force.  I
20 don't -- I'm not sure that I could stipulate to
21 the date, but I certainly accept that.
22       Q.   Do you recall that --
23       MS. KEARSE:  Object to form.
24       MR. BOEHM:  Are you objecting to
25 the form of the answer?

Page 220

1        MS. KEARSE:  I just don't want you
2 to guess.  I just don't want guessing.
3        Go ahead.
4        Q.   Have you read the report that the
5 governor's Ohio Prescription Drug Abuse Task
6 Force prepared in 2010?
7        A.   I may have looked at it.  I don't
8 know that I've read it through completely.
9        Q.   You indicated earlier today that
10 when you present to the community and to other
11 individuals about the opioid epidemic in Summit
12 County, it's important for you to describe what
13 you believe to be the contributing factors to
14 the epidemic, correct?
15       A.   Yes.
16       Q.   Do you recall that the governor's
17 task force on Ohio prescription drug abuse
18 included a section on what that task force
19 concluded were the causes of the epidemic in
20 Ohio?
21       MS. KEARSE:  Object to form.
22       A.   I -- I could not say that I -- I
23 know that.
24       Q.   Do you remember when you last
25 looked at the Ohio Prescription Drug Abuse Task

Page 221

1 Force report from October 2010?
2        MS. KEARSE:  Just first is --
3 Counsel, I would ask that you show the exhibit
4 to him so --
5        MR. BOEHM:  I'm hand- --
6        MS. KEARSE:  Okay.
7        MR. BOEHM:  I think you saw me
8 handing it to him as you were saying that.
9        MS. KEARSE:  Okay.  Well, you
10 usually hand it before if you're going to ask
11 him if he's ever saw this before.
12       MR. BOEHM:  I think I had a
13 question pending, too.
14       Q.   Do you remember when you last
15 looked at the Ohio Prescription Drug Abuse Task
16 Force report from October 2010?
17       MS. KEARSE:  Object to form.  Lack
18 of foundation.
19       A.   As -- as I'm looking at this now, I
20 don't have a recollection of having reviewed
21 this.
22       Q.   You don't know if you've ever
23 looked at this?
24       A.   I don't know that I've ever looked
25 at this.

56 (Pages 218 - 221)

Page 222

1    Q.   Doesn't ring a bell?
2    A.   I just don't recall.
3    Q.   But you indicated that you did know
4  that Governor Strickland had in fact formed an
5  Ohio Prescription Drug Abuse Task Force, right?
6    A.   Yes, I do.  I was aware of that.
7    Q.   Did you ever take interest in what
8  the conclusions of the task force were?
9         MS. KEARSE:  Object to form.
10    A.   Did I ever -- I'm sorry.  Could you
11  repeat that?
12    Q.   Sure.  Did you ever take interest
13  in what the conclusions of the Ohio
14  Prescription Drug Abuse Task Force were?
15    A.   I don't -- I -- like I said, I
16  don't know that I've ever seen this document or
17  read this document, so I don't know.
18    Q.   But that's not my question, just
19  to -- just to be clear.  And I'm not arguing --
20    A.   Okay.
21    Q.   -- with you, I just want to make
22  sure you understand my question.
23         You indicated you knew that this
24  task force had been formed --
25    A.   Yes.

Page 223

1    Q.   -- right?
2         And so my question to you is simply
3  whether or not you ever took an interest in
4  what the conclusions of this task force ended
5  up being.
6         MS. KEARSE:  Object to form.
7    A.   I wasn't aware that there were
8  recommendations that came out of this, so I
9  don't know that I took an interest in them,
10  because I didn't -- wasn't aware of anything
11  that I needed to take an interest in.
12    Q.   Is it fair to say that before this
13  moment you didn't know that the Ohio
14  Prescription Drug Abuse Task Force had in fact
15  issued a report about the prescription opioid
16  epidemic in Ohio back in October 2010?
17    A.   I'm not -- I -- I don't have a
18  recollection of this.
19         - - - - -
20         (Thereupon, Deposition Exhibit 16,
21         10/1/2010 Document Titled "Ohio
22         Prescription Drug Abuse Task Force:
23         Final Report Task Force
24         Recommendations, was marked for
25         purposes of identification.)

Page 224

1         - - - - -
2    Q.   All right.  I'm going to direct
3  your attention to a section of this report
4  entitled "How Did This Become an Epidemic?"
5  It's on page 21.
6         Do you see in the bottom half of
7  page 21 of this report, which is now Exhibit 16
8  for your deposition, this graphic --
9    A.   Yes.
10    Q.   -- that has a large circle in the
11  middle.  It says "Epidemic" --
12    A.   Yes.
13    Q.   -- right?
14         And then it has various boxes with
15  inputs into the epidemic.
16    A.   Yes.
17    Q.   Do you see that?
18         Have you seen this graphic or
19  similar graphics before?
20    A.   This is the graphic that we use in
21  our literature and in our -- our presentations
22  through the Opiate Task Force.
23    Q.   And when you say "we," you mean the
24  Summit County ADAMHS Board?
25    A.   The Summit County Opiate Task

Page 225

1  Force.
2    Q.   And this is something that you have
3  used yourself in your own presentations about
4  the Summit County opioid epidemic, right?
5    A.   Yes.
6    Q.   Did you know that you were using a
7  graphic that came from the October 2010 report
8  from the Ohio Prescription Drug Abuse Task
9  Force?
10    A.   I was not aware of the source.
11    Q.   For those presentations, do you
12  prepare your own slides?
13    A.   I --
14    Q.   My question should be a little bit
15  more clear.
16         For the presentations that you have
17  referred to making to the community and to
18  others in Summit County, are those slide decks
19  that you prepare yourself, or does somebody do
20  that on your behalf?
21    A.   Both.  Typically, our Opiate Task
22  Force, their speakers bureau has created a
23  PowerPoint deck, and I customize that for my
24  presentations.
25    Q.   Okay.  So I know you're familiar

57 (Pages 222 - 225)

Page 226

1 with this graphic because it's in your own
2 presentations, but let's just look at it
3 together quickly, if we could.
4      You see it lists three reasons or
5 causes for why there's an opioid epidemic.  Do
6 you see that?
7      A.   Yes.
8      Q.   It says, "Changes in clinical pain
9 management, aggressive marketing, growing use
10 of prescription opioids, direct-to-consumer
11 marketing, diversion, and self-medicating
12 habits of baby boomers."
13      Do you see that?
14      A.   I see that.
15      Q.   Do you agree with the causes of the
16 opioid abuse epidemic stated in this graphic,
17 this section, "How Did This Become an
18 Epidemic" --
19      MS. KEARSE:  Object to form.
20      Q.   -- of the Ohio Prescription Drug
21 Abuse Task Force final report from October 1,
22 2010, insofar as the epidemic has impacted
23 Summit County?
24      MS. KEARSE:  Object to form.
25 Misstates what the document states.

Page 227

1      A.   You -- you went a couple different
2 places with that.
3      I can respond by saying I -- I
4 believe that each of these are factors in -- in
5 why we have the problem we have today.
6      Q.   You agree that all of the factors
7 listed here in this graphic are contributing
8 factors in how an opioid epidemic occurred in
9 Ohio, right?
10      A.   Yes.
11      Q.   And do you believe that those are
12 factors that explain the opioid epidemic in
13 Summit County?
14      A.   I believe that these are all
15 factors that contributed to the -- the problems
16 that we faced in Summit County.
17      Q.   Okay.  I want to just very quickly
18 go through each one to make sure I understand
19 your view on them.
20      The first one, if you turn to page
21 22, is "Changes in clinical pain management."
22      Do you see that?
23      A.   Yes.
24      Q.   In what way do you believe changes
25 in clinical pain management caused an opioid

Page 228

1 epidemic in Summit County?
2      A.   Well, I know even from personal
3 experience when I go to visit my doctor's
4 office, I'm asked to rate my pain on -- on the
5 basis of a scale of 1 to 10.
6      I know that I'm now -- I'm now
7 asked -- or I'm aware that patients are asked,
8 "How would you rate the management of your
9 pain?" in some of the patient satisfaction
10 surveys.
11      I know that the hospitals and
12 medical practitioners that I interact with have
13 reported to me that their -- they have -- that
14 the ratings -- sometimes the ratings of the
15 hospitals are contingent on their prescribing
16 practices.
17      Q.   How do you believe those changes in
18 clinical pain -- well, let me actually back up
19 one step.  How -- in what way are those
20 reflective of changes in clinical pain
21 management?
22      A.   I think -- I think that there was
23 less attention paid to -- to pain in -- in the
24 past.  That many times -- and I'm also aware
25 of -- of some studies that have been published

Page 229

1 that have indicated that pain was under --
2 undertreated in emergency departments and in
3 other medical settings.
4      Q.   Do you disagree with the
5 conclusions of health care professionals and
6 scientists who have concluded that pain was
7 undertreated?
8      MS. KEARSE:  Object to form.
9      A.   I don't -- I don't really know.
10 Again, these are -- these are studies and
11 information that I've run across, and -- and
12 I have no reason to doubt them.
13      Q.   In what way do you believe that the
14 changes in clinical pain management, as you've
15 described them in the form of pain ratings and
16 patient satisfaction surveys and so on, have
17 contributed to the opioid epidemic in Summit
18 County?
19      In other words, you've described
20 some changes, and why do you think that those
21 have, at least in part, caused the epidemic
22 that we're discussing?
23      MS. KEARSE:  Object to form.
24      A.   I think -- I think they've
25 contributed to the epidemic in the sense that

58 (Pages 226 - 229)

Page 230

1 when -- when doctors prescribe more opiates
2 than they have in the past, that -- and in
3 particular to -- to patients, that -- that
4 there's more -- there are more medications out
5 in the community. And individuals who go
6 through -- who -- who tend -- who visit their
7 doctors and they bring home a prescription and
8 they don't finish it, those meds are left
9 subject to diversion.
10     Q.   Okay. Yeah. We're going to come
11 back to that point.
12         The next thing on the lists is
13 "Aggressive marketing." Do you see that?
14     A.   I do see that.
15     Q.   In what way do you believe
16 aggressive marketing of opioids by
17 pharmaceutical companies has contributed to the
18 opioid epidemic in Summit County?
19     A.   I think in general, my -- my
20 experience has been that -- that in our -- in
21 our physician practices within our agencies,
22 even going back to my days at Community Support
23 Services, that the pharmaceutical sales
24 representatives were typically present and
25 sometimes very aggressive in their -- in the

Page 231

1 promotion of medications; therefore, as I -- as
2 I hear more and more about this, I -- I would
3 tend to believe that.
4     Q.   Do you know of any specific
5 instances where a representative of a
6 pharmaceutical company that makes prescription
7 opioids was overly aggressive with a health
8 care provider in Summit County?
9     A.   No.
10     Q.   Are you aware of any instances
11 where a representative of a pharmaceutical
12 company that makes prescription opioids
13 provided false information to a health --
14 health care provider in Summit County?
15         MS. KEARSE: Object to form.
16     A.   I'm not aware of any.
17     Q.   Are you aware of any instance of a
18 representative of a pharmaceutical company who
19 makes prescription opioids giving information
20 to a health care provider that is inconsistent
21 with the FDA-approved package insert for that
22 medication in Summit County?
23     A.   I am not aware of any instances.
24     Q.   All right. The third thing on the
25 list is "Growing use of prescription opioids."

Page 232

1         Do you see that?
2     A.   I do see that.
3     Q.   Do you agree that the growing use
4 of prescription opioids has been a contributing
5 factor to the opioid epidemic in Summit County?
6     A.   Yes, I do.
7     Q.   Can you describe in what way you
8 believe that the growing use of prescription
9 opioids has contributed to the opioid epidemic
10 in Summit County?
11     A.   I believe that -- that when we look
12 at the data that comes from the Ohio
13 prescription reporting system, that you look at
14 the sheer number of opiates that are prescribed
15 per capita is -- is stunning -- is stunning,
16 and that to a reasonable person, you can look
17 at those numbers and really wonder how could
18 anybody use that number of medications.
19     Q.   Okay. And in what way do you
20 believe that the growth in use of prescription
21 opioids has contributed specifically to the
22 opioid epidemic in Summit County?
23     A.   Because there were oppor- --
24 because -- because there were opportunities for
25 people to get their hands on medications that

Page 233

1 either weren't prescribed for them, or that
2 because those medications were -- were
3 potentially overprescribed to individuals, that
4 there was an opportunity for some level of
5 abuse that led to addiction.
6         And also that -- that when we
7 started to see a reduction in the availability
8 of prescription pain medications, that we saw
9 the illicit drug business pick up. And that's
10 when we started to see more and more of the
11 fatal overdoses.
12     Q.   I think in part you might be
13 talking also about diversion. Is that fair?
14     A.   Sure.
15     Q.   Okay. And that's also on --
16     A.   It's all connec- -- it's all
17 connected.
18     Q.   Yeah. That's also on this list. I
19 was just about to make that point.
20         Do you see the "Diversion" -- if we
21 skip over "Direct-to-consumer," we'll come back
22 to it.
23         If you go to page 24, "Diversion"
24 is on the list, and you started to talk about
25 that, so let's do that next. Fair?

59 (Pages 230 - 233)

Page 234

1    A.   Sure.
2    Q.   In what way do you believe that
3 diversion of prescription opioids has impacted
4 the opioid epidemic in Summit County?
5    A.   I know that there have been
6 newspaper stories and -- and others where
7 individuals are picked up by police officers
8 and found with medications that they could
9 not -- that they couldn't demonstrate belonged
10 to them.
11        There were -- there are lots of
12 situations, and again anecdotally, where
13 stories that we've -- that we've been -- that
14 have been shared with us about people breaking
15 into homes, into nursing homes stealing
16 medications, employees of hospitals and other
17 places.
18        And there was a big -- there was a
19 big effort on the part of our task force to
20 make sure that we took these extra medications
21 out of the homes of these individuals,
22 particularly people experiencing end-of-life
23 issues and things like that.
24        I'm also aware of people sharing
25 medications in social settings.  You know,

Page 235

1 somebody has a headache, and somebody has an
2 opiate medication and -- and offers one to
3 somebody.  That's not unusual to happen.  I've
4 witnessed it myself.
5        So all of those things, I think,
6 have gone towards contributing to the problem.
7    Q.   Of all of the forms of diversion
8 that you just identified, are they all things
9 that have happened in Summit County and
10 contributed to the opioid epidemic here?
11    A.   I have not witnessed all of those
12 things in Summit County, so I can -- I have no
13 doubt that those things have all happened in
14 Summit County.
15    Q.   Yeah.  Right.  And -- and we talked
16 earlier today about how as head of the ADAMHS
17 Board you considered one of your duties and
18 responsibilities to understand the causes of
19 this health epidemic that the county is facing,
20 right?
21        MS. KEARSE:  Object to form.
22    A.   Yes, I have.
23    Q.   And so whether you've seen it or
24 not, you've looked into the causes, right?
25    A.   Yes.

Page 236

1    Q.   And -- and is it your understanding
2 that all of the forms of diversion that you
3 identified here today are forms of diversion
4 that have occurred in Summit County?
5    A.   I think that's a reasonable...
6    Q.   Okay.  We skipped over one.  I just
7 want to quickly go back to it.  It's on page
8 23, "Direct-to-consumer marketing of
9 pharmaceuticals."
10        Do you see that?
11    A.   I do see that.
12    Q.   There's a reference to a
13 philosophical shift, right?  And I think that
14 has to do with the direct-to-consumer piece of
15 it?
16    A.   Yes.
17    Q.   Okay.  Can you explain to -- do you
18 agree that direct-to-consumer marketing of
19 pharmaceuticals has in some way contributed to
20 the opioid epidemic in Summit County?
21    A.   Yes, I do.
22    Q.   How so?
23    A.   I think any time that we encourage
24 people to ask their doctors or -- or sort of
25 practice medicine themselves by asking for a

Page 237

1 drug by name, it's -- it puts pressure on the
2 physicians.  It -- it creates an expectation
3 that -- that again puts pressure on the medical
4 system to meet that person's needs.
5    Q.   Are you aware of any specific
6 instances where a Summit County health care
7 provider has prescribed an opioid medication to
8 a patient for something other than a legitimate
9 medical need?
10        MS. KEARSE:  Object to form.
11    A.   A specific instance of -- I know
12 that there have been pill mills that have been
13 shut down in Summit County, several.
14    Q.   What are the -- can you describe
15 your understanding of what a pill mill is?
16    A.   These are individuals who've been
17 investigated and arrested because they --
18 because they were alleged to have sold large
19 quantities or prescribed large quantities of
20 opiate medications.
21    Q.   Yeah.  That's illegal, right?
22    A.   That is illegal.
23    Q.   And when you were talking about
24 diversion of opioids, which is a control- --
25 which are controlled substances, that's also

60 (Pages 234 - 237)

Veritext Legal Solutions
www.veritext.com                          888-391-3376

Page 238

1 illegal, right?
2     A.   Yes --
3         MS. KEARSE:  Object to form.
4     A.   Yes, it is.
5     Q.   You indicated that you personally
6 had seen somebody offer a prescription opioid
7 that was not prescribed to the person to whom
8 it was being offered.  What was the
9 circumstance that you're describing?
10     A.   Sitting in the bleachers watching a
11 sporting event, conversation -- very casual
12 conversation between two other parents.
13     Q.   And what did you hear?
14     A.   Essentially, one individual talking
15 about a headache, and another person -- or some
16 sort of ache.  And I don't -- I don't recall
17 the exact scenario, but, essentially, it was --
18 what struck me was the fact that somebody
19 wanted to take medication out of their purse
20 that was prescribed for them and offer it to
21 someone else.
22     Q.   Do you know if the medication that
23 was being discussed in that circumstance was a
24 prescription opioid medication?
25     A.   I believe it was, yes.

Page 239

1     Q.   You heard them identify the
2 medicine by name?
3     A.   Yes.
4     Q.   Did you do anything?
5     A.   I didn't do a citizen's arrest or
6 anything, no.
7     Q.   Or even make any remark?
8     A.   I didn't report them.  I didn't
9 report them, and I did not -- no.  No, I did
10 not.
11     Q.   Okay.  The one thing that doesn't
12 get separately listed in this section but is on
13 that chart --
14     A.   Uh-huh.
15     Q.   -- that chart is "Self-medicating
16 habits of baby boomers."
17         Do you see that?
18     A.   Yes.
19     Q.   Do you know what that refers to?
20     A.   Well, I think it -- like you said
21 before, all of this sort of works together, so
22 when you -- when you have direct-to-market --
23 direct-to-consumer marketing, you create an
24 expectation that there's a pill for everything
25 that ills you.  And so I think that we begin to

Page 240

1 enculturate our population with a sense that if
2 I have a problem, there's got to be a pill that
3 addresses it, and that we should not experience
4 pain of any sort.
5         And I think that as we look more
6 and more at the -- all these different causes,
7 all of that's created a -- a sense from
8 individuals in our communities that they should
9 just seek medications and medications will fix
10 it.
11     Q.   So you're kind of referring to,
12 like, a cultural mindset, if I understand you
13 correctly.  Is that fair?
14     A.   That's what I said, yeah.
15     Q.   And is it your view that that
16 cultural mindset, at least to some extent,
17 accounts for the opioid epidemic here in Summit
18 County?
19     A.   It's a contributing factor.
20     Q.   Very quickly going back to
21 direct-to-consumer marketing of pharmaceuticals
22 that's described in greater depth on page 23,
23 are you aware of any particular
24 direct-to-consumer marketing of prescription
25 opioids that has occurred in Summit County?

Page 241

1     A.   I'm not -- no.  Not -- not -- I'm
2 not recalling any.
3     Q.   When -- when you -- in your
4 presentations and discussions with people about
5 the causes of the opioid epidemic, when you
6 discuss direct-to-consumer marketing of
7 pharmaceuticals, do you mean to include
8 direct-to-consumer marketing of pharmaceuticals
9 overall, or do you mean direct-to-consumer
10 marketing specifically of prescription opioids?
11         MS. KEARSE:  Object to form.
12     A.   I'm speaking in a general sense.  I
13 think that the direct-to-consumer marketing of
14 pharmaceuticals in and of itself creates an
15 expectation, irrespective of the -- the drug
16 that's being marketed, that individuals should
17 be asking for their -- the drugs that they want
18 by name.
19     Q.   Okay.  So we've gone through the
20 factors that are identified here in this report
21 in the section entitled "How Did This Become an
22 Epidemic?"  And I want to ask you, in your view
23 are there any factors that have contributed to
24 the opioid epidemic in Summit County, in your
25 opinion, that are not identified in this

61 (Pages 238 - 241)

Page 242

1 section of the October 1, 2010, report from the
2 Ohio Prescription Drug Abuse Task Force?
3        MS. KEARSE:  Object to the form.
4    A.   Are there other factors that are
5 not listed here?  Sure.
6    Q.   What -- what are the other factors,
7 in your view, not identified in the section of
8 the report that we've been discussing that have
9 contributed to the opioid epidemic in Summit
10 County?
11    A.   I think that when -- like I said
12 before, when some of the pill mills were shut
13 down, when some of the pain management clinics
14 lose a physician, often people are left to seek
15 substances to avoid withdrawal and will often
16 go to street drugs.
17    Q.   Okay.  Do you see that as a factor
18 that's separate and apart from the ones we've
19 already been discussing?
20    A.   I don't know what you mean by
21 "separate and apart."  I think they're --
22 they're -- those are other contributing
23 factors.
24    Q.   Okay.  So your understanding is
25 that one contributing factor to the opioid

Page 243

1 epidemic in Summit County is that some people
2 move from one kind of opioid to a different
3 kind of opioid?
4    A.   Yes.  When -- once they're -- once
5 they're dependent on a prescription pain
6 medication, for example, and that prescription
7 pain medication is not available, they build up
8 a tolerance and they need more and more, that
9 oftentimes they will gravitate towards
10 something that's a little more potent, and
11 often that is street medications -- street --
12 street drugs, I mean.
13    Q.   Okay.  Are there any other factors
14 that we've not discussed that in your view have
15 contributed to the opioid epidemic in Summit
16 County?
17    A.   None -- none that occur to me right
18 off the top of my head.
19    Q.   Okay.  Do you believe that any
20 medical organizations or accrediting bodies are
21 responsible for the opioid epidemic in Summit
22 County?
23    A.   So you're -- you're referring to
24 JCHO or some of the other standard --
25 certification standards for hospitals that will

Page 244

1 rate patients' satisfaction and attach that to
2 their -- attach that to the reimbursements the
3 hospitals receive.  Yes, I'm aware of that.
4    Q.   Can you tell us in what way those
5 accrediting guidelines or prescribing
6 guidelines from medical organizations or
7 accrediting bodies have, in your view,
8 contributed to the opioid epidemic in Summit
9 County?
10        MS. KEARSE:  Object to form.
11    A.   I think that physicians feel
12 pressured by their health care organizations to
13 be more liberal with the number of opiates that
14 they prescribe as a result of pressures that
15 they feel from the certification standards.
16    Q.   Have you ever heard of the concept
17 of treating pain as the fifth vital sign?
18    A.   Yes, I have.
19    Q.   Do you know if any medical
20 organizations or accrediting bodies have
21 endorsed the concept of treating pain as a
22 fifth vital sign?
23    A.   I'm not aware of the specific --
24 I've -- the -- the term is very familiar to me.
25 I know that it was something that medical

Page 245

1 schools were promoting and -- or -- or
2 teaching, I guess would be the better way of
3 putting it, but I don't know the origin of
4 that.
5    Q.   Do you know what it means to treat
6 pain as the fifth vital sign, based on the
7 research and investigation you've done to try
8 and understand the epidemic?
9    A.   I know what the intent is.  I don't
10 know what the meaning is.  Because when you
11 look at the vital signs, the absence of pain is
12 not necessarily, in my mind, a vital sign,
13 or -- or pain itself is not necessarily a vital
14 sign.  To hurt means that you live.  I don't
15 know that that's the case, but.
16    Q.   Okay.  You -- you indicated that
17 the Joint Commission had adopted treating pain
18 as a fifth vital sign?  Did I hear you right?
19    A.   Yes.
20    Q.   And do you know that the Veterans
21 Administration also adopted and promoted the
22 treatment of pain as, quote, "the fifth vital
23 sign"?
24        MS. KEARSE:  Object to form.
25    A.   I don't -- I don't know the details

62 (Pages 242 - 245)

Page 246

1  of that.  I know that the -- the study came out
2  of the Kaiser Foundation, and I believe the --
3  the VA had a significant role in that as well.
4  So it doesn't surprise me that the VA also has
5  that standard.
6      Q.   For those who may not be entirely
7  familiar with the Joint Commission, can you
8  describe your understanding of what that entity
9  is and what it does?
10     A.   The Joint Commission looks at all
11 aspects of health care and establishes specific
12 standards of care and treatment.  Everything
13 from the environment of care all the way
14 through the practices of the individuals.
15     Q.   Is it your view that the Joint
16 Commissions and the Veteran Administrations and
17 potentially other organizations' adoption of
18 treating pain as the fifth vital sign
19 contributed to the opioid epidemic in Summit
20 County?
21     MS. KEARSE:  Object to form.
22     A.   Yes, I would say that they have --
23 that they've made a contribution to the problem
24 we have today.
25     Q.   In what way?

Page 247

1      A.   That, again, it created a
2  disproportionate amount of attention on -- on
3  the management of pain.  And the -- and the
4  message that physicians were receiving, by
5  their account, is that this is important.
6  "This is something we need to pay close
7  attention to."
8      Q.   Do you know in what years the Joint
9  Commission, the Veterans Administration, or
10 other medical organizations adopted the concept
11 of treating pain as the fifth vital sign?
12     A.   No, I don't.
13     Q.   Do you know even the decade?
14     A.   I believe it was in the '90s.
15     Q.   Do you know who at the Joint
16 Commission or the Veterans Administration
17 performed the evaluation and arrived at the
18 recommendation --
19     A.   I've never --
20     Q.   -- to treat -- sorry -- to treat
21 pain as the fifth vital sign?
22     A.   I've never seen the study, so, no,
23 I don't.
24     Q.   Do you know whether doctors and
25 scientists were involved in that evaluation and

Page 248

1  recommendation?
2      MS. KEARSE:  Object to form.
3      A.   I don't know.  I've not seen the
4  study.
5      Q.   Okay.  Let me ask you this
6  question.
7      Do -- do you have a view as to
8  whether or not the health care professionals at
9  the Joint Commission, the Veterans
10 Administration, or other entities that adopted
11 the concept of treating pain as the fifth vital
12 sign were exercising what at the time was their
13 best medical judgment?
14     MS. KEARSE:  Object to form.
15     A.   Do I believe that they were
16 exercising what is their best medical judgment?
17     Q.   At that time.
18     A.   I don't -- I don't know what
19 their -- I don't know what their objective was.
20 I think that -- that I can't -- I -- I can't --
21 I can't assign their motives.
22     Q.   Do you have any reason to believe
23 that the health care professionals at the Joint
24 Commission, the Veterans Administration, or any
25 other medical organization that adopted and

Page 249

1  promoted treating pain as the fifth vital sign
2  did so for any reason other than the exercise
3  of what at the time was their best medical
4  judgment?
5      MS. KEARSE:  Object to form.  Asked
6  and answered, I believe.
7      A.   I think that the -- there was an
8  interest in making sure that pain was
9  appropriately addressed in treatment.
10     MS. KEARSE:  Is this a good time --
11     Q.   Do --
12     MS. KEARSE:  -- for a break?
13     I'm sorry.  I didn't mean --
14     MR. BOEHM:  I'm almost done with a
15 section, if you don't mind.
16     MS. KEARSE:  Okay.  I thought you
17 were moving on.
18     MR. BOEHM:  And then we can take a
19 break.
20     Q.   And you indicated that treatment of
21 pain as a fifth vital sign was something that
22 was taught at medical schools in the United
23 States, right?
24     A.   That's what I understand.
25     Q.   Do you know when medical schools

63 (Pages 246 - 249)

Page 250

1 started to instruct their students about
2 treating pain as a fifth vital sign?
3     A.   No, I don't know when.
4     Q.   Do you believe that licensed
5 physicians who prescribed -- I'm sorry.  Let me
6 start over.
7         Do you believe that the licensed
8 physicians in the United States and in Summit
9 County who adopted the treatment of pain as the
10 fifth vital sign sincerely believed at the time
11 that doing so was medically appropriate --
12     MS. KEARSE:  Objection.
13     Q.   -- and in the best interest of
14 their patients?
15     MS. KEARSE:  Object to form.
16     A.   Do I believe that they felt that
17 way?  I suppose.  I suppose that would be fair.
18     Q.   Do you agree that the
19 undertreatment of pain was broadly recognized
20 by the medical community as a legitimate and
21 serious public health problem in the 1990s?
22     MS. KEARSE:  Object to form.
23     A.   Yes, I would say that they probably
24 thought that.
25     Q.   Are you aware that the State of

Page 251

1 Ohio itself officially recognized that the
2 undertreatment of pain was a legitimate and
3 serious public health problem?
4     MS. KEARSE:  Object to form.
5     A.   Am I aware that the State had --
6 I'm not aware that the State had, no.
7     Q.   Have you ever heard of the
8 Intractable Pain Act of 1998?
9     A.   It sounds familiar, but I don't
10 know that I would have any reason to -- to have
11 read that or -- or read about it.
12     Q.   We can check, but I think it shows
13 up in some of the ADAMHS Board slide decks that
14 we'll look at.
15     A.   Okay.
16     Q.   Does -- does the Intractable Pain
17 Act of 1998 ring a bell for you?
18     MS. KEARSE:  Object.  Asked -- he
19 just answered the question and said he didn't
20 recall it, so.
21     A.   It sounds familiar, but I don't
22 know that I'm familiar with the actual document
23 itself or the -- the act itself.
24     Q.   Do you know enough to say what the
25 purpose of the Intractable Pain Act of 1998

Page 252

1 was?
2     A.   No.
3     MS. KEARSE:  Object to form.
4     THE WITNESS:  I'm sorry.
5     A.   No.
6     Q.   Have you ever heard of the Ohio
7 Compassionate Care Task Force?
8     A.   Sounds familiar, but, no, I'm
9 not -- I don't have direct awareness of their
10 existence.
11     Q.   Has the State of Ohio, Summit
12 County, or the ADAMHS Board -- well, let me --
13 let me actually strike that and say it a
14 different way.
15         During the time that there had been
16 changes in clinical pain management, including
17 this adoption of treating pain as the fifth
18 vital sign, did Summit County or the ADAMHS
19 Board ever adopt or propose revised prescribing
20 guidelines for the use of prescription opioids?
21     MS. KEARSE:  Object to form.
22     A.   No.  That would fall outside of
23 our -- of our scope of work.
24     Q.   Why do you say that would fall
25 outside of your scope of work?

Page 253

1     A.   Because we don't -- we don't get
2 into medical treatment.
3     Q.   Who are the people who get into
4 medical treatment and that would be positioned
5 to -- to render recommendations along those
6 lines?
7     A.   Practitioners.  Medical
8 practitioners.
9     MR. BOEHM:  All right.  Now is a
10 fine time for a break if it works for you.
11     THE WITNESS:  Okay.
12     THE VIDEOGRAPHER:  Off the record,
13 3:03.
14     (A recess was taken.)
15     - - - - -
16     (Thereupon, Deposition Exhibit 17,
17     ADM Slide Deck Titled "Summit County
18     Opiate Task Force: Key Stakeholders
19     Meeting", was marked for purposes of
20     identification.)
21     - - - - -
22     THE VIDEOGRAPHER:  On the record,
23 3:26.
24 BY MR. BOEHM:
25     Q.   Okay.  We're back after just a

64 (Pages 250 - 253)

Page 254

1 short break.  And I have marked the next
2 document as Exhibit 17.  This is a slide deck
3 that has John Ellis's name on it.
4      Do you see that?
5   A.  I do see that.
6   Q.  And at the time of this
7 presentation, it appears that he was still the
8 manager of clinical services for the Summit
9 County ADAMHS Board, right?
10   A.  Yes.
11      MR. BOEHM:  I'll just state for the
12 record that this document was produced in
13 native format, and so that means that we don't
14 have that fancy little number in the corner.
15      THE WITNESS:  Okay.
16      MR. BOEHM:  So I'll just say for
17 the record that the natively produced file was
18 stamped SUMMIT_001110699.
19   Q.  And I want to direct your attention
20 to -- I guess it would be the fourth slide in.
21 It's entitled "Other Dynamics Include."
22      Do you see that one?
23   A.  Yes.
24   Q.  And the fourth bullet point on this
25 particular slide states "Overprescribing equals

Page 255

1 diversion."
2      Do you see that?
3   A.  Yes.
4   Q.  I want to ask you a few questions
5 about that concept.  And let me start by just
6 asking, do you agree with the concept that
7 overprescribing equals diversion?
8   A.  Overprescribing contributes to
9 diversion.
10   Q.  What is meant by "overprescribing"?
11   A.  When somebody who may need -- have
12 a need for a medication for three to four days
13 receives 30 to 60, 90 days' supply of
14 medications.
15   Q.  Whose decision is it how much of a
16 prescription medication to provide to a
17 patient?
18   A.  It's usually the physician.
19   Q.  Okay.  Is it -- isn't it always the
20 physician who's treating that particular
21 patient?
22      MS. KEARSE:  Object to form.
23   A.  The prescriber.
24   Q.  Okay.  In terms of overprescribing,
25 who decides whether a doctor is, quote,

Page 256

1 "overprescribing"?
2   A.  Who decides?
3   Q.  Yeah.
4   A.  I think that's a -- a question
5 that -- I think that's a subjective question.
6   Q.  When you say it's a subjective
7 question, you mean it's a subjective question
8 the analysis and decision of how much to
9 prescribe to a patient depends on the
10 particular patient and all the circumstances of
11 that situation; is that right?
12   A.  That's one way of looking at it.
13 I -- I was thinking that the evaluation of
14 whether someone is overprescribing is a
15 subjective fact.
16   Q.  Okay.  Do you have an opinion about
17 how one would go about performing rigorous
18 analysis of whether or not the amount of drug
19 prescribed to a particular patient by a
20 particular physician was too much?
21   A.  Again, I think it's subjective.  I
22 would -- I would say that if someone had a
23 medical procedure that was -- was fairly minor
24 and received an exorbitant number of -- of
25 pills, that it was -- it would probably be

Page 257

1 overprescribing.
2   Q.  Do you agree that making a
3 determination about whether or not the volume
4 of a particular amount of drug prescribed to a
5 particular patient by a particular physician
6 would require a case-by-case evaluation?
7      MS. KEARSE:  Object to form.
8   A.  I would -- I would say that would
9 be the case.
10   Q.  You'd have to look at the complete
11 medical history of the patient, right?
12   A.  Yes.
13   Q.  You'd want to know, for example, if
14 that patient had a history of substance abuse?
15      MS. KEARSE:  Object to form.
16   A.  I think that would be an important
17 consideration.
18   Q.  You'd want to know what the
19 particular medical diagnosis was?
20   A.  I think that would be a reasonable
21 thing to want to know.
22   Q.  Okay.  Are you aware generally that
23 there are privacy protections in place -- in
24 fact, I think that you referenced some earlier
25 today in relation to some of my questions --

65 (Pages 254 - 257)

Page 258

1 that protect individual health care information
2 that a prescriber would have access to but is
3 otherwise protected?
4    A.   Yes.
5    Q.   Okay.  So returning to the concept
6 of overprescribing contributing to diversion,
7 can you describe what it is you mean in a
8 little bit more detail when you present that
9 concept?
10      MS. KEARSE:  Objection.
11    A.   That what I would -- what I would
12 take from that statement -- how I would
13 interpret that statement is that the more
14 unused medications that are left un- -- the
15 more -- more medications are left unused,
16 they're -- they could be susceptible to
17 diversion.
18    Q.   Okay.  When you say "susceptible to
19 diversion," does that refer to the factors that
20 we were discussing earlier, the ways by which
21 legitimately prescribed medications fall into
22 hands of individuals who are using them for
23 reasons other than a legit- -- legitimate
24 medical need?
25      MS. KEARSE:  Object to form.

Page 259

1    A.   Yes.
2    Q.   I think you indicated that one form
3 of diversion is theft?
4    A.   Yes.
5    Q.   And I think you -- you've indicated
6 that one way drugs can be stolen is just out of
7 somebody's medicine cabinet or a drawer; is
8 that right?
9    A.   Yes.
10    Q.   Is doctor shopping a concept with
11 which you're familiar?
12    A.   I've heard the term used.
13    Q.   Do you know what it means?
14    A.   Yes, I do.
15    Q.   What is that?
16    A.   It's going from one prescriber to
17 another seeking medications.
18    Q.   That's illegal, right?
19    A.   Yes, it is.
20    Q.   Is that a form of diversion?
21    A.   That's not necessarily a form of
22 diversion.  I think it's a form of drug
23 seeking.
24    Q.   What about buying prescription
25 opioids from someone on the street as -- as

Page 260

1 opposed to getting a legitimate prescription
2 from a licensed physician?
3    A.   What about it?
4    Q.   Is that diversion?
5    A.   Yes, that is diversion.
6    Q.   What about when your friend has an
7 extra pill and you break your arm and you use
8 your friend's pill, is that diversion?
9    A.   Yes, it is.
10    Q.   That's illegal too, right?
11    A.   Yes, it is.
12    Q.   Do you agree that there is regional
13 variation in the number of opioids that
14 licensed physicians prescribe?
15    A.   Do I agree that there's regional
16 variation?  I agree that there could be
17 regional variation, but I have no knowledge of
18 data that would inform me.
19    Q.   Have you ever looked at the
20 question of how prescribing of prescription
21 opioids varies state by state or region by
22 region?
23    A.   Say that again.  I'm sorry.
24    Q.   Have you ever looked at the
25 question of how prescribing of prescription

Page 261

1 opioids varies on a state-by-state or
2 region-by-region basis?
3    A.   I -- I don't know that I've done it
4 on a state-by-state basis.  I think that I've
5 seen some of the OARRS information, the
6 automated prescription monitoring program, that
7 will demonstrate variations in different parts
8 of the state.
9    Q.   Okay.  But you don't know if
10 there's variation in terms of prescribing
11 habits on a state-by-state or region-by-region
12 basis?
13    A.   I would have no way of being able
14 to say that.
15    Q.   Okay.  You don't recall ever having
16 received that information?
17    A.   I don't recall.
18    Q.   And you never went to look for that
19 information as part of your duties as the head
20 of the Summit County ADAMHS Board?
21      MS. KEARSE:  Object to form.
22    A.   Not that I can recall.
23    Q.   Do you know how Ohio stacks up in
24 terms of prescribing of prescription opioids as
25 compared to other states?  And I mean by

66 (Pages 258 - 261)

Page 262

1  volume.
2      A.   By volume?  No.  You know, I've
3  seen some heat maps that show, but -- but
4  that -- but that -- those don't necessarily
5  relate to numbers of -- of prescribed
6  medications.
7          - - - - -
8          (Thereupon, Deposition Exhibit 18,
9          Document Titled "Opioid Painkiller
10         Prescribing: Where You Live Makes a
11         Difference," Summit_001112390 to
12         001112393, was marked for purposes
13         of identification.)
14         - - - - -
15     Q.   I'm going to show you a document
16  that I've just marked Exhibit 18.  It's a CDC
17  report from July 2014.  And on the third page
18  of the document, there's some information about
19  prescribing trends on a region-by-region,
20  state-by-state basis.
21         Do you see that?
22     A.   I do see that.
23     Q.   And do you see there's some pretty
24  wide variation, actually, in terms of volume of
25  prescriptions as between states.  Do you see

Page 263

1  that?
2      A.   Yes, I see that.
3      Q.   It looks like Ohio is in the middle
4  category, the average category.  Do you see
5  that?
6      A.   Yes, I see that.
7      Q.   Do you have any view about why
8  there has been regional and state-by-state
9  variation in terms of the number of opioids
10  that licensed physicians prescribe to their
11  patients?
12     A.   I have no idea.
13     Q.   Do you believe that licensed
14  physicians who have prescribed opioid
15  medications in and around Summit County share
16  responsibility for the opioid abuse epidemic in
17  Summit County?
18         MS. KEARSE:  Object to form.
19     A.   Do I believe that prescribers share
20  the responsibility?  Yes.
21     Q.   How so?
22     A.   I believe that physicians who are
23  prescribing opiate medications have -- have a
24  duty, particularly in the wake of -- of what
25  we've experienced in this county, to educate

Page 264

1  the individuals that they're prescribing to
2  about the dangers of prescription medications,
3  and also to be careful about the numbers of
4  medications that are being prescribed.
5      Q.   Okay.  For what years that Summit
6  County has had an opioid epidemic do you
7  believe licensed physicians who have prescribed
8  opioid medications share in responsibility for
9  the epidemic?
10     A.   I think they've always shared in
11  the responsibility.  I -- I think that when you
12  see the consequences of the deaths and -- and
13  the overdoses that have occurred in our
14  communities, that that should heighten their
15  sense of responsibility.
16     Q.   Do you believe that pharmacists who
17  have dispensed opioid medications in or around
18  Summit County by filling legitimate
19  prescriptions from licensed physicians have
20  responsibility for the opioid epidemic in
21  Summit County?
22         MS. KEARSE:  Object to form.
23     A.   I think that pharmacists do have a
24  responsibility, yes.
25     Q.   I get -- I just want to make sure

Page 265

1  the question is clear.
2          Not just generically do they have a
3  responsibility.  My question is, do you believe
4  that pharmacists who have dispensed legitimate
5  opioid medication prescriptions in or around
6  Summit County that were provided by a licensed
7  physician have responsibility for the opioid
8  epidemic in Summit County?
9      A.   I'm sorry.
10         MS. KEARSE:  Object to form.  Asked
11  and answered.
12     A.   I'm sorry.  They do -- they do
13  have -- they do share the responsibility.
14     Q.   Why do you believe that?
15     A.   Because everybody -- everybody who
16  has a role in this, from the prescriber, to the
17  person that fills the prescription, to the
18  person using the prescription, to the -- to the
19  other -- to the hospital systems, everybody
20  shares some role in -- in addressing this and
21  some responsibility.
22     Q.   For which years that Summit County
23  has had an opioid epidemic do you believe that
24  pharmacists who have dispensed opioid
25  medications in Summit County for legitimate

67 (Pages 262 - 265)

Page 266

1 prescriptions of opioids share responsibility
2 for the epidemic in the county?
3     A.    To what extent?
4     Q.    I said for which years.
5     A.    For which years?
6     Q.    Uh-huh.
7     A.    Their responsibility, I think,
8 again, is they've always been -- they've always
9 had a responsibility.  I think their
10 responsibility, again, has been heightened as a
11 result of what we've experienced in our
12 community.
13     Q.    Do you believe that the scientists
14 and medical doctors at the Food and Drug
15 Administration have responsibility for the
16 opioid epidemic in Summit County?
17         MS. KEARSE:  Object to form.
18     A.    I -- I don't know.  I don't -- I
19 don't know enough about what their role is in
20 this that -- that I would be able to assign
21 them any level of responsibility.
22     Q.    Do you know what the Food and Drug
23 Administration is?
24     A.    Yes, I do.
25     Q.    Do you know they approve

Page 267

1 medications for indicated uses?
2     A.    Yes, I do.
3     Q.    And do you know that the
4 prescription opioid medications that are at
5 issue in this matter all involved FDA-approved
6 medications?
7     A.    Yes.
8     Q.    Do you know anything about the
9 process by which the FDA reviews and approves
10 medications for use for approved indications?
11     A.    I -- I do not.  I -- I have a very
12 superficial knowledge.
13     Q.    Do you know whether or not the Food
14 and Drug Administration has scientists and
15 medical doctors who have responsibility for
16 reviewing scientific data in reaching their
17 conclusions about whether drugs should be
18 approved and for what indications they should
19 be approved?
20     A.    Yes.
21         MS. KEARSE:  Object to form.
22     A.    I'm sorry.  Yes.
23     Q.    You do know they have those people?
24     A.    I do know they have those people.
25     Q.    Do you have any criticism of the

Page 268

1 Food and Drug Administration in connection with
2 the opioid epidemic insofar as it concerns
3 Summit County or otherwise?
4     A.    No, I don't.
5     Q.    Do you know what the United States
6 Drug Enforcement Agency is?
7     A.    Yes, I do.
8     Q.    What is it?
9     A.    It's the -- it's the agency that
10 looks at -- that enforces the laws around
11 medications and -- and also illicit drugs.
12     Q.    What are the responsibilities of
13 the United States Drug Enforcement Agency in
14 connection with controlled substances?
15     A.    I think they're -- I -- I'm not
16 sure, but I believe that they have an
17 investigative -- investigative role.
18     Q.    Okay.  What do you mean an
19 investig- -- investigative role?  I'm not sure
20 either of us said that quite right.
21     A.    They -- when they're -- when they
22 become aware or it's reported that there are
23 bad things happening with regard to these
24 drugs, that -- that they -- that they are
25 engaged to investigate.

Page 269

1     Q.    Have you ever heard of the
2 aggregate production quota?
3     A.    No.
4     Q.    Are you aware that the United
5 States Drug Enforcement Agency each year sets
6 an aggregate production quota of how -- how
7 many controlled substances pharmaceutical
8 manufacturers can make?
9     A.    No, I'm not familiar with that.
10     Q.    Never heard of that?
11     A.    No.
12     Q.    You don't know what the factors are
13 that inform the DEA's decision-making process
14 in determining what an annual aggregate
15 production quota should be for any particular
16 year?
17         MS. KEARSE:  Object to form.
18     A.    I -- I don't have any -- I'm not
19 familiar with this process.
20     Q.    This is the first time you're
21 hearing about that, as we sit here today?
22     A.    Yes.
23     Q.    Do you know whether or not the DEA
24 sets annual aggregate production quotas in
25 connection with prescription opioids?

68 (Pages 266 - 269)

Page 270

1     MS. KEARSE:  Object to form.
2     A.   I don't know -- I didn't know that
3  they exist, therefore, by extension, I don't --
4  I'm not aware of any of their activities.
5     Q.   Do you know whether anybody on
6  behalf of Summit County or the ADAMHS Board for
7  Summit County has ever discussed with the DEA
8  or representatives of the DEA the aggregate
9  production quotas for prescription opioid
10  medications for any particular year?
11     MS. KEARSE:  Object to form.
12     A.   I don't -- I don't know.
13     Q.   You're not aware of any such --
14     A.   I'm not.
15     Q.   -- communications?
16     A.   That's correct; I'm not aware.
17     Q.   Do you believe that the United
18  States Drug Enforcement Agency has any
19  responsibility for the opioid epidemic in the
20  country or in Summit County?
21     MS. KEARSE:  Object to form.
22     A.   If you're asking me if they're
23  responsible, they have -- they have a
24  responsibility to address it.  I don't know
25  that they're necessarily responsible for the

Page 271

1  epidemic.  You could kind of interpret that
2  question in two different ways.
3     Q.   That's fair.  I'm asking more about
4  the latter, so let me just rephrase it.
5     Do you, based on all that you know
6  and all that you've investigated and all that
7  you've learned about the opioid epidemic
8  insofar as it concerns Summit County, place any
9  blame for the opioid epidemic in the county at
10  the feet of the United States Drug Enforcement
11  Agency?
12     A.   No, no.
13     Q.   Do you know what the role of
14  wholesale drug distributors are or is in the
15  delivery of health care in the United States?
16     A.   Yes.
17     Q.   What is your understanding about
18  the role of wholesale drug distributors in the
19  delivery of health care in the United States?
20     A.   I think that -- that they receive
21  or -- or are responsible on behalf of the
22  pharmaceutical companies to manage the
23  distribution of those drugs to communities.
24     Q.   When you say on behalf of the
25  pharmaceutical companies, number one, where are

Page 272

1  you getting that information?  Number two, what
2  is your basis?
3     MS. KEARSE:  Object to form.
4     A.   So on behalf of -- I don't know if
5  they buy the drugs from the pharmaceutical
6  companies and then distribute them, or if they
7  are contractually -- so I don't understand that
8  aspect of it.
9     So I guess what I was trying to
10  say, I don't know how that happens, but I know
11  that they are responsible for the distribution
12  of those medications across the United States.
13     Q.   Do you know how they do that or
14  based on what standards wholesale drug
15  distributors deliver medicines to pharmacies?
16     A.   No.  I've only -- I only know as
17  much as I've read in -- in news accounts.
18     Q.   What news accounts have you read
19  about the role of wholesale drug distributors
20  in the delivery of health care in the United
21  States?
22     A.   Just the -- just the various news
23  stories about opiates and, you know, the
24  inclusion of the distributors in that -- in
25  that problem.

Page 273

1     Q.   What news reports have you read
2  about that?
3     A.   Just general newspaper accounts.
4     Q.   Do you recall any particular
5  newspaper reports on the role of wholesale drug
6  distributors?
7     A.   No.  And -- and the newspaper
8  accounts that I've read have mentioned them.
9  They're not necessarily about them.  But
10  I've -- I've read newspaper articles where the
11  distributors were mentioned.
12     Q.   Have you seen any other news
13  reports in print or other types of media about
14  the role of wholesale drug distributors in
15  connection with the opioid epidemic?
16     A.   In news reports you're asking me?
17     Q.   Yes.  And I said in print or any
18  other --
19     A.   Right.
20     Q.   -- form of media reports.
21     A.   In lots of -- you know, I do a lot
22  of reading on the Internet and our local
23  newspaper.  So, yes, I have.
24     Q.   Okay.  What is your understanding,
25  based on those news reports, about the role of

69 (Pages 270 - 273)

Page 274

1  wholesale drug distributors insofar as it does
2  or does not concern the opioid epidemic in
3  Summit County?
4      A.   Well, I guess probably the most --
5  the most disturbing thing that I've read is
6  that there have been communities with very low
7  populations where, you know, they've received
8  exorbitant -- wildly exorbitant numbers of
9  prescription pain medications that would lead a
10  reasonable person to believe that nobody could
11  ever use that much medication at one time.
12      And I believe that the account that
13  I'm referring to was a community in West
14  Virginia.
15      Q.   Do you have any firsthand knowledge
16  about the amounts or volumes of prescription
17  opioids that have been delivered to pharmacies
18  by wholesale drug distributors in any
19  particular geographic region?
20      A.   I do not.
21      Q.   You're basing that on some news
22  reports that you saw?
23      A.   I'm basing that on -- on the things
24  that I've read, yes.
25      Q.   And you haven't conducted any

Page 275

1  analysis of your own to try and understand the
2  role of wholesale drug distributors in
3  connection with the delivery of prescription
4  opioids to pharmacies.  Is that fair?
5      A.   That's fair.  That would be
6  somewhat outside the scope of my realm of --
7  of -- I mean, in order for me to do something
8  about it, I might -- that -- if I felt that
9  there was a role that I could play in that, I
10  might take more of an interest in it, but I
11  didn't feel like it was something that I needed to
12  study.
13      Q.   Okay.  Do you have any firsthand
14  knowledge of the systems that wholesale drug
15  distributors use to detect and prevent
16  diversion of controlled substances?
17      A.   Am I aware of systems that they
18  use?  No, I'm not.
19      Q.   Have you ever looked into that?
20      A.   No.  I've never -- I've never
21  sought that information, no.
22      Q.   Okay.  Have you ever heard of
23  Cardinal Health?
24      A.   I have heard of Cardinal Health.
25      Q.   What have you heard?  How do you

Page 276

1  know about Cardinal Health?
2      A.   Cardinal Health has been involved
3  with a lot of the activities in Ohio in
4  particular, which is what -- where I'm mostly
5  familiar with is the work that they've done
6  with some of our -- our local agencies funding
7  some of the programs and services.
8      Q.   What specific services or programs
9  has Cardinal Health funded in the community?
10      A.   I'm not familiar with all of them,
11  but I do know that they funded a prevention
12  program, for example, in one of the agencies in
13  our community, and they had provided some
14  funding to our -- our board association, and as
15  part of the -- our work that we've done through
16  the opiate conference.
17      Q.   And -- and the prevention program
18  that you had in mind, was that related to
19  opioids?
20      A.   Not sure if it was related to
21  opioids or if it was more of a general
22  prevention program.
23      Q.   Based on your own understanding, do
24  you believe that Cardinal Health is responsible
25  in any way for the opioid epidemic insofar as

Page 277

1  it concerns Summit County?
2      MS. KEARSE:  Object to form.
3      A.   I would have no way of knowing
4  that.
5      Q.   Have you ever heard of McKesson?
6      A.   Yes, I have.
7      Q.   What do you know about McKesson?
8      A.   I -- I know that it's a drug
9  distribution company.
10      Q.   Beyond that do you know anything --
11      A.   No.
12      Q.   -- about them?
13      A.   No.
14      Q.   The question I asked about whether
15  or not Cardinal, in your view, has
16  responsibility in any way for the opioid
17  epidemic in Summit County, would your answer be
18  the same with respect to McKesson,
19  AmerisourceBergen, and any other wholesale drug
20  distributors?
21      A.   I would have no way of knowing.
22      Q.   You have no way of knowing whether
23  or not --
24      A.   Whether they were responsible.
25      Q.   And why is that?

70 (Pages 274 - 277)

1    A.   Because my organization is
2 responsible for the treatment of individuals
3 with mental illnesses and addictions, and that
4 really falls far outside of the scope of what
5 our funding is -- is designated for.
6    Q.   You've indicated a couple of times
7 today that as part of your job responsibilities
8 as the head of the ADAMHS Board, you felt that
9 you had a duty to try to investigate and
10 understand the causes of the opioid epidemic in
11 Summit County.
12       My question for you is whether or
13 not that investigation and work that you've
14 done over the course of your leading of the
15 ADAMHS Board in Summit County has led you to
16 believe that the wholesale drug distributors
17 have responsibility for the opioid epidemic in
18 Summit County.
19       MS. KEARSE:  Object to form.
20    A.   Through my work at the ADM Board
21 and -- and some of the -- some of the
22 reading that I have done, I've come to
23 understand that that's the case, but I don't
24 know that I have direct knowledge that that's
25 the case.

1    Q.   Well, just back up for a second.
2    A.   Okay.
3    Q.   When I asked you about this before,
4 you talked about drug reports -- or I'm
5 sorry -- media reports.
6    A.   Yes.
7    Q.   And you said really that's the only
8 thing you've ever read about that, right?
9    A.   Right.
10    Q.   Okay.  And then when I asked you
11 whether or not you had a view as to whether
12 Cardinal Health, McKesson, AmerisourceBergen,
13 or any other wholesale drug -- or --
14    A.   Uh-huh.
15    Q.   -- distributor had responsibility
16 for the opioid epidemic --
17    A.   Uh-huh.
18    Q.   -- in the county, you said you
19 would have no way of knowing that, right?
20       MS. KEARSE:  Object to form.
21    A.   Personally, yes.
22    Q.   Okay.  And so when you say you've
23 come to understand that, what are you talking
24 about?
25    A.   I guess what I'm saying is that

1 if -- if I were asked to prove that these --
2 these companies were responsible, I don't
3 necessarily think that I could prove it, but
4 I've read enough information and that -- that I
5 wouldn't have a difficult time believing that
6 that's the case.
7    Q.   Is that based on the media reports
8 that you were talking about?
9    A.   It's based on the media reports.
10 It's based on the other information that's
11 been -- that's been made available to me
12 through the -- I guess -- I guess it's
13 generally media reports.
14    Q.   That's what I wanted to make sure
15 we had pinned down.
16    A.   Yeah.
17    Q.   Is there any information other than
18 the media reports that you're having in mind?
19    A.   Well, you know, I've done a lot of
20 reading about different aspects of this
21 problem.  I mean, I've read the -- you know,
22 Sam Quinones' book on Dreamland, and -- and I'm
23 just trying to -- you know, in my mind's eye, I
24 was just trying to determine whether or not
25 there was any mention of the distributors in

1 that -- in that book.  But, you know, I just --
2 I just can't recall.
3    Q.   Okay.  So you're not aware, sitting
4 here today, whether or not in your own
5 investigation of the opioid epidemic, insofar
6 as it concerns Summit County, you determined
7 that wholesale drug distributors had
8 responsibility for the opioid epidemic in the
9 county.  Is that fair?
10       MS. KEARSE:  Object to form.
11    A.   That I have information that
12 would -- that I could arrive at that
13 determination?
14    Q.   Yeah.  My -- my que- -- let me --
15 let me just --
16    A.   Okay.
17    Q.   -- make sure the question is clear.
18    I -- we talked about how you had
19 done your own investigation and analysis to try
20 and understand the causes of the opioid
21 epidemic in Summit County, right?
22    A.   Yes.  Well, let me -- let me take
23 issue with that.  I haven't done my --
24    Q.   Okay.
25    A.   -- research to understand it.  I

71 (Pages 278 - 281)

Page 282

1 have read things that I have run across. I
2 haven't -- I haven't done an exhaustive
3 research on these issues.
4      What I do is I read information as
5 it's -- as it comes before my attention, but
6 it's not that I'm out there doing research on
7 this issue.
8      Q.  What -- what are the sources of
9 information that you use when you go around
10 presenting to people about the causes of the
11 opioid epidemic in Summit County?
12      A.  Some of it was from presentations
13 that have been done other places where I've
14 picked up some of the -- the talking points.
15 I've -- you know, I've read articles. I've
16 read newspaper articles that have citations,
17 and, you know, usually I'll at least want to
18 understand where that citation came from so
19 that I'm not just putting out information
20 that's -- you know, that's not necessarily --
21 that's just -- that somebody just makes a
22 statement.  There has to be some sort of a
23 basis for that information.
24      And so our board association has
25 sent people to us.  Our -- the experiences of

Page 283

1 the folks in our Opiate Task Force and their
2 collective knowledge and input about that have
3 all kind of helped to inform me about this
4 issue and the way that I understand it.
5      Q.  Okay.  And -- and you put that
6 together in slide decks, and sometimes you use
7 those slide decks as part of your presentation,
8 right?
9      A.  The Opiate Task Force's speakers
10 bureau put this together in a -- and I -- in a
11 slide deck, and then I modify that slide deck
12 for my use.
13      Q.  And as part of the discovery
14 process, as I'm sure you understand, we've had
15 the opportunity to see at least some of the
16 slide decks that you've used and that others at
17 the ADAMHS Board have used.
18      Do you recall ever in, any of your
19 presentations to the community about why there
20 was an opioid epidemic in Summit County, saying
21 that you believed that wholesale drug
22 distributors were at least partly responsible
23 for the opioid epidemic in the county?
24      MS. KEARSE:  Object to form.
25      A.  I'm not sure that I've ever singled

Page 284

1 out the distributors.  I may have lumped them
2 together with the pharmaceutical companies.  So
3 there could be -- there could be talking points
4 in my slide deck that -- that talk about opiate
5 manufacturers and distributors.
6      Q.  And if I represent to you that
7 there's not, would that surprise you?
8      A.  That there's not what?
9      Q.  Any reference to wholesale drug
10 distributors.
11      MS. KEARSE:  Object to form.
12      A.  That wouldn't surprise me, no.
13      Q.  As you sit here today, do you
14 recall ever arriving at a conclusion that in
15 your view the opioid epidemic in Summit County
16 had been driven in part by wholesale drug
17 distributors?
18      MS. KEARSE:  Object to form.
19      A.  No.
20      Q.  Do you believe that the County
21 itself shares any responsibility for the opioid
22 epidemic in Summit County?
23      A.  So when you say "the County," what
24 are you talking about?
25      Q.  I'm talking about County government

Page 285

1 and the -- the organs and various departments,
2 divisions and programs of the County.
3      A.  I don't know.  I'd have to think
4 about that.  There's -- there's a lot of places
5 where the County touches individuals.
6      That they're responsible for the
7 opiate epidemic?
8      Q.  Yeah.  The question I asked you is
9 whether you believe that the County itself
10 shares responsibility for the opioid epidemic
11 in Summit County.
12      MS. KEARSE:  Object to form.
13      A.  By sharing the -- by sharing the
14 responsibility if you mean contributing to?
15 No, I don't think so.
16      Q.  Why not?
17      A.  I'm just -- I'm just trying to walk
18 through the different parts of the County to
19 say -- to look at how the County might -- how
20 the County might impact this issue, and I don't
21 know that there are -- I don't think that they
22 made any -- any kind of a contribution to that,
23 that I can -- that I can think of.
24      Q.  In your view has the County -- in
25 retrospect, as we sit here in early 2019 and

72 (Pages 282 - 285)

Page 286

1  you look back at the opioid epidemic in Summit
2  County, do you believe that there are different
3  decisions made or priorities set that the
4  County could have made or set that didn't --
5  but did not --
6        MS. KEARSE:  Objection.  Calls for
7  speculation.
8        Q.   -- in the last decade or so?
9        MS. KEARSE:  Objection.  Calls for
10  speculation.
11        A.   I -- I don't know.  I don't know.
12        Q.   I know that the "calls for
13  speculation" is intended to help you answer
14  that question, but I'm asking your opinion.
15  I'm not asking about -- just to clarify, I'm
16  not asking about what other people did.  I'm
17  asking whether you have a view here today
18  about, in retrospect, whether or not the County
19  could have made decisions or set priorities
20  differently than they did --
21        MS. KEARSE:  And I -- I object
22  to --
23        MR. BOEHM:  I'm sorry.  I'm not
24  done.
25        Q.   -- in a way that would have perhaps

Page 287

1  helped out with respect to the opioid epidemic?
2        MS. KEARSE:  I object to form
3  again.
4        A.   I don't have -- I don't have any
5  personal feelings about the County's role in --
6  in the opiate epidemic.
7        Q.   You don't have any suggestions,
8  anything in retrospect or views about what the
9  County could have done differently?
10        MS. KEARSE:  Object to form.
11        A.   No, I don't.
12        Q.   Do you believe that the State of
13  Ohio shares responsibility for the opioid
14  epidemic in the state and in Summit County?
15        MS. KEARSE:  Object to form.
16        A.   I -- I think that the State has
17  some responsibility in the -- in the sense that
18  they've been very slow to respond with funding
19  for us to address it.  But that -- I guess that
20  would be my complaint with the State.
21        Q.   When you say they have been slow to
22  address the opioid epidemic, what is it that
23  you mean by that?
24        A.   That there was a call for state of
25  emergency to address the opiate epidemic,

Page 288

1  particularly on the heels of an event that
2  occurred here in July of 2016, and we felt --
3  we felt as though the -- the State could have
4  been more helpful.
5        Q.   Okay.  Setting the events of 2016
6  aside, are there other ways in which you
7  believe the State was slow to respond to the
8  opioid epidemic that contributed to the scope
9  and scale of the epidemic in Summit County?
10        MS. KEARSE:  Object to form.
11        A.   I -- I don't have an opinion.
12        Q.   We looked earlier at the 2010
13  report --
14        A.   Uh-huh.
15        Q.   -- from the governor.  He put
16  together that prescription drug abuse task
17  force.
18        Do you remember that?
19        A.   Yes.
20        Q.   Do you believe generally that the
21  State has been slow to respond to the opioid
22  epidemic in Ohio?
23        MS. KEARSE:  Object to form.  Asked
24  and answered.
25        A.   I don't know if they've been slow.

Page 289

1  I think their response has been inadequate.
2        Q.   In what ways do you think the
3  State's response to the opioid epidemic has
4  been inadequate?
5        A.   I believe that when we sought help
6  from the State, that they came and they talked
7  to us, but that was essentially all they did.
8        Q.   When was that?  When did you seek
9  help from the State?
10        A.   In particular, in 2016, after
11  this -- after we had the spate of -- the spike
12  in our overdoses and deaths.
13        Q.   Those overdoses that you're
14  referring to in 2016 were largely driven by
15  fentanyl overdoses; is that correct?
16        MS. KEARSE:  Object to form.
17        A.   They were largely due to an influx
18  in carfentanil in our community.
19        Q.   And that was illegal carfentanil,
20  correct?
21        A.   It was -- it was illegally -- it
22  was being used illegally, yes.
23        Q.   And carfentanil is not something
24  that's prescribed for use in humans to treat
25  pain, right?

73 (Pages 286 - 289)

1    A.   Right.  It's an elephant
2  tranquilizer.
3        - - - - -
4        (Thereupon, Deposition Exhibit 19,
5        Ohio House of Representatives
6        Prescription Drug Addiction and
7        Healthcare Reform Legislative Study
8        Committee Chairman's Report,
9        SUMMIT_001017850 to 001017865, was
10       marked for purposes of
11       identification.)
12       - - - - -
13   Q.   Okay.  I'm going to show you this
14  document that's been marked as Exhibit 19 for
15  purposes of the deposition today.  It's an
16  October 17th, 2013 --
17   A.   Uh-huh.
18   Q.   -- report from the Ohio House of
19  Representatives Prescription Drug Addiction and
20  Healthcare Reform Legislative Study Committee.
21  That's a mouthful.
22       Do you see that?
23   A.   Yes.
24   Q.   And the chairman of this committee
25  was Representative Robert Cole Sprague.

1        Do you see that?
2   A.   Yes.
3   Q.   Do you know Representative Sprague?
4   A.   Yes.  I know Representative
5  Sprague.
6   Q.   Have you ever had any conversations
7  with Representative Sprague about the opioid
8  epidemic in Ohio or in Summit County?
9   A.   I had several conversations with
10  Representative Sprague about the opiate
11  epidemic and -- and our needs in Summit County.
12   Q.   When have you had those
13  conversations?
14   A.   Boy.  You know, I've -- I've talked
15  to Representative Sprague probably three or
16  four times over the past three -- three years.
17   Q.   What have you discussed with
18  Representative Sprague insofar as it concerns
19  the opioid epidemic in Summit County?
20   A.   We -- we talked to him about the
21  need to keep Medicaid expansion, because
22  they're -- in spite of the fact that we did
23  have Medicaid expansion, it was threatened on a
24  number of occasions.
25       We talked to Representative Sprague

1  about the disbursal of funding to address the
2  opiate epidemic.
3        And -- and we've had -- we had
4  several conversations with him as part of our
5  board association.
6   Q.   Do you recall ever having had a
7  conversation with Representative Sprague about
8  the causes of the opioid epidemic?
9   A.   I don't believe we ever talked
10  about the causes.
11   Q.   Have you seen this report before
12  that's been marked as Exhibit 19?
13   A.   I have not.
14   Q.   I want to direct your attention to
15  page 6 of the document.  It's Roman numeral
16  III, which is entitled, quote, "A
17  State-Sponsored Problem."
18        Do you see that?
19   A.   Yes.
20   Q.   And this section of the document
21  goes on to relate, in the view of the Ohio
22  House of Representative Committee, who looked
23  at this issue, the ways in which the State
24  itself has contributed to the opioid epidemic.
25        Do you see that?

1   A.   Yes.
2   Q.   The first in the list provided is
3  the fact that the general assembly passed the
4  Intractable Pain Act in 1998.
5        Do you see that?
6   A.   Yes.
7   Q.   And we talked a little bit about
8  that earlier.  Do you remember that?
9   A.   Yes.
10   Q.   And I think you said you weren't
11  familiar with the details?
12   A.   Right.
13   Q.   And remind me, did you know
14  generally what this act of legislation was
15  about?
16   A.   No.
17   Q.   Do you know in what way the
18  Intractable Pain Act in 1998, quote, "opened
19  the floodgates for doctors to treat chronic
20  pain with prescription opioids"?
21   A.   Do I know in what way?  No.
22   Q.   Do you agree or disagree with the
23  conclusion of this committee of the Ohio House
24  of Representatives about passage of the
25  Intractable Pain Act and its impact on the

74 (Pages 290 - 293)

Page 294

1 opioid epidemic?
2     A.   I would have to read the report
3 to -- in full to offer an opinion.
4     Q.   Are you familiar with the Ohio
5 medical board?
6     A.   I know there is an Ohio medical
7 board.  I'm not familiar with it, and I've
8 never had any interactions with the Ohio
9 medical board.
10     Q.   Do you know what the basic
11 responsibility of the Ohio medical board is?
12     A.   No.  I couldn't -- I couldn't state
13 that to you cogently.
14     Q.   Do you know that the Ohio medical
15 board is the entity that sometimes brings
16 investigations against licensed physicians?
17         MS. KEARSE:  Object to form.
18     A.   Against physicians?  No, I -- I was
19 not aware of that.
20     Q.   Number 2 on this page 6 of Exhibit
21 19 says, "The Ohio medical board and others
22 throughout the country convinced the medical
23 community to adopt pain as the fifth vital
24 sign."
25         Do you see that?

Page 295

1     A.   Yes, I do.
2     Q.   Do you agree with that statement?
3     A.   Do I agree with this -- do I agree
4 that -- with what is in this report?
5     Q.   Yes.  This statement that I just
6 read.
7     A.   This statement that the Ohio
8 medical board and others throughout the county
9 [sic] convinced the medical community to adopt
10 pain as the fifth vital sign?
11     Q.   Yes.
12     A.   Do I agree with that?  I would
13 accept that that's true.
14     Q.   Do you know in what way the Ohio
15 medical board and others convinced the medical
16 community to adopt pain as the fifth vital
17 sign?
18     A.   I have no idea.
19     Q.   Okay.  Number 4 -- just skipping
20 down for a second -- refers to Medicaid and
21 Medicare, and it talks about grading hospitals
22 and physicians.
23         Do you see that?
24     A.   Yes.
25     Q.   Is that what you were referring to

Page 296

1 earlier when you talked about patient
2 satisfaction surveys?
3     A.   Yes, in part.
4     Q.   Okay.  And Medicaid and Medicare
5 are federal systems, right?
6     A.   Yes, they are.
7     Q.   Okay.  So is it your understanding
8 that the Medicaid and Medicare systems were
9 requiring patient satisfaction surveys that
10 informed the grading of hospitals and
11 individual physicians?
12         MS. KEARSE:  Object to form.
13     A.   I accept what's stated here, yes.
14     Q.   You indicated earlier today that
15 you're familiar with the concept of pill mills,
16 right?
17     A.   Yes.
18     Q.   And I think you said that some pill
19 mills have been shut down in Summit County; is
20 that right?
21     A.   Yes.
22     Q.   What are the pill mills in Summit
23 County that have been shut down?
24     A.   I -- I don't know the specifics.  I
25 don't know the names of the -- of the people

Page 297

1 who are involved in these -- in this -- in this
2 massive overprescribing.
3         I know that there was a physician
4 that was connected to Summa, for example, who
5 was arrested for operating a -- pill mill.
6 I -- and I'm aware of a couple of others
7 anecdotally.
8     Q.   Do you know how many pill mills
9 have operated in Summit County?
10     A.   Specifically, no.
11     Q.   Do you know roughly?
12     A.   Three or four.
13     Q.   And do you know the physicians or
14 other individuals who ran those pill mills?
15     A.   Not personally, no.
16     Q.   Do you believe that unscrupulous
17 individuals who have ran or presently run pill
18 mills have responsibility --
19         MS. KEARSE:  Object to form.
20     Q.   -- for the opioid epidemic in
21 Summit County?
22         MS. KEARSE:  Object to form.
23     A.   Can -- can you ask me the first
24 part of that question again?
25     Q.   Sure.  Do you believe that

75 (Pages 294 - 297)

1 unscrupulous individuals who have run or run
2 pill mills have responsibility for the opioid
3 epidemic in Summit County?
4      MS. KEARSE:  Object to form.
5      A.   In part, yes.
6      Q.   How so?
7      A.   That when they flood the market
8 with medications, they're feeding the problem.
9 And -- and once -- once they're removed from
10 the communities, then that leaves a void and
11 typically the dealers step in to fill that
12 void.
13      Q.   Do you believe that drug dealers
14 have responsibility for the opioid epidemic in
15 Summit County?
16      A.   In part, yes.
17      Q.   To what extent do you believe drug
18 dealers are responsible for the opioid epidemic
19 in the County?
20      A.   I couldn't assign a number or a
21 percentage of responsibility.
22      Q.   How would you characterize the
23 extent of the responsibility, even if you don't
24 use a number?
25      A.   They've been more than happy to

1 step in and fill the void.
2      Q.   Okay.  How would -- how would you
3 characterize the -- the nature of their
4 contribution to the epidemic in Summit County?
5      MS. KEARSE:  Object to form.
6      A.   They've introduced more lethal and
7 more potent substances into the community.
8      Q.   Are you referring to fentanyl and
9 carfentanil?
10      A.   Yes.
11      Q.   And are you referring to --
12      A.   And methamphetamine and other --
13 and other very potent drugs of abuse.
14      Q.   And cocaine?
15      A.   Yes.
16      Q.   We talked earlier today a little
17 bit about the cultural mindset of using pills.
18 Do you remember that?
19      A.   Yes.
20      Q.   To what extent do you believe that
21 a cultural mindset of taking prescription
22 medicines to address pain is responsible for
23 the opioid epidemic in Summit County?
24      A.   I think that that's -- that's --
25 they are -- that that cultural mindset is in

1 part responsible.
2      Q.   And -- and to what extent would you
3 ascribe responsibility for the opioid epidemic
4 in Summit County to a broader cultural mindset
5 about the use of prescription medications?
6      MS. KEARSE:  Object to form.
7      A.   Because -- because all of these
8 factors are linked to one another, I think that
9 you could make the argument that aggressive
10 marketing, aggressive advertising of
11 pharmaceuticals create, in part, that culture.
12 So I -- I see that that culture is very much
13 a -- a product of the marketing campaigns.
14      Q.   And when you talk more broadly
15 about the cultural mindset and marketing of
16 pharmaceutical medications, are you talking
17 about the marketing of prescription opioid
18 medications particularly, or are you talking
19 just generally about marketing of
20 pharmaceutical products?
21      MS. KEARSE:  Object to form.
22      A.   I'm talking about the overall
23 culture, because I believe that that translates
24 irrespective of the issue for which you're
25 seeking treatment.

1      Q.   Is it your view that pharmaceutical
2 manufacturers should not be permitted to
3 advertise their products?
4      A.   That pharmaceutical companies
5 should not be?  I believe that -- I believe
6 that there should be some controls put on the
7 information that's put out there.
8      Q.   Do you know if there already are
9 controls in place in terms of the information
10 that pharmaceuticals can use to advertise their
11 products?
12      A.   Evidently not enough.
13      Q.   So your view is there ought to be
14 more controls than there currently are?
15      A.   I think that's worth considering,
16 yes.
17      Q.   What additional controls do you
18 believe ought to be put in place in terms of
19 pharmaceutical manufacturers' marketing of
20 their products?
21      A.   I don't know.  I guess I've never
22 thought about it until -- until being asked
23 about it.
24      Q.   Okay.  So you -- you don't have any
25 particular suggestions?

76 (Pages 298 - 301)

Page 302

1    A.   I don't have anything that comes
2  immediately to mind, no.
3    Q.   Okay.  And you don't have any
4  particular criticisms of the particular
5  guidelines currently in place for the
6  advertising of pharmaceutical products?
7    A.   I'm not aware of the guidelines
8  that are currently in place.
9    Q.   You mean you're not familiar with
10  the guidelines?
11    A.   I'm not -- I'm not aware that there
12  are guidelines, and I'm not familiar with any
13  guidelines that may exist.
14    Q.   Okay.  You indicated a couple of
15  times that Summit County set up this group
16  called the Opiate Task Force.
17       Do you remember that?
18    A.   Yes.
19    Q.   Did I hear you right that that was
20  established in 2014?
21    A.   Yes.
22    Q.   Why did Summit County establish the
23  Opiate Task Force?
24    A.   Because the community was seeing
25  more and more of an impact.  And as we

Page 303

1  interacted in our planning function with other
2  parts of our community, we were hearing more
3  and more about the impact of opiates in the
4  health care system, in other social service
5  agencies, and so we felt as though a lot of the
6  issues that we were hearing about were a lot
7  broader than what the ADM Board could tackle on
8  its own within its -- its particular purview or
9  its particular scope of -- of work.
10       So we felt as though we needed to
11  bring in those other sectors of the community
12  in a similar fashion as a community drug
13  coalition to try to address this so that we
14  could have a broader impact.
15    Q.   Why didn't Summit County or the
16  ADAMHS Board establish an Opiate Task Force
17  earlier than 2014?
18    A.   We -- we wanted to establish it
19  earlier.  Initially we had courted our local
20  drug abuse coalition, and they just didn't seem
21  to be able to get any traction on that, so we
22  determined that it was something that we wanted
23  to do.
24       What we want- -- what we wanted to
25  avoid was that this would be seen as an

Page 304

1  ADM-centric entity.  We really wanted it to be
2  owned by the community.  But it became very
3  clear to us that nobody else in the community
4  was taking the mantle of responsibility, and so
5  I felt as though we couldn't wait for somebody
6  else to take responsibility, so we did.
7    Q.   When did you first put out the
8  feelers in the community to try and assess
9  whether or not others would be willing to form
10  this type of group?
11    A.   Probably 2012 and the first part of
12  2013.
13    Q.   And your -- your general sense was
14  that there was a somewhat unenthusiastic
15  reaction?
16       MS. KEARSE:  Object to form.
17    A.   I think -- I think the way that I
18  looked at it was in assessing the capability of
19  that organization to take that on left me to
20  decide that it probably wasn't going to happen.
21    Q.   What was that organization?  I'm
22  not sure I caught that.
23    A.   I'm -- I'll have to -- I can't
24  remember the name of the organization just
25  because of -- because I'm trying so hard to

Page 305

1  remember the name of the organization.  Summit
2  County Community Partnership.
3    Q.   Is that the name of the
4  organization?
5    A.   That's the name of the
6  organization.  It just came to me.
7    Q.   Who runs that?
8    A.   Darryl Brake.
9    Q.   Why did you think that that entity
10  would be an appropriate place to house an
11  Opiate Task Force?
12    A.   Because they -- because they were
13  not -- they were not staffed, and they did not
14  appear to -- they did not appear to be moving
15  in a -- in a direction that would suggest that
16  they were -- that they were capable of doing
17  that.
18    Q.   No.  My question was why did you
19  initially consider them to be a good
20  candidate --
21    A.   Okay.
22    Q.   -- even if you concluded ultimately
23  that they were not, to house the opiate task
24  force?
25    A.   Because they were a community

77 (Pages 302 - 305)

Page 306

1 coalition, and a -- and a coalition engages all
2 the sectors of the community.  So they already
3 had a relationship with the business community,
4 with health care, with some of the others as
5 part of the other work that they did.
6      Q.   To what extent do you assign
7 responsibility to drug cartels and other
8 transnational criminal organizations for the
9 opioid epidemic in Summit County?
10      MS. KEARSE:  Object to form.
11      A.   How would I characterize their
12 responsibility?  Or how would I --
13      Q.   That's one way of saying it.  I
14 think I asked you to what extent do you assign
15 responsibility to the cartels and the other
16 international criminal organizations?
17      MS. KEARSE:  Object to form.
18      A.   As I've said in -- to these types
19 of questions in the past, I think they played a
20 role.  I don't know that -- how I would rate
21 their role in comparison to some of these other
22 factors.
23      Q.   Okay.  You do know that drug
24 cartels and international criminal
25 organizations have played a significant role in

Page 307

1 fueling the opioid epidemic in the United
2 States, fair?
3      MS. KEARSE:  Object to form.
4      A.   I -- I think that would be a
5 reasonable conclusion.
6      Q.   And we've talked about a lot of
7 things, contributing factors.  We spent a lot
8 of time today going through them.
9      A.   Uh-huh.
10      Q.   Are there any contributing factors
11 to the opioid epidemic in Summit County that
12 you believe we've not already discussed today
13 that I've forgotten about or that have been on
14 your mind?
15      MS. KEARSE:  Object to form.
16      A.   None that come to mind.
17      Q.   Okay.  Do you agree that the opioid
18 epidemic in the country, in Ohio, and in Summit
19 County is extraordinarily complex and
20 multifaceted?
21      MS. KEARSE:  Object to form.
22      A.   I would agree that it is very
23 complex.
24      Q.   And do you agree that it's
25 extraordinarily multifaceted?

Page 308

1      MS. KEARSE:  Object to form.
2      A.   Yes, I would say that it's very
3 multifaceted.
4      Q.   And I know this is difficult, but
5 if you were to allocate responsibility for the
6 various factors, individuals, entities that you
7 believe have contributed to the opioid abuse
8 epidemic in Summit County, what factor would
9 you rank as number one?
10      MS. KEARSE:  Object to form.
11      A.   Wow.  I don't know.
12      I -- from -- from all things
13 that -- that, you know, I've read about and all
14 the information that's come to me, I believe
15 that had it not been for the number of
16 prescription pain medications that have been
17 distributed throughout the communities, and
18 particularly in some of the areas -- and again,
19 I go back to some of the reading that I've done
20 through Sam Quinones' Dreamland and others --
21 that had those -- had those -- had those pill
22 mills and those -- and those prescription pain
23 medications not been so widely available, that
24 there may not have been a ready market waiting
25 for the -- the cartels to come in.

Page 309

1      So I would have to say that
2 without -- without having a -- a ready market,
3 that the -- the pills really set the table for
4 that to occur.
5      Q.   Okay.  And -- and why is it that
6 you think there were more pills in the
7 communities?  You talked about the -- the
8 amount of pills in the -- in Summit County.
9      A.   Uh-huh.
10      Q.   What are the factors that you think
11 inform the -- the number of pills that you see?
12      A.   The factors that informed the
13 number of pills?
14      Q.   Yeah.
15      A.   I don't know what you mean by that.
16      Q.   Well, we've talked about a lot of
17 things today.  We've talked about changes of
18 prescribing guidelines.  We've talked about
19 treating pain as the fifth vital sign.  We've
20 talked about diversion.  We've talked about a
21 lot of things.
22      And so I'm just trying to
23 understand, when you talk about there were
24 pills in the community, what is it that you
25 think explains that?

78 (Pages 306 - 309)

Page 310

1    MS. KEARSE:  Object to form.
2    A.    Well, you know, all of those things
3 I think play a role, but I think that the
4 unscrupulous prescribers have -- certainly have
5 a role, but they would not have had access to
6 the medications to prescribe had it not been
7 for the drug companies that provided them
8 inordinate -- exorbitant amounts of these pain
9 medications for them to be able to prescribe.
10    Q.    Okay.  Do you agree that to some
11 extent opioid abuse and the opioid epidemic in
12 Summit County is due to the disease of
13 addiction itself?
14    MS. KEARSE:  Object to form.
15    A.    Do I believe that the opiate
16 epidemic is due to the disease of addiction
17 itself?
18    It's a -- it's a -- the disease of
19 addiction is triggered by the substance.
20 And -- and so certainly the person who's
21 susceptible to addiction, whether it's somebody
22 who takes the first pill and they're on the
23 road towards addiction, to the person that
24 builds up a tolerance and then finds themselves
25 addicted, I think that, you know, those two

Page 311

1 things work hand in hand.
2    Q.    Okay.  I think you've talked about
3 addiction earlier today as a brain disease.
4    A.    Yes.
5    Q.    Is that, in your view, a fair
6 characterization?
7    A.    That's a fair characterization,
8 yes.
9    Q.    And do you agree that some people
10 are predisposed to the disease of addiction?
11    A.    I believe that some people are
12 predisposed to addiction.
13    Q.    And some people are not, right?
14    A.    That's correct.
15    Q.    And some people can use opioid
16 medications appropriately from a licensed
17 physician and never run any risk of becoming an
18 addict just based on their -- they got the luck
19 of the draw in terms of their biological
20 makeup, fair?
21    MS. KEARSE:  Object to form.
22    A.    I'd say that's fair.
23    Q.    And other people aren't so lucky
24 and might have a predisposition toward
25 addiction, right?

Page 312

1    MS. KEARSE:  Object to form.
2    A.    That's correct.
3    Q.    Is it possible for a licensed
4 physician making a prescribing decision for a
5 legitimate medical need to know in advance
6 whether or not an individual patient is
7 predisposed to the disease of addiction?
8    A.    I believe that any prescriber
9 should treat everyone with universal
10 precautions just like we do with people with
11 HIV.  You treat everybody with the idea that
12 that person could be susceptible.
13    Q.    I -- I guess my question still
14 stands, though.  Do -- do you know whether or
15 not it's possible for a health care provider
16 making a prescribing decision about an
17 individual patient to know in advance whether
18 or not that patient has a predisposition to the
19 disease of addiction?
20    A.    I don't know that, whether that's
21 possible or not.
22    Q.    Do you know, in terms of the
23 overdose data in Summit County, what percentage
24 of the toxicology reports find that individuals
25 who have overdosed on opioids are also using

Page 313

1 psychiatric medications?
2    MS. KEARSE:  Object to form.
3    A.    I've never -- I've never looked at
4 that to -- I've never looked at that, no.
5    Q.    Okay.
6    MS. KEARSE:  Is this a good time
7 for a break?  I know we've been going an hour.
8    MR. BOEHM:  Sure.
9    THE VIDEOGRAPHER:  Off the record,
10 4:29.
11    (A recess was taken.)
12    THE VIDEOGRAPHER:  On the record,
13 5:04.
14 BY MR. BOEHM:
15    Q.    Mr. Craig, welcome back from
16 another of our breaks today.
17    Do you agree that using
18 prescription opioid medications under the care
19 of a licensed physician for a legitimate
20 medical need does not result in addiction or
21 substance abuse for the vast majority of
22 patients?
23    MS. KEARSE:  Object to form.
24    A.    Yes.
25    Q.    You indicated earlier today your

79 (Pages 310 - 313)

1 concerns with respect to, kind of, the amount

2 of opioids that were being prescribed, right?

3    A.   Yes.

4    Q.   And you kind of referred to that, I

5 think to some extent, as overprescribing?

6    A.   Yes.

7    Q.   Do you agree that individual

8 prescribing decisions by licensed prescribers

9 are not made in relation to a particular

10 patient based on how much inventory of a

11 prescription opioid medication there is or is

12 not at a pharmacy?

13       MS. KEARSE:  Object to form.

14    A.   I'm going to ask you to repeat that

15 question again.

16    Q.   Sure.  Do you agree that individual

17 prescribing decisions by licensed prescribers

18 are not made, on a patient basis, based on the

19 amount or volume of a -- of a drug that's

20 available at a neighborhood pharmacy?

21       MS. KEARSE:  Object to form.

22    A.   I would agree with that statement.

23    Q.   They base those decisions, as we

24 discussed earlier, based on individual

25 case-by-case considerations related to the

1 patient, right?

2       MS. KEARSE:  Object to form.

3    A.   Yes.

4       - - - - -

5       (Thereupon, Deposition Exhibit 20,

6       Federation of State Medical Boards

7       Model Policy on the Use of Opioid

8       Analgesics in the Treatment of

9       Chronic Pain, July 2013,

10       SUMMIT_001233672 to 001233700, was

11       marked for purposes of

12       identification.)

13       - - - - -

14    Q.   I'm going to mark the next exhibit

15 here as Exhibit 20 for your deposition.  I'm

16 handing it to you now.

17       MR. BOEHM:  And, Anne, there's a

18 copy for you.

19    Q.   This is a July 2013 document from

20 the Federation of State Medical Boards.  Do you

21 see that?

22    A.   I do see that.

23    Q.   We talked earlier about the Ohio

24 medical board?

25    A.   Yes.

1    Q.   And this is the federal kind of

2 umbrella organization for the state medical

3 boards.  And you see that this document is a

4 model policy on the use of opioid analgesics in

5 the treatment of chronic pain; do you see that?

6    A.   Yes, I do see that.

7    Q.   Have you ever seen this document

8 before?

9    A.   No, I have not.

10    Q.   Are you familiar with the

11 Federation of State Medical Boards?

12    A.   No, I am not.

13    Q.   Did you know that they have, over

14 the course of time, propagated prescribing

15 guidelines for the use of prescription opioids

16 to treat pain, including chronic pain?

17    A.   I'm not aware of any of their

18 activities.

19    Q.   Okay.  If you turn to page 8 of

20 this document, I'm going to direct your

21 attention to a section entitled "Preventing

22 Opioid Diversion and Abuse."

23       Do you see that?

24       MS. KEARSE:  Counsel, I think the

25 witness has testified he's never seen this

1 document.  I don't think there's any foundation

2 to ask him questions about the document.  It

3 speaks for itself.

4    Q.   Do you see that section of the

5 document?

6       MS. KEARSE:  Objection.

7    A.   Yes, I do.

8    Q.   Okay.  If you go to the third

9 paragraph of that section, the first sentence

10 says, "The board will judge the validity of the

11 physician's treatment of a patient on the basis

12 of available documentation rather than solely

13 on the quantity and duration of medication

14 administered."

15       Do you see that?

16    A.   Yes.

17    Q.   Do you agree that the quantity and

18 duration of prescription opioids alone cannot

19 determine the validity of an individual

20 prescribing decision by a licensed physician?

21       MS. KEARSE:  Object to form.

22 Improper question.

23    A.   I -- I'm not a -- I'm not a medical

24 practitioner, so I don't really -- I don't know

25 that I'm qualified to -- to have an opinion

Page 318

1 about that.
2    Q.   Uh-huh.  And you indicated earlier
3 today you're not familiar with any of the
4 federal agencies or specific regulations in
5 place to set quotas for the amount of
6 controlled substances, including prescription
7 opioids, that are made available in the United
8 States, correct?
9    A.   That's correct.
10    Q.   And you're not familiar with any of
11 the specific federal regulations or agencies
12 that govern the distribution of controlled
13 substances, including prescription opioids,
14 true?
15    A.   That's correct.
16    Q.   And you agree that in order to
17 assess whether or not a physician is
18 overprescribing, you have to take into account
19 case-by-case, patient-specific factors, right?
20        MS. KEARSE:  Object to form.
21    A.   Yes.
22    Q.   All right.  You can set that one
23 aside.
24        Going back just for a moment to our
25 earlier discussion about the claims data that

Page 319

1 you have available, we talked about the fact
2 that you can't really distinguish between
3 prescription opioids and illicit opioids in
4 terms of assessing those data.
5        Is that also true with respect to
6 differentiating as between different types of
7 prescription opioids?
8    A.   All our claims data show us is
9 whether or not an opioid was involved.
10    Q.   It doesn't say whether it's
11 prescription or illicit, right?
12    A.   Our claims data only states the
13 classification of the -- of the substance.
14    Q.   Does your claims data allow you to
15 determine, to the extent a substance was a
16 prescription opioid, where that particular
17 prescription was filled?
18    A.   If we don't know whether or not it
19 was a prescription pain medication from our
20 claims data, then, by extension, we wouldn't
21 know where it was filled.
22    Q.   And by extension, you wouldn't know
23 which physician prescribed it?
24    A.   That's correct.
25    Q.   Do you know what percentage of

Page 320

1 prescription opioid medications that are used
2 by individuals for reasons other than a
3 legitimate medical need --
4        MS. KEARSE:  Object to form.
5    Q.   -- are --
6        MS. KEARSE:  Oh, sorry.
7    Q.   -- come from a legitimate
8 prescription from a licensed physician to the
9 individual who is misusing the drug?
10    A.   I have no way of knowing that.
11    Q.   Why don't you have any way of
12 knowing that?
13    A.   Because I don't -- because it falls
14 outside the scope of -- of the work that we do
15 at the board.  We don't investigate the -- we
16 don't investigate the sources and -- and
17 medical -- medical -- we don't -- we don't --
18 it just falls outside of our domain.
19    Q.   Have you ever seen any data that
20 would give you insight into the question of
21 what percentage of prescription opioid pills
22 that are being used or misused for reasons
23 other than a legitimate medical need come from
24 a legitimate prescription from a licensed
25 prescriber to the individual who is misusing

Page 321

1 that drug?
2        MS. KEARSE:  Object to form.
3    A.   No.  I don't have access to any of
4 that kind of data.
5        MR. BOEHM:  Okay.  I'm going to
6 mark this next document as Exhibit 21.
7        - - - - -
8        (Thereupon, Deposition Exhibit 21,
9        3/22/2016 E-Mail Re: The Recorder:
10        Missing Mark on Addiction,
11        SUMMIT_001039666 to 001039667, was
12        marked for purposes of
13        identification.)
14        - - - - -
15    Q.   This is a document that was
16 produced to us by your lawyers here.  And it
17 looks like it's cut-and-paste of an article
18 from a publication called The Recorder.
19 "Missing Mark on Addiction."
20        Do you see that?
21    A.   Uh-huh.
22    Q.   If you look in the third paragraph
23 of this March 20, 2016, article, the third
24 sentence says, "Most, 80 percent, of pills used
25 for a person's addiction don't come from a

81 (Pages 318 - 321)

Page 322

1 legitimate prescription; they come for
2 diversion."
3      Do you see that?
4   A.  Yes, I see that.
5   Q.  Is that true with respect to the
6 percentage of pills used for a person's
7 addiction in Summit County?
8   A.  I don't know.
9   Q.  Do you have any reason to question
10 that statistic based on what you do know about
11 the opioid epidemic in Summit County?
12      MS. KEARSE:  Object to form.
13   A.  I'm sorry.  Can you ask that
14 question again, please?
15   Q.  Do you have any reason to disagree
16 with this statistics here, the 80 percent
17 statistic --
18      MS. KEARSE:  Object to form.
19   Q.  -- that's in this article, based on
20 what you do know about the opiate epidemic in
21 Summit County?
22      MS. KEARSE:  The same objection.
23   A.  I don't have any reason to question
24 this data.
25   Q.  If you go to the next paragraph,

Page 323

1 the last sentence says that, "The real killer
2 is cheap, potent, often tainted heroin."
3      Do you see that?
4   A.  Yes, I see that.
5   Q.  Is that something that you agree
6 with insofar as it concerns Summit County?
7      MS. KEARSE:  Object to form.
8   A.  Opiates are the -- are the real
9 killer.  I don't know.  The -- the fentanyl
10 and -- and carfentanil have been the culprit in
11 most of these fatalities.
12   Q.  You say they have been, or you
13 don't know if they have --
14   A.  They have been.
15   Q.  They have.
16   A.  They have been, yes.
17   Q.  Okay.  For how many years have
18 fentanyl and carfentanil been the primary
19 drivers of opioid-related overdose deaths in
20 Summit County?
21   A.  I would say probably the last five
22 or six years, for sure.  It's been present even
23 before that, but I think the -- the -- that the
24 diverted fentanyl versus the street fentanyl, I
25 think, has become more and more prolific.

Page 324

1   Q.  Okay.  You understand that in
2 Summit County, as in Ohio, as in the United
3 States, that the fentanyl that's being detected
4 in toxicology reports of overdose victims is
5 almost exclusively illicitly manufactured
6 fentanyl, oftentimes from China and Mexico?
7      MS. KEARSE:  Object to form.
8   A.  Yes.
9   Q.  And here in the next paragraph, if
10 you keep going down the article, this
11 individual says, "I'm seeing people whose first
12 drug was heroin.  They did not have a pill
13 problem."
14   A.  I'm sorry --
15   Q.  It's the next paragraph down.
16   A.  From -- which par- -- can you give
17 me a number?
18   Q.  It begins, "For the time" -- "For
19 the first time in 14 years."
20   A.  Okay.
21   Q.  Now, do you see that this person is
22 saying they're seeing people whose first drug
23 was heroin?
24   A.  Yes.
25   Q.  And they did not have a pill

Page 325

1 problem.
2      Are you seeing a similar phenomenon
3 in Summit County in terms of trends of use and
4 initiation of opioid addiction?
5   A.  We don't -- we don't track that.
6 We don't track that, so I would have no way of
7 knowing.
8      We use the national statistics as
9 we become aware of them, and the national
10 statistics -- I think the latest that I've
11 heard is that 83 percent of people who are
12 using illicit drugs start with prescription
13 pain medications.
14   Q.  Do you agree that in Summit County
15 most first-time abusers of prescription opioids
16 obtain them from family or friends, not from a
17 licensed physician?
18      MS. KEARSE:  Object to form.
19   A.  Am I aware that that's the case?
20   Q.  Do you agree?
21   A.  Do I agree?  I don't know.  I don't
22 know that for a fact.
23   Q.  Do you know who Lou LaMarca is?
24   A.  The name doesn't strike a chord.
25   Q.  Have you ever heard of the

Page 326

1 Community Assessment and Treatment Services?
2    A.   No.
3    Q.   When you say "strike a chord," I
4 just want to make sure you mean doesn't ring a
5 bell?
6    A.   It doesn't ring a bell.  No, it
7 doesn't.
8    Q.   I didn't know if you just meant
9 that --
10    A.   That was Ohio vernacular.
11    Q.   -- hearing the -- hearing the name
12 didn't make you angry or anything.
13        MR. BOEHM:  Struggling to find a
14 place for this.  I'm going to put this exhibit
15 sticker in the middle because I found some
16 space there.  It's Exhibit 22.
17         - - - - -
18        (Thereupon, Deposition Exhibit 22,
19        10/10/2017 E-Mail Chain Re: Update
20        from Dr. Gilson, CUYAH_002049206 to
21        002048210, was marked for purposes
22        of identification.)
23         - - - - -
24    Q.   It's an October 2017 e-mail from
25 Lou LaMarca.  And he says -- well, we can

Page 327

1 actually go down a little bit.
2        Do you know here today in Summit
3 County the extent to which individuals
4 suffering from opiate use disorder have
5 initiated their opioid use with heroin or other
6 illicit opioid?
7    A.   No.  We have no way of knowing
8 that.
9    Q.   Okay.
10        MS. KEARSE:  Counsel, I'm just
11 going -- I know you've marked 22.  Is this --
12 this is not a document that's come out of
13 Summit County's file.
14        MR. BOEHM:  Correct.  It's a
15 Cuyahoga County-produced document.
16        MS. KEARSE:  Right.  And -- and the
17 witness has testified he doesn't even know who
18 Lou LaMarca is, and I'm not sure that the
19 witness was a recipient of this e-mail as well.
20        MR. BOEHM:  Okay.
21    Q.   I just have --
22        MR. BOEHM:  Understood.
23    Q.   I just have a quick question for
24 you about it, and then we'll keep moving.
25        MS. KEARSE:  Okay.  Well, I'm going

Page 328

1 to object to this line of question on a
2 document that he's never received that suggests
3 that he's on this e-mail chain --
4        MR. BOEHM:  Okay.
5        MS. KEARSE:  -- and it's a Cuyahoga
6 exhibit.
7        MR. BOEHM:  Okay.
8    Q.   My question for you is in relation
9 to this very short e-mail from Mr. LaMarca --
10    A.   Yes.
11    Q.   -- in relation to this update that
12 he had received from Dr. Gilson.
13        And he says, "It is rare for one of
14 our clients to have started with a medically
15 necessary opioid prescription."
16        Do you see that?
17    A.   I do see that.
18    Q.   Is that true with respect to what
19 you see in Summit County and what you have seen
20 in Summit County?
21    A.   Like I said, before, we don't track
22 that information.  And our Oriana House has
23 tracked that information in the past and -- and
24 has provided us some data, but that was several
25 years ago.

Page 329

1    Q.   Okay.  Receiving a pill for a
2 prescription opioid that didn't come from a
3 doctor but come -- came from family or friends
4 or from a drug dealer on the street or from
5 some other diverted source, like theft, that's
6 not the same as obtaining a prescription pain
7 medication from a licensed physician for a
8 legitimate medical need, fair?
9        MS. KEARSE:  Object to form.
10    A.   That's fair.
11    Q.   Do you know the percentage of
12 first-time abusers of -- of prescription
13 opioids in Summit County who have obtained them
14 from sources other than a licensed physician
15 for a legitimate medical need?
16        MS. KEARSE:  Object to form.
17    A.   I believe I already answered that.
18 We don't track that information.
19    Q.   Would there be any way for you to
20 try and figure that out based on the data
21 available to you?
22    A.   We don't -- we don't capture that
23 data anywhere in our system that I'm aware of.
24    Q.   We talked earlier about
25 conversations you've had with the county

Page 330

1  executive or people from the county executive's
2  office in connection with the opioid epidemic.
3  I want to ask you questions about the county
4  council.
5       Do you ever have communications
6  with the Summit County Council about the opioid
7  epidemic?
8    A.   I've had conversations with council
9  as a whole, and also with individual members,
10  yes.
11   Q.   When have you had those
12  conversations?
13   A.   Periodically, we are called to
14  present to council a financial picture of our
15  agency, and also to offer any information that
16  they might find helpful.
17       Typically, we're responding to a
18  request for information of some sort.  So the
19  county council may reach out to me through
20  their -- through their clerk and ask me to come
21  and be prepared to talk about such-and-such an
22  issue, so -- so we've done that.
23       And I also meet with individual
24  county council members on -- on about an
25  every-other-month basis.

Page 331

1    Q.   And do you discuss with individual
2  county council members the opioid epidemic?
3    A.   In part, along with a lot of the
4  other activities that the board's engaged in.
5    Q.   Are there any county council
6  members who, from your perspective, have taken
7  a particular interest in issues related to the
8  opioid epidemic in the county?
9    A.   By "particular interest," I'm not
10  sure what you mean.
11   Q.   I just mean that they've been more
12  active in wanting to communicate with you or
13  asking questions, or, really, any involvement
14  or interest in the epidemic in the county.
15   A.   There have been a handful of county
16  council members over the years who have reached
17  out to me to get some education or -- or at
18  least a better understanding of the issue, yes.
19   Q.   Okay.  And who are those council
20  members?
21   A.   Tamela Lee was -- was one person.
22  Jeff Wilhite is somebody else.
23       Some individuals who are running
24  for county council who wanted to help -- were
25  interested in learning more about this to help

Page 332

1  inform some of their campaigning.  And I'm
2  drawing a blank on the name of the individual.
3       So there have been -- those are the
4  ones that I can recall at this point in time.
5       - - - - -
6       (Thereupon, Deposition Exhibit 23,
7       ADM Slide Deck Titled "The Opiate
8       Epidemic: Our Community Response",
9       was marked for purposes of
10       identification.)
11       - - - - -
12       MR. BOEHM:  Okay.  I want to mark
13  the next document as Exhibit 23.  I'm giving
14  that to you now.
15       And unfortunately this is a
16  document that was produced in native format,
17  and I do not know the -- if or what the Bates
18  number is, but I'm happy to see if we can track
19  that down and supplement the record on that.
20   Q.   But do you see that this is a slide
21  deck for a presentation from the Summit County
22  ADAMHS Board?
23   A.   Yes.
24   Q.   Are you familiar with this
25  particular slide deck?

Page 333

1    A.   It looks familiar to me.  I
2  would -- I -- I believe that this is one that
3  possibly Dr. Smith used.
4    Q.   Okay.  Do you know if you've ever
5  used this slide deck?
6    A.   I probably used parts of it, but
7  not this specific slide deck, no.
8    Q.   It's a little tricky because,
9  again, we don't have page numbers --
10   A.   Sure.
11   Q.   -- but we'll see if we can muddle
12  our way through it.
13       I want to ask you questions in
14  particular about -- oh, you're almost there.
15  It's the slide that says, "Typical Opiate
16  Heroin Addict."
17   A.   Uh-huh.
18   Q.   "The Current Path to Heroin
19  Addiction."  Do you see that?
20   A.   Yes.
21   Q.   And the first checkmark there says,
22  "Started on prescription pain medication a few
23  years ago for a legitimate injury."
24       Do you see that?
25   A.   Yes, I do.

84 (Pages 330 - 333)

Page 334

1    Q.   I think you testified -- I just
2 want to make sure I understand -- that in
3 Summit County you actually don't track
4 information and can't really provide
5 information about whether or not it's most
6 common for somebody to initiate the use of
7 opioids, prescription or not, based on a
8 legitimate prescription for a legitimate
9 medical need, right?
10    A.   Yes, I did.
11       MS. KEARSE:  Object to form.
12    Q.   And do you -- and do you stand by
13 that testimony, notwithstanding this
14 characterization in this particular slide?
15    A.   Yes.
16    Q.   And you don't know what data, if
17 any, were used to back up the statement that's
18 presented in the first checkmark on this slide?
19    A.   I do not.
20    Q.   Okay.  Do you know if, in Summit
21 County, opioid-related overdose deaths are
22 categorized as between prescription opioids and
23 non-prescription, illegal, illicit opioids?
24    A.   I don't know that.
25    Q.   When did you start paying attention

Page 335

1 to overdose death data from the Summit County
2 office of the medical examiner?
3       MS. KEARSE:  Object to form.  Asked
4 and answered.
5    A.   Sometime after 2014.  During or
6 after 2014.
7    Q.   When you noticed the burgeoning
8 opiate population that we talked about earlier
9 in July -- that was referenced in July 2011,
10 did you, at that time, consider communicating
11 in any way with the office of medical examiner
12 to better understand the information that was
13 coming from there?
14    A.   No.
15    Q.   Do you agree that it would have
16 been helpful for you to have been aware and had
17 access to overdose data from the medical
18 examiner's office for Summit County?
19    A.   Not within the scope of our
20 responsibility, no.
21    Q.   Okay.  Why not?
22    A.   Because we were trying to gauge
23 the -- the demand and capacity for treatment,
24 and looking at overdose data really wouldn't
25 help us to gauge the demand for treatment.

Page 336

1    Q.   But ultimately you did decide it
2 was important to have that, right?
3    A.   The Opiate Task Force decided that
4 that would be a good metric to see whether or
5 not we're making progress in trying to impact
6 this particular aspect of the -- of the
7 epidemic, yes.
8    Q.   Not just making progress, but also
9 to understand better what substances were being
10 used and abused in Summit County, right?
11       MS. KEARSE:  Object to form.
12    A.   I think that was a -- I think that
13 was a secondary benefit of collecting that
14 information.
15    Q.   And it's been useful, for example,
16 to know that it's been fentanyl and carfentanil
17 that have been the primary drivers of overdose
18 death in Summit County, because you know that
19 from looking at the overdose data from the
20 medical examiner's office, right?
21    A.   Yes.
22    Q.   Have you ever read the President's
23 Commission report on the opioid epidemic?
24    A.   Which president are you talking
25 about?  President Trump?

Page 337

1    Q.   I believe that President Trump
2 established a committee to -- to look into the
3 opioid epidemic, and that committee prepared a
4 report.  It was chaired by Governor Chris
5 Christie.
6       Are you familiar with that?
7    A.   I am familiar with that.  I'm
8 familiar with the report.  I don't know -- I
9 don't know if I actually looked at the report
10 itself or not.
11    Q.   You're not sure whether or not
12 you've ever read the report?
13    A.   That's -- that's correct.
14    Q.   Do you have any recollection,
15 sitting here today, that you've ever read the
16 report from the President's Commission?
17    A.   I don't know that I've read the
18 report itself.  We may have talked about some
19 things that were in the report in different --
20 different professional settings, but I -- I
21 cannot recall actually reading the report.
22    Q.   Why didn't you read the report when
23 it came out?
24       MS. KEARSE:  Object to form.
25    A.   Because I didn't feel it would be a

85 (Pages 334 - 337)

Page 338

1 good use of my time.
2    Q.   Why not?
3    A.   Because I was pressed with other
4 things that we were trying to get done in the
5 community.
6        - - - - -
7        (Thereupon, Deposition Exhibit 24,
8        1/21/2011 Document Titled "Craig's
9        List," SUMMIT_001233282 to
10       001233283, was marked for purposes
11       of identification.)
12       - - - - -
13   Q.   Is it fair to say that you believed
14 you had higher priorities, based on your
15 overall responsibilities as the head of the
16 Summit County ADAMHS Board, than reading the
17 President's Commission report on combatting
18 drug addiction and the opioid crisis?
19   A.   Yes.  Now, I did -- I did read
20 newspaper accounts of the report, and there
21 wasn't anything in there that I felt would be
22 particularly -- there was nothing in those
23 accounts that compelled me to read the report.
24   Q.   Are you somebody who typically
25 trusts media reports over primary sources of

Page 339

1 information?
2        MS. KEARSE:  Object to form.
3    A.   No, not necessarily.  But I think
4 that, you know, as part of an overall -- an
5 overarching -- an overarching summary of the
6 information, I think the media generally does a
7 pretty good job of -- of summarizing at least
8 the high points.
9    Q.   In this case, with respect to the
10 President's Commission report on the opioid
11 epidemic, you chose to rely on media reports
12 rather than to review the primary source; is
13 that fair?
14       MS. KEARSE:  Object to form.
15 Mischaracterizes testimony.
16   A.   Not -- not necessarily.  But I
17 did -- I did read, so I wasn't totally
18 unfamiliar with the -- with the contents of the
19 president's report.
20   Q.   You didn't read the report, right?
21   A.   I did not read the report.
22   Q.   You read media reports and you
23 relied on the media reports for your
24 understanding of what the report contained,
25 right?

Page 340

1    A.   Yes.
2    Q.   And my question to you is whether
3 or not you're somebody who typically relies on
4 media reports rather than on the primary
5 sources of information relevant to the job you
6 do in Summit County, and, in particular, as it
7 concerns the opioid epidemic?
8        MS. KEARSE:  Objection to form.
9    A.   Is that a question?
10   Q.   It is.
11   A.   If I -- if I primarily rely on
12 media reports in Summit County to inform the
13 work that we do at the ADM Board?
14   Q.   If -- if you're someone who
15 typically relies on media accounts rather than
16 primary sources of information insofar as it
17 concerns the opiate epidemic.
18   A.   No, I don't primarily rely on media
19 reports.
20       As I said before, there are --
21 there are some things that I read and I -- and
22 information that I -- that I pick up that is --
23 that sources data, and I will often go back to
24 that data source to -- to see where it came
25 from and to check the legitimacy of -- of that

Page 341

1 information.
2    Q.   Okay.  So as you sit here today,
3 having not read the report from the President's
4 Commission, you can't say whether or not
5 there's anything in particular that you
6 disagree with or that you agree with; is that
7 fair?
8    A.   That would be fair.
9    Q.   I'm directing your attention, now,
10 to this document marked as Exhibit 24 to your
11 deposition.  It's dated January 21, 2011, and
12 this is one of these newsletters that you refer
13 to as "Craig's List," right?
14   A.   Yes.
15   Q.   And the title -- what's the title
16 of this particular weekly newsletter?
17   A.   "The Opiate Epidemic."
18   Q.   Did you come up with the title for
19 your weekly newsletter, or did somebody write
20 this for you?
21   A.   That was me.
22   Q.   Certainly by January 21, 2011, it
23 was your view that there was an opioid epidemic
24 in Summit County, right?
25       MS. KEARSE:  Object to form.

86 (Pages 338 - 341)

1    A.    That's what I entitled the form,
2 yes.
3    Q.    And you don't disagree with that,
4 sitting here today, right?
5    A.    That I don't disagree with what?
6    Q.    That there was in your view, as of
7 at least January 21, 2011, an opiate epidemic
8 in Summit County.
9         MS. KEARSE:  Object to form.
10    A.    That's the term I used to describe
11 the -- the opiate problem, yes.
12    Q.    And I'm asking whether or not,
13 sitting here today in early 2019, you some- --
14 you think you somehow got it wrong when in
15 January 2011 you called -- you titled this
16 document "The Opiate Epidemic."
17    A.    Do I think that I got it wrong?  I
18 called it -- I called it what I called it.
19    Q.    Let me say --
20    A.    I called it what I -- I did call it
21 "The Opiate Epidemic," if that's what you're
22 asking me.
23    Q.    And it's fair to say --
24    A.    I wrote that.  It's -- it's my
25 language.  I'm the one that put "epidemic" in

1 there, yes.
2    Q.    And you stand by it?
3    A.    Yes.
4    Q.    Are you familiar with OARRS?
5    A.    Yes, I am.
6    Q.    What is OARRS?
7    A.    It's a mechanism by which the
8 prescribing of certain drugs are tracked
9 through a state-run system that can be accessed
10 by prescribers and other authorized
11 individuals.
12    Q.    Do you know when OARRS was
13 established?
14    A.    I'm not -- I'm not entirely sure
15 when.
16    Q.    Do you agree that ADAMHS Board for
17 Summit County has had access to OARRS data at
18 least since the time that you joined ADAMHS in
19 2007?
20    A.    I'm not sure at what point I became
21 aware that we had access to OARRS data.  I know
22 that I became aware as a result of our
23 discussions through the task force and possibly
24 earlier, but I don't -- I don't know when I
25 became aware of OARRS data being available.

1    Q.    When you -- in and around January
2 of 2011, for example, when you put out your
3 weekly newsletter titled "The Opiate Epidemic,"
4 did you, in or around that time, consider OARRS
5 data as part of your investigation and analysis
6 of the causes of the opioid epidemic in Summit
7 County?
8         MS. KEARSE:  Object --
9    A.    I don't -- I don't believe so.  I
10 don't believe that we began to use OARRS data
11 in an intentional way until we established the
12 Opiate Task Force.
13    Q.    Why didn't you consider using OARRS
14 data before the establishment of the Opiate
15 Task Force here in Summit County?
16    A.    Because it was a result of my
17 involvement in the Opiate Task Force where I
18 began to understand and appreciate the
19 information that was available on the OARRS
20 website.
21         Prior to that, I knew that there
22 was an automated prescription reporting system,
23 but I wasn't aware that there were actually
24 reports that were available publicly.
25    Q.    Okay.  You actually were getting

1 automated reports from the OARRS system before
2 the establishment of the Opiate Task Force in
3 Summit County, true?
4    A.    It's possible.
5    Q.    And you can't say, sitting here
6 today, when you started receiving data and
7 reports from the OARRS system?
8    A.    No, I can't.  I don't -- I don't
9 recall.
10    Q.    And you don't recall when or if
11 ADAMHS Board had access to data from OARRS?
12    A.    I don't know when we had -- when we
13 became aware that we had access to that system.
14         And again, I'm speaking only for
15 myself.  My staff may have known, but I was not
16 aware.
17    Q.    Okay.  Do you recall a time when
18 you first became aware that you had access to
19 OARRS data?
20    A.    I can tell you that when we
21 established the Opiate Task Force, we -- at our
22 first meeting we had a rather robust discussion
23 about the OARRS data and how that data could be
24 helpful to us.
25    Q.    Okay.  Who led that conversation?

87 (Pages 342 - 345)

Page 346

1    A.   I don't know if it was Dr. Smith or
2 Orman Hall, but both of them were at that
3 meeting, and there was discussion about it.
4        - - - - -
5        (Thereupon, Deposition Exhibit 25,
6        10/22/2013 E-Mail Re: OARRS
7        Quarterly Statistics for Summit
8        County, with Attachment,
9        SUMMIT-001017988, was marked for
10       purposes of identification.)
11       - - - - -
12   Q.   I'm giving you a document marked as
13 Exhibit 25 to this deposition that was produced
14 by your lawyers.
15       And do you see this is an example
16 of an automatically generated report --
17   A.   Yes.
18   Q.   -- from the OARRS system sent
19 directly to you as the head of the Summit
20 County ADAMHS Board, right?
21   A.   Yes.
22   Q.   Okay.  And this was sent in October
23 2013?
24   A.   Yes.
25   Q.   Was this before or after the

Page 347

1 establishment of the Summit County Opiate Task
2 Force?
3    A.   It was roughly six months before.
4    Q.   And it says here, "Dear Executive
5 Director, attached to this e-mail is the
6 quarterly statistical report for your county
7 from the Ohio State Board of Pharmacy."
8        Do you see that?
9    A.   Yes, I do.
10   Q.   And the next paragraph says that
11 the OARRS system was established in 2006.  Do
12 you see that?
13   A.   I do see that.
14   Q.   Do you dispute the fact that Summit
15 County and the ADAMHS Board could have had
16 access to data from the OARRS system starting
17 in 2006?
18       MS. KEARSE:  Object to form.
19   A.   So what this document demonstrates
20 is that we were sent information from OARRS,
21 which is -- you know, obviously that's the
22 case.  But it doesn't describe in here anywhere
23 that I'm seeing that it describes that we would
24 have access to data -- additional data online.
25 So I don't know that --

Page 348

1    Q.   Well --
2    A.   So while we've received these
3 reports from the OARRS system, I don't know
4 that that necessarily meant that we had access
5 to anything further than that.
6    Q.   Okay.  You switched it up a little
7 bit --
8    A.   Okay.
9    Q.   -- by throwing in the online thing.
10       I'm asking you just generally, do
11 you know whether or not you had access to OARRS
12 data in 2006?
13       Goodness, I remember a time in our
14 lives when there was no online and we had to
15 get data in the old-fashioned way.
16       So setting aside the online part,
17 my question to you is whether or not you know
18 whether or not the ADAMHS Board in Summit
19 County had access to OARRS data going back to
20 2006, or certainly earlier than October 2013,
21 the date of this e-mail?
22       MS. KEARSE:  Object to form.
23 Twice.
24   A.   I don't know -- I don't know when I
25 knew that the OARRS data was available, when I

Page 349

1 first became aware of that.
2    Q.   Okay.  This particular report from
3 October 2013, you can tell it's automatically
4 generated, right?
5    A.   I don't know how it's generated.
6    Q.   Okay.  Well, it says Ohio Automated
7 Prescription Reporting System.
8    A.   Right.
9    Q.   Right.  And then you have kind of a
10 form e-mail, it looks like.  Do you see that?
11   A.   I do see that.
12   Q.   Do you recall getting other
13 automated quarterly reports from the OARRS
14 system?
15   A.   I don't.  I don't remember.
16   Q.   Is sitting here right now the first
17 time you remember ever having -- or let me back
18 up.
19       As you sit here today, do you
20 remember having ever received this or any other
21 report from the OARRS system?
22   A.   I can say that having seen this, it
23 looks familiar, but I don't have -- I can't
24 draw a recollection of being able to see this
25 report on a regular basis.

88 (Pages 346 - 349)

Page 350

1    Q.    Did you ever endeavor to use data
2  from the OARRS system to try and better
3  understand the opioid epidemic in Summit
4  County?
5    A.    Only in the context of our data
6  dashboard for the Opiate Task Force.
7    Q.    Describe that.  In what respects
8  did you use OARRS data in the context of your
9  data dashboard?
10    A.    We used -- we used the OARRS data
11  to -- to be able to track, over time, the
12  number of opiates dispensed per capita.
13    Q.    And that's information that's
14  actually here in this October 2013 report,
15  right?
16    A.    Yes.
17    Q.    This report is telling you the
18  number of doses dispensed overall in the
19  county, right?
20    A.    Yes.
21    Q.    It's telling you the number of
22  doses dispensed per patient, right?
23    A.    Yes.
24    Q.    And it's telling you the number of
25  doses dispensed per capita?

Page 351

1    A.    Yes.
2    Q.    So you're getting all that
3  information in -- in this automatically
4  generated report, fair?
5    A.    On a quarterly basis.  It looks
6  like that's the case.
7    Q.    Did you or anybody else from the
8  Summit County ADAMHS Board ever use data from
9  OARRS in presentations to the public or other
10  individuals about the opioid epidemic in the
11  county?
12    A.    Yes, I'm sure we did.
13    Q.    Do you agree that the OARRS system
14  is a mechanism to monitor misuse and diversion
15  of controlled substances?
16    A.    Yes, I would agree that that's the
17  case.
18    Q.    And it's also a system that let's
19  you know the volume of prescription opioids
20  that are being prescribed in Summit County,
21  right?
22    A.    Yes.
23    Q.    Do you recall or do you know when
24  in Summit County the volume of prescription
25  opioid -- of prescription opioids began to

Page 352

1  increase?  Let me -- let me strike that.  That
2  was clunky.  I'm going to try this again and
3  see if I do any better.
4        Do you know, in Summit County, when
5  the number of prescriptions for FDA-approved
6  opioid medications began to go upward?
7    A.    Not specifically, no.
8    Q.    Do you know generally?
9    A.    I -- just trying to think in my
10  mind's eye as I -- some of the charts that I've
11  seen that show an increase through the '90s.
12    Q.    Did you know, when you joined the
13  ADAMHS Board in 2007, that the amount of opioid
14  prescribing being done by physicians was
15  increasing in Summit County and elsewhere?
16        MS. KEARSE:  Object to form.
17    A.    No, I did not.
18    Q.    When did you first learn that the
19  amount of prescribing of FDA-approved opioid
20  medications was increasing in Summit County?
21    A.    I don't know when I became aware of
22  it.  I -- I saw a lot of data from -- in a lot
23  of different venues, so -- and I can't pinpoint
24  when I first became aware of that.
25    Q.    Do you know whether Summit County

Page 353

1  classifies fentanyl-related overdose deaths as
2  prescription opioid deaths?
3    A.    I don't know.  I would have to ask
4  the medical examiner.
5    Q.    Have you ever asked the medical
6  examiner's office about that?
7    A.    I have not.
8    Q.    Do you know if there's ever been a
9  time when the Summit County Medical Examiner's
10  Office has classified overdoses from illicit
11  fentanyl as a prescription opioid death?
12    A.    I would have no way of knowing
13  that.
14    Q.    Why do you say you would have no
15  way of knowing that?
16    A.    Because I'm not involved in
17  day-to-day discussions or conversations with
18  the medical examiner to analyze her data.  That
19  may be a better question for Eric Hutzell.
20        MR. BOEHM:  If you guys don't mind,
21  let me take a break and get a little more
22  organized as we head down the stretch.  Does
23  that work?
24        MS. KEARSE:  If that means you'll
25  be done sooner, yeah.

89 (Pages 350 - 353)

Page 354

1      THE VIDEOGRAPHER: Off the record,
2  5:49.
3        (A recess was taken.)
4      THE VIDEOGRAPHER: We're on the
5  record, 6:20.
6  BY MR. BOEHM:
7      Q.  Great.  We're back from another
8  break, Mr. Craig.
9        Earlier today and several times
10 over the course of the day, we've talked about
11 these claims data that you all have at ADAMHS.
12 Do you remember that?
13     A.  Yes.
14     Q.  And I asked you whether or not you
15 knew the names of the software or databases
16 that are used to store the claims data?
17     A.  Yes.
18     Q.  And I think you said that you
19 weren't sure?
20     A.  No.  I know the name of the
21 software.
22     Q.  What's the name of the software?
23     A.  It's -- it's called GOSH.  And we
24 also have claims data that we've navigated over
25 from an old claims system, which is called

Page 355

1  MACSIS.
2      Q.  Okay.
3      A.  Both of those are acronyms.
4      Q.  Are those the two systems that you
5  all use to compute expenditures that you
6  believe are related to opioid use disorder?
7      A.  This -- this is the software that
8  we use to collect claims information for
9  payment purposes and from which we pull claims
10 data.
11     Q.  And you said that MACSIS -- is that
12 M-A-C-S-I-S?
13     A.  Yes.
14     Q.  You said that's the predecessor or
15 the current system?
16     A.  The predecessor.
17     Q.  Okay.  So -- and GOSH?  Is that
18 G-O-S-H?
19     A.  Yes.
20     Q.  Is that the current system?
21     A.  Yes.
22     Q.  When was the GOSH System put in
23 place?
24     A.  Roughly two years ago.
25     Q.  At the time when the predecessor

Page 356

1  system was replaced with the current system,
2  did all of the data from the predecessor system
3  get migrated over to the current system?
4      A.  I believe so.
5      Q.  Okay.  Is there any data in the
6  predecessor system that's not contained in the
7  current system?
8      A.  No.  No.
9      Q.  Would we need to talk to
10 Ms. Peivich in order to confirm that?
11     A.  I think Nick Veauthier, who's our
12 IT specialist, would probably be in a better
13 position to talk about what types of data we
14 have now versus the type of data we had before.
15     My -- my understanding is that we
16 have the ability to track more data in our
17 new -- in our new system than we had in our old
18 system.
19     Q.  Okay.  Which of the two systems did
20 you use for purposes of computing expenditures
21 that you believe are related to the opioid
22 epidemic in -- in Summit County, or did you use
23 both?
24     A.  I don't -- I don't know.  I don't
25 know if we -- I don't know.

Page 357

1      Q.  Who would I have to ask about --
2      A.  You'd have to --
3      Q.  -- which systems were used for the
4  computation?
5      A.  You'd have to ask Nick.
6      Q.  Would Ms. Peivich know that as
7  well?
8      A.  Possibly.
9      Q.  Okay.  Exhibit 2 is a document that
10 we marked and then didn't really spend any time
11 on, so I just wanted to very quickly go back to
12 it.
13     A.  Okay.
14     Q.  You see that document?
15     A.  I do see that document, yes.
16     Q.  And this was an exchange between
17 you and Ms. Walter from November of 2017?
18     A.  Yes.
19     Q.  Is this an e-mail exchange that you
20 had with Ms. Walter?
21     A.  Yes, it is.
22     Q.  Okay.
23     MR. BOEHM:  I'm marking Exhibit 26
24 to your deposition, which is an e-mail exchange
25 from October of 2015.

Page 358

1         - - - - -
2         (Thereupon, Deposition Exhibit 26,
3         10/26/2015 E-Mail Chain Re: CDC
4         Health Advisory - Fentanyl-Related
5         Overdose Fatalities,
6         SUMMIT_001029476 to 001029477, was
7         marked for purposes of
8         identification.)
9         - - - - -
10    Q.    And the e-mail exchange appears to
11 be between yourself and Ms. Kim McMahan.  Do
12 you see that?
13    A.    Yes.
14    Q.    Who is Kim McMahan?
15    A.    She's a reporter and columnist for
16 the Akron Beacon Journal.  Since retired.
17    Q.    Okay.  In this October 26, 2015,
18 exchange, you write to Ms. McMahan at
19 a.m., that "The report was helpful in
20 understanding that this is not a diversion
21 problem."
22         And I'll just note that the subject
23 of this e-mail exchange is "CDC health
24 advisory, fentanyl-related overdose
25 fatalities."

Page 359

1         Did I get all that right?
2    A.    Yes.
3    Q.    Do you remember what this report
4 was about?
5    A.    I need to look at this and then I
6 can -- I can tell you.
7    Q.    Sure.
8    A.    Let me just start at the beginning
9 here.
10         Okay.
11    Q.    Okay.  So I think my question was
12 whether or not you can tell us what this report
13 was about.
14    A.    I don't re- -- I don't recall.  I
15 can only look at it in the context of somebody
16 from public health sent me a health advisory,
17 and we were reacting to the content of that.
18    Q.    Okay.  And it looks like the
19 advisory had to do with fentanyl-related
20 overdose fatalities?
21    A.    Yes.
22    Q.    Okay.  And it was from the CDC?
23    A.    That's correct.
24    Q.    Do you know what the CDC is?
25    A.    Yes.

Page 360

1    Q.    What does CDC stand for?
2    A.    Center for Disease Control and
3 Prevention.
4    Q.    And you indicate that your view is
5 the report had been helpful in understanding
6 that this is not a diversion problem.  Do you
7 recall what you meant by that?
8    A.    As it -- that -- yes, I do recall
9 what I meant by that.  I think it was probably
10 one of the first times that I was aware that
11 there was illicit fentanyl -- illicitly
12 produced fentanyl, synthetic fentanyl, for --
13 for lack a better way of saying it, in our
14 community.  And so -- so the fact that -- that
15 we're seeing that in our community was a
16 sobering fact.
17    Q.    And it says, "I was not aware that
18 it could be so easily manufactured."
19    A.    Yes.
20    Q.    And what did you mean by that?
21    A.    Just what I said.  Just what I
22 said.
23    Q.    That it wasn't being made by
24 pharmaceutical companies; it was being made by
25 drug cartels, often in Mexico and China, right?

Page 361

1         MS. KEARSE:  Object to form.
2    A.    I was -- and again, I don't -- I
3 don't remember exactly what I was reacting to,
4 but I think I was surprised that it could be
5 manufactured in a laboratory.
6    Q.    Okay.  Independent of this
7 exchange, you're aware that the fentanyl that's
8 largely being used in Summit County, and for
9 that matter in other parts of the United
10 States, is largely being manufactured by
11 cartels in other countries?
12         MS. KEARSE:  Object to form.
13    A.    Yes.  And I came to understand that
14 later as I -- as I looked into this a little
15 bit further.
16         - - - - -
17         (Thereupon, Deposition Exhibit 27,
18         March 2018 E-Mail Chain Re: Plan -
19         Progressive Opioid Event, with
20         Attachment, SUMMIT_001102842 to
21         001102843, was marked for purposes
22         of identification.)
23         - - - - -
24    Q.    This is now a document marked
25 Exhibit 27.  It's an e-mail from March 2018,

91 (Pages 358 - 361)

Page 362

1 attached to which there is a slide deck.
2        And this is something that you
3 received in March 2018, right?
4    A.   Yes.
5    Q.   And the title of this deck is, "The
6 Prescription Pill and Heroin/Fentanyl
7 Epidemic," right?
8    A.   Yes.
9    Q.   Again, unfortunately this slide
10 deck does not come with numbers, but if you go
11 to the fourth page you see --
12    A.   The fourth total page or the fourth
13 page of the slide deck?
14    Q.   Yeah.  Thank you.  Fourth page of
15 the slide deck.
16        You see --
17    A.   "The Dealer in your Medicine
18 Cabinet"?  Yes.
19    Q.   Right.  The title of this slide is
20 "The Dealer in your Medicine Cabinet."
21        Do you know what that refers to?
22    A.   Yes.
23    Q.   What -- what is your understanding
24 of that?
25    A.   It refers to diversion.

Page 363

1    Q.   In other words, people taking
2 medications that are not prescribed for them
3 and using them for non-medical needs?
4        MS. KEARSE:  Object to form.
5    A.   Yes, that's --
6    Q.   This particular slide indicates
7 that prescription drugs were the leading cause
8 until 2012, when surpassed by heroin.
9        Do you see that?
10    A.   Yes.
11    Q.   Is that consistent with your
12 understanding of what's happened in Summit
13 County?
14        MS. KEARSE:  Object to form.
15    A.   I don't -- I don't know where this
16 information came from.  I believe this is a
17 slide deck that was used by one of the other
18 presenters, so I don't have any -- he sources,
19 I guess, the Centers for Disease Control,
20 but --
21    Q.   Yeah.
22    A.   -- I don't have -- we don't have --
23 I don't have access to any information in
24 Summit County.
25    Q.   Okay.  Yeah, you're right.  This

Page 364

1 particular statistic appears to come from the
2 CDC, and that was my question, whether or not
3 you had any data in Summit County on this same
4 subject.
5    A.   No, we do not.
6    Q.   If you turn over a couple pages,
7 you see a slide that says, "From Prescription
8 Pills to Heroin:  A New Epidemic."
9    A.   Yes.
10    Q.   And the first bullet point there
11 says, "By 2010, heroin is the number one drug
12 threat in the United States."
13        Do you see that?
14    A.   I do see that.
15    Q.   Do you agree with that statement?
16    A.   I have no way of -- of evaluating
17 that statement.
18    Q.   I'm really asking you, based on
19 your position at the ADAMHS Board for Summit
20 County since 2007 and as its director since
21 2010, in that capacity, do you agree or
22 disagree with the statement that "By 2010,
23 heroin was the number one drug threat in the
24 United States"?
25        MS. KEARSE:  Object to form.

Page 365

1    A.   And -- and I can tell you I don't
2 really know.  I don't know that.
3    Q.   It indicates here that "By 2010,
4 large amounts of heroin were coming into the
5 United States from Mexico."
6        Do you see that?
7    A.   I do see that.
8    Q.   Do you agree with that statement?
9        MS. KEARSE:  Object to form.
10    A.   Again, I don't know.  This is -- I
11 don't know that I can stipulate to this
12 information.  I don't know the source of it,
13 and I don't know -- I can't confirm or -- or
14 deny it.
15    Q.   Uh-huh.  Have you ever undertaken
16 any effort to try and understand when in Summit
17 County large amounts of illicit heroin were
18 coming into the borders of the county?
19        MS. KEARSE:  Object to form.
20    A.   No, I don't believe I have.
21    Q.   Are you familiar with the term
22 "black tar heroin"?
23    A.   Yes, I am.
24    Q.   Is that something that has shown up
25 in Summit County?

Page 366

1    A.   I -- I don't recall reading
2  anything about black tar heroin in Summit
3  County.
4    Q.   So you don't know one way or
5  another whether or not black tar heroin has, in
6  part, fueled the opiate epidemic in Summit
7  County?
8        MS. KEARSE:  Object to form.
9    A.   I've read about black tar heroin in
10  the context of the Dreamland book.  I know that
11  we get some reports from the Ohio Substance
12  Abuse Monitoring Network that mentions that in
13  terms of how available it is and in what
14  form -- how available heroin is and in what
15  form, but I don't have a -- a distinct
16  recollection.
17    Q.   Okay.  As the head of the ADAMHS
18  Board since 2010, do you know whether or not
19  black tar heroin has, in part, driven the
20  opioid epidemic within Summit County?
21        MS. KEARSE:  Object to form.  Asked
22  and answered.
23    A.   I don't know.
24    Q.   Have you ever asked anybody about
25  that?

Page 367

1    A.   From the information that I've seen
2  in the most recent OSAM reports, Ohio Substance
3  Abuse Monitoring Network, black tar heroin is
4  not typically one of the more prevalent --
5  prevalent forms of heroin.
6    Q.   What are the more prevalent forms
7  of heroin that you see in Summit County?
8    A.   There are different
9  characterizations.  Sometimes it's
10  characterized by color.  Sometimes it's
11  characterized by consistency.  I don't -- I
12  don't remember particularly, but there have
13  been certain news reports that have talked
14  about heroin that appears to be like concrete
15  or cement.
16        There have been some that have been
17  characterized to -- by its -- by its color
18  being pink, I believe.  That's what I -- that's
19  what I recall just from sort of in my mind's
20  eye, looking at those reports.
21    Q.   Okay.  This slide deck indicates
22  that the heroin that was coming into the United
23  States from Mexico that represented the number
24  one drug threat to the United States had a
25  direct link to terrorism.

Page 368

1        Do you see that?
2    A.   I do see that.
3    Q.   Would you agree with that statement
4  insofar as it concerns Summit County?
5        MS. KEARSE:  Object to form.
6    A.   I -- I have no way of knowing.
7    Q.   All right.  If you skip down to the
8  bottom of the page, do you see it says, "Heroin
9  and fentanyl are directly linked to Mexico
10  DTOs"?
11    A.   Yes, I do see that.
12    Q.   Okay.  Do you know what that means?
13    A.   I don't know what DTOs are.
14    Q.   Does drug trafficking organization
15  sound right to you?
16    A.   That makes sense, yes.
17    Q.   Is it your understanding that the
18  heroin and fentanyl that you see here in Summit
19  County is linked to Mexican and -- and drug
20  trafficking organizations from other countries
21  as well?
22        MS. KEARSE:  Object to form.
23    A.   I've come to understand that over
24  time, yes.
25    Q.   And, in fact, if you skip over to

Page 369

1  the next slide that's titled "The Fentanyl
2  Threat" -- or maybe it's two slides on.  I'm
3  sorry.
4    A.   Yes.
5    Q.   There's reference to both fentanyl
6  and then carfentanil, sometimes referred to as
7  "China White," and synthetics.
8        Do you see that?
9    A.   Yes, I do.
10    Q.   And it says that those are produced
11  in Mexico and China and shipped to the United
12  States.  Do you see that?
13    A.   I do see that.
14    Q.   And is that your understanding?
15        MS. KEARSE:  Object to form.
16    A.   Is that my understanding that it's
17  shipped from China?  That's my understanding
18  based on reports from law enforcement, yes.
19    Q.   And when you talk about reports
20  from law enforcement, are you talking about
21  from Summit County law enforcement?
22    A.   I'm talking about from
23  presentations that I've heard when I've done
24  presentations with members from the DEA and
25  either some of our local law enforcement

93 (Pages 366 - 369)

Page 370

1 agencies.
2     Q.    What presentations have you done
3 with the DEA?
4     A.    We did a -- we did a presen--- I
5 did a presentation in Barberton, and I did
6 another presentation in Twinsburg, where it was
7 a panel presentation, and we looked at the
8 problem from a variety of perspectives.
9            - - - - -
10        (Thereupon, Deposition Exhibit 28,
11        OSAM Document Titled "Drug Abuse
12        Trends in the Akron-Canton Region,"
13        Summit_001103531 to 001103554, was
14        marked for purposes of
15        identification.)
16           - - - - -
17     Q.    Okay.  I'm giving you a document
18 that I've marked as Exhibit 28 --
19     A.    Yes.
20     Q.    -- for purposes of your deposition
21 here today.
22         And it's a document from the Ohio
23 Substance Abuse Monitoring Network.  Is that
24 the organization that you just referenced not a
25 couple minutes ago in your testimony?

Page 371

1     A.    Yes.
2     Q.    And you're familiar with these
3 periodic reports from the Ohio Substance Abuse
4 Monitoring Network?
5     A.    Yes, I am.
6     Q.    Do you receive and read those when
7 they come in?
8     A.    Yes, I do.
9     Q.    Okay.  This particular report from
10 OSAM -- which is the acronym for that entity,
11 right?
12     A.    Correct.
13     Q.    This particular report from OSAM is
14 from January to June 2017.
15         Do you see that?
16     A.    No.  I'm looking for the date.  Oh,
17 there it is.
18     Q.    The bottom.
19     A.    Okay.  Yes.
20     Q.    And this concerns drug abuse trends
21 in the Akron/Canton region, right?
22     A.    Yes, it is.
23     Q.    And that's where we're here today,
24 in Akron, right?
25     A.    We are in Akron.

Page 372

1     Q.    So if you turn a few pages in, the
2 numbers are -- start at page 25, so you have to
3 get to page 31 to get to the section on heroin
4 and fentanyl.
5         Do you see that?
6     A.    31 -- I'm sorry.  Yes, I see that
7 section.
8     Q.    And then that section, as you're
9 familiar from having read these reports, they
10 sometimes have information that they have
11 done -- they provide information based on their
12 investigations and discussions with individuals
13 in the community, right?
14     A.    Yes, in part.
15     Q.    Right.  And about halfway down that
16 first paragraph in the left-hand column of page
17 31, under the heroin and fentanyl section, do
18 you see it says "Participants reported"?
19     A.    I do see that.
20     Q.    And then it says, "It's easier to
21 find than weed."  In other words marijuana.
22         Do you see that?
23     A.    I do see that.
24     Q.    And do you see that that's in
25 reference to heroin?

Page 373

1     A.    Yes.
2     Q.    And it says, "80 percent of my
3 clients are on heroin."  That's another report
4 there at the bottom.
5         MS. KEARSE:  Object to form.
6     A.    It does say that, yes.
7     Q.    Okay.  Are those statements
8 consistent with your understanding of what's
9 happening or has happened in Summit County?
10 That it's easy to find heroin?
11         MS. KEARSE:  Object to form.
12     A.    These statements help to inform my
13 understanding.  So this -- these are, again,
14 inputs into informing me about better
15 understanding the problem.
16     Q.    Now, if you go a few pages in --
17 and this goes on for a while.  If you go a few
18 more pages over, you'll see on page 34 there's
19 a section about prescription opioids.
20         Do you see that?
21     A.    Yes, I do.
22     Q.    And I want to direct your attention
23 to page 35.  The final paragraph that starts --
24 I'm sorry.  It's the next to last paragraph in
25 the left-hand column of page 35 that begins,

94 (Pages 370 - 373)

Page 374

1 "Participants and community professionals."
2      Do you see that?
3      A.  I do see that.
4      Q.  It says, "Participants and
5 community professionals reported that the
6 general availability of prescription opioids
7 has decreased during the last six months.
8 Participants stated the DEA really cracked down
9 on doctors."
10      See that?
11      A.  I do see that.
12      Q.  It goes on to say, "You almost have
13 to get your arm cut off to get them now."
14      Do you see that?
15      A.  Yes.
16      Q.  And then it refers to stricter laws
17 and issues surrounding overprescribing.
18      Do you see that?
19      MS. KEARSE:  Object to form.
20      A.  Yes, I see that.
21      Q.  Are those statements consistent
22 with your understanding of the trends of opiate
23 use and abuse in Summit County --
24      MS. KEARSE:  Objection.
25      Q.  -- as between heroin and

Page 375

1 prescription opioids?
2      A.  These statements help to inform my
3 understanding.  I don't know that they're
4 consistent with my understanding.  They help to
5 inform my understanding.
6      Q.  Are these statements inconsistent
7 with your understanding in terms of --
8      A.  These particular and my
9 understanding at the time that I read these
10 or -- at now?
11      Q.  As you sit here now.
12      A.  As I sit here now, I wouldn't say
13 it's inconsistent.
14      Q.  Okay.  Do you know that the Ohio
15 Department of Health issues periodic drug
16 overdose data reports?
17      A.  Yes, I am.
18      Q.  And are those reports that you
19 review?
20      A.  Not always, no.
21      Q.  Why not?
22      A.  Because we generate our own
23 reports.
24      Q.  Is it interesting to you to know
25 what the overall trends are in the state of

Page 376

1 Ohio when it comes to drug overdose data?
2      A.  Yes, it is.
3      Q.  Okay.  And that's something you
4 have to get from the Ohio Department of Health;
5 you can't just go to your Summit County people,
6 right?
7      A.  We go through the Ohio Department
8 of Health, CDC, and other sources, yes.
9      - - - - -
10      (Thereupon, Deposition Exhibit 29,
11      Ohio Department of Health Document
12      Titled "2016 Ohio Drug Overdose
13      Data: General Findings,"
14      SUMMIT_001085401 to 001085408, was
15      marked for purposes of
16      identification.)
17      - - - - -
18      Q.  All right.  I'm going to show you
19 one of those reports from 2016.  And I'm --
20 I've marked it as Exhibit 29.
21      It says, "Fentanyl and related
22 drugs like carfentanil, as well as cocaine,
23 drove increase in overdose deaths."
24      Do you see that?
25      A.  I see that.

Page 377

1      Q.  And we've -- we've talked about
2 fentanyl and carfentanil.  Those are those
3 illicit substances we were talking about
4 earlier, right?
5      A.  Yes.
6      Q.  Okay.  If you go down to the fourth
7 paragraph on this first page, do you see where
8 it says, "Fentanyl and related drugs were
9 involved in 58.2 percent of all unintentional
10 drug overdose deaths in 2016"?
11      A.  Yes, I do.
12      Q.  Do you agree that that trend is
13 consistent going back, actually, several years
14 before 2016, that fentanyl and related drugs
15 are driving drug overdose deaths?
16      A.  They certainly played a role, yes.
17      Q.  Well, it played a role, but I'm
18 asking whether or not --
19      A.  I don't know.
20      Q.  -- this trend of them being the
21 primary driver actually goes back several years
22 before 2016.  Do you know?
23      MS. KEARSE:  Object to form.
24      A.  As to whether or not they were
25 drivers, I -- I don't know.  I don't know that

Page 378

1 to be the case.
2     Q.   All right.  Well, let's look at
3 this a little bit further.
4         The last full paragraph on this
5 particular page says that the number of
6 overdose deaths involving heroin had remained
7 relatively flat, right, as between 2016 and
8 2015?
9     A.   Yes.
10     Q.   Okay.  And then if you turn the
11 page to page 2 of this exhibit, there's a
12 section entitled "Unintentional Overdose Deaths
13 Involving Prescription Opioids Continued to
14 Decline."
15         Do you see that?
16     A.   I do see that.
17     Q.   Has that been true in Summit
18 County?
19         MS. KEARSE:  Object to form.
20     A.   As I'm sitting here right now, I
21 don't -- I don't know the answer to that
22 question.
23     Q.   Is that something you have ever
24 known; you just can't remember?  Or is that
25 something you've never paid attention to?

Page 379

1     A.   I've never really paid attention to
2 that.
3     Q.   If you go down to Figure 2 at the
4 bottom of that second page, do you see there's
5 some data that's depicted in this chart?
6     A.   Yes.
7     Q.   And it compares the percentage of
8 unintentional overdose deaths by drug from the
9 year 2010 to the year 2016.  Do you see that?
10     A.   I do see that.
11     Q.   And do you see that the number of
12 prescription opioid deaths is dropping, really,
13 every year between 2010 and 2016.  Do you see
14 that?
15     A.   Yes, I do see that.
16     Q.   And on the contrary -- or by
17 contrast, I should say, fentanyl rises pretty
18 dramatically, right?
19     A.   Yes.
20     Q.   And heroin goes up and then kind of
21 levels off?
22     A.   Yes.
23     Q.   And then you see cocaine goes up,
24 too, right?
25     A.   Yes, I do see that.

Page 380

1     Q.   What's your understanding as to why
2 the number of cocaine overdose deaths goes up
3 as between 2010 and 2016?
4     A.   Well, what I don't know about this
5 data is whether these are drugs that -- that
6 these drugs, while they're the cause of death,
7 whether they were -- whether there were other
8 substances involved, whether -- so I don't
9 really know what to attribute the increase in
10 cocaine deaths to be --
11     Q.   What other sub- --
12     A.   -- during --
13     Q.   -- I'm sorry.  What other
14 substances do you have in mind?
15     A.   I'm talking about having any of
16 these mixed together in -- in a toxicology
17 report.
18     Q.   Do you sometimes see illicit
19 fentanyl mixed together with cocaine in the
20 toxicology reports of an overdose death?
21     A.   I know that there is fentanyl.  I
22 don't know if it's illicit fentanyl or not.  I
23 just know that they're -- the toxicology
24 reports will list fentanyl as one of the
25 ingredients.

Page 381

1     Q.   Combined with cocaine?
2     A.   Yes.
3     Q.   Okay.  Is Summit County claiming
4 that the Defendants in this case are somehow
5 responsible for overdose deaths of individuals
6 who have overdosed on cocaine that's been cut
7 with illicit fentanyl?
8         MS. KEARSE:  Object to form.
9     A.   I'm sorry.  I didn't -- can you
10 repeat that question, please?
11         MR. BOEHM:  I'll have the court
12 reporter read it back.
13         (Record read.)
14         MS. KEARSE:  Object to form.
15     A.   I don't know that we've ever made
16 any kind of mention about cocaine --
17     Q.   Okay.  So is the answer --
18     A.   -- in this lawsuit, so, no.
19     Q.   What about individuals who have
20 overdosed on methamphetamine that's been cut by
21 illicit fentanyl?  Is Summit County claiming
22 the Defendants are somehow responsible for
23 those overdose deaths?
24         MS. KEARSE:  Object to form.
25     A.   I don't know that we -- I don't

96 (Pages 378 - 381)

Page 382

1 believe that that's part of the -- part of this
2 lawsuit, no.
3      Q.   Okay.  What about individuals
4 who've overdosed on illicit heroin and have
5 never been prescribed a prescription opioid for
6 a legitimate medical need?  Is the County
7 alleging that the Defendants in this case are
8 somehow responsible for those overdose deaths?
9      A.   Yes, I believe they are.
10     Q.   Okay.  What's your understanding
11 about that theory?
12     A.   Well, just as you see in the
13 first -- the first group of -- of prescription
14 opioids, as you see that decline over time, if
15 you look at the second, you see an increase
16 over time in fentanyl and the analogues.
17         So my belief is that the groundwork
18 was laid by the overprescribing of these
19 medications for -- for people to become
20 addicted, not have access to those med- --
21 medications as the government shut -- shut down
22 some of the pill mills and tried to address the
23 overprescribing, and that that void was filled
24 with these other -- these other illicit
25 substances.

Page 383

1      Q.   I understand that's your belief.
2 Do you have any data, specific data, that you
3 rely on in espousing that belief?
4      A.   Do I have any data?  This is --
5 this data here is pretty compelling.
6      Q.   Do you believe that what you see
7 here is, by itself, enough to lead you to the
8 conclusion that you just articulated?
9      A.   Not by itself it's not.
10     Q.   Do you have any other data that you
11 rely on in espousing the view that you just
12 articulated?
13     A.   Data?  Not necessarily data, but
14 other information that I've -- that I've come
15 to understand through discussions with -- you
16 know, with individuals who've been affected by
17 this and people who study this have led me to
18 that conclusion.
19     Q.   What analyses or studies are you
20 relying on for purposes of arriving at the
21 conclusion, beyond just looking at these
22 charts?
23     A.   Well, I think that this is
24 something that as we've -- as we've learned
25 more and more about this epidemic, we've --

Page 384

1 we've had topic experts who've -- who've been
2 able to help us to understand the -- the
3 relationship between the reduction in
4 prescription opioids and the fact that that's
5 left people --
6      Q.   Not -- not -- I'm sorry.  Go ahead.
7 Go ahead.
8      A.   -- the fact that that's left people
9 with no option other than to seek those drugs
10 on the streets, that I --
11     Q.   Not my question.
12     A.   Okay.
13         MS. KEARSE:  He's still -- he's
14 still answering the question.
15         MR. BOEHM:  I don't think so.
16         MS. KEARSE:  Well, you just cut him
17 off.
18     Q.   My -- my question, just to -- just
19 to let you hear it again --
20         MS. KEARSE:  Counsel -- but,
21 Counsel, I -- if -- if you don't think it was
22 the same question, I'd appreciate you let the
23 witness still continue answering the question.
24         MR. BOEHM:  I was getting a long
25 answer to -- that wasn't --

Page 385

1          MS. KEARSE:  Wait --
2          MR. BOEHM:  -- to something that
3 wasn't my question.
4          Let -- let me just ask it again, if
5 that's okay.
6          MS. KEARSE:  Well, Counsel --
7          MR. BOEHM:  Is that fair?
8          MS. KEARSE:  -- I'm just going to
9 object.  If he's still answering the question,
10 let him finish --
11         MR. BOEHM:  Sure.
12         MS. KEARSE:  -- and then you can --
13         MR. BOEHM:  Okay.
14         MS. KEARSE:  -- ask another
15 question.
16     Q.   Was there something more you wanted
17 to add there, Mr. Craig?
18     A.   No.
19     Q.   Okay.  My question to you was what
20 specific studies or analyses or reports are you
21 relying on in arriving at the conclusion that
22 individuals who had a prescription opiate
23 addiction moved to fentanyl or other illicit
24 substances like heroin?
25         I'm -- I'm asking you specifically

97 (Pages 382 - 385)

Page 386

1 about actual reports, not general ideas or
2 thoughts.  Specific data reports or analyses
3 that you are relying on, if any, for that view.
4      MS. KEARSE:  Object to form.
5      A.   Well, I guess I would characterize
6 this as an analysis, and in -- when I read the
7 book Dreamland and saw what happened in
8 Portsmouth when they shut down those pill
9 mills, and the drug cartels moved in and they
10 started to sell these substances on the
11 streets, they filled a void that was left.
12      Q.   Okay.  Anything else besides the
13 book Dreamland?
14      A.   No.  But I think that -- you know,
15 I think that -- I think that that was a
16 prevailing -- that was a prevailing and -- and
17 accepted explanation for that.
18      Q.   Right.  But my question right now
19 is about analyses, specific analyses, reports,
20 or studies that have been performed.
21      A.   No others.
22      Q.   Okay.  With respect to Dreamland,
23 was that written by a medical doctor?
24      A.   It was written by an investiga- --
25 investigative reporter.

Page 387

1      Q.   A newspaper reporter, right?
2      A.   I don't know what sort of reporter
3 he was, but he was a reporter for -- in
4 Los Angeles, I believe.
5      Q.   Reporter for the Los Angeles Times,
6 right?
7      A.   If you say so.
8      Q.   Do you know if he has a degree in
9 public health?
10      A.   I don't know what his degree is in.
11      Q.   Do you know if he's an
12 epidemiologist?
13      A.   I don't know if he's an
14 epidemiologist.
15      Q.   Do you know if he's a
16 biostatistician?
17      A.   I don't know if he's a
18 biostatistician.
19      Q.   Do you know if he has any of the
20 credentials who participated in the
21 Presidential Commission report from 2017 that
22 you have not yet read?
23      A.   I do not know that.
24      MS. KEARSE:  Object to form.
25      Q.   My original question to you was

Page 388

1 about people who got addicted to heroin but
2 never used prescription opioids.
3      Do you remember that?
4      A.   No.
5      Q.   Is the County claiming that
6 Defendants are somehow responsible for
7 individuals who became addicted to
8 non-prescription opioids without ever having
9 used a prescription opioid, whether it was
10 legally obtained or not?
11      MS. KEARSE:  Object to form.
12      A.   No, I don't believe they are.
13      Q.   Would we be able to use the claims
14 data from ADAMHS in order to separate out
15 individuals who got addicted to heroin without
16 having developed an abuse disorder with
17 prescription opioids first?
18      A.   I've already answered this question
19 a number of times.
20      Q.   The answer is no, right?
21      A.   I've already answered this
22 question.
23      Q.   Is the answer no?
24      A.   I've answered this question.
25      Q.   I just am confirming to make sure I

Page 389

1 understand correctly.
2      MS. KEARSE:  Right.  And,
3 Counsel --
4      A.   Then check the record.  Check the
5 record.
6      Q.   I -- I couldn't use your data to do
7 that, right?
8      MS. KEARSE:  Asked and answered.
9 Objection.
10      Q.   I'm going to take that as a no, so
11 correct me if I'm misunderstanding.  Is that
12 fair?
13      MS. KEARSE:  Counsel, Let's move
14 on.
15      MR. BOEHM:  Okay.
16      - - - - -
17      (Thereupon, Deposition Exhibit 30,
18      ADM Board Document Titled "Summit
19      County Quick Response Team,"
20      SUMMIT_001793050 to 001793051, was
21      marked for purposes of
22      identification.)
23      - - - - -
24      Q.   I'm going to direct your attention
25 to the next exhibit.  It's Exhibit 30.  We've

Page 390

1 gotten to a nice round number.
2        This is -- oh -- yeah, I gave you
3 the right one.
4        This is an ADAMHS Board Summit
5 County Quick Response Team memo from March
6 2018.
7        Do you see that?
8    A.   Yes, I do.
9    Q.   Is this something you're familiar
10 with?
11   A.   Yes.
12   Q.   How often do you put these out?
13   A.   I don't know.
14   Q.   Okay.
15   A.   Possibly quarterly.  We put
16 maybe -- this is the only one that I'm aware of
17 that I've seen.
18        (Telephonic interruption.)
19   Q.   It's okay.  Go ahead.  This is the
20 only one that you've seen?
21   A.   This is the only one that I'm aware
22 of having been produced.
23   Q.   Okay.  Were you aware of this one
24 at the time it was released?
25   A.   Yes, I was.

Page 391

1    Q.   Is this made available to the
2 public?
3    A.   This was made available to the
4 Quick Response Teams as part of the quarterly
5 meeting, I believe.
6    Q.   Okay.  And what's the purpose of
7 the Quick Response Team report?
8    A.   This is to demonstrate the -- some
9 of the -- some of the statistics related to the
10 first response teams.  The -- how many
11 individuals they touched, how many of those
12 individuals that they touched got into
13 treatment, and -- and the number of visits that
14 they -- that they had.
15   Q.   Okay.  What are Quick Response
16 Teams?  Or is it just one thing?  Is there just
17 one team, or are there multiple teams?
18   A.   In Summit County we have nine Quick
19 Response Teams that touch 10 communities.  The
20 communities that we touch represent about 85
21 percent of the overdoses that have occurred in
22 Summit County.
23        The Quick -- each team is comprised
24 of a police officer, a first respond-- -- an
25 EMS -- EMT, emergency medical technician, and

Page 392

1 a -- either a counselor or a recovery coach.
2        They knock on the doors of people
3 who've experienced an overdose to offer them an
4 opportunity to get into treatment.
5        We also provide information to
6 family members about treatment options and also
7 some stories that -- of individuals who've --
8 who are in recovery as a -- a message of hope.
9        The objective is to get that
10 individual who's recently experienced an
11 overdose within -- and those visits occur
12 within a week of their overdose.  The hope is
13 that they would see that as an opportunity to
14 engage that person in treatment.
15   Q.   Thank you.  Is that something
16 that's been effective, from your perspective,
17 in addressing the opioid epidemic?
18   A.   It's been helpful, yes.
19   Q.   There's some reference to an ADM
20 Helpline in the document.  What is the ADM
21 Helpline?
22   A.   The ADM Helpline is a -- a phone
23 system that's staffed during regular business
24 hours that allows an individual who -- or a
25 family member who has a -- who's aware of

Page 393

1 somebody with an addiction need, to get
2 information about resources to link them into
3 treatment.
4        So if I'm a -- if I'm a family
5 member and my son is with me and I want to try
6 to get them into treatment, we can look at
7 their insurance coverage, if they have it or
8 not, where they live, and what's the nature of
9 their issue or problem, and we can link them to
10 services.
11   Q.   Got it.
12   A.   As part of -- as part of the
13 Addiction Helpline, we -- we can track the
14 length of time it takes from the time somebody
15 requests an appointment to the time that they
16 get that appointment.
17        And also in response -- in return,
18 the agency tells us whether or not that
19 referral was successful.
20   Q.   On the first page of this document
21 that's been marked as Exhibit 30 --
22        MR. BOEHM:  I think.  Did I get
23 that right?  Are we on Exhibit 30?
24        MS. KEARSE:  Yeah.  You said we
25 were at a -- finally at a round number.

99 (Pages 390 - 393)

Page 394

1     MR. BOEHM:  Okay.
2     Q.   On the first page of Exhibit 30, in
3  bottom right-hand corner, do you see a little
4  graphic there that says, "Top five substances
5  reported from the ADM Helpline in 2017"?
6     A.   I'm not sure which is the first
7  page.  I'm sorry.
8     Q.   Yeah.  It's 3050 on the bottom
9  right-hand corner.
10    A.   Okay.  Thank you.
11    Q.   You see that --
12    A.   Oh, I'm --
13    Q.   -- graphic?
14    A.   Yes, I do see that.
15    Q.   And this tells us the top five
16  substances that were reported from the ADM
17  Helpline during the year of 2017, right?
18    A.   Yes.
19    Q.   And it has heroin, meth, fentanyl,
20  alcohol, and cannabis, right?
21    A.   This information is captured
22  directly from the individuals, so it's what
23  they report.
24    Q.   Okay.  Fair to say that
25  prescription opioids doesn't make the list of

Page 395

1  top five substances?
2     A.   It's not listed here, no.
3     Q.   Just to make sure the record is
4  clear, so it is fair to say that prescription
5  opioids is not in the top five of the
6  substances reported to the ADM Helpline in
7  2017?
8     MS. KEARSE:  Object to form.
9     A.   Yes.
10    - - - - -
11    (Thereupon, Deposition Exhibit 31,
12    June 2015 E-Mail Chain between Kim
13    McMahan and Jerry Craig Re:
14    Prescribing, SUMMIT_001022445 to
15    001022447, was marked for purposes
16    of identification.)
17    - - - - -
18    Q.   Has the overall number of drug
19  overdose deaths in Summit County been going
20  downward in recent years?
21    A.   The number of overdoses?  Yes.
22    Q.   For how long has the trend been
23  downward?
24    A.   Probably since November of 2017 it
25  started -- is when it started to -- to come

Page 396

1  down.
2     Q.   Why do you believe that the number
3  of drug overdose deaths has been trending
4  downward in Summit County?
5     A.   I'd like to believe that many of
6  the things that we put into place to mitigate
7  the risk for people who are -- who -- who are
8  addicted have been effective in reducing those
9  overdoses, but I also cannot rule out the
10  possibility that our -- the drugs that are --
11  that are out on the street are less potent.
12    So there could be a variety of
13  reasons, and I can't make an attribution to any
14  one cause, but I'd like to believe that the
15  collective efforts of our community would be
16  making an impact.
17    Q.   Have you ever had conversations
18  with individuals in -- in County government or
19  at the ADAMHS Board about the reason why the
20  overdose deaths in Summit County has been
21  declining recently?
22    A.   Have I had conversations?
23    Q.   About the reasons why.
24    A.   If I'm asked, I -- I suppose, yes.
25    Q.   What are the conversations?  And

Page 397

1  what have -- let me back up.
2     Are you indicating that you have
3  been asked why drug overdose deaths have been
4  going downward?
5     A.   I've been asked -- when presented
6  with the data that people would say, "Why do
7  you think this is the case?"
8     Q.   And what have you said in response?
9     A.   I'd say that a lot of our harm
10  reduction strategies have been effective; that
11  the potency of the -- the drugs that are out in
12  the community are -- are -- the drugs that are
13  out in the community are less potent, that the
14  dealers don't want to kill off their customers;
15  that we've done a better job of getting people
16  into treatment faster; that we've increased the
17  capacity of our system.  A lot of those factors
18  have, I think, weighed into that.
19    Q.   Okay.  When you talk about potency
20  being not as strong because dealers don't want
21  to kill their customers, are there
22  particular illicit substances that you're
23  referring to?
24    A.   Yes.
25    Q.   What are those?

100 (Pages 394 - 397)

Page 398

1     A.    Fentanyl and carfentanil.
2     Q.    Okay.  All right.  I want to direct
3  your attention to this next document that's
4  been marked as Exhibit 31.  This is an e-mail
5  exchange between you and that same reporter
6  from the Akron Beacon Journal, Kim McMahan.
7        Do you see that?
8     A.    Yes.
9     Q.    And she sends you -- if you go to
10  the bottom -- because it's an e-mail exchange,
11  you have to start at the bottom to --
12     A.    Uh-huh.
13     Q.    -- start at the beginning.
14        She, in June 2015 -- I'm sorry.
15  This is you writing to her in June 2015 at
16  a.m., saying, "Thought you might be interested
17  in this OARRS report."
18        Do you see that?
19     A.    Yes.
20     Q.    And then you say, "I think this is
21  relatively self-explanatory."
22        Do you see that?
23     A.    Yes.
24     Q.    "Gives you an idea about
25  prescribing practices."

Page 399

1        What did you have in mind when you
2  wrote that?
3     A.    That in this -- in the OARRS
4  reports that there are typically -- there's
5  typically information available about
6  per capita doses that have been prescribed.
7     Q.    Okay.  Why did you think that that
8  information might be interesting to this
9  reporter from the local newspaper?
10     A.    Because there's an association
11  between the number of people who have their
12  hands on prescription medications and people
13  who are -- fall prey to addiction.
14     Q.    And you're saying that's based on
15  this particular OARR- -- you just thought that
16  this OARRS report that you forwarded to her
17  substantiated that?
18     A.    In part, yes.
19     Q.    Okay.  And what was it about this
20  OARRS report that you believe substantiated the
21  idea that there's an association between the
22  amount of prescription opioids available and
23  people who, as you put it, fall prey to
24  addiction?
25     A.    I don't remember the report that I

Page 400

1  sent her, so I -- so I would be speculating.
2     Q.    But the bottom line is you believe
3  that data from OARRS allows you to draw a
4  conclusion that the volume of prescription
5  opioids in the community is a driver of the
6  amount of addiction and overdose deaths that
7  you see in the community?
8     A.    I think it goes back to this
9  prospect that when you see a reduction in the
10  number of opioids prescribed, that we have also
11  seen that, an increase in the illicit opiates
12  in the community.
13     Q.    Okay.  And that's the question that
14  we were asking about earlier, where I was
15  asking you what data, specific analyses, and
16  reports you're relying on for that connection,
17  right?
18     A.    Sure.  Yes.
19     Q.    Same -- same issue?
20     A.    Same issue.
21     Q.    A little bit later in the
22  exchange -- this takes us to the first page of
23  Exhibit 31 --
24     A.    Uh-huh.
25     Q.    -- Ms. McMahan writes, "Thanks.  I

Page 401

1  really need someone in the County to say
2  something like (hundreds or thousands) have
3  been saved by Narcan, because I really don't
4  know.  Since I'm reporting the deaths, I need
5  to say something about how much it could be
6  worse."
7        Do you see that?
8     A.    Yes.
9     Q.    Do you know what she was trying to
10  communicate to you?  What was your
11  understanding of what she was saying there?
12     A.    My read on it was that she wanted
13  to get a sense if -- she wanted to know whether
14  or not we could -- if we could quantify the
15  number of people who had been saved by Narcan.
16     Q.    And you said you were going to try
17  and get her something more definitive, right?
18     A.    Correct.
19     Q.    You didn't have that information at
20  your fingertips?
21     A.    That's correct.
22     Q.    Do you know if you ever provided
23  her with any such information?
24     A.    I don't recall.
25     Q.    Okay.  The e-mail exchange that was

101 (Pages 398 - 401)

1 produced to us in the litigation ends with her
2 response to you where she says, "Jerry, today I
3 told someone that there have been 78 deaths
4 caused by fentanyl and heroin in Summit County
5 through June 9th."
6          Did I read that correctly?
7     A.   Yes, you read that correctly.
8     Q.   She goes on to say, "He said 'That
9 doesn't seem like all that many.'"
10         Do you see that?
11    A.   I do see that.
12    Q.   And then she says, "Ah!!!," three
13 exclamation points.
14         Do you see that?
15    A.   Yes, I do see that.
16    Q.   What did you understand -- did you
17 understand her to be frustrated by the fact
18 that somebody had said that doesn't seem like
19 all that many?
20         MS. KEARSE:  Object to form.
21 Speculation.
22    A.   I don't know -- I don't know why
23 she made that exclamation.
24    Q.   What was your read of it when you
25 saw this e-mail come through?

1          MS. KEARSE:  Object to form.
2     A.   I don't know.  Kim -- Kim's always
3 been sort of exuberant in her -- in her
4 interactions with me.
5     Q.   Did she -- do you think she was
6 excited when she said, "Ah!!!"?
7          MS. KEARSE:  Object.  Asked and
8 answered.
9     A.   I don't -- I don't know what
10 you'd -- I don't know why she put "Ah" with
11 three exclamation points.
12    Q.   So you have no idea one way or
13 another?
14    A.   No.
15    Q.   Okay.  You don't know if she was
16 disappointed that the number of deaths from
17 fentanyl and heroin in Summit County through
18 June 9th had caused somebody to say that's not
19 very many?
20         MS. KEARSE:  Objection.  Asked and
21 answered.
22    A.   Again, I don't know.
23    Q.   Okay.
24         MR. BOEHM:  For the record, the
25 Bates number for Exhibit 23 is

1 SUMMIT_001039894.
2          MS. KEARSE:  Whatever Exhibit 23
3 was, but thank you.
4          MR. BOEHM:  And let's go off the
5 record for a moment.
6          THE VIDEOGRAPHER:  Off the record,
7 7:08.
8          (A recess was taken.)
9          THE VIDEOGRAPHER:  On the record,
10 7:21.
11         MR. BOEHM:  Mr. Craig, thank you
12 very much for your time today.  I'm going to
13 pass the -- pass my time along to
14 Ms. Feinstein.
15         MS. FEINSTEIN:  Thank you.
16         EXAMINATION OF GERALD CRAIG
17 BY MS. FEINSTEIN:
18    Q.   Good evening, Mr. Craig.  I'll just
19 reintroduce myself briefly.  I know we've all
20 been here for a long time.  My name is Wendy
21 West Feinstein.  I represent the Teva
22 Defendants in this litigation.
23         Do you know who the Teva Defendants
24 are?
25    A.   Did you say Tubba?

1     Q.   Teva.
2     A.   Teva?  Yes, I've -- I've heard of
3 Teva.
4     Q.   Okay.  Do you know Teva to be a
5 manufacturer of prescription opioids?
6     A.   I'm just familiar with the name.
7     Q.   Do you know whether Teva
8 manufactures prescription opioids?
9     A.   I don't know that.
10    Q.   Do you know why it's a defendant in
11 this case?
12    A.   I know that -- that any -- any
13 company that was named in the suit has had a
14 role in the complaint.
15    Q.   Do you have any understanding of
16 what role Teva played that resulted in it being
17 named in the lawsuit?
18    A.   Not specifically, no.
19    Q.   Earlier this evening you spoke
20 about -- or throughout the day, actually,
21 you've mentioned several times, pill mills.  Do
22 you recall that testimony --
23    A.   Yes, I --
24    Q.   -- talking about pill mills?
25 Sorry.

102 (Pages 402 - 405)

Page 406

1    A.   Sorry.  Yes, I do.
2    Q.   You would agree with me that pill
3  mills are illegal operations, right?
4        MS. KEARSE:  Object to form.
5    A.   That would probably be a good way
6  to characterize them, yes.
7    Q.   And they're -- they're shut down by
8  the authorities because they're illegal
9  operations, right?
10       MS. KEARSE:  Object to form.
11   A.   The ones that are shut down are
12  shut down by the authorities because they're
13  illegal, yes.
14   Q.   And you understand that
15  prescription opioids, in and of themselves, are
16  not illegal?
17   A.   That's correct.
18   Q.   So it is legal for a physician to
19  prescribe, for a medical need, a prescription
20  opioid in the United States, correct?
21   A.   That's correct.
22   Q.   And for some patients -- you would
23  agree with me that for some patients suffering
24  from pain, that a prescription opioid is the
25  pharmaceutical product that alleviates that

Page 407

1  pain for that patient?
2    A.   To some degree or extent, yes.
3    Q.   And you would agree that for some
4  patients suffering from pain, that prescription
5  opioids may be medically necessary?
6        MS. KEARSE:  Object to form.
7    A.   Yes, I would agree.
8    Q.   And that determination is made by
9  their physician, correct?
10   A.   Yes.
11   Q.   You testified earlier today that
12  you're not familiar with the FDA regulations
13  that apply to pharmaceuticals, right?
14   A.   No, I -- I'm not.
15   Q.   You are not aware?
16   A.   I'm not aware.
17   Q.   Are you aware that prescription
18  opioids are approved by the FDA?
19   A.   I believe that all drugs that are
20  distributed through pharmacies have -- have to
21  be approved by the FDA.
22   Q.   Are you aware that the FDA also
23  approves what is called as a -- as a package
24  insert that is provided along with prescription
25  medications?

Page 408

1        MS. KEARSE:  Object to form.
2    A.   I was not aware that the FDA has to
3  approve those packet inserts.
4    Q.   Have you ever read the package
5  insert for a prescription medication?
6    A.   No, I have not.
7    Q.   So you've never read the package
8  insert that goes along with an opioid.
9        MS. KEARSE:  Object to form.
10   A.   That is correct.
11   Q.   Are you aware that the package
12  inserts for prescription medications include
13  information about risks associated with those
14  pharmaceutical products?
15       MS. KEARSE:  Object to form.
16   A.   Generally, yes.
17   Q.   Are you aware that the package
18  inserts for prescription opioids include
19  information about the risk of addiction?
20       MS. KEARSE:  Object to form.
21   A.   Am I aware that that -- that -- I
22  don't have direct knowledge of that, but I
23  would -- I would tend to believe that.
24   Q.   Have you ever heard of risk
25  evaluation and mitigation strategies with

Page 409

1  respect to opioids -- prescription opioids?
2    A.   Not -- not in that term and not
3  with prescription opioids.
4        We have a term that we call "harm
5  reduction strategies" within our -- you know,
6  our business.
7    Q.   Have you ever heard of -- it's
8  sometimes also called the REMS program for
9  prescription opioids, R-E-M-S?
10   A.   I've not heard of R-E-M-S.
11   Q.   Do you -- you mentioned earlier
12  that you had heard of -- of Teva before.  Can
13  you please tell me whether you are familiar
14  with the prescription opioid manufacturers who
15  are defendants in this litigation?
16   A.   In -- in what way?
17   Q.   Are you familiar with them as, one,
18  prescription opioid manufacturers, and, two,
19  with what product they manufacture?
20   A.   If I was given a test, I probably
21  could not assign a specific opioid to a
22  specific manufacturer.  Many of the
23  manufacturers have been talked about more than
24  others, so some of them I would recognize.
25   Q.   But you -- just kind of sitting

103 (Pages 406 - 409)

Page 410

1 here today, you couldn't identify for me a list
2 of prescription opioid manufacturers who are
3 named in the Summit County lawsuit?
4      A.   Not off the top of my head, I
5 couldn't, no.
6      Q.   Do you know the prescription
7 opioid -- any prescription opioid names off the
8 top of your head, the products?
9      A.   I could name some off the top of my
10 head, yes.
11      Q.   What can you name off the top of
12 your head?
13      A.   Opana, OxyContin, Dilaudid,
14 methadone.
15           I'm drawing a blank on -- on some
16 of the other -- morphine, and probably some
17 others that I can't think of right off the top
18 of my head.
19      Q.   Do you know any of the -- do you
20 know the name of the manufacturer of any of
21 those that you just listed?
22      A.   Not -- not -- I wouldn't bet the
23 house on it.
24      Q.   And I believe you testified about
25 this earlier, but I just want to confirm, and I

Page 411

1 apologize if I'm repeating.
2           You have not seen any advertising,
3 direct-to-consumer advertising, for
4 prescription opioids, have you?
5      A.   Not that I can recall.
6      Q.   Do you personally have any
7 information about any false statements made by
8 any of the prescription opioid manufacturers in
9 this litigation?
10      A.   I'm aware, through reading
11 Dreamland, that the -- that there was a letter
12 that was -- was cited by -- I don't know if it
13 was a doctor, but his name was Jick, that
14 led -- that was used to diminish the -- I'm
15 sorry.  I'm having -- having a hard time
16 tracking here -- that was used to downplay the
17 addictive nature of opiates.
18      Q.   Okay.  Is Dr. Jick a manufacturer
19 of prescription opioids?
20      A.   I don't believe that he was a -- a
21 manufacturer.
22      Q.   Okay.  And -- and my question was a
23 little bit different than that.  My -- my
24 question is, do you personally have any
25 information about any false statements made by

Page 412

1 a prescription opioid manufacturer?  Not a
2 physician about or a researcher about a
3 prescription opioid, but false statements made
4 by a prescription opioid manufacturer that you
5 have personal knowledge of?
6           MS. KEARSE:  Object to form.
7      A.   No, I do not.
8      Q.   Do you personally have any
9 information about any agreements between or
10 among any prescription opioid manufacturers?
11      A.   No, I do not.
12      Q.   Do you personally have any
13 information about anything that any of the
14 prescription opioid manufacturers did wrong in
15 Summit County?
16           MS. KEARSE:  Object to form.
17      A.   No, I do not.
18           MS. FEINSTEIN:  Give me one second
19 to look through my notes, but I think I'm done.
20           Thank you.  I will now hand the
21 microphone to one of my colleagues.  I
22 appreciate your time.
23           EXAMINATION OF GERALD CRAIG
24 BY MR. MOYLAN:
25      Q.   Mr. Craig, again, my name is Daniel

Page 413

1 Moylan, and I represent the CVS Defendants in
2 the litigation.  I'll just have, I think,
3 relatively few questions.
4           Have you ever heard of a company
5 called CVS Indiana LLC?
6      A.   I've heard of CVS, but not
7 specifically the longer version of that.
8      Q.   Okay.  So you haven't heard of that
9 particular entity?
10      A.   Right.
11      Q.   Have you heard of an entity called
12 CVS Rx Services, Inc.?
13      A.   I have not.
14      Q.   Okay.  So is it fair to say that
15 you don't have an understanding of what either
16 of those entities' business -- what the nature
17 of that business is?
18      A.   That would be a fair assessment.
19      Q.   Were you aware that either of those
20 entities is a defendant in this case?
21      A.   I am not aware.
22      Q.   So it's fair to say that you don't
23 have an understanding of why they're named as
24 defendants?
25      A.   I wouldn't -- I wouldn't go that

Page 414

1 far.  I think that we -- we understand that
2 certain companies have been identified as
3 having a role in the -- in the distribution of
4 large amounts of -- of medic- -- of
5 prescription pain medications.
6     Q.   Okay.  What do you specifically
7 know about the distribution activity of those
8 two entities that I just referred to?
9     A.   I know nothing about the
10 distribution activities of those two companies.
11    Q.   Okay.  In addition to CVS, are you
12 aware of any other national pharmacy chains
13 that are defendants in this case?
14    A.   Walmart.  And that's -- that's the
15 only one I can think of right now today.
16    Q.   And you know that from your review
17 of the complaint that you described earlier?
18    A.   From my review of the -- from --
19 from what I've -- not necessarily from the
20 review of the complaint.  I think that I just
21 recognize that they were -- their name was --
22 was -- was included in the -- in the suit.
23    Q.   Okay.  And what do you understand
24 about the nature of the claims against Walmart?
25    A.   I don't -- I don't know that I've

Page 415

1 read the suit to really understand what the
2 claims are against Walmart.
3     Q.   With respect to Rite Aid,
4 are you aware that they're a defendant in the
5 litigation?
6     A.   I don't know if -- I don't know
7 that -- I don't know if -- if Rite Aid is a --
8 is a -- is a defendant in this case or not.
9     Q.   Okay.  So it's fair to say that if
10 I represent that they are a defendant, you
11 don't have any understanding of the basis of
12 the claims against Rite Aid?
13    A.   That would be correct.
14    Q.   And with respect to Walgreens, were
15 you aware that they were a defendant in
16 the lit- -- in the litigation?
17    A.   Well, earlier I was equivocating
18 about whether I should say Walgreens because I
19 thought I remembered seeing Walgreen, but I
20 wasn't going to speak because I wasn't sure.
21    Q.   So you're not sure that they're
22 named as a defendant?
23    A.   I'm not sure that they are.
24    Q.   Okay.  And so it's fair to say that
25 you don't have any understanding of the nature

Page 416

1 of the claims against Walgreens --
2         MS. KEARSE:  Object to form.
3     Q.   -- in the case?
4         MS. KEARSE:  Object to form.
5     A.   That's correct.
6     Q.   Okay.  Were you aware that of all
7 of the retail pharmacy chains that I've
8 mentioned, that none of them is sued in their
9 role as a pharmacy in this litigation?
10    A.   No, I'm not aware of that.
11    Q.   Okay.  So you're not aware that
12 none of those entities is sued for its role in
13 dispensing prescription opioids?
14        MS. KEARSE:  Object to form.
15    A.   I'm not aware of that, yes -- or,
16 no.  No, I'm not aware of that.
17    Q.   Okay.  Do you have any personal
18 knowledge or information about anything that
19 the whole- -- wholesale distributors did wrong
20 with respect to the prescription opioid
21 epidemic in Summit County?
22        MS. KEARSE:  Object to form.
23    A.   In Summit County, no.
24    Q.   Okay.  Over your tenure as
25 executive director of the ADAMHS Board, have

Page 417

1 you ever communicated with any CVS personnel
2 about efforts to address the opioid problem in
3 Summit County?
4     A.   Have I -- I'm sorry.  Could you
5 repeat the question?
6     Q.   Have you ever had any personal
7 interactions with CVS personnel with respect to
8 the opioid problem in Summit County?
9     A.   No.
10    Q.   The same question with respect to
11 Rite Aid.  Do you recall having any discussions
12 with Rite Aid personnel with respect to the
13 opioid problem in Summit County?
14    A.   Yes.
15    Q.   What do you remember about
16 conversations with Rite Aid personnel?
17    A.   I just had a -- a conversation with
18 a pharmacist who worked at -- at one of the
19 Rite Aids where I picked up a prescription
20 and -- and asked about the use of drug disposal
21 pouches and sort of getting a sense of what
22 he's -- what he's seeing in his -- in his
23 pharmacy.
24    Q.   When did this conversation happen,
25 if you remember?

Page 418

1   A.   Sometime within the past six
2 months.
3   Q.   And it's your general understanding
4 that Rite Aid has dug -- drug distribution
5 centers at some of its pharmacies in Summit
6 County?
7   A.   Yes.
8   Q.   Okay.  What was the -- what was the
9 nature of the discussion with the pharmacist
10 that you mentioned?
11   A.   I don't recall specifically what --
12 what I asked.  I think one of the inquiries
13 that I made was whether or not they made those
14 drug disposal pouches available to customers.
15 And I also offered that our task force would be
16 willing to provide some materials to the
17 pharmacy.
18   Q.   And has there been any followup
19 since then regarding the -- the issue that you
20 discussed?
21   A.   I left some of that information
22 with my staff, and I don't know that they're --
23 whether there's been followup or not.
24   Q.   Do you have a sense of how many
25 Rite Aid pharmacies in Summit County have drug

Page 419

1 distribution facilities?
2   A.   I'm not aware, no.
3   Q.   Which -- which particular pharmacy
4 did this pharmacist work at?
5   A.   Tallmadge.
6   Q.   Okay.  Do you remember the name of
7 the pharmacist?
8   A.   No.
9   Q.   Apart from this conversation with
10 the Tallmadge pharmacist, have you had any
11 other conversations with Rite Aid personnel
12 about efforts to deal with the opioid problem
13 in Summit County?
14   A.   No, I have not.
15   Q.   With respect to Walgreens, do you
16 have any recollection of conversations that
17 you've had with any Walgreens personnel
18 regarding efforts to combat the opioid
19 problem --
20   A.   No.
21   Q.   -- in Summit County?
22   A.   I'm sorry.  No, I have not.
23   Q.   And same question with respect to
24 Walmart.  Do you have any recollection of
25 discussions with Walmart personnel about the

Page 420

1 same topic?
2   A.   No, I have not.
3   Q.   Okay.  Are you generally familiar
4 with efforts by the retail pharmacies that I've
5 mentioned to make naloxone available without a
6 prescription?
7       MS. KEARSE:  Object to form.
8   A.   I know that there have been
9 pharmacies who have made naloxone available to
10 individuals without a prescription, but I don't
11 know which pharmacies those are.  I don't
12 have -- I don't collect that information to --
13 for ease of retrieval, so -- so I don't --
14 again, I couldn't tell you which pharmacies
15 those are.
16   Q.   If I represented to you that my
17 understanding is that each of the national
18 retail chains that I've referred to currently
19 make naloxone available without a prescription
20 in Summit County, does that sound correct or
21 not to you?
22       MS. KEARSE:  Object to form.  Asked
23 and answered.
24   A.   I -- I just don't know.
25   Q.   Okay.

Page 421

1       - - - - -
2       (Thereupon, Deposition Exhibit 32,
3       9/15/2016 E-Mail Chain between
4       Douglas Smith and Jerry Craig Re:
5       Pharmacies with Naloxone,
6       SUMMIT_000870043 to 000870044, was
7       marked for purposes of
8       identification.)
9       - - - - -
10       THE WITNESS:  Excuse me.
11       MR. MOYLAN:  I've just handed you
12 an exhibit marked as Exhibit 32.  The Bates
13 number is SUMMIT_000870043.
14       MS. KEARSE:  Can I -- was there a
15 3- -- okay.  I'm sorry.  There was a 31.  Okay.
16   Q.   It appears to be an e-mail exchange
17 between you and Doug Smith, and the date of the
18 first e-mail appears to be from September 15,
19 2016.
20       The subject line of the e-mails
21 appears to be "Pharmacies with naloxone," and
22 Mr. Smith's e-mail to you appears to be a
23 response that says, "Only CVS so far in our
24 county.  Amazing that Acme is not on board
25 yet."

106 (Pages 418 - 421)

Page 422

1    What is your understanding of what
2  this exchange means as you read it today?
3    A.   Based on what I'm reading here, it
4  would be pharmacies that -- that have naloxone.
5  It's not clear to me what that means, though.
6    Q.   Okay.  But --
7    A.   Whether that means that they -- I'm
8  sorry.  Whether that means that they stock it
9  or that they make it available to people free
10  of charge, or -- or how that -- you know,
11  what -- what exactly -- how that's -- what that
12  means.
13    Q.   Okay.  Do you recall this is an
14  exchange that you had with Doug Smith in or
15  around September of 2016?
16    A.   I -- to be honest with you, I don't
17  remember this -- this exchange.
18    Q.   But you don't have any doubt that
19  you did engage in this e-mail exchange with
20  him?
21    A.   Yes.
22    Q.   Okay.
23         - - - - -
24    (Thereupon, Deposition Exhibit 33,
25    3/29/2016 E-Mail Re: Very Important

Page 423

1    Invitation and New Information,"
2    etc., with Attachment,
3    SUMMIT_001040139 to 001040146, was
4    marked for purposes of
5    identification.)
6         - - - - -
7    Q.   Just handed you what's been marked
8  as Exhibit 33.  The Bates number on this
9  document is SUMMIT_001040139.
10         It appears to come from a LISTSERV,
11  and one that we've seen in a number of e-mails.
12  So when you look at the top line of the e-mail,
13  that has the "From," do you have an
14  understanding, as you look at that, what --
15  what this sender refers to?
16    A.   No.  What I can tell you, just to
17  add a little bit of context to this, is that I
18  was on this LISTSERV, and we got five, six, up
19  to 10 e-mails a day from this particular
20  LISTSERV, so I didn't read all of these.
21    Q.   Okay.  If you could scan through
22  this briefly.  I'm only going to have a few
23  questions.
24    A.   Okay.
25    Q.   But my -- my first question is,

Page 424

1  does it look familiar to you as -- as a
2  LISTSERV e-mail that you did review or not?
3    A.   Okay.
4    Q.   Does it look like a particular
5  LISTSERV message that you recall having
6  reviewed before?
7    A.   I have not, no.
8    Q.   Okay.  I'm just going to have a
9  couple of questions, then, about the contents.
10         If you could turn to the page with
11  the Bates number that ends in 144.  It's near
12  the end.
13         MS. KEARSE:  I'll have a running
14  objection that the witness does not recall
15  reading or reviewing this document before.
16    Q.   Okay.  You'll note near the top
17  that there -- the first full paragraph begins
18  "Rite Aid," and I would just ask you to read
19  the first sentence of that paragraph, "Rite
20  Aid" -- "Rite Aid has trained."
21         MS. KEARSE:  The document speaks
22  for itself, Counsel.
23    Q.   So just to read it into the record,
24  "Rite Aid has trained over 8,400 pharmacists on
25  naloxone and is dispensing naloxone to patients

Page 425

1  without needing an individual prescription in
2  10 states with plans to expand to additional
3  states."
4         My question is, do you have any
5  recollection, in reviewing that, of whether
6  Rite Aid is currently supplying naloxone
7  without a prescription within Summit County?
8         MS. KEARSE:  Object to form and
9  asked and answered.
10    A.   If I'm -- if I was ever aware of
11  that, I've forgotten, so I'm not -- I don't
12  have a recollection of that.
13    Q.   Even today you're not aware of
14  whether Rite Aid is supplying naloxone without
15  a prescription?
16    A.   I do not.  I don't know for sure.
17    Q.   Okay.  And if you could turn to the
18  last page of the e-mail I'll read into the
19  record.  There's a paragraph that states, "In
20  February, Walgreens announced that it will
21  install" -- "install safe medication disposal
22  kiosks in more than 500 drug stores across the
23  country, primarily at locations open 24 hours."
24         Were you aware whether Walgreens
25  has installed safe medication disposal kiosks

107 (Pages 422 - 425)

Page 426

1  at drugstores within Summit County?
2      A.   I'm not aware, no.
3      Q.   Okay.  There's also a statement in
4  that paragraph that says, "Walgreens will make
5  naloxone available without needing an
6  individual prescription at its 35" -- "at its
7  pharmacies in 35 states and Washington, D.C.
8  throughout this year."
9          Are you aware whether Walgreens is
10 currently supplying naloxone without a
11 prescription in Summit County?
12         MS. KEARSE:  Objection.  Asked and
13 answered.
14     A.   I'm not aware.
15     Q.   Okay.  And the last paragraph
16 refers to CVS Health, similar content.  It has
17 worked to increase naloxone by establishing
18 standing orders in collaborative practice
19 agreements.
20         The question I have is, are you
21 aware whether CVS is currently supplying
22 naloxone without a prescription within Summit
23 County?
24         MS. KEARSE:  Object to form.
25     A.   I'm not aware.  I don't have direct

Page 427

1  knowledge.
2      Q.   Okay.  The last sentence in that
3  document says, "CVS Health has also launched a
4  drug abuse prevention program called
5  Pharmacists Teach, which brings CVS pharmacists
6  into schools across the country to educate
7  students about the dangers of drug abuse."
8          Are you aware of the CVS
9  pharmacists program?
10     A.   I am not.
11     Q.   And are you aware of whether the
12 program has been rolled out or implemented
13 within Summit County?
14         MS. KEARSE:  Object to form.
15     A.   I've not -- I've not heard that
16 it's been rolled out in Summit County.
17         MR. MOYLAN:  Okay.  That's all the
18 questions I have.  Thank you.
19         THE WITNESS:  Okay.
20         MR. MOYLAN:  So we go off the
21 record.
22         MS. FEINSTEIN:  Any questions on
23 the phone or anything from you guys?
24         MS. KEARSE:  I'm going to take a
25 break, and we'll let you know.

Page 428

1          MS. FEINSTEIN:  Okay.
2          THE VIDEOGRAPHER:  Off the record,
3  7:47.
4          (A recess was taken.)
5          THE VIDEOGRAPHER:  On the record,
6  7:58.
7          EXAMINATION OF GERALD CRAIG
8  BY MS. KEARSE:
9      Q.   Good evening, Mr. Craig.  Thank you
10 for being here today and answering questions of
11 counsel.  I have one question for you.
12         What percentage of people with a
13 substance use disorder seek treatment?
14     A.   National statistics that we've --
15 that we've used in our presentations would
16 indicate that fewer than 10 percent of people
17 with substance use disorders actually touch
18 treatment systems.  So I could -- so we use
19 those same statistics and apply those to our
20 local community.
21         MS. KEARSE:  Thank you, Mr. Craig.
22 That's all the question I have, and thank you
23 for being here today.
24         MR. BOEHM:  I -- I just have one
25 question about that.

Page 429

1          EXAMINATION OF GERALD CRAIG
2  BY MR. BOEHM:
3      Q.   With respect to the percentage of
4  people with a substance use disorder who seek
5  treatment in Summit County, do you have any
6  statistical data on that particular subject?
7      A.   On that --
8      Q.   In Summit County.
9      A.   -- in Summit County?
10     Q.   Yeah.
11     A.   No.
12         MR. BOEHM:  Thanks.
13         EXAMINATION OF GERALD CRAIG
14 BY MS. KEARSE:
15     Q.   And, Counsel [sic], is there any
16 reason to think that Summit County is any
17 different from your national statistics that
18 you just talked about?
19     A.   There's no reason to believe that.
20         MS. KEARSE:  Thank you.
21         EXAMINATION OF GERALD CRAIG
22 BY MR. BOEHM:
23     Q.   Is that true with respect to any
24 statistics that we've discussed today, or are
25 there diff- -- different demographics and

108 (Pages 426 - 429)

Page 430

1 population-based reasons why information such
2 as that might actually vary dramatically from
3 state to state or region to -- region by
4 region?
5      A.   Absent any local data, we tend to
6 use the national data.
7      Q.   Okay.  You don't consider yourself
8 an expert in terms of population-based
9 statistics, right?
10     A.   That's correct.
11          MR. BOEHM:  Okay.  Thank you.
12          MS. KEARSE:  That's it.
13          MS. FLOWERS:  Off the record.
14          THE VIDEOGRAPHER:  Off the record,
15 7:59.
16     (Deposition concluded at 7:59 p.m.)
17          ~ ~ ~ ~ ~
18
19
20
21
22
23
24
25

Page 431

1 Whereupon, counsel was requested to give
2 instructions regarding the witness's review of
3 the transcript pursuant to the Civil Rules.
4
5          SIGNATURE:
6 Transcript review was requested pursuant to the
7 applicable Rules of Civil Procedure.
8
9          TRANSCRIPT DELIVERY:
10 Counsel was requested to give instructions
11 regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 432

1          REPORTER'S CERTIFICATE
2 The State of Ohio,   )
3                SS:
4 County of Cuyahoga.  )
5
6      I, Stephen J. DeBacco, a Notary
7 Public within and for the State of Ohio, duly
8 commissioned and qualified, do hereby certify
9 that the within named witness, GERALD CRAIG,
10 was by me first duly sworn to testify the
11 truth, the whole truth and nothing but the
12 truth in the cause aforesaid; that the
13 testimony then given by the above-referenced
14 witness was by me reduced to stenotypy in the
15 presence of said witness; afterwards
16 transcribed, and that the foregoing is a true
17 and correct transcription of the testimony so
18 given by the above-referenced witness.
19      I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25

Page 433

1      I do further certify that I am not
2 a relative, counsel or attorney for either
3 party, or otherwise interested in the event of
4 this action.
5      IN WITNESS WHEREOF, I have hereunto
6 set my hand and affixed my seal of office at
7 Cleveland, Ohio, on this 16th day of
8 January, 2019.
9
10
11
12
13
14      Stephen J. DeBacco, Notary Public
15      within and for the State of Ohio
16
17 My commission expires September 30, 2022.
18
19
20
21
22
23
24
25

109 (Pages 430 - 433)

Page 434

1        Veritext Legal Solutions
          1100 Superior Ave
2              Suite 1820
          Cleveland, Ohio 44114
3         Phone: 216-523-1313
4
   January 16, 2019
5
   To: Anne Kearse, Esq.
6
   Case Name: In Re: National Prescription Opiate Litigation
7
   Veritext Reference Number: 3182086
8
   Witness: Gerald Craig      Deposition Date:  1/11/2019
9
10 Dear Sir/Madam:
11
        Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
        If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 435

1        DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3182086
3  CASE NAME: In Re: National Prescription Opiate Litigation
   DATE OF DEPOSITION: 1/11/2019
4  WITNESS' NAME: Gerald Craig
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____
9  Date          Gerald Craig
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13 They signed the foregoing Sworn
   Statement; and
14 Their execution of this Statement is of
   their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18 _____
   Notary Public
19 _____
   Commission Expiration Date
20
21
22
23
24
25

Page 436

1        DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3182086
3  CASE NAME: In Re: National Prescription Opiate Litigation
   DATE OF DEPOSITION: 1/11/2019
4  WITNESS' NAME: Gerald Craig
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9     I request that these changes be entered
   as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____
   Date          Gerald Craig
14
        Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
        They have listed all of their corrections
18    in the appended Errata Sheet;
        They signed the foregoing Sworn
19    Statement; and
        Their execution of this Statement is of
20    their free act and deed.
21 I have affixed my name and official seal
22 this _____ day of_____, 20____.
23 _____
   Notary Public
24
25 _____
   Commission Expiration Date

Page 437

1        ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 1/11/2019
3  PAGE/LINE(S) /      CHANGE      /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 Date          Gerald Craig
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23 _____
   Notary Public
24
25 _____
   Commission Expiration Date

110 (Pages 434 - 437)

[& - 13]

**&**

**&** 2:14,16 3:5,15 4:15 5:5,16 19:1,3 19:15 20:1

**0**

000870043 10:12 421:6,13
000870044 10:12 421:6
001017850 8:22 290:9
001017865 8:23 290:9
001017988 9:15 346:9
001018649 7:24 170:5
001018665 7:25 170:5
001022445 10:8 395:14
001022447 10:9 395:15
001024592 8:3 170:17
001024609 8:4 170:17
001029476 9:18 358:6
001029477 9:18 358:6
001039666 9:6 321:11
001039667 9:6 321:11
001039894 404:1
001040139 10:15 423:3,9
001040146 10:15 423:3

001080804 8:7 171:3
001080819 8:7 171:3
001085401 10:2 376:14
001085408 10:3 376:14
001090134 7:6 97:7
001090135 7:7 97:8
001102842 9:21 361:20
001102843 9:21 361:21
001103531 9:24 370:13
001103554 9:24 370:13
001104515 7:3 73:11
001104516 7:4 73:11
001110699 254:18
001112390 8:18 262:11
001112393 8:18 262:12
001113145 8:1 170:11
001113162 8:2 170:11
001122421 7:10 116:19
001147357 7:20 169:18
001147365 7:21 169:18
001170991 7:16 145:8

001171802 7:16 145:8
001220716 7:22 169:24
001220731 7:23 169:24
001233282 9:12 338:9
001233283 9:13 338:10
001233373 7:18 152:14
001233374 7:19 152:15
001233672 9:3 315:10
001233700 9:4 315:10
001793050 10:5 389:20
001793051 10:6 389:20
001952555 201:22 203:12
002048210 9:8 326:21
002049206 9:8 326:20

**1**

**1** 7:3 73:9,16 103:5 139:8 226:21 228:5 242:1
**1/11/2019** 434:8 435:3 436:3 437:2
**1/21/2011** 9:11 338:8
**10** 7:24 86:22 105:16 170:3 181:4 228:5 391:19 423:19

425:2 428:16
**10/1/2010** 8:10 223:21
**10/10/2017** 9:7 326:19
**10/22/2013** 9:14 346:6
**10/26/2015** 9:16 358:3
**100** 4:5
**1000** 5:12
**101** 5:6
**10178-0060** 5:7
**102** 12:19
**103** 12:19
**106** 7:8
**109** 12:20
**10:18** 65:1
**11** 1:18 8:1 18:2 170:9 181:6
**11/2/2017** 7:5 97:5
**110** 12:20
**1100** 3:17 434:1
**111** 12:21
**114** 12:21
**11472** 433:13
**116** 7:9 12:22
**117** 12:22
**11:16** 126:22
**11:31** 126:25
**12** 8:3 116:7,7 170:15 181:8 182:5
**121** 12:23
**122** 12:23,24,24
**123** 12:25
**124** 13:1,1
**127** 3:12
**12:13** 169:13
**13** 8:5 170:21 176:15 181:10

186:24 188:18,20
190:5
**13.1** 177:4
**13.2** 190:6
**130** 13:2,2
**1301** 5:12
**131** 13:3,3
**133** 13:4
**134** 7:11
**137** 13:4
**138** 13:5
**139** 13:5
**14** 8:6 171:1,22
172:3,18 181:12
188:19 324:19
**142** 13:6,6,7
**1420** 4:10
**144** 13:7,8 424:11
**145** 7:15
**147** 13:8
**148** 13:9,9
**149** 13:10
**15** 8:8 200:8 201:6
201:22 203:10,11
204:7 206:13
207:25 208:8,20
215:19 421:18
**151** 13:10
**152** 7:17 13:11
**15219-6401** 3:6
**153** 13:11
**154** 13:12
**155** 13:12
**157** 13:13
**158** 13:13
**159** 13:14
**16** 8:10 50:9
211:10 223:20
224:7 434:4
**160** 13:14

**161** 13:15,15
**162** 13:16
**163** 13:16
**164** 13:17
**165** 13:17
**167** 13:18,18,19
**168** 13:19,20,20
**169** 7:20,22
**16th** 433:7
**17** 1:6,10 8:13
50:9,11 192:6
253:16 254:2
**170** 7:24 8:1,3,5
**171** 8:6
**17th** 290:16
**18** 1:12,13 8:16
171:22,25 262:8
262:16
**1820** 434:2
**185** 13:21
**186** 13:21
**19** 8:19 50:10
290:4,14 292:12
294:21
**191** 13:22
**196** 13:22
**197** 13:23
**198** 13:23
**1980s** 21:3
**199** 13:24
**1990s** 250:21
**1998** 251:8,17,25
293:4,18
**1999** 139:18
140:14 141:2,23
**1:20** 171:8
**1:53** 203:3

**2**

**2** 6:3 7:5 97:4
98:25 100:2
164:15 294:20

357:9 378:11
379:3
**20** 6:8 9:1 108:15
109:7 315:5,15
321:23 435:16
436:22 437:22
**200** 8:8 153:1
**2000** 3:12 115:12
**20005** 2:17 4:17
5:13
**2000s** 22:22
116:23 118:17
168:8 169:4
**2003** 217:21
**2006** 139:25
213:13 347:11,17
348:12,20
**2007** 47:10 66:18
105:19,22,25
108:7,7 114:17,22
115:4,22 132:3
134:21,22 138:7
142:2,22 151:21
153:7,10,11,12
195:1,17 213:14
343:19 352:13
364:20
**2008** 153:13
208:22,24 213:10
213:14,21
**2009** 135:12
140:14 141:2,23
213:11,19,21
**201** 1:21
**2010** 106:6 108:8
115:5 144:2,16,22
144:24 145:25
146:21 147:5,24
147:25 148:4
149:9,10,16 150:2
150:6,10,16,24,25

151:12,25 152:23
153:8,17,23
155:17,19 163:18
163:24 164:25
167:19 168:1,4
219:15 220:6
221:1,16 223:16
225:7 226:22
242:1 288:12
364:11,21,22
365:3 366:18
379:9,13 380:3
**2011** 106:10
151:14 159:5,24
160:7,18 161:1,18
162:4,5,16 163:10
168:2 335:9
341:11,22 342:7
342:15 344:2
**2012** 7:15,20 145:7
158:8 169:17
171:20 172:19
173:10,23,25
175:23 176:11
177:7 178:13
181:20 186:23
304:11 363:8
**2013** 7:16,22 9:3
145:7 168:4
169:23 181:1
217:2,21 290:16
304:12 315:9,19
346:23 348:20
349:3 350:14
**2014** 7:24 137:18
137:20 138:19
139:2 170:4 181:3
183:4 262:17
302:20 303:17
335:5,6

[2015 - 309-6864]                                                    Page 3

**2015**  8:1 10:7
170:10 181:5
208:22,24 209:24
210:5 211:9
357:25 358:17
378:8 395:12
398:14,15
**2016**  8:3 10:1
120:2 170:16
181:7 192:2,4,5
209:2,11,25 210:5
210:13 212:10
288:2,5 289:10,14
321:23 376:12,19
377:10,14,22
378:7 379:9,13
380:3 421:19
422:15
**2017**  8:5 100:5
157:13 170:22
181:9 188:6,16,21
189:25 190:1,8
191:2 192:4,7
194:9 204:24
209:6,11 210:13
212:10 326:24
357:17 371:14
387:21 394:5,17
395:7,24
**2018**  1:18 8:6 9:19
73:19 76:3 77:13
103:6,14 104:22
105:1 157:14
158:18 171:2,21
172:19 181:11
188:6,16 190:9
192:1 204:22,24
361:18,25 362:3
390:6
**2019**  18:2 192:11
192:13,17 195:22

285:25 342:13
433:8 434:4
**202**  2:17,18 4:17
5:13
**2022**  433:17
**206**  13:24,25
**21**  9:5 224:5,7
321:6,8 341:11,22
342:7
**210**  14:1
**211**  14:1
**212**  5:7
**21202-1031**  4:6
**214**  14:2
**216**  3:13,18 14:2
**216-523-1313**
434:3
**216-9140**  2:8
**216-9163**  2:9
**216-9225**  2:10
**216-9461**  2:11
**218**  14:3,3
**219**  14:4,4
**22**  9:7 159:5
227:21 326:16,18
327:11
**220**  14:5
**221**  14:5
**222**  14:6
**223**  8:10 14:6
**226**  14:7,7
**229**  14:8,8
**23**  9:9 236:8
240:22 332:6,13
403:25 404:2
**231**  14:9
**235**  14:9
**237**  14:10
**238**  14:10
**24**  9:11 233:23
338:7 341:10

425:23
**241**  14:11
**242**  14:11
**244**  14:12
**2440**  4:5
**245**  14:12
**246**  14:13
**248**  14:13,14
**249**  14:14
**25**  9:14 11:3
176:11 346:5,13
372:2
**250**  14:15,15,16
**251**  14:16,17
**252**  14:17,18
**253**  8:13
**255**  14:18
**25557**  205:19
**257**  14:19,19
**258**  14:20,20
**26**  9:16 357:23
358:2,17
**261**  14:21
**262**  8:16
**263**  14:21
**264**  14:22
**265**  14:22
**266**  14:23
**267**  14:23
**269**  14:24
**27**  9:19 361:17,25
**270**  14:24,25 15:1
**272**  15:1
**277**  15:2
**278**  15:2
**279**  15:3
**28**  2:7 9:22 370:10
370:18
**2804**  1:5,6
**281**  15:3

**283**  15:4
**284**  15:4,5
**285**  15:5
**286**  15:6,6,7
**287**  15:7,8,8
**288**  15:9,9
**289**  15:10
**29**  10:1 11:3
145:25 376:10,20
**290**  8:19
**294**  15:10
**29464**  2:7
**296**  15:11
**297**  15:11,12
**298**  15:12
**299**  15:13
**2:06**  203:6

**3**

**3**  7:8 106:12,22
421:15
**3.2**  190:18
**3.28**  179:20,23
**3/22/2016**  9:5
321:9
**3/29/2016**  10:13
422:25
**30**  10:4 11:4 91:9
91:11,14 255:13
389:17,25 393:21
393:23 394:2
433:17
**300**  15:13,14
**300,000**  193:23
**30309-3053**  4:11
**304**  15:14
**3050**  394:8
**306**  15:15,15
**307**  15:16,16,17
**308**  15:17,18
**309-6864**  5:7

**31**   10:7 11:4 372:3
   372:6,17 395:11
   398:4 400:23
   421:15
**310**   15:18,19
**311**   15:19
**312**   15:20
**313**   15:20,21
**314**   15:21,22
**315**   9:1 15:22
**317**   15:23,23
**318**   15:24
**3182086**   434:7
   435:2 436:2
**32**   10:10 11:5
   421:2,12
**320**   15:24
**321**   9:5 15:25
**322**   16:1,1,2
**323**   16:2
**324**   16:3
**325**   16:3
**326**   9:7
**328**   16:4
**329**   16:4,5
**32nd**   3:6
**33**   10:13 422:24
   423:8
**332**   9:9
**334**   16:5
**335**   16:6
**336**   16:6
**337**   16:7
**338**   9:11
**339**   16:7,8
**34**   373:18
**340**   16:8
**341**   16:9
**342**   16:9
**344**   16:10

**346**   9:14
**347**   16:10
**348**   16:11
**35**   373:23,25 426:6
   426:7
**352**   16:11
**358**   9:16
**36**   11:5
**361**   9:19 16:12,12
**363**   16:13,13
**364**   16:14
**365**   16:14,15
**366**   16:15,16
**368**   16:16,17
**369**   16:17
**370**   9:22
**373**   16:18,18
**374**   16:19,19
**376**   10:1
**377**   16:20
**378**   16:20
**38**   11:6,6
**381**   16:21,21,22
**385**   16:22
**386**   16:23
**387**   16:23
**388**   16:24
**389**   10:4 16:24
**39**   11:7,7
**395**   10:7 16:25
**3:03**   253:13
**3:26**   253:23

**4**

**4**   7:9 116:16
   118:23 129:3
   295:19
**40**   11:8
**402**   17:1
**403**   17:1,2,2
**404**   4:12 6:9

**406**   17:3,3
**407**   17:4
**408**   17:4,5,5,6
**41**   11:8
**410**   4:6
**412**   3:7 6:10 17:6
   17:7
**414-9226**   5:13
**415**   5:18
**416**   17:7,8,8,9
**42**   11:9,9
**420**   17:9,10
**421**   10:10
**422**   10:13
**424**   17:10
**425**   17:11
**426**   17:11,12
**427**   17:12
**428**   6:11
**429**   6:12,13,14
**43**   11:10
**432**   6:16
**434-5181**   2:18
**434-5182**   4:17
**434-5366**   2:17
**44**   11:10,11,11
**44113**   3:18
**44114**   434:2
**44114-1214**   3:12
**45**   11:12,12
**45004**   1:10
**45090**   1:13
**45132**   1:12
**47**   11:13,13
**48**   11:14
**49**   11:14,15
**4:29**   313:10

**5**

**5**   7:11 134:1,4
**5/3/2018**   7:3 73:10

**50**   1:21 146:2,6,7
**500**   425:22
**51**   11:15
**52**   11:16,16
**53**   11:17
**54**   11:17
**560-7455**   3:7
**58**   11:18,18,19
**58.2**   377:9
**581-8043**   4:12
**591-7093**   5:18
**5:04**   313:13
**5:49**   354:2

**6**

**6**   7:15 91:11,14
   145:5 149:10
   292:15 294:20
**60**   11:19,20 255:13
**61**   11:20,21
**62**   11:21,22
**63**   11:22
**66**   11:23
**67**   11:23
**69**   11:24,24
**696-2493**   3:18
**6:20**   354:5

**7**

**7**   6:5 7:17 152:12
   153:1 159:4
**7/22/2011**   7:17
   152:13
**70**   11:25 109:18
**70s**   87:10
**71**   12:1
**72**   12:1,2,2
**725**   2:16 4:16
**73**   7:3
**7364**   175:19
**74**   12:3

**75** 12:3,4
**76** 12:4
**77** 12:5
**78** 12:5 402:3
**79** 12:6
**7:08** 404:7
**7:21** 404:10
**7:47** 428:3
**7:58** 428:6
**7:59** 430:15,16

**8**

**8** 7:20 169:16
171:25,25 172:1,2
172:18 173:10
174:25 316:19
**8,400** 424:24
**80** 321:24 322:16
373:2
**800** 4:11
**80s** 20:23
**81** 12:6,7,7
**83** 12:8 325:11
**84** 12:8,9,9
**843** 2:8,9,10,11
**85** 12:10,10 391:20
**86** 12:11,11,12
**861-7420** 3:13
**87** 12:12
**89** 12:13,13,14

**9**

**9** 7:22 169:22
181:2 189:3,20,25
190:16
**9/15/2016** 10:10
421:3
**90** 12:14,15,15,16
195:25 196:5
255:13
**90s** 247:14 352:11

**93** 12:16
**94** 12:17
**94111-5356** 5:18
**949-1159** 4:6
**95** 12:17,18
**950** 3:17
**96** 12:18
**97** 7:5
**9:12** 1:18 18:2
**9:58** 64:23
**9th** 402:5 403:18

**a**

**a.m.** 1:18 358:19
398:16
**aaron** 1:7
**abide** 61:22
**ability** 185:19
192:19,19 356:16
**able** 30:20,21,23
42:18 47:4 62:19
62:20 68:1 71:17
79:16 85:13 121:5
122:14 127:16
135:23 137:10
148:19 149:3
178:7 182:17
183:16,22 184:2,6
184:21 185:16
186:15 187:25
191:10,15,16
194:16 197:19
207:20 214:1
261:13 266:20
303:21 310:9
349:24 350:11
384:2 388:13
**absence** 245:11
**absent** 430:5
**abuse** 8:11 9:23
31:20 32:9 33:18
35:22 36:16 38:16

41:3,17,25 44:11
45:2,6,8,11 49:18
50:5 54:14 67:4
67:12 68:9 71:3
83:15 94:17 96:7
96:19 111:16
113:3 122:1,8,12
122:13 123:8,20
124:15 147:7
153:18 176:5,9,14
176:22 177:4,8
183:11,15,17
184:4 186:25
187:10,15 190:5
212:24 219:17
220:5,17,25
221:15 222:5,14
223:14,22 225:8
226:16,21 233:5
242:2 257:14
263:16 288:16
299:13 303:20
308:7 310:11
313:21 316:22
366:12 367:3
370:11,23 371:3
371:20 374:23
388:16 427:4,7
**abused** 177:25
336:10
**abusers** 325:15
329:12
**abusing** 45:12
47:22 49:9 123:3
123:15,19 124:9
124:12
**accept** 45:23
219:21 295:13
296:13
**accepted** 386:17

**access** 56:17
133:10 137:2,21
138:3,9,18 258:2
310:5 321:3
335:17 343:17,21
345:11,13,18
347:16,24 348:4
348:11,19 363:23
382:20
**accessed** 343:9
**accidents** 139:13
140:3
**account** 49:6
247:5 274:12
318:18
**accountants**
194:19
**accounted** 32:7,21
33:1
**accounts** 240:17
272:17,18 273:3,8
338:20,23 340:15
**accrediting** 243:20
244:5,7,20
**accurate** 38:19
41:5 58:7,10 84:1
84:19 95:25
121:13 138:22
173:24
**accused** 22:8
**ache** 238:16
**achieve** 99:21
**acknowledge**
435:11 436:16
**acknowledging**
74:21
**acme** 421:24
**acronym** 107:11
371:10
**acronyms** 355:3

**act** 183:1 193:1
251:8,17,23,25
293:4,14,18,25
435:14 436:20
**actavis** 3:3,3 5:3,3
**action** 70:18 433:4
**active** 331:12
**activities** 31:3,9
33:20 38:7 131:2
173:3,7 198:19
199:4,16,20 270:4
276:3 316:18
331:4 414:10
**activity** 37:23
414:7
**acts** 42:4
**actual** 132:21,22
132:25 173:2
215:24,25 251:22
386:1
**adamhs** 32:7,23
33:17 34:24 35:3
35:19 36:14 38:15
41:1,7,15 47:10
49:15,16 51:1
66:18 68:11 69:11
70:5,7 71:20 72:1
72:11,18 73:1
74:12 75:1,9,16
79:4 80:1,11,11
81:11 82:5 83:1
83:14 91:2,8,23
93:1 94:15 100:7
101:15 103:9,15
103:19 104:12,12
105:5,11,18 106:4
107:11,16,24
108:1,12,14
114:17 115:4,21
116:5 118:25
119:6 120:23,24

121:22 128:11
129:5 130:9,15
131:22 132:5,10
136:10,18 137:1,1
137:21 138:3,7,17
138:24 142:1,22
143:6,8,12 144:14
146:24 150:23
152:22 155:16
157:23 158:21
163:5,24 168:15
172:21,25 174:4
174:18 175:25
176:20 177:1,14
177:15 178:3,9
179:1,25 180:2,9
180:13 182:15
185:6 186:17
194:10 195:14,16
195:18 197:12
198:3 208:4,16,22
213:22 214:6,15
214:17 215:2
216:13,14,20
217:22,24 218:13
218:14 224:24
235:16 251:13
252:12,18 254:9
261:20 270:6
278:8,15 283:17
303:16 332:22
338:16 343:16,18
345:11 346:20
347:15 348:18
351:8 352:13
354:11 364:19
366:17 388:14
390:4 396:19
416:25
**add** 153:25 194:12
385:17 423:17

**addict** 311:18
333:16
**addicted** 45:3 47:1
47:19 48:4,8
123:5 124:8 144:4
310:25 382:20
388:1,7,15 396:8
**addiction** 8:20 9:6
47:1,24 48:1,3
94:3 107:7,12
111:24 112:15
113:22 114:20
115:9,16,24
116:25 118:19
121:3,18 123:21
141:15,17 144:18
147:7 152:4,5,7
164:2,5,7 165:1,2
165:9,11 167:5,7
167:14,15 233:5
290:6,19 310:13
310:16,19,21,23
311:3,10,12,25
312:7,19 313:20
321:10,19,25
322:7 325:4
333:19 338:18
385:23 393:1,13
399:13,24 400:6
408:19
**addictions** 41:8
42:1 278:3
**addictive** 411:17
**addition** 414:11
**additional** 178:10
192:23 193:10
210:4,17 211:3,5
211:18,23 212:12
213:23 214:19
217:5 301:17
347:24 425:2

**addict** 311:18
333:16
**address** 31:16
71:13 121:4,17
147:6 148:19
149:4,4 152:9
178:5,7 186:19
191:4 195:12
216:16 270:24
287:19,22,25
292:1 299:22
303:13 382:22
417:2 434:15
**addressed** 178:1
249:9
**addresses** 240:3
**addressing** 120:20
120:21 148:14
178:11 190:10,25
199:8 265:20
392:17
**adequately** 164:18
**adjournment**
432:22
**adjusted** 216:15
**adm** 7:20,22,24
8:1,3,5,6,8,13 9:9
10:4 18:15 101:19
101:19 103:22
106:1 108:21
114:22 128:13
132:2 169:17,23
170:4,10,16,22
171:2,20 173:4,7
178:20 179:20
180:6 182:9 200:9
204:15 253:17
278:20 303:7
304:1 332:7
340:13 389:18
392:19,20,22
394:5,16 395:6

**administered**
317:14
**administration**
129:25 245:21
247:9,16 248:10
248:24 266:15,23
267:14 268:1
**administrations**
246:16
**administrative**
198:5
**administrator**
112:2
**adopt** 252:19
294:23 295:9,16
**adopted** 245:17,21
247:10 248:10,25
250:9
**adoption** 246:17
252:17
**advance** 312:5,17
**advertise** 301:3,10
**advertising** 300:10
302:6 411:2,3
**advice** 35:25 60:22
88:24 89:12 93:17
95:9
**advise** 60:21 87:20
90:22 117:14,22
**advised** 117:9
**advisory** 9:17
358:4,24 359:16
359:19
**affect** 131:9
**affiliated** 75:14
**affixed** 433:6
435:15 436:21
**affordable** 183:1
193:1
**aforesaid** 432:12

**age** 20:3
**agencies** 34:21,22
34:23,23,25 38:1
41:14 42:6 43:14
43:14 44:21 48:21
54:5,5 94:17
103:3 115:14,17
173:8 193:9,15
211:25 212:16
214:2 230:21
276:6,12 303:5
318:4,11 370:1
**agency** 108:21
133:3 177:18,23
178:6 180:20
183:10 188:22
190:1 268:6,9,13
269:5 270:18
271:11 330:15
393:18
**aggregate** 215:23
216:1 269:2,6,14
269:24 270:8
**aggregation** 216:7
**aggressive** 226:9
230:13,16,25
231:7 300:9,10
**ago** 35:15 63:13
116:8 328:25
333:23 355:24
370:25
**agree** 123:14
140:20 141:22
142:4,16 144:2,7,8
148:17 149:1
150:5,8 162:10,11
163:4 205:6
226:15 227:6
232:3 236:18
250:18 255:6
257:2 260:12,15

260:16 293:22
295:2,3,3,12
307:17,22,24
310:10 311:9
313:17 314:7,16
314:22 317:17
318:16 323:5
325:14,20,21
335:15 341:6
343:16 351:13,16
364:15,21 365:8
368:3 377:12
406:2,23 407:3,7
**agreed** 58:17
209:20
**agreement** 103:8
**agreements** 412:9
426:19
**ah** 402:12 403:6
403:10
**ahead** 18:11 25:1
25:1,3,6 44:3,6
52:22 62:2 88:1
88:10,17 101:1,8
117:10,25 124:4
126:10 151:10
164:16 166:6
202:4 220:3 384:6
384:7 390:19
**aid** 415:3,7,12
417:11,12,16
418:4,25 419:11
424:18,20,20,24
425:6,14
**aids** 417:19
**aimee** 119:25
130:16
**akearse** 2:8
**akouba** 2:10
**akron** 1:22 2:3
9:23 18:6,14,18,20

18:23 358:16
370:12 371:21,24
371:25 398:6
**al** 1:10,12,13,13
**alcohol** 107:6,12
109:20 113:2
164:13 187:2
211:10,11 394:20
**alice** 119:19
**allegations** 66:11
83:24 84:10,13,15
84:16,19
**alleged** 237:18
**alleging** 382:7
**alleviated** 77:12
**alleviates** 406:25
**allocate** 308:5
**allocated** 178:2
190:24 193:9
211:16
**allocating** 214:1
**allocation** 177:18
**allow** 110:10
118:13 121:17
147:22 164:23
185:6 203:12
319:14
**allowed** 46:16
**allows** 392:24
400:3
**amazing** 421:24
**amerisourceberg...**
5:9 19:23 277:19
279:12
**amount** 35:18
38:14 54:12 68:24
169:2 198:10,16
209:23 216:19
217:23 218:17,21
247:2 256:18
257:4 309:8 314:1

314:19 318:5
352:13,19 399:22
400:6
**amounts** 196:12
196:20 274:16
310:8 365:4,17
414:4
**analgesics** 9:2
315:8 316:4
**analogues** 382:16
**analyses** 383:19
385:20 386:2,19
386:19 400:15
**analysis** 158:17,19
256:8,18 275:1
281:19 344:5
386:6
**analyze** 353:18
**anecdotally**
234:12 297:7
**angeles** 387:4,5
**angry** 326:12
**anne** 2:5 18:10,12
18:13 171:18
189:6 203:7
315:17 434:5
**annie** 2:6 18:16
**announced** 74:15
425:20
**annual** 132:6
172:25 174:4
176:23 183:8
186:22 188:1
198:3 269:14,24
**answer** 23:11,25
24:4 46:18 49:23
50:12 65:10 68:1
81:17 87:3,3 88:5
88:12,12 92:5
93:18 117:16,21
135:8 147:15

152:19 156:7
165:16 166:1,18
166:21 181:23
184:2 211:22
219:25 277:17
286:13 378:21
381:17 384:25
388:20,23
**answered** 90:15
147:3 151:4,22
154:17 155:21
157:2,5,8 162:18
163:12 167:9
249:6 251:19
265:11 288:24
329:17 335:4
366:22 388:18,21
388:24 389:8
403:8,21 420:23
425:9 426:13
**answering** 25:22
25:24 97:12,16,22
98:20 99:8 147:18
384:14,23 385:9
428:10
**anticipate** 57:2
192:12
**anticipated** 57:4
**anybody** 28:3,7,16
49:12 59:8 66:10
66:14,20,23 67:2,6
67:6,9,20 68:23
69:1,10 72:10
79:3 82:4 94:12
113:24 133:13,16
136:5 139:4
214:14 232:18
270:5 351:7
366:24
**anybody's** 90:25

**anymore** 145:18
**apart** 83:2 242:18
242:21 419:9
**apologize** 189:7
197:5 201:12,23
411:1
**apology** 45:24
**appear** 305:14,14
435:11 436:15
**appearances** 2:1
3:1 4:1 5:1 6:3
**appeared** 91:18
**appears** 176:10
254:7 358:10
364:1 367:14
421:16,18,21,22
423:10
**appended** 436:11
436:18
**applicable** 431:7
**apply** 407:13
428:19
**appointed** 106:5,7
108:8 149:18
151:25 152:2
**appointment**
393:15,16
**appreciate** 122:17
344:18 384:22
412:22
**appreciation** 78:7
**approached** 59:16
59:21 71:12
**appropriate** 51:17
70:18 99:19 102:1
117:17,19 250:11
305:10
**appropriately**
148:20 249:9
311:16

**approval** 79:17
**approve** 172:20
266:25 408:3
**approved** 103:15
103:19 104:12,16
125:2 195:2
231:21 267:5,10
267:18,19 352:5
352:19 407:18,21
**approves** 267:9
407:23
**approximately**
105:16
**area** 90:22
**areas** 211:1,1
308:18
**arguing** 222:19
**argument** 300:9
**argumentative**
77:6 93:6
**arm** 260:7 374:13
**arrangement**
136:20
**arrest** 239:5
**arrested** 237:17
297:5
**arrive** 281:12
**arrived** 36:11
39:16 52:1,13,15
120:16 247:17
**arriving** 284:14
383:20 385:21
**article** 321:17,23
322:19 324:10
**articles** 273:10
282:15,16
**articulated** 383:8
383:12
**ascribe** 300:3
**aside** 61:15 70:3
188:9,13 193:8,10

216:20 288:6
318:23 348:16
**asked** 25:8,25 26:1
29:7,8 40:3 49:12
55:11 62:16 64:12
66:5 67:19,20,21
72:7,8 92:10 98:7
98:17 101:6
133:13,16 138:25
139:5,6 147:2
151:4,22 153:9
154:17 155:20
158:6,8,24 162:2
162:17 163:11
166:10 167:8
178:20 181:20
197:23 214:6
228:4,7,7 249:5
251:18 265:10
277:14 279:3,10
280:1 285:8
288:23 301:22
306:14 335:3
353:5 354:14
366:21,24 389:8
396:24 397:3,5
403:7,20 417:20
418:12 420:22
425:9 426:12
**asking** 20:14
25:11 30:3 31:4
47:7 67:23 71:23
90:25 91:15 92:3
94:11,19 95:2,3,4
95:5 100:13,20
110:24 114:8
118:8 122:15
142:12 151:19
154:3,14 163:14
184:19 185:24
186:13 187:13

218:9 236:25
241:17 255:6
270:22 271:3
273:16 286:14,15
286:16,17 331:13
342:12,22 348:10
364:18 377:18
385:25 400:14,15
**aspect** 37:15 272:8
336:6
**aspects** 131:13
246:11 280:20
**assembly** 293:3
**assess** 121:2 304:8
318:17
**assessing** 304:18
319:4
**assessment** 326:1
413:18
**assign** 35:14
248:21 266:20
298:20 306:6,14
409:21
**assigned** 199:24
**assignment** 173:2
199:22 435:2
436:2 437:2
**assimilate** 86:17
**assist** 71:17 112:6
**assisted** 64:2
130:20,24 193:11
193:16
**associate** 112:23
**associated** 30:2
31:16,20 56:8
78:5 109:23
408:13
**association** 127:18
276:14 282:24
292:5 399:10,21

**assume** 105:24
**assumed** 56:24
74:20
**assumption** 69:19
**assured** 81:9
**atlanta** 4:11
**attach** 244:1,2
**attached** 347:5
362:1 436:7
**attachment** 9:15
9:20 10:15 346:8
361:20 423:2
**attempted** 49:17
**attempting** 166:1
**attend** 28:4
**attendance** 199:21
**attention** 116:4
149:22 174:10
224:3 228:23
247:2,7 254:19
282:5 292:14
316:21 334:25
341:9 373:22
378:25 379:1
389:24 398:3
**attorney** 50:17
51:4 52:6 83:13
83:22 433:2
**attorneys** 24:12,19
25:18 26:11,17,25
27:2,16 28:4,8
33:10 54:2 61:13
77:16 215:8
**attribute** 380:9
**attributed** 210:16
**attribution** 396:13
**august** 50:8
**authorities** 406:8
406:12
**authorize** 74:18
436:11

**authorized** 74:23
76:20 79:10
343:10
**automated** 261:6
344:22 345:1
349:6,13
**automatically**
346:16 349:3
351:3
**availability** 233:7
374:6
**available** 40:6
42:16,18 106:18
134:15 138:11,15
182:14 185:6
192:22,24 193:2,3
212:4 214:20
216:19 218:14
243:7 280:11
308:23 314:20
317:12 318:7
319:1 329:21
343:25 344:19,24
348:25 366:13,14
391:1,3 399:5,22
418:14 420:5,9,19
422:9 426:5
**ave** 434:1
**avenue** 3:17 5:6
**average** 263:4
**avoid** 242:15
303:25
**aware** 24:20 44:21
45:1 84:14 96:11
101:22 103:22
104:1 110:9
112:14 115:22
116:12,13,24
126:6 131:15
132:5,7 138:10
140:6,8 146:25

147:11,23 151:11
151:12,13,17
152:7 153:14,15
153:22 155:23,23
155:24 156:7,17
160:8 165:14
168:8,25 169:7,8
222:6 223:7,10
225:10 228:7,24
231:10,16,17,23
234:24 237:5
240:23 244:3,23
250:25 251:5,6
257:22 268:22
269:4 270:4,13,16
275:17 281:3
294:19 297:6
302:7,11 316:17
325:9,19 329:23
335:16 343:21,22
343:25 344:23
345:13,16,18
349:1 352:21,24
360:10,17 361:7
390:16,21,23
392:25 407:15,16
407:17,22 408:2
408:11,17,21
411:10 413:19,21
414:12 415:4,15
416:6,10,11,15,16
419:2 425:10,13
425:24 426:2,9,14
426:21,25 427:8
427:11
**awareness** 252:9

**b**

**b** 91:9,11,14
**baby** 226:12
239:16

**back** 20:23 26:3
44:24 51:9 55:17
65:3 72:23 87:10
94:21 95:11 111:2
122:18 134:20
157:20,21 158:3,4
158:5,7,12,18
163:18 165:23
166:10 171:10
175:20 176:18
177:20 184:22
186:1,10 187:19
188:12 189:17
191:9 194:3
195:15 197:14,21
199:5 207:9
216:12 217:12
223:16 228:18
230:11,22 233:21
236:7 240:20
253:25 279:1
286:1 308:19
313:15 318:24
334:17 340:23
348:19 349:17
354:7 357:11
377:13,21 381:12
397:1 400:8
434:15
**background** 152:5
152:6,7 164:2,5
**bad** 268:23
**baker** 3:10 19:7
**bakerlaw.com**
3:13
**balance** 190:23
194:15,20,25
195:9,25 196:2,6
**ball** 185:11
**ballpark** 36:7

**baltimore** 4:6
**barberton** 370:5
**base** 314:23
**based** 111:14
114:16 150:12,12
160:5 186:6
191:20 192:21
199:21 206:5,7
209:22 245:6
271:5 272:14
273:25 276:23
280:7,9,10 311:18
314:10,18,24
322:10,19 329:20
334:7 338:14
364:18 369:18
372:11 399:14
422:3 430:1,8
**baseline** 137:13
**basic** 23:5 120:22
209:21 294:10
**basically** 182:20
**basing** 274:21,23
**basis** 22:2 79:14
80:5 152:1 159:10
186:22 200:18,19
228:5 261:2,4,12
262:20 272:2
282:23 314:18
317:11 330:25
349:25 351:5
415:11
**bates** 188:25
189:21 201:7,10
203:11 205:19,21
332:17 403:25
421:12 423:8
424:11
**bath** 149:20
164:11 165:1,9,15
166:16 167:2,5,10

167:14,17,22
**beacon** 358:16
398:6
**becoming** 311:17
**beds** 212:3,4
**began** 55:20
131:10,24 137:8
197:15 344:10,18
351:25 352:6
**beginning** 130:11
168:14 195:7,8
359:8 398:13
**begins** 324:18
373:25 424:17
**behalf** 2:3,13 3:2,9
3:15 4:3,8,14 5:2
5:9,15 18:17,20,23
19:21,23 20:1
69:11 70:24 82:25
107:2 177:15
225:20 270:6
271:21,24 272:4
**belief** 79:7 382:17
383:1,3
**believe** 21:21
24:24 32:5 33:14
33:16 35:2 49:6
52:23 60:12 69:19
70:1,16 78:23
80:1 90:15 95:1
96:17 104:10
106:10 114:18
123:18,20 128:22
145:20 149:20
156:1,10,19 158:7
160:18 164:25
166:12 179:21
188:7,17,23
206:11 215:23
220:13 227:4,11
227:14,24 228:17

229:13 230:15
231:3 232:8,11,20
234:2 238:25
243:19 246:2
247:14 248:15,22
249:6 250:4,7,16
263:13,19,22
264:7,16 265:3,14
265:23 266:13
268:16 270:17
274:10,12 276:24
278:16 284:20
285:9 286:2
287:12 288:7,20
289:5 292:9
297:16,25 298:13
298:17 299:20
300:23 301:5,5,18
307:12 308:7,14
310:15 311:11
312:8 329:17
333:2 337:1 344:9
344:10 355:6
356:4,21 363:16
365:20 367:18
382:1,9 383:6
387:4 388:12
391:5 396:2,5,14
399:20 400:2
407:19 408:23
410:24 411:20
429:19
**believed** 36:13
38:13 54:13 103:6
250:10 283:21
338:13
**believing** 280:5
**bell** 222:1 251:17
326:5,6
**belonged** 234:9

**beneath** 119:10
**benefit** 336:13
**benzodia** 114:4
**benzodiazepine**
113:2
**best** 31:6 33:3
36:24 37:2 69:9
166:21 199:10
248:13,16 249:3
250:13
**bet** 410:22
**better** 63:23 96:20
166:22 167:23
245:2 331:18
335:12 336:9
350:2 352:3
353:19 356:12
360:13 373:14
397:15
**beyond** 192:13,16
277:10 383:21
**bidirectional**
110:4
**big** 234:18,19
**bigger** 53:1,2,3
157:13,17,18
165:1,3 167:14
**bill** 43:15 55:6
56:19 57:20,22
149:17
**bill's** 58:11
**billed** 212:18
**billing** 191:18
**biological** 311:19
**biostatistician**
387:16,18
**bit** 29:12 32:14
40:23 73:19 77:20
109:10 139:23
142:14 145:2
194:22 208:23

225:14 258:8
293:7 299:17
327:1 348:7
361:15 378:3
400:21 411:23
423:17
**black** 365:22
366:2,5,9,19 367:3
**blame** 271:9
**blank** 332:2
410:15
**bleachers** 238:10
**bmasters** 4:18
**board** 7:20,22,24
8:1,3,5,6,8 10:4
32:7,23 33:17
34:24 35:3,19
36:15 38:15 41:1
41:7,15 47:10
48:17 49:16 51:1
56:20,22 66:18
68:11 69:12,25
70:5,7 71:20 72:2
72:11,18 73:1
74:12,18,22 75:1,9
75:16 77:14 78:7
79:4,11,17 80:2,11
81:11 82:5 83:1
83:14,19 91:2,8,23
94:15 100:7
101:15,19,19
103:9,14,15,18,19
103:22 104:8,11
104:12,13,15,20
105:1,5,8,10,11,13
105:15,18 106:1,4
106:5 107:8,13,16
107:25 108:1,12
108:14,21 114:17
114:22 115:4,21
116:5 118:25

119:6 120:25
121:22 127:18
128:11,13 129:6
130:9,15 131:22
132:2,5,10 133:16
136:10,18 137:1,2
137:21 138:3,7,17
138:24 142:2,22
143:8,12 144:14
146:24 150:23
152:22 155:16
157:23 158:21
163:5,24 168:20
169:17,23 170:4
170:10,16,22
171:2 172:21
173:4,7,20 174:4
174:18 175:25
176:21 177:14,15
178:3,9,21 179:1
179:20,25 180:2,6
180:9,13 182:9,15
185:6 186:17
195:14,17,18
197:12 198:4
200:9,24 201:2
204:15 207:7
208:4,22 213:22
214:6,15 216:20
217:24 218:14
224:24 235:17
251:13 252:12,19
254:9 261:20
270:6 276:14
278:8,15,20
282:24 283:17
292:5 294:5,7,9,11
294:15,21 295:8
295:15 303:7,16
315:24 317:10
320:15 332:22

338:16 340:13
343:16 345:11
346:20 347:7,15
348:18 351:8
352:13 364:19
366:18 389:18
390:4 396:19
416:25 421:24
**board's** 74:25,25
331:4
**boards** 9:1 74:1
101:25 103:3,4
315:6,20 316:3,11
**bockius** 3:5 5:5
**bodies** 243:20
244:7,20
**boehm** 2:15 6:8,12
6:14 18:9,9,11,25
18:25 20:9,13
23:20 31:24 32:3
44:4 45:17,19,23
46:5,14,17 52:20
61:24 62:9 64:18
64:20 65:2 86:4
87:25 88:4,15
91:6,9,11,15,21
92:2,6,8,12,17,22
93:2,7,10,11 97:18
98:1,4,9,12,21,23
99:6,11 100:21
101:1 117:5,15
126:14,19 127:1
133:25 134:12
135:6 151:5,7
154:3,8,11,14
163:15 165:19,22
166:6,9,23 169:11
171:9,17 172:1,3,6
172:9 189:1,5,12
189:16,22 201:4,9
201:12,19,21

202:2,9,13,16,19
202:25 203:10,16
203:25 204:5
207:3 209:19
217:11 219:24
221:5,7,12 249:14
249:18 253:9,24
254:11,16 286:23
313:8,14 315:17
321:5 326:13
327:14,20,22
328:4,7 332:12
353:20 354:6
357:23 381:11
384:15,24 385:2,7
385:11,13 389:15
393:22 394:1
403:24 404:4,11
428:24 429:2,12
429:22 430:11
**book** 280:22 281:1
366:10 386:7,13
**boomers** 226:12
239:16
**borders** 365:18
**boring** 85:9,11
**bottom** 146:6,13
175:1,3,13 190:14
205:20 224:6
368:8 371:18
373:4 379:4 394:3
394:8 398:10,11
400:2
**boulevard** 2:7
**boxes** 224:14
**boy** 107:23 291:14
**brad** 4:16 19:18
**brain** 311:3
**brake** 305:8
**break** 46:12 49:5
49:13 64:16 65:4

65:10 126:11,19
166:3 169:10
249:12,19 253:10
254:1 260:7 313:7
353:21 354:8
427:25
**breaking** 234:14
**breaks** 65:6
313:16
**brenda** 3:17 19:13
**brenda.sweet** 3:19
**bridgeside** 2:7
**briefly** 404:19
423:22
**bring** 60:4 70:24
71:15,21 230:7
303:11
**brings** 294:15
427:5
**broad** 123:9
127:24
**broader** 300:4
303:7,14
**broadly** 250:19
300:14
**broke** 40:7 65:4
**broken** 176:2
**brotherhood**
212:1
**brought** 22:7
64:14 67:9 103:20
195:6
**budget** 7:20,22,24
8:1,3,5,7 132:6,9
132:12 169:17,23
170:4,10,16,22
171:2 172:25
173:2,6,10,18,19
173:23,25 174:4
175:23 176:23
177:21 179:2

181:1,3,5,7,9,11
181:20 183:8
184:11 188:6
192:9,11
**budgeting** 174:24
**budgets** 171:20
172:9,17,19
176:21 181:1
183:6,7 188:1
198:3 211:2
**build** 214:2 243:7
**building** 210:14
211:19,23
**builds** 310:24
**bullet** 134:21
135:11,14 140:13
254:24 364:10
**buprenorphine**
193:18
**bureau** 225:22
283:10
**burgeoning** 160:1
160:9,12,23 161:3
162:14 163:8
164:9 167:25
168:9,16 335:7
**burling** 5:16 20:1
**business** 130:2
233:9 306:3
392:23 409:6
413:16,17
**buy** 272:5
**buying** 259:24

**c**

**c** 4:10 355:12
**ca** 434:25
**cabinet** 259:7
362:18,20
**calculate** 38:13
43:8 49:17 186:6

calculated 206:6 208:21
calculating 37:5 205:18 206:2
calculation 35:1 50:4,24 185:7 207:14 208:1,3
calculations 38:22 53:23 130:9 133:20
california 5:18
call 127:6 287:24 342:20 409:4
called 20:3 133:9 208:9 302:16 321:18 330:13 342:15,18,18,18 342:20 354:23,25 407:23 409:8 413:5,11 427:4
calling 7:10 44:15 116:18
calls 44:14 53:10 53:15 84:11 286:6 286:9,12
camera 154:7
campaigning 332:1
campaigns 300:13
candidate 305:20
cannabis 394:20
canton 9:23 370:12 371:21
capability 304:18
capable 305:16
capacity 150:21 193:11 210:14,17 211:19,23 213:5 214:3 335:23 364:21 397:17

capita 232:15 350:12,25 399:6
capitalize 38:1
caption 432:21
capture 329:22
captured 394:21
capturing 38:4 53:5
cardinal 2:13 4:14 19:1,19 275:23,24 276:1,2,9,24 277:15 279:12
care 127:23 183:1 193:1 229:5 231:8 231:14,20 237:6 244:12 246:11,12 246:13 248:8,23 252:7 258:1 271:15,19 272:20 303:4 306:4 312:15 313:18
career 111:23 112:1
careful 53:4 77:24 264:3
carey 5:17 19:25 19:25
carfentanil 289:18 289:19,23 299:9 323:10,18 336:16 369:6 376:22 377:2 398:1
caricature 61:25
carole 3:11 19:7
carolina 2:7
carried 216:5
carry 195:25
cartels 306:7,15 306:24 308:25 360:25 361:11 386:9

case 1:6,10,12,13 112:4,10 156:20 176:24,25 177:22 215:19 245:15 257:6,6,9 278:23 278:25 280:6 314:25,25 318:19 318:19 325:19 339:9 347:22 351:6,17 378:1 381:4 382:7 397:7 405:11 413:20 414:13 415:8 416:3 434:6 435:3 436:3
cases 42:22 112:8
casual 238:11
catalog 177:12,16 178:6
catches 140:2
categories 31:19 32:8,22 33:2,15 34:17 35:5 43:3
categorized 334:22
category 38:11 40:8,8 179:18 263:4,4
caught 304:22
causal 110:20
cause 111:1 134:25 136:1 148:18 363:7 380:6 396:14 432:12
caused 68:18 227:25 229:21 402:4 403:18
causes 68:25 110:25 131:5 136:8 147:25

148:8,12,13 149:3 149:11 220:19 226:5,15 235:18 235:24 240:6 241:5 278:10 281:20 282:10 292:8,10 344:6
causing 69:3
caveat 58:21
cdc 9:17 262:16 358:3,23 359:22 359:24 360:1 364:2 376:8
cement 367:15
center 160:16 360:2
centers 363:19 418:5
centralized 42:12
centre 3:6
centric 304:1
cephalon 3:2 5:2
certain 39:2 166:17 167:3 189:7 199:24 219:2 343:8 367:13 414:2
certainly 67:20 82:1 96:11 118:16 146:17 148:23 153:16 160:7 165:4 219:21 310:4,20 341:22 348:20 377:16
certainty 36:6 39:4 140:25 144:23 156:6
certificate 6:16 432:1 436:11
certification 243:25 244:15

435:1 436:1

**certified** 20:6
194:19

**certify** 432:8,19
433:1

**chain** 7:3,5 9:7,16
9:19 10:7,10
73:10,18,19 97:5
326:19 328:3
358:3 361:18
395:12 421:3

**chains** 414:12
416:7 420:18

**chaired** 337:4

**chairman** 290:24

**chairman's** 8:22
290:8

**challenges** 49:8

**chance** 94:20

**change** 123:12
434:13,14 436:8
437:3

**changed** 77:11
218:16,22,25

**changes** 192:25
219:4 226:8
227:21,24 228:17
228:20 229:14,20
252:16 309:17
434:12 435:7
436:7,9

**characterization**
56:20 76:15 123:1
123:10 162:6
311:6,7 334:14

**characterizations**
367:9

**characterize** 124:6
162:9 197:20
298:22 299:3
306:11 386:5

406:6

**characterized**
97:1 113:11
367:10,11,17

**charge** 422:10

**chart** 118:24
119:8 129:4
205:13,19 206:13
208:7,20 213:11
213:13 239:13,15
379:5

**charts** 352:10
383:22

**cheap** 323:2

**check** 202:22
251:12 340:25
389:4,4

**checkmark** 333:21
334:18

**cheek** 185:13

**cheri** 7:6 73:22
97:6

**chief** 34:19,20
35:10 39:2 50:21
51:24 54:4 120:7

**children** 28:15

**china** 324:6
360:25 369:7,11
369:17

**choice** 78:16,24,25
79:4,8,20,22,25

**chord** 325:24
326:3

**chose** 76:12 77:25
78:13 339:11

**chris** 337:4

**christie** 337:5

**christina** 83:12,21

**christine** 130:16

**chronic** 9:2 293:19
315:9 316:5,16

**circle** 224:10

**circumstance**
238:9,23

**circumstances**
217:21 256:10

**citation** 282:18

**citations** 282:16

**cited** 411:12

**citizen's** 239:5

**citizens** 214:7

**city** 1:11 2:3 18:14
18:18,20,23 52:6

**civil** 20:5 21:4,14
22:16 431:3,7
435:5 436:5

**claim** 22:3 46:6
48:3 62:12 63:3

**claimed** 42:22
61:23

**claiming** 203:24
381:3,21 388:5

**claims** 21:11,12
34:1,3,3,4 37:11
42:5,8,11,13,18,20
42:23,25 43:5,5,6
43:18,24 44:9,9,21
44:22,23 48:22
54:6,19 63:23
187:20 191:8
197:8 206:5,7,11
207:6,16 212:16
215:1,3,16,17,24
215:25 216:9,9
318:25 319:8,12
319:14,20 354:11
354:16,24,25
355:8,9 388:13
414:24 415:2,12
416:1

**clarification** 24:23

**clarify** 30:21
34:20 62:13
286:15

**clarifying** 54:5

**clarity** 32:15
185:17

**classification**
319:13

**classified** 353:10

**classifies** 353:1

**classify** 199:5

**clawback** 201:25

**clear** 51:10 76:22
94:11 96:10 111:5
115:2 149:6
181:16 184:16
214:11 222:19
225:15 265:1
281:17 304:3
395:4 422:5

**clerk** 330:20

**cleveland** 1:11
3:12,18 433:7
434:2

**client** 89:13 90:22
117:22 120:21
204:3

**clients** 112:3
328:14 373:3

**clinic** 34:19

**clinical** 106:2
108:3,6 112:8,11
119:24 120:7,18
141:11 226:8
227:21,25 228:18
228:20 229:14
252:16 254:8

**clinics** 242:13

**clock** 99:19

**close** 53:10,15
88:23 89:25 90:18

93:13,25 95:15
96:4 247:6
clue 204:19
clunky 352:2
coach 392:1
coalition 303:13
303:20 306:1,1
cocaine 113:3,3
125:10,12 187:7
299:14 376:22
379:23 380:2,10
380:19 381:1,6,16
codes 191:17,18
coding 197:8
cogently 294:13
cole 290:25
collaborative
426:18
colleague 19:2
colleagues 28:20
29:6,14 33:12
82:20 102:20
412:21
collect 33:5 133:14
355:8 420:12
collected 37:15,17
61:11 180:4 215:6
218:21 219:3,4
collecting 38:6
336:13
collective 283:2
396:15
collectively 31:15
color 367:10,17
column 372:16
373:25
columnist 358:15
com 157:22
combat 419:18
combatting
338:17

combined 381:1
come 30:1 51:16
66:14 67:9 68:23
69:1 81:7 116:4
156:15 174:17,22
178:7 185:17
186:1 190:21
230:10 233:21
278:22 279:23
307:16 308:14,25
320:7,23 321:25
322:1 327:12
329:2,3 330:20
341:18 362:10
364:1 368:23
371:7 383:14
395:25 402:25
423:10
comes 190:18
193:23 232:12
282:5 302:1 376:1
comfortable 62:18
88:18 93:22 94:8
coming 169:3
212:21 335:13
365:4,18 367:22
commentary 86:3
commission
245:17 246:7,10
247:9,16 248:9,24
336:23 337:16
338:17 339:10
341:4 387:21
433:17 435:19
436:25 437:25
commissioned
432:8
commissions
246:16
committee 8:21
290:8,20,24

292:22 293:23
337:2,3
committees
199:22,25
common 48:11
112:20 334:6
communicate
51:21 72:1 331:12
401:10
communicated
130:14 417:1
communicating
335:10
communications
270:15 330:5
communities
165:6 166:13,17
167:3 240:8
264:14 271:23
274:6 298:10
308:17 309:7
391:19,20
community 7:15
9:10 22:15 30:18
33:21 37:19 67:18
108:16,20,24
109:8,8,14 112:1
112:12,23 113:1,8
113:20 114:11
121:3,19 129:1
131:14 132:1
143:20 145:6
149:19 165:6
174:10 195:13
220:10 225:17
230:5,22 250:20
266:12 274:13
276:9,13 283:19
289:18 294:23
295:9,16 299:7
302:24 303:2,11

303:12 304:2,3,8
305:2,25 306:2,3
309:24 326:1
332:8 338:5
360:14,15 372:13
374:1,5 396:15
397:12,13 400:5,7
400:12 428:20
companies 230:17
271:22,25 272:6
280:2 284:2 301:4
310:7 360:24
414:2,10
company 42:5
231:6,12,18 277:9
405:13 413:4
compared 261:25
compares 52:14
139:12 379:7
comparison
306:21
compassionate
252:7
compelled 338:23
compelling 383:5
compensated
43:23
compensation
81:19 82:6
complaint 21:15
63:7 64:2,7,13
66:5,9,24 67:5
69:13 72:3,13
84:1,10,18 85:5
86:20 287:20
405:14 414:17,20
complete 66:19
257:10
completed 432:22
434:15

**completely** 198:1
220:8
**complex** 112:7,11
307:19,23
**complexity** 41:20
**component** 78:11
176:23
**components** 173:1
**comprised** 391:23
**compu** 196:24
**computation** 35:2
43:25 44:8,15
48:23 51:13 59:19
60:8,10 61:2,4
130:20,25 158:20
196:7,16 197:22
206:9,12,14,18,21
207:14 208:1
357:4
**computations**
38:22 39:7 54:25
130:5,10,15
133:20 157:12
196:10,20 197:11
198:8 209:23
215:4,18
**compute** 157:22
355:5
**computed** 196:12
206:4 212:15
**computer** 60:14
**computing** 36:13
356:20
**concept** 244:16,21
247:10 248:11
255:5,6 258:5,9
259:10 296:15
**concern** 61:9 72:9
72:17,25 74:8
76:2,5,7 82:5
101:10 274:2

**concerned** 75:19
75:23 77:2,3 78:3
78:4,6 81:1,6 82:2
101:21 150:18
**concerns** 73:4,5,6
74:1,11 77:12
80:19 100:6,15
101:14,18 122:2
268:2 271:8 277:1
281:6 291:18
314:1 323:6 340:7
340:17 368:4
371:20
**conclude** 31:11
**concluded** 32:25
220:19 229:6
305:22 430:16
**conclusion** 22:7
31:12 44:14 51:17
156:15,24 284:14
293:23 307:5
383:8,18,21
385:21 400:4
**conclusions** 39:19
222:8,13 223:4
229:5 267:17
**concrete** 367:14
**condition** 110:1
**conducted** 274:25
**conference** 276:16
**confident** 40:4
**confirm** 356:10
365:13 410:25
**confirming** 388:25
**confused** 186:11
**connec** 233:16
**connected** 168:20
168:22 233:17
297:4
**connection** 32:9
33:18 36:15 38:15

49:18 50:4 54:14
54:21 67:8 74:14
81:3,12 82:7
83:15 157:24
158:20 164:8
193:1 196:9,11,18
197:13 198:9
206:15 207:15
214:9 268:1,14
269:25 273:15
275:3 330:2
400:16
**connolly** 2:14,16
4:15 19:1,3
**cons** 77:18 82:19
**consequence**
168:25
**consequences**
264:12
**conservative**
36:23 53:16
**consider** 53:11
61:13 67:11 75:8
121:8 125:4,10,12
125:12,13,15,17
125:19,21 305:19
335:10 344:4,13
430:7
**consideration**
257:17
**considerations**
314:25
**considered** 37:4
67:3 69:2 70:17
235:17
**considering** 66:16
301:15
**consistency**
367:11
**consistent** 135:18
363:11 373:8

374:21 375:4
377:13
**constituted** 217:25
**consult** 66:10,13
66:23 70:2,5,6
82:25
**consultation** 103:8
**consultations**
112:5,11,12
**consulted** 69:6,12
72:12
**consumer** 226:10
233:21 236:8,14
236:18 239:23
240:21,24 241:6,8
241:9,13 411:3
**contact** 113:23
**contained** 339:24
356:6
**content** 59:9,14
61:2 66:24 69:12
72:2,12 359:17
426:16
**contents** 339:18
424:9
**context** 22:12 23:4
58:11 68:22
112:10 350:5,8
359:15 366:10
423:17
**contingent** 228:15
**continue** 23:25
73:25 192:20
384:23
**continued** 3:1 4:1
5:1 135:11 151:3
378:13
**continues** 192:16
**continuity** 7:9
116:17

contract 34:25
48:20 106:9,9
108:21 188:21
189:25
contracting 34:23
41:14 94:17
177:23
contracts 121:5
contractual
175:24 176:10
183:9
contractually
272:7
contrary 379:16
contrast 379:17
contributed 128:5
227:15 229:17,25
230:17 232:9,21
235:10 236:19
241:23 242:9
243:15 244:8
246:19 288:8
292:24 308:7
contributes 255:8
contributing 67:3
67:12 128:22
220:13 227:7
232:4 235:6
240:19 242:22,25
258:6 285:14
307:7,10
contribution
246:23 285:22
299:4
control 75:6
237:24 360:2
363:19
controlled 237:25
268:14 269:7
275:16 318:6,12
351:15

controls 301:6,9
301:14,17
conversation 30:5
31:14 32:6 34:19
54:3 59:25 81:22
128:25 131:1
200:18,20,20
238:11,12 292:7
345:25 417:17,24
419:9
conversations
30:4,10,11 32:20
34:12,14,16 39:1
51:3 53:22,24,25
59:7 71:2,6,9 79:3
82:13,16,23
102:20 112:9
130:4,7 204:2
291:6,9,13 292:4
329:25 330:8,12
353:17 396:17,22
396:25 417:16
419:11,16
convinced 294:22
295:9,15
copies 171:17
copy 60:7,12,16
134:12,13 201:15
315:18
corner 175:1,3
189:4 254:14
394:3,9
corporation 5:10
5:15 19:24 20:2
correct 32:24 39:9
40:9,10,15 41:19
51:12 63:6 76:13
76:13 83:4 105:20
107:9,18 115:6
119:17 127:8
129:7,20 132:18

145:23 147:4
153:7,20 160:6
164:3 174:1
176:16 186:9
187:1,8,12 190:19
192:8 196:19
197:10 216:18,23
219:12 220:14
270:16 289:15,20
311:14 312:2
318:8,9,15 319:24
327:14 337:13
359:23 371:12
389:11 401:18,21
406:17,20,21
407:9 408:10
415:13 416:5
420:20 430:10
432:17
corrections 434:12
436:17
correctly 37:3
76:23 90:16 96:3
117:2 144:21
198:13 240:13
389:1 402:6,7
cost 30:1 78:5
198:3 205:15
costs 31:16 37:5
56:8 80:23 158:21
198:5 199:17
206:4,6,10 207:6
208:21 209:11,12
209:24 211:8
212:10,12 213:23
council 174:3,17
330:4,6,8,14,19,24
331:2,5,16,19,24
couns 89:12
counsel 18:7 35:24
35:25,25 50:16

60:21,22 82:25
83:6 91:17,17,19
92:16 97:11,23
98:6 117:8 126:7
134:13 135:4
147:17 151:2
153:24 155:11
157:7 163:14
165:20 166:20
169:9 221:3
316:24 327:10
384:20,21 385:6
389:3,13 424:22
428:11 429:15
431:1,10 433:2
counselor 392:1
counted 53:12
countries 361:11
368:20
country 270:20
294:22 307:18
425:23 427:6
county 1:10,13 2:3
7:20,22,24 8:1,3,5
8:6,14 9:15 10:4
18:13,17,20,24
31:21 32:7,10
33:17 35:3,20
36:14,18 38:15,16
40:21 41:1,15
47:10 48:21 49:15
49:16,19,23 50:2,5
50:13,17,19,23
51:1,4,8,22 52:2,7
52:13 54:1,15
63:8 64:13,14
66:6,10,17 67:4,13
68:9,22 69:1,3,11
69:14,20,21,21,23
69:24 70:1,5,8,16
70:19,25 71:4,12

72:1,3,11,13,19,25
74:2,12,15,21 75:2
75:5,7,8,9,19
77:15,15 78:14,23
79:4 80:2,11,13,15
81:11 82:4,21
83:1,2,9,14,25
84:7,17,24 86:21
91:2 94:15 103:7
103:15,20 104:2
104:12 105:5,11
105:18 106:4
107:6 108:21
112:15 113:21
114:18 115:8
116:25 118:19,24
120:24,24 121:10
121:15,22 122:2,9
123:4,6,15 127:6
127:11 128:4,6,18
131:6,10,22
135:20,24,25
136:2,11,12,19
137:1,20,23
138:17 140:21
143:5,8 144:3,5,9
144:14,17,19
146:3,13,18
147:24 148:1,3,9
149:8,12 150:7,10
150:23,25 152:23
152:24 154:24
155:5,7,18 156:11
157:23,25 158:22
160:19 161:2,19
162:14 163:6,9
164:9 165:2,4,9,11
166:15 167:3,7,15
169:17,23 170:4
170:10,16,22
171:2 172:25

174:2,3,15,16,17
174:18,20,22
178:10,15,19,21
178:22,24 179:1,2
179:22,24 180:1,5
180:5,7,14,18,19
180:23 182:15
186:5 191:5,25
194:8 195:1,24
197:1,15 205:10
214:7,10,16,21
215:3 216:16
217:4,24 218:19
219:9 220:12
224:24,25 225:4
225:18 226:23
227:13,16 228:1
229:18 230:18
231:8,14,22 232:5
232:10,22 234:4
235:9,12,14,19
236:4,20 237:6,13
240:18,25 241:24
242:10 243:1,16
243:22 244:9
246:20 250:9
252:12,18 253:17
254:9 261:20
263:15,17,25
264:6,18,21 265:6
265:8,22,25 266:2
266:16 268:3
270:6,7,20 271:8,9
274:3 277:1,17
278:11,15,18
279:18 281:6,9,21
282:11 283:20,23
284:15,20,22,23
284:25 285:2,5,9
285:11,18,19,20
285:24 286:2,4,18

287:9,14 288:9
291:8,11,19 295:8
296:19,23 297:9
297:21 298:3,15
298:19 299:4,23
300:4 302:15,22
303:15 305:2
306:9 307:11,19
308:8 309:8
310:12 312:23
322:7,11,21 323:6
323:20 324:2
325:3,14 327:3,15
328:19,20 329:13
329:25 330:1,3,6
330:19,24 331:2,5
331:8,14,15,24
332:21 334:3,21
335:1,18 336:10
336:18 338:16
340:6,12 341:24
342:8 343:17
344:7,15 345:3
346:8,20 347:1,6
347:15 348:19
350:4,19 351:8,11
351:20,24 352:4
352:15,20,25
353:9 356:22
361:8 363:13,24
364:3,20 365:17
365:18,25 366:3,7
366:20 367:7
368:4,19 369:21
373:9 374:23
376:5 378:18
381:3,21 382:6
388:5 389:19
390:5 391:18,22
395:19 396:4,18
396:20 401:1

402:4 403:17
410:3 412:15
416:21,23 417:3,8
417:13 418:6,25
419:13,21 420:20
421:24 425:7
426:1,11,23
427:13,16 429:5,8
429:9,16 432:4
435:10 436:15
**county's**  72:20
73:2 74:3,14
100:9 101:16
115:23 132:10
146:24 287:5
327:13
**couple**  102:8
161:13 172:14
227:1 278:6 297:6
302:14 364:6
370:25 424:9
**course**  34:4 37:25
64:18 70:18
102:18 131:18
132:20 278:14
316:14 354:10
**court**  1:1 6:19
23:12 25:23
115:13 165:22
217:11 381:11
435:7
**courted**  303:19
**courtroom**  22:19
22:20
**cov.com**  5:19
**cover**  64:4 85:13
214:18
**coverage**  192:25
393:7
**covered**  30:12
31:9,14,19 95:11

210:19
covering   31:1
  213:22
covers   34:9,10
covington   5:16
  20:1
crack   113:3 114:1
  125:15,17
cracked   374:8
craig   1:17 6:7 7:5
  7:8 10:8,11 18:14
  18:18 20:3,8,10
  65:3 66:15 67:10
  67:11 91:18 93:12
  97:6 99:3 100:1
  101:8 106:13
  117:25 127:3
  150:22 163:4
  204:6 313:15
  354:8 385:17
  395:13 404:11,16
  404:18 412:23,25
  421:4 428:7,9,21
  429:1,13,21 432:9
  434:8 435:4,9
  436:4,13 437:20
craig's   7:18 9:12
  152:13 159:6,15
  338:8 341:13
craziest   97:18
create   35:7 194:25
  239:23 300:11
created   193:14
  204:14 225:22
  240:7 247:1
creates   237:2
  241:14
credentials   387:20
credible   186:6
crendon   3:13

criminal   120:11
  127:22 306:8,16
  306:24
crisis   160:15
  167:18 338:18
critical   85:25
criticism   267:25
criticisms   302:4
crystal   185:11
culprit   323:10
cultural   240:12,16
  299:17,21,25
  300:4,15
culture   300:11,12
  300:23
curiosity   63:17
curious   91:1
current   333:18
  355:15,20 356:1,3
  356:7
currently   217:25
  301:14 302:5,8
  420:18 425:6
  426:10,21
custody   6:18
customers   397:14
  397:21 418:14
customize   225:23
cut   321:17 374:13
  381:6,20 384:16
cuyah   9:8 326:20
cuyahoga   1:10
  327:15 328:5
  432:4
cvs   4:3,3 19:10
  413:1,5,6,12
  414:11 417:1,7
  421:23 426:16,21
  427:3,5,8
cycle   195:8 196:4

d

d.c.   2:17 4:17 5:13
  426:7
damages   30:1 44:1
  44:8,15 48:24
  157:12
dan   1:7
dancing   169:7
dangers   89:22
  264:2 427:7
daniel   4:5 19:9
  412:25
danielle   2:6 18:22
darryl   305:8
dashboard   350:6
  350:9
data   10:2 37:10,11
  38:7 42:23,25
  43:5,5,6 44:9
  48:22 133:14
  137:2 138:5,14,18
  140:10 161:15
  185:5 186:6
  187:20 191:8
  197:8 206:5,7,8,11
  215:1,3,16,17,23
  215:25 216:1,8
  232:12 260:18
  267:16 312:23
  318:25 319:4,8,12
  319:14,20 320:19
  321:4 322:24
  328:24 329:20,23
  334:16 335:1,17
  335:24 336:19
  340:23,24 343:17
  343:21,25 344:5
  344:10,14 345:6
  345:11,19,23,23
  347:16,24,24
  348:12,15,19,25

350:1,5,8,9,10
  351:8 352:22
  353:18 354:11,16
  354:24 355:10
  356:2,5,13,14,16
  364:3 375:16
  376:1,13 379:5
  380:5 383:2,2,4,5
  383:10,13,13
  386:2 388:14
  389:6 397:6 400:3
  400:15 429:6
  430:5,6
database   133:19
  133:24 194:2
  216:10
databases   354:15
date   18:1 28:2
  116:13 119:9
  147:22 149:9
  151:16,19 153:15
  204:18 219:21
  348:21 371:16
  421:17 431:11
  434:8 435:3,9,19
  436:3,13,25
  437:20,25
dated   341:11
day   4:9 19:12 23:8
  27:12,12 142:13
  206:20,22 353:17
  353:17 354:10
  405:20 423:19
  433:7 435:16
  436:22 437:22
days   195:25 196:5
  230:22 255:12,13
  434:18
de   215:22
dea   269:23 270:7,8
  369:24 370:3

374:8
**dea's** 269:13
**deal** 419:12
**dealer** 329:4
  362:17,20
**dealers** 143:21
  298:11,13,18
  397:14,20
**dear** 347:4 434:10
**death** 134:25
  136:2,22 137:22
  138:5 335:1
  336:18 353:11
  380:6,20
**deaths** 136:12,19
  137:3,9 139:1,12
  139:14,19,22
  140:1,3,15 141:23
  142:17 143:4,11
  264:12 289:12
  323:19 334:21
  353:1,2 376:23
  377:10,15 378:6
  378:12 379:8,12
  380:2,10 381:5,23
  382:8 395:19
  396:3,20 397:3
  400:6 401:4 402:3
  403:16
**debacco** 1:25
  432:6 433:14
**decade** 115:12
  116:23 118:16,17
  168:7 169:4 205:2
  247:13 286:8
**decide** 63:21
  218:15 304:20
  336:1
**decided** 30:25
  79:11 157:22
  336:3

**decides** 255:25
  256:2
**decision** 70:11,24
  71:21 83:19,20
  255:15 256:8
  269:13 312:4,16
  317:20
**decisions** 286:3,19
  314:8,17,23
**deck** 8:13 9:9
  173:24 175:9
  225:23 253:17
  254:2 283:11,11
  284:4 332:7,21,25
  333:5,7 362:1,5,10
  362:13,15 363:17
  367:21
**decks** 225:18
  251:13 283:6,7,16
**decline** 378:14
  382:14
**declining** 396:21
**decreased** 374:7
**dedicated** 190:9
  193:20 200:1
**deed** 435:14
  436:20
**deemed** 434:19
**defend** 62:19
**defendable** 36:23
**defendant** 21:9,10
  405:10 413:20
  415:4,8,10,15,22
**defendants** 19:6,8
  19:10,21 20:14
  381:4,22 382:7
  388:6 404:22,23
  409:15 413:1,24
  414:13
**deferred** 55:15

**define** 124:15
**defining** 208:13
**definitive** 401:17
**degree** 36:6 39:4
  140:25 144:23
  156:6 387:8,10
  407:2
**delay** 98:5
**delaying** 99:18
**deliver** 272:15
**delivered** 274:17
**delivery** 271:15,19
  272:20 275:3
  431:9,11
**demand** 149:25
  153:5 213:6
  335:23,25
**demographics**
  429:25
**demonstrate**
  234:9 261:7 391:8
**demonstrates**
  347:19
**deny** 365:14
**department** 7:11
  10:1 129:24 134:5
  134:15 142:18
  145:13 146:10,17
  147:1 375:15
  376:4,7,11 434:22
**departments**
  229:2 285:1
**depended** 37:9
**dependence** 37:14
  113:10 123:21
**dependent** 124:10
  243:5
**depending** 38:7,11
  199:6
**depends** 256:9

**depicted** 379:5
**deposed** 20:6,19
  20:24 21:3
**deposition** 1:16
  18:5 22:18 23:4
  24:10,25 26:7,13
  26:18,24 27:2,17
  27:23 28:5,9,21
  29:4,9,12,15 54:22
  55:3,7,8,17,23,25
  57:11 58:14 59:1
  59:2,9 63:15 73:9
  73:17 97:4 98:15
  99:5,15 100:3
  106:12 116:16
  130:11 134:2,4
  145:5 152:12
  159:5 169:16,22
  170:3,9,15,21
  171:1 200:8 204:8
  223:20 224:8
  253:16 262:8
  290:4,15 315:5,15
  321:8 326:18
  332:6 338:7
  341:11 346:5,13
  357:24 358:2
  361:17 370:10,20
  376:10 389:17
  395:11 421:2
  422:24 430:16
  432:20 434:8,11
  435:1,3 436:1,3
**depositions** 55:4,5
  55:21 57:7
**depth** 240:22
**describe** 207:20
  220:12 232:7
  237:14 246:8
  258:7 342:10
  347:22 350:7

described  22:24
  133:21 142:18
  192:25 193:21
  207:13 229:15,19
  240:22 414:17
describes  173:7
  175:24 347:23
describing  238:9
description  7:2
  57:23
designated  73:16
  180:1 278:5
detail  258:8
details  245:25
  293:11
detect  275:15
detected  324:3
determination
  47:5 150:15 257:3
  281:13 407:8
determine  30:19
  184:22 192:16
  280:24 317:19
  319:15
determined  35:19
  281:6 303:22
determining
  269:14
detox  141:14
  212:1
develop  131:18
  193:10
developed  111:24
  120:13 177:22
  388:16
developing  43:17
development
  182:14
devote  41:15
devoted  44:9

diagnosed  34:6
  37:13
diagnosis  34:7
  42:9,14 212:18
  216:5 257:19
diaz  83:12,21
died  48:15
diff  429:25
difference  8:17
  209:22 213:10
  262:11
different  30:14
  31:9 37:4 41:2,8,9
  41:10,17 43:2,3,7
  71:24 82:18 96:24
  142:14 157:2,5
  158:24 182:2,22
  211:17 227:1
  240:6 243:2
  252:14 261:7
  271:2 280:20
  285:18 286:2
  319:6 337:19,20
  352:23 367:8
  411:23 429:17,25
differentiate  208:8
differentiating
  319:6
differently  286:20
  287:9
difficult  280:5
  308:4
dilaudid  410:13
diminish  411:14
diminished  213:5
ding  151:16
direct  51:2 81:16
  84:8 102:19
  113:23 121:6
  129:13 194:16
  212:8 217:8 224:2

226:10 233:21
  236:8,14,18
  239:22,23 240:21
  240:24 241:6,8,9
  241:13 252:9
  254:19 278:24
  292:14 316:20
  367:25 373:22
  389:24 398:2
  408:22 411:3
  426:25
directed  56:5,7
  177:9 179:25
  181:22 183:18
  184:4,24 186:18
  187:15 193:3
  194:9
directing  341:9
direction  305:15
directly  36:24
  49:7 50:3 112:3
  346:19 368:9
  394:22
director  105:10,22
  106:4,6 107:6,17
  112:23 114:22
  115:5 132:9
  149:18 151:25
  152:3 161:14
  164:22 347:5
  364:20 416:25
directors  69:25
  74:18,23 77:14
  78:7 79:11,18
  103:14,18 104:8
  104:11,16 105:6,8
  105:14,15 133:17
  173:20
disagree  123:7,9
  123:11,13 229:4
  293:22 322:15

341:6 342:3,5
  364:22
disagreed  57:12
  57:17
disagreeing  58:23
disappointed
  403:16
disbursal  292:1
disclose  87:5,23
  90:23
disclosing  88:20
  93:22 94:9
discover  104:5
discovery  78:4
  283:13
discuss  29:13
  33:12 54:7,11,17
  59:13 88:13
  174:18 241:6
  331:1
discussed  29:5
  30:6 36:21 54:18
  82:3 90:7,11
  130:5,10,21 142:1
  142:5,7,11,21
  143:1 216:13
  238:23 243:14
  270:7 291:17
  307:12 314:24
  418:20 429:24
discussing  208:2
  229:22 242:8,19
  258:20
discussion  128:21
  318:25 345:22
  346:3 418:9
discussions  112:5
  128:21 241:4
  343:23 353:17
  372:12 383:15
  417:11 419:25

disease 47:24 48:1 310:12,16,18 311:3,10 312:7,19 360:2 363:19
diseases 211:17
disorder 34:6 37:12 43:13 45:11 47:13,15 48:20 90:20 93:15 96:16 96:20 109:19 110:1 111:8,9 153:19 156:11 177:9,20,20 181:23 183:19 184:5,25 186:19 187:17 188:4 190:10 193:4 205:3,14,25 209:10,24 210:5 210:25 211:9,13 212:9,12 213:23 214:5 327:4 355:6 388:16 428:13 429:4
disorders 41:3,11 41:17,18,25 42:1 44:12 45:2,6,7,8 49:1 94:2 95:17 96:6,23 109:2,11 109:17,24 110:6,8 110:21,25 111:1 111:13,16 112:21 113:7 152:9 178:1 178:5,12 182:11 193:13 196:22 211:10,11 212:17 212:20,21,24 213:1,3,8 428:17
dispensed 264:17 265:4,24 350:12 350:18,22,25

dispensing 416:13 424:25
disposal 417:20 418:14 425:21,25
disproportionate 247:2
dispute 347:14
disrespectful 97:17,19
distinct 366:15
distinguish 319:2
distracting 97:14 98:11
distribute 272:6
distributed 101:25 308:17 407:20
distribution 271:23 272:11 277:9 318:12 414:3,7,10 418:4 419:1
distributor 279:15
distributors 63:25 271:14,18 272:15 272:19,24 273:6 273:11,14 274:1 274:18 275:2,15 277:20 278:16 280:25 281:7 283:22 284:1,5,10 284:17 416:19
district 1:1,2
disturbing 274:5
diversion 143:16 226:11 230:9 233:13,20,23 234:3 235:7 236:2 236:3 237:24 255:1,7,9 258:6,17 258:19 259:3,20 259:22 260:4,5,8

275:16 309:20 316:22 322:2 351:14 358:20 360:6 362:25
diverted 323:24 329:5
division 1:3 69:23
divisions 285:2
dmoylan 4:7
doc 97:21
doctor 125:23,24 126:1 255:25 259:10 329:3 386:23 411:13
doctor's 228:3
doctors 125:9 230:1,7 236:24 247:24 266:14 267:15 293:19 374:9
document 1:9 7:9 7:12,15,17 8:8,10 8:16 9:11,22 10:1 10:4 35:7 42:7 62:19 73:15 86:1 86:6 97:13,20,24 98:2,18 100:19 101:3 116:17 118:23 129:3 134:1,7 135:5,7 145:6,12,24 146:8 148:4 149:9 151:9 152:13 159:3,5 173:22 175:7 184:20 200:9 201:5,21 203:13 203:14,20,23,23 204:4,7,12,16 205:1,13 219:14 222:16,17 223:21 226:25 251:22

254:2,12 262:9,15 262:18 290:14 292:15,20 315:19 316:3,7,20 317:1,2 317:5 321:6,15 327:12,15 328:2 332:13,16 338:8 341:10 342:16 346:12 347:19 357:9,14,15 361:24 370:11,17 370:22 376:11 389:18 392:20 393:20 398:3 423:9 424:15,21 427:3
documentation 317:12
documents 55:2 59:5 171:19,23 183:21,24 184:7
dodson 50:21 52:5
doing 23:7 99:18 100:21 109:12 154:7,10 166:20 192:13 250:11 282:6 305:16
dollars 81:7 173:3 182:17 209:3
domain 178:8 320:18
domains 30:14
doors 392:2
doses 350:18,22,25 399:6
doubt 229:12 235:13 422:18
doug 55:7 120:6 130:16 421:17 422:14

douglas 10:10
421:4
downplay 411:16
downward 395:20
395:23 396:4
397:4
dr 9:8 56:16 58:13
58:14 120:8
326:20 328:12
333:3 346:1
411:18
dragged 75:16,23
76:8,11,16 77:2,4
dramatically
379:18 430:2
draw 174:9 212:6
311:19 349:24
400:3
drawer 259:7
drawing 332:2
410:15
dreamland 280:22
308:20 366:10
386:7,13,22
411:11
driven 140:16
141:5,24 142:19
143:10,14 284:16
289:14 366:19
driver 377:21
400:5
drivers 323:19
336:17 377:25
driving 377:15
dropping 379:12
drove 376:23
drug 5:9 7:13 8:11
8:20 9:22 10:2
19:23 107:7,12
134:8,17,24 136:1
136:11,19 137:21

138:5,18 139:1,14
139:18 140:1,15
140:16 141:3,4,6
141:23,25 142:17
142:20 143:4,11
164:13 219:16
220:5,17,25
221:15 222:5,14
223:14,22 225:8
226:20 233:9
237:1 241:15
242:2 256:18
257:4 259:22
266:14,22 267:14
268:1,6,13 269:5
270:18 271:10,14
271:18 272:14,19
273:5,14 274:1,18
275:2,14 277:8,19
278:16 279:4,13
281:7 283:21
284:9,16 288:16
290:6,19 298:13
298:17 303:12,20
306:7,23 310:7
314:19 320:9
321:1 324:12,22
329:4 338:18
360:25 364:11,23
367:24 368:14,19
370:11 371:20
375:15 376:1,12
377:10,15 379:8
386:9 395:18
396:3 397:3
417:20 418:4,14
418:25 425:22
427:4,7
drugs 241:17
242:16 243:12
259:6 267:17

268:11,24 271:23
272:5 299:13
325:12 343:8
363:7 376:22
377:8,14 380:5,6
384:9 396:10
397:11,12 407:19
drugstores 426:1
dsalerno 2:11
dtos 368:10,13
due 289:17 310:12
310:16
dug 418:4
duly 20:5 432:7,10
duration 317:13
317:18
duties 121:25
122:4 127:4
129:17,18,21
164:22 235:17
261:19
duty 121:9,14,21
154:21 155:5,6
263:24 278:9
dying 143:25
dynamics 182:6
254:21

e

e 2:6,15 7:3,5 9:5,7
9:14,16,19 10:7,10
10:13 33:13 60:16
73:10,18,20 97:5
100:5 321:9
326:19,24 327:19
328:3,9 346:6
347:5 348:21
349:10 357:19,24
358:3,10,23
361:18,25 395:12
398:4,10 401:25
402:25 409:9,10

421:3,16,18,20,22
422:19,25 423:11
423:12,19 424:2
425:18
earlier 34:18
73:19 85:24
105:17 130:5,21
133:21 156:5
168:6 169:5
187:22 196:9,17
198:7,12 202:7
207:8,13 208:2,6
220:9 235:16
257:24 258:20
288:12 293:8
296:1,14 299:16
303:17,19 311:3
313:25 314:24
315:23 318:2,25
329:24 335:8
343:24 348:20
354:9 377:4
400:14 405:19
407:11 409:11
410:25 414:17
415:17
early 22:22 285:25
342:13
earmarked 179:9
179:11
earned 195:5
ease 420:13
easier 372:20
easily 360:18
east 4:5 5:12
eastern 1:3
easy 373:10
educate 263:25
427:6
educating 128:25

education 33:21
127:17 331:17
effect 195:4
effective 392:16
396:8 397:10
effort 128:4
234:19 365:16
efforts 128:2
137:15 164:7
396:15 417:2
419:12,18 420:4
either 177:18
210:19 233:1
268:20 369:25
392:1 413:15,19
433:2
elements 67:3
elephant 290:1
eligible 212:5
ellis 3:16 19:14
119:18 120:1
141:10
ellis's 120:4 254:3
email 434:17
emergency 229:2
287:25 391:25
empathy 96:18
employed 61:3
136:25 143:7
employees 234:16
ems 391:25
emt 391:25
enclosed 434:11
encompasses 84:6
encountered
121:19
encourage 236:23
enculturate 240:1
endeavor 350:1
endeavored 198:9

ended 143:25
223:4
endo 3:9,9 19:8
endorsed 244:21
ends 402:1 424:11
energy 148:13,14
enforcement
268:6,13 269:5
270:18 271:10
369:18,20,21,25
enforces 268:10
engage 83:5,11
392:14 422:19
engaged 83:21
173:8 268:25
331:4
engagement 33:22
engages 173:4
306:1
engineer 39:17,25
enjoyed 171:11
ensure 83:2
entail 78:5,8
enter 62:7 79:16
entered 436:9
entering 40:19
entire 435:5 436:5
entirely 183:20
246:6 343:14
entities 248:10
308:6 413:16,20
414:8 416:12
entitled 95:2
134:16 204:9
206:25 224:4
241:21 254:21
292:16 316:21
342:1 378:12
entity 74:2 108:15
109:12 114:12
246:8 294:15

304:1 305:9
371:10 413:9,11
environment
246:13
epidemic 7:13 8:9
9:10 29:18 30:2
30:13 31:10,17,20
32:10 33:18 35:22
36:16 37:20,24
38:16 49:18 50:5
50:25 53:8 54:14
56:9,22 59:20
67:4,13 68:9,13,19
68:25 69:3,8 71:4
71:7,14 83:15
122:1,6,9,12,13,13
123:20,22,24
124:1,6 127:6,11
128:3,6,17,23
131:6 134:7,16
148:1,8,18 149:2
149:11 150:7,11
150:17,19 151:1
152:25 155:19,25
156:2,12 157:24
158:22 160:20
167:18 168:13,17
174:14,20 180:15
186:5 190:13
191:1,4,25 194:7
197:16,20 198:18
198:24 199:19
200:10 204:9
214:9,21 216:16
216:23 218:2,18
218:23 219:9
220:11,14,19
223:16 224:4,11
224:15 225:4
226:5,16,18,22
227:8,12 228:1

229:17,21,25
230:18 232:5,9,22
234:4 235:10,19
236:20 240:17
241:5,22,24 242:9
243:1,15,21 244:8
245:8 246:19
263:16 264:6,9,20
265:8,23 266:2,16
268:2 270:19
271:1,7,9 273:15
274:2 276:25
277:17 278:10,17
279:16 281:5,8,21
282:11 283:20,23
284:15,22 285:7
285:10 286:1
287:1,6,14,22,25
288:8,9,22 289:3
291:8,11,19 292:2
292:8,24 294:1
297:20 298:3,14
298:18 299:4,23
300:3 306:9 307:1
307:11,18 308:8
310:11,16 322:11
322:20 330:2,7
331:2,8,14 332:8
336:7,23 337:3
339:11 340:7,17
341:17,23 342:7
342:16,21,25
344:3,6 350:3
351:10 356:22
362:7 364:8 366:6
366:20 383:25
392:17 416:21
epidemiological
111:14
epidemiologist
387:12,14

episodic 167:22
equals 254:25
  255:7
equipped 164:19
equivocating
  415:17
eric 353:19
errata 434:13,18
  436:7,10,18 437:1
especially 99:20
espousing 383:3
  383:11
esq 2:5,5,6,6,15,15
  3:5,11,17 4:5,10
  4:16 5:6,11,17
  434:5
essentially 54:18
  199:14 238:14,17
  289:7
establish 118:13
  302:22 303:16,18
established 105:17
  192:2 193:15
  302:20 337:2
  343:13 344:11
  345:21 347:11
establishes 246:11
establishing
  137:13 426:17
establishment
  344:14 345:2
  347:1
estimate 37:2
  53:19,20 198:16
  198:20,23 199:12
  199:18
estimated 199:15
estimates 200:14
et 1:10,12,13,13
evaluate 71:18
  121:6

evaluating 120:18
  364:16
evaluation 247:17
  247:25 256:13
  257:6 408:25
evening 404:18
  405:19 428:9
event 9:20 57:21
  57:22 58:1 81:2
  118:12 238:11
  288:1 361:19
  433:3
events 288:5
everybody 265:15
  265:15,19 312:11
evidence 160:5
evidently 146:22
  160:10 301:12
exact 30:9 238:17
exactly 22:6 36:11
  39:18 91:6,21
  123:24 153:22
  186:7 197:21
  361:3 422:11
examination 6:7
  20:4,8 404:16
  412:23 428:7
  429:1,13,21
examiner 335:2,11
  353:4,18
examiner's 136:16
  136:18,21 137:3
  137:23 138:6,12
  138:19,25 139:6
  335:18 336:20
  353:6,9
example 37:10
  41:6 173:9 174:9
  186:23 199:23
  243:6 257:13
  276:12 297:4

336:15 344:2
  346:15
exception 65:7
excerpts 55:22
exchange 357:16
  357:19,24 358:10
  358:18,23 361:7
  398:5,10 400:22
  401:25 421:16
  422:2,14,17,19
excited 403:6
exclamation
  402:13,23 403:11
exclusively 206:7
  324:5
excuse 24:8
  421:10
excused 79:9
executed 436:10
execution 435:14
  436:19
executive 49:23
  51:22 52:2,6
  70:17,20 72:1
  74:15,21 75:20
  78:15,24 104:2
  105:21 106:3
  107:6,17 115:4
  132:9 151:25
  152:3 161:14
  164:22 174:3,16
  330:1 347:4
  416:25
executive's 40:21
  50:2,13,17,19,24
  51:8 52:14 54:1
  69:20,22 77:16
  197:1 330:1
exercise 61:12
  249:2

exercising 248:12
  248:16
exhaustive 282:2
exhibit 6:18 7:3,5
  7:8,9,11,15,17,20
  7:22,24 8:1,3,5,6,8
  8:10,13,16,19 9:1
  9:5,7,9,11,14,16
  9:19,22 10:1,4,7
  10:10,13 73:9,16
  97:4 98:8,14,25
  99:10 100:2 103:5
  106:12,22 116:16
  118:23 129:3
  134:1,4 139:9
  145:5 149:10
  152:12 159:4
  169:16,22 170:3,9
  170:15,21 171:1
  172:10,18 173:10
  174:25 181:2,3,6,7
  181:10,12 188:20
  200:8 201:5,6,22
  203:9 204:7
  206:13 207:25
  208:8,20 215:18
  221:3 223:20
  224:7 253:16
  254:2 262:8,16
  290:4,14 292:12
  294:20 315:5,14
  315:15 321:6,8
  326:14,16,18
  328:6 332:6,13
  338:7 341:10
  346:5,13 357:9,23
  358:2 361:17,25
  370:10,18 376:10
  376:20 378:11
  389:17,25,25
  393:21,23 394:2

395:11 398:4
400:23 403:25
404:2 421:2,12,12
422:24 423:8
**exhibits** 6:5,19 7:1
171:22,25 188:18
**exist** 149:5 270:3
302:13
**existence** 216:22
216:22 218:1,1,18
219:9 252:10
**existing** 194:10
211:1
**exorbitant** 256:24
274:8,8 310:8
**expand** 160:2
425:2
**expanded** 212:3
**expansion** 182:8
182:21 217:3,6
219:1 291:21,23
**expectation** 237:2
239:24 241:15
**expended** 184:12
184:12 210:4
**expending** 94:16
**expenditure** 38:12
38:13 40:4 53:7
176:11 194:13
**expenditures**
32:22 33:16 35:3
35:21 36:14,24,25
37:18,25 40:8,24
41:23,24 42:22
43:3,8,16,18 49:17
50:4,25 54:12
59:20 60:9 62:17
62:21 63:2 130:10
130:21 132:17,21
132:23,25 133:15
157:23 158:20

174:19 175:24
177:8 183:10,19
184:23 186:3,7,16
186:24 187:16
188:22 190:1,5
191:11 195:11
196:20 197:12
209:12 211:5
214:18 355:5
356:20
**expense** 40:11,11
**expenses** 30:12
32:8 210:18,19
**experience** 58:11
91:16 96:12
120:12 197:15
228:3 230:20
240:3
**experienced**
263:25 266:11
392:3,10
**experiences** 93:25
94:18 95:1,6,15
96:4,15 282:25
**experiencing**
44:11 113:22
150:7,10,25
152:25 153:18
155:18 160:25
234:22
**expert** 430:8
**experts** 384:1
**expiration** 435:19
436:25 437:25
**expires** 433:17
**explain** 67:17
103:25 227:12
236:17
**explains** 309:25
**explanation**
386:17

**explanatory**
398:21
**explore** 160:2
**exposed** 161:14
**expressed** 72:9,17
72:24 76:3 77:13
88:22 89:5 101:10
101:13,18
**expressing** 74:8
100:6,15
**extension** 270:3
319:20,22
**extent** 36:2 42:15
43:4 62:8 81:10
81:15 94:24 104:9
121:16 137:11
203:22 204:1
240:16 266:3
298:17,23 299:20
300:2 306:6,14
310:11 314:5
319:15 327:3
407:2
**extra** 234:20 260:7
**extraordinarily**
307:19,25
**extraordinary**
211:3
**exuberant** 403:3
**eye** 154:6 280:23
352:10 367:20

**f**

**f** 3:3 5:3
**faced** 227:16
**facilities** 419:1
**facing** 235:19
**fact** 28:9,20 72:10
76:8 83:5 91:5,19
92:25 106:22
143:18,22 184:11
210:16 222:4

223:14 238:18
256:15 257:24
291:22 293:3
319:1 325:22
347:14 360:14,16
368:25 384:4,8
402:17
**factor** 232:5
240:19 242:17,25
308:8
**factors** 67:2,12
68:18 69:2,7
128:5,22 143:15
192:15 220:13
227:4,6,8,12,15
241:20,23 242:4,6
242:23 243:13
258:19 269:12
300:8 306:22
307:7,10 308:6
309:10,12 318:19
397:17
**fair** 23:16 40:25
41:9 48:7 58:9
68:4,6,11,19 92:15
95:24 100:8,16
101:14,20 114:23
121:8,20 122:2
146:21 149:5
161:21 162:16
167:19 168:17
179:12,17 182:23
186:7 188:5
223:12 233:13,25
240:13 250:17
271:3 275:4,5
281:9 307:2 311:5
311:7,20,22 329:8
329:10 338:13
339:13 341:7,8
342:23 351:4

385:7 389:12 394:24 395:4 413:14,18,22 415:9,24

**fairly** 38:17 95:25 165:7 256:23

**fall** 105:1 252:22 252:24 258:21 399:13,23

**falls** 278:4 320:13 320:18

**false** 231:13 411:7 411:25 412:3

**familiar** 114:8 175:6 179:9 219:18 225:25 244:24 246:7 251:9,21,22 252:8 259:11 269:9,19 276:5,10 293:11 294:4,7 296:15 302:9,12 316:10 318:3,10 332:24 333:1 337:6,7,8 343:4 349:23 365:21 371:2 372:9 390:9 405:6 407:12 409:13,17 420:3 424:1

**families** 96:21,22 96:25 127:19

**family** 87:14,16,21 88:20,23 89:21 90:1,19,24 91:24 91:24 93:13,22,25 94:10 95:16 96:5 96:13 325:16 329:3 392:6,25 393:4

**family's** 87:14 88:14 89:15 91:10

**fancy** 254:14

**far** 23:6 138:24 157:20,21 158:3,4 158:12,18 197:21 278:4 414:1 421:23

**fashion** 303:12

**fashioned** 348:15

**faster** 397:16

**fatal** 233:11

**fatalities** 9:18 323:11 358:5,25 359:20

**fault** 186:12

**fda** 125:3,8 231:21 267:5,9 352:5,19 407:12,18,21,22 408:2

**february** 425:20

**federal** 20:4 128:9 179:4,5 296:5 316:1 318:4,11

**federation** 9:1 315:6,20 316:11

**feedback** 69:2 71:20

**feeding** 298:8

**feel** 59:24 64:1 76:16 77:9 88:18 93:22 94:8 244:11 244:15 275:11 337:25

**feelers** 304:8

**feeling** 74:19

**feelings** 287:5

**feet** 271:10

**feinstein** 3:5 6:9 19:4,5 404:14,15 404:17,21 412:18 427:22 428:1

**felt** 36:22 58:6 70:1 76:17 102:1 164:19 250:16 275:8 278:8 288:2 288:3 303:5,10 304:5 338:21

**fentanyl** 9:17 289:15 299:8 323:9,18,24,24 324:3,6 336:16 353:1,11 358:4,24 359:19 360:11,12 360:12 361:7 362:6 368:9,18 369:1,5 372:4,17 376:21 377:2,8,14 379:17 380:19,21 380:22,24 381:7 381:21 382:16 385:23 394:19 398:1 402:4 403:17

**fewer** 211:11 428:16

**fifth** 244:17,22 245:6,18,22 246:18 247:11,21 248:11 249:1,21 250:2,10 252:17 294:23 295:10,16 309:19

**fight** 45:10

**figure** 139:8 194:2 207:11 329:20 379:3

**figures** 205:18 206:2

**file** 66:19 104:2 254:17 327:13

**filed** 64:13 66:6,7 66:9,25 67:5 69:4

69:13,19 72:3,14 83:25 86:20

**filing** 66:16 68:22

**fill** 126:4 143:22 152:1 298:11 299:1

**filled** 129:8 319:17 319:21 382:23 386:11

**filling** 264:18

**fills** 265:17

**final** 8:11 175:11 223:23 226:21 373:23

**finally** 36:11 393:25

**finance** 129:17

**finances** 29:17

**financial** 29:17 56:11,17 78:2 80:19 81:3,10 133:2 330:14

**find** 126:17 188:21 189:8 211:2 312:24 326:13 330:16 372:21 373:10 434:11

**findings** 10:2 376:13

**finds** 310:24

**fine** 26:2 62:1 100:21 135:6 171:13,14 253:10

**finger** 115:17

**fingertips** 401:20

**finish** 25:6 26:2 44:3 97:12 98:7 99:7 230:8 385:10

**finished** 201:17

**first** 7:13 20:5 26:5 63:18 104:1

114:21 115:12
116:3,5,12,23
118:11,14,16,17
131:4 134:7,20
135:10,14 139:9
140:14 146:7
153:15,22 155:24
156:7 161:13
168:7,19 169:4
172:17 175:18
176:8 191:2
211:21 221:2
227:20 269:20
293:2 297:23
304:7,11 310:22
317:9 324:11,19
324:22 325:15
329:12 333:21
334:18 345:18,22
349:1,16 352:18
352:24 360:10
364:10 372:16
377:7 382:13,13
388:17 391:10,24
393:20 394:2,6
400:22 421:18
423:25 424:17,19
432:10
**firsthand**  274:15
275:13
**fiscal**  178:12
**fit**  42:22
**five**  27:8 62:10
158:16 323:21
394:4,15 395:1,5
423:18
**fix**  240:9
**flat**  378:7
**flip**  175:16
**flippant**  85:14,20

**flipped**  63:10
**flood**  298:7
**floodgates**  293:19
**floor**  3:6
**flowers**  2:5 18:19
18:19 45:4,15,21
46:1 92:4,7,14
117:24 430:13
**focus**  122:15 164:7
**focused**  135:22
198:11 213:7
**focusing**  64:17
**fold**  174:11
**folks**  141:15 283:1
**follow**  23:6 32:15
179:15
**followed**  75:20
103:24
**following**  67:16
**follows**  20:7
**followup**  418:18
418:23
**food**  266:14,22
267:13 268:1
**force**  8:11,12,14
30:16 33:20 37:25
127:20 137:11
138:14 147:6
198:18 199:24
219:17,19 220:6
220:17,18 221:1
221:16 222:5,8,14
222:24 223:4,14
223:22,23 224:22
225:1,9,22 226:21
234:19 242:2
252:7 253:18
283:1 288:17
302:16,23 303:16
305:11,24 336:3
343:23 344:12,15

344:17 345:2,21
347:2 350:6
418:15
**force's**  283:9
**foregoing**  432:16
432:21 435:13
436:18
**forensic**  120:10
**forgotten**  33:24
307:13 425:11
**form**  29:23 30:7
31:22 32:11 36:19
38:18,23 39:8,20
40:2 41:4 42:3,24
43:11 44:2,14,19
47:3,21 48:13
49:2,10 51:19
52:18,20 53:13
54:16 58:4,8,22
60:11,21 61:8,21
62:24 63:5 66:21
67:14 69:5,15
70:9 71:5 72:4,15
72:21 74:10 75:3
75:18 76:24 78:17
79:6 81:5,14,25
83:17 84:2,11,20
85:10,19 86:2,9,15
87:2 89:3 90:21
92:18 95:18 96:8
102:17 103:11
109:13 110:22
111:8,17 114:7
116:1 117:3,6
121:11 122:3,10
122:25 124:3
130:12,23 131:7
131:23 133:22
137:24 138:20
139:3 142:3,8,23
144:6,20 148:10

148:22 149:13
153:2 155:20
157:15 158:1
159:19 160:21
161:10,22 162:17
163:11 167:16
168:18 185:1
186:8 191:14
196:23 197:17
198:14 199:13
206:3 210:11
211:6 214:22
216:24 218:3,20
219:11,23,25
220:21 221:17
222:9 223:6
226:19,24 229:8
229:15,23 231:15
235:21 237:10
238:3 241:11
242:3 244:10
245:24 246:21
248:2,14 249:5
250:15,22 251:4
252:3,21 255:22
257:7,15 258:25
259:2,20,21,22
261:21 263:18
264:22 265:10
266:17 267:21
269:17 270:1,11
270:21 272:3
273:20 277:2
278:19 279:20
281:10 283:24
284:11,18 285:12
287:2,10,15
288:10,23 289:16
294:17 296:12
297:19,22 298:4
299:5 300:6,21

304:9,16 306:10
306:17 307:3,15
307:21 308:1,10
310:1,14 311:21
312:1 313:2,23
314:13,21 315:2
317:21 318:20
320:4 321:2
322:12,18 323:7
324:7 325:18
329:9,16 334:11
335:3 336:11
337:24 339:2,14
340:8 341:25
342:1,9 347:18
348:22 349:10
352:16 361:1,12
363:4,14 364:25
365:9,19 366:8,14
366:15,21 368:5
368:22 369:15
373:5,11 374:19
377:23 378:19
381:8,14,24 386:4
387:24 388:11
395:8 402:20
403:1 406:4,10
407:6 408:1,9,15
408:20 412:6,16
416:2,4,14,22
420:7,22 425:8
426:24 427:14
**formally** 103:15
103:19
**format** 254:13
332:16
**formed** 219:16,19
222:4,24
**formerly** 182:18
**forms** 112:20
130:25 235:7

236:2,3 367:5,6
**forward** 70:12
434:15
**forwarded** 399:16
**found** 22:2,4
106:17 189:9
234:8 326:15
**foundation** 45:5
45:15 176:18
221:18 246:2
317:1
**four** 27:5,14,20
62:10 129:12
255:12 291:16
297:12
**fourth** 254:20,24
362:11,12,12,14
377:6
**frame** 168:5
**frames** 158:25
197:24
**francisco** 5:18
**free** 422:9 435:14
436:20
**freed** 182:21 217:7
**friday** 46:7
**friend** 260:6
**friend's** 260:8
**friends** 88:23
89:25 90:1,18
91:24 93:13,25
94:10 95:15 96:5
325:16 329:3
**friendships** 96:14
**front** 5:17 55:17
55:19 97:24 98:18
118:22 159:3
171:16 204:6
**frustrated** 402:17
**fueled** 366:6

**fueling** 307:1
**full** 27:12 106:8
113:17 152:2
294:3 378:4
424:17
**fun** 64:9
**function** 303:1
**fund** 178:4 182:18
190:23 192:20
194:15,20,25
195:9,25 196:2,6
212:17
**funded** 38:8 41:14
182:9 192:21
212:18 276:9,11
**funder** 178:24
**funding** 121:16
178:25 179:4,4,5
180:3,3 196:6
276:6,14 278:5
287:18 292:1
**funds** 34:5,24
36:25 41:7,13
44:8 81:12 94:16
101:24 102:15,21
103:2 160:4
178:10,14,17,21
178:22 180:14,15
182:14 184:11,12
188:7 190:9,21,23
191:10 192:19,21
192:24 193:2,10
194:11,14,16
196:1 205:22
208:9,10,14,15,17
208:18 209:9
210:4,20,20 211:1
211:3,12,15 212:7
212:10 214:2,8,19
216:19,20 217:5,8
218:14

**furniture** 159:16
**further** 197:14
348:5 361:15
378:3 432:19
433:1
**future** 185:22
186:3

**g**

**g** 355:18
**gain** 56:13
**games** 98:24
**gamut** 109:20
**gaps** 120:20
**gashash** 130:16
**gathered** 196:25
**gauge** 335:22,25
**general** 10:2 29:20
29:22,24,24 56:2
56:14 68:1 230:19
241:12 273:3
276:21 293:3
304:13 374:6
376:13 386:1
418:3
**generally** 27:10
36:20 58:19,20
65:8 82:18 84:14
130:13 138:22
168:4 193:12
257:22 280:13
288:20 293:14
300:19 339:6
348:10 352:8
408:16 420:3
**generate** 214:8,19
217:23 375:22
**generated** 218:17
346:16 349:4,5
351:4
**generically** 215:13
265:2

geographic  274:19
georgia  4:11
gerald  1:17 6:7
  20:3,8 404:16
  412:23 428:7
  429:1,13,21 432:9
  434:8 435:4,9
  436:4,13 437:20
getting  98:1
  100:22 115:13
  143:25 149:23
  160:14 168:12,15
  198:23 260:1
  272:1 344:25
  349:12 351:2
  384:24 397:15
  417:21
gilson  9:8 326:20
  328:12
give  28:2 29:7
  33:25 34:2 36:5,7
  173:20 194:22
  202:15 204:18
  216:5 320:20
  324:16 412:18
  431:1,10
given  22:24 41:20
  66:16 68:8,12,14
  68:17,23,24 70:7
  88:23 91:1 94:14
  100:1 183:17
  184:23 186:17
  187:17 199:9
  409:20 432:13,18
gives  398:24
giving  28:9,21
  29:4 99:13 159:17
  231:19 332:13
  346:12 370:17
go  18:11 21:22
  25:1,1,3,6 29:1

39:22 41:7,22
  42:11 43:18 44:3
  44:5 52:22 62:2
  63:1,2 64:4,20
  70:13 88:1,10,17
  94:21 101:1,8
  103:2 117:10,25
  124:4 125:8,23
  126:1,3,10,12
  128:16 132:24
  151:10 157:20,21
  158:3,4,19 164:16
  166:6 179:24
  183:5,14 187:9,19
  188:12,14 189:17
  191:9 197:14
  198:22 202:3,23
  202:25 205:12,17
  213:22 217:1
  220:3 227:18
  228:3 230:5
  233:23 236:7
  242:16 256:17
  282:9 308:19
  317:8 322:25
  327:1 340:23
  352:6 357:11
  362:10 373:16,17
  376:5,7 377:6
  379:3 384:6,7
  390:19 398:9
  404:4 413:25
  427:20
goes  208:22 209:2
  209:6 292:21
giving  373:17 374:12
  377:21 379:20,23
  380:2 400:8 402:8
  408:8
going  25:21 32:13
  35:23 44:13 45:13

46:7,8 50:15 51:2
  52:3 60:20,21
  61:20,21 62:5
  76:9 82:6 85:18
  87:1,2,19 88:3,8
  89:2 90:22 92:17
  92:19,22 93:18
  94:23 95:8 98:23
  98:24 99:22
  100:17 102:6,8
  104:2 117:13
  125:24 126:9,12
  126:17 133:25
  135:9 139:22
  151:2 154:5
  165:14,20,21,24
  166:3,4 169:9
  175:10 185:17
  189:19,19 196:14
  199:5 206:24
  212:25 213:3
  216:12 217:12
  221:10 224:2
  230:10,22 240:20
  259:16 262:15
  290:13 304:20
  307:8 313:7
  314:14 315:14
  316:20 318:24
  321:5 324:10
  326:14 327:11,25
  348:19 352:2
  376:18 377:13
  385:8 389:10,24
  395:19 397:4
  401:16 404:12
  415:20 423:22
  424:8 427:24
good  20:10,11
  23:7 120:14
  126:17 166:23

171:12,14 202:19
  249:10 305:19
  313:6 336:4 338:1
  339:7 404:18
  406:5 428:9
goodness  348:13
gosh  354:23
  355:17,22
gotten  390:1
govern  318:12
government  69:24
  75:2,5,7,10 80:13
  179:24 214:17
  284:25 382:21
  396:18
governments
  128:9
governor  145:14
  145:15,17,18,21
  147:6 219:15,19
  222:4 288:15
  337:4
governor's  147:14
  147:20 220:5,16
grading  295:21
  296:10
gradually  168:23
graph  139:10,11
  139:17
graphic  224:8,18
  224:20 225:7
  226:1,16 227:7
  394:4,13
graphics  224:19
gravitate  243:9
great  217:10 354:7
greater  167:5
  240:22
ground  23:5
groundwork
  382:17

[group - helpful]

**group**  22:17
302:15 304:10
382:13
**groups**  128:16
**growing**  161:18
226:9 231:25
232:3,8
**growth**  232:20
**guarantee**  46:1
**guess**  27:7 32:18
48:6 49:23 50:9
96:9 102:1 117:11
117:14,23 137:17
147:9 159:15
167:22 210:9
220:2 245:2
254:20 272:9
274:4 279:25
280:12,12 287:19
301:21 312:13
363:19 386:5
**guessing**  156:3
220:2
**guesstimate**  201:3
**guidelines**  7:15
145:7 179:15
244:5,6 252:20
302:5,7,10,12,13
309:18 316:15
**guys**  92:9 353:20
427:23

**h**

**h**  5:11 355:18
**habits**  226:12
239:16 261:11
**half**  27:12 55:21
209:3,7 224:6
**halfway**  31:25
372:15
**hall**  346:2

**hand**  175:1,3,13
189:4 221:5,10
311:1,1 372:16
373:25 394:3,9
412:20 433:6
**handed**  100:19
101:4 421:11
423:7
**handful**  331:15
**handing**  134:12
221:8 315:16
**hands**  150:17
232:25 258:22
399:12
**happen**  45:24 46:8
104:18 117:18
137:16 182:24
235:3 304:20
417:24
**happened**  156:19
189:13 201:13
235:9,13 363:12
373:9 386:7
**happening**  87:8
160:20 268:23
373:9
**happens**  48:9
272:10
**happy**  46:10 218:5
298:25 332:18
**harassing**  166:7
**hard**  32:17 46:22
85:16 304:25
411:15
**harm**  397:9 409:4
**harper**  149:17
**harper's**  55:6
56:19
**head**  47:9 66:17
68:10 91:1 94:14
114:16 119:5

120:23 121:21
136:10 143:6
144:13 150:23
152:22 154:1,7
155:16 163:5,23
172:20 174:17
235:16 243:18
261:19 278:8
338:15 346:19
353:22 366:17
410:4,8,10,12,18
**headache**  235:1
238:15
**heading**  7:13
134:7
**health**  2:13 3:9
4:14 7:11 9:17
10:1 19:19 41:11
41:18,25 48:25
49:8 88:21 93:23
94:9 95:4 107:7
107:12 109:23
110:1,6,17 111:9
111:13 120:9
121:3,18 127:23
134:5,15 142:19
145:13 146:11,18
147:1 152:6 176:3
176:9,10,21
177:20 183:10
229:5 231:7,13,14
231:20 235:19
237:6 244:12
246:11 248:8,23
250:21 251:3
258:1 271:15,19
272:20 275:23,24
276:1,2,9,24
279:12 303:4
306:4 312:15
358:4,23 359:16

359:16 375:15
376:4,8,11 387:9
426:16 427:3
**healthcare**  8:21
290:7,20
**hear**  23:10,11
45:20 46:10 92:23
96:3 217:15 231:2
238:13 245:18
302:19 384:19
**heard**  47:12,14
65:17 93:4 97:19
118:12 239:1
244:16 251:7
252:6 259:12
269:1,10 275:22
275:24,25 277:5
325:11,25 369:23
405:2 408:24
409:7,10,12 413:4
413:6,8,11 427:15
**hearing**  269:21
303:2,6 326:11,11
**heat**  262:3
**heels**  288:1
**heighten**  264:14
**heightened**  266:10
**held**  65:22,25
107:16 180:5
**help**  29:11,14
68:15 109:6
175:16 182:1
286:13 289:5,9
331:24,25 335:25
373:12 375:2,4
384:2
**helped**  96:20
283:3 287:1
**helpful**  55:24
56:15,23 57:3,5
59:25 189:23

217:10 288:4
330:16 335:16
345:24 358:19
360:5 392:18
**helping** 99:17
120:19
**helpline** 392:20,21
392:22 393:13
394:5,17 395:6
**helps** 23:12 217:19
**henschel** 5:22
**hereinafter** 20:6
**hereunto** 433:5
**heroin** 113:19,22
113:24 114:10
124:12,16,23
125:4,19,21,25
126:5 191:12
323:2 324:12,23
327:5 333:16,18
362:6 363:8 364:8
364:11,23 365:4
365:17,22 366:2,5
366:9,14,19 367:3
367:5,7,14,22
368:8,18 372:3,17
372:25 373:3,10
374:25 378:6
379:20 382:4
385:24 388:1,15
394:19 402:4
403:17
**hi** 65:3
**hibbert** 5:11 19:22
19:22
**high** 30:5 339:8
**higher** 338:14
**hired** 106:1
**history** 257:11,14
**hit** 166:16

**hiv** 312:11
**holly** 5:6 19:20,20
**home** 22:17 212:1
230:7
**homes** 234:15,15
234:21
**honest** 22:5 142:9
422:16
**honestly** 57:24
**hope** 23:20 171:10
196:13 392:8,12
**hoping** 56:12
**hospital** 120:15,16
265:19
**hospitals** 112:6
120:17 228:11,15
234:16 243:25
244:3 295:21
296:10
**hostetler** 3:10 19:8
**hour** 126:10,11,18
313:7
**hours** 27:10,14,20
392:24 425:23
**house** 8:19 212:2
290:5,18 292:22
293:23 305:10,23
328:22 410:23
**hr** 21:4 129:25
**huh** 73:21,24
79:24 80:18
102:12 106:20
108:2 110:19
144:12 146:14,20
148:6 163:7,25
173:11 181:15
184:18 194:21
213:20 239:14
266:6 279:14,17
288:14 290:17
307:9 309:9 318:2

321:21 333:17
365:15 398:12
400:24
**humans** 289:24
**hundreds** 401:2
**hurt** 245:14
**hutzell** 353:19

### i

**idea** 55:10,12 56:4
263:12 295:18
312:11 398:24
399:21 403:12
**ideas** 386:1
**identification**
73:13 97:9 106:15
116:20 134:10
145:10 152:16
169:20 170:1,7,13
170:19,24 171:5
200:11 223:25
253:20 262:13
290:11 315:12
321:13 326:22
332:10 338:11
346:10 358:8
361:22 370:15
376:16 389:22
395:16 421:8
423:5
**identified** 35:5
59:3 108:10 137:8
144:4,9,17,24
158:25 188:8
208:18 215:22
235:8 236:3
241:20,25 242:7
414:2
**identify** 18:7 42:9
42:14 49:5 94:12
119:13 120:20
121:17 187:14

191:20 193:6
207:6 216:4 239:1
410:1
**identifying** 95:4
**iii** 292:16
**illegal** 237:21,22
238:1 259:18
260:10 289:19
334:23 406:3,8,13
406:16
**illegally** 289:21,22
**illicit** 109:21
141:18 143:21
191:12,21 196:21
233:9 268:11
319:3,11 325:12
327:6 334:23
353:10 360:11
365:17 377:3
380:18,22 381:7
381:21 382:4,24
385:23 397:22
400:11
**illicitly** 324:5
360:11
**illness** 110:18,24
111:1
**illnesses** 108:23
109:16 278:3
**ills** 239:25
**imagine** 109:5
**immaterial** 57:14
**immediately**
103:22 116:2
302:2
**impact** 8:9 121:7
122:5 165:9,10
167:5,6,6 200:10
204:10 285:20
293:25 302:25
303:3,14 336:5

396:16
impacted 71:21
95:16 96:5,11,15
166:17 167:3
226:22 234:3
impactful 166:13
impacting 165:5,6
implemented
427:12
implications
144:18 182:13,16
important 10:14
148:19,24,25
149:22 220:12
247:5 257:16
336:2 422:25
impossible 156:8
improper 98:13
98:17 99:21
317:22
inaccurate 58:15
inadequate 289:1
289:4
inappropriate
60:24
incidences 213:2
incidents 164:12
include 43:25 44:7
75:21 104:4
128:21 131:3
196:12 198:10
241:7 254:21
408:12,18
included 24:16
48:23 76:9,17
79:1 128:4 131:2
173:17 196:20
206:8 220:18
414:22 434:13
includes 132:12
187:2

including 30:14
204:15 252:16
316:16 318:6,13
inclusion 272:24
inconsistent
231:20 375:6,13
incorporated
105:7 108:16,25
109:9 112:13,24
113:8,21 114:11
436:12
incorrect 58:2
increase 114:19
115:8,23 139:17
140:15 141:4,22
142:17 143:4,11
143:14 144:3,17
153:17 195:2,11
205:2 213:14,18
352:1,11 376:23
380:9 382:15
400:11 426:17
increased 149:25
150:21 153:4,5
214:19 397:16
increasing 118:18
169:2 352:15,20
incurred 32:9
33:17 35:20 36:15
independent 49:19
75:2,5 80:12,15
219:8 361:6
index 6:1,5 7:1
11:1
indiana 4:3 413:5
indicate 149:24
360:4 428:16
indicated 26:7
32:19 40:13 42:21
43:1 71:19 80:18
92:4 95:14 128:15

129:4 130:3
157:11 168:6
169:5 190:8
191:23 198:7
202:7 216:14
220:9 222:3,23
229:1 238:5
245:16 249:20
259:2,5 267:1
278:6 296:14
302:14 313:25
318:2
indicates 107:5
363:6 365:3
367:21
indicating 26:16
397:2 434:13
indications 267:10
267:18
individual 21:17
42:9 47:25 49:9
70:23 115:19
172:4 177:19
200:21,22 238:14
258:1 296:11
312:6,17 314:7,16
314:24 317:19
320:9,25 324:11
330:9,23 331:1
332:2 392:10,24
425:1 426:6
individuals 37:12
41:16 42:14 43:13
43:22 44:10 47:17
56:3 71:12,14
82:21 96:12,19,25
108:22 109:1,18
111:12,24 112:14
112:14 113:21
114:19 115:9,24
116:24 118:19

119:11 123:15
127:19,20 129:12
130:8,18 141:13
141:13 144:3
153:18 177:15
199:25 200:25
205:24 210:18
213:1,4,8 216:4
220:11 230:5
233:3 234:7,21
237:16 240:8
241:16 246:14
258:22 264:1
278:2 285:5
297:14,17 298:1
308:6 312:24
320:2 327:3
331:23 343:11
351:10 372:12
381:5,19 382:3
383:16 385:22
388:7,15 391:11
391:12 392:7
394:22 396:18
420:10
influx 289:17
inform 91:3 94:18
215:17 260:18
269:13 283:3
309:11 332:1
340:12 373:12
375:2,5
information 10:14
29:11,13,16 33:5,7
33:9 34:4,4 36:2
37:15,17 40:6,18
40:20,23 42:16,17
42:20 51:5 52:5
53:18 56:13,18
61:10,11,12,19
62:4,8,17 81:16

86:16 87:6,22,23
88:21 90:24 91:8
93:23 94:9 95:5
110:10 127:15,17
131:12 133:2,18
133:23 136:22
137:6,13,22 138:9
138:10 139:1,5
141:11 146:25
149:23 150:13
152:4 156:22
158:6,9,24 159:1
161:6,7,15,17,25
162:3,4,7,13 163:1
163:2,8,16,19,21
168:13,16,21,23
168:24 169:3
173:19 177:13,16
194:23 196:25
197:24 204:3
207:5,18,24 208:5
215:7,10,13,21
216:6 229:11
231:13,19 258:1
261:5,16,19
262:18 272:1
275:21 280:4,10
280:17 281:11
282:4,9,19,23
301:7,9 308:14
328:22,23 329:18
330:15,18 334:4,5
335:12 336:14
339:1,6 340:5,16
340:22 341:1
344:19 347:20
350:13 351:3
355:8 363:16,23
365:12 367:1
372:10,11 383:14
392:5 393:2

394:21 399:5,8
401:19,23 408:13
408:19 411:7,25
412:9,13 416:18
418:21 420:12
423:1 430:1
**informed** 83:23
84:18 94:1,25,25
95:6 296:10
309:12
**informing** 373:14
**ingredients** 380:25
**initial** 25:23 53:19
53:19
**initially** 25:25
49:22 98:16
303:19 305:19
**initiate** 334:6
**initiated** 327:5
**initiation** 325:4
**initiative** 200:4
**injury** 7:12 125:24
134:6,25 136:2
333:23
**inordinate** 310:8
**input** 66:19 70:10
120:18 174:2,8,23
204:14 283:2
**inputs** 206:8
224:15 373:14
**inquiries** 418:12
**inquiring** 202:12
**insert** 231:21
407:24 408:5,8
**inserts** 408:3,12
408:18
**insight** 320:20
**insofar** 226:22
268:2 271:8 274:1
276:25 281:5
291:18 323:6

340:16 368:4
**install** 425:21,21
**installed** 425:25
**instance** 74:7
231:17 237:11
**instances** 22:23
48:18 49:4 113:5
113:6,10 114:9
124:11 231:5,10
231:23 237:6
**instruct** 24:3 87:2
250:1
**instructed** 89:25
**instructions** 431:2
431:10
**insurance** 42:5
393:7
**intended** 286:13
**intent** 245:9
**intentional** 53:5
164:7 344:11
**interact** 228:12
**interacted** 303:1
**interaction** 84:25
**interactions** 43:23
294:8 403:4 417:7
**interest** 222:7,12
223:3,9,11 249:8
250:13 275:10
331:7,9,14
**interested** 331:25
398:16 433:3
**interesting** 375:24
399:8
**interim** 106:6
152:1 163:23
**interject** 117:20
**international**
306:16,24
**internet** 273:22

**interpret** 258:13
271:1
**interrupt** 117:15
**interrupting** 24:23
99:13 165:25
**interruption**
390:18
**interval** 212:1
**intractable** 251:8
251:16,25 293:4
293:18,25
**introduce** 193:16
**introduced** 20:16
299:6
**introduction**
143:23
**inventory** 314:10
**investig** 268:19
**investiga** 386:24
**investigate** 128:5
131:5 147:25
148:8,11 149:11
268:25 278:9
320:15,16
**investigated**
237:17 271:6
**investigating**
148:13 150:14
**investigation**
131:17 245:7
278:13 281:5,19
344:5
**investigations**
294:16 372:12
**investigative**
268:17,17,19
386:25
**investment** 56:10
**investments**
211:19

**invitation** 10:14
423:1
**invoices** 37:22
**invol** 128:1
**involve** 104:4
108:25
**involved** 26:19
41:22,24 104:8
112:4 120:11
128:1 136:24
150:1 153:6
160:16 161:12
198:17 247:25
267:5 276:2 297:1
319:9 353:16
377:9 380:8
**involvement** 33:21
157:14,18 172:24
331:13 344:17
**involves** 41:2
**involving** 112:5
378:6,13
**irrespective** 197:3
241:15 300:24
**issue** 21:5 92:1
127:21 147:7
167:25 185:19
267:5 281:23
282:7 283:4
285:20 292:23
300:24 330:22
331:18 393:9
400:19,20 418:19
**issued** 128:11
223:15
**issues** 88:16 89:15
109:23 120:9
121:18 131:9,13
149:21 152:8
164:24 167:2
179:6 198:11,25

234:23 282:3
303:6 331:7
374:17 375:15
**item** 190:17 191:3
191:24 194:8,25
**iterations** 36:10

**j**

**j** 1:25 432:6
433:14
**jackie** 119:21
**jackson** 1:21
**janssen** 3:15 19:14
**january** 1:18 18:2
341:11,22 342:7
342:15 344:1
371:14 433:8
434:4
**jason** 50:21 52:5
**jcho** 243:24
**jeff** 331:22
**jen** 35:11,12 51:24
54:10 130:17
133:11 204:14
**jerry** 7:5,8 10:8,11
18:14,18 97:5
106:13 395:13
402:2 421:4
**jflowers** 2:9
**jick** 411:13,18
**job** 23:7 278:7
339:7 340:5
397:15
**jodi** 2:5 18:19
**john** 119:18
141:10 254:3
**johnson** 2:15 3:15
3:15 19:2,15,15
**joined** 19:1 105:18
108:14 115:21
132:1 138:7 142:1
142:22 343:18

352:12
**joint** 245:17 246:7
246:10,15 247:8
247:15 248:9,23
**jones** 4:9 19:12
**jonesday.com**
4:12
**journal** 358:16
398:6
**judge** 1:7 22:4
65:25 94:21
317:10
**judgment** 248:13
248:16 249:4
**july** 9:3 106:5,6
108:8 159:5,24
160:7,18 161:1,17
262:17 288:2
315:9,19 335:9,9
**june** 10:7 371:14
395:12 398:14,15
402:5 403:18
**justice** 120:11
127:22
**justify** 53:7 62:17
62:20

**k**

**k** 3:3 5:3,12
**kaiser** 246:2
**kearse** 2:5 6:11,13
18:10,13,13 23:19
23:22 24:3,22
25:8,21 29:21,23
30:7 31:22 32:1
32:11 35:23 36:17
36:19 38:18,23
39:8,20 40:2 41:4
42:3,24 43:9,11
44:2,5,13,19 45:13
45:16,18,25 46:3
46:12,15,24 47:3

47:21 48:13 49:2
49:10 50:15 51:2
51:19 52:3,18
53:13 54:16 58:4
58:8,22 60:11,20
61:6,8,20 62:5,7
62:24 63:5 66:21
67:14 69:5,15
70:9 71:5 72:4,15
72:21 74:10 75:3
75:18 76:24 77:5
78:17,19,21 79:6
81:5,14,25 83:17
84:2,11,20 85:10
85:18,22 86:2,9,15
87:1,19 88:2,7,11
88:16 89:2,9,11,20
90:3,6,9,14,21
91:4,7,10,13,17,22
92:11,16,21,24
93:5,9,16 94:5,23
95:8,18 96:8
97:11,22 98:3,6,11
98:16,22 99:1,4,7
99:12,24 100:17
100:22,24 101:2,6
102:17 103:11
109:13 110:22
111:17 114:7
116:1 117:3,8,13
117:22 121:11
122:3,10,25
123:17 124:3,13
126:7,9,16 130:12
130:23 131:7,23
133:22 135:4
137:24 138:20
139:3 142:3,8,23
144:6,20 147:2,17
148:10,22 149:13
151:2,6,8,22

| | | | |
|---|---|---|---|
| 152:21 153:2,24 | 263:18 264:22 | 385:12,14 386:4 | 240:11 243:2,3 |
| 154:2,5,9,12,16,22 | 265:10 266:17 | 387:24 388:11 | 271:1 283:3 |
| 155:10,13,20 | 267:21 269:17 | 389:2,8,13 393:24 | 285:22 314:1,4 |
| 157:7,10,15 158:1 | 270:1,11,21 272:3 | 395:8 402:20 | 316:1 321:4 349:9 |
| 159:19 160:21 | 277:2 278:19 | 403:1,7,20 404:2 | 379:20 381:16 |
| 161:10,20,22 | 279:20 281:10 | 406:4,10 407:6 | 409:25 |
| 162:15,17 163:11 | 283:24 284:11,18 | 408:1,9,15,20 | **kindly**  165:19 |
| 164:10 165:12,20 | 285:12 286:6,9,21 | 412:6,16 416:2,4 | **kinds**  67:19 |
| 165:24 166:7,20 | 287:2,10,15 | 416:14,22 420:7 | **kiosks**  425:22,25 |
| 166:25 167:8,16 | 288:10,23 289:16 | 420:22 421:14 | **knew**  55:14 114:1 |
| 167:20 168:3,10 | 294:17 296:12 | 424:13,21 425:8 | 146:18 147:1 |
| 168:18 169:9 | 297:19,22 298:4 | 426:12,24 427:14 | 153:3,17 217:6 |
| 171:25 172:2,4,8 | 299:5 300:6,21 | 427:24 428:8,21 | 222:23 344:21 |
| 172:11 185:1 | 304:16 306:10,17 | 429:14,20 430:12 | 348:25 354:15 |
| 186:8 188:24 | 307:3,15,21 308:1 | 434:5 | **knock**  392:2 |
| 189:11,14,18,24 | 308:10 310:1,14 | **keep**  38:20,24 | **know**  30:6,21 |
| 191:14 196:23 | 311:21 312:1 | 39:10,11,13 117:9 | 36:12 39:2,5 |
| 197:17 198:14 | 313:2,6,23 314:13 | 122:11 135:9 | 44:20,20,23 45:7 |
| 199:13 201:7,11 | 314:21 315:2 | 155:11 166:5 | 46:6 47:6,7,8 48:9 |
| 201:24 202:5,11 | 316:24 317:6,21 | 167:10 169:7 | 56:16,16 57:8 |
| 202:14,18,21 | 318:20 320:4,6 | 175:8 291:21 | 59:23 60:23 64:7 |
| 203:7,8,11,19 | 321:2 322:12,18 | 324:10 327:24 | 65:17 69:17 70:10 |
| 204:1 206:3,24 | 322:22 323:7 | **kelley**  1:21 | 72:5 78:1,25 |
| 209:17 210:11 | 324:7 325:18 | **kelly**  5:11 19:22 | 80:14,16 81:18,20 |
| 211:6 214:22 | 327:10,16,25 | **kept**  39:6 | 82:16 84:13 87:4 |
| 216:24 218:3,20 | 328:5 329:9,16 | **key**  3:11 8:14 | 87:7,7,9,12,13 |
| 219:11,23 220:1 | 334:11 335:3 | 253:18 | 96:1 110:4,12,14 |
| 220:21 221:2,6,9 | 336:11 337:24 | **khibbert**  5:14 | 111:12,19,19 |
| 221:17 222:9 | 339:2,14 340:8 | **kill**  397:14,21 | 112:25 113:12,16 |
| 223:6 226:19,24 | 341:25 342:9 | **killer**  323:1,9 | 113:17 116:7 |
| 229:8,23 231:15 | 344:8 347:18 | **kim**  10:7 24:21 | 117:16 124:14,14 |
| 235:21 237:10 | 348:22 352:16 | 358:11,14 395:12 | 124:18,21,22 |
| 238:3 241:11 | 353:24 361:1,12 | 398:6 403:2 | 126:8,12,14 133:8 |
| 242:3 244:10 | 363:4,14 364:25 | **kim's**  403:2 | 133:8 135:21,25 |
| 245:24 246:21 | 365:9,19 366:8,21 | **kincaid**  4:10 19:11 | 136:3 138:18,24 |
| 248:2,14 249:5,10 | 368:5,22 369:15 | 19:11 | 139:4 140:22,23 |
| 249:12,16 250:12 | 373:5,11 374:19 | **kind**  22:8 30:21 | 140:24 141:2,7 |
| 250:15,22 251:4 | 374:24 377:23 | 59:24 68:3 81:2 | 142:10,13,24,25 |
| 251:18 252:3,21 | 378:19 381:8,14 | 85:16 175:8,14 | 143:2,16,24 144:8 |
| 255:22 257:7,15 | 381:24 384:13,16 | 177:12 185:7,13 | 144:8,16,22,23 |
| 258:10,25 261:21 | 384:20 385:1,6,8 | 208:22,23 211:3 | 146:23 147:5,10 |

147:21 151:11,12
151:13,23 153:11
153:12,13,21
156:25 157:2
158:10,12,15,16
158:23 160:1,23
161:4,6,11,23
162:5,6,21,22
163:1,2,19 165:3
165:13,18 169:6,8
175:5 185:3 189:1
189:2 192:14
197:18,18,19,21
199:6 200:23
201:23 203:20
204:21 207:17
213:2 215:2,20,20
215:21 218:8
220:8,23 221:22
221:24 222:3,16
222:17 223:9,13
225:6,25 228:2,6
228:11 229:9
231:4 234:5,25
237:11 238:22
239:19 242:20
244:19,25 245:3,5
245:9,10,15,20,25
246:1 247:8,13,15
247:24 248:3,18
248:19 249:25
250:3 251:10,22
251:24 257:13,18
257:21 259:13
261:3,9,23 262:2
266:18,19,22,25
267:3,8,13,23,24
268:5 269:12,23
270:2,2,5,12,24
271:5,13 272:4,10
272:10,13,16,23

273:21 274:7
276:1,11 277:7,8
277:10 278:24
280:19,21,23
281:1 282:15,17
282:20 285:3,21
286:11,11,12
288:25 291:3,4,14
293:13,17,21
294:6,10,14
295:14 296:24,25
297:3,8,11,13
301:8,21 306:20
306:23 308:4,11
308:13 309:15
310:2,25 312:5,14
312:17,20,22
313:7 316:13
317:24 319:18,21
319:22,25 322:8
322:10,20 323:9
323:13 325:21,22
325:23 326:8
327:2,11,17
329:11 332:17
333:4 334:16,20
334:24 336:16,18
337:8,9,17 339:4
343:12,21,24
345:12 346:1
347:21,25 348:3
348:11,17,24,24
349:5 351:19,23
352:4,8,12,21,25
353:3,8 354:20
356:24,25,25
357:6 359:24
362:21 363:15
365:2,2,10,11,12
365:13 366:4,10
366:18,23 368:12

368:13 375:3,14
375:24 377:19,22
377:25,25 378:21
380:4,9,21,22,23
381:15,25 383:16
386:14 387:2,8,10
387:11,13,15,17
387:19,23 390:13
401:4,9,13,22
402:22,22 403:2,9
403:10,15,22
404:19,23 405:4,7
405:9,10,12 409:5
410:6,19,20
411:12 414:7,9,16
414:25 415:6,6,7
418:22 420:8,11
420:24 422:10
425:16 427:25
**knowing** 112:21
210:12 277:3,21
277:22 279:19
320:10,12 325:7
327:7 353:12,15
368:6
**knowledge** 33:3
69:10 84:8 87:17
91:16 120:9
131:17 164:21
260:17 267:12
274:15 275:14
278:24 283:2
408:22 412:5
416:18 427:1
**known** 138:13
142:21 143:1
156:5 345:15
378:24
**knows** 155:13
**kouba** 2:6 18:16
18:16

**kurt** 5:22

**l**

**l.p.** 1:11,13
**laboratories** 3:4
5:4
**laboratory** 361:5
**lack** 45:4 221:17
360:13
**laid** 121:2 382:18
**lamarca** 325:23
326:25 327:18
328:9
**land** 103:4
**language** 64:9
123:12 342:25
**large** 214:18
224:10 237:18,19
365:4,17 414:4
**largely** 140:16
141:5,24 142:19
289:14,17 361:8
361:10
**larger** 52:23
**late** 116:23 168:7
**latest** 325:10
**launched** 427:3
**law** 369:18,20,21
369:25
**lawful** 20:3
**laws** 268:10
374:16
**lawsuit** 7:6 63:9
64:14 66:6,16,20
67:8 68:23 69:4
69:18 70:12,24
71:22 72:20 73:2
74:3,14,16,17,19
74:24 75:17,21,24
76:9,18 77:3,4,25
78:13 79:1,5,9,13
79:21 80:17,24

81:4 82:7 83:20
83:25 84:6,15
85:1 97:7 100:10
101:17 103:6,16
103:20 104:3,5,6
104:13 105:2
196:12,19 197:14
198:9 206:16
207:16 381:18
382:2 405:17
410:3
**lawsuits**  101:23
**lawyer**  23:17
**lawyers**  26:19
27:22 40:14 52:17
66:7 83:8 157:14
157:18 175:8
204:2 215:5,19
321:16 346:14
**lead**  274:9 383:7
**leading**  69:7
134:25 136:1
278:14 363:7
**learn**  57:6 64:6
131:12 352:18
**learned**  56:21 64:8
86:13 118:14
271:7 383:24
**learning**  331:25
**leave**  100:25 120:1
**leaves**  298:10
**lectures**  117:24
**led**  156:23 233:5
278:15 345:25
383:17 411:14
**lee**  331:21
**leffler**  119:20
129:5,11,15
**left**  23:21 119:11
127:2 129:11
143:20 149:17

**200:24 201:1**
230:8 242:14
258:14,15 304:19
372:16 373:25
384:5,8 386:11
418:21
**legal**  5:22 44:14
64:8 82:25 84:12
406:18 434:1
437:1
**legalese**  86:14
**legally**  388:10
**legislation**  293:14
**legislative**  8:21
290:7,20
**legislature**  219:5
**legit**  258:23
**legitimacy**  68:5
340:25
**legitimate**  124:24
237:8 250:20
251:2 258:23
260:1 264:18
265:4,25 312:5
313:19 320:3,7,23
320:24 322:1
329:8,15 333:23
334:8,8 382:6
**legitimately**
258:21
**length**  393:14
**lethal**  299:6
**letter**  411:11
434:19
**level**  30:5 82:20
161:12 185:17
233:4 266:21
**levels**  379:21
**levy**  179:3,3,18,19
179:21,23 180:4,9
180:16 190:22,22

**194:10,11 195:3,4**
195:7,8 196:4
208:15,16,18
210:6 214:7,17
216:13,15 217:22
217:22 218:12,13
218:13,17,22
**lewis**  3:5 5:5 19:5
19:21
**liberal**  244:13
**licensed**  86:23
89:1,8,19 124:23
250:4,7 260:2,14
263:10,13 264:7
264:19 265:6
294:16 311:16
312:3 313:19
314:8,17 317:20
320:8,24 325:17
329:7,14
**life**  234:22
**line**  56:2 89:11
151:3 190:13,17
191:3,24 194:8,25
328:1 400:2
421:20 423:12
434:13 436:7
437:3
**lines**  56:25 66:15
67:11 82:13 85:15
253:6
**link**  367:25 393:2
393:9
**linked**  300:8 368:9
368:19
**linkedin**  7:8
106:13,18,22,24
107:20
**list**  7:18 9:12
40:24 107:15
152:14 159:6,16

**187:10 231:25**
233:18,24 293:2
338:9 341:13
380:24 394:25
410:1
**listed**  37:11
107:20 227:7
239:12 242:5
395:2 410:21
436:7,17
**listen**  154:8,11
**listing**  436:7
**lists**  226:4 230:12
**listserv**  423:10,18
423:20 424:2,5
**lit**  415:16
**literature**  110:5
224:21
**litigation**  1:5 18:4
21:4,6,13,20 36:1
40:20 60:19 79:17
80:3 81:8 82:17
91:20 102:10
196:9 215:5 402:1
404:22 409:15
411:9 413:2 415:5
415:16 416:9
434:6 435:3 436:3
**litigations**  102:3
**little**  29:12 32:14
40:23 73:19 77:20
139:23 142:13
145:2 174:5
181:13 186:11
194:22 208:23
225:14 243:10
254:14 258:8
293:7 299:16
327:1 333:8 348:6
353:21 361:14
378:3 394:3

400:21 411:23
423:17
**live** 8:17 102:22,24
109:7 245:14
262:10 393:8
**lives** 348:14
**llc** 2:4,3 3:3 4:3 5:3
413:5
**llp** 2:16 3:5,16 4:4
4:15 5:5,11,16
19:14
**local** 190:22 208:9
208:13,15 210:20
212:6 273:22
276:6 303:19
369:25 399:9
428:20 430:5
**locations** 425:23
**log** 202:10
**long** 27:9,19 86:1
86:6 99:13 142:10
161:1 196:14
384:24 395:22
404:20
**longer** 119:18,20
119:21 124:9
129:5 158:9 219:3
413:7
**look** 39:15 44:22
48:14 59:5 77:24
119:9 136:8 139:8
158:2 175:18
176:7 177:3 182:3
183:6 187:25
188:20 191:9
194:2,3 202:4
226:2 232:11,13
232:16 240:5
245:11 251:14
257:10 261:18
285:19 286:1

321:22 337:2
359:5,15 378:2
382:15 393:6
412:19 423:12,14
424:1,4
**looked** 36:9 37:21
55:4 110:15
111:20 141:8,12
156:22 220:7,25
221:15,23,24
235:24 260:19,24
275:19 288:12
292:22 304:18
313:3,4 337:9
361:14 370:7
**looking** 151:18
161:5 162:20
183:20,23 184:22
185:21 186:10
204:18 221:19
256:12 335:24
336:19 367:20
371:16 383:21
**looks** 139:21,25
190:17 204:23
209:3 246:10
263:3 268:10
321:17 333:1
349:10,23 351:5
359:18
**los** 387:4,5
**lose** 122:14 242:14
**lot** 40:25 46:23
56:17 68:8,12,14
68:17 95:10 96:24
113:2 115:18
120:9,18 143:15
143:19 148:12,14
149:22 168:13,15
168:21 210:14
273:21 276:3

280:19 285:4
303:5,6 307:6,7
309:16,21 331:3
352:22,22 397:9
397:17
**lots** 125:6 162:7,7
162:25,25 234:11
273:21
**lou** 325:23 326:25
327:18
**low** 274:6
**luck** 311:18
**lucky** 311:23
**lumped** 284:1
**lunch** 166:4
169:10 171:11
**luncheon** 169:14

**m**

**m** 2:6 355:12
409:9,10
**macsis** 355:1,11
**madam** 434:10
**mail** 7:3,5 9:5,7,14
9:16,19 10:7,10,13
33:13 60:16 73:10
73:18,20 97:5
100:5 321:9
326:19,24 327:19
328:3,9 346:6
347:5 348:21
349:10 357:19,24
358:3,10,23
361:18,25 395:12
398:4,10 401:25
402:25 421:3,16
421:18,22 422:19
422:25 423:12
424:2 425:18
**mails** 421:20
423:11,19

**main** 1:21 3:17
**maintain** 52:21
106:25 107:3
**maintained**
191:25
**majority** 124:6
313:21
**makeup** 311:20
**making** 61:25
62:12 78:6 160:3
209:13 225:17
249:8 257:2
269:13 312:4,16
336:5,8 396:16
**manage** 271:22
**management**
226:9 227:21,25
228:8,21 229:14
242:13 247:3
252:16
**manager** 106:2
108:3,5 119:24
129:17,24 141:10
254:8
**manner** 39:24
101:25
**mantle** 304:4
**manufacture**
409:19
**manufactured**
324:5 360:18
361:5,10
**manufacturer**
405:5 409:22
410:20 411:18,21
412:1,4
**manufacturers**
63:25 269:8 284:5
301:2,19 409:14
409:18,23 410:2
411:8 412:10,14

**manufactures**
　405:8
**maps** 262:3
**march** 9:19 106:9
　137:18,20 321:23
　361:18,25 362:3
　390:5
**marijuana** 113:2
　114:2 372:21
**mark** 9:5 133:25
　315:14 321:6,10
　321:19 332:12
**marked** 7:2 73:12
　97:8 100:2 106:14
　106:21 116:19
　118:23 129:3
　134:9 145:9
　149:10 152:15
　159:4 169:19,25
　170:6,12,18,23
　171:4,15,21 172:6
　172:18 180:25
　200:10 201:5,22
　204:7 223:24
　253:19 254:1
　262:12,16 290:10
　290:14 292:12
　315:11 321:12
　326:21 327:11
　332:9 338:10
　341:10 346:9,12
　357:10 358:7
　361:21,24 370:14
　370:18 376:15,20
　389:21 393:21
　395:15 398:4
　421:7,12 423:4,7
**market** 239:22
　298:7 308:24
　309:2

**marketed** 241:16
**marketing** 37:18
　226:9,11 230:13
　230:16 236:8,18
　239:23 240:21,24
　241:6,8,10,13
　300:10,13,15,17
　300:19 301:19
**marking** 73:15
　357:23
**mary** 119:19
**maryland** 4:6
**massive** 297:2
**masters** 4:16
　19:18,18
**material** 57:13
　64:3 85:12 95:10
**materially** 70:11
**materials** 54:20
　58:25 60:5 418:16
**matter** 18:3 21:2
　22:16 64:14 77:17
　79:8 86:21 100:14
　267:5 361:9
**mcginness** 2:5
**mckesson** 5:15
　20:1 277:5,7,18
　279:12
**mcmahan** 10:7
　358:11,14,18
　395:13 398:6
　400:25
**md** 1:6
**mdl** 1:5
**mean** 21:25 22:1
　24:14 34:23 47:16
　56:6 66:12 67:6
　70:20 80:22 85:14
　96:10 102:25
　116:6 160:12
　164:15 178:16

　179:10,13 185:14
　185:15 192:4
　194:23 200:20
　206:17 211:24
　216:2 218:25
　224:23 241:7,9
　242:20 243:12
　249:13 256:7
　258:7 261:25
　268:18 275:7
　280:21 285:14
　287:23 302:9
　309:15 326:4
　331:10,11 360:20
**meaning** 79:23
　245:10
**means** 47:17
　194:24 207:2
　245:5,14 254:13
　259:13 353:24
　368:12 422:2,5,7,8
　422:12
**meant** 58:21
　255:10 326:8
　348:4 360:7,9
**measure** 123:25
　137:11
**mechanism** 343:7
　351:14
**med** 382:20
**media** 273:13,20
　279:5 280:7,9,13
　280:18 338:25
　339:6,11,22,23
　340:4,12,15,18
**medic** 125:9 414:4
**medicaid** 182:7,12
　182:21 192:25
　212:5 217:3,6
　218:25 291:21,23
　295:20 296:4,8

**medical** 9:1 87:5
　87:21 88:16 89:15
　90:24 124:24
　125:9 136:15,17
　136:21 137:3,23
　138:6,11,19,25
　139:5 228:12
　229:3 237:3,9
　243:20 244:6,19
　244:25 247:10
　248:13,16,25
　249:3,22,25
　250:20 253:2,4,7
　256:23 257:11,19
　258:24 266:14
　267:15 294:5,6,9
　294:11,14,21,22
　295:8,9,15,15
　312:5 313:20
　315:6,20,24 316:2
　316:11 317:23
　320:3,17,17,23
　329:8,15 334:9
　335:2,11,17
　336:20 353:4,5,9
　353:18 363:3
　382:6 386:23
　391:25 406:19
**medically** 250:11
　328:14 407:5
**medicare** 295:21
　296:4,8
**medicating** 226:11
　239:15
**medication** 86:25
　87:18 88:25 89:10
　89:18 90:2,13
　109:22 124:17,21
　125:1,2,5,7,11,13
　125:14,16,18,20
　125:22 141:18

[medication - mischaracterized]

191:22 193:11,16
231:22 235:2
237:7 238:19,22
238:24 243:6,7
255:12,16 265:5
274:11 314:11
317:13 319:19
329:7 333:22
408:5 425:21,25
**medications** 88:19
89:23 123:19
124:9,10 143:17
230:4 231:1
232:18,25 233:2,8
234:8,16,20,25
237:20 240:9,9
243:11 255:14
258:14,15,21
259:17 262:6
263:15,23 264:2,4
264:8,17 265:25
267:1,4,6,10
268:11 270:10
272:12 274:9
298:8 300:5,16,18
308:16,23 310:6,9
311:16 313:1,18
320:1 325:13
352:6,20 363:2
382:19,21 399:12
407:25 408:12
414:5
**medicine** 236:25
239:2 259:7
362:17,20
**medicines** 272:15
299:22
**meds** 230:8
**meet** 27:1,15,19
105:14 237:4
330:23

**meeting** 7:3 8:15
29:1 73:10 104:20
105:4 253:19
345:22 346:3
391:5
**meetings** 24:11,18
25:13,15,20 26:8
26:11,12,19,23
28:4 71:16 105:10
**meets** 105:15
**melinda** 2:15 19:2
**member** 200:21
392:25 393:5
**members** 87:14,16
87:21 88:20,23
89:22 90:1,19
93:14,22 94:1,10
95:16 96:5 200:23
330:9,24 331:2,6
331:16,20 369:24
392:6
**memo** 390:5
**memory** 116:9
147:21
**mental** 41:11,18
41:25 48:25 49:8
107:7,12 108:23
109:16,23 110:1,6
110:17,24 111:1,8
111:13 120:9
121:3,18 145:13
146:11,18 147:1
152:5 176:3,9,10
176:21 177:20
183:10 278:3
**mention** 280:25
381:16
**mentioned** 28:18
29:3 113:24 273:8
273:11 405:21
409:11 416:8

418:10 420:5
**mentions** 366:12
**meredith** 4:10
19:11
**merits** 71:18
**message** 247:4
392:8 424:5
**met** 26:16 27:9,22
**meth** 114:2 394:19
**methadone** 410:14
**methamphetamine**
113:4 164:12
299:12 381:20
**methamphetami...**
149:20 167:11
187:5
**methodologies**
36:22 37:4 38:6
38:11,21 39:6,12
39:14 43:2,7 61:3
207:21
**methodology**
29:25 30:22,24
31:5 36:12,21
37:10,14 38:25
39:11 200:16
206:1
**metric** 137:9
336:4
**mexican** 368:19
**mexico** 324:6
360:25 365:5
367:23 368:9
369:11
**microphone**
412:21
**mid** 20:23 21:3
**middle** 117:16,21
224:11 263:3
326:15

**midwest** 434:17
437:1
**migrated** 356:3
**mil** 179:20,23
190:6
**mill** 237:15 297:5
**millage** 195:3
**million** 176:11,15
177:5 186:24
190:6,18 209:3,7
**mills** 143:19
237:12 242:12
296:15,19,22
297:8,14,18 298:2
308:22 382:22
386:9 405:21,24
406:3
**mind** 48:6 102:4
147:16 165:23
166:9 193:23
217:12 245:12
249:15 276:18
280:18 302:2
307:14,16 353:20
380:14 399:1
**mind's** 280:23
352:10 367:19
**mindset** 240:12,16
299:17,21,25
300:4,15
**mine's** 201:11
**minor** 256:23
**minute** 26:4 34:2
166:4 202:2
**minutes** 23:23
86:22 105:5,8,9
370:25
**miscalculates**
52:19
**mischaracterized**
117:4

mischaracterizes 31:23 78:19 95:19 95:20 149:14 339:15
misconduct 22:9
missing 9:5 173:13 321:10,19
mission 109:15
misstates 32:12 226:25
mistakes 40:1
misunderstand 78:22 95:21
misunderstanding 389:11
misuse 351:14
misused 320:22
misusing 320:9,25
mitigate 396:6
mitigation 408:25
mixed 380:16,19
mkincaid 4:12
mkjohnson 2:19
model 9:1 315:7 316:4
modify 283:11
moment 70:4 182:4 216:12 223:13 318:24 404:5
monday 27:24 46:7
money 38:14 81:2 176:21 178:2 179:14,16 182:21 190:20 193:19 194:9,24 195:5,6 210:22,24 217:2,7 218:21
monies 41:16

monitor 351:14
monitoring 261:6 366:12 367:3 370:23 371:4
month 35:14 104:19 330:25
months 27:5 34:14 35:15,16 347:3 374:7 418:2
morgan 3:5 5:5 19:5,20
morganlewis.com 3:7 5:8
morning 20:10,11 85:24
mornings 28:25
morphine 410:16
motives 248:21
motley 2:4 18:16 18:23 26:11,20 27:22 28:4,8 49:20,21
motleyrice.com 2:8,9,10,11
motor 139:13,13 139:21 140:3
mouth 92:13
mouthful 290:21
move 70:11 92:7 99:8 129:2 157:10 163:13 219:13 243:2 389:13
moved 385:23 386:9
moving 97:14,20 249:17 305:14 327:24
moylan 4:5 6:10 19:9,9 412:24 413:1 421:11 427:17,20

mt 2:7
muddle 333:11
multifaceted 307:20,25 308:3
multiple 391:17
murder 22:17

**n**

naloxone 10:11 420:5,9,19 421:5 421:21 422:4 424:25,25 425:6 425:14 426:5,10 426:17,22
name 20:12 90:25 104:6 159:22 237:1 239:2 241:18 254:3 304:24 305:1,3,5 325:24 326:11 332:2 354:20,22 404:20 405:6 410:9,11,20 411:13 412:25 414:21 419:6 434:6 435:3,4,15 436:3,4,21
named 74:16 80:7 80:8,12,15 84:25 103:22 108:15 405:13,17 410:3 413:23 415:22 432:9
names 95:3 296:25 354:15 410:7
narcan 401:3,15
narrative 173:6,13
national 1:5 18:4 325:8,9 414:12 420:17 428:14 429:17 430:6 434:6 435:3 436:3

native 254:13 332:16
natively 254:17
naturally 131:18
nature 21:11,12 30:9 38:12 66:11 70:7 71:8 121:25 122:8 127:5,10 128:3,17 172:23 185:18 299:3 393:8 411:17 413:16 414:24 415:25 418:9
navigated 354:24
near 424:11,16
nearly 108:15 176:11
necessarily 38:4 53:15 80:16 101:24 102:22 132:19 135:21 136:8 162:8 168:20 181:25 184:20 245:12,13 259:21 262:4 270:25 273:9 280:3 282:20 339:3,16 348:4 383:13 414:19
necessary 70:1,4 328:15 407:5
need 32:14 59:23 64:16 65:11 117:7 124:24 135:8 150:20 154:18 155:10 160:2,25 164:6 165:16 166:22 174:10 185:9 237:9 243:8 247:6 255:11,12 258:24 291:21

312:5 313:20
320:3,23 329:8,15
334:9 356:9 359:5
382:6 393:1 401:1
401:4 406:19
**needed** 65:8 104:9
131:2 151:24
152:9 223:11
275:11 303:10
**needing** 425:1
426:5
**needs** 23:13 71:13
120:21 121:3,4
131:25 148:14
178:7 179:6
190:25 195:12
237:4 291:11
363:3
**neighborhood**
314:20
**neither** 72:10
**net** 195:4
**network** 366:12
367:3 370:23
371:4
**never** 47:12 60:1,1
111:20 117:19,19
139:6 178:14,17
214:25 247:19,22
261:18 269:10
275:20,20 294:8
301:21 311:17
313:3,3,4 316:25
328:2 378:25
379:1 382:5 388:2
408:7
**new** 5:7,7 10:14
26:1 194:11,11
356:17,17 364:8
423:1

**newly** 193:2
**news** 272:17,18,22
273:1,12,16,25
274:21 367:13
**newsletter** 159:23
341:16,19 344:3
**newsletters**
341:12
**newspaper** 234:6
273:3,5,7,10,23
282:16 338:20
387:1 399:9
**nice** 390:1
**nicely** 42:23
**nick** 356:11 357:5
**nine** 391:18
**nominal** 37:1
**non** 216:22 218:1
334:23 363:3
388:8
**north** 3:17
**northeast** 4:10
**northern** 1:2
**northwest** 2:16
4:16 5:12
**notarized** 434:14
**notary** 432:6
433:14 434:25
435:10,18 436:15
436:23 437:23
**note** 358:22
424:16 434:12
**notes** 412:19
**noticed** 189:1,6
198:2 335:7
**notwithstanding**
217:20 334:13
**november** 100:5
357:17 395:24
**number** 7:2 36:6,8
39:16,25 40:5,18

51:17,21,25 52:12
52:14,24 114:19
115:9,23 118:18
127:20 140:1,2
175:19 176:14
189:20,21 201:8
205:21 207:17
212:3,25,25
232:14,18 244:13
254:14 256:24
260:13 263:9
271:25 272:1
291:24 294:20
295:19 298:20,24
308:9,15 309:11
309:13 324:17
332:18 350:12,18
350:21,24 352:5
364:11,23 367:23
378:5 379:11
380:2 388:19
390:1 391:13
393:25 395:18,21
396:2 399:11
400:10 401:15
403:16,25 421:13
423:8,11 424:11
434:7,13
**numbered** 175:10
189:3
**numbers** 36:10
52:8 139:12 146:4
175:2,7,11,11
188:1 212:15
232:17 262:5
264:3 274:8 333:9
362:10 372:2
436:7
**numeral** 292:15
**nursing** 234:15

**O**

**o** 355:18
**oarr** 399:15
**oarrs** 9:14 261:5
343:4,6,12,17,21
343:25 344:4,10
344:13,19 345:1,7
345:11,19,23
346:6,18 347:11
347:16,20 348:3
348:11,19,25
349:13,21 350:2,8
350:10 351:9,13
398:17 399:3,16
399:20 400:3
**oath** 65:14 118:1,4
144:11 155:9,14
**object** 11:2,3,4,4,5
11:5,6,6,7,7,8,8,9
11:9,10,10,11,11
11:12,13,13,14,14
11:15,15,16,16,17
11:17,18,18,19,19
11:20,20,21,22,22
11:23,23,24,24,25
12:1,1,2,2,3,3,4,4
12:5,6,6,7,7,8,8,9
12:9,10,10,11,11
12:12,12,13,14,18
12:19,19,20,20,21
12:21,22,22,23,23
12:24,24 13:1,2,2
13:3,3,4,4,5,5,6,6
13:7,7,8,9,9,10,12
13:12,13,13,14,14
13:15,15,16,16,20
13:21,21,22,22,23
13:23,24,24,25
14:1,1,2,2,3,3,4,4
14:5,5,6,6,7,7,8,8
14:9,9,10,10,11,11

14:12,12,13,13,14
14:14,15,16,16,17
14:17,18,18,19,19
14:20,21,21,22,22
14:23,23,24,24,25
15:1,1,2,2,3,3,4,4
15:5,5,7,7,8,8,9,9
15:10,10,11,11,12
15:12,13,13,14,14
15:15,15,16,16,17
15:17,18,18,19,19
15:20,20,21,21,22
15:22,23,24,24,25
16:1,1,2,3,3,4,4,5
16:5,6,6,7,7,8,8,9
16:10,10,11,11,12
16:12,13,13,14,14
16:15,15,16,16,17
16:17,18,18,19,20
16:20,21,21,22,22
16:23,23,24,25
17:1,1,2,3,3,4,4,5
17:5,6,6,7,7,8,8,9
17:9,10,11,12,12
25:21 30:7 31:22
32:4,11 36:17,19
38:18,23 39:8,20
40:2 41:4 42:3,24
43:9,11 44:2,13,19
45:13,20 47:3,21
48:13 49:2,10
51:19 52:3,18,20
53:13 54:16 58:4
58:8,22 60:11,20
61:6,8,20,21 62:24
63:5 66:21 67:14
69:5,15 70:9 71:5
72:4,15,21 74:10
75:3,18 76:24
78:17 79:6 81:5
81:14,25 83:17

84:2,11,20 85:10
85:19 86:2,9,15
87:1 89:2 90:3
95:18 102:17
103:11 109:13
110:22 111:17
114:7 116:1 117:3
121:11 122:3,10
122:25 124:3
130:12,23 131:7
131:23 133:22
137:24 138:20
139:3 142:3,8,23
144:6,20 148:10
148:22 151:3
154:6,13 155:20
157:15 158:1
159:19 160:21
161:10,20,22
162:15,17 163:11
168:18 185:1
186:8 191:14
196:23 197:17
198:14 199:13
206:3,24 209:18
210:11 211:6
214:22 216:24
218:3,20 219:11
219:23 220:21
221:17 222:9
223:6 226:19,24
229:8,23 231:15
235:21 237:10
238:3 241:11
242:3 244:10
245:24 246:21
248:2,14 249:5
250:15,22 251:4
251:18 252:3,21
255:22 257:7,15
258:25 261:21

263:18 264:22
265:10 266:17
267:21 269:17
270:1,11,21 272:3
277:2 278:19
279:20 281:10
283:24 284:11,18
285:12 286:21
287:2,10,15
288:10,23 289:16
294:17 296:12
297:19,22 298:4
299:5 300:6,21
304:16 306:10,17
307:3,15,21 308:1
308:10 310:1,14
311:21 312:1
313:2,23 314:13
314:21 315:2
317:21 318:20
320:4 321:2
322:12,18 323:7
324:7 325:18
328:1 329:9,16
334:11 335:3
336:11 337:24
339:2,14 341:25
342:9 344:8
347:18 348:22
352:16 361:1,12
363:4,14 364:25
365:9,19 366:8,21
368:5,22 369:15
373:5,11 374:19
377:23 378:19
381:8,14,24 385:9
386:4 387:24
388:11 395:8
402:20 403:1,7
406:4,10 407:6
408:1,9,15,20

412:6,16 416:2,4
416:14,22 420:7
420:22 425:8
426:24 427:14
**objecting**  219:24
**objection**  11:1,3
11:12,21 12:5,13
12:14,15,15,16,16
12:17,17,18,25
13:1,8,10,11,11,17
13:17,18,18,19,19
13:20 14:15,20
15:6,6,23 16:2,8
16:19,24 17:2,10
17:11 23:18 24:6
29:21 45:4 52:21
62:3,7 77:5 89:3,9
89:11,20 90:9,14
90:21 92:18 93:16
94:5 95:9 96:8
117:6,7 123:17
124:13 147:2
149:13 152:21
153:2 164:10
165:12 167:8,16
167:20 168:3,10
209:20 250:12
258:10 286:6,9
317:6 322:22
340:8 374:24
389:9 403:20
424:14 426:12
**objections**  89:12
99:14,20
**objective**  248:19
392:9
**obligated**  87:22
**obligations**  155:14
**obstruct**  99:14
**obstructive**  93:10

**obtain** 325:16
**obtained** 329:13
  388:10
**obtaining** 329:6
**obviously** 156:18
  347:21
**occasion** 117:19
  174:16
**occasions** 23:3
  27:4 40:18 114:1
  291:24
**occur** 217:4
  243:17 309:4
  392:11
**occurred** 112:9
  131:14 136:22
  182:7 227:8 236:4
  240:25 264:13
  288:2 391:21
**occurring** 109:17
**october** 104:21
  144:24 221:1,16
  223:16 225:7
  226:21 242:1
  290:16 326:24
  346:22 348:20
  349:3 350:14
  357:25 358:17
**offended** 98:9,12
**offer** 238:6,20
  294:3 330:15
  392:3
**offered** 59:17
  106:8 238:8
  418:15
**offers** 235:2
**office** 40:21 50:2
  50:13,17,20,24
  51:8 54:1 69:20
  77:16 136:16,18
  136:21 137:3,23

138:6,12,19,25
139:6 228:4 330:2
335:2,11,18
336:20 353:6,10
433:6
**officer** 34:20
  35:10 39:3 51:24
  54:4 120:7 391:24
**officers** 234:7
**official** 435:15
  436:21
**officially** 251:1
**oftentimes** 243:9
  324:6
**oh** 28:22 205:20
  320:6 333:14
  371:16 390:2
  394:12
**ohio** 1:2,11,13,22
  3:12,18 7:11,14
  8:11,19 10:1,1
  18:6 134:5,8,14,17
  135:1 141:23
  142:18 145:12,14
  146:10,17,25
  147:8 219:16
  220:5,17,20,25
  221:15 222:5,13
  223:13,16,21
  225:8 226:20
  227:9 232:12
  242:2 251:1 252:6
  252:11 261:23
  263:3 276:3
  287:13 288:22
  290:5,18 291:8
  292:21 293:23
  294:4,6,8,11,14,21
  295:7,14 307:18
  315:23 324:2
  326:10 347:7

349:6 366:11
367:2 370:22
371:3 375:14
376:1,4,7,11,12
432:2,7 433:7,15
434:2
**okay** 23:2,23 24:2
  25:2,17,19 26:3,15
  27:1 28:3 32:17
  32:25 33:11 38:20
  39:10 40:7 42:21
  44:17 45:9,18,23
  46:14 47:19 49:4
  51:7,16,25 57:2
  61:15 63:11 64:1
  64:19 65:24 66:3
  70:3,13 75:15
  77:1,21 79:2 80:5
  89:16 90:6 92:21
  96:3 102:7 103:5
  104:18 106:17
  108:9 110:2 111:4
  114:24 115:1
  116:3,14 117:20
  119:18 122:20
  124:16,22 126:3
  126:20 129:14,18
  129:21 133:18
  135:15 138:4,23
  139:8 141:1,21
  142:15,16 145:1,3
  146:2,9 149:8
  153:16 155:3
  156:9,14 157:20
  158:5 159:15
  161:16 165:17
  169:11 171:10,14
  172:5,8,11,12,16
  173:9 174:2,12,25
  175:12,17,21
  176:2,7,17 177:3,7

178:9,23 179:18
180:11 182:1,5,24
183:3,5 184:14,14
185:24 186:10
187:13,24 188:9
188:10,14,18
189:11,14 190:3
190:12,20 191:2
191:23 192:12,23
193:6 194:6
197:11 199:9
200:6 201:4,20
202:18,25 203:16
203:25 204:5,21
204:25 205:17,22
206:12 207:12,23
209:21 211:21
212:8 213:9
214:13 215:14
216:12 217:16,20
218:24 219:13
221:6,9 222:20
225:25 227:17
230:10 232:19
233:15 236:6,17
239:11 241:19
242:17,24 243:13
243:19 245:16
248:5 249:16
251:15 253:11,25
254:15 255:19,24
256:16 257:22
258:5,18 261:9,15
264:5 268:18
273:24 275:13,22
279:2,10,22 281:3
281:16,24 283:5
288:5 290:13
295:19 296:4,7
299:2 301:24
302:3,14 305:21

306:23 307:17
309:5 310:10
311:2 313:5
316:19 317:8
321:5 323:17
324:1,20 327:9,20
327:25 328:4,7
329:1 331:19
332:12 333:4
334:20 335:21
341:2 344:25
345:17,25 346:22
348:6,8 349:2,6
355:2,17 356:5,19
357:9,13,22
358:17 359:10,11
359:18,22 361:6
363:25 366:17
367:21 368:12
370:17 371:9,19
373:7 375:14
376:3 377:6
378:10 381:3,17
382:3,10 384:12
385:5,13,19
386:12,22 389:15
390:14,19,23
391:6,15 394:1,10
394:24 397:19
398:2 399:7,19
400:13 401:25
403:15,23 405:4
411:18,22 413:8
413:14 414:6,11
414:23 415:3,9,24
416:6,11,17,24
418:8 419:6 420:3
420:25 421:15,15
422:6,13,22
423:21,24 424:3,8
424:16 425:17

426:3,15 427:2,17
427:19 428:1
430:7,11
**old** 348:15 354:25
356:17
**once** 20:25 152:2
243:4,4 298:9,9
**ones** 242:18 332:4
406:11
**online** 347:24
348:9,14,16
**op** 1:10,12,13
**opana** 410:13
**open** 23:21 425:23
**opened** 293:18
**operated** 195:19
297:9
**operates** 212:3
**operating** 34:20
35:10 39:3 51:24
54:4 179:21,23
196:1 297:5
**operational** 130:1
**operations** 7:10
116:18 129:23
406:3,9
**opiate** 1:5 7:6 8:9
8:14 9:10 18:4
29:18 30:2,13,16
30:18 31:10,16,20
33:20 37:13,20,24
37:24 53:8 56:21
59:20 63:24 68:13
69:8 71:14 82:17
89:22 96:7 97:6
113:7 122:5,12,12
122:13 123:19
127:20 137:10
138:13 144:18
146:12,19 147:7
150:1,19 153:6,18

156:11 157:24
160:1,8,11,16,19
161:2,18 162:13
163:9 164:9
168:13,16 177:9
178:12 180:15
181:23 183:19
184:5,25 186:4,4
186:19 187:16
188:4 190:10,13
190:25 191:4,24
193:4,12 194:7,17
196:21 197:2
198:11,17,18,24
199:24 200:4,10
204:9 205:25
209:24 210:22,22
211:8,13 212:21
213:8 218:23
219:19 224:22,25
225:21 235:2
237:20 253:18
263:23 276:16
283:1,9 284:4
285:7 287:6,25
291:10 292:2
302:16,23 303:16
305:11,23 310:15
322:20 327:4
332:7 333:15
335:8 336:3
340:17 341:17
342:7,11,16,21
344:3,12,14,17
345:2,21 347:1
350:6 366:6
374:22 385:22
434:6 435:3 436:3
**opiates** 87:12
96:12 97:1 112:19
113:12 118:12

123:6 167:18,21
167:21,24 230:1
232:14 244:13
272:23 303:3
323:8 350:12
400:11 411:17
**opinion** 241:25
256:16 286:14
288:11 294:3
317:25
**opioid** 8:16 9:2,20
32:9 33:18 34:7
35:21 36:16 38:16
41:23 49:18 50:5
50:25 54:14 67:4
67:12 68:9 71:3,7
83:15 86:24 87:17
88:25 89:10,17
90:2 122:1,8
127:5,10 128:3,6
128:17 131:6
148:1,8 149:2,11
150:7,11,16,25
152:25 155:18
158:22 165:11
167:6,15 168:9
174:14,19 197:16
199:19 205:3,14
209:10 210:4,22
210:25 212:9,12
213:1,23 214:9,21
216:16,22 218:1
218:18 219:9
220:11 223:15
225:4 226:5,16
227:8,12,25
229:17 230:18
232:5,9,22 234:4
235:10 236:20
237:7 238:6,24
240:17 241:5,24

242:9,25 243:2,3
243:15,21 244:8
246:19 262:9
263:14,16 264:6,8
264:17,20 265:5,7
265:23,24 266:16
267:4 268:2 270:9
270:19 271:7,9
273:15 274:2
276:25 277:16
278:10,17 279:16
281:5,8,20 282:11
283:20,23 284:15
284:21 285:10
286:1 287:1,13,22
288:8,21 289:3
291:7,19 292:8,24
294:1 297:20
298:2,14,18
299:23 300:3,17
306:9 307:1,11,17
308:7 310:11,11
311:15 313:18
314:11 315:7
316:4,22 319:9,16
320:1,21 322:11
323:19 325:4
327:5,6 328:15
329:2 330:2,6
331:2,8 334:21
336:23 337:3
338:18 339:10
340:7 341:23
344:6 350:3
351:10,25 352:6
352:13,19 353:2
353:11 355:6
356:21 361:19
366:20 379:12
382:5 388:9
392:17 406:20,24

408:8 409:14,18
409:21 410:2,7,7
411:8 412:1,3,4,10
412:14 416:20
417:2,8,13 419:12
419:18
**opioids** 49:7 91:25
94:4 111:25
112:16 113:15
114:20 115:10,25
117:1 118:20
123:3,16 144:4
165:2 191:12,12
197:4 226:10
230:16 231:7,12
231:19,25 232:4,9
232:21 234:3
237:24 240:25
241:10 252:20
259:25 260:13,21
261:1,24 263:9
266:1 269:25
274:17 275:4
276:19,21 293:20
312:25 314:2
316:15 317:18
318:7,13 319:3,3,7
325:15 329:13
334:7,22,23
351:19,25 373:19
374:6 375:1
378:13 382:14
384:4 388:2,8,17
394:25 395:5
399:22 400:5,10
405:5,8 406:15
407:5,18 408:18
409:1,1,3,9 411:4
411:19 416:13
**oppor** 232:23

**opportunities**
131:12 232:24
**opportunity** 60:2
77:17 172:20
213:4 217:1 233:4
283:15 392:4,13
**opposed** 49:7
260:1
**opted** 105:1
**option** 79:13 384:9
**options** 37:8 392:6
**order** 30:1 43:14
149:3 197:9 212:8
212:11 214:19
216:15 217:7
275:7 318:16
356:10 388:14
**orders** 426:18
**ordinarily** 211:4
**organ** 75:9,11
**organization**
22:14 24:16,18
35:7 42:4 75:14
79:23 119:19,20
119:21 136:6
248:25 278:1
304:19,21,24
305:1,4,6 316:2
368:14 370:24
**organizational**
118:24 119:8
129:4
**organizations**
148:16 243:20
244:6,12,20
246:17 247:10
306:8,16,25
368:20
**organized** 353:22
**organs** 285:1

**oriana** 212:2
328:22
**origin** 245:3
**original** 387:25
**orman** 346:2
**osam** 9:22 367:2
370:11 371:10,13
**ought** 301:13,18
**outcome** 21:19
**outside** 37:24
252:22,25 275:6
278:4 320:14,18
**overall** 111:18
167:4 214:16
241:9 300:22
338:15 339:4
350:18 375:25
395:18
**overarching** 339:5
339:5
**overdose** 7:13
9:17 10:2 134:8
134:17 136:12,19
136:23 137:2,22
138:5,18 139:1,14
139:18 140:1,15
141:23 142:17
143:4,11 312:23
323:19 324:4
334:21 335:1,17
335:24 336:17,19
353:1 358:5,24
359:20 375:16
376:1,12,23
377:10,15 378:6
378:12 379:8
380:2,20 381:5,23
382:8 392:3,11,12
395:19 396:3,20
397:3 400:6

**overdosed** 312:25
381:6,20 382:4
**overdoses** 48:16
136:1 137:9
140:17 141:4,6,25
142:20 233:11
264:13 289:12,13
289:15 353:10
391:21 395:21
396:9
**overly** 231:7
**overprescribed**
233:3
**overprescribing**
254:25 255:7,8,10
255:24 256:1,14
257:1 258:6 297:2
314:5 318:18
374:17 382:18,23
**oversees** 129:24
129:25
**owned** 304:2
**owners** 179:22
**oxford** 3:6
**oxycontin** 410:13

**p**

**p** 4:5
**p.m.** 430:16
**package** 231:21
407:23 408:4,7,11
408:17
**packet** 408:3
**page** 11:2 76:22
139:9 140:14
146:2,4,6,7,13
175:13,18,19
183:9 188:21
189:3,19,20,20,25
190:16 205:12
207:25 208:8
215:18 224:5,7

227:20 233:23
236:7 240:22
262:17 292:15
294:20 316:19
333:9 362:11,12
362:13,14 368:8
372:2,3,16 373:18
373:23,25 377:7
378:5,11,11 379:4
393:20 394:2,7
400:22 424:10
425:18 434:13,15
436:7 437:3
**pages** 364:6 372:1
373:16,18
**paid** 34:21 54:6,19
179:21 228:23
378:25 379:1
**pain** 9:3 109:22
141:18 143:17
191:21 226:8
227:21,25 228:4,9
228:18,20,23
229:1,6,14,15
233:8 240:4
242:13 243:5,7
244:17,21 245:6
245:11,13,17,22
246:18 247:3,11
247:21 248:11
249:1,8,21 250:2,9
250:19 251:2,8,16
251:25 252:16,17
274:9 289:25
293:4,18,20,25
294:23 295:10,16
299:22 308:16,22
309:19 310:8
315:9 316:5,16,16
319:19 325:13
329:6 333:22

406:24 407:1,4
414:5
**painkiller** 8:16
262:9
**painkillers** 113:11
113:13,18
**pair** 118:11
**pam** 19:20
**pamela** 5:6
**pamela.holly** 5:8
**panel** 370:7
**paper** 107:23
**par** 324:16
**paragraph** 159:25
317:9 321:22
322:25 324:9,15
347:10 372:16
373:23,24 377:7
378:4 424:17,19
425:19 426:4,15
**parents** 238:12
**park** 5:6
**parrots** 159:17
**part** 30:10 42:8
69:21,22,22 76:19
81:11 85:4 96:9
103:8 115:12
123:13 129:16
137:10 148:23
151:24,24 173:5
176:4,5 185:25
197:7 200:2 201:2
211:21,22 212:14
214:18 229:21
233:12 234:19
261:19 276:15
278:7 283:7,13
284:16 292:4
296:3 297:24
298:5,16 300:1,11
304:11 306:5

331:3 339:4 344:5
348:16 366:6,19
372:14 382:1,1
391:4 393:12,12
399:18 436:9
**participants**
372:18 374:1,4,8
**participate** 74:24
77:25 78:13,16
79:5,12 83:20
**participated** 25:14
25:16,19 26:8,10
26:12 387:20
**participation**
72:19 73:2 74:2
74:19,20 76:20
77:19 80:24 81:19
82:19 103:16,19
104:13 105:2
**particular** 38:12
56:11 82:4 94:3
177:24 203:20,21
208:20 211:25
230:3 240:23
254:25 255:20
256:10,19,20
257:4,5,5,19
269:15 270:10
273:4 274:19
276:4 289:10
301:25 302:4,4
303:8,9 314:9
319:16 331:7,9
332:25 333:14
334:14 336:6
340:6 341:5,16
349:2 363:6 364:1
371:9,13 375:8
378:5 397:22
399:15 413:9
419:3 423:19

424:4 429:6
**particularly** 23:4
55:24 120:10
175:11 182:10
193:17 234:22
263:24 288:1
300:18 308:18
338:22 367:12
**particulars** 30:4
**partly** 283:22
**partnership** 305:2
**parts** 55:18 84:7
84:23 176:3 261:7
285:18 303:2
333:6 361:9
**party** 21:6 80:2,8
80:12,15 103:23
433:3
**pass** 214:7 404:13
404:13
**passage** 157:19
293:24
**passed** 53:18
293:3
**passes** 140:2
**paste** 321:17
**path** 333:18
**patient** 228:9
229:16 237:8
255:17,21 256:9
256:10,19 257:5
257:11,14 296:1,9
312:6,17,18
314:10,18 315:1
317:11 318:19
350:22 407:1
**patients** 124:24
228:7 230:3 244:1
250:14 263:11
313:22 406:22,23
407:4 424:25

**patrick** 5:17 19:25
**patterns** 136:9
**patton** 24:21
**paul** 2:15 18:9,25
20:13
**paula** 115:20
**pay** 34:5 212:11
247:6
**paying** 42:15
334:25
**payment** 42:12,19
130:1 355:9
**payments** 37:22
**pboehm** 2:18
**pcarey** 5:19
**peachtree** 4:10
**peivich** 35:11,19
36:13 39:5 41:21
44:7 48:24 51:24
54:10,12,21 59:8
59:11,13,16 60:8
61:5 129:9,14
130:4,8,17,19
133:11 194:1
196:8,11,18
197:13 198:8
204:14 206:15,22
207:15 208:2
215:3 356:10
357:6
**pending** 65:5,6,9
66:4 221:13
**pennsylvania** 3:6
**people** 24:17
32:20 34:5 45:1
45:20 46:4,15,23
46:25 48:15
109:15 112:5
113:10 121:9,15
121:19 123:3,5,18
124:7,8,11 125:7

127:25 143:24
148:15 150:1
153:5 154:24
155:5,6 160:16
182:10 211:8,9,11
211:17 212:17,20
212:23 214:4,16
232:25 234:14,22
234:24 236:24
241:4 242:14
243:1 253:3
267:23,24 282:10
282:25 286:16
296:25 311:9,11
311:13,15,23
312:10 324:11,22
325:11 330:1
363:1 376:5
382:19 383:17
384:5,8 388:1
392:2 396:7 397:6
397:15 399:11,12
399:23 401:15
422:9 428:12,16
429:4
**percent** 109:18
321:24 322:16
325:11 373:2
377:9 391:21
428:16
**percentage** 199:15
199:17 298:21
312:23 319:25
320:21 322:6
329:11 379:7
428:12 429:3
**perception** 199:2
**perfect** 188:14
**perform** 38:21
39:7 51:13 61:4
185:7 215:4

**performed** 35:1
158:18 207:14
208:4 247:17
386:20
**performing**
133:19 256:17
**performs** 41:2
**period** 158:7,9
161:11
**periodic** 371:3
375:15
**periodically**
330:13
**permanent** 106:8
**permission** 74:25
**permitted** 301:2
**persistent** 108:22
109:16
**person** 48:7
115:15 164:20,20
232:16 238:7,15
265:17,18 274:10
310:20,23 312:12
324:21 331:21
392:14
**person's** 237:4
321:25 322:6
**personal** 88:20
91:8,16,24,25
93:23,24 94:9
95:1,4,5,15 96:4
96:13 219:5 228:2
287:5 412:5
416:17 417:6
**personally** 35:6
238:5 279:21
297:15 411:6,24
412:8,12 435:11
436:15
**personnel** 417:1,7
417:12,16 419:11

419:17,25
**perspective** 61:1
78:2,9 111:15
331:6 392:16
**perspectives**
127:22 370:8
**pharma** 1:10,11
1:13 3:3,3 5:3,3
**pharmaceutical**
230:17,23 231:6
231:11,18 269:7
271:22,25 272:5
284:2 300:16,20
301:1,4,19 302:6
360:24 406:25
408:14
**pharmaceuticals**
3:3,9,15 5:3 19:14
236:9,19 240:21
241:7,8,14 300:11
301:10 407:13
**pharmacies** 10:11
272:15 274:17
275:4 407:20
418:5,25 420:4,9
420:11,14 421:5
421:21 422:4
426:7
**pharmacist**
417:18 418:9
419:4,7,10
**pharmacists**
264:16,23 265:4
265:24 424:24
427:5,5,9
**pharmacy** 126:4
314:12,20 347:7
414:12 416:7,9
417:23 418:17
419:3

**phenomenon**
142:21 325:2
**philosophical**
236:13
**phone** 392:22
427:23 434:3
**physician** 86:23
89:1,8,19 113:16
230:21 242:14
255:18,20 256:20
257:5 260:2 265:7
297:3 311:17
312:4 313:19
317:20 318:17
319:23 320:8
325:17 329:7,14
406:18 407:9
412:2
**physician's** 317:11
**physicians** 124:23
143:18 237:2
244:11 247:4
250:5,8 260:14
263:10,14,22
264:7,19 294:16
294:18 295:22
296:11 297:13
352:14
**pick** 233:9 340:22
**picked** 182:11
234:7 282:14
417:19
**picture** 330:14
**piece** 236:14
**pill** 143:19 237:12
237:15 239:24
240:2 242:12
260:7,8 296:15,18
296:22 297:5,8,14
297:17 298:2
308:21 310:22

324:12,25 329:1
362:6 382:22
386:8 405:21,24
406:2
**pills** 256:25
299:17 309:3,6,8
309:11,13,24
320:21 321:24
322:6 364:8
**pilot** 193:15,25
**pink** 367:18
**pinned** 280:15
**pinpoint** 147:22
151:16 352:23
**pittsburgh** 3:6
**place** 18:5 102:16
120:4 135:19
257:23 271:8
301:9,18 302:5,8
305:10 318:5
326:14 355:23
396:6 432:20
**placed** 171:15
**places** 227:2
234:17 282:13
285:4
**plaintiff** 21:8,16
74:17
**plan** 7:10 9:20
116:18 361:18
**planning** 174:8,11
303:1
**plans** 195:10
425:2
**play** 7:15 72:19
73:1 98:24 145:6
159:20 275:9
310:3
**played** 99:2
109:11 306:19,25
377:16,17 405:16

**pleasant** 2:7
**please** 18:7,12
25:5 99:6 117:5
117:25 119:14
148:2 151:7 193:7
322:14 381:10
409:13 434:11,11
**pllc** 1:21
**point** 46:9 104:6
131:11 134:21
135:11,22 140:9
140:13 141:9
149:18 156:1,10
156:16,17 161:15
164:20 209:21
230:11 233:19
254:24 332:4
343:20 364:10
**points** 282:14
284:3 339:8
402:13 403:11
**poisoning** 134:24
**poisonings** 141:3
**police** 234:7
391:24
**policy** 9:1 315:7
316:4
**politely** 98:18
**polster** 1:8
**polysubstance**
41:25 44:11 47:12
47:14 48:19
**popped** 45:22
**population** 111:14
111:18 146:12,19
160:1,9,12 161:2
161:18 162:13
163:9 164:9
180:22 240:1
335:8 430:1,8

**populations**
120:21 160:3
274:7
**portion** 55:6,7
173:6
**portsmouth** 386:8
**position** 68:10
105:24 106:2
119:23 129:8,15
152:2 198:16
356:13 364:19
**positioned** 253:4
**positions** 107:15
107:19,22 108:9
**possibility** 23:21
210:10 396:10
**possible** 39:1,17
39:21 44:16,17
48:22 49:3 53:16
53:17 57:15 87:9
87:11 211:12
312:3,15,21 345:4
**possibly** 28:14
57:15 333:3
343:23 357:8
390:15
**potency** 397:11,19
**potent** 143:24
243:10 299:7,13
323:2 396:11
397:13
**potential** 100:8
101:15
**potentially** 56:12
233:3 246:17
**pouches** 417:21
418:14
**pounding** 154:6
**powerpoint**
225:23

**practice** 236:25
426:18
**practices** 143:18
228:16 230:21
246:14 398:25
**practitioner**
317:24
**practitioners**
228:12 253:7,8
**pratt** 4:5
**precautions**
312:10
**precisely** 42:14
**predecessor**
355:14,16,25
356:2,6
**predict** 185:16
**predicting** 186:3
**predisposed**
311:10,12 312:7
**predisposition**
311:24 312:18
**preliminary**
100:14 172:15
**preparation** 24:24
25:2 26:13,18
54:21 55:3,25
59:1 63:14 172:24
**prepare** 24:9 26:6
27:2,16,22 28:5
29:12,14 225:12
225:19
**prepared** 56:3
60:8 63:8 196:8
196:11,18 197:13
204:12,16 220:6
330:21 337:3
**prepares** 132:6
**prescribe** 124:23
125:25 230:1
244:14 256:9

260:14 263:10
310:6,9 406:19
**prescribed** 88:19
89:1,18 125:8
232:14 233:1
237:7,19 238:7,20
250:5 256:19
257:4 258:21
262:5 263:14
264:4,7 289:24
314:2 319:23
351:20 363:2
382:5 399:6
400:10
**prescriber** 255:23
258:2 259:16
265:16 312:8
320:25
**prescribers**
263:19 310:4
314:8,17 343:10
**prescribing** 8:16
10:8 143:17
228:15 244:5
252:19 260:20,25
261:10,24 262:10
262:19 263:23
264:1 309:18
312:4,16 314:8,17
316:14 317:20
343:8 352:14,19
395:14 398:25
**prescription** 1:5
7:13 8:11,20 18:4
86:24 87:17 88:25
89:8,17 90:2
109:21 111:25
112:16 114:20
115:10,24 117:1
118:20 126:4
134:8,17 140:16

141:5,24 142:20
143:17 191:11,21
196:21 197:3
219:16 220:5,17
220:25 221:15
222:5,14 223:14
223:15,22 225:8
226:10,20 230:7
231:6,12,19,25
232:4,8,13,20
233:8 234:3 238:6
238:24 240:24
241:10 242:2
243:5,6 252:20
255:16 259:24
260:1,20,25 261:6
261:24 264:2
265:17,18 267:4
269:25 270:9
274:9,16 275:3
288:16 290:6,19
293:20 299:21
300:5,17 308:16
308:22 313:18
314:11 316:15
317:18 318:6,13
319:3,7,11,16,17
319:19 320:1,8,21
320:24 322:1
325:12,15 328:15
329:2,6,12 333:22
334:7,8,22,23
344:22 349:7
351:19,24,25
353:2,11 362:6
363:7 364:7
373:19 374:6
375:1 378:13
379:12 382:5,13
384:4 385:22
388:2,8,9,17

394:25 395:4
399:12,22 400:4
405:5,8 406:15,19
406:24 407:4,17
407:24 408:5,12
408:18 409:1,3,9
409:14,18 410:2,6
410:7 411:4,8,19
412:1,3,4,10,14
414:5 416:13,20
417:19 420:6,10
420:19 425:1,7,15
426:6,11,22 434:6
435:3 436:3
**prescriptions**
262:25 264:19
265:5 266:1 352:5
**presen** 370:4
**presence** 432:15
**present** 5:21 124:7
220:10 230:24
258:8 323:22
330:14
**presentation**
173:19,25 175:23
254:7 283:7
332:21 370:5,6,7
**presentations**
67:18,22 128:20
156:22 224:21
225:3,11,16,24
226:2 241:4
282:12 283:19
351:9 369:23,24
370:2 428:15
**presented** 131:11
140:10 148:15
195:12 334:18
397:5
**presenters** 363:18

**presenting** 160:17
282:10
**presently** 297:17
**president** 336:24
336:25 337:1
**president's** 336:22
337:16 338:17
339:10,19 341:3
**presidential**
387:21
**pressed** 338:3
**pressure** 237:1,3
**pressured** 244:12
**pressures** 244:14
**pretty** 23:7 120:14
152:19 166:23
199:2 262:23
339:7 379:17
383:5
**prevailed** 21:21,24
**prevailing** 386:16
386:16
**prevalent** 367:4,5
367:6
**prevent** 275:15
**preventing** 316:21
**prevention** 7:12
30:15 134:6
276:11,17,22
360:3 427:4
**previous** 209:13
211:2
**prey** 399:13,23
**primarily** 34:7
115:15 136:7
340:11,18 425:23
**primary** 323:18
336:17 338:25
339:12 340:4,16
377:21

**print** 273:13,17
**printout** 7:8
106:13,21
**prior** 23:3 40:19
137:20 139:1
161:1,17 162:16
163:1,10 191:7
344:21
**priorities** 217:9
286:3,19 338:14
**priv** 202:3
**privacy** 257:23
**privilege** 61:16,22
202:10 203:22,24
**privileged** 36:1
51:5 61:14 62:8
81:16 203:17
204:3
**pro** 61:11 98:8
**probably** 20:23
34:14 38:3 50:11
86:22 96:24
109:18 120:2
186:12 213:12
218:10 250:23
256:25 274:4
291:15 304:11,20
323:21 333:6
356:12 360:9
395:24 406:5
409:20 410:16
**problem** 137:12
157:4 165:1,4
167:14,21,24
168:9 191:20
199:7 227:5 235:6
240:2 246:23
250:21 251:3
272:25 280:21
292:17 298:8
324:13 325:1

342:11 358:21
360:6 370:8
373:15 393:9
417:2,8,13 419:12
419:19
**problems** 118:20
131:14 149:4
227:15
**procedure** 20:5
87:11 256:23
431:7 435:5 436:5
**proceeding** 103:7
**proceeds** 99:15
100:9 101:16
**process** 34:20
41:22 42:8 44:10
52:25 54:18,18
78:4 104:3 131:21
174:24 191:19
267:9 269:13,19
283:14
**processing** 43:19
**produced** 189:8
254:12,17 321:16
327:15 332:16
346:13 360:12
369:10 390:22
402:1
**product** 203:18
300:13 406:25
409:19
**production** 269:2
269:6,15,24 270:9
434:15,17,22
**products** 300:20
301:3,11,20 302:6
408:14 410:8
**professional** 28:20
94:25 95:7 337:20
**professionals**
229:5 248:8,23

374:1,5
**profile** 7:8 106:14
106:18,23,24,25
**program** 7:12
134:6 141:14
199:7 212:2 261:6
276:12,17,22
409:8 427:4,9,12
**programming**
43:17
**programs** 38:2
160:5 182:18
192:20 198:20
200:3 276:7,8
285:2
**progress** 137:14
336:5,8
**progressive** 9:20
361:19
**projected** 186:23
196:3,5
**prolific** 323:25
**promised** 81:19
**promises** 102:23
102:25
**promoted** 21:15
21:18 245:21
249:1
**promoting** 245:1
**promotion** 231:1
**propagated**
316:14
**proper** 75:21
76:10 99:4
**properly** 83:3
**property** 179:3,22
219:6
**proposal** 71:18
**propose** 132:18
252:19

**proposed** 36:21
214:15
**pros** 77:18 82:19
**prospect** 400:9
**prospectively**
184:8,13
**protect** 258:1
**protected** 258:3
**protections** 78:1
80:19 87:4,24
88:13 257:23
**protocol** 46:3,5,9
75:21 76:10 99:5
**prove** 280:1,3
**provide** 42:7
50:12 59:10,15
60:18 62:16 69:1
98:8 99:9 109:15
121:6 132:14
136:18 158:6,9
193:11 205:24
255:16 334:4
372:11 392:5
418:16
**provided** 20:4
33:9 40:14,17,19
40:20,22,23 52:4
53:17 61:12
150:13 178:2
191:18 215:5,7,9
215:16,21,24
231:13 265:6
276:13 293:2
310:7 328:24
401:22 407:24
**provider** 231:8,14
231:20 237:7
312:15
**providers** 121:5
141:12 149:24
150:14

**provides** 120:18
**providing** 42:10
43:12 136:7
**prudent** 82:25
**psychiatric** 313:1
**psychiatrist** 120:8
**public** 3:12 194:19
203:14 214:15
250:21 251:3
351:9 359:16
387:9 391:2 432:7
433:14 435:10,18
436:15,23 437:23
**publication**
321:18
**publicly** 106:18
138:11 141:25
142:6,11,21 143:1
344:24
**published** 128:13
228:25
**pull** 37:11 210:25
355:9
**pulled** 141:11
190:23
**pulse** 115:18
**purdue** 1:10,11,13
**purpose** 99:16
131:1 178:11
188:8 190:24
193:20 251:25
391:6
**purposes** 26:17,17
43:12 52:1,13
54:24 63:9 73:12
73:17 97:8 100:2
106:14 116:20
132:13 133:19
134:1,9 145:9
152:15 159:4
169:19,25 170:6

170:12,18,23
171:4 182:14
197:25 200:11
204:8 206:8
210:21,24 211:4
218:15 223:25
253:19 262:12
290:10,15 315:11
321:12 326:21
332:9 338:10
346:10 355:9
356:20 358:7
361:21 370:14,20
376:15 383:20
389:21 395:15
421:7 423:4
**purse** 238:19
**pursuant** 431:3,6
**purview** 303:8
**put** 61:7 92:12
97:13 98:18
118:22 147:20
159:3,9 203:8
283:5,10 288:15
301:6,7,18 304:7
326:14 342:25
344:2 355:22
390:12,15 396:6
399:23 403:10
**puts** 237:1,3
**putting** 97:23
98:14 167:23
245:3 282:19

| q |
|---|

**qualified** 317:25
432:8
**quality** 160:4
**quantify** 401:14
**quantities** 237:19
237:19

**quantity** 317:13
317:17
**quarterly** 9:14
346:7 347:6
349:13 351:5
390:15 391:4
**que** 281:14
**queries** 216:4
**question** 23:10,25
24:6,24 25:4,7,9
25:10,23,25 26:1,5
31:25 32:14 43:21
44:24 45:16 46:19
46:21 47:6 52:4
60:24 65:5,6,9,10
66:3 68:21 71:24
72:23 77:8 80:6
86:3,5 89:24
92:10,18 93:8,12
93:19 94:14 95:12
95:13,22 96:2,9
97:13,16,23 98:7
98:20 99:8,9
100:12 101:6,11
101:12 111:11,21
114:25 117:23
122:16 126:13
131:20 136:4
138:2 142:13
147:15,18 151:10
152:18 153:8
154:4,15,17,18
155:12 156:9
157:6,8 162:1,19
163:14 165:16,23
166:10,19,24
176:19 180:12
181:20 184:2,16
196:14 203:13
207:1,23 209:14
210:8 214:11

215:15 217:13,15
217:17 218:4
221:13 222:18,22
223:2 225:14
248:6 251:19
256:4,5,7,7 260:20
260:25 265:1,3
271:2 277:14
278:12 281:17
285:8 286:14
297:24 305:18
312:13 314:15
317:22 320:20
322:9,14,23
327:23 328:1,8
340:2,9 348:17
353:19 359:11
364:2 378:22
381:10 384:11,14
384:18,22,23
385:3,9,15,19
386:18 387:25
388:18,22,24
400:13 411:22,24
417:5,10 419:23
423:25 425:4
426:20 428:11,22
428:25
**questioning** 56:25
151:3
**questionings** 56:3
**questions** 20:15
29:6,8,24 55:11,13
55:15 56:5,6,7,8
56:11,14 59:18
67:19,21 85:23
92:3 100:20 102:9
135:8 166:1,21,22
172:15 255:4
257:25 306:19
317:2 330:3

331:13 333:13
413:3 423:23
424:9 427:18,22
428:10
**quick** 10:4 200:1
327:23 389:19
390:5 391:4,7,15
391:18,23
**quickly** 55:20
226:3 227:17
236:7 240:20
357:11
**quinones** 280:22
308:20
**quite** 48:11 148:18
180:12 268:20
**quota** 269:2,6,15
**quotas** 269:24
270:9 318:5
**quote** 140:15
208:13 245:22
255:25 292:16
293:18

## r

**r** 5:17 409:9,10
**rabinowitz** 115:20
**raise** 48:2
**raising** 167:10
**ran** 207:6 297:14
297:17
**range** 113:17
**rank** 308:9
**rare** 328:13
**rate** 141:2,5 228:4
228:8 244:1
306:20
**ratings** 228:14,14
229:15
**reach** 50:3 199:11
199:18 330:19

**reached** 39:19
50:20 331:16
**reaching** 200:14
267:16
**reacting** 359:17
361:3
**reaction** 304:15
**read** 55:5,6 57:10
58:2,6,14,17,24
62:6 63:7 72:22
85:4,7,17 86:8,10
100:11 101:3
102:5 127:15
128:8 166:11
220:4,8 222:17
251:11,11 272:17
272:18 273:1,8,10
274:5,24 279:8
280:4,21 282:1,4
282:15,16 294:2
295:6 308:13
336:22 337:12,15
337:17,22 338:19
338:23 339:17,20
339:21,22 340:21
341:3 366:9 371:6
372:9 375:9
381:12,13 386:6
387:22 401:12
402:6,7,24 408:4,7
415:1 422:2
423:20 424:18,23
425:18 435:5,6,12
436:5,6,17
**reading** 57:7 64:1
64:7,8 76:22
85:15 86:14,20,20
165:23 166:10
273:22 278:22
280:20 308:19
337:21 338:16

**[reading - referral]**

366:1 411:10
422:3 424:15
434:19
**ready**   46:18 98:2
308:24 309:2
**real**   323:1,8
**reality**   69:23
182:8
**realized**   104:7
**really**   59:22,24
89:14 93:9 99:14
111:20 115:17
128:24 139:17
159:1 166:16
184:19 200:17
204:17 229:9
232:17 278:4
279:7 304:1 309:3
317:24 319:2
331:13 334:4
335:24 357:10
364:18 365:2
374:8 379:1,12
380:9 401:1,3
415:1
**realm**   275:6
**reason**   60:17,23
60:25 61:16,17
85:2 188:24
201:14 229:12
248:22 249:2
251:10 322:9,15
322:23 396:19
429:16,19 434:14
436:8 437:3
**reasonable**   213:15
232:16 236:5
257:20 274:10
307:5
**reasons**   226:4
258:23 320:2,22

396:13,23 430:1
**recall**   22:6,6 23:1
23:2 28:17 36:4
57:16 81:21 82:11
82:12,22 87:8
100:6,15 101:13
111:22 112:18,21
113:10 116:6
140:12 194:5
207:8 219:15,22
220:16 222:2
238:16 251:20
261:15,17,22
273:4 281:2
283:18 284:14
292:6 332:4
337:21 345:9,10
345:17 349:12
351:23 359:14
360:7,8 366:1
367:19 401:24
405:22 411:5
417:11 418:11
422:13 424:5,14
**recalling**   241:2
**receipt**   434:18
**receive**   81:12 89:7
100:8 161:24
244:3 271:20
371:6
**received**   49:20,22
52:2 60:15 81:7
127:17 161:23
162:7,25 163:3,16
163:19 168:22
256:24 261:16
274:7 328:2,12
348:2 349:20
362:3
**receives**   255:13

**receiving**   100:15
101:14,20 141:13
161:8,17,25 162:3
162:4,12 163:5
168:24 247:4
329:1 345:6
**recess**   64:24
126:23 169:14
203:4 253:14
313:11 354:3
404:8 428:4
**recipient**   105:9
327:19
**recognize**   409:24
414:21
**recognized**   250:19
251:1
**recollection**   30:9
54:25 57:18,21
118:10 145:2
163:18 174:21
221:20 223:18
337:14 349:24
366:16 419:16,24
425:5,12
**recommendation**
247:18 248:1
**recommendations**
8:12 223:8,24
253:5
**record**   18:2,8
20:17,18 38:20,24
39:6,11,13 64:21
64:22 65:1 76:21
99:11,24 107:10
126:21,25 155:8
155:15 166:11
169:12 171:7,22
181:1,16 201:14
201:16 202:24
203:1,2,5,8 205:21

253:12,22 254:12
254:17 313:9,12
332:19 354:1,5
381:13 389:4,5
395:3 403:24
404:5,6,9 424:23
425:19 427:21
428:2,5 430:13,14
436:9
**recorded**   200:13
200:16
**recorder**   9:5 321:9
321:18
**records**   194:4
**recourse**   78:12
**recoverable**   80:25
**recovery**   81:3,10
81:13 392:1,8
**reduced**   195:3
432:14
**reducing**   396:8
**reduction**   233:7
384:3 397:10
400:9 409:5
**reed**   5:11 19:22
**reedsmith.com**
5:14
**refer**   191:8 205:9
258:19 341:12
**reference**   146:3,11
175:15 236:12
284:9 369:5
372:25 392:19
434:7 435:2 436:2
**referenced**   179:19
196:17 198:3
257:24 335:9
370:24 432:13,18
435:11 436:15
**referral**   393:19

referred   179:8
  182:25 196:7
  206:14 211:23
  215:2 225:17
  314:4 369:6 414:8
  420:18
referring   77:22
  179:19 180:19
  187:22 195:20
  208:6 240:11
  243:23 274:13
  289:14 295:25
  299:8,11 397:23
refers   134:20
  239:19 295:20
  362:21,25 374:16
  423:15 426:16
reflect   99:25
reflected   105:4
  190:12 205:18
  206:13 207:24
reflecting   183:8
reflective   212:19
  228:20
reflects   211:7,7
reform   8:21 290:7
  290:20
refresh   145:1
refreshing   54:24
regard   56:15 64:2
  73:7 74:2 198:13
  268:23
regarding   51:4
  91:22,25 93:1
  418:19 419:18
  431:2,11
regardless   216:21
  217:25
region   9:23 260:21
  260:22 261:2,2,11
  261:11 262:19,19

274:19 370:12
  371:21 430:3,3,4
regional   260:12,15
  260:17 263:8
registered   57:19
regular   159:10
  349:25 392:23
regulations   318:4
  318:11 407:12
reimbursed   43:15
reimbursements
  244:2
reinforced   96:18
reintroduce
  404:19
relate   262:5
  292:21
related   9:17 22:16
  29:17 30:13,18
  31:10 35:21 37:23
  37:23 42:23 43:16
  43:21 49:7 50:25
  53:8 59:18,19,20
  152:8 174:19
  187:10 190:25
  197:2 198:11,19
  198:24 199:19
  200:4 212:21
  276:18,20 314:25
  323:19 331:7
  334:21 353:1
  355:6 356:21
  358:4,24 359:19
  376:21 377:8,14
  391:9
relates   1:9 120:10
relation   158:21
  164:11 257:25
  314:9 328:8,11
relations   37:19

relationship   110:3
  110:20 306:3
  384:3
relative   111:18
  176:22 433:2
relatively   40:4
  135:9 378:7
  398:21 413:3
released   61:10
  390:24
releasing   61:9
  62:4
relevancy   88:8
relevant   87:25
  340:5
relied   339:23
relies   340:3,15
rely   43:5 120:6
  339:11 340:11,18
  383:3,11
relying   383:20
  385:21 386:3
  400:16
remained   378:6
remark   239:7
remember   33:23
  36:10 46:20 52:8
  52:9,12 57:5,19,25
  58:23 82:15 95:22
  96:2 104:19 113:5
  113:6 115:11
  116:11 145:15,17
  149:15 158:14
  168:11 193:19
  204:19 207:21
  220:24 221:14
  288:18 293:8
  299:18 302:17
  304:24 305:1
  348:13 349:15,17
  349:20 354:12

359:3 361:3
  367:12 378:24
  388:3 399:25
  417:15,25 419:6
  422:17
remembered
  415:19
remind   293:13
reminding   155:11
removed   298:9
rems   409:8
render   42:19
  253:5
rendon   3:11 19:7
  19:7 202:23
reorganization
  129:11
repeat   25:10
  101:10 222:11
  314:14 381:10
  417:5
repeating   411:1
rephrase   271:4
replace   189:17
replaced   119:11
  356:1
replicate   40:5
report   8:9,12,22
  134:14 147:20
  200:9 204:9,13
  220:4 221:1,16
  223:15,23 224:3,7
  225:7 226:21
  239:8,9 241:20
  242:1,8 262:17
  288:13 290:8,18
  292:11 294:2
  295:4 336:23
  337:4,8,9,12,16,18
  337:19,21,22
  338:17,20,23

339:10,19,20,21
339:24 341:3
346:16 347:6
349:2,21,25
350:14,17 351:4
358:19 359:3,12
360:5 371:9,13
373:3 380:17
387:21 391:7
394:23 398:17
399:16,20,25
**reported** 141:15
141:17 228:13
268:22 372:18
374:5 394:5,16
395:6
**reporter** 6:19
23:12 25:24
165:22 217:11
358:15 381:12
386:25 387:1,2,3,5
398:5 399:9 435:7
**reporter's** 6:16
432:1
**reporting** 232:13
344:22 349:7
401:4
**reports** 42:13
48:15 115:13
128:8,12,14
129:13 133:1
136:11,14,15,19
153:4 160:15
216:3,11 273:1,5
273:13,16,20,25
274:22 279:4,5
280:7,9,13,18
312:24 324:4
338:25 339:11,22
339:23 340:4,12
340:19 344:24

345:1,7 348:3
349:13 366:11
367:2,13,20
369:18,19 371:3
372:9 375:16,18
375:23 376:19
380:20,24 385:20
386:1,2,19 399:4
400:16
**represent** 20:13
77:17 183:7
202:16 284:6
391:20 404:21
413:1 415:10
**representative**
22:14 231:5,11,18
290:25 291:3,4,7
291:10,15,18,25
292:7,22
**representatives**
8:20 24:15 77:15
230:24 270:8
290:5,19 293:24
**represented** 83:3
367:23 420:16
**representing**
83:14 203:17
**request** 49:19,22
50:3,7,13,20,24
51:11 52:1,14,16
91:19 92:25 178:9
330:18 436:9,11
**requested** 51:14
178:14,17 180:14
195:1 216:14
431:1,6,10
**requests** 30:18
158:25 160:14
197:2 393:15
**require** 257:6

**required** 177:24
195:24 434:25
**requirement**
196:4
**requirements**
179:14
**requiring** 296:9
**res** 149:1
**research** 245:7
281:25 282:3,6
**researcher** 412:2
**resident** 22:17
**residents** 131:10
**resolution** 104:17
104:25 105:7
**resolving** 112:7
**resources** 71:16
212:9 393:2
**respect** 35:4 58:12
72:19 73:1 80:6
84:16 94:3 96:7
114:9 140:20
149:2 158:17
172:24 174:12,14
174:23 186:4,14
194:6 196:16
213:9 215:1
277:18 287:1
314:1 319:5 322:5
328:18 339:9
386:22 409:1
415:3,14 416:20
417:7,10,12
419:15,23 429:3
429:23
**respectfully**
166:19
**respects** 350:7
**respond** 30:17
50:23 110:11
196:25 197:1

227:3 287:18
288:7,21 391:24
**responded** 51:10
95:23 96:2
**responding** 330:17
**response** 9:10 10:5
29:8 31:10 52:5
52:16 53:8 92:9
200:1,5 289:1,3
332:8 389:19
390:5 391:4,7,10
391:15,19 393:17
397:8 402:2
421:23
**responsibilities**
120:23 121:21,24
127:4 235:18
268:12 278:7
338:15
**responsibility**
94:16 121:1 131:8
131:25 132:8
263:16,20 264:8
264:11,15,20,24
265:3,7,13,21
266:1,7,9,10,15,21
267:15 270:19,24
277:16 278:17
279:15 281:8
284:21 285:10,14
287:13,17 294:11
297:18 298:2,14
298:21,23 300:3
304:4,6 306:7,12
306:15 308:5
335:20
**responsible** 136:7
243:21 270:23,25
271:21 272:11
276:24 277:24
278:2 280:2

283:22 285:6
298:18 299:22
300:1 381:5,22
382:8 388:6
**rest** 122:15
**restricted** 179:11
180:6
**result** 48:16
102:21 110:7
137:15 138:13
143:25 160:4
212:16 218:23
244:14 266:11
313:20 343:22
344:16
**resulted** 405:16
**ret** 167:12
**retail** 416:7 420:4
420:18
**retained** 6:19
**retired** 358:16
**retrieval** 420:13
**retrospect** 160:22
285:25 286:18
287:8
**retrospectively**
156:4 167:12
187:20 194:4
**return** 393:17
**returned** 434:18
**returning** 258:5
**revenue** 132:12
217:23 218:17
**reverse** 39:17,25
**review** 54:20
55:16 58:25 64:12
66:5 77:18 86:18
100:18 135:7
163:21 172:20
339:12 375:19
414:16,18,20

424:2 431:2,6
434:12 435:1
436:1
**reviewed** 55:2
221:20 424:6
**reviewing** 135:5
267:16 424:15
425:5
**reviews** 267:9
**revise** 114:25
**revised** 252:19
**rice** 2:4 18:17,23
26:11,20 27:22
28:4,8 49:20,21
**right** 24:5 26:22
32:1,10,23 33:2,7
40:14 41:12 42:23
43:10 45:3,12
47:10,20,23 48:9
48:12 51:11 53:23
62:23 63:4 66:1
68:15 73:15 74:4
74:8 75:2,17 76:3
76:4,12,23 77:4
80:13,20 81:24
84:10 85:5 86:1,8
86:14 88:7 90:10
90:13 102:16
103:9,12 105:19
107:8,13,17
108:17 111:9,10
114:3 118:2 119:3
123:4 124:12,17
125:25 126:5,12
127:7 128:18
129:6 130:6
132:14,20 139:25
144:15 145:19,22
148:24 150:2
154:25 155:5,8
157:16 159:18,20

159:24 160:5
161:9 164:2 168:1
168:9,15 169:1
175:1,3,13 176:5
176:12,15 180:16
180:17,21 183:12
184:15 185:24
186:13,25 187:3,4
187:6,9,11 189:4
190:1,6 192:1
198:5 203:18
206:22 207:19
209:4 210:2
211:14 213:12
216:8,17 218:19
219:10 222:5
223:1 224:2,13
225:4 227:9
231:24 235:15,20
235:24 236:13
237:21 238:1
243:17 245:18
249:23 253:9
254:9 256:11
257:11 259:8,18
260:10 268:20
273:19 279:8,9,19
281:21 283:8
289:25 290:1
293:12 296:5,16
296:20 302:19
311:13,25 314:2
315:1 318:19,22
319:11 327:16
334:9 336:2,10,20
339:20,25 341:13
341:24 342:4
346:20 349:4,8,9
349:16 350:15,19
350:22 351:21
359:1 360:25

362:3,7,19 363:25
368:7,15 371:11
371:21,24 372:13
372:15 376:6,18
377:4 378:2,7,20
379:18,24 386:18
386:18 387:1,6
388:20 389:2,7
390:3 393:23
394:3,9,17,20
398:2 400:17
401:17 406:3,9
407:13 410:17
413:10 414:15
430:9
**rights** 21:14
**rigorous** 256:17
**ring** 222:1 251:17
326:4,6
**rise** 146:11,19
**rises** 379:17
**risk** 311:17 396:7
408:19,24
**risks** 90:8,11
408:13
**rite** 415:3,7,12
417:11,12,16,19
418:4,25 419:11
424:18,19,20,24
425:6,14
**road** 104:7 310:23
**robert** 290:25
**robust** 345:22
**role** 72:18,25 73:7
74:1,12,13 120:7
201:1 246:3
265:16,20 266:19
268:17,19 271:13
271:18 272:19
273:5,14,25 275:2
275:9 287:5

306:20,21,25
310:3,5 377:16,17
405:14,16 414:3
416:9,12
**rolled** 427:12,16
**rolling** 154:6
**roman** 292:15
**room** 181:18
**root** 95:12
**rough** 36:7 199:18
**roughly** 27:13
52:9 118:21
158:15 183:4
208:24 297:11
347:3 355:24
**round** 94:22 390:1
393:25
**row** 119:10
**rpr** 1:25
**rude** 98:22
**rule** 65:8 396:9
**rules** 20:4 23:5
431:3,7 435:5
436:5
**run** 42:12 109:20
127:16 133:1
216:3,11 229:11
282:1 297:17
298:1,1 311:17
343:9
**running** 95:9
99:19 198:4
331:23 424:13
**runs** 133:3,12
305:7
**rx** 4:3 413:12

**s**

**s** 3:11 355:12,12
355:18 409:9,10
434:15 436:8,8
437:3

**safe** 425:21,25
**salerno** 2:6 18:22
18:22
**sales** 230:23
**salt** 167:5,14
**salts** 149:20
164:12 165:1,9,15
166:16 167:2,10
167:17,22
**sam** 280:22 308:20
**san** 5:18
**satisfaction** 228:9
229:16 244:1
296:2,9
**satisfied** 31:13
**satisfy** 48:2
**saved** 401:3,15
**saw** 103:5 113:1
140:9 163:20
164:6 221:7,11
233:8 274:22
352:22 386:7
402:25
**saying** 25:14 62:16
68:7 92:24 93:3
102:16 122:11
124:5 125:2 147:9
162:23,25 185:13
186:2 221:8 227:3
279:25 283:20
306:13 324:22
360:13 398:16
399:14 401:11
**says** 23:17 135:11
140:14 173:23
189:20 213:13
224:11 226:8
294:21 317:10
321:24 323:1
324:11 326:25
328:13 333:15,21

347:4,10 349:6
360:17 364:7,11
368:8 369:10
372:18,20 373:2
374:4 376:21
377:8 378:5 394:4
402:2,12 421:23
426:4 427:3
**scale** 228:5 288:9
**scan** 423:21
**scenario** 238:17
**schedule** 29:2
**scheduled** 217:3
**schools** 245:1
249:22,25 427:6
**scientific** 110:5
199:2,10 267:16
**scientists** 229:6
247:25 266:13
267:14
**scope** 68:25 122:1
122:5,8 127:5,10
128:3,17 252:23
252:25 275:6
278:4 288:8 303:9
320:14 335:19
**se** 173:18
**seal** 433:6 435:15
436:21
**second** 44:25
52:24 70:14 102:6
122:19 159:25
173:5 188:11
202:15 204:25
207:9 211:22
279:1 295:20
379:4 382:15
412:18
**secondary** 336:13
**section** 175:22
220:18 224:3

226:17 239:12
241:21 242:1,7
249:15 292:20
316:21 317:4,9
372:3,7,8,17
373:19 378:12
**sections** 176:8
**sectors** 303:11
306:2
**see** 23:21 39:24
73:22 74:5 75:25
92:19 100:3,4
102:12 112:3,13
113:19 114:18
119:1 134:18,19
134:21 135:2,3,10
135:16,17 137:14
139:7,10,11,14,16
139:19,20,23,24
140:4,5,18 141:20
145:1,25 146:4,15
146:16 154:9
159:7,8 162:20
171:23,24 173:12
175:1,2,22 177:5,6
191:9 204:8,25
205:4,13 207:11
208:11,19,25
209:22 213:13,16
217:19 224:6,17
226:4,6,13,14
227:22 230:13,14
232:1,2 233:7,10
233:20 236:10,11
239:17 242:17
254:4,5,22 255:2
262:21,22,23,25
263:2,4,6 264:12
283:15 290:22
291:1 292:18,25
293:5 294:25

295:23 300:12
309:11 315:21,22
316:3,5,6,23 317:4
317:15 321:20
322:3,4 323:3,4
324:21 328:16,17
328:19 332:18,20
333:11,19,24
336:4 340:24
346:15 347:8,12
347:13 349:10,11
349:24 352:3
357:14,15 358:12
362:11,16 363:9
364:7,13,14 365:6
365:7 367:7 368:1
368:2,8,11,18
369:8,12,13
371:15 372:5,6,18
372:19,22,23,24
373:18,20 374:2,3
374:10,11,14,18
374:20 376:24,25
377:7 378:15,16
379:4,9,10,11,13
379:15,23,25
380:18 382:12,14
382:15 383:6
390:7 392:13
394:3,11,14 398:7
398:18,22 400:7,9
401:7 402:10,11
402:14,15
**seeing** 48:22
111:24 115:8,23
160:13 167:24
302:24 324:11,22
325:2 347:23
360:15 415:19
417:22

**seek** 178:22 195:2
240:9 242:14
289:8 384:9
428:13 429:4
**seeking** 153:19
259:17,23 300:25
**seen** 222:16
224:18 235:23
238:6 247:22
248:3 261:5 262:3
273:12 292:11
303:25 316:7,25
320:19 328:19
349:22 352:11
367:1 390:17,20
400:11 411:2
423:11
**sel** 37:7
**selected** 36:22
37:7
**self** 226:11 239:15
398:21
**sell** 386:10
**selling** 159:16
**semantics** 45:10
122:21
**send** 33:11
**sender** 423:15
**sends** 398:9
**sense** 23:15 56:2
59:22 172:12
180:12 209:14,16
218:4,6 229:25
240:1,7 241:12
264:15 287:17
304:13 368:16
401:13 417:21
418:24
**sent** 136:21 163:21
282:25 346:18,22
347:20 359:16

400:1
**sentence** 205:1
317:9 321:24
323:1 424:19
427:2
**separate** 69:24
83:1,8 172:10
197:9 208:3
242:18,21 388:14
**separately** 239:12
**september** 104:20
144:2 145:24
146:21 421:18
422:15 433:17
**series** 24:11 26:8
26:10 34:13
156:21 171:19
**serious** 250:21
251:3
**seriously** 121:22
**serve** 177:19
210:17 213:4
214:4
**served** 211:9,10
**serves** 216:10
**service** 41:14
48:20 303:4
**serviced** 212:16
**services** 4:3 22:16
30:15,15 33:22
38:2 41:7 42:7,10
43:16 56:10 106:2
107:7,13 108:4,6
108:16,20,25
109:8,9,14,15
112:2,13,24 113:1
113:8,20 114:11
119:24 120:20
121:6,7 124:8
132:13 141:11,13
149:25 150:21

153:5,19 160:3,14
160:17 176:4,22
177:4,8 178:5
182:9,10,18,19
184:24 185:18
186:20 187:2,11
187:17 188:4
193:4 210:15
211:20 212:5,11
213:6 230:23
254:8 276:7,8
326:1 393:10
413:12
**serving** 108:22
**set** 88:8 97:20
147:6 157:13,13
176:18 188:9
193:10 286:3,4,19
302:15 309:3
318:5,22 433:6
**sets** 128:24 269:5
269:24
**setting** 61:15 70:3
216:20 288:5
348:16
**settings** 229:3
234:25 337:20
**settlement** 100:9
101:16,20,24
102:11,15,22
**severe** 108:22
109:16
**sfy** 7:15 145:7
**shapiro** 49:25
70:20,23 71:3,7,9
71:15
**shapiro's** 71:21
**share** 61:2,18
100:8,16 101:14
101:20 138:12
263:15,19 264:8

**[share - sorry]**

265:13 266:1
**shared** 234:14
264:10
**shares** 265:20
284:21 285:10
287:13
**sharing** 234:24
285:13,13
**shaynak** 83:12,21
**sheer** 232:14
**sheet** 434:13 436:7
436:10,18 437:1
**shift** 236:13
**shipped** 369:11,17
**shopping** 259:10
**short** 65:4 86:17
254:1 328:9
**show** 221:3 262:3
262:15 290:13
319:8 352:11
376:18
**shown** 148:7
365:24 434:16
**shows** 251:12
**shut** 143:19
237:13 242:12
296:19,23 382:21
382:21 386:8
406:7,11,12
**sic** 171:22 295:9
429:15
**side** 130:1
**sign** 244:17,22
245:6,12,14,18,23
246:18 247:11,21
248:12 249:1,21
250:2,10 252:18
294:24 295:10,17
309:19
**signature** 431:5
433:13 434:14

**signed** 435:13
436:18
**significant** 149:21
165:10 200:2
201:1 212:6 246:3
306:25
**significantly** 165:7
**signing** 434:19
**signs** 245:11
**similar** 114:9
224:19 303:12
325:2 426:16
**simple** 151:10
152:19,20 154:4
154:14 162:19
**simplify** 141:20
196:15
**simply** 98:6 223:2
**sincerely** 250:10
434:21
**singled** 283:25
**sir** 65:16 101:11
153:22 434:10
**sit** 59:17 63:1
269:21 284:13
285:25 341:2
349:19 375:11,12
**sitting** 65:25
104:10 141:1
181:17 187:24
238:10 281:3
337:15 342:4,13
345:5 349:16
378:20 409:25
**situation** 256:11
**situations** 94:13
234:12
**six** 35:16 50:9
158:16 323:22
347:3 374:7 418:1
423:18

**skim** 55:20 86:11
**skip** 233:21 368:7
368:25
**skipped** 236:6
**skipping** 295:19
**slice** 49:6
**slide** 8:13 9:9
173:24 175:9
225:18 251:13
253:17 254:2,20
254:25 283:6,7,11
283:11,16 284:4
332:7,20,25 333:5
333:7,15 334:14
334:18 362:1,9,13
362:15,19 363:6
363:17 364:7
367:21 369:1
**slides** 181:2,3,5,7
181:9,11 183:8
198:2 225:12
369:2
**slightly** 71:24
**slow** 287:18,21
288:7,21,25
**smith** 5:11 10:10
19:23 56:16 120:6
120:8 130:17
333:3 346:1 421:4
421:17 422:14
**smith's** 55:7 58:13
58:14 421:22
**sobering** 360:16
**social** 234:25
303:4
**software** 133:5,7
133:14 354:15,21
354:22 355:7
**sold** 237:18
**solely** 317:12

**solutions** 3:9
190:13 191:3,24
194:7,17 434:1
437:1
**somebody** 39:15
45:11 48:4,25
67:21 107:1 115:3
140:10 152:3,6
164:4 174:16
225:19 235:1,1,3
238:6,18 255:11
282:21 304:5
310:21 331:22
334:6 338:24
340:3 341:19
359:15 393:1,14
402:18 403:18
**somebody's** 48:19
55:5 259:7
**somewhat** 275:6
304:14
**son** 89:6,7,16
393:5
**sonnhalter** 119:19
**soon** 131:24
**sooner** 353:25
**sorry** 18:11 26:23
31:24 45:17,19,21
49:15 64:15 68:6
72:22 75:13 87:14
90:5 109:8 120:24
122:11 143:6
155:1 157:1
164:15 174:12
181:13 184:9,10
196:13 209:15
210:23 217:21
222:10 247:20
249:13 250:5
252:4 260:23
265:9,12 267:22

279:5 286:23
320:6 322:13
324:14 369:3
372:6 373:24
380:13 381:9
384:6 394:7
398:14 405:25
406:1 411:15
417:4 419:22
421:15 422:8
**sort** 55:10 57:19
109:19 133:4
137:14 167:24
201:2 219:6
236:24 238:16
239:21 240:4
282:22 330:18
367:19 387:2
403:3 417:21
**sought** 137:7
178:21 275:21
289:5
**sound** 183:12
368:15 420:20
**sounds** 171:11
251:9,21 252:8
**source** 37:9
194:11 209:9
210:3,6 225:10
329:5 339:12
340:24 365:12
**sources** 178:25
282:8 320:16
329:14 338:25
340:5,16,23
363:18 376:8
**south** 1:21 2:7
**space** 326:16
**spaeder** 4:4 19:10
**spate** 289:11

**speak** 54:8 117:5
128:16 415:20
**speakers** 225:22
283:9
**speaking** 82:18
99:13 117:7
241:12 345:14
**speaks** 99:12
204:4 317:3
424:21
**specialist** 356:12
**specif** 67:24
**specific** 26:24 40:3
41:23 43:22 48:4
49:6 67:24 83:24
94:13 123:25
142:13 146:3
149:16 150:1
151:18 177:16
179:6,14 190:24
199:22 215:15,16
216:3,5 231:4
237:5,11 244:23
246:11 276:8
318:4,11,19 333:7
383:2 385:20
386:2,19 400:15
409:21,22
**specifically** 28:18
35:13,21 37:19
44:22 49:13 51:23
59:12 77:22 80:17
82:22,22 96:7
112:19 113:9
118:10 146:12
147:10 158:10
177:9 178:11
180:1 181:22
183:18 184:4,24
186:18 187:16
188:3,8 190:10

193:3 204:20
214:20 215:20
216:15 232:21
241:10 297:10
352:7 385:25
405:18 413:7
414:6 418:11
**specifics** 296:24
**specified** 432:21
**specter** 127:25
**spectrum** 127:25
164:14
**speculating** 400:1
**speculation** 151:6
286:7,10,13
402:21
**spend** 86:19
148:12 179:16
195:9 214:20
218:15,15 357:10
**spending** 30:17
210:21,24
**spent** 38:15
108:15 148:13
191:10 195:7
198:11,24 199:3
199:16,19 216:21
307:7
**spike** 289:11
**spite** 291:22
**spoke** 405:19
**spoken** 28:12,19
29:10
**sponsored** 292:17
**sporting** 238:11
**sprague** 290:25
291:3,5,7,10,15,18
291:25 292:7
**square** 3:12
**ss** 432:3

**stack** 171:23
**stacks** 261:23
**staff** 29:1 30:17
32:21 33:22 34:12
34:16 37:2 50:1
50:22 51:15 53:22
78:8 112:7 115:15
198:10,16 199:4,5
199:23,24 200:15
200:21,22,23
204:15 345:15
418:22
**staffed** 305:13
392:23
**stake** 77:20
**stakeholders** 8:14
253:18
**stall** 98:5,5
**stamp** 188:25
189:21 201:8
203:12
**stamped** 175:7
201:10 254:18
**stand** 200:2
334:12 343:2
360:1
**standard** 65:22,24
88:8 191:18
243:24 246:5
**standards** 243:25
244:15 246:12
272:14
**standing** 426:18
**stands** 107:11
312:14
**start** 55:19 87:15
111:23 119:9
153:10 174:13
196:13 250:6
255:5 325:12
334:25 359:8

372:2 398:11,13
**started**  55:19
86:10,11 114:18
115:8 168:19
233:7,10,24 250:1
328:14 333:22
345:6 386:10
395:25,25
**starting**  139:17
347:16
**starts**  159:6
373:23
**startup**  38:1
**state**  9:1 24:21
31:7 82:20 112:6
120:15,16,17
128:8 140:10,25
147:8 161:12
179:4,5,12 182:7
250:25 251:5,6
252:11 254:11
260:21,21 261:1,1
261:4,4,8,11,11
262:20,20 263:8,8
287:12,14,16,20
287:24 288:3,7,21
289:6,9 292:17,23
294:12 315:6,20
316:2,11 343:9
347:7 375:25
430:3,3 432:2,7
433:15 435:10
436:15
**state's**  289:3
**stated**  80:17
226:16 296:13
374:8
**statement**  205:7,9
258:12,13 282:22
295:2,5,7 314:22
334:17 364:15,17

364:22 365:8
368:3 426:3
435:13,14 436:19
436:19
**statements**  373:7
373:12 374:21
375:2,6 411:7,25
412:3
**states**  1:1 84:10
205:1 226:25
249:23 250:8
254:25 261:25
262:25 268:5,13
269:5 270:18
271:10,15,19
272:12,21 307:2
318:8 319:12
324:3 361:10
364:12,24 365:5
367:23,24 369:12
406:20 425:2,3,19
426:7
**statistic**  322:10,17
364:1
**statistical**  347:6
429:6
**statistics**  9:14
322:16 325:8,10
346:7 391:9
428:14,19 429:17
429:24 430:9
**statute**  121:2
**stealing**  234:15
**stenotypy**  432:14
**step**  228:19 298:11
299:1
**stephen**  1:25
23:12 432:6
433:14
**steward**  119:22

**stewardship**  35:10
**sticker**  98:14
326:15
**stipulate**  219:20
365:11
**stock**  422:8
**stolen**  259:6
**stop**  92:12 93:10
99:6,23 117:24
151:7 163:15
164:16 165:25
**store**  354:16
**stored**  216:8
**stores**  425:22
**stories**  234:6,13
272:23 392:7
**straight**  85:22
**strategies**  397:10
408:25 409:5
**street**  1:21 2:16
4:5,10,16 5:12,17
242:16 243:11,11
243:12 259:25
323:24 329:4
396:11
**streets**  384:10
386:11
**stretch**  27:11
353:22
**strickland**  145:14
145:16,17 219:16
222:4
**stricter**  374:16
**strictly**  206:10
**strike**  252:13
325:24 326:3
352:1
**strong**  397:20
**struck**  238:18
**struggled**  86:8

**struggling**  149:19
326:13
**students**  250:1
427:7
**studies**  228:25
229:10 383:19
385:20 386:20
**study**  8:21 246:1
247:22 248:4
275:12 290:7,20
383:17
**stunning**  232:15
232:15
**sub**  380:11
**subdivide**  191:10
**subject**  71:10
94:19 128:12
230:9 358:22
364:4 421:20
429:6
**subjective**  256:5,6
256:7,15,21
**submission**  44:10
**submit**  44:21
**submitted**  42:6
53:25 63:8 72:13
**suboxone**  193:18
**subscribed**  435:10
436:14 437:21
**subsequently**
106:7
**substance**  34:6
37:12 41:3,17
43:13 45:2,3,6,7,8
45:11,12 47:2,23
48:2,4,5,17 49:1
59:9,14 90:19
93:14 94:2,17
95:17 96:6,16,19
96:22 109:2,11,19
109:21,24,25,25

[substance - summit]

110:7,21,25 111:1
111:7,16 112:21
115:16 141:16
152:8 176:4,9,14
176:22 177:4,8,19
177:25 178:4,5
181:21 182:11
183:11,15,17
184:3,23 186:16
186:25 187:10,15
188:3 190:4
191:21 212:17,20
212:23 257:14
310:19 313:21
319:13,15 366:11
367:2 370:23
371:3 428:13,17
429:4
**substances** 41:9
42:2 47:18,20
48:8 49:9 113:6
114:5 125:7
141:16,19 143:21
143:23 177:24
212:24 237:25
242:15 268:14
269:7 275:16
299:7 318:6,13
336:9 351:15
377:3 380:8,14
382:25 385:24
386:10 394:4,16
395:1,6 397:22
**substantiated**
399:17,20
**substantive** 61:16
**subtotal** 177:3
181:21 183:11,11
183:15,18 184:4
186:16,18 187:15
188:2 190:4

**subtotals** 176:8
**successful** 393:19
**sued** 416:8,12
**suffer** 41:16 45:2
47:1 111:15
**suffered** 90:19
93:14 109:1
**suffering** 96:19
327:4 406:23
407:4
**sufficient** 102:2
164:21
**suggest** 103:13,17
157:10 305:15
**suggested** 203:21
**suggesting** 85:16
85:24
**suggestion** 98:10
98:13
**suggestions** 287:7
301:25
**suggests** 328:2
**suit** 80:7 103:23
405:13 414:22
415:1
**suite** 1:21 3:12,17
4:5,11 5:12 434:2
**summa** 297:4
**summarize** 38:17
90:16
**summarizing**
339:7
**summary** 132:16
339:5
**summit** 1:13 2:3
7:3,6,10,16,18,20
7:20,22,22,24,24
8:1,1,3,3,5,6,7,14
8:18,22 9:3,6,12
9:15,15,18,21,24
10:2,4,5,8,12,15

18:14,17,20,23
31:21 32:7 33:17
35:3,20 36:14
38:14 41:1,15
47:9 48:21 49:16
50:5 51:1 54:15
63:8 64:13 66:6
66:10,17 67:4,13
68:9,22,25 69:3,11
69:13 70:25 71:4
72:3,11,18,25
73:11 74:12,14
75:8,9 79:4 80:2
80:11,12 81:11
83:1,14,25 84:17
86:21 91:2 94:15
97:7 100:9 101:16
103:7,15,20
104:11 105:11,18
106:4 107:6
108:21 112:15
113:21 114:18
115:8,22 116:19
116:25 118:19,24
120:24 121:9,15
121:22 122:2,9
123:3,6,15 127:6
127:11 128:4,6,18
131:6,9,22 132:9
135:20,23,25
136:2,11,12,19
137:1,20,22
138:17 140:21
143:4,7 144:3,9,13
144:17 145:8
146:3,12,18,24
147:24 148:1,3,9
149:8,12 150:6,10
150:23,25 152:14
152:23,24 155:18
156:11 157:23

160:19 161:2,19
162:14 163:6,9
164:9 165:2,4,8
166:15 167:7,15
169:17,18,23,24
170:4,5,10,11,16
170:17,22 171:2,3
172:25 174:15,18
178:10,15,19,21
178:22,24 179:1,2
179:22 180:1,7,14
180:17 182:15
186:5 191:4,25
194:8 195:1
197:15 201:22
205:9 214:7,10
217:24 220:11
224:24,25 225:4
225:18 226:23
227:13,16 228:1
229:17 230:18
231:8,14,22 232:5
232:10,22 234:4
235:9,12,14 236:4
236:20 237:6,13
240:17,25 241:24
242:9 243:1,15,21
244:8 246:19
250:8 252:11,18
253:17 254:8,18
261:20 262:11
263:15,17 264:5
264:18,21 265:6,8
265:22,25 266:16
268:3 270:6,7,20
271:8 274:3 277:1
277:17 278:11,15
278:18 281:6,21
282:11 283:20
284:15,22 285:11
286:1 287:14

| | | | |
|---|---|---|---|
| 288:9 290:9 291:8 | 420:20 421:6,13 | 202:3,6 204:17,24 | **switched** 348:6 |
| 291:11,19 296:19 | 423:3,9 425:7 | 206:17,20 207:3 | **sworn** 20:5 22:25 |
| 296:22 297:9,21 | 426:1,11,22 | 207:10 209:16 | 432:10 435:10,13 |
| 298:3,15 299:4,23 | 427:13,16 429:5,8 | 210:7 217:18 | 436:14,18 437:21 |
| 300:4 302:15,22 | 429:9,16 | 218:9,11 219:20 | **synthetic** 197:4 |
| 303:15 305:1 | **superficial** 267:12 | 222:12,22 227:18 | 360:12 |
| 306:9 307:11,18 | **superior** 434:1 | 233:14 234:1,20 | **synthetics** 369:7 |
| 308:8 309:8 | **supervision** 75:6 | 242:5 249:8 | **system** 38:9 42:12 |
| 310:12 312:23 | **supplement** | 264:25 268:16,19 | 43:19 115:13 |
| 315:10 321:11 | 332:19 | 276:20 280:14 | 120:11,15,16 |
| 322:7,11,21 323:6 | **supply** 255:13 | 281:17 283:14,25 | 152:10 205:23 |
| 323:20 324:2 | **supplying** 425:6 | 297:25 304:22 | 212:22 216:10 |
| 325:3,14 327:2,13 | 425:14 426:10,21 | 313:8 314:16 | 217:8 232:13 |
| 328:19,20 329:13 | **support** 22:15 | 322:22 326:4 | 237:4 303:4 |
| 330:6 332:21 | 33:22 108:16,20 | 327:18 331:10 | 329:23 343:9 |
| 334:3,20 335:1,18 | 108:25 109:9,14 | 333:10 334:2 | 344:22 345:1,7,13 |
| 336:10,18 338:9 | 112:2,13,23 113:1 | 337:11 343:14,20 | 346:18 347:11,16 |
| 338:16 340:6,12 | 113:8,20 114:11 | 351:12 354:19 | 348:3 349:7,14,21 |
| 341:24 342:8 | 230:22 | 359:7 385:11 | 350:2 351:13,18 |
| 343:17 344:6,15 | **supports** 110:6 | 388:25 394:6 | 354:25 355:15,20 |
| 345:3 346:7,9,19 | **suppose** 250:17,17 | 395:3 400:18 | 355:22 356:1,1,2,3 |
| 347:1,14 348:18 | 396:24 | 415:20,21,23 | 356:6,7,17,18 |
| 350:3 351:8,20,24 | **supposed** 102:5 | 425:16 | 392:23 397:17 |
| 352:4,15,20,25 | 103:2 213:11 | **surgical** 87:11 | **systems** 265:19 |
| 353:9 356:22 | **sure** 23:9 25:22,24 | **surpassed** 363:8 | 275:14,17 296:5,8 |
| 358:6 361:8,20 | 28:1 32:15 40:1 | **surplus** 195:19,22 | 355:4 356:19 |
| 363:12,24 364:3 | 46:20 50:8 53:11 | 210:9 | 357:3 428:18 |
| 364:19 365:16,25 | 62:10,14 64:18 | **surprise** 246:4 | |
| 366:2,6,20 367:7 | 65:13 66:12 72:24 | 284:7,12 | t |
| 368:4,18 369:21 | 76:19,21 78:6 | **surprised** 361:4 | **table** 128:25 309:3 |
| 370:13 373:9 | 95:14 100:13 | **surrounding** | **tackle** 303:7 |
| 374:23 376:5,14 | 101:12 103:24 | 374:17 | **tainted** 323:2 |
| 378:17 381:3,21 | 110:23 114:6 | **surveys** 228:10 | **take** 65:5 89:17 |
| 389:18,20 390:4 | 115:2 118:3 | 229:16 296:2,9 | 90:2,13 120:4 |
| 391:18,22 395:14 | 122:23 124:19,25 | **susceptible** 258:16 | 121:20 126:19 |
| 395:19 396:4,20 | 131:1 146:8,8 | 258:18 310:21 | 173:9 174:25 |
| 402:4 403:17 | 160:3 164:18 | 312:12 | 187:25 199:14 |
| 404:1 410:3 | 182:3 184:16 | **sustainability** | 202:2,4 212:10 |
| 412:15 416:21,23 | 185:12,14 189:12 | 192:18 | 222:7,12 223:11 |
| 417:3,8,13 418:5 | 193:22,22,23 | **sweet** 3:17 19:13 | 238:19 249:18 |
| 418:25 419:13,21 | 198:1 201:13,25 | 19:13 | 258:12 275:10 |
| | | | 281:22 304:6,19 |

318:18 353:21
389:10 427:24
**taken** 1:20 64:24
65:13 119:23
126:23 203:4
253:14 313:11
331:6 354:3 404:8
428:4 432:20
**takes** 310:22
393:14 400:22
**talk** 39:23 51:7
59:17 60:2 71:16
89:15 165:18
194:19 216:1
233:24 284:4
300:14 309:23
330:21 356:9,13
369:19 397:19
**talked** 28:7,23
82:9 89:21 127:18
130:20 235:15
279:4 281:18
289:6 291:14,20
291:25 292:9
293:7 296:1
299:16 307:6
309:7,16,17,18,20
309:20 311:2
315:23 319:1
329:24 335:8
337:18 354:10
367:13 377:1
409:23 429:18
**talking** 23:9 24:5
36:3 46:23 49:25
88:18 92:9 107:24
116:7 119:15
123:24 127:3
155:1,2 168:1
185:21 206:19,21
233:13 237:23

238:14 279:23
280:8 282:14
284:3,24,25
300:16,18,22
336:24 369:20,22
377:3 380:15
405:24
**talks** 183:9 295:21
**tallmadge** 419:5
419:10
**tamela** 331:21
**tangible** 219:5
**tar** 365:22 366:2,5
366:9,19 367:3
**targeted** 37:19
135:9 179:6,7
190:13 191:3,24
194:7
**task** 8:11,12,14
30:16 33:20 37:24
127:20 137:10
138:14 147:6
198:18 199:24
219:17,19 220:5
220:17,18,25
221:15 222:5,8,14
222:24 223:4,14
223:22,23 224:22
224:25 225:8,21
226:21 234:19
242:2 252:7
253:18 283:1,9
288:16 302:16,23
303:16 305:11,23
336:3 343:23
344:12,15,17
345:2,21 347:1
350:6 418:15
**taught** 249:22
**tax** 179:3 219:6

**taxes** 219:2
**taxpayers** 217:1,5
**teach** 427:5
**teaching** 245:2
**team** 10:5 389:19
390:5 391:7,17,23
**teams** 200:1 391:4
391:10,16,17,19
**teasing** 41:22
**technician** 391:25
**ted** 145:14 219:16
**tedious** 181:14
**teleconference**
4:14 5:4,10
**telephone** 19:17
**telephonic** 390:18
**tell** 24:13 35:13
48:14 65:14 89:16
118:5 152:20
155:22,24 156:8
159:1 177:10
183:16,22 184:6
184:11,13 186:15
188:1 244:4
345:20 349:3
359:6,12 365:1
409:13 420:14
423:16
**telling** 61:21
350:17,21,24
**tells** 393:18 394:15
**tend** 230:6 231:3
408:23 430:5
**tenure** 416:24
**term** 65:18 84:12
107:11 123:7,23
124:1 160:23
161:13 179:9
244:24 259:12
342:10 365:21
409:2,4

**terminology** 207:1
**terms** 35:20 55:24
57:23 59:13 60:9
133:14 139:18
158:19 165:10
174:3 178:1
179:15 186:2
197:8 199:11
200:15 206:2
218:16 255:24
261:10,24 262:24
263:9 301:9,18
311:19 312:22
319:4 325:3
366:13 375:7
430:8
**terrorism** 367:25
**test** 409:20
**testified** 22:11,20
32:5 316:25
327:17 334:1
407:11 410:24
**testify** 22:18 23:3
432:10
**testimony** 22:25
28:10 29:7 31:23
32:12 52:19 58:13
59:10,14 78:21
90:23 92:23 95:19
117:4 118:15
137:19 138:16
139:2 144:10
149:14 151:8
198:13 334:13
339:15 370:25
405:22 432:13,17
435:6,7 436:6,9,12
**teva** 3:2 5:2 19:5
19:21 404:21,23
405:1,2,3,4,7,16
409:12

**thank** 20:12
171:13 180:24
189:5,22 217:10
362:14 392:15
394:10 404:3,11
404:15 412:20
427:18 428:9,21
428:22 429:20
430:11
**thanks** 400:25
429:12
**thea** 154:22
**theatrics** 154:22
**theft** 259:3 329:5
**theory** 382:11
**thing** 65:12 85:7
86:8,12 97:19
219:6 230:12
231:24 239:11
257:21 274:5
279:8 348:9
391:16
**things** 29:3 64:6
147:21,23 154:7
234:23 235:5,8,12
235:13 268:23
274:23 282:1
307:7 308:12
309:17,21 310:2
311:1 337:19
338:4 340:21
396:6
**think** 23:6,19 25:8
26:16 30:10 31:15
34:9,9 40:13,18
46:10 48:5 53:6
56:1 57:22 58:2
58:10 60:24,25
61:18 62:9 70:6
71:20 85:19 87:25
97:14,16,25 98:22

99:12,17 105:17
106:17 111:7
113:14 115:5
116:22 117:4
123:21 126:7,10
127:2 131:11
152:18 155:10
158:8 163:13
167:13 184:14,15
186:11 200:17
206:25 213:10
218:8,10 221:7,12
228:22,22 229:20
229:24,24 230:19
233:12 235:5
236:5,13,23
239:20,25 240:5
241:13 242:11,21
244:11 248:20
249:7 251:12
256:4,5,21 257:16
257:20,24 259:2,5
259:22 261:4
264:10,11,23
266:7,9 268:15
271:20 280:3
285:3,15,21,23
287:16 289:1,2
293:10 296:18
299:24 300:8
301:15 304:17,17
305:9 306:14,19
307:4 309:6,10,25
310:3,3,25 311:2
314:5 316:24
317:1 323:23,25
325:10 334:1
336:12,12 339:3,6
342:14,17 352:9
354:18 356:11
359:11 360:9

361:4 383:23
384:15,21 386:14
386:15,15 393:22
397:7,18 398:20
399:7 400:8 403:5
410:17 412:19
413:2 414:1,15,20
418:12 429:16
**thinking** 256:13
**third** 140:13
207:25 208:7
215:18 231:24
262:17 317:8
321:22,23
**thirty** 434:18
**thorough** 53:16
**thought** 31:19
43:4 55:23 58:15
68:8,12,14,17,24
82:24 85:9,15
97:15 104:3 111:3
141:24 142:19
198:7 249:16
250:24 301:22
398:16 399:15
415:19
**thoughtful** 40:24
**thoughts** 66:19
386:2
**thousands** 401:2
**threat** 364:12,23
367:24 369:2
**threatened** 291:23
**three** 23:22 27:14
106:9 193:14,15
226:4 255:12
291:15,16,16
297:12 402:12
403:11
**throwing** 348:9

**time** 22:15 23:10
27:13 30:16 33:22
37:2 52:24 53:18
56:20,22 59:21
63:18 64:4 69:18
86:17,19 106:8
112:22 113:1,7
114:10 115:22
118:11,13 126:17
131:11,15,19
135:22 137:7
138:6,10 141:9
142:1,7,22 143:5,7
143:12 145:13
149:7,19 152:2
156:16,17,23
157:19,21 158:4,7
158:9,19,25 161:4
161:5,8,12,15
167:13,17 168:1,5
168:14,21 177:21
191:2 197:14,24
198:10,16,21,23
199:3,6,16,19
200:2,15 216:25
217:15 218:8
236:23 248:12,17
249:3,10 250:10
252:15 253:10
254:6 269:20
274:11 280:5
307:8 313:6
316:14 324:18,19
325:15 329:12
332:4 335:10
338:1 343:18
344:4 345:17
348:13 349:17
350:11 353:9
355:25 357:10
368:24 375:9

382:14,16 390:24
393:14,14,15
404:12,13,20
411:15 412:22
432:20
**times** 27:6,8 62:10
67:22 71:11
105:16 158:2
228:24 278:6
291:16 302:15
354:9 360:10
387:5 388:19
405:21
**title** 341:15,15,18
362:5,19
**titled** 7:9,15,17 8:8
8:10,13,16 9:9,11
9:22 10:1,4
116:17 145:6
152:13 200:9
205:14 223:21
253:17 262:9
332:7 338:8
342:15 344:3
369:1 370:11
376:12 389:18
**tobacco** 102:11,14
102:22
**today** 20:15,20
23:13,18 24:10
26:7 27:3 28:10
46:8 49:14 54:22
55:3,25 59:1,10,15
60:4 62:22,25
63:15 65:14,22
76:6 77:9 104:10
117:18 118:1,15
119:16 130:22
133:21 137:19
138:16 141:1
144:10 168:6

169:5 176:20
187:22,24 196:9
196:17 198:8
207:8,13,18 208:3
220:9 227:5
235:16 236:3
246:24 257:25
269:21 278:7
281:4 284:13
286:17 290:15
296:14 299:16
307:8,12 309:17
311:3 313:16,25
318:3 327:2
337:15 341:2
342:4,13 345:6
349:19 354:9
370:21 371:23
402:2 404:12
407:11 410:1
414:15 422:2
425:13 428:10,23
429:24
**today's** 18:1 29:9
130:11
**told** 32:19 59:22
78:15,24 90:12
402:3
**tolerance** 243:8
310:24
**tom** 119:20 129:5
129:11
**tongue** 185:13
**top** 119:3,10
129:19,22 189:4
209:11,12 243:18
394:4,15 395:1,5
410:4,8,9,11,17
423:12 424:16
**topic** 384:1 420:1

**topics** 31:2
**total** 35:18 36:4,5
38:14 54:12 84:3
84:5 177:7 185:4
186:21,25 193:24
199:17 207:17
209:23 212:14
218:16 362:12
**totally** 339:17
**touch** 84:24
391:19,20 428:17
**touched** 127:21
391:11,12
**touches** 285:5
**tower** 3:11 5:12
**toxicology** 312:24
324:4 380:16,20
380:23
**track** 36:24
132:21,22 175:8
177:24 184:15
199:4 325:5,6
328:21 329:18
332:18 334:3
350:11 356:16
393:13
**tracked** 38:8
328:23 343:8
**tracking** 132:24
411:16
**traction** 303:21
**traffic** 139:13,22
**trafficking** 368:14
368:20
**trained** 424:20,24
**tranquilizer** 290:2
**transcribed**
432:16 435:7
**transcript** 6:1
58:14 431:3,6,9,11
434:11,12 435:5

435:12 436:5,11
436:17
**transcription**
432:17
**transcripts** 55:17
55:23 57:11 58:3
59:2
**translates** 300:23
**transnational**
306:8
**treat** 124:24 245:5
247:20,20 289:24
293:19 312:9,11
316:16
**treated** 48:19
**treating** 212:19
244:17,21 245:17
246:18 247:11
248:11 249:1
250:2 252:17
255:20 309:19
**treatment** 9:2
30:14 41:8 43:12
43:21 44:10 48:24
94:18 103:3 109:1
109:10 115:14,17
120:19 121:4
124:7 136:7
182:19 184:5
185:18 186:19
187:17 188:3,4
193:4,17 205:14
205:24 206:10
208:20 209:11,24
210:5,14,25 211:8
212:9,12 213:24
245:22 246:12
249:9,20 250:9
253:2,4 278:2
300:25 315:8
316:5 317:11

326:1 335:23,25
391:13 392:4,6,14
393:3,6 397:16
428:13,18 429:5
**treatments** 193:12
**tree** 7:10 116:18
**tremendous** 205:2
**trend** 135:11
377:12,20 395:22
**trending** 396:3
**trends** 9:23 140:7
140:8 262:19
325:3 370:12
371:20 374:22
375:25
**trial** 21:22
**tricky** 333:8
**tried** 127:15
163:20,20 198:15
198:15,20 382:22
**triggered** 310:19
**trouble** 64:16
**true** 41:13 46:10
46:25 62:11 92:2
135:23 176:20
217:22 295:13
318:14 319:5
322:5 328:18
345:3 378:17
429:23 432:16
**trump** 336:25
337:1
**trusts** 338:25
**truth** 65:14,18,18
65:19 118:5,5,6
432:11,11,12
**try** 23:5 39:17
43:7 49:5,12
135:9 149:4 150:4
196:14 214:12
218:5,7 245:7

275:1 278:9
281:19 303:13
304:8 329:20
350:2 352:2
365:16 393:5
401:16
**trying** 33:23 92:12
98:4,5 99:14
126:16 131:4
169:1 199:11
210:7 218:11
272:9 280:23,24
285:17 304:25
309:22 335:22
336:5 338:4 352:9
401:9
**tubba** 404:25
**tucker** 3:16 19:13
**tuckerellis.com**
3:19
**tuesday** 28:25
**turn** 146:2 227:20
316:19 364:6
372:1 378:10
424:10 425:17
**twelfth** 2:16 4:16
**twice** 348:23
**twinsburg** 370:6
**two** 22:23 45:20
46:4,15 149:21
173:1 176:3,8
213:25 238:12
271:2 272:1
310:25 355:4,24
356:19 369:2
409:18 414:8,10
**type** 101:23
109:21 177:16
304:10 356:14
**types** 113:13
182:19 273:13

306:18 319:6
356:13
**typical** 333:15
**typically** 45:12
48:17 65:5 225:21
230:24 298:11
330:17 338:24
340:3,15 367:4
399:4,5
**typo** 213:12

**u**

**uh** 73:21,24 79:24
80:18 102:12
106:20 108:2
110:19 144:12
146:14,20 148:6
163:7,25 173:11
181:15 184:18
194:21 213:20
239:14 266:6
279:14,17 288:14
290:17 307:9
309:9 318:2
321:21 333:17
365:15 398:12
400:24
**ultimate** 70:24
**ultimately** 305:22
336:1
**umbrella** 316:2
**un** 258:14
**underlying** 215:17
**understand** 23:24
24:6 25:11 37:3
39:18 48:1 62:11
65:15,21 66:1
68:2,7 77:19
80:10 84:9 99:16
109:9 117:2 118:2
118:6 121:14,25
122:4,7,24 123:2

123:13 127:5,10
128:2,4 131:5,9,16
131:16 144:21
149:3 150:5,8
151:20 162:24
169:2 182:1,20
184:17 189:14
198:12 210:8
218:11 222:22
227:18 235:18
240:12 245:8
249:24 272:7
275:1 278:10,23
279:23 281:20,25
282:18 283:4,14
309:23 324:1
334:2 335:12
336:9 344:18
350:3 361:13
365:16 368:23
383:1,15 384:2
389:1 402:16,17
406:14 414:1,23
415:1
**understanding**
43:20 63:23 70:22
71:1 74:22 77:12
79:15 80:6 94:1
96:21 102:14,18
102:19 104:25
114:16 115:7
120:15 131:25
135:19 138:8
148:17 180:18
203:9 236:1
237:15 242:24
246:8 271:17
273:24 276:23
296:7 331:18
339:24 356:15
358:20 360:5

362:23 363:12
368:17 369:14,16
369:17 373:8,13
373:15 374:22
375:3,4,5,7,9
380:1 382:10
401:11 405:15
413:15,23 415:11
415:25 418:3
420:17 422:1
423:14
**understood** 25:13
65:13 78:14 79:19
89:24 118:18
327:22
**undertake** 150:4
**undertaken** 122:7
127:9 365:15
**undertreated**
229:2,7
**undertreatment**
250:19 251:2
**unenthusiastic**
304:14
**unexpended**
194:15
**unfairly** 21:15
**unfamiliar** 339:18
**unfortunately**
332:15 362:9
**unintentional**
134:24 141:3
377:9 378:12
379:8
**united** 1:1 249:22
250:8 268:5,13
269:4 270:17
271:10,15,19
272:12,20 307:1
318:7 324:2 361:9
364:12,24 365:5

367:22,24 369:11
406:20
**universal** 312:9
**unmet** 190:25
**unscrupulous**
297:16 298:1
310:4
**unused** 258:14,15
**unusual** 235:3
**unwilling** 60:18
**update** 9:8 326:19
328:11
**updated** 40:22
53:17,19
**uptick** 116:24
**upward** 352:6
**usa** 3:3 5:3
**use** 9:2 30:23,25
31:5 34:6 37:12
43:2,7,13 45:7
47:13,14,17 48:19
49:1 88:24 90:20
91:25 93:14 94:2
95:17 96:6,16,22
107:10 109:2,11
109:19,24,25
110:7,21,25 111:1
111:7 112:21
113:7 122:14
123:23 124:1
125:7 133:4,18,23
152:8 156:11
175:10 177:9,19
177:25 178:5,12
180:6 181:21,23
182:11,17,22
183:19 184:5,23
184:25 186:16,19
187:16,21 188:3,4
189:20 190:10
191:4,17 193:4,13

193:17,17 196:21
205:3,14,25
209:10,24 210:4
210:22,25 211:8
211:10,11,13
212:9,12,17,20
213:1,8,23 214:17
224:20 226:9
231:25 232:3,8,18
232:20 252:20
260:7 267:10
274:11 275:15,18
282:9 283:6,12
289:24 298:24
300:5 301:10
311:15 315:7
316:4,15 325:3,8
327:4,5 334:6
338:1 344:10
350:1,8 351:8
355:5,6,8 356:20
356:22 374:23
388:13 389:6
417:20 428:13,17
428:18 429:4
430:6
**useful** 336:15
**uses** 267:1
**usually** 202:21
221:10 255:18
282:17
**utilize** 120:17
137:10
**utilized** 29:25 34:5

| v |
| --- |

**v** 1:10,11,13
**va** 246:3,4
**vacated** 129:15
**validity** 317:10,19
**variation** 260:13
260:16,17 261:10

262:24 263:9
**variations** 261:7
**varies** 260:21
261:1
**variety** 37:4 38:10
41:2,8,9,10,16
42:1 47:18,20
48:25 82:17
127:14,21 182:22
197:24,25 370:8
396:12
**various** 32:22 38:5
38:6 67:22 131:13
224:14 272:22
285:1 308:6
**vary** 430:2
**vast** 313:21
**veauthier** 356:11
**vehicle** 139:13,22
140:3
**venues** 82:18
352:23
**veritext** 434:1,7
437:1
**veritext.com.**
434:17
**vernacular** 326:10
**version** 189:9
413:7
**versus** 119:16
141:18 189:20
191:12 209:25
210:5 323:24
356:14
**veteran** 246:16
**veterans** 245:20
247:9,16 248:9,24
**victims** 324:4
**video** 11:1
**videographer** 5:22
18:1 19:16 64:22

64:25 126:21,24
169:12 171:7
203:2,5 253:12,22
313:9,12 354:1,4
404:6,9 428:2,5
430:14
**videotaped**  1:16
**view**  75:1 83:23
84:18 110:6 111:8
143:10 150:6,9,22
152:24 155:17
165:8 167:4
197:15 227:19
240:15 241:22
242:7 243:14
244:7 246:15
248:7 263:7
277:15 279:11
284:15 285:24
286:17 292:21
301:1,13 311:5
341:23 342:6
360:4 383:11
386:3
**views**  91:3 94:19
94:24,25 95:7,17
96:6,11,16 287:8
**violence**  7:12
134:5
**virginia**  274:14
**virtue**  68:10
**visit**  228:3 230:6
**visits**  391:13
392:11
**visual**  165:5
**vital**  244:17,22
245:6,11,12,13,18
245:22 246:18
247:11,21 248:11
249:1,21 250:2,10
252:18 294:23

295:10,16 309:19
**void**  143:20
298:10,12 299:1
382:23 386:11
**volume**  257:3
262:1,2,24 314:19
351:19,24 400:4
**volumes**  274:16
**vote**  180:8 217:22
**voters**  180:7

**w**

**wade**  119:25 120:3
130:16
**wait**  32:3 304:5
385:1
**waiting**  308:24
**waived**  434:19
**waiving**  203:22
**wake**  263:24
**walgreen**  415:19
**walgreens**  415:14
415:18 416:1
419:15,17 425:20
425:24 426:4,9
**walk**  285:17
**walmart**  4:8 19:12
414:14,24 415:2
419:24,25
**walter**  7:6 73:22
75:22 97:6 357:17
357:20
**want**  23:8 25:22
26:2 30:6 45:9
46:9 55:12 79:12
87:3 88:11 89:14
90:23 92:5 93:7
99:11 117:17
122:21 123:12
124:5 126:1
152:19 154:16,20
156:6 164:4

165:18 178:6
201:24 202:5,22
218:7 220:1,2
222:21 227:17
236:7 241:17,22
254:19 255:4
257:13,18,21
264:25 282:17
292:14 303:24
326:4 330:3
332:12 333:13
334:2 373:22
393:5 397:14,20
398:2 410:25
**wanted**  20:17
53:15 63:22 65:12
71:13 77:23,24
101:3 123:11
152:1,6 157:22
164:1,17 181:14
195:11 200:25
238:19 280:14
303:18,22,24
304:1 331:24
357:11 385:16
401:12,13
**wanting**  331:12
**wants**  88:5
**washington**  2:17
4:17 5:13 426:7
**watching**  66:1
238:10
**watson**  3:3,4 5:3,4
**wave**  160:25
**way**  29:6 31:6
32:17 40:1 66:24
83:16 86:16 96:21
99:14 100:23
104:15,25 109:4,5
110:11,12 116:10
122:22 124:25

139:18 164:7
167:23 179:12
184:1 186:6 191:9
192:11 198:17
214:3 218:11
227:24 228:19
229:13 230:15
232:7,19 234:2
236:19 244:4
245:2 246:13,25
250:17 252:14
256:12 259:6
261:13 276:25
277:3,16,21,22
279:19 283:4
286:25 293:17,21
295:14 304:17
306:13 320:10,11
325:6 327:7
329:19 333:12
335:11 344:11
348:15 353:12,15
360:13 364:16
366:4 368:6
403:12 406:5
409:16
**ways**  38:6 96:25
127:14 157:3
182:22 213:25
258:20 271:2
288:6 289:2
292:23
**wc.com**  2:18,19
4:18
**we've**  23:6,22
24:11 53:25 60:1
83:18 126:9,17
130:19 172:18
178:14 181:18
192:20,21 206:19
206:21 208:2

215:7 234:13,13
241:19 242:8,18
243:14 263:25
266:11 276:15
283:14 292:3
307:6,12 309:16
309:17,18,19,20
313:7 330:22
348:2 354:10,24
377:1,1 381:15
383:24,24,25
384:1 389:25
397:15,16 404:19
423:11 428:14,15
429:24
**wears**  23:8
**web**  7:8 106:13
**website**  106:19
134:16 159:21
189:10 344:20
**weed**  372:21
**weeds**  164:23
**week**  29:4 34:18
392:12
**weekly**  341:16,19
344:3
**weeks**  63:13
**weighed**  397:18
**welcome**  313:15
**wendy**  3:5 19:4
404:20
**wendy.feinstein**
3:7
**went**  20:17 52:24
52:25 151:16
158:5,7,13 180:13
188:3 195:9
197:21 200:14
210:18 213:1
227:1 261:18

**west**  3:5 19:4
274:13 404:21
**westbrook**  2:5
**whereof**  433:5
**white**  369:7
**who've**  96:12,25
127:21 237:16
382:4 383:16
384:1,1 392:3,7
**wholesale**  271:14
271:18 272:14,19
273:5,14 274:1,18
275:2,14 277:19
278:16 279:13
281:7 283:21
284:9,16 416:19
**wide**  262:24
**widely**  308:23
**wife**  28:14
**wildly**  274:8
**wilhite**  331:22
**williams**  2:14,16
4:15 18:25 19:2
**willing**  61:2,18
143:22 304:9
418:16
**withdrawal**
242:15
**withdrawn**  79:20
**witness**  2:3 18:18
18:21,24 35:24
50:16 51:3 64:15
64:19 87:2,20
90:5 91:5,12,20
92:19,25 98:19
99:17 100:18
117:14,16 154:12
165:25 166:8
189:3 201:17,20
203:13 252:4
253:11 254:15

316:25 327:17,19
384:23 421:10
424:14 427:19
432:9,14,15,18
433:5 434:8,11
435:1,4,11 436:1,4
436:15
**witness's**  92:13
117:21 431:2
**witnessed**  205:2
235:4,11
**witness'**  434:14
**wonder**  232:17
**wondering**  81:24
202:10
**words**  76:12,22,25
92:13 110:4 141:4
159:6 195:17
229:19 363:1
372:21
**work**  28:20 29:5
30:15 33:12 41:1
70:7 91:22 108:24
113:20 120:12
203:17 252:23,25
276:5,15 278:13
278:20 303:9
306:5 311:1
320:14 340:13
353:23 419:4
**worked**  115:15
136:20 417:18
426:17
**working**  22:15
48:5 60:19 199:25
**works**  218:12
239:21 253:10
**worried**  75:15
**worse**  401:6
**worth**  301:15

**wow**  44:4 308:11
**wrap**  185:25
**write**  33:4 73:25
75:22 76:25
159:25 341:19
358:18
**writes**  400:25
**writing**  23:13
398:15
**written**  63:7 66:5
66:24 67:5 69:13
72:2,12 83:25
84:9,17 86:20,24
386:23,24
**wrong**  57:20,23
342:14,17 412:14
416:19
**wrote**  77:7 342:24
399:2

**y**

**yeah**  25:1 46:22
75:12 101:12
172:6 189:5,15,24
201:19 202:2,13
230:10 233:18
235:15 237:21
240:14 256:3
280:16 281:14
285:8 309:14
353:25 362:14
363:21,25 390:2
393:24 394:8
429:10
**year**  50:9 105:16
106:9 116:4,5
147:10,13,19
148:4 149:17
150:24 152:23,25
155:19 163:18
178:12 181:22
182:2,2 183:17

184:22,24 186:17
187:18 188:2
190:4 191:7,8
195:10,18 217:2
269:5,16 270:10
379:9,9,13 394:17
426:8
**yearly**   172:9
**years**   108:5,15
109:7 116:7
151:19 158:11,16
161:9,13,17
162:14 163:9
168:7 169:4
171:20 172:19
181:24 183:16,23
184:3 186:14
209:13 247:8
264:5 265:22
266:4,5 291:16
323:17,22 324:19
328:25 331:16
333:23 355:24
377:13,21 395:20
**yesterday**   27:18
27:19
**yielded**   180:4
**york**   5:7,7
**yourself's**   87:21

**z**

**zuckerman**   4:4
19:10
**zuckerman.com**
4:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.