Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION
 3   **************************
     IN RE:  NATIONAL
 4   PRESCRIPTION OPIATE         MDL No. 2804
     LITIGATION
 5                              Case No.
     This document relates to:  17-MD-2804
 6
     The County of Summit,
 7   Ohio, et al v. Purdue      Hon. Dan A. Polster
     Pharma L.P., et al
 8   Case No. 1:18-OP-45090
 9
     The County of Cuyahoga v.
10   Purdue Pharma L.P., et al
     Case No. 17-OP-45004
11
     **************************
12        HIGHLY CONFIDENTIAL - SUBJECT TO
13          FURTHER CONFIDENTIALITY REVIEW
14     VIDEOTAPED DEPOSITION OF DAVID CUTLER, Ph.D.
15
16            Friday, April 26th, 2019
17                  9:00 a.m.
18
19   Held At:
20           Robins Kaplan LLP
             800 Boylston Street
21           Boston, Massachusetts
22
23   REPORTED BY:
24   Maureen O'Connor Pollard, RMR, CLR, CSR
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:
 2
     FOR THE PLAINTIFFS and THE DEPONENT:
 3
 4   DAVID J. KO, ESQ.
     DEREK W. LOESER, ESQ.
 5   KELLER ROHRBACK, LLP
     1201 Third Avenue
 6   Seattle, Washington 98101
     206-623-1900
 7   dko@kellerrohrback.com
 8       -and-
 9   THOMAS M. SOBOL, ESQ.
     HAGENS BERMAN SOBOL SHAPIRO LLP
10   55 Cambridge Parkway
     Cambridge, Massachusetts 02142
11   617-482-3700
     tom@hbsslaw.com
12
13        -and-
14   HOLLY DOLEJSI, ESQ.
     ROBINS KAPLAN LLP
15   800 LaSalle Avenue
     Minneapolis, Minnesota 55402
16   612-349-8500
     hdolejsi@robinskaplan.com
17
18   FOR CAYAHOGA COUNTY:
19   SALVATORE C. BADALA, ESQ.
     NAPOLI SHKOLNIK PLLC
20   400 Broadhollow Road
     Melville, New York 11747
21   631-224-1133
     sbadala@napolilaw.com
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):
 2
     FOR PURDUE PHARMA:
 3
 4       WILL SACHSE, ESQ.
         DECHERT LLP
 5       2929 Arch Street
         Philadelphia, Pennsylvania 19104
 6       215-994-4000
 7       will.sachse@dechert.com
 8   FOR McKESSON CORPORATION:
 9       DAVID HALLER, ESQ.
         FATMATA S. KABIA, ESQ.
10       COVINGTON & BURLING LLP
         620 Eighth Avenue
11       New York, New York 10118
         212-841-1000
12       dhaller@cov.com
13
14   FOR AMERISOURCEBERGEN DRUG CORPORATION:
15       BRIAN T. HIMMEL, ESQ.
         REED SMITH LLP
16       225 Fifth Avenue
         Pittsburgh, Pennsylvania 15222
17       412-288-4058
         bhimmel@reedsmith.com
18
19
     FOR WALGREENS:
20
         MATTHEW BREWER, ESQ.
21       BARTLIT BECK LLP
         54 West Hubbard Street
22       Chicago, Illinois 60654
         312-494-4445
23       matthew.brewer@bartlitbeck.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):
 2
     FOR H.D. SMITH:
 3
 4       ALICE SPRINGER, ESQ. (Remotely)
         BARNES & THORNBURG LLP
 5       100 North Michigan
         South Bend, Indiana 46601-1632
 6       574-237-1120
         alice.springer@btlaw.com
 7   FOR WALMART:
 8       CLAIRE CASTLES, ESQ.
         JONES DAY
 9       555 South Flower Street
         Los Angeles, California 90071-2300
10       213-489-3939
         ccastles@jonesday.com
11
12        -and-
13       STEVEN N. GEISE, ESQ.
         JONES DAY
14       4655 Executive Drive, Suite 1500
         San Diego, California 92121-3134
15       858-314-1170
         sngeise@jonesday.com
16
17   FOR CVS INDIANA, LLC and CVS RX SERVICES, INC.:
18       DANIEL P. MOYLAN, ESQ.
         ZUCKERMAN SPAEDER, LLP
19       100 East Pratt Street
         Baltimore, Maryland 21202-1031
20       410-949-1159
         dmoylan@zuckerman.com
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):
 2
      FOR ANDA, INC.:
 3
          KATY E. KOSKI, ESQ.
 4             FOLEY & LARDNER LLP
              111 Huntington Avenue
 5            Boston, Massachusetts 02199-7610
              617-342-4000
 6            kkoski@foley.com
 7
 8    FOR ALLERGEN FINANCE:
 9        TIMOTHY W. KNAPP, ESQ.
          JOHN BAILEY, ESQ.
10            KIRKLAND & ELLIS LLP
              300 North LaSalle
11            Chicago, Illinois 60654
              312-862-7170
12            timothy.knapp@kirkland.com
              john.bailey@kirkland.com
13
14
      FOR JANSSEN and JOHNSON & JOHNSON DEFENDANTS:
15
          MATTHEW KAISER, ESQ.
16            O'MELVENY & MYERS LLP
              400 South Hope Street
17            Los Angeles, California 90071-2899
              213-430-8117
18            mkaiser@omm.com
19
20    FOR HBC SERVICE, INC.:
21        RICHARD I. HALPERN, ESQ.
              MARCUS & SHAPIRA LLP
22            One Oxford Centre, 35th Floor
              301 Grant Street
23            Pittsburgh, Pennsylvania 15219-6401
              412-338-4690
24            halpern@marcus-shapira.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):
 2
      FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
 3    SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
      INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.)
 4
          SAMUEL N. LONERGAN, ESQ.
 5            ARNOLD & PORTER KAYE SCHOLER LLP
              250 West 55th Street
 6            New York, New York 10019-9710
              212-836-7408
 7            samuel.lonergan@arnoldporter.com
 8
 9    FOR TEVA PHARMACEUTICALS USA, INC., CEPHALON,
      INC., WATSON LABORATORIES, INC., ACTAVIS LLC,
10    ACTAVIS PHARMA, INC., f/k/a WATSON PHARMA, INC.:
11        MARTHA A. LEIBELL, ESQ.
              MORGAN, LEWIS & BOCKIUS LLP
12            200 S. Biscayne Boulevard, Suite 5300
              Miami, Florida 33131-2339
13            305-415-3387
              martha.leibell@morganlewis.com
14
15
      FOR RITE AID OF MARYLAND:
16
          JOHN M. MALOY, ESQ. (Remotely)
17            MORGAN, LEWIS & BOCKIUS LLP
              101 Park Avenue
18            New York, New York 10178-0060
              212-309-6682
19            john.maloy@morganlewis.com
20
      FOR HENRY SCHEIN, INC., and HENRY SCHEIN MEDICAL
21    SYSTEMS, INC.:
          BRANDAN MONTMINY, ESQ. (Remotely)
22            LOCKE LORD LLP
              2200 Ross Avenue, Suite 2800
23            Dallas, Texas 75201
              214-740-8445
24            brandan.montminy@lockelord.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):
 2
      FOR MALLINCKRODT, LLC and SPECGX, LLC:
 3
          NICHOLAS BRADLEY, ESQ.
 4            ROPES & GRAY LLP
              1211 Avenue of the Americas
 5            New York, New York 10036
              212-596-9000
 6            nick.bradley@ropesgray.com
 7
 8    ALSO PRESENT:
      Sean Taylor, Charles River Associates
 9
10    ALSO PRESENT VIA STREAM
      E. McKay, Compass Lexecon
11
12    VIDEOGRAPHER:  Robert Martignetti
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   INDEX
 2    EXAMINATION                       PAGE
 3    DAVID CUTLER, Ph.D.
 4      BY MR. KNAPP                      11
 5         E X H I B I T S
 6    NO.       DESCRIPTION             PAGE
 7    1    Expert Report of Professor David
           Cutler, 3/25/19................... 22
 8
 9    2    Cutler, et al article, Has Wider
           Availability of Prescription Drugs
           for Pain Relief: Affected SSDA and
10         SSI Enrollment?................... 43
11    3    The Economic Impact of Illicit
           Drug Use on American Society, 2001...200
12
13    4    Cutler, et al paper, Economic
           Approaches to Estimating Benefits
           of Regulations Affecting Addictive
14         Goods.............................216
15    5    ADAMHS Calendar Year 2017 Annual
           Report............................243
16
17         ..................................
18    6    PCSAO, The Opioid Epidemic's
           Impact on Children Services in
           Ohio, December 2017...............261
19
20    7    Article titled Suicide Emerges In
           Understanding The Opioid Epidemic....297
21    8    Cutler, et al working paper,
           Explaining the Rise in Youth
22         Suicide...........................313
23    Kohler Exhibit 1 (Referred to)
      Drug Overdose Deaths, 1/1/2015 to 12/31/2015,
24    Summit County Medical Examiner
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              P R O C E E D I N G S

 2

 3          THE VIDEOGRAPHER:  We are now on the

 4   record.  My name is Robert Martignetti.  I'm a

 5   videographer for Golkow Litigation Services.

 6          Today's date is April 26th, 2019, and

 7   the time is 9:00 a.m.

 8          This video deposition is being held in

 9   Boston, Massachusetts In re:  National

10   Prescription Opioid Litigation.

11          The deponent is David Cutler.

12          Will counsel in the room please

13   identify themselves.

14          MR. KNAPP:  Tim Knapp of Kirkland &

15   Ellis on behalf of Allergan Finance.

16          MR. BAILEY:  John Bailey, Kirkland &

17   Ellis, on behalf of Allergan Finance.

18          MR. BRADLEY:  Nick Bradley, Ropes &

19   Gray, on behalf of Mallinckrodt LLC and SpecGx

20   LLC.

21          MR. HALPERN:  Richard Halpern, Marcus

22   & Shapira, Pittsburgh, on behalf of HBC Service

23   Company.

24          MR. HIMMEL:  Brian Himmel, Reed Smith,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   on behalf of AmerisourceBergen Drug Corporation.

 2          MR. BREWER:  Matt Brewer from Bartlit

 3   Beck on behalf of Walgreens.

 4          MS. KOSKI:  Katy Koski, Foley &

 5   Lardner, on behalf of Anda, Inc.

 6          MR. MOYLAN:  Dan Moylan, Zuckerman

 7   Spaeder, on behalf of CVS.

 8          MS. CASTLES:  Claire Castles on behalf

 9   of Walmart.

10          MR. GEISE:  Steve Geise from Jones Day

11   on behalf of Walmart.

12          MR. LONERGAN:  Sam Lonergan on behalf

13   of defendants Endo and Par.

14          MS. DOLEJSI:  Holly Dolejsi from

15   Robins Kaplan on behalf of Plaintiffs.

16          MR. BADALA:  Salvatore Badala on

17   behalf of plaintiff Cuyahoga County.

18          MR. LOESER:  Derek Loeser from Keller

19   Rohrback on behalf of plaintiffs.

20          MR. KO:  David Ko, also of Keller

21   Rohrback, on behalf of plaintiffs, also on

22   behalf of the witness.

23          MR. SOBOL:  Tom Sobol, Hagens, Berman,

24   Sobol, Shapiro, for the MDL plaintiffs and the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   witness.

 2          MR. SACHSE:  Will Sachse from Dechert

 3   LLP in Philadelphia on behalf of the Purdue

 4   defendants.

 5          MR. HALLER:  David Haller and Sean

 6   Taylor and Fatmata Kabia for McKesson.

 7          MS. LEIBELL:  Martha Leibell, Morgan

 8   Lewis, for defendants Teva and Actavis.

 9          MR. KAISER:  Matthew Kaiser, O'Melveny

10   & Myers, for the J&J and Janssen defendants.

11          THE VIDEOGRAPHER:  The court reporter

12   is Maureen Pollard, and will now swear in the

13   witness.

14

15          DAVID CUTLER, Ph.D.,

16   having been duly identified and sworn, was

17   examined and testified as follows:

18          EXAMINATION

19   BY MR. KNAPP:

20     Q.   Good morning, Professor Cutler.  My

21   name is Tim Knapp.  I'm from Kirkland & Ellis.

22   I represent Allergan Finance.

23          I'm going to be starting out in the

24   deposition today.  I expect that I'll have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   questions for you throughout the day today.  As

 2   we can see, there are a number of other

 3   defendants here, and they all have reserved

 4   their rights to ask questions, and I expect that

 5   that will happen at some point tomorrow.

 6          Does that sound okay?

 7     A.   Yes, that sounds fine to me.

 8     Q.   Could you please state your name for

 9   the record?

10     A.   My name is David Cutler.

11     Q.   You understand that you're under oath

12   in your testimony today?

13     A.   Yes, I understand that I'm under oath.

14     Q.   And is there anything that would

15   prevent you from providing truthful testimony?

16     A.   Forgive me while I put on the

17   microphone as asked.

18          No, there is nothing that would

19   prevent me from giving truthful testimony today.

20     Q.   So throughout the day today I'm going

21   to ask you a series of questions, and I'm going

22   to assume that if you answer my question that

23   you understood my question.  Is that fair?

24     A.   Yes, that is fair.
```

```
1       Q.   If you don't understand one of my
2   questions, I'd ask you to just ask me to correct
3   it and I'll take a shot at correcting the
4   question.  Is that fair?
5       A.   Yes, that's fair.
6       Q.   Okay.  When were you retained by the
7   plaintiffs in this case?
8       A.   I was retained in this case in June of
9   2018.
10      Q.   Who were you retained by?
11      A.   I was retained by the consortium of
12  lawyers for the plaintiffs.
13      Q.   Anyone in particular?
14      A.   I believe the retention agreement is
15  with the group as a whole.
16      Q.   Okay.  All right.  In a second here
17  I'm going to hand you a copy of your report.
18  Did you write your report on your own?
19      A.   I wrote all of the report.  I had
20  assistance in terms of writing, but it was all
21  my writing.
22      Q.   Who provided you with assistance?
23      A.   There was a team of economic experts,
24  and there was also a consulting firm.
```

```
1       Q.   Who was on the team of economic
2   experts?
3       A.   Professor Gruber, Professor Rosenthal,
4   and Professor McGuire.
5       Q.   Did anyone on the team of economic
6   experts write any portion of your report?
7       A.   No, they did not.
8       Q.   So what do you mean when you say they
9   assisted you with your report?
10      A.   We would talk through the issues
11  involved, we would talk through the nature of
12  the modeling, we talked through the data sources
13  and the types of analysis, and the general
14  findings.
15      Q.   How often did you talk to Professor
16  Gruber's -- Professors Gruber, Rosenthal, and
17  McGuire?
18      A.   We spoke regularly.  I would estimate
19  several times a week.
20      Q.   Starting when?
21      A.   Starting in June of last year.
22      Q.   And have you maintained contact with
23  them, talking to them a couple times a week up
24  to the present?
```

```
1           MR. SOBOL:  Objection.
2       A.   Yes, I have maintained contact with
3   those individuals, that's correct.
4   BY MR. KNAPP:
5       Q.   And have you continued to speak a
6   couple of times a week?
7           MR. SOBOL:  Objection.
8       A.   It varies by the week.  Some weeks
9   that amount, some weeks not as much, so it would
10  not have been every week.
11  BY MR. KNAPP:
12      Q.   Okay.  And as we go on today we'll
13  talk a little bit about your interaction with
14  each of those individuals a little bit more
15  in-depth.
16          MR. SOBOL:  Maybe.
17  BY MR. KNAPP:
18      Q.   Who are the consultants that you said
19  assisted you in writing your report?
20      A.   The consultants are from the firm
21  Compass Lexecon.
22      Q.   And who are they specifically?
23      A.   The primary point person at Compass
24  Lexecon is Hal Sider.
```

```
1       Q.   Who is Mr. Sider?
2       A.   Mr. Sider is an economist.  He studies
3   any number of healthcare topics -- excuse me,
4   any number of economic topics, beyond just
5   healthcare.
6       Q.   How do you spell Sider?
7       A.   S-I-D-E-R.
8       Q.   And what was his role with respect to
9   writing your report?
10      A.   Mr. Sider was the principle involved
11  at Compass Lexecon.  The team at Compass Lexecon
12  were the ones who did all of the data analysis,
13  substantially all of the data analysis, and then
14  provided inputs and suggestions, and on occasion
15  I asked them to help me with different parts,
16  and so they would do that.
17      Q.   What parts did you ask them to assist
18  you with?
19      A.   Let me make sure I answer the question
20  directly.  They were involved with all of the
21  parts with -- at various points with almost all
22  of the report in terms of helping to make sure
23  that what was said was accurate, that the
24  analysis that was presented was appropriate,
```

1 that what was being said was what was done.  So
2 there was not a single section or two of the
3 report, but rather help with all of the
4 sections.
5 Q.   You mentioned data analysis.  What did
6 Compass Lexecon do with respect to the data
7 analysis in your report?
8 A.   With respect to the data analysis,
9 Compass Lexecon helped to gather the data, to
10 input it into the appropriate statistical
11 programs, to estimate the analyses under the
12 directions that I provided, to do various
13 testing that one does to make sure that the
14 models are appropriate, and then to convey the
15 results.
16 Q.   And when you say "convey the results,"
17 they conveyed the results of the testing that
18 they did to you?
19 A.   That's correct, they would convey the
20 results of the testing to me.
21 Q.   And then you incorporated the results
22 of the testing into the opinions in your report,
23 right?
24 A.   I took the results of the testing and

1 my own interpretation, and then I put those into
2 the report.
3 Q.   You mentioned testing of models that
4 one does.  What are you referring to there?
5 A.   In order to judge how well a model
6 fits, there are many criteria that one would
7 use.  Among those criteria include, for example,
8 statistical output, for example, the R-squared
9 of a regression, analysis of looking at
10 individual data points or particular groups of
11 data points, consideration of how results relate
12 to other results in the literature, and other
13 studies, consideration of the magnitude and
14 whether the magnitude of the results are
15 plausible, consideration of the overall
16 structure of the model, and whether the model
17 seems to be fitting well or whether there are
18 outliers that are not being fit by the model
19 well for which a different model would be
20 needed.
21 So there -- so in the end there is a
22 process that an economist, that an academic,
23 that an analyst uses involving consideration of
24 a large number of elements to determine whether

1 a particular model is an appropriate one or not.
2 Q.   And you mentioned testing of the
3 R-squared and certain data points.  What
4 particular types of tests are you referring to?
5 A.   Can you rephrase the question, please?
6 Q.   So you mentioned testing,
7 consideration of different variables.  And now
8 I'm asking you what specific types of tests on
9 the R-squared and other data points did Compass
10 Lexecon do with respect to your model?
11 MR. SOBOL:  Objection.
12 A.   There's not a single statistical test.
13 One of the things that they did, for example,
14 was to output the R-squared, and that's
15 something that I would look at that we would
16 discuss as a group in terms of whether the model
17 seemed to be fitting well enough, and that's
18 something that would be -- that is commonly
19 reported in articles, which is what is the
20 R-squared of the model, and it's often remarked
21 upon.
22 In addition, you asked about specific
23 data points.  It's very common in judging a
24 model to see is it fitting well.  For example,

1 if it's a cross-section, how well is it fitting
2 the cross-section, or if it's a time series, how
3 well is it fitting the time series by looking at
4 predicted values or looking at other metrics.
5 So it's -- as I said, it's a variety of inputs
6 and not a single bright line that says this
7 model is appropriate or this model is not
8 appropriate.
9 BY MR. KNAPP:
10 Q.   So you mentioned Hal Sider.  Who else
11 at Compass Lexecon was on the consulting team
12 that assisted on your report?
13 A.   There were a number of individuals at
14 Compass Lexecon.  The two others in addition to
15 Hal with whom I worked most closely were Erica
16 Benton and Evan McKay.
17 Q.   Anyone else that you can recall
18 specifically?
19 A.   Those were the two who I spoke with
20 the most.
21 Q.   My question was, is there anyone else
22 that you can recall specifically?
23 A.   No, there's no one else specifically
24 that I recall.

Highly Confidential - Subject to Further Confidentiality Review

1   Q.   And do you know how much time Compass
2  Lexecon has billed to working on the models in
3  your report to date?
4   A.   I do not know how much time Compass
5  Lexecon has billed working on the models in this
6  report.
7   Q.   Do you have an estimate?
8   A.   No, I do not have an estimate of how
9  much time Compass Lexecon has billed in this
10  report.
11   Q.   Do you know if it's over ten hours?
12   A.   I don't have an estimate of how many
13  hours Compass Lexecon spent on this report.
14   Q.   You don't know if it was over ten,
15  over 500, over a thousand, you just don't even
16  have a ballpark estimate?
17   A.   I don't have a ballpark estimate.  If
18  you want to know is it over ten, I would say
19  yes, I'm reasonably certain it is over ten, but
20  I do not have any ballpark estimate of the
21  total.
22       MR. SOBOL:  The plaintiffs will
23  stipulate it's over ten.
24  BY MR. KNAPP:

Highly Confidential - Subject to Further Confidentiality Review

1   Q.   And how much time have you spent
2  working on your report and the models that feed
3  into your report?
4   A.   I have spent, I believe it is on the
5  order -- I meant to check this for sure.  I
6  believe it's on the order of 200 hours.
7   Q.   200 hours since you were retained in
8  June of 2018?
9   A.   That's correct.  That would be from
10  the time since I was retained in June of 2018.
11   Q.   I'm going to hand you what I'm marking
12  as Cutler Exhibit 1 --
13       (Whereupon, Cutler Exhibit Number 1
14       was marked for identification.)
15  BY MR. KNAPP:
16   Q.   -- which is a copy of your report.
17       MR. KNAPP:  Does anybody else need a
18  copy?
19       MR. SOBOL:  I didn't bring one.
20       MR. KNAPP:  (Handing).
21       MR. SOBOL:  Thank you.
22  BY MR. KNAPP:
23   Q.   All right.  I'm going to direct your
24  attention to Appendix III-A, which is towards

Highly Confidential - Subject to Further Confidentiality Review

1  the back, actually maybe about halfway through.
2  Is Appendix III.A your CV?
3   A.   Yes, Appendix III.A is my CV.
4   Q.   Is it accurate?
5   A.   Yes.  This is an accurate CV for me.
6   Q.   Does it include all of your prior
7  testimony as an expert?
8   A.   Yes, the CV includes -- or rather does
9  not have any prior testimony since I have not
10  testified before.
11   Q.   So you've never testified as an expert
12  in any legal proceeding before?
13   A.   That is correct.  I have never
14  testified as an expert in a legal proceeding
15  before.
16   Q.   Have you testified in any capacity?
17   A.   No, I have not testified in any
18  capacity.
19   Q.   Is there anything else beyond what's
20  listed in Appendix III.A, your CV, that you
21  believe qualifies you to offer the opinions that
22  you've offered in this report?
23       MR. SOBOL:  Objection.
24   A.   The CV does not list several things.

Highly Confidential - Subject to Further Confidentiality Review

1  One is it does not list the content of the
2  courses that I've taught which are relevant to
3  this case.  The CV does not list the students
4  that I've advised, many of whom have done work
5  that's relevant to this particular case.  The CV
6  does not reflect articles that I have refereed
7  or that I've been the editor for at various
8  publications which are also relevant to the
9  case.  The CV does not list articles in the
10  field of health economics or in other areas of
11  economics which I have read because of my
12  expertise in health economics which are also
13  relevant to the case.
14  BY MR. KNAPP:
15   Q.   Which courses have you taught that you
16  believe are relevant to this case -- strike
17  that.
18       Which courses have you taught that you
19  believe are relevant to your qualifications as
20  an expert in this case?
21   A.   I think two courses are particularly
22  relevant.  The first one is a course that I
23  teach on health economics, a graduate course on
24  health economics, Economics 2465 at Harvard,

Highly Confidential - Subject to Further Confidentiality Review

1  Health Economics.

2  The second course which I teach which

3  I believe is relevant is a course for

4  undergraduates.  The current title of the course

5  is Why is There No Cure For Health.  In the past

6  the course had the title The Business and

7  Politics of Health.  That was the most recent

8  name.  There were also other names for the

9  course at previous points in time.

10  Q.  In either of those courses, do you

11  discuss the opioid crisis in any way?

12  A.  Yes, the opioid crisis comes up in

13  both of those courses.

14  Q.  In either of those courses, do you

15  discuss the causes of the opioid crisis?

16  A.  Yes, as part of teaching about them we

17  discuss the causes of the opioid crisis.

18  Q.  And what do you recall discussing

19  about the causes of the opioid crisis in these

20  courses?

21  A.  In these courses part of my goal -- so

22  I have two goals in these courses.  The first

23  one is to make students aware of what the

24  literature is, so I indicate to them the --

Highly Confidential - Subject to Further Confidentiality Review

1  maybe I should say three goals.

2  So the first one is the literature, so

3  I indicate to them what is the relevant

4  literature on the causes of the opioid crisis,

5  some of which is cited in the -- my report,

6  although obviously there are things that are in

7  addition to that, so I would make them aware of

8  the literature.

9  Second, in the discussion of

10  healthcare topics in general that are related to

11  individual behaviors and are related to

12  pharmaceutical policy, I would often make

13  mention of the fact that there would be

14  implications of this in one's thinking about the

15  opioid crisis even if that specific topic that I

16  was covering was not specifically the opioid

17  crisis.

18  Third, I would also point out to them

19  the importance of thinking of looking at

20  research that is not just the economics research

21  but a lot of the epidemiologic research, a lot

22  of the public health research that is related to

23  the opioid crisis.  I would refer them to not

24  just journal articles and academic writings, but

Highly Confidential - Subject to Further Confidentiality Review

1  to other writings in more general interest

2  journals or books that would be appropriate.

3  And I would direct students who are interested

4  towards those topics as well, towards those --

5  towards those readings as well.

6  Q.  In any of these courses did you

7  attempt to identify with any specificity the

8  causes, or what you believe are the causes of

9  the opioid crisis?

10  A.  Generally not with certainty.  The --

11  I would give to them some of what the literature

12  spoke about in terms of the various debates in

13  the literature.  I didn't attempt to do that

14  because I myself didn't have a view, and I

15  formed a view in the course of doing this

16  report.

17  Q.  And when you mentioned the debates in

18  the literature, what are some of the factors in

19  the literature that are -- that academics point

20  to as potentially being a cause of the opioid

21  crisis?

22  MR. SOBOL:  Objection.

23  A.  If you look in the literature and, for

24  example, some of the papers, particularly by

Highly Confidential - Subject to Further Confidentiality Review

1  Professor Ruhm bring this out, there is an issue

2  as to how much of the opioid crisis is a result

3  of misconduct on the part of the defendants in

4  this case versus how much is a result of the

5  fact that the economies of many areas have done

6  less well than people would like, and so whether

7  changes in economic and social factors are

8  responsible for a greater portion of the opioid

9  crisis.

10  BY MR. KNAPP:

11  Q.  Is it fair to say there's still a

12  debate in the academic literature about the

13  causes of the opioid crisis?

14  MR. SOBOL:  Objection.

15  A.  I don't know that I can characterize

16  the literature as a whole.  There are a number

17  of papers that are being written.  By large

18  the papers tend to come to a fairly similar

19  conclusion.  So I believe that the weight of the

20  evidence supports the conclusions that I reached

21  in this report.

22  I don't think I'm qualified to talk

23  about the view of the vast bulk of researchers

24  in the area because I haven't seen anything.  I

1  have no data that suggests what are the opinions
2  of the vast bulk of researchers in the area.
3  BY MR. KNAPP:
4      Q.   You mentioned students that you've
5  advised.  Have you advised any students
6  researching the causes of the opioid crisis?
7      A.   I have some ongoing students who are
8  researching the causes of the opioid crisis.
9  There are no students that have graduated with
10  dissertations or papers that have been published
11  for whom I was a primary adviser and that
12  addressed the causes of the opioid epidemic.
13      Q.   Okay.  Are all of the opinions that
14  you plan to give at trial in this matter
15  contained within your report?
16      A.   Yes.  This report has all of the
17  opinions that I intend to present.
18      Q.   And sitting here today testifying, do
19  you believe that the opinions in your report are
20  still accurate?
21      A.   Yes, I believe that the opinions in my
22  report are still accurate.
23      Q.   And is there anything in your report
24  that you intend to change?

1      A.   No, there is nothing in my report that
2  I intend to change.
3      Q.   So, Professor Cutler, you're a
4  healthcare economist, right?
5      A.   That's correct.  My -- one of my areas
6  of expertise is in healthcare economics.
7      Q.   What do you consider your other areas
8  of expertise?
9      A.   The primary fields that I had when I
10  was in graduate school in which I took my
11  general examinations were public economics and
12  international economics.  I no longer consider
13  myself an expert in international economics.
14  It's not an area I've done any research or
15  teaching since my dissertation, since my Ph.D.
16  I do still advise students in areas of public
17  economics, in areas of applied microeconomics
18  generally, including public economics, labor
19  economics, industrial organization, any number
20  of applied econometric and economic topics, so I
21  consider myself somewhat of an expert in those
22  areas, even if the vast bulk of my personal
23  research is in the area of health economics.
24      Q.   Any other areas that you consider

1  yourself an expert in?
2      A.   No, I would leave it at those areas.
3      Q.   You're not an expert in addiction?
4      A.   There are parts of health economics
5  literature that have to do with addiction and
6  models of addiction, and those are areas that I
7  teach, that I have written about, that I
8  consider myself an expert in, so certainly on
9  the economics of addiction I consider myself an
10  expert.  In terms of any of the medical
11  components of addiction, whether it's changes in
12  brain activity or other type of activity, those
13  I am not an expert in.
14      Q.   You're also not an expert in addiction
15  psychology?
16          MR. SOBOL:  Objection.
17      A.   No, I'm not an expert in addiction
18  psychology.
19  BY MR. KNAPP:
20      Q.   Not an expert in opioid use disorder?
21      A.   To the extent that opioid use disorder
22  is related to economic concepts, for example, as
23  it's used in economic studies about the impact
24  of the opioid epidemic or the extent of the

1  opioid epidemic or the data sources that are
2  involved in learning about the opioid epidemic,
3  then those are areas that I am expert in.  To
4  the extent that it involves physiological issues
5  about opioid use and its impact on the human
6  body or psychological or physical manifestations
7  of that, those are areas where I'm not an
8  expert.
9      Q.   You're not an expert in pharmacology?
10      A.   If by pharmacology you mean the impact
11  in the body of certain medications, then no, I'm
12  not an expert on that.
13          Just to be clear, if by pharmacology
14  you mean the economics of the pharmaceutical
15  industry, that is a topic that I have taught,
16  that I have written some about, that I have read
17  about, and so those are areas where an economist
18  would be an expert.
19      Q.   You're not an expert in epidemiology?
20      A.   Again, I want to differentiate
21  different types of epidemiology.  There are
22  certain types of epidemiology that do involve
23  economic expertise.  For example, models of
24  spread of epidemics are something that I teach

1  and I use in my research, models about how
2  economic factors influence epidemiological
3  outcomes and population level outcomes, those
4  are areas in which I do research and I teach and
5  I consider myself an expert.  In terms of other
6  aspects of epidemiology that get into more
7  clinical issues, that, I would not be an expert
8  in.
9          And just to go back to the first part
10  in terms of thinking about other areas that have
11  -- of economics that are like epidemics, for
12  example, things like the spread of obesity,
13  smoking, alcoholism, thinking about the
14  relationships, the similarities and differences
15  across those different areas, those are also
16  things that economists in general, and I in
17  specific, have looked at, and so I do consider
18  myself an expert in those areas.
19      Q.    Do you consider yourself an expert in
20  criminology?
21      A.    I have done some research on crime,
22  and there are areas of crime -- of the crime
23  literature that have been very much within the
24  economic context, and they are things that are

1  addressed by health economists.
2          For example, in this particular matter
3  there are issues about estimating the aggregate
4  costs of the opioid epidemic for which crime has
5  been an outcome, and those have been looked at
6  by economists, health economists and other
7  applied microeconomists.  So there are a good
8  part of the literature that happens within the
9  economic literature, and it is something that
10  I'm quite familiar with.
11          There are other parts of the
12  criminology literature that are -- that I am
13  less specific -- that I'm less familiar with,
14  and there are other areas of the criminology
15  literature where I would not consider myself an
16  expert.
17      Q.    You're not an expert in law
18  enforcement?
19      A.    Law enforcement, again, has an issue
20  where some of the areas of law enforcement do
21  come into economic analysis.  So, for example,
22  there are quite a number of issues in opioids
23  with respect to policies that governments
24  undertook to try to address the opioid epidemic,

1  ranging from closing pill mills and trying to
2  stop prescribing or prosecute doctors who were
3  believed to be inappropriately prescribing, and
4  a variety of other law enforcement actions.
5  Those areas of law enforcement are areas that I
6  know about, that I have read about, that I teach
7  about as they arise, both in this context and in
8  the context of other related behaviors or
9  epidemics.
10          Then there are other areas of law
11  enforcement where I do not consider myself an
12  expert having to do with certain aspects that
13  are very separate from what economists do that
14  have to do with -- I won't even try and
15  characterize them, but other areas of law
16  enforcement for which I would not be an expert.
17      Q.    Not an expert in toxicology?
18      A.    With respect to the specific issue of
19  how a certain drug affects certain cells or
20  other parts of the body, no, that is not an area
21  where I would be an expert.
22      Q.    You're not an expert in autopsies?
23      A.    Analysis of -- I want to differentiate
24  it as I have with some of the other areas that

1  you've asked about into two parts.  One is using
2  data on autopsies to, for example, estimate, to,
3  for example, use information on people who are
4  dying of particular causes and to identify how
5  many people are dying of particular causes over
6  time and how that relates to things that may be
7  going on in the world, then use -- then that is
8  an area where I am an expert.
9          I have used mortality data in many,
10  many studies.  Many of the results of those
11  studies come from autopsy analyses, although not
12  all, but many do, and so the use of data from
13  autopsies with respect to cause of death and the
14  number of people dying and what they're dying of
15  and so on is an area in which I'm an expert.
16          In terms of clinical analysis of would
17  I be -- would it be appropriate for me to opine
18  upon whether a particular autopsy was done
19  correctly or what tests in a particular autopsy
20  should have been done to determine a particular
21  cause of death, that is not an area in which I
22  am an expert.
23      Q.    Not an expert in pain management?
24      A.    With respect to pain management, there

1 is a component of the literature on pain that

2 has been involved in economic and general social

3 science applied microeconomics work.  Those are

4 areas where I am familiar.

5          I teach in my classes, for example,

6 about disability insurance.  I do research on

7 disability insurance.  Many people who are on

8 disability insurance are on disability insurance

9 because of pain related issues, so the whole

10 economics of pain as in -- as it affects

11 individuals and their labor supply decisions,

12 pain as it affects individuals and their receipt

13 of public insurance programs such as disability

14 insurance, pain as it affects individuals and

15 the receipt and cost of medical care through

16 medical care services, those are examples of

17 areas of the study of pain where I consider

18 myself an expert.

19          There are other areas of pain where I

20 do not consider myself an expert.  So, for

21 example, areas about what precisely would be --

22 what precisely is happening when a person feels

23 pain in a particular part of the body and which

24 types of interventions one should think about

1 for each particular type of patient and each

2 particular duration or type of pain, those are

3 areas where I would not be an expert.

4     Q.   Have you ever taken a prescription

5 opioid before?

6     A.   No, I have never taken a prescription

7 opioid.

8     Q.   You understand that the prescription

9 opioids at issue in this lawsuit are approved by

10 the FDA?

11     A.   I do understand that the prescription

12 opioids in this -- at issue in this lawsuit were

13 approved by the FDA.

14     Q.   Bear with me one second.

15          And you understand that drugs may be

16 approved by the FDA even if there are known

17 risks associated with them, right?

18     A.   My understanding of the FDA process is

19 that drugs can be approved even if there are

20 known risks.

21     Q.   Setting aside the economic study or

22 economic impacts of the FDA, you don't consider

23 yourself an expert in the FDA, do you?  Again,

24 setting aside -- I understand you're going to

1 tell me you're -- from an economic perspective

2 you've looked at this.  But setting that aside,

3 you don't consider yourself an expert in the

4 FDA?

5          MR. SOBOL:  Objection.

6     A.   Let me just make sure what I'm setting

7 aside, which is I'm setting aside the economics

8 of pharmaceuticals and as the FDA relates to

9 that in terms of the costs of drug development

10 and the impact of the FDA on how -- which drugs

11 are sold and how they're marketed and things

12 like that, all of which are issues associated

13 with economics and that I am an expert.

14          The part of the FDA which is the

15 specific basis that any particular FDA review

16 panel or an FDA commissioner would use in order

17 to decide whether -- which -- the specific

18 criteria would be used to decide whether a

19 particular drug would be approved or not, that's

20 not an area in which I am an expert.

21 BY MR. KNAPP:

22     Q.   In areas where more drugs that have

23 known risks are prescribed, you would expect to

24 see more adverse outcomes, right?

1          MR. SOBOL:  Objection.

2     A.   I don't necessarily agree with that

3 statement, no.

4 BY MR. KNAPP:

5     Q.   Why not?

6     A.   So there are many reasons why I don't

7 think that's true.  Let me give just one

8 example, and then if you wish I can present

9 other examples.

10          One example is, for example, if the

11 drug is marketed and used only as appropriate,

12 and where the pharmaceutical companies and the

13 distributors exercise the appropriate actions to

14 make sure that the drug is used only as

15 appropriate, and drugs are used only as

16 appropriate, in that circumstance one would not

17 expect the number of medications to be related

18 to the amount of inappropriate use of the

19 medications in any way.

20     Q.   So my question wasn't about

21 inappropriate uses.  I'm sticking to appropriate

22 uses of the medicine.

23          If a medicine has known adverse risks

24 associated with taking the medicine, would you

Highly Confidential - Subject to Further Confidentiality Review

1   expect to see more adverse outcomes in a
2   population that takes more -- or consumes more
3   of those drugs than in other areas?
4        MR. SOBOL:  Objection.
5        A.   Let me answer the question that I
6   think you're asking.  If each drug -- if each
7   individual taking it has, for example, a
8   probability of having an adverse outcome, let's
9   say that's P, if more people take the drug, so
10  say N is the number of people who take the drug
11  and P is the probability that they have an
12  adverse outcome, then the number of -- the
13  actual number of adverse outcomes will increase
14  proportionately with the number of people taking
15  the medication, as long as the -- which, as long
16  as the P is constant, and I believe that's the
17  assumption that you're making here.
18       Q.   Now, one of the studies that you rely
19  on in your report is the Evans study from March
20  of 2019 related to the reformulation of
21  OxyContin, is that right?
22       MR. SOBOL:  Objection.
23       A.   Yes, that is correct.
24  BY MR. KNAPP:

Highly Confidential - Subject to Further Confidentiality Review

1        Q.   You know what study I'm referring to?
2        A.   Yes, I do know what study you're
3   referring to.
4        Q.   The authors state in that piece that
5   "When used as directed, opioids are an important
6   element of fighting acute and chronic pain."
7        Do you agree with that statement?
8        MR. SOBOL:  Objection.
9        A.   I'm not a medical expert, and so I
10  don't have an expert opinion as to which
11  patients should be prescribed opioids, or what
12  the delineation between appropriate and
13  inappropriate use of opioids would be.
14  BY MR. KNAPP:
15       Q.   So in connection with your model and
16  the opinions that you're offering in this case,
17  you don't have any opinion on whether opioids
18  can be appropriately prescribed for, say,
19  chronic pain?
20       MR. SOBOL:  Objection.
21       A.   The models that I built for this
22  particular case do not involve any assumptions
23  as to whether the -- in this case the drug
24  shipments were for appropriate or for

Highly Confidential - Subject to Further Confidentiality Review

1   inappropriate uses.  It's not something that I
2   needed to consider here.
3   BY MR. KNAPP:
4        Q.   And it's not something that you
5   considered in connection with your report at
6   all?
7        MR. SOBOL:  Objection.
8        A.   It was not necessary for the report
9   for me to delineate between appropriate and
10  inappropriate uses of the medications.
11  BY MR. KNAPP:
12       Q.   I understand it wasn't necessary.
13       My question was, you did not consider
14  it, did you?
15       MR. SOBOL:  Objection.
16       A.   Because it was not necessary, I did
17  not make any determination as to whether the
18  shipments were for appropriate or inappropriate
19  purposes.
20  BY MR. KNAPP:
21       Q.   I'm going to hand you what I'm marking
22  as Cutler Exhibit 2.
23       (Whereupon, Cutler Exhibit Number 2
24       was marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. KNAPP:
2        Q.   What is Cutler Exhibit 2?
3        A.   Is that a question for me?
4        Q.   Yes.
5        A.   Okay.  Cutler Exhibit 2 is a
6   preliminary analysis that I did on prescription
7   medication and SSDI and SSI enrollment.
8        Q.   All right.  I want to direct your
9   attention to Page 38, although I guess it's
10  really the first page of text.  And in the
11  second full paragraph, do you see that in the
12  second sentence it says, "On the one hand,
13  greater availability of pain medications may
14  increase the ability of people with
15  musculoskeletal ailments to remain active and
16  working."
17       Do you see that?
18       A.   Yes, I do see that.
19       Q.   You understand that greater
20  availability of pain medications may increase
21  the ability of people with musculoskeletal
22  ailments to remain active and working, right?
23       A.   Yes.
24       Q.   And you understand that there are

Highly Confidential - Subject to Further Confidentiality Review

1  studies of people with cardiovascular disease,
2  vision problems, and mental illness that it's
3  suggested that therapeutic advance in the area
4  of pain medicine and pain management has led to
5  improved physical and mental health, right?
6      A.   No, that's not correct.
7      Q.   Do you see the third sentence there?
8      A.   Yes, I do.
9      Q.   Do you see it says "Studies of people
10 with cardiovascular disease, vision problems and
11 mental illness have suggested that therapeutic
12 advance in these areas, the areas of greater
13 availability of pain medications, has led to
14 improved physical and mental health"?
15      MR. SOBOL:  Objection.
16      A.   That sentence is -- that sentence is
17 not referring to therapeutic advances in areas
18 of pain management.  That sentence is referring
19 to therapeutic advances in areas of
20 cardiovascular disease, vision problems, and
21 mental illness.
22           I'd be happy to expand on that.  For
23 example, the Chernew, et al study from 2015, if
24 you look in the references, you'll see that that

Highly Confidential - Subject to Further Confidentiality Review

1  was a study on which I was a co-author, and that
2  study was looking at improvement in
3  disability-free life expectancy in US
4  population.  The improvement in disability-free
5  life expectancy in the US population is to a
6  great extent driven by the fact that fewer
7  people are dying of and fewer people are
8  impaired by cardiovascular disease than used to
9  be the case.  And in addition, the second
10 element that we focused on there is fewer people
11 impaired by vision problems.
12           In each of those areas what we did in
13 that paper is we went through, we looked at the
14 nature of the medical advances that may have
15 been associated with improvement in those areas.
16           In the first case, in the case of
17 cardiovascular disease, what we looked at were
18 primarily medications, cholesterol lowering
19 agents, blood pressure reducing agents,
20 antidiabetic agents, aspirin, a variety of
21 different medications that improved the survival
22 of people with cardiovascular disease, and that
23 reduced the disability associated with
24 cardiovascular disease for people who had

Highly Confidential - Subject to Further Confidentiality Review

1  experienced cardiovascular disease, both of
2  which led to increased life expectancy in the US
3  population.
4           In the second case in the area of
5  vision problems we were looking specifically at
6  the share of people who reported that they had
7  difficulty seeing over time, which is actually a
8  very big component of people being disabled in
9  the US elderly population as people report that
10 they have difficulty with vision.  The biggest
11 change among people who have vision impairment
12 over time is that cataracts used to be a very
13 disabling condition among the elderly
14 population, and that's increasingly less so, to
15 a great extent because cataract surgery has
16 become much easier and much more common.  So
17 what you observe in the data is a very large
18 increase in cataract surgery over time
19 associated with a very significant reduction in
20 the share of people who are experienced vision
21 problems which they associated with cataracts.
22      Q.   Professor --
23      A.   The point that we make in that paper
24 is that both of those types of medical advances

Highly Confidential - Subject to Further Confidentiality Review

1  may have had enormous impact in terms of the
2  population's disability adjusted life
3  expectancy.  That paper did not consider pain
4  medication in any way.
5      Q.   So, Professor Cutler, you've received
6  research funding from pharmaceutical
7  manufacturers, right?
8      A.   That's correct, I have received
9  research funding from pharmaceutical
10 manufacturers.
11      Q.   Including Pfizer?
12      A.   That's correct, I have received
13 research funding from Pfizer.
14      Q.   How much in research funding have you
15 received from Pfizer?
16      MR. SOBOL:  Objection.
17      A.   I don't have the specific number off
18 the top of my head.
19 BY MR. KNAPP:
20      Q.   Can you estimate?
21      MR. SOBOL:  Objection.
22      A.   My estimate would be that I've
23 received probably, I would guess, maybe 25,000
24 to $50,000 in research funding from Pfizer.

1    Q.   And when did you receive that funding?

2    A.   It was a number of years ago.  One of

3  my ongoing research projects, if I'm not

4  mistaken, the direct funding from Pfizer would

5  have been about a decade ago.

6    Q.   And what study or studies did Pfizer

7  provide research funding for?

8    A.   What Pfizer was interested in, which

9  is a subject that I do work on, is what is the

10 economic and social impact of medical advance,

11 particularly pharmaceutical advance.  And so

12 some of the work, not all of the work, but some

13 of the work I've done on cardiovascular disease

14 over time, which has been a subject of a number

15 of areas of research, a number of papers that

16 I've written, some of that research was funded

17 by Pfizer because I wished to explore things

18 having to do with the impact of pharmaceuticals

19 on populations', for example, disability

20 adjusted life expectancy or populations' ability

21 to engage in different activities.

22    Q.   Did the source of the funding impact

23 the analyses that you ran in connection with the

24 work that you were doing?

1    A.   The source of the funding did not

2  influence the analyses that I ran or the

3  conclusions that I reached.

4    Q.   So you were able to conduct analyses

5  independent of the funding sources?

6    A.   That is correct.  My analysis was

7  independent of the funding sources.

8    Q.   And so you recognize that academics or

9  doctors can conduct analyses and reach

10 conclusions independent of the sources of

11 funding that they receive?

12         MR. SOBOL:  Objection.

13         You can answer.

14    A.   I do believe that academics can

15 conduct studies independent of the funding that

16 they reach -- excuse me, independent of the

17 funding that was provided.  The results can be

18 independent of the funding that was provided.

19 BY MR. KNAPP:

20    Q.   Do you know if Pfizer and any of its

21 affiliates ever manufactured or marketed

22 prescription opioids?

23    A.   I do not recall specifically whether

24 Pfizer or any of its affiliates manufactured or

1  marketed opioids.

2    Q.   Did you attribute any harms in your

3  report to Pfizer?

4         MR. SOBOL:  Objection.

5    A.   In this report I do not attribute

6  harms to any specific company.

7  BY MR. KNAPP:

8    Q.   You attribute harms to defendants,

9  right?

10    A.   That is correct.  In this report the

11 harms are attributed to defendants.

12    Q.   All harms are attributed to all

13 defendants, right?

14    A.   Not all harms are attributed to all

15 defendants, no.

16    Q.   All harms that are the result of the

17 calculation that you do and the regressions that

18 you run are attributed to the defendants, right?

19         MR. SOBOL:  Objection.

20    A.   That's correct.  The harms here are

21 attributed generally to the defendants.

22 BY MR. KNAPP:

23    Q.   Is Pfizer a defendant?

24    A.   I do not recall for certain the answer

1  to that question.

2    Q.   Professor Cutler, do you know the

3  names of all of the defendants that you're

4  attributing harms to?

5    A.   I have known them.  Whether I could

6  recite them all now, I don't know that I could

7  recite them all now.

8    Q.   Why don't you take your best shot at

9  it.

10         MR. SOBOL:  Objection to the form.

11         You can answer.

12    A.   The reason why I'm hesitating is

13 because I -- what I -- the way that I've done

14 this most in my mind is to think about the

15 different molecules that are involved, and so

16 what I then want to do is to relate the

17 different molecules to the defendants.

18         So for example, the one that's

19 probably been written about the most in the

20 economics literature is OxyContin, for which

21 there was -- the biggest manufacturer was

22 Purdue.  There were also -- there was a joint

23 marketing agreement, I know, for a certain

24 period of time, although I'm going to get the

1   company name wrong in terms of who is -- which

2   -- who is the company who had the joint

3   marketing agreement.  There were fentanyl

4   patches for which I know INSYS was one of the

5   providers.  There were others as well, although

6   I don't remember the names.  I also remember

7   having gone through this as part of the

8   litigation.

9           One of the reasons why it's difficult

10  is because companies acquired other companies at

11  different points in time, so the names of the

12  companies changed.  Allergan was obviously

13  involved.  Mallinckrodt was involved.  There

14  were -- I'm trying to remember some of the other

15  -- Endo Pharmaceuticals was involved.  I'm

16  trying to remember back.

17          There was a time where, of course, we

18  looked at the tables that are in -- they may --

19  they may be in Professor Rosenthal's appendix

20  which has the tables of all the defendants and

21  how much they shipped in each year, so let me

22  not -- I don't want to implicate any company by

23  saying it if it's not the case, so let me stop

24  there so that I don't make a mistake.

1       Q.  Any other companies that you can think

2   of that you've attributed harms to in this case?

3           MR. SOBOL:  Objection.

4   BY MR. KNAPP:

5       Q.  In your report.  Strike that.

6           Any other companies you can think of

7   that you've attributed harms to in your report?

8           MR. SOBOL:  Objection.

9       A.  I do not attribute harms in the report

10  to any single company.

11  BY MR. KNAPP:

12      Q.  Well, by implication, if defendants

13  are specific companies, are you attributing harm

14  to particular companies, or no?

15          MR. SOBOL:  Objection.

16      A.  There are two types of defendants

17  here.  Let me answer your question that way.

18  There are two types of defendants.  There are

19  the manufacturers, and there are the

20  distributors, at least from an economic

21  perspective, that's how I think about them.  So

22  I was giving you, obviously, some of the

23  manufacturers.

24          In terms of the distributors, there

1   are a number of distributors as well.  There are

2   also -- distributors are both those involved in

3   shipments as well as those involved in sales,

4   for example, Walgreens and CVS, but there are

5   also the shipment companies, for example,

6   Cardinal Health and McKesson and other

7   companies.

8           But again, I don't want to implicate

9   any without being absolutely correct, so I

10  will -- I will not say any more company names.

11  BY MR. KNAPP:

12      Q.  Let's turn to Paragraph 31 of your

13  report.  Are you at Paragraph 31?

14      A.  Yes, I am.

15      Q.  So you made no attempt to uniquely

16  apportion harms resulting from actions by any

17  individual type of defendant, right?

18      A.  That's correct.  I did not attempt to

19  apportion harms to any individual type of

20  defendant.

21      Q.  And you also made no attempt to

22  uniquely apportion harm to any individual

23  defendant, correct?

24      A.  That is correct, I did not make any

1   attempt to apportion harm to any individual

2   defendant.

3       Q.  And your model does not calculate the

4   percentage of tortious conduct that proximally

5   caused any harm that is attributable to the

6   plaintiff, doesn't it?

7       A.  The model does not attempt to

8   apportion any harm to any specific party.

9       Q.  Including the plaintiff?

10          MR. SOBOL:  Objection.

11      A.  That's correct, including the

12  plaintiff.

13  BY MR. KNAPP:

14      Q.  And including each defendant, right?

15          MR. SOBOL:  Objection.

16          You can answer.

17      A.  That is correct.  The model does not

18  determine the portion of harm for any individual

19  defendant.

20  BY MR. KNAPP:

21      Q.  And the model does not calculate the

22  percentage of harm that was proximately caused

23  by any non-defendants either, right?

24          MR. SOBOL:  Objection.

1    A.   That is correct.  There is no
2  apportionment of harm to any non-defendant.
3  BY MR. KNAPP:
4    Q.   And you made no attempt to calculate
5  whether any particular defendant was more than
6  50 percent at fault, did you?
7         MR. SOBOL:  Objection.
8    A.   I did not make any attempt to
9  determine whether any individual defendant was
10  more than 50 percent at fault.
11  BY MR. KNAPP:
12    Q.   You made no attempt to calculate the
13  percentage of fault of any individual defendant?
14    A.   I made no attempt to calculate the
15  proportion of fault due to any individual
16  defendant.
17    Q.   Now, the plaintiffs have recently
18  represented that they may proceed to trial with
19  only a subset of the defendants that are
20  currently in this case.  If that happens, would
21  you need to redo your model?
22         MR. SOBOL:  Objection.
23    A.   The model that I estimate translates
24  the shipments of opioids into harms.  It then

1  takes as an input the share of opioid shipments
2  which are due to misconduct on the part of the
3  defendants.  If the court or for any other
4  reason -- if the court wishes to know the impact
5  of any particular single defendant or subset of
6  defendants, the model could be used to do that
7  because it would take as input those harms which
8  are related to that specific defendant or set of
9  defendants.
10  BY MR. KNAPP:
11    Q.   And what you're referring to when you
12  say the share of opioid shipments which are due
13  to misconduct on the part of defendants, are you
14  referring to Professor Rosenthal's conclusions?
15    A.   In the body of the report, the share
16  of shipments that result from misconduct on the
17  part of the defendants comes from Professor
18  Rosenthal's conclusions.
19    Q.   And so you would have to redo your
20  report to reduce the amount of shipments that
21  you're calculating the percentages off of, is
22  that right?
23         MR. SOBOL:  Objection.
24  BY MR. KNAPP:

1    Q.   Strike that.
2         If any defendant is not in the first
3  trial, you would have to redo your model to
4  remove the percentages of shipments associated
5  with that defendant, correct?
6         MR. SOBOL:  Objection.
7    A.   I would like to make a distinction.
8  The model is the model that translates shipments
9  into harms.  That model would not need to be
10  reestimated.  The inputs to the model, which
11  is -- which is the percentage of shipments which
12  are due to misconduct, that input would change,
13  and so, therefore, the harms would change, but
14  the model that's used would not change.
15  BY MR. KNAPP:
16    Q.   Professor Cutler, you made no attempt
17  to link any alleged harm to any particular
18  prescription, is that right?
19         MR. SOBOL:  Objection.
20    A.   I did not relate the harm to any
21  particular prescription.
22  BY MR. KNAPP:
23    Q.   And you didn't relate the harm to any
24  particular shipment either, did you?

1         MR. SOBOL:  Objection.
2         You can answer.
3    A.   The harm is related to the aggregate
4  of shipments to particular areas, so it's not on
5  a shipment-by-shipment basis, but it is related
6  to the shipments going to different areas.
7  BY MR. KNAPP:
8    Q.   But you did not attempt to apportion
9  harm and link it to a particular shipment, is
10  that correct?
11    A.   Can you just explain what you mean by
12  "a particular shipment"?
13    Q.   X company sent Y MMEs to Z company.
14         MR. SOBOL:  Object to the form.
15         You can answer.
16    A.   No, it did not relate any particular
17  shipment to harms.
18  BY MR. KNAPP:
19    Q.   And you made no attempt to link any
20  particular type of opioid to the harms you
21  analyzed in your report, right?
22    A.   That's correct.  We took all the
23  opioids together here.
24    Q.   So you treat for purposes of your

1  report all opioid medicines as if they're the

2  same, right?

3          MR. SOBOL:  Objection.

4      A.   They're not the same in terms --

5  they're treated as similar given the MMEs, given

6  the milligrams of morphine equivalent.  That

7  differs across medications.  So, for example,

8  one prescription of one medication, say 30

9  pills, and 30 pills prescription of a different

10 medication, they have different milligrams of

11 morphine equivalents and, therefore, they would

12 contribute differently to the shipments which

13 are then related to the harms.

14 BY MR. KNAPP:

15     Q.   Other than making the conversion for

16 milligrams -- morphine milligram equivalence,

17 you treated all opioid medicines as if they were

18 the same, correct?

19         MR. SOBOL:  Objection.

20     A.   Other than for the MME conversion,

21 they were added together -- there's another

22 issue, which is two of the categories of opioid

23 medications are used as both treatments for pain

24 and as treatments for addiction, and so we had

1  to decide those were buprenorphine and

2  Methadone, so in the end the shipments variable

3  that I decided to use does not include shipments

4  of buprenorphine or of Methadone because using

5  the data that we have, we cannot separate out

6  which of those shipments are for treatment of

7  pain and which of those shipments are for

8  treatment of opioid addiction.

9      Q.   So I'm focused on shipments that you

10 did include in your analysis.  Other than making

11 the conversion for morphine milligram

12 equivalents, you treated all opioid medicines as

13 if they were the same, right?

14         MR. SOBOL:  Objection.  Form.

15     A.   Yes.  Once drugs had been converted to

16 milligrams of morphine equivalent, and once we

17 had decided on which drugs to include, then all

18 drugs contributed equally, and we looked at the

19 milligrams of morphine equivalency as a whole.

20 BY MR. KNAPP:

21     Q.   So you assume in your model that all

22 opioids have the same likelihood of contributing

23 to the harms that you analyzed regardless of the

24 particular characteristics of the opioid, is

1  that right?

2          MR. SOBOL:  Objection.

3      A.   No, that's not the way I would phrase

4  it.

5  BY MR. KNAPP:

6      Q.   Well, so, for example, you treated,

7  after making your MME adjustment, you treated

8  oxycodone and hydrocodone as if they were the

9  same, right?

10         MR. SOBOL:  Objection.

11     A.   What we are estimating in these models

12 is the average impact, so the impact of the

13 average shipments on -- at least in the direct

14 model we're estimating the impact of the average

15 shipments on harms.  That doesn't have to mean

16 that each individual drug has the same impact;

17 it rather means that what we're getting is on

18 net the relationship between them, that is the

19 average relationship.

20 BY MR. KNAPP:

21     Q.   Did you make any adjustments in your

22 model for the active ingredient included in any

23 of the opioid shipments that you looked at?

24     A.   I did not estimate the model

1  separately for different active ingredients.

2      Q.   And you understand that different

3  types of opioids have different potential risks

4  for abuse and addiction, right?

5      A.   I'm not a toxicologist, so I don't --

6  I do not have an expert opinion as to whether

7  different types of opioids have different

8  potential for addiction.

9      Q.   But you assume for purposes of your

10 report, at least implicitly, that all different

11 types of opioid medicines that you looked at in

12 your report were equally likely to contribute to

13 harms, right?

14         MR. SOBOL:  Objection.

15     A.   No, that's not correct.

16 MR. KNAPP:

17     Q.   How did you adjust for the -- other

18 than the morphine milligram equivalent

19 adjustment that you made, how did you account

20 for the different characteristics of particular

21 types of opioids?

22     A.   If you're asking about the direct

23 model, again what we're estimating here is the

24 average effect, so it is the average impact of

1  opioid shipments in MMEs on harms.  That does
2  not require that each medication have the same
3  impact.  Rather, it's saying what is the typical
4  relationship between shipments of MMEs and harms
5  across areas.
6       To the extent that different
7  medications have different harms and that they
8  were shipped differently in different areas,
9  that would then be one of the factors that is in
10  the residual.  That would be a difference across
11  areas.  But the model does not require that the
12  harms be the same for each particular type of
13  opioid.
14     Q.   So looking back at Paragraph 31, it
15  says "The analysis presented here does not
16  attempt to uniquely apportion."  What does
17  "uniquely apportion" mean in that sentence?
18     A.   When the sentence says the article --
19  "The analysis presented here does not attempt to
20  uniquely apportion harm resulting from actions
21  by any individual type of defendant," uniquely
22  in terms of estimating each individual
23  defendant's contribution to the total harm.
24     Q.   So, for example, you don't have any

1  opinion regarding any harms that were
2  specifically caused by Allergan Finance, right?
3     A.   In this model we -- I do not have any
4  particular -- I do not have any harms that are
5  attributed to any particular defendant.
6     Q.   And so going back to the point that we
7  were just talking about, if a particular
8  defendant manufactured or distributed a type of
9  opioid that had less risk for abuse than other
10  types of opioids, your model doesn't make any
11  adjustments in terms of allocating percentages
12  of harm to that defendant based upon the types
13  of opioids that they sold?
14          MR. SOBOL:  Objection.
15     A.   In this model there is no allocation
16  to any single defendant, and so, therefore --
17  let me just say there is no -- there is no
18  allocation to any single defendant.
19  BY MR. KNAPP:
20     Q.   Well, isn't it possible, Professor
21  Cutler, that you could rule out certain
22  defendants as having contributed to some of the
23  harms that you looked at?
24          MR. SOBOL:  Objection.

1     A.   The model that I have here is not
2  designed to do that.  One would need to develop
3  a different model to do that for each specific
4  defendant.  I haven't developed that model.
5  BY MR. KNAPP:
6     Q.   Well, let's just say that a
7  manufacturer didn't start manufacturing
8  prescription opioids until 2010, okay?  That's
9  the hypothetical here.  Your model would
10  attribute harms from 2006 to 2009 to that
11  defendant, correct?
12          MR. SOBOL:  Objection.
13  BY MR. KNAPP:
14     Q.   As part of the group of defendants,
15  they are attributed harm according to your
16  model, is that right?
17          MR. SOBOL:  Objection.
18     A.   What the model gives is the harm that
19  results from all the defendants together.  If
20  the court wished to know about the impact of any
21  individual defendant, the way to do that would
22  be through the inputs that Professor Rosenthal
23  provides where she provides the share of
24  shipments in each year that are a result of

1  misconduct.  In the case of the model here, she
2  provides the share of the shipments in each year
3  that are a result of misconduct on the part of
4  defendants as a whole.  If one had data on the
5  share of shipments that result from a specific
6  defendant in a particular year, one could feed
7  that into the model here and calculate -- the
8  model that I developed and calculate the harms
9  from that.
10  BY MR. KNAPP:
11     Q.   But you haven't done that here, right?
12     A.   I have not done anything with respect
13  to any specific defendant.
14     Q.   And so to the extent that a defendant
15  wasn't marketing, manufacturing, or distributing
16  from 2006 to 2009, you still attribute harm to
17  that defendant, correct?
18          MR. SOBOL:  Objection.
19     A.   That's not correct.
20  BY MR. KNAPP:
21     Q.   Why is that not correct?
22     A.   It's not correct because it is
23  attributing the harm to the defendants as a
24  whole.  It is not attributing it to any specific

1  defendant.  And there is nothing in this report

2  that says in order to attribute it to a specific

3  defendant, follow the following procedure.

4      Q.   All right.  In Paragraph 31 you also

5  refer to indivisible harms.  What are

6  indivisible harms?

7      A.   Can you just refer me to the very

8  specific wording?

9      Q.   It's in Paragraph 31, it's in the

10  third line.

11      A.   Thank you very much.

12          An indivisible harm is a harm where --

13  at least as I was using the term, it's a harm

14  where multiple parties may be responsible for

15  the same harm.

16          So, for example, in a situation where

17  a manufacturer inappropriately promotes a

18  medication and where a distributor

19  inappropriately does not flag a suspicious

20  shipment, then that is an indivisible harm, at

21  least as I'm using the word, because there are

22  multiple parties, that each were at fault.

23      Q.   And how did you determine that the

24  harms that you analyzed in your report were

---

1  indivisible?

2          MR. SOBOL:  Objection.

3          You may answer.

4      A.   I did not make a -- I did not make a

5  determination in this report as to which

6  specific harms resulted from, for example,

7  manufacturers and which specific harms resulted

8  from distributors, so I did not do a division of

9  the harms that way.

10  BY MR. KNAPP:

11      Q.   My question was, how did you determine

12  that these particular harms were indivisible?

13          MR. SOBOL:  Objection.

14      A.   This is a statement not that I

15  determined that, but rather it was a reason why

16  I was bolstering the argument in the first

17  sentence, which is in part why I did not try to

18  uniquely apportion harm.  And I was giving an

19  example of why one might not want to try to

20  uniquely apportion harm as a specific example of

21  which might be harms that are indivisible.

22  BY MR. KNAPP:

23      Q.   So do you -- strike that.

24          Do you have an opinion whether these

---

1  harms are indivisible, or are they divisible?

2      A.   I do not have an opinion about that.

3      Q.   All right.  If we go to the next

4  clause of that sentence, it says "It is unlikely

5  that a unique attribution of harm to each

6  contributing" possible -- "each contributing" --

7  excuse me -- "party is possible."

8          Do you see that?

9      A.   Yes, I do see that.

10      Q.   Why is it unlikely?

11      A.   I'm going to tell you what I meant,

12  which was economics language, and that may not

13  be -- I'm not sure I'm going to get the legal

14  words correctly, so just to give you that.

15          As an economic matter, if there is a

16  harm which both parties are responsible for the

17  full extent of the harm, for example, one party,

18  the manufacturer, is engaged in misconduct in

19  promoting the medication inappropriately and

20  another party, the distributor, engaged in

21  misconduct by not noting the suspicious

22  shipments, then in essence both are responsible

23  for the harm, and as an economic matter one

24  could not assign a percentage of the blame to

---

1  each party because the harm would not have

2  occurred unless -- it had to be the case that

3  both parties failed their responsibilities in

4  order for the harm to occur.

5      Q.   And so here did you conclude that it's

6  impossible to uniquely attribute harm to each

7  contributing party?

8          MR. SOBOL:  Objection.

9      A.   No, I did not conclude that it was

10  impossible to do so.  I merely noted why I was

11  not doing so here.

12  BY MR. KNAPP:

13      Q.   So -- strike that.

14          Do you agree that there are parties

15  that are not defendants here that contributed to

16  the harms that you analyzed in your report?

17          MR. SOBOL:  Objection.

18      A.   That sentence is too vague for me to

19  give you a yes or no answer to.

20  BY MR. KNAPP:

21      Q.   Do you believe that there are

22  individuals or entities that contributed to the

23  harms that you analyzed that are not defendants

24  in this lawsuit?

1    MR. SOBOL:  Objection.

2    A.    I don't make a determination here as

3  to who gets what portion of the blame, so that's

4  not -- that's not an area that I have an opinion

5  upon.

6  BY MR. KNAPP:

7    Q.    Your model cannot rule out that there

8  are individuals or entities that contributed to

9  the harms that you analyzed that are not

10  defendants in this case?

11    MR. SOBOL:  Objection.

12    A.    I haven't made any -- the model does

13  not rely upon any specific delineation as to who

14  it was that caused the harm.

15  BY MR. KNAPP:

16    Q.    Now, Professor Cutler, that wasn't my

17  question.

18       My question was, your model does not

19  rule out that there are individuals or entities

20  that contributed to the harms that you analyzed

21  who are not parties to this lawsuit?

22    MR. SOBOL:  Objection.  Asked and

23  answered twice.

24    A.    Again, I haven't made any

1  determination as to who are the parties at fault

2  here.

3  BY MR. KNAPP:

4    Q.    All right.  Let's turn to Paragraph 3

5  of Appendix J, which is towards the back.  All

6  right.  I'm looking on the second page of

7  paragraph -- sorry, Paragraph 3 which goes on to

8  the second page, Page 2.

9       Do you see the first full sentence?

10  It says "As an economic matter, manufacturers

11  are appropriately held liable for at least the

12  10 percent of the harm that distributors could

13  not have avoided."

14       That refers back to the prior

15  sentence, right?

16    A.    That is correct, yes.

17    Q.    What does it mean to be held liable as

18  an economic matter?

19    MR. SOBOL:  Objection.

20    A.    As an economic matter, held liable

21  would be that the blame would be attributable to

22  them economically.

23  BY MR. KNAPP:

24    Q.    And you say that if the share of the

1  harm attributed to manufacturers is greater than

2  the share of harms that could have been avoided

3  by distributors, that the manufacturers are

4  liable for at least the difference, right?

5    A.    Yes, that is correct.

6    Q.    And do you have an opinion on whether

7  the manufacturers are liable for just that

8  difference, or if they're liable for something

9  more than that as an economic matter?

10    A.    As an economic matter, no, as we were

11  talking about, the harm which is caused by

12  failure on the part of both parties, as an

13  economic matter there's no easy way to attribute

14  it between the different defendants.

15    Q.    And again, when you say there's no

16  easy way, what you mean is you haven't done it?

17    MR. SOBOL:  Objection.

18    A.    What I mean is that one would have to

19  make some type of assumptions to do it.  I have

20  not made any assumptions that would do that.

21  BY MR. KNAPP:

22    Q.    All right.  So if you look at Table

23  J.1, do you see Table J.1 says the

24  percentages -- sorry, "percent of shipments

1  attributable to distributors' misconduct."

2       Do you see that?

3    A.    Yes, I do see that.

4    Q.    Do you know whether the percentage of

5  shipments that you attribute to distributor

6  misconduct in each year is higher, lower, or the

7  same as the percentage of shipments that you

8  attribute to marketing misconduct?

9    MR. SOBOL:  Objection to the form, but

10  he can answer.

11    A.    I have not -- I have not attributed

12  anything specifically to marketers, marketers'

13  misconduct.

14  BY MR. KNAPP:

15    Q.    When I say for -- for purposes of this

16  question, when I say marketing misconduct, I

17  mean the part of your analysis that relies on

18  the percentages from Professor Rosenthal's

19  report.  Do you understand that?

20    A.    Okay.  That -- so just to be clear,

21  that's not what I -- the word marketing is what

22  threw me off there since Professor Rosenthal

23  gave me an estimate which is not specific just

24  to marketers.

1    Q.   What is your understanding of what the
2    percentages are that you got from Professor
3    Rosenthal?
4    A.   Professor Rosenthal gave me an
5    estimate of the share of shipments which are due
6    to misconduct on the part of the defendants as a
7    whole.
8    Q.   And so you don't understand Professor
9    Rosenthal's percentages to be attributed to any
10   particular defendant group, is that your
11   understanding?
12   A.   That is my understanding of Professor
13   Rosenthal's percentages.
14   Q.   And what is your understanding of the
15   alleged misconduct that Professor Rosenthal was
16   looking at?
17       MR. SOBOL:  Objection.  Asked and
18   answered.
19   A.   Professor Rosenthal was looking at the
20   misconduct on the part of the manufacturers in
21   terms of promoting the drugs in an inappropriate
22   way, and of the distributors in terms of failing
23   to identify, report, and stop suspicious
24   shipments.

1    Q.   Okay.  So do you understand, or do you
2    know whether the percentages in this Table J.1
3    that you say are attributable to distributors'
4    misconduct are higher, lower, or the same as the
5    percentages of harm that Professor Rosenthal
6    attributes to defendants' misconduct?
7        MR. SOBOL:  Objection.
8    A.   Let me say one thing first about Table
9    J 1.  These numbers were provided to me by
10   counsel, so I did not calculate them.  I think
11   you said when -- "the numbers that you provide."
12   So they are in the appendix to my report, but
13   they are numbers that were provided to me by
14   counsel, and they were not numbers that I --
15   that I am saying -- I am not giving the opinion
16   that these numbers are correct percentages
17   associated with distributors' misconduct.
18   BY MR. KNAPP:
19   Q.   But can you answer my question?  Do
20   you need me to read it back?
21       MR. SOBOL:  Objection.
22   A.   Yes, please read the question back.
23   BY MR. KNAPP:
24   Q.   Do you know whether the percentages in

1    this Table J.1 that you attribute to
2    distributors' misconduct are higher, lower, or
3    the same as the percentages of harm that
4    Professor Rosenthal attributes to defendants'
5    misconduct?
6        MR. SOBOL:  Objection.
7    A.   I'd want to look specifically at the
8    comparable table from Professor Rosenthal to see
9    about each year.
10   BY MR. KNAPP:
11   Q.   So you don't know?
12       MR. SOBOL:  Objection.  Asked and
13   answered.
14   A.   Not for each year, no.
15   BY MR. KNAPP:
16   Q.   Do you know for any year?
17       MR. SOBOL:  Objection.  Asked and
18   answered.
19   A.   If you'd like, I would be happy to
20   look at the specific table.
21   BY MR. KNAPP:
22   Q.   Well, what is the relationship between
23   the percentages in Table J.1 and the percentages
24   that you received from Professor Rosenthal?

1        MR. SOBOL:  Objection.
2    BY MR. KNAPP:
3    Q.   Is there any relationship?
4        MR. SOBOL:  Objection.
5    A.   The percentages in Table J.1 were from
6    Mr. McCann.  I was not involved, obviously, in
7    Mr. McCann's report.  Those numbers were
8    provided to me by counsel.  My purpose in
9    including them here was to let the court know
10   that if it wished, one could take -- if the
11   court wished, I could take estimates of the harm
12   resulting from a particular group of defendants,
13   in this case the distributors, and calculate the
14   harms that would come from that.
15       These numbers, I am not -- I am not
16   testifying -- it is not my opinion that these
17   numbers are the correct numbers.  They were
18   given to me by counsel who asked if these were
19   the correct numbers, what would be the harm that
20   would -- that your model would estimate from
21   that.
22   BY MR. KNAPP:
23   Q.   So, Professor Cutler, I really need
24   you to focus on the question that I'm asking and

1   just answer that question.

2        MR. SOBOL:  Objection.  He has been.

3   BY MR. KNAPP:

4        Q.   My question is, what is your

5   understanding of the relationship between the

6   percentages in Table J.1 and the percentages

7   that you received from Professor Rosenthal, if

8   there is any relationship?

9        MR. SOBOL:  Objection.  Asked and

10  answered twice.

11       A.   The estimates in Table J.1 are the

12  estimates of Mr. McCann about the percent of

13  shipments that are attributable to distributors'

14  misconduct.  The estimates from Professor

15  Rosenthal are her estimates of the percent of

16  shipments attributable to misconduct on the part

17  of the defendants as a whole.

18  BY MR. KNAPP:

19       Q.   Do you contend that the distributors

20  should have stopped a greater percentage of

21  shipments than Professor Rosenthal attributes to

22  the defendants as a whole?

23       MR. SOBOL:  Objection.

24       A.   I'm not -- I'm not giving an expert

---

1   opinion as to whether Mr. McCann's numbers are

2   correct or incorrect, or how Mr. McCann's

3   numbers compare with Professor Rosenthal's

4   numbers.  What I'm doing here is I'm saying -- I

5   am demonstrating to the court that one can use

6   estimates of shipments attributable to any

7   particular category of defendants and use that

8   to estimate the harms that result from that.

9   BY MR. KNAPP:

10       Q.   All right.  Let's look at Page 62 of

11  your report.  Maybe keep your hand on Table J.1

12  because we're going to compare them.

13       So on Page 62, column C, there's a

14  column for percent of shipments attributable to

15  defendants' misconduct, and that's the

16  percentage you got from Professor Rosenthal,

17  right?

18       A.   That is correct.

19       Q.   Okay.  So let's just take -- why don't

20  we take 1997.  The number of shipments

21  attributable to defendants' misconduct in 1997

22  from Professor Rosenthal is 18.2 percent, right?

23       A.   That is correct.

24       Q.   All right.  Now let's go back to J 1.

---

1   The percent of shipments attributable to

2   distributors' misconduct in 1997 is

3   49.9 percent.

4        Do you see that?

5        A.   Yes, I do see that.

6        Q.   What caused the shipments -- the

7   incremental difference in shipments that the

8   distributors -- you say the distributors --

9   strike that.  What is the cause -- strike that.

10       Why is the percent in Table J.1 for

11  1997 higher than the percent from Professor

12  Rosenthal's report?

13       MR. SOBOL:  Objection.

14       A.   I am not -- I don't have an expert

15  opinion on the analysis that Mr. McCann did, so

16  I don't have a view as to the primary sources of

17  the difference between what Mr. McCann did and

18  what Professor Rosenthal did.

19       My purpose in this appendix is to show

20  the court how such an analysis could be used to

21  estimate harms, not to decide which of these two

22  estimates here is more appropriate.

23  BY MR. KNAPP:

24       Q.   And you also don't have an opinion --

---

1   strike that.

2        Do you have an opinion on why the

3   distributors should have stopped approximately

4   30 percent more shipments in 1997 than that are

5   attributable to defendants' misconduct?

6        MR. SOBOL:  Objection.  Form.

7        A.   I'm not -- I'm not testifying to the

8   accuracy of Mr. McCann's analysis here.  I'm

9   showing the court how an estimate of the harms

10  associated with a particular class of defendants

11  could -- how the shipments associated with

12  misconduct on the part of any particular class

13  of defendants could be used to estimate the

14  harms from those defendants.

15  BY MR. KNAPP:

16       Q.   Do you know or have any opinion on

17  whether the percentages in Table J.1 are

18  reasonable in any way?

19       MR. SOBOL:  Objection.

20       A.   I'm not -- I do not have an opinion as

21  to whether the estimates in Table J.1 are

22  correct or incorrect.

23  BY MR. KNAPP:

24       Q.   And what about the percent of

1  shipments attributable to defendants' misconduct

2  in column C of Table 3.9, those are percentages

3  from Professor Rosenthal's report, right?

4      A.   That's correct.  Column C of Table 3.9

5  is from Professor Rosenthal's report.

6      Q.   Do you have an opinion on whether

7  those numbers are reasonable or correct?

8      A.   I -- as an economic matter, I

9  understand what Professor Rosenthal did, and it

10  makes a good deal of economic sense, yes.

11     Q.   Do you have an opinion on whether the

12  numbers in column C are correct?

13         MR. SOBOL:  Objection.

14     A.   I believe that the methodology in

15  column C is correct, and that the data are

16  appropriate, and that these are appropriate

17  estimates.

18  BY MR. KNAPP:

19     Q.   Now, Professor Cutler, you would agree

20  that if the percentages in Table 1, Table J.1 of

21  your Appendix J, III.J, if the percentages there

22  are higher than the percentages that you got

23  from Professor Rosenthal, something other than

24  defendants' misconduct had to cause those

1  shipments, right?

2         MR. SOBOL:  Objection.

3      A.   No, I don't agree with that.

4  BY MR. KNAPP:

5      Q.   Well, Professor Rosenthal is

6  identifying the percentage of shipments that are

7  attributable to defendants' misconduct, right?

8      A.   That's correct.

9      Q.   And so what would cause the additional

10  percentage of prescriptions that are included in

11  Table J.1 that are identified as attributable to

12  distributor's misconduct?

13         MR. SOBOL:  Objection.  Scope.

14     A.   I don't know -- as I've said, I don't

15  know exactly how Mr. McCann did his analysis.

16  It can be the case that different people can

17  choose different types of analysis and reach

18  different numbers.  The fact that two

19  individuals have estimates that are not exactly

20  the same does not mean automatically that there

21  is an additional party responsible.  It might

22  mean that the methodologies give different

23  results, and that one should then compare the

24  methodologies in greater detail to see which of

1  those methodologies is the more plausible

2  methodology.

3         MR. KNAPP:  Why don't we take a break,

4  and we can pick up here.

5         THE VIDEOGRAPHER:  The time is

6  10:39 a.m., and we're off the record.

7         (Whereupon, a recess was taken.)

8         THE VIDEOGRAPHER:  The time is

9  11:03 a.m., and we're on the record.

10         MR. BADALA:  Quickly before you start,

11  we just want to confirm something.  Is Carol

12  Rendon or anyone from Baker Hostetler on the

13  phone?  I just had to, you know, state our

14  objection to any involvement of Carol Rendon or

15  Baker Hostetler at the deposition.

16  BY MR. KNAPP:

17     Q.   Okay.  On paragraph -- let's turn back

18  to Paragraph 31 of your report.  The fourth --

19  sorry, one, two, three, four, five -- fifth

20  line, it says "However, as noted, such harms

21  cannot be solely attributable to manufacturers

22  since some harm could have been prevented had

23  all registrants of the CSA, including

24  distributors, met their legal obligations."

1         Do you see that?

2      A.   Yes, I do see that.

3      Q.   Is what you're referring to there that

4  people or entities further down the causal chain

5  between marketing by a manufacturer and someone

6  overdosing on an opioid could have acted to

7  prevent those harms?

8         MR. SOBOL:  Objection.  Form.

9      A.   In the specifics of this sentence,

10  what I'm referring to is the fact that one

11  doesn't want to think about the harms as

12  resulting just from the marketing.

13         And the specific example that I have

14  in mind is that there were at least two sources

15  of fault here, one is the manufacturers, and

16  then second is the distributors who did not meet

17  their legal obligation in this case, so that not

18  all of the harm, even if it's -- even if it's

19  related to the marketing, not all of the harm is

20  just from the marketing component.

21  BY MR. KNAPP:

22     Q.   And you focused on distributors based

23  upon what you say is obligation under the CSA,

24  right?

1    A.   Yes, that is correct.

2    Q.   Isn't it the case that there's other

3  entities between a manufacturer marketing to a

4  doctor and someone overdosing on an opioid that

5  also could have prevented the harms?

6    A.   Prevented is difficult.  There are, of

7  course, many entities in the causal chain here.

8  The one that I focus on specifically is the

9  contribution of the defendants in this case.

10   Q.   Who are the other entities in the

11  causal chain that you did not focus on in your

12  report?

13       MR. SOBOL:  Objection.

14   A.   I don't have a delineation because I

15  didn't seek -- I did not identify them

16  specifically.  There -- I'll just take one

17  example here, which is a number of physicians

18  have faced consequences of overprescribing --

19  inappropriately prescribing opioid medication,

20  and so that is one example of another party that

21  may be responsible for the misconduct here.

22  BY MR. KNAPP:

23   Q.   Your model doesn't attribute any share

24  of the harms to prescribing doctors, does it?

1        MR. SOBOL:  Objection.

2    A.   The model that I built doesn't by

3  itself attribute the harms to any specific

4  party.  It then takes as an input estimates of

5  the harms that result from misconduct of

6  particular parties, in this case Professor

7  Rosenthal's estimates of the misconduct

8  resulting from the defendants in this

9  litigation, and then it estimates the harms that

10  result from that.  But by itself the model does

11  not consider any specific party.

12  BY MR. KNAPP:

13   Q.   And so based upon the inputs in your

14  model, you can't say whether any particular

15  defendant is economically responsible for any of

16  the harms you looked at, right?

17       MR. SOBOL:  Objection.

18   A.   The specifics of this model are to

19  look at the relationship between misconduct and

20  harms.  I then use as an input the estimate of

21  misconduct that's estimated by Professor

22  Rosenthal to have resulted from the defendants

23  in this case, and therefore, I show the harms

24  that result from the actions of the defendants

1  in this case.

2  BY MR. KNAPP:

3    Q.   My question was, based upon the inputs

4  in your model, you can't say whether any

5  particular defendant is responsible for any of

6  the harms that you analyzed in your report,

7  right?

8        MR. SOBOL:  Objection.  Asked and

9  answered several times.

10   A.   My report does not delineate the harms

11  that result from any specific defendant.

12  BY MR. KNAPP:

13   Q.   So the answer is you can't say whether

14  any particular defendant caused any of the

15  particular harms that you analyzed, correct?

16       MR. SOBOL:  Objection.  Asked and

17  answered several times.

18   A.   I'm going to be very precise.  The

19  model shows the harms that result from shipments

20  of medications.  It then uses as an input the

21  harms -- the shipments that are a result of

22  misconduct on the part of the defendants.  It

23  does not give an answer for the harms that

24  result from any single defendant.

1  BY MR. KNAPP:

2    Q.   Okay.  We talked about doctors as

3  entities who potentially could have prevented

4  these harms.  What about insurers who reimburse

5  prescriptions after evaluating medical

6  necessity, could they have prevented any of the

7  harms that you analyzed?

8        MR. SOBOL:  Objection.  Beyond the

9  scope of the report.

10   A.   The report doesn't talk about any

11  specific entity that -- doesn't give specifics

12  on any specific entity that should have done

13  anything other than to say that with the

14  estimates that Professor Rosenthal gives of the

15  misconduct, I can then give the harms that

16  result from that.

17  BY MR. KNAPP:

18   Q.   That wasn't my question.

19       So my question was, could insurers who

20  reimburse prescriptions after evaluating medical

21  necessity have prevented any of the harms you

22  analyzed in your report?

23       MR. SOBOL:  Objection.  Scope, asked

24  and answered.

```
 1        A.   I haven't made a quantitative
 2   assessment of whether insurers should have been
 3   able to prevent the harms or not.
 4   BY MR. KNAPP:
 5        Q.   You're not able to rule out insurers
 6   as having potentially contributed to the harms
 7   you analyzed in your report, right?
 8             MR. SOBOL:  Objection.  Scope of his
 9   report.  Answered previously.
10        A.    The report does not rule out any
11   specific other entity.  And in fact, in the
12   report not all of the harms are attributed to
13   the defendants here, so I'm not -- I'm also not
14   attributing 100 percent of the harms to the
15   defendants here.
16   BY MR. KNAPP:
17        Q.   What about drug dealers who sell
18   illicit opioids, could they have prevented any
19   of the harms that you listed in your report?
20             MR. SOBOL:  Objection.
21        A.   I haven't done a specific analysis of
22   drug dealers to determine whether they should
23   have -- whether they might have done something,
24   so I think what you're asking is -- I'm not
```

```
 1   going to put words in your mouth.  That's a
 2   mistake.
 3             In order to answer a question like
 4   that, for sure one would need to do an economic
 5   analysis of the relevant party or parties.  I
 6   haven't done an economic analysis of the
 7   relevant parties to say, oh, okay, either
 8   insurers or drug dealers should have been able
 9   to do X or Y.
10   BY MR. KNAPP:
11        Q.   And so you're not able to rule them
12   out as contributing to the harms you analyzed in
13   your report, right?
14             MR. SOBOL:  Objection.  Asked and
15   answered, scope.
16        A.    The report does not rule them -- does
17   not rule out any single defendant or rule in any
18   single defendant as causing -- or non-defendant
19   as causing a specific harm.
20   BY MR. KNAPP:
21        Q.   And that would be true of cartels as
22   well, right?
23             MR. SOBOL:  Objection.
24             What true?
```

```
 1        A.   I'm sorry, what would be true?  Can
 2   you just repeat the question?
 3   BY MR. KNAPP:
 4        Q.   It would be -- strike that.
 5             You can't rule out cartels that sell
 6   illicit opioids as contributing to any of the
 7   harms that you analyzed in your report, right?
 8        A.   I have not made a determination about
 9   any specific individual or group of individuals.
10        Q.   You can't rule out cartels as
11   contributing to the harms you analyzed in your
12   report, can you?
13             MR. SOBOL:  Objection.  Scope, asked
14   and answered.
15        A.   I haven't -- I haven't estimated any
16   harm to any specific entity or individual or
17   company.
18   BY MR. KNAPP:
19        Q.   Is there something you don't
20   understand about my question?
21             MR. SOBOL:  Objection.  I think he
22   answered the question, so given your prior
23   instruction to him this morning, he did
24   understand it.
```

```
 1             There's no question before you.
 2   BY MR. KNAPP:
 3        Q.   There is a question pending.  Is there
 4   something you don't understand about my
 5   question?
 6        A.   I haven't done an economic analysis of
 7   any of those specific organizations, so I don't
 8   have a basis to say that I either rule them in
 9   or out.
10        Q.   And you don't have a basis to rule in
11   or rule out pill mills as contributing to the
12   harms you analyzed in your report, right?
13             MR. SOBOL:  Objection.  Scope.
14        A.   That's correct.
15   BY MR. KNAPP:
16        Q.   And you don't have a basis to say
17   whether internet sellers of illicit opioids
18   contributed to the harms you analyzed in your
19   report?
20             MR. SOBOL:  Objection.  Scope, form.
21        A.   That's correct, I have not analyzed
22   them.
23   BY MR. KNAPP:
24        Q.   And you don't have a basis to say
```

1  whether individuals who divert opioids

2  contributed or did not contribute to the harms

3  you analyzed in your report?

4          MR. SOBOL:  Objection.  Scope, form.

5      A.  That's correct.  In this report I do

6  not make any determination about that.

7  BY MR. KNAPP:

8      Q.  You can't rule out the DEA as

9  contributing to any of the harms you analyzed in

10  your report, can you?

11          MR. SOBOL:  Objection.  Scope, form.

12      A.  I have not -- no, I have not

13  modelled -- I have not come up with an empirical

14  estimate of the impact of the DEA.

15  BY MR. KNAPP:

16      Q.  You're not able to rule out the FDA as

17  contributing to any of the harms that you

18  analyzed in your report, are you?

19          MR. SOBOL:  Objection.  Scope, form.

20      A.  No, I haven't ruled in or out any

21  action by the FDA.

22  BY MR. KNAPP:

23      Q.  And you haven't -- strike that.

24          You can't rule out the State of Ohio

1  as contributing to any of the harms you analyzed

2  in your report, right?

3          MR. SOBOL:  Objection.  Scope, form.

4      A.  That's correct, I have not done any

5  assessment of any of the consequence of any

6  action by the State of Ohio.

7  BY MR. KNAPP:

8      Q.  You can't rule out law enforcement as

9  contributing to the harms you analyzed in your

10  report, right?

11          MR. SOBOL:  Objection.  Scope, form.

12      A.  Correct, I cannot -- I have not

13  reached any conclusions about the impact of law

14  enforcement.

15  BY MR. KNAPP:

16      Q.  Now, going back to the DEA and FDA,

17  don't you and Professor Gruber attribute some of

18  the post 2010 market contraction to actions

19  taken by the DEA and FDA?

20          MR. SOBOL:  Objection.  Scope, form.

21      A.  The DEA and the FDA were both

22  responding to the opioid epidemic, so their

23  actions were not coming out of the blue.  And so

24  they -- whatever consequences there were, I

1  think it's -- they were trying to act with

2  respect to the opioid epidemic, and then that

3  played into other things that were going on.

4  BY MR. KNAPP:

5      Q.  So my question was, don't you and

6  Professor Gruber attribute some of the post 2010

7  market contraction to actions taken by the DEA

8  and FDA?

9          MR. SOBOL:  Objection.  Form.

10      A.  It's a complex answer so I want to

11  differentiate two things.  The first is whether

12  specific actions such as the reformulation of

13  OxyContin to be abuse-deterrent had any impact

14  on the shift from legal to illegal opioids.  The

15  answer to that in the literature is very clearly

16  yes.  That is, the reformulation of OxyContin,

17  for whatever reasons it was done, did have an

18  impact on the increased use and misuse of

19  illegal opioids.  So that's one part of the

20  answer.

21          A second part of the answer is that

22  that is not coming out of nowhere.  So as an

23  economic matter, you have to say, were there

24  precursors to that that laid the groundwork for

1  subsequent harms, and the precursors to that

2  were the fact that many people were addicted to

3  legal opioids at the time.

4          And so the actions affected --

5  actions, for example reformulation of OxyContin,

6  affected harms in part because of other prior

7  actions, and one shouldn't think of the policy

8  as just coming out of the blue there.

9  BY MR. KNAPP:

10      Q.  So from an economic perspective, when

11  you have to look at precursors, how far back do

12  you go?  Because you've said you didn't look at

13  any actions taken by the FDA in approving these

14  medications and whether they contributed to the

15  harms, so where do you draw the line, Professor

16  Cutler?

17          MR. SOBOL:  Objection.  Form.

18      A.  In this specific report I build a

19  model to translate shipments into harms --

20  shipments into harms.  One would then feed that

21  into the model by attributing a certain share of

22  the shipments to actions of different

23  individuals or companies.  One would then have

24  to make a determination, an economic empirical

1   determination as to what the harm -- where the

2   harm -- what entity or individual organization

3   caused the harm.

4         And as we were talking about earlier,

5   there may be harms that for which there are

6   multiple factors that go into it, any one of

7   which might have prevented it.  So, for example,

8   the fact that there were many people addicted to

9   opioid medications combined with the fact that

10  one of those opioid medications was made

11  abuse-deterrent then led people to move into

12  illegal opioids.  The assignment of blame or of

13  attribution is difficult in that circumstance

14  for the reason we were talking about earlier,

15  which is the fact that multiple factors

16  contributed to it, and so, therefore, one has to

17  make an economic determination about that.

18        In this specific report I did not make

19  a determination about who was responsible for

20  that particular harm, other than as I used the

21  estimates from Professor Rosenthal.

22  BY MR. KNAPP:

23       Q.  Do you have an opinion on whether the

24  defendants here are jointly and severally liable

---

1   for all the harms that you identified?

2         MR. SOBOL:  Objection.

3       A.  I do not have a legal opinion on that,

4   no.  I have only economic opinions.

5   BY MR. KNAPP:

6       Q.  And you don't have an economic opinion

7   on whether the defendants here are jointly or

8   severally liable for the harms you analyzed?

9         MR. SOBOL:  Objection.  Scope, form.

10      A.  I have not done an economic analysis

11  to apportion the harm to any specific defendant

12  or group of defendants.  I use the estimate of

13  that that comes from Professor Rosenthal in my

14  calculations.

15  BY MR. KNAPP:

16      Q.  And so you haven't attempted to

17  establish a causal relationship between any

18  defendant's conduct and the harms you analyzed,

19  correct?

20        MR. SOBOL:  Objection.  Scope, form,

21  asked and answered.

22      A.  The model -- the model can be used to

23  apportion the harms that are directed to any

24  specific defendant or group of defendants, so

---

1   the model is designed -- excuse me, the model is

2   designed to show how shipments translate into

3   harms, and then using the estimates of the harms

4   that -- using the estimates of the shipments due

5   to misconduct that come from Professor

6   Rosenthal -- excuse me -- that come from

7   Professor Rosenthal, it then turns those into

8   estimates of harms.

9         I myself in building the model did not

10  say -- did not make the model dependent on the

11  harm of any specific company or group of

12  companies.

13      Q.  So your model didn't establish a

14  causal connection between defendants' conduct

15  and the harms you analyzed?  Your personal

16  model.

17      A.  I'd like to break that into two parts.

18  There's the impact of the defendants' misconduct

19  on the shipments of opioids.  That model is done

20  by Professor Rosenthal.  That's not my model.

21        The model that I have then makes a

22  causal determination as to the harms that result

23  from the shipments of opioids.  That is a causal

24  statement that I am making in my model.

---

1       Q.  Professor Cutler, I'm going to try to

2   ask this one more time.

3         Your model, your personal model, the

4   regression model that you built, set aside what

5   Professor Rosenthal did, did not connect any

6   defendant's conduct to any of the harms you

7   looked at, correct?

8         MR. SOBOL:  Objection.  Asked -- he

9   just answered the question.

10      A.  As a component of the model, it is not

11  in there.  As an output of the model when given

12  the outputs of Professor Rosenthal, it then uses

13  those estimates to produce a causal estimate.

14      Q.  So you rely on Professor Rosenthal to

15  establish the causal connection between --

16  strike that.

17        You rely on Professor Rosenthal to

18  establish the alleged causal connection between

19  defendants' misconduct and the harms that you

20  analyzed?

21        MR. SOBOL:  Objection.  Asked and

22  answered.

23      A.  No.  I rely on Professor Rosenthal to

24  assess the relationship between the misconduct

1   on the part of the defendants and the shipments

2   of opioid medication, not rely on her to measure

3   the harms, but to measure the shipments.

4   BY MR. KNAPP:

5       Q.   Okay.  Let's look at Appendix III.B

6   quickly.

7           MR. SOBOL:  Professor Cutler, is there

8   any rhyme and reason for the numbering of these

9   appendices?  Are they intended simply to

10  confuse, sir?

11          THE WITNESS:  They make great sense to

12  an economist.

13  BY MR. KNAPP:

14      Q.   So Appendix III.B is your list of

15  materials considered, right?

16      A.   That is correct, Appendix III.B is the

17  list of materials considered.

18      Q.   Is it a complete list of the materials

19  that you considered for your opinions in this

20  case?

21      A.   If you note the last line of Appendix

22  III.B, it says "And all other documents cited in

23  the report, the tables, or the appendices."

24      Q.   So are all of the materials you

1   considered for your opinions in this case in

2   your Appendix III.B cited in the report, in the

3   tables, or the appendices?

4       A.   Yes, that is correct.

5       Q.   Any other materials beyond that you

6   considered in formulating your opinions?

7       A.   I read widely in areas of health

8   economics, in areas of public economics as we

9   were talking about, in areas of epidemiology,

10  and in areas of healthcare, so I have read many

11  studies associated with opioids, with illegal

12  behavior, with crime, with mortality outcomes,

13  so all of those go into my -- the knowledge base

14  that I use to then build the model.

15          The Appendix III.B shows the very

16  specific inputs that are used to justify the

17  specific choices that I made here, but it's not

18  a complete set of everything that goes into my

19  thinking about how to build models, how to build

20  a model in this specific case, how to think

21  about causality and all the various other

22  issues.

23      Q.   So, Professor Cutler, I know -- I can

24  already tell from having only known you for two

1   hours here you're a very precise guy, so I'm

2   sure you understand that you were obligated to

3   identify the materials that you considered in

4   formulating your opinions, and you're obligated

5   to include them on the list.  So are there any

6   other particular materials or documents that you

7   considered in formulating your opinions here?

8           MR. SOBOL:  Objection.

9       A.   In terms of very specific substantive

10  choices that were made in the model, this is the

11  list.  It may be possible that if you ask me why

12  I approach something a certain way, I may say,

13  oh, well, based on the literature that I know

14  and am an expert in that guided me to think

15  along these directions, but I didn't -- I did

16  not -- I might not have specifically noted that

17  because it would not have been relevant for the

18  specific choice that was made here.

19  BY MR. KNAPP:

20      Q.   All right.  So you list two

21  depositions in your list of materials

22  considered, right?

23      A.   That is correct, I do list two

24  depositions.

1       Q.   How did you figure out which

2   depositions to look at?

3       A.   I was guided in the depositions by

4   counsel who indicated them as being of

5   particular relevance for this.

6       Q.   Did you ask for all of the depositions

7   in this matter?

8       A.   No, I did not ask for all of the

9   depositions in this matter.

10      Q.   Did you ask for all depositions that

11  touched on the subjects of your report?

12      A.   I don't remember the specific request,

13  but it would have been something similar to

14  that.

15      Q.   Would you have wanted to review all of

16  the depositions that touched on the subject

17  matter of your report?

18      A.   Yes, I would have wanted to review all

19  the depositions that touched on the specific

20  matters of this report.

21      Q.   And do you think you did review all of

22  the depositions that touched on the subject

23  matter in your report?

24      A.   Yes, I believe I did review the

1  depositions that touch on the specific subject

2  matter.

3      Q.   Okay.  I think I know the answer, but

4  did you read these depositions?

5      A.   I read parts of these depositions.

6  I'm not a lawyer, so there are vast parts that

7  I couldn't make a lot of sense of.

8          MR. SOBOL:  Oh, come on.

9  BY MR. KNAPP:

10     Q.   That won't be the case for this

11 transcript, I promise you.

12          Okay.  All right.  So then we've got

13 Bates numbered documents listed right below that

14 on Page 4.

15          Do you see that?

16     A.   Yes, I do see that.

17     Q.   And you list, I counted them, you list

18 16 documents that were produced in this

19 litigation, is that right?

20     A.   Yes, that is correct.

21     Q.   Do you know how many documents have

22 been produced in the litigation?

23     A.   No, I don't know how many documents

24 have been produced.

1      Q.   Do you know if it's in the millions?

2      A.   No, I don't know how many documents.

3      Q.   How did you figure out which documents

4  to look at?

5      A.   Generally we looked for documents that

6  would provide the data that we needed to

7  construct the model.  So if there was a

8  particular issue that we needed, like, for

9  example, the number of autopsies that were done

10 and the number with a particular finding as to

11 cause of death, then we would look through

12 documents that indicated that.  So it tended to

13 be based on a specific need for data.

14     Q.   Is it true with documents, like it is

15 for depositions, that you would have wanted to

16 see any of the documents that were produced that

17 touched on the subject matter of your report?

18     A.   Yes, that is correct, I would have

19 wanted to see any documents related to the

20 subject matter of the report.

21     Q.   All right.  If you turn to Page 6,

22 there's data sources.  Did you sign any

23 protective orders to get access to any of this

24 data?

1      A.   The NCHS multiple cause of death data,

2  it's not a protective order, but it's signed

3  under a data use agreement, so one has to agree

4  to the terms of the data use agreement in order

5  to access those data.

6      Q.   Did you sign any other data use

7  agreements?

8      A.   There is -- I believe there is a data

9  use agreement for the IQVIA data.  I -- there

10 were terms under which it was acquired, and I

11 don't know the specific wording to apply to

12 that.

13     Q.   Okay.  I asked before about protective

14 orders and we went to data use agreements, so

15 I'm going to ask, did you sign any protective

16 orders for any of the data that you accessed in

17 connection with your assignment here?

18          MR. SOBOL:  Objection to form.

19     A.   I do not believe there were any

20 protective orders on any of the data.

21 BY MR. KNAPP:

22     Q.   You didn't conduct any interviews as

23 part of your -- the preparation of your report?

24     A.   I personally did not conduct any

1  interviews.  There were members of the team who

2  did conduct interviews.

3      Q.   And where are those interviews listed

4  in your report?  Well, strike that.

5          Let me ask, did you rely on any of

6  those interviews in connection with preparing

7  your report?

8      A.   Those interviews were conducted to

9  determine the areas of activity that the

10 counties undertake for which there might be

11 harms, and to get from the counties their sense

12 about what those harms were.  That was then used

13 to determine the specific areas that we wanted

14 to model the harms in, and then the specific

15 strategy that we might use in order to come up

16 with an appropriate estimate of the harms that

17 would result in those areas.

18     Q.   Were those interviews conducted by

19 Compass Lexecon?

20     A.   There were a number of sources.  Some

21 of the interviews were conducted by Compass

22 Lexecon, some were conducted -- I believe

23 Professor McGuire conducted some, although I

24 don't want to be 100 percent on that, but I

1 believe he did some. And then some were from --
2 were conducted with attorneys who then relayed
3 the results of the discussions.
4      Q.   Did you personally participate in any
5 of those interviews?
6      A.   No, I did not personally participate
7 in any of the interviews.
8      Q.   And -- strike that.
9           Do you know who any of the individuals
10 were that were interviewed?
11      A.   No, I don't know any of the specific
12 individuals that were interviewed.
13      Q.   Your understanding is that they
14 helped -- well, let me ask -- strike that and
15 let me ask this.
16           Did Professor McGuire identify the
17 areas for which you analyzed harms, or did you
18 independently come up with that list yourself?
19           MR. SOBOL:  Objection.
20           Go ahead.
21           THE WITNESS:  I'm sorry?
22           MR. SOBOL:  Go ahead.
23      A.   Professor McGuire was the one who came
24 up with the areas.  We then discussed them all

1 as a group.
2 BY MR. KNAPP:
3      Q.   When you say you discussed them as a
4 group, who was -- who participated in those
5 discussions?
6      A.   Professor Gruber, Professor Rosenthal,
7 Professor McGuire, me, the team at Compass
8 Lexecon, and the attorneys.
9      Q.   Was Professor McCann involved in any
10 of those discussions?
11      A.   Professor McCann was not involved in
12 those discussions.
13      Q.   Why not?
14           MR. SOBOL:  Objection to the form.
15      A.   I don't -- I suppose mostly in the
16 interest -- mostly in the interest of keeping
17 the team at a workable level.
18 BY MR. KNAPP:
19      Q.   Did you have any conversations with
20 Professor McCann prior to issuing your report?
21           MR. SOBOL:  That's a yes or a no.
22      A.   No, I did not have any conversations
23 with Professor McCann.
24 BY MR. KNAPP:

1      Q.   So to the extent that the numbers in
2 Table J.1 of your Appendix III.J come from
3 Professor McCann, you don't know anything about
4 the source or where those numbers came from?
5           MR. SOBOL:  Objection.
6      A.   That's correct, I do not know the
7 source or where they came from.  I was asked by
8 counsel to demonstrate how one could use
9 estimates of distributor misconduct to identify
10 harm, and so that's what I did in that appendix.
11 BY MR. KNAPP:
12      Q.   So prior to issuing your report, you
13 didn't personally talk to anyone, any
14 representatives of Summit County, is that
15 correct?
16      A.   That's correct, I did not personally
17 talk to any representatives of Summit County.
18      Q.   And you didn't talk to any residents
19 of Summit County either, did you?
20      A.   With respect to this litigation
21 matter, no, I did not talk to any residents of
22 Summit County.
23      Q.   And you didn't talk to any
24 representatives of Cuyahoga County prior to

1 issuing your report, right?
2      A.   That's correct, I did not talk to any
3 representatives of Cuyahoga County myself.
4      Q.   And you didn't talk to any residents
5 of Cuyahoga County prior to issuing your report,
6 right?
7      A.   With respect to this specific matter,
8 I did not talk to any residents of Cuyahoga
9 County.
10      Q.   You might have talked to someone in
11 Cleveland on a personal basis?
12      A.   I have a number of students and some
13 co-authors who are in the area and I like to
14 talk to them about research and about life and
15 so on, but not about this specific matter.
16      Q.   Okay.
17      A.   I'm sorry, I'm a very precise person,
18 so --
19      Q.   I appreciate that.  I like precision.
20 I try to be precise.
21      A.   I just wish to answer precisely.
22      Q.   No, I appreciate it.
23           MR. SOBOL:  Here we are with the
24 bromance.

Highly Confidential - Subject to Further Confidentiality Review

BY MR. KNAPP:

Q.  Okay.  I'll try to be precise in my questions, but we'll see.

Did you look at anything else to prepare for your deposition today?

A.  As a general matter of course, I read very widely about the opioid epidemic, as I have for quite a long period of time, and so that's always going on.  But I'm not -- maybe if you give examples I might react to them, but I'm not thinking of anything specific that I would have done, read to prepare.

Q.  Well, let me ask you this.  How much time did you spend preparing for your deposition today?

A.  I would guess I spent probably ten hours.

Q.  And was that ten hours in the last week?

A.  The ten hours would have been in the last maybe three weeks.

Q.  And explain to me what you did during those ten hours.  It was --

MR. SOBOL:  Just the topics, not the

---

Highly Confidential - Subject to Further Confidentiality Review

content of the conversations.

A.  So it was a mix.  I reviewed the details of all of the estimation, and then I also practiced answering questions about the materials.

BY MR. KNAPP:

Q.  When you say you "practiced answering questions," did you do some sort of media training?

MR. SOBOL:  Objection.  I instruct him not to answer.

BY MR. KNAPP:

Q.  What do you mean when you say you practiced questions?  What do you mean by that?

MR. SOBOL:  Objection.  I instruct him not to answer.

BY MR. KNAPP:

Q.  I'm not asking for the content of the questions that you considered.  I'm asking you just what you mean by you practiced questions and answers.  What does that mean?

MR. SOBOL:  Objection.  I instruct him not to answer.

MR. KNAPP:  What's the basis for the

---

Highly Confidential - Subject to Further Confidentiality Review

objection?  Because I'm not asking about the content.

MR. SOBOL:  It was with counsel.

BY MR. KNAPP:

Q.  Did counsel participate in all of the sessions that you participated in where you practiced answering questions and answers?

A.  Yes, counsel participated in all of the sessions.

Q.  And were you instructed to look at the camera when you're answering questions?

MR. SOBOL:  Objection.  I instruct him not to answer.

BY MR. KNAPP:

Q.  Let's look at page -- would you turn to Page 12 of your report -- I'm sorry, Paragraph 12.  It's on Page 6.  Do you see it says "In preparing this report, I and staff under my direction analyzed data, reviewed economic literature, court filings, documents produced in this litigation, and deposition testimony"?

Do you see that?

A.  Yes, I do see that.

---

Highly Confidential - Subject to Further Confidentiality Review

Q.  Did you personally review all of the materials that were cited in your list of reliance materials?

MR. SOBOL:  Materials considered.

MR. KNAPP:  Materials considered, thank you.  Lack of precision there.

A.  I and others reviewed everything here.  I believe I looked at everything that's cited, yes.

BY MR. KNAPP:

Q.  There's nothing in particular that you could point to where you would say, well, that was somebody on my staff, but I didn't personally look at it?

A.  The only thing I'm wondering about is the very specific documents that might have data in them that might be, for example, a single page of data.  There may have been some of those that I personally did not review that would have been looked at and transcribed into the appropriate member of, in this case, Compass Lexecon, so I cannot say for sure every single bit of data that I looked at.  But other than that, I looked at everything else.

1    Q.   So in Paragraph 12 when you refer to
2  your staff, are you referring to the folks that
3  we talked about from Compass Lexecon?
4    A.   Yes, I'm referring to the Compass
5  Lexecon team.
6    Q.   Okay.  If we go back to Paragraph 10,
7  Paragraph 10 describes your assignment in this
8  report, correct?
9    A.   That's correct, yes.
10    Q.   Was the assignment defined by counsel?
11    A.   Yes, the assignment was defined by
12  counsel.
13    Q.   And in Paragraph 10.3 there's a
14  reference to defendants.  What does that mean in
15  the context of your report?
16    A.   The part of Paragraph 3 which says
17  "What is the percentage of harm attributable to
18  prescription opioid shipments for which
19  defendants are responsible," what that is
20  referring to is taking the estimates from
21  Professor Rosenthal of the shipments for which
22  defendants are responsible, which are due to --
23  excuse me, which are due to misconduct on the
24  part of the defendants, and then using those to

1  estimate the harms that result from that
2  misconduct.
3    Q.   Right.  And I guess what I'm asking
4  about is when you refer to defendants in this
5  report, unless it's followed -- or preceded by
6  manufacturer, distributor, or pharmacy, are you
7  referring to all of the defendants in the
8  litigation?
9    A.   I didn't understand your earlier
10  question.  My apologies.
11    Yes, I'm referring to all of the
12  defendants in this litigation.
13    Q.   Okay.  And did you conduct any
14  analyses of which manufacturers manufactured
15  which types of opioids?
16    A.   For this report I did not take into
17  account any of that.  I did not use that in
18  making the estimates here.
19    Q.   And did you conduct any analysis of
20  which distributor shipped which types of opioid
21  medicines?
22    A.   No.  And the purpose of this report, I
23  did not build that into the model that I
24  constructed in any way.

1    Q.   Okay.  Then if we go up to
2  Paragraph 10.2, you refer to calculating harms
3  from 2006 to 2018.  How did you pick that time
4  period?
5    A.   That time period was given to us by
6  counsel.
7    Q.   And when you say "us," who are you
8  referring to?
9    A.   Us being myself, Professor Gruber,
10  Professor Rosenthal, Professor McGuire, and of
11  course the teams that were supporting us as we
12  did our reports.
13    Q.   Okay.  All right.  Then if we move to
14  Paragraph 11, 11.2 -- well, first, Paragraph 11
15  summarizes your conclusions, right?
16    A.   Yes, that is correct.
17    Q.   And Paragraph 11.2 refers to the
18  percentage of harms that can be economically
19  estimated.
20    Do you see that?
21    A.   Yes, I do see that.
22    Q.   What's -- from an economic
23  perspective, what's the difference between an
24  estimate and a calculation?

1    A.   I don't make a distinction between an
2  estimate and a calculation.  Typically -- so I'm
3  not trying to be precise in that.  Typically a
4  calculation is something for which the answer is
5  exact, and an estimation is something for which
6  one had to -- I hate to use the word again --
7  one had to estimate, so there's some
8  uncertainty, more than just a calculation.  But
9  that's not a hard-and-fast distinction for which
10  the economic literature is extremely clear.
11    Q.   And so in connection with your report,
12  when you refer to "estimates" you're referring
13  to numbers that don't have an exact calculation,
14  is that right?
15    A.   Generally, yes.  If I estimated
16  something, it typically implies that it's my
17  best informed estimate, but it's not an exact --
18  it may not be an exact calculation.
19    Q.   Is there a particular percentage of
20  confidence that you need for an estimate to
21  become a calculation?
22    A.   Oftentimes when we refer to estimates
23  we typically refer to them as the outcome of an
24  estimation methodology, like, for example, one

1  would use the word estimate as a regression,
2  "based on a regression I estimated the
3  following." So that's a very common economic
4  terminology.
5       And so I'm following that here by, in
6  essence, saying, yes, as a result of the model
7  that I developed which, amongst other things,
8  uses regression analysis, that this can be
9  estimated. So that's the specific context here.
10  Q.   Now, I noticed in the reports of
11  Professor Gruber and Professor Rosenthal they
12  refer to offering their opinions based upon a
13  reasonable degree of certainty in the field of
14  economics. Did you see that language in their
15  reports?
16  A.   I don't recall it specifically. I
17  would have to look through their reports to
18  verify it exactly.
19  Q.   You don't use the language of
20  reasonable certainty -- let me get it, make sure
21  I've got it. Strike that.
22       You don't use the language that your
23  opinions are based upon a reasonable degree of
24  certainty in the field of economics, is that

1  right?
2       MR. SOBOL: Objection.
3  A.   That's correct, I don't use that
4  specific language.
5  BY MR. KNAPP:
6  Q.   Is there any particular reason why you
7  didn't use that language?
8       MR. SOBOL: Objection.
9  A.   No, there's no specific reason why I
10  didn't -- I didn't use that language.
11  BY MR. KNAPP:
12  Q.   Were you asked to offer opinions based
13  upon a reasonable degree of certainty?
14  A.   I understood my task as to offer
15  opinions upon a reasonable degree of certainty.
16  Q.   And do you have a reasonable degree of
17  certainty in each of the opinions that you
18  offered in your report?
19  A.   Yes, I do have a reasonable degree of
20  certainty about the opinions that I offer in the
21  report.
22  Q.   And does that also include the
23  calculation based upon the numbers that are in
24  Table J.1 where you weren't able to confirm the

1  accuracy or reasonability of the numbers?
2       MR. SOBOL: Objection. Scope.
3  A.   As noted in Appendix J.1, those
4  numbers were provided to me by counsel, so I'm
5  not making a determination as to those numbers.
6  I'm using them to demonstrate how the
7  methodology can be used. The numbers that I
8  developed in my report are the ones for which I
9  have a reasonable degree of certainty.
10  BY MR. KNAPP:
11  Q.   But in your report you produce numbers
12  that are the result of a calculation that
13  includes the percentages in Table J.1, right?
14  A.   That's correct. In the Appendix J, I
15  then show the impact of those percentages on the
16  harms that would result.
17  Q.   So my question is, are you offering
18  those calculations -- strike that.
19       Do you have a reasonable degree of
20  economic certainty in the results of those
21  calculations that rely on the inputs from Table
22  J.1?
23  A.   I have a reasonable degree of
24  certainty that given the inputs as specified in

1  Appendix J.1, the outputs that I give, which are
2  the harms that result from that, that those are
3  the -- with a reasonable degree of certainty
4  those are the harms that result from that level
5  of misconduct.
6  Q.   Did you consider whether there's an
7  error rate for any of the estimates that you
8  provided in your report?
9  A.   Can you rephrase the question, please?
10  Q.   Did you consider whether there was a
11  margin for error, or error rate, associated with
12  any of the estimates that are included in your
13  report?
14  A.   Yes, there are error rates associated
15  with any estimation.
16  Q.   And do you have -- well, strike that.
17       What are the error rates associated
18  with the calculations that you include in your
19  report? Do they vary by calculation?
20  A.   Yes. The errors vary by calculation.
21  Q.   And you didn't include the error rates
22  in your report itself, did you?
23       MR. SOBOL: Objection.
24  A.   What I'm -- the term error rate is not

1    an economic term, so I want to -- if you would
2    help me define what you mean by error rate, then
3    I can answer the question better.
4    BY MR. KNAPP:
5         Q.   Were you more comfortable with the
6    term margin for error?
7              MR. SOBOL:  Objection.
8         A.   That's not a particular term that gets
9    applied to an economic estimate.
10   BY MR. KNAPP:
11        Q.   Well, let me ask you this.  The
12   question I asked you was, did you consider
13   whether there was a margin for error or error
14   rate associated with any of the estimates that
15   are included in your report, and you answered
16   yes, there are error rates associated with any
17   estimation.  What did you have in mind when you
18   answered that question?
19        A.   Any estimation involves standard
20   errors, and so I did consider the standard
21   errors that are associated with the model that I
22   developed.
23        Q.   And you didn't -- did you outline or
24   include any of the standard errors associated

1    with any of your calculations, from the
2    calculations in step 1 to step 3, in your
3    report?
4         A.   Yes, I do include the standard errors
5    in several parts of the report.
6         Q.   Is there any standard errors included
7    in the calculations associated with step 1 of
8    your report that are actually included in your
9    report?
10        A.   Can I just make sure I understand
11   exactly what you mean by step 1 of my report?
12        Q.   So step 1 is your estimate of --
13        A.   I just want to make sure that I'm
14   answering exactly the question you wish.
15        Q.   So I consider step 1, and I guess in
16   Paragraph 24 you refer to it as your first step.
17        A.   Got it.
18        Q.   But it's your calculation or your
19   estimation of the share of harms attributable to
20   opioids.  Are we on the same page there?
21        A.   Yes, I am -- I am here.
22        Q.   Did you include any standard errors
23   associated with these estimations in your
24   report?

1         A.   This -- so what this is largely
2    referring to is, for example, what share of each
3    department's activity was a result of opioid
4    use.  There we present -- I present the means
5    but not the standard errors of those estimates.
6         Q.   And do you know, sitting here today,
7    what the standard errors are for those
8    estimates?
9         A.   No, I don't know them offhand, no.
10        Q.   Did you calculate them?
11        A.   No.  Some of them can be easily
12   calculated.  Things that are probabilities will
13   have straightforward standard errors.  But no, I
14   did not calculate them.
15        Q.   Did anybody working under your
16   direction calculate the standard errors
17   associated with your estimations of the share of
18   harms attributable to opioids?
19        A.   No, I don't believe we did, no.
20        Q.   Okay.  Let's turn, then, back to
21   Paragraph 11.1.  So in 11.1 you refer to the
22   increase in prescription opioid shipments.  Is
23   what you're referring to there shipments from
24   distributors to pharmacies of prescription

1    opioid medicines?
2         A.   I'm not sure if you're trying to make
3    a distinction between that and something else.
4         Q.   Well, you're not referring to
5    shipments from a manufacturer to a distributor,
6    are you?
7              MR. SOBOL:  Objection.
8    BY MR. KNAPP:
9         Q.   Or do you know?
10             MR. SOBOL:  Objection.
11        A.   What I'm looking at is the
12   relationship between the opioid shipments to a
13   particular area and the harms.  I'm not making
14   any statement about the causal chain that got
15   the drugs to the area.  So I'm picking up when
16   the drugs are at the area.
17   BY MR. KNAPP:
18        Q.   Right.
19             But you looked at particular data on
20   shipments, right?
21        A.   We looked at the shipments, the sum of
22   all the shipments that got to the area.
23        Q.   And so my question is, are those
24   shipments from manufacturers to distributors,

Highly Confidential - Subject to Further Confidentiality Review

1  distributors to pharmacies, pharmacies to
2  patients?  What shipments are you looking at?
3          MR. SOBOL:  Objection.  Asked and
4  answered.
5      A.   We're looking at -- so we're looking
6  at all the shipments that go to the dispensers
7  in the area.  So the ARCOS data which have the
8  data on shipments indicate all the categories
9  through which drugs are shipped for retail
10  consumption to different areas, in this case
11  three-digit ZIP codes, and so that's -- those
12  are the data that I'm referring to in this
13  paragraph.
14  BY MR. KNAPP:
15      Q.   And so the ARCOS data includes
16  shipments of medicines that are made by
17  companies that are not defendants in this
18  litigation, right?
19      A.   I believe that's correct, yes.
20      Q.   And so your model finds that
21  non-defendants' shipments are correlated with
22  increases in mortality, is that right?
23          MR. SOBOL:  Objection.
24      A.   I don't look at the shipments of any

Highly Confidential - Subject to Further Confidentiality Review

1  particular set of companies, either defendants
2  or not defendants.  What I do in the model is I
3  relate the shipments to the harms, and then I
4  take as an input to evaluate what share of
5  shipments are a result of misconduct on the part
6  of the defendants.  That number then is an
7  input, and gives a harm associated with the
8  misconduct on the part of the defendants.
9  BY MR. KNAPP:
10      Q.   So do you know one way or another
11  whether the shipments that you find are
12  correlated with increases in mortality include
13  shipments of products that were manufactured or
14  distributed by non-defendants?
15          MR. SOBOL:  Objection.
16      A.   All shipments in the ARCOS data with
17  the exception of buprenorphine and Methadone are
18  included in the analysis here.  So that would
19  include any company that -- from which there
20  were shipments of opioids other than those two.
21  BY MR. KNAPP:
22      Q.   And I want to make sure we're being
23  precise when we refer to Methadone and
24  buprenorphine.  When you say that they were

Highly Confidential - Subject to Further Confidentiality Review

1  excluded, they were excluded from the shipments,
2  but they were not excluded from the mortality
3  data, correct?
4      A.   That is correct.  We excluded them
5  from the shipments.  We have all deaths in the
6  mortality data.
7      Q.   Why did you decide that it was
8  reasonable to include deaths from Methadone and
9  buprenorphine if you did not include shipments
10  of those medicines in your regression?
11          MR. SOBOL:  Objection to form.
12          But go ahead.
13      A.   Partly it's very difficult to separate
14  out the mortality data by specific drugs, so we
15  do an estimate for, for example, opioids, but
16  not by the specific opioid.  It's not actually
17  reported that way.  So we wouldn't be able to do
18  it even if there was a desire to.  But, also,
19  the exclusion -- so that's part one.
20          Part two is the exclusion of those
21  drugs, is because most of those -- not most, a
22  lot of those medications are used for treating
23  addiction rather than for treating pain, and so
24  it wouldn't be appropriate to include on the

Highly Confidential - Subject to Further Confidentiality Review

1  right-hand side.  It would be biased to include
2  on the right-hand side something which is used
3  to treat addiction rather than treating pain.
4  BY MR. KNAPP:
5      Q.   Now, when you said it's very difficult
6  to separate out the mortality data by specific
7  drug, are you referring to drugs generally, or
8  opioids specifically there?
9      A.   There are many issues with the
10  mortality data.  Sometimes the data list drug
11  overdose, but they don't indicate any particular
12  type of drug.  And then sometimes they will
13  indicate, for example, opioids, but not give a
14  specific type of opioid, whether it's a
15  synthetic opioid or heroin or semisynthetic
16  opioid.  And I don't believe they ever give the
17  specific drug that's used.  I would want to look
18  in the data appendix to be absolutely certain of
19  that, but I don't think they have the specific
20  drug that's used.
21      Q.   That would be the case not just for
22  opioids, but all other classes of drugs as well?
23      A.   There's some delineation that the
24  death certificates have in terms of the nature

1   of the drugs that they include. Generally as

2   you want more and more detail, the data are less

3   complete.

4       Q. What are some of the other issues --

5   strike that.

6       You mention that there are many issues

7   with mortality data. What are the other issues

8   that you had in mind?

9       A. You asked a specific question about

10   the use of mortality data as related -- even

11   that might include deaths due to abuse of other

12   drugs that are not included in the ARCOS, so

13   those are the specific reasons why those -- why

14   one would want to exclude -- why one cannot

15   exclude death due solely to those drugs that are

16   excluded from the shipments variable.

17       Q. When you said there are many issues

18   with the mortality data, what else did you have

19   in mind? Well, strike that.

20       Did you identify any other issues with

21   the mortality data in terms of trying to

22   identify the cause of death associated with any

23   particular incident?

24       A. As we discuss in the data appendix,

1   the primary issue is the one that we were

2   talking about, which is the fact that not all

3   causes are identified on each death certificate,

4   and so we followed the methodology of Professor

5   Christopher Ruhm in order to adjust for that.

6       In addition, there's an issue about

7   the fact that their cause of death codes are

8   coded in ICD-9 prior to 1999 and ICD-10 after

9   1999, and those codings do not always give the

10   same share of deaths, the same number of deaths

11   due to each cause. So we used comparability

12   ratios for cause of death between ICD-10 and

13   ICD-9 to adjust to a consistent standard over

14   time.

15       Q. Bear with me just one second here.

16       MR. SOBOL: Take all the time you'd

17   like.

18   BY MR. KNAPP:

19       Q. All right. So just kind of sticking

20   with the topic of the mortality data, what your

21   regression model does is it models the

22   relationship between opioid-related mortality

23   and prescription opioid shipments, right?

24       A. To be precise, that's one of the

1   models that we use, so that's the direct model

2   that we use. There's another set of models, the

3   indirect model, which is a different way of

4   approaching the problem of the harm that results

5   from opioid shipments. That does not model

6   specifically the relationship between deaths and

7   shipments of medications.

8       Q. For both models you're looking at both

9   deaths from licit as well as illicit opioids,

10   right?

11       A. Sometimes we break them out, and

12   sometimes they're included together, that's

13   correct.

14       Q. And actually let's turn to

15   Paragraph 94 of your report. So Paragraph 94 is

16   talking about your indirect model for illicit

17   mortality post 2010, right?

18       A. Yes, that is correct.

19       Q. And in Paragraph 94, five lines down

20   there's a sentence that says "The death rate due

21   to use of illicit opioids is defined to include

22   any death involving heroin and/or fentanyl."

23       Do you see that?

24       A. Yes, I do see that.

1       Q. Did you use that definition for deaths

2   related to illicit opioids for both your direct

3   and your indirect models?

4       A. The direct model uses any opioid death

5   as the dependent variable. It does not make a

6   distinction between deaths due to use of licit

7   opioids and deaths due to use of illicit

8   opioids.

9       Q. But to identify in your direct model,

10   the deaths due to the use of -- strike that.

11       In your direct model, did you include

12   deaths that involve heroin and fentanyl?

13       A. Yes, the direct model has as the

14   dependent variable any death due to opioids.

15       Q. So I guess what I'm getting at is,

16   what does this mean? You used the term

17   "involving heroin and/or fentanyl." What does

18   that mean, "involving"?

19       A. So when we say any death involving

20   heroin and/or fentanyl, some people have

21   multiple drugs listed as a cause of death, so a

22   particular death might have use of both -- might

23   have a report of use of a licit opioid as well

24   as an illicit opioid. This sentence is

Highly Confidential - Subject to Further Confidentiality Review

1   referring -- excuse me, this sentence is

2   referring to how we divide deaths into those

3   involving licit opioids and those involving

4   illicit opioids.  And what it's saying is that

5   any death where there was any involvement of

6   heroin and/or fentanyl, so any death involving

7   use of an illicit opioid, was included in our

8   definition of deaths due to illicit opioids,

9   independent of whether there was also any

10  mention of a licit opioid.

11      Q.   Do you use the word "involving" here

12  to mean caused?

13      A.   Cause implies something very specific.

14  So the -- in the case of -- for example, a death

15  with multiple drugs listed, the coroner or the

16  medical examiner will generally write down

17  "these were the drugs that were in the person's

18  system," but they don't make a distinction as to

19  which of the drugs, for example, was it a licit

20  drug or an illicit drug was the cause.  There

21  will be an overall cause, which is drug

22  poisoning, but there will not be -- there may be

23  multiple causes listed.  So this is saying what

24  do we do when there are multiple causes listed.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.   And so for purposes of your regression

2   models, if a medical examiner report lists

3   opioid and opioid along with several other

4   drugs, you included it as an opioid-related

5   death, right?

6       A.   That's correct.  If there was a death

7   that involved opioids and other drugs, it was

8   included as an opioid-related death.

9       Q.   And there's no way to tell from the

10  medical examiner data whether the opioid was

11  actually the cause of death, right?  It could

12  have been one of the other drugs?

13          MR. SOBOL:  Objection.

14      A.   That's correct, there's no way to

15  tell.  The medical examiner in those cases does

16  not make a determination as to which specific

17  drug was the cause, even to the extent one could

18  do that.

19  BY MR. KNAPP:

20      Q.   But in your model and in your report,

21  you assume that the opioid was the cause of the

22  death, right?

23      A.   No.  We're actually not making the

24  assumption that the opioid is the cause of the

Highly Confidential - Subject to Further Confidentiality Review

1   death.  We're including it in opioid-related

2   deaths, but we don't have to make an assumption

3   that the opioid was the cause here.

4       Q.   So even if somebody overdosed on

5   cocaine, you would say -- well, strike that.

6           If a person overdosed on cocaine but

7   there was some heroin in their system, but the

8   heroin wasn't the cause of death, you would

9   include that in your opioid-related deaths,

10  right?

11          MR. SOBOL:  Objection.

12      A.   That's correct.  It would be counted

13  in the opioid-related deaths.

14  BY MR. KNAPP:

15      Q.   Even though the opioid did not cause

16  the death?

17          MR. SOBOL:  Objection.

18      A.   I'm not -- there's a hypothetical

19  there that I'm not -- that I don't know how to

20  answer.  So you're sort of positing that the one

21  caused the death over the other.  What I'm doing

22  is just using the data to say that there was a

23  presence of illicit opioids in that person when

24  he or she died.

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. KNAPP:

2       Q.   So you're not making -- with respect

3   to any of the mortality data, you're not making

4   any causal assumptions or conclusions about what

5   caused those deaths?

6       A.   I'm only using what the medical

7   examiner gives as the cause.

8           To the extent that the medical

9   examiner gives multiple deaths -- multiple

10  drugs, one an opioid and one a non-opioid, I'm

11  not making an assumption, I'm including them in

12  the estimate here, but I'm not -- but it doesn't

13  have to be the case that all of those would have

14  resulted from the opioid death.

15      Q.   What --

16      A.   From the opioid.  Excuse me.

17      Q.   What percentage of deaths in the

18  mortality data you looked at had multiple drugs

19  listed in the cause of death?

20      A.   I don't know the answer to that

21  offhand.

22      Q.   Do you have an estimate?

23      A.   No, I don't have an estimate.  It will

24  certainly vary over time.  It would have been

1  smaller earlier in the time period than later,

2  but I don't have an estimate.

3      Q.  Do you know if at any time period it

4  was more than 20 percent?

5      A.  No, I don't.  I don't have an

6  estimate.

7      Q.  Now, you would agree that the

8  pharmaceutical manufacturers that are defendants

9  in this lawsuit, they manufacture different

10  types of opioids, right?  We talked about that

11  before, right?

12      A.  That is correct, there are different

13  active ingredients in the opioids.

14      Q.  There's also differences in strengths

15  that are sold?

16      A.  That is correct, there are differences

17  in strengths.

18      Q.  Differences in dosing intervals?

19      A.  That's correct, there are also

20  differences in dosing intervals.

21      Q.  And differences in indication?

22      A.  That's correct, there are differences

23  in indication.

24      Q.  And differences in potential for

1  abuse?

2          MR. SOBOL:  Objection.

3      A.  I don't -- I don't want to testify as

4  to potential for abuse because that's a medical

5  statement, and I'm not qualified to give a

6  medical opinion.

7  BY MR. KNAPP:

8      Q.  Well, let's try to speak in numbers

9  then.

10          Do different opioids have different

11  actual rates of abuse?

12      A.  I don't know of the latest data on

13  that, so I don't want to say yes or no.

14      Q.  Do you know of any data on the actual

15  rates of abuse of different opioids?

16      A.  No, I don't offhand know of any data.

17      Q.  How do you account for the differences

18  in the rates of abuse of different opioids in

19  your model, if at all?

20          MR. SOBOL:  Objection.

21      A.  What the model does is it relates the

22  shipments of opioids to the harms that result.

23  Implicitly what the model is giving is an

24  average, that is, on average when there's a

1  certain amount of shipments, what is the impact

2  on harms.  That average will average over some

3  drugs which may be more abused than other drugs,

4  and some drugs which may be less abused than

5  other drugs.  So that's one -- so the model is

6  sort of giving an average of those.  I did not

7  build the model to look at each specific type of

8  molecule or specific type of drug.

9  BY MR. KNAPP:

10      Q.  You would agree that some types of

11  opioids contributed to the harms that you

12  analyzed more than others, right?

13          MR. SOBOL:  Objection.  Asked and

14  answered.

15      A.  Certain drugs were shipped for more

16  than others, so certainly one difference between

17  different types of drugs is that the harms that

18  I document are related to the amount shipped,

19  and that would be one obvious difference across

20  different drugs would be how much they were

21  shipped.

22  BY MR. KNAPP:

23      Q.  Well, I understand that you've got,

24  you know, sort of a weighting for the volume of

1  shipments of each different type of opioid.

2  Setting aside that, do you acknowledge -- strike

3  that.

4          So setting aside the weighting that's

5  done by nature of including the volume of each

6  different type of prescription, do you agree

7  that certain types or classes of opioids

8  contributed to the harms you analyzed in your

9  model more than others given that you used an

10  average?

11          MR. SOBOL:  Objection to the form.

12          You can answer.

13      A.  I can't say for sure whether, from my

14  model, whether some contributed more than

15  others, so I have no way to tell that from the

16  model.  And I'm not a medical expert to say

17  whether any one particular drug would be more

18  associated with, for example, addiction or

19  anything else harmful than another type of drug.

20  BY MR. KNAPP:

21      Q.  All right.  Let's look at Table 3.9 on

22  Page 62.  And I want to look in column F, and if

23  we look at the number for 2014.  I just want to

24  make sure I understand what this model is, what

1   this table is showing.

2        Is it your opinion that half of all

3   opioid prescriptions -- strike that.

4        Is it your opinion that half of all

5   opioid shipments in 2016 were medically

6   unnecessary?

7        MR. SOBOL:  Objection.

8   A.   I'm not making a statement about

9   medical necessity or not.  This is a -- this is

10  a statement about the shipments attributable to

11  misconduct on the part of the defendants.

12  BY MR. KNAPP:

13  Q.   So you don't have an assessment one

14  way or another of whether any of these shipments

15  that fall within the 50 percent were actually

16  medically necessary for someone in Summit County

17  or Cuyahoga County?

18       MR. SOBOL:  Objection.  Asked and

19  answered.

20  A.   I don't make an assessment in this

21  report about medical necessity.

22  BY MR. KNAPP:

23  Q.   Well, you're attempting to analyze the

24  net harms associated with these shipments,

1   correct?

2   A.   That's correct, I am estimating the

3   net harms from the shipments.

4   Q.   And if these medicines and these

5   prescriptions, 50 percent of prescriptions were

6   medically necessary for someone in Cuyahoga

7   County, you would have to offset the benefits

8   from those prescriptions against the harms,

9   wouldn't you?

10       MR. SOBOL:  Objection.

11  A.   A different type of analysis is to do

12  a cost effectiveness analysis associated with

13  any technological innovation that has both

14  benefits and costs.  So I interpret your

15  question as being if you were going to do a

16  cost-benefit analysis of this particular class

17  of medications, would you want to look at the

18  benefits in addition to the costs?  The answer

19  to that is absolutely yes, if one wanted to do a

20  cost effectiveness analysis.

21       In this case I'm not doing a cost

22  effectiveness analysis.  Instead I'm looking at

23  the harms, and that's a very different type of

24  analysis than a cost-benefit analysis.

1   BY MR. KNAPP:

2   Q.   So, Professor Cutler, you testified

3   earlier that you're looking at the net harms

4   associated with these shipments, right?

5   A.   That's correct, yes.

6   Q.   Doesn't net harms mean harms net of

7   the benefits associated with these shipments?

8   A.   No, that's not what I mean by net

9   harms.  By net harms I mean the net to the

10  government, that is the net to each of the

11  agencies.  So I was not using net in the

12  framework of a cost-benefit analysis.

13  Q.   So would you agree that to the extent

14  that any of these 50 percent of prescriptions in

15  2014 provided benefits to residents of Cuyahoga

16  and Summit County that your model overstates the

17  net harm associated with these shipments?

18       MR. SOBOL:  Objection.  Scope, form.

19  A.   No, that's not correct actually,

20  because what the model does is it relates the

21  total shipments to the harms, so it's saying --

22  it could have been the case for some particular

23  medications, one could build a model and they

24  would show that increased shipment of a

1   medication for something, a completely different

2   condition, is associated with fewer arrests and

3   fewer cases of child custody and less crime and

4   fewer deaths and medical examiner affects and so

5   on.  So any -- so what this is giving is through

6   all the channels, both positive and negative,

7   what is the impact of shipments of opioid on --

8   shipments of opioids on those harms.

9        And so if there -- if it were a

10  favorable impact, the model would have said

11  increased shipments are associated with

12  benefits.  The fact that it doesn't is a sign

13  that all things taken into account, it's not

14  associated with benefits, it's associated with

15  harms.

16  BY MR. KNAPP:

17  Q.   What benefits -- strike that.

18       Your regression model looks at

19  mortality, right?

20  A.   That particular regression model.  I

21  also -- of course, at the end there are

22  regressions for crime.  But the ones we've been

23  talking about are the models for mortality.

24  Q.   Where in your regression model do you

1   account for the benefits that the county might

2   receive from medically necessary prescriptions

3   of opioid medicines?

4           MR. SOBOL:  Objection.  Scope, form.

5       A.   I think you're asking me a

6   hypothetical, so let me give you a hypothetical

7   answer.

8           If it had been the case that treating

9   people's pain improved their quality of life to

10  a degree sufficient that their mortality fell,

11  and that, therefore, they lived longer and so on

12  and so forth, that would -- and there was no

13  crime and no child welfare issues and so on,

14  that would show up in the models, in the

15  mortality models it would show up as a reduction

16  in deaths associated with increased shipments.

17  Nothing in this requires that the increased

18  shipments be associated with increased -- with

19  increased deaths.  There's absolutely nothing

20  here that says that that has to happen.

21          Similarly, in the crime models that we

22  use as confirmation, if increased shipment of

23  opioids reduces crime by, for example, allowing

24  people to be at work longer, be more productive

1   at work, earn more, less need to resort to crime

2   and so on, those models would also have shown

3   that an increase in shipment leads to lower

4   crime.  There's absolutely nothing in the

5   analysis that prejudges that these will find

6   harmful effects of opioid shipments as opposed

7   to favorable effects of opioid shipments.

8       Q.   Now, with respect to the regression,

9   the direct and indirect regression you did on

10  mortality, your model would only account for the

11  benefits of opioids to the extent it had an

12  impact on mortality, right?

13          MR. SOBOL:  Objection.

14      A.   In those -- in those specific models,

15  the dependent variable is mortality, so that any

16  impact that was favorable would be captured only

17  to the extent that it influenced mortality.

18  BY MR. KNAPP:

19      Q.   So if there were benefits to these

20  counties that didn't impact mortality, your

21  direct and indirect mortality regressions would

22  not pick up those benefits, right?

23          MR. SOBOL:  Objection.  Scope.

24      A.   That's one of the reasons why we were

1   particularly interested in doing the crime

2   models that are in the appendix -- or excuse me,

3   not in the appendix, that are in the last

4   section of the report, because we wanted to see

5   if we could confirm the methodology that we had

6   directly using crime data, so we didn't have to

7   go through the mortality component.  And the

8   results of those models were that the impact on

9   crime, using crime as the dependent variable,

10  crime is the variable that we're explaining,

11  actually suggested a bigger impact on crime than

12  the results using the mortality data, so that

13  lends confirmation to what we were finding

14  there.

15  BY MR. KNAPP:

16      Q.   So I asked a pretty direct question.

17  I'm going to ask it again.

18          If there were benefits to these

19  counties that did not impact mortality, your

20  direct and indirect mortality regressions would

21  not account for those benefits, is that right?

22          MR. SOBOL:  Objection.  Asked and

23  answered, scope.

24      A.   The mortality regressions would not

1   pick up anything that's not mortality.  The

2   crime regressions would.  And, yes, so I'll

3   leave it there.

4   BY MR. KNAPP:

5       Q.   And you didn't run any regressions for

6   any other categories of harms that you looked at

7   other than mortality and crime, right?

8       A.   That's correct.  We didn't run any

9   other regressions.

10      Q.   So you didn't run a regression on

11  juvenile removals?

12      A.   The data on juvenile removals are

13  not -- they're --

14      Q.   Sir, just -- my question was, did you

15  or didn't you.  I don't need to know what the

16  explanation is.  The question is, did you run

17  it?

18      A.   My apologies, I'm being a professor.

19      Q.   But it's just -- honestly it's just a

20  yes or no question.

21          MR. SOBOL:  No, no, no, you can't tell

22  him how he's going to answer.  He's going to

23  answer -- testify truthfully as best he can.

24  BY MR. KNAPP:

1    Q.   So my question is did you run it, not
2  why didn't you run it.  I may ask you why you
3  didn't.  But my question is, did you run it?
4       MR. SOBOL:  Now we're getting a little
5  testy.  You can answer the question however you
6  think best to answer it truthfully.
7       A.   In my report I don't rely on anything
8  about that at all.
9  BY MR. KNAPP:
10      Q.   Okay.  You also didn't run a
11 regression on the relationship between shipments
12 and children and family services, did you?
13      A.   In the report I don't rely on anything
14 about that.
15      Q.   You didn't run a regression on the
16 relationship between shipments and addiction and
17 mental health activity in Summit or Cuyahoga
18 County?
19      A.   In the report I don't rely on any of
20 that.
21      Q.   Well, did you -- when you say you
22 didn't rely on it in your report, did you run
23 regression analyses on any of these other
24 categories of harm that you didn't include in

1  your report?
2       MR. SOBOL:  Objection.
3       A.   I'm not relying on anything other than
4  what's here.
5  BY MR. KNAPP:
6       Q.   That wasn't my question.
7       My question is, did you run the
8  analyses?
9       MR. SOBOL:  Objection.  Asked and
10 answered.
11      When the witness said "here," he
12 pointed to his report.
13      A.   In the report I'm not relying on
14 anything other than the analysis here.
15 BY MR. KNAPP:
16      Q.   Professor Cutler, my question was, did
17 you look at and did you run regression analyses
18 on any of these other categories of harm that
19 you didn't include in your report?
20      MR. SOBOL:  Objection.  Asked and
21 answered three times now.
22      A.   The report doesn't -- I'm not relying
23 on anything except what's here.
24 BY MR. KNAPP:

1       Q.   Do you not understand my question?  My
2  question is not about what's in your report.  I
3  can read your report, I know what's in there.
4       My question is, did you run any other
5  regression analyses and look at them related to
6  any of these other categories of harm?
7       MR. SOBOL:  Objection.  Asked and
8  answered.
9       You've answered it enough times now.
10 BY MR. KNAPP:
11      Q.   I'm waiting for an answer to my
12 question.
13      MR. SOBOL:  I've instructed him not to
14 answer.  You've already asked four times.
15      MR. KNAPP:  What is the basis for
16 instructing him not to answer?  He said it's not
17 in his report.  He didn't say whether he looked
18 at it.
19      Counsel?
20      MR. SOBOL:  Yes.
21      MR. KNAPP:  What's the basis for the
22 objection?
23      MR. SOBOL:  I just told you a minute
24 ago, it was less than a minute ago.

1       MR. KNAPP:  Your position is that
2  because he says it's not in his report he
3  doesn't have to answer if he -- this is analysis
4  that he looked at.
5       MR. SOBOL:  No, my position is that
6  you asked him the question three or four times.
7  Professor Cutler very carefully gave you the
8  answer that he thinks is truthful testimony.
9  You didn't like it, so you asked it again.  He
10 gave you the same answer that he thought was
11 truthful testimony.  You asked it again.  A
12 third time, he gave you what he thought was the
13 truthful testimony.  Now you've asked it a
14 fourth time, and I've instructed him not to
15 answer.  Now, if you'd like to spend your time
16 like this, fine.
17      MR. KNAPP:  All right.  Well, I'm just
18 going to state for the record that the witness
19 is refusing to answer whether he ran regression
20 analyses that weren't included in his report.
21      MR. SOBOL:  You can say whatever you
22 want to say.
23      MR. KNAPP:  Okay.
24      MR. SOBOL:  What I'm telling you is if

Highly Confidential - Subject to Further Confidentiality Review

1 you'd like to spend the time, you can ask him

2 the question again.

3      I now will withdraw my instruction. I

4 have a hunch that Professor Rosenthal [sic],

5 being the precise person that he is, will give

6 you the exact same answer again, so spend your

7 time however you'd like.

8 BY MR. KNAPP:

9     Q. Okay. Professor Cutler, whether or

10 not you included it in your report, did you run

11 a regression on any of the other categories of

12 harm that are referenced in your report?

13     MR. SOBOL: Objection to the form.

14 Asked and answered.

15     A. I'm -- in my report what I want to

16 focus on is the conclusions I give in my report,

17 which are what's noted here.

18     MR. KNAPP: Okay. I'm just noting for

19 the record that the witness is refusing to

20 answer my question about analyses that he did

21 and may have considered in connection with

22 reaching conclusions in this report, and I'm

23 going to reserve the right to open up the

24 deposition to ask further questions about these,

Highly Confidential - Subject to Further Confidentiality Review

1 to request the regressions that this witness may

2 or may not have seen, because he's refusing to

3 answer my question.

4     MR. KO: Let me just note for the

5 record also that pursuant to the CMO, and in

6 particular Paragraph 10B, all drafts are off

7 limits. So to the extent you're asking him

8 about regressions that are not in the report,

9 not discoverable, completely outside, Mr. Cutler

10 has responded to your questions.

11     MR. KNAPP: Okay. And my rights are

12 reserved on that.

13 BY MR. KNAPP:

14     Q. In connection with your models, did

15 you consider whether -- well, strike that.

16     Let's go back to Table 3.9, and we're

17 dealing with -- we were looking at the

18 percentage in column F for 2014, which is 50.6.

19 And that's the cumulative percent of shipments

20 that you identify as attributable to defendants'

21 misconduct, right?

22     A. The weighted average cumulative

23 percentage of shipments attributable to

24 defendants' misconduct.

Highly Confidential - Subject to Further Confidentiality Review

1     Q. Did you consider whether if fully

2 50 percent of the prescription opioids

3 referenced in your model were removed from

4 Summit or Cuyahoga County, whether that would

5 leave legitimate pain untreated?

6     MR. SOBOL: Objection to form.

7     A. No, I made no determination as to what

8 would happen to any individual who was -- let me

9 just -- I'm just -- rather than giving a long

10 answer. No, there's no determination here as to

11 what this would mean for any specific

12 individual.

13 BY MR. KNAPP:

14     Q. And there's no determination for what

15 the impact on Cuyahoga or Summit might be if

16 removing 50 percent of the prescriptions from

17 the population left legitimate pain untreated?

18     MR. SOBOL: Objection to the form.

19     A. You're asking about a hypothetical,

20 which is if one removed the opioids from Summit

21 or Cuyahoga County. That's -- so, A, I did not

22 look at the impact for any specific individual.

23 But B, also that hypothetical doesn't -- is not

24 what these data are, because what this is

Highly Confidential - Subject to Further Confidentiality Review

1 showing is how was the increase in shipments

2 associated with harms.

3     You're then asking a hypothetical,

4 suppose you take those away. In thinking about

5 that hypothetical, I think there are many more

6 things one needs to think about than just what

7 this calculation gives.

8 BY MR. KNAPP:

9     Q. Well, in connection with your model,

10 you're calculating how many deaths there would

11 be -- would have been but for the existence of

12 these opioid shipments in the world, right?

13     A. That's correct, yes.

14     Q. So my question to you, sir, is, in

15 this but-for world, did you consider whether

16 there would be other costs to these counties

17 associated with removing these prescriptions

18 from the world?

19     MR. SOBOL: Objection. Scope, form.

20     A. What the but for is here -- I want to

21 be very, very precise. What the but for is here

22 is what was the impact of shipments on mortality

23 relative to what mortality would have been had

24 there been no misconduct on the part of the

1  defendants.  So it's about the shipments due to

2  misconduct.

3        You're then asking a different

4  question, which is suppose I then take that and

5  I say, what if I remove opioids.  That's

6  actually a -- not the same calculation as what

7  happened when opioids came in because, as we

8  know, when you then remove the opioids,

9  additional things can happen like, for example,

10  people use illicit opioids.  So that

11  hypothetical in terms of, okay, suppose I now

12  remove the opioids does not follow directly as

13  the converse of what was the impact of the

14  increase in the number of opioids.

15        What this model does is it tells what

16  is the impact of the increase in the number of

17  opioids.  As written, I would -- you then need

18  to think about how to extend that to a situation

19  where you then remove opioids.

20        I hope that was clear.  I'm trying my

21  very best to answer your question.

22  Q.  All right.  Let's look at

23  Paragraph 18.  Do you see in Paragraph 18 --

24  one, two, three, four, five -- six lines down

1  you say, "For the purposes of my analysis, I

2  assumed defendants' misconduct directly

3  influences sales and shipments of prescription

4  opioids as presented in the Rosenthal report."

5        Do you see that?

6  A.  Yes, I do see that.

7  Q.  And you don't intend to offer any

8  opinions on whether there's anything inherently

9  unlawful about promotion of prescription

10  medicines, do you?

11  A.  I'm not making any statements about

12  general promotion of pharmaceuticals.

13  Q.  And you don't have any opinions -- you

14  don't offer any opinions on whether promotion in

15  general has a positive or negative impact from

16  an economic perspective?

17  A.  That's correct, I'm not making any

18  determination as to whether any -- I'm not

19  offering any opinion as to whether promotion of

20  pharmaceuticals in general is a good or a bad

21  idea.

22  Q.  Now, to your knowledge, does Professor

23  Rosenthal opine that all promotion of opioids by

24  the manufacturer defendants from 1995 to the

1  present was unlawful?

2  MR. SOBOL:  Objection.  Form.

3  A.  Professor Rosenthal uses -- she has

4  estimates of what share of the promotion was

5  misconduct.  And I'm trying to remember if I --

6  I'm trying to remember that specific part of her

7  report, and I would want to review her report

8  before I answered that question specifically.

9  BY MR. KNAPP:

10  Q.  Well, let's assume that Professor

11  Rosenthal is opining that all promotion by the

12  manufacturer defendants of prescription opioids

13  from 1995 to the present was unlawful, and

14  that's at least an assumption that's built into

15  her model, do you agree that that's a reasonable

16  assumption?

17  MR. SOBOL:  Objection.  Form,

18  mischaracterizes the report.

19  A.  I'm not -- it's not my opinion.  I

20  don't make an opinion about the reasonableness

21  of that assumption.

22  BY MR. KNAPP:

23  Q.  Well, aren't the assumptions that are

24  baked into Dr. Rosenthal's opinion baked into

1  your model because you rely on the output of her

2  report?

3  A.  I rely on the output of Professor

4  Rosenthal's report.  If she were to conclude

5  that there was a different percentage of

6  shipments which were due to misconduct, I could

7  take those estimates and then use those to

8  estimate the share of -- estimate the harms that

9  result from opioids.

10        So it's not baked into the model.  The

11  model takes that as an input.  If she or the

12  court determined that that -- the true number

13  was different or the court decided that it

14  wanted to look at some harms and not other

15  harms, or harms from some defendants and not

16  other defendants, that's something that she

17  could output from her model that I could then

18  take and say, okay, therefore, what were the

19  harms associated with that.

20  Q.  Do you believe it's a reasonable

21  assumption that all promotion by manufacturing

22  defendants of opioids -- strike that.

23        Do you believe it's a reasonable

24  assumption that all promotion of opioids by

1  manufacturing defendants from 1995 to the
2  present was unlawful?
3         MR. SOBOL:  Objection.  Scope.
4     A.  It's not -- that's not a subject that
5  I've examined here, so I don't have an opinion
6  on it.
7  BY MR. KNAPP:
8     Q.  You haven't examined any of the
9  marketing materials that were used by the
10 manufacturing defendants in this case?
11    A.  I have not examined any of the
12 marketing materials used by the defendants,
13 employed -- employed by -- I'm trying to
14 remember the word used exactly, employed by or
15 used by the defendants.
16    Q.  I'm trying to understand -- since you
17 are relying on Dr. Rosenthal's output, right?
18    A.  Mm-hmm.
19    Q.  -- do you know one way or another,
20 sitting here today, whether she assumed that all
21 marketing of prescription opioids by the
22 manufacturing defendants was unlawful?
23    A.  I would just want to check her report
24 to be very precise to give you a precise answer.

1     Q.  So you don't know one way or another
2  as you sit here?
3     A.  Again, I don't want to give you a -- I
4  don't want to say something incorrect, so I'd
5  rather review her report and give you a precise
6  answer.
7     Q.  That's a clever way to say no.
8     A.  I'm not trying to say no.  I'm
9  trying -- my job as a professor is to teach
10 students and be as accurate as possible to
11 students.
12    Q.  Okay.
13    A.  So when a student asks me a question,
14 my job is to try and give them a precise answer.
15    Q.  Okay.
16    A.  In this circumstance, I think giving
17 an imprecise answer is worse than not giving an
18 answer.
19    Q.  Okay.  All right.  So in Paragraph 18
20 you say that you assume defendants' misconduct
21 directly influences sales.  What do you mean by
22 "influence"?
23    A.  This is just restating the -- in this
24 sentence I'm just restating the conclusion of

1  the Rosenthal report, which is that the
2  misconduct is directly related to the shipments.
3  So I'm really here just trying to refer to the
4  Rosenthal report.
5     Q.  But for the purposes of the way you
6  use this assumption in your report, does this
7  mean that but for the defendants' conduct, these
8  shipments would not have happened?
9     A.  What Professor Rosenthal's report says
10 is but for the defendants' misconduct, here's
11 what shipments would not have happened.  I can
12 then -- if she concluded that there was no
13 misconduct and, therefore, there was --
14 therefore, that all of the shipments -- that
15 none of the shipments were associated with
16 misconduct, then the outcome of my model would
17 be no damages, no harms at all.
18    Q.  Do you intend to offer an independent
19 opinion on any of the opinions in
20 Dr. Rosenthal's report?
21    A.  No, Dr. Rosenthal should offer an
22 opinion on her report.
23    Q.  Did you do anything on your own to
24 validate any of the opinions that were offered

1  in her report?
2         MR. SOBOL:  Objection to form.
3         You can answer.
4     A.  There are several things that one
5  does.  One thing that one always does is look at
6  the numbers and see, do they seem reasonable by
7  various metrics, and so that is something that
8  one -- that happens.
9         As I noted, we also as a group
10 discussed the reports as we were going forward
11 providing advice to each other, and so I would
12 ask Professor Rosenthal questions, would see
13 things and remark, as would other folks, to give
14 her advice as to what to do.  So I know a fair
15 amount about what she did and how she went about
16 doing it.  The final decisions were hers, and so
17 she's the one who should talk about those
18 decisions.
19    Q.  Did you review her regressions?
20    A.  As part of meetings that we had, she
21 would show some of the regressions to the group
22 and show some of the results of them, and then
23 we would talk about the specifications and
24 things like that.

1  Q.   When did you first review one of her

2  regressions?

3       MR. SOBOL:  Was counsel present?

4       THE WITNESS:  Counsel would have been

5  present at all such discussions.

6       MR. SOBOL:  Then I instruct him not to

7  answer.

8       MR. KNAPP:  As to the timing of when

9  the meeting was?  I'm not asking for the

10  content.

11      MR. SOBOL:  I'll give you the timing.

12      A.   I don't know for sure.  My guess is

13  that it would have been around January --

14      MR. SOBOL:  Don't guess.  Give him a

15  reasonable estimate or calculation.

16      A.   A reasonable estimate would be around

17  November to January.

18  BY MR. KNAPP:

19      Q.   Did you identify any issues with

20  Professor Rosenthal's regressions?

21      MR. SOBOL:  Was counsel present?

22      A.   Counsel was present.

23      MR. SOBOL:  I instruct you not to

24  answer.

1  BY MR. KNAPP:

2       Q.   With respect to the final -- strike

3  that.

4       For purposes of this question I want

5  to focus on the final regression model that

6  Dr. Rosenthal -- strike that.

7       I want to focus on the final

8  regression models that Dr. Rosenthal built for

9  purposes of her report.  Did you identify any

10  issues associated with those models?

11      MR. SOBOL:  I instruct him not to

12  answer, because you've got embedded in the

13  question the communications.

14      If you want to ask him just if he has

15  an opinion about it, I'm not going to instruct

16  him not to answer about that, but it sounds like

17  right now, to me, what you're asking about is

18  what was discussed at meetings with the lawyers,

19  which is not appropriate.

20      You can ask questions anyway.  I'm

21  actually trying to be helpful here.

22  BY MR. KNAPP:

23      Q.   So, Professor Cutler, I'm asking about

24  the final regression model that Professor

1  Rosenthal put together.  Do you believe that the

2  regressions that she ran were appropriate?

3       A.   Yes, I do believe that the regressions

4  Professor Rosenthal ran are appropriate.

5       Q.   And you've adopted them as your own

6  for purposes of incorporating the outputs into

7  your model?

8       A.   I have incorporated the outputs of

9  Professor Rosenthal as an input into my model,

10  with the understanding that I believe that

11  they're appropriate.

12      Q.   Did you run any sensitivity tests to

13  see how her results would be impacted?

14      A.   I did not run any sensitivity analysis

15  on her models.

16      Q.   What are the standard diagnostic tests

17  that you would run when running a time series

18  regression?

19      MR. SOBOL:  Objection.  Scope.

20      You can answer.

21      A.   In any regression that one runs there

22  are several diagnostics.  One thing that one

23  would do would be to look at the R-squared

24  statistic or the adjusted R-squared statistic as

1  a measure.  That is a measure of the goodness of

2  fit of the model.

3       In addition, one would look at the

4  predictions of the model relative to the actual

5  data, so does the model seem to be fitting the

6  data well, or are there aspects of the data that

7  the model cannot fit well, and if so, that

8  suggests that the model is not accurate and

9  needs to be revised in some way.

10  BY MR. KNAPP:

11      Q.   Based upon what you know from -- well,

12  strike that.

13      Is a negative depreciation rate

14  inconsistent with the literature on regressions?

15      MR. SOBOL:  Objection.  Scope.

16      You can answer.

17      A.   Actually in a model of addiction, a

18  negative depreciation rate would not be

19  inappropriate at all.  In fact, one way to

20  interpret addiction is that the effects build up

21  over time, so being -- having taken a drug

22  first, one needs an increasing amount of it

23  over time, and that's going to show up as a

24  negative depreciation rate; that is, the impact

1  of actions build over time rather than

2  depreciating over time.

3  BY MR. KNAPP:

4      Q.  Is there any specific literature that

5  you're relying on for the statement that you

6  just made?

7      A.  There is theoretical literature in the

8  economics of rational addiction that addresses

9  it.  I don't know offhand whether there are any

10  empirical papers that would -- that estimate a

11  negative depreciation rate, and I don't know in

12  the sense that I just have not reviewed the

13  literature.  So it's not that I've reviewed the

14  literature and I -- that is not a disguised way

15  of saying no.  That's just me saying I have not

16  reviewed that literature well enough to see if

17  anyone has estimated negative depreciation rate.

18      Q.  Is there a particular paper that

19  you're referring to in the economics of rational

20  addiction that you think addresses this topic?

21      A.  There are.  I'm trying to remember if

22  any of the papers have phrased it as in terms of

23  a negative depreciation rate or whether instead

24  they've just phrased it as -- mostly what they

1  phrased it as is complementary consumption over

2  time, that is complementarity of consumption, so

3  consuming more of the good today increases my

4  margin utility of the good tomorrow.

5      In that framework, that is -- it's

6  typically done through the utility function

7  preferences that way rather than through the

8  discount rate, in part because one wants to do

9  welfare analysis, and so you really are thinking

10  about a positive discount rate from the

11  individual utility point of view.  So I think

12  most of the studies have not put it in the

13  discount rate because they're not doing

14  empirical analysis for which they're then saying

15  what would be the impact on the estimated

16  depreciation rate.  They're doing theoretical

17  analysis that says how would addiction show up

18  in such a model.

19      Q.  Sitting here today, there's not

20  particular papers that you can identify?

21      MR. SOBOL:  Objection.  Asked and

22  answered.

23      A.  I don't have a specific paper that has

24  translated it into a depreciation rate for a

1  regression like what Professor Rosenthal has

2  run.

3  BY MR. KNAPP:

4      Q.  Now, did -- strike that.

5      Professor Rosenthal estimated the

6  impact of promotion in three different time

7  periods, right?

8      A.  That's correct, yes.

9      Q.  And did you agree with that approach?

10      A.  Yes, I did agree with Professor

11  Rosenthal's approach.

12      Q.  And is the reason that she looked at

13  three different time periods because she assumed

14  that there were three different structural

15  breaks in the market?

16      A.  She assumed that there were two

17  different structural breaks in the market which

18  led to three different time periods.

19      Q.  Thank you.  Good clarification.

20      Your model assumes that there's only a

21  single structural break in the market, right?

22      A.  That's correct, my model has only one

23  structural break.

24      Q.  If Dr. Rosenthal concluded that there

1  were two structural breaks, why does your model

2  only account for one structural break?

3      A.  The reason for the difference is that

4  we're modeling two different things.  So

5  Dr. Rosenthal is modeling prescription drug

6  shipments as the outcome variable, and the

7  misconduct on the part of defendants as the

8  explanatory variable.  In that case one needs to

9  think about how many breaks are there in the

10  shipment variable, and she identifies those two

11  break points, as we were talking about.

12      In my case the issue is not so much

13  was there a change in the slope of shipments

14  over time, but rather what impact does -- do the

15  shipments of drugs have on the mortality

16  outcome, and that doesn't necessarily have a

17  break at any particular point in time when, for

18  example, shipments of a particular set of

19  medications ramp up.  The model says that that

20  has the same impact.  It's only when the

21  mortality framework changes, not so much the

22  shipment framework, but it's only when the

23  mortality framework changes that there would be

24  a break in the mortality relationship.

1    Q.    You understand that Dr. Rosenthal's

2    measurement of the percent of MME's that were

3    attributable to challenge promotion is a

4    national average effect, right?

5    A.    Yes, I do understand that.

6    Q.    In your -- what your regression

7    analyses do is you look at the geographic

8    variation in shipments per capita to evaluate

9    the relationship between shipments and

10   mortality, right?

11   A.    That's correct.  I'm using a

12   geographic level analysis.

13   Q.    So if the marketing effects are

14   national, to what would you attribute the

15   geographic variation that you're analyzing?

16   MR. SOBOL:  Objection.

17   A.    We were talking earlier about the fact

18   that the regression averages over, for example,

19   shipments that may be more or less causing of

20   harm.  In the same way here, the regression is

21   taking all shipments to the area and it's not

22   making a -- it's not saying that -- I have no

23   way to say, were the shipments in one county

24   more or less caused by misconduct than shipments

1    in another county.

2    To the extent that they were, then

3    there would be measurement error in the

4    shipments variable; that is, some would be

5    differentially due to misconduct and others

6    might not be differentially due to misconduct.

7    If those two are differentially associated with

8    harms, I would then estimate an impact of

9    shipments on mortality that was too low; that

10   is, would not show an appropriate impact of

11   inappropriate shipment of harms because it would

12   be bringing in different outcomes in different

13   counties that were -- that -- for which the

14   effects are bigger and smaller.

15   BY MR. KNAPP:

16   Q.    I want to hand you -- now, have you

17   studied the different factors that motivate

18   doctors to write prescriptions, or the

19   variations in treatment among particular

20   doctors?

21   MR. SOBOL:  Objection to the form.

22   You can answer.

23   A.    In this analysis I have not done that.

24   As part of my academic work I both do some

1    analyses, and I teach about factors that

2    motivate behavior of physicians.

3    So the answer is yes, in general, but

4    no in this specific report.

5    BY MR. KNAPP:

6    Q.    And you understand that in connection

7    with the studying that you've done that doctors

8    are strongly motivated to write prescriptions

9    based upon their own belief about the

10   appropriateness of treatment, right?

11   MR. SOBOL:  Objection.

12   A.    That's correct, that's one of the

13   factors that enters into physicians'

14   prescriptions is their own belief about

15   effectiveness.

16   BY MR. KNAPP:

17   Q.    And you've written about that in your

18   paper "Physician Beliefs and Patient

19   Preferences, A New Look At Regional Variation in

20   Healthcare Spending," right?

21   A.    I'm glad you've read it.  I like that

22   paper.  Yes, I have.

23   Q.    Okay.  Would you agree that physicians

24   are also motivated by prescribing standards of

1    care in terms of determining what types of

2    prescriptions they write?

3    A.    In general there are a lot of

4    influences on physicians, one of which will be

5    prescribing standards of care and one of which,

6    as you said, was the physicians' perception

7    about the effectiveness of a class of

8    medications or a single medication within a

9    class.

10   Q.    And patient preference also impacts a

11   doctor's motivations to write prescriptions,

12   right?

13   MR. SOBOL:  Objection.

14   A.    The economic literature -- so I'm not

15   testifying about it here.  If you're asking

16   about the economic literature, the economic

17   literature does suggest that patient preferences

18   are important, although the economic literature

19   suggests that physician factors are far more

20   important, supply side factors are far more

21   important than are patient preferences.

22   BY MR. KNAPP:

23   Q.    Drug reimbursement policy also impacts

24   the types and volume of prescriptions that

1    doctors write?

2            MR. SOBOL:  Objection.  Scope.

3            You can answer.

4        A.  Again, within -- again, with the

5    proviso that I've not offered an opinion about

6    that in this report, I'm going to answer this

7    question as if you're asking me in general about

8    the health economics literature.  And in general

9    within the health economics literature, it shows

10   very much that the -- that insured -- that

11   factors such as the restrictions in terms of

12   prior authorization or costs do influence what

13   physicians prescribe.

14   BY MR. KNAPP:

15       Q.  And similarly, insurers' preferred

16   drug list also influences the types and volume

17   of prescriptions that doctors write?

18           MR. SOBOL:  Objection.  Scope.

19           You can answer.

20       A.  That's correct.  In terms of the

21   general health economics literature, the

22   formularies, the prior authorization, they all

23   influence what physicians prescribe.

24   BY MR. KNAPP:

1        Q.  And you would agree that prescribing

2    decisions by doctors are complex decisions that

3    are necessarily reliant on the individual

4    examination of a particular patient, right?

5            MR. SOBOL:  Objection.  Scope.

6            You can answer.

7        A.  I don't want to use complex because I

8    don't know relative to simple, so I will just

9    say that there are many factors that go into --

10   that often -- that often go into a physician's

11   decision about prescriptions.

12   BY MR. KNAPP:

13       Q.  Other than the factors that we've

14   already talked about, any other factors that

15   you've identified through the economic

16   literature that motivate doctors to write

17   prescriptions?

18           MR. SOBOL:  Objection.  Scope.

19           You can answer.

20       A.  Again, certainly the literature has

21   shown very clearly that promotion activity on

22   the part of manufacturers influences what

23   physicians do, what physicians prescribe, that

24   recommendations from senior colleagues or

1    colleagues who are expert in a particular area

2    can influence what physicians do.  So I think

3    there are -- there are a number of things

4    associated with beliefs.

5            I group them into categories, maybe

6    beliefs of physicians, financial incentives, and

7    other constraints.  And I think those three

8    areas, each of them influence what physicians

9    do.

10   BY MR. KNAPP:

11       Q.  Have you determined that Rosenthal's,

12   both of her direct and indirect models are

13   economically sound and reliable?

14       A.  I believe that her models are

15   economically sound and reliable.

16       Q.  Do you have a view on which model is

17   more reliable?

18       A.  I don't have a view as to which model

19   is more reliable.  I think in many ways the fact

20   that both Professor Rosenthal and I have

21   different models that reach relatively similar

22   conclusions adds strength to each of the models.

23       Q.  Now, if Dr. Rosenthal's opinions on

24   the percentage of shipments that were influenced

1    by the defendants' misconduct changed, then your

2    conclusions will change proportionately, right?

3            MR. SOBOL:  Objection.

4        A.  That -- not necessarily

5    proportionately, in a strict proportional sense.

6            But yes, if Dr. Rosenthal's opinions

7    change, that would influence the results that I

8    present.

9    BY MR. KNAPP:

10       Q.  So if the percentage that she's

11   attributing to defendants' misconduct -- strike

12   that.

13           If the percentage of shipments that

14   she's attributing to defendants' misconduct

15   drops from 10 to 5, the input in your model will

16   have to drop from 10 to 5?

17       A.  That is correct.  If she were to drop

18   her input, then that would directly translate

19   into a reduction in the input I use in my model.

20       Q.  And if a jury concludes that her

21   calculations are wrong, then that would

22   necessarily mean that your conclusions are

23   wrong, too, right?

24           MR. SOBOL:  Objection.

```
 1      A.   I don't think about it as a conclusion
 2  being wrong.  What I have is a model that will
 3  translate in input, which is shipments due to
 4  misconduct into an output which is harm.  That
 5  model will still be correct.
 6           What one can then do is apply that
 7  model to a different estimate about what share
 8  of harms are due to misconduct on the part of
 9  defendants as a whole or any single defendant.
10  It will yield an answer that's appropriate for
11  that.  That answer will not be wrong, no answer
12  is wrong, it's sort of giving you for the
13  appropriate input what is the appropriate
14  output.
15  BY MR. KNAPP:
16      Q.   Well, to be clear, if Dr. Rosenthal's
17  opinion is excluded or rejected, you don't offer
18  the court or the jury any way to link any harms
19  to defendants' conduct, correct?
20           MR. SOBOL:  Objection.
21      A.   In order to calculate the harms, I
22  would need an estimate from the court, from
23  Dr. Rosenthal, from any other expert as to what
24  share of harms are a result of defendants'
```

```
 1  misconduct.  With that, I could then estimate a
 2  damage calculation, a harm percentage.
 3  BY MR. KNAPP:
 4      Q.   But you personally haven't done the
 5  calculation of the percent of shipments that are
 6  attributable to defendants' misconduct?
 7      A.   I personally have not done the
 8  calculation as to the percent of shipments that
 9  are attributable to defendants' misconduct.
10           MR. KNAPP:  Why don't we break for
11  lunch.
12           THE VIDEOGRAPHER:  The time is
13  1:04 p.m., and we're off the record.
14           (Whereupon, a luncheon recess was
15           taken.)
16
17
18
19
20
21
22
23
24
```

```
 1           AFTERNOON SESSION
 2
 3           THE VIDEOGRAPHER:  The time is
 4  2:09 p.m., and we're on the record.
 5  BY MR. KNAPP:
 6      Q.   Good afternoon, Professor Cutler.
 7           Can you turn to Paragraph 10.1 in your
 8  report?  And actually I'm looking at the
 9  sentence above 10.1.  There's a reference to the
10  effect of prescription opioids shipments on
11  harms.
12           And I just want to clarify, when you
13  are referring to harms in this report, what
14  you're referring to is discrete events like an
15  arrest; you're not referring to the costs
16  associated with an event, right?
17      A.   That's correct.
18           MR. SOBOL:  Objection.
19           Don't forget about me.
20           THE WITNESS:  I apologize, sir.
21           MR. SOBOL:  And I'll call you
22  Dr. Cutler from now on, okay?
23      A.   In this report I show the impact on
24  events such as arrests, autopsies, child
```

```
 1  services issues.  It's then Professor McGuire's
 2  report that translates those into dollar
 3  amounts.
 4  BY MR. KNAPP:
 5      Q.   So if you look at Paragraph 11.4, it
 6  says "My Analysis of the Percentage of Costs,"
 7  and then it goes on from there.  You never
 8  actually look at the costs associated with any
 9  of these harms, right?
10           MR. SOBOL:  Objection.
11      A.   That's correct.  It's -- that's
12  correct.  I don't specifically look at the costs
13  here.
14  BY MR. KNAPP:
15      Q.   So you assume that each harm has the
16  same cost?
17           MR. SOBOL:  Objection.
18      A.   I don't assume that each harm has the
19  same cost.  Professor McGuire takes these
20  estimates and then he uses them to calculate the
21  cost burden faced by each of the specific
22  agencies.
23  BY MR. KNAPP:
24      Q.   So you don't weight your percentage of
```

1  harms that you say are attributable to opioids
2  based upon the costs that are associated with
3  any of those individual events, right?
4          MR. SOBOL:  Objection.
5      A.  I think that's correct.  That is, I'm
6  looking at, for example, the percentage of all
7  autopsies which are opioid-related.  If there
8  were different costs for an autopsy for
9  different reasons, that's something that
10  Professor McGuire would need to take into
11  account, but that's not something in this
12  report.
13  BY MR. KNAPP:
14      Q.  So for purposes of this question,
15  let's just assume that non-opioid-related harms
16  within a particular category of harms has a
17  greater overall cost than the harms associated
18  with opioids, okay?  Do you understand the
19  assumption?
20          MR. SOBOL:  Objection.
21      A.  Yes, I do understand the assumption.
22  BY MR. KNAPP:
23      Q.  If in that hypothetical your
24  percentage of harms attributable to the

1  defendants' misconduct was applied to the costs,
2  then the cost estimate would overstate the cost
3  attributable to opioids, is that right?
4      A.  So that's an issue where Professor
5  McGuire would need to have a different number,
6  so he would need to not be able to multiply an
7  aggregate percentage by a total dollar amount,
8  and so he would -- he would require a different
9  input than just, for example, the percentage of
10  that activity which is due to opioids.
11      Q.  And do you know if Professor McGuire
12  made any adjustments in his cost calculations
13  for the possibility that costs associated with
14  opioid-related harms are less than costs
15  associated with other non-opioid-related harms
16  within a category of harm?
17          MR. SOBOL:  Objection.  Scope.
18      A.  There is -- Professor McGuire did a
19  number of things to back out different parts of
20  the cost; that is, what the costs would be
21  applied to.  I don't recall whether he did
22  anything specific on backing out if there were
23  different -- within a category if there were
24  different parts that would result from

1  opioid-related harms relative to
2  non-opioid-related harms.
3  BY MR. KNAPP:
4      Q.  So do you know -- well, strike that.
5          Do you agree with the way that
6  Professor McGuire used your percentages in his
7  calculation of the costs associated with the
8  defendants' alleged misconduct?
9          MR. SOBOL:  Objection.  Scope.
10      A.  Yes, I believe he used them
11  appropriately.
12  BY MR. KNAPP:
13      Q.  All right.  If you turn to
14  Paragraph 24, we're going to talk for a while
15  now about what you refer to as the first step.
16          You say, "The first step requires
17  estimating the share of various harms
18  attributable to opioids."
19          Do you see that?
20      A.  Yes, I do see that.
21      Q.  For purposes of your model, what that
22  means is but for the existence of opioids in the
23  world, you're concluding that these harms would
24  not have occurred, right?

1          MR. SOBOL:  Objection.
2          You can answer.
3      A.  I'm -- the specific calculation is
4  what share of all the activity of the
5  relevant -- of the relevant agency was a result
6  of opioids.  That by itself doesn't -- I'm
7  trying to make fine distinctions in my mind,
8  which I'm not able to express.
9          So it is -- yes, it is like if, if --
10  as if there were -- what share of the activity
11  would not have needed to be undertaken if there
12  were no opioid -- no harms from opioids.
13  BY MR. KNAPP:
14      Q.  Well, let's try to make it concrete in
15  the context of crimes, which is your first
16  category.
17      A.  Mm-hmm.
18      Q.  What you're attempting to calculate is
19  the number of crimes that would not have
20  occurred if there weren't opioids in the world,
21  is that right?
22          MR. SOBOL:  Objection.
23      A.  It's actually the percentage of crimes
24  that result from the shipments of opioids above

1  the but-for level.

2  BY MR. KNAPP:

3      Q.  So I'm going to try to put it in

4  layman's terms.

5          MR. SOBOL:  I've been objecting

6  because you say "in the world," otherwise I

7  probably wouldn't be, in case that matters to

8  you.

9          MR. KNAPP:  Okay.  I appreciate it.

10  BY MR. KNAPP:

11      Q.  Well, let's start with kind of a first

12  principle.

13          If the percentage of harms that you

14  identify would occur even without opioids in the

15  United States, then you would agree that the

16  defendants' hurt here could not be but-for

17  causes of those harms, right?

18          MR. SOBOL:  Objection.  Scope.

19      A.  I'm going to restate it.  I'm going to

20  say exactly what I -- what I agree with.  These

21  are harms that are resulting from the

22  prescription opioids, and in some cases from the

23  illicit opioids, so if there had been no

24  prescription or illicit opioids then these harms

1  would not have occurred.

2  BY MR. KNAPP:

3      Q.  Okay.  So I want to talk about how

4  you -- how you make that conclusion that there

5  would be less crime in the world without

6  opioids.  So let's look at Paragraph 38.

7          You say, "Using the data described

8  above, the next step in the analysis is to then

9  determine the share of these crimes that were

10  either directly or indirectly motivated by

11  drugs."

12          Do you see that?

13      A.  Yes, I do see that.

14      Q.  And so for purposes of this model,

15  you're assuming that "motivated by drugs" means

16  that but for drugs these crimes would not have

17  been committed, right?

18      A.  In the case of the crime data, there

19  are very clear definitions that the FBI uses,

20  the national databases use in determining

21  whether the crime was either caused directly by

22  drugs or caused -- or resulting in some way from

23  the fact that the individual was addicted to

24  drugs.

1      Q.  That wasn't my question.

2          My question is the conclusions that

3  you're drawing from this data.  And the

4  conclusion that you're drawing is that but for

5  drugs, these crimes would not be committed?

6      A.  But for either the use of the drugs or

7  the desire to have money to buy the drugs.  Both

8  of those categories are in the data that are

9  attributed as being drug-related.

10      Q.  Okay.  And the data you rely upon to

11  estimate the percent of crimes that would not

12  have been committed in the absence of drugs is

13  the NDIC study titled "Economic Impact of

14  Illicit Drug Use on American Society," right?

15      A.  There are a couple of different

16  inputs.  There are a couple of parts.  One is

17  what share of the use is -- what share of the

18  crimes are by people who were either using drugs

19  or were committing the crime to obtain money for

20  drugs, and then that gets apportioned into an

21  opioid part.

22      Q.  And that -- those percentages you

23  pulled from the Economic Impact of Illicit Drug

24  Use on American Society from 2011, right?

1      A.  Yes, that's correct.

2      Q.  I'm handing you what's been marked as

3  Exhibit 3.

4          (Whereupon, Cutler Exhibit Number 3

5          was marked for identification.)

6  BY MR. KNAPP:

7      Q.  Now, this study relies on a survey

8  that was conducted by the Bureau of Justice

9  Statistics in 2002, right?

10      A.  Yes, that's correct.

11      Q.  And so you rely on a survey from 2002

12  to estimate the crimes in Summit and Cuyahoga

13  through 2016 that would not have been committed

14  but for drugs, right?

15      A.  That is one part of the analysis that

16  goes into it.  That's not the only part of the

17  analysis.

18      Q.  The 2002 survey was a national survey,

19  right?

20      A.  Yes, that is correct.

21      Q.  It was not specific to Cuyahoga or

22  Summit?

23      A.  No, it was not specific to either

24  Cuyahoga or Summit.

1    Q.   And you're relying on a question from
2  the survey -- well, strike that.
3         Do you know which question you're
4  relying on from the survey to identify your
5  percentages?
6    A.   Yes.  Let me look at -- let me draw
7  your attention in the report to Table 1.7, which
8  I need to find.  Okay.  So the specific --
9         MR. SOBOL:  Page.
10   A.   -- data are on Page 58, Table 1.7,
11  Jail Attribution Factors.  And I had thought I
12  remembered that it had the specific question,
13  although I see that it is not here, so it must
14  then be in the text, and so I don't recall off
15  the top of my head the specific question that
16  this is based on.
17  BY MR. KNAPP:
18   Q.   Do you know, sitting here today, what
19  the question was?
20        MR. SOBOL:  Objection.  Asked and
21  answered.
22   A.   Not the exact wording of it.  I'd like
23  to look through the report to find the question.
24  BY MR. KNAPP:

1    Q.   So if we go back to your report, let's
2  look at Table 3.3, which I believe is right
3  after Paragraph 38, these are the percentages of
4  crimes that you identified as being motivated by
5  drugs, right?
6    A.   Either committed by individuals on
7  drugs, or to obtain drugs, or to obtain money
8  for drugs.
9    Q.   And for the percentage of crimes that
10  you identified as being committed for -- to
11  obtain money for drugs or to obtain drugs
12  themselves, you assumed that there was a single
13  factor that motivated that crime, right?
14        MR. SOBOL:  Objection.  Asked and
15  answered.
16   A.   I don't recall specifically whether
17  the question here was about a single factor or
18  whether they asked about multiple factors.  I
19  would want to go back and look at the specifics
20  of the question here to answer that.
21  BY MR. KNAPP:
22   Q.   So would you agree that if the survey
23  didn't ask about whether drugs were their sole
24  motivation or if there was other motivations,

1  that it wouldn't be reliable to use that
2  percentage to say that these drugs wouldn't have
3  occurred but for drugs?
4         MR. SOBOL:  Objection.  Asked -- go
5  ahead.
6    A.   Actually I don't agree with that
7  statement, no.
8  BY MR. KNAPP:
9    Q.   So do you know if the survey question
10  asked the people who responded to it if their
11  sole motivation to commit these crimes was
12  drugs?
13        MR. SOBOL:  Objection.  Asked and
14  answered.
15        He's indicated -- why don't you go
16  back and look into the report and find the
17  answer you want.
18  BY MR. KNAPP:
19   Q.   Well, I can tell you the survey
20  question isn't in there, so you're not going to
21  find it in there.
22   A.   Okay.  Did you actually look at the
23  survey, sir?
24        MR. SOBOL:  He said he wanted to look

1  to see if it was there.  Or do you not want him
2  to look?
3  BY MR. KNAPP:
4    Q.   I have a question for you.  Did you
5  look at the survey that you relied on, the
6  results of which you relied on the data?
7    A.   Yes, I have looked at the survey.
8    Q.   So my question, without looking in
9  that report do you recall if the question in the
10  survey asked if the crime was motivated by a
11  single factor?
12   A.   I don't recall the specific question,
13  no.
14   Q.   The percentages that you have here
15  assume that these crimes were motivated by a
16  single factor, and but for that factor they
17  would not have occurred, right?
18        MR. SOBOL:  Objection.
19   A.   I'd want to look at the question to be
20  sure.  But also there are a number of sources of
21  uncertainty in estimates like this, and a number
22  of reasons why they might also be low in
23  addition to being high, so I don't have an
24  overall sense that the results would obviously

Highly Confidential - Subject to Further Confidentiality Review

1  have to be higher or lower than what's here.
2  BY MR. KNAPP:
3      Q.   Do you have any reason to believe that
4  anyone can identify the single factor that
5  causes an individual to commit a crime?
6          MR. SOBOL:  Objection.
7      A.   I'm not a criminologist, so I did not
8  design the survey.  In general, when I design
9  surveys or participate in surveys, there is some
10  pretesting to make sure that the question
11  elicits what one wants, so I don't know that
12  that's what was done here, but that would have
13  been a standard thing to do.
14  BY MR. KNAPP:
15     Q.   You relied on this data without
16  knowing if that standard pretesting was done,
17  right?
18         MR. SOBOL:  Objection.
19     A.   I relied on it.  And these data are
20  also used by other studies in the literature,
21  and so other authors have also relied on it.
22  BY MR. KNAPP:
23     Q.   But you don't know if the survey did
24  any standard pre-survey testing?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. SOBOL:  Objection.
2      A.   I did not look to see the history of
3  the development of the survey, no.
4  BY MR. KNAPP:
5      Q.   How many people responded to the
6  survey?
7      A.   Again, I'd like to check the number
8  before giving you an exact answer.
9      Q.   Can you estimate it sitting here right
10  now?
11         MR. SOBOL:  Do you want him to look at
12  the report, or do you want him to --
13  BY MR. KNAPP:
14     Q.   I'm asking what you know sitting here
15  today.  Do you know without looking at the
16  report how many people responded to the survey?
17     A.   No.  And I'd rather not hazard a guess
18  when the survey is sitting right in front of me.
19     Q.   Do you know how many jails
20  participated in the survey?
21         MR. SOBOL:  With or without looking at
22  the report?
23     A.   Without looking at the report, no, I
24  don't know.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. KNAPP:
2      Q.   Do you know if any Ohio jails
3  participated in the survey?
4      A.   Again, I'd like to look at the report
5  before answering.  I do not know off the top of
6  my head.
7      Q.   Do you know if any jails in Summit
8  County participated in the survey?
9      A.   I'd like to look at the report before
10  giving a specific answer as to whether jails in
11  Summit County participated.
12     Q.   Do you know if any jails in Cuyahoga
13  County participated in the survey?
14         MR. SOBOL:  Objection.  Asked and
15  answered.
16     A.   I'd like to look at the report before
17  answering how many jails in Cuyahoga
18  participated in the survey.
19  BY MR. KNAPP:
20     Q.   How many pages is the survey?
21         MR. SOBOL:  Do you want him to guess
22  that, too, or can he look at the report for
23  that?
24  BY MR. KNAPP:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   I'm asking for your recollection.
2      A.   I don't recall the number of pages in
3  the specific survey.  And as always, I don't
4  wish to guess when one could know the answer for
5  certain by looking.
6      Q.   Do you know how long it took for
7  anyone to complete the survey?
8      A.   No, I don't know their estimate of the
9  average time.
10     Q.   And you mentioned that you've
11  conducted surveys yourself, right?
12     A.   I have been involved in projects where
13  surveys have been conducted, that's correct.
14     Q.   And you didn't conduct your own survey
15  in connection with your report here about what
16  crimes would occur in the absence of drugs?
17     A.   No, I did not conduct a survey of
18  anyone about what crimes would have been
19  committed in the absence of drugs.
20     Q.   So what did you do to assess whether
21  this NDIC survey was representative of what
22  motivates crimes in Summit or Cuyahoga County?
23     A.   There are two answers to that.  First
24  is there are no surveys that I know of or that

1 anyone on our team was aware of that estimated
2 specifically for those for either Cuyahoga or
3 Summit County, so we -- I believe it would be
4 impossible to get an answer that is specific to
5 those counties.
6     Second, the data from this survey are
7 standardly used in the literature, and so we
8 were relying in addition to the -- obviously the
9 readings here, we were relying on the literature
10 that uses these data to estimate drug-associated
11 crimes.
12     Q.  When you say it's impossible to get an
13 answer to what percentage of crimes were
14 motivated by drugs in Summit or Cuyahoga County,
15 you mean it's impossible based upon existing
16 data sources, or it would be impossible to
17 structure a survey that could come up with an
18 estimate of that?
19     A.  I meant that it was impossible based
20 on existing data sources.
21     Q.  You could conceivably set up a survey
22 in Summit and Cuyahoga County to try to come up
23 with percentages, right?
24     MR. SOBOL:  Objection.

1     A.  Yes, you absolutely could design a
2 survey to do that.  Of course, one couldn't have
3 gotten historical data from a survey conducted
4 now, but it could be done.
5 BY MR. KNAPP:
6     Q.  Okay.  So look -- if we look back at
7 the report on Page 20, Table 3.3, what you've
8 concluded here is that but for drugs, there
9 would be 51.1 percent less cases of
10 prostitution, right?
11     A.  I just want to be very precise.
12 51.1 percent of prostitution crimes were either
13 committed while on drugs, for -- to obtain
14 drugs, or to obtain money for drugs.
15     Q.  And I'm focused on how you use that
16 data.
17     For purposes of your report, you
18 assume that there would be 51.1 percent less
19 cases of prostitution but for drugs in the
20 world?
21     MR. SOBOL:  Objection.
22     A.  The contribution of drugs to
23 prostitution is 51.1 percent.
24     The reason why I keep hesitating on

1 that is I don't mean it to imply that if you
2 reduced the drugs now that you would eliminate
3 51.1 percent of the prostitution.  As we spoke
4 about earlier, being where you are means that if
5 you then make changes it may have a different
6 effect than if it hadn't have occurred in the
7 first place.  So the distinction I'm making is
8 that the drugs having been there, it is,
9 therefore, the case that 51.1 percent are
10 related to drugs.
11 BY MR. KNAPP:
12     Q.  So you can't say in a but-for world
13 that there would be 51.1 percent less cases of
14 prostitution in the absence of drugs?
15     MR. SOBOL:  Objection.
16     A.  You'd need to define what the term "in
17 the absence of drugs" means.  That may be a
18 hypothetical, and I wouldn't want to answer a
19 hypothetical question.
20 BY MR. KNAPP:
21     Q.  Well, you're an expert that's opining
22 on the causes of drugs in the world, and you're
23 making conclusions here, so I'm going to ask you
24 a hypothetical, which is -- well, strike that.

1     I'm asking what your conclusions are
2 from this data.  And do you or do you not agree
3 that there would be 51.1 percent less cases of
4 prostitution but for drugs?
5     MR. SOBOL:  Objection.  Asked and
6 answered.
7     A.  I will say the statement that I agree
8 with.  51.1 percent of the cases of prostitution
9 involve individuals who are either using drugs,
10 engaged in prostitution to obtain drugs, or
11 engaged in prostitution to obtain money for
12 drugs.
13 BY MR. KNAPP:
14     Q.  Sir, if you cannot say that these
15 harms wouldn't have occurred but for drugs, how
16 can you say that the defendants here are the
17 but-for cause of any of these harms?
18     MR. SOBOL:  Objection.
19     A.  I want to make sure I'm -- there's a
20 part of your statement which I don't want to
21 agree with, which is a hypothetical that if we
22 eliminated drugs we would eliminate 51.1 percent
23 of prostitution.  I'm not making a statement
24 that going forward if we reduced shipments by

1  51.1 percent -- if we reduced shipments entirely

2  we would reduce prostitution by 51.1 percent.

3  I'm making a statement that because drugs had

4  become so important, 51.1 percent of

5  prostitution was associated with drugs.

6  BY MR. KNAPP:

7      Q.   Now, to be clear, in this world you've

8  created where there's no drugs, there would

9  still be alcohol, right?

10         MR. SOBOL:  Objection.

11     A.   That's correct, there would still be

12  alcohol.

13  BY MR. KNAPP:

14     Q.   And there would still be poverty?

15     A.   That's correct, there would still be

16  poverty.

17     Q.   There would still be income

18  inequality?

19     A.   That's correct, there would still be

20  income inequality.

21     Q.   There would still be unemployment?

22     A.   That's correct, there would still be

23  unemployment.

24     Q.   There would still be depression?

---

1      A.   That's correct, there would still be

2  depression.

3      Q.   There would still be anxiety?

4      A.   That is correct, there would still be

5  anxiety.

6      Q.   There would still be mental illness?

7      A.   That's correct, there would still be

8  mental illness.

9      Q.   And you assume for purposes of your

10  calculation that these other factors that I just

11  went through would not cause people to commit

12  the percentage of crimes identified in Table

13  3.3, that's implicit in your model, right?

14     A.   No, it's actually not implicit in the

15  model.  The -- those crimes, crimes committed

16  for those reasons are, of course, included here,

17  and so that's why these numbers are not

18  100 percent.  It is not the case that

19  100 percent of prostitution or 100 percent of

20  aggravated assault is a result of drugs, so all

21  of those are still going on.  They're all

22  leading to crime.  And then this is just the

23  additional amount that comes because the drugs

24  were so readily available, were shipped in such

---

1  quantities.

2      Q.   Well, to be clear, Professor Cutler,

3  this -- these figures are not limited to

4  opioids, these are just all drugs, right?

5      A.   That is correct, these are all drugs.

6      Q.   But you're just not comfortable saying

7  but for drugs in the world, any of these crimes

8  would be avoided or wouldn't have happened?

9          MR. SOBOL:  Objection.

10     A.   I'm trying to -- I'm trying to make a

11  distinction between the fact that the drugs were

12  out there and what the impact was, and a

13  hypothetical of eliminating the drugs.  And I'm

14  not making any statement about a hypothetical as

15  to eliminating the drugs.  I am -- nor am I

16  making a statement that other factors are not

17  important in crime at all.

18         All of these other factors are

19  important in crime in this and in the other --

20  and in the other analysis that I do.  All I'm

21  making a statement about is the share of these

22  crimes for which there was involvement of drugs

23  and for which one of the purposes involved

24  either directly drugs or money for drugs.

---

1  BY MR. KNAPP:

2      Q.   All right.  I'm going to hand you what

3  I'm marking as Cutler Exhibit 4.

4          (Whereupon, Cutler Exhibit Number 4

5          was marked for identification.)

6          MR. SOBOL:  This one must have sold

7  tens.

8  BY MR. KNAPP:

9      Q.   Okay.  So tab 4 is "Economic

10  Approaches to Estimating Benefits of Regulations

11  Affecting Addictive Goods," and it's a study

12  that you co-authored, right?

13     A.   That is correct, yes.

14     Q.   In this paper you recognize that

15  policies that take away addictive goods or

16  restrict consumption of illicit goods may lead

17  to substitution into other, quote unquote, bads,

18  right?

19     A.   That is one of the points that's made

20  by this paper, correct.

21     Q.   How do you account for that

22  substitution in your model?

23         MR. SOBOL:  Objection.

24     A.   I'm sorry, can you rephrase the

1  question, please?  Can you restate the question,
2  please?
3  BY MR. KNAPP:
4     Q.   How do you account for what you refer
5  to as substitution into other consumption bads
6  in your model in this case?
7     A.   In this case, one of the ways in which
8  that shows up is the substitution from
9  consumption of legal opioids into the
10  consumption of illegal opioids.  So that's one
11  example where people substitute from one harm
12  into another harm.
13     Q.   Well, I'm talking about just this
14  first step where you're calculating the
15  percentage of crimes that are -- that you say
16  are attributable to drugs.  And do you account
17  for at all the phenomenon that if there weren't
18  drugs in the world, people might move to other
19  consumption bads that would lead them to commit
20  crimes, the exact same crimes that you've
21  identified as being motivated by drugs?
22        MR. SOBOL:  Objection.
23     A.   In this specific table I haven't done
24  anything to say that individuals would switch

1  into another harm, which harm would then cause
2  them to commit crime.
3  BY MR. KNAPP:
4     Q.   When you say you haven't done anything
5  to say that individuals would switch into
6  another crime, what you mean is you haven't done
7  any analysis to say that individuals would not
8  switch into other crime, right?
9        MR. SOBOL:  Objection.
10     A.   I haven't done any analysis as to
11  whether individuals would or would not switch
12  into other drugs, any other activities that
13  would bring crime in the absence of drugs.
14     Q.   So if you look at S.22 of your paper,
15  Cutler Exhibit 4, do you see there's a -- I
16  guess you'd call it a graphic in the top left
17  there.
18        Do you see that?
19     A.   Yes, I do see that.
20     Q.   This is outlining the positive and
21  negative affects associated with existing users
22  who reduce their consumption of addictive goods,
23  is that right?
24     A.   Yes, that is correct.  And then

1  there's a lower part on potential users who are
2  deterred from initiation.
3     Q.   And at the top part, one of the things
4  that you look at is the negative effects of
5  taking away or restricting consumption of
6  addictive goods, right?
7     A.   Yes, that is correct.  That is one
8  possible negative consequence.
9     Q.   And one of the things that you
10  identify is the loss of positive attributes of
11  consumption, right?
12     A.   Yes, that is correct.
13     Q.   Where in your model do you account for
14  the loss of positive attributes of consumption,
15  assuming that opioid shipments did not happen?
16     A.   So when we -- when I estimate the
17  models here, when I present the models here, the
18  models here with respect to crime and with
19  respect to mortality are the net effect taking
20  account of any harmful activity as well as any
21  beneficial activity.
22        So if, for example, increased
23  shipments of opioids in an area had led more
24  people to be pain-free and able to work and

1  earning more and, therefore, not in some way
2  engaged in criminal activity, that would show up
3  in the crime regressions as a reduction in crime
4  associated with increased shipments of opioids.
5  What those regressions are giving is the net
6  effect of the factors that -- where -- of the
7  aspects where increased shipments lead to
8  increased crime, net of the effects where
9  increased shipments lead to lower crime.  And on
10  net what it's showing is a very strong increase
11  in crime associated with shipments of opioids.
12     Q.   To the extent that the benefits --
13  strike that.
14        To the extent that the loss of
15  positive attributes of consumption manifest
16  themselves in something other than mortality or
17  crime, your model doesn't account for that,
18  right?
19     A.   This model doesn't look at the welfare
20  consequences to the individual.  It's looking at
21  the impact on public services.
22        So, for example, if one were doing a
23  benefit-cost analysis of opioid shipments as a
24  whole, benefits for some people might be an

Highly Confidential - Subject to Further Confidentiality Review

1  increased ability to work and the amount that
2  they would earn, even if there were no impact
3  on, for example, criminal activity.  Losses to
4  the individual or to their family would include
5  morbidity consequences and mortality
6  consequences.  I have not estimated any of the
7  benefits or the costs to the individual.  So I'm
8  not doing an individual benefit-cost or a social
9  benefit-cost analysis here.  I'm strictly
10  looking at a government spending analysis here.
11       Just to contrast that, in the analysis
12  that was -- that's being done for -- in this
13  paper, there we are looking at a social
14  calculation of benefits and costs.  And so for a
15  social calculation of benefits and costs, one
16  wants to take into account the impact on the
17  individual.
18       So, for example, an individual who
19  lives longer because they're deterred from
20  smoking, that is a social benefit.  It doesn't
21  show up here, the reduction in mortality doesn't
22  directly show up as a loss associated with the
23  individual not living as long.
24       Q.   Have you ever heard of a concept

Highly Confidential - Subject to Further Confidentiality Review

1  called addiction replacement?
2       A.   Yes, I have heard of addiction
3  replacement.
4       Q.   What is that?
5       A.   It's a term from psychology, I
6  believe, that people who are addicted to one
7  substance might also become addicted to another
8  substance if the first substance is removed.
9       Q.   What is the prevalence of addiction
10  replacement in drug addicts?
11       A.   I do not know what the prevalence of
12  addiction replacement is in drug addicts.
13       Q.   How does your model account for
14  addiction replacement?
15       A.   The models of -- so the regression
16  models for mortality and for crime, each of
17  those, to the extent that there's addiction
18  replacement, would be -- would take that into
19  account.
20       So, for example, suppose that people
21  who used opioids in the absence of opioids would
22  have used cocaine and they would have died of
23  cocaine drug use.  One would pick that up by
24  looking at drug poisoning mortality overall, and

Highly Confidential - Subject to Further Confidentiality Review

1  one would see that shipments of opioids are not
2  associated with drug poisoning deaths overall.
3       Or similarly, looking at crime, if
4  people who were using opioids, instead of
5  opioids would have been using cocaine, just to
6  take that example since you raised it, and,
7  therefore, would have committed crimes
8  associated with cocaine, then there would be no
9  impact at all across areas in the relationship
10  -- there would be no relationship at all across
11  areas in shipments of opioid medications,
12  shipments of opioid drugs and crime because
13  there would simply be no tendency for crime to
14  be higher in areas with more shipments if all
15  those shipments were doing was just substituting
16  for other addictive substances that would have
17  led to crime.
18       Q.   Professor Cutler, if all of the crimes
19  in Table 3.3, let's go back to it, on Page 32
20  would have happened even now --
21       A.   I'm sorry, Page 32?
22       Q.   Page 20, Table 3.3.
23       A.   Okay.  Thank you.  Just want to make
24  sure I'm looking at the same table as you are.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.   If all -- this is a hypothetical
2  question.  If all of these crimes still would
3  have happened even without the existence of
4  drugs, the first variable in your calculation in
5  the percentage of harms attributable to these
6  defendants would be zero, right?
7       MR. SOBOL:  Objection.  Asked and
8  answered.
9       A.   So if everyone would have committed
10  crimes in the absence of drugs, then yes, these
11  would all be zero.  And then when we did the
12  crime models at the end, they would show no
13  relationship between opioid shipments and crime.
14  BY MR. KNAPP:
15       Q.   Well, to be clear again, Table 3.3 is
16  not just looking at opioids, it's looking at all
17  drugs, right?
18       A.   That's correct.  That is correct.
19       Q.   And you didn't run a regression on
20  crime and the prevalence of all drugs?
21       A.   No, we ran -- we ran the regression
22  relating crime to opioid drugs, which is the
23  correct one here because that would really
24  say -- to test the drug substitution hypothesis

1   or the addiction substitution hypothesis you
2   would want to relate it to the shipments of
3   opioid medications because that would then
4   directly test whether those shipments themselves
5   led to increased crime, or whether those
6   shipments simply substituted people from using
7   other drugs into using those drugs and had no
8   net effect on crime as a result.
9       Q.   We talked earlier about the standard
10  error.  What is the standard error associated
11  with this component of your calculation?  And by
12  "this component" I mean the percent of crimes
13  that you attribute to drugs.
14      A.   I don't have the standard errors
15  immediately offhand.  If I recall correctly, the
16  report indicates the nature of the standard
17  errors, but I don't recall it offhand.
18      Q.   Does it indicate the nature of the
19  standard errors for all steps in the
20  calculation, or is it just for the regression,
21  the regressions that you ran?
22      A.   I was referring -- when I said the
23  report indicates the standard errors, this
24  report you identified as Exhibit 3 would

1   indicate the standard errors associated with the
2   survey responses.  So that those standard errors
3   would come from the survey designer, and any
4   survey designer would indicate what the standard
5   errors are.  I report the standard errors for
6   the models that I do.
7       Q.   But the survey designer did not use
8   the results of the survey to say, you know --
9   well, strike that.
10          Let's turn to Paragraph 39.  So after
11  you have this calculation of crimes that you say
12  are attributable to drugs, and you try to
13  estimate the percentage of those crimes that are
14  attributable to opioids, right?
15      A.   Yes, that is correct.
16      Q.   And is it fair to say you're not
17  comfortable opining that the crimes -- those
18  crimes would not have occurred but for the
19  existence of opioids?
20      A.   I think the answer is the same here,
21  which is that what we're using for this are the
22  estimates of the opioid contribution of those
23  drug cases.
24          One of the reasons to do the analysis

1   of crime that we do in the report is to provide
2   another independent way of validating these
3   crime estimates.  So if these estimates were off
4   because people would have used some other drug,
5   that would also show up in our crime models as
6   no relationship between shipments and crime.
7       Q.   So my question was a little different.
8           Do you have an opinion on whether the
9   percentage of crimes that you identify as due to
10  opioids would not have occurred if there were no
11  opioids in the world?
12          MR. SOBOL:  Objection.
13      A.   So I think you're -- to the extent
14  that you're asking --
15          (Phone interruption.)
16          MR. SOBOL:  Oh, it's like the morning.
17      A.   To the extent that you're asking
18  about, for example, the substitution again, the
19  answer is correct that this assumes that there
20  would be no substitution into other types of
21  activities which would have also led to the
22  crime.
23      Q.   Okay.
24      A.   Or excuse me, another type of drug

1   that would have -- not activities, another type
2   of drug that would have led to the crime.
3   Excuse me.
4       Q.   And for -- to calculate the percentage
5   of drug crimes that are -- that you attribute to
6   opioids, you use crime data from the National
7   Forensic Laboratory Information System, right?
8       A.   Yes, that is correct.
9       Q.   And the NFLIS data, that's
10  national-level data, right?
11      A.   Yes, that is correct.
12      Q.   And in that data there's no
13  distinction between illicit opioids like heroin
14  and prescription opioids, right?
15      A.   Actually, let me just go back.  These
16  data, while they're national -- and I say here
17  so I just wanted to check that before answering.
18  The opioid share of reported drug crimes is
19  calculated using the share of such tests
20  undertaken by forensic laboratories in Ohio in
21  which an opioid was detected.
22      Q.   Got it.
23          So these are state-level data?
24      A.   I misspoke earlier when I agreed with

1  your assessment -- with your statement that it

2  was national.  That's correct.

3      Q.  So these are not data that are

4  specific to either Cuyahoga or Summit, right?

5      A.  That's correct.  They're not specific

6  to Cuyahoga or Summit.

7      Q.  And do you know if the plaintiffs here

8  have crime data for Cuyahoga and Summit that

9  could be used to identify the percentages of

10  laboratory testing that were -- that found an

11  opioid?

12      MR. SOBOL:  It's a yes or a no.

13      A.  I'm sorry.  Could you just repeat the

14  question, please?

15  BY MR. KNAPP:

16      Q.  Did you ask the -- well, strike that.

17      Do you know if the plaintiffs have

18  data that identifies the percentage of drugs

19  seized and tested by forensic laboratories in

20  Cuyahoga and Summit that include an opioid?

21      MR. SOBOL:  That's a yes or no.

22      A.  No, I do not know if they have that

23  information.

24  BY MR. KNAPP:

1      Q.  And you didn't ask for that data?

2      A.  As I indicated, I did not have the

3  conversations with the officials in Cuyahoga and

4  Summit, so I don't know whether that specific

5  question was asked and answered negatively or

6  not.

7      Q.  You personally didn't ask for it,

8  right, sir?

9      A.  I personally did not ask for it,

10  that's correct.

11      Q.  How does the NFLIS study handle crimes

12  when there are multiple drugs involved?  Strike

13  that.  Let me ask a different question.

14      In the NFLIS study when there's

15  multiple crimes -- strike that.

16      In the NFLIS study when there are

17  multiple drugs involved, the NFLIS study doesn't

18  weight the results based upon the volume of the

19  drug found, right?

20      A.  I would want to look back specifically

21  at the NFLIS study to be sure before agreeing to

22  that.

23      Q.  Do you know one way or another if it

24  weights crime statistics based upon the volume

1  of drugs that are found?

2      A.  Off the top of my head, no, I do not

3  know that.

4      Q.  Did you make any adjustments in your

5  report to address the possibility that NFLIS

6  data does not weight the results based upon the

7  volume of product?

8      A.  No, we did not make any adjustments

9  for that.

10      Q.  All right.  So then for other crimes

11  that you identify as drug-related crimes, you

12  use data on the share of people in Ohio with

13  substance use disorder who have been diagnosed

14  with opioid use disorder, right?

15      A.  I'm sorry.  Can you just repeat the

16  question?  I just want to make sure I process

17  the whole question.

18      Q.  So I'm down on Paragraph 39 at the

19  bottom of the page, the last sentence there.  To

20  estimate the other drug-related crimes

21  associated with opioids, what you do is you use

22  the share of people in Ohio with substance use

23  disorder who have opioid use disorder, right?

24      A.  Yes, that is correct.

1      Q.  And is what you're trying to estimate

2  there the people who commit drug-related crimes

3  who are motivated by opioids as opposed to some

4  other drug?

5      A.  Yes, that is correct.

6      Q.  And why is the share of people with

7  opioid use disorder a good proxy for that?

8      A.  It is, of course, a proxy, and so

9  every proxy could have possible errors.  In this

10  case, part of the -- probably the hypothesis

11  that's going in is that the crimes are more

12  likely to be committed by people who have use

13  disorder than by people with, say, appropriate

14  use, and so the use disorder is likely to be a

15  good proxy for the part which is criminal.

16      Q.  Well, to be clear, the crimes we're

17  looking at, we're not just looking at crimes

18  committed by people with opioid use disorder --

19  or strike that.

20      We're not just looking at crimes by

21  people with substance use disorders, it's crimes

22  committed by all people, right?

23      A.  Yes.  But remember that the definition

24  is people who are committing the crimes while on

Highly Confidential - Subject to Further Confidentiality Review

1  medication, or to obtain the drugs, or to obtain

2  money to obtain the drugs, and so that implies a

3  more severe form than just using the drugs.

4      Q.   And you agree that not all people who

5  commit crimes are -- have been diagnosed with

6  substance use disorders, right?

7      A.   Oh, that's correct.

8      Q.   Do you know what percentage have been

9  diagnosed with substance use disorder?

10     A.   No, I don't know which people with --

11  who commit a crime have been diagnosed with

12  substance use disorder.

13     Q.   So you referred to an error, a

14  potential error for when you use proxies.  Is

15  there an error rate associated with this

16  component of your calculation where you're

17  trying to calculate the percentage of crimes

18  that are attributable to opioids?

19         MR. SOBOL:  Objection.

20         You can answer.

21     A.   There are two types of errors that

22  economists traditionally think about.  There's

23  errors in measurement, for example, because one

24  has a small sample and that one can calculate

Highly Confidential - Subject to Further Confidentiality Review

1  the standard error associated with having a

2  small sample.  So, for example, one can obtain

3  the standard error around an estimate of a

4  percentage of people who have substance use

5  disorder by knowing the size, the population

6  size that was sampled and so on.

7         Then the second type of error is error

8  associated with what's called model uncertainty,

9  which is I'm not sure -- one can question

10  whether the model is accurate or not.  In that

11  type of model uncertainty, it's difficult, if

12  not impossible, to assign a specific standard

13  error.

14         What -- the example of something

15  that's used as a proxy for something else, it's

16  -- while sometimes one can construct a measure

17  of uncertainty, it's often the case that one

18  cannot do so because you're asking whether if I

19  had a different model in essence I would have

20  had a different result, and I don't --

21  therefore, I don't have an estimate of the

22  standard error associated with that part,

23  because it's really asking if I could use a

24  different model for that, how different would

Highly Confidential - Subject to Further Confidentiality Review

1  the results have been.

2      Q.   So in coming up with these percentages

3  of crimes that you attribute to opioids, you

4  didn't look at the details of a single case that

5  was handled by a prosecutor in Cuyahoga or

6  Summit County, is that right?

7      A.   I did not look at any specific cases

8  that were handled in either Cuyahoga or Summit

9  County.

10     Q.   And you didn't look at a single case

11  that was handled by a public defender in

12  Cuyahoga?

13     A.   I did not look at any specific cases

14  that were handled by a public defender in

15  Cuyahoga.

16     Q.   Did you look at any prosecutor data in

17  Summit or Cuyahoga County to see if it

18  identified crimes that involved drugs?

19     A.   The -- as noted here, the forensic

20  tests were done for Ohio, and so those

21  identifications were specifically from Ohio.  We

22  also matched these -- so this is what share of

23  the crimes were committed by people that -- were

24  committed that are drug-related.  Those then get

Highly Confidential - Subject to Further Confidentiality Review

1  applied to the specific crime totals in Cuyahoga

2  and Summit, crimes of each type in Cuyahoga and

3  Summit, so those numbers are a part of the

4  calculation.

5      Q.   My question was, did you look at the

6  actual records associated with any particular

7  crime that took place in Cuyahoga or Summit

8  County?

9      A.   I did not look at the records of any

10  particular crime, no.  We looked at the

11  aggregate numbers of crimes.

12     Q.   Did you look at the LERMS database to

13  identify whether there were -- the percentages

14  that you're applying here are consistent with

15  the law enforcement records in Summit or

16  Cuyahoga County?

17     A.   No, I did not look at the LERMS

18  database.

19     Q.   Do you know what the LERMS database

20  is?

21     A.   I have heard about it, yes.

22     Q.   You didn't ask to access the LERMS

23  database so that you could run searches across

24  it to see if the actual law enforcement records

1  were consistent with the percentages that you're

2  applying?

3      A.  As I say, I did not do the specific

4  asking, so I would want to go back and review

5  the notes from the team that asked to determine

6  what questions were asked about that and then

7  what answers were given.

8      Q.  Well, whether it was asked or not, you

9  didn't personally look at the LERMS database to

10  determine whether the crimes that actually took

11  place in Summit and Cuyahoga County were

12  consistent with the percentages that you're

13  calculating in this first step of your

14  calculation?

15      A.  That's correct, I did not specifically

16  look at LERMS database for this.

17      Q.  All right.  Let's move on to the next

18  section, share of addiction and mental health

19  activity attributable to --

20      A.  I wonder if we could take a break so I

21  could use the men's room --

22      Q.  Let's do it.

23      A.  -- and get some water.

24          THE VIDEOGRAPHER:  The time is

1  3:08 p.m., and we're off the record.

2          (Whereupon, a recess was taken.)

3          THE VIDEOGRAPHER:  The time is

4  3:22 p.m., and we're on the record.

5  BY MR. KNAPP:

6      Q.  Professor Cutler, I want to circle

7  back to a response that you gave to a question I

8  asked about whether you asked to access the

9  LERMS database, and what you said was, "as I

10  said, I did not do the specific asking, so I'd

11  want to go back and review the notes from the

12  team that asked."

13          What notes are you referring to?

14          MR. SOBOL:  Are they with counsel, or

15  the presence of counsel?

16      A.  I think I misspoke.  I don't have any

17  notes.  I think I should have said I would want

18  to ask the team that did the asking.

19  BY MR. KNAPP:

20      Q.  So you don't have any written memos,

21  written notes, whether it's handwritten, typed

22  up, nothing like that from the team that

23  conducted interviews?

24      A.  No, I do not have any written,

1  handwritten, typed e-mailed notes.

2      Q.  Did you ever have notes of that sort?

3      A.  No, I never did have notes of that

4  sort.

5          I apologize.  I misspoke then.

6      Q.  All right.  So if we look at 23, you

7  have "Share of addiction in mental health

8  activity attributable to opioids."  And I want

9  to ask a similar question to what I asked on the

10  crime data, is, are you opining that but for the

11  existence of opioids in the world, the

12  percentages that you calculate of addiction and

13  mental health activity would not have happened?

14          MR. SOBOL:  Objection.

15      A.  Again, I just want to make clear the

16  distinction between the fact that because there

17  were opioids these services had to be provided

18  which would not otherwise have been provided,

19  versus the hypothetical of if one now reduced

20  opioids would, therefore, these services no

21  longer need to be provided.

22          On the first of those, that is what

23  I'm opining, that because of opioids these

24  services had to be provided and they would not

1  otherwise have had to be provided.

2      Q.  So I want to ask you about the

3  second -- the latter part of your answer, which

4  is, are you opining that, let's say, back in

5  2006, but for the existence of opioids, Summit

6  and Cuyahoga would have avoided the harms that

7  you calculate for addiction and mental health

8  activity?

9      A.  Yes, had there not been the influx of

10  opioids, then those harms in the ADAMHS Board in

11  Cuyahoga and the ADM Board in Summit, those

12  services would not have needed to have been

13  provided.

14      Q.  So let me make sure I understand this.

15          So if we look at Table 3.5, under

16  Cuyahoga 2006, it says 3.3 percent

17  opioid-related percent of services.  So are you

18  opining that there would have been 3.3 percent

19  less services provided by the Cuyahoga ADAMHS

20  Board but for the existence of opioids?

21      A.  Technically, it's that 3.3 percent of

22  their services were utilized by opioids that

23  would not have otherwise need to.  The

24  3.3 percent less is an issue that 3.3 percent of

1  the existing services is not exactly 3.3 percent

2  less than the total.  Other than that, that is

3  correct.

4      Q.   And for purposes of this part of your

5  analysis, the results in Table 3.5, what

6  analysis did you do that if there were no

7  opioids, but for the existence of opioids, the

8  people that you identified as addicted to

9  opioids wouldn't have become addicted to other

10  drugs?

11      A.   In this analysis we did not assume any

12  offset; that is, we did not assume that people

13  who were addicted to opioids if there had been

14  no opioids would have been addicted to anything

15  else.

16      Q.   So you didn't account for addiction

17  replacement in connection with this calculation

18  of the percent of treatment and addiction

19  services associated with opioids?

20          MR. SOBOL:  Objection.  Misstates.

21      A.   The ideal way to look at addiction

22  offset is like what we did with the models of

23  crime that are in the report, is to look at the

24  harm as it relates to opioids because that is

---

1  the -- that nets out all the different factors

2  for that.

3          Unfortunately, the data do not exist

4  to allow one to do that in this circumstance, so

5  I couldn't do a model that would try to look at

6  the offsetting -- any potential offsetting

7  effects the way that I could with the models for

8  crime.

9  BY MR. KNAPP:

10      Q.   All right.  And so let's talk, then,

11  about the data that you used to come up with

12  these percentages.  And I want to start with the

13  Cuyahoga County ADAMHS Board.

14          And to come up with the percentages

15  attributable to opioids, did you look at annual

16  reports prepared by the Cuyahoga ADAMHS Board?

17      A.   Let me refer you very specifically to

18  what we did, which you'll find in the appendix,

19  and so let me turn to the appendix.  So you can

20  see the --

21          MR. SOBOL:  Where are you?  The

22  appendix is fairly limited, Doctor.

23          THE WITNESS:  It's enough to give one

24  a hernia.

---

1          Appendix III.D shows the specific data

2  that are used in the -- that are used in the

3  opioid-related percent of addiction and

4  treatment services.  III.D.1 is for Cuyahoga,

5  and III.D.2 is for Summit County.

6  BY MR. KNAPP;

7      Q.   Okay.  Handing you what I have marked

8  as Cutler Exhibit 5.

9          (Whereupon, Cutler Exhibit Number 5

10          was marked for identification.)

11  BY MR. KNAPP:

12      Q.   Have you seen this document before,

13  sir?

14      A.   I believe I have, yes.

15      Q.   And is this one of the documents that

16  you relied on to calculate the opioid-related

17  share of addiction and mental health activity by

18  the Cuyahoga ADAMHS Board?

19      A.   I would just want to check exactly to

20  make sure that it's precisely what it is that's

21  referred to in the report, so I'd be happy to do

22  that if you wish.

23      Q.   Well, if we look at Appendix III.D.1,

24  panel B-2, sources and notes 1 to 15, you say

---

1  2009 to 2017 ADAMHS annual reports.

2          Do you see that?

3      A.   Yes, I do.

4      Q.   Do you know if this is an ADAMHS

5  annual report, the document that I just handed

6  you, Cutler Exhibit 5?

7      A.   Yes, this is an ADAMHS annual report.

8  Again, I just wanted to make sure that the

9  numbers would match exactly, but yes.

10      Q.   So point me to where in this Cutler

11  Exhibit 5 you're pulling the data for for 2017.

12      A.   Okay.  Let me make sure I get the

13  exact cite correctly.

14          So I'm sorry, so which number would

15  you like to know about exactly?  Could you just

16  please repeat that part?

17      Q.   I'm -- my question is where in this

18  annual report did you pull the data from that's

19  in your Appendix III.D?

20      A.   And which specific row in III.D would

21  you like me to point you to?

22      Q.   Let's do assessment.

23      A.   So which part of III.D are you looking

24  at?  Can you just let me know just the --

1  Q.  Panel B.2.

2  A.  Panel B.2.  Okay.  And then the

3  assessment.

4  So the specific footnote refers to

5  annual reports, Page 8, and the addiction

6  services are here's the total of the addiction

7  services, 23.3 million in the Page 8 and

8  23.28 million in the total addiction services

9  spending in line 16 -- row 16, excuse me.

10  And then these would come from just

11  taking the percentages, so the assessment number

12  would come from taking the 2 percent in the

13  assessment, or you can also see the 410,000

14  that's -- since these are in millions, the

15  410,000 in the column for 2017 in row 1 matches

16  the 407,000 in the top pie chart on Page 8 of

17  the annual report.

18  Q.  So did you verify in connection with

19  your report how the expenses identified in this

20  annual report were calculated?

21  A.  I did not personally, so we used the

22  data from here.  So I did not personally verify

23  how these numbers were calculated.

24  Q.  Are you aware that in 2012 the

1  Cuyahoga ADAMHS Board stopped reporting its

2  Medicaid-related expenses?

3  A.  No, I wasn't aware of that.

4  Q.  You didn't account for that in your

5  analysis?

6  A.  No.  I would need to -- I did not

7  account for any Medicaid-related component.

8  Q.  And you didn't speak with anyone at

9  the ADAMHS Board to determine how they

10  calculated the board's expenses by service

11  category as they're reported in this report?

12  A.  I personally did not.  I don't know if

13  that was part of one of the -- one of the other

14  members of the team.  I don't know if they spoke

15  with them.  It might also have been one of the

16  lawyers might have spoken with them and obtained

17  information, so I don't -- but I did not

18  personally.

19  Q.  Well, can you identify any particular

20  information that was communicated to you by the

21  lawyers or by your team that you're relying on

22  for purposes of your report that you're relying

23  on?

24  MR. SOBOL:  Objection.

1  I instruct him not to answer.

2  MR. KNAPP:  What's the basis for that

3  if he's relying on the data for purposes of his

4  report?

5  MR. SOBOL:  You just asked him what

6  the lawyers told him.  He didn't say he has

7  relied upon anything the lawyers told him.

8  MR. KNAPP:  I limited my question to

9  what he's relying on.

10  MR. SOBOL:  I didn't hear it that way

11  at all.

12  A.  Could you repeat the question, please?

13  MR. SOBOL:  You said lawyers or by

14  your team.

15  MR. KNAPP:  That you're relying on.

16  MR. SOBOL:  Why don't you break it up.

17  It's compound.

18  BY MR. KNAPP:

19  Q.  Well, let's start with, can you

20  identify any particular information that was

21  communicate -- well, strike that.  I'm going to

22  break it up into pieces.

23  You didn't -- you personally did not

24  speak with anyone associated with Cuyahoga

1  ADAMHS Board, right?

2  A.  Correct.  I personally did not speak

3  with anyone at the ADAMHS Board.

4  Q.  And you don't -- you can't say sitting

5  here today if anyone on your team spoke with

6  anyone from the Cuyahoga County ADAMHS Board,

7  right?

8  A.  That's correct.  I don't know whether

9  anyone on the team spoke with the ADAMHS Board.

10  Q.  You can't identify any information

11  that was communicated to you by anyone about the

12  ADAMHS Board that you're relying on for purposes

13  of these calculations, right?

14  MR. SOBOL:  I instruct him not to

15  answer to the extent it might involve an

16  attorney-client -- excuse me -- an attorney

17  communication.

18  A.  With respect to non-legal

19  communications, I do not know of any direct

20  communication about these specific data from a

21  member of the ADAMHS Board.

22  BY MR. KNAPP:

23  Q.  Okay.  If you look at Page 11 of the

24  annual report, Cutler Exhibit 5, do you see

1  there's a pie chart down at the bottom?

2      A.   Yes, I do see the pie chart.

3      Q.   Identifies opioid-type dependence?

4      A.   Yes, I see that.

5      Q.   Do you know what that -- what

6  opioid-type dependence means in connection with

7  this report?

8      A.   I believe that refers to, as the words

9  say, any type of opioid dependence.

10     Q.   So a dependence upon any type of

11  opioid would fall within this category?  That's

12  your understanding?

13     A.   Yes, that is my understanding.

14     Q.   What's the basis for that

15  understanding?

16     A.   The basis -- so what I would first

17  want to do is check to make sure my

18  understanding is correct by looking specifically

19  at where the data come from, and then what I

20  would do is the basis for that would then be the

21  report itself and our reading of the report.

22     Q.   Do you know if opioid-type dependence

23  includes dependence on any drugs not including

24  opioids?

1      A.   I don't know the answer offhand, and I

2  would want to look through specifically to see.

3      Q.   I want to circle back to my question

4  about Medicaid expenses with respect to the

5  Cuyahoga County ADAMHS Board.  Do you know if

6  Medicaid-related expenses were included in

7  annual reports prior to 2012?

8          MR. SOBOL:  Objection.  Asked and

9  answered.

10     A.   No, I do not know about the treatment

11  of Medicaid.

12  BY MR. KNAPP:

13     Q.   You don't know how it was handled in

14  these reports or in your report?

15          MR. SOBOL:  Objection.  Asked and

16  answered.

17     A.   In the report, not off the top of my

18  head.  I would want to do a little bit of -- I

19  want to -- I would want to look at each of the

20  numbers in specific before giving you an answer.

21  BY MR. KNAPP:

22     Q.   Well, let's assume that Medicaid

23  expenses are in the data prior to 2012 and not

24  in the data after 2012.  If that's the case,

1  would you want to pull out the Medicaid expenses

2  from prior to 2012?

3          MR. SOBOL:  Objection.

4      A.   What we're interested in here is what

5  percentage of the activity of the boards is

6  related to opioids.  First what share of the

7  activity is related to drugs, and then second is

8  what share of the activity is related to

9  opioids.  What I would want to do is to look and

10  see how each of those percentages varies over

11  time with the components that the ADAMHS Board

12  has included.

13  BY MR. KNAPP:

14     Q.   But you haven't done that, correct?

15     A.   That's correct, I have not made any

16  adjustment over time.

17     Q.   Okay.  Did you speak with anyone at

18  the Summit County Alcohol, Drug and Mental

19  Health Board in connection with preparing your

20  opinions here?

21          MR. SOBOL:  Objection.  Asked and

22  answered.

23     A.   I personally --

24          MR. KNAPP:  This is now Summit.  We

1  were talking about Cuyahoga before.

2          MR. SOBOL:  I was thinking about this

3  morning.

4      A.   I personally did not speak with anyone

5  at the ADM Board in Summit.

6  BY MR. KNAPP:

7      Q.   And you personally didn't verify how

8  any of the expenditures in Summit County's ADM

9  Board's annual reports were prepared?

10     A.   That's correct, I personally did not

11  verify it with anyone at the ADM Board.

12     Q.   You calculated the harms related to

13  addiction services for both licit and illicit

14  opioids, right?

15     A.   Yes, that is correct.

16     Q.   And you don't have any calculation in

17  your report that shows the harms associated

18  solely with licit opioids, correct?

19     A.   In this specific component of the

20  share of ADM and ADAMHS spending that are

21  associated with opioids, those specific shares

22  do not differentiate between use of licit and

23  illicit opioids.  We do other things in the

24  report to pull apart the parts that are due to

1 each as you -- as we were talking about, for

2 example, with the direct and the indirect

3 models.

4    Q.   But at this step in your calculation

5 when you're calculating the harms that you say

6 are associated with opioids, you don't

7 differentiate between licit or illicit?

8    MR. SOBOL:  "This part" being?

9    MR. KNAPP:  The calculation that's

10 reflected in paragraph -- well, let me get the

11 right table.  Table 3.5.

12    A.   Can you just refer me to the page,

13 please?

14 BY MR. KNAPP:

15    Q.   24.

16    A.   Thank you.

17         That is correct.  In Table 3.5 we do

18 not make any differentiation as to licit and

19 illicit opioid services.

20    Q.   And so if a jury finds that the

21 defendants cannot be held responsible for harms

22 caused by illicit opioids, you can't identify

23 the portion of treatment and addiction services

24 that are limited to licit opioids, correct?

1    A.   That's correct.

2    MR. SOBOL:  Objection to form.

3    Go ahead.

4    A.   That's correct.  One would need to do

5 additional data analysis to try to pull out the

6 parts which are due to licit and illicit

7 opioids.

8 BY MR. KNAPP:

9    Q.   Okay.  Let's turn to Paragraph 44.

10 And 44 -- strike that.

11         In Paragraph 44, you're describing how

12 you calculated the share of children's and

13 family services activity attributable to

14 opioids, right?

15    A.   Yes, that's correct.  That paragraph

16 discusses calculating the share of children's

17 services due to opioids.

18    Q.   Does Table 3.6 reflect the percentage

19 of child removals in each year that you believe

20 would have been avoided but for opioids?

21    A.   Again, I want to make the distinction.

22 Because of the widespread shipments and use of

23 opioid drugs, these were child-related services

24 that would not otherwise have needed to occur,

1 but that's not saying anything about if one were

2 to reduce opioids at this point would those

3 services disappear.

4    Q.   Do you mean at this point as in 2000

5 -- April 26th of 2019?

6    A.   That's correct.

7    Q.   And so you are opining that if there

8 were no opioids in 2006, there would be

9 4.5 percent less opioid-related removals in

10 Cuyahoga children and family services?

11    MR. SOBOL:  Objection.

12    A.   Technically you're mixing up the

13 4.5 percent.  So the 4.5 percent is of the

14 services provided in 2006.  That's not the

15 reduction in what the services would be because

16 of the difference in the denominator, but yes.

17    I'm sorry.  I don't mean to be

18 pedantic about the --

19 BY MR. KNAPP:

20    Q.   No, it's a different calculation, so I

21 want to make sure I understand it.

22    Can you explain to me how you would

23 calculate the -- hang on one second.  Strike

24 that.

1         So if we look at Table 3.6, you

2 estimate that in 2017 there would be 27 --

3 strike that.

4         In 2017 you estimate that 27 percent

5 of the child removals in Summit County are

6 opioid related, right?

7    A.   Yes, that's correct.  In 2017, it's

8 27 percent in Summit County.

9    Q.   And so if we were trying to calculate

10 what that implies in terms of a but-for

11 percentage of removals, that -- strike that.

12    Can you just explain how you would

13 calculate the percentage of removals that would

14 have occurred in your calculation but for the

15 existence of opioids?

16    A.   I think the safest statement here is

17 that 27 percent of the child service -- of the

18 child removals were associated with opioids, and

19 therefore those 27 percent of services would not

20 need to be provided but for the opioid epidemic.

21    Q.   Okay.

22    A.   Those 27 percent of the total of

23 existing services.

24    Q.   And just to be clear, in this but-for

1  world with respect to child removals, there
2  would still be poverty, right?
3      A.   That's correct, there would still be
4  poverty.
5      Q.   And there still would be alcohol
6  abuse?
7      A.   That's correct, there would still be
8  alcohol abuse.
9      Q.   Still be abuse of other drugs?
10     A.   That's correct, there would still be
11 abuse of other drugs.
12     Q.   Still be mental illness?
13     A.   That's correct, there would still be
14 mental illness.
15     Q.   There would still be teenage
16 pregnancy?
17     A.   That's correct, there would still be
18 teenage pregnancy.
19     Q.   There would still be depression?
20     A.   That's correct, there would still be
21 depression.
22     Q.   There would still be unemployment?
23     A.   That's correct, there would still be
24 unemployment.

1      Q.   There would still be domestic
2  violence?
3      A.   That's correct, unfortunately there
4  would still be domestic violence.
5      Q.   There would still be child neglect and
6  abuse?
7      A.   That's correct, there still would be
8  child neglect and abuse.
9      Q.   And so your analysis assumes that
10 these factors played no part in the 27 percent
11 of child removals in Summit County in 2017 that
12 you attribute to opioids?
13     A.   I don't think that's correct.  Those
14 may have also been occurring, but the opioid --
15 but the removal was related to the opioids, but
16 I don't think it says those were not occurring
17 at all.  So it doesn't say, for example, that
18 the family was not in poverty, it doesn't say
19 that the family was not a single-headed family
20 or a family of a teenage mom.
21     Q.   You said the removal was related to
22 the opioids.  What is the basis for that
23 statement?
24     A.   So that comes from the Public

1  Children's Services Association of Ohio which
2  has its report on the opioid epidemic's impact
3  on children's services in Ohio.
4      Q.   And so is it your understanding that
5  that report identifies opioids as the cause of
6  the child removal in 27 percent of the cases in
7  Summit County in 2017?
8          MR. SOBOL:  Objection.
9      A.   The -- let me call your attention to
10 the footnote of Appendix III.E.2, the first note
11 of that table, which is on Page 2 of Appendix
12 III.E.  "25 percent of children taken into
13 custody in 2015 had parents using opioids at the
14 time of removal."
15 BY MR. KNAPP:
16     Q.   Right.  So let's -- that's a good
17 distinction.  Let's focus on 2015.
18         So the report that you're relying on
19 contains data from 2015, is that right?
20     A.   Yes, that is correct.
21     Q.   And I just want to make sure if you
22 understand what that data reflects.  Do you
23 believe that the data for 2015 says that
24 25 percent of the child removals in Summit

1  County were caused by opioids?
2          MR. SOBOL:  Objection.  Asked and
3  answered.
4      A.   I want to look back at the report to
5  use the -- to get the specific language that's
6  used.  Here we have -- I have parents using
7  opioids at the time of removal, but I want to
8  look back because I think it may have been a
9  little stronger language in the report.
10 BY MR. KNAPP:
11     Q.   In the report, the opioid epidemic's
12 impact on children's services in Ohio, you
13 believe the language is stronger?
14     A.   That's correct.  I want to look at the
15 language to be sure in the PCSAO report.  I
16 would like to look back at that language.
17     Q.   Does your model -- strike that.
18         Your Table 3.6 implicitly assumes that
19 the opioid was the cause of the child removal,
20 correct?
21         MR. SOBOL:  Objection.
22     A.   Not so much the cause as that the
23 removal would not have occurred had the family
24 not been using opioids, so it tipped the scale

1  in terms of removal.
2  BY MR. KNAPP:
3      Q.   And you believe that the survey that
4  you looked at supports that conclusion?
5      A.   Yes, I do.  And, again, I'd really
6  like to get the specific language if that's an
7  issue.
8      Q.   Well, let me ask you this.
9          Did you see the survey that you're
10  relying on that's reported -- the results of
11  which are reported in -- actually, you know
12  what?  Strike that.
13          Let me mark this.
14          (Whereupon, Cutler Exhibit Number 6
15          was marked for identification.)
16  BY MR. KNAPP:
17      Q.   Handing you what's been marked as
18  Cutler Exhibit 6.  Is this the report that
19  you're relying on for the percentages in Table
20  3.6?
21      A.   Yes, this is the report that's used in
22  Table 3.6.
23      Q.   And if we look at the tenth page, it
24  says "Impact of opioid epidemic on children."

1  Is that where you're pulling your percentages
2  from?
3      A.   Yes, that is correct.
4      Q.   And this particular data relies on a
5  PCSAO opiate survey, correct?
6      A.   That's correct.  This is a survey by
7  the Public Children's Services Association of
8  Ohio.
9      Q.   Did you see any of the survey
10  questions?
11      A.   No.  I don't think I saw the survey
12  questions for this.
13      Q.   Did you see any of the completed
14  survey forms?
15      A.   I have not looked at the completed
16  survey forms.
17      Q.   Did you see any of the underlying
18  data?
19      A.   My understanding is that these are the
20  underlying data that was reported to PCSAO.
21      Q.   Have you seen the underlying data?
22  There has to be numbers that make up these
23  percentages, right?
24      A.   I have not seen a specific form that

1  was filled out by any particular county in Ohio.
2      Q.   And do you know how many cases of
3  child removals are reflected in this survey?
4      A.   It varies by the county.  The
5  counties -- if I recall the survey correctly,
6  the counties were asked about all child removals
7  in the county.
8      Q.   You say you recall the survey
9  correctly, yet did you testify that you haven't
10  seen the survey, though, correct?
11      A.   If I recall -- that's correct, I
12  haven't seen the survey.  I have seen the
13  reports and I've read some of the deposition
14  transcripts from others who were asked about the
15  PCSAO survey and its reporting.
16      Q.   Okay.  If we look at what Page 10
17  says, it says "Impact of opioid epidemic on
18  children.  28 percent of children taken into
19  custody in 2015 had parents who were using
20  opioids at time of removal."
21          Do you see that?  It's the text on
22  the -- big blue text on the right.
23      A.   Yes.  Yes, I do see that.  Thank you.
24      Q.   Where does it say in this report that

1  the opioid tipped the scales, as you said, to
2  cause the removal?
3      A.   I'd like to look back and see the
4  specific question that was asked of them.  And
5  it may be I'm remembering it incorrectly or it
6  may be that I'm remembering it from one of the
7  depositions, but I -- so I just want to be -- I
8  would like to be certain before saying that.
9      Q.   You can look at the report.
10      A.   Okay.  If I recall correctly, it's not
11  in this specific report because one would need
12  the survey data.  And then I'm trying to
13  remember whether, for example, it was in the
14  deposition testimony or whether I had seen it
15  somewhere else, but I don't recall off the top
16  of my head a specific source for the exact
17  question that was asked of the counties.
18      Q.   But your -- you believe that the
19  results of the survey indicated that the opioid
20  use is what tipped the scales to require a child
21  removal?
22      A.   I don't want to state that with
23  100 percent confidence that that's true because
24  I don't recall it 100 percent for sure.  So let

1  me say that I'd like to go back and look at the

2  specific question that was asked of the county.

3      Q.   Your figures in Table 3.6 implicitly

4  assume that the opioid is what caused or tipped

5  the scales to result in the child removal,

6  right?

7      A.   Correct.  Here the 25 percent is that

8  those removals would not have occurred in the

9  absence of the opioids.

10     Q.   Do you see any survey data on the

11 percentage of removals that involved opioid use

12 from prior to 2015?

13     A.   I have not seen any data from Ohio

14 that are as reliable that are from prior to

15 2015.

16     Q.   And what you did is you back casted

17 the percentages that you're estimating based

18 upon this 2015 survey, right?

19     A.   That's --

20          MR. SOBOL:  Objection.

21     A.   That's correct.  We estimated back

22 casting and then forecasting to 2016 and 2017

23 from the data in 2015.

24 BY MR. KNAPP:

1      Q.   You didn't see any data about child

2  removals from prior to 2015 that would give you

3  comfort that you could accurately back cast

4  based upon this 2015 survey?

5          MR. SOBOL:  Objection.

6      A.   There was no comparable survey that

7  was done by PCSAO or any other organization that

8  was comparable to this that we could use to look

9  farther back in time.

10 BY MR. KNAPP:

11     Q.   So I understand there was no

12 comparable survey.  I'm asking what gave you

13 comfort that you could back cast in prior years

14 based upon the 2015 report?

15     A.   The back casting that we're using from

16 the 2015 report is based on the share of people

17 with substance use that are related to opioids

18 from the ADAMHS Board and the ADM Board.

19 Those -- again, substance use disorder is a very

20 severe form of utilization, and, of course,

21 child removals is a very severe form of

22 interaction with a family -- with a troubled

23 family, so I was -- I felt confident in using

24 the severe form of use disorder to back cast the

1  severe form of child intervention.

2      Q.   And so what evidence do you have that

3  the trend of opioid use disorder in these

4  counties is applicable or a good proxy for child

5  removals in these counties?

6      A.   I'm sorry, can you just repeat the

7  question, please?

8      Q.   What evidence do you have that the

9  trend of opioid use disorder in these counties

10 is a good proxy for child removals in these

11 counties prior to 2015?

12     A.   Unfortunately, without a good time

13 series of data that are comparable to this, I

14 don't have any way of benchmarking this with

15 other information.

16     Q.   Do you understand if people with

17 children are more or less likely to use opioids,

18 to abuse opioids?  Strike that.

19          Do you understand if someone with a

20 child is more or less likely to abuse opioids?

21          MR. SOBOL:  Objection.

22     A.   That's an epidemiological question

23 about abuse of opioids, and I don't know the

24 answer off the top of my head.  I would want to

1  consult with epidemiology papers on opioid

2  abuse.

3  BY MR. KNAPP:

4      Q.   You didn't get the answer to that

5  question before using the trend of opioid use

6  disorder to project and back cast child removals

7  in Summit or Cuyahoga County, right?

8      A.   I don't think that question is

9  relevant for whether this is an appropriate way

10 to extrapolate.

11     Q.   My question wasn't whether you think

12 it's relevant or not.  You didn't do it, did

13 you?

14          MR. SOBOL:  Objection.  Asked and

15 answered.

16     A.   I didn't do it because it wasn't

17 relevant.

18 BY MR. KNAPP:

19     Q.   Now, to be clear, Paragraph 10 doesn't

20 reflect whether the parents involved in the

21 25 percent of removals in 2015 that were using

22 opioids were also abusing alcohol, does it?

23     A.   Let me just be sure.  You said

24 Paragraph 10.  Did you mean by that Page 10?

1    Q.   Page 10 of the -- of Cutler Exhibit 6.

2    A.   Okay.  I just wanted to be sure you

3  weren't referring to Page 10 of the report in

4  some way.

5         That's correct, this chart does not

6  show whether these parents were using other

7  substances at the time.

8    Q.   And this report also doesn't show if

9  they were sent to jail for some other reason

10  other than opioids?

11    A.   That's correct, it doesn't say whether

12  they were sent to jail for any other reason.

13    Q.   Did you review -- strike that.

14         You mentioned that you reviewed some

15  deposition testimony that talked about this

16  survey.  Do you recall what deposition it was

17  that talked about this survey?

18    A.   If I'm not mistaken, the deposition of

19  Cynthia -- I'm going to butcher her last name,

20  for which I apologize -- Weiskittel spoke about

21  this survey.

22    Q.   And did you review the exhibits to

23  that deposition?

24    A.   No, I did not review the exhibits to

1  the deposition.

2    Q.   Do you know if one of the exhibits to

3  that deposition was an exhibit calling into

4  question the accuracy of the data in this

5  report, Cutler Exhibit 6?

6    A.   No, I don't know anything about any of

7  the exhibits in that deposition.

8    Q.   So if there was a document that was

9  produced by the plaintiffs here that called into

10  question the accuracy of the data in this

11  survey, is that a document that you would have

12  wanted to see?

13         MR. SOBOL:  Objection.

14    A.   I think you said a document produced

15  by the plaintiffs in this case.

16  BY MR. KNAPP:

17    Q.   Correct.

18    A.   Without answering with respect to the

19  plaintiffs or the defendants, if there were a

20  document about the accuracy of the survey I

21  would be -- I would want to see it.

22    Q.   Okay.  We've talked about standard

23  error on your other calculations.  What is the

24  standard error associated with your calculation

1  of the share of children's and family services

2  due to opioids?

3    A.   I'm sorry.  With respect to the share

4  of -- just say the last part of that sentence

5  again, if you would, please.

6    Q.   Well, let's make it easier.  What is

7  the standard error associated with your

8  calculations reflected in Table 3.6?

9    A.   I have not estimated a standard error

10  for them, so I can't tell you off the top of my

11  head what that is.

12    Q.   So if we look at 2015 and compare the

13  opioid-related percentage of removals in

14  Cuyahoga and Summit, do you see it's 25 percent

15  in Summit and 11 percent in Cuyahoga?

16    A.   Yes, I do see that.

17    Q.   To what do you explain -- or strike

18  that.

19         To what do you attribute the

20  significant difference in the percentages in the

21  two counties?

22    A.   I have not done any analysis of why

23  those two numbers differ so I could come up with

24  hypotheses, but I do not have an -- I have not

1  investigated or report on any answer to that.

2    Q.   You have investigated the shipments of

3  opioids into these counties, right?

4    A.   That's correct, I have investigated

5  the shipments into the counties.

6    Q.   Did you investigate whether the

7  shipments of prescription opioids in these

8  counties could account for the difference in the

9  opioid-related percent of child removals in

10  Summit and Cuyahoga in 2015?

11    A.   I did not do a cross-section analysis.

12  I don't -- I don't report a cross-section

13  analysis of whether the shipments of opioids

14  into a county are related to the percent of

15  child removals from parents who are using

16  opioids in that county.

17    Q.   Based upon what you know about the

18  shipments in the Cuyahoga and Summit County, do

19  you believe that the shipments of prescription

20  opioids can explain the substantial difference

21  between the percentages in Summit County and

22  Cuyahoga County?

23         MR. SOBOL:  Objection.

24    A.   I haven't done the analysis, so I

1  can't say for sure.  One would need to know

2  about the relationship between shipments of

3  opioids and child removals, and whatever that

4  coefficient is would be used to establish

5  what -- to what extent this was due to opioids.

6  BY MR. KNAPP:

7      Q.   Did you ask to see any county data

8  from either Summit or Cuyahoga County to see if

9  it backed up or supported the percentages in the

10  statewide survey that you relied on?

11          MR. SOBOL:  Objection.

12      A.   My understanding is that these data

13  were reported by county authorities to this --

14  to the public PCSAO, Public Children Services

15  Association of Ohio, so that this was a

16  tabulation of the raw data by the counties.

17  BY MR. KNAPP:

18      Q.   My question was, did you look at any

19  of the county-level data to see if it supported

20  the numbers in the survey --

21          MR. SOBOL:  Objection.

22  BY MR. KNAPP:

23      Q.   -- or in the report?

24          MR. SOBOL:  Objection.

---

1      A.   If you're asking did I look at the

2  specific form that was submitted to PCSAO, no, I

3  did not look at any of those specific forms that

4  were submitted.  I presumed that PCSAO when they

5  published this correctly reported what the

6  counties told them.

7  BY MR. KNAPP:

8      Q.   The percentages that are reflected in

9  Table 3.6 reflect opioid-related removals

10  associated with both licit and illicit opioids,

11  right?

12      A.   That is correct, no differentiation is

13  made here between removals associated with licit

14  and illicit opioids.

15      Q.   And you didn't calculate the

16  percentage of Children and Family Services that

17  were related to licit opioids only, correct?

18      A.   That's correct, I did not do a

19  calculation about child removals related to use

20  of licit opioids only.

21      Q.   Okay.  Let's move to juvenile court

22  activity, Paragraph 45.  And in this section you

23  are estimating the share of juvenile court

24  activity attributable to opioids, right?

---

1      A.   That's correct.  This section is about

2  juvenile court activity attributed to opioids.

3      Q.   And you include harms attributable --

4  strike that.

5          You include harms attributable to

6  drug-related crimes and harms related to child

7  removals, right?

8      A.   That's correct, it's both drug-related

9  crimes and child removals.

10      Q.   For juvenile court activity, is there

11  any overlap in the harms that are caused by

12  juvenile crime and child removal cases?

13      A.   I'm not sure I understand the

14  question.  Could you rephrase it?

15      Q.   So you're looking at specific

16  incidents in the juvenile court, right?

17      A.   Mm-hmm.

18      Q.   And my question is, is there any

19  overlap where a case involved an incident of a

20  juvenile crime as well as a child removal?

21      A.   I don't know for sure.  I would guess

22  there would be.

23      Q.   And how did you account for that

24  overlap in connection with the calculations that

---

1  you report on Table 3.7?

2      A.   Let me look back at the appendix just

3  to be certain so I give you the correct answer.

4  Appendix III.F.1.  And, of course, III.F.2 would

5  be the corresponding one for Summit.

6          So we have the -- so if you were to

7  look at panel A, the first thing that we

8  calculate is the opioid-related delinquency and

9  unruly charges as a share of the total of the

10  delinquency and unruly charges.  That then gets

11  multiplied by the total number of such cases to

12  get an opioid-related percentage of -- or I'm

13  sorry.

14          We take the opioid-related percentage

15  of delinquency and unruly charges and multiply

16  it by the delinquency and unruly cases so that

17  we get the opioid-related delinquency and unruly

18  cases.  That then gets added into the number of

19  the opioid-related percent of removals.

20          So it's -- so I think the question

21  that you're asking me about is coming in the

22  upper half of this table, which is where we pull

23  out the opioid-related delinquency and unruly

24  charges component.

Highly Confidential - Subject to Further Confidentiality Review

1   Q.  So I'm going to ask the same question

2   that I've asked with respect to the other

3   categories of harms, are you opining that but

4   for the existence of opioids there would have

5   been -- 1.6 percent of juvenile cases would have

6   been avoided in 2006?

7        MR. SOBOL:  Objection.

8   A.  That is correct, my calculation is

9   that 1.6 percent of the cases are attributable

10  to the fact that opioids were more commonly

11  available.

12  BY MR. KNAPP:

13  Q.  So for this analysis, just as with the

14  general -- well, strike that.

15       For your estimate of delinquency and

16  unruly cases associated with opioids, you rely

17  on the 2002 Bureau of Justice statistics survey

18  that we talked about earlier with respect to the

19  general crime analysis, right?

20  A.  That is correct, yes.

21  Q.  And you don't have any other data

22  sources with respect to the estimate of -- well,

23  strike that.

24       Do you know if any juveniles

---

Highly Confidential - Subject to Further Confidentiality Review

1   participated in the 2002 Bureau of Justice

2   statistics survey?

3        A.  I don't know if there were any

4   juveniles in the 2002 survey.

5        Q.  So what's the basis for your

6   conclusion that that survey reflects the

7   percentage of juvenile crimes that are motivated

8   by drugs in Summit and Cuyahoga County?

9        A.  In many respects the age differences

10  between the juvenile cases and many of the adult

11  cases that are going to involve juvenile won't be

12  so big.  So as is well-known, crime tends to

13  skew younger in the population.  So in practice,

14  these are likely to be more similar populations

15  than just the distinction between juvenile and

16  adults would make one think.

17       Q.  Did you do any analysis to see if the

18  data actually supported that hypothesis that you

19  just stated?

20       A.  Unfortunately, I was not able to do

21  any data analysis to support that.

22       Q.  You didn't review any records of any

23  individual juvenile cases to see if they were

24  motivated by opioids?

---

Highly Confidential - Subject to Further Confidentiality Review

1        A.  I did not review records of specific

2   juvenile cases.

3        Q.  You didn't look at the SACWIS database

4   when you were trying to estimate the percentage

5   of crimes, juvenile crimes that are attributed

6   to opioids?

7        A.  We actually did consider the SACWIS

8   data and -- but decided not to use the SACWIS

9   data.

10       Q.  Why did you decide not to use the

11  SACWIS data?

12       A.  There are two reasons for it.  The

13  first one is that theoretically the -- not

14  theoretically.  Excuse me.  The data only

15  reports a single cause, so if opioids were a

16  contributing factor but the individual filling

17  it out -- there were other things going on so

18  the individual filling it out chose something

19  else, the opioids would not be noted.

20       And then second, the SACWIS data, if I

21  recall correctly, do not identify the specific

22  type of drug prior to very recent years, so it

23  would not be able to go back in time.

24       Q.  So let's take those in turn.  Why is

---

Highly Confidential - Subject to Further Confidentiality Review

1   it a limitation -- well, strike that.

2        If the purpose of Table 3.7 is to

3   identify the percent of juvenile cases that are

4   attributable to opioids, why is it a limitation

5   of the SACWIS data that it only identifies a

6   single cause of a crime?

7        A.  There may have been multiple cause --

8   causes associated with, for example, child

9   removal.  Opioids may have been a key component

10  of that.  It may very well have been that the

11  child would not be removed but for the presence

12  of opioids, and yet still that wouldn't

13  necessarily have been reported in the SACWIS

14  data.

15       Q.  So what you're showing in Table 3.6

16  is -- I'm sorry, in Table 3.7 is the percent of

17  juvenile court activities that has any

18  relationship to opioids, is that right?

19       MR. SOBOL:  Objection to the form.

20       A.  It's based on the same crime metrics

21  as are in the adult -- that are -- excuse me --

22  that are -- that we were talking about earlier,

23  which are crimes for which the individual was --

24  either committed the crime because he or she was

1   on opioids, to obtain money for opioids or
2   drugs, or to obtain drugs directly.  So it's not
3   any -- not every crime in which the individual
4   had any use of opioids would be counted in that.
5   BY MR. KNAPP:
6       Q.   The second limitation that you
7   identified in the SACWIS data is that it didn't
8   identify the type of drug until a certain period
9   of time.  What period of time was that?
10      A.   If I recall correctly, it's from 2014
11  on, but I would want to check for certain before
12  saying that with absolute certainty.
13      Q.   Did you review the SACWIS data after
14  2015 to see if it supported the percentages that
15  you calculated in Table 3.7?
16      A.   We did -- I did.  We did review the
17  SACWIS trends.  And, of course, there's only a
18  couple of years.  In general, they didn't --
19  they looked reasonably consistent, but there's
20  no real statistical test one can do with just a
21  couple of years, so there's nothing one can say
22  that I've concluded statistically significantly
23  that the trends were the same in the two sources
24  of data.

1       Q.   So I just want to make sure we're
2   clear.  You had access to a database that had
3   information specific to someone in Cuyahoga
4   County that identified a single cause of
5   juvenile criminal court activity that you did
6   not rely on for purposes of estimating the
7   opioid-related percent of juvenile court
8   activity, is that correct?
9           MR. SOBOL:  Objection to the form.
10      A.   I relied on the data that I thought
11  were the most accurate, and so my economic
12  determination was this was a more accurate way
13  of estimating it than data that are generally
14  agreed to be underestimates of the true
15  percentage.
16  BY MR. KNAPP:
17      Q.   If we look at Table 3.7 again for
18  2017, do you see that the percentage of juvenile
19  cases in Summit County is about one and a half
20  times the percent in Cuyahoga County?
21      A.   Yes, I do see that the rate is higher
22  in Summit County than in Cuyahoga County.
23      Q.   How do you explain that difference?
24          MR. SOBOL:  Objection.

1       A.   I don't do any analysis here to
2   explain the cross-section difference between the
3   two counties.  Of course, in general there are a
4   lot of different theories that could be offered,
5   and with only two counties there's no way to
6   tell for sure which theory would be more
7   appropriate.  So I don't have -- I don't state
8   and I don't have an opinion as to why it's
9   higher in one than in the other.
10  BY MR. KNAPP:
11      Q.   You didn't do an analysis to determine
12  if pre-2016 shipments could explain the
13  difference in the percentages between Cuyahoga
14  and Summit?
15      A.   I did not.  So first off, with only
16  two data points you can't really do an analysis
17  of that because there are many more theory --
18  there are many more theories than just that,
19  that is with two data points.  I could come up
20  with a million theories that would fit the data
21  well.
22           If in -- if all states and all
23  counties had -- if all states or the nation had
24  data for all counties, one could imagine doing a

1   type of cross-sectional analysis of juvenile
2   crime as it related to opioid shipments.  With a
3   sufficiently large sample, one could imagine
4   doing that kind of analysis.  Those data don't
5   exist, so unfortunately I was not able to do an
6   analysis like that.
7       Q.   So your -- the percentages of
8   opioid-related juvenile court activity includes
9   harms related to both licit and illicit opioids,
10  right?
11      A.   That is correct.  These estimates
12  include harms related to both licit and illicit
13  opioid activity.
14      Q.   And so you didn't calculate the
15  percent of juvenile court activity that's
16  related to just licit opioids, correct?
17      A.   That is correct, I did not calculate
18  the share which is due to just licit opioids.
19      Q.   All right.  Let's turn to Appendix
20  III.G.1, and let's look at panel A.  Go to
21  Page 2.  Let's start with Summit.  And so we've
22  moved on now to the medical examiner component
23  of your harms analysis.  Okay?
24      A.   That's fine with me.

1    Q.   Sounds good.

2        Okay.   So to identify the total number

3   of opioid-related overdoses, you say you looked

4   at the medical examiner autopsies where opioids

5   are identified in the cause of death or where

6   drugs or substance abuse are identified in the

7   cause of death and opioids are found in

8   toxicology results.

9        Do you see that?

10   A.   Yes, I do see that.

11   Q.   So for autopsies where you consulted

12   toxicology reports, what was your method of

13   determining whether an opioid was found?

14   A.   So I did not do these calculations.

15   These calculations came from the medical

16   examiner's office of Summit.

17   Q.   So you didn't personally consult

18   toxicology reports?

19        MR. SOBOL:   Objection.

20   A.   That's correct, I did not personally

21   consult toxicology reports.

22   BY MR. KNAPP:

23   Q.   And no one on your team, to your

24   knowledge, consulted toxicology reports?

1    A.   To my knowledge, no one on my team

2   consulted toxicology reports.

3    Q.   And do you know in the Summit County

4   medical examiner data how autopsies are dealt

5   with when there was more than one drug found in

6   the toxicology report?

7    A.   I don't know for certain.   The wording

8   identified in the cause of death suggests that

9   that is any presence of opioids, but I would

10   want to check that 100 percent before saying

11   that definitively.   I would want to check that

12   before saying that definitively.

13   Q.   So sitting here today, you can't say

14   for certain whether the numbers in line 1,

15   opioid-related overdose autopsies, are only

16   those opioids where the -- where an opioid --

17   strike that.

18        Sitting here today, you can't say for

19   certain whether the opioid-related overdose

20   autopsies are limited to those autopsies where

21   an opioid was identified as the cause of death?

22        MR. SOBOL:   Objection.   Asked and

23   answered.

24   A.   The words are total opioid -- total

1   number of medical examiner autopsies where

2   opioids are identified in the cause of death.

3   So assuming we wrote that correctly, that would

4   be any case where opioids are identified in the

5   cause of death.

6   BY MR. KNAPP:

7    Q.   Then it goes on to say "or substance

8   abuse" -- strike that, "or where drugs or

9   substance abuse are identified in the cause of

10   death and opioids are found in toxicology

11   results."

12        Do you see that?

13   A.   Yes, I do see that.

14   Q.   And so that would indicate that if

15   opioids were included in the toxicology reports

16   along with methamphetamines and cocaine, you

17   would include that as an overdose-related

18   autopsy regardless of what was identified as the

19   cause of death, correct?

20        MR. SOBOL:   Objection.

21   A.   In this circumstance, typically what

22   this refers to is many medical examiners just

23   write down "drug overdose" as a cause of death

24   and without identifying a specific drug.   So

1   what this -- so what I believe this is referring

2   to is then going further and saying, okay, the

3   death certificate may say that drug poisoning is

4   the cause of death, what does the toxicology

5   report say about the specific drugs.

6   BY MR. KNAPP:

7    Q.   Understand that.   And I'm trying to

8   ask you about a situation where there's multiple

9   drugs in the toxicology report.

10        My question is, if there is an opioid

11   that was listed in the toxicology report but

12   also other drugs, like cocaine and

13   methamphetamine, as long as there was an opioid

14   listed, you would count that as an

15   opioid-related overdose autopsy, correct?

16   A.   That's correct, that would count as an

17   opioid-related autopsy.

18   Q.   And you didn't make any adjustments to

19   your data based upon the percentage or the

20   volume of opioids found in a toxicology report

21   compared to the volume of any other drugs that

22   might have been found?

23   A.   I did not make any adjustment for the

24   volume of opioids relative to other types of

Highly Confidential - Subject to Further Confidentiality Review

1  drugs, and I don't believe that the data when

2  they were collected did any such adjustment.

3      Q.  So if there was an overdose where

4  there was ten times as much cocaine and

5  methamphetamine found in someone's system as

6  opioids, you would still count that as an

7  opioid-related overdose autopsy, correct?

8          MR. SOBOL:  Objection.

9      A.  That's correct, that would be an

10  opioid-related overdose death.

11  BY MR. KNAPP:

12      Q.  Did you -- you say that you're relying

13  on data provided by the medical examiner for

14  your opioid-related overdose figures, right?

15      A.  That's correct, these are data

16  provided by the medical examiners.

17      Q.  Did you speak with anyone in the

18  medical examiner's office in Summit or Cuyahoga

19  about their data?

20      A.  I personally did not --

21          MR. SOBOL:  Objection.

22      A.  -- speak with anyone in the medical

23  examiners' offices of either Cuyahoga or Summit.

24  BY MR. KNAPP:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.  Did you speak with any -- or strike

2  that.

3          Did you review any deposition

4  transcripts from anyone from the medical

5  examiners' offices of Summit or Cuyahoga who

6  testified in this case?

7      A.  I did not review any deposition

8  transcripts from anyone from the medical

9  examiners' offices.

10      Q.  Do you know who Lisa Kohler is?

11      A.  No, I do not know who Lisa Kohler is.

12      Q.  Do you know who the Summit County

13  medical examiner is?

14      A.  No, I do not know who the Summit

15  County medical examiner is.

16      Q.  Okay.  I'm going to hand you what's

17  already been marked as Kohler Exhibit 1.

18      A.  Can we -- can I -- I beg your pardon.

19  Can I just take a quick break --

20      Q.  Sure.  Absolutely.

21      A.  -- to use the restroom?

22          THE VIDEOGRAPHER:  The time is

23  4:31 p.m., and we're off the record.

24          (Whereupon, a recess was taken.)

Highly Confidential - Subject to Further Confidentiality Review

1          THE VIDEOGRAPHER:  The time is

2  4:50 p.m., and we're on the record.

3  BY MR. KNAPP:

4      Q.  So, Professor Cutler, I just handed

5  you Kohler Exhibit 1.  Before I get to that, I

6  wanted to circle back on something.

7          We were talking about the SACWIS

8  database, and you mentioned that you looked at

9  it and that you couldn't use it for estimating

10  the harms.

11          Do you recall that testimony?

12      A.  Yes, I do.

13      Q.  And when did you look at the SACWIS

14  database?

15      A.  I think it came up on several

16  occasions.  I think it came up early on as we

17  were doing inventory of the various possible

18  data sources, and then -- so that would have

19  obviously been one of the items in the

20  inventory.

21          And then second is as we would walk

22  through the various estimates we would examine

23  them for reasonableness, and if I recall

24  correctly, it came up there as well.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.  And so when you say "it came up early

2  on," do you mean that you got access to the

3  SACWIS database early on in your retention?

4      A.  Yes, I believe so, but I don't

5  remember the exact date.

6      Q.  It was sometime in 2018, fair to say?

7      A.  I think it was in 2018.

8      Q.  And when you say you got access to the

9  SACWIS database, what do you mean by that?

10      A.  We would have had the numbers that

11  came -- the percentages that came from the

12  SACWIS data, so not the raw data, but the

13  tabulated percentages.

14      Q.  And so what form did it come in?

15      A.  I don't remember those data in

16  specific in terms of what form they came in.

17      Q.  But did you yourself, you personally

18  look at the tabulated percentages from the

19  SACWIS data?

20      A.  I can't recall if I looked at it or if

21  instead the folks at -- I know for sure the

22  folks at Compass Lexecon had the data, and so

23  they would have then presented it in terms of

24  what we know from various data sources, and then

1  we would have discussed the different data

2  sources, what they say, what we know about how

3  they were done, and thoughts about accuracy and

4  relevance and so on.

5      Q.  Did you run any models based upon the

6  percentages tabulated from the SACWIS data?

7      A.  No, we did not run any models to

8  estimate -- based on the percentages estimated

9  from the SACWIS data.

10      Q.  So you mentioned -- sorry.  One

11  second.

12          Okay.  Let's go back to Kohler

13  Exhibit 1.  And just to re-orient ourselves, you

14  don't know who Lisa Kohler is, right?

15      A.  That is correct.

16      Q.  Okay.  I'll represent to you that she

17  either is or was the Summit County medical

18  examiner.  Okay?

19      A.  I will take your word for it then.

20      Q.  And I can represent to you that

21  Ms. Kohler testified that Kohler Exhibit 1 is a

22  collection of overdose deaths that were

23  processed by her department in calendar year

24  2015.

1          MR. SOBOL:  Objection.

2  BY MR. KNAPP:

3      Q.  So what I want to direct your

4  attention to is if you look at the last page of

5  this exhibit, do you see the total there is 213?

6      A.  Yes, I see that total.

7      Q.  And I will represent to you that

8  Ms. Kohler testified that that represents the

9  total number of drug-related overdose deaths in

10  2015.  Okay?

11          MR. SOBOL:  Objection.

12      A.  Okay.

13  BY MR. KNAPP:

14      Q.  Now, let's compare that to Appendix

15  III.G.1.

16          Actually, before we get to III.G.1,

17  you would agree that the number of

18  opioid-related overdoses would be a subset of

19  all drug overdoses, right?

20          MR. SOBOL:  Objection.

21      A.  Yes, opioid-related overdoses should

22  be a subset of drug-related overdoses.

23  BY MR. KNAPP:

24      Q.  Okay.  And if you look at Appendix

1  III.G.1, panel A for Summit County --

2      A.  III.G.1, Summit County.  Okay.

3      Q.  -- do you see that there are -- it's

4  identified as 214 opioid-related overdose

5  autopsies?

6      A.  Yes, I see the 214 there.

7      Q.  Do you have any way to explain how

8  there could be 214 opioid-related overdose

9  autopsies in 2015 in Summit County if there were

10  only a total of 213 overdose deaths associated

11  with all drugs?

12          MR. SOBOL:  Objection.

13      A.  I don't have an obvious answer.  I

14  would -- if asked to investigate this, I would

15  investigate each data source and I would look

16  and see what they're recording and who they were

17  done by and then potentially go case by case.

18  But I don't have a -- I don't have an estimate

19  of the -- I don't have an explanation for the

20  difference right at hand.

21  BY MR. KNAPP:

22      Q.  So I also want to ask a -- well,

23  strike that.

24          Ms. Kohler also testified that the

1  number of overdose deaths associated with

2  opioids may be inflated because those figures

3  include suicides.  Are you familiar with that

4  testimony?

5      A.  No, I have not seen her testimony.

6      Q.  Did you do anything to account for the

7  possibility that suicides were reported in the

8  number of opioid-related overdose autopsies?

9          MR. SOBOL:  Objection.

10          You may answer.

11      A.  No, we did not pull out suicides from

12  here.

13  BY MR. KNAPP:

14      Q.  Do you know what -- well, strike that.

15          Do you know what percentage of drug

16  overdoses are actually suicide attempts?

17      A.  No.  And in general it's very

18  difficult to separate out accidental drug deaths

19  from drug suicides.

20      Q.  And you haven't attempted to do that

21  in connection with your analysis, correct?

22      A.  No, I have not attempted to do that.

23      Q.  Do you have an estimate based upon any

24  literature that you've read or any studies that

```
 1   you've done of the percentage of overdose deaths
 2   that are actually suicides?
 3       A.   I have not done any study of
 4   drug-related deaths and the percentage that
 5   would be suicide.  I don't offhand recall having
 6   seen any literature on this.  It's possible that
 7   literature exists, but I don't have it off the
 8   top of my head.
 9       Q.   I want to hand you what I'm marking as
10   Cutler Exhibit 7.
11           (Whereupon, Cutler Exhibit Number 7
12           was marked for identification.)
13   BY MR. KNAPP:
14       Q.   So Cutler Exhibit 7 is an article
15   called "Suicide Emerges in Understanding the
16   Opioid Epidemic" from January 9th of 2018, is
17   that right?
18       A.   Yes, it is.
19       Q.   And if you turn to Page 6 of 10, do
20   you see that you're quoted in this article, sir?
21       A.   Yes, I do see that.
22       Q.   Have you seen this article before?
23       A.   Yes, I have seen the article before.
24       Q.   Okay.  So let's start on Page 4 of 10.
```

```
 1   And if you go to the fourth paragraph from the
 2   bottom, it starts "For one thing."
 3           Do you see that?
 4       A.   Yes, I do see that.
 5       Q.   Do you see "For one thing, medical
 6   examiners use different criteria for whether
 7   suicide was involved or not"?
 8           Do you see that?
 9       A.   Yes, I do see that.
10       Q.   Did you make adjustments to any of the
11   analyses in your model for the differences in
12   how medical examiners account for suicides?
13           MR. SOBOL:  Objection.
14       A.   I assume you're referring to this
15   specific analysis in Appendix III.G.  Is that --
16   I'm not allowed to ask a question?
17   BY MR. KNAPP:
18       Q.   Let's start there and then we'll talk
19   about your regressions after that.
20       A.   Okay.  In that analysis, we did not do
21   any adjustment for people who committed suicide,
22   nor do I necessarily think that it would be
23   appropriate to do an adjustment for suicide.
24       Q.   So let's then talk about your
```

```
 1   regressions.  Did you make any adjustments for
 2   the number of overdose deaths that are actually
 3   intentional suicides in running your
 4   regressions?
 5       A.   In the data appendix, we talk about
 6   the drug poisoning deaths, and I just want to --
 7   I'd like to look at that specifically, because
 8   in that analysis what we do is we look at drug
 9   poisoning deaths which are separate -- what I'm
10   trying to remember is whether that's separate
11   from suicide or not, and I just want to refresh
12   my memory on that.
13       Q.   Okay.  Why don't you take a look at
14   it.
15       A.   I don't have here a copy of the data
16   appendix.
17       Q.   I have my copy.  Let me just check
18   this.  I'm going to hand you -- I'm not going to
19   mark this as an exhibit, a copy of your data
20   appendix (handing).
21       A.   Thank you.
22           MR. SOBOL:  He's just refreshing his
23   recollection?
24           MR. KNAPP:  Correct.
```

```
 1       A.   I just want to be sure -- I always
 2   want to be sure I give you the correct answer.
 3   BY MR. KNAPP:
 4       Q.   I appreciate that.
 5           (Witness reviewing document.)
 6       A.   So I feel embarrassed because I should
 7   remember this, and I don't.  I don't -- and I
 8   don't see the exact wording here as to whether
 9   suicides are included or not in the drug
10   overdose.
11           In general, I think that the
12   distinction between suicide and accidental
13   poisoning is not -- is a very fluid one, and I
14   don't often -- I'm uneasy often about making the
15   distinction between them.
16   BY MR. KNAPP:
17       Q.   Let's go back, then, to Cutler
18   Exhibit 7.
19           So two paragraphs down from where we
20   just were, do you see it's in brackets, "based
21   on the literature that's available," it looks
22   like it's anywhere between 25 and 45 percent of
23   deaths by overdose that may be actual suicides?
24       A.   Yes, I do see that.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   So you didn't make any adjustments in
2  your regressions for the 25 to 45 percent of
3  deaths by overdose that may be actual suicides?
4    A.   In the --
5       MR. SOBOL:  Objection.  Asked and
6  answered.
7    A.   You mean in the regressions that I do
8  on the mortality?
9  BY MR. KNAPP:
10   Q.   Correct.
11   A.   Let me -- again, and I should remember
12  and I don't, which I feel bad about, as to
13  whether the suicides are included or not.  Let
14  me, however, make two comments.
15       The first comment is that as this
16  article notes, and as many other article notes,
17  the distinction between what's a suicide and
18  what's an accidental poisoning is not always
19  clear, and it often relies upon the medical
20  examiner to determine intent, which is very
21  difficult in -- for a medical examiner,
22  obviously, because the patient is no longer
23  alive.  So it's very common for researchers to
24  treat suicides and accidental poisonings in the

Highly Confidential - Subject to Further Confidentiality Review

1  same bucket.
2       In addition, it is also the case that
3  the availability of opioids may lead to
4  additional suicides.  We know from a lot of
5  psychology literature that many suicides are
6  impulsive, and so the availability of having the
7  opioid around may be a factor that turns an
8  individual who is experiencing pain, mental
9  pain, into someone who commits suicide.  And so
10  just because something is a suicide does not
11  mean that the availability of opioids were not
12  involved, nor does it mean that if the opioids
13  were not around the individual would have found
14  a different way to commit suicide.
15   Q.   Okay.  And I know you've got some
16  studies on that, so we're going to walk through
17  those as well.
18   A.   Very good.
19   Q.   Let's move on in the article.  The
20  next paragraph says she, being Dr. Mary Oquendo,
21  immediate past president of the American
22  Psychiatric Association, she points to a study
23  that prescription overdose -- opioid overdoses,
24  and have found that 54 percent were

Highly Confidential - Subject to Further Confidentiality Review

1  unintentional.
2       Do you see that?
3    A.   Yes, I do see that.
4    Q.   And the rest were either suicide or
5  undetermined.
6       Do you see that?
7    A.   Yes, I do see that.
8    Q.   And I asked you about your
9  regressions.  But for purposes of your Table
10  3.8, you don't make any adjustments for the
11  percentage of overdose deaths that are actually
12  suicides?
13       MR. SOBOL:  Objection.  Asked and
14  answered.
15   A.   No.  As I said, I think of the opioids
16  as being something that may lead to a suicide
17  death just as it may lead to an accidental drug
18  poisoning death.
19  BY MR. KNAPP:
20   Q.   So why don't we turn then to Page 6.
21  Do you see at the top there there's a quote
22  from, I believe it's Professor Deaton, "We think
23  of opioids as something that's thrown petrol on
24  the flame and made things infinitely worse, but

Highly Confidential - Subject to Further Confidentiality Review

1  the underlying deep malaise would be there even
2  without the opioids"?
3       Do you see that?
4    A.   Yes, I do see that.
5    Q.   And you're quoted below that as
6  identifying some reasons for that deep malaise,
7  right?
8    A.   Yes, I am quoted that way.
9    Q.   And those reasons include good
10  education -- well, strike that.  The lack of --
11  strike that.
12       MR. SOBOL:  Strike that.
13  BY MR. KNAPP:
14   Q.   The reasons you identify for the
15  underlying deep malaise that may be responsible
16  for these suicides include lack of a good
17  education, lack of a steady job that pays a
18  decent wage, lack of secure housing, food, and
19  healthcare, is that right?
20   A.   Yes, that is correct.
21   Q.   Do you agree with Professor Deaton
22  when he says that the underlying deep malaise
23  would be there even without the opioids?
24   A.   I believe that there is a lot of

1 malaise in many parts of the country that would
2 remain even without opioids.
3     Q.   And we'll talk about your regressions
4 either later this evening or tomorrow, but did
5 you control for -- do you believe you controlled
6 for all of the factors that contribute to the
7 deep malaise that would exist even without
8 opioids?
9         MR. SOBOL:  Objection to the form.
10         You can answer.
11     A.   In my analysis I controlled for as
12 many factors as we could possibly get any
13 information on.  So it's always possible that
14 one would always want to include additional data
15 if one had it, but we took account of everything
16 that we could think of that would pick up the
17 malaise.
18 BY MR. KNAPP:
19     Q.   But you can't rule out that there are
20 other factors that contribute to the malaise
21 that you haven't controlled for in your
22 regressions, correct?
23         MR. SOBOL:  Objection.
24     A.   There could be other factors, and so,

1 in part, that's one of the rationales for doing
2 the direct model, which is that in the direct
3 model we are taking all of the affect that -- or
4 excuse me -- we are taking the affect that is
5 only due to the shipments of opioids.  So it's
6 not saying whatever reason people were dying in
7 Cuyahoga or Summit, those are deaths that are
8 attributable to a particular cause, it's sort of
9 saying take only those parts that are related to
10 the shipments of opioids.  Of course that will
11 yield a lower bound because there's measurement
12 error in the shipments to the area.  It's not
13 perfectly associated with consumption and so on,
14 so that's why we supplement that also with the
15 indirect model where, again, we try to control
16 for as many demographic economic social factors
17 as we possibly can.
18     Q.   And to the extent -- strike that.
19         With respect to your indirect model,
20 to the extent that you haven't controlled for
21 any factors that contribute to the deep malaise
22 that you agree exists within society, you've
23 attributed the harms associated with those
24 factors to the defendants, correct?

1     A.   That's actually --
2         MR. SOBOL:  Objection.
3     A.   That's actually not correct.  Any
4 other factor that's not included that's
5 correlated with the things that are included
6 will be picked up by what's included.  So, for
7 example, we include education, and we include
8 employment, and employment shares, and age and
9 so on.  Anything about an area that we cannot
10 measure but that is associated with population
11 change and employment and the age distribution
12 and the education distribution, those will be
13 picked up by those coefficients.
14         So the only thing that would affect
15 the model is anything having to do with malaise
16 that is completely uncorrelated with everything
17 else that is in the regression.
18 BY MR. KNAPP:
19     Q.   But you haven't been able to test any
20 of those other factors to determine if they are
21 correlated with the factors that you did include
22 in your indirect regression, right?
23         MR. SOBOL:  Objection.
24     A.   In general, if I had more data, I

1 would always include them.  In this case, I have
2 quite a lot of variables in the regression, so
3 I'm less worried about it than in situations
4 where I don't have as many.
5         But in answer to the question as a
6 researcher would one value having additional
7 data -- additional variables to look at, the
8 answer is yes, always one would value additional
9 data to look at.
10 BY MR. KNAPP:
11     Q.   Okay.  Let's go back to Cutler
12 Exhibit 7.  I'm on Page 5 of 10.  One, two,
13 three, four, five paragraphs down, do you see
14 there's a quote there, "No one has answered the
15 chicken and egg question."  And it goes on to
16 say, "Is it that patients have mental health
17 issues that lead to addiction, or did a life of
18 addiction then trigger mental health problems?"
19         Do you see that?
20     A.   Yes, I do see that.
21     Q.   And you haven't solved that chicken or
22 egg problem, have you?
23         MR. SOBOL:  Which?  Well, then
24 objection.

1    BY MR. KNAPP:

2        Q.   You can answer the question.

3             MR. SOBOL:  Objection to the form

4    then.

5        A.   We are not -- we -- in the models that

6    I developed, we have not answered those

7    questions, but we also do not need to answer

8    those questions.  So we are taking the

9    relationship between the shipments and the

10   mortality in the direct models and using that to

11   develop an estimate of the impact of opioids,

12   and therefore as a result we do not -- because

13   we have that variable we can look at, we don't

14   need to develop a model that says either

15   addiction results from mental health issues or

16   that mental health issues result from addiction.

17   So that's one of the advantages of that problem

18   is that you don't need to solve this.

19   BY MR. KNAPP:

20       Q.   Well, with respect to Table 3.8 --

21       A.   I'm sorry.  Table?

22       Q.   3.8 at Page 28 of your report.

23       A.   Mm-hmm.

24       Q.   If you haven't made any adjustments to

---

1    the opioid-related autopsy figures for suicides,

2    isn't it the case that you are necessarily

3    attributing some suicide deaths to the actions

4    of the defendants here?

5             MR. SOBOL:  Objection to the form.

6             You may answer.

7        A.   It is, and I believe that that's an

8    appropriate thing to do.

9    BY MR. KNAPP:

10       Q.   And that's because you're making an

11   assumption that these suicide deaths were

12   triggered by opioid shipments, is that right?

13            MR. SOBOL:  Objection.

14       A.   I'm making the assumption that the

15   opioid shipments were, through any number of

16   reasons, were one of the factors that might have

17   led an individual to commit suicide and/or

18   increased the propensity of people in severe

19   mental despair, the rapidity with which they

20   could commit suicide and, therefore, the impact

21   of mental anguish on suicide.

22   BY MR. KNAPP:

23       Q.   So aren't you necessarily making a

24   judgment about this chicken or egg problem in

---

1    assuming that for some percentage of suicides

2    the issue was caused by opioids as opposed to

3    mental illness?

4             MR. SOBOL:  Objection to the form.

5             You can answer.

6        A.   In this specific case, these numbers

7    do include suicide, and so they are assuming --

8    they're just -- I mean, what they are is a

9    statement about the activity of the medical

10   examiner, and so it's saying that the activity

11   of the medical examiner is driven by the opioid

12   -- by the suicides, including those that involve

13   opioids.  So here those deaths are being

14   included.

15            In the regression model, which also

16   examines mortality, it's not making any specific

17   assumption that those deaths would not have

18   other -- would not have otherwise occurred in

19   the absence of the opioids.

20   BY MR. KNAPP:

21       Q.   And to come up with your ultimate

22   share of harms attributable to the defendants

23   for medical examiner harms, you multiple these

24   percentages in Table 3.8 by the results of your

---

1    regression and by the results of Dr. Rosenthal's

2    analysis, right?

3        A.   Yes, that is correct.

4        Q.   And so it's necessarily the case that

5    some of the suicides end up in the percentage of

6    harms that you're attributing to the defendants,

7    correct?

8             MR. SOBOL:  Objection.  Asked and

9    answered.

10       A.   Yes, that is correct.

11   BY MR. KNAPP:

12       Q.   So on the -- sorry.  Bear with me one

13   second.

14            So going back to the concept of the

15   deep malaise that was referenced in Cutler

16   Exhibit 7, why didn't you try to estimate a

17   malaise variable in your regressions, those

18   deaths that are non-opioid-related deaths of

19   despair?

20            MR. SOBOL:  Objection.  Asked and

21   answered.

22       A.   So first off, deep malaise was not my

23   term, I would have used a different terminology

24   for it, but that's obviously the term that

1  Professor Deaton finds.  I believe that I have
2  included many, many variables that reflect the
3  "deep malaise" or the difficulty that people are
4  feeling associated with economic conditions,
5  social conditions, demographic conditions.
6  Quite a large number of them are in the models
7  that we estimate.
8  BY MR. KNAPP:
9      Q.  And those are the demographic and
10  economic control variables that are described in
11  your report?
12     A.  That's correct, they include the
13  demographic, the social, the economic variables
14  that are described in the report.
15     Q.  Okay.  I'm handing you what's been
16  marked as Cutler Exhibit 8 (handing).
17
18         (Whereupon, Cutler Exhibit Number 8
19         was marked for identification.)
20  BY MR. KNAPP:
21     Q.  This is an article that you
22  co-authored explaining the rise in youth
23  suicide, right?
24     A.  Yes, that is correct.

1      Q.  And one of the things that you were
2  attempting to analyze in connection with this
3  paper is what is -- what was contributing to a
4  rise in youth suicides in different areas in
5  the -- I believe it's the 1990s?
6      A.  Yes, that is correct.  We actually
7  have long-term data in here.
8      Q.  I want to look at Page 22.  And you
9  see at the top of the second full paragraph on
10  Page 22 it says, "A clear issue with these
11  variables is the endogeneity problem.  Children
12  who take drugs more, for example, may be more
13  likely to attempt suicide for other reasons.
14  Without instruments for these teen activities,
15  we cannot resolve the causality question.  We
16  thus primarily think of these regressions as
17  correlations more than a strict theory of
18  causation."
19         Do you see that?
20     A.  Yes, I do see that.
21     Q.  What is the endogeneity problem you're
22  identifying there?
23     A.  The endogeneity problem, I want to
24  just remind myself of exactly which regression

1  equation I'm -- we are discussing there, so give
2  me just one second to look at that, if you
3  would, please.
4         (Witness reviewing document.)
5      A.  Yeah.  So these are data from the AD
6  health survey, and so -- excuse me.  So the
7  dependent variable that we're looking at is in
8  this case self-reports of suicide attempts, and
9  then we're relating that to a number of other
10  characteristics of the child and the child's
11  family and the area of the child and so forth.
12         And so the endogeneity problem in
13  general refers to that a particular variable may
14  not be definitive on its own, but may be picking
15  up something about the individual.
16         So the specific example here might be
17  someone who takes drugs.  It will look like
18  drugs are harmful, but that may just be picking
19  up something else about the individual, and
20  therefore you would be overestimating the impact
21  of any particular -- if any particular thing
22  like taking drugs or going to church or whatever
23  it is on suicide attempts.
24  BY MR. KNAPP:

1      Q.  How did you do with -- deal with the
2  endogeneity problem in connection with the
3  regression models you ran in this case?
4      A.  The -- so first off, these regression
5  models we ran here are not at the individual
6  level, they're at the area level, so there's
7  less of an issue with looking at a particular
8  individual who takes drugs and then dies as
9  opposed to looking at the area level.
10         But another answer to -- so that's one
11  answer, is that at the area level these issues
12  are different than they are at the individual
13  level.
14         Another answer is that the results
15  here are relating the shipments to the harms
16  and, if you will, the instrumental variable that
17  we're talking about, to put it in that language,
18  the instrumental variable that we're talking
19  about is the result from Professor Rosenthal's
20  research, which is the share of shipments which
21  are due to misconduct on the part of the
22  defendants.
23         So we have a measure here which is not
24  just -- which is not related to, for example,

1  whether an individual was particularly seeking

2  out medications, but are -- but is directly

3  related to the misconduct at issue, and so that

4  provides the causal chain from the defendants'

5  misconduct to the harms, whereas in the paper

6  that you referenced we did not have that

7  causality associated with the individual taking

8  drugs.

9       Q.   And so it's your view that you didn't

10  need to make any adjustments to the mortality

11  data that was included in your report to deal

12  with this endogeneity problem, you believe it

13  was all resolved through Dr. Rosenthal's

14  attribution of shipments to defendants'

15  misconduct, is that right?

16           MR. SOBOL:  Objection.

17       A.   It was resolved in a few ways.  One

18  was by using data at the area level rather than

19  at the individual level.  And second, it was

20  resolved by using Dr. Rosenthal's estimates of

21  the shipments that are due to the misconduct of

22  the defendants.

23  BY MR. KNAPP:

24       Q.   How does Dr. Rosenthal's

1  identification of shipments that she attributes

2  to the defendants tell you whether someone who

3  committed suicide had other mental illness

4  factors that would cause them to commit suicide

5  as opposed to, you know, the opioids being the

6  cause of the suicide?

7       A.   Dr. Rosenthal's analysis doesn't

8  directly assess that.  That comes out of the

9  models that I do.

10           So let's say it were the case, for

11  example, that the people who are taking opioids

12  and dying of opioids would have in the absence

13  of opioids taken cocaine and died of cocaine.

14  Then when I relate in my -- in the models that I

15  estimate, when I relate death rates from drug

16  overdoses to opioid shipments, I would find no

17  impact, or when I relate -- when I relate crime

18  to shipments of opioids I'd find no impact,

19  because in the hypothetical that you gave it's

20  all just a substitution from one to the other,

21  and so, therefore, the shipments of opioids to

22  an area would not be related to any measurable

23  harm.

24       Q.   That answer that you just gave, that

1  relies on the assumption that you have included

2  all the variables in your report that would

3  explain why somebody might commit suicide,

4  right?

5           MR. SOBOL:  Objection.

6       A.   No, actually not.  If all there was

7  was a substitution from suicide to accidental

8  poisoning, then a combined measure of mortality

9  that included them both would not be related to

10  drug shipments at all, provided one were looking

11  at all the causes of death.

12           So it's -- so a substitution from A to

13  B wouldn't affect the estimates if you're

14  looking at the total of A and B together.

15  BY MR. KNAPP:

16       Q.   If we look back at Page 3 of Cutler

17  Exhibit 8, do you see that there's a comment

18  there that says "In addition to these general

19  social stresses, there had been a concurrent

20  drug epidemic that may have been intimately

21  related to the suicide epidemic."  Then it goes

22  on to say "A nationwide decrease in the price of

23  heroin resulted in an increase in heroin use by

24  even very young adolescents in South Boston in

1  1995 and 1996."

2           Do you see that?

3       A.   Yes, I do see that.

4       Q.   You opined or you wrote that there was

5  a heroin -- strike that.

6           You wrote that there was a drug

7  epidemic in 1995 and 1996 in South Boston that

8  included the use of heroin, right?

9           MR. SOBOL:  Objection.

10       A.   It was terrible.  Yes, there was.

11  BY MR. KNAPP:

12       Q.   And you attributed one of the --

13  strike that.

14           You identified one of the reasons for

15  the epidemic was a decrease in the price of

16  heroin.

17           Do you see that?

18       A.   Yes, that's correct.

19       Q.   And you understand that there was

20  generally a decrease in the price of heroin in

21  the United States in the 2010s, right?

22       A.   Yes, that's correct, there was a

23  decrease in the price of heroin.

24       Q.   And you haven't controlled for the

Highly Confidential - Subject to Further Confidentiality Review

1 decrease in the price of heroin in connection
2 with your regression models, correct?
3     A.    Actually, I don't think that it would
4 be appropriate to control for the price of
5 heroin in those models.
6     Q.    So the answer is you haven't done it?
7         MR. SOBOL:  Objection.  Asked and
8 answered.
9     A.    I haven't done it because it wouldn't
10 be appropriate to do so.
11 BY MR. KNAPP:
12     Q.    And you haven't attributed any of the
13 harms that you identify as resulting from the
14 opioid epidemic to the decrease in prices
15 associated with heroin, right?
16     A.    The decrease in prices associated with
17 heroin to a great extent are because the markets
18 for heroin got to be what economists called
19 thick markets, which is more people on the --
20 more people on the supply side, more people on
21 the demand side.
22         The reason they got to be so thick --
23 the reasons the markets got to be so thick is
24 because there were so many people that had been

Highly Confidential - Subject to Further Confidentiality Review

1 addicted to opioids, and then when the opioid
2 supply was reduced they went to look for other
3 alternatives, and heroin was a cheaper other
4 alternative.  So that led more people into the
5 market.  As a result of more people being in the
6 market, there were more sellers, there were more
7 buyers, and in thick markets like that prices
8 tend to fall.
9         I think that the reduction in heroin
10 prices and the increase in heroin use are a
11 result of the factors associated with the
12 opioid -- legal opioid epidemic, and they are
13 not some exogenous change that just happened to
14 occur.
15     Q.    What analysis did you do to support
16 the statement you just made that the fact that
17 there were, quote, so many people addicted to
18 opioids created the thicker markets?
19     A.    If you look in the report, there are
20 several different pieces of evidence.  One piece
21 of evidence comes from the test for the
22 structural breaks.
23         MR. SOBOL:  Pages?
24     A.    I'm sorry.  Pages 33 and 34, Figure

Highly Confidential - Subject to Further Confidentiality Review

1 3.2 and 3.3.  What those figures show is that
2 the transition from deaths which were largely
3 due to legal opioids to deaths which were due --
4 largely due to illegal opioids, that happened
5 very suddenly in 2010.  That's, of course,
6 exactly around the time formulation of -- the
7 time of the reformulation of OxyContin to
8 abuse-deterrent formulation, and reflects the
9 fact that people were moving into markets for
10 illegal opioids as their preferred legal opioids
11 became more difficult to obtain.  So that's one
12 piece of evidence that suggests that -- that is
13 consistent with the thickening of the markets.
14         A second piece of evidence comes from
15 Figure 3.4 on Page 35 of the report.  What that
16 figure shows you, the red line is the heroin
17 mortality rate for the counties in the sample
18 that I analyze that had high shipments.  Those
19 counties always had a little bit higher heroin
20 mortality rate prior to 2010, but in those areas
21 where there were more people taking prescription
22 -- excuse me -- more people who were -- more --
23 where there were more shipments of prescription
24 opioids, those areas had a particularly large

Highly Confidential - Subject to Further Confidentiality Review

1 increase in heroin mortality relative to other
2 areas that had lower shipments again
3 associated -- consistent with the creation of
4 thicker markets in areas where legal opioids
5 were more prevalent.  So that's the second piece
6 of evidence.
7         The third piece of evidence comes from
8 the literature of other economists that have
9 looked at the transition in opioid-related
10 deaths from legal opioids to illegal opioids.
11 Think about in particular two specific studies
12 which I'll just cite because we note them in the
13 report, the studies of Alpert, et al, and the
14 study of Evans, et al, both of which examined
15 the transition from legal opioids to illegal
16 opioids associated with supply side changes, and
17 both show very large substitution consistent
18 with people moving in and creating a thick
19 market.
20         And then finally I cite numerous
21 studies of sort of anthropological studies or
22 epidemiological studies of people who were
23 abusing illegal opioids, particularly heroin,
24 after 2010, and many of the people in those

1   studies started on prescription medications and
2   transitioned to heroin over time and helped to
3   create a thicker market there.  So I believe
4   there -- there's quite a lot of evidence in
5   support of that.
6   BY MR. KNAPP:
7       Q.   Okay.  Let's -- there was a lot there,
8   so we're going to unpack that, okay?
9       A.   Very good.
10      Q.   Let's start at Paragraph 48, because I
11  think that's where this analysis starts.  And
12  what you're talking about in Paragraph 48 is why
13  you ran two different regression frameworks to
14  estimate the impact of shipments on opioid
15  mortality, right?
16      A.   Yes, that is correct.
17      Q.   And what you say is it's due in part
18  to data limitations.  Okay?  Is that right?
19      A.   Yes.  I can't remember if that said so
20  specifically in this paragraph or elsewhere, but
21  yes, I do say that it's due to data limitation.
22      Q.   And so what are the data limitations
23  that you're referring to there?
24      A.   Let me just look at this specific

1   paragraph just to remind myself of exactly what
2   is in this paragraph.
3       Q.   It's in the first sentence.
4       A.   Thank you, sir.
5            Yes.  Okay.  The specific data
6   limitation that I'm referring to is if you want
7   to relate mortality to use of opioids or
8   consumption of opioids, which is what one really
9   wants, you need data on consumption of opioids
10  over the time period for which you want to
11  relate it to mortality.
12           We have a proxy for consumption of
13  opioids up to and including 2010.  That proxy is
14  the shipments of opioids to the area.  So that
15  proxy is not perfect, but it's a reasonably good
16  proxy for consumption of opioids would be
17  shipment of opioids.
18           After 2010, if one wanted to do the
19  analogous type of regression, one would need
20  data on consumption of illegal opioids across
21  areas.  The primary data limitation that's
22  referenced here is that we don't have the data
23  on consumption of illegal opioids, because by
24  definition they're illegal so they're not

1   gathered, and so, therefore, I cannot estimate a
2   model that goes past 2010.  It would not be
3   economically appropriate to estimate a model
4   that goes past 2010 because I don't have the key
5   independent variable.
6       Q.   And the basis for your statement that
7   it would not be economically appropriate to
8   estimate a model that goes past 2010 is based
9   upon your conclusion that there was this break
10  in 2010 that shifted the relationship between
11  shipments and mortality, right?
12      A.   That's a part of it.  So first is
13  there's a break in 2010, a very clear break in
14  2010 where it's clear that there's a different
15  source of mortality that is occurring with
16  increasing frequency after 2010, and coupled
17  with I do not have the data on consumption of
18  total opioids, not just legal opioids, but
19  illicit opioids as well.  I do not have data on
20  consumption of opioids in each area past 2010.
21      Q.   And it's the case that you don't have
22  data on consumption of illegal opioids for any
23  period, right, not just post 2010?
24      A.   That's correct, I don't have data on

1   consumption of illegal -- of legal opioids for
2   any time period, but I have what I believe is a
3   very good proxy, which is shipments of opioids
4   to the area.
5       Q.   And so it's your opinion that after
6   2010 a direct model would not support your
7   conclusion that shipments drive mortality,
8   right?
9            MR. SOBOL:  Objection.
10      A.   That is not my conclusion.
11  BY MR. KNAPP:
12      Q.   Well, so what you found is that after
13  2010 the -- there was a decrease in shipments
14  that's correlated with an increase in mortality,
15  right?
16      A.   That is correct, after 2010 there's a
17  decrease in shipments of legal opioids and an
18  increase in deaths due to opioids largely due to
19  illegal opioids.
20      Q.   And so if you ran a direct model after
21  2010, it would not be consistent with the
22  results of your direct model prior to 2010,
23  right?
24      A.   It would not be appropriate to

1  estimate a direct model after 2010.

2      Q.   And it would not be -- if you did, it

3  would not be consistent with your pre-2010

4  results, correct?

5      A.   I cannot actually do it because I

6  don't have the data.  I would -- in order to

7  estimate the equivalent model, I would need the

8  data on, if you will, total shipments of legal

9  and illegal opioids to an area after 2010.  I

10 don't have the data.  If I had that data, it

11 would be totally appropriate to estimate a model

12 after 2010 for mortality or mortality changes as

13 a function of shipments of both legal and

14 illegal opioids to the area after 2010.  I don't

15 have that data.

16          In the absence of not -- when you are

17 not able to form the key independent variable,

18 you -- economically you just cannot estimate

19 that model.  You'd like to do it, but you just

20 can't do it.

21     Q.   But you ran a model prior to 2010 that

22 you believe you are comfortable -- strike that.

23          You ran a model prior to 2010 that was

24 based on shipments of just licit opioids,

1  correct?

2          MR. SOBOL:  Objection.

3      A.   That's correct, because prior to 2010,

4  essentially all of the use of opioids was use of

5  legal opioids, so therefore the key independent

6  variable, which is the shipments of legal

7  opioids to an area, is a very good proxy for the

8  total use of opioids in that area.

9  BY MR. KNAPP:

10     Q.   So you did not attempt to run a direct

11 model after 2010 that was just based upon

12 shipments of prescription medicines?

13         MR. SOBOL:  Objection.  Asked and

14 answered.

15     A.   It wouldn't be appropriate to run a

16 model --

17 BY MR. KNAPP:

18     Q.   I'm not asking if it's appropriate.

19 I'm just asking did you do it.

20         MR. SOBOL:  Objection.  Asked and

21 answered twice.

22     A.   I think I'm just going to say it would

23 not be appropriate to do it.  It would not be an

24 informative model.

1  BY MR. KNAPP:

2      Q.   Would it be truthful to say that you

3  ran a direct regression after 2010 based upon

4  just shipments of prescription medicines?

5          MR. SOBOL:  Objection.  Asked and

6  answered several times.

7      A.   I'm just going to say that it would

8  not be an appropriate model to estimate.

9  BY MR. KNAPP:

10     Q.   Would it be truthful to say that you

11 ran a regression after 2010 based upon only

12 licit opioid shipments?

13     A.   That's -- it's just -- my job is to

14 help with the best models, and that is not an

15 appropriate model to estimate.

16     Q.   I'm not asking if it's appropriate.

17 I'm just asking if you did it.

18         MR. SOBOL:  Objection.  Asked and

19 answered.

20         MR. KNAPP:  It is -- the answers are

21 non-responsive.

22         MR. SOBOL:  Objection.  Asked and

23 answered several times.

24     A.   I'm going to repeat the answer, which

1  is that it would not be an appropriate model to

2  look at.

3  BY MR. KNAPP:

4      Q.   I'm going to ask you one more time.

5  Is it truthful or not -- you're here to tell the

6  truth.  Is it truthful to say that you ran a

7  direct model after 2010 based only on

8  prescription opioid shipments?

9      A.   And I'm going to repeat that it's just

10 not an appropriate model to look at.

11     Q.   Did you look at it?

12     A.   It's not an appropriate model to look

13 at.  It is not in the report.  I do not rely on

14 it in reaching any conclusions.

15     Q.   Did Compass Lexecon run a direct model

16 based upon licit opioid shipments after 2010?

17     A.   The conclusions that I reach in the

18 report are based on the models that are here.  I

19 believe that the models that are here are the

20 appropriate ones to estimate.

21     Q.   Let's go to Paragraph 17.  So in

22 Paragraph 17 you say "Available evidence

23 indicates" -- well, let me get there.

24 "Available evidence indicates that licit and

1    illicit opioids are to some degree substitutes."

2         Do you see that?

3    A.    Yes, I do see that.

4    Q.    What do you mean by "substitutes"?

5    A.    In economic terms, a substitute is

6    when you consider two goods, and the question is

7    when the price of one goes up what happens to

8    consumption of the other.  So if the price of,

9    say, legal opioids goes up because they're more

10   difficult to obtain or insurance is not covering

11   them as much or you have to make more doctors'

12   visits and pay more in co-pays, then any -- then

13   a complement is a good -- so when the price of

14   prescription opioids goes up, people consume

15   less of that good.

16        A complement is when people consume

17   less of another related good.  A substitute is

18   when someone consumes more of another related

19   good.  In this case, the substitution is from

20   the legal opioids which got more difficult both

21   in time and money to obtain, and the

22   substitution increased use of the other good, in

23   this case illegal opioids.

24   Q.    So you talked about the price of legal

1    opioid goes up, legal opioids goes up because

2    they're more difficult to obtain.  In typical

3    substitutes, if the price of one good goes up,

4    would you expect that the price of the

5    substitute would go up as well, or would you

6    expect it to go down, stay the same?

7    A.    The price of the substitute good might

8    go up or it might go down or it might stay the

9    same.  It depends a lot on the supply conditions

10   in the substitute market.  If, for example,

11   marginal cost is increasing, that is, you have

12   to use more and more resources to get into that

13   other market, then you would expect that the

14   price of that other good would go up.  If the

15   other good is sort of what the economists call

16   perfectly elastically supplied, that is, you can

17   get as much of it as you want at whatever the

18   going price is, you would expect its price not

19   to change.

20        If there are sort of fixed costs, that

21   is, it takes some cost to get into business, but

22   once the market is there then you can produce it

23   more cheaply and more people buy it and so the

24   price can fall, then you would expect the price

1    to decline.

2         So the theory, economic theory does

3    not give any specific prediction about the price

4    of a substitute good.

5    Q.    So going further in Paragraph 17, you

6    say "The analysis thus needs to explicitly

7    consider harms due to any use of illicit opioids

8    that resulted from defendants' actions along

9    with harms due to licit opioids."

10        Do you see that?

11   A.    Yes, I do see that.

12   Q.    And is it fair to say that your model

13   attributes to defendants the harms that you

14   identify as resulting from the public and

15   private interventions that decrease the

16   availability of some licit opioid products?

17   A.    No, I don't think that's -- excuse me.

18   Can you just restate the question?  I'm sorry.

19   I just missed the last part of the question.  I

20   apologize.

21   Q.    Let me limit this question just to the

22   indirect models that you ran.

23        Is it fair to say that your model

24   attributes to defendants the harms that you

1    identify as resulting from the public and

2    private interventions that decrease the

3    availability of some licit opioid products?

4    A.    I have two responses to give.  One is

5    that the -- it doesn't attribute to any specific

6    party or parties, so there's nothing that gets

7    pulled out that says this is -- this gets

8    attributable to this party and this gets

9    attributable to this party.

10        But second, I think that it's --

11   economically, I think it's very difficult to

12   start the movie in 2010 because those actions

13   were undertaken with respect to market

14   conditions and those market conditions were

15   enormous of use and harms resulting from

16   opioids.  And so those actions then were taken

17   by those agencies to try and stem the opioid

18   epidemic, and they were not sort of out of the

19   blue actions that one typically evaluates in an

20   economic context to say, well, did this

21   government policy designed to do X result in X

22   or in some unintended effect.  I think the story

23   is actually more complex here.

24   Q.    My question was narrower than that.

1    My question was, your indirect model
2  attributes to defendants any of the harms that
3  resulted from the public and private
4  interventions that decreased the availability of
5  some licit opioid products after 2010, correct?
6       MR. SOBOL:  Objection.
7    A.  What the indirect model does is it
8  says let's estimate all of the deaths that are a
9  result -- that we cannot otherwise explain with
10 social and demographic and economic change.  It
11 then -- so it has that.  It then applies to that
12 the estimates -- in order to calculate the
13 harms, it then applies to that the estimates of
14 Professor Rosenthal on the components that are
15 due to the defendants' misconduct.  But as I
16 estimate it, I don't have any controls for any
17 actions that any agencies or organizations took.
18 BY MR. KNAPP:
19   Q.  All right.  So turning then to
20 Paragraph 18, I want to focus on the last
21 sentence of Paragraph 18.  Well, actually, let's
22 go up a sentence before that.  It says, "The
23 policy response to these problems played out on
24 a number of levels, including federal, state and

1  local policy changes by private and public
2  insurers, recommendations and restrictions
3  implemented by medical societies and healthcare
4  organizations, and changes by pharmaceutical
5  companies."
6       Then you say, "Together these various
7  policies contributed to the increased use of
8  illicit opioids and further harms."
9       Do you see that?
10   A.  Yes, I do see that.
11   Q.  So you've identified here certain
12 public and private policy restrictions that
13 increased the harms that you're analyzing,
14 right?
15   A.  Yes, that is correct.
16   Q.  And then you go on to say, "none of
17 which would have been expected to occur in the
18 absence of defendants' actions."
19       What's the basis for that statement,
20 sir?
21   A.  The increase in opioid shipments and
22 harms in particular that occurred because of
23 shipments are, as the report shows, a direct
24 result of the misconduct on the part of the

1  defendants.  Therefore, without the misconduct
2  and thus without those harms, there would have
3  been no reason for any policy change to have
4  been undertaken, and therefore those policy
5  changes would not have had any impact on the
6  furtherance of the opioid epidemic.
7    Q.  So in your model, you're not modeling
8  that opioids disappear -- strike that.
9       In your model, you're not assuming
10 that opioids disappear from the United States at
11 any period of time, right?  There's still a
12 volume of opioids that you assume would have
13 been shipped in your but-for model, right?
14      MR. SOBOL:  Objection.
15   A.  That is correct, in the but-for model
16 there is an existing -- there are some opioid
17 shipments that occur even in the but-for model.
18 BY MR. KNAPP:
19   Q.  And those opioid shipments would have
20 risks of abuse or addiction, right?
21   A.  That's correct, those shipments do
22 have risk of abuse and addiction.
23   Q.  And so if there's opioids even in your
24 but-for model that have a risk of abuse or

1  addiction, how can you say with any degree of
2  confidence that these public and private policy
3  interventions would not have happened?
4    A.  I don't -- I think the counterfactual
5  may be a bit strong here, and I shouldn't be in
6  the business of trying to forecast what would
7  have happened in the world in the absence -- in
8  the but-for world.
9       I think what's more accurate to say is
10 that in the end we relate these harms to the
11 percentage of shipments related to misconduct,
12 and so that's the quantitative estimate, and I
13 think that's more precise.
14   Q.  So let me try to be precise.
15      When you say the counterfactual is a
16 bit strong, you mean the statement here that
17 none of which would have been expected to occur
18 in the absence of defendants' actions, you think
19 that's a bit of an aggressive statement?
20   A.  I think that's probably stronger
21 than I would -- than I think may be appropriate.
22   Q.  Let's look at Figure 3.1 on Page 10.
23 Do you see there's a box for defendants'
24 misconduct, then we have an arrow to excessive

1  shipments, then an arrow down to harms incurred,

2  and there's a line -- or a box there that says

3  "Direct pathway"?  Do you see that?

4      A.  Yes, I do see that.

5      Q.  What do you mean by "direct pathway"?

6      A.  By direct pathway I'm referring to

7  what we analyze in the direct model.

8      Q.  So this direct pathway only relates to

9  pre-2011 harms?

10     A.  That's correct.  That's the harms that

11 result directly from the excessive shipments

12 before there is any, then, activity that occurs

13 post 2010.

14     Q.  Your pre-2010 model models mortality

15 based upon both licit and illicit opioids,

16 correct?

17     A.  That's correct, it is both licit and

18 illicit opioids.

19     Q.  And so you don't have a box -- why

20 don't you have a box for use of illicit opioids

21 in the direct pathway part of this diagram like

22 you do in the bottom where you're referring to

23 the indirect pathway?

24     A.  There was some death from illicit

1  opioids, particularly as it relates to the

2  period just before 2010 when one started to see

3  some substitution into heroin even then.

4          The -- what I was trying to get at

5  here is that I can estimate that directly

6  because I have what I think is the key input

7  here, which is the vast bulk of the use of

8  opioids was related to the shipments of legal

9  opioids.

10         And so I don't -- so what I really

11 wanted to demonstrate in this figure is where I

12 have data that I believe are appropriate to

13 analyze the model and where I don't have the

14 data that I would need to analyze the model, and

15 so that's what I'm trying to get with this

16 distinction here.

17     Q.  Okay.  So looking at Figure 3.1, the

18 restrictive policies that you identify are

19 abuse-deterrent reformulations, prescription

20 drug monitoring programs, reductions in

21 prescribing sales.  Are there any other

22 restrictive policies that you considered as

23 contributing to the use of illicit opioids after

24 2010?

1      A.  Two answers to that.

2          Number one is some of these specific

3  lines have more things in them than just those

4  words.  For example, reductions in prescription

5  sales are because of actions by insurance

6  companies, public and private, actions of

7  medical associations to recommend against using

8  opioids, a variety of different things like

9  that, so that's -- there are more things buried

10 there.

11         But second, I didn't feel the need to

12 flesh them all out because in the end I don't --

13 I don't -- I can't estimate a direct model after

14 2010, and so it didn't seem like I needed to

15 enumerate specifically each of the reasons why

16 as opposed to providing several of the reasons

17 why the market changed in the way that it did.

18     Q.  And to be clear, regardless of what

19 the policies were that resulted in increased use

20 of illicit opioids after 2010, your indirect

21 model attributes all of the harm associated with

22 those reductions to the defendants, correct?

23     A.  No.  It attributes the harm that

24 cannot be explained by other social demographic

1  economic changes.

2      Q.  So in your report you discuss only the

3  reformulation of OxyContin.  What other drugs

4  were at issue when you referenced

5  abuse-deterrent reformulations?

6      A.  OxyContin is the one that the

7  literature has studied the most, so it's the one

8  for which there's the clearest evidence of the

9  impact of reformulation on use of illegal

10 opioids.

11     Q.  I know.  I'm asking you, what other

12 reformulations did you consider?

13     A.  I didn't need to make a list of all

14 the reformulations because I was not -- I

15 concluded that there was just no way I could

16 estimate a model for post 2010, so I did not

17 make a list of all of the abuse-deterrent

18 reformulations.

19     Q.  Well, do you know if there were any

20 abuse-deterrent reformulations prior to the

21 reformulation of OxyContin in December of 2010?

22     A.  I believe December of 2010 was not the

23 correct date for the reformulation of OxyContin.

24     Q.  I guess I'm thinking of your

1  structural break, the point that you identified.

2  Do you know when the reformulation of OxyContin

3  was?

4      A.   If I recall correctly, the

5  abuse-deterrent formulation of OxyContin was in

6  August of 2010 that it first started being

7  shipped.

8      Q.   Right.  That's where Professor

9  Rosenthal identifies the break in the market,

10  right?

11     A.   That is correct.

12     Q.   Do you know if there were any

13  abuse-deterrent reformulations prior to that?

14     A.   None are coming to my mind right away,

15  no.

16     Q.   So we've talked a little bit about the

17  Evans article from 2019, and that article states

18  that "There was not a change to the opioid

19  market more generally.  The shock was specific

20  to oxycodone and heroin."

21          Do you agree with that statement?

22     A.   The events that he's looking at are

23  the specific reformulation of OxyContin, and

24  he's looking at a very specific time period

1  where that was the major event that was going

2  on.

3      Q.   Do you agree in that time period,

4  August of 2010, that there was not a change to

5  the opioid market more generally, and that it

6  was specific to oxycodone and heroin?

7          MR. SOBOL:  Objection.

8      A.   I don't know with absolute certainty

9  that there weren't, for example, insurers that

10  put in restrictions on use of opioids around

11  that time period, so I haven't done the research

12  on every single action that might be taken by an

13  insurance company or by a state government, and

14  that would obviously influence people in those

15  areas.

16          MR. KNAPP:  So just to clarify, the

17  videographer just identified that we're at seven

18  hours at this point.  I think it makes sense,

19  given tomorrow is a Saturday, let's kind of take

20  this as far as we can get and that everyone is

21  comfortable with, as long as the witness is

22  comfortable.

23          MR. SOBOL:  Why don't we go to 6:30

24  and check it out then.

1          MR. KNAPP:  See how everyone feels?

2          Okay.  I think to the extent we can

3  have a shorter day tomorrow, I think people will

4  prefer that, but let's keep going for 20 minutes

5  and we'll see where we're at.

6          MR. KO:  I concur.  Let's go until

7  midnight.

8  BY MR. KNAPP:

9      Q.   Okay.  So I want to talk to you a

10  little bit about the gateway theory.

11          You're familiar with the gateway

12  theory, right?

13     A.   Yes, I am familiar with it.

14     Q.   And is that something that you

15  separately opine on in this case?

16     A.   No, I have not opined upon

17  specifically the gateway theory.

18     Q.   Okay.  You understand that other

19  plaintiffs' experts have opined on that, right?

20     A.   I don't know which experts

21  specifically you're referring to.

22     Q.   Are you aware of any experts that

23  opined on the gateway theory?  Do you rely on

24  any experts that opined on the gateway theory?

1          MR. SOBOL:  Objection.  Compound.

2          You may answer.

3  BY MR. KNAPP:

4      Q.   Let me rephrase it.

5          Did you rely on any experts that

6  opined on the gateway theory?

7      A.   In this specific instance, no.  To the

8  best of my recollection, none of the articles

9  relied upon here rely upon the gateway theory.

10     Q.   When you say "none of the articles

11  relied upon here rely upon the gateway theory,"

12  does that mean that you also do not rely upon

13  the gateway theory?

14     A.   I think it would help if you can go

15  back and give me what you want -- what your

16  definition of the gateway theory is so that I

17  can then answer directly.

18     Q.   Well, why don't I ask you the

19  question.

20          What is your understanding of the

21  gateway theory?

22     A.   The gateway theory is that one drug

23  serves as -- one substance serves as a gateway

24  to another substance.  So the most common way

1  this is told is about teens and, for example,

2  smoking, so that teens may start smoking and

3  then that may then lead them into other

4  typically illegal and more dangerous drugs like

5  marijuana or cocaine or opioids or anything

6  else.

7       Q.   With that understanding, are you

8  relying on the gateway theory for any of the

9  opinions you offer in this case?

10      A.   No, I'm not relying on the gateway

11  theory.

12      Q.   Okay.  So after 2010, you believe that

13  the opioid crisis became an illegal opioid

14  crisis, right?

15      A.   It became to a significant extent an

16  illegal opioid crisis.  It was not exclusively

17  an illegal opioid crisis.

18      Q.   But there was a shift to substantially

19  more of the deaths were associated with illegal

20  opioids, right?

21      A.   That is correct, there was a shift,

22  and substantially more of the deaths were a

23  result of illicit opioids.

24      Q.   And what you've done in your report is

1  you've tried to identify a precise date at which

2  there was the shift in the opioid crisis, right?

3       A.   We've tried to identify -- I've tried

4  to identify a date at which I think it's

5  appropriate to relate death to shipments

6  directly, and a point after which it's

7  inappropriate to relate deaths to shipments of

8  legal opioids.

9       Q.   And did you consider whether the shift

10  in the market or a shift in the crisis from a

11  licit opioid crisis to an illicit opioid crisis

12  was actually a gradual shift as opposed to an

13  abrupt shift in December of 2010?

14           MR. SOBOL:  Objection.

15      A.   Yes, I did consider that.

16  BY MR. KNAPP:

17      Q.   And you've rejected that possibility?

18      A.   Let me refer you to Figures 3.2 and

19  3.3 on Pages 33 and 34 of the report,

20  specifically Figure 3.2 which I think is most

21  helpful for this question.

22           What this figure shows is it is at

23  each date if you ask the data to determine

24  whether there was a structural change in the

1  relationship between heroin -- the trend in

2  heroin mortality over time and a jump in the

3  level with what confidence would it -- would the

4  data conclude that there was a break at that

5  time.  What you can see is that the data cluster

6  very, very strongly, if you look at the dashed

7  line, which is the F statistic for the test for

8  the break in the trend, the data cluster very

9  strongly at 2010.

10           So it's not suggesting a very spread

11  out range where it's uncertain and maybe the

12  shift happened at an earlier date or maybe it

13  happened at a later date.  The data are very

14  clear that around that date is when it believes

15  there was a structural change.

16           MR. SOBOL:  The record reflect -- can

17  you show into the camera where you were circling

18  for the jury, please?

19      A.   Yes.  I was circling right here where

20  the data are very clear that the break is

21  happening here.

22           And if you go just a little bit before

23  and a little bit after, it very strongly rejects

24  that that's the point where the break occurs.

1  It really wants to focus on the data in 2010.

2  BY MR. KNAPP:

3       Q.   Well, you say "the data in 2010."  Are

4  you -- does it focus on December of 2010, or

5  does it focus on 2010 generally?

6       A.   In general, it's relatively flat

7  around many of the months in 2010, so the data

8  have a hard time saying is the shift exactly in

9  August or is it in July or whenever.  There's a

10  few -- it doesn't pin it down specifically to

11  one month as opposed to a few months around that

12  point in time.

13      Q.   Well, if you had concluded that the

14  break was earlier in 2010, you would have begun

15  applying your indirect regression at an earlier

16  period of time, is that right?

17      A.   That's correct.  If, for example, I

18  had concluded that the break was in 2009, then I

19  would have estimated the direct model only

20  through, for example, 2009.

21      Q.   Well, if the break was somewhere in

22  the middle of 2010, would you have had to split

23  your model for the year 2010 between direct

24  through the first half of 2010 and indirect for

Highly Confidential - Subject to Further Confidentiality Review

1 the second half of 2010 and going forward?

2     A.  If one had the ability to do it, it

3 would -- you know, the ideal model would be able

4 to work off daily data.  But in this case we

5 were restricted to being able to do it annually,

6 and so 2010 seemed like the natural break point

7 from this.

8     Q.  When you say you were restricted to

9 doing it annually, is that because of

10 limitations in the ARCOS data, or limitations in

11 the mortality data, or something else?

12     A.  In the -- I want to check to be sure.

13 I think, if I recall correctly, the ARCOS data

14 at the three digit ZIP are only available

15 annually.  I don't think I have those data at

16 any higher frequency.  I would want to be 100

17 percent certain before answering that

18 definitively.

19     Q.  So just to be clear, is your opinion

20 that the break here occurred in December of

21 2010, or that it occurred at some point in 2010?

22     A.  The evidence suggests that it occurred

23 at some point in 2010, but cannot definitively

24 say one month is obviously a superior break than

Highly Confidential - Subject to Further Confidentiality Review

1 another.

2     There's also, of course, the papers by

3 Evans, et al and Alpert, et al, that they looked

4 very specifically around August of 2010 with the

5 reformulation of OxyContin, so those papers also

6 influenced my thoughts as to the appropriate

7 break point, and in their case it was August of

8 2010.  And so more of the year 2010 was in the

9 pre-reformulation time period than the post

10 reformulation time period.

11     Q.  Did you do any analysis of whether the

12 population of people who overdosed on illicit

13 opioids after 2010 first became addicted to

14 prescription opioids prior to 2010, any data

15 analysis?

16     A.  I did not do data analysis on when the

17 people who overdosed after 2010 started using

18 opioids.

19     Q.  And so you don't know if a particular

20 overdose after 2010 was an overdose of someone

21 who had become addicted prior to 2010?

22     A.  That's correct, I did not do any

23 analysis at any individual level to say whether

24 a particular -- how long a particular individual

Highly Confidential - Subject to Further Confidentiality Review

1 had been addicted before he or she died.

2     Q.  And you didn't do any demographic

3 analysis at a more macro level to identify

4 whether the population of addicts prior to 2010

5 matched up with the population of overdose

6 victims after 2010?

7     A.  There are several pieces of data that

8 point to that.  First is Figure 3.4 which is on

9 Page 35 of the report.  Figure 3.4 shows that

10 the share -- shows that the increase in the

11 overdose rate after 2010 was significantly

12 greater in areas where there were greater

13 shipments of opioids prior to 2010.

14     And then in addition the paper by -- I

15 believe it's the paper by Alpert, et al shows

16 that the shipments of opioids to areas in the

17 2000s is related to the share of people who have

18 substance use -- who report substance use

19 disorder using the NISD data, and so, therefore,

20 from that it's -- those two correlations imply

21 that areas where more people are addicted to

22 opioids prior to 2010 are areas with greater

23 increases in mortality after 2010.

24     Q.  So I understand you've got the

Highly Confidential - Subject to Further Confidentiality Review

1 correlation analysis here, but my question is,

2 did you look at any demographic statistics or

3 characteristics of individuals who overdosed

4 after 2010 and compare them to the

5 characteristics of people who were prescribed

6 and became addicted to prescription opioids

7 prior to 2010?

8     MR. SOBOL:  Objection.

9     A.  I did not do an analysis that looked

10 at the demographics of the addicted population

11 prior to 2010 and compare that with the

12 demographics of death after 2010.

13 BY MR. KNAPP:

14     Q.  You would agree that some percentage

15 of people that overdosed on illicit opioids

16 after 2010 started on opioids prior to 2010?

17     A.  I don't have any data, but I would be

18 surprised if that were not the case.

19     Q.  And do you know what percentage of

20 overdoses that represents?

21     MR. SOBOL:  Objection.

22     A.  No, I have not seen any data on people

23 with overdose deaths when they started using

24 overdose -- excuse me -- when they started using

```
 1   opioids with the deaths at different points in
 2   time.  I haven't seen anything on that.
 3   BY MR. KNAPP:
 4       Q.   And you would agree that some
 5   percentage of people that overdosed on illicit
 6   opioids after 2010 first became addicted to an
 7   illicit opioid, not a prescription opioid?
 8          MR. SOBOL:  Objection.
 9       A.   I don't know for a fact whether that's
10   true or not.  I don't -- I -- if you ask me as a
11   statistical matter would there likely be people
12   like that, I would absolutely say yes.
13          Just to reference our earlier
14   discussion, the heroin markets and fentanyl
15   markets became what economists call thick
16   markets in part because of the opioid epidemic,
17   so even individuals who never took a licit
18   opioid but who started on illicit opioids may
19   very well have been affected by the actions of
20   the defendants that created such a large market
21   for illicit opioids.
22   BY MR. KNAPP:
23       Q.   And I just want to clarify here.  You
24   said -- at least the transcript says so, even
```

```
 1   individuals who never took a licit opioid but
 2   who started on illicit opioids may very well
 3   have been affected by the actions of the
 4   defendant.  It's individuals who never took a
 5   licit opioid, you're saying that they're still
 6   impacted by the actions of these defendants?
 7          MR. SOBOL:  Objection.
 8       A.   That is correct, that's what I'm
 9   saying.
10   BY MR. KNAPP:
11       Q.   And did you do any analysis of whether
12   anyone reflected in the mortality data that you
13   analyzed had actually received a prescription
14   from a doctor for a prescription opioid?
15       A.   No, I haven't done any analysis of
16   whether people in the death records had any
17   prescriptions, and I don't know of any
18   literature that has done so.
19       Q.   And so you can't say that any of the
20   mortality that you attribute to -- strike that.
21          You can't say whether any of the
22   increase in mortality that you attribute to
23   defendants resulted from individuals who
24   actually got a prescription for one of the
```

```
 1   opioids that was manufactured or distributed by
 2   any defendant?
 3          MR. SOBOL:  Objection.
 4       A.   Two comments.  One is I can't say that
 5   for sure.  But second is I also don't think
 6   that's entirely relevant to the point that's
 7   being made here.
 8          The point that's being made is that
 9   even if the individual did not start on licit
10   opioids, that individual's access to illicit
11   opioids is due at least in some part to the
12   misconduct of the defendants in terms of having
13   such a high level of shipments of opioids.
14   BY MR. KNAPP:
15       Q.   And so defendants are indirectly
16   responsible for that, in your view, because
17   they're responsible for creating the environment
18   for criminals?
19          MR. SOBOL:  Objection.
20       A.   They're responsible for creating an
21   environment in which people are addicted.  Those
22   people who are addicted, some of them naturally
23   turn to illegal substances because it's cheaper.
24   Some turn to illegal substances as it gets more
```

```
 1   expensive and more difficult to obtain legal
 2   substances.
 3          And so -- and that movement of people,
 4   that movement of people into illegal markets
 5   makes those markets be thicker in an economic
 6   sense, more readily available, and therefore
 7   much lower cost -- by cost I mean monetary,
 8   time, potential consequences and so on -- much
 9   lower cost for people who start off even in the
10   illegal market.
11   BY MR. KNAPP:
12       Q.   Did you do any data analysis of the
13   thickness of markets for illegal opioids in
14   Summit or Cuyahoga County?
15       A.   There are reports that were -- so did
16   I -- there's not a single measure of how thick
17   the market is that one can produce an estimate
18   for.  There are a number of reports that were
19   done that I believe are in the estimates from
20   the -- from the -- I'm trying to remember
21   whether they're from the police or from the
22   sheriff's, I can't remember who, that document
23   over time what people are saying about ability
24   to get opioids, and those do show increased
```

1  ability to get illegal opioids.

2  Q.  Professor Cutler, did you personally

3  do any analysis of the thickness of the market

4  for illicit opioids in Summit or Cuyahoga County

5  at any time period that you analyzed?

6  MR. SOBOL:  Objection.  Asked and

7  answered.

8  A.  Unfortunately -- going back to our

9  earlier discussion, unfortunately we don't have

10  data on the total use of illegal opioids

11  anywhere, whether it's in Summit or Cuyahoga or

12  any other county.  So if one wanted to look at

13  use of those substances, one simply does not

14  have the data to do so, so I could not do an

15  economic analysis of the use of illegal

16  substances in those markets.  What I know are

17  the death rates that come from that.

18  There are also data, of course, from

19  NSDUH on the share of people who have substance

20  use disorder, and they also show an increase

21  across the country and in Ohio in substance use

22  disorder associated with illegal opioids.

23  BY MR. KNAPP:

24  Q.  And to be clear, none of the papers

1  that you looked at talk about the thickness or

2  the relative thickness of the market for illegal

3  opioids in Summit or Cuyahoga County, right?

4  A.  Unfortunately, no one has data on the

5  total extent of heroin or fentanyl in those

6  markets.

7  Q.  So we've talked about what --

8  MR. SOBOL:  I don't want to interrupt

9  you.  Why don't we do one more like piece, okay?

10  But we need to call it quits.  I think the

11  witness is fading, even though he's hanging in

12  there.

13  MR. KNAPP:  That's fair.

14  THE WITNESS:  Are you saying the

15  witness is a whimp?

16  MR. SOBOL:  Yes, the witness is a

17  whimp.  I mean, obviously it's up to you.

18  Right.  If you want to do another piece, that's

19  great.  I'm not trying to cut you off in a piece

20  either, so you decide.

21  MR. KNAPP:  Yeah, yeah.  I appreciate

22  it.  Yep.  I appreciate that.

23  BY MR. KNAPP:

24  Q.  So we've talked about two of the

1  factors that you attribute to the increase in

2  illicit opioid deaths after 2010.  We've talked

3  about decline in shipments and the restrictive

4  policies that you've talked about.

5  Were there any other factors that you

6  considered that contributed to the increase in

7  deaths from illicit opioids after 2010?

8  A.  I'm sorry, can you just give the two

9  factors that you mentioned again?

10  Q.  Decline in shipments, restrictive

11  policies broadly defined.

12  A.  Of course the restrictive policies

13  were partly responsible for the decline in

14  shipments, so it's -- the primary thing that we

15  observed after 2010 was a reduction in shipments

16  of legal opioids and a shift into illegal

17  opioids, and that was caused by a number of

18  different policies, including those we've spoken

19  about.

20  Q.  Were increase in traffickers from

21  Mexico a contributing factor to the increase in

22  deaths from illegal opioids after 2010?

23  MR. SOBOL:  Objection.

24  You may answer.

1  A.  I don't model specific factors in the

2  report is one answer, so I don't have a

3  quantitative basis to give you an answer to

4  that.

5  The second answer I would give is also

6  that as we discussed, the extent of the illegal

7  market responds directly to people who are

8  addicted and their need for continued substance

9  use.  So I don't think of that as an independent

10  factor that would explain the mortality

11  associated with illegal opioids so much as I

12  think of that as a result of the conditions that

13  had been created beforehand.

14  BY MR. KNAPP:

15  Q.  What about reduction in the social

16  stigma of using heroin, did that contribute to

17  the increase in deaths from illegal opioids

18  after 2010?

19  MR. SOBOL:  Objection.

20  You may answer.

21  A.  Again, I don't have any quantitative

22  data on that, so I don't -- I cannot say

23  anything quantitative.

24  I also believe that to the extent

1  there was a reduction in stigma associated with
2  using heroin, that may very well have been a
3  result of the increased use associated with the
4  fact that so many people were addicted to
5  opioids and, therefore, needed a place to go.
6  BY MR. KNAPP:
7      Q.   What about the change in the purity of
8  heroin that was available, did that contribute
9  to the increase in opioid deaths after 2010?
10         MR. SOBOL:  Objection.
11     You can answer.
12     A.   I have no data on the impact of the
13  change in the potency of heroin, so I can't say
14  anything specific about it.
15         I also think that changes in potency
16  are likely driven by the increased demand for
17  heroin associated with people who were addicted
18  to legal opioids making a transition from legal
19  to illegal opioids.
20  BY MR. KNAPP:
21     Q.   What about the introduction of illicit
22  fentanyl, did that contribute to the increase in
23  illicit mortality after 2010?
24     A.   I don't have any data on the exact

1  introduction.  It is, of course, true in the
2  mortality data that use of fentanyl -- deaths
3  associated with fentanyl increased enormously
4  particularly after 2013, and certainly there are
5  anecdotal reports of more fentanyl availability
6  after 2013.
7          I again think that this is a result of
8  individuals who were addicted to legal opioids
9  finding it difficult to get those, creating
10  thicker markets for illegal opioids, and then
11  those illegal opioid markets becoming deeper,
12  more -- that is the supply conditions in the
13  illegal markets evolving to meet people's needs
14  for the addictive product.
15         MR. KNAPP:  Let's pick up here
16  tomorrow.
17         MR. KO:  How much time do we have on
18  the record?
19         THE VIDEOGRAPHER:  The time is
20  6:30 p.m., and we're off the record.
21         (Whereupon, the deposition was
22         adjourned.)
23
24

1  COMMONWEALTH OF MASSACHUSETTS )
2  SUFFOLK, SS.                  )
3          I, MAUREEN O'CONNOR POLLARD, RMR, CLR,
4  and Notary Public in and for the Commonwealth of
5  Massachusetts, do certify that on the 26th day
6  of April, 2019, at 9:00 o'clock, the person
7  above-named was duly sworn to testify to the
8  truth of their knowledge, and examined, and such
9  examination reduced to typewriting under my
10  direction, and is a true record of the testimony
11  given by the witness.  I further certify that I
12  am neither attorney, related or employed by any
13  of the parties to this action, and that I am not
14  a relative or employee of any attorney employed
15  by the parties hereto, or financially interested
16  in the action.
17         In witness whereof, I have hereunto
18  set my hand this 29th day of April, 2019.
19
20         _____
21         MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
22         Realtime Systems Administrator
23         CSR #149108
24

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8          After doing so, please sign the
9  errata sheet and date it.  It will be attached
10  to your deposition.
11         It is imperative that you return
12  the original errata sheet to the deposing
13  attorney within thirty (30) days of receipt of
14  the deposition transcript by you.  If you fail
15  to do so, the deposition transcript may be
16  deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              - - - - -
              E R R A T A
 2              - - - - -
 3  PAGE  LINE  CHANGE
 4  ____  ____  _____
 5     REASON: _____
 6  ____  ____  _____
 7     REASON: _____
 8  ____  ____  _____
 9     REASON: _____
10  ____  ____  _____
11     REASON: _____
12  ____  ____  _____
13     REASON: _____
14  ____  ____  _____
15     REASON: _____
16  ____  ____  _____
17     REASON: _____
18  ____  ____  _____
19     REASON: _____
20  ____  ____  _____
21     REASON: _____
22  ____  ____  _____
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2          ACKNOWLEDGMENT OF DEPONENT
 3
 4       I, _____, do
    Hereby certify that I have read the foregoing
 5  pages, and that the same is a correct
    transcription of the answers given by me to the
 6  questions therein propounded, except for the
    corrections or changes in form or substance, if
 7  any, noted in the attached Errata Sheet.
 8
 9  _____
    DAVID CUTLER, Ph.D.           DATE
10
11
12
13
14
15
16  Subscribed and sworn
    To before me this
17  _____ day of _____, 20____.
18  My commission expires: _____
19
    _____
20  Notary Public
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              LAWYER'S NOTES
 2  PAGE  LINE
 3  ____  ____  _____
 4  ____  ____  _____
 5  ____  ____  _____
 6  ____  ____  _____
 7  ____  ____  _____
 8  ____  ____  _____
 9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```