Highly Confidential - Subject to Further Confidentiaity Review

```
 1              UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3    ***************************
 4    IN RE:  NATIONAL          MDL No. 2804
      PRESCRIPTION OPIATE
 5    LITIGATION               Case No.
                               17-MD-2804
 6    This document relates to:
 7    The County of Summit,     Hon. Dan A. Polster
      Ohio, et al v. Purdue
 8    Pharma L.P., et al
      Case No. 1:18-OP-45090
 9
10    The County of Cuyahoga v.
      Purdue Pharma L.P., et al
11    Case No. 17-OP-45004
12    ***************************
13        HIGHLY CONFIDENTIAL - SUBJECT TO
14          FURTHER CONFIDENTIALITY REVIEW
15     VIDEOTAPED DEPOSITION OF DAVID CUTLER, Ph.D.
16
17           Saturday, April 27th, 2019
18                8:06 a.m.
19    Held At:
20         Robins Kaplan LLP
           800 Boylston Street
21         Boston, Massachusetts
22
23    REPORTED BY:
24    Maureen O'Connor Pollard, RMR, CLR, CSR
```

Highly Confidential - Subject to Further Confidentiaity Review

```
 1    APPEARANCES:
 2
      FOR THE PLAINTIFFS:
 3
 4       DAVID J. KO, ESQ.
         DEREK W. LOESER, ESQ.
 5          KELLER ROHRBACK, PLLC
            1201 Third Avenue
 6          Seattle, Washington 98101
            206-623-1900
 7          dko@kellerrohrback.com
 8            -and-
 9       HOLLY DOLEJSI, ESQ.
            ROBINS KAPLAN LLP
10          800 LaSalle Avenue
            Minneapolis, Minnesota 55402
11          612-349-8500
            hdolejsi@robinskaplan.com
12
13
      FOR CAYAHOGA COUNTY:
14
         SALVATORE C. BADALA, ESQ. (Remotely)
15          NAPOLI SHKOLNIK PLLC
            400 Broadhollow Road
16          Melville, New York 11747
            631-224-1133
17          sbadala@napolilaw.com
18
19    FOR PURDUE PHARMA:
20       WILL. SACHSE, ESQ.
            DECHERT LLP
21          2929 Arch Street
            Philadelphia, Pennsylvania 19104
22          215-994-4000
            will.sachse@dechert.com
23
24
```

Highly Confidential - Subject to Further Confidentiaity Review

```
 1    APPEARANCES (Continued):
 2
      FOR McKESSON CORPORATION:
 3
 4       DAVID HALLER, ESQ.
            COVINGTON & BURLING LLP
            620 Eighth Avenue
 5          New York, New York 10118
            212-841-1000
 6          dhaller@cov.com
 7            -and-
 8       BRYANT PULSIPHER, ESQ.
            COVINGTON & BURLING LLP
 9          415 Mission Street
            San Francisco, California 94105
10          415-591-7055
            bpulsipher@cov.com
11
12
      FOR AMERISOURCEBERGEN DRUG CORPORATION:
13
14       BRIAN T. HIMMEL, ESQ.
            REED SMITH LLP
            225 Fifth Avenue
15          Pittsburgh, Pennsylvania 15222
            412-288-4058
16          bhimmel@reedsmith.com
17
18    FOR H.D. SMITH:
19       ALICE SPRINGER, ESQ. (Remotely)
            BARNES & THORNBURG LLP
20          100 North Michigan
            South Bend, Indiana 46601-1632
21          574-237-1120
            alice.springer@btlaw.com
22
23
24
```

Highly Confidential - Subject to Further Confidentiaity Review

```
 1    APPEARANCES (Continued):
 2
      FOR WALMART:
 3
 4       CLAIRE CASTLES, ESQ.
            JONES DAY
            555 South Flower Street
 5          Los Angeles, California 90071-2300
            213-489-3939
 6          ccastles@jonesday.com
 7            -and-
 8       STEVEN N. GEISE, ESQ.
            JONES DAY
 9          4655 Executive Drive, Suite 1500
            San Diego, California 92121-3134
10          858-314-1170
            sngeise@jonesday.com
11
12
      FOR CVS INDIANA, LLC and CVS RX SERVICES, INC.:
13
14       DANIEL P. MOYLAN, ESQ.
            ZUCKERMAN SPAEDER, LLP
            100 East Pratt Street
15          Baltimore, Maryland 21202-1031
            410-949-1159
16          dmoylan@zuckerman.com
17
18    FOR ANDA, INC.:
19       KATY E. KOSKI, ESQ.
            FOLEY & LARDNER LLP
20          111 Huntington Avenue
            Boston, Massachusetts 02199-7610
21          617-342-4000
            kkoski@foley.com
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2    APPEARANCES (Continued):
 3
      FOR ALLERGEN:
 4
          TIMOTHY W. KNAPP, ESQ.
 5        JOHN BAILEY, ESQ.
              KIRKLAND & ELLIS LLP
 6            300 North LaSalle
              Chicago, Illinois 60654
 7            312-862-7170
              timothy.knapp@kirkland.com
 8            john.bailey@kirkland.com
 9    FOR JANSSEN and JOHNSON & JOHNSON DEFENDANTS:
10        MATTHEW KAISER, ESQ.
              O'MELVENY & MYERS LLP
11            400 South Hope Street
              Los Angeles, California 90071-2899
12            213-430-8117
              mkaiser@omm.com
13
14    FOR HBC SERVICE, INC.:
15
          RICHARD I. HALPERN, ESQ.
16            MARCUS & SHAPIRA LLP
              One Oxford Centre, 35th Floor
17            301 Grant Street
              Pittsburgh, Pennsylvania 15219-6401
18            412-338-4690
              halpern@marcus-shapira.com
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):
 2    FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
      SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
 3    INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.)
 4        SAMUEL N. LONERGAN, ESQ.
              ARNOLD & PORTER KAYE SCHOLER LLP
 5            250 West 55th Street
              New York, New York 10019-9710
 6            212-836-7408
              samuel.lonergan@arnoldporter.com
 7
 8    FOR TEVA PHARMACEUTICALS USA, INC., CEPHALON,
      INC., WATSON LABORATORIES, INC., ACTAVIS LLC,
 9    ACTAVIS PHARMA, INC., f/k/a WATSON PHARMA, INC.:
10        MARTHA A. LEIBELL, ESQ.
              MORGAN, LEWIS & BOCKIUS LLP
11            200 S. Biscayne Boulevard, Suite 5300
              Miami, Florida 33131-2339
12            305-415-3387
              martha.leibell@morganlewis.com
13
14    FOR RITE AID OF MARYLAND:
15        JOHN M. MALOY, ESQ. (Remotely)
              MORGAN, LEWIS & BOCKIUS LLP
16            101 Park Avenue
              New York, New York 10178-0060
17            212-309-6682
              john.maloy@morganlewis.com
18
19    FOR MALLINCKRODT, LLC and SPECGX, LLC:
20        NICHOLAS BRADLEY, ESQ.
              ROPES & GRAY LLP
21            1211 Avenue of the Americas
              New York, New York 10036
22            212-596-9000
              nick.bradley@ropesgray.com
23
24    VIDEOGRAPHER:  Robert Martignetti
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      INDEX
 2    EXAMINATION                        PAGE
 3    DAVID CUTLER, Ph.D.
 4      BY MR. KNAPP                      381
 5      BY MR. HALLER                     603
 6      BY MR. GEISE                      648
 7      BY MR. KO                         682
 8
 9
10            E X H I B I T S
11    NO.     DESCRIPTION                 PAGE
12    9    Evans, et al paper, How The
           Reformulation Of OxyContin Ignited
13         The Heroin Epidemic..................391
14    10   Alpert, et al paper, Supply-Side
           Drug Policy in the Presence of
15         Substitutes: Evidence from the
           Introduction of Abuse-Deterrent
16         Opioids.............................422
17    11   Case and Deaton paper, Mortality
           and Morbidity in the 21st Century....474
18
19    12   Case and Deaton paper, Deaths of
           despair redux: a response to
           Christopher Ruhm.....................482
20
21    13   Understanding Crime Trends:
           Workshop Report (2008)...............574
22    14   Baumer, et al paper, Bringing
           Crime Trends Back into
23         Criminology: A Critical Assessment
           of the Literature and a Blueprint
24         for Future Inquiry...................584
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
      15   Supplemental Expert Report of
 2         Craig J. McCann, Ph.D, CFA, 4/3/19...596
 3    16   Expert Report of Professor
           Jonathan Gruber, 3/25/19.............608
 4
      17   Online Appendix, Supply-Side Drug
 5         Policy in the Presence of
           Substitutes:  Evidence from the
 6         Introduction of Abuse-Deterrent
           Opioids..............................668
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1              P R O C E E D I N G S
 2
 3         THE VIDEOGRAPHER:  We are now on the
 4    record.  My name is Robert Martignetti.  I'm a
 5    videographer for Golkow Litigation Services.
 6         Today's date is April 27, 2019, and
 7    the time is 8:06 a.m.
 8         This continued video deposition of
 9    Daniel Cutler --
10         THE WITNESS:  David.
11         THE VIDEOGRAPHER:  I'm sorry.
12         -- David Cutler is being held in
13    Boston, Massachusetts, In Re:  National
14    Prescription Opioid Litigation.
15         Counsel will be noted on the
16    stenographic record.
17         The court reporter is Maureen Pollard,
18    and will now swear in the witness.
19
20              DAVID CUTLER, Ph.D.,
21    having been duly identified and sworn, was
22    examined and testified as follows:
23
24              FURTHER EXAMINATION
```

```
 1    BY MR. KNAPP:
 2    Q.   Good morning, Professor Cutler.
 3    Welcome back.
 4    A.   Good morning, Mr. Knapp.  It's good to
 5    see you again.
 6    Q.   Good to see you, too.  Thanks.
 7         Why don't we pick up where we left off
 8    yesterday.  And so if you could pull out your
 9    report, which is Cutler Exhibit 1, and turn
10    to -- I want to ask about paragraphs 53 and 54
11    which are on Page 31 and 32.
12         And let's start with 54.  What 54 says
13    is, "The combined consequence of these factors
14    was a rapid growth in misuse of illicit opioids
15    and increase in mortality due to heroin and
16    fentanyl which began around 2010."
17         What are the factors that you're
18    referring to were a combined consequence?
19    A.   So the specific factors that I'm
20    referring to there are the ones that are
21    mentioned in the previous paragraphs and that
22    are summarized in Figure 3.1, which is on
23    Page 10 of the report.  And so those are
24    generally referring to the abuse-deterrent
```

```
 1    reformulations of some of the medications, where
 2    obviously OxyContin is a big part of that as the
 3    literature shows, prescription drug monitoring
 4    programs put it in place by many states, and
 5    reductions in prescription sales resulting from
 6    actions of insurance companies, both public and
 7    private, sometimes employers who are sponsoring
 8    insurance policies, guidelines for medical
 9    societies, information provided directly to
10    primary care physicians, and related types of
11    activities.
12    Q.   Is one of the factors that you're
13    referring to in this first sentence of
14    Paragraph 54 what you refer to at the end of
15    Paragraph 53, "The enormous increase in
16    prescription opioid shipments resulting from
17    defendants' misconduct"?
18    A.   The increase in opioid shipments
19    resulting from defendants' misconduct then set
20    the stage for everything that happened
21    thereafter.  So because of the misconduct, there
22    were excessive prescription opioid shipments,
23    excessive use individuals who were addicted to
24    opioids.  Some movement to illegal opioids might
```

```
 1    have happened even in the absence of any other
 2    policy because of ease in different areas of
 3    obtaining illegal opioids.
 4         And some of the transition to illicit
 5    opioids occurred as a result of interventions
 6    that were undertaken because of the widespread
 7    harms that resulted from the excessive shipments
 8    of opioid medications.
 9    Q.   So just to be clear, when you say the
10    combined consequence of these factors, one of
11    those factors is the increase in legal
12    prescription opioid shipments prior to 2010?
13    A.   That is in many ways the driving
14    factor for all of the increase in illicit use.
15    Without that, of course, there would have been
16    no need for any of the policies that came in
17    place afterwards.
18    Q.   And just to be clear, you haven't made
19    any attempt to disentangle or separate out the
20    percentages that each of these factors that you
21    just walked through contributed to the rapid
22    growth in the misuse of illicit opioids after
23    2010?
24         MR. KO:  Object to the form.
```

1    A.   I do not -- I did not develop a model
2    that looked specifically at all of the
3    individual components that are involved with
4    the sort of bottom part of Figure 3.1.  I didn't
5    -- that would be a different type of an
6    epidemiological framework.
7         But I also think -- again, I just want
8    to reiterate -- not all of the factors are on
9    the same level; that is, the underlying driver
10   was the increase in prescription opioids, and
11   without that there would have been no need for
12   any of the other policies, public or private.
13        So I don't think it's right to think
14   about them as equally -- as apportioning
15   100 percent into what percent is the
16   prescriptions of legal opioids and then what
17   percent would have been this action by this
18   insurance company and what percent would have
19   been this action by this particular government
20   agency.  I don't think that's the right model
21   here, because those were -- those actions were
22   taken in response to the excessive quantities of
23   legal opioids.  And so they need to be seen in
24   that context rather than as just independent

1    events that occurred.
2    BY MR. KNAPP:
3         Q.   So I want to make sure I understand,
4    Professor Cutler, if you're walking back your
5    testimony from yesterday.
6         Do you remember when you testified
7    that the counterfactual of none of these public
8    interventions would have taken place but for the
9    increase in shipments prior to 2010?  Do you
10   remember when you said that that counterfactual
11   was too strong?
12        MR. KO:  Object to the form.
13        A.   I want to clarify what I meant by
14   that, and so let me -- if I could, maybe I could
15   return to that sentence.  If you recall where --
16   where exactly -- here it is.  It's on Page 9, at
17   the bottom of Paragraph 18 on Page 9.
18        What I was talking about was not --
19   was -- it was a kind of statement of fact about
20   what happened as a result of the excessive
21   shipments of opioids.  Yesterday you had asked
22   it -- at least I was thinking in the context of,
23   well, suppose that there had been only half --
24   it became in our discussion of suppose some of

1    the shipments were legal and so on.  And that
2    involved a hypothetical calculation as to would
3    any of these actions have occurred had there
4    been, for example, only half the set of
5    shipments.
6         And what I answered at that time was I
7    don't feel comfortable making a hypothetical
8    statement about suppose there had been only half
9    the amount of shipments and, therefore, would
10   those actions have taken place.  So I can't make
11   any hypothetical statement as to what percentage
12   of shipments would have triggered those actions.
13        What I am saying here is that I
14   believe those actions were a result of the legal
15   shipments that took place.  And so I'm not
16   modeling policy, I'm merely stating that the
17   policy was in reaction to those events, and
18   that, therefore, the shipments of legal opioids
19   were the drivers of that policy.
20   BY MR. KNAPP:
21        Q.   You're not comfortable stating that
22   but for the increase in shipments prior to 2010
23   there would not have been these public
24   interventions, including the reformulation of

1    OxyContin?
2         A.   I don't have in this report a model of
3    government behavior, so I'm not trying to say in
4    this report my estimate suggests that the
5    government would have done this under this other
6    hypothetical.
7         So I'm explicitly not doing what in
8    economics terms is called political economy,
9    which is an analysis of how changes in the
10   economies affect government policy.  That's not
11   an area on which I've drawn an inference.
12        What I have -- what I am saying is
13   that these policies occurred in light of the
14   enormous increase in opioid shipments, and in
15   particular the belief that those were excessive
16   shipments, and that, therefore, those policies
17   need to be understood in that context.
18        Q.   All right.  If we look at
19   Paragraph 55, you state in that paragraph that
20   the shift in the relationship between shipments
21   of prescription opioids and mortality, you say
22   that has been widely recognized in the economic
23   literature.
24        Do you see that?

1  A.   Yes, I do see that.

2  Q.   What articles are you relying on --

3  well, strike that.

4       Are you relying on any articles to

5  support your statement that this relationship

6  has been widely recognized beyond the article

7  cited in Footnote 37?

8       MR. KO:  Object to the form.

9       Go ahead.

10  A.   Those two articles make the case very

11  clearly.  There are other articles in the

12  literature that cite those articles, obviously.

13  I don't list them specifically.

14       But as a scholar, one of the things

15  that one does is gauges what your opinion is

16  about the accuracy of research in part by what

17  other scholars say about it, say about research

18  in addition to your own reading, so if other

19  scholars find flaws or say that they have not

20  identified flaws or rely on it.

21       So the fact that those studies have

22  been cited favorably by other papers also

23  contributes to my view that -- contributes to my

24  view, but those are the two primary papers that

1  address this issue.

2  BY MR. KNAPP:

3  Q.   Now, Professor Cutler, is it your

4  understanding that either of these studies

5  attributed the increase in post-2010 deaths from

6  illegal opioids to pre-2010 shipments?  Did

7  either of those studies look at that question?

8       MR. KO:  Object to the form.

9  Compound.

10       Go ahead.

11  A.   Both of the studies -- so the Alpert,

12  et al study related the increase in heroin

13  deaths to the use of OxyContin in different

14  states before 2010, so that was a very direct

15  link between pre-2010 opioid shipments and

16  post-2010 heroin mortality.

17       The Evans, et al paper, it used, I

18  believe, although I'd want to -- I'd want to

19  refresh my memory exactly, I believe it used

20  data on the pre-2010 death rate which, of

21  course, is a reflection of prescription opioid

22  use in looking at post-2010 mortality.

23  BY MR. KNAPP:

24  Q.   So let's just start with Evans.  I

1  want to be clear to make sure I understand what

2  you believe these papers conclude.

3       The Evans study does not attribute the

4  increase in heroin to shipments of prescription

5  opioids prior to 2010, does it?

6  A.   Remember, the Evans paper is looking

7  in the context where opioids were very

8  prevalent, so it's focusing specifically on the

9  event of the reformulation.  But if I recall,

10  they also have some cross-sectional results.

11       I see you have a copy of it.  If I

12  could look through the copy, I would be more

13  certain about exactly the relationship with

14  pre-2010.

15  BY MR. KNAPP:

16  Q.   Are you aware that Evans attributes

17  the quadrupling of heroin death rates to the

18  August, 2010 reformulation of an oft-abused

19  prescription opioid OxyContin?

20       MR. KO:  If you know without looking

21  at the report or the study.

22  A.   I am aware of that.  In fact, that's

23  the big event he looks at, which is also, of

24  course, in the context of what came before it as

1  we were talking about.

2  BY MR. KNAPP:

3  Q.   All right.  I'm handing you what is

4  Cutler Exhibit 9.

5       (Whereupon, Cutler Exhibit Number 9

6       was marked for identification.)

7  BY MR. KNAPP:

8  Q.   This is the Evans study you cite in

9  Footnote 37.

10       MR. KO:  Are we at 9?

11       MR. KNAPP:  Did we do 8 yesterday?

12       MR. KO:  One of them was Kohler

13  Exhibit 1.

14       THE WITNESS:  I have Cutler Exhibit 8.

15       MR. KO:  8 was this.

16       MR. KNAPP:  Let's mark this as 9.

17       THE WITNESS:  It's so rare that people

18  cite my study so frequently that I want to make

19  sure they get their own number.

20       MR. KNAPP:  What am I doing here?

21  This is the wrong one.  Can I get your copy?

22  BY MR. KNAPP:

23  Q.   Do you see in the abstract at the top

24  the statement "We attribute the recent

1  quadrupling of heroin death rates to the August,
2  2010 reformulation of an oft-abused prescription
3  opioid OxyContin," right?
4      A.   Yes, I do see that.
5      Q.   And there's nothing in the abstract
6  that talks about attributing the increase in
7  heroin death rates to pre-2010 shipments, is
8  there?
9      A.   If I could call your attention to
10  Figure 2, which is the figure that I was in my
11  mind reconstructing.  Figure 2 shows the
12  relationship between attributes of different
13  areas prior to 2010, going all the way back to
14  2004, and the increase in heroin death rates
15  after 2010.
16          And one of the points that the authors
17  make there is that the heroin death rate
18  increased the most in the solid -- in the states
19  with the solid black line.  Those are the states
20  with the highest rate of deaths from OxyContin
21  and heroin in the period prior to 2010.
22          So what this is saying is that the
23  reformulation had a different impact in
24  different areas, and that it's directly related

1  to the extent of deaths associated with
2  prescription opioids prior to 2010.
3      Q.   Professor Cutler, Figure 1 is not a
4  causation analysis, right?  It's a correlation?
5          MR. KO:  I believe it was Figure 2
6  that he was referencing.
7  BY MR. KNAPP:
8      Q.   I'm sorry, you were reference --
9          MR. KO:  And object to the form.
10  BY MR. KNAPP:
11      Q.   Were you referring to Figure 2?
12      A.   Yes, I was.  I was referring
13  specifically to Figure 2B.
14      Q.   Well, same question then.  Figure 2B,
15  that is a correlation analysis, not a causation
16  analysis?
17          MR. KO:  Object to the form.
18      A.   In this case I think it provides
19  fairly strong evidence of causation.  There was
20  a sudden event, which was the reformulation of
21  OxyContin.  That sudden event had different
22  impacts on the basis of what states were like
23  prior to 2010.
24          There is no indication in the

1  evidence -- if you look at the line for
2  mortality prior to 2010, there is no indication
3  in the data that heroin mortality was trending
4  higher in the areas that had high OxyContin
5  deaths and high heroin deaths prior to 2010.  It
6  was only with that sudden change in policy that
7  there was an increase in heroin deaths
8  disproportionate in the areas with high
9  OxyContin and high heroin deaths relative to
10  other areas, particularly areas with low
11  OxyContin and low heroin deaths.  So I believe
12  this actually does provide a quite nice testing
13  of causality.
14  BY MR. KNAPP:
15      Q.   And where -- can you point me to where
16  in the Evans study that they derived this
17  causation conclusion that you've just drawn that
18  pre-2010 shipments caused post-2010 deaths as a
19  result of illegal opioids?
20      A.   Let me look specifically through the
21  paper and provide a very specific reference for
22  you.
23          (Witness reviewing document.)
24      A.   Okay.  If you look on Page 2 of their

1  paper, in the top -- in the second column, the
2  column on the right, if I could read a few
3  sentences from the second row of that.  "This
4  suggests that there was not a differential shock
5  at the time.  Second, we provide additional
6  evidence in favor of the reformulation causing
7  the increase in heroin death that takes
8  advantage of differences in the degree to which
9  reformulation would have affected abusers' home
10  markets.  In particular, we note that markets
11  with greater access to heroin and markets with
12  higher rates of pre-reformulation opioid abuse
13  are likely to show more substitution away from
14  opioids and towards heroin than markets with
15  less access to heroin or lower opioid abuse
16  rates.  The proxy for the former with whether a
17  state is above or below the median
18  pre-reformulation per capital heroin death rate
19  and the latter with whether a state is above or
20  below the median pre-reformulation per capita of
21  oxycodone consumption.  Breaking states into
22  four groups based on these measures, we estimate
23  pre-reformulation trends and post-reformulation
24  trends and test whether their trend breaks after

```
 1   2010 for each of these groups.  We find that the
 2   heroin death rates increase substantially in all
 3   groups.  In addition, we find that the trend
 4   breaks are largest in states that appear ex ante
 5   to be at the highest risk of substitution.
 6   These results are previewed graphically in
 7   Figure 2B where we display the monthly heroin
 8   death rates from 2004 through 2014.  While
 9   trends" -- for the four groups of states.
10   "While trends in heroin death rates are similar
11   across the groups before the reformulation,
12   afterwards the groups diverge and the states
13   likely to be at the highest risk of substitution
14   rose above the median and both pre-reformulation
15   measures diverged the most."
16          So that's their statement that the
17   reformulation had a different effect based on
18   the initial OxyContin rate and the initial
19   heroin rate.  And while they do not use the word
20   causality, that's what's implied by that
21   paragraph.
22   BY MR. KNAPP:
23       Q.   And when you say that's what's implied
24   by that paragraph, you don't -- you're not
```

```
 1   suggesting that this is a regression model that
 2   controls for other variables that might cause
 3   the change in the death rates?
 4          MR. KO:  Object to the form.
 5       A.   As they note specifically, trends in
 6   heroin death rates are similar across the groups
 7   before the reformulation, so, therefore,
 8   there's -- that's a statement that they're
 9   saying there's nothing else that would have led
10   to the differential trend in heroin deaths
11   across those areas.  So that is getting at --
12   getting at the -- getting at the there's nothing
13   else component.
14   BY MR. KNAPP:
15       Q.   Did they run a regression to control
16   for any other factors that might have led to the
17   change in the heroin death rates?
18       A.   They then do -- they then do
19   regression analyses.  And if you look, those
20   are -- their regression analyses are reported in
21   Table 3, which is on Page 9 of the paper in the
22   top.
23          And so what they're showing is the
24   different trends in death rates in areas based
```

```
 1   on the initial heroin death rates and the
 2   initial OxyContin abuse rates.  And so what they
 3   show is that the heroin death rates increased
 4   much more in the high OxyContin, high heroin
 5   areas than in the other areas.  That's the
 6   coefficient 0.0042, which is in the fourth row
 7   of Panel A of the table.
 8          Of course, the standard error shows
 9   that this is a statistically significant
10   difference between the low OxyContin, low heroin
11   areas and the high OxyContin, high heroin areas.
12   So this is the regression analysis that's
13   designed to test that relationship specifically.
14       Q.   So earlier you said that the shift in
15   the heroin mortality rates in high shipment
16   areas was a test -- nice testing of causality,
17   and I think it just refers to their conclusions
18   of causality here as well --
19       A.   That's correct.
20       Q.   -- the testing of their relationship.
21          What do you mean by the testing of the
22   relationship?  Is that a conclusion of
23   causality, or something else?
24       A.   I believe it's a causal conclusion.
```

```
 1   So let me state what I believe their conclusion
 2   is both from Figure 2B and from Table 3.
 3          There were differences across states
 4   in the extent to which opioids were abused.
 5   Those differences are very clear and large.
 6   Excuse me.  Prior to 2010 there were differences
 7   in the extent to which opioids were abused.
 8   When then the reformulation of OxyContin took
 9   place, that led to a significant widening in the
10   heroin mortality rate -- causally led to a
11   significant widening in the heroin mortality
12   rate where the areas that had the most abuse of
13   both legal drugs -- both OxyContin -- excuse me,
14   OxyContin and heroin beforehand had the largest
15   increase in heroin death rates afterwards.
16          And so it is a causal impact of a
17   policy that differentially affected areas that
18   were most affected prior to the policy.
19       Q.   Are you aware of any studies that test
20   the relationship between heroin mortality post
21   2010 and any other types of opioids other than
22   oxycodone?
23       A.   Not in terms -- I'm not thinking of
24   any in terms of published studies.  In my report
```

1   in Figure 3.4, which is on Page 35 of the
2   report, what we present -- what I present there
3   is the change in heroin mortality in two groups
4   of counties.  One is with -- the red line is
5   with high total shipments of opioids, so that
6   includes OxyContin plus all the other opioids,
7   and the blue line is areas with low shipments of
8   opioids, including all opioids, OxyContin and
9   all other opioids.
10        And so this is quite consistent with
11  the Evans, et al study, which is areas with
12  higher shipments of all opioids prior to 2010
13  had a much greater increase in heroin mortality
14  post 2010 than did areas with lower shipments of
15  opioids pre-2010.
16        Q.  All right.  So I want to come back to
17  the Alpert study, but I want to ask you about
18  Figure 3.4 while we're on it.
19             This is a -- Figure 3.4 represents a
20  correlation analysis, not a causation analysis,
21  correct?
22             MR. KO:  Object to the form.
23        A.  I think of this in the same fashion as
24  I think of the Evans, et al study.  On the one

1   hand, the only thing you ever get from a
2   regression -- let me step back from this for one
3   second.
4             As an economist, an applied economist,
5   all any analysis shows you is a correlation.
6   That's all a regression does, is it shows you a
7   correlation between different things.  The
8   causality part is added by the researcher who
9   then gives you a reason to believe that what's
10  happening is exogenous.
11             So in this case I'm showing different
12  areas that differed initially in their rates of
13  opioid shipments.  Prior to 2010 the heroin
14  death rates in both were on a relatively similar
15  trend.  They were both declining, maybe flatter,
16  declining a little bit.
17             And then you have the, of course,
18  exogenous shock of the reformulation of
19  OxyContin combined with the other changes that
20  are going on here that are also, many of them,
21  occurring around this period in time.  And then
22  you see a very big divergence post 2010.
23             So you could argue that's all
24  correlation and that would have happened after

1   2010 regardless of whether there was any other
2   policy, and that there would have been that huge
3   divergence regardless of any other -- of
4   anything else going on.
5             And there's nothing to say an
6   individual couldn't do that.  In fact, in
7   economic seminars that's what happens all the
8   time, someone presents results and someone --
9   and then there's a generalized discussion as to
10  whether that's truly causal or not.
11             In this case the causality is enhanced
12  by two pieces of evidence -- several pieces of
13  evidence really.  The first one being the Evans,
14  et al study where they try to look explicitly at
15  were there any other events that were going on
16  at the time that would have been instead the
17  factor, and they conclude based on their
18  analysis that there were no other events going
19  on around that time that would have had that
20  sharp a change, that immediate a change.
21             Second is the fact that prior to
22  2010 -- so economists will often do what's
23  called a pre-intervention analysis or pre-trend
24  analysis, which is before the events you're

1   thinking of were the -- was the outcome that
2   you're looking at trending differently for the
3   groups that were, say, treated versus not
4   treated, or more affected versus less affected
5   in that case.  And so that pre-trend analysis is
6   something that economists do.
7             Figure 3.4 is showing you visually the
8   pre-trend analysis.  And you can see that the
9   trend lines look very similar so that at least
10  I, as an individual, if I saw this presented in
11  a seminar or I were asked to referee a paper or
12  I read a paper, I would conclude that these are
13  very similar pre-trend analyses.
14             And then third, you see the very sharp
15  divergence at exactly the time that you're
16  looking, and the divergence sort of continues.
17  It's not a very small blip.  It doesn't erase
18  itself after one year or one month in the Evans,
19  et al analysis, but it's a very, very sustained
20  change.
21             And so together that time pattern is
22  what allowed Evans, et al to conclude that it
23  was causal, and what makes me comfortable in
24  Figure 3.4 for exactly similar reasons that this

Highly Confidential - Subject to Further Confidentiality Review

1    is causal.

2        Q.    In your analysis reference shown in
3    Figure 3.4, you haven't controlled for any other
4    variables like demographic variables, social
5    variables, or economic variables, right?

6        A.    Figure 3.4 does not control for them.
7    The beauty of having the intervention is that
8    none of those variables changed very radically,
9    so none of those variables changed in a way that
10    would explain such a huge shift in heroin death
11    rates in that one period of time.

12        Q.    You -- Figure 3.4 does not show
13    whether these other variables would affect the
14    heroin death rate after 2010?

15        A.    That's correct.  Figure 3.4 by itself
16    does not show how those other variables would,
17    but there's no economic or social or demographic
18    variable that changes with anywhere near --
19    anywhere near the rapidity of which these lines
20    are changing.

21        Q.    Is Summit County a high shipment
22    county as you've defined it in Paragraph 60?

23        A.    I think I should know the answer off
24    the top of my head, but I don't know the answer

Highly Confidential - Subject to Further Confidentiality Review

1    off the top of my head, and -- so I don't want
2    to guess.  But I believe -- I should have -- my
3    guess is it would be in Professor Gruber's
4    report.  One could see whether Summit and
5    Cuyahoga Counties were high shipment counties or
6    not.

7        Q.    Is Cuyahoga County a high shipment
8    county as you've defined it in Paragraph 60?

9        A.    Again, I don't have it specifically in
10    my report.  I know I knew it at one point.  And
11    I -- that is because I obviously looked at those
12    counties in specific.  But I don't -- to my
13    embarrassment, I do not recall it.  And in the
14    absence -- I think it would be in Professor
15    Gruber's report.  But in the absence of seeing
16    that specifically, I don't want to say something
17    that might not be correct.

18        Q.    Did you run trend lines for the second
19    and third quartiles that are referenced in
20    Paragraph 60 in Figure 3.4?

21        A.    Yes, we would have run -- we would
22    have -- we would have plotted this directly for
23    all the different quartiles.

24        Q.    And what was the result for the second

Highly Confidential - Subject to Further Confidentiality Review

1    quartile?

2        A.    I don't recall the result directly.
3    I -- we presented it this way so that we
4    wouldn't confuse things with too many lines, so
5    I don't remember it exactly.  All of the areas
6    in general showed very clear, very similar
7    pre-trends, and then very sharp breaks in 2010.

8        Q.    What was the result for the counties
9    in the third quartile?

10        A.    Again, I don't remember it
11    specifically.  I do remember that all of the
12    quartiles showed very similar pre-trends and
13    then sharp breaks in 2010.

14            I should also say there's more, of
15    course, more going on with the increase in
16    heroin mortality than just what the shipment
17    rates were like prior to 2010.  Of course, that
18    interacted with other things, like, for example,
19    the nature of the heroin that was available in
20    the market, the extent of the supply of
21    illegal -- of individuals engaging in illegal
22    activities.

23            So you wouldn't expect to see this
24    line up one for one with exactly the pre-2010

Highly Confidential - Subject to Further Confidentiality Review

1    shipments because in any market, when you induce
2    a big change in demand, the actual increase in
3    quantity depends upon what the supply curve
4    looks like.  And the supply curve, the ability
5    to supply heroin, certainly differs across areas
6    in ways that cannot be measured.  So I would not
7    expect a one-for-one lining up.

8        Q.    Does it matter for your analysis if
9    Summit or Cuyahoga are high shipment counties,
10    low shipment counties, or somewhere in between?

11        A.    For this specific analysis, it does
12    not matter whether Cuyahoga and Summit are high
13    or low shipment counties.  For this specific
14    analysis, what I'm doing is I'm simply showing
15    that -- I'm making the point that the increase
16    in heroin mortality is a direct relationship to
17    the extent -- of the extent to which areas were
18    affected by the opioid epidemic prior to 2010.
19    So I'm making that -- I'm using all the counties
20    in the analysis to make that point, not just
21    those two counties.

22        Q.    But the conclusions that you're
23    drawing in this report are specific to Summit
24    and Cuyahoga County, correct?

Highly Confidential - Subject to Further Confidentiality Review

1  A.   That's correct.  What I'm doing in a
2  lot of this report is I'm using national data to
3  estimate truths about the world, to estimate
4  statements about the world, and then I am
5  applying those to data from Cuyahoga and Summit.
6       So in this case, in order to infer
7  whether there was a change in the nature of the
8  types of opioids that individuals are using in
9  that year, it makes sense to look at a lot of
10 different data from across the country from all
11 counties that are similar to Summit and
12 Cuyahoga, then specifically that gets applied to
13 the harms in those areas.
14      And so what I'm trying to do is bring
15 together the best analyses that I can of what's
16 happening, of how to understand the
17 relationships with then the very specific
18 on-the-ground impacts in those two bellwether
19 counties.
20 Q.   Now, you also mention that the extent
21 to which there's an increase in illicit
22 mortality after 2010 depends upon the
23 sophistication of the illegal market that's
24 developed at that time, right?

Highly Confidential - Subject to Further Confidentiality Review

1       MR. KO:  Object to the form.
2  A.   That is correct.  It depends on, in
3  essence, what does the supply look like.  So
4  what -- in economic terms, what the -- in this
5  case the reformulation and the other actions
6  that reduced the ability and increased the cost
7  of obtaining prescription opioids, what that did
8  was it reduced demand for prescription opioids
9  because when it's more difficult to obtain,
10 people obtain less of it, and it increased the
11 demand for illegal opioids, first heroin and
12 then later fentanyl.
13      The exact extent to which that
14 increase in demand translates into increased
15 quantity depends upon a number of factors; for
16 example, the extent of the illegal market in the
17 area, the extent to which the product can be
18 gotten into that area, the thickness of the
19 market and, therefore, the cost, the
20 transactions costs and the shipments costs
21 of obtaining the product, the various
22 distribution networks and so on.  So it depends
23 on all sorts of characteristics.  That supply
24 curve of illegal opioids has many, many things

Highly Confidential - Subject to Further Confidentiality Review

1  that go into it.
2  BY MR. KNAPP:
3  Q.   Let's look at Paragraph 71 of your
4  report.  And on the second page on Page 41,
5  second-to-last sentence, it says, "However, the
6  presence and sophistication of drug networks is
7  partially a result of opioid shipments prior to
8  2010 as they create 'thicker' markets for
9  illegal products."
10      Do you see that?
11 A.   Yes, I do see that.
12 Q.   When did the -- well, strike that.
13      When you state that pre-2010 shipments
14 are partially a result -- strike that.
15      When you state that the presence and
16 sophistication of drug networks is partially a
17 result of opioid shipments, what part of the
18 presence and sophistication of the market in
19 2010 was a result of pre-2010 legal prescription
20 opioid shipments?
21 A.   I'm sorry.  Can you just repeat the
22 question?
23 Q.   What part -- strike that.
24      What part of the presence and

Highly Confidential - Subject to Further Confidentiality Review

1  sophistication of drug networks in Cuyahoga and
2  Summit was a result of opioid shipments prior to
3  2010?
4       MR. KO:  Object to the form.
5  A.   So I understand the words, so I'll try
6  and answer, but I'm not sure I'm going to
7  directly answer your question, so please let me
8  know if I'm not directly answering your
9  question.
10      The presence and sophistication of
11 drug networks depends on -- in part on how many
12 people are in those markets, so the more people
13 that are in the market the more sophisticated
14 the network becomes.  Just like in any market,
15 the more buyers there are, the more quantity
16 there is, the more fluid becomes the market and
17 the ability to get the product that people want
18 to them when they want.
19      So that's just a statement that in any
20 market where -- the opioid shipments prior to
21 2010 sort of created the set of people who would
22 then transition into the illegal opioid market.
23 And the more people that transitioned, the more
24 is the demand for that, and, therefore, the

1  greater the development of that market would

2  be.

3  BY MR. KNAPP:

4      Q.   You cannot quantify the contribution

5  that pre-2010 shipments made to the presence or

6  sophistication of drug networks in Cuyahoga or

7  Summit after 2010?

8      A.   Unfortunately we don't have data on

9  presence or the sophistication of drug networks

10  anywhere.  Because it's an illegal good, we just

11  don't have that.  So there's really no economic

12  way to try and do a quantification of that.

13      Q.   How did you account for, in your

14  analysis, that the presence and sophistication

15  of illegal drug networks in Cuyahoga and Summit

16  County after 2010 was the result of factors

17  other than shipments of legal opioids?

18      A.   If the primary difference across areas

19  were a result of other factors unrelated to

20  anything having to do with consumption of

21  opioids prior to 2010, then in Figure 3.4, when

22  one looks at the relationship between pre-2010

23  deaths from -- or excuse me, shipments of

24  prescription opioids and post-2010 increases in

1  heroin, there would have been no difference

2  across those areas.  So if it was all due to

3  something else, one wouldn't see any

4  relationship between the pre-2010 shipments and

5  the post-2010 increases in heroin deaths.

6      Q.   Well, I'm not asking if it was all due

7  to something else.  How did you account for --

8  if part of it was due to something else, how did

9  you account for that in your analysis?

10          MR. KO:  Objection.  Object to the

11  form.  Objection, asked and answered.

12      A.   So two points which I've said before.

13  One is I don't have data on the extent of the

14  illegal market so I don't know the number of

15  participants, I don't know the prices, I don't

16  know the distribution system, so I cannot --

17  it's impossible to estimate something

18  econometrically.  It's literally -- without the

19  data you cannot estimate something, so I

20  literally -- just literally could not do it.

21          And then second is the data that I do

22  have in Figure 3.4 show that there is at least

23  some relationship between the initial shipments

24  and the post-2010 increase.

1          Now, as I said, these wouldn't line up

2  one-for-one across counties so you wouldn't

3  explain 100 percent of the differences based on

4  just the shipments pre-2010.  There are clearly

5  other factors going on.

6          I don't -- because I don't have any

7  data on them, I don't have any capacity to

8  empirically test whether there was some other

9  change that would have been involved in

10  increasing the extent of illegal markets.

11  BY MR. KNAPP:

12      Q.   You didn't run a regression between --

13  that would show -- strike that.

14          You didn't run a regression that would

15  show the relationship between pre-2010 shipments

16  and the sophistication of drug networks or the

17  thickening of drug networks after 2010, correct?

18          MR. KO:  Object to the form.

19  Objection, asked and answered.

20      A.   I wish I had data for many purposes,

21  many academic purposes.  I wish I had data on

22  the presence and sophistication of drug networks

23  in different areas.  It would be enormously

24  valuable as an academic to be able to study

1  those, to be able to provide advice to local

2  authorities about what those are and how to

3  address them.  Unfortunately, those data just

4  don't exist anywhere, and so I'm just not able

5  to do any econometric analysis.

6  BY MR. KNAPP:

7      Q.   And so you couldn't -- well, strike

8  that.

9          Did you consider a hypothesis that

10  before 2010, the break in the market in 2010,

11  that increased shipments of opioids created a

12  thinning in the sophistication and presence of

13  drug networks?

14          MR. KO:  Object to the form.

15      A.   One of the -- one of the fascinating

16  things -- again I want to come back to Figure

17  3.4.  One of the very interesting things is that

18  there does not seem to be a differential trend

19  in the heroin death rate in areas where opioid

20  shipments were higher versus areas where they

21  were lower, so those trends are very similar

22  trends.

23          And so while I don't have the data, as

24  we were talking about, I don't have the data on

Highly Confidential - Subject to Further Confidentiality Review

1  the presence or sophistication or any other
2  features of the drug networks, I don't see any
3  differences in the primary outcome that I have,
4  which is the mortality rate differently in some
5  areas than in other areas prior to that point.
6  BY MR. KNAPP:
7     Q.   So if we look at Figure 3.4, you've
8  got the different curves for low shipment
9  counties and high shipment counties.  At the
10 end, after you run your regression and plot --
11 and apply your shipment coefficient, you're not
12 applying a different coefficient for high
13 shipment counties or low shipment counties,
14 right?
15    A.   Can you just refer specifically to
16 which regression you're referring to?
17    Q.   Let's look at 3.10, Table 3.10 on
18 Page 64.  Let's look at column D.  This is your
19 shipment coefficient from your regression,
20 right?
21    A.   Yes, that is correct.
22    Q.   What does that reflect?
23    A.   That -- what column D shows is the
24 impact of -- excuse me -- of additional

Highly Confidential - Subject to Further Confidentiality Review

1  shipments of opioid medications in MMEs,
2  milligrams of morphine equivalent, on the
3  increase in the death rate in the area from the
4  beginning time period that we look at up through
5  roughly the 2010 time period based on the direct
6  model.
7     Q.   And that is a national shipment
8  coefficient that you apply to all counties,
9  correct?
10    A.   It is a regression coefficient for
11 large counties.  So it doesn't use all 3,000
12 plus counties, it uses the roughly 400 largest
13 counties.
14    Q.   400 largest counties in the United
15 States, not just in Ohio, correct?
16    A.   That's correct, roughly the 400
17 largest counties in the United States, largest
18 by population in the United States.
19    Q.   And you don't apply a different
20 coefficient based upon whether a county was a
21 high shipment county or a low shipment county?
22    A.   I think what you're asking
23 econometrically is whether, for example, the
24 impact of shipments would enter non-linearly in

Highly Confidential - Subject to Further Confidentiality Review

1  the model for mortality, because if it entered
2  non-linearly, then one would think that the
3  relationship would be different at a level of
4  high shipments, for example, versus at a level
5  of low shipments.  We did not enter that
6  non-linearly.  In general, with this number of
7  observations I wouldn't feel completely
8  comfortable about entering it non-linearly.
9        My guess is that at some point we
10 looked at it, although I don't remember
11 specifically.  And, you know, had there been an
12 obvious non-linearity, one would think about it.
13       But no, we don't -- we don't have any
14 differential effect at high or low levels.
15 We're assuming that there's a single
16 relationship that comes from additional
17 shipments.
18    Q.   To be clear, though, Figure 3.4 shows
19 a -- you conclude that Figure 3.4 shows a
20 stronger substitution effect in high shipment
21 counties, correct?
22    A.   The way you want to interpret Figure
23 3.4 is as, in essence, what is the -- think
24 about -- the way to relate Figure 3.4 to the

Highly Confidential - Subject to Further Confidentiality Review

1  analysis that you were referring to in, I
2  believe it was Table 3.10, is that Figure 3.4
3  shows -- let me just come back to this page.
4        Figure 3.4 is showing what is the
5  increase in -- actually, Figure 3.4 is not --
6  excuse me.  Figure 3.4 is not -- let me just go
7  back one step.
8        What Table 3.10 is from is our direct
9  model which is estimating total opioid mortality
10 rates over the period from the mid 1990s to
11 around 2010.  Figure 3.4 is really looking at
12 what's happening to heroin mortality rate in the
13 period before and after 2010.  So Figure 3.4 is
14 not a figure whose results translate directly
15 into the coefficients that then go into Table
16 3.10.
17    Q.   My question was simpler than that.
18       My question was, what your Figure 3.4
19 shows is that there's a higher substitution --
20 strike that.
21       What you conclude is that Figure 3.4
22 shows a higher rate of substitution in high
23 shipment counties, correct?
24    A.   I don't want to say the rate.  There

1   is a higher -- there's a greater increase in

2   heroin mortality.

3   Q.   In high shipment counties?

4   A.   That's correct.

5   Q.   Okay.

6   A.   That is correct.

7   Q.   Bear with me just one second.

8        All right.  So before we went on a

9   little bit of a tangent we were talking about

10  the studies that you identified as widely

11  supporting your conclusion that shipments of

12  prescription opioids had a relationship to

13  post-2010 mortality from illicit opioids.  We

14  talked about the Evans study.

15       Is it your -- do you believe that --

16  strike that.

17       Do you believe that the Evans study

18  attributes the increase in post-2010 mortality

19  from heroin to pre-2010 shipments?

20  A.   What the Evans study does is it shows

21  the confluence of two factors.  First, there

22  were --

23  Q.   Actually, can I strike the question?

24  I meant to be asking about the Alpert study now.

1        MR. KO:  You've got to -- that's fine.

2   BY MR. KNAPP:

3   Q.   We already talked about the Evans

4   study, so let me -- let me ask you about the

5   Alpert study.

6   A.   Okay.

7   Q.   Do you believe that the Alpert study

8   concludes that shipments of opioids, legal

9   opioids, prior to 2010 caused the increase in

10  heroin mortality after 2010?

11  A.   I believe the Alpert study shows that

12  the use of opioids, legal opioids prior to 2010

13  then created conditions under which making

14  OxyContin more difficult to obtain led to an

15  increase in post-2010 heroin mortality.

16       So it was -- there were confluence of

17  two events; the high shipments of opioid

18  mortality as well as the reformulation, and it's

19  those two together that lead to the -- that they

20  conclude leads to the heroin epidemic.

21  Q.   And Alpert doesn't seek to

22  differentiate the contribution to the increase

23  in heroin mortality between pre-2010 shipments

24  versus the reformulation of OxyContin, right?

1        MR. KO:  Object to the form.

2        Go ahead.

3   A.   In this case the two go -- in this

4   case the two are synergistic in that it is both

5   the high level of OxyContin prior to 2010 and

6   the reformulation that are showing up.

7        So it's -- I think yesterday we were

8   talking a little bit about what -- economically

9   what happens when multiple things have to happen

10  for something bad to occur.  And in this case

11  Alpert, et al are saying that multiple things

12  happened that led to the heroin mortality

13  increase.

14       MR. KNAPP:  All right.  Let's mark

15  Cutler Exhibit 10, which is the Alpert study in

16  your footnote 37.

17       (Whereupon, Cutler Exhibit Number 10

18       was marked for identification.)

19  BY MR. KNAPP:

20  Q.   Can you identify where in this study

21  you believe that Alpert, et al attribute the

22  increase in heroin deaths after 2010 to pre-2010

23  shipments?

24  A.   If you look in Table 2 of the paper,

1   which is on Page 18, Table 2 is estimating a

2   model where the dependent variable is the heroin

3   mortality rate per 100,000, and -- excuse me.

4   The change in the heroin death rate per 100,000.

5   And then what they're relating that to in the

6   table is the initial rate of OxyContin misuse,

7   which they're drawing from the NSDUH survey,

8   NSDUH survey.

9        And so they're showing directly that

10  the initial rate of misuse of OxyContin is

11  positively and statistically significantly

12  associated with increases in deaths, heroin

13  deaths.  Panel A is showing any heroin death,

14  and Panel B is showing heroin only deaths, so

15  that is deaths where heroin is the only

16  identified substance.

17  Q.   So this is showing a relationship

18  between misuse of OxyContin and heroin deaths,

19  correct?

20  A.   Yes, that's correct.

21  Q.   And are you assuming that misuse of

22  heroin -- strike that.

23       Are you assuming that misuse of

24  OxyContin is a proxy for shipments?

1     A.   In the online appendix to the paper,
2  so not -- it's not physically in what is Cutler
3  Exhibit 10.  In the online appendix to the paper
4  they have a chart that shows that explicitly.
5  So they show that the OxyContin misuse rate is
6  positively and statistically significantly
7  related to the shipments of opioids in the area.
8  But you'd need to pull up the online appendix to
9  see that.
10     Q.   And what is the analysis that they
11  run?  Is it a regression analysis between
12  OxyContin shipments and OxyContin misuse?
13     A.   They present a figure showing the
14  cross-state relationship between the two.  I
15  can't remember whether they present the
16  regression analysis, but I believe they show
17  what the regression line is, so it's very clear
18  what that looks like.
19     Q.   Are there any other studies that you
20  rely on for your statement in Paragraph 55 that
21  the shift in the relationship between shipments
22  of prescription opioids and mortality has been
23  widely recognized in the economic literature?
24     A.   Those are the two studies that I rely

1  upon.
2         I just want to return to my earlier
3  answer, which is that other studies cite those
4  studies.  So one thing that any scholar does is
5  they say, well, even if there's -- even if
6  someone hasn't written a counter-paper, if
7  someone writes a paper saying there are X
8  reasons why I believe this paper is incorrect,
9  one takes that into account.
10         The fact that the paper is cited
11  positively and approvingly by other scholars
12  adds to my own assessment of those papers, which
13  is that they are well done and accurate.
14     Q.   In Paragraph 62 you cite a number
15  of -- strike that.
16         Paragraph 62 says, "A number of
17  epidemiological studies have established that
18  much of the increase in the use of illicit
19  opioids after 2010 was the result of addictions
20  resulting from prior use of prescription
21  opioids."
22         Have you identified how much of the
23  increase in the use of illicit opioids is the
24  result of prior opioid shipments?

1     A.   No, I have not -- I do not have a
2  complete answer, so let me give a couple of
3  comments.
4         One is it comes up in a few studies.
5  These studies tend to be relatively small ends
6  because they're small numbers of observations
7  because they're -- oh, thank you so much --
8  because they're typically interviewing people,
9  and so the numbers of people are small.  They
10  also tend to be limited to a particular area
11  because they're interviewing people.  So they
12  don't claim to be nationally representative, so
13  I haven't seen any nationally representative
14  number.
15         Second is I really view these studies
16  as a kind of confirmation; that is, even in the
17  absence of these studies, my econometric
18  analysis and the results of other analyses lead
19  me to that conclusion.  So many -- so the fact
20  that one sees this in the epidemiological data
21  confirms, but it's not the thing that makes me
22  say, oh, well, I didn't believe it before and
23  now I believe it because of those studies.
24         And third, also, and I think we spoke

1  about this a little bit yesterday, the fact that
2  markets became thicker and so it became much
3  more common for people to be using illegal
4  opioids, I would guess, although I haven't done
5  a full analysis of this, I would guess there's
6  some people particularly over time who started
7  on illegal opioids without having started on
8  legal opioids, and that is attributable to the
9  fact that the legal opioids created such a
10  crisis of addiction and that then led through
11  the -- through the mechanism that we focused on,
12  that then led to the creation -- to the
13  substantial, not creation, to the substantial
14  expansion of the illegal markets which then some
15  people will start in.
16         So even those who didn't necessarily
17  start on illegal opioids doesn't necessarily --
18  legal opioids, excuse me, does not necessarily
19  mean that they were not affected by what had
20  happened in the legal opioid market.
21     Q.   Just to be clear, you cannot quantify
22  how much of the increase in use of illegal --
23  well, strike that.
24         You cannot quantify how much of the

1   increase of addictions -- well, strike that.

2           You cannot quantify how much of the

3   increase in the use of illicit opioids after

4   2010 was the result of addictions prior to 2010?

5   I'm just asking if you can quantify it.

6       MR. KO:  Object to the form.

7   Objection, asked and answered.

8       A.   I do not quantify it, and I do not

9   know any national attempt in the literature to

10  quantify it.

11  BY MR. KNAPP:

12      Q.   Let's look at Paragraph 63.  In

13  Paragraph 63, you say, "The increase in deaths

14  due to illicit opioid use is closely related to

15  the growth in demand for illicit drugs after

16  2010."

17           Where do you analyze and quantify the

18  increase in demand for illicit drugs after 2010?

19      MR. KO:  Just so the record is clear,

20  that was just a portion of what's set forth in

21  the first sentence of Paragraph 63.

22           But go ahead.

23      A.   The increase in demand is coming from

24  the substitution effect which we spoke about in

1   reference to both the Alpert, et al study, the

2   Evans, et al study, and Figure 3.4.  So all of

3   those show that the specific act of increasing

4   the price of opioids and reducing the ability to

5   get opioids, raising the cost in other ways, led

6   to an increased -- increased demand for illegal

7   opioids.

8           Because I don't have data on the exact

9   consumption of heroin, I cannot estimate a

10  demand curve directly.  So that would, of

11  course, be -- the ideal would be to have data on

12  the consumption of heroin and other illegal

13  drugs across different areas.  And I don't have

14  that, so I don't have a demand curve.

15          So here what I'm doing is I'm using

16  sort of economic analysis to say that the impact

17  of the price increase, in essence, which is

18  what's shown in all of those analyses, led to

19  a -- would have led to an increase in demand for

20  substitutes.

21  BY MR. KNAPP:

22      Q.   You're looking at mortality from

23  illegal opioids as a proxy for demand, right?

24      A.   What I'm doing here, yes.  In

1   addition, the Alpert, et al paper shows that

2   there's a relationship with people reporting

3   heroin use disorder on the NSDUH survey, and so

4   that's another measure of opioids -- of use of

5   illegal opioids.

6       Q.   Did you consider that the demand for

7   opioids may have stayed flat, but the toxicity

8   of heroin increased?

9       A.   So a couple of points.  One is the

10  toxicity increase may very well have been a

11  result of the increased demand.

12          But second, I think the Alpert -- so,

13  again, I'm not looking specifically at the

14  numbers of people, but the Alpert, et al paper

15  does look at the numbers -- does look at the

16  heroin OUD population, the heroin disorder

17  population, and does show an increase there.

18      Q.   You would agree, sir, that the sharp

19  increase in heroin mortality after 2010 was due

20  at least in part to the introduction of

21  fentanyl, illegal fentanyl?

22      A.   I think the sentence that you said I

23  don't agree with.  So I -- the sentence that I

24  heard you say is the increase in heroin

1   mortality after 2010 is due to the sharp

2   increase in illegal fentanyl.  That -- that

3   sentence I don't agree with.

4       Q.   Let me ask the question again.

5           You would agree that the sharp

6   increase in deaths from illicit opioids is in

7   part attributable to the introduction of illegal

8   fentanyl after 2010?

9       A.   Yes.  The introduction of illicit

10  fentanyl after 2010, particularly later on after

11  2013 or 2014, is a very big component that I

12  believe is also driven by people's -- by the

13  demand that was initially created by the

14  widespread availability of licit opioids.

15          So as people were addicted to those

16  opioids, licit, legal opioids, and then the

17  cost, both monetary and price and time and so

18  on, of obtaining those drugs increased, people

19  shifted into illegal markets.

20          The first illegal market that occurred

21  was a shift into heroin, which is where one sees

22  the heroin mortality rate first, and then over

23  time it then shifted into fentanyl.  And I

24  believe, based on the types of analyses that are

Highly Confidential - Subject to Further Confidentiality Review

1  done in these studies, that those are all of a
2  continuum.
3          Q.   You're not able to quantify the impact
4  that the introduction of illicit fentanyl had on
5  the number of deaths from illegal opioids after
6  2010, correct?
7          MR. KO:  Object to the form.
8          A.   Unfortunately, no one has data -- with
9  any illegal market, no one has data on the total
10  quantity.  So just as we don't have data on the
11  total quantity of heroin, we don't have data on
12  the total quantity of fentanyl.
13          But I also want to come back, I don't
14  think the introduction of fentanyl was a sort of
15  out-of-the-blue event; that is, I believe it is
16  responding to the substitution to the fact that
17  people were addicted to prescription opioids,
18  and then they migrated over.  And so in this
19  case, as in many markets where there's a demand,
20  that then leads to supply to enter, and that's,
21  I believe, what's happening here.
22          Q.   Do you agree that the increase in
23  deaths from illicit opioids after 2010 is due in
24  part to the introduction of carfentanil?

Highly Confidential - Subject to Further Confidentiality Review

1          A.   I think I have the same answer here,
2  which is that I don't have data to test that
3  econometrically, so I'm not giving -- I'm not
4  offering an opinion about that econometrically.
5          Obviously that is a source of death in
6  the death records, so that's -- it's very, very
7  clear that people are using it and unfortunately
8  dying from it.  I believe that the use of
9  carfentanil is related to the fact that people
10  were addicted to prescription opioids and then
11  transitioned into illegal opioids over time.
12          Q.   If you were submitting an article for
13  submission to -- well, strike that.
14          If you were submitting an article to
15  an academic journal, would you try to cite all
16  of the papers that both supported and
17  potentially contradicted the conclusions that
18  you were drawing?
19          A.   Yes, as a general matter, one would
20  want to refer to all papers that have addressed
21  the subject.
22          Q.   And you've read some papers that
23  contradict or don't agree with the conclusions
24  that you've drawn in your report, right?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. KO:  Object to the form.
2          Which conclusions?
3          A.   I think I'd want you to be a little
4  more specific about any particular conclusion
5  you're referring to.
6  BY MR. KNAPP:
7          Q.   Any conclusion that you have in your
8  report.
9          MR. KO:  Any single one in the entire
10  report, Tim?
11  BY MR. KNAPP:
12          Q.   You can answer.
13          A.   In the report I do point out some of
14  the debates that people have.  And you asked me
15  about it yesterday, which was completely fair.
16          For example, I noted the discussion of
17  the Case and Deaton analyses about the deaths of
18  despair and the debate in the literature about
19  the importance of deaths of despair relative to
20  other causes of increased drug deaths so --
21  other causes of increased deaths from opioid
22  drugs.  So that's at least one example where I
23  tried to be very clear about what the economic
24  issues and debates are, and then do analyses to

Highly Confidential - Subject to Further Confidentiality Review

1  address that.  So I think I tried to do that in
2  all the areas in which I'm an expert.
3          Q.   Any other studies that you can
4  identify that potentially contradict or don't
5  agree with the conclusions you've drawn in your
6  report?
7          MR. KO:  Object to the form.
8          A.   No.  What I'd really like to do is
9  look through every article that I cite and to --
10  many of them will, for example, agree in parts
11  and disagree in other parts, or they'll do
12  something a little bit differently than I do in
13  the report, and I still cite them.
14          For example, I'll just take another
15  example just because it comes to mind, I've
16  cited articles on trends in crime over time that
17  talk about and identify a number of factors that
18  would be leading to trends in crime over time,
19  not all of which are the opioid ones, and some
20  reach different conclusions about things.  So as
21  I think about it, I tried to be -- I did not go
22  into it with a bias of citing only articles that
23  supported my conclusion.
24  BY MR. KNAPP:

1    Q.   Okay.  We'll talk about the Case and
2  Deaton articles later this morning.
3    A.   Okay.
4    Q.   But I want to take a break after this
5  question, but I do want to ask you it before we
6  take a break.
7         Do you believe that Professor
8  Rosenthal's model meets the standard for
9  submission to a peer-reviewed academic journal?
10    A.   Yes, I --
11         MR. KO:  Objection.  Scope.
12         But go ahead.
13    A.   Yes, I do believe Professor
14  Rosenthal's article meets the standard for
15  submission to an academic journal.
16         MR. KNAPP:  Okay.  Let's take a break.
17         THE VIDEOGRAPHER:  The time is
18  9:24 a.m., and we're off the record.
19         (Whereupon, a recess was taken.)
20         THE VIDEOGRAPHER:  The time is
21  9:42 a.m., and we're on the record.
22  BY MR. KNAPP:
23    Q.   So, Professor Cutler, I want to make
24  sure I understand sort of how far your

1  thickening theory goes.  So let's imagine a
2  scenario where there's a factory in China
3  sometime next year develops a new, stronger form
4  of opioid, stronger than carfentanil, stronger
5  than fentanyl.  Under your theory and under the
6  opinions you offer in this case, are the
7  defendants responsible for the deaths resulting
8  from that opioid?
9         MR. KO:  Object to the form.
10    A.   So let me give you what the evidence
11  shows.  There were obviously people -- not
12  obviously.  There were people who became
13  addicted to prescription opioids in the course
14  of the 2000s.  That -- those people, once they
15  were addicted, were then -- had strong demand
16  for opioids.  As it became more difficult to
17  obtain those legally, people moved into illegal
18  substances, first heroin and then fentanyl.
19         There are two aspects of the -- that
20  shift that are directly related to the
21  misconduct on the part of the defendants.  The
22  first -- and in the example you cite.
23         The first is the demand; that is,
24  creating a product for which there is no demand

1  will lead to no sales.  So deaths that result
2  from the fact that there are people who became
3  addicted and then had demand for illegal
4  opioids, that part is attributable to the
5  defendants' misconduct.
6         In addition, the extent of the
7  delivery markets, possibly the -- possibly the
8  reason for developing it, although not -- well,
9  let me list that as a third possible reason.
10         So the second one is the extent of the
11  markets that then bring that delivery to people,
12  those -- the extent of those -- that bring that
13  new type of fentanyl to people.  Those markets
14  are thicker because of the demand that was
15  created by the misconduct on the part of the
16  defendants.
17         And so that thickness of the market
18  then allows any new innovation, a new type of
19  opioid, to be brought in, if you will, more
20  efficiently; that is, at lower cost, in greater
21  quantities, distributed in easier ways, perhaps
22  people being more willing to take it who might
23  otherwise not be willing to take it.
24         Third, there is some economic

1  literature that new products are created in
2  response to demand.  The leading -- so that is
3  one would not be looking for a new product in
4  the absence of demand.
5         In this third part, the leading
6  industry for which that evidence is cited is the
7  pharmaceutical industry where the pharmaceutical
8  industry responds quite appropriately to demand
9  from individuals for relief from certain
10  diseases or illnesses, and then develops
11  medications that respond to that.
12         And so it is also possible -- I have
13  not done an economic analysis, but it is
14  absolutely theoretically possible that the
15  development of new types of opioids, legal or
16  illegal, would be a response to the demand that
17  was brought about by the misconduct on the part
18  of the defendants.
19  BY MR. KNAPP:
20    Q.   And so let's take another
21  hypothetical.  Let's say in 50 years another
22  factory, a different factory in China comes up
23  with yet a stronger form of opioid.  No one can
24  anticipate it at this point, but it's stronger

```
 1   than anything that's on the market now.  Under
 2   your theory, are the defendants responsible for
 3   the deaths that would result from that new
 4   opioid product?
 5        MR. KO:  50 years from now or 50 years
 6   from 2010?
 7           Object to the form.
 8      A.  One would need to do an economic
 9   analysis.  So some technological innovation
10   comes out of the blue.  So, for example, if one
11   comes back to the pharmaceutical example, some
12   pharmaceuticals just happen because a scientist
13   is looking at something and she or he discovers
14   that a compound they were looking at has an
15   effect on the part of the body that they never
16   thought about, that they never anticipated, and
17   so that comes out of the blue, and that's an
18   important form of scientific advance.
19           Some other innovation occurs in
20   response to demand; that is, there are a number
21   of people suffering from a particular type of
22   cancer which is currently not able to be treated
23   well, and pharmaceutical companies then devote
24   resources and scientists' ability and effort to
```

```
 1   developing -- to developing a treatment for
 2   that.
 3           Just knowing that there is a treatment
 4   for a particular type of cancer does not say for
 5   sure whether it was a result of the demand or
 6   whether it was a result of just happenstance.
 7   And in the case of the beneficial pharmaceutical
 8   we got lucky; in the case of the harmful opioid
 9   we got unlucky.
10           So I couldn't say theoretically
11   whether a new drug, a new type of fentanyl
12   analog developed 50 years from now was a
13   response to what happened.  One would need to do
14   an econometric analysis to understand what --
15   the drivers of different types of medications
16   and to consider the various factors that were
17   involved.
18           So I would need -- so the answer to
19   your immediate question, would I automatically
20   assume that that was related to the defendants'
21   misconduct, no, I would not.
22   BY MR. KNAPP:
23      Q.  So let's --
24      A.  But it doesn't -- but that's a
```

```
 1   statement that one needs to do analysis to learn
 2   the answer, not just theorize.
 3      Q.  All right.  So let's move out of the
 4   realm of theory and talk about your model.
 5           You understand that if there's this
 6   new opioid product developed by a factory in
 7   China, no one knows about it now, comes onto the
 8   market a year from now, and then there are
 9   deaths associated with that, you understand that
10   the way your model works is you would hold the
11   defendants responsible for the deaths resulting
12   from that introduction of a new opioid that no
13   one can anticipate right now?
14        MR. KO:  Object to the form.
15   Objection, mischaracterizes his testimony and
16   the report.
17           But go ahead.
18      A.  Let me give you an empirical
19   statement.  The Alpert, et al paper, which we
20   were talking about just a few minutes ago, shows
21   both that heroin deaths are related to the
22   pre-2010 use of prescription opioids and that
23   fentanyl deaths are related to the pre-2010 use
24   of opioids.
```

```
 1           So, for example, if you look at -- I
 2   just want to find the appropriate table.  If you
 3   look at Table 5 of the Alpert, et al study, that
 4   is the relationship between the initial use of
 5   OxyContin and the death rate from synthetic
 6   opioids, panel A is any synthetic opioid
 7   involved in the death, and Panel B is synthetic
 8   opioid deaths only per 100,000.
 9           And so just focus for a moment on
10   Column 5 of Table 5, which is on Page 25.  So
11   including both the state and time varying
12   covariates as well as various policy measures in
13   their regression estimates, both for any
14   synthetic opioid death and for synthetic opioid
15   only deaths, there is a relationship that areas
16   that had higher initial use of OxyContin have
17   increasing deaths -- have great -- excuse me,
18   greater deaths from synthetic opioids as well,
19   so the coefficient is 1.137 for any synthetic
20   opioid death, and, of course, it's statistically
21   significant in that regression.
22           So here they're showing
23   econometrically that not only was the use of
24   heroin -- deaths from heroin related to use of
```

1  OxyContin, but also deaths from fentanyl are

2  related to the initial use of OxyContin in the

3  area.

4  BY MR. KNAPP:

5      Q.  I don't think that possibly could have

6  been more nonresponsive to my question.  My

7  question was about your model.

8      A.  I'm sorry you feel that way.

9      Q.  You didn't mention your model once.

10  So I'm going to try to ask the question again.

11          You understand that your model -- I'm

12  not talking about Alpert, I'm not talking about

13  Evans, I'm talking about your model.  You

14  understand that?

15      A.  Uh-huh.

16      Q.  You understand that your model would

17  hold these defendants responsible from deaths

18  that would result from the introduction of an

19  illicit -- a new illicit opioid that was

20  developed in China in a factory that no one

21  knows about right now, if it was introduced in a

22  year, that your model would hold the defendants

23  responsible for those deaths?  Do you understand

24  that?

1          MR. KO:  Object to the form.

2      A.  I don't believe that's accurate.  In

3  order to apply the model going forward, you need

4  to make sure that you think the conditions are

5  appropriate.  So if, for example -- let me go

6  back one second.

7          So what my model does is it translates

8  the shipments of opioids into the harms that

9  were then incurred.  To the extent that one

10  thinks that there was another factor -- and then

11  it -- and then it takes out -- then it uses as

12  an input -- it uses as an input the shipments

13  that are due to misconduct on the part of the

14  defendants.

15          To the extent that there are shipments

16  that do not result from misconduct on the part

17  of defendants, that are due to something else,

18  for example, if there just happened to be

19  something else in the market, then that would

20  show up as being not an impact -- that would --

21  that would show up then as having no impact on

22  harms.

23          So I think what you're saying is could

24  one -- should one be sensitive to over which

1  time period, and is it truly the case that in

2  different years one is correctly measuring the

3  share of use that's related to misconduct on the

4  part of the defendants.  If there is a reason

5  why that should change, then one could change

6  that input, and then the model would correctly

7  give the impact of the shipments that are due to

8  misconduct.

9          So it's not that the model assumes

10  that.  It's really that's taking as an input --

11  the model requires as an input the shipments due

12  to misconduct on the part of the defendants.

13  And then one could say -- and then -- to the

14  extent that that changes, then just -- then that

15  would show up in that input.

16  BY MR. KNAPP:

17      Q.  So let's assume that there's no new

18  alleged misleading marketing.  Is it your theory

19  that that would stop all of the attribution of

20  harm to the defendants based upon deaths that

21  later occur?  And how is that consistent with

22  your substitution theory, sir?

23          MR. KO:  Object to the form.

24          Which question do you want him to

1  answer?

2  BY MR. KNAPP:

3      Q.  You can answer.

4          MR. KO:  Which?

5      A.  Could you just repeat the question?

6  BY MR. KNAPP:

7      Q.  Let's assume in a hypothetical that

8  there's -- starting today that there's no new

9  misleading marketing and there's a death

10  tomorrow.  Is it your opinion that the

11  defendants cannot be responsible for that death

12  that happens tomorrow?  Is that your opinion?

13          MR. KO:  Object to the form.

14      A.  No, that's not my opinion.  The impact

15  of the marketing, the mis -- the impact of the

16  marketing -- misconduct in marketing on the

17  shipments of opioids comes from Professor

18  Rosenthal's analysis.

19          So if there were any marketing in the

20  past or in the future that was not misconduct,

21  she would then take those out of her estimates,

22  and then we would have estimates of those that

23  were corrected for the true estimate of

24  misconduct, and then I would then give a

Highly Confidential - Subject to Further Confidentiality Review

1  different estimate of the harms.  If there were
2  less misconduct, there would be less harms
3  associated with that.
4         It is also -- but it is also not the
5  case that the model starts fresh at every moment
6  because people are addicted.  So even deaths
7  that occur after any period of misconduct in
8  marketing had -- or in distribution had --
9  monitoring of distribution had occurred, some of
10 those deaths will still be a result of the prior
11 misconduct because of the addiction component.
12 BY MR. KNAPP:
13     Q.  Under your thickening theory, are
14 defendants responsible for any increases in
15 deaths associated with cocaine use?
16     A.  In the model here, that are here, the
17 only deaths that we look at are deaths from
18 opioid use.  So any death which has just cocaine
19 use is not counted as a harm associated with
20 opioid shipments.
21     Q.  I understand that's how your model
22 works.  I'm trying to understand the scope of
23 your thickening theory.
24         And so my question is, under your

Highly Confidential - Subject to Further Confidentiality Review

1  thickening theory, are defendants responsible
2  for deaths associated with cocaine use?
3         MR. KO:  Objection.  Asked and
4  answered.
5     A.  I'm not making a theoretical statement
6  about that.  There are arguments in the
7  literature about, as we were talking about
8  yesterday, about gateway drugs.  I'm actually
9  not -- so I actually don't want to make it be a
10 theoretical discussion, unless you want to ask
11 about it theoretically.  I will just say as an
12 empirical matter, the model does not attribute
13 deaths from cocaine to the misconduct of the
14 defendants.
15 BY MR. KNAPP:
16     Q.  Sitting here today, you're not willing
17 to rule out the possibility that defendants are
18 responsible for increases in deaths associated
19 with cocaine?
20         MR. KO:  Objection.  Asked and
21 answered.
22     A.  In my model, there is no impact at all
23 of deaths from cocaine on the harms due to
24 defendants.  So it's not in the data.  It's not

Highly Confidential - Subject to Further Confidentiality Review

1  in the results.  It's not in the conclusions
2  that I draw.
3  BY MR. KNAPP:
4     Q.  Well, you said if I want to have a
5  theoretical discussion, you would have it, so
6  let me ask you as a matter of theory.
7         Under your thickening theory, are
8  defendants responsible for increases in deaths
9  associated only with cocaine?
10     A.  So there is theoretical work that has
11 been done.  I have not seen -- ultimately this
12 is then an empirical question as to whether
13 people transition from opioids to cocaine -- or
14 whether -- excuse me, whether opioids are, in
15 essence, a gateway drug to cocaine.  I do not
16 know of any empirical literature on that at all.
17         So all -- I can tell you that it's a
18 theory, and I could tell you arguments as to why
19 it would be, and I could tell you arguments why
20 it wouldn't be.  Ultimately, as an applied
21 economist, one needs to see empirical evidence,
22 and there is no evidence on it that I know of.
23     Q.  When did the market in Cuyahoga County
24 begin thickening, under your theory?

Highly Confidential - Subject to Further Confidentiality Review

1         MR. KO:  Object to the form.
2     A.  Begin thickening I don't have an
3  answer to because I cannot measure how thick the
4  market is.  So I would love to have data on the
5  extent of the market for illegal drugs in
6  different areas over time, that's what I would
7  love to have, and then I could give you an
8  empirical analysis because I could plot that and
9  I could show you where the breaks were, where
10 the breaks in that were.  I don't have an
11 estimate of that because those data do not
12 exist.
13         The only thing I can tell you is about
14 heroin and other illegal drugs, what happens to
15 the death rates.  That's the only thing I can
16 tell you.  We were looking at those earlier, and
17 so you saw what those trends looked like.  But I
18 don't have an empirical way of answering your
19 question.
20 BY MR. KNAPP:
21     Q.  How much thicker was the illegal drug
22 market in Cuyahoga County in 2010 than it was in
23 1995?
24     A.  So, again, you're asking an empirical

Highly Confidential - Subject to Further Confidentiality Review

1  question to which I would love to know the

2  answer.  I would love to know the answer as an

3  economist.  I would love to know the answer as a

4  public policy person.  I would love to have a

5  measure of the amount of illegal -- the amount

6  of use of illegal opioids over time.

7  Unfortunately, I don't have that.

8         So the equivalent of the ARCOS data is

9  what one would want in order to have that, and

10  there just is nothing like that that indicates

11  the extent of the illegal market.

12     Q.  Let's turn to Paragraph 47 of your

13  report.  In your regression models you use --

14  well, strike that.

15         In the way that you apply your

16  regression models, you use mortality as a proxy

17  for the other harms that you analyzed, right?

18         MR. KO:  Which regression models?

19         Object to the form.

20     A.  There are different regression models.

21  In some of the regression models I use mortality

22  as a proxy for other harms.  I also present

23  analysis using crime rates as the dependent

24  variable, and in that analysis I do not use

Highly Confidential - Subject to Further Confidentiality Review

1  mortality as a proxy for the harms, I'm looking

2  directly at the harms using crime.

3  BY MR. KNAPP:

4     Q.  Okay.  And in Paragraph 47 you say

5  that crime in foster care -- strike that.

6         In Paragraph 47 you admit that crime

7  in foster care placements would exist at some

8  level even in the absence of opioids, right?

9     A.  Yes, that's correct.

10     Q.  And so you're admitting that there's a

11  different relationship between foster care and

12  opioid shipments than there is between opioid

13  mortality and opioid shipments, right?

14     A.  That's not the distinction I'm making

15  there.

16     Q.  Well, let me -- it's a true statement,

17  right, that there's a different relationship

18  between foster care and opioid shipments than

19  there is between opioid mortality and opioid

20  shipments?

21         MR. KO:  Object to the form.

22     A.  I don't know empirically whether the

23  relationship would be similar or different.  So

24  I think you're saying would there be a different

Highly Confidential - Subject to Further Confidentiality Review

1  empirical relationship.  Because I can't measure

2  the empirical relationship the same way, I can't

3  do a comparison across those and say if they're

4  different.

5  BY MR. KNAPP:

6     Q.  How did you factor into your model the

7  fact that you can't model the relationship

8  between opioid shipments and foster care and

9  opioid mortality and shipments?

10     A.  As is stated here, I'm using mortality

11  as an estimate of the share of the harms that

12  are due to shipments of opioids, so I'm going to

13  assume that that share of the harms is due to

14  opioids, and that's a fairly -- obviously a very

15  severe form of harm.

16         Similarly, child removal is a very

17  severe form of intervention with a family.  It's

18  a very, very big form of intervention with the

19  family.

20         So what I do is I use data on the

21  share of deaths that are a result of opioid

22  shipments to then say I'm going to assume that

23  that same share of children removed from their

24  families because of opioids, that same share is

Highly Confidential - Subject to Further Confidentiality Review

1  also due to the opioid shipments as opposed to

2  other reasons why families may be using opioids

3  and then child removals associated with that.

4     Q.  Professor Cutler, you can't say with

5  any degree of economic certainty that the

6  correlation between opioid shipments and any

7  categories of harms that you analyzed other than

8  mortality and crime are the same as the

9  relationship between opioid mortality and

10  shipments, right?

11         MR. KO:  Object to the form.

12     A.  I want to focus on the crime ones for

13  a second because the crime ones I do have the

14  data to estimate directly --

15  BY MR. KNAPP:

16     Q.  Sir, my question was other than --

17         MR. KO:  Let him finish the answer.

18  BY MR. KNAPP:

19     Q.  My question is other than mortality --

20         MR. KO:  Tim, you cut him off.  Let

21  him finish the answer.

22  BY MR. KNAPP:

23     Q.  Do you understand that my question --

24         MR. KO:  Tim --

BY MR. KNAPP:

Q.   -- was other than mortality?

MR. KO:  Tim, you cut him off.  He was in the middle of an answer.

BY MR. KNAPP:

Q.   Okay.  I just want to make sure you understand what the question is.

MR. KO:  Before -- why don't you go ahead and finish your response to the earlier question.

A.   Okay.  With crime, I can do an analysis where I directly estimate the impact of opioid shipments on crime, and then I can compare that to what I get when I look at the -- when I do it through using the impact of opioid-related shipments on mortality, and then applying that percentage to the opioid-related component of crimes.

And in that case, the direct analysis of the crime effects actually suggest a greater impact of opioid shipments on crime than I get using the more -- using the method through mortality.

I cannot do the same for the other

harms because I don't have the data, but I took from the crime analysis that one -- that the results were in the same ballpark, so, therefore, that I took confirmation.

And, second, that, if anything, I may be underestimating the effect by looking through the mortality lens as opposed to being able to estimate the direct effect.

But that said, I don't have hard and fast empirical data to say with absolute certainty the effect if I could estimate it a different way would be stronger.

BY MR. KNAPP:

Q.   So I want to ask you about the mortality data that you use in your regressions.  Did you exclude any counties that qualify as large counties in any of the regressions that you ran?

A.   There were four counties that were excluded because they had very high -- they are in areas where there was known to be a good deal of transshipment, that is, drugs that were sent to that area and then sent elsewhere, and then -- excuse me, not sent elsewhere, but

people from elsewhere would go to those areas to obtain medication and then either consume it there or take it back to where they were.  And they were identified by areas where the shipments per person, so the MME per person, were extremely high relative to the rest of the large counties.

Q.   One of the counties that you removed was Franklin County, Ohio, right?

A.   I believe that's correct.

Q.   How did you determine that there were transshipments out of Franklin County, Ohio?

MR. KO:  Object to the form.

A.   What -- so, of course, we don't know about transshipments from each county.  What we did was we excluded the four counties that were very appreciable outliers in the shipments per capita, which my theory is that there was a good deal of transshipment, but I do not have a direct estimate of that.

BY MR. KNAPP:

Q.   Were you able to quantify the amount of transshipments out of Cuyahoga or Summit County into other counties of Ohio?

A.   No, I was not able to calculate the transshipment from either -- out of either Cuyahoga or Summit.

Q.   So you didn't make any adjustments for if someone from a neighboring county filled their prescription in Cuyahoga County and then consumed it as a resident of a different county?

A.   I wasn't able to do that.  And, in fact, what that does is it creates measurement error in the independent variable.  So if you think about what I would like to do, I would like to relate deaths to use of opioids in that area.

What I have is shipments of opioids to the area.  Since shipments are not exactly equal to use, there is measurement error; that is, the variable is -- the variable that I'm trying to measure use is measured with error, that is shipments.

As is standard in models with measurement error, this will lead to my coefficient being too low; that is, it will attribute fewer deaths to opioid use than would happen correctly, so that the percentages that I

1  estimate because of this from the direct model
2  are actually lower than would be the case if I
3  did -- if I had the ideal data.
4      Q.  Would you agree that for counties that
5  are a center of a metropolitan area with a
6  number of surrounding more rural counties, you
7  might expect that people from the rural counties
8  would come into the urban county to fill
9  prescriptions?
10     MR. KO:  Object to the form.
11     A.  Yes, it's possible that people from
12  rural areas -- of course, it would depend a lot
13  on the characteristics of the area, but it is
14  possible.
15  BY MR. KNAPP:
16     Q.  So would you expect higher per capita
17  shipments in those types of counties because the
18  county population would understate the
19  utilization?
20     MR. KO:  Object to the form.
21     A.  In the hypothetical that you're
22  giving, or in the example that you're giving, it
23  is the case that the shipments to the area are
24  only a noisy measure of the use in the area,

1  they have -- there is measurement error in that.
2  That, as we were just talking about, that would
3  lead to my estimates of the impact of shipments
4  on mortality being too low; that is, it would
5  lead to not attributing enough deaths to the
6  opioid shipments.
7      And so that's part of the reason why I
8  believe that the direct model estimates are
9  conservative in that they are -- I know because
10  of measurement error that they will yield too
11  low an impact of misconduct on the part of the
12  defendants.
13  BY MR. KNAPP:
14     Q.  What is the measurement error that
15  you're referring to?
16     A.  If you think about a regression model,
17  you're trying to relate one outcome, in this
18  case mortality change, to another outcome, in
19  this case consumption of opioids.  That's the
20  ideal thing you'd want is consumption of
21  opioids.
22      So if I -- I would get one effect if I
23  estimate the relationship between mortality and
24  consumption of opioids.  Instead of consumption

1  of opioids, I have only a proxy for it.  And
2  that proxy is, let's say, the true amount plus
3  some noise, some differences across different
4  areas.
5      Because it's got noise, that noise is
6  not related to the mortality component.  As you
7  said, the noise may be people coming in from
8  rural areas or people coming in from other
9  cities entirely and then getting medications and
10  leaving, so that noise is not going to be
11  related to mortality in the area.
12      Therefore, since my -- the variable
13  that I have in there included has got a true
14  effect plus noise, which has no effect.  When I
15  estimate the relationship between mortality and
16  that combined, it's going to be lower than if
17  I'd estimated the relationship between the
18  mortality and the true variable I want, because,
19  in essence, it's going to be an average between
20  the true effect from that true variable I want
21  and the zero that comes from all that noise.
22      And so having all that noise means
23  that the estimate will be below the estimate of
24  the true effect because it's going to be biased

1  towards zero.
2      Q.  Wouldn't it depend on a
3  county-by-county basis whether there's
4  transshipments into the county or out of the
5  county, whether you've overstated it or
6  understated the amount of consumption?
7      MR. KO:  Object to the form.
8      A.  That's correct.  The amount of
9  consumption in the area may be higher or lower
10  than shipments depending upon the -- whether
11  people are moving -- obtaining their medications
12  in there or in other pleases or so on.  And it's
13  exactly the fact that that noise is random; that
14  is, in some counties it's going to be one way,
15  in other counties it's going to be another way.
16  It's exactly the result of that randomness that
17  you have this noise component that says I'm
18  looking at the relationship between mortality
19  and something true, plus something I can't get
20  rid of which has no effect, it's just a random
21  component.
22  BY MR. KNAPP:
23     Q.  Well, in this case we're focused on
24  Cuyahoga and Summit Counties.  So do you know,

Highly Confidential - Subject to Further Confidentiality Review

1  sir, one way or another whether there was net
2  transshipments into or out of either Cuyahoga or
3  Summit County?
4      A.   I have no data on whether there are
5  net transshipments into or out of Summit or
6  Cuyahoga Counties.
7      Q.   Did you run your regression models
8  with the four counties that you excluded --
9  strike that.
10          Did you run any of your regression
11  models with the four counties you've excluded
12  included in the regressions?
13     A.   Yes, I did run the models with those
14  four counties included.
15     Q.   And do you know what the impact was?
16     A.   I do not remember the specific number
17  offhand.  I recall that the answers were very
18  similar -- that the estimates were very similar
19  to those I reported.
20     Q.   Let's turn to Paragraph 65.  This is a
21  discussion -- strike that.
22          Paragraph 65 starts the discussion of
23  your direct regression model that you ran for
24  licit and illicit mortality through 2010,

Highly Confidential - Subject to Further Confidentiality Review

1  correct?
2      A.   Yes, that is correct.
3      Q.   And as we discussed earlier, this
4  regression model is a correlation analysis,
5  right?
6          MR. KO:  Object to the form.
7      A.   All regressions are by definition
8  correlations.  All that a regression does -- I
9  teach my classes this, so I preach it very
10  widely -- all that a regression does is gives
11  you correlations, gives you very sophisticated
12  correlations, but they're correlations.
13          The causality comes from the
14  interpretation of the individual who is using
15  the results as to whether they want to provide a
16  causal interpretation and, if so, make the
17  argument that that's a -- that that's a causal
18  interpretation.
19  BY MR. KNAPP:
20     Q.   So I just want to make sure we
21  understand your opinion here.  Your opinion is
22  that the increase in opioid shipments prior to
23  2010 caused an increase in both licit and
24  illicit mortality prior to 2010, is that right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.   In the -- so what -- I want to
2  distinguish between the -- what the regression
3  says, which is that the regression is just
4  giving a correlation.  It is then my
5  interpretation that it is -- that the
6  relationship is a causal one; that is, that the
7  increase in shipments led to the increase in
8  mortality.
9      Q.   And what is the basis for your
10  conclusion that there's a causal relationship?
11     A.   There's several bases for the
12  conclusion that it's a causal relationship.  One
13  is that I've controlled for as many demographic,
14  economic, and social factors as I possibly
15  could, and I find that those do not explain the
16  relationship between shipments and mortality.
17          In addition, there is not a
18  theoretical reason to think that shipments would
19  have increased more in areas where for other
20  reasons people were going to die more of opioid
21  use.
22          So, for example, if you go back to
23  Figure 3.4 -- excuse me, I wish I remembered
24  which page -- Figure 3.4 which is on Page 35,

Highly Confidential - Subject to Further Confidentiality Review

1  there is no trend, for example, in heroin
2  mortality rates in areas that had -- over the
3  1999 to 2010 time period in areas that had
4  greater and lesser shipments of opioids.
5          So I don't see any other indication
6  that the shipments of opioids to the area were a
7  response to what would have been an increase in
8  death rates for those medications in the absence
9  of the increase in shipments.
10     Q.   Any other bases that support your
11  conclusion that there's a causal relationship
12  between shipments of legal opioids prior to 2010
13  and licit and illicit mortality prior to 2010?
14     A.   No.  Let me -- those are the two.
15     Q.   So you would agree, sir, that your
16  regression would overstate the causal
17  relationship if there are factors or variables
18  that are not included in your model that may
19  explain the increase in mortality that are not
20  correlated with the variables that you included,
21  that are not perfectly correlated?
22          MR. KO:  Object to the form.
23     A.   No, that's not correct when you said
24  "not perfectly correlated."  If the variable is

```
 1   correlated with the variables that are included,
 2   so it does not have to be a correlation of one,
 3   if the variable is correlated with what is -- if
 4   there's another variable that's correlated with
 5   what's included in the model, at least a part of
 6   the impact of that variable will be picked up by
 7   what's in the model.  So it's not an all or
 8   nothing that says if the correlation is one it's
 9   included, and if the correlation is less than
10   one then no part of it is otherwise explained.
11   BY MR. KNAPP:
12       Q.  Well, when you say that part will be
13   picked up, that necessarily means that part will
14   not be picked up, right?
15       A.  That's correct.  There --
16           MR. KO:  Object to the form.
17       A.  That's correct.  There may be a
18   part -- unless the correlation is one, there
19   would be a part of that variable that is not
20   picked up.
21   BY MR. KNAPP:
22       Q.  So in creating your direct regression
23   model for prior to 2010, did you consider any
24   other variables, independent variables that you
```

```
 1   did not include in the direct regression?
 2       A.  Undoubtedly we considered them.  I
 3   think in the end what limited us was the data
 4   that we had, not the -- not a lack of desire to
 5   have anything else.
 6       Q.  What are those factors that you
 7   undoubtedly considered?
 8       A.  We had very lengthy consideration of
 9   the so-called deaths of despair, and we tried to
10   think of -- and we looked at the previous
11   literature for any variables that people had
12   used, that researchers had used in models where
13   they tried to look at deaths of despair.  So
14   that was the primary alternative that the
15   literature suggested.
16       Q.  Were there particular variables that
17   you considered that you thought might capture
18   deaths of despair that you did not include in
19   your regression?
20       A.  Nothing that we could measure that --
21   so there were no variables that we said, oh,
22   this looks like a good measure of despair but
23   let's not use it in the model.
24       Q.  What about factors that you couldn't
```

```
 1   measure through data that you had?
 2       A.  There are always factors that you
 3   can't measure through data that you have, and
 4   unfortunately they just can't be included in
 5   models.
 6       Q.  And to the extent that factors that
 7   you don't have data for explain the increase in
 8   mortality and they're not perfectly correlated
 9   with the variables you didn't include, then your
10   regression model would overstate the causal
11   relationship?
12           MR. KO:  Object to the form.
13       A.  Overstate implies that it would be a
14   particular direction.  In general, when
15   variables are excluded from a model, there's
16   no -- you can't say without empirical evidence
17   whether it would change the included variables
18   in one direction -- it would explain it in one
19   direction or another direction, particularly
20   when you're saying that there's a component
21   which has already been, in essence, included
22   because of its correlation with other variables
23   of the model.  So you're making a statement
24   about econometric results that isn't appropriate
```

```
 1   there.
 2   BY MR. KNAPP:
 3       Q.  So just to be clear, if there are
 4   variables for which you do not have data and
 5   those factors are -- strike that.
 6           If there are factors that have an
 7   impact on mortality for which you don't have
 8   data, and those factors are not perfectly
 9   correlated with the variables you did include in
10   your model, then your model may overstate, may
11   understate, or may have the right result with
12   respect to the causal relationship that you're
13   drawing, right?
14           MR. KO:  Object to the form.  Asked
15   and answered.
16       A.  That's correct.  Any variables that
17   are omitted and that are not perfectly
18   correlated with what is included in the model,
19   they could have an impact that would lead any
20   model that does not include them to either
21   overstate, understate, or be unaffected by
22   including them.
23   BY MR. KNAPP:
24       Q.  So if we look at Paragraph 88, does
```

1   Paragraph 88 include the demographic variables
2   that you included in your direct regression
3   model?
4        A.   Yes, it does.
5        Q.   You didn't consider any other
6   demographic variables other than what's in
7   Paragraph 88, right?
8        A.   We don't include in the model any
9   other demographic variables than what's here.
10  "Consider" implies whether we spoke about would
11  it be -- would we be able to come up with data
12  on something, and I don't want to say we didn't
13  ask whether we could come up with data on
14  anything else.
15       Q.   Okay.  Then the economic variables --
16  well, strike that.  Let me come back to that.
17            I think I've asked this question, but
18  I want to ask it specific in the context of
19  demographic variables.  Were there any other
20  specific demographic variables that you
21  considered but did not include in your
22  regression?
23            MR. KO:  Objection.  Asked and
24  answered.

1        A.   I don't recall any.  We also -- but we
2   did try and talk about all the variables we
3   could get, we would like to have had, so it's
4   possible that there may have been one that we
5   hunted for but couldn't find, but I do not
6   recall one in any variable in specific.
7   BY MR. KNAPP:
8        Q.   Okay.  And then you also included
9   economic variables in your direct regression,
10  correct?
11       A.   That's correct.  We include a number
12  of economic variables in the direct regression.
13       Q.   Are all of the economic variables you
14  included in the direct regression in
15  Paragraph 88?
16       A.   Yes, all of the variables are -- that
17  we included are in Paragraph 88.
18       Q.   Did you consider any other economic
19  variables that you did not include in your
20  direct regression model?
21       A.   We -- so I don't remember specific
22  variables that we thought, oh, I would love to
23  have this, but we don't.  But it is also the
24  case that we looked around for any number of

1   economic variables.  So it's possible there was
2   one that we tried to get but just were unable to
3   obtain.
4        Q.   Okay.  I'm going to -- in a little bit
5   I want to walk through some variables and ask if
6   you considered them.  Before we do that, I want
7   to talk about the Case and Deaton study that you
8   referenced earlier.
9            So I'm going to mark as Cutler
10  Exhibit 11 a study by Anne Case and Angus Deaton
11  called "Mortality and Morbidity in the 21st
12  Century."
13            (Whereupon, Cutler Exhibit Number 11
14            was marked for identification.)
15  BY MR. KNAPP:
16       Q.   Sir, have you -- you've seen this
17  paper before?
18       A.   Yes, I have seen this paper.
19       Q.   And did you review this paper before
20  it was published?
21       A.   I was one of the discussants of the
22  paper before it was published.
23       Q.   Sorry.  I didn't catch that.  You were
24  one of the what?

1        A.   Oh, discussants.  This is a conference
2   where the authors present their paper and then
3   there are two individuals who are asked to
4   discussion of the paper.  So I was one of the
5   people who was a formal discussant.  I gave
6   official comments on the paper.
7        Q.   Okay.  Bear with me one second.  I
8   need to find my copy.  Oh, here it is.  Too many
9   papers.
10       A.   Not enough of them written by me.
11            MR. KO:  At least you were a
12  discussant in this one.
13  BY MR. KNAPP:
14       Q.   All right.  Let's turn to Page 444.
15  What's -- is what's included on Page 444, that's
16  a comment that you wrote about this Case and
17  Deaton article?
18       A.   As I noted, this is a conference where
19  the authors present their paper, and then there
20  are two discussants who discuss the paper and
21  then write up their thoughts, and those are
22  published along with the paper.  So what begins
23  on Page 44 is my discussion of the paper.
24       Q.   Okay.  And I want to start on

1    Page 445.  Do you see at the top there you say,
2    "The bigger issue, however, is about why these
3    trends are occurring and what can be done to
4    reverse them.  What is it about the economic,
5    social, or medical landscape that is leading to
6    the higher mortality for a very large segment of
7    the population?"
8        Do you see that?
9    A.   Yes, I do see that.
10   Q.   And that is one of the issues that
11   Case and Deaton were addressing in their -- in
12   this paper, right?
13   A.   Yes, that is correct.
14   Q.   And then you go down two paragraphs,
15   the last sentence -- the second-to-last sentence
16   says, "In their current paper, their emphasis
17   has changed.  Rather than emphasizing the supply
18   of pills, they now focus on the social and
19   economic circumstances that lead people to take
20   them."
21       MR. KO:  I just want to note --
22   BY MR. KNAPP:
23   Q.   Do you see that?
24       MR. KO:  I just want to note for the

1    record that you left off some of that statement.
2        But go ahead.
3    BY MR. KNAPP:
4    Q.   Let me read it again just to make sure
5    we get it exactly right.
6        MR. KO:  Thank you.
7    BY MR. KNAPP:
8    Q.   It says, "In their current paper,
9    their emphasis has changed a bit.  Rather than
10   emphasizing the supply of pills, they now focus
11   on the social and economic circumstances that
12   lead people to take them."
13       Do you see that?
14   A.   Yes, I do see that.
15   Q.   And then you go on to say, "Their
16   overall suggestion is very much in the tradition
17   of ?mile Durkheim.  People despair when their
18   material and social circumstances are below what
19   they had expected."
20       Do you see that?
21   A.   Yes.  And, actually, just on the
22   French, it's actually ?mile.
23   Q.   Thank you.  I appreciate that.
24   A.   He was a great --

1    Q.   I'm not a French speaker.
2    A.   He was a great -- I'm not a French
3    speaker either.  But he was a great scholar.
4        MR. KO:  From 1897.
5    BY MR. KNAPP:
6    Q.   Do you agree with that, that people
7    despair when their financial and social
8    circumstances are below what they had expected?
9    A.   So I'm giving this as an explanation
10   of their -- as an explanation of what they're
11   saying.  I'm not an expert in psychology.  If
12   you -- in general, I am, is what the Durkheim
13   theory is, which is that despair is a product of
14   having unmet expectations, so not -- having
15   expectations that are not fulfilled.
16       And so that's -- that is their theory,
17   that is a very, very common theory, and it's one
18   that has come up in my work, for example, on
19   youth suicide.  I don't want to testify that I
20   am an expert on psychology theories.  I hope
21   that distinction makes sense to you.
22   Q.   It does.
23   A.   Okay.  Thank you.
24   Q.   So the next sentence goes on -- well,

1    strike that.
2        Do you agree that despair leads people
3    to act in ways that significantly harm their
4    health?
5    A.   Again, here I'm giving their
6    description which is based on Durkheim, and so
7    that's a very common view.  Again, I don't want
8    to -- I don't want to pretend to be an expert in
9    psychology and to say I know all of the
10   literature that explains despair and I've read
11   all of the literature and so on.  That's not an
12   expert that I am.  So this is really a summary
13   of their -- of theirs for which I'm pointing out
14   the relationship with other studies in the
15   literature.
16   Q.   Well, if we look at the first sentence
17   of the next paragraph, you say, "This
18   explanation is certainly correct," right?
19   A.   That's correct.
20   Q.   So in this comment that you wrote in
21   2017, you said that Case and Deaton's
22   explanation about despair were certainly correct,
23   right?
24   A.   Yes.  And by "this," I'm referring, of

1  course, to -- at least a part of it is a
2  response to that; that is, it is certainly
3  correct for some part.
4      Q.  And what Case and Deaton says is that
5  at root of this despair is economic and social
6  breakdown, right?
7      A.  That's correct.  They put a lot of
8  emphasis on economic and social breakdown.
9      Q.  And when you say the explanation is
10  certainly correct, what you're referring to,
11  that the root cause of the despair is economic
12  and social breakdown, right?
13      A.  I'm not referring to all of it.  I'm
14  saying that the theory that economic and social
15  breakdown leads people to despair and that they
16  then act in ways that may be harmful, for
17  example, through heavy drinking, smoking, drug
18  abuse, not taking preventive medications, and so
19  on, that that is certainly correct at least in
20  part.  It's not -- I'm not making a quantitative
21  statement here about do I think that's the
22  entire explanation or what percentage of an
23  explanation do I think that is.
24      Q.  You agree that there's no way to

1  understand the mortality pattern or changes in
2  mortality without considering sources of
3  despair, right?
4      MR. KO:  Object to the form.
5      A.  That is correct.  One absolutely needs
6  to consider despair in looking at mortality
7  patterns.
8  BY MR. KNAPP:
9      Q.  And you agree that the source of
10  despair -- strike that.
11      You agree that the sources of despair
12  are very deep-seated indeed, right?
13      A.  Yes.
14      MR. KO:  Object.
15      THE WITNESS:  Oh, I'm sorry.
16      MR. KO:  Go ahead.
17      Object to the form.
18      But go ahead.
19      A.  Yes, that's correct.
20  BY MR. KNAPP:
21      Q.  And in their paper Case and Deaton
22  discuss where despair may be coming from, and
23  you suspect that there may be merit in their
24  discussion there as well, right?

1      A.  Yes, that is correct.
2      Q.  All right.  I want to mark as Cutler
3  Exhibit 12 a short paper called "Deaths of
4  despair redux: a response to Christopher Ruhm."
5  It's by Case and Deaton dated January 8, 2018.
6      (Whereupon, Cutler Exhibit Number 12
7      was marked for identification.)
8  BY MR. KNAPP:
9      Q.  Cutler Exhibit 12 is a response that
10  Professors Cane and Deaton wrote to --
11      A.  Case and Deaton.
12      Q.  -- Case and Deaton wrote in response
13  to a paper by Christopher Ruhm, right?
14      A.  Yes, that is correct.
15      Q.  And that's a paper by Christopher Ruhm
16  that you relied on in connection with your
17  report, right?
18      A.  Yes, that's correct.
19      Q.  And Professors Case and Deaton do not
20  agree with the conclusions that Professor Ruhm
21  drew, is that right?
22      MR. KO:  Object to the form.
23      A.  It's actually a more subtle conclusion
24  than that.  Professor Ruhm was saying that he

1  was going to test the hypotheses of Case and
2  Deaton by looking at what he called medium-run
3  changes in economic conditions which also
4  include social conditions, so think about it as
5  a group, by testing medium-run changes.
6      He estimated models for changes in
7  mortality similar to the models that I present
8  in this report relating mortality changes to
9  economic and social conditions, and he concluded
10  from that that economic -- changes in economic
11  and social conditions did not have a significant
12  impact on mortality due to drug use.
13      He then interpreted that as a
14  rejection of the theory that Case and Deaton put
15  forward saying that, therefore, it's not due to
16  despair.
17      What Case and Deaton are pointing out
18  in this note is two things.  First they're
19  saying we had done the regressions that
20  Professor Ruhm did, and, in fact, we reached the
21  same conclusion, that we cannot explain the
22  mortality change with the economic factors that
23  Professor Ruhm looks at and we, Case and Deaton,
24  did that and we agree with that and he's

1  confirming our analysis.

2      But second they're saying the part

3  that they disagree with him is they're disputing

4  that that is a test -- is a fully accurate way

5  of testing all the theory that they're putting

6  forward.  So they think that the long-run social

7  and economic conditions have an impact and not

8  just the medium-run conditions.

9      So what they're disputing is whether

10  the results of Professor Ruhm, which they agree

11  with, challenge their broader conclusion which

12  Professor Ruhm says it rejects, or whether that

13  broader hypothesis has not been adequately

14  tested by Professor Ruhm.

15  Q.  And if we turn to Page 2, final full

16  paragraph, first sentence, Case and Deaton say,

17  "This is much more" -- emphasis on much more --

18  "than economic circumstances and goes back

19  much" -- emphasis on much -- "much further than

20  1999."

21      Do you see that?

22  A.  Yes, I do see that.

23  Q.  You agree that increases in mortality

24  in the '90s and the 2000s is about much more

1  than economic circumstances and goes back much

2  further than 1999, right?

3  A.  They're putting forward a hypothesis

4  here, and their hypothesis is that despair is

5  driven by circumstances that are not just

6  medium-term circumstances, that are not just

7  economic and social and demographic change from

8  1999 to 2015, but that they're a result of a

9  lifetime of events.  So that's the hypothesis

10  that they're putting forward.

11      As a hypothesis, I think that's a

12  perfectly valid hypothesis.  I think that's a

13  very important and interesting hypothesis.  They

14  don't have any data that says that that

15  hypothesis is true.

16      So what this is here, this is really a

17  statement of their belief about the appropriate

18  theory and why they think that Professor Ruhm's

19  characterization of his results as rejecting

20  their theory is not right.  They're restating

21  their theory and that their theory is not just

22  related to results from -- to economic and

23  demographic changes from 1999 on.

24  Q.  Just like Case and Deaton, you also

1  don't have data to say whether their theory that

2  these deaths -- increase in deaths in the '90s

3  and 2000s are related to deep-seated social and

4  demographic circumstances?

5  A.  I wish I had the ability as a scholar

6  and a human being to test that.  They were

7  unable to test it fully in their work.  They

8  showed some correlations.  They were unable to

9  test it fully in their work.  I wasn't able

10  to -- I did not have access to any data they did

11  not have access to.

12  Q.  So in your regression model, you were

13  not able to control for the fact that despair

14  and deaths resulting from despair may go back

15  much further than 1999, right?

16      MR. KO:  Objection to form.

17      Which regression model.

18  A.  Could you just indicate which

19  regression model you're referring to?

20  BY MR. KNAPP:

21  Q.  Stick with the direct regression.

22  A.  So I want to give two answers, which

23  is why I turned to this specific page.  The -- I

24  don't have data to test many of the specific --

1  some of the specific things that one would want

2  to get at.

3      I do think that some of the variables

4  that are included in the model are likely to

5  pick up some of these long-term issues, and, in

6  fact, part of the reason for including them in

7  the model is that they would pick up some of

8  these long-term factors that may be driving

9  people's sense of themselves.

10  Q.  You would agree that it's hard to

11  control for these non-economic factors that lead

12  to despair, right?

13  A.  I wouldn't say it as hard to control

14  for non-economic factors.  There are many

15  factors that are non-economic that one can

16  control for.  For example, population

17  distributions are not strictly economic, they're

18  more demographic and they can be controlled for.

19      The real issue is whether there is a

20  variable that one can accurately measure, and

21  some of the variables that one would want to

22  include are not variables that we can measure

23  either at all or over any period of time.

24  Q.  So those are variables that you

1  wouldn't be able to and didn't control for in

2  your direct regression model, right?

3       A.   That is correct.  And in this case I'm

4  explicitly hoping that they are correlated with

5  the variables that we included in the direct

6  model so that the effect of those variables in

7  the direct model will be picking up those other

8  characteristics that we cannot directly measure.

9       Q.   I understand that's what you're

10  hoping.  But you can't say with any degree of

11  reasonable economic certainty that the variables

12  you included would pick up these other

13  non-economic variables of despair?

14       MR. KO:  Object to the form.

15       A.   Without data, one can never say for

16  sure whether a variable that's not included

17  would affect the results or not, so I have no

18  way to say for sure about that.

19            I just want to make clear that you say

20  non-economic variables, that is not -- it's

21  really non-measured variables.  And the

22  distinction is not between economic and

23  non-economic.  Anything that we could measure

24  that either we hypothesized or other studies

1  hypothesized would be related to mortality is

2  included.

3            The only things that are not here are

4  variables that we simply could not measure

5  regardless of whether they're economic or social

6  or demographic or psychological or anything

7  else.

8  BY MR. KNAPP:

9       Q.   So let's look at -- stay with this

10  paragraph of Cutler Exhibit 12.  Case and Deaton

11  say, "In our paper we talk about morbidity as

12  well as mortality, and while we recognize the

13  deterioration in wages for those without a BA,

14  we also focus on the decline in labor force

15  participation."

16            Do you see that?

17       A.   Yes, I do see that.

18       Q.   Did you control for decline in labor

19  force participation in your model?

20       A.   Actually, yes.  So what we have is --

21  it's picked up in several ways.  So we have the

22  change in the employment ratio, so that's the

23  share of the population that's unemployed --

24  excuse me, excuse me -- that is the share of the

1  population that's employed.

2            We also have the percentage -- the

3  change and the level in the percent of the

4  population that's unemployed.  So together those

5  two will give us the labor force participation

6  rate.  We decided to separate it into the

7  employed and the unemployed to allow a little

8  bit more freedom for the regression to think

9  about them differently.

10            We also have the levels of those.  So

11  you can see up above we have the level of the

12  employment ratio, and we have the percent that's

13  unemployed.  And then, of course, we have the

14  demographics, so anything about changes in labor

15  force related to demographics would be included

16  in there as well.

17       Q.   The next one is the decline in

18  marriage rates.  Did you control for that in any

19  of your regressions?

20       A.   We -- so what they're talking about

21  are long-term declines in marriage rates, and we

22  do not have a long-term decline in marriage

23  rates in here.

24       Q.   Was the data available for the

1  long-term decline in marriage rates?

2       A.   I believe -- I would want to check

3  100 percent.  I believe the reason why we didn't

4  include that would be because the long-term data

5  on marriage rates are not available at, say, at

6  the county level, but I would just want to check

7  that to be sure.

8       Q.   The next one is the rise of

9  cohabitation.  Did you include a variable to

10  control for the rise of cohabitation in any of

11  your regressions?

12       A.   It's again something that we weren't

13  able to measure over a long period of time.

14       Q.   Let me go back to the decline in

15  marriage rates.  Would you agree that the

16  decline in marriage rates may have an impact on

17  the increase in mortality in the '90s and the

18  2000s?

19       A.   It's a hypothesis that the decline in

20  marriage rates could have an impact on mortality

21  in the 1990s and 2000s.

22       Q.   And to the extent that it did have an

23  impact and is not correlated with the variables

24  you considered, then your regression may

Highly Confidential - Subject to Further Confidentiality Review

1  overstate, understate, or have no effect on the
2  causal relationship that you draw?
3          MR. KO:  Objection.  Asked and
4  answered.
5      A.  That's correct.  If it -- if it -- the
6  component of that that's not related to what's
7  included here could have an impact on the
8  regression, and it could lead the impact of the
9  shipments variable to go up, to go down, to be
10  the same.
11  BY MR. KNAPP:
12      Q.  So I have the same question about the
13  rise of cohabitation.  To the extent that it has
14  an impact on mortality rates and is not
15  correlated with the variables you included, that
16  it could increase or decrease or have no effect
17  on the causal relationship that you draw in your
18  direct regression, right?
19      A.  Just qualifying that, the part of the
20  change in the cohabitation rate, that would not
21  be related.  So anything about changing in
22  cohabitation that's also related to these, the
23  impact of that would be picked up.
24          So it would be other exogenous changes

Highly Confidential - Subject to Further Confidentiality Review

1  or other non-correlated changes in the
2  cohabitation rate which may be due to different
3  reasons than the part which is related to what's
4  here.  So any part that's uncorrelated with
5  what's here could have -- could have an
6  independent effect, and it could affect the
7  coefficients.
8      Q.  The next variable is the rise in
9  out-of-wedlock births.  Did you control for that
10  in your -- any of your regressions?
11      A.  No.  I wish we had the data to do so.
12      Q.  And to the extent that the rise in
13  out-of-wedlock births had an impact in
14  mortality, then -- that is not correlated with
15  the variables you considered, then that could
16  mean that the conclusion you draw about the
17  causal relationship between your variables is
18  either overstated, understated, or has no
19  effect?
20          MR. KO:  Object to the form.
21      A.  That's correct that the -- that
22  change -- that any component of that variable
23  that is not correlated with what's included
24  could affect the coefficients here.

Highly Confidential - Subject to Further Confidentiaity Review

1  BY MR. KNAPP:
2      Q.  Next one is parents living apart from
3  children that they barely know.  Did you control
4  for that factor in your -- any of your
5  regressions?
6      A.  I wish I could have controlled for
7  that factor, but no, there are no data on it.
8      Q.  And to the extent that that factor
9  impacts mortality, your regression models may
10  overstate, understate, or have no effect on the
11  causal relationships that you're drawing between
12  shipments and mortality, right?
13          MR. KO:  Object to the form.
14      A.  That's correct.  If the variable on
15  parents living apart from children, the part
16  which is not correlated with the variables that
17  are included here, if one were able to include
18  it, it could impact the coefficient on the
19  shipments variable.  It could increase,
20  decrease, stay the same.  We unfortunately don't
21  have a way to say how big the effect would be.
22  BY MR. KNAPP:
23      Q.  Decline in the quality of jobs, did
24  you control for that variable in any of your

Highly Confidential - Subject to Further Confidentiality Review

1  regressions?
2      A.  We have many variables that are
3  associated with changes in the quality of jobs.
4  So we have, for example, the percent in
5  manufacturing in 1993 to 1995.  We have the
6  change in the percent in manufacturing.
7          We also have the percent in other what
8  are called one-digit industry, agriculture,
9  mining, construction, utilities, retail
10  transportation, professional, and we have those
11  in both the levels and in the changes.
12          So we have a number of measures of
13  changes in economic opportunity that are
14  included in the model.
15      Q.  Let me go to changing religious
16  practice.  Did you include a variable in any of
17  your regression models that control for changes
18  in religious practices?
19      A.  I wish I had the data to measure
20  changes in religious practices, but without that
21  data, we were not able to include it in the
22  model.
23      Q.  And to the extent that changes in
24  religious practices had an impact on mortality,

1  your regressions either overstate, understate,
2  or have no change on the impact that opioid
3  shipments had on mortality?
4        MR. KO:  Object to the form.
5     A.  That's correct.  If changes in
6  religious practices, the part of that which is
7  not correlated with the variables that we have
8  included, that part of it could have an effect
9  on the coefficient on shipments per capita, and
10  it could lead it to be either higher or lower or
11  it could have no impact on it.
12  BY MR. KNAPP:
13     Q.  The next one is decline of unions.
14  Did you include a variable in your direct --
15  strike that.
16        The next one is decline of unions.
17  Did you include a variable in any of your
18  regressions that controls for decline of unions?
19     A.  Several of the variables here will
20  pick up the decline in unions.  So unions are
21  much more common in some industries than in
22  others.  So while I did not include a direct
23  variable on the change in unionization rates,
24  which don't exist at the level detailed over

1  these time periods, we do have variables that
2  will be, I believe, reasonably closely related
3  to them.
4     Q.  All right.  I want to walk through --
5  well, strike that.
6        Let me go back to the Cutler
7  Exhibit 11, which is the Case and Deaton study.
8     A.  The full study?
9     Q.  The full study, yeah.
10     A.  Not the response.
11     Q.  Look at Page 451.  In the second full
12  paragraph, it says, "It is not entirely clear
13  what policy remedies are appropriate in this
14  situation, but this explanation does suggest
15  focusing a little bit more on the supply side
16  than just on the demand side."
17        Do you see that?
18     A.  Yes, I do see that.
19     Q.  And your opinions in your report are
20  that reductions in the supply side actually
21  relieve -- strike that.
22        Your opinions in this report are that
23  reductions in the supply side of licit
24  prescription opioids actually increases

1  mortality, right?
2     A.  That is correct, yes.
3     Q.  And here you were proposing that there
4  should be a focus on actually reducing the
5  supply of legal prescription opioids, right?
6     A.  Notice that what I'm saying here is
7  reducing access to legal and illegal opioid
8  drugs.  So what I'm referring to here is that if
9  one just reduced access to legal drugs, then
10  people, as we know, substitute into use of
11  illegal drugs, and that an appropriate supply
12  side policy would need to focus on the totality
13  of the drugs that people are using, not just the
14  legal drugs.
15     Q.  So in your direct regression model, I
16  want to talk about other factors that you didn't
17  control for.
18        You didn't control for children,
19  correct?
20        MR. KO:  Object to the form.
21     A.  We have data on the population age
22  distribution and the change in the population
23  age distribution over time.  So we actually do
24  have data on the share of the population that is

1  children.
2  BY MR. KNAPP:
3     Q.  You don't control for living alone in
4  any of your regressions?
5     A.  In these regressions we do not control
6  for the share of the population that is living
7  alone.
8     Q.  And to the extent that living alone
9  has an impact on mortality, your model may
10  overstate the relationship between mortality and
11  prescription opioid shipments, right?
12        MR. KO:  Object to the form.
13     A.  It may overstate or it may understate
14  the relationship between shipments and mortality
15  rates.
16  BY MR. KNAPP:
17     Q.  You don't control for veterans in any
18  of your regression model?
19     A.  No, we do not control for veterans.
20     Q.  And to the extent that veteran status
21  has an impact on mortality, your regression
22  model may overstate, understate, or have no
23  effect on the causal conclusions you're drawing?
24        MR. KO:  Object to the form.

1    A.   That's correct.  To the extent that
2    it's not correlated with other variables we
3    have, it could -- it could affect the
4    coefficient on the shipments variable.
5    BY MR. KNAPP:
6    Q.   You didn't control for the number of
7    doctors in your regression models?
8    A.   No, we did not control for the number
9    of doctors in the regression models.
10    Q.   And to the extent that the number of
11    doctors has an impact on mortality, the
12    conclusions you draw may be overstated,
13    understated, or have no effect?
14    MR. KO:  Object to the form.
15    A.   That's correct.  To the extent that
16    it's not correlated with other variables, the
17    number of doctors could have an impact on the
18    other coefficients in the model.
19    BY MR. KNAPP:
20    Q.   You didn't control for the number of
21    hospitals in any of your regression models?
22    A.   No, we did not control for the number
23    of hospitals.
24    Q.   And so to the extent that the number

1    of hospitals has an impact on mortality, the
2    conclusions you draw may be overstated,
3    understated, or have no effect, right?
4    MR. KO:  Object to the form.
5    A.   That's correct.  To the extent that
6    it's not perfectly correlated with the variables
7    that are included, it could lead the effect of
8    shipments to be overstated or understated.
9    BY MR. KNAPP:
10    Q.   You didn't control for eligibility for
11    Medicare Part D in any of your regression
12    models?
13    A.   We did include the population
14    distribution, so the omitted category of the
15    population is the elderly population.  So the
16    population that is eligible for Medicare Part D
17    is actually included by that.
18    Q.   You didn't control for eligibility for
19    employer-sponsored health insurance in any of
20    your regression models?
21    A.   I wish I had the data to include
22    eligibility for employer-sponsored health
23    insurance.  But no, we didn't have the data for
24    that.

1    Q.   To the extent that employer-sponsored
2    health insurance has an impact on mortality, the
3    conclusions you draw may be understated,
4    overstated, or have no effect?
5    MR. KO:  Object to the form.
6    A.   That's correct, although in this case
7    employer-sponsored health insurance is likely to
8    be highly related to the industrial composition
9    of the workforce.  So, for example, people in
10    manufacturing are much more likely to have
11    employer-sponsored health insurance than are
12    people in, for example, service industries.  And
13    so I suspect that a component of that -- a
14    decent component of that would be coming through
15    the industrial composition variables that we
16    have included.
17    BY MR. KNAPP:
18    Q.   You didn't control for the incidence
19    of cancer in any of your regression models?
20    MR. KO:  Object to the form.
21    A.   We did not control for the incidence
22    of cancer in the regression models.
23    BY MR. KNAPP:
24    Q.   To the extent that the incidence of

1    cancer had an impact on any of your models, the
2    conclusions you draw are either overstated,
3    understated, or have no effect, right?
4    MR. KO:  Same objection.
5    A.   That's correct.  If the incidence of
6    cancer changed in a way that we do not capture
7    here, that that would potentially affect the
8    coefficients.  Just to note that, of course,
9    Professor Rosenthal in her report does discuss
10    issues about change in cancer.
11    But to your specific question, no, we
12    did not include it here, and any variable that's
13    not included could affect the coefficients.
14    BY MR. KNAPP:
15    Q.   If Professor Rosenthal controlled for
16    cancer in her regressions, why didn't you?
17    A.   Professor Rosenthal is looking at
18    cancer nationally, so she's doing those
19    nationally.  We actually don't have data on the
20    incidence of cancer in each county, and we're
21    using county-level data here.
22    Q.   You didn't control for mental health
23    in any of your regressions?
24    A.   Unfortunately there's no consistent

1    measure of mental health.  One of the banes of
2    my academic existence is that we don't know very
3    well what's happened to the mental health of the
4    population over time.
5        Q.   So to the extent that mental health
6    has an impact on the mortality that you studied,
7    your conclusions are either overstated,
8    understated, or have no impact?
9            MR. KO:  Object to the form.
10       A.   To the extent that it has -- to the
11   extent that it's not correlated with the
12   variables that are included here.  I believe
13   that many of the variables that are included
14   here would likely be things that would be
15   associated with changes in mental health status,
16   for example the decline of manufacturing or
17   changes in education or other things like that,
18   any part that's not associated with that could
19   then affect the results.
20   BY MR. KNAPP:
21       Q.   Just to be clear, you haven't studied
22   the part that is associated?
23           MR. KO:  Object to the form.
24       A.   We have not -- I'm sorry, can you just

1    rephrase the question?
2    BY MR. KNAPP:
3        Q.   You didn't study the extent to which
4    changes in mental health are correlated with any
5    of the variables that you included in your
6    regression models, right?
7        A.   No, there's no data with which we
8    could do so.
9        Q.   You didn't control for access to
10   treatment for opioid use disorder in any of your
11   regression models?
12       A.   No, we did not control for access to
13   treatment for opioid use disorder in the models.
14       Q.   And to the extent that access to
15   treatment for opioid use disorder had an impact
16   on mortality, your conclusions may be
17   overstated, understated, or have no effect,
18   right?
19           MR. KO:  Object to the form.
20       A.   In this case I think we actually can
21   say what the effect would be.  So over time
22   there was greater access to opioid treatment
23   than there had been, for example, Narcan and its
24   greater availability and greater knowledge of

1    personnel about how to use it.
2            And so a number of studies have shown
3    that greater access to treatment for opioids has
4    led to reduced mortality for people with
5    opioids, and, therefore, the mortality increase
6    in the model in, for example, the indirect model
7    is smaller than would be implied just by the
8    shipments alone because there is -- because
9    fewer people are dying even given the events
10   that are occurring.
11   BY MR. KNAPP:
12       Q.   In your model you didn't control for
13   the location of where any county is located,
14   whether it was east or west of the Mississippi
15   or what region of the country it's in?
16           MR. KO:  Object to the form.
17       A.   These models are estimated in changes,
18   so what we're looking at is the increase in the
19   mortality rate in different areas.  We did not
20   assume that that increase would differ by areas.
21   That's a much less common assumption than if one
22   is estimating models in levels where researchers
23   sometimes include more on the geographic data.
24           But no, we did not -- we did not

1    estimate a different trend in different regions.
2    BY MR. KNAPP:
3        Q.   To the extent that geographic factors
4    had an impact on mortality that you studied,
5    your conclusions may be either overstated,
6    understated, or have no impact, right?
7            MR. KO:  Object to the form.
8        A.   With this variable, with geographic
9    information, you'd want to be a little bit
10   careful.  So, for example, if it -- as we were
11   talking about, there are people who move from
12   one geography to another in order to obtain
13   medicines, in order to obtain medication, either
14   legal or illegal medication.  In that sense,
15   what the geographic regions would do is they
16   would say, well, within areas what's the
17   relationship between shipments and mortality.
18   That's really putting a lot of emphasis on the
19   error that comes from the transshipment within
20   the region, so, for example, people going to
21   Florida or West Virginia or Kentucky or Ohio or
22   wherever that is for their medication, to obtain
23   medications.
24           And so it's really putting a lot more

Highly Confidential - Subject to Further Confidentiality Review

1  emphasis on that transshipment source of error.

2  And so I would be very cautious about including

3  geographic data because it may be forcing the

4  regression to use some of the variation that's

5  not -- that's more the measurement error than

6  the true signal in the data.

7  BY MR. KNAPP:

8      Q.  You didn't include any variables

9  associated with the sophistication of a drug

10  trafficking network in any of your regression

11  models, correct?

12         MR. KO:  Object to the form.

13  Objection, asked and answered.

14     A.  I wish I had data on the

15  sophistication of drug networks in different

16  areas, but I don't, so I could not include it.

17  BY MR. KNAPP:

18     Q.  To the extent that the sophistication

19  of drug networks in any area had an impact on

20  mortality, the conclusions that you draw are

21  either overstated, understated, or have no

22  impact, right?

23         MR. KO:  Object to the form.

24     A.  I actually don't agree with that

Highly Confidential - Subject to Further Confidentiality Review

1  because I think that the sophistication of the

2  drug networks may be a response to people's

3  demand for opioids, in this case illegal,

4  although some drug networks might also have been

5  involved with legal opioids as well.

6         And so no one would not want to include

7  in the regression a variable which is just

8  mediating, that is, the mechanism by which

9  shipments get translated into harms, because

10  that may arise endogenously from people's demand

11  driven from the misconduct on the part of the

12  defendants.

13         So I think of that as more an outcome

14  variable than I think of it as something that

15  one needs to control for in order to get precise

16  estimates here.

17  BY MR. KNAPP:

18     Q.  You didn't control for the use of

19  other types of drugs, non-opioids, in any of

20  your regression models, right?

21     A.  Again, one needs to be careful -- so

22  the answer to the specific question is no, we

23  did not.  And, again, one needs to be careful

24  because of the relationship amongst the

Highly Confidential - Subject to Further Confidentiality Review

1  different drugs.

2         So people who are using one drug may

3  then switch over to another drug as its -- as

4  the availability of the first drug changes or

5  the second drug changes, and so that in some

6  ways is an outcome, not an independent factor.

7     Q.  To the extent that use of other drugs

8  has an impact on mortality, would you agree that

9  your conclusions about the causal relationship

10  between shipments of prescription opioids and

11  mortality is either overstated, understated, or

12  has no impact?

13         MR. KO:  Object to the form.

14     A.  No, I do not agree with that, because

15  in the case of that variable, one would really

16  need to do a lot more to say is the use of those

17  drugs exogenous, in which case what you're

18  saying is appropriate, or is it endogenous to,

19  for example, the variables, the shipment

20  variable.  And to the extent that it's

21  endogenous to that, then it is not appropriate

22  to control for it even if controlling for it

23  would change the other coefficients in the

24  model.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. KNAPP:

2     Q.  You didn't cover -- strike that.

3         You didn't control for the percent of

4  the population that's covered by insurance in

5  any of your regression models?

6     A.  That's correct.  That will to some

7  extent be picked up by the different industry

8  variables and, of course, the different age

9  variables as well.  But we didn't have a measure

10  that we could -- we did not have a measure of

11  that that we could include directly.

12     Q.  And to the extent that the percent of

13  the population that's covered by insurance has

14  an impact on mortality, the conclusions you draw

15  about the causal relationship between opioid

16  shipments and mortality is either overstated,

17  understated, or has no impact, correct?

18         MR. KO:  Object to the form.

19     A.  Only to the extent that that -- only

20  to the extent that that variable is not

21  perfectly correlated with other variables that

22  are included in the model.

23         So to the extent that insurance

24  coverage is associated with, for example,

1  manufacturing employment, which we know that it
2  is, and employment in other industries, that
3  part is picked up by the model.  It's only any
4  part that would be differential -- excuse me,
5  not differential.  It's only a part that would
6  be separate from that correlation that would
7  be -- that would potentially influence -- impact
8  the coefficients here.
9  BY MR. KNAPP:
10    Q.   You're not able to quantify the
11  percent of your variables that pick up the
12  percent of the population that's covered by
13  insurance and its affect on mortality, correct?
14    A.   Unfortunately, without the data, one
15  can't estimate what that is empirically.
16    Q.   You didn't include a variable for
17  exposure to trade liberalization in any of your
18  regression models?
19       MR. KO:  Object to the form.
20    A.   The variables, there are studies on
21  trade liberalization and various outcomes, for
22  example, by Professor Otter at MIT and a number
23  of colleagues of his.  Those tend to work
24  through the changes in the industrial

1  composition, so those are quite correlated with,
2  for example, the decline in manufacturing in the
3  area.  So my belief is that that's -- is that
4  trade liberalization will show up in the impact
5  of those variables.
6  BY MR. KNAPP:
7    Q.   You haven't been able to measure that
8  yourself, correct?
9    A.   That's correct.  That's my -- that's
10  my statement of how I believe it would be
11  accounted for, but I don't have data to tell you
12  for certain that that's how it's accounted for.
13    Q.   To the extent that exposure to trade
14  liberalization has an impact on mortality that
15  you studied, your conclusions about the
16  relationship between opioid shipments and
17  mortality is either overstated, understated, or
18  has no impact?
19       MR. KO:  Object to the form.
20    A.   To the extent that it has an impact
21  that is -- and to the extent that there's a part
22  of it which -- part of it which is not
23  correlated with the employment change in
24  different industries, that part of it could have

1  an impact on the estimates for the other
2  coefficients.
3       MR. KNAPP:  Okay.  Let's take a break.
4       THE VIDEOGRAPHER:  The time is
5  11:18 a.m., and we're off the record.
6       (Whereupon, a recess was taken.)
7       THE VIDEOGRAPHER:  The time is
8  11:38 a.m., and we're on the record.
9       MR. KO:  Do you want to go for like an
10  hour and then break for lunch?  Because I forgot
11  that we started at 8:00 this morning, so maybe
12  we can do a little bit of an earlier lunch.
13       MR. KNAPP:  Sure.  Somebody -- if I
14  don't pick it up, just, you know, speak up.
15       MR. KO:  Yeah, about an hour.
16       MR. KNAPP:  Sounds good.
17       MR. KO:  Okay.  Thanks.
18  BY MR. KNAPP:
19    Q.   Professor Cutler, one of the variables
20  that we talked about was -- strike that.
21       One of the variables that you did not
22  include in your regression was county-level
23  cancer data, right?
24    A.   Yes, that's correct.

1    Q.   And I believe you testified that you
2  didn't believe that that data existed, right?
3    A.   What I -- what I thought you asked
4  about was county-level incidence of cancer.
5  Those data do not exist.  County-level mortality
6  from cancer do exist.
7    Q.   And if you had had data on incidence
8  of cancer, that's something that you would have
9  wanted to factor into your model, right?
10       MR. KO:  Object to the form.
11    A.   If I had had data on county-level
12  incidence of cancer, I would have wanted to
13  factor that in.
14       Can I just explain one, I think, poor
15  wording choice that I made?  Which is, I said in
16  response to several of your questions I wish I
17  had the data.  That was me talking as an
18  academic saying I wish the data existed.
19       So for every time I said I wish I had
20  the data, I did not mean to imply that the data
21  are there and someone was withholding it from
22  me.  What I was saying was the data are not
23  there.  And in terms of doing academic work and
24  understanding more about the world, I consider

1   it unfortunate that the world doesn't have it.

2       But I just want -- I don't want there

3   to be a misconception that the data exists and I

4   purposely was prohibited from using it.

5   BY MR. KNAPP:

6       Q.   Professor Cutler, do you know how the

7   incidence of cancer in Ohio compares to the

8   incidence of cancer nationally?

9       A.   I do not know how the incidence of

10  cancer in Ohio compares to the incidence of

11  cancer nationally.

12      Q.   All right.  I'm going to -- I'm

13  handing you a tablet right now that has a report

14  that we ran from a website called

15  statecancerprofiles.cancer.gov.

16          MR. KO:  I'm sorry, who ran it?

17          MR. KNAPP:  It's a website.  It's just

18  a website that we -- you can put some inputs

19  into, and it will spit out the incidence of

20  cancer throughout the country.

21  BY MR. KNAPP:

22      Q.   I'm going to hand this to you.  And

23  you can see a map that has the incidence of

24  cancer by county, right?

1       A.   Yes.  I do see that map, yes.

2       Q.   And it has data for 2011 through 2015,

3   right?

4       A.   Yes, that's correct.

5       Q.   And you can see from that map that the

6   incidence of cancer in Ohio is on the high end

7   of the incidence of cancer nationally, right?

8       A.   There are more red areas in Ohio than

9   there are -- it's preponderantly towards the

10  orange and the red, that's correct.

11      Q.   And to be clear, you didn't include

12  this county-level cancer data in your regression

13  models?

14      A.   These data are from 2011 to 2015, so

15  we needed data that were over the whole time

16  period.

17      Q.   Had you accessed this website before,

18  Professor Cutler?

19      A.   I have -- yes, I have used cancer.gov

20  and state cancer profiles.

21      Q.   And can you state for certain sitting

22  here today that this county-level cancer data

23  for Ohio and nationally was not available for

24  years prior to 2011?

1       A.   No.  I had thought it wasn't, but I

2   may be -- I may have been incorrect on that.

3           I also -- I think of the variables you

4   listed, the cancer incidence rate is one that I

5   would have expected would have a smaller -- a

6   negligible impact; that is, the people who are

7   using opioids for treatment of cancer pain are

8   probably not associated with the mortality of

9   opioids in the overall population, and it's a

10  fairly confined population.  So my guess is that

11  that would not -- that's not a variable that I

12  would ex ante guess would have a very big impact

13  on any of the other variables in the model.

14      Q.   Just to be clear, you haven't done any

15  quantitative analysis to support that conclusion

16  you just stated about cancer, correct?

17      A.   That's correct.  I was giving you a

18  conceptual theoretical statement about it as

19  opposed to an empirical statement.

20      Q.   Now, in your regression models you say

21  the ideal situation would have been if you could

22  have used consumption data, right?

23          MR. KO:  Object to the form.

24          Which regression models?

1   BY MR. KNAPP:

2       Q.   In all of your regression models,

3   correct, sir?

4       A.   In the direct models that use the

5   shipments per day, the ideal variable to use

6   would have been consumption of opioids per

7   capita -- excuse me, per capita.

8       Q.   And you would agree that some pills

9   that are shipped into a county are not consumed

10  because they're destroyed, right?

11      A.   That's correct.  That is one of the

12  reasons why pills shipped will differ from

13  consumption, is that the pills might not be

14  taken.  That's one reason.

15      Q.   Did you investigate what percentage of

16  pills that are shipped are actually consumed?

17      A.   No.  I don't know of county-level data

18  that would provide information over different

19  points in time on the share of pills that were,

20  let's say, received by individuals were actually

21  consumed.

22      Q.   And you don't have any data about the

23  percentage of pills that were shipped to

24  Cuyahoga or Summit that were actually consumed?

1    MR. KO:  Object to the form.  And
2  objection, asked and answered.
3        Go ahead.
4    A.   No, I don't have that data for
5  Cuyahoga and Summit.  And as we were talking
6  about, that adds to the measurement error in the
7  model.  And so that source of measurement error
8  would drive the coefficient down; that is, it
9  would estimate a smaller impact of shipments on
10  deaths than is true in the world because of the
11  measurement error.
12  BY MR. KNAPP:
13    Q.   And if you apply that on a
14  county-by-county basis, would the impact in a
15  particular county depend upon whether there's
16  more or less than the average pills that are
17  destroyed as opposed to being consumed?
18        MR. KO:  Object to the form.
19    A.   In each county the relationship
20  between the shipments of opioids and the
21  consumption of opioids based on the part which
22  is pills picked up but not consumed, that could
23  very well differ across counties, and that is
24  again a source of measurement error; that is,

1  that's why -- one of the reasons why pills
2  shipped is not perfectly correlated with the
3  consumption.
4        And as a result of that, if that's
5  random measurement error, then that will lead to
6  an estimate that is too low; that is, it will
7  understate the impact of the misconduct of the
8  defendants on the harms.
9  BY MR. KNAPP:
10    Q.   In order to have consumption of a
11  prescription opioid, first a doctor needs to
12  write a prescription, right?
13    A.   I believe that some pills are stolen.
14  I'm not an expert on this.  So I don't know that
15  every single pill that's taken came because of a
16  doctor's prescription.
17        For a legal use, yes, one would need a
18  doctor's prescription.
19    Q.   Would your analysis that shows that
20  increase in mortality is correlated with
21  increases in shipments of prescription opioids,
22  would that relationship apply equally to
23  prescriptions that were written for prescription
24  opioids?

1        MR. KO:  Object to the form.
2    A.   I don't know -- so you're asking an
3  empirical statement as to whether this
4  regression would give the same result if one
5  used prescriptions.
6        There are not data on prescriptions
7  that can be used to test this.  The -- my sense
8  as a model builder is that the MME measure is
9  likely preferred -- for this analysis the MME
10  measure is likely preferred to a number of
11  prescriptions because, for example,
12  prescriptions differ in the number of days and
13  in the dosing or in the amount of the molecule,
14  and the harms are more likely related to the
15  MMEs than they are to just the presence of a
16  prescription, say, that was filled.
17        So I don't have an empirical answer,
18  but I think an MME measure makes more sense
19  theoretically to include than a prescription
20  measure.
21  BY MR. KNAPP:
22    Q.   Just to be clear, you didn't study the
23  impact on mortality that doctors' prescriptions
24  had at any point in time, correct?

1    A.   To the extent that the shipments that
2  we're picking up here are a result of doctors'
3  prescriptions, then they are, in fact, here,
4  so -- as opposed to other ways of obtaining
5  MMEs, either stolen or through borrowing from
6  friends or family.  So this is a summary of all
7  the prescriptions sort of weighted up in terms
8  of the MMEs that were shipped.
9    Q.   But to be clear, in your model you
10  don't attribute any of the harms associated with
11  the shipments to the doctors that actually wrote
12  the prescriptions, right?
13        MR. KO:  Objection.  Asked and
14  answered.
15    A.   This model is not designed to say how
16  much of this shipment is a result of different
17  factors.  This is designed to give the effect of
18  the shipments on mortality.  That's then used in
19  conjunction with Professor Rosenthal's estimates
20  to say what is the impact of the misconduct of
21  the defendants.
22        So anything about misconduct of a
23  particular person or organization would show up
24  in the input from Professor Rosenthal, and I

Highly Confidential - Subject to Further Confidentiality Review

1  would not want to -- it wouldn't make economic

2  sense to include them in this model.

3  BY MR. KNAPP:

4      Q.  So let's look at Paragraph 82.  It

5  says you looked at the change in mortality from

6  1993 to 1995 compared to 2009 to 2010.  Why did

7  you select a three-year period on the front end

8  and a two-year period on the back end?

9      A.  The three-year period -- so the reason

10  for including more than one year is because

11  there are random fluctuations in mortality rates

12  in one year as opposed to another year, and

13  averaging over more years smooths those out

14  more.  So that's why we should do that.

15      The choice of the years 1993 to 1995

16  is a result of the fact that we wanted to get

17  mortality in years before the opioid epidemic,

18  and so 1995 is -- the latter parts of 1995 are,

19  of course, when OxyContin is approved.  And so,

20  therefore, these are years where up to -- right

21  up to that point.  And three years is a -- just

22  a natural averaging over that reduces the

23  fluctuation sufficiently without going too far

24  into the history.

Highly Confidential - Subject to Further Confidentiality Review

1      On the later end, the averaging -- so

2  there's not a scientific criteria.  There's not

3  a test statistic that one could use to determine

4  which years you should average over.  I wanted

5  to end in 2010 for the reasons that we've spoken

6  about having to do with the transition from

7  legal opioid deaths to illegal opioid deaths.

8      I didn't want to go too far back

9  because then you're missing, of course -- you're

10  sort of averaging in years where there's a

11  smaller effect, and one doesn't want -- where

12  the effects are still ongoing and building up,

13  and one doesn't want to do that.

14      So two years seemed like it was a

15  natural compromise between doing just one year,

16  which exposes one to the random fluctuations in

17  coding and just other random causes, and going

18  back many more years which would cut out some of

19  the impact one wishes to measure.

20      Q.  Did you run the model with more years

21  on the back end, for example, 2008 to 2010?

22      A.  I don't know that we did.  I don't

23  recall having run the model with different years

24  on the back end.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.  If you look at Paragraph 90, you agree

2  that the relationship between opioid shipments

3  and mortality may vary across areas, right?

4      A.  For example, in more or less populated

5  areas, that is an example of how it may vary

6  across areas, correct.

7      Q.  And you estimate that the impact --

8  well, strike that.

9      In running your regression you

10  estimate the impact on mortality using the

11  national average of 1997 to 2010, average

12  shipments across the regression sample, right?

13      A.  That is correct.  It is the average

14  shipments from 1997 up through 2010.

15      Q.  And how different is the national

16  average than the figures for Summit and

17  Cuyahoga?

18      A.  My recollection, although it's not in

19  the paper so -- excuse me, it's not in the

20  report so I don't want to state this with

21  100 percent certainty, my recollection is that

22  Cuyahoga and Summit are near the average.  And I

23  think, if I recall correctly, they're within the

24  50 percent that's neither the bottom shipments

Highly Confidential - Subject to Further Confidentiality Review

1  nor the top shipments.  But I don't recall

2  that -- I don't want to say for certain because

3  I don't see the specific figure here.

4      Q.  In applying the national averages to

5  data for Cuyahoga and Summit, did you make any

6  adjustments for the variation of the figures for

7  Cuyahoga and Summit from the national average?

8      MR. KO:  Object to the form.

9      A.  Can you rephrase the question?

10  BY MR. KNAPP:

11      Q.  When you applied your percentage of

12  harm attributable to shipments to harms in

13  Cuyahoga and Summit, did you make any

14  adjustments for the differences between the

15  national average and Cuyahoga and Summit?

16      MR. KO:  Same objection.

17      A.  When we estimated the percentage of

18  harms that results from shipments, there was

19  no -- we used the predictions from the model, so

20  we did not do any ex post adjustments across

21  different counties, which one wouldn't want to

22  do without a valid theoretical reason for doing

23  why.

24      They're then, of course, applied to

1    the data on crime, child services, medical

2    examiner data, law enforcement data from those

3    specific counties.  So the estimates that I

4    reach at the end are based on data from specific

5    counties.  They're not based on just the

6    national average.

7    BY MR. KNAPP:

8        Q.   The shipment coefficient that you

9    apply in calculating the impact on mortality is

10   a national statistic, correct?

11       A.   That is one statistic that applies

12   given the variation in the data in all of the

13   large counties that are involved in the

14   analysis.

15       Q.   And you didn't make any adjustments to

16   that shipment coefficient considering that you

17   were going to apply this data just to Summit and

18   Cuyahoga?

19       A.   One has to estimate it across a sample

20   of areas.  So all of the adjustments associated

21   with then applying it to Cuyahoga and Summit

22   come in the form of controlling for these other

23   factors.  These other factors absolutely vary

24   across areas, and they clearly -- they explain a

1    large part of the variation in mortality changes

2    across areas.  So in that sense we're

3    controlling for differences in Cuyahoga and

4    Summit relative to the rest of the nation.

5        But the specific shipments variable,

6    there's -- we have no way to see whether that

7    number would be different in one or two

8    particular counties relative to the rest of the

9    counties.  There's no econometric way one could

10   estimate whether that coefficient is different

11   for just those two counties.  You'd need a

12   different type of model entirely in order to

13   estimate a coefficient for a single county.  You

14   can't do it with just one observation for a

15   county, or even a group of two counties.  You

16   couldn't do it.

17       Q.   All right.  Let's look at Table 3.10

18   on 64.  And I just want to make sure my

19   understanding of these columns is correct, so

20   hopefully these will be relatively simple

21   questions.

22       Column A reports actual mortality for

23   all the counties in your sample, right?

24       A.   That is correct, column A is the

1    actual mortality rate.

2        Q.   And column B reports the actual

3    shipments for all counties -- excuse me, strike

4    that.

5        Column B reports actual shipments for

6    all counties in your sample, right, the

7    cumulative average?

8        A.   That is correct, column B is the

9    cumulative average shipment for the counties in

10   the sample.

11       Q.   And then we talked about this, but

12   column D is the shipment coefficient for all of

13   the counties in your sample, right?

14       A.   That's correct.  That is the -- that's

15   not quite phrased the exact way I would phrase

16   it.  That is the shipment coefficient from the

17   regression model that uses cross-county data, so

18   it is the shipment coefficient from the model.

19       Q.   But it's not as if there's a different

20   shipment coefficient for different counties

21   included in your sample?

22       A.   No.

23       MR. KO:  Object to the form.

24       A.   No.  As I said, it would not be

1    possible given just one observation per county

2    to have a different -- it's econometrically

3    impossible to have a different coefficient for

4    each county.

5    BY MR. KNAPP:

6        Q.   Did you test whether the impacts that

7    you estimated based upon all the counties in

8    your sample lead to unexpected results in any

9    particular county?

10       MR. KO:  Object to the form.

11       A.   A general thing that one does in

12   looking at regression analysis is often to look

13   at the specific observations and then to see how

14   well the regression fits the observations.

15       To the extent that there are outliers

16   in that, that is, a particular county is way off

17   the regression line, one then often either

18   adjusts the model or sometimes decides to

19   eliminate an observation entirely because it may

20   not be relevant.

21       In this case, as we spoke about

22   earlier, there were four counties that they're

23   not so far off the line but the shipments were

24   so high that it seemed clear that they -- and

1  they were from areas where cross-county
2  transshipment was reported by press and others
3  to be big, that they seemed so high that I felt
4  more comfortable using the vast bulk of the
5  other data, the 400 out of 404 other data that
6  did not have any concerns about those issues in
7  those four counties.
8  BY MR. KNAPP:
9      Q.  So let me just pick up on something
10  that you said.  You said you looked at press
11  articles about high rates of transshipments.
12  What press articles did you look at that
13  referenced high rates of transshipments into or
14  out of Franklin County, Ohio?
15      A.  I don't think there were any that
16  specifically mentioned Franklin County, Ohio.
17  There are articles and books that have spoken
18  about transshipments from, for example, Florida,
19  from West Virginia, from Kentucky, from Ohio.
20          And so because the counties with the
21  very high shipments tended to be in states in
22  general where transshipments were reported to be
23  an issue, I thought it -- I thought it more -- a
24  more convincing analysis to eliminate those four

1  observations as being very different on
2  the shipment variable.
3      Q.  Did you consider whether it's possible
4  that your regression model would attribute
5  greater than 100 percent impact on mortality
6  when applied to any single county?
7          MR. KO:  Object to the form.
8          Which regression model?
9      A.  It's -- so, in general, one does look
10  for things like that.  But the issue is there
11  are always, of course, points that are off the
12  line, so there are always outlier observations.
13          There may be observations for which
14  there was a particularly high level of shipments
15  relative to population not in those four, or for
16  which other factors imply an increase in
17  mortality where the prediction as a whole could
18  very well lead to an estimate of over
19  100 percent or any other type of issue.
20          That's why as an econometrician you
21  wouldn't use the analysis of this to predict for
22  a single county, but rather one wants to use
23  this to develop an estimate for the set of
24  counties as a whole because that's what this --

1  this is what is describing the vast -- the
2  average county in the data set, and that's what
3  that regression coefficient is giving, and,
4  therefore, it's appropriate to evaluate it at
5  the average in the data set.
6  BY MR. KNAPP:
7      Q.  You would agree that shipments of
8  prescription opioids can't have more than
9  100 percent impact on mortality, right?
10      A.  Of course, the question is 100 percent
11  relative to what?  It is possible that there
12  could be fewer deaths than would be predicted by
13  a model.  For example, if a county were
14  particularly good at treat -- if a county got to
15  be particularly good at treating people who had
16  opioid overdoses, then the actual mortality rate
17  would be lower than would be predicted on the
18  basis of shipments because the county was
19  successfully able to prevent death that results
20  from opioid use.
21      Q.  So it's your testimony that if there's
22  a greater than 100 percent impact on mortality
23  for any given county that that can be explained
24  by shipments into that county?

1      A.  I'm not saying that that's -- I'm not
2  saying that that is the explanation.  I'm making
3  two points.  The first point is that it is, of
4  course, theoretically possible that a county
5  could be estimated to have more deaths than it
6  actually does because the county does a good job
7  at preventing deaths, so preventing actual
8  deaths relative to -- relative to what would be
9  predicted.  So that county is not -- in that
10  eventually, in that hypothetical, that county
11  would have predicted deaths greater than actual
12  deaths, and that would be a perfectly correct
13  statement -- conclusion to draw.
14          And, second, I'm making -- so that's
15  the first point to make.  And then the second
16  point to make is that using a regression
17  coefficient to then predict and look at a single
18  county is generally not what an applied
19  economist does, because a single county may have
20  an outlier for a particular reason in a
21  particular year.  And the regression says yes,
22  given all the outliers, here is the nature of
23  the data, here is what I -- here's what's true
24  about the data as a whole, but that doesn't --

1  but it doesn't erase what may be an outlier for
2  any number of reasons in a county.
3          And so it's just not -- this is not
4  the methodology you'd use if you wanted to
5  understand that single county.  You would sort
6  of almost do an exact time series of that
7  specific county, and you'd use a very different
8  methodology.
9          So just as a -- so the second point is
10  as a general matter, I wouldn't apply this to a
11  single county and say, oh, okay, that's the
12  obvious way to do it.  Instead I would do what
13  we did here and what most econometricians would
14  do, which is to apply it to the sample as a
15  whole.
16      Q.   Okay.  Let's look at Paragraph 109.
17  So now Paragraph 109, we're looking at your
18  application of the direct model to the period --
19  to elicit mortality in the period 2011 to 2016,
20  right?
21      A.   Yes, that is correct.
22      Q.   Why did you conclude that it was
23  reasonable to assume that the relationship
24  between opioid shipments and deaths prior to

1  2010 could be applied to licit opioid deaths the
2  post-2010 period when you've concluded that the
3  relationship between shipments and mortality
4  changed after 2010?
5          MR. KO:  Object to the form.
6      A.   I think of the estimates that we have
7  from the direct model from the mid 1990s
8  through 2010 as being, if you will, a form of
9  structural analysis, so it's a truth about the
10  world, which is that shipments of legal opioids
11  lead to this level of mortality.
12          To the extent that that's then a truth
13  about the world, it can then be run forward into
14  years post 2010, so that's the -- that's the --
15  the reasonableness is my sense that it's a true
16  structural relationship.
17  BY MR. KNAPP:
18      Q.   And did that -- the structural
19  relationship between shipments and mortality
20  actually changed after 2010, correct?
21      A.   That part is particularly involving
22  the use of illegal opioids.  What this is saying
23  is given what I observed in the period up to
24  2010, what would I have forecast for the deaths

1  due to legal opioids after 2010 in light of the
2  shipments.  And so that's exactly why we broke
3  it into two parts, the legal component and the
4  illegal component, for exactly that reason.
5      Q.   Okay.  So let's turn to Table I.2 in
6  Appendix 3.1, share of harms due to all
7  shipments.
8      A.   I'm sorry, Table I.2?
9      Q.   I.2.
10          MR. KO:  Are you in Appendix 3?
11          MR. KNAPP:  3.1.
12      A.   I'm sorry.  Let me just make sure I
13  have the correct appendix.  I'm sorry.
14  BY MR. KNAPP:
15      Q.   I think you've got it.
16      A.   Appendix 3.I.
17      Q.   Oh, is that 3.I?
18      A.   Yes.
19      Q.   III.I.  Thank you.
20      A.   The appendices are delineated by
21  letters, so...
22      Q.   I was going to say it didn't make
23  sense to me that it would be 3.1, but --
24      A.   I thought for a minute I was missing

1  out on something so --
2      Q.   Okay.
3      A.   So --
4      Q.   Glad we're on the same page.
5      A.   So there we are.
6      Q.   Okay.  So when you -- after you ran
7  your regression and you come up with your
8  shipment coefficient, you calculate the percent
9  impact on mortality.  And the question that I
10  have is, in column B of Table I.2, why did you
11  use the cumulative average shipments?
12      A.   The regression model that we
13  estimated, it relates mortality changes to
14  cumulative average shipments, and, as I said, I
15  interpret that as a structural estimate; that
16  is, that is the true relationship.
17          Therefore, to continue that forward, I
18  need to continue that true relationship, and
19  that true relationship is with the cumulative
20  average shipments.  So, therefore, I use the
21  cumulative average shipments going forward.
22      Q.   Why did you use a cumulative average
23  as opposed to just cumulative shipments?
24      A.   The cumulative average shipments is

Highly Confidential - Subject to Further Confidentiality Review

1   just dividing by the number of years.  So in the
2   regression, it would not have affected things at
3   all; that is, the estimates would have been that
4   the R-squared of the model would have been
5   exactly the same.  The coefficients on all the
6   variables other than the shipments would have
7   been the same.  And the shipments variables
8   would just be, you know, 13 times smaller; that
9   is, that's what the cumulative is, is it's 13
10  times bigger, so the average would be -- so,
11  therefore, the coefficient estimate would be 13
12  times smaller.  So it would give exactly the
13  same -- the same predictions there.  I thought
14  that -- so it wouldn't affect the regressions.
15          But, in general, you don't want to
16  have a model that sort of explodes.  So if it
17  were cumulative shipments, then that implies
18  that at some indefinite point in the future
19  mortality rates would exceed the entire
20  population because the cumulative keeps growing,
21  and that's clearly not a good feature of a
22  model, so the average makes more conceptual
23  sense.
24      Q.   So agree with you on the shipment

Highly Confidential - Subject to Further Confidentiality Review

1   coefficient for 2010.  But let me ask you about
2   for years prior to that.
3          In the cumulative average shipments
4   for 2009, 2008, 2007, and 2006, do you know if
5   you're dividing by the same number of years that
6   you divide for in 2010?
7      MR. KO:  Are you looking at Table I.1?
8      MR. KNAPP:  Now I'm looking at Table
9   I.1.  Thanks.
10     A.   I believe we're dividing by the
11  cumulative average shipments up to that point,
12  which is what one would want to do.
13  BY MR. KNAPP:
14     Q.   So, for example, in 2009, you're
15  dividing by the total number of years between
16  1997 and 2009, so it would be divided by, I
17  believe -- is that 13?
18     A.   12 years.
19     Q.   It would be 12 years, so 2010 divided
20  by 13?
21     A.   Whatever, maybe 13.
22     Q.   Yeah.  It depends upon how you count
23  the first year, I think.
24     A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

1      MR. KO:  Or the last.
2      MR. KNAPP:  Or the last, correct.
3   Thank you.
4   BY MR. KNAPP:
5      Q.   Do you know if you're dividing by
6   13 years in 2009 and 13 years in 2008, or are
7   you dividing by increasingly less years as the
8   years go back from 2010 to 2006?
9      A.   I'd want to look at the -- so I don't
10  know offhand.  I'd want to look at the actual
11  spreadsheet to give you a definitive answer.
12     Q.   Do you know if there -- what is --
13  strike that.
14          Do you have a view on what is the
15  right approach in order to maintain consistency
16  between the cumulative average shipments that
17  are reported prior to 2010 and the shipment
18  coefficient that you apply for all years 2010
19  and prior?
20     A.   One would want to measure the
21  cumulative average shipments using the number of
22  years included in the average, so that -- so in
23  2006 it should be a different number of years
24  than in 2010.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   And so your view is that you wouldn't
2   change the shipment coefficient for the prior
3   years to reflect the decreased number of years
4   that you're reflecting in the sample?
5      A.   No.
6      MR. KO:  Object to the form.
7      A.   No, you wouldn't change the shipment
8   coefficient because the shipment coefficient is
9   sort of a structural estimate of how cumulative
10  shipments up to that point -- cumulative average
11  shipments up to that point affect mortality up
12  to that point.
13          So I'm treating that as a structural
14  parameter; that is, that coefficient is true,
15  and it's true about the world in different
16  periods of time -- I should say over the whole
17  time period.
18  BY MR. KNAPP:
19     Q.   Okay.  So let's go back into Table
20  I.2.  So I want to imagine a world where actual
21  shipments into a county after 2011 dropped to
22  zero, and they stay at zero from 2011 to 2012.
23  Okay?
24     A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

1  Q.  Would your model still predict that

2  shipments in a year where there aren't actually

3  any shipments have an impact on mortality?

4  A.  The model uses the cumulative average

5  shipments, so that the past shipments still have

6  an impact on individuals, and that's directly

7  because of the addiction-related component.

8  So the individuals who took the

9  medications earlier when there were shipments,

10  then become addicted and, therefore, there's

11  still an impact on mortality even after

12  shipments, for example, fall.

13  Q.  But here in Table I.2 we're just

14  looking at licit mortality.  How is it possible

15  that there would be deaths from licit opioids in

16  this hypothetical we've constructed where

17  there's no licit opioid shipments?

18  MR. KO:  Object to the form.

19  A.  So I'm going to give you two answers to

20  you.  The first answer is that, of course, some

21  individuals obtain opioids outside of their

22  county, and so, therefore, there will be some --

23  there will be some opioid use associated with

24  that, so that's the first, and some

Highly Confidential - Subject to Further Confidentiality Review

1  opioid-related deaths associated with that.

2  The second point which I think is

3  probably more fundamental is you're asking a

4  question here that's far, far out of sample.  So

5  there are no counties in the data where

6  shipments went from a high number to zero.  So

7  as a result, it's often difficult in econometric

8  circumstances to use a result that's estimated

9  within a sample to forecast very far out of

10  sample.

11  So to give you an analogy, if you

12  estimated the relationship between -- well, I'm

13  not sure if I can come up with one.

14  Let's say if you estimated the

15  relationship between a person's weight and their

16  consumption of a particular food item, or their

17  death and the consumption of a particular food

18  item, and then you said now suppose that that

19  individual consumed that food item 24 hours a

20  day, seven days a week continuously, what age

21  would they die at, your model can give you an

22  estimate, but that is so far out of the range of

23  the data that you observe that you wouldn't

24  trust that model even though it can give you an

Highly Confidential - Subject to Further Confidentiality Review

1  estimate.

2  So I think the hypothetical that

3  you're asking about here is so far out of the

4  range of the data that it's almost not the right

5  model, because we just never observe anything

6  that looks like that in the data.

7  BY MR. KNAPP:

8  Q.  So if we look at Table I.2, do you see

9  that the impact on mortality for licit opioids

10  is increasing from 2011 to 2016?  Do you see

11  that?

12  A.  Yes, I do see that.

13  Q.  And this is happening at a period

14  where shipments into the counties -- strike

15  that.

16  This is happening at a period where

17  overall shipments of licit prescription opioids

18  are going down, right?

19  A.  Yes, I do see that.

20  Q.  And this is happening at a period

21  where, according to your theory, folks who are

22  addicted to prescription opioids were

23  substituting into illegal opioids, right?

24  A.  Yes, that is correct.

Highly Confidential - Subject to Further Confidentiality Review

1  Q.  Given that framework in the post-2010

2  period, to what do you attribute the increasing

3  impact on mortality for licit opioids?

4  A.  There are several factors that could

5  explain that, the increasing.  So first off,

6  what I want you to note is that the coefficients

7  in -- excuse me, the percentages in column I,

8  they're rising.  They're all, of course, less

9  than 100 percent; that is, the model is not

10  predicting more deaths than occur.

11  What's -- what the -- what's happening

12  here is that -- one way this could occur -- let

13  me say I don't have evidence, but one way this

14  could occur is a lot of the reduction in

15  prescription of -- in shipments of opioids are

16  for people who are taking, for example, small

17  quantities.

18  So you have -- you know, you can think

19  about people who are addicted to opioids and are

20  taking large amounts and then people taking

21  smaller amounts.  This could very well occur if

22  the bigger reduction is among the people who are

23  taking smaller amounts, but then the harms are,

24  of course, among those who are taking larger

1　amounts, and then those larger amounts would be
2　associated with a higher percentage of the
3　mortality impact.
4　　Q.　So what percentage of the population
5　that you claim was addicted to prescription
6　opioids substituted into illegal opioids versus
7　fall into this bucket of people using what you
8　speculated was larger amounts of opioids in the
9　post-2010 -- of prescription opioids in the
10　post-2010 period?
11　　MR. KO:　Object to the form.
12　　A.　I don't have epidemiological data to
13　answer that.
14　　I also want to point out that,
15　remember, these are deaths due to use only of
16　legal opioids.　So someone who is using legal
17　opioids and also illicit opioids, illegal
18　opioids, would be included in the next set of
19　tables there.
20　　I think the reason why I made that
21　point is some of what you're asking about is
22　people who are switching back and forth, and
23　that switch may not be complete, and an
24　individual may be using both legal and illegal

---

1　opioids, in which case you'd really need to be
2　looking at the illegal opioid components right
3　alongside the legal, the licit opioid deaths.
4　BY MR. KNAPP:
5　　Q.　But the mortalities that are reflected
6　in Table I.2 after 2010 would have to be people
7　that did not fit your theory of substituting
8　from prescription opioids to illegal opioids,
9　right?
10　　MR. KO:　Object.
11　BY MR. KNAPP:
12　　Q.　These are deaths only resulting from
13　licit opioids?
14　　MR. KO:　Object to the form.
15　　A.　These are deaths for which the --
16　correct, for which the cause of death is only
17　legal opioids.
18　BY MR. KNAPP:
19　　Q.　And do you have any quantitative
20　explanation -- I know you've speculated and you
21　said you don't have evidence for it, but do you
22　have any quantitative explanation for why the
23　impact on mortality is increasing after 2010 for
24　licit prescription opioids when licit

---

1　prescription opioid shipments are going down?
2　　MR. KO:　Object to the form.
3　Objection, mischaracterization of previous
4　testimony.
5　　A.　The -- I do not have -- in order to
6　answer that question specifically one would need
7　a detailed epidemiological model.　I have not
8　developed a detailed epidemiological model here,
9　so I can't answer that specifically.
10　　There are certain hypotheses in which
11　this would make sense, but I don't have an
12　empirical analysis that says here's how to
13　answer your question exactly, here's a
14　quantitative answer to your question.
15　　MR. KNAPP:　Do you want to break for
16　lunch now?　I don't know.　Have we been going
17　about an hour?　I'm moving to a different topic.
18　　MR. KO:　Is it like ten minutes?　I'm
19　fine with --
20　　MR. KNAPP:　It's not ten minutes.
21　　MR. KO:　Two minutes?
22　　MR. KNAPP:　It's not two minutes.
23　　Why don't we break for lunch.
24　　THE VIDEOGRAPHER:　The time is

---

1　12:27 p.m., and we're off the record.
2　　　(Whereupon, a luncheon recess was
3　　　taken.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

```
1              AFTERNOON SESSION
2
3          THE VIDEOGRAPHER:  The time is
4  1:06 p.m., and we're on the record.
5  BY MR. KNAPP:
6      Q.  Professor Cutler, for your regression
7  of the relationship between shipments and
8  mortality for the period 2011 to 2016, in your
9  approach 1 you used an indirect regression
10  model, right?
11      A.  Yes, that's correct.  The approach 1
12  used an indirect regression model to estimate
13  over that time period.
14      Q.  And if we look at Paragraph 96 of your
15  report, your model produced an R-squared of .31,
16  right?
17      A.  Yes, that is correct.
18      Q.  And so about 69 percent of the
19  variance between counties was not predicted by
20  variables in your model, right?
21          MR. KO:  Objection to the form.
22  Object to the extent it mischaracterizes the
23  report.
24      A.  Actually, while that's accurate, what
```

Highly Confidential - Subject to Further Confidentiality Review

```
1  I'd like to note is that in that model, in a
2  cross-section model like that, an R-squared of
3  31 percent is really quite high.  So that's much
4  higher than many estimates of cross-section
5  mortality rates get as an R-squared.
6          And similarly, the R-squared of
7  57 percent in the direct model is extremely high
8  and is much higher than most estimates in a
9  cross-section regression get.
10          So I interpreted the R-squared
11  estimates from the indirect model as -- from the
12  direct model as both being indicators that the
13  models fit extremely well.
14  BY MR. KNAPP:
15      Q.  You don't know what caused the
16  60 percent of variation in your indirect model
17  that's not explained by the variables in your
18  regression, correct?
19      A.  That's correct.  It's not explained by
20  the variables in the regression.  Some of it is
21  just true randomness; that is, there's just
22  different mortality rates, perhaps a particular
23  county was better or worse at saving individuals
24  who had opioid overdoses, perhaps the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1  relationship between -- in the direct model
2  opioid shipments is not obviously saying who
3  gets the shipments.  These estimates don't say,
4  you know -- I don't have within county variation
5  in terms of exactly where people are living and
6  so on.  So actually you would never, ever expect
7  a cross-section model like this to give an
8  R-squared near 1, you just never see that.
9          And the 31 percent here, as again just
10  mentioned the 57 percent, both of those numbers
11  are actually quite high.
12      Q.  And in your indirect model, what you
13  do is you attribute to defendants all of the
14  mortality, the mortality from illegal opioids
15  that cannot be explained by the variables in
16  your indirect model, correct?
17      A.  That's not correct.  It attributes to
18  the shipments of medication all the effects that
19  cannot be attributed to those characteristics.
20  It then takes out -- it then uses that to --
21  with the percentage of the shipments due to
22  misconduct on the part of the defendants, that
23  is incorporated there as well.
24      Q.  And that's a good clarification.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          So you attribute all of the
2  unexplained variation in your indirect model to
3  shipments, not defendants' misconduct?
4      A.  That is correct, it is attributed to
5  the shipments, not to the defendants'
6  misconduct.
7      Q.  And if we look at footnote 53 on
8  Page 45 of your report, the second sentence
9  says -- let's read the whole thing -- it says,
10  "The indirect regression attributes the entirety
11  of unexplained opioid-related mortality to
12  shipments.  To the extent that other factors not
13  modelled in the baseline regression contributed
14  to increases in opioid mortality, the indirect
15  approach has the potential to overstate the
16  impact of defendants' actions."
17          Do you see that?
18      A.  Yes, I do see that.
19      Q.  And the factors that are included in
20  the baseline regression are social and
21  demographic and economic factors, right?
22      A.  That is correct, they are demographic,
23  social, and economic factors.
24      Q.  And are they the same factors that are
```

Highly Confidential - Subject to Further Confidentiality Review

1  included in the direct regression?

2      A.  Yes, they are the same factors that

3  are included in the direct regression.

4      Q.  So we went through a whole list of

5  factors that you didn't include in your direct

6  regression.  You didn't include those factors in

7  your indirect regression either, correct?

8          MR. KO:  Object to the extent it

9  mischaracterizes his previous testimony and the

10  report about what factors that were actually

11  included or not.

12          But go ahead and answer.

13      A.  All of the factors for which we had

14  data we included here.  The only things that are

15  not included are things for which we wish we

16  had -- for things which we did not have the data

17  that -- the data do not exist that they could be

18  included.

19          Again, I want to avoid implying data

20  were withheld.  No data were withheld from me

21  for any reason.

22  BY MR. KNAPP:

23      Q.  So when you say that to the extent

24  that other factors modelled in the baseline

Highly Confidential - Subject to Further Confidentiality Review

1  regression -- not modelled in the baseline

2  regression contributed to increases in opioid

3  mortality, what factors did you have in mind

4  there?

5      A.  I was referring back specifically to

6  the discussion that we had earlier of the

7  analysis like that of Professor Ruhm and

8  Professors Case and Deaton.

9          So in that case there was a discussion

10  about were all of the issues associated with

11  despair in different areas included in the

12  models that Professors Case and Deaton and

13  Professor Ruhm estimated, and as you noted

14  correctly that not everything that one would

15  like to have data on to measure despair we

16  actually do have data on.  And so, therefore,

17  there are variables that are omitted from the

18  model that if the data existed we would like to

19  have included in the model.

20      Q.  To the extent that any of those

21  variables associated with despair for which you

22  don't have data contributed to mortality, your

23  indirect regression attributes those harms to

24  the shipments of prescription opioids?

Highly Confidential - Subject to Further Confidentiality Review

1      A.  That's not correct.  To the extent

2  that they contribute to mortality -- so two

3  things.  One is to the extent they're correlated

4  with the variables that are included, they will

5  be picked up by the variables that are included,

6  so it's only to the extent that they're not

7  correlated with the variables that are included,

8  so that's the first issue.

9          And then the second issue is that

10  nothing says that those variables have to

11  positively affect the mortality rate.  Some of

12  them could negatively affect the mortality rate,

13  again, particularly if you're looking at the

14  part that is independent of the variables that

15  are included.

16          So it does not have to be the case

17  that any variable that -- it does not have to be

18  the case that any variable that is omitted, by

19  including it one would automatically assign

20  less -- a smaller share of opioid-related deaths

21  to opioid shipments.

22      Q.  And just to be clear, you haven't been

23  able to quantify whether any of these factors

24  associated with despair that you haven't been

Highly Confidential - Subject to Further Confidentiality Review

1  able to get data for have a positive or negative

2  impact on mortality?

3          MR. KO:  Objection to the form.

4  Objection, asked and answered.

5      A.  That's correct.  Just to restate, I do

6  not know for the data that I don't have whether

7  the components of those variables that are not

8  correlated with the independent variables would

9  have a positive relationship with opioid

10  mortality or a negative relationship with opioid

11  mortality or no relationship with opioid

12  mortality.  So I cannot give an econometric

13  answer to the question of what impact including

14  such variables would have.

15  BY MR. KNAPP:

16      Q.  In preparing your indirect model, you

17  didn't consider the change in the number of pain

18  diagnoses in your -- as a variable in your

19  indirect regression?

20      A.  Let me give two answers to that.

21          First, in the indirect model, we're

22  not using change variables, we're using levels,

23  because we're estimating the mortality rate at a

24  point in time.

```
 1        In the case of approach 1, we're
 2   estimating it at '93 to '95.  In the case of
 3   approach 2, we're estimating it -- I'm sorry.
 4   In the case of approach 2, we're estimating at
 5   '93 to '95.  In the case of approach 1, we're
 6   estimating from 2008 to '10.  So the change
 7   would not -- doesn't enter into those
 8   variables -- excuse me, into those regressions.
 9        But in addition, there's an issue
10   about including the name of pain diagnoses,
11   which is that physicians need -- for many -- in
12   many occasions physicians need a diagnosis
13   before writing a prescription.  So individuals
14   who get a prescription for opioids will be
15   diagnosed generally with pain or -- and
16   oftentimes with pain.
17        Just knowing what share of
18   individuals' diagnosis of pain is conflating the
19   fact that the variation in the shipments of
20   opioids driven by the defendants' misconduct may
21   be also influencing doctors writing down of pain
22   as a diagnosis for the patient, some form of
23   pain as a diagnosis for the patient, and,
24   therefore, the pain reports.
```

```
 1        So the pain reports will explain
 2   mortality, but those pain reports are not an
 3   appropriate measure of the true degree of pain
 4   differences across areas.  And that's a very
 5   common issue in many areas of health economics
 6   where studies show that diagnosis responds to
 7   treatment in some cases, and it's not always the
 8   case that treatment is an unbiased estimate
 9   across areas that then -- that diagnosis is not
10   an unbiased estimate across areas that then
11   treatment responds to.
12        Q.  You didn't include a variable for the
13   number of doctor convictions related to opioid
14   prescribing in your indirect models, correct?
15        A.  I did not include them.  And, again, I
16   don't think that that variable would be
17   appropriate to include in the model because that
18   is also an outcome of the misconduct on the part
19   of the defendants, at least in part, and,
20   therefore, one wouldn't want to say that the
21   shipments were due to misconduct on the part of
22   defendants -- on the part of doctors rather than
23   on the part of defendants if the misconduct on
24   the part of doctors was driven in some part by
```

```
 1   the misconduct on the part of defendants.
 2        Q.  I want to make sure we're clear.  Are
 3   you independently opining that defendants'
 4   conduct caused doctors to write prescriptions
 5   that they ended up getting convicted of crimes
 6   for?
 7        A.  No, that's not an issue on which I
 8   have an opinion.  I'm just saying that in the
 9   model one would need -- in the econometrics one
10   would need to be careful about including a
11   variable like that because that's an issue one
12   would need to consider.
13        Q.  And are you independently opining that
14   the defendants' marketing or promotion of
15   prescription opioids had an independent impact
16   on any shipments, or are you completely relying
17   on Professor Rosenthal?
18        A.  I --
19        MR. KO:  Object to the form.
20        A.  I am completing relying upon Professor
21   Rosenthal's estimates about the impact of
22   defendants' misconduct on shipments of opioids.
23   BY MR. KNAPP:
24        Q.  Did you include a variable for
```

```
 1   depression diagnoses?
 2        A.  I did not include a variable for
 3   depression diagnosis.  Again, the literature
 4   shows that the variability in depression
 5   diagnosis is not an independent variable of
 6   itself that is measuring just the true
 7   prevalence of diagnosis across areas.  It's also
 8   measuring the propensity of physicians to
 9   diagnose the -- diagnose that particular
10   condition, the extent to which physicians are
11   going to treat depression and, therefore, what
12   conditions they choose to write down as
13   diagnoses.  And so that by itself is not an
14   exogenous measure of the health of the
15   population in different areas.
16        Q.  All right.  Let's just talk briefly
17   about your indirect model from 1995 to 2016.
18   Why don't we turn to Paragraph 116 on Page 70.
19        And you attribute 100 percent of the
20   unexplained residual in this indirect model to
21   opioid shipments, correct?
22        A.  That is correct.  In this model the
23   entirety of the residual is attributed to opioid
24   shipments.
```

Highly Confidential - Subject to Further Confidentiality Review

1   Q.   And as with your other indirect model,
2  to the extent that there are other factors that
3  are not modelled in your baseline regression
4  that contributed to increases in mortality, this
5  indirect model has the potential to overstate
6  the impact of the defendants' actions?
7       MR. KO:  Object to the form.  Also
8  object to the extent it mischaracterizes his
9  prior testimony and report regarding the other
10  factors that are not purportedly modelled.
11       A.   So to the extent that there are other
12  variables not in the model that are not
13  correlated with the variables that are included
14  in the model, they could influence these
15  estimates, either making them higher or lower
16  than would be true if they -- if one were able
17  to measure the data and they could be included
18  in the model.  There could be a bias upwards,
19  there could be a bias downwards from including
20  any additional variables.
21       In addition, there are other ways in
22  which this model may give an estimate which is
23  too low for the impact of misconduct -- on
24  defendants' misconduct on harms or the shipments

Highly Confidential - Subject to Further Confidentiality Review

1  on harms.  And the reason for that is that over
2  time areas got better at treating people who
3  overdosed on opioids.  Those are not deaths, but
4  those are harms that ought to be attributed to
5  the shipments of opioids.
6       And those all work in the direction --
7  because areas have gotten better at treating
8  opioid overdose, those all work in the direction
9  that they understate the harms that result from
10  opioid shipments because they understate the
11  mortality in later years.
12       So, for example --
13  BY MR. KNAPP:
14       Q.   Looking --
15       A.   Let me just finish.
16       So, for example, the increased
17  availability of Narcan, training in terms of how
18  to address individuals who have opioid overdose
19  would all reduce mortality, and, therefore, this
20  approach will attribute too little in the way of
21  deaths to the opioid shipments.
22       Q.   Look at footnote 53 again on Page 45.
23  Do you see in footnote 53 you only reference the
24  potential to overstate the impact of defendants'

Highly Confidential - Subject to Further Confidentiality Review

1  actions?
2       A.   Yes, I do.  I do note that there.
3       Q.   And you understand that if a variable
4  increases, contributes to increases in potential
5  mortality, then your indirect approach has the
6  potential to overstate the impact of the
7  defendants' actions, right?
8       A.   That's correct.  But as we were
9  discussing, it could also understate it.  I
10  wrote overstate here because I wanted to be very
11  clear to the court that this could be an
12  overstatement.  And so in my desire to be as
13  accurate as possible to the court, I wanted to
14  say very specifically what the potential
15  problems with -- what the potential issues with
16  this approach are.
17       Q.   So let me make sure I understand.
18       What factors that you didn't include
19  in your indirect models that contributed to
20  increases in mortality would result in an
21  understatement of the defendants' -- of the
22  impact of the defendants' actions?
23       MR. KO:  Object to the form.
24       A.   Remember, it's the part of an

Highly Confidential - Subject to Further Confidentiality Review

1  additional variable -- I'm sorry.  So if it --
2  this sentence is correct.  The baseline -- if
3  there are other factors not modelled in the
4  baseline regression that contribute to increases
5  in opioid mortality, then it would overstate the
6  impact of shipments on harms.  So that statement
7  is correct.
8       As we were talking about it in
9  general, there may have been other factors that
10  might lead to decreases in mortality which would
11  understate the impact, but this specific
12  sentence deals only with the overstatement.
13  BY MR. KNAPP:
14       Q.   Got it.
15       And just to be precise, I was asking
16  about increases in mortality.
17       A.   My apologies.  I didn't --
18       Q.   It's been a long two days --
19       A.   I apologize.
20       Q.   -- for sure.
21       A.   I'll try to listen more carefully as
22  we go.
23       Q.   All right.  So let's turn to the
24  regression you ran on crime, and I believe that

1  starts on Paragraph 124, Page 75 of your report.

2      A.   Thank you.

3      Q.   The regression that you ran on the

4  relationship between opioid shipments and crime

5  is an indirect model, correct?

6      A.   No.  The regression that we ran

7  relating opioid shipments and crime is an

8  example of the direct model, so it's analogous

9  to the models that we ran for mortality in the

10 direct model.

11     Q.   Okay.  So if we look at -- bear with

12 me one second.

13          Okay.  In Paragraph 124, you state,

14 "This section presents a confirmatory analysis."

15 Do you see that?  It's three or four lines down.

16          MR. KO:  I think it's the second

17 sentence.

18     A.   Yes, I do see that.

19 BY MR. KNAPP:

20     Q.   You didn't prepare any confirmatory

21 analyses for the category of harms that fall

22 into the juvenile crimes bucket, correct?

23     A.   No, I did not do any confirmatory

24 analysis on juvenile crimes.

1      Q.   You didn't do a confirmatory analysis

2  on addiction and mental health services,

3  correct?

4      A.   No, I did not do a confirmatory

5  analysis on addiction and mental health services

6  because the data to do so are not avail -- are

7  not -- the data do not exist.

8      Q.   You didn't do a confirmatory analysis

9  on children and family services?

10     A.   No, I didn't do a confirmatory

11 analysis on children and family services because

12 the data to do so do not exist.

13     Q.   If you turn to Paragraph 130, you

14 state that, "The overall trends in property and

15 violent crime are a product of many factors,

16 only one of which is opioid use," right?

17     A.   Yes, that is correct.

18     Q.   What are the other factors that

19 contribute to overall trends in property and

20 violent crime?

21     A.   The -- there is a vast criminology

22 literature that addresses the factors that

23 influence crime.  I've provided some citations,

24 although by no means an exhaustive citation

1  list, in the report.

2          So, for example, just to give one

3  example, footnote 86 on Page 77 provides one

4  paper that addresses a number of different

5  hypotheses for changes in crime.  I will give a

6  few of the hypotheses -- let me give you a few

7  of the hypotheses that people mention with the

8  understanding, as I said as we began earlier, my

9  expertise is not in criminology, it's in

10 economics and particularly health economics.

11         One of the big factors that the

12 literature has looked at is changes in law

13 enforcement, so, for example, the impact of

14 increased numbers of police or of different

15 types of police on crime.

16         Another factor that the literature has

17 looked at is changes in punishment for crime,

18 so, for example, do changes in punishment for

19 crime affect the amount of crime.

20         Other factors that people have looked

21 at for changes in crime include economic

22 factors, for example, changing economic

23 opportunities; social factors, for example, the

24 distribution of the population by age and by

1  gender influences crime.

2          And so that's -- those are at least

3  some of the theories that have been put

4  forward -- or some of the factors that have been

5  put forward as influencing crime.

6      Q.   Did you control for changes in law

7  enforcement in your crime regression?

8      A.   We did not control for changes in law

9  enforcement in the crime regression.

10     Q.   And you -- strike that.

11         To the extent that changes in law

12 enforcement impact crime and they're not

13 correlated with the variables you did include,

14 your crime regression would overstate the

15 impact -- overstate, understate, or have no

16 impact on the impact of shipments on crime,

17 correct?

18         MR. KO:  Object to the form.

19     A.   That is correct.  There is one

20 variable here that is worth noting, which is the

21 property crime level in the case of the property

22 crime model and the violent crime level in the

23 case of the violent crime model in the base

24 period.

1    Some of what the literature has
2  hypothesized is that areas that initially had
3  more crime would have invested more in, for
4  example, law enforcement activities associated
5  with that crime.  So in addition to all of the
6  other economic and demographic and social
7  variables that are included, I think that one is
8  particularly important for thinking about
9  potential instigators of changes in law
10  enforcement or potential variables correlated
11  with changes in law enforcement.
12  BY MR. KNAPP:
13    Q.   In your crime regression, did you
14  control for changes in punishments for crimes?
15    MR. KO:  Object to the form.
16    A.   No, we have not controlled for changes
17  in the punishment for crimes.
18  BY MR. KNAPP:
19    Q.   To the extent that the changes in
20  punishment for crimes had an impact on the
21  overall rates of crimes, are the conclusions
22  from your crime regression either overstated,
23  understated, or have no impact?
24    MR. KO:  Object to the form.

1    A.   To the extent that changes in
2  punishment are the part which is not correlated
3  with the variables that are included here, that
4  part may be associated with greater reductions
5  in crime, smaller reductions in crime.  They
6  could affect the impact of shipments in any way.
7    I should say in response to your
8  question, this is another example where the high
9  adjusted R-squared is, I think, of particular
10  note; that is, overall explaining crime over
11  this 20-year period, the R-squared -- adjusted
12  R-squared for property crime is 79 percent, and
13  the adjusted R-squared for violent crime is
14  78 percent.
15    So we are explaining an enormous
16  amount of the change in crime in different
17  areas, and that is a -- is something that an
18  analyst always looks at to -- as a measure of
19  how well their model is doing.
20  BY MR. KNAPP:
21    Q.   I'm going to hand you what I'm marking
22  as Cutler Exhibit 13.
23
24    (Whereupon, Cutler Exhibit Number 13

1    was marked for identification.)
2  BY MR. KNAPP:
3    Q.   Which is titled "Understanding Crime
4  Trends Workshop Report."
5    Have you seen this document before,
6  Professor Cutler?
7    A.   I don't know if I've seen this
8  particular document.  It's 11 years old.  So
9  it's possible that I saw it at some point in the
10  past 11 years, but I don't know for certain.
11    Q.   All right.  Can you turn to Page 129
12  of the document?  Do you see there's a Figure
13  5.1 there that's titled "Heuristic Model of
14  Hypothesized Main Effects on Recent Crime
15  Trends"?
16    A.   Yes, I do see that.
17    Q.   And do you understand that these are
18  factors that may increase -- strike that.
19    Do you understand that these are
20  factors that may impact rates of crime?
21    MR. KO:  Object to the extent that
22  you're asking Mr. Cutler to respond summarily to
23  a 241-page document without giving him the
24  opportunity to look at the context.

1    But if you can answer the question --
2  feel like you can answer the question, go ahead
3  and do so.
4    MR. KNAPP:  I think "form" is
5  sufficient.
6    MR. KO:  Noted.
7    A.   These look to be the author's -- the
8  author's presentation of factors to be
9  attributed to crime.
10  BY MR. KNAPP:
11    Q.   Which of these factors did you not
12  control for in your crime regression?
13    MR. KO:  Factors on Page 241 -- or
14  129?
15    MR. KNAPP:  Correct.
16    A.   We include in our models the
17  demographics about the age distribution of the
18  population.  We include in the models a number
19  of variables that are going to pick up the
20  economic variables and demographic variables,
21  even if we don't have the exact specification
22  that the author puts forward here.  But the
23  unemployment, wages, immigration will all be
24  correlated, quite strongly, I believe, with the

1   variables that we've included.

2       We have included illegal drug --

3   excuse me, not illegal drug.  We're interested

4   in looking at the issue of opioids, so we've

5   included the opioid drug shipments, so that's

6   obviously included in the model.

7   BY MR. KNAPP:

8       Q.   Just to stop right there, you haven't

9   included variables for all illicit drug use and

10  market activity, correct?

11      A.   We have not included data for all

12  illicit drug use and market activity because

13  those data do not -- are not available.

14      MR. KO:  Go ahead and finish your

15  response that you were giving previously.

16      A.   And so then the other ones are things

17  that we do not include in the model.  In

18  general, I think for most of these the data on

19  prevalence in different areas over time are not

20  available on a consistent basis, so I would need

21  to look for sure.  But, for example, most of

22  what I know about alcohol consumption, alcohol

23  consumption -- sort of individual level alcohol

24  consumption which one can average to come up

1   with area averages are not available in the time

2   -- for counties in the times that are entered

3   into our model so we could not include them in

4   the model.  And I think that's true about a

5   number of the other variables as well.

6   BY MR. KNAPP:

7       Q.   You didn't include a variable for

8   alcohol consumption, correct, Professor Cutler?

9       A.   That's correct that it's not included.

10  And I believe the data for that do not exist.

11      Q.   You didn't include a variable for

12  firearm prevalence?

13      A.   That is correct, we did not include a

14  variable for firearm prevalence.  I have done --

15  I don't think data on firearm prevalence over

16  time are -- say, at the county level over this

17  period of time exist.  I'm not 100 percent sure

18  of that, but I -- that would be my guess.

19      Q.   In your crime regression -- strike

20  that.

21      In any of your regressions, you didn't

22  include proxy variables for illicit drug use and

23  market activity other than opioids?

24      MR. KO:  Objection.  Asked and

1   answered.

2       A.   In the case of illicit drug use and

3   market activity, we did not -- data on that do

4   not exist, so we were not able to include the

5   them in the model.

6   BY MR. KNAPP:

7       Q.   Have you seen any studies that use

8   proxy variables for illicit drug use and market

9   activity?

10      A.   Off the top of my head, I'm not -- I'm

11  not -- I don't know of any.  As I said, my

12  expertise is not in criminology, so I do not

13  have a -- I don't want to be an expert -- I

14  don't want to pretend to be an expert in

15  criminology, and, therefore, I shouldn't -- I

16  won't say definitively that I know it doesn't

17  exist.

18      Q.   You didn't include a variable for

19  police force size in your crime regression?

20      A.   We did not.  In this case, as we point

21  out in the report, there's not just one force.

22  There is all the contributing areas within the

23  county.  So one would need to get data on all

24  the -- on the police force of all the

1   contributing areas in the county.  To my

2   knowledge, that does not exist for all of the

3   areas in the county.

4       Q.   You didn't include a variable for

5   public enforcement and weapons enforcement,

6   right?

7       A.   Did you mean public order and weapons

8   enforcement?

9       Q.   Correct.

10      A.   We did not, and I do not know whether

11  any such variable exists.

12      Q.   You didn't include a variable for

13  incarceration in your crime regression?

14      A.   We did not include a variable for

15  incarceration.  We have -- many of the variables

16  are likely correlated with incarceration, but we

17  do not have a specific incarceration variable in

18  the regression.

19      Q.   When you say many of your variables

20  are likely correlated with incarceration, you

21  haven't done any analysis of the actual

22  relationship between incarceration and any of

23  the variables you included in your crime

24  regression?

1    MR. KO:  Object to the form.

2    A.    There are studies in the literature

3    that, for example, relate incarceration rates to

4    economic conditions, and I believe those show

5    that economic conditions are associated with

6    incarceration, and so to that extent -- that's

7    my recollection of those studies.  And so to

8    that extent, those variables would be picking up

9    some of the incarceration.

10   BY MR. KNAPP:

11   Q.    My question was about you personally.

12   You didn't do any analysis of the relationship

13   between incarceration and any of the variables

14   that are included in your crime regression?

15   A.    I personally did not do analysis, so

16   the answer I gave you was based on my reading of

17   the relevant literature.

18   Q.    You didn't include a variable for

19   volume of offender re-entry in your crime

20   regression, right?

21   A.    That's correct, we did not include a

22   variable for volume of offender re-entry in the

23   regression.

24   Q.    You didn't include a variable for

1    levels of fertility control?

2    A.    As this model points out here, the

3    levels of fertility control are -- would

4    primarily affect crime -- at least as

5    hypothesized in this particular model of crime

6    -- would primarily affect crime by affecting the

7    age distribution of the population, and so we

8    have included the age distribution of the

9    population, in which case the levels of

10   fertility control would not need to be

11   controlled for here.

12   Q.    So to the extent that any of the

13   factors that we just went through that you did

14   not include in your model have an effect of

15   increasing crime and they're not correlated with

16   your variables, your crime regression would

17   either overstate, understate -- strike that.

18        To the extent that any of the

19   variables included in Cutler Exhibit --

20        MR. KO:  13.

21   BY MR. KNAPP:

22   Q.    -- Exhibit 13, Figure 5.1, increase

23   crime, rates of crime, and are not correlated

24   with the variables you included in your model,

1    then your crime regression would overstate the

2    impact of shipments on crime?

3        MR. KO:  Object to the form.

4    A.    No, that's not correct.  It would not

5    necessarily overstate the impact of shipments on

6    crime.

7        The impact of -- those variables could

8    very well explain some of crime.  They could

9    make the R-squared for the crime regressions

10   increase by explaining more of the difference

11   in -- more differences in the change in crime

12   rates across counties.

13        They would not necessarily reduce the

14   impact of shipments.  That would depend also on

15   the relationship between those variables which

16   is not correlated with the included model,

17   correlation between that and the shipments per

18   capita per day.

19        And there's no theoretical way one

20   could say that that would reduce the impact of

21   the shipment coefficient.  It could very well

22   increase the impact of the shipment coefficient.

23   It could be that they're uncorrelated and the

24   shipment coefficient would remain essentially

1    the same.

2    BY MR. KNAPP:

3    Q.    So to the extent that any of these

4    variables have an impact on crime and they're

5    not correlated with your variable -- the

6    variables you included in your crime regression,

7    then your crime regression would either

8    overstate, understate, or have no impact on the

9    regression you drew between opioid shipments and

10   crime?

11        MR. KO:  Object to the form.

12   A.    The conclusion that we're drawing from

13   this is about how opioid shipments in particular

14   affect crime.  So it would have to be not just

15   that a variable when included explains more of

16   crime than can just be explained here, that is,

17   it's not a question of would the R-squared or

18   the adjusted R-squared increase by adding

19   additional variables, but it would have to be

20   how that changes the relationship between

21   shipments and crime.  So it's that specific

22   coefficient.

23        That specific -- the change in that

24   specific coefficient is going to depend upon the

```
 1   correlation between the shipments variable and
 2   that unmeasured aspect of the newly posited
 3   variables to be included.  That correlation is
 4   not something that one can theoretically say
 5   anything about.
 6          So one wouldn't have a basis to say
 7   this coefficient would obviously get smaller or
 8   this coefficient would obviously get bigger or
 9   this coefficient would obviously stay the same
10   here.  This -- the key here is this coefficient,
11   and this coefficient -- the impact on this
12   coefficient cannot be given so easily.
13   BY MR. KNAPP:
14      Q.   Thanks for the clarification on that.
15          MR. KNAPP:  Let's mark Cutler
16   Exhibit 14.
17          (Whereupon, Cutler Exhibit Number 14
18          was marked for identification.)
19          MR. KO:  You've got all your
20   colleagues here, and they can't help you out?
21          MR. KNAPP:  Riding solo right now.
22   All right.  I'm not sure anybody is still awake
23   out there.
24      A.   I find this fascinating.
```

```
 1   BY MR. KNAPP:
 2      Q.   Yeah.
 3      A.   I find this fascinating.
 4          MR. HALLER:  We have to push the bird
 5   out of the nest and see how he does.
 6          MR. KO:  And?
 7          MR. HALLER:  And he's doing great.
 8   BY MR. KNAPP:
 9      Q.   Let's go with -- well, strike that.
10          I just marked as Cutler Exhibit 14 an
11   article titled "Bringing Crime Trends Back Into
12   Criminology:  A Critical Assessment of the
13   Literature and a Blueprint for Future Inquiry."
14          Have you seen this article before,
15   Professor Cutler?
16      A.   I don't think I have seen this article
17   before.
18      Q.   Turn to Page 48, please.  Do you see
19   there's a table at the top of Page 48 titled
20   "Implied Causal Mechanisms for Factors
21   Highlighted as Explanations of the Contemporary
22   Crime Decline"?
23          Do you see that?
24      A.   Yes, I do see that table.
```

```
 1      Q.   So my question here is the same as the
 2   question that I asked you about the previous
 3   exhibit.  Can you identify for me the factors
 4   that are included in Table 1 that you did not
 5   include in your crime regression?
 6          MR. KO:  Professor Cutler, since
 7   you've never seen this article, go ahead and --
 8   I would advise you to take your time and look at
 9   it in detail such that you can answer
10   Mr. Knapp's questions sufficiently.
11          THE WITNESS:  Thank you.
12          Since I haven't seen the paper, I'd
13   like to look through it.
14   BY MR. KNAPP:
15      Q.   Well, so, Professor Cutler, I'm just
16   asking you about the particular line items in
17   Table 1.  So let me do it this way.  Did you
18   include a -- well, strike that.
19          Did you include a variable in your
20   crime regression for increased community
21   cohesion and stronger social institutions?
22          MR. KO:  And I would give Mr. Cutler
23   the same direction.
24          To the extent that you can answer it
```

```
 1   without looking at the entire article, since you
 2   haven't read it, I strongly advise you to go
 3   ahead and review and examine the entire article.
 4          MR. KNAPP:  Mr. Ko, at this point
 5   you're just coaching the witness.  He's an
 6   expert.  He can handle himself.  He's done a
 7   real fine job up to this point.  I don't think
 8   you need to coach him up any more, and I'd ask
 9   you to please not coach him.
10          MR. KO:  I think he's doing more than
11   a fine job, but I am just lodging my objection
12   for the record.
13          MR. KNAPP:  That's not an objection.
14   That's an instruction.  I'd ask you not to
15   instruct your expert.  This is an expert
16   witness.  It's totally inappropriate to coach
17   him up.  Allow him to answer the question,
18   please.
19          MR. KO:  Disagree with the fact that
20   I'm coaching.  But go ahead and ask your
21   question again.
22          And, Mr. Cutler, if you can respond to
23   whatever question is on the record or pending,
24   feel free to do so.
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.   I just want to look and make sure that

2  I understand the specific context around Table

3  1.  So I don't -- I won't read the whole

4  article.  I'll just read around Table 1.

5        (Witness reviewing document.)

6    A.   So specifically with respect to the

7  increased community cohesion and stronger social

8  institutions, I do not have a variable that

9  directly measures that.  There are a number of

10  variables that are in the regression model that

11  I believe would be associated with community

12  cohesion and social institutions.

13        I don't know -- because I want to

14  answer your question without reading the whole

15  study, I don't know how the authors here posit

16  to measure increased community cohesion and

17  stronger social institutions, so I don't -- I

18  cannot say to what extent the variables here are

19  likely to be correlated with this particular

20  explanation or not.

21        I think if you wanted me to talk about

22  that, I would need to take more time to look

23  through the ways that they propose measuring

24  community cohesion -- increased community

Highly Confidential - Subject to Further Confidentiality Review

1  cohesion and stronger social institutions.

2  BY MR. KNAPP:

3    Q.   Did you include a variable for

4  increased government trust in your crime

5  regression?

6        MR. KO:  Object to the form.

7  Foundation.

8    A.   So, again, I do not know how the

9  authors here have suggested the best way to

10  measure government trust.  We do not include a

11  measure of government trust.  I do not -- I do

12  not believe data exists that indicate levels --

13  changes in government trust over the time period

14  that we're looking at the county basis, so my

15  understanding, based on my knowledge of the

16  literature of this, is that this variable would

17  not be able to be included in a model like the

18  one that we use.

19  BY MR. KNAPP:

20    Q.   Did you include a variable for

21  legalization of abortion in your crime

22  regression?

23    A.   The issue of legalization of abortion

24  is one where there has been a good deal, of

Highly Confidential - Subject to Further Confidentiality Review

1  course, of economic literature.  In this

2  specific case, abortion was legal throughout the

3  time period that we're looking at, thus, there

4  would be no change across the counties in the

5  status of legalization of abortion.

6        And so that variable can't have any

7  impact on crime because it -- on crime rate --

8  differential crime rate changes across areas

9  because there is no differential change in the

10  extent to which abortion was legal across

11  different areas.

12  BY MR. KNAPP:

13    Q.   Did you include a variable for

14  reduction in lead exposure in your crime

15  regression?

16    A.   I did not include a variable for

17  reduction in lead exposure.  My reading is that

18  most of the reduction in lead exposure that the

19  studies refer to happened earlier than the time

20  period that we're looking at.

21        So typically, for example, the Reyes

22  study, which I know somewhat, the Reyes study is

23  looking at the reduction in lead in gasoline and

24  its impact on crime, and lead was taken out of

Highly Confidential - Subject to Further Confidentiality Review

1  gasoline well before the time period that we're

2  looking at.  So that would not have been a

3  variable which would have explained the change

4  in crime -- if I recall this correctly, that is

5  not a variable that would have explained the

6  change in crime over this time period.

7    Q.   Did you include a variable for

8  increased time spent in the home and away from

9  public spaces in your crime regression?

10        MR. KO:  Object to the form.

11  Objection, foundation.

12    A.   We did not include a variable for

13  increased time spent in the home and away from

14  public spaces.  I know about much of the data on

15  time use surveys, and I know two points about

16  them.

17        First is that most of the data that we

18  have from crime -- from, excuse me, time use

19  surveys comes from relatively small sample sizes

20  which cannot be disaggregated to a county level,

21  so, therefore, they could not be included in the

22  model that we estimate.  That's the first point.

23        And, second, that the measurement of

24  time use is generally not consistent over time.

1  For example, things change as to whether --

2  what -- how you count time where a person is

3  doing multiple things.  And so those definitions

4  change over time.

5        And, therefore, even at the national

6  level, even without thinking about the county

7  level, researchers have not found that over any

8  reasonable period of time they can look at time

9  use allocation.  So, therefore, there is no way

10  to include this variable.  It's simply not

11  possible to include this variable in the models

12  that we estimate.

13  BY MR. KNAPP:

14    Q.  To the extent that any of the factors

15  in Table 1 that you did not include in your

16  crime regression increased crime and were not

17  correlated with the variables included in your

18  crime regression, you agree that these

19  regressions -- or these variables would either

20  increase, decrease, or have no impact on the

21  results you draw from your crime regression?

22        MR. KO:  Object to the form.

23    A.  I want to reiterate, to be very

24  precise, the key that we're drawing from this is

1  not can we explain more of differences in crime.

2  So the issue here is not whether the R-squared

3  increases from 79 percent and 78 percent, both

4  of which are obviously very high numbers; the

5  issue is whether they would affect the

6  coefficients on the shipment variables.  And

7  that is not just a statement that says -- you

8  can't tell the impact on the shipment variable

9  just by saying if I included that variable,

10  would it help to explain changes in crime.  That

11  by itself does not tell you anything about

12  whether the coefficient on the shipment variable

13  would change.

14  BY MR. KNAPP:

15    Q.  Sitting here right now, you don't know

16  how any of these factors would impact the

17  coefficient on shipments, correct?

18    A.  As --

19        MR. KO:  Object to form.

20    A.  As a theoretical matter, you cannot

21  say how these variables would affect the

22  shipment coefficient.  And because the data, to

23  the best of my knowledge of them, do not exist

24  to measure them, I cannot do an estimate to say

1  how including these would affect the coefficient

2  estimate.

3        So that is, like everything, an issue

4  associated with a regression, which is that it

5  has -- it can only tell about the things it has.

6        But I again want to emphasize, just

7  saying that these variables matter is not --

8  would matter is not the issue here.  It's more

9  involved than that.

10  BY MR. KNAPP:

11    Q.  Let's look at Appendix 3.J in your

12  report.  I want to start with Table J.1.  And we

13  talked a bit about this yesterday.  What is your

14  understanding of where these percentages come

15  from in Table J.1?

16    A.  These percentages were given to me by

17  counsel who said that they were the output of

18  Mr. McCann's analysis.

19    Q.  Have you looked at Mr. McCann's

20  report?

21    A.  I have not looked at Mr. McCann's

22  report.

23    Q.  Do you know if any of these

24  percentages are actually in Professor McCann's

1  report?

2    A.  I have not looked at Mr. McCann's

3  report, so I can't answer that question.

4        MR. KO:  I don't know for sure, Tim,

5  but I think he's not a professor.

6        MR. KNAPP:  I'm elevating him.

7    A.  After this, Mr. Knapp, we may choose

8  to make you a professor.

9  BY MR. KNAPP:

10    Q.  Depends upon the subject, I don't

11  know.  We'll have to see.

12    A.  I don't know, you seem to have a

13  knowledge of econometrics that is quite

14  impressive.

15    Q.  Oh, well, I appreciate that.  Thank

16  you very much.

17        MR. KO:  So complimentary.

18  BY MR. KNAPP:

19    Q.  I would say the same about you,

20  Professor Cutler.

21    A.  But not about my knowledge of law,

22  that I assure you.

23  BY MR. KNAPP:

24    Q.  Okay.  Well, let me just start with

```
1   this.
2           We received an e-mail from your
3   counsel identifying the supplemental report of
4   Dr. McCann as the source of the figures in Table
5   J.1, okay?
6           I'm going to hand you that
7   supplemental report as Cutler Exhibit 15, and
8   I'd ask you to identify for me where these
9   percentages come from.
10          (Whereupon, Cutler Exhibit Number 15
11  was marked for identification.)
12      A.  Do you want me to look through the
13  whole report to find these?
14  BY MR. KNAPP:
15      Q.  I'm just asking you if you can
16  identify them anywhere in the report.
17      A.  So as I just said, I have not seen the
18  deposition -- excuse me, the expert report of
19  Dr. McCann before this.  So I would be happy to
20  look through the report to do that, and I would
21  be more than willing to do that, but I don't
22  know offhand where in the report these numbers
23  would have come have.
24      Q.  You know what, it's a short report,
```

```
1   there are only a couple of tables that look like
2   the table that you have here, so I think we can
3   really get to the heart of the issue here pretty
4   quickly.
5       A.  Okay.  I will be happy to look through
6   it then.
7           (Witness reviewing document.)
8       A.  The print is getting small.
9       Q.  My understanding is that's how the
10  copy came over to us.
11          (Witness reviewing document.)
12      A.  So I've looked through the report.  I
13  have not, obviously, read every page.  And I'm
14  sorry, let me just put the clip back on.  I
15  apologize.
16      Q.  I think it slipped under here
17  (handing).
18      A.  Thank you, sir.
19          I have looked through the report.  I
20  have not read every page.  And some of the pages
21  the type was too small and fuzzy for me to read.
22  From what I did look at, I did not see a table
23  with these exact numbers in it in Dr. McCann's
24  report.
```

```
1       Q.  And to be clear, Professor Cutler, all
2   of your calculations of the percent of harms
3   attributable to distributors' misconduct rely on
4   these percentages in Table J.1, right?
5       A.  Let me say that slightly differently.
6   What I was asked to do in Appendix J was to
7   demonstrate to the Court how one could use data
8   on misconduct associated with distributors.  So that
9   infer what the harms from that were.  So that
10  was a task I was given.
11          And so I developed the model that
12  would be able to use the data -- use any inputs
13  about the harms from distributors' misconduct --
14  excuse me, use data from the percentage of
15  shipments attributable to distributors'
16  misconduct to estimate the harms that resulted
17  from that.
18          The model that I built is independent
19  of the specific percentage of shipment
20  attributable to distributor's misconduct.  So it
21  takes that as an input and gives an output which
22  is what are the harms associated with that by
23  type of agency in the counties.
24          If the court for whatever reason or
```

```
1   any expert would like to put in a different set
2   of inputs, the model is exactly correct, and the
3   model would give the correct outputs.
4   Obviously, if the inputs change, the outputs
5   will change.  The model that I built is not
6   affected by anything that is associated with any
7   particular percentage like what is in Table J.1.
8       Q.  I want to focus for purposes of this
9   question on the outputs.  I think maybe the
10  easiest way to do it is to look at Table J.2 and
11  Table J.3.  The percent impact calculated in
12  both Table J.2 and J.3 relies on the percentages
13  in Table J.1, correct?
14      A.  That is correct, the specific numbers
15  in terms of the percentage impact in column M in
16  Table J.2 and column E in Table J.3 do depend on
17  the input that's provided -- that is used, in
18  this case the input from Table J.1.
19      Q.  So if we go back to Paragraph 6 of
20  your report --
21          MR. KO:  Paragraph 6 of Appendix J?
22          MR. KNAPP:  Paragraph 6 of Appendix J.
23      A.  Oh, I'm sorry, this --
24  BY MR. KNAPP:
```

1    Q.   Yeah.  Stay where you are.

2    A.   Okay.

3    Q.   You say that the data in Table J.1 was

4  provided to you by counsel, you say, "I

5  understand will be set forth in reports

6  disclosed on April 15, 2019."

7         Is it fair to say as we sit here right

8  now that you don't know which expert report is

9  the source of the data in Table J.1?

10   A.   I'm reporting here what was true at

11  the time that I filed this report, and at that

12  time these data had been provided to me by

13  counsel, and I had been -- they had -- counsel

14  had indicated to me that they would be in

15  reports disclosed on April 15th.

16        I do not know whether in the

17  interim -- for example, this report is dated

18  April 3rd.  I don't know whether there is any

19  subsequent report or whether -- or what exactly,

20  so I literally don't know any more than that I

21  was told that the report would be filed on

22  April 15th.  And I'm accurately saying what I

23  was told here.

24   Q.   Okay.  You're not independently

1  qualified to opine on whether the defendants --

2  whether any of the defendants here violated the

3  CSA, right?

4    A.   I am not making a determination as to

5  whether the defendants violated the CSA.

6    Q.   And we talked about unique attribution

7  of harms in connection with the report as a

8  whole, but I want to ask you specifically to the

9  model in Appendix J.

10        You do not attempt to uniquely

11  attribute harm between any different type of

12  defendant in Appendix J, correct?

13        MR. KO:  Object to the form.

14   A.   Can you just explain by you mean --

15  what you mean by "you do not attempt to

16  distribute to any particular type of defendant,"

17  what you mean by "type of defendant" in that

18  sentence?

19  BY MR. KNAPP:

20   Q.   You said distribute, and I may have

21  said distribute.  I meant uniquely attribute,

22  with an A, not a D.

23        But when I say type of defendant, I

24  mean manufacturer, distributor, pharmacy, so let

1  me ask you that.

2         In this model you do not attempt to

3  uniquely attribute harm between the different

4  types of defendants in this lawsuit, right?

5         MR. KO:  Object to the form.

6    A.   In the model that I develop as a

7  whole, there is nothing that says how the harm

8  gets attributed to any particular defendant.

9         The model can then take as an input

10  the percentage of shipments associated with

11  misconduct of all the parties as a whole, some

12  of the parties, some particular group of

13  parties, and then use that to come up with an

14  output.  But I myself do not come up with that

15  attribution.

16  BY MR. KNAPP:

17   Q.   And in this model, Appendix J, you're

18  not attempting to and you do not uniquely

19  attribute harm, any of the harms that you

20  analyzed, to any particular defendant, correct?

21        MR. KO:  Object to the form.  Asked

22  and answered.

23   A.   That's correct.  Appendix J is not

24  looking at any single defendant.  It's merely

1  showing how to take an estimate of

2  distributors' -- in this case an estimate that

3  was provided to me of distributors' misconduct

4  and calculate the harms that result from that.

5  And nothing in Appendix J is specific to any

6  single defendant.

7         MR. KNAPP:  Why don't we take just a

8  five-minute break, and I'll be turning over the

9  mic here.

10        THE VIDEOGRAPHER:  The time is

11  2:19 p.m., and we're off the record.

12        (Whereupon, a recess was taken.)

13        THE VIDEOGRAPHER:  The time is

14  2:36 p.m., and we're on the record.

15        EXAMINATION

16  BY MR. HALLER:

17   Q.   Good afternoon, Professor Cutler.  I'm

18  David Haller.  We've just had a chance to meet

19  very briefly just before we went on the record.

20  You will not be as impressed by my econometric

21  knowledge as you were by Mr. Knapp's, so I hope

22  you'll be a little patient with me.

23   A.   I will do my best.

24   Q.   Now, near the end of your analysis,

1  one of the things you arrive at is a percent
2  impact, right, a percent of harms attributable
3  to defendants' misconduct, and your endpoint
4  there is a percent impact, correct?
5      A.   That is correct.  I estimate an
6  endpoint which is the percentage of harms which
7  are attributable to defendants' misconduct.
8      Q.   And then your final step is to apply
9  that percentage to certain assumed dollars spent
10 by the counties in various areas, correct?
11     A.   I do not apply it specifically to the
12 dollars spent by the counties.  The application
13 to the dollars spent by the counties is in
14 Professor McGuire's report.
15     Q.   What do you -- what do you apply the
16 percent impact to?
17     A.   What I estimate in my report is the
18 percentage of the activities of these agencies
19 that resulted from misconduct on the part of
20 defendants.
21     Q.   So if I, for example, refer you to
22 Table 3.13 on Page 70 of your report, you can
23 see there on the right-hand column the percent
24 impact percentages that you calculated and

1  believe to be attributable to the defendants'
2  misconduct, is that right?
3      A.   That's correct.  Column M has the
4  percentage of harms attributable to defendants'
5  misconduct under the first approach that's
6  utilized.
7      Q.   And are those percent impacts that you
8  calculated, are those for Cuyahoga County or for
9  Summit County?
10     A.   These percent impacts are for the
11 average county, in this case the average large
12 county.  They then -- so that's -- that's a sort
13 of average among the set of large counties.
14 They then get applied to the specific
15 utilization of the individual counties, Summit
16 and Cuyahoga.
17     Q.   So in this case you use the same
18 identical percent impact for both Cuyahoga and
19 Summit Counties, is that right?
20          MR. KO:  Object to the form.
21     A.   Let me just be very careful in my
22 phrasing.  This part is from what is the impact
23 of shipments on harms, and then what is the
24 impact of misconduct on shipments.  So it's

1  indicating the impact of defendants' misconduct
2  on the harms.
3          So that is a number that is then
4  taken, and then that percentage is combined with
5  data that is directly from Cuyahoga and Summit
6  County to estimate the specific harms in each
7  division for each of the relevant agencies.
8  BY MR. HALLER:
9      Q.   My question is whether you applied the
10 exact same percent impact both to the Cuyahoga
11 divisions and to the Summit divisions.
12          MR. KO:  Object to the form.
13     A.   Yes, because this part is based on the
14 national model, these percentages are applied to
15 both Cuyahoga and to Summit County.
16 BY MR. HALLER:
17     Q.   And you understand that the shipments
18 into Cuyahoga and Summit were not identical
19 through the relevant period, is that right?
20          MR. KO:  Object to the form.
21 Relevance.
22     A.   That's --
23          MR. KO:  Go ahead and answer.
24          THE WITNESS:  I'm sorry.  I'm sorry.

1  I'm sorry.
2          MR. KO:  I'm sorry.  Object to the
3  form.
4          Go ahead and answer.
5      A.   That is correct, the shipments into
6  Cuyahoga and Summit were different.
7  BY MR. HALLER:
8      Q.   And, in fact, as Professor Gruber
9  illustrates in his report, the shipments into
10 Cuyahoga were below the national average, and
11 the shipments into Summit were above the
12 national average, isn't that right?
13          MR. KO:  Object to the form.  Object
14 to the extent it mischaracterizes the entire
15 relevant time period that Dr. Gruber measures in
16 his report.
17          But you can go ahead and answer.
18     A.   I don't remember the specifics.  I
19 know that both -- as we said earlier, I believe
20 both Summit and Cuyahoga are near the average
21 shipments, but I don't remember precisely which
22 side of the average they would be on.
23 BY MR. HALLER:
24     Q.   Professor Cutler, I've handed you

1  what's been marked as Cutler Exhibit 16.  It's

2  the report of Professor Gruber.

3         (Whereupon, Cutler Exhibit Number 16

4         was marked for identification.)

5  BY MR. HALLER:

6     Q.   Can you turn to Page 43?  And can you

7  see from that -- from the Figure 1.10 on that

8  page that the shipments into Cuyahoga were below

9  the national average throughout the relevant

10  period, whereas the shipments into Summit County

11  were for the most part above the national

12  average, with some exceptions?

13     A.   Yes, that is correct.

14     Q.   And throughout the period, the

15  shipments into Summit on an MME per capita per

16  day, throughout the entire period, the shipments

17  into Summit were higher than those into

18  Cuyahoga, correct?

19     A.   Yes, that is correct.

20     Q.   And even though the shipments as

21  between the two counties were substantially

22  different, you nonetheless thought it

23  appropriate to apply the exact same percent

24  impact in your analysis, is that right?

1         MR. KO:  Object to the form.

2     A.   Remember that what these are is --

3  what these percentages are are the percentage of

4  the harms that are due to the misconduct that

5  come from looking across -- that come from

6  looking across the country.  So in that case

7  there's really only one estimate that one can

8  come up with econometrically from that, which is

9  an average for the country.

10  BY MR. HALLER:

11     Q.   All right.  So my question is that you

12  applied the exact same percent impact for both

13  Cuyahoga and for Summit even though the

14  shipments into those counties were significantly

15  different, right, because, for the reason you

16  said, you're applying a national average, right?

17         MR. KO:  Object to the form.

18     A.   I'm using the same percentage because

19  the national average is the one that is

20  econometrically the more relevant one here.

21  BY MR. HALLER:

22     Q.   And is the answer to my question yes?

23         MR. KO:  Objection.  Asked and

24  answered.

1     A.   The answer is yes, and that is because

2  it is the more reasonable thing to do

3  econometrically.

4  BY MR. HALLER:

5     Q.   Thank you.  I'm always willing to let

6  you have a chance to explain your yes or your

7  no, but I'd like to get the yes or no, and then

8  we can move on a little more quickly.

9     A.   My apologies.  I thought I had.

10     Q.   Okay.  Maybe you did.

11     A.   It clearly slipped my mind.

12     Q.   Okay.  You might have.  I don't have

13  the little transcript in front of me.

14         MR. KO:  It's right here if you want

15  it.

16         MR. HALLER:  That's all right.  I can

17  only look at so many screens at once.

18         MR. KO:  All right.

19         MR. HALLER:  Unlike Mr. Knapp, I

20  can't, like, think and look at the same time,

21  and listen.

22         MR. KO:  Let's not give him too much

23  credit.

24         MR. KNAPP:  I know.

1         MR. KO:  Walk out of here with a big

2  head.

3  BY MR. HALLER:

4     Q.   And a similar question, which is you

5  applied the exact same percent impact to

6  determine harms in Cuyahoga and Summit even

7  though opioid mortality in those two counties

8  was different, correct?  Again, because you're

9  using a national average, right?

10     A.   In this particular step, I'm applying

11  the same percentage.  As you know, these then

12  get applied to detailed data from Cuyahoga and

13  Summit that are county-specific.

14     Q.   In terms of the impact from the

15  defendants' misconduct, you used the same

16  percent, but then you apply that to what you

17  think are different levels of opioid-related

18  activity in the different divisions, correct?

19     A.   That's correct, those are applied to

20  differences in opioid -- to opioid-related

21  activity that differs across the two counties.

22     Q.   Now, looking at the same table, 3.13,

23  in column A there's a list of actual mortality

24  figures.  Are those mortality figures for

1   Summit, or for Cuyahoga, or for neither?

2       A.   In column A, the actual mortality data

3   are for the set of counties as a whole.

4       Q.   So those are also national averages in

5   that column, is that right?

6       A.   Technically they're not national

7   averages because we're using only the large

8   counties.  So this is the actual mortality

9   within large counties that are analyzed in the

10  model.

11      Q.   The average for the large counties, is

12  that right?

13      A.   That is correct.  It is the average

14  for the large counties.

15      Q.   And do you know whether Summit and

16  Cuyahoga's actual mortality exceed or are less

17  than any of the figures in column A?

18      A.   I know that after 2010, opioid-related

19  mortality in both Summit and Cuyahoga increased

20  quite rapidly into amongst the highest tier of

21  counties that we examined.

22          In the period -- column A specifically

23  is referring to the period before 2010.  And I

24  don't recall exactly where they are relative to

1   the mean.  I do recall that they were not very

2   far from the mean amongst counties.

3       Q.   And you said that their mortality went

4   into one of the highest tiers after 2010.  Were

5   you referring to both counties, or one of them,

6   and to what extent?

7       A.   So I don't have the exact chart in my

8   report so I want to be careful and indicate that

9   I'm giving a recollection as opposed to citing a

10  specific fact which would be in the report.

11          My recollection is that mortality

12  increased very significantly in both Cuyahoga

13  and Summit Counties.  As I say, my guess is it

14  would be in Professor Gruber's report, and so

15  I'd be happy to look through it -- or I would

16  want to look through it to confirm that

17  statement.

18      Q.   As we saw previously, the shipments

19  into Cuyahoga were below the national average,

20  correct?

21      A.   That's correct.  Professor Gruber's

22  report showed that shipments into Cuyahoga were

23  a little bit below the national average.

24      Q.   And if shipments affect mortality

1   everywhere in accordance with your coefficient,

2   how do you explain the fact that Cuyahoga's

3   mortality went into what you said was the

4   highest tier, as did Summit's, even though

5   Cuyahoga's shipments were significantly below

6   Summit's?

7       A.   What the data and the model that I

8   estimate and other models in the literature

9   estimate are that initially people took and

10  became addicted to prescription opioids.  After

11  2010, the increase in price and decreased

12  availability of prescription opioids led people

13  to substitute, to wish to substitute into

14  illegal opioids, first heroin and then fentanyl.

15  That was economically an increase in demand for

16  illegal opioids.  That increase in demand would

17  be related to the overall extent of prescription

18  opioid addiction abuse as well as to utilization

19  of specific substances, for example, OxyContin

20  or oxycodone, as shown in the papers that are

21  referenced.

22          The increase in demand differed across

23  areas, some areas somewhat higher, some areas

24  somewhat lower.  How an increase in demand

1   translates into an increase in quantity depends

2   on the elasticity of supply as well as on the

3   change in demand.

4           So what we had in different areas were

5   changing demand for illegal substances.  In some

6   areas there was a ready market providing illegal

7   medications -- or excuse me, illegal substances

8   and/or the ability to obtain and supply those

9   illegal substances rapidly.  And so in those

10  markets, there would have been an increase in

11  the quantity of use of illegal substances that

12  might be greater than in other areas where

13  either the supply was more difficult to obtain

14  or the markets for supply were less thick, or

15  there were other things that prevented or

16  discouraged people from moving into those.

17          So the structural break in the market

18  in 2010 means that there's a lot more

19  heterogeneity in the use of illegal opioids

20  after 2010 simply because the conditions of

21  supply differ across different markets.

22      Q.   Did you do any analysis by which you

23  can specify the differences between Cuyahoga and

24  Summit such that they both ended up in what you

1  refer to as the highest tier of mortality, and
2  yet their shipments during the relevant period
3  were significantly different?
4          MR. KO:  Object to the form.
5      A.   Unfortunately, to do the full
6  econometric analysis here unfortunately would
7  require data on the nature of the illegal market
8  in different areas, how extensive it was
9  beforehand, the ability to obtain different
10  types of medications, the ability to distribute
11  them in different ways more or less efficiently;
12  that is, at low cost.
13          Data on those are not available.
14  They're not available in an area.  They're not
15  available across areas.  So the econometric
16  analysis one would want to use is not available
17  to be used in this case.
18  BY MR. HALLER:
19      Q.   Did you make any attempt to do an
20  analysis of the type I just described that did
21  not rely on crime data of the type that you've
22  just referenced?
23      A.   I'm sorry.  Can you repeat the
24  question, sir?

1      Q.   I think you said that the reason, or
2  one of the reasons you didn't do any analysis to
3  explain the difference as between Cuyahoga and
4  Summit is that you didn't have the crime data
5  that you would have liked in order to do that,
6  is that right?
7      A.   It's not the crime data.  It's data on
8  the supply conditions in the market.  For
9  example, how easy was it for people who were
10  moving illegal drugs to be able to obtain --
11  people who were selling illegal drugs to be able
12  to obtain them, to be able to communicate with
13  customers efficiently, to be able to have access
14  to products as appropriate and so on.
15          So it's not necessarily the crime,
16  it's the market which -- clearly the market is
17  engaged in illegal activity, but it's not the
18  crime outcome that would be the defining feature
19  there.
20      Q.   So you were able to do your national
21  level regression without that data, correct?
22      A.   That's correct.  The national level
23  analysis goes up to the period of 2010 where
24  there was not a very significant role for deaths

1  due to illegal opioids, where a lot more of the
2  deaths were due to legal opioids.  And so
3  economically it was reasonable to estimate the
4  model through that period of time, whereas
5  economically it was not reasonable to estimate
6  it after that period of time.
7      Q.   So let's focus on the period 2010 and
8  prior.  Did you make any attempt to do any
9  analysis that would explain differences between
10  Cuyahoga and Summit such that they had similar
11  levels of mortality but significantly different
12  levels of shipments?
13      A.   So we have the -- the model that would
14  be most informative to that question is the
15  direct model for opioid mortality rate changes
16  from 1993, '95, to 2000, '10.  And so what that
17  model does is it looks at the impact of
18  shipments per capita on mortality rates, and
19  then controls for a number of other factors.
20          And I think the question that you're
21  asking is do those controls for other factors
22  help to understand the difference between how
23  shipments in the two counties are related
24  relative to how mortality in the two counties

1  are related.
2          I haven't done the specific analysis
3  that you are suggesting, which is to see after
4  controlling for these other factors whether one
5  can help -- whether that -- how that sheds light
6  or what light that sheds on the relative
7  difference in the change in the mortality rate
8  in two counties in comparison to the relative
9  difference in the shipments of opioids to those
10  areas.  It is something that could be done, but
11  I have not done so.
12      Q.   I think in response to one of the
13  questions from Mr. Knapp you suggested -- and my
14  notes might not be perfect on this -- that it
15  was impossible to have a coefficient for each
16  county, is that right?
17      A.   That's correct.  There's only one
18  observation per county here.  So the regression
19  has 400 observations.  Each county is
20  represented once.  So this is, if you will,
21  looking at a scatterplot of what is the change
22  in mortality -- opioid-related mortality in the
23  county as related to shipments of opioids to the
24  county while adjusting for the many other

Highly Confidential - Subject to Further Confidentiality Review

1  factors that go on.

2       But each county is in this regression

3  only once, so there's no way from this to

4  estimate a separate relationship between

5  shipments per capita and mortality in any single

6  county as it would compare to a different

7  county.

8       Q.   But if you wanted to do an analysis of

9  Summit versus Cuyahoga, you could do a panel

10  regression to examine that relationship,

11  correct?

12       A.   That is correct.  So a different

13  methodology would be to use a panel data model

14  where one took data for Summit and saw whether

15  one could explain the increase in mortality by

16  shipments in Summit, and then compared that to a

17  model estimated for Cuyahoga where one would see

18  whether the increase in shipments in Cuyahoga

19  were related to mortality in Cuyahoga.

20       So with that kind of panel model for

21  the two -- for each of those two counties, that

22  would be a different way of estimating the

23  relationship between shipments and mortality in

24  the two counties.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.   But you didn't do that, correct?

2       A.   I didn't do that.  And I judged this

3  model to be superior economically, and so let me

4  just give you a little bit of a sense about why

5  that's the case.

6       First, the time series data on which

7  those models would be based would be a very

8  short time series for each county, so it would

9  really only have, for example, 11 years if one

10  wanted to look by specific type of opioid

11  mortality, or 15, roughly, years if one wanted

12  to look for any opioid mortality rate.

13       And, in general, econometrically you

14  don't want to be estimating models where you

15  want to be controlling for lots of independent

16  variables with very short time periods like

17  that.  That's not something that economically

18  one would want to do.

19       In addition, in a model like that, one

20  would have to make very stringent assumptions

21  about what is the relationship between --

22  exactly between shipments in any one year and

23  mortality in any set of subsequent years.  And

24  doing that in a very -- what's called a

Highly Confidential - Subject to Further Confidentiality Review

1  high-frequency sense, that is, year to year,

2  it's very difficult to know how to make that

3  assumption because the harms from opioid use in

4  any one year may not translate into -- or the

5  deaths from opioid use starting in any one year

6  may not translate -- may not be apparent until

7  several years later.

8       So it would require a lot more in the

9  degree of assumptions to make -- to estimate a

10  model that way.  As a result, I concluded that

11  econometrically this was a much superior method

12  than to do individual county time series

13  analysis.

14       Q.   And are those -- is that the totality

15  of the reasons why you think a panel analysis

16  wouldn't be appropriate and why you didn't do

17  it?

18       MR. KO:  Object to the form.

19       A.   I just want to be clear.  What you had

20  suggested was to do a model for each county

21  separately.  That's not a panel model in quite

22  the same way that you're -- the word panel model

23  refers to something different.  So I was giving

24  you an explanation as to why one would not want

Highly Confidential - Subject to Further Confidentiality Review

1  to do a model separately by -- for each county.

2  BY MR. HALLER:

3       Q.   Okay.  So you were addressing the

4  question of whether you could do a time series

5  for each county separately?

6       A.   That's correct.

7       Q.   Okay.

8       A.   That's the answer that I was giving.

9  I apologize if that's not the question you asked

10  me.

11       Q.   That's fine.

12       And that's something that someone

13  could have done, but you didn't do it because

14  you think there's not enough years to do that

15  well, correct?

16       A.   That's one reason.

17       And then the other reason why is

18  because it would require making very specific

19  assumptions about the timing of when shipments

20  affect mortality in a particular time

21  relationship that one doesn't have to make over

22  a longer period of time.

23       Q.   What is your assumption about the time

24  period by which it takes shipments to affect

1  mortality?

2      A.  I'm not really making an assumption

3  about that.  I'm looking at the totality, or in

4  this case the average of the shipments over the

5  entire time period.  So I don't -- so I'm

6  explicitly not specifying what an exact

7  relationship would be like, in part because I

8  don't have a very firm basis for doing so.

9      Q.  So to get us on the same page, so we

10  just discussed a time series that could have

11  been done, but you didn't do for the reasons you

12  stated.

13          Another suggested way that I had to do

14  this, if you wanted to look at these two

15  counties separate and apart from the national

16  level, sort of total county level analysis, is

17  you could have done a panel regression which

18  included these two counties, either just those

19  two counties or with a few other counties, to

20  assess the individual affect of shipments on

21  these counties, correct?

22          MR. KO:  Object to the form.

23      A.  That's correct.  One could have done a

24  panel model where one allowed the coefficient on

1  shipments to differ between these counties and

2  other counties.

3          Again, that faces the same issue,

4  which is that in order to identify the effect

5  for these counties, one would, in essence, be

6  using roughly 15 years of data.  So you'd be

7  looking for a different relationship between

8  shipments and mortality in these counties

9  relative to other counties, and you'd only have

10  15 years of data to do so.

11          In addition, you'd have to specify

12  very strictly what that relationship looks like.

13  And econometrically it's very difficult to

14  estimate something with only 15 years of data in

15  a time series context and really get a different

16  estimate.  That's not something that

17  econometrically is a very comfortable regression

18  to be estimating.

19  BY MR. HALLER:

20      Q.  How many jurisdictions do you think

21  are too few to run the panel regression?  I

22  mean, you thought 400 was plenty for your

23  analysis, right?  How many is too few?

24          MR. KO:  Object to the form.

1      A.  This is a cross-section analysis, so

2  it's not a panel because each observation is

3  here only once.

4          So if you -- if I'm understanding your

5  question correctly, which is you, David, clearly

6  feel comfortable estimating this with 400

7  observations, how many observations would have

8  been too few, I don't -- there's no hard and

9  fast econometric statistics rule that says when

10  is there too few.

11          In general, we have a lot of

12  independent variables.  We have something like

13  45 independent variables in this model.  That's

14  a lot.  And so you need a reasonable amount of

15  data in order to estimate that.  You need

16  obviously at least 45, but you need many more

17  observations than that in order to estimate this

18  model.

19          So the more things you want to control

20  for, which as we've discussed we wanted to

21  control for a lot, the more observations that

22  you need, and the less you can rely on very,

23  very small sets of data.

24  BY MR. HALLER:

1      Q.  So do you have a view on what the

2  minimum would be in order to do what you would

3  believe to be a sufficient panel analysis by

4  which one could derive coefficients for Summit

5  and Cuyahoga?

6          MR. KO:  Object to the form.

7      A.  I don't have a specific number, so

8  there's not a statistical number of counties

9  that one would give.  But, in general, you would

10  have to do -- you would have to have -- if you

11  wanted to make one group of counties have a

12  different coefficient than another group of

13  counties, you would need, in my estimation, far

14  more than two counties to do that.  I would be

15  very surprised if the standard errors would

16  permit doing that for just two counties.

17  BY MR. HALLER:

18      Q.  Could you do it with five Ohio

19  counties?

20      A.  So there's not a statistical basis in

21  order to say yes or no.  If you said to me as a

22  scholar, suppose that someone submitted a paper

23  and you were reviewing a paper where they have

24  estimated a panel model with five counties and a

1  lot of controls and a time series relationship
2  that's complex to specify, I would be very
3  skeptical going in that that methodology would
4  yield results that I would judge to be credible.
5  BY MR. HALLER:
6      Q.   Did you try or consider doing such a
7  panel analysis?
8      A.   I did not do a panel analysis.  I did
9  not do a panel analysis.  In terms of
10  consideration, we talked about all sorts of ways
11  to do things, but I did not estimate a panel
12  model or -- certainly not a panel model
13  that -- with separate coefficients for these
14  bellwether counties.
15      Q.   Professor Cutler, I want to circle
16  back to the question of the four counties that
17  you left out of your regression.  Those were the
18  four counties that had the highest level of
19  shipments during the relevant period, correct?
20          MR. KO:  Object to the form.
21      A.   Those four counties had not just the
22  highest level, but extremely high levels, so
23  they were very different from the other counties
24  that were included.

1  BY MR. HALLER:
2      Q.   And I take it they did not have the
3  four highest levels of opioid mortality change,
4  is that right?
5      A.   I don't recall exactly the opioid
6  mortality change in those -- with those four
7  counties.  I do recall that the regression
8  coefficients were not very materially different
9  when those four observations were included or
10  excluded.
11          And so as an econometrician, one of
12  the things that you always do is you look for
13  outliers in the data, and to the extent there
14  are outliers, you need to decide whether they're
15  appropriately included or not included.
16          When the results don't differ much,
17  you don't have to worry about it so much, so I
18  didn't have to inspect each one individually.
19  But given what I knew about potential for
20  transshipments and given the very significant
21  outlier status of those counties, I made the
22  decision not to include them in these models.
23      Q.   So to go back to my question, you
24  don't know as we sit here today whether those

1  four counties did or did not have the four
2  highest levels of opioid mortality change, is
3  that right?
4      A.   I do not know exactly where they fall
5  in the distribution of mortality rate changes.
6      Q.   Do you -- is it your recollection that
7  not all of them were in the top four for opioid
8  mortality change?
9      A.   I don't recall.  And so rather than
10  saying something incorrect, let me just repeat
11  that I don't recall exactly where they stood in
12  that.
13      Q.   Is there something in your report you
14  can refer to to determine what the -- whether
15  those four excluded counties had the highest
16  level of opioid mortality change or not?
17      A.   Unfortunately, no, I don't believe I
18  included any specific analysis of those four
19  counties in either the report or the
20  supplemental data appendix.
21      Q.   So in your direct model, when you
22  excluded those four counties, you said that this
23  change was small to your coefficient, but
24  directionally, once you excluded them, did the

1  coefficient go up or go down?
2          MR. KO:  Object to the form.
3      A.   I don't remember, but I also
4  suspect -- we kept iterating on these models in
5  terms of making sure that we were including as
6  many variables as we could and developing new
7  data to include and so on.
8          I believe that -- although I'm not
9  100 percent certain, I think that I had made the
10  decision to eliminate those four counties before
11  we reached the final set of variables that were
12  included here.
13          So I don't have in hand and I'm not
14  sure I -- I'm not sure I knew for this final
15  specification what the impact was of excluding
16  or including those four counties.
17  BY MR. HALLER:
18      Q.   Let's look at -- let me then ask a
19  question about the impact on the model as of the
20  time that you measured the impact.
21          Given the model in its state at that
22  point when you excluded the four counties, what
23  directionally happened to the coefficient?  Did
24  it go up or go down?

1    A.  I --

2        MR. KO:  Object to the form.

3        I just want to clarify just to make

4  the record clear that obviously Professor Cutler

5  has a lot of models.  I just want to make sure

6  that the record is clear that we're talking

7  about the direct regression model right now.

8        MR. HALLER:  Right.

9    A.  I do not recall exactly what happened

10  to the coefficient.  I'm sorry, I don't recall

11  that.

12  BY MR. HALLER:

13    Q.  And is there anywhere in your report

14  where we could look to see directionally what

15  happens if you include or exclude those four

16  counties?

17    A.  No, there's nowhere in the report that

18  has it, because I made the determination at some

19  point that it was more economically appropriate,

20  econometrically appropriate to exclude those

21  counties.  So, therefore, I didn't focus on

22  examining the difference in the regression model

23  estimates with those counties included as

24  opposed to excluded.

1    Q.  So your report discloses the fact that

2  you excluded four counties, but doesn't disclose

3  the directionality of any change that that

4  exclusion had on the model, correct?

5    A.  That's correct.  The report notes the

6  exclusion.  It does not present a specific

7  analysis of that as indeed there -- let me just

8  go back.

9        There are literally hundreds of

10  decisions that had to be made about processing

11  the data, the analysis of the data.  We were

12  discussing earlier with Mr. Knapp the specific

13  time periods and so on.  So there were literally

14  hundreds of decisions.

15        I think a report that tried to

16  identify the impact of those hundreds of

17  decisions would have gone on for probably

18  thousands of pages, and so I didn't -- I didn't

19  think that that was a very valuable thing to do.

20    Q.  So because you don't know as we sit

21  here today, let's assume that if the exclusion

22  of those counties increased the coefficient,

23  then that also would have increased your percent

24  impact, and that ultimately would have increased

1  the damages numbers of Mr. McGuire, correct?

2    A.  That is correct.  If the coefficient

3  here were to increase, that would increase the

4  harms that result from misconduct on the part of

5  defendants, and, therefore, that would increase

6  the damage estimates that Professor McGuire

7  estimates.

8    Q.  Can I refer you, please, to the Table

9  J.1 that we were looking at earlier?  What

10  I'd -- what I'd like to do is compare the

11  percentages that are on Table J.1 with the

12  percentages that appear in column C of your

13  Table 3.9 on Page 62.

14        Do you have any understanding as to

15  whether -- what the relationship is between the

16  percentages that appear on J.1 as compared to

17  the percentages that appear in column C of Table

18  3.9?

19        In other words, are the shipments that

20  are attributable to distributors' misconduct --

21  let me put that another way.

22        Are the shipments attributable to

23  defendants' misconduct that appear in column C,

24  are those a subset of the shipments attributable

1  to distributors' misconduct in Table J.1, or are

2  they like some sort of an overlapping Venn

3  diagram, or what is the relationship between

4  those two?

5        MR. KO:  Object to the form.

6    A.  Let me answer your question I think as

7  I understand it, and you then please tell me if

8  I'm not getting your question correctly.

9        The estimates in column F of Table 3.9

10  come from Professor Rosenthal's analysis and

11  refer to the cumulative percent of shipments

12  attributable to defendants' misconduct.  Those

13  are her estimates based on looking at the data

14  that she does on the promotion of -- the

15  misconduct associated with the promotion of the

16  drugs at issue here and then translating that

17  through her econometric methodology into the

18  percentage of shipments that they would have --

19  that they resulted in.

20        Appendix -- Table J.1 in Appendix 3.J

21  is an estimate of Mr. McCann about shipments --

22  percentage of shipments attributable to

23  distributors' misconduct.  I do not know -- and

24  so it's not the entirety of the defendants in

1  this case.  It's just the distributors.

2         I do not know how Mr. McCann went

3  about estimating this, so I did not see his

4  report.  These numbers were given to me so that

5  I could demonstrate to the court how with data

6  on the percentage of shipments attributable to

7  distributors' misconduct one could then estimate

8  the harms that result from that.

9         So my analysis of these data is not to

10  endorse them or not to say anything about them

11  other than that with data like this, one could

12  estimate the harms that result from

13  distributors' misconduct.

14  BY MR. HALLER:

15     Q.  You just referred to Mr. McCann a

16  couple times.  Footnoting, you and Mr. Knapp

17  established that we don't know if these figures

18  actually came from Mr. McCann, right?

19     MR. KO:  Object to the form.

20  BY MR. HALLER:

21     Q.  The J.1 numbers.

22     MR. KO:  Object to the form.

23     A.  The only thing I can say here is

24  that --

1  BY MR. HALLER:

2     Q.  You got them from counsel?

3     A.  I got them from counsel.  That is the

4  one statement that I can say with certainty.

5     Q.  And I just wanted to say in your last

6  answer when you referred to Mr. McCann, that was

7  shorthand for you got them from counsel, right?

8     A.  That's --

9     MR. KO:  Object to the form.

10     A.  That is correct.  I do not wish to say

11  anything other than that.

12  BY MR. HALLER:

13     Q.  And my question is pretty simple, and

14  I think I know the answer, which is that you

15  don't know, but I just want to make sure that

16  you don't know.

17         So if we look, for example, at 1997,

18  Ms. Rosenthal says that 18 percent of shipments

19  are attributable to defendants' misconduct.

20  Counsel says that 50 percent of shipments are

21  attributable to distributors' misconduct.

22         Are those the same shipments or are

23  they two -- are different shipments that add up?

24  Like is the total number of shipments, do we add

1  those two numbers, or is 18 percent a part of

2  the 50 percent, or you don't know?

3     MR. KO:  Object to the form.

4     A.  The short answer is I don't know

5  because I do not -- I do not have Dr. McCann's

6  calculations.

7  BY MR. HALLER:

8     Q.  Now, did you make any effort to

9  develop a unitary model that would -- you know,

10  a direct model that would apply throughout the

11  time period including past 2010 through the

12  addition of additional variables such as maybe a

13  heroin price variable or a fentanyl availability

14  variable?

15     MR. KO:  Object to the form.  Asked

16  and answered.

17     A.  The data that one would need to do

18  that is not price data.  Price data are not the

19  appropriate ones there because the data that we

20  have through 2010 are shipments of opioids which

21  are a proxy for consumption of opioids.

22         The comparable data that one would

23  need post 2010 would be ideally consumption of

24  total opioids, legal or illegal, or in the case

1  of the proxy, shipments to an area of opioids,

2  legal and illegal.  So one actually needs the

3  quantity data, not the price data, to do the

4  regression.

5  BY MR. HALLER:

6     Q.  Did you read the transcript of

7  Professor Gruber's deposition?

8     A.  No, I have not read the transcript of

9  Professor Gruber's deposition.

10     Q.  And have you spoken to Professor

11  Gruber in between the time of his deposition and

12  yours?

13     A.  I have not spoken with Professor

14  Gruber between the time of his deposition and

15  mine.

16     Q.  Did you read Mr. Gruber's report --

17  his final report after it was issued?

18     A.  Yes, I did read Professor Gruber's

19  final report.

20     Q.  Did you read any drafts of Professor

21  Gruber's report prior to its being issued?

22     A.  Yes, I did read drafts of Professor

23  Gruber's report prior to when it was issued.

24     Q.  And when you read Professor Gruber's

1   report, was there -- when you read the draft,

2   did you -- was there anything that you thought

3   was incorrect that you asked him to correct?

4          MR. KO:  I'm going to instruct -- at

5   this point instruct Professor Cutler not to

6   respond to the extent any of those

7   communications involved counsel or with counsel.

8   BY MR. HALLER:

9      Q.   My question is non-substantive.

10          Did you have a correction or did you

11  not have a correction to any of his drafts?

12          MR. KO:  Well, and I'm instructing you

13  to the extent that these purported corrections

14  involved communications with or involving

15  counsel, I'd instruct you not to answer.

16     A.   All of these communications involved

17  counsel.

18  BY MR. HALLER:

19     Q.   Focusing on Professor Gruber's final

20  report, is there anything in it that you think

21  is wrong?

22     A.   There's nothing in Professor Gruber's

23  report that I think is incorrect.

24     Q.   And do you agree with all the

1   statements in Professor Gruber's report?

2      A.   I agree with all the conclusions that

3   Professor Gruber reaches.  I think when you say

4   do I agree with all of the statements, I

5   don't -- what I hear when you say that is do you

6   agree with every sentence that Professor Gruber

7   has written.  And I don't know for sure whether,

8   just because I haven't -- I didn't do that, I

9   don't know for sure whether if you chose every

10  single sentence I would agree with it.  But his

11  conclusions I certainly agree with.

12     Q.   Professor Gruber in Paragraph 74 says

13  that prescriptions drive shipments to an area.

14  Do you agree with that?

15          MR. KO:  Let him get there.

16     A.   I'm sorry.  I'm sorry.  Can you just

17  point me to the specific --

18  BY MR. HALLER:

19     Q.   Yes.  In Paragraph 74 on Page 52 in

20  the second line, Professor Gruber says,

21  "Prescription activity" -- and I'm going to omit

22  the word "which" -- but "Prescription activity

23  drives shipments to an area."

24          Do you see that?

1      A.   Yes, I do see that.

2      Q.   Do you agree with that statement?

3          MR. KO:  Object to the form, and

4   object to the extent it mischaracterizes the

5   complete sentence of Paragraph 74 in the Gruber

6   report.

7      A.   What Professor Gruber is talking about

8   in this sentence is that he's making the point

9   that per capita shipments, many of which are

10  associated with prescriptions, although, as we

11  were talking about earlier, not everyone is

12  associated with its own prescription, but many

13  of which are associated with prescriptions bears

14  little relationship to medical need.  That

15  statement that per capita shipments bears little

16  relationship to medical need is something that I

17  agree with.

18  BY MR. HALLER:

19     Q.   My question is, do you agree with the

20  clause in the middle of the sentence which says

21  that "Prescription activity drives shipments to

22  an area"?

23          MR. KO:  Clause relative to what?  I'm

24  going to object to the form, and also object to

1   the extent it mischaracterizes the complete

2   sentence in Paragraph 74 of the Gruber report.

3      A.   I do not read Professor Gruber's

4   sentence to mean that he believes that

5   prescriptions are independent variable and that

6   the prescriptions explain shipments

7   independently of any misconduct on the part of

8   defendants.

9          That is, put another way, I do not

10  believe that Professor Gruber believes the

11  causal chain -- I do not read the sentence as

12  Professor Gruber suggesting that the causal

13  chain begins with a prescription and not -- and,

14  therefore -- and I do not read this as him

15  saying that the causal chain does not begin with

16  misconduct on the part of the defendants.

17  BY MR. HALLER:

18     Q.   Well, let's put aside causality for a

19  moment.  Do you believe that prescription

20  activity is very highly correlated with

21  shipments?

22     A.   The data that we have from Professor

23  Rosenthal's report as well as -- I believe other

24  data in the literature, but certainly in

1    Professor Rosenthal's report is that
2    prescriptions track shipments very well over
3    time.
4        Q.  So with regard to your direct model,
5    if instead of using shipments you had used
6    prescription activity, if you had data for
7    county-by-county prescription activity, do you
8    believe that your model would generate
9    substantially the same coefficient with
10   prescription activity driving opioid mortality?
11           MR. KO:  Object to the form.
12   Objection, scope.
13       A.  The coefficient would certainly be
14   different.  The coefficient is in terms of the
15   relevant units.
16           So in the case of the shipments to the
17   area, the units are milligrams of morphine
18   equivalent per capita.  In the case of
19   prescriptions, it might be something like number
20   of prescriptions per capita.  Those units are
21   not the same, so the coefficients should be
22   extremely -- would be expected to be very
23   different from those regressions.
24   BY MR. HALLER:

1        Q.  So what if -- what if we convert the
2    prescriptions to milligram equivalents,
3    milligram morphine equivalents, my question is,
4    if you had run your direct regression using
5    prescription activity, do you believe that it
6    would result in substantially the same
7    coefficient in relation to driving opioid
8    mortality?
9            MR. KO:  Objection, form.  Objection,
10   scope.
11       A.  I don't want to hazard a guess as to
12   what the coefficient would be.  In general --
13   and I also want -- would want to compare the two
14   series.  The ARCOS data includes, I believe it
15   is six different categories of where drugs are
16   shipped to.  The prescriptions may only capture
17   one of those areas or potentially more than one.
18           In order to judge those two, which,
19   first off, I don't -- I don't have an
20   econometric way to estimate whether they would
21   be similar.  But in order to judge those two,
22   what I would want to see is which one is picking
23   up more of what we think would be the shipments
24   that would be associated with harms, those that

1    come from prescriptions themselves or those that
2    come from all shipments to all the retail
3    categories that are picked up in ARCOS.
4    BY MR. HALLER:
5        Q.  So we established a moment ago that
6    prescription activity is very highly correlated
7    with shipments, right?  That's what you've said.
8        A.  Certainly in aggregate they're very
9    highly correlated.
10       Q.  So don't you have the belief that if
11   you pulled out shipments from your direct model
12   and dropped in prescription activity which is
13   very highly correlated that your model would
14   show substantially the same result?
15           MR. KO:  Object to the form.
16   BY MR. HALLER:
17       Q.  Same relationship?
18           MR. KO:  Objection to the form.
19   Objection to scope.
20       A.  You're asking me to speculate about an
21   econometric analysis with different variables.
22   What I'd really like to do is to get more
23   information on not just the aggregate time
24   series relationship between them, but on the

1    cross-sectional relationship between them before
2    I make that -- before I make a statement about
3    that.  The aggregate time series correlation is
4    not the correlation that would be relevant for
5    the hypothetical that you're suggesting.
6    BY MR. HALLER:
7        Q.  So the short answer is you don't know,
8    is that right?
9            MR. KO:  Object to the form.
10   BY MR. HALLER
11       Q.  You'd need more data to know; you
12   wanted to look -- you'd want to look at it a
13   little more closely?
14           MR. KO:  Object to the form.
15       A.  The short answer is that in order to
16   consider any change in the model, in any model,
17   not just this model, in any model that one does
18   as an economist and as an applied economist, you
19   need to understand exactly the data that you're
20   using.  And it's hazardous to speculate about
21   what an empirical relationship ought to be
22   before you do the analysis.
23   BY MR. HALLER:
24       Q.  Did you make any effort to run your

Highly Confidential - Subject to Further Confidentiality Review

1   direct model using prescriptions instead of

2   shipments?

3          MR. KO:  Objection.  Asked and

4   answered.

5      A.   No, we did not have the data with

6   which we could estimate the model with

7   prescriptions.

8          MR. HALLER:  Why don't we go off the

9   record.  We might have one more switch.

10         THE VIDEOGRAPHER:  The time is

11  3:29 p.m., and we're off the record.

12         (Whereupon, a recess was taken.)

13         THE VIDEOGRAPHER:  The time is

14  3:31 p.m., and we're on the record.

15                EXAMINATION

16  BY MR. GEISE:

17     Q.   Good afternoon, Professor Cutler.  My

18  name is Steve Geise.  We had a chance to meet

19  earlier in the deposition.  I'm with the Jones

20  Day law firm, and I represent Walmart in this

21  case.

22     A.   Can you just spell your last name for

23  me?

24     Q.   I sure can.  It's G-E-I-S-E.

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Thank you, sir.

2      Q.   Professor Cutler, we don't have a lot

3   of time left, and the good news is I don't have

4   a lot of questions, but I do have a few

5   follow-ups on some of the things you've talked

6   about either yesterday or today.

7          I would like first to direct your

8   attention to Exhibit 9, which is the Evans

9   article that you discussed yesterday.

10     A.   Yes, sir.

11     Q.   And in particular, if I could ask you

12  to turn your attention to Page 3 of Exhibit 9,

13  if you look at the first full sentence on the

14  left-hand column of Page 3, Evans and his

15  co-authors write, "The Food and Drug

16  Administration (FDA) has promoted the

17  development of abuse-deterrent opioids to

18  pharmaceutical companies and worked with

19  manufacturers to bring these products to market

20  as quickly as possible."

21         Do you see that?

22     A.   Yes, I do see that.

23     Q.   And the Evans article and other

24  articles you discussed both in your report and

Highly Confidential - Subject to Further Confidentiality Review

1   during your deposition look to, in particular,

2   the reformulation of OxyContin in 2010, correct?

3      A.   They certainly used the reformulation

4   of OxyContin to understand the trends in markets

5   and harms associated with opioids, in particular

6   the transition from legal to illegal opioids.

7      Q.   And you would agree that the purpose

8   of a reformulation of an abuse-deterrent form of

9   a drug is to deter abuse of the drug, is that

10  accurate?

11         MR. KO:  Object to the form.

12     A.   My understanding was that the idea was

13  to reduce the abuse associated with the drug.

14  BY MR. GEISE:

15     Q.   Was it known to healthcare economists

16  in 2010 that a reduction in a prescription drug

17  of abuse could cause a thickening in an illicit

18  market for drugs?

19         MR. KO:  If you can speak as to all

20  healthcare economists.

21         Object to the form.

22     A.   There has been a literature for quite

23  some time on substitution across different types

24  of drugs -- across different -- excuse me,

Highly Confidential - Subject to Further Confidentiality Review

1   across different types of substances.  So there

2   is a literature on both gateway drugs; that is,

3   one drug being used to -- being used and then

4   progressing to another drug.  And there is also

5   literature on substitution; that is, prices of

6   one drug changing leading to changes to another

7   drug -- or another substance, excuse me.

8          I do not know of an article that has

9   said it specifically with respect to these

10  particular drugs, but as a general economics,

11  health economics concept, yes, the analyses that

12  suggest this could occur -- analyses that

13  suggest this could occur, many predate 2010.

14  BY MR. GEISE:

15     Q.   At the time that the FDA was promoting

16  the reformulation of abuse-deterrent opioids, do

17  you recall if there was commentary from

18  economists about the impact it could have on

19  illicit drug markets?

20     A.   I do not recall any specific

21  commentary as to what impact this might have on

22  illicit drug markets.

23     Q.   Do you recall if the DEA offered a

24  position statement about the impact on illicit

1  drug markets that could come from the

2  reformulation of OxyContin in 2010?

3      A.  I do not recall if the DEA had any

4  statements on the potential impact of the

5  reformulation.

6      Q.  Would you agree that the literature

7  that predates 2010 with regard to an analyses

8  that could suggest that a thickening of the

9  market could occur was available to both the FDA

10  and the DEA?

11      MR. KO:  Object to the form.

12      A.  The articles that suggested possible

13  substitution of one substance to another were

14  both -- were all -- all would have been in the

15  peer-reviewed literature.  Either they would

16  have been published or they would have been

17  available as working papers which are generally

18  able to be circulated in economics.  So I

19  believe that any such analysis would have been

20  available widely.

21  BY MR. GEISE:

22      Q.  In your report and in some of the

23  articles that you cite within your report,

24  there's a reference to prescription drug

1  monitoring programs, correct?

2      A.  Yes, that is correct.

3      Q.  Professor Cutler, have you conducted

4  any research into the development and evolution

5  of Ohio's prescription drug monitoring program?

6      A.  I have not conducted any research into

7  the development of Ohio's prescription drug

8  monitoring program.

9      Q.  Do you know the acronym by which

10  Ohio's prescription drug monitoring program is

11  referred?

12      A.  I do not know the acronym specific to

13  Ohio.  In the literature in general they are

14  termed PDMPs.  They're said faster than that,

15  PDMPs.  So people tend not to refer to the

16  specific acronym for any individual state.

17      Q.  Do you know what the specific acronym

18  is for Ohio's PDMP?

19      MR. KO:  Objection.  Asked and

20  answered.

21      A.  No, I do not know the specific acronym

22  for Ohio's PDMP.

23  BY MR. GEISE:

24      Q.  Professor Cutler, if I could turn you

1  to Page 5 of Exhibit 9, still the Evans article,

2  and direct your attention to the right-hand

3  column.  Near the end of the paragraph above

4  Subsection 3 to a sentence that reads, "In the

5  population of people who use pain medicine

6  recreationally, few eventually moved to heroin.

7  According to data from the third quarter of 2010

8  through the end of 2014 in the annual NSDUH,

9  among respondents who used pain medicine

10  recreationally over the past year, less than 1

11  percent said they ever used heroin."

12      Do you see that?

13      A.  Yes, I do see that.

14      Q.  Do you agree from that data that over

15  99 percent of recreational prescription opioid

16  users ever use heroin?

17      MR. KO:  Object to the form.

18      A.  I obviously have not done the

19  calculation myself, but that is a correct

20  interpretation of that sentence.

21  BY MR. GEISE:

22      Q.  And, Professor Cutler, if I could turn

23  your attention to Page 13 of Exhibit 9.  In the

24  second paragraph under the heading "Conclusion,"

1  the authors write, "An important caveat is that

2  we are able to examine only short run impacts of

3  the reformulation.  If the stock of opioid

4  abusers is significantly reduced in the long run

5  because of the introduction of ADFs, then it is

6  likely that the stock of heroin users would also

7  be reduced in the long run.  As a consequence,

8  although there does not appear to be a reduction

9  in total opioid and heroin deaths due to the

10  reformulation of OxyContin in the first five

11  years after reform, there could be a reduction

12  in these death rates in the long run."

13      Do you see that?

14      A.  Yes, I do see that.

15      Q.  Does that caveat work opposite to a

16  thickening theory?

17      MR. KO:  Object to the form.

18      A.  No, not really.  What this caveat is

19  saying is that -- so the thickening theory is

20  that as people move from legal opioids to

21  illegal opioids, the market gets thicker, and so

22  that's what I'm citing evidence and showing

23  empirically in my report.

24      What Professor Evans and his

1    colleagues are talking about here is that that
2    is absolutely occurring in the short run, indeed
3    there are papers, one of the two that I cite in
4    this is an extremely nice paper showing this --
5    but that over time, probably in a period of time
6    after -- in fact, they speculate in a period of
7    time after those five years that a reduction in
8    the number of people who abuse opioids because
9    of abuse-deterrent formulations, there would
10   then be a reduction in the number of people
11   transitioning onto heroin simply because -- or
12   other illegal medication, illegal opioids simply
13   because there are fewer people at risk for that.
14        So he's not talking -- he's not --
15   first off, he's not talking about the first five
16   years.  And second off, he's then not talking
17   about the thickness of the markets.  He's making
18   an epidemiological statement about with fewer
19   people at risk, there will, therefore, be fewer
20   people to -- for whom that transition will
21   occur.
22        Q.   And he is suggesting that after the
23   first five years that there could be a reduction
24   in the death rates, correct?

1         A.   What he's saying -- he's not specific
2    about after the first five years.  The reason
3    why he's referring to five years here is because
4    that's the nature of his analysis, it's his
5    analysis.  So he's saying after the period of
6    time that I analyze, in which case there is
7    no -- there is no reduction.
8         It could be the case that at some
9    later time there would be a reduction if, for
10   example, fewer people begin taking prescription
11   opioids and, therefore, fewer people are at risk
12   for transitioning on to heroin.  He's not giving
13   a specific time frame other than to say he does
14   not see any evidence of that within the time
15   frame that he looks at.
16        Q.   Have you conducted any analysis of
17   your own to see if that time frame with a
18   reduction in death rates has started?
19        A.   In the report that I put together, and
20   particularly in Professor Gruber's report,
21   Professor Gruber presents the most recent data
22   on trends in mortality from opioids, and there
23   is not evidence that mortality rates from
24   opioids, combined legal and illegal opioids, are

1    declining.  So we've seen no evidence nationally
2    of any turnaround.
3         Q.   What about in Cuyahoga and Summit
4    County, have you conducted any research on that
5    issue for those two counties?
6         A.   I believe that the trends are in
7    Professor Gruber's report, and so if you'd like
8    I'd be happy to find them in Professor Gruber's
9    report.  But I don't -- without looking at his
10   report, I do not recall specifically what the
11   trend would be -- what the trends are in the
12   very last year of the market.
13        Q.   Professor Cutler, if I could ask you
14   to turn now to Exhibit 10 to your deposition,
15   and this is the Alpert article that you
16   discussed earlier today, is that correct?
17        A.   That's correct, this is the Albert, et
18   al article.
19        Q.   And if I could ask you to turn to
20   Page 7 of the article, in the top paragraph, do
21   you see where they write, "However, a review
22   article," and they cite Compton, Jones, and
23   Baldwin, 2016, "argues that the reformulation
24   and other policies are not the main drivers of

1    the heroin epidemic because heroin use began to
2    rise prior to 2010"?
3         Do you see that?
4         A.   Yes, I do see that.
5         Q.   Have you reviewed that Compton article
6    from 2016?
7         A.   Yes, I have reviewed the Compton
8    article.
9         Q.   From looking at the articles that you
10   cite in your materials considered, I notice you
11   don't list the Compton article.  Is there a
12   reason why it was omitted?
13        A.   What I tried to do in the list of
14   articles reviewed is to try and include those
15   articles that specifically had a point about
16   data or of methodology that was relevant to what
17   I was doing.
18        And I think Mr. Knapp asked the
19   question, I think it was yesterday, and I said I
20   didn't put in every academic article that had
21   anything to do with opioids because that would
22   have been a voluminous list.
23        So it was -- so that -- so that
24   article is something that informed my thinking,

1    but it did not directly inform the nature of the
2    analysis that I conducted for the report.
3         Q.    Do you recall if you have any
4    criticisms of the Compton article from 2016?
5         A.    So what's clear in the data -- two
6    things are clear in the data.  One is that one
7    sees a bit of an increase in heroin mortality
8    rates prior to 20 -- prior to 2010.  In the --
9    the Compton article shows that -- and it's also
10   shown, for example, in my Figure 3.4 show --
11   where you can see there's somewhat of an
12   increase in heroin mortality in the period just
13   before -- in the couple of years just before
14   2010.  And you can also see that in my Figure
15   3.2 on Page 33 where you can see that.
16        And so what the Compton, et al article
17   does is it notes that, and notes that there is
18   an increase in mortality from heroin in that
19   period of time, and that is actually apparent in
20   the data.
21        But then what is particularly apparent
22   in the data is the very enormous change in
23   mortality from heroin both in a jump sense and
24   in a trend sense over time.

1         And so, in part, to address issues
2    like that, I estimated the models that I did,
3    which is to try and analyze in the data where
4    the transition from legal to illegal opioids --
5    where the data suggests the transition from
6    legal to illegal opioids really began.  And the
7    data overwhelmingly believed that 2010 is a far
8    better period of time for the transition than,
9    say, 2007.
10        So I don't think the Compton article
11   is incorrect in noting the increase in heroin
12   mortality, it is absolutely there, but the far
13   bigger change is the very big jump and the very
14   rapid increase in trend beginning in 2010.
15        Q.    Is it fair to say the amount of the
16   increase is greater in 2010 than the amount of
17   the increase in 2007?
18        A.    In heroin mortality you're referring
19   to?
20        Q.    Yes.
21        A.    I believe it is the case.  I haven't
22   done the specific analysis.  But certainly
23   looking at the figures, it certainly appears to
24   be the case from, for example, Figure 3.2 in the

1    report that the increase in 2010 would be
2    greater than the increase in 2007.  But, again,
3    I haven't done the specific analysis.
4         Q.    Do you agree that there is an increase
5    in heroin mortality in 2007 through 2009?
6         A.    Yes.  In fact, you can see it quite
7    clearly in Figure 3.2 where beginning around
8    2007 there's an increase that levels off a
9    little bit somewhere in 2008, declines a little
10   bit just before 2010.
11        Q.    And in fact, if you look at Figure 1
12   to Exhibit 10, the Alpert article, they have in
13   panel C charted out drug overdose deaths due to
14   heroin, correct?
15        A.    Yes, that is correct, in panel C they
16   have drug overdose deaths due to heroin.
17        Q.    And their Figure 1, panel C also shows
18   an increase in drug overdose deaths from 2007 to
19   2009, correct?
20        A.    That's correct.  And it's clear in all
21   the data presented in the different studies that
22   heroin mortality rose a little bit from 2007 to
23   2009.
24        Q.    You agree that the rise in heroin

1    mortality from 2007 to 2009 cannot be
2    attributable to the reformulation of OxyContin
3    in 2010, correct?
4         A.    That's correct.  Those changes
5    preceded the reformulation of OxyContin, and
6    there's no indication that people had knowledge
7    that OxyContin was going to be reformulated, and
8    therefore switched drug consumption in advance
9    of that reformulation.
10        Q.    Do you agree that the increase in
11   heroin mortality in 2007 to 2009 was also not
12   due to any thickening of the heroin market
13   because of the reformulation of OxyContin in
14   2010?
15        MR. KO:  Object to the form.
16        A.    There was a compound sentence in
17   there, and so I want to separate it out.
18        Do I believe that there could be some
19   part of the increase in heroin mortality from
20   2007 to 2009 associated with the thickening of
21   illegal drug markets?  The answer to that is
22   yes, I do believe that there could be.  I'm not
23   saying for certain, but I do believe there could
24   be.

Highly Confidential - Subject to Further Confidentiality Review

1    Because remember, by 2007 there had
2    been approximately 11 or 12 years of people
3    taking medications.  The changes that occurred
4    in people's availability to medications were not
5    exclusive to the reformulation of OxyContin in
6    2010, but they involved a number of issues as we
7    were talking about yesterday with respect to
8    Figure 3.1, including actions by public and
9    private insurers and government organizations
10   and bodies recommending to physicians that they
11   not be prescribing so many opioids.
12       So it is entirely possible -- again,
13   I'm not saying as an econometric statement it's
14   true -- but it's entirely possible that this
15   could be driven by people finding it more
16   difficult to get prescription opioids in some
17   areas and, therefore, turning to illegal
18   substances, particularly heroin.
19       The part of your compound statement
20   which is certainly true is that that increase
21   would not have been associated with a thickening
22   of markets driven by the reformulation of
23   OxyContin.
24   Q.   In response to a question asked by

Highly Confidential - Subject to Further Confidentiality Review

1    Mr. Haller just a few minutes ago, you indicated
2    that some of the factors occurring in 2010 and
3    after was an increase in the price of
4    prescription opioids and a decrease in the
5    availability of prescription opioids.  Do you
6    recall that testimony?
7    A.   I do.  And just to be clear, by price,
8    I mean an economic definition of price which
9    includes both, obviously, the monetary cost but
10   also the time cost and the hassle and the
11   waiting cost and the shopping cost.  So price
12   does not necessarily mean just dollars spent for
13   the medication.
14   Q.   You would agree that the increase in
15   heroin mortality from 2007 to 2009 took place
16   prior to the price and availability changes you
17   described in 2010 and after, correct?
18       MR. KO:  Object to the form.
19   A.   I don't want to agree with the
20   sentence as you said it.  Many of the changes
21   were diffusing slowly over this time period.
22   For example, restrictions by private insurers,
23   guideline recommendations to physicians, news
24   articles creating awareness among the clinical

Highly Confidential - Subject to Further Confidentiality Review

1    community about the dangers associated with
2    OxyContin, about the misleading promotion of
3    these medications.
4        So I think there was in many ways a
5    gradual change in the willingness of physicians
6    to prescribe opioids and the specific -- in the
7    willingness, and that, therefore, the price that
8    individuals faced.
9        There was obviously one extremely
10   large change, which was the reformulation of
11   OxyContin to be abuse-deterrent.  That does not
12   mean that there were no other changes.  And, in
13   fact, Professor Rosenthal in her report goes
14   through quite a number of other things that were
15   going on that changed perceptions -- that
16   changed information and would have been expected
17   to influence perceptions of physicians about
18   whether to prescribe prescription opioids which
19   were not every single one completely synchronous
20   with the abuse-deterrent formulation of
21   OxyContin.
22   Q.   Let me ask this question, maybe make
23   it simpler.
24       You agree that the period of time from

Highly Confidential - Subject to Further Confidentiality Review

1    2007 to 2009 predates 2010?
2    A.   I sure as heck hope we could all agree
3    on that.
4    Q.   All right.  If I could ask you to turn
5    your attention to Page 15 of Exhibit 10, and
6    this is a concept I think you talked a little
7    bit about in one of your answers, but I want to
8    follow up.
9        If you look at the next to last
10   paragraph on Page 15 in the Alpert article, the
11   authors write, "In states with the highest
12   initial OxyContin misuse, the rate of OxyContin
13   misuse declined by nearly 50 percent after the
14   reformulation, while OxyContin misuse actually
15   increased slightly in states with the lowest
16   rates of initial OxyContin misuse."
17       Do you see that statement?
18   A.   Yes, I do see that statement.
19   Q.   And, Professor Cutler, my question to
20   you is, do you know where the State of Ohio
21   falls within the states in terms of initial --
22   highest initial OxyContin misuse or lowest rates
23   of initial OxyContin misuse?
24   A.   I do not know.  My guess is it's in

1    the appendix, the online appendix to the Alpert,

2    et al article, but I don't have that off the top

3    of my head.

4              (Whereupon, Cutler Exhibit Number 17

5              was marked for identification.)

6    BY MR. GEISE:

7        Q.    Professor Cutler, I'm going to hand

8    you my only copy of the appendix that I think

9    you're referring to, and my question is going to

10   simply be, on the first page you see that

11   there's a color coding of states in terms of the

12   highest initial misuse of OxyContin, and it's in

13   a quartile, correct?

14       A.    That's correct.  There seem to be four

15   buckets.  I'm not sure whether they're

16   quartiles.

17       Q.    Fair enough.

18       A.    But they look approximately like

19   quartiles.

20       Q.    There are four buckets, and the top

21   bucket has the highest amount of misuse,

22   correct?

23       A.    The print is too small for me to read

24   directly, but I will take your word for it.

1        Q.    And would you take my word for it

2    that, according to the color-coding, that Ohio

3    falls in that third bucket in terms of misuse?

4        A.    I will take your word for it.

5              MR. KO:  And I'll just note for the

6    record while it's true it is color-coded, this

7    particular one is black and white, so there are

8    various shades of gray.

9              MR. GEISE:  We're all dealing with

10   shades of gray here, aren't we?

11             MR. KO:  Intentional statement.

12   BY MR. GEISE:

13       Q.    Professor Cutler, I'd like to turn

14   your attention now to your expert report, and in

15   particular the Data Considered section of your

16   appendix.  And I -- there will be a couple of

17   things I'm going to ask you.

18             If you could turn to Page 6 of

19   Appendix 3.B where you have a list of the data

20   sources considered.

21             Do you see that?

22       A.    Yes, I do see that.

23       Q.    And I believe in response to some

24   questioning yesterday you were asked about ARCOS

1    data, and you were asked if you were aware of

2    any protective orders that applied to ARCOS

3    data.

4              Do you recall that question?

5        A.    Yes, I do recall that question.

6        Q.    And I want to ask you, do you -- did

7    you sign a protective order for access to any

8    ARCOS data in this matter?

9        A.    In this specific report, the ARCOS

10   data that are used are the public ARCOS data.

11   Those data are available on the DEA website.

12   They don't require any protective order in order

13   to access those data.

14       Q.    Do you --

15       A.    I do know --

16       Q.    I'm sorry.

17       A.    ARCOS -- I know that ARCOS maintains

18   other data which is protected.  In my report,

19   I'm not using any protected ARCOS data.

20       Q.    Do you know if the individuals you've

21   worked with at Compass Lexecon have accessed any

22   of the non-public ARCOS data for purposes of

23   their assistance to you and others in this case?

24       A.    For purposes of their assistance to

1    me, they did not access any of the non-public

2    ARCOS data.  I don't know -- I'm not in a

3    position to say for sure whether they accessed

4    any of the non-public ARCOS data for any other

5    purpose associated with this litigation.

6        Q.    Do you know if any of the materials

7    you've been provided in this case, no matter

8    what the source, obtained their -- or derived

9    from non-public ARCOS data?

10             MR. KO:  Object to the form.

11       A.    I'm sorry.  Could you restate the

12   question, please?

13   BY MR. GEISE:

14       Q.    Sure.

15             Do you know if you've been provided

16   any materials in this case that came from

17   non-public ARCOS data?

18       A.    I do not know of any materials I was

19   provided that came from non-public ARCOS data.

20       Q.    Professor Cutler, yesterday you

21   indicated that you had some familiarity with the

22   fact that NCHS has a data use agreement.  Do you

23   recall that testimony?

24       A.    That is correct, NCHS does have a data

1  use agreement.

2      Q.   Did you sign a data use agreement from

3  NCHS in this case?

4          MR. KO:  Objection.  Asked and

5  answered.

6          Go ahead.

7      A.   Yes, I did sign a data use agreement

8  from NCHS in this case.

9  BY MR. GEISE:

10     Q.   When did you sign that data use

11  agreement?

12     A.   I believe it would have been signed

13  in -- my guess is June of last year.

14     Q.   Did the data use agreement that you

15  signed with NCHS have a provision about the use

16  of restricted access data?

17     A.   You're referring to restricted access

18  NCHS data?

19     Q.   That's correct, sir.

20     A.   Yes.  Just to fill this out, the

21  mortality data that we utilize come from both

22  public sources and from sources which require a

23  data use agreement.  So some of the data,

24  particularly the data before 2005, are available

1  publicly by county.  Other data, national data

2  post 2005, are available publicly.  But the

3  county-level data post 2005 need to be -- to

4  have a data use agreement in order to use those

5  data.

6      Q.   For the data use agreement for the

7  county-level mortality data post 2005, are there

8  any restrictions on the use of that data?

9      A.   There are restrictions on what can be

10  reported.  So one cannot report sales of under a

11  certain size, and one cannot release the data,

12  and the data have to be used for the purpose

13  which NCHS approved.  So an individual is not

14  granted the right to use the data for any

15  purpose that he or she wishes.  The individual

16  needs to use the data for the purpose for which

17  NCHS approved it.

18     Q.   For what purpose did you request

19  approval from NCHS for use of that data?

20         MR. KO:  Object to the form.

21     A.   The original approval for -- the

22  original approval for the NCHS data came from

23  Ted Miller, and Ted had requested use of the

24  data for the purpose of doing this type of

1  analysis.

2  BY MR. GEISE:

3      Q.   Did you yourself request approval for

4  use of the data, or are you relying on the

5  original approval from Ted Miller?

6      A.   In the analysis here we're relying on

7  the data from Ted Miller.  I do have access to

8  the data separately for research purposes, so I

9  have applied to NCHS and received approval to

10  use data for research purposes, but that is not

11  the data that are used here.

12     Q.   Do you understand that it would be

13  inappropriate for you to rely on the approval

14  you have to use the research -- to use the

15  materials for research purposes to use it as an

16  expert witness in this matter?

17     A.   I absolutely understand that if I have

18  access to the data for research purposes, I

19  cannot use that for expert report purposes.  In

20  fact, at several times during this analysis I

21  told my colleagues I have access to the NCHS

22  data for research purposes and I am not able to

23  use it for the purposes of this analysis.

24     Q.   Have you seen the scope of the

1  approval that Ted Miller obtained for use of the

2  materials?

3          MR. KO:  Object to the form.

4      A.   I believe I saw it.  Yes, I would have

5  seen the scope that Ted Miller had for use of

6  the data.

7  BY MR. GEISE:

8      Q.   Does the scope that Ted Miller

9  received for use of the data allow the use of

10  the data for purposes of expert witness work in

11  this case?

12     A.   My understanding is that it does.  I

13  do not have the language with me here so I

14  cannot look at it specifically here.

15     Q.   Given that you are a precise person,

16  did you ask Mr. Miller to make sure that the

17  approval was appropriate for using that data in

18  this case?

19     A.   Yes, I did ask Mr. Miller that.

20     Q.   Did you ask Mr. Miller to see a copy

21  of the data use agreement?

22     A.   I had to sign, I believe, the data use

23  agreement, in which case I would have seen a

24  copy of it.

1    Q.   Have you had any contact with the NCHS

2    confidentiality officer with regard to the use

3    of the data as approved in Ted Miller's request?

4         MR. KO:  Object to the form.

5    A.   I have not had any conversation with

6    the confidentiality officer with respect to the

7    data in Ted Miller's use agreement.

8    BY MR. GEISE:

9    Q.   How does the scope of the data use

10   agreement you have for research purposes differ

11   from the scope of the data use agreement Ted

12   Miller obtained?

13   A.   The data use agreement that I have for

14   research purposes, technically I have two data

15   use agreements for research purposes because

16   there are two research projects that I am

17   engaged in, they each specify the topics that I

18   am able to use the data for.

19        In one case it is for research that

20   I'm conducting on opioid issues.  In another

21   case it's for research on how education

22   differences across areas are related at a point

23   in time and over time to overall mortality rates

24   in areas.

1         So those are very specific research

2    projects that I have.  I should -- yes, so those

3    are the very specific research projects that I

4    have.

5    Q.   And I guess my question was, how does

6    the scope of the data use agreements you have

7    for use of that data compare to the data use

8    agreement that Ted Miller obtained?

9    A.   Ted Miller has data for a very

10   different purpose, so his data were for analysis

11   of the relationship between opioids and

12   mortality.  I don't remember the exact title of

13   it, but it would have been something to that

14   effect.  And that's the analysis then permitted

15   by his data use agreement.

16   Q.   Did Ted Miller's data use agreement

17   specifically provide for the use of the data in

18   litigation?

19        MR. KO:  Object to the form.

20   Objection, asked and answered.

21   A.   I don't recall the specifics of the

22   data use agreement, so I would need to go -- to

23   go look at it.  It was my understanding, Ted's

24   understanding, Compass Lexecon's understanding,

1    and the lawyers' understanding that that data

2    use agreement was appropriate to do this

3    analysis.

4    BY MR. GEISE:

5    Q.   In your discussions of matters

6    relevant to this case with Professors Gruber and

7    McGuire, did you discuss the post-2005

8    county-level mortality data with the two of

9    them?

10        MR. KO:  And I'll instruct the

11   answer -- or I'll instruct the witness not to

12   answer to the extent these discussions with

13   Professor McGuire and Professor Cutler were with

14   or involved counsel.

15   A.   These discussions were with or

16   involved counsel.

17   BY MR. GEISE:

18   Q.   Do you know if Professor Gruber signed

19   a data use agreement with respect to NCHS data

20   for purposes of this case?

21   A.   I do not know if he signed a data use

22   agreement for purposes of this case.

23   Q.   Because you are precise, Professor

24   Cutler, would you have made sure that Professor

1    Gruber had signed such an agreement before you

2    discussed that data with him?

3         MR. KO:  Object to the form.  Object

4    to the extent you need to reveal any

5    communications you had with Professor Gruber

6    that were in the presence or involved or were

7    with counsel.

8    A.   The NCHS data come with some

9    restrictions on what one can report.  For

10   example, you cannot report cells with fewer than

11   ten observations.  Presenting results of

12   estimation models is not something that's

13   prohibited by the data use agreement.  And,

14   similarly, presenting trends across different

15   types of counties or across different groups

16   would not be in violation of any data use

17   agreement.

18   BY MR. GEISE:

19   Q.   Professor Cutler, my question is

20   whether you would make sure that Professor

21   Gruber had signed a data use agreement before

22   discussing that data with him.

23        MR. KO:  Same objections as before.

24   Same instructions as before.  Objection, asked

1    and answered.

2        A.   If Professor Gruber were going to work

3    with data as it were covered by the data use

4    agreement, that is access to data that needs to

5    be kept confidential, then he would have to be

6    part of the data use agreement.

7             If someone is just viewing results and

8    commenting upon results, they do not need to be

9    part of the data use agreement, provided that

10   the results that they're reviewing do not fall

11   under the restrictions for which the data use

12   agreement says you cannot disclose results.

13   BY MR. GEISE:

14       Q.   Do the results contained in your

15   expert report include data that was only usable

16   to you because you had signed a data use

17   agreement with NCHS?

18       A.   Yes.  Some of the data involved in the

19   estimation involved data that were obtained

20   under the data use agreement.

21       Q.   And as you said, did you share your

22   report with Professor Gruber?

23       A.   Professor Gruber, yes, did receive --

24   did see the report, yes.

1        Q.   And I know you said you haven't had an

2    opportunity to review Professor Gruber's

3    deposition, but one of the things he indicated

4    is that you and he and Professor McGuire would

5    discuss each other's reports with them during

6    the formative process.  Is that accurate?

7        A.   Yes, that is accurate.

8        Q.   So as part of that discussion in the

9    formation of your report, did you discuss with

10   Professor Gruber data that was subject to the

11   data use agreement that you signed with NCHS?

12           MR. KO:  Objection.  Asked and

13   answered.

14       A.   We discussed results of analysis.  At

15   no time did we specifically discuss or was sent

16   around any data that was prohibited by the data

17   use agreement from being shared and discussed.

18           MR. GEISE:  Professor Cutler, I think

19   we're within five minutes here.  In case

20   somebody else has a minute or two, let's go off

21   the record.  And I appreciate your time in

22   answering my questions today.

23           THE VIDEOGRAPHER:  The time is

24   4:12 p.m., and we're off the record.

1            (Pause.)

2            THE VIDEOGRAPHER:  The time is

3    4:13 p.m., and we're on the record.

4            MR. GEISE:  Professor Cutler, after

5    conferring with my colleagues in the room, we

6    have no further questions for you this

7    afternoon.  Thank you.

8            THE WITNESS:  Thank you for the

9    discussion.

10           MR. KO:  Professor Cutler, I just

11   actually have a few quick follow-up questions.

12   And I understand that it is your anniversary

13   today, so I apologize that I'm not letting you

14   go right away, but I promise this will be quick.

15           THE WITNESS:  Thank you, sir.

16               EXAMINATION

17   BY MR. KO:

18       Q.   So earlier today Mr. Knapp asked you

19   questions regarding your direct regression

20   model.

21           Do you recall that?

22       A.   Yes, I do.

23       Q.   Can you please turn to Appendix 3.H of

24   your report.  Please let me know when you get

1    there.

2        A.   Yes, I am there.

3        Q.   And the first page of this report, and

4    where you're at is the actual direct regression

5    model that you ran, correct?

6        A.   That is correct.

7        Q.   And the first page of Appendix 3.H

8    contains, among other things, the variables that

9    you utilized in your direct regression model,

10   correct?

11       A.   That is correct.

12       Q.   Approximately how many variables are

13   included in this direct regression model on the

14   first page of Appendix 3.H?

15       A.   There are about 45 of them.

16       Q.   And why did you believe these were the

17   appropriate variables to utilize for your direct

18   regression model?

19       A.   We included in the model all the

20   variables that we could measure that either we

21   or other studies suggested would have an impact

22   on the mortality rate.

23       Q.   Okay.  And on the top right-hand

24   corner there is a reference to adjusted

1  R-squared which we discussed at moments -- or at
2  some times earlier this afternoon.
3          Do you see that?
4      A.  Yes, I do see that.
5      Q.  Can you describe to the jury what that
6  actually signifies?
7      A.  Yes.  The R-squared is a measure of
8  how well the model is fitting the data, so it
9  ranges between zero and 1.  A value of zero
10  means that your model cannot explain any of the
11  data difference -- any of the data variation.
12  An R-squared of 1 means that there's a perfect
13  relationship.  So, for example, height in inches
14  versus height in meters would have a perfect
15  relationship with each other.
16          This particular adjusted R-squared,
17  adjusted just means it corrects for the number
18  of regressors, the number of variables that are
19  included.  This particular adjusted R-squared of
20  0.57, or 57 percent, shows that the model is
21  explaining 57 percent of the variation across
22  areas.
23          That is an extremely high R-squared
24  for regression that's using cross-section data.

1  So any economist who looked at a number like
2  that in this context would feel like the model
3  was a very good model.
4      Q.  Mr. Knapp also asked you some
5  questions yesterday regarding the Ohio PCSAO
6  data.
7          Do you recall that?
8      A.  That is -- yes, I do recall that.
9      Q.  And I believe he asked you about the
10  years for which you had data from that report
11  that went into your analysis regarding the
12  opioid-related percent of child removals.
13          Do you recall that?
14      A.  Yes, I do recall that.
15      Q.  And if I understood your testimony and
16  the exhibit Mr. Knapp showed you correctly, I
17  believe that the report from the Ohio PCSAO had
18  some missing data for years prior to 2015.
19      A.  That's correct.  Unfortunately, they
20  gathered the data only in 2015.
21      Q.  And in your report -- and I see that
22  you're actually at Appendix 3.E.1, you have
23  input data for years prior to 2015, correct?
24      A.  That's correct.  We've made an

1  estimate of what we believe is a reasonable
2  number for years prior to 2015.
3      Q.  And can you describe to the jury and
4  the court what you did to make that reasonable
5  estimate?
6      A.  Yes.  So what -- of course, we don't
7  have the trend in child removals.  What we have
8  is the trend in something that is very severe as
9  well, and that is people treated by the ADAMHS
10  Board in Cuyahoga and the ADM Board in Summit,
11  and we know those by year.
12          So what we do is we assume that there
13  would have been the same proportionate growth in
14  child removals in those years as in people
15  treated by the ADAMHS Board and the ADM Board.
16  So we're directly using information on people
17  with opioid use issues in Ohio to -- in these
18  counties in Ohio to estimate these values.
19      Q.  Okay.  Thank you.
20          Final set of questions.
21          Earlier today Mr. Knapp and Mr. Geise
22  had asked you questions about the Evans article
23  that is reflected in Exhibit 9 of your
24  deposition.  Do you recall that series of

1  questions regarding this article?
2      A.  Yes, I do.
3      Q.  And I want to turn your attention to
4  Page 6 of this article titled "How the
5  Reformulation of OxyContin Ignited the Heroin
6  Epidemic" and, in particular, the table in the
7  top left-hand corner of Figure 3.
8          Do you see that?
9      A.  Yes, I do see that.
10      Q.  Can you describe to the court and to
11  the jury what that figure represents?
12      A.  Yes.  What Evans, et al are showing is
13  the trend in quarterly shipments of oxycodone
14  over the time period from 2004 to 2014, so you
15  can see that they are, in fact, analyzing
16  oxycodone.
17          They show a very marked increase in
18  the first part of this period up until the
19  reformulation of OxyContin, and then a decline
20  after that period.  So their estimates shown in
21  the -- with the F statistic in the circles show
22  a very sharp break around that period in time in
23  oxycodone shipments.
24      Q.  So this figure takes into account

Highly Confidential - Subject to Further Confidentiality Review

```
 1   shipments of opioids, and in particular
 2   oxycodone, prior to 2010 that caused heroin
 3   poisonings following 2010, correct?
 4        A.   That is correct.
 5             MR. GEISE:  Object to form.
 6             MS. CASTLES:  Object to form.
 7             MR. KO:  That's all I have.
 8             THE VIDEOGRAPHER:  The time is
 9   4:19 p.m.  This deposition has concluded, and we
10   are off the record.
11             (Whereupon, the deposition was
12             concluded.)
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   COMMONWEALTH OF MASSACHUSETTS )
 2   SUFFOLK, SS.                  )
 3        I, MAUREEN O'CONNOR POLLARD, RMR, CLR,
 4   and Notary Public in and for the Commonwealth of
 5   Massachusetts, do certify that on the 27th day
 6   of April, 2019, at 8:06 o'clock, the person
 7   above-named was duly sworn to testify to the
 8   truth of their knowledge, and examined, and such
 9   examination reduced to typewriting under my
10   direction, and is a true record of the testimony
11   given by the witness.  I further certify that I
12   am neither attorney, related or employed by any
13   of the parties to this action, and that I am not
14   a relative or employee of any attorney employed
15   by the parties hereto, or financially interested
16   in the action.
17             In witness whereof, I have hereunto
18   set my hand this 29th day of April, 2019.
19
20   _____
21        MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
22        Realtime Systems Administrator
23        CSR #149108
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        INSTRUCTIONS TO WITNESS
 2
 3             Please read your deposition over
 4   carefully and make any necessary corrections.
 5   You should state the reason in the appropriate
 6   space on the errata sheet for any corrections
 7   that are made.
 8             After doing so, please sign the
 9   errata sheet and date it.  It will be attached
10   to your deposition.
11             It is imperative that you return
12   the original errata sheet to the deposing
13   attorney within thirty (30) days of receipt of
14   the deposition transcript by you.  If you fail
15   to do so, the deposition transcript may be
16   deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        - - - - -
 2        E R R A T A
 3        - - - - -
 3   PAGE  LINE   CHANGE
 4   ____  ____  _____
 5        REASON: _____
 6   ____  ____  _____
 7        REASON: _____
 8   ____  ____  _____
 9        REASON: _____
10   ____  ____  _____
11        REASON: _____
12   ____  ____  _____
13        REASON: _____
14   ____  ____  _____
15        REASON: _____
16   ____  ____  _____
17        REASON: _____
18   ____  ____  _____
19        REASON: _____
20   ____  ____  _____
21        REASON: _____
22   ____  ____  _____
23
24
```

Highly Confidential - Subject to Further Confidentiaity Review

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
 4          I, _____, do
     Hereby certify that I have read the foregoing
 5   pages, and that the same is a correct
     transcription of the answers given by me to the
 6   questions therein propounded, except for the
     corrections or changes in form or substance, if
 7   any, noted in the attached Errata Sheet.
 8
 9   _____
     DAVID CUTLER, Ph.D.          DATE
10
11
12
13
14
15
16   Subscribed and sworn
     To before me this
17   _____ day of _____, 20_____.
18   My commission expires: _____
19
     _____
20   Notary Public
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiaity Review

```
 1               LAWYER'S NOTES
 2   PAGE  LINE
 3   _____ _____ _____
 4   _____ _____ _____
 5   _____ _____ _____
 6   _____ _____ _____
 7   _____ _____ _____
 8   _____ _____ _____
 9   _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22   _____ _____ _____
23   _____ _____ _____
24   _____ _____ _____
```