1    IN THE UNITED STATES DISTRICT COURT
2      FOR THE NORTHERN DISTRICT OF OHIO
3             EASTERN DIVISION
4                  -  -  -
5

     IN RE:  NATIONAL        :   HON. DAN A.
6    PRESCRIPTION OPIATE      :   POLSTER
     LITIGATION              :
7                            :
     APPLIES TO ALL CASES    :   NO.
8                            :   1:17-MD-2804
                             :
9

          - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                  -  -  -
12
               January 4, 2019
13
                  -  -  -
14
15            Videotaped deposition of
     MATTHEW DAY, taken pursuant to notice,
16   was held at the offices of Golkow
     Litigation Services, 1650 Market Street,
17   Philadelphia, Pennsylvania, beginning at
     9:35 a.m., on the above date, before
18   Michelle L. Gray, a Registered
     Professional Reporter, Certified
19   Shorthand Reporter, Certified Realtime
     Reporter, and Notary Public.
20
                  -  -  -
21
22        GOLKOW LITIGATION SERVICES
      877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2

      WAGSTAFF & CARTMELL, LLP
 3    BY:  BRIAN J. MADDEN, ESQ.
      BY:  ANDREW N. FAES, ESQ.
 4    4740 Grand Avenue, Suite 300
      Kansas City, Missouri 64112
 5    (816) 701-1132
      bmadden@wcllp.com
 6    afaes@wcllp.com
 7          - and -
 8    BRANSTETTER, STRANCH & JENNINGS, PLLC
      BY:  BEN GASTEL, ESQ.
 9    223 Rosa L. Parks Avenue, Suite 200
      Nashville, Tennessee 37203
10    (615) 254-8801
      Beng@bsjfirm.com
11    Representing the Plaintiffs
12

      MORGAN LEWIS & BOCKIUS, LLP
13    BY:  NATHAN J. ANDRISANI, ESQ.
      1701 Market Street
14    Philadelphia, Pennsylvania 19103
      (215) 963-5362
15    nandrisani@morganlewis.com
16          - and -
17    MORGAN LEWIS & BOCKIUS, LLP
      BY:  JONATHAN E. MAIER, ESQ.
18    1111 Pennsylvania Avenue, NW
      Washington, DC 20004
19    (202) 739-5806
      Jonathan.maier@morganlewis.com
20    Representing the Defendant, Teva
      Pharmaceuticals and the Witness
21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Cont'd.)
 2

      JONES DAY
 3    LOUIS P. GABEL, ESQ.
      150 West Jefferson, Suite 2100
 4    Detroit, Michigan 48226
      (313) 733-3939
 5    Lpgabel@jonesday.com
      Representing the Defendant, Walmart
 6

 7    PIETRAGALLO GORDON ALFANO BOSICK &
      RASPANTI, LLP
 8    BY:  DOUGLAS K. ROSENBLUM, ESQ.
      1818 Market Street, Suite 3402
 9    Philadelphia, Pennsylvania 19103
      (215) 320-6200
10    Dkr@pietragallo.com
      Representing the Defendant, Cardinal
11    Health
12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    TELEPHONIC APPEARANCES:
 2

      REED SMITH, LLP
 3    BY:  ABIGAIL M. PIERCE, ESQ.
      Three Logan Square
 4    1717 Arch Street, Suite 3100
      Philadelphia, Pennsylvania 19103
 5    (215) 851-8226
      Abigail.pierce@reedsmith.com
 6    Representing the Defendant,
      AmerisourceBergen Drug Corporation
 7

 8    COVINGTON & BURLING, LLP
      BY:  SARA SUNDERLAND, ESQ.
 9    One Front Street
      San Francisco, California 94111
10    (415) 591-7063
      Ssunderland@cov.com
11    Representing the Defendant, McKesson
      Corporation
12

13    ARNOLD & PORTER KAYE SCHOLER, LLP
      BY:  JOHN CELLA, ESQ.
14    601 Massachusetts Avenue, NW
      Washington, D.C. 20001
15    (202) 942-6771
      John.cella@arnoldporter.com
16    Representing the Defendants, Endo
      Health Solutions; Endo Pharmaceuticals,
17    Inc.; Par Pharmaceutical Companies, Inc.,
      f/k/a Par Pharmaceutical Holdings, Inc.
18

19    ALLEGAERT, BERGER & VOGEL, LLP
      BY:  LOUIS A. CRACO, JR., ESQ.
20    111 Broadway, 20th Floor
      New York, New York 10006
21    (212) 616-7060
      Lcraco@abv.com
22    Representing the Defendant,
      Rochester Drug Co-op
23

24
```

1     APPEARANCES:   (Cont'd.)

2

      ALSO PRESENT:

3

4     VIDEO TECHNICIAN:

      Dan Lawlor

5

6     LITIGATION TECHNICIAN

      Joe Wills

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2              I N D E X
 3                    -   -   -
 4

    Testimony of:
 5                              MATTHEW DAY
 6
          By Mr. Madden        18, 367
 7
          By Mr. Faes              314
 8
          By Mr. Gastel            356
 9
          By Mr. Andrisani         364
10
11
                      -   -   -
12
                  E X H I B I T S
13
                      -   -   -
14
15  NO.              DESCRIPTION            PAGE
16  Teva
    Day-1            Notice of Deposition  18
17                   Of Matthew Day
18  Teva
    Day-2            E-mail Thread          32
19                   10/15/08
                     Subject, Self Appraisal
20                   TEVA_MDL_A_00916554-56
21  Teva
    Day-3            E-mail Thread          74
22                   5/21/10
                     Subject, Area Manager
23                   Interview
                     TEVA_MDL_A_01109867-71
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                         -   -   -
2              E X H I B I T S  (Cont'd.)
3                         -   -   -
4
5   NO.              DESCRIPTION             PAGE
6   Teva
    Day-4            E-mail Thread           82
7                    8/18/16
                     Subject, Request for
8                    Input CNS Field Sales
                     TEVA_MDL_A_01077432-38
9
    Teva
10  Day-5            LinkedIn Profile        94
                     Of Matthew Day
11
    Teva
12  Day-6            E-mail Thread           96
                     1/14/10
13                   Subject, 2009 Year
                     End Review
14                   TEVA_MDL_A_00916767-73
15  Teva
    Day-7            E-mail Thread           100
16                   6/29/11
                     Subject, 2nd Semester
17                   Bonus Plan
                     TEVA_MDL_A_08213457-58
18
    Teva
19  Day-8            E-mail Thread           113
                     6/22/10
20                   Subject, Q2 2010 PCS
                     Area Manager Bonus
21                   Plan
                     TEVA_MDL_A_00892757-62
22
    Teva
23  Day-9            Letter, 9/10/07         118
                     Dear Doctor
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5   NO.              DESCRIPTION              PAGE
 6   Teva
     Day-10           E-mail Thread           121
 7                    10/25/07
                      Subject, Marketing
 8                    Feedback Requested
                      TEVA_MDL_A_00891861-62
 9
     Teva
10   Day-11           E-mail Thread           132
                      10/26/07
11                    Subject, Marketing
                      Feedback Requested
12                    TEVA_MDL_A_00895570-71
13   Teva
     Day-12           Fentora 2011            135
14                    Brand Plan
                      January 5, 2010 Draft
15                    TEVA_MDL_A_00874984-05
16   Teva
     Day-13           E-mail Thread           149
17                    11/25/08
                      Subject, Oncology
18                    B Focused Team
                      Meeting Teleconference
19                    TEVA_MDL_A_ 00890304-82
20   Teva
     Day-14           E-mail, 8/2/07          165
21                    Subject, Fentora
                      M2 No Cancer
22                    TEVA_MDL_A_00893086-87
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2             E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Teva
      Day-15           Slide Deck               167
 7                     Sales Training
                       & Development
 8                     PCS Training Class
                       July 2008
 9                     TEVA_MDL_A_01211895
10    Teva
      Day-16           Complaint,               179
11                     State Board of Pharmacy
                       v. Steve Simon
12
      Teva
13    Day-17           Sales Training           182
                       & Development
14                     Training, 2010
                       Fentora Training
15                     TEVA_MDL_A_08646185
16    Teva
      Day-18           iPad Strategy            187
17                     Meeting, Matthew Day
                       4/19/12
18                     Kansas City
                       TEVA_MDL_A_08697905
19
      Teva
20    Day-19           Imagine the              192
                       Possibilities
21                     Slide Deck
                       TEVA_MDL_A_01102507
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -
 2               E X H I B I T S  (Cont'd.)
 3                          -   -   -
 4
 5      NO.               DESCRIPTION              PAGE
 6      Teva
        Day-20            E-mail Thread           210
 7                        2/10/12
                          Subject, Fentora
 8                        Reprints
                          TEVA_MDL_A_00911134-35
 9
        Teva
10      Day-21            Fentanyl Buccal         214
                          Tablet for the Treatment
11                        Of Breakthrough Pain
                          In Opioid-Tolerant
12                        Patients with Chronic
                          Cancer Pain
13                        (Weinstein)
                          TEVA_MDL_A_01207430-38
14
        Teva
15      Day-22            A Randomized, Placebo 214
                          Controlled Study of
16                        Fentanyl Buccal Tablet
                          For Breakthrough Pain
17                        In Opioid Treated Patients
                          With Cancer
18                        (Portenoy)
                          TEVA_MDL_A_01198481-87
19
        Teva
20      Day-23            E-mail Thread           220
                          11/12/14
21                        Subject, Updated
                          Creative for Unbranded
22                        Initiative
                          TEVA_MDL_A_02296564-69
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Teva
      Day-24           Incremental             225
 7                     Performance Detail
                       Q4 2015
 8                     TEVA_MDL_A_08657218-24
 9    Teva
      Day-25           Discovery Channel       228
10                     Documentary
                       Pain Matters
11                     TEVA_MDL_A_08657349
12    Teva
      Day-26           Be the Voice that       233
13                     Inspires Change
                       Pain Matters
14                     Printout
15    Teva
      Day-27           American Academy        259
16                     Of Pain Medicine
                       Pre-Con Deck
17                     TEVA_MDL_A_ 08216169
18    Teva
      Day-28           E-mail Thread           262
19                     8/21/12
                       Subject, Final IASP
20                     Posters
                       TEVA_MDL_A_00946278
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5   NO.              DESCRIPTION              PAGE
 6   Teva
     Day-29           Teva Advocacy           273
 7                    Mapping:  Identifying
                      Advocacy Partner to
 8                    Enhance Patient Care
                      TEVA_MDL_A_00499645-51
 9
     Teva
10   Day-30           Teva PAINWeek           282
                      5/29/14
11                    TEVA_MDL_A_00886736
12   Teva
     Day-31           2014 Vantrela ER        287
13                    12/23/13
                      Launch Plan Draft
14                    TEVA_MDL_A_01204103-32
15   Teva
     Day-32           Pain Strategy Team      296
16                    10 March 2015
                      Global Scientific
17                    Communications
                      TEVA_MDL_A_08218672
18
     Teva
19   Day-33           Prescription Drug       297
                      Abuse & Alliance to
20                    Prevent the Abuse of
                      Medicines
21                    TEVA_MDL_A_00694962-63
22   Teva
     Day-34           Patient Exploration     298
23                    For CEP-33237
                      TEVA_MDL_A_00861724
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                        -   -   -
2              E X H I B I T S  (Cont'd.)
3                        -   -   -
4
5     NO.              DESCRIPTION              PAGE
6     Teva
      Day-35           Teva's Current          299
7                      Internal Plan for
                       Vantrela
8                      TEVA_MDL_A_08658859
9     Teva
      Day-36           E-mail Thread           309
10                     5/24/17
                       Subject, BD Inquiry
11                     Abuse Deterrent
                       Dosage Form
12                     TEVA_MDL_A_08654985-86
13    Teva
      Day-37           Breakthrough Pain:      311
14                     An Important
                       Component of Chronic
15                     Pain
                       TEVA_MDL_A_00891678
16
      Teva
17    Day-38           2009 PCS                316
                       Mid-Atlantic Area
18                     Map
                       TEVA_MDL_A_01095974
19
      Teva
20    Day-39           Fentora Learning        330
                       System, Module 3
21                     Risk Minimization
                       Plan
22                     TEVA_MDL_A_08172252-95
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5   NO.               DESCRIPTION              PAGE
 6   Teva
     Day-40            E-mail Thread           339
 7                     4/15/08
                       Subject, For Review
 8                     Fentora World Cup
                       Briefing Booklet
 9                     TEVA_CHI_00005027-59
10   Teva
     Day-41            E-mail Thread           349
11                     4/15/08
                       For Review, Slide
12                     Presentations for 4/21
                       TEVA_MDL_A_02024819-23
13
     Teva
14   Day-42            Fentora                 349
                       Brand Audit/Market
15                     Pulse
                       TEVA_MDL_A_02024820
16
     Teva
17   Day-43            Fentora Forecast        353
                       Assumptions Based
18                     On Conjoint
                       9/5/08
19                     TEVA_MDL_A_03163162
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -

 2        P R E V I O U S L Y   M A R K E D

 3                E X H I B I T S

 4                      -  -  -

 5

 6    NO.                DESCRIPTION

 7    Spokane-15    US DEA Letter, 9/29/08
                    Pharmaceutical Company
 8                  Cephalon to Pay $425

 9    Spokane-16    Guilty Plea Agreement
                    USA v Cephalon

10

11    Spokane-24    FAST Team Meeting
                    7/20/07
12                  TEVA_MDL_A_0001034-82

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2              DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5   Direction to Witness Not to Answer

 6   PAGE    LINE
     None.

 7

 8   Request for Production of Documents

 9   PAGE    LINE
     None.

10

11   Stipulations

12   PAGE    LINE
     None.

13

     Questions Marked

14

     PAGE    LINE

15   None.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              THE VIDEOGRAPHER:  We are

2      now on the record.  My name is Dan

3      Lawlor, I'm a videographer with

4      Golkow Litigation Services.

5              Today's date is January 4th,

6      2019, and the time is 9:35 a.m.

7              This video deposition is

8      being held in Philadelphia,

9      Pennsylvania, in the matter of In

10     Re National Prescription Opiate

11     Litigation, MDL Number 2804.

12             The deponent is Matthew Day.

13             Counsel will be noted on the

14     stenographic record.

15             The court reporter is

16     Michelle Gray and will now swear

17     in the witness.

18                     -   -   -

19             ... MATTHEW DAY, having been

20     first duly sworn, was examined and

21     testified as follows:

22                     -   -   -

23             EXAMINATION

24                     -   -   -
```

```
 1    BY MR. MADDEN:
 2         Q.    Please state your name, sir.
 3         A.    Matthew Maxwell Day.
 4         Q.    Mr. Day, I'm Brian Madden.
 5    I represent the plaintiffs in this
 6    litigation.  Can you tell us what city
 7    you live in?
 8         A.    West Chester, Pennsylvania.
 9         Q.    Have you ever given a
10    deposition before today?
11         A.    I have not.
12         Q.    All right.  If I ask you a
13    question today that you do not
14    understand, will you tell me so?
15         A.    Yes.
16         Q.    And will you agree to give
17    me a verbal answer as opposed to a shake
18    of the head or an mm-hmm or unh-unh?
19         A.    Yes, I will.
20         Q.    All right.  Thank you.
21              (Document marked for
22              identification as Exhibit
23              Teva-Day-1.)
24
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. MADDEN:

2         Q.     We noticed your deposition

3    for today, January 4, at this location.

4    Have you seen this notice prior to today?

5         A.     I have not.

6         Q.     All right.  Do you -- do you

7    understand that you are here pursuant to

8    a deposition notice?

9         A.     I do.

10        Q.     Are you represented by

11   counsel today?

12        A.     Yes.

13        Q.     Okay.  And what law firm is

14   representing you, if you know?

15        A.     Morgan Lewis.

16        Q.     What did you do to prepare

17   for giving your deposition today?

18        A.     I had met with Morgan Lewis

19   on December 18th and yesterday.

20        Q.     How much time did you spend

21   with attorneys from Morgan Lewis to

22   prepare for your deposition?

23        A.     On December 18th we spent

24   about three to four hours together and

1    yesterday about four hours.

2            Q.    So about eight -- seven to

3    eight hours total?

4            A.    Correct.

5            Q.    Did you review any

6    deposition testimony to get ready for

7    today?

8            A.    Not testimony.

9            Q.    All right.

10           A.    No.

11           Q.    Did you review any documents

12   to prepare for today?

13           A.    Yes.

14           Q.    Do you recall what documents

15   you reviewed?

16           A.    I don't recall specific

17   documents.

18           Q.    Do you recall categories of

19   documents?  Were they e-mails for

20   example?

21           A.    Yes.

22           Q.    Okay.  Anything besides

23   e-mails that you reviewed to prepare for

24   today?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Primarily e-mails and

2    resources.

3    Q.    What do you mean by

4    resources?

5    A.    Like a -- like a brochure.

6    Q.    Okay.  What about

7    PowerPoints?

8    A.    Yes.  PowerPoints.

9    Q.    What type of brochures?

10   A.    Marketing brochures.

11   Q.    Marketing plans?

12   A.    No marketing plans.

13   Q.    Were the brochures that you

14   reviewed marketing brochures that you had

15   prepared?

16   A.    Yes.

17   Q.    Okay.  And were the

18   PowerPoints, PowerPoints that you had

19   prepared?

20   A.    Yes.

21   Q.    In the context of your work

22   for Cephalon or Teva, can you explain to

23   me what would cause you to prepare a

24   marketing brochure?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yeah.  So typically when a

2    product is approved, when that product

3    gets approved, the prescribing

4    information is then sent to the

5    organization.  In order to communicate

6    with healthcare professionals, an

7    organization will develop resources of

8    promotional materials that goes through a

9    review process that they use.

10    Q.    I see.  And then those

11    brochures would be used for detailing

12    doctors?

13    A.    That's correct.

14    Q.    What's your highest level of

15    education?

16    A.    A bachelor of arts.

17    Q.    From what --

18    A.    Villanova University.

19    Bachelor of arts.

20    Q.    So you went to Villanova.

21    What year did you graduate?

22    A.    '95.

23    Q.    Who is your current

24    employer?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Harmony Biosciences.

2        Q.      When did you hire on with

3   Harmony Biosciences?

4        A.      About -- it's been about

5   16 days ago.

6        Q.      Okay.

7        A.      Fairly recent.

8        Q.      So as of today you are a

9   former employee of Teva, correct?

10        A.      That's correct.

11        Q.      What do you do for Harmony

12   Biosciences?

13        A.      I work in marketing.

14        Q.      Are there any particular

15   drugs that you work on in marketing?

16        A.      No, we don't currently

17   have -- we have two drugs in development,

18   but nothing is currently approved.  It's

19   a younger startup company, only 51

20   employees.

21        Q.      So you're working in

22   marketing for drugs that are yet to be

23   approved, correct?

24        A.      Correct.

1    Q.    What type of drugs are in

2  development?

3    A.    There's a -- the lead

4  candidate is for narcolepsy.

5    Q.    Any pain drugs?

6    A.    No.

7    Q.    Before hiring on with

8  Harmony Biosciences did you work for

9  Teva?

10    A.    Yes, I did.

11    Q.    And what was your last

12  position with Teva?

13    A.    Director of marketing.

14    Q.    What other positions did you

15  hold with either Cephalon or Teva?

16    A.    So starting kind of, I guess

17  chronologically when I started with

18  Cephalon, I worked as a sales training

19  manager.

20    Q.    Okay.  You hired on as a

21  sales training manager?

22    A.    I did.

23    Q.    What year?

24    A.    2007.

1    Q.    What was your next position
2    with either Cephalon or Teva?
3          A.    It was sales manager.
4          Q.    What year was that?
5          A.    2009.  Or 2010, I'm sorry.
6          Q.    In 2010 when you took the
7    sales manager job, was that with Cephalon
8    or Teva?
9          A.    It was with Cephalon.
10          Q.    All right.  And did you have
11    a particular region that you oversaw?
12          A.    The Mid-Atlantic.
13          Q.    What states were included in
14    the Mid-Atlantic?
15          A.    New Jersey, Pennsylvania,
16    Delaware, and, sorry, Maryland.
17          Q.    Was any portion of Ohio
18    included in that region?
19          A.    No, it was not.
20          Q.    All right.  How many years
21    were you sales manager over the
22    Mid-Atlantic?
23          A.    Just under two years.  It
24    was about a year and seven months.

1     Q.    All right.  What was your

2  next position with either Cephalon or

3  Teva?

4     A.    It was with Cephalon.  And

5  Cephalon and Teva was integrating at the

6  time.  So that position was product

7  manager, marketing.

8     Q.    So in the 2012 time frame,

9  you moved over to product manager?

10     A.    Correct.

11     Q.    Over what products?

12     A.    Over Fentora, Amrix, and

13  Nuvigil.

14     Q.    Nuvigil?

15     A.    Mm-hmm.

16     Q.    Fentora is an opioid,

17  correct?

18     A.    Correct.

19     Q.    What is Amrix?

20     A.    Skeletal-muscle relaxant.

21     Q.    And Nuvigil?

22     A.    It's for narcolepsy, so wake

23  promoting.

24     Q.    Okay.  What were your job

1    duties as product manager for Fentora?

2        A.    As a product manager in

3    marketing, your job duties are to develop

4    resources for Schedule II products like

5    opioids, and like Fentora, we only spoke

6    with healthcare professionals.  We would

7    develop resources that would be utilized

8    by the field force during

9    doctor-to-sales-force interactions.

10        Q.    How did that differ from the

11    sales training manager position that you

12    had held when you first started?

13        A.    The way I would characterize

14    the sales training role is sales training

15    was really better characterized as

16    product training.  What we would do is

17    when the prescribing information was

18    approved, we would then train the sales

19    representatives on that prescribing

20    information, the actual package insert

21    itself, to make sure they understood the

22    product.  And then in marketing they

23    would develop resources, or ads or

24    brochures.  So training was more product

1    training on the prescribing information,

2    and marketing resources.

3          Q.    And those marketing

4    resources, when you were product manager,

5    would include leave-behinds for doctors,

6    for example?

7          A.    Yes.

8          Q.    And a leave-behind is a

9    brochure, perhaps?

10         A.    Yes.

11         Q.    Okay.  All right.  How long

12   were you product manager over Fentora?

13         A.    So I was product manager for

14   Fentora for approximately, I would say,

15   two years.  Yeah.

16         Q.    All right.  So that takes us

17   to 2014?

18         A.    Correct.

19         Q.    And then you were promoted

20   to director of marketing in 2014?

21         A.    I was promoted to associate

22   director of marketing.

23         Q.    And as associate director of

24   marketing in 2014, was Fentora under your

Highly Confidential - Subject to Further Confidentiality Review

1    jurisdiction?

2         A.    During part of the time it

3    was, and at some point, and I can't

4    recall the specific date, my

5    responsibility shifted solely to Nuvigil.

6         Q.    I see.  During that time

7    period when you were associate director

8    of marketing and had some responsibility

9    for Fentora, what were your job duties

10   with regard to Fentora?

11        A.    They were fairly similar to

12   the product manager.  The only addition

13   to scope would be that I had a product

14   manager that reported to me, so I kind of

15   oversaw some of the development of those

16   materials.

17        Q.    During the time that you

18   were a sales training manager from 2007

19   to 2010, did you train the sales force on

20   Actiq and Fentora?

21        A.    Only Fentora.

22        Q.    Did someone else have

23   responsibility with regard to Actiq

24   during that time period?

1    A.    No.  When I had joined the

2    organization, Actiq was not currently in

3    promotion.

4         Q.    Why did you leave Teva for

5    Harmony Biosciences?

6         A.    I left Teva for Harmony

7    because -- well, I don't know how much

8    you know about the Teva situation, but

9    Teva has a new leader now, Kåre Schultz,

10   and one of the remits is there's been

11   significant costs and layoffs throughout

12   the organization.  And one of the things

13   they announced earlier this year is that

14   all of our jobs would be relocated to

15   Parsippany, New Jersey.  So I had a

16   decision with my family; I live here in

17   the area, and we couldn't move.  And

18   honestly, I didn't feel that it was a

19   good opportunity for me to continue on.

20        Q.    Were you ever disciplined at

21   Teva or Cephalon?

22        A.    No.

23        Q.    When you worked for

24   Cephalon -- well, strike that.

1          When you worked for Teva,

2     who paid you?

3          A.    When I worked for Teva, who

4     paid me?

5          Q.    Right.  So I assume you were

6     paid on a --

7          A.    Yeah.

8          Q.    -- monthly, or every --

9     every two-week basis?

10          A.    Yeah.

11          Q.    Do you know where the money

12     came from?

13          A.    From Teva.

14          Q.    Do you know which Teva?

15          A.    I -- I mean I would see my

16     direct deposit it would say Teva

17     Pharmaceuticals.  I don't know if there

18     was a subsidiary or something under that,

19     I didn't know.

20          Q.    As I understand it, there's

21     Teva USA and Teva Israel.  Do you have

22     that understanding?

23          A.    Yes.

24          Q.    Okay.  Do you know which of

1    those entities you worked for?

2                    MR. ANDRISANI:  Objection.

3                    THE WITNESS:  Teva USA.

4    BY MR. MADDEN:

5          Q.    And you believe that you

6    were paid by Teva USA?

7          A.    To my knowledge, yes.

8                    MR. MADDEN:  Do you want a

9          paper copy or --

10                   MR. ANDRISANI:  Yes, please.

11                   THE WITNESS:  Sometimes

12         paper is easier.

13                   MR. ANDRISANI:  Yeah.

14   BY MR. MADDEN:

15         Q.    I'm handing you and your

16   counsel Exhibit 2.

17                   (Document marked for

18         identification as Exhibit

19         Teva-Day-2.)

20   BY MR. MADDEN:

21         Q.    Mr. Day, Exhibit 2 has an

22   e-mail dated October 15, 2008, from you

23   to Dan Scott with a cc to Michael Tryba.

24   And you have an attached self-appraisal,

Highly Confidential - Subject to Further Confidentiality Review

1    your first one, apparently with the

2    company.  Do you see that?

3            A.    I do see the e-mail, yes.

4            Q.    All right.  Have you

5    reviewed this e-mail recently?

6            A.    No.

7            Q.    And the attachment which is

8    two pages, do you recognize that as your

9    employee self-appraisal dated 10/15/2008?

10           A.    Yeah, it looks familiar.

11           Q.    Okay.  You list your title

12   on this document as senior training

13   manager, correct?

14           A.    Correct.

15           Q.    And that was your first job

16   with Cephalon, right?

17           A.    Correct.

18           Q.    And your supervisors are

19   listed as Dan Scott and Mike Tryba,

20   correct?

21           A.    Correct.

22           Q.    Were they -- were they

23   indeed your supervisors?

24           A.    They were.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And what roles did they have

2    with Cephalon at that time?

3    A.    So starting at the top, Dan

4    Scott was the -- I forget the exact

5    title -- our titles changed.  I think he

6    was the senior director of sales training

7    and development, so he would have

8    overseen the entire organization.

9         Mike reported to Dan and was

10   probably the director of sales training,

11   overseeing specific products.

12   Q.    Before joining Cephalon, had

13   you had any training or experience with

14   regard to sales training?

15   A.    Yeah, I had worked for

16   Abbott virology.  I worked in their HIV

17   division, and I was a national sales

18   training manager.

19   Q.    I've -- I've seen some

20   documents that indicate your prior sales

21   experience before joining Cephalon was

22   in -- with HIV drugs, correct?

23   A.    Yes.

24   Q.    And did you have a

1   particular region?

2       A.    I was not a manager.  I was

3   a representative, and I worked in

4   Washington and Baltimore.

5       Q.    Why did you leave that job

6   to join Cephalon?

7       A.    The primary reason I left

8   that job was because my wife and I had

9   twin boys in Chicago and we were from the

10  Philadelphia area, so we needed to move

11  back home.  We had lived up there for a

12  couple years, but it was hard so...

13      Q.    All right.  When you were

14  senior training manager for Cephalon, how

15  many salespeople did you oversee for

16  training?

17      A.    I'm sorry, can you re-ask?

18      Q.    Probably a bad question.

19            When you were senior

20  training manager for Cephalon, that we

21  see here in October of 2008, what

22  salespeople were you training?

23      A.    This -- it would have been

24  the pain care sales force, which was

1    about 100 to 110 representatives.

2            Q.    And you were training those

3    110 salespeople with regard to Fentora,

4    correct?

5            A.    Yes, I was.

6            Q.    And that would include the

7    state of Ohio sales reps, correct?

8            A.    Yes.

9            Q.    So if we look at Page 2 of

10   Exhibit 2, on your employee

11   self-appraisal, do you see the section

12   under strategic planning and agility?

13   The top third of the page.

14           A.    Mm-hmm.  Yes, I do.

15           Q.    Okay.

16           A.    It's highlighted here while

17   you are talking so I can -- okay.

18           Q.    Either way is fine.  If it's

19   easier for you to look at the screen, we

20   can do that.

21           A.    Okay.

22           Q.    But with regard to that

23   section, strategic planning and

24   agility --

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Mm-hmm.

2    Q.    -- it says, "Initial

3 Training Class redesign:  Worked with

4 cross-functional teams to redesign the

5 class to the learner through a series of

6 application-based exercises that were

7 built around 'real world' scenarios."

8    A.    Mm-hmm.

9    Q.    Would that be playacting, I

10 guess, as one rep would play the rep, and

11 one rep would play the doctor?

12    A.    Part of that would be, yes,

13 role playing.  Mm-hmm.

14    Q.    Okay.  And how is it that

15 you redesigned that from what had taken

16 place before?

17    A.    So if I can recall, the

18 original training system was a series of

19 modules with exams.  So what we would do

20 is, from time to time, there would be

21 updates to like the prescribing

22 information.  So we would update all of

23 those modules accordingly, redo the exams

24 each year, so that when you were testing

Highly Confidential - Subject to Further Confidentiality Review

1    for the knowledge, you knew that you were

2    getting a recall.  You didn't have the

3    same exams.

4              And then to your point, also

5    looking at some adult learning principles

6    and trying to incorporate like role play

7    and verbalization exercises.

8         Q.    Prior to your becoming the

9    sales training manager, were there -- I

10   call them -- what do you call them,

11   modules --

12        A.    Yeah.

13        Q.    -- for the sales force with

14   regard to Fentora?

15        A.    There were to my knowledge,

16   which I didn't develop prior to, but I --

17   those are what I was working off of.

18        Q.    I see.  And did you review

19   or utilize any modules for Actiq in your

20   job?

21        A.    No.

22        Q.    All right.  The next heading

23   under strategic planning and agility is

24   training materials for 2008 POAs.

Highly Confidential - Subject to Further Confidentiality Review

1    What -- what are those?

2         A.    The acronym stands for plan

3    of action.  And essentially what it is is

4    it's a meeting for -- typically it's a

5    meeting that is held once or twice a year

6    in which they develop, you know, a plan

7    of action.  And there's additional

8    training and certification that was done.

9         Q.    Okay.  And would that once

10   or twice a year meeting for a plan

11   include only sales managers?

12        A.    It would depend upon the

13   business need.  Sometimes it would

14   include both sales managers and sales

15   representatives and sometimes it would

16   just be managers.

17        Q.    All right.  Your next entry

18   under strategic planning and agility is

19   Fentora 2008 business plan, and you

20   reference the FAST team planning

21   sessions.  Do you see that?

22        A.    Mm-hmm.

23        Q.    Is that a yes?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What was the FAST team?

2    A.    The FAST team was really

3    just an acronym for us as an organization

4    to start the year fast.  At the beginning

5    of each year, like you would have to go

6    through like a recertification process.

7    Kind of systems would be reset and

8    sometimes that would take, you know,

9    upwards of three to four months.  So as

10    that was transpiring, our goal was to

11    kind of get through that as quickly as

12    possible.

13          So it was just to get off to

14    a fast start with the year.

15    Q.    Okay.  I've seen references

16    to FAST as Fentora Assessment Strategy

17    Tactics.  Have you heard of that before?

18    A.    I don't recall that.

19    Q.    I've also seen reference in

20    documents to the FAST team being that

21    team which was responsible for the

22    transition from Actiq to Fentora.  Are

23    you familiar with that?

24    A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    All right.  Your next entry

2    under strategic planning and agility is,

3    "Noncancer Fentora modules."

4          Do you see that?

5    A.    Yes.

6    Q.    What were the noncancer

7    Fentora modules?

8    A.    So during this time period,

9    as part of lifecycle management, the

10   medical department was seeking

11   indications outside of cancer.  I believe

12   that this was filed as a new drug

13   application, which was subsequently not

14   approved.  But this would have been, we

15   would have had to develop additional

16   training if it was approved.

17   Q.    Did you have any role in

18   developing these noncancer modules for

19   Fentora?

20   A.    I did begin the process of

21   reviewing them and starting the draft.

22   They were never fully approved, but yes.

23   Q.    Okay.

24   A.    It was in my remit.

1    Q.    Did an outside firm or

2    company prepare the modules for your

3    review?

4    A.    Yes.  We did work -- we

5    typically worked with, like, outside

6    vendors who helped us.

7    Q.    Do you recall the outside

8    vendor who prepared the noncancer Fentora

9    module?

10    A.    I believe it was either EDSI

11    or ETSI or possibly Axiom.  We've worked

12    with a lot of different vendors over the

13    years.  I think it was one of those.

14    Q.    About this time in

15    October 15, 2008, when you prepared your

16    employee self-appraisal, were you made

17    aware of anything with regard to a guilty

18    plea with regard to Actiq?

19    A.    I was aware of the Corporate

20    Integrity Agreement which had been put in

21    place as a result of that, yes.

22    Q.    And did you understand that

23    in the fall of 2008, Cephalon had agreed

24    to a Corporate Integrity Agreement

Highly Confidential - Subject to Further Confidentiality Review

1   because of prior off-label promotion of

2   Actiq?

3          A.    I did.

4          Q.    So if that were taking place

5   at the same time, why would modules have

6   been prepared at that same time for what

7   was then off-label promotion of Fentora?

8              MR. ANDRISANI:  Objection

9          form.

10             THE WITNESS:  I always saw

11         Actiq and Fentora as different

12         products.  And as different

13         products, Fentora had a different

14         lifecycle and medical development

15         program.  So part of that was

16         indications, possibly or probably

17         outside of cancer, so they

18         continued to pursue those.

19   BY MR. MADDEN:

20         Q.    Do you understand that Actiq

21   and Fentora had the same indication?

22         A.    Yes.

23         Q.    And that indication was for

24   opioid-tolerant patients suffering from

1    breakthrough cancer pain?

2           A.    Yes.

3           Q.    Okay.  If we look at Page 3

4    of Exhibit 2 on your self-evaluation,

5    Roman Numeral IV, "What can we do to make

6    you more effective in your current

7    position?"

8                 You have a Bullet Point 3,

9    which says, "Provide an additional

10   training manager to support the pain care

11   portfolio of products."

12                Do you see that?

13          A.    Mm-hmm.

14          Q.    Is that a yes, Mr. Day?

15          A.    Yes.

16          Q.    Thank you.  Did you feel at

17   that time that you needed help doing the

18   sales training for pain care?

19          A.    At that time the

20   responsibilities with Amrix were

21   increasing.  I believe the organization

22   was also expanding to support that

23   product.  So yes, at that time I felt it

24   was appropriate to bring another sales

Highly Confidential - Subject to Further Confidentiality Review

1    training manager on to assist with that.

2         Q.    Did you get that additional

3    sales training help?

4         A.    I did.

5         Q.    Who was that other manager

6    who was hired?

7         A.    Kate Reedy.

8         Q.    Was she hired soon after

9    your self-evaluation?

10        A.    I can't recall the specific

11   time.

12        Q.    How do you spell her last

13   name?

14        A.    R-E-E-D-Y.

15        Q.    All right.  I'll hand you

16   what we marked at Mr. Spokane's

17   deposition at Exhibit 16, which is a

18   guilty plea agreement between the U.S.

19   government and Cephalon.  If you turn to

20   Page 9, you will see a date of

21   September 26, 2008.

22             Do you see that?

23        A.    Mm-hmm.

24        Q.    Is that a yes?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     Have you seen this document

3  before today?

4      A.     I have not, no.

5      Q.     Okay.  If we go to Page 5 of

6  this document, Subsection 8 says,

7  "Between January 2001 and October 1,

8  2001, Cephalon promoted Actiq for uses

9  not approved by the FDA, including for

10  noncancer pain uses such as injuries and

11  migraines."

12          Do you see that?

13      A.     Yes.

14      Q.     Had that information been

15  brought to your attention when you hired

16  on at Cephalon?

17      A.     Yes.

18      Q.     Okay.  And how was that

19  information brought to your attention?

20      A.     This was information that we

21  built and included into the training

22  modules for Fentora.  It was -- that was

23  a time when we were updating those that

24  we spoke about earlier.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    But at the same time you

2    were developing modules for off-label use

3    for Fentora, correct?

4                MR. ANDRISANI:  Objection.

5                THE WITNESS:  It was around

6          the same time.

7    BY MR. MADDEN:

8    Q.    I'll hand you Exhibit 15

9    from Mr. Spokane's deposition.  This is a

10   U.S. Department of Justice press release

11   dated September 29, 2008, regarding a

12   settlement between the U.S. government

13   and Cephalon regarding off-label

14   marketing.  Did you have an understanding

15   before seeing this document that Cephalon

16   had paid $425 million with regard to

17   off-label marketing of its drugs that

18   included Actiq?

19   A.    I was not aware of the

20   dollar amount prior to reviewing this.

21   Q.    If we go to the last full

22   paragraph on Exhibit 15 from Spokane.

23   Second sentence says, "The drug is a

24   strong and highly addictive narcotic,

1   with significant potential for abuse."

2            Do you see that?

3       A.    Is it highlighted?

4       Q.    Last full paragraph, second

5   sentence.

6       A.    Yes.

7       Q.    And would you agree with

8   that sentence?

9       A.    Yes.

10      Q.    Would you agree that the

11  same is true for Fentora?

12           MR. ANDRISANI:  Objection.

13           THE WITNESS:  Yes.

14  BY MR. MADDEN:

15      Q.    The last sentence on Page 1

16  of Exhibit 15 from Spokane that bleeds

17  onto Page 2 says, "Cephalon also promoted

18  Actiq for use in patients who were not

19  yet opioid tolerant and for whom it could

20  have life-threatening results."

21           Do you see that?

22      A.    Yes.

23      Q.    When you came in as sales

24  training manager, were you made aware of

1    those prior marketing activities?

2         A.    Yes.

3         Q.    How were you made aware of

4    those?

5         A.    Through -- these continued

6    to be points of emphasis during the

7    training program that we were developing.

8    Opioid tolerance was critical because it

9    could lead to life-threatening

10   respiratory depression in patients.

11        Q.    You get hired on in, what,

12   July of '07 as kind of the sales training

13   manager, correct?

14        A.    Mm-hmm.

15        Q.    Is that yes?

16        A.    Yes.

17        Q.    And who advised or trained

18   you when you were first hired as sales

19   training manager at Cephalon?

20             MR. ANDRISANI:  Objection to

21        form.

22             THE WITNESS:  I was trained

23        by a combination of people from

24        medical to my direct line manager

Highly Confidential - Subject to Further Confidentiality Review

1    to meeting with marketing and even

2    regulatory personnel and legal.

3  BY MR. MADDEN:

4        Q.    All right.  With regard to

5  the items that we just looked at with

6  regard to Actiq -- Actiq, the guilty plea

7  and the prior off-label marketing

8  activities, who at Cephalon informed you

9  about that prior activity with regard to

10  Actiq?

11        A.    Our compliance department.

12        Q.    Who in the compliance

13  department?

14        A.    Karen Lowney.

15        Q.    Is she still with Teva?

16        A.    She is not.

17        Q.    Do you know where she is

18  now?

19        A.    I do not.

20        Q.    What did Karen tell you

21  about the Actiq situation and prior

22  off-label marketing activities?

23            MR. ANDRISANI:  Objection.

24            THE WITNESS:  Well, from my

1    recollection of the way the

2    organization communicated this is

3    that once they entered into the

4    CIA, there was actually an entire

5    training program and protocol that

6    was put in place through the

7    compliance department.  I believe

8    it was three or four modules that

9    highlighted the important features

10   that we are talking here, and also

11   other key areas within the CIA.

12          So it wasn't like a

13   one-on-one interaction.  It was a

14   companywide training initiative.

15   BY MR. MADDEN:

16          Q.    And did you read and take

17   the test that went with those manuals?

18          A.    Yes.

19          Q.    Have you read the Corporate

20   Integrity Agreement entered by Cephalon?

21          A.    I have not.

22          Q.    But you read the modules and

23   took the test, correct?

24          A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So with regard to your work

2   as a sales training manager for Fentora,

3   you did not have the benefit of reading

4   the actual Corporate Integrity Agreement,

5   is that true?

6    A.    Yes, that's true.

7    Q.    When in the fall of

8   September of 2008 it was announced that

9   Cephalon had entered an agreement to pay

10  $425 million for off-label promotion of

11  drug that included Actiq, were there

12  people who lost their jobs as a result of

13  that?

14          MR. ANDRISANI:  Objection.

15          THE WITNESS:  I'm not aware

16      of specific displacements due to

17      that.

18  BY MR. MADDEN:

19      Q.    Were you aware of your

20  predecessor as sales training manager,

21  whether that person was disciplined or

22  fired as a result of the prior off-label

23  promotion of Actiq?

24          MR. ANDRISANI:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  No.
2   BY MR. MADDEN:
3          Q.    Were you aware of anyone at
4   Cephalon who lost their job as a result
5   of the prior off-label promotion of
6   Actiq?
7                    MR. ANDRISANI:  Objection.
8                    THE WITNESS:  No.
9   BY MR. MADDEN:
10         Q.    With regard to the modules
11  that we've discussed that went along with
12  the Corporate Integrity Agreement, did
13  you have any role or responsibility with
14  either reviewing those or administering
15  those?
16         A.    No, I did not.
17         Q.    Compliance had that
18  responsibility?
19         A.    Yes, they did.
20         Q.    And who in sales took those
21  modules?
22                    MR. ANDRISANI:  Objection to
23         form.
24                    THE WITNESS:  Not just

1      sales, everyone in the company.

2   BY MR. MADDEN:

3         Q.    Those were companywide

4   modules?

5         A.    Yes.

6         Q.    All right.  We saw on your

7   prior self-evaluation a reference to

8   FAST.  Do you remember that?

9         A.    Mm-hmm.  Yes.

10        Q.    And the FAST team?

11        A.    Correct.

12        Q.    And you had indicated that

13  your memory, and I'll grant you it's been

14  ten years.

15        A.    Yeah.

16        Q.    Your memory was that FAST

17  meant get out of the gates fast, right?

18        A.    Correct.

19        Q.    Okay.  So I'm going to hand

20  you a document that we marked again in

21  Mr. Spokane's deposition as Exhibit 24.

22             MR. FAES:  Are you going to

23        mark that as Exhibit 5 to this

24        deposition?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. MADDEN:  No.

2          Does it have -- yeah, it has

3     an exhibit sticker from Spokane.

4     Okay.  So we'll just stick with

5     that so we don't get confused.

6  BY MR. MADDEN:

7          Q.    Have you seen this document

8  before?

9          A.    I can't recall this

10 document.

11         Q.    Okay.

12         A.    I started in July of 2007.

13         Q.    Got it.  But do you see

14 there on the second page of Exhibit 24,

15 there's a reference to FAST team meaning

16 Fentora assessment strategy tactics?

17 Yeah, go back to --

18         A.    This page?

19         Q.    Yes, sir.

20         A.    Yes, I do see that.

21         Q.    Okay.  Does that refresh

22 your recollection that the FAST team was

23 Fentora assessment strategy tactics?

24         A.    It does.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And do you recall

2    being on that team?

3    A.    I don't recall being on that

4    team.

5    Q.    All right.

6    A.    This was a time -- like, not

7    to repeat.  But this was a time when I

8    had just joined the organization.  So I

9    was just getting onboard at -- so that's

10   my recollection of strategy, assessment,

11   and tactics is...

12   Q.    Fair.  May I see that copy?

13   All right.  Sir, in the

14   lower right-hand of these pages is what

15   we call a Bates number.

16   A.    Okay.

17   Q.    So I'm going to reference

18   you to the Bates number in this document.

19   A.    Okay.  Sounds good.

20   Q.    So if you'll turn to a Bates

21   number ending in 12.

22   A.    Oh, it's up above the slide.

23   Q.    It's right here, right --

24   A.    I was looking for the same

Highly Confidential - Subject to Further Confidentiality Review

1    stamp.

2         Q.    -- below the slide.

3         A.    Okay.

4         Q.    So on that Bates number 12,

5    we've got a differentiation slide.  Do

6    you see that?

7         A.    I do.

8         Q.    And under strategies, it

9    says, "Promote ROO subclass as ideal

10   treatment option for BTP."

11            Do you understand BTP to be

12   breakthrough pain?

13        A.    I do.

14        Q.    And what is ROO?

15        A.    Rapid onset opioid.

16        Q.    Fentora is a rapid onset

17   opioid, correct?

18        A.    Prior to it -- it was

19   re-categorized as a transmucosal

20   immediate release fentanyl.  Prior to

21   that nomenclature, it was -- the class

22   was considered ROO.

23        Q.    All right.  And Actiq was

24   also a rapid onset opioid?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Under bullet point 2 for

3  strategies, it says, "Launch broad label

4  and launch higher dose."

5          Do you see that?

6    A.    Yes.

7    Q.    And did you participate in

8  efforts to get a broader label for

9  Fentora?

10   A.    I did not.

11   Q.    You did draft the modules in

12 case a broader label was granted,

13 correct?

14   A.    I did, yes.

15   Q.    Or at least you reviewed

16 those modules, correct?

17   A.    Yes.

18   Q.    How about launch higher

19 dose, did you have any role or

20 responsibility with that?

21   A.    No.  That was with medical.

22   Q.    Okay.  Was a higher dose

23 ever approved by the FDA?

24   A.    No, it was not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    The last bullet point for

2    strategies is, "Strengthen the

3    utilization of KOLs across all regions."

4              Are those key opinion

5    leaders?

6         A.    Yes, they are.

7         Q.    Did you have any role or

8    responsibility with regard to that?

9         A.    In my marketing role I did

10    interact with key opinion leaders, yes.

11        Q.    How so?

12        A.    During promotional

13    programming through the speakers bureau.

14        Q.    And did you recruit

15    speakers?

16        A.    No.  The recruitment process

17    for the speakers bureau was done by a

18    cross-functional body, so it was

19    marketing, legal, compliance and medical

20    that would develop that speakers bureau.

21    So I didn't personally recruit.

22        Q.    All right.  How would you

23    utilize speakers or key opinion leaders

24    and marketing in your role as a sales

1  manager?

2      A.    The sales representatives

3  would set up local programs and they

4  would utilize, usually, a local speaker

5  to review that promotional material, to

6  run the program.

7      Q.    Let's go to Page 13 in this

8  document, the expansion page.  Do you see

9  that?

10      A.    Yes, I do.

11      Q.    First strategy is to

12  maximize core prescribers to set the

13  stage for expanded use.

14          Do you see that?

15      A.    Yes.

16      Q.    What do you understand that

17  to mean?

18      A.    I would understand that to

19  mean going to prescribers that were most

20  familiar with how to properly utilize

21  Fentora and talk to them about expanded

22  use should it occur.

23      Q.    Do you understand that the

24  Fentora core prescribers were carryovers

Highly Confidential - Subject to Further Confidentiality Review

1  from Actiq promotion?

2       A.    I know -- yes.  I know that

3  some prescribed Actiq and the same ones

4  would prescribe Fentora.  Some would and

5  some wouldn't, yes.

6       Q.    Do you understand there was

7  a marketing strategy in place to convert

8  the Actiq prescribers to Fentora

9  prescribers?

10           MR. ANDRISANI:  Objection.

11           THE WITNESS:  No.

12  BY MR. MADDEN:

13      Q.    You weren't part of that?

14      A.    No.

15      Q.    The last bullet point on

16  Page 13 says, "Increase recognition and

17  support of BTP and ROOs by professional

18  societies and patient advocacy groups."

19           Do you see that?

20      A.    Yes.

21      Q.    Did you have any role with

22  regard to that?

23      A.    No.

24      Q.    All right.  Let's go to

1    Page 16 in this document.

2           A.    Okay.

3           Q.    This is a slide that says

4    abuse, addiction and diversion.  And the

5    issue is identified as risk for abuse,

6    addiction and diversion.  Do you see

7    that?

8           A.    Yes.

9           Q.    Do you understand that there

10   was a risk for abuse, addiction and

11   diversion with regard to Fentora?

12          A.    Yes.

13          Q.    The second strategy listed

14   on this page is, "Educate patients about

15   safe use of Fentora and allay fears of

16   opioids."

17                Do you see that?

18          A.    Yes.

19          Q.    What do you understand by

20   the "fears of opioids" that existed in

21   the 2007 time frame?

22                MR. ANDRISANI:  Objection.

23                THE WITNESS:  Honestly I

24          don't know.

1    BY MR. MADDEN:

2         Q.    Have you ever heard the term

3    "opioid phobia"?

4         A.    Yes.

5         Q.    Okay.  What do you

6    understand opioid phobia to mean?

7         A.    Just generally that

8    prescribers may be scared to use opioids.

9         Q.    And when you were a sales

10   training manager, did you view opioid

11   phobia as an objection that a doctor may

12   raise with regard to Fentora?

13             MR. ANDRISANI:  Objection.

14             THE WITNESS:  No, I can't

15        recall specifically discussing

16        opioid phobia as an objection.

17   BY MR. MADDEN:

18        Q.    Did you have any sales

19   training material that would assist a

20   sales representative in overcoming fears

21   of opioids that doctors may have?

22        A.    No.

23        Q.    Did you have any sales

24   training materials that the sales force

Highly Confidential - Subject to Further Confidentiality Review

1    could use if a doctor raised the spectrum

2    of addiction with regard to Fentora?

3            A.    Yeah.  There was, as part of

4    the training protocol and within the

5    prescribing information in the important

6    safety information, it always indicated

7    that as a Schedule II product, there was

8    a risk of abuse, misuse, and diversion.

9    And that was something that we emphasized

10   to talk about on each and every call.

11           Q.    When you say "each and every

12   call," were there regularly scheduled

13   calls with the sales force?

14           A.    There were calls.  I don't

15   know if they were regular.

16           Q.    All right.  Let's go to Page

17   44.

18           A.    Okay.

19           Q.    And this is, again, in

20   Spokane Exhibit 24, Page 44.  We have a

21   slide that says, "Overview of 2008."  Do

22   you see the acronyms that appear above

23   the months in this slide?

24           A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What are those acronyms?

2    A.    Some I recognize.  Some I do

3 not.  Like ONS is Oncology Nursing

4 Society.  APS is American Pain Society.

5         So I believe all of these

6 are medical conferences.

7    Q.    Okay.  And below the line of

8 months, you have numbers like 3040.  What

9 do you understand those to be?

10    A.    So those would probably --

11 this would be for the medical team.  But

12 those would probably refer back to the

13 publications or posters that were being

14 presented during these conferences.

15    Q.    All right.  What role, if

16 any, did you have with regard to posters

17 that were presented at medical

18 conferences?

19    A.    None.

20    Q.    All right.  On Page 44, it

21 says, "Support of marketing messages,

22 BTP," which is breakthrough pain,

23 "similar characteristics in cancer and

24 noncancer."

1    Do you see that?

2    A.    Yes.

3    Q.    Did you see posters that

4    were presented at these meetings that

5    conveyed the message that breakthrough

6    pain has similar characteristics in

7    cancer and noncancer?

8    A.    I can't recall if any of

9    these publications were noncancer.  I'm

10   not sure which data was --

11   Q.    Would any of those posters

12   or publications be utilized by the sales

13   force?

14   A.    No.

15   Q.    Those would be posters or

16   publications that would be used at

17   meetings that doctors would attend?

18   A.    Yes.

19   Q.    And Cephalon would present

20   at those meetings, correct?

21   A.    Yes, they would.

22   Q.    All right.  Let's go to Page

23   46 of this exhibit.  This is a marketing

24   update slide, "Promotional and

Highly Confidential - Subject to Further Confidentiality Review

1  educational resources."  And then it says

2  "personal."

3           Do you have an understanding

4  as to what personal means on that slide?

5           MR. ANDRISANI:  Objection.

6           THE WITNESS:  I'm sorry.

7     Where does it say personal?

8  BY MR. MADDEN:

9     Q.    At the very top.

10    A.    No, I don't.

11    Q.    All right.  The first bullet

12  point references --

13    A.    I see that.  I don't know

14  what that means.

15    Q.    You don't know what that

16  means?

17    A.    No.

18    Q.    At this time you're sales

19  training manager, correct?

20    A.    Correct.

21    Q.    And we see the first bullet

22  point as, "Efficacy flashcard released

23  7/9 to field force."

24           Do you see that?

1    A.    Yes.

2    Q.    Do you know what the

3  efficacy flashcard is?

4    A.    I do.

5    Q.    Okay.  What is it?

6    A.    So the marketing department

7  would develop resources.  One of those

8  was an efficacy flashcard that talked

9  about the efficacy, but also the safety

10 of the product.  It was like a one-pager,

11 front and back.

12   Q.    Right.  And the product that

13 we are talking about here is Fentora?

14   A.    Correct.  Yes.

15   Q.    And the second bullet point

16 is, "WLF, neuropathic pain released 7/9

17 to field force," correct?

18   A.    Correct.

19   Q.    Do you recall that being

20 distributed to your sales force?

21   A.    I don't specifically recall.

22   Q.    Okay.  Do you have any

23 reason to doubt that it was distributed

24 to your sales force in or about July 9th

1    of 2007?

2           A.    Based on this document, no.

3           Q.    Okay.  Would you agree with

4    me that Fentora was not indicated for

5    neuropathic pain?

6           A.    Yes.

7           Q.    Do you know why then this

8    article was released to the sales force

9    in July of 2014?

10                MR. ANDRISANI:  Objection.

11                THE WITNESS:  I do not.

12   BY MR. MADDEN:

13          Q.    Did you train on it?

14          A.    I did not.

15          Q.    All right.  Let's go to the

16   third bullet point on Page 46.

17   "Promotional resources with inclusion of

18   ten-minute onset data in development for

19   August rollout materials include," and

20   then we have a series of inclusions.

21                Do you recognize those

22   inclusions as having been distributed to

23   the sales force in 2007?

24                MR. ANDRISANI:  Objection.

1            THE WITNESS:  I can't

2       specifically recall each one of

3       the resources and what was

4       distributed.

5            We do typically have, like,

6       a core visual aid, patient FAQ.

7       So it looks to be consistent with

8       what would be rolled out.  Yes.

9  BY MR. MADDEN:

10       Q.    What is a CVA or core visual

11  aid?

12       A.    Core visual aid is

13  essentially the core resource that a

14  sales representative would use to talk to

15  healthcare professional.  It's built off

16  of the prescribing information and

17  includes, like, efficacy, safety, those

18  types of things.

19       Q.    What is a file card?

20       A.    A file card, this is a

21  very -- I don't know -- usually a file

22  card is usually like a note card size

23  that has some information about the

24  product.  It may be about a savings

1    program.  It may be about the efficacy or

2    safety.

3            Q.    What about an enlarged PI?

4    What is that?

5            A.    That's just a larger version

6    of the PI that's printed out that's

7    easier for doctors or representatives to

8    read.

9            Q.    How about pocket folder?

10           A.    Same thing as kind of like

11   the core visual aid, but just a smaller

12   resource that would fit in your pocket if

13   you needed a reference.

14           Q.    All right, sir.  Let's go to

15   Page 52.

16           A.    Mm-hmm.

17           Q.    At Page 52 we have a slide

18   for sales training update.

19           A.    Mm-hmm.

20           Q.    One of the entries under

21   execute high priority deliverables is,

22   "IG for efficacy flashcard."

23                 Do you know what that means?

24                 MR. ANDRISANI:  Objection.

1        THE WITNESS:  IG?  No, I

2     can't recall what IG means for.

3  BY MR. MADDEN:

4        Q.    The next entry is, "Fentora

5  module update to reflect label changes."

6        Do you see that?

7        A.    Yes.

8        Q.    And would that be what we

9  saw in your self-evaluation, the module

10  that anticipated a noncancer indication

11  for Fentora?

12        MR. ANDRISANI:  Objection.

13        THE WITNESS:  To the best of

14     my knowledge, those dates, based

15     on what we talked about

16     previously, seem to coincide,

17     so...

18  BY MR. MADDEN:

19        Q.    And then we have, "Establish

20  goals and learning objectives of

21  additional key promotional pieces."  And

22  there's a reference to a BTP flashcard.

23        Do you see that?

24        A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Do you recall the sales

2  force using a BTP flashcard on details

3  with doctors?

4    A.   I can recall the resource.

5  I can't recall seeing it being actually

6  used in the field.

7    Q.   Would you have trained on

8  that resource?

9    A.   We -- yes, I think we would

10  have trained on that.

11    Q.   And you understand BTP to be

12  breakthrough pain, correct?

13    A.   Correct.

14    Q.   What about PK flashcard?  Do

15  you know what that means?

16         MR. ANDRISANI:  Objection.

17         THE WITNESS:  That was

18    pharmacokinetic flashcard.

19  BY MR. MADDEN:

20    Q.   I failed to say at the

21  beginning of the deposition that, you

22  know, you can take a break whenever we

23  want.  I typically take a break every

24  hour, so we can take a break now if you'd

1    like.

2         A.    If you'd -- yeah.  That's

3    fine.  Would you like -- we can do every

4    hour, that's fine.

5              THE VIDEOGRAPHER:  Going off

6         record.  The time is 10:29.

7              (Short break.)

8              THE VIDEOGRAPHER:  We are

9         going back on record.  Beginning

10        of Media File Number 2.  The time

11        is 10:41.

12   BY MR. MADDEN:

13        Q.    Mr. Day, I handed your

14   counsel Exhibit 3.

15             (Document marked for

16        identification as Exhibit

17        Teva-Day-3.)

18   BY MR. MADDEN:

19        Q.    Do you see Exhibit 3 is a

20   cover e-mail from you dated May 21, 2010,

21   with the subject area manager interview?

22        A.    Yes.

23        Q.    And you addressed the e-mail

24   to Randy Spokane and Chandler Tatum,

1 correct?

2          A.     Correct.

3          Q.     Who were they in that time

4 period, within the company?

5          A.     Randy and Chandler were

6 regional directors.  One above a sales

7 manager.

8          Q.     Okay.  When you were a sales

9 training manager, did you report to

10 either Mr. Spokane or Mr. Tatum?

11         A.     No.

12         Q.     You were sending your resumé

13 along for the Mid-Atlantic position here,

14 correct?

15         A.     Yes.

16         Q.     Why is it that you wanted to

17 move from sales training into a sales

18 management position?

19         A.     It was an opportunity for

20 promotion.  And for me, I thought it was

21 career development to get more experience

22 within the organization.

23         Q.     All right.  If we go to the

24 first page of your attached resumé, under

1    senior manager sales training and

2    development, you list management and

3    develop -- oh, I'm sorry.  "Management

4    and development of one sales training

5    manager and all training initiatives to

6    support the promotion of two

7    pharmaceutical products, Amrix and

8    Fentora."

9              Do you see that?

10   A.    Yes.

11   Q.    What is sales training

12   manager that you reference there?

13   A.    Who --

14   Q.    Oh, that's a person.  So you

15   developed one sales training manager?

16   A.    Yes.

17   Q.    That's the woman that you

18   mentioned earlier?

19   A.    Yes.

20   Q.    Okay.  And then your second

21   bullet point there on the first page of

22   your resumé says, "Development of the

23   2010 sales training plans for Fentora and

24   Amrix," correct?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Correct.

2     Q.     Would those have been the

3   modules that we discussed earlier?

4     A.     Yes.

5     Q.     If we go to the second page

6   of your resumé in this document, the

7   first bullet point at the top says,

8   "Developed" -- "Developed of the 2008

9   training plan to support the Fentora

10  brand strategy."

11           Do you see that?

12    A.     Yes.

13    Q.     How were you made aware of

14  the Fentora brand strategy?

15    A.     The Fentora brand strategy

16  was communicated to the cross-functional

17  organization via a meeting.

18    Q.     Would the marketing plan

19  have been presented to you at that

20  meeting?

21    A.     Yes.

22    Q.     The second bullet point

23  says, "Redesign of the initial training

24  curriculum to incorporate blended

Highly Confidential - Subject to Further Confidentiality Review

1    learning approach."

2              Do you see that?

3         A.    Yes.

4         Q.    What is the blended learning

5    approach to which you refer there?

6         A.    It's a term used in adult

7    learning to talk about blending different

8    learning styles, like exams or role play

9    or presentations, blending that

10   altogether and not just making it

11   didactic.

12        Q.    Your fourth bullet point on

13   Page 2 references a managed care

14   curriculum for all Cephalon field-based

15   employees.

16              Do you see that?

17        A.    Yes.

18        Q.    What was the managed care

19   curriculum?

20        A.    The managed care curriculum

21   was developed in conjunction with the

22   managed care team.  And it talked about

23   different formularies, like it would

24   have, like -- whether it was -- like, a

Highly Confidential - Subject to Further Confidentiality Review

1    product was approved, like an NBC block

2    or if it was approved with a prior

3    authorization.  It was training around

4    that -- those terms.

5         Q.    So for example, Fentora,

6    some third-party payers may require a

7    prior authorization before the drug could

8    be prescribed, correct?

9         A.    Yes.

10        Q.    And you trained your sales

11   force on how to deal with those prior

12   authorization?

13        A.    Not how to deal with the

14   prior authorizations.  The doctor on

15   behalf of the patient would work with the

16   managed care company.  But we would train

17   them on if it needed a prior

18   authorization.  So if a doctor asked a

19   question, "I have a Blue Cross Blue

20   Shield patient," they could say, "That

21   would be a prior authorization.  You need

22   to go to Blue Cross and download that

23   form."

24              And then the doctor, on

1    behalf of the patient, if the patient

2    consented, would communicate to Blue

3    Cross.

4         Q.    Did Cephalon or later Teva

5    have a hotline that doctors could call to

6    work their way through that process?

7         A.    They did, yes.

8         Q.    And the sales reps were

9    trained on that hotline?

10        A.    The sales reps were trained

11   on it, to the extent that they knew the

12   number.  But they weren't to call it.

13   And they weren't to utilize it as their

14   own resource.

15        Q.    Are you aware of any sales

16   reps for either Cephalon or Teva who

17   assisted the doctors with either the

18   hotline or the prior authorization

19   process?

20             MR. ANDRISANI:  Objection to

21        form.

22             THE WITNESS:  No.

23   BY MR. MADDEN:

24        Q.    Who in managed care did you

1    work with?

2         A.    Deb Bearer.

3         Q.    What was her role with the

4    company?

5         A.    Well, she -- I believe -- I

6    think, you know, it was like associate

7    director and then probably director of

8    market -- of market access or managed

9    care.

10        Q.    I've seen a document, I

11   think, in your file where you list Deb

12   Bearer as a mentor.

13        A.    Yes.

14        Q.    Did you consider her a

15   mentor?

16        A.    Currently?  Well, she was a

17   mentor.  Yeah.

18        Q.    Okay.  And why do you say

19   that?

20        A.    Her area, I would say, of

21   expertise was really within managed care.

22   And working in the pharmaceutical

23   industry, that was something that I

24   wanted to learn more about.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Were there any other people

2    at Cephalon or Teva that you considered

3    mentors?

4    A.    Specifically, no.  I mean,

5    the way I've kind of always run my career

6    is -- I mean at different points, I try

7    to take the best of the people so

8    they're, you know -- like, Dan Scott may

9    have been, we could call him a mentor at

10   one point, but that's just kind of -- but

11   does that make sense?

12   Q.    Sure.  What about

13   Mr. Spokane?  Did you consider him a

14   mentor?

15   A.    Yeah.  He would be from a

16   sales perspective, yeah.

17             (Document marked for

18             identification as Exhibit

19             Teva-Day-4.)

20   BY MR. MADDEN:

21   Q.    I'll hand you what we have

22   marked as Exhibit 4.  Exhibit 4 is an

23   e-mail string.  And on Page 1 you will

24   see the e-mail dated Thursday, August 18,

1    2016, at 1:38 p.m.  You are listed as one

2    of the recipients.

3                Do you see that?

4         A.    Yes.

5         Q.    And then if we, I'm going to

6    refer you to Bates numbers here, Mr. Day.

7         A.    Okay.

8         Q.    So about halfway through

9    this exhibit, you have a Bates number

10   that ends in 435.

11        A.    Yes.

12        Q.    Do you see that?

13        A.    Yes.

14        Q.    And there we have an e-mail

15   from Dalton Tomlinson dated Tuesday,

16   August 16, 2016.

17               Do you see that?

18        A.    Yes.

19        Q.    What was Mr. Tomlinson's

20   role with the company?

21        A.    He would have been at this

22   point, I believe, vice president of

23   marketing.

24        Q.    And at this point in 2016,

Highly Confidential - Subject to Further Confidentiality Review

1    we are talking about Teva, correct?

2         A.    Correct.

3         Q.    All right.  So

4    second-to-last page, which is Bates

5    number ending in 437, you're getting a

6    shout out in this e-mail congratulating

7    you for your promotion to director of

8    abuse-deterrent opioids.

9              Do you see that?

10        A.    Yes.

11        Q.    And were you indeed promoted

12   to director of abuse-deterrent opioids?

13        A.    I was, yes.

14        Q.    And was that in or about

15   August of 2016?

16        A.    Yes.

17        Q.    What did your promotion to

18   director of abuse-deterrent opioids

19   entail?

20        A.    We essentially had a lead

21   candidate for an abuse-deterrent

22   formulation that's indicated here called

23   Vantrela ER that was in development.  My

24   role was to see and work with the

1    cross-functional team for that NDA, that

2    new drug application, to get the

3    prescribing information filed and then

4    eventually approved, which it was.

5            Then my role would be as the

6    marketing lead to develop the materials

7    that would be utilized and ultimately

8    build the team that would help launch the

9    product.

10           Q.    This abuse-deterrent opioid,

11   was it fentanyl based?

12           A.    It was not.  It was

13   hydrocodone based.

14           Q.    Okay.  And you indicated

15   that the NDA was granted by the FDA?

16           A.    It was.

17           Q.    So the drug was given

18   approval by the FDA?

19           A.    It was.

20           Q.    And did the drug ever

21   launch?

22           A.    It did not.

23           Q.    Why didn't the drug launch?

24           MR. ANDRISANI:  Objection.

1          THE WITNESS:  There was a

2      significant delay in the FDA

3      approval process of a year and a

4      half.  And the exclusivity of the

5      drug was three years, so by the

6      time we could get the drug to

7      market, it could potentially go

8      generic due to manufacturing.

9          The delay from FDA approval

10     of that year and a half was really

11     what led to us not launching the

12     product.

13  BY MR. MADDEN:

14     Q.    Did you participate in

15  decisionmaking with regard to launch of

16  the product?

17     A.    Yes.

18     Q.    You were in meetings where

19  it was discussed whether the product

20  would launch or not, correct?

21     A.    Yes.

22     Q.    And you were there

23  representing marketing?

24     A.    Correct.

1    Q.    All right.  Part of this

2  e-mail that we are looking at, which

3  describes your promotion to director of

4  abuse-deterrent opioids says that you had

5  a role with regard to an abuse deterrent

6  educational campaign called Pain Matters.

7          Do you see that?

8    A.    Yes.

9    Q.    What was that abuse

10 deterrent educational campaign?

11   A.    So Pain Matters was an

12 unbranded campaign that healthcare

13 professionals and doctors could access.

14 It was a website that was designed to

15 provide information and resources, not

16 only about abuse-deterrent formulations,

17 but about safe and appropriate use of

18 opioids.

19   Q.    And the campaign was called

20 Pain Matters?

21   A.    It was.

22   Q.    What media were used in that

23 campaign?

24   A.    The media, so we had search

1    and display, which is primarily internet

2    based.  There was one satellite media

3    tour in which there were interviews, like

4    a half-hour interview that was conducted

5    and different news outlets from across

6    the country would call in to talk with

7    the healthcare professional about the

8    Pain Matters campaign.  It was primarily

9    internet based.  But there was a media

10   tour live.

11        Q.    When that Pain Matters

12   internet campaign and media campaign were

13   done, what opioid pain medicines was Teva

14   promoting at the time?

15        A.    We weren't.  There was no

16   promotion of Fentora at the time, or it

17   was just migrating away.  And then we

18   were moving to the abuse-deterrent

19   portfolio which never launched.

20        Q.    So the company ran a media

21   and internet campaign for opioids without

22   any opioids being currently detailed or

23   marketed, correct?

24             MR. ANDRISANI:  Objection.

1          THE WITNESS:  Yes.

2   BY MR. MADDEN:

3          Q.    And you called it an

4   unbranded campaign, right?

5          A.    Mm-hmm, yes.

6          Q.    Yes.  What do you mean by

7   unbranded?

8          A.    Means that -- it's a word

9   that we used that it was not -- branded

10  typically refers to like a product.

11  Unbranded, usually when we use that,

12  refers to not a product.

13         Q.    At the time that the Pain

14  Matters -- Pain Matters campaign was

15  being run, did Teva distribute generic

16  opioids?

17         A.    So I would assume yes.  I

18  didn't have responsibility for the

19  generic portfolio, but.

20         Q.    So you're running this

21  campaign called Pain Matters that has

22  both media and internet.  What was the

23  purpose for running that campaign?

24         A.    The sole purpose of Pain

Highly Confidential - Subject to Further Confidentiality Review

1    Matters was to provide information and

2    education around the safe and effective

3    use of opioids.

4          Q.    Why would the company run a

5    campaign regarding the safe and effective

6    use of opioids, if the company wasn't

7    marketing any opioids at the time?

8              MR. ANDRISANI:  Objection.

9              THE WITNESS:  It was a

10         program that through our AOP

11         process, we decided to continue,

12         because we had had relationships

13         within pain management and within

14         oncology.

15             So even though there was a

16         gap in the portfolio of products,

17         it made sense to continue to -- to

18         help where we could.

19   BY MR. MADDEN:

20         Q.    Fentora was still being sold

21   at the time of the Pain Matters campaign,

22   correct?

23         A.    I believe, I can't recall

24   the specific time when Fentora was turned

Highly Confidential - Subject to Further Confidentiality Review

1  on and off.  But at one point it was very

2  lightly promoted through an inside sales

3  team.  And the Pain Matters campaign was

4  running.  My recollection is that was

5  maybe about a six-month period and then

6  promotions ceased on Fentora.

7         Q.    Okay.  Your previous answer

8  was that the Pain Matters campaign was

9  run with regard to the safe and effective

10 use of opioids and to help.  Do you

11 recall that testimony from just a minute

12 ago?

13              MR. ANDRISANI:  Objection.

14              THE WITNESS:  Yes.

15 BY MR. MADDEN:

16        Q.    And you were in between

17 opioid marketing for Fentora and this

18 potential abuse-deterrent drug called

19 Vantrela, correct?

20        A.    Yes.

21        Q.    When you say the campaign

22 was run to help, do you mean it was run

23 to help with the then evident opioid

24 epidemic?

Highly Confidential - Subject to Further Confidentiality Review

1              MR. ANDRISANI:  Objection.

2              THE WITNESS:  It wasn't

3         specifically targeted towards the

4         opioid epidemic.  It was geared

5         towards providing education and

6         resources for pain management

7         specialists on the treatment of

8         pain.

9    BY MR. MADDEN:

10        Q.    With opioids, right?

11        A.    With -- well, not just

12   opioids.  There was other information on

13   there as well, like urine drug screen

14   testing, information on proper nutrition.

15   So it was more balance.  It wasn't solely

16   about the use of opioids.

17        Q.    Was there anything in the

18   pain -- I'm sorry.  Was there anything in

19   the Pain Matters campaign that addressed

20   pain drugs other than opioids?

21        A.    Can you re-ask the question?

22   I'm sorry.

23        Q.    Sure, sure.  You told me

24   that the Pain Matters campaign was

Highly Confidential - Subject to Further Confidentiality Review

1    broader than opioids --

2         A.    Yeah.

3         Q.    -- that it included other

4    treatments that didn't involve drugs,

5    correct?

6         A.    It didn't mention specific

7    treatments.

8         Q.    Okay.

9         A.    But like diet, exercise.

10        Q.    Right.  Nondrug

11   treatments --

12        A.    Nondrug treatments were not

13   mentioned in the campaign --

14        Q.    All right.

15        A.    -- were.

16        Q.    In the Pain Matters

17   campaign, was there any mention of

18   pharmaceutical treatment other than

19   opioid treatment?

20             MR. ANDRISANI:  Objection.

21             THE WITNESS:  I would have

22        to go back and look.

23   BY MR. MADDEN:

24        Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1          A.     But there may have been.

2          Q.     We'll get to that.

3          A.     Okay.  That's fine.

4                 (Document marked for

5          identification as Exhibit

6          Teva-Day-5.)

7    BY MR. MADDEN:

8          Q.     Mr. Day, I handed you

9    Exhibit 5.  Do you recognize Exhibit 5 as

10   a copy of your LinkedIn page?

11         A.     Yes.

12         Q.     All right.  And do you still

13   maintain a LinkedIn page?

14         A.     I do.

15         Q.     All right.  And does

16   Exhibit 5 appear to be a fair and

17   accurate copy of your LinkedIn page?

18         A.     It does.

19         Q.     And we see on your LinkedIn

20   page that you list the two positions with

21   Cephalon that we have talked about which

22   are senior manager sales training and

23   development for pain care, and then area

24   field sales manager for pain care,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2          A.    Correct.

3          Q.    And then you list for Teva,

4    director -- director of marketing,

5    CNS/migraine pain care, correct?

6          A.    Correct.

7          Q.    And for some time in that

8    period that you were director of

9    marketing, CNS/migraine pain care, you

10   had some responsibility with regard to

11   Fentora, right?

12         A.    Yes.

13         Q.    You don't have on this

14   LinkedIn page your promotion to director

15   of abuse-deterrent opioids, correct?

16         A.    Correct.

17         Q.    Why didn't you list that?

18         A.    It transpired very quickly

19   from one role to the other.  And that's

20   true of all the roles here, like a sales

21   trainer, or product manager, an associate

22   director, director, abuse deterrent.  So

23   there's several roles that we discussed

24   today.  So I just rolled it into one.

1    Q.    I see.  So while you were

2  marketing director for CNS, you also had

3  the role of abuse-deterrent opioid

4  director, correct?

5    A.    Yes.  At a certain time from

6  the previous e-mail.

7    Q.    And in that role as director

8  of abuse-deterrent opioids, did you

9  coordinate the Pain Matters campaign?

10    A.    Yes.

11    Q.    So any website or media that

12  was generated with regard to that

13  campaign, you reviewed?

14    A.    Yes.

15        (Document marked for

16        identification as Exhibit

17        Teva-Day-6.)

18  BY MR. MADDEN:

19    Q.    I'll hand you Exhibit 6.

20  Exhibit 6 is an e-mail dated January 14,

21  2010, from you to Mr. Tryba, with your

22  2009 year-end review, correct?

23    A.    Yes.

24    Q.    And then we have an attached

Highly Confidential - Subject to Further Confidentiality Review

1    document which is your performance

2    summary, correct?

3          A.    Correct.

4          Q.    If we go to the third page

5    in this document, which has a Bates

6    number ending 769.

7          A.    Yes.

8          Q.    Under performance results it

9    says, "Matt has successfully managed the

10   PCS expansion of 70 PCS TSSs, and 35 CNS

11   TSSs."

12                What are PCS TSSs?

13         A.    Pain care territory sales

14   specialists.

15         Q.    And did that expansion go to

16   the promotion of Fentora?

17         A.    Fentora and Amrix.

18         Q.    And what are the CNS TSSs?

19         A.    Central nervous system

20   territory sales specialists.

21         Q.    And did they promote

22   something other than Fentora?

23         A.    The CNS team promoted

24   Nuvigil and Amrix.

1    Q.    If you go to the next page

2    sir, with the Bates number ending 770,

3    there in the last paragraph it says,

4    "Matt continues to work with Amrix and

5    Fentora PDRC members to improve overall

6    process and improve compliance with

7    GPO-110 regarding individual roles and

8    responsibilities."

9          Do you see that?

10    A.    Yes.

11    Q.    What is PDRC?

12    A.    It stands for promotional

13    development review committee.  It's the

14    group of people that review promotional

15    materials.

16    Q.    All right.  And then

17    GPO-110, what is that?

18    A.    I can't recall that specific

19    policy.  I would believe that would be

20    the policy that would govern PDRC.

21    Q.    When you were a regional

22    sales manager overseeing the Mid-Atlantic

23    for Fentora, were there bonus plans in

24    place for the sales representatives with

Highly Confidential - Subject to Further Confidentiality Review

1   regard to Fentora sales?

2          A.     Yes.

3          Q.     Can you describe those for

4   me?

5          A.     So the bonus plans changed

6   year by year.  The way I would describe

7   the bonus plan was, there were

8   essentially three parts.  There was what

9   I would term administrative, which

10  included things like compliance, exams,

11  and then there was Fentora and Amrix.  So

12  the -- the bonus would be made up of

13  those three components:  Administrative,

14  Fentora, and Amrix.

15         Q.     What do you mean by

16  administrative?

17         A.     That would be like

18  completing expense reports on time.  Just

19  kind of the day-to-day business.

20  Developing routing schedules.  The

21  day-to-day business, things that a

22  representative would do or need to do.

23         Q.     Okay.  And was a portion of

24  the bonus plan tied to sales for that

1    representative?

2           A.    Yes.

3           Q.    And what percentage?

4           A.    I can't recall the exact

5    percentage, and it changed year over

6    year.  Sales operations department, which

7    we had, would set the quota methodology.

8           Q.    Give me one second.  I'm

9    trying to find my stickers.  Here they

10   are.

11                (Document marked for

12                identification as Exhibit

13                Teva-Day-7.)

14   BY MR. MADDEN:

15          Q.    Do you have an understanding

16   while you were either sales manager --

17   sales training manager or sales manager

18   for the Mid-Atlantic as to what

19   percentage of Fentora sales were

20   off-label?

21                MR. ANDRISANI:  Objection.

22                THE WITNESS:  I do not.

23   BY MR. MADDEN:

24          Q.    Has anyone ever told you

Highly Confidential - Subject to Further Confidentiality Review

1    that it was 80 to 90 percent off-label?

2           A.    I've never seen that data.

3           Q.    Okay.  No one ever

4    communicated that to you at the company?

5           A.    No.

6           Q.    If I told you that Fentora

7    sales were 80 to 90 percent off-label,

8    that is, not for breakthrough cancer

9    pain, would you have any reason to

10   disagree with me?

11              MR. ANDRISANI:  Objection.

12              THE WITNESS:  I don't have

13         the data.  I don't know how we

14         would know that.

15   BY MR. MADDEN:

16         Q.    Okay.  So as a sales manager

17   and a sales training manager, that data

18   was not communicated to you, is that

19   true?

20              MR. ANDRISANI:  Objection.

21              THE WITNESS:  Yes.

22   BY MR. MADDEN:

23         Q.    All right.  Sir, I'll hand

24   you Exhibit 7.  Exhibit 7 has a cover

Highly Confidential - Subject to Further Confidentiality Review

1    e-mail of June 29, 2011, from you with

2    the subject, "Second semester bonus

3    plan."

4            Do you see that?

5        A.    Yep.

6        Q.    It's an e-mail to the team.

7    Would that be your sales team for the

8    Mid-Atlantic?

9        A.    Yes.

10       Q.    The attachment has a set of

11   slides dated -- well, if you go to the

12   third page of this document, it says,

13   "Semester 2, 2011 bonus plan."

14           Do you see that?

15       A.    Mm-hmm.

16       Q.    Is that a yes?

17       A.    Yes.

18       Q.    Okay.  Did you draft these

19   slides?

20       A.    No.

21       Q.    Who drafted these slides?

22       A.    Sales operations.

23       Q.    Okay.  And would sales

24   operations communicate these slides to

1  you and then you communicate them to the

2  team?

3          A.    Usually sales operations

4  would communicate directly to the entire

5  sales organization.  They would send it

6  to us and we would follow up to see if

7  there were any questions.

8          Q.    Is the slide plan that's

9  attached to your e-mail that you sent to

10  your sales team the bonus plan that was

11  in effect at that time, to your

12  knowledge?

13          A.    To my knowledge, yes.

14          Q.    And if -- I don't have page

15  numbers for you here, unfortunately.

16          A.    That's okay.

17          Q.    So we're going to have to

18  struggle through this.  But the fourth

19  page, which you happen to be on, "Fentora

20  2011 forecast annual," can you explain

21  what's depicted in that graph for me?

22          A.    That would be the annual

23  gross sales for Fentora.

24          Q.    Okay.  And what's the "IC

1  demand" part of that graph?

2       A.    It looks like based on the

3  footer, that that is demand sales less

4  any DNC.

5       Q.    What is DNC?

6       A.    Do not compensate.

7       Q.    Okay.  What did DNC, or do

8  not compensate, stand for?

9       A.    It would be doctors that

10  would not be compensated -- I'm sorry.

11  Not doctors.  It would be if a doctor

12  generated a prescription, was on the DNC

13  list, a representative would not receive

14  compensation.

15       Q.    Okay.  As I understand it,

16  there was a DNC or do not compensate list

17  which were doctors that the sales force

18  had flagged to not call on, correct?

19       A.    Correct.

20       Q.    And the company would send

21  out a list periodically of doctors in a

22  region who were not to be called upon,

23  correct?

24       A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    What were the reasons that a

2    doctor would land on that DNC list?

3          A.    I didn't review the DNC

4    list.  That was typically done by legal

5    and compliance.  So they would set the

6    methodology to which doctors were

7    determined to be added to the do not

8    compensate.

9          Q.    Okay.  Well, you were a

10   sales manager.  If a doctor were running

11   a pill mill, that could be a reason that

12   the doctor could land on the DNC list,

13   right?

14              MR. ANDRISANI:  Objection.

15              THE WITNESS:  I'm not aware

16         of any doctors running a pill mill

17         or -- so --

18   BY MR. MADDEN:

19         Q.    Have you not seen news

20   reports of doctors who ran pill mils for

21   opioids -- the opioid epidemic?

22              MR. ANDRISANI:  Objection.

23              THE WITNESS:  I've seen

24         reports, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1   BY MR. MADDEN:

2       Q.    Okay.  And so why is it that

3   you say that such a doctor would not land

4   on the DNC list?

5           MR. ANDRISANI:  Objection.

6           THE WITNESS:  What I'm

7       saying is I'm not aware of any

8       doctors that were running a pill

9       mill that were in my call

10      universe, and -- yeah.

11  BY MR. MADDEN:

12      Q.    Okay.  For your Mid-Atlantic

13  region, were there doctors on a DNC list?

14      A.    Yes.

15      Q.    What were the reasons those

16  doctors were on a DNC list?

17          MR. ANDRISANI:  Objection.

18          THE WITNESS:  I don't

19      specifically know the reasons they

20      were on the do not call list,

21      because they were placed on the

22      list by legal and compliance.

23  BY MR. MADDEN:

24      Q.    And do you know any of the
```

Highly Confidential - Subject to Further Confidentiality Review

1    reasons why any of those doctors were

2    placed on the DNC list?

3              MR. ANDRISANI:  Objection.

4              THE WITNESS:  Not

5         specifically.  When we had the do

6         not call, we were not to call on

7         those doctors.  There was no other

8         discussion.

9    BY MR. MADDEN:

10        Q.    Okay.

11        A.    We didn't ask questions.

12        Q.    So looking at that graph,

13   how would a doctor who is on the DNC list

14   who wrote a prescription for Fentora, how

15   would that data be captured?

16             MR. ANDRISANI:  Objection.

17             THE WITNESS:  How would that

18        data be captured?

19   BY MR. MADDEN:

20        Q.    Right.  So we have a graph

21   that says gross Fentora sales of

22   $205 million, right?

23        A.    Mm-hmm.

24        Q.    Is that a yes?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    And then we have a graph

3  that shows IC demand, which is a graph

4  that is total sales minus DNC sales of

5  $201.9 million, correct?

6      A.    Correct.

7      Q.    So that difference of

8  $3 million in sales approximately,

9  $3.1 million in sales was by doctors who

10 were on the DNC list, right?

11     A.    Based on this you can assume

12 that, yes.

13     Q.    Do you know how that data

14 was captured; that is, how the company

15 knew that $3.1 million of its product was

16 being written by doctors who were not

17 on -- who were on its do not call list?

18          MR. ANDRISANI:  Objection.

19          THE WITNESS:  I didn't

20      receive the aggregate of data,

21      just a subset of it.  That data

22      would come into sales operations.

23 BY MR. MADDEN:

24     Q.    From whom?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      From IMS.

2      Q.      What is IMS?

3      A.      It's now IQVIA.  That's the

4  data vendor that supplies the

5  prescription data to the pharmaceutical

6  companies.

7      Q.      Okay.  So when you as a

8  regional sales -- were you regional sales

9  manager?

10     A.      I was area sales manager.

11     Q.      When you as an area sales

12 manager were forwarded this compensation

13 plan which had a graph that showed

14 $3.1 million of Fentora was being written

15 by doctors who were on a do not call

16 list, did you or anyone else from the

17 company report that to the DEA as being

18 suspicious?

19              MR. ANDRISANI:  Objection.

20              THE WITNESS:  I did not.  I

21      don't know about the company.  For

22      do not call doctors, we didn't

23      call on them.

24 BY MR. MADDEN:

1      Q.    I understand.  Do you

2   understand, as a sales training manager,

3   that there are duties under the

4   Controlled Substances Act to report

5   suspicious activities with regard to

6   opioids?

7               MR. ANDRISANI:  Objection.

8               THE WITNESS:  As a sales

9          training manager, I'm aware of

10          that, yes.

11   BY MR. MADDEN:

12      Q.    And I presume you trained

13   your sales force of their duties under

14   the Controlled Substances Act?

15      A.    Part of their training was

16   in the risk map module, which would

17   include things like discussing training

18   around abuse, misuse, diversion of

19   products.  Yes.

20      Q.    And as you sit here today,

21   you know that you didn't report to the

22   DEA that $3.1 million of these Fentora

23   sales were by doctors on the DNC list,

24   right?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. ANDRISANI:  Objection.

2          THE WITNESS:  I didn't

3      report that, no.

4  BY MR. MADDEN:

5      Q.    Do you know of anybody in

6  the company who did report that?

7          MR. ANDRISANI:  Objection.

8          THE WITNESS:  I wouldn't

9      have knowledge of that.  I don't

10     know.

11 BY MR. MADDEN:

12     Q.    Would you agree with me that

13 if $3.1 million of Fentora sales for this

14 time period were written by doctors on

15 the company's own do not call list, that

16 that would be suspicious activity?

17         MR. ANDRISANI:  Objection.

18         THE WITNESS:  I don't know.

19 BY MR. MADDEN:

20     Q.    Okay.  Let's look a couple

21 pages further in this PowerPoint.  A

22 slide called, "Pain care bonus plan."

23 Semester 2, 2011.  It might be easier to

24 follow it on the screen.

1        A.      Okay.

2        Q.      So we see a sales specialist

3   level indicated here.  Would that be just

4   your sales force that worked under you?

5        A.      Yes.

6        Q.      And then we have a target

7   bonus of $15,000 with 60 percent

8   allocated to Fentora sales and 40 percent

9   allocated to Fentora MBO, correct?

10       A.      Yes.

11       Q.      Does this refresh your

12  recollection that sales drove 60 percent

13  of the bonus plan?

14       A.      Yes.

15       Q.      What is MBO?

16       A.      Management by objective.

17  Those were the administrative portions of

18  the plan that I talked about earlier.

19       Q.      Those were, you know, making

20  your quota sales calls, things like that?

21       A.      Making sales calls, expense

22  reports, completing, you know, just

23  day-to-day business things on time, yes.

24       Q.      Okay.  Going back to the

Highly Confidential - Subject to Further Confidentiality Review

1    Controlled Substances Act, in your time

2    as a sales training manager, what did you

3    train the sales force with regard to

4    reporting suspicious activities as

5    regards to Fentora?

6            MR. ANDRISANI:  Objection.

7            THE WITNESS:  What did we

8        train them on?

9    BY MR. MADDEN:

10       Q.    Yes.

11       A.    Well, one module in

12   particular trained the representatives on

13   the risks of abuse, misuse, and diversion

14   of Schedule II products like Fentora.

15       Q.    Did that module inform the

16   sales reps as to any duties to report to

17   the DEA with regard to abuse or

18   diversion?

19           MR. ANDRISANI:  Objection.

20           THE WITNESS:  No.

21           (Document marked for

22       identification as Exhibit

23       Teva-Day-8.)

24   BY MR. MADDEN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'll hand you Exhibit 8.

2 All right.  Exhibit 8 is a June 22, 2010,

3 e-mail from Sheldon Bertz to you.  What

4 was Mr. Bertz's role with the company?

5    A.    He was in sales operations.

6    Q.    Okay.  And we have a subject

7 of, "Second quarter 2010 PCS manager

8 bonus plan."

9         Do you see that?

10    A.    Yes.

11    Q.    And that forwarded an

12 earlier e-mail of May 20, 2010 to you,

13 correct?

14    A.    Yes.

15    Q.    And then we have a graph at

16 the bottom of the page for area managers.

17         Do you see that?

18    A.    Yes.

19    Q.    Now, is this the bonus plan

20 for you as opposed to the salespeople who

21 worked under you?

22    A.    Yes.

23    Q.    And explain to me what this

24 graph means about how you were bonused on

1   Fentora sales.

2       A.    So if I go to the actual

3   compensation plan itself --

4       Q.    That would be the -- that

5   would be the third page of this document?

6       A.    Yeah.  759.

7       Q.    Okay.

8       A.    It says that, "Amrix second

9   quarter bonus was weighted at

10  70 percent."

11      Q.    All right.  So I see that.

12  But I just want to talk to you about

13  Fentora.

14      A.    Okay.

15      Q.    At the time.  At this time,

16  which would be the 2010 time frame.

17      A.    Right.

18      Q.    So as a Mid-Atlantic sales

19  manager, how were you bonused with regard

20  to Fentora sales at this time?

21      A.    30 percent of my bonus was

22  on Fentora.

23      Q.    Okay.  And that would be

24  based on Fentora sales within your

1    Mid-Atlantic region?

2          A.    Correct.

3          Q.    And the multiplier would be

4    1.486?

5          A.    Yes.

6          Q.    And that would be 1.486 of

7    what, total sales for that time period in

8    your region?

9          A.    Correct.  But I can't recall

10   what the multiplier was.

11         Q.    Well, if we go back to

12   Page 1, we see that the graph there has a

13   multiplier of 1.486.

14         A.    Mm-hmm.

15         Q.    And then a dollar figure for

16   Fentora of 2,625.  Do you see that?

17         A.    Mm-hmm.

18         Q.    Does that refresh your

19   recollection as to how you were bonused

20   on Fentora sales?

21         A.    Yes.

22         Q.    Tell me how it happened.

23               The -- I assume you had a

24   base salary as an area sales manager,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2         A.    Yes.

3         Q.    Do you recall what your --

4    your highest base salary was as an area

5    sales manager?

6         A.    I can't recall the specific

7    amount.

8         Q.    Okay.  Without giving me a

9    specific amount, can you give me a

10   ballpark?

11        A.    Probably $165,000.

12        Q.    Okay.  And that would be an

13   annual base salary, correct?

14        A.    Yes.

15        Q.    And then Fentora sales drove

16   some bonus over and above that, correct?

17        A.    Yes, 30 percent.

18        Q.    When you say 30 percent, you

19   mean 30 percent of your bonus was tied to

20   Fentora sales?

21        A.    Yes.

22        Q.    Okay.  70 percent of your

23   bonus was tied to Amrix sales?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And that would be sales

2   within your Mid-Atlantic region, correct?

3      A.    Yeah, correct.

4      Q.    Did you always make a bonus

5   while you were an area sales manager with

6   regard to Fentora sales?

7      A.    I can't specifically recall,

8   but no, I don't think I did.  I know that

9   the year and a half to two years I was a

10  manager, bonuses were extremely low.

11     Q.    Both you and the sales team

12  that worked under you did receive a bonus

13  based on Fentora sales if they met the

14  goals set by the company, correct?

15     A.    Yes, we did.

16          (Document marked for

17          identification as Exhibit

18          Teva-Day-9.)

19  BY MR. MADDEN:

20     Q.    I'll hand you Exhibit 9.

21          Oh, was there any bonus tied

22  to utilization of speakers that you

23  recall?

24     A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    All right.  Let's go to

2  Exhibit 9.  This is a "Dear Doctor"

3  letter put out by Cephalon, in September

4  of 2007.

5         Was this "Dear Doctor"

6  letter ever brought to your attention?

7    A.    I can't recall the specific

8  letter, but at this time I was employed

9  and this would be something that I would

10  be informed of.

11    Q.    All right.  And at this

12  time, you were sales training manager,

13  right?

14    A.    Correct.

15    Q.    The first paragraph of the

16  "Dear Doctor" letter refers to the

17  company learning of serious adverse

18  events including deaths in patients

19  treated with Fentora.  Do you see that?

20    A.    Yes.

21    Q.    It then says, "These deaths

22  occurred as a result of improper patient

23  selection, e.g., use in opioid

24  non-tolerant patients, improper dosing,

Highly Confidential - Subject to Further Confidentiality Review

1    and/or improper product substitution."

2              Do you see that?

3         A.    Yes.

4         Q.    Do you recall when you

5    started with the company that information

6    being brought to your attention?

7         A.    Yes.

8         Q.    And do you have a

9    recollection of what you were told about

10   the deaths being caused by Fentora at

11   that time?

12             MR. ANDRISANI:  Objection.

13             THE WITNESS:  I don't know

14        information about the specific

15        deaths.

16   BY MR. MADDEN:

17        Q.    Do you know that there were

18   deaths, but you don't know the specifics

19   of it?

20        A.    Correct.

21        Q.    Do you recall utilizing this

22   "Dear Doctor" letter in your role as a

23   sales training manager?

24        A.    This -- the policy was that

Highly Confidential - Subject to Further Confidentiality Review

1  when this "Dear Doctor" letter would go

2  out to the healthcare professionals, that

3  it would also go out to the field force

4  to inform them of the updates that we see

5  here.  So, yes.

6          Q.    And how did you utilize the

7  "Dear Doctor" letter, if you recall, with

8  regard to sales training?

9          A.    Like what I can recall is

10  that this would be distributed to the

11  sales force for their information and

12  then if there were things within the

13  "Dear Doctor" letter that updated the

14  prescribing information, we would then

15  update the modules and all of the

16  resources to be in compliance.

17              (Document marked for

18          identification as Exhibit

19          Teva-Day-10.)

20  BY MR. MADDEN:

21          Q.    I'll hand you Exhibit 10.

22              Exhibit 10 is an e-mail

23  string from October of 2007.  And if we

24  look at the bottom of the string there's

Highly Confidential - Subject to Further Confidentiality Review

1    an e-mail from you dated October 25,

2    2007, to a series of people with the

3    subject, marketing feedback requested.

4    Do you see that?

5          A.    Yes.

6          Q.    Who are those people to whom

7    you sent this e-mail?

8          A.    Those would be field sales

9    representatives.

10         Q.    Okay.  In any particular

11   region?

12         A.    No, it looks to be area

13   trainers which would be nationwide.

14   Usually had an area trainer in different

15   parts of the country.  That looks to be

16   this group.

17         Q.    So you were the national

18   sales trainer, and then you had area

19   trainers underneath you; is that correct?

20         A.    Yes.  Well, no, the area

21   trainers reported to the managers.  They

22   didn't report directly to me.

23         Q.    Okay.  You say in -- in your

24   e-mail, "Marketing has asked me to see if

Highly Confidential - Subject to Further Confidentiality Review

1    I could get some feedback from you on the

2    'Dear Doctor/HCP' letter."

3              Do you see that?

4         A.    Yes.

5         Q.    And do you understand that

6    to be the letter we just looked at from

7    the 2007 time frame?

8         A.    Yes.

9         Q.    Why was marketing asking you

10   as a sales training manager to get

11   feedback regarding the "Dear Doctor"

12   letter?

13             MR. ANDRISANI:  Objection.

14             THE WITNESS:  From what I

15        can recall is that they would want

16        to know if the information

17        contained was understood.  A "Dear

18        Doctor" letter goes out like this

19        to the entire healthcare

20        professionals.  And the hope is

21        that they receive the information,

22        understand it, and act

23        accordingly.

24   BY MR. MADDEN:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  You get a response

2  from Timothy Fortescue on the same day at

3  4:35 p.m., correct?

4      A.    Mm-hmm.

5      Q.    Yes?  Is that a yes?

6      A.    Yes.

7      Q.    And Mr. Fortescue is one of

8  your area trainers, is that true?

9      A.    He's an area trainer.

10  Doesn't report to me.

11      Q.    Right.

12      A.    Yes.

13      Q.    But he is one of the

14  addressees of your earlier e-mail,

15  correct?

16      A.    Yes.

17      Q.    And Mr. Fortescue responds

18  regarding the "Dear Doctor" letter.  His

19  second sentence says, "Some of my key

20  customers' responses have been absolutely

21  detrimental to my territory business.

22  See first bullet."

23            Do you see that?

24      A.    Yes.

1   Q.    He then goes on to say in

2   that same paragraph, "Generally speaking,

3   my territory has taken a major hit since

4   September, much of which can be

5   attributed to this topic."

6           Do you see that?

7   A.    Yes.

8   Q.    Okay.  And then his first

9   bullet says, "Some key thought leaders in

10  my territory including a national speaker

11  and a regional speaker for Fentora feel

12  that the letter has put them in a bad

13  predicament.  They feel as if they will

14  be putting themselves in jeopardy of a

15  lawsuit for prescribing Fentora for some

16  of their patients."

17          Do you see that?

18  A.    Yes.

19  Q.    So Mr. Fortescue's response

20  to your e-mail about feedback on the

21  "Dear Doctor" letter was that it was

22  hurting sales for him, correct?

23          MR. ANDRISANI:  Objection.

24          THE WITNESS:  His

Highly Confidential - Subject to Further Confidentiality Review

1       interpretation, yes.

2   BY MR. MADDEN:

3           Q.      And his interpretation was

4   that it was hurting sales because doctors

5   felt that the letter was putting them in

6   legal jeopardy, right?

7                   MR. ANDRISANI:  Objection.

8                   THE WITNESS:  I don't know.

9   BY MR. MADDEN:

10          Q.      Well, he says, "They feel

11  they will be putting themselves in

12  jeopardy of a lawsuit for prescribing

13  Fentora for some of their patients."

14                  Do you see that?

15          A.      Yes.

16          Q.      That's what he reported to

17  you?

18          A.      Yes.

19          Q.      Further in that first bullet

20  point he says the -- he says, "One of

21  them took all of his patients off the

22  Fentora and the other is hesitant to

23  start any new patients at this time.  The

24  latter informed me that he feels a great

Highly Confidential - Subject to Further Confidentiality Review

1    deal of disdain towards Cephalon for

2    turning their backs on their doctors by

3    choosing the wording that they used in

4    the letter."

5              Do you see that?

6         A.    Yes.

7         Q.    So Mr. Fortescue is

8    communicating to you that the letter has

9    decreased sales in his territory because,

10   in his view, the doctors feel that

11   Cephalon turned their back on them,

12   correct?

13             MR. ANDRISANI:  Objection.

14             THE WITNESS:  I wasn't there

15        for the conversation.  But I can

16        read it, yes.

17   BY MR. MADDEN:

18        Q.    Yeah, I'm -- and I

19   understand that.

20        A.    Okay.

21        Q.    I'm only asking what he

22   reported to you.

23        A.    In this -- it's in this

24   e-mail, yes.

1    Q.   Okay.  And do you understand

2  that he's reporting to you that these

3  doctors who are complaining about the

4  "Dear Doctor" letter are doctors who are

5  writing Fentora off-label?

6           MR. ANDRISANI:  Objection.

7           THE WITNESS:  No.

8  BY MR. MADDEN:

9    Q.   Well, it has to be, doesn't

10  it?

11           MR. ANDRISANI:  Objection.

12           THE WITNESS:  I don't know.

13    I didn't write the e-mail.

14  BY MR. MADDEN:

15    Q.   If the doctors that are

16  complaining about the "Dear Doctor"

17  letter are writing Fentora on label,

18  there's no reason to be concerned, is

19  there?

20           MR. ANDRISANI:  Objection.

21           THE WITNESS:  I don't know.

22    I mean, the purpose of the letter

23    was to highlight that there were

24    unfortunate deaths.  So I think

Highly Confidential - Subject to Further Confidentiality Review

1      that in itself -- I don't know if

2      the deaths were on label or off

3      label.

4  BY MR. MADDEN:

5      Q.   Well, the letter also

6  highlights, I believe on the first page,

7  that the indication is for breakthrough

8  cancer pain only, correct?

9      A.   Yeah.  That would be

10 consistent with every communication that

11 we have.

12     Q.   Right.  So if a doctor in

13 Mr. Fortescue's territory is writing off

14 label, that is either writing for a

15 patient who is not opioid tolerant or who

16 doesn't have breakthrough cancer pain,

17 then that doctor who receives the "Dear

18 Doctor" letter may have some concern that

19 it would put him or her in a legal

20 predicament, correct?

21          MR. ANDRISANI:  Objection.

22          THE WITNESS:  I don't know

23      if I can answer on the doctors'

24      behalf.  I think based on my

Highly Confidential - Subject to Further Confidentiality Review

1      recollection of this letter, the

2      letter, and the intent behind the

3      letter was to communicate that

4      there was death -- unfortunately

5      deaths that had occurred, which is

6      very obviously, not coy -- very

7      serious.  I think that probably,

8      when you have a death occur, you

9      look at the way you do things.

10  BY MR. MADDEN:

11      Q.    Right.  But the letter ties

12  the deaths to inappropriate patient

13  selection, such as patients who are not

14  opioid tolerant, correct?

15      A.    It says improper patient

16  selection, improper dosing, yes.

17      Q.    Right.  So --

18      A.    I just --

19      Q.    Let's go to the fourth

20  bullet point in Mr. Fortescue's response

21  to you.

22           He says, "I've had one

23  instance where a pharmacy that refused to

24  dispense Fentora for a patient because

Highly Confidential - Subject to Further Confidentiality Review

1    the pharmacy received the letter and

2    found the patient to be an inappropriate

3    choice.  They contacted the prescribing

4    physician, and he confirmed that he was

5    aware of the letter and wanted to proceed

6    with ordering the script, and the

7    pharmacy continued to withhold the

8    script."

9              Do you see that?

10        A.    Yes.

11        Q.    That would indicate that

12   that doctor in that instance was writing

13   Fentora off-label, correct?

14             MR. ANDRISANI:  Objection.

15             THE WITNESS:  It would

16        indicate an inappropriate choice,

17        which could be off-label.

18   BY MR. MADDEN:

19        Q.    Okay.  Right.  Well, if a

20   patient doesn't have underlying cancer,

21   would you agree with me that that patient

22   is an inappropriate candidate for

23   Fentora?

24             MR. ANDRISANI:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1            THE WITNESS:  The patient

2        must have cancer, yes.

3            (Document marked for

4        identification as Exhibit

5        Teva-Day-11.)

6    BY MR. MADDEN:

7        Q.    Mr. Day, I handed you

8    Exhibit 11.  This is an e-mail also from

9    the October 2007 time frame in response

10   to your e-mail of October 25th, asking

11   for feedback on the "Dear Doctor" letter.

12   And this is from Chai Lee.

13            Do you see that?

14       A.    Yes.

15       Q.    Was he one of the

16   salespeople for Fentora?

17       A.    Yes.

18       Q.    The feedback that he gives

19   you with regard to response to the "Dear

20   Doctor" letter, Number 2 on his response

21   is, "Some (20 percent) have seen this

22   letter as liability, whereas they are no

23   longer able to write Fentora except in

24   cancer pain."

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.    Yes.

3     Q.    Now, having read that, you

4  would agree with me that you were getting

5  feedback that, at least from Mr. Lee,

6  20 percent of his prescribers found the

7  "Dear Doctor" letter to be a liability

8  because they can no longer write off

9  label, correct?

10          MR. ANDRISANI:  Objection.

11          THE WITNESS:  That's what

12     the sentence says, yes.

13  BY MR. MADDEN:

14     Q.    And that ties into

15  Mr. Fortescue's response, which was that

16  doctors were raising concerns about the

17  letter creating liability?

18          MR. ANDRISANI:  Objection.

19          THE WITNESS:  Mm-hmm.

20  BY MR. MADDEN:

21     Q.    Is that true?

22          MR. ANDRISANI:  Objection.

23          THE WITNESS:  I don't know

24     if the two relate.  If one is off

1          label discussion or a discussion

2          on death, or -- so, I think they

3          are separate letters.

4     BY MR. MADDEN:

5          Q.    Fair enough.  Mr. Chai is

6     more direct in his response to you?

7          A.    Yes.

8          Q.    Mr. Chai directly told you

9     that feedback he was getting from doctors

10    with regard to the "Dear Doctor" letter

11    is that they see it as a liability

12    because they're no longer able to write

13    Fentora off-label, correct?

14          MR. ANDRISANI:  Objection.

15    Misstates what's on the paper.

16    BY MR. MADDEN:

17          Q.    All right.  Let's read it

18    directly then.

19          Mr. Chai lists four -- four

20    points that he's getting his feedback

21    from the field with regard to the "Dear

22    Doctor" -- I'm sorry.  Mr. Lee lists four

23    points of feedback to you, correct?

24          A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    The second point is that,

2     "Some (20 percent) have seen this letter

3     as liability, whereas they are no longer

4     able to write Fentora except in cancer

5     pain," right?

6          A.    Yes.

7          Q.    Okay.  Which would indicate

8     to you that at least 20 percent of those

9     to whom Mr. Lee spoke, were writing

10    Fentora for something other than cancer

11    pain, correct?

12         A.    I don't know.  "Some

13    20 percent have seen this letter as a

14    liability" -- yes, could you interpret it

15    that way.

16         Q.    Right.  And if they are

17    writing Fentora for something other than

18    cancer pain, that would be an off-label

19    prescription, correct?

20         A.    Yes.

21              (Document marked for

22              identification as Exhibit

23              Teva-Day-12.)

24    BY MR. MADDEN:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Mr. Day, I'm handing hand

2  you Exhibit 12.  If you can give a copy

3  to your lawyer, please.

4            This is a Fentora brand plan

5  draft for 2011 dated January 5, 2010.

6            Have you seen this document

7  before?

8      A.    Not before -- I mean, I

9  probably seen it.  I can't recall it.

10     Q.    Okay.  A brand plan document

11  in the 2010 time frame, is that something

12  that would have been shared with you in

13  your role at that time?

14     A.    Yes.

15     Q.    And your role in

16  January 2010, remind me, was what?

17     A.    January 2010, that would

18  be -- I would have either been in,

19  depending upon the month, in sales

20  training, or I may have been an area

21  manager at the time.

22     Q.    All right.  Would you have

23  had any role in preparing this document

24  or one like it?

1          A.     No.

2          Q.     Who would have prepared the

3     brand plan?

4          A.     The marketing department,

5     the marketing.

6          Q.     And do you recall who headed

7     Fentora marketing in January of 2010?

8          A.     I do not.

9          Q.     All right.  Let's go to Page

10    2 of this exhibit.  Executive summary,

11    market overview.  And if you look at the

12    second paragraph under market overview,

13    it says, "The current market ROOs

14    accounts for approximately 220,000

15    prescriptions annually down from a peak

16    of 420,000 in 2005 due in part to the

17    introduction of generics and the

18    subsequent reduction in promotional

19    efforts in the class."

20               Do you see that?

21         A.     Yes.

22         Q.     At this time, was Teva in

23    the generic opioid business to your

24    knowledge?

1        A.     I am not aware.  I don't

2    know.

3        Q.     What was the reason for the

4    subsequent reduction in promotional

5    efforts in the class?

6             MR. ANDRISANI:  Objection.

7    BY MR. MADDEN:

8        Q.     Is that because Actiq went

9    generic?

10             MR. ANDRISANI:  Objection.

11             THE WITNESS:  I can't

12        recall.  I don't know from this

13        time frame.

14    BY MR. MADDEN:

15        Q.     All right.  If we look at

16    midway through that same page, it says,

17    "In 2010, Fentora is set to achieve its

18    financial goal of $175 million,

19    stabilizing total Rx volume through

20    physician retention efforts, despite

21    losses in physician productivity and new

22    patient starts.  While a small core group

23    of prescribers, approximately 1,800,

24    primarily pain specialists, account for

Highly Confidential - Subject to Further Confidentiality Review

1   the majority of Fentora total

2   prescriptions, in 2011 there is the

3   opportunity to drive demand by broadening

4   reach with ROO prescribers, non-ROO

5   prescribing oncologists, and allied

6   health professionals, which in turn will

7   drive the identification of new patients

8   for Fentora."

9           Do you see that?

10      A.    Yes.

11      Q.    Did you have an

12  understanding about this time period that

13  there were only a core group of about

14  1,800 Fentora prescribers?

15      A.    Yes.

16      Q.    And did you train or

17  instruct the sales force to concentrate

18  their efforts on that core group?

19      A.    No.

20      Q.    What did you train the sales

21  force to do with regard to that core

22  group?

23          MR. ANDRISANI:  Objection.

24          THE WITNESS:  Trained the --

Highly Confidential - Subject to Further Confidentiality Review

1      we trained the sales force on the

2      product information, the

3      prescribing information.

4  BY MR. MADDEN:

5      Q.    Are you -- how did your

6  sales force know who to target?

7            MR. ANDRISANI:  Objection.

8            THE WITNESS:  So that was

9      outside of sales training.  That

10     was sales operations that would

11     set up the targeting methodology.

12  BY MR. MADDEN:

13     Q.    Right.  When you became a

14  sales manager, how did the sales force

15  underneath you know how to target

16  physicians for Fentora sales?

17            MR. ANDRISANI:  Objection.

18            THE WITNESS:  We -- we would

19     receive a list of targets from

20     sales operations.

21  BY MR. MADDEN:

22     Q.    And do you know how that

23  list was generated?

24            MR. ANDRISANI:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1            THE WITNESS:  I don't know

2       all of the specifics, no.

3  BY MR. MADDEN:

4       Q.    Okay.  If we look at Page 4

5  of this document, this brand plan.  The

6  middle of that page you'll see a heading

7  that says "Market Performance."

8       A.    Mm-hmm.

9       Q.    It says, "Cephalon launched

10  the first ROO, Actiq, establishing the

11  market and managing to drive a

12  significant growth trajectory in total

13  prescriptions, peaking at 420,000 in

14  2005."

15            Do you see that?

16       A.    Yes.

17       Q.    Have you seen that

18  information before today?

19       A.    No.

20       Q.    It then says, "Early success

21  in this arena can be attributed to the

22  promotional focus by Cephalon and the

23  required investment tools to enhance new

24  patient starts and to support

Highly Confidential - Subject to Further Confidentiality Review

1    reimbursement challenges, and significant

2    corporate support and prioritization."

3              Do you see that?

4         A.    Yes.

5         Q.    Do you understand that the

6    market created by Cephalon with regard to

7    the first rapid onset opioid Actiq also

8    drove sales for Fentora later?

9              MR. ANDRISANI:  Objection.

10             THE WITNESS:  No.

11   BY MR. MADDEN:

12        Q.    If we go to the next page,

13   Page 5.  You see the specialty is listed

14   for Fentora prescribers?

15        A.    Yes.

16        Q.    Do you see that the

17   percentage of prescribers for oncology

18   are only 4 percent?

19        A.    Yes.

20        Q.    And that that only

21   represents about 7 percent of Fentora

22   sales?

23        A.    Yes.

24        Q.    Would you agree with me that

Highly Confidential - Subject to Further Confidentiality Review

1  that's suspicious?

2          MR. ANDRISANI:  Objection.

3          THE WITNESS:  No.

4  BY MR. MADDEN:

5      Q.    Why?

6      A.    At the time oncologists

7  would refer to pain management

8  specialists.

9      Q.    So did you not call on

10 oncologists at this time?

11     A.    We called on oncologists.

12     Q.    Okay.  Why would you do that

13 if they weren't writing much Fentora?

14     A.    The oncology landscape was

15 evolving at the time.  Part of the

16 treatment paradigm or coordinated care in

17 oncology was to start to incorporate pain

18 management into oncologic offices.  So we

19 were at a time when they were going --

20 oncologists were going to treat more and

21 more pain and not just refer out.

22     Q.    Okay.  Page 7 of this

23 document has a brand vision.  Middle of

24 the page, 2011 objectives.  "The vision

1    (2020 assuming expanded label) for

2    Fentora is to become the gold standard

3    for treating breakthrough pain and for

4    breakthrough pain to be universally

5    recognized."

6              Do you see that?

7         A.    Mm-hmm.

8         Q.    Is that a yes?

9         A.    Yes.

10        Q.    Do you understand that that

11   was the goal for Fentora, to have a

12   breakthrough pain indication not limited

13   by cancer?

14             MR. ANDRISANI:  Objection.

15             THE WITNESS:  I don't -- I

16        don't understand that to be the

17        only goal.

18   BY MR. MADDEN:

19        Q.    Okay.  Do you understand

20   that to have been a goal of the company?

21             MR. ANDRISANI:  Objection.

22             THE WITNESS:  Yes.

23   BY MR. MADDEN:

24        Q.    And did you have some role

Highly Confidential - Subject to Further Confidentiality Review

1    or responsibility in reaching that goal,

2    other than the module that we discussed

3    earlier?

4            A.    No.

5                  MR. ANDRISANI:  Objection.

6    BY MR. MADDEN:

7            Q.    Okay.  Page 11 of this

8    document.  Under 2011 plan of action,

9    second paragraph, it says, "Although

10   Fentora promotion has been limited over

11   the past two years, it has been

12   demonstrated that the brand is highly

13   sensitive to promotion across a range of

14   tactics."

15                 Do you see that?

16           A.    Yes.

17           Q.    Do you have an understanding

18   as to why Fentora promotion was limited

19   over that two-year period?

20           A.    No.

21           Q.    Would you agree that the

22   Fentora brand was highly sensitive to

23   promotion?

24                 MR. ANDRISANI:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  I -- no.

2   BY MR. MADDEN:

3          Q.    Okay.

4          A.    I didn't write that, so I

5   don't know what the specific words --

6          Q.    You don't understand what

7   that means?

8          A.    Well, I know what it means,

9   but I don't know if I would necessarily

10  agree with it.

11         Q.    Okay.

12         A.    Yeah.

13         Q.    The second sentence says,

14  "Representative-driven detailing

15  activities, messaging, vouchers, and

16  debit cards, and speaker programs, have

17  demonstrated a significant impact,

18  driving 29 percent of Fentora sales

19  historically."

20              Do you see that?

21         A.    Yes.

22         Q.    Would that indicate to you

23  that at least according to the author of

24  this document, 29 percent of Fentora

Highly Confidential - Subject to Further Confidentiality Review

1    sales were attributable to detailing?

2              MR. ANDRISANI:  Objection.

3              THE WITNESS:  It could but

4         that also wouldn't indicate that

5         it was highly sensitive to me.

6    BY MR. MADDEN:

7         Q.    All right.  It then says,

8    "The remaining 71 percent of sales

9    reflect carryover as a result of

10   physician loyalty and past promotion."

11             Do you see that?

12        A.    Yes.

13        Q.    Would that indicate to you

14   that the 71 percent of Fentora sales were

15   a result of market creation done through

16   the promotion of Actiq?

17             MR. ANDRISANI:  Objection.

18             THE WITNESS:  I don't know.

19   BY MR. MADDEN:

20        Q.    Could be that, right?

21             MR. ANDRISANI:  Objection.

22             THE WITNESS:  I don't know.

23   BY MR. MADDEN:

24        Q.    Okay.  Tell me what you

Highly Confidential - Subject to Further Confidentiality Review

1   believe the 71 percent sales carryover as

2   a result of physician loyalty and past

3   promotion goes to?

4           MR. ANDRISANI:  Objection.

5           THE WITNESS:  Well, Fentora

6       launched in 2006, and this is

7       2011.

8   BY MR. MADDEN:

9       Q.    Okay.

10      A.    I wasn't part of the

11  organization with Actiq.  And Actiq was

12  prior to 2006, so I'm not sure what is

13  meant by carryover.  But there is five

14  years between the launch of Fentora to

15  this sentence.  So that would --

16      Q.    So you think that physician

17  loyalty and past promotion carryover

18  could be as a result of Fentora

19  promotion?

20          MR. ANDRISANI:  Objection.

21          THE WITNESS:  I don't know

22      what the loyalty was based on or

23      what past promotion is without

24      time frames.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. MADDEN:

2         Q.    What number is that, 12?

3         A.    Yeah.

4               (Document marked for

5         identification as Exhibit

6         Teva-Day-13.)

7    BY MR. MADDEN:

8         Q.    All right.  Mr. Day,

9    Exhibit 13, this is an e-mail regarding a

10   teleconference from November 25, 2008.

11   You were one of the attendees listed.  Do

12   you see that?

13        A.    Yes.

14        Q.    And then there is an

15   attachment which is called Pre-Module

16   Introduction to Pain.  Do you see this?

17        A.    Yes.

18        Q.    Is this one of the modules

19   that we were discussing that you used as

20   a sales training guide?

21        A.    Yes.

22        Q.    And do you recognize this

23   module as one that would have been

24   administered to the sales force?

1          A.    I'm not sure if this was the

2    final approved version.  But for internal

3    use, it looks to be, yes, on the -- a

4    version that would be introduced, yes.

5          Q.    What were the purposes of

6    these modules such as we've marked as

7    Exhibit 13?

8          A.    To train the field force

9    on -- I mean this one in particular was

10   to train the field force on pain;

11   different types of pain, like, you know,

12   what is pain, the evaluation of pain.

13   Basically, how pain is managed.

14         Q.    All right.  And so the

15   Fentora sales force, which was selling a

16   product used to address breakthrough

17   cancer pain, would take a module such as

18   this as part of their training for

19   detailing doctors, correct?

20              MR. ANDRISANI:  Objection.

21              THE WITNESS:  It wouldn't be

22         for detailing doctors.  It would

23         be for internal education, for

24         them to learn about the entire

Highly Confidential - Subject to Further Confidentiality Review

1    pain landscape.

2         So for example, with

3    Fentora, you have to be opioid

4    tolerant.  So there's an

5    underlying opioid that needs to be

6    taken, right, around the clock,

7    and they need to be tolerant to

8    that for a week or longer.

9         So that is a part of the

10   treatment paradigm and how patient

11   management is treating that we

12   would train them on.

13   BY MR. MADDEN:

14        Q.   Right.  That opioid

15   tolerance though has to be in a patient

16   with cancer, correct?

17        A.   Correct, yeah.

18        Q.   But the sales force that's

19   taking this module, their job essentially

20   is to call on doctors with regard to

21   Fentora, correct?

22        A.   Yes.

23        Q.   They don't have a job

24   description that's broader than that, do

Highly Confidential - Subject to Further Confidentiality Review

1    they?

2              MR. ANDRISANI:  Objection.

3              THE WITNESS:  Without

4         looking at their specific job

5         function, one of their primary

6         functions, yes, was to call on

7         healthcare professionals for

8         Fentora.

9    BY MR. MADDEN:

10        Q.    And you were in charge, at

11   least for a period of time, in training

12   those representatives who were calling on

13   doctors, right?

14        A.    Yes.

15        Q.    And part of that training

16   included these modules, right?

17        A.    Yes.

18        Q.    Okay.  If we go to -- well,

19   let's go back a minute here.  How is the

20   module administered to the sales force?

21        A.    The module is -- this is

22   taken during initial sales, like when

23   you're hired or it's e-mailed to you and

24   then you review it and take a

Highly Confidential - Subject to Further Confidentiality Review

1    certification exam.

2         Q.    And is there a test that

3    goes along with the module?

4         A.    Yes.

5         Q.    Is that taken online or on

6    paper?

7         A.    Online.

8         Q.    And I take it the sales

9    force member has to pass the test to be

10   able to be out in the field dealing with

11   doctors, right?

12        A.    Correct.

13        Q.    Okay.  Let's go to Page 45

14   of this module.  And the numbers I'm

15   using are in that black box.  Do you see

16   that?

17        A.    Yes.

18        Q.    This paragraph, first full

19   paragraph on Page 45 says, "Healthcare

20   professionals also have concerns and

21   fears about opioid side effects and fears

22   about addiction.  The actual likelihood

23   of becoming addicted to opioids when used

24   under medical supervision varies by

Highly Confidential - Subject to Further Confidentiality Review

1    patient population.  Factors that

2    increase the likelihood of developing an

3    addiction include preexisting addictive

4    disorders, untreated psychopathology, or

5    a family history of addictive disease."

6              It then says, "However, in

7    patients without personal or family

8    history of substance abuse, addiction

9    resulting from exposure to opioid therapy

10   is uncommon."

11             Do you see that?

12   A.    Yes.

13   Q.    And your sales force was

14   trained with regard to that paragraph in

15   this module, correct?

16             MR. ANDRISANI:  Objection.

17             THE WITNESS:  As that

18        sentence was included in the

19        training module, yes, and they

20        would have reviewed that.

21   BY MR. MADDEN:

22   Q.    Okay.  The sentence that

23   says, "However, in patients without

24   personal or family history of substance

Highly Confidential - Subject to Further Confidentiality Review

1    abuse, addiction resulting from exposure

2    to opioid therapy is uncommon," do you

3    see that sentence?

4            A.    Yes.

5            Q.    Is that true?

6                  MR. ANDRISANI:  Objection.

7                  THE WITNESS:  I don't know.

8            It's cited from APA.  So it was

9            taken from that article.

10   BY MR. MADDEN:

11           Q.    Do you have information that

12   today would indicate to you that is an

13   untrue statement?

14                 MR. ANDRISANI:  Objection.

15                 THE WITNESS:  I don't know

16           if it's true or if it's not true.

17           "Patients without personal or

18           family history of substance

19           abuse" -- "resulting from exposure

20           to opioid therapy is uncommon."  I

21           mean, I didn't write the article.

22           I don't know personally or have

23           the dataset to say if you're a

24           person or a family without a

Highly Confidential - Subject to Further Confidentiality Review

1       history, that you are therefore

2       going to be not at risk for abuse.

3       I don't know.  I don't have those

4       data or whoever wrote this

5       article.

6   BY MR. MADDEN:

7       Q.    So you were the director in

8   charge of the abuse-deterrent formulation

9   for an opioid, correct?

10      A.    Mm-hmm.

11      Q.    Is that true?

12      A.    Yes.

13      Q.    And part of the reason that

14  the company, Teva, was developing that

15  abuse-deterrent formulation was to deal

16  with the risk of addiction, correct?

17      A.    Abuse.

18      Q.    The risk of abuse, correct?

19      A.    Yes.

20      Q.    And as a director, you don't

21  know one way or the other whether that

22  sentence we've just read is untrue?

23          MR. ANDRISANI:  Objection.

24          THE WITNESS:  No, I don't

Highly Confidential - Subject to Further Confidentiality Review

1    know if it's true or untrue from

2    2005.  And I don't know if it's

3    still true.

4  BY MR. MADDEN:

5        Q.    Further down on Page 45, in

6  this module, it says, "Another

7  significant barrier to appropriate opioid

8  pain management is concern over the legal

9  liabilities associated with controlled

10  substances.  The Federal Controlled

11  Substances Act categorizes drugs with

12  potential for abuse and controls their

13  manufacture and distribution."

14        Do you see that?

15        A.    Yes.

16        Q.    Do you remember earlier we

17  talked about a module addressing the

18  Controlled Substances Act?

19        A.    Yes.

20        Q.    Is this the module about

21  which we were speaking?

22        A.    This is a sentence.  I

23  believe there is information also

24  included in the risk map module.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Is there anything in this

2  module or the risk module that instructs

3  the sales representative to report

4  suspicious prescribing activities?

5         MR. ANDRISANI:  Objection.

6  BY MR. MADDEN:

7    Q.    To the DEA?

8    A.    The sales representative to

9  report to the DEA?

10   Q.    Correct.

11   A.    Not to my knowledge.

12   Q.    Okay.  Page 48 and 49.

13 Let's go to Page 49.  First paragraph

14 says, "Pain appears to reduce the

15 euphoric effects of opioids, so people

16 taking opioids to manage their pain may

17 be at a lower risk for addiction."

18         Do you see that?

19   A.    Yes.

20   Q.    And that, again, is

21 something that was in this training

22 module for the sales force, correct?

23   A.    Yes.

24   Q.    Is that a true statement, to

Highly Confidential - Subject to Further Confidentiality Review

1    your knowledge?

2              MR. ANDRISANI:  Objection.

3              THE WITNESS:  I don't know

4         if it's a true statement.  It's a

5         statement from the source.  But I

6         think -- I mean, opioids are

7         addictive.  Like, we know that.

8         It's an indication in the

9         important safety information,

10        right, bolded.

11   BY MR. MADDEN:

12        Q.    But I guess as someone who

13   has been involved in the opioid world

14   from at least 2007 in the sales and

15   promotion of fentanyl, as someone with

16   that experience, do you believe that

17   someone who is in pain is less likely to

18   become addicted to opioids?

19             MR. ANDRISANI:  Objection.

20             THE WITNESS:  I don't treat

21        patients, so -- but -- can you

22        rephrase the question?

23   BY MR. MADDEN:

24        Q.    Let's just look at the

Highly Confidential - Subject to Further Confidentiality Review

1    sentence again.  In taking into account

2    your experience from 2007 to the present

3    with opioids, it says, "Pain appears to

4    reduce the euphoric effects of opioids,

5    so people taking opioids to manage their

6    pain may be at a lower risk for

7    addiction," is what the statement is in

8    the module from the company, correct?

9         A.    Correct.

10        Q.    And based on your experience

11   since 2007 to the present with marketing

12   and selling opioids, is that a true

13   statement?

14             MR. ANDRISANI:  Objection.

15             THE WITNESS:  I'm not --

16        yeah, I'm not sure who is at lower

17        risk.  I think everyone is at

18        risk.  So the resources are citing

19        different behaviors or personality

20        types.  So I'm not sure.  Everyone

21        is at risk.

22   BY MR. MADDEN:

23        Q.    It then goes on to say,

24   "Certain behaviors are sometimes mistaken

Highly Confidential - Subject to Further Confidentiality Review

1    for addiction.  If patients receive

2    inadequate pain relief, they may exhibit

3    drug-seeking behaviors.  This is called

4    pseudoaddiction.  When these patients

5    receive adequate pain management they no

6    longer exhibit the same behaviors.

7    Patients in pain do not usually become

8    addicted to opioids."

9             Are those true statements?

10            MR. ANDRISANI:  Objection.

11            THE WITNESS:  It's a -- it's

12       a generalization.  Patients can or

13       can not become addicted to

14       opioids.

15   BY MR. MADDEN:

16       Q.    So if a patient, is on an

17   opioid that is not at a high enough dose

18   and exhibits drug-seeking behavior, would

19   you agree to me that that is -- would you

20   agree with this language, that that is a

21   pseudoaddiction?

22            MR. ANDRISANI:  Objection.

23            THE WITNESS:  I mean, I'm

24       not a doctor.  I'm not a

Highly Confidential - Subject to Further Confidentiality Review

1      prescriber.  So I don't know if

2      that fits the strict definition of

3      pseudoaddiction.  I'm not -- I'm

4      not really as familiar with the

5      term pseudoaddiction either.

6   BY MR. MADDEN:

7      Q.    But you were the sales

8   training manager, right?

9      A.    Yes.  Yes.

10     Q.    And you were the one who

11  administered modules such as this one to

12  the sales force, right?

13          MR. ANDRISANI:  Objection.

14     Asked and answered.

15          THE WITNESS:  Yes.

16  BY MR. MADDEN:

17     Q.    Okay.  So what you're

18  telling me is that as a sales training

19  manager who had this module that

20  describes pseudoaddiction, you really

21  don't understand what that means?

22          MR. ANDRISANI:  Objection.

23     Misstates the testimony.

24          THE WITNESS:  No, I mean, we

Highly Confidential - Subject to Further Confidentiality Review

1        know what pseudoaddiction means

2        based on the reference here.  But

3        there are other factors that

4        doctors may consider that I'm not

5        aware of.

6    BY MR. MADDEN:

7        Q.    All right.  How about just

8    that last sentence, "Patients in pain do

9    not usually become addicted to opioids."

10        As you sit here today,

11    knowing what you know --

12        A.    Yeah.

13        Q.    -- is that a true statement?

14        MR. ANDRISANI:  Objection.

15        THE WITNESS:  I think it

16        depends on the patient, the

17        person.

18    BY MR. MADDEN:

19        Q.    So patients in pain can

20    become addicted to opioids.  You would

21    agree with that?

22        A.    Yes, I would.

23        Q.    Was part of this training

24    manual that deals with pseudoaddiction

Highly Confidential - Subject to Further Confidentiality Review

1    and whether patients in pain can become

2    addicted to opioids, was part of this to

3    train the sales force to overcome

4    objections from doctors?

5              MR. ANDRISANI:  Objection.

6              THE WITNESS:  No.

7    BY MR. MADDEN:

8         Q.    What was the purpose then?

9         A.    It was background

10   information on the management of pain.

11             MR. ANDRISANI:  Brian, are

12        you on the same topic?

13             MR. MADDEN:  We can take a

14        break.

15             THE VIDEOGRAPHER:  Going off

16        the record.  The time is 12:05.

17             (Short break.)

18             THE VIDEOGRAPHER:  We are

19        going back on record beginning

20        Media File Number 3.  The time is

21        12:20.

22   BY MR. MADDEN:

23        Q.    Mr. Day, I handed you

24   Exhibit 14.

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Thank you.

2                 (Document marked for

3          identification as Exhibit

4          Teva-Day-14.)

5                 THE WITNESS:  Do you have a

6          sticker?

7    BY MR. MADDEN:

8          Q.     Exhibit 14 is an e-mail

9    dated August 2, 2007, from Elizabeth

10   Amend to you and Danielle Leap dated

11   August 2, 2007.  Who was Ms. Leap?

12         A.     She was my manager.

13         Q.     And Ms. Amend?

14         A.     She was a consultant.

15         Q.     We talked earlier about

16   modules being created by third-party

17   consultants for your review, correct?

18         A.     Yes.

19         Q.     And was Ms. Amend such a

20   consult?

21         A.     Yes.

22         Q.     Okay.  So in August 2007,

23   which, what was that, about a month after

24   you started with the company?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    You get this e-mail from

3    Ms. Amend that attaches a no cancer

4    version of the Fentora product

5    backgrounder, correct?

6        A.    Yes.

7        Q.    And we had the attachment

8    which is Module 2, Fentora learning

9    system.  And this was a noncancer

10   version, correct?

11       A.    Yes.

12       Q.    Did you review this document

13   when you received it?

14       A.    Yes.

15       Q.    Was this noncancer

16   backgrounder ever administered as a

17   module to the sales force?

18       A.    No.

19       Q.    What feedback, if any, do

20   you recall giving on this noncancer

21   backgrounder for Fentora?

22       A.    I -- I don't recall getting

23   feedback.

24       Q.    Why was a noncancer

Highly Confidential - Subject to Further Confidentiality Review

1   backgrounder for Fentora created in

2   August of '07, if Fentora didn't have a

3   indication for noncancer pain?

4        A.   As we talked about earlier,

5   it was, I believe -- so this is when I

6   came into the organization, it was filed

7   with the FDA.  So this was in

8   anticipation of it potentially being

9   approved.

10       Q.   So with the supplemental new

11  drug application, this backgrounder would

12  have been provided to the FDA?

13       A.   Had it been approved.

14       Q.   Handing you Exhibit 15.

15            (Document marked for

16            identification as Exhibit

17            Teva-Day-15.)

18  BY MR. MADDEN:

19       Q.   Exhibit 15 appears to be a

20  PowerPoint or slides --

21            MR. ANDRISANI:  Do you have

22            an extra one?

23            MR. MADDEN:  I gave them to

24            you, but...

Highly Confidential - Subject to Further Confidentiality Review

1          MR. ANDRISANI:  Is there

2     two?

3          THE WITNESS:  Sorry.

4          MR. MADDEN:  And, counsel,

5     I'm happy to hand them to you

6     first.

7          MR. ANDRISANI:  Absolutely

8     fine.

9          THE WITNESS:  That's the

10     first one I dropped.

11 BY MR. MADDEN:

12     Q.    This sales training and

13 development slide dated July 2008.  Do

14 you recognize this?

15     A.    Now that it's here, yes.

16     Q.    Okay.  Did you have any role

17 with regard to preparing this as sales

18 training manager?

19     A.    I'm not sure if I would have

20 specifically created this, but it may

21 have been me or Danielle or somebody in

22 the training department, but it does look

23 familiar, yes.

24     Q.    All right.  If we go to

Highly Confidential - Subject to Further Confidentiality Review

1  Page 2 -- do you have page numbers on

2  there?

3      A.    I do.

4      Q.    All right.  If we go to

5  Page 2 under background, it says, "An

6  initial sales training program was

7  conducted in Malvern, Pennsylvania, from

8  July 14 to 24, 2008."

9          Do you see that?

10     A.    Yes.

11     Q.    What was the purpose of that

12 program to your recollection?

13     A.    Initial sales training

14 programs were put together to train new

15 hires.

16     Q.    Okay.  Were they usually a

17 ten-day ordeal?

18     A.    Yes.

19     Q.    And was this done annually?

20     A.    They were done on an

21 as-needed basis.  So if a representative

22 would leave and go to another company, we

23 would put together a class when that

24 person was backfilled or rehired.

Highly Confidential - Subject to Further Confidentiality Review

1   Q.    I see.  What role did you
2   play in that ten-day sales training
3   program to your recollection?
4        A.    In 2008 I'm not sure if I
5   would have played a lead role or
6   supporting role.  But sales training
7   would be responsible for training the new
8   hires during that ten-day class.
9        Q.    Would the modules be
10  administered during that ten-day period?
11       A.    They would have completed
12  the modules and the certification exams
13  prior to attending.
14       Q.    Okay.  So what then would
15  the sales reps do during that ten-day
16  period at a sales training program such
17  as this?
18       A.    So essentially it was
19  product training and all of the modules
20  were taking -- we would go through
21  different courses on the prescribing
22  information.  The prescribing information
23  for Fentora was quite lengthy, so there
24  was also a medication guide that

Highly Confidential - Subject to Further Confidentiality Review

1    accompanied that, and those two documents

2    are what we would focus the training on

3    to ensure that there was proper retention

4    of the information.

5         Q.    Would you invite outside

6    speakers to these training programs?

7         A.    Yes.

8         Q.    What type of outside

9    speakers?

10        A.    Usually the outside speakers

11   would be internal personnel, like

12   compliance, legal, our medical department

13   to discuss some of the package insert,

14   and occasionally like somebody from sales

15   or marketing.

16        Q.    So those would be internal

17   company speakers, correct?

18        A.    Correct.

19        Q.    From the different

20   departments in the company, right?

21        A.    Correct.

22        Q.    What about somebody from

23   outside the company who would be brought

24   in to speak to the sales force for this

Highly Confidential - Subject to Further Confidentiality Review

1    training, would you ever bring in someone

2    from outside the company?

3            A.    I'm not sure if we did for

4    this specific training.  From time to

5    time we would bring in outside speakers.

6            Q.    What type of outside

7    speakers would you bring in?

8            A.    Like a healthcare

9    professional or a doctor.

10           Q.    And would that healthcare

11   professional or doctor be a -- someone

12   from the speakers bureau typically?

13           A.    Yes.

14           Q.    And the speakers bureau are

15   doctors who acted as key opinion leaders,

16   is that true?

17           A.    Yes.

18           Q.    And those doctors would

19   speak to other doctors about Fentora and

20   be compensated for it, true?

21               MR. ANDRISANI:  Objection.

22               THE WITNESS:  Yes.

23   BY MR. MADDEN:

24           Q.    And that would be arranged

Highly Confidential - Subject to Further Confidentiality Review

1  by the sales force, correct?

2       A.    Correct, as we talked about,

3  yes.

4       Q.    All right.  And Steven Simon

5  is one of those speakers in the speakers

6  bureau for Cephalon/Teva with regard to

7  its opioid products, correct?

8            MR. ANDRISANI:  Objection.

9            THE WITNESS:  He was.

10 BY MR. MADDEN:

11      Q.    All right.  What

12 interactions have you had with Dr. Steven

13 Simon?

14      A.    I have -- during my time as

15 a product manager and marketer, I would

16 attend the speakers bureau training, and

17 during that training, Dr. Simon would be

18 one of the speakers that would attend

19 that.  And him amongst the others.

20      Q.    Dr. Simon's from my neck of

21 the woods, Kansas City.  You know that,

22 right?

23      A.    Yes.

24      Q.    Okay.  Would Dr. Simon ever

Highly Confidential - Subject to Further Confidentiality Review

1  be brought to the Mid-Atlantic region

2  that you oversaw to speak to doctors

3  about Fentora?

4       A.    When I was a Mid-Atlantic

5  manager I can't recall specifically

6  bringing Dr. Simon, but yes, he could

7  have been.  If a representative had

8  requested Dr. Simon or another doctor

9  across the country, yes, they could have

10  gone to the Mid-Atlantic.

11       Q.    Why would a representative,

12  let's say in the Mid-Atlantic region,

13  request a speaker from some other part of

14  the country to come speak to a doctor in

15  the Mid-Atlantic region?

16       A.    In the speakers bureau, they

17  had different tiers, based on your --

18  your knowledge, if you were well

19  published, if you spoke.  So he would be

20  an example.  Or there would be doctors

21  that were Tier 1 or Tier 2 that may have

22  more knowledge and may have more

23  publications, that they would bring in

24  instead of just a local speaker.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So let's go to Page 12 of

2    your PowerPoint here.  For this ten-day

3    conference in July of '08 for the sales

4    force training, you see a slide there

5    that says, "Dr. Steven Simon"?

6    A.    Yes.

7    Q.    And would that indicate to

8    you that Dr. Simon was brought in to

9    speak during this ten-day training

10   program?

11   A.    Yes.

12   Q.    Would you have arranged for

13   Dr. Simon to come speak to the sales

14   force for this program?

15   A.    Sales training would have

16   arranged, yes.

17   Q.    Okay.  Did you personally do

18   it?

19   A.    I can't recall if I

20   personally contacted him for this

21   engagement.  But it would be me -- it

22   could have been me, or somebody in the

23   sales training department, yes.

24   Q.    Okay.  Do you have an

Highly Confidential - Subject to Further Confidentiality Review

1  understanding as to why the sales

2  training department would have brought

3  Dr. Simon from Kansas City in for this

4  ten-day training program?

5      A.   To -- yes, to train on

6  Fentora.

7      Q.   Right.  But why, why bring

8  somebody from Kansas City as opposed to

9  somebody from Pittsburgh or Philly?

10      A.   I don't know around the

11  specific time.  There could be various

12  different reasons.  Like somebody local

13  may not be available.  Or, you know, he

14  could have been, or -- at this time was

15  like a higher tier physician that had

16  more knowledge about pain management.  So

17  there could have been various factors

18  into why he was selected.

19          I think across the different

20  sales training programs, there was almost

21  always a different doctor.  So it was

22  kind of multifactorial.

23      Q.   Do you have an understanding

24  that Dr. Simon after July of 2008 was a

Highly Confidential - Subject to Further Confidentiality Review

1    paid speaker for Fentora?

2              MR. ANDRISANI:  Objection.

3              THE WITNESS:  After 2008 was

4         a paid speaker.

5    BY MR. MADDEN:

6         Q.    Right.

7         A.    Yes, I -- yes, I think he

8    was.

9         Q.    Okay.  Before bring --

10   before either you or whoever in your

11   department brought Dr. Simon in for this

12   training program, what background

13   information did you have about Dr. Simon?

14        A.    So when a speaker is

15   identified on the bureau, it goes through

16   a review process, which consists of

17   legal, compliance, and medical.  And they

18   look at like a doctor's, you know,

19   practice, history, publications, things

20   like that.

21        Q.    So there is some background

22   check done on the doctor --

23        A.    Yes.

24        Q.    -- before he comes in to

1    train the reps, right?

2            A.    Yes, yes.

3            Q.    And you -- and it's your

4    understanding that background check is

5    done by legal, medical, and who else?

6            A.    Compliance.

7            Q.    Compliance?

8            A.    Yes.

9            Q.    Do you know what that

10   background check entails?

11           A.    I don't know the specifics

12   behind it, no.

13           Q.    Did you do any background

14   check on Dr. Simon or did anyone from

15   your department do a background check on

16   him before bringing him in to train the

17   sales force?

18           A.    The speakers bureau is

19   looked at twice a year and reevaluated

20   and re-credentialed.  That's done by the

21   compliance and legal department, not by

22   me.

23           Q.    Is Dr. Simon one of the top

24   speakers for Fentora?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. ANDRISANI:  Objection.

2          THE WITNESS:  I think he is

3      a speaker for Fentora.  I don't

4      know specifically how much he was

5      utilized in comparison to other

6      speakers.  He's a pain

7      management -- he's a nationally

8      known pain management specialist.

9  BY MR. MADDEN:

10      Q.    And because of that national

11  recognition as a pain management

12  specialist, he was brought in for this

13  ten-day session to train sales reps,

14  right?

15      A.    That may have been one of

16  the reasons.  I'm not sure if it was the

17  only one.  Like I said before, it could

18  be geographic.  Other doctors might not

19  have been available.  Different doctors

20  were selected at different times.

21          (Document marked for

22      identification as Exhibit

23      Teva-Day-16.)

24  BY MR. MADDEN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'll hand you Exhibit 16.
2  Were you aware that Dr. Simon was a
3  pharmacist before he was a doctor?
4    A.    We may have discussed it.
5  It doesn't -- now that -- yeah.
6    Q.    Now, seeing this document --
7    A.    Yes.
8    Q.    -- are you aware --
9    A.    Yes.
10    Q.    -- that Dr. Simon was a
11  pharmacist before he was a doctor?
12    A.    Yes.
13    Q.    And if you turn to Page 3 of
14  this document.  Were you aware that he
15  was indicted in 1974 for illegal
16  distribution of a controlled substance
17  when he was a pharmacist?
18    A.    I was not.
19    Q.    Is this news to you?
20    A.    Yes.
21    Q.    Is it news to you that one
22  of your top Fentora speakers was indicted
23  for controlled substance violation in
24  1974?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Does it surprise you?

3         MR. ANDRISANI:  Objection.

4         THE WITNESS:  It's news to

5    me.  I didn't know this.

6  BY MR. MADDEN:

7    Q.    Okay.  But in any event, the

8  Steve Simon that was brought out in --

9  for the ten-day training session, you now

10  know was indicted as a pharmacist for

11  controlled substance violations, correct?

12         MR. ANDRISANI:  Objection.

13         THE WITNESS:  I now know, in

14    1974, yes.

15  BY MR. MADDEN:

16    Q.    And if you look at the last

17  page of that document, do you see a

18  finding of guilty?

19    A.    Where would I see that?

20    Q.    About a third of the way

21  down the page there, being a finding of

22  guilty?

23    A.    Yes, I do see that.

24    Q.    And that was in the United

Highly Confidential - Subject to Further Confidentiality Review

1    States District Court for the Western

2    District of Missouri, correct?

3              MR. ANDRISANI:  Objection.

4              THE WITNESS:  That's --

5         that's what it says.

6    BY MR. MADDEN:

7         Q.    And you know from

8    interacting with Dr. Simon that that's

9    where he's from, right?

10        A.    Yes.

11             (Document marked for

12        identification as Exhibit

13        Teva-Day-17.)

14   BY MR. MADDEN:

15        Q.    All right, sir.  Exhibit 17.

16        A.    Yep.

17        Q.    This is another sales

18   training and development slide, "2010

19   Fentora training?"

20             Do you see that?

21        A.    Yes.

22        Q.    Did you create this or

23   assist in its creation?

24        A.    Yes.  May have either

Highly Confidential - Subject to Further Confidentiality Review

1    created or assisted in the creation, yes.

2         Q.    Okay.  Page 3 of this

3    document has a needs assessment box,

4    field based.  And the second bullet point

5    says, "I do not have any cancer

6    patients."  And that's in quotes.  And it

7    says, "NSMM, post-NSMM."  What does NSMM

8    mean?

9         A.    National sales meeting -- I

10   don't know what the other M stands for.

11   I'm sorry.

12        Q.    So if -- can you tell from

13   this slide that the sales reps were

14   trained with regard to doctors who said,

15   "I do not have any cancer patients"?

16             MR. ANDRISANI:  Objection.

17   BY MR. MADDEN:

18        Q.    That's a bad question.  Let

19   me ask a better question.

20             What do you recollect from

21   the sales training and development

22   training from 2010 as to what the sales

23   reps were trained to do when a doctor

24   said, "I do not have any cancer

Highly Confidential - Subject to Further Confidentiality Review

```
 1    patients"?

 2              MR. ANDRISANI:  Objection.

 3              THE WITNESS:  I mean, the

 4         sales -- I can't recall from the

 5         specific -- this is a needs

 6         assessment.  The sales

 7         representatives were always

 8         trained to promote on label,

 9         patients with cancer that were

10         opioid tolerant.  So if this was

11         an objection, that wouldn't be a

12         doctor that we would call on.

13    BY MR. MADDEN:

14         Q.   Okay.  What is the Voices

15    and Faces campaign?  Do you remember

16    that?

17         A.   I believe, so I wasn't in

18    marketing at the time.  But that was --

19    actually, I don't know.  I don't want to

20    speculate.

21         Q.   Okay.  Let's go to Page 4 of

22    this slide then, this slide presentation.

23    And you see it has, "Quarter 1 basics,

24    plus one."
```

Highly Confidential - Subject to Further Confidentiality Review

1          The third entry in that box

2    says, "CVA, what's missing?"

3          Do you have any idea what

4    that means as you sit here today?

5          A.    I think that was a game that

6    you would play with the CVA, that goes

7    back to the blended learning in using

8    game-ification for learning.

9          Q.    Some kind of role playing

10   for the sales force, correct?

11         A.    Yeah, like -- I can't really

12   describe it.  Maybe a board where there

13   were different, you know, facts that they

14   had to recall.

15         Q.    Okay.  And then let's go to,

16   "Assessment and treatment case studies

17   workshop."  There's a bullet entry,

18   "Marketing Voices and Faces campaign,

19   selling strategy."  And then a second

20   bullet that says, "I have no cancer

21   patients."

22         A.    Mm-hmm.

23         Q.    Do you have an understanding

24   as to what that means?

Highly Confidential - Subject to Further Confidentiality Review

1    MR. ANDRISANI:  Objection.

2    THE WITNESS:  Without the

3    supporting documentation, I

4    believe Voices and Faces was about

5    patients, and the "I have no

6    cancer," as we said before, was,

7    you know, always stating the

8    indication and finding the

9    appropriate patient, with regard

10    to that.

11    BY MR. MADDEN:

12    Q.    Do you recall an iPad

13    strategy campaign?

14    A.    Yes.

15    Q.    What was your role with

16    regard to the iPad strategy campaign?

17    A.    I was a member of the iPad

18    cross-functional team.

19    Q.    Okay.  What did you do as a

20    member of the iPad cross-functional team?

21    A.    Sat in a lot of meetings to

22    review.  It was a time when the

23    organization was incorporating the iPads

24    into the sales force as opposed to like

Highly Confidential - Subject to Further Confidentiality Review

1   hardcopy and paper.  So I sat in meetings

2   to discuss, like, the functionality of it

3   and how it was going to be integrated.

4        Q.    Okay.  Do you recognize the

5   name Dr. Portenoy?

6        A.    Yes.

7        Q.    Who is Dr. Portenoy?

8        A.    He was a primary

9   investigator on the pivotal study that

10  led to the indication for Fentora that

11  was in the prescribing information.

12       Q.    For Fentora?

13       A.    Yes.

14       Q.    Do you recall that

15  Dr. Portenoy also wrote papers and/or

16  posters that discussed use of Fentora for

17  noncancer breakthrough pain?

18       A.    No, I don't recall a

19  specific paper by him.

20       Q.    Okay.  What about posters?

21       A.    No.

22             (Document marked for

23             identification as Exhibit

24             Teva-Day-18.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. MADDEN:

2         Q.    I'll hand you Exhibit 18.

3    Exhibit 18 has your name on the front of

4    it.  It's called "iPad Strategy Meeting,

5    Matthew Day, April 19, 2012."

6         A.    Yep.

7         Q.    That was in my hometown,

8    Kansas City, right?

9         A.    Yes.

10        Q.    What were you doing out in

11   Kansas City for this?

12        A.    Teva had an office in Kansas

13   City --

14        Q.    Overland --

15        A.    -- in Overland Park.

16        Q.    Okay.

17        A.    Yeah.

18        Q.    And did this meeting involve

19   sales reps from around the country?

20        A.    This may have just been

21   managers.  I'm not sure if it was sales

22   reps and managers or just managers.

23        Q.    In 2012, were you product

24   manager for Fentora?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    Okay.  If you look at Page

3   10 of this document -- well, I take that

4   back.  Let's go to Page 4.

5            You've got 2012 strategies

6   and supporting iPad tactics.

7            Do you see that?

8      A.    Yes.

9      Q.    Did you draft or have a role

10  in drafting this document?

11     A.    Yes.

12     Q.    This is your document?

13     A.    Yes.  This is one I would

14  have drafted with the team, yes.

15     Q.    Okay.  Key strategic

16  imperatives on Page 4.

17     A.    Mm-hmm.

18     Q.    "Maintain existing

19  prescriber base and develop new

20  opportunities to expand prescriber base."

21           Do you see that?

22     A.    Yes.

23     Q.    Then it says, "New

24  comprehensive DSA."

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     What's DSA?

3          A.     Digital sales aid.  Earlier

4    we talked about the core visual aid.  The

5    core visual aid was in paper.  Digital

6    sales aid is on the iPad.

7          Q.     Got it.  Okay.  Page 10 of

8    this document has a slide that says,

9    "Fentora DSA and interactive experience.

10   Maintain existing prescriber base and

11   develop new opportunities to expand

12   prescriber base."

13            Do you see that?

14         A.     Yes.

15         Q.     And then you have a cut-out

16   that says, "The importance of Portenoy in

17   practice."

18         A.     Mm-hmm.

19         Q.     Yes?  Is that a yes?

20         A.     Yes.

21         Q.     What was the importance to

22   you of using that cut-out?

23         A.     The data that you see to the

24   right is taken from the publication on

Highly Confidential - Subject to Further Confidentiality Review

1    the left.

2          Q.    From the Portenoy

3    publication?

4          A.    Yes.

5          Q.    Would the sales force use

6    the Portenoy data on sales calls on their

7    iPad with doctors?

8          A.    I don't believe the Portenoy

9    reprint was available on the iPad.  It

10   may have been.  But they would use the

11   digital sales aid more frequently.

12         Q.    The digital sales aid was

13   based on Portenoy data?

14         A.    Yes.

15         Q.    So -- and that data would be

16   available on the iPad for detailing

17   doctors?

18         A.    Yes.  In the images that you

19   see here to the --

20         Q.    Got it.

21         A.    -- to the right.

22         Q.    But one of the images ties

23   to, it looks like a Portenoy paper.  It's

24   too small for me to see, but would --

Highly Confidential - Subject to Further Confidentiality Review

1    would the paper be on the iPad for

2    detailing doctors?

3            A.    I can't recall if the paper

4    was on the iPad or not.  It may have

5    been.  But the primary point of this

6    slide was to show that that's where the

7    data came from that built the digital

8    sales aid.

9            Q.    All right.

10            (Document marked for

11            identification as Exhibit

12            Teva-Day-19.)

13   BY MR. MADDEN:

14            Q.    I'll hand you Exhibit 19.

15            A.    Thank you.

16            Q.    This is a document that has

17   a cover page that says Imagine The

18   Possibilities.  Have you seen this

19   document before today?

20            A.    I'm sure that I have.  I

21   don't recall it, but...

22            Q.    Okay.  Let me point your

23   attention to Page 3.  And it's --

24   indicates that fall managers meeting,

Highly Confidential - Subject to Further Confidentiality Review

1    this may have been prepared for.

2              Do you see that?

3         A.    Yes, I do.

4         Q.    Would you have been at this

5    fall managers meeting?

6         A.    Yes, I think I was here.

7         Q.    Okay.  If we go to Page 4,

8    you'll see that at the meeting 2013

9    performance highlights were discussed.

10         A.    Mm-hmm.

11         Q.    So would that put us in the

12    fall of 2013 or the fall of 2014, or can

13    you tell?

14         A.    This would put us in '13 I

15    believe.

16         Q.    Okay.  So year-to-date

17    performance results for 2013 would have

18    been discussed at this fall meeting.  Is

19    that your recollection?

20         A.    That is, yes.

21         Q.    And at the time you were the

22    manager of -- were you Mid-Atlantic at

23    that time or were you the Fentora product

24    manager?

1          A.     I was product manager.   I

2    was in marketing.

3          Q.     Got it.  Okay.  Page --

4    Page 6 of this document.

5          A.     Mm-hmm.

6          Q.     You see Fentora and then

7    what looks to be a list of competitors in

8    the TIRF market.

9          A.     Yes.

10          Q.     Next to Fentora it says,

11    "Market leader with largest prescriber

12    base."

13               Do you see that?

14          A.     Yes.

15          Q.     Then it says, "About

16    27 percent of TIRF"?

17          A.     Yes.

18          Q.     What do you understand that

19    to mean?

20          A.     The TIRF class.

21          Q.     The TIRF class was fentanyl

22    products such as Fentora and Subsys,

23    right?

24          A.     Yeah, they are all

Highly Confidential - Subject to Further Confidentiality Review

1    fentanyl-based products essentially in

2    different delivery systems.

3        Q.    Got it.  And at least at the

4    time of this fall meeting, Fentora was

5    the market leader in that class, correct?

6        A.    Yes.

7        Q.    And it had 27 percent of

8    that market?

9        A.    Yes.

10        Q.    What's it mean when it says

11    48 percent SOV?

12        A.    That stands for share of

13    voice.  You go -- you go out -- market

14    research, and this is available in the

15    market research document, go out and they

16    ask doctors which product, like, they

17    recall, did they recall, like, Fentora,

18    Onsolis, Abstral, Lazanda, and 48 percent

19    of them recalled Fentora, 8.9 Abstral, so

20    it's a -- how large their share of voice

21    is.

22        Q.    Okay.  Page 10 of this

23    document?

24        A.    Mm-hmm.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    In the "Imagine" slides has

2    a -- a graph, a circle graph?

3         A.    Mm-hmm.

4         Q.    And then below that graph it

5    says, "Teva products make up about

6    60 percent of the overall U.S. TIRF

7    market sales."

8              Do you see that?

9         A.    Yes.

10        Q.    Okay.  So the earlier slide

11   referenced 27 percent of the TIRF market,

12   and then we have a slide that talks about

13   60 percent of the TIRF market sales.

14             Can you explain to me the

15   discrepancy between the two?

16        A.    It looks like this is

17   prescriptions.  And this is dollars.

18        Q.    Okay.  And we have a dollar

19   figure of approximately $173 million,

20   correct?

21        A.    Correct.

22        Q.    And if we look at the

23   electronic version, it's a little better

24   than what I gave you in paper.  You see

1    other drugs listed such as Actiq, Subsys,

2    and generics, correct?

3         A.    Yes.

4         Q.    All right.  The -- that

5    generic fentanyl slice, would that

6    include Teva products?

7         A.    No, I don't -- I don't

8    believe so.  I'm not sure.

9         Q.    Okay.  What generic --

10        A.    That would be --

11        Q.    -- TIRFs would have been on

12   the market at this time?

13        A.    Actiq.  Generic Actiq.

14        Q.    Okay.  That's it, right?

15        A.    Yeah.

16        Q.    That was the only generic

17   TIRF out there, right?

18        A.    Yeah, I believe so.

19        Q.    And Actiq was sold by whom

20   at this time?

21        A.    It was generic.  I don't

22   believe it was promoted by anyone.

23        Q.    Well, I understand it wasn't

24   promoted and I --

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Who --

2          Q.      I asked you a bad question.

3          A.      Yeah.

4          Q.      Who distributed generic

5     Actiq at this time?

6          A.      I don't know.

7          Q.      Who manufactured it?

8          A.      I think -- I don't know who

9     manufactured Actiq, because I'm not sure

10    if it was Teva or if it was the previous

11    company manufacturing on behalf of

12    someone.

13         Q.      Okay.

14         A.      I'm not sure.

15         Q.      By previous company, do you

16    mean Cephalon?

17         A.      Yes.

18         Q.      Okay.  So is it your

19    understanding that the generic fentanyl

20    slice here that we see at 95.9 million

21    for sales, that that Actiq slice, the

22    manufacturer was either Teva or Cephalon?

23              MR. ANDRISANI:  Objection.

24              THE WITNESS:  I'm not sure

1          who the manufacturer was of

2          generic fentanyl or -- or Actiq.

3          Because it changed companies so

4          many times so I'm not sure.

5    BY MR. MADDEN:

6          Q.    Do you know who distributed

7    it?

8          A.    Who distributed which --

9    which one?

10         Q.    Generic Actiq.

11         A.    No.  I don't -- I don't know

12   who manufactured or distributed it.

13         Q.    Okay.  And Actiq is the

14   fentanyl sucker, right?

15         A.    Yes.

16         Q.    And it went generic before

17   Fentora was launched, correct?

18         A.    Yes.

19         Q.    All right.  In that same --

20   on that same page, Page 10, on

21   Exhibit 19 -- well, let's take a step

22   back.

23         A.    Mm-hmm.

24         Q.    If you look at that graph --

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Mm-hmm.

2      Q.      Okay.  So we see that

3   Fentora is about 50 percent of the -- we

4   have to look at -- well --

5      A.      Either way, that's fine.

6      Q.      So Fentora is 50 percent of

7   the market that we see on that graph,

8   correct?

9      A.      Yes.

10      Q.      And that's a branded TIRF

11   product sold by Teva, correct?

12      A.      Yes.

13      Q.      And then we see Actiq sales

14   of 8.9 percent at 31.2 million, correct?

15      A.      Yes.

16      Q.      And then we see below that

17   it says, "Teva products make up about

18   60 percent of the overall U.S. TIRF

19   market sales."

20              Do you see that?

21      A.      Yes.

22      Q.      So if you put the 50 percent

23   Fentora and the approximately 10 percent

24   of Actiq, that would get you to the

Highly Confidential - Subject to Further Confidentiality Review

1   60 percent, right?

2        A.    Yes.

3        Q.    Okay.  Sorry for the

4   confusion.

5        A.    It's okay.

6        Q.    All right.  In that box

7   that's increasingly dynamic marketplace,

8   did you have anything to do with the --

9   this language that's in that box on this

10  slide?

11       A.    Yeah, I mean this would be

12  part of the language that we would have

13  created, these slides would be approved,

14  so yes.

15       Q.    Okay.  And that slide lists

16  as an increasingly dynamic marketplace, a

17  bullet point called public pressure.  Do

18  you see that?

19       A.    Yes.

20       Q.    What was the public pressure

21  being referenced in this slide?

22            MR. ANDRISANI:  Objection.

23            THE WITNESS:  I can't recall

24       what exactly public pressure was

Highly Confidential - Subject to Further Confidentiality Review

1          referring to.  In 2013, I mean

2          there are -- I think it relates to

3          like the market access landscape

4          was changing, and as a result of

5          that, there was not access to

6          medications.  There were more

7          restrictions being placed on

8          opioids.

9    BY MR. MADDEN:

10         Q.    Was the public pressure, to

11   your memory, in 2013, being applied in

12   that there was a growing opioid epidemic?

13              MR. ANDRISANI:  Objection.

14              THE WITNESS:  I mean there

15         was a growing opioid epidemic.  I

16         don't know if that was a result of

17         the public pressure.

18   BY MR. MADDEN:

19         Q.    Okay.  I guess my question

20   is the reverse of that.  Is the public

21   pressure that's listed as a changing

22   market dynamic, is that public pressure

23   as a result of the growing opioid

24   epidemic?

1          MR. ANDRISANI:  Objection.

2          THE WITNESS:  It could be as

3     a result of that, but it could

4     also be as a result of some of the

5     restrictions that I talked about

6     earlier through market access and

7     the -- the inability for patients

8     to receive these therapies.

9          It was a time when the

10     market access landscape was

11     getting severely constricted and

12     more steps were, like we talked

13     about earlier, like NDC blocks

14     were being put on place, so I

15     think there'd be a combination.

16  BY MR. MADDEN:

17     Q.    So there were a time when

18  third-party payers were being more strict

19  about prior authorization for fentanyl

20  products?

21     A.    Yeah -- well, for all.

22     Q.    All opioids?

23     A.    Yes.

24     Q.    Okay.  Let's go to Page 13

Highly Confidential - Subject to Further Confidentiality Review

1  of this "Imagine" slide presentation from

2  2013.  It says, "Fentora is responsive to

3  promotion," and then it has a tactic and

4  a total ROI.

5      A.    Mm-hmm.

6      Q.    What -- what do you

7  understand the total ROI to mean?

8      A.    ROI is return on investment.

9  That is something that ZS & Associates

10  calculates on a sales call and whether or

11  not it was effective.

12      Q.    Okay.  ZS Associates, was

13  that a third-party vendor?

14      A.    They are.  They do market

15  research.

16      Q.    Okay.  And would they

17  actually go interview doctors after sales

18  calls to generate data?

19      A.    I don't know if they

20  specifically interviewed doctors, but

21  they would look at, like, the prescribing

22  data from IMS that we talked about

23  earlier and then come up with an ROI

24  analysis for that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And so looking at

2  this, Page 13, we see a sales call has a

3  return on investment of 160 percent --

4    A.    Right.

5    Q.    -- correct?

6         So would that be a

7  comparison at the cost to the company of

8  that sales call versus the money

9  generated for the Fentora prescription?

10         MR. ANDRISANI:  Objection.

11         THE WITNESS:  Yes.

12  BY MR. MADDEN:

13    Q.    Okay.  And what about

14  promotion programs venue at 117 percent?

15  What would that mean?

16         MR. ANDRISANI:  Objection.

17         THE WITNESS:  I don't know

18       if it necessarily tied back to the

19       dollar figure, because within the

20       sales call there was -- for

21       example, an Rx savings card was --

22       essentially provided financial

23       assistance for patients.

24         So 117 percent would tie

Highly Confidential - Subject to Further Confidentiality Review

1   back to the overall amount of

2   money that was being spent on

3   promotional programs.

4   BY MR. MADDEN:

5   Q.    Got it.  When it says,

6   "Promotional programs - venue versus -

7   office," what do you understand that to

8   mean?

9   A.    The venue would be outside

10  of an office, like at a hotel or a

11  conference center.  And office would be

12  in the doctor's office.

13  Q.    And this is where a speaker

14  would come and speak to the doctor either

15  inside the office or at an outside venue?

16  MR. ANDRISANI:  Objection.

17  THE WITNESS:  Yes.

18  BY MR. MADDEN:

19  Q.    Okay.  What is PA Plus.

20  A.    PA Plus was a prior

21  authorization.  It was a third-party

22  vendor that provided prior authorization

23  assistance that we talked about earlier,

24  like the 1-800 number that the reps

1    didn't have but that the doctors could

2    access to help get patients on Fentora.

3            Q.    Did Cephalon and/or Teva pay

4    that third-party vendor to assist the

5    doctors with prior authorization process?

6                 MR. ANDRISANI:  Objection.

7                 THE WITNESS:  No.

8    BY MR. MADDEN:

9            Q.    How were the third party

10   vendors compensated then?

11                MR. ANDRISANI:  Objection.

12                THE WITNESS:  We would sign

13        up for their -- let me think.  We

14        would sign up for their program

15        and the doctors in Cover My Meds

16        would -- they create an account in

17        Cover My Meds.  And that platform

18        on the internet would give them

19        the ability to download prior

20        authorization forms to the

21        insurance company.

22                It wouldn't complete the

23        form for them.  Instead a doctor

24        going to, like, Blue Cross and all

Highly Confidential - Subject to Further Confidentiality Review

1           the other plans, it was one area

2           that they could go to get that

3           form.

4   BY MR. MADDEN:

5           Q.    So the doctor would go

6   out-of-pocket to pay for that prior

7   authorization plus program?

8               MR. ANDRISANI:  Objection.

9               THE WITNESS:  To my

10          knowledge, it's free to doctors.

11          I don't know if they pay a fee or

12          not.  But I think --

13  BY MR. MADDEN:

14          Q.    If it's free to doctors,

15  somebody has got to be paying the PA Plus

16  people?

17          A.    Yeah.

18          Q.    Who is paying them?

19              MR. ANDRISANI:  Objection.

20              THE WITNESS:  Well, we --

21          and maybe I misstated.  But we

22          would enter into a contract with

23          Cover My Meds and PA Plus so that

24          our product was within their

Highly Confidential - Subject to Further Confidentiality Review

1          platform with multiple other

2          products.

3     BY MR. MADDEN:

4          Q.    Got it.  And so the

5     contract --

6          A.    Sorry, I may have misspoke

7     --

8          Q.    So the contract for this PA

9     Plus which assisted with prior

10    authorizations, was between Teva and this

11    third party?

12         A.    Correct.

13         Q.    What do you understand the

14    circle graph there or pie graph, rather,

15    to mean on this Page 13?

16         A.    It goes back to what we

17    spoke about earlier, where about 68,

18    70 percent of the sales were carryover

19    from previous, and 30 percent were new.

20         Q.    Carryover from what?

21              MR. ANDRISANI:  Objection.

22              THE WITNESS:  So if a

23         patient with cancer went on

24         Fentora, they would typically be

Highly Confidential - Subject to Further Confidentiality Review

1          on it for a while.  It wasn't

2          something that you would go on and

3          off of.

4   BY MR. MADDEN:

5          Q.    Okay.  Carryover from prior

6   years?

7          A.    Yeah, or months.  Yeah.

8                How much longer?

9          Q.    Do you want to break for

10  lunch now?  We can.  Fine by me.

11         A.    Do you want to do like

12  another half hour and then break for

13  lunch?  Or if that doesn't work we can

14  break for lunch now.

15         Q.    Yeah, we can go another half

16  hour.

17         A.    Okay.  Does that work for

18  you guys?

19                Okay.  I still see breakfast

20  back there.

21                (Document marked for

22         identification as Exhibit

23         Teva-Day-20.)

24  BY MR. MADDEN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Exhibit 20 I handed you,

2    which is an e-mail string from February

3    of 2012.  And with these e-mail strings

4    you've got to kind of start at the bottom

5    and go to the top.  So the bottom e-mail

6    is from you to James Wilson regarding

7    Fentora reprints.

8          Do you see that?

9    A.    Yes.

10    Q.    Who is James Wilson?

11    A.    Okay.  I didn't remember.

12    He is from Buddco.  Buddco is a

13    fulfillment house.  They would have all

14    of the promotional materials where a

15    representative would order stuff.

16    Q.    All right.

17    A.    It's a warehouse.

18    Q.    By promotional materials

19    from this warehouse, do you mean

20    materials that the sales force could use

21    in detailing doctors, right?

22    A.    Yes.

23    Q.    All right.  So you say, "I

24    need to make an adjustment to the

Highly Confidential - Subject to Further Confidentiality Review

1  warehouse inventory and ordering form for

2  the reps.  Only the Portenoy FEN-2227,

3  and Weinstein FEN-2225 reprints should be

4  available for ordering."

5          Do you see that?

6      A.    Yes.

7      Q.    Why in February 10, 2012,

8  did you issue this direction to

9  Mr. Wilson?

10     A.    I'm not sure without the

11 context behind it.  There were different

12 reprints that were used.  And I think at

13 one point, just due to the amount of

14 reprints, we just consolidated it down to

15 make it simpler.

16     Q.    One of your instructions is

17 that all other reprints should be removed

18 from ordering.  Do you recall what those

19 other reprints were?

20     A.    I don't recall all of them.

21     Q.    How would the sales force

22 use the reprints in detailing doctors?

23          MR. ANDRISANI:  Objection.

24          THE WITNESS:  If a reprint

Highly Confidential - Subject to Further Confidentiality Review

```
 1              was approved through the PARC

 2              system, they would use that if a

 3              doctor asked additional

 4              information about what was

 5              contained within a visual aid or a

 6              brochure.

 7     BY MR. MADDEN:

 8         Q.    All right.  So if a doctor

 9     asked about use of Fentora for back pain,

10     could the sales rep use a reprint to

11     leave with the doctor?

12              MR. ANDRISANI:  Objection.

13              THE WITNESS:  No.

14     BY MR. MADDEN:

15         Q.    Why not?

16         A.    They were always instructed

17     to state the indication and go back to

18     the approved prescribing and the approved

19     use.  Back pain was not one of those.

20         Q.    Okay.  What additional

21     information would be in these reprints

22     then, other than what was in the label

23     information?

24         A.    Really not -- not much, to
```

Highly Confidential - Subject to Further Confidentiality Review

1    my knowledge.  A lot of these reprints,

2    again, they were studies that built the

3    prescribing information and led to the

4    approval.

5                    (Document marked for

6            identification as Exhibit

7            Teva-Day-21.)

8                    (Document marked for

9            identification as Exhibit

10           Teva-Day-22.)

11   BY MR. MADDEN:

12           Q.    All right, sir.  I'm handing

13   you two exhibits, 21 and 22, that are

14   articles, one from a Sharon Weinstein,

15   M.D., and the other from a Russell

16   Portenoy, M.D., as lead authors.

17           A.    Mm-hmm.

18           Q.    And on the Portenoy article

19   it has an, "Approved by Matt Day," and a

20   date.

21                 Do you see that?

22           A.    Yes.

23           Q.    Okay.  Are these the

24   handouts -- I'm sorry -- or articles

Highly Confidential - Subject to Further Confidentiality Review

1    mentioned in the e-mail we just reviewed,

2    which are referenced as Portenoy 2227 and

3    Weinstein 2225?

4         A.    Yes, they should be.

5         Q.    So you were telling the guy

6    at the warehouse these are the two

7    articles that sales reps can order from

8    here on out, correct?

9         A.    Yes.

10        Q.    And do you recall the other

11   articles that you were discontinuing, did

12   they discuss use of Fentora off label?

13        A.    No.

14             MR. ANDRISANI:  Objection.

15   BY MR. MADDEN:

16        Q.    They did not?

17        A.    No.

18        Q.    Were there ever --

19        A.    Not to my knowledge, no.

20        Q.    Were there ever Fentora

21   handouts that discussed use of Fentora

22   off label?

23        A.    No.

24        Q.    Did you ever see posters at

Highly Confidential - Subject to Further Confidentiality Review

1    a convention that discussed use of

2    Fentora off label?

3         A.    The medical department would

4    present posters.  But I never saw them at

5    the conference.  Like that was handled by

6    medical.  Not -- anything that we had was

7    approved through this process that you

8    see here, through like the PARC, legal,

9    compliance, and regulatory, and

10   consistent with the prescribing

11   information.

12        Q.    Okay.  When would you have

13   an opportunity to see posters?

14        A.    The only time I would see

15   posters is when I went to the conference.

16        Q.    As Fentora product manager,

17   did medical run the posters by you before

18   they were used at a conference?

19        A.    No.

20              MR. ANDRISANI:  Objection.

21              THE WITNESS:  I didn't have

22        any input into that.

23   BY MR. MADDEN:

24        Q.    And so as Fentora product

Highly Confidential - Subject to Further Confidentiality Review

1    manager, did you have occasion to go to

2    national conferences?

3           A.    Yes.

4           Q.    And those could be pain

5    conferences, correct?

6           A.    Correct.

7           Q.    And when you went to those,

8    would you stop by the Fentora booth?

9           A.    Yes.

10          Q.    And you'd see what posters

11   were being displayed at the Fentora

12   booth?

13          A.    The posters wouldn't be

14   displayed at the booth.  The booth was

15   just the promotional material that was

16   approved through PARC.  The posters were

17   in a separate hall, like a poster

18   session.

19          Q.    Okay.  Would you have

20   occasion at those national conferences to

21   walk through the posters halls and see

22   what posters were associated with

23   Fentora?

24          A.    Yes, we could see them.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    All right.  When you did

2    that, did you ever see posters for

3    Fentora that were for other than

4    breakthrough cancer pain?

5    A.    I can't recall any specific

6    ones, no.  I know it was part -- again,

7    this, this was for medical.  I know it

8    was part of the medical development

9    program, but I can't recall specifically

10   what they had studied, what they had

11   published, what posters were presented.

12   Q.    All right.  I want to go --

13   before we break for lunch, maybe I can

14   get through this section.

15   A.    These are done?

16   Q.    Yes.

17   MR. MADDEN:  You know, we

18   probably ought to break for lunch,

19   because I -- my next section we

20   probably don't want to break up,

21   so...

22   THE WITNESS:  Okay.

23   MR. MADDEN:  Okay?

24   THE WITNESS:  Sounds good.

1              THE VIDEOGRAPHER:  Going off

2       the record.  The time is 1:08.

3                    -   -   -

4              (Lunch break.)

5                    -   -   -

6              THE VIDEOGRAPHER:  We are

7       going back on record.  Beginning

8       Media File Number 4.  The time is

9       1:41.

10   BY MR. MADDEN:

11       Q.    Mr. Day, we're back after a

12   lunch break.  And I want to go back to a

13   subject that we started talking about

14   this morning, which is the Pain Matters

15   unbranded marketing that we talked about

16   this morning.

17       A.    Yes.

18       Q.    It's a campaign, correct?

19       A.    Yes.

20       Q.    And your role was as

21   director of that campaign in the

22   marketing department?

23       A.    Yes.

24       Q.    All right.

1          (Document marked for

2          identification as Exhibit

3          Teva-Day-23.)

4    BY MR. MADDEN:

5          Q.    I'll hand you Exhibit 23.

6                We have a cover e-mail dated

7    11/12/2014, with an attachment of Teva

8    Pain Matters routes.  And that's

9    forwarded to you from Samantha Schwarz,

10   November 12, 2014.

11               Do you see that?

12         A.    Yes.

13         Q.    Ms. Schwarz was?

14         A.    GolinHarris was our PR

15   agency.

16         Q.    I see.  And the people cc'd

17   are those all GolinHarris people?

18         A.    Yes, they are.

19         Q.    And is that the company that

20   you used to assist you in this unbranded

21   marketing campaign called Pain Matters?

22         A.    Yes.

23         Q.    If we go to the second page,

24   which is a Bates number ending 565.  You

1   see a slide at the bottom of that page

2   which has a quote that says, "Teva

3   understands the risk of opioid abuse as a

4   societal challenge and one many

5   healthcare professionals face in treating

6   people living with chronic pain."

7          Do you see that?

8       A.    Yes.

9       Q.    I can't tell who that quote

10  is attributed to.  Do you know?

11      A.    I believe it's Dr. Michael

12  Hayden who was our chief, excuse me,

13  medical officer at the time.

14      Q.    Okay.  Dr. Hayden at the

15  time was inhouse with Teva?

16      A.    Yes.

17      Q.    Okay.  And what do you

18  understand this second page to be, is

19  this part of the website?

20      A.    It is, yes.

21      Q.    And it was forwarded to you

22  for approval then?

23      A.    Yes, it -- yes.  Yes, we

24  would update the website and this was

Highly Confidential - Subject to Further Confidentiality Review

1    sent to me.  Now I wouldn't approve this

2    solely.  This would be in a draft version

3    and it would go back into that PARC

4    committee that I talked about earlier

5    that would review the content.

6          Q.    What is the societal

7    challenge that's being referenced here,

8    opioid abuse?

9          A.    I don't -- I don't know.  I

10   didn't speak to Dr. Hayden directly.

11         Q.    At the time you received

12   this, you were the director for Pain

13   Matters marketing, right?

14         A.    I was, yes.

15         Q.    And this was part of that

16   marketing program, correct?

17         A.    Correct.

18         Q.    Okay.  And you have included

19   a quote from Dr. Hayden that says, "Teva

20   understands the risk of opioid abuse as a

21   societal challenge."

22         A.    Yeah.  I mean, I think they

23   can be multifaceted, right.  Abuse,

24   misuse, diversion, I think he's referring

1    to all of those as societal challenges

2    that were going on and that still exist

3    today.

4              Q.    Okay.   This campaign then

5    was a public relations campaign for Teva?

6                    MR. ANDRISANI:  Objection.

7                    THE WITNESS:  It was -- no,

8         it was managed and created by a

9         public relations firm but it

10        wasn't a PR campaign as much as it

11        was really, in its truest sense, a

12        campaign of information and

13        education around pain management,

14        appropriate use of opioids, other

15        therapies, resources.

16             There was a lot of

17        information within the pain

18        community and there was no one

19        place to get all the resources

20        that you needed.  So it wasn't

21        necessarily a PR campaign.  It was

22        run by the PR company.

23   BY MR. MADDEN:

24             Q.    So typically, when a

Highly Confidential - Subject to Further Confidentiality Review

1   campaign such as this is run, it is

2   either for an existing opioid or pain

3   product, or an anticipated opioid or pain

4   product.  Was this campaign run in

5   connection with either of those?

6          A.    This campaign was run more

7   as a franchise campaign to speak to

8   Teva's commitment within pain management,

9   not just specific to opioids, Fentora or

10  Amrix or things in development.  But this

11  was a therapeutic focus of the

12  organization, was pain care.  So it

13  was -- it was a larger franchise.

14         Q.    What other pain products

15  were within that pain franchise at the

16  time this campaign was run?

17         A.    So this was a time, as we

18  spoke about earlier, with Fentora and

19  Amrix, and then the -- also the pipeline

20  which was developing the abuse-deterrent

21  opioids.  And the company was actually

22  looking into other areas of pain

23  management as well, like devices.  As I

24  mentioned, this was a therapeutic focus

1    for Teva.

2           Q.    At the time Pain Matters was

3    run, was Fentora being detailed to

4    doctors?

5           A.    From what I can recall,

6    there may have been a short period of

7    time that it was.  And then I think, if I

8    recall, it was about four to six months,

9    and then it ceased promotion, and this

10   campaign continued.

11          Q.    All right.  At the time Pain

12   Matters campaign was run, was Amrix being

13   promoted to doctors?

14          A.    Yes.

15          Q.    At the time this campaign

16   was run, was the abuse-deterrent formula

17   Vantrela being detailed to doctors?

18          A.    No, it wasn't.

19                (Document marked for

20          identification as Exhibit

21          Teva-Day-25.)

22   BY MR. MADDEN:

23          Q.    Mr. Day, I'll hand you

24   Exhibit 25.

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Mm-hmm.

2      Q.      We spoke this morning about

3  media portion for the Pain Matters

4  campaign.

5      A.      Mm-hmm.

6      Q.      And this indicates that

7  there was a screening on the Discovery

8  Channel.  Is that true?

9      A.      Pain Matters originally was

10 a documentary that was created by the

11 Discovery Channel that chronicled the

12 lives of four patients that were

13 suffering from painful conditions but

14 then evolved into a campaign.  So the

15 movie clip that you see here, like Derek

16 McGuiness was a Iraqi war veteran van,

17 who was highlighted in the film in this

18 program.  That's in the brochure.

19     Q.      Okay.  So at the bottom we

20 see, "Supporting partners of Pain

21 Matters."  Teva is listed as one of the

22 supporting partners, correct?

23     A.      Mm-hmm.

24     Q.      Is that true?

1      A.     Yes.

2      Q.     Did Teva help fund Pain

3   Matters, either the documentary or the

4   website?

5      A.     This is referring to the

6   documentary, which we did help fund

7   through the Discovery Channel.

8      Q.     Do you recall what the

9   amount of funding was?

10     A.     I do not.

11     Q.     The speakers are listed

12  here, correct?  Are any of those inhouse

13  Teva people?

14     A.     No.

15     Q.     All right.  And then the

16  description for the documentary says,

17  "Exploring perspectives around unmet

18  needs in chronic pain care and discussing

19  the future of pain management."

20            Do you see that?

21     A.     Yes.

22     Q.     At this time what chronic

23  pain medications were being promoted by

24  Teva?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    We weren't promoting any
2    chronic pain.
3      Q.    So the marketing campaign
4    centered around chronic pain, even though
5    the company wasn't marketing any products
6    for chronic pain?
7            MR. ANDRISANI:  Objection.
8            THE WITNESS:  Not just
9         chronic pain.  There were other
10        hallmarks of the program.  This
11        was just one particular program.
12   BY MR. MADDEN:
13     Q.    But you would concede that
14   this description from the documentary
15   from the Discovery Channel references
16   unmet needs in chronic pain care,
17   correct?
18     A.    Yes.
19     Q.    I'm going backwards on you
20   here.
21            (Document marked for
22        identification as Exhibit
23        Teva-Day-24.)
24   BY MR. MADDEN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    We're going to mark this one

2  Exhibit 24.

3    A.    Okay.  Keep this one?

4    Q.    Keep it.

5    A.    Okay.

6    Q.    I'll hand you Exhibit 24.

7  Should be the second one.  All right.

8         So you get this incremental

9  performance -- strike that.

10        Exhibit 24 is an incremental

11  performance detail for the fourth quarter

12  of 2015 with regard to Pain Matters,

13  correct?

14    A.    Correct.

15    Q.    Is this a report that you

16  would have received as the director of

17  the Pain Matters campaign?

18    A.    Yes.

19    Q.    From whom would you have

20  received it?

21    A.    This would come from the PR

22  agency GolinHarris.

23    Q.    All right.  If we go to Page

24  2 of Exhibit 24, in this report, do you

1    see that there is a bullet point that

2    says, "Total 2015 budget $998,750"?

3         A.    Yes.

4         Q.    Does that indicate to you

5    that Teva spent almost a million dollars

6    in 2015 on the Pain Matters campaign?

7         A.    Yes, although I'm not sure

8    that is exactly what was spent that year.

9    I think it was less.  But yes, that

10   was -- that was the approved budget.

11        Q.    All right.  And did you

12   oversee that budget?

13        A.    Yes.

14        Q.    And were you in charge of

15   approving the spend on that budget?

16        A.    Yes.  I would make the

17   recommendations, and then my senior line

18   management would approve it.

19        Q.    If we go to page -- the next

20   page.  "Pain Matters website, media spend

21   and traffic."

22              Do you see that?

23        A.    Yes.

24        Q.    And do we see a graph that

Highly Confidential - Subject to Further Confidentiality Review

1    shows the media spend and then the

2    website traffic associated therewith?

3            A.    Yes.

4            Q.    So was a goal of the Pain

5    Matters campaign to drive viewers to the

6    Pain Matters website?

7            A.    Yes.

8            Q.    And what would be the

9    purpose of that if the company wasn't

10   marketing any pain products at the time?

11              MR. ANDRISANI:  Objection.

12              THE WITNESS:  The purpose of

13           the Pain Matters campaign was to

14           provide information and resources

15           in one place for patients and

16           healthcare professionals about

17           management of pain and provide

18           those resources in one area.  And

19           it was a larger, as I mentioned

20           earlier, kind of franchise

21           umbrella, where, you know, we have

22           a therapeutic focus in pain.  Not

23           just the products, but the

24           condition itself.

1    BY MR. MADDEN:

2         Q.    Okay.  So you had an

3    understanding that with this, at least

4    from the document, million dollars spend

5    in 2015, that doctors and patients would

6    go to the website if they were impacted

7    by that media spend to look at the

8    website?

9         A.    Mm-hmm.

10        Q.    Correct?

11        A.    Yes.

12        Q.    When is the last time that

13   you looked at the Pain Matters website?

14        A.    I cannot recall.  Maybe

15   three months ago.

16        Q.    Is it still up?

17        A.    I believe, yes.

18        Q.    Is -- I know you recently

19   left Teva within the last couple weeks,

20   but as of the time that you left Teva,

21   was Teva still contributing to the Pain

22   Matters campaign?

23        A.    No.

24        Q.    When did that stop?

1      A.      Approximately a year ago.

2      Q.      Okay.  Do you know why it

3  stopped?

4      A.      The short answer is budget

5  cuts.  Teva's going to a significant

6  restructuring and as a part of that lost

7  a lot of funding for various projects.

8              (Document marked for

9              identification as Exhibit

10             Teva-Day-26.)

11 BY MR. MADDEN:

12     Q.      Let me hand you Exhibit 26.

13 Do you recognize Exhibit 26 as printed

14 excerpts from web pages of the Pain

15 Matters website?

16     A.      Yes.

17     Q.      What role, if any, did you

18 have in reviewing and/or approving items

19 that went on the Pain Matters website?

20     A.      I would work myself.  I

21 would work with the PR agency, Golin.  We

22 would develop the drafts of the various

23 different pages of the website that you

24 see here.  And then it would be submitted

Highly Confidential - Subject to Further Confidentiality Review

1    into PARC, the promotional review

2    committee, to review the content and

3    approve it.

4         Q.    The promotional review

5    committee, was that a committee within

6    Teva?

7         A.    Yes.

8         Q.    Were there any other

9    manufacturers or distributors of opioids

10   who contributed to the Pain Matters

11   website?

12        A.    No.

13        Q.    So it was really a Teva

14   website, correct?

15        A.    Yes.

16        Q.    Because it's printed from

17   the web, page numbers are difficult.  So

18   I've provided tabs for you.  Okay?

19        A.    Okay.  Great.

20        Q.    So the third page in is

21   tabbed.  We have a page that says, "Pain

22   perspective, hear from the community."

23             Do you see that page?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  And we see Bob

2     Twillman, Ph.D.?

3          A.     Yes.

4          Q.     Was he one of the paid

5     speakers for Fentora?

6          A.     He was not paid.

7          Q.     Okay.  What was

8     Dr. Twillman's role with regard to the

9     Pain Matters website?

10         A.     He runs a patient advocacy

11    group, and from time to time he would

12    contribute blogs or posts about different

13    topics within the pain community.

14         Q.     Okay.  And if we look at a

15    quote from him on Page 3.  It says,

16    "Chronic pain continues to be a serious

17    issue for millions of Americans, and Teva

18    is committed to supporting responsible

19    pain management that meets the needs of

20    people living with pain and healthcare

21    professionals," correct?

22         A.     Mm-hmm, yes.

23         Q.     So you have this quote on

24    your Pain Matters website from

1    Dr. Twillman regarding chronic pain, even

2    though at the time Teva has got no

3    chronic pain medications it's marketing,

4    correct?

5              MR. ANDRISANI:  Objection.

6              THE WITNESS:  Correct.

7    BY MR. MADDEN:

8         Q.    And you're asking -- you're

9    spending money for doctors and patients

10   to go look at this website that's

11   discussing chronic pain, correct?

12             MR. ANDRISANI:  Objection.

13             THE WITNESS:  Not just

14        chronic pain, other parts, but

15        yes, through the media spend that

16        we saw earlier.

17   BY MR. MADDEN:

18        Q.    Right.  But this

19   Dr. Twillman who's giving a quote here is

20   talking about chronic pain, right?

21        A.    Yes.

22        Q.    And then if we go to the

23   next page, there's a place to click to

24   learn more about Teva Pharmaceuticals,

Highly Confidential - Subject to Further Confidentiality Review

1    right, right after his quote.  Do you see

2    that box at the top?

3              A.    Yes.

4              Q.    Okay.  So you've got -- is

5    that a correct depiction of the website?

6              A.    I'm not sure if this quote

7    was associated with him or if this quote

8    may have been associated with Michael

9    Hayden.

10             Q.    Okay.

11             A.    I can't tell from the screen

12   shot with what's around it.

13             Q.    Michael Hayden is inhouse

14   Teva doctor, correct?

15             A.    He is.

16             Q.    All right.  So --

17             A.    Wait, yes, whether it was a

18   quote from him or from Michael Hayden,

19   yes, you could click to learn more about

20   Teva.

21             Q.    But if you click on "learn

22   more about Teva Pharmaceuticals," there

23   won't be any pharmaceuticals for the user

24   to review that are marketed for chronic

Highly Confidential - Subject to Further Confidentiality Review

1    pain, are there?

2                MR. ANDRISANI:  Objection.

3                THE WITNESS:  This would go

4          to the Teva Pharmaceuticals larger

5          umbrella, to the -- to the

6          company, to learn about the

7          company.

8    BY MR. MADDEN:

9          Q.    I see.

10         A.    And its therapeutic focus,

11   one of those being pain care.

12         Q.    Okay.  Again, tab -- so it

13   would be the third tab in, which is six

14   pages into our document.  You have a page

15   that says, "Teva Pharmaceuticals and pain

16   management," correct?

17         A.    Yes.

18         Q.    And this would have been

19   approved by you as the manager of this

20   campaign, correct?

21         A.    The committee again.

22         Q.    All right.  But you would

23   have had some role in approving it,

24   right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I would work with Golin to

2   develop all this content and then put it

3   through the approval process.

4      Q.    Okay.  On this page, the

5   first sentence says, "At Teva

6   Pharmaceuticals we understand that

7   chronic pain affects more than 100

8   million Americans.  It can greatly affect

9   people, touching many aspects of lives,

10   including their physical health and

11   ability to participate in daily tasks."

12            Do you see that?

13      A.    Mm-hmm.

14      Q.    And then below that, "Our

15   commitment to pain care," in the middle

16   of that paragraph says, "Prescription

17   opioid medications are an important part

18   of treatment plan for many people living

19   with chronic pain, but we know that they

20   carry a serious risk of abuse and misuse.

21   Teva is equally committed to addressing

22   the serious problems of chronic pain and

23   prescription drug abuse."

24            Do you see that?

1    A.    Mm-hmm.  Yes.

2    Q.    That's language that you

3  reviewed and approved?

4    A.    Yes.

5    Q.    Okay.  Why would you put on

6  this Pain Matters website information

7  about use of opioid medications for

8  treatment plan for chronic pain when none

9  of the medications we've discussed,

10  Fentora, Actiq, were indicated for

11  chronic pain?

12         MR. ANDRISANI:  Objection.

13         THE WITNESS:  At the time

14      the organization was looking to

15      continue its commitment to pain

16      management.  The abuse-deterrent

17      formulations were indicated for

18      chronic pain, or those were the

19      indications they were seeking.

20      The current portfolio with Amrix

21      and Fentora was not in promotion.

22      The -- what this is reflecting is

23      that there was a commitment to

24      pain care.  There was a

Highly Confidential - Subject to Further Confidentiality Review

1          recognition that unfortunately

2          abuse and misuse can occur.  Part

3          of the solution could be

4          abuse-deterrent technologies which

5          is what we were focusing on.

6     BY MR. MADDEN:

7          Q.     All right.  But the user of

8     the website, the doctor or the patient

9     who saw The Discovery Channel show --

10          A.     Mm-hmm.

11          Q.     -- who then went and clicked

12    on the Pain Matters website, and was

13    interested in chronic pain and opioid use

14    for chronic pain, there was no Teva

15    product available for that user to go

16    seek at that point for chronic pain, was

17    there?

18          A.     No.

19          Q.     At least on label, right?

20          A.     Correct.  This was education

21    and information, and primarily when you

22    are talking about chronic pain, the

23    organization was developing

24    abuse-deterrent technologies for those

1    long-acting opioids that were currently

2    in the market, the re-formulation of

3    hydrocodone to become, you know, less

4    abuse.

5         Q.    All right.  So the sentence

6    that appears on this page that says,

7    "Teva is equally committed to addressing

8    the serious problems of chronic pain and

9    prescription drug abuse," what was that

10   commitment?

11              MR. ANDRISANI:  Objection.

12              THE WITNESS:  So the -- I

13         think part of the commitment was

14         to take a look at the portfolio in

15         the opioid products and see how

16         you could improve upon them to

17         deal with some of the risks of

18         abuse, misuse, and diversion.  And

19         abuse-deterrent formulations were

20         part of that solution, or part of

21         that commitment.

22   BY MR. MADDEN:

23         Q.    Okay.  And you had a role

24   with regard to the abuse-deterrent

Highly Confidential - Subject to Further Confidentiality Review

1    technology, right?

2          A.    I did.

3          Q.    You were a manager with

4    regard to that drug, correct?

5          A.    I was the director, yes.

6          Q.    Director, sorry.  And

7    ultimately the company decided not to

8    market that drug, even though it got FDA

9    approval, correct?

10         A.    Correct.

11         Q.    So beyond the

12   abuse-deterrent formulation that was

13   developed but never promoted, what other

14   commitments did Teva make to address the

15   serious problem of chronic pain and

16   prescription drug abuse?

17               MR. ANDRISANI:  Objection.

18               THE WITNESS:  So I think the

19         campaign itself was part of that

20         commitment to provide education

21         around the misuse, diversion and

22         proper pain management.

23               Teva now, and I can't really

24         speak on behalf because I'm not

Highly Confidential - Subject to Further Confidentiality Review

1       with them, is engaged in a

2       partnership with Regeneron to

3       develop opioid alternatives.  So I

4       think that's -- and there's other

5       things that speak to the

6       commitment that Teva was evolving

7       to within pain management.

8  BY MR. MADDEN:

9       Q.    Is Regeneron a drug in

10  development that is not an opioid that

11  treats pain?

12       A.    It is.

13       Q.    Did you have some role or

14  responsibility with regard to it?

15       A.    I did.

16       Q.    What was your role?

17       A.    I was a director of

18  marketing for -- for that.

19       Q.    All right.  And were there

20  any websites or promotional spins done

21  with regard to Regeneron?

22       A.    No.

23       Q.    Okay.  Let's go to the next

24  page in the Pain Matters website, which

1    is the seventh page in.  There's

2    reference to the Alliance to Prevent the

3    Abuse of Medicines on this page.  Are you

4    familiar with that?

5          A.    Yes.

6          Q.    What was the Alliance?

7          A.    This is a -- I don't know if

8    it was run by a pharmacy or in

9    collaboration with a pharmacy,

10   wholesalers and industry.  It was a

11   cross-functional group that had got

12   together, a non-for-profit, to discuss

13   some of the issues around pain

14   management, and one of those being abuse.

15         Q.    Okay.

16         A.    I was never a member of the

17   committee.

18         Q.    All right.  So the alliance

19   committee had presumably a representative

20   from Teva, correct?

21         A.    Correct.

22         Q.    Who was that?

23         A.    I believe at the time this

24   could have been -- I'm not sure.  I think

Highly Confidential - Subject to Further Confidentiality Review

1  it might have been Michael Hayden, but I

2  can't specifically recall.

3      Q.    Did you ever attend any

4  alliance committee meetings?

5      A.    No.

6      Q.    Did you ever --

7      A.    A little bit higher than me.

8      Q.    All right.  Did you ever

9  receive any reports regarding alliance

10  committee meetings?

11      A.    No.

12      Q.    Do you recognize one of the

13  appliance members Cardinal Health?

14      A.    Yes.

15      Q.    What -- what does Cardinal

16  Health do, what's their business?

17      A.    They are a drug distributor.

18      Q.    Okay.  How about Kaleo, what

19  do they do?

20      A.    I'm not as familiar with

21  Kaleo.

22      Q.    All right.  What about CVS

23  Caremark.  What is their business?

24      A.    Same thing, acts as a

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacy benefit manager.

2         Q.    Are there any other drug

3    manufacturers included in the alliance to

4    your knowledge?

5         A.    Not to my knowledge.  I

6    wouldn't know beyond what's here.

7         Q.    Prime Therapeutics, what do

8    they do?

9         A.    That's a pharmacy benefit

10   manager, as well.

11        Q.    All right.  If we go to the

12   next page.  I believe it's Page 8.  It

13   says "related content."  And it says,

14   "Understanding chronic pain.  Watch the

15   Pain Matters documentary to learn about

16   the impact of chronic pain."

17             Do you see that?

18        A.    Yes.

19        Q.    So the website user has the

20   option to watch the Pain Matters

21   documentary on the website?

22        A.    Yes.

23        Q.    And do you see that they

24   describe the documentary as discussing

1    the impact of chronic pain?

2         A.    Yes.

3         Q.    The next tab, I believe, is

4    at Page 24.  There's a heading that says

5    "Understanding Opioid Abuse and Misuse."

6         A.    Yes, I have it.

7         Q.    Do you have that page?

8         A.    Yes.

9         Q.    Did you review and approve

10   this language?

11        A.    Yes.

12        Q.    Okay.  On this web page it

13   says, "More than 12 million people

14   reported using prescription pain

15   medications nonmedically in 2010.  That

16   number encompasses both abuse and

17   misuse."

18             Do you see that language?

19        A.    Yes.

20        Q.    And it then says, "The abuse

21   and misuse of prescription pain

22   medications were responsible for more

23   than 475,000 emergency department visits

24   in 2009, a number that nearly doubled in

Highly Confidential - Subject to Further Confidentiality Review

1    just five years."

2              Do you see that language?

3        A.    Yes.

4        Q.    Then it then says, "Further,

5    opioid overdoses in particular are

6    increasingly due to the abuse of

7    prescription painkillers."

8              Do you see that?

9        A.    Yes.

10       Q.    Who provided that language

11   and data to you?

12       A.    The reference would be 10,

13   which would be included in the website in

14   the back here, which is Center for

15   Disease Control, if I'm reading 10

16   correctly.  Center for Disease Control

17   and Prevention Policy Impact.

18       Q.    Did you gather that data or

19   did the PR company?

20       A.    The PR company.

21       Q.    Okay.  They provided it to

22   you, and you approved this language?

23       A.    Yes.

24       Q.    And then if you -- so would

Highly Confidential - Subject to Further Confidentiality Review

1   you agree with me that fentanyl products

2   such as Fentora and Actiq have

3   contributed to the data that we see here?

4           MR. ANDRISANI:  Objection.

5   BY MR. MADDEN:

6       Q.    With regard to abuse and

7   overdose and hospital visits?

8           MR. ANDRISANI:  Objection.

9           THE WITNESS:  I don't have

10      the data to know.

11  BY MR. MADDEN:

12      Q.    So -- but you put this

13  information in this website called Pain

14  Matters, right?

15      A.    Yes.

16      Q.    Which is unbranded marketing

17  for the company, right?

18      A.    Yes.

19      Q.    And presumably you wouldn't

20  put it in there if it didn't apply to

21  your products, would you?

22          MR. ANDRISANI:  Objection.

23          THE WITNESS:  I don't know

24      if it applies to the products or

Highly Confidential - Subject to Further Confidentiality Review

```
1            not.  It's a broader statement.  I

2            don't know which product is

3            specifically attributed to the

4            facts that we see here.

5   BY MR. MADDEN:

6            Q.    Are you aware, during your

7   many years at Cephalon and Teva, of

8   whether there's ever been a report to you

9   regarding overdose, death,

10  hospitalization, associated with the use

11  of Fentora?

12           A.    The only one was what we

13  spoke about earlier with the "Dear

14  Healthcare Professional" letter that went

15  out.

16           Q.    That's the extent of your

17  knowledge of --

18           A.    Yes.

19           Q.    -- anybody who has ever OD'd

20  or abused or been to the hospital with

21  the use of Fentora, correct?

22               MR. ANDRISANI:  Objection.

23               THE WITNESS:  Correct.

24  BY MR. MADDEN:
```

1    Q.    Would you agree with me that

2  this data that you include in the Pain

3  Matters website indicates that there is a

4  serious opioid epidemic problem in the

5  United States?

6    A.    Yes.

7    Q.    And part of the reason that

8  you, and/or the company were interested

9  in the abuse-deterrent formulation was to

10  address that epidemic, correct?

11    A.    Part of the solution, yes.

12    Q.    All right.  If we go to Page

13  28, which is your next tabbed page,

14  there's a section that says, "The role of

15  opioids in chronic pain management.

16  Prescription pain medications such as

17  opioids may be an appropriate treatment

18  option for people whose chronic pain is

19  not adequately managed by other methods.

20  Opioids are an important option for the

21  treatment of certain types of chronic

22  pain."

23         Did you review and approve

24  that language?

Highly Confidential - Subject to Further Confidentiality Review

1         A.     Yes.

2         Q.     And who provided you that

3    language?

4         A.     That would be from the PR

5    agency.

6         Q.     As the director or manager

7    of the Pain Matters campaign, as the

8    director for Fentora, can you point me to

9    any randomized controlled trials that

10   indicate opioids are safe and effective

11   for the management -- safe and effective

12   for the management of chronic pain?

13              MR. ANDRISANI:  Objection.

14              THE WITNESS:  I'm sorry, can

15        you ask the question again?

16   BY MR. MADDEN:

17        Q.     Sure.  Tell me -- I'm

18   getting your titles mixed up.  As we get

19   past lunch here, it's difficult.  So

20   forgive me.

21        A.     It's okay.

22        Q.     Your role with regard to

23   Fentora at one point was product manager.

24        A.     Product manager.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    And then you became a
2  marketing director after that, right?
3     A.    Correct.
4     Q.    And Fentora was under your
5  umbrella?
6     A.    For a short period of time,
7  yes.
8     Q.    All right.  And you received
9  a promotion to --
10    A.    Abuse deterrent --
11    Q.    -- to do the abuse deterrent
12 at one point?
13    A.    Yes.
14    Q.    And then you oversaw this
15 Pain Matters website, correct?
16    A.    Yes, correct.
17    Q.    All right.  And we have
18 language in the Pain Matters website that
19 says that opioids are an appropriate
20 treatment option for people in chronic
21 pain.  Do you see that language?
22          MR. ANDRISANI:  Objection.
23          THE WITNESS:  Yes.
24 BY MR. MADDEN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    My question is, can you

2    point me to any randomized controlled

3    trials that you're aware of that show

4    that opioids are safe and effective for

5    the management of chronic pain?

6              MR. ANDRISANI:  Objection.

7              THE WITNESS:  I can point

8         you to the reference.

9    BY MR. MADDEN:

10   Q.    All right.  Let's look at

11   the reference?

12   A.    Number 9.  But I don't run

13   clinical trials, randomized clinical

14   trials.  So I'm not sure what this is.

15   Q.    You have an article as

16   Number 9, right?

17   A.    Yeah.

18   Q.    By -- who is that?

19   Manchikanti and others?

20   A.    "Monitoring Opioid Adherence

21   in Chronic Pain Patients:  Tools,

22   Techniques, and Utility."

23   Q.    Okay.  So that's not a

24   randomized controlled trial, is it?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. ANDRISANI:  Objection.

2          THE WITNESS:  No.

3   BY MR. MADDEN:

4          Q.    All right.  And then the

5   other cite that we have is 2, which is

6   the American Academy of Pain Medicine,

7   "Use of Opioids For Treatment of Chronic

8   Pain:  A Statement From the American

9   Academy of Pain Medicine."

10          A.    Mm-hmm.

11          Q.    Those are the two references

12   that we see there?

13          A.    Correct.

14          Q.    So can you -- those are not

15   randomized controlled trials, are they?

16          MR. ANDRISANI:  Objection.

17          THE WITNESS:  I don't

18     believe there's any randomized

19     controlled trials within those

20     references.

21   BY MR. MADDEN:

22          Q.    Fair enough.  So putting

23   those references aside, with all your

24   training and experience with regard to

1    Fentora and opioids --

2              A.    Yeah.

3              Q.    -- can you point me to any

4    randomized controlled trial that shows

5    that opioids are safe and effective for

6    the treatment of chronic pain?

7                   MR. ANDRISANI:  Objection.

8                   THE WITNESS:  There are

9              trials.  I don't know what they're

10             concluding without knowing, like,

11             the specific trial.  So there have

12             been lots of trials on different

13             opioid therapies, long-acting,

14             short-acting, TIRFs.

15                  Whether they're safe and

16             effective, that information would

17             be contained within the trial.  So

18             without the -- I know that there

19             are trials that study these drugs.

20   BY MR. MADDEN:

21             Q.    I want to be very specific

22   here.  I'm only talking about chronic

23   pain.  Not short-term pain, not

24   breakthrough pain, chronic pain.

Highly Confidential - Subject to Further Confidentiality Review

1            Can you point me today to
2  any trials that show opioid therapy is
3  safe and effective for chronic pain?
4            MR. ANDRISANI:  Objection.
5            THE WITNESS:  I don't know
6       the specific trials.  But I do
7       know that there are therapies and
8       opioids approved for the
9       management of chronic pain, which
10      would thereby stand that there
11      were trials that would be
12      contained within their prescribing
13      information.
14  BY MR. MADDEN:
15      Q.    Were you -- are you familiar
16  with another unbranded marketing campaign
17  by Teva or Cephalon called
18  BreakthroughPain.com?
19      A.    No.
20      Q.    You had nothing to do with
21  that?
22      A.    No.
23      Q.    Have you ever seen that
24  website?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No.

2    Q.    Are you doing all right?

3    A.    Yeah, I'm fine.  Thank you.

4         (Document marked for

5    identification as Exhibit

6    Teva-Day-27.)

7    BY MR. MADDEN:

8         Q.    Exhibit 27, I'm going to

9    hand you, is a slide deck.  It looks like

10   slide deck by Teva for the American

11   Academy of Pain Medicine, Pre-Con Deck.

12   Did you have any role or responsibility

13   with regard to this slide deck?

14        A.    I can't recall.  Do we know

15   when it was created?

16        Q.    Do you recall participating

17   in any meetings regarding pre-conference

18   meeting for the AAPM?  It looks like 2010

19   is our time frame here.

20        A.    I may have.

21        Q.    I take that back?

22        MR. ANDRISANI:  Page --

23   yeah.

24   BY MR. MADDEN:

1    Q.    If you go to the fourth page

2    in, fifth page in, we're looking at

3    February of 2012.

4    A.    Yes.  This would be -- I

5    mean I don't know what my exact

6    involvement.  This would be when I was

7    coming into the marketing role for

8    Fentora.  2007, 2010.  Yes, coming out of

9    the field and into the marketing role,

10   around this same time frame.

11   Q.    And is this a meeting that

12   you would have attended, the AAPM?

13   A.    I don't know if I would have

14   attended this or not.

15   Q.    All right.  I want to point

16   your attention to Page 3.  Do you see

17   that -- I think that's a typo there --

18   AAPM demographics from 2010 that are

19   listed?

20   A.    Yes.

21   Q.    There don't appear to be any

22   oncologists listed, correct?

23   A.    No, not from other, no.

24   Current practice settings, other.  I'm

Highly Confidential - Subject to Further Confidentiality Review

1    not sure what that is, but I --

2         Q.    And then the next page in

3    the slide deck lists conference

4    objectives, correct?

5         A.    Yes.

6         Q.    And first objective is

7    increase brand awareness of Fentora?

8         A.    Yes.

9         Q.    And the last objective is

10   generate appropriate sales leads for PCS

11   representatives, correct?

12        A.    Yes.

13        Q.    And then if we go to Page 8,

14   you see the Fentora promotional materials

15   that are listed?

16        A.    Yes.

17        Q.    Some of these we talked

18   about.  MIRFs we haven't talked about.

19   What are those?

20        A.    It stands for medical

21   information request form.

22        Q.    So if a doctor asks an

23   off-label question, is that form

24   generated?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     It could be, yes.

2          Q.     These are promotional

3   materials that would be at the booth for

4   this meeting?

5          A.     Yes.

6          Q.     The last bullet says

7   Fentora/Actiq, do you see that?

8          A.     Yes.

9          Q.     So at this time in 2012,

10  what promotional materials would be

11  related to Actiq?

12         A.     Nothing to my knowledge.

13         Q.     So as you sit here today,

14  can you tell me what that means,

15  Fentora/Actiq?

16                MR. ANDRISANI:  Objection.

17                THE WITNESS:  No.

18                (Document marked for

19         identification as Exhibit

20         Teva-Day-28.)

21  BY MR. MADDEN:

22         Q.     All right, sir, I'll hand

23  you Exhibit 28.  I'll ask you to look at

24  that.

1          Exhibit 28 is an August 21,

2   2012, e-mail from Aji Nair?

3          A.   Yes.

4          Q.   To you and others, regarding

5   IASP posters.  Do you recall seeing this

6   e-mail?

7          A.   Yes.

8          Q.   What was the IASP?

9          A.   International Association

10  and Society For Pain, I believe, is the

11  acronym.

12         Q.   Okay.  This would have been

13  a conference then?

14         A.   International Society For

15  the Study of Pain.  Yes, a conference.

16         Q.   Did you attend the

17  conference?

18         A.   I do not -- I can't recall

19  it, but I don't believe I would have

20  attended this.

21         Q.   It looks like it was in

22  Milan, Italy.  Were you high enough up

23  the chain to go to Milan, Italy?

24         A.   No, I did not go to Milan,

1    Italy, so I did not attend -- I would

2    have remembered that.  No, I didn't go to

3    Italy.  I'll go though, if --

4          Q.    Who is Aji Nair?

5          A.    He was in medical, like

6    global scientific communications, fell

7    under the medical umbrella.

8          Q.    Did he office in the U.S.?

9          A.    Yes.

10          Q.    Okay.  The first recipient

11   of the e-mail is Arvind Narayana.  Who --

12          A.    Yeah.

13          Q.    Who is he or she?

14          A.    He was the medical director

15   for pain care.

16          Q.    Is Mr. -- Dr. Narayana still

17   with the company?

18          A.    He is not.

19          Q.    Okay.  So the e-mail to you

20   and others says, "Attached are the final

21   posters for the International Society For

22   the Study of Pain conference next week in

23   Milan.  These data are not published so

24   please do not distribute these to anyone

Highly Confidential - Subject to Further Confidentiality Review

1    externally.  Thank you."

2              Do you see that?

3         A.    Yes.

4         Q.    And then it lists three

5    original presentations, correct?

6         A.    Yes.

7         Q.    Would those be original

8    presentation posters for the meeting?

9         A.    Yes.

10        Q.    Okay.  The first one is

11   3055/3056, secondary analysis authored by

12   Narayana and others, right?

13        A.    Yes.

14        Q.    And Dr. Narayana was inhouse

15   at Teva, correct?

16        A.    Yes.

17        Q.    Have you seen that poster?

18        A.    I can't recall if I've seen

19   it or not.

20        Q.    The title indicates that

21   it's -- the poster -- that poster is

22   discussing fentanyl buccal tablet

23   compared with immediate release Oxycodone

24   for the management of breakthrough pain

Highly Confidential - Subject to Further Confidentiality Review

1    in opioid-tolerant patients with chronic

2    pain.  Do you see that?

3         A.    Yes.

4         Q.    Okay.  The fentanyl buccal

5    tablet would be what?

6         A.    Fentora.

7         Q.    Okay.  So Dr. Narayana did

8    two studies comparing Fentora to

9    oxycodone for the management of

10   breakthrough pain?

11              MR. ANDRISANI:  Objection.

12              THE WITNESS:  I'm not sure

13        if it's two studies or one study.

14   BY MR. MADDEN:

15        Q.    Okay.  That's probably a bad

16   question anyway.  This poster would

17   appear to discuss the use of Fentora as

18   compared to oxycodone for the management

19   of breakthrough pain in patients with

20   chronic pain, correct?

21        A.    I mean the title says that.

22   I'm not sure what the primary or

23   secondary endpoints were.  And it's a

24   pooled analysis so I'm not exactly sure

Highly Confidential - Subject to Further Confidentiality Review

1    if it was...

2         Q.    That poster is not

3    discussing on-label use of Fentora, is

4    it?

5              MR. ANDRISANI:  Objection.

6              THE WITNESS:  I don't know.

7    BY MR. MADDEN:

8         Q.    Okay.  Let's look at the

9    second one.  3052, secondary analysis by

10   Webster and others?

11        A.    Mm-hmm.

12        Q.    It's a 12-week randomized

13   double-blind placebo-controlled study of

14   fentanyl buccal tablet for the relief --

15   relief of breakthrough pain in

16   opioid-tolerant patients with chronic

17   noncancer-related pain, correct?

18        A.    Correct.

19        Q.    So that poster discusses the

20   use of Fentora in chronic

21   noncancer-related pain, right?

22        A.    The title says that.  I

23   don't know what the poster and the data,

24   if they looked at just noncancer or --

Highly Confidential - Subject to Further Confidentiality Review

1    but yes, the title says that.

2         Q.    That's what it says, right?

3         A.    Yes.

4         Q.    Have you seen that poster?

5         A.    No.

6         Q.    All right.  Then the third

7    one is 3055/3056.  The author is Wallace

8    and others.  Fentanyl buccal tablet

9    compared with immediate release oxycodone

10   for the management of breakthrough pain

11   in opioid-tolerant patients with chronic

12   pain.

13             Do you see that?

14        A.    Yes.

15        Q.    Those three posters, if you

16   just look at their description, would

17   appear to be posters that discuss

18   off-label use of Fentora, would you agree

19   with that?

20             MR. ANDRISANI:  Objection.

21             THE WITNESS:  The

22        description discusses chronic

23        pain.

24   BY MR. MADDEN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Right.  Not breakthrough

2    cancer pain, correct?

3    A.    They say breakthrough pain.

4    Again, I don't know if there were cancer

5    patients included or not.  I guess you

6    could reasonably assume that there

7    wasn't.  But without seeing the data and

8    knowing --

9    Q.    At least with regard to

10   Number 2, if you just look at the

11   description, the description itself --

12   A.    Yeah --

13   Q.    -- is a study of chronic

14   noncancer-related pain, right?

15   A.    Yes.  Seems to be basically.

16   Q.    That would be -- would you

17   agree with me that would be an off-label

18   use of Fentora?

19   A.    Yes.  That's outside its

20   current indication.

21   Q.    So when this poster was

22   forwarded to you and others for approval

23   for presentation at the Milan meeting,

24   what occurred?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I don't know.  I wasn't in

2   Milan.

3          Q.    Did you push back as the

4   Fentora director and say you can't use

5   that Study Number 2 that talks about

6   chronic noncancer-related pain because

7   that's off-label?

8               MR. ANDRISANI:  Objection.

9               THE WITNESS:  So this -- in

10          this conference data would

11          typically fall within medical's

12          protocol, not within marketing or

13          sales training.

14              So we strictly adhered to

15          the prescribing information.  So

16          they have different protocols.  I

17          think, you know, you have to ask

18          them if they presented it there

19          or...

20              But it wouldn't be included

21          in anything that I did.

22   BY MR. MADDEN:

23          Q.    All right.  Okay.  Are you

24   aware of whether Teva had advocacy

Highly Confidential - Subject to Further Confidentiality Review

 1   partners --

 2        A.    Yes.

 3        Q.    -- with regard to its pain

 4   medications?

 5        A.    Yes.

 6        Q.    Who were those advocacy

 7   partners?

 8        A.    An example of an advocacy

 9   partner would be the American Society For

10   Pain.

11        Q.    How would Teva partner with

12   those advocacy partners in the pain

13   world?

14        A.    Typically what would happen

15   is different advocacy -- pain advocacy

16   groups and advocacy groups across

17   different therapeutic areas would contact

18   pharmaceutical industry, in this case

19   Teva, and ask for support in a given year

20   for some of their educational

21   initiatives.

22        Q.    Financial support, I take

23   it?

24        A.    Financial support.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    All right.  Did GolinHarris

2    assist Teva in identifying such partners?

3          A.    They did.

4          Q.    And were you involved in

5    that process?

6          A.    Yes.

7          Q.    How so?

8          A.    We would receive hundreds of

9    requests -- I don't know if it was

10   hundreds.  But we would receive a lot of

11   requests from different advocacy groups

12   to support them throughout the year.

13                I would take those different

14   requests and then, with a

15   cross-functional team, we would determine

16   what to fund and what not to fund.

17         Q.    Okay.  So these advocacy

18   partners may reach out to Teva and Teva

19   would make a business decision as to who

20   to fund or not fund, correct?

21         A.    Yes.

22         Q.    What about the other way,

23   would Teva identify advocacy partners

24   that it wanted to be involved with and

Highly Confidential - Subject to Further Confidentiality Review

1   approach them?

2          A.    We would do -- we wouldn't

3   proactively solicit partnerships.  They

4   would most typically approach us.  But we

5   would gain an understanding of that

6   organization to ensure that they went

7   through the compliance process and we

8   knew that they were like a safe group to

9   partner with.

10              (Document marked for

11         identification as Exhibit

12         Teva-Day-29.)

13  BY MR. MADDEN:

14         Q.    I'll hand you Exhibit 29.

15  Have you seen that document before today?

16         A.    Yes, I believe I've seen

17  this before today.

18         Q.    This appears to be a report

19  prepared by GolinHarris which you

20  identified as a PR firm --

21         A.    Correct.

22         Q.    -- identifying advocacy

23  partners to enhance patient care,

24  correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Correct.

2      Q.     And it's dated March of

3  2013, right?

4      A.     Yes.

5      Q.     You're the Fentora manager

6  at that time, right?

7      A.     Correct.  This would -- yep.

8      Q.     Do you recall reviewing this

9  document?

10     A.     Yes, I do remember looking

11  at this.

12     Q.     All right.  So let's look

13  at -- and I'm going to refer you to the

14  Bates numbers --

15     A.     Okay.

16     Q.     -- because that's what we

17  have on here.

18     A.     Got it.

19     Q.     Bates number ending in 648,

20  fourth page in, "Advocacy mapping need."

21         Do you see that?

22     A.     Yes.

23     Q.     There's some handwriting

24  next to the first bullet point.  Do you

Highly Confidential - Subject to Further Confidentiality Review

1  recognize that handwriting?

2          A.    No.

3          Q.    Okay.  So that's not your

4  handwriting?

5          A.    No.

6          Q.    All right.  Let's turn back

7  to Bates Number 499725, which is about

8  three-quarters of the way back.

9                MR. ANDRISANI:  725?

10               MR. MADDEN:  Yeah.  499725.

11  BY MR. MADDEN:

12         Q.    Do you have that?

13         A.    56, yes.

14         Q.    Okay.  So we've got a

15  PAINWeek overview page here.

16               Do you see this?

17         A.    Yes.

18         Q.    What is PAINWeek?

19         A.    It's an annual conference on

20  the management of pain.

21         Q.    Did you ever attend the

22  PAINWeek conference?

23         A.    Yes.

24         Q.    Where was that held?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     Las Vegas.
2          Q.     Was it the same time every
3   year?
4          A.     Same time, same place.
5          Q.     Where was it?
6          A.     Las Vegas.
7          Q.     Yeah, I know that.  But
8   where in Las Vegas?
9          A.     Oh.  The Cosmopolitan Hotel.
10         Q.     Okay.  And what time of year
11  was it typically?
12         A.     It's right when the kids go
13  back to school.  So that's -- what's
14  that?  Is that Labor Day?
15         Q.     Fall?
16         A.     Fall.  Yeah, it always
17  coincided with when your kids went back
18  to school.  Terrible time.
19         Q.     Would Teva sponsor a booth
20  at that meeting?
21         A.     Yes, we would.
22         Q.     Would Teva also sponsor the
23  program itself?
24         A.     We would support a booth and
```

Highly Confidential - Subject to Further Confidentiality Review

1    educational programs during the

2    conference.

3            Q.    So let's go to Bates Number

4    499739.  There's a section provided by

5    GolinHarris that says, "Pain advocacy

6    influencers."

7                  Do you see that?

8            A.    Yes.

9            Q.    And then it identifies

10   organizational leaders, correct?

11           A.    Yes.

12           Q.    What would this information

13   be used for by you or others within Teva

14   with regard to these pain advocacy

15   influencers?

16                 MR. ANDRISANI:  Objection.

17                 THE WITNESS:  Background for

18       who is attending the conference.

19   BY MR. MADDEN:

20           Q.    I see.  Would any of these

21   folks be targeted to become part of the

22   speakers bureau?

23           A.    It wasn't a targeting list.

24   So if anybody on here was a speaker, they

1    would go through the speaker bureau

2    process.

3             Q.    I see.  So if someone like

4    you were attending this meeting or

5    convention, you would know who the pain

6    advocacy influencers were in case you ran

7    into one of them.  Is that the purpose of

8    this report?

9             A.    Yeah.

10            Q.    Okay.  So let's go then

11   to -- back in the back of this document,

12   499750.

13            A.    Yes.

14            Q.    There is a section provided

15   by the PR firm for Teva that says,

16   "Monitor for activity."

17                  Have you seen this before?

18            A.    I don't recall this page.

19            Q.    Okay.  Do you recognize any

20   of these names?  Avi Israel, Andrew

21   Kolodny, Michael Schatman?

22            A.    No.  I haven't met -- I

23   recognize Andrew Kolodny, but I haven't

24   met or know any of them.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Do you know why the

2  PR firm would prepare this information

3  regarding these people, these three

4  people to monitor for activity?

5            MR. ANDRISANI:  Objection.

6            THE WITNESS:  Can I look at

7      the pages before?

8  BY MR. MADDEN:

9    Q.    Yeah, sure.  And feel free

10  to read the bios that they prepared on

11  these three people, and I'll ask you some

12  questions.

13    A.    I don't know why they would

14  flag them for monitor activities.  It

15  looks like all of the, you know, people

16  within here had activity during the

17  conference.

18    Q.    Let's look at the

19  description that they write for

20  Dr. Schatman.  It says, "Dr. Schatman

21  feels special interest groups and

22  industry have tainted pain medicine, the

23  ability to treat patients effectively.

24  This includes universities, medical

1    schools, some pain groups, and pharma,

2    and is a KOL that Teva should monitor for

3    activity."

4            Do you see that?

5        A.    Yes.

6        Q.    Do you understand that

7    Dr. Schatman may be a critic of the

8    opioid industry as reflected here in this

9    document?

10            MR. ANDRISANI:  Objection.

11            THE WITNESS:  Without

12        knowing him, it looks like that

13        could be how it's interpreted

14        here.  But --

15   BY MR. MADDEN:

16        Q.    So did Teva take this advice

17   and monitor his activity?

18            MR. ANDRISANI:  Objection.

19            THE WITNESS:  Not to -- not

20        to my knowledge.

21   BY MR. MADDEN:

22        Q.    You had no part of that, did

23   you?

24        A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     How about Dr. Kolodny?  You

2  said you recognized his name.  What do

3  you recognize about Dr. Kolodny?

4      A.     Only his name because he's

5  been a pain management thought leader.

6      Q.     And you understand

7  Dr. Kolodny has been critical of the

8  pharma industry with regard to opioid

9  promotion, don't you?

10      A.     I don't know much about

11  Dr. Kolodny.

12      Q.     Well, if we look at these

13  three summaries -- and if you need time

14  to do it -- these three people appear to

15  me from this page to be critics of the

16  opioid pharma industry.  The public -- or

17  GolinHarris is giving you this

18  information and indicating these people

19  should be monitored for activity.  Do you

20  know whether Teva took any steps to

21  monitor these critics?

22          MR. ANDRISANI:  Objection.

23          THE WITNESS:  Not to my

24      knowledge, no.

1    BY MR. MADDEN:

2         Q.    Can you tell me why the

3    public relations firm would have

4    identified critics of Teva to be

5    monitored for activity?

6              MR. ANDRISANI:  Objection.

7              THE WITNESS:  So I haven't

8         worked in PR.  So we have a PR

9         agency.  But part of what PR does

10        is look for things that could be

11        in, I don't know, the news or --

12        so I don't work in PR.

13   BY MR. MADDEN:

14        Q.    All right.  Fair enough.

15             (Document marked for

16        identification as Exhibit

17        Teva-Day-30.)

18   BY MR. MADDEN:

19        Q.    Mr. Day, I'll hand you

20   Exhibit 30, which is a slide presentation

21   for PAINWeek dated May 29, 2014.  Did you

22   have any role in preparing this slide

23   deck?

24        A.    I would have been aware of

Highly Confidential - Subject to Further Confidentiality Review

1    it.  I'm not sure if I specifically

2    created this one.

3         Q.    Would you have reviewed it?

4         A.    Yes.  I -- yes, I may have

5    reviewed it.

6         Q.    All right.  Page 3 of this

7    document references PAINWeek being

8    September 3 to 6, 2014, in Las Vegas,

9    right?

10        A.    Yes.

11        Q.    That's consistent with your

12   memory?

13        A.    Yes.

14        Q.    Did you attend that

15   particular PAINWeek meeting?

16        A.    I believe so, yes.

17        Q.    All right.  And if we look

18   on that same page, it says, "PAINWeek is

19   now the largest U.S. pain conference and

20   is managed by Aventine Company, a medical

21   communications company primarily focused

22   on pain management education."  Correct?

23        A.    Yes.

24        Q.    Did Teva have any role or

1   relationship with regard to Aventine Co?

2          A.     Aventine managed the

3   conference.  So we would work with

4   Aventine to secure -- like they would set

5   up the booth and they would set up the

6   programs that I talked about earlier.

7          Q.     Did Teva fund Aventine for

8   PAINWeek?

9          A.     We funded -- we funded

10  PAINWeek, but when you funded PAINWeek,

11  you receive like a booth, a program.

12  Yes.

13         Q.     Okay.  And the page numbers

14  for this slide deck are in the top

15  right-hand.  Let's go to Page 4.  So

16  PAINWeek marketing activities are listed.

17  Corporate sponsorship.  Is that

18  consistent with your memory?  Teva

19  sponsored this meeting?

20         A.     Yes.

21         Q.     And then it says, "Pain

22  Matters screening and panel discussion."

23                Were you part of that?

24         A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      That's because you were in

2  charge of Pain Matters, right?

3      A.      Yes.

4      Q.      Were you on the panel?

5      A.      No.

6      Q.      Who were the panel members?

7  Page 5 may jog your memory on that.

8  Those are the same people that we saw

9  that were discussed in the -- in the

10  documentary, right?

11      A.      Yeah.  In the invitation

12  that we looked at earlier.

13      Q.      Okay.

14      A.      Yes.

15      Q.      And the objective that's

16  listed here is to shed light -- one of

17  the objectives is "to shed light on the

18  real impact of chronic pain through

19  personal stories and insight into the

20  individual and societal burden," correct?

21      A.      Yes.

22      Q.      Is that the burden of pain?

23      A.      Yes.

24      Q.      Did -- did any of these

Highly Confidential - Subject to Further Confidentiality Review

1  panel members discuss the burden of abuse

2  and addiction?

3      A.    No.

4      Q.    Okay.  Page 6 of this slide

5  deck, "Provide an industry overview on

6  the development of AD technologies

7  including Teva's proprietary AD

8  technology."

9            Do you see that?

10     A.    Mm-hmm.

11     Q.    Is that the abuse-deterrent

12 drug that you were managing?

13     A.    Yes.

14     Q.    And the speakers are who,

15 proposed speakers, rather?

16     A.    Dr. Jeffrey Gudin,

17 Dr. Charles Argoff, and Dr. Melanie

18 Rosenblatt.

19     Q.    Did you arrange for those

20 speakers for this conference?

21     A.    Yes.

22     Q.    And the purpose of having

23 them speak about the abuse-deterrent

24 formulation before it went to market was

Highly Confidential - Subject to Further Confidentiality Review

1    what?

2         A.    It wasn't specifically about

3    the formulation within the product.  It

4    was about abuse-deterrent formulations in

5    general.  There's over 22 that were in

6    development at the time.

7              Can we take a quick five

8    minutes?

9         Q.    Absolutely.

10             MR. MADDEN:  Let's do it.

11             THE VIDEOGRAPHER:  Going off

12        the record at 2:46.

13             (Short break.)

14             THE VIDEOGRAPHER:  We are

15        going back on record.  Beginning

16        Media File Number 5.  The time is

17        2:55.

18   BY MR. MADDEN:

19        Q.    Mr. Day, I want to talk with

20   you now about your work with the

21   abuse-deterrent formulation Vantrela ER.

22        A.    Okay.

23             (Document marked for

24        identification as Exhibit

1    Teva-Day-31.)

2  BY MR. MADDEN:

3    Q.    I'll hand you in connection

4  with that Exhibit 31.  Have you seen

5  Exhibit 31 before today?

6    A.    Yes.  I've seen it.

7    Q.    All right.  And the Vantrela

8  ER launch plan for 2014 is the title of

9  the document, correct?

10    A.    Yes.

11    Q.    Did you participate in

12  drafting this or review it?

13    A.    Participated in drafting it.

14    Q.    Let's go to Page 3 of this

15  exhibit which has an executive summary.

16    Do you see that?

17    A.    Yes.

18    Q.    On the executive summary,

19  the first numbered paragraph addresses

20  abuse and misuse of opioids, correct?

21    A.    Yes.

22    Q.    And it says, "The prevalence

23  of prescription opioid abuse and misuse

24  has increased in the past decade and

1    poses a serious public health issue."

2           Do you see that?

3    A.    Yes.

4    Q.    Do you agree with that?

5    A.    Yes.

6    Q.    It then says, "The

7    development of LA opioids formulated to

8    deter abuse is a priority for the FDA."

9    Correct?

10   A.    Yes.

11   Q.    And was Vantrela a

12   long-acting opioid?

13   A.    Yes.

14   Q.    Was Vantrela ER indicated --

15   if it had been marketed, indicated for

16   chronic pain?

17   A.    Yes.  Its indication was for

18   mild to moderate chronic pain.

19   Q.    All right.  If we go to Page

20   5 of this document, there is a section

21   regarding -- or rather statistics

22   regarding opioid abuse and misuse that

23   have five bullet points.

24           Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     Did you participate in

3     drafting that section of this launch

4     plan?

5          A.     No.

6          Q.     Where did that data come

7     from?

8               MR. ANDRISANI:  Objection.

9               THE WITNESS:  I'm not sure

10          where the bullet points came from.

11          The source reference is referring

12          to the pie charts above it.

13     BY MR. MADDEN:

14          Q.     Okay.  If we look above the

15     bullet points, second sentence above the

16     bullet points, it says, "The societal

17     impact of abuse and misuse has led to

18     numerous detrimental health outcomes,

19     creating the search for answers on how to

20     minimize this issue."

21               Do you see that?

22          A.     Yes.

23          Q.     And then there are

24     statistics associated with the opioid

1    epidemic, correct?

2         A.    Yes.

3         Q.    And the last bullet point

4    says, "Nonmedical use of prescription

5    pain medications costs health insurers

6    upwards of 72.5 billion annually in

7    direct healthcare costs."

8              Do you see that?

9         A.    Yes.

10        Q.    Do you know what the number

11   is for public entities?

12             MR. ANDRISANI:  Objection.

13             THE WITNESS:  No, I do not.

14   BY MR. MADDEN:

15        Q.    Do you understand that the

16   litigation about which we are here today,

17   about which I'm asking you questions is

18   litigation brought by public entities to

19   recover for the opioid epidemic?

20        A.    Yes.

21        Q.    How -- given the statistics

22   that are listed here regarding the opioid

23   epidemic, how would Vantrela ER help with

24   regard to that issue?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Well, as I mentioned

2    earlier, it could be part of the

3    solution.

4             Abuse-deterrent opioids in

5    their nature are formulated to be tamper

6    deterrent.  A lot of times opioids can be

7    abused by being crushed or snorted or

8    injected.  The formulation that we were

9    exploring prevented that.

10            And when they're crushed or

11   they're snorted, they're injected, that

12   can lead to respiratory depression.

13        Q.    Which can lead to death,

14   correct?

15        A.    Which can lead to death.

16        Q.    If we look at Page 6 that

17   goes along with those statistics that are

18   on Page 5, we see two graphs.  One graph

19   has, "Drug overdose death rates in the

20   U.S. have more than tripled since 1990."

21            Do you see that?

22        A.    Yes.

23        Q.    And the graph below that

24   says, "For every one death there are 32

Highly Confidential - Subject to Further Confidentiality Review

1  emergency visits for misuse and abuse,

2  130 people who are abuse or are

3  dependent, and 825 nonmedical users."

4            Do you see that?

5      A.    Yes.

6      Q.    And that data relates to the

7  use of opioids, correct?

8      A.    These data in the graph

9  above, I'm not sure if it's specific to

10 opioids or overdose of drugs in general.

11     Q.    Let take --

12     A.    Yeah.  Again, the last --

13     Q.    Let's say since -- let's say

14 since 2000.  Actiq was on the market in

15 2000, wasn't it?  Or was that 2008?

16     A.    I don't know.

17     Q.    That's a bad question.

18 Strike it.

19            Do you understand that

20 opioid overdose deaths and

21 hospitalizations and other ill effects

22 have far outpaced other drugs, such as

23 cocaine?

24            MR. ANDRISANI:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  I understand

2       that opioid deaths have increased.

3       I don't know in relation to other

4       drugs or therapies, to the

5       proportion.

6   BY MR. MADDEN:

7       Q.    Well, the Vantrela ER launch

8   plan document includes this data to tout

9   the value of a tamper-resistant opioid,

10  correct?

11      A.    I think it shows the

12  potential value or a need, yeah.

13      Q.    So we talked about Teva's

14  reaction to the opioid epidemic.  One of

15  the reactions was to create this

16  tamper-resistant opioid, correct?

17      A.    Yes.

18      Q.    But then it made the

19  economic decision not to market the drug,

20  correct?

21          MR. ANDRISANI:  Objection.

22          THE WITNESS:  The decision

23      to market Vantrela ER was -- I

24      think there was more in that than

1        just a financial decision.

2   BY MR. MADDEN:

3        Q.    What else was taken into

4   consideration by you and others who are

5   on the Vantrela team?

6              MR. ANDRISANI:  Objection.

7              THE WITNESS:  So I think

8        when you're looking at launching a

9        product, you know, you look at

10       different factors, one of those

11       being the current state, like for

12       example, of approval with managed

13       care plans, the -- the time that

14       the FDA grants you for

15       exclusivity.

16             And also within that time

17       period there was a year and a half

18       delay.  There was an additional

19       abuse-deterrent hydrocodone

20       formulation that was launched

21       ahead of us that wasn't previously

22       to be launched.

23             So to my understanding there

24       were also legal concerns while

1    there was a hydrocodone

2    abuse-deterrent formulation and

3    then Vantrela, that they could be

4    the same, and there may not even

5    be a legal pathway to launch the

6    product.  So it is multifactorial.

7  BY MR. MADDEN:

8        Q.    Teva pain strategy team,

9  were you on that team?

10           (Document marked for

11       identification as Exhibit

12       Teva-Day-32.)

13  BY MR. MADDEN:

14       Q.    Exhibit 32.

15       A.    This looks to be a global

16  science -- excuse me, global scientific

17  communications, which falls under

18  medical.  I guess they were calling it

19  pain strategy team.  There's a divide

20  between medical and marketing.  So I

21  wouldn't have had direct input or have

22  created anything in this.

23       Q.    At Page 7 in Exhibit 32,

24  there's reference to Study 1085, Abuse

1   Liability Manuscript?

2          A.     Yes.

3          Q.     Are you familiar with that

4   study?

5          A.     Yes, I am familiar with

6   these studies.

7          Q.     Okay.  Were those studies

8   published?

9          A.     I believe these were the

10   drug liking studies that -- yes, I

11   believe they were published.

12          Q.     What do you mean when you

13   say "drug liking studies"?

14          A.     It's a study methodology

15   that medical employs during one of these

16   protocols to assess the abuse potential

17   of a product.  It's -- I mean, it's

18   really more of a question for medical

19   than for marketing.  But it's a

20   methodology that they use.

21               (Document marked for

22          identification as Exhibit

23          Teva-Day-33.)

24   BY MR. MADDEN:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  I'm handing you

2   Exhibit 33.  Did you see that document in

3   connection with your work on Vantrela?

4   It's titled, "Prescription Drug Abuse &

5   Alliance to Prevent the Abuse of

6   Medicines."

7      A.    I can't recall this

8   document.

9      Q.    Did you have any authorship

10   in it?

11      A.    No.

12      Q.    And I think you told me

13   earlier that you were not on the alliance

14   committee; is that right?

15      A.    That's correct.

16      Q.    Exhibit 34 is a patient

17   exploration document.  Are you familiar

18   with that document?

19           (Document marked for

20        identification as Exhibit

21        Teva-Day-34.)

22           THE WITNESS:  Not previous

23        to this.  I'm viewing it now.

24   BY MR. MADDEN:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  All right.  So it
2  appears to me, from looking through this
3  document, that CEP-33237 was another name
4  for Vantrela.  Are you familiar with
5  that?
6    A.    Yes.
7    Q.    Okay.  And this appears to
8  be -- have been a study submitted to Teva
9  from Pinnacle Research Group LLC in
10  Perryville, Missouri.  Did you have any
11  interaction with them?
12    A.    No.  This was in 2011.  I
13  would have been in field.  I wasn't in
14  the marketing role.
15    Q.    When you were director of
16  Vantrela, was this study ever presented
17  to you?
18    A.    No, I've never seen this.
19        (Document marked for
20        identification as Exhibit
21        Teva-Day-35.)
22  BY MR. MADDEN:
23    Q.    Exhibit 35.  Have you seen
24  this document before?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I can't recall.  This looks
2    to be a slide that may have been included
3    in a presentation to management.  But I
4    had not presented this slide.
5          Q.     All right.  So you are the
6    director of Vantrela.
7          A.     Mm-hmm.
8          Q.     And part of the team that
9    decided not to launch Vantrela.
10         A.     Correct.
11         Q.     And we had this slide that
12   talks about reasoning around that
13   decision, correct?
14         A.     Correct.
15         Q.     The first bullet point --
16   well, first of all, it's titled Teva's
17   current internal plan for Vantrela,
18   right?
19              The first bullet point says,
20   "In event Vantrela cannot be divested,
21   Teva does not plan to launch the
22   product."
23         A.     Okay.
24         Q.     Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.    Yes.
2           Q.    Was there a plan to sell
3    Vantrela to another company?
4           A.    Yes.
5           Q.    That's the divestment that
6    is being discussed here?
7           A.    Correct.
8           Q.    Had that been the plan all
9    along?
10          A.    No.
11          Q.    When did that plan come into
12   effect?
13          A.    When we were assessing
14   options after the year and a half delay.
15          Q.    Talk to me about that year
16   and a half delay.  You said that FDA
17   delayed a year and a half to approve the
18   drug, correct?
19          A.    Mm-hmm.
20          Q.    Yes?
21          A.    Yes.
22          Q.    And then the drug would have
23   only had three years of patent
24   protection?
```

1    A.    Correct.  So a year and a

2  half left.

3    Q.    Why wouldn't the three years

4  have run from approval?

5    A.    The -- there was another --

6  the timing, we have to go back and look

7  at the timing.  But there was another

8  abuse-deterrent hydrocodone formulation

9  already on the market.  Its exclusivity

10  would have ended, thus entering a generic

11  version into the market.

12    Q.    So it -- so it was patent

13  protection for a competitor that would

14  have caused the year-and a half problem

15  for the company, right?

16    A.    Yes.

17    Q.    It wasn't patent -- losing

18  patent protection for your drug, was it?

19    A.    No.

20    Q.    Okay.  Second bullet point

21  is, "Key reasons include greater expenses

22  expected to be associated with Vantrela

23  versus its sales potential, particularly

24  given Teva's near-term financial

Highly Confidential - Subject to Further Confidentiality Review

1  constraints."

2          Do you see that?

3      A.    Yes.

4      Q.    Was an analysis done as to

5  what it would cost to detail Vantrela?

6      A.    There was analysis on the

7  field sales to detail it, yes.  240

8  full-time equivalence or representatives.

9      Q.    Okay.  So the cost

10  outweighed the benefit if you were going

11  to run -- if somebody else was going to

12  go generic with a similar product in a

13  year and a half.  Is that what it came

14  down to?

15          MR. ANDRISANI:  Objection.

16          THE WITNESS:  That was part

17      of it.  And Teva was cutting costs

18      dramatically.

19  BY MR. MADDEN:

20      Q.    So let's go to the last

21  bullet point.  It says, "Teva's interest

22  in opioid market has declined

23  significantly.  Sociopolitical sentiment

24  towards opioids has continued to

Highly Confidential - Subject to Further Confidentiality Review

1    decline."

2                    Do you see that?

3         A.    Yes.

4         Q.    Do you understand that to

5    mean that public political sentiment

6    towards opioids was not favorable?

7                    MR. ANDRISANI:  Objection.

8                    THE WITNESS:  I would say

9            that it was not favorable.

10   BY MR. MADDEN:

11        Q.    What's that last bullet

12   point referring to, the two IR AD

13   opioids?

14                   MR. ANDRISANI:  Objection.

15                   THE WITNESS:  We had

16           intended on using the

17           abuse-deterrent technology in

18           Vantrela in other immediate

19           release formulations.  It -- we

20           could never get it to work in

21           clinical trials.

22   BY MR. MADDEN:

23        Q.    So Fentora would be an

24   immediate release product, right?

Highly Confidential - Subject to Further Confidentiality Review

1         A.     Fentora is a transmucosal
2   immediate release fentanyl.
3         Q.     Yes, right.  And Vantrela
4   would be a long-acting opioid, not an
5   immediate release opioid, right?
6         A.     Yes.
7         Q.     So there were studies or --
8   or attempts to create an abuse-deterrent
9   immediate release opioid, right?
10         A.     Right.  Not fentanyl based.
11         Q.     What about the fentanyl
12   patch, was that developed?
13         A.     It was not.
14         Q.     Did you ever see that?
15         A.     There was a program.  I
16   didn't see it.  It was never developed.
17   They couldn't get it to work.
18         Q.     So at the -- so at the time
19   that the Pain Matters campaign was
20   running by you and you were overseeing
21   Vantrela, it appears to me that Teva was
22   promoting opioids in general for chronic
23   use even though it was making economic
24   decisions against Vantrela which was for

Highly Confidential - Subject to Further Confidentiality Review

1    chronic use, am I right about that?

2                    MR. ANDRISANI:  Objection.

3                    THE WITNESS:  No.  I

4          wouldn't say we were promoting

5          opioids at the time.  The Pain

6          Matters campaign was promoting

7          education and information about

8          pain management.  It wasn't

9          specific to opioids or products.

10   BY MR. MADDEN:

11         Q.    Right.  We looked at the

12   Pain Matters website, correct?

13         A.    Yeah.

14         Q.    It mentions chronic pain,

15   right?

16         A.    Mm-hmm.

17         Q.    It mentions opioids, right?

18         A.    Mm-hmm.

19         Q.    Yes on both of those?

20         A.    Yes.

21         Q.    It doesn't mention any other

22   drugs used to treat chronic pain other

23   than opioids, am I correct?

24         A.    I -- I believe as a -- I

Highly Confidential - Subject to Further Confidentiality Review

1    can't recall as I said earlier.  But I

2    believe there's additional information on

3    therapies like acupuncture,

4    acetaminophen.  There is information on

5    opioids, yes.  But I think there's other

6    information as well about the entire

7    management of pain.

8           Q.    At the very beginning of the

9    day you referred to the Pain Matters

10   campaign as unbranded marketing, right?

11          A.    Mm-hmm.  Yes.

12          Q.    Yes.  Unbranded meaning it's

13   not associated with Fentora or some other

14   branded drug, correct?

15          A.    Correct.

16          Q.    But it is marketing, right,

17   it is promotion?

18              MR. ANDRISANI:  Objection.

19              THE WITNESS:  It -- yes, it

20        is within marketing.

21   BY MR. MADDEN:

22          Q.    Sure.  It is a promotional

23   piece that doctors and patients were

24   directed to based on media as we saw in

Highly Confidential - Subject to Further Confidentiality Review

1    the report that was sent to you, right?

2              MR. ANDRISANI:  Objection.

3              THE WITNESS:  I don't know

4         if I would characterize it as

5         promotion.  I always characterized

6         it more as education and

7         information.

8    BY MR. MADDEN:

9         Q.    But you called it unbranded

10   marketing, right?

11             MR. ANDRISANI:  Objection,

12        asked and answered.

13             THE WITNESS:  Yes.

14   BY MR. MADDEN:

15        Q.    Okay.  And that unbranded

16   marketing, if a patient or a doctor saw

17   it and went to the website, they could

18   read about opioid management for chronic

19   pain, right?

20             MR. ANDRISANI:  Objection.

21             THE WITNESS:  They could

22        read about that and other things.

23   BY MR. MADDEN:

24        Q.    Right.

Highly Confidential - Subject to Further Confidentiality Review

1                (Document marked for

2          identification as Exhibit

3          Teva-Day-36.)

4     BY MR. MADDEN:

5          Q.    Exhibit 36.  This is an

6     e-mail dated May 24, 2017 --

7                MR. MADDEN:  I'm sorry.

8                MR. ANDRISANI:  That's okay.

9          Thank you.

10    BY MR. MADDEN:

11         Q.    The string begins with --

12    well, on the first page there's an e-mail

13    to you from Joseph Grotzinger, correct?

14         A.    Yes.

15         Q.    Who is he?

16         A.    He was a -- he was a

17    brand -- in marketing, a brand director

18    in marketing.  Joseph Grotzinger.  He was

19    in -- I believe he was in the respiratory

20    division as well.

21         Q.    Mr. Grotzinger forwards you

22    an e-mail from someone outside the

23    company and says, "I received this

24    request from a former colleague, Bob

1  Verscharen who is consulting with a

2  development company working on the

3  patented abuse-deterrent technology.

4  They also claim there is some

5  environmental" -- "environmental benefit

6  to this technology as it prevents the

7  drug from entering the water supply."

8         Do you see that?

9     A.    Yes.

10    Q.    Was that one of the

11 considerations you had in -- in

12 overseeing the abuse-deterrent version,

13 that it would somehow keep it out of the

14 water supply?

15    A.    I didn't develop the

16 abuse-deterrent technology.  I don't know

17 if that was something it could do or not

18 do.  I -- I wasn't aware of that being a

19 feature of the technology we were

20 developing.

21    Q.    Fair enough.  You respond in

22 May of '17, "Thanks for sending this

23 over.  We are no longer developing

24 abuse-deterrent drugs.  The program has

1    been discontinued."

2              Do you see that?

3        A.    Yes.

4        Q.    And it was discontinued for

5    the reasons we previously discussed,

6    right?

7        A.    Correct.

8              (Document marked for

9              identification as Exhibit

10             Teva-Day-37.)

11   BY MR. MADDEN:

12       Q.    Exhibit 37 is a slide

13   presentation.  It does not appear to be

14   dated.  But my question for you is, have

15   you seen this before, or did you have any

16   role with putting it together?

17       A.    I mean, some of the slides

18   look familiar.  I'm not sure if I put

19   together this exact thing, this

20   presentation.

21       Q.    Let's look at some of the

22   slides then and see if you recognize

23   them.

24             Slide 48 in Exhibit 37.

1    A.    The numbers on the bottom?

2    Q.    I hope so.

3    A.    The page number on the

4  bottom?  Okay.  Okay.

5    Q.    This slide entitled "Drug

6  Diversion" in Exhibit 37, have you seen

7  that before?

8    A.    I can't recall this slide.

9    Q.    How about the slide at Page

10  49.  Have you seen that one before?

11    A.    No.  I mean, these look to

12  be similar data to what we looked at

13  previously in the Vantrela plan, but I

14  can't recall the specific dataset or this

15  slide.

16    Q.    How about the slide at Page

17  50?

18    A.    I can't recall having

19  created this.  I think I've seen this

20  before.

21    Q.    Okay.  Remember earlier we

22  were talking about overdose deaths in the

23  U.S. --

24    A.    Yes.

1      Q.     -- and how they've gone

2  up --

3      A.     Yes.

4      Q.     -- increasingly over the

5  last couple decade?

6      A.     Yes.

7      Q.     And do you see that pain

8  relievers are the highest growth numbers

9  when compared to tranquilizers,

10  stimulants, and sedatives on this page?

11      A.     Yes.  That's what I was

12  referring to earlier with -- I didn't

13  know what else was in that dataset.

14      Q.     Going back to Exhibit 37,

15  Page 48, the pie chart that deals with

16  where abusers are getting their opioids.

17      A.     Mm-hmm.

18      Q.     The data that's contained in

19  here, was that brought to your attention

20  in connection with the development of the

21  abuse-deterrent version, Vantrela?

22      A.     It's contained within here.

23  But I can't recall specifically

24  developing, or discussing the reasons for

Highly Confidential - Subject to Further Confidentiality Review

1    the data.

2            MR. MADDEN:  Mr. Day, some

3        of these lawyers may have some

4        questions for you.  So I'm going

5        to pass you to these other

6        lawyers.

7            THE WITNESS:  Okay.

8            THE VIDEOGRAPHER:  Going off

9        the record.  The time is 3:22.

10           (Brief pause.)

11           THE VIDEOGRAPHER:  We are

12       going back on the record.

13       Beginning of Media File Number 6.

14       The time is 3:24.

15               -  -  -

16               EXAMINATION

17               -  -  -

18   BY MR. FAES:

19       Q.    Good afternoon, Mr. Day.  My

20   name is Andy Faes, and I also have some

21   additional questions and some follow-up

22   questions for you today.

23       A.    Okay.

24       Q.    I also represent the

Highly Confidential - Subject to Further Confidentiality Review

1    plaintiffs in this case.  Do you

2    understand that?

3            A.    Yes, I do.

4            Q.    I'll try to be brief and try

5    not to re-cover old ground.  The nature

6    of follow-up questions is I may have to

7    ask a few questions over again --

8            A.    Okay.

9            Q.    -- just to ground you to

10   where we are in space and time.  Okay?

11           A.    Sounds good.

12           Q.    Now, when you first joined

13   Cephalon, you joined as a sales training

14   manager in approximately July of 2007; is

15   that right?

16           A.    Correct.

17           Q.    And you eventually became a

18   senior sales training manager, right?

19           A.    I did.

20           Q.    How many -- at its peak, how

21   many people were in the sales training

22   department?

23           A.    I would say five.

24           Q.    Okay.  And one of those

Highly Confidential - Subject to Further Confidentiality Review

1    persons was the individual we discussed

2    earlier who you trained, right?

3            A.    Yes.

4            Q.    What was her name again?

5            A.    Kate Reedy.

6            Q.    While were you sales

7    training manager from approximately 2007

8    through the end of 2009, early 2010, you

9    would have been responsible for training

10   sales reps who called on doctors

11   regarding the Fentora product all across

12   the country, right?

13           A.    Yes.

14           Q.    And that would have included

15   the state of Ohio, right?

16           A.    Yes.

17           Q.    And you became a sales

18   manager for the Mid-Atlantic region in

19   early 2010; is that right?

20           A.    Yes.

21                 (Document marked for

22           identification as Exhibit

23           Teva-Day-38.)

24   BY MR. FAES:

Highly Confidential - Subject to Further Confidentiality Review

1  Q.   I'm going to hand you what's

2  been marked as Exhibit 38.  This is from

3  Teva's files.  You can see, it's -- let

4  me start over.

5       This is a document from

6  Teva's files.  You can see at the top

7  it's labeled "2009 PCS Mid-Atlantic

8  area."

9       Do you see that at the top?

10 A.   Yes.

11 Q.   And this would have been --

12 2009 would have been right before you

13 became the Mid-Atlantic manager, right?

14 A.   Yes.

15 Q.   And if you look at the

16 graphic, you can see over on the

17 left-hand side, it appears that part of

18 Ohio was actually included in the

19 Mid-Atlantic territory, right?

20 A.   Yes.

21 Q.   Does this refresh your

22 recollection about whether or not at

23 least part of Ohio was in your territory

24 during the time that you were the

Highly Confidential - Subject to Further Confidentiality Review

1    Mid-Atlantic manager?

2         A.    Yes.

3         Q.    So is this an accurate

4    representation of your territory that

5    included Ohio during the time you were

6    Mid-Atlantic sales manager in 2010 and

7    2011?

8         A.    I'm not sure if this was the

9    exact territory cut in 2010 and 2011.  It

10   looks to be accurate, yes, and parts of

11   Ohio.

12        Q.    But just to be clear, you

13   now -- strike that.

14             Just to be clear, you would

15   agree with me now that when you were

16   Mid-Atlantic sales manager in 2010 and

17   2011, your territory would have included

18   at least part of Ohio, correct?

19        A.    Yes.

20        Q.    And actually, if you look on

21   the second page of this, you can actually

22   see with a little bit more detail the

23   area of Ohio that would have been

24   included in your territory, right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     And does that appear to be

3     roughly accurate to you?

4          A.     Yes.

5          Q.     Okay.  You can set that

6     document aside.

7                 And after you were the

8     Mid-Atlantic sales manager, you later

9     became, in addition to a manager of other

10    products, the Fentora product manager in

11    2012, right?

12         A.     Yes, I did.

13         Q.     And as part of your job as

14    the Fentora product manager, you would

15    have been responsible for developing

16    marketing, sales, and training materials

17    for the Fentora product, right?

18         A.     Yes.

19         Q.     And those materials would

20    have been intended for distribution to

21    Cephalon and Teva employees all across

22    the country, right?

23         A.     Correct.

24         Q.     And in fact, the materials

1   that you worked on were distributed all

2   across the country, right?

3         A.    Yes.  The sales training

4   materials were used to train the

5   representatives across the country, yes.

6         Q.    And that would include the

7   state of Ohio, correct?

8         A.    Yes.

9         Q.    Okay.  In 2016 you changed

10  roles again; is that accurate?

11        A.    Yes.

12        Q.    And at least one of your --

13  I don't want to, you know, fight about on

14  your specific title was --

15        A.    I had a lot of roles.

16        Q.    At least one of your titles

17  in 2016, we saw, was as the director of

18  abuse-deterrent opioids, right?

19        A.    Yes, correct.

20        Q.    And part of your duties

21  actually, I think predating 2015, was to

22  work on the Pain Matters website, right?

23        A.    Yes.

24        Q.    And we looked at some

1  excerpts from the Pain -- the Pain

2  Matters website which we marked as

3  Exhibit 26.  Do you remember that?

4        A.    Yes.

5        Q.    You'd agree with me that

6  that website is available to be accessed

7  by patients or doctors or anyone with web

8  access all across the country, right?

9        A.    Yes.

10        Q.    And that includes the state

11  of Ohio, right?

12        A.    Yes, it does.

13        Q.    Now, I think we talked about

14  during the -- well, let me back up.

15            Do you recall when the Pain

16  Matters website was initially launched?

17  Was it around 2015?

18        A.    I can't recall the exact --

19  that sounds about right as a time frame.

20  I can't recall the specific launch date.

21        Q.    Okay.  I think you testified

22  earlier that during the Pain Matters

23  campaign, at least at the start of it,

24  you weren't -- I think you said that you

1   weren't marketing any opioids, correct?

2       A.    I think there was a time

3   when Fentora was being marketed and the

4   Pain Matters campaign had launched, and I

5   think that was like a six-month time

6   frame.  And then Fentora was not

7   promoted, if memory -- so there was, I

8   think, a small window in there.

9       Q.    And so when you say

10  "marketed," what you're -- what you're

11  really meaning is it wasn't promoted,

12  meaning there was no active sales force,

13  right?

14      A.    Correct.

15      Q.    But Teva and Cephalon

16  continued to sell both the Actiq and the

17  Fentora products the entire time that the

18  Pain Matters program was running, right?

19      A.    They continued to distribute

20  them, not through promotion with field

21  sales.

22      Q.    So it continued to be

23  available for sale --

24      A.    Yes, yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    -- during the entire time

2    that the Pain Matters program ran,

3    correct?

4    A.    Yes, it did.

5    Q.    And it continues to be

6    available today, right?

7    A.    Yes.

8    Q.    And during at least part of

9    that time that the Pain Matters program

10   was running, Teva was also selling

11   generic opioid products, right?

12   A.    I wasn't in charge of the

13   generic portfolio.  I -- I believe so.

14   But I don't know what their portfolio

15   consisted of.

16   Q.    But you understood as a --

17   as an employee of Teva that in around

18   2016, Teva acquired Actavis and that

19   included a portfolio of opioids, right?

20   A.    I didn't know Actavis's

21   specific portfolio of products.  I knew

22   that -- I really didn't have much

23   interaction with the generic side.  The

24   company was very siloed.  You know,

1  specialty was the side of the

2  organization that I resided on.

3           So I knew there was an

4  integration with Actavis, but I didn't

5  know what products Actavis brought in

6  relation to what Teva already had on the

7  generic side.

8       Q.   So for example, as part of

9  your responsibilities as director of

10 abuse-deterrent opioids, you worked on

11 the Vantrela ER product --

12      A.   Yes.

13      Q.   -- which is a hydrocodone

14 product, right?

15      A.   Yes.

16      Q.   So did you know that Teva

17 actually had a non-abuse-deterrent

18 hydrocodone generic program that they

19 were selling or not?

20           MR. ANDRISANI:  Objection.

21           THE WITNESS:  I didn't know

22      if there were versions or if there

23      were sales associated with that.

24 BY MR. FAES:

1    Q.    So as -- as part of your

2  job, you never looked at sales of Teva's

3  existing nonabuse-deterrent hydrocodone

4  product in any of your sales or marketing

5  analysis related to the Vantrela ER

6  product?

7           MR. ANDRISANI:  Objection.

8           THE WITNESS:  I -- I don't

9       think in relation to Teva.  We

10       looked at hydrocodone.  But I

11       don't specifically, like if Teva

12       had a version, I think Teva had

13       versions of hydrocodone and

14       oxycodone, but I don't know the

15       specifics behind when they were

16       launched, how they were acquired

17       and --

18  BY MR. FAES:

19    Q.    Okay.  So, it's fair to say

20  that if Teva generic was actually selling

21  millions of dollars worth of opioid

22  products, generic opioid products during

23  the Pain Matters campaign, you would have

24  no knowledge of that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No.  I didn't see any

2  reports.

3    Q.    And as you sit here today,

4  you have no knowledge of -- of how many

5  generic opioid products Teva was selling

6  during the Pain Matters campaign; is that

7  accurate?

8    A.    No.  That's accurate, yes.

9    Q.    Okay.  If I could have you

10  go back to Exhibit Number 26, which is

11  the web capture.

12    A.    Yep.

13    Q.    And I'm going to have you go

14  to -- it's six pages in.  The bottom is 1

15  of 4.

16    A.    Is it this one?

17    Q.    Yes.  Six pages in.  I'm

18  having you go to this page.

19    A.    Okay.

20    Q.    It says 1 of 4 at the

21  bottom, but it's the sixth page in?

22    A.    Okay.

23    Q.    So, Mr. Day, we're looking

24  at Exhibit Number 26 which is an archived

```
 1   web capture, I'll represent to you it's

 2   from 2015, of the Pain Matters website.

 3   Do you see that?  At the top there it

 4   says, "Teva Pharmaceuticals and pain

 5   management"?

 6           A.    Yes.

 7           Q.    And actually down, if you

 8   look at the bottom, it says

 9   archiveweb.org and there's a 2015 year in

10   there with a date.

11           A.    Yes.

12           Q.    Do you see that?

13           A.    Yes.

14           Q.    If you look at the second

15   paragraph from the top it states, "As

16   part of our ongoing commitment to support

17   healthcare professionals and patients

18   dealing with chronic pain, we were

19   developing an innovative abuse deterrence

20   technology platform to address the

21   challenges of opioid abuse and misuse."

22                 Do you see that?

23           A.    Yes.

24           Q.    That's return -- that's
```

1   referring to the Vantrela ER product that

2   you had in development at this time,

3   right?

4         A.    Correct.  And there were

5   other abuse-deterrent formulations in

6   development too.

7         Q.    Right.  There were at

8   least -- there were at least two other

9   formulations that you had in development,

10  right?

11        A.    Yes.  Immediate release

12  oxycodone and immediate release

13  hydrocodone.

14        Q.    That Vantrela ER was the

15  furthest along in the FDA approval

16  process at this time, right?

17        A.    Yes, correct.

18        Q.    And, in fact, some of your

19  projections indicated that the Vantrela

20  ER product could launch as soon as 2016,

21  right, if it -- if it got approval?

22        A.    That sounds accurate.  I'd

23  have to go back and look at the business

24  plans, but --

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And I think earlier you

2    testified that Teva terminated funding

3    for the Pain Matters product about a year

4    ago, right, so early -- early 2017?

5    A.    I think it -- yeah, in '17.

6    Q.    And early 2017, isn't that

7    about the same time that Teva made the

8    announcement that they would not be

9    selling or launching the Vantrela ER

10   product?

11   A.    I am not sure they ever made

12   a public announcement.

13   Q.    Would you agree that that's

14   about the time that Teva made the -- the

15   decision internally to not launch the

16   Vantrela ER product?

17   A.    Based on that e-mail that we

18   saw earlier, yes.

19   Q.    Okay.  You can set that

20   aside.

21   A.    Yep.

22   Q.    Now, I'm going to go back in

23   time again, to when you first joined the

24   organization Cephalon at that time --

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Okay.

2    Q.    -- in July of 2017 as a

3  sales training manager, right?

4    A.    Okay.

5    Q.    And we talked earlier that

6  one of your responsibilities in that role

7  would have been to train the sales force

8  on how to promote the Fentora product,

9  right?

10    A.    Yes.

11    Q.    And we discussed earlier

12  that one of the modules, learning

13  modules, was actually on the RiskMAP,

14  right?

15    A.    Yes.

16         (Document marked for

17         identification as Exhibit

18         Teva-Day-39.)

19  BY MR. FAES:

20    Q.    I'm going to hand you what's

21  been marked Exhibit Number 39 to your

22  deposition.

23    A.    Yep.

24    Q.    And Exhibit Number 39 in

Highly Confidential - Subject to Further Confidentiality Review

1    front of you, this is actually the

2    learning module that you would have used

3    to train Fentora sales reps on the

4    RiskMAP, right?

5           A.    Yes, this looks to be the

6    approved version.

7           Q.    And it looks, if you see the

8    copyright date down towards the bottom

9    there, it actually says copyright 2007.

10   So this probably would have been the

11   version that you would have utilized upon

12   your initial hire at Cephalon, correct?

13               MR. ANDRISANI:  Objection.

14               THE WITNESS:  This may be

15          the specific version.  There's no

16          tracking number at the bottom.  So

17          I don't know if this is a draft or

18          a final version.

19               But this looks to be, yes,

20          like one of the first RiskMAP

21          modules that I would have seen

22          upon my hire.

23   BY MR. FAES:

24          Q.    Okay.  And you would

Highly Confidential - Subject to Further Confidentiality Review

1    actually be very familiar with this

2    document, right?

3         A.    Yes, very familiar --

4         Q.    And this was a document --

5         A.    Yeah, I mean it was a long

6    time ago, so...

7         Q.    So you would have been very

8    familiar with this document at least in

9    2007 and 2008 and you would have been

10   using this to actually train Fentora

11   sales reps as part of your job, right?

12              MR. ANDRISANI:  Objection.

13              THE WITNESS:  So this would

14         go out to the representatives.

15         They would study the module and

16         take the exam based on that.  I

17         wouldn't train off of the module

18         so I wouldn't know specifically

19         every word and train from the

20         module itself.  This was -- does

21         that make --

22   BY MR. FAES:

23         Q.    Sure, sure.  So you --

24         A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    -- you would agree that it

2    was part of your responsibilities as the

3    sales training manager to know this

4    material, right?

5    A.    Yes.

6    Q.    If you look at Page Number 1

7    of this, which I think is actually the

8    third page in, you see under Section 4

9    that there's -- under Section 4, there's

10   goals and objectives of the Fentora

11   RiskMAP.  Do you see that?

12   A.    Yes.

13   Q.    And the number one goal is

14   that Fentora should -- should be used

15   only by opioid-tolerant patients with

16   cancer.

17         Do you see that?

18   A.    Yes.

19   Q.    You would agree with me that

20   breakthrough -- breakthrough pain --

21   strike that.

22         You would agree with me that

23   breakthrough pain without cancer was not

24   indicated Fentora at the time you joined

Highly Confidential - Subject to Further Confidentiality Review

1    Cephalon in 2007, right?

2              MR. ANDRISANI:  Objection.

3         We've been over this.

4    BY MR. FAES:

5         Q.    Is that right?

6         A.    Breakthrough pain in

7    patients with cancer is how it was

8    indicated.

9         Q.    Right.  And breakthrough

10   pain -- breakthrough pain without cancer

11   is not indicated, right?

12        A.    Correct.

13        Q.    In fact, as we sit here

14   today in 2018, it's never been indicated

15   for Fentora, right?

16        A.    No, it hasn't.

17        Q.    So you would agree with me

18   that marketing or promoting Fentora for

19   breakthrough pain without cancer would be

20   off-label, right?

21             MR. ANDRISANI:  Objection.

22             THE WITNESS:  Can -- can

23        you --

24   BY MR. FAES:

Highly Confidential - Subject to Further Confidentiality Review

1       Q.     You would agree with me that

2   marketing or promoting Fentora for

3   breakthrough pain without cancer would be

4   considered off-label, right?

5       A.     Yes.

6       Q.     And you understood during

7   your time at Cephalon, that marketing

8   either Actiq or Fentora off-label, would

9   be illegal, right?

10      A.     Yes.

11      Q.     If you go to Page 17 of this

12  document, it actually breaks down the

13  goals again, goals and objectives of the

14  Fentora RiskMAP.  Do you see that?

15      A.     Yes, I do.

16      Q.     And again, the number one

17  goal is Fentora should be used only in

18  opioid-tolerant patients with cancer.

19          Do you see that?

20      A.     Yes.

21      Q.     And do you see under the

22  subobjectives it says, "Educate patients

23  that Fentora should not be used in opioid

24  nontolerant patients," right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And it also says, "To

3  educate patients, that Fentora should be

4  used only by individuals with cancer who

5  are opioid tolerant."

6         Do you see that?

7    A.    Yes.

8    Q.    And the third point is "to

9  educate pharmacists and other healthcare

10 personnel of the importance of Fentora

11 being prescribed, distributed and used

12 only by opioid-tolerant patients with

13 cancer."

14        Do you see that?

15   A.    Yes.

16   Q.    And do you notice that

17 Points 2 and 3 specifically reference

18 patients with cancer.  But Point 1, that

19 educate physicians that Fentora should be

20 used in opioid nontolerant patients,

21 doesn't mention that it shouldn't be used

22 by patients with only -- only be used by

23 patients with cancer, correct?

24        MR. ANDRISANI:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  The sentence

2       does say that, but the context

3       within the module is for cancer

4       pain.

5   BY MR. FAES:

6       Q.    But you'd agree at least

7   according --

8       A.    The header says,

9   "Opioid-intolerant patients with cancer."

10  It's just further kind of breaking that

11  down, because you have to explain why

12  they need to be opioid tolerant, why they

13  need to have cancer, because as we talked

14  about earlier, if you're not opioid

15  tolerant, it could lead to respiratory

16  depression, which could lead to death.

17      Q.    Now, at some point you were

18  made aware that Cephalon was actually

19  seeking an expanded indication for

20  Fentora to be used in opioid-tolerant

21  patients with breakthrough pain without

22  cancer, right?

23      A.    Yes.

24      Q.    In fact, there were people

Highly Confidential - Subject to Further Confidentiality Review

1    at Cephalon that really wanted to be able

2    to sell it to -- to sell Fentora to

3    patients without cancer, right?

4              MR. ANDRISANI:  Objection.

5              THE WITNESS:  I don't -- I

6         can't speak on other people's

7         behalf.  There was a developmental

8         program through medical to explore

9         that.

10   BY MR. FAES:

11        Q.    As part of the sales force

12   as the sales training manager, you

13   actually prepared for the possibility of

14   getting that expanded indication for the

15   use of Fentora -- Fentora in

16   opioid-tolerant patients without cancer,

17   right?

18        A.    The only recollection that I

19   have is from the module that we saw

20   earlier and reviewed.

21        Q.    Okay.  But in fact, didn't

22   you go to a war game simulation in early

23   2008 of what that might look like?

24        A.    I may have.  I can't recall

1    if I had gone to a war game simulation.

2            (Document marked for

3        identification as Exhibit

4        Teva-Day-40.)

5    BY MR. FAES:

6        Q.    I'm going to hand you what's

7    been marked as Exhibit Number 40 to your

8    deposition.

9        A.    Okay.

10           MR. ANDRISANI:  Thank you.

11   BY MR. FAES:

12       Q.    And this is another document

13   from Teva's files.  And you see this is

14   an e-mail and attachment, and the e-mail

15   is dated April 15, 2008.

16           Do you see that?

17       A.    Yes.

18       Q.    And you see in the second

19   line, you're included -- Day, Matthew --

20   as one of the recipients of this e-mail?

21       A.    Yes.

22       Q.    And you see the first line

23   that states, "Please find below a

24   briefing booklet for the Fentora World

1    Cup (war games) meeting on Monday 4/21 at

2    the Desmond Hotel.  The booklet will

3    provide you with the following

4    information."

5                Do you see that?

6          A.    Yes.

7          Q.    And it lists items that are

8    included in the booklet that are attached

9    here.  If you turn to the third page in

10   this document, you actually see that

11   there's a -- this is a 2008 Fentora World

12   Cup briefing book.

13               Do you see that?

14         A.    Mm-hmm.  Mm-hmm.

15         Q.    And this is a document that

16   you would have received and reviewed

17   prior to this event, right?

18         A.    Would have received it and,

19   yes, reviewed it.  I don't know how

20   detailed I would have reviewed it.  But

21   yes, I would have received it.  It was

22   e-mailed to me.

23         Q.    And if you turn to the next

24   page in, ending in 5030 on the Bates, you

1    see that there's -- under player

2    profiles, it states that one of the

3    player profiles is Fentora EI, or

4    expanded indication, on Page 10.

5              Do you see that?

6         A.    Mm-hmm.

7         Q.    And Fentora EI, expanded

8    indication is referring to Fentora for

9    patients without cancer, right?

10        A.    If I go to Page 10, I would

11   assume based on what we're talking about.

12   If I go to Page 10.  Yes.

13        Q.    Okay.  And if you can turn

14   to Page 3 of this document, with the

15   Bates number ending 5032.  You actually

16   see there's a 2008 Fentora World Game

17   Internal War Games workshop, right?

18        A.    Mm-hmm.

19        Q.    And there's a team Fentora.

20             Do you see that?

21        A.    Yes.

22        Q.    You were actually on the

23   team, on the second name -- second name

24   down, right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     And there's a team Fentora

3    for the expanded indication, and that

4    would be the indication for Fentora in

5    patients without cancer, right?

6          A.     Based on Page 10, yes.

7          Q.     Okay.  So apart -- and as

8    part of this meeting, this Fentora war

9    games, you would have actually looked at

10   other materials as well, looked at some

11   PowerPoints that had some market analysis

12   and you -- right?

13         A.     I'm sure we would have,

14   yeah.  I can't recall what they were, but

15   yes.

16         Q.     Okay.  We'll look at those

17   in a minute.

18         A.     Okay.

19         Q.     And one of the things that

20   you would have discussed is how to

21   potentially market Fentora to patients

22   without cancer if the indication were

23   received, right?

24         A.     If that's a stated objective

Highly Confidential - Subject to Further Confidentiality Review

1    in here or one of the subsequent

2    documents, then yes.

3         Q.    Okay.  And if you turn to

4    Page 7 of this document ending in 5036,

5    you see that the top of this document is

6    titled, "The 2000 (sic) Fentora World Cup

7    Internal War Games Workshop"?

8              Do you see that?

9         A.    Yes.

10        Q.    And you see in the middle of

11   the page it states that, "Currently

12   most" -- "Currently physicians' most

13   common treatment for breakthrough pain,

14   BTP, is to increase the dose of LAOs,

15   followed by increasing the dose or

16   frequency of SAOs."

17             Do you see that?

18        A.    Yes.

19        Q.    And LAOs means long-acting

20   opioids, right?

21        A.    Yes.

22        Q.    And SAOs means short-acting

23   opioids, right?

24        A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     "While the familiarity with
 2    the use of ROOs to treat BTP is growing
 3    are being, the ROO market is actually
 4    shrinking with moving annual total, MAT,
 5    growth down an average of 16 percent in
 6    2008 compared to the same months in
 7    2007."
 8            Do you see that?
 9            A.     Yes.
10            Q.     So this document from year
11    2008 war games indicates that the
12    rapid-onset opioid market, which includes
13    the fentanyl product Fentora, is
14    shrinking, right?
15            A.     Yes.
16            Q.     And if you look down towards
17    the bottom of this page it states,
18    "Currently the lead prescribers of
19    rapid-onset opioids for breakthrough pain
20    treatment are pain specialists and
21    anesthesiologists; however, they still
22    consider rapid-onset of opioids to be a
23    final resort, last cause (sic) of action.
24    In part this is due to" -- and the first
```

Highly Confidential - Subject to Further Confidentiality Review

1    bullet point is, "The limited

2    indication."

3              Do you see that?

4         A.    Yes.

5         Q.    And in this context, the

6    limited indication means the fact that

7    it's only indicated for treatment of

8    breakthrough pain in patients with

9    cancer, right?

10             MR. ANDRISANI:  Objection.

11             THE WITNESS:  I didn't write

12        the document.  I don't know, I

13        mean, the limited -- that's what

14        the indication was for.

15             As I had mentioned earlier,

16        there's a lifecycle management

17        program.  One of those was

18        noncancer.  But there's multiple

19        of studies that go on.

20             So whoever wrote this could

21        be referring to multiple different

22        indications that may or may not

23        have been pursued.

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. FAES:

2         Q.    Well, you were -- you were

3    at these war games, right?

4         A.    I was at them.

5         Q.    And you were -- you were

6    sent and reviewed this document in

7    preparation for the war games, right?

8              MR. ANDRISANI:  Objection.

9         Asked and answered.

10             THE WITNESS:  Yeah.  I mean,

11        I can't -- I was sent it and I

12        reviewed it, yeah.

13   BY MR. FAES:

14        Q.    So what's your -- so what's

15   your interpretation of that statement

16   that, "Currently, the lead prescribers of

17   rapid-onset opioids for breakthrough pain

18   treatment are pain specialists and

19   anesthesiologists; however, they still

20   consider rapid-onset opioids to be a

21   final resort, last cause (sic) of action.

22   This is in part due to the limited

23   indication"?  What is -- what is your

24   interpretation of what that means?

1          MR. ANDRISANI:  Objection.

2          THE WITNESS:  Just what it

3     says.  I don't have an

4     interpretation.  I mean, the way

5     that I read it is that, just how

6     it reads.  It's pain specialists,

7     anesthesiologists that consider

8     ROO or TIRF to be a last resort.

9          And that one of the reasons

10    is the limited indication, which

11    could be what we spoke about in

12    that lifecycle management program,

13    other indications that they're

14    pursuing or other indications that

15    doctors may have considered

16    Fentora for use.

17 BY MR. FAES:

18    Q.    Right.  And one of those

19 indications that was being pursued at

20 this time was an indication for treatment

21 of breakthrough pain in patients without

22 cancer, right?

23    A.    Yes, as we reviewed earlier.

24 And I'm not as familiar with the

Highly Confidential - Subject to Further Confidentiality Review

1    developmental program of Fentora.

2         Q.    Okay.  You can set that --

3             MR. MADDEN:  Can you take a

4         five-minute break?  Are you done

5         with that document?

6             MR. FAES:  Sure.

7             THE VIDEOGRAPHER:  Off the

8         record.  The time is 3:54.

9             (Short break.)

10            THE VIDEOGRAPHER:  We are

11        going back on record.  Beginning

12        Media File Number 7.  The time is

13        4:02.

14   BY MR. FAES:

15        Q.    Mr. Day, we are back on the

16   record after a short break.  Are you

17   ready to proceed?

18        A.    Yes.

19        Q.    Before we took a break, we

20   were talking about the Fentora war games

21   that occurred in April of 2008.  Do you

22   remember that?

23        A.    Yes.

24        Q.    And we talked about as part

Highly Confidential - Subject to Further Confidentiality Review

1    of that event there would have been, you

2    know, materials and PowerPoints that were

3    distributed and looked at by the more

4    than 30 people that attended that event,

5    right?

6              A.    Yes.

7              Q.    And I'm going to hand you

8    what I've marked as Exhibit 41 and 42.

9    And 41 is just an e-mail attaching

10   Exhibit Number 42, which is one of the

11   materials that was apparently distributed

12   at this event.

13              (Document marked for

14         identification as Exhibit

15         Teva-Day-41.)

16              (Document marked for

17         identification as Exhibit

18         Teva-Day-42.)

19   BY MR. FAES:

20              Q.    So if you could look at

21   Exhibit Number 42.  You can see that's

22   titled Fentora brand audit/market --

23   market pulse.

24              Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     And do you recognize this as

3    one of the PowerPoints that was

4    distributed and discussed at this

5    meeting?

6          A.     I don't recall receiving

7    this or discussing it.  It may have been

8    discussed at the meeting.  I just can't

9    recall the specific --

10         Q.     Okay.  Well, let's take a

11   look through it --

12         A.     -- PowerPoint.

13         Q.     -- and see if any of it

14   refreshes your memory.

15                It appears to be a market

16   survey of -- of doctors that prescribe

17   Fentora.  And if you turn to the ninth

18   page in.

19         A.     Okay.

20         Q.     And you see, this appears to

21   be --

22         A.     I'm sorry, can I just look

23   at this?

24         Q.     Sure.  Take as long as you

Highly Confidential - Subject to Further Confidentiality Review

1    need.

2         A.    Is there anything else back

3    here?  No.

4         Q.    Yeah, those -- those

5    documents on the back are just

6    placeholders --

7         A.    Okay.

8         Q.    -- for the PowerPoints that

9    were -- that were attached.

10        A.    Okay, okay, okay.  Yep.

11   This slide.

12        Q.    If you're looking at the

13   eighth page in of Exhibit 42, it looks

14   like there is a claims overview and a

15   rank order.  Do you see that?

16        A.    Yes.

17        Q.    And the first rank is

18   expanded labeling.  Do you see that?

19        A.    Yes.

20        Q.    And you see over on the left

21   it says expanded labeling,

22   permission/justification, and smoother

23   approval process.

24             Do you see that?

1    A.    Yes.

2    Q.    At this meeting, did you

3  discuss potential enhancements to the

4  Fentora marketing program and determine

5  that an expanded labeling would be the

6  number one thing that you could get to

7  help you improve the marketing of -- of

8  Fentora?

9         MR. ANDRISANI:  Objection.

10        THE WITNESS:  I don't recall

11    that discussion.

12  BY MR. FAES:

13    Q.    Okay.  If you turn to the

14  following page, do you see where it

15  states, "Physicians agree that an

16  expanded labeling would provide

17  validation of current physician

18  prescribing behavior, would ease the

19  approval process, and would increase

20  confidence among dabblers and

21  nonwriters."

22         Do you see that?

23    A.    I do.

24    Q.    Is that something that was

1    discussed at this Fentora world cup

2    meeting?

3              MR. ANDRISANI:  Objection.

4              THE WITNESS:  I -- I don't

5         know where this document was

6         created or presented or who -- I

7         don't know the context behind it,

8         I guess.  It's here.  It's

9         written.  I don't know if it was

10        discussed.  I can't recall

11        discussing confidence amongst

12        dabblers.

13   BY MR. FAES:

14        Q.   Did you ever at any Fentora

15   meeting discuss that an expanded

16   indication, meaning an indication for

17   Fentora for noncancer patients would

18   provide validation of current physician

19   prescribing behavior?

20             MR. ANDRISANI:  Objection.

21             THE WITNESS:  No.

22             (Document marked for

23        identification as Exhibit

24        Teva-Day-43.)

1    BY MR. FAES:

2         Q.    Mr. Day, I'm going to hand

3    you what's been marked as Exhibit 43 to

4    your deposition.

5         A.    Okay.

6              MR. ANDRISANI:  Thank you.

7    BY MR. FAES:

8         Q.    And this is a PowerPoint

9    dated September 5th of 2008.  And it's

10   titled Fentora forecast assumptions based

11   on conjoint.  Do you see that?

12        A.    Yes.  And assumptions and

13   conjoint is usually analysis done by

14   market research.  I was in the sales

15   training role.

16        Q.    Okay.  But if you -- if you

17   turn to the third page in of this, and it

18   says, "Why was this conjoint conducted."

19   And it's to -- it looks like the purpose

20   of this conjoint summarized in this

21   PowerPoint is to "quantify Fentora impact

22   of expanded indication beyond

23   breakthrough patients" -- "beyond

24   breakthrough pain in patients with

Highly Confidential - Subject to Further Confidentiality Review

1   cancer."

2                 Do you see that?

3        A.    I do.

4        Q.    And if you turn to the 13th

5   page in, the slide labeled, "High Impact

6   Events."

7        A.    Okay.

8        Q.    Do you see there on the

9   second bar from the bottom, it states,

10  "Expanded indication with a launch date

11  of October 2010"?

12                Do you see that?

13       A.    Yes.

14       Q.    And it looks like the

15  projected impact to sales going through

16  2015 of an expanded indication is

17  $70 million in sales.

18                Do you see that?

19       A.    Yes.

20       Q.    Did you have an

21  understanding at any time when you were

22  either the Fentora product manager or the

23  sales trainer or the manager of the

24  Mid-Atlantic region that getting an

Highly Confidential - Subject to Further Confidentiality Review

1    expanded indication for Fentora would

2    have a significant impact, increasing the

3    sales of Fentora?

4           A.    No.

5           Q.    Was this data ever shared

6    with you?

7           A.    No.

8           MR. FAES:  Okay.  I think

9           that's all the questions I have

10          for you right now, Mr. Day.  Thank

11          you for your time.

12          THE WITNESS:  Thank you.

13          THE VIDEOGRAPHER:  Going off

14          record.  The time is 4:09.

15          (Brief pause.)

16          THE VIDEOGRAPHER:  We are

17          back on the record.  Beginning of

18          Media File Number 8.  The time is

19          4:10.

20                -  -  -

21                EXAMINATION

22                -  -  -

23    BY MR. GASTEL:

24          Q.    Mr. Day, I represent a group

Highly Confidential - Subject to Further Confidentiality Review

1    of plaintiffs in the Tennessee lawsuit

2    pending currently in Tennessee state

3    court.  So it's a different group of

4    plaintiffs than the lawyers that were

5    asking you questions throughout the day.

6                    MR. GASTEL:  I first want to

7         state for the record my usual

8         objection that on behalf of my

9         clients, due to our belief that

10        Teva has failed to continue to

11        meet its obligations under the

12        state and federal cooperation

13        protocol, we object to the

14        deposition going forward today.

15        And we've laid out the reasons for

16        that in the previous depositions

17        and motions to quash.

18                    MR. ANDRISANI:  Understood.

19   BY MR. GASTEL:

20        Q.    With that objection, I just

21   have a couple of questions and hopefully

22   we're going to get out of here really

23   quick.

24                    A.    Sounds good.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    How many times in your work
2    for Teva did you travel to the state of
3    Tennessee, if at all?
4    A.    Never.
5    Q.    Do you have an idea of
6    prescription opioid -- prescription
7    opioid prescribing rates in the state of
8    Tennessee?
9    A.    I do not.
10    Q.    Do you have any idea of the
11    rates of prescriptions for Fentora in
12    Tennessee from 2015 to the present?
13    A.    I do not.
14    Q.    Do you have any idea of the
15    rates of prescriptions for Actiq in
16    Tennessee from 2015 to the present?
17    A.    I do not.
18    Q.    You were in charge for a
19    brief period of time of the Mid-Atlantic
20    region as the regional sales manager,
21    right?
22    A.    Yes.
23    Q.    We saw earlier that that did
24    not include the state of Tennessee,

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2            A.    Correct.

3            Q.    Do you know who was in your

4    role from the area that covered Tennessee

5    or parts of Tennessee?

6            A.    I can't recall.  I don't

7    know.  There should be a sales roster.  I

8    don't know where Tennessee -- this is

9    embarrassing.  But I don't know -- I've

10   never been to Tennessee.  I'm not sure if

11   it falls in the upper on -- I mean, I

12   know where it is on the map.

13           Q.    Sure.

14           A.    But in terms of our

15   geographical cuts, I'm not sure if it

16   would have been somebody in the more

17   Northern section of the middle of the

18   country or the southern.

19           Q.    Okay.

20           A.    So --

21           Q.    That's all right.

22           A.    And managers change pretty

23   frequently.

24           Q.    Sure.  Again, I don't want

Highly Confidential - Subject to Further Confidentiality Review

1  to belabor too much and I don't want to

2  go -- I don't want to redo anything that

3  was done earlier this morning.  But we

4  did see a slide earlier that you were

5  presented with that stated that there

6  were 12 million people abusing or

7  misusing opioids in 2010.  Do you recall

8  that document?  It came from Teva's Pain

9  Matters website.

10         A.    Yes.

11         Q.    And those numbers on that

12  website that you saw were related to the

13  year of 2010.  You remember that document

14  and those numbers, right?

15         A.    Yes.

16         Q.    So the problem that was

17  outlined there, it didn't go away in

18  2010.  You would agree with me, right?

19         A.    Yes.

20         Q.    That the problem of millions

21  of people abusing or misusing opioids

22  continues to this very day, right?

23         A.    Yes.

24         Q.    And that happens throughout

Highly Confidential - Subject to Further Confidentiality Review

1  the country, right?

2          A.    Yes, it does.

3          Q.    And it would happen by

4  definition in the state of Tennessee too,

5  right?

6          A.    Yes.

7          Q.    And you testified earlier

8  that -- and again, I don't want to

9  belabor the points --

10         A.    Yep.

11         Q.    -- but earlier you provided

12 a lot of testimony about conferences that

13 you oversaw, marketing materials that you

14 drafted or reviewed, the documentary that

15 you went over all with Mr. Madden.

16              Those materials were

17 available for people throughout the

18 country, right?

19         A.    Yes, they were.

20         Q.    They were -- and that

21 includes doctors and patients in the

22 state of Tennessee, right?

23         A.    We did not promote --

24 materials weren't available to patients

Highly Confidential - Subject to Further Confidentiality Review

1  via us.  There would be a patient

2  brochure, but it would have to come from

3  the doctor to the patient.

4          Q.    Sure.  And what I mean is

5  your website, there's not -- you're not

6  designing your website so that people

7  from Tennessee can't see it.  It's a

8  website, anybody can see it, including in

9  the state of Tennessee?

10         A.    That's correct, yes.

11         Q.    And patients can access

12  that, correct?

13         A.    Yes, correct.

14         Q.    You referenced earlier today

15  a little bit today about your use of IMS

16  Health data?

17         A.    Yes.

18         Q.    What is IMS Health data?

19         A.    I don't know what IMS stands

20  for.  I should.  But it is basically

21  prescription level data that is available

22  to the pharmaceutical industry.  So it

23  shows a prescriber or a doctor and their

24  prescription, what they prescribe.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Sure.  And you used that in

2    your work with Teva, correct?

3        A.    Yes.

4        Q.    And you found that data

5    reasonably reliable, correct?

6        A.    Yes.

7        Q.    And Teva had that

8    information in its possession and custody

9    and control from 2015 to present,

10   correct?

11       A.    Yes.

12       Q.    MR. GASTEL:  Subject to my

13   previous objection, that's all the

14   questions that I have for you.

15             MR. ANDRISANI:  I'll only

16        take about two minutes of your

17        time if that's all right.

18             MR. GASTEL:  You want to get

19        the mic?

20             MR. ANDRISANI:  It will be

21        two minutes.

22                  -   -   -

23             EXAMINATION

24                  -   -   -

1  BY MR. ANDRISANI:

2      Q.    Matt, I'm going to refer you

3  back to a document that you were shown

4  earlier in the day that was marked as

5  Exhibit 13.  It was an oncology team

6  meeting, and they sent to you.  It sounds

7  like you received a Fentora learning

8  system, pre-module introduction to pain.

9  Do you remember talking about that

10  document?

11      A.    Yes.

12      Q.    And I think counsel referred

13  you to Page 45 and asked you if you saw

14  different sentences in the document

15  talking about how healthcare

16  professionals have expressed concerns and

17  fears and different things?

18      A.    Yes.

19      Q.    At the end of those

20  sentences, there's a citation that says,

21  "APA, 2005, 2."

22          Do you know what that is?

23      A.    No.

24      Q.    Do you know what types of

Highly Confidential - Subject to Further Confidentiality Review

1    cites these would be?

2           A.     These would be -- the APA

3    2005, these would be references in the

4    back that were used to get the

5    information.

6           Q.     Okay.  Are they scientific

7    studies or medical journal articles?

8           A.     Combination of.

9           Q.     Okay.  And when documents

10   like these were put together, were they

11   your words or were you taking from the

12   scientists and the doctors who did the

13   studies?

14          A.     The scientists and the

15   doctors.

16          Q.     Okay.  What does Fentora

17   treat?  What is it used for?

18          A.     Breakthrough cancer pain in

19   opioid-tolerant patients.

20          Q.     And what types of patients

21   have that symptom?

22          A.     Yeah, I mean, the types of

23   patients that we were working with were

24   usually Stage III, Stage IV, highly

Highly Confidential - Subject to Further Confidentiality Review

1    advanced cancer patients, those that had,

2    like, head, neck, bone, and lung cancers,

3    that were more advanced and more painful.

4         Q.    And what would Fentora do

5    for them?

6         A.    Fentora would essentially

7    relieve their breakthrough pain episodes.

8         Q.    In your life, do you know

9    anybody that had to take Fentora for

10   those types of symptoms?

11        A.    Yeah.  Well, I've personally

12   experienced cancer loss, and the pain

13   through lung cancer and pancreatic

14   cancer.  Pancreatic cancer, seen a

15   neighbor go through it, in particular,

16   and the amount of hardship that it places

17   on not only the patient, but the family

18   and the caregiver.

19        Q.    Also earlier today, we spoke

20   briefly -- counsel asked you briefly

21   about the Cephalon CIA and was talking to

22   you at the time you were working on

23   developing potential materials that could

24   be used for promotion if Fentora's label

Highly Confidential - Subject to Further Confidentiality Review

1  was expanded.  Do you recall that?

2         A.    Yes.

3         Q.    Were any of those

4  promotional materials ever used for the

5  product?

6         A.    No, they were not.

7         Q.    Why not?

8         A.    Because it was always

9  indicated for the management of

10  breakthrough pain in opioid-tolerant

11  patients with cancer.

12         Q.    So that was just done --

13  that exercise was just done for planning

14  in the event that the indication was

15  expanded?

16         A.    Correct.

17              MR. ANDRISANI:  I think

18         that's all I have.

19                   -  -  -

20              EXAMINATION

21                   -  -  -

22  BY MR. MADDEN:

23         Q.    Briefly following up on

24  that.  Exhibit 14 was the module that was

Highly Confidential - Subject to Further Confidentiality Review

1    used for sales training with regard to

2    introduction to pain on Fentora, correct?

3          A.    Correct.

4          Q.    And you and I sparred a

5    little bit on part of that module, which

6    at Page 49, for example, said, "Patients

7    in pain do not usually become addicted to

8    opioids."

9                Do you recall that?

10         A.    Yes.

11         Q.    Do you recall you and I

12   talking about that?

13         A.    Yes.

14         Q.    You're familiar, I take it,

15   with the Fentora label?

16         A.    Yes.

17         Q.    Addiction, is it listed as a

18   risk or side effect in the Fentora label?

19         A.    Yes.

20         Q.    So the statement in the

21   training module which says, "Patients in

22   pain do not usually become addicted to

23   opioids," is contrary to the label, isn't

24   it?

Highly Confidential - Subject to Further Confidentiality Review

 1                    MR. ANDRISANI:  Objection.

 2                    THE WITNESS:  Patients can

 3            become addicted and patient -- not

 4            all patients become addicted.  So

 5            it's -- I don't know if it

 6            contradicts it.  It depends upon

 7            the patient.

 8     BY MR. MADDEN:

 9            Q.    I understand that.  But you

10     would agree with me that the label warns

11     about addiction as a risk or side effect

12     of Fentora use, right?

13            A.    Absolutely, absolutely.

14            Q.    If the module has

15     information in it, the training module

16     has some information in it that patients

17     in pain are different in that they do not

18     become addicted to opioids, that would be

19     contrary to the Fentora label, wouldn't

20     it?

21                    MR. ANDRISANI:  Objection.

22            Misstates the document.

23                    THE WITNESS:  I don't

24            interpret it that way.  Patients

1          in pain may or may not become

2          addicted.  If -- if you're in pain

3          and you're treated with an opioid,

4          you could become addicted.  But

5          there are also patients that are

6          treated with opioids that are not

7          addicted.

8     BY MR. MADDEN:

9          Q.    Fair enough.  But the

10    statement that's in the module that says,

11    "Patients in pain do not usually become

12    addicted to opioids," is contrary to what

13    you just told me, right?

14              MR. ANDRISANI:  Objection.

15              THE WITNESS:  I don't know

16         what's meant by "usually become

17         addicted."

18    BY MR. MADDEN:

19         Q.    Let me ask you this.  Let's

20    go about it another way.  What about

21    being in pain would make a patient less

22    likely to become addicted?

23              MR. ANDRISANI:  Objection.

24    BY MR. MADDEN:

1      Q.    To an opioid.

2      A.    What about being in pain.

3      Q.    What would be the medical

4   reason that somebody who is in pain would

5   be less likely to become addicted to an

6   opioid?

7           MR. ANDRISANI:  Objection.

8           THE WITNESS:  It's

9        multifactorial.  I don't know if

10       it's just a medical reason or a --

11       I don't know.  It -- I feel like

12       I'm getting into like a doctor

13       space.

14  BY MR. MADDEN:

15      Q.    So your answer is you don't

16   know, right?

17      A.    I don't know.

18           MR. MADDEN:  Okay.  Fair

19       enough.  That's all I have.

20           MR. ANDRISANI:  I have

21       nothing further.

22           THE VIDEOGRAPHER:  That

23       concludes today's deposition.

24       Going off the record.  The time is

Highly Confidential - Subject to Further Confidentiality Review

1         4:22.

2              (Excused.)

3              (Deposition concluded at

4         approximately 4:22 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2                    CERTIFICATE

3

4

5           I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.

7

            It was requested before
8   completion of the deposition that the
    witness, MATTHEW DAY, have the
9   opportunity to read and sign the
    deposition transcript.

10

11

12
    _____
    MICHELLE L. GRAY,
13  A Registered Professional
    Reporter, Certified Shorthand
14  Reporter, Certified Realtime
    Reporter and Notary Public
15  Dated:  January 9, 2019

16

17

18          (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4   over carefully and make any necessary

 5   corrections.  You should state the reason

 6   in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8              After doing so, please sign

 9   the errata sheet and date it.

10              You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                          -   -   -   -   -   -

                              E  R  R  A  T  A

2                          -   -   -   -   -   -

3

4        PAGE   LINE    CHANGE

5        _____  _____   _____

6            REASON:    _____

7        _____  _____   _____

8            REASON:    _____

9        _____  _____   _____

10           REASON:    _____

11       _____  _____   _____

12           REASON:    _____

13       _____  _____   _____

14           REASON:    _____

15       _____  _____   _____

16           REASON:    _____

17       _____  _____   _____

18           REASON:    _____

19       _____  _____   _____

20           REASON:    _____

21       _____  _____   _____

22           REASON:    _____

23       _____  _____   _____

24           REASON:    _____

Highly Confidential - Subject to Further Confidentiality Review

1

2                ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 377, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16   MATTHEW DAY                         DATE

17

18

19   Subscribed and sworn
     to before me this

20   _____ day of _____, 20____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

1                          LAWYER'S NOTES

2        PAGE   LINE

3        _____  _____   _____

4        _____  _____   _____

5        _____  _____   _____

6        _____  _____   _____

7        _____  _____   _____

8        _____  _____   _____

9        _____  _____   _____

10       _____  _____   _____

11       _____  _____   _____

12       _____  _____   _____

13       _____  _____   _____

14       _____  _____   _____

15       _____  _____   _____

16       _____  _____   _____

17       _____  _____   _____

18       _____  _____   _____

19       _____  _____   _____

20       _____  _____   _____

21       _____  _____   _____

22       _____  _____   _____

23       _____  _____   _____

24       _____  _____   _____