Highly Confidential - Subject to Further Confidentiality Review

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
2           EASTERN DIVISION

3               - - -

IN RE:  NATIONAL      :   HON. DAN A.
4 PRESCRIPTION OPIATE   :   POLSTER
LITIGATION          :
5                     :
APPLIES TO ALL CASES  :   NO.
6                     :   1:17-MD-2804
                    :
7

8       - HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
9

10             VOLUME I

11             - - -

12        January 22, 2019

13             - - -

14

15        Videotaped deposition of
MICHELE R. DEMPSEY, taken pursuant to
16 notice, was held at the law offices of
Drinker Biddle & Reath, 105 College Road
17 East, Princeton, New Jersey, beginning at
9:12 a.m., on the above date, before
18 Michelle L. Gray, a Registered
Professional Reporter, Certified
19 Shorthand Reporter, Certified Realtime
Reporter, and Notary Public.
20

            - - -
21

     GOLKOW LITIGATION SERVICES
22   877.370.3377 ph | 917.591.5672 fax
        deps@golkow.com
23

24

```
 1    APPEARANCES:
 2
      THE LANIER FIRM
 3    BY:  EVAN M. JANUSH, ESQ.
           IAN S. MILLICAN, ESQ.
 4    126 East 56th Street
      6th Floor
 5    New York, New York 10022
      (212) 421-2800
 6    evan.janush@lanierlawfirm.com
      ian.millican@lanierlawfirm.com
 7    Representing the Plaintiffs
 8
      O'MELVENY & MYERS, LLP
 9    BY:  JEFFREY A. BARKER, ESQ.
      610 Newport Center Drive
10    Newport Beach, California 92660
      (949) 823-79623
11    Jbarker@omm.com
12       - and -
13    O'MELVENY & MYERS, LLP
      BY:  EMILIE K. WINCKEL, ESQ.
14    1625 Eye Street, NW
      Washington, D.C. 20006
15    (202) 383-5300
      Ewinckel@omm.com
16    Representing the Defendants, Janssen
      and Johnson & Johnson and the
17    Witness
18
      PIETRAGALLO GORDON ALFANO BOSICK &
19    RASPANTI, LLP
      BY:  ELISA M. BOODY, ESQ.
20    1818 Market Street, Suite 3402
      Philadelphia, Pennsylvania 19103
21    (215) 320-6200
      emb@pietragallo.com
22    Representing the Defendant, Cardinal
      Health
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          TELEPHONIC APPEARANCES:
 2

            REED SMITH, LLP
 3          BY:  SARAH B. JOHANSEN, ESQ.
            355 South Grand Avenue, Suite 2900
 4          Los Angeles, California 90071
            (213) 457-8135
 5          sjohansen@reedsmith.com
            Representing the Defendant,
 6          AmerisourceBergen
 7

            HUGHES HUBBARD & REED, LLP
 8          BY:  TINA M. SCHAEFER, ESQ.
            2345 Grand Boulevard
 9          Kansas City, Missouri 64108
            (816) 709-4159
10          tina.schaefer@hugheshubbard.com
            Representing the Defendant, UCB,
11          Inc.
12

            ARNOLD & PORTER KAYE SCHOLER, LLP
13          BY:  KAREN RIGBERG, ESQ.
            777 Figueroa Street, 44th Floor
14          Los Angeles, California 90017
            (213) 243-4000
15          karen.rigberg@arnoldporter.com
            Representing the Defendants, Endo
16          Health Solutions; Endo
            Pharmaceuticals, Inc.; Par
17          Pharmaceutical Companies, Inc. f/k/a
            Par Pharmaceutical Holdings, Inc.
18

19          JONES DAY
            BY:  NICOLE LANGSTON, ESQ.
20          77 West Wacker Drive
            Chicago, Illinois 60601
21          (312) 269-4113
            Nlangston@jonesday.com
22          Representing the Defendant, Walmart
23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1    APPEARANCES:  (Cont'd.)

2

3    ALSO PRESENT:

4

5    VIDEOTAPE TECHNICIAN:

6       Henry Marte

7

     Sofia McDonald  - Law Clerk

8    (Ropes & Gray)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2                  I N D E X
 3                        -   -   -
 4
    Testimony of:
 5                        MICHELE R. DEMPSEY
 6
         By Mr. Janush                    12
 7
 8
 9
                     -   -   -
10
                 E X H I B I T S
11
                     -   -   -
12
```

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| Janssen Dempsey-1 | 2017 Year-End Performance Michele R. Dempsey JAN-MS-03120846-53 | 44 |
| Janssen Dempsey-2 | Regulatory Agency Contact Report Memo, 10/20/11 Meeting Purpose, Present 2012 and Beyond Noramco Volumes JAN-006-0000953-93 | 62 |

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5    NO.               DESCRIPTION              PAGE
 6    Janssen
      Dempsey-3        Slide Deck                91
 7                     Trade Analytics
                       Managed Market
 8                     Summit
                       October 18, 2012
 9                     JAN-MS-01117436
10    Janssen
      Dempsey-4        E-mail Thread             134
11                     6/25/12
                       Subject, Nucynta
12                     Trade Plans
                       JAN-MS-00454956-58
13
      Janssen
14    Dempsey-5        E-mail Thread             151
                       3/17/13
15                     Subject, CSOS Update
                       JAN-MS-03054480-81
16
      Janssen
17    Dempsey-6        E-mail Thread             162
                       6/17/13
18                     Subject, SOM Contact
                       JAN-MS-03115781-98
19
      Janssen
20    Dempsey-7        E-mail Thread             201
                       4/26/13
21                     Subject, MARC DEA
                       Reports Meeting Minutes
22                     JAN-MS-03054285-86
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          -   -   -
 2              E  X  H  I  B  I  T  S   (Cont'd.)
 3                          -   -   -
 4
 5     NO.                 DESCRIPTION                 PAGE
 6     Janssen
       Dempsey-8          E-mail Thread             207
 7                        4/29/13
                          Subject, Nucynta
 8                        Shipments
                          JAN-MS-02963560-61
 9
       Janssen
10     Dempsey-9          Slide Deck                211
                          Suspicious Order
11                        Monitoring,
                          May 2015
12                        JAN-MS-02985441
13     Janssen
       Dempsey-10         E-mail Thread             246
14                        4/15/13
                          Subject, April SOM
15                        Compliance Review
                          JAN-MS-00421188-91
16
       Janssen
17     Dempsey-11         E-mail Thread             268
                          5/6/14
18                        Subject, Discuss
                          Schnucks and Concerta
19                        JAN-MS-03054667-68
20
       Janssen
21     Dempsey-12         Memo, 8/21/17             274
                          Subject, Review of
22                        SOM Questionnaires
                          JAN-MS-02963380-82
23
24
```

```
1                        -   -   -
2              E X H I B I T S  (Cont'd.)
3                        -   -   -
4
5    NO.              DESCRIPTION              PAGE
6    Janssen
     Dempsey-13       Controlled Substances 283
7                     SOM Program Questionnaire
                      JAN-MS-02964406-13
8
     Janssen
9    Dempsey-14       E-mail Thread           287
                      4/23/14
10                    Subject, JOM
                      Distributor Questionnaire
11                    JAN-MS-02965280
12   Janssen
     Dempsey-15       E-mail Thread           289
13                    1/18/17
                      Subject, McKesson Agrees
14                    To Pay Record $150 Million
                      JAN-MS-02966153-182
15
     Janssen
16   Dempsey-16       E-mail Thread           297
                      9/24/12
17                    Subject, DEA Serves
                      a Suspension Order
18                    JAN-MS-02963719-21
19   Janssen
     Dempsey-17       E-mail, 2/21/13         305
20                    Subject, Walgreens
                      Perrysburg, Ohio Vault
21                    JAN-MS-03115514-16
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -   -   -
 2           E X H I B I T S  (Cont'd.)
 3                     -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Janssen
      Dempsey-18    E-mail Thread            316
 7                  5/3/17
                    Subject, Q&A Language
 8                  Re ESK Potential
                    Issues REMS
 9                  JAN-MS-02963752-53
10    Janssen
      Dempsey-19    December 13, 2017         325
11                  Suspicious Order
                    Monitoring Workshop
12                  JAN-MS-02987551-56
13    Janssen
      Dempsey-20    (Clawback)               345
14                  JAN-MS-02983578
15    Janssen
      Dempsey-21    Letter/Memo              368
16                  JAN-MS-03060702-03
                    (First Page
17                  Clawed Back)
18    Janssen
      Dempsey-22    E-mail Thread            389
19                  5/17/18
                    Subject, IntegriChain
20                  Meeting Follow-Up
                    JAN-MS-02969719-22
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

1                      -   -   -

2              DEPOSITION SUPPORT INDEX

3                      -   -   -

4

5   Direction to Witness Not to Answer

6   PAGE    LINE
    None.

7

8   Request for Production of Documents

9   PAGE    LINE
    382     15

10

11  Stipulations

12  PAGE    LINE
    None.

13

14  Questions Marked

15  PAGE    LINE
    None.

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1                    -   -   -

2                THE VIDEOGRAPHER:  We are

3        now on the record.  My name is

4        Henry Marte, videographer with

5        Golkow Litigation Services.

6                Today's date is

7        January 22nd, 2019, and the time

8        on the monitor is 9:12 a.m.

9                This videotaped deposition

10       is being held in Princeton, New

11       Jersey, in the matter of National

12       Prescription Opiate Litigation.

13               The deponent today is

14       Michele Dempsey.  All appearances

15       are noted on the stenographic

16       record.

17               Will the court reporter

18       please administer the oath to the

19       witness.

20                   -   -   -

21               ... MICHELE R. DEMPSEY,

22       having been first duly sworn, was

23       examined and testified as follows:

24                   -   -   -

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    EXAMINATION

 2                     -   -   -

 3   BY MR. JANUSH:

 4         Q.    Hi, Ms. Dempsey.  How are

 5   you this morning?

 6         A.    Good.  Thank you.

 7         Q.    My name is Evan Janush.  I

 8   had an opportunity to introduce myself to

 9   you at the hotel just moments ago.  It's

10   been a pleasure to meet you.

11               I represent the plaintiffs

12   in this case taking this deposition on

13   behalf of all plaintiffs in the MDL.

14               Before we begin, I'd like to

15   know, have you ever been deposed before?

16         A.    No.

17         Q.    Did you meet with counsel in

18   preparation for this deposition?

19         A.    Yes.

20         Q.    On how many occasions?

21         A.    Five days.

22         Q.    Five separate days?

23         A.    Yes.

24         Q.    Okay.  Were they full days?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    No.

2      Q.    Okay.  Can you describe each

3  day in terms of how many hours

4  approximately you met with counsel?

5      A.    Approximately five to

6  6 hours for the first three to four days

7  was -- we spent collecting documentation

8  that the lawyers had requested.

9      Q.    Okay.  And did all of your

10 meetings concerning collecting

11 documentation or did you also go over,

12 you know, without getting into the

13 substance of any specifics, did you also

14 go over the content of this deposition?

15     A.    We did spend time reviewing

16 some of the documentation that was

17 retrieved.

18     Q.    Okay.  When was the first

19 time that you met with counsel to prepare

20 for this deposition?

21     A.    Right after the start of the

22 new year.

23           MR. BARKER:  Slow down.  Let

24      him finish his question --

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  Yes.

2           MR. BARKER:  -- before you

3      start answering.

4           THE WITNESS:  Yeah.

5           MR. BARKER:  And give me an

6      opportunity to object.  I don't

7      have a problem with that question,

8      but I may -- if you could wait.

9           THE WITNESS:  Right.

10           MR. JANUSH:  Sure.

11  BY MR. JANUSH:

12      Q.    So after the start of the

13  new year is the first time that you met

14  with counsel?

15      A.    Yes.

16      Q.    When was the second time?

17  Oh, and when you first met was that one

18  day or sequential days?

19      A.    We met for two sequential

20  days after the new year.

21      Q.    When did you meet next with

22  counsel?

23      A.    The following week for two

24  sequential days.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  And following that,

2    did you meet again?

3          A.     Yesterday.

4          Q.     Yesterday.  Okay.  Aside

5    from meeting with counsel, did you meet

6    with anyone else to prepare for this

7    deposition?

8          A.     No.

9          Q.     Did you review any of the

10   transcripts in this litigation in

11   preparation -- preparation for your

12   deposition?

13         A.     No.

14         Q.     Did you speak with anybody

15   who has been deposed that is a current or

16   former employee of Janssen or Johnson &

17   Johnson or JOM in preparation for this

18   deposition?

19         A.     No.

20         Q.     Did you speak with any

21   employee who has been deposed in this

22   litigation at all concerning their

23   depositions?

24         A.     No.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you have an understanding
2    as you sit here today why your deposition
3    has been requested?
4    A.    Yes.
5    Q.    And what is that
6    understanding?
7    A.    My understanding is I am
8    here to speak on behalf of Janssen on our
9    suspicious order monitoring program.
10    Q.    What is your current job
11    title?
12    A.    My current job title is
13    director of controlled substance
14    compliance.
15    Q.    And who is your current
16    employer?
17    A.    Johnson & Johnson.
18    Q.    And I'm going to have you go
19    through briefly your general employment
20    history from, starting with graduating
21    from college, I believe your first job
22    out of college was with Noramco; is that
23    right?
24    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  I'd like you to start

2    by discussing that job, that first

3    employment experience with Noramco, and

4    giving us a sense of who Noramco was or

5    is, what they do, and what you did for

6    Noramco.  And then we'll transition to

7    your next position.  Okay?

8         A.    Yes.

9         Q.    So let's start with your

10   first job out of the college at Noramco.

11   What was that job and who is Noramco?

12        A.    I started with Noramco in

13   the summer of 1986 as a process engineer.

14   Noramco is -- was a wholly owned

15   subsidiary of Johnson & Johnson.  We

16   produced active pharmaceutical

17   ingredients for, at the time it was

18   Ortho-McNeil Janssen.  So we did -- the

19   client that I supported produced active

20   pharmaceutical intermediates for the

21   product called Tolmetin, which was for

22   tennis elbow.

23             So I was the engineer that

24   was responsible for monitoring the

Highly Confidential - Subject to Further Confidentiality Review

1    process.  I did do configuration of the

2    distributive control system to produce

3    the active ingredients, monitored,

4    dealed -- you know, reported out on

5    production activity.  And did project

6    management in regards to equipment,

7    modifications, writing batch logs,

8    writing SOPs and training operators.

9         Q.    And for approximately how

10   long did you perform this role as a

11   process engineer for Noramco?

12        A.    I spent several years in

13   that engineering track.  So then I was

14   promoted to senior process engineer.  I

15   got more responsibility for more

16   intermediates.  Then I also had an

17   opportunity to do some product transfers

18   from our Belgium location.  We did some

19   other active pharmaceutical anti-fungals.

20             So I was involved in getting

21   the plant equipment prepared and doing

22   all the qualification for new equipment

23   for the intermediates that we transferred

24   from Belgium to the United States, the

Highly Confidential - Subject to Further Confidentiality Review

1    location in Delaware.

2            Q.    What are intermediates?

3            A.    They're the chemical

4    molecules that are involved -- they are

5    isolated to develop the active

6    pharmaceutical.

7                  So it's not the actual

8    active pharmaceuticals, but we made a

9    compound that goes into an antifungal.

10           Q.    Okay.  And how -- what were

11   the years that you served as a process

12   engineer and a senior process engineer as

13   you've just described?

14           A.    Since '86 until '95.  Like I

15   said, through the years, I believe in '95

16   at that point I had responsibility for

17   the entire site from process engineering

18   standpoint.  And I was introduced to the

19   other production facility at Noramco

20   where they produced codeine and

21   narcotics.

22                 So at that point in 1995, I

23   was supporting all the manufacture of the

24   anti-fungals, as well as the narcotics.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Let's talk about that role.

2  What was your title in 1995?

3    A.    Senior process engineer.

4    Q.    Okay.  And when you say that

5  you were supporting all of the

6  manufacture of anti-fungals, as well as

7  the narcotic, what does that mean?

8    A.    Basically it involved

9  writing SOPs, writing batch logs,

10  training operators, monitoring yield,

11  which is actually the output of all the

12  batches to make sure that there aren't

13  any yield issues or the synthesis --

14  chemical synthesis is running as

15  intended.  So just monitoring all the

16  chemical reactions and production

17  activities.

18    Q.    What role did you play, if

19  we can break it down with respect to

20  monitoring narcotic production?

21    A.    Well, at the time as an

22  engineer I made sure the batch logs were

23  written to produce the -- the compounds

24  which was codeine and morphine at the

Highly Confidential - Subject to Further Confidentiality Review

1    time.  Make sure that it was isolating

2    the morphine and codeine, and that we

3    were doing the steps necessary to purify

4    it to its active pharmaceutical

5    ingredient state.

6         Q.    And at that time, this is

7    '95 through what we're speaking about?

8         A.    It was basically '93 to '95,

9    I had -- that's when the narcotics were

10   introduced from my bandwidth.

11        Q.    Okay.  So your first

12   experience dealing with narcotics started

13   in 1993, and from 1993 through 1995, you

14   were involved in addressing batch logs,

15   and taking steps necessary to ensure that

16   the purity of the drug was -- was correct

17   in its -- in the sense of the active

18   pharmaceutical ingredient was what,

19   correctly being manufactured?

20             I'm trying to understand

21   exactly in layman's terms.

22        A.    Right.  Right.

23        Q.    We're going to break this

24   down.  I don't know what a batch log is.

1    I'm going to have you explain that too.

2         A.    Sure.  So Noramco was under

3    FDA regulations for good manufacturing

4    practices.  And as part of those

5    guidelines, you needed to produce your

6    active ingredients the same way

7    consistently to meet specifications.

8              So every active

9    pharmaceutical had a specification that

10   said this is the level and purities that

11   were permitted to be present in the level

12   at which it's allowed to be present.

13             So as the production

14   engineer supporting the actual batch

15   records, which is the step-by-step

16   process that the operator follows to

17   produce the active ingredient, I made

18   sure that they followed the batch logs,

19   that we isolated the product, that it

20   tested and met the specifications.

21        Q.    Okay.  And at that time, '93

22   to '95, you were just addressing codeine

23   and morphine as it concerned narcotics;

24   is that right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And when you were addressing

3 codeine and morphine, were you -- was

4 Noramco producing codeine and morphine

5 only for Noramco or was Noramco producing

6 codeine and morphine for external

7 customers as well?

8            MR. BARKER:  Object to form.

9 BY MR. JANUSH:

10   Q.    Do you know what I mean by

11 external customers?

12   A.    Yes.

13   Q.    What -- how would you

14 describe an external customer?

15   A.    Outside of J&J.

16   Q.    Okay.  So I just want to

17 make sure we're on the same page since

18 there was an objection.

19            Was Noramco manufacturing

20 codeine and morphine for customers

21 outside of J&J?

22            MR. BARKER:  Object to form.

23 BY MR. JANUSH:

24   Q.    In this 1993 to 1995 time

1    period?

2                    MR. BARKER:  Object to form.

3                    MR. JANUSH:  You've objected

4         twice.

5                    MR. BARKER:  You added a

6         time frame that addressed part of

7         my objection.  So you now have a

8         different question.

9                    MR. JANUSH:  Okay.

10                   MR. BARKER:  So I'm

11        objecting to the different

12        question.

13                   MR. JANUSH:  Fair enough.

14   BY MR. JANUSH:

15        Q.    You can answer.

16        A.    I don't recall who the

17   customers were, but I believe there were

18   some codeine and morphine customers that

19   were not J&J.

20        Q.    Okay.  Take us forward from

21   1995.  What happened next?

22        A.    In 1995 I was asked to lead

23   a technology transfer team where J&J had

24   made the decision to shut down an active

Highly Confidential - Subject to Further Confidentiality Review

1     pharmaceutical ingredient manufacturing

2     location in Puerto Rico and relocate the

3     processes to the Noramco site in Athens,

4     Georgia.  So for two years I was part of

5     this team to collect all of the related

6     equipment information, analytical

7     information, batch records, and chemistry

8     documentation for these active

9     pharmaceutical ingredients, they were

10    non-narcotic, that Janssen produced.

11          Q.    Okay.  And this lasted from

12    1995 to 1997; is that right?

13          A.    Yes.

14          Q.    What happened in 1997?

15          A.    In 1997 I was asked to be

16    the intermediate plant manager for the

17    original plant that I started as a

18    process engineer.  So I was managing the

19    operators and the supervisors in the

20    production of the antifungal, seven-day

21    operation.

22          Q.    And where was this original

23    plant?

24          A.    In Wilmington, Delaware, at

Highly Confidential - Subject to Further Confidentiality Review

1    the Noramco location.

2         Q.    And what did you do in that

3    role?

4         A.    I had the overall

5    supervision of the operators and the

6    supervisors.  I ensured that we produced

7    our product meeting the regulatory

8    requirements from the FDA standpoint, as

9    well as EPA and the other regulatory

10   agencies that are involved with the

11   production of this antifungal,

12   nonnarcotic.

13        Q.    And what was the name of

14   this antifungal nonnarcotic?

15        A.    The -- the intermediate we

16   called TA-24 which went into imazalil.

17        Q.    How do I spell that?

18        A.    I-M-A-Z-I-L-I-L.  Or

19   A-L-I-L.

20        Q.    And how long did you stay in

21   that role that you started in 1997 as the

22   interim plant manager for the Wilmington,

23   Delaware, site?

24        A.    Until 2001.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What happened in 2001 with

2  your employment?

3    A.    I moved over to a process

4  engineering role.

5    Q.    And what was that role?

6    A.    It was validation manager.

7  So I was -- I had engineers reporting to

8  me, and our role was to produce all of

9  the FDA required documentation

10  surrounding validation of our processes.

11  So if we make any changes in our chemical

12  synthesis or the isolation or the

13  particle sizing, we are required by FDA

14  guideline, good manufacturing practices,

15  to have a validation document that

16  demonstrates that for three or four

17  batches, we can consistently produce this

18  active pharmaceutical to meet the

19  specifications outlined in the document.

20    Q.    And that role lasted from

21  2001 to what year?

22    A.    Till 2005.

23    Q.    And as a validation manager,

24  did you also oversee the validation of

Highly Confidential - Subject to Further Confidentiality Review

1  the raw ingredients of narcotics?

2      A.    I did cover the validation

3  of the narcotic process, the APIs.

4      Q.    And what does API stand for?

5      A.    Active pharmaceutical

6  ingredients.

7      Q.    Okay.  Which narcotics did

8  you cover overseeing the validation of

9  between 2001 and 2005?

10      A.    Codeine, morphine,

11  Oxycodone, hydrocodone, and then the

12  intermediate steps had to be validated as

13  well.  So you had the -- the crude

14  Oxycodone and purified steps as well as

15  the various steps involved with

16  hydrocodone.  And I mentioned codeine,

17  morphine.

18      Q.    And how did your employment

19  change, if at all, in 2005?

20      A.    I was asked to lead a

21  project, an IT project from the business

22  standpoint.  At the time Noramco was

23  asked -- we were onboarding our -- onto

24  the Janssen Supply Chain, SAPERP system.

1    It's an enterprise -- basically inventory

2    control, IT platform, where you are

3    tracking the -- what goes into the batch,

4    and what is isolated into the batch, and

5    end to end, from receipt of raw material

6    to shipments.  So it's an IT system that

7    used to track all the movements, and I

8    was asked to lead the project.  So that's

9    what I did from 2005 until I went live in

10   January 2006.  And then I was asked to

11   do -- to lead -- in IT, I was in IT at

12   the time, to lead a group that would

13   sustain the IT system and make sure that

14   it was operating as it was intended.

15        Q.    And that was in 2006?

16        A.    Yes.

17        Q.    What happened after 2006,

18   how did your employment capacity change?

19        A.    In 2006 we -- we did a few

20   more other SAP projects, barcoding, and

21   more updates to the SAP processes.  And

22   then in 2007, I was asked to expand my

23   bandwidth and take over DEA compliance

24   and security.

1    Q.    And what does it mean to

2    take over DEA compliance and security for

3    Noramco?

4    A.    Well, I left IT to get a

5    role in supply chain.  And at the time,

6    supply chain, the leader had DEA and

7    compliance -- DEA and security under him.

8    And his bandwidth was stretched and he

9    didn't have the time to spend with the

10   group and he asked me to step in and

11   provide guidance and manage the group of

12   employees that were supporting the DEA

13   compliance and security processes at both

14   locations, Athens and Wilmington,

15   Delaware.

16   Q.    And -- and what kind of

17   day-to-day responsibilities would you

18   have supporting DEA compliance and

19   security?

20   A.    Well, the -- the group, the

21   manager, and the specialist, they did the

22   transactional work.  So my work involved

23   more of the high level processing, making

24   sure that we are inspection ready, that

Highly Confidential - Subject to Further Confidentiality Review

1    we have the same processes and SOPs

2    across both sites when it's dealing with

3    a DEA inspection.  Make sure we have

4    similar security procedures.  That we're

5    providing effective controls to prevent

6    diversion.

7              And also my role was

8    engaging DEA when necessary involving

9    policy interpretations or other

10   discussions related to DEA items.

11        Q.    And when you speak about

12   SOPs, you're referring to standard

13   operating procedures; is that right?

14        A.    Yes.

15        Q.    So throughout this

16   deposition, every time you use the term

17   "SOP," we'll agree that that means

18   standard operating procedures?

19        A.    Yes.

20        Q.    Okay.  With respect to this

21   role, this DEA compliance and security

22   role within the supply chain at Noramco,

23   you started in 2007.  When did that role

24   end?

1    A.    I no longer had oversight of

2  DEA compliance and security with the

3  divestiture of Noramco in 2016.

4    Q.    Okay.  So did there come a

5  time between 2007, when you oversaw

6  Noramco's supply chain, and 2016, when

7  Noramco was divested, that you

8  simultaneously had another role within

9  Johnson & Johnson?

10    A.    Yes.

11    Q.    And can you describe that?

12    A.    In 2011, I was asked to lead

13  a project to introduce quota

14  understanding with -- outside of Noramco

15  into Janssen Supply Chain for -- so I was

16  involved in this project where I updated

17  existing SOPs outside of Noramco.  I

18  became aware and visited the other

19  locations that did the manufacturing of

20  the Janssen products.

21         And over -- from 2011 until

22  2012, 2012 March was when I was formally

23  given direct -- I had people at the sites

24  reporting into me.  So I had the

1  distribution centers and the

2  manufacturing formulating locations

3  reporting in through me as of March of

4  2012.

5          And we had developed this

6  organization called controlled substance

7  compliance for Janssen Supply Chain.

8      Q.    Is it fair to say in

9  March 2012, you took on a secondary or

10  additional role called director of

11  controlled substance compliance for

12  Janssen?

13          A.    Yes.

14      Q.    And when you took on that

15  role as director of controlled substance

16  compliance for Janssen, you remained in

17  the prior role as the head of DEA

18  compliance and security within the supply

19  chain for Noramco?

20          A.    Yes.

21          Q.    Is that right?

22          A.    Yes.

23          Q.    Sounds like a lot of work.

24          A.    Yes.

1    Q.    Let's go back to Noramco for

2  a moment.  At all times that you were

3  overseeing the DEA compliance and

4  security and quota issues concerning

5  Noramco, was Noramco only making the raw

6  narcotic ingredients or did Noramco also

7  manufacture the end product, the actual

8  pill, as an example?

9    A.    We did not make final

10  product pill.  Noramco took the narcotic

11  raw materials and produced active

12  pharmaceutical ingredient powders.

13    Q.    Okay.  So is it a correct

14  statement that Noramco would get orders

15  from outside companies, as well as

16  internally from -- as an example, a

17  Johnson & Johnson family company, such as

18  Janssen, to provide the raw powder that

19  would be a Schedule II underlying

20  substance for inclusion into a narcotic

21  pill?

22    A.    Noramco did provide active

23  pharmaceutical ingredient powder to

24  Janssen locations as well as outside of

1    Janssen.

2         Q.    Okay.  Before we move on

3    from employment history, I just want to

4    make sure that I have this -- this down.

5              You addressed that in March

6    of 2012, you took on the additional role

7    of being director of controlled

8    substances compliance -- substance

9    compliance; is that right?

10        A.    Yes.

11        Q.    And that was for Johnson &

12   Johnson?

13        A.    That was for the Janssen

14   Supply Chain.

15        Q.    Okay.  And when we speak

16   about the Janssen Supply Chain, I know of

17   another company called JOM.  Do you know

18   who JOM is?

19        A.    Janssen Ortho-McNeil is the

20   legal entity name of the distribution

21   centers in which -- under J&J.

22        Q.    Okay.  So when I see or when

23   we see JOM as an emblem or insignia on

24   letterhead, that's referring to Janssen

Highly Confidential - Subject to Further Confidentiality Review

1    Ortho-McNeil; is that right?

2        A.    Yes.

3        Q.    Okay.  And Janssen

4    Ortho-McNeil, or JOM, oversaw supply

5    chain distribution for Janssen's

6    pharmaceutical products; is that right?

7            MR. BARKER:  Objection.

8            THE WITNESS:  Yes.

9    BY MR. JANUSH:

10       Q.    JOM, for short, oversaw the

11   shipments of products from Janssen to

12   wholesaler customers, as an example; is

13   that correct?

14       A.    JOM received orders for

15   wholesalers and shipped orders that were

16   approved to the wholesalers that went

17   through.

18       Q.    Okay.  And your function as

19   director of controlled substance

20   compliance operated out of JOM or out of

21   Janssen or Johnson & Johnson?  Which is

22   it?

23       A.    My role was in Janssen

24   Supply Chain, which I was located in

1    Wilmington, Delaware under Noramco.

2         Q.    So you were simultaneously

3    working for Noramco addressing DEA

4    compliance issues, quota issues, security

5    issues for Noramco, right?

6         A.    Yes.

7         Q.    And at the same time you

8    were based out of Noramco's site in

9    Wilmington, Delaware.  And you were

10   overseeing Janssen's compliance with

11   controlled substances; is that right?

12        A.    Noramco was part of Janssen

13   Supply Chain.  They were the active

14   pharmaceutical ingredient supplier.  So I

15   expanded my support from just the active

16   pharmaceutical ingredient manufacture

17   through formulation to distribution.

18        Q.    But to be clear, Noramco was

19   a wholly separate company than Janssen,

20   right?

21        A.    It was a wholly owned

22   subsidiary of Johnson & Johnson.

23        Q.    Right.  And Noramco made the

24   raw ingredient that went into Janssen's

Highly Confidential - Subject to Further Confidentiality Review

1    narcotic drugs as well as other non-J&J

2    customers' narcotics, right?

3         A.    Noramco provided API for

4    Janssen as well as other customers.

5         Q.    That's a long way of saying

6    right to my other question -- to my

7    question, correct?

8         A.    But Noramco -- the

9    leadership reported in to Janssen Supply

10   Chain.

11        Q.    All right.  Why don't you

12   explain that.

13        A.    The employees that worked at

14   the Wilmington and Athens facilities, the

15   operations personnel, reported in to

16   Janssen Supply Chain.

17        Q.    Okay.

18        A.    Under the organization

19   structure, even though it was a legal

20   entity subsidiary.

21        Q.    So Janssen -- Janssen

22   oversaw Noramco?

23             MR. BARKER:  Objection.  Let

24        her finish her answer.  She wasn't

1     quite done before you started the

2     next question.

3            MR. JANUSH:  My apologies.

4     I thought she was finished.

5   BY MR. JANUSH:

6            Q.    What else do you have to

7   add?  I apologize.

8            A.    So Noramco had its own legal

9   entity; however, the operations

10  manufacturing personnel reported in

11  through Janssen Supply Chain.

12           Q.    And so my question was -- so

13  Janssen Supply Chain oversaw Noramco; is

14  that right?

15           A.    The organization reporting

16  went into Janssen Supply Chain.

17           Q.    And what does that mean, the

18  organization reporting went into Janssen

19  Supply Chain?

20           A.    From the performance

21  management, our goals and objectives,

22  they had to be reported up into Janssen

23  Supply Chain.

24           Q.    Janssen Supply Chain

Highly Confidential - Subject to Further Confidentiality Review

1  supervised Noramco?

2      A.    The operations

3  manufacturing; however, the marketing and

4  sales was not part of Janssen Supply

5  Chain.  That was a separate entity called

6  Worldwide Narcotic Franchise.

7      Q.    So Noramco had a separate

8  sales and marketing division called

9  Worldwide Narcotic --

10     A.    It was the narcotic -- the

11 narcotic --

12     Q.    Let me finish.

13     MR. BARKER:  You need to let

14     him finish as well.

15 BY MR. JANUSH:

16     Q.    Yeah, because it -- and

17 we'll do our best.  I know we're not

18 doing this purposefully.

19         So let me ask my question

20 again.

21         Noramco had a separate sales

22 and marketing division called Worldwide

23 Narcotic unit?

24     A.    The Narcotic Franchise.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      Franchise.  And during your

2   time with Noramco, who oversaw the sales

3   and marketing of the Worldwide Narcotic

4   Franchise?

5       A.      Matthew Martin.

6       Q.      Was he with Noramco in 2016

7   when Noramco was divested?

8       A.      Yes.

9       Q.      Is -- that's a yes?

10      A.      Yes, he was with Noramco.

11      Q.      Do you know if he moved over

12  to the new co, the new Noramco company --

13      A.      Yes.

14      Q.      -- when Noramco was

15  acquired?

16      A.      Yes.

17      Q.      Do you know if he's still

18  there today?

19      A.      No, I don't.

20      Q.      Okay.  Have you stayed in

21  touch with folks who you worked with at

22  Noramco who may have moved over to the

23  new company after divestiture?

24      A.      A few.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And who would those folks

2  be?

3    A.    They would be the DEA

4  compliance personnel that at one time

5  reported to me.

6    Q.    And who's that?

7    A.    Gene Haines and Ann

8  Strusowski.  She had a previous role in

9  DEA compliance at Noramco.

10    Q.    Okay.  Following the

11  divestiture of Noramco by Johnson &

12  Johnson in 2016 and through the present

13  date, has your role remained the same as

14  director of controlled substances

15  compliance?

16    A.    I remained in a role of

17  controlled substance compliance.  I've

18  just expanded outside the U.S. in my

19  support.

20    Q.    Can you explain how your

21  role has changed from 2016 to the present

22  date?

23    A.    From 2016 to 2017, I -- I

24  continued to support the manufacturing

1    locations within Janssen Supply Chain.

2    And then in January 2018 I moved to a

3    regulatory compliance role in this global

4    organization, J&J regulatory compliance,

5    where I now have a regulatory compliance

6    role for all of the -- global, from

7    manufacture to distribution.

8         Q.    And does this include opiate

9    products?

10        A.    It includes all controlled

11   substances that J&J handles.

12        Q.    And did you retain the title

13   of director of controlled substances

14   compliance -- controlled substance

15   compliance in January of 2017 or did you

16   take on a new title?

17        A.    The title remained the same,

18   director of controlled substance

19   compliance.

20        Q.    So the title remained the

21   same, but your oversight, the scope of

22   your role, grew; is that right?

23        A.    Yes.

24             (Document marked for

Highly Confidential - Subject to Further Confidentiality Review

1    identification as Exhibit

2    Dempsey-1.)

3  BY MR. JANUSH:

4        Q.    I'm going to mark a document

5  as Exhibit 1, which is a year-end

6  performance review from 2017, and the

7  Bates number for this document is

8  JAN-MS-03120846.

9            And I really want to -- I

10  want to note that this is for January 1,

11  2017, through December 31, 2017; is that

12  right?

13            That's up in the upper

14  right-hand corner.  Do you see that?

15        A.    Yes, yes.

16        Q.    Okay.  All right.  And --

17  and in the middle of the page, I'm going

18  to underline to draw your attention to it

19  on the screen so you can follow me.  It

20  says, "She does this very well," and the

21  this is that, referring to -- I'll let

22  you go -- actually read up a little bit.

23            "Michele is such a strong

24  asset in her area and is making important

1   impact to our products and company.

2   Related to the how, Michele is very

3   strong connected to the key players

4   within and outside the company in

5   relation to controlled substances.  She

6   does this very well.  Knows how to make

7   and sustain these connections, being with

8   DEA, regulatory bodies or internal

9   stakeholders within the different

10  segments and make the necessary impact.

11  2017 and 2018 will be a transition year

12  for Michele.

13              "One way in delivering the

14  CSC/COE processes and organization and

15  otherwise, and Michele transitioning from

16  being more tactical in executing things

17  towards becoming more global, setting

18  direction and expectations and enabling

19  the CSC activities to be done.  Still an

20  area where I see Michele somewhat

21  struggling."

22              Did I read correctly through

23  that point?

24          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What -- what was your

2    supervisor Gianluca Vissani -- or

3    actually, this was an evaluation done by

4    Stefan Bouckaert -- is that right?

5    A.    Stefan Bouckaert.

6    Q.    Bouckaert.  What -- what was

7    Stefan Bouckaert addressing that an area

8    where -- where you were viewed to be

9    somewhat struggling?

10         MR. BARKER:  Object to form.

11         THE WITNESS:  Is there a

12    question?

13    BY MR. JANUSH:

14    Q.    I think you can read it on

15    the screen.  If not, I can read it for

16    you.

17    A.    The --

18    Q.    My question was, what was

19    Stefan Bouckaert addressing concerning an

20    area where -- is it a he or a she,

21    Stefan?

22    A.    He.

23    Q.    Where he sees Michele

24    somewhat struggling.

1           MR. BARKER:  Object to form.

2  BY MR. JANUSH:

3           Q.    You can answer.

4           A.    The -- the challenge was, in

5  his mind, I should not be involved in

6  local activities like writing quota

7  letters or supporting DEA inspections.

8  He really wanted to see me at a global

9  level setting direction and ensuring that

10  the local quality ownership is done and

11  that they are comfortable in executing

12  inspections and engaging DEA on the

13  quota-related questions and the policy

14  questions.  He wanted more of a global

15  strategic.  And -- and it was -- the

16  reason he said it's a transition year is

17  we were building that inhouse knowledge

18  at a local level.

19           Q.    I want to take you back to

20  slightly before 2017 when your role was

21  less global in nature.  Can you describe

22  what the role of director of controlled

23  substance compliance is and what you were

24  entrusted to do?

1    A.    Well, in 2000 -- if --

2    Q.    I'm taking you back before

3  this year-end review.

4    A.    Before this year-end report,

5  my job description involved ensuring that

6  end-to-end supply chain, all locations

7  were compliant with the local

8  regulations.

9         So, at this time in 2016, I

10  had to ensure that all of the

11  manufacturing locations, not just the

12  U.S. ones, were compliant, which

13  involved -- I did do on-site audits and

14  working with the local team, making sure

15  everything was documented in SOPs and

16  that we understood what the regulatory

17  authority of the competent national

18  authority for the country expected of the

19  local site.

20         So his comment here was that

21  I needed to focus more on outside the

22  U.S. in this more global role.

23    Q.    And I'm taking you back

24  before 2017.  Did you have a role in

Highly Confidential - Subject to Further Confidentiality Review

1    overseeing suspicious order monitoring

2    for Janssen or Johnson & Johnson?

3         A.    It went back to Noramco.

4    Because Noramco was obligated to have a

5    suspicious order monitoring program.  And

6    then when, in 2012 I had the two

7    distribution centers reporting into me.

8    I had input on their order monitoring

9    system as well.

10        Q.    I'm separating out Noramco

11   in -- well, and Janssen.  Okay.

12              So let's start with Noramco.

13   Your -- your role in overseeing

14   suspicious order monitoring for Noramco

15   was what?

16              MR. BARKER:  Object to form.

17   BY MR. JANUSH:

18        Q.    Can you describe your role

19   overseeing suspicious order monitoring

20   for Noramco?

21        A.    As I mentioned before, my

22   role as the director of DEA compliance

23   and security is I ensured that the

24   manager and the specialist, that we had

1    SOPs in place that would describe our

2    process for monitoring all the orders

3    that we received from the customers.

4                    And from an active

5    pharmaceutical ingredient standpoint,

6    everything is very controlled because DEA

7    grants us quota and we only produce to

8    the quota that DEA has provided us.  And

9    in order -- our order monitoring program

10   for those customers, they have to --

11   besides the 222 and have a valid DEA

12   license, they had to provide a

13   certificate of a procurement quota, which

14   was a document that confirmed that they

15   have quota from DEA to receive our

16   product.

17                    So at high level, that was

18   what was required from that standpoint.

19   We did supply active pharmaceutical

20   ingredients to researchers and we had

21   stricter rules for those including

22   quantity, protocols from them, local DEA

23   approval for our product.  So we did have

24   an order monitoring process in place.

1    Q.    And then moving over to the

2  manufacturing side for Janssen, the role

3  of overseeing suspicious order monitoring

4  can be defined as what by you?

5         MR. BARKER:  Object to form.

6         THE WITNESS:  Anyone that

7         holds a license with DEA that

8         involves distribution you're

9         required to operate a system to

10        monitor orders for size, frequency

11        and patterns.

12  BY MR. JANUSH:

13    Q.    And you oversaw suspicious

14  order monitoring on behalf of Johnson &

15  Johnson's Schedule II and other scheduled

16  products; is that right?

17        MR. BARKER:  Object to form.

18        THE WITNESS:  I had

19        responsibility and oversight in

20        2012 for the personnel at JOM that

21        was involved with reviewing orders

22        for release.

23  BY MR. JANUSH:

24    Q.    You were the director of the

1    unit that oversaw controlled substance

2    compliance from 2012 through, in fact,

3    the present date; is that right?

4         A.    Through December 31, 2017.

5         Q.    Okay.  And what happened on

6    December 31, 2017?

7         A.    Local quality accepted

8    ownership of controlled substance

9    compliance, and I moved to the global

10   oversight role within J&J regulatory

11   compliance.

12        Q.    You were still, however,

13   involved in suspicious order monitoring,

14   standard operating procedures and design

15   after December -- December of 2017; isn't

16   that right?

17        A.    Yes.

18        Q.    You were not just involved,

19   you were a point person involved in

20   overseeing the redesign of suspicious

21   order monitoring for Janssen and Johnson

22   & Johnson after December of 2017; isn't

23   that also right?

24        A.    As of January 2018, my role

Highly Confidential - Subject to Further Confidentiality Review

1    is more of an oversight, provide guidance

2    on interpretation, and ensure that the --

3    the local quality are implementing the

4    controls per the regulations.

5         Q.    You're not taking the

6    position that you weren't involved in

7    designing a revised suspicious order

8    monitoring system as of January 1, 2018,

9    for Johnson & Johnson, are you?

10              MR. BARKER:  Object to form.

11              THE WITNESS:  No, I provide

12         input into the system from an

13         oversight perspective.

14   BY MR. JANUSH:

15        Q.    You were the leader; isn't

16   that right?

17        A.    In 2018 I was not the

18   leader.  Our local quality at that site,

19   DEA compliance reports into local

20   quality.  They had the accountability for

21   the program.

22        Q.    And you were very much

23   involved in the redesign of the

24   suspicious order monitoring program in

Highly Confidential - Subject to Further Confidentiality Review

1   2018, weren't you?

2             MR. BARKER:  Object to form.

3             THE WITNESS:  The redesign?

4       I don't -- no, I don't understand

5       what you mean by redesign.

6   BY MR. JANUSH:

7       Q.   Modifications.  Do you

8   understand what modifications to a system

9   means?

10      A.   Yes, I understand what

11   modification to a system means.  But I'm

12   looking at 2018 and I know that there is

13   a project to enhance our program.  And I

14   was providing input into that project.

15      Q.   Okay.  And -- and by

16   enhance, you mean modify the suspicious

17   order monitoring program, don't you?

18      A.   No.  I mean enhance it.  We

19   had learned that there may be other

20   information that DEA has required, and we

21   wanted to make sure that our program is

22   delivering what DEA expects.  And so we

23   are making those enhancements so we're

24   more robust and ready for a DEA

1    inspection should the new requirements be

2    reviewed.  But at this time, our program

3    has been reviewed with DEA.

4         Q.    When you say, "At this time,

5    our program has been reviewed with DEA,

6    when was the last review of your program

7    with DEA?

8         A.    The -- every time they come

9    in and inspect the distribution centers,

10   they ask for our suspicious order

11   monitoring procedures.  So the last time

12   they got our procedures were in

13   December 2017.

14        Q.    And that was in conjunction

15   with an inspection of what site?

16        A.    Kentucky distribution site.

17        Q.    Now, I'm going to turn your

18   attention to the page that ends in Bates

19   stamp 50 on Exhibit 1.  And this goes

20   hand in hand with something that you were

21   just testifying about.  You were talking

22   about the -- let's see -- that you

23   learned that there may be other

24   information that the DEA has required.

1        So first I want to know,

2    what's that other information that the

3    DEA required that you were speaking to in

4    more recent years like 2017?

5        A.    Well, we were constantly

6    engaging DEA to understand if they -- if

7    there's new expectations.  And in 2017 --

8    we were on the e-mail list from the DEA

9    website.  There was an e-mail that we

10   received from DEA in regards to

11   Mallinckrodt, a settlement with

12   Mallinckrodt.

13       And in that e-mail we heard

14   DEA say that there may be a requirement

15   for more downstream analysis by the

16   manufacturer.

17       Q.    Okay.  So let's go to this

18   second bullet that I'm drawing a line

19   through that reads, "The U.S. environment

20   changing because of the opioid epidemic

21   increased the workload for JOM."

22       Can you explain what this

23   sentence meant?  This is what you wrote

24   as part of your comment in your personnel

1    review; is that right?

2         A.    It was my self-assessment.

3         Q.    Okay.  What -- what did that

4    statement mean?

5         A.    That enhancements will be

6    needed beyond what we currently are

7    doing.  And that because there's more

8    requirements to perform on order reviews,

9    that this could impact Janssen

10   Ortho-McNeil in how they do the order

11   monitoring process, as well as our due

12   diligence and our compliance meetings,

13   right.

14              So, I'm trying to remember

15   that -- that we are also preparing for a

16   launch of a new product, which --

17        Q.    Let's --

18        A.    -- which -- I mean, that

19   was -- so that was why the increased

20   workload for JOM.  Because of these

21   new -- because of the Mallinckrodt

22   expectations to know downstream, that

23   there is more data that we'll have to

24   review, so there's more workload on the

1  specialists that do the day-to-day order

2  monitoring.

3         Q.    Okay.  And when you speak

4  about the Mallinckrodt DEA action, are

5  you referring to the 2017 DEA action that

6  determined Mallinckrodt had an obligation

7  to know customers' customer?  In other

8  words, to know where its sales were going

9  to the end pharmacy?

10        A.    I believe that the e-mail

11 that I received from DEA said that they

12 had -- they had data downstream of where

13 the wholesalers were shipping --

14        Q.    Right.

15        A.    -- that needed -- that could

16 have told them about the diversion of

17 their products.

18        Q.    And that's --

19        A.    The difference between data

20 that was being analyzed.

21        Q.    And so we're talking about

22 the same thing.  We're not cross-talking.

23 When I say knowing your customers'

24 customer, you understand that to knowing

1    if you're a seller like Mallinckrodt, and

2    you are selling to a wholesaler, and that

3    wholesaler is selling to a drug store,

4    for example a CVS or a Walgreens, that's

5    an example, and if Mallinckrodt had data

6    as to where customers' customer was

7    stocking its product, it should have

8    known that.  Do you understand?  We're on

9    the same page on that, aren't we?

10              MR. BARKER:  Object to form.

11              THE WITNESS:  I believe the

12         way DEA commented is you know the

13         customer and the downstream data,

14         where it goes.  I don't believe

15         they say know your customers'

16         customer.  But that was the intent

17         that, if you had this data

18         downstream that indicated where

19         your products go, you should have

20         been looking at it.

21    BY MR. JANUSH:

22         Q.    And 2017 wasn't the first

23    time that you had been introduced to the

24    concept of knowing who your customers'

Highly Confidential - Subject to Further Confidentiality Review

1    customer is; is that right?

2         A.    That was the first time that

3    I became aware of the downstream data

4    that should be used.  At the point up

5    till then, it was know my customer, which

6    were the wholesalers.

7         Q.    And when you say that was

8    the first time that you had been -- that

9    you became aware of the downstream data

10   that should be used, what does that mean?

11        A.    That prior to that I never

12   heard DEA tell the manufacturer that you

13   needed to know beyond your customer, that

14   information.

15        Q.    Did you hear of other

16   manufacturers engaging in best practices

17   to know your customers' customer, to know

18   that downstream information as a

19   manufacturer of opioid products?

20             MR. BARKER:  Object to form.

21             THE WITNESS:  I had not

22        heard of many manufacturers that

23        were using that downstream data

24        beyond the wholesaler up until DEA

Highly Confidential - Subject to Further Confidentiality Review

1            sent that e-mail.

2               I had been to some

3            conferences where there was some

4            talk on chargebacks, but with

5            brand products, there was

6            challenges.

7  BY MR. JANUSH:

8        Q.   So my question wasn't

9  whether you had been aware of many

10  manufacturers who were, as part of their

11  best practices, using data to know their

12  customers' customers, my question was,

13  did you know of other manufacturers who

14  were in fact doing that and investigating

15  their customers' customers with

16  chargeback data and other data before

17  2017?

18            MR. BARKER:  Object to form.

19            THE WITNESS:  I do not

20            recall discussing the use of

21            chargeback data with any other

22            manufacturer.  I was not aware.

23              (Document marked for

24            identification as Exhibit

1          Dempsey-2.)

2     BY MR. JANUSH:

3          Q.    I'm going to mark as

4     Exhibit 2 a document called a regulatory

5     agency contact report.  I believe it's

6     dated 2011.  And it concerns an

7     October 21, 2011, or October 20, 2011,

8     meeting with DEA.

9               And the summary on the front

10    page says, "Noramco participated in a

11    meeting with DEA in Washington to discuss

12    future volumes and impact on aggregate

13    production quota."

14              Do you see that?

15              And the Bates number is

16    JAN-00060000953.

17              But do you see the summary

18    that I was drawing your attention to on

19    the first page?

20         A.    Yes.

21         Q.    Okay.  Do you remember

22    seeing this document?

23         A.    I remember that I wrote it.

24         Q.    That was going to be my next

1  question.  I thought so.  So these are

2  notes of your minutes with the DEA on

3  Noramco -- joint Noramco and Janssen

4  letterhead; is that right?

5      A.    Yes.

6      Q.    Okay.  And there's a lot

7  here to cover, so I'm going to try and

8  just cover five or so different topic

9  areas and go through this document as

10  quickly as I can.

11          The first issue I'd like to

12  cover is on the second page of the

13  document, ending in Bates number 54.

14          And it says "Meeting

15  purpose:  Present 2012 and beyond Noramco

16  volumes that impact aggregate production

17  quota."

18          Do you see that?

19      A.    Yes.

20      Q.    And so can you describe

21  exactly what -- what the goal of this

22  meeting was?

23      A.    The meeting purpose was for

24  sales and marketing to present their --

1    what they are projecting as the demand

2    for Noramco with DEA.

3              DEA is responsible for

4    setting up the aggregate production

5    quota.  And they request that bulk

6    manufacturers provide information to them

7    that they can review as they set up the

8    aggregate production quotas.

9         Q.    Okay.  And your meeting is

10   with Denise Curry, the deputy director,

11   office of diversion control; is that

12   right?

13        A.    Yes.

14        Q.    And Dr. Chris Sannerud,

15   section chief for quota and UN reporting

16   unit, Office of Diversion Control.  True?

17        A.    Dr. Sannerud, yes.

18        Q.    Okay.  And Stacy

19   Harper-Avilla, the quota chief for quota

20   and UN reporting unit, Office of

21   Diversion and Control.

22              And do you remember who Adam

23   Goldsmith and -- and Greg Kavanaugh are

24   or were in terms of their roles with the

1   DEA?

2          A.    Greg Kavanaugh was a -- in

3   the quota group.  He was one of the --

4   the specialists that reviewed requests.

5          Q.    And how about Adam

6   Goldsmith?

7          A.    I don't recall.

8          Q.    And you were there with Mike

9   Kindergan, global vice president sales

10  business development for Noramco; is that

11  right?

12         A.    Yes.

13         Q.    And Bill Grubb who's the --

14  was the senior director U.S. sales and

15  marketing?

16         A.    Yes.

17         Q.    And those were the only two

18  that joined you at this meeting on your

19  side; is that right?

20         A.    Yes.

21         Q.    Okay.  Now, moving down to

22  your notes.  At this meeting you

23  presented a slide deck to the DEA, did

24  you not?

1      A.     I personally did not

2    present.  Bill Grubb and Mike Kindergan

3    did.

4            Q.     Okay.  And you wrote the

5    notes concerning the presentation; is

6    that right?

7            A.     I was the scribe.

8            Q.     Okay.  So I want to focus

9    first on Slide 2, oxy market, Noramco

10   message, IR growth in the slide is

11   conservative and could be higher.

12   Noramco supplies bulk of the IR market.

13            Did you convey to the DEA

14   that -- that Noramco supplied the bulk of

15   the Oxycodone market?

16            MR. BARKER:  Object to form.

17   BY MR. JANUSH:

18       Q.     As of 2011?

19            MR. BARKER:  Object to form.

20            THE WITNESS:  Bill Grubb and

21       Mike Kindergan presented that

22       information.

23   BY MR. JANUSH:

24       Q.     And what does the IR market

Highly Confidential - Subject to Further Confidentiality Review

1  stand for?  That -- that stands for

2  immediate release; is that right?

3          A.    IR does stand for immediate

4  release.

5          Q.    Okay.  And it looks like in

6  the first bullet, Dr. Sannerud was asking

7  why OxyContin volume was decreasing and

8  what was taking its place.  And Bill,

9  that's Bill Grubb, right?

10         A.    Yes.

11         Q.    Responded that in the

12 branded SR space, and what does SR stand

13 for?

14         A.    SR stands for suspended

15 release.

16         Q.    In the branded suspended

17 release space, also known as ER, extended

18 release, right?

19              MR. BARKER:  Object to form.

20              THE WITNESS:  I don't recall

21     if it meant exactly extended

22     release.

23 BY MR. JANUSH:

24         Q.    Okay.  There are now other

Highly Confidential - Subject to Further Confidentiality Review

1   choices available such as Opana, Exalgo,

2   and Nucynta which are likely being

3   prescribed in place of the OxyContin.  He

4   stated that Nucynta in particular has

5   less side effects.

6              I'm going to stop there.  Do

7   you know what data led Bill Grubb to --

8   to state to the DEA that Nucynta has less

9   side effects than OxyContin?

10             MR. BARKER:  Objection.

11             THE WITNESS:  No, I do not.

12  BY MR. JANUSH:

13       Q.    And then the next sentence

14  states, "Also, the decline could be due

15  to the abuse deterrent formulation having

16  the intended impact, (with abusers), and

17  mentioned reports that the reformulated

18  OxyContin pill swells in the throat if

19  not swallowed quickly."

20             Did I read that correctly?

21       A.    Yes.

22       Q.    Do you know what the abuse

23  deterrent formulation was that -- that

24  Bill Grubb was speaking to?

1          MR. BARKER:  Object to form.

2          THE WITNESS:  I don't

3      recall.

4  BY MR. JANUSH:

5      Q.    Concerning -- I'll ask it

6  differently.

7          Do you know whether Bill

8  Grubb was speaking to an abuse deterrent

9  formulation concerning Nucynta at this

10 time?

11         MR. BARKER:  Object to form.

12         THE WITNESS:  I don't

13     recall.

14 BY MR. JANUSH:

15     Q.    Do you know whether Nucynta

16 had an abuse deterrent label approved by

17 the FDA?

18     A.    No.

19     Q.    No, you don't recall or no,

20 it did not?

21     A.    My recollection is no, it

22 did not.

23     Q.    Okay.  I'm going to jump

24 forward to the page ending in 56.  And

Highly Confidential - Subject to Further Confidentiality Review

1    specifically Slide 15.  And I'm marking

2    on the screen where I am if I can help

3    you if you need to look at your monitor.

4    And it's addressing oxymorphone API for

5    sale.

6              Dr. Sannerud asks:  Did the

7    FDA act on the Endo citizen petition?

8              Bill said, "Yes.  FDA agreed

9    with the purity requirements but not

10   other aspects of the petition."

11             Dr. Sannerud asked if

12   Noramco will be supplying the brand Opana

13   in 2012, and Bill said, "Not

14   commercially, but yes, we have worked

15   with them and are in discussions that

16   could lead to a new qualification volumes

17   in 2012."

18             Do you see that?

19        A.    Yes.

20        Q.    Did Noramco work with Endo

21   in supplying oxymorphone for Opana?

22             MR. BARKER:  Object to form.

23             THE WITNESS:  I don't

24        recall.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. JANUSH:

2        Q.    Do you know if -- do you

3    recall whether Noramco produced

4    oxymorphone generally for other

5    manufacturers beyond Endo?

6        A.    I do recall that we did

7    produce oxymorphone active pharmaceutical

8    ingredient.

9        Q.    Okay.  Do you remember about

10   how much of the market Noramco had

11   producing oxymorphone active

12   pharmaceutical ingredient for the

13   non-Endo market in 2011?

14            MR. BARKER:  Object to form.

15            THE WITNESS:  I didn't

16       have -- I didn't see the marketing

17       information.  I don't know the

18       market share.  I was not privy to

19       that.

20   BY MR. JANUSH:

21       Q.    I'm going to turn your

22   attention to a page that's ending in 58.

23   And specifically I want to address this

24   bullet that I'm circling regarding "the

1    time to process quota requests is the

2    same, it is just that the request leaves

3    the quota group now and is processed

4    through seven layers of review.  The

5    order monitoring group was discussed, the

6    suspicious order monitoring group is not

7    reviewing quota requests from

8    manufacturers and reducing quota by the

9    percent diversion they are seeing out in

10   the market.  Stacy hinted that we may get

11   a visit regarding our monitoring

12   program."

13          What is this referring to?

14       A.    At this time quota request

15   approvals went from just Dr. Sannerud

16   approving quota requests to a longer

17   multi office review.

18          So we had heard that there

19   was an investigation unit in Washington

20   that was also looking at quota requests,

21   and providing input if they are seeing

22   diversion of the products that the quota

23   request was related to.  And she was

24   hinting that because of the distributor

Highly Confidential - Subject to Further Confidentiality Review

1    initiative, and at this time we knew some

2    of the Noramco customers had been asked

3    to go to Washington to review their

4    suspicious order monitoring program and

5    review ARCOS.  She was just -- just

6    letting us know that Janssen may be asked

7    to come to Washington as part of the

8    distributor initiative.

9            Q.    And do you know which of

10   your Noramco manufacturing customers

11   were -- were asked to go to Washington

12   and review their suspicious order

13   monitoring program with the DEA?

14           A.    I just recall one.

15           Q.    And who was that?

16           A.    KVK.

17           Q.    And the statement, "The

18   suspicious order monitoring group is not

19   reviewing quota requests from

20   manufacturers and reducing quota by the

21   percent diversion they are seeing out in

22   the market," did this concern the Noramco

23   suspicious order monitoring group?

24           A.    No.  Because we don't ship

1  Schedule IIs to customers that do not

2  have active DEA licenses or procurement

3  quota.  So it is a controlled market.

4  And --

5          Q.    Keep going.

6          A.    So our order monitoring

7  group is focused on those locations that

8  DEA has granted approval to receive our

9  active pharmaceutical ingredient.

10         Q.    But this is addressing the

11  suspicious order monitoring group is not

12  reviewing quota requests from

13  manufacturers and reducing quota by the

14  percent of diversion.  Who is this

15  referring to, if not Noramco?

16         A.    Oh, the suspicious order

17  monitoring group at DEA.

18         Q.    Okay.

19         A.    Remember I said that there's

20  seven layers of review, and there's an

21  investigation group that looked at ARCOS

22  data as well as other data.  And that's

23  what it meant.

24         Q.    And then at the bottom, it's

Highly Confidential - Subject to Further Confidentiality Review

1    addressing attachments.  I'm circling it.

2    Do you see that?

3           A.    Mm-hmm.

4           Q.    And it's the presentation.

5    Charts of Noramco data given to Noramco

6    by Greg Kavanaugh and value stream maps.

7    Do you see that?

8           A.    Mm-hmm.

9           Q.    Okay.  So earlier I

10   addressed the fact that the slideshow or

11   slide deck was presented to the FDA.

12   This is the slide deck, is that right,

13   Noramco products DEA review, October 20,

14   2011?  Michele Dempsey, Bill Grubb, Mike

15   Kindergan?

16          A.    Yes.

17                MR. BARKER:  Object to form.

18   BY MR. JANUSH:

19          Q.    Is this -- is this the slide

20   deck that -- that I was speaking to

21   earlier?

22          A.    This looks like the slide

23   deck.

24          Q.    Okay.  And I want to jump to

1    Page 2 of the slide deck where you, Bill

2    Grubb and Mike Kindergan have addressed

3    Oxycodone.  Do you see that?

4         A.    Yes.

5         Q.    And here, you are addressing

6    market observations, are you not?

7         A.    This is data that Bill Grubb

8    presented in regards to the market.

9         Q.    And specifically addressing

10   items such as, "Purdue's volume dropped

11   by 12 percent year over year based on

12   June IMS data."

13             Did I read that right?

14        A.    Yes.

15        Q.    And that, "IR market growth

16   is still very strong."

17             Read that right?

18        A.    Yes.

19        Q.    And that, "Noramco customers

20   are growing faster than the market."

21             Do you see that?

22        A.    Yes.

23        Q.    And in this grid it's

24   addressing, in the center, 2011 oxy base,

Highly Confidential - Subject to Further Confidentiality Review

1    2011 oxy total market, and 2011 oxy

2    immediate release total; is that right?

3         A.    Yes.

4         Q.    And specifically where it

5    says, "U.S. market 63 tons," under total

6    2011 oxy market, that's referring to

7    total quota authorized for Oxycodone for

8    the U.S. market; is that right?

9         A.    No.

10        Q.    What's it referring to?

11        A.    That is the equivalent

12   active pharmaceutical kilogram quantity

13   that's available for the market.

14        Q.    Right.  I think we're saying

15   the same thing.  Maybe I said it --

16        A.    No.  The aggregate

17   production quota was a larger number.

18        Q.    Okay.  So why don't you

19   explain the difference in layman's terms

20   then, the difference between the 63 tons

21   U.S. market and the aggregate production

22   quota.

23        A.    Aggregate production quota

24   is the amount of quota that DEA has

Highly Confidential - Subject to Further Confidentiality Review

1    identified that is needed to produce to

2    support exports, research, as well as

3    medical need.  So it is granted to the

4    manufacturers of active pharmaceutical

5    ingredients.  And the quota is based on

6    the first isolation step of the -- of the

7    drug product.

8              So the first time that

9    oxycodone is isolated, that is the

10   production quota that you're granted.

11   But it goes down to further processing.

12   You know, there's purification steps,

13   there's particle sizing steps.  And

14   during this additional processing you do

15   lose more material.  So what you actually

16   get, you may have a quota grant of

17   100 kilos, but you may only get 80 at the

18   end that is available for the formulator.

19              And then the formulator

20   receives that 80 kilos, and then they

21   formulate, and they have maybe 20 percent

22   losses.  So that's why I said this number

23   is lower than what the total aggregate

24   is, because by the time the formulator is

Highly Confidential - Subject to Further Confidentiality Review

1  done and it's packaged ready for the

2  patient, it's down to that which is based

3  on IMS data.  And it's -- it doesn't

4  include the research or export quantities

5  of Oxycodone as well.

6         Q.    So this number, 63 tons, is

7  after processing, this is how much -- how

8  many tons of Oxycodone made it to market?

9         A.    That is the -- I'm believing

10 it's the IMS data that said it made it to

11 the market.

12        Q.    Okay.

13        A.    But there is other -- you

14 know, like I said, there's export and

15 research, so...

16        Q.    And then going down two

17 boxes, it says, "Share:  Total market,

18 51 percent."  Is this referring to

19 Noramco's share of the total market of

20 oxycodone?

21              MR. BARKER:  Object to form.

22              THE WITNESS:  I believe that

23        is what -- I believe -- it's been

24        a while.  But I believe that's

1    what Bill was saying.

2  BY MR. JANUSH:

3        Q.    Okay.  And earlier I asked

4  you about insights into Noramco's market

5  share.  And you said that you didn't have

6  access to that data.  Do you recall that?

7        A.    I know that I was present in

8  the room when this data was reviewed.

9  But in my role I didn't need to know it,

10  so I didn't retain that knowledge.

11        Q.    And then in this -- the

12  bottom of the slide, "Noramco production

13  affects the entire IR market."

14            Do you see that?

15        A.    Yes.

16        Q.    What was meant by that?

17            MR. BARKER:  Object to form.

18            THE WITNESS:  I don't

19        recall.

20  BY MR. JANUSH:

21        Q.    Might it have been that

22  Noramco had 51 percent of the total

23  oxycodone raw API market and, therefore,

24  Noramco's production affects the entire

1    IR market?

2              MR. BARKER:  Object to form.

3              THE WITNESS:  I don't

4         recall.  It could have meant many

5         things.  It could have meant

6         production reliability.  I don't

7         recall.

8    BY MR. JANUSH:

9         Q.    Now, I'm going to move to

10   the slide marked Page 4, Slide 4.  And it

11   ends in Bates number 963.

12             And here, on oxycodone quota

13   considerations, your group was telling

14   the DEA, "Noramco has virtually all of

15   the immediate release market excluding

16   Covidien source dosages."

17             Is that right?

18             MR. BARKER:  Object to form.

19             THE WITNESS:  My group,

20        which was DEA compliance, was not

21        telling them.  Sales and marketing

22        was telling DEA.

23   BY MR. JANUSH:

24        Q.    Well, you were part of quota

Highly Confidential - Subject to Further Confidentiality Review

1    oversight in 2011 for Noramco, weren't

2    you?

3            A.    I managed the quota

4    submission process at Noramco at this

5    time.

6            Q.    And you -- when I say group,

7    you and Bill and --

8            A.    Mike and --

9            Q.    -- and Mike were a group of

10   three that were presenting Noramco quota

11   considerations to the DEA in October of

12   2011; true or false?

13           A.    I was present at this

14   meeting where sales and marketing

15   presented this information to DEA for

16   their consideration in the aggregate

17   production quota process.

18           Q.    But it's not just sales and

19   marketing.  You provided the credibility

20   from the Noramco side of the fence

21   because you were involved in setting

22   quota for Noramco, right?

23                 MR. BARKER:  Object to form.

24                 THE WITNESS:  I did not set

1     quota.  I -- based on the

2     production plan and the demand,

3     when you're in the API quota

4     manufacturing process, you don't

5     know if the demand is accurate

6     because it's based on what our

7     customers get, and we don't have

8     visibility to their quota grants.

9          So we have these meetings

10    where we're meeting with DEA,

11    presenting what we think we know

12    what the market is going to be

13    because we're getting these demand

14    signals from these customers.  And

15    these meetings were used to, you

16    know, to let DEA know, here are

17    some of the customers, here is the

18    feedback.  And, you know, keep

19    this -- consider this when you're

20    reviewing our 2012 request for

21    quota.  This is what our customers

22    are telling us.

23   BY MR. JANUSH:

24          Q.    Right.  And going back to my

1    question that I actually asked you, you

2    were involved in the meeting because you

3    were involved in quota issues on behalf

4    of Noramco, weren't you?

5                 MR. BARKER:  Object to form.

6                 THE WITNESS:  The word

7          "quota issues" is what has me

8          confused.  I managed the quota

9          process, which means going out,

10         doing the year-end reporting,

11         getting the quota that we are to

12         produce, and then engaging DEA if

13         we need more current year quota.

14   BY MR. JANUSH:

15         Q.    Now, I'm going to move over

16   to hydrocodone.  This is Slide 12, ending

17   in Bates number 971.  I'm going to

18   address the market observations.  And

19   here too, as with oxy, you're presenting

20   to the DEA that Noramco customers gaining

21   market share from Covidien.

22                 Do you see that?

23                 MR. BARKER:  Object to form.

24                 THE WITNESS:  Mm-hmm.  Yes,

Highly Confidential - Subject to Further Confidentiality Review

1      I do see that.

2  BY MR. JANUSH:

3      Q.    And part of your

4  presentation also entailed this bold

5  bullet, "Noramco is a key supplier,

6  hydrocodone to the market."

7          Do you see that?

8          MR. BARKER:  Object to form.

9          THE WITNESS:  I see that.

10 BY MR. JANUSH:

11     Q.    Did you agree with that when

12 you met with DEA in 2011?

13     A.    Did I agree with that?

14     Q.    That statement.

15     A.    Personally?

16     Q.    There's data on this page,

17 right?

18     A.    It appears that the demand

19 shows that, based on the IMS sales, we

20 did have a market share.

21     Q.    And, in fact, Noramco's

22 market share of the -- as expressed in

23 base product in June of 2011, was

24 43 percent of 38.5 tons of hydrocodone in

1   the market; is that right?

2           MR. BARKER:  Object to form.

3           THE WITNESS:  That is what

4       the table states.

5   BY MR. JANUSH:

6       Q.   Do you try and be accurate

7   when presenting Noramco information to

8   the DEA?

9           MR. BARKER:  Object to form.

10          THE WITNESS:  Sales and

11      marketing provided -- I know that

12      they did have IMS data.  But if

13      this is accurate, I don't know.

14  BY MR. JANUSH:

15      Q.   What does it mean, "Share

16  of" -- "share - available market" with

17  the asterisk here?  What does that mean?

18          MR. BARKER:  Object to form.

19          THE WITNESS:  I don't

20      recall.

21  BY MR. JANUSH:

22      Q.   Now, I want to shift to

23  oxymorphone.  And that's Slide 15.  And

24  it ends in 974.

Highly Confidential - Subject to Further Confidentiality Review

1    Do you see that?

2    A.    Yes.

3    Q.    And the market summary

4  presented by your group to the DEA was,

5  "Endo's Opana is growing rapidly,

6  54 percent.  Many generics to Opana brand

7  poised to launch in September of 2012."

8    Did I read that market

9  summary correct?

10   A.    Yes.

11   Q.    Okay.  And API supplier

12  shifts is addressed; is that right?

13   A.    Yes.

14   Q.    And the first hyphen or note

15  is, "Noramco produces a low ABUK active

16  ingredient."

17   What does that mean?

18   MR. BARKER:  Object to form.

19   THE WITNESS:  It is an

20  abbreviation for a long impurity.

21  BY MR. JANUSH:

22   Q.    For a what?

23   A.    Impurity.  So what they are

24  saying is our oxymorphone is low

1    impurity.  The specific impurity which I

2    don't recall what ABUK stands for.

3         Q.    Okay.  And it's the next two

4    notes that I'm going to specifically

5    focus on.

6         "Unexpectedly Noramco has

7    received increase from virtually every

8    generic who originally formulated with

9    Mallinckrodt material.  API demand went

10    from near 60 kilograms to near

11    600 kilograms overnight and now includes

12    nine companies."

13         Is that right?

14         MR. BARKER:  Object to form.

15         THE WITNESS:  That is what

16      the slide says.

17    BY MR. JANUSH:

18         Q.    Okay.  Do you recall who the

19    other -- who the generics were that were

20    reformulating originally with

21    Mallinckrodt that turned to Noramco for

22    oxymorphone?

23         A.    I do not recall.

24         Q.    Where would information

1   concerning that API supplier shift be

2   stored?

3            MR. BARKER:  Object to form.

4            THE WITNESS:  That would be

5       in the sales and marketing files

6       at Noramco.

7   BY MR. JANUSH:

8       Q.    Do you know -- do you know

9   why Noramco received inquiries from

10  virtually every generic manufacturer or

11  generic seller who was originally --

12  originally formulating with Mallinckrodt?

13           MR. BARKER:  Object to form.

14           THE WITNESS:  I don't

15       recall.

16  BY MR. JANUSH:

17      Q.    I'm going to turn to

18  Slide 23.  There's a summary of requests

19  at 982.  Bates number ending in 982.

20           And -- and here are a

21  summary of requests that were being made

22  to the DEA; is that right?

23      A.    That is what this table was,

24  yes.

1    Q.    Okay.  And so for Oxycodone,

2  you were asking "include exports and

3  inventory for customer qualification in

4  the 2012 aggregate production quota"; is

5  that right?

6              MR. BARKER:  Object to form.

7              THE WITNESS:  Yes.

8  BY MR. JANUSH:

9    Q.    And, "For hydrocodone

10  include second site qualification quota

11  in the 2012 aggregate production quota."

12              What does that mean?

13              MR. BARKER:  Object to form.

14              THE WITNESS:  When you want

15        to produce an active

16        pharmaceutical at a new location,

17        you need to have development

18        validation quota.  This is quota

19        that is not readily available to

20        the patient because you have to

21        demonstrate through three to four

22        batches that you can produce the

23        active pharmaceutical to

24        specifications and you

1    consistently can make it.  And

2    then that material gets placed on

3    hold until customer filings get

4    approved by FDA.

5         So it's not quota that is

6    going to be consumed for medical

7    year in the year in which it's

8    produced.

9  BY MR. JANUSH:

10       Q.   Got it.  Thank you for that

11 explanation.  I'm going to move off this

12 document and move on to Exhibit 3.

13       (Document marked for

14       identification as Exhibit

15       Dempsey-3.)

16 BY MR. JANUSH:

17       Q.   This is a document from

18 trade analytics titled Managed Market

19 Summit, October 18, 2012.  Incidentally,

20 do you know what the trade analytics

21 group does at Johnson & Johnson or

22 Janssen?

23            MR. BARKER:  Object to form.

24            THE WITNESS:  No, I'm not

Highly Confidential - Subject to Further Confidentiality Review

1          aware.

2     BY MR. JANUSH:

3          Q.    Okay.  Did you ever deal

4     with trade analytics?

5          A.    Not in the past, no.

6          Q.    It's fair.  I'm just going

7     to ask you some questions about it.

8               MR. BARKER:  Before you ask

9          your next question, do you happen

10         to have the Bates that is

11         associated with this native file?

12              MR. JANUSH:  My apologies, I

13         should have read that into the

14         record.

15              Yes, it's not on the file.

16         It's on my folder.  It's

17         JAN-MS-01117436.  And I believe

18         this came from the custodial file

19         of Paul Lowman, L-O-W-M-A-N.

20    BY MR. JANUSH:

21         Q.    Do you know who Paul Lowman

22    is?  No?

23              THE REPORTER:  Please answer

24         out loud.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  No.

2    BY MR. JANUSH:

3           Q.    All right.  Okay.  I'm using

4    this more so for informational purposes.

5    This isn't to cross-examine you over this

6    document.  I want to establish some

7    concepts in this document.  And then I'll

8    address them later in your deposition as

9    it concerns documents in your custodial

10   file, okay?

11          A.    Okay.

12          Q.    Just wanted to give you that

13   background as to why I'm presenting you

14   with this.

15                So this is trade analytics.

16   And it appears to be addressing in the

17   header of Page 2 of the slide deck.  "In

18   2011, Janssen recognized need to better

19   understand the distribution of our

20   products."

21                Did I read that right?

22          A.    Yes.

23          Q.    Okay.  And at the bottom,

24   it's addressing this concept of a bullet

1    that just says leverage new data sources,

2    right?  And then here on Page 3, or

3    Slide 3, it's addressing -- trade

4    analytics is addressing, "In 2005,

5    wholesalers began sending us information

6    on their shipments to qualify for a

7    distributor performance agreement, a

8    DPA."

9              So my question to you first

10   is, have you heard of this concept of a

11   distributor performance agreement in your

12   various roles with Johnson & Johnson

13   entities?

14        A.    Not in my compliance role.

15   I've never had visibility to this

16   performance agreement.

17        Q.    Okay.  And key information

18   that we received, the we being trade

19   analytics it appears, is 852, wholesalers

20   inventory and total sales out to their

21   customers.  Do you see that?

22        A.    Yes.

23        Q.    Do you have an understanding

24   as you sit here today as to what 852 data

Highly Confidential - Subject to Further Confidentiality Review

1    is?

2                 MR. BARKER:  Object to form.

3                 THE WITNESS:  I have been

4           told it allows our trade customers

5           to see the level of days of

6           supply, or weeks of supply, I'm

7           not sure which, of all of our

8           Janssen products.

9    BY MR. JANUSH:

10          Q.    And the next bullet is

11   addressing 867 data.  And it states,

12   "Wholesalers' total sales out to their

13   customers, broken out by outlet," and in

14   parens, (i.e., retail pharmacies,

15   hospitals, long-term care, clinics, et

16   cetera, last points of care in the supply

17   chain where product is shipped prior to

18   delivering to the patients).

19                Do you see that?

20          A.    Mm-hmm.

21          Q.    Do you have an understanding

22   of what 867 data is as it concerns

23   wholesalers' sales?

24                MR. BARKER:  Object to form.

1    THE WITNESS:  I -- I do

2    understand now 867.  We -- there

3    are people in the planning and

4    trade that does provide this data

5    to us occasionally.  So yes, I am

6    aware of 867.

7 BY MR. JANUSH:

8    Q.    And what is -- why is 867

9 data provided from trade to compliance

10 occasionally?

11    A.    For order monitoring.  If we

12 have an order that is questionable, we --

13 our process involves planning, trade and

14 customer service reaching out to the

15 customer, obtaining information to

16 justify the questionable order demand

17 change.  And so 867 data can be provided

18 to -- as part of the investigation.

19    Q.    And the last bullet is

20 addressing 844 and 849.  "Chargeback data

21 which identifies how much a vendor

22 qualifies for rebates."

23    Do you see that?

24    A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And do you have an

2    understanding of what chargeback data or

3    844, 849 data is?

4         A.    I never heard of the word

5    844, 849.  But in -- after the

6    Mallinckrodt incident, I did learn about

7    chargeback data.

8         Q.    And did you only learn about

9    chargeback data after the Mallinckrodt

10   incident?

11              Are you referring to the

12   2017 DEA citation with Mallinckrodt?

13        A.    Yes.

14        Q.    Okay.  And so after some

15   point in time in 2017 when the DEA

16   cracked down on Mallinckrodt for not

17   using its chargeback data to figure out

18   how much drugs their end purchasers

19   were -- were obtaining, that's the first

20   time you learned about chargeback data?

21        A.    That's the first time I

22   asked if we had the chargeback data, and

23   then I received the data.  And we tried

24   to analyze it.  But it was missing, it

1    was blinded and was missing some

2    information that we couldn't do a full

3    analysis.

4        Q.    Okay.  And -- and that leads

5    to the very next slide, this concept of

6    blinded data and unblinded data.

7            So trade analytics is

8    addressing, on October 18, 2012, in this

9    slide deck, "However, wholesalers provide

10   partial 867 information at the zip code

11   level and this limits our ability to

12   generate insights."

13           Do you see that?

14       A.    I do.

15       Q.    And the next statement

16   following that header is, "With the help

17   of outside data vendors, we are able to

18   unblind and unblock this information.

19   Provides visibility to inventory at

20   retail chain pharmacies.  Provides

21   visibility of shipments to individual

22   retail stores.  This level of visibility

23   was not available prior to 2011."

24           Did I read that page

1    correctly?

2        A.    Yes.

3        Q.    Okay.  In October 2012, did

4    you know that your company had the

5    ability to unblind and unblock the sales

6    it was making to wholesalers to obtain

7    visibility of your inventory at

8    individual retail stores?

9            MR. BARKER:  Object to form.

10           THE WITNESS:  In 2012, no.

11   BY MR. JANUSH:

12       Q.    When did you first learn

13   that as the director of controlled

14   substance compliance?

15           MR. BARKER:  Object to form.

16           THE WITNESS:  In 2017.

17   BY MR. JANUSH:

18       Q.    Until sitting here for your

19   deposition and being presented with this

20   trade analytics document that's

21   addressing how trade was unblinding and

22   unblocking wholesalers' data with the

23   help of outside vendors, had you ever

24   heard that this was happening --

Highly Confidential - Subject to Further Confidentiality Review

1              MR. BARKER:  Object.

2     BY MR. JANUSH:

3          Q.    -- before today?

4              MR. BARKER:  My apologies.

5          Object to form.

6              THE WITNESS:  I knew in the

7          fall of 2017 that the reason why

8          trade analytics wasn't familiar,

9          the Commercial Center of

10         Excellence was obtaining

11         IntegriChain data for our brand

12         products that did not include our

13         established products that covered

14         Duragesic.

15             So I did find out at the end

16         of 2017 that we were -- that we

17         were using IntegriChain for some

18         of our products.

19    BY MR. JANUSH:

20         Q.    But not for Duragesic; is

21    that right?

22         A.    Right.

23         Q.    And not using IntegriChain

24    for Nucynta during the years that Nucynta

Highly Confidential - Subject to Further Confidentiality Review

1  was sold by Janssen from 2009 through

2  2015; is that right?

3              MR. BARKER:  Object to form.

4              THE WITNESS:  I did not know

5        that this data was available.  No,

6        I did not know.

7  BY MR. JANUSH:

8        Q.    So I didn't -- I appreciate

9  your answer that you didn't know this

10  data was available, and actually being

11  purchased by outside vendors at Johnson &

12  Johnson.  I'm addressing a different

13  question.  I'm addressing that throughout

14  all of the time -- I'll ask it totally

15  differently.

16              Throughout all of the time

17  that Duragesic was being sold in brand or

18  generic format, you didn't know until

19  2017 that another division within Johnson

20  & Johnson was using outside data vendors

21  to unblind and unblock sales to

22  wholesalers; is that right?

23              MR. BARKER:  Object to form.

24              THE WITNESS:  At that time

1    we had a compliance program with

2    our order monitoring where we

3    delivered what DEA asked for.  And

4    up until 2017, DEA had never

5    mentioned the requirement that

6    they wanted us to look at

7    chargeback or downstream

8    analytics.

9           MR. JANUSH:  Move to strike

10   as nonresponsive.

11   BY MR. JANUSH:

12          Q.    You understand that wasn't

13   my question, right?

14          A.    Yes.

15          Q.    Okay.  Let's answer my

16   question.

17          So my question was,

18   throughout all of the time that Duragesic

19   was being sold in brand or generic

20   format, you didn't know until 2017 that

21   another division within Johnson & Johnson

22   was using outside data vendors to unblind

23   and unblock sales to wholesalers; is that

24   right?

1                    MR. BARKER:  Object to form.

2                    THE WITNESS:  Yes.

3    BY MR. JANUSH:

4            Q.    Moving to Slide 5.  Title or

5    header of the slide reads, "New unblinded

6    data allowed Janssen to gain a number of

7    new insights."

8                    Did I read that right?

9            A.    Yes.

10           Q.    First bullet, "Shipment

11   volume to pharmacy chains.  For example,

12   Nucynta ER sales to Walgreens in 2012

13   year-to-date 31,354 units, and current

14   WAC dollars" -- W-A-C dollars --

15   "year-to-date are $9.76 million."

16                   Do you see that?

17           A.    Yes, I do.

18           Q.    So although you're the

19   director of controlled substance

20   compliance, you weren't getting this

21   detail, this information that new

22   unblinded data was able to show Nucynta

23   ER sales to Walgreens in year 2012?

24                   MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  No.

2     BY MR. JANUSH:

3          Q.    And earlier you said that

4     you were aware that in 2017 that another

5     division within Johnson & Johnson was

6     getting this data.  But that it was not

7     getting this data concerning Duragesic

8     and Nucynta, right?

9          A.    At the time that I learned

10    about this IntegriChain data, it was only

11    for key products.  I don't know if prior

12    to 2017 they did include Duragesic and

13    Nucynta.  But at the time that I was -- I

14    learned of this, Duragesic was not

15    included, and Nucynta was no longer a

16    product.

17         Q.    Okay.  But in 2012, Nucynta

18    was a product, right?

19         A.    Yes.

20         Q.    Not just Nucynta IR, Nucynta

21    ER was as well, right?

22         A.    I'm trying to --

23              MR. BARKER:  Object to form.

24              THE WITNESS:  I don't know

Highly Confidential - Subject to Further Confidentiality Review

1       when -- I forget when we exactly

2       launched the ER.

3  BY MR. JANUSH:

4       Q.    I'm going to represent to

5  you that Nucynta ER was launched 2011.

6  But you don't have to trust me on that.

7       A.    Okay.

8       Q.    I'm just making that --

9       A.    It says it here as well.

10       Q.    -- representation.  Okay.

11       So this is showing --

12  depicting that unblinded data allowed

13  Janssen to see Nucynta ER sales to

14  Walgreens in 2012.  And what are current

15  WAC dollars?  Do you know what WAC means?

16       MR. BARKER:  Object to form.

17       THE WITNESS:  No.

18  BY MR. JANUSH:

19       Q.    But current dollars year to

20  date looks like $9.76 million is listed

21  here; is that right?

22       MR. BARKER:  Objection to

23       form.

24       THE WITNESS:  That's what

Highly Confidential - Subject to Further Confidentiality Review

1          this says.

2   BY MR. JANUSH:

3          Q.    Okay.  And yet in 2012, your

4   compliance group wasn't getting this

5   unblinded data to see where your drugs

6   were winding up at the retail level, were

7   you?

8          A.    No.

9          Q.    We talked earlier about

10  unblinded 867 data.  Do you remember

11  that?

12         A.    Yes.

13         Q.    And can you remind me what

14  867 data is?

15         A.    That is the data from the

16  wholesaler to the pharmacy.

17         Q.    Okay.  And this is

18  showing -- stating from the trade

19  analytics group, "Unblinded data also

20  allows us to answer a number of questions

21  from the SCG trade group and marketing

22  teams."

23              What's the SCG trade group?

24  That's the supply chain group, isn't it?

1          MR. BARKER:  Object to form.

2          THE WITNESS:  No, I don't

3     believe that's -- I don't know

4     what it stands for.

5  BY MR. JANUSH:

6          Q.    I'm going to represent to

7  you that I've only seen SCG as referring

8  to supply chain group.  Do you know --

9  have you seen any other group listed at

10  Janssen with an acronym of SCG?

11          MR. BARKER:  Object to form.

12          THE WITNESS:  I just know

13     them as the trade folks, the trade

14     group.

15  BY MR. JANUSH:

16          Q.    There is a supply chain

17  distribution group within JOM, isn't

18  there?

19          MR. BARKER:  Object to form.

20          THE WITNESS:  They are --

21     JOM is part of the organization,

22     the logistics organization within

23     J&J.

24  BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And logistics refers to --

2    A.    Yes.

3    Q.    -- supply chain, doesn't it?

4    A.    Yes.

5    Q.    So I'm not pulling this out

6  of left field when I say there's a supply

7  chain group within J&J, right?

8         MR. BARKER:  Object to form.

9         THE WITNESS:  I don't -- I

10        don't know what the SC stands for

11        in here.  It could be strategic.

12        But I don't know what it stands

13        for.

14 BY MR. JANUSH:

15    Q.    Okay.  But that's not my

16 question.  I'm making the comment that

17 SCG, you've heard of the term supply

18 chain group before, haven't you?

19        MR. BARKER:  Object to form.

20        THE WITNESS:  No, I have not

21        heard the word "supply chain

22        group."  That is why.

23 BY MR. JANUSH:

24    Q.    And it's stating here that,

1    "Insights around purchasing behavior of

2    individual outlets can resolve demand

3    issues and help build demand strategies.

4    For example, which high decile pharmacies

5    should be targeted for Xarelto DVT at

6    launch."

7              Do you see that?

8         A.    Yes.

9         Q.    And I'm going to skip.  But

10   it also says at the lower two bullets,

11   the last two, "How long will the

12   inventory with CVS last?"

13             Do you see that?

14        A.    Yes.

15        Q.    And the last bullet, "What

16   mix of product strengths are stocked by

17   an outlet?"

18             Do you see that?

19        A.    Yes.

20        Q.    So unblinded data, looks

21   like, can be pretty helpful in gaining

22   some insights into the individual

23   outlets; is that right?

24             MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  Yes.

2  BY MR. JANUSH:

3           Q.    And now I want to turn to

4  Slide 14.  And this is addressing the

5  stocking tool territory level.  "For the

6  first time our sales reps know which

7  pharmacies have purchased and which high

8  decile pharmacies have not purchased our

9  products."

10           Do you see that?

11           A.    Yes.

12           Q.    And Nucynta ER and Nucynta

13  are being shown along with Xarelto as the

14  current 13-week example; isn't that

15  right?

16           MR. BARKER:  Object to form.

17  BY MR. JANUSH:

18           Q.    I circled it to make it

19  easier for you to see.

20           A.    Yes, I see.

21           Q.    Okay.  And this is looking

22  at the Denver, Colorado region.  District

23  name, Kingman, Arizona.  Territory name,

24  Phoenix, North Arizona.

Highly Confidential - Subject to Further Confidentiality Review

1          Am I reading that right?

2     A.    Yes, you are.

3     Q.    And it's showing that

4  Johnson & Johnson had -- and Janssen had

5  the ability to see down to the individual

6  pharmacy level, like the first example,

7  CVS 9339.  That's a store number.  And

8  C -- let's go to the maroon in the

9  middle, Nucynta ER decile, Nucynta ER

10  stocking status for the rolling 13 weeks.

11          Do you see this?  I'm

12  circling in red.

13     A.    Yes.

14     Q.    Yet, you in your compliance

15  group wasn't getting this stocking tool

16  data while you were looking at suspicious

17  order monitoring in 2012, were you?

18     A.    No, we were not.

19     Q.    It might have been useful to

20  see which pharmacies were stocking at a

21  higher volume than others in a zip -- in

22  a given zip code, right?

23          MR. BARKER:  Object to form.

24  BY MR. JANUSH:

1    Q.    It certainly wouldn't have

2    been useless, right?

3            MR. BARKER:  Object to form.

4            THE WITNESS:  We have a very

5        transparent relationship with DEA.

6        And if DEA was noting any unusual

7        activity, they would have

8        contacted us.  And we were

9        delivering -- our order monitoring

10       program was delivering what DEA

11       wanted to see, and they were not

12       asking us to provide this

13       information to them at the time.

14   BY MR. JANUSH:

15       Q.    Ma'am, what was my question?

16       A.    You were asking me would

17   this information have been relevant for

18   our order monitoring program.  And I'm

19   saying during Nucynta, that we were not

20   asked to provide this information to DEA.

21           MR. JANUSH:  So I'm going to

22       move to strike as nonresponsive.

23   BY MR. JANUSH:

24       Q.    I asked you it might have

Highly Confidential - Subject to Further Confidentiality Review

 1   been useful to see which pharmacies were

 2   stocking at a higher volume than others

 3   in a given zip code, right?

 4              MR. BARKER:  That's the

 5         second time that you have said

 6         that as though her answer wasn't

 7         responsive to your question.  It

 8         was.  You asked her --

 9              MR. JANUSH:  No speaking

10         objections under our rules.  You

11         may make your record by saying

12         objection and preserve it.  But

13         there's no speaking objections

14         under our rules.

15              MR. BARKER:  Well, in that

16         case, then I object to the motion

17         to strike.

18              MR. JANUSH:  I don't want to

19         get the court on the phone.

20              MR. BARKER:  And I don't

21         want you to get the court on the

22         phone either.

23              MR. JANUSH:  Okay.  Then

24         you --

1          MR. BARKER:  But you -- you

2     are suggesting something that

3     isn't true.

4          MR. JANUSH:  Please don't

5     muddy up my record.  There are

6     rules here.  We all operate by

7     them.  I'll be similarly

8     respectful to you and just say

9     objection and preserve our record

10    for later on at the court level.

11 BY MR. JANUSH:

12    Q.    I asked the question.  My

13 question was, "It might have been useful

14 to see which pharmacies were stocking at

15 a higher volume than others in a given

16 zip code," right?

17    A.    No.

18    Q.    Are you sure about that?

19    A.    Yes.

20    Q.    So as an example to follow

21 up my question, if you had data at your

22 disposal that trade analytics had in

23 2012, and hypothetically could see that a

24 given pharmacy was buying a -- was

Highly Confidential - Subject to Further Confidentiality Review

1    receiving from one of your wholesaler

2    customers a significant amount of Nucynta

3    in a particular zip code, that wouldn't

4    have been a red flag for you?

5                MR. BARKER:  Object to form.

6                THE WITNESS:  DEA expected

7         the wholesalers to be monitoring

8         those levels.  And since we know

9         our customers and we do the due

10        diligence with the wholesaler,

11        part of the due diligence is

12        ensuring that our products are

13        covered in their suspicious order

14        monitoring program.  And if there

15        was a pharmacy with unusual

16        levels, they would have flagged it

17        and done the investigation.

18   BY MR. JANUSH:

19        Q.    So that information would

20   have been entirely useless to you.  Is

21   that what you're saying?

22                MR. BARKER:  Object to form.

23                THE WITNESS:  Yes.  As

24        long -- because they had their

1           suspicious order monitoring

2           program in place.

3    BY MR. JANUSH:

4           Q.    This information that I'm

5    talking about concerning specific

6    pharmacy retail level data would fall

7    under the rubric of knowing your

8    customers' customers, right?

9                MR. BARKER:  Object to form.

10               THE WITNESS:  That would be

11          what it would be termed as after

12          the 2017 notification, knowing the

13          downstream customers of your

14          products.

15   BY MR. JANUSH:

16          Q.    But you heard about this

17   concept from other manufacturers

18   regarding the need to know your

19   customers' customers as early as 2012,

20   didn't you?

21               MR. BARKER:  Object to form.

22               THE WITNESS:  I did not hear

23          from other manufacturers this need

24          to know your customer beyond the

Highly Confidential - Subject to Further Confidentiality Review

1      wholesaler.  I didn't engage

2      manufacturers to know that

3      downstream data.

4  BY MR. JANUSH:

5      Q.    Are you sure about that?

6      A.    Well, I know Noramco

7  customers, we asked about their SOM

8  program.  We had them fill out a

9  questionnaire, do they have a suspicious

10 order monitoring program in place and

11 are -- you know, does it cover our

12 products.

13     Q.    You didn't -- you didn't --

14     A.    But we didn't go visit and

15 say show me how you do it and the

16 downstream data that they analyze.

17     Q.    And when you just said we

18 didn't go visit and say show me how you

19 do it and the downstream data that they

20 analyze, you're referring to we didn't go

21 and visit other manufacturers that were

22 similar to Janssen and visit with them to

23 visit the downstream data; is that right?

24          MR. BARKER:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2              THE WITNESS:  We benchmarked

3          with Noramco customers.  As part

4          of our due diligence from Noramco,

5          we wanted to understand their

6          suspicious order monitoring

7          program.  And so we did reach out

8          to Purdue and Watson to understand

9          what the program involved, the

10         algorithm, the compliance

11         meetings, the due diligence on the

12         wholesalers.

13     BY MR. JANUSH:

14         Q.    Purdue is more like Janssen

15     as a manufacturer and seller of product

16     than it is like Noramco, correct?

17             MR. BARKER:  Objection.

18         Object to form, I guess.

19     BY MR. JANUSH:

20         Q.    In other words, Noramco is

21     making raw opioid products --

22         A.    The pharmaceutical

23     ingredients.

24         Q.    -- active pharmaceutical

Highly Confidential - Subject to Further Confidentiality Review

1  ingredients, API, right?

2        A.    Yes.

3        Q.    And Purdue is, like Janssen,

4  a manufacturer and marketer, a seller, of

5  opioid products, and other products,

6  correct?

7        A.    Purdue does formulate and

8  sell products, yes.

9        Q.    And markets their opioid

10  products, correct?

11        A.    Yes.

12        Q.    And Janssen markets its

13  opioid products, right?

14        A.    Janssen -- Janssen does have

15  opiate products that I guess were

16  marketed years ago.  But I don't recall

17  if their opiates are marketed right now.

18        Q.    Earlier you addressed

19  that -- that, on behalf of Noramco, you

20  benchmarked with other manufacturers who

21  make and sell opioid products; is that

22  right?

23        A.    Yes.

24        Q.    But Noramco was not like a

Highly Confidential - Subject to Further Confidentiality Review

1     Purdue; Janssen was more like Purdue than

2     Noramco, true or false?

3                    MR. BARKER:  Object to form.

4                    THE WITNESS:  Okay.

5            Technically Purdue had an API

6            manufacturer called Rhodes, just

7            like Janssen has an API

8            manufacturer like Noramco.  That's

9            why I'm hesitating.  So they are

10           both alike, that they had inhouse

11           API manufacturing through

12           formulation and distribution.

13    BY MR. JANUSH:

14           Q.    Okay.  Noramco doesn't look

15    at red flag issues concerning high

16    prescribing physicians, right?

17                   MR. BARKER:  Object to form.

18                   THE WITNESS:  In our -- in

19           our controlled environment we only

20           ship to licensed customers that

21           had procurement -- certificate of

22           procurement quota and a 222 to

23           receive our products.

24    BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What was my question?

2    A.    You wanted to know if we

3 used the red flags that the wholesalers

4 to the pharmacies monitor.

5    Q.    What's the answer to that

6 question?

7    A.    No, Noramco did not have to

8 monitor the red flags to the pharmacies.

9    Q.    Okay.  Thank you.

10         MR. BARKER:  Evan, you've

11    been going nearly two hours.  I

12    see you reaching for another

13    document.  If you're done with

14    this document, is now a good time

15    for a break?

16         MR. JANUSH:  Absolutely.

17    Absolutely.

18         THE VIDEOGRAPHER:  Stand by.

19    Remove your microphones.

20         The time is 11:03 a.m.  Off

21    the record.

22         (Short break.)

23         THE VIDEOGRAPHER:  We are

24    back on the record.  The time is

1          11:25 a.m.

2  BY MR. JANUSH:

3          Q.    Hello, Ms. Dempsey.  I'm

4  going to take you back to Exhibit 3,

5  Slide 3.  And it's up on the monitor for

6  you as well.  And earlier I had asked you

7  if you were aware in 2012 that Johnson &

8  Johnson or any of its pharmaceutical

9  entities, including Janssen, was

10  purchasing 852 or 867 data from outside

11  vendors.  Do you remember that?

12          MR. BARKER:  Object to form.

13          THE WITNESS:  Yes, I do

14     remember you asking that question.

15  BY MR. JANUSH:

16          Q.    And you didn't know in 2012

17  and didn't learn until 2017 that Janssen

18  had been acquiring 852 and 867 data

19  concerning wholesalers' inventory or

20  wholesalers' total sales out to their

21  customers; is that right?

22          MR. BARKER:  Object to form.

23          THE WITNESS:  No.  As I

24     explained before, I was aware of

Highly Confidential - Subject to Further Confidentiality Review

1    852 and 867 from the wholesaler

2    perspective, and we used that data

3    in our order monitoring program as

4    needed.  But I did not know 844,

5    849 at the time.  I heard the

6    terminology 867 and 852 by some of

7    the planners at JOM.  But I did

8    not know what those meant until

9    later on.

10   BY MR. JANUSH:

11       Q.    When you say, "We used that

12   data as needed," the 852 and 867 data,

13   how did you use that data as needed?

14       A.    As I explained before, when

15   an order, a controlled substance order,

16   goes through the order monitoring

17   program, if it is deemed to be

18   questionable, customer service planning

19   is involved in reaching out to the

20   customer to understand why it is not a

21   typical order.  And this data is used

22   to -- in some cases, as justification to

23   show that downstream inventory is low and

24   it required additional information --

Highly Confidential - Subject to Further Confidentiality Review

1  this order was justified for release.

2       Q.    Okay.  And I asked you

3  earlier in this deposition, quote, "In

4  October 2012" -- and this was asked

5  before you took your break -- "did you

6  know that your company had the ability to

7  unblind and unblock the sales it was

8  making to wholesalers to obtain

9  visibility of your inventory at

10  individual retail stores?"  And your

11  answer was, "In 2012, no."

12          Do you remember being asked

13  that and giving that answer?

14       A.    Yes, I do.

15       Q.    And I asked you, "When did

16  you first learn that as the director of

17  controlled substance compliance?"  And

18  you said, "In 2017."

19          Do you remember being asked

20  that question and giving that answer?

21       A.    Yes, I do.

22       Q.    And I said, "Until sitting

23  here for your deposition and being

24  presented with this trade analytics

1    document that's addressing that trade was

2    unblocking and unblinding wholesalers'

3    data with the help outside vendors, had

4    you ever heard that this was happening

5    before today?"  And you said, "I knew in

6    the trade analytics" -- this is -- "I

7    knew in the trade analytics -- wasn't

8    familiar being the Commercia Center of

9    Excellence was obtaining IntegriChain

10   products for our brand products.  That

11   did not include our established products

12   that covered Duragesic.  So I did find

13   out at the end of 2017 that we were using

14   IntegriChain for some of our products."

15            And I asked, "But not for

16   Duragesic?"  And you answered, "Right."

17            Do you remember being asked

18   that question and answering as such?

19        A.    Yes.

20        Q.    And I then asked, "And not

21   using IntegriChain for Nucynta during the

22   years that Nucynta was sold by Janssen

23   from 2009 through 2015; is that right?"

24   And you said, "I did not know that this

Highly Confidential - Subject to Further Confidentiality Review

1    data was available.  No, I did not know."

2              Do you remember being asked

3    that question and giving that answer?

4         A.    Yes.

5         Q.    Okay.  Can you appreciate

6    that your answer to my question at the

7    outset of -- circling back from the long

8    break that we just took, is inconsistent

9    with the answers that you gave earlier?

10             MR. BARKER:  Object to the

11             form.

12             THE WITNESS:  No.  As I

13             explained previously, I heard the

14             planners speak to 852 and 867

15             data.  I did not know what that

16             means until -- in 2017 when it was

17             communicated about understanding

18             downstream data.  And then it was

19             explained in more detail.  And we

20             realized for our Duragesic in

21             2017, we no longer -- I don't know

22             if we had it in the past, but for

23             Duragesic, we did not have the

24             unblinded data from IntegriChain.

Highly Confidential - Subject to Further Confidentiality Review

1          So -- so I've heard, like I

2     mentioned before, 867 and 852 were

3     terms used by our planners in

4     trade while we were investigating

5     questionable orders.  But I did

6     not know that we could go

7     downstream for some of our

8     products that -- that there was

9     some downstream data, because I

10    was never asked to provide that

11    data to DEA.

12  BY MR. JANUSH:

13         Q.    You were the director of

14  controlled substance compliance, though,

15  from March 2012 forward, correct?

16         A.    Yes.

17         Q.    And as the director of

18  controlled substance compliance, you

19  didn't know that -- what 852 and 867 data

20  could or could not be used to investigate

21  orders?

22         A.    No, I know what data DEA

23  requested us to provide when they came in

24  to do their inspections and when they

1  reviewed our suspicious order monitoring

2  program.

3            Matter of fact, we sat down

4  with DEA in July of 2013 and reviewed our

5  program.  We asked for recommendations or

6  input, and they were happy with our --

7  they just had no recommendations at that

8  time.

9            MR. JANUSH:  Move to strike

10       as nonresponsive.

11  BY MR. JANUSH:

12       Q.    My question was, and as the

13  director of controlled substance

14  compliance, you didn't know that 852 and

15  850 -- what 852 and 867 data could or

16  could not be used to investigate orders?

17            MR. BARKER:  Object to form.

18            MR. JANUSH:  That was my

19       question.

20            THE WITNESS:  As the

21       compliance leader, we want to

22       provide DEA with the information

23       they request.  And in our order

24       monitoring program we had a

Highly Confidential - Subject to Further Confidentiality Review

1      process where all the orders were

2      investigated that were

3      questionable, and either the

4      customer provided data or the

5      planners provided the data.

6          In this compliance role I

7      did not have to know down to the

8      detail of what this data was.

9      There was a DEA compliance manager

10     that understood what this

11     information was and provided the

12     release of them if it deemed

13     justified.

14  BY MR. JANUSH:

15     Q.    Who was that?

16     A.    At the time it was Mike

17  Levitt.

18     Q.    And what time was that?

19     A.    2012 through 2016.

20     Q.    Okay.  And you as the

21  director of controlled substance

22  compliance didn't have any -- a specific

23  understanding of what 852 and 867 data

24  was between 2012 and 2017 until the DEA

1    cracked down on Mallinckrodt?

2         A.    I knew that 867 and 852

3    provided information on the wholesaler

4    inventory.  What they have there, and

5    what's going out, so that we can evaluate

6    if their local distribution center

7    inventory is consistent with historical.

8    Which is part of our due diligence was to

9    know our customer which was the

10   wholesaler.

11        Q.    But you just testified

12   moments ago, "But I did not know that we

13   could go downstream for some of our

14   products, that there was some downstream

15   data, because I was never asked to

16   provide that data to the DEA."

17             Didn't you just testify as

18   such?

19             MR. BARKER:  Object to form.

20             THE WITNESS:  I provided DEA

21        what they expected us to provide,

22        which was know our customer, which

23        was the wholesaler.  And when

24        orders were being released,

Highly Confidential - Subject to Further Confidentiality Review

1            there -- if there was questionable

2            orders, we had to do the

3            investigation and engage the

4            customer for justification.

5  BY MR. JANUSH:

6        Q.   I'm addressing the fact that

7  you personally did not know that you

8  could go downstream for some of your

9  products, and you have testified that you

10  did not believe you had data on Nucynta

11  or Duragesic concerning 852 and 867 data.

12           MR. BARKER:  Objection.

13  BY MR. JANUSH:

14        Q.   Do you recall providing such

15  testimony?

16           MR. BARKER:  My apologies.

17            Object to form.

18           THE WITNESS:  I did not know

19            that there was data available for

20            Nucynta that told -- down to the

21            pharmacy level.

22  BY MR. JANUSH:

23        Q.   And the same goes for

24  Duragesic?

1    A.    Yes.

2    Q.    Okay.  Earlier we talked

3  about IntegriChain third-party data.  Do

4  you remember that?

5    A.    Yes.

6    Q.    Okay.  Would your answers be

7  the same, that you didn't know about a

8  company -- a third-party company called

9  ValueCentric 852 data or 867 data before

10 2017?

11          MR. BARKER:  Object to form.

12          THE WITNESS:  I did learn

13      about ValueTrak, ValueCentric

14      data.  That they were the ones

15      supplying the blinded 852, 867

16      data.

17 BY MR. JANUSH:

18    Q.    Okay.  And is that the sole

19 capacity -- how did you learn about

20 ValueTrak or ValueCentric data?

21    A.    I believe -- I don't recall

22 the exact date, but during our monthly

23 compliance reviews, it was presented as a

24 data source that could be used,

Highly Confidential - Subject to Further Confidentiality Review

1  potentially, to help investigate

2  questionable orders.

3        Q.    Okay.  It was not a data

4  source that was built into your

5  suspicious order monitoring protocols to

6  stop a suspicious order in realtime,

7  right?

8        A.    We have another order

9  monitoring program that reviews the

10  orders.  Value -- it's a separate --

11  ValueTrak is a separate IT.

12        Q.    So the answer to my question

13  is yes, right?

14              MR. BARKER:  Object to form.

15  BY MR. JANUSH:

16        Q.    My question was --

17        A.    ValueTrak --

18        Q.    It was not --

19        A.    Sorry.

20        Q.    My question was it was not a

21  data source that was built into your

22  suspicious order monitoring protocols to

23  stop an order in realtime, right?

24              MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Yes, it was

2     not our order monitoring program.

3  BY MR. JANUSH:

4          Q.    Okay.  And it wasn't a

5  component of your order monitoring

6  program, correct?

7          MR. BARKER:  Object to form.

8          THE WITNESS:  It was part of

9     our investigation process, that

10    our -- during the investigation,

11    did use that data.

12  BY MR. JANUSH:

13         Q.    Okay.

14         (Document marked for

15    identification as Exhibit

16    Dempsey-4.)

17  BY MR. JANUSH:

18         Q.    Let me show you what's been

19  marked as Exhibit 4.  And this is a

20  parent cover e-mail, JAN-MS-00454956 with

21  an attachment.  This runs sequentially

22  through 957 and 958.  The attachment is

23  the third page, "High level overview of

24  JOM suspicious or excessive order

Highly Confidential - Subject to Further Confidentiality Review

1    monitoring SOM."

2              Do you see that, third page?

3         A.    I'm -- I'm reading that now.

4         Q.    So I'm going to -- I'm

5    actually going to first turn your

6    attention -- I just wanted to run through

7    the header that you saw that the third

8    page existed so I gave you a complete

9    document.

10             Do you see that?

11        A.    Yes.

12        Q.    Okay.  Turning to the first

13   page.  This is from Luis Valcárcel to Ron

14   Kuntz and Paul Lowman.

15             Who is Luis or Luis

16   Valcárcel in the organization of

17   Ortho-McNeil?

18             MR. BARKER:  Object to form.

19             THE WITNESS:  Luis was in

20        trade.

21   BY MR. JANUSH:

22        Q.    And do you remember what his

23   title was?

24        A.    No, I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And Ron Kuntz, who was he?

2    A.    He was in marketing for

3  Nucynta.

4    Q.    He was the director of the

5  pain franchise, right?

6            MR. BARKER:  Object to form.

7            THE WITNESS:  I don't recall

8      his actual title.

9  BY MR. JANUSH:

10    Q.    And how about Paul Lowman?

11    A.    I never -- I do not know who

12  he is.

13    Q.    Okay.  And this is

14  addressing the -- in -- underneath Luis's

15  e-mail, in the second paragraph,

16  "ValueTrak EDI 852 data has McKesson and

17  Cardinal constantly (sic) over 99 percent

18  in stock levels at a macro level.  There

19  are some deviations from the 99 plus

20  stocking levels at a few selected

21  distribution centers."

22            Do you see that?

23            MR. BARKER:  Object to form.

24      The witness had asked you before

Highly Confidential - Subject to Further Confidentiality Review

1          for an opportunity to read the

2          document, Evan.

3                  MR. JANUSH:  Okay.  I was

4          reading that sentence to her

5          though.  I'm asking if she sees

6          what I've read.

7                  THE WITNESS:  I can see -- I

8          see what you've read.

9     BY MR. JANUSH:

10         Q.    Did I read that question

11    correctly, or that statement correctly?

12         A.    You did read the statement

13    correctly.

14         Q.    Okay.  And then the next

15    ensuing statement is, "ValueTrak EDI 852

16    data for ABC at a macro level is slightly

17    below 98 percent.  There is further

18    analysis being conducted as there were

19    some distribution centers that were out

20    of stock on some dosage strengths."

21              Do you see that?

22         A.    Yes, I do.

23         Q.    So this seems to show that

24    trade was using this ValueTrak 852 data

1 to check stock of dosage strengths at

2 AmerisourceBergen distribution centers.

3 Would you agree with that?

4          MR. BARKER:  Object to form.

5          THE WITNESS:  Your

6      interpretation does seem to

7      support that they were monitoring

8      the inventory level at ABC.

9 BY MR. JANUSH:

10      Q.    And, in fact, the -- the

11 following bullet statement seems to

12 confirm that, doesn't it, stating, "Luis

13 will join weekly calls with

14 AmerisourceBergen buyer, ABC buyer, and

15 JOM planner with an action plan to

16 proactively track stocking levels at the

17 distribution centers based on hot spot

18 markets and formulary wins.  ABC agreed

19 to move inventory internally as needed."

20          Did I read that right?

21          MR. BARKER:  Object to form.

22          THE WITNESS:  Yes, you read

23      it correctly.

24 BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What are hot spot markets?

2    A.    I do not know.

3              MR. BARKER:  Object to the

4        form.

5   BY MR. JANUSH:

6    Q.    You are the director of

7   controlled substance compliance for

8   Janssen and you don't know what hot spot

9   markets are?

10             MR. BARKER:  Object to form.

11             THE WITNESS:  I do not know

12       what the intent was in this e-mail

13       from trade, what he meant by hot

14       spot markets.

15  BY MR. JANUSH:

16   Q.    Okay.  But it is addressing

17  proactively tracking stocking levels at

18  the distribution centers based on hot

19  spot markets and formulary wins, isn't

20  it?

21             MR. BARKER:  Object to form.

22             THE WITNESS:  That is what

23       it reads.

24  BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

1       Q.     What are formulary wins?

2              MR. BARKER:  Object to form.

3              THE WITNESS:  I don't know.

4              MR. BARKER:  You need to

5       slow down.

6   BY MR. JANUSH:

7       Q.     Let's turn to the next page.

8              "If there is going to be a

9   spike in demand in an identified

10  geographic area, trade needs to be made

11  aware.  This can help in any potential

12  delays at the distributor and JOM level

13  due to suspicious order monitoring."

14             Do you see that?

15      A.     Yes, I do.

16      Q.     Have you -- do you have an

17  understanding as to why trade would need

18  to be aware if there is going to be a

19  spike in demand in an identified

20  geographic area?

21             MR. BARKER:  Object to form.

22             THE WITNESS:  If it is to a

23      distribution center that has never

24      received a product or is covering

Highly Confidential - Subject to Further Confidentiality Review

1    area where there is an increased

2    medical need for our -- for the

3    medicine, if we know in advance,

4    we can get information from the

5    customer.  And when we do -- when

6    it comes up as a questionable

7    order in our program, we'd have

8    all of the documentation in

9    advance.  And we'd understand that

10   the questionable order is not

11   questionable, that there is a

12   justification, that there is

13   substantiated evidence to support

14   the demand.

15 BY MR. JANUSH:

16       Q.    And this e-mail, with the

17 attachment is dated June 25th, 2012; is

18 that right, going to the cover page?

19       A.    That is what the cover page

20 says.

21       Q.    That's about, what, three

22 months after you joined as the director

23 of controlled substance compliance for

24 Janssen or JOM?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     So at the last paragraph of

3     this second page ending in Bates number

4     957, the definition of suspicious and

5     excessive order is provided, is it not?

6                 MR. BARKER:  Object to form.

7                 THE WITNESS:  That is a

8          definition that the writer of the

9          e-mail had provided, is their

10         interpretation of what a

11         suspicious and excessive order is.

12    BY MR. JANUSH:

13         Q.     Why don't you read that into

14    the record.

15         A.     It states, "A potentially

16    suspicious or excessive controlled

17    substance order can be defined as an

18    order that exceeds the minimum order

19    quantity requirements and is above three

20    times (300 percent) the calculated

21    12-month per weekly order average.  This

22    definition also applies to products that

23    are scheduled in one or more states but

24    not by DEA."

1    Q.    Do you disagree that in June

2    of 2012 this was your company's

3    definition of a suspicious -- potentially

4    suspicious order?

5    A.    That is the order monitoring

6    program's parameters that it was looking

7    for, so yes that was.

8    Q.    So you don't disagree with

9    this statement, correct?

10    A.    I do not disagree with the

11    statement that that is what the order

12    monitoring program was looking for.

13    Q.    Okay.  And by that we're

14    talking about three times or 300 percent

15    of the calculated 12-month per weekly

16    order average, right?

17    A.    Yes.

18    Q.    Now, turning to the last

19    page.  That same definition carries over

20    onto the high level overview of JOM

21    suspicious or excessive order monitoring;

22    is that right?

23            MR. BARKER:  Object to form.

24    BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'm highlighting it on the

2    screen for you --

3    A.    Right.  That is what our

4    order monitoring report or program does.

5    Q.    Okay.  Now moving to the JOM

6    suspicious order report.  The first

7    bullet says, "BW report is generally

8    completed by 4:00 p.m."

9              What is the acronym BW stand

10   for?

11   A.    So it's an SAP terminology,

12   which is an IT system called Business

13   Warehouse.  We developed a report that

14   takes the last 12-month weekly order

15   average and factors in the three times

16   percent.  So when you're -- when you

17   review the definition above, that's

18   exactly what this BW report does, is all

19   the orders go through it, and history is

20   compared and is -- that one single order

21   is compared to this threshold.

22   Q.    When that one single order

23   is compared to threshold, how is that

24   order compared -- how is it broken down

1    in terms of at a SKU or SKU level of a

2    product?

3         A.    It is per customer, per DEA

4    license SKU.

5         Q.    So just so we're on the same

6    page, and I'm going to break that down

7    into layman's terms, or try to since I'm

8    not in your business, when that BW report

9    is run or generally completed at

10   4:00 p.m., and it's comparing a

11   particular customer's order against their

12   rolling 12-month per weekly order

13   average, it's comparing for particular

14   SKUs for particular drug types and drug

15   strengths against the same drug type and

16   drug strength in the new order; is that

17   right?

18        A.    Yeah, it takes the SKU,

19   which is that dosage formulation, and it

20   compares to the past 12-month rolling

21   average.

22        Q.    Okay.  So we are on the same

23   page then.  What it doesn't do,

24   therefore, and correct me if I'm wrong,

Highly Confidential - Subject to Further Confidentiality Review

1  is address if hypothetically a wholesaler

2  like a Cardinal, AmerisourceBergen, or

3  McKesson, had previously purchased

4  Duragesic at 50-milligram strength, but

5  in an ensuing order, present day, so to

6  speak, purchased at a 75-milligram

7  strength, your system wouldn't compare

8  the 75-milligram order being made in the

9  present tense to the 50-milligram orders

10  that had previously been made because

11  they are different SKUs or S-K-U-s; is

12  that right.

13          MS. BOODY:  Object to form.

14          THE WITNESS:  Yes.

15  BY MR. JANUSH:

16      Q.    I didn't hear you.  I'm

17  sorry.  Is that right?

18      A.    Yes.

19      Q.    And moving beyond a

20  different SKU issue, for example, a

21  strength issue with Duragesic, that might

22  be produced in multiple different

23  strengths, your order monitoring system

24  or suspicious order monitoring system

Highly Confidential - Subject to Further Confidentiality Review

1   also wouldn't have captured the aggregate

2   of opioid products sold to a wholesaler

3   customer and compared the aggregate order

4   history against the present day order;

5   isn't that also true?

6               MR. BARKER:  Object to form.

7   BY MR. JANUSH:

8        Q.    For example, to make this

9   more clear, we'll just speak in terms of

10  Nucynta and Duragesic.  Okay?

11       A.    Okay.

12       Q.    So if hypothetically

13  Cardinal purchased Duragesic

14  50-milligram, 2 cases of 24 patches last

15  month with one case of Nucynta ER -- and

16  this is obviously a hypothetical, because

17  Nucynta, I appreciate, was sold in 2016

18  or thereabouts.  Your system in a

19  hypothetical universe of 2012 wouldn't

20  have compared a new order by Cardinal,

21  where Duragesic was being purchased at

22  75 milligrams and Nucynta IR was being

23  purchased instead of Nucynta ER.

24  Those -- the past order and the current

Highly Confidential - Subject to Further Confidentiality Review

1    order, having completely different SKUs,

2    would not have been compared against each

3    other under your suspicious order

4    monitoring system; isn't that right?

5                    MR. BARKER:  Object to form.

6                    MS. BOODY:  Object to form.

7                    THE WITNESS:  Every order

8            that we received with a customer

9            based on the SKU is reviewed for

10           historical ordering of that SKU.

11           We do also take in context total

12           products that are shipped to

13           Cardinal and McKesson, and we

14           compare total products to

15           controlled substances.  We're

16           monitoring how much of controlled

17           substances they're ordering

18           compared to other of our J&J

19           products.

20                   So quarterly basis we're

21           reviewing that information.  So --

22           so we have more visibility to what

23           volume of controlled substances

24           are they ordering compared to

1   other J&J products.

2  BY MR. JANUSH:

3        Q.    Thank you for your

4  clarification.  I was speaking to

5  realtime monitoring.  And you just added

6  some answers that concerned quarterly

7  reviews, how you would use, as an

8  example, percent of controlled substances

9  against the percent of uncontrolled

10  substances as a metric to review sales to

11  a wholesaler, right?

12            MR. BARKER:  Object to form.

13            THE WITNESS:  We used that

14        to track if there's any trends of

15        controlled substances going up

16        compared with the total volume

17        going to the wholesaler.

18  BY MR. JANUSH:

19        Q.    Okay.  And that's a

20  quarterly review, right?

21        A.    It's done on a quarterly

22  basis.

23        Q.    Okay.  To answer my earlier

24  question, in realtime your system

Highly Confidential - Subject to Further Confidentiality Review

1    wouldn't have picked up or compared a

2    Duragesic 50-milligram case order against

3    a new order by the same purchaser of

4    Duragesic 75 milligrams; is that right?

5              MR. BARKER:  Object to form.

6              THE WITNESS:  The order

7          monitoring takes the order, the

8          SKU that they are requesting, and

9          compares the historical ordering

10         patterns of that SKU.

11   BY MR. JANUSH:

12         Q.    Of that SKU.  And of that

13   SKU means of that dosing, right?

14         A.    Yes.  That SKU is based on

15   the dosage.

16         Q.    Now, here we are in 2012.

17   And it shows, in your bullet that I'm

18   highlighting, "Once the reason for the

19   increase is received, then the customer

20   service will run a ValueTrak report that

21   will show the customer's inventory and

22   compare to the demand of the increase."

23              Do you see that?

24         A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      So earlier when I spoke

2    about knowing that you had outside data

3    vendors providing reports concerning

4    wholesalers' purchases of product, you

5    advised that you didn't know about that

6    until 2017.

7                This shows that outside

8    vendors were being utilized by customer

9    service in 2012; isn't that the case?

10       A.      What I had said is I did not

11   know that we had unblinded data to the

12   pharmacy level, that we did use ValueTrak

13   to understand the inventory levels at our

14   customers, the wholesaler.

15               (Document marked for

16       identification as Exhibit

17       Dempsey-5.)

18   BY MR. JANUSH:

19       Q.      I'm going to hand you what

20   I've marked -- that's the wrong one.

21   Let's see -- as Exhibit 5.  And this is

22   Bates number JAN-MS-03054480.

23               And it's an e-mail from Mike

24   Bulone to a host of folks at Johnson &

1    Johnson companies.

2             Do you see that at the top?

3        A.    Yes.

4        Q.    And it's dated March 17,

5    2013.  And it's addressing the CSOS

6    overview B.PowerPoint regarding the

7    attachment.

8        A.    Yes.

9        Q.    Do you recall a point in

10   time where J -- Johnson & Johnson was

11   moving from a manual 222 DEA order form

12   to an electronic-based order form?

13       A.    Yes, I do remember that we

14   moved from a paper based for the three

15   big wholesalers.

16       Q.    Okay.  Was it only for the

17   three big wholesalers that you moved from

18   paper-based forms to the electronic

19   forms?

20       A.    Yes.

21       Q.    So through the present day,

22   does Janssen use 222 forms for every

23   customer other than the three big

24   wholesalers?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, we still use Paper 222.

2    Q.    And when we speak about the

3  three big wholesalers, we're referring to

4  Cardinal, McKesson, and

5  AmerisourceBergen; is that right?

6    A.    Yes.

7    Q.    Okay.  What caused you to

8  still use 222s with all other wholesalers

9  that you sell to?

10    A.    They didn't request for

11  electronic.

12    Q.    So Cardinal,

13  AmerisourceBergen, and McKesson all

14  requested an electronic system?

15    A.    Yes.

16    Q.    And what was the purpose

17  of -- of those requests to the extent

18  that you know?

19    A.    From what I was aware, that

20  CSOS would be a streamlined process to --

21  for controlled substance Schedule II

22  ordering.

23    Q.    What does CSOS stand for,

24  C-S-O-S?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Controlled substance

2   ordering system.  I don't remember the

3   exact words.

4      Q.     I thought so as well.  I

5   just wanted to ask to clarify.

6            And I'd like to turn to the

7   attachment.  And the attachment -- let me

8   lift this up a bit, at page -- it's

9   actually Page Zero of the slide.  It's

10  the first page.  And it states, "JOM" --

11  and I apologize I didn't give you the

12  Bates number for.  The Bates number for

13  the attachment is JAN-MS-03115790.

14           And the attachment states at

15  the top, "JOM is the Pharma customer

16  service and distribution center for North

17  America with around 14 billion worth of

18  sales shipped every year."

19           Did I read that right?

20     A.     Yes, you did read it right.

21     Q.     And in the second bullet,

22  why don't you read the second bullet.

23     A.     "Last year JOM shipped

24  1.6 billion worth of Class II narcotic

Highly Confidential - Subject to Further Confidentiality Review

1    drug" -- "shipments."

2         Q.    Keep going.

3         A.    "Class II are drugs with

4    high potential for abuse with severe

5    psychological or physical dependency,

6    codeine, opium, et cetera.  In order to

7    comply with DEA regulations for Class II

8    shipments, the JOM team manually entered

9    22,000 line items on paper-based DEA 222

10   forms."

11        Q.    Do you agree with the

12   statement you just read?

13             MR. BARKER:  Object to form.

14             THE WITNESS:  I would offer

15        one clarifying point, that our

16        ADHD medicines which is a

17        psychotropic, he is throwing that

18        in here as well as Class II.

19   BY MR. JANUSH:

20        Q.    And with that caveat, do you

21   agree with all of the -- the language

22   included in Bullet 2 here?

23             MR. BARKER:  Object to form.

24             THE WITNESS:  I do.  If you

Highly Confidential - Subject to Further Confidentiality Review

1     include the psychotropics, I agree

2     with what is written here, that

3     this was Greg -- Mike -- what's --

4     what's being said in regards to

5     how many line items in 222

6     customer service was handling.

7  BY MR. JANUSH:

8     Q.   Okay.  Do you agree with

9  the -- what you also read, that Class II

10  drugs are drugs with high potential for

11  abuse with severe psychological or

12  physical dependencies, (codeine, opium,

13  et cetera)."

14     Do you agree with that?

15     MR. BARKER:  Object.  Object

16     to form.

17     THE WITNESS:  I -- I

18     agree -- I do not -- I agree with

19     what he wrote in regards to that

20     we handle Schedule II

21     psychotropics and narcotics, and

22     they are controlled substances

23     based on their high potential for

24     abuse.  That is why FDA and DEA

Highly Confidential - Subject to Further Confidentiality Review

1    has made them Schedule II

2    products.

3  BY MR. JANUSH:

4        Q.    Ma'am, I just asked if you

5  agreed that Class II are drugs with high

6  potential for abuse with severe

7  psychological or physical dependencies.

8  Do you agree with that?

9              MR. BARKER:  Object to form.

10             THE WITNESS:  Class --

11       Schedule II drugs are scheduled

12       based on their high potential for

13       abuse, yes.

14             I don't know where he got

15       the severe psychological and

16       physical dependencies.

17  BY MR. JANUSH:

18       Q.    Do you disagree with that

19  language?

20             MR. BARKER:  Object to form.

21             THE WITNESS:  I would have

22       worded it as drugs with high

23       potential for abuse or misuse.

24             So -- that -- that is why they are

1     Schedule II.

2          THE VIDEOGRAPHER:  Counsel,

3     you might have pulled down your

4     microphone.

5  BY MR. JANUSH:

6          Q.    I want you to turn to Page 4

7  of the slideshow, and address JOM

8  estimated business benefits.  This

9  appears to be the cost benefits of

10  switching to an electronic system from

11  the Form 222 system; is that right?

12          MR. BARKER:  Object to form.

13  BY MR. JANUSH:

14          Q.    You can review the whole

15  document if you need to, to answer that,

16  but --

17          A.    I'd like to.

18          This appears to be the

19  line -- the processes that are involved

20  in receiving, reviewing the Paper 222s,

21  and the cost benefit if you go to

22  electronic form.

23          Q.    All right.  Great.  So let's

24  skip down to, and I'll circle it in blue

1    ink for you, DEA compliance notification.

2    Current baseline quarterly.  Future

3    performance going to the electronic

4    system every 48 hours.

5              Do I have that right?

6         A.    Yes, you do.

7         Q.    Okay.  So what was the DEA

8    compliance notification that you were

9    then currently making quarterly?

10        A.     Every quarter we need to

11   provide ARCOS reports.  So what we're

12   saying is DEA only quarterly saw our

13   transactional data because we uploaded

14   our ARCOS data on a quarterly basis.

15   With CSOS, DEA has direct visibility.

16   Every 48 hours, they get realtime

17   transaction information from JOM.

18        Q.     Okay.  But they are only

19   able to get that for the big three,

20   AmerisourceBergen, Cardinal, McKesson; is

21   that right?

22        A.     The CSOS scope was only for

23   the big three.  The large -- the larger

24   transactions.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Incidentally, I missed that

2    within this entire CSOS background.  Can

3    you show me or point out where this was

4    limited to only the big three?  All I see

5    are words like wholesalers generally.

6         A.    All right.  So this was the

7    kickoff for the project.

8         Q.    Yep.

9         A.    We also followed the project

10   in our monthly compliance meetings for

11   suspicious order monitoring.

12        Q.    So in the kickoff, there's

13   no mention -- is there a mention that

14   this only concerned the big three?

15             MR. BARKER:  Object to form.

16             THE WITNESS:  I don't recall

17        if that was the intent.  I knew

18        the intent which prioritized

19        the -- the large wholesalers.

20   BY MR. JANUSH:

21        Q.    And to be clear, when I --

22   when I had this Page Zero, the cover page

23   out, and it was addressing last year JOM

24   shipped 1.6 worth of Class II narcotic

Highly Confidential - Subject to Further Confidentiality Review

1    shipments, JOM is not Noramco, correct?

2         A.    Yes.  They are not Noramco.

3         Q.    JOM is Johnson Ortho-McNeil,

4    correct?

5         A.    Yes.

6         Q.    And JOM, the bullet above

7    it, is the Pharma customer service and

8    distribution center for North America

9    with around 14 billion worth of sales

10   shipped every year.

11              This is referring to Johnson

12   & Johnson's pharmaceutical sales that are

13   shipped through JOM; is that right?

14              MR. BARKER:  Object to form.

15              THE WITNESS:  I don't know

16         if that was the intent of that

17         bullet or where this data came

18         from.  But it speaks to, I do know

19         that our two distribution centers

20         under JOM do handle the

21         pharmaceutical products of

22         Janssen.

23   BY MR. JANUSH:

24         Q.    Okay.  I'm just trying to

Highly Confidential - Subject to Further Confidentiality Review

1   delineate very clearly between when we're

2   speaking about JOM and when we're

3   speaking about Noramco.  Do you

4   understand that goal?

5           A.    Yes.

6           Q.    Okay.  And in this document,

7   you are -- not you, JOM is addressing

8   what JOM business is, right?

9           A.    Yes.  And as I mentioned

10  before, they lumped in Schedule II, the

11  psychotropic ADHD meds as well, instead

12  of just narcotics.

13          Q.    Okay.

14               (Document marked for

15               identification as Exhibit

16               Dempsey-6.)

17  BY MR. JANUSH:

18          Q.    I'm going to move to what

19  I've marked as Dempsey Exhibit 6.  This

20  is an e-mail string with an attachment.

21  This concerns communications between you

22  and Ron Kuntz that was then forwarded on

23  by Ron to Patricia Yap.  And I'm going to

24  read -- start by reading -- having you

1    read your e-mail in the middle of the

2    first page where you wrote to Ron, "I

3    just called my friend."

4              Why don't you start there?

5         A.    "I just called my friend

6    that retired in December from Purdue,

7    ex-DEA, that managed the relationship

8    with DEA during the OxyContin years, and

9    setup their suspicious order monitoring

10   program.  He was the one who went to

11   visit pharmacies with wholesalers.  I

12   attached benchmarking notes taken when

13   JOM chatted with the Purdue on the

14   suspicious order monitoring program last

15   year."

16        Q.    Now, let's just stop and

17   pause right there.

18              "I attached benchmarking

19   notes taken when JOM chatted with Purdue

20   on the SOM program last year."

21              Do you see that?

22        A.    Yes.

23        Q.    And that's not saying, "I

24   attached benchmarking notes when Noramco

1    chatted with Purdue on the SOM program

2    last year"; is that right?

3          A.     Right.  It was JOM.

4          Q.     Okay.  And again, as you

5    just testified moments ago, JOM is

6    different from Noramco, right?

7          A.     Yes.

8          Q.     Okay.  And reading below his

9    business card that's embedded in your

10   e-mail -- why don't you read below?

11         A.     "He met with sales force

12   with Purdue.  He also was the one that

13   called DEA when sales force found

14   suspicious doctors.  Law department gave

15   suspicious order monitoring training to

16   sales."

17               Continue?

18               "I am not sure of the

19   project scope.  Didn't give him any

20   details but said you may call him.

21   Please do.  You will enjoy it.  He was

22   widely respected in the New Jersey pharma

23   industry group."

24         Q.     Now, before I go any

1    further, do you remember proposing to Ron

2    Kuntz that Jack Crowley come in after he

3    retired from Purdue to pitch or address

4    the potential for a sales training

5    seminar for the sales folks to spot high

6    prescribers that might be suspicious?

7         A.    Can you repeat your

8    question?

9         Q.    Sure.  Jack Crowley was your

10   counterpart at Purdue, correct, in terms

11   of a suspicious order monitoring

12   compliance role that he played, right?

13              MR. BARKER:  Object to form.

14              THE WITNESS:  He was the

15         manager of controlled substance

16         compliance.  He was a leader

17         there.

18              MR. BARKER:  You need to

19         slow down.

20   BY MR. JANUSH:

21         Q.    Was he -- was he your

22   counterpart, your peer at Purdue?

23         A.    As far as I'm aware, yes.

24         Q.    And he is an ex-DEA

Highly Confidential - Subject to Further Confidentiality Review

1    employee, correct?

2            A.     Yes.  He retired from DEA.

3            Q.     And he ultimately, in or

4    around 2000 -- or in between 2012, March

5    of 2012 and this e-mail in June of 2013,

6    he -- well, actually it says it.  In

7    December of 2012, he retired from Purdue.

8            Do you recall that?

9            A.     Yes.

10           Q.     And he created a consulting

11   business.  Do you remember that?

12           A.     Yes.

13           Q.     And he advised you of his

14   ability to come into Janssen and create a

15   sales training seminar to teach sales

16   force, as he did at Purdue, how to spot

17   questionable prescribers of interest.

18           Do you remember that?

19           MR. BARKER:  Object to form.

20           THE WITNESS:  I remember

21       that Ron asked -- he was

22       evaluating that -- our suspicious

23       order monitoring program.  And I

24       suggested that he talk to Jack.  I

Highly Confidential - Subject to Further Confidentiality Review

1          wasn't involved in the meetings

2          or -- so I just forwarded his

3          information.

4                So what the content, I

5          was -- I was not really involved

6          with those meetings with Ron.

7                So he asked for who can give

8          him advice on understanding

9          what -- what is typical.  And I

10         provided a source for him.

11    BY MR. JANUSH:

12         Q.   I don't understand your

13    answer.  What is typical for what?

14         A.   So as we were preparing for

15    Nucynta, I was asked, did I know anybody

16    in industry that could provide

17    information on what's done with the sales

18    force in regards to training.

19         Q.   Okay.  And you provided Jack

20    Crowley --

21         A.   Yes.

22         Q.   -- as a reference?

23         A.   Right.

24         Q.   Okay.  And what follows in

Highly Confidential - Subject to Further Confidentiality Review

1    this same string from June of 2013 on the

2    very next page is your earlier e-mail to

3    Michael Levitt of March 21, 2012.

4                 Do you see that?

5         A.    Yes, I do.

6         Q.    And this is concerning that

7    you scanned your nine pages of notes.

8    "Up to you to complete a summary and

9    share with JOM.  Nice job.  Don't you

10   think?"

11                You wrote that, right?

12                MR. BARKER:  I think you

13       misread that.

14   BY MR. JANUSH:

15        Q.    "I scanned my nine pages of

16   notes...  up to you to compile" -- my

17   apologies --

18        A.    Compile.

19        Q.    -- not complete -- "compile

20   a summary and share with JOM...  nice

21   job, don't you think?"

22                Did I read that accurately?

23        A.    You did read that

24   accurately.

Highly Confidential - Subject to Further Confidentiality Review

1   Q.   Okay.  And who is Michael

2   Levitt?

3   A.   He was the DEA compliance

4   manager for JOM.

5   Q.   Was he under you?

6   A.   Yes.

7   Q.   So you were the DEA -- you

8   were the -- excuse me -- the director of

9   controlled substance compliance, and

10  Michael Levitt was your -- a direct

11  report of yours who managed DEA

12  compliance?

13  A.   Yes.

14  Q.   Okay.  And following below

15  that is March 21, 2012, e-mail from Jack

16  Crowley, while he was at Purdue, to you

17  and Michael Levitt addressing the

18  pre-meeting that was had on March 20th;

19  is that right?

20  A.   Yes, this is the

21  pre-meeting, what he wanted to cover at

22  the meeting.

23  Q.   Okay.  And going to the

24  bottom of the page, or the middle of the

1    page, he's addressing some background

2    information that, "Purdue enhanced its

3    order monitoring program beginning in

4    early 2008."

5            Do you see that?

6       A.    Yes, I do.

7       Q.    And then he addressed formal

8    monitoring meetings that were held with

9    various wholesalers; is that right?

10       A.    The authorized distributors,

11    yes.

12       Q.    Okay.  And we'll skip

13    forward to the attachment, which is

14    Bates-stamped JAN-MS-03115790.

15            These are the nine pages of

16    notes that you addressed with Michael

17    Levitt that you attached to the e-mail,

18    aren't they?

19          MR. BARKER:  Object to form.

20       You've got a gap in your Bates

21       numbers in this document.

22          MR. JANUSH:  Yes, I do.

23       It's due to the whole production

24       fight that we fought over.  You

Highly Confidential - Subject to Further Confidentiality Review

1      may recall how these were

2      produced -- originally withheld as

3      nonresponsive, and then produced.

4      There was a reason for pushing

5      back this deposition.

6             So unfortunately --

7             MR. BARKER:  This is one of

8      them?

9             MR. JANUSH:  This is one of

10     those documents that Seth Baglin

11     said could not reproduce it in the

12     correct Bates range.  I would have

13     liked it to have been done right

14     as well.

15   BY MR. JANUSH:

16        Q.    Going back to my question.

17   These are your nine pages of notes from

18   my --

19        A.    This looks like my

20   handwriting and my notes, yes.

21        Q.    Okay.  And from a -- from a

22   3/20/12 pre-meeting, at the top.  Those

23   are your notes from the pre-meeting; is

24   that right?  Right?

1          And then moving to the

2   bottom, 3/21/12, that's the more complete

3   in-person meeting; is that right?

4          A.    Yes.

5          Q.    And this concerns what is

6   stated in the earlier e-mail when you

7   wrote to Ron Kuntz about your notes from

8   when JOM benchmarked with Purdue, right?

9          A.    These are the notes that I

10  took when we benchmarked with Purdue on

11  their suspicious order monitoring

12  program, and it was attached to the

13  e-mail that I sent to Ron Kuntz.

14          MR. JANUSH:  Not answering

15      my question specifically.  So I'm

16      going to move to strike as

17      nonresponsive.  I'm focusing on

18      JOM.

19  BY MR. JANUSH:

20          Q.    My question was, this

21  concerns what is stated in the earlier

22  e-mail when you wrote to Ron Kuntz that

23  you were attaching notes from when JOM

24  benchmarked with Purdue, right?  Just

Highly Confidential - Subject to Further Confidentiality Review

1    asking for a yes or no here.

2        A.    Yes, these are the notes in

3    reference, yes.

4        Q.    Not from when Noramco

5    benchmarked with Purdue.  From when JOM

6    benchmarked with Purdue, right?

7        A.    Yes, JOM.

8        Q.    Okay.  We're going to go

9    through some of these notes.  All right?

10        A.    Mm-hmm.

11        Q.    And really, what my goal

12    here is to just figure out what -- what

13    information was conveyed by Mr. Crowley

14    and Purdue and perhaps other attendees to

15    JOM and you and your colleagues during

16    this meeting.

17              So first, in the pre-meeting

18    on March 20th, 2012, Mr. Crowley or

19    someone, appears to have stated, "Purdue

20    has a contract with wholesalers to buy

21    sales data."

22              Do you see that?

23        A.    Yes, I do.

24        Q.    Did you inquire as to what

1    that actually means in practice, who the

2    contract is with with wholesalers to buy

3    sales data?

4          A.    No.

5          Q.    Do you know if Purdue had a

6    contract with Cardinal,

7    AmerisourceBergen, and McKesson to buy

8    sales data?

9          A.    No.

10          Q.    Never inquired?

11          A.    No.

12          Q.    And next statement is,

13    "Design a system so that they get

14    realtime information about wholesaler

15    sales."

16                Do you see that?

17          A.    Yes.

18          Q.    Did you -- was this just

19    informational as setup for the next day,

20    or did you get into a discussion

21    regarding how Purdue designed a system so

22    that they could get realtime information

23    about wholesaler sales?

24          A.    This was just a high level

1  discussion point of elements that we were

2  going to discuss at the benchmark

3  meeting.

4        Q.    Got it.  So let's just then

5  move forward to the benchmark meeting if

6  these elements are covered therein.

7             We'll go to the bottom of

8  the page, 3/21/2012.  Stephen Seid

9  executive director, national accounts,

10 Purdue, was present; is that right?

11       A.    Yes.

12       Q.    Jack Crowley, Controlled

13 Substances Act compliance, Purdue.  And

14 Rebecca Lyons listed as a VP of JOM.

15 What was Rebecca Lyons' role?

16       A.    She had accountability for

17 the two distribution centers.  I forget

18 exactly what her title was.  But the

19 operations reported in to her.

20       Q.    Okay.  Mike Levitt, he is

21 who we discussed earlier that was a DEA

22 compliance manager?

23       A.    Yes.

24       Q.    How about Bruce Keale?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     Finance on the leadership
2   team at JOM.
3          Q.     Why would finance have been
4   involved in this benchmarking meeting?
5          A.     I wanted all the leaders to
6   understand the requirements of suspicious
7   order monitoring.
8          Q.     Okay.  How about Greg
9   Wolski?
10         A.     He was at the time, 2012,
11  customer service.
12         Q.     All right.  And so, would it
13  have been -- let's move to the next page
14  ending in Bates number 03115791.  And it
15  says, "Purdue enhanced in 2008, designed
16  program to characterize data exposure to
17  retail data, 'know your customers'
18  customer."
19               Do you see that?
20         A.     Yes, I do.
21         Q.     So here you were in 2012, in
22  March, specifically March 21, 2012,
23  benchmarking with Purdue, right?
24         A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And you were learning that

2  Purdue, in 2008, designed their

3  suspicious order monitoring program to

4  characterize data exposure to retail data

5  to know your customers' customer.  Is

6  that also right?

7            MR. BARKER:  Object to form.

8            THE WITNESS:  That is --

9      that is what Purdue relayed to us.

10  BY MR. JANUSH:

11     Q.    Janssen didn't follow

12  Purdue's benchmark, did they?

13            MR. BARKER:  Object to form.

14  BY MR. JANUSH:

15     Q.    You can answer.

16     A.    We -- we -- our system

17  provided the data that DEA had requested

18  from us.  And we had no -- with our

19  multiple engagements with DEA in -- in

20  2013, we talked about this, you know, and

21  we were not -- the DEA did not expect

22  that information from us at that time,

23  for our Duragesic and Nucynta.

24            Q.    That was a great answer to a

Highly Confidential - Subject to Further Confidentiality Review

1    question I never asked so I'm going to

2    move to strike as nonresponsive.

3              Do you remember my actual

4    question?

5              MR. BARKER:  Object to form.

6              THE WITNESS:  Yes.  You

7         asked if JOM implemented a know

8         your customers' customer --

9    BY MR. JANUSH:

10        Q.    No, that's not what I asked.

11   I said Janssen didn't follow Purdue's

12   benchmark, did they?

13             MR. BARKER:  Object to form.

14             THE WITNESS:  We --

15        actually, this entire benchmark we

16        did incorporate some of the

17        recommendations --

18   BY MR. JANUSH:

19        Q.    We'll get there.

20        A.    -- but the specific know

21   your customers' customer, we did not

22   include it as an enhancement to our

23   system at that time.

24        Q.    Okay.  Did you include know

1    your customers' customer in order to get

2    data exposure to retail data at any time

3    into your suspicious order monitoring

4    realtime system?

5         A.    There were some cases where

6    we attempted to use our 867 data to see

7    where our Duragesic and Nucynta was

8    going.  But because it was blinded, it

9    was a challenge.

10        But it was only when we --

11   we were always monitoring the landscape.

12   And if for example, we heard about

13   Lakeland, Florida, we did do some

14   analysis of the data as best we could to

15   determine how much we were shipping to

16   that region, to see if there was any

17   suspicious activity.  So we did try to

18   use our 867 data, but it wasn't a routine

19   data that was reviewed constantly.  It

20   was used when we needed to investigate a

21   questionable order or if -- if we heard

22   through the news that there was a region

23   that was in question.

24        Q.    Stated differently.  Janssen

Highly Confidential - Subject to Further Confidentiality Review

1  and JOM didn't incorporate retail level

2  data points into its realtime suspicious

3  order monitoring protocol, correct?

4          MR. BARKER:  Object to form.

5          THE WITNESS:  No.  We did --

6      we had an order monitoring

7      algorithm that did not include

8      retail data.

9  BY MR. JANUSH:

10     Q.    And moving down to the

11  middle of the page.  It says, "Need

12  relationship with DEA.  Send message to

13  DEA so they know what you're doing and

14  they will leave you alone."

15         Do you see that?

16     A.    Yes, I do.

17     Q.    Now, I'm going to move on to

18  the following page.  And here Jack

19  Crowley is advising that the SOP at

20  Purdue had to be strengthened.  Am I

21  right?

22     A.    That is the note that I

23  took.

24     Q.    And he addressed what SOM

Highly Confidential - Subject to Further Confidentiality Review

1    committee looked like, with a

2    chairperson, VP general counsel, a VP

3    corporate secretary chief, an executive

4    director DEA, and Steve, as the national

5    accounts -- that's -- that's talking

6    about Stephen Seid, right, or Seid?

7           A.    I don't know if it's --

8           Q.    Who was involved in your

9    meeting with you?

10               We addressed his name at the

11   front page of attendees?

12          A.    Stephen, okay.

13          Q.    Is that right?

14          A.    I would assume yes.

15          Q.    Okay.  A director of

16   suspicious order monitoring program,

17   security investigation.

18               What is this?  I couldn't

19   read it.  It says attorney and I couldn't

20   make out, is that an "on" or "or

21   prescriber"?

22          A.    I don't recall what that is.

23          Q.    It's your handwriting.  I'm

24   just asking if you can make it out.

Highly Confidential - Subject to Further Confidentiality Review

1          A.    No.  It looks like attorney

2     on prescriber.

3          Q.    What would that mean?

4               MR. BARKER:  Object to form.

5               THE WITNESS:  I don't

6     recall.

7     BY MR. JANUSH:

8          Q.    And then professional reps

9     from sales force and systems are the last

10    folks that were on this committee; is

11    that right?

12         A.    Yes.

13         Q.    Okay.  And some of the

14    things that you were told during this

15    benchmark included meet monthly -- I'm

16    going to circle it.  Discuss trends.

17    Focus on certain accounts or hot spot

18    areas.

19               Do you see that?

20         A.    And in this, I know what

21    this -- I did not know what the trade

22    individual was talking about.  But in

23    this case, that is diversion hot spot

24    areas.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Isn't it also a hot spot

2  area an area that got a high prescribing

3  rate of opioids?

4      A.     I don't know.  At this time

5  it was those areas where there were

6  abuse, hot spots.

7      Q.     And --

8      A.     That was my -- my

9  interpretation from 2012.

10     Q.     And -- and isn't hot spot

11  areas where there is a high amount of

12  abuse and diversion correlated to hot

13  spot areas where there's a high amount of

14  prescribing?

15     A.     I don't know that data to --

16  to make an answer on that.

17     Q.     And it says, "Look at all

18  products."

19            Do you see that?

20     A.     Yes.

21     Q.     "Have an agenda."  Do you

22  see that?

23     A.     Yes.

24     Q.     At this time in March of

1    2012, you were being guided that Purdue

2    looks at all products when -- when it

3    revises its suspicious order monitoring

4    standard operating procedures, right?

5                    MR. BARKER:  Object to form.

6                    THE WITNESS:  That is what

7           they reviewed to us.

8    BY MR. JANUSH:

9           Q.    And earlier you and I were

10   discussing the concept of Janssen or JOM

11   only looking and running its suspicious

12   order monitoring calculation against the

13   same SKU so that an order would come up

14   as suspicious when the same SKU was

15   compared against a prior order involving

16   that specific product and strength, i.e.,

17   SKU.  Remember that discussion?

18          A.    I do remember that

19   discussion.

20          Q.    Okay.  Purdue was doing it

21   differently, weren't they?

22                    MR. BARKER:  Object to form.

23                    THE WITNESS:  I don't recall

24          if what he was talking about was

1    all of Purdue's products, meaning

2    controlled and noncontrolled, or

3    if they meant at the drug class.

4         It was a high level

5    discussion.  We didn't get into

6    the detail of what they actually

7    looked at in regards to all the

8    products.

9    BY MR. JANUSH:

10        Q.    Okay.  And it says, "Between

11   meetings meet with wholesalers, orders

12   looked at daily basis"; is that right?

13        A.    That's what it says.

14        Q.    "Channel strategy, 866 data,

15   orders monitored reach out.  Order arrow,

16   use day-to-day ValueCentric data to send

17   message when doesn't meet guidelines."

18             What does that mean, "to use

19   day-to-day ValueCentric data to send

20   message when it doesn't meet guidelines"?

21        A.    What that means is because

22   we had visibility to what the

23   wholesalers' inventory at their DC is

24   with this ValueCentric data, if a

1    questionable order comes in that doesn't

2    meet the typical ordering pattern or

3    volumes, we use this data to -- before we

4    reach out to the customer because their

5    order does not meet what they currently

6    have in inventory that -- that they --

7    the questionable order amount doesn't

8    appear to be needed.  That's what that

9    means.  And --

10        Q.    It says, "Use day-to-day

11   ValueCentric data to send message when

12   doesn't meet guidelines."

13             Was -- was there a way to

14   send message within ValueCentric?

15        A.    No.  This was -- customer

16   service.

17        Q.    He just meant to send -- he

18   just meant to send the message that

19   something is amiss?

20        A.    Yes.

21        Q.    What does it mean when you

22   wrote, "Different" -- when you took the

23   notes, "Different algorithm for SC-867

24   data"?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I don't recall.

2          Q.    What is SC?

3          A.    I don't remember.

4          Q.    "Trend prescriber data."

5    You know what this means, don't you?

6          A.    Yes, I do.

7          Q.    What does it mean?

8          A.    I am -- what he was saying

9    at a high level, that Purdue does use

10   prescriber data and analyze where it's

11   coming from.

12         Q.    In other words, they were

13   looking at prescriber data as a potential

14   red flag, right?

15              MR. BARKER:  Object to form.

16              THE WITNESS:  It appears

17        that they were for their products.

18   BY MR. JANUSH:

19         Q.    And Janssen and JOM were not

20   doing that, correct?

21              MR. BARKER:  Object to form.

22              THE WITNESS:  No, for our

23        Duragesic and Nucynta and other

24        scheduled products, we did not do

Highly Confidential - Subject to Further Confidentiality Review

1          trend analysis on the prescriber

2          data as I previously said.  We

3          stopped at the wholesaler.

4     BY MR. JANUSH:

5          Q.    Did you know that your sales

6     group was doing trend analysis on its

7     higher prescribers of Nucynta and

8     Duragesic?

9          A.    I did not know.

10         Q.    Did you know that Janssen

11    was ranking its high Duragesic

12    prescribers and calling them Duragesic

13    loyalists in spreadsheets that were

14    shared with the sales force?

15         A.    No, I did not know that.

16         Q.    Did you know that Janssen,

17    while you were head of controlled -- you

18    still are, but while you were director of

19    controlled substance compliance, was in

20    2013 and perhaps earlier ranking doctors

21    based on whether they were platinum,

22    gold, silver, or bronze, based on how

23    many long-acting and short-acting Janssen

24    opioid products they were writing?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BARKER:  Object to form.

2          THE WITNESS:  No.

3 BY MR. JANUSH:

4          Q.    Is that information that you

5 would have wanted to know after meeting

6 with Jack Crowley and given -- been given

7 benchmarking guidance about looking at

8 prescriber data trends?

9          A.    No.  I was responsible for

10 ensuring our order monitoring process was

11 giving what DEA requested.  And through

12 numerous engagements, every two to

13 three years we reviewed our program with

14 DEA.  And they expected the wholesalers

15 to get that information.  You know, we

16 asked for recommendations, and they never

17 told us that they needed that information

18 from us.

19          Q.    Is it at all possible, have

20 you contemplated the fact that the DEA

21 might not have known what Janssen's

22 internal capabilities were in 2012 and

23 after?

24          MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  I don't know

2         how to answer that.

3    BY MR. JANUSH:

4         Q.    Let me ask it differently.

5    In meeting with the DEA, did you ever

6    say, "Hey, DEA, our sales folks are

7    tracking the highest, hottest prescribing

8    doctors in hot spot areas, and we target

9    them for sales.  Do you want us to be

10   looking at those doctors to be analyzing

11   them as part of our suspicious order

12   monitoring program?"

13              Did you ever do that?

14              MR. BARKER:  Object to form.

15              THE WITNESS:  I only learned

16        from you right now that we had

17        that information.  Therefore, no,

18        I would not have reported that to

19        DEA, because I did not -- I was

20        not aware of that information.

21   BY MR. JANUSH:

22        Q.    But you're not the only

23   employee at JOM and Janssen that would

24   have had knowledge about how marketing

Highly Confidential - Subject to Further Confidentiality Review

1    was done and how doctors were being

2    tracked for high prescribing status, were

3    you?

4                    MR. BARKER:  Object to form.

5                    THE WITNESS:  I am a

6          controlled substance compliance

7          leader.

8    BY MR. JANUSH:

9          Q.    Right.

10         A.    And I am -- I only get -- I

11   only see the processes that are required

12   from DEA.

13         Q.    Let's go back to the first

14   page of the e-mail.  This e-mail

15   concerning your notes about benchmarking

16   with Purdue and Jack Crowley, ex-DEA, and

17   addressing Purdue's SOM system that was

18   revised in '08 made it to Ron Kuntz,

19   product director of the pain franchise,

20   right?

21         A.    I did forward it to him.

22         Q.    And Ron forwarded notes with

23   an FYI to Patricia Yap or Trish Yap,

24   right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. BARKER:  Object to form.
 2                    THE WITNESS:  Well, I am not
 3          on this e-mail --
 4   BY MR. JANUSH:
 5          Q.    But you see --
 6          A.    -- so I never received --
 7          Q.    You can see that now, right?
 8          A.    I can see that it was
 9   forwarded.
10          Q.    Sorry.
11                    MR. BARKER:  You need to let
12          her answer too.
13                    MR. JANUSH:  My apologies.
14   BY MR. JANUSH:
15          Q.    And you know who Patricia
16   Yap is, right?
17          A.    No, I do not.
18          Q.    Did you know that Patricia
19   Yap was one of the most senior executives
20   in sales and marketing in the pain
21   franchise?
22                    MR. BARKER:  Object to form.
23                    THE WITNESS:  I just said I
24          didn't know who she was.
```

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. JANUSH:

2      Q.    We'll go to the bottom of

3  this page ending in 793 addressing zip

4  codes, "Prescribers of concern.  Do

5  targeting zip code pharmacies.  If had

6  CVS and Walgreens, would be benefit."

7          That's referring to if we

8  had CVS and Walgreens' data unblinded,

9  that would be a benefit; is that right?

10     A.    At the time, the word

11 "unblinding" wasn't --

12     Q.    No, I know, but I'm saying

13 the intent of what this is capturing.

14     A.    The intent, yes.

15     Q.    Right?  I have this correct.

16          So it is, though,

17 addressing, "Zip codes, prescribers of

18 concerns.  Do targeting zip code

19 pharmacies."

20          Do you see that?

21     A.    Yep.

22     Q.    And so Purdue was reviewing

23 prescribers of concern and targeting zip

24 code pharmacies, right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    That is what it says.

2    Q.    Janssen and JOM were not,

3  correct?

4    A.    Our program --

5    Q.    You can give me the

6  monologue.  But I'm asking if they were

7  not, yes or no.

8    A.    We were not.

9    Q.    Okay.  Flipping to the next

10  page.  "852 data, ordering pattern,

11  deviants in order data SKU.  867 data

12  suspicious, occasion limit wholesalers."

13        Did I read this correctly

14  what I'm boxing in?

15    A.    Yes.

16    Q.    So at this time in 2012,

17  Purdue is addressing that when they

18  redesigned their 2008 SOM system, this is

19  information that was included in the

20  standard operating procedures; is that

21  right?

22    A.    I don't know if it was

23  included in their SOPs, but they said

24  this is what they consider in their

Highly Confidential - Subject to Further Confidentiality Review

1    process.

2         Q.    Got it.

3         A.    I didn't review SOPs.

4         Q.    Understood.  Then below

5    there's a note, "Sensitive to

6    wholesalers' relationship.  Purdue rarely

7    called and said concerned about account,

8    seen it before, will cut orders to

9    wholesalers."

10             Can you elaborate on that

11   part of the discussion?

12        A.    Looking at it all these

13   years, I don't recall what the discussion

14   was about.

15        Q.    Okay.  Was Janssen and JOM

16   concerned about their wholesalers'

17   relationships as well --

18             MR. BARKER:  Object to form.

19   BY MR. JANUSH:

20        Q.    -- when it came to notifying

21   wholesalers about suspicious orders?

22             MR. BARKER:  Object to form.

23             THE WITNESS:  Our process,

24        we already engaged the wholesalers

Highly Confidential - Subject to Further Confidentiality Review

1       whenever a questionable order was

2       discovered.  So we had no concern.

3       We reached out, and if necessary

4       engaged trade to reach up to the

5       wholesaler leaders to make sure

6       that we had the justification and

7       documentation, or if there's -- if

8       an order was deemed suspicious.

9   BY MR. JANUSH:

10      Q.    Moving to the next page

11  ending in 795.  It states, "Uses SAP

12  algorithm whiz, tweaks algorithm

13  instantly."  This refers to the fact that

14  the Purdue system, the computer algorithm

15  that runs the suspicious order monitoring

16  math could be tweaked instantly; is that

17  right?

18          MR. BARKER:  Object to form.

19          THE WITNESS:  We didn't get

20      into the details of their actual

21      algorithm.  So I don't -- I wrote

22      what they said, that -- apparently

23      they said tweaks instantly.

24  BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And you did get into

2    the system enough to see it, looking at

3    it on their screen, right?  That's what

4    follows next; is that right?

5    A.    No.  I just took notes.

6    They said looking on the screen.  They

7    didn't show us the screen.

8    Q.    Got it.

9    A.    So he said, "Looking at the

10   screen, you'd see" -- I apologize.  I

11   didn't give that detail there.

12   Q.    Okay.  Go ahead.

13   A.    They did not show -- it was

14   a phone call.  There was nothing -- by

15   then there was no WebEx or sharing.

16   Q.    Understood.  So why don't

17   you read what he stated looking at their

18   screen, what they could see?

19   A.    "Can see largest purchaser,

20   total sales."  I don't know what W stands

21   for.  Apologies.  I don't remember.  "How

22   many orders per day and strength info."

23   Q.    Keep going.

24   A.    "Compare three months, six,

1    nine, 12.  Room for committee to make

2    comment categories, pending, complete,

3    refer with wholesaler to DEA."

4         Q.    And now I'm just going to

5    skip forward to the page ending in 796.

6    And going to address, at the bottom, it

7    looks like information that was being

8    conveyed about what to look for.

9              But why don't you describe

10   what this is referring to.  It says,

11   "Number of prescriptions per month,

12   number for your product in month for

13   certain strength, number paid by cash.

14   DEA can figure out by NDC and number who

15   made it.  If 95 percent in cash is an

16   indicator."

17             What's that referring to?

18        A.    I don't recall.  I mean,

19   just looking at this, it looks like one

20   of the red flags about the cash.

21        Q.    Okay.  And then -- and then,

22   "Rebate reports, systems.  See what's

23   distributed, paid by cash."  How were

24   rebates reports and systems being used by

1   Purdue as a potential red flag alert?

2            MR. BARKER:  Object to form.

3            THE WITNESS:  I don't know

4        how they -- I don't -- I didn't

5        see SOPs.  He just mentioned it as

6        I guess one of the elements that

7        they consider in their program.

8   BY MR. JANUSH:

9        Q.    Okay.  And in their program,

10  he's addressing at the bottom of Page

11  797, "Guidelines set up at ValueTrak

12  system.  Tracks order variation versus

13  parameters.  Agreements include order

14  variations.  If new customer, holiday, or

15  year-end, there will be a variation.

16  Know" -- I can't see if that says, "how

17  look at it," or what that's referring to.

18       A.    "Know we look at it."

19       Q.    "Know we look at it.  They

20  call Purdue so order is not held up."

21            So was the ValueTrak system,

22  as you understood it, embedded into

23  Purdue's suspicious order monitoring

24  system?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. BARKER:  Object to form.

2           THE WITNESS:  I don't know.

3       All I know is that they used the

4       data.

5   BY MR. JANUSH:

6           Q.    Okay.

7           A.    And how it was used, I do

8   not know.

9           Q.    I think the answer's on the

10  top of the next page.  And you might have

11  known it then, but maybe this will

12  refresh your recollection.

13          A.    Thank you.

14          Q.    You wrote, "ValueTrak, data

15  fed into their own system, more robust

16  than ValueTrak system.  Use all inhouse

17  resources."

18          Did I read that right?

19          A.    Yes.  It looks like they

20  came up with their own program.

21          Q.    But that they fed ValueTrak

22  data into their system.  Do you see that?

23          A.    Yes.

24          Q.    Okay.  JOM and Janssen did

Highly Confidential - Subject to Further Confidentiality Review

1    not do that between your meeting,

2    benchmarking meeting on March 21, 2012,

3    and at least January of 2018; is that

4    right?

5            A.    No, we did not.

6            Q.    We'll move off this

7    document.

8                  (Document marked for

9            identification as Exhibit

10           Dempsey-7.)

11   BY MR. JANUSH:

12           Q.    I'm going to hand you what

13   I've marked as Exhibit 7.

14                 And this is an e-mail from

15   you.  Forgive the print.  This is how it

16   came, in this horizontal small font.

17                 And it's to John Daly

18   regarding mark DEA reports and meeting

19   minutes.  And it's attaching multiple

20   attachments.  I'm going to read them out.

21                 Compliance security

22   considerations in 2013 PDF.  How to

23   maintain an anti-diversion program in

24   PDF.  State of the industry DEA

1    compliance in PDF.  The core of

2    compliance reconciliation and

3    documentation in PDF.

4              And you wrote, after a

5    lead-in sentence or paragraph, "Here is

6    our opportunity at the DEA PDMA

7    conference" -- and let me stop right

8    there.  PDMA refers to Buzzeo PDMA,

9    right?

10        A.    Yes.

11        Q.    And -- and that's that

12   division of IQVIA, right?

13        A.    I believe it is now.

14        Q.    Okay.  And 13 would have

15   been a division of Cegedim, right?

16              MR. BARKER:  Object to form.

17              THE WITNESS:  I lost track.

18        I know it was Dendrite.  It might

19        have been at that time.

20   BY MR. JANUSH:

21        Q.    Yeah.  So let me read it

22   again.

23              "Here is our opportunity at

24   the DEA PDMA conference.  I heard a lot

Highly Confidential - Subject to Further Confidentiality Review

1    of industry speak to DEA compliance.

2    They reviewed their practices.  Check out

3    Slides 13/14... Industry practice...

4    Actavis/Watson."

5            Do you see that?

6        A.    Yes.

7        Q.    And then you attach the

8    PowerPoints that I was referring to

9    earlier.

10           These PowerPoints were at

11   least interesting enough to you

12   concerning anti-diversion and compliance

13   to forward them on to John Daly, correct?

14       A.    Yes.

15       Q.    Who is John Daly?

16       A.    He was the general manager

17   at Noramco Wilmington location.

18       Q.    Who what?

19       A.    He was the general manager

20   at the Noramco Wilmington, Delaware,

21   location.

22       Q.    Okay.  I didn't hear

23   Wilmington.  I apologize.

24       A.    He was also my boss.

Highly Confidential - Subject to Further Confidentiality Review

1      MR. JANUSH:  Incidentally on

2   the record at this moment I'd like

3   to call for production of each of

4   these PowerPoints.  They've been

5   withheld on grounds of

6   nonresponsiveness.

7      If they were important

8   enough for the witness to forward

9   on to her boss, they're responsive

10   enough for plaintiffs to get in

11   this litigation.

12      So we'd respectfully request

13   that Janssen take note of this.

14      MR. BARKER:  I don't know

15   that they have not been produced.

16   But your -- your statement is --

17      MR. JANUSH:  There may be

18   one of the four that have been,

19   but it's hard for me to

20   consolidate with the recent

21   reproduction that occurred.

22      But I know for a fact that

23   three of four have not been.

24      MR. BARKER:  Your comment is

Highly Confidential - Subject to Further Confidentiality Review

1      noted.

2            MR. JANUSH:  Thank you so

3      much.  I respect that.

4  BY MR. JANUSH:

5        Q.    I'd like to focus, before I

6  move off this document, on one

7  particular -- couple particular comments.

8  I'm circling it.

9            With regard to the core of

10  compliance reconciliation and

11  documentation, there's a note underneath

12  that that says, "The infamous Teva deck.

13  Slide 6 is when she spoke to API

14  manufacturers.  Your trash is other

15  people's treasure."

16            Do you remember that?

17        A.    Yes.

18        Q.    What did that mean, "Your

19  trash is other people's treasure"?

20        A.    In regards to these slide

21  decks, and why I sent it to my boss, it

22  had nothing to do with suspicious order

23  monitoring.  It was in response to

24  effective controls in the API

1   manufacturing building.

2              So it was reenforcing how

3   important it is to have access control,

4   make sure that there's two people at all

5   times, and preventing and making sure

6   that any liners or any packaging

7   equipment that could have come in contact

8   with API is properly disposed, because

9   your trash could be somebody's treasure

10  if there is residual API.

11       Q.    And thank you for that

12  clarification.

13              And with respect to how to

14  maintain an anti-diversion program, you

15  wrote, "And finally a good overall deck

16  on DEA compliance.  Key slides to review,

17  39 to 47 and 54."

18              That's your comment written

19  in this e-mail; is that right?

20       A.    Yes.

21       Q.    Okay.  And do you know who

22  produced the -- the deck, how to maintain

23  an anti-diversion program, do you

24  remember that offhand?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Apologies, I don't recall.

2     Q.     Okay.  How about the next

3  one, state of the industry DEA

4  compliance?  Do you remember who

5  presented that?

6     A.     I'm guessing it was one of

7  the Buzzeo consultants, but I don't know

8  who.

9     Q.     Okay.  Moving on to Slide 8.

10  I mean, excuse me.  Exhibit 8.

11        (Document marked for

12        identification as Exhibit

13        Dempsey-8.)

14  BY MR. JANUSH:

15     Q.     This is a document, an

16  e-mail, Bates number JAN-MS-02963560.

17        And this is from April 29,

18  2013, and it's addressing, I'll represent

19  to you by going to the very back page,

20  the second page, that "Nucynta and

21  Nucynta ER demand was slightly up last

22  week at the wholesaler.  And one that

23  stuck out a bit more is Injured Workers

24  Pharmacy."  It provides the address.

Highly Confidential - Subject to Further Confidentiality Review

1    "They buy about 20,000 worth of Nucynta

2    and Nucynta ER per week.  You may want to

3    research them.  Our co-op can pull their

4    buying history if desired.  Regards,

5    Greg."

6              Do you see that?

7         A.   Yes, I do.

8         Q.   And that's -- again, that's

9    Gregory Wolski, right?

10        A.   Yes.

11        Q.   And his role was what, can

12   you remind me?

13             MR. BARKER:  Object to form.

14             THE WITNESS:  At this time

15        he was head of planning channel

16        ops.

17   BY MR. JANUSH:

18        Q.   Okay.  And so he's

19   highlighting this Injured Workers

20   Pharmacy.  Did you know whether that

21   Injured Workers Pharmacy is an

22   internet-based pharmacy?  Do you know

23   that?

24        A.   I don't know.

Highly Confidential - Subject to Further Confidentiality Review

1           MR. BARKER:  Object to form.

2   BY MR. JANUSH:

3           Q.    Okay.  And Greg is asking

4   Shweta Raval, "Hi Shweta, can you please

5   pull an 867 report for the customer," and

6   provided Injured Workers Pharmacy

7   information.  Do you see that?

8                I'm putting it on the

9   monitor.

10          A.    Yep.

11          Q.    Okay.  And then -- that's on

12  April 16, 2013, right?

13          A.    Yes.

14          Q.    And nine days later you're

15  following up, "Did we ever review the

16  output of the 867 report," right?

17          A.    Yes.

18          Q.    And on the tenth day, Greg

19  forwards or says, "Here is the 867 data

20  for the customer, all products including

21  controlled substances."

22               Did I read that right?

23          A.    Yes.

24          Q.    And your answer on

1  April 29th, which is 13 days after the

2  report was requested to be pulled, "Not

3  quite sure what I'm looking at, but

4  seeing high volume of CS with tramadol

5  and Flexeril has me wanted to know more."

6          Did I read that right?

7      A.    Yes, you did.

8      Q.    Okay.  All right.  What did

9  you do when you wanted to learn more, if

10  anything?

11          MR. BARKER:  Object to form.

12          THE WITNESS:  Typically we

13      review it at the monthly

14      compliance meeting or we'd have a

15      meeting to review it.  And I don't

16      recall exactly for this, what was

17      done.

18  BY MR. JANUSH:

19      Q.    We -- we couldn't find

20  anything in your production, in your

21  company's production that addressed the

22  outcome of this investigation.

23          Would it be typical to have

24  a memo memorializing when a customer

1    raised a red flag of concern significant

2    enough to populate over a year of 867

3    data to review that customer?

4              MR. BARKER:  Object to form.

5              THE WITNESS:  It was not our

6         current procedure to document

7         these -- like I said, I was at a

8         meeting where they were showing

9         the number of shipments and my

10        request for more information.  It

11        wasn't, like, an order was picked

12        up as questionable.  So it was not

13        related to an order.  Orders are

14        documented, the investigation and

15        justification.  This was just a

16        question that provided me

17        additional information.  And

18        obviously we did not reply via

19        e-mail with our resolution.

20             (Document marked for

21        identification as Exhibit

22        Dempsey-9.)

23   BY MR. JANUSH:

24        Q.    I'm going to move on to

```
 1    Exhibit 9.  This is a document that was
 2    from your custodial file production.  The
 3    cover is Janssen Pharmaceutical Companies
 4    of Johnson & Johnson.  And the title on
 5    Page 1 is "Suspicious Order Monitoring,
 6    May 2015, JOM SOM Program."
 7              Did you personally create
 8    this slide deck?
 9         A.    I'm looking at the slides.
10    This is the slide deck that I prepared.
11         Q.    Okay.  Page 2.
12              I should have read into the
13    record by the way, the Bates number.
14    It's JAN-MS-02985441.
15              Turning to Page 2.  Title,
16    "JOM Suspicious Order Monitoring."
17              Can you read the first
18    bullet?
19         A.    "Companies are required to
20    design and operate a system that would
21    detect suspicious orders and report those
22    suspicious orders to DEA."
23         Q.    Okay.  And you agree with
24    that requirement, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BARKER:  Object to form.

2   BY MR. JANUSH:

3          Q.    I can ask it differently.

4                Do you agree with that

5   statement?

6          A.    Yes.

7          Q.    And you noted that JOM

8   program was initiated in 2006 is that

9   right?

10         A.    That is when we initiated

11  the BW report.

12         Q.    Okay.  And you further

13  note -- and I'm going to try to get

14  through this as quickly as I can.  It's a

15  long document.  But I only have like

16  eight areas to cover with you.

17               That -- "From 2006 through

18  first quarter of 2012, the program

19  involved using SAP to monitor historical

20  ordering patterns and flagging orders

21  exceeding three times the 12-month

22  rolling average."

23               Is that right?

24         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And QA is, what,

2  quality assurance?

3    A.    Yes.

4    Q.    And quality assurance falls

5  under what team?

6    A.    Quality assurance reports up

7  through to the quality officer, the chief

8  quality officer of J&J Supply Chain.

9    Q.    And is that under JOM?

10    A.    No.  Quality has their own

11  separate reporting organization that goes

12  up to Johnson & Johnson Supply Chain,

13  leadership.

14    Q.    So when you said reports

15  to --

16    A.    They don't report to the

17  local operations leadership.  They're a

18  separate -- separate entity for that

19  independent oversight, the quality that

20  FDA requires as well, you know.

21    Q.    So a quality assurance group

22  worked with customer service between

23  '06 -- 2006 and first quarter of 2012, to

24  complete investigation on each flagged

1   order; is that right?

2           A.    As the overseer of the

3   compliance program, if there was ever a

4   questionable order, it was -- QA were the

5   ones that would determine whether the

6   justification deemed it not suspicious

7   and the order could be released.  So

8   that -- they did work with customer

9   service to complete all of the

10  investigations on any questionable order.

11          Q.    How did you have personal

12  knowledge of this since you only started

13  in March of 2012?  How do you have

14  knowledge of what occurred between '06

15  and first quarter 2012?

16          A.    The quality leadership was

17  still there.

18          Q.    So someone else conveyed to

19  you what --

20          A.    They transferred the process

21  to DEA compliance.

22          Q.    Okay.  And so to be clear,

23  quality assurance was reporting up to the

24  parent company, Johnson & Johnson, on its

Highly Confidential - Subject to Further Confidentiality Review

1    work; is that right?

2              MR. BARKER:  Object to form.

3              THE WITNESS:  I know how

4         they're currently organized

5         reporting.  But I don't -- to your

6         point, during this time period, I

7         don't know who they reported in

8         to.

9    BY MR. JANUSH:

10        Q.    I thought --

11        A.    But right now, I apologize,

12   I do know where quality reports now.  And

13   I don't know back then in 2006 what the

14   organization reporting structure was.

15        Q.    Okay.

16        A.    But it was separate from the

17   site leadership.  I do know that.

18        Q.    Skip ahead to second quarter

19   2012.  "New controlled substance

20   compliance group in place, benchmarked

21   with Purdue, Actavis, and Watson for best

22   practices."

23              That -- we've seen one

24   benchmarking memo, the notes in Purdue,

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2           A.     Mm-hmm.

3           Q.     Do you have notes from

4    benchmarking with Actavis and Watson?

5           A.     I don't know if I took

6    notes.  But it was -- it wasn't two

7    separate companies.  It was Actavis

8    Watson at the time.

9           Q.     You don't recall if you took

10   notes?

11          A.     It was more informal.

12          Q.     Okay.  What did you learn

13   from Actavis and Watson?

14          A.     We discussed their

15   algorithm, what kind of algorithm they

16   had.

17          Q.     What did they have?

18          A.     They used the Buzzeo system.

19   But we didn't go into detail about what

20   it was set up with and all that stuff.

21          Q.     And then you wrote,

22   "Developed SOM questionnaire in May."

23                 This is referring to your

24   know your customer questionnaire; is that

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2            A.    Yes.

3            Q.    And you noted that you

4    received most of the completed

5    questionnaires by end of the year; is

6    that right?

7            A.    Yes.

8            Q.    And then, "January 2013,

9    initiated first monthly compliance review

10   meeting, and by first quarter to second

11   quarter 2013 revised all standard

12   operating procedures related to

13   suspicious order monitoring and created

14   VSM in preparation for walking through

15   process with DEA if asked at KDC

16   inspection."

17           Did I read that right?

18           A.    Yes.

19           Q.    Okay.  Now, let's just take

20   it through.  So from -- up through second

21   quarter of 2013, you'd agree with me,

22   would you not, that the program, the

23   suspicious order monitoring program SAP

24   program, or SAP program, still used three

Highly Confidential - Subject to Further Confidentiality Review

1    times the 12-month rolling average to

2    flag a suspicious order based on

3    particular SKUs or SKUs, true?

4            A.    Yes.

5            Q.    Okay.  And then on Slide 3,

6    you address some of the things that

7    Mr. Jack Crowley spoke with you about in

8    your meeting.  "Meet monthly with a

9    standing agenda."  You talked about that,

10   right?

11           A.    Yes.

12           Q.    "Follow up actions from

13   prior meetings."  Discussed that, right?

14           A.    Yes.

15           Q.    "Metric review and trend

16   review and current events."  Addressed

17   all that, right?

18           A.    Yes.

19           Q.    And this seems to be

20   addressing that, "On metrics, monthly CS

21   orders, number monitored, lack of

22   12-month history, and number flagged."

23                 What were you looking at

24   here?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    So at that time if a

2  customer hadn't ordered that SKU in over

3  12 months, when they go in to order

4  again, it would automatically be flagged

5  as questionable because we -- over the

6  12-month period they hadn't ordered it.

7           But then we would go back to

8  the ordering pattern and see they

9  typically order every 18 months, do the

10 investigation, discuss it with the

11 customer, and then we'd release the

12 order.

13     Q.    Okay.  And, "Quarterly

14 performance, percent of CS to non CS,"

15 this referred to what you testified about

16 earlier today, that on a quarterly basis

17 you'd look at your wholesaler customers

18 percent of controlled substance purchases

19 to their percent of non-controlled

20 substance purchases; is that right?

21     A.    Yes.

22     Q.    Not a realtime issue though,

23 right?

24     A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And when we speak

2    about quarterly trending.  Here's a

3    dashboard that was created after you

4    started as compliance director or

5    director of controlled substance

6    compliance; is that right?

7    A.    Yes.

8    Q.    And this shows, for example,

9    Cardinal Distribution Inc. over time by

10   quarter, their percentage of scheduled

11   orders, as well as -- well, actually it's

12   Schedule II, Schedule III, tramadol, and

13   a combination of all scheduled products

14   being tracked; is that right?

15   A.    Yes.  Tramadol was not a

16   scheduled controlled substance at the

17   time; however, in Kentucky they did

18   control it, so we do include it in our

19   suspicious order monitoring program.

20   Q.    Okay.  Now, I want you to

21   flip forward to Page 9.  And Page 9 is

22   the JOM controlled substance order

23   processing; is that right?  This is the

24   flowchart for how an order is processed?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    Okay.  And since we're

 3   speaking about suspicious orders, I want

 4   to focus on -- I'm going to circle it --

 5   "Order flagged and forwarded to quality."

 6   And then there's the DS SOP 1235.

 7   "Follow DS-WI" -- I think that's 3824,

 8   but it's really hard to read.

 9              A.    It's 3824.

10              Q.    Okay.  Thank you.  And we'd

11   have to flip the page to see the rest of

12   the flowchart for happens next; is that

13   right?

14              A.    Yes.

15              Q.    Because what the next

16   flowchart gives us is specific to a

17   controlled substance flagged order; is

18   that right?

19              A.    Yes.

20              Q.    You received the order from

21   the customer for Schedule II product.

22   The next step is run DEA unusual quantity

23   report per DS-WI3824; is that right?

24              A.    Yes.
```

1    Q.    And running the DEA unusual

2    order quantity report is your

3    mathematical formula of three times or

4    300 percent the average rolling weekly --

5    A.    Monthly.

6    Q.    -- monthly order.  So you're

7    comparing that given day's order that was

8    flagged to what?

9    A.    To the last average monthly

10   ordering pattern for 12 months.  So we

11   take the average of 12 months, times it

12   by three.

13   Q.    Okay.  Incidentally, do you

14   know where the three times historical

15   average order came from at the DEA level

16   originated from?

17   A.    The List I chemical

18   guidelines for CMEA, which was the only

19   information available in regards to

20   thresholds.

21   Q.    It didn't apply to opioid

22   products though, right, it was about

23   List I chemicals?

24   A.    It was a guidance that DEA

1    provided the pharmaceutical companies

2    that produce list chemicals.  And DEA

3    didn't provide guidance on controlled

4    substances.  So we went with the guidance

5    that was available, that DEA provided.

6           Q.    On a totally different

7    matter.

8               MR. BARKER:  Object to form.

9    BY MR. JANUSH:

10          Q.    Right?

11          A.    At the time that the

12   thresholds were presented, there was a

13   serious issue.  It was right after this

14   Combat Methamphetamine Act came out.  So

15   List I chemicals, there was a serious

16   issue.

17          Q.    What does that mean?

18          A.    There was a serious meth

19   issue in the country at the time that

20   these thresholds came out, and that is

21   why DEA provided guidance to wholesalers

22   and handlers of pseudoephedrine products

23   on what they should be -- what thresholds

24   should be used when monitoring orders.

1    Q.    So your position is the DEA

2  told Janssen or JOM to utilize

3  300 percent of the average monthly or

4  annual monthly order to set its threshold

5  for suspicious order monitoring?

6    A.    No.  DEA did not tell us

7  what to set our thresholds for.  However,

8  we wanted to use information that was out

9  there, and DEA did provide this to

10  registrants that handled List I

11  chemicals.

12         In 2013 -- actually in 2007,

13  we reviewed it with the DEA.  In 2013, we

14  once again reviewed it, our whole

15  program, with DEA.  So they were aware

16  that we were using this List I threshold

17  in our suspicious order monitoring

18  program.

19         In every inspection they

20  would take our SOPs with them.

21    Q.    You are talking about a

22  plant inspection?

23    A.    I'm talking about the

24  distribution license inspections where

Highly Confidential - Subject to Further Confidentiality Review

1    they come in and they determine whether

2    effective control is in place to prevent

3    diversion and abuse.

4              So besides reviewing all of

5    the security systems that you have in

6    place, the cameras, the alarms, they do

7    review suspicious order monitoring to

8    make sure that your system is adequate.

9    And so they request our procedures.

10             And in 2013, we specifically

11   sat down with Kentucky diversion

12   investigators, they did the inspection.

13   And we provided them the whole program,

14   these flow diagrams, that showed this is

15   how we -- we monitor our orders.

16        Q.    And -- and who did you meet

17   with and provide this to?

18        A.    In 2013, it was diversion

19   investigators Billy Lane and Jason, I

20   apologize, I forget Jason's last name.

21   But we can follow up with that.

22        Q.    And what about earlier?

23        A.    I do recall a regulatory

24   contact -- regulatory agency contact

Highly Confidential - Subject to Further Confidentiality Review

1   report that was provided by a previous

2   DEA compliance person for JOM, where in

3   2007 he reached out to a California

4   diversion investigator, a supervisor, and

5   he relayed our three times the rolling

6   12-month average to that -- I believe it

7   was -- I forget which district out of

8   California.  So that's the earliest that

9   I'm aware of that the three times was

10  given to DEA.

11              But they have -- in 2008,

12  they took our SOP from the Newark office,

13  came into our New Jersey distribution

14  center, and they took our suspicious

15  order monitoring SOPs.  And that's a

16  routine request, along with all of

17  your -- they ask for all of your SOPs

18  around handling controlled substances and

19  including suspicious order monitoring,

20  has been a request.

21       Q.    Do you have memos of those

22  meetings?

23       A.    Yes.

24              MR. JANUSH:  We call for the

Highly Confidential - Subject to Further Confidentiality Review

1      production of any memos concerning

2      the testimony just provided.

3           MR. BARKER:  They've been

4      produced.

5           MR. JANUSH:  You're making a

6      statement on the record that memos

7      have been produced where employees

8      at JOM have confirmed that they

9      handed over SOM, suspicious order

10      monitoring protocols to the DEA?

11           MR. BARKER:  The

12      documentation relating to those

13      meetings has been produced.

14  BY MR. JANUSH:

15      Q.    Let's go back to the

16  flowchart and address.  So we talked

17  about that the math would be run at three

18  times the annual average.  Then you'd

19  open a DEA unusual order quality report

20  query; is that right?

21      A.    Quantity report.

22      Q.    Right.  Sorry.  Order

23  quantity report query -- query.

24           And going below, if the

1    order exceeded the minimum order quantity

2    and is above three times the calculated

3    12-month per weekly order average, it

4    would go to customer service, who would

5    reach out to the customer to obtain a

6    reason for the increase; is that right?

7          A.    That's what -- that's what

8    it reads.

9          Q.    And then from there,

10   ValueTrak report would be run to compare

11   inventory to the demand of the increase?

12         A.    So that, as earlier

13   explained, customer service or the

14   planning, after they engage with the

15   customer, they have a defined script,

16   when -- when there is a questionable

17   order.  We want to make sure that we're

18   asking the same question, no matter what

19   the customer.  And part of the

20   investigation is to use that 852 and 867

21   data to the best that we could to

22   determine whether that questionable order

23   made sense or if there's some unplanned

24   change in their demand that they didn't

1    communicate to us.

2         Q.    Is it your position that in

3    and after April 2013, the date of this

4    document, ValueTrak reports were being

5    run for every questionable order?

6              MR. BARKER:  Object to form.

7         Evan, you're ending your questions

8         in kind of an odd place and I

9         think the witness is having

10        trouble following you there.

11             MR. JANUSH:  That's okay.

12             THE WITNESS:  So as of this

13        flow diagram, the SOP stated that

14        they would have to run and get the

15        852 and 867 data, the channel ops,

16        the planners would.

17   BY MR. JANUSH:

18        Q.    But you know in -- in

19   reality that wasn't happening for every

20   suspicious order, right?

21             MR. BARKER:  Object to form.

22             THE WITNESS:  I do not

23        believe that's true.  Any order

24        that is questionable was

1    investigated, and they did this

2    activity.

3  BY MR. JANUSH:

4         Q.    And where would the

5  documentation be kept at JOM showing that

6  the ValueTrak report was run to compare

7  to inventory for every order that was

8  exceeding the minimum order quantity and

9  above three times the calculated 12-month

10  weekly -- per weekly order average?

11         A.    Customer service had a share

12  point where they stored all this

13  information.

14         Q.    And that customer service

15  was with which company?

16         A.    JOM.

17         Q.    Okay.  So somewhere at JOM,

18  within a customer service share point,

19  outside of the suspicious order

20  monitoring share point, would be a folder

21  area where all of the ValueTrak analysis

22  would exist for every order that exceeded

23  the minimum order mathematical formula?

24              MR. BARKER:  Object to form.

1              THE WITNESS:  The -- I'm not

2         quite -- I do not understand what

3         you mean by suspicious order

4         monitoring share point.  The --

5    BY MR. JANUSH:

6         Q.    So there's a suspicious

7    order monitoring share point, I'm going

8    to represent to you that we have been

9    produced documents from, at Janssen.  Do

10   you understand that?

11        A.    Yes.  There are -- there's

12   several share points that are involved in

13   the program.

14        Q.    Okay.

15        A.    So I just wanted to say that

16   suspicious order monitoring share point

17   is owned by channel ops, the planners.

18   Customer service had their share point

19   that they maintained the metrics and

20   these -- this documentation.

21        Q.    Okay.  So customer service

22   has a separate share point that falls

23   outside of suspicious order monitoring

24   share point, at which internal folks at

Highly Confidential - Subject to Further Confidentiality Review

1    Janssen can pull up the ValueTrak report

2    that was run for every suspicious order

3    that exceeded the minimum order quantity

4    and was above the three times the

5    calculated 12-month per weekly order

6    average; is that right?

7         A.    As I am aware, there is a

8    C-II metrics folder that retains all of

9    the correspondence with the customer, as

10   well as the reports that were run from

11   ValueTrak for all of the questionable

12   orders.

13        Q.    Did you assist in -- in

14   seeking to locate such information for

15   production in this case?

16             MR. BARKER:  Objection.

17             MR. JANUSH:  I'm not going

18        to --

19             MR. BARKER:  Object to form.

20        I'll let her answer that question,

21        as long as you agree that her

22        answer is not a waiver of attorney

23        work product or attorney/client

24        communications.

Highly Confidential - Subject to Further Confidentiality Review

1           MR. JANUSH:  I agree

2      entirely.

3           MR. BARKER:  She can answer

4      that question with that

5      understanding that there is no

6      waiver.

7           MR. JANUSH:  No waiver.

8           THE WITNESS:  I did direct

9      the lawyers to these share points

10     that contain this information.

11          MR. JANUSH:  Okay.  We'll

12     deal with after this deposition

13     where these ValueTrak reports are

14     and where the customer service

15     investigation notes are concerning

16     each suspicious order.

17          I haven't been able to

18     locate them.  I'm just putting

19     that on the record.

20 BY MR. JANUSH:

21     Q.    Next step is that JOM DEA

22 compliance team makes a determination; is

23 that right?

24     A.    Yes.

1        Q.    It either notifies that the

2    order will be canceled and not shipped,

3    or it determines that the order can

4    proceed or be reduced.  Those are the two

5    decision points here; is that correct?

6        A.    Yes.

7             MR. BARKER:  Object to form.

8    BY MR. JANUSH:

9        Q.    Okay.  And if it decides,

10   the DEA compliance team, that the

11   customer needs to be notified the order

12   will be canceled and not shipped, the

13   last step here is, "JOM compliance

14   determines whether DEA notification is

15   required."

16            Am I reading that right?

17       A.    Yes.

18       Q.    However, if a manufacturer

19   utilizing a suspicious order monitoring

20   program determines that an order was

21   suspicious enough that it could not be

22   shipped, it has a duty to notify the DEA

23   of that fact, doesn't it?

24            A.    If there was-- we had been

Highly Confidential - Subject to Further Confidentiality Review

1    instructed over the years with DEA with

2    our encounters, that if there is an order

3    that's truly suspicious they want to know

4    about it.  They don't -- do not want to

5    know every order that's been reviewed.

6    They call that excessive.

7                  So if it was truly deemed

8    suspicious, we have been told to notify

9    them.

10        Q.    So we're on the same page.

11   Here you are addressing in a workflow

12   that if the compliance team deems the

13   order to be canceled and not be shipped,

14   it notifies the customer, and that JOM

15   DEA compliance determines whether DEA

16   notification is required.

17        A.    Yes.

18        Q.    But if an order is deemed

19   suspicious enough to be not shipped,

20   you've determined that it's suspicious,

21   no?

22        A.    No.  It depends.  I mean,

23   you could have a customer -- and we've

24   had these cases, where the national

1    distribution center normally does the

2    ordering.  But then some local

3    distributor, who goes in and orders

4    stuff, it gets monitored because they

5    don't typically order, it goes to the

6    national hub.

7              And so we go through our

8    entire process.  You know, we run the

9    ValueTrak, see that it doesn't go there.

10   And then when it gets to be here, we

11   notify the customer.  Working with the

12   customer, they tell us, "Oh, it's a

13   training error.  The person shouldn't

14   have submitted that order."  In which

15   case, that is not a suspicious order, and

16   we're not required to report to DEA.  So

17   there's lots of different types of orders

18   that come in.

19        Q.    Got it.

20        A.    And just -- you know, and

21   that's an example.  We did -- you know,

22   recently reach out to DEA and said, you

23   know, if there's a training error and

24   somebody placed an order that got flagged

Highly Confidential - Subject to Further Confidentiality Review

1    in our system and we followed up, and

2    they said, "Oh, that was a training

3    issue.  The national potential hub is

4    supposed to receive it," to cancel the

5    order.

6              So we asked DEA, "Do we

7    report those?"  And we were instructed

8    that's nice information to have, but it's

9    not a requirement to report.

10        Q.    So when you have a situation

11   like a training error, or conversely a

12   worse situation like a truly suspicious

13   order, your JOM DEA compliance team

14   documents that investigation, doesn't it?

15        A.    Yes.

16        Q.    Okay.  So I'm going to

17   circle that last box here, one of those

18   last boxes here.  And I'm going to ask

19   and write here, "Where is the

20   documentation?"  And your answer is what?

21   Where is the documentation at this step

22   maintained?

23              MR. BARKER:  Object.  Object

24        to the demonstrative.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  So if there is

2      communication with DEA, we use our

3      regulatory agency contact reports.

4           So if there was any

5      discussion around an order that

6      was questionable, we would use

7      that tool to document the actual

8      discussion with DEA.

9           And then --

10 BY MR. JANUSH:

11      Q.    What tool is that?

12      A.    It's Regulatory Agency

13 Contact Report.  We call it RACR for

14 short.

15      Q.    Okay.

16      A.    So there would be a RACR

17 report of a discussion with DEA.

18           The actual documentation for

19 the investigation, as I mentioned before,

20 would be maintained on the customer

21 service SharePoint.

22      Q.    Okay.  So let's move forward

23 to Page 15.  And looking at this

24 SharePoint, suspicious order monitoring

Highly Confidential - Subject to Further Confidentiality Review

 1    SharePoint, is there any folder here

 2    where that information concerning a

 3    suspicious order investigation or report

 4    would be maintained?

 5              MR. BARKER:  Object to form.

 6              THE WITNESS:  So if you look

 7         above the word "suspicious order

 8         monitoring."

 9    BY MR. JANUSH:

10         Q.    Yep.

11         A.    It shows "channel ops."

12         Q.    Sure.

13         A.    So channel ops are the

14    planners that work with the big

15    wholesalers.  And this -- when we were

16    doing our questionnaires, we -- channel

17    ops as well as trade, engage with the

18    wholesalers to get these questionnaires

19    done.  So channel ops made this

20    SharePoint specifically for the

21    questionnaires for them to upload.  It is

22    not what we deem our order monitoring

23    compliance SharePoint.

24              This is -- you know, this is

Highly Confidential - Subject to Further Confidentiality Review

1    their SharePoint.  And they kept track of

2    the questionnaire documentation they

3    received from the customers.  Because

4    they are the ones that had the more

5    day-to-day interaction with the customers

6    and were able to get the questionnaires

7    completed.

8         Q.    So what do you consider your

9    order monitoring compliance SharePoint?

10        A.    The C-II, right here.  The

11   following one.  The customer service

12   Schedule II.

13        Q.    Schedule II metrics

14   SharePoint?

15        A.    Yes.  That is our --

16        Q.    And what would the folder be

17   called in Schedule II SharePoint where we

18   would find these reports?

19             MR. BARKER:  Object to form.

20             THE WITNESS:  Well, this was

21        in -- from 2014.  That -- there

22        has been an updated document

23        folder, where we are adding it,

24        we're adding the justification on

1       there.

2   BY MR. JANUSH:

3       Q.    And what would it be called?

4            MR. BARKER:  Object to form.

5            THE WITNESS:  The actual

6       wording, I don't have it in front

7       of me.

8   BY MR. JANUSH:

9       Q.    So I'm going -- I'm going to

10  represent to you that we've received a --

11  what's called a noncustodial production

12  in this case of the suspicious order

13  monitoring SharePoint, but have never

14  received a production from the

15  noncustodial SharePoint called Schedule

16  II SharePoint.  So that's why I'm asking

17  all these probing questions.

18      A.    Well, one thing -- this is

19  how it looked at 2014.  Since then, we've

20  included a lot of enhancements through

21  the benchmarking.

22            And we -- in later 2013, we

23  identified that we wanted to do a folder

24  for SharePoint.  So I don't recall if

Highly Confidential - Subject to Further Confidentiality Review

1    this shared documents is where they put

2    it.

3         Q.    Okay.

4         A.    I mean --

5         Q.    But if someone looked --

6         A.    -- it's been more organized

7    since then.

8         Q.    If someone looked hard

9    enough, they'd be able to find the folder

10   where your customer service group

11   documented each investigation into a

12   potentially suspicious order; is that

13   right?

14              MR. BARKER:  Object to form.

15              THE WITNESS:  The

16        documentation for each order

17        release was documented and stored.

18        I just -- I just don't know where

19        it was stored under -- at this

20        time in 2014.

21   BY MR. JANUSH:

22        Q.    Okay.

23        A.    I do know, 2018, I know

24   where the documentation is stored.

1      Q.    Where's that?

2      A.    It is on this -- this --

3   since 2014, it's been migrated to

4   Microsoft 365.  It's a whole new

5   SharePoint, and there's more information.

6   There's also the justification forms.

7   All the -- there's a tab for

8   justification forms, which come from the

9   customer for all the monitor orders.

10           So it's in there now.

11     Q.    And how far back does your

12  data go storing documents concerning

13  prior investigations of suspicious

14  orders?

15     A.    Our record retention for DEA

16  records is two years.  However, we do

17  have records back to 2014.

18     Q.    Who would be a point person,

19  key custodian for the SharePoint files

20  that fall outside of the suspicious order

21  monitoring SharePoint but would capture

22  these investigation memos?

23           MR. BARKER:  Object to form.

24           THE WITNESS:  The

Highly Confidential - Subject to Further Confidentiality Review

1      investigation documentation was

2      maintained by the customer service

3      department.

4  BY MR. JANUSH:

5      Q.   Can you name a key person in

6  the customer service department, if I

7  were to want to depose them and learn

8  more about where these documents are, who

9  would that person be?

10     A.   Raphaela Figgalri.  She's

11 the -- she would have -- she was the one

12 that would have all the documentation for

13 most of the order releases.

14     Q.   But only from 2014 forward?

15     A.   Yes.

16     MR. BARKER:  If you're

17     asking whether --

18     MR. JANUSH:  I don't need

19     to -- we can go off the record for

20     a moment to have a discussion.

21     THE VIDEOGRAPHER:  The time

22     is 1:31 p.m.  We are going off the

23     record.

24     (Lunch break.)

Highly Confidential - Subject to Further Confidentiality Review

1           THE VIDEOGRAPHER:  We are

2           back on the record.  The time is

3           2:38 p.m.

4    BY MR. JANUSH:

5           Q.    Hello, Ms. Dempsey.

6                 I'm going to hand you what's

7    been marked as Exhibit 10.

8                 (Document marked for

9           identification as Exhibit

10          Dempsey-10.)

11   BY MR. JANUSH:

12          Q.    And it's going to look a

13   little familiar to you, because it's

14   similar to a string, an e-mail string

15   that we were addressing earlier regarding

16   communications between you and Ron Kuntz

17   regarding red flag issues like

18   prescribers of interest.  Do you remember

19   that discussion a while back?

20          MR. BARKER:  Object to form.

21          THE WITNESS:  I recall that

22          we discussed it.

23   BY MR. JANUSH:

24          Q.    Okay.  So, and that's on

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Page 2 of this e-mail where --
 2    "Greetings, Ron.  Every month JOM and DEA
 3    team review orders" --
 4              I'm sorry.  I should do the
 5    Bates into the record.  It's
 6    JAN-MS-00421189.
 7              "Every month JOM and DEA
 8    team review orders.  This month we
 9    reviewed recent HDMA slide deck HD Smith
10    provided.  If you look at Page 13, there
11    is a slide on six components.  The group
12    wanted to know if you knew if the Nucynta
13    team keeps track" -- "keeps tab on the
14    following three items:
15              "Number 3:  Cash and
16    insurance payment trends.
17              "Number 5:  Top 10
18    prescriber analysis.
19              "And Number 6:  Individual
20    analysis of prescribers of interest.
21              "What are your thoughts
22    about an idea I had that we perhaps do a
23    training deck for the Nucynta sales force
24    on the red flags shown in the HD Smith
```

1    deck?"

2              Did I read that accurately?

3         A.    Yes, you did.

4         Q.    Okay.  So earlier I

5    addressed this -- this topic of high

6    prescribers being analyzed as a red flag

7    issue.  And here it's made more clear

8    that it's being addressed as a red flag

9    issue in the recent HDMA -- that's the --

10   the Healthcare Distributors Association;

11   is that right?

12             MR. BARKER:  Object to form.

13             THE WITNESS:  Healthcare

14        Distribution Management

15        Association.

16   BY MR. JANUSH:

17        Q.    Okay.  And now, that name

18   has been changed to HDA today, right?

19        A.    Healthcare Distribution

20   Association, yes.

21        Q.    Okay.  And so this is

22   referring to a slide deck that HDMA

23   created that HD Smith provided to you; is

24   that right?

Highly Confidential - Subject to Further Confidentiality Review

1              MR. BARKER:  Object to form.

2              THE WITNESS:  HD Smith, who

3         was one of our wholesalers --

4    BY MR. JANUSH:

5         Q.    This --

6         A.    -- that we provided, they

7    presented at HDA and after you attend

8    their conferences you have access to the

9    slide deck that was presented during the

10   conferences.

11        Q.    Got it.  So HD Smith --

12        A.    They presented at the

13   conference.

14        Q.    -- presented at a conference

15   and provided you with their slide deck;

16   is that right?

17        A.    No.  HD Smith did not give

18   us the slide deck.  HDA posts the

19   presentations that are given and we went

20   online and retrieved the presentation

21   from the HDMA website.

22        Q.    Great.  How would you go

23   about retrieving slide decks from HDMA

24   presentations?

1        A.      When you typically attend

2    the conferences, at the end, they e-mail

3    you with links to the conference

4    presentation matter.

5        Q.      How many HDA conferences

6    would you say you've attended throughout

7    your years working with JOM or Janssen?

8        A.      I believe I have attended

9    four of the March conferences.

10       Q.      Is there something specific

11   about a March conference, is that the

12   annual conference?

13       A.      Yes.  At the March

14   conference, that is more of a focus on

15   the regulatory, you know, so I go -- DEA

16   speaks at that March conference.  DEA has

17   a booth at the -- on the floor of the

18   conference.  So, you know, you listen to

19   DEA.  Plus you can -- during your break

20   while you are looking at all the vendors,

21   policy and liaison is there if you want

22   to approach them and discuss issues.

23              They also have state and

24   federal regulations around handling

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substances they report out on,

2    as well as security, supply chain

3    security, what kind of theft, GPS,

4    FreightWatch, any of the various controls

5    that are the best practices for securing

6    your product to your customer.

7            So DEA compliance would go

8    to this session, as opposed to other

9    sessions which have different focuses.

10        Q.    Okay.  And at this session,

11   six red flag components were presented

12   within the HD Smith slide deck; is that

13   right?

14            MR. BARKER:  Object to the

15        form.

16            Do you want to give the

17        witness an opportunity to review

18        it?

19            THE WITNESS:  It's not

20        attached.  It's not attached.

21   BY MR. JANUSH:

22        Q.    It's the e-mail that I'm

23   addressing.

24        A.    Right.

1    Q.    "This month we reviewed

2    recent HDMA slide deck HD Smith provided.

3    If you look at Page 13, there is a slide

4    on six components.

5              "The group wanted to know if

6    you knew if the Nucynta team keeps tab on

7    the following three items."

8              So I'm assuming these are

9    three of the six red flag components; is

10   that right?

11             MR. BARKER:  Object to form.

12             THE WITNESS:  For our

13        customer, the wholesaler, they

14        presented on their six components,

15        and I copied the three that I

16        wanted to ask Ron about.

17   BY MR. JANUSH:

18        Q.    And when we say -- when you

19   wrote, "The group wanted to know if you

20   knew if the Nucynta team keeps tab on the

21   following three items," who is the group

22   that wanted to know if Ron Kuntz knew if

23   Nucynta team keeps tab on these three

24   items?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    The suspicious order

2    monitoring compliance group, which was

3    customer service and DEA compliance.

4    Q.    Okay.  So customer service

5    and DEA compliance at JOM, right?

6    A.    Yes.

7    Q.    Wanted to know if Ron Kuntz

8    knew whether the Nucynta team keeps track

9    of cash and insurance payment trends,

10   right?

11   A.    Yes.

12   Q.    Keeps track of ten top

13   prescriber analysis, right?

14   A.    Yes.

15   Q.    And keeps track of

16   individual analysis of prescribers of

17   interest; is that right?

18   A.    Yes.

19   Q.    And Ron didn't answer you in

20   writing, at least in this e-mail string,

21   he didn't answer your questions.  He

22   instead invited a visit with you, didn't

23   he?

24   MR. BARKER:  Object to form.

1    BY MR. JANUSH:

2         Q.    You can take time to review

3    the e-mail.  But I can't find his

4    answers.  You asked a pretty

5    straightforward question, didn't you?

6         A.    Yes, I did.

7         Q.    His answer was, "Hi,

8    Michele.  Long time, no see.  Sorry to

9    take so long to get back to you."  And I

10   emphasize because there are three so in

11   the "so."

12              "I would really like to meet

13   with you to discuss this topic.  We are

14   working on some ideas and you may be able

15   to provide some very good insights.  When

16   do you think you can come up to T-Ville?"

17              Did I read that right?

18        A.    Yes.

19        Q.    Did you ever get up to

20   T-Ville?

21        A.    I believe I believe we did

22   meet because that precipitated the other

23   e-mail that we reviewed where I forwarded

24   him information.  So we met about --

Highly Confidential - Subject to Further Confidentiality Review

1  overall in the general, and he asked if

2  there was anybody that I knew that could

3  help.  And that's why I forwarded Jack

4  Crowley's information to him.

5      Q.    And what was the answer as

6  to -- that Ron eventually gave you, if

7  any, as to whether the Nucynta team was

8  keeping track of cash and insurance

9  payment trends, the top ten prescriber

10  analysis, and individual analysis of

11  prescribers of interest?

12      A.    I don't recall.

13      Q.    Moving over to the next page

14  of this document, there's an

15  attachment -- or not attachment.  An

16  e-mail from April 8, 2013, and a string

17  titled, "Suspicious order monitoring

18  monthly review agenda."

19      A.    Monthly compliance review.

20      Q.    "Monthly compliance review

21  agenda."  Right.  Zooming out.  I'm

22  trying to do two things at once here.

23          Okay.  And I want you to

24  turn your attention to trend review at

Highly Confidential - Subject to Further Confidentiality Review

 1    Number 3.

 2              Do you see that?

 3         A.    Yes.

 4         Q.    And it looks like the

 5    Walgreens Perrysburg, Ohio was facing

 6    immediate suspension.  And incidentally,

 7    do you know -- do you know who wrote this

 8    review?

 9              MR. BARKER:  Object to form.

10              THE WITNESS:  These are

11         notes that I took during the

12         meeting.

13    BY MR. JANUSH:

14         Q.    You wrote this review,

15    right?

16         A.    Yes.

17         Q.    You wrote this?  You wrote

18    the e-mail and transmitted it; is that

19    right?

20         A.    Yes.

21         Q.    Okay.  And you're saying,

22    "We will block them, Walgreens,

23    Perrysburg, from ordering CS once we get

24    official notification."  And then it

1    looks like you have an update here.  And

2    I'm sure if we saw this in a string with

3    color, we'd see comments, "Update, DEA

4    has not pulled their registration at this

5    time, so SAP master data cannot be

6    modified to prevent shipping to them.

7    Court case still underway.  Action, none

8    until court case is over."

9            Did I read that right?

10   A.    Yes.

11   Q.    Okay.  Why would JOM or

12   Janssen block -- not block Walgreens that

13   was facing an imminent suspension until

14   the official notification came?

15   A.    We -- when we say official

16   notification, that is when they lose

17   their DEA license.

18           We did not ship directly to

19   Walgreens.  We supplied the wholesalers.

20           So we were -- we were

21   monitoring the situation to see if DEA

22   pulls that registration, in which case we

23   would communicate with our customers, the

24   wholesalers, to make sure that they were

1   not shipping to our location that did not

2   have a valid DEA license to handle and

3   distribute controlled substances.

4          Q.     So if you were not shipping

5   to Walgreens, Perrysburg, how would

6   you -- were you in a position to write,

7   "We will block them from ordering CS once

8   we get official notification"?

9          A.     If we knew that they lost

10  their license, we would have -- we would

11  have made sure that the wholesalers were

12  not shipping to that location.

13         Q.     But you know in practical --

14  in practical terms, that that's not how

15  it worked, right?

16                MR. BARKER:  Object to form.

17  BY MR. JANUSH:

18         Q.     You know what really

19  happened when a site was shut down by the

20  DEA, right?  I mean, let's talk turkey

21  about what actually happened in practice.

22                MR. BARKER:  Object to form.

23         Is there a question?

24                THE WITNESS:  Could you

Highly Confidential - Subject to Further Confidentiality Review

1       explain?

2   BY MR. JANUSH:

3       Q.   Sure.  You know, that what

4   would really happen is it would be

5   business as usual, and a Walgreens

6   central distribution center would just

7   handle all of the distribution of

8   controlled substances to make sure that

9   Janssen's products remained unaffected in

10  terms of -- unaffected in the chain of

11  commerce.  You know that, right?

12          MR. BARKER:  Object to form.

13          THE WITNESS:  I do know that

14      we had had cases in the past where

15      we engaged DEA when there was an

16      investigation of a wholesaler.  We

17      knew that some of those

18      distribution centers were -- lost

19      their licenses, and they were

20      directing that material to another

21      distribution center that had an

22      active DEA license.

23          And we analyzed the quantity

24      of the order, that it was

Highly Confidential - Subject to Further Confidentiality Review

1      consistent to what that DC and the

2      other three would have been

3      supplying of our Duragesic and

4      Nucynta, and then we reached out

5      to the DEA of that DC, which was

6      in California.

7           And we reviewed our

8      rationale to explain, here is the

9      situation, patients need medicine.

10     Our Duragesic needs to go to the

11     patient.  We understand that these

12     other DCs have lost their

13     licenses; however, this one

14     located in your California DC

15     still has the license.

16          Is the company in good

17     standing?  And these orders do

18     not -- are not suspicious.  And we

19     asked him if he agreed with our

20     approach.

21          And he verbally gave his

22     agreement with our approach.

23  BY MR. JANUSH:

24          Q.   Well, I'm not sure what

Highly Confidential - Subject to Further Confidentiality Review

1    question you answered.

2          A.    It was for -- a

3    regulatory -- it was RACR where we

4    engaged DEA to review our process,

5    understanding that if there are

6    locations -- a wholesaler has many

7    locations.  If there are some locations

8    that have lost their license, I guess you

9    said you -- you were talking a pharmacy

10   level.  We don't ship to the pharmacy

11   level.

12          You were giving an example

13   that, well, one Walgreens would lose its

14   license, and they'd ship the inventory to

15   another location.  I was giving you an

16   example of our customer, of when a

17   wholesaler has a local DC that loses its

18   license, what we do and how we have

19   reviewed it with DEA, our rationale

20   for -- if there's a license revocation at

21   a DC, how we continue the patient supply

22   of medicine.

23          Q.    Okay.  I'm going to move on

24   to another exhibit.  You know what?

Highly Confidential - Subject to Further Confidentiality Review

1    Before I do, I just want to ask one

2    follow-up question.  Going back to the

3    red flag issue, it's April 8, 2013.

4    You're in about a year and a month as

5    director of controlled substance

6    compliance at Johnson & Johnson or JOM;

7    is that right?

8          A.    Yes.

9          Q.    And you're asking a

10   marketing guy, Ron Kuntz, who's

11   overseeing the -- the -- a product

12   director for the pain franchise whether

13   the Nucynta team engages in a top ten

14   prescriber analysis to review prescribers

15   that may be of concern, right?

16              MR. BARKER:  Object to form.

17              THE WITNESS:  As we

18         previously -- before you wanted to

19         know if I knew what the trade

20         analytics had, and I was not aware

21         of that.  I went to a conference

22         where one of our customers, HD

23         Smith, presented out on some of

24         the items that they monitor.  So I

Highly Confidential - Subject to Further Confidentiality Review

1    was asking the person that I

2    thought would know if we had this

3    information and if we collected

4    it.

5  BY MR. JANUSH:

6       Q.    Shouldn't you have known

7  independently, as the director of

8  compliance, whether, as a matter of

9  substantive compliance, Janssen was

10  tracking the Top 10 prescribers to

11  determine whether there was anything

12  suspicious with their prescribing habits?

13            MR. BARKER:  Object to form.

14            THE WITNESS:  No.  As I

15       stated before, we are transparent

16       with DEA.  We go to all the DEA

17       conferences, the distributor

18       conferences.  We -- our program,

19       we enhance it to make sure that

20       we're addressing what DEA has

21       asked for.  And they never asked

22       us for this information.

23            In all of our reviews and

24       inspections they never told us

Highly Confidential - Subject to Further Confidentiality Review

1        that they expected us to know this

2        information.

3               MR. JANUSH:  For those on

4        the phone I'm just reviewing an

5        exhibit.

6    BY MR. JANUSH:

7        Q.    Isn't it true that the DEA

8    was presenting slides, PowerPoint slide

9    decks, at various conferences addressing

10   red flags, factors to consider when

11   operating a suspicious order monitoring

12   program such as, where is your product

13   going, who is it going to, how many other

14   distributors are involved, and who are

15   the downstream customers?

16              MR. BARKER:  Object to form.

17              THE WITNESS:  DEA has held

18       several different types of

19       conferences.  They hold the

20       manufacturing import/export

21       conferences.  They hold

22       distributor conferences.  They

23       hold pharmaceutical pharmacy

24       awareness.  And now they're

1          currently offering practitioner

2          awareness training.

3               So they have gone through

4          all of the -- down the supply

5          chain presenting out.

6    BY MR. JANUSH:

7          Q.    And you've never seen a

8    presentation in which the DEA addressed

9    that you need to look at high prescribers

10   as a red flag for -- for an interest

11   group to be monitored?

12              MR. BARKER:  Object to form.

13              THE WITNESS:  The

14         presentations that mention that

15         were for those distributors that

16         went to pharmacies.

17   BY MR. JANUSH:

18         Q.    And you're saying those

19   presentations didn't apply to

20   manufacturers who may have been at the

21   same time as they were selling their

22   drugs to distributors were targeting

23   doctors to -- to write prescriptions of

24   their product?

Highly Confidential - Subject to Further Confidentiality Review

 1                    MR. BARKER:  Object to form.

 2                    THE WITNESS:  Can you repeat

 3           the question you want me to

 4           answer?

 5    BY MR. JANUSH:

 6           Q.    Sure.

 7                    And you're saying those

 8    presentations didn't apply to

 9    manufacturers who may have been at the

10    same time as they were selling their

11    drugs to distributors, targeting doctors

12    to write prescriptions of their opioid

13    products?

14                    MR. BARKER:  Object to form.

15                    THE WITNESS:  I'm saying

16           that those presentations at

17           conferences that DEA held were

18           specific for the licenses that

19           were being held by the

20           participants.

21                    So a manufacturing

22           registration, you went to the

23           manufacturing, and they said you

24           need to have a suspicious order

Highly Confidential - Subject to Further Confidentiality Review

1     monitoring in place.  And it

2     specified monitoring your orders.

3           And then if you go to a

4     distributor presentation, they

5     would go into know your customer.

6           And then when you would go

7     to the pharmacy, that's the last

8     line, there's specific

9     requirements and red flags for

10    those.

11          So was there a specific

12    manufacturer know-your-customer

13    downstream?  That was never

14    communicated at a DEA conference.

15    And as I mentioned before, it

16    wasn't until the 2017 Mallinckrodt

17    e-mail notification that DEA

18    formally indicated downstream data

19    analysis.

20          THE VIDEOGRAPHER:  Where is

21    your microphone clipped?  Is it --

22    I want to make sure it's -- there

23    you are.  All right.  Thank you.

24          (Document marked for

Highly Confidential - Subject to Further Confidentiality Review

1      identification as Exhibit

2      Dempsey-11.)

3  BY MR. JANUSH:

4      Q.    I'm going to hand you what

5  I've marked as Dempsey Exhibit 11.

6           And this is an e-mail from

7  you to John Daly.  And it's dated May 6,

8  2014.  Its Bates stamp is

9  JAN-MS-03054667.

10          And this appears to be

11  addressing the potential to change the

12  shipment of the Concerta model such that

13  Janssen or Johnson & Johnson would ship

14  the brand directly to St. Louis's

15  Schnucks distribution center where their

16  100 pharmacies will get Concerta.  Do I

17  have that right?

18          MR. BARKER:  Objection.

19      Object to form.

20          THE WITNESS:  This is a

21      potential strategy that commercial

22      was pursuing for our ADHD medicine

23      to go to the pharmacy.

24  BY MR. JANUSH:

1    Q.    Okay.  And when you say go

2    to the pharmacy, to go direct to

3    pharmacy --

4    A.    The distribution center.

5    Q.    -- and cut out the

6    wholesaler, right?

7    A.    This was a Concerta strategy

8    that was never implemented.

9    Q.    Okay.  And so I'm not

10   addressing it to get into ADHD or

11   Concerta.  I'm addressing it for the

12   second paragraph.

13          Can you read that starting

14   with "problem" and ending with "defense"?

15   A.    "Problem is, our SOM program

16   needs to be enhanced significantly to

17   match what the wholesalers do if we are

18   going direct to pharmacies."

19   Q.    Keep going.

20   A.    "We will no longer have the

21   wholesaler thresholds to be our last line

22   of defense."

23   Q.    So what were you

24   communicating to John Daly here about the

Highly Confidential - Subject to Further Confidentiality Review

1   need to enhance your suspicious order

2   monitoring program significantly to match

3   what the wholesalers do if you were going

4   direct to pharmacies?

5         A.    Our customer changes.  So

6   the whole due diligence that's required

7   for knowing your customer will now

8   involve going to all 100 pharmacies and

9   doing more due diligence on the end, if

10  we follow this distribution model.

11        Q.    And where you wrote, "We

12  will no longer have the wholesaler

13  thresholds to be our last line of

14  defense," what were you referring to

15  there?

16        A.    The wholesalers'

17  responsibility as part of their

18  suspicious order monitoring, to monitor

19  the orders that are going to the

20  pharmacies.

21        Q.    Did Janssen and JOM rely on

22  wholesaler thresholds as their last line

23  of defense with regard to suspicious

24  order monitoring?

Highly Confidential - Subject to Further Confidentiality Review

1              MR. BARKER:  Object to form.

2              THE WITNESS:  No.  As part

3         of our due diligence, it was not

4         just their algorithm.  It was

5         their onsite visits.  It was

6         their -- the compliance, all the

7         onboarding of the -- the

8         pharmacies and their due diligence

9         program.

10    BY MR. JANUSH:

11         Q.    I'm not sure I understand.

12         A.    What -- what I'm saying

13    is --

14         Q.    Hold on one second.  Hold on

15    one second.  I had a question pending

16    that simply asked, "Did Janssen and JOM

17    rely on wholesaler thresholds as their

18    last line of defense with regard to

19    suspicious order monitoring?"

20         A.    No.

21         Q.    Well, here you have a

22    statement saying, if you go to -- direct

23    to the pharmacy, "we will no longer have

24    the wholesaler thresholds to be our last

1    line of defense."

2                   Did I read that right?

3                   MR. BARKER:  Object to form.

4                   THE WITNESS:  At this point,

5          when I was communicating to the

6          Noramco general manager, he had

7          only knowledge of certain aspects

8          of suspicious order monitoring.

9          And that is how I presented it to

10         him.

11                  Because Noramco really

12         didn't -- I reported in Noramco

13         and the general manager did not

14         understand all of the details

15         around JOM suspicious order

16         monitoring.  But I wanted to relay

17         to him that this would be a

18         significant change and I was

19         asking for support.

20   BY MR. JANUSH:

21         Q.    But you haven't answered my

22   question.  My question is --

23         A.    I cited --

24         Q.    -- about -- excuse me?  It

1    wasn't about who you were talking to.  It

2    really wasn't about the context.  It's

3    about the fact that you were stating,

4    declaring, "We will no longer have the

5    wholesaler thresholds to be our last line

6    of" -- "of defense."

7              Do you see that?  I'm

8    circling it.

9         A.    Yes, I do.

10        Q.    You said that, right?

11        A.    I wrote that.

12        Q.    Okay.  And you wrote that in

13   the context of, if you ship brand

14   directly to Schnucks distribution center,

15   rather than through or to a wholesaler,

16   your company won't be able to rely on the

17   wholesaler thresholds as its last line of

18   defense, right?

19              MR. BARKER:  Object to form.

20              THE WITNESS:  That is what I

21        wrote.

22   BY MR. JANUSH:

23        Q.    Thank you.

24              Also, at the bottom of the

1    page, you addressed, "If Stefan talks to

2    you about CSC" -- is that controlled

3    substance compliance?

4            A.    Yes.

5            Q.    -- "please reinforce SOM.  I

6    don't think any of the leaders understand

7    or know the work JOM customer service and

8    CSC do."

9                  Do you see that?

10           A.    Yes, I do.

11           Q.    What was causing you to say

12   this, to write this, at this point this

13   time on May 6, 2014?

14           A.    Because I reported in to

15   Janssen Supply Chain which was separate

16   than JOM, and reported in through

17   Noramco.  And I wanted his support should

18   we need resources or capital to change

19   our program.

20                 (Document marked for

21           identification as Exhibit

22           Dempsey-12.)

23   BY MR. JANUSH:

24           Q.    I'm going to hand you what's

Highly Confidential - Subject to Further Confidentiality Review

1 been marked as Dempsey Exhibit 12.

2 　　　　　This is a document dated

3 August 21, 2017.  It's -- the subject is

4 "Review of suspicious order monitoring

5 questionnaires."  It looks like the

6 participants in this review meeting were

7 you and Belinda Corum.  Who is Belinda

8 Corum?

9 　　　　A.　　She is the control substance

10 specialist located at the Kentucky

11 distribution center.

12 　　　　Q.　　Okay.  And this appears to

13 be a memo addressing the following

14 company files that were reviewed, and I

15 counted 19 different files that had been

16 reviewed to determine the date of the

17 most recent questionnaire that had been

18 completed and whether the customer was an

19 active customer of JOM Pharmaceutical

20 Services, Inc.

21 　　　　　Do I have that right?

22 　　　　A.　　Yes.  We were doing a review

23 of the questionnaires that we had on land

24 and if the customer were still active.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And I just want to

2  draw your attention to Cardinal.  Date of

3  most recent questionnaire was August 17,

4  2012.

5          Do you see that?

6    A.    Yes.

7    Q.    And this -- this is five

8  years later that you're doing your review

9  in August of 2017; is that right?

10   A.    We had been looking at these

11 questionnaires throughout the year.  This

12 was a formal, let's review all of them

13 and assess where we are with these.

14          So, you know, this was -- we

15 had -- these questionnaires were looked

16 at before, previously.  But we were doing

17 an annual -- this was our first, let's do

18 an annual review, what does it have and

19 what do they say.  So yes for Cardinal.

20 We knew on file that we had a form letter

21 in 2015, and they did fill out a

22 questionnaire in 2012.

23   Q.    So Ms. Dempsey, all I was

24 addressing was that it was August 2017,

1    and you were noting that the date of

2    their most recent questionnaire was

3    August 2012, right?  Yes or no?

4          A.    I wrote in this review that

5    we looked at the questionnaires, and that

6    was the date.

7          Q.    Okay.  The --

8          A.    But you're implying that I

9    never saw these questionnaires, but I

10   did.

11         Q.    No, I'm not I am supplying

12   anything.  That's not -- that's actually

13   not what I was seeking to imply.

14         A.    Okay.

15         Q.    I'm seeking to imply the

16   following.

17               I'm actually not seeking to

18   imply anything.  I'm going to have you

19   address it and you testify.

20               Date of most recent

21   questionnaire was August 12, 2017.

22               That only reflects -- that

23   reflects the questionnaire that you sent,

24   the date that you sent a questionnaire.

1              The fact is that Cardinal

2     didn't ever complete that questionnaire,

3     but responded with a form letter to the

4     2015 questionnaire request; isn't that

5     right?  Look under actions?

6              A.    No.  The first --

7              MS. BOODY:  Object to form.

8              THE WITNESS:  The first

9         column is the date of the

10        questionnaire we have on file.  So

11        we had a questionnaire completed

12        by Cardinal in 2012.

13    BY MR. JANUSH:

14             Q.    Was it -- was the 2012

15    questionnaire your four-question

16    questionnaire?

17             A.    Yes, it is.

18             Q.    Okay.  And so the later

19    questionnaire that was sent out in '15

20    was the one where you had Buzzeo's

21    guidance and you upped it to a multi-page

22    questionnaire; is that right?

23             A.    Yes.

24             Q.    Okay.  And so Cardinal

Highly Confidential - Subject to Further Confidentiality Review

1 responded to the four question

2 questionnaire in 2012; is that your

3 testimony?

4          A.     Yes.

5          Q.     But when you sent the more

6 robust multi-page questionnaire in 2015,

7 is it right that Cardinal responded with

8 a form letter to your 2015 questionnaire?

9          A.     They did provide us a form

10 letter in 2015, and did not complete the

11 questionnaire.

12          Q.     Okay.  And let's go down to

13 McKesson.  McKesson, coincidentally,

14 responded to your 2012 questionnaire on

15 the very same date, on August 17, 2012;

16 is that right?

17          A.     That was the four-question

18 questionnaire.

19          Q.     And McKesson responded on

20 the very same day as Cardinal; is that

21 right?

22          A.     That is the date that's on

23 the questionnaire.

24          Q.     Okay.  And Frank W. Kerr

1    responded on August 17, 2012, the same

2    date as Cardinal; is that right?

3                 MS. BOODY:  Object to form.

4                 THE WITNESS:  That -- that

5            is the date that was on the

6            questionnaire in the folder, in

7            the file.

8    BY MR. JANUSH:

9            Q.    In other words, it might not

10   be the date that the response was

11   received; is that right?

12           A.    That was the date we

13   received it.

14           Q.    Okay.  And when we look at

15   McKesson, "Actions, responded with a form

16   letter to the 2015 questionnaire

17   requests."

18                 Did I read that right?

19           A.    Responded with a form

20   letter -- yes.  Yes you did.

21           Q.    So McKesson and Cardinal

22   both did not fill out JOM's questionnaire

23   concerning suspicious order monitoring

24   systems; is that right?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      How did you feel about that?

3               MR. BARKER:  Object to form.

4               THE WITNESS:  We had the

5       original questionnaire on file.

6       So technically, we understood they

7       had a program.  And we did request

8       the new questionnaire.  But the

9       2012 questionnaire answered our

10      question, did you have a program

11      in place, and were our products

12      covered.

13  BY MR. JANUSH:

14      Q.      If it answered -- how sure

15  are you about that, that it answered your

16  question, if you had a program in place

17  and were our products covered?

18      A.      They described their -- in

19  2012?

20      Q.      Yeah.

21      A.      I believe both of these

22  questionnaires had a high-level summary

23  of their programs.

24      Q.      I'm just waiting to see if

Highly Confidential - Subject to Further Confidentiality Review

1    you're done.

2         A.    Oh, I'm done.

3         Q.    If your four-question

4    questionnaire was good enough, why did

5    you draft a multi-page questionnaire in

6    2015?

7              MR. BARKER:  Object to form.

8              THE WITNESS:  Throughout the

9         years, we identified enhancements

10        to make our program more robust so

11        we could provide DEA what they

12        wanted to see.  They never asked

13        for questionnaires.  We reviewed

14        our program with them.  When

15        Cardinal and McKesson did not fill

16        out the questionnaire, I did

17        follow up.  And I did understand

18        that because of the current --

19        they were being investigated, and

20        they did not complete

21        questionnaires at that time.  And

22        that is why we only got the form.

23   BY MR. JANUSH:

24        Q.    So --

Highly Confidential - Subject to Further Confidentiality Review

1    A.    So within -- so, like, I

2  just wanted to have it on record that we

3  continued to engage with Cardinal and

4  McKesson in regards to this

5  questionnaire, and we did follow-up.  I

6  met with my two counterparts at these two

7  locations to ask why they never completed

8  the questionnaires.  And I was informed

9  it was because they were -- there were

10  legal reasons.  And they both have

11  invited us to come and see their

12  programs.

13         But they did not -- at this

14  time in 2015, and -- '15 did they

15  complete our questionnaire.

16         (Document marked for

17       identification as Exhibit

18       Dempsey-13.)

19  BY MR. JANUSH:

20    Q.    Okay.  I'm going to hand you

21  what's been marked as Dempsey Exhibit 13.

22  I believe this is an example of your

23  questionnaire in March of 2015.  And I'm

24  really only entering it into the record

1  as an exemplar.  So first of all, is this

2  the 2015 questionnaire that Cardinal and

3  McKesson did not complete?

4           MR. BARKER:  Object to form.

5           THE WITNESS:  This is dated

6      March 2015.  And it most likely

7      was.

8  BY MR. JANUSH:

9      Q.    Okay.  And the questionnaire

10 addressed issues like general issues

11 about the company, the DEA registration

12 number, company ownership.  In Section 3,

13 prior history and associations concerning

14 whether the registrant had ever had a DEA

15 registration denied, suspended, or

16 revoked.

17           Do you see that?

18     A.    Yes, I do.

19     Q.    And other examples of items

20 are -- of information that you're seeking

21 is business information, is the

22 company -- is the company affiliated with

23 any business that handles controlled

24 substances through internet websites.

Highly Confidential - Subject to Further Confidentiality Review

1    That's at Number 28, right?

2         A.    Mm-hmm.

3         Q.    Okay.  And then at Section

4    5, you are addressing, "Does the company

5    have a suspicious order monitoring

6    program?  Please describe your program.

7    Is there a standard operating procedure

8    that describes the suspicious order

9    monitoring system?"  And then at Number

10   34, you are addressing very specific

11   drugs that Janssen or JOM and -- I should

12   say that Janssen and JOM sell.

13            You ask, "Are Nucynta,

14   Nucynta ER, Duragesic, Concerta, Tylox,

15   Tylenol with codeine, Ultracet, and

16   Ultram covered in your SOM program?  If

17   so, provide threshold limits if

18   applicable."

19            Did I read that right?

20        A.    Yes.

21        Q.    What's the reason for

22   seeking information as to whether your

23   company's drugs are included within a

24   distributor's suspicious order monitoring

Highly Confidential - Subject to Further Confidentiality Review

1  program?

2      A.    It's part of our due

3  diligence with our customers.  We want to

4  make sure, A, they have a suspicious

5  order monitoring program; and, B, that

6  our controlled substances are included in

7  that program.

8      Q.    Why is that important?

9      A.    We want to make sure that

10 they are doing their due diligence in

11 regard to C.F.R. 1301.74(b) about

12 operating a system to monitor orders for

13 unusual size, quantity, frequency, and

14 patterns.

15     Q.    It's important for you to

16 know the answers to these questions

17 because you are selling to these

18 distributors your opioid products, right?

19     A.    It is important for us to

20 meet our requirement to operate an order

21 monitoring program where we know our

22 customers and that they are doing their

23 due diligence in monitoring those

24 products as well.  All controlled

Highly Confidential - Subject to Further Confidentiality Review

1    substances.

2         MS. BOODY:  Could I just see

3    a copy of Exhibits 12 and 13?  I

4    don't think you have the Bates

5    number on the record.

6         Thank you.

7         MR. JANUSH:  For the record,

8    the Bates number of Exhibit 13 is

9    JAN-MS-02964406.

10         And Exhibit 12 is

11    JAN-MS-02963380.

12         (Document marked for

13    identification as Exhibit

14    Dempsey-14.)

15    BY MR. JANUSH:

16         Q.    I'm going to hand you what's

17    been marked as Dempsey Exhibit 14.

18         And earlier I -- I addressed

19    how you drafted your questionnaire.  And

20    this just confirms for the record that

21    you wrote to Brian Strehlke, Michael

22    Levitt, Guy Bacco and Art Dysart, "I took

23    the Buzzeo questionnaire and blended our

24    questions.  Could you all review and let

1    me know your thoughts by this Wednesday?

2    I have a meeting with trade to review.

3    Would like to get this to ABC, Cardinal

4    and McKesson before our May visits.

5    Thanks."

6                Did I read that accurately?

7        A.    Yes, you did.

8        Q.    Okay.  Why was it important

9    to you to get this to ABC,

10   AmerisourceBergen, Cardinal, and McKesson

11   before your May visits?

12       A.    We had intended to have --

13   to set up meetings.  I was going to work

14   with trade in order to meet with the

15   wholesalers to review our new

16   questionnaire.

17       Q.    Did that meeting happen?

18       A.    The meeting with trade did

19   happen.

20       Q.    Did the meeting with

21   McKesson happen?

22       A.    No.

23       Q.    Why not?

24       A.    They were not available to

Highly Confidential - Subject to Further Confidentiality Review

1    meet.

2         Q.    Do you know why?

3         A.    No.

4         Q.    Did the meeting with

5    Cardinal happen?

6         A.    No.

7         Q.    Do you know why?

8         A.    No.  The meeting with ABC

9    did occur.

10             (Document marked for

11             identification as Exhibit

12             Dempsey-15.)

13   BY MR. JANUSH:

14        Q.    I'm going to hand you what's

15   been marked as Exhibit 15.  And this is

16   Bates Number JAN-MS-02966153.

17             And I'm going to draw your

18   attention to the third page.  There's an

19   attachment or a forward from the DEA to

20   Michele Dempsey, subject, McKesson agrees

21   to pay record $150 million settlement for

22   failure to report suspicious orders of

23   pharmaceutical drugs.

24             Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, I do.

2    Q.    And you, on the next day, on

3    January 18th, a day after receiving this,

4    forwarded this on to Frank Mashett and

5    asked if Frank can confirm whether the

6    Ohio distribution center listed below is

7    the location we ship schedules and what

8    precautions we should take in order to

9    ensure we don't ship to a location that

10   no longer is allowed to have CS, right?

11   A.    Yes.

12   Q.    For the record, can you

13   speak up?

14   A.    Yes.

15   Q.    Okay.  And who is Frank

16   Mashett?

17   A.    He was in the trade.

18   Q.    So does that mean that he's

19   involved in sales?

20   A.    No.  He managed the

21   relationship with the wholesalers.

22   Q.    Okay.  Did he manage the

23   relationship with McKesson at this time,

24   in 2017?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     No.  As he was to remind me

2     that Phil West was the director for

3     McKesson.

4          Q.     Sorry, I see that right

5     above.

6               So Frank responded by

7     letting you know Phil West is the trade

8     account director for McKesson and SeWha

9     Park is the JOM planner.  The two of them

10    would be best to address my questions you

11    have related to this issue involving

12    McKesson.

13              And you respond, "Can you

14    please advise?  Thanks."  Right?

15              And you're writing to Phil

16    West and SeWha Park?

17         A.     Yes.

18         Q.     Okay.  And the answer that

19    you got from Phil West was, "Hi, Michele.

20    This has been an on" -- "this has been

21    ongoing litigation and McKesson has

22    contingency plans in place to leverage

23    their distribution center network over 30

24    sites to continue continuity of product.

1    SeWha is actively engaged with McKesson."

2              Do you see that?

3         A.    Yes.

4         Q.    That didn't exactly answer

5    your question, did it?

6              MR. BARKER:  Object to form.

7              THE WITNESS:  It did not

8         answer my question about what was

9         going into Ohio.

10   BY MR. JANUSH:

11        Q.    Okay.  And SeWha then wrote

12   back, "Hello, Michele.  JOM ships

13   scheduled products and controlled

14   substances to McKesson's RDC/regional

15   distribution center, Olive Branch, and

16   RDC distributes down to their forwarding

17   distribution centers.  So from JOM

18   perspective, we do not sell/ship

19   scheduled products/controlled substances

20   direct to McKesson forwarding

21   distribution centers.  We will review

22   this article with McKesson team to

23   receive any information and actions that

24   are required on our side."

Highly Confidential - Subject to Further Confidentiality Review

1        Did I read that right?

2        A.      Yes.

3        Q.      And you responded and I'm

4    not going to read your whole response,

5    but I'm going to read the part that I

6    want to focus most on.  And you can see

7    where I'm going.  I'm drawing it out for

8    you on the Elmo.

9        You wrote, "Hello, SeWha."

10   In your second paragraph, you said, "I do

11   have one more question.  Glad to see

12   there are contingency plans, but since

13   McKesson failed to fill out our

14   suspicious order monitoring

15   questionnaire, choosing only to send us a

16   blanket letter saying they have a

17   suspicious order monitoring program, can

18   we confirm somehow that Concerta, Tylenol

19   with codeine, Ultram, or Duragesic were

20   not involved?  Our questionnaire, if they

21   completed it, would have told us if our

22   products were in their SOM program."

23       Did I read that correctly?

24       A.      You did read that correctly.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    So do you know where I'm

2   going right now?

3              MR. BARKER:  Object to form.

4   BY MR. JANUSH:

5      Q.    I'm going back to your

6   earlier testimony where you addressed

7   that four-question questionnaire and said

8   you would have felt comfortable because

9   you would have known from that

10  questionnaire that your products were

11  included in their program.  Do you

12  remember testifying in that way?

13     A.    Yes.  And I believe the

14  second question of that four-question

15  questionnaire asked them are our products

16  included.

17     Q.    And here you are addressing

18  a worry on January 18, 2017, not that

19  long ago, that --

20             THE VIDEOGRAPHER:  Lower

21        that page, because it's not

22        projecting.

23             MR. JANUSH:  Thank you.

24  BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You're addressing a worry

2  that because McKesson "failed to fill out

3  our SOM questionnaire, choosing only to

4  send us a blanket letter saying they have

5  a suspicious order monitoring program,

6  can we somehow confirm that Concerta,

7  Tylenol with codeine, Ultram or Duragesic

8  were not involved?  Our questionnaire, if

9  they completed it, would have told us if

10  our products were in their SOM program."

11          Now read it a second time.

12  Do you see it?

13    A.    Yes, I do see it.

14    Q.    This would be a superfluous

15  or unnecessary question if you truly had

16  a four-question questionnaire in your

17  pocket from McKesson that answered this

18  issue, wouldn't it?

19          MR. BARKER:  Object to form.

20          THE WITNESS:  We did have

21      the four-question answer from

22      McKesson.  What we didn't have is

23      the eight-page detailed one that

24      went into length about their

1          algorithm and thresholds.

2    BY MR. JANUSH:

3          Q.    Miss, you are not -- you're

4    not -- Ms. Dempsey, you are not

5    addressing algorithms and thresholds

6    here.

7               You are addressing whether

8    you can confirm that these specifically

9    named products, Concerta, Tylenol with

10   codeine, Ultram or Duragesic were

11   involved in the problem, and that your

12   questionnaire, if completed, would have

13   told you if your products were included

14   in their program, their SOM program.

15              Isn't that what this is

16   addressing?

17              MR. BARKER:  Object to form.

18              THE WITNESS:  This was about

19        the new questionnaire that we

20        would have had on file, yes.

21   BY MR. JANUSH:

22         Q.    And it was addressing

23   whether your products were included in

24   their SOM program, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    So if your four-question

3  questionnaire gave you such comfort, why

4  in the world would you have sent this

5  e-mail?

6      A.    Because we wanted to have

7  the longer questionnaire on file, which

8  would go into more detail about their

9  program, beyond the high-level summary

10  that we had received in the past.

11      Q.    But again, in your e-mail,

12  you're not addressing high-level issues,

13  are you?  You're addressing just wanting

14  to confirm if these named products sold

15  by Janssen and JOM were involved in their

16  SOM program, correct?

17      A.    Yes.

18          (Document marked for

19          identification as Exhibit

20          Dempsey-16.)

21  BY MR. JANUSH:

22      Q.    I'm going to hand you what

23  I'm going to mark as Exhibit 16.  Now, at

24  this e-mail, we're going back in time to

Highly Confidential - Subject to Further Confidentiality Review

1    September of 2012.  On the second page --

2    and this e-mail is Bates-stamped

3    JAN-MS-02963719.

4              And here -- I'm addressing

5    Steve Noetzel's e-mail.  And he is

6    writing -- and you're cc'd, by the way.

7    I'm circling so you can find your name on

8    the Elmo.

9         A.    I just want to review the

10   whole document, if you don't mind.

11        Q.    Sure.

12        A.    Thank you.

13        Q.    So I'm on the second page.

14   I'm looking at the bottom of the page.

15   Steve Noetzel is writing to a host of

16   individuals at Johnson & Johnson,

17   Janssen, it looks like Noramco as well.

18   And is writing, "All, the DEA has

19   announced an immediate suspension of

20   Walgreens' license to ship Schedule C-II

21   through V products from their Jupiter,

22   Florida distribution center.  Tim and I

23   have already spoken about this with our

24   respective accounts, and here's the

1    takeaway.  Walgreens only warehouses a

2    select few C-II through IV products.  The

3    rest are sold direct to store from the

4    Cardinal distribution centers in

5    Wheeling, West Virginia and Madison,

6    Mississippi.  Cardinal will now supply

7    all C-II to IV --

8            A.    To V.

9            Q.    Sorry, to V.

10           A.    It says to V.

11           Q.    My eyes are playing tricks

12   on me this late in the day.

13           A.    That's okay.

14           Q.    -- "products to Walgreens

15   stores via the direct-to-store method as

16   they do all other Janssen products.

17   There should be no interruption of supply

18   of our products to any Walgreens store.

19   This should be business as usual for all

20   Walgreens stores.  We will keep you

21   posted as this progresses."

22           You wrote back, "I

23   understand trade's standpoint of ensuring

24   continuity of supply for our products.

Highly Confidential - Subject to Further Confidentiality Review

1    However, here is more details."

2              And you provided the DEA

3    publication of the suspension order, a

4    link to it, didn't you?

5         A.    There is a link to -- from

6    the DEA website.

7         Q.    And you wrote, "Should we

8    collect 2009 to 2011 data on our

9    controlled substances products at the

10   Walgreens listed to see if there is a

11   similar trend?"  Right?

12        A.    Yes.

13        Q.    And following that -- well,

14   let's pause there.

15              You've said a lot throughout

16   the day that you didn't ship directly to

17   Walgreens or the individual store level,

18   right?

19        A.    Yes.

20        Q.    And that it wasn't your

21   responsibility to know your customers'

22   customer, right?

23        A.    At this time, DEA did not

24   ask us to know beyond our customer.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     And yet you were worried

2     enough after reading the suspension order

3     to seek to collect data from 2009 to 2011

4     on your controlled substance products at

5     this Walgreens site to see if there is a

6     similar trend, right?

7                    MR. BARKER:  Object to form.

8                    THE WITNESS:  I wanted them

9               to use what data they had

10              available to see if we could see

11              how much was going into this area

12              in Florida.

13     BY MR. JANUSH:

14          Q.     And data was reviewed.  We

15     can see at the bottom of Page 1, Greg

16     Wolski writes back.  "We reviewed

17     controlled substances sales of JOM

18     products from Cardinal to the location we

19     believe to be Walgreens Jupiter

20     distribution center.  We cannot

21     100 percent confirm this is the data for

22     the location, since it is blinded, but we

23     believe that it is.  We trended the sales

24     for 2011 and 2012 year to date, and

1    found:"

2             And thereafter they

3    address -- Greg Wolski addresses, over

4    this time period, that the Jupiter

5    distribution center stocked five

6    strengths of Duragesic, four strengths of

7    Concerta, and one strength of Nucynta.

8             A.    Yeah, so they had --

9             Q.    Right?

10            A.    They had the data for the

11   Cardinal Jupiter location.  Using their

12   867 data, they were able to identify

13   that.

14            Q.    And even down to, at the

15   fourth line, the language, "The most

16   heavily purchased product was Nucynta IR

17   50 milligrams, which had average

18   purchases/sales of 324 bottles per week."

19            Do you see that?

20            A.    Yes, I do.

21            Q.    Okay.  And at the top of

22   this e-mail, you then address the notion

23   that, "We should be doing this," and by

24   "this" I think you mean this kind of an

1  intense review, "not just when DEA shuts

2  down Walgreens...  Mike and I fear that

3  JOM is going to reduce head count and

4  there will not be anyone left to do this

5  kind of analysis.  These are the key

6  products we should be constantly

7  monitoring, but the current process of

8  collecting data is time consuming.  Took

9  Greg all week."

10          Do you see that?

11      A.    Yes, I do.

12      Q.    The process to collect this

13  data was time consuming because your

14  group wasn't working with an outside

15  vendor to know your customers' customer,

16  was it?

17          MR. BARKER:  Object to form.

18          THE WITNESS:  The reason it

19      took a lot of time was it was

20      blinded and we had to look at this

21      data for this one DC location.

22      And as I explained before, DEA

23      never asked us for this

24      information.  We were doing this

Highly Confidential - Subject to Further Confidentiality Review

1    out of our own review.

2    BY MR. JANUSH:

3        Q.    But as we've addressed

4    earlier today, blinded data can be

5    unblinded by outside third-party vendors

6    and by chargeback data by 852, by 867

7    data, correct?

8                MR. BARKER:  Object to form.

9                THE WITNESS:  That came out

10           in 2017 and 2018.  But back then,

11           in 2012, DEA did not ask for that

12           information.  They did not expect

13           the manufacturers to be reviewing

14           that information.

15   BY MR. JANUSH:

16       Q.    When you say that came out

17   in 2017, you're only referring to the

18   "that" as being the DEA --

19       A.    The downstream data.

20       Q.    The DE -- let me finish my

21   question.

22             You are referring to the

23   DEA's determination in a case against

24   Mallinckrodt; is that right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2      Q.      You're not referring to the

3  notion that the technology didn't exist

4  in 2012 to unblind data, right?

5              MR. BARKER:  Object to form.

6              THE WITNESS:  In 2012, I did

7         not know that there was a

8         technology to unblind the data or

9         that we needed to unblind the data

10         because DEA never asked for that

11         data.

12             MR. BARKER:  Are you sure

13         you don't want to use the copy

14         with your notes on it?  You can

15         just hand it right over.

16            (Document marked for

17         identification as Exhibit

18         Dempsey-17.)

19  BY MR. JANUSH:

20     Q.      Please find Exhibit 17.

21  This is Bates stamped JAN-MS-03115514.

22             And this is also attaching a

23  compliance PowerPoint that's Bates

24  stamped JAN-MS-03115516.

Highly Confidential - Subject to Further Confidentiality Review

1          So I'm going to focus your

2   attention to the bottom of Page 1 where

3   Steve Noetzel is writing to a big group

4   and cc'ing you.

5          A.    Mm-hmm.

6          Q.    And he's addressing, "All, I

7   heard back from Cardinal again last night

8   and wanted to provide you all with an

9   update.

10          "The DEA has not yet

11   suspended Walgreens license for

12   controlled products from their

13   Perrysburg, Ohio, distribution center.

14   Walgreens has decided, however, to

15   voluntarily discontinue shipping Class II

16   through V products from this location for

17   the time being.  As of now they are

18   depleting all inventory and receiving no

19   replenishment for controlled products

20   until further notice.

21          Walgreens will begin

22   shipping Class III to V products to their

23   stores serviced out of Perrysburg from

24   another Walgreens distribution center.

Highly Confidential - Subject to Further Confidentiality Review

1      "Class II products, on the

2    other hand, will now be shipped to most

3    of these stores from Cardinal.

4      "As of this morning,

5    Cardinal will be able to ship product to

6    95 percent of the Walgreens stores

7    serviced out of the Perrysburg facility."

8      Did I read that right?

9      A.    You read what the e-mail

10   states.

11     Q.    Okay.  And Steve is

12   addressing further in the e-mail,

13   "Finally, I want to alleviate any

14   concerns that the situation at the

15   Perrysburg facility is not a result of

16   any DEA concerns with any Janssen

17   products."

18     Did that -- did I read that

19   correctly as well?

20     A.    Yes.

21     Q.    Okay.  And the e-mail

22   attaches a PowerPoint addressing the

23   current DEA external environment in 2012.

24   And it's on Janssen -- I'm going to try

1    and shrink this.  It's on Janssen paper,

2    with Janssen's emblem.

3            Did you create this

4    PowerPoint?

5        A.    Yes.

6        Q.    Okay.  And it's 2012.  And

7    you are addressing "intense scrutiny

8    of" -- "of industry.

9            "Manufacturers, formulators

10   being called to Washington to explain

11   suspicious order monitoring programs."

12           Who were you referring to

13   when you drafted this PowerPoint slide

14   that had been called to Washington to

15   explain their SOM programs?

16       A.    From my Noramco due

17   diligence and know your customer, I know

18   that some of the formulators, as I

19   mentioned before KVK, was asked to go

20   down to Washington to explain their

21   suspicious order monitoring programs.

22       Q.    Okay.  But you -- you listed

23   manufacturers plural and formulators

24   plural.  Who beyond KVK were you

1    referring to?

2         A.    I can only remember KVK at

3    this time.  I do know at conferences, DEA

4    spoke in plural.  Manufacturers were

5    being called to Washington.

6              We were never called down.

7         Q.    And if you turn to Slide 3,

8    did you draft this or did the -- did you

9    get this from a DEA slide, this

10   controlled substance compliance pyramid?

11        A.    This was part of a DEA site

12   training that was developed at our Athens

13   facility.  So a specialist put this

14   together.

15        Q.    Okay.  And when you say a

16   specialist, is that a --

17        A.    A DEA compliance specialist

18   at the API manufacturing location, based

19   on what we had heard from previous

20   conferences.

21        Q.    Okay.  And -- and when you

22   say a DEA compliance specialist, you're

23   referring to a JOM employee?

24        A.    A Noramco.

1    Q.    A Noramco employee.

2    A.    Right.

3    Q.    Okay.  So you had a Noramco

4  employee putting on a presentation on

5  Janssen and Johnson & Johnson letterhead

6  for which company's employees?

7        MR. BARKER:  Object to form.

8        THE WITNESS:  I pulled a

9        compliance deck that we usually

10       had from previous onsite training.

11       I pulled relevant slides that

12       somebody else developed the

13       content, into this overall

14       compliance slide deck for 2012.

15  BY MR. JANUSH:

16    Q.    And -- and what company did

17  the employees work for who were receiving

18  this discussion?

19        MR. BARKER:  Object to form.

20        THE WITNESS:  I forwarded --

21       I was forwarding this to the

22       quality manager at JOM for

23       consideration of inclusion in

24       their routine DEA compliance

Highly Confidential - Subject to Further Confidentiality Review

1          training.

2     BY MR. JANUSH:

3          Q.     Okay.

4          A.     She owned the training

5     program.

6          Q.     And listed as a major

7     violation, wilful nonconformance with

8     federal regulations.  No internal DEA

9     compliance processes in place to...

10              And we have things like

11     "detect and prevent diversion"; is that

12     right?

13          A.     Yes.

14          Q.     And, "submit DEA reports."

15     That's listed as well, right?

16          A.     Mm-hmm.

17          Q.     And, "identify and report

18     suspicious orders" is also listed, right?

19          A.     Yes.

20          Q.     And "train employees" is

21     also listed as a major violation; is that

22     right?

23          A.     Yes.

24          Q.     What's that regarding, train

1    employees?

2           A.     Make sure that those that

3    are handling controlled substances know

4    how the regulations apply to their

5    activities.

6           Q.     Okay.  And control

7    distribution of controlled substance is

8    listed as a major -- an area for major

9    violation; is that right?

10          A.     Well, it's listed as if you

11   do not demonstrate anything and having no

12   process in place to control the

13   distribution, you will potentially get

14   a -- a violation with the DEA.

15          Q.     Now on to the next page you

16   address serious violations, right?

17          A.     The next level down, yes.

18          Q.     And at serious violations

19   you address "failure to implement

20   corrective actions that cause deviations

21   from federal regulations or internal DEA

22   compliance processes."

23                 Did I read that correctly?

24          A.     Yes, you did.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And the second arrow you

2    address "consequence of deviations could

3    cause reporting errors or allow diversion

4    to go undetected."

5          Did I read that correctly?

6    A.    Yes, you did.

7    Q.    Would it be a serious

8    violation if you had a suspicious order

9    monitoring system that shuts off in the

10   afternoon and would permit orders that

11   come in after 3:45 p.m. to potentially go

12   out unchecked?

13         MR. BARKER:  Object to form.

14         THE WITNESS:  All orders of

15         controlled substances are placed

16         on hold until they've gone through

17         the algorithm.

18         MR. JANUSH:  Move to strike,

19         nonresponsive.

20   BY MR. JANUSH:

21   Q.    I asked you would it be a

22   serious violation if you had a suspicious

23   order monitoring system that shuts off in

24   the afternoon and would permit orders

Highly Confidential - Subject to Further Confidentiality Review

1    that come in after 3:45 p.m. to

2    potentially go out unchecked?

3            MR. BARKER:  Object to form.

4    BY MR. JANUSH:

5        Q.    You can answer.

6        A.    If a suspicious order was

7    released, it did not fall -- go through

8    the monitoring program, it could be a

9    violation.

10       Q.    A serious violation, right?

11       A.    Yes, according to this, a

12   serious violation.

13       Q.    Before we put that exhibit

14   away, let's go back to 17 just for a

15   moment.

16            I went through the

17   compliance slides very briefly with you

18   just now that you attached to this

19   e-mail.  And I'm going to circle --

20   that's that document that I circled.  You

21   can look at the screen.

22            Is that right?

23       A.    Yeah.  Yeah.

24       Q.    Okay.  And -- and you wrote

Highly Confidential - Subject to Further Confidentiality Review

1   to Maryann Gribbin, "I asked Mike to

2   update the JOM DEA training.  We both

3   agree more focus on suspicious order

4   monitoring needs to be added.

5              "Next week at HDMA should be

6   interesting.  Hope you don't mind my

7   e-mail is just to you, not to Steve.

8   Being in compliance, I know you get it.

9   For Steve it is about the sale.  Ha-ha!"

10             Do you see that?

11       A.    Yes, I do.

12       Q.    Steve Noetzel, he's the

13   trade guy, right?

14       A.    He managed the relationship

15   with the wholesaler.

16       Q.    So you're writing an e-mail

17   that cut out Steve to not offend him and

18   to address to Maryann the importance of

19   JOM DEA training and with a greater focus

20   on suspicious order monitoring; is that

21   right?

22       A.    As in charge of the quality

23   assurance compliance at JOM, she would

24   manage the training program, and so I

Highly Confidential - Subject to Further Confidentiality Review

1    directly sent this to her asking for her

2    inclusion in the routine training for DEA

3    compliance.  I --

4         Q.    But you also -- go ahead.

5         A.    Now I lost my train of

6    thought.  Sorry.

7         Q.    Sorry.  I apologize.

8         A.    That's okay.

9         Q.    I was just going to address,

10   but you also wrote with purpose, didn't

11   you, when writing, "Hope you don't mind

12   my e-mail is just to you, not to Steve.

13   Being in compliance, I know you get it.

14   For Steve, it is all about the sale,

15   ha-ha."

16              MR. BARKER:  Object to form.

17        Is there a question?

18   BY MR. JANUSH:

19        Q.    You wrote that, right?

20        A.    I wrote that, yes.

21              (Document marked for

22        identification as Exhibit

23        Dempsey-18.)

24   BY MR. JANUSH:

1    Q.    Ms. Dempsey, I'm handing you

2    what I've marked as Dempsey-18.

3          This document concerned

4    language regarding esketamine, right?

5    A.    Yes.

6    Q.    What is esketamine?

7    A.    It is a new product that

8    Janssen has developed, and is in clinical

9    trials and awaiting approval from FDA.

10   Q.    What kind of product is it?

11   A.    It is psychotropic

12   non-narcotic for depression.

13   Q.    Okay.  And isn't it true

14   that you admitted in this e-mail that

15   because Janssen's brand volume is very

16   low, we do not have experience around

17   suspicious order monitoring?

18         MR. BARKER:  Object to form.

19         THE WITNESS:  Let me read

20      what he wrote.

21         Okay.  So this is in regards

22      to the distribution pattern that

23      is being proposed for esketamine

24      where it's going to the healthcare

1          provider.  And so I was saying

2          that our current suspicious order

3          monitoring program, which only

4          goes to the wholesaler, we don't

5          have that experience delivering

6          directly to a doctor's office.

7                The -- esketamine will be

8          administered under the supervision

9          of a healthcare provider.

10    BY MR. JANUSH:

11          Q.    You were being asked, "Hi,

12    Michele.  We are finalizing a Q&A for J&J

13    Pharma analyst day on May 17.  Are you

14    okay with the copy below re esketamine

15    and potential abuse as well as potential

16    for REMS program?"  That is a risk

17    evaluation mitigation strategy program,

18    right?

19          A.    Yes.

20          Q.    "I believe you have seen

21    this previously."

22          A.    Yes.

23          Q.    "Thanks, Greg."

24                And he -- you write in your

1  first response, "Number one, I don't

2  consider what we have done for Concerta

3  and Duragesic can be called deep

4  experience."

5          That's responding to a

6  general question about, are you okay with

7  the copy below re esketamine and

8  potential abuse as well as potential for

9  REMS program, isn't it?

10     A.    So I was questioning the

11  word "deep," because that implies that we

12  had multiple products in large volumes.

13  So I was saying our experience in

14  manufacturing, in commercialization, I

15  would not call that a deep experience,

16  and that when we launched Concerta in

17  2000 -- and I -- excuse me, I don't

18  remember when Duragesic launched, those

19  requirements back then are not as -- the

20  requirements are different in 2017, as

21  when we launched our other controlled

22  substances --

23     Q.    Are you --

24     A.    -- in regards to -- there's

1    been more enhancements to our suspicious

2    order monitoring and the requirements for

3    our current distribution.

4          Q.    The answer that you just

5    gave implies that you are completely

6    unaware that REMS programs were initiated

7    for Duragesic after its launch, in the

8    years after its launch?

9                MR. BARKER:  Objection.

10   BY MR. JANUSH:

11         Q.    Were you aware of that?

12               MR. BARKER:  Object to form.

13   BY MR. JANUSH:

14         Q.    In other words, you're

15   analyzing the environment when Duragesic

16   originally launched.  But in between that

17   year that Duragesic launched in the 1990s

18   and the present date, a lot has happened

19   concerning risk evaluation and mitigation

20   strategies related to Duragesic; isn't

21   that true?

22               MR. BARKER:  Object to form.

23               THE WITNESS:  In my realm at

24         this point, I was not involved in

Highly Confidential - Subject to Further Confidentiality Review

1          the REMS.  I'm not medical

2          affairs.  So I would not know what

3          was exactly done in regard to

4          Duragesic REMS.

5     BY MR. JANUSH:

6          Q.    But -- so you're giving a

7     wrong -- you're giving a wrong answer

8     here, aren't you, saying -- by saying --

9     without knowing, by saying you wouldn't

10    consider what we have done for Concerta

11    and Duragesic can be called deep

12    experience.  "The environment has changed

13    substantially in regards to abuse and the

14    requirements for due diligence on the

15    pharmaceutical companies since we

16    launched those products, and because our

17    brand volume is very low, we do not have

18    experience around suspicious order

19    monitoring."

20          The answer that you gave

21    failed to take into account Janssen's

22    experience attempting to address --

23    address risk evaluation and mitigation

24    strategies concerning Duragesic in the

1    years after its launch, didn't it?

2                MR. BARKER:  Object to form.

3                THE WITNESS:  I can't speak

4         to REMS.  As I said, I'm in the

5         DEA compliance base, which is DEA,

6         not FDA.  So I was not aware of

7         what was done with Duragesic in

8         regards to REMS.

9    BY MR. JANUSH:

10        Q.    So why didn't you say that

11   in your answer?

12        A.    I was reading here what they

13   -- the summary.  They -- they weren't

14   even talking about REMS in this

15   paragraph.  Well, the risk mitigation

16   plans.  They mentioned Janssen has deep

17   experience.

18             So based on my limited

19   knowledge of manufacturing and the DEA

20   compliance, I wouldn't say that we had

21   deep recent experience.  And that's what

22   I was trying to say up above.

23        Q.    Do you understand -- do you

24   understand that Duragesic had been on the

Highly Confidential - Subject to Further Confidentiality Review

1    market for over 20 years when you wrote

2    this responsive e-mail?

3          A.    I knew it had been for a

4    long time.  Not the 20 years.

5          Q.    And you're addressing a

6    20-year fentanyl product that had been

7    being sold -- that had been sold by

8    Janssen, each of those 20-plus years

9    had -- was associated with not much

10   experience around suspicious order

11   monitoring, are you not?

12               MR. BARKER:  Objection.

13        Object to form.

14               MR. JANUSH:  I'll ask it

15        differently.

16   BY MR. JANUSH:

17        Q.    You wrote, "Since we

18   launched those product" -- "the

19   environment has changed substantially in

20   regards to abuse and the requirements for

21   due diligence on the pharmaceutical

22   company since we launched those products,

23   and because our brand volume is very low,

24   we do not have experience around

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order monitoring."

2              And that was in relation to

3    Concerta and Duragesic, was it not, those

4    words?

5              MR. BARKER:  Object to form.

6              THE WITNESS:  It was for

7         Concerta and Duragesic, in 2017,

8         the number of orders that we were

9         handling.

10   BY MR. JANUSH:

11        Q.   But you're addressing in

12   2017 a lookback -- you're using the word,

13   "Since we launched those products and

14   because our brand volume is very low, we

15   do not have experience around suspicious

16   order monitoring."

17              Your words are not just

18   limited to 2017, are they?

19              MR. BARKER:  Object to form.

20              THE WITNESS:  I was

21         comparing our current number of

22         orders for those products to

23         when -- so this -- we were getting

24         ready to launch a new product.

1           And I was trying to relay that the

2           environment is a lot different

3           than when we launched Concerta,

4           which is the other non-narcotic as

5           well as Duragesic, which you

6           reminded me was over 20 years old.

7                (Document marked for

8           identification as Exhibit

9           Dempsey-19.)

10   BY MR. JANUSH:

11        Q.    I'm going to hand you what's

12   been marked as Exhibit 19.

13           This is minutes of a

14   suspicious order monitoring workshop.

15           MR. BARKER:  Did you hand me

16        two copies?

17           MR. JANUSH:  Sorry, I

18        apologize.  I did.  Maybe you can

19        pass one down.

20           MR. BARKER:  Sure.  Just

21        wanted to make sure --

22           MR. JANUSH:  Total mistake.

23   BY MR. JANUSH:

24        Q.    And it looks at the top of

Highly Confidential - Subject to Further Confidentiality Review

1    the workshop agenda you are listed as a

2    speaker from the 11 to 12 o'clock hour.

3    And you are listed to address current JOM

4    program and Teva or Teva benchmark.

5                Do you see that?

6         A.    Yes, I do.

7         Q.    In 2017 did you benchmark

8    with Teva?

9         A.    In 2017, yes, we did.

10        Q.    And what did you benchmark

11   on?

12        A.    We reviewed how they handle

13   the authorized generic of our ADHD

14   medicine.  So we -- they walked through

15   their suspicious order monitoring program

16   in regards to the handling of our

17   methylplenidate product.

18        Q.    Okay.  And I'm going to turn

19   your attention to the second page here.

20   And you're addressing opportunities with

21   current order monitoring program

22   discussed at December 13, 2017 workshop.

23                And by -- by the way, were

24   you the author of this document?  This

1    came from your custodial file so I --

2         A.    Yes.

3         Q.    You are?  Okay.

4              And where we see redline

5    comments, and it's DM, is that -- is that

6    your initials, Michele Dempsey?

7         A.    Yes.

8         Q.    Okay.  So at Number 1 you

9    address algorithm.  And specifically you

10   address "the current monitoring report in

11   SAP BW runs once a day, assumes all

12   orders have been placed for the day.

13   There have been instances where

14   controlled substances, Schedule III to V,

15   are placed after the report is run,

16   3:45 p.m., and there is the potential

17   that an order can be released the next

18   morning without being monitored in the

19   program.

20              "Current remediation

21   process.  If order timestamp is after

22   2:30, the order is held.  Tramadol,

23   Tylenol with codeine orders on business

24   manager hold until the next day, so the

Highly Confidential - Subject to Further Confidentiality Review

1    order can run through the algorithm."

2              Did I read that right?

3         A.    Yes, you did.

4         Q.    Okay.  And you wrote as a

5    redline edit:  "Any time we need to have

6    a review done each morning by personnel

7    leads to potential of error.  The current

8    remediation is not the preferred

9    long-time solution"; is that right?

10             A.    Yes.

11        Q.    And so by that, you were

12   addressing that the notion that your

13   orders run once a day through your SAP

14   system at 3:45 p.m. leads to a potential

15   for human error in catching something

16   that -- or in not catching an order that

17   may be placed after 3:45 p.m.; is that

18   right?

19             MR. BARKER:  Object to form.

20             THE WITNESS:  There is that

21        potential as it's stated.

22   BY MR. JANUSH:

23        Q.    Okay.  And you are also

24   addressing, at Number 2, "The current

Highly Confidential - Subject to Further Confidentiality Review

1    monitoring report is based on three times

2    the customer's 12-month rolling weekly

3    average of shipments.  The report rolling

4    average will not show slow increases in

5    order patterns or if a new customer

6    starts at higher levels verse similar

7    size customers."

8              Did I read that correctly?

9         A.    Yes, you did.

10        Q.    That was viewed to be a

11   weakness by you, right?

12        A.    That was an opportunity for

13   an enhancement.

14        Q.    Okay.

15        A.    As I stated before, our

16   program was reviewed with DEA on numerous

17   occasions.  They knew what our current

18   program did.

19              MR. JANUSH:  Move to strike

20        as nonresponsive everything after

21        the word "enhancement."

22   BY MR. JANUSH:

23        Q.    "The report does not take

24   into consideration multiple orders in one

Highly Confidential - Subject to Further Confidentiality Review

1    month.  The accumulation effect exceeding

2    the total for the month.  It compares the

3    one order against the historical three

4    times 12-month week average."

5            Did you view that to be an

6    opportunity for enhancement as well?

7            A.    Yes, we saw that as an

8    enhancement opportunity.

9            Q.    And the current three times

10   12-month moving average was based on DEA

11   feedback for List I/precursor chemical

12   orders.  We talked about that earlier,

13   right?

14           A.    Yes, we did.

15           Q.    "Future state monitor" --

16   "monitoring program needs to be more

17   current to industry practice."

18           Here you are acknowledging

19   that your program is not current, right?

20           MR. BARKER:  Object to form.

21           THE WITNESS:  Object.  That

22       we have a program that DEA has

23       reviewed with us, and this is

24       after the Mallinckrodt

Highly Confidential - Subject to Further Confidentiality Review

1         announcement came out and we were

2         using our -- this workshop as an

3         opportunity to identify future

4         enhancements.

5 BY MR. JANUSH:

6         Q.    And just to wrap this up and

7 be technically correct.  Earlier in the

8 day we started with a PowerPoint that you

9 drafted that showed the first quarter

10 of -- or that showed 2006, I believe Q1

11 through Q1 or Q2, 2012 and showed three

12 times or 300 percent of the average

13 annual weekly order was the mathematical

14 formula for a suspicious order.

15         Is that right?

16         A.    Three times the 12-month

17 rolling, 12-month rolling average.

18         Q.    Okay.  And here we are, move

19 forward from 2006.  Here we are 11 years

20 later in December 2017, and JOM and

21 Janssen's suspicious order monitoring

22 mathematical formula is the same, as of

23 December 13, 2017, as it was in 2006;

24 isn't that right?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. BARKER:  Object to form.
2              THE WITNESS:  This algorithm
3         was reviewed with DEA and DEA did
4         not provide any recommendations or
5         told us otherwise that this was
6         not acceptable.  So at this time
7         that was what we used for our
8         algorithm.
9    BY MR. JANUSH:
10        Q.    Okay.  Now, I'd like you to
11   answer the question I asked you which is,
12   in 2006 you utilized the same
13   mathematical formula to compute a
14   suspicious order as you did as of
15   December 13, 2017; is that right?
16        A.    Yes.
17        Q.    And you keep referring it to
18   an algorithm.  It's actually like fourth
19   grade simple math, isn't it?
20        A.    I wouldn't say that.
21   Because the system has to pull all the
22   historical data and do the calculations.
23        Q.    But it --
24        A.    It's just a report.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    But it's just simple math.

2  It's not an algorithm.  It's averaging

3  out total numbers of sales by a specific

4  product with a specific strength over a

5  year and determining if an order is three

6  times that; isn't that right?

7    A.    It is identifying if there

8  is a questionable order that doesn't meet

9  the usual quantity that the customer

10  receives of that SKU.

11    Q.    I'd like you to answer my

12  question.

13    Your formula is averaging

14  out the total number of historical sales

15  by a specific product SKU with a specific

16  strength that has been sold over the past

17  year, averaging those sales and

18  determining if the current order is three

19  times that average; isn't that right?

20    A.    Yes.  That's the -- three

21  times.

22    Q.    And that isn't an algorithm,

23  is it?

24    MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1        THE WITNESS:  An algorithm

2     is any calculation.  And it's a

3     program in SAP.

4  BY MR. JANUSH:

5     Q.    Turn to Page 36 of 6.  It's

6  got a lot of redline comments on the

7  side.  It's ending in Number 02987653.

8        And here I'm addressing the

9  investigation processes, at Subpart 2,

10  Paragraph 1.  "When an order hits the

11  monitoring report, DEA compliance should

12  review the investigation and then make

13  the decision on whether the order should

14  ship."

15        Subpart A states, "Those

16  supporting the order, planning channel

17  ops, trade, customer service, need to

18  complete the documented investigation and

19  ensure all areas are covered in the

20  documentation."

21        Subpart B:  "If channel ops

22  team knows an order is larger than

23  typical, they should communicate in

24  advance so documentation can be prepared

1    before the order is placed and run

2    through the order monitoring program."

3                Having read that, I'd like

4    to draw your attention to your comment

5    DM 7.  Why don't you read that?

6         A.    Sure.

7                "Currently when an atypical

8    order is identified, customer service

9    e-mails DEA compliance and that is all.

10   DEA compliance has to ask the questions,

11   collect the data, complete into a

12   document to save on the share point.  We

13   are asking the owners of the information

14   to do the documentation, and then DEA

15   compliance reviews and makes final

16   decision.

17               "We'll explain more about

18   this with you later."

19        Q.    Did this get implemented

20   in -- into a new SOP?

21        A.    Yes, it did.

22        Q.    And was that Version 10?

23        A.    I'm not sure which SOP you

24   are referencing Version 10.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    If I have time later I'll --

2  I'll definitely pull it out.

3      A.    Okay.  Definitely.  I lost

4  count of the version --

5      Q.    I thought -- thought it got

6  implemented.

7      A.    -- I thought it was 8, but

8  yes.

9      Q.    So earlier we were talking

10 about the reports or memos that would be

11 written when a potentially suspicious

12 order is investigated.  Do you -- do you

13 recall that?

14     A.    Yes.

15     Q.    Okay.  And here you are

16 addressing that, you are asking the

17 owners of the information to do the

18 documentation.  Who are the owners of the

19 information you're asking to do the

20 documentation?

21     A.    The planners and channel

22 ops, as well as customer service that

23 engages with the customer.

24     Q.    All right.  Earlier, when

1    you testified that when you were talking

2    about customer service being involved in

3    writing the memos and that the memos

4    would be with customer service, now

5    you're talking about asking the owners of

6    the information who are planners in

7    channel ops who are different than the --

8    they're different employees than customer

9    service folks, aren't they?

10         A.    They're all reporting into

11    the same organization, which is the

12    customer service deliver -- they have the

13    same leaders.

14              In the past, they did do --

15    what I was trying to say here is they did

16    eventually do all the documentation, but

17    DEA compliance had to go and tell them

18    pull the data out, let us review it.

19              So we would like to not have

20    to remind them that they could get this

21    data in advance and give it to us to

22    review.  Instead of waiting for us to

23    tell them, "Did you do -- did you run

24    your reports?  Did you -- did you fill

Highly Confidential - Subject to Further Confidentiality Review

1   out -- get the questions from the

2   customer?"

3         Q.    Okay.

4         A.    And we changed the SOPs to

5   specifically address that that need to be

6   all done first before handing it over to

7   DEA compliance to review the entire

8   package.

9         Q.    And moving on to Paragraph

10  Number 4, ordering, here you wrote, "The

11  existing suspicious order monitoring

12  program is dependent on human

13  interaction.  A, every

14  shipment/order/timestamp is checked

15  manually against the SAP monitoring

16  report to ensure it was run through the

17  program (confirmed Schedule II are

18  checked, gap with Schedule III to V).

19              "B, the same restrictions on

20  order placements for Schedule IIs is not

21  used for schedule III to IV" -- "to V.

22  There is no flag in the system to prevent

23  orders from being placed throughout the

24  day for scheduled products.

Highly Confidential - Subject to Further Confidentiality Review

1    "And C" -- which I'd like to

2   really focus with you on -- "SAP allows

3   orders to be placed anytime.  There is no

4   hard stop with the monitoring report.

5   The future state program should have

6   thresholds embedded into master data such

7   that when an order is placed, the person

8   who enters it is immediately notified

9   that the order is not typical."

10          Do you see that?

11      A.    Yes.

12      Q.    And you wrote at Comment DM

13   11, "I think at this time the future

14   state has not been defined and approved

15   yet.  IT workshop in January to define

16   whether the threshold process will work."

17          What were you referring to

18   here at Comment 11?

19      A.    Oh, we were identifying if

20   this -- realtime, I enter in the order,

21   it comes up and tells me immediately,

22   versus having a report running in the

23   background at a scheduled time.  We

24   didn't make that -- we were going to have

1   a future discussion on, could we do the

2   realtime.  So that was saying in the

3   workshop in January, we're going to

4   define where this process will work, if

5   physically SAP could allow us to do that.

6        Q.    Okay.  And here, this brings

7   us full circle to what I was discussing

8   with you earlier this morning regarding

9   order monitoring.  Paragraph 8, "Order

10   monitoring.  Identify how chargeback/EDI

11   ValueCentric data could be routinely used

12   to identify potential suspicious trends

13   at the pharmacy patient level.  Need to

14   discuss how we can use 852, 867 and

15   IntraChain (sic) data for follow-up

16   investigation on typical orders as well."

17        Did you mean IntegriChain?

18      A.    Yes, I did.

19      Q.    Okay.  And here in that

20   bullet that I'm circling at the bottom.

21   You were writing, "IntegriChain is a

22   competitor of ValueTrak that takes all

23   the 867 field data and unblinds it so we

24   can see buying patterns.  Commercial

1    excellence, Glen Moering, Cheryln, can

2    explain what data we receive and if we

3    are tracking sales."

4              Did I read that correctly?

5         A.    Yes.

6         Q.    This comes full circle to

7    the very type of information, and in fact

8    the third parties we were discussing

9    earlier today that your trade group was

10   utilizing to track sales, right?

11             MR. BARKER:  Object to form.

12             THE WITNESS:  This shows you

13        that after we learned about the

14        Mallinckrodt -- the new

15        expectation for downstream data,

16        we held a workshop to evaluate our

17        current state and determined that

18        we need to do that know your

19        customer downstream, and at that

20        time, in present at the workshop,

21        we had commercial -- if you notice

22        we had a lot of individuals from

23        the established products

24        commercial product directors, and

Highly Confidential - Subject to Further Confidentiality Review

1          at this meeting provided that we

2          had -- they're the ones that told

3          us about IntegriChain and that we

4          could use this data.

5               So we had this

6          cross-functional workshop.  We

7          reviewed the current state for

8          suspicious order monitoring,

9          including the recent issue with

10         Mallinckrodt, and this was our

11         attempt to identify future

12         enhancements to bring our program

13         up to speed.

14              And that was addressing the

15         newly discovered downstream data.

16    BY MR. JANUSH:

17         Q.    You know that you didn't

18    answer my question, right?

19              MR. BARKER:  Object to form.

20              THE WITNESS:  Well, you were

21         trying to --

22    BY MR. JANUSH:

23         Q.    Well, rather than say what I

24    was trying to do, let's actually quote

Highly Confidential - Subject to Further Confidentiality Review

1    what I did do.

2         A.    Okay.

3         Q.    Question, quote:  "This

4    comes full circle to the very type of

5    information, and in fact the third

6    parties that we were discussing earlier

7    today, that your trade group was

8    utilizing to track sales, right?"

9              I'm just asking if we've

10   come full circle to the very same third

11   parties, ValueTrak and IntegriChain, that

12   your trade group was bragging about using

13   in a 2012 PowerPoint earlier today?

14              MR. BARKER:  Object to form.

15              THE WITNESS:  This is when

16        we realized that they had this

17        downstream data, that we discussed

18        previously, that you showed me the

19        analytics.  So this is when we

20        realized it was available.

21   BY MR. JANUSH:

22        Q.    You realized -- your

23   testimony today, right now, is that you

24   realized in 2017 that third party vendors

Highly Confidential - Subject to Further Confidentiality Review

1    could unblind sales data down to the

2    retail level.  You personally, and your

3    group, learned that only as of 2017.  Is

4    that your testimony?

5         A.    That it was late in 2017

6    that I knew that there was this

7    commercial excellence group and that they

8    were buying data from IntegriChain.

9              MR. BARKER:  Evan, I see you

10        going to a new document.  Is this

11        a good time to break?

12             MR. JANUSH:  Absolutely.

13             MR. BARKER:  Whenever it's

14        convenient for you.

15             MR. JANUSH:  We can break

16        right now.  Let's go off the

17        record.

18             THE VIDEOGRAPHER:  All

19        right.  Stand by.  The time is

20        4:28 p.m.  We're off the record.

21             (Short break.)

22             THE VIDEOGRAPHER:  Okay.  We

23        are back on the record.  The time

24        is 4:46 p.m.

Highly Confidential - Subject to Further Confidentiality Review

1              (Document marked for

2         identification as Exhibit

3         Dempsey-20.)

4    BY MR. JANUSH:

5         Q.    Okay.  Ms. Dempsey, I'm

6    going to hand you a new exhibit.  It's

7    exhibit -- Dempsey Exhibit 20.

8              MR. JANUSH:  Counsel, copies

9         for you.

10   BY MR. JANUSH:

11        Q.    And this exhibit is Bates

12   stamped JAN-MS-02983578, and Ms. Dempsey,

13   this is a list, kind of in a chart form,

14   of recommendations that I believe you

15   drafted.  Do you see your name at the top

16   of this?

17        A.    Yes.

18              THE WITNESS:  Can I -- can I

19        talk to counsel?

20   BY MR. JANUSH:

21        Q.    You are on the record.

22              MR. BARKER:  Is it a matter

23        of privilege?

24              THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

1       MR. BARKER:  If it's a

2   matter of privilege I'd like to go

3   off to the record -- off the

4   record and talk to her about it.

5       I'm unsure at the moment

6   what it is, but --

7       MR. JANUSH:  Okay.

8       THE VIDEOGRAPHER:  Off the

9   record?

10      All right.  The time is

11  4:47 p.m.  Off the record.

12      (Short break.)

13      THE VIDEOGRAPHER:  We are

14  back on the record.  The time is

15  4:49 p.m.

16      MR. BARKER:  Having

17  consulted with the witness, this

18  document apparently was

19  inadvertently produced.  We're

20  going to claw it back.  It deals

21  with attorney work product,

22  attorney/client communications and

23  self-critical analysis, privileged

24  communications.  And so we need to

1    claw this one back.

2         MR. JANUSH:  So you

3    understand the rule in this

4    litigation regarding how clawbacks

5    have worked particularly when

6    noticed at depositions, right?

7    That counsel is permitted to

8    question on the clawed back

9    document.  The record gets

10   preserved, and the testimony moves

11   forward subject to your clawback

12   and we litigate before Special

13   Master Cohen and/or Judge Polster,

14   the issue and propriety of your

15   clawback.

16        But that's how it's worked.

17   This has happened before with

18   respect to Cardinal.  It's

19   happened in multiple significant

20   depositions.  And it should happen

21   here as well.

22        You -- that's how clawback

23   works.

24        You don't just get an

Highly Confidential - Subject to Further Confidentiality Review

1    automatic right to claw it back

2    and stop the deposition from --

3    from going forward by asserting

4    privilege.

5           We can carve out and mark

6    this portion of the record as

7    subject to your challenge and your

8    clawback.  And if you win before

9    the court, the testimony that I

10   elicit will get struck from the

11   record.  And I agree that it would

12   be struck if you win your proof --

13   your privilege issue.

14          My concern goes beyond the

15   late clawback and addresses the

16   notion that this is nowhere

17   identified on the Janssen

18   privilege log, that it is not

19   identified as a counsel-authored

20   document in any way.  That it is

21   an e-mail forwarded by Ms. Dempsey

22   with recommendations stating here

23   you go, with a grid of

24   recommendations.

1          It's sent to a Debbie

2     Sniscak.

3  BY MR. JANUSH:

4          Q.    Who is Debbie Sniscak?

5          A.    She is the business

6  relationship manager in IT.

7               MR. JANUSH:  Who is not a

8          lawyer.  So she is communicating

9          third-party documents with a

10         nonlawyer within Janssen.

11              And so I -- I am going to

12         urge you or else I'm going to have

13         to call Special Master Cohen on

14         his cell phone right now, I'm

15         going to urge you to permit me to

16         question on your challenged

17         clawback, and preserve your

18         objection.  I'm agreeing to

19         preserve it.  And we can litigate

20         it before Special Master Cohen and

21         Judge Polster.

22              You should also be

23         forewarned that Judge Polster has

24         taken a very limited view as to

1   what is privileged in this case

2   concerning suspicious order

3   monitoring, including issuing a

4   ruling on November 21st in open

5   court with most defendants

6   present, including Janssen,

7   regarding suspicious order

8   monitoring and the fact that he

9   did not have a view that anything

10   related to SOM is privileged.  I

11   can pull that order out, but it's

12   irrelevant because you've made an

13   objection.  I responded on the

14   record.  And I would like to

15   proceed subject to your right --

16   subject to your clawback argument.

17   Just as has happened in multiple

18   other depositions in this case.

19       MR. BARKER:  So I'm not

20   aware that it's happened in other

21   depositions.  And so at a minimum

22   what I'd like to do is go off the

23   record again, make a call.  I'm

24   happy to leave the witness here.

Highly Confidential - Subject to Further Confidentiality Review

1          It doesn't -- it's not about

2          talking to the witness.  Because

3          if I can verify what you've talked

4          about, that's a lot easier than

5          trying to get the special master

6          on the phone.

7              The further understanding

8          that I have, at least with respect

9          to Judge Polster's statements

10         regarding suspicious order

11         monitoring, is that -- at least

12         Special Master Cohen has not

13         interpreted so broadly that there

14         is conceivably no privilege.  It

15         was more directed at if people

16         were not disclosing any

17         information about their suspicious

18         order monitor programs, claiming

19         that the suspicious order

20         monitoring programs were entirely

21         privileged matters.  And that's --

22             MR. JANUSH:  I'm agreeing

23         with you on what you've just said

24         regarding Special Master Cohen's

Highly Confidential - Subject to Further Confidentiality Review

1    view of it.  And I'm asserting

2    that based on being on nearly

3    every one of the recent

4    teleconference calls with Special

5    Master Cohen, I will have no issue

6    presenting him with this document

7    and hearing what his ruling is

8    concerning this.

9         I think that it's undeniably

10   not going to be deemed privileged

11   based on -- on the face of this

12   document, and that it was

13   thereafter disclosed to a business

14   person within Janssen with nothing

15   indicating that this came from

16   counsel in any way.

17        But that said --

18        MR. BARKER:  Well, you

19   didn't ask the -- the witness, and

20   I let you ask that question --

21        MR. JANUSH:  Well, I --

22        MR. BARKER:  I did.  I

23   allowed you to ask the question.

24        MR. JANUSH:  No, no, no, no.

Highly Confidential - Subject to Further Confidentiality Review

1    You went off the record the moment

2    that I brought up the document.

3         MR. BARKER:  Right, but then

4    you asked a question in the middle

5    of your speech --

6         MR. JANUSH:  We're not --

7    we're not --

8         MR. BARKER:  -- of the

9    witness, and I let you ask that

10   question.

11        MR. JANUSH:  I didn't ask

12   the multitude of questions that I

13   would ask.

14        MR. BARKER:  Okay.  I

15   understand that.  And you are

16   making an assumption about who

17   Ms. Sniscak is and the purpose in

18   forwarding the document.

19        But what I'd like to do is

20   go off the record --

21        MR. JANUSH:  Let's call

22   Special Master Cohen.

23        MR. BARKER:  Well, what I'd

24   like to do is talk to somebody

Highly Confidential - Subject to Further Confidentiality Review

1       from my office and find out

2       whether this happened in such a

3       way.

4            I don't want to escalate

5       this and make this a dispute where

6       I'm denying that it happened.  I

7       just don't want --

8            MR. JANUSH:  Oh, no, I -- by

9       the way, I'm not taking the

10      position that you're denying what

11      happened.  I'm addressing

12      ethically that I'm confident in

13      what I'm saying that I'm willing

14      to contact the court right now

15      rather than talk to a colleague of

16      yours that might not have been or

17      might have been at a Cardinal

18      deposition where this very issue

19      occurred.  In fact, I believe more

20      than once.

21           That said --

22           MR. BARKER:  Well, let's go

23      off the record and call him then.

24      If you -- if you think that that's

Highly Confidential - Subject to Further Confidentiality Review

 1        the fastest way for me to get the

 2        information that I'm looking

 3        for --

 4            MR. JANUSH:  I can't tell

 5        you that I -- I have his cell on

 6        my cell phone, but let's look --

 7            MR. BARKER:  Yeah.

 8            MR. JANUSH:  -- leave the --

 9        the room and call.

10            MR. BARKER:  Let's go off

11        the record.

12            THE VIDEOGRAPHER:  Remove

13        your microphones.  The time is

14        4:55 p.m.  Off the record.

15            (Short break.)

16            THE VIDEOGRAPHER:  We are

17        back on the record.  The time is

18        5:04 p.m.

19            MR. JANUSH:  To the extent

20        that I may have been overly

21        confident with respect to my

22        understanding of what occurred in

23        a prior deposition, I'm going to

24        be extra safe and agree to the

1    clawback and to not questioning

2    the witness on this document, that

3    is Bates-marked JAN-MS-02983578.

4        In accepting the clawback

5    and putting the document away, I

6    am also reserving my rights to --

7    plaintiffs' rights to challenge

8    this clawback before the Court.

9    And if plaintiffs are victorious

10   in their challenge concerning this

11   clawback, to redepose the witness

12   for the limited purpose of

13   addressing this document and the

14   contents of this document.

15       With that said, I am by no

16   means agreeing that this document

17   is, as it's been claimed, written

18   by someone other than the witness.

19       We will challenge the

20   clawback issue at a later date.

21   Feel free to make any record that

22   you need to before I move on to my

23   next document.

24       MR. BARKER:  The document

Highly Confidential - Subject to Further Confidentiality Review

1    that was marked is a two-page

2    document beginning with the Bates

3    number that you stated and going

4    on to JAN-MS-02983579.

5         Is it your understanding

6    that there are no other related

7    documents to this?  In other

8    words, were there attachments that

9    you were going to roll into the

10   next exhibit?  Because we may as

11   well deal with it now.

12        MR. JANUSH:  There are no

13   attachments that I'm aware of.

14        MR. BARKER:  Okay.

15        MR. JANUSH:  But we could --

16   counsel can confirm that on the

17   system.

18        And the copies that I know

19   to exist would be on the online

20   repository that warehouses the

21   documents.

22        MR. BARKER:  Okay.

23        MR. JANUSH:  So I will --

24        MR. BARKER:  And you have

Highly Confidential - Subject to Further Confidentiality Review

1    hard copies that I just saw you

2    put yours away.  I'm not sure

3    quite what -- oh, you're handing

4    it to me.  Well, thank you.  I

5    don't know what other copies you

6    have.

7         MR. JANUSH:  Let me just

8    make sure that I don't have notes.

9         MR. BARKER:  No, that's a --

10   and that's a fair point.  You can

11   destroy it.  Yeah.  You don't need

12   to give it back to me, as long as

13   it gets destroyed.

14        MR. JANUSH:  Ian, do you

15   have a copy to hand over?

16        MS. BOODY:  I returned my

17   copy, for the record.

18        MR. BARKER:  So that's all

19   the hard copies in the room.

20        MR. JANUSH:  That is.

21        MR. BARKER:  Okay.  Next

22   exhibit.  Hopefully it will be a

23   little simpler.

24        MR. JANUSH:  That was marked

Highly Confidential - Subject to Further Confidentiality Review

 1          as 20.

 2                  MR. BARKER:  That was marked

 3          as 20.  Yes.  Do you want to

 4          leave --

 5                  MR. JANUSH:  I want to keep

 6          it marked as 20 and have it

 7          redacted for clawback.  So that

 8          it's --

 9                  MR. BARKER:  Okay.  And one

10          question for the record.  I'm

11          unfamiliar with the process that

12          you're using here with the

13          electronic Elmo.  Has that

14          document been made part of the

15          video record that is available to

16          you or any other party?

17                  THE VIDEOGRAPHER:  Yes.

18                  MR. JANUSH:  Okay.  But you

19          have the ability to --

20                  THE VIDEOGRAPHER:  We can

21          take it off.

22                  MR. JANUSH:  -- take that

23          off.

24                  THE VIDEOGRAPHER:  Yes.

1      Absolutely.

2            MR. BARKER:  And so that's

3      something that will happen before

4      this video gets circulated, that

5      the video operator will be taking

6      that image off the screen if it

7      appeared on the screen.

8            Yes?

9            THE VIDEOGRAPHER:  Sure,

10     yes.

11           MR. BARKER:  Thank you.

12           MR. JANUSH:  No issues.

13           MR. BARKER:  Okay.  No

14     issues.  Let's keep going.

15  BY MR. JANUSH:

16     Q.    Would it be a true

17  statement, Ms. Dempsey, that in the

18  beginning of 2018, you, meaning JOM, did

19  not have visibility into the pharmacy

20  store level detail and wholesaler

21  distribution data which limits JOM's

22  ability to identify pharmacies generating

23  the highest number of scripts for your

24  controlled substances?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    As I explained previously,

2  we had 867 data that had some blinded

3  data.  But there was other data available

4  that would provide us information, the --

5  the wholesaler to the pharmacy.  But not

6  all of it.

7    Q.    And tell us about JOM's and

8  Janssen's ability in 2018 to have insight

9  into the population per capita to

10  associate with your historical and

11  current distribution volume, or your

12  historical and then current distribution

13  volume.

14    A.    At that time, our order

15  monitoring program did not contain that

16  downstream data, and we were evaluating

17  working with outside vendors to see if

18  there was a way that we could get all

19  that information so that could be part of

20  our program.

21    Q.    Okay.  And one of the things

22  that you, JOM and Janssen were lacking

23  when it came to suspicious order

24  monitoring, even as of 2018, was

Highly Confidential - Subject to Further Confidentiality Review

1  visibility into pharmacy level purchasing

2  and demand volume; isn't that right?

3           MR. BARKER:  Object --

4       object to form.

5           THE WITNESS:  I'm here to

6       talk about the order monitoring

7       program.  And as I stated before,

8       it was constantly reviewed with

9       DEA and we had the data that DEA

10      asked for.

11          MR. JANUSH:  Move to strike,

12      nonresponsive.

13 BY MR. JANUSH:

14      Q.   I asked you, one of the

15 things that JOM and Janssen were lacking

16 when it came to suspicious order

17 monitoring, even as of 2018, was

18 visibility into pharmacy level purchases

19 and demand volume; isn't that right?

20          MR. BARKER:  Object to form.

21          THE WITNESS:  What I'm

22      saying -- what I'm objecting to is

23      that you are linking suspicious

24      order monitoring as a requirement

1         that you needed to have the

2         pharmaceutical data in the

3         statement you were saying, as part

4         of the suspicious order

5         monitoring, you needed to have the

6         pharmacy data.

7              And I'm explaining that we

8         have met with DEA, we've reviewed

9         our program, we have asked for

10        recommendations.  And the last

11        time they had our SOPs was

12        December of 2017 that we provided

13        them our program.  And that not

14        any of those times did they come

15        back and say well, you need to get

16        pharmaceutical data for our

17        Duragesic product.

18   BY MR. JANUSH:

19        Q.   But you wanted to get

20   pharmaceutical data for your Schedule II

21   products in 2018 in order to enhance your

22   suspicious order monitoring program,

23   didn't you?

24             A.   We were looking into that to

Highly Confidential - Subject to Further Confidentiality Review

1    enhance it, because we thought that that

2    was what was the next phase of what was

3    needed.

4         Q.    And one of the other things

5    that you were looking to do, was it not,

6    was to address the fact that your then

7    current suspicious order monitoring

8    program, as we've discussed a lot today,

9    only compared against a specific drug at

10   a specific strength when running the

11   mathematical formula to determine if an

12   order is suspicious.  And you viewed that

13   to be an issue that should be fixed going

14   forward, right?

15             MR. BARKER:  Object to form.

16             THE WITNESS:  Our current

17        program was looking at Duragesic

18        SKUs, history of ordering patterns

19        with our customers.

20             DEA regulations say you have

21        to have a system in place that

22        monitors orders, and it doesn't

23        say you need to have pharmacy data

24        downstream.  We were monitoring

Highly Confidential - Subject to Further Confidentiality Review

1    orders to our customer.

2         MR. JANUSH:  Move to strike,

3    nonresponsive.

4         I'm not speaking about

5    downstream.  I asked you a

6    different question.

7    BY MR. JANUSH:

8         Q.   I asked, and one of the

9    other things that you were looking to do,

10   was it not, was to address the fact that

11   your then current suspicious order

12   monitoring program, as we've discussed a

13   lot today, only compared a specific drug

14   at a specific strength when running the

15   mathematical formula to determine if a

16   order is suspicious.  And you viewed that

17   to be a problem, right?

18         MR. BARKER:  Object to form.

19         THE WITNESS:  Not a problem.

20    But an enhancement that we should

21    be considering in how to include

22    more information in our program.

23   BY MR. JANUSH:

24         Q.   In other words, from 2006 to

Highly Confidential - Subject to Further Confidentiality Review

1   at least the beginning of 2018, Janssen

2   didn't aggregate all of the strengths of

3   Duragesic, as an example, into its

4   mathematical formula when determining if

5   a particular Duragesic order for a

6   specific strength was atypical or

7   suspicious; is that right?

8           MR. BARKER:  Object to form.

9           THE WITNESS:  Our order

10      monitoring program looked at the

11      Duragesic product SKU.  There was

12      no requirement that we did a sum

13      of all of the SKUs.

14  BY MR. JANUSH:

15      Q.    In other words, you didn't

16  look at the customer's aggregate purchase

17  history of Schedule II products.  You

18  only looked at a specific strength of a

19  specific product, right?

20          MR. BARKER:  Object to form.

21          THE WITNESS:  As I

22      mentioned, on a quarterly basis we

23      look at the total volume of

24      controlled substances compared to

Highly Confidential - Subject to Further Confidentiality Review

1    the total volume.  And I think, I

2    believe you reviewed the trend in

3    graphs so you can see in some --

4    in some of the major wholesalers,

5    our controlled substance orders

6    were less than 9 percent, or

7    actually it dropped to 3 percent,

8    of the total volume of products

9    that we shipped to the wholesaler.

10        MR. JANUSH:  Move to strike

11    as nonresponsive.

12        MR. BARKER:  Object to the

13    motion to strike.

14        THE WITNESS:  But we were

15    monitoring the total amount of

16    controlled substances going to the

17    customers.

18        MR. JANUSH:  Move to strike

19    as continued to be nonresponsive.

20  BY MR. JANUSH:

21    Q.   Earlier we discussed the

22  December 2017 suspicious order monitoring

23  workshop.  Do you remember that?

24    A.   Yes.

1    Q.    And I showed you a document

2  concerning the minutes of that workshop,

3  right?

4    A.    Yes.

5    Q.    And some of the things that

6  you considered were how to improve your

7  then existing suspicious order monitoring

8  platform, right?

9    A.    We did discuss enhancements

10  to our existing program.

11    Q.    Okay.

12         (Document marked for

13         identification as Exhibit

14         Dempsey-21.)

15  BY MR. JANUSH:

16    Q.    I've marked as Exhibit 21 an

17  e-mail between you and Christopher

18  Villani.  Who is Christopher Villani?

19    A.    He is in marketing.

20    Q.    He's in marketing?

21    A.    Janssen sales and marketing.

22  Commercial.

23    Q.    Do you know what his

24  specific title is?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't recall.

2    Q.    Okay.  And you were

3    forwarding him an e-mail between you and

4    Andres Lopez, Frank Mashett.  I'm -- I'm

5    not going to pronounce the next name

6    correctly.  Why don't you help me there?

7    A.    Nguyen Tran.

8    Q.    Nguyen Tran?

9    A.    Mm-hmm.

10    Q.    And John Leahy and Scott

11    Trembly, Tracy Guldan, Thomas Stukane and

12    Brian Strehlke who were on the cc line.

13    Are these all Janssen

14    employees that -- that you were writing

15    to at this moment?

16    A.    Yes.

17    Q.    And you were forwarding an

18    e-mail from Sue Sopko of IntegriChain; is

19    that right?

20    A.    Yes.

21    Q.    And what you were forwarding

22    was an e-mail that also attached a

23    statement of work that I don't have

24    attached to this e-mail.  And I don't

Highly Confidential - Subject to Further Confidentiality Review

1    know if it was produced.  I can't

2    represent whether it was or wasn't.  If

3    it wasn't we'll address that later as

4    well.

5                You were -- you were

6    receiving an attached statement of work

7    to support Janssen's efforts to identify

8    and take action on any potential abuse of

9    your controlled substance product

10   distribution.

11               Do you see that?

12        A.    Yes, I do.

13        Q.    Do you agree with that

14   language?

15        A.    This was to -- to present

16   out the downstream data.  Yes.

17        Q.    Do you agree with the

18   language that -- that you were seeking

19   IntegriChain's statement of work to

20   support Janssen's efforts to identify and

21   take action on any potential abuse of

22   your controlled substance product

23   distribution?

24               MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Yes.

2  BY MR. JANUSH:

3          Q.    Okay.  And Sue notes,

4  "Reasons you are not able to effectively

5  monitor and detect potential abuse of

6  your controlled substance distribution.

7              "You currently do not have

8  visibility into the pharmacy, store level

9  detail, and wholesaler distribution data

10 which limits your ability to identify the

11 pharmacies generating the highest number

12 of scripts for your controlled

13 substances."

14             Did I read that correctly?

15         A.    Yes, you did.

16         Q.    Did you agree with that

17 statement?

18         A.    As I had mentioned before,

19 our data was blinded.  So we did not have

20 the visibility to all of the pharmacy

21 state level detail.

22         Q.    And it goes on, Sue goes on

23 to say, "Additionally, you currently do

24 not have insight into the population per

Highly Confidential - Subject to Further Confidentiality Review

1    capita to associate with your historical

2    and current distribution volume."

3              And she continues,

4    "Capabilities you said you need to more

5    effectively monitor and detect suspicious

6    order activity in your distribution

7    channel to keep up with the DEA

8    regulatory compliance and internal

9    reporting requirements are:

10             "Visibility into

11   pharmacy-level purchasing and demand

12   volume."

13             Did you agree with that?

14             MR. BARKER:  Object to form.

15             THE WITNESS:  That is what

16        she was quoting on, yes.

17   BY MR. JANUSH:

18        Q.    "Visibility into

19   pharmacy-level purchasing to determine if

20   duplicate orders to multiple wholesalers

21   are occurring."

22             Did you agree with that

23   statement by Sue?

24             MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  This was all
 2         part of her statement of work.
 3         This is what she was communicating
 4         to us that they could provide us.
 5         So we did not say this is exactly
 6         what we need.  They were coming to
 7         us to say that this is what they
 8         can give us, visibility of the
 9         pharmacy level as well as
10         visibility into the purchasing
11         determinative of duplicate orders.
12              So I did not say I wanted
13         this.  But she was telling us what
14         we need.
15    BY MR. JANUSH:
16         Q.    Okay.  So go up --
17         A.    Based on what they --
18         Q.    Go up a few --
19         A.    -- can provide.
20         Q.    Go up a few sentences.  I'm
21    not trying to cut you off.  I'm just
22    trying to speed this along.  Go up a few
23    sentences to capabilities.  I'm going to
24    underline it for you.  "Capabilities you
```

1  said you need to more effectively monitor

2  and detect suspicious order activity in

3  your distribution channel to keep up with

4  the DEA regulatory compliance and

5  internal reporting requirements are."

6           Did you not say that you

7  need these things?  Did she make this up?

8       A.    Not in the exact wording.

9  She took what we were saying in our -- in

10  our introduction meeting and put it into

11  what data they have that they can provide

12  us.

13       Q.    Okay.

14       A.    So we were asking for

15  downstream understanding of where our

16  product is going, the pharmacy, and

17  that's what she came back and provided

18  us.

19       Q.    "Understand the population

20  per capita for your highest geographic

21  distribution areas."

22           Was this something that you

23  expressed you would like data on?

24       A.    We said we wanted regional

1    analysis.  And that's how she interpreted

2    the regional analysis.

3          Q.    Okay.  "Understand the

4    market behavior associated with similar

5    and competitive products to provide a

6    baseline to determine atypical behavior."

7                Did you say that you wanted

8    that capability?

9          A.    In -- not exactly in those

10   words, but we did want to know how our

11   compounds compared to competitors.

12         Q.    "Understand the purchasing

13   behavior of your wholesalers to ensure

14   compliance."

15               Did you want that capability

16   to effectively monitor and detect

17   suspicious orders?

18               MR. BARKER:  Object to form.

19               THE WITNESS:  As a -- we

20         were confirming that our

21         wholesalers were doing their due

22         diligence in their suspicious

23         order monitoring by ensuring that

24         there was not any questionable

Highly Confidential - Subject to Further Confidentiality Review

1     quantities going to downstream.

2  BY MR. JANUSH:

3     Q.    So my question is, did you

4  want the data that would provide you with

5  the capability to understand the

6  purchasing behavior of your wholesalers

7  to ensure compliance?

8         MR. BARKER:  Object to form.

9         THE WITNESS:  With respect

10       to wholesalers, yes.

11  BY MR. JANUSH:

12    Q.    "The ability to leverage

13  historical data and trends to develop

14  ordering thresholds to monitor and

15  potentially hold suspicious orders."

16       Did you want that ability?

17         MR. BARKER:  Object to form.

18         THE WITNESS:  We -- we asked

19       if there was information that we

20       could evaluate as part of our

21       order threshold calculations.

22  BY MR. JANUSH:

23    Q.    I'm not going to cover every

24  sentence in the e-mail.  I'm going to

Highly Confidential - Subject to Further Confidentiality Review

1    turn you back to the first page.  When

2    you wrote to all these Johnson & Johnson

3    folks, okay, did you ever express in the

4    body of your e-mail that you disagreed

5    with any of her statements?

6         A.    Let me read it.

7              Once again, it contained

8    information.  But I was providing this

9    information to the leadership team that

10   participated in the workshop as a

11   potential solution to know our -- to know

12   our downstream data.

13             MR. BARKER:  Actually, as I

14        look at this e-mail that you were

15        just asking about, the February

16        14th one, we need to go off the

17        record, and I can ask the witness

18        or you can ask the witness whether

19        this relates to the same subject

20        matter as the exhibit that we just

21        clawed back.

22             THE WITNESS:  It does.

23             MR. BARKER:  Okay.  But --

24             MR. JANUSH:  While we're on

Highly Confidential - Subject to Further Confidentiality Review

1      the record.

2  BY MR. JANUSH:

3          Q.    The -- is it your testimony

4  that the -- the prior exhibit that was

5  clawed back at Exhibit 20 contained

6  information that was conveyed to you by

7  IntegriChain?

8              MR. BARKER:  Objection.  No.

9          Look --

10             MR. JANUSH:  I'm

11         trying to -- you're saying the

12         same --

13             MR. BARKER:  Evan, just so

14         that you're clear, what I'm saying

15         is in the middle of this e-mail,

16         it looks like there is privileged

17         information that is attorney work

18         product and self-critical analysis

19         privilege, privileged, and that it

20         should have been redacted.

21             And it's not the e-mail from

22         the vendor to her which you've

23         been talking about.  It's what you

24         just moved on to, as I sit here

Highly Confidential - Subject to Further Confidentiality Review

1   and I read it.

2         It's the February 14th,

3   2018, e-mail from Ms. Dempsey to

4   several people dated 2/01.  That

5   is what has the privileged

6   information in it.  So if this

7   document had been properly

8   produced, it -- this would have

9   been redacted and you would have

10  had the information at the bottom

11  that you were just questioning the

12  witness about.  But I see this

13  information, and I can see it's

14  the same as the document we just

15  clawed back.

16        MR. JANUSH:  Actually, and I

17  don't have the document committed

18  to memory that you clawed back,

19  but from my -- from my memory, it

20  actually is not the same

21  information.  It may have

22  overlapping information.

23        MR. BARKER:  It's not

24  literally the same.  But it falls

Highly Confidential - Subject to Further Confidentiality Review

1    within the same realm of

2    privileged information in that

3    section of the document.

4           MR. JANUSH:  And just so

5    that I understand what the

6    privilege is that's being

7    asserted, can you address this on

8    the record so that I understand,

9    because all I see is that Sue

10   Sopko, a vendor, wrote to Michele

11   Dempsey and provided an attached

12   statement of work and addressed

13   the issues concerning the reasons

14   that Janssen or JOM was not able

15   to effectively monitor suspicious

16   order monitoring, at least in the

17   words of the consultant.

18          And that the middle e-mail

19   that you're referring to on Page 1

20   is Michele Dempsey, our witness,

21   the deponent, addressing to a

22   bunch of J&J folks what was

23   conveyed during a -- December 2017

24   workshop minutes, of which I've

Highly Confidential - Subject to Further Confidentiality Review

1        already addressed and the subject

2        matter which I've already

3        addressed, earlier in this

4        deposition.

5            THE WITNESS:  But the next

6        sentence is not the content from

7        the workshop.

8            MR. BARKER:  Yeah, so hang

9        on a second, because you asked --

10       you asked for the position.  So

11       I'll tell you what the positions.

12           MR. JANUSH:  Yeah.

13           MR. BARKER:  You are

14       misreading and misunderstanding

15       what the consultant means in that

16       middle e-mail.  You are assuming

17       that it is the IntegriChain person

18       below, which is it is not.  And so

19       there's a wholly separate issue

20       that's going on in the content of

21       that middle e-mail.

22           I do not dispute that that

23       e-mail that you just talked to her

24       about and the scope of work, not

Highly Confidential - Subject to Further Confidentiality Review

1    privileged.  That portion of the

2    document, I had no issue with.

3    It's when you turned to this and I

4    read this that I have an issue

5    because of what's being

6    communicated there.

7          Since I'm clawing it back.

8    We'll give you a redacted version

9    of this document.  But I'm clawing

10   it back.  I'm not going to debate

11   this any further.  The grounds are

12   attorney work product,

13   attorney/client privilege and

14   self-critical analysis privilege.

15         MR. JANUSH:  Okay.  So that

16   we can get this matter addressed

17   expeditiously through the court,

18   and since it's only been two

19   documents that have been clawed

20   back during this deposition, will

21   you agree to provide the basic

22   privilege log-type information

23   very soon within a reasonable time

24   period so that the to, the from,

1    the who the consultant is, et

2    cetera, so that we can address

3    this and address this and tee it

4    up before Special Master Cohen?

5         MR. BARKER:  And I'm not

6    sure what -- our processes on

7    that.  But yes, I think that is a

8    fair ask.  And I will -- I will

9    commit that we will get that as

10   fast as our processes allow.

11        So if we can have those

12   copies back, and we'll get you a

13   redacted copy.

14        MR. JANUSH:  This copy

15   actually should go to the court

16   reporter and remained marked as

17   clawback, because it's part of the

18   trial transcript and video exhibit

19   with the writings.

20        MR. BARKER:  Here's a

21   suggestion for you on that.  If

22   you pull off that top page, and

23   then we can put a sticker on that

24   page that you were using, then at

Highly Confidential - Subject to Further Confidentiality Review

```
1              least -- because again, I am

2         not --

3                   MR. JANUSH:  Let the record

4         reflect that I pulled off the top

5         page and handed it back to

6         counsel.

7                   Here's the other top page.

8    BY MR. JANUSH:

9         Q.      There came a point in time,

10   Ms. Dempsey, in May of 2018 where Janssen

11   and JOM were considering a revision to

12   the proposed current mathematical formula

13   or the then-current mathematical formula

14   of three times the average annual weekly

15   order and considering a different

16   algorithm; is that right?

17        A.      Yes.

18        Q.      And one of the algorithms

19   that was being considered to change to

20   was the two-Sigma rule combined with 867

21   data feeds that you would get from

22   IntegriChain.  Do you recall that

23   discussion?

24        A.      Not specifically.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Has Janssen since -- has

2    Janssen ever modified its suspicious

3    order monitoring mathematical computation

4    through the present date since 2006?

5                Bless you.

6    A.    The current order monitoring

7    program continues to exist as it is from

8    2006.

9    Q.    Janssen never moved to a

10   two-Sigma or a two-standard deviation

11   rule, did it?

12   A.    No.  We are currently

13   working with an outside vendor Analysis

14   Group who is going to be, currently in

15   the upcoming months, going to provide us

16   with -- actually this week, they are

17   going to review some of the statistical

18   analysis that they are going to recommend

19   in regards to monitoring our customers.

20   Q.    Okay.  Has Analysis Group

21   provided you with a proposed scope of

22   work?

23                MR. BARKER:  Wait a minute.

24                MR. JANUSH:  These are --

1    this is all discoverable.  This is

2    all part of -- you can challenge

3    the -- the concept of whether it

4    gets produced, but --

5         MR. BARKER:  True.

6         MR. JANUSH:  -- the

7    knowledge of whether a scope of

8    work has been provided is

9    something that's gone before the

10   court.

11        MR. BARKER:  I'm only going

12   to object to the extent you're

13   calling for any advice that was

14   actually provided.

15        If you want foundational

16   information that meetings have

17   happened, that sort of stuff, I

18   agree, you are entitled --

19        MR. JANUSH:  And -- and

20   whether a written scope of work

21   has been conveyed.  That's all.

22        MR. BARKER:  Yes, you can --

23   you can get into that.

24        MR. JANUSH:  I'm not going

Highly Confidential - Subject to Further Confidentiality Review

1    to get into it with you on that.

2          MR. BARKER:  But -- but what

3    I -- all I wanted -- my objection

4    is privilege, and I'm just

5    instructing the witness not to

6    disclose the content of any

7    communications or recommendations.

8          And so with respect to the

9    foundational matters, go ahead and

10   ask your question.

11         MR. JANUSH:  I asked it.

12   You know it.

13   BY MR. JANUSH:

14         Q.    You can answer it.

15         A.    Yes, we got a statement of

16   work.

17         Q.    Okay.  Did you receive more

18   than one statement of work from Analysis

19   Group?

20         A.    We received two.

21         Q.    Okay.  On or about what

22   dates did you receive such statement of

23   work?

24         A.    I don't recall the dates.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Have you entered into a

2    contract yet with Analysis Group to

3    modify or create a new suspicious order

4    monitoring program for Janssen?

5                    MR. BARKER:  Object to form.

6                    THE WITNESS:  We are working

7          with them to enhance our current

8          order monitoring program.

9    BY MR. JANUSH:

10         Q.     You can answer.  I'm not --

11   I'm not trying to be your attorney.  But

12   you are allowed to answer whether you've

13   entered into a contract with Analysis

14   Group.

15         A.     Yes.

16         Q.     You have?

17         A.     Yes.

18         Q.     Okay.  Do you know which

19   person or persons on behalf of Janssen

20   executed that contract with Analysis

21   Group?

22         A.     JOM.

23         Q.     Do you know what person

24   within JOM would have negotiated and

Highly Confidential - Subject to Further Confidentiality Review

1    executed the contract?

2              MR. BARKER:  Object to form.

3              THE WITNESS:  It may have

4         been Andres Lopez.

5    BY MR. JANUSH:

6         Q.    And remind me of Andres

7    Lopez's title?

8         A.    He is director customer

9    experience -- customer service.

10        Q.    Is he an attorney?

11        A.    No.

12             (Document marked for

13        identification as Exhibit

14        Dempsey-22.)

15   BY MR. JANUSH:

16        Q.    I'm going to hand you what I

17   marked as Exhibit 22.  This will be my

18   last exhibit.

19             And I'm going to turn your

20   attention to Vishal Varma's e-mail on

21   May 16, 2018, middle of the page, at

22   JAN-MS-02969720.

23             Who is Vishal Varma?

24        A.    He is Johnson & Johnson's IT

Highly Confidential - Subject to Further Confidentiality Review

1   digital strategy I believe.

2          Q.    And you -- you forwarded

3   this e-mail to a Soledad Cepeda stating

4   that "Soledad, we are in the process of

5   enhancing our suspicious order monitoring

6   program for our existing products,

7   Concerta, Duragesic, tramadol, and

8   esketamine.  There is a group addressing

9   the data analytics where our products" --

10  "where are products are going."  I think

11  you meant our products are going.

12          "Would you like to

13  participate in the project?  Michele."

14          Who is Soledad Cepeda?

15      A.    The next page.  She is

16  epidemiology.

17          Q.    Okay.  And in the middle of

18  the page where Vishal Varma is writing to

19  you, she is writing:  "Hi, Michele.

20  Absolutely appreciate you passing along

21  all background documentation which always

22  helps us understand the state of the art,

23  and hence calibrate our anomaly detection

24  algorithms.

Highly Confidential - Subject to Further Confidentiality Review

1              "On blinded data, we are

2      pursuing a couple of possible pathways.

3      We have started discussions with Daniel

4      Kinney from commercial data governance.

5      He is ex-IntegriChain alum and will help

6      us to have a dialogue with their senior

7      level.  See if we can facilitate flow of

8      unblinded data.  He is going to get

9      IntegriChain to visit us."

10             I'm going to stop there.

11         A.    Mm-hmm.

12         Q.    Is that how you started to

13     work with IntegriChain?

14         A.    No.

15         Q.    How did -- how did you start

16     to come to know IntegriChain and get

17     their proposal?

18         A.    I learned in the previous

19     fall, from the Concerta commercial team,

20     that they were -- they were getting

21     IntegriChain data on our ADHD medicine.

22             So Cheryl, I forget her last

23     name, did set up an introduction with

24     IntegriChain previous to this.

1    Q.    Okay.  And below is an

2  e-mail from February 28, 2018, in this

3  string from Sue Sopko of IntegriChain to

4  you following up on the presentation deck

5  that Shivani had presented to you and

6  Janssen on Monday -- I guess that would

7  be Monday, February 26th.

8         Who is Shivani?  Is she an

9  employee at IntegriChain?

10        A.    Yes.

11        Q.    Okay.  And did Janssen ever

12  enter into a scope of work or a contract

13  with IntegriChain?

14        A.    Yes.

15        Q.    Okay.  And is Janssen still

16  working with IntegriChain now to assist

17  with providing unblinded data for

18  Janssen's SOM program?

19        A.    Yes.

20        Q.    How far along is that

21  process?

22        A.    That statement of work was

23  signed before Christmas.

24        Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    So.

2    Q.    So did the work -- did the

3  work commence yet?

4    A.    I'm not quite sure how much

5  is done.  But it was kicked off.

6         MR. JANUSH:  Okay.  Okay.

7         At this point I have no further

8         questions, subject to my

9         Reservation of Rights if we should

10        win the clawback issues.

11        And subject to one other

12        issue that I need to note for the

13        record.

14        During this deposition I

15        learned that over 1,000 documents

16        were produced over the weekend,

17        many of which concern suspicious

18        order monitoring.  I had thought

19        that we were pushing the

20        suspicious order monitoring

21        deposition in order to accommodate

22        additional document production

23        from Janssen.  I don't have

24        personal knowledge of that

Highly Confidential - Subject to Further Confidentiality Review

1      production as I've been in this

2      room all day; however, I'm going

3      to look into it and I want to

4      reserve my rights to reopen this

5      deposition, if it is, in fact, the

6      case that documents that concern

7      the topics Ms. Dempsey has

8      testified on today were produced

9      belatedly over the weekend,

10     particularly over a holiday

11     weekend.

12         That's all that I have to

13     say on that topic.

14         MR. BARKER:  Okay.  My

15     understanding is that document

16     productions have been ongoing in

17     this case.  And I don't know what

18     was produced over the weekend.

19     And I don't know what the base of

20     information is that you're working

21     from there.  So I don't know how

22     to respond to that here.

23         It's been a long day.  The

24     witness appears tired.  But I'll

Highly Confidential - Subject to Further Confidentiality Review

1      talk to her.  And if she's

2      prepared to go for another hour,

3      hour and a half tonight, then we

4      can -- we can do my redirect.

5          Otherwise I propose that we

6      just start in the morning and we

7      knock it out in the morning.

8          But let me talk to her first

9      and find out how she is feeling.

10          MR. JANUSH:  Okay.  And just

11      so you understand where I'm coming

12      from, you know, I want to make

13      sure that my objection regarding

14      the recent document production is

15      clear.

16          The parties have been

17      serving -- the defendants have

18      been serving what is called

19      substantial completion charts by

20      topic, and suspicious order

21      monitoring is a topic within the

22      substantial completion charts.

23      And for quite sometime Janssen has

24      represented that its production

Highly Confidential - Subject to Further Confidentiality Review

1          was substantially complete.

2               I've also had significant

3          correspondence with Amy Lucas of

4          your firm as you know, because

5          you've been copied on that

6          correspondence, regarding my

7          serious concerns about late

8          document production concerning

9          suspicious order monitoring,

10          anti-diversion, et cetera.

11               So I'll let the records of

12          my e-mails speak for themselves,

13          and certainly the issue of the

14          substantial compliance charts.

15               But again, I'm only saying

16          this to preserve the record.  I'm

17          not representing that I have yet

18          have firsthand knowledge of what

19          was produced because I have not

20          been on the site to personally

21          review the documents.

22               When I do, and if there's an

23          issue, I'll raise it at the

24          appropriate time.  I just wanted

Highly Confidential - Subject to Further Confidentiality Review

1    to preserve the record.

2         MR. BARKER:  And let me --

3    when we take the break, I also

4    want to do some digging.  I want

5    to find out what's going on with

6    that production in particular,

7    because if there is an issue, it

8    might make sense, rather than come

9    back today, tomorrow for another

10   couple hours, to defer that and we

11   can -- maybe we can make an

12   arrangement.  I'm not agreeing

13   that --

14        MR. JANUSH:  I understand --

15        MR. BARKER:  You want more

16   than seven hours, I think you're

17   entitled to it.  I'm saying during

18   this next break, find out some

19   additional information so that you

20   and I can have a discussion off

21   the record and figure out what

22   makes the most sense in this case.

23        MR. JANUSH:  Thank you for

24   your courtesy.

 1              THE VIDEOGRAPHER:  All

 2      right.  The time is 5:45 p.m.  Off

 3      the record.

 4              (Short break.)

 5              THE VIDEOGRAPHER:  The time

 6      is 6:29 p.m.  Back on the record.

 7              MR. BARKER:  After

 8      conferring with counsel during the

 9      break, I think we've mutually

10      agreed that it makes the most

11      sense to sort out any issues with

12      respect to the document

13      production.

14              We believe that it was made

15      on Thursday or Friday.  Counsel

16      believes that it may not have been

17      made until Sunday.  Neither one of

18      us are representing that that is a

19      firm understanding as to when the

20      documents were produced.

21              But in any event, it looks

22      like we're going to have to come

23      back on another day.  So we're --

24      we're going to hold the deposition

Highly Confidential - Subject to Further Confidentiality Review

1      open for now.  And we're going to

2      have a discussion to figure out

3      when would be the next most

4      convenient date to get back

5      together, that allows counsel to

6      review the documents that he says

7      were produced over the weekend,

8      that we believe were produced last

9      week.

10         And we are also going to try

11     to sort out the issues with the

12     documents that were clawed back

13     today at the deposition.  And

14     we're going to have a further

15     discussion about that to see if we

16     can resolve issues on that.

17         And failing that, if we can

18     figure out a way to resolve the

19     clawback issues, such that the

20     deposition can go forward and

21     counsel is either going to be

22     permitted to ask questions about

23     those documents or not.

24         MR. JANUSH:  And this is

1    Evan Janush for plaintiffs.  I

2    want to add to this record that

3    plaintiffs seek information,

4    additional information concerning

5    the circumstances in which the

6    clawed-back documents were

7    created, vendor information, who

8    retained the vendor, who shared

9    the documents, who -- who received

10   the documents, et cetera.

11        And I understand that

12   Mr. Barker is not -- is not

13   prepared to address that right

14   now, I'm okay with that.

15        But we seek that information

16   in order to be able to put a

17   cogent argument before the court

18   as to why the documents may not be

19   properly the subject of a

20   clawback.

21        In addition, concerning the

22   subject of the recently produced

23   document production by Janssen,

24   whether the documents were

Highly Confidential - Subject to Further Confidentiality Review

1          produced Thursday, Friday or
2          Sunday, we can address at another
3          time.
4               I just want the record to be
5          clear that there has been a
6          long-standing dispute concerning
7          the suspicious order monitoring
8          production in this case, and only
9          after a challenge by me were
10          hundreds of documents produced
11          days before the originally
12          scheduled deposition of Ms.
13          Dempsey's -- for Ms. Dempsey,
14          resulting in the -- the
15          accommodation by Mr. Barker to
16          reschedule the deposition without
17          argument.
18               And with the recent
19          production that occurred, whether
20          it's Thursday, Friday or Sunday,
21          as we believe occurred, there was
22          no notification by counsel for
23          Janssen that any documents, albeit
24          potentially more than a thousand,

Highly Confidential - Subject to Further Confidentiality Review

1    concerning suspicious order

2    monitoring were being produced in

3    advance of this deposition.

4         So without that heads-up, I

5    had no idea to focus in on a

6    recent document production to

7    prepare for this deposition.  And

8    if it proves to be true that the

9    documents concern suspicious order

10   monitoring, we are going to seek a

11   reasonable accommodation for

12   additional time and a respectful

13   accommodation.

14        MR. BARKER:  And without

15   agreeing with the factual

16   predicates asserted for that

17   request, we've agreed that we will

18   discuss whether a reasonable

19   accommodation can be made, and

20   that it would be appropriately

21   sized to whatever issue there may

22   be, if any, regarding production

23   of suspicious order monitoring

24   documents.

Highly Confidential - Subject to Further Confidentiality Review

1           MR. JANUSH:  Agreed.

2           MR. BARKER:  So with that, I

3      think that we're prepared to have

4      the court reporter prepare this

5      transcript, even though the

6      deposition will continue.

7           We asked the videographer

8      before going back on the record

9      what the total record time today

10     is, and it was 6 hours 35 minutes.

11     And the state of play right now is

12     counsel has passed the witness to

13     me, and that we will take up the

14     direct exam of Ms. Dempsey at a

15     later date.

16          MR. JANUSH:  I would only --

17     I would only state that if it is

18     the case that, either through

19     agreement or through the Court,

20     that the deposition -- additional

21     time would be afforded to

22     plaintiffs by virtue of the

23     recently produced documents, that

24     my passing of the witness would be

Highly Confidential - Subject to Further Confidentiality Review

1    rendered moot, and I would still

2    be in my direct on the original

3    documents that should have been

4    produced earlier and wouldn't be

5    redirecting the witness with these

6    recently produced documents.

7         MR. BARKER:  And we can have

8    a further discussion off the

9    record about such issues.  The

10   amount of documentation relating

11   to suspicious order monitoring

12   going back to at least 2014 is a

13   massive material.  And as it has

14   been located, we have been

15   producing it.  Our production has

16   not been staged in any way in an

17   attempt to prejudice plaintiffs or

18   to game the system.

19        There's a large amount of

20   information.  It is in a lot of

21   different places.  The locations

22   have changed over time, as the

23   witness has told you today, and

24   we're doing our best to gather it

Highly Confidential - Subject to Further Confidentiality Review

1    all and produce it as fast as

2    possible.

3         MR. JANUSH:  And to be

4    clear, not to belabor this, but

5    I've not cast any aspersions or

6    addressed an attempt to prejudice

7    me.  I would only say that it

8    would have been good to have the

9    heads-up in advance, and we

10   probably could have had a second

11   reasonable discussion about moving

12   the deposition, if it was required

13   based on the volume of recently

14   produced documents.

15        And I wasn't afforded that

16   opportunity.  So that's why I

17   addressed that.  It may be

18   premature to confirm that I've

19   passed the witness.

20        MR. BARKER:  As the record

21   reflects, we now have that

22   opportunity.

23        THE VIDEOGRAPHER:  Off the

24   record?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BARKER:  Off the record,
 2      yes.
 3              THE VIDEOGRAPHER:  Okay.
 4      This marks the end of today's
 5      deposition.  The time is 6:36 p.m.
 6      Off the record.
 7              (Excused.)
 8              (Adjourned at approximately
 9      6:36 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2                    CERTIFICATE

3

4

5          I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.

7

           It was requested before
8   completion of the deposition that the
    witness, MICHELE R. DEMPSEY, have the
9   opportunity to read and sign the
    deposition transcript.

10

11

12
       _____
       MICHELLE L. GRAY,
13     A Registered Professional
       Reporter, Certified Shorthand
14     Reporter, Certified Realtime
       Reporter and Notary Public
15     Dated:  January 25, 2019

16

17

18          (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)

23

24

Highly Confidential - Subject to Further Confidentiality Review

1          INSTRUCTIONS TO WITNESS

2

3                Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8                     After doing so, please sign

9    the errata sheet and date it.

10                    You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14                    It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -    -    -    -    -    -

                          E  R  R  A  T  A

 2                    -    -    -    -    -    -

 3

 4      PAGE   LINE   CHANGE

 5      _____  _____  _____

 6          REASON: _____

 7      _____  _____  _____

 8          REASON: _____

 9      _____  _____  _____

10          REASON: _____

11      _____  _____  _____

12          REASON: _____

13      _____  _____  _____

14          REASON: _____

15      _____  _____  _____

16          REASON: _____

17      _____  _____  _____

18          REASON: _____

19      _____  _____  _____

20          REASON: _____

21      _____  _____  _____

22          REASON: _____

23      _____  _____  _____

24          REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

1

2                ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 411, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    MICHELE R. DEMPSEY                    DATE

17

18

19   Subscribed and sworn
     to before me this

20   _____ day of _____, 20____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

1                          LAWYER'S NOTES

2       PAGE   LINE

3       _____  _____  _____

4       _____  _____  _____

5       _____  _____  _____

6       _____  _____  _____

7       _____  _____  _____

8       _____  _____  _____

9       _____  _____  _____

10      _____  _____  _____

11      _____  _____  _____

12      _____  _____  _____

13      _____  _____  _____

14      _____  _____  _____

15      _____  _____  _____

16      _____  _____  _____

17      _____  _____  _____

18      _____  _____  _____

19      _____  _____  _____

20      _____  _____  _____

21      _____  _____  _____

22      _____  _____  _____

23      _____  _____  _____

24      _____  _____  _____