1

      IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF OHIO

2

           EASTERN DIVISION

             - - -

3

IN RE:  NATIONAL      :  HON. DAN A.

4

PRESCRIPTION OPIATE   :  POLSTER

LITIGATION         :

5

                  :

APPLIES TO ALL CASES  :  NO.

6

                  :  1:17-MD-2804

                  :

7

      - HIGHLY CONFIDENTIAL -

8

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

9

10

          VOLUME II

11

         - - -

12

      March 8, 2019

13

         - - -

14

15

       Continued videotaped

16

deposition of MICHELE R. DEMPSEY, taken
pursuant to notice, was held at the law

17

offices of Drinker Biddle & Reath, 105
College Road East, Princeton, New Jersey,

18

beginning at 10:15 a.m., on the above
date, before Michelle L. Gray, a

19

Registered Professional Reporter,
Certified Shorthand Reporter, Certified

20

Realtime Reporter, and Notary Public.

             - - -

21

22

     GOLKOW LITIGATION SERVICES
  877.370.3377 ph | 917.591.5672 fax

23

        deps@golkow.com

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2
       THE LANIER FIRM
 3     BY:  EVAN M. JANUSH, ESQ.
            IAN S. MILLICAN, ESQ.
 4     126 East 56th Street
       6th Floor
 5     New York, New York 10022
       (212) 421-2800
 6     evan.janush@lanierlawfirm.com
       ian.millican@lanierlawfirm.com
 7     Representing the Plaintiffs
 8
       O'MELVENY & MYERS, LLP
 9     BY:  JEFFREY A. BARKER, ESQ.
       610 Newport Center Drive
10     Newport Beach, California 92660
       (949) 823-79623
11     Jbarker@omm.com
12        - and -
13     O'MELVENY & MYERS, LLP
       BY:  EMILIE K. WINCKEL, ESQ.
14     1625 Eye Street, NW
       Washington, D.C. 20006
15     (202) 383-5300
       Ewinckel@omm.com
16     Representing the Defendants, Janssen
       and Johnson & Johnson and the
17     Witness
18
       PIETRAGALLO GORDON ALFANO BOSICK &
19     RASPANTI, LLP
       BY:  ELISA M. BOODY, ESQ.
20     1818 Market Street, Suite 3402
       Philadelphia, Pennsylvania 19103
21     (215) 320-6200
       emb@pietragallo.com
22     Representing the Defendant, Cardinal
       Health
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          TELEPHONIC APPEARANCES:
 2
 3          DECHERT, LLP
            BY:  CAROLINE POWER, ESQ.
 4          2929 Arch Street
            Philadelphia, Pennsylvania 19104
 5          (215) 994-4000
            Caroline.power@dechert.com
 6          Representing the Defendant, Purdue
            Pharmaceuticals
 7
 8          JACKSON KELLY, PLLC
            BY:  SANDRA K. ZERRUSEN, ESQ.
 9          ANDREW N. SCHOCK, ESQ.
            50 South Main Street, Suite 201
10          Akron, Ohio 44308
            (330) 252-9060
11          skzerrusen@jacksonkelly.com
            anschock@jacksonkelly.com
12          Representing the Defendant,
            AmerisourceBergen
13
14          JONES DAY
            BY:  NICOLE LANGSTON, ESQ.
15          77 West Wacker Drive
            Chicago, Illinois 60601
16          (312) 269-4113
            Nlangston@jonesday.com
17          Representing the Defendant, Walmart
18
            MARCUS & SHAPIRA, LLP
19          BY:  RICHARD I. HALPERN, ESQ.
            One Oxford Centre, 35th Floor
20          Pittsburgh, Pennsylvania 15219
            (412) 338-3990
21          halpern@marcus-shapira.com
            Representing the Defendant, HBC
22          Service Company
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        APPEARANCES:  (Cont'd.)
 2

          ROPES & GRAY LLP
 3        BY:  TORRYN M. TAYLOR, ESQ.
          Three Embarcadero Center
 4        San Francisco, California 94111
          (415) 315-6300
 5        Torryn.taylor@ropesgray.com
          Representing the Defendant,
 6        Mallinckrodt
 7

          BAILEY WYANT PLLC
 8        BY:  MICHAEL W. TAYLOR, ESQ.
          500 Virginia Street East
 9        Suite 600
          Charleston, West Virginia 25301
10        (304) 345-4222
          Mtaylor@baileywyant.com
11        Representing the Defendant, West
          Virginia Board of Pharmacy
12
13        ALSO PRESENT:
14
15        VIDEOTAPE TECHNICIAN:
16           Henry Marte
17
          John R. Santacruz  Law Clerk
18        (Ropes & Gray - via telephone)
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -   -   -

 2                 I N D E X

 3                     -   -   -

 4

     Testimony of:

 5                         MICHELE R. DEMPSEY

 6

         By Mr. Janush              427, 736

 7

         By Mr. Barker               579

 8

 9

10                     -   -   -

11               E X H I B I T S

12                     -   -   -

13

14   NO.            DESCRIPTION            PAGE

15   Janssen
     Dempsey-23   E-mail Thread         427
16               4/13/18
                 Subject, Review
17               Controlled Substance
                 Analytics
18               JAN-MS-05444681-92

19   Janssen
     Dempsey-24   E-mail Thread         435
20               6/8/18
                 Subject, Controlled
21               Substances Project
                 JAN-MS-05444730-37

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5     NO.               DESCRIPTION              PAGE
 6     Janssen
       Dempsey-25    Controlled              446
 7                   Substances Suspicious
                     Order Monitoring
 8                   Program Questionnaire
                     JAN-MS-02960654-19
 9
10     Janssen
       Dempsey-26    Evaluation of the       455
11                   Suspicious Orders
                     Monitoring System
12                   For J&J
                     (Woodworth)
13                   JAN-MS-05444748-63
14     Janssen
       Dempsey-27    E-mail Thread           489
15                   2/6/18
                     Subject, Question
16                   JAN-MS-05444648-65
17     Janssen
       Dempsey-28    E-mail Thread           498
18                   2/16/18
                     Subject, Report
19                   Change
                     JAN-MS-05444781-82
20
       Janssen
21     Dempsey-29    Evaluation of the       500
                     Suspicious Monitoring
22                   System for J&J
                     JAN-MS-0544783-98
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -  -  -
 2           E X H I B I T S  (Cont'd.)
 3                        -  -  -
 4
 5     NO.              DESCRIPTION              PAGE
 6     Janssen
       Dempsey-30       Regulatory Agency       503
 7                      Contact Report
                        12/17/18
 8                      JAN-MS-05433750-53
 9     Janssen
       Dempsey-31       Excel File              517
10                      JAN-MS-03739863
11     Janssen
       Dempsey-32       E-mail Thread           528
12                      5/15/08
                        Subject, Follow-Up
13                      With Analysis Group
                        JAN-MS-03059382-92
14
       Janssen
15     Dempsey-33       Preliminary             540
                        Algorithm Logic
16                      For SOM
                        JAN-MS-05444640-11
17
       Janssen
18     Dempsey-34       E-mail, 1/23/18         543
                        Subject, Recommendations
19                      JAN-MS-02983578-79
20     Janssen
       Dempsey-35       E-mail Thread           545
21                      2/14/18
                        IntegriChain
22                      Advisory Services
                        SOW Controlled
23                      Substance Order
                        Analytics
24                      JAN-MS-03060701-11
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       -   -   -
 2              E X H I B I T S  (Cont'd.)
 3                       -   -   -
 4
 5     NO.               DESCRIPTION           PAGE
 6     Janssen
       Dempsey-36        E-mail Thread          554
 7                       7/26/13
                         Subject, Introductory
 8                       Call
                         JAN-MS-02984629-31
 9
       Janssen
10     Dempsey-37        Work Instruction       559
                         JOM Customer Service
11                       Suspicious or
                         Excessive Orders
12                       JAN-MS-03124101-10
13     Janssen
       Dempsey-38        SOP, JOM Customer      561
14                       Support Services
                         Schedule II-V
15                       JAN-MS-03115424-30
16     Janssen
       Dempsey-39        E-mail Thread          563
17                       11/15/17
                         Subject, 11/15/07
18                       SOM Minutes
                         JAN-MS-03115570-85
19
       Janssen
20     Dempsey-40        SOP JOM Customer       565
                         Support Services
21                       Schedule II-V Order
                         Processing
22                       JAN-MS-03121360-68
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Janssen
      Dempsey-41     Regulatory Agency      567
 7                   Contact Report
                     JAN-0006-0001431-73
 8
      Janssen
 9    Dempsey-42-A  Work Instruction       583
                    JOM Customer Service
10                  Order Processing of
                    Controlled Substance
11                  JAN-MS-03741177-00
12    Janssen
      Dempsey-42-B  Work Instruction       583
13                  JOM Customer Service
                    Suspicious Or Excessive
14                  Narcotic Orders
                    JAN-MS-03741170-76
15
      Janssen
16    Dempsey-42-C  SOP JOM Customer        583
                    Service Schedule II-V
17                  Order Processing
                    JAN-MS-03741201-05
18
      Janssen
19    Dempsey-43    Appendix E-3            588
                    Suspicious Order
20                  Reporting System for
                    Use in Automated
21                  Tracking Systems
22    Janssen
      Dempsey-44    CR-10029                595
23                  JAN-MS-05444824-73
24
```

```
 1                    -  -  -
 2          E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5   NO.            DESCRIPTION            PAGE
 6   Janssen
     Dempsey-45    Regulatory Agency       602
 7                 Contact Report
                   12/12/07
 8                 JAN-MS-03124082-87
 9   Janssen
     Dempsey-46    E-mail Thread           612
10                 10/22/08
                   Subject, JOM FDC
11                 DEA Inspection Day 1
                   Summary 10/22/08
12                 JAN-MS-05433748-49
13   Janssen
     Dempsey-47-A SOP JOM Customer         643
14                Service Customer
                  Master Data Process
15                JAN-MS-5457234-47
16   Janssen
     Dempsey-47-B Job Aid, JOM             643
17                Customer Service
                  New Customer Pre-
18                Application
                  JAN-MS-03124146-47
19
     Janssen
20   Dempsey-47-C Job Aid, JOM             643
                  Customer Service
21                New Customer Post
                  Application
22                JAN-MS-03124141-45
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -   -   -
 2            E X H I B I T S  (Cont'd.)
 3                        -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Janssen
      Dempsey-47-D Work Instruction            643
 7                  License Management
                    SOP
 8                  JAN-MS-03124088-00
 9    Janssen
      Dempsey-48   E-mail Thread               649
10                 7/30/13
                   Subject, Notice of
11                 Inspection at KDC
                   JAN-MS-03123994-05
12
      Janssen
13    Dempsey-49   E-mail Thread               676
                   1/28/15
14                 Subject, DEA at
                   JOM KDC 1/28/14
15                 JAN-MS-02984602-07
16    Janssen
      Dempsey-50   E-mail Thread               682
17                 1/22/19
                   Subject, DEA Follow-up
18                 Opportunities and
                   Notes
19                 JAN-MS-05433741
20    Janssen
      Dempsey-51   E-mail Thread               686
21                 8/4/15
                   Subject, Unannounced
22                 DEA Inspection at
                   FDC 8/4/15
23                 JAN-MS-05433744-45
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -   -   -
 2           E X H I B I T S  (Cont'd.)
 3                     -   -   -
 4
 5    NO.              DESCRIPTION              PAGE
 6    Janssen
      Dempsey-52    E-mail Thread         688
 7                  12/20/17
                    Subject, Notification
 8                  Unannounced DEA
                    Inspection at the
 9                  KDC 12/20/17
                    JAN-MS-03124006-09
10
      Janssen
11    Dempsey-53    E-mail Thread          692
                    1/22/19
12                  Subject, Information
                    For JOM Inspection
13                  JAN-MS-05433730-40
14    Janssen
      Dempsey-54    E-mail Thread          697
15                  12/28/17
                    Subject, Notification
16                  Announced DEA
                    Inspection at the KDC
17                  12/28/17
                    JAN-MS-03124010-11
18
      Janssen
19    Dempsey-55    The Drug & Chemical   708
                    Advisory Group
20                  Who We Are
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2          E X H I B I T S  (Cont'd.)

 3                    -   -   -

 4

 5    NO.              DESCRIPTION              PAGE

 6    Janssen

      Dempsey-56    Regulatory Agency        729

 7                  Contact Report

                    1/7/19

 8                  JAN-MS-03124076-79

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                      -   -   -

 4

 5     Direction to Witness Not to Answer

 6     PAGE    LINE
       None.

 7

 8     Request for Production of Documents

 9     PAGE    LINE
       None.

10

11     Stipulations

12     PAGE    LINE
       None.

13

14     Questions Marked

15     PAGE    LINE
       None.

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                  -  -  -

2                  THE VIDEOGRAPHER:  We are

3       now on the record.  My name is

4       Henry Marte.  I'm a videographer

5       with Golkow Litigation Services.

6                  Today's date is March 8,

7       2019, and the time is 10:15 a.m.

8                  This videotaped deposition

9       is being held in Princeton, New

10      Jersey, in the matter of National

11      Prescription Opiate Litigation.

12                 This is Day 2 of the

13      deposition of Michele Dempsey.

14                 All appearances are noted on

15      the stenographic record.

16                 Will the court reporter

17      please re-administer the oath.

18                  -  -  -

19                 ... MICHELE R. DEMPSEY,

20      having been first duly sworn, was

21      examined and testified as follows:

22                  -  -  -

23           CONTINUED EXAMINATION

24                  -  -  -

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. JANUSH:

2        Q.    Hi, Ms. Dempsey.  How are

3    you today?

4        A.    Good.  Thank you.

5        Q.    Thank you for appearing for

6    Day 2 of your deposition.

7              When we last broke at the

8    conclusion of the January 22, first date

9    of your deposition, we were talking about

10   the audit that had been performed of

11   your -- or Janssen's suspicious order

12   monitoring system.

13             Do you remember that?

14       A.    Yes.

15       Q.    And I'm going to mark a new

16   document as Dempsey Exhibit 23.

17             MR. JANUSH:  Copies to you,

18        your counsel.

19             (Document marked for

20        identification as Exhibit

21        Janssen-Dempsey-23.)

22             MR. BARKER:  Evan, just for

23        clarification, this is a

24        collective exhibit?  There are a

1        couple of documents that are

2        binder clipped.

3                MR. JANUSH:  Yeah, I'm going

4        to -- I'm going to clarify that.

5    BY MR. JANUSH:

6        Q.    So this is an e-mail.  And

7    its Bates number is JAN-MS-0544681, and

8    it is part of a family of documents.  And

9    it included, as I understand it, a

10   Janssen PowerPoint that flows

11   sequentially in Bates numbering.

12               And then following the

13   Janssen PowerPoint, is a second Bates

14   number within the family.  And that Bates

15   number is JAN-MS-05444692.

16               I have added a separator

17   sheet in big bold ink to mark that

18   document with a separate Bates number.

19               And really, I just want to

20   focus on the fact that there is an e-mail

21   addressing the -- let's go to the first

22   page, if you will, at the very bottom.

23               Joshua Hankins is writing to

24   multiple people, including you,

Highly Confidential - Subject to Further Confidentiality Review

1   Ms. Dempsey.  And he's saying, "Hey,

2   team.  This meeting is a follow-up to our

3   meeting on 3/19 to discuss the controlled

4   substance use case for Janssen Genius.

5   Over the next couple of weeks we are

6   going to be building and testing a model

7   for Concerta.  Let me know if this time

8   works for you.  Josh."

9              Do you see that?

10       A.    Yes.

11       Q.    Okay.  And if you go forward

12   just a few pages, you'll see Janssen

13   suspicious order monitoring PowerPoint,

14   right?

15       A.    JOM suspicious order

16   monitoring, yes.

17       Q.    And that's Janssen at the

18   bottom --

19       A.    Yes.

20       Q.    -- of the -- okay.

21              And current suspicious order

22   monitoring program is being addressed.

23   And that's current as of 2018; is that

24   right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    This was at that time, yes.

2    Q.    Then I'm going to flip

3    forward to that separator sheet that I

4    spoke to you about, with the big bold

5    numbers for the separate set of Bates

6    numbering.

7         And there we have the Drug

8    and Chemical Advisory Group LLC,

9    suspicious orders monitoring, SOM, for

10   Johnson & Johnson, dated December 13,

11   2017.  Presented by Terrance W.

12   Woodworth.

13        Do you see that?

14   A.    Yes.

15   Q.    Was this the presentation or

16   the slideshow of the presentation that

17   Mr. Woodworth presented to your

18   December 13th workshop on suspicious

19   order monitoring?

20   A.    Yes, it is.

21   Q.    It is.  Okay.  And it goes

22   through an overview of drug control

23   history; is that right?  Is that a yes?

24   A.    Yes, yes.

1     Q.    Okay.  And we'll flip

2  through it fairly quickly for time

3  purposes.

4           And at Page 7, it addresses

5  U.S. drug law and regulations, Controlled

6  Substance Act, CSA, of 1970.

7           Do you see that?

8     A.    Yes, I do.

9     Q.    That Page 9, it's addressing

10  Schedule II through V drugs, which are

11  deemed, according to Mr. Woodworth, to

12  have a -- to include at Schedule II,

13  excuse me, hydromorphone, morphine,

14  fentanyl, methylphenidate.

15          Do you see that?

16     A.    Yes, I do.

17     Q.    And at Page 11,

18  Mr. Woodworth was addressing the opioid

19  epidemic in the U.S.; is that right?

20     A.    Yes, he was.

21     Q.    At Page 12, he was

22  addressing how in 2015 there were 52,404

23  drug-related overdose deaths; is that

24  right?

Highly Confidential - Subject to Further Confidentiality Review

1                      MR. BARKER:  Object to form.

2                      THE WITNESS:  Yeah.

3       BY MR. JANUSH:

4           Q.     And he addressed there were

5       143 deaths every 24 hours; is that also

6       right?

7                      MR. BARKER:  Object to form.

8                      THE WITNESS:  That is the

9           data that he presented.

10      BY MR. JANUSH:

11          Q.     Okay.  He presented data

12      that 33,091 deaths involved opioids

13      including heroin; is that also right?

14                     MR. BARKER:  Object to form.

15                     THE WITNESS:  That is what

16          is presented on the slide, yes.

17      BY MR. JANUSH:

18          Q.     And he went into a little

19      bit more detail about the -- on an

20      average day in the U.S., at Page 13, the

21      650,000 opioid prescriptions that are

22      dispensed; is that right?

23                     MR. BARKER:  Object to form.

24                     THE WITNESS:  The slide does

Highly Confidential - Subject to Further Confidentiality Review

1    present the data on the opioid

2    prescriptions, yeah.

3  BY MR. JANUSH:

4        Q.    And he addressed, at Page

5  14, opioid diversion and abuse and the

6  high abuse potential of these drugs; is

7  that right?

8        A.    He did speak to high abuse

9  potential during the presentation.

10        Q.    And he addressed severe

11  dependence liabilities as well, didn't

12  he?

13        A.    He read the bullet during

14  his presentation, yes.  He did.  He

15  mentioned -- so these are the bullets

16  that he read during the training.

17        Q.    Okay.  At Page 17, he

18  addressed 21 C.F.R. 1301.74(b); is that

19  right?

20        A.    Yes.

21        Q.    And that says, "The

22  registrant shall design and operate a

23  system to disclose to the registrant

24  suspicious orders of controlled

Highly Confidential - Subject to Further Confidentiality Review

1  substances.  The registrant shall inform

2  the field division office of the

3  administration in his area of suspicious

4  orders when discovered by the

5  registrant."

6            Do you see that?

7       A.    Yes.

8       Q.    And do you recall this being

9  presented to Johnson & Johnson?

10      A.    Yes.

11            MR. BARKER:  Object to form.

12  BY MR. JANUSH:

13      Q.    And then he defined the

14  suspicious order monitoring regulation or

15  quoted the definition at Page 18, or

16  Slide 18.  Quote, "Suspicious orders

17  include orders of unusual size, orders

18  deviating substantially from a normal

19  pattern, and orders of unusual

20  frequency."

21            Do you see that?

22      A.    Yes, I do.

23      Q.    Did you have an

24  understanding that this was the

Highly Confidential - Subject to Further Confidentiality Review

1    definition of suspicious orders?

2         A.    Yes, we did.

3         Q.    Okay.  What's the earliest

4    date that you had that understanding of

5    this definition?

6              MR. BARKER:  Object to form.

7              THE WITNESS:  Back to my

8         early -- when I took over the DEA

9         compliance with Noramco in 2007,

10        2008.

11   BY MR. JANUSH:

12        Q.    So in or around 2007 or

13   2008, you had an understanding that the

14   definition of suspicious orders include

15   orders of unusual size, orders deviating

16   substantially from a normal pattern, and

17   orders of unusual frequency; is that

18   right?

19        A.    Yes.

20        Q.    We're going to move on from

21   this exhibit for a moment.

22             (Document marked for

23        identification as Exhibit

24        Janssen-Dempsey-24.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. JANUSH:

2         Q.    I'm going to mark a new

3    exhibit as Exhibit Dempsey -- Exhibit 24.

4              MR. JANUSH:  And copies to

5         opposing counsel.

6    BY MR. JANUSH:

7         Q.    This exhibit is

8    Bates-stamped JAN-MS-05444730.

9              It is an e-mail from Valerie

10   Chikwendu to Michele Dempsey.  And you

11   don't actually get the date until reading

12   slightly below the first e-mail.  And it

13   looks like it's June 8th, 2018.  Do I

14   have that right?

15        A.    Yes.

16        Q.    And who is Valerie

17   Chikwendu?

18        A.    She is a project manager

19   from the project management organization

20   of JOM.

21        Q.    And what does it mean to be

22   a project manager?

23        A.    You take on a project to

24   make sure you have the funding, the team,

Highly Confidential - Subject to Further Confidentiality Review

1    the resources, the capital expenses to

2    deliver a project.

3            Q.    Does she work within a

4    different -- a specific group?  For

5    example, does she work within compliance?

6            A.    No, she does not.

7            Q.    She does not.  So she

8    assists in getting a project funded, off

9    the ground, et cetera; is that right?

10           A.    She does all the tactical

11   activity to facilitate making sure a

12   project gets done when it's supposed to

13   get done.

14           Q.    Okay.  And she is providing

15   you with a draft e-mail, it looks like

16   to, a Sudha, S-U-D-H-A.  Who is Sudha?

17           A.    I believe she's a finance

18   leader.

19           Q.    Okay.  And in this draft

20   e-mail, she's addressing questions that

21   Sudha raised earlier in the e-mail string

22   regarding the compliance-related

23   investment to meet DEA requirements; is

24   that right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Can I read?

2    Q.    You may.

3    A.    Thank you.

4    Q.    It's the second page.  Turn

5    to the -- follow with me, the second page

6    of the e-mail is where I'm focusing where

7    Sudha wrote in the middle of the page to

8    John Dzurenko, Katrina Purifoy -- or

9    Purifoy, and is addressing, "Agree that

10   it is compliance related.  Would like to

11   understand how this investment will meet

12   the DEA requirement.  Are there other

13   programs that are doing this, i.e.,

14   within commercial?  What is the

15   cap/expense split?"

16          Do you see that?

17   A.    Yes, I do.

18   Q.    Okay.  And Valerie Chikwendu

19   is drafting a response for you and she

20   wrote on Page 1, "Michele, here's the

21   e-mail I plan to send."

22          Do you see that?

23   A.    Yes, I do.

24   Q.    All right.  And I'm moving

Highly Confidential - Subject to Further Confidentiality Review

1   down to the draft e-mail.  She wrote,

2   "Hello, Sudha.  Here are the answers to

3   your questions below.  I have also cc'd

4   Michele Dempsey, director of controlled

5   substances compliance, for further

6   elaboration if needed.

7           "DEA guidelines:  The DEA

8   guidelines include an expectation for us

9   to flag:  Orders of unusual size, orders

10  deviating substantially from normal

11  pattern, orders of unusual frequency."

12          Do you see that?

13      A.    Yes, I do.

14      Q.    Okay.  Now, focusing on my

15  prior question, Ms. Dempsey, that I asked

16  just moments ago, I asked if you agreed

17  with that definition.  And if -- you said

18  you did, right?

19      A.    Yes.

20      Q.    I asked when is your

21  earlier -- earliest understanding of that

22  definition, and you said around 2007,

23  2008 when you joined Noramco; is that

24  right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Okay.  Next sentence in this

3  draft e-mail is, "We currently have a

4  process to flag unusual based on List 1

5  chemicals, and it is not up to current

6  industry practice.  The other two

7  requirements are vulnerabilities that

8  must be addressed.  Our current

9  monitoring program flags orders of

10  unusual size (a running average of past

11  orders is taken and we flag any order

12  that is 300 percent more than average).

13  We do not currently account for ordering

14  frequency or cumulative effect of

15  multiple orders in one month against the

16  threshold, and we plan to incorporate

17  other ordering deviations based on

18  patterns which will be defined as part of

19  this project."

20          Did I read that correctly?

21    A.    You did.

22    Q.    Do you agree that at that

23  time, the we, Johnson & Johnson, or JOM,

24  did not account with its current

1  monitoring system, for ordering frequency

2  or cumulative effect of multiple orders

3  in one month against a threshold?

4       A.    No.

5       Q.    You don't agree or you do

6  agree?

7       A.    I do not agree.  The

8  algorithm, which is what is being spoken

9  to, because we're asking for capital

10  funding to reprogram, to come up with an

11  algorithm that factors in the three, the

12  current one was only looking at the

13  12-month rolling average of a quantity.

14          But our program, the

15  outside, the overall review and

16  investigation, that's where we have the

17  frequency and pattern reviewed, because

18  if a customer orders one SKU every

19  12 months, it's going to be flagged.  And

20  then we look at the ordering pattern,

21  their history, and that's how -- so this

22  was for a capital appropriation to get

23  funding for an IT system.

24       Q.    Let's go back to what this

1   says, because -- because you had an

2   opportunity to edit this document, right?

3   Let's go up to the top of the e-mail.

4          A.    Yes.

5          Q.    It says -- I'm going to

6   circle it.

7                "Made some tweaks below.

8   Thank you."

9                Do you see that?

10         A.    Yes.  Yes.

11         Q.    Your tweaks are embedded in

12  this document, correct, in this e-mail?

13  "Made some tweaks below"?

14         A.    Yes.

15               MR. BARKER:  Object to form.

16  BY MR. JANUSH:

17         Q.    Is that right?

18         A.    I did make some

19  modifications below.

20         Q.    Okay.  Okay.  And you didn't

21  edit the language, "We currently have a

22  process to flag unusual based on List 1

23  chemicals and is not up to current

24  industry practice."

1    You didn't edit that

2    sentence, right?

3         A.    No, I -- I don't have her

4    previous one to see what she originally

5    wrote to see what I actually tweaked.

6         Q.    But you didn't change it?

7         A.    No.

8         Q.    That language is in here,

9    you didn't modify that beyond the

10   statement that's written here, correct?

11        A.    Right.  Our algorithm --

12        Q.    No, that's not what I'm

13   asking you.  I'm -- don't talk about your

14   algorithm.  I'm asking about whether you

15   modified that first sentence, beyond

16   what's written here?

17        A.    No, I didn't.

18             MR. BARKER:  Object to form.

19   BY MR. JANUSH:

20        Q.    No, you did not, right?

21        A.    No, I not modify it.

22        Q.    Second sentence, "The other

23   two requirements are vulnerabilities that

24   must be addressed."

1    You didn't modify that

2    sentence beyond the language that's

3    written there, correct?

4            MR. BARKER:  Object to form.

5            THE WITNESS:  No, I didn't.

6    BY MR. JANUSH:

7        Q.    Third sentence, "Our current

8    monitoring program flags orders of

9    unusual size, a running average of past

10   orders is taken, and we flag any order

11   that is 300 percent more than average."

12           You didn't modify that

13   sentence beyond what's written there,

14   right?

15       A.    No, I didn't.

16       Q.    Next sentence, "We do not

17   currently account for ordering frequency

18   or cumulative effect of multiple orders

19   in one month against a threshold, and we

20   plan to incorporate other ordering

21   deviations based on patterns which will

22   be defined as part of the project."

23           You didn't edit this

24   sentence beyond what is written here; is

1    that right?

2                    MR. BARKER:  Object to form.

3                    THE WITNESS:  I don't have

4          the original to see what I

5          actually tweaked.  But this is the

6          end product which would include

7          what I tweaked.

8    BY MR. JANUSH:

9          Q.    Thank you.  Now, to go back

10   to what you were addressing earlier, I

11   think.  Your algorithm was designed to

12   flag any order that is 300 percent more

13   than the average rolling annual weekly

14   order; is that right?

15         A.    For every customer that

16   places an order for one particular SKU,

17   it looks at the 52-week history ordering

18   and compares -- takes an average, times

19   by the 300 percent, and compares the

20   current order against what they have

21   ordered -- this threshold.

22         Q.    And by this threshold, you

23   mean the 300 percent more than their

24   average; is that right?

1    A.    Yes.

2    Q.    I'm going to move on to

3  another document that I'm marking as

4  Dempsey Exhibit 25.

5         (Document marked for

6         identification as Exhibit

7         Janssen-Dempsey-25.)

8         MR. JANUSH:  Let me hand all

9         three to you.

10  BY MR. JANUSH:

11    Q.    This document is

12  Bates-stamped in the upper right corner

13  vertically, JAN-MS-02960650.  It's a

14  completed questionnaire from Miami-Luken

15  concerning the JOM SOM program

16  questionnaire.

17         Does that look right to you

18  on the first page, that this would have

19  been the JOM program -- SOM program

20  questionnaire?

21         MR. BARKER:  Object to form.

22         THE WITNESS:  It appears to

23      be the April 2014 questionnaire.

24

1    BY MR. JANUSH:

2         Q.    Okay.  And I've only

3    encompassed this large 70-page document

4    for your review because it included a

5    letter from the DEA way at the end of

6    this, at Bates number ending in 712.  So

7    I'm going to ask you to turn to -- look

8    in the upper right corner and turn to

9    712.

10              You are with me on 712.  The

11   header is -- the letterhead is from the

12   United States Department of Justice Drug

13   Enforcement Administration.

14              Do you see that?

15        A.    Mm-hmm.

16        Q.    The date is December 27,

17   2007.

18              Do you see that?

19        A.    Mm-hmm.

20        Q.    And it's signed by, if you

21   turn to Page 2, Joseph T. Rannazzisi,

22   deputy assistant administrator, office of

23   diversion control.

24              Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1       A.     Yes, I do.

2       Q.     Okay.  So I'm producing you

3   with the letter that was produced from

4   Miami-Luken as part of their

5   questionnaire response on your suspicious

6   order monitoring questionnaire because

7   I'm representing to you today that we

8   couldn't locate the Johnson & Johnson,

9   JOM, Noramco, or Ortho-McNeil letter that

10  might have been sent by the -- that would

11  have been sent, excuse me, by the United

12  States Department of Justice.

13          I'm going to read you the

14  first sentence.  It says, "Dear

15  Registrant, this letter is being sent to

16  every entity in the United States

17  registered with the Drug Enforcement

18  Administration, DEA, to manufacture or

19  distribute controlled substances.  The

20  purpose of this letter is to reiterate

21  the responsibilities of controlled

22  substance manufacturers and distributors

23  to inform DEA of suspicious orders in

24  accordance with 21 C.F.R. 1301.74(b)."

1                    Do you see that?

2                    MR. BARKER:  Object to form.

3         Object to the preamble.

4                    THE WITNESS:  Yes, I do see

5         it.

6    BY MR. JANUSH:

7         Q.    And in December of 2007,

8    Janssen was a manufacturer of controlled

9    substances, correct?

10        A.    Yes.

11        Q.    And go on to read the next

12   paragraph.  "In addition to and not in

13   lieu of the general requirement under 21

14   U.S.C. 823, that manufacturers and

15   distributors maintain effective controls

16   against diversion, DEA regulations

17   require all manufacturers and

18   distributors to report suspicious orders

19   of controlled substances."

20                    Did I read that right?

21                    MR. BARKER:  Object to form.

22                    THE WITNESS:  Yes, you did.

23   BY MR. JANUSH:

24        Q.    Okay.  Title 21 C.F.R.

1  1301.74(b) specifically requires that a

2  registrant design and operate a system to

3  disclose to the registrant suspicious

4  orders of controlled substances."

5           Did I read that correctly?

6           MR. BARKER:  Object to form.

7           THE WITNESS:  Yes.

8  BY MR. JANUSH:

9      Q.    Okay.  I'm going to have

10  you, for the purposes of time, jump down

11  to the very last paragraph on the page

12  with me.  Okay.

13           It begins with, "The

14  regulation."  Are you there?

15      A.    Yes.

16      Q.    Okay.  I'm going to read it

17  out loud.

18           "The regulation specifically

19  states that suspicious orders include

20  orders of an unusual size, orders

21  deviating substantially from a normal

22  pattern, and orders of an unusual

23  frequency."

24           Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2                 MR. BARKER:  Object to form.

3    BY MR. JANUSH:

4          Q.     And that's the same language

5    that Terrance Woodworth presented to you

6    on December 13, 2017, in his suspicious

7    order monitoring workshop, right?

8          A.     Very similar wording.

9          Q.     Okay.  And it's the same

10   language that, in the e-mail below, in

11   the e-mail that we just marked into

12   evidence at Exhibit 24 that I

13   highlighted -- we'll pull that up on the

14   screen for you.  It's the same language

15   that is listed in this June 8, 2018,

16   e-mail that you had the opportunity to

17   edit concerning, "The DEA guidelines

18   include an expectation for us to flag

19   orders of unusual size, orders deviating

20   substantially from normal pattern, orders

21   of unusual frequency."

22                Is that right?

23         A.     Yes.

24         Q.     Same language?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    So the requirements that

3 Joseph Rannazzisi, as the deputy

4 assistant administrator, office of

5 diversion control, was listing in 2007

6 are the same requirements that you and

7 your company were acknowledging in

8 June 2018 that you had only met one of

9 the three requirements with your

10 algorithm, correct?

11    A.    Our algorithm was only

12 addressing the quantity.  But our program

13 outside the algorithm covered the other

14 aspects.  But we wanted --

15    MR. JANUSH:  Move to strike.

16    Nonresponsive.

17 BY MR. JANUSH:

18    Q.    I didn't ask about your

19 program.  For the moment, I asked only

20 about your algorithm.  So --

21    A.    But the regulation doesn't

22 say the algorithm has to have all three.

23 It just says that you have to have a

24 system.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Right.  I asked about your

2  algorithm, did I not?

3    A.    Yes.

4    Q.    Okay.  And there's a reason

5  for me asking that.  I'm going to connect

6  the dots in a moment.  Okay?

7    A.    Okay.

8    Q.    So my question was, you were

9  acknowledging in that e-mail, Exhibit 24,

10  that your algorithm only addressed one of

11  the three requirements stated by the DEA

12  concerning unusual size, deviating

13  substantially from a normal pattern, and

14  orders of an unusual frequency; is that

15  right?

16          MR. BARKER:  Object to form.

17  BY MR. JANUSH:

18    Q.    I'm only speaking of the

19  algorithm.

20    A.    That is what I -- what is

21  written.

22    Q.    Okay.  And in realtime, in

23  practice, when an order is placed for a

24  Schedule II drug, it is your algorithm

1  that will flag whether the order is

2  suspicious or atypical and needing review

3  in that moment; isn't that right?

4          MR. BARKER:  Object to form.

5          THE WITNESS:  When an order

6      is placed and the quantity doesn't

7      match what the weekly average of a

8      52 weeks times three, it gets

9      flagged.

10 BY MR. JANUSH:

11     Q.    Right.  So going back to the

12 question I asked you.  In realtime, in

13 practice, when an order is placed for a

14 Schedule II drug, it is your algorithm

15 that will flag whether the order is

16 suspicious or atypical and needing review

17 in that moment, true or false?

18     A.    True.

19     Q.    Okay.  So the fact that you

20 have a program that has the capability to

21 analyze orders beyond the algorithm only

22 comes into play when that -- on that date

23 the order is placed when an order is

24 flagged; isn't that right?

1      MR. BARKER:  Object to form.

2      THE WITNESS:  When the order

3   is flagged as atypical, it gets

4   investigated.  And then that

5   includes running all of the

6   historical -- looking through the

7   ordering pattern, as well as the

8   frequency part of that.

9   BY MR. JANUSH:

10      Q.    But you can't do an

11   investigation until the order is flagged,

12   right, in realtime?

13      A.    Agreed.

14      Q.    Okay.  When we concluded the

15   deposition -- when we concluded your

16   first day of this deposition, we ended

17   discussing the audit and that

18   December 13, 2017, workshop by the drug

19   and chemical advisory group, as we

20   discussed earlier, right?

21      A.    Yes.

22      (Document marked for

23   identification as Exhibit

24   Janssen-Dempsey-26.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. JANUSH:

2        Q.    Here's Exhibit 26.

3        MR. JANUSH:   There are

4    copies for counsel.

5    BY MR. JANUSH:

6        Q.    This has been produced by

7    your counsel following the January 21 --

8    22, excuse me, 2019, Day 1 of your

9    deposition.

10        And this document appears to

11    be the draft presented to Johnson &

12    Johnson by Terrance Woodworth dated

13    January 8, 2018; is that right?

14        A.    Yes.

15        Q.    And the purpose of this is

16    found within the title.   It's an

17    evaluation of the suspicious orders

18    monitoring system for Johnson & Johnson;

19    is that right?

20        A.    Yes.

21        Q.    Okay.   And Terrance met with

22    you and key customer service personnel at

23    the Piscataway facility concerning their

24    roles in the operation of the JOM

Highly Confidential - Subject to Further Confidentiality Review

1  suspicious order monitoring program in

2  order to conduct his examination of your

3  system, his audit of your system; is that

4  right?

5      A.    He met with several groups

6  to discuss the current process, yes.

7      Q.    Okay.  And for the record,

8  if I didn't already say this, this

9  document starts at JAN-MS-05444748.

10      I'm going to have you jump

11  to Page 3.  We're just going to focus on

12  some key aspects of this document.  At

13  Paragraph 3 at the bottom of the page,

14  Terrance wrote, "Start resolving the

15  issue of possibly not applying the SOM

16  order quantity assessment algorithm (SOM

17  algorithm) to all customer orders for

18  Schedule III and IV controlled substances

19  which are received via electronic data

20  interchange (EDI) throughout the day and

21  night.

22      "The SOM algorithm is run

23  against all existing controlled

24  substances orders each day at 3:45 p.m.

Highly Confidential - Subject to Further Confidentiality Review

1  Any orders that are received by J&J

2  customer service via EDI after that time

3  may be shipped to a customer the

4  following day without being subjected to

5  the SOM algorithm unless the EDI orders

6  are checked the next morning to ensure

7  the SOM algorithm has been applied."

8            Do you see that?

9       A.   Yes.

10       Q.   And we addressed that, you

11  may recall, at Day 1 of your deposition,

12  this issue of -- the fact that your

13  monitoring system physically cuts off at

14  a certain point in the afternoon and

15  would require manual review the next

16  morning to ensure that controlled

17  substance orders do not go out unchecked.

18            Do you remember that?

19            MR. BARKER:  Object to form.

20            THE WITNESS:  Yes.

21  BY MR. JANUSH:

22       Q.   Okay.  This issue, was it

23  new to you following the audit or did you

24  know about this limitation, this time

1    limitation concerning when the system

2    would shut down in the late afternoon?

3                MR. BARKER:  Object to form.

4                THE WITNESS:  We knew that

5           the program ran every day in the

6           afternoon.  And that's why it was

7           important -- when orders are

8           received, they get manually

9           entered and placed in business

10          manager hold until this program is

11          run.

12                And then the morning, the

13          timestamp for every order is

14          compared to make sure that the

15          order is placed before the report

16          is run.

17   BY MR. JANUSH:

18          Q.    And then I'm going to jump

19   down to Paragraph 7.  It says, "Consider

20   modifying" -- same page, same page,

21   sorry.

22                "Consider modifying

23   Janssen's corporate policy to include the

24   organization's responsibility for

1    safeguarding controlled substances and

2    preventing their diversion, maintenance

3    of effective controls to prevent

4    diversion, Title 21 United States Code

5    Section 823, and include a summary of the

6    SOM program."

7            Do you see that?

8        A.    Mm-hmm.

9        Q.    Who -- what was being

10   referred to here concerning modifying --

11   consider modifying Janssen's corporate

12   policy to include the organization's

13   responsibility for safeguarding

14   controlled substances and preventing

15   their diversion?

16       A.    A lot of the manufacturing

17   sites had a diversion control policy.

18   And they wanted to make sure that that

19   diversion control policy incorporated the

20   suspicious order monitoring requirements.

21       Q.    Okay.  And at Page 8,

22   Paragraph 8, he noted, "Stop using the

23   term 'suspicious' or 'unusual' in all

24   standard operating procedures and work

Highly Confidential - Subject to Further Confidentiality Review

1    instructions related to the corporation's

2    SOM program and start using another term

3    which is more appropriate" -- "a more

4    appropriate characterization of the order

5    evaluation possess, such as 'questionable

6    orders' or 'atypical orders' or 'orders

7    of concern.'"

8              Do you see that?

9        A.    Yes, I do.

10       Q.    And after receiving his

11   guidance, you all actually did stop using

12   the term "suspicious" and modified, your

13   standard operating procedures, to

14   language such as "atypical orders," or

15   "questionable orders"; isn't that right?

16       A.    We started to use

17   questionable orders.

18       Q.    Okay.  And here too in the

19   original audit, the original draft of the

20   audit, Terrance Woodworth -- I'm going to

21   circle the center.  I've already

22   highlighted it -- is addressing the

23   registrant's obligation to design and

24   operate a system to disclose to the

Highly Confidential - Subject to Further Confidentiality Review

1  registrant suspicious orders of

2  controlled substances.

3          And Terrance quoted, "The

4  registrant shall inform the field

5  division office of the administration in

6  his area of suspicious orders when

7  discovered by the registrant.  Suspicious

8  orders include orders of unusual size,

9  orders deviating substantially from a

10  normal pattern, and orders of unusual

11  frequency."

12          Do you see that?

13      A.    Yes, I do.

14      Q.    And that's what we've been

15  discussing, those three factors; is that

16  right?

17      A.    Yes.

18      Q.    Okay.  And then if you move

19  to Page 8, your auditor addressed, in the

20  middle of the page, second paragraph --

21  I'm going to show you on your screen

22  where I am with the big vertical line

23  that I'm highlighting, okay, vertical

24  lines.

Highly Confidential - Subject to Further Confidentiality Review

1    "The JOM program also takes

2    advantage of the capabilities of the SAP

3    software, which enables generation of

4    several key reports that are helpful in

5    identifying questionable aspects of an

6    order or customer activity over selected

7    time periods."

8                    Do you see that?

9         A.    Yes, I do.

10        Q.    And then it goes on to say,

11   in the second sentence, "For example,

12   among many other possible reports, the

13   system can facilitate a report of all

14   controlled substance orders where the DEA

15   registration is missing, invalid or

16   expired; all controlled substances orders

17   where there is an incomplete or

18   inaccurately completed DEA Form 222; and

19   all monitored orders for controlled

20   substances where the quantity ordered has

21   exceeded the current threshold

22   algorithm."

23                    Do you see that?

24        A.    Yes, I do.

1    Q.    And so that means that the

2  program looks at monitored orders where

3  the quantity order exceeded the then

4  current 300 percent of an average annual

5  weekly order; is that right?

6            MR. BARKER:  Object to form.

7            THE WITNESS:  The algorithm

8       has the current threshold for

9       quantity ordered.

10  BY MR. JANUSH:

11    Q.    So is that right what I

12  asked?

13    A.    Yes.

14    Q.    And then he appears to be

15  addressing, in the last paragraph, that,

16  "Currently it appears the JOM

17  distribution center in Kentucky is unable

18  to independently render a final SOM

19  determination on a given atypical order.

20  Several different company elements, such

21  as customer service, channel operations,

22  established products, supply chain

23  analysis, and quality assurance, possess

24  information and perform key functions

Highly Confidential - Subject to Further Confidentiality Review

1    which could pertain to every controlled

2    substance order."

3              Do you see that?

4         A.    Yes.

5         Q.    Okay.  So was he getting at

6    the point that the Kentucky distribution

7    center could not independently render a

8    final suspicious order monitoring

9    determination because several other

10   company functions like customer service

11   and channel operations had to play a role

12   in the determination of a suspicious

13   order?

14        A.    I think what he was talking

15   about is, physically in Kentucky, we only

16   have the material handlers, and that all

17   of the customer service, compliance, and

18   the planners are located in New Jersey.

19        Q.    I think we're on the same

20   page.  That was --

21        A.    Right.

22        Q.    That was what I was getting

23   at with my question.

24        A.    But the order -- the order

1    is not released to pick, pack, and

2    deliver until all the elements are

3    reviewed.  And that releasing happens

4    in -- by customer service, not local.

5         Q.    Then on Page 9, he addresses

6    recommendations.  I'm not going to go

7    through every one for the purpose of

8    time.

9              I am going to start with the

10   bottom of Page 9 at Paragraph 3.  He does

11   address that you have to start resolving

12   the issue of possibly not applying the

13   SOM order quantity assessment algorithm

14   to all customer orders for Schedule III

15   and IV controlled substances which are

16   received via electronic data interchange

17   throughout the day and night, right?

18        A.    Yes.

19        Q.    But there's actually no

20   difference between a Schedule II order

21   and a Schedule III and IV order with

22   respect to how that algorithm ran and

23   when that algorithm cut off during the

24   day; isn't that right?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. BARKER:  Object to form.

2           THE WITNESS:  Well, Schedule

3      IIs don't come in through EDI.

4  BY MR. JANUSH:

5           Q.    Oh, right.

6           A.    Schedule II have 222s that

7  have to be entered in.

8           Q.    That's right.  And once

9  entered in, how do they -- how do they

10 run?

11          A.    Well, when you receive the

12 order, it goes into SAP and placed on

13 business manager hold until the

14 algorithm --

15          Q.    Right.  So the same

16 algorithm, though, applies with these

17 Schedule II as well, is what I'm getting

18 at, right?

19          A.    Yes.

20          Q.    And the same cutoff of that

21 algorithm, in terms of when it runs, it

22 runs for II, III, and IV, and it stops at

23 3:45 in the afternoon; is that right?

24          MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1        THE WITNESS:  It runs --

2     yes, it runs every afternoon.

3  BY MR. JANUSH:

4        Q.    And stops after that 3:45

5  run, correct?

6           MR. BARKER:  Object to form.

7           THE WITNESS:  It takes every

8        order that's been placed up until

9        the time it runs and it runs all

10       those orders through the

11       algorithm.

12  BY MR. JANUSH:

13       Q.    Right.  And that includes

14  Schedule II, correct?

15       A.    Yes.

16       Q.    Now let's go to Paragraph 4,

17  okay?

18           "Start modifying the

19  existing suspicious order monitoring

20  algorithm and/or adding algorithms to

21  include additional evaluation criteria

22  for each specific DEA basic class of

23  controlled substance handled by J&J;

24  example fentanyl, methylphenidate, and

Highly Confidential - Subject to Further Confidentiality Review

1    tramadol."

2                Do you see that?

3         A.    Yes.

4         Q.    "Consider a base unit

5    measurement" -- "unit of measurement such

6    as grams of active ingredient for the SOM

7    algorithms.

8                "Consider separating J&J

9    customers into two or more groups and

10   perform different analyses of orders for

11   these different groups; e.g., largest

12   three wholesalers in one group, smaller

13   wholesalers in another group.

14               "Consider evaluating

15   customer orders for specific DEA basic

16   classes of substances against similar

17   size and geographically placed customers,

18   and perform national, regional, state,

19   and perhaps three digit zip code

20   comparisons among like-size customers."

21               Did I read that correctly?

22        A.    Yes, you did.

23        Q.    Before getting Terrance

24   Woodworth's audit suggestion within this

Highly Confidential - Subject to Further Confidentiality Review

1    report concerning this Paragraph 4, had

2    you and your team previously considered

3    modifying your suspicious order

4    monitoring algorithm in the manners that

5    he suggested here?

6         A.    We were in discussion about

7    these items.  After -- through

8    benchmarking, in recent benchmarking, we

9    realized these are potential enhancements

10   that DEA may expect us to do.

11        Q.    And let's go to Paragraph

12   4A.

13             Quote, "Stop using the

14   current single-criterion algorithm which

15   selects and holds orders from customers

16   when the quantity of an order is greater

17   than three times, 300 percent, the

18   customer's average weekly order based on

19   a rolling 12-month ordering history from

20   that customer."

21             Do you see that?

22        A.    Yes, I do.

23        Q.    And this is -- this report

24   was dated January --

Highly Confidential - Subject to Further Confidentiality Review

1           A.      January.

2           Q.      -- of -- January 6th -- 8th,

3    excuse me, of 2018, right?

4           A.      Yes.

5           Q.      And a little more than a

6    year and about two weeks -- actually a

7    year and exactly two weeks later, on

8    January 22, 2019, I first deposed you.

9    And you indicated that you had not

10   stopped using the single-criterion

11   algorithm as of that date and were still

12   using the 300 percent of the customer's

13   average weekly order in J&J's suspicious

14   order monitoring algorithm; is that

15   right?

16              MR. BARKER:  Object to form.

17              THE WITNESS:  We are

18         currently using the algorithm

19         while the project, which you

20         already provided information on,

21         is underway.

22   BY MR. JANUSH:

23          Q.      And Terrance goes on to

24   critique the current single-criterion

Highly Confidential - Subject to Further Confidentiality Review

1    algorithm, which, by the way -- we

2    established in the last deposition, and

3    just to refresh everything for Day 2,

4    this 300 percent of the customer's

5    average weekly order based on a rolling

6    12-month order history is the algorithm

7    that existed since the inception of

8    Johnson & Johnson's suspicious order

9    monitoring program through the present

10   date, right?

11            MR. BARKER:  Object to form.

12            THE WITNESS:  This is the

13       algorithm that was implemented

14       late 2006.

15   BY MR. JANUSH:

16       Q.    Through the present date,

17   correct?

18       A.    Yes.

19       Q.    Okay.  And Terrance

20   Woodworth states, "This algorithm only

21   measures quantity and does not consider

22   frequency or a pattern of ordering by the

23   same customer," right?

24       A.    Yes.

1    Q.    And you agree with that,

2  right?

3              MR. BARKER:  Object to form.

4              THE WITNESS:  It focuses on

5        the ordering of one single

6        customer, yes.

7  BY MR. JANUSH:

8        Q.    And that's not my question.

9  I said this algorithm only measures

10  quantity and does not consider frequency

11  or a pattern of ordering by the same

12  customer.

13              Do you agree with that?

14        A.    That is what the algorithm

15  does, the quantity.

16        Q.    And so you agree with that,

17  right?  Yes?

18        A.    Yes.

19        Q.    And the algorithm compares a

20  customer's order quantity against only

21  that customer's average annual purchases,

22  right?

23        A.    Yes.

24        Q.    The algorithm would not

Highly Confidential - Subject to Further Confidentiality Review

1  detect multiple customer orders during a

2  given week, right?

3          MR. BARKER:  Object to form.

4          THE WITNESS:  Yes.

5  BY MR. JANUSH:

6      Q.    The algorithm would not

7  detect orders which consist of gradual

8  quantity increases of controlled

9  substance over time, right?

10          MR. BARKER:  Object to form.

11          THE WITNESS:  That is what

12      he wrote.

13  BY MR. JANUSH:

14      Q.    Is that right though?

15      A.    I've never seen it happen,

16  but it -- I guess it could.

17      Q.    Is it right that --

18      A.    He wrote that, yes.  He

19  wrote that, yes.

20      Q.    I'm not asking if he wrote

21  it.  I'm asking if you agree with it,

22  that the algorithm would not detect

23  orders which consist of gradual quantity

24  increases of a controlled substance over

1    time.

2         A.     In theory it could happen.

3         Q.     What could happen?

4         A.     That if they ordered tiny

5    increases over time, by averaging it out,

6    it might -- it might not show.

7         Q.     Meaning the algorithm might

8    not pick it up?

9         A.     Yes.

10        Q.     Okay.  The algorithm would

11   not detect a new customer's orders for

12   controlled substances which initially

13   commence with larger than normal

14   quantities and remain at a constant

15   level.

16             Do you agree with that?

17             MR. BARKER:  Object to form.

18             THE WITNESS:  The algorithm

19        only detects what the orders are.

20        However, our outside processes by

21        onboarding new customers, we look

22        at their quantity.  So, if -- so

23        what number gets entered into the

24        algorithm, I question that one,

1     that, you know, would we really

2     start a customer at a high level.

3  BY MR. JANUSH:

4     Q.    Well, you would go through

5  your -- your questionnaire process,

6  right?

7     A.    Yes.

8     Q.    And you would get on the

9  phone with the customer and ask what

10 their needs are, right?

11    A.    And then we would also

12 evaluate whether that makes sense.

13    Q.    Right.  And if it seemed to

14 make sense to customer service to clear

15 the order, and the order started at a

16 high number, that would be the starting

17 point for that new customer, right?

18    A.    But customer service doesn't

19 do the approval.  It would go to the DEA

20 compliance group that would look at it

21 and question it and ask for justification

22 for that high level.

23    Q.    Okay.  So you -- you

24 corrected me in terms of the department

Highly Confidential - Subject to Further Confidentiality Review

1  that would analyze it.  But I'm still

2  addressing the fundamental concept.  And

3  the fundamental concept that I'm

4  addressing is that DEA compliance would

5  question and speak with the customer and

6  see if they are content with the

7  explanation that the high order is

8  justified; is that correct?

9      A.    Yes.  And with the

10  documentation on hand, yes, that could

11  happen.

12      Q.    And so once a customer

13  starts at a high, larger than normal,

14  quantity, if they remain at that constant

15  level, the algorithm wouldn't detect --

16  it wouldn't detect anything, right?

17          MR. BARKER:  Object to form.

18          THE WITNESS:  If they

19      consistent -- if they ordered

20      consistently that amount over

21      time.  But if they had one big

22      order and they don't order for

23      12 months, the algorithm will flag

24      it.  And we'll have to investigate

Highly Confidential - Subject to Further Confidentiality Review

1    it again.  Why did you not order

2    it, so --

3                MR. JANUSH:  Move to strike

4    as nonresponsive.

5    BY MR. JANUSH:

6         Q.    The algorithm does not

7    distinguish between controlled

8    substances, geographic areas, or similar

9    size customers; example, similar size

10   wholesaler.

11               Do you agree with that?

12        A.    Our algorithm doesn't,

13   right.

14        Q.    Doesn't or does?

15        A.    Does not.

16        Q.    I'm going to have you turn

17   to Page 14, if you will.

18               At the top, I'm looking at

19   the bullets that fall within Terrance

20   Woodworth's Paragraph 12.

21               And to be fair, we'll go to

22   13 -- Page 13.  He's addressing

23   continue -- issues to continue/enhance

24   J&J's program.  And multiple bullets

1    follow.

2              And so on 14, I'm looking at

3    the second bullet.  "When an SOM-related

4    action against a DEA registrant is noted,

5    determine whether there is a learning

6    from that case.  Determining whether it

7    involves one of J&J's customers, and if

8    so, whether the JOM suspicious order

9    monitoring algorithm identified any

10   previous atypical orders for that

11   customer and modify the algorithm

12   accordingly."

13             Do you see that?

14        A.    Yes, I do.

15        Q.    Okay.  And the last bullet

16   addresses, "Take past order examples and

17   evaluate their circumstances, order

18   patterns, and activity against revised

19   algorithm or algorithms to determine

20   discrepancies or adjustments needed."

21             Do you see that last bullet?

22        A.    Yes.

23        Q.    You didn't like that much,

24   did you?

Highly Confidential - Subject to Further Confidentiality Review

1        MR. BARKER:  Object to form.

2        THE WITNESS:  I don't

3    understand that.  He was saying

4    that once we include his

5    enhancements, to keep looking

6    at -- he was asking us, once we

7    identify -- we fix the

8    algorithm -- not fix -- we make

9    these enhancements for quantity,

10   frequency, and pattern, he said we

11   should run past examples through

12   it.

13       And at this time we didn't

14   understand why, because the

15   algorithm, the thresholds we

16   already are setting up is based on

17   historical ordering pattern.  And

18   those orders have already been

19   investigated.

20       And, you know, by sending

21   them through the new thresholds,

22   it would have confirmed we

23   shouldn't have investigated them,

24   because they were -- our current

1  algorithm was overflagging.

2  Do you know what I mean?

3  Because we were going based on

4  SKU, with these enhancements where

5  we're going on active ingredient,

6  if we were to throw all those

7  orders through the new system,

8  they would have shown that we

9  shouldn't have investigated them.

10  And --

11  BY MR. JANUSH:

12  Q.  So you're saying -- saying

13  throwing orders into a more robust

14  algorithm would have shown you that you

15  shouldn't have investigated prior orders?

16  That's your position?

17  A.  No.

18  Q.  Okay.  So let's get this

19  straight so that I can explain my

20  question.

21  A.  All right.

22  Q.  As of this date that he,

23  Terrance, is making his recommendations,

24  you have a one-dimensional algorithm that

1    only looks at quantity ordered over the

2    past year, correct?

3              MR. BARKER:  Object to form.

4              THE WITNESS:  SKU ordered

5         over the year.

6    BY MR. JANUSH:

7         Q.    Right.  Only looks at the

8    SKU of a given order, meaning the same

9    NDC code, the same drug at the same

10   milligram compared to that same drug at

11   the same milligram purchased over the

12   year, right?

13        A.    So, yeah.  So --

14        Q.    And he's saying take past

15   order examples and evaluate them against

16   when you come up with whatever your new

17   future state algorithm is, isn't he?

18        A.    He is saying once we

19   incorporate the enhancements and we go to

20   active ingredient, so all of

21   methylphenidate a customer orders, run

22   these past orders through it.

23        Q.    And you expect less hits to

24   result under a newer program?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      And why is that?

3        A.      Because we are currently

4   over flagging a lot because if a

5   customer -- we're basing it -- I can use

6   ADHD medicines.  You know, 18-milligram

7   is not commonly prescribed.  So a

8   customer may only order it once a year,

9   like in September before school starts.

10  And they only order that one 18-milligram

11  once a year.

12              But 12 months prior average

13  is zero.  So we're going to flag it even

14  though it makes sense, if you run the

15  investigation, you run what they've

16  ordered the past year, or we actually go

17  back two years, they see this wholesaler

18  always gets this 18-milligram before

19  school starts.

20        Q.      You're only looking at the

21  outlier where a rare order or a lesser

22  ordered product is being placed.  What

23  about the scenario where a Cardinal, for

24  example, is ordering a thousand cases of

Highly Confidential - Subject to Further Confidentiality Review

1  Nucynta every few days or 600 cases of

2  Nucynta every few days in various

3  milligrams, and your old order would have

4  only been looking -- your old algorithm

5  would have only been looking at it as SKU

6  to SKU, and your new algorithm might be

7  looking at it in the cumulative as to the

8  total amount of product that is being

9  shipped, right?

10            MR. BARKER:  Object to form.

11            THE WITNESS:  So when we get

12       the new enhancements, the products

13       that we would use are Duragesic

14       and Concerta and Ultram that we

15       have now.  That's the historical

16       orders.

17            And those products are

18       pretty consistent in the ordering

19       pattern.  So by running them

20       through, we're not going to get

21       any more new hits, because for the

22       past orders for the past few

23       years, because we divested

24       Nucynta --

1  BY MR. JANUSH:

2          Q.    Sure.

3          A.    So it would be a very -- to

4  have customer service -- instead of

5  focusing on our current products and

6  using this new threshold to get -- we

7  are -- it would just -- it wouldn't be

8  time well spent because we already know

9  that those past orders, the customer's

10 ordered the same time, the same

11 quantities, we know the ordering history,

12 anything that's atypical that arrived

13 would have been flagged in our existing

14 program.  So that is why we didn't see

15 the value at that time.

16         Q.    Got it.  Okay.  I'm going to

17 show you an example live in a moment.

18         A.    Okay.

19         Q.    And we're going to go back

20 in time to see how Terrance's

21 recommendation would have impacted you

22 years ago before you divested Nucynta,

23 fair?

24         A.    Sure.

```
 1            Q.     Before doing that I want to
 2    go Paragraph 13.
 3                   MR. BARKER:  Before you ask
 4            that question, Evan, are you
 5            representing that the highlighting
 6            is in the original document.
 7                   MR. JANUSH:  No, I am
 8            absolutely not.  I highlighted all
 9            of this.  I apologize.  I can give
10            you clean copies here.  But
11            everything here is something I
12            highlighted.
13                   MR. BARKER:  Including
14            the --
15                   MR. JANUSH:  Including the
16            yellow highlighting that's
17            computer highlighted by me to
18            focus your attention on it.  I
19            didn't want to play hide the ball.
20            I wanted you to see exactly what I
21            was going to turn to when I
22            touched this page.  I made that
23            highlight.
24
```

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. JANUSH:

2        Q.    So that highlight in

3  brighter gold at the bottom of Paragraph

4  13 states, "It appears that the JOM

5  suspicious order monitoring program" --

6  or "suspicious order monitoring has not

7  reported an order for controlled

8  substances as suspicious during its time

9  in operation."

10            Do you see that?

11        A.    Yes, I do.

12        Q.    Do you agree with that?

13        A.    We have not reported a

14  suspicious order, yes.

15        Q.    And when you say we have not

16  reported a suspicious order, you are

17  referring to the fact that we, JOM, or

18  Johnson & Johnson, has not reported a

19  suspicious order to the DEA; is that

20  correct?

21        A.    Right, we have -- might have

22  reported investigated orders to DEA.  But

23  none were deemed suspicious.

24        Q.    Did you report investigated

1    orders to DEA?

2         A.    We -- I recall, and I think

3    we spoke previously in 2007, when there

4    was a Cardinal distribution license

5    issue, and we saw an increased demand in

6    California.  And we reached out to San

7    Francisco DEA, explained our algorithm,

8    explained that we saw an increased demand

9    in this DC because three other DCs lost

10   their license.  We didn't -- we

11   investigated it.  It made sense, and we

12   didn't deem it suspicious.

13        Q.    And beyond that reporting,

14   did you ever report an order to the DEA?

15        A.    We had informal discussions

16   with DEA asking if they wanted every

17   order we investigated.  But no, none that

18   was suspicious.

19        Q.    You didn't like this

20   language that I highlighted in gold in

21   your audit report, did you?  And I'm

22   circling it in red.  You didn't like it,

23   right?

24              MR. BARKER:  Object to form.

1        THE WITNESS:  I don't know

2     what -- I -- it's -- we haven't

3     done any suspicious -- we haven't

4     reported suspicious --

5  BY MR. JANUSH:

6        Q.    You didn't like having the

7  language in the -- in the report and you

8  wanted it wiped out and deleted, didn't

9  you?

10        MR. BARKER:  Object to form.

11        THE WITNESS:  I don't

12     recall.

13  BY MR. JANUSH:

14        Q.    I'll work to refresh your

15  recollection.

16        (Document marked for

17     identification as Exhibit

18     Janssen-Dempsey-27.)

19  BY MR. JANUSH:

20        Q.    I'll mark Exhibit 27 a

21  document beginning with Bates

22  JAN-MS-05444648.

23        I'm going to have you turn

24  to the last page of the e-mail.

1          And this is a family

2    document, and it's attaching a new draft

3    of the same date, Drug and Chemical

4    Advisory Group, evaluation of the

5    suspicious order monitoring system audit

6    that is JAN-MS-05444650.

7          But for the moment, I'm

8    going to look at 649, the second page of

9    the e-mail.

10          I'm going to draw your

11    attention to your e-mail to Terry.

12          And you wrote, "Hello,

13    Terry.  During the review last week,

14    Brian pointed out one statement that I

15    think needs to be clarified.  The below

16    statement in red can be misleading.

17    Perhaps you could consider rewording?

18    Something like, 'Due to the current

19    algorithm and order investigation

20    process, there has not been any deemed

21    suspicious that would require

22    reporting.'"

23          Do you see that?

24    A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And the sentence that you're

2  referring to is the last sentence that is

3  also being boxed by me.  "It appears that

4  the JOM suspicious order monitoring has

5  not reported an order for controlled

6  substances as suspicious during its time

7  in operation."

8         Isn't that right?

9    A.    Yes.

10   Q.    Okay.  So Terry -- Terrance

11 Woodworth wrote back to you, "Hi, Michele

12 and Brian.  I hope you are both doing

13 well.  I am happy to just delete this

14 sentence altogether."

15        Do you see that?

16   A.    Mm-hmm.

17   Q.    And he says, "It really

18 doesn't fit well with the recommendation

19 being made.  What do you think?  And if

20 this is okay, do you want me to send you

21 a new draft with the sentence omitted?

22 Thank you, Michele and Brian!!"

23        Do you see that?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Does this refresh your

2  recollection of what happened?

3    A.    Yes, it does.

4    Q.    And then on the first page,

5  Brian Strehlke writes back, "Hi, Terry.

6  That sounds fine to me.  From our time

7  spent together in December, I took away

8  that:  One, our system has been working

9  well; two, there is an identified

10  weakness with Schedule III orders that

11  come in late in the day requiring manual

12  processing to verify their non-suspicious

13  nature; three, you made recommendations

14  necessary to enhance our process to meet

15  changing regulatory expectations; four,

16  there have been no orders identified as

17  suspicious and there have been none

18  reported.

19         "Are you in agreement with

20  the above?"

21         Did I read that right?

22    A.    Yes.

23    Q.    Okay.  Now, let's -- going

24  with Number 2, "There is an identified

1    weakness with Schedule III orders that

2    come in late in the day requiring manual

3    processing to verify their non-suspicious

4    nature."

5              We have already established

6    that that same issue can exist with

7    Schedule II orders that come in late in

8    the day as well, right?

9              MR. BARKER:  Object to form.

10   BY MR. JANUSH:

11        Q.   Meaning a Schedule II order

12   that comes in late in the day, regardless

13   of whether it comes in on EDI or though a

14   manual 222 documentation, still can be

15   captured -- still may not be captured by

16   the running of the suspicious order

17   monitoring algorithm late in the day,

18   right?

19             MR. BARKER:  Object to form.

20             THE WITNESS:  If the human

21        error -- customer service puts the

22        order on after the time.

23   BY MR. JANUSH:

24        Q.   Okay.  And Terrance responds

1    to Brian, doesn't he, at the top of this

2    e-mail string?

3            A.    Yes, he does.

4            Q.    And he says, "Hi, Brian.

5    Okay.  Sentence has been deleted!"

6                  Do you see that?

7            A.    Mm-hmm.

8            Q.    "Yes, I am in agreement with

9    all of your takeaway comments, and I

10   would add that we felt the current

11   algorithm was one-dimensional and thus

12   had some draw backs that could be

13   addressed by enhancing the algorithm."

14                  Do you see that?

15           A.    Yes, I do.

16           Q.    Okay.  Did you agree with

17   his conclusion?

18           A.    That -- it just factored --

19   yes, that it was only on quantity.

20           Q.    Okay.  And going -- going to

21   the bottom again to Brian's e-mail.  At

22   Number 3, Brian sought to confirm, "You

23   made recommendations necessary to enhance

24   our process to meet changing regulatory

Highly Confidential - Subject to Further Confidentiality Review

1    expectations."

2                Do you see that?

3        A.    Yes, I do.

4        Q.    But, there were no changing

5    regulatory expectations as it concerned

6    the three factors of an algorithm that

7    we've been addressing in Joseph

8    Rannazzisi's letter of December 2007,

9    right?

10               MR. BARKER:  Object to form.

11               THE WITNESS:  The three

12          factors, the C.F.R., had not

13          changed; however, there were

14          changes through interaction with

15          DEA and going to conferences where

16          there were additional

17          expectations.

18    BY MR. JANUSH:

19        Q.    But the three factors hadn't

20    changed, right?

21        A.    No, the factors had not

22    changed.

23        Q.    Okay.  And if you turn to

24    page ending in 663 in the audit that's

1    attached, and you go to Paragraph 13, the

2    statement that you and Brian Strehlke

3    asked to be removed would have appeared

4    here.

5           A.    I would like to correct, we

6    didn't ask it to be removed.  Terry said

7    that he would be happy to delete it.  And

8    even Brian said there were no orders

9    identified as suspicious and thus had

10   none reported.  It was Terry that said

11   sentence has been deleted.

12          Q.    Except he said, "What do you

13   think?"  Which means -- if you go back to

14   the e-mail, he put the ball in your

15   court.  "What do you think?"

16                Do you see that?

17                MR. BARKER:  Object to form.

18   BY MR. JANUSH:

19          Q.    I'm highlighting it.  I'm

20   boxing it in.

21          A.    Yes.  But --

22          Q.    And the answer was, "That

23   sounds fine to me."

24                Do you see that?

1        A.    That is what Brian said,

2   yes.

3        Q.    So Brian had the opportunity

4   to say, "No, don't delete it.  We

5   disagree," correct?

6        A.    Yes.

7        Q.    And he didn't do it, right?

8        A.    Yes.

9        Q.    And, again, going back to

10  the deletion, it would have appeared

11  where I'm drawing this red underline at

12  the end of Paragraph 13, correct?

13       A.    Yes.

14       Q.    That's not all that was

15  deleted, is it?

16            MR. BARKER:  Object to form.

17            THE WITNESS:  No.

18  BY MR. JANUSH:

19       Q.    Do you remember other stuff

20  that was deleted, other language?

21       A.    As we were working through

22  the report in identifying how to actually

23  perform the enhancements, we did identify

24  some that we didn't -- we had some

1    issues -- not issues, but we didn't

2    understand why it was there.

3            Q.    Okay.

4                  (Document marked for

5            identification as Exhibit

6            Janssen-Dempsey-28.)

7    BY MR. JANUSH:

8            Q.    I'm going to hand you what's

9    been marked as Exhibit 28.

10                 MR. JANUSH:  Counsel.

11                 MR. BARKER:  Thank you.

12   BY MR. JANUSH:

13           Q.    And this is Bates-numbered

14   JAN-MS-05444781.

15                 And I'm going down to your

16   e-mail, middle of the -- I'm going to

17   draw a line to make it easier for you, if

18   you want to look at the screen too.  Your

19   e-mail, second half of the first page.

20   You're writing to Terry.  "Some other

21   tweaks I thought I would mention for your

22   consideration."

23                 Do you see that?

24           A.    Yes.

1    Q.    And then go down to the

2  bottom.  Last sentence.  "Also, in

3  thinking this one over:  Take past order

4  examples and evaluate their

5  circumstances, order patterns, and" --

6  flip the page -- "activity against

7  revised algorithms to determine

8  discrepancies or adjustment needed."

9            Quote, or I should say end

10  quote.

11            And your statement that I've

12  highlighted is:  "I don't think we want

13  to question release decisions after the

14  fact.  We should remove this item.  The

15  intent will be covered when we implement

16  867 chargeback/data analytics and

17  reviewing actions taken against DEA

18  registrants."

19            Do you see that?

20    A.    Yes, I do.

21    Q.    Now, I'm going to introduce

22  you -- introduce to you, Exhibit 29,

23  which is another copy of the same draft

24  audit from Terrance Woodworth and the

Highly Confidential - Subject to Further Confidentiality Review

1   Drug and Chemical Advisory Group.  The

2   Bates numbering is JAN-MS-05444783.

3                (Document marked for

4          identification as Exhibit

5          Janssen-Dempsey-29.)

6   BY MR. JANUSH:

7          Q.    And I am going to draw your

8   attention to Paragraph 12.  And right

9   where I'm drawing the line on the screen

10  for your benefit is where the last bullet

11  was deleted; isn't that right?

12         A.    Yes.

13         Q.    Did you hire Terrance

14  Woodworth to be your independent

15  suspicious order monitoring auditor or to

16  be your lackey?

17               MR. BARKER:  Object to form.

18               THE WITNESS:  We hired him

19         to do an audit of our program.

20  BY MR. JANUSH:

21         Q.    Did you hire him to be an

22  independent auditor or to be your lackey?

23               MR. BARKER:  Object to form.

24               THE WITNESS:  We hired him

1    to be an auditor of our program

2    and provide us enhancements of

3    what he is currently seeing out in

4    industry.

5 BY MR. JANUSH:

6    Q.    Did you expect him to work

7 independently and give his independent

8 feedback to you?

9    A.    We expected him to give his

10 feedback.  And that's what this audit was

11 for.

12    Q.    Why did you play a role in

13 editing his audit?

14    A.    Because as this was being

15 developed, there were changes happening.

16       As -- you didn't mention,

17 but the whole funding item that he

18 suggested, which might have been fine in

19 the past, but given what Senator

20 McCaskill's -- the whole group was

21 identifying, that all these

22 pharmaceutical companies providing

23 funding, we didn't think that was

24 appropriate in this document.

1          So we took his -- his

2    recommendations; however, we also looked

3    at the current environment to see.

4              MR. JANUSH:  Move to strike

5         all aspects of that answer

6         concerning funding.

7    BY MR. JANUSH:

8         Q.    I didn't ask about funding,

9    did I?

10        A.    No, but it was an item that

11   we also asked to be changed.  Just try to

12   explain, you know, that he gave his

13   recommendations; however, there were

14   different nuances happening out in the

15   environment that would require different

16   wording.

17        Q.    You all weren't handcuffed

18   to abide by every recommendation in his

19   audit, right?  You could have disagreed

20   with his audit concerning anything

21   related to funding and left it in, true?

22        A.    This was -- this was his

23   recommendations that we consider --

24        Q.    No, that's not what I'm

Highly Confidential - Subject to Further Confidentiality Review

1    asking.  You could have kept the language

2    as it was and ignored certain quoted

3    language, true or false?

4           A.    True.

5           Q.    And instead you actively

6    affirmatively chose to involve yourself

7    in an independent auditor's draft and

8    edit his draft, true or false?

9                 MR. BARKER:  Object to form.

10                THE WITNESS:  True, we made

11          changes.

12                MR. JANUSH:  Okay.  We are

13          going to toggle now to the

14          computer HDMI hookup.  And we are

15          going to mark this exhibit as

16          Exhibit 35 (sic).

17                (Document marked for

18          identification as Exhibit

19          Janssen-Dempsey-30.)

20   BY MR. JANUSH:

21          Q.    It is an Excel file too

22   large to produce at this deposition, so

23   we'll pull it up on this 49-inch screen.

24   It's JAN-MS-03739863.

Highly Confidential - Subject to Further Confidentiality Review

1    And I have filtered this

2    Excel file to just address a portion of

3    it related to your customer, Cardinal

4    Health, and to go back in time to look at

5    Nucynta sales.  And at the bottom, you'll

6    see the tab, "SAP direct sales."

7         Do you see that?

8         A.    Yes.

9         Q.    And I'm going to draw your

10   attention to -- close to the top of the

11   screen, about four or five lines down,

12   I've highlighted it or grayed it in.  It

13   is Line 6016.  Or maybe that's not Line

14   6016.  But it ends in column O,

15   $322,608.96.

16        And Column N addresses

17   Nucynta tablets, 100 milligrams, 100s, 24

18   count, and 864 as the quantity number.

19        Do you see that?

20        MR. BARKER:  I'm going to

21        object to form and to the line of

22        questioning because I cannot see

23        what -- I'm looking up at that

24        screen, and I can't see what

Highly Confidential - Subject to Further Confidentiality Review

1       you're.

2               MR. JANUSH:  Okay.  You have

3       a right to walk up to the screen.

4               MR. BARKER:  And I'm happy

5       to do that.  I'm going to pass

6       behind the witness.

7               MR. JANUSH:  If you'd like.

8       If you'd like.  Since I have the

9       screen in front on have me, let me

10      give you this and make life easier

11      for you.  Okay.

12              MR. BARKER:  That's helpful.

13              MR. JANUSH:  There you have

14      a monitor.  Let the record reflect

15      that I've handed my monitor to

16      Mr. Barker, opposing counsel.  And

17      it is approximately 24 inches from

18      him.  And it appears to be a

19      20-inch wide-screen monitor.

20              MR. BARKER:  Okay.  I'm also

21      objecting because I don't -- I

22      don't know how this document has

23      been filtered, and I also don't

24      know what --

Highly Confidential - Subject to Further Confidentiality Review

1          MR. JANUSH:  Okay.  That's

2     fine.

3          MR. BARKER:  -- what

4     information is being presented and

5     its accuracy.  So I object.

6          MR. JANUSH:  Okay.  I

7     appreciate that.  I didn't create

8     the document.  I didn't edit the

9     document.  You're going to get the

10    document on CD-ROM.  It's an exact

11    replica.  It's a saved downloaded

12    file from Janssen's production.

13    Again it's JAN-MS-03739863.

14         I have done nothing but

15    filtered Column F in alphabetical

16    order so that I could just look at

17    exemplar sales to Cardinal for

18    Nucynta in a short time period,

19    just a snippet in time.

20 BY MR. JANUSH:

21         Q.    Do you understand what I'm

22 getting at?

23         A.    Can you go to the left so I

24 can see the time?

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Yes.  I absolutely intended

2   to do so.  So let me do that at Line 16.

3   So this is September 3, 2013.

4              Do you see that?

5      A.    Mm-hmm.

6      Q.    Okay.  It was -- was that --

7   I need a verbal answers.

8      A.    Yes.  Yes, I see it now.

9   Thank you.

10     Q.    Okay.  So the sale date is

11  9/3/13.  And I'm going to scroll over.

12  Nucynta tablets, 100 mg, 100s, 24-count.

13             What's 100 mg?  That's

14  100 milligrams, right?

15     A.    Yes.

16     Q.    What does 100s mean?

17             MR. BARKER:  Object to form.

18  BY MR. JANUSH:

19     Q.    It means 100 pills in a

20  bottle?

21     A.    Pills in a bottle.

22     Q.    And 24-count means 24

23  bottles to a pack, right, to a casing?

24     A.    Right.

1        Q.    A case unit, right?

2        A.    Yes.

3        Q.    And the number to the right

4    says 864.  That means 864 cases of

5    24-count bottles of 100-milligram Nucynta

6    containing 100 pills are being ordered;

7    is that right?

8              MR. BARKER:  Object to form.

9              THE WITNESS:  That's what it

10       says.

11   BY MR. JANUSH:

12       Q.    And the pricing lists

13   $322,608.96.

14             Do you see that?

15             MR. BARKER:  Object to form.

16             THE WITNESS:  I see it.

17   BY MR. JANUSH:

18       Q.    Okay.  And then the very

19   same -- let's see.  We'll go down to the

20   next line, 6017, three days later.  And

21   we'll scroll over.  The same exact

22   Nucynta purchase, same SKU, same

23   100-milligram, 100s, 24-count, 96 are

24   purchased, right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2          MR. BARKER:  Object to form.

3   BY MR. JANUSH:

4          Q.    And I'm going to scroll --

5   jump down two more lines.  Two more lines

6   later, on -- four days later on

7   September 10th, 2013, 624 cases of the

8   same drug are purchased for $232,995.36.

9          Do you see that?

10         MR. BARKER:  Object to form.

11         THE WITNESS:  Yes, I do.

12  BY MR. JANUSH:

13         Q.    All right.  Let's jump down.

14  We'll go down to where I've boxed it in

15  at Line 6027.  And 480 cases at

16  $179,227.20 have been ordered, and that's

17  three days from the last order on 9/13 of

18  2013.

19         Do you see that?

20         MR. BARKER:  Object to form.

21         THE WITNESS:  Yes, I do.

22  BY MR. JANUSH:

23         Q.    All right.  Let's keep

24  going.

Highly Confidential - Subject to Further Confidentiality Review

1                    Jumping down four lines

2    about, four days later, on September 17,

3    2013, 624 cases of Nucynta 100 -- excuse

4    me.  I have that wrong.  That's 60.  No,

5    I have it right.  My apology.  My eyes

6    are playing tricks.

7                    Nucynta 100, 100s, 24-count,

8    624 cases, $232,995.36.

9                    Do you see that?

10                    MR. BARKER:  Object to form.

11                    THE WITNESS:  Yes, I do.

12   BY MR. JANUSH:

13        Q.    And that is on

14   September 17th, right?

15        A.    Yes.

16        Q.    Okay.  And let's go forward

17   three days later, September 20th.

18   Nucynta 100-milligram, 100s, 24-count,

19   600 cases ordered, $224,034.

20                    Do you see that?

21                    MR. BARKER:  Object to form.

22                    THE WITNESS:  Yes, I do.

23   BY MR. JANUSH:

24        Q.    Okay.  Earlier we talked

1    about the Rannazzisi letter.

2            A.     Mm-hmm.

3            Q.     We talked about the concept

4    of frequency being a component that needs

5    to be investigated as part of a

6    suspicious order monitoring program,

7    didn't we?

8            A.     Mm-hmm.

9            Q.     Would you agree that three

10   and four days apart, having orders like

11   this, would be a frequency issue?

12           A.     No.  Because as you

13   present -- you presented some evidence

14   prior that showed -- it was an e-mail

15   that showed Cardinal always places orders

16   Mondays -- two -- twice a week.  So the

17   frequency of the orders there, we knew

18   that there would be ordering on those

19   days.

20           Q.     Ma'am, the fact that

21   Cardinal placed orders twice a week,

22   three times a week, four times a week or

23   five times a week is irrelevant to my

24   question.  I'm asking you about whether

Highly Confidential - Subject to Further Confidentiality Review

1    your algorithm -- your algorithm didn't

2    address frequencies, right?

3              MR. BARKER:  Object to form.

4              THE WITNESS:  No.  But these

5         orders were probably investigated.

6         Did you --

7    BY MR. JANUSH:

8         Q.    An order doesn't get

9    investigated unless it's first flagged,

10   right?

11             MR. BARKER:  Object to form.

12             THE WITNESS:  Well, I'm just

13        looking at this date, period, and

14        how long the ER was on the market.

15             And I'm recalling that there

16        was -- there was some

17        investigations capturing the

18        demand for Cardinal Health.

19   BY MR. JANUSH:

20        Q.    Okay.  But an order in

21   realtime in a moment of the day is not

22   investigated, as you testified earlier

23   today, until it's first flagged, right?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And you can't flag frequency

2    if frequency is not part of your

3    algorithm, right?

4              MR. BARKER:  Object to form.

5              THE WITNESS:  Agreed.

6    BY MR. JANUSH:

7         Q.    Okay.

8              MR. JANUSH:  Is this is a

9         good time for a break?

10             MR. BARKER:  If you need

11        one, yeah.

12             MR. JANUSH:  Let's go off

13        the record.

14             THE VIDEOGRAPHER:  Stand by,

15        please.  The time is 11:38 a.m.

16        Going off the record.

17             MR. JANUSH:  Earlier, I had

18        represented that this Excel file

19        marked at JAN-MS-03739863 was

20        Exhibit 35.  I intended for it to

21        be marked as Exhibit 30.  So we

22        will correct the record to reflect

23        that it is Exhibit 30.

24             MR. BARKER:  That's fine.

1          MR. JANUSH:  Thank you.

2          (Short break.)

3          THE VIDEOGRAPHER:  We are

4     back on the record.  The time is

5     12:01 p.m.

6 BY MR. JANUSH:

7     Q.    Ms. Dempsey, who is

8 Stephanie Dixon?

9     A.    She's the controlled

10 substance compliance manager for JOM.

11     Q.    Is that the fairly new

12 position that got added quite recently?

13     A.    May of last year.

14     Q.    May of 2018?

15     A.    Mm-hmm, yes.

16     Q.    Is she -- is Stephanie Dixon

17 the only compliance manager that you have

18 had serving under you?

19     A.    She doesn't report to me.

20 But JOM has had previous compliance

21 managers from the DEA perspective.

22     Q.    Okay.  This was the new

23 compliance role where -- where you were

24 involved in creating a job description;

Highly Confidential - Subject to Further Confidentiality Review

1    is that right?

2            A.     Yes.

3            Q.     Okay.  And who does she

4    report to, Stephanie Dixon?

5            A.     Jose Boursin.

6            Q.     How do you spell his last

7    name?

8            A.     Her.

9            Q.     Oh, sorry.

10           A.     B-O-U-R -- I'm sorry.

11   B-O-R -- B-O-U-R-S-I-N.

12           Q.     And does Jose Boursin report

13   to you?

14           A.     No.

15           Q.     Who does Jose Boursin report

16   to?

17           A.     Liz Allison.

18           Q.     Okay.  And what role does

19   Jose Boursin have?

20           A.     She is director of quality

21   and compliance for Deliver, or -- which

22   is logistics organization within J&J.

23           Q.     Okay.  And you stated who

24   Jose reports to.  Can you repeat that

1    name again?

2         A.    Liz Allison.

3         Q.    And what role does Liz

4    Allison have?

5         A.    She is the North America

6    regional leader for quality and

7    compliance for the Deliver organization.

8         Q.    Okay.  Were you aware of the

9    fact that on December 17, 2018, the

10   controlled substance compliance manager,

11   Stephanie Dixon, contacted the new

12   Louisville, Kentucky DEA supervisor, Ben

13   Vinson, to request guidance on suspicious

14   order monitor reporter specifications

15   from orders shipped from the Kentucky

16   distribution center?

17        A.    Yes, I am aware.

18        Q.    When did you become aware of

19   that?

20        A.    After she engaged with him,

21   she reviewed the conversation with me.

22        Q.    What -- on or about what

23   date would that be?

24        A.    It was in December.  I don't

Highly Confidential - Subject to Further Confidentiality Review

1    recall the exact date.  But it was in the

2    middle -- towards the middle of December,

3    end of December.

4        Q.    So she engaged with Ben

5    Vinson, according to this contact date,

6    on what I'll hand you as Dempsey

7    Exhibit 31 on December 17, 2018.

8              (Document marked for

9         identification as Exhibit

10        Janssen-Dempsey-31.)

11   BY MR. JANUSH:

12       Q.    The Bates number is

13   JAN-MS-05433750.

14             Have you seen this document

15   before?

16       A.    Yes, I have.

17       Q.    Did it get shared with you

18   internally by a colleague of yours at

19   Johnson & Johnson?

20       A.    Stephanie provided me a copy

21   of this.

22       Q.    Okay.  And I'm going to

23   direct your attention to -- there seems

24   to be a bunch of questions and answers,

Highly Confidential - Subject to Further Confidentiality Review

1  questions asked by Stephanie that are

2  logged in notes on Page 1 and Page 2, as

3  well as an e-mail that follows

4  documenting a conversation between

5  Stephanie Dixon and Ben Vinson.

6           Do you see that?

7      A.    Yes.

8      Q.    Okay.  And so with respect

9  to the question and answers, at the very

10 bottom, updated on January 21, 2019, it

11 states, on January 21st -- "On 21 Jan,

12 2019, the controlled substance compliance

13 manager contacted the Louisville,

14 Kentucky Division of the Drug Enforcement

15 Agency via an e-mail to Ben Vinson as

16 requested to send the orders flagged in

17 2018 for DEA awareness and to confirm the

18 accuracy of the telephone conversation on

19 December 17, 2018."

20           Do you see that?

21     A.    Yes, I do.

22     Q.    Okay.  And it says -- I want

23 to circle the fact that it says here,

24 "See attachment."

Highly Confidential - Subject to Further Confidentiality Review

1              Have you seen the

2    attachment, the orders flagged in 2018?

3    Have you seen that Excel file?

4         A.    Yes.

5              MR. BARKER:  Objection.

6    BY MR. JANUSH:

7         Q.    You have?

8         A.    Yes.

9         Q.    Okay.

10             MR. JANUSH:  I don't know

11        that it's been produced in this

12        case.

13             I think that to the extent

14        that it hasn't, we're calling for

15        production of that Excel file.

16             MR. BARKER:  Two points in

17        response to that.  The first is

18        you are misinterpreting the

19        document.  It's talking about on a

20        conversation on January 21.

21        There's a January 21st e-mail

22        that's attached.

23             And secondly the document

24        that you're referring to has been

Highly Confidential - Subject to Further Confidentiality Review

1      produced.
2           MR. JANUSH:  The Excel file
3      has been produced?
4           MR. BARKER:  Yes, it has.
5           MR. JANUSH:  So the
6      January 21 e-mail is referencing
7      JOM monitored orders.xlsx as an
8      attachment, so I wasn't
9      misrepresenting that.
10          MR. BARKER:  Oh, where are
11     you looking at?
12          MR. JANUSH:  On the e-mail.
13          MR. BARKER:  Oh, on the
14     e-mail itself.  My apologies.  I
15     now -- I thought you were still
16     reading from the bottom of Page 2
17     of the -- okay.
18          MR. JANUSH:  So that's the
19     attachment that I'm referring to.
20     And you're saying that has been
21     produced.
22          MR. BARKER:  It has been
23     produced.
24          MR. JANUSH:  Okay.

Highly Confidential - Subject to Further Confidentiality Review

1     MR. BARKER:  And this is the

2     whole document here.  But that has

3     been produced.

4     MR. JANUSH:  Okay.  Do you

5     know if it wasn't produced as a

6     family?

7     MS. WINCKEL:  It was

8     produced as a family.

9     MR. JANUSH:  It was?

10    Thanks.  Thanks for that

11    clarification.

12    MR. BARKER:  That helps.

13    See, if you want real details,

14    you've got to talk to Emilie.

15    MR. JANUSH:  All right,

16    Emilie.

17  BY MR. JANUSH:

18    Q.    Okay.  So the issue that I

19  wanted to address was, first of all,

20  there's obviously a host of notes,

21  questions with answers, on the first two

22  pages of this document that precede the

23  e-mail.  And it's notes contained within

24  a document called a regulatory agency

Highly Confidential - Subject to Further Confidentiality Review

1    contact report.

2                Do you see that?

3        A.    Yes, I do.

4        Q.    Okay.  And so Stephanie

5    wrote -- appears to have written

6    questions and written what Ben's answers

7    were.  Do I have that down right?  Am I

8    understanding?

9        A.    These were the notes of the

10   conversations that she had with Ben.

11       Q.    And in order to confirm her

12   accuracy of the conversations she had

13   with Ben, she then wrote him one day

14   before you were deposed in this case on

15   January 21, 2019; is that right?  I'm

16   highlighting the date sent.  January 21,

17   2019, at 11:03 p.m.

18                Do you see that?

19       A.    Yes.

20       Q.    Did you speak with her about

21   her seeking to contact the DEA on the day

22   before or the evening before you were

23   deposed?

24       A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1           Q.      Okay.

2           A.      But I know that the

3    discussion happened in December, and then

4    we had Christmas holidays.  And then she

5    went away for a few weeks to Florida for

6    a horse show.  And then this is probably

7    the earliest we can get to it.  This is

8    when she was back in the office.

9           Q.      So she contacted Ben Vinson,

10   the field agent for Louisville Kentucky

11   at the DEA on September --

12          A.      December.

13          Q.      Excuse me.  On

14   December 17th, and you're saying the

15   earlier she could get back to confirming

16   her conversation with Ben Vinson was a

17   month and four days after she first spoke

18   with him, which coincidentally was the

19   evening before you were deposed in this

20   case?  Is that what you're saying?

21               MR. BARKER:  Object to form.

22               THE WITNESS:  Based on the

23          sent date on the e-mail, it

24          appears she sent it out on Monday

Highly Confidential - Subject to Further Confidentiality Review

1          the 29th.

2    BY MR. JANUSH:

3          Q.    21st, right?

4          A.    21st.

5          Q.    Which was late in the

6    evening before you were deposed the next

7    morning by me, correct?

8              MR. BARKER:  Object to form.

9              THE WITNESS:  I was deposed

10         on the 22nd, correct.

11   BY MR. JANUSH:

12         Q.    Okay.  And the last question

13   that Stephanie asked Mr. Vinson, if you

14   turn to the last page, the last question

15   that she sought to confirm, "Question:

16   Overall when should an order be" -- "When

17   should an order be reported to

18   Louisville?

19              "Answer:  DEA used to get

20   excessive purchase reports that were too

21   much information in the past.

22   Technically, reporting should occur when

23   JOM does not deem an order suspicious,

24   but it has flagged and we released it for

Highly Confidential - Subject to Further Confidentiality Review

1    a reason except for the reasons listed in

2    the questions above that do not need to

3    be reported."

4              Do you see that?

5         A.   Yes, I do.

6         Q.   So JOM had not been

7    following that kind of a policy, at least

8    prior to getting this answer from Ben

9    Vinson; isn't that right?  In other

10   words, stated differently, JOM was not

11   reporting orders to the DEA when it

12   didn't deem it suspicious after an

13   investigation, but flagged it, later

14   released the order; is that right?

15             MR. BARKER:  Object to form.

16             THE WITNESS:  This was a new

17        expectation that Ben communicated

18        to us, because we had prior

19        engagement with a different leader

20        at Kentucky, who, when we walked

21        through this process, they were

22        fine with us not reporting if we

23        had the justification.

24   BY MR. JANUSH:

1    Q.    Okay.  And who was that

2    leader?

3    A.    It was Billy Lane.

4    Q.    Billy Lane.  And do you have

5    any correspondence with Billy Lane like

6    you do in an e-mail where you wrote to

7    Billy Lane and said, "When should orders

8    be reported to the DEA?" and Billy Lane

9    wrote back and said, "Don't worry.  If

10   you've investigated an order and cleared

11   it on your own, you do not need to

12   release the -- and released it after

13   investigation, you do not need to report

14   it to the DEA"?

15   A.    We do not have it in an

16   e-mail.  It was a verbal discussion.

17   Q.    Okay.  And who had that --

18   who was that verbal discussion between?

19   A.    It was DEA, diversion

20   investigators Jason Smith, Billy Lane,

21   with the JOM leaders at Kentucky, Michael

22   Griffith, then Mike Levitt, Brian

23   Strehlke and myself.

24   Q.    And after getting such

Highly Confidential - Subject to Further Confidentiality Review

1   important guidance from the DEA, did you,

2   Brian Strehlke, or Michael Levitt draft a

3   memorandum where you documented that

4   guidance from the DEA, that any order you

5   investigate and flag as potentially

6   suspicious does not need to be reported

7   to the DEA as per these DEA agents that

8   you have named?

9        A.    We did not write a formal

10  document.  We do have the record of the

11  conversation that the recorder was typing

12  at the inspection.  That's the only

13  record that we have of discussing this,

14  but nothing formally sent to Louisville.

15       Q.    And where is that record of

16  this discussion with DEA?

17       A.    It was attached to the

18  inspection report from their visit in

19  2013.

20       Q.    Okay.  And is it your

21  position that that was produced in this

22  case?

23       A.    I believe it was.

24            MR. BARKER:  You seem to be

Highly Confidential - Subject to Further Confidentiality Review

1          asking that of the witness.  Are

2          you asking us?

3     BY MR. JANUSH:

4          Q.    Do you know whether it was

5     produced in this case?

6          A.    I believe it was.

7               MR. JANUSH:  Do you know?

8               MR. BARKER:  Yes, it was.

9     BY MR. JANUSH:

10         Q.    I'm handing you what's been

11    marked as Dempsey Exhibit 32.

12    JAN-MS-03059382.

13              (Document marked for

14         identification as Exhibit

15         Janssen-Dempsey-32.)

16    BY MR. JANUSH:

17         Q.    And it contains an

18    attachment at 59385 from The Analysis

19    Group.

20              When I deposed you on

21    January 22nd, 2019, you had addressed

22    that right around Christmas time, Johnson

23    & Johnson or Janssen had contracted with

24    The Analysis Group to assist in creating

Highly Confidential - Subject to Further Confidentiality Review

1    the -- in -- on -- creating the revised

2    suspicious order monitoring system; is

3    that right?

4                MR. BARKER:  Object to form.

5                THE WITNESS:  No.  I said in

6           December we received a statement

7           of work for IntegriChain, another

8           consultant.  We've been working

9           with The Analysis Group since last

10          summer.

11   BY MR. JANUSH:

12          Q.    Okay.

13          A.    Two different consultants.

14   One was working on the algorithm, and one

15   was downstream customer.

16          Q.    Okay.  Just as an aside, for

17   purposes of this document, this -- is

18   this document -- this e-mail string dated

19   May 15, 2018, which attaches a proposal

20   for suspicious order monitoring

21   evaluation dated May 10, 2018, is this

22   the next time following your work with

23   the -- with Terrance Woodworth that you

24   sought to retain a third party to

1  evaluate suspicious order monitoring?

2            MR. BARKER:  Object to form.

3            THE WITNESS:  We were not

4       asking The Analysis Group to speak

5       to our existing program.  We

6       engaged them to help us identify

7       enhancements to our current

8       algorithm with the thresholds.

9  BY MR. JANUSH:

10      Q.    Okay.  My question was, is

11 this the next time following your work

12 with Terrance Woodworth that you sought

13 to retain a third party to evaluate

14 suspicious order monitoring.  And so what

15 you're saying is, you weren't hiring The

16 Analysis Group to evaluate.

17      A.    Exactly.

18      Q.    You were hiring The Analysis

19 Group to help you create your next

20 system; is that right?

21      A.    The enhanced algorithm.

22 Yes.

23      Q.    Okay.  And the attached

24 document was a proposal for preliminary

Highly Confidential - Subject to Further Confidentiality Review

1    evaluation of controlled substance

2    monitoring opportunities dated May 10,

3    2018; is that right?

4         A.    That is what on the -- yes,

5    that's what it says.

6         Q.    Did this document get

7    executed?

8              MR. BARKER:  Object to form.

9    BY MR. JANUSH:

10        Q.    I don't see an execution

11   sheet.  Did you enter into a -- into a --

12        A.    We did.

13        Q.    -- an agreement following

14   this?

15        A.    We did, but I don't know if

16   this is the actual one, because it might

17   have been -- there's been revisions to it

18   to include the new product.  And I don't

19   know if -- I didn't get to read this, to

20   see if it's in here.

21        Q.    Do you know what the latest

22   date of the contract is --

23        A.    Yes.

24        Q.    -- with The Analysis Group?

Highly Confidential - Subject to Further Confidentiality Review

1       A.     No, I don't.  Like I said

2  this is the project team that's managing

3  this.  I'm a high level watching it.

4       Q.     And who manages the

5  product --

6       A.     Valerie.

7       Q.     -- project team?

8              Valerie Chikwendu?

9       A.     Mm-hmm.

10      Q.     And --

11      A.     I do know there's been a few

12  since then.  This was the initial

13  kickoff, and more followed as we got to

14  the threshold.

15      Q.     So when did you start

16  working with The Analysis Group?  Was it

17  in May after receiving this, in May of

18  2018, after receiving this proposal?

19      A.     I believe we had them -- we

20  had a workshop where they came in, and I

21  can't remember what day it was.

22      Q.     Do you have notes from that

23  workshop?

24      A.     It wasn't my -- I just

Highly Confidential - Subject to Further Confidentiality Review

1    attended it.  I didn't lead the workshop.

2    But I think it was July.

3              But yeah, so this is when we

4    were initially engaging them and getting

5    the funding to pay for them to come to

6    the workshop.

7         Q.    Incidentally, does Terrance

8    Woodworth and his company also assist in

9    creating revised algorithms?

10        A.    I don't know.

11        Q.    Did you ever investigate

12   that with Terrance Woodworth?

13        A.    No.

14        Q.    No.  Why not?

15        A.    I just -- we --

16        Q.    In other words, what made

17   you walk away from working with Terrance

18   Woodworth and move towards working with

19   The Analysis Group?

20              MR. BARKER:  Object to form.

21              THE WITNESS:  Oh, at a -- at

22         an HDA conference, The Analysis

23         Group was there.  And they

24         introduced themselves.  And I saw

Highly Confidential - Subject to Further Confidentiality Review

1    what they provide, the services.

2    And we thought they were more

3    relevant to the actual -- doing

4    the statistical analysis.

5  BY MR. JANUSH:

6    Q.    Thought what was more

7  relevant?

8    A.    What they do, the services

9  that they provide, is more in line with

10  what we needed for the thresholds.  I was

11  not aware that Terry could provide those

12  services.  So we didn't even think to ask

13  Terry.

14    Q.    When you say the services

15  that they provide, can you elaborate on

16  that?

17    A.    The Analysis Group aids

18  companies with looking at their data to

19  set up thresholds for suspicious order

20  monitoring.

21    Q.    Okay.  But lots of companies

22  do that.  How did they do it differently

23  than other companies?  You were

24  explaining that there was something

Highly Confidential - Subject to Further Confidentiality Review

1    different about The Analysis Group.

2         A.    Well, you were asking me to

3    compare to Terry.

4         Q.    Right.

5         A.    And I wasn't -- I had not

6    heard of anything that Terry -- the

7    services that Terry provides.

8         Q.    You said, "And we thought

9    they were more relevant to the actual --

10   doing the statistical analysis."  And I

11   said, "What was more relevant?"

12             I'm trying to dig a little

13   deeper and find out what was it that was

14   more relevant that The Analysis Group

15   could provide you with.

16             MR. BARKER:  Object to form.

17             THE WITNESS:  Well, your

18        question is, why didn't we use

19        Terry.

20   BY MR. JANUSH:

21        Q.    That's not my question now.

22        A.    I'm sorry.  Okay.  Well,

23   when we engaged with The Analysis Group,

24   what services they communicated to us

Highly Confidential - Subject to Further Confidentiality Review

1    appeared to support the enhancements that

2    we wanted to make with our program

3    because --

4         Q.    And what services were

5    those?

6         A.    -- they --

7              MR. BARKER:  Let's slow this

8         down.  Let her finish her answer

9         before we start with the next

10        question, please.  Thank you.

11             THE WITNESS:  So when we

12        engaged with them, they told us

13        that they come into companies that

14        distribute controlled substances.

15        They can assist them in

16        configuring their own systems with

17        threshold algorithms, or they

18        could provide -- or they can

19        provide guidance on other systems

20        that could do these calculations.

21        So they do the statistics based on

22        historical data and help the

23        companies configure their IT

24        systems to do the own threshold

Highly Confidential - Subject to Further Confidentiality Review

1    analysis.

2         And that's what we basically

3    needed.  We needed somebody to

4    help us take our historical data

5    and determine what statistics does

6    DEA expect to see on that data and

7    set up thresholds for our

8    products.

9    BY MR. JANUSH:

10        Q.    What are the statistics that

11   you believe DEA expects to see to set up

12   thresholds on your products?

13        A.    They expect us to be

14   monitoring quantity, frequency, and

15   patterns.  And The Analysis Group has had

16   experience with other companies

17   identifying what kind of thresholds are

18   needed to address those factors.

19        Q.    And again, the expectation

20   from the DEA concerning the requirement

21   that a registrant monitor quantity,

22   frequency, and patterns is not new,

23   right?

24        A.    No.  But we were currently

Highly Confidential - Subject to Further Confidentiality Review

1   doing it from an algorithm and then the

2   manual for the pattern and frequency.

3   And we wanted one system that would do it

4   all automatically.

5          Q.    You're not testifying today

6   that you were in realtime every day when

7   an order was being placed doing an

8   investigation of every order for pattern

9   and frequency unless an order was first

10  flagged by your algorithm, right?

11             MR. BARKER:  Object to form.

12             THE WITNESS:  There are --

13        obviously the orders that are

14        flagged do get the investigation.

15             But we know the typical

16        ordering pattern of the customers,

17        if they order either once a week

18        or -- the big three, or twice a

19        week.  So the customer service

20        knows the typical ordering

21        patterns, that if they saw

22        somebody order twice, that they

23        would question it.

24             So that's what I'm saying,

1        the human element was trying to

2        follow the frequency and pattern.

3        And we just wanted to make the

4        algorithm do all of it at once,

5        versus relying on a manual.

6  BY MR. JANUSH:

7        Q.    Except for Cardinal, where I

8  showed you on that spreadsheet, was

9  ordering three days apart from the prior

10 order for the same drug, that's not

11 something that would be flagged by your

12 algorithm, correct?  And it's something

13 that you knew happened because you knew

14 Cardinal's ordering schedule, right?

15             MS. BOODY:  Object to form.

16             THE WITNESS:  We knew that

17        they ordered Mondays and

18        Wednesdays for example.  The

19        quantity, we knew that that

20        location was the main hub that

21        Cardinal supplied all of their DCs

22        and pharmacies.  So -- and that

23        quantity was obviously less than

24        the threshold unless it was

Highly Confidential - Subject to Further Confidentiality Review

```
 1              flagged as atypical.  So...
 2   BY MR. JANUSH:
 3         Q.    I'm going to move on to what
 4   I've marked as Exhibit 33.
 5              (Document marked for
 6              identification as Exhibit
 7              Janssen-Dempsey-33.)
 8   BY MR. JANUSH:
 9         Q.    This looks like the
10   preliminary algorithm for --
11              MR. JANUSH:  I have two
12              copies to share.
13              MR. BARKER:  How many pages
14              should this be?
15              MR. JANUSH:  It begins on
16              JAN-MS-05444640.  And that is Page
17              1.
18              And it ends on Page 7,
19              JAN-MS-05444646.
20              MR. BARKER:  One of the
21              copies you handed me goes that
22              far.  The other one only has six
23              pages, going through 45.  But I do
24              appear to have --
```

1           MR. JANUSH:  Here you go.

2       There's a corrected one.

3           MR. BARKER:  Thanks.  You

4       want that back.  There you go.

5           MR. JANUSH:  And that

6       explains my problem.  If you can

7       give that to Cardinal's counsel.

8           MR. BARKER:  Well, that

9       should be a complete copy.

10          MS. WINCKEL:  I can look on

11      here.

12  BY MR. JANUSH:

13      Q.    And this is dated

14  preliminary draft February 1st, 2019.

15          Do you see that?

16      A.    Yes.

17      Q.    Have you seen this before?

18  This is titled "Preliminary Algorithm

19  Logic For Suspicious Order Monitoring"?

20      A.    I have not seen this before.

21      Q.    Okay.  So I'm going to

22  represent that this was not produced with

23  any family, it was just produced

24  generally.  But since you have not seen

Highly Confidential - Subject to Further Confidentiality Review

1    it before, I'll just ask you to take a

2    look at it and ask if you can explain it.

3    And if the answer -- your answer will

4    dictate what we do next.

5              MR. BARKER:  Object to form.

6              You're asking her to explain

7         a document that she's never seen

8         before.

9              THE WITNESS:  Yes, this is

10        trying to explain how SAP is going

11        to work in --

12   BY MR. JANUSH:

13        Q.    Are you involved in the new

14   algorithm logic for suspicious order

15   monitoring?

16        A.    I am not involved in the

17   tactical execution, no.

18        Q.    Okay.  Who are the folks

19   that are involved in the tactical

20   execution going forward?

21        A.    Stephanie Dixon.  She -- the

22   control substance compliance manager.

23   IT.

24        Q.    Who from IT?

 1          A.    Deb Sniscak.  She's the

 2    interface between business and IT.  And I

 3    don't remember the IT team.

 4          Q.    Is Valerie Chikwendu at all

 5    involved in this project?

 6          A.    She's the project manager,

 7    so she has the oversight of how the

 8    activities are progressing.  But she

 9    would not have the expertise to provide

10    input on how it should run.

11          Q.    Is Brian Strehlke involved

12    in this at all?

13          A.    No.  Just Stephanie.

14               (Document marked for

15               identification as Exhibit

16               Janssen-Dempsey-34.)

17    BY MR. JANUSH:

18          Q.    I'm marking Dempsey Exhibit

19    34.  This was a previously clawed back

20    document at the last deposition.

21               This is a document that

22    should look familiar to you.  It's an

23    e-mail from you to Debbie Sniscak who you

24    just referred to; is that right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Okay.  And this is dated

3  January 23, 2018.

4         Subject, "Recommendations."

5  You wrote, "Here you go."

6         And below that it looks like

7  you lifted some of the recommendations

8  from Terrance Woodworth's audit into the

9  body of this e-mail.  Is that a fair

10  characterization of this e-mail?

11    A.    Yes.

12    Q.    What was the reason that you

13  were transmitting Terrance Woodworth's

14  audit recommendations to Debbie Sniscak?

15    A.    As I mentioned before,

16  Debbie is the business relationship

17  person with IT.  So if we are getting

18  ready to approach IT to make

19  modifications or IT solution, she would

20  be the one that would take the business

21  requirements, so in this case, the

22  business requirements would be taken from

23  the recommendations, and put it into a

24  functional requirements and

Highly Confidential - Subject to Further Confidentiality Review

1   specifications that IT can actually do

2   the programming.

3              And at this time, they were

4   evaluating what could be done in SAP and

5   what had to be done outside of SAP based

6   on all these enhancements.

7         Q.    Do you recall whether Debbie

8   wrote back to you after you sent this

9   e-mail?

10        A.    I don't believe she did.

11             (Document marked for

12             identification as Exhibit

13             Janssen-Dempsey-35.)

14   BY MR. JANUSH:

15        Q.    And this I'm going to hand

16   you what's been marked as Dempsey Exhibit

17   35.  This is JAN-MS-03060701.

18             MR. JANUSH:  Copies for

19             counsel.

20   BY MR. JANUSH:

21        Q.    This is an e-mail from you

22   to Christopher Villani.  Who is

23   Christopher Villani?

24        A.    He is in commercial, the

Highly Confidential - Subject to Further Confidentiality Review

1   marketing group for our new product.

2          Q.     What new product?

3          A.     Esketamine.

4          Q.     Okay.  And here you were

5   addressing in the middle of the page, on

6   February 14, 2018, a recap of what took

7   place during the December workshop with

8   Terrance Woodworth, your outside auditor

9   for suspicious order monitoring; is that

10  right?

11         A.     Yes.

12         Q.     And it states at the bottom,

13  "The commercial excellence team

14  introduced Brian and I to Sue.

15  IntegriChain is beginning to see a future

16  need in providing companies with trend

17  analysis beyond the wholesaler to

18  pharmaceutical companies and provided the

19  following scope of work.  Suspicious

20  order monitoring data analytics is new to

21  us and other companies as well.  I

22  recently saw my counterparts at

23  Mallinckrodt in D.C. and I asked them

24  what they are doing and was told they are

Highly Confidential - Subject to Further Confidentiality Review

1    paying Quintiles/IMS, now IQVia, to do

2    the analysis for them."

3              Did I read that right?

4         A.    Yes, you did.

5         Q.    And then you asked if the

6    attachments could be reviewed and be

7    ready -- if they could be ready to

8    provide feedback at a teleconference that

9    you'll set up next week; is that correct?

10        A.    Yes.

11        Q.    And the attachments, Number

12   2, one is the IntegriChain substance

13   order analytics and reporting overview,

14   dated February 14, 2018.  And the other

15   is an IntegriChain statement of work

16   presented to Janssen Pharmaceuticals,

17   Inc., for controlled substance order

18   compliance, also dated February 14, 2018;

19   is that right?

20             MR. BARKER:  Objection.

21             THE WITNESS:  Yes.

22             MR. BARKER:  You misread the

23        statement of that document.

24             THE WITNESS:  Statement of

1          work presented at Janssen

2          Pharmaceuticals for controlled

3          substance order analytics.

4    BY MR. JANUSH:

5          Q.    Sorry.  Actually, statement

6    of work presented to Janssen

7    Pharmaceuticals, Inc., for controlled

8    substance order analytics, right?

9          A.    Yes.

10          MR. BARKER:  Object to form.

11   BY MR. JANUSH:

12          Q.    And the statement of work is

13   Bates Number JAN-MS-03060712.

14          And the IntegriChain slide

15   deck is JAN-MS-03060704.

16          Had you met with

17   IntegriChain before February 14, 2018,

18   prior to being provided with this

19   statement of work?

20          A.    I can't recall the first

21   time that I met them.

22          Q.    Okay.  What's your

23   understanding of what IntegriChain is --

24   let's take a step back.

1            Janssen wound up retaining

2   IntegriChain, correct?

3        A.    JOM retained them last -- we

4   got the -- this SOW approved last

5   December.  Janssen has been using

6   IntegriChain.  The trade marketing folks

7   have been using them.

8        Q.    Right.  Janssen, for

9   purposes of sales and marketing, has been

10  using IntegriChain data dating back to at

11  least 2011; is that right?

12       A.    I don't know the actual

13  date.  But I do know that they've been

14  using this data.

15       Q.    And we -- we addressed that

16  at the last deposition with a document

17  showing ValueTrak and IntegriChain data

18  in 2011 and 2012; is that right?

19       A.    You did show me that trade

20  analytics slide deck.

21       Q.    And when was the first time

22  that compliance started working with

23  IntegriChain?

24       A.    It was when commercial

1    excellence introduced Brian Strehlke and

2    I to IntegriChain.  And I don't remember

3    when.  I guess it was in February.

4         Q.    Of 2018?

5         A.    Yeah.

6         Q.    What is your understanding

7    of what IntegriChain brings to the table

8    in terms of assisting with Janssen's

9    to-be-updated or revised suspicious order

10   monitoring program?

11             MR. BARKER:  Object to form.

12             THE WITNESS:  What

13        IntegriChain can assist us with is

14        identifying at the pharmacy level,

15        if there's any trends with our

16        products.

17             Right now, our 867 data is

18        blinded, and IntegriChain can get

19        the unblinded data and do the

20        analysis off our data to let us

21        know at the pharmacy level, how

22        does our product compare to, I

23        guess, national averages is what

24        they explained to us.  And they

Highly Confidential - Subject to Further Confidentiality Review

1          could do regional analysis and let

2          us know if there is any trends

3          with our product that we need to

4          investigate.

5     BY MR. JANUSH:

6          Q.    For example, on Page 2 of

7     the slide deck, "Identify pharmacies with

8     high volume purchasing trends leveraging

9     product and market deciles."  Is that

10    right?

11         A.    That is what -- yes.

12         Q.    Okay.  And that they can

13    also assist, based on, going to the last

14    bullet, "Based on historical purchasing

15    trends, set volume thresholds at the

16    pharmacy and distributor level.  Total

17    volume can be rolled up to distributor as

18    an input into the order monitoring

19    system."

20              Do you see that?

21         A.    Yes.

22         Q.    Are you doing that now going

23    forward?  Are you implementing this?

24         A.    This is the Track 2 of our

Highly Confidential - Subject to Further Confidentiality Review

1    project where we will be looking

2    downstream to determine whether, based on

3    what the wholesalers ship out, if we need

4    to adjust the thresholds.  So, yes, our

5    new enhancements will be doing this.

6         Q.    And to be clear, this is the

7    kind of third-party data vendor that

8    assists in unblinding sales that you make

9    to your distributor, such that they are

10   able to report back to you when a

11   Cardinal, as an example, may sell to a

12   CVS, they may be able to report back to

13   you which CVS store your products are

14   ending up at; is that right?

15            MR. BARKER:  Object to form.

16            THE WITNESS:  IntegriChain

17        can give us visibility to the CVS

18        level.

19   BY MR. JANUSH:

20        Q.    Okay.  This is the know your

21   customers' customer data, so to speak,

22   right?

23            MR. BARKER:  Object to form.

24   BY MR. JANUSH:

1    Q.    Remember we talked about

2  that concept of know your customers'

3  customer, in the context of the

4  Mallinckrodt DEA investigation?

5            MR. BARKER:  Object to form.

6            THE WITNESS:  We were told

7        to -- yes.  Well, you need to know

8        where your products are going

9        downstream.

10  BY MR. JANUSH:

11    Q.    Right.  And that refers to

12  knowing your customers' customer, right?

13    A.    Yes.

14    Q.    And knowing your customers'

15  customer was not a new concept for you,

16  was it?  You learned about this concept

17  when you benchmarked with Jack Crowley at

18  Purdue on March 21, 2012, didn't you?

19            MR. BARKER:  Object to form.

20            THE WITNESS:  We understood

21        that Purdue was doing that.

22  BY MR. JANUSH:

23    Q.    And by doing that, what do

24  you mean?

1          A.     That they were doing the

2    downstream pharmacy analysis because of

3    the oxycodone situation.

4          Q.     So Purdue was knowing their

5    customers' customer; is that right --

6    what you're testifying to?

7               MR. BARKER:  Object to form.

8               THE WITNESS:  That is what

9          they communicated to us.

10              (Document marked for

11         identification as Exhibit

12         Janssen-Dempsey-36.)

13   BY MR. JANUSH:

14         Q.     I'm going to hand you what's

15   been marked as 36.  It actually is a

16   document that references the know your

17   customers' customer.  Its Bates number is

18   JAN-MS-02984629, and this is when in July

19   of 2013, Jack Crowley, formerly of

20   Purdue, then on his own as Crowley

21   Associates, was pitching to Janssen an

22   abuse and diversion detection program,

23   isn't it?

24              MS. POWER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          THE COURT REPORTER:  Can you

2      identify who you are?

3          MS. POWER:  This is Caroline

4      Power for the Purdue defendants.

5          MR. JANUSH:  Representing

6      which defendant?

7          MS. POWER:  The Purdue

8      defendants.

9          MR. JANUSH:  Thank you.

10  BY MR. JANUSH:

11      Q.    Let's go to the first line

12  of the middle of the e-mail.  "Hello,

13  Ron.  Here are a preliminary rough notes

14  on the subject of our recent

15  conversation.  DEA impact on pharmacy

16  stocking C-II medications - developing a

17  system for your abuse and diversion

18  detection program - prescribers of

19  concern."

20          Did I read that right?

21          MR. BARKER:  Object to form.

22          THE WITNESS:  Yes.

23  BY MR. JANUSH:

24      Q.    And it says, "We discussed

Highly Confidential - Subject to Further Confidentiality Review

1   training for the sales force how to

2   recognize what is suspicious or a cause

3   for concern, that this is a delicate

4   balance and generally what steps need to

5   be taken to bring information into the

6   home office, so to speak, how to handle

7   that information, and how to move

8   forward."

9                Did I read that correctly?

10               MR. BARKER:  Object to form.

11               THE WITNESS:  Yes.

12  BY MR. JANUSH:

13       Q.    And at the bottom, it's

14  addressing five different suggestions,

15  after which Jack writes, "'Know your

16  customers' customers,' Janssen's

17  suspicious or noteworthy order monitoring

18  system and collaboration/mutual support

19  with authorized distributors."

20               Did I read that correctly?

21       A.    Yes.

22       Q.    From July 26, 2013, when

23  Jack Crowley pitched this abuse and

24  diversion detection program that follows

Highly Confidential - Subject to Further Confidentiality Review

1    at JAN-MS-02984631 with his presentation

2    to the present date, you didn't implement

3    a know your customers' customer program

4    to address prescribers of concern at the

5    sales force level, did you?

6         A.    It wasn't an expectation.

7    We weren't told by DEA to do this.  But I

8    am not aware if Ron implemented that.  I

9    did not.  I can't speak on behalf of Ron

10   what he did with this.  But I do know

11   that I did not.

12        Q.    And just to wrap up this

13   document, the attachment from Jack

14   Crowley, Bates Number JAN-MS-02984631,

15   concerned his pitch on how to address

16   prescribers of concern with a stated

17   goal, in the middle of the first page --

18   I'm going to direct your attention to the

19   first page of his title page.  "Goal -

20   make sure that the company is marketing

21   to the proper prescribers."

22             Do you see that?

23        A.    Yes, I do.

24        Q.    "Secondary goal, to provide

Highly Confidential - Subject to Further Confidentiality Review

1  guidance and require the sales

2  representatives to recognize, detect, and

3  report suspicious" -- "suspected abuse

4  and suspected diversion by healthcare

5  practitioners of Janssen products."

6           Do you see that?

7           MR. BARKER:  Object to form.

8           THE WITNESS:  Yes, I do.

9  BY MR. JANUSH:

10     Q.    Do you remember internally

11  pitching this within Janssen as something

12  that you had an interest in having Jack

13  present on?

14           MR. BARKER:  Object to form.

15           THE WITNESS:  I recall that

16      Ron asked me if I knew anybody

17      that could talk to him about

18      training of the sales force.  And

19      I introduced him to Jack Crowley.

20  BY MR. JANUSH:

21     Q.    You were friends with Jack

22  though, right?

23     A.    I have known Jack for many

24  years, yes.

1       Q.    So if Jack got retained

2  after you introduced him, you would have

3  known that, wouldn't you?

4       A.    Yes, I would have.

5       Q.    And to this day, you

6  don't -- you have no knowledge that he

7  was retained, right?

8       A.    He was not retained.

9            (Document marked for

10           identification as Exhibit

11           Janssen-Dempsey-37.)

12  BY MR. JANUSH:

13       Q.    I'm going to move on to

14  Exhibit 37, JAN-MS-03124101.

15            MR. JANUSH:  Whoops.  I

16       marked the wrong one.

17            MR. BARKER:  Feel free to

18       mark the one with all your notes

19       on it if you want.  That's all

20       right.

21  BY MR. JANUSH:

22       Q.    I'm going to just address

23  this.  This is the July 24, 2013, Version

24  2, work instruction, document entitled

Highly Confidential - Subject to Further Confidentiality Review

1    "JOM Customer Service Suspicious Or

2    Excessive Orders."  Document Number DS/WI

3    3824, Version 2.0.

4              Do you see that?

5         A.   Yes.

6         Q.    This is the Version 2 of the

7    suspicious order monitoring program work

8    instruction that you played a role in

9    putting together after you came on board

10   as director of controlled substance

11   compliance in 2012; is that right?

12             MR. BARKER:  Object to form.

13             THE WITNESS:  Yes.

14   BY MR. JANUSH:

15        Q.    And just for the record,

16   this -- the purpose of this is stated at

17   1.1, "To define a process that complies

18   with DEA or state requirements to provide

19   information on any prescription order,

20   controlled or noncontrolled substances,

21   that could be considered potentially

22   suspicious or excessive," right?

23        A.   Yes.

24        Q.    And the algorithm that

Highly Confidential - Subject to Further Confidentiality Review

1    existed in Version 1.0 that we addressed

2    at the last deposition is the same here

3    isn't it, at 3.2.  It's 300 percent of

4    the calculated 12-month per weekly order

5    average; is that right?

6                    MR. BARKER:  Object to form.

7                    THE WITNESS:  Yes.  12-month

8           per weekly order average.

9                 (Document marked for

10            identification as Exhibit

11            Janssen-Dempsey-38.)

12   BY MR. JANUSH:

13          Q.    I'm going to mark for you

14   Exhibit 38.

15                 And this is a different

16   document.  It's JOM customer support

17   services Schedule II through V order

18   processing and investigating suspicious

19   or excessive orders.  This is DS SOP

20   1235, Version 7.0, found at

21   JAN-MS-03115424.  And the effective date

22   of this is December 19, 2016.

23                 And here too, the purpose of

24   this document is to provide instructions

Highly Confidential - Subject to Further Confidentiality Review

1    for processing Schedule II through V

2    controlled substance orders and for

3    investigating suspicious or excessive

4    orders for controlled substances; is that

5    right?

6         A.    Yes.

7         Q.    And again, the algorithm is

8    stated differently.  But it's stated in

9    the definition section at 3.1.

10   "Suspicious orders or excessive

11   controlled substances orders:  Any

12   customers for Schedule II through V

13   orders exceeding three times the normal

14   12-month rolling demand."

15             Did I read that right?

16        A.    Yes.

17        Q.    And that's not 12 times the

18   normal 12-month weekly rolling demand

19   stated here.  It's just 12 times the

20   normal 12-month -- three times the normal

21   12-month rolling demand; is that right?

22             MR. BARKER:  Object to form.

23             THE WITNESS:  That is what

24        it reads.

1    BY MR. JANUSH:

2         Q.    Did you have a role in

3    drafting this document?

4         A.    I reviewed it.  But

5    customer -- this is a customer service

6    SOP.  They wrote it.

7         Q.    Did you have the ability to

8    edit the document if you thought it was

9    in error?

10        A.    Yes.

11        Q.    Did you ever edit that

12   document?

13        A.    I don't recall.

14             (Document marked for

15             identification as Exhibit

16             Janssen-Dempsey-39.)

17   BY MR. JANUSH:

18        Q.    I'm marking 39.  And I'm

19   handing copies to counsel.

20   JAN-MS-03115570.  This appears to be an

21   e-mail from you to Belinda Corum dated

22   November 15, 2017, concerning

23   suspicious -- titled -- the subject is

24   2017 -- November 15, 2017, "Suspicious

1    order monitoring minutes."

2              And it attaches DS/WI 3824,

3    the atypical order justification release

4    form work instruction, which can be found

5    at JAN-MS-03115575.

6              Do you see that work

7    instruction?

8         A.    Getting to it.  Yes.

9         Q.    And have you seen this

10   document before?

11        A.    I have seen this document

12   before.

13        Q.    Did you ever edit this

14   document?

15        A.    Yes.

16        Q.    You did.  Okay.

17              And here we have definition,

18   DEA unusual order quantity report at 3.1.

19   "A report that captures potentially

20   unusual quantities of controlled

21   substance orders, Schedule II through V,

22   that is equal to or greater than three

23   times (300 percent) the calculated

24   12-month order average."

1          Do you see that?

2          A.    I do see that.

3          Q.    That's not addressing a

4    weekly order average.  That's looking at

5    the calculated 12-month order average; is

6    that right?

7          A.    The way it's written, yes.

8          Q.    I'm going to mark as Dempsey

9    Exhibit 40 --

10              (Document marked for

11              identification as Exhibit

12              Janssen-Dempsey-40.)

13    BY MR. JANUSH:

14          Q.    -- a standard operating

15    procedure.  And this is Bates-stamped

16    JAN-MS-03121360.

17              And here too, at definition

18    3.0 of Document Number DS -- standard

19    operating procedure 1235, Version 8.0

20    dated May 4, 2018, Janssen -- JOM is

21    defining a DEA questionable order report

22    as, "Identifying orders for all customers

23    ordering Schedule II to V orders that

24    exceed three times the normal 12-month

Highly Confidential - Subject to Further Confidentiality Review

1    rolling demand."  Is that right?

2         A.    Yes.

3         Q.    Okay.  And to be clear,

4    numerous other provisions exist within

5    this document.  Do you recognize this

6    document?

7              MR. BARKER:  Object to form.

8              THE WITNESS:  I do recognize

9         this document.

10   BY MR. JANUSH:

11        Q.    Did you have a role in

12   creating the document?

13        A.    It's a customer service

14   document.  And at this date, I was not in

15   the approval route.

16        Q.    Did you ever have the

17   opportunity to edit this document?

18        A.    As you showed me in 2017, I

19   did.

20        Q.    I'm going to switch gears

21   for a moment.  We're going to go back to

22   the Noramco topic that we talked about

23   during Day 1 of your deposition.  I've

24   marked this as Exhibit 41.

1          (Document marked for

2          identification as Exhibit

3          Janssen-Dempsey-41.)

4     BY MR. JANUSH:

5          Q.    This is Bates-marked

6     JAN-00060001431, and it's a regulatory

7     agency contact report, much like what I

8     addressed with you on the first day of

9     your deposition.  And here in the summary

10    it's saying, "Noramco submitted comments

11    to the 2013 proposed aggregate production

12    quota, Federal Register posting."

13              And second page in, it looks

14    to be an August 31, 2012, Noramco

15    comment, letter to the DEA, office of

16    diversion control.

17              Do I have that right?

18         A.    Yes.

19         Q.    Okay.  And in it, you're

20    referencing Noramco's quota applications

21    by reference number for codeine,

22    morphine, morphine for conversion,

23    oxycodone for sale, oxymorphone for

24    conversion, oxymorphone for sale,

Highly Confidential - Subject to Further Confidentiality Review

1   oxymorphone for sale again, oripavine,

2   hydromorphone, hydrocodone for sale, and

3   methylphenidate; is that right?

4               MR. BARKER:  Object to form.

5               THE WITNESS:  Yes.

6   BY MR. JANUSH:

7        Q.    And there's also a letter

8   dated August 31, 2012, where you're

9   addressing your quota application, your

10  quota reference numbers.  But also

11  addressing the 2013 April submission of

12  base kilograms and the revised 2013 quota

13  kilograms base, and the change between

14  the two; is that right?

15       A.    Yes.

16       Q.    Okay.  And jumping forward

17  to the page ending in 1440.  You are

18  addressing the rationale for demand

19  increase for morphine.  And in it, in

20  this letter of August 31, 2012, you

21  state, "As communicated in the July 27,

22  2012, quota request, morphine sales are

23  holding steady.  Noramco 2012 sales to

24  Purdue and Roxane Boehringer Ingelheim

1    were well above forecast due to

2    continuing marketing adjustments from the

3    Novartis manufacturing issues."

4           Did I read that right?

5           A.    Yes.

6           Q.    And then down below, you

7    show sales to Purdue -- or forecasts,

8    excuse me, of base kilograms of morphine

9    to Purdue at 6,825 base kilograms; is

10   that correct?

11          A.    Yes.

12          Q.    And for Actavis Elizabeth

13   LLC, 1,875 base kilograms, right?

14          A.    Yes.

15          Q.    And for Actavis Elizabeth

16   LLC there's an additional 26 kilograms

17   listed above that; is that right?

18          A.    Yes.

19          Q.    And now I'm going to have

20   you move forward to the document, Page

21   Number 1443.  And here you're addressing

22   the rationale for demand increase

23   oxycodone; is that correct?

24          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And you are addressing

2   that -- at the bottom bullet, "Noramco

3   has numerous supply agreements for

4   oxycodone hydrochloride.  The most

5   impactful and important agreements based

6   on the market position of the companies

7   are with Actavis, greater than or equal

8   to 90 percent; Watson, greater than or

9   equal to 90 percent; Endo/Qualitest,

10  greater than or equal to 80 percent; and

11  Amneal, greater than or equal to

12  90 percent."

13              Did I read that right?

14              MR. BARKER:  Object to form.

15              THE WITNESS:  Yes.

16  BY MR. JANUSH:

17      Q.    So is this confirming that

18  Noramco has agreements to supply these

19  companies with greater than 90, 90, 80,

20  and 90 percent respectively of their

21  total projected oxycodone --

22              MR. BARKER:  Object to form.

23  BY MR. JANUSH:

24      Q.    -- API?

Highly Confidential - Subject to Further Confidentiality Review

1           MR. BARKER:  Object to form.

2           THE WITNESS:  The way that

3      it's described, it is -- it's

4      stating that of their market

5      share, Noramco has supply

6      agreements in place to provide

7      90 percent of their market.

8  BY MR. JANUSH:

9           Q.    So 90 percent of Actavis'

10  market, 90 percent of Watson's market,

11  80 percent of Endo and Qualitest's market

12  and 90 percent of Amneal's market; is

13  that right?

14           A.    That is what it states.

15           MR. BARKER:  Object to form.

16  BY MR. JANUSH:

17           Q.    Moving to the next page,

18  oxycodone contract volumes.  It says in

19  the bottom of this box, "Percentage of

20  total oxycodone hydrochloride domestic

21  sales, 60,218 kilograms as base."  And it

22  shows 68.1 percent of the 2013 forecast

23  kilograms as base, and 73.7 percent of

24  the 2013 contract kilograms as base; is

Highly Confidential - Subject to Further Confidentiality Review

1    that right?

2                    MR. BARKER:  Object to form.

3                    THE WITNESS:  That is what

4           it states.

5    BY MR. JANUSH:

6           Q.    And does this mean that you

7    had -- that Noramco had 68.1 percent of

8    the forecast market for oxycodone

9    hydrochloride --

10                   MR. BARKER:  Object to --

11   BY MR. JANUSH:

12          Q.    -- at this time?

13                   MR. BARKER:  Object to form.

14                   THE WITNESS:  It states that

15          in the next year, based on what

16          the customers have told us and our

17          contracts, that this is the

18          percent.

19   BY MR. JANUSH:

20          Q.    Okay.  And I'm going to have

21   you move forward to the document, Page

22   1449.

23                   This is addressing the

24   rationale for demand increase of

Highly Confidential - Subject to Further Confidentiality Review

1   oxymorphone; is that right?

2           A.     Yes, it is.

3           Q.     And the first bullet says,

4   "The total demand for oxymorphone for

5   conversion is driven by supplying

6   intermediates to Rhodes Technologies."

7   Rhodes is Purdue, correct?

8                  MR. BARKER:  Object to form.

9                  THE WITNESS:  I believe it's

10          a subsidiary.  I'm not -- I don't

11          remember --

12  BY MR. JANUSH:

13          Q.     It's a wholly subsidiary of

14  Purdue that makes their raw API according

15  to your deposition testimony from

16  January 22nd, right?

17                 MR. BARKER:  Object to form.

18  BY MR. JANUSH:

19          Q.     You may answer.

20          A.     That is what I understood.

21          Q.     And here you're addressing

22  that in regards to oxymorphone

23  hydrochloride demand, Noramco is

24  experiencing API supplier shifts, and

Highly Confidential - Subject to Further Confidentiality Review

1   unexpectedly Noramco received increase

2   from virtually every generic who

3   originally formulated with Mallinckrodt

4   material.

5              Do you see that, that

6   sentence?  I skipped a sentence.  But do

7   you see that?

8              MR. BARKER:  Object to form.

9              THE WITNESS:  Yes.

10  BY MR. JANUSH:

11       Q.    Okay.  Do you know why

12  Noramco received -- why -- why other

13  folks, other generics switched and moved

14  away from Mallinckrodt?

15             MR. BARKER:  Object to form.

16             THE WITNESS:  No.

17  BY MR. JANUSH:

18       Q.    Okay.  And there's also a

19  rationale for demand increase for

20  hydrocodone; is that right?  And that's

21  on Page 1457.

22             MR. BARKER:  Object to form.

23             THE WITNESS:  Yes, it is.

24

1    BY MR. JANUSH:

2         Q.    And going to the bottom of

3    the box, 2013 forecast kilograms as base.

4    Percentage of total Noramco forecast, you

5    list 89 percent.  What does that

6    89 percent mean?

7              MR. BARKER:  Object to form.

8              THE WITNESS:  I'm sorry.

9         Can you show me where the

10        89 percent is.

11   BY MR. JANUSH:

12        Q.    Yeah, I'll circle it in

13   blue.

14        A.    Oh, down there.  Okay.

15             MR. BARKER:  Object to form.

16             THE WITNESS:  So what it is

17        saying is based on what the

18        customers have told us for next

19        year, the total quantity

20        against -- I'm not quite sure.

21        Well, okay, yes, I understand.

22             Of the total demand we're

23        receiving for hydrocodone, these

24        top three customers are 89 percent

Highly Confidential - Subject to Further Confidentiality Review

1      of it.

2  BY MR. JANUSH:

3      Q.    And below that grid, it

4  says, "Taken together, Noramco's top

5  three customers represent approximately

6  74 percent of the hydrocodone market.

7  All discussions and contracts to date

8  indicate our customers intend to keep

9  buying at or near the percentages shown

10  above."

11      Did I read that right?

12      A.    Yes.

13      Q.    So Noramco was producing raw

14  API for its top three customers that

15  represented approximately 74 percent of

16  the hydrocodone market; is that correct?

17          MR. BARKER:  Object to form.

18          THE WITNESS:  Noramco

19      produced hydrocodone, what the

20      manufacturing quota granted by

21      DEA, that did represent 74 percent

22      of the hydrocodone market.

23  BY MR. JANUSH:

24      Q.    Okay.  And incidentally at

Highly Confidential - Subject to Further Confidentiality Review

1    the last page --

2                    MR. BARKER:  You've exceeded

3          your time.  Are you close?

4                    MR. JANUSH:  Ten seconds.

5                    MR. BARKER:  Okay, go.

6                    MR. JANUSH:  Thanks.

7    BY MR. JANUSH:

8          Q.    Going to Page 1464, just to

9    wrap up this document, this letter was

10   submitted by you, and that's your

11   signature with all -- that's your

12   signature below all of the data that I

13   was just addressing; is that right?

14                   MR. BARKER:  Object to form.

15                   THE WITNESS:  That is my

16         signature.  But this letter was a

17         compilation of many people doing

18         it.

19   BY MR. JANUSH:

20         Q.    But ultimately it went out

21   over your name, right?

22         A.    My name was on it.

23         Q.    And your name was on it as

24   director of process engineering and DEA

Highly Confidential - Subject to Further Confidentiality Review

1    compliance; is that right?

2         A.    Yes.

3         Q.    At the same time that you

4    were serving -- is this at the same time

5    that you were serving as director of

6    controlled substance compliance for JOM?

7              MR. BARKER:  Object to form.

8              THE WITNESS:  Yes, I did.

9    BY MR. JANUSH:

10        Q.    So you were serving in two

11   distinctly different roles, one for

12   Noramco as listed here, and one for JOM

13   as director of controlled substance

14   compliance, correct?

15        A.    Yes.

16             MR. JANUSH:  I have no

17        further questions at this time.

18             MR. BARKER:  I appreciate

19        that.  Do you want to break for

20        lunch here?

21             MR. JANUSH:  Sure.

22             THE VIDEOGRAPHER:  All

23        right.  The time is 1:05 p.m.  Off

24        the record.

Highly Confidential - Subject to Further Confidentiality Review

1                    (Lunch break.)

2                    THE VIDEOGRAPHER:  We are

3          back on the record.  The time is

4          2:16 p.m.

5                       -  -  -

6                    EXAMINATION

7                       -  -  -

8     BY MR. BARKER:

9          Q.    Good afternoon, Ms. Dempsey.

10         A.    Hi.

11         Q.    We've already covered a

12    number of these things, but just so we

13    can get them out in a solid line of

14    questioning.  I'm going to cover a few

15    things that Mr. Janush covered but I'm

16    going to cover them very quickly.

17                    You graduated from Villanova

18    in 1986 with a bachelor of science in

19    chemical engineering, correct?

20         A.    Yes.

21         Q.    Noramco was your first job

22    after graduating?

23         A.    Yes.

24         Q.    You held several positions

Highly Confidential - Subject to Further Confidentiality Review

1    at Noramco, correct?

2         A.    Yes.

3         Q.    When did you start handling

4    suspicious order monitoring for Noramco?

5         A.    When I took over DEA

6    compliance at the end of 2007 I became

7    aware of the requirement for suspicious

8    order monitoring.

9         Q.    Okay.  And what training did

10   you receive for handling suspicious order

11   monitoring?

12        A.    I attended DEA conferences.

13   Plus we had internal training about the

14   Controlled Substance Act.

15        Q.    And did you have training on

16   how to handle inspections?

17        A.    Yes.

18        Q.    And how about handling

19   customer complaints?

20        A.    Yes.

21        Q.    And how about reporting

22   suspicious orders or other activities?

23        A.    Yes.

24        Q.    When did you first become

1    involved in DEA compliance for a Johnson

2    & Johnson company outside of Noramco?

3         A.    In 2011.

4         Q.    And how is it that you

5    became involved in DEA compliance for a

6    Johnson & Johnson company outside of

7    Noramco?

8         A.    I was asked to consult and

9    advise the other locations within the

10   United States that handled controlled

11   substances.

12        Q.    Thanks.  And when did the

13   Janssen suspicious order monitoring

14   program become part of your

15   responsibilities?

16        A.    In first quarter of 2012.

17        Q.    Okay.  And what sort of

18   training did you receive when you were

19   asked to take on the Janssen suspicious

20   order monitoring responsibilities?

21        A.    I was still attending the

22   DEA courses.  And then in 2013, DEA held

23   their first distributor conference which

24   I attended.  And then I was introduced to

Highly Confidential - Subject to Further Confidentiality Review

1    the HDMA conferences where they have a

2    special track on compliance items like

3    suspicious order monitoring where DEA

4    speaks to distributors.

5         Q.    What was your title when you

6    took over responsibilities for Janssen's

7    suspicious order monitoring?

8         A.    Director of controlled

9    substance compliance.

10         Q.    Okay.  And is that still

11   your title today?

12         A.    Yes.

13         Q.    I'd like to discuss the

14   evolution of the Janssen suspicious order

15   monitoring program in more detail.

16              When you first became

17   involved in Janssen's suspicious order

18   monitoring program, what was your

19   understanding as to when that program

20   came into being?

21         A.    I learned that the algorithm

22   that was currently being used was

23   implemented in 2006.

24         Q.    Okay.  And do you have an

Highly Confidential - Subject to Further Confidentiality Review

1    understanding as to whether there was a

2    program in place to monitor potentially

3    suspicious orders before that one?

4          A.    I was aware that in the

5    previous year there was a manual process.

6                MR. BARKER:  Okay.  Let's

7          mark as Exhibits 42-A, B, and C.

8                (Document marked for

9          identification as Exhibit

10         Janssen-Dempsey-42-A.

11               (Document marked for

12         identification as Exhibit

13         Janssen-Dempsey-42-B.

14               (Document marked for

15         identification as Exhibit

16         Janssen-Dempsey-42-C.)

17               MR. BARKER:  Documents that

18         begin with the Bates Numbers

19         JAN-MS-03741177 running through

20         41200.  42-B is JAN-MS-0374110

21         running through 76, and 42-C is

22         374 -- excuse me, JAN-MS-03741201

23         through 05.

24   BY MR. BARKER:

1       Q.    Ms. Dempsey, do you have

2   Exhibits 42-A, B, and C in front of you?

3       A.    Yes, I do.

4       Q.    Okay.  Do you recognize

5   these documents?

6       A.    Yes.

7       Q.    What are they?

8       A.    They are JOM SOPs from -- I

9   had to check the back, from 2015 that

10  covers how customer service process

11  orders, how they handle excessive and

12  suspicious orders, and then the

13  investigations.

14      Q.    Okay.  And were these the

15  SOPs or -- we've actually used the term

16  SOP quite a bit today.  I don't think

17  anybody asked you.  What is an SOP?

18      A.    Standard operating

19  procedure.

20      Q.    And what are standard

21  operating procedures used for?

22      A.    They are used to document

23  how a process is supposed to be executed.

24      Q.    And were the three SOPs that

1   have been marked as 42-A, B, and C in

2   place before the automated suspicious

3   order monitoring system was created?

4              MR. JANUSH:  Objection.

5              THE WITNESS:  That is what I

6       was told, yes.

7   BY MR. BARKER:

8       Q.    Okay.  And do the three

9   documents that we've marked as 42-A, B,

10  and C come from Janssen's files?

11      A.    They come from JOM, Janssen

12  Ortho-McNeil's documentation system.

13      Q.    As the director of

14  controlled -- controlled substance

15  compliance, do you understand that they

16  were created in the ordinary course of

17  business and maintained in the ordinary

18  course of business?

19      A.    Yes.

20      Q.    I want to direct your

21  attention to 42-B.  And let's turn to

22  Page 3 of 42-B.  And in particular, I'll

23  direct your attention to Paragraph 8.1.4.

24              Can you please read what it

1    says?

2         A.    "Highlight any order with a

3    percent variance value greater than three

4    times the customers average order over a

5    52-week period."

6         Q.    Okay.  And what was that

7    process used for in these 2005 SOPs?

8         A.    So this SOP documented how

9    they manually downloaded historical data

10   and compared the current order against

11   this threshold.

12        Q.    Okay.  And this calculation

13   was done by hand in the 2005 process?

14        A.    Yes.

15        Q.    Now, there are three SOPs

16   here.  What's the difference between

17   them?

18        A.    Well, this first one, B,

19   42-B, describes how to get the data out

20   of SAP and review it.

21             42-A goes into how 222s are

22   processed and confirmed to be accurate

23   and the order gets placed into SAP.  And

24   just basically how an order gets reviewed

Highly Confidential - Subject to Further Confidentiality Review

1    and then released to ship.

2         Q.    Okay.  Let me ask you to

3    pause there.

4              Does the customer service

5    SOP have anything to do with the flagging

6    of an order for review?

7         A.    I am trying to find out if

8    it does.  Apologies.  That's how they do

9    the order report.  Process of printed

10   out.  So this is basically just how they

11   process it into the system.

12        Q.    Okay.  And does that have

13   anything to do with how an order gets

14   flagged for potential review as a --

15        A.    No.  Because 42-B did.

16        Q.    Okay.  Let me finish my

17   question before you go to the answer.

18              Does that have anything to

19   do with how an order gets flagged for

20   further review?

21        A.    42-A doesn't.

22        Q.    And what's the third SOP?

23        A.    The third SOP is the

24   instructions for investigating suspicious

1    or excessive orders.

2         Q.    Going back to 42-B and, in

3    particular, the paragraph that we were

4    looking at before, 8.1.4.  Do you have an

5    understanding as to where the threshold

6    of looking for orders with a percent

7    variance value greater than three times

8    the customer's average order over a

9    52-week period came from?

10        A.    It was DEA guidance that was

11   provided on the website in the chemical

12   handler handbook.

13             (Document marked for

14        identification as Exhibit

15        Janssen-Dempsey-43.)

16   BY MR. BARKER:

17        Q.    I'm going to mark as

18   Exhibit 43 a document entitled chemical

19   handlers manual, Appendix E-3,

20   "Suspicious order reporting system for

21   use in automated tracking systems."

22             This is a two-page document.

23             Do you have Exhibit 43 in

24   front of you?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Yes.

2        Q.     Do you recognize it?

3        A.     Yes.

4        Q.     What is it?

5        A.     It is a guidance document

6   that DEA put on their website to describe

7   how to set up thresholds in suspicious

8   order reporting systems.

9        Q.     Was this a document that DEA

10  just posted or was it a document that was

11  providing guidance to the manufacturing

12  community?

13       A.     It was part of the chemical

14  handler manual, which provides guidance

15  to industry.

16              MR. JANUSH:  I'm going to

17         object and note for the record

18         that this is dated -- that it was

19         pulled from the web and printed on

20         February 28, 2019.  And I'm going

21         to ask for some clarification as

22         to whether you have any evidence

23         or proof that this related to the

24         time period of 2005 that you were

Highly Confidential - Subject to Further Confidentiality Review

1    addressing with the prior SOPs.

2         MR. BARKER:  Well, the date

3    of the document is in the upper

4    right-hand side.  But the witness

5    also knows the document from the

6    time period.  The fact that it's

7    just pulled recently off the DEA's

8    website doesn't matter here or

9    there.

10        MR. JANUSH:  Where is the

11   date of the document in the upper

12   right-hand side?

13        MR. BARKER:  It's in the

14   search box up there.  It's showing

15   the capture.

16        THE WITNESS:  April 17,

17   2001.

18        MR. BARKER:  April 17, 2001.

19        MR. JANUSH:  Through

20   October?

21        MR. BARKER:  I will help you

22   out.  Look on the screen.

23        THE WITNESS:  You can move

24   it down.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. BARKER:  Sorry.
 2   BY MR. BARKER:
 3        Q.    So is this the source that
 4   you were thinking of when you said that
 5   the three times metric came from the DEA?
 6        A.    Yes.
 7        Q.    And where is the metric that
 8   were you describing?
 9        A.    Each step tells you, you
10   take the last 12 months.  You calculate
11   the total purchase a month, multiply --
12   the average, you multiply by a factor
13   below to give the maximum amount that a
14   customer can other per month before
15   showing up on the suspicious order
16   report.  And factor equals three for
17   Schedule IIs and Schedule IIIs controlled
18   substances containing List 1 chemicals
19   and eight for Schedule III, IV and V
20   controlled substances and noncontrolled
21   over-the-counter products.
22        Q.    Has the DEA ever provided
23   any other guidance as to what thresholds
24   should be used to determine if a purchase
```

Highly Confidential - Subject to Further Confidentiality Review

1    quantity is excessive?

2         A.    No.

3         Q.    You can put that aside.

4               You mentioned during your

5    testimony that the current suspicious

6    order monitoring program at Janssen

7    started in 2006, correct?

8         A.    The algorithm, yes.

9         Q.    The algorithm.  And what's

10   the difference between the algorithm and

11   the suspicious order monitoring process

12   itself?

13        A.    The algorithm is just one

14   part of it.  You also have the

15   investigation and the investigation of

16   the orders.

17        Q.    Okay.  And what changed from

18   what Janssen was doing in 2005 as

19   outlined in the SOPs that we just looked

20   at, versus what was being done in 2006?

21        A.    In 2005, the algorithm was a

22   manual calculation.  In 2006, we moved

23   the algorithm to the SAP system that was

24   receiving the customers orders.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And what is your

2    understanding as to what the

3    computer-based system is now doing?

4    A.    It is taking all the history

5    of the past 12 months of each customer

6    for every SKU that they order,

7    calculating this threshold on a rolling

8    basis, and comparing every realtime order

9    against this threshold.

10    Q.    Okay.  And if an order is

11    flagged by this algorithm, what then

12    happens?

13    A.    There's an investigation

14    process whereby we engage the customer to

15    understand why there's an increase in

16    demand, and they provide us a

17    justification.  And then the data is

18    reviewed by the DEA compliance manager or

19    quality assurance, and the order is

20    released if the justification makes

21    sense, and I would document that

22    discussion.

23    Q.    Okay.  Previously in

24    questioning you, Mr. Janush described the

Highly Confidential - Subject to Further Confidentiality Review

1    algorithm, the three times 12-month

2    rolling weekly average, as "fourth grade

3    simple math."

4              Do you recall that?

5         A.    Yes.

6         Q.    Do you agree that the

7    execution of the algorithm in the

8    computer program is fourth grade simple

9    math?

10        A.    No.

11        Q.    Why not?

12        A.    Because SAP is a validated

13   system that FDA obviously inspects.  And

14   any code that is programmed requires a

15   lot of effort around validating.  So

16   anytime -- you know, to go back to find

17   the code that records the order history

18   and pull it out and extract it, you have

19   to do a functional requirement that IT

20   can make the specification against.  Then

21   we also have a test script where we're

22   saying for this -- say pull the history

23   from 12 months ago.  We have to confirm

24   that SAP is going back to the right

1    dataset and pulling it out.  And then if

2    it is, you have to confirm it.  And then

3    it all gets signed off as validation.

4                So every single component,

5    everything that you take for granted that

6    you may download in Excel, every action,

7    has to be programmed in the computer.

8          Q.    Okay.

9                (Document marked for

10         identification as Exhibit

11         Janssen-Dempsey-44.)

12               MR. BARKER:  Let's mark as

13         Exhibit 44 -- I guess I should

14         apologize to the court reporter.

15         This is Exhibit 44.

16               It is -- I'm not exactly

17         sure -- it's not going to work

18         over there.

19   BY MR. BARKER:

20         Q.    So Exhibit 44 begins with

21   Bates Number JAN-MS-05444824 and runs

22   through JAN-MS-05446674.

23               I'm just going to take off

24   my microphone and walk this over to you

Highly Confidential - Subject to Further Confidentiality Review

1    rather than take the chance of passing it

2    across the table.

3              Do you have Exhibit 44 in

4    front of you?

5              MR. BARKER:  We need to pass

6         one over to him too.

7    BY MR. BARKER:

8         Q.    Go ahead and take a moment

9    and unbundle that.  Take a look at it.

10   My first question is going to be, do you

11   recognize it?

12        A.    It's the information I

13   requested be retrieved.

14        Q.    And what information did you

15   request be retrieved?

16        A.    The validation documentation

17   for the algorithm.

18        Q.    And do the materials that we

19   have marked collectively as Exhibit 44

20   come from JOM's files?

21        A.    Yes.  It's the record

22   retention for IT.

23        Q.    Okay.  And so these are

24   records that were generated in the

Highly Confidential - Subject to Further Confidentiality Review

1    ordinary course of business?

2         A.    Yes.

3         Q.    And maintained in the

4    ordinary course of business?

5         A.    Yes.

6              MR. JANUSH:  Let the record

7         reflect that less than 60 seconds

8         has passed for the witness to

9         answer that question for a stack

10        that's about 11 and a half inches

11        tall.

12             MR. BARKER:  Well, that's

13        fine.  She said she recognized.

14             THE WITNESS:  This is very

15        familiar because I ran an SAP

16        project.

17             MR. JANUSH:  That's fine.  I

18        just want the record to reflect

19        what I said.

20             THE WITNESS:  Okay.  Okay.

21   BY MR. BARKER:

22        Q.    Take all the time that you

23   need to confirm that this is the document

24   that you think it is.

1        A.      Yes.  All the technical

2   design documentation.

3        Q.      Do you need any more time to

4   review the document?

5        A.      I'm familiar with the

6   acronym TCPA test scripts, but yes, it's

7   all the DEA still.

8        Q.      I'll ask the question that I

9   asked before.  I'll ask it again.  Having

10  reviewed more of Exhibit 44, do you

11  recognize this as documentation that was

12  generated in the ordinary course of

13  business and maintained in the ordinary

14  course of business relating to the

15  validation of the 2006 Janssen suspicious

16  order monitoring process algorithm?

17       A.      Yes.

18       Q.      Would you need to run

19  validation reports like this if all the

20  computer was doing was fourth grade

21  simple math?

22       A.      No.

23       Q.      You can put that aside.

24               You mentioned during your

1   prior testimony -- excuse me.  You

2   previously testified that over time,

3   enhancements had been made to the Janssen

4   suspicious order monitoring program,

5   correct?

6          A.    Yes.

7          Q.    Were these changes made

8   because the DEA said that Janssen's

9   suspicious order monitoring program was

10  inadequate in any way?

11         A.    No.

12         Q.    So why were the enhancements

13  being made over time?

14         A.    Well, over time through

15  attending conferences and various other

16  conferences about controlled substances,

17  whether DEA led them or not, we learned

18  of other expectations that may be

19  required and we proactively wanted to

20  make sure our system and our processes

21  were enhanced to have what we thought DEA

22  may expect us to have in our program.

23         Q.    Okay.  And the regulations

24  related to the Controlled Substance Act,

1    those haven't changed over time, have

2    they?

3            A.    No, they haven't.

4            Q.    Mr. Janush asked you a bunch

5    of questions to establish that point,

6    correct?

7            A.    Yes.

8            Q.    Okay.  But have DEA's

9    expectations as to what information

10   registrants, such as manufacturers,

11   should be reviewing and considering

12   changed over time?

13                 MR. JANUSH:  Objection.

14                 THE WITNESS:  They have, in

15           that they expected -- they

16           communicate at conferences what

17           they expect manufacturers and

18           distributors to know about the

19           customer.

20   BY MR. BARKER:

21           Q.    And has that information

22   changed over time?

23                 MR. JANUSH:  Objection.

24                 THE WITNESS:  Yes.

1    BY MR. BARKER:

2        Q.    Did you or your team have

3    discussions with the DEA about how

4    Janssen's suspicious order monitoring

5    program operated?

6        A.    Yes.

7        Q.    Did you show them your SOPs?

8            MR. JANUSH:  Objection.

9            THE WITNESS:  Yes.

10   BY MR. BARKER:

11       Q.    Did you discuss with them

12   what types of orders you were

13   investigating and what types of orders

14   you would deem suspicious and report to

15   them if necessary?

16       A.    Yes.

17            MR. JANUSH:  Objection.  Is

18       there a time frame for that

19       question?

20   BY MR. BARKER:

21       Q.    I'm talking about it did you

22   do it at any point in time?

23       A.    Yes.

24       Q.    Okay.  When was the first

Highly Confidential - Subject to Further Confidentiality Review

1    such discussion with the DEA about your

2    suspicious order monitoring program that

3    you can recall?

4              A.    2007.

5                    MR. BARKER:  Let's mark as

6              Exhibit 45 a document beginning

7              with Bates Numbers JAN-MS-03124082

8              continuing through 087.

9                    (Document marked for

10             identification as Exhibit

11             Janssen-Dempsey-45.)

12   BY MR. BARKER:

13             Q.    Do you have Exhibit 45 in

14   front of you?

15             A.    Yes, I do.

16             Q.    Do you recognize it?

17             A.    Yes, I do.

18             Q.    What is it?

19             A.    It is a regulatory agency

20   contact report, a RACR, that was prepared

21   to document discussions with San

22   Francisco DEA.

23             Q.    Okay.  And you used the term

24   "RACR."  Is that the acronym R-A-C-R?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Yes.

2          Q.      Are RACRs prepared in the

3    ordinary course of business by

4    responsible employees involved in the

5    communications with the DEA?

6          A.      Yes.

7          Q.      And are these RACRs

8    maintained in the ordinary course of

9    business by Janssen?

10          A.      Yes.

11          Q.      And they are prepared at or

12    about the time of the conversations in

13    question, correct?

14          A.      Yes.

15          Q.      In preparing for your

16    deposition, did you attempt to locate any

17    documents relating to communications with

18    the DEA about suspicious order

19    monitoring?

20          A.      Yes.

21          Q.      Was this one of the

22    documents that was located?

23          A.      Yes.

24          Q.      Where did you get it?

1        A.    Brian Strehlke provided it

2   to me.

3        Q.    Okay.  And you see

4   Mr. Strehlke's name here as the Johnson &

5   Johnson contact?

6        A.    Yes.

7        Q.    Does Mr. Strehlke currently

8   report to you?

9        A.    Yes, he does.

10       Q.    Okay.  Now, I want to direct

11  your attention to the page beginning with

12  Bates 4086.  And here we have an e-mail

13  chain between Mr. Strehlke and someone

14  named William R. Davis.

15            Do you know who Mr. Davis

16  is?

17       A.    He is the diversion program

18  manager for San Francisco.

19       Q.    And how do you know that?

20       A.    It's on the front page.

21       Q.    So you're referring to the

22  front page of this exhibit.

23       A.    Mm-hmm.

24       Q.    There we have Mr. Davis.

1    And where did you get his position from?

2         A.    Position is right underneath

3    there.

4         Q.    And his district, as you

5    said, was San Francisco.  Okay.

6              Let's go back to that

7    e-mail.  And down at the bottom of the

8    page there is a header from an e-mail

9    from Mr. Strehlke to Mr. Davis, right?

10   But the e-mail starts on the next page.

11             And what was the nature of

12   this contact with DEA?

13        A.    We were seeing some

14   increased demand at some of the local DCs

15   for Cardinal as a result of -- there were

16   a few other DCs that had their licenses

17   suspended.  So this increase in demand

18   was flagged on our system because it was

19   an increase to what they typically order.

20   And so we wanted to get guidance from DEA

21   on our interpretation to confirm that our

22   thinking is, they're a large distributor,

23   we understand why there's an increase in

24   demand, and you know, they're not

Highly Confidential - Subject to Further Confidentiality Review

1  suspicious.

2      Q.    Was there any change in the

3  pattern of Cardinal's ordering that

4  caused Mr. Strehlke to do a further

5  investigation of the orders?

6              MS. BOODY:  Object to form.

7              THE WITNESS:  Typically the

8          orders were sent to several

9          Cardinal DCs.  And as a result of

10         recent actions they were

11         redirecting it.  So there was a

12         change in the pattern.

13  BY MR. BARKER:

14      Q.    Okay.  New DCs were placing

15  orders, correct?

16      A.    Yes.

17      Q.    And did Mr. Strehlke discuss

18  with the DEA what algorithm was being

19  used to flag the suspicious orders?

20      A.    He wrote an e-mail to DEA

21  how our suspicious order quantity

22  trigger, which is three times the average

23  order of the last 12 months.

24      Q.    Right.  You are reading that

1    from right here in the document?

2         A.    Yeah.

3         Q.    Okay.  He's also telling the

4    DEA that you do not regard these orders

5    as being suspicious, correct?

6         A.    Correct.

7         Q.    And what were the reasons

8    why this order was not deemed to be

9    suspicious?

10        A.    The total quantity that

11   Cardinal was ordering was consistent.  It

12   was just the direction of which local DC

13   was receiving it.

14        Q.    And he asked a question to

15   the DEA at the bottom, correct?

16        A.    Yes.

17        Q.    What was the question?

18        A.    "Does DEA have any objection

19   to our filling the increased orders to

20   Cardinal DCs which have registrations

21   which are still in good standing?"

22        Q.    And he's asking you that

23   because you knew that some distribution

24   centers had had their DEA registrations

Highly Confidential - Subject to Further Confidentiality Review

1    placed on hold, correct?

2            A.     Yes.

3            Q.     Let's go up one e-mail.

4    When we go up one e-mail, we see

5    Mr. Davis.  That's the DEA agent, right?

6            A.     Yes.

7            Q.     And he responds in all caps.

8            "Brian, I have forwarded

9    your questions to our associate chief

10   counsel for diversion.  The San Francisco

11   division is not directly involved with

12   this investigation, so I want someone to

13   knows the restrictions to respond to you

14   directly concerning Cardinal issues."

15           Did I read that correctly?

16           A.     Yes.

17           Q.     Okay.  So is it your

18   understanding that he kicked the request,

19   including the statement about how

20   suspicious orders were being flagged, up

21   another level within the DEA?

22           A.     To headquarters, yes.

23           Q.     Okay.  And then above that,

24   there's a further e-mail from

Highly Confidential - Subject to Further Confidentiality Review

1    Mr. Strehlke to Mr. Davis, right?

2           A.     Mm-hmm.

3           Q.     And he also copies somebody

4    else.  Somebody named David Barber.  Do

5    you know who David Barber is?

6           A.     As you saw from the previous

7    e-mail, he is the associate chief counsel

8    for diversion.

9           Q.     He's the person to whom it

10   was sent that's higher up?

11          A.     Yes.  Mm-hmm.

12          Q.     Okay.  And here --

13                 MR. JANUSH:  What page are

14          you at?

15                 MR. BARKER:  This is page --

16          ending in Bates 086.

17                 MR. JANUSH:  Thank you.

18   BY MR. BARKER:

19          Q.     And he writes here, "We do

20   not want to risk patients not getting

21   needed medication and plan to fill these

22   orders."

23                 Do you see that?

24          A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then he tells the DEA

2    what the sites are, where the orders will

3    be shipped, correct?

4    A.    He does not -- he relays the

5    sites that have the registration

6    suspended.

7    Q.    Correct.

8    A.    And then the remaining

9    Cardinal facilities are already -- they

10   have their licenses intact and they're in

11   good standing.

12   Q.    So he's acknowledging which

13   ones are not going to get it.  I actually

14   said the inverse.

15   A.    Yes.

16   Q.    Okay.  And he says exactly

17   which controlled substance products were

18   going to be shipped, correct?

19   A.    Yes.

20   Q.    And then finally he says,

21   "Please get back to me if the agency is

22   looking for a different approach,"

23   correct?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know if these orders

2   shipped?

3    A.    Yes.

4    Q.    And what was the DEA's

5   response, if any, to this inquiry?

6    A.    If you go to the first page.

7    Q.    Yes.

8    A.    It says Mr. Davis -- said

9   called Brian back.  Said, "He sent the

10  inquiry to David Barber, associate chief

11  counsel for diversion, who is heading up

12  the Cardinal investigation.  He responded

13  to Mr. Davis that "DEA would not tell us

14  not to fill orders for a registrant in

15  good standing.  Mr. Davis said that our

16  approach sounded good and was a

17  reasonable response to this situation."

18   Q.    And in your experience, is

19  it typical that DEA provides advice and

20  guidance of this type orally on the phone

21  and not in a written letter or e-mail?

22   A.    Yes.

23   Q.    You can put that aside.

24        MR. BARKER:  Let's mark as

Highly Confidential - Subject to Further Confidentiality Review

1          Exhibit 46 an e-mail dated

2          October 22, 2008, from Maryann

3          Gribbin to a host of people.

4              It is Bates-numbered

5          JAN-MS-05433748 to 49.

6              (Document marked for

7          identification as Exhibit

8          Janssen-Dempsey-46.)

9    BY MR. BARKER:

10         Q.    Do you have Exhibit 46 in

11   front of you?

12         A.    Yes, I do.

13         Q.    Okay.  When you're done

14   taking a look at it, let me know whether

15   you recognize it.

16         A.    Yes, I do recognize this.

17         Q.    What is it?

18         A.    It is a daily summary of a

19   DEA inspection.

20         Q.    Okay.  And are summaries of

21   FDA -- excuse me.  Are summaries of DEA

22   inspections generally circulated by

23   e-mail?

24         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And are such e-mails

2    prepared in the ordinary course of

3    business by somebody who was present for

4    the inspection?

5    A.    Yes.

6    Q.    And is it part of their job

7    to accurately summarize what happened at

8    the inspection?

9    A.    Yes.

10    Q.    And are such records

11    maintained by Janssen in the ordinary

12    course of business?

13    A.    Yes.

14    Q.    And so this -- this is

15    different than a RACR, correct?

16    A.    Yes.

17    Q.    Okay.  Why is a RACR not

18    prepared for an inspection?

19    A.    It was just different

20    purposes.  The RACR is when there is --

21    when you are seeking interpretation of

22    regulations or policies.  And then this

23    is just reporting out on what an

24    inspection -- what happened during --

Highly Confidential - Subject to Further Confidentiality Review

1    it's any regulatory inspection, not just

2    DEA.  This just happens to be a summary

3    from a DEA inspection, that is sent out

4    to senior leaders.

5         Q.    Understood.  So who is

6    Maryann Gribbin, the author of this

7    e-mail?

8         A.    She was the quality leader

9    at JOM at the time.

10        Q.    And was she the one with

11   responsibility to generate a report on

12   inspections?

13        A.    Yes.

14        Q.    When did this particular

15   inspection take place?

16        A.    October 22, 2008.

17        Q.    And where did it take place?

18        A.    At a Franklin distribution

19   center in New Jersey.

20        Q.    And is that what FDC is,

21   Franklin distribution center?

22        A.    Yes.

23        Q.    I want to direct your

24   attention to the second page under the

1    heading "Preparation for Day 2."

2            Are you there?

3        A.    Yes.

4        Q.    And it says here,

5    "Investigators are expected to complete

6    the inventory reconciliation, review

7    handling of suspicious orders and conduct

8    a security review."

9        A.    Yes.

10       Q.    Is it your understanding

11   that those types of inspections are

12   generally done by the DEA when they come

13   to one of your facilities?

14       A.    Yes.

15       Q.    And are you aware of any

16   other report relating to day two of this

17   particular inspection?

18       A.    I don't know.

19       Q.    Is it -- is it your -- have

20   you ever experienced a situation where

21   the DEA did not come back on the second

22   day of a scheduled two-day inspection?

23            MR. JANUSH:  Objection.

24            THE WITNESS:  No.  They

Highly Confidential - Subject to Further Confidentiality Review

1    usually return.  It may be not --

2    be the next day if something comes

3    up, but they do return.

4  BY MR. BARKER:

5    Q.    So to the best of your

6  knowledge, would you expect that the

7  suspicious order monitoring materials

8  were provided, or -- actually, strike

9  that.

10          Is it your understanding

11  that information about suspicious order

12  monitoring was provided to the inspectors

13  at the Franklin distribution center as

14  part of this inspection?

15          MR. JANUSH:  Objection.

16      Calls for speculation.

17          THE WITNESS:  Yes.

18  BY MR. BARKER:

19    Q.    Was there ever a negative

20  review or citation as a result of this

21  inspection at the Franklin distribution

22  center?

23    A.    Not that I recall.

24    Q.    Did anyone from the DEA

Highly Confidential - Subject to Further Confidentiality Review

1    communicate to Janssen after the

2    inspection at the Franklin distribution

3    center that there was a problem or an

4    issue with Janssen's suspicious order

5    monitoring program?

6              MR. JANUSH:  Objection.

7              THE WITNESS:  Not that I was

8         aware of.

9    BY MR. BARKER:

10        Q.    What I'm going to hand you

11   is a document that was previously marked

12   at the last session of your deposition as

13   Dempsey Exhibit 2.

14             MR. BARKER:  For those on

15        the phone, it begins with Bates

16        number JAN-MS-00060000953.  And

17        it's a RACR report dated

18        October 20th, 2011.

19   BY MR. BARKER:

20        Q.    Do you have Exhibit 2 in

21   front of you?

22        A.    Yes, I do.

23        Q.    Do you recall Mr. Janush

24   asking you questions about this document?

1    A.    Yes, I do.

2    Q.    And this document concerns a

3  meeting that you had in your capacity as

4  a Noramco employee with other Noramco

5  employees and the DEA, correct?

6    A.    Yes.

7    Q.    And that meeting took place

8  when?

9    A.    October 20th, 2011.

10    Q.    Okay.  I don't want to go

11  over a lot of the ground that Mr. Janush

12  already covered, but I'll cover some

13  ground that he didn't.  Did the DEA

14  request this meeting?

15    A.    No.

16    Q.    Then what was the purpose of

17  the 2011 meeting?

18    A.    We -- we asked DEA if we

19  could come in and present the demand

20  signals, the forecasts we were receiving

21  from the customers as they -- this was

22  the timing that they were getting ready

23  to issue the next year's aggregate

24  production quota.  And we wanted them to

1  see what our customers were saying what

2  they needed in terms of to support the

3  medical need as well as to support

4  validation and development volumes needed

5  for, like, the new innovators or anybody

6  that was doing a different formulation.

7       Q.    And you used a term in

8  there, aggregate -- aggregate production

9  quota.

10      A.    Yes.

11      Q.    What is aggregate production

12 quota?

13      A.    It's the total amount of

14 gram space active pharmaceutical

15 ingredient that can be manufactured in

16 the United States to support medical

17 research and exports.

18      Q.    Okay.  Does an API

19 manufacturer like Noramco need production

20 quota in order to make an opioid API?

21      A.    Noramco needs manufacturing

22 quota to isolate and produce active

23 pharmaceutical ingredients.

24      Q.    Okay.  And how is

1   manufacturing quota different than

2   production quota?

3          A.    The aggregate production

4   quota is the whole country volume.  And

5   then individual book manufacturers get

6   pieces of the pie.  And that's

7   manufacturing quota.

8          Q.    Understood.  So who

9   allocates manufacturing quota to Noramco

10  and other producers of opioid APIs?

11         A.    DEA.

12         Q.    And I guess we should define

13  another term we're using there, API.

14  What does API stand for?

15         A.    Active pharmaceutical

16  ingredient.

17         Q.    And is that a drug that

18  people can take, or is that something

19  different?

20         A.    That's the raw powder that

21  goes into the formulation step.

22         Q.    And who is Noramco selling

23  opioid API to?

24         A.    To formulators or

1  manufacturers that make the pills, the

2  patches or the other -- the dosage.

3  　　　　Q.　　So Noramco doesn't sell to

4  any of the big wholesalers or

5  distributors, correct?

6  　　　　A.　　No.

7  　　　　Q.　　And Noramco doesn't sell

8  anything to pharmacies, correct?

9  　　　　A.　　No.

10  　　　　Q.　　Noramco doesn't sell

11  anything to doctors or hospitals,

12  correct?

13  　　　　A.　　No.

14  　　　　Q.　　Who makes the decision as to

15  how much manufacturing quota Noramco gets

16  in any given year?

17  　　　　A.　　DEA.

18  　　　　Q.　　Do Noramco's customers also

19  need a form of quota to buy opioid API

20  from Noramco?

21  　　　　A.　　They need procurement quota.

22  　　　　Q.　　How do they get that?

23  　　　　A.　　They have to submit a

24  request to DEA based on their sales and

Highly Confidential - Subject to Further Confidentiality Review

1   their process losses.  You know, when

2   they take the API and they formulate it,

3   it's not a one to one.  So there is some

4   losses during the handling.  So they will

5   go into DEA with their projected forecast

6   production.  And ask for procurement

7   quota for the API to support their plan.

8           Q.     And who makes the decision

9   as to how much procurement quota any of

10  Noramco's customers will get?

11          A.     DEA.

12          Q.     And could Noramco any amount

13  of API to whomever it wants?

14          A.     No.

15          Q.     What were the limits on what

16  API could sell -- excuse me.

17                 What are the limits as to

18  what opioid API Noramco could sell?

19          A.     Noramco could only sell API

20  a customer that has an active valid DEA

21  license and certificate of procurement

22  quota which tells us how much quota DEA

23  has given them.  And we also, at the

24  time, Noramco did monthly report to DEA

Highly Confidential - Subject to Further Confidentiality Review

1   how much we had shipped to all the

2   customers so DEA knew how much was going

3   to all those formulators.

4       Q.    And DEA monitors that,

5   correct?

6       A.    Yes.

7       Q.    Can DEA adjust quota as the

8   year goes on?

9       A.    There is a process where the

10  aggregate production quota can be

11  revised.  The current year can be

12  revised.  And it gets posted in a federal

13  register.  And manufacturers can comment

14  on it if they see an increase in demand

15  where more quota is needed.

16      Q.    Okay.  Now, I want to take

17  you into the RACR itself and direct your

18  attention to the page ending in Bates

19  Number 957.  Are you there?

20      A.    Yes.

21      Q.    And in particular, I want to

22  direct your attention to the paragraph a

23  little over halfway down.  It reads, "Dr.

24  Sannerud" -- let me pause there.

1    Who is Dr. Sannerud?

2    A.    Dr. Christine Sannerud was

3  the head of quota and the UN reporting

4  group at headquarters.

5    Q.    So she was DEA?

6    A.    Yes.

7    Q.    Okay.  So, "Dr. Sannerud of

8  the DEA was concerned that Noramco is

9  sole sourced from Turkey and Tasmania.

10  She was watching The Weather Channel the

11  other day, and was mentioning how

12  Tasmania climate would be changing in the

13  future.  Bill assured her that we have

14  BCP and are looking at alternate regions

15  and even hemisphere.  And Tasmania has

16  taken measures to ensure that it can

17  handle droughts, irrigation systems."

18    Did I read that correctly?

19    A.    Yes.

20    Q.    Okay.  Who's Bill?

21    A.    Bill Grubb.

22    Q.    Okay.  So Bill Grubb was

23  Noramco, correct?

24    A.    Yea, he was.  He was Noramco

1  sales and marketing.

2      Q.    Okay.  And what is BCP?

3      A.    Business continuity plan.

4      Q.    Okay.  Was -- you were at

5  this meeting, correct?

6      A.    Yes.

7      Q.    In fact, you were the one

8  who wrote this note, right?

9      A.    Yes.

10     Q.    All right.  Was the DEA

11 concerned that there was a time where

12 Noramco would not be able to produce

13 enough API opioid to satisfy the medical

14 need in the United States?

15     A.    DEA was concerned that

16 should Turkey or Tasmania have weather

17 issues and the supply would be limited,

18 then we would not be able to procure

19 adequate narcotic raw materials to

20 support our quota grants in the medical

21 need.

22     Q.    Did anybody from the DEA

23 suggest that you were asking for too much

24 manufacturing quota that year?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     No.

2                 MR. JANUSH:  Objection.

3   BY MR. BARKER:

4          Q.     Did Noramco get --

5   Noramco -- did Noramco get opioid API

6   manufacturing quota from the DEA for the

7   year after this, which would have been

8   2012?

9          A.     Yes, we got manufacturing

10  quota.

11         Q.     And who gave you that quota?

12         A.     DEA.

13         Q.     Did the DEA ever express a

14  concern that Noramco was producing too

15  much opioid API for the U.S.?

16         A.     No.

17         Q.     Let's go to another document

18  that Mr. Janush marked at the last

19  session of your deposition.  It was

20  previously marked as Exhibit 4.

21                MR. BARKER:  For those on

22         the phone, it begins with Bates

23         JAN-MS-00454956 and it runs

24         through 958.

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. BARKER:

2          Q.     Ms. Dempsey, do you recall

3   Mr. Janush asking you questions about

4   this document?

5          A.     Yes, I do.

6          Q.     Okay.  And he didn't ask you

7   whether you ever received this e-mail?

8          A.     No.

9          Q.     Did you receive it?

10         A.     No.

11         Q.     Had you ever seen this

12  e-mail before he questioned you about it

13  at your deposition?

14         A.     I don't recall, no.

15         Q.     Okay.  In questioning you

16  about this document, Mr. Janush had a

17  hypothetical about a customer who had

18  purchased a SKU for 50 milligrams of an

19  opioid product, and then one day decided

20  to purchase a 75-milligram SKU instead.

21             Do you remember that

22  hypothetical?

23         A.     Yes, I do.

24         Q.     Okay.  Would the Janssen's

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order monitoring system flag

2    that 75-milligram order?

3         A.    Yes, it would.

4         Q.    Why?

5         A.    If the customer typically

6    ordered 50 milligrams, and then switched

7    and then ordered a 75-milligram, we'd

8    have no history.  The 12-month rolling

9    average times three would be zero.  And,

10   therefore, that order would have been

11   flagged as atypical requiring

12   investigation.

13        Q.    Okay.  And what if the

14   customer had ordered the 75-milligram

15   dose once before?

16        A.    It still would have flagged

17   because one divided by 12, 52 weeks times

18   three is still a low volume.

19        Q.    Okay.  So in most cases

20   where a customer -- were a customer to be

21   switching SKUs to up the amount of opioid

22   in grams, it would get flagged because

23   it's a new SKU for that customer,

24   correct?

1          MR. JANUSH:  Objection.

2          THE WITNESS:  There was no

3     12-month consistent ordering

4     pattern for that SKU.

5  BY MR. BARKER:

6          Q.    And even if they had a

7  history of having ordered a small amount

8  of that other SKU before, would it still

9  flag?

10          MR. JANUSH:  Objection.

11          THE WITNESS:  It was a

12     larger order, it would have.

13  BY MR. BARKER:

14          Q.    Why?

15          A.    Because it was exceeding the

16  three times the 52-week average.

17          MR. JANUSH:  Objection.

18  BY MR. BARKER:

19          Q.    And would this be the case

20  regardless of how many different SKUs

21  were placed in a single order?

22          A.    The program goes by each

23  individual line item on the order, so

24  it's by SKU.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Does the Janssen suspicious

2  order monitoring program ever look at

3  total orders by a customer and conduct an

4  analysis?

5    A.    On a quarterly basis, we

6  take the entire volume of noncontrolled

7  products that we ship to the customers

8  along with all of the scheduled products

9  and do a comparison to see how much

10  percent control to non control they are

11  ordering.

12    Q.    Okay.  When you're looking

13  at that aspect of an order pattern, is

14  there a particular threshold that you're

15  looking at?

16    A.    We like to generally see

17  more noncontrolled.  We set up a

18  15 percent as an internal limit that

19  if -- should percent to CS go above

20  15 percent, we'd reach out and

21  investigate with the customer.

22    Q.    And why did you set the

23  limit at 15 percent?

24    A.    It was just based on what we

Highly Confidential - Subject to Further Confidentiality Review

1    generally saw and thought would be a

2    significant -- and then recently DEA has

3    been reporting out that a typical

4    pharmacy should only be receiving

5    13 percent.  So that sort of fell in line

6    with our 15 percent standard that we set

7    many years ago.

8         Q.    Okay.  And this analysis is

9    performed every quarter for every

10   customer, correct?

11        A.    Yes.  Every customer that

12   receives controlled substances.

13        Q.    And what do you do if you

14   see a percentage of controlled substances

15   to non-controlled substances that's

16   higher than 15 percent?

17        A.    We investigate.

18        Q.    Okay.  Would you ship it

19   unless your investigation cleared the

20   order as being reasonable?

21        A.    Well, keep in mind that this

22   is only done every -- on a quarterly

23   basis and not set for each individual

24   order.  But our current practice is that

Highly Confidential - Subject to Further Confidentiality Review

1    if there is an order that is deemed

2    atypical, we have a standard process that

3    we look through and we do pull up what

4    was the last percentage CS to non-CS to

5    make sure that they're low.

6           Q.    Okay.  I'll next hand you

7    another document that was previously

8    marked at your deposition.

9                 It was marked as Exhibit 16.

10   It begins with Bates JAN-MS-02963719 and

11   runs through 21.

12                Do you recall being asked

13   about this document at the last session

14   of your deposition?

15          A.    Yes, I do.

16          Q.    And Mr. Janush focused his

17   questioning on this sentence by my pen

18   which reads, "The most heavily purchased

19   product was Nucynta IR 50 milligrams

20   which had averages purchases" -- "average

21   purchases/sales of 324 bottles per week."

22                Did I read that correctly?

23          A.    Yes.

24          Q.    Do you recall that

Highly Confidential - Subject to Further Confidentiality Review

1  questioning?

2       A.    Yes.

3       Q.    Well, let's put that in

4  context.  He didn't ask you about the

5  sentence right before that, which reads?

6       A.    "Sales of Schedule IIs

7  trended downward over this time period."

8       Q.    Yes.  He also didn't ask you

9  about the sentence right after that.  Can

10  you read that one, please?

11       A.    "Considering that Jupiter

12  Services, Southern Florida, and Walgreens

13  has 250-plus stores in the Miami/Fort

14  Lauderdale/Pompano Beach area alone, this

15  appears to be a reasonable figure."

16       Q.    Now, I'm not that great at

17  fourth grade simple math, but 324 divided

18  by 250 would be roughly one and a quarter

19  bottle per store in a 250-plus store

20  area, correct?

21       A.    Yes.

22       Q.    And what was the conclusion

23  of the Janssen personnel who were looking

24  into the facts and circumstances here?

```
 1            A.    Well, I had asked for an

 2   analysis to look at the recent data going

 3   into this area to see if there was any

 4   suspicious activity on our products.  And

 5   based on the fact that the C-IIs were

 6   trending downward, and they reviewed all

 7   the data and agreed that nothing -- the

 8   next page, "I reviewed the data and agree

 9   nothing seemed alarmed to us.  We do not

10   believe the Jupiter DC was

11   overstocking/overpurchasing JOM

12   controlled substances based on the data

13   we found."

14            Q.    Okay.  And I've highlighted

15   that on the screen there.

16                  Did you agree with that

17   conclusion?

18            A.    Yes.

19            Q.    Now, Mr. Janush also asked

20   you about another statement in this

21   document up at the top that says, "Mike

22   and I" -- who would Mike be in that

23   sentence?

24            A.    Mike Levitt.
```

1    Q.    Okay.  So Mr. Levitt and

2  Mr. Martin fear that JOM is going to

3  reduce head count and there will not be

4  anyone left to do this kind of analysis

5  for them in the future.

6          Do you see that sentence?

7    A.    Yes.

8    Q.    Okay.  Did JOM ever reduce

9  head count such that there was not anyone

10  left at the company to do this type of

11  analysis for you?

12    A.    No, we continue to get this

13  type of analysis.

14    Q.    I'm going to hand you what

15  was previously marked as Dempsey

16  Exhibit 5.

17          MR. BARKER:  For those on

18       the phone, it begins with Bates

19       Number JAN-MS-03054480 and runs

20       through -- well, there's a native

21       document that's attached to it

22       apparently.  The non-native runs

23       through 3054481.

24  BY MR. BARKER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So this is an e-mail that
2    related to the implementation of the
3    CSOS, C-S-O-S, system, correct?
4         A.    Yes.
5         Q.    You previously testified
6    that CSOS is only in place for the big
7    three distributors, McKesson, Cardinal
8    and ABC, correct?
9         A.    Yes.
10        Q.    Okay.  Why was the CSOS
11   system put in place for only those three
12   distributors?
13        A.    They requested it and they
14   had a higher volume of paper 222s.
15        Q.    Than who?
16        A.    Than the other customers.
17        Q.    And was CSOS an electronic
18   system that Janssen created?
19        A.    No.  It was a DEA online
20   system.
21        Q.    So it's the DEA's system,
22   not Janssen's system, correct?
23        A.    Right.
24        Q.    Okay.  And CSOS, as you

Highly Confidential - Subject to Further Confidentiality Review

1    said, is an electronic order processing

2    system, correct?

3           A.    Yes.

4           Q.    Okay.  And even though

5    orders may be placed by the big three

6    distributors electronically, are those

7    orders still reviewed by the suspicious

8    order monitoring program at Janssen?

9           A.    Yes.

10          Q.    Was CSOS in any way an

11   end-run around the suspicious order

12   monitoring process?

13          A.    No.

14          Q.    What happens to an

15   electronically placed CSOS order when

16   it's received by Janssen?

17          A.    Well, when it comes in from

18   the customer, our customer service has to

19   go in to an IT system that's -- that --

20   that'll show the electronic 222.  And

21   just like the paper 222, customer service

22   has to review it for accuracy and make

23   sure there's no mistakes.  If there's

24   mistakes, it has to go back to the

Highly Confidential - Subject to Further Confidentiality Review

1  customer.  If the 222 is accurate, then

2  it goes -- the order goes into SAP, and

3  it's placed on business manager hold,

4  just like the paper system.

5        Q.    So are the same checks done

6  on a CSOS order that are done on an order

7  filed by a paper Form 222?

8        A.    Yes.

9        Q.    In or about 2013, were there

10 any enhancements made to Janssen's

11 suspicious order monitoring processes?

12       A.    In 2013, we started monthly

13 compliance meetings, where we were

14 reviewing a set agenda, review our

15 metrics, orders, trends.  And we also

16 revised all of the SOPs to make sure that

17 they reflect what we were currently

18 doing.

19       Q.    Okay.  And those monthly

20 meetings, were there minutes that went

21 with those?

22       A.    Yes.

23       Q.    Let's -- let's look at what

24 has been previously marked as Exhibit 10.

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BARKER:  For those on

2     the phone, it begins with Bates

3     Number JAN-MS-00421188 and runs

4     through 91.

5  BY MR. BARKER:

6          Q.    Do you recall Mr. Janush

7  asking you questions about this e-mail?

8          A.    Yes.

9          Q.    Okay.  If you turn to the

10 page ending in Bates 90, is this an

11 example of minutes from a monthly

12 compliance meeting?

13         A.    Yes.

14         Q.    On that same page -- strike

15 that.

16              So this is part of your

17 suspicious order monitoring process, to

18 have regular meetings to consider current

19 events and to talk about things that

20 you're seeing in the ordering process,

21 correct?

22         A.    Yes.

23         Q.    So let's go down to the

24 Number 3, trend review.

Highly Confidential - Subject to Further Confidentiality Review

1          It says there, "Walgreens

2     Perrysburg, Ohio, imminent suspension."

3          Do you see that?

4     A.     Yes.

5     Q.     You were at this meeting on

6     or about April 8th of 2013, correct?

7     A.     Yes.

8     Q.     All right.  So what was --

9     what was this issue that's being

10    discussed in the Paragraph Number 3?

11    A.     Well, there were some news

12    articles that were communicating that DEA

13    was going to be pulling the DEA license

14    for this Walgreens distribution center in

15    Ohio.

16    Q.     Okay.  And I don't see the

17    words "distribution center" there.  How

18    do you know that's a distribution center?

19    A.     Our trade confirmed that it

20    was the distribution center.

21    Q.     Okay.  So that's not an

22    individual pharmacy, correct?

23    A.     No.

24    Q.     Why did it matter to you

Highly Confidential - Subject to Further Confidentiality Review

1    that a distribution center for Walgreens

2    potentially faced imminent suspension?

3         A.   Because we wanted to make

4    sure that if they lost their license, our

5    product wasn't going to be shipped to it.

6         Q.   And that particular

7    location, given that it was a

8    distribution center, also served multiple

9    individual pharmacies, correct?

10        A.   Yes.

11        Q.   Why is it that when you knew

12   Walgreens was under investigation, you

13   didn't immediately block orders of

14   controlled substances that Walgreens was

15   placing with Janssen?

16        A.   Well, they never -- they

17   still had an active DEA license.  And as

18   our previous discussion from 2007, DEA

19   told us that our rationale that, as long

20   as they have their license, patients need

21   medicine; therefore, we didn't stop our

22   shipments to the wholesaler that was --

23   that was distributing to this DC.

24        Q.   Okay.  And you're referring

Highly Confidential - Subject to Further Confidentiality Review

1    to the advice that you got from DEA, or

2    rather the guidance, that you got from

3    DEA back in 2007 that we saw in

4    Exhibit 45, correct?

5         A.    Yes.

6         Q.    You also mentioned that SOPs

7    were revised in 2013.  Let's talk about

8    those SOPs that were put in place.

9               I'm going to hand you five

10   documents.

11              MS. WINCKEL:  Four and

12         actually --

13              MR. BARKER:  Oh, that's

14         true.

15   BY MR. BARKER:

16        Q.    So I'm going to hand you a

17   group of documents, four of which will be

18   marked as Exhibits 47-A through D, and

19   the fifth we're going to call it

20   Exhibit 40?

21              MS. WINCKEL:  37.

22              MR. BARKER:  37.  Excuse me.

23         Because it was previously marked

24         by Mr. Janush.

Highly Confidential - Subject to Further Confidentiality Review

1              (Document marked for

2         identification as Exhibit

3         Janssen-Dempsey-47-A.)

4              (Document marked for

5         identification as Exhibit

6         Janssen-Dempsey-47-B.)

7              (Document marked for

8         identification as Exhibit

9         Janssen-Dempsey-47-C.

10             (Document marked for

11        identification as Exhibit

12        Janssen-Dempsey-47-D.)

13   BY MR. BARKER:

14        Q.    So can you pull out

15   Exhibit 37 out from your pile of exhibits

16   there, or maybe the court reporter has

17   it.

18        A.    37?

19        Q.    Yes.  And then here are the

20   other ones, 47-A through D.  Do you have

21   Exhibits 47-A through D and 37 in front

22   of you?

23        A.    Yes, I do.

24             MR. JANUSH:  Is A the one

Highly Confidential - Subject to Further Confidentiality Review

 1          ending in 34?

 2                    MR. BARKER:  Yeah.  Why

 3          don't I identify them for the

 4          record, just to keep it clear.

 5     BY MR. BARKER:

 6          Q.    So Exhibit 47-A begins with

 7     Bates JAN-MS-5457234 and runs through

 8     7247.

 9                    47-B begins with

10     JAN-MS-03124146, runs through 4148.

11                    Exhibit 47-C begins with

12     JAN-MS-03124141 and runs through 4145.

13                    47-D is JAN-MS-03124088 and

14     it runs through 4100.

15                    And Exhibit 37 that was

16     previously marked begins with

17     JAN-MS-03124101 and runs through 4110.

18                    Okay.  Do you have all those

19     in front of you?

20          A.    Yes, I do.

21          Q.    What is Exhibit 47-A?

22          A.    47-A is an SOP describing

23     the procedures to set up and create, and

24     maintain a customer master for any new

1    customers that JOM wants to ship product

2    to.

3            Q.    And what's a customer

4    master?

5            A.    Customer master data process

6    to set up a customer in SAP, so that we

7    can accept an order and process it.  We

8    have to put the master data, which is all

9    the detailed information about the

10   customer, into SAP.  And this --

11           Q.    Okay.  So this -- I'm sorry.

12           A.    This tells us all the stuff

13   that we need from the customer in order

14   to fill out the master data fields.

15           Q.    Okay.  And was this

16   replacing another SOP?

17           A.    It's Version 5.  So I am

18   guessing it did.  Yes.

19           Q.    Let's go on to 47-B.  What

20   is Exhibit 47-B?

21           A.    Well, it is a job -- which

22   is a form, I'm guessing.  Yeah, 47-A is

23   referencing this job, which is the

24   pre-application for new customers.  So

Highly Confidential - Subject to Further Confidentiality Review

1   this forms gets some of the preliminary

2   information required to set up a new

3   customer.

4          Q.    Okay.  And was this a new

5   form or was it replacing something else?

6          A.    It appears to be a new

7   version, one -- a new form.

8          Q.    And what is Exhibit 47-C?

9          A.    After the application, this

10  is more detailed information on the

11  customer.  So after it goes through an

12  internal review and a customer is

13  approved, they go and get more

14  information in regard around billing and

15  paying and shipping.

16         Q.    Okay.  What is Exhibit 47-D?

17         A.    This is the SOP that is used

18  to monitor the licenses for the

19  customers.

20         Q.    And that's a process for

21  checking that there's a valid license to

22  be ordering and receiving a controlled

23  substance?

24         A.    Right.

1        Q.    And what is the last one,

2   Exhibit 37?

3        A.    It is the JOM customer

4   service suspicious and excessive order

5   SOP.

6        Q.    Okay.  And this is the

7   document --

8        A.    I'm sorry.  It's a work

9   instruction.  A little bit more detail,

10  versus an SOP.

11       Q.    Well, that's interesting.

12  Can you explain the difference between an

13  SOP and work instruction?

14       A.    An SOP is usually -- it's

15  more high level, and it may detail

16  processes across more than one function.

17  So, you know, it may encompass more than

18  just one functional organization.

19            A work instruction is a

20  detailed work instruction that one group

21  is responsible -- limited few are

22  responsible for executing, and it gives

23  more of the detailed execution steps.

24       Q.    And it's in Exhibit 37, the

Highly Confidential - Subject to Further Confidentiality Review

1   work instruction, where we find the

2   definition of the current algorithm

3   threshold that states, at Paragraph 3.2,

4   "A potentially suspicious or excessive

5   controlled substance order can be defined

6   as the order that exceeds the minimum

7   order quantity requirements and is above

8   the three times (300%) of the calculated

9   12-month per week order average.  This

10  definition also applies to products that

11  are scheduled in one or more states, but

12  not by the DEA."

13          Did I read that correctly?

14  A.    Yes, you did.

15  Q.    And is that the definition

16  of the threshold used by the algorithm in

17  the suspicious order monitoring process

18  at Janssen that is covered by this

19  particular work instruction?

20  A.    Yes.  That is the work

21  instruction definition in this SOP.

22  Q.    Okay.  Put those aside but

23  keep them handy.

24          Were the SOPs that we just

1    looked at, Exhibits 47-A through D, and

2    Exhibit 37, were they ever reviewed by

3    the DEA?

4          A.    Yes.

5          Q.    When was that?

6          A.    In July of 2013.

7          Q.    Okay.  And in what context

8    were they reviewed?

9          A.    During the inspection, we

10   provided an overview showing DEA a

11   process flow that took all these steps

12   and put it in a process flow, and then

13   provided them these SOPs during our

14   discussion of suspicious order

15   monitoring.

16              MR. BARKER:  Okay.  So let's

17         mark as Exhibit 48 a document

18         beginning JAN-MS-03123994, and

19         including the attachment, it runs

20         through 4005.

21              (Document marked for

22         identification as Exhibit

23         Janssen-Dempsey-48.)

24   BY MR. BARKER:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you have Exhibit 48 in

2    front of you?

3    A.    Yes, I do.

4    Q.    Do you recognize it?

5    A.    Yes, I do.

6    Q.    What is it?

7    A.    It is the daily notice of

8    inspection of DEA's visit at the end of

9    July of 2013.

10    Q.    Okay.  And is this another

11    one of the e-mail reports that are

12    standard practice to give after a DEA

13    inspection at a Janssen site?

14    A.    It is a typical e-mail

15    notification for any regulatory body that

16    comes to inspect a J&J -- Janssen site,

17    but yes.

18    Q.    Okay.  And I won't belabor

19    this because we went over it before.

20    This type of an e-mail notice is

21    regularly prepared in the ordinary course

22    of business?

23    A.    Yes.

24    Q.    By someone who was present

Highly Confidential - Subject to Further Confidentiality Review

1  and whose job it was to accurately take

2  notes of what happened, correct?

3      A.    Yes.

4      Q.    And these are maintained in

5  the ordinary course of business as well,

6  correct?

7      A.    Yes.

8      Q.    All right.  So who's Martha

9  Wick?

10     A.    She works in quality

11  assurance at the Kentucky distribution

12  center.

13     Q.    Okay.  And was it her job to

14  prepare this type of report at this point

15  in time?

16     A.    She's typically the scribe

17  that attends inspections and writes down

18  what is discussed.

19     Q.    When was this inspection?

20     A.    It started on July 29, 2013.

21     Q.    Okay.  It was a two-day

22  inspection?

23     A.    Yes.

24     Q.    And she sent this notice on

Highly Confidential - Subject to Further Confidentiality Review

1    July 30th of 2013, correct?

2            A.     It looks like she sent this,

3    the final summary, at the end of the

4    entire e-mail chain, yeah.

5            Q.     Okay.  Were you present for

6    this inspection?

7            A.     Yes, I was.

8            Q.     And have you reviewed this

9    e-mail and notes in preparation for your

10   deposition?

11           A.     Yes, I did.

12           Q.     Do you believe that this

13   e-mail and the notes that are attached to

14   it are accurate?

15           A.     Yes, I do.

16           Q.     Okay.  And for the record,

17   what I'm referring to is the notes,

18   because if we flip to page

19   JAN-MS-03123997, there is a document

20   that's entitled "Notes:  DEA at KDC,"

21   correct?

22           A.     Yes.

23           Q.     And that is the attachment

24   to the e-mail that we're looking at, DEA

1   at KDC notes, correct?

2          A.    Yes.

3          Q.    Let's go to the attachment.

4   And in particular, I'd like you to turn

5   to Page 2 of the attachment.  I'd like to

6   direct your attention to Point 13, which

7   says, "BL, suspicious orders?"

8                Okay.  Does that mean

9   anything to you, "BL, suspicious orders?"

10         A.    Right.  So BL is Billy Lane.

11  He was the diversion investigator who was

12  leading the inspection.  And he wanted to

13  discuss suspicious order process.

14         Q.    Let's -- let's pause there

15  then.  How many inspectors were there

16  that day?

17         A.    This were two.

18         Q.    Okay.  And there is

19  Mr. Lane, we see back on the first page

20  of the report, right?

21         A.    Yes.

22         Q.    And then who is the other

23  inspector?

24         A.    Jason Smith.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    He's listed here as well,

2    correct?  All right.

3          So let's go back to the

4    attachment.  It says underneath, "BL

5    suspicious orders," "A, GB, gave SOPs and

6    overview."

7          Does that mean anything to

8    you.

9    A.    Guy Bacco was the customer

10   service supervisor, and he provided the

11   SOPs and the overview flow diagrams.

12   Q.    Can you spell Mr. Bacco's

13   last name for the court reporter, please?

14   A.    B-A-C-C-O.

15   Q.    All right.  And then there's

16   a list of items underneath there,

17   correct?

18   A.    Yes.

19   Q.    Okay.  Were those the

20   suspicious order materials provided to

21   DEA at the time of the inspection?

22   A.    Yes.

23          MR. JANUSH:  Objection.

24   BY MR. BARKER:

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    So let's come back to the

2  first item under there.  Let's go to the

3  second item, the one that says, "DS-SOP

4  1251, JOM customer service, customer

5  master data process, V. 5.0, ED 23 July

6  2013."

7           Do you recognize that as an

8  identification of a particular document?

9     A.    Yes.

10    Q.    Is that one of the documents

11 that we previously marked as 47-A through

12 D or 37?

13    A.    That document is 47-A.

14    Q.    47-A.

15          Let's go to the next item.

16          "DS-JOB 959, JOM customer

17 service new customer pre-application

18 Version 1, ED, 24 January, 2013."

19          Is that one of the SOPs that

20 we previously marked as 47-A through D or

21 37?

22    A.    It's JOB Aid, which is 47-B.

23    Q.    So let's go to the next

24 item, "DS-JOB 960.  JOM customer service

1  new customer post application V. 1.0, ED

2  24 January, 2013.

3           Is that one of the documents

4  that we previously marked as Exhibit 47-A

5  through D or 37?

6       A.    47-C.

7       Q.    Let's go to the next item,

8  "DS-WI 6049 license management SOP,

9  Version 1.0, ED 03 August, 2011."

10          Is that one of the documents

11 we previously marked?

12      A.    47-D.

13      Q.    Okay.  So it is

14 Exhibit 47-D, correct?

15      A.    Yes.

16      Q.    And the sixth item, "DS-WI

17 3824 JOM customer service suspicious or

18 excessive orders, Version 2.0, ED 24

19 July" -- it says 0213, but I think that's

20 probably a typo.  Do you recognize that

21 as one of the documents that we

22 previously marked?

23      A.    Yes.

24      Q.    Which one is that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    37.

2    Q.    That leaves us with the

3 document at the top of the list there.

4 "JOM controlled substance order

5 processing, scope Schedule II to V and

6 include" -- it says say, but it's

7 probably state scheduled products, three

8 pages.  Do you see that what that is?

9    A.    That was an overview process

10 flow.

11    Q.    Okay.  Did you previously

12 see a copy of that document during your

13 deposition?

14    A.    Yes.  Those flow diagrams

15 are typically included in the training

16 decks when we -- when we train about our

17 suspicious order monitoring program.

18    Q.    Okay.  I'm going to hand you

19 a document that was previously marked at

20 your deposition as Exhibit 9.  It's a

21 PowerPoint presentation that was produced

22 in native, so there aren't any Bates.

23        Do you have Exhibit 9 in

24 front of you?

Highly Confidential - Subject to Further Confidentiality Review

1         A.      Yes.

2         Q.      And the item that is the

3    first item under the heading 13-A in the

4    notes that we were looking at is where in

5    this PowerPoint?

6         A.      It's on Page 9.  It starts

7    on Page 9.

8         Q.      Starts on Page 9.

9         A.      It's three pages, and it

10   shows the flow diagram.

11        Q.      So it's the flowchart on

12   Pages 9, 10, and 11 of Exhibit 9?

13        A.      Yes.

14        Q.      And how do you know that's

15   the same document as what's described in

16   these notes?

17        A.      Well, the title.  And then

18   the date.  And then I'm the one who

19   developed these.

20        Q.      Developed these meaning --

21        A.      Flow diagram.  I -- the flow

22   diagrams.

23        Q.      The flow diagram.  Okay.

24                And when you say the title,

1    what are you referring to as the title?

2          A.    The top of the flow diagrams

3    is "JOM controlled substance order

4    processing, scope Schedule II through V

5    and includes state scheduled products."

6          Q.    Okay.  So that's the same

7    title as what we saw in the other

8    document?

9          A.    Mm-hmm.

10         Q.    And these flow charts cover

11   one, two, three pages, right?

12         A.    Yes.

13         Q.    And in this flowchart, for

14   example, on the second page of it, it

15   shows the application of the algorithm

16   using the three times monthly -- weekly

17   average for each customer, correct?

18         A.    Yes.

19         Q.    And as we already covered

20   before, back in Exhibit 37, that same

21   standard is set forth at Paragraph 3.2,

22   correct?

23         A.    Yes.

24         Q.    Yes?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2      Q.      Okay.  So let's turn back --

3  let's turn back to the inspection itself.

4              How long was this

5  inspection?

6      A.      Two days.

7      Q.      And how long each day?

8      A.      I think she may have told

9  you when they showed up.  I don't

10  remember the exact.

11      Q.      Your best estimate?

12      A.      They came at 8:30 and then

13  they'd leave after lunch.

14      Q.      Okay.

15      A.      So I think six hours a day.

16      Q.      Six hours a day?

17      A.      Yeah.

18      Q.      For two days?

19      A.      Yes.

20      Q.      And did the DEA agents have

21  any comments on the suspicious order

22  monitoring materials that were provided

23  to them?

24      A.      Well, as was recorded, there

Highly Confidential - Subject to Further Confidentiality Review

1  were a few question -- Billy Lane had

2  questions, but Mike Levitt answered the

3  questions and reviewed the program.

4          Q.    Are you looking on Page 3 of

5  the notes?

6          A.    Yes.

7          Q.    Let's go there.  Where are

8  you looking?

9          A.    At the top.

10         Q.    Okay.  Paragraph 14?

11         A.    Yes.

12         Q.    All right.  So tell me what

13  happened.

14         A.    So Billy Lane asked, "Is

15  there a sales rep that does a physical

16  visit to customers?"  Mike Levitt says,

17  "Our customer base is just wholesalers,

18  not direct shipments to doctors or

19  pharmacies.  93-95 percent go to the big

20  three wholesalers.  Program is based on a

21  new customer profile.  We do a DEA check,

22  credit check, et cetera.  Have enhanced

23  this program recently.  We took

24  historical data and put it into a

Highly Confidential - Subject to Further Confidentiality Review

1    database as a" --

2         Q.    Pause there for a second.

3    So one of the things that he specifically

4    told them during this inspection was that

5    Janssen had enhanced its program

6    recently, taking historical information

7    and putting it into a database, correct?

8         A.    Yes.

9         Q.    And then they had a

10   question, right?

11        A.    No, he didn't have --

12        Q.    Oh, okay.

13        A.    That wasn't DEA.  That's --

14        Q.    Then I'm -- go ahead.

15   Keep -- why don't you keep going there.

16   I'm sorry for interrupting.

17        A.    So -- that's okay.  So, "It

18   gives us more information, and we ask

19   additional questions if necessary.  We

20   keep records of current programs.  We

21   asked Billy Lane if it was necessary.  As

22   far as the sales force, that would be our

23   trade group.  We work with them if a

24   potential suspicious order, more in depth

Highly Confidential - Subject to Further Confidentiality Review

1   now.  We have a suspicious order

2   monitoring team that meets once a month,

3   looks for trends, et cetera.  Has given

4   us more visibility with trade group.

5   Recently benchmarked with Purdue.

6   Additional training for sales group.

7   Recently" -- meaning the trade, the trade

8   folks -- "recently received information

9   from a sales group about a physician sent

10  to Martin Redd, and stopped shipping to

11  this customer."

12          Q.    Okay.  Why don't you pause

13  there.  What does that mean?

14          A.    In regards to Nucynta, we

15  received word from a sales team member

16  that they visited a physician where they

17  did not feel comfortable and they sensed

18  there was some suspicious activity going

19  on.  And so we took the name, the

20  address, and we provided it to Kentucky

21  distribution -- sorry, Kentucky DEA,

22  Martin Redd.  He was the leader at

23  Louisville DEA.

24          Q.    Okay.  So go ahead.  Keep

Highly Confidential - Subject to Further Confidentiality Review

1    going.  What else were the agents told

2    about the suspicious order monitoring

3    process in addition to being provided

4    with all the documentation related to

5    that program?

6                MR. JANUSH:  Objection.

7                THE WITNESS:  "Guy Bacco's

8           group runs reports daily and may

9           call customers if necessary.

10          Sends report to DEA compliance

11          group.  AD is Art Dysart,

12          "99 percent of what they review.

13          If a customer has not ordered in a

14          while and does, they will look at

15          it.  Would like further direction

16          from DEA if any recommendation is

17          in general and especially for

18          suspicious order monitoring."

19   BY MR. BARKER:

20          Q.   So at the end of the

21   discussion, Janssen specifically asked if

22   DEA had any recommendations in general or

23   especially for suspicious order

24   monitoring, correct?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     Did DEA give any specific

3    advice relating to your suspicious order

4    monitoring program, including whether

5    there were any deficiencies or

6    improvements that could be made?

7          A.     No.  And if you look at the

8    end, in closing.  He said no --

9          Q.     You're saying the end.

10   Where are you looking?

11         A.     Page 4.

12         Q.     Page 4.  Okay.

13         A.     Closing.

14         Q.     So what is the -- what is

15   closing?  What are we talking about here?

16         A.     This is what Billy Lane

17   said.

18         Q.     Okay.  Billy Lane is one of

19   the two DEA agents?

20         A.     He was the lead inspector.

21         Q.     Okay.  So Mr. Lane told you

22   what?

23         A.     "No violations of the

24   C.F.R."  But he said the audit came out

Highly Confidential - Subject to Further Confidentiality Review

1    fine.

2         Q.    Okay.  And again, as

3    Mr. Janush pointed out multiple times

4    before, the suspicious order monitoring

5    regulations are in the C.F.R.s, correct?

6         A.    Yes.

7         Q.    And then let's go to the top

8    of the next page too, please.  It also

9    says, "No actions for their part."

10        Does that mean that there

11   were no violations or any other action

12   taken by the DEA?

13        A.    That Billy Lane said that

14   they were not taking any actions.

15        Q.    Okay.  And BL is Billy Lane?

16        A.    Yes.

17        Q.    Okay.  Did Billy Lane say

18   that he likes coming to facilities like

19   the Kentucky distribution center?

20        A.    He says that, "Overall likes

21   coming to places like this."

22        Q.    And did he have any comments

23   on your recordkeeping systems?

24        A.    We had -- we asked him how

1    long we needed to maintain records.  And

2    he was saying, "Keep everything in a

3    binder month by month and only required

4    to keep it for two years, although the

5    state, he thinks, may require five

6    years."  And Guy Bacco said, "Seven years

7    from the J&J perspective."

8         Q.    All right.  I do have one

9    further question on this, Ms. Dempsey, if

10   you have a recollection.  If you know.

11        What was this discussion

12   about here, "MG - who does report go to?

13   BL - we don't get a report."

14        A.    When DEA comes to inspect a

15   location, they do prepare an inspection

16   report that goes up to headquarters.  And

17   MG, Mike Griffith, he was like the

18   general manager, the head of operations

19   at the distribution center.  And he was

20   asking, who does it go to.  And he wanted

21   to know if we could get a copy of it.

22        Q.    A copy of the DEA's internal

23   report --

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    -- about the inspection?

2    A.    Yeah.  And...

3    Q.    And what the agents tell

4  you?

5    A.    We don't get -- we don't get

6  a report.

7         MR. BARKER:  I think we've

8         been going for a little more than

9         an hour.

10         MS. WINCKEL:  Almost two.

11         MR. BARKER:  All right.  My,

12         how time flies.  Do you want to

13         take a break now?  Okay.

14         THE VIDEOGRAPHER:  Remove

15         your microphones.  The time is

16         3:48 p.m.  Off the record.

17         (Short break.)

18         THE VIDEOGRAPHER:  The time

19         is 3:59 p.m.  Back on the record.

20  BY MR. BARKER:

21    Q.    We're back from the break.

22  And before I move on, I want to go back

23  to this PowerPoint that was previously

24  marked as Exhibit 9.

Highly Confidential - Subject to Further Confidentiality Review

1            When you were questioned

2   about Exhibit 9 before, Ms. Dempsey,

3   Mr. Janush asked you if you created this

4   deck.

5            Do you remember that?

6        A.    Yes, I do.

7        Q.    Did you create all the

8   slides in this deck?

9        A.    No.  I cut and pasted some

10  content from the DEA's presentations.

11       Q.    Okay.  And where are those?

12       A.    Starting on Page 19 to the

13  rest.

14       Q.    Okay.  Page 19.

15            So from this Page 19 on,

16  these are not materials that you created,

17  correct?

18       A.    No.

19       Q.    And where did this portion

20  of the materials come from that we're

21  looking at right now on Page 19?

22       A.    The slides from the October

23  DEA distributor conference.

24       Q.    Who was the speaker?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I'm getting to that.  It was

2     at the end.  Page 35.  Prevoznik

3     presented it at the 2013 distributor

4     conference.

5          Q.    Okay.  And Prevoznik is the

6     name we see right here?

7          A.    Yes.

8          Q.    And are there more slides

9     after this?

10          A.    So this is the session that

11     I attended.  But since DEA posts a lot of

12     their training content on the website, I

13     wanted to bring this ability to a slide

14     deck that Rannazzisi presented in

15     February of 2014 at a pharmaceutical

16     awareness meeting, which was just with

17     pharmacists.  And that's what this Slides

18     36 to 47 covered.

19          Q.    So 36, and that's by Joe

20     Rannazzisi?

21          A.    Mm-hmm.

22          MR. JANUSH:  Just for the

23          record, the date of Page 19 is

24          April 1, 2014.  And the date

1    within the file name on Page 35 is

2    2013.

3  BY MR. BARKER:

4        Q.    Okay.  Is that consistent

5  with your recollection, that the file was

6  from 2014 and not 2013?  He's referring

7  to, here, on Page 35, is what he's

8  referring to.

9        A.    Right.  The distributor

10  conference was in 2013.  Yes.

11        Q.    Was it in the fall of 2013?

12        A.    I'd have to check.  They had

13  three of them.  I don't remember the

14  month.

15        Q.    Okay.  So that is consistent

16  with your recollection?

17        A.    Mm-hmm.

18        Q.    That this was a presentation

19  given in 2013?

20        A.    Yes.

21        Q.    Okay.  Let's -- if you can

22  turn to Page 37.  This is in that second

23  DEA slide deck that is part of Exhibit 9.

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And this is a slide entitled
2    DEA distributor initiative, correct?
3    A.    Yes.
4    Q.    What was the distributor
5    initiative, to your understanding?
6    A.    Do you want me to read the
7    slide?
8    Q.    No.  Do you have an
9    understanding as to what the DEA
10   distributor initiative was.  You don't
11   need to read the slide.
12   A.    From DEA conferences, the
13   way it was communicated is they were
14   inviting manufacturers and distributors
15   to headquarters to review their
16   suspicious order monitoring systems and
17   review company-specific ARCOS data for
18   the sales and purchases of controlled
19   substances, IIs and IIIs.
20   Q.    Okay.
21   A.    And the -- and as it says,
22   they also talked about trends involving
23   abuse of prescription controlled
24   substances.

1      Q.    Okay.  And was the -- it

2    says here that the distributor initiative

3    was going from August of 2005 to the

4    present, correct?

5      A.    The present meaning 2014

6    when this was, yes.

7      Q.    2014.  At least.  Okay.

8           So that included the period

9    that you were inspected at the Kentucky

10   distribution center, and you provided

11   your suspicious order monitoring SOPs,

12   work instructions, and other materials to

13   the DEA agents, correct?

14     A.    Yes.

15     Q.    It mentions here that there

16   were briefings to 81 firms with 233

17   locations.

18           Do you have an understanding

19   as to what the briefings were that are

20   referred to on this slide as part of the

21   distributor initiative?

22     A.    What I understood is exactly

23   what was up above, that they reviewed the

24   companies, the firms' suspicious order

Highly Confidential - Subject to Further Confidentiality Review

1    monitoring system and ARCOS data.  And

2    discussed the abuse of prescription

3    controlled substances.

4          Q.    Did you have an

5    understanding as to whether any

6    distributors or manufacturers were asked

7    to come to Washington to have specific

8    meetings with the DEA?

9          A.    DEA was communicating that

10   they did ask distributors and

11   manufacturers to come to Washington for

12   these briefings.

13         Q.    Okay.  And do you have an

14   understanding as to why some companies

15   were called to Washington and others were

16   not?

17              MR. JANUSH:  Objection.

18              THE WITNESS:  I think the

19         focus of these initiatives were on

20         the national trends involving

21         abuse of prescription drugs.  It

22         was focused on Schedule IIs and

23         IIIs that were being abused.  So

24         they were the firms that were

Highly Confidential - Subject to Further Confidentiality Review

1           focused on.

2    BY MR. BARKER:

3           Q.    Focused on by the DEA?

4           A.    Mm-hmm.

5           Q.    Was Janssen called to

6    Washington as part of the distributor

7    initiative to have meetings with the DEA?

8           A.    No.

9           Q.    Was Noramco called to

10   Washington to have meetings with the DEA

11   as part of the distributor initiative?

12          A.    No.

13          Q.    Was any J&J company, to your

14   knowledge, called to Washington to meet

15   with the DEA about the issues that were

16   involved in the distributor initiative?

17          A.    No.

18          Q.    So the only contacts that

19   Janssen had were with the DEA agents

20   responsible for its specific facilities,

21   correct?

22          A.    Yes.

23          Q.    Let's go back to the

24   timeline of inspections of Janssen's

Highly Confidential - Subject to Further Confidentiality Review

1  distribution centers.

2           Was the Janssen distribution

3  center in Kentucky inspected after 2013?

4      A.    Yes.  Routinely.

5           MR. BARKER:  We're going to

6      mark as Exhibit 49, another

7      document beginning with Bates

8      Numbers JAN-MS-02984602 and

9      running through 84607.

10          (Document marked for

11     identification as Exhibit

12     Janssen-Dempsey-49.)

13 BY MR. BARKER:

14     Q.    Do you have Exhibit 49 in

15 front of you?

16     A.    Yes.

17     Q.    And directing your attention

18 to the bottom of the page.  We have an

19 e-mail that begins on the first page that

20 is coming from Martha Wick, right?

21     A.    Yes.

22     Q.    And she's the same person

23 that we saw prepared the last report,

24 correct?

1          A.     Yes.

2          Q.     And it's part of her job to

3    prepare these types of reports in the

4    ordinary course of business, correct?

5          A.     Yes.

6          Q.     All right.  And this one is

7    dated January 28th, 2015?

8          A.     Yes.

9          Q.     And it continues on the next

10   page.  When was this particular

11   inspection that where we were talking

12   we -- looking at -- strike that.

13              When did the inspection take

14   place that was the subject of this

15   report?

16         A.     It looks like it was

17   January 28th, 2015.

18         Q.     You see that from the

19   subject line of the report?

20         A.     No.  I see it from the body.

21   She has a typo.

22         Q.     Oh, date 28 January?

23         A.     Yeah.  She wasn't quite used

24   to 2015.  It was January.

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.    Got it.  So the subject
 2    line, although it says 28 January, 2014,
 3    it's actually 2015 --
 4          A.    Yes.
 5          Q.    -- as reflected in the body.
 6                Okay.  And at the top line
 7    it says, "The DEA just left, there were
 8    no observations."
 9                What does that tell you
10    about this particular inspection?
11                MR. JANUSH:  Objection.
12                MR. BARKER:  Strike that.
13    BY MR. BARKER:
14          Q.    Do you have an understanding
15    of what the result of the inspection was
16    on or about January 28th of 2015?
17          A.    As it's explained here, that
18    from the time period that they audited,
19    which was August 18, 2014, through that
20    January, all the documentation and all
21    the processes they reviewed, there was --
22    there were no observations.  Everything
23    was good.
24          Q.    Okay.  And if we go to Page

Highly Confidential - Subject to Further Confidentiality Review

1  605, we see a brief inspection summary of

2  the day before, correct?

3          A.     Yes.

4          Q.     That's for January 27th?

5          A.     Mm-hmm.

6          Q.     And beginning on that page

7  and continuing onto the next there's a

8  list of attendees at the bottom, right?

9          A.     Mm-hmm.

10          Q.     If we can get that

11  straightened out.  Attendees.  Who is

12  Mike G.?

13          A.     Mike Griffith.

14          Q.     Who is Kevin P.?

15          A.     Kevin Pedergast.

16          Q.     Joe C., who is that?

17          A.     Hmm.  It's been a while.  I

18  have to find out.  I don't recall who

19  that is.

20          Q.     Okay.  And -- well, let me

21  ask a different question.  There were a

22  number of Janssen people present,

23  correct?

24          A.     Yes.

1       Q.     Okay.  And who were the

2   investigators from the DEA?

3       A.     As you looked up before,

4   there were three.  You had Pat Sowers,

5   Jason Smith again, and Chris Skaggs.

6       Q.     And when we go to the next

7   page, one of the requests of this

8   inspection, just like in 2013 was for

9   suspicious order procedures, correct?

10      A.     Yes.

11      Q.     Did you provide those

12  suspicious order procedures materials to

13  the DEA agents who were inspecting the

14  Kentucky facility?

15      A.     Yes.

16      Q.     And were those the current

17  SOPs that were provided?

18              MR. JANUSH:  Objection.

19              THE WITNESS:  The SOPs that

20          were effective at the date of the

21          inspection were provided.

22  BY MR. BARKER:

23      Q.     Now, again, going back to

24  the previous page.  It says there were no

Highly Confidential - Subject to Further Confidentiality Review

1    observations, correct?

2          A.    Yes.

3          Q.    Okay.  And if we look

4    further down on that same page.  It says,

5    "Open discussion points, none

6    identified," correct?

7          A.    Yes.

8                (Brief interruption.)

9                THE VIDEOGRAPHER:  The time

10         is 4:12 p.m.  Off the record.

11               (Brief pause.)

12               THE VIDEOGRAPHER:  Okay.  We

13         are back on the record.  The time

14         is 4:24 p.m.

15   BY MR. BARKER:

16         Q.    We had to go off the record

17   there briefly due to a technical issue,

18   but we're back.

19               And we were talking about

20   Exhibit 49, the inspection of the Janssen

21   Kentucky distribution center on or about

22   January 27th and 28th, 2015.

23               When that -- after that

24   inspection was over, did DEA follow up

Highly Confidential - Subject to Further Confidentiality Review

1   with the Kentucky distribution center

2   with any comments, positive or negative,

3   about its suspicious order monitoring

4   program?

5          A.    No.

6          Q.    Were there any other

7   inspections of Janssen DCs in 2015?

8          A.    There was most likely,

9   because we had two DCs, so there probably

10  was another inspection.  I don't know of

11  the year.  But the DEA goes to both DCs

12  on a regular basis, every two to

13  three years.

14              MR. BARKER:  Let's mark as

15        Exhibit 50.

16              (Document marked for

17        identification as Exhibit

18        Janssen-Dempsey-50.)

19              MR. BARKER:  A one-page

20        document bearing Bates Number

21        JAN-MS-05433741.

22  BY MR. BARKER:

23          Q.    Ms. Dempsey, do you

24  recognize this as another e-mail report

Highly Confidential - Subject to Further Confidentiality Review

1   of an inspection at a Janssen

2   distribution center?

3           A.    It appears to me to be a

4   notes that were taken during the DEA

5   inspection.

6           Q.    And when you say there were

7   notes taken, are you talking about the

8   e-mail from Robert Helfrick?

9           A.    Yes.

10          Q.    Dated August 4th, 2015,

11  right?

12          A.    Yes.

13          Q.    And these are -- and who is

14  Robert Helfrick?

15          A.    He was the QA manager over

16  both distribution centers.

17          Q.    Okay.  And what do these

18  notes relate to?

19          A.    It is his notes that he took

20  during a DEA inspection.

21          Q.    Okay.  And where was this

22  inspection?

23          A.    Based on the fact of some of

24  the people involved and FDC.

1           So a percent of total

2    business of controlled substances being

3    shipped out of FDC.  I'm going to say it

4    was the Franklin distribution center.

5           Q.    Okay.  And you're looking at

6    this right here?

7           A.    Yes.

8           Q.    Correct?

9           A.    Yes.  And above it says too,

10   "DEA Form 222 associated with the

11   distributor registration materials

12   received in/shipped out of FDC."

13           So the scope of the

14   inspection was from January 21, 2015, to

15   August 4, 2015.

16           Q.    Okay.  And is it a standard

17   practice for a quality assurance manager

18   like Mr. Helfrick to take notes at these

19   types of inspections?

20           A.    Typically, quality leads the

21   inspection and somebody in quality

22   assurance does take notes.

23           Q.    Can you tell from this

24   report whether the suspicious order

1    monitoring SOPs were provided to the DEA

2    inspectors for this inspection?

3              MR. JANUSH:  Objection.

4              THE WITNESS:  If you look at

5         the list of requests and

6         activities, you can see what was

7         provided and what wasn't to be

8         provided, and it looks like at the

9         end, a copy of suspicious order

10        SOP.

11   BY MR. BARKER:

12        Q.    And that's right here?

13        A.    Yes.

14        Q.    All right.  And where is the

15   Franklin distribution center located?

16        A.    New Jersey.

17        Q.    New Jersey.  And so, was

18   this a different group of DEA agents who

19   were doing the inspection?

20        A.    Yes.  Our Franklin

21   distribution center falls under the

22   Newark district for DEA.

23        Q.    And are you aware of any

24   comments, positive or negative, about the

1   suspicious order monitoring SOPs that

2   were provided to the Newark office of the

3   DEA?

4        A.   No.  No comments that I

5   recall.

6           MR. BARKER:  Let's mark as

7       Exhibit 51 a two-page document

8       beginning with Bates

9       JAN-MS-05433744 going onto 3745.

10       (Document marked for

11       identification as Exhibit

12       Janssen-Dempsey-51.)

13   BY MR. BARKER:

14        Q.   Do you have Exhibit 51 in

15   front of you?

16        A.   Yes.

17        Q.   Okay.  Do you recognize it?

18        A.   Yes.

19        Q.   What is it?

20        A.   It was an e-mail I received

21   in regards to the unannounced DEA

22   inspection at the Franklin distribution

23   center.

24        Q.   And is that the same

Highly Confidential - Subject to Further Confidentiality Review

1    inspection that you were just looking at

2    in Exhibit 50?

3            A.     The dates match.

4            Q.     And what was the result of

5    that inspection by the New Jersey

6    Newark -- strike that.

7                   What was the result of the

8    inspection by the Newark, New Jersey

9    office of the DEA at the Franklin

10   distribution center?

11           A.     There were zero

12   observations.

13           Q.     Okay.  You're seeing that

14   here?

15           A.     Yes.

16           Q.     And what does zero

17   observations mean?

18           A.     They did not find any

19   noncompliance during their audit of the

20   FDC.

21           Q.     When was the next inspection

22   that occurred of a Janssen facility that

23   you're aware of?

24           A.     I am guessing two years

Highly Confidential - Subject to Further Confidentiality Review

1   after.

2        Q.    After 2015?

3        A.    Yes.

4        Q.    So 2017?

5        A.    Yes.  Especially since KDC

6   said that the -- at the last KDC, that

7   the DEA said they'd be back in two years.

8        Q.    So let's mark as Exhibit 52

9   a document beginning with JAN-MS-0412006

10  through 4009.

11            (Document marked for

12            identification as Exhibit

13            Janssen-Dempsey-52.)

14  BY MR. BARKER:

15       Q.    Do you have Exhibit 52 in

16  front of you?

17       A.    Yes, I do.

18       Q.    And for the record

19  Exhibit 52 is a two-page e-mail followed

20  by a two-page attachment, correct?

21       A.    Yes.

22       Q.    Okay.  And this e-mail is

23  again from Mr. Helfrick, correct?

24       A.    Yes.  Yep.

1     Q.    He's a manager, correct?

2     A.    Yes.

3     Q.    And his -- part of his job

4     is to prepare reports of inspections,

5     correct?

6     A.    Yes.

7     Q.    And he prepares those

8     reports at or about the time of the

9     inspection in the ordinary course of

10    business, correct?

11    A.    Yes.

12    Q.    And those reports are

13    maintained in the ordinary course of

14    business, correct?

15    A.    Yes.

16    Q.    Okay.  So what inspection

17    does this report relate to?

18    A.    It was the three-year

19    inspection on importer/exporter for

20    Kentucky distribution center.

21    Q.    Okay.  So it's the Kentucky

22    distribution center again?

23    A.    Yes.

24    Q.    And who were the inspectors

Highly Confidential - Subject to Further Confidentiality Review

1    this time?

2         A.    B. Morgan Freeman and Carl

3    O. Maskew.

4         Q.    And were they from the DEA?

5         A.    Yeah.  Louisville, Kentucky

6    DEA.

7         Q.    Was there a discussion of

8    suspicious order monitoring protocols at

9    this inspection?

10        A.    According to Rob in his

11   notes, he said there was.

12        Q.    And where do you see that?

13        A.    On the first page.

14        Q.    Okay.

15        A.    "As an FYI, there was a

16   discussion on suspicious order monitoring

17   process."

18        Q.    Okay.  And if we look at the

19   attachment -- and you see there's a --

20   the attachment is indicated here.  It's a

21   regulatory inspection, importer/exporter

22   checklist.

23        A.    Mm-hmm.

24        Q.    Right.  So we go to the

Highly Confidential - Subject to Further Confidentiality Review

1    attachment.  And that's a regulatory

2    inspection, importer/exporter checklist,

3    right?

4          A.    Mm-hmm.

5          Q.    And let's look down at

6    number 15.

7                Is it the case that what the

8    DEA inspectors who visited the Kentucky

9    distribution facility on or about

10   December 20th of 2017 wanted to see all

11   written policies or procedures pertaining

12   to controlled substances; i.e., standard

13   operating procedures, and to include due

14   diligence for new customers and new

15   patients?

16         A.    Yes.

17               MR. JANUSH:  Objection.

18   BY MR. BARKER:

19         Q.    Okay.  Were those materials

20   provided to the DEA inspectors?

21               MR. JANUSH:  Objection.

22               THE WITNESS:  I can't tell

23         from this document if it was.  But

24         it looks like it was asked for.

Highly Confidential - Subject to Further Confidentiality Review

1        Just the DEA didn't finish filling

2        it out.

3   BY MR. BARKER:

4        Q.    And you are referring to the

5   attachment here in that it doesn't say

6   anything in this box.  Is that what

7   you're saying?

8        A.    Yes, yes.

9        Q.    Okay.  All right.

10        MR. BARKER:  Let's mark as

11       the next exhibit.  Exhibit 53.

12        (Document marked for

13       identification as Exhibit

14       Janssen-Dempsey-53.)

15        MR. BARKER:  Exhibit 53 for

16       the record that begins at Bates

17       JAN-MS-05433730 and runs through

18       3740.

19   BY MR. BARKER:

20        Q.    Do you have Exhibit 53 in

21   front of you?

22        A.    Yes.

23        Q.    No, hang on.

24        MR. BARKER:  Can I have that

Highly Confidential - Subject to Further Confidentiality Review

1    back, please?

2                MS. WINCKEL:  No, that's it.

3                MR. BARKER:  That's it?

4                MS. WINCKEL:  Remember, this

5        is the new one.

6                MR. BARKER:  Oh, right.

7        Thank you.  My mistake.

8    BY MR. BARKER:

9        Q.    And Exhibit 53 is an e-mail

10   from Mr. -- from Mr. Helfrick, who we saw

11   on Exhibit 52, correct?

12       A.    Mm-hmm.

13       Q.    Who was running the meeting

14   with the DEA.  He is e-mailing to two

15   folks, Carl Maskew and Brittany Freeman,

16   both at DOJ.  And again from 52, those

17   were the investigators?

18       A.    Mm-hmm.

19       Q.    And he's e-mailing this the

20   same day as the inspection, correct?

21       A.    Yes.

22       Q.    December 20th, 2017.  And

23   his e-mail reads, "Hi, Morgan and Carl.

24   It was a pleasure to meet both of you

Highly Confidential - Subject to Further Confidentiality Review

1   today.  Attached is our local procedure

2   on suspicious and excessive order

3   monitoring.  Also I've added my contact

4   information below."

5            Do you see that?

6        A.    Yes.

7        Q.    Did I read it correctly?

8        A.    Yes.

9        Q.    Okay.  Does that refresh

10  your recollection as to whether a

11  suspicious order monitoring protocol was

12  provided to the DEA during the

13  December 20th, 2017, inspection of the

14  Kentucky distribution facility?

15           MR. JANUSH:  Objection.

16           THE WITNESS:  Yes.

17  BY MR. BARKER:

18       Q.    It does?

19       A.    Yes.

20       Q.    Okay.  And was -- was it

21  provided?

22           MR. JANUSH:  Objection.

23           THE WITNESS:  Based on the

24       attachment, it's a PDF that was

Highly Confidential - Subject to Further Confidentiality Review

1      attached to the e-mail.

2  BY MR. BARKER:

3      Q.    Right.  And so -- and you're

4  referring to the attachment right here.

5  It says suspicious and excessive order

6  procedure.PDF, right?

7      A.    Yes.

8      Q.    And then we go to it.  And

9  that's right here.  It's the work

10 instruction, correct?

11     A.    Yes.

12     Q.    After Mr. Helfrick provided

13 the DEA Investigators Freeman and Maskew

14 with a copy of the suspicious order

15 monitoring protocol, did you hear

16 anything more from DEA?

17     A.    On the SOP, no.

18     Q.    About anything?  Did you

19 hear anything more from DEA about that

20 inspection?

21     A.    If I recall, they came back

22 again to do the distributor.

23     Q.    Oh, okay.  Well, let's mark

24 another exhibit, and we'll get to that.

Highly Confidential - Subject to Further Confidentiality Review

1            But let me -- let me ask you

2    the more narrow question, which is did

3    you hear back from them about the

4    suspicious order monitoring materials

5    that you had provided to them?

6                MR. JANUSH:  Objection.

7                THE WITNESS:  No.

8                MR. JANUSH:  Are you

9        representing that this witness

10       provided?  You keep using the word

11       "you."

12               THE WITNESS:  JOM.

13               MR. BARKER:  Well, fair

14       enough, that it was provided by

15       the company.

16   BY MR. BARKER:

17           Q.    So I should say, did you

18   ever hear back from DEA regarding the

19   monitoring materials that Janssen had

20   provided to them at the inspection of the

21   Kentucky distribution facility on or

22   about December 20th, 2017?

23               MR. JANUSH:  Objection.

24               THE WITNESS:  Rob did not

Highly Confidential - Subject to Further Confidentiality Review

1          communicate that he had any

2          response from DEA.

3    BY MR. BARKER:

4          Q.    Okay.  And certainly not

5    part of his report, which we saw here in

6    Exhibit 52, correct?

7          A.    Right.

8          Q.    The result of the inspection

9    was what?

10         A.    Zero observations.

11         Q.    Zero observations.  Meaning

12   that they had no criticisms or

13   corrections for your distribution

14   facility, correct?

15         A.    Correct.

16         Q.    I'm going to mark as the

17   next exhibit a document beginning Bates

18   JAN-MS-03124010 going through 4011.

19              MR. BARKER:  We're marking

20         this as Exhibit 54.

21              (Document marked for

22         identification as Exhibit

23         Janssen-Dempsey-54.)

24   BY MR. BARKER:

1    Q.    Do you have Exhibit 54 in

2  front of you?

3    A.    Yes.

4    Q.    Do you recognize it as

5  another inspection report prepared by

6  Mr. Helfrick --

7    A.    Yes.

8    Q.    -- in the ordinary course of

9  business?

10    Okay.  And to what

11  inspection of the Kentucky distribution

12  center does this report relate?

13    A.    It covers the three-year

14  inspection on the distributor.

15    Q.    And it's the same facility,

16  right?  It's the Kentucky distribution

17  center, correct?

18    A.    Mm-hmm, yes.

19    Q.    Okay.  And it's the same two

20  agents?

21    A.    No.  No.

22    Q.    Oh, you're right?

23    A.    Same leader.

24    Q.    Same leader.  Okay.  Thank

1    you for correcting me.  Who was the lead

2    investigator?

3            A.    B. Morgan Freeman.

4            Q.    And who is the other

5    investigator this time?

6            A.    Jason Smith.

7            Q.    The same one who had been

8    there in 2013, right?

9            A.    Yes.

10           Q.    Okay.  And so this was eight

11   days after the SOP had been provided by

12   Mr. Helfrick, as we saw in Exhibit 53,

13   correct?

14           A.    Correct.

15           Q.    He provided that on the

16   20th.  And now they are back on the 28th?

17           A.    Yes.

18           Q.    Were there any issues found

19   by the DEA in its follow-up inspection on

20   December 28th of 2017 at the Kentucky

21   distribution center?

22           A.    Going to the summary, there

23   were zero observations, no issues.

24           Q.    So again, they had no

Highly Confidential - Subject to Further Confidentiality Review

1    criticisms or comments on what they had

2    been provided, correct?

3          A.     Correct.

4                 MR. BARKER:  Next document

5          that I'm going to provide you was

6          one previously marked at your

7          deposition as Exhibit 19.

8    BY MR. BARKER:

9          Q.     It begins with

10   JAN-MS-2987651, running through 7656.

11                Do you have Exhibit 19 in

12   front of you?

13         A.     Yes, I do.

14         Q.     Do you recall Mr. Janush

15   questioning you about this document?

16         A.     Yes, I do.

17         Q.     Okay.  So I want to direct

18   your attention to the second page of the

19   document.  And to the comment for DM-3.

20   Are you DM-3 for purposes of this

21   document?

22         A.     Yes.

23         Q.     How do you know that?

24         A.     It's Dempsey, Michele.  My

1    initials.

2        Q.    All right.  And you write in

3    this document -- well, let's back up

4    here.

5            What are you commenting on?

6        A.    We held a workshop in

7    December of 2017.  It was

8    cross-functional.  We had people from

9    quality and commercial, and IT, customer

10   service, plant -- we had a

11   cross-functional team.  And we were going

12   through our current process for the whole

13   program and identifying opportunities.

14   And we were discussing about the

15   algorithm and the fact that it's only run

16   once a day, and that EDIs come around the

17   clock.

18       Q.    Okay.  You are also talking

19   about the current monitoring report is

20   based on the three times the customer's

21   12-month rolling weekly average of

22   shipments, correct?

23       A.    Yes.

24       Q.    And you're talking about the

Highly Confidential - Subject to Further Confidentiality Review

1    potential enhancements that can be made

2    to that system as recommended by

3    Mr. Woodworth and DCAG, correct?

4         A.    This is when we were

5    initially discussing the opportunity.

6    This is before the report.

7         Q.    One of the workshop

8    attendees was Mr. Woodworth, correct?

9         A.    Yes.  Yes, yes.

10        Q.    Okay.  So on that topic, can

11   you read what your comment was?

12        A.    "Anytime we need to have a

13   review done each morning by personnel

14   leads to potential of error, the

15   correct" -- "the current remediation is

16   not the perfect" -- "not the preferred

17   long-term" -- "long-time solution."

18        Q.    Okay.  What is it about the

19   current process that could lead to error?

20        A.    It is manually intensive,

21   requiring a person to do activity.

22        Q.    Would it be better if you

23   could get a computer to do that activity?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Just like in 2005, you

2     upgraded to a computer system that did

3     the stuff that you were doing manually

4     before, correct?

5          A.    Correct.

6          Q.    Okay.  Does someone have to

7     manually hold back the order until the

8     suspicious order monitoring protocol is

9     executed?

10          A.    Any controlled substance

11     order that is put into SAP goes in this

12     business manager hold, and someone

13     physically have has to go into SAP and

14     release it after all the processing is

15     done.

16          Q.    So all the orders are

17     automatically held, and they have to be

18     manually released, correct?

19          A.    Yes, yes, yes.

20          Q.    Now, let's look at third

21     item on this page.  It reads, "Current BW

22     report algorithm measures orders by NDC

23     number, SKU, not drug class, total

24     fentanyl, for example, or consolidated

Highly Confidential - Subject to Further Confidentiality Review

1    customer, just ship-to address, and total

2    brand base of controlled substance to the

3    consolidated or individual registrant."

4                Okay.  Now, this is the

5    potential issue and enhancement that

6    Mr. Janush spent a lot of time talking to

7    you about in this deposition, correct?

8          A.    Yes.

9          Q.    Okay.  And previously you

10   tried to explain to him what the issue

11   was.

12               Let's look at your comment

13   over on the right-hand side.

14               MR. JANUSH:  Object to the

15         narrative.

16               MR. BARKER:  Okay.  We'll

17         strike the narrative.

18   BY MR. BARKER:

19         Q.    I want to -- on this topic,

20   I want to direct your attention to the

21   comment SB-4.  Who is making this

22   comment?

23         A.    Brian Strehlke.

24         Q.    And Brian Strehlke works

1    with you, correct?

2         A.    Yes, yes.

3         Q.    And what does Mr. Strehlke

4    say?

5         A.    "Considering drug class and

6    customer locations should go a long way

7    towards eliminating false positives in

8    the report."

9         Q.    Okay.  And what's he talking

10   about there?

11        A.    He's talking about when we

12   had -- as I explained earlier today, if a

13   customer only orders one SKU once a year,

14   when it's time for them to reorder, they

15   automatically come up as a flagged order

16   and per our process, we have to

17   investigate, document the investigation,

18   and then -- prior to releasing it.

19        Q.    And right below

20   Mr. Strehlke's comment is another comment

21   from you.  That's DM, right?

22        A.    Yes.

23        Q.    And what's your comment?

24        A.    "Agree, can't tell you how

1   many investigations are done because a

2   customer hasn't ordered a particular

3   strength in the last 12 months."

4        Q.    Okay.  And is this what you

5   were trying to explain to Mr. Janush

6   before, that the improvement of moving

7   from a SKU-based system to a brand-based

8   system would reduce the number of

9   potentially questionable orders that you

10   had to investigate?

11             MR. JANUSH:  Objection.

12             THE WITNESS:  It would

13        eliminate the false positives so

14        that the orders that we do see

15        would be the ones that are truly

16        suspicious and not based on the

17        ordering pattern of the customer.

18   BY MR. BARKER:

19        Q.    Well, you mean truly

20   potentially suspicious, correct?

21        A.    Right.

22        Q.    Because until you complete

23   your investigation, you don't know

24   whether they are suspicious?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Agreed.

2        Q.    Were any of the improvements

3   that were being discussed at this meeting

4   or in Mr. Woodworth's report from the

5   group DCAG about improving the system so

6   that you would catch orders that were

7   potentially suspicious that were possibly

8   being missed?

9        A.    No.

10        Q.    Okay.  Were there additional

11   updates to Janssen's suspicious order

12   monitoring program in 2017 and 2018?

13        A.    Well, after receiving the

14   recommendations from DCAG we did

15   implement some changes to address some of

16   the recommendations enhancing our

17   program.  So there were SOP changes, an

18   introduction of a customer form to fill

19   out when we do have questionable orders.

20        Q.    Okay.  And let's talk about

21   Mr. Woodworth, right?

22        A.    Yes.

23        Q.    Were you the one that hired

24   Mr. Woodworth and his group, the Drug and

1    Chemical Advisory Group?

2         A.    I was involved with the

3    selection of him, to bring him in, yes.

4         Q.    Was -- and if I refer to

5    that as DCAG for short, would you

6    recognize that as the Drug and Chemical

7    Advisory Group?

8         A.    Drug and Chemical

9    Advisory -- yes.

10        Q.    Were you familiar with the

11   drug and chemical advisory group?

12        A.    Yes.

13        Q.    I'm going to hand you a

14   document that we marked as Exhibit 55

15   which are the bios of the DCAG principals

16   that were pulled off of their website.

17             (Document marked for

18             identification as Exhibit

19             Janssen-Dempsey-55.)

20   BY MR. BARKER:

21        Q.    You testified before that

22   you knew about DCAG before you hired

23   them?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And how -- how do you know

2    the principals of DCAG?

3        A.    When I was working for

4    Noramco, I know that Terry Woodworth and

5    Frank Sapienza had provided guidance to

6    the Noramco company.  So that's how I

7    knew them.

8        Q.    Okay.  And their bios are

9    briefly stated on the second page of

10   Exhibit 55, correct?

11       A.    Well, Frank Sapienza starts

12   on the bottom of the first page.

13       Q.    It does.  You're absolutely

14   right, even though his picture is on the

15   next page.  It starts -- starts here.

16             And did you review their

17   qualifications before you hired them?

18       A.    For suspicious order

19   monitoring, no.

20       Q.    But did you have an

21   understanding as to whether either of

22   them had a background with the DEA

23   before --

24       A.    Yes.

1      Q.    -- you hired them?

2      A.    Yes.  I knew from my

3  experience at Noramco that they were

4  retired headquarter DEA employees with

5  experience and knowledge of the

6  regulations.

7      Q.    Okay.  And, in fact,

8  Mr. Sapienza was a former chief of the

9  drug and chemical evaluation section of

10  the DEA office of diversion control,

11  correct?

12      A.    Yes.

13      Q.    And Mr. -- Mr. Woodworth was

14  deputy director in the DEA office of

15  diversion control, correct?

16      A.    Yes.

17      Q.    You thought that these

18  gentlemen would be knowledgeable about

19  diversion issues and suspicious order

20  monitoring, correct?

21          MR. JANUSH:  Objection.

22          THE WITNESS:  Yes.

23  BY MR. BARKER:

24      Q.    Let's talk about the report

1    that was generated by the DCAG group.

2              MR. JANUSH:  Which one?

3              MR. BARKER:  That's not --

4         there were multiple -- was that an

5         objection, sir?

6              MR. JANUSH:  I'm asking

7         which one so that I know which

8         ones to pull up.

9              MR. BARKER:  You'll know

10        when I give you an exhibit number.

11             MR. JANUSH:  All right.

12   BY MR. BARKER:

13        Q.    If you pull out from your

14   stack of exhibits over there from earlier

15   today, pull out Exhibit 26.  Do you have

16   Exhibit 26 in front of you?

17        A.    I do.

18        Q.    We previously went over

19   that.  This was the initial draft of the

20   report provided by Mr. Woodworth --

21   Woodworth, excuse me, correct?

22        A.    Correct.

23        Q.    And I want you to turn to

24   Page 2, and direct your attention to the

Highly Confidential - Subject to Further Confidentiality Review

1   full paragraph at the bottom.

2           A.     Yes.

3           Q.     And what was DCAG's ultimate

4   conclusion about Janssen's suspicious

5   order monitoring system, in the initial

6   draft of its report?

7           A.     The DCAG evaluation found

8   that the suspicious orders monitoring

9   program for the JOM site in

10  Shepherdsville, Kentucky complies with

11  the DEA requirements set forth in the

12  federal regulations, Title 21 Code of

13  Federal Regulations, C.F.R. section

14  1301.74(b).

15          Q.     And those were sections of

16  the C.F.R. that Mr. Janush showed you

17  repeatedly talking about orders of

18  unusual size, unusual frequency or an

19  unusual pattern, correct?

20          A.     That is the section that

21  says you need to have a -- design and

22  operate a system to disclose orders --

23          Q.     Or to identify suspicious

24  order monitoring.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.  And to inform the

2  field office.  And then suspicious orders

3  include orders of unusual size, orders

4  deviating substantially from a normal

5  pattern, and orders of unusual frequency.

6      Q.    And where are you reading

7  that from?

8      A.    He puts it on the background

9  information.  He reads the entire

10  section, 1301.74.

11      Q.    And that's on Page 5?

12      A.    Five.

13      Q.    Right.

14      A.    Yeah, mm-hmm.

15      Q.    And that's the same Title

16  21 --

17      A.    Yes.

18      Q.    -- Code of Federal

19  Regulations, 1301.74(b)?

20      A.    Yep.

21      Q.    And, "Suspicious orders

22  include orders of unusual size, orders

23  deviating substantially from a normal

24  pattern, or orders of unusual frequency."

Highly Confidential - Subject to Further Confidentiality Review

1          And the conclusion that DCAG

2    came to in the first draft of the report

3    before it was ever circulated to you and

4    before you provided any comments on it,

5    was that the Janssen system complied with

6    those regulations?

7          MR. JANUSH:  Objection.

8    BY MR. BARKER:

9          Q.    Correct?

10         A.    Yes.

11         Q.    Now, in this draft that we

12   are looking at, we got to Page 14 of the

13   document.  And there, there was a

14   sentence that was highlighted, not by

15   Mr. Woodworth or you, but by Mr. Janush,

16   correct?

17         A.    Yes.

18         Q.    And Mr. Janush asked you

19   some questions about that sentence,

20   correct?

21         A.    Yes, he did.

22         Q.    Okay.  Let's go to the

23   e-mail exchange that relates to that

24   sentence.  If you can pull out from the

Highly Confidential - Subject to Further Confidentiality Review

1    stack that you have there Exhibit 27.

2            Do you have Exhibit 27 in

3    front of you?

4        A.    Yes.

5        Q.    Okay.  And so let's go to

6    the second page of Exhibit 27.  And we

7    want to go down to the February 5th

8    e-mail from you to Mr. Woodworth, right?

9        A.    Mm-hmm.

10        Q.    You write, "Hello, Terry.

11    During the review last week, Brian

12    pointed out one statement that I think

13    needs to be clarified.  The below

14    statement in red can be misleading.

15    Perhaps you could consider rewording?

16    Something like, 'Due to the current

17    algorithm and order investigation

18    process, there has not been any deemed

19    suspicious" -- I think you mean any

20    orders deemed suspicious -- "that would

21    require reporting."

22            MR. JANUSH:  Objection.

23    BY MR. BARKER:

24        Q.    Did I read that correctly?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     Okay.  And the sentence that

3  was highlighted is right there.  And so

4  although we don't have this document in

5  color, I'll ask you, is that the sentence

6  that was in red?

7      A.     Yes.

8      Q.     Okay.  Did you think that

9  that sentence that we've highlighted here

10  at the bottom, that appeared in the

11  original draft report was misleading?

12      A.     Yes.

13      Q.     Why?

14      A.     Because it did not

15  specifically say whether it was the

16  algorithm or our processes, like our

17  compliance program.  It just said our SOM

18  has not reported.

19      Q.     Okay.  Are you saying that

20  it was incorrectly suggesting that the

21  SOM program wasn't working?

22      A.     Right.

23      Q.     Did you understand it to be

24  Mr. Woodworth's intent to suggest that

1    the Janssen SOM program wasn't working?

2         A.    No.

3         Q.    Because he concluded that it

4    was compliant, correct?

5              MR. JANUSH:  Objection.

6              THE WITNESS:  Yes.

7    BY MR. BARKER:

8         Q.    Okay.  And then Mr. Janush

9    went over the rest of this e-mail with

10   you earlier.  I won't belabor that.

11             But Mr. Woodworth writes

12   back.  And he says, "I am happy to delete

13   this sentence altogether.  It really

14   doesn't fit with the recommendations

15   being made."

16             Correct?

17        A.    Yes.

18        Q.    Okay.  Did Mr. Woodworth

19   agree with you that it was potentially

20   misleading to phrase the sentence the way

21   that he'd originally phrased it?

22        A.    It appears that he agrees.

23             MR. JANUSH:  Objection.

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BARKER:

2         Q.    And it was Mr. Woodworth's

3    idea to remove the sentence as opposed to

4    modify it to address your concern,

5    correct?

6         A.    Yes.

7         Q.    Can you also pull out

8    Exhibit 24 from that stack that you have

9    there.  This was another e-mail that

10   Mr. Janush asked you about.  And in

11   particular, he was focusing on this

12   paragraph down at the bottom, where

13   Ms. Chikwendu had sent you a draft e-mail

14   that said, "We currently have a process

15   to flag unusual" -- I guess that should

16   be unusual orders -- "based on List 1

17   chemicals and is not up to current

18   industry practice."  Right?

19        A.    Right.

20        Q.    And it continues, and it

21   says the other things that Mr. Janush

22   went over with you.

23             Now, I recognize that you

24   already said that you disagreed with

Highly Confidential - Subject to Further Confidentiality Review

1   them.  And I also recognize that

2   Mr. Janush pointed out that you could

3   have changed them, and you didn't.

4          Why didn't you change more

5   of this if you didn't agree with it?

6       A.    Well, this summary was to

7   relay to the leaders why it was important

8   that we address the algorithm to make

9   sure that the algorithm factors in all of

10  the requirements.

11      Q.    And was the funding being

12  sought by Ms. Chikwendu for all

13  enhancements to the entire SOM program,

14  or was this just for part of it?

15      A.    This was for the IT effort.

16      Q.    The algorithm itself?

17      A.    Yes.  The IT effort for the

18  algorithm, and we were also asking for

19  funding for the downstream IT effort, for

20  the know your customer.

21      Q.    Okay.  And so although it

22  doesn't say algorithm here, that was the

23  whole point of what you were seeking

24  funding for, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And it was the algorithm

3  that wasn't up to current industry

4  practice, correct?

5    A.    Correct.

6    Q.    But the overall JOM

7  suspicious order monitoring program was,

8  correct?

9         MR. JANUSH:  Objection.

10         THE WITNESS:  Yes.

11  BY MR. BARKER:

12    Q.    Can you pull out Exhibit 37,

13  38, and 40 that you were previously asked

14  about.

15    A.    Yes.  I have to find 37.

16    Q.    37 got attached through 47-A

17  through D.  Now do you have it?

18    A.    Yes, I have it now.

19    Q.    So in Exhibit 37, as we've

20  gone over a couple of times before.  We

21  have the definition of the algorithm, the

22  operation that is being done by the

23  algorithm, I should say, of three times

24  300 percent of the calculated 12-month

1    per weekly average, correct?

2         A.    Yes.

3         Q.    But then Mr. Janush showed

4    you two other similar looking documents,

5    Exhibit 38 where there is a shorter

6    version of the definition here at

7    Paragraph 3.1.  And I'm marking it on the

8    screen.

9              And he also showed you

10   Exhibit 40, where there's a similar

11   shortened definition.

12             Okay.  So the documents with

13   the shortened definition, Exhibits 38 and

14   40, how, if at all, are they different

15   from Exhibit 37?

16        A.    38 and 40 are different

17   versions of a standard operating

18   procedure that goes over the high

19   level -- the order processing

20   investigation of suspicious and excessive

21   orders.

22             Exhibit 37 is the work

23   instruction, which is more like the

24   task-driven execution work that's done

Highly Confidential - Subject to Further Confidentiality Review

1    when an order is placed.

2         Q.    So is the work instruction

3    required to be more precise than the

4    standard operating procedures that we saw

5    in Exhibit 38 and 40?

6              MR. JANUSH:  Objection.

7              THE WITNESS:  It is more

8         detailed about the tasks that are

9         done -- performed for that

10        process.

11   BY MR. BARKER:

12        Q.    Okay.  For purposes of the

13   suspicious order monitoring process at

14   Janush, do the definitions provided in

15   the SOPs marked as Exhibit 38 and 40,

16   modify or change in any respect the

17   actual definition of the algorithm that

18   is in Exhibit 37?

19        A.    No.

20             MR. JANUSH:  Objection.

21             THE WITNESS:  No.

22   BY MR. BARKER:

23        Q.    So can you also pull out

24   Exhibit 29, which is another version of

Highly Confidential - Subject to Further Confidentiality Review

1    the DCAG report that was used by

2    Mr. Janush.

3              Okay.  And do you recognize

4    Exhibit 29 as the last version of the

5    DCAG report provided by Mr. Woodworth?

6         A.    Let me check.  Yes.

7         Q.    And in the last version that

8    he provided, it still concludes on Page

9    2, correct, that the DCAG evaluation

10   found that the suspicious order

11   monitoring program for the JOM site in

12   Shepherdsville, Kentucky complies with

13   the DEA requirements set forth in the

14   federal regulations, correct?

15        A.    Correct.

16        Q.    Did Mr. Woodworth ever

17   change that conclusion?

18        A.    No.

19        Q.    Have you or anyone on your

20   team been in contact with the DEA

21   regarding suspicious order monitoring

22   this year?  Actually, you know what,

23   that's a silly question, because I think

24   Mr. Janush actually showed you something.

Highly Confidential - Subject to Further Confidentiality Review

1           Let's mark that document.

2   Let's do it that way.

3           MS. WINCKEL:  The one that

4       we already looked at?

5           MR. BARKER:  Yes.  It would

6       be -- do we have the exhibit

7       number for that.

8           MS. WINCKEL:  Yes, 31.

9   BY MR. BARKER:

10      Q.    Can you pull out Exhibit 31

11  from your stack.

12          Okay.  So as we established

13  before, this is -- this is a RACR form,

14  correct?

15      A.    Yes.

16      Q.    And it's one of those forms

17  that's prepared in the ordinary course of

18  business?

19      A.    Yes.

20      Q.    And this relates to a

21  contact by Stephanie Dixon of -- in your

22  group?

23      A.    No, she's not in my group.

24      Q.    Oh, she's not in your group.

Highly Confidential - Subject to Further Confidentiality Review

1    Who is Stephanie Dixon?

2          A.    She reports into quality and

3    compliance at JOM.

4          Q.    Okay.  But this is the

5    report that she prepares over the

6    communication that she has with DEA,

7    correct?

8          A.    Correct.

9          Q.    And this was with Ben

10   Vinson, who was a supervisor at the

11   Louisville office of the DEA, correct?

12         A.    Correct.

13         Q.    Okay.  And Mr. Janush went

14   over one of the items that she discussed,

15   correct?

16         A.    Yes.

17         Q.    Okay.  And that was the

18   instruction that -- it says -- he -- what

19   he told her was, "Technically reporting

20   should occur when we do not deem

21   suspicious but it has been flagged and we

22   released it for the reason, except for

23   the reasons listed in the questions above

24   that do not need to be reported."

Highly Confidential - Subject to Further Confidentiality Review

1          Right?

2     A.    Yes.

3          MR. JANUSH:  Wrong -- when

4     JOM does not deem, not "we."

5          MR. BARKER:  I was just

6     reading the statement.  But you

7     can substitute the word JOM if you

8     want.

9          MR. JANUSH:  Where are you

10    reading from?

11         THE WITNESS:  From the

12    contact report.

13         MR. BARKER:  From Page 2,

14    right there on the screen.  I was

15    highlighting --

16         MR. JANUSH:  My apology.  I

17    was reading a different provision.

18         THE WITNESS:  He was reading

19    the actual e-mail sent to DEA.

20         MR. JANUSH:  Right.

21         MR. BARKER:  I was reading

22    from the RACR, which is what I

23    said I was doing.

24         MR. JANUSH:  I'm sorry.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BARKER:

2         Q.    Okay.  Right.  And the

3    notion that the -- that an office of the

4    DEA wanted to know about investigated

5    orders and not just those that were

6    deemed suspicious after investigation was

7    a new notion to you, correct?

8              MR. JANUSH:  Objection.

9              THE WITNESS:  It was a new

10        expectation.

11   BY MR. BARKER:

12        Q.    New expectation.  Okay.  Had

13   you been told something different before?

14        A.    We were not told anything

15   about our investigation process.

16        Q.    And you'd previously

17   submitted your suspicious order

18   monitoring protocols to the DEA agents

19   from the Louisville office when they came

20   for multiple inspections at the Kentucky

21   distribution center, correct?

22        A.    Correct.

23        Q.    And those were the ones who

24   knew that they had not received any

Highly Confidential - Subject to Further Confidentiality Review

1   reports of suspicious orders from Janssen

2   in all the years that they had been

3   there, correct?

4           MR. JANUSH:  Objection.

5           THE WITNESS:  Correct.

6   BY MR. BARKER:

7       Q.    And they never had any

8   observations or criticisms about that

9   practice, correct?

10      A.    Correct.

11      Q.    Was Mr. Vinson new to the

12  Louisville DEA office?

13      A.    Yes.

14      Q.    And how do you know that?

15      A.    Stephanie records it on the

16  first page.

17      Q.    Let's go there.  She reports

18  here that Mr. Vinson has over 23 years

19  with DEA starting in Sacramento, El Paso,

20  and now Louisville, correct?

21      A.    Correct.

22      Q.    So he's the new guy in town,

23  right?

24      A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And even though he

2  was changing what information wanted to

3  be provided, you still agreed to provide

4  that information, correct?

5    A.    Correct.

6    Q.    Let's talk about another

7  regulatory contact that you had in the

8  same time period.

9         MR. BARKER:  Let's mark as

10        Exhibit 56 another RACR beginning

11        with JAN-MS-03124076 and running

12        through 4079.

13        (Document marked for

14        identification as Exhibit

15        Janssen-Dempsey-56.)

16        THE WITNESS:  This wasn't

17        done by me.  Again, this was done

18        by Stephanie.

19  BY MR. BARKER:

20    Q.    I understand.

21    A.    Okay.  You had said that I

22  had.  I just wanted to clarify.  I did

23  not.

24    Q.    Okay.  I said you.  I meant

1    that in the larger sense, Janssen.

2          A.    Okay.

3          Q.    I'm happy to be corrected.

4    Janssen had another contact with the DEA

5    on this issue in 20 -- in 2019, correct?

6          A.    Correct.

7          Q.    Okay.  So this is another

8    RACR prepared in the ordinary course of

9    business at or about the time of the

10   events in question by somebody

11   responsible for preparing it, correct?

12         A.    Correct.

13         Q.    Okay.  And, again, the

14   contact is Ms. Dixon at Janssen, correct?

15         A.    Correct.

16         Q.    And this time the DEA

17   contact is somebody named Roxanna Soraya,

18   correct?

19         A.    Yes.

20         Q.    And where is she?

21         A.    She's Newark DEA.

22         Q.    She's in the Newark office,

23   New Jersey.  And tell me what -- what

24   this RACR contact is about.

1    A.    Well, during the inspection

2  of Franklin distribution center in

3  September of 2018, Stephanie and Roxanna

4  spoke about suspicious order monitoring.

5    Q.    Okay.

6    A.    And if you go to the back

7  page.  You can see the original e-mail

8  that she sent to Roxanna.  So she wanted

9  to, "Confirm our conversation during the

10  September 2018 inspection at Franklin

11  distribution center.  During the topic of

12  suspicious order monitoring, we discussed

13  that JOM is not required to report a

14  flagged order to the Newark office but is

15  to report orders once the investigation

16  had been completed and the order has been

17  identified as suspicious.  Please let me

18  know if this requirement has changed or

19  if I have stated it incorrectly.

20          "Thank you."

21    Q.    So this is an e-mail from

22  Stephanie Dixon, right?  We're going to

23  go back to the prior page.  It's from

24  Ms. Dixon to Roxanna Soraya of the Newark

1    DEA office confirming a conversation that

2    they had, right?

3          A.    Yes.

4          Q.    Okay.  And in this

5    conversation, the exact opposite advice

6    is being provided by the Newark DEA's

7    office as to what they want to see,

8    correct?

9          A.    Correct.

10         Q.    They only want to see

11   reports of orders that have been deemed

12   suspicious after an investigation and not

13   all orders that are flagged, correct?

14         A.    Correct.

15         Q.    And is that consistent with

16   the guidance that you had been provided

17   by the Kentucky DEA office up to the

18   communication with Mr. Vinson?

19              MR. JANUSH:  Objection.

20              THE WITNESS:  Up until then,

21        that was the understanding.

22   BY MR. BARKER:

23         Q.    That it had been provided to

24   Janssen, correct?

1    A.    JOM, correct.

2    Q.    Now, let's go back to

3    Exhibit 31 and the communication between

4    Ms. Dixon and Mr. Vinson at that

5    particular location.

6          Now, she doesn't argue with

7    Mr. Vinson about what he's asking her to

8    provide, correct?

9    A.    Correct.

10   Q.    She doesn't say, "But I was

11   just told by the New Jersey DEA office

12   that they only want to see orders after

13   they are deemed suspicious following an

14   investigation," correct?

15   A.    Correct.

16   Q.    Okay.  Is it the practice of

17   Janssen to provide whatever information

18   they understand DEA wants to know about

19   potentially suspicious orders?

20   A.    Yes.  No matter what

21   district, whatever the DEA at that

22   district requires, we would like to make

23   sure we're meeting their expectations in

24   providing the data.

1    Q.    Okay.  And so you followed

2    the guidance of the local DEA offices in

3    terms of what they want to see in

4    suspicious order monitoring, correct?

5    A.    Correct.

6    Q.    And in this particular case

7    that we're looking at here in Exhibit 31,

8    you provided the report of all flagged

9    orders, even though none were deemed to

10   be suspicious to DEA Agent Vinson,

11   correct?

12   A.    Correct, even though

13   technically he did not want to see the

14   orders that he answered the questions

15   above.

16   Q.    Okay.  And that was provided

17   by the e-mail we see here on January 21st

18   of 2019, correct?

19   A.    Mm-hmm, correct.

20   Q.    Have you heard anything from

21   Agent Vinson with him having an issue

22   with any of the orders that were cleared

23   after being flagged as listed on that

24   report?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. JANUSH:  Objection.

2          THE WITNESS:  Stephanie has

3     not told me if he has replied with

4     any feedback.

5  BY MR. BARKER:

6          Q.   If he had replied with

7  negative feedback, criticizing an order,

8  would Ms. Dixon have told you that?

9          A.   Yes, she would.

10         Q.   And you would expect that as

11 part of her job, she would have written

12 you a memo or a report that he had

13 contacted her to say that he had an issue

14 with one of the orders that had been

15 released, correct?

16         A.   Correct.

17         MR. BARKER:  No further

18     questions.

19         MR. JANUSH:  Off the record.

20         THE VIDEOGRAPHER:  Stand by,

21     please.  The time is 5:19 p.m.

22     Off the record.

23          (Short break.)

24         THE VIDEOGRAPHER:  We are

Highly Confidential - Subject to Further Confidentiality Review

1    back on the record.  The time is

2    5:49 p.m.

3                    -   -   -

4                 EXAMINATION

5                    -   -   -

6    BY MR. JANUSH:

7        Q.    Hi, Ms. Dempsey.  I'm going

8    to put before you Exhibit 43.  It's the

9    Appendix E-3 that your counsel,

10   Mr. Barker, had represented came from a

11   capture from the internet between

12   April 17, '01, and October 18, 2003.  And

13   it concerned suspicious order reporting

14   system for use in automated tracking

15   systems.

16          Do you want to pull it up

17   before you, or are you just going to rely

18   on what I have on the screen?  Which you

19   can do.  I want you to be comfortable.

20       A.    It's exhibit number --

21       Q.    It's Exhibit 43.

22       A.    Okay.  Got it.

23       Q.    Okay.  And with respect to

24   Exhibit 43, Mr. Barker had asked you some

1    questions as to where your three times

2    the order -- average order requirement

3    comes from.  And I'm paraphrasing.  But

4    is it your testimony today that the

5    genesis of Janssen's or JOM's algorithm

6    to spot suspicious orders comes from this

7    Appendix E-3?

8              MR. BARKER:  Object to form.

9              THE WITNESS:  The

10        calculation that is used is based

11        on this, yes.  It was based on

12        this -- this guidance that was

13        provided.

14    BY MR. JANUSH:

15        Q.    Do you know what this

16    actually is?

17        A.    Yes.

18        Q.    What is it?

19        A.    It was the guidance that

20    they provided for suspicious order

21    monitoring for pseudoephedrine and

22    ephedrine products.

23        Q.    That's right.  It was the

24    guidance that was provided for -- well,

Highly Confidential - Subject to Further Confidentiality Review

1   let me ask a different question.

2           Do you know how this

3   guidance was to be used in calculating a

4   suspicious order for a List 1 chemical?

5           MR. BARKER:  Object to form.

6           THE WITNESS:  It is my

7       understanding that List 1 -- the

8       companies that distribute and

9       handle the pseudoephedrine and

10      ephedrine products needed to have

11      a suspicious order monitoring

12      program.  And this was guidance

13      provided to them on how to set up

14      thresholds for the customers.

15  BY MR. JANUSH:

16      Q.    Okay.  You know that this

17  isn't a realtime suspicious order

18  monitoring threshold, right?

19      A.    This was guidance that we

20  used as -- this was what was out there

21  from DEA to -- that registrants had

22  available, and they interpreted it, and

23  we used it in our program.

24          MR. JANUSH:  Move to strike.

Highly Confidential - Subject to Further Confidentiality Review

1    Nonresponsive.

2    BY MR. JANUSH:

3         Q.   You know this wasn't a

4    realtime suspicious order monitoring

5    threshold; isn't that true?

6              MR. BARKER:  Object to form.

7              THE WITNESS:  What do you

8         mean by realtime suspicious order

9         monitoring threshold?

10   BY MR. JANUSH:

11        Q.   You were --

12        A.   This --

13        Q.   I'll answer.  I'll answer.

14        A.   This -- we --

15        Q.   You were required by the

16   Code of Federal Regulations to create a

17   suspicious order monitoring program and

18   to not release an order that may be

19   deemed suspicious, correct?

20             MR. BARKER:  Object to form.

21             THE WITNESS:  The regulation

22        say that you need to have a system

23        that monitors orders.

24   BY MR. JANUSH:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And not to release an order

2  that might be suspicious, correct?

3              MR. BARKER:  Object to form.

4              THE WITNESS:  It says that

5         any orders that are deemed

6         suspicious are not to be released.

7  BY MR. JANUSH:

8    Q.    Right.  So let's go to what

9  this actually is.

10             Let's read it together.

11             "This formula" -- "This

12  voluntary formula is for use by

13  distributors to wholesale and retail

14  levels.  The formula calculates the

15  quantity which, if exceeded in one month,

16  constitutes an order which may be

17  considered excessive or suspicious and

18  therefore require reporting to DEA."

19             Let me stop there.

20             Do you understand the

21  concept that this is a appendix that

22  causes the wholesaler or distributor to

23  look back at all orders from the prior

24  month?

Highly Confidential - Subject to Further Confidentiality Review

1              MR. BARKER:  Object to form.

2    BY MR. JANUSH:

3         Q.    Do you understand that?

4              MR. BARKER:  Object to form.

5              THE WITNESS:  I understand

6         what it reads right here.

7    BY MR. JANUSH:

8         Q.    Do you understand what I

9    just asked?

10        A.    Yes.

11        Q.    Okay.  And go to the first

12   paragraph.  "Add purchased quantities for

13   the last 12 months for same customers

14   within same distribution center and

15   customer type (hospital, pharmacy, or

16   other) for any List 1 chemical containing

17   items stocked by the distribution

18   center."

19              And it goes on to say, in

20   Paragraph 2, "Add customer months for

21   every record used in above total.  Months

22   within the last 12 that customer

23   purchases of the item were not zero."

24              And in 3, "Divide total

1    quantity purchases by the total customer

2    months."

3              And in 4, "Then multiply by

4    the factor below to give the maximum

5    amount that the customer can order per

6    month before showing up on the suspicious

7    order report."

8              Do you see that?

9         A.    Yes.

10        Q.    This is woefully different

11   than a suspicious order monitoring system

12   for a Schedule II product, correct?

13              MR. BARKER:  Object to form.

14              THE WITNESS:  This is

15         guidance that was out there as an

16         example of thresholds to set up

17         for, and it even says they are

18         controlled substances containing

19         this one.

20              MR. JANUSH:  Move to strike

21         as nonresponsive.

22   BY MR. JANUSH:

23        Q.    What I read is woefully

24   different than a suspicious order

1    monitoring system for a Schedule II

2    product; isn't that right?

3              MR. BARKER:  Object to form.

4              THE WITNESS:  No, because

5         the C.F.R. doesn't specify what

6         your order monitoring system is

7         supposed to have.  It says you

8         just have to have a system.

9    BY MR. JANUSH:

10        Q.    That's right.  But the

11   system has to operate in real time, not a

12   month later, right?

13        A.    We took the calculation and

14   we are doing realtime orders being placed

15   based on weekly average for a 12-month

16   period.

17        Q.    But this entire Appendix E-3

18   concerns looking back a month later at

19   the month's prior orders.

20              MR. BARKER:  Object to form.

21              THE WITNESS:  But we are

22        using this for our factor that we

23        are -- when we're monitoring the

24        historical value.  We were looking

1      for guidance on what we should be

2      using, and this is the only thing

3      that was available in 2005 or

4      2006, and that told us that we

5      should use a factor three when we

6      are evaluating historical selling

7      patterns for the past 12 months.

8   BY MR. JANUSH:

9      Q.    But you made it seem like

10  the DEA told you that this is what you

11  should be using.

12     A.    I said this was guidance out

13  there that, as we were developing a

14  program, was available for us to see what

15  DEA may be expecting others to do.

16     Q.    DEA never told you, use

17  Appendix E-3 to set your thresholds for

18  your realtime system, did they?

19     A.    No.  But they never said

20  what we were doing wrong to start with.

21     Q.    Okay.  Let me ask you a

22  different question.  Beyond letting the

23  DEA know that you monitored orders for

24  three times the average weekly order

1    based on the rolling 12-month -- past

2    12-month period, did you ever write to

3    the DEA and advise them, "We don't follow

4    the regulation and track orders of

5    atypical size or orders of -- or address

6    frequency in our algorithm"?

7                    MR. BARKER:  Object to form.

8                    THE WITNESS:  There was

9           nothing there that says the

10          algorithm had to take care of

11          those three factors.  We had an

12          algorithm that looked at the

13          quantity.  It also did give,

14          inadvertently, frequency and

15          pattern, because if a customer

16          didn't order that SKU in

17          12 months, we got a flag.

18                 And our overall program took

19          in effect the pattern and the

20          frequency.  And we reviewed it

21          with them --

22    BY MR. JANUSH:

23          Q.    You keep --

24          A.    -- numerous times.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You keep going back to that

2  situation where a customer doesn't order

3  a product in 12 months.  But there is a

4  converse situation that I showed you

5  today using Cardinal as an example --

6  hold on -- where a customer orders a

7  significant amount of product and breaks

8  it up every three and four and five days.

9         MS. BOODY:  Object to form.

10  BY MR. JANUSH:

11    Q.    Do you appreciate that?

12         MR. BARKER:  Object to form.

13         THE WITNESS:  Well, that

14      data you provided doesn't -- I

15      cannot tell you that was a

16      significant quantity because 600

17      bottles in their main hub --

18  BY MR. JANUSH:

19    Q.    600 cases.

20    A.    600 cases that goes to their

21  main hub that gets distributed across the

22  country, and you saw there's 250

23  locations in one area of Florida.  So

24  600 cases?

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    But it wasn't just

2    600 cases, was it?  It was 600, followed

3    by another 400 or followed by another

4    500.  It was -- it was hundreds upon

5    hundreds within days apart.

6                    MR. BARKER:  Object to form.

7                    MS. BOODY:  Object to form.

8                    THE WITNESS:  But we are

9               looking at, on a quarterly basis,

10              the total amount of material

11              they're receiving versus our other

12              J&J products.  And it didn't flag

13              that they were saying a

14              significant quantity.

15                   As a matter of fact, in that

16              one or two-year period, the trends

17              were going down in that one area

18              in Florida of our Schedule IIs,

19              which was Duragesic and Nucynta.

20   BY MR. JANUSH:

21          Q.    But opioid products aren't

22   like your other J&J products, are they?

23                   MR. BARKER:  Object to form.

24                   MS. BOODY:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. JANUSH:

2         Q.    Opioid products aren't --

3    we're not talking about a standard

4    prescription that's a non-opioid drug,

5    are we?

6              MR. BARKER:  Object to form.

7              THE WITNESS:  Can you repeat

8         what you're trying to say?

9         Because we are monitoring

10        Duragesic, and we are also

11        monitoring Concerta, which isn't

12        an opiate.  We're also monitoring

13        the Nucynta.  And I'm trying to

14        understand what you're saying,

15        because the suspicious order

16        monitoring program is a system.

17        It's not just an algorithm.

18             So whether the algorithm is

19        flagging all three or your overall

20        program is encompassing all

21        three --

22   BY MR. JANUSH:

23        Q.    But you don't get to the

24   overall program unless the algorithm

1   flags the order to begin with.  I'm

2   talking about in real time, as you

3   testified earlier today with me, you

4   don't get to a suspicious order review

5   unless the algorithm flags a particular

6   order initially?

7       A.    For the particular order,

8   but we do look at the entire order

9   shipped to that customer.

10      Q.    But you do that as like a

11  monthly meeting, right?

12      A.    But it's still looking at

13  what where we've distributed to the

14  customer --

15      Q.    But it's too --

16      A.    -- on a whole.

17      Q.    When you've done the monthly

18  meeting, you've already shipped the

19  product, right?

20      A.    Yes, but if there was an

21  order that was not typical, there had

22  been an investigation.

23      Q.    But again, not typical is

24  viewed against -- not typical is viewed

1    against your initial algorithm, is what

2    flags what's not typical, right?

3              MR. BARKER:  Object to form.

4    BY MR. JANUSH:

5         Q.    Day one, realtime, shipping

6    an order, it's your algorithm that flags

7    the order, right?

8              MR. BARKER:  Object to form.

9              THE WITNESS:  Not

10        necessarily, because if we know

11        that there's a change downstream,

12        the customer has gotten a new

13        contract, we know in advance that

14        there's going to be an uptick in

15        demand.  And before the order is

16        placed -- for example, when we

17        reviewed with Kentucky DEA,

18        because of the opioid tax, we were

19        asked to ship directly to New

20        York.

21             So we knew that we had no

22        history going to New York.  So no,

23        the order system did not flag,

24        because we knew in advance that we

Highly Confidential - Subject to Further Confidentiality Review

1        were shipping to New York State

2        with no history.  And we had to do

3        an investigation to figure out how

4        much typically goes to New York

5        prior to the order.

6            So you are just focused on

7        the algorithm.  But I'm saying our

8        overall suspicious order

9        monitoring program, there's other

10       components to it.

11    BY MR. JANUSH:

12       Q.    Those other components,

13    though, don't typically come into play in

14    the regular course of business when you

15    have rolling customers who are known to

16    you.  We're not talking about the rare

17    issue of the opioid tax, and having a

18    base level of knowledge of zero, and

19    having to investigate on the front end.

20    With a customer that is known to you and

21    has been purchasing from you, your

22    algorithm is the trigger to start an

23    investigation, true or false?

24            MR. BARKER:  Object to form.

1    THE WITNESS:  For our
2    established products, we place the
3    order.  We know when the customer
4    orders because they -- the big
5    three have their days when they
6    place the orders.  We know what
7    they historically order.  And if
8    there is an increase, the
9    algorithm does tell us if there is
10    an atypical ordering pattern.
11   BY MR. JANUSH:
12    Q.    My question was, with a
13   customer that is known to you and has
14   been purchasing from you, your algorithm
15   is the trigger to start an investigation,
16   true or false?
17    MR. BARKER:  Object to form.
18    THE WITNESS:  And I'm saying
19    in the typical business, yes, an
20    order goes through the algorithm,
21    and it's reviewed.  And if it
22    comes up as flagged, we
23    investigate.  But there are orders
24    that we know in advance that are

Highly Confidential - Subject to Further Confidentiality Review

1          not -- that there's going to be a
2          change, that we know in advance
3          and we do the analysis ahead of
4          time.
5    BY MR. JANUSH:
6          Q.    Right.
7          A.    So it's not just the
8    algorithm.
9          Q.    But in the scheme of your
10   orders, that's a relatively small
11   component, isn't it?
12         A.    For the products that we
13   have remaining --
14         Q.    I'm not talking about
15   remaining.  I'm not talking about present
16   day.  I'm going back over a history.
17   This case is about many more years than
18   2019.
19              Do you understand that as a
20   concept?
21         A.    Yes.
22         Q.    Okay.  So can you answer my
23   question?
24         A.    Can you repeat the question?

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    First I said, in the scheme

2    of your orders, that's a relatively small

3    component, isn't it?

4          A.    Today it is.

5          Q.    I'm not talking about C-II

6    orders.  I'm talking about the -- looking

7    at the rare purchaser who might not have

8    a history with you.  That is a rare

9    issue.  I mean, I showed you a

10   spreadsheet.  I could pull it up from

11   2013 and go through every order of every

12   big three purchase that was in date order

13   with you.  There are literally hundreds

14   and hundreds of lines.  Those purchases

15   from your big three, which make up over

16   70-something percent of your total order

17   history, those are your regular daily

18   routine orders, true or false?

19         MR. BARKER:  Object to form.

20         THE WITNESS:  In 2013, yes.

21   BY MR. JANUSH:

22         Q.    Okay.  How about in 2010?

23         A.    2010, I don't recall the

24   volume would have been that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'll pull up at a break some

2    of those sales Excel files as well.

3              I'm going to move to

4    Exhibit 44, this big stack of documents.

5    So this was -- this Exhibit 44 was

6    represented to be the validation

7    documentation for the algorithm, wasn't

8    it?

9    A.    It is the validation

10   documentation for Change Request 10029

11   which included the algorithm and all of

12   the components that were needed to make

13   the report run.

14   Q.    Yes.  This is much, much,

15   much, much, much more comprehensive than

16   just addressing the mathematical

17   algorithm, isn't it?

18   A.    It is all of the elements

19   that are needed to make the report run.

20   Q.    Yes.  It's -- this is

21   literally the documentation to create the

22   SAP report system for your ordering

23   system -- for your entire order

24   monitoring system, isn't it?

Highly Confidential - Subject to Further Confidentiality Review

1           A.     This is all of the technical

2     design documents, the test scripts that

3     were done in 2006 to deliver the

4     DEA-related suspicious order reports that

5     are used in these SOPs.

6           Q.     Right.  It's even more than

7     that though, isn't it?  It contains --

8     well, let me ask you something.

9                  Do you have personal

10    knowledge of these documents to have

11    answered Mr. Barker's question as to

12    whether this -- this document, as a

13    single document represented the

14    validation documentation for the

15    algorithm?

16                 MR. BARKER:  Object to form.

17                 THE WITNESS:  I have had

18          experience with SAP projects in

19          the past.  As a matter of fact I

20          was in IT at the time, 2006.  So I

21          knew this project was underway

22          because it was happening when my

23          project was going.

24                 So I asked IT to please

Highly Confidential - Subject to Further Confidentiality Review

1          provide all of the validation

2          documentation that was required to

3          test the configuration for this

4          DEA project that JOM has

5          requested.

6     BY MR. JANUSH:

7          Q.    Okay.  When you say I was in

8     IT at the time, what does that mean?

9          A.    Well, in -- from 2006, in

10    March of 2006 I was the SAP COE IT person

11    for Noramco.  And we had just --

12         Q.    What does that mean?

13         A.    SAP is the IT system.  And I

14    was responsible for the project that put

15    Noramco on the same SAP.  So as -- in my

16    role I was familiar with the validation

17    practices and processes that were

18    required to make changes in SAP.

19         Q.    Okay.  So are you familiar

20    enough, then, to have thumbed through

21    this document and realized this is far

22    beyond just the algorithm validation?

23         A.    This contains all of the

24    test script documentation to test the

Highly Confidential - Subject to Further Confidentiality Review

1    front-end queries for the DEA -- this is

2    everything that was required for the DEA

3    project, which was all of -- the BW

4    report as well as --

5         Q.    And what is a BW report?

6         A.    Business warehouse.

7         Q.    Talk about that.  What's

8    that?

9         A.    It is a module in SAP where

10   it's separate from the active production

11   for SAP.

12              SAP has a transactional

13   module where the actual movements, the

14   goods issues, the receipts are happening.

15   And then you have this business warehouse

16   where data from the transaction all gets

17   move over, and they use this business

18   warehouse to develop reports so that you

19   can analyze what actually happened on the

20   transactional level.

21         Q.    That's totally a different

22   IT concept than the mathematical

23   algorithm to spot a suspicious order,

24   isn't it?

1    A.    No, because the

2  transactional data, the actual orders

3  that go into SAP, that's in the

4  production environment.  So that's

5  customer service going in, entering in,

6  getting the 222, entering it in.  And

7  then the information of everything that

8  was entered every day goes into this

9  business warehouse.  And that's where

10  they collect it and they do your

11  algorithm onto the order.

12    Q.    Right.  But the -- this

13  documentation that is here far exceeds --

14  this is -- how many pages is this?  It

15  starts at --

16    A.    The thing is you have to do

17  the functional requirements.  Then you

18  have to develop specifications.  And then

19  every specification requires a test

20  script.  And it has to be tested, and the

21  actual results.

22    So, you know, here you go.

23  This is just one way of testing the

24  monthly order quantity average, to make

Highly Confidential - Subject to Further Confidentiality Review

1  sure it's calculating the average right.

2         I mean, and then this is

3  developing what it looks like, the

4  report, if you ever saw the BW report

5  that flags an order.  So what's the

6  screen look like.  That's the test.

7         Q.    What's a BEX monthly DEA

8  double exception report?

9         A.    That was one of the reports

10  referenced in the SOPs, that's run --

11  that they can check to see what's been

12  shipped to the customer over a certain

13  amount of time.

14         Q.    And what is the master data

15  list?

16         A.    As I mentioned before, it's

17  setting up all of the -- all the

18  customers, what products they're allowed

19  to receive and, you know, the information

20  about the customers, so that this report

21  runs on the right customer order.

22         Q.    And let's see.  I want to

23  try to get to something different here.

24  I'm trying to skip forward a number of

1   hundreds of pages to...

2           So to be clear, this isn't

3   the issue of what I called fourth grade

4   math in terms of checking an order

5   against all prior orders over the same

6   12 months SKU to SKU.

7           This is the setup of the

8   computer program programming in every

9   order, making sure every order is able to

10  be tracked, isn't it?

11          A.   This is for every order, and

12  recognize that -- I don't want to make it

13  more complicated.  There are several

14  different types of orders that can be

15  received by a customer.  You know, and so

16  SAP had to check.  It's not just a

17  simple -- every order has a code number.

18  And so we had to make sure that SAP

19  looked at every single potential code,

20  because some of these wholesalers might

21  want it shipped somewhere else, or it may

22  be going to -- we have different codes

23  for the various shipping logic.  So we

24  had to make sure that every potential

Highly Confidential - Subject to Further Confidentiality Review

1    scenario was identified so we're not just

2    looking at one order type.

3                You know, I know I'm making

4    this really complicated.  But there are

5    so many different, like, customer return

6    is an order type.  So we wanted to

7    factor -- they just -- different

8    movements out of SAP is an order type.

9    But it's considered a shipment.  So we

10   had to make sure that the BW report was

11   looking at that for every customer, every

12   SKU, every type of movement.

13               And that's why there's a lot

14   here.  If it was a simple -- I just went

15   in, said so much for this customer, it

16   would have been easier.  But there's --

17   it's complex.

18          Q.    But I could take your Excel

19   file -- I could take that Excel file that

20   I pulled up earlier today, that came from

21   your company, and I can filter that Excel

22   file for the last 12 months.  I can

23   look -- filter it for just the drug type,

24   just the SKU, just the exact milligrams

1    that have been shipped.  And I can figure

2    out, divided by 52 weeks, what the

3    average weekly order is, and from that I

4    can compare it to a current order that's

5    placed tomorrow?

6           A.    But then you have a data

7    integrity issue and FDA would not be

8    happy.

9           Q.    What do you mean I have a

10   data integrity issue?

11          A.    Because you can manipulate

12   that Excel sheet to say whatever you'd

13   like it to say and say it was always

14   under the threshold.

15          Q.    And how is that, that I

16   would manipulate an Excel spreadsheet by

17   just doing simple math?

18          A.    I'm just saying that, you

19   know, if -- using Excel, you're relying

20   on a manual person, a human person to do

21   all these calculations, and they can be

22   prone to make mistakes, which is why we

23   moved to this system, where all the

24   actual shipments are maintained and the

1    history is in here, and it can do the

2    math for you.

3            Q.    Got it.  So -- so this is --

4    this system, this documentation, is far

5    more than validating just the math, isn't

6    it?

7            A.    It's validating all the data

8    that goes into the equation as well as

9    the math.

10           Q.    Got it.  Got it.  It seemed

11   like Mr. Barker and you were representing

12   that this by itself, this whole stack of

13   documents, was just the algorithm

14   validation.  And I was seeking to

15   disagree with that.  And I think that

16   you've come around to me.

17           A.    No, I haven't --

18                 MR. BARKER:  Object to form.

19                 THE WITNESS:  -- because

20           this is everything that was needed

21           to make sure that the calculation

22           worked as it was intended and gave

23           us accurate information.

24

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. JANUSH:

2        Q.    That's a different issue

3   than whether the math ultimately is

4   fourth grade math?

5             MR. BARKER:  Object to form.

6             THE WITNESS:  If the math

7        equation is not using the right

8        data, it doesn't work, and if it's

9        not validated and working as it's

10       intended.

11  BY MR. JANUSH:

12       Q.    Okay.  Earlier do you recall

13  that you were shown Exhibit 10 that I

14  marked at Day 1 of your deposition.

15       A.    Yes.

16       Q.    And you were asked why you

17  continued to ship to Walgreens

18  Perrysburg, Ohio, that was facing an

19  imminent suspicious.  And the answer was

20  what?

21       A.    They still had an active

22  license.

23       Q.    But you knew as compared

24  with the Cardinal situation that your

Highly Confidential - Subject to Further Confidentiality Review

1    counsel, Mr. Barker, showed you to

2    justify continued shipments to Walgreens'

3    Perrysburg, Ohio distribution center, you

4    knew that this distribution center, the

5    Walgreens center, was about to have their

6    registration pulled, didn't you?

7         A.    Right.  But we don't ship to

8    Walgreens.  We ship to Cardinal that

9    ships to this location.  We were

10   monitoring it, so should they lose their

11   license, we would have followed up with

12   the wholesaler.

13        Q.    And you answered your

14   counsel by saying something to the effect

15   of the license wasn't pulled, it was

16   still active.  It was like the guidance

17   we got from the DEA in the Cardinal

18   situation.

19             Do you remember that?

20        A.    Yes.

21        Q.    Okay.  But the Cardinal

22   situation was different, wasn't it?

23             MR. BARKER:  Object to form.

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. JANUSH:

2          Q.    I'm going to pull up

3    Exhibit 45.

4                The Cardinal situation was a

5    specific and narrow inquiry by Brian

6    Strehlke addressing the fact that Janssen

7    was seeing upticks in demands from other

8    Cardinal distribution centers as their

9    system attempts to accommodate customers

10   who cannot presently be supplied by the

11   distribution centers, which have been

12   placed on hold.

13               Do you see that language in

14   the middle of the page of the -- Page 1

15   of the e-mail?  It's actually the second

16   page.

17         A.    Yes.

18         Q.    Do you see that?

19         A.    Yeah.

20         Q.    Yeah.  And so the question

21   was, "Does DEA have any objection to our

22   filling the increased orders to Cardinal

23   distribution centers which have

24   registrations which are still in good

Highly Confidential - Subject to Further Confidentiality Review

1    standing?"

2              Do you see that?

3        A.    Yes.

4        Q.    Those were Cardinal

5    distribution centers that were then not

6    currently under investigation.

7              Do you understand that?

8              MR. BARKER:  Object to form.

9              THE WITNESS:  They had their

10        licenses.

11   BY MR. JANUSH:

12        Q.    They were not under

13   investigation.

14             Do you understand that?

15        A.    But Cardinal as a whole.

16        Q.    No, Cardinal as a whole was

17   not under investigation.  Cardinal had

18   specific distribution centers that were

19   placed on hold.

20             Do you understand that

21   distinction?

22             MR. BARKER:  Object to form.

23             THE WITNESS:  I understand

24        what you're saying.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. JANUSH:

2         Q.    And Janssen, Brian Strehlke

3    was asking, does the DEA have an

4    objection to us, Janssen, filling orders

5    to Cardinal distribution centers that

6    aren't on hold?

7              Do you get that?

8         A.    Yep.

9         Q.    Okay.  That's different than

10   the inquiry of whether shipments should

11   be going to a distribution center for

12   Walgreens that's being hotly investigated

13   and about to be shut down by the DEA,

14   isn't it?

15             MR. BARKER:  Object to form.

16   BY MR. JANUSH:

17        Q.    They're not analogous

18   situations, are they?

19        A.    Well, Walgreens, of course,

20   is not our customer.  But we were

21   monitoring it.

22        Q.    They are not analogous

23   situations, are they?

24             MR. BARKER:  Object to form.

1               THE WITNESS:  In this case,

2          they are in a similar way that

3          they still had their license.

4     BY MR. JANUSH:

5          Q.    Okay.  So because -- so you

6     compared --

7          A.    And I --

8          Q.    -- Cardinal distribution --

9     you know, at this deposition, just

10    moments ago, you compared Cardinal

11    distribution centers that were not under

12    investigation to a Walgreens distribution

13    center that was under a heated DEA

14    investigation that you knew was about to

15    have their license pulled.  You equated

16    that, didn't you?

17              MR. BARKER:  Object to form.

18              THE WITNESS:  We don't

19         know --

20              MR. BARKER:  Are you

21         representing that license got

22         pulled, Counsel?

23              MR. JANUSH:  I'm

24         representing what I'm

1          representing.  I'm asking my

2          question.

3                     THE WITNESS:  We were

4          watching it, but they had not had

5          their license pulled.

6    BY MR. JANUSH:

7          Q.    So you're not willing to

8    address whether the situations were the

9    same or different, are you?

10                    MR. BARKER:  Object to form.

11                    THE WITNESS:  It's in

12         regards to being -- having a DEA

13         license --

14   BY MR. JANUSH:

15         Q.    I'm not asking whether the

16   DEA license existed.  Can you appreciate

17   the situations were different?

18                    MR. BARKER:  Object to form.

19                    THE WITNESS:  I can see

20         where you would think that they

21         would be different.  But we were

22         still supplying the wholesaler,

23         who was supplying that.  And they

24         had not lost their license.

1    BY MR. JANUSH:

2         Q.    Moving on to Exhibit 46.

3    Counsel asked you about this DEA site

4    inspection of October 22nd, 2008, of your

5    Franklin distribution center in New

6    Jersey.

7              Do you remember that?

8         A.    Yes, I do.

9         Q.    Okay.  And let's go over

10   summary of Day 1 of the inspection.

11   "Numerous documents were requested and

12   reviewed by the investigators including:

13   JOM Inc., articles of incorporation, list

14   of corporate officers, power of attorney

15   documentation, list of authorized vault

16   personnel -- cage and vault personnel,

17   list of domestic customers, third quarter

18   2008 ARCOS report, returned goods log,

19   DEA 222 forms for receipts and shipments

20   for March 2008."

21             Do you see that?

22        A.    Yes, I do.

23        Q.    Okay.  And then it says,

24   "Investigators also requested a list of

Highly Confidential - Subject to Further Confidentiality Review

1    all products on hand, current inventory

2    under our distributor registration.  They

3    selected four SKUs to audit, along with

4    an audit time frame of close of business

5    12/31/07 through today, 10/22/08."

6              Do you see that?

7         A.    Yes.

8         Q.    And then it goes on to say,

9    "The investigators" -- on the second

10   page -- "then proceeded to conduct an

11   inventory reconciliation."

12             Nothing about Day 1

13   concerned suspicious order monitoring; is

14   that right?

15        A.    No.  It reviewed our orders,

16   what was shipped out of the DC.

17        Q.    Nothing reviewed suspicious

18   order monitoring; is that right?

19        A.    At that time, no.

20        Q.    At that time, no, that is

21   not right?  Or at that time, you are

22   right?

23        A.    At this time you are right,

24   they did not discuss specific on

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order monitoring.

2         Q.    Okay.  And, "Preparation for

3    Day 2.  Investigators are expected to

4    complete the inventory reconciliation,

5    review handling of suspicious orders, and

6    conduct a security review," right?

7         A.    Yes.

8         Q.    But you have no firsthand

9    personal knowledge as you sit here today

10   that that Day 2 happened, do you?

11        A.    I was not involved in this

12   inspection, but I know individuals that

13   were that said it did happen.  So...

14        Q.    You have no personal

15   firsthand knowledge that a Day 2

16   inspection occurred, and you have no

17   record of it at this deposition; is that

18   right?

19        A.    I don't have a record of it.

20        Q.    Okay.  And you're the head

21   of compliance today, not in 2008.  I

22   appreciate that.

23             But, I assume you searched

24   for this record of Day 2, right?

1          A.      I did make the request, did

2     anybody have it.

3          Q.      And nobody could locate it?

4          A.      No.  It's beyond the seven

5     years records retention.

6          Q.      So is the 2008 e-mail that

7     I'm looking at right now, but you found

8     that, right?

9          A.      Yep.  But somebody kept

10    this.  Somebody kept this.

11         Q.      Okay.  Mr. Barker introduced

12    Exhibit 48 as well.  I'll have you pull

13    that up.

14              Exhibit 48 was a notice

15    of -- was titled in the subject of the

16    e-mail.  It's dated 7/30/2013.  The

17    subject is "Notice of inspection at KDC,

18    29 July, 2013."

19              And in paren, it says "30

20    July 2013 update."

21              Do you see that?

22         A.      Yes.

23         Q.      It addresses, "Here's the

24    final inspection summary," at the outset.

Highly Confidential - Subject to Further Confidentiality Review

1          And if you go down a few

2   bullets, it says, "Reason for inspection

3   type:  Routine regulatory inspection.

4          "Observations:  None.

5          "Primary areas reviewed

6   today."

7          "Security" is the first

8   bullet.  "Alarm testing, review of select

9   222 forms, receiving and shipping

10  documents for audit period, 31 of

11  December 2011 to 29 July 2013."

12          In parentheses it says,

13  "January 2012, June 2012, and

14  January 2013."

15          Do you see that?

16      A.    Yes, I do.

17      Q.    And the second bullet says,

18  "Closing comments indicated primary focus

19  was security and records review.

20          "Primary focus was security

21  and records review.  No issues noted

22  during records audit review.  Alarm

23  testing results were good.  No C.F.R.

24  violations were identified.  No report

Highly Confidential - Subject to Further Confidentiality Review

1    will be issued.  The DEA inspection is

2    closed."

3              Do you see that?

4         A.    Yes, I do.

5         Q.    Suspicious order monitoring

6    was not a primary subject of this

7    inspection, was it?

8              MR. BARKER:  Object to form.

9              THE WITNESS:  It was part of

10         the inspection, and that closing

11         summary, that's the closing

12         comments that Billy Lane presented

13         in the document attached, exactly

14         what he said, Billy Lane.

15         "Primary focus was security and

16         records review.  Audit came out

17         fine for the time frame," that we

18         just -- so she wrote exactly what

19         Billy Lane spoke to.

20    BY MR. JANUSH:

21         Q.    What I'm addressing is that

22    the primary areas reviewed were security,

23    alarm testing, and not suspicious order

24    monitoring; isn't that right?

Highly Confidential - Subject to Further Confidentiality Review

1            MR. BARKER:  Object to form.

2            THE WITNESS:  She gave a

3       high level summary, and then she

4       sent the attached notes.

5  BY MR. JANUSH:

6       Q.    And then when you get to the

7  next -- and that was the Day 2, that was

8  the July 30th day, right?  There was a

9  Day 1 as well, correct?

10       A.    Yes.

11       Q.    If you flip the page, you

12  get to Day 1.

13       A.    Yep.

14       Q.    And Day 1 also had a primary

15  areas reviewed today, didn't it?

16       A.    Yep.

17       Q.    Show the jury in this case

18  within this box that I've just

19  highlighted where suspicious order

20  monitoring was a primary area of focus by

21  the DEA.

22            MR. BARKER:  Object to form.

23            THE WITNESS:  It was

24       embedded in their review, and you

Highly Confidential - Subject to Further Confidentiality Review

1    can see the daily summary.  She

2    says, "See internal notes."

3  BY MR. JANUSH:

4         Q.    Not what I asked.

5              MR. BARKER:  Actually it is

6    what you asked.

7  BY MR. JANUSH:

8         Q.    Show within the box that

9  I've highlighted --

10        A.    On the document, okay.

11        Q.    -- on the document.

12        A.    So they said, "Supply a

13 customer list."  So how did you know that

14 the customer list didn't include

15 suspicious order monitoring discussion?

16        Q.    Well, suspicious order

17 monitoring is a very specific concept,

18 isn't it?

19        A.    And it's a typical topic of

20 discussion, as we demonstrated.  They

21 always asked for our SOP when they come

22 to visit.

23             MR. JANUSH:  Not my

24    question.  Move to strike

```
 1              nonresponsive.
 2    BY MR. JANUSH:
 3         Q.    I was addressing the primary
 4    areas reviewed today as catalogued or
 5    documented by your own employees.  And I
 6    asked you to find me where in the primary
 7    areas reviewed, suspicious order
 8    monitoring was a topic?
 9              MR. BARKER:  Object to form.
10              THE WITNESS:  She did not
11         record it there.  She recorded it
12         on the internal notes and the
13         regulatory inspection document and
14         provided it.
15    BY MR. JANUSH:
16         Q.    I guess what I'm getting at
17    is, the DEA came for a primary mission
18    that stated for each day, Day 1 and Day
19    2, in the body of these e-mails; isn't
20    that right?
21              MR. BARKER:  Object to form.
22              THE WITNESS:  Yes.
23    BY MR. JANUSH:
24         Q.    And in the context of coming
```

Highly Confidential - Subject to Further Confidentiality Review

1    to visit with those primary objectives, a

2    whole host of paperwork was provided that

3    goes beyond -- purportedly provided, as

4    these notes confirm, that was beyond the

5    primary purposes -- went beyond the

6    primary purposes of the inspection, fair?

7                    MR. BARKER:  Object to form.

8                    THE WITNESS:  No, because

9            what you don't have is an e-mail

10           from a few months prior to this

11           inspection where DEA reached out

12           to us and said during their

13           inspection this year they're going

14           to review suspicious order

15           monitoring.

16                So that is why we were

17           prepared and had all this

18           information for them.

19   BY MR. JANUSH:

20           Q.   Did your counsel introduce

21   that e-mail as well into evidence today?

22           A.    No.  But he did ask if I was

23   present.  And that was the reason why

24   we -- all of us were present, because

Highly Confidential - Subject to Further Confidentiality Review

1   they wanted -- they asked to talk about

2   suspicious order monitoring.

3           Q.    Okay.  Suspicious order

4   monitoring is a pretty important topic,

5   and it was really important in 2013,

6   wasn't it?

7                 MR. BARKER:  Object to form.

8                 THE WITNESS:  It was a topic

9           that DEA in Kentucky wanted to

10          review with us.

11  BY MR. JANUSH:

12          Q.    2013 is -- was a very

13  significant year in terms of the opioid

14  crisis, wasn't it?

15          A.    I don't know.

16          Q.    Okay.  What I'm getting at

17  is, suspicious order monitoring as a

18  topic is important, and yet it's nowhere

19  listed within the primary areas of review

20  for Day 1 or Day 2, is it?

21                MR. BARKER:  Object to form.

22                THE WITNESS:  It was part of

23          the discussion and included in the

24          list of documents that we gave

Highly Confidential - Subject to Further Confidentiality Review

1          them.

2     BY MR. JANUSH:

3          Q.    I understand.  I understand

4     what you want to answer.

5          A.    I was there.

6          Q.    I understand.

7          A.    I know that it was talked

8     about.

9               MR. JANUSH:  Move to strike.

10          Nonresponsive.

11               THE WITNESS:  She chose not

12          to write it in a summary because

13          she had it all outlined in detail

14          attached.

15     BY MR. JANUSH:

16          Q.    Okay.  What does it mean to

17     say that the Kentucky distribution center

18     doesn't import or export scheduled

19     product?

20          A.    You get a license based on

21     your activity.  And if you had a

22     Schedule -- it would be Schedule III

23     through V, and you want to bring it --

24     it's manufactured in another country, you

Highly Confidential - Subject to Further Confidentiality Review

1    need to have an import registration, an

2    import license, in order to get the

3    approval and the permits or the

4    declarations to bring it into the

5    country.

6          Q.    And so KDC -- I saw a note

7    here.  I'm just trying to understand it.

8    I saw a note here that said the DEA

9    investigation at Exhibit 49 was reduced

10   from three days to two days because KDC

11   doesn't import or export scheduled

12   product.

13         A.    Right.  At this time we were

14   not currently importing any scheduled

15   product, so there was no documentation

16   for DEA to review.  And that's why they

17   cut back the inspection time so they

18   could focus on the distributor, which was

19   an active license.

20         Q.    You were asked a bunch of

21   questions about this inspection, the

22   DEA's inspection in Kentucky in

23   January 2014.  Do you remember that?

24         A.    It was --

1           MR. BARKER:  Object to form.

2           THE WITNESS:  -- January of

3      2015.

4  BY MR. JANUSH:

5      Q.    Sorry.  January of 2015.

6  It's a --

7      A.    Typo.

8      Q.    -- typo, right.  We figured

9  that out earlier.

10          Do you remember being asked

11  a bunch of questions?

12     A.    Yes, I do.

13     Q.    And is it the case -- I'm

14  looking at the products.  I see that it

15  says for imported materials, the

16  inventory that was noted was tramadol and

17  Ultram.

18          I don't see anything

19  concerning -- oh, I do on this page.  I

20  apologize.  I see it on the next page on,

21  or two pages later, on January 27th, Day

22  1, 2015, the cage and vault confirmation.

23          So you were asked questions

24  that were directed to you, personally,

1   concerning what was handed over, what was

2   done with respect to this investigation.

3           Were you physically present

4   at this investigation?

5       A.    No.

6       Q.    Did you hand over any

7   materials at this investigation?

8       A.    No.

9       Q.    Do you have any personal

10  knowledge as to anything that was done in

11  this investigation other than to what you

12  were told or what you read?

13      A.    I had DEA compliance manager

14  Mike Levitt who was the key contact and

15  part of the inspection.  He reported in

16  to me.

17      Q.    Right.  But you -- any

18  testimony concerning you, or the word

19  "you," cannot be read to mean Michele

20  Dempsey; is that right?

21      A.    It was JOM.

22      Q.    Okay.  Did you have

23  differing local procedures versus

24  national procedures for suspicious order

1    for JOM?

2         A.    We had -- we had two

3    distribution centers and they used the

4    same SOPs.

5         Q.    Okay.  In other words, was

6    JOM's -- Johnson Ortho-McNeil standard

7    operating procedures for suspicious order

8    monitoring the same as a national

9    program?

10        A.    I don't understand what you

11   mean national program.

12        Q.    In other words -- in other

13   words, you had two different distribution

14   centers, right?

15        A.    Under the same leadership

16   and quality functions, yes.

17        Q.    Right.  You didn't have two

18   different standard operating procedures

19   for -- you wouldn't have had two

20   different standard operating procedures,

21   would you have, for suspicious order

22   monitoring?  Or would you?

23        A.    No, because the suspicious

24   order monitoring procedures that we've

Highly Confidential - Subject to Further Confidentiality Review

1    reviewed, either they're with DEA

2    compliance or they're with customer

3    service.  Each individual distribution

4    center, the material handler, how they

5    ship and pack, because of the different

6    configurations, there may be different

7    SOPs locally -- locally for the material

8    handlers, because it's a different

9    layout, different vaults, different

10   setups in how to do the pick, pack, and

11   ship to the customers.

12             So at a local level there

13   may be some work instructions, job aids

14   that are different based on the

15   activities.  But when it comes to

16   suspicious order monitoring, it was the

17   same quality group across both locations

18   that are following the same SOPs all

19   under the JOM.

20        Q.   Earlier -- the audit at

21   page -- at Exhibit 26 is the original

22   draft audit from Terrance Woodworth, was

23   presented to you by your counsel.

24             Do you remember that?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      And your counsel asked you,

3   were any of the improvements that were

4   being discussed at this meeting or in

5   Mr. Woodworth's report, and I think he's

6   referring to the original December 13,

7   2017, meeting -- I'll start again.

8               Were any of the improvements

9   that were being discussed at this meeting

10  or in Mr. Woodworth's report from the

11  Drug and Chemical Advisory Group about

12  improving the suspicious order monitoring

13  system so that you would catch orders

14  that were potentially suspicious that

15  were possibly being missed.

16              Do you remember that?

17      A.      I remember that.

18      Q.      You answered no, right?

19      A.      Right.

20      Q.      That doesn't make sense,

21  does it?

22              MR. BARKER:  Object to form.

23              THE WITNESS:  Yes.  We did

24      not design our program -- so let

Highly Confidential - Subject to Further Confidentiality Review

1    me -- can you repeat what you

2    said?  That --

3  BY MR. JANUSH:

4    Q.    Wasn't Mr. Woodworth trying

5  to improve your suspicious order

6  monitoring program so that it would catch

7  orders that potentially were being missed

8  under the single-criteria algorithm?

9    A.    No.

10    Q.    So if I depose Mr. Woodworth

11  in, say, two months from now, do you

12  expect him to testify that he was not

13  seeking to develop a more DEA-compliant

14  suspicious order monitoring algorithm

15  that might take into account other

16  variables and pick up suspicious orders

17  that were being missed by your

18  one-criteria algorithm?

19         MR. BARKER:  Object to form.

20         THE WITNESS:  Our overall

21    suspicious order monitoring

22    program is compliant.

23  BY MR. JANUSH:

24    Q.    That's not what I asked.

Highly Confidential - Subject to Further Confidentiality Review

1        A.    And his recommendations were

2   enhancements to make us ready for any

3   future inspections or expectations that

4   come out of the SUPPORT Act or what --

5   all the new regulations that are going to

6   be coming out of FD -- DEA.

7              MR. JANUSH:  Move to strike

8        as entirely nonresponsive.

9   BY MR. JANUSH:

10       Q.    You know that I didn't ask

11  that question that you gave that answer

12  to, right?

13       A.    He did not --

14             MR. BARKER:  It is

15       absolutely responsive.

16  BY MR. JANUSH:

17       Q.    So let's --

18       A.    He did not come in to give

19  recommendations to make our algorithm

20  find orders that were missing.

21       Q.    Okay.  Why then did he

22  recommend that you take past order

23  examples and evaluate their

24  circumstances, order patterns, and

1    activity against revised algorithms to

2    determine discrepancies or adjustments

3    needed?

4         A.    He wanted us to make sure

5    the thresholds that we set up with -- let

6    me find it.

7             So what he was saying is,

8    once you determined -- using your --

9    well, once you use your historical

10   ordering patterns and frequency and

11   quantities, and you do the statistics to

12   develop your thresholds, take all your

13   past orders through, and evaluate whether

14   you wouldn't see -- basically based on --

15   once you identify the three criteria,

16   that you wouldn't be getting the

17   excessive orders that we're getting right

18   now based on the SKU.  And that's

19   basically what he was saying there.

20        Q.    So it's your testimony today

21   that Terrance Woodworth and the Drug and

22   Chemical Advisory Group was solely

23   concerned with why Janssen was getting

24   red flags or suspicious orders based on

Highly Confidential - Subject to Further Confidentiality Review

1    their single-criteria SKU-to-SKU program?

2                    MR. BARKER:  Object to form.

3                    THE WITNESS:  No.  He was

4              here to review our program, audit

5              it, and provide recommendations so

6              that we could be proactively ready

7              for when new regulations come out

8              from DEA or new expectations are

9              coming out.

10   BY MR. JANUSH:

11        Q.    And let's look at again what

12   his recommendations were, because his

13   actual -- what your counsel referred to

14   as conclusions was nothing more than an

15   executive summary.  It wasn't

16   conclusions.  It was an executive

17   summary, wasn't it?

18                    MR. BARKER:  Object to form.

19   BY MR. JANUSH:

20        Q.    Look at the first page.  It

21   was an executive summary; is that right?

22        A.    Yes.

23        Q.    And then the actual

24   conclusions come at a spot in the report

1    called "Recommendations"?

2          A.    It doesn't say conclusion.

3    That's recommendation.

4          Q.    It's a heck of a lot

5    stronger than executive summary?

6                THE WITNESS:  It doesn't say

7          conclusion.

8                MR. BARKER:  Object to form.

9                THE WITNESS:  It says

10         recommendations.

11   BY MR. JANUSH:

12         Q.    I honestly can't believe

13   you're fighting with me over that word.

14         A.    It is --

15               MR. BARKER:  I can't believe

16         that you're arguing with the

17         witness over something that

18         doesn't say conclusions.  It says

19         recommendations.

20               MR. JANUSH:  Right.

21         Recommendations.

22               MR. BARKER:  Future actions,

23         not past.

24               MR. JANUSH:  Excuse me.

1    Excuse me.

2          MR. BARKER:  Well, you're

3    arguing with the witness.  So I'm

4    arguing with you.

5          MR. JANUSH:  So move to

6    strike counsel's interruptions.

7    BY MR. JANUSH:

8          Q.    I'm talking to you.  You're

9    my witness.  I'm going to ask you some

10   questions about recommendations.

11         You hired an auditor to make

12   recommendations to improve your system,

13   right?

14         A.    We hired an auditor to give

15   us recommendations to enhance our current

16   program so that we could be proactive.

17         Q.    That's a long way of saying

18   right, isn't it?

19         A.    These aren't improvements.

20   These are recommendations.  He said we're

21   compliant.  These are recommendations to

22   make it better, enhancements.

23         MR. JANUSH:  Move to strike.

24   Nonresponsive.

Highly Confidential - Subject to Further Confidentiality Review

1    MR. BARKER:  Object to the

2    objection.  It's --

3    MR. JANUSH:  Enough.

4    MR. BARKER:  -- commentary.

5  BY MR. JANUSH:

6    Q.    Let's go to Page 10.  At

7  Recommendation 4, he told you to start

8  modifying the existing suspicious order

9  monitoring algorithm and/or adding

10  algorithms to include additional

11  evaluation criteria for each specific DEA

12  basic class of controlled substance

13  handled by J&J; example, fentanyl,

14  methylphenidate, tramadol.  Right?

15    MR. BARKER:  Object to form.

16    THE WITNESS:  Right.

17  BY MR. JANUSH:

18    Q.    He told you to consider a

19  base unit of measurement, such as grams

20  of active ingredient, for the SOM

21  algorithms, right?

22    A.    Yes.

23    Q.    Are you following that

24  instruction going forward, by the way?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    As a matter of fact, today

2     we are receiving thresholds from The

3     Analysis Group on a new product that will

4     be grams for our esketamine product.

5          Q.    And a gram-based unit of

6     measurement for a suspicious order

7     monitoring program is more rigorous than

8     the program you've had in place for the

9     last many years, isn't it?

10               MR. BARKER:  Object to form.

11               THE WITNESS:  I can't answer

12          that question because, in talking

13          to Analysis Group, we are going to

14          be most likely -- we won't be

15          getting the orders that we

16          received that the -- the false

17          positives.  So I cannot say

18          whether going to this is going to

19          give us fewer or more orders,

20          because we are launching a new

21          product, so we're going to be

22          receiving a higher number of

23          orders.  So I can't give you an

24          answer right now if this is going

Highly Confidential - Subject to Further Confidentiality Review

1    to be less or more.

2    BY MR. JANUSH:

3    Q.    I didn't say less or more.

4    I said more rigorous.  And I'm talking

5    about spotting actual suspicious orders.

6    A.    That is the intent of going

7    to this, the intent.

8    Q.    Right.  We're not talking

9    about -- I'm not here to talk about false

10   positives.  This case, this opioid

11   epidemic, isn't about false positives.

12   It's about real orders that made it out

13   there that shouldn't have made it out

14   there.

15        Do you understand that?

16        MR. BARKER:  Object to form.

17        THE WITNESS:  I understand

18   you.

19   BY MR. JANUSH:

20   Q.    Okay.  Now, I understand

21   that you want to talk about false

22   positives.  I want to talk about what

23   Terrance was seeking to do in this audit

24   and in this recommendations.  Okay?

1      A.      Okay.

2      Q.      Next, he said, "Consider

3  separating J&J customers into two or more

4  groups and perform different analyses of

5  orders for these different groups;

6  largest three wholesalers in one group,

7  smaller wholesalers in another group."

8              Do you see that?

9      A.      Yes.

10     Q.      Are you following something

11 like that going forward in your new

12 program?

13     A.      Yes, we are.

14     Q.      When he said, "Consider

15 evaluating customer orders for specific

16 DEA basic classes of substances against

17 similar size and geographically placed

18 customers and perform national, regional,

19 state, and perhaps three digit zip code

20 comparisons among like-size customers."

21             Did I read that right?

22     A.      Yes, you did read it.

23     Q.      Are you implementing any of

24 that in your new protocols?

1    A.    You saw the IntegriChain

2  statement of work, so yes, we are going

3  to be going to that level.

4    Q.    Okay.  And now, at 4-A,

5  Terrance advised, "Stop using this

6  current single-criterion algorithm which

7  selects and holds orders from customers

8  when the quantity of an order is greater

9  than three times, 300 percent, the

10  customer's average weekly order based on

11  a rolling 12-month ordering history from

12  that customer."

13        Did I read that right?

14    A.    Yes.

15    Q.    And he said, "This algorithm

16  only measures quantity and does not

17  consider frequency or a pattern of

18  ordering by the same customer."

19        Did I read that right?

20    A.    Yes, you did.

21    Q.    That statement isn't about

22  limiting Janssen's or JOM's false

23  positives.  That statement is about

24  improving your program so that you

Highly Confidential - Subject to Further Confidentiality Review

1    measure the other two C.F.R.-required

2    elements, isn't it?

3                    MR. BARKER:  Object to form.

4                    THE WITNESS:  In our

5          algorithm, he is suggesting that

6          we capture all three.

7    BY MR. JANUSH:

8          Q.    My question was, that

9    statement isn't about limiting Janssen's

10   or JOM's false positives.  That statement

11   is about improving your program so you

12   measure the other two C.F.R.-required

13   elements, isn't it?

14                   MR. BARKER:  Object to form.

15                   THE WITNESS:  He is

16         suggesting that we make

17         enhancements to the algorithm to

18         capture more formally the

19         frequency and pattern requirements

20         that we are doing outside --

21   BY MR. JANUSH:

22         Q.    Because --

23         A.    -- of the algorithm.

24         Q.    Because there's a risk that

Highly Confidential - Subject to Further Confidentiality Review

1    if you don't have those elements in your

2    algorithm, those elements are possibly

3    being missed, right?

4                MR. BARKER:  Object to form.

5                THE WITNESS:  Not with our

6         current products, because we have

7         established customers that haven't

8         changed that much, and we know

9         what they're ordering.  This

10        report was not just for

11        established products, but for this

12        product that just got approval

13        this year.  And we will have more

14        customers, different distribution,

15        and more orders.

16             So he's saying, make sure

17        that we need to make these

18        changes.

19   BY MR. JANUSH:

20        Q.    You bring up a really good

21   point.  Thank you so much.

22             The point that you're

23   bringing up is, you had a one-dimensional

24   algorithm during the hottest years that

Highly Confidential - Subject to Further Confidentiality Review

1    were you selling Duragesic and Nucynta;

2    isn't that right?

3                    MR. BARKER:  Object to form.

4                    THE WITNESS:  What were the

5         hottest years?

6    BY MR. JANUSH:

7         Q.    Well, Nucynta came on the

8    market in 2009.  Nucynta was divested, I

9    believe, in 2015 or '16.

10        A.    When you mean the hottest

11   years --

12        Q.    So meaning, when Terrance is

13   doing this review, it's already long

14   after Nucynta is gone, right?

15                   MR. BARKER:  Object to form.

16                   THE WITNESS:  Nucynta was

17        gone.

18   BY MR. JANUSH:

19        Q.    And you had a

20   one-dimensional algorithm during the

21   entire time Nucynta was being sold,

22   right?

23                   MR. BARKER:  Object to form.

24                   THE WITNESS:  We had an

Highly Confidential - Subject to Further Confidentiality Review

1    algorithm that looked at the

2    quantity that the customer -- the

3    historical ordering pattern.

4  BY MR. JANUSH:

5    Q.    And that is a

6  one-dimensional algorithm, right?

7         MR. BARKER:  Object to form.

8         THE WITNESS:  The algorithm

9    had one factor.

10 BY MR. JANUSH:

11   Q.    As you sit here today, and

12 after reading Terrance's report from the

13 Drug and Chemical Advisory Group, you're

14 not the least bit concerned that during

15 the years that you were selling the

16 opioid product, Nucynta, and during the

17 heavier years, before it became generic,

18 that you were selling and marketing

19 Duragesic, that you only had a

20 one-dimensional, one-factor algorithm?

21        MR. BARKER:  Object to form.

22        THE WITNESS:  If there was a

23   problem with our products, we

24   would have been called down as

1          part of the distributor

2          initiative.

3   BY MR. JANUSH:

4          Q.     That's not what I asked you.

5          A.     No.  You're asking if we

6   were concerned.  And that would mean, I

7   would be concerned if there was diversion

8   and abuse of our products.  And if there

9   was, that was one of the criteria for the

10  distributor initiative.  You were called

11  in, reviewed your SOM and your ARCOS

12  data.

13         Q.     And two of the other

14  requirements of the C.F.R. at the very

15  same time as the distributor initiative

16  was ongoing concerned the fact that you

17  were to be measuring frequency as well as

18  ordering patterns, not just quantity;

19  isn't that right?

20         A.     The C.F.R. says you need to

21  have a system in place.  It does not say

22  your algorithm is the system.

23         Q.     But if your algorithm isn't

24  measuring all three factors, you cannot

1   trigger for all three factors to be

2   reviewed.  It would require a manual

3   review of every single order for you to

4   have a good system in the absence of

5   those two factors; isn't that right?

6             MR. BARKER:  Object to form.

7             THE WITNESS:  For Schedule

8        II orders, they are manually

9        entered.  We get them on the same

10       days every week.  The customer

11       service personnel know what the

12       customers typically order.

13             And when it goes in, the

14       algorithm would flag anything

15       suspicious, if the customer

16       service -- they're seeing every

17       Monday, Wednesday, from this

18       customer.  This one only receives

19       once every 12 months.

20  BY MR. JANUSH:

21       Q.    You're not saying customer

22  service is eyeballing every order and

23  manually checking every order, are you?

24       A.    No.  What I'm saying

1    overall, there is a program in place

2    where orders are looked at, and every

3    month we reviewed the orders that were

4    reviewed, put on, and we track how much

5    is going to all the customers based on

6    total controlled versus noncontrolled.

7         Q.    But you weren't following

8    the C.F.R. --

9         A.    The C.F.R. does not say your

10   algorithm needs to have all this.

11        Q.    But your algorithm is what

12   triggers the review, right?

13        A.    I'm saying we do other

14   reviews of all the other --

15        Q.    You can't review an order

16   that wasn't tripped, correct?  You can't

17   review it in realtime is what I'm saying?

18   If it's not tripped, it ships, right?

19             MR. BARKER:  Object to form.

20             THE WITNESS:  If it is not

21        typical of the ordering pattern

22        for the previous 12-month, 52-week

23        average, we --

24

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. JANUSH:

2         Q.    Ship it?

3              MR. BARKER:  Object to form.

4              THE WITNESS:  No.  We

5         investigate.

6    BY MR. JANUSH:

7         Q.    If it's -- if -- I'm saying

8    if you have an order and you're only

9    investigating an order on an algorithm

10   that measures quantity, you inherently

11   cannot trip that order via the algorithm

12   for frequency or for --

13        A.    You can do pattern.

14        Q.    -- pattern?

15        A.    You can do pattern, because

16   if they don't order on a monthly basis

17   it's going to get flagged.  That's a

18   pattern.

19        Q.    When you say if they don't

20   order on a monthly basis.  That's more

21   like when a SKU is not ordered over a

22   period of time, it trips?

23        A.    So if a customer regularly

24   orders every month 100 each of a product,

Highly Confidential - Subject to Further Confidentiality Review

1    that is their order.  Their average is

2    going to be factored on that.  So if they

3    deviate and all of the sudden orders 150,

4    it's going to flag it, that the quantity

5    is high, and then when we run the report,

6    we'll say, well, hey, why -- you've

7    always been getting 100 each.  Why are

8    you asking 150 this month?

9        Q.    Right.  But that's a

10    quantity measurement.  That's --

11        A.    But that's also the pattern,

12    because the pattern takes in the

13    12 months, what they typically order, to

14    come up with the average.

15        Q.    Right.  The 12 months in

16    average, 150 is not going to be an

17    outlier on an average on -- if an order

18    is 100 for 12 months, you're going to

19    average that in, that's not going to be

20    a -- that's going to be a blip on the

21    radar, is what your example is.

22        A.    I used the wrong number.

23    But if it -- if it was a significant

24    increase, it would have been.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     And then Terrance goes on to

2    say, going back to his recommendations,

3    "The algorithm would not detect multiple

4    customer orders during a given week.  It

5    would not detect orders which consist of

6    gradual quantity increases of a

7    controlled substance over time."

8           Do you agree with his

9    position that the algorithm that you had

10   wouldn't have detected multiple customer

11   orders during a given week?

12     A.     If we received multiple on

13   days that we weren't expecting.

14     Q.     I'm not -- I'm not --

15     A.     Because --

16     Q.     -- allowing you to add --

17   add language on days that you were not

18   expecting.  I'm talking about what he's

19   addressing.

20           He's addressing, "The

21   algorithm would not detect multiple

22   customer orders during a given week."

23           MR. BARKER:  Object to form.

24

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. JANUSH:

2         Q.    Do you agree that the

3    algorithm would not have addressed

4    multiple customer orders during a given

5    week?

6              MR. BARKER:  Object to form.

7              THE WITNESS:  That is what

8         he wrote, and if they ordered it

9         continuously every single day, it

10        compares to the previous weeks.

11   BY MR. JANUSH:

12        Q.    Or even multiple orders in a

13   week like I showed earlier with Cardinal,

14   right?

15             MS. BOODY:  Object to form.

16   BY MR. JANUSH:

17        Q.    It compares it to the

18   previous weeks, right?

19             MR. BARKER:  Object to form.

20             THE WITNESS:  That is

21        comparing to the previous weeks

22        average, the 52 weeks.

23   BY MR. JANUSH:

24        Q.    So if Cardinal ordered every
```

1    three days a specific order, what

2    Terrance is saying is, your algorithm is

3    not detecting multiple customer orders

4    during a given week.

5         A.    That is what he's saying.

6         Q.    Do you disagree with it or

7    agree with it?

8         A.    I don't know.  Because I

9    would have to see somebody actually go --

10   we never had the case where somebody's

11   going in every single day to see what the

12   algorithm would do.

13        Q.    And then he wrote, "It would

14   not detect orders which consist of

15   gradual quantity increases of a

16   controlled substance over time."

17             Do you see that?

18        A.    Yes.

19        Q.    Do you agree or disagree

20   with that statement?

21        A.    I agree.

22        Q.    And he wrote, "It would not

23   detect a new customer's orders for

24   controlled substances which initially

1    commence with larger than normal

2    quantities and remain at a constant

3    level."

4              Do you agree or disagree

5    with that recommendation?

6         A.    If it was entered in

7    initially at a high level, yes.

8         Q.    And he wrote that, "Your

9    algorithm does not distinguish between

10   controlled substances."

11             Do you agree that?

12        A.    What do you think -- we

13   treat all of our control -- the

14   algorithm, we use it for -- no matter

15   what schedule, if it's an ADHD med or if

16   it's an opioid.

17        Q.    I think that's his point,

18   that he's recommending that that be

19   modified.  Isn't that his point?

20             MR. BARKER:  Object to form.

21             THE WITNESS:  I don't know

22        what he intended.

23   BY MR. JANUSH:

24        Q.    Well, go up to Paragraph 4.

Highly Confidential - Subject to Further Confidentiality Review

1    Isn't the purpose of Paragraph 4, above,

2    "Start modifying the existing SOM

3    algorithm and/or adding algorithms to

4    include additional evaluation criteria

5    for each specific DEA basic class of

6    controlled substance handled by J&J."

7                Isn't that going to this

8    concept of distinguishing between

9    controlled substances?

10        A.    I misread this in thinking

11   that the algorithm doesn't do anything

12   different, no matter what the product is,

13   whether it's an opiate or a psychotropic.

14   And what he was saying is you should lump

15   in all the SKU -- all the total quantity

16   of the drug class and -- rather than the

17   SKU.

18        Q.    Right.  That's a critique on

19   his part, isn't it?  I mean, I'm going to

20   find out.  I'm going to be deposing him

21   one day.  So I just want your opinion

22   whether he's critiquing Janssen or not on

23   this.

24                MR. BARKER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

 1              THE WITNESS:  I don't know

 2        what he means by that.

 3   BY MR. JANUSH:

 4        Q.    Even when you look up at

 5   Paragraph 4, you --

 6        A.    Well, I understand what he's

 7   saying up here, that we should move from

 8   the SKU to do an overall -- the drug

 9   class of that product.

10              But down here, the algorithm

11   doesn't -- I don't know if he's saying,

12   you should do something different from

13   opiates versus ADHD.  You shouldn't.

14   It's all a controlled substance.

15        Q.    So let's talk about -- let's

16   talk about what he's saying in Paragraph

17   4.

18              Earlier, I was just

19   following along the lines of what JOM has

20   done.  I was only looking at, on that

21   sales spreadsheet, the 100-milligram,

22   bottles of 100 pills, packed in 24

23   bottles per case.

24              Do you remember that?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    I wasn't also adding in the

3  same day or same week orders for the

4  Nucynta 50 milligrams or the Nucynta

5  75 milligrams or the Nucynta

6  125 milligrams on top of Cardinal's

7  Nucynta 100-milligram orders.

8           You agree I was not doing

9  that, right?

10          MR. BARKER:  Object to form.

11          MS. BOODY:  Object to form.

12          THE WITNESS:  You were just

13     highlighting the 100-milligram.

14  BY MR. JANUSH:

15     Q.    Right.  So there is a reason

16  I'm circling back to that, because what

17  Terrance was suggesting, was to move away

18  from the SKU to SKU, the same SKU

19  analysis, and lump in the total grams of

20  product and take into account all of the

21  Nucynta that would have been ordered by,

22  as an example, Cardinal, in a given week

23  or month, right?

24     A.    Right.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    And there is a huge

2    difference between that suspicious order

3    monitoring analysis, and just going SKU

4    to SKU, isn't there?

5              MR. BARKER:  Object to form.

6              THE WITNESS:  It depends,

7         because when you come down to it,

8         and you just calculate how much

9         active ingredient is in a

10        50-milligram -- so there's

11        50 milligrams times 100 pills,

12        times whatever you mention, you're

13        going to come up with a different

14        historical ordering pattern.

15             And so you are not going to

16        have more flagged orders than we

17        currently have.

18   BY MR. JANUSH:

19        Q.    Well, you're going to

20   have -- you're not going to have the

21   false positives on the company that

22   ordered a lot of the 100s of Nucynta but

23   may have only ordered a few of the 50s,

24   and then increases their orders of 50,
```

1  right?  You're not going to have that get

2  flagged?

3       A.    When they switch between

4  SKUs?

5       Q.    Right?

6       A.    Right.

7       Q.    Am I correct?

8       A.    Right.

9       Q.    So Terrance is removing the

10  false positives and focusing on the

11  substantive issue of how much drug is a

12  company buying in a class, right?

13       A.    How much of the active

14  ingredient the customer is ordering, yes.

15       Q.    And yet, you still take the

16  position that he was not concerned about

17  whether JOM's system had, over the years,

18  missed suspicious orders?

19       A.    No.

20            MR. JANUSH:  I have no

21       further questions at this time.

22            MR. BARKER:  Okay.  Let's go

23       off the record.  I just want to

24       talk to my colleague and see

Highly Confidential - Subject to Further Confidentiality Review

1    whether I have any further

2    questions.  But I don't think I

3    do.

4         THE VIDEOGRAPHER:  The time

5    is 7:09 p.m.  Off the record.

6         (Short break.)

7         THE VIDEOGRAPHER:  The time

8    is 7:15 p.m.  Back on the record.

9         MR. BARKER:  Okay.  Back on

10   the record.  I have no further

11   questions, but I do have a request

12   in terms of reading and signing.

13       The usual stipulations

14   apply, except that the witness is

15   going to be out of town -- out of

16   the country for two weeks on

17   business.  And so, therefore, we'd

18   like to have 45 days rather than

19   30.

20       MR. JANUSH:  Agreed.

21       MR. BARKER:  Thank you.

22   Nothing further.

23       MR. JANUSH:  Thank you.

24       THE VIDEOGRAPHER:  This

Highly Confidential - Subject to Further Confidentiality Review

```
1            marks the end of today's

2            deposition.  The time is 7:15 p.m.

3            Off the record.

4                    (Excused.)

5                    (Deposition concluded at

6            7:15 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2                    CERTIFICATE

3

4

5            I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6    deposition is a true record of the
    testimony given by the witness.

7

            It was requested before
8    completion of the deposition that the
    witness, MICHELE R. DEMPSEY , have the
9    opportunity to read and sign the
    deposition transcript.

10

11

    _____
12    MICHELLE L. GRAY,
    A Registered Professional
13    Reporter, Certified Shorthand
    Reporter, Certified Realtime
14    Reporter and Notary Public
    Dated:  March 13, 2019

15

16

17            (The foregoing certification
18    of this transcript does not apply to any
19    reproduction of the same by any means,
20    unless under the direct control and/or
21    supervision of the certifying reporter.)

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4    over carefully and make any necessary

 5    corrections.  You should state the reason

 6    in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8              After doing so, please sign

 9    the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                   -   -   -   -   -   -

                  E R R A T A

2                   -   -   -   -   -   -

3

4      PAGE   LINE   CHANGE

5      _____  _____   _____

6        REASON: _____

7      _____  _____   _____

8        REASON: _____

9      _____  _____   _____

10       REASON: _____

11     _____  _____   _____

12       REASON: _____

13     _____  _____   _____

14       REASON: _____

15     _____  _____   _____

16       REASON: _____

17     _____  _____   _____

18       REASON: _____

19     _____  _____   _____

20       REASON: _____

21     _____  _____   _____

22       REASON: _____

23     _____  _____   _____

24       REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

1

2            ACKNOWLEDGMENT OF DEPONENT

3

4            I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 412 - 825, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    MICHELE R. DEMPSEY                    DATE

17

18

19   Subscribed and sworn
     to before me this

20   _____ day of _____, 20_____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____   _____

 4      _____  _____   _____

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____
```