Page 1

1              IN THE UNITED STATES COURT

2             NORTHERN DISTRICT OF OHIO

3                 EASTERN DIVISION

4

5           ~~~~~~~~~~~~~~~~~~~~

6   IN RE:  NATIONAL PRESCRIPTION

7   OPIATE LITIGATION          MDL No. 2804

8                              Case No.

9                              17-mdl-2804

10                             Judge Dan Polster

11

12  This document relates to:

13  The County of Cuyahoga, Ohio, et al., v.

14  Purdue Pharma L.P., et al.,

15  Case No. 1:17-OP-45004 (N.D. Ohio)

16

17          ~~~~~~~~~~~~~~~~~~~~

18          Videotaped deposition of

19              WILLIAM DENIHAN

20            January 30, 2019

                  9:02 a.m.

21

                  Taken at:

22          Kelley & Ferraro LLP

              950 Main Avenue

23            Cleveland, Ohio

24          Wendy L. Klauss, RPR

25

Page 2

```
 1  APPEARANCES:
 2
    On behalf of Cuyahoga County
 3  and the Witness:
       Napoli Shkolnic PLLC
 4     SHAYNA E. SACKS, ESQ.
       360 Lexington Avenue, 11th Floor
 5     New York, NY  10017
       (212) 397-1000
 6     Ssacks@napolilaw.com
 7  On behalf of Cardinal Health, Inc.,
    Co-Liaison Counsel for the Distributor
 8  Defendants:
       Williams & Connolly LLP
 9     PAUL E. BOEHM, ESQ.
       WILL HAWKINS, ESQ.
10     725 Twelfth Street, N.W.
       Washington, DC  20005
11     (202) 434-5000
       Pboehm@wc.com
12     Whawkins@wc.com
13  On behalf of Johnson and Johnson and
    Janssen Pharmaceuticals, Inc.:
14     Tucker Ellis, LLP
       JENNIFER L. STEINMETZ, ESQ.
15     950 Main Avenue, Suite 1100
       Cleveland, OH  44113
16     (216) 592-5000
       Jennifer.steinmetz@tuckerellis.com
17
    On behalf of Walmart Inc. F/K/A
18  Wal-Mart Stores, Inc.:
       Jones Day
19     SHIRLETHIA V. FRANKLIN, ESQ.
       51 Louisiana Avenue, N.W.
20     Washington, D.C.  20001-2113
       (202) 879-3939
21     Sfranklin@jonesday.com
22
23
24
25
```

Page 3

```
 1  APPEARANCES, Continued:
 2  On behalf of Distributor
    AmerisourceBergen Drug Corporation,
    Co-Liaison Counsel for the Distributor
    Defendants:
 4     Jackson Kelly PLLC
       JON L. ANDERSON, ESQ.
 5     500 Lee Street East, Suite 1600
       Charleston, WV  25301-3202
 6     (304) 340-1169
       Janderson@jacksonkelly.com
 7
    On behalf of Distributor Defendant
 8  McKesson Corporation, Co-Liaison Counsel
    for the Distributor Defendants:
 9     Covington & Burling LLP
       JOHN ZIPP, ESQ.
10     One City Center
       850 Tenth Street, NW
11     Washington, DC  20001-4956
       (202) 662-6000
12     Jzipp@cov.com
13  On behalf of Endo Health Solutions, Inc.,
    Endo Pharmaceuticals Inc., Par
14  Pharmaceutical, Inc., and Par
    Pharmaceutical Companies, Inc.,(FKA Par
15  Pharmaceutical Holdings, Inc.):
       Arnold & Porter LLP
16     ZENO HOUSTON, ESQ.
       250 West 55th Street
17     New York, NY  10019-9710
       (212) 836-8000
18     Zeno.houston@arnoldporter.com
19  On behalf of HBC Service Company:
       Marcus & Shapira, LLP
20     MOIRA CAIN-MANNIX, ESQ.
       One Oxford Centre, 35th Floor
21     301 Grant Street
       Pittsburgh, PA  15219-6401
22     (412) 471-3490
       Cain-Mannix@marcus-shapira.com
23     ~ ~ ~ ~ ~
    ALSO PRESENT:
24     Kurt Henschel, Videographer
       ~ ~ ~ ~ ~
25
```

Page 4

```
 1              TRANSCRIPT INDEX
 2
 3   APPEARANCES:............................   2
 4
 5   INDEX OF EXHIBITS .......................   5
 6
 7   EXAMINATION OF WILLIAM DENIHAN
 8   By Mr. Boehm............................   15
 9   By Ms. Steinmetz........................  269
10
11   REPORTER'S CERTIFICATE...................  273
12
13   EXHIBIT CUSTODY
14   EXHIBITS RETAINED BY COURT REPORTER
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1      INDEX OF EXHIBITS
 2  NUMBER     DESCRIPTION        MARKED
 3  Exhibit 1  Designated Confidential, .....  27
               Email with Attachment,
 4             Subject: Denihan's Bio and
               Resume, Beginning with Bates
 5             Label CUYAH 012702365
 6  Exhibit 2  Designated Confidential, .....  54
               11/16/2012 Email, Subject:
 7             Update on County Budget,
               with Attachment, Beginning
 8             with Bates Label CUYAH
               012792297
 9
    Exhibit 3  Designated Confidential, The . 108
10             Center for Health Affairs,
               ADAMHS Board Needs Analysis,
11             Beginning with Bates Label
               CUYAH 012460111
12
    Exhibit 4  Designated Confidential, ..... 131
13             6/16/2017 Email, Subject:
               Document for Opioid
14             Epidemic, with Attachment,
               Beginning with Bates Label
15             CUYAH 012582972
16  Exhibit 5  Designated Confidential, ..... 142
               5/16/2011 Email, Subject:
17             Open This One For Mr.
               Denihan's Testimony, with
18             Attachment, Beginning with
               Bates Label CUYAH 012536538
19
    Exhibit 6  Designated Confidential, ..... 160
20             4/10/2013 Email, Subject:
               Mental Health & Addiction
21             Levy Fact Sheet, with
               Attachment, Beginning with
22             Bates Label CUYAH 012357240
23  Exhibit 7  Designated Confidential, May . 166
               2010 Email, Subject: ODH
24             Prescription for Prevention
               Initiative: Cuyahoga County
25             Coalition, with Attachment,
               Beginning with Bates Label
```

2 (Pages 2 - 5)

Page 6

1      CUYAH 012366210...............
2  Exhibit 8   Designated Confidential, ..... 174
         4/27/2010 Email, Subject:
3        Several Things, with
         Attachment, Beginning with
4        Bates Label CUYAH 012367618
5  Exhibit 9   Designated Confidential, ..... 177
         2/12/2007 Email, Forward:
6        Executive Update, with
         Attachment, Beginning with
7        Bates Label CUYAH 012875387
8  Exhibit 10  Designated Confidential, ..... 181
         1/17/2013 Email, Forward:
9        Several Things/Updates, with
         Attachment, Beginning with
10       Bates Label CUYAH 012549313
11 Exhibit 11  Designated Confidential, ..... 208
         September 2013 Email,
12       Subject RE; September 12
         Testimony for Rep. Sprague
13       Prescription Drug Addiction
         Legislative Study Committee,
14       with Attachment, Beginning
         with Bates Label CUYAH
15       12550626
16 Exhibit 12  Designated Confidential, ..... 223
         5/18/2017 Email, Subject:
17       Cleveland Clinic May 19
         Denihan Remarks, with
18       Attachment, Beginning with
         Bates Label CUYAH 012564935
19
     Exhibit 13  Designated Confidential, ..... 234
20       8/26/2014 Email, Subject:
         ADAMHS TV 20 Heroin
21       Interview Q&A, Beginning
         with Bates Label CUYAH
22       012397975
23 Exhibit 14  Designated Confidential, ..... 242
         8/31/16 Email, Subject:
24       Overdose Report, with
         Attachment, Beginning with
25       Bates Label CUYAH 012475366

Page 7

1  Exhibit 15  Designated Confidential, ..... 247
         7/28/2017 Email, Subject:
2        Matt Carroll Opioid Ask July
         28, 2017, with Attachment,
3        Beginning with Bates Label
         CUYAH 012595362
4
     Exhibit 16  Ohio Prescription Drug Abuse . 252
5        Task Force, Final Report,
         Task Force Recommendations,
6        October 1, 2010, Beginning
         with Bates Label CUYAH
7        000166378
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1        INDEX OF VIDEO OBJECTION
2   OBJECT                          PAGE
3   objection..................   23
4   objection..................   36
5   objection..................   37
6   objection..................   39
7   objection..................   44
8   objection..................   53
9   objection..................   62
10  objection..................   63
11  objection..................   63
12  objection..................   66
13  objection..................   67
14  objection..................   78
15  objection..................   80
16  objection..................   84
17  objection..................   84
18  objection..................   86
19  objection..................   87
20  objection..................   87
21  objection..................   87
22  objection..................   87
23  objection..................   89
24  objection..................   90
25  objection..................   91

Page 9

1   objection..................   91
2   objection..................   92
3   objection..................   93
4   objection..................   94
5   objection..................   94
6   objection..................   98
7   objection..................   98
8   objection..................   98
9   objection..................   98
10  objection..................   98
11  objection..................   99
12  objection..................   100
13  objection..................   101
14  objection..................   101
15  objection..................   101
16  objection..................   102
17  objection..................   110
18  objection..................   111
19  objection..................   113
20  objection..................   118
21  objection..................   123
22  objection..................   126
23  objection..................   127
24  objection..................   127
25  objection..................   127

3 (Pages 6 - 9)

Page 10

| | | |
|---|---|---|
| 1 | objection | 128 |
| 2 | objection | 128 |
| 3 | objection | 128 |
| 4 | objection | 129 |
| 5 | objection | 133 |
| 6 | objection | 135 |
| 7 | objection | 135 |
| 8 | objection | 136 |
| 9 | objection | 137 |
| 10 | objection | 137 |
| 11 | objection | 138 |
| 12 | objection | 139 |
| 13 | objection | 139 |
| 14 | objection | 141 |
| 15 | objection | 141 |
| 16 | objection | 142 |
| 17 | objection | 145 |
| 18 | objection | 148 |
| 19 | objection | 149 |
| 20 | objection | 151 |
| 21 | objection | 154 |
| 22 | objection | 156 |
| 23 | objection | 156 |
| 24 | objection | 156 |
| 25 | objection | 157 |

Page 11

| | | |
|---|---|---|
| 1 | objection | 157 |
| 2 | objection | 157 |
| 3 | objection | 157 |
| 4 | objection | 169 |
| 5 | objection | 177 |
| 6 | objection | 181 |
| 7 | objection | 186 |
| 8 | objection | 193 |
| 9 | objection | 195 |
| 10 | objection | 200 |
| 11 | objection | 203 |
| 12 | objection | 203 |
| 13 | objection | 203 |
| 14 | objection | 204 |
| 15 | objection | 206 |
| 16 | objection | 206 |
| 17 | objection | 207 |
| 18 | objection | 207 |
| 19 | objection | 208 |
| 20 | objection | 213 |
| 21 | objection | 213 |
| 22 | objection | 214 |
| 23 | objection | 214 |
| 24 | objection | 215 |
| 25 | objection | 221 |

Page 12

| | | |
|---|---|---|
| 1 | objection | 222 |
| 2 | objection | 223 |
| 3 | objection | 224 |
| 4 | objection | 225 |
| 5 | objection | 226 |
| 6 | objection | 226 |
| 7 | objection | 232 |
| 8 | objection | 233 |
| 9 | objection | 233 |
| 10 | objection | 233 |
| 11 | objection | 233 |
| 12 | objection | 234 |
| 13 | objection | 234 |
| 14 | objection | 238 |
| 15 | objection | 239 |
| 16 | objection | 240 |
| 17 | objection | 240 |
| 18 | objection | 240 |
| 19 | objection | 240 |
| 20 | objection | 241 |
| 21 | objection | 242 |
| 22 | objection | 244 |
| 23 | objection | 246 |
| 24 | objection | 250 |
| 25 | objection | 250 |

Page 13

| | | |
|---|---|---|
| 1 | objection | 250 |
| 2 | objection | 251 |
| 3 | objection | 252 |
| 4 | objection | 255 |
| 5 | objection | 255 |
| 6 | objection | 255 |
| 7 | objection | 256 |
| 8 | objection | 256 |
| 9 | objection | 257 |
| 10 | objection | 257 |
| 11 | objection | 258 |
| 12 | objection | 258 |
| 13 | objection | 260 |
| 14 | objection | 261 |
| 15 | objection | 261 |
| 16 | objection | 261 |
| 17 | objection | 262 |
| 18 | objection | 263 |
| 19 | objection | 263 |
| 20 | objection | 265 |
| 21 | objection | 266 |
| 22 | objection | 268 |
| 23 | objection | 268 |
| 24 | objection | 270 |
| 25 | objection | 270 |

4 (Pages 10 - 13)

Page 14

1      THE VIDEOGRAPHER:  We are on the
2  record at 9:02.  Today's date is January 30,
3  2019.  We are here in the matter of National
4  Prescription Opiate Litigation.  This
5  deposition is taking place in Cleveland, Ohio.
6      Would counsel please identify
7  themselves for the record.
8      MS. SACKS:  Shayna Sacks, for the
9  plaintiff, Cuyahoga County, and the witness.
10      MR. BOEHM:  Paul Boehm, from
11  Williams & Connolly, for Cardinal Health, and
12  I'm joined by my colleague, William Hawkins.
13      MS. STEINMETZ:  Jennifer Steinmetz,
14  from Tucker Ellis, on behalf of Johnson &
15  Johnson and Janssen Pharmaceuticals, Inc.
16      MS. FRANKLIN:  Shirlethia Franklin,
17  Jones Day, on behalf of Walmart, Inc.
18      THE NOTARY:  On the phone, please.
19      MR. ANDERSON:  Jon Anderson,
20  Jackson Kelly, on behalf of AmerisourceBergen.
21      MS. CAIN-MANNIX:  This is Moira
22  Cain-Mannix, from Marcus & Shapira, on behalf
23  HBC Service Company.
24      MR. ZIPP:  This is John Zipp of
25  Covington & Burling, on behalf of McKesson.

Page 15

1      MR. HOUSTON:  This is Zeno Houston,
2  from Arnold & Porter, on behalf of the Endo and
3  Par defendants.
4      WILLIAM DENIHAN, of lawful age,
5  called for examination, as provided by the
6  Statute, being by me first duly sworn, as
7  hereinafter certified, deposed and said as
8  follows:
9      EXAMINATION OF WILLIAM DENIHAN
10  BY MR. BOEHM:
11      Q.   Good morning, Mr. Denihan.
12      A.   Good morning.
13      Q.   We introduced ourselves before we
14  went onto the record, but for the record, my
15  name is Paul Boehm, I'm representing one of the
16  defendants in this lawsuit, and I'm going to
17  ask you some questions today.  Thank you for
18  being here.
19      Have you ever been deposed before
20  today?
21      A.   Yes.
22      Q.   How many times have you been
23  deposed?
24      A.   Probably a dozen.
25      Q.   Can you describe the circumstances

Page 16

1  of those depositions?
2      A.   The positions I served in state
3  government and city government were -- in some
4  cases they were products, where two companies
5  wanted the contract and there was a dispute.
6  Other cases, they were personnel matters.
7      Q.   When is the last time that you gave
8  sworn testimony in a deposition?
9      A.   That I recall was I served as the
10  safety director for Cleveland, and it had to do
11  with personnel matters.  That was in the mid
12  1990s.
13      Q.   So the last time you gave a
14  deposition was in the mid 1990s or so?
15      A.   Uh-huh, that I recall.
16      Q.   I'm sure that Ms. Sacks has given
17  you a reminder or a refresher about how the
18  deposition will work today, but for the record,
19  let me just go through a few basic ground rules
20  that we try and follow to make sure that this
21  is as orderly as possible.
22      First of all, it is important that
23  you and I take turns talking, and what I mean
24  by that is I will try and wait until you are
25  completely done with your answer before I ask

Page 17

1  my next question, and you will want to wait
2  until I'm done with my question before you
3  start to answer.  Even if you have an idea of
4  where I'm going, it's important that you wait
5  until I'm all the way done.  And that's so that
6  the record is clear, and it also helps the
7  court reporter here, who, as you know, is
8  writing down what we say; does that make sense?
9      A.   It makes a lot of sense.
10      Q.   We probably will not be perfect in
11  that respect today, and the court reporter will
12  remind us if we start to talk at the same time,
13  but let's just do our very best, fair?
14      A.   Fair enough.
15      Q.   And you've reminded me of one other
16  ground rule --
17      A.   Right.
18      Q.   -- and that is in our normal way of
19  talking, if you give me a nonverbal signal, nod
20  your head or shake your head, I would know what
21  you mean.  Because this is being written down,
22  it's important that you have to -- you speak
23  your answer.  So if the answer is yes, you
24  can't just nod your head, you have to also say
25  yes.  Make sense?

5 (Pages 14 - 17)

Page 18

1    A.   Understood.
2    Q.   It may be that Ms. Sacks will say,
3  "Objection to form," to some of my questions
4  today, and she might do that because she wishes
5  to preserve an objection to a question that
6  would be decided later by a judge.
7         Do you understand that even if Ms.
8  Sacks lodges an objection, you should go ahead
9  and still answer the question?
10    A.   I don't understand that.
11    Q.   Okay.  That's how it will work.  So
12  if I ask a question, Ms. Sacks says, "Objection
13  to form," you should still go ahead and answer
14  the question.  She is objecting to preserve
15  that issue for a later time.  Make sense?
16    A.   Okay.
17    Q.   If you do not understand a question
18  today, will you let me know that?
19    A.   Yes, sir.
20    Q.   Is there any reason today why you
21  are not able to testify truthfully and
22  completely?
23    A.   No.
24    Q.   You are not under any medications
25  that would impinge on your memory or your

Page 19

1  ability to be truthful; is that right?
2    A.   That's correct.
3    Q.   What is your understanding about
4  why you have been asked to give a deposition
5  here today?
6    A.   My understanding is that for the
7  position I held with the ADAMHS Board, that it
8  was in the field of recovery, where people with
9  addictions, that a case had been brought by the
10  county and other places against those that made
11  opiate pills, and that that and in its entity
12  is why I was asked to come here, I understand.
13    Q.   Is it fair to say that your
14  understanding for why you have been asked to
15  give deposition testimony today is because of
16  your role as the former CEO of the Cuyahoga
17  County ADAMHS Board?
18    A.   Yes.
19    Q.   And are you aware that you were
20  identified by lawyers in this case as somebody
21  who has knowledge and information related to
22  the allegations that are made in this lawsuit?
23    A.   No, I wasn't aware of that.
24    Q.   Do you believe that you do have
25  information and knowledge related to the

Page 20

1  allegations made in the lawsuit?
2    A.   I don't know if I do or not.
3    Q.   Have you read the lawsuit?
4    A.   No, I haven't.
5    Q.   As I understand it, you were the
6  head of the Cuyahoga County ADAMHS Board for
7  many years; is that right?
8    A.   That's correct.
9    Q.   And just for the record, for those
10  who may not be familiar with an ADAMHS Board,
11  can you tell us what the acronym "ADAMHS"
12  stands for, and describe a bit about the duties
13  and responsibilities of the board itself in the
14  community?
15    A.   The ADAMHS Board is the Alcohol,
16  Drug Addiction and Mental Health Board for
17  Cuyahoga County.  Our role is to receive
18  funding from the state and other places, such
19  as the county, and distribute that funding to
20  providers to provide services to individuals
21  that have either mental illness and/or
22  addiction.
23    Q.   Is it fair to say that the ADAMHS
24  Board services involve all forms of
25  substance-use disorders, in other words, all

Page 21

1  forms of addiction?
2    A.   Yes, it's fair to say.
3    Q.   That would include alcohol?
4    A.   Yes, it would.
5    Q.   Would that include addiction to
6  methamphetamines?
7    A.   Yes.
8    Q.   Cocaine?
9    A.   Yes.
10    Q.   Heroin?
11    A.   Yes.
12    Q.   And other substances?
13    A.   Yes.
14    Q.   You also indicated the ADAMHS Board
15  has responsibilities in connection with
16  services for people suffering from mental
17  health disorders; is that right?
18    A.   That's correct.
19    Q.   How did it come to be that the
20  ADAMHS Board has responsibility both for
21  addiction treatment services and for mental
22  health services?
23    A.   Prior to the ADAMHS Board, which
24  became effective July 1, 1990 -- excuse me --
25  2009, there with two boards: the mental health

6 (Pages 18 - 21)

Page 22

1  board and the alcohol and drug, both by itself.
2        And the state gave the opportunity
3  for counties to bring both these boards
4  together, since they are both considered the
5  same, behavioral health, affecting the same
6  parts of the body and the brain, and thought of
7  in the same social services of behavioral
8  health.
9        So the county ordered both boards
10  to dissolve on June 30 of 2008 -- excuse me --
11  2009, and form a board on July 1 of 2009, and
12  that was the beginning of the ADAMHS Board.
13      Q.    Were you employed by the ADAMHS
14  Board in 2009?
15      A.    Yes.
16      Q.    Had you previously been affiliated
17  with one of the two pre-existing boards?
18      A.    Yes.
19      Q.    Which one?
20      A.    Mental health board.
21      Q.    For how long were you employed by
22  the mental health board for Cuyahoga County?
23      A.    From July of 2002 to June 30 of
24  2009.
25      Q.    On July 1, 2009, when the two

Page 23

1  pre-existing boards formed to become one,
2  namely the ADAMHS Board, who became the CEO of
3  the newly formed board?
4      A.    I did.
5      Q.    Did you apply for that position?
6      A.    Yes.
7      Q.    Who made the decision to hire you
8  as the CEO of the newly formed ADAMHS Board in
9  July 2009?
10      A.    A combination of both boards of
11  directors.
12      Q.    For how long did you stay in the
13  position of CEO for the Cuyahoga County ADAMHS
14  Board?
15      A.    Until August 1 of 2017.
16      Q.    What have you done since August
17  2017?
18        MS. SACKS: Objection. Form.
19      A.    Just a lot of different things. I
20  no longer work for the ADAMHS Board. I'm
21  retired.
22      Q.    You retired?
23      A.    Yeah.
24      Q.    Did you retire in August of 2017?
25      A.    Yes.

Page 24

1      Q.    Mr. Denihan, did you do anything to
2  prepare for the deposition that you are giving
3  here today?
4      A.    Other than meet with Ms. Sacks.
5      Q.    You met with Ms. Sacks?
6      A.    Yes, I do now.
7      Q.    When did you meet with Ms. Sacks?
8      A.    Yesterday.
9      Q.    For how long did you meet?
10      A.    Most of the day.
11      Q.    Other than the meeting that you had
12  for most of the day yesterday with Ms. Sacks,
13  have you had any other meetings with attorneys
14  or others to prepare for your deposition?
15      A.    No.
16      Q.    Did anybody other than Ms. Sacks
17  attend the meeting that you participated in
18  yesterday?
19      A.    No.
20      Q.    Have you reviewed any documents in
21  preparation for your deposition here today?
22      A.    Yes.
23      Q.    What documents have you reviewed?
24      A.    I can't remember them, but they
25  were documents that Ms. Sacks had.

Page 25

1      Q.    Were there any documents that you
2  reviewed that refreshed your memory about
3  things that you might have forgotten until you
4  saw the documents?
5      A.    I don't know if that's the purpose
6  I was to review them, but there were documents
7  that I was -- I had an association with on my
8  job.
9      Q.    Are you able to recall any of the
10  documents that you looked at?
11      A.    No. There were too many of them.
12  No.
13      Q.    Okay. Fair enough. Have you read
14  any transcripts of depositions that other
15  people have given in connection with this
16  lawsuit?
17      A.    No, I haven't.
18      Q.    Have you ever had the opportunity
19  to read the written complaint that was
20  submitted in connection with this lawsuit?
21      A.    No.
22      Q.    Did you have any involvement in the
23  decision to bring this lawsuit?
24      A.    No.
25      Q.    Nobody ever consulted with you

7 (Pages 22 - 25)

Page 26

1  about whether that was a good idea?
2      A.   No.
3      Q.   I would like to ask you some
4  general background questions about your
5  education and work history; does that sound
6  okay?
7      A.   Sure.
8      Q.   I understand from some of the
9  documents that were produced to us in this
10  litigation that you studied at Cuyahoga
11  Community College and then later at Cleveland
12  State University; is that right?
13      A.   Yes.
14      Q.   And then it looks like you also
15  took some graduate courses at Cleveland State
16  University in the College of Urban Affairs; is
17  that right?
18      A.   Yes.
19      Q.   Have you completed any graduate
20  degrees?
21      A.   No.
22      Q.   Over the course of the day, we will
23  be marking certain documents as exhibits to
24  your deposition, and I'm going to mark the
25  first of those right now.  It will be Exhibit

Page 27

1  1.
2              - - - - -
3          (Thereupon, Deposition Exhibit 1,
4          Designated Confidential, Email with
5          Attachment, Subject: Denihan's Bio
6          and Resume, Beginning with Bates
7          Label CUYAH 012702365, was marked
8          for purposes of identification.)
9              - - - - -
10      Q.   I'm going to hand you one copy of
11  Exhibit 1 and I'm giving one copy to Ms. Sacks.
12          I'll represent, as you can see,
13  that this is a document produced to us in this
14  litigation by the county.  It was an email that
15  has a brief biography about you, and then it
16  has a resume, or a curriculum vitae that is
17  yours; do you see that?
18      A.   Yes, I do.
19      Q.   Would you have been the author of
20  these documents?
21      A.   Let me read them.
22          Yes, I could have been the author.
23      Q.   Thank you.  If you look in the
24  third paragraph of the biography, there is
25  reference to the ADAMHS Board in particular,

Page 28

1  and I wanted to direct your attention to that
2  paragraph.
3          It says, "Currently, Bill serves as
4  the chief executive officer"; do you see that
5  paragraph?
6      A.   Uh-huh.
7      Q.   So let me just read a little bit
8  from that.  "Currently, Bill serves as the
9  chief executive officer for the Alcohol, Drug
10  Addiction and Mental Health Services,"
11  parentheses, "ADAMHS, Board of Cuyahoga County.
12  He has also served as the CEO of the former
13  Cuyahoga County Mental Health Board and as the
14  executive director of the Cuyahoga County
15  Department of Children and Family Services; do
16  you see that?
17      A.   Uh-huh.
18      Q.   Is this the ADAMHS Board that we
19  have been discussing so far this morning, that
20  you have led since 2009?
21      A.   I don't understand the question.
22      Q.   This reference in your biography to
23  the ADAMHS Board, is that the same entity that
24  we have been discussing so far this morning,
25  the Cuyahoga County ADAMHS Board?

Page 29

1      A.   Yes, sir.
2      Q.   What were your duties and your
3  responsibilities as the chief executive officer
4  of the ADAMHS Board for Cuyahoga County?
5      A.   Duties and responsibilities were to
6  oversee the activities of the ADAMHS Board, in
7  the receiving of funding and the allocation and
8  distribution of such funding for treatment
9  services for those that had a mental illness
10  and/or addiction problems, and to report to a
11  volunteer, specifically appointed board on a
12  regular basis those activities and the
13  distribution of funding.
14      Q.   For what years were you the
15  executive director of the Cuyahoga County
16  Department of Children and Family Services?
17      A.   1999, 2000 and 2001.
18      Q.   Were you the executive director of
19  the Cuyahoga County Department of Children and
20  Family Services at the same time you held any
21  positions in connection with the mental health
22  board?
23      A.   No.
24      Q.   Your biography also references that
25  you were the highway state director -- I'm

8 (Pages 26 - 29)

Page 30

1    sorry.  I misspoke.
2         Your biography references the fact
3    that you served as highway safety director for
4    the State of Ohio; is that right?
5         A.    Correct.
6         Q.    For what years did you do that?
7         A.    1986 to 1989.  Excuse me.  I'm
8    sorry.  1985.
9         Q.    1985 to 1989?
10        A.    Yes.
11        Q.    You also spent some time as the
12   Cleveland Public Safety Director; is that
13   correct?
14        A.    Correct.
15        Q.    For what years did you do that?
16        A.    1994 to 1999.
17        Q.    What were your duties as the
18   Cleveland Public Safety Director?
19        A.    Director of public safety is to
20   oversee all of the activities of the major
21   divisions.  There was a department of police,
22   fire department, emergency medical services,
23   the dog kennel and the workhouse.
24        Q.    What's the workhouse?
25        A.    The workhouse is where individuals

Page 31

1    would go to serve short periods of time from
2    the municipal court system.
3         Q.    Your biography also indicates that
4    you served as acting chief of police on two
5    separate occasions?
6         A.    That's correct.
7         Q.    What were the circumstances of you
8    serving as an acting police chief?
9         A.    The circumstances were that the
10   chief was removed on both occasions, and the
11   mayor wanted to have someone in there to
12   provide some continuity relative to the
13   programs we had going on.
14        Since the chief reports to the
15   safety director, that seemed to be a good role
16   for him, so he demoted me twice to serve in the
17   position.  The public doesn't understand that,
18   but that's what it was.
19        Q.    Did you maintain your
20   responsibilities as the public safety director
21   for Cleveland during the time that you were the
22   acting chief of police?
23        A.    No, I couldn't.
24        Q.    In what years did you serve as
25   acting chief of police?

Page 32

1         A.    The first time it was 1996 and the
2    second time was 1998.  The first time it was
3    six months, the second time it was exactly one
4    week.
5         Q.    Your biography also indicates that
6    you had been appointed by the governor of Ohio
7    to the state alcohol and drug advisory board
8    from 1996 to 2000?
9         A.    That's correct.
10        Q.    What were your responsibilities as
11   a member of the state alcohol and drug advisory
12   board?
13        A.    The advisory boards at that time
14   was just looking at various state policies, of
15   which I can't remember at this point.  But it
16   was more advisory than any other role.
17        Q.    Did your duties and
18   responsibilities as a member of the state
19   alcohol and drug advisory board have anything
20   to do with drug abuse and addiction?
21        A.    I don't recall.
22        Q.    Your biography also indicates that
23   you are the founder and first president of an
24   entity named Cudell Improvement, Incorporated?
25        A.    Cudell.

Page 33

1         Q.    Cudell.  Thank you.  That's Cudell,
2    that's C-U-D-E-L-L Improvement, Incorporated,
3    correct?
4         A.    No.  C-U-D-E-L-L.
5         Q.    Oh.  That's what I meant to say.
6    If I misspelled it, I apologize.
7         A.    That's okay.
8         Q.    What is Cudell Improvement,
9    Incorporated?
10        A.    It's a local development
11   corporation that was formed to deal with
12   self-help within an entity and to deal with
13   specific problems in a neighborhood.  So
14   generally that's what it was -- it is for.
15        Q.    Does Cudell Improvement,
16   Incorporated still exist?
17        A.    Yes, it does.
18        Q.    Do you have any affiliation with
19   that?
20        A.    No, I don't.
21        Q.    When did you cease having
22   affiliation with Cudell Improvement,
23   Incorporated?
24        A.    About six or seven years ago.  I
25   served on the board and decided that -- I had

Page 34

1 moved to the Edgewater area and set up and
2 actually ran the Edgewater Homeowners
3 Association, and it was a conflict between two
4 organizations, so I resigned.
5     Q.   What were the specific problems in
6 the neighborhood that the Cudell Improvement,
7 Incorporated entity addressed?
8     A.   Barking dogs, stolen cars,
9 break-ins, muggings, some drugs, things of that
10 nature.
11     Q.   When was Cudell Improvement,
12 Incorporated established?
13     A.   1973.
14     Q.   In what respect or respects has the
15 Cudell Improvement, Incorporated addressed
16 problems related to drugs?
17     A.   At that time, it was all new to us,
18 and there was kids at West Tech High School
19 were using drugs, and I really can't remember
20 too much about it, other than we were dealing
21 with the outcomes of them breaking into homes
22 and stealing things.
23     And my recollection is more of what
24 we were dealing with the police at the time and
25 getting them to do a better job on

Page 35

1 apprehension.
2     Q.   At what time period are you
3 referring to right now, when you talk about the
4 time when --
5     A.   70s. 40 years ago, 50 years.
6     Q.   Do you know what substances were
7 primarily being abused at that time?
8     A.   No, I don't.
9     Q.   What were your duties as the
10 executive director of the Cuyahoga County
11 Department of Children and Family Services?
12     A.   To oversee all the actions of
13 children at risk, dealing with foster care,
14 adoption and unruly children, and to ensure
15 that children who were brought into any type of
16 care were correctly treated. We were the
17 protector of children.
18     Q.   To what extent did the abuse of
19 drugs or alcohol factor into the services that
20 you and others from the county Department of
21 Children and Family Services provide?
22     A.   Well, drugs had a major
23 contribution to the destruction of the family
24 and harm against children.
25     Q.   What were the primary substances of

Page 36

1 abuse during the period of time that you were
2 the executive director of the Cuyahoga County
3 Children and Family Services?
4     A.   I can't remember the exact
5 different substances used. All I recall is the
6 consequences that it had on children.
7     Q.   Is it fair to say that alcohol
8 abuse has been a major contributor to problems
9 in the family that the Department of Children
10 and Family Services has had to address?
11     A.   Yeah. Alcohol is also a drug, so,
12 yes.
13     Q.   Has that always been the case, for
14 as long as you have been involved in county
15 government?
16     MS. SACKS:  Objection.
17     A.   Has what been the case?
18     Q.   That alcohol abuse and addiction
19 has had a significant impact on families in the
20 community?
21     A.   Yes.
22     Q.   Are there any other substances that
23 come to mind as being particularly notable
24 during the time that you were a -- the
25 executive director of the Cuyahoga County

Page 37

1 Department of Children and Family Services that
2 you believe to be particularly problematic?
3     MS. SACKS:  Objection.
4     A.   There was a random number of drugs,
5 and I can't remember all the different names.
6 Meth, crack, heroin are some of the things that
7 came up.
8     Q.   Your resume indicates that you were
9 a candidate for mayor for the City of Cleveland
10 in 2001; is that correct?
11     A.   Uh-huh. Yes.
12     Q.   Who were you running against in
13 election?
14     A.   There were 15 people running. Jane
15 Campbell, who won; Tim McCormack, who was a
16 county commissioner; Jane Campbell was also a
17 county commissioner; Dan Brady, who was a state
18 rep; Rosemary Oakar was a congresswoman; John
19 Hurd, who was a state rep. I can't remember
20 everybody, but obviously somebody had to win.
21 It wasn't me.
22     Q.   Well, that's a pretty good list.
23 Thank you.
24     Do you recall what your platform
25 was during that campaign? What were the issues

10 (Pages 34 - 37)

Page 38

1 that you were most focused on when you decided
2 to run and when you ran for mayor of Cleveland?
3     A.   Tough on issues, soft on people.
4     Q.   And what do you mean by that?
5     A.   That I knew how to deal with all
6 the issues, and that I had an ability to treat
7 people with respect and dignity and actually
8 get the most out of them.
9     Q.   Were there any particular issues of
10 concern in the community at that time that were
11 primary issues in your platform?
12     A.   Yes.
13     Q.   What were those?
14     A.   One was the potential lack of
15 funding in city government that would affect
16 the future, which ended up being true; the
17 deployment of police officers, in terms of
18 community policing.  There is a lot -- there
19 was a lot of them, but those are two big ones.
20     Q.   When you talk about the lack of
21 funding being a concern back in 2001, and then
22 that actually turning into a problem down the
23 road, can you tell us a little bit more about
24 what you mean by that?
25     A.   We saw a forecast that there would

Page 39

1 be a shortfall of funding for the city in the
2 succeeding years after our new mayor took over,
3 and that actually happened.
4         And the new mayor had to lay off,
5 after the second year, 700 police officers and
6 300 firefighters, and it was a catastrophic
7 event, and she did not prepare for it, and she
8 lost the next race.
9     Q.   That was Mayor Campbell?
10     A.   Yes.
11     Q.   Do you recall in what year Mayor
12 Campbell had to lay off 700 police officers and
13 300 firefighters?
14     A.   It was 2003 or 4.  I think 4.
15     Q.   Why did she have to do that?
16         MS. SACKS:  Objection.
17     A.   Because of a -- at the time it was
18 a shortfall of funding that was predicted.
19     Q.   When you talk about a shortfall of
20 funding for city funds, how does that happen,
21 what are the sources of funding that fell short
22 in 2004, 2005 that didn't allow -- or that
23 required the mayor to lay off 700 police
24 officers and 300 firefighters?
25     A.   I can't remember exactly, but I

Page 40

1 could give you an example.
2         Many times, especially with police
3 and fire, we get public grants in, which pay
4 for a police officer for two or three years,
5 entire salary and benefits.  That comes due,
6 and when it comes due, they still have to be
7 paid, and that's an example.
8         The eroding tax base also.
9 Cleveland had a significantly eroding tax base.
10     Q.   What was causing the eroding tax
11 base in the 2004, 2005 timeframe that required
12 the laying off of those police officers and
13 firefighters?
14     A.   Cleveland, not unlike any other
15 major city in America, with the tax base
16 eroding, people moving out of the city, and
17 that's one of the largest things that happened
18 in America.
19     Q.   Your resume also references that
20 you were associated with the Ohio Association
21 of County Behavioral Health Authorities and you
22 were on the executive committee for that
23 organization; is that right?
24     A.   Yes.
25     Q.   What is the Ohio Association of

Page 41

1 County Behavioral Health Authorities?
2     A.   The State of Ohio has 50 boards
3 like ADAMHA in the 88 counties, and they have
4 an association, and its purpose is to track
5 bills in the general assembly and be a conduit
6 of information for the state government.
7     Q.   Do I understand correctly that the
8 Ohio Association of County Behavioral Health
9 Authorities is an umbrella organization for the
10 counties' respective ADAMHS Boards?
11     A.   It could be looked at that way,
12 yes.
13     Q.   What were your responsibilities as
14 a member of the executive committee?
15     A.   To be sensitive to major issues
16 coming down, and mostly inform the rest of the
17 membership, and seek advice and counsel from
18 the body.
19     Q.   When you talk about the body, you
20 mean other members?
21     A.   Yes, the other members.
22     Q.   For what years were you on the
23 executive committee for the Ohio Association of
24 County and Behavioral Health Authorities?
25     A.   I think every year I was on, except

11 (Pages 38 - 41)

Page 42

1  for the last year.
2      Q.    Would that be from 2009 to 2016 or
3  so?
4      A.    Yeah, yeah, yeah.
5      Q.    What are the sources of funding for
6  the Cuyahoga County ADAMHS Board?
7      A.    The major source of funding is the
8  county subsidy of -- I can't remember the exact
9  numbers, but they seem to get the majority of
10  the money, plus they got money from the state
11  government, different government funds, plus
12  they got some grants from the federal
13  government and other nonprofit organizations.
14      Q.    Does Medicaid funding have any
15  impact on the amount of money that ADAMHS has
16  available?
17      A.    It did, until the state took over
18  the distribution of the Medicaid.  The county
19  boards don't do that any more, but it does have
20  an impact on the funding applications.
21      Q.    For those of us who are not
22  familiar with the details of Medicaid and its
23  impact on available resources for the ADAMHS
24  Board, can you describe just a little bit more
25  about how Medicaid funding plays into it and

Page 43

1  describe the change that you are talking about?
2      A.    Well, previously Medicaid funding
3  used to go directly to the board, then we would
4  distribute to the providers.  We no longer do
5  that.  The providers get their funding directly
6  from Medicaid through the State of Ohio.
7          So those who qualify for Medicaid,
8  those that get funding for their services,
9  whether it be in a hospital or other services,
10  and Medicaid pays for it.
11      Q.    And you said that there was some
12  change that took place.
13      A.    Yes.  That change was about seven
14  or eight years ago.
15      Q.    Was that with the passage of the
16  Affordable Care Act?
17      A.    No.  The Affordable Care Act came
18  after that.
19      Q.    So what is the change that you are
20  referring to and what caused that change?
21      A.    Well, there is one of two ways to
22  do it:  The state would give the money to the
23  county, and the county would distribute the
24  money and Medicaid, or the state would pay the
25  money directly to the providers.  Now they pay

Page 44

1  the money directly to the providers.
2      Q.    What, was there a piece of
3  legislation that passed in the Ohio General
4  Assembly that caused that change, or was that
5  changed caused by some other action?
6      A.    I think it was through
7  administrative action.  It didn't need
8  legislative -- it didn't need to be passed
9  through the general assembly.
10      Q.    Is that through the Ohio Department
11  of Health?
12      A.    No.  It's through the Ohio
13  Department of Mental Health and Addiction.
14      Q.    Do you know the relative
15  percentages as between the revenue sources for
16  the ADAMHS Board from county dollars versus
17  from state dollars versus from federal dollars
18  versus private funds?
19          MS. SACKS:  Objection.
20      A.    I did, but I don't remember them
21  anymore.  I did, but I don't know what they are
22  anymore.  All the ones -- they fluctuate back
23  and forth.
24      Q.    You indicated that the county
25  provides some funding to the ADAMHS Board; is

Page 45

1  that right?
2      A.    That's correct.
3      Q.    What is the source of the funding
4  that the county provides to the ADAMHS Board?
5      A.    Through the county taxes.
6      Q.    Is it through the HHS levy?
7      A.    That is the major part of it, yes.
8      Q.    Talking now strictly about funds
9  that the ADAMHS Board receives directly from
10  the county, are there any other sources, other
11  than the HHS levy, that is a source for ADAMHS
12  Board funding from the county?
13      A.    Yes, there are.  I don't remember
14  what they are called.  They are very small, as
15  compared to the large health and human service
16  funding.
17      Q.    Are you able in any way to describe
18  these other non-HHH levy funding sources from
19  the county?
20      A.    No.
21      Q.    You indicated they are very small?
22      A.    Yes.
23      Q.    Can you give us some sense of what
24  you mean by that?
25      A.    Yeah.  10,000 as compared a

12 (Pages 42 - 45)

Page 46

1  million, that's small.
2      Q.   During the time that you were the
3  chief executive officer of the Cuyahoga County
4  ADAMHS Board, did the ADAMHS Board ever make
5  any expenditures that were directed
6  specifically at trying to understand the
7  contributing factors or causes of opioid abuse
8  or overdose trends within the county?
9      A.   Would you repeat that question so I
10  understand it better.
11      Q.   Sure.  Let me do it one more time.
12      A.   Okay.
13      Q.   During the time that you were the
14  chief executive officer for the Cuyahoga County
15  ADAMHS Board, did the board ever make any
16  expenditures that were directed specifically at
17  trying to understand the contributing factors
18  or the causes of opioid abuse or overdose
19  trends within the community?
20      A.   I don't recall.
21      Q.   During the time that you were the
22  chief executive officer of the Cuyahoga County
23  ADAMHS Board, did the board ever make any
24  expenditures that were specifically directed at
25  mitigating or reducing levels of opioid abuse

Page 47

1  or overdose trends in the community?
2      A.   I don't think so, but I don't
3  recall.
4      Q.   During the time that you were the
5  chief executive officer of the Cuyahoga County
6  ADAMHS Board, did the board ever make any
7  specific requests to the county for any funds
8  specifically to address opioid abuse or
9  overdose in the community?
10      A.   Yes, in terms of more funding for
11  treatment beds, things of that nature, because
12  of the epidemic.
13      Q.   That's what I wanted to ask you
14  about.
15      A.   Okay.
16      Q.   When did the Cuyahoga County ADAMHS
17  Board go to the county and specifically request
18  funds to address opioid abuse and overdose
19  trends?
20      A.   I believe -- I don't recall the
21  exact years, but I think it would be the last
22  two or three years.
23      Q.   When you say, "Last two or three
24  years," what do you mean by that?
25      A.   14, 15, 16.

Page 48

1      Q.   I just want to make sure I
2  understand this correctly.  Is it your
3  recollection that prior to 2014, the Cuyahoga
4  County ADAMHS Board never went to the county
5  and requested funds specifically to address
6  opioid abuse or overdose trends in the
7  community?
8      A.   No, that's not what I'm saying.
9          I'm saying that we did request
10  additional funding, and I can recall back to
11  14, 15, in that area, and some of it was for
12  opiate abuse and some of it was for other
13  things.
14      Q.   Do you recall prior -- well, let's
15  talk specifically about any requests for
16  expenditures that were related directly and
17  specifically to opioid abuse, okay?
18          Do you recall whether or not the
19  Cuyahoga County ADAMHS Board ever went to the
20  county government and requested funds
21  specifically to address opioid abuse or
22  overdose?
23      A.   Yes.
24      Q.   When is the first time that you
25  recall the Cuyahoga County ADAMHS Board going

Page 49

1  to the county to request funds to specifically
2  address opioid abuse or overdose trends?
3      A.   I would say it's either 2014, 15 or
4  16.
5      Q.   Do you recall what specific purpose
6  the ADAMHS Board went to the county and made
7  those requests for?
8      A.   The specific purpose was to provide
9  funding for such things as beds.
10      Q.   For those who may not be as
11  familiar with the treatment of substance-use
12  disorders, what do you mean when you say
13  funding for beds?
14      A.   Well, a person goes to the
15  hospital.  The hospital needs beds.  Should
16  they have the disease of mental illness or
17  addiction, and because of the epidemic, the
18  beds were becoming fewer and fewer, and the
19  waiting period was becoming longer and longer,
20  and we needed the beds for medically assisted
21  treatment and beds for long-term sober
22  recovery.
23          So that was the general request
24  that we made.  I don't remember the exact
25  numbers, but generally that's what it was for.

13 (Pages 46 - 49)

Page 50

1    Q.   Do you recall how much money the
2  ADAMHS Board requested from the county
3  specifically for the purpose of addressing
4  opioid abuse and overdose trends in the
5  community?
6    A.   Not exactly.  I can't remember
7  exactly, but it was more than what we received.
8    Q.   You requested more than what you
9  received?
10   A.   Yes.
11   Q.   You anticipated my next question.
12 I was going to ask you whether or not your
13 request for those funds to the county was
14 honored?
15   A.   Sometimes it was and sometimes it
16 wasn't.
17   Q.   When you would make those requests
18 of the county, to whom would those requests be
19 made?
20   A.   It would be made in -- the process
21 is to submit it to the county council, and who
22 would work with -- in concurrence with the
23 county administration, to see if they would
24 agree and/or disagree.
25   Q.   When you talk about county

Page 51

1  administration, do you mean the county
2  executive's office.
3    A.   Yes.
4    Q.   Were there members of the county
5  council who were particularly involved in
6  budgeting decisions and specifically
7  ADAMHS-related budgeting?
8    A.   Yes.
9    Q.   Who were those individuals.
10   A.   It was usually the council
11 president and the council finance chair.
12   Q.   Can you give us names?
13   A.   Sure.  Council president was Dan
14 Brady and the county finance chair was Dale
15 Miller.
16   Q.   Were there any members of the
17 Cuyahoga County Council who, in your view, had
18 a particular interest in understanding and
19 addressing opioid abuse, addiction and overdose
20 in the community?
21   A.   Yes.
22   Q.   Who were those individuals?
23   A.   I can't remember them all, but one
24 of them I do remember was Yvonne Conwell.
25 That's one that I recall.

Page 52

1    Q.   Anybody else?
2    A.   Well, it's kind of unfair to all
3  the other council, I just can't remember them,
4  and they all, from time to time.
5        Ms. Conwell made it a point of
6  coming to meetings and demonstrating a real
7  genuine interest in it, but I think all of
8  them, from time to time, shared an interest in
9  it, all of them.  I would say all of them at
10 one time or another shared an interest in it.
11   Q.   You indicated that in some
12 instances, requests for funding by the ADAMHS
13 Board to the county in relation to opioid abuse
14 were honored, and in other instances those
15 funds were not granted.
16       What is your understanding as to
17 what the factors were that determined whether
18 or not the county provided the funds you
19 requested to address opioid abuse?
20   A.   That was not my area of expertise.
21 I don't know how they made their decisions or
22 why they did.  So you have to ask them.
23   Q.   Did you ever have any conversations
24 with them about the requests, why you wanted
25 the money, what you were going to use it for

Page 53

1  and so on?
2    A.   Oh, yes.  They wanted -- they all
3  asked for specifics as to why you wanted it,
4  why you needed it, and what it would go for.
5  So it is part of the procedure.
6    Q.   Based on those conversations, did
7  you get a sense as to the reasons why the county
8  council might agree or not agree --
9    A.   No.
10   Q.   -- to the request that you made?
11   A.   No.
12   Q.   Who would we need to talk to to get
13 a better sense of that?
14       MS. SACKS:  Objection.
15   A.   My sense is the county council
16 themselves.
17   Q.   Do you know Mr. Scott Osiecki?
18   A.   Uh-huh.  Yes.  I'm sorry.
19   Q.   That's okay.  We've been doing a
20 pretty good job so far.
21       MR. BOEHM:  Why don't we just go
22 off the record for a moment.
23       THE VIDEOGRAPHER:  Off the record,
24 9:57.
25       (Recess taken.)

14 (Pages 50 - 53)

Page 54

1        THE VIDEOGRAPHER:  On the record,
2   10:09.
3        Q.   Mr. Denihan, welcome back from our
4   short break.
5        I understand that there was
6   something from your earlier testimony this
7   morning that you wish to clarify.
8        A.   If you allow me to include that I
9   finally did get a bachelor's degree at 61 at
10  Cleveland State University, when I was 61 and
11  the safety director for the City of Cleveland.
12        The other part that I'm very proud
13  of is I have a doctorate degree, honorary
14  doctorate degree.  I was awarded that two years
15  ago from Cleveland State for public service.
16  So I would like to have that added to it.
17        Q.   Great.  Wonderful.  Thank you and
18  congratulations.
19        A.   Thank you.
20        Q.   I have seen your resume, and it is
21  long and distinguished, so congratulations.
22             - - - - -
23             (Thereupon, Deposition Exhibit 2,
24             Designated Confidential, 11/16/2012
25             Email, Subject: Update on County

Page 55

1             Budget, with Attachment, Beginning
2             with Bates Label CUYAH 012792797,
3             was marked for purposes of
4             identification.)
5             - - - - -
6        Q.   I have marked the next document as
7   an exhibit to the deposition.  This is Exhibit
8   2.  I'll give you a moment to take a look at
9   it, and while you are doing that, I'll just for
10  the record indicate that this is an email from
11  Mr. Scott Osiecki that attaches a county budget
12  presentation made in November 2012 before the
13  county council committee as a whole, and it
14  appears from this document that you,
15  Mr. Denihan, were the presenter of this
16  presentation.
17        Would you just let me know when you
18  have had a chance to skim it.
19        Have you had a chance to read the
20  email?
21        A.   The email I have.
22        Q.   And I'm going to direct your
23  attention to a couple of the slides, but before
24  we do that, let me just ask you about the
25  content of the email.

Page 56

1        First of all, do you recall making
2   the presentation in November 2012 to the county
3   council that's referenced here?
4        A.   Vaguely.
5        Q.   Is that something that you
6   regularly would do?  In other words, would you,
7   as chief executive officer of the ADAMHS Board,
8   routinely make presentations related to the
9   ADAMHS budget to the county council?
10        A.   Yes.
11        Q.   How often would you do that; was
12  that on an annual basis?
13        A.   Mostly on an annual basis.
14        Q.   What was the purpose of those
15  presentations you would make to the county
16  council, in terms of the budget?
17        A.   A number of things.  To defend and
18  protect the stability of the budget, and to
19  demonstrate a need for additional funding or a
20  cutting of the funding or a program.
21        Q.   It appears from this email that in
22  2012, you, on behalf the Cuyahoga County ADAMHS
23  Board, requested a total of $936,550 in
24  additional funding for various different
25  programs; do you see that?

Page 57

1        A.   That's correct.
2        Q.   The first item on the list is
3   something called Bridgeway; do you see that?
4        A.   Yes.
5        Q.   What is Bridgeway?
6        A.   Bridgeway is a provider.  They went
7   belly up and out of business.  And these are
8   additional expenses to pay for consumers that
9   were living in properties owned by Bridgeway,
10  and to continue their survival and life after
11  Bridgeway.  They would be homeless otherwise.
12        So we were asking for that money to
13  continue their housing and their treatment
14  services.
15        Q.   What services did Bridgeway
16  provide?
17        A.   Counseling services, mental illness
18  counseling services, and also some drug
19  addiction services.
20        Q.   Do you know roughly what percentage
21  of services Bridgeway provided was mental
22  health services versus substance abuse
23  services?
24        A.   In this particular point in time,
25  there were probably more mental health services

15 (Pages 54 - 57)

Page 58

1  than substance abuse services.  That's what
2  Bridgeway focused on.
3      Q.   If I understand it correctly,
4  ADAMHS Board was requesting $591,550 in order
5  to fund services that Bridgeway previously had
6  been providing but could no longer provide,
7  given that it had, as you put it, gone belly
8  up; is that right?
9      A.   Uh-huh.
10     Q.   You have to --
11     A.   I'm sorry.
12     Q.   Is that correct?
13     A.   I'm sorry.  I wasn't paying
14  attention, as I should have.  Would you repeat
15  the question, please.
16     Q.   Absolutely.  Sure.
17          Tell me if I've got this correctly
18  summarized:  Is it true that the ADAMHS Board
19  was requesting $591,550 in order to fund the
20  services that Bridgeway previously had been
21  providing, but no longer could, because, as you
22  put it, they went belly up?
23     A.   Yes.
24     Q.   Are you able to say --
25          Your microphone, you might want

Page 59

1  to --
2          MR. BOEHM:  Should he slide it up a
3  little bit?
4          THE VIDEOGRAPHER:  Thank you.
5      Q.   Are you able to say how much of
6  that $591,550 would have been directed toward
7  substance-use services, as opposed to mental
8  health?
9      A.   No, I'm not able to do that.
10     Q.   Did the county council approve
11  ADAMHS Board's request for $591,550 related to
12  Bridgeway expenses?
13     A.   I believe they did, but I can't
14  totally recall to affirm they did.
15     Q.   The second item on the list is
16  $150,000 for team decisionmaking at DCFS; do
17  you see that?
18     A.   Yes.
19     Q.   To what does that refer?
20     A.   The Department of Children and
21  Family Services had a study completed, and one
22  of the recommendations was to have team
23  decisionmaking, and what it refers to is
24  members of the team be from other departments
25  within the organization, within county

Page 60

1  government, and the mental health board was one
2  of those partners, and that there would be a
3  cost to the team decisionmaking, and this was
4  the cost for doing that.
5          For foster care and adoption, all
6  too often all the parties weren't at the table,
7  especially if it was a mental health case, and
8  we didn't have the mental health professional
9  there, they would have to reschedule the case
10  to get the mental health professional there,
11  and that was wasting time and costing money,
12  and that was what that was for.
13     Q.   What would the $120,000 that was
14  requested be used for specifically at the
15  ADAMHS Board?
16     A.   The money was not for the ADAMHS
17  Board.  It was for the Department of Children
18  and Family Services, for us to pay for
19  counselors to go to these hearings.
20     Q.   The third item I think we can
21  probably skip over.  It refers to some mental
22  health services at the community-based
23  correctional facility.  That doesn't have
24  anything to do with substance abuse, correct?
25     A.   It could have, yes.

Page 61

1      Q.   In what way?
2      A.   Well, so many times, actually the
3  majority of the times, people had dual
4  diagnosis, and many times the mental illness
5  masked the substance abuse or vice versa, so
6  which is one of the reasons we consolidated
7  both.
8          And the correction based --
9  correction facility did not have funding for
10  mental services at this location.  The
11  state -- for some reason, the state doesn't
12  fund correctional facilities within the
13  community, so we were recommending that this
14  money go to that.
15     Q.   Is it correct that many individuals
16  who have addiction have an underlying mental
17  illness?
18     A.   I don't think you can say it that
19  way you just said it.  Could I correct you for
20  a second?
21     Q.   Of course.  Tell me how you would
22  say it.
23     A.   That the majority of people -- a
24  majority, not 90 percent, but closer to 60
25  percent, have dual diagnosis, period.

16 (Pages 58 - 61)

1    Q.    When you say dual diagnosis, you
2  mean --
3    A.    Mental illness and addiction.
4    Q.    And when you say 60 percent, 60
5  percent of what, of people who have a
6  substance-use disorder?
7    A.    Yes.
8    Q.    So to sum it up, approximately 60
9  percent of individuals who have a substance
10  abuse disorder, also have some kind of mental
11  health disorder?
12    A.    Yes.
13    Q.    Based on your work at the ADAMHS
14  Board for all those years, do you have an
15  understanding about what the relationship is
16  and why that's true, that there is so commonly
17  an underlying mental health disorder in
18  individuals who have a substance-use disorder?
19        MS. SACKS:  Objection.
20    A.    I don't know that I could be there
21  a hundred years and be able to understand that
22  and give you a definite answer.  I'm not a
23  psychiatrist or a doctor.  So I can't answer
24  that.
25    Q.    Okay.  Have you ever had

1  communications with individuals in the mental
2  health or substance-use disorder community here
3  in the county on that subject?
4        MS. SACKS:  Objection.
5    A.    I'm sure we have had conversations
6  on it, but I don't deny that we had
7  conversations, period.
8    Q.    I guess I'm really just trying to
9  understand if you have any understanding at all
10  about why it is that so many individuals who
11  have a substance abuse problem have mental
12  health disorders?
13        MS. SACKS:  Objection.
14    A.    I just don't know.
15    Q.    The fourth item on the list here,
16  going back to Exhibit 2, refers to a request
17  for $150,000 for a prevention campaign to
18  address the opiate/heroin epidemic; do you see
19  that?
20    A.    Yes, I do.
21    Q.    Do you recall making a request to
22  the county council in 2012 on behalf of the
23  Cuyahoga County ADAMHS Board for $150,000 for a
24  prevention campaign to address the
25  opiate/heroin epidemic?

1    A.    Yes, I do.
2    Q.    Why had the ADAMHS Board made this
3  request in 2012?
4    A.    We made the request to increase
5  public awareness of the consequences of
6  becoming addicted, that it can kill you.  And
7  so we wanted to have -- propose a prevention
8  campaign to do that, and that was the request.
9    Q.    Was there anybody at ADAMHS during
10  the time that you were the chief executive
11  officer who was particularly focused on opioid
12  abuse and overdose issues?
13    A.    No.  No.
14    Q.    The email here says that the
15  purpose was to address an opiate/heroin
16  epidemic, and you, in your testimony this
17  morning, have referred to trends of opioid
18  abuse and overdose as an epidemic.
19        Can you describe why you have
20  chosen to use the term "epidemic" and what your
21  understanding is of what that term means in
22  this context?
23    A.    I used that term in the beginning,
24  recognizing I was one of the first ones to use
25  that term, because I saw the difference of

1  figures of fatalities early on.
2        And, for example, the crack cocaine
3  era, it went up to 50, down, up, and down to
4  50.  The heroin and the opiate didn't stop at
5  50.  I think it went to like 156 and then 212,
6  and I thought that was the highest it was going
7  to get.
8        So that's why I used -- that's why
9  I used that term.  It just didn't increase, it
10  exploded and -- period.
11    Q.    And when you talk about those
12  figures, 50 and 212 and the other numbers, what
13  are you referring to exactly?
14    A.    We kept -- there are figures that
15  we kept, and I actually tracked through my
16  career, through public safety, in terms of
17  automobile crashes, drunk driving crashes --
18  deaths rather, homicides and suicides, and I
19  knew what those were for the last 20 years, 25
20  years.
21        And in Cuyahoga County, for
22  example, homicides, suicides and automobile
23  crashes hovered between 150 and 180 deaths a
24  year, up and down for the last so many years.
25        And down at the bottom were a

17 (Pages 62 - 65)

Page 66

1  number of other diseases and illness, crack,
2  heroin, et cetera, and it was always very low,
3  at a low basis.  And when the epidemic started,
4  it didn't go like this, it went like -- it
5  didn't go gradually up, on a stepladder, it
6  went almost straight up on the map.
7          That's why -- that's unusual.  It
8  doesn't happen all the time, and I saw that was
9  extremely unusual, and that's why I reacted
10  that way.
11      Q.    So those numbers that you are
12  referring to, are those in reference to
13  overdoses, overdose fatalities?
14      A.    Yes.
15      Q.    And here in November 2012, you are
16  referring to it as an epidemic.  On what basis
17  had the county and the ADAMHS Board determined
18  that Cuyahoga County was experiencing an
19  opioid/heroin epidemic in or before 2012?
20          MS. SACKS:  Objection.
21      A.    The basis was that previous reports
22  were far lower than what the pattern had set
23  the year before and what we were experiencing
24  then.
25      Q.    When in Cuyahoga did the trends of

Page 67

1  opioid/heroin-related overdose fatalities start
2  to go up?
3      A.    I think the trend started in 2012,
4  13, 14, that era, that time.
5      Q.    Do you know when overdose
6  fatalities became the leading cause of
7  accidental death in Cuyahoga County?
8      A.    When it exceeded motor vehicle
9  accidents at 212 and 215.  And I can't remember
10  what year that was.
11      Q.    If I understand you correctly, the
12  ADAMHS Board and you, as the chief executive
13  officer for the ADAMHS Board, tracked the
14  numbers of accidental deaths in the county and
15  the causes of those accidental deaths over the
16  years; is that correct?
17          MS. SACKS:  Objection.
18      A.    We track the accidental deaths as
19  best as we can, and we take the figures that's
20  given to us from the medical examiner's office.
21      Q.    For how long has you been
22  tracking the numbers of accidental deaths and
23  the causes of those deaths; has that been true
24  for as long as you have been the chief
25  executive officer?

Page 68

1      A.    Yes, at least then.
2      Q.    Why do you refer to it as the -- in
3  this document it's referred -- let me start
4  that question over.
5          Going back to Exhibit 2, item
6  number 4, the request for these additional
7  funds is in relation to the opiate/heroin
8  epidemic.  Why was it referred to as an
9  opiate/heroin epidemic?
10      A.    I can't give you an answer today.
11  I don't know why.  I believe this is all
12  beginning jargon for us at that time.  So the
13  best I could tell you.
14      Q.    Based on the years that you have
15  been involved in public safety in Cuyahoga
16  County, and the executive director of the
17  Department of Children and Family Services and
18  your other roles in county government, for how
19  long has addiction to heroin been something
20  that county government has had to deal with?
21      A.    Oh, I think it has been there for a
22  long, long time.  I don't think it's brand new.
23  I think for as long as I know of, it's been
24  around.  Not with these numbers.
25      Q.    You indicated that the $150,000 for

Page 69

1  the prevention campaign would, in part, be used
2  for building awareness?
3      A.    Yes.
4      Q.    Awareness about what?
5      A.    Awareness, we tried to find out how
6  to reach the public, to let them know whatever
7  form of opiate or heroin they took, no matter
8  what it was, it could end up in death.  So it
9  was a very short message and was specific to
10  let folks know this could kill you.
11      Q.    Did the county council approve the
12  request for $150,000 for a prevention campaign
13  to address the opioid and heroin epidemic --
14      A.    I can't remember--
15      Q.    I'm sorry.  I just got to finish
16  the question.
17      A.    I'm sorry.
18      Q.    No, that's okay.  Let me just say
19  it again.  It's tricky.  We will both make that
20  mistake.
21          Do you recall whether the county
22  council approved ADAMHS Board's request for
23  $150,000 for this prevention campaign to
24  address the opiate/heroin epidemic in Cuyahoga
25  County?

18 (Pages 66 - 69)

Page 70

1    A.   I can't remember.
2    Q.   If you turn to the second page of
3  the email, the fourth paragraph down says,
4  "Councilman Michael Gallagher questioned the
5  effectiveness of prevention and wanted
6  Mr. Denihan to provide him with proof that the
7  opiate prevention campaign would work before
8  considering the request of $150,000"; do you
9  see that?
10    A.   Oh, yes.
11    Q.   Who is Councilman Michael
12  Gallagher?
13    A.   Councilman Michael Gallagher is now
14  state representative Michael Greenspan,
15  representing the western suburbs of Cuyahoga
16  County.
17    Q.   Greenspan or Gallagher?
18    A.   I'm sorry.  I thought we were
19  talking about Greenspan.
20    Q.   Greenspan is referenced in the
21  paragraph above the one we just read.
22    A.   Oh, I'm sorry.
23    Q.   The one below it says Councilman
24  Michael Gallagher is the one who questioned the
25  effectiveness of prevention and wanted you to

Page 71

1  provide proof that the prevention campaign
2  would work before considering the requested
3  money; do you see that?
4    A.   Yes, I do.
5    Q.   Who is Councilman Michael
6  Gallagher?
7    A.   He is a minority councilman.
8    Q.   What do you mean, "He is a minority
9  councilman"?
10    A.   When you look at minority and
11  majority, he is a Republican, with three
12  Republicans and nine Democrats.
13    Q.   Is Michael Gallagher still a county
14  councilman?
15    A.   Yes, he is.
16    Q.   What is your recollection about the
17  request from Councilman Gallagher that you
18  provide some proof that the awareness campaign
19  would work?
20    A.   My experience has been it's very
21  difficult, whether it is opiate or anything
22  else, to provide any prevention campaign to
23  work.
24    Q.   So provide proof?
25    A.   To provide proof that it's working.

Page 72

1    I'll give you an example.  On
2  suicide presentation, to prove that we
3  prevented suicide prevention is very difficult.
4    However, every time we would spend,
5  say, $150,000, the next year suicide would go
6  down 10 to 15 percent.  We would not spend it
7  the next year, it would go up the following
8  year 10 to 15 percent.  It would go up.  That
9  is the best example of proof we could get, and
10  some folks do not appreciate that.
11    So my experience has been, and
12  relative to that comment, to prove prevention
13  is very difficult, very, very difficult, and in
14  this case we didn't.
15    Q.   In this case you did not provide
16  proof?
17    A.   No, we couldn't.  If we could have,
18  it went down.  It didn't go down, opiate went
19  up.
20    Q.   Well, do you know if this awareness
21  campaign or prevention campaign was ever put
22  into effect?
23    A.   Yes, it was.  A campaign was put
24  into effect.  That's why I said what I just
25  said.

Page 73

1    Q.   When was that campaign put into
2  effect; was it in the 2012 timeframe?
3    A.   I think it was after that.  I can't
4  remember exactly when, but it was after that.
5    Q.   Can you remember a year?
6    A.   13 or 14.
7    Q.   In the next paragraph down, it
8  states, "Mr. Denihan explained that the board
9  is an active partner in the Cuyahoga County
10  Opiate Task Force, which both the sheriff and
11  the medical examiner also participate"; do you
12  see that?
13    A.   Yeah.  Yes.
14    Q.   What is the Cuyahoga County Opiate
15  Task Force?
16    A.   A collection of individuals that
17  have a relationship with the county to serve on
18  this task force.
19    Q.   In what way has the ADAMHS Board
20  been a partner with the Cuyahoga County Opiate
21  Task Force?
22    A.   Well, we were an active partner,
23  active in the campaign.  We went to meetings,
24  and we went to meetings and had dialogue and
25  communications.

19 (Pages 70 - 73)

Page 74

1    Q.    Were you one of the founders of the
2 Cuyahoga County Opiate Task Force?
3    A.    I never thought of myself as a
4 founder, but I was one of the original ones.
5    Q.    Were you one of the original
6 members of the Cuyahoga County --
7    A.    I think I was, yes.
8    Q.    The question is: Were you one of
9 the original members of the Cuyahoga County
10 Opiate Task Force?
11    A.    I believe I was.
12    Q.    Do you recall that the Opiate Task
13 Force for Cuyahoga County was established in
14 2010?
15    A.    I don't remember the exact date it
16 was established.
17    Q.    This statement here in the document
18 we have marked as Exhibit 2 indicates that the
19 sheriff and the medical examiner were also
20 partners with the Cuyahoga County Opiate Task
21 Force, correct?
22    A.    Correct.
23    Q.    Has the sheriff's department and
24 the office of the medical examiner always been
25 active partners for the Cuyahoga County Opiate

Page 75

1 Task Force?
2    A.    To the best of my knowledge, yes.
3    Q.    The last sentence of that paragraph
4 states that "Councilman Gallagher asked
5 Mr. Denihan to make a presentation about the
6 campaign and prove that prevention works during
7 the council's public safety committee at
8 a.m. on Tuesday, November 27"; do you see that?
9    A.    Yes, I do.
10    Q.    Do you recall whether or not you
11 made such a presentation?
12    A.    I don't recall that we did.
13    Q.    Other than the ADAMHS Board, the
14 sheriff, the medical examiner, what other
15 active partners were involved in the Cuyahoga
16 County Opiate Task Force?
17    A.    The county health director, the
18 City of Cleveland Health Department, somebody
19 from children and family services, the
20 prosecutor's office, the federal assistant
21 prosecutor, assistant attorney, various chiefs
22 of police from different communities, highway
23 patrol. Those are some of the ones I can
24 remember -- and some various hospitals.
25    Q.    Those would be hospitals within the

Page 76

1 county?
2    A.    Uh-huh.
3    Q.    Would MetroHealth have been an
4 active partner with the Cuyahoga County Opiate
5 Task Force?
6    A.    Yes.
7    Q.    How about Cleveland Clinic?
8    A.    Yes.
9    Q.    What about University Hospitals?
10    A.    Yes.
11    Q.    What is your understanding about
12 what the overarching purpose of the Cuyahoga
13 County Opiate Task Force is and was?
14    A.    To save lives.
15    Q.    Can you just explain that a bit
16 more?
17       In what way did you understand that
18 the purpose of the Cuyahoga County Opiate Task
19 Force to be to save lives?
20    A.    Rarely can one entity be the answer
21 to a large problem like this, and bringing all
22 the forces together, just the act of
23 communication with one another makes it
24 stronger to enact public policy, public policy
25 that needs to change or be accepted to deal

Page 77

1 with things that we were dealing with.
2       We were dealing with something that
3 is totally explosive, that we did not have the
4 capacity to deal with. And by having a task
5 force made us a stronger entity to come up with
6 programs to deal with it, and many good
7 programs came out of this.
8    Q.    You indicated earlier today that
9 you believe yourself to be one of the first
10 people to notice the worrisome trends of opioid
11 abuse and overdoses and maybe one of the first
12 people to use the term "epidemic" in connection
13 with those trends.
14       Do you recall when you first
15 noticed those worrisome trends?
16    A.    Around this time, the time when I
17 noticed that --
18    Q.    What time are you referring to?
19    A.    The time that -- this time right
20 here, 2000- -- I guess it's 12. I didn't
21 realize it was that early.
22       When I start looking at the death
23 rates going above 100, went to 156 or something
24 like that, when they hovered in between 20 and
25 40 for years, and then it went up to 212 or

20 (Pages 74 - 77)

1  something like that.  That's when I noticed,
2  and that's when I used those terms.
3      Q.  You don't recall exactly what year
4  that was in?
5      A.  No, I don't recall.
6      Q.  And by 2012, the county had already
7  established an Opiate Task Force, right?
8      A.  That's correct.
9      Q.  So these trends were recognized,
10  the worrisome trends in term of opioid abuse
11  and overdose were recognized by the county
12  sometime before 2012, correct?
13          MS. SACKS:  Objection.
14      A.  That's correct.
15      Q.  I want to direct your attention to
16  one of the slides in particular that's attached
17  to this email.  Unfortunately, these documents
18  are not numbered, so we are just going to have
19  to sort our way through it, but it is a slide
20  that's about six or seven in, and it looks like
21  this.  It has a graph.
22          MS. SACKS:  805 Bates number?
23          MR. BOEHM:  Yes.
24          MS. SACKS:  Remember I told you
25  about the numbers in the corner?  So look for

1  805.
2      Q.  There it is.
3          MS. SACKS:  You passed it, yeah.
4      Q.  One back.
5          Okay.  We are, for the record,
6  looking at the page of Exhibit 2 that's stamped
7  Cuyahoga 012793805.  It is a graph that
8  compares spending by the ADAMHS Board, or
9  revenue available to each ADAMHS Board on a
10  county-by-county basis; do you see that?
11      A.  Yes.
12      Q.  And it also shows each county's
13  population?
14      A.  Yes.
15      Q.  Cuyahoga County has the largest
16  population in the state?
17      A.  I think it's second now to Franklin
18  County.
19      Q.  But at this time, it appears that
20  Cuyahoga had a slightly larger population than
21  Franklin County?
22      A.  Yes.
23      Q.  And then on the right-hand side of
24  this schematic, do you see there are some
25  dollar figures?

1      A.  Yep, I do.
2      Q.  Can you explain what this chart is
3  designed to demonstrate?
4          MS. SACKS:  Objection.
5      A.  I believe it's at a point in time,
6  in terms of population versus funding.
7      Q.  Was the point of this particular
8  slide that you were using in your presentation
9  to the Cuyahoga County Council to show that the
10  amount of spending by the Cuyahoga County
11  ADAMHS Board was low, relative to the
12  population of the county, as compared to
13  spending by ADAMHS Boards in other counties?
14      A.  I don't know if that was a direct
15  purpose of it.  I don't recall.
16      Q.  Look at the bottom, the last
17  sentence.
18      A.  Okay.  I see it.
19      Q.  The last two lines say, "The
20  Cuyahoga board is funded at the same level as
21  the Athens, Hocking, Vinton board, when
22  Cuyahoga has 11.9 times more people"; do you
23  see that?
24      A.  Uh-huh.
25      Q.  What is the point you were trying

1  to convey to the county council when you
2  presented this information?
3      A.  I don't recall exactly why I said
4  that, other than the fact that I was looking to
5  try to get more money.
6      Q.  Okay.  It might help if we turn to
7  the next slide, which has another schematic.
8  I'll let you get there.
9      A.  I'm sorry.  I'm having a hard time
10  changing these pages.
11      Q.  That's okay.
12          MS. SACKS:  Do you want me to
13  change it?
14          THE WITNESS:  Would you?
15          MS. SACKS:  Yeah.
16          THE WITNESS:  Thanks.
17          MS. SACKS:  You're welcome.
18      Q.  Okay.  This schematic is titled
19  Allocated Amount Per Person in County Board
20  Population; do you see that?
21      A.  Yes, I do.
22      Q.  And Cuyahoga is the last county
23  that's listed, at the very end of the
24  schematic; do you see that?
25      A.  Yes, I do.

21 (Pages 78 - 81)

Page 82

1    Q.    And it looks to me like the county
2  ADAMHS Boards are organized by order of highest
3  amount of spending per capita to lowest amount
4  of spending per capita; is that right?
5    A.    Yep.
6    Q.    And what point were you trying to
7  convey to the county council when you
8  communicated to them that the Cuyahoga County
9  ADAMHS Board had the least amount of spending
10  per capita of any ADAMHS Board in the state?
11    A.    This is my recollection regarding
12  the former chart.  I was pointing out the State
13  of Ohio was not providing enough funding to
14  Cuyahoga County as compared to other counties.
15  It was a state funding issue, and I was also
16  asking the county for the advocacy on
17  equalizing the funding in the 505 account, and
18  I was showing them the disparity between all
19  the other counties.
20    Q.    So do these charts that are on the
21  pages that end with Bates numbers 3805 and 3806
22  reflect only money that came from the State of
23  Ohio and not any other sources of revenue?
24    A.    I think so.  I think that's what it
25  was.  That's what we were trying to show.

Page 83

1    MS. SACKS:  There it is.
2    THE WITNESS:  Thank you.
3    MS. SACKS:  This one and this one.
4    Q.    Do you know why the State of Ohio
5  gave money to Cuyahoga that was so much less
6  per capita than it provided to ADAMHS Boards in
7  other counties in the state?
8    A.    No, I do not.  It is a
9  source -- it's a sore point.
10    Q.    Did you ever go to the powers that
11  be in state government and raise this point?
12    A.    Yes, I did.
13    Q.    And can you describe those
14  conversations?
15    A.    Well, I went to the general
16  assembly, I went to the Minority Caucus, to the
17  Black Caucus, and finally somebody said to me,
18  "Denihan, you're Democrat, you're from Cuyahoga
19  County, you are not in charge anymore of the
20  State of Ohio."  That was the answer.
21    Q.    Did you interpret that to mean that
22  because you were a Democrat --
23    A.    Cuyahoga County is Democratic,
24  heavily Democratic, and the state government
25  was run by the Republicans, and they're going

Page 84

1  to do what they want to do, and they are not
2  going to make any changes, and that's just too
3  bad.  That's just the way it goes.
4    Q.    Was it your understanding that the
5  state government, because it was in the control
6  of the Republican Party, gave less funding to
7  Democratic strongholds within the state?
8    A.    That's exactly what I'm saying.
9    Q.    Including with respect to spending
10  on substance abuse disorders?
11    MS. SACKS:  Objection.
12    A.    Whatever.  It doesn't really
13  matter.  I don't know if they zeroed in on
14  substance abuse disorders.
15    My point is that we were pointing
16  out that the state funding level was
17  inadequate, as it relates to 505 funding line
18  and population of all the other counties.  That
19  was our point, and that's what this is about.
20    Q.    And you were sharing that
21  information with the county council in hopes
22  that they could provide money that would help
23  fill in the gaps; is that right?
24    MS. SACKS:  Objection.
25    A.    My hope was twofold:  One is that

Page 85

1  they could use whatever influence they could
2  and the power structure in Columbus to bring
3  equity to this, and also provide funding, as
4  requested.  But that's really what was behind
5  here.
6    Q.    Got it.  I'm going to have you turn
7  ahead several pages.  At some point the
8  numbers -- the numbering of the slides starts
9  to pick up again, and I'm going to have you
10  look for a slide with the number 19 in the
11  bottom right-hand corner.  The Bates number
12  ends with 3817.  And if you would like, I'm
13  happy to help you get there.
14    A.    Here.
15    Q.    Sure.
16    A.    I seem to be all thumbs.  Thanks.
17    Q.    No problem.  Happy to do it.  Just
18  let me know if you would like me to do that
19  moving forward.
20    This is slide 19 of this November
21  2012 presentation you made to the county
22  council.  This slide is titled Opioid/Heroin
23  Epidemic; do you see that?
24    A.    Yes.
25    Q.    The first bullet point here states

22 (Pages 82 - 85)

Page 86

1  that, "Heroin is the most common drug present
2  in drug-related deaths"; do you see that?
3      A.   Yes, I do.
4      Q.   What is the difference between
5  heroin and a prescription opioid medication?
6      A.   I believe the general understanding
7  is that heroin is on the streets and it's not
8  prescribed, not legal, it's illegal, and that
9  opiates as coming from a prescription, where it
10  is authorized.
11      Q.   Is it your understanding that
12  prescription opioid medications are only
13  lawfully used under the direction and care of a
14  licensed physician?
15          MS. SACKS:  Objection.
16      A.   Sure.  Yes.
17      Q.   Is it your understanding that
18  prescription opioid medications require
19  approval by the United States Food and Drug
20  Administration?
21      A.   Yes.
22      Q.   Are you familiar at all with the
23  approval process by which the FDA reviews drug
24  applications and decides whether or not to
25  approve a drug?

Page 87

1      A.   No.
2      Q.   How does heroin come into the
3  community, if it's an illegal substance?
4          MS. SACKS:  Objection.
5      A.   I don't know.  I wish I knew.  I
6  don't know.
7      Q.   Is that something you have ever
8  tried to understand better in your role as CEO
9  of the Cuyahoga ADAMHS Board and in connection
10  with your work on the Cuyahoga County Opiate
11  Task Force?
12          MS. SACKS:  Objection.
13      A.   Not really.  I spend my time trying
14  to deal with those that have the disease of
15  addiction as a result of heroin.
16      Q.   Do you know whether or not drug
17  cartels have been active in Cuyahoga County?
18          MS. SACKS:  Objection.
19      A.   I don't know.
20      Q.   Does Cuyahoga County have drug
21  dealers?
22          MS. SACKS:  Objection.
23      A.   I'm told they do.
24      Q.   On this particular slide that we
25  are looking at now, where it says that heroin

Page 88

1  is the most common drug present in drug-related
2  deaths, what is your understanding about what
3  that means?
4      A.   It's by the medical examiner, and I
5  think you would have to ask him what he means.
6      Q.   I understand.  It looks like this
7  information came to you from the medical
8  examiner?
9      A.   Yeah.
10      Q.   And then you put it into your
11  report to the county council?
12      A.   Right.
13      Q.   What did you understand it to mean
14  when you put in this report information from
15  the medical examiner that heroin is the most
16  common drug present in drug-related deaths?
17      A.   I think you just stated it, that it
18  is the most common of the drug-related deaths.
19      Q.   Do you know in what year heroin
20  became the most common drug present in
21  drug-related deaths in Cuyahoga County?
22      A.   I don't know the exact year, but it
23  was within this timeframe, within four to five
24  years.
25      Q.   Within four to five years of 2012?

Page 89

1      A.   Well, it's in the time period.
2      Q.   Around 2012?
3      A.   Yeah.
4      Q.   When you and others in Cuyahoga
5  County recognized that there were worrisome
6  trends in terms of the level of opioid abuse
7  and overdose fatalities, did you, either you
8  personally or people you were working with on
9  the task force or at ADAMHS Board, undertake to
10  investigate the causes of those trends?
11      A.   I wish I could tell you I had, but
12  my time was taken up trying to deal with the
13  ramifications of what was happening.
14      Q.   Do you agree that it is important
15  to understand the causes of an epidemic in
16  order to be able to address it?
17          MS. SACKS:  Objection.
18      A.   Well, I don't know if I agree with
19  that.  All I know is my responsibility was
20  trying to find beds for the people that were
21  getting it and deal more effectively with those
22  that wanted treatment.
23          So that's what we were doing,
24  that's what we were caught up with, that's what
25  we spent our time with.

23 (Pages 86 - 89)

Page 90

1    Q.   Understood.  My question is a
2  little different than that for now.  I do want
3  to ask you more about that part of it.
4        My question right now is whether
5  you agree that in order to be able to
6  effectively respond to any public health
7  crisis, it is important to understand the cause
8  or causes of that crisis?
9        MS. SACKS:  Objection.
10    A.   I think it would be nice to know
11  that, I think that would be good, but that
12  wasn't my job.
13    Q.   Whose job was it, on the task
14  force, at ADAMHS Board, or otherwise in county
15  government, to try and understand the cause or
16  contributing factors to these worrisome trends
17  in opioid abuse or overdoses that you have
18  described?
19    A.   I don't know.  I don't know.
20    Q.   Do you know if anybody ever
21  undertook, within the county, to try and
22  understand the causes or contributing factors
23  to this public health crisis?
24    A.   I don't know.
25    Q.   Have you ever heard of fentanyl?

Page 91

1    A.   Yes, I have.
2    Q.   What is your understanding about
3  what fentanyl is?
4    A.   It's a synthetic drug, legally used
5  to put people under for heart surgery.  I guess
6  I had it when my open heart surgery.
7    Q.   You yourself were administered
8  fentanyl?
9    A.   I find out I did.  I didn't even
10  know that that's what it was for, but I learned
11  that that's what it is legally for.  A
12  synthetic drug, very strong.
13    Q.   There are some forms of fentanyl
14  that are approved by the FDA for legitimate
15  medical uses, right?
16    A.   That's what I understood.
17        MS. SACKS:  Objection.
18    Q.   And there are other forms of
19  fentanyl that are illegal, illegally made, and
20  then imported into our country, correct?
21        MS. SACKS:  Objection.
22    A.   I don't know -- I don't know if I
23  agree with you "imported into our country."
24    Q.   Well, let me just --
25    A.   They use a laboratory.

Page 92

1    Q.   Let me keep it more simple.  You're
2  right, because they could come from various
3  sources.
4        There is legal fentanyl and then
5  there is something different, which is illegal
6  fentanyl, correct?
7    A.   I would agree to that.
8    Q.   And illegal fentanyl is not
9  something that's approved by the FDA?
10    A.   Right.
11    Q.   And illegal fentanyl is something
12  that, unfortunately, has been introduced into
13  substances, and that has resulted in an
14  increase in overdose fatalities, correct?
15        MS. SACKS:  Objection.
16    A.   That's one of the causes, yes.
17    Q.   Do you know the source of the
18  fentanyl that's being illegally used and
19  introduced into the drug market in Cuyahoga
20  County?
21    A.   No, I don't.
22    Q.   Have you ever heard it said, as
23  part of your responsibilities as chief
24  executive officer at the ADAMHS Board or as a
25  member of the Opiate Task Force, that the

Page 93

1  fentanyl that was being introduced in Cuyahoga
2  County was illegally made?
3    A.   I don't understand the question.
4    Q.   It was bad.  Let me start over.
5    A.   Okay.
6    Q.   It will not be my last bad question
7  today.
8    A.   I hope I recognize it.
9    Q.   Okay.  Speaking now about the
10  fentanyl that's being used illegally and
11  introduced into substances that are resulting
12  in overdose fatalities in the county, have you
13  ever heard it said that that fentanyl is
14  illegally made?
15    A.   Yes.
16    Q.   Have you ever heard it said that
17  the fentanyl that's being used and introduced
18  into drugs in Cuyahoga County is illegally made
19  in places like China and Mexico?
20        MS. SACKS:  Objection.
21    A.   No.
22    Q.   Have you ever heard of carfentanil?
23    A.   Yes.
24    Q.   What is your understanding about
25  what carfentanil is?

24 (Pages 90 - 93)

1    A.   It's like a super effective,
2  demonstrative impact, it can bring down an
3  elephant.
4    Q.   Carfentanil is not approved for use
5  in humans, correct?
6    A.   Right.
7    Q.   It's illegal, right?
8       MS. SACKS:  Objection.
9    A.   Right.
10   Q.   Has carfentanil been illegally
11 introduced into the drug market in Cuyahoga
12 County?
13      MS. SACKS:  Objection.
14   A.   The answer to that lies in what the
15 medical examiner has found.  Carfentanil has
16 been found, and some of the people have died
17 from it.
18   Q.   Do you know the extent to which
19 illicit fentanyl and carfentanil have
20 contributed or caused overdose fatalities
21 within Cuyahoga County?
22   A.   No, I don't.
23   Q.   I want to direct your attention to
24 the final bullet point here on slide 19.  It
25 say, "Pressure from dealers" -- well, actually,

1  let's back up.
2       The top line bullet point is,
3  "Heroin use is increasing because"; do you see
4  that?
5    A.   Uh-huh.
6    Q.   And then the final sub-bullet point
7  reads, "Pressure from dealers to switch from
8  crack and prescription drugs to more
9  profitability heroin"; do you see that?
10   A.   Uh-huh.
11   Q.   Why did you say that there was
12 pressure being applied by drug dealers for
13 individuals to switch from crack to heroin?
14   A.   I don't know why.  I don't know
15 why.  All I know is that this is in the
16 beginning, early stages of reacting to these
17 statements.
18   Q.   Is it your understanding that drug
19 dealers in Cuyahoga County were pressuring
20 addicts to switch from crack cocaine to heroin?
21   A.   That's not -- what we knew in 2012
22 is different than we know today, and I don't
23 know if I would agree with that today or not.
24   Q.   Where did you get that information,
25 that --

1    A.   I don't know where we got it at
2  that time, but that seemed to be the best
3  information that we had, and --
4    Q.   Would that have come from law
5  enforcement?
6    A.   Pardon?
7    Q.   Would that information, that drug
8  dealers were pressuring their clientele, for
9  lack of a better term, to switch from crack
10 cocaine to heroin, have come from law
11 enforcement officials within the county?
12   A.   It could.  It could come from a
13 whole number of issues.
14   Q.   Where else might that have come
15 from, besides law enforcement?
16   A.   It could come from the regular TV
17 screen.  It could come from general releases by
18 other people in other parts of the state or the
19 country.
20   Q.   What do you mean "TV screen," on
21 the news?
22   A.   Yes, from the news.  So I'm saying
23 to you that the information that we collected
24 wasn't just one source.  It was a source of --
25 it was many sources, and it was the putting

1  together of that understanding at that moment
2  in time, and that's what we understood then,
3  and we look at it today, I could see why you
4  asked that question.
5       And so when you asked me why we did
6  it, I don't know, other than the fact that it's
7  the best knowledge that we had at that time.
8    Q.   Do you have any information,
9  sitting here today, that indicates that the
10 statement that drug dealers in and around 2012
11 were pressuring addicts to switch from crack to
12 heroin was incorrect?
13   A.   I don't know if it's incorrect, but
14 if a person's run out of prescription drug and
15 they want to continue, then they would progress
16 to the street.
17   Q.   We'll get to that in a minute.
18 Right now I'm just asking you about this
19 statement.
20      Do you have any reason, sitting
21 here today, to believe that what you said in
22 2012 to the county council, that drug dealers
23 were pressuring addicts to switch from crack
24 cocaine to heroin, was incorrect?
25   A.   No, I don't.

25 (Pages 94 - 97)

1    Q.    You agree that individuals can
2  begin abusing heroin who already have a
3  pre-existing addiction to other substances,
4  correct?
5         MS. SACKS: Objection.
6    A.    Would you clarify that?
7    Q.    Sure. Do you agree that
8  individuals who begin abusing heroin may
9  already have a pre-existing addiction to other
10  substances?
11         MS. SACKS: Same objection.
12    A.    Well, they could. Sure they could.
13    Q.    And one example here that you
14  reference is crack. These are individuals who
15  would already be addicted to crack cocaine and
16  then might switch over to heroin, right?
17         MS. SACKS: Objection.
18    A.    It could.
19    Q.    Do you agree that it is common for
20  individuals who have a substance-use disorder
21  to abuse more than one substance?
22         MS. SACKS: Objection.
23    A.    It could.
24    Q.    Do you agree that it's common?
25         MS. SACKS: Objection.

1    A.    I don't know.
2    Q.    What is your understanding about
3  whether or not it is common for somebody who
4  has a substance-use disorder to abuse more than
5  one substance?
6         MS. SACKS: Objection.
7    A.    I don't know. And the reason I
8  don't know is that I only get those that are a
9  problem, and you just described what the
10  problem is. I don't get the full population.
11         So a person will come up and
12  say -- or we would find out that this is what
13  they have. Somebody would call and say, he or
14  she is using these three things, and we could
15  find out from a doc saying that, we could find
16  out from their family.
17         So I don't, all I -- I don't see
18  the whole population. I just see the
19  population that needs help, and that population
20  that needs help has multiple uses at times. I
21  don't know if it's common or not. What I do
22  know is the end result was a huge increase in
23  deaths in our county. That's what I know.
24    Q.    Let me just go back to my question,
25  and if you don't know, that's fine, but as the

1  chief executive officer for the ADAMHS Board,
2  did you come to an understanding about the
3  frequency or the commonality of individuals who
4  suffer from a substance-use disorder having an
5  addiction to more than one substance?
6    A.    I don't know if I did that or not.
7  I don't think I did.
8    Q.    You agree that individuals can
9  begin abusing prescription opioid medications
10  who already have a pre-existing addiction to
11  another substance, correct?
12    A.    I agree that could happen.
13    Q.    Do you know the percentage of
14  individuals who began abusing prescription
15  opioid medications who already had a
16  pre-existing addiction to another substance?
17    A.    No, I don't.
18    Q.    Do you know the percentage of
19  individuals who abused prescription opioid
20  medication who developed their addiction to
21  opioids through the use of heroin?
22         MS. SACKS: Objection.
23    A.    No, I don't.
24    Q.    Is that something you have ever
25  looked into?

1    A.    No.
2         MS. SACKS: Objection.
3    Q.    Do you agree that most individuals
4  who have begun abusing prescription opioid
5  medications in Cuyahoga County obtained the
6  pills illegally, not from a licensed doctor for
7  a legitimate medical need?
8         MS. SACKS: Objection.
9    A.    Would you clarify that?
10    Q.    Sure. Do you agree that
11  individuals -- let me start over.
12         Do you agree that most individuals
13  who have developed -- I'll start again. Sorry.
14    A.    That's okay.
15    Q.    I'm going to try to get this as
16  good as I can.
17    A.    That's all right.
18    Q.    Do you agree that most individuals
19  in Cuyahoga County who have begun abusing
20  prescription opioid medications obtained their
21  pills illegally, rather than through a licensed
22  physician for a legitimate medical need?
23         MS. SACKS: Objection.
24    A.    No, I don't.
25    Q.    What is your understanding? Why do

26 (Pages 98 - 101)

1  you say that?  What statistical information are
2  you basing that on?
3      A.   I don't know.
4      Q.   You don't know?
5      A.   No.
6      Q.   You don't know what percentage of
7  individuals in Cuyahoga County who have abused
8  prescription opioid medications first obtained
9  pills illegally; is that right?
10     A.   I don't know.
11     Q.   Is that something that the ADAMHS
12 Board or the Cuyahoga County Opiate Task Force
13 has ever looked into, as far as you know?
14          MS. SACKS:  Objection.
15     A.   I don't think so.
16     Q.   Would you just turn to the next
17 page.  I'll help you out, if you don't mind.
18     A.   No, I don't mind at all.
19     Q.   I'm just going to flip this over to
20 the very next slide that was part of your
21 presentation to the county council in 2012.
22          This slide breaks down the request
23 for $150,000 for this awareness campaign you
24 described and the purposes for the money,
25 right?

1      A.   Yes, it does.
2      Q.   It looks like there was a plan to
3  rent some billboards, to put up some bus
4  placards, and then to have some radio and
5  internet advertisements, right?
6      A.   Uh-huh.
7      Q.   You have to say yes or no.
8      A.   Yes.
9      Q.   Setting aside this request for
10 $150,000 by the ADAMHS Board to the county
11 council, do you recall any other instances
12 where the ADAMHS Board went to the county
13 council or the county executive and made
14 requests for additional funds specifically for
15 the purpose of addressing opioid abuse or
16 overdose trends in the community?
17     A.   Yes.
18     Q.   What else do you recall in that
19 respect?
20     A.   A request for funding, a couple
21 years ago, for sober beds.
22     Q.   Okay.  Any other requests?  If you
23 set aside for now the 150,000 requested in 2012
24 and the request, from a couple years ago, for
25 money to spend on sober beds, can you recall

1  any other instances when the ADAMHS Board went
2  to the county council or county executive to
3  request funding specifically to address opioid
4  abuse, addiction and overdose?
5      A.   The only other request, if there
6  were -- if there were -- would have been in the
7  annual budgets presented for an increase in
8  funding for beds and prevention, treatment and
9  prevention.
10          So the funding breaks down into one
11 of two areas, treatment or prevention -- excuse
12 me -- treatment, yeah, treatment or prevention.
13          So if it happened, it happened in
14 the annual budgets we submitted.  These were
15 other than the annual budget.
16     Q.   This was a specific request --
17     A.   Yes, yes, right.
18     Q.   -- right?
19          You were going to the county
20 council and saying, "We need some additional
21 money"?
22     A.   So the question was had we done
23 it --
24     Q.   Let me just finish my question.
25     A.   Yeah, finish your question.

1      Q.   This was an occasion here in 2012
2  where the ADAMHS Board specifically went to the
3  county council and made a request for $150,000
4  that was specifically to address opioid abuse,
5  addiction and overdose, right?
6      A.   Correct.
7      Q.   And then you indicated that a
8  couple of years ago, there was a --
9      A.   You asked me if we had done
10 something else, and I was pointing out the
11 answer to that is yes, and it was for
12 prevention for medically assisted treatment
13 beds and sober beds.
14     Q.   That was a couple of years ago,
15 correct?
16     A.   It was, I think, my last year
17 there.
18     Q.   2017?
19     A.   Yeah.
20     Q.   Can you recall any other instances
21 where the ADAMHS Board went to the county
22 council or county executive to specifically
23 request funds to address trends of opioid
24 abuse, addiction or overdose in the community?
25     A.   I think my answer is still the

27 (Pages 102 - 105)

1  same, that it would have been put in the annual
2  budget request.  You have to make a request
3  every year for your annual budget.  I don't
4  recall it other than what I told -- shared with
5  you on the beds, but other than to say it
6  could, for example -- and I can't even think of
7  an example.
8       If we did do it, it would have been
9  the annual budgets.
10      Q.   Can you recall any instances other
11  than the two you have identified?
12      A.   Well, I think one year we supported
13  the Dawn Program, the Narcan kits for
14  MetroHealth.
15      Q.   The Dawn Program was funded by the
16  Ohio Department of Health, right?
17      A.   They may have, but we were the
18  first one to fund them $50,000.
19      Q.   So my question to you again is:
20  Other than in 2012 when ADAMHS requested
21  150,000, and then in 2017 when ADAMHS requested
22  funding for sober beds and medically assisted
23  treatment related to opioids, are there any
24  other specific instances that you can recall
25  where ADAMHS went to the county council or

1  county executive to request specific funds to
2  address opioid abuse, addiction or overdose?
3      A.   I can't think of it, only to tell
4  you that we took discretionary funds, where we
5  didn't go to county council, and used it to pay
6  for other programs that would be used to deal
7  with opiates.
8      Q.   Understood, and I'll ask about that
9  too, but right now I just want to -- I want to
10  stick with my question here and make sure I
11  understand it.
12      A.   Oh, I think -- I can't remember if
13  there is any other.  I can't remember.
14      Q.   You do not recall, sitting here
15  today, any instances where the ADAMHS Board
16  went to the county council or county executive
17  to request funds specifically to address opioid
18  abuse, addiction or overdose, other than in
19  2012, when you requested $150,000, and in 2017,
20  when you requested money for the sober beds; is
21  that correct?
22      A.   That's correct.
23           MR. BOEHM:  Go off the record.
24           THE VIDEOGRAPHER:  Off the record.
25  11:24.

1       (Recess taken.)
2       - - - - -
3       (Thereupon, Deposition Exhibit 3,
4       Designated Confidential, The Center
5       for Health Affairs, ADAMHS Board
6       Needs Analysis, Beginning with Bates
7       Label CUYAH 012460111, was marked
8       for purposes of identification.)
9       - - - - -
10      THE VIDEOGRAPHER:  On the record,
11  11:42.
12      Q.   Welcome back from our short break,
13  Mr. Denihan.
14      A.   Yes, sir.
15      Q.   While we were off the hard, I
16  handed you a document that has been marked as
17  Exhibit 3 for the purpose of this deposition,
18  which is entitled ADAMHS Board Needs Analysis,
19  and the date is from November and December,
20  2016; do you see that?
21      A.   Yes, I do.
22      Q.   Do you recognize this document?
23      A.   No.
24      Q.   What is the Center For Health
25  Affairs?

1      A.   The Center For Health Affairs is an
2  organization that, that -- if this is the one I
3  think it is -- it was Community Solutions.  I'm
4  trying to see if it's the same one.
5      Q.   This slide deck indicates that this
6  presentation was made by the Center For Health
7  Affairs, and the title is ADAMHS Board Needs
8  Analysis; do you see that?
9      A.   I see that.
10      Q.   What is the relationship between
11  the ADAMHS Board for Cuyahoga County and the
12  Center For Health Affairs?
13      A.   Well, it's a collegial
14  relationship.  We don't report to them, they
15  don't fund us.  They are an organization that
16  looks at various health programs, makes
17  recommendations and comments, and is a valuable
18  asset to the community.
19      Q.   Does the ADAMHS Board for Cuyahoga
20  County provide funding in any way to The Center
21  For Health Affairs?
22      A.   At times it does, if we ask for a
23  specific project or program, and this has drawn
24  my memory back.
25      Q.   What does The Center For Health

28 (Pages 106 - 109)

Page 110

1  Affairs do?
2       MS. SACKS:  Objection.
3       A.   I believe The Center For Health
4  Affairs is an organization that has the ability
5  to make presentations, evaluations, and comment
6  upon various health affairs, if you will, in
7  the community.
8       Q.   Okay.  This slide deck, at page 13,
9  if you go to slide 13, that's a number that's
10  in the bottom right-hand corner of the page,
11  has a slide number and expenditures for
12  the ADAMHS Board, and I wanted to use this
13  slide to ask you some questions about funding
14  and expenditures by the ADAMHS Board.  Are you
15  at slide 13?
16       A.   Yes, sir.
17       Q.   Do you see in the middle of the
18  page there is a pie chart?
19       A.   I see it.
20       Q.   Does this slide reflect the sources
21  of revenue that the ADAMHS Board had, at least
22  as of 2015?
23       A.   Yes.
24       Q.   It indicates that some of the funds
25  are from county levies, some are from federal

Page 111

1  funds, some are from state funds, and some are
2  from grants that presumably are from private
3  entities; is that right?
4       A.   Correct.
5       Q.   What percentage of the
6  funds -- well, let me just back up one second.
7       Earlier today you indicated that
8  there is some discretion in how the ADAMHS
9  Board uses some of the funds that are available
10  to it; is that right?
11       A.   Yes, I said that.
12       Q.   And can you describe what you meant
13  by that just a little bit more?
14       A.   Discretion as to who we select to
15  receive these awards.  Out of all these
16  categories, there might be 150 different
17  contracts.
18       Q.   Are you able to determine in any
19  way what percentage of expenditures the ADAMHS
20  Board has made in financing these services that
21  directly go to opioid-related services?
22       MS. SACKS:  Objection.
23       A.   No.
24       Q.   Why are you not able to do that?
25       A.   Well, one thing is, it changes from

Page 112

1  time to time, and two, it's up for contract, up
2  for bid by the contracts, so...
3       Q.   Okay.  Let's see if we can break
4  that down just a little bit more.
5       A.   Sure.
6       Q.   Let's look first at the county
7  funds.  Are any of the funds that are provided
8  to ADAMHS Board -- let me say it just slightly
9  differently.
10       Have any of the funds provided to
11  the ADAMHS Board by Cuyahoga County been
12  earmarked or designated for opioid-related
13  expenditures?
14       A.   I believe some have, but I can't
15  determine which ones.  I can't remember which
16  ones.
17       Q.   Can you identify any earmarked
18  funds that the county has given to ADAMHS Board
19  that are specifically designated for
20  opioid-related expenditures?
21       A.   No.
22       Q.   What percentage of the funding that
23  comes directly from the county is discretionary
24  versus earmarked?
25       A.   I do not recall.  I don't remember.

Page 113

1       Q.   How would we go about trying to
2  figure that out?
3       MS. SACKS:  Objection.
4       A.   Well, you'd have to take the
5  budget, and take every line item on it, and go
6  through it.
7       Q.   Are you talking about the ADAMHS
8  budget?
9       A.   Yes.
10       Q.   Who was responsible for the ADAMHS
11  budget during the period of time that you were
12  the chief executive officer?
13       A.   What time period?
14       Q.   Well, you were the chief executive
15  officer, as I understand it --
16       A.   No.  I mean, there is two of them,
17  that's the reason I asked.
18       Q.   Well, just tell me both and what
19  periods of time those individuals had
20  responsibility.
21       A.   Cassandra Richardson from 2009 to
22  2012 maybe, and then there was another
23  gentleman, his name escapes me right at the
24  moment -- before we leave I'll give you his
25  name -- from then until the time I left.

29 (Pages 110 - 113)

Page 114

1    I just can't remember his name
2  right now, but I'll give it to you before we
3  leave.
4    Q.   That's fine.  Will you just let me
5  know --
6    A.   Sure.
7    Q.   -- when that name comes to mind?
8    A.   Sure.  Sure.
9    Q.   I believe you indicated that the
10  ADAMHS Board had made some expenditures related
11  to opioid abuse, addiction and overdose out of
12  discretionary funds that were available to the
13  board; did I understand that correctly?
14    A.   Yes.
15    Q.   What were the discretionary
16  expenditures that the ADAMHS Board has made
17  specifically related to opioid abuse?
18    A.   What's the question?  What do we
19  fund?
20    Q.   You indicated that there were these
21  discretionary expenditures, right?
22    A.   They came from the health and human
23  service levy.
24    Q.   Okay.
25    A.   Okay.  And you want examples of

Page 115

1  what they would be for?
2    Q.   Correct.  I'm asking you to
3  identify --
4    A.   Sure.
5    Q.   -- those expenditures that were
6  specifically made related to the opioid
7  epidemic?
8    A.   Sure.  This is not in the level of
9  importance or size, but the Narcan project was
10  the Dawn project with MetroHealth.
11    Q.   Was the Dawn or Narcan project
12  funded out of the HHS levy funds?
13    A.   That's where we got the money, yes.
14    Q.   Was the Dawn project in part funded
15  by state dollars?
16    A.   I don't know.  I mean, they could
17  have.  I don't know.  I was giving you
18  examples.
19    Q.   Yes, please.  Go ahead.
20    A.   Medically assisted treatment beds,
21  sober beds, detox unit, and miscellaneous
22  things.  Like somebody developed a strip on how
23  to identify something that had fentanyl in it,
24  and they would give it to the needle exchange
25  program for those to have the opportunity to

Page 116

1  see if their use of fentanyl or not.  That's an
2  example.
3    Q.   Can you think of any other
4  expenditures that the ADAMHS Board has made,
5  during the time that you were the chief
6  executive officer, that were directed
7  specifically at understanding or addressing --
8    A.   Prevention programs.
9    Q.   Sorry.  I just had to finish my
10  question.
11    A.   I'm sorry.
12    Q.   No.  That's okay.
13    Can you think of any other
14  expenditures that the ADAMHS Board has made,
15  during the time that you were the chief
16  executive officer, that were directed
17  specifically at understanding or addressing
18  opioid abuse or overdose in the community,
19  other than the ones you have now already
20  referenced?
21    A.   I understand the question to be to
22  understand the abuse of.
23    Q.   Or to address the impact of.
24    A.   I take the impact in terms of
25  treatment.  Then what I just explained to you,

Page 117

1  and in prevention, it could have been funds to
2  have public meetings, it could be development
3  of news announcements and literature, besides
4  what I already explained.
5    Q.   To what extent did the ADAMHS Board
6  expend funds for public meetings directly in
7  connection with opioid abuse?
8    A.   I could give you an example.
9    Q.   I'm looking -- an example would be
10  fine, but what I'm really looking for is to
11  understand the extent to which that was done
12  and how much money was spent?
13    A.   I can't tell you.
14    Q.   Why not?
15    A.   I just can't remember.
16    Q.   Would that be identified in a line
17  item in the ADAMHS budget?
18    A.   It may and it may not.
19    Q.   Why would it not be?
20    A.   Public funding is not as black and
21  white as you might think.
22    We start at the beginning of the
23  year, we have budgets.  Most of the budget on
24  public funding is personnel.  Rarely is the
25  whole personnel budget line used.  Sometimes it

30 (Pages 114 - 117)

Page 118

1  is, sometimes it isn't.  And many times people
2  come and go, and it takes a long time to
3  replace people, and you have a reserve at the
4  end of the year, in October, November,
5  December, resulting from not using all of the
6  funding on the personnel line.
7         And many times we take that and use
8  it on discretionary dollars -- as discretionary
9  dollars, and it varies from every year and
10  opportunity, and what could you do before the
11  end of the year.  So that's an example of where
12  discretionary comes from and understanding that
13  it changes all the time, and that's where it
14  comes from.
15     Q.   Do ADAMHS Board personnel track
16  their time on a daily basis?
17         MS. SACKS:  Objection.
18     A.   I don't understand the question.
19     Q.   Well, I, as a lawyer, have to write
20  down every day how much time I spend on each
21  task.
22     A.   As you should.
23     Q.   My question to you is whether or
24  not -- Shayna probably doesn't have to do that,
25  but I do.

Page 119

1         So my question to you is whether or
2  not personnel for the ADAMHS Board track
3  exactly how they are spending their time on a
4  daily basis?
5     A.   They get paid by a time clock
6  method.  The executive director, CEO, I was
7  paid by a salary.
8         And by the time clock method, if
9  they put more time in, they get paid overtime
10  for that.  They do not clock, out of 40 hours,
11  22 hours for this project and 16 hours for this
12  project.  They get paid for the job that they
13  do.
14     Q.   Okay.  So it's more of a -- they
15  keep track of the total time, but they are not
16  identifying exactly how that time is spent,
17  fair?
18     A.   That's correct.  Unless I want them
19  to do it on a specific project, and that's
20  not -- that's rare.
21     Q.   Did you ever request that ADAMHS
22  personnel track their time spent on activities
23  that were specifically related to opioid abuse
24  or addiction?
25     A.   No.  No.

Page 120

1     Q.   You mentioned the fentanyl test
2  strips.  Is it your understanding that the
3  fentanyl testing strips were funded by money
4  out of the HHS levy?
5     A.   Yes.
6     Q.   How much money was spent by ADAMHS
7  in connection with the fentanyl testing strips?
8     A.   I can't remember the exact amount,
9  but it was a very small amount of money.
10     Q.   When you say, "A very small
11  amount," what do you mean?
12     A.   As compared to other accounts.  It
13  was like $15,000.
14     Q.   You indicated that one expenditure
15  related to opioids might have to do with
16  detoxification units?
17     A.   Yes.
18     Q.   How much money did the ADAMHS Board
19  spend on opioid-related detoxification?
20     A.   Well, I don't know, other than the
21  fact that it was about $900,000 for the unit,
22  and we opened it because of the increase in the
23  opiates.
24     Q.   Did the detoxification unit that
25  cost approximately $900,000 deal exclusively

Page 121

1  with opioid abuse, or did it deal with abuse of
2  other substances as well?
3     A.   I don't know.  All I know is that
4  the purpose was to deal with the opiate influx
5  coming in, that we had not enough, and we
6  didn't have a policy saying, "Okay, opiates
7  only."  If somebody came in with something
8  else, we would treat them also.
9     Q.   Did the ADAMHS Board or any of its
10  service providers keep track of the extent to
11  which the detoxification unit was used to treat
12  opioid substance-use disorder versus other
13  substance-use disorders?
14     A.   They could have.
15     Q.   Do you know if it did or not?
16     A.   No, I don't.
17     Q.   Who would we ask to determine
18  whether or not the detoxification expenditures
19  were tracked such that one could determine
20  whether or not the services were opioid
21  specific versus related to other substances?
22     A.   You would start with Scott, and he
23  would go to the provider.
24     Q.   So if we asked Mr. Osiecki and he
25  didn't know, what would we do then?

31 (Pages 118 - 121)

1     A.    Well, go to the provider.
2     Q.    Who would the provider be?
3     A.    I believe the provider is Catholic
4  Charities.
5     Q.    Any other providers who were
6  involved in the detoxification expenditures
7  that you're talking about now?
8     A.    I can't think of them right now.
9     Q.    Are there others, and you just
10  can't think of them?
11     A.    I just can't think of them right
12  now.
13     Q.    My question is:  Do you know that
14  there are other providers?
15     A.    I don't know.  I don't know.
16     Q.    And then you mentioned the sober
17  beds.  How much money has the ADAMHS Board
18  spent on sober beds specifically related to
19  opioid abuse and addiction?
20     A.    I don't know.
21     Q.    How would we figure that out?
22     A.    I don't know.
23     Q.    Do you know if there is any way to
24  try and track that with that kind of
25  specificity?

1     A.    I don't know if that's possible or
2  not.
3     Q.    Why not?
4           Let me ask it this way:  Why might
5  it not be possible?
6     A.    Because we didn't -- we didn't set
7  it up to do it that way.  We set it up to deal
8  with the increase in the use of sober beds
9  because of the opiate epidemic, and that would
10  take care of all the back waiting periods,
11  backlog of people needing services, and I don't
12  know if they made a record of that or not.
13     Q.    Who would we ask?
14          MS. SACKS:  Objection.
15     A.    I don't know.  Frankly, it would
16  probably be by individual provider, and if we
17  are going back three or four years, I don't
18  know what you are going to get.
19     Q.    Does the ADAMHS Board have some
20  kind of database by which it tracks claims data
21  that are made by the service providers that the
22  ADAMHS Board funds?
23     A.    I don't think so.
24     Q.    Do the sober beds that you are
25  referring to now provide services to

1  individuals who have substance-use disorders
2  other than opiate-related disorders?
3     A.    It could be, yes.
4     Q.    And then you mentioned Narcan and
5  the DAWN project.  How much money did the
6  ADAMHS Board spend out of its funds on the
7  Narcan or Dawn project?
8     A.    I can't tell you, but you could
9  find that out easy enough every year, because
10  they keep a record of that.
11     Q.    When did that project begin?
12     A.    When the DAWN project began, I
13  thought 2012 or 13 -- or it was 13 or 14 -- I'm
14  sorry -- in that time period.
15     Q.    In the 2012 to 13 timeframe?
16     A.    I believe so.
17     Q.    Who ran the Dawn program?
18     A.    MetroHealth.
19     Q.    Are there any expenditures related
20  to opioids that the ADAMHS Board has made that
21  we have not now discussed?
22     A.    I don't recall.
23     Q.    Sitting here today, you cannot
24  recall any other expenditures related to
25  opioids --

1     A.    Other than what you've --
2     Q.    Sorry.
3     A.    I'll wait.
4     Q.    Let me just start it over, make
5  sure the record is clean.
6           Are you able to identify any other
7  expenditures related to opioids that the ADAMHS
8  Board for Cuyahoga County has made that we have
9  not already discussed today?
10     A.    I do not believe so.
11     Q.    If you turn to the next slide, it's
12  slide 14, we can see a summary that organizes
13  or categorizes expenditures by the ADAMHS Board
14  from 2013 to 2015 in a slightly different way.
15          MS. SACKS:  You asked slide 14,
16  right?
17          MR. BOEHM:  Slide 14.
18          MS. SACKS:  He's talking about this
19  one on top.  It is double sided.
20     Q.    You see slide 14 there that's in
21  front of you now?
22     A.    Yes, I do.
23     Q.    You mentioned sober beds, and if
24  you look, the third to the end -- the category
25  that's the third to the end on this particular

Page 126

1  summary references sober beds; do you see that?
2     A.  Yes.
3     Q.  Are these the sober bed
4  expenditures that you had in mind when you
5  identified those earlier today?
6     A.  I don't know.  I don't know.  I
7  don't know if it does or not.
8     Q.  And this slide identifies various
9  other categories as well of ADAMHS Board
10  expenditures, correct?
11     A.  Uh-huh.
12     Q.  You have to say yes or no.
13     A.  I'm sorry, sir.  Yes.
14     Q.  Prevention services, right?
15     A.  Right.  Outpatient treatment,
16  psychiatric services --
17     Q.  Right.
18     A.  -- detoxification and so forth.
19     Q.  Are you able to, for each of these
20  categories, determine how much of these dollars
21  were opioid-related expenditures?
22     A.  No.
23     Q.  Is it possible to do that?
24        MS. SACKS:  Objection.
25     A.  I don't know.  I didn't put it

Page 127

1  together.  Somebody else put it together.
2     Q.  Who do you believe would know
3  whether or not it is possible to identify how
4  much of the dollars -- how many of the dollars
5  spent in each category, as reflected on slide
6  14 of Exhibit 3, were opioid-related
7  expenditures?
8        MS. SACKS:  Objection.
9     A.  The persons that put it together,
10  Center For Family Health Affairs.
11     Q.  Is there anybody at the ADAMHS
12  Board who would be able to answer that
13  question?
14        MS. SACKS:  Objection.  Form.
15     A.  I don't know.  I don't know.
16     Q.  Is alcohol addiction the most
17  common substance-use disorder --
18        MS. SACKS:  Objection.
19     Q.  -- that the ADAMHS Board provides
20  services for in Cuyahoga County?
21     A.  It was, until the opiate epidemic
22  hit.
23     Q.  Is it your testimony here today
24  that addiction to opioids is more common in
25  Cuyahoga County than addiction to alcohol?

Page 128

1        MS. SACKS:  Objection.
2     A.  It is my testimony that at certain
3  locations, where alcohol was 90 percent or 80
4  percent, now opiates has taken that over, in
5  terms of treatment.
6     Q.  Is it your testimony that
7  addiction -- let me just ask it this way:  Do
8  you agree that alcohol addiction is the most
9  common substance-use disorder?
10     A.  Yes, I do.
11        MS. SACKS:  Objection.
12     Q.  And that's true today?
13     A.  No, I do.  No, I do.  I do agree
14  with that.  But I don't think that's the
15  question I answered.
16     Q.  Okay.  But that's the question I
17  intended to ask, so let's stick with that one.
18     A.  Okay.  So...
19     Q.  Alcohol addiction today is the most
20  common form of substance-use disorder in
21  Cuyahoga County, correct?
22     A.  Yes.
23        MS. SACKS:  Objection.
24     A.  Yes, it is.
25     Q.  And that has always been true

Page 129

1  during the years that you have been the chief
2  executive officer of the ADAMHS Board?
3        MS. SACKS:  Objection.
4     A.  That's correct.
5        MS. SACKS:  Remember to wait until
6  he's done with his question, because she's
7  typing.  You're good.
8     A.  Are you waiting for me?
9        MS. SACKS:  No, no.  That was the
10  phone.
11     Q.  I'm not waiting for you, no.  I'm
12  just getting to my next question, while
13  somebody was sending us a fax, I think, over
14  the phone.
15        You mentioned Mr. Osiecki a couple
16  of times today.  Who is Scott Osiecki?
17     A.  He is the present CEO of the ADAMHS
18  Board.
19     Q.  Did he replace you in that
20  position?
21     A.  No.
22     Q.  Who was in between you and Mr.
23  Osiecki?
24     A.  Valeria Harper.
25     Q.  For how long was Ms. Harper the CEO

33 (Pages 126 - 129)

Page 130

1  of the ADAMHS Board?
2      A.   About six months.
3      Q.   Why was her stay so short?
4      A.   She died.
5      Q.   Sorry to hear that.
6      A.   Tragically.
7      Q.   And then Mr. Osiecki became the CEO
8  of the ADAMHS Board?
9      A.   Uh-huh.  Yes.
10      Q.   Did you work with Mr. Osiecki
11  during your time as the CEO?
12      A.   Yes.
13          For the record, Frank Brickner was
14  the person that -- the finance person that you
15  wanted to know.
16      Q.   Oh, okay.  Great.  So when you were
17  earlier trying to remember the name of the
18  individual --
19      A.   Exactly.
20      Q.   -- responsible for budgeting and
21  expenditures, that person was Mr. Frank
22  Brickner?
23      A.   Uh-huh.
24      Q.   Yes?
25      A.   Yes.

Page 131

1      Q.   And he is the sender of the email
2  that has now been marked as Exhibit 4.
3      A.   Yes.
4              - - - - -
5          (Thereupon, Deposition Exhibit 4,
6          Designated Confidential, 6/16/2017
7          Email, Subject: Document for Opioid
8          Epidemic, with Attachment, Beginning
9          with Bates Label CUYAH 012582972,
10          was marked for purposes of
11          identification.)
12              - - - - -
13      Q.   So that was fortuitous.
14          This is a June 16, 2017 email, and
15  you and Ms. Harper and others are recipients of
16  the email.  The subject is Document For Opioid
17  Epidemic; do you see that?
18      A.   Yes.
19      Q.   Mr. Brickner writes that he started
20  the document discussed yesterday regarding a
21  response to the opioid epidemic, it is a rough
22  draft, and he welcomes input; do you see that?
23      A.   Yes.
24      Q.   Attached to the email, as part of
25  Exhibit 4, is the document that Mr. Brickner

Page 132

1  sent to you and others.
2      A.   Uh-huh.
3      Q.   I'll give you a chance to take a
4  look at this, and my question to you is whether
5  or not you remember this document?
6      A.   Yes, I do.
7      Q.   This document refers to residential
8  treatment and sober recovery beds; do you see
9  that?
10      A.   Yes.
11      Q.   And earlier today you had told me
12  that in your final year as CEO of the ADAMHS
13  Board for Cuyahoga County, there had been a
14  request to the county council and county
15  executive for funding specifically for sober
16  beds in response to the opioid abuse epidemic
17  in the county, right?
18      A.   Correct.
19      Q.   Does this document reflect that
20  request?
21      A.   Yes, it does.
22      Q.   It appears that in the category of
23  medication assisted treatment based services
24  and sober beds, Mr. Brickner has put the number
25  $2,647,277 next to that category; do you see

Page 133

1  that?
2      A.   Yes.
3      Q.   Are you able to say the extent to
4  which -- well, let me back up for just a
5  second.
6          Did the county council agree to
7  provide the funding that the ADAMHS Board had
8  requested for medication assisted treatment
9  based services and sober beds?
10          MS. SACKS:  Objection.
11      A.   I don't believe the entire amount
12  was funded.
13      Q.   Do you know how much of the ADAMHS
14  Board's request was funded in connection with
15  medication assisted treatment based services
16  and sober beds?
17      A.   I believe half the funding -- I
18  can't remember.  I can't remember.
19      Q.   You started to say you thought it
20  might have been half?
21      A.   Yeah, but I'm guessing, and I don't
22  want to guess.  I just don't know.
23      Q.   Do you remember approximately how
24  much of the request was granted by the county
25  council?

34 (Pages 130 - 133)

1    A.   No, I don't.  No, I don't know.  I
2  thought I would by looking at it, but I'm
3  having a hard time trying to figure out which
4  was funded and which was not.
5    Q.   What was the source or sources of
6  the funds that were granted for purposes of
7  medication assisted treatment based services
8  and sober beds?
9    A.   I had explained to you earlier
10  about the residue reserve from not spending all
11  of a budget.  This is the primary source from
12  the ADAMHS Board.  The other two sources was
13  the county and the City of Cleveland.  And I
14  don't know if I had left by the time this was
15  all over, and I don't know if those moneys were
16  collected in full or not.
17    Q.   Okay.  We will get a little help if
18  we look at the last page of the document.  Page
19  4 of 4, about halfway down, it say, "Currently
20  of the $3,927,331 of initiatives" --
21    A.   Okay.  This is helpful.
22    Q.   -- "2,625,000 of additional funding
23  was provided to the ADAMHS Board as follows";
24  do you see that?
25    A.   Uh-huh.  Yes.

1    Q.   It indicates that the county itself
2  provided $250,000, right?
3    A.   Correct.
4    Q.   The City of Cleveland provided
5  another $250,000, right?
6    A.   Yeah.
7    Q.   And $2,125,000 was provided by the
8  federal government through the CURES Act,
9  C-U-R-E-S, correct?
10    A.   Correct.
11    Q.   So the bulk of this money actually
12  came from the federal government, right?
13    A.   Well --
14    MS. SACKS:  Objection.
15    A.   I don't know.  I don't know.
16    Q.   Why don't you know?
17    A.   Because I can't remember.
18    Q.   Well, it says it right here on the
19  page; doesn't it?
20    MS. SACKS:  Objection.
21    A.   I know that's what it says, but I
22  do not know -- I don't know.
23    Q.   When it says here --
24    A.   This was produced June 16.  I was
25  gone in two weeks after that.

1    Q.   You were a recipient on this email
2  though, right?
3    A.   Yeah, I was.  Yeah.
4    Q.   And this had happened before
5  June --
6    A.   It says the Federal CURES Act.  I
7  don't know how far that went and whether that
8  was -- I can't remember if that was totally
9  approved or not.
10    Q.   Approved by whom?
11    A.   By the Feds.  I don't know.  That's
12  the sticking point.  I don't know if it was or
13  not.
14    Q.   Let's look at the language again of
15  the document.  It says that $2,625,000 of
16  additional funding was provided to the ADAMHS
17  Board as follows; do you see that?
18    A.   I see it.
19    Q.   That's in past tense?
20    A.   Yes, it is.
21    Q.   And that indicates that this money
22  had already been provided to ADAMHS Board?
23    A.   Okay.  So --
24    MS. SACKS:  Objection.
25    A.   I don't know.

1    Q.   You know what the past tense is,
2  right?
3    MS. SACKS:  Objection.
4    A.   I do know what the past tense is,
5  and you asked me what I know, and I'm telling
6  you I don't know if this total amount is the
7  total amount that actually happened, and it's
8  not unusual for it to happen.  So I don't know.
9    Q.   It's not unusual for what to
10  happen?
11    A.   Budgets change while they are in
12  stream.
13    Q.   Do you see on the first page, it
14  says that, "The charts below identify the
15  services commenced/enhanced"?
16    A.   Okay.  It's not going to change my
17  answer.  I don't know.
18    Q.   Well, I would like you to look at
19  the document before you decide whether you are
20  going to change your answer or not.
21    A.   Okay.
22    Q.   That's only fair.
23    MS. SACKS:  Objection.
24    Q.   You see here it says, "The charts
25  below identify the services

35 (Pages 134 - 137)

Page 138

1  commenced/enhanced"?
2      A.   Uh-huh.
3      Q.   Yes?
4      A.   Yes, I see it.
5      Q.   And, indeed, some of the money has
6  already been apportioned out among the various
7  service providers?
8      A.   Exactly.
9      Q.   Do you have any memory of this at
10  all, or is this just a blank slate for you?
11      MS. SACKS:  Objection.
12      A.   No.  We enhance the services and
13  accept the responsibility of paying for those
14  services that were enhanced and covered, and I
15  believe that we acted in good faith.  I just
16  don't know how much of this eventually worked
17  out.  That's what I'm trying to say.
18      Q.   You know this isn't a projected
19  budget, right, this is a summary of what has
20  happened?
21      A.   Yes, it is.  Right.
22      Q.   And you don't have any reason to
23  disagree with the information that's provided
24  in this document, do you?
25      A.   No, I don't.

Page 139

1      Q.   And back on page 4, it says that,
2  "The remaining funding for this initiative,
3  $1,302,331, came from ADAMHS reserves, which
4  are now near depleted"; do you see that?
5      A.   Uh-huh.
6      Q.   Yes?
7      A.   Yes, I do.
8      Q.   What are the sources of the ADAMHS
9  reserve funds that are referenced here in
10  connection with these initiatives?
11      A.   They are the funds kept over from
12  the previous budget that are reserved from
13  funds not expended.
14      Q.   Was there ever a time during your
15  tenure as the chief executive officer for the
16  ADAMHS Board when the ADAMHS Board spent more
17  money than it had available?
18      MS. SACKS:  Objection.
19      A.   I don't believe so.
20      Q.   Did you always have a surplus at
21  the end of each year?
22      MS. SACKS:  Objection.
23      A.   It would indicate yes, we had a
24  little bit of reserve every year.
25      Q.   Would the reserve funds come from

Page 140

1  various different sources, or were the reserve
2  funds funds that were set aside from one source
3  or another?
4      A.   They would come from various
5  sources.
6      Q.   What is the Federal CURES Act?
7      A.   I cannot remember exactly what it
8  was.  It was new then.  I just don't remember.
9      Q.   You don't remember the details, but
10  do you remember the term?
11      A.   I remember the term.
12      Q.   Do you know if the money from the
13  Federal Cures Act was earmarked for specific
14  purposes or if it was available for the ADAMHS
15  Board's discretion?
16      A.   I think it was discretion.  Well,
17  wait a minute.  I stand corrected.  I think
18  that it was earmarked for opiate, yeah, I
19  think.
20      Q.   With respect to the $250,000 that
21  was provided by the county, do you know out of
22  what revenue source those $250,000 were drawn?
23      A.   No.
24      Q.   Do you know whether or not the
25  county provided any funds beyond the $250,000

Page 141

1  that are referenced here to the ADAMHS Board in
2  connection with opioid-related expenditures?
3      A.   No, I don't.
4      Q.   Has the ADAMHS Board ever asked the
5  county to raise new taxes or new funds in order
6  to address the issue of opioid addiction, abuse
7  or overdose?
8      MS. SACKS:  Objection.
9      A.   No.
10      Q.   You have, from time to time,
11  presented in public fora about the opioid issue
12  and trends in the community, correct?
13      A.   Yes.
14      Q.   Do you remember when you first did
15  that?
16      A.   No.
17      MS. SACKS:  Objection.
18      Q.   Do you recall at one time
19  testifying before the Ohio General Assembly
20  about opioid issues?
21      A.   No, I don't remember, but I know I
22  did it.
23      Q.   Do you remember testifying before
24  the Ohio Senate Finance Committee about issues
25  related to opioids?

36 (Pages 138 - 141)

Page 142

1     A.   I could have done that, yes.
2     Q.   Do you remember that?
3          MS. SACKS:  Objection.
4     A.   I remember going to Columbus on a
5  number of occasions to testify.  On a specific
6  date, I can't remember that.
7          -  -  -  -  -
8          (Thereupon, Deposition Exhibit 5,
9          Designated Confidential, 5/16/2011
10         Email, Subject: Open This One For
11         Mr. Denihan's Testimony, with
12         Attachment, Beginning with Bates
13         Label CUYAH 012536538, was marked
14         for purposes of identification.)
15         -  -  -  -  -
16    Q.   I want to show you a document I've
17 marked as Exhibit 5.  This is an email that was
18 sent by Mr. Scott Osiecki to Cheri Walter and
19 Suzanne Dulaney, with you being copied; do you
20 see that?
21    A.   Yes.
22    Q.   And Mr. Osiecki indicates that he
23 is sending along a version of your testimony,
24 and that testimony is before the senate finance
25 committee in May of 2011, right?

Page 143

1     A.   Uh-huh.  Okay.
2     Q.   You see that?
3     A.   Yes.
4     Q.   Who is Cheri Walter?
5     A.   She's the executive director of the
6  organization we talked about earlier that I was
7  a member of.  Excuse me.  All of the mental
8  health and drug boards.
9     Q.   That's the OACBHA?
10    A.   I believe so.
11    Q.   The next paragraph of Mr. Osiecki's
12 email indicates -- or requests to confirm that
13 the message has been received, as well as the
14 one with Conwell's testimony; do you see that?
15    A.   Yes.
16    Q.   Do you know who the Conwell is
17 that's being referred to there?
18    A.   I believe it is Yvonne Conwell.
19    Q.   That's the person you mentioned
20 earlier --
21    A.   Yes.
22    Q.   -- that's on the county council?
23    A.   Yes.
24    Q.   Do you recall going with Ms.
25 Conwell to testify before the Ohio Senate?

Page 144

1     A.   I don't recall it specifically.
2     Q.   All right.  Let's look at the
3  testimony that you provided.  It appears that
4  your testimony in May 2011 had to do with
5  Amended Substitute Bill 153; do you remember
6  that at all?
7     A.   It was that biennial budget bill,
8  yes, sir.
9     Q.   About halfway down the page, it
10 says here in your testimony that, "Funding for
11 mental health community service is being cut by
12 30 percent, while the entire state budget has
13 been reduced by 20 percent.  Why this
14 disproportional cut to community services?"; do
15 you see that?
16    A.   Yeah, I do see it.
17    Q.   What was the point that you were
18 making in your testimony to the Ohio Senate
19 Finance Committee?
20    A.   Let me finish reading.
21    Q.   Certainly.
22    A.   Okay.
23    Q.   What is the point that you were
24 making to the Ohio Senate Finance Committee in
25 May 2011?

Page 145

1     A.   That they were proposing to reduce
2  the funding.
3          I got a muscle cramp in my leg.
4     Q.   Do you want to take a break?
5     A.   Yeah, I do, but let me finish this.
6     Q.   Sure.
7     A.   It was just totally inadequate, in
8  terms of mental health and addiction funding,
9  and we were letting them know that this would
10 have serious consequences on the people living
11 in Cuyahoga County.
12    Q.   Why do you believe there has been
13 so much reluctance among public officials
14 within the state to fund mental health and
15 addiction treatment services at the local
16 level?
17         MS. SACKS:  Objection.
18    A.   Well, there is two parts there.  I
19 have to understand both parts.  Why public
20 officials, do you mean statewide public
21 officials?
22    Q.   That's what I'm asking about.  What
23 is your understanding as to why there has been
24 reluctance by state public officials to fund
25 mental health and addiction services that are

37 (Pages 142 - 145)

Page 146

1  provided at the local level?
2      A.   That are provided at the local
3  level, okay.  I thought that were enacted at
4  the local level.
5          Excuse me, I'm sorry.
6      Q.   Would you like to break?
7      A.   I don't know why.  It's been a
8  frustration, since I took the job, going down
9  there to testify.  I don't know why there is a
10  mindset on behavioral health, and behavioral
11  health, across the country, awards between 75
12  and 80 percent to mental health and 20 percent
13  to addiction.
14          And I didn't make it up, that's
15  just the way it is in the federal sense, and it
16  goes that way on the state.  If you looked at
17  all of our funding charts, you will see 75
18  percent are mental health and 25 percent are
19  addiction.  So that's the first part.
20          The second part is that during the
21  last 15 years, there has been a greater
22  reception to mental health, and -- but when the
23  opioid crisis occurred, the state senate and
24  legislature set up a 21-member committee to
25  come around and testify -- or to get testimony

Page 147

1  from across the state, and they appeared here
2  at the one of the local hospitals to take
3  testimony, and it was regarding funding like
4  this.
5          And one of the state legislatures
6  said to me, "Mr. Denihan, you could talk to me
7  about mental health, but you can't talk to me
8  about addiction, when a person has a choice,"
9  and did not understand it's a disease, and
10  diseases are treatable.  And so that's a person
11  who makes decisions in the State of Ohio
12  relative to funding, so that goes to part of
13  your answer.
14          There is a stigma involved in it
15  that's been hard to break, and I don't
16  understand why.  To me, it's simple, that it is
17  a disease, and diseases are treatable, and if
18  you treat them, you save money.
19          But I've learned that if I could
20  give them a program that actually saves them
21  money, they would be more receptive.  And so
22  that's when we talked about jail incarceration,
23  treatment versus incarceration, stuff like
24  that.
25          So to answer your question, I don't

Page 148

1  know why it's a stigma that people have, and it
2  goes to how they were brought up and what they
3  believe and so forth.  So that's my answer.
4      Q.   Do you agree that the State of Ohio
5  itself has some responsibility for the opioid
6  abuse epidemic?
7          MS. SACKS:  Objection.
8      A.   I don't know.  I don't know how to
9  answer -- I don't know.  The answer to that
10  question, I don't know.
11      Q.   Why do you say you don't know?
12      A.   Because it's all of our
13  responsibility and the people we elect.  We all
14  have a responsibility.  And letting -- it's not
15  just the state.  It's everybody that's
16  involved.  So I don't know.
17          I don't know if it's just the State
18  of Ohio, and I have gone there to testify in a
19  number of different ways, asking them for
20  money, and I haven't been that successful, darn
21  it.  I wish I was.  But it has not been one of
22  the things that I could say, boy, I really did
23  a great job on that.  I wish I could say that.
24  No, I haven't.  Although --
25      Q.   You tried, right?

Page 149

1          MS. SACKS:  Objection.
2      A.   Well, when I started, the county
3  was awarding $14 million, and when I left, it
4  went up to 30, more than doubled in my time
5  period for the county locally.  So that was
6  good.
7          But I can't say that about the
8  state.  The state has been a great
9  disappointment, in terms of behavioral health
10  funding, and so I don't understand why, but
11  there it is.
12      Q.   We looked at a document earlier
13  today, I think it was Exhibit 2, where at least
14  one county council member, I think it was
15  Mr. Gallagher --
16      A.   Mr. who?
17      Q.   Gallagher, Michael Gallagher.
18      A.   Can I see it?
19      Q.   Yeah.  I don't know where your
20  exhibits went.  It is Exhibit 2.
21          Do you remember we looked at this
22  document?
23      A.   Yeah.
24      Q.   And counsel member Gallagher --
25      A.   Oh, Gallagher.  I thought you said

38 (Pages 146 - 149)

Page 150

1 something else.
2    Q.   Sorry.  Maybe I wasn't pronouncing
3 it just right.
4    A.   Gallagher.
5    Q.   Gallagher.  We looked at a
6 document, it was Exhibit 2, where Counsel
7 Member Gallagher was also expressing reluctance
8 about providing funding in response to the
9 opioid epidemic, right?
10    A.   I don't know what that was about.
11 Councilman Gallagher has since been a supporter
12 of what we have been doing.  And he was new
13 then and we were new then, the county
14 government was new then, and you go through
15 fluctuations of things like that, and I'm not
16 trying to make excuses for him, I'm just saying
17 that that happens, and that can't be a
18 reflection of everybody.
19    Q.   You indicated that there were times
20 when the ADAMHS Board requested funding related
21 to opioid addiction and, in some instances,
22 those requests were granted and, in some
23 instances, those requests were denied, right?
24    A.   I could say for my whole career, I
25 could say that about everything I requested.

Page 151

1 Some of it has been approved and some of it
2 hasn't been approved.  It's just that -- so to
3 say just because it was opioids did not --
4 wasn't the -- I don't -- the part of government
5 and awarding contracts and budgets is you don't
6 get everything that you request and ask for.
7 That is a part of it.
8        It's not to suggest it's not
9 needed, it's just that their job is to award
10 the money, and our job is to ensure that it is
11 allocated correctly and that we are good
12 stewards of the funds, and sometimes it doesn't
13 work out that way.  It doesn't work out that we
14 get what we think we need.
15    Q.   To what extent would you say that
16 local county officials share at least some
17 responsibility for the opioid abuse epidemic in
18 this community?
19        MS. SACKS:  Objection.
20    A.   I don't think -- I don't know.
21 I've never -- I haven't given it a thought.  I
22 don't know.
23    Q.   You mentioned stigma as an issue.
24 Can you just say a bit more about your view of
25 why stigma and how stigma contributes to trends

Page 152

1 of opioid abuse?
2    A.   It's hard to answer something when
3 you don't know why, why other people act the
4 way they act.  So I don't know if I could
5 answer that, other than to tell you that they
6 do, and we have responsibilities to carry out
7 no matter how they act, and our job is to
8 figure it out and overcome and try to do the
9 best job we can.  So how they do it and why
10 they do it, I have no idea.
11    Q.   What is the stigma that you believe
12 exists in the minds of public officials or the
13 community overall, when it comes to
14 substance-use disorders, including addiction to
15 opioids?
16    A.   Well, I certainly would like to
17 give that a lot of thought.  I'll come back to
18 you at a later date.  I haven't thought about
19 it.  And, quite frankly, I don't know if I want
20 to think about it.  I'm retired now.  I don't
21 know.  I wish that things were different in
22 this country, but I don't know.
23        All I know, it's worth the effort
24 of trying to make a difference.  I was around
25 when drunk driving was an issue, and mothers

Page 153

1 and drunk driving made a difference, and the
2 moms said, "We got to change things," and they
3 did.  They made a big difference in America,
4 reducing drunk driving deaths in half.
5        I see that advocacy taken up by
6 families now.  I don't know.  All I know is it
7 is a problem, and my career, I have been the
8 resolver of problems with agencies and getting
9 things done.  My expertise hasn't been why it
10 happened.  My expertise has been getting
11 something done and making them accountable.
12    Q.   When you talk about stigma though,
13 I just want you to explain what you mean.  What
14 is the stigma that exists in terms of
15 substance-use disorders and specifically
16 opioid-use disorders?
17    A.   Well, it could mean many things to
18 many people, and if we're talking about the
19 general population, the general population may
20 not even have an idea what's going on.  A
21 stigma is somebody reluctant to do something
22 and accept something.
23        In our advertisements, we try to
24 make it clear that if somebody uses the opiate,
25 no matter where it comes from, they could die,

39 (Pages 150 - 153)

Page 154

1  and break down that stigma that they are
2  invincible.
3       Anyhow, I do not know if I could
4  answer that question what stigma is.  The more
5  I think about it, the more I'm thinking that I
6  don't think I can answer that question.
7       Q.   Okay.  To what extent -- well, let
8  me back up for just one moment.
9       Do you recall that around 2008,
10  there was an economic downturn that is
11  sometimes referred to as the Great Recession?
12      A.   Oh, yeah.  I was around.  I was
13  awake then.
14      Q.   Yes.  I think everybody in the room
15  would have been.
16      What is your understanding about
17  how the Great Recession impacted the financial
18  condition of Cuyahoga County?
19      MS. SACKS:  Objection.
20      A.   Well, I don't know how it impacted
21  Cuyahoga County.  I don't know, because I was
22  concerned about the ADAMHS Board, which is
23  actually the mental health board at the point
24  in time, so...
25      Q.   So I'll just point you to a bit of

Page 155

1  your testimony to the Ohio State senate.
2       A.   Yeah.
3       Q.   On the last page, it's page -- it's
4  the page with 6541 on the bottom right-hand
5  corner --
6       A.   What do I say?
7       Q.   Well, you make a reference to what
8  I think is the Great Recession, although you
9  can correct me if I'm misinterpreting.
10      A.   You're probably right.
11      Q.   Right in the middle of the page you
12  say, "Reduction in mental health and addiction
13  services are especially devastating as our
14  weakening economy truly has an impact on the
15  population's mental health;" do you see that?
16      A.   Yeah.
17      Q.   This is from 2011, yes?
18      A.   Yes, sir.
19      Q.   Is that in reference to the Great
20  Recession, when you talk about the weakening
21  economy?
22      A.   I would imagine it is.
23      Q.   Has the ADAMHS Board or anybody
24  else in Cuyahoga County, to your knowledge,
25  ever undertaken to try and understand the

Page 156

1  impact of the Great Recession on levels of
2  substance-use disorders?
3       MS. SACKS:  Objection.
4       A.   I don't know if that's occurred or
5  not.
6       Q.   Has the ADAMHS Board ever
7  undertaken that?
8       MS. SACKS:  Objection.
9       A.   No, I don't believe we have.
10      Q.   Do you believe that the Great
11  Recession has been a contributing factor to
12  levels of opioid abuse in Cuyahoga County?
13      MS. SACKS:  Objection.
14      A.   I don't know.  I don't know.
15      Q.   You said here, to the Ohio
16  Senate --
17      A.   I know what I said, and I'm being
18  honest with you, I don't know.
19      Q.   You said in 2011 that, "As people
20  continue to lose jobs and homes, many suffer
21  with depression and emotional strain and turn
22  to drugs and alcohol" --
23      A.   That's a true statement.
24      Q.   -- "and they turn to drugs and
25  alcohol to cope --

Page 157

1       A.   Oh, yes, they do.
2       Q.   -- "which leads to dependency."
3       A.   Yes, they do.
4       Q.   So is your view that the Great
5  Recession contributed to levels of opioid abuse
6  in Cuyahoga County?
7       MS. SACKS:  Objection.
8       A.   Well, it could, yes.
9       Q.   To what extent do you believe that
10  the economic downturn that began around 2008
11  has contributed to opioid abuse in Cuyahoga
12  County?
13      A.   I don't know.
14      MS. SACKS:  Objection.
15      A.   I don't know.  What I do know is
16  that people lose jobs, lose homes, get sick,
17  and many of them get addicted.
18      Q.   Does the Cuyahoga County ADAMHS
19  Board have its own designated levy?
20      MS. SACKS:  Objection.
21      A.   No.
22      Q.   Has it ever?
23      MS. SACKS:  Objection.
24      A.   No.
25      MR. BOEHM:  What's the basis of the

40 (Pages 154 - 157)

Page 158

1 objection about whether or not the ADAMHS Board
2 has ever had its own levy?
3        MS. SACKS:  I don't know if he's
4 making the connection between the two
5 questions.  So can you put it together?
6        MR. BOEHM:  There is no connection
7 between any question.
8    Q.   My question is just one question,
9 and I think you answered it.
10       MS. SACKS:  You said has it ever.
11       MR. BOEHM:  First I asked does it
12 have its own levy, he said no, and then I said
13 has it ever, and he said no.
14    Q.   Are those correct answers?
15    A.   Correct answers.
16    Q.   Has the Cuyahoga County ADAMHS
17 Board ever lobbied to get its own designated
18 levy?
19    A.   Yes.
20    Q.   What was the outcome of those
21 efforts?
22    A.   It came within one vote of
23 happening.  The year was -- I can't remember
24 the year, it was 12, 13 or 14, and it's up to
25 the vote of the county council, and there is 12

Page 159

1 members -- excuse me -- there is 11 members on
2 the council, and they needed a nine-member
3 vote, and Dan Brady was the champion of it, and
4 he got eight votes.
5        To pass a budget resolution, you
6 only needed seven, and six for approval, but
7 for a charter change, you need eight -- nine
8 rather, and it came that close.
9        So, yes, there was that effort, and
10 it did not happen.
11    Q.   In what year was that effort?
12    A.   I can't remember.
13    Q.   By my math, that would mean that
14 three county council members did not vote in
15 favor of a designated ADAMHS levy?
16    A.   Yes.
17    Q.   Who were those three council
18 members?
19    A.   They were Republicans, Greenspan,
20 Gallagher, and I can't remember the other one.
21       Actually, there were four votes
22 against it.  There was that one Democrat voted
23 against it, and it was the woman on the east
24 side, and I can't remember her name.  She is
25 from Highland Heights, who has said to me that

Page 160

1 she would vote for it now, but it doesn't make
2 any difference.  It had actually four votes
3 against it, and so we missed it by one, and I
4 was told, and that's where we're at.
5    Q.   Has there ever been a renewed
6 effort to get an ADAMHS specific HHS -- I'm
7 sorry -- an ADAMHS specific levy in Cuyahoga
8 County?
9    A.   There has been discussion, but no
10 action.
11    Q.   Does the county executive have a
12 role in determining whether or not there should
13 be an ADAMHS designated levy?
14    A.   Well, the final, it's not up to the
15 county executive.  It is up to county council.
16       MR. BOEHM:  Do you want to go off
17 the record for a minute.
18       THE VIDEOGRAPHER:  Off the record
19 at 12:51.
20       (Recess taken.)
21       - - - - -
22       (Thereupon, Deposition Exhibit 6,
23       Designated Confidential, 4/10/2013
24       Email, Subject: Mental Health &
25       Addiction Levy Fact Sheet, with

Page 161

1       Attachment, Beginning with Bates
2       Label CUYAH 012357240, was marked
3       for purposes of identification.)
4       - - - - -
5       THE VIDEOGRAPHER:  On the record,
6  1:34.
7    Q.   Welcome back from lunch,
8 Mr. Denihan.
9    A.   Oh, you're welcome.  Thank you.
10   Q.   I have placed in front of you a
11 document marked as Exhibit 6, which is an April
12 2013 email with an attachment that has to do
13 with efforts to pass an ADAMHS specific levy,
14 and we were talking about that before we broke
15 for lunch, right?
16   A.   Right.
17   Q.   Is this the period of time, 2013,
18 when efforts were undertaken to try and pass an
19 ADAMHS specific levy in Cuyahoga County?
20   A.   Yes, yes.  I know, I'm supposed to
21 speak up.
22   Q.   Okay.  No, that was great.  Thank
23 you.
24       About a third of the way down the
25 first page of the attachment to this email,

41 (Pages 158 - 161)

1  there is a section that begins -- or that is
2  titled Decreasing Funds.  Do you see Decreasing
3  Funds on the page?
4        Do you want me to help you, point
5  that out?  Decreasing funds.
6     A.   Thank you.
7     Q.   You're welcome.  And underneath the
8  decreasing funds section of this document
9  marked as Exhibit 6, there is an explanation of
10  decreasing state funds and then decreasing
11  county funds; do you see that?
12     A.   Yes.
13     Q.   Let's starts with the state
14  decreasing funds.  The document says that,
15  "Since 2002, State General Revenue Funding for
16  non-Medicaid alcohol, drug addiction and mental
17  health prevention, treatment and support
18  services has declined by $140 million or 62.68
19  percent."  Did I read that correctly?
20     A.   Yes.
21     Q.   Do you know why State General
22  Revenue Funding for drug addiction, mental
23  health prevention and those other services had
24  declined $140 million between 2002 and 2013?
25     A.   It had something to do with the

1  Medicaid funding.
2     Q.   Do you know in what way Medicaid
3  was related to this loss of funding?
4     A.   No, I don't.  I don't recall, but
5  it had something to do with it.
6     Q.   Did this loss of state funding of
7  $140 million impact the Cuyahoga County ADAMHS
8  Board's ability to respond to trends of opioid
9  abuse and overdose in the community?
10     A.   Yes.
11     Q.   How so?
12     A.   Well, it affects all of the funding
13  of the ADAMHS Board that's included.
14     Q.   All right.  Let's go to the next
15  section here, which has to do with the county,
16  and the county, of course, there is Cuyahoga
17  County, right?
18     A.   Yes.
19     Q.   It say, "Funding from the Cuyahoga
20  County Health and Human Services levy has also
21  been steadily declining over the last ten
22  years"; do you see that?
23     A.   Yes.
24     Q.   To what extent had funding from the
25  Cuyahoga County Health and Human Service levy

1  to the ADAMHS Board been steadily declining
2  between approximately 2003 and approximately
3  2013?
4     A.   This is in reference to
5  non-Medicaid funding, which seemed to be
6  increasing at the same time also, and some of
7  the areas -- not some of them, all of them that
8  are bulleted there are those that are affected.
9     Q.   Did you say that some funding had
10  been increasing to the ADAMHS Board between
11  2003 and 2013?
12     A.   No, I didn't say that.  I don't
13  think I said that.  I said that the --
14     Q.   Can you say it one more time.
15     A.   The non-Medicaid -- this impacted
16  the non-Medicaid funding and which is not
17  covered by Medicaid, those services, and these
18  services are appropriate for that would be
19  impacted by it.
20     Q.   If you read further along in this
21  same paragraph where the county decreased
22  funding, it indicates that although the ADAMHS
23  Board has had a role in ensuring passage of the
24  HHS levy in the county, that the board itself
25  has received less and less funding, while other

1  county departments received increases, and
2  programs that were funded by the County General
3  Fund were moved under the Health and Human
4  Services levy umbrella; do you see that?
5     A.   Yes, I do.
6     Q.   What is your understanding as to
7  why the ADAMHS Board was receiving less and
8  less funding from the county's HHS levy between
9  approximately 2003 and 2013?
10     A.   I don't know.  I could only explain
11  to you that it happened, and I wasn't happy
12  about it.
13     Q.   Whose decision was it to provide
14  less and less funding to the ADAMHS Board
15  between 2003 and 2013 and instead direct those
16  moneys to other programs in the county?
17     A.   The county administration.
18     Q.   Would that be the county council,
19  the county executive or both?
20     A.   Well, it's presented by the county
21  administration and approved by the county
22  council.
23     Q.   You said you weren't happy about
24  the fact that this was happening over this
25  approximately ten years.  Why were you not

Page 166

1  happy about that?
2      A.   Because instead of receiving a
3  decrease in the number of individuals to serve,
4  that had continued to increase.
5      Q.   Did the fact that the ADAMHS Board
6  was receiving less and less funding from the
7  county between approximately 2003 and 2013 have
8  an impact on the ADAMHS Board's ability to
9  respond to the problem of opioid abuse in the
10 community?
11     A.   It affected everything we tried to
12 serve, and that's included.
13         - - - - -
14         (Thereupon, Deposition Exhibit 7,
15         Designated Confidential, May 2010
16         Email, Subject: ODH Prescription for
17         Prevention Initiative: Cuyahoga
18         County Coalition, with Attachment,
19         Beginning with Bates Label CUYAH
20         012366210, was marked for purposes
21         of identification.)
22         - - - - -
23     Q.   Okay.  We are moving right along.
24 This is Exhibit 7.
25         Mr. Denihan, this email exchange

Page 167

1  takes us back to May 2010, and it is from
2  somebody by the name of Jennifer Miltner; do
3  you see that?
4      A.   Yes, I do.
5      Q.   And this email was written to you,
6  right?
7      A.   Yes.
8      Q.   I'll give you a chance to look at
9  the email, and my question to you is going to
10 be: Does this refresh your memory about
11 exchanges you had with individuals on behalf of
12 the Ohio Department of Health in May 2010 about
13 abuse of prescription opioid drugs in Ohio and
14 in the county?
15     A.   Okay.
16     Q.   Have you had a chance to look this
17 over?
18     A.   Yes, I did, the first page.
19     Q.   Would you like a moment to read the
20 second page?
21     A.   I would like one, yeah.
22     Q.   Sure.
23     A.   Okay.
24     Q.   Mr. Denihan have you had a chance
25 to review --

Page 168

1      A.   Yes.
2      Q.   -- the document marked as Exhibit
3  7?
4      A.   Yes.
5      Q.   Does this refresh your memory about
6  communications you had with representatives of
7  the Ohio Department of Health about
8  prescription opioid abuse in and around May
9  2010?
10     A.   No.  I don't deny that I did
11 receive it, I just don't remember.
12     Q.   You don't remember this specific
13 correspondence?
14     A.   No.
15     Q.   Do you remember the Ohio Department
16 of Health, in or around 2010, endeavoring to
17 start initiatives to respond to trends of
18 opioid abuse and overdose in the state?
19     A.   I remember something going on.
20     Q.   And that something that was going
21 on had to do with abuse of prescription opioid
22 drugs, correct?
23     A.   Apparently.
24     Q.   And that was in 2010?
25     A.   Yes.

Page 169

1      Q.   And in this instance, Ms. Miltner
2  reaches out to you directly.  You are the only
3  recipient of this email, right?
4      A.   Yes.
5      Q.   And do you see in the first line
6  she says she is reaching out to you on behalf
7  of the Ohio Department of Health?
8      A.   Yes.
9      Q.   And she describes an epidemic of
10 prescription drug overdose and abuse in the
11 state, right?
12     A.   Uh-huh.
13     Q.   Yes?
14     A.   Yeah.  I'm sorry.  Yes.
15     Q.   So there we see that term again
16 "epidemic."
17     A.   Okay.
18         MS. SACKS:  Objection.
19     Q.   And in this instance, the word
20 "epidemic" is being used in May 2010, right?
21     A.   Okay.
22     Q.   So do you agree, having seen this
23 document, that the Ohio Department of Health
24 was reaching out to you in May 2010 to address
25 what it believed to be an epidemic of

43 (Pages 166 - 169)

1  prescription drug abuse and overdose?
2      A.   I don't understand the question.
3      Q.   Let me give it to you one more
4  time.  And you just let me know if you need a
5  break at any moment.
6          Do you agree, having looked at this
7  document, that in May 2010, the Ohio Department
8  of Health reached out to you because it
9  believed that there was an epidemic of
10  prescription opioid abuse taking place in Ohio?
11      A.   I believe that the attached
12  memorandum, which mentions the epidemic of
13  prescription drug overdose, was sent to me, and
14  that they want to start something off.
15      Q.   And specifically, it says, in the
16  second paragraph -- you have to look back at
17  the first page, there you go.  It says,
18  "Because of your leadership as the chief
19  executive officer of the ADAMHS Board of
20  Cuyahoga County, you have a unique perspective
21  on this issue;" do you see that?
22      A.   Yes, I do.
23      Q.   Do you agree that due to your
24  leadership as the CEO of the ADAMHS Board for
25  the county, you had a unique perspective on the

1  subject of prescription abuse and overdose in
2  Cuyahoga County?
3      A.   I would agree that I'm not the only
4  one that has this perspective.
5      Q.   Do you agree that you are one of
6  the people who has that unique perspective?
7      A.   I think I'm one of the people, yes.
8      Q.   Who are the other people you would
9  say have a unique perspective, particularly
10  going back to May 2010 when this was written,
11  on the subject of worrisome trends in terms of
12  prescription abuse or overdose in Cuyahoga
13  County, other than yourself?
14      A.   The county health department, city
15  health department, the county medical examiner,
16  I believe, would be -- would fit that
17  accreditation.
18      Q.   And if you flip to the next page,
19  which is the formal invitation to you on behalf
20  of the Ohio Department of Health, do you see
21  the third paragraph down is in bold print?
22      A.   Yes, I see it.
23      Q.   It says, "As you are an active and
24  influential leader within your community, we
25  would like to work with you in a local effort

1  in Cuyahoga County to address this epidemic";
2  do you see that, Mr. Denihan?
3      A.   I'm with you.
4      Q.   Did I read that correctly, that
5  third paragraph?
6      A.   Yes.  Yes, you did.  What is the
7  question?
8      Q.   I was just asking if you saw it and
9  if I read that section correctly.
10      A.   Yes, you did.
11      Q.   So in 2010, Ms. Miltner, on behalf
12  of the Ohio Department of Health, is indicating
13  that she wants to work with you, the CEO of the
14  ADAMHS Board, to address the opioid abuse
15  epidemic in Cuyahoga County, correct?
16      A.   Yes.  Yes.
17      Q.   Did you at -- let me start this
18  question over.
19          In or around May 2010, did you, as
20  the CEO of the ADAMHS Board or as part of your
21  involvement on the Cuyahoga County Opiate Task
22  Force, undertake to try and understand the
23  reasons why Cuyahoga County was experiencing
24  worrisome trends in terms of the levels of
25  opioid abuse and overdoses?

1      A.   No.
2      Q.   Why didn't you undertake to try to
3  understand the causes?
4      A.   I don't know if I had the clinical
5  research background to do that.
6      Q.   Well, isn't it true that the ADAMHS
7  Board has scientists and medical doctors who
8  consult with the board?
9      A.   They do, but they're tied up doing
10  clinical work.
11      Q.   Do you, as the CEO of the ADAMHS
12  Board, ever ask any of the consultants or
13  employees who had scientific and medical
14  expertise to try and investigate and understand
15  the causes of opioid abuse trends and overdose
16  trends in the county?
17      A.   I don't recall.
18      Q.   Do you recall that in this same
19  timeframe, 2010, then Governor Strickland had
20  established a Prescription Drug Abuse Task
21  Force?
22      A.   Yes.
23      Q.   Do you recall that the Ohio
24  Prescription Drug Abuse Task Force that had
25  been established by Governor Strickland issued

Page 174

1 a final report?
2     A.   Okay.
3     Q.   Do you remember that?
4     A.   I don't remember the final report,
5 but go ahead.
6     Q.   Is that something that you would
7 have read at the time?  I know it's been some
8 years, but would you have read that report at
9 the time?
10     A.   I may I have.
11     Q.   You can set that one aside.  Thank
12 you, Mr. Denihan.
13           - - - - -
14           (Thereupon, Deposition Exhibit 8,
15           Designated Confidential, 4/27/2010
16           Email, Subject: Several Things, with
17           Attachment, Beginning with Bates
18           Label CUYAH 012367618, was marked
19           for purposes of identification.)
20           - - - - -
21     Q.   This is going to be Exhibit Number
22 8.  This also is 2010.  In fact, this one is
23 from April 2010.  It is an email from.
24       Ms. Cheri Walter, and you talked
25 little bit about her earlier today; do you

Page 175

1 recall that?
2     A.   Yes.
3     Q.   She sent this email to you and to
4 other individuals.  The subject is Several
5 Things, and if you look at the document, the
6 first of those several things is an indication
7 that you are the president elect of the OACBHA,
8 right?
9     A.   Correct.
10     Q.   Would you remind us of what that
11 acronym stands for OACBHA?
12     A.   Ohio Association of County
13 Behavioral Health Authorities.
14     Q.   What were your responsibilities as
15 the president elect of that organization?
16     A.   To work with an executive committee
17 and conduct meetings on a range of issues that
18 is facing our members.
19     Q.   And the fact that you were
20 president elect suggestions that you at some
21 point became the president; is that fair?
22     A.   Yes.
23     Q.   And in 2010 you were the president
24 elect.  Did you become the president of the
25 OACBHA in 2011?

Page 176

1     A.   Yes.
2     Q.   Did your duties change when you
3 became the president, as opposed to your role
4 as the president elect?
5     A.   They were somewhat different, yes.
6     Q.   How so?
7     A.   Well, president elect was -- there
8 was a president in place while a president
9 elect was there.  So it's a question of who ran
10 the meetings.
11     Q.   Do you recall during your time as
12 president elect and president of the OACBHA
13 addressing issues related to opioid abuse and
14 overdose in Cuyahoga County and other parts of
15 the state?
16     A.   Yes.
17     Q.   And, in fact, if you look to the
18 second page of the document marked as Exhibit
19 8, in April 2010, about three-quarters of the
20 way down the page, do you see where it says
21 Governor's Prescription Drug Abuse Task Force?
22     A.   Right.
23     Q.   And it indicates that the minutes
24 from that meeting are attached for all of the
25 recipients?

Page 177

1     A.   Okay.
2     Q.   Do you see that?
3     A.   Yes.
4     Q.   And that's related to concerns
5 about opioid abuse and overdose during that
6 timeframe, right?
7       MS. SACKS:  Objection.
8     A.   Right.
9     Q.   Okay.  You can set that document
10 aside.
11           - - - - -
12           (Thereupon, Deposition Exhibit 9,
13           Designated Confidential, 2/12/2007
14           Email, Forward: Executive Update,
15           with Attachment, Beginning with
16           Bates Label CUYAH 012875387, was
17           marked for purposes of
18           identification.)
19           - - - - -
20     Q.   The document in front of you now
21 has been marked as Exhibit 9 for purposes of
22 your deposition here today, and I'll give you a
23 moment to kind of flip through it, but for the
24 record, it is an email that you sent to a group
25 of people forwarding along information that had

45 (Pages 174 - 177)

1 been provided to you in February 2007 by
2 somebody by the name of Marilee Oldfield; do
3 you see that?
4    A.  Yes, I do.
5    Q.  Who is Marilee Oldfield?
6    A.  I do not know who she is.
7    Q.  It looks like she is also with the
8 OACBHA organization, right?
9    A.  Okay.
10   Q.  Do you see that in her email?
11   A.  I see that, yeah.  I don't know who
12 she is though.
13   Q.  The attachment to this document
14 that was produced to us by the lawyers in this
15 case is entitled Opiate Pharmacotherapy White
16 Paper, January 2007, and it has been authored
17 on behalf of the Ohio Association of County
18 Behavioral Health Authorities; do you see that?
19   A.  Yes.
20   Q.  Do you recall having received in or
21 around February 2007 an opiate pharmacotherapy
22 white paper through the OACBHA?
23   A.  No, I don't recall receiving it.
24       Just for the record, I received
25 hundreds, literally hundreds of hard copies and

1 emails.  This is, unfortunately, part of that.
2    Q.  Yeah.  The world we live in today.
3    A.  That's true.
4    Q.  I want to direct your attention in
5 particular to pages 5 and 6 of the attachment.
6 It is a section entitled The Current Opiate
7 Problem.
8    A.  Okay.
9    Q.  Do you see that?
10   A.  Uh-huh.
11   Q.  This section of the document, as
12 you can see, tries to describe the nature of
13 the opioid problem that was occurring in Ohio
14 at this time, right?
15   A.  Yes.
16   Q.  And if you go on to page 6, the
17 second bullet point on page 6 says, "There has
18 been an escalation of individuals addicted to
19 prescription opiate analgesics, OxyContin,
20 Demerol, Percodan, Vicodin, et cetera."
21      And then skipping down a little
22 bit, it says, "Pain medications implicated in
23 drug abuse-related emergency room visits rose
24 20 percent in 2002.  A large portion of these
25 involved oxycodone," and then it references the

1 DAWN Report; do you see all that?
2    A.  Yes.
3    Q.  Did I read all that correctly?
4    A.  Yes, you did.
5    Q.  So you knew in February 2007 that
6 there was an escalation of individuals in the
7 community who were addicted to prescription
8 opioid medications, correct?
9    A.  Yes.
10   Q.  And you knew that prescription
11 opioid medications had been implicated in drug
12 abuse-related emergency room visits at least by
13 February 2007 as well, correct?
14   A.  Yes.
15   Q.  The last bullet point in that
16 section reads, "The opiate epidemic is creating
17 additional burdens on this already taxed
18 system"; do you see that?
19   A.  Yes, I do.
20   Q.  So in February 2007, you received a
21 document that described trends of opioid
22 addiction and overdose as an epidemic, correct?
23   A.  Uh-huh.
24   Q.  Yes?
25   A.  Yes.

1    Q.  Do you agree that as of February
2 2007, at least by that date, it was appropriate
3 to refer to trends in opiate and opioid-related
4 overdose and abuse as an epidemic?
5       MS. SACKS:  Objection.
6    A.  So I don't know if I'm qualified to
7 agree.  I don't know how to answer that,
8 candidly.  I don't know if I'm qualified at
9 that point, 2007.  My expertise and area was
10 mental health, and we had yet to consolidate
11 with the alcohol and drug board.
12   Q.  In any event, whether it
13 technically would qualify under epidemiological
14 standards as an epidemic, you knew that as of
15 February 2007, people in Ohio and Cuyahoga
16 County were referring to trends of opioid abuse
17 and overdose in the county as an epidemic,
18 correct?
19   A.  I would say that's correct.
20 Somebody in our field was saying it, yes.
21   Q.  We're making good time.
22   A.  Well, I'm glad to hear that.
23      - - - - -
24      (Thereupon, Deposition Exhibit 10,
25      Designated Confidential, 1/17/2013

46 (Pages 178 - 181)

1    Email, Forward: Several
2    Things/Updates, with Attachment,
3    Beginning with Bates Label CUYAH
4    012549313, was marked for purposes
5    of identification.)
6    - - - - -
7    Q.    I've given you a document that I've
8    marked as Exhibit 10.  This one is from October
9    2013, and it is again from the OACBHA,
10   specifically Ms. Walter; do you see that?
11   A.    Yes, I do.
12   Q.    And if you turn to page 2 of this
13   document, you will see that Ms. Walter has
14   forwarded to the membership of the OACBHA
15   information about a Prescription Drug Addiction
16   and Healthcare Reform Study and a committee
17   press conference.
18   MS. SACKS:  What page are you on?
19   MR. BOEHM:  I'm on the second page
20   of the document.  It is about three-quarters of
21   the way down the page.
22   MS. SACKS:  Okay.
23   Q.    Do you see that, Mr. Denihan?
24   A.    Yes, I do.  Yeah.
25   Q.    And this section makes reference to

1    a committee at the Ohio General Assembly that
2    has members including Nan Baker and
3    Representative Robert Sprague?
4    A.    Sprague, yes.
5    Q.    Let's start with Representative
6    Baker.  Do you know Representative Baker?
7    A.    Yes.
8    Q.    Have you ever communicated with
9    Representative Baker about any subjects related
10   to opioid abuse?
11   A.    Yes.
12   Q.    Can you please tell us about that?
13   A.    I don't recall the specific time,
14   but a general discussion, in terms of advocacy
15   work with the general assembly.
16   Q.    Is Representative Baker from
17   Cuyahoga County?
18   A.    Yes, she is.
19   Q.    Do you know Representative Robert
20   Sprague?
21   A.    Yes, I do.
22   Q.    In what way do you know
23   Representative Sprague?
24   A.    He was the chair of the opioid
25   committee and the general assembly.

1    Q.    Okay.
2    A.    And I got to know him through the
3    discussions of funding for the whole opioid
4    experience.
5    Q.    Do you remember when you first
6    spoke with Representative Sprague about opioid
7    abuse in Cuyahoga County?
8    A.    No, but it had to be at a time when
9    he was conducting a hearing, and I either
10   testified on behalf of the county or the
11   association, or a meeting after that particular
12   point in time on the same day.
13   Q.    Well, let's look at the attachment
14   to this particular email, which may be what you
15   are talking about, but you tell me.
16   This is an Ohio House of
17   Representatives Prescription Drug Addiction and
18   Healthcare Reform Legislative Study Committee
19   from October 2013; do you see that?
20   A.    Yes, I do.
21   Q.    It looks like Representative Robert
22   Sprague was the chair of this committee, right?
23   A.    Correct.
24   Q.    I want to direct your attention in
25   particular to page 6 of this document.  It is

1    Roman numeral III, and the section is entitled
2    A State-Sponsored Problem; do you see that?
3    A.    Yes, I do.
4    Q.    I'll give you just a chance to look
5    that over.  I'm going to have a few questions
6    for you.
7    A.    I've read it.
8    MS. SACKS:  You read the whole
9    thing?
10   THE WITNESS:  Section number III.
11   Q.    The section --
12   MS. SACKS:  Read the whole section.
13   THE WITNESS:  Okay.  Thank you.
14   A.    Okay.
15   Q.    You have had a chance to read
16   through section III of this 2013 report?
17   A.    Uh-huh.  Yes.
18   Q.    I want to direct your attention to
19   some of the specifics in this section.  The
20   first point that Representative Sprague and his
21   committee makes, under the section A
22   State-Sponsored Problem, is that the general
23   assembly of Ohio passed an act of legislation
24   referred to as the Intractable Pain Act of
25   1998, correct?

47 (Pages 182 - 185)

Page 186

1    A.   Yes.  That's what it says.
2    Q.   What is the Intractable Pain Act of
3  1998?
4    A.   I don't know.
5    Q.   Have you ever heard of that before?
6    A.   Not recently.
7    Q.   Well, what about at some point in
8  time?
9    A.   It does not ring a bell.
10    Q.   Are you aware that prescribing
11  guidelines were changed in connection with the
12  use of prescription opioid medications in the
13  late 1990s?
14    A.   I was not aware of it.
15    Q.   If I were to show you documents
16  where you yourself have talked about that,
17  would that come as a surprise to you?
18    MS. SACKS:  Objection.
19    A.   Everything is coming as a surprise
20  to me today.
21    Q.   Well, I hope not.
22    Let me ask you, and then we can
23  look at your documents.
24    A.   Okay.
25    Q.   Does it -- do you agree that there

Page 187

1  were changes in guidelines for the use of
2  prescribed prescription opioid medications in
3  the 1990s?
4    A.   Yes.
5    Q.   And it says here, in connection
6  with this piece of legislation from the Ohio
7  legislature that it, quote, Opened the
8  floodgates for doctors to treat chronic pain
9  with prescription opioids; do you see that?
10    A.   I see that.
11    Q.   What is your understanding about
12  how changes in the guidelines for using
13  prescription opioids opened the floodgates, to
14  use the terminology from this report, or in
15  other words, impacted opioid abuse and overdose
16  in Cuyahoga County?
17    A.   I don't think I'm qualified to
18  answer that.
19    Q.   Well, you may not be a medical
20  doctor, but I'm asking you, based on your
21  leadership as the CEO of the ADAMHS Board in
22  Cuyahoga County for many years, and as an
23  active partner on the Cuyahoga Opiate Task
24  Force that we have talked about, in that
25  capacity, what is your understanding as to the

Page 188

1  way in which changes in prescribing guidelines
2  for prescription opioid medications impacted
3  levels of opioid abuse or overdose in this
4  community?
5    A.   I don't know if I could recite
6  specifically.  All I know is something
7  happened, and folks in the medical field are
8  concerned, and the end result is more people
9  dying.
10    Q.   So let's see if we can break that
11  down just a little bit.
12    A.   Well, you asked me.
13    Q.   You said, "Folks in the medical
14  field are concerned."
15    A.   Somebody, the general assembly,
16  medical field, everybody shared with me has
17  shared a concern, and they all have done
18  something to it.  Here is the general assembly
19  passing an Intractable Pain Act.
20    By the way, this doesn't
21  come -- this comes from, many times, from the
22  medical community themselves.
23    Q.   What do you mean by that?
24    A.   When legislation is enacted, many
25  times it comes at the testimony and advice of

Page 189

1  the practitioner.  It's not passed in a vacuum.
2    Q.   Do you agree that in the late
3  1990s, there was a consensus in the medical
4  community at that time that pain was
5  undertreated?
6    A.   No, I have no idea to say whether
7  it was or it wasn't.
8    Q.   What is your understanding as to
9  why prescribing guidelines were changed with
10  respect to the use of prescription opioid
11  medications in the 1990s?
12    A.   I don't know if I could answer the
13  1990s or today.  I don't know if I have the
14  background to do that.  So show me what the
15  next document is.
16    Q.   Oh, no.  With we're still working
17  on this one.
18    A.   Okay.
19    Q.   The second number here in section
20  III of this document indicates, and this is a
21  document you received in 2013, says that, "The
22  Ohio Medical Board and others throughout the
23  country convinced the medical community to
24  adopt pain as the fifth vital sign, putting
25  pain on the same level as blood pressure, heart

48 (Pages 186 - 189)

Page 190

1  rate, breathing rate and temperature, which
2  effectively began an overt effort for doctors
3  to treat all kinds and amounts of pain with
4  opioids"; do you see that?
5      A.  I see that.
6      Q.  Is that consistent with your
7  understanding, as the --
8      A.  Actually, yes.
9      Q.  And what is your understanding
10  about that, as it concerns Cuyahoga County?
11      A.  My understanding and concern is a
12  nurse or a doctor would come in, quite
13  frequently during the day and time when a
14  person is in treatment or in the hospital, and
15  ask them, "What's your pain level," and somehow
16  this is related to somebody saying, "Well, it's
17  no longer a 5 or a 6 or whatever, it's higher,"
18  and that, as this statement suggests,
19  contributed to more pain prescriptions.
20      Q.  Do you know why the Ohio Medical
21  Board and others throughout the country
22  convinced the medical community to adopt the
23  treatment of pain as a fifth vital sign?
24      A.  I don't know what it was, but it
25  could be -- I don't know.  Actually, I don't

Page 191

1  know.
2      Q.  Do you know if the Ohio Medical
3  Board has ever revised its guidelines to
4  prescribers in the State of Ohio for how they
5  treat pain and how they use prescription opioid
6  medications?
7      A.  I do know that going into a
8  hospital myself, that the number of times they
9  come in to ask me if I had pain had increased
10  significantly as a result of this.
11      Q.  During this timeframe?
12      A.  Yes.
13      Q.  Do you have a view that the changes
14  that you are referring to now, in terms of the
15  use of prescription opioids and the treatment
16  of pain as a fifth vital sign, contributed
17  ultimately to the levels of opioid abuse and
18  overdoses that have taken place here in
19  Cuyahoga County?
20      A.  I don't know.
21      Q.  You don't know whether it has been
22  a contributing factor or not?
23      A.  Well, I think it could -- upon
24  reflection, I think it could play a
25  contributing factor.  I think it could.

Page 192

1      Q.  And indeed Representative Sprague
2  and his colleagues at the Ohio legislature are
3  trying to describe several contributing
4  factors.
5      A.  Right.
6      Q.  That's actually the language they
7  use, right?
8      A.  Correct.
9      Q.  And you agree with their
10  assessment?
11      A.  Well, yes, I do.
12      Q.  Number 3 states that, "In the late
13  1990s, the FDA approved several new and
14  powerful opioid pain medications with
15  hydrocodone as the active agreement, a very
16  powerful and addictive opioid"; do you see
17  that?
18      A.  Yes, I do.
19      Q.  Do you believe that the FDA's
20  approval of new opioid prescription pain
21  medication was a contributing factor to opioid
22  abuse and overdose in this community?
23      A.  If the FDA says -- has approved it,
24  and I'm inclined to agree with it, yes.
25      Q.  You are inclined to agree with the

Page 193

1  FDA, or you are inclined to agree that that is
2  a contributing factor?
3      A.  That it is a contributing factor.
4      Q.  To what extent do you believe the
5  United States Food and Drug Administration has
6  responsibility for the opioid abuse epidemic?
7      MS. SACKS:  Objection.
8      A.  I don't know.
9      Q.  Do you believe they have any
10  responsibility?
11      A.  I don't know.  I'm a not a
12  clinician, I'm not a doctor, I don't know.
13      Q.  Well, again, I'm not asking you as
14  a clinician or doctor.  I'm asking you as an
15  active partner on the Cuyahoga County Opiate
16  Task Force and the CEO of the ADAMHS Board.  So
17  it's only in that capacity that I'm asking you
18  these questions; does that make sense?
19      A.  I wish it did make sense, but to
20  me, the limit of my capability to assess a
21  value of a clinical diagnosis is something that
22  I'm not trained for.
23      Q.  When you say the, "Value of a
24  clinical diagnosis," can you tell me what you
25  mean by that?

49 (Pages 190 - 193)

Page 194

1    A.   Well, I look at these questions as
2  to whether I have the ability to -- I could
3  agree with every one of them, saying, well, the
4  general assembly looked at it, and I agree with
5  the committee, what they have done, and I do
6  agree with the committee, what they have done,
7  but if I have to sit here and quantify by my
8  background at what that actually means, I don't
9  think I'm capable of doing it.
10        And that's what I'm getting from
11  your questions.  That's what I'm getting from
12  it.  That may not be what you're saying, but
13  that's what I'm getting from it.
14    Q.   In other words, are you saying that
15  it's not possible for you, to when you take all
16  the contributing factors to the opioid abuse
17  epidemic in Cuyahoga County, it's not possible
18  for you to try and figure out exactly or even
19  approximately which factors contributed which
20  amount; is that what you are saying?
21    A.   I think that's part of what I'm
22  saying, that I think there are many factors
23  that contributed to it, and yeah.
24    Q.   Is it possible for you, as somebody
25  who has been an active partner on the Cuyahoga

Page 195

1  County Opiate Task Force and the CEO of the
2  ADAMHS Board, to take all those factors into
3  account and try and assign approximately how
4  much each of those factors has contributed to
5  the epidemic in this community?
6    A.   I'm not so sure that's what my job
7  is.  My job is to provide services and
8  provide -- a good steward of the funding, and
9  ensure that folks get the services.
10    Q.   But whether it's your job or not,
11  I'm just asking you the question whether or not
12  you believe that would be possible to do?
13    A.   I don't think so.
14    Q.   Why wouldn't that be possible?
15    A.   Well --
16        MS. SACKS:  Objection.
17    A.   -- I'm not a doctor, I'm not a
18  clinician, and I'm not an attorney.  I'm an
19  administrator, responsible for the distribution
20  of state and county funding for individuals who
21  have one of these illnesses, and I don't think
22  that includes what you just described.
23    Q.   Okay.
24    A.   And I also didn't think -- I never
25  had the time to do that, while trying to deal

Page 196

1  with the many demands of the job in the first
2  place.
3    Q.   Right, but my question is different
4  than that.
5    A.   Oh, okay.
6    Q.   I understand you are saying you
7  don't believe you ever did it, but my -- and I
8  understand that you are not a medical doctor,
9  but you are the longtime CEO of the ADAMHS
10  Board, and you were an active partner on the
11  Cuyahoga County Opiate Task Force, and so one
12  of the things we are trying to do here is get
13  your knowledge, from having had that long
14  record of experience and having studied the
15  problem, having tried to understand the
16  problem, and having tried to address the
17  problem in this community.
18    A.   And you want me --
19        MS. SACKS:  Hold on.  Hold on.  He
20  didn't ask a question.  He just gave you a
21  statement.
22    Q.   So my question --
23        MR. BOEHM:  That's appropriate.
24  That's fine.
25        MS. SACKS:  Yeah.

Page 197

1    Q.   So my question is, with that
2  background, with that explanation, my question
3  to you is whether or not you believe it is
4  possible, having looked this issue in Cuyahoga
5  County, to take all the various contributing
6  factors that we have talked about, some that we
7  will talk about, and try and figure out which
8  contributed in which amount; is that possible?
9    A.   I don't know.  I would like to
10  think about that question for a minute or two.
11    Q.   Okay.
12    A.   See if I understand the question.
13  Is it possible for me to -- repeat the question
14  for me again.
15    Q.   Do you believe that it is possible
16  to take all of the various contributing factors
17  to the opioid abuse epidemic in Cuyahoga County
18  and then try and assess which factors
19  contributed and to which extent each factor
20  contributed to the opioid abuse problem here in
21  this community?
22    A.   I think it's possible.
23    Q.   Okay.  And how would you go about
24  doing that?
25    A.   I have no idea.

50 (Pages 194 - 197)

1    Q.    So why do you say it's possible?
2    A.    Well, you put out all the
3  contributing factors, and if they are true
4  contributing factors, then somebody ought to
5  have the ability to take those and make that
6  decision, and if you ask me I thought it was
7  possible, yeah, I think it's possible.
8    Q.    Did anybody at the ADAMHS Board
9  ever try and do that?
10    A.    Not to my knowledge.
11    Q.    Did anybody at the Cuyahoga County
12  Opiate Task Force ever try and do that?
13    A.    Not to my knowledge.
14    Q.    Why not?
15    A.    Well, I think I'll speak for
16  myself, that we were too busy trying to stay a
17  step ahead of those that were getting sick and
18  dying.
19    Q.    But we talked about this earlier,
20  Mr. Denihan, and I want to go back it to.
21         You agreed, when I asked you
22  earlier today, that in order to be able to
23  really be effective in addressing a public
24  health crisis, it is important to know why that
25  crisis is happening, and you agreed with that

1  statement.  So my question to you now --
2    A.    I don't disagree with that
3  statement.  Okay.  I'm sorry.
4    Q.    Do you agree that in order to be
5  able to properly and appropriately and
6  effectively address the trends of opioid abuse
7  and overdose in Cuyahoga County, it is
8  imperative to understand the reasons why the
9  crisis is taking place?
10    A.    I think I would like to know why,
11  yeah.
12    Q.    You think it is imperative, in
13  order to be able to effectively address the
14  crisis, to know why the crisis is taking place?
15    A.    To provide treatment for a person
16  who needs help, I don't know if I need to know
17  how the crisis began.
18    Q.    Respectfully, not my question.
19    A.    I know, but that's how I'm
20  answering it.
21    Q.    But I get to ask my question, and
22  then it only works if you answer my question.
23         Do you think it is imperative, in
24  order to understand how best to respond and
25  address the trends of opioid abuse and overdose

1  in a community, to understand the reasons why
2  that those trends are taking place?
3    A.    I think eventually, yes, it is.
4    Q.    And that's what Representative
5  Sprague was trying to do here, right, trying to
6  understand the contributing factors?
7         MS. SACKS:  Objection.
8    Q.    Yes?
9    A.    I would -- on the surface, yes, it
10  looks that way.
11    Q.    And is there anything among the
12  contributing factors that Representative
13  Sprague has identified here in section three --
14    A.    As a what?
15    Q.    Is there any contributing factor
16  that Representative Sprague and his colleagues
17  for the Ohio Prescription Drug Addiction Study
18  Committee has concluded in terms of
19  contributing factors that you disagree with,
20  insofar as it concerns Cuyahoga County?
21    A.    No.
22    Q.    Do you agree that all of the
23  factors that are identified by Representative
24  Sprague and his colleagues --
25    A.    I think that is that --

1         MS. SACKS:  Wait until he's done
2  with his question.
3         THE WITNESS:  I'm sorry.
4         MS. SACKS:  That's okay.
5    Q.    Did you agree that all of the
6  factors that were identified in this October
7  2013 report by Representative Sprague and his
8  colleagues were and have been contributing
9  factors to the opioid abuse epidemic in
10  Cuyahoga County?
11    A.    Yes.
12    Q.    In what way do you believe that the
13  grading of hospital systems and physicians on
14  how effectively pain has been treated has been
15  a contributing factor to the opioid abuse
16  epidemic in Cuyahoga County?
17    A.    What was the first two words you
18  said, "the glading"?
19    Q.    In what way do you believe that the
20  grading --
21    A.    Oh, grading.
22    Q.    -- of hospitals and physicians on
23  how effectively they treat pain has contributed
24  to opioid abuse and addiction in Cuyahoga
25  County?

51 (Pages 198 - 201)

Page 202

1    A.   Well, if a person has a low
2  threshold of pain and they report -- if I
3  understand of your question -- a low, I'm a 2
4  or 3, it would not be required for them to get
5  a medication, but if they say, well, I am a 10
6  and, in fact, I'm a 15, and say higher numbers,
7  they could possibly get a higher amount of
8  doses than they would normally get without
9  asking the question.
10   Q.   Do you believe that the ADAMHS
11 Board is qualified to assess the
12 appropriateness of prescribing decisions by
13 particular licensed physician to particular
14 patients?
15   A.   No.  I think that's up to the
16 certified boards to do that.  No, I don't.
17   Q.   Do you agree that a licensed
18 prescribing physician is the person who is best
19 situated to determine whether or not a
20 prescription opioid medication is appropriate
21 for a particular patient?
22   A.   Yes.
23   Q.   And that's because a prescribing
24 physician is the one who is able to see a
25 patient and take a medical history and

Page 203

1  understand exactly what the illness is, right?
2        MS. SACKS:  Objection.
3    A.   Yes.
4    Q.   Does the ADAMHS Board do anything
5  to come in after the fact and review whether or
6  not prescriptions made by physicians are
7  legitimate?
8        MS. SACKS:  Objection.
9    A.   Does the ADAMHS Board come in and
10 do something if somebody says that the pain is
11 legitimate?
12   Q.   No.  We talked about how a licensed
13 physician is the one best situated to make a
14 prescribing decision for a particular patient,
15 right?
16   A.   Yeah.
17   Q.   My question to you now is whether
18 or not the ADAMHS Board ever comes in and
19 assesses whether or not a healthcare provider
20 who has prescribed an opioid medication has
21 done so mistakenly or illegitimately?
22       MS. SACKS:  Objection.
23   A.   I think if -- I think that if we
24 were told something is going on that it's
25 illegal, that we would turn it over to the

Page 204

1  proper authorities to evaluate, but I don't
2  think that's our role to do the actual
3  evaluation ourselves.
4    Q.   Are you aware of any illegitimate
5  or illegal prescribing of prescription opioid
6  medications by healthcare providers within
7  Cuyahoga County?
8    A.   No, I'm not.
9    Q.   The next item on the list here
10 refers to direct-to-consumer advertising; do
11 you see that?
12   A.   Yes, I do.
13   Q.   What is your understanding about
14 what direct-to-consumer advertising is?
15   A.   The advertising on TV, that you
16 should get ABC drug, and that will help you
17 with your back pain or whatever.
18   Q.   Are you aware of any
19 direct-to-consumer advertising that has been
20 conducted by the manufacturers of prescription
21 opioid medications?
22       MS. SACKS:  Objection.
23   A.   No, I'm not.  I'm not.
24   Q.   Are you aware of any specific
25 interactions that representatives of the

Page 205

1  manufacturers of prescription opioid
2  medications have had with licensed healthcare
3  providers in or around Cuyahoga County?
4    A.   I'm aware that physicians would
5  call and ask for authority to pay something for
6  a specific drug that somebody has not approved,
7  and I can't give any examples, but I'm aware
8  that that happens, which I turn over to the
9  chief clinical officer.
10   Q.   Is that in relation to prescription
11 opioid medications?
12   A.   I don't know.
13   Q.   Let me ask you the question this
14 way:  Are you aware of any particular
15 interactions that representatives of
16 prescription opioid manufacturers have had with
17 licensed physicians or other healthcare
18 providers in or around Cuyahoga County about
19 prescription opioid medications?
20   A.   No, I'm not.
21   Q.   Are you aware of any misleading or
22 fraudulent statements that the makers of
23 prescription opioid medications have made to
24 the medical community in or around Cuyahoga
25 County?

52 (Pages 202 - 205)

1    A.   No, I'm not.
2         MS. SACKS:  Objection.
3    Q.   Are you aware of any misleading or
4  false statements about prescription opioid
5  medications that either the makers of
6  prescription opioid medications or others
7  operating in connection with prescription
8  opioid medications have made to the medical
9  community in Cuyahoga County?
10    A.   No, I'm not.
11    Q.   Do you know why Representative
12  Sprague and his colleagues refer to the opioid
13  abuse epidemic as a state-sponsored problem?
14    A.   I don't know why.
15    Q.   What is your understanding?
16         MS. SACKS:  Objection.
17    A.   My understanding is that the state
18  was being bombarded for funding, either being
19  where the funding was either being cut or
20  needed because of the escalation and need for
21  folks with opiate problems around the state.
22    Q.   What is your understanding as to
23  why Representative Sprague and his colleagues
24  referred to the opioid abuse epidemic in Ohio
25  as a state-sponsored problem?

1         MS. SACKS:  Objection.  He just
2  answered that.
3    Q.   Go ahead.
4    A.   I don't know why he said that,
5  other than it happens across the whole state.
6    Q.   Do you believe that the Ohio
7  Medical Board shares responsibility for levels
8  of opioid abuse, addiction and overdose?
9         MS. SACKS:  Objection.
10    A.   I don't know.
11    Q.   Well, you indicated earlier that
12  the Ohio Medical Board, as Representative
13  Sprague talked about, had altered prescribing
14  guidelines to treat pain as the fifth vital
15  sign, and in other ways, and pushed that.
16         Do you believe that the Ohio
17  Medical Board has some responsibility, in light
18  of the actions they took in the 1990s, to
19  change prescribing guidelines?
20    A.   Yes, as noted in this document.
21    Q.   And do you agree that the Ohio
22  General Assembly has some share of
23  responsibility, in light of their passage of
24  the Intractable Pain Act in 1998 that also
25  changed prescribing guidelines for prescription

1  opioids?
2         MS. SACKS:  Objection.
3    A.   Yes.
4    Q.   I'm going to move along to the next
5  document, and you can set the one in front of
6  you aside for a moment.
7         - - - - -
8         (Thereupon, Deposition Exhibit 11,
9         Designated Confidential, September
10         2013 Email, Subject RE; September 12
11         Testimony for Rep. Sprague
12         Prescription Drug Addiction
13         Legislative Study Committee, with
14         Attachment, Beginning with Bates
15         Label CUYAH 12550626, was marked for
16         purposes of identification.)
17         - - - - -
18    Q.   Mr. Denihan, this is a document
19  marked as Exhibit 11.  It is another email
20  exchange from September 2013, and I'll give you
21  whatever time you need to look it over, but
22  I'll just represent, for the record, it is an
23  exchange between you, Dr. Christina Delos
24  Reyes, and Mr. Osiecki about pain management
25  guidelines and the state medical board, in

1  connection with the use of prescription opioid
2  medications.
3         MS. SACKS:  It is two sided.
4         Is the highlighting on the second
5  page yours?
6         MR. BOEHM:  No.  I believe that the
7  highlighting came to us in the production from
8  the county.
9    Q.   Have you had a chance the look this
10  over.
11    A.   Yes.  I am just finishing.  Thank
12  you.  Okay.
13    Q.   I want to direct your attention,
14  now that you have had a chance to read the
15  entire document, to the email you sent on
16  September 6, 2013 at 5:15 p.m.  It's about
17  halfway down the first page of the document.
18  And you are writing to Dr. Christina Delos
19  Reyes; do you see that?
20    A.   Yes.
21    Q.   Dr. Christina Delos Reyes is a
22  medical doctor, right?
23    A.   Yes.
24    Q.   And she is somebody who has
25  consulted with and worked with the ADAMHS Board

53 (Pages 206 - 209)

1   for Cuyahoga County?
2       A.   Yes.
3       Q.   Have you ever discussed with Dr.
4   Christina Delos Reyes what are the causes of
5   the opiate abuse epidemic in the county?
6       A.   I don't recall such discussions,
7   but it's possible.
8       Q.   But here you indicate to Dr. Delos
9   Reyes that you have a few recommendations that
10  you would make in connection with opioid abuse
11  in the county.
12      A.   Yes, I see that.
13      Q.   The first thing that said is you
14  would like to see some specific training for
15  doctors on addiction and proper drug
16  prescription; do you see that?
17      A.   Uh-huh.
18      Q.   What about what was happening in
19  the medical community at this time was not
20  working, in your view, that you thought
21  required specific training for doctors?
22      A.   I had doctors say to me that they
23  needed more training.
24      Q.   Well, you say -- did you have
25  doctors say to you they needed more training

1   about proper drug prescription use?
2       A.   Yes.
3       Q.   What did those doctors say to you
4   about that?
5       A.   We need more training, relative to
6   prescription use and also the use of OARRS,
7   that there ought to be a way to make sure that
8   they make the call to see if -- to find out
9   whether the individual had used the
10  prescription before, if at all.
11      Q.   Did ADAMHS ever provide any
12  specific training for doctors in this community
13  about addiction and the proper use of
14  prescription opioid medications?
15      A.   No, not to my knowledge.
16      Q.   The second recommendation you make
17  is that you would like to see consistent and
18  reasonable pain management policy for
19  hospitals?
20      A.   Uh-huh.
21      Q.   What did you mean by that?
22      A.   At that time, I thought that the
23  pain management were inconsistent among one
24  another.  I can't remember where they were
25  inconsistent, but I thought they were

1   inconsistent, and that I felt that, on the
2   surface they seemed to be pretty good, but in
3   reality they weren't working.
4       Q.   In what way were they not working?
5       A.   Doctors weren't following it.
6       Q.   In what way were doctors not
7   following them?
8       A.   Well, most of the pain management
9   policy said to use OARRS, for example.
10  Sometimes they'd say, I just want to get them
11  out of my office, sign the script and get rid
12  of them.  That's an example.
13      Q.   What is the OARRS database?
14      A.   It is of the user who is receiving
15  it, and I believe the Social Security Number,
16  and it has a doctor who prescribed it and what
17  the prescription was, and the date.  I think
18  that's what it is.
19      Q.   In what way was utilization of
20  OARRS helpful in addressing and understanding
21  opioid abuse?
22      A.   A client saying, "I need this, I
23  need this," and they would call, they would
24  find out they just got it a week before from
25  another doctor, who prescribed the same thing

1   and the same amount.
2       Q.   The ADAMHS Board for Cuyahoga
3   County had access to the OARRS database as
4   well, correct?
5          MS. SACKS:  Objection.
6       A.   Our physicians did, but I never
7   used it.
8       Q.   When you say your physicians, do
9   you mean doctors like Christina Delos Reyes?
10      A.   Yes.
11      Q.   Why didn't you ever use it?
12          MS. SACKS:  Objection.  Form.
13      A.   I don't recall specifically why,
14  but -- what would I do with it?  I don't know
15  what I would do with it, quite frankly.
16      Q.   Well, you could have used OARRS
17  data --
18          MS. SACKS:  Hold on.  Hold on.  Let
19  him ask a question and then you answer.
20      Q.   Go ahead and finish.  I didn't mean
21  to cut you off.
22      A.   I don't know why I didn't use it.
23  I just didn't use it.  I felt this was for --
24  an official document for the doctors to use and
25  not for me as an administrator to use.

54 (Pages 210 - 213)

1      I would just find out information
2  about one client.  What would I do with it?
3      Q.   Well, you could use the OARRS
4  database to determine the volume of
5  prescription opioids being prescribed by
6  doctors in Cuyahoga County, correct?
7      MS. SACKS:  Objection.
8      A.   I don't know if that's a fact.
9  What I do know is that we could find out for a
10  specific individual, and it never occurred to
11  me, other than of the hospital finding out on
12  their pain management that who is using what
13  and so forth.  So I didn't use it.
14     Q.   Do you know when the county first
15  gained access to the OARRS database, whether it
16  used it or not?
17     A.   No, I didn't.  The OARRS didn't
18  come up until the heroin epidemic, opiate
19  epidemic surfaced.
20     Q.   Do you know when the OARRS system
21  was set up?
22     A.   No, I don't.
23     MS. SACKS:  Objection.
24     Q.   You indicate that you would like to
25  see consistent and reasonable pain management

1  policies for hospitals.  Were there ways in
2  which you considered pain management policies
3  at hospitals to be unreasonable?
4      A.   I don't remember at the time
5  specifically what the unreasonable or
6  reasonable is.  I felt that it needed to have a
7  review and have some consistency amongst each
8  other.
9      Q.   I'm sorry.  Go ahead.
10     A.   Nothing.  That's all right.
11     Q.   I'm very sorry.  I thought you were
12  done.  I apologize.
13     A.   I'm done now.
14     Q.   You indicated earlier that doctors
15  at the hospitals may not have been following
16  the guidelines that were in place, right?
17     A.   Uh-huh.
18     Q.   Yes?
19     A.   Yes.
20     MS. SACKS:  Objection.
21     Q.   At what hospitals do you believe
22  there were doctors who were not following the
23  prescribing guidelines for the use of
24  prescription opioids?
25     A.   I don't remember at all.

1      Q.   Are you -- whether you can remember
2  the details today or not, do you recall that
3  there were specific instances where healthcare
4  providers at hospitals within Cuyahoga County
5  failed to appropriately follow guidelines for
6  the use of prescription opioid medications?
7      A.   They would come up in complaints
8  registered by individuals, and we received
9  complaints from individuals, and that's how
10  that type of stuff -- that's one of the ways it
11  surfaced.
12     Q.   Who were the individuals who
13  would --
14     A.   The users themselves.
15     Q.   Patients?
16     A.   Yeah.
17     Q.   What would the nature of their
18  complaints be?
19     A.   I don't remember the nature of
20  their complaints.  Also those that are in
21  recovery would also share that.
22     Q.   What would they complain about?
23     A.   They would tell about the process.
24     Q.   I understand, but what about the
25  process would individuals who are seeing these

1  doctors at the hospitals in the county complain
2  about?
3      A.   I don't remember specifically.  All
4  I remember is that that is an avenue where some
5  of this information came from.
6      Q.   Dr. Delos Reyes writes back to you
7  in the next email up the chain and says, "I
8  like what you have said here.  All of your
9  recommendations have the potential to make a
10  big difference.  However, I wonder what the
11  legislature can do about payment management at
12  hospitals?"
13     A.   Yes, that's the question.
14     Q.   Do you see that?
15     A.   Yeah.
16     Q.   "It seems like the hospitals
17  function outside of what the legislature does,
18  except perhaps through the state medical
19  board"; do you see that?
20     A.   Uh-huh.
21     Q.   Did I read that correctly?
22     A.   Yes, I did -- you did.
23     Q.   What did you and Dr. Delos Reyes
24  want the state legislature to do in connection
25  with pain management guidelines at hospitals?

55 (Pages 214 - 217)

Page 218

1    A.    More consistency and to --
2  actually, two things: more consistency, not
3  have different pain management policies, and
4  two, have a process to see if it is actually
5  working.
6    Q.    What do you mean by that second
7  part, "The process to see if it is working"?
8    A.    To make sure that everybody is
9  following the process, the pain management
10  plan.
11    Q.    So in other words, some way in
12  which the hospitals can measure whether or not
13  their doctors are following the guidelines?
14    A.    Yes.
15    Q.    During the time that you were the
16  chief executive officer for the ADAMHS Board,
17  do you believe that the hospitals in Cuyahoga
18  County had guidelines that allowed for them to
19  measure whether or not their doctors were
20  following the guidelines?
21    A.    I don't know.
22    Q.    Well, here you're saying you want
23  the legislature to do something about it,
24  right?
25    A.    Yeah.

Page 219

1    Q.    So was it your understanding that
2  the hospitals had failed to put into place
3  measures that would ensure compliance with
4  prescribing guidelines for prescription opioid
5  medications?
6    A.    Yes, that's true.
7    Q.    If you go up, the next email in the
8  chain is you writing back to Dr. Delos Reyes.
9  She corrects your spelling of the term OARRS.
10    A.    Right.  Yes, she did, put the R
11  where the S is.
12        MR. BOEHM:  And for the court
13  reporter, OARRS is O-A-R-R-S.
14    A.    Two Rs.
15    Q.    You write back to say, "I don't
16  know how the legislature can impact the
17  hospitals, but I do know is we have to create
18  the political will for them to act, much like
19  we did for our county council to act as they
20  are now"; do you see that?
21    A.    Yes, I do.
22    Q.    What did you mean when you talked
23  about creating political will at the Ohio
24  legislature level, similar to what you had done
25  with the Cuyahoga County Council?

Page 220

1    A.    I don't recall specifically, but
2  I -- I don't recall specifically.
3    Q.    You were going to say something
4  else.  What were you going to say?
5    A.    I'm tired.
6        MS. SACKS:  If you're done, you're
7  done.  It's okay.  He'll ask another question.
8    A.    I don't recall specifically.
9    Q.    In what way do you believe you
10  created political will, with respect to the
11  Cuyahoga County Council, in connection with
12  opioid abuse and prescribing guidelines at
13  hospitals?
14    A.    Legislators want to hear from not
15  only citizens and people that run boards, but
16  also other legislators, and to have our
17  legislators talk to them was a big deal, and
18  they did it, and they -- the example was the
19  legislature that was pointed out in one of the
20  memos previously.  The name escapes me.
21    Q.    Representative Sprague?
22    A.    No.  It wasn't Sprague.  You said
23  who is this person, a county council.
24    Q.    Are you talking about
25  Representative Nan Baker?

Page 221

1    A.    No.  But she is now with the county
2  council, was a state legislator.  That's a good
3  example.
4    Q.    In what way do you believe the
5  ADAMHS Board or the Cuyahoga County Opiate Task
6  Force was able to create political will for the
7  Cuyahoga County Council to act?
8        MS. SACKS:  Objection.
9    A.    Convince them to take a position on
10  most likely funding, or the lack of Cuyahoga
11  County getting funding, to stand up and be
12  heard that this is not right.
13    Q.    You say -- you are referencing what
14  you believe to be the creation of political
15  will at the level of the Cuyahoga County
16  Council, and I'm trying to understand what that
17  is about.
18    A.    Okay.  Well, let me try it one more
19  time.
20        Us going down ourselves were one
21  voice, but to have Cuyahoga County Council say
22  to the general assemble, and it's Cuyahoga
23  County representative, "Look, there is a
24  problem here, you got to resolve it.  Cuyahoga
25  County is not receiving enough money, as it

56 (Pages 218 - 221)

Page 222

1  should."
2      Q.   Did that happen?
3      A.   Yes.
4          MS. SACKS:  Objection.
5      A.   And the one memo that you have
6  there, where you asked who that is, is an
7  example.  I'm just having a brain drain here.
8  Evelyn -- Yvonne Conwell.
9      Q.   Yvonne Conwell?
10     A.   Yvonne Conwell, that's what it was.
11 Yvonne Conwell.  That is an example.
12         The other example is that Dan
13 Brady, Dale Miller were former state
14 representatives, they also played a role, and
15 that was what I termed, in my little world,
16 political will, that politically they stood up
17 and had the will to say, "This is wrong."
18     Q.   And the thing that was wrong was
19 the lack of funding that was being provided to
20 the Cuyahoga County ADAMHS Board?
21     A.   As compared to any other county.
22     Q.   Did the efforts by the Cuyahoga
23 County ADAMHS Board or on behalf of the
24 Cuyahoga County ADAMHS Board to communicate
25 with the Ohio General Assembly about funding

Page 223

1  issues have any impact?
2          MS. SACKS:  Objection.
3      A.   Whether it was successful or not?
4      Q.   Yes.
5      A.   No.
6          Are we through with this one?
7      Q.   Yes.
8          - - - - -
9          (Thereupon, Deposition Exhibit 12,
10         Designated Confidential, 5/18/2017
11         Email, Subject: Cleveland Clinic May
12         19 Denihan Remarks, with Attachment,
13         Beginning with Bates Label CUYAH
14         012564935, was marked for purposes
15         of identification.)
16         - - - - -
17     Q.   I'm going to mark the next document
18 as Exhibit 12, Mr. Denihan.  This is a document
19 from May 2017 that has attached to the email
20 some remarks that you made at The Cleveland
21 Clinic in May of the year 2017; do you see
22 that?
23     A.   Yes, I do.
24     Q.   Do you recall having made
25 presentations about opioid abuse at The

Page 224

1  Cleveland Clinic?
2      A.   I recall a presentation, yes.
3      Q.   Who was the audience?
4          MS. SACKS:  Objection.
5      A.   They were the clinic workers.
6      Q.   Doctors?
7      A.   Some were doctors.
8      Q.   Nurses?
9      A.   Nurses, some were not.
10     Q.   Nurse practitioners?
11     A.   Pardon?
12     Q.   Nurse practitioners?
13     A.   It could be.
14     Q.   There is a section of your
15 presentation to The Cleveland Clinic that's
16 entitled Who is Affected, and I wanted to ask
17 you just a couple of questions about that.  Do
18 you see that section, Who is Affected?
19     A.   Yes, I do.
20         MS. SACKS:  What page is it?
21         MR. BOEHM:  Well, unfortunately,
22 these were produced to us in an unnumbered
23 format, but if you look --
24         MS. SACKS:  The Bates number.
25         MR. BOEHM:  -- Bates number is

Page 225

1  4940.
2      Q.   The third bullet point under the
3  section Who is Affected says that, "The face of
4  the epidemic is right here in this room"; do
5  you see that?
6      A.   Uh-huh.
7      Q.   What did you mean by that?
8      A.   I mean that everybody in this room
9  is involved in it, in terms of recovery and
10 treatment.
11     Q.   The next bullet point says, "It's
12 suburban Caucasians between the ages of 25 and
13 45"?
14     A.   Correct.
15     Q.   What does that mean?
16         MS. SACKS:  Objection.
17     A.   The dealers had switched from the
18 inner city to the suburbs, and the records from
19 the medical director not only in Cleveland,
20 Ohio, but across largest cities of the country
21 looked at the Caucasians in the suburbs to be
22 some of the main targets.
23     Q.   Is it your understanding that in
24 Cuyahoga County, as in other parts of the
25 country, the opioid abuse that has taken place

57 (Pages 222 - 225)

1  has been disproportionately in the Caucasian
2  community?
3         MS. SACKS:  Objection.
4     A.    Are you affirming what that says?
5     Q.    Well, I'm making sure my
6  understanding is correct.
7     A.    Yes.
8     Q.    Has the fact that opioid abuse has
9  been largely centered in the Caucasian
10  community, as compared to past substance-use
11  epidemics, had any impact on the way that the
12  county has responded and tried to understand or
13  address opioid abuse?
14         MS. SACKS:  Objection.
15     A.    Yes.
16     Q.    In what way?
17     A.    Communications.  Communications
18  mostly.
19     Q.    What do you mean by that?
20     A.    Well, we would have public
21  meetings, and in the inner city, a church would
22  be the rallying point generally, in the
23  suburban communities, it might have been city
24  hall or a -- it wasn't as much the church, as
25  it was in the inner city -- or a business.  So

1  that's the point.
2     Q.    Have there been differences in how
3  Cuyahoga County has responded to the levels of
4  opioid abuse and addiction, as compared to the
5  county's efforts to respond to drug abuse
6  epidemics from past years, such as crack?
7     A.    Sure.  Absolutely.  It comes to
8  mind, we never had judges going out to public
9  meetings or high schools to talk about the
10  abuse.
11     Q.    The abuse of crack?
12     A.    Yeah.  And we had had -- things
13  have changed.  The chiefs of police, instead of
14  arresting people, they put them in their
15  waiting rooms and try to find treatment for
16  them.  Those are changes, those are different
17  how things have happened.
18         The biggest difference, in terms of
19  the law enforcement community, has been thought
20  of as treatment versus a crime.  When we had
21  the crack cocaine era, we treated it as a
22  crime, a criminal activity.  And no matter
23  where it occurred, it's been treated as it
24  should be, as an illness and a disease.  Those
25  are changes, those are some of the changes that

1  happened.
2     Q.    Why was the approach to past drug
3  epidemics, such as the response to crack
4  cocaine --
5     A.    Pardon?
6     Q.    Do you want me to start over?
7     A.    Go ahead.
8     Q.    Sure.  Why was the county's
9  response to the crack cocaine epidemic, for
10  example, different in terms of the emphasis on
11  law enforcement as opposed to medical
12  treatment, as compared to the way the county
13  has responded to abusers of opioids?
14     A.    I don't know if I understand your
15  question.  I'll try to answer, and you can
16  clear it up.  You connected law
17  enforcement with --
18     Q.    Let me clear it up.  I thought I
19  had heard you say that one of the differences
20  among several differences in the way the county
21  has responded to opioid abusers --
22     A.    Right.
23     Q.    -- as opposed to in the past,
24  abusers of other substances --
25     A.    Yes.

1     Q.    -- had to do with the way law
2  enforcement has treated --
3     A.    Yes.
4     Q.    -- individuals who are addicted,
5  and you identified some other changes as well.
6     A.    Right.
7     Q.    My question is why:  Why is it
8  different?
9     A.    Well, first of all, it makes all
10  the sense in the world.  We were putting away
11  first time, nonviolent users, first time, not
12  multiple, nonviolent users, not dealers.  We
13  made them felons, and we put them in prison,
14  and 15 years ago, we had one-fifth -- not
15  one-fifth -- one-fourth, 25 percent of all the
16  criminals going into the state institution
17  coming from Cuyahoga County.
18         By turning treatment versus
19  incarceration, we cut that in half, reduced the
20  number of felons, made them recovering citizens
21  with jobs.
22         Now, why is that important?
23  Besides it being the right thing to do, it
24  saves money.  It saves money on state prison,
25  it creates jobs, and it makes people safer.  So

Page 230

1  those are some of the realities that happened
2  now, as compared to 15 years ago, and I was
3  there during both times.  I was at that
4  experience.
5      Q.   Is it correct that in Cuyahoga
6  County, the crack abuse epidemic was more of an
7  inner city problem than the opioid abuse
8  problem has been?
9      A.   No.  Just the opposite.
10     Q.   Your view is that the crack abuse
11 epidemic was more suburban?
12     A.   No.
13     Q.   Let me make sure you heard my
14 question right, and it's possible I misstated
15 it.
16     A.   Okay.
17     Q.   Is it true that in Cuyahoga County,
18 abuse of crack cocaine was primarily centered
19 in the inner city?
20     A.   Yes.
21     Q.   And it was disproportionally
22 impacting the African American community?
23     A.   Yes.
24     Q.   I want to direct your attention to
25 a page a little bit further along in your

Page 231

1  presentation to The Cleveland Clinic that has
2  the section What Explains This Tsunami; do you
3  see that?
4      A.   I'll find it.  Okay.  I'm with you.
5      Q.   The third bullet point says, "While
6  the pain management protocols at The Cleveland
7  Clinic are very good, they are not always
8  followed"; do you see that?
9      A.   I see it.  Wait a minute.  I'm
10 sorry.
11        MS. SACKS:  He's talking about this
12 section up here.
13     Q.   The third bullet point down on this
14 page.
15     A.   Go ahead.
16     Q.   Did I read that correctly?
17     A.   Uh-huh.
18     Q.   Yes?
19     A.   Yes.
20     Q.   How did you become aware the pain
21 management protocols of The Cleveland Clinic
22 were not being followed?
23     A.   By doctors, by clients, by users,
24 and people in recovery.
25     Q.   In what way were the pain

Page 232

1  management protocols in place at The Cleveland
2  Clinic not being followed?
3      A.   One of the ways was not using
4  OARRS, and another way was, as reported to me,
5  "Oh, I just want to get him out of here, I'll
6  just sign a script to get him out of here."
7      Q.   This presentation was in May 2017,
8  right?
9      A.   If that's what it says.  Yeah, I
10 think so.
11     Q.   And the utilization of OARRS by
12 doctors who are prescribing prescription opioid
13 medication is required under Ohio law, right?
14        MS. SACKS:  Objection.
15     A.   I believe so, yeah.
16     Q.   Toward the end of the presentation,
17 if you turn to the next page from where you are
18 now, it says, What is Our Agency Doing About
19 This Tsunami; do you see that?
20     A.   I see it, yes.
21     Q.   The final bullet point on this page
22 refers to your gratitude to Cuyahoga County
23 executive Armond Budish and the Cleveland Mayor
24 Frank Jackson for making this happen; do you
25 see that?

Page 233

1      A.   Yes.
2      Q.   What are you talking about there?
3         MS. SACKS:  Objection.
4      A.   The example of financing that you
5  had before, where the city and the county gave
6  25,000 each -- or 250,000 each.
7      Q.   Do you agree that the use of heroin
8  in Cuyahoga County and across the State of Ohio
9  has ebbed and flowed over the past many
10 decades?
11        MS. SACKS:  Objection.
12     A.   Yes, I do.
13     Q.   And that the popularity of various
14 drugs that are abused by people in the
15 community phase in and out in cycles, correct?
16        MS. SACKS:  Objection.
17     A.   They could.
18     Q.   That's been true with respect to
19 heroin, right?
20        MS. SACKS:  Objection.
21     A.   Yes.
22        Are you through with this one?
23     Q.   Yes.
24        And that's been true with respect
25 to heroin going back many decades in Cuyahoga

59 (Pages 230 - 233)

Page 234

1  County, right?
2       MS. SACKS:  Same objection.
3    A.   Pardon?
4    Q.   And that has been true with respect
5  to heroin going back many decades here in
6  Cuyahoga County, right?
7    A.   Yes.
8       MS. SACKS:  Same objection.
9            - - - - -
10       (Thereupon, Deposition Exhibit 13,
11       Designated Confidential, 8/26/2014
12       Email, Subject: ADAMHS TV 20 Heroin
13       Interview Q&A, Beginning with Bates
14       Label CUYAH 012397975, was marked
15       for purposes of identification.)
16            - - - - -
17    Q.   I'm showing you the next document,
18  which has been marked as Exhibit 13.  It's from
19  August 2014.  This is similar to the document
20  we were just looking at.  It is a script of a
21  presentation that you are going to make, but
22  this one is to a television station, TV 20; do
23  you see that?
24    A.   Uh-huh.
25    Q.   And it is going to be broadcast,

Page 235

1  Mr. Osiecki explains, on the Channel 5 news
2  that night; right?
3    A.   Yes.
4       Could we take a break.
5       MR. BOEHM:  Absolutely.  Let's go
6  off the record.
7       THE VIDEOGRAPHER:  Off the record,
8  3:13.
9       (Recess taken.)
10       THE VIDEOGRAPHER:  On the record,
11  3:28.
12       MR. BOEHM:  Okay.  I believe Ms.
13  Sacks wanted to say something on the record.
14       MS. SACKS:  I do.  I went back and
15  I was just reading through the transcript in
16  the beginning, and I noticed that you said that
17  Mr. Denihan was identified by the lawyers in
18  the case as somebody who has knowledge and
19  information related to the allegations made in
20  the lawsuit, but I just wanted to clarify that
21  he's a fact witness, not designed by us.
22       MR. BOEHM:  Oh, correct.
23       MS. SACKS:  Did you misspeak?
24       MR. BOEHM:  No, I did not misspeak.
25       It is true that Mr. Denihan was

Page 236

1  identified as somebody with knowledge about the
2  claims or allegations in the case.  He was not
3  designated as a 30(b)(6) witness, if that's
4  what you are referring to.
5       MS. SACKS:  Well, you said
6  identified by lawyers in this case as somebody
7  who has knowledge, but we didn't identify him
8  as somebody with knowledge.  Did you mean you,
9  because you picked him?
10       MR. BOEHM:  We can deal with this
11  off the record.  I was not referring to
12  30(b)(6), if that's what you're talking about.
13       MS. SACKS:  Okay.  Right.
14       MR. BOEHM:  I'm not sure it matters
15  anyway.
16    Q.   Dr. Denihan, we're back from a
17  short break, and as I indicated, I believe and
18  hope that we are in the home stretch here
19  today.  Thank you very much for your time so
20  far.
21    A.   You're welcome.
22    Q.   I directed your attention to a
23  particular page of this summary of the comments
24  that you were going to make to a television
25  station back in August of 2014.

Page 237

1       Question 6, Why Does the Use of
2  Heroin Ebb and Flow; do you see that?
3    A.   Yes, I do.
4    Q.   And if you look at the third -- I'm
5  sorry.
6       Let's go to the second sub-bullet
7  point under the second bullet point, does that
8  make sense?  So you got the two bullet points,
9  and under that second bullet point, there is
10  some sub-bullet points, right?
11    A.   Uh-huh.
12    Q.   I want to direct your attention to
13  the second sub-bullet point that says, "The
14  drug cartel has perfected and purified heroin
15  so that it can be snorted to achieve the same
16  effect"; do you see that?
17    A.   Yes, I do.
18    Q.   And I asked you earlier about the
19  role of drug cartels in Cuyahoga County, in
20  terms of opioid abuse, distribution, overdoses
21  and so on.
22    A.   Uh-huh.
23    Q.   Do you agree that the activities of
24  drug cartels have materially contributed to the
25  drug abuse epidemic in Cuyahoga County?

60 (Pages 234 - 237)

Page 238

1        MS. SACKS:  Objection.
2      A.  Yes.
3      Q.  Do you agree that the activities of
4  drug dealers in and around Cuyahoga County have
5  contributed materially to the opioid abuse
6  epidemic in this community?
7        MS. SACKS:  I think that's the same
8  question.
9        MR. BOEHM:  No, it's not.
10     A.  The part of the question that I
11 heard was "materially."  What is the
12 difference?  I don't understand the difference
13 between --
14     Q.  I first asked you about drug
15 cartels, and then the next question I asked you
16 was about drug dealers, and while I agree with
17 Ms. Sacks that those are not necessary
18 distinct, they are different things and, in
19 fact, you have them listed separately in the
20 bullet points for your presentation to the
21 television station; do you see that?
22     A.  Uh-huh.
23     Q.  Yes?
24     A.  Oh, I see what you're saying.  So
25 the answer is yes.

Page 239

1      Q.  So let me just ask the question,
2  and then you can answer it so we have it clean
3  for the record.
4        Do you agree that the activities of
5  drug dealers in and around Cuyahoga County have
6  contributed materially to the opioid abuse
7  epidemic within this community?
8      A.  Yes.
9      Q.  How would you characterize the
10 extent to which the activities of drug cartels
11 and drug dealers have contributed to the opioid
12 abuse epidemic in this community?
13     A.  I don't think I could -- relative
14 to dealers is third hand, and it's from
15 information received from police organizations.
16       Cartels, my knowledge is what I
17 read or hear.  So I don't know if I could
18 answer that question.
19     Q.  Do you agree the activities of drug
20 cartels and drug dealers in and around Cuyahoga
21 County have been significant contributors to
22 opioid abuse and opioid-related overdose
23 fatalities in this community?
24       MS. SACKS:  Objection.
25     A.  Yes.

Page 240

1      Q.  Do you know the percentage of
2  individuals in Cuyahoga County who have become
3  addicted to opioids who initiated their use of
4  opioids through illicit heroin?
5        MS. SACKS:  Objection.
6      A.  No, I do not.
7      Q.  Do you know the percentage of
8  individuals who have developed an opioid-use
9  disorder in Cuyahoga County who have initiated
10 their abuse through prescription opioid pills?
11       MS. SACKS:  Objection.
12     A.  No, I do not.
13     Q.  Do you agree that heroin has been
14 easily accessible to substance abusers in
15 Cuyahoga County?
16       MS. SACKS:  Objection.
17     A.  Yes.
18     Q.  Do you agree that the relationship
19 between prescription painkillers and heroin is
20 poorly researched?
21       MS. SACKS:  Objection.
22     A.  Yes.
23     Q.  And do you agree that it is not
24 clear the extent to which individuals who abuse
25 prescription opioid medications use heroin

Page 241

1  interchangeably or have transitioned from
2  prescription opioid medications to the use of
3  heroin?
4        MS. SACKS:  Objection.
5      A.  I don't know.
6      Q.  You don't know one way or another?
7      A.  Right.
8      Q.  Do you agree that for the last
9  several years, prescription opioid-related
10 overdose fatalities have been trending downward
11 in Cuyahoga County?
12     A.  I was not aware of that.  You say
13 over the last several years?
14     Q.  Yes.  Do you want me to ask the
15 question again?
16     A.  Yes.
17     Q.  Do you agree that the level of
18 prescription drug-related overdoses has been
19 trending downward in Cuyahoga County for the
20 last several years?
21     A.  I agree that it's been trending
22 down over the last couple of years.
23     Q.  Do you agree that the number of
24 prescription opioid-related fatalities in
25 Cuyahoga County has been trending downward in

61 (Pages 238 - 241)

Page 242

1 Cuyahoga County -- I'm going to start over.
2 Okay. Let's do that one more time.
3      Do you agree that the level of
4 prescription drug-related overdose fatalities
5 in Cuyahoga County has been trending downward
6 ever since 2010?
7    A.   I did not know that.
8    Q.   What is your understanding about
9 when prescription drug-related overdose
10 fatalities began to trend downward?
11     MS. SACKS:  Objection.
12    A.   I understood it was not 2010, it
13 was after that date.
14          - - - - -
15      (Thereupon, Deposition Exhibit 14,
16      Designated Confidential, 8/31/16
17      Email, Subject: Overdose Report,
18      with Attachment, Beginning with
19      Bates Label CUYAH 012475366, was
20      marked for purposes of
21      identification.)
22          - - - - -
23    Q.   I'm showing you now a document that
24 has been marked as Exhibit 14 for purposes of
25 your deposition.

Page 243

1      Exhibit 14 is an email from August
2 2016, from somebody by the name of David Royer.
3 Do you know who David Royer is?
4    A.   Yes, I do.
5    Q.   Who is David Royer?
6    A.   He was my counterpart in Franklin.
7    Q.   Is he the CEO of the Franklin
8 ADAMHS Board?
9    A.   Yes.
10    Q.   The subject of the email is
11 Overdose Report, and then he attaches to his
12 email the data from the 2015 Ohio Drug Overdose
13 General Findings; do you see that?
14    A.   I'm looking at it, yes.
15     MS. SACKS:  Do you need a second to
16 look at it?
17    Q.   Sure. Take whatever time you need
18 to look at it. I'm going to ask you a specific
19 question, along the lines of where we left off
20 before I showed you this document, that is in
21 relation to figure 4, which is on page 3 of the
22 report.
23      Just let me know when you have had
24 a chance to look that over.
25    A.   Okay. Go ahead. I'm ready.

Page 244

1    Q.   Okay. Figure 4 of the 2015 Ohio
2 Drug Overdose Data General Findings report,
3 that was sent to you by Mr. Royer, outlines the
4 drugs that have caused various overdose deaths
5 between the years 2010 and 2015; do you see
6 that?
7    A.   Uh-huh.
8    Q.   And do you see the prescription
9 opioid overdose fatalities has been --
10    A.   Yes.
11    Q.   -- steadily declining since 2010?
12    A.   Yes, I do.
13    Q.   Is that something that you were
14 aware of before you retired as the chief
15 executive officer of the Cuyahoga County ADAMHS
16 Board?
17    A.   Not to the actual dates, no. I was
18 aware of some decline, but not on the dates.
19    Q.   But you see that those are the
20 data, as you look at this now, right?
21     MS. SACKS:  Objection.
22    A.   Yes.
23    Q.   And you don't have any reason to
24 believe that Cuyahoga County has trends that
25 are any different than the ones that we are

Page 245

1 looking at here in figure 4; is that fair?
2    A.   Ask me the question again, please.
3    Q.   Sure. Do you have any reason to
4 believe that overdose fatality trends in
5 Cuyahoga County between the years 2010 and 2015
6 are any different than the trends that are
7 reflected here in figure 4 of the 2015 Ohio
8 Drug Overdose Data General Findings?
9    A.   And this is a Hamilton County?
10    Q.   No, it's not. This is Ohio.
11    A.   Then I don't know if I agree with
12 that or not.
13    Q.   Well, I'm asking you if you have
14 any reason to believe that the trends in
15 Cuyahoga County are different than the trends
16 that are set forth here in the Ohio report on
17 page 3, figure 4?
18    A.   I may think they may be different.
19    Q.   My question is:  Do you have a
20 reason to believe that the trends are different
21 in Cuyahoga County than the trends that are
22 reported in the 2015 Ohio Drug Overdose Data
23 General Findings report that's been marked as
24 Exhibit 14 for your deposition?
25    A.   No.

62 (Pages 242 - 245)

Page 246

1    Q.    And looking at figure 4, it appears
2  that as of 2015, the number of prescription
3  opioid overdoses is just about the same as the
4  number of cocaine-related overdose fatalities,
5  right, for 2015?
6    A.    If you're talking about these two
7  right here, they are about the same, yes, yes.
8    Q.    Do you know whether or not the
9  number of prescription opioid-related overdose
10  fatalities has continued to go down in Cuyahoga
11  County since 2015?
12    A.    I understood it had continued to go
13  down, yes.
14    Q.    Do you agree the trends, in terms
15  of prescription opioid-related overdoses, are
16  quite favorable right now?
17      MS. SACKS:  Objection.
18    A.    I don't know what -- I don't know
19  if I agree with "favorable" at any rate.
20    Q.    I'm talking about the trend.  Of
21  course we all agree we would like to have there
22  to be zero, but you agree that it is a good
23  thing when the trend is going downward, right?
24    A.    Yes, I agree it is a good thing it
25  is going down.

Page 247

1        - - - - -
2      (Thereupon, Deposition Exhibit 15,
3      Designated Confidential, 7/28/2017
4      Email, Subject: Matt Carroll Opioid
5      Ask July 28, 2017, with Attachment,
6      Beginning with Bates Label CUYAH
7      012595362, was marked for purposes
8      of identification.)
9        - - - - -
10    Q.    I'm showing you a document marked
11  as Exhibit 15 from July 2017.  This is an email
12  that you authored at that time, and sent to
13  somebody by the name of Linda Lamp; do you see
14  that?
15    A.    Yes.
16    Q.    Who is Linda Lamp?
17    A.    She was my administrative
18  assistant.
19    Q.    The subject is Matt Carroll Opioid
20  Ask July 28, 2017; do you see that?
21    A.    Yes.
22    Q.    Who is Matt Carroll?
23    A.    Assistant to Armond Budish.
24    Q.    What was the ask that was being
25  made of you?

Page 248

1    A.    I don't remember what the ask was.
2    Q.    Let me give you a minute just to
3  take a look at this document and the
4  attachment, and my question to you will be:
5  What was the ask that you received from the
6  county executive's office in July 2017?
7    A.    This looks like an ask of potential
8  services for drug treatment.
9    Q.    If you look at your email, it says
10  that actually it is Laura sending this document
11  from the chief's desktop.  Are you the chief in
12  that sentence?
13    A.    Yes, I am.
14    Q.    Did sometimes people refer to you
15  as "Chief"?
16    A.    Sometimes, yes.
17    Q.    Who is Laura?
18    A.    Laura was an assistant for Scott
19  Osiecki.
20    Q.    And Laura indicates that you, the
21  chief, would like for Linda to send this
22  document to Matt Carroll at the county as a
23  cover to the opioid ask document also attached;
24  do you see that?
25    A.    Yes, I do.

Page 249

1    Q.    I don't know that we got the opioid
2  ask document, but we did get the document that
3  was going to be attached as a cover, that's
4  attached, right?
5      MS. SACKS:  There is a page missing
6  in the order.  Maybe that's what you're
7  referring to, OK?
8      MR. BOEHM:  Maybe that is the ask
9  document.  Yeah.  It's possible.  I'll go back
10  and check.
11      MS. SACKS:  Okay.
12    Q.    Okay.  I want to direct your
13  attention to the first page of the attachment.
14  The attachment is called Strategy For Tackling
15  Cuyahoga County's Opioid Emergency; do you see
16  that?
17    A.    Yes.
18    Q.    And then about a third or a half of
19  the way down the page, New Dynamic; do you see
20  that?
21    A.    Yes.
22    Q.    And it references a spike in
23  African American deaths, right?
24    A.    Yes.
25    Q.    And you write, "This is due to the

63 (Pages 246 - 249)

Page 250

1  addition of fentanyl to cocaine" --
2      A.   Yes.
3      Q.   -- "of which crack is a derivative,
4  and marijuana"; do you see that?
5      A.   Yes.
6      Q.   Is it your understanding that
7  fentanyl ws being added by drug cartels and
8  drug dealers to cocaine?
9          MS. SACKS:  Objection.
10     A.   Yes.
11     Q.   And was fentanyl being added by
12  drug cartels and drug dealers to marijuana?
13         MS. SACKS:  Objection.
14     A.   Yes.
15     Q.   Does Cuyahoga County have any
16  evidence that individuals who died overdosing
17  using cocaine that dealers had added fentanyl
18  to had a history of abusing prescription
19  opioids?
20         MS. SACKS:  Objection.
21     A.   I don't know.
22     Q.   Are you aware of any information or
23  data to suggest that individuals who died from
24  an overdose of marijuana cut or laced with
25  fentanyl had a history of abusing prescription

Page 251

1  opioids?
2      A.   I don't know.
3      Q.   Do you know how those overdose
4  deaths would be classified at the medical
5  examiner's office?
6          In other words, if an individual
7  dies from an overdose of marijuana that was
8  laced with fentanyl, how would the medical
9  examiner categorize that overdose?
10     A.   Marijuana and fentanyl, and that's
11  where you would find the information.
12     Q.   Does the county believe that the
13  defendants are responsible for individuals who
14  have died from an overdose of cocaine that was
15  laced with fentanyl?
16         MS. SACKS:  Objection.
17     A.   I didn't understand the question.
18     Q.   Sure.  Do you believe that the
19  defendants in this lawsuit are somehow
20  responsible for the overdose fatality of an
21  individual who has died from overdosing on
22  cocaine that was laced with fentanyl?
23     A.   I haven't given it any thought.
24     Q.   How about an individual who has
25  died from using marijuana that was laced with

Page 252

1  fentanyl?
2          MS. SACKS:  Objection.
3      A.   I haven't given it any thought.
4          - - - - -
5          (Thereupon, Deposition Exhibit 16,
6          Ohio Prescription Drug Abuse Task
7          Force, Final Report, Task Force
8          Recommendations, October 1, 2010,
9          Beginning with Bates Label CUYAH
10         000166378, was marked for purposes
11         of identification.)
12         - - - - -
13     Q.   I'm showing you a document,
14  Mr. Denihan, marked as Exhibit 16.  This is an
15  October 2010 report by the Ohio Prescription
16  Drug Abuse Task Force.  We referenced this
17  report a little bit earlier today.  I want to
18  give you a chance just to skim it.
19         Do you recall that the Ohio
20  Prescription Drug Abuse Task Force issued a
21  report in 2010?
22     A.   Yes.
23     Q.   My questions for you are going to
24  be in relation to a section of this report
25  entitled How Did This Become an Epidemic.  It

Page 253

1  is on page 21, and it carries over for a few
2  pages from there.
3          Do you recall that the Ohio
4  Prescription Drug Abuse Task Force in 2010
5  reached conclusions about the contributing
6  factors to the trend of opioid abuse and
7  overdose at the time?
8      A.   Yes.
9      Q.   And on that first page of this
10  section, page 21, do you see there is a
11  schematic that has the word "epidemic" in a
12  circle, and then there are these boxes that
13  reflect contributing factors pointing toward
14  the epidemic; do you see that?
15     A.   Yes.
16     Q.   Is that a schematic that you have
17  seen before?
18     A.   I don't recall.  It doesn't -- I
19  just don't recall it.
20     Q.   We have already talked about
21  changes in clinical pain management and the
22  growing use of prescription opioids, and we
23  have talked about direct-to-consumer marketing.
24  I want to ask and you few more questions about
25  some of the other items listed here.

64 (Pages 250 - 253)

Page 254

1     One of the boxes that this report
2 is saying has been a contributing factor to
3 opioid abuse is aggressive marketing of
4 opioids; do you see that?
5     A.   Yes.
6     Q.   Do you have an understanding about
7 how, if at all, aggressive marketing of opioids
8 has contributed to opioid abuse and overdose in
9 Cuyahoga County?
10     A.   My understanding is that opioid use
11 is a more continuing contributing factor to
12 death in Cuyahoga County.
13     Q.   My question is about marketing of
14 opioid medications.
15     Do you have any knowledge or
16 information about the nature of marketing
17 efforts to promote prescription opioid
18 medications?
19     A.   No.
20     Q.   Have you ever heard of the term
21 "diversion"?
22     A.   I have heard of the term.  I don't
23 know how it is referred to here, but...
24     Q.   What is your understanding of what
25 diversion means in the context of opioid abuse?

Page 255

1     A.   I don't know if I have one.  I
2 don't have a -- I don't know what diversion
3 means in the context of the opioid use.  I
4 don't understand it, but it does ring a bell
5 right now.
6     Q.   But you understand that there are
7 legitimate medical purposes for using a
8 prescription opioid medication, right?
9     MS. SACKS:  Objection.
10     Q.   Yes?
11     A.   Yes.
12     Q.   And anybody who uses a prescription
13 opioid medication that has not been prescribed
14 to them by a licensed physician is breaking the
15 law, right?
16     MS. SACKS:  Objection.
17     Q.   Yes?
18     A.   Yes.
19     Q.   So, for example, if somebody were
20 to go into a family member's bathroom, open up
21 the medicine cabinet and take pills of
22 prescription opioids, not prescribed to them,
23 that would not be legal, correct?
24     MS. SACKS:  Objection.
25     A.   Correct.

Page 256

1     Q.   Have you ever heard of the term
2 "doctor shopping"?
3     A.   Yes.
4     Q.   What is doctor shopping?
5     A.   It's going to multiple doctors,
6 asking for a prescription to be filled that
7 would be an opiate.
8     Q.   And do you agree that doctor
9 shopping is also against the law?
10     MS. SACKS:  Objection.
11     A.   Yes.
12     Q.   Do you know the percentage of
13 prescription opioid pills that are used for
14 abuse that have been diverted, as opposed to
15 have been prescribed by a licensed physician to
16 the individual who is using the medication?
17     MS. SACKS:  Objection.
18     A.   No, I don't.
19     Q.   Have you ever heard of the United
20 States Drug Enforcement Agency?
21     A.   Yes.
22     Q.   What is your understanding about
23 the responsibilities and duties of the DEA?
24     A.   Enforcement to stop illegal drugs
25 coming into this country.

Page 257

1     Q.   Do you believe that the United
2 States Drug Enforcement Agency has any
3 responsibilities in connection with the abuse
4 of controlled substances, including
5 prescription opioid medications?
6     MS. SACKS:  Objection.
7     Q.   Do you want me to say it again?
8     A.   No.  I would say no, because of the
9 way you said it, so, no.
10     Q.   When you say you were going to say
11 no because of the way I said it, what do you
12 mean?
13     A.   Just no.
14     MS. SACKS:  Wait.  Wait until he's
15 done with his question.
16     A.   No.
17     Q.   Was there something about the way I
18 said it?
19     MS. SACKS:  Objection.
20     A.   No.  The answer is no.
21     Q.   So my question is:  Do you believe
22 that the United States Drug Enforcement Agency
23 has any responsibilities in connection with the
24 abuse of controlled substances, including
25 prescription opioid medications?

65 (Pages 254 - 257)

Page 258

1    A.  No.
2        MS. SACKS:  Objection.
3    Q.  Why not?
4    A.  From my understanding, theirs the
5  enforcement of drugs coming into this country,
6  and not prescribed drugs by doctors and local
7  hospitals.
8    Q.  Have you ever heard of the
9  aggregate production quota?
10    A.  No.
11    Q.  Do you know what role, if any, the
12  United States Drug Enforcement Agency plays in
13  terms of determining how much of a controlled
14  substance, including a prescription opioid
15  medication, can be manufactured by
16  pharmaceutical companies in the United States
17  each year?
18    A.  No.
19    Q.  Have you ever heard anything about
20  that?
21        MS. SACKS:  Objection.
22    A.  No.
23    Q.  Have you ever heard of the Joint
24  Commission?
25    A.  I've heard -- no.  I've heard of

Page 259

1  joint commissions, but I don't know the
2  relationship to this.  I don't know.
3    Q.  You have never heard of the Joint
4  Commission having adopted the treatment of pain
5  as the fifth vital sign?
6    A.  No.
7    Q.  The way you said "no" made me think
8  that maybe -- there was some hesitation.
9    A.  There is a lot of joint commissions
10  around --
11        MS. SACKS:  Wait until he's done
12  with his question.
13    Q.  The way that you said "no," you
14  kind of suggested that maybe there was more to
15  it.  What were you trying to communicate?
16    A.  Your first question was just Joint
17  Commission.  There is a lot of joint
18  commissions.  You didn't specify the question
19  until the second part, and the answer is still
20  no, I don't.  I have not heard of it.
21    Q.  Just to make sure the record is
22  clear, you are saying that you have never heard
23  of the Joint Commission in connection with the
24  concept of treatment of pain as a fifth vital
25  sign?

Page 260

1    A.  Yes, that's correct.  I have not
2  heard of it.
3    Q.  Do you believe that licensed
4  physicians who have prescribed opioid
5  medications in and around Cuyahoga County share
6  responsibility for the opioid abuse epidemic in
7  this community?
8        MS. SACKS:  Objection.
9    A.  Yes.
10    Q.  And why do you say yes?
11    A.  For prescribing drugs that are not
12  necessarily -- that are not needed by
13  individuals that want prescribed drugs, for
14  overprescribing drugs, overprescribing.
15    Q.  And when you use the term
16  "overprescribing," what do you think that term
17  means?
18    A.  That a person is requesting a
19  refill or a continuation, and the doctor does
20  not believe that it's necessary, but the person
21  convinces them that they should have it, and
22  they agree with that person and prescribe it.
23    Q.  Do you agree that a licensed
24  physician must consider the risks and the
25  benefits of prescribing an opioid medication to

Page 261

1  each individual patient?
2    A.  Yeah.
3    Q.  And do you agree that that licensed
4  physician is duty bound to consider each
5  patient's individual medical history, condition
6  and diagnosis?
7        MS. SACKS:  Objection.
8    A.  Yes.
9    Q.  And do you agree that doctors
10  cannot write a prescription without an
11  individualized determination that a
12  prescription for an opioid medication is
13  medically necessary for that patient?
14        MS. SACKS:  Objection.
15    A.  I don't know.  I don't understand
16  the question.
17    Q.  Do you agree that doctors cannot
18  write a prescription for an opioid medication
19  without making an individualized determination
20  for the patient that it is medically necessary?
21        MS. SACKS:  Objection.
22    A.  Yes.
23    Q.  And do you agree that when doctors
24  make that individual, specific determination or
25  judgment of whether to prescribe a prescription

66 (Pages 258 - 261)

1  medication, that they do not take into account
2  the volume of opioid medications that are being
3  stored at pharmacies in the communities?
4       MS. SACKS: Objection.
5       A.   Yes.
6       Q.   Are you qualified to say whether a
7  doctor's prescribing practices in any given
8  case are appropriate or not?
9       A.   No.
10      Q.   Another of the boxes here on page
11  21 of the 2010 report by the Ohio Prescription
12  Drug Abuse Task Force says self-medicating
13  habits of baby boomers.  It is in the bottom
14  right-hand corner of that little schematic.
15      A.   I see it.
16      Q.   What's your understanding of how
17  self-medicating habits of baby boomers have
18  contributed to opioid abuse and overdose in
19  Cuyahoga County?
20      A.   I'm not sure I understand what it
21  means in this context.  I don't understand what
22  it means in this context.  I didn't write it,
23  so other than -- I don't understand what this
24  means by the person that wrote it.
25      Q.   Do you believe that there are

1  cultural mindsets about the use of prescription
2  medications in general that have contributed to
3  opioid abuse?
4       MS. SACKS: Objection.
5       A.   I don't know.
6       THE VIDEOGRAPHER:  He had his hand
7  on his microphone.
8       MR. BOEHM:  When I was asking?  Do
9  I need to reask my question?
10      THE VIDEOGRAPHER:  Yes.
11      Q.   Do you believe that there are any
12  cultural mindsets about the use of prescription
13  medications in general in the United States
14  that have contributed to opioid abuse?
15      MS. SACKS: Objection.
16      A.   I am not aware of any.
17      Q.   Based on your many years as a
18  partner of the Cuyahoga County Opiate Task
19  Force and as the chief executive officer of the
20  Cuyahoga County ADAMHS Board, are there any
21  other factors that you believe have contributed
22  to opioid abuse, addiction or overdose in
23  Cuyahoga County that are not identified in this
24  schematic on page 21 of the 2010 Ohio
25  Prescription Drug Abuse Task Force report?

1       Do you need me to say that question
2  one more time for you?
3       A.   No.  I believe I understand it.
4       Q.   Okay.
5       A.   Besides this, is there anything
6  else that would contribute to the opioid
7  epidemic?
8       Q.   That's right.  That is my question.
9       A.   Can you tell me what this word is
10  here?
11      Q.   Theft.
12      A.   Oh, is that what it is?
13      Q.   Yeah.  You, just for the record,
14  you are pointing to the box that has the word
15  diversion at the top and then it says internet,
16  pill mills --
17      A.   It could be criminal.
18      Q.   -- and so on, and then theft is the
19  second from the bottom.
20      MS. SACKS:  What's the third one
21  say?
22      MR. BOEHM:  I think it says
23  prescription scams, I believe.
24      MS. SACKS:  Deception?
25      MR. BOEHM:  Oh, yeah, maybe it is

1  deception.
2       MS. SACKS:  I don't know what the
3  second one, between the two of us.
4       MR. BOEHM:  I think it is deception
5  scam.
6       MS. SACKS:  Deception scam.  Okay.
7       Q.   Okay.  Do you have my question
8  still in mind?
9       A.   Yes, I do.  The only thing I would
10  add on there, maybe for clarity, would be
11  criminal activity.
12      Q.   All diversion is criminal activity
13  in some form or another, correct?
14      MS. SACKS: Objection.
15      Q.   Yes?
16      A.   Yes.
17      Q.   Anything else?
18      A.   That's it.
19      MR. BOEHM:  All right.  Let's go
20  off the record.
21      THE VIDEOGRAPHER:  Off the record
22  at 4:09.
23      (Recess taken.)
24      THE VIDEOGRAPHER:  On the record,
25  4:28.

67 (Pages 262 - 265)

1    Q.   Thank you, Mr. Denihan.  Welcome
2  back from another short break.  I have only a
3  few questions left for you this afternoon.
4       You indicated earlier that you have
5  not read the written complaint that was
6  submitted by the county in connection with this
7  lawsuit, correct?
8    A.   Correct.
9    Q.   Do you know who the defendants are
10  in this lawsuit?
11    A.   No.  I heard one, Purdue.  Did I
12  say that right, Purdue?
13    Q.   Purdue, okay.  Other than Purdue,
14  do you know any other defendants that have been
15  named in this lawsuit?
16    A.   No, no, no.
17    Q.   Do you have any understanding about
18  why defendants have been named as defendants in
19  this case?
20       MS. SACKS:  Objection.
21    A.   No, I don't.
22    Q.   Have you ever heard of wholesale
23  drug distributors?
24    A.   No.
25    Q.   Do you know what the role of

1  wholesale drug distributors is in the delivery
2  of healthcare in the United States?
3    A.   Nope.
4    Q.   Do you believe that wholesale drug
5  distributor companies are responsible in any
6  way for opioid abuse or overdoses in Cuyahoga
7  County?
8    A.   No.
9    Q.   Have you ever heard of Cardinal
10  Health?
11    A.   I believe I have, yes.
12    Q.   What do you know about Cardinal
13  Health?
14    A.   Nothing.
15    Q.   You have just heard the name?
16    A.   Yes.
17    Q.   Have you ever heard of McKesson?
18    A.   Who?
19    Q.   McKesson.
20    A.   No.
21    Q.   Have you ever heard of
22  AmerisourceBergen?  AmerisourceBergen?
23    A.   No.
24    Q.   Are you aware of any pharmacy
25  defendants that have been named as parties in

1  this lawsuit?
2    A.   No.
3    Q.   Are you familiar with the specific
4  allegations that the county has made against
5  any defendant in this case?
6    A.   No.
7    Q.   Do you agree that pharmacies cannot
8  dispense a prescription opioid medication to a
9  patient without a valid prescription from a
10  licensed physician?
11       MS. SACKS:  Objection.
12    A.   I don't have an opinion.
13    Q.   Well, I'm just asking whether you
14  know.  Do you know --
15    A.   No, I don't know.
16    Q.   You don't know?
17    A.   I don't think so, no.
18    Q.   Have you ever -- you're not aware
19  whether or not you have to have a prescription
20  for a medication to get a drug dispensed by a
21  pharmacist?
22       MS. SACKS:  Objection.  I think he
23  answered that.
24    A.   I'm aware --
25    Q.   Let me ask it again.  Let's clean

1  it up.
2       My question is this:  Do you agree
3  that a pharmacy cannot dispense a prescription
4  opioid medication without a valid prescription
5  from a licensed doctor?
6    A.   Yes.
7       MR. BOEHM:  I don't have any more
8  questions for you right now.  I'll look at my
9  colleagues and see if they do around the table.
10       EXAMINATION OF WILLIAM DENIHAN
11  BY MS. STEINMETZ:
12    Q.   Good afternoon, Mr. Denihan.  My
13  name is Jennifer Steinmetz.  I represent the
14  defendants Janssen and Johnson & Johnson in
15  this lawsuit.  I just have a couple follow-up
16  questions for you, okay?
17       You mentioned Purdue specifically,
18  but do you know the specific allegations made
19  against Purdue or any of the pharmaceutical
20  manufacturers in this lawsuit?
21    A.   No.
22    Q.   Are you aware of any specific
23  conduct by any of the pharmaceutical
24  manufacturer defendants that resulted in harm
25  to Cuyahoga County?

68 (Pages 266 - 269)

Page 270

1    A.   No.
2    Q.   Are you aware of any specific
3  statements made by any of the pharmaceutical
4  manufacturer defendants regarding the
5  addictiveness or the nonaddictiveness of
6  prescription opioids?
7    A.   No.
8    Q.   Do you know what pharmaceutical
9  manufacturers do in their day-to-day business?
10       MS. SACKS:  Objection.
11   A.   Not really.
12   Q.   Do you know the names of any of the
13  drugs that were made by the manufacturer
14  defendants in this lawsuit?
15       MS. SACKS:  Objection.
16   A.   No.
17       MS. STEINMETZ:  Those are all the
18  questions I have for you today, Mr. Denihan.
19  Thank you for your time today.
20       MR. BOEHM:  Let's check to see if
21  anybody has any questions on the phone.  Any
22  lawyers on the phone have questions?
23       MR. ANDERSON:  This is Jon
24  Anderson.  I have none.
25       MR. ZIPP:  This is John Zipp.  I

Page 271

1  have none.
2       MR. BOEHM:  Sounds like we don't
3  have any from attorneys on the phone.
4       Shayna, do you have any questions?
5       MS. SACKS:  I do not.
6       MR. BOEHM:  So I think you are
7  done, sir.  Thank you very much for your time.
8       THE VIDEOGRAPHER:  Off the record
9  at 4:33.
10       (Deposition concluded at 4:33 p.m.)
11           - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 272

1  Whereupon, counsel was requested to give
2  instruction regarding the witness's review of
3  the transcript pursuant to the Civil Rules.
4
5       SIGNATURE:
6  Transcript review was requested pursuant to the
7  applicable Rules of Civil Procedure.
8
9       TRANSCRIPT DELIVERY:
10  Counsel was requested to give instruction
11  regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 273

1       REPORTER'S CERTIFICATE
2  The State of Ohio,  )
3              SS:
4  County of Cuyahoga.  )
5
6       I, Wendy L. Klauss, a Notary Public
7  within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, WILLIAM DENIHAN,
10  was by me first duly sworn to testify the
11  truth, the whole truth and nothing but the
12  truth in the cause aforesaid; that the
13  testimony then given by the above-referenced
14  witness was by me reduced to stenotypy in the
15  presence of said witness; afterwards
16  transcribed, and that the foregoing is a true
17  and correct transcription of the testimony so
18  given by the above-referenced witness.
19       I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified and was
22  completed without adjournment.
23
24
25

69 (Pages 270 - 273)

Page 274

1    I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5    IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 4th day of
8  February, 2019.
9
10
11
12
13
14    Wendy L. Klauss, Notary Public
15    within and for the State of Ohio
16
17  My commission expires July 13, 2019.
18
19
20
21
22
23
24
25

Page 275

1    Veritext Legal Solutions
    1100 Superior Ave
2    Suite 1820
    Cleveland, Ohio 44114
3    Phone: 216-523-1313
4
  February 4, 2019
5
  To: Shayna E. Sacks
6
  Case Name: In Re: National Prescription Opiate Litigation v.
7
  Veritext Reference Number: 3207639
8
  Witness:  William Denihan    Deposition Date:  1/30/2019
9
10  Dear Sir/Madam:
11
  Enclosed please find a deposition transcript.  Please have the witness
12
  review the transcript and note any changes or corrections on the
13
  included errata sheet, indicating the page, line number, change, and
14
  the reason for the change.  Have the witness' signature notarized and
15
  forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
  If the errata is not returned within thirty days of your receipt of
19
  this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 276

1    DEPOSITION REVIEW
    CERTIFICATION OF WITNESS
2
  ASSIGNMENT REFERENCE NO: 3207639
3  CASE NAME: In Re: National Prescription Opiate Litigation v.
  DATE OF DEPOSITION: 1/30/2019
4  WITNESS' NAME: William Denihan
5    In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have made no changes to the testimony
  as transcribed by the court reporter.
8
9  Date _____    William Denihan
10    Sworn to and subscribed before me, a
  Notary Public in and for the State and County,
11  the referenced witness did personally appear
  and acknowledge that:
12
  They have read the transcript;
13  They signed the foregoing Sworn
  Statement; and
14  Their execution of this Statement is of
  their free act and deed.
15
  I have affixed my name and official seal
16
  this _____ day of _____, 20____.
17
18    _____
  Notary Public
19
  _____
  Commission Expiration Date
20
21
22
23
24
25

Page 277

1    DEPOSITION REVIEW
  CERTIFICATION OF WITNESS
2
  ASSIGNMENT REFERENCE NO: 3207639
3  CASE NAME: In Re: National Prescription Opiate Litigation v.
  DATE OF DEPOSITION: 1/30/2019
4  WITNESS' NAME: William Denihan
5    In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have listed my changes on the attached
  Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9    I request that these changes be entered
  as part of the record of my testimony.
10
    I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
  that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  Date _____    William Denihan
14
    Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
  the referenced witness did personally appear
16  and acknowledge that:
17  They have read the transcript;
  They have listed all of their corrections
18  in the appended Errata Sheet;
  They signed the foregoing Sworn
19  Statement; and
  Their execution of this Statement is of
20  their free act and deed.
21  I have affixed my name and official seal
22  this _____ day of _____, 20____.
23
    _____
  Notary Public
24
  _____
25  Commission Expiration Date

Page 278

1       ERRATA SHEET

      VERITEXT LEGAL SOLUTIONS MIDWEST

2      ASSIGNMENT NO: 1/30/2019

3 PAGE/LINE(S) /    CHANGE    /REASON

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19

  _____   _____

20 Date      William Denihan

21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22 DAY OF _____, 20_____ .

23 _____

    Notary Public

24

    _____

25    Commission Expiration Date

71 (Page 278)

**[& - 1998]**                                                                    Page 1

| & |
| --- |

**&** 1:22 2:8,13 3:9
3:15,19 5:20
14:11,14,22,25
15:2 160:24
269:14

| 0 |
| --- |

**000166378** 7:7
252:10
**012357240** 5:22
161:2
**012366210** 6:1
166:20
**012367618** 6:4
174:18
**012397975** 6:22
234:14
**012460111** 5:11
108:7
**012475366** 6:25
242:19
**012536538** 5:18
142:13
**012549313** 6:10
182:4
**012564935** 6:18
223:14
**012582972** 5:15
131:9
**012595362** 7:3
247:7
**012702365** 5:5
27:7
**012792797** 5:8
55:2
**012793805** 79:7
**012875387** 6:7
177:16

| 1 |
| --- |

**1** 5:3 7:6 21:24
22:11,25 23:15
27:1,3,11 252:8
**1,302,331** 139:3
**1/17/2013** 6:8
181:25
**1/30/2019** 275:8
276:3 277:3 278:2
**10** 6:8 72:6,8
181:24 182:8
202:5
**10,000** 45:25
**100** 9:12 77:23
**10017** 2:5
**10019-9710** 3:17
**101** 9:13,14,15
**102** 9:16
**108** 5:9
**10:09** 54:2
**11** 6:11 159:1
208:8,19
**11.9** 80:22
**11/16/2012** 5:6
54:24
**110** 9:17
**1100** 2:15 275:1
**111** 9:18
**113** 9:19
**118** 9:20
**11:24** 107:25
**11:42** 108:11
**11th** 2:4
**12** 6:12,16 77:20
158:24,25 208:10
223:9,18
**120,000** 60:13
**123** 9:21
**12550626** 6:15
208:15

**126** 9:22
**127** 9:23,24,25
**128** 10:1,2,3
**129** 10:4
**12:51** 160:19
**13** 6:19 67:4 73:6
110:8,9,15 124:13
124:13,15 158:24
234:10,18 274:17
**131** 5:12
**133** 10:5
**135** 10:6,7
**136** 10:8
**137** 10:9,10
**138** 10:11
**139** 10:12,13
**14** 6:23 47:25
48:11 67:4 73:6
124:13 125:12,15
125:17,20 127:6
149:3 158:24
242:15,24 243:1
245:24
**140** 162:18,24
163:7
**141** 10:14,15
**142** 5:16 10:16
**145** 10:17
**148** 10:18
**149** 10:19
**15** 4:8 7:1 37:14
47:25 48:11 49:3
72:6,8 146:21
202:6 229:14
230:2 247:2,11
**15,000** 120:13
**150** 65:23 111:16
**150,000** 59:16
63:17,23 68:25
69:12,23 70:8
72:5 102:23

**103:10,23 105:3
106:21 107:19
**151** 10:20
**15219-6401** 3:21
**153** 144:5
**154** 10:21
**156** 10:22,23,24
65:5 77:23
**157** 10:25 11:1,2,3
**16** 7:4 47:25 49:4
119:11 131:14
135:24 252:5,14
**160** 5:19
**1600** 3:5
**166** 5:23
**169** 11:4
**17** 1:9
**174** 6:2
**177** 6:5 11:5
**180** 65:23
**181** 6:8 11:6
**1820** 275:2
**186** 11:7
**19** 6:17 85:10,20
94:24 223:12
**193** 11:8
**195** 11:9
**1973** 34:13
**1985** 30:8,9
**1986** 30:7
**1989** 30:7,9
**1990** 21:24
**1990s** 16:12,14
186:13 187:3
189:3,11,13
192:13 207:18
**1994** 30:16
**1996** 32:1,8
**1998** 32:2 185:25
186:3 207:24

**1999**   29:17 30:16
**1:17**   1:15
**1:34**   161:6

**2**

**2**   4:3 5:6 54:23
   55:8 63:16 68:5
   74:18 79:6 149:13
   149:20 150:6
   182:12 202:3
**2,125,000**   135:7
**2,625,000**   134:22
   136:15
**2,647,277**   132:25
**2/12/2007**   6:5
   177:13
**20**   6:20 65:19
   77:24 144:13
   146:12 179:24
   234:12,22 276:16
   277:22 278:22
**200**   11:10
**2000**   29:17 32:8
   77:20
**20001-2113**   2:20
**20001-4956**   3:11
**20005**   2:10
**2001**   29:17 37:10
   38:21
**2002**   22:23 162:15
   162:24 179:24
**2003**   39:14 164:2
   164:11 165:9,15
   166:7
**2004**   39:22 40:11
**2005**   39:22 40:11
**2007**   178:1,16,21
   180:5,13,20 181:2
   181:9,15
**2008**   22:10 154:9
   157:10

**2009**   21:25 22:11
   22:11,14,24,25
   23:9 28:20 42:2
   113:21
**2010**   5:23 7:6
   74:14 166:15
   167:1,12 168:9,16
   168:24 169:20,24
   170:7 171:10
   172:11,19 173:19
   174:22,23 175:23
   176:19 242:6,12
   244:5,11 245:5
   252:8,15,21 253:4
   262:11 263:24
**2011**   142:25 144:4
   144:25 155:17
   156:19 175:25
**2012**   55:12 56:2,22
   63:22 64:3 66:15
   66:19 67:3 73:2
   78:6,12 85:21
   88:25 89:2 95:21
   97:10,22 102:21
   103:23 105:1
   106:20 107:19
   113:22 124:13,15
**2013**   6:11 125:14
   161:12,17 162:24
   164:3,11 165:9,15
   166:7 182:9
   184:19 185:16
   189:21 201:7
   208:10,20 209:16
**2014**   48:3 49:3
   234:19 236:25
**2015**   110:22
   125:14 243:12
   244:1,5 245:5,7,22
   246:2,5,11

**2016**   42:2 108:20
   243:2
**2017**   7:2 23:15,17
   23:24 105:18
   106:21 107:19
   131:14 223:19,21
   232:7 247:5,11,20
   248:6
**2019**   1:20 14:3
   274:8,17 275:4
**202**   2:11,20 3:11
**203**   11:11,12,13
**204**   11:14
**206**   11:15,16
**207**   11:17,18
**208**   6:11 11:19
**21**   146:24 253:1,10
   262:11 263:24
**212**   2:5 3:17 65:5
   65:12 67:9 77:25
**213**   11:20,21
**214**   11:22,23
**215**   11:24 67:9
**216**   2:16
**216-523-1313**
   275:3
**22**   119:11
**221**   11:25
**222**   12:1
**2222**   274:13
**223**   6:16 12:2
**224**   12:3
**225**   12:4
**226**   12:5,6
**23**   8:3
**232**   12:7
**233**   12:8,9,10,11
**234**   6:19 12:12,13
**238**   12:14
**239**   12:15

**240**   12:16,17,18,19
**241**   12:20
**242**   6:23 12:21
**244**   12:22
**246**   12:23
**247**   7:1
**25**   65:19 146:18
   225:12 229:15
**25,000**   233:6
**250**   3:16 12:24,25
   13:1
**250,000**   135:2,5
   140:20,22,25
   233:6
**251**   13:2
**252**   7:4 13:3
**25301-3202**   3:5
**255**   13:4,5,6
**256**   13:7,8
**257**   13:9,10
**258**   13:11,12
**260**   13:13
**261**   13:14,15,16
**262**   13:17
**263**   13:18,19
**265**   13:20
**266**   13:21
**268**   13:22,23
**269**   4:9
**27**   5:3 75:8
**270**   13:24,25
**273**   4:11
**28**   7:2 247:5,20
**2804**   1:7,9

**3**

**3**   5:9 108:3,17
   127:6 192:12
   202:4 243:21
   245:17
**3,927,331**   134:20

**30**   1:20 14:2 22:10
22:23 144:12
149:4 236:3,12
**300**   39:6,13,24
**301**   3:21
**304**   3:6
**3207639**   275:7
276:2 277:2
**340-1169**   3:6
**35th**   3:20
**36**   8:4
**360**   2:4
**37**   8:5
**3805**   82:21
**3806**   82:21
**3817**   85:12
**39**   8:6
**397-1000**   2:5
**3:13**   235:8
**3:28**   235:11

**4**

**4**   5:12 39:14,14
68:6 131:2,5,25
134:19,19 139:1
243:21 244:1
245:1,7,17 246:1
275:4
**4/10/2013**   5:20
160:23
**4/27/2010**   6:2
174:15
**40**   35:5 77:25
119:10
**412**   3:22
**434-5000**   2:11
**44**   8:7
**44113**   2:15
**44114**   275:2
**45**   225:13
**45004**   1:15

**471-3490**   3:22
**4940**   225:1
**4:09**   265:22
**4:28**   265:25
**4:33**   271:9,10
**4th**   274:7

**5**

**5**   4:5 5:16 142:8
142:17 179:5
190:17 235:1
**5/16/2011**   5:16
142:9
**5/18/2017**   6:16
223:10
**50**   35:5 41:2 65:3
65:4,5,12
**50,000**   106:18
**500**   3:5
**505**   82:17 84:17
**51**   2:19
**53**   8:8
**54**   5:6
**55th**   3:16
**591,550**   58:4,19
59:6,11
**592-5000**   2:16
**5:15**   209:16

**6**

**6**   5:19 160:22
161:11 162:9
179:5,16,17
184:25 190:17
209:16 236:3,12
237:1
**6/16/2017**   5:13
131:6
**60**   61:24 62:4,4,8
**61**   54:9,10
**62**   8:9

**62.68**   162:18
**63**   8:10,11 249:7
**6541**   155:4
**66**   8:12
**662-6000**   3:11
**67**   8:13

**7**

**7**   5:23 166:14,24
168:3
**7/28/2017**   7:1
247:3
**700**   39:5,12,23
**70s**   35:5
**725**   2:10
**75**   146:11,17
**78**   8:14

**8**

**8**   6:2 174:14,22
176:19
**8/26/2014**   6:20
234:11
**8/31/16**   6:23
242:16
**80**   8:15 128:3
146:12
**805**   78:22 79:1
**836-8000**   3:17
**84**   8:16,17
**850**   3:10
**86**   8:18
**87**   8:19,20,21,22
**879-3939**   2:20
**88**   41:3
**89**   8:23

**9**

**9**   6:5 177:12,21
**90**   8:24 61:24
128:3
**900,000**   120:21,25

**91**   8:25 9:1
**92**   9:2
**93**   9:3
**936,550**   56:23
**94**   9:4,5
**950**   1:22 2:15
**98**   9:6,7,8,9,10
**99**   9:11
**9:02**   1:20 14:2
**9:57**   53:24

**a**

**a.m.**   1:20 75:8
**abc**   204:16
**ability**   19:1 38:6
110:4 163:8 166:8
194:2 198:5
**able**   18:21 25:9
45:17 58:24 59:5
59:9 62:21 89:16
90:5 111:18,24
125:6 126:19
127:12 133:3
198:22 199:5,13
202:24 221:6
**absolutely**   58:16
227:7 235:5
**abuse**   7:4 32:20
35:18 36:1,8,18
46:7,18,25 47:8,18
48:6,12,17,21 49:2
50:4 51:19 52:13
52:19 57:22 58:1
60:24 61:5 62:10
63:11 64:12,18
77:11 78:10 84:10
84:14 89:6 90:17
98:21 99:4 103:15
104:4 105:4,24
107:2,18 114:11
114:17 116:18,22
117:7 119:23

121:1,1 122:19
132:16 141:6
148:6 151:17
152:1 156:12
157:5,11 163:9
166:9 167:13
168:8,18,21
169:10 170:1,10
171:1,12 172:14
172:25 173:15,20
173:24 176:13,21
177:5 179:23
180:12 181:4,16
183:10 184:7
187:15 188:3
191:17 192:22
193:6 194:16
197:17,20 199:6
199:25 201:9,15
201:24 206:13,24
207:8 210:5,10
212:21 220:12
223:25 225:25
226:8,13 227:4,5
227:10,11 230:6,7
230:10,18 237:20
237:25 238:5
239:6,12,22
240:10,24 252:6
252:16,20 253:4,6
254:3,8,25 256:14
257:3,24 260:6
262:12,18 263:3
263:14,22,25
267:6
**abused**  35:7
100:19 102:7
233:14
**abusers**  228:13,21
228:24 240:14

**abusing**  98:2,8
100:9,14 101:4,19
250:18,25
**accept**  138:13
153:22
**accepted**  76:25
**access**  213:3
214:15
**accessible**  240:14
**accidental**  67:7,14
67:15,18,22
**accidents**  67:9
**account**  82:17
195:3 262:1
**accountable**
153:11
**accounts**  120:12
**accreditation**
171:17
**achieve**  237:15
**acknowledge**
276:11 277:16
**acronym**  20:11
175:11
**act**  43:16,17 76:22
135:8 136:6 140:6
140:13 152:3,4,7
185:23,24 186:2
188:19 207:24
219:18,19 221:7
276:14 277:20
**acted**  138:15
**acting**  31:4,8,22
31:25
**action**  44:5,7
160:10 274:4
**actions**  35:12
207:18
**active**  73:9,22,23
74:25 75:15 76:4
87:17 171:23

187:23 192:15
193:15 194:25
196:10
**activities**  29:6,12
30:20 119:22
237:23 238:3
239:4,10,19
**activity**  227:22
265:11,12
**actual**  204:2
244:17
**adamha**  41:3
**adamhs**  5:10 6:20
19:7,17 20:6,10,11
20:15,23 21:14,20
21:23 22:12,13
23:2,8,13,20 27:25
28:11,18,23,25
29:4,6 41:10 42:6
42:15,23 44:16,25
45:4,9,11 46:4,4
46:15,23 47:6,16
48:4,19,25 49:6
50:2 51:7 52:12
56:7,9,22 58:4,18
59:11 60:15,16
62:13 63:23 64:2
64:9 66:17 67:12
67:13,21 69:22
73:19 75:13 79:8
79:9 80:11,13
82:2,9,10 83:6
87:9 89:9 90:14
92:24 100:1
102:11 103:10,12
104:1 105:2,21
106:20,21,25
107:15 108:5,18
109:7,11,19
110:12,14,21
111:8,19 112:8,11

112:18 113:7,10
114:10,16 116:4
116:14 117:5,17
118:15 119:2,21
120:6,18 121:9
122:17 123:19,22
124:6,20 125:7,13
126:9 127:11,19
129:2,17 130:1,8
132:12 133:7,13
134:12,23 136:16
136:22 139:3,8,16
139:16 140:14
141:1,4 150:20
154:22 155:23
156:6 157:18
158:1,16 159:15
160:6,7,13 161:13
161:19 163:7,13
164:1,10,22 165:7
165:14 166:5,8
170:19,24 172:14
172:20 173:6,11
187:21 193:16
195:2 196:9 198:8
202:10 203:4,9,18
209:25 211:11
213:2 218:16
221:5 222:20,23
222:24 234:12
243:8 244:15
263:20
**add**  265:10
**added**  54:16 250:7
250:11,17
**addicted**  64:6
98:15 157:17
179:18 180:7
229:4 240:3
**addiction**  5:20
6:13 20:16,22

21:1,5,21 28:10
29:10 32:20 36:18
44:13 49:17 51:19
57:19 61:16 62:3
68:19 87:15 98:3
98:9 100:5,10,16
100:20 104:4
105:5,24 107:2,18
114:11 119:24
122:19 127:16,24
127:25 128:7,8,19
141:6 145:8,15,25
146:13,19 147:8
150:21 152:14
155:12 160:25
162:16,22 180:22
182:15 184:17
200:17 201:24
207:8 208:12
210:15 211:13
227:4 263:22
**addictions** 19:9
**addictive** 192:16
**addictiveness**
270:5
**addicts** 95:20
97:11,23
**addition** 250:1
**additional** 48:10
56:19,24 57:8
68:6 103:14
104:20 134:22
136:16 180:17
**address** 36:10
47:8,18 48:5,21
49:2 52:19 63:18
63:24 64:15 69:13
69:24 89:16 104:3
105:4,23 107:2,17
116:23 141:6
169:24 172:1,14

196:16 199:6,13
199:25 226:13
275:15
**addressed** 34:7,15
**addressing** 50:3
51:19 103:15
116:7,17 176:13
198:23 212:20
**adjournment**
273:22
**administered** 91:7
**administration**
50:23 51:1 86:20
165:17,21 193:5
**administrative**
44:7 247:17
**administrator**
195:19 213:25
**adopt** 189:24
190:22
**adopted** 259:4
**adoption** 35:14
60:5
**advertisements**
103:5 153:23
**advertising** 204:10
204:14,15,19
**advice** 41:17
188:25
**advisory** 32:7,11
32:13,16,19
**advocacy** 82:16
153:5 183:14
**affairs** 5:10 26:16
108:5,25 109:1,7
109:12,21 110:1,4
110:6 127:10
**affect** 38:15
**affiliated** 22:16
**affiliation** 33:18
33:22

**affirm** 59:14
**affirming** 226:4
**affixed** 274:6
276:15 277:21
**affordable** 43:16
43:17
**aforesaid** 273:12
**african** 230:22
249:23
**afternoon** 266:3
269:12
**age** 15:4
**agencies** 153:8
**agency** 232:18
256:20 257:2,22
258:12
**ages** 225:12
**aggregate** 258:9
**aggressive** 254:3,7
**ago** 33:24 35:5
43:14 54:15
103:21,24 105:8
105:14 229:14
230:2
**agree** 50:24 53:8,8
89:14,18 90:5
91:23 92:7 95:23
98:1,7,19,24 100:8
100:12 101:3,10
101:12,18 128:8
128:13 133:6
148:4 169:22
170:6,23 171:3,5
181:1,7 186:25
189:2 192:9,24,25
193:1 194:3,4,6
199:4 200:22
201:5 202:17
207:21 233:7
237:23 238:3,16
239:4,19 240:13

240:18,23 241:8
241:17,21,23
242:3 245:11
246:14,19,21,22
246:24 256:8
260:22,23 261:3,9
261:17,23 268:7
269:2
**agreed** 198:21,25
**agreement** 192:15
**ahead** 18:8,13
85:7 115:19 174:5
198:17 207:3
213:20 215:9
228:7 231:15
243:25
**al** 1:13,14
**alcohol** 20:15 21:3
22:1 28:9 32:7,11
32:19 35:19 36:7
36:11,18 127:16
127:25 128:3,8,19
156:22,25 162:16
181:11
**allegations** 19:22
20:1 235:19 236:2
268:4 269:18
**allocated** 81:19
151:11
**allocation** 29:7
**allow** 39:22 54:8
**allowed** 218:18
**altered** 207:13
**amended** 144:5
**america** 40:15,18
153:3
**american** 230:22
249:23
**amerisourceberg...**
3:2 14:20 267:22
267:22

[amount - attachment]

amount 42:15
80:10 81:19 82:3
82:3,9 120:8,9,11
133:11 137:6,7
194:20 197:8
202:7 213:1
amounts 190:3
analgesics 179:19
analysis 5:10
108:6,18 109:8
anderson 3:4
14:19,19 270:23
270:24
announcements
117:3
annual 56:12,13
104:7,14,15 106:1
106:3,9
answer 16:25 17:3
17:23,23 18:9,13
62:22,23 68:10
76:20 83:20 94:14
105:11,25 127:12
137:17,20 147:13
147:25 148:3,9,9
152:2,5 154:4,6
181:7 187:18
189:12 199:22
213:19 228:15
238:25 239:2,18
257:20 259:19
answered 128:15
158:9 207:2
268:23
answering 199:20
answers 158:14,15
anticipated 50:11
anybody 24:16
52:1 64:9 90:20
127:11 155:23
198:8,11 255:12

270:21
anymore 44:21,22
83:19
anyway 236:15
apologize 33:6
215:12
apparently 168:23
appear 276:11
277:15
appearances 2:1
3:1 4:3
appeared 147:1
appears 55:14
56:21 79:19
132:22 144:3
246:1
appended 277:11
277:18
applicable 272:7
applications 42:20
86:24
applied 95:12
apply 23:5
appointed 29:11
32:6
apportioned 138:6
appreciate 72:10
apprehension 35:1
approach 228:2
appropriate
164:18 181:2
196:23 202:20
262:8
appropriately
199:5 216:5
appropriateness
202:12
approval 86:19,23
159:6 192:20
approve 59:10
69:11 86:25

approved 69:22
91:14 92:9 94:4
136:9,10 151:1,2
165:21 192:13,23
205:6
approximately
62:8 120:25
133:23 164:2,2
165:9,25 166:7
194:19 195:3
april 161:11
174:23 176:19
area 34:1 48:11
52:20 181:9
areas 104:11
164:7
armond 232:23
247:23
arnold 3:15 15:2
arnoldporter.com
3:18
arresting 227:14
aside 103:9,23
140:2 174:11
177:10 208:6
asked 19:4,12,14
53:3 75:4 97:4,5
105:9 113:17
121:24 125:15
137:5 141:4
158:11 188:12
198:21 222:6
237:18 238:14,15
asking 57:12
82:16 97:18 115:2
145:22 148:19
172:8 187:20
193:13,14,17
195:11 202:9
245:13 256:6
263:8 268:13

assemble 221:22
assembly 41:5
44:4,9 83:16
141:19 183:1,15
183:25 185:23
188:15,18 194:4
207:22 222:25
assess 193:20
197:18 202:11
assesses 203:19
assessment 192:10
asset 109:18
assign 195:3
assignment 276:2
277:2 278:2
assistant 75:20,21
247:18,23 248:18
assisted 49:20
105:12 106:22
115:20 132:23
133:8,15 134:7
associated 40:20
association 25:7
34:3 40:20,25
41:4,8,23 175:12
178:17 184:11
athens 80:21
attached 78:16
131:24 170:11
176:24 223:19
248:23 249:3,4
277:7
attaches 55:11
243:11
attachment 5:3,7
5:14,18,21,25 6:3
6:6,9,14,18,24 7:2
27:5 55:1 131:8
142:12 161:1,12
161:25 166:18
174:17 177:15

178:13 179:5
182:2 184:13
208:14 223:12
242:18 247:5
248:4 249:13,14
**attend**  24:17
**attention**  28:1
55:23 58:14 78:15
94:23 179:4
184:24 185:18
209:13 230:24
236:22 237:12
249:13
**attorney**  75:21
195:18 274:2
**attorneys**  24:13
271:3
**audience**  224:3
**august**  23:15,16
23:24 234:19
236:25 243:1
**author**  27:19,22
**authored**  178:16
247:12
**authorities**  40:21
41:1,9,24 175:13
178:18 204:1
**authority**  205:5
**authorize**  277:11
**authorized**  86:10
**automobile**  65:17
65:22
**available**  42:16,23
79:9 111:9 114:12
139:17 140:14
**ave**  275:1
**avenue**  1:22 2:4,15
2:19 217:24
**awake**  154:13
**award**  151:9

**awarded**  54:14
**awarding**  149:3
151:5
**awards**  111:15
146:11
**aware**  19:19,23
186:10,14 204:4
204:18,24 205:4,7
205:14,21 206:3
231:20 241:12
244:14,18 250:22
263:16 267:24
268:18,24 269:22
270:2
**awareness**  64:5
69:2,4,5 71:18
72:20 102:23

**b**

**b**  236:3,12
**baby**  262:13,17
**bachelor's**  54:9
**back**  38:21 44:22
48:10 54:3 63:16
68:5 79:4 95:1
99:24 108:12
109:24 111:6
123:10,17 133:4
139:1 152:17
154:8 161:7 167:1
170:16 171:10
198:20 204:17
217:6 219:8,15
233:25 234:5
235:14 236:16,25
249:9 266:2
275:15
**background**  26:4
173:5 189:14
194:8 197:2
**backlog**  123:11

**bad**  84:3 93:4,6
**baker**  183:2,6,6,9
183:16 220:25
**barking**  34:8
**base**  40:8,9,11,15
**based**  53:6 60:22
61:8 62:13 68:14
132:23 133:9,15
134:7 187:20
263:17
**basic**  16:19
**basing**  102:2
**basis**  29:12 56:12
56:13 66:3,16,21
79:10 118:16
119:4 157:25
**bates**  5:4,8,11,14
5:18,22,25 6:4,7
6:10,14,18,21,25
7:3,6 27:6 55:2
78:22 82:21 85:11
108:6 131:9
142:12 161:1
166:19 174:17
177:16 182:3
208:14 223:13
224:24,25 234:13
242:19 247:6
252:9
**bathroom**  255:20
**becoming**  49:18
49:19 64:6
**bed**  126:3
**beds**  47:11 49:9,13
49:15,18,20,21
89:20 103:21,25
104:8 105:13,13
106:5,22 107:20
115:20,21 122:17
122:18 123:8,24
125:23 126:1

132:8,16,24 133:9
133:16 134:8
**began**  100:14
124:12 157:10
190:2 199:17
242:10
**beginning**  5:4,7,11
5:14,18,21,25 6:3
6:6,9,14,18,21,24
7:3,6 22:12 27:6
55:1 64:23 68:12
95:16 108:6
117:22 131:8
142:12 161:1
166:19 174:17
177:15 182:3
208:14 223:13
234:13 235:16
242:18 247:6
252:9
**begins**  162:1
**begun**  101:4,19
**behalf**  2:2,7,13,17
3:2,7,13,19 14:14
14:17,20,22,25
15:2 56:22 63:22
167:11 169:6
171:19 172:11
178:17 184:10
222:23
**behavioral**  22:5,7
40:21 41:1,8,24
146:10,10 149:9
175:13 178:18
**believe**  19:24 37:2
47:20 59:13 68:11
74:11 77:9 80:5
86:6 97:21 110:3
112:14 114:9
122:3 124:16
125:10 127:2

133:11,17 138:15
139:19 143:10,18
145:12 148:3
152:11 156:9,10
157:9 170:11
171:16 192:19
193:4,9 195:12
196:7 197:3,15
201:12,19 202:10
207:6,16 209:6
212:15 215:21
218:17 220:9
221:4,14 232:15
235:12 236:17
244:24 245:4,14
245:20 251:12,18
257:1,21 260:3,20
262:25 263:11,21
264:3,23 267:4,11
**believed** 169:25
170:9
**bell** 186:9 255:4
**belly** 57:7 58:7,22
**benefits** 40:5
260:25
**best** 17:13 67:19
68:13 72:9 75:2
96:2 97:7 152:9
199:24 202:18
203:13
**better** 34:25 46:10
53:13 87:8 96:9
**beyond** 140:25
**bid** 112:2
**biennial** 144:7
**big** 38:19 153:3
217:10 220:17
**biggest** 227:18
**bill** 28:3,8 144:5,7
**billboards** 103:3

**bills** 41:5
**bio** 5:4 27:5
**biography** 27:15
27:24 28:22 29:24
30:2 31:3 32:5,22
**bit** 20:12 28:7
38:23 42:24 59:3
76:15 111:13
112:4 139:24
151:24 154:25
174:25 179:22
188:11 230:25
252:17
**black** 83:17
117:20
**blank** 138:10
**blood** 189:25
**board** 5:10 19:7
19:17 20:6,10,13
20:15,16,24 21:14
21:20,23 22:1,11
22:12,14,20,22
23:2,3,8,14,20
27:25 28:11,13,18
28:23,25 29:4,6,11
29:22 32:7,12,19
33:25 42:6,24
43:3 44:16,25
45:4,9,12 46:4,4
46:15,15,23,23
47:6,6,17 48:4,19
48:25 49:6 50:2
52:13 56:7,23
58:4,18 60:1,15,17
62:14 63:23 64:2
66:17 67:12,13,21
73:8,19 75:13
79:8,9 80:11,20,21
81:19 82:9,10
87:9 89:9 90:14
92:24 100:1

102:12 103:10,12
104:1 105:2,21
107:15 108:5,18
109:7,11,19
110:12,14,21
111:9,20 112:8,11
112:18 114:10,13
114:16 116:4,14
117:5 118:15
119:2 120:18
121:9 122:17
123:19,22 124:6
124:20 125:8,13
126:9 127:12,19
129:2,18 130:1,8
132:13 133:7
134:12,23 136:17
136:22 139:16,16
141:1,4 150:20
154:22,23 155:23
156:6 157:19
158:1,17 163:13
164:1,10,23,24
165:7,14 166:5
170:19,24 172:14
172:20 173:7,8,12
181:11 187:21
189:22 190:21
191:3 193:16
195:2 196:10
198:8 202:11
203:4,9,18 207:7
207:12,17 208:25
209:25 213:2
217:19 218:16
221:5 222:20,23
222:24 243:8
244:16 263:20
**board's** 59:11
69:22 133:14
140:15 163:8

166:8
**boards** 21:25 22:3
22:9,17 23:1,10
32:13 41:2,10
42:19 80:13 82:2
83:6 143:8 202:16
220:15
**body** 22:6 41:18
41:19
**boehm** 2:9 4:8
14:10,10 15:10,15
53:21 59:2 78:23
107:23 125:17
157:25 158:6,11
160:16 182:19
196:23 209:6
219:12 224:21,25
235:5,12,22,24
236:10,14 238:9
249:8 263:8
264:22,25 265:4
265:19 269:7
270:20 271:2,6
**bold** 171:21
**bombarded**
206:18
**boomers** 262:13
262:17
**bottom** 65:25
80:16 85:11
110:10 155:4
262:13 264:19
**bound** 261:4
**box** 264:14
**boxes** 253:12
254:1 262:10
**boy** 148:22
**brady** 37:17 51:14
159:3 222:13
**brain** 22:6 222:7

**brand** 68:22
**break** 34:9 54:4
  108:12 112:3
  145:4 146:6
  147:15 154:1
  170:5 188:10
  235:4 236:17
  266:2
**breaking** 34:21
  255:14
**breaks** 102:22
  104:10
**breathing** 190:1
**brickner** 130:13
  130:22 131:19,25
  132:24
**bridgeway** 57:3,5
  57:6,9,11,15,21
  58:2,5,20 59:12
**brief** 27:15
**bring** 22:3 25:23
  85:2 94:2
**bringing** 76:21
**broadcast** 234:25
**broke** 161:14
**brought** 19:9
  35:15 148:2
**budget** 5:7 55:1,11
  56:9,16,18 104:15
  106:2,3 113:5,8,11
  117:17,23,25
  134:11 138:19
  139:12 144:7,12
  159:5
**budgeting** 51:6,7
  130:20
**budgets** 104:7,14
  106:9 117:23
  137:11 151:5
**budish** 232:23
  247:23

**building** 69:2
**bulk** 135:11
**bullet** 85:25 94:24
  95:2,6 179:17
  180:15 225:2,11
  231:5,13 232:21
  237:6,7,8,9,10,13
  238:20
**bulleted** 164:8
**burdens** 180:17
**burling** 3:9 14:25
**bus** 103:3
**business** 57:7
  226:25 270:9
**busy** 198:16

**c**

**c** 33:2,4 135:9
**ca** 275:25
**cabinet** 255:21
**cain** 3:20,22 14:21
  14:22
**call** 99:13 205:5
  211:8 212:23
**called** 15:5 45:14
  57:3 249:14
**campaign** 37:25
  63:17,24 64:8
  69:1,12,23 70:7
  71:1,18,22 72:21
  72:21,23 73:1,23
  75:6 102:23
**campbell** 37:15,16
  39:9,12
**candidate** 37:9
**candidly** 181:8
**capability** 193:20
**capable** 194:9
**capacity** 77:4
  187:25 193:17
**capita** 82:3,4,10
  83:6

**caption** 273:21
**cardinal** 2:7 14:11
  267:9,12
**care** 35:13,16
  43:16,17 60:5
  86:13 123:10
**career** 65:16
  150:24 153:7
**carfentanil** 93:22
  93:25 94:4,10,15
  94:19
**carries** 253:1
**carroll** 7:2 247:4
  247:19,22 248:22
**carry** 152:6
**cars** 34:8
**cartel** 237:14
**cartels** 87:17
  237:19,24 238:15
  239:10,16,20
  250:7,12
**case** 1:8,15 19:9
  19:20 36:13,17
  60:7,9 72:14,15
  178:15 235:18
  236:2,6 262:8
  266:19 268:5
  275:6 276:3 277:3
**cases** 16:4,6
**cassandra** 113:21
**catastrophic** 39:6
**categories** 111:16
  126:9,20
**categorize** 251:9
**categorizes** 125:13
**category** 125:24
  127:5 132:22,25
**catholic** 122:3
**caucasian** 226:1,9
**caucasians** 225:12
  225:21

**caucus** 83:16,17
**caught** 89:24
**cause** 67:6 90:7,15
  273:12
**caused** 43:20 44:4
  44:5 94:20 244:4
**causes** 46:7,18
  67:15,23 89:10,15
  90:8,22 92:16
  173:3,15 210:4
**causing** 40:10
**cease** 33:21
**center** 3:10 5:10
  108:4,24 109:1,6
  109:12,20,25
  110:3 127:10
**centered** 226:9
  230:18
**centre** 3:20
**ceo** 19:16 23:2,8
  23:13 28:12 87:8
  119:6 129:17,25
  130:7,11 132:12
  170:24 172:13,20
  173:11 187:21
  193:16 195:1
  196:9 243:7
**certain** 26:23
  128:2
**certainly** 144:21
  152:16
**certificate** 4:11
  273:1 277:11
**certification** 276:1
  277:1
**certified** 15:7
  202:16
**certify** 273:8,19
  274:1
**cetera** 66:2 179:20

chain 217:7 219:8
chair 51:11,14
  183:24 184:22
champion 159:3
chance 55:18,19
  132:3 167:8,16,24
  185:4,15 209:9,14
  243:24 252:18
change 43:1,12,13
  43:19,20 44:4
  76:25 81:13
  137:11,16,20
  153:2 159:7 176:2
  207:19 275:13,14
  277:8 278:3
changed 44:5
  186:11 189:9
  207:25 227:13
changes 84:2
  111:25 118:13
  187:1,12 188:1
  191:13 227:16,25
  227:25 229:5
  253:21 275:12
  276:7 277:7,9
changing 81:10
channel 235:1
characterize 239:9
charge 83:19
charities 122:4
charleston 3:5
chart 80:2 82:12
  110:18
charter 159:7
charts 82:20
  137:14,24 146:17
check 249:10
  270:20
cheri 142:18 143:4
  174:24

chief 28:4,9 29:3
  31:4,8,10,14,22,25
  46:3,14,22 47:5
  56:7 64:10 67:12
  67:24 92:23 100:1
  113:12,14 116:5
  116:15 129:1
  139:15 170:18
  205:9 218:16
  244:14 248:11,15
  248:21 263:19
chief's 248:11
chiefs 75:21
  227:13
children 28:15
  29:16,19 35:11,13
  35:14,15,17,21,24
  36:3,6,9 37:1
  59:20 60:17 68:17
  75:19
china 93:19
choice 147:8
chosen 64:20
christina 208:23
  209:18,21 210:4
  213:9
chronic 187:8
church 226:21,24
circle 253:12
circumstances
  15:25 31:7,9
cities 225:20
citizens 220:15
  229:20
city 3:10 16:3 37:9
  38:15 39:1,20
  40:15,16 54:11
  75:18 134:13
  135:4 171:14
  225:18 226:21,23
  226:25 230:7,19

233:5
civil 272:3,7 276:5
  277:5
claims 123:20
  236:2
clarify 54:7 98:6
  101:9 235:20
clarity 265:10
classified 251:4
clean 125:5 239:2
  268:25
clear 17:6 153:24
  228:16,18 240:24
  259:22
cleveland 1:23
  2:15 6:17 14:5
  16:10 26:11,15
  30:12,18 31:21
  37:9 38:2 40:9,14
  54:10,11,15 75:18
  76:7 134:13 135:4
  223:11,20 224:1
  224:15 225:19
  231:1,6,21 232:1
  232:23 274:7
  275:2
client 212:22
  214:2
clientele 96:8
clients 231:23
clinic 6:17 76:7
  223:11,21 224:1,5
  224:15 231:1,7,21
  232:2
clinical 173:4,10
  193:21,24 205:9
  253:21
clinician 193:12
  193:14 195:18
clock 119:5,8,10

close 159:8
closer 61:24
coalition 5:25
  166:18
cocaine 21:8 65:2
  95:20 96:10 97:24
  98:15 227:21
  228:4,9 230:18
  246:4 250:1,8,17
  251:14,22
colleague 14:12
colleagues 192:2
  200:16,24 201:8
  206:12,23 269:9
collected 96:23
  134:16
collection 73:16
college 26:11,16
collegial 109:13
columbus 85:2
  142:4
combination
  23:10
come 19:12 21:19
  36:23 77:5 87:2
  92:2 96:4,10,12,14
  96:16,17 99:11
  100:2 118:2
  139:25 140:4
  146:25 152:17
  186:17 188:21
  190:12 191:9
  203:5,9 214:18
  216:7
comes 40:5,6
  112:23 114:7
  118:12,14 152:13
  153:25 188:21,25
  203:18 227:7
coming 41:16 52:6
  86:9 121:5 186:19

229:17 256:25 258:5

**commenced**
137:15 138:1

**comment** 72:12 110:5

**comments** 109:17 236:23

**commission**
258:24 259:4,17
259:23 274:17
276:19 277:25
278:25

**commissioned**
273:8

**commissioner**
37:16,17

**commissions**
259:1,9,18

**committee** 6:13
40:22 41:14,23
55:13 75:7 141:24
142:25 144:19,24
146:24 175:16
182:16 183:1,25
184:18,22 185:21
194:5,6 200:18
208:13

**common** 86:1 88:1
88:16,18,20 98:19
98:24 99:3,21
127:17,24 128:9
128:20

**commonality**
100:3

**commonly** 62:16

**communicate**
222:24 259:15

**communicated**
82:8 183:8

**communication**
76:23

**communications**
63:1 73:25 168:6
226:17,17

**communities**
75:22 226:23
262:3

**community** 20:14
26:11 36:20 38:10
38:18 46:19 47:1
47:9 48:7 50:5
51:20 60:22 61:13
63:2 87:3 103:16
105:24 109:3,18
110:7 116:18
141:12 144:11,14
151:18 152:13
163:9 166:10
171:24 180:7
188:4,22 189:4,23
190:22 192:22
195:5 196:17
197:21 200:1
205:24 206:9
210:19 211:12
226:2,10 227:19
230:22 233:15
238:6 239:7,12,23
260:7

**companies** 3:14
16:4 258:16 267:5

**company** 3:19
14:23

**compared** 45:15
45:25 80:12 82:14
120:12 222:21
226:10 227:4
228:12 230:2

**compares** 79:8

**complain** 216:22
217:1

**complaint** 25:19
266:5

**complaints** 216:7
216:9,18,20

**completed** 26:19
59:21 273:22
275:15

**completely** 16:25
18:22

**compliance** 219:3

**concept** 259:24

**concern** 38:10,21
188:17 190:11

**concerned** 154:22
188:8,14

**concerns** 177:4
190:10 200:20

**concluded** 200:18
271:10

**conclusions** 253:5

**concurrence** 50:22

**condition** 154:18
261:5

**conduct** 175:17
269:23

**conducted** 204:20

**conducting** 184:9

**conduit** 41:5

**conference** 182:17

**confidential** 5:3,6
5:9,12,16,19,23
6:2,5,8,11,16,19
6:23 7:1 27:4
54:24 108:4 131:6
142:9 160:23
166:15 174:15
177:13 181:25
208:9 223:10
234:11 242:16

247:3

**confirm** 143:12

**conflict** 34:3

**congratulations**
54:18,21

**congresswoman**
37:18

**connected** 228:16

**connection** 21:15
25:15,20 29:21
77:12 87:9 117:7
120:7 133:14
139:10 141:2
158:4,6 186:11
187:5 206:7 209:1
210:10 217:24
220:11 257:3,23
259:23 266:6

**connolly** 2:8 14:11

**consensus** 189:3

**consequences** 36:6
64:5 145:10

**consider** 260:24
261:4

**considered** 22:4
215:2

**considering** 70:8
71:2

**consistency** 215:7
218:1,2

**consistent** 190:6
211:17 214:25

**consolidate** 181:10

**consolidated** 61:6

**consult** 173:8

**consultants**
173:12

**consulted** 25:25
209:25

**consumer** 204:10
204:14,19 253:23

consumers 57:8
content 55:25
context 64:22
 254:25 255:3
 262:21,22
continuation
 260:19
continue 57:10,13
 97:15 156:20
continued 3:1
 166:4 246:10,12
continuing 254:11
continuity 31:12
contract 16:5
 112:1
contracts 111:17
 112:2 151:5
contribute 264:6
contributed 94:20
 157:5,11 190:19
 191:16 194:19,23
 195:4 197:8,19,20
 201:23 237:24
 238:5 239:6,11
 254:8 262:18
 263:2,14,21
contributes
 151:25
contributing 46:7
 46:17 90:16,22
 156:11 191:22,25
 192:3,21 193:2,3
 194:16 197:5,16
 198:3,4 200:6,12
 200:15,19 201:8
 201:15 253:5,13
 254:2,11
contribution
 35:23
contributor 36:8

contributors
 239:21
control 84:5
controlled 257:4
 257:24 258:13
conversations
 52:23 53:6 63:5,7
 83:14
convey 81:1 82:7
convince 221:9
convinced 189:23
 190:22
convinces 260:21
conwell 51:24 52:5
 143:16,18,25
 222:8,9,10,11
conwell's 143:14
cope 156:25
copied 142:19
copies 178:25
copy 27:10,11
corner 78:25
 85:11 110:10
 155:5 262:14
corporation 3:2,8
 33:11
correct 19:2 20:8
 21:18 30:5,13,14
 31:6 32:9 33:3
 37:10 45:2 57:1
 58:12 60:24 61:15
 61:19 67:16 74:21
 74:22 78:8,12,14
 91:20 92:6,14
 94:5 98:4 100:11
 105:6,15 107:21
 107:22 111:4
 115:2 119:18
 126:10 128:21
 129:4 132:18
 135:3,9,10 141:12

155:9 158:14,15
 168:22 172:15
 175:9 180:8,13,22
 181:18,19 184:23
 185:25 192:8
 213:4 214:6
 225:14 226:6
 230:5 233:15
 235:22 255:23,25
 260:1 265:13
 266:7,8 273:17
corrected 140:17
correction 61:8,9
correctional 60:23
 61:12
corrections 275:12
 277:17
correctly 35:16
 41:7 48:2 58:3,17
 67:11 114:13
 151:11 162:19
 172:4,9 180:3
 217:21 231:16
corrects 219:9
correspondence
 168:13
cost 60:3,4 120:25
costing 60:11
council 50:21 51:5
 51:10,11,13,17
 52:3 53:8,15
 55:13 56:3,9,16
 59:10 63:22 69:11
 69:22 80:9 81:1
 82:7 84:21 85:22
 88:11 97:22
 102:21 103:11,13
 104:2,20 105:3,22
 106:25 107:5,16
 132:14 133:6,25
 143:22 149:14

158:25 159:2,14
 159:17 160:15
 165:18,22 219:19
 219:25 220:11,23
 221:2,7,16,21
council's 75:7
councilman 70:4
 70:11,13,23 71:5,7
 71:9,14,17 75:4
 150:11
counsel 2:7 3:3,8
 14:6 41:17 149:24
 150:6 272:1,10
 274:2
counseling 57:17
 57:18
counselors 60:19
counterpart 243:6
counties 22:3 41:3
 41:10 80:13 82:14
 82:19 83:7 84:18
country 91:20,23
 96:19 146:11
 152:22 189:23
 190:21 225:20,25
 256:25 258:5
county 1:13 2:2
 5:7,24 14:9 19:10
 19:17 20:6,17,19
 22:9,22 23:13
 27:14 28:11,13,14
 28:25 29:4,15,19
 35:10,20 36:2,14
 36:25 37:16,17
 40:21 41:1,8,24
 42:6,8,18 43:23,23
 44:16,24 45:4,5,10
 45:12,19 46:3,8,14
 46:22 47:5,7,16,17
 48:4,4,19,20,25
 49:1,6 50:2,13,18

| | | | |
|---|---|---|---|
| 50:21,23,25 51:1,4 | 157:18 158:16,25 | 245:15,21 246:11 | **created** 220:10 |
| 51:14,17 52:13,18 | 159:14 160:8,11 | 248:6,22 250:15 | **creates** 229:25 |
| 53:7,15 54:25 | 160:15,15 161:19 | 251:12 254:9,12 | **creating** 180:16 |
| 55:11,13 56:2,9,15 | 162:11 163:7,15 | 260:5 262:19 | 219:23 |
| 56:22 59:10,25 | 163:16,17,20,25 | 263:18,20,23 | **creation** 221:14 |
| 63:3,22,23 65:21 | 164:21,24 165:1,2 | 266:6 267:7 268:4 | **crime** 227:20,22 |
| 66:17,18 67:7,14 | 165:16,17,18,19 | 269:25 273:4 | **criminal** 227:22 |
| 68:16,18,20 69:11 | 165:20,21 166:7 | 276:10 277:15 | 264:17 265:11,12 |
| 69:21,25 70:16 | 166:18 167:14 | **county's** 79:12 | **criminals** 229:16 |
| 71:13 73:9,14,17 | 170:20,25 171:2 | 165:8 227:5 228:8 | **crisis** 90:7,8,23 |
| 73:20 74:2,6,9,13 | 171:13,14,15 | 249:15 | 146:23 198:24,25 |
| 74:20,25 75:16,17 | 172:1,15,21,23 | **couple** 55:23 | 199:9,14,14,17 |
| 76:1,4,13,18 78:6 | 173:16 175:12 | 103:20,24 105:8 | **cudell** 32:24,25 |
| 78:11 79:10,10,15 | 176:14 178:17 | 105:14 129:15 | 33:1,1,8,15,22 |
| 79:18,21 80:9,10 | 181:16,17 183:17 | 224:17 241:22 | 34:6,11,15 |
| 80:12 81:1,19,22 | 184:7,10 187:16 | 269:15 | **cultural** 263:1,12 |
| 82:1,7,8,14,16 | 187:22 190:10 | **course** 26:22 | **cures** 135:8 136:6 |
| 83:19,23 84:21 | 191:19 193:15 | 61:21 163:16 | 140:6,13 |
| 85:21 87:10,17,20 | 194:17 195:1,20 | 246:21 | **current** 179:6 |
| 88:11,21 89:5 | 196:11 197:5,17 | **courses** 26:15 | **currently** 28:3,8 |
| 90:14,21 92:20 | 198:11 199:7 | **court** 1:1 4:14 | 134:19 |
| 93:2,12,18 94:12 | 200:20 201:10,16 | 17:7,11 31:2 | **curriculum** 27:16 |
| 94:21 95:19 96:11 | 201:25 204:7 | 219:12 276:7 | **custody** 4:13 |
| 97:22 99:23 101:5 | 205:3,18,25 206:9 | **cov.com** 3:12 | **cut** 144:11,14 |
| 101:19 102:7,12 | 209:8 210:1,5,11 | **cover** 248:23 | 206:19 213:21 |
| 102:21 103:10,12 | 213:3 214:6,14 | 249:3 | 229:19 250:24 |
| 103:13 104:2,2,19 | 216:4 217:1 | **covered** 138:14 | **cutting** 56:20 |
| 105:3,21,22 | 218:18 219:19,25 | 164:17 | **cuyah** 5:5,8,11,15 |
| 106:25 107:1,5,16 | 220:11,23 221:1,5 | **covington** 3:9 | 5:18,22 6:1,4,7,10 |
| 107:16 109:11,20 | 221:7,11,15,21,23 | 14:25 | 6:14,18,21,25 7:3 |
| 110:25 112:6,11 | 221:25 222:20,21 | **crack** 37:6 65:2 | 7:6 27:7 55:2 |
| 112:18,23 125:8 | 222:23,24 225:24 | 66:1 95:8,13,20 | 108:7 131:9 |
| 127:20,25 128:21 | 226:12 227:3 | 96:9 97:11,23 | 142:13 161:2 |
| 132:13,14,14,17 | 228:12,20 229:17 | 98:14,15 227:6,11 | 166:19 174:18 |
| 133:6,24 134:13 | 230:6,17 232:22 | 227:21 228:3,9 | 177:16 182:3 |
| 135:1 140:21,25 | 233:5,8 234:1,6 | 230:6,10,18 250:3 | 208:15 223:13 |
| 141:5 143:22 | 237:19,25 238:4 | **cramp** 145:3 | 234:14 242:19 |
| 145:11 149:2,5,14 | 239:5,21 240:2,9 | **crashes** 65:17,17 | 247:6 252:9 |
| 150:13 151:16 | 240:15 241:11,19 | 65:23 | **cuyahoga** 1:13 2:2 |
| 154:18,21 155:24 | 241:25 242:1,5 | **create** 219:17 | 5:24 14:9 19:16 |
| 156:12 157:6,12 | 244:15,24 245:5,9 | 221:6 | 20:6,17 22:22 |

23:13 26:10 28:11
28:13,14,25 29:4
29:15,19 35:10
36:2,25 42:6 46:3
46:14,22 47:5,16
48:3,19,25 51:17
56:22 63:23 65:21
66:18,25 67:7
68:15 69:24 70:15
73:9,14,20 74:2,6
74:9,13,20,25
75:15 76:4,12,18
79:7,15,20 80:9,10
80:20,22 81:22
82:8,14 83:5,18,23
87:9,10,17,20
88:21 89:4 92:19
93:1,18 94:11,21
95:19 101:5,19
102:7,12 109:11
109:19 112:11
125:8 127:20,25
128:21 132:13
145:11 154:18,21
155:24 156:12
157:6,11,18
158:16 160:7
161:19 163:7,16
163:19,25 166:17
170:20 171:2,12
172:1,15,21,23
176:14 181:15
183:17 184:7
187:16,22,23
190:10 191:19
193:15 194:17,25
196:11 197:4,17
198:11 199:7
200:20 201:10,16
201:24 204:7
205:3,18,24 206:9

210:1 213:2 214:6
216:4 218:17
219:25 220:11
221:5,7,10,15,21
221:22,24 222:20
222:22,24 225:24
227:3 229:17
230:5,17 232:22
233:8,25 234:6
237:19,25 238:4
239:5,20 240:2,9
240:15 241:11,19
241:25 242:1,5
244:15,24 245:5
245:15,21 246:10
249:15 250:15
254:9,12 260:5
262:19 263:18,20
263:23 267:6
269:25 273:4
**cycles** 233:15

**d**

**d** 33:2,4
**d.c.** 2:20
**daily** 118:16 119:4
**dale** 51:14 222:13
**dan** 1:10 37:17
  51:13 159:3
  222:12
**darn** 148:20
**data** 123:20
  213:17 243:12
  244:2,20 245:8,22
  250:23
**database** 123:20
  212:13 213:3
  214:4,15
**date** 14:2 74:15
  108:19 142:6
  152:18 181:2
  212:17 242:13

272:11 275:8
276:3,9,19 277:3
277:13,25 278:20
278:25
**dates** 244:17,18
**david** 243:2,3,5
**dawn** 106:13,15
  115:10,11,14
  124:5,7,12,17
  180:1
**day** 2:18 14:17
  24:10,12 26:22
  118:20 184:12
  190:13 270:9,9
  274:7 276:16
  277:22 278:22
**days** 275:18
**dc** 2:10 3:11
**dcfs** 59:16
**dea** 256:23
**deal** 33:11,12 38:5
  68:20 76:25 77:4
  77:6 87:14 89:12
  89:21 107:6
  120:25 121:1,4
  123:7 195:25
  220:17 236:10
**dealers** 87:21
  94:25 95:7,12,19
  96:8 97:10,22
  225:17 229:12
  238:4,16 239:5,11
  239:14,20 250:8
  250:12,17
**dealing** 34:20,24
  35:13 77:1,2
**dear** 275:10
**death** 67:7 69:8
  77:22 254:12
**deaths** 65:18,23
  67:14,15,18,22,23

86:2 88:2,16,18,21
99:23 153:4 244:4
249:23 251:4
**decades** 233:10,25
  234:5
**december** 108:19
  118:5
**deception** 264:24
  265:1,4,6
**decide** 137:19
**decided** 18:6
  33:25 38:1
**decides** 86:24
**decision** 23:7
  25:23 165:13
  198:6 203:14
**decisionmaking**
  59:16,23 60:3
**decisions** 51:6
  52:21 147:11
  202:12
**deck** 109:5 110:8
**decline** 244:18
**declined** 162:18
  162:24
**declining** 163:21
  164:1 244:11
**decrease** 166:3
**decreased** 164:21
**decreasing** 162:2
  162:2,5,8,10,10,14
**deed** 276:14
  277:20
**deemed** 275:19
**defend** 56:17
**defendant** 3:7
  268:5
**defendants** 2:8 3:3
  3:8 15:3,16
  251:13,19 266:9
  266:14,18,18

267:25 269:14,24
270:4,14
**definite** 62:22
**degree** 54:9,13,14
**degrees** 26:20
**delivery** 267:1
272:9,11
**delos** 208:23
209:18,21 210:4,8
213:9 217:6,23
219:8
**demands** 196:1
**demerol** 179:20
**democrat** 83:18
83:22 159:22
**democratic** 83:23
83:24 84:7
**democrats** 71:12
**demonstrate**
56:19 80:3
**demonstrating**
52:6
**demonstrative**
94:2
**demoted** 31:16
**denied** 150:23
**denihan** 1:19 4:7
6:17 15:4,9,11
24:1 54:3 55:15
70:6 73:8 75:5
83:18 108:13
147:6 161:8
166:25 167:24
172:2 174:12
182:23 198:20
208:18 223:12,18
235:17,25 236:16
252:14 266:1
269:10,12 270:18
273:9 275:8 276:4
276:9 277:4,13

278:20
**denihan's** 5:4,17
27:5 142:11
**deny** 63:6 168:10
**department** 28:15
29:16,19 30:21,22
35:11,20 36:9
37:1 44:10,13
59:20 60:17 68:17
74:23 75:18
106:16 167:12
168:7,15 169:7,23
170:7 171:14,15
171:20 172:12
275:22
**departments**
59:24 165:1
**dependency** 157:2
**depleted** 139:4
**deployment** 38:17
**deposed** 15:7,19
15:23
**deposition** 1:18
14:5 16:8,14,18
19:4,15 24:2,14,21
26:24 27:3 54:23
55:7 108:3,17
131:5 142:8
160:22 166:14
174:14 177:12,22
181:24 208:8
223:9 234:10
242:15,25 245:24
247:2 252:5
271:10 273:20
275:8,11 276:1,3
277:1,3
**depositions** 16:1
25:14
**depression** 156:21

**derivative** 250:3
**describe** 15:25
20:12 42:24 43:1
45:17 64:19 83:13
111:12 179:12
192:3
**described** 90:18
99:9 102:24
180:21 195:22
**describes** 169:9
**description** 5:2
**designated** 5:3,6,9
5:12,16,19,23 6:2
6:5,8,11,16,19,23
7:1 27:4 54:24
108:4 112:12,19
131:6 142:9
157:19 158:17
159:15 160:13,23
166:15 174:15
177:13 181:25
208:9 223:10
234:11 236:3
242:16 247:3
**designed** 80:3
235:21
**desktop** 248:11
**destruction** 35:23
**details** 42:22
140:9 216:2
**determination**
261:11,19,24
**determine** 111:18
112:15 121:17,19
126:20 202:19
214:4
**determined** 52:17
66:17
**determining**
160:12 258:13

**detox** 115:21
**detoxification**
120:16,19,24
121:11,18 122:6
126:18
**devastating**
155:13
**developed** 100:20
101:13 115:22
240:8
**development**
33:10 117:2
**diagnosis** 61:4,25
62:1 193:21,24
261:6
**dialogue** 73:24
**die** 153:25
**died** 94:16 130:4
250:16,23 251:14
251:21,25
**dies** 251:7
**difference** 64:25
86:4 152:24 153:1
153:3 160:2
217:10 227:18
238:12,12
**differences** 227:2
228:19,20
**different** 23:19
36:5 37:5 42:11
56:24 75:22 90:2
92:5 95:22 111:16
125:14 140:1
148:19 152:21
176:5 196:3 218:3
227:16 228:10
229:8 238:18
244:25 245:6,15
245:18,20
**differently** 112:9

**difficult** 71:21
72:3,13,13
**dignity** 38:7
**direct** 28:1 55:22
78:15 80:14 94:23
165:15 179:4
184:24 185:18
204:10,14,19
209:13 230:24
237:12 249:12
253:23
**directed** 46:5,16
46:24 59:6 116:6
116:16 236:22
**direction** 86:13
**directly** 43:3,5,25
44:1 45:9 48:16
111:21 112:23
117:6 169:2
**director** 16:10
28:14 29:15,18,25
30:3,12,18,19
31:15,20 35:10
36:2,25 54:11
68:16 75:17 119:6
143:5 225:19
**directors** 23:11
**disagree** 50:24
138:23 199:2
200:19
**disappointment**
149:9
**discretion** 111:8
111:14 140:15,16
**discretionary**
107:4 112:23
114:12,15,21
118:8,8,12
**discussed** 124:21
125:9 131:20
210:3

**discussing** 28:19
28:24
**discussion** 160:9
183:14
**discussions** 184:3
210:6
**disease** 49:16
87:14 147:9,17
227:24
**diseases** 66:1
147:10,17
**disorder** 62:6,10
62:11,17,18 63:2
98:20 99:4 100:4
121:12 127:17
128:9,20 240:9
**disorders** 20:25
21:17 49:12 63:12
84:10,14 121:13
124:1,2 152:14
153:15,16 156:2
**disparity** 82:18
**dispense** 268:8
269:3
**dispensed** 268:20
**disproportional**
144:14
**disproportionally**
230:21
**disproportionately**
226:1
**dispute** 16:5
**dissolve** 22:10
**distinct** 238:18
**distinguished**
54:21
**distribute** 20:19
43:4,23
**distribution** 29:8
29:13 42:18
195:19 237:20

**distributor** 2:7 3:2
3:3,7,8 267:5
**distributors**
266:23 267:1
**district** 1:2
**diversion** 254:21
254:25 255:2
264:15 265:12
**diverted** 256:14
**division** 1:3
**divisions** 30:21
**doc** 99:15
**doctor** 62:23
101:6 187:20
190:12 193:12,14
195:17 196:8
209:22 212:16,25
256:2,4,8 260:19
269:5
**doctor's** 262:7
**doctorate** 54:13
54:14
**doctors** 173:7
187:8 190:2
210:15,21,22,25
211:3,12 212:5,6
213:9,24 214:6
215:14,22 217:1
218:13,19 224:6,7
231:23 232:12
256:5 258:6 261:9
261:17,23
**document** 1:12
5:13 27:13 55:6
55:14 68:3 74:17
108:16,22 131:7
131:16,20,25
132:5,7,19 134:18
136:15 137:19
138:24 142:16
149:12,22 150:6

161:11 162:8,14
168:2 169:23
170:7 175:5
176:18 177:9,20
178:13 179:11
180:21 182:7,13
182:20 184:25
189:15,20,21
207:20 208:5,18
209:15,17 213:24
223:17,18 234:17
234:19 242:23
243:20 247:10
248:3,10,22,23
249:2,2,9 252:13
**documents** 24:20
24:23,25 25:1,4,6
25:10 26:9,23
27:20 78:17
186:15,23
**dog** 30:23
**dogs** 34:8
**doing** 53:19 55:9
60:4 89:23 150:12
173:9 194:9
197:24 232:18
**dollar** 79:25
**dollars** 44:16,17
44:17 115:15
118:8,9 126:20
127:4,4
**doses** 202:8
**double** 125:19
**doubled** 149:4
**downturn** 154:10
157:10
**downward** 241:10
241:19,25 242:5
242:10 246:23
**dozen** 15:24

dr 208:23 209:18
209:21 210:3,8
217:6,23 219:8
236:16
draft 131:22
drain 222:7
drawn 109:23
140:22
driving 65:17
152:25 153:1,4
drug 3:2 6:13 7:4
20:16 22:1 28:9
32:7,11,19,20
36:11 57:18 86:1
86:2,19,23,25
87:16,20 88:1,1,16
88:16,18,20,21
91:4,12 92:19
94:11 95:12,18
96:7 97:10,14,22
143:8 162:16,22
169:10 170:1,13
173:20,24 176:21
179:23 180:11
181:11 182:15
184:17 193:5
200:17 204:16
205:6 208:12
210:15 211:1
227:5 228:2
237:14,19,24,25
238:4,14,16 239:5
239:10,11,19,20
241:18 242:4,9
243:12 244:2
245:8,22 248:8
250:7,8,12,12
252:6,16,20 253:4
256:20 257:2,22
258:12 262:12
263:25 266:23

267:1,4 268:20
drugs 34:9,16,19
35:19,22 37:4
93:18 95:8 156:22
156:24 167:13
168:22 233:14
244:4 256:24
258:5,6 260:11,13
260:14 270:13
drunk 65:17
152:25 153:1,4
dual 61:3,25 62:1
due 40:5,6 170:23
249:25
dulaney 142:19
duly 15:6 273:7,10
duties 20:12 29:2
29:5 30:17 32:17
35:9 176:2 256:23
duty 261:4
dying 188:9
198:18
dynamic 249:19

e

e 2:4,9 33:2,4
135:9 275:5
earlier 54:6 77:8
111:7 126:5
130:17 132:11
134:9 143:6,20
149:12 174:25
198:19,22 207:11
215:14 237:18
252:17 266:4
early 65:1 77:21
95:16
earmarked 112:12
112:17,24 140:13
140:18
easily 240:14

east 3:5 159:23
eastern 1:3
easy 124:9
ebb 237:2
ebbed 233:9
economic 154:10
157:10
economy 155:14
155:21
edgewater 34:1,2
education 26:5
effect 72:22,24
73:2 237:16
effective 21:24
94:1 198:23
effectively 89:21
90:6 190:2 199:6
199:13 201:14,23
effectiveness 70:5
70:25
effort 152:23
159:9,11 160:6
171:25 190:2
efforts 158:21
161:13,18 222:22
227:5 254:17
eight 43:14 159:4
159:7
either 20:21 49:3
89:7 184:9 206:5
206:18,19 274:2
elect 148:13 175:7
175:15,20,24
176:4,7,9,12
election 37:13
elephant 94:3
ellis 2:14 14:14
email 5:3,6,13,16
5:20,23 6:2,5,8,11
6:16,20,23 7:1
27:4,14 54:25

55:10,20,21,25
56:21 64:14 70:3
78:17 131:1,7,14
131:16,24 136:1
142:10,17 143:12
160:24 161:12,25
166:16,25 167:5,9
169:3 174:16,23
175:3 177:14,24
178:10 182:1
184:14 208:10,19
209:15 217:7
219:7 223:11,19
234:12 242:17
243:1,10,12 247:4
247:11 248:9
275:17
emails 179:1
emergency 30:22
179:23 180:12
249:15
emotional 156:21
emphasis 228:10
employed 22:13
22:21
employees 173:13
enact 76:24
enacted 146:3
188:24
enclosed 275:11
endeavoring
168:16
ended 38:16
endo 3:13,13 15:2
ends 85:12
enforcement 96:5
96:11,15 227:19
228:11,17 229:2
256:20,24 257:2
257:22 258:5,12

enhance 138:12
enhanced 137:15
  138:1,14
ensure 35:14
  151:10 195:9
  219:3
ensuring 164:23
entered 277:9
entire 40:5 133:11
  144:12 209:15
  276:5 277:5
entities 111:3
entitled 108:18
  178:15 179:6
  185:1 224:16
  252:25
entity 19:11 28:23
  32:24 33:12 34:7
  76:20 77:5
epidemic 5:14
  47:12 49:17 63:18
  63:25 64:16,18,20
  66:3,16,19 68:8,9
  69:13,24 77:12
  85:23 89:15 115:7
  123:9 127:21
  131:8,17,21
  132:16 148:6
  150:9 151:17
  169:9,16,20,25
  170:9,12 172:1,15
  180:16,22 181:4
  181:14,17 193:6
  194:17 195:5
  197:17 201:9,16
  206:13,24 210:5
  214:18,19 225:4
  228:9 230:6,11
  237:25 238:6
  239:7,12 252:25
  253:11,14 260:6

264:7
epidemics 226:11
  227:6 228:3
epidemiological
  181:13
equalizing 82:17
equity 85:3
era 65:3 67:4
  227:21
eroding 40:8,9,10
  40:16
errata 275:13,18
  277:7,10,18 278:1
escalation 179:18
  180:6 206:20
escapes 113:23
  220:20
especially 40:2
  60:7 155:13
esq 2:4,9,9,14,19
  3:4,9,16,20
established 34:12
  74:13,16 78:7
  173:20,25
et 1:13,14 66:2
  179:20
evaluate 204:1
evaluation 204:3
evaluations 110:5
evelyn 222:8
event 39:7 181:12
  274:3
eventually 138:16
  200:3
everybody 37:20
  148:15 150:18
  154:14 188:16
  218:8 225:8
evidence 250:16
exact 36:4 42:8
  47:21 49:24 74:15

88:22 120:8
exactly 32:3 39:25
  50:6,7 65:13 73:4
  78:3 81:3 84:8
  119:3,16 130:19
  138:8 140:7
  194:18 203:1
examination 4:7
  15:5,9 269:10
examiner 73:11
  74:19,24 75:14
  88:4,8,15 94:15
  171:15 251:9
examiner's 67:20
  251:5
example 40:1,7
  65:2,22 72:1,9
  98:13 106:6,7
  116:2 117:8,9
  118:11 212:9,12
  220:18 221:3
  222:7,11,12
  228:10 233:4
  255:19
examples 114:25
  115:18 205:7
exceeded 67:8
exchange 115:24
  166:25 208:20,23
exchanges 167:11
exclusively 120:25
excuse 21:24
  22:10 30:7 104:11
  143:7 146:5 159:1
excuses 150:16
executed 277:10
execution 276:14
  277:19
executive 6:6 28:4
  28:9,14 29:3,15,18
  35:10 36:2,25

40:22 41:14,23
  46:3,14,22 47:5
  56:7 64:10 67:12
  67:25 68:16 92:24
  100:1 103:13
  104:2 105:22
  107:1,16 113:12
  113:14 116:6,16
  119:6 129:2
  132:15 139:15
  143:5 160:11,15
  165:19 170:19
  175:16 177:14
  218:16 232:23
  244:15 263:19
executive's 51:2
  248:6
exhibit 4:13 5:3,6
  5:9,12,16,19,23
  6:2,5,8,11,16,19
  6:23 7:1,4 26:25
  27:3,11 54:23
  55:7,7 63:16 68:5
  74:18 79:6 108:3
  108:17 127:6
  131:2,5,25 142:8
  142:17 149:13,20
  150:6 160:22
  161:11 162:9
  166:14,24 168:2
  174:14,21 176:18
  177:12,21 181:24
  182:8 208:8,19
  223:9,18 234:10
  234:18 242:15,24
  243:1 245:24
  247:2,11 252:5,14
exhibits 4:5,14 5:1
  26:23 149:20
exist 33:16

existing 22:17
23:1 98:3,9
100:10,16
exists 152:12
153:14
expend 117:6
expended 139:13
expenditure
120:14
expenditures 46:5
46:16,24 48:16
110:11,14 111:19
112:13,20 114:10
114:16,21 115:5
116:4,14 121:18
122:6 124:19,24
125:7,13 126:4,10
126:21 127:7
130:21 141:2
expenses 57:8
59:12
experience 71:20
72:11 184:4
196:14 230:4
experiencing
66:18,23 172:23
expertise 52:20
153:9,10 173:14
181:9
expiration 276:19
277:25 278:25
expires 274:17
explain 76:15 80:2
153:13 165:10
explained 73:8
116:25 117:4
134:9
explains 231:2
235:1
explanation 162:9
197:2

exploded 65:10
explosive 77:3
expressing 150:7
extent 35:18 94:18
117:5,11 121:10
133:3 151:15
154:7 157:9
163:24 193:4
197:19 239:10
240:24
extremely 66:9

**f**

f 2:17
face 225:3
facilities 61:12
facility 60:23 61:9
facing 175:18
fact 5:21 30:2 81:4
97:6 120:21
160:25 165:24
166:5 174:22
175:19 176:17
202:6 203:5 214:8
226:8 235:21
238:19
factor 35:19
156:11 191:22,25
192:21 193:2,3
197:19 200:15
201:15 254:2,11
factors 46:7,17
52:17 90:16,22
192:4 194:16,19
194:22 195:2,4
197:6,16,18 198:3
198:4 200:6,12,19
200:23 201:6,9
253:6,13 263:21
failed 216:5 219:2
fair 17:13,14
19:13 20:23 21:2

25:13 36:7 119:17
137:22 175:21
245:1
faith 138:15
false 206:4
familiar 20:10
42:22 49:11 86:22
268:3
families 36:19
153:6
family 28:15 29:16
29:20 35:11,21,23
36:3,9,10 37:1
59:21 60:18 68:17
75:19 99:16
127:10 255:20
far 28:19,24 53:20
66:22 102:13
136:7 236:20
fatalities 65:1
66:13 67:1,6 89:7
92:14 93:12 94:20
239:23 241:10,24
242:4,10 244:9
246:4,10
fatality 245:4
251:20
favor 159:15
favorable 246:16
246:19
fax 129:13
fda 86:23 91:14
92:9 192:13,23
193:1
fda's 192:19
february 178:1,21
180:5,13,20 181:1
181:15 274:8
275:4
federal 42:12
44:17 75:20

110:25 135:8,12
136:6 140:6,13
146:15
feds 136:11
fell 39:21
felons 229:13,20
felt 212:1 213:23
215:6
fentanyl 90:25
91:3,8,13,19 92:4
92:6,8,11,18 93:1
93:10,13,17 94:19
115:23 116:1
120:1,3,7 250:1,7
250:11,17,25
251:8,10,15,22
252:1
ferraro 1:22
fewer 49:18,18
field 19:8 181:20
188:7,14,16
fifth 189:24
190:23 191:16
207:14 229:14,15
259:5,24
figure 113:2
122:21 134:3
152:8 194:18
197:7 243:21
244:1 245:1,7,17
246:1
figures 65:1,12,14
67:19 79:25
fill 84:23
filled 256:6
final 7:5 94:24
95:6 132:12
160:14 174:1,4
232:21 252:7
finally 54:9 83:17

**[finance - funding]**                                                    Page 20

**finance** 51:11,14
  130:14 141:24
  142:24 144:19,24
**financial** 154:17
**financing** 111:20
  233:4
**find** 69:5 89:20
  91:9 99:12,15,15
  124:9 211:8
  212:24 214:1,9
  227:15 231:4
  251:11 275:11
**finding** 214:11
**findings** 243:13
  244:2 245:8,23
**fine** 99:25 114:4
  117:10 196:24
**finish** 69:15
  104:24,25 116:9
  144:20 145:5
  213:20
**finishing** 209:11
**fire** 30:22 40:3
**firefighters** 39:6
  39:13,24 40:13
**first** 15:6 16:22
  26:25 32:1,2,23
  48:24 56:1 57:2
  64:24 77:9,11,14
  85:25 102:8
  106:18 112:6
  137:13 141:14
  146:19 158:11
  161:25 167:18
  169:5 170:17
  175:6 184:5
  185:20 196:1
  201:17 209:17
  210:13 214:14
  229:9,11,11
  238:14 249:13

  253:9 259:16
  273:10
**fit** 171:16
**five** 88:23,25
**fka** 3:14
**flip** 102:19 171:18
  177:23
**floodgates** 187:8
  187:13
**floor** 2:4 3:20
**flow** 237:2
**flowed** 233:9
**fluctuate** 44:22
**fluctuations**
  150:15
**focused** 38:1 58:2
  64:11
**folks** 69:10 72:10
  188:7,13 195:9
  206:21
**follow** 16:20 216:5
  269:15
**followed** 231:8,22
  232:2
**following** 72:7
  212:5,7 215:15,22
  218:9,13,20
**follows** 15:8
  134:23 136:17
**food** 86:19 193:5
**fora** 141:11
**force** 7:5,5 73:10
  73:15,18,21 74:2
  74:10,13,21 75:1
  75:16 76:5,13,19
  77:5 78:7 87:11
  89:9 90:14 92:25
  102:12 172:22
  173:21,24 176:21
  187:24 193:16
  195:1 196:11

  198:12 221:6
  252:7,7,16,20
  253:4 262:12
  263:19,25
**forces** 76:22
**forecast** 38:25
**foregoing** 273:16
  273:21 276:13
  277:18
**forgotten** 25:3
**form** 18:3,13
  22:11 23:18 69:7
  127:14 128:20
  213:12 265:13
**formal** 171:19
**format** 224:23
**formed** 23:1,3,8
  33:11
**former** 19:16
  28:12 82:12
  222:13
**forms** 20:24 21:1
  91:13,18
**forth** 44:23 126:18
  148:3 214:13
  245:16
**fortuitous** 131:13
**forward** 6:5,8
  85:19 177:14
  182:1 275:15
**forwarded** 182:14
**forwarding**
  177:25
**foster** 35:13 60:5
**found** 94:15,16
**founder** 32:23
  74:4
**founders** 74:1
**four** 88:23,25
  123:17 159:21
  160:2

**fourth** 63:15 70:3
  229:15
**frank** 130:13,21
  232:24
**franklin** 2:19
  14:16,16 79:17,21
  243:6,7
**frankly** 123:15
  152:19 213:15
**fraudulent** 205:22
**free** 276:14 277:20
**frequency** 100:3
**frequently** 190:13
**front** 125:21
  161:10 177:20
  208:5
**frustration** 146:8
**full** 99:10 134:16
**function** 217:17
**fund** 58:5,19 61:12
  106:18 109:15
  114:19 145:14,24
  165:3
**funded** 80:20
  106:15 115:12,14
  120:3 133:12,14
  134:4 165:2
**funding** 20:18,19
  29:7,8,13 38:15,21
  39:1,18,20,21 42:5
  42:7,14,20,25 43:2
  43:5,8 44:25 45:3
  45:12,16,18 47:10
  48:10 49:9,13
  52:12 56:19,20,24
  61:9 80:6 82:13
  82:15,17 84:6,16
  84:17 85:3 103:20
  104:3,8,10 106:22
  109:20 110:11,13
  112:22 117:20,24

118:6 132:15
133:7,17 134:22
136:16 139:2
144:10 145:2,8
146:17 147:3,12
149:10 150:8,20
162:15,22 163:1,3
163:6,12,19,24
164:5,9,16,22,25
165:8,14 166:6
184:3 195:8,20
206:18,19 221:10
221:11 222:19,25
**funds** 39:20 42:11
44:18 45:8 47:7
47:18 48:5,20
49:1 50:13 52:15
52:18 68:7 103:14
105:23 107:1,4,17
110:24 111:1,1,6,9
112:7,7,10,18
114:12 115:12
117:1,6 123:22
124:6 134:6 139:9
139:11,13,25
140:2,2,25 141:5
151:12 162:2,3,5,8
162:10,11,14
**further** 164:20
230:25 273:19
274:1
**future** 38:16

**g**

**gained** 214:15
**gallagher** 70:4,12
70:13,17,24 71:6
71:13,17 75:4
149:15,17,17,24
149:25 150:4,5,7
150:11 159:20

**gaps** 84:23
**general** 26:4 41:5
44:3,9 49:23
83:15 86:6 96:17
141:19 153:19,19
162:15,21 165:2
183:1,14,15,25
185:22 188:15,18
194:4 207:22
221:22 222:25
243:13 244:2
245:8,23 263:2,13
**generally** 33:14
49:25 226:22
**gentleman** 113:23
**genuine** 52:7
**getting** 34:25
89:21 129:12
153:8,10 194:10
194:11,13 198:17
221:11
**give** 17:19 19:4,15
40:1 43:22 45:23
51:12 55:8 62:22
68:10 72:1 113:24
114:2 115:24
117:8 132:3
147:20 152:17
167:8 170:3
177:12 185:4
205:7 208:20
248:2 252:18
272:1,10
**given** 16:16 25:15
58:7 67:20 112:18
151:21 182:7
251:23 252:3
262:7 273:13,18
**giving** 24:2 27:11
115:17

**glad** 181:22
**glading** 201:18
**go** 16:19 18:8,13
31:1 43:3 47:17
53:4,21 60:19
61:14 66:4,5 67:2
72:5,7,8,18 83:10
99:24 107:5,23
110:9 111:21
113:1,5 115:19
118:2 121:23
122:1 150:14
160:16 163:14
170:17 174:5
179:16 197:23
198:20 207:3
213:20 215:9
219:7 228:7
231:15 235:5
237:6 243:25
246:10,12 249:9
255:20 265:19
**goes** 49:14 84:3
146:16 147:12
148:2
**going** 15:16 17:4
26:24 27:10 31:13
48:25 50:12 52:25
55:22 63:16 65:6
68:5 77:23 78:18
83:25 84:2 85:6,9
101:15 102:19
104:19 123:17,18
137:16,20 142:4
143:24 146:8
153:20 167:9
168:19,20 171:10
174:21 185:5
191:7 203:24
208:4 220:3,4
221:20 223:17

227:8 229:16
233:25 234:5,21
234:25 236:24
242:1 243:18
246:23,25 249:3
252:23 256:5
257:10
**good** 15:11,12
26:1 31:15 37:22
53:20 77:6 90:11
101:16 129:7
138:15 149:6
151:11 181:21
195:8 212:2 221:2
231:7 246:22,24
269:12
**government** 16:3
16:3 36:15 38:15
41:6 42:11,11,13
48:20 60:1 68:18
68:20 83:11,24
84:5 90:15 135:8
135:12 150:14
151:4
**governor** 32:6
173:19,25
**governor's** 176:21
**grading** 201:13,20
201:21
**gradually** 66:5
**graduate** 26:15,19
**grant** 3:21
**granted** 52:15
133:24 134:6
150:22
**grants** 40:3 42:12
111:2
**graph** 78:21 79:7
**gratitude** 232:22
**great** 54:17 130:16
148:23 149:8

154:11,17 155:8
155:19 156:1,10
157:4 161:22
**greater** 146:21
**greenspan** 70:14
70:17,19,20
159:19
**ground** 16:19
17:16
**group** 177:24
**growing** 253:22
**guess** 63:8 77:20
91:5 133:22
**guessing** 133:21
**guidelines** 186:11
187:1,12 188:1
189:9 191:3
207:14,19,25
208:25 215:16,23
216:5 217:25
218:13,18,20
219:4 220:12

**h**

**habits** 262:13,17
**half** 133:17,20
153:4 229:19
249:18
**halfway** 134:19
144:9 209:17
**hall** 226:24
**hamilton** 245:9
**hand** 27:10 79:23
85:11 110:10
155:4 239:14
262:14 263:6
274:6
**handed** 108:16
**happen** 39:20 66:8
100:12 137:8,10
159:10 222:2
232:24

**happened** 39:3
40:17 104:13,13
136:4 137:7
138:20 153:10
165:11 188:7
227:17 228:1
230:1
**happening** 89:13
158:23 165:24
198:25 210:18
**happens** 150:17
205:8 207:5
**happy** 85:13,17
165:11,23 166:1
**hard** 81:9 108:15
134:3 147:15
152:2 178:25
**harm** 35:24
269:24
**harper** 129:24,25
131:15
**hawkins** 2:9 14:12
**hbc** 3:19 14:23
**he'll** 220:7
**head** 17:20,20,24
20:6
**health** 2:7 3:13
5:10,20 14:11
20:16 21:17,22,25
22:5,8,20,22 28:10
28:13 29:21 40:21
41:1,8,24 44:11,13
45:15 57:22,25
59:8 60:1,7,8,10
60:22 62:11,17
63:2,12 75:17,18
90:6,23 106:16
108:5,24 109:1,6
109:12,16,21,25
110:3,6 114:22
127:10 143:8

144:11 145:8,14
145:25 146:10,11
146:12,18,22
147:7 149:9
154:23 155:12,15
160:24 162:17,23
163:20,25 165:3
167:12 168:7,16
169:7,23 170:8
171:14,15,20
172:12 175:13
178:18 181:10
198:24 267:10,13
**healthcare** 182:16
184:18 203:19
204:6 205:2,17
216:3 267:2
**hear** 130:5 181:22
220:14 239:17
**heard** 90:25 92:22
93:13,16,22 186:5
221:12 228:19
230:13 238:11
254:20,22 256:1
256:19 258:8,19
258:23,25,25
259:3,20,22 260:2
266:11,22 267:9
267:15,17,21
**hearing** 184:9
**hearings** 60:19
**heart** 91:5,6
189:25
**heavily** 83:24
**heights** 159:25
**held** 19:7 29:20
**help** 33:12 81:6
84:22 85:13 99:19
99:20 102:17
134:17 162:4
199:16 204:16

**helpful** 134:21
212:20
**helps** 17:6
**henschel** 3:24
**hereinafter** 15:7
**hereunto** 274:5
**heroin** 6:20 21:10
37:6 63:18,25
64:15 65:4 66:2
66:19 67:1 68:7,9
68:19 69:7,13,24
85:22 86:1,5,7
87:2,15,25 88:15
88:19 95:3,9,13,20
96:10 97:12,24
98:2,8,16 100:21
214:18 233:7,19
233:25 234:5,12
237:2,14 240:4,13
240:19,25 241:3
**hesitation** 259:8
**hhh** 45:18
**hhs** 45:6,11 115:12
120:4 160:6
164:24 165:8
**high** 34:18 227:9
**higher** 190:17
202:6,7
**highest** 65:6 82:2
**highland** 159:25
**highlighting** 209:4
209:7
**highway** 29:25
30:3 75:22
**hire** 23:7
**history** 26:5
202:25 250:18,25
261:5
**hit** 127:22
**hocking** 80:21

[hold - indicate]

**hold** 196:19,19
213:18,18
**holdings** 3:15
**home** 236:18
**homeless** 57:11
**homeowners** 34:2
**homes** 34:21
156:20 157:16
**homicides** 65:18
65:22
**honest** 156:18
**honorary** 54:13
**honored** 50:14
52:14
**hope** 84:25 93:8
186:21 236:18
**hopes** 84:21
**hospital** 43:9
49:15,15 190:14
191:8 201:13
214:11
**hospitals** 75:24,25
76:9 147:2 201:22
211:19 215:1,3,15
215:21 216:4
217:1,12,16,25
218:12,17 219:2
219:17 220:13
258:7
**hours** 119:10,11
119:11
**house** 184:16
**housing** 57:13
**houston** 3:16 15:1
15:1
**hovered** 65:23
77:24
**huge** 99:22
**huh** 16:15 28:6,17
37:11 53:18 58:9
76:2 80:24 95:5

95:10 103:6
126:11 130:9,23
132:2 134:25
138:2 139:5 143:1
169:12 179:10
180:23 185:17
210:17 211:20
215:17 217:20
225:6 231:17
234:24 237:11,22
238:22 244:7
**human** 45:15
114:22 163:20,25
165:3
**humans** 94:5
**hundred** 62:21
**hundreds** 178:25
178:25
**hurd** 37:19
**hydrocodone**
192:15

**i**

**idea** 17:3 26:1
152:10 153:20
189:6 197:25
**identification** 27:8
55:4 108:8 131:11
142:14 161:3
166:21 174:19
177:18 182:5
208:16 223:15
234:15 242:21
247:8 252:11
**identified** 19:20
106:11 117:16
126:5 200:13,23
201:6 229:5
235:17 236:1,6
263:23
**identifies** 126:8

**identify** 14:6
112:17 115:3,23
125:6 127:3
137:14,25 236:7
**identifying** 119:16
**iii** 185:1,10,16
189:20
**illegal** 86:8 87:3
91:19 92:5,8,11
94:7 203:25 204:5
256:24
**illegally** 91:19
92:18 93:2,10,14
93:18 94:10 101:6
101:21 102:9
**illegitimate** 204:4
**illegitimately**
203:21
**illicit** 94:19 240:4
**illness** 20:21 29:9
49:16 57:17 61:4
61:17 62:3 66:1
203:1 227:24
**illnesses** 195:21
**imagine** 155:22
**impact** 36:19
42:15,20,23 94:2
116:23,24 155:14
156:1 163:7 166:8
219:16 223:1
226:11
**impacted** 154:17
154:20 164:15,19
187:15 188:2
**impacting** 230:22
**imperative** 199:8
199:12,23
**impinge** 18:25
**implicated** 179:22
180:11

**importance** 115:9
**important** 16:22
17:4,22 89:14
90:7 198:24
229:22
**imported** 91:20,23
**improvement**
32:24 33:2,8,15,22
34:6,11,15
**inadequate** 84:17
145:7
**incarceration**
147:22,23 229:19
**inclined** 192:24,25
193:1
**include** 21:3,5
54:8
**included** 163:13
166:12 275:13
**includes** 195:22
**including** 84:9
152:14 183:2
257:4,24 258:14
**inconsistent**
211:23,25 212:1
**incorporated**
32:24 33:2,9,16,23
34:7,12,15 277:12
**incorrect** 97:12,13
97:24
**increase** 64:4 65:9
92:14 99:22 104:7
120:22 123:8
166:4
**increased** 191:9
**increases** 165:1
**increasing** 95:3
164:6,10
**index** 4:1,5 5:1 8:1
**indicate** 55:10
139:23 210:8

214:24
indicated 21:14
44:24 45:21 52:11
68:25 77:8 105:7
111:7 114:9,20
120:14 150:19
207:11 215:14
236:17 266:4
indicates 31:3
32:5,22 37:8
74:18 97:9 109:5
110:24 135:1
136:21 142:22
143:12 164:22
176:23 189:20
248:20
indicating 172:12
275:13
indication 175:6
individual 123:16
130:18 211:9
214:10 251:6,21
251:24 256:16
261:1,5,24
individualized
261:11,19
individuals 20:20
30:25 51:9,22
61:15 62:9,18
63:1,10 73:16
95:13 98:1,8,14,20
100:3,8,14,19
101:3,11,12,18
102:7 113:19
124:1 166:3
167:11 175:4
179:18 180:6
195:20 216:8,9,12
216:25 229:4
240:2,8,24 250:16
250:23 251:13

260:13
influence 85:1
influential 171:24
influx 121:4
inform 41:16
information 19:21
19:25 41:6 81:2
84:21 88:7,14
95:24 96:3,7,23
97:8 102:1 138:23
177:25 182:15
214:1 217:5
235:19 239:15
250:22 251:11
254:16
initiated 240:3,9
initiative 5:24
139:2 166:17
initiatives 134:20
139:10 168:17
inner 225:18
226:21,25 230:7
230:19
input 131:22
ins 34:9
insofar 200:20
instance 169:1,19
instances 52:12,14
103:11 104:1
105:20 106:10,24
107:15 150:21,23
216:3
institution 229:16
instruction 272:2
272:10
intended 128:17
interactions
204:25 205:15
interchangeably
241:1

interest 51:18 52:7
52:8,10
interested 274:3
internet 103:5
264:15
interpret 83:21
interview 6:21
234:13
intractable 185:24
186:2 188:19
207:24
introduced 15:13
92:12,19 93:1,11
93:17 94:11
investigate 89:10
173:14
invincible 154:2
invitation 171:19
involve 20:24
involved 36:14
51:5 68:15 75:15
122:6 147:14
148:16 179:25
225:9
involvement 25:22
172:21
issue 18:15 82:15
141:6,11 151:23
152:25 170:21
197:4
issued 173:25
252:20
issues 37:25 38:3,6
38:9,11 41:15
64:12 96:13
141:20,24 175:17
176:13 223:1
item 57:2 59:15
60:20 63:15 68:5
113:5 117:17
204:9

items 253:25

j

jackson 3:4 14:20
232:24
jacksonkelly.com
3:6
jail 147:22
janderson 3:6
jane 37:14,16
janssen 2:13 14:15
269:14
january 1:20 14:2
178:16
jargon 68:12
jennifer 2:14
14:13 167:2
269:13
jennifer.steinmetz
2:16
job 25:8 34:25
53:20 90:12,13
119:12 146:8
148:23 151:9,10
152:7,9 195:6,7,10
196:1
jobs 156:20
157:16 229:21,25
john 3:9 14:24
37:18 270:25
johnson 2:13,13
14:14,15 269:14
269:14
joined 14:12
joint 258:23 259:1
259:3,9,16,17,23
jon 3:4 14:19
270:23
jones 2:18 14:17
jonesday.com
2:21

**judge** 1:10 18:6
**judges** 227:8
**judgment** 261:25
**july** 7:2 21:24
  22:11,23,25 23:9
  247:5,11,20 248:6
  274:17
**june** 22:10,23
  131:14 135:24
  136:5
**jzipp** 3:12

**k**

**k** 2:17
**keep** 92:1 119:15
  121:10 124:10
**kelley** 1:22
**kelly** 3:4 14:20
**kennel** 30:23
**kept** 65:14,15
  139:11
**kids** 34:18
**kill** 64:6 69:10
**kind** 52:2 62:10
  122:24 123:20
  177:23 259:14
**kinds** 190:3
**kits** 106:13
**klauss** 1:24 273:6
  274:14
**knew** 38:5 65:19
  87:5 95:21 180:5
  180:10 181:14
**know** 17:7,20
  18:18 20:2 25:5
  35:6 44:14,21
  52:21 53:17 55:17
  57:20 62:20 63:14
  67:5 68:11,23
  69:6,10 72:20
  80:14 83:4 84:13
  85:18 87:5,6,16,19

88:19,22 89:18,19
90:10,19,19,20,24
91:10,22,22 92:17
94:18 95:14,14,15
95:22,23 96:1
97:6,13 99:1,7,8
99:21,22,23,25
100:6,13,18 102:3
102:4,6,10,13
114:5 115:16,17
120:20 121:3,3,15
121:25 122:13,15
122:15,20,22,23
123:1,12,15,18
126:6,6,7,25 127:2
127:15,15 130:15
133:13,22 134:1
134:14,15 135:15
135:15,16,21,22
135:22 136:7,11
136:12,25 137:1,4
137:5,6,8,17
138:16,18 140:12
140:21,24 141:21
143:16 145:9
146:7,9 148:1,8,8
148:9,10,11,16,17
149:19 150:10
151:20,22 152:3,4
152:19,21,22,23
153:6,6 154:3,20
154:21 156:4,14
156:14,17,18
157:13,15,15
158:3 161:20
162:21 163:2
165:10 170:4
173:4 174:7 178:6
178:11 181:6,7,8
183:6,19,22 184:2
186:4 188:5,6

189:12,13 190:20
190:24,25 191:1,2
191:7,20,21 193:8
193:11,12 197:9
198:24 199:10,14
199:16,16,19
205:12 206:11,14
207:4,10 213:14
213:22 214:8,9,14
214:20 218:21
219:16,17 228:14
239:17 240:1,7
241:5,6 242:7
243:3,23 245:11
246:8,18,18 249:1
250:21 251:2,3
254:23 255:1,2
256:12 258:11
259:1,2 261:15
263:5 265:2 266:9
266:14,25 267:12
268:14,14,15,16
269:18 270:8,12
**knowledge** 19:21
  19:25 75:2 97:7
  155:24 196:13
  198:10,13 211:15
  235:18 236:1,7,8
  239:16 254:15
**kurt** 3:24

**l**

**l** 1:24 2:14 3:4
  33:2,2,4,4 273:6
  274:14
**l.p.** 1:14
**label** 5:5,8,11,14
  5:18,22,25 6:4,7
  6:10,14,18,21,25
  7:3,6 27:7 55:2
  108:7 131:9
  142:13 161:2

166:19 174:18
  177:16 182:3
  208:15 223:13
  234:14 242:19
  247:6 252:9
**laboratory** 91:25
**laced** 250:24 251:8
  251:15,22,25
**lack** 38:14,20 96:9
  221:10 222:19
**lamp** 247:13,16
**language** 136:14
  192:6
**large** 45:15 76:21
  179:24
**largely** 226:9
**larger** 79:20
**largest** 40:17
  79:15 225:20
**late** 186:13 189:2
  192:12
**laura** 248:10,17,18
  248:20
**law** 96:4,10,15
  227:19 228:11,16
  229:1 232:13
  255:15 256:9
**lawful** 15:4
**lawfully** 86:13
**lawsuit** 15:16
  19:22 20:1,3
  25:16,20,23
  235:20 251:19
  266:7,10,15 268:1
  269:15,20 270:14
**lawyer** 118:19
**lawyers** 19:20
  178:14 235:17
  236:6 270:22
**lay** 39:4,12,23

**laying** 40:12
**leader** 171:24
**leadership** 170:18
  170:24 187:21
**leading** 67:6
**leads** 157:2
**learned** 91:10
  147:19
**leave** 113:24 114:3
**led** 28:20
**lee** 3:5
**left** 113:25 134:14
  149:3 243:19
  266:3
**leg** 145:3
**legal** 86:8 92:4
  255:23 275:1
  278:1
**legally** 91:4,11
**legislation** 44:3
  185:23 187:6
  188:24
**legislative** 6:13
  44:8 184:18
  208:13
**legislator** 221:2
**legislators** 220:14
  220:16,17
**legislature** 146:24
  187:7 192:2
  217:11,17,24
  218:23 219:16,24
  220:19
**legislatures** 147:5
**legitimate** 91:14
  101:7,22 203:7,11
  255:7
**letter** 275:19
**letting** 145:9
  148:14

**level** 80:20 84:16
  89:6 115:8 145:16
  146:1,3,4 189:25
  190:15 219:24
  221:15 241:17
  242:3
**levels** 46:25 156:1
  156:12 157:5
  172:24 188:3
  191:17 207:7
  227:3
**levies** 110:25
**levy** 5:21 45:6,11
  45:18 114:23
  115:12 120:4
  157:19 158:2,12
  158:18 159:15
  160:7,13,25
  161:13,19 163:20
  163:25 164:24
  165:4,8
**lexington** 2:4
**liaison** 2:7 3:3,8
**licensed** 86:14
  101:6,21 202:13
  202:17 203:12
  205:2,17 255:14
  256:15 260:3,23
  261:3 268:10
  269:5
**lies** 94:14
**life** 57:10
**light** 207:17,23
**limit** 193:20
**linda** 247:13,16
  248:21
**line** 84:17 95:2
  113:5 117:16,25
  118:6 169:5
  275:13 277:7
  278:3

**lines** 80:19 243:19
**list** 37:22 57:2
  59:15 63:15 204:9
**listed** 81:23
  238:19 253:25
  277:7,17
**listing** 277:7
**literally** 178:25
**literature** 117:3
**litigation** 1:7 14:4
  26:10 27:14 275:6
  276:3 277:3
**little** 28:7 38:23
  42:24 59:3 90:2
  111:13 112:4
  134:17 139:24
  174:25 179:21
  188:11 222:15
  230:25 252:17
  262:14
**live** 179:2
**lives** 76:14,19
**living** 57:9 145:10
**llp** 1:22 2:8,14 3:9
  3:15,19
**lobbied** 158:17
**local** 33:10 145:15
  146:1,2,4 147:2
  151:16 171:25
  258:6
**locally** 149:5
**location** 61:10
**locations** 128:3
**lodges** 18:8
**long** 22:21 23:12
  24:9 36:14 49:21
  54:21 67:21,24
  68:19,22,22,23
  118:2 129:25
  196:13

**longer** 23:20 43:4
  49:19,19 58:6,21
  190:17
**longtime** 196:9
**look** 27:23 55:8
  71:10 78:25 80:16
  85:10 97:3 112:6
  125:24 132:4
  134:18 136:14
  137:18 144:2
  167:8,16 170:16
  175:5 176:17
  184:13 185:4
  186:23 194:1
  208:21 209:9
  221:23 224:23
  237:4 243:16,18
  243:24 244:20
  248:3,9 269:8
**looked** 25:10
  41:11 100:25
  102:13 146:16
  149:12,21 150:5
  170:6 194:4 197:4
  225:21
**looking** 32:14
  77:22 79:6 81:4
  87:25 117:9,10
  134:2 234:20
  243:14 245:1
  246:1
**looks** 26:14 78:20
  82:1 88:6 103:2
  109:16 178:7
  184:21 200:10
  248:7
**lose** 156:20 157:16
  157:16
**loss** 163:3,6
**lost** 39:8

**lot** 17:9 23:19 38:18,19 152:17 259:9,17
**louisiana** 2:19
**low** 66:2,3 80:11 202:1,3
**lower** 66:22
**lowest** 82:3
**lunch** 161:7,15

**m**

**madam** 275:10
**main** 1:22 2:15 225:22
**maintain** 31:19
**major** 30:20 35:22 36:8 40:15 41:15 42:7 45:7
**majority** 42:9 61:3 61:23,24 71:11
**makers** 205:22 206:5
**making** 56:1 63:21 144:18,24 153:11 158:4 181:21 226:5 232:24 261:19
**management** 208:24 211:18,23 212:8 214:12,25 215:2 217:11,25 218:3,9 231:6,21 232:1 253:21
**mannix** 3:20,22 14:21,22
**manufactured** 258:15
**manufacturer** 269:24 270:4,13
**manufacturers** 204:20 205:1,16 269:20 270:9

**map** 66:6
**marcus** 3:19,22 14:22
**marijuana** 250:4 250:12,24 251:7 251:10,25
**marilee** 178:2,5
**mark** 26:24 223:17
**marked** 5:2 27:7 55:3,6 74:18 108:7,16 131:2,10 142:13,17 161:2 161:11 162:9 166:20 168:2 174:18 176:18 177:17,21 182:4,8 208:15,19 223:14 234:14,18 242:20 242:24 245:23 247:7,10 252:10 252:14
**market** 92:19 94:11
**marketing** 253:23 254:3,7,13,16
**marking** 26:23
**mart** 2:18
**masked** 61:5
**materially** 237:24 238:5,11 239:6
**math** 159:13
**matt** 7:2 247:4,19 247:22 248:22
**matter** 14:3 69:7 84:13 152:7 153:25 227:22
**matters** 16:6,11 236:14
**mayor** 31:11 37:9 38:2 39:2,4,9,11

39:23 232:23
**mccormack** 37:15
**mckesson** 3:8 14:25 267:17,19
**mdl** 1:7,9
**mean** 16:23 17:21 38:4,24 41:20 45:24 47:24 49:12 51:1 62:2 71:8 83:21 88:13 96:20 113:16 115:16 120:11 145:20 153:13,17 159:13 188:23 193:25 211:21 213:9,20 218:6 219:22 225:7,8,15 226:19 236:8 257:12
**means** 64:21 88:3 88:5 194:8 254:25 255:3 260:17 262:21,22,24
**meant** 33:5 111:12
**measure** 218:12 218:19
**measures** 219:3
**medicaid** 42:14,18 42:22,25 43:2,6,7 43:10,24 162:16 163:1,2 164:5,15 164:16,17
**medical** 30:22 67:20 73:11 74:19 74:24 75:14 88:4 88:7,15 91:15 94:15 101:7,22 171:15 173:7,13 187:19 188:7,13 188:16,22 189:3 189:22,23 190:20 190:22 191:2

196:8 202:25 205:24 206:8 207:7,12,17 208:25 209:22 210:19 217:18 225:19 228:11 251:4,8 255:7 261:5
**medically** 49:20 105:12 106:22 115:20 261:13,20
**medicating** 262:12 262:17
**medication** 86:5 100:20 132:23 133:8,15 134:7 192:21 202:5,20 203:20 232:13 255:8,13 256:16 258:15 260:25 261:12,18 262:1 268:8,20 269:4
**medications** 18:24 86:12,18 100:9,15 101:5,20 102:8 179:22 180:8,11 186:12 187:2 188:2 189:11 191:6 192:14 204:6,21 205:2,11 205:19,23 206:5,6 206:8 209:2 211:14 216:6 219:5 240:25 241:2 254:14,18 257:5,25 260:5 262:2 263:2,13
**medicine** 255:21
**meet** 24:4,7,9
**meeting** 24:11,17 176:24 184:11

**meetings** 24:13
52:6 73:23,24
117:2,6 175:17
176:10 226:21
227:9
**member** 32:11,18
41:14 92:25 143:7
146:24 149:14,24
150:7 159:2
**member's** 255:20
**members** 41:20,21
51:4,16 59:24
74:6,9 159:1,1,14
159:15 175:18
183:2
**membership**
41:17 182:14
**memo** 222:5
**memorandum**
170:12
**memory** 18:25
25:2 109:24 138:9
167:10 168:5
**memos** 220:20
**mental** 5:20 20:16
20:21 21:16,21,25
22:20,22 28:10,13
29:9,21 44:13
49:16 57:17,21,25
59:7 60:1,7,8,10
60:21 61:4,10,16
62:3,10,17 63:1,11
143:7 144:11
145:8,14,25
146:12,18,22
147:7 154:23
155:12,15 160:24
162:16,22 181:10
**mentioned** 120:1
122:16 124:4
125:23 129:15

143:19 151:23
269:17
**mentions** 170:12
**message** 69:9
143:13
**met** 24:5
**meth** 37:6
**methamphetami...**
21:6
**method** 119:6,8
**metrohealth** 76:3
106:14 115:10
124:18
**mexico** 93:19
**michael** 70:4,11
70:13,14,24 71:5
71:13 149:17
**microphone** 58:25
263:7
**mid** 16:11,14
**middle** 110:17
155:11
**midwest** 275:17
278:1
**miller** 51:15
222:13
**million** 46:1 149:3
162:18,24 163:7
**mills** 264:16
**miltner** 167:2
169:1 172:11
**mind** 36:23 102:17
102:18 114:7
126:4 227:8 265:8
**minds** 152:12
**mindset** 146:10
**mindsets** 263:1,12
**minority** 71:7,8,10
83:16
**minute** 97:17
140:17 160:17

197:10 231:9
248:2
**minutes** 176:23
**miscellaneous**
115:21
**misinterpreting**
155:9
**misleading** 205:21
206:3
**missed** 160:3
**missing** 249:5
**misspeak** 235:23
235:24
**misspelled** 33:6
**misspoke** 30:1
**misstated** 230:14
**mistake** 69:20
**mistakenly** 203:21
**mitigating** 46:25
**moira** 3:20 14:21
**moment** 53:22
55:8 97:1 113:24
154:8 167:19
170:5 177:23
208:6
**moms** 153:2
**money** 42:10,10
42:15 43:22,24,25
44:1 50:1 52:25
57:12 60:11,16
61:14 71:3 81:5
82:22 83:5 84:22
102:24 103:25
104:21 107:20
115:13 117:12
120:3,6,9,18
122:17 124:5
135:11 136:21
138:5 139:17
140:12 147:18,21
148:20 151:10

221:25 229:24,24
**moneys** 134:15
165:16
**months** 32:3 130:2
**morning** 15:11,12
28:19,24 54:7
64:17
**mothers** 152:25
**motor** 67:8
**move** 208:4
**moved** 34:1 165:3
**moving** 40:16
85:19 166:23
**muggings** 34:9
**multiple** 99:20
229:12 256:5
**municipal** 31:2
**muscle** 145:3

**n**

**n.d.** 1:15
**n.w.** 2:10,19
**name** 15:15
113:23,25 114:1,7
130:17 159:24
167:2 178:2
220:20 243:2
247:13 267:15
269:13 275:6
276:3,4,15 277:3,4
277:21
**named** 32:24
266:15,18 267:25
273:9
**names** 37:5 51:12
270:12
**nan** 183:2 220:25
**napoli** 2:3
**napolilaw.com** 2:6
**narcan** 106:13
115:9,11 124:4,7

**national** 1:6 14:3
  275:6 276:3 277:3
**nature** 34:10
  47:11 179:12
  216:17,19 254:16
**near** 139:4
**necessarily** 260:12
**necessary** 238:17
  260:20 261:13,20
**need** 44:7,8 53:12
  56:19 101:7,22
  104:20 151:14
  159:7 170:4
  199:16 206:20
  208:21 211:5
  212:22,23 243:15
  243:17 263:9
  264:1
**needed** 49:20 53:4
  151:9 159:2,6
  206:20 210:23,25
  215:6 260:12
**needing** 123:11
**needle** 115:24
**needs** 5:10 49:15
  76:25 99:19,20
  108:6,18 109:7
  199:16
**neighborhood**
  33:13 34:6
**never** 48:4 74:3
  151:21 195:24
  213:6 214:10
  227:8 259:3,22
**new** 2:5 3:17
  34:17 39:2,4
  68:22 140:8 141:5
  141:5 150:12,13
  150:14 192:13,20
  249:19

**newly** 23:3,8
**news** 96:21,22
  117:3 235:1
**nice** 90:10
**night** 235:2
**nine** 71:12 159:2,7
**nod** 17:19,24
**non** 45:18 162:16
  164:5,15,16
**nonaddictiveness**
  270:5
**nonprofit** 42:13
**nonverbal** 17:19
**nonviolent** 229:11
  229:12
**nope** 267:3
**normal** 17:18
**normally** 202:8
**northern** 1:2
**notable** 36:23
**notarized** 275:14
**notary** 14:18
  273:6 274:14
  275:25 276:10,18
  277:15,23 278:23
**note** 275:12
**noted** 207:20
**notice** 77:10
**noticed** 77:15,17
  78:1 235:16
**november** 55:12
  56:2 66:15 75:8
  85:20 108:19
  118:4
**number** 5:2 37:4
  56:17 66:1 68:6
  78:22 85:10,11
  96:13 110:9
  132:24 142:5
  148:19 166:3
  174:21 185:10

189:19 191:8
  192:12 212:15
  224:24,25 229:20
  241:23 246:2,4,9
  275:7,13
**numbered** 78:18
**numbering** 85:8
**numbers** 42:9
  49:25 65:12 66:11
  67:14,22 68:24
  78:25 82:21 85:8
  202:6 277:7
**numeral** 185:1
**nurse** 190:12
  224:10,12
**nurses** 224:8,9
**nw** 3:10
**ny** 2:5 3:17

---

### o

**o** 219:13
**oacbha** 143:9
  175:7,11,25
  176:12 178:8,22
  182:9,14
**oakar** 37:18
**oarrs** 211:6 212:9
  212:13,20 213:3
  213:16 214:3,15
  214:17,20 219:9
  219:13 232:4,11
**object** 8:2
**objecting** 18:14
**objection** 8:1,3,4,5
  8:6,7,8,9,10,11,12
  8:13,14,15,16,17
  8:18,19,20,21,22
  8:23,24,25 9:1,2,3
  9:4,5,6,7,8,9,10,11
  9:12,13,14,15,16
  9:17,18,19,20,21
  9:22,23,24,25 10:1

10:2,3,4,5,6,7,8,9
  10:10,11,12,13,14
  10:15,16,17,18,19
  10:20,21,22,23,24
  10:25 11:1,2,3,4,5
  11:6,7,8,9,10,11
  11:12,13,14,15,16
  11:17,18,19,20,21
  11:22,23,24,25
  12:1,2,3,4,5,6,7,8
  12:9,10,11,12,13
  12:14,15,16,17,18
  12:19,20,21,22,23
  12:24,25 13:1,2,3
  13:4,5,6,7,8,9,10
  13:11,12,13,14,15
  13:16,17,18,19,20
  13:21,22,23,24,25
  18:3,5,8,12 23:18
  36:16 37:3 39:16
  44:19 53:14 62:19
  63:4,13 66:20
  67:17 78:13 80:4
  84:11,24 86:15
  87:4,12,18,22
  89:17 90:9 91:17
  91:21 92:15 93:20
  94:8,13 98:5,11,17
  98:22,25 99:6
  100:22 101:2,8,23
  102:14 110:2
  111:22 113:3
  118:17 123:14
  126:24 127:8,14
  127:18 128:1,11
  128:23 129:3
  133:10 135:14,20
  136:24 137:3,23
  138:11 139:18,22
  141:8,17 142:3
  145:17 148:7

149:1 151:19
154:19 156:3,8,13
157:7,14,20,23
158:1 169:18
177:7 181:5
186:18 193:7
195:16 200:7
203:2,8,22 204:22
206:2,16 207:1,9
208:2 213:5,12
214:7,23 215:20
221:8 222:4 223:2
224:4 225:16
226:3,14 232:14
233:3,11,16,20
234:2,8 238:1
239:24 240:5,11
240:16,21 241:4
242:11 244:21
246:17 250:9,13
250:20 251:16
252:2 255:9,16,24
256:10,17 257:6
257:19 258:2,21
260:8 261:7,14,21
262:4 263:4,15
265:14 266:20
268:11,22 270:10
270:15
**obtained** 101:5,20
102:8
**obviously** 37:20
**occasion** 105:1
**occasions** 31:5,10
142:5
**occurred** 146:23
156:4 214:10
227:23
**occurring** 179:13
**october** 7:6 118:4
182:8 184:19

201:6 252:8,15
**odh** 5:23 166:16
**office** 51:2 67:20
74:24 75:20
212:11 248:6
251:5 274:6
**officer** 28:4,9 29:3
40:4 46:3,14,22
47:5 56:7 64:11
67:13,25 92:24
100:1 113:12,15
116:6,16 129:2
139:15 170:19
205:9 218:16
244:15 263:19
**officers** 38:17 39:5
39:12,24 40:12
**official** 213:24
276:15 277:21
**officials** 96:11
145:13,20,21,24
151:16 152:12
**oh** 2:15 33:5 53:2
68:21 70:10,22
107:12 130:16
149:25 154:12
157:1 161:9
189:16 196:5
201:21 232:5
235:22 238:24
264:12,25
**ohio** 1:2,13,15,23
7:4 14:5 30:4 32:6
40:20,25 41:2,8,23
43:6 44:3,10,12
82:13,23 83:4,20
106:16 141:19,24
143:25 144:18,24
147:11 148:4,18
155:1 156:15
167:12,13 168:7

168:15 169:7,23
170:7,10 171:20
172:12 173:23
175:12 178:17
179:13 181:15
183:1 184:16
185:23 187:6
189:22 190:20
191:2,4 192:2
200:17 206:24
207:6,12,16,21
219:23 222:25
225:20 232:13
233:8 243:12
244:1 245:7,10,16
245:22 252:6,15
252:19 253:3
262:11 263:24
273:2,7 274:7,15
275:2
**okay** 18:11,16
25:13 26:6 33:7
46:12 47:15 48:17
53:19 62:25 69:18
79:5 80:18 81:6
81:11,18 93:5,9
101:14 103:22
110:8 112:3
114:24,25 116:12
119:14 121:6
128:16,18 130:16
134:17,21 136:23
137:16,21 143:1
144:22 146:3
154:7 161:22
166:23 167:15,23
169:17,21 174:2
177:1,9 178:9
179:8 182:22
184:1 185:13,14
186:24 189:18

195:23 196:5
197:11,23 199:3
201:4 209:12
220:7 221:18
230:16 231:4
235:12 236:13
242:2 243:25
244:1 249:11,12
264:4 265:6,7
266:13 269:16
**oldfield** 178:2,5
**ones** 38:19 44:22
64:24 74:4 75:23
112:15,16 116:19
244:25
**op** 1:15
**open** 5:17 91:6
142:10 255:20
**opened** 120:22
187:7,13
**operating** 206:7
**opiate** 1:7 14:4
19:11 48:12 63:18
63:25 64:15 65:4
68:7,9 69:7,24
70:7 71:21 72:18
73:10,14,20 74:2
74:10,12,20,25
75:16 76:4,13,18
78:7 87:10 92:25
102:12 121:4
123:9 124:2
127:21 140:18
153:24 172:21
178:15,21 179:6
179:19 180:16
181:3 187:23
193:15 195:1
196:11 198:12
206:21 210:5
214:18 221:5

256:7 263:18
275:6 276:3 277:3
**opiates**  86:9 107:7
120:23 121:6
128:4
**opinion**  268:12
**opioid**  5:13 7:2
46:7,18,25 47:8,18
48:6,17,21 49:2
50:4 51:19 52:13
52:19 64:11,17
66:19 67:1 69:13
77:10 78:10 85:22
86:5,12,18 89:6
90:17 100:9,15,19
101:4,20 102:8
103:15 104:3
105:4,23 107:2,17
111:21 112:12,20
114:11,17 115:6
116:18 117:7
119:23 120:19
121:1,12,20
122:19 126:21
127:6 131:7,16,21
132:16 141:2,6,11
141:20 146:23
148:5 150:9,21
151:17 152:1
153:16 156:12
157:5,11 163:8
166:9 167:13
168:8,18,21
170:10 172:14,25
173:15 176:13
177:5 179:13
180:8,11,21 181:3
181:16 183:10,24
184:3,6 186:12
187:2,15 188:2,3
189:10 191:5,17

192:14,16,20,21
193:6 194:16
197:17,20 199:6
199:25 201:9,15
201:24 202:20
203:20 204:5,21
205:1,11,16,19,23
206:4,6,8,12,24
207:8 209:1
210:10 211:14
212:21 216:6
219:4 220:12
223:25 225:25
226:8,13 227:4
230:7 232:12
237:20 238:5
239:6,11,22,22
240:8,10,25 241:2
241:9,24 244:9
246:3,9,15 247:4
247:19 248:23
249:1,15 253:6
254:3,8,10,14,17
254:25 255:3,8,13
256:13 257:5,25
258:14 260:4,6,25
261:12,18 262:2
262:18 263:3,14
263:22 264:6
267:6 268:8 269:4
**opioids**  100:21
106:23 120:15
124:20,25 125:7
127:24 141:25
151:3 152:15
187:9,13 190:4
191:15 208:1
214:5 215:24
228:13 240:3,4
250:19 251:1
253:22 254:4,7

255:22 270:6
**opoid**  228:21
**opportunity**  22:2
25:18 115:25
118:10
**opposed**  59:7
176:3 228:11,23
256:14
**opposite**  230:9
**order**  58:4,19 82:2
89:16 90:5 141:5
198:22 199:4,13
199:24 249:6
**ordered**  22:9
**orderly**  16:21
**organization**
40:23 41:9 59:25
109:2,15 110:4
143:6 175:15
178:8
**organizations**  34:4
42:13 239:15
**organized**  82:2
**organizes**  125:12
**original**  74:4,5,9
**osiecki**  53:17
55:11 121:24
129:15,16,23
130:7,10 142:18
142:22 208:24
235:1 248:19
**osiecki's**  143:11
**ought**  198:4 211:7
**outcome**  158:20
**outcomes**  34:21
**outlines**  244:3
**outpatient**  126:15
**outside**  217:17
**overall**  152:13
**overarching**  76:12

**overcome**  152:8
**overdose**  6:24
46:8,18 47:1,9,18
48:6,22 49:2 50:4
51:19 64:12,18
66:13 67:1,5
78:11 89:7 92:14
93:12 94:20
103:16 104:4
105:5,24 107:2,18
114:11 116:18
141:7 163:9
168:18 169:10
170:1,13 171:1,12
173:15 176:14
177:5 180:22
181:4,17 187:15
188:3 192:22
199:7,25 207:8
239:22 241:10
242:4,9,17 243:11
243:12 244:2,4,9
245:4,8,22 246:4,9
250:24 251:3,7,9
251:14,20 253:7
254:8 262:18
263:22
**overdoses**  66:13
77:11 90:17
172:25 191:18
237:20 241:18
246:3,15 267:6
**overdosing**  250:16
251:21
**overprescribing**
260:14,14,16
**oversee**  29:6 30:20
35:12
**overt**  190:2
**overtime**  119:9

owned  57:9
oxford  3:20
oxycodone  179:25
oxycontin  179:19

**p**

p.m.  209:16
  271:10
pa  3:21
page  8:2 70:2 79:6
  102:17 110:8,10
  110:18 134:18,18
  135:19 137:13
  139:1 144:9 155:3
  155:3,4,11 161:25
  162:3 167:18,20
  170:17 171:18
  176:18,20 179:16
  179:17 182:12,18
  182:19,21 184:25
  209:5,17 224:20
  230:25 231:14
  232:17,21 236:23
  243:21 245:17
  249:5,13,19 253:1
  253:9,10 262:10
  263:24 275:13,15
  277:7 278:3
pages  81:10 82:21
  85:7 179:5 253:2
paid  40:7 119:5,7
  119:9,12
pain  179:22
  185:24 186:2
  187:8 188:19
  189:4,24,25 190:3
  190:15,19,23
  191:5,9,16 192:14
  192:20 201:14,23
  202:2 203:10
  204:17 207:14,24
  208:24 211:18,23

212:8 214:12,25
  215:2 217:25
  218:3,9 231:6,20
  231:25 253:21
  259:4,24
painkillers  240:19
paper  178:16,22
par  3:13,14,14
  15:3
paragraph  27:24
  28:2,5 70:3,21
  73:7 75:3 143:11
  164:21 170:16
  171:21 172:5
pardon  96:6
  224:11 228:5
  234:3
parentheses  28:11
part  45:7 53:5
  54:12 69:1 90:3
  92:23 102:20
  115:14 131:24
  146:19,20 147:12
  151:4,7 172:20
  179:1 194:21
  218:7 238:10
  259:19 277:9
participate  73:11
participated  24:17
particular  27:25
  38:9 51:18 57:24
  78:16 80:7 87:24
  125:25 179:5
  184:11,14,25
  202:13,13,21
  203:14 205:14
  236:23
particularly  36:23
  37:2 51:5 64:11
  171:9

parties  60:6
  267:25
partner  73:9,20,22
  76:4 187:23
  193:15 194:25
  196:10 263:18
partners  60:2
  74:20,25 75:15
parts  22:6 96:18
  145:18,19 176:14
  225:24
party  84:6 274:3
pass  159:5 161:13
  161:18
passage  43:15
  164:23 207:23
passed  44:3,8 79:3
  185:23 189:1
passing  188:19
patient  202:21,25
  203:14 261:1,13
  261:20 268:9
patient's  261:5
patients  202:14
  216:15
patrol  75:23
pattern  66:22
paul  2:9 14:10
  15:15
pay  40:3 43:24,25
  57:8 60:18 107:5
  205:5
paying  58:13
  138:13
payment  217:11
pays  43:10
pboehm  2:11
people  19:8 21:16
  25:15 37:14 38:3
  38:7 40:16 61:3
  61:23 62:5 77:10

77:12 80:22 89:8
  89:20 91:5 94:16
  96:18 118:1,3
  123:11 145:10
  148:1,13 152:3
  153:18 156:19
  157:16 171:6,7,8
  177:25 181:15
  188:8 220:15
  227:14 229:25
  231:24 233:14
  248:14
percent  61:24,25
  62:4,5,9 72:6,8
  128:3,4 144:12,13
  146:12,12,18,18
  162:19 179:24
  229:15
percentage  57:20
  100:13,18 102:6
  111:5,19 112:22
  240:1,7 256:12
percentages  44:15
percodan  179:20
perfect  17:10
perfected  237:14
period  35:2 36:1
  49:19 61:25 63:7
  65:10 89:1 113:11
  113:13 124:14
  149:5 161:17
periods  31:1
  113:19 123:10
person  49:14
  81:19 99:11
  130:14,14,21
  143:19 147:8,10
  190:14 199:15
  202:1,18 220:23
  260:18,20,22
  262:24

person's 97:14
personally 89:8
  276:11 277:15
personnel 16:6,11
  117:24,25 118:6
  118:15 119:2,22
persons 127:9
perspective
  170:20,25 171:4,6
  171:9
pharma 1:14
pharmaceutical
  3:14,14,15 258:16
  269:19,23 270:3,8
pharmaceuticals
  2:13 3:13 14:15
pharmacies 262:3
  268:7
pharmacist
  268:21
pharmacotherapy
  178:15,21
pharmacy 267:24
  269:3
phase 233:15
phone 14:18
  129:10,14 270:21
  270:22 271:3
  275:3
physician 86:14
  101:22 202:13,18
  202:24 203:13
  255:14 256:15
  260:24 261:4
  268:10
physicians 201:13
  201:22 203:6
  205:4,17 213:6,8
  260:4
pick 85:9

picked 236:9
pie 110:18
piece 44:2 187:6
pill 264:16
pills 19:11 101:6
  101:21 102:9
  240:10 255:21
  256:13
pittsburgh 3:21
placards 103:4
place 14:5 43:12
  170:10 176:8
  191:18 196:2
  199:9,14 200:2
  215:16 219:2
  225:25 232:1
  273:20
placed 161:10
places 19:10 20:18
  93:19
plaintiff 14:9
plan 103:2 218:10
platform 37:24
  38:11
play 191:24
played 222:14
plays 42:25 258:12
please 14:6,18
  58:15 115:19
  183:12 245:2
  275:11,11
pllc 2:3 3:4
plus 42:10,11
point 32:15 52:5
  57:24 80:5,7,25
  82:6 83:9,11
  84:15,19 85:7,25
  94:24 95:2,6
  136:12 144:17,23
  154:23,25 162:4
  175:21 179:17

180:15 181:9
  184:12 185:20
  186:7 225:2,11
  226:22 227:1
  231:5,13 232:21
  237:7,7,9,13
pointed 220:19
pointing 82:12
  84:15 105:10
  253:13 264:14
points 237:8,10
  238:20
police 30:21 31:4,8
  31:22,25 34:24
  38:17 39:5,12,23
  40:2,4,12 75:22
  227:13 239:15
policies 32:14
  215:1,2 218:3
policing 38:18
policy 76:24,24
  121:6 211:18
  212:9
political 219:18,23
  220:10 221:6,14
  222:16
politically 222:16
polster 1:10
poorly 240:20
popularity 233:13
population 79:13
  79:16,20 80:6,12
  81:20 84:18 99:10
  99:18,19,19
  153:19,19
population's
  155:15
porter 3:15 15:2
portion 179:24
position 19:7 23:5
  23:13 31:17

129:20 221:9
positions 16:2
  29:21
possible 16:21
  123:1,5 126:23
  127:3 194:15,17
  194:24 195:12,14
  197:4,8,13,15,22
  198:1,7,7 210:7
  230:14 249:9
possibly 202:7
potential 38:14
  217:9 248:7
power 85:2
powerful 192:14
  192:16
powers 83:10
practices 262:7
practitioner 189:1
practitioners
  224:10,12
pre 22:17 23:1
  98:3,9 100:10,16
predicted 39:18
preparation 24:21
prepare 24:2,14
  39:7
prescribe 260:22
  261:25
prescribed 86:8
  187:2 203:20
  212:16,25 214:5
  255:13,22 256:15
  258:6 260:4,13
prescribers 191:4
prescribing
  186:10 188:1
  189:9 202:12,18
  202:23 203:14
  204:5 207:13,19
  207:25 215:23

219:4 220:12
232:12 260:11,25
262:7
**prescription** 1:6
5:24 6:13 7:4 14:4
86:5,9,12,18 95:8
97:14 100:9,14,19
101:4,20 102:8
166:16 167:13
168:8,21 169:10
170:1,10,13 171:1
171:12 173:20,24
176:21 179:19
180:7,10 182:15
184:17 186:12
187:2,9,13 188:2
189:10 191:5,15
192:20 200:17
202:20 204:5,20
205:1,10,16,19,23
206:4,6,7 207:25
208:12 209:1
210:16 211:1,6,10
211:14 212:17
214:5 215:24
216:6 219:4
232:12 240:10,19
240:25 241:2,9,18
241:24 242:4,9
244:8 246:2,9,15
250:18,25 252:6
252:15,20 253:4
253:22 254:17
255:8,12,22 256:6
256:13 257:5,25
258:14 261:10,12
261:18,25 262:11
263:1,12,25
264:23 268:8,9,19
269:3,4 270:6
275:6 276:3 277:3

**prescriptions**
190:19 203:6
**presence** 273:15
**present** 3:23 86:1
88:1,16,20 129:17
**presentation**
55:12,16 56:2
72:2 75:5,11 80:8
85:21 102:21
109:6 224:2,15
231:1 232:7,16
234:21 238:20
**presentations** 56:8
56:15 110:5
223:25
**presented** 81:2
104:7 141:11
165:20
**presenter** 55:15
**preserve** 18:5,14
**president** 32:23
51:11,13 175:7,15
175:20,21,23,24
176:3,4,7,8,8,12
176:12
**press** 182:17
**pressure** 94:25
95:7,12 189:25
**pressuring** 95:19
96:8 97:11,23
**presumably** 111:2
**pretty** 37:22 53:20
212:2
**prevented** 72:3
**prevention** 5:24
63:17,24 64:7
69:1,12,23 70:5,7
70:25 71:1,22
72:3,12,21 75:6
104:8,9,11,12
105:12 116:8

117:1 126:14
162:17,23 166:17
**previous** 66:21
139:12
**previously** 22:16
43:2 58:5,20
220:20
**primarily** 35:7
230:18
**primary** 35:25
38:11 134:11
**print** 171:21
**prior** 21:23 48:3
48:14
**prison** 229:13,24
**private** 44:18
111:2
**probably** 15:24
17:10 57:25 60:21
118:24 123:16
155:10
**problem** 38:22
63:11 76:21 85:17
99:9,10 153:7
166:9 179:7,13
185:2,22 196:15
196:16,17 197:20
206:13,25 221:24
230:7,8
**problematic** 37:2
**problems** 29:10
33:13 34:5,16
36:8 153:8 206:21
**procedure** 53:5
272:7 276:5 277:5
**process** 50:20
86:23 216:23,25
218:4,7,9
**produced** 26:9
27:13 135:24
178:14 224:22

**production** 209:7
258:9 275:15,17
275:22
**products** 16:4
**professional** 60:8
60:10
**profitability** 95:9
**program** 56:20
106:13,15 109:23
115:25 124:17
147:20
**programs** 31:13
56:25 77:6,7
107:6 109:16
116:8 165:2,16
**progress** 97:15
**project** 109:23
115:9,10,11,14
119:11,12,19
124:5,7,11,12
**projected** 18:18
**promote** 254:17
**pronouncing**
150:2
**proof** 70:6 71:1,18
71:24,25 72:9,16
**proper** 204:1
210:15 211:1,13
**properly** 199:5
**properties** 57:9
**propose** 64:7
**proposing** 145:1
**prosecutor** 75:21
**prosecutor's** 75:20
**protect** 56:18
**protector** 35:17
**protocols** 231:6,21
232:1
**proud** 54:12
**prove** 72:2,12 75:6

**provide** 20:20
31:12 35:21 49:8
57:16 58:6 70:6
71:1,18,22,24,25
72:15 84:22 85:3
109:20 123:25
133:7 165:13
195:7,8 199:15
211:11
**provided** 15:5
52:18 57:21 83:6
112:7,10 134:23
135:2,4,7 136:16
136:22 138:23
140:21,25 144:3
146:1,2 178:1
222:19
**provider** 57:6
121:23 122:1,2,3
123:16 203:19
**providers** 20:20
43:4,5,25 44:1
121:10 122:5,14
123:21 138:7
204:6 205:3,18
216:4
**provides** 44:25
45:4 127:19
**providing** 58:6,21
82:13 150:8
**psychiatric** 126:16
**psychiatrist** 62:23
**public** 30:12,18,19
31:17,20 40:3
54:15 64:5 65:16
68:15 69:6 75:7
76:24,24 90:6,23
117:2,6,20,24
141:11 145:13,19
145:20,24 152:12
198:23 226:20

227:8 273:6
274:14 276:10,18
277:15,23 278:23
**purdue** 1:14
266:11,12,13,13
269:17,19
**purified** 237:14
**purpose** 25:5 41:4
49:5,8 50:3 56:14
64:15 76:12,18
80:15 103:15
108:17 121:4
**purposes** 27:8
55:3 102:24 108:8
131:10 134:6
140:14 142:14
161:3 166:20
174:19 177:17,21
182:4 208:16
223:14 234:15
242:20,24 247:7
252:10 255:7
**pursuant** 272:3,6
**pushed** 207:15
**put** 58:7,22 72:21
72:23 73:1 88:10
88:14 91:5 103:3
106:1 119:9
126:25 127:1,9
132:24 158:5
198:2 219:2,10
227:14 229:13
**putting** 96:25
189:24 229:10

**q**

**q&a** 6:21 234:13
**qualified** 181:6,8
187:17 202:11
262:6 273:8
**qualify** 43:7
181:13

**quantify** 194:7
**quarters** 176:19
182:20
**question** 17:1,2
18:5,9,12,14,17
28:21 46:9 50:11
58:15 68:4 69:16
74:8 90:1,4 93:3,6
97:4 99:24 104:22
104:24,25 106:19
107:10 114:18
116:10,21 118:18
118:23 119:1
122:13 127:13
128:15,16 129:6
129:12 132:4
147:25 148:10
154:4,6 158:7,8,8
167:9 170:2 172:7
172:18 176:9
195:11 196:3,20
196:22 197:1,2,10
197:12,13 199:1
199:18,21,22
201:2 202:3,9
203:17 205:13
213:19 217:13
220:7 228:15
229:7 230:14
237:1 238:8,10,15
239:1,18 241:15
243:19 245:2,19
248:4 251:17
254:13 257:15,21
259:12,16,18
261:16 263:9
264:1,8 265:7
269:2
**questioned** 70:4
70:24

**questions** 15:17
18:3 26:4 110:13
158:5 185:5
193:18 194:1,11
224:17 252:23
253:24 266:3
269:8,16 270:18
270:21,22 271:4
**quite** 152:19
190:12 213:15
246:16
**quota** 258:9
**quote** 187:7

**r**

**r** 135:9 219:10,13
219:13
**race** 39:8
**radio** 103:4
**raise** 83:11 141:5
**rallying** 226:22
**ramifications**
89:13
**ran** 34:2 38:2
124:17 176:9
**random** 37:4
**range** 175:17
**rare** 119:20
**rarely** 76:20
117:24
**rate** 190:1,1
246:19
**rates** 77:23
**reach** 69:6
**reached** 170:8
253:5
**reaches** 169:2
**reaching** 169:6,24
**reacted** 66:9
**reacting** 95:16
**read** 20:3 25:13,19
27:21 28:7 55:19

70:21 162:19
164:20 167:19
172:4,9 174:7,8
180:3 185:7,8,12
185:15 209:14
217:21 231:16
239:17 266:5
276:5,6,12 277:5,6
277:17
**reading**  144:20
235:15 275:19
**reads**  95:7 180:16
**ready**  243:25
**real**  52:6
**realities**  230:1
**reality**  212:3
**realize**  77:21
**really**  34:19 63:8
84:12 85:4 87:13
117:10 148:22
198:23 270:11
**reask**  263:9
**reason**  18:20
61:11 97:20 99:7
113:17 138:22
244:23 245:3,14
245:20 275:14
277:8 278:3
**reasonable**  211:18
214:25 215:6
**reasons**  53:7 61:6
172:23 199:8
200:1
**recall**  16:9,15 25:9
32:21 36:5 37:24
39:11 46:20 47:3
47:20 48:10,14,18
48:25 49:5 50:1
51:25 56:1 59:14
63:21 69:21 74:12
75:10,12 77:14

78:3,5 80:15 81:3
103:11,18,25
105:20 106:4,10
106:24 107:14
112:25 124:22,24
141:18 143:24
144:1 154:9 163:4
173:17,18,23
175:1 176:11
178:20,23 183:13
210:6 213:13
216:2 220:1,2,8
223:24 224:2
252:19 253:3,18
253:19
**receipt**  275:18
**receive**  20:17
111:15 168:11
**received**  50:7,9
143:13 164:25
165:1 178:20,24
180:20 189:21
216:8 239:15
248:5
**receives**  45:9
**receiving**  29:7
165:7 166:2,6
178:23 212:14
221:25
**reception**  146:22
**receptive**  147:21
**recess**  53:25 108:1
160:20 235:9
265:23
**recession**  154:11
154:17 155:8,20
156:1,11 157:5
**recipient**  136:1
169:3
**recipients**  131:15
176:25

**recite**  188:5
**recognize**  93:8
108:22
**recognized**  78:9
78:11 89:5
**recognizing**  64:24
**recollection**  34:23
48:3 71:16 82:11
**recommendation**
211:16
**recommendations**
7:5 59:22 109:17
210:9 217:9 252:8
**recommending**
61:13
**record**  14:2,7
15:14,14 16:18
17:6 20:9 53:22
53:23 54:1 55:10
79:5 107:23,24
108:10 123:12
124:10 125:5
130:13 160:17,18
161:5 177:24
178:24 196:14
208:22 235:6,7,10
235:13 236:11
239:3 259:21
264:13 265:20,21
265:24 271:8
277:9
**records**  225:18
**recovering**  229:20
**recovery**  19:8
49:22 132:8
216:21 225:9
231:24
**reduce**  145:1
**reduced**  144:13
229:19 273:14

**reducing**  46:25
153:4
**reduction**  155:12
**refer**  59:19 68:2
181:3 206:12
248:14
**reference**  27:25
28:22 66:12 98:14
155:7,19 164:4
182:25 275:7
276:2 277:2
**referenced**  56:3
70:20 116:20
139:9 141:1
252:16 273:13,18
276:11 277:15
**references**  29:24
30:2 40:19 126:1
179:25 249:22
**referencing**
221:13
**referred**  64:17
68:3,8 143:17
154:11 185:24
206:24 254:23
**referring**  35:3
43:20 65:13 66:12
66:16 77:18
123:25 181:16
191:14 236:4,11
249:7
**refers**  59:23 60:21
63:16 132:7
204:10 232:22
**refill**  260:19
**reflect**  82:22
110:20 132:19
253:13
**reflected**  127:5
245:7

**reflection** 150:18 191:24

**reform** 182:16 184:18

**refresh** 167:10 168:5

**refreshed** 25:2

**refresher** 16:17

**regarding** 82:11 131:20 147:3 270:4 272:2,11

**registered** 216:8

**regular** 29:12 96:16

**regularly** 56:6

**related** 19:21,25 34:16 48:16 51:7 56:8 59:11 67:1 86:2 88:1,16,18,21 106:23 111:21 112:12,20 114:10 114:17 115:6 119:23 120:15,19 121:21 122:18 124:2,19,24 125:7 126:21 127:6 141:2,25 150:20 163:3 176:13 177:4 179:23 180:12 181:3 183:9 190:16 235:19 239:22 241:9,18,24 242:4 242:9 246:4,9,15

**relates** 1:12 84:17

**relation** 52:13 68:7 205:10 243:21 252:24

**relationship** 62:15 73:17 109:10,14 240:18 259:2

**relative** 31:12 44:14 72:12 80:11 147:12 211:5 239:13 274:2

**releases** 96:17

**reluctance** 145:13 145:24 150:7

**reluctant** 153:21

**remaining** 139:2

**remarks** 6:17 223:12,20

**remember** 24:24 32:15 34:19 36:4 37:5,19 39:25 42:8 44:20 45:13 49:24 50:6 51:23 51:24 52:3 67:9 69:14 70:1 73:4,5 74:15 75:24 78:24 107:12,13 112:15 112:25 114:1 117:15 120:8 129:5 130:17 132:5 133:18,18 133:23 135:17 136:8 140:7,8,9,10 140:11 141:14,21 141:23 142:2,4,6 144:5 149:21 158:23 159:12,20 159:24 168:11,12 168:15,19 174:3,4 184:5 211:24 215:4,25 216:1,19 217:3,4 248:1

**remind** 17:12 175:10

**reminded** 17:15

**reminder** 16:17

**removed** 31:10

**renewed** 160:5

**rent** 103:3

**rep** 6:12 37:18,19 208:11

**repeat** 46:9 58:14 197:13

**replace** 118:3 129:19

**report** 6:24 7:5 29:10 88:11,14 109:14 174:1,4,8 180:1 185:16 187:14 201:7 202:2 242:17 243:11,22 244:2 245:16,23 252:7 252:15,17,21,24 254:1 262:11 263:25

**reported** 232:4 245:22

**reporter** 4:14 17:7 17:11 219:13 276:7

**reporter's** 4:11 273:1

**reports** 31:14 66:21

**represent** 27:12 208:22 269:13

**representative** 70:14 183:3,5,6,9 183:16,19,23 184:6,21 185:20 192:1 200:4,12,16 200:23 201:7 206:11,23 207:12 220:21,25 221:23

**representatives** 168:6 184:17 204:25 205:15

222:14

**representing** 15:15 70:15

**republican** 71:11 84:6

**republicans** 71:12 83:25 159:19

**request** 47:17 48:9 49:1,23 50:13 53:10 59:11 63:16 63:21 64:3,4,8 68:6 69:12,22 70:8 71:17 102:22 103:9,20,24 104:3 104:5,16 105:3,23 106:2,2 107:1,17 119:21 132:14,20 133:14,24 151:6 277:9,11

**requested** 48:5,20 50:2,8 52:19 56:23 60:14 71:2 85:4 103:23 106:20,21 107:19 107:20 133:8 150:20,25 272:1,6 272:10

**requesting** 58:4,19 260:18

**requests** 47:7 48:15 49:7 50:17 50:18 52:12,24 103:14,22 143:12 150:22,23

**require** 86:18

**required** 39:23 40:11 202:4 210:21 232:13 275:25

**reschedule** 60:9

research 173:5
researched 240:20
reserve 118:3
  134:10 139:9,24
  139:25 140:1
reserved 139:12
reserves 139:3
residential 132:7
residue 134:10
resigned 34:4
resolution 159:5
resolve 221:24
resolver 153:8
resources 42:23
respect 17:11
  34:14 38:7 84:9
  103:19 140:20
  189:10 220:10
  233:18,24 234:4
respectfully
  199:18
respective 41:10
respects 34:14
respond 90:6
  163:8 166:9
  168:17 199:24
  227:5
responded 226:12
  227:3 228:13,21
response 131:21
  132:16 150:8
  228:3,9
responsibilities
  20:13 21:15 29:3
  29:5 31:20 32:10
  32:18 41:13 92:23
  152:6 175:14
  256:23 257:3,23
responsibility
  21:20 89:19
  113:20 138:13

148:5,13,14
151:17 193:6,10
207:7,17,23 260:6
responsible
  113:10 130:20
  195:19 251:13,20
  267:5
rest 41:16
result 87:15 99:22
  188:8 191:10
resulted 92:13
  269:24
resulting 93:11
  118:5
resume 5:4 27:6
  27:16 37:8 40:19
  54:20
retained 4:14
retire 23:24
retired 23:21,22
  152:20 244:14
returned 275:18
revenue 44:15
  79:9 82:23 110:21
  140:22 162:15,22
review 25:6
  167:25 203:5
  215:7 272:2,6
  275:12 276:1
  277:1
reviewed 24:20,23
  25:2
reviews 86:23
revised 191:3
reyes 208:24
  209:19,21 210:4,9
  213:9 217:6,23
  219:8
richardson 113:21
rid 212:11

right 17:17 19:1
  20:7 21:17 26:12
  26:17,25 30:4
  35:3 40:23 45:1
  58:8 77:19 78:7
  79:23 82:4 84:23
  85:11 88:12 90:4
  91:15 92:2,10
  94:6,7,9 97:18
  98:16 101:17
  102:9,25 103:5
  104:17,18 105:5
  106:16 107:9
  110:10 111:3,10
  113:23 114:2,21
  122:8,11 125:16
  126:14,15,17
  132:17 135:2,5,12
  135:18 136:2
  137:2 138:19,21
  142:25 144:2
  148:25 150:3,9,23
  155:4,10,11
  161:15,16 163:14
  163:17 166:23
  167:6 169:3,11,20
  175:8 176:22
  177:6,8 178:8
  179:14 184:22
  192:5,7 196:3
  200:5 203:1,15
  209:22 215:10,16
  218:24 219:10
  221:12 225:4
  228:22 229:6,23
  230:14 232:8,13
  233:19 234:1,6
  235:2 236:13
  237:10 241:7
  244:20 246:5,7,16
  246:23 249:4,23

255:5,8,15 262:14
264:8 265:19
266:12 269:8
ring 186:9 255:4
risk 35:13
risks 260:24
road 38:23
robert 183:3,19
  184:21
role 19:16 20:17
  31:15 32:16 87:8
  160:12 164:23
  176:3 204:2
  222:14 237:19
  258:11 266:25
roles 68:18
roman 185:1
room 154:14
  179:23 180:12
  225:4,8
rooms 227:15
rose 179:23
rosemary 37:18
rough 131:21
roughly 57:20
routinely 56:8
royer 243:2,3,5
  244:3
rpr 1:24
rs 219:14
rule 17:16
rules 16:19 272:3
  272:7 276:5 277:5
run 38:2 83:25
  97:14 220:15
running 37:12,14

s

s 135:9 219:11,13
  275:15 277:8,8
  278:3

**sacks** 2:4 14:8,8
16:16 18:2,8,12
23:18 24:4,5,7,12
24:16,25 27:11
36:16 37:3 39:16
44:19 53:14 62:19
63:4,13 66:20
67:17 78:13,22,24
79:3 80:4 81:12
81:15,17 83:1,3
84:11,24 86:15
87:4,12,18,22
89:17 90:9 91:17
91:21 92:15 93:20
94:8,13 98:5,11,17
98:22,25 99:6
100:22 101:2,8,23
102:14 110:2
111:22 113:3
118:17 123:14
125:15,18 126:24
127:8,14,18 128:1
128:11,23 129:3,5
129:9 133:10
135:14,20 136:24
137:3,23 138:11
139:18,22 141:8
141:17 142:3
145:17 148:7
149:1 151:19
154:19 156:3,8,13
157:7,14,20,23
158:3,10 169:18
177:7 181:5
182:18,22 185:8
185:12 186:18
193:7 195:16
196:19,25 200:7
201:1,4 203:2,8,22
204:22 206:2,16
207:1,9 208:2

209:3 213:5,12,18
214:7,23 215:20
220:6 221:8 222:4
223:2 224:4,20,24
225:16 226:3,14
231:11 232:14
233:3,11,16,20
234:2,8 235:13,14
235:23 236:5,13
238:1,7,17 239:24
240:5,11,16,21
241:4 242:11
243:15 244:21
246:17 249:5,11
250:9,13,20
251:16 252:2
255:9,16,24
256:10,17 257:6
257:14,19 258:2
258:21 259:11
260:8 261:7,14,21
262:4 263:4,15
264:20,24 265:2,6
265:14 266:20
268:11,22 270:10
270:15 271:5
275:5
**safer** 229:25
**safety** 16:10 30:3
30:12,18,19 31:15
31:20 54:11 65:16
68:15 75:7
**salary** 40:5 119:7
**save** 76:14,19
147:18
**saves** 147:20
229:24,24
**saw** 25:4 38:25
64:25 66:8 172:8
**saying** 48:8,9 84:8
96:22 99:15

104:20 121:6
150:16 181:20
190:16 194:3,12
194:14,20,22
196:6 212:22
218:22 238:24
254:2 259:22
**says** 18:12 28:3
64:14 70:3,23
87:25 135:18,21
135:23 136:6,15
137:14,24 139:1
144:10 162:14
169:6 170:15,17
171:23 176:20
179:17,22 186:1
187:5 189:21
192:23 203:10
217:7 225:3,11
226:4 231:5 232:9
232:18 237:13
248:9 262:12
264:15,22
**scam** 265:5,6
**scams** 264:23
**schematic** 79:24
81:7,18,24 253:11
253:16 262:14
263:24
**school** 34:18
**schools** 227:9
**scientific** 173:13
**scientists** 173:7
**scott** 53:17 55:11
121:22 129:16
142:18 248:18
**screen** 96:17,20
**script** 212:11
232:6 234:20
**seal** 274:6 276:15
277:21

**second** 32:2,3 39:5
59:15 61:20 70:2
79:17 111:6 133:5
146:20 167:20
170:16 176:18
179:17 182:19
189:19 209:4
211:16 218:6
237:6,7,9,13
243:15 259:19
264:19 265:3
**section** 162:1,8
163:15 172:9
179:6,11 180:16
182:25 185:1,10
185:11,12,16,19
185:21 189:19
200:13 224:14,18
225:3 231:2,12
252:24 253:10
**security** 212:15
**see** 27:12,17 28:4
28:16 50:23 56:25
57:3 59:17 63:18
70:9 71:3 73:12
75:8 79:10,24
80:18,23 81:20,24
85:23 86:2 95:3,9
97:3 99:17,18
108:20 109:4,8,9
110:17,19 112:3
116:1 125:12,20
126:1 131:17,22
132:8,25 134:24
136:17,18 137:13
137:24 138:4
139:4 142:20
143:2,14 144:15
144:16 146:17
149:18 153:5
155:15 162:2,11

163:22 165:4
167:3 169:5,15
170:21 171:20,22
172:2 176:20
177:2 178:3,10,11
178:18 179:9,12
180:1,18 182:10
182:13,23 184:19
185:2 187:9,10
188:10 190:4,5
192:16 197:12
202:24 204:11
209:19 210:12,14
210:16 211:8,17
214:25 217:14,19
218:4,7 219:20
223:21 224:18
225:5 231:3,8,9
232:19,20,25
234:23 237:2,16
238:21,24 243:13
244:5,8,19 247:13
247:20 248:24
249:15,19 250:4
253:10,14 254:4
262:15 269:9
270:20
**seeing** 216:25
**seek** 41:17
**seen** 54:20 169:22
253:17
**select** 111:14
**self** 33:12 262:12
262:17
**senate** 141:24
142:24 143:25
144:18,24 146:23
155:1 156:16
**send** 248:21
**sender** 131:1

**sending** 129:13
142:23 248:10
**sense** 17:8,9,25
18:15 45:23 53:7
53:13,15 146:15
193:18,19 229:10
237:8
**sensitive** 41:15
**sent** 132:1 142:18
170:13 175:3
177:24 209:15
244:3 247:12
**sentence** 75:3
80:17 248:12
**separate** 31:5
**separately** 238:19
**september** 6:11,12
208:9,10,20
209:16
**serious** 145:10
**serve** 31:1,16,24
73:17 166:3,12
**served** 16:2,9
28:12 30:3 31:4
33:25
**serves** 28:3,8
**service** 3:19 14:23
45:15 54:15
114:23 121:10
123:21 138:7
144:11 163:25
**services** 20:20,24
21:16,21,22 22:7
28:10,15 29:9,16
29:20 30:22 35:11
35:19,21 36:3,10
37:1 43:8,9 57:14
57:15,17,18,19,21
57:22,23,25 58:1,5
58:20 59:7,21
60:18,22 61:10

68:17 75:19
111:20,21 121:20
123:11,25 126:14
126:16 127:20
132:23 133:9,15
134:7 137:15,25
138:12,14 144:14
145:15,25 155:13
162:18,23 163:20
164:17,18 165:4
195:7,9 248:8
**serving** 31:8
**set** 34:1 66:22
103:23 123:6,7
140:2 146:24
174:11 177:9
208:5 214:21
245:16 274:6
**setting** 103:9
**seven** 33:24 43:13
78:20 159:6
**sfranklin** 2:21
**shake** 17:20
**shapira** 3:19 14:22
**shapira.com** 3:22
**share** 151:16
207:22 216:21
260:5
**shared** 52:8,10
106:4 188:16,17
**shares** 207:7
**sharing** 84:20
**shayna** 2:4 14:8
118:24 271:4
275:5
**sheet** 5:21 160:25
275:13 277:7,10
277:18 278:1
**sheriff** 73:10
74:19 75:14

**sheriff's** 74:23
**shirlethia** 2:19
14:16
**shkolnic** 2:3
**shopping** 256:2,4
256:9
**short** 31:1 39:21
54:4 69:9 108:12
130:3 236:17
266:2
**shortfall** 39:1,18
39:19
**show** 80:9 82:25
142:16 186:15
189:14
**showed** 243:20
**showing** 82:18
234:17 242:23
247:10 252:13
**shown** 275:16
**shows** 79:12
**sick** 157:16 198:17
**side** 79:23 159:24
**sided** 125:19 209:3
**sign** 189:24 190:23
191:16 207:15
212:11 232:6
259:5,25
**signal** 17:19
**signature** 272:5
274:13 275:14
**signed** 276:13
277:18
**significant** 36:19
239:21
**significantly** 40:9
191:10
**signing** 275:19
**similar** 219:24
234:19

**simple** 92:1
147:16
**sincerely** 275:21
**sir** 18:19 29:1
108:14 110:16
126:13 144:8
155:18 271:7
275:10
**sit** 194:7
**sitting** 97:9,20
107:14 124:23
**situated** 202:19
203:13
**six** 32:3 33:24
78:20 130:2 159:6
**size** 115:9
**skim** 55:18 252:18
**skip** 60:21
**skipping** 179:21
**slate** 138:10
**slide** 59:2 78:19
80:8 81:7 85:10
85:20,22 87:24
94:24 102:20,22
109:5 110:8,9,11
110:13,15,20
125:11,12,15,17
125:20 126:8
127:5
**slides** 55:23 78:16
85:8
**slightly** 79:20
112:8 125:14
**small** 45:14,21
46:1 120:9,10
**snorted** 237:15
**sober** 49:21
103:21,25 105:13
106:22 107:20
115:21 122:16,18
123:8,24 125:23

126:1,3 132:8,15
132:24 133:9,16
134:8
**social** 22:7 212:15
**soft** 38:3
**solutions** 3:13
109:3 275:1 278:1
**somebody** 19:20
37:20 75:18 83:17
99:3,13 115:22
121:7 127:1
129:13 153:21,24
167:2 178:2
181:20 188:15
190:16 194:24
198:4 203:10
205:6 209:24
235:18 236:1,6,8
243:2 247:13
255:19
**somewhat** 176:5
**sore** 83:9
**sorry** 30:1,8 53:18
58:11,13 69:15,17
70:18,22 81:9
101:13 116:9,11
124:14 125:2
126:13 130:5
146:5 150:2 160:7
169:14 199:3
201:3 215:9,11
231:10 237:5
**sort** 78:19
**sound** 26:5
**sounds** 271:2
**source** 42:7 45:3
45:11 83:9 92:17
96:24,24 134:5,11
140:2,22
**sources** 39:21 42:5
44:15 45:10,18

82:23 92:3 96:25
110:20 134:5,12
139:8 140:1,5
**speak** 17:22
161:21 198:15
**speaking** 93:9
**specific** 33:13 34:5
47:7 49:5,8 69:9
104:16 106:24
107:1 109:23
119:19 121:21
140:13 142:5
160:6,7 161:13,19
168:12 183:13
204:24 205:6
210:14,21 211:12
214:10 216:3
243:18 261:24
268:3 269:18,22
270:2
**specifically** 29:11
46:6,16,24 47:8,17
48:5,15,17,21 49:1
50:3 51:6 60:14
103:14 104:3
105:2,4,22 107:17
112:19 114:17
115:6 116:7,17
119:23 122:18
132:15 144:1
153:15 170:15
182:10 188:6
213:13 215:5
217:3 220:1,2,8
269:17
**specificity** 122:25
**specifics** 53:3
185:19
**specified** 273:21
**specify** 259:18

**spelling** 219:9
**spend** 72:4,6 87:13
103:25 118:20
120:19 124:6
**spending** 79:8
80:10,13 82:3,4,9
84:9 119:3 134:10
**spent** 30:11 89:25
117:12 119:16,22
120:6 122:18
127:5 139:16
**spike** 249:22
**spoke** 184:6
**sponsored** 185:2
185:22 206:13,25
**sprague** 6:12
183:3,4,20,23
184:6,22 185:20
192:1 200:5,13,16
200:24 201:7
206:12,23 207:13
208:11 220:21,22
**ss** 273:3
**ssacks** 2:6
**stability** 56:18
**stages** 95:16
**stamped** 79:6
**stand** 140:17
221:11
**standards** 181:14
**stands** 20:12
175:11
**start** 17:3,12 67:1
68:3 77:22 93:4
101:11,13 117:22
121:22 125:4
168:17 170:14
172:17 183:5
228:6 242:1
**started** 66:3 67:3
131:19 133:19

**[started - summary]**

149:2
**starts** 85:8 162:13
**state** 16:2 20:18
22:2 26:12,15
29:25 30:4 32:7
32:11,14,18 37:17
37:19 41:2,6
42:10,17 43:6,22
43:24 44:17 54:10
54:15 61:11,11
70:14 79:16 82:10
82:12,15,22 83:4,7
83:11,20,24 84:5,7
84:16 96:18 111:1
115:15 144:12
145:14,24 146:16
146:23 147:1,5,11
148:4,15,17 149:8
149:8 155:1
162:10,13,15,21
163:6 168:18
169:11 176:15
185:2,22 191:4
195:20 206:13,17
206:21,25 207:5
208:25 217:18,24
221:2 222:13
229:16,24 233:8
273:2,7 274:15
276:10 277:15
**stated** 88:17
**statement** 74:17
97:10,19 156:23
190:18 196:21
199:1,3 276:13,14
277:19,19
**statements** 95:17
205:22 206:4
270:3
**states** 1:1 73:8
75:4 85:25 86:19

192:12 193:5
256:20 257:2,22
258:12,16 263:13
267:2
**statewide** 145:20
**station** 234:22
236:25 238:21
**statistical** 102:1
**statute** 15:6
**stay** 23:12 130:3
198:16
**steadily** 163:21
164:1 244:11
**stealing** 34:22
**steinmetz** 2:14 4:9
14:13,13 269:11
269:13 270:17
**stenotypy** 273:14
**step** 198:17
**stepladder** 66:5
**steward** 195:8
**stewards** 151:12
**stick** 107:10
128:17
**sticking** 136:12
**stigma** 147:14
148:1 151:23,25
151:25 152:11
153:12,14,21
154:1,4
**stolen** 34:8
**stood** 222:16
**stop** 65:4 256:24
**stored** 262:3
**stores** 2:18
**straight** 66:6
**strain** 156:21
**strategy** 249:14
**stream** 137:12
**street** 2:10 3:5,10
3:16,21 97:16

**streets** 86:7
**stretch** 236:18
**strickland** 173:19
173:25
**strictly** 45:8
**strip** 115:22
**strips** 120:2,3,7
**strong** 91:12
**stronger** 76:24
77:5
**strongholds** 84:7
**structure** 85:2
**studied** 26:10
196:14
**study** 6:13 59:21
182:16 184:18
200:17 208:13
**stuff** 147:23
216:10
**sub** 95:6 237:6,10
237:13
**subject** 5:4,6,13
5:16,20,23 6:2,12
6:16,20,23 7:1
27:5 54:25 63:3
131:7,16 142:10
160:24 166:16
171:1,11 174:16
175:4 208:10
223:11 234:12
242:17 243:10
247:4,19
**subjects** 183:9
**submit** 50:21
**submitted** 25:20
104:14 266:6
**subscribed** 276:10
277:14 278:21
**subsidy** 42:8
**substance** 20:25
49:11 57:22 58:1

59:7 60:24 61:5
62:6,9,18 63:2,11
84:10,14 87:3
98:20,21 99:4,5
100:4,5,11,16
121:12,13 124:1
127:17 128:9,20
152:14 153:15
156:2 226:10
240:14 258:14
**substances** 21:12
35:6,25 36:5,22
92:13 93:11 98:3
98:10 121:2,21
228:24 257:4,24
**substitute** 144:5
**suburban** 225:12
226:23 230:11
**suburbs** 70:15
225:18,21
**succeeding** 39:2
**successful** 148:20
223:3
**suffer** 100:4
156:20
**suffering** 21:16
**suggest** 151:8
250:23
**suggested** 259:14
**suggestions**
175:20
**suggests** 190:18
**suicide** 72:2,3,5
**suicides** 65:18,22
**suite** 2:15 3:5
275:2
**sum** 62:8
**summarized** 58:18
**summary** 125:12
126:1 138:19
236:23

**super** 94:1
**superior** 275:1
**support** 162:17
**supported** 106:12
**supporter** 150:11
**supposed** 161:20
**sure** 16:16,20 26:7
  46:11 48:1 51:13
  58:16 63:5 85:15
  86:16 98:7,12
  101:10 107:10
  112:5 114:6,8,8
  115:4,8 125:5
  145:6 167:22
  195:6 211:7 218:8
  226:5 227:7 228:8
  230:13 236:14
  243:17 245:3
  251:18 259:21
  262:20
**surface** 200:9
  212:2
**surfaced** 214:19
  216:11
**surgery** 91:5,6
**surplus** 139:20
**surprise** 186:17,19
**survival** 57:10
**suzanne** 142:19
**switch** 95:7,13,20
  96:9 97:11,23
  98:16
**switched** 225:17
**sworn** 15:6 16:8
  273:10 276:10,13
  277:14,18 278:21
**synthetic** 91:4,12
**system** 31:2
  180:18 214:20
**systems** 201:13

**t**

**table** 60:6 269:9
**tackling** 249:14
**take** 16:23 55:8
  67:19 113:4,5
  116:24 118:7
  123:10 132:3
  145:4 147:2
  194:15 195:2
  197:5,16 198:5
  202:25 221:9
  235:4 243:17
  248:3 255:21
  262:1
**taken** 1:21 53:25
  89:12 108:1 128:4
  153:5 160:20
  191:18 225:25
  235:9 265:23
  273:20
**takes** 118:2 167:1
**talk** 17:12 35:3
  38:20 39:19 41:19
  48:15 50:25 53:12
  65:11 147:6,7
  153:12 155:20
  197:7 220:17
  227:9
**talked** 143:6
  147:22 174:24
  186:16 187:24
  197:6 198:19
  203:12 207:13
  219:22 253:20,23
**talking** 16:23
  17:19 43:1 45:8
  70:19 113:7 122:7
  125:18 153:18
  161:14 184:15
  220:24 231:11
  233:2 236:12

246:6,20
**targets** 225:22
**task** 7:5,5 73:10
  73:15,18,21 74:2
  74:10,12,20 75:1
  75:16 76:5,13,18
  77:4 78:7 87:11
  89:9 90:13 92:25
  102:12 118:21
  172:21 173:20,24
  176:21 187:23
  193:16 195:1
  196:11 198:12
  221:5 252:6,7,16
  252:20 253:4
  262:12 263:18,25
**tax** 40:8,9,10,15
**taxed** 180:17
**taxes** 45:5 141:5
**team** 59:16,22,24
  60:3
**tech** 34:18
**technically** 181:13
**television** 234:22
  236:24 238:21
**tell** 20:11 38:23
  58:17 61:21 68:13
  89:11 107:3
  113:18 117:13
  124:8 152:5
  183:12 184:15
  193:24 216:23
  264:9
**telling** 137:5
**temperature**
  190:1
**ten** 163:21 165:25
**tense** 136:19 137:1
  137:4
**tenth** 3:10

**tenure** 139:15
**term** 49:21 64:20
  64:21,23,25 65:9
  77:12 78:10 96:9
  140:10,11 169:15
  219:9 254:20,22
  256:1 260:15,16
**termed** 222:15
**terminology**
  187:14
**terms** 38:17 47:10
  56:16 65:16 78:2
  80:6 89:6 116:24
  128:5 145:8 149:9
  153:14 171:11
  172:24 183:14
  191:14 200:18
  225:9 227:18
  228:10 237:20
  246:14 258:13
**test** 120:1
**testified** 184:10
**testify** 18:21 142:5
  143:25 146:9,25
  148:18 273:10
**testifying** 141:19
  141:23
**testimony** 5:17
  6:12 16:8 19:15
  54:6 64:16 127:23
  128:2,6 142:11,23
  142:24 143:14
  144:3,4,10,18
  146:25 147:3
  155:1 188:25
  208:11 273:13,17
  276:6,7 277:6,9,12
**testing** 120:3,7
**thank** 15:17 27:23
  33:1 37:23 54:17
  54:19 59:4 83:2

161:9,22 162:6
174:11 185:13
209:11 236:19
266:1 270:19
271:7
**thanks**  81:16
85:16
**theft**  264:11,18
**theirs**  258:4
**thing**  111:25 185:9
210:13 212:25
222:18 229:23
246:23,24 265:9
**things**  6:3,9 23:19
25:3 34:9,22 37:6
40:17 47:11 48:13
49:9 56:17 77:1
99:14 115:22
148:22 150:15
152:21 153:2,9,17
174:16 175:5,6
182:2 196:12
218:2 227:12,17
238:18
**think**  39:14 41:25
44:6 47:2,21 52:7
60:20 61:18 65:5
67:3 68:21,22,23
73:3 74:7 79:17
82:24,24 88:5,17
90:10,11 100:7
102:15 105:16,25
106:6,12 107:3,12
109:3 116:3,13
117:21 122:8,10
122:11 123:23
128:14 129:13
140:16,17,19
149:13,14 151:14
151:20 152:20
154:5,6,14 155:8

158:9 164:13
171:7 187:17
191:23,24,25
194:9,21,22
195:13,21,24
197:10,22 198:7
198:15 199:10,12
199:23 200:3,25
202:15 203:23,23
204:2 212:17
232:10 238:7
239:13 245:18
259:7 260:16
264:22 265:4
268:17,22 271:6
**thinking**  154:5
**third**  27:24 60:20
125:24,25 161:24
171:21 172:5
225:2 231:5,13
237:4 239:14
249:18 264:20
**thirty**  275:18
**thought**  22:6 65:6
70:18 74:3 124:13
133:19 134:2
146:3 149:25
151:21 152:17,18
198:6 210:20
211:22,25 215:11
227:19 228:18
251:23 252:3
**three**  40:4 47:22
47:23 71:11 99:14
123:17 159:14,17
176:19 182:20
200:13
**threshold**  202:2
**thumbs**  85:16
**tied**  173:9

**tim**  37:15
**time**  16:7,13 17:12
18:15 29:20 30:11
31:1,21 32:1,2,3
32:13 34:17,24
35:2,4,7 36:1,24
38:10 39:17 46:2
46:11,13,21 47:4
48:24 52:4,4,8,8
52:10 57:24 60:11
64:10 66:8 67:4
68:12,22 72:4
77:16,16,18,19,19
79:19 80:5 81:9
87:13 89:1,12,25
96:2 97:2,7 112:1
112:1 113:11,13
113:19,25 116:5
116:15 118:2,13
118:16,20 119:3,5
119:8,9,15,16,22
124:14 130:11
134:3,14 139:14
141:10,10,18
149:4 154:24
161:17 164:6,14
170:4 174:7,9
176:11 179:14
181:21 183:13
184:8,12 186:8
189:4 190:13
195:25 208:21
210:19 211:22
215:4 218:15
221:19 229:11,11
236:19 242:2
243:17 247:12
253:7 264:2
270:19 271:7
273:20

**timeframe**  40:11
73:2 88:23 124:15
173:19 177:6
191:11
**times**  15:22 40:2
61:2,3,4 80:22
99:20 109:22
118:1,7 129:16
150:19 188:21,25
191:8 230:3
**tired**  220:5
**title**  109:7
**titled**  81:18 85:22
162:2
**today**  15:17,20
16:18 17:11 18:4
18:18,20 19:5,15
24:3,21 68:10
77:8 93:7 95:22
95:23 97:3,9,21
107:15 111:7
124:23 125:9
126:5 127:23
128:12,19 129:16
132:11 149:13
174:25 177:22
179:2 186:20
189:13 198:22
216:2 236:19
252:17 270:18,19
**today's**  14:2
**told**  78:24 87:23
106:4 132:11
160:4 203:24
**top**  95:2 125:19
264:15
**total**  56:23 119:15
137:6,7
**totally**  59:14 77:3
136:8 145:7

tough 38:3
track 41:4 67:18
 118:15 119:2,15
 119:22 121:10
 122:24
tracked 65:15
 67:13 121:19
tracking 67:22
tracks 123:20
tragically 130:6
trained 193:22
training 210:14,21
 210:23,25 211:5
 211:12
transcribed
 273:16 276:7
transcript 4:1
 235:15 272:3,6,9
 272:11 275:11,12
 276:5,12 277:5,11
 277:17
transcription
 273:17
transcripts 25:14
transitioned 241:1
treat 38:6 121:8
 121:11 147:18
 187:8 190:3 191:5
 201:23 207:14
treatable 147:10
 147:17
treated 35:16
 201:14 227:21,23
 229:2
treatment 21:21
 29:8 47:11 49:11
 49:21 57:13 89:22
 104:8,11,12,12
 105:12 106:23
 115:20 116:25
 126:15 128:5

132:8,23 133:8,15
 134:7 145:15
 147:23 162:17
 190:14,23 191:15
 199:15 225:10
 227:15,20 228:12
 229:18 248:8
 259:4,24
trend 67:3 242:10
 246:20,23 253:6
trending 241:10
 241:19,21,25
 242:5
trends 46:8,19
 47:1,19 48:6 49:2
 50:4 64:17 66:25
 77:10,13,15 78:9
 78:10 89:6,10
 90:16 103:16
 105:23 141:12
 151:25 163:8
 168:17 171:11
 172:24 173:15,16
 180:21 181:3,16
 199:6,25 200:2
 244:24 245:4,6,14
 245:15,20,21
 246:14
tricky 69:19
tried 69:5 87:8
 148:25 166:11
 196:15,16 226:12
tries 179:12
true 38:16 58:18
 62:16 67:23
 128:12,25 156:23
 173:6 179:3 198:3
 219:6 230:17
 233:18,24 234:4
 235:25 273:16

truly 155:14
truth 273:11,11,12
truthful 19:1
truthfully 18:21
try 16:20,24 81:5
 90:15,21 101:15
 122:24 152:8
 153:23 155:25
 161:18 172:22
 173:2,14 194:18
 195:3 197:7,18
 198:9,12 221:18
 227:15 228:15
trying 46:6,17
 63:8 80:25 82:6
 82:25 87:13 89:12
 89:20 109:4 113:1
 130:17 134:3
 138:17 150:16
 152:24 192:3
 195:25 196:12
 198:16 200:5,5
 221:16 259:15
tsunami 231:2
 232:19
tucker 2:14 14:14
tuckerellis.com
 2:16
tuesday 75:8
turn 70:2 81:6
 85:6 102:16
 125:11 156:21,24
 182:12 203:25
 205:8 232:17
turning 38:22
 229:18
turns 16:23
tv 6:20 96:16,20
 204:15 234:12,22
twelfth 2:10

twice 31:16
two 16:4 21:25
 22:17,25 31:4
 34:3 38:19 40:4
 43:21 47:22,23
 54:14 80:19
 104:11 106:11
 112:1 113:16
 134:12 135:25
 145:18 158:4
 197:10 201:17
 209:3 218:2,4
 219:14 237:8
 246:6 265:3
twofold 84:25
type 35:15 216:10
typing 129:7

**u**

u 33:2,4 135:9
uh 16:15 28:6,17
 37:11 53:18 58:9
 76:2 80:24 95:5
 95:10 103:6
 126:11 130:9,23
 132:2 134:25
 138:2 139:5 143:1
 169:12 179:10
 180:23 185:17
 210:17 211:20
 215:17 217:20
 225:6 231:17
 234:24 237:11,22
 238:22 244:7
ultimately 191:17
umbrella 41:9
 165:4
underlying 61:16
 62:17
underneath 162:7
understand 18:7
 18:10,17 19:12

20:5 26:8 28:21
31:17 41:7 46:6
46:10,17 48:2
54:5 58:3 62:21
63:9 67:11 76:17
87:8 88:6,13
89:15 90:7,15,22
93:3 107:11
113:15 114:13
116:21,22 117:11
118:18 145:19
147:9,16 149:10
155:25 170:2
172:22 173:3,14
196:6,8,15 197:12
199:8,24 200:1,6
202:3 203:1
216:24 221:16
226:12 228:14
238:12 251:17
255:4,6 261:15
262:20,21,23
264:3
**understanding**
19:3,6,14 51:18
52:16 62:15 63:9
64:21 76:11 84:4
86:6,11,17 88:2
91:2 93:24 95:18
97:1 99:2 100:2
101:25 116:7,17
118:12 120:2
145:23 154:16
165:6 187:11,25
189:8 190:7,9,11
204:13 206:15,17
206:22 212:20
219:1 225:23
226:6 242:8 250:6
254:6,10,24
256:22 258:4

262:16 266:17
**understood** 18:1
90:1 91:16 97:2
107:8 242:12
246:12
**undertake** 89:9
172:22 173:2
**undertaken**
155:25 156:7
161:18
**undertook** 90:21
**undertreated**
189:5
**unfair** 52:2
**unfortunately**
78:17 92:12 179:1
224:21
**unique** 170:20,25
171:6,9
**unit** 115:21 120:21
120:24 121:11
**united** 1:1 86:19
193:5 256:19
257:1,22 258:12
258:16 263:13
267:2
**units** 120:16
**university** 26:12
26:16 54:10 76:9
**unnumbered**
224:22
**unreasonable**
215:3,5
**unruly** 35:14
**unusual** 66:7,9
137:8,9
**update** 5:7 6:6
54:25 177:14
**updates** 6:9 182:2
**urban** 26:16

**use** 20:25 49:11
52:25 59:7 62:6
62:18 63:2 64:20
64:24 77:12 85:1
91:25 94:4 95:3
98:20 99:4 100:4
100:21 110:12
116:1 118:7
121:12,13 123:8
124:1 127:17
128:9,20 152:14
153:15,16 156:2
186:12 187:1,14
189:10 191:5,15
192:7 209:1 211:1
211:6,6,13 212:9
213:11,22,23,24
213:25 214:3,13
215:23 216:6
226:10 233:7
237:1 240:3,8,25
241:2 253:22
254:10 255:3
260:15 263:1,12
**user** 212:14
**users** 216:14
229:11,12 231:23
**uses** 91:15 99:20
111:9 153:24
255:12
**usually** 51:10
**utilization** 212:19
232:11

| **v** |
|---|

**v** 1:13 2:19 275:6
276:3 277:3
**vacuum** 189:1
**vaguely** 56:4
**valeria** 129:24
**valid** 268:9 269:4

**valuable** 109:17
**value** 193:21,23
**varies** 118:9
**various** 32:14
56:24 75:21,24
92:2 109:16 110:6
126:8 138:6 140:1
140:4 197:5,16
233:13 244:4
**vehicle** 67:8
**veritext** 275:1,7
278:1
**veritext.com.**
275:17
**versa** 61:5
**version** 142:23
**versus** 44:16,17,18
57:22 80:6 112:24
121:12,21 147:23
227:20 229:18
**vice** 61:5
**vicodin** 179:20
**video** 8:1
**videographer** 3:24
14:1 53:23 54:1
59:4 107:24
108:10 160:18
161:5 235:7,10
263:6,10 265:21
265:24 271:8
**videotaped** 1:18
**view** 51:17 151:24
157:4 191:13
210:20 230:10
**vinton** 80:21
**visits** 179:23
180:12
**vitae** 27:16
**vital** 189:24
190:23 191:16
207:14 259:5,24

voice 221:21
volume 214:4
  262:2
volunteer 29:11
vote 158:22,25
  159:3,14 160:1
voted 159:22
votes 159:4,21
  160:2

**w**

wait 16:24 17:1,4
  125:3 129:5
  140:17 201:1
  231:9 257:14,14
  259:11
waiting 49:19
  123:10 129:8,11
  227:15
waived 275:19
wal 2:18
walmart 2:17
  14:17
walter 142:18
  143:4 174:24
  182:10,13
want 17:1 48:1
  58:25 78:15 81:12
  84:1 90:2 94:23
  97:15 107:9,9
  114:25 119:18
  133:22 142:16
  145:4 152:19
  153:13 160:16
  162:4 170:14
  179:4 184:24
  185:18 196:18
  198:20 209:13
  212:10 217:24
  218:22 220:14
  228:6 230:24
  232:5 237:12

241:14 249:12
252:17 253:24
257:7 260:13
wanted 16:5 28:1
  31:11 47:13 52:24
  53:2,3 64:7 70:5
  70:25 89:22
  110:12 130:15
  224:16 235:13,20
wants 172:13
washington 2:10
  2:20 3:11
wasting 60:11
way 17:5,18 41:11
  45:17 61:1,19
  66:10 73:19 76:17
  78:19 84:3 109:20
  111:19 122:23
  123:4,7 125:14
  128:7 146:15,16
  151:13 152:4
  161:24 163:2
  176:20 182:21
  183:22 188:1,20
  200:10 201:12,19
  205:14 211:7
  212:4,6,19 218:11
  220:9 221:4
  226:11,16 228:12
  228:20 229:1
  231:25 232:4
  241:6 249:19
  257:9,11,17 259:7
  259:13 267:6
ways 43:21 148:19
  207:15 215:1
  216:10 232:3
wc.com 2:11,12
we've 53:19
weakening 155:14
  155:20

week 32:4 212:24
weeks 135:25
welcome 54:3
  81:17 108:12
  161:7,9 162:7
  236:21 266:1
welcomes 131:22
wendy 1:24 273:6
  274:14
went 15:14 48:4
  48:19 49:6 57:6
  58:22 65:3,5 66:4
  66:6 72:18,18
  73:23,24 77:23,25
  83:15,16 103:12
  104:1 105:2,21
  106:25 107:16
  136:7 149:4,20
  235:14
west 3:16 34:18
western 70:15
whawkins 2:12
whereof 274:5
white 117:21
  178:15,22
wholesale 266:22
  267:1,4
william 1:19 4:7
  14:12 15:4,9
  269:10 273:9
  275:8 276:4,9
  277:4,13 278:20
williams 2:8 14:11
win 37:20
wish 54:7 87:5
  89:11 148:21,23
  152:21 193:19
wishes 18:4
witness 2:3 14:9
  81:14,16 83:2
  185:10,13 201:3

235:21 236:3
273:9,14,15,18
274:5 275:8,11
276:1,4,11 277:1,4
277:15
witness's 272:2
witness' 275:14
woman 159:23
won 37:15
wonder 217:10
wonderful 54:17
word 169:19
  253:11 264:9,14
words 20:25 56:6
  187:15 194:14
  201:17 218:11
  251:6
work 16:18 18:11
  23:20 26:5 50:22
  62:13 70:7 71:2
  71:19,23 87:10
  130:10 151:13,13
  171:25 172:13
  173:10 175:16
  183:15
worked 138:16
  209:25
workers 224:5
workhouse 30:23
  30:24,25
working 71:25
  89:8 189:16
  210:20 212:3,4
  218:5,7
works 75:6 199:22
world 179:2
  222:15 229:10
worrisome 77:10
  77:15 78:10 89:5
  90:16 171:11
  172:24

[worth - zipp]

**worth**   152:23
**write**   118:19
  219:15 249:25
  261:10,18 262:22
**writes**   131:19
  217:6
**writing**   17:8
  209:18 219:8
**written**   17:21
  25:19 167:5
  171:10 266:5
**wrong**   222:17,18
**wrote**   262:24
**ws**   250:7
**wv**   3:5

### y

**yeah**   23:23 36:11
  42:4,4,4 45:25
  73:13 79:3 81:15
  88:9 89:3 104:12
  104:25 105:19
  133:21 135:6
  136:3,3 140:18
  144:16 145:5
  149:19,23 154:12
  155:2,16 167:21
  169:14 178:11
  179:2 182:24
  194:23 196:25
  198:7 199:11
  203:16 216:16
  217:15 218:25
  227:12 232:9,15
  249:9 261:2
  264:13,25
**year**   39:5,11 41:25
  42:1 65:24 66:23
  67:10 72:5,7,8
  73:5 78:3 88:19
  88:22 105:16
  106:3,12 117:23

  118:4,9,11 124:9
  132:12 139:21,24
  158:23,24 159:11
  223:21 258:17
**years**   20:7 29:14
  30:6,15 31:24
  33:24 35:5,5 39:2
  40:4 41:22 43:14
  47:21,22,24 54:14
  62:14,21 65:19,20
  65:24 67:16 68:14
  77:25 88:24,25
  103:21,24 105:8
  105:14 123:17
  129:1 146:21
  163:22 165:25
  174:8 187:22
  227:6 229:14
  230:2 241:9,13,20
  241:22 244:5
  245:5 263:17
**yep**   80:1 82:5
**yesterday**   24:8,12
  24:18 131:20
**york**   2:5 3:17
**yvonne**   51:24
  143:18 222:8,9,10
  222:11

### z

**zeno**   3:16 15:1
**zeno.houston**   3:18
**zero**   246:22
**zeroed**   84:13
**zipp**   3:9 14:24,24
  270:25,25

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.