IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

~~~~~~~~~~~~~~~~~~~~

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION

                        MDL No. 2804
                        Case No. 1:17-MD-2804
THIS DOCUMENT RELATES     Hon. Dan A. Polster
TO ALL CASES

HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

~~~~~~~~~~~~~~~~~~~~

Video Deposition of

JENNIFER DIEBERT

JANUARY 24, 2019
8:05 a.m.

Location:
Renaissance Toledo Downtown Hotel
444 North Summit Street
Toledo, Ohio

Todd L. Persson, Notary Public

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Page 120

1        identification.)

2        - - - - -

3        Q.    This is going to be P-WAG-233.  Do you

4    see this is an e-mail dated May 11, 2011?

5        A.    I see that.

6        Q.    And this is to Tammy Trumbull?

7        A.    I see that.

8        Q.    Do you know who that is?

9        A.    Yes.

10        Q.    Who is that?

11        A.    That is now Tammy Hensley.  She's our

12    admin manager.

13        Q.    Okay.  And we're going to spend the bulk

14    of our time talking about the attachment to this

15    e-mail.  But you see here where what is written to

16    Tammy is -- at the end there it says, "I'm

17    attaching the policy I use for Rx questionable

18    orders if that will help you."  Do you see that?

19        A.    I see that.

20        Q.    Do you understand what policy is being

21    referred to there?

22        A.    Not until I see the policy.

23        Q.    Okay.  Well, let's look at it.

24        So on the next page, do you see at the

25    top of the page this is a Walgreens document for

Page 119

1        A.    That's correct.

2        Q.    What is your role in processing the

3    orders after the excessive query report that we

4    talked about just a second ago?

5        A.    The reports are the last thing that we do

6    before we process the orders.

7        Q.    So after you run any excessive query

8    reports for, whether it's front end items, whether

9    it's pharmacy items, whether it's C-IIIs or C-Vs,

10    the orders get processed, the label is printed for

11    the pickers, and the pickers pick the items, bag

12    the items, and send them to the trucks?

13        A.    That's correct.

14        Q.    We talked a little bit about the phrase

15    "suspicious orders," and I think you told me you

16    heard of it.  But what about the phrase "orders of

17    interest;" does that mean anything to you?

18        A.    I have not heard that term before.

19        Q.    I'll show you what I'll mark as Exhibit

20    Number 10.

21        - - - - -

22        (Thereupon, Deposition Exhibit

23        Walgreens-Diebert 10, May 11, 2011

24        E-mail WAGMDL00751821 - 00751823,

25        was marked for purposes of

Page 121

1    the -- the subject of the document is the Rx

2    questionable order of quantity?

3        A.    I do see that.

4        Q.    And now that you've looked at it, do you

5    recognize what this policy is?

6        A.    I do not recognize this policy.

7        Q.    Okay.  And it says that this particular

8    policy originated in December of 2006; do you see

9    that?

10        A.    I see that.

11        Q.    Okay.  And what we're looking at here is

12    a revised policy from April of 2010; do you see

13    that?

14        A.    I see that.

15        Q.    Okay.  And this was -- it says the

16    department is SAIL?

17        A.    Yes.

18        Q.    And that would have been your department?

19        A.    At the Mt. Vernon distribution center,

20    yes.  That was not our distribution center.

21        Q.    Okay.  Do different distribution centers

22    have different policies?

23        A.    They may have at the time.  I couldn't

24    tell you.

25        Q.    And if you look at the first heading, it

31 (Pages 118 to 121)

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1  says "purpose." Do you see that?
2      A.  I see that.
3      Q.  It says, "to establish procedures for
4  verifying questionable store order quantities on
5  Rx items." Do you see that?
6      A.  Yes.
7      Q.  And you've been telling me about some
8  type of excessive order query that you would do on
9  the C-III to Vs. Do you have an understanding of
10  whether or not this is talking about that process?
11  And if you want to read through it for a minute,
12  feel free.
13      MS. SWIFT:  Take your time to read it if
14  you need to.
15      A.  Okay. It seems similar to what we would
16  have done.
17      Q.  Okay. This is generally describing the
18  process that you've been telling us about as far
19  as running the excessive order queries?
20      A.  Yes.
21      Q.  Do you know that there's a written policy
22  in place at Perrysburg that applied to the same
23  process?
24      A.  I don't know that.
25      Q.  Okay. So it says, "the purpose to

Page 123

1  establish procedures for verifying questionable
2  store order quantities on Rx items." Do you see
3  that?
4      A.  Yes.
5      Q.  When it says "Rx items," what does that
6  mean to you in the context of the distribution
7  center?
8      A.  Anything that needs a prescription.
9      Q.  So that would apply to diabetes
10  medication, blood pressure medication, as well as
11  controlled substances; is that fair?
12      A.  That's fair.
13      Q.  It says, "the scope of this procedure
14  covers the steps in verifying questionable store
15  order quantities prior to order processing on Rx
16  items." And the procedure, it says, "the
17  responsibilities of the computer room personnel
18  and the SAIL team prior to order processing." Do
19  you see that?
20      A.  I see that.
21      Q.  Okay. And is that consistent with what
22  you've told me, that this is something you go
23  through, and I think you said it's the last thing
24  that you do before the order gets processed?
25      A.  It is similar, yes.

Page 124

1      Q.  Okay. I think you've told me that you do
2  this process not only for pharmacy items and
3  controlled substances, but you also do this same
4  process for front end of the store items, correct?
5      A.  That's correct.
6      Q.  So you do the same process for the paper
7  towels, the toilet paper, the bubble gum, all that
8  stuff, too, as well?
9      A.  Yes.
10      Q.  It says for -- under the procedures, it
11  says, "once transmissions have been" -- well,
12  strike me. Let me ask you this real quick.
13      What's the involvement of the computer
14  room personnel in this process?
15      A.  It depends on which DC. Some
16  distribution centers the computer room is solely
17  responsible for checking orders and processing
18  them. Some distributions centers the SAIL will
19  check orders and the computer room will process
20  them. At our distribution center, on Sundays the
21  computer room is solely responsible for it, and
22  then Monday through Thursday SAIL checks orders
23  and then the computer room does the processing.
24      Q.  Okay. So you would be in charge of this
25  Monday through Thursday?

Page 125

1      A.  Correct.
2      Q.  Okay. Does the computer room have any
3  involvement whatsoever on Monday through Thursday?
4      A.  Not for our regular orders, no.
5      Q.  Okay. Do you actually run the query, or
6  run the report that would give you a printout of
7  anything that flagged?
8      A.  Yes.
9      Q.  All right. So in number 1, it says,
10  "once transmissions have been received from the
11  stores to its fullest, it tells you to run a query
12  that would be printed for the next process cycle
13  date to be reviewed." It says, "any Rx order
14  greater than 24" -- can we just call that units?
15      A.  Yes.
16      Q.  Okay. "Any Rx order greater than 24
17  units of one item should print on a query and
18  store numerical order along with SS items." Do
19  you see that?
20      A.  Yes.
21      Q.  What is "SS items"?
22      A.  Self-serve or front of store,
23  non-pharmacy items.
24      Q.  Gotcha. Okay. So self-serve, meaning
25  the consider can grab it off the shelves

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  themselves?

2    A.  They can grab it themselves, correct.

3    Q.  Okay.  So does that number -- I think

4  earlier today I asked you what the limit was that

5  would flag any pharmacy item, and I think you

6  didn't remember.  Does that 24 jog your memory?

7    A.  No.  And it could have been different at

8  the DCs.  I don't know what Mt. Vernon would have

9  done compared to Perrysburg.

10    Q.  And you don't remember what Perrysburg

11  did?

12    A.  No, I don't.

13    Q.  Okay.  But, anyway, the number generated

14  across any prescription item, according to this

15  policy, was the same?

16    A.  Yes.

17    Q.  Whether it's blood pressure medication,

18  diabetes medication, or controlled substances?

19    A.  Yes.  Depending on the query.  Perrysburg

20  ran a query for controlled substances, and we ran

21  a separate query for non-pharmacy items.  So in

22  reading this, it sounds like they may have just

23  run one query that would show everything over 24

24  SKUs totally.  We ran a separate query for

25  controls versus non-pharmacy, and they would have

Page 127

1  been different thresholds.

2    Q.  Did you run different queries for

3  controlled versus regular pharmacy?

4    A.  Regular pharmacy would have shown up on

5  the regular report because they weren't controlled

6  substances.

7    Q.  Okay.  So you ran a query for front end

8  plus regular pharmacy, and you ran a separate

9  query for controlled?

10    A.  Correct.

11    Q.  Okay.  And do you know if that was

12  pursuant to any written policy?

13    A.  I don't know that.

14    Q.  How did you know to do that?

15    A.  Tammy Trumbull, Hensley, who is the admin

16  manager now, was the SAIL coordinator when I took

17  that position over, and that is how she trained

18  me.

19    Q.  Okay.  But, anyway, according to the

20  policy, the report is run, and this one is 24

21  units, correct?

22    A.  Yes.  On this it is.

23    Q.  Okay.  And you don't remember what it was

24  for Perrysburg?

25    A.  No, I don't.

Page 128

1    Q.  Do you remember if it was the same or

2  different for front end items and pharmacy

3  items -- excuse me -- front end items and

4  controlled items?

5    A.  Perrysburg versus Mt. Vernon?

6    Q.  No, no.  Within Perrysburg, whether or

7  not the trigger number was the same or different

8  for controlled substances versus the pharmacy

9  items and non-controlled?

10    A.  It was different.

11    Q.  Then it goes on to say in the second

12  paragraph, it says, "the computer room or SAIL

13  personnel working the query will review the

14  listing.  If there is a questionable quantity, the

15  pharmacy is contacted at that store and the order

16  is questioned."  Do you see that?

17    A.  Yes.

18    Q.  It goes on to say, "if the order is

19  incorrect, the original order for the item is

20  deleted and rekeyed correctly."  Do you see that?

21    A.  I do see that.

22    Q.  Is this accurately -- and I know this is

23  a Mt. Vernon document -- but is this accurately

24  describing what -- what your process was at

25  Perrysburg?

Page 129

1    A.  Not specifically.  For controlled C-III

2  through V, if we did have something that got

3  flagged on the overage report, we would contact

4  the store if it looked like it wasn't in line with

5  their normal orders.  And if it was a wrong order,

6  we would either delete it or decrease it.  But we

7  wouldn't delete it and reenter an order.

8    Q.  Okay.  So would it be fair to say that

9  when you called the pharmacy, you were trying to

10  determine whether or not the order had been

11  entered in error?

12    A.  Yes.

13    Q.  So are you familiar with the phrase "fat

14  finger report"?

15    A.  I'm familiar with fat fingering, but not

16  a specific report.

17    Q.  Okay.  Okay.  So what you're looking for

18  here is fat fingering errors?

19    A.  Yes.

20    Q.  Okay.  So you're looking for places where

21  somebody wanted one unit and asked for 100 units?

22    A.  Exactly.

23    Q.  Okay.  And those are the type of

24  situations that would flag on this report and that

25  you would make a phone call to the pharmacy about?

33 (Pages 126 to 129)

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    A.   That's correct.
2    Q.   Okay.  Why is that something that was
3  important to the distribution center?
4    A.   We want to make sure that we were sending
5  the orders out the stores needed.
6    Q.   Okay.  If you sent an excessive quantity
7  that the store didn't need, would the store often
8  have to return those items?
9    A.   We did not return items at the DC.  I
10 don't know what processes the stores would have
11 used.  They would have contacted their district
12 office, and then asset protection for their
13 geographical location would have been involved.
14 But they would not have come back to the
15 distribution center.
16   Q.   Okay.  Well, some aspect of your job
17 involved returns, right, or trying to lower
18 returns?
19   A.   Not for Rx.  Not for pharmacy items.
20   Q.   Okay.  So front end items, if you shipped
21 them too many rolls of toilet paper, would those
22 get returned to the distribution center?
23   A.   There's criteria that the products have
24 to meet before we would approve a return.  But
25 they would -- we do do that.

Page 131

1    Q.   And that's something that you want to
2  avoid; is that fair to say?
3    A.   Yes.  Yes.
4    Q.   Okay.  And why is it that you want to
5  avoid those types of returns?
6    A.   Well, it doesn't suit the store or the
7  customers or the distribution center or Walgreens
8  in general to have excess stock sitting on the
9  shelves that's not getting sold.  If we send too
10 much to one store, we could be shorting another
11 store and missing sales on that.
12   Q.   Okay.  So in addition to looking for
13 these fat finger errors, is there anything else
14 that you're looking for when you're reviewing this
15 excessive order report?
16   A.   Not from a sales perspective, no.
17   Q.   At any time -- so let me make sure I
18 understand your process.
19        If you have an order that flags on the
20 excessive order report, that, frankly, is a fat
21 finger report; do you agree with that?
22   A.   Yes.
23        MS. SWIFT:  Object to the form.
24   Q.   And so if you have an order that flags on
25 the fat finger report, you make a phone call to

Page 132

1  the pharmacy?
2    A.   That's correct.
3    Q.   Okay.  You said that you would maybe look
4  at the past ordering history for a store, but I
5  would assume that a lot of times you can see the
6  orders that come in on those fat finger reports
7  and realize they're clearly in error?
8        MS. SWIFT:  Object to the form,
9  characterization of the report.
10   A.   So it was very infrequent that we ever
11 actually had to -- or had those items show up on
12 the report.  When they did, I don't recall ever
13 actually having to call the store to see if it was
14 correct or not.  That's how infrequent it would
15 have been.  But, yes, we did check their order
16 history to see if it was something that was
17 regular and average for what the store goes
18 through and orders.
19   Q.   Okay.  Give me an example -- or give me
20 an estimate of how often you would have a
21 controlled drug flag on one of these reports.
22        MS. SWIFT:  Objection.  Calls for
23 speculation.
24   A.   Yeah, I have no idea.
25   Q.   Well, you said it happened very

Page 133

1  infrequently.  What do you mean by that?
2    A.   I mean, it happened -- I don't recall it
3  ever actually happening.  I don't recall ever
4  contacting a store to say, you know, is your C-III
5  through V item, whatever it was, you know, is that
6  a valid order.
7    Q.   Do you recall a C-III through V item ever
8  flagging on this excessive order, fat finger
9  report?
10   A.   I'm --
11        MS. SWIFT:  Object to the
12 characterization of the report.
13   A.   So I'm sure that it would have come up,
14 but I don't recall it at all.  It was a long time
15 ago.
16   Q.   Okay.  Was this -- this process of
17 running this report and looking for these fat
18 finger errors, was that always a part of your
19 duties and responsibilities as a SAIL coordinator?
20        MS. SWIFT:  Object to the form of the
21 question.
22   A.   It -- for the C-III through Vs while we
23 distributed them and I was the SAIL coordinator,
24 yes.  And for the -- I'm sorry, go ahead.
25   Q.   No --

34 (Pages 130 to 133)

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    MS. SWIFT: Did you finish your answer?
2    A.   No.  For non-pharmacy, we have always --
3  as the SAIL coordinator, we've always run that
4  report.
5    Q.   Okay.  But for controlled drugs, you've
6  run that all the way back to 2008, when you became
7  the SAIL coordinator?
8    A.   If that is the -- I don't remember what
9  dates we were distributing C-III through V.  But
10  during my time as SAIL coordinator while we were
11  distributing, yes, we ran that report.
12    Q.   And tell me if I'm wrong, but I heard you
13  tell me that you don't ever remember there being a
14  C-III through V drug that flagged on that report?
15    MS. SWIFT: Object to the form.
16    A.   I don't recall it happening.
17    Q.   Do you recall ever having to review a
18  store's ordering history for Schedule III through
19  V drugs to evaluate any of these orders that would
20  have flagged on a report?
21    A.   I don't specifically remember reviewing
22  C-III through V.  But we regularly check that for
23  all items that we process now and did then.  But I
24  don't remember if it was C-III through V.  I don't
25  have a specific recollection of that.

Page 135

1    Q.   Okay.  But so you would have reviewed the
2  historical orders for bubble gum if that were to
3  pop up on one of these reports?
4    A.   Yes, we would.
5    Q.   And you would have looked into whether or
6  not the bubble gum order that came in on this
7  particular order that flagged on the report was
8  consistent with what that store had typically been
9  getting?
10    A.   That's true.
11    Q.   And if it wasn't consistent, in that
12  situation you would make a phone call to the
13  store?
14    A.   That's right.
15    Q.   And you would ask the store, you know,
16  you usually only get 10 units of bubble gum, but
17  here you asked for 1,000 units of bubble gum; did
18  you really want 1,000 units?
19    A.   That's what we would do.
20    Q.   Okay.  And they would tell you, no, we
21  just want our normal 10 units of bubble gum, and
22  in that case you would do what?
23    A.   We would decrease the order to the 10
24  units that they asked for, for non-pharmacy.
25    Q.   You took your direction from the store on

Page 136

1  what to change the order to if the order was to be
2  changed?
3    A.   Yes, we did.
4    Q.   You didn't contact anybody at -- in loss
5  prevention or corporate or internal audit, or
6  anything like that, and ask them for any
7  instructions or directions on what to change the
8  order to?
9    MS. SWIFT: Object to the form of the
10  question.
11    A.   No, we did not.
12    Q.   Whatever the store told you to do, that's
13  what you inputted for that order?
14    MS. SWIFT: Object to the form.
15    A.   Yes.
16    Q.   Would there ever be an occasion where the
17  store would say, no, we want -- we want 50 units
18  of bubble gum today, and you would say, well, no,
19  we're only going to give you 10?  Would that ever
20  happen?
21    A.   It's possible.  We would base it on what
22  our current DC inventory was.  We don't want to
23  short other stores just to give a bulk of the
24  product to one store.  So it is possible that we
25  would give them a lesser amount than what they

Page 137

1  were requesting.
2    Q.   But the reason for that would be the
3  amount of inventory that you have in the
4  distribution center?
5    A.   That's correct.
6    Q.   Do you ever recall having one of these
7  fat finger reports flagged for a controlled
8  substance and then you reporting that to the DEA?
9    MS. SWIFT: Object to the form of the
10  question.
11    A.   I never had any contact with the DEA.
12    Q.   Okay.  Would it even have occurred to you
13  if there had been an order that had come in for
14  1,000 bottles of a C-III drug for a store that
15  usually got 10 bottles, would it even have
16  occurred to you to contact the DEA?
17    MS. SWIFT: Object to the form.  Assumes
18  facts not in evidence.
19    A.   I don't know what I would have done.
20    Q.   Okay.  Well, your normal process would
21  have been to call the store, right?
22    A.   Yes.
23    Q.   And ask the store did you really want
24  these 1,000 bottles of the C-IIIs, correct?
25    MS. SWIFT: Object to form.  Calls for

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1   speculation.
2       A.   Yes.  I would have called the store to
3   see if it was a legitimate order.
4       Q.   Okay.  And if they told you that was a
5   fat finger error, we really only want our 10
6   bottles, you would have lowered it to 10 and sent
7   them the 10, correct?
8       A.   Correct.
9           MS. SWIFT:  Objection.  Calls for
10  speculation.
11      Q.   If -- in a similar situation, if you had
12  a store and an order for 100 bottles of
13  controlled -- a Schedule III controlled drug, and
14  it flagged on your report, and you looked, and the
15  store typically got 10 bottles, and you called the
16  store and said did you really want these 100
17  bottles or was that an error, and they told you,
18  no, we really want the 100 bottles; if you had
19  sufficient inventory within the store, was there
20  anything that would have prevented you from
21  sending that order?
22          MS. SWIFT:  Objection.  Calls for
23  speculation.  Hypothetical.
24      A.   Well, we can't see the inventory at the
25  store.  Did you mean the DC?

Page 139

1       Q.   I'm sorry.  That's exactly what I meant.
2       A.   Okay.
3           MS. SWIFT:  Same objections.
4       A.   I still -- I don't know what I would have
5   done at the time.  It did not happen that I can
6   recall, so I'm not sure what my follow-up would
7   have been.
8       Q.   But there was no policy or procedure that
9   was in place to tell you to do anything other than
10  fill the order if you verified with the store that
11  the order was accurate?
12          MS. SWIFT:  Objection.  Calls for
13  speculation.
14      Q.   Is that correct?
15      A.   Since it didn't happen that I can recall,
16  I don't know if there was a policy or procedure in
17  place.
18      Q.   Okay.  So if you read the last sentence
19  of paragraph 2 under 3-A, it says "if the order
20  is."  Do you see where I am?
21      A.   Paragraph 2, under -- where are you at?
22      Q.   Under "procedure."
23      A.   3-A -- so the C2 SAIL personnel working
24  query?  Is that where you are?
25      Q.   Correct.

Page 140

1       A.   Okay.  I got you.  I see.
2       Q.   All right.  I'm looking at the last --
3       A.   Okay.  Sorry.
4       Q.   It says, "if the order is incorrect, the
5   original order for the item is deleted and rekeyed
6   correctly."  Do you see that?
7       A.   I see that it says that.
8       Q.   Okay.  And you agree that that was the
9   procedure?
10          MS. SWIFT:  Object to the form.
11      A.   That was Mt. Vernon's procedure,
12  according to this document.  But we did not delete
13  and rekey an order.  We either deleted the order,
14  or we just decreased the existing order.
15      Q.   Okay.  And the purpose for doing that was
16  to correct any errors and make sure that the store
17  got what they were really asking for?
18          MS. SWIFT:  Objection to form.
19      A.   That's correct.
20      Q.   And then it looks like the next step is
21  once all orders have been reviewed for accuracy,
22  computer personnel is notified to kick off order
23  processing?
24      A.   That is correct.
25      Q.   So once it's been verified that the --

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

REDACTED

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

REDACTED

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    A.   Yes, I do.
2    Q.   I'm presuming that that would be you.  Do
3    you know what's being referred to there?
4    A.   I believe that that is referring to the
5    sheet that the loaders signed off when they loaded
6    a controlled tote or case onto their truck.  They
7    would keep it, they would sign off on it, and file
8    it.
9    Q.   And what type of information would be on
10   that form?
11   A.   It would have the date, the store number
12   that the item belonged to, the unique scan ID that
13   was assigned to that tote so that it could be
14   tracked, and then the loader -- the trailer
15   number, route number, and then the loader's
16   signature on it.
17   Q.   When you were the SAIL coordinator, did
18   you have physical access to the C-III through C-V
19   drugs?
20   A.   I did not.
21   Q.   If you look at the next page, at the item
22   number 21, it lists it looks like eight different
23   items there of records.  Do you see that?
24   A.   I do see that.
25   Q.   And do you see number 7 says "monthly

Page 283

1    suspicious controlled drug order report"?  Do you
2    see that?
3    A.   I see that on there.
4    Q.   And, again, we looked at some of those
5    this morning.  You're not familiar with those,
6    correct?
7    A.   I am not familiar with those.
8    Q.   And in the column to the right where it
9    says who's responsible, it's indicating that would
10   be Tammy?
11   A.   That's correct.
12   Q.   I'm going to show you what I'll mark as
13   Exhibit Number 30.  It starts out at Bates number
14   757188.
15           - - - - -
16        (Thereupon, Deposition Exhibit
17        Walgreens-Diebert 30, Perrysburg
18        Distribution Center DEA Review
19        WAGMDL00757188 - 00757192, was
20        marked for purposes of
21        identification.)
22           - - - - -
23   Q.   And, again, this is one I just got last
24   night, so I think you'll have a color copy that
25   will pop up on the screen there.

Page 284

1    And the first two pages of this looks
2    pretty much the same.  Do you recognize this to be
3    your document in your handwriting?
4    A.   No.  That's -- I think that's Tammy's
5    handwriting again, too, but there's very little on
6    there.
7    Q.   Okay.
8    A.   That's her handwriting on the second
9    page.
10   Q.   Okay.  And if you flip to the third page,
11   same thing, again, it appears to be Tammy's
12   handwriting?
13   A.   Yes.  That's Tammy's handwriting.
14   Q.   If you go to the last page of the
15   document, it says, "daily agenda Perrysburg
16   distribution center DEA review."  Do you see that?
17   A.   Yes.
18   Q.   Would you have been involved in this
19   process?
20        MS. SWIFT:  Object to the form.
21   A.   No.
22   Q.   And under Monday, in the box with item 2,
23   it has the name Scott Brown.  Do you know who that
24   is?
25   A.   I do.  He's no longer with Walgreens.

Page 285

1    Q.   What was his role when he was there?
2    A.   He was the shipping function manager.
3    Q.   What does the shipping function manager
4    do?
5    A.   They would make sure they had loaders
6    assigned to the doors that were being loaded into,
7    that all the product was getting put on the
8    trailers.
9    Q.   In the Wednesday box, do you see an item
10   number 2, it says "afternoon"?
11   A.   I do.
12   Q.   And it says "interviews," and it says
13   "ARCOS Rx manager and SAIL."  Do you see that?
14   A.   I do see that.
15   Q.   And at this time you would have been the
16   SAIL, correct?
17        MS. SWIFT:  Object to the form.
18   A.   Yes.  I was the SAIL coordinator in 2012.
19   Q.   Do you recall participating in interviews
20   with the DEA during this time period?
21   A.   No, I do not.
22        MS. SWIFT:  Object to the form.
23   Q.   Do you know that you didn't, or do you
24   just not remember?
25   A.   I don't recall ever talking to a DEA

Highly Confidential - Subject to Further Confidentiality Review

Page 286  **REDACTED**

1    agent.
2        Q.   Do you ever recall DEA being at
3    Perrysburg and at the distribution center in any
4    form or fashion?
5            MS. SWIFT:  Objection.  Asked and
6    answered.
7        A.   I don't recall when the DEA was there.  I
8    know that they were there, but I couldn't tell you
9    dates, or what they were there for.
10       Q.   Sure.  So -- sorry, that was a bad
11   question.  So we looked at documents earlier that
12   talked about exactly when they came in to inspect,
13   correct?
14       A.   Yes.
15       Q.   Okay.  What I meant to ask you is if
16   you've ever -- whether that time or any other time
17   while you've been at Perrysburg, have you ever
18   seen DEA agents within the facility?
19       A.   I have not seen any DEA agents in the DC.
20       Q.   I had asked you earlier about whether or
21   not you had ever been asked to purge or destroy
22   any older documents.  Do you know -- if I was --
23   if I was wanting to know who did that at the
24   Perrysburg distribution center, who would you
25   suggest I talk to?

Page 287

1            MS. SWIFT:  Object to the form.  Vague.
2        A.   I'm not sure.  I may even be able to find
3    that information out.  I would have to look once I
4    got back to work.  Tammy may also know that, but
5    our HR department may also know, too.  I really am
6    not sure.
7                  - - - - -
8            (Thereupon, Deposition Exhibit
9            Walgreens-Diebert 31, August 13,
10           2012 E-Mail WAGMDL00757172 -
11           007571187, was marked for purposes
12           of identification.)
13                 - - - - -
14       Q.   I'll show you what I'll mark as Exhibit
15   Number 31.  This is -- it begins with Bates
16   757172.
17           And, again, this is a document I just got
18   yesterday, so I think you might have a color copy
19   on the screen, but I just have a black and white
20   that I was able to print out downstairs.

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**