IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
------------------------    )
IN RE: NATIONAL             ) MDL No. 2804
PRESCRIPTION OPIATE         )
LITIGATION                  ) Case No.
------------------------    ) 1:17-MD-2804
                            )
THIS DOCUMENT RELATES TO    ) Hon. Dan A. Polster
ALL CASES                   )
------------------------    )
```

HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW


VIDEOTAPED DEPOSITION OF

CHRISTOPHER DOMZALSKI

January 17, 2019


Chicago, Illinois


GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services – 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Page 156

1    MR. HOUTZ:  Object to form.
2    THE WITNESS:  I'm sorry.
3    BY THE WITNESS:
4    A.   Yes, and, again, I would say the
5    combination of the policy along with those
6    discussions with legal and with the management
7    team.
8    BY MR. MOUGEY:
9    Q.   Sir, if you turn the page, and you see
10   in the middle the cite to 21 CFR 1301.74.  It's the
11   same section we just read.
12        Do you see that, sir?
13   A.   Sorry.  Where at?
14   Q.   In the middle of the page, the block
15   quote.
16   A.   Yes, yes.
17   Q.   It's the same section of the federal
18   regs that we just reviewed together, right?
19   A.   Yes.
20   Q.   Do you see the sentence that, "It bears
21   emphasis that the foregoing reporting requirement
22   is in addition to, and not in lieu of, the general
23   requirement under 21 U.S.C. Section 823(e)."
24        Do you see that, sir?

Page 155

1    A.   And react to it.
2    Q.   -- and then take their policy and
3    procedure manuals and incorporate that direction
4    from the DEA into its day-to-day manuals, correct?
5    A.   My assumption would be that they would
6    react to it.
7    Q.   And I understand.  We have said it's
8    important and we've said that it's reacting to it,
9    but what I asked was a little bit different.
10        What I asked was:  They would take the
11   direction from the DEA and make sure that that
12   information was included in its policies and
13   procedures, correct?
14   MR. HOUTZ:  Object to form.
15   BY THE WITNESS:
16   A.   Yes, I would expect that.
17   BY MR. MOUGEY:
18   Q.   So, the fact that you expected that,
19   your group was relying on the policies and
20   procedures that Walgreens had in the context of
21   Walgreens' responsibility as a distributor for
22   Schedule II and Schedule III when performing your
23   audit, correct?
24   A.   Yes.

Page 157

1    A.   Yes.
2    Q.   The next paragraph, "Thus, in addition
3    to reporting all suspicious orders, a distributor
4    has a statutory responsibility to exercise due
5    diligence to avoid filling suspicious orders."
6        Do you see that, sir?
7    A.   Yes.
8    Q.   All right.  Now, let's stop for a
9    second.
10        Do you have an understanding, just
11   generally, of what due diligence means?
12   A.   Generally, yes.
13   Q.   What is your understanding generally of
14   what due diligence means?
15   A.   Take actions to ensure, perform some
16   kind of review or evaluation.
17   Q.   Let's take it in the context of the
18   internal audit group, your group.  Okay.
19        Your group's due diligence would mean
20   explaining what you've told me today, that when
21   understanding Walgreens' responsibilities as a
22   distributor, you met with distribution center
23   management, correct?
24   A.   Partially, yep.

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    Q.  And you also met with regulatory and
2  legal, correct?
3    A.  We did.
4    Q.  You also looked at Walgreens' policies
5  and procedure manuals, correct?
6    A.  Correct.
7    Q.  You also performed or interviewed
8  employees at Walgreens, correct?
9    A.  Correct.
10    Q.  And I'm assuming that your group would
11  typically also look at some documentation from
12  Walgreens, correct?
13    A.  Correct.
14    Q.  That's -- that could be referred to as
15  internal audit performing due diligence, correct,
16  sir?
17    A.  Yes.
18    Q.  Yes.  So, in the context here, due
19  diligence wouldn't be a foreign concept in that
20  Walgreens as a distributor has a statutory
21  responsibility to exercise due diligence to avoid
22  filling suspicious orders, right?
23    A.  Say that again.
24    Q.  That you understand the context of due

Page 159

1  diligence in this sentence that Walgreens has a
2  statutory responsibility before it fills suspicious
3  orders to exercise due diligence, correct?
4    A.  Yes.
5    Q.  Now, let's go back to Domzalski 3.  Can
6  you tell me in the scope of this internal audit
7  whether or not your group looked to determine
8  whether or not Walgreens fulfilled its statutory
9  responsibility to exercise due diligence before
10  filling suspicious orders?
11    A.  I can't tell you from the words that are
12  in the audit report, no.
13    Q.  I will hand you what we'll mark as --
14    MR. HOUTZ:  Chris, do you want to do the lunch
15  break?
16    THE WITNESS:  No, let's finish.
17  BY MR. MOUGEY:
18    Q.  I have two more quick documents.  I
19  think I told you I should be 20, 25 minutes.  It
20  should be close.  Okay?  Is that okay?
21    A.  Yes.
22    Q.  Okay.  Thank you.
23    MR. MOUGEY:  I hand you what we are going to
24  mark as Domzalski 8.

Page 160

1    (WHEREUPON, a certain document was
2      marked as Walgreens-Domzalski
3      Exhibit No. 8:  2/7/07 letter from
4      U.S. DOJ DEA; ABDCMDL00269687 -
5      0026960.)
6  BY MR. MOUGEY:
7    Q.  What I want you to do is just --
8      (Clarification requested by the
9      reporter.)
10    MR. MOUGEY:  I'm sorry.
11    MS. SCHUCHARDT:  Counsel, this appears to be
12  an AmerisourceBergen document that's confidential.
13  I have not been apprised that we have given
14  authority to show it to a Walgreens employee.
15    MR. MOUGEY:  I have used this document in
16  about ten depositions at this point.  It's a
17  general form letter sent to every single registrant
18  in the United States, and it's the -- it says right
19  on the first page, "This letter is being sent
20  to every commercial entity in the United States
21  registered with the Drug Enforcement Agency to
22  distribute controlled substances."
23    MS. SCHUCHARDT:  Be that as it may, I have an
24  obligation to request if we can give permission.

Page 161

1  Can you use another document in the meantime?
2    MR. MOUGEY:  I don't have access to another
3  document.  Would it be okay with you is if you
4  didn't waive any of your objections and if there is
5  any problem with us, that you have kept all your
6  rights under whatever the privilege or protective
7  order is, that we are not waiving anything by
8  letting us use this today?
9    MS. SCHUCHARDT:  Go ahead.
10    MR. MOUGEY:  Thank you.
11    THE WITNESS:  So, can I just -- I have two --
12    MS. SIBISKI:  Counsel, can I have the Bates
13  number for Exhibit 7 and Exhibit 8.
14    MR. MOUGEY:  Sure.  It's ABDCMDL269687.  It's
15  the February 7, 2007 letter that went to every
16  distributor in the country.
17    MS. SIBISKI:  Okay.  And I also need 7,
18  please.
19    MR. MOUGEY:  MCKMDL00478906.
20    MS. SIBISKI:  Thank you.
21    MR. MOUGEY:  Certainly.
22  BY MR. MOUGEY:
23    Q.  What I want you to just do quickly and
24  see if we can do this without going through each

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  paragraph.

2        Would you just compare.  Generally

3  Exhibits 7 and 8 appear to be very similar or

4  almost identical.

5     A.  Yes, they appear to be -- from what I

6  can tell, yeah, they look pretty similar.

7     Q.  Again, I know you didn't have time to

8  review every single word but they're very similar,

9  correct?

10    A.  They look similar.

11    Q.  So, now, sir, as part of or chief

12  director of internal audit at Walgreens, do you

13  recall seeing this February 7, 2007 letter as part

14  of the -- your group's internal audit of the

15  distribution centers?

16    A.  I don't recall seeing this document.

17    Q.  Just to make sure I'm not missing

18  something, you don't recall in the last two

19  exhibits, 7 and 8, seeing any synopsis or bullets

20  or anything that captures the content in Exhibits 7

21  or 8 when performing the audit, correct?

22    A.  I certainly don't recall that, no.

23    Q.  All right.  Let me hand you what I will

24  mark as Domzalski 9.

Page 163

1        (WHEREUPON, a certain document was

2           marked as Walgreens-Domzalski

3           Exhibit No. 9:  12/27/07 letter

4           from U.S. DOJ DEA; MCKMDL00478910 -

5           00478911.)

6  BY MR. MOUGEY:

7     Q.  Do you see the date on this, sir,

8  December 27, 2007?

9     A.  Yes, I do.

10    Q.  And we've now -- the first sentence,

11  "This letter is being sent to every entity in the

12  United States registered with the Drug Enforcement

13  Administration to manufacture or distribute

14  controlled substances."

15        Correct?

16    A.  Yes.

17    Q.  And your understanding is, again, that

18  would include Walgreens?

19    A.  Yes.

20    Q.  So, we've now seen correspondence from

21  the U.S. Department of Justice DEA from

22  September 27, 2006, February 7, 2007 and then a

23  third letter, December 27, 2007, correct, sir?

24    A.  Yes.

Page 164

1     Q.  So, all within a matter of approximately

2  14 months, 15 months?

3     A.  Yes.

4     Q.  And, again, the second sentence of 9,

5  Exhibit 9, says, "The purpose of this letter is to

6  reiterate the responsibilities of controlled

7  substance manufacturers and distributors to inform

8  DEA of suspicious orders in accordance with 21

9  CFR."

10        Correct?

11    A.  I'm sorry.  I lost you on that.  Where

12  are you at?

13    Q.  The second sentence of the first

14  paragraph.

15    A.  First paragraph.  Okay.

16    Q.  "The purpose of this letter is to

17  reiterate the responsibilities of controlled

18  substance manufacturers and distributors to inform

19  DEA of suspicious orders in accordance with 21 CFR

20  1301.74(b)."

21        Correct?

22    A.  Yes.

23    Q.  Now, just to quickly look over --

24  quickly review this document.

Page 165

1        The second paragraph, do you see the

2  second sentence indicates that DEA regs require all

3  distributors to report suspicious orders of

4  controlled substances, right?

5     A.  Yes.

6     Q.  And I'm assuming the answer to this next

7  question is the same as before, that you can't

8  discern from the internal audit report whether your

9  group's audit covered Walgreens' responsibility to

10  identify suspicious orders, right?

11    A.  No, I cannot recall that.

12    Q.  And --

13    A.  Cannot identify it from the report.

14    Q.  You'll see here -- let's go down to the

15  third paragraph.

16    A.  Yes.

17    Q.  "The regulation also requires the

18  registrant inform the local DEA Division Office of

19  suspicious orders when discovered by the

20  registrant."

21        Sir, is it safe to conclude that you

22  can't tell from looking at this internal audit,

23  meaning Exhibit 3, whether or not the excessive

24  purchase reports or suspicious order reports were

42 (Pages 162 to 165)

Page 166

1  sent when discovered by Walgreens?
2      A.   No, you can't tell.
3      Q.   And, sir, the next sentence, "Filing a
4  monthly report of completed transactions
5  ('excessive purchase report' or 'high unit
6  purchases') does not meet the regulatory
7  requirement to suspicious orders."
8          There was no -- you can't tell whether
9  or not your group, the internal audit report,
10 analyzed whether or not Walgreens was fulfilling
11 its obligations with the type of reporting it was
12 providing to the DEA?
13     A.   No, I can't tell that.
14     Q.   Sir, if you skip a sentence, the next
15 sentence says, "Registrants must conduct an
16 independent analysis."
17         Do you see where I am?
18     A.   Yes, I do.
19     Q.   "Registrants must conduct an independent
20 analysis of suspicious orders prior to completing a
21 sale to determine whether the controlled substances
22 are likely to be diverted from legitimate
23 channels."
24         Did I read that right?

Page 167

1      A.   Yes, you did.
2      Q.   And you can't tell looking at the scope
3  of the audit in Exhibit 3 whether or not your group
4  determined whether or not Walgreens was conducting
5  an independent analysis of suspicious orders prior
6  to completing the sale, correct, sir?
7      A.   No, I cannot tell that.
8      Q.   If you turn to the second page, sir, the
9  back of it.  The sentence that begins with
10 "Registrants that rely on rigid formulas to define
11 whether an order is suspicious may be failing to
12 detect suspicious orders."
13         Do you see that, sir?
14     A.   Yes, I do.
15     Q.   Sir, is it safe to conclude that we
16 can't tell from the scope of the internal audit
17 report whether or not Walgreens was using a rigid
18 formula to identify suspicious orders?
19     A.   That's correct.  You can't tell.
20     Q.   And if you go to the next paragraph, the
21 second sentence, "Daily, weekly, or monthly reports
22 submitted by a registrant indicating 'excessive
23 purchases' do not comply with the requirement to
24 report suspicious orders, even if the registrant

Page 168

1  calls such reports 'suspicious order reports.'"
2          Is it safe to conclude, sir, that the
3  audit as Exhibit 3, we don't know whether or not
4  your group determined whether the reports were
5  daily, weekly or monthly, correct?
6      A.   Correct.  You can't tell from the words.
7      Q.   Sir, the directors that worked, the five
8  directors that worked for you.
9      A.   Yes.
10     Q.   Just on average, what were their annual
11 salaries?
12     A.   Maybe in the $150,000 range.
13     Q.   150?
14     A.   Base salary.
15     Q.   150,000 range.  I'm assuming yours was
16 more than 150?
17     A.   Yes.
18     Q.   In between 2 and 300?
19     A.   Probably closer to 2.  200,000.
20     Q.   Closer to 2.  So, the five directors
21 that you had performing these audit reports,
22 Walgreens believed in enough, with their expertise
23 and sophistication, that they would make about 150
24 grand, correct?

Page 169

1      A.   Can you repeat the question?  I don't
2  know if I understood it.
3      MR. MOUGEY:  I will tell you what.  Let's stop
4  there for lunch, if that's all right.
5      THE VIDEOGRAPHER:  We are off the record at
6  12:32 p.m.
7          (WHEREUPON, a recess was had
8           from 12:32 to 1:20 p.m.)
9      THE VIDEOGRAPHER:  We are back on the record
10 at 1:20 p.m.
11 BY MR. MOUGEY:
12     Q.   Mr. Domzalski, are there -- is there a
13 shared drive at Walgreens that during your tenure
14 that has a list of all of the different audits that
15 were performed?
16     A.   I don't know if it has a list.  I
17 think -- I think it has probably some folder
18 mechanism that would capture individual audits
19 performed, and I don't recall if it's by year or by
20 area.  I don't remember what the structure of the
21 shared drives would be in.
22     Q.   But it's your recollection, irrespective
23 of the shared drive, that Walgreens has a mechanism
24 to capture what audits were performed and what

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  department?
2      A.  Yes, absolutely.
3      Q.  All right.  Do you have an independent
4  recollection of, during your tenure, how many
5  audits were performed on the distribution centers
6  in relation to the Controlled Substance Act
7  Schedule II, Schedule III opiates?
8      A.  No, I don't.
9      Q.  Let's broaden that out.
10         Do you have any recollection sitting
11  here how many audits were performed on the
12  distribution centers generally?
13     A.  No, I do not.
14     Q.  Do you have an understanding of the
15  frequency of how often audits were to be performed
16  on distribution centers?
17     A.  Not specifically.  I would, again, best
18  recollection would be that we would have had them
19  on some kind of rotational basis, but I don't
20  honestly recall what that rotational basis would
21  have been.
22     Q.  Do you have -- I'm sorry.
23         Do you have a recollection of just a
24  typical frequency?

Page 171

1      A.  No, I don't, especially in the broader
2  picture of the audits, a lot of the audits we were
3  doing, they may have been first-time audits of that
4  specific -- of a specific area.  So, it wasn't like
5  all audits were subject to a rotational basis, but
6  I think the -- my expectation would have been that
7  the DC audits would have been on some more formal
8  rotational basis.
9      Q.  I'm going to hand you what we're going
10  to mark as Domzalski 10.
11         (WHEREUPON, a certain document was
12         marked as Walgreens-Domzalski
13         Exhibit No. 10:  PowerPoint,
14         "Walgreen Co. Controlled Substance
15         Anti-Diversion and Compliance
16         Program"; WAGMDL0000659801 -
17         00659856.)
18  BY MR. MOUGEY:
19     Q.  And it's WAGMDL659803.  This appears to
20  be a PowerPoint.  First page is titled "Walgreen
21  Company Controlled Substance Anti-Diversion and
22  Compliance Program."
23         Do you see that on the first slide?
24     A.  Yes, I do.

Page 172

1      Q.  It's dated July 17, 2012, and if you
2  see -- you know how sometimes you have PowerPoint
3  and you have talking points below?
4      A.  Yes.
5      Q.  That's what this appears to be, right?
6      A.  Yes.
7      Q.  All right.  Have you seen this before,
8  just the first -- do you recall?
9      A.  No, I don't recall seeing this.
10     Q.  So, you'll see the notes that it -- "We
11  want to work with you.  We want to cooperate and
12  avoid litigation."  It appears to be communication
13  between Walgreens and some regulator.
14         So, where I want to direct your
15  attention is Bates No. 19.  On Bates No. 19, under
16  the "Audit program."  Do you see that?
17     A.  Yes.
18     Q.  All right.  Now, do you see that the
19  first entrants under "Audit program" is
20  "Mini-audits"?
21     A.  Yes.
22     Q.  And as you testified earlier,
23  "Distribution center conduct mini-audits in order
24  to ensure that the handling of Schedule II to V

Page 173

1  controlled substance complies with DEA
2  regulations."
3         Do you see that?
4      A.  I see that.
5      Q.  "The audit reviews registration,
6  security, employee screening, inventory
7  requirements, recordkeeping and reporting."
8         Do you see that?
9      A.  Yes, I do.
10     Q.  Okay.  Now, below that is the "Internal
11  audits," and the internal audit is what you and I
12  were just reviewing under as Exhibit 3.  Okay?
13     A.  Yes.
14     Q.  Now, do you see the reference
15  "Distribution centers undergo more thorough audits
16  every three to five years in order to ensure that
17  the handling of Schedule II to V controlled
18  substances complies with DEA regs"?
19     A.  Yes.
20     Q.  Does that comport with your general
21  recollection of how frequent the internal audits
22  were conducted on the distribution centers?
23     A.  It certainly sounds like a reasonable
24  period of time, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 174                    REDACTED

1       Q.   So, during the time -- do you have --
2   that you were at Walgreens, do you have a
3   recollection, at least up until the end of '14,
4   that there were three distribution centers at
5   Walgreens that handled Schedule II and III opiates?
6       A.   So, I don't remember specific numbers,
7   but I remember there were differentiations between
8   the DCs in terms of what products they handled and
9   that certainly only certain of those DCs handled
10  Schedule --
11      Q.   So -- I'm sorry.
12      A.   Yeah.
13      Q.   At least according to this entry and
14  your general recollection, we should -- we should
15  have in our -- there should have been one or two
16  audits during your tenure of the distribution
17  centers while you were at Walgreens.  Does that
18  make sense?
19      A.   That's --
20      MR. HOUTZ:  Object to form, foundation.
21  BY THE WITNESS:
22      A.   It makes logical sense to me, yes.
23  BY MR. MOUGEY:
24      Q.   Okay.  Who would know that?  Where would

Page 175

1   we go to know for sure?  We have a PowerPoint.  You
2   don't have a specific recollection.  But I think
3   you said that that generally comports with your
4   recollection of three to five years.
5           Where would we know for sure?  Where
6   would we go to look of how frequent the internal
7   audits were of the distribution centers?
8       A.   Probably for sure in the shared drive
9   would be, again, some record of -- I don't know,
10  again, what form you'd have to take, but certainly
11  the data would be there.
12      Q.   All right.
13      A.   I don't know if there is better
14  locations.
15      Q.   Let me broaden that question up.
16          Is there a -- and I apologize because I
17  think you told me this earlier.
18          But what was the catalyst or initiation
19  of an audit where they -- was someone in your
20  group?  Did someone keep track of how often the
21  audits would occur?  Or just tell me what the
22  genesis of an audit was.
23      A.   So, I think there is -- I think you have
24  to look at it, step up to the overall audit

45 (Pages 174 to 177)

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED