## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
------------------------    )
IN RE: NATIONAL         )   MDL No. 2804
PRESCRIPTION OPIATE     )
LITIGATION              )   Case No.
------------------------    )   1:17-MD-2804
                            )
THIS DOCUMENT RELATES TO    )   Hon. Dan A. Polster
ALL CASES               )
------------------------    )
```

HIGHLY CONFIDENTIAL
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VIDEOTAPED DEPOSITION OF

MICHAEL STEPHEN DORSEY

January 8, 2019

Chicago, Illinois

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

## Page 2

```
1
2
3
4
5              The videotaped deposition of
6    MICHAEL STEPHEN DORSEY, called by the Plaintiffs
7    for examination, taken pursuant to the Federal
8    Rules of Civil Procedure of the United States
9    District Courts pertaining to the taking of
10   depositions, taken before CORINNE T. MARUT, C.S.R.
11   No. 84-1968, Registered Professional Reporter and a
12   Certified Shorthand Reporter of the State of
13   Illinois, at the offices of Morgan, Lewis & Bockius
14   LLP, Suite 500, 77 West Wacker Drive, Chicago,
15   Illinois, on January 8, 2019, commencing at 9:02
16   a.m.
17
18
19
20
21
22
23
24
```

## Page 3

```
1    APPEARANCES:
2      ON BEHALF OF THE PLAINTIFFS:
3        ROBBINS GELLER RUDMAN & DOWD LLP
           One Montgomery Street, Suite 1800
4          San Francisco, California  94104
           415-288-4545
5          BY:  MATTHEW S  MELAMED, ESQ
             mmelamed@rgrdlaw com
6            KELLI BLACK, ESQ
             kblack@rgrdlaw com
7
8        WAGSTAFF & CARTMELL LLP
           4740 Grand Avenue, Suite 300
9          Kansas City, Missouri  64112
           816-701-1100
10         BY:  JONATHAN P  KIEFFER, ESQ
             jpkieffer@wcllp com
11           JACK T  HYDE, ESQ
             jhyde@wcllp com
12
13     ON BEHALF OF TEVA PHARMACEUTICALS USA, INC :
14       MORGAN, LEWIS & BOCKIUS LLP
           77 West Wacker Drive
15         Chicago, Illinois  60601
           312-324-1000
16         BY:  TINOS DIAMANTATOS, ESQ
             tinos diamantatos@morganlewis com
17
18     ON BEHALF OF DEFENDANT ALLERGAN FINANCE, LLC:
19       KIRKLAND & ELLIS LLP
           300 North LaSalle Street
20         Chicago, Illinois  60654
           312-862-3429
21         BY:  MARTIN L  ROTH, ESQ
             martin roth@kirkland com
22           PRATIK K  GHOSH, ESQ
             pratik ghosh@kirkland com
23
24
```

## Page 4

```
1    APPEARANCES (Continued):
2      ON BEHALF OF ENDO HEALTH SOLUTIONS INC  and
         ENDO PHARMACEUTICALS, INC ,
3        PAR PHARMACEUTICAL, INC , and PAR PHARMACEUTICAL
         COMPANIES, INC (f/k/a Par Pharmaceutical
4        Holdings, Inc ):
5        ARNOLD & PORTER KAYE SCHOLER LLP
           370 Seventeenth Street, Suite 4400
6          Denver, Colorado  80202-1370
           303-863-2373
7          BY:  ELISEO R  PUIG, ESQ
             eliseo puig@arnoldporter com
8
9      ON BEHALF OF McKESSON CORPORATION:
10       TABET DIVITO & ROTHSTEIN LLC
           209 South LaSalle Street, 7th Floor
11         Chicago, Illinois  60604
           312-762-9461
12         BY:  KYLE A  COOPER, ESQ
             kcooper@tdrlawfirm com
13
14     ON BEHALF OF CARDINAL HEALTH, INC :
15       ARMSTRONG TEASDALE LLP
           7700 Forsyth Boulevard, Suite 1800
16         St  Louis, Missouri  63105
           314-621-5070
17         BY:  JULIE FIX MEYER, ESQ
             jfixmeyer@ArmstrongTeasdale com:
18
19     ON BEHALF OF AMERISOURCEBERGEN CORPORATION:
20       JACKSON KELLY PLLC
           50 South Main Street, Suite 201
21         Akron, Ohio  44308
           330-252-9060
22         BY:  ANDREW N  SCHOCK, ESQ
             anschock@jacksonkelly com
23             (via telephonic communication)
24
```

Page 5

```
 1   APPEARANCES (Continued):
 2   ON BEHALF OF WALMART:
 3      JONES DAY
        77 West Wacker Drive
 4      Chicago, Illinois 60601-1692
        312-782-3939
 5   BY: MARK W. DeMONTE, ESQ.
        mdemonte@jonesday.com
 6
 7   ON BEHALF OF ROCHESTER DRUG CO-OP:
 8      ALLEGAERT BERGER & VOGEL LLP
        111 Broadway, 20th Floor
 9      New York, New York 10006
        212-616-7060
10   BY: LYNNE M. FISCHMAN UNIMAN, ESQ.
        luniman@abv.com
11         (via livestream)
        LUCY N. ONYEFORO, ESQ.
12      lonyeforo@abv.com
           (via livestream)
13
14   ON BEHALF OF THE DEPONENT:
15      GODFREY KAHN S.C.
        833 East Michigan Street, Suite 1800
16      Milwaukee, Wisconsin 53202-5615
        414-273-3500
17   BY: BRIAN C. SPAHN, ESQ.
        bspahn@gklaw.com
18
19
20
21
22
23
24
```

Page 6

```
 1   ALSO PRESENT:
 2      CHRIS GRIMM, Trial Technician
 3
 4
 5
 6   VIDEOTAPED BY: BEN STANSON
 7
 8
 9   REPORTED BY: CORINNE T MARUT, C S R  No 84-1968
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 7

```
 1            I N D E X
 2   MICHAEL STEPHEN DORSEY        EXAMINATION
 3      BY MR MELAMED           12
 4      BY MR KIEFFER          277
 5
 6
 7          E X H I B I T S
 8   ALLERGAN-DORSEY EXHIBIT         MARKED FOR ID
 9   No 1   Plaintiffs' Notice of Oral      17
           Videotaped Fact Deposition of
10         Michael Dorsey
11   No 2   Personnel file;          44
           ALLERGAN_MDL_SUPP_0001122 -
12         00001237
13   No 3   2/12/12 e-mail with         71
           attachment; ACTAVIS0323261 -
14         0323277
15   No 4   4/19/12 e-mail string with      126
           attachment; ACTAVIS0302153 -
16         0302161
17   No 5   4/27/11 e-mail string with      150
           attachments;
18         Acquired_Actavis_00485597 -
           00485602
19
     No 6   10/17/11 e-mail string;       154
20         Acquired_Actavis_00486766 -
           00486770
21
22
23
24
```

Page 8

```
 1          E X H I B I T S
 2   ALLERGAN-DORSEY EXHIBIT         MARKED FOR ID
 3   No 7   3/11/11 e-mail string with     171
           attachment;
 4         ALLERGAN_MDL_01698571 -
           01698574
 5
     No 8   2/18/11 e-mail string;        180
 6         Acquired_Actavis_01257892 -
           01257893
 7
     No 9   5/23/12 e-mail with          185
 8         attachment;
           Acquired_Actavis_01825237 -
 9         01825239
10   No 10  3/18/11 e-mail string;       197
           Acquired_Actavis_00237627 -
11         00237628
12   No 11  11/11/11 e-mail string;      206
           ALLERGAN_MDL_02879204 -
13         02879205
14   No 12  9/26/12 e-mail string;       208
           Acquired_Actavis_00096109 -
15         00096110
16   No 13  1/3/13 e-mail string;        218
           Acquired_Actavis_00352198 -
17         00352202
18   No 14  e-mail string;             230
           Acquired_Actavis_00353871 -
19         00353874
20   No 15  10/29/14 e-mail string;      239
           Acquired Actavis_00248484 -
21         00248489
22
23
24
```

## Page 9

```
 1        E X H I B I T S
 2    ALLERGAN-DORSEY EXHIBIT        MARKED FOR ID
 3    No 16   7/23/15 e-mail string;        249
              Acquired_Actavis_00254144 -
 4            00254146
 5    No 17   7/23/15 e-mail string;        266
              Acquired_Actavis_00254149
 6
 7    No 18   10/5/15 e-mail string;        269
              Acquired_Actavis_00492349 -
              00492350
 8
 9    No 19   PowerPoint,                   287
              TEVA_MDL_A_09134868
10    No 20   Personnel File;              293
              ALLERGAN_MDL_SUPP_00001122 -
11            0000127
12    No 21   PowerPoint,                   329
              TEVA_MDL_A_01439745
13
14    No 22   1/25/16 e-mail;             351
              TEVA_MDL_A_01428524 - 01428525
15    No 23   5/31/16 e-mail;             356
              TEVA_MDL_A_01428583 - 01428584
16
17    No 24   12/8/16 e-mail;             357
              TEVA_MDL_A_01436277
18    No 25   1/4/17 e-mail string;        385
              TEVA_MDL_A_06418852 - 06418855
19
      No 26   Accusation before the State of   391
20            California Board of Pharmacy;
              TEVA_MDL_A_02311164 - 02311181
21
22       PREVIOUSLY MARKED EXHIBIT REFERRED TO
23          Clarke Exhibit 14 - Page 275
24
```

## Page 10

```
 1        THE VIDEOGRAPHER:  We are now on the record.
 2    My name is Ben Stanson.  I'm a videographer for
 3    Golkow Technologies.
 4            Today's date is January 8, 2018 (sic),
 5    and the time is 9:02 a.m.
 6            This video deposition is being held in
 7    Chicago, Illinois, in the matter of the National
 8    Prescription Opiate Litigation, MDL No. 2804,
 9    pending in the U.S. District Court, Northern
10    District of Ohio, Eastern Division.
11            The deponent is Michael Dorsey.
12            Will counsel please identify yourselves
13    for the record.
14        MR. MELAMED:  Good morning.  Matt Melamed from
15    Robbins, Geller, Rudman & Dowd for the Plaintiffs.
16        MS. BLACK:  Kelli Black, Robbins, Geller,
17    Rudman & Dowd.
18        MR. KIEFFER:  Jon Kieffer, Wagstaff &
19    Cartmell, for the Teva Plaintiffs.
20        MR. HYDE:  Jack Hyde, Wagstaff & Cartmell, for
21    the Teva Plaintiffs.
22        MR. PUIG:  Eliseo Puig, Arnold & Porter, for
23    Endo and Par.
24        MR. COOPER:  Kyle Cooper, Tabet DiVito &
```

## Page 11

```
 1    Rothstein, on behalf of McKesson Corporation.
 2        MR. DeMONTE:  Mark DeMonte on behalf of
 3    Walmart.
 4        MS. FIX MEYER:  Julie Fix Meyer, Armstrong
 5    Teasdale, on behalf of Cardinal Health.
 6        MR. GHOSH:  Pratik Ghosh on behalf of Allergan
 7    Finance.
 8        MR. ROTH:  Martin Roth on behalf of Allergan
 9    Finance.
10        MR. SPAHN:  Brian Spahn, counsel for
11    Mr. Dorsey.
12        MR. DIAMANTATOS:  Tinos Diamantatos with
13    Morgan Lewis on behalf of the Teva Defendants.
14        THE VIDEOGRAPHER:  Counsel on the phone, will
15    you please introduce yourselves.
16        MR. SCHOCK:  Yes.  This is Andrew Schock of
17    Jackson Kelly for AmerisourceBergen Drug
18    Corporation.
19        THE VIDEOGRAPHER:  Thank you.  Our Court
20    Reporter is Corinne Marut.  Will you please swear
21    in the witness.
22            (WHEREUPON, the witness was duly
23            sworn.)
24
```

## Page 12

```
 1        MICHAEL STEPHEN DORSEY,
 2    called as a witness herein, having been first duly
 3    sworn, was examined and testified as follows:
 4            EXAMINATION
 5    BY MR. MELAMED:
 6      Q.   Good morning, Mr. Dorsey.
 7      A.   Good morning.
 8      Q.   My name is Matt Melamed.  I'm from the
 9    law firm of Robbins, Geller, Rudman & Dowd, and I
10    represent Plaintiffs in this matter.
11            Can you state your full name and address
12    for the record, please.
13      A.   Michael Stephen Dorsey,
14                                       .
15      Q.   And what is your current occupation?
16      A.   Sales.
17      Q.   And for what company do you currently
18    work?
19      A.   Teva Pharmaceutical.
20      Q.   And where is your current work address,
21    business address?
22      A.   I work out of my house.  That or an
23    airplane.  So, it would be the same.
24      Q.   You understand you're under oath,
```

## Page 13

1   correct?

2       A.   Yes.

3       Q.   Are you taking any medications or is

4   there any other reason that you may not be able to

5   provide complete and accurate testimony today?

6       A.   Medications that would affect my thought

7   process? No.

8       Q.   Have you been deposed before?

9       A.   Yes.

10      Q.   So you generally understand how

11  depositions work?

12      A.   As best can, yes.

13      Q.   Okay. I will go over this.  If you have

14  any questions, you know, if you have any concerns

15  about how this is working, you know, we can address

16  those.

17      A.   Okay.

18      Q.   But if you're asked a question that you

19  don't understand, please let me know.  It's my job

20  to make the questions as clear as I can.  And I'll

21  try to rephrase it for you.

22      A.   Okay.

23      Q.   Please ensure that I -- that you give me

24  time to finish my question even if you know where

## Page 14

1   I'm going before you answer.

2       A.   Okay.

3       Q.   I will try to do the same for you.

4   That's so we create a clear record and make the

5   Court Reporter's life as easy as possible.  It is

6   natural that we will occasionally speak over one

7   other conversationally.  Please don't take it

8   personally if I remind you or somebody else reminds

9   you to please pause.  Okay?

10      A.   Okay.

11      Q.   Again, please answer verbally as opposed

12  to shaking your head yes or no so that we have a

13  clear record and as well, try to answer with words

14  that are easily transcribed, yes and no versus

15  uh-huh or uh-uh.  Understand?

16      A.   Yes.

17      Q.   You mentioned that you had been deposed

18  before, correct?

19      A.   Yes.

20      Q.   How many times?

21      A.   One time.

22      Q.   Do you recall the circumstances of that

23  deposition?

24      A.   It was the -- I believe it was -- I

## Page 15

1   don't know what the legal term was.  But it was

2   centering around AWP.

3       Q.   AWP?

4       A.   Yes.

5       Q.   I'm sorry.  And what is AWP?

6       A.   Average wholesale price.

7       Q.   And where were you employed at the time

8   of your deposition?

9       A.   Actavis.

10      Q.   And is that prior to the transfer of the

11  Actavis division you worked for to Teva?

12      A.   Yes.

13      Q.   Do you remember whether Actavis was a

14  party to that litigation?  Was it a Plaintiff or a

15  Defendant?

16      A.   The technical component I don't -- I'm

17  not sure.

18      Q.   You testified truthfully in that

19  deposition?

20      A.   Yes.

21      Q.   Who are the people seated with you

22  today?

23      A.   That were previous introduced

24  themselves?

## Page 16

1       Q.   Yes.

2       A.   Okay.  Tinos and then Brian and Marty

3   and -- yes.  Oh.  Hang on.  Another from Kirkland.

4   Two gentlemen from Kirkland.

5       Q.   Okay.  So, you identified two lawyers

6   from Morgan Lewis, two lawyers from Kirkland,

7   correct?

8       A.   No.

9       Q.   No?  I'm sorry.

10      A.   No.  One from Morgan Lewis, Tinos, and

11  then Brian is my -- my lawyer, private lawyer, and

12  then the last two gentlemen are from Kirkland.

13      Q.   Understand.  And who represents you here

14  today?

15      A.   For this litigation --

16      Q.   Yes.

17      A.   -- piece?

18      Q.   For the purposes of your deposition in

19  this litigation.

20      A.   Tinos.

21      Q.   I'm sorry?

22      A.   I would believe it's Tinos with any --

23  yeah.

24      Q.   I'm handing you what's been marked as

1   Exhibit 1.
2           (WHEREUPON, a certain document was
3           marked as Allergan-Dorsey Exhibit
4           No. 1: Plaintiffs' Notice of Oral
5           Videotaped Fact Deposition of
6           Michael Dorsey.)
7       MR. MELAMED:  For counsel on the phone, the
8   Elmo is currently down.  We hope to get it up
9   shortly.  Exhibit 1 is the Plaintiff notice of --
10  oral videotaped fact deposition of Michael Dorsey.
11  BY MR. MELAMED:
12      Q.   Have you seen this document before,
13  Mr. Dorsey?
14      A.   Yes.  I believe so, yes.
15      Q.   When did you -- when do you recall first
16  seeing it?
17      A.   It was in '18.  I'm -- this has the
18  actual date.  I'm not exactly sure when -- when I
19  saw it, if I did.  Because this is just in essence
20  spelling out when the videotape is taking place,
21  correct?
22      Q.   I can't answer your questions today.
23      A.   Oh, okay.  I'm sorry.
24      Q.   That's fair enough.

1       A.   I'm sorry.
2       Q.   You saw this, is it accurate to say you
3   saw this more than -- earlier than this past week?
4       A.   I -- you know what?  I don't know for
5   100 percent certainty at this -- at this time.  It
6   was a long time, yes.  I don't know how else to
7   answer it.
8       Q.   You understand that this is the document
9   concerning -- that notices your deposition here
10  today?
11      A.   Yes.
12      Q.   Okay.  Did you bring any documents with
13  you today?
14      A.   No, I did not.
15      Q.   Did you provide any documents to your
16  attorneys relating to this litigation?
17      MR. DIAMANTATOS:  Objection.
18  BY THE WITNESS:
19      A.   No, I did not.
20  BY MR. MELAMED:
21      Q.   If called to testify in a trial in this
22  case, would you be willing to appear in the
23  Northern District of Ohio?
24      MR. DIAMANTATOS:  Objection; form.

1   BY THE WITNESS:
2       A.   I would have -- seek counsel's feedback
3   on that.
4   BY MR. MELAMED:
5       Q.   And just -- you answered that
6   appropriately and counsel will be sure to object if
7   there is a privilege issue, but I want to let you
8   know I'm not seeking privileged information, you
9   know.  We can discuss if there is an issue.  But
10  thank you for noting -- for not going beyond the
11  fact that you would seek --
12      A.   Okay.
13      Q.   -- counsel's advice.
14          What did you do to prepare for today's
15  deposition?
16      A.   Really just reviewed some -- some
17  previous or just some e-mails.
18      Q.   Did you do that on your own?
19      A.   I --
20      Q.   Did you review them on your own?
21      A.   No.
22      Q.   You reviewed them in the presence of
23  counsel?
24      A.   Yes.

1       Q.   Were they identified by counsel for you?
2       MR. DIAMANTATOS:  Objection.  As to his
3   preparation process with counsel, I'm not going to
4   let him answer those questions.  You can ask him
5   what he did to prepare but not what we specifically
6   did with him to prepare.
7       MR. MELAMED:  I'm not asking him anything
8   about the identity of the documents.  Just whether
9   they were identified by you.  Is your objection
10  going to stand?
11      MR. DIAMANTATOS:  My objection is going to
12  stand.
13      MR. MELAMED:  Okay.
14  BY MR. MELAMED:
15      Q.   And are you going to choose to follow --
16      A.   Yes.
17      Q.   -- your attorney's advice?
18      A.   Yes.
19      Q.   Approximately how many documents did you
20  review?
21      A.   More than ten, less than -- I don't
22  know -- 40, 30.
23      Q.   Did you meet with counsel in person to
24  prepare for today's deposition?

Page 21

1    A.  Yes.
2    Q.  And that was with Tinos?
3    A.  Yes.
4    Q.  With any other -- were any other people
5    in the room when you met to prepare?
6    A.  Yeah, the two gentlemen from Kirkland.
7    Q.  Did you prepare -- other than preparing
8    in person, did you prepare over the phone?  Did you
9    have any phone conversations in preparation for
10   today's deposition?
11   A.  No.
12   Q.  How many times did you meet in person to
13   prepare for today's deposition?
14   A.  We had one -- one meeting.
15   Q.  When did that occur?
16   A.  Yesterday.
17   Q.  About how long did you prepare?
18   A.  It wasn't a full workday.  Six, six
19   hours maybe.  I'm not sure.
20   Q.  Did you review any deposition testimony
21   from this case from other deponents?
22   A.  No.
23   Q.  Did you review any expert reports or
24   memoranda?

Page 22

1    A.  No.
2    Q.  Did you review any court documents that
3    you -- to the extent you're aware, any filings in
4    this case made by either party?
5    A.  No.
6    Q.  Did you review any databases, access any
7    databases that may record -- have recorded
8    information pertaining to this litigation?
9    A.  No.
10   MR. DIAMANTATOS:  Objection; form.
11   BY MR. MELAMED:
12   Q.  I didn't do this part during the
13   introduction of the deposition, but you understand
14   that from time to time counsel may interject
15   objections and regardless of the objection, you
16   still are required to answer the question if you
17   can.
18   A.  Okay.
19   Q.  Understood?
20       Did you look in your own personal paper
21   or electronic files to identify any documents that
22   might be relevant to this litigation?
23   MR. DIAMANTATOS:  Objection; form.
24   BY THE WITNESS:

Page 23

1    A.  No.
2    BY MR. MELAMED:
3    Q.  You said this already.  I just want to
4    be clear.
5        During your in-person preparation there
6    were three other individuals present, correct?
7    A.  Correct.
8    Q.  Two lawyers from Kirkland and one from
9    Morgan Lewis, correct?
10   A.  Yes.
11   Q.  Are you being represented by the lawyers
12   from Kirkland in this litigation?
13   A.  When you say "represented," again, it's
14   not my everyday.  So, when you say "represented,"
15   can you help me better understand that what --
16   Q.  I can try and rephrase it.
17   A.  Okay.
18   Q.  Who -- how did you choose who is going
19   to represent you here today?
20   A.  Morgan Lewis is Teva's legal counsel and
21   Kirkland is Allergan, Allergan, which used to be
22   the owner of Actavis, legal counsel.
23   Q.  And were you given the choice of who
24   would represent you here today?

Page 24

1    A.  There was -- I guess you could say yes,
2    if I did not like who I -- who was being
3    represented.
4    Q.  But you had no problem with it?
5    A.  Correct.
6    Q.  Can you just help me understand the
7    process by which that happened.
8        Did Teva -- did somebody at Teva state
9    to you, "Morgan Lewis is our counsel for this
10   litigation," and make them available to you to
11   represent you in this deposition?
12   MR. DIAMANTATOS:  Objection to the question to
13   the extent it calls for advice from in-house legal
14   counsel to the witness.
15   BY MR. MELAMED:
16   Q.  Was the -- let me start with a
17   predecessor question to that.
18   A.  Okay.
19   Q.  Were you provided advice by in-house
20   counsel at your current employer about who should
21   represent you in this -- in this deposition?
22   MR. DIAMANTATOS:  I'm going to object and
23   instruct the witness not to answer about what, if
24   anything, he was told by in-house counsel at Teva.

1      MR. MELAMED:  Not asking what he was --
2      MR. DIAMANTATOS:  Your question isn't clean
3   enough and the witness is going to trip up on that
4   and answer a question and go into the subject
5   matter.
6      I don't know why we're wasting time with
7   this line of questioning, but I am going to object
8   and tell the witness not to answer any questions
9   about what he was told, in-house counsel advising
10   him or not advising him about this case and his
11   representation.
12   BY MR. MELAMED:
13      Q.   As a question of yes or no, did Teva
14   identify to you, anyone at Teva identify to you,
15   that Morgan Lewis was available to represent you in
16   this deposition?
17      MR. DIAMANTATOS:  Same objection.
18   BY MR. MELAMED:
19      Q.   Are you going to follow counsel's
20   advice?
21      A.   I'm going to follow counsel's advice.
22      Q.   Did you speak to anyone at your current
23   employer about this deposition once you received
24   the Notice?

1      MR. DIAMANTATOS:  Objection to the extent it
2   calls for conversations with in-house legal
3   counsel.
4   BY MR. MELAMED:
5      Q.   You can answer.  Or unless -- I'm
6   unclear about the objection.  My only --
7      MR. DIAMANTATOS:  If you could rephrase the
8   question to include that caveat, then perhaps I
9   won't object but I'll have to hear the question.
10   If you could rephrase it.
11   BY MR. MELAMED:
12      Q.   It's a yes-or-no question.  Did you
13   speak to anyone at your current employer about this
14   deposition once you received the Notice?
15      MR. DIAMANTATOS:  Same objection.  Absent
16   in-house legal counsel.  You should be clear who
17   you are talking about.  Anyone at his employer
18   covers a lot of people.
19   BY MR. MELAMED:
20      Q.   Let me start in this way.  Did you speak
21   to in-house counsel, yes or no, at Teva in
22   preparation for your deposition?
23      A.   No.
24      Q.   Did you speak to anybody else at Teva in

1   preparation for your deposition?
2      A.   No.
3      Q.   Did you speak to anyone at Allergan or
4   any of its previous -- previously named
5   predecessors in preparation for today's deposition?
6      MR. DIAMANTATOS:  Objection to form.
7   BY THE WITNESS:
8      A.   No, I did not.
9   BY MR. MELAMED:
10      Q.   Did you speak to anybody aside from
11   counsel sitting with you today in preparation for
12   your deposition?
13      A.   Say it one more time.
14      Q.   Did you speak -- in preparation for
15   today's deposition --
16      A.   Oh, prep.  Okay, okay.
17      Q.   -- did you speak to anybody aside from
18   the people sitting with you today?
19      A.   In preparation, no.
20      Q.   Did you discuss what you expected to
21   testify about with anybody other than counsel
22   sitting here with you today?
23      A.   So, the question -- did I discuss with
24   anyone what I thought was going to happen?

1      Q.   Um-hmm.
2      MR. DIAMANTATOS:  Object to the form of the
3   question.
4   BY THE WITNESS:
5      A.   No, not that I'm -- no.
6   BY MR. MELAMED:
7      Q.   Did you speak to any family members
8   about your appearance here today?
9      MR. DIAMANTATOS:  Objection; asked and
10   answered.
11   BY THE WITNESS:
12      A.   Well, my wife.
13   BY MR. MELAMED:
14      Q.   And did you tell her anything about what
15   you expected the testimony to cover?
16      A.   Well, she knows the -- what the overall
17   umbrella is, but that's -- that's it.
18      Q.   Did you talk to her about any
19   conversations you had with your attorneys?
20      A.   No.
21      Q.   Are you being reimbursed by anyone for
22   your expenses in connection with today's
23   deposition?
24      A.   Like food and hotel?

Page 29

1    Q.   Are you being -- any expenses in
2  connection with today's deposition?
3    A.   Well, the -- yes.
4    Q.   By whom?
5    A.   Teva.
6    Q.   And what did those expenses include?
7    A.   Hotel, food and train.
8    Q.   Are you being compensated for any time
9  taken to prepare for today's deposition?
10   A.   No.
11   Q.   You can put Exhibit 1 aside.  You should
12  keep those, however, because those will be the
13  official --
14   A.   Okay.
15   Q.   -- deposition copies.  And we may go
16  back to certain exhibits from time to time.
17        You have an undergraduate degree from
18  the University of Minnesota Duluth, correct?
19   A.   Yes.
20   Q.   And that's in economics and computer
21  science?
22   A.   Yes.
23   Q.   Double major?
24   A.   Major-minor.

Page 30

1    Q.   Major in economics?
2    A.   Major, yes.
3    Q.   And minor in computer science?
4    A.   Yes.
5    Q.   You received your Bachelor of Arts for
6  the major in economics, correct?
7    A.   Yes.
8    Q.   What year did you graduate?
9    A.   1987.
10   Q.   What employment did you have after
11  graduation?
12   A.   That was a struggling time.  It was
13  multiple part-time jobs, trying to find what I
14  wanted to be in life.  I was a computer programmer.
15  After a year I determined that wasn't -- wasn't
16  what I needed, wasn't fulfilling my -- my lifelong
17  dream.
18        So, I eventually -- I think after three
19  years of a lot of struggles, went and found --
20  after my third attempt, I got a job at Russ Berrie,
21  which is a stuffed animals and toys.  So, yes, I
22  was selling teddy bears for about three and a half
23  years all over the Dakotas, and I knew I wanted to
24  get back to the Twin Cities.

Page 31

1        So, I used some of my networking folks I
2  may have known to get into the pharmaceutical
3  business, and that's how I finally landed the job
4  at Schwartz Pharma.
5    Q.   Okay.  And when did you land the job at
6  Schwartz Pharma?
7    A.   Maybe 25 years ago.  So, was that '94?
8  No.  '92?
9    Q.   And --
10   A.   I'd --about 25 years ago.
11   Q.   You worked at Schwartz Pharma until
12  2007, is that right?
13   A.   If that's the year that UCB bought
14  Schwartz Pharma and Kremers Urban, then yes.
15   Q.   I'm sorry.  If that's the year?
16   A.   If that's the year that UCB bought
17  Schwartz Pharma and Kremers Urban, then yes.  It
18  coincided with that.
19   Q.   What's UCB?
20   A.   A pharmaceutical company.
21   Q.   Is it an acronym?  Does it stand for
22  something or is it --
23   A.   It's Belgium.  It does, but I don't
24  know.

Page 32

1    Q.   Okay.  And did you leave Schwartz Pharma
2  and Kremers Urban at the time UCB acquired them?
3    A.   Yes.
4    Q.   What was the purpose for your -- why did
5  you leave at that point?
6    A.   The direction that we felt that they
7  were going to take the -- they were a brand
8  company.  So, the direction we felt they were
9  taking it and information they were sharing with us
10  is that it was not going to last.  So, we opted not
11  to -- I opted not to move on, and seek employment
12  elsewhere.
13   Q.   So, it was by choice?
14   A.   Yes.
15   Q.   During your time at -- well, let me step
16  back.
17        You've referred to both Schwartz Pharma
18  and Kremers Urban?
19   A.   Yes.
20   Q.   Are those two separate companies?
21   A.   They're one and the same.  So, Schwartz
22  Pharma is the -- think of it as the brand arm and
23  then Kremers Urban is the generic, generic arm.
24   Q.   And which of those did you work for?

## Page 33

1    A.  Both.

2    Q.  Can you take me through your roles at

3  Schwartz Pharma and Kremers Urban until you left?

4    A.  I'm sorry.  I blanked out.  What was the

5  question?

6    Q.  Can you take me through your different

7  positions that you held --

8    A.  Take you through it.

9    Q.  -- at those two companies.

10    A.  Multiple roles.  Would be calling on

11  physicians, and then it was more kind of liaison

12  between, what they call a managed care liaison, so

13  kind of understanding, working with the district

14  managers and the reps, trying to understand their

15  territories.

16        And then went into a managed care role

17  and then after that, there was a -- afforded the

18  opportunity to go over to just Kremers Urban

19  specifically.

20        Actually, no, it would have been -- it

21  would have been both.  Then I was going to -- moved

22  from managed care over to trade but supporting the

23  brand, brand stockings for the reps and then as

24  well as generic pharmaceuticals.

## Page 34

1    Q.  Did Schwartz Pharma or Kremers Urban

2  ever sell opioid prescription drugs?

3    A.  Best of my knowledge, no.

4    Q.  You do not recall that you ever --

5    A.  Correct.

6    Q.  Or your recollection is that you never

7  sold anything related to opioids, is that correct?

8    A.  I --

9    MR. DIAMANTATOS:  Objection; form.

10  BY THE WITNESS:

11    A.  Best of my -- best of my knowledge, we

12  did not have that in our portfolio.

13  BY MR. MELAMED:

14    Q.  I want to understand a little bit more

15  some of the specific roles you mentioned.

16    A.  Okay.

17    Q.  First you talked about calling on

18  physicians?

19    A.  Um-hmm.

20    Q.  Was that -- were those detailing visits?

21    A.  Yes.

22    Q.  And for specific drugs or for the

23  entirety of the drug portfolio available through

24  Schwartz and Kremers?

## Page 35

1    A.  Specific.

2    Q.  Do you recall what specific drugs they

3  were?

4    A.  The tag -- well, it's -- in essence

5  heart products, heart, gut and butt.  So, it was

6  irritable bowel syndrome or unstable bladder or

7  angina.  So, in those realms.

8    Q.  And then you said then it was more kind

9  of liaison between what they called a managed care

10  liaison.  Was that a promotion?

11    A.  Yes.

12    Q.  And can you explain what you -- what

13  your role was as a managed care liaison in a little

14  bit more detail?

15    A.  It was newly created.  So, it was a

16  draft in work.  But primarily it was helping the

17  district managers and the representatives kind of

18  understanding their -- their -- I guess their --

19  their docs, their territories a little better and

20  just trying to help them manage it, manage it

21  better, be more efficient.

22    Q.  Then you said you moved from managed

23  care over to trade and supporting the brand, brand

24  stocking for the reps and then generic

## Page 36

1  pharmaceuticals?

2    A.  So, sorry.  I may have missed a step.

3  So, managed care liaison.  Then it was managed

4  care.  So, that was calling on, you know, your

5  managed care facilities.  And then after that, then

6  it was the trade -- trade only, but supporting

7  brand as well as generics.

8    Q.  What do you mean by calling on managed

9  care facilities?

10    A.  So, managed care, you've probably heard

11  of United Healthcare, Blue Cross Blue Shield, those

12  plans.  There's formularies for -- in the brand

13  world that they will -- you're in essence -- your

14  products they want to have -- sometimes they'll

15  have clinical reviews and in order to have the

16  product listed on the formulary.

17        So, that's why you as a consumer when

18  you go to get your prescription at the pharmacy,

19  sometimes your brand could be a preferred brand or

20  a non-preferred brand and you're paying more.

21    Q.  And so your role was to call on these

22  managed care organizations that you mentioned to

23  try to get Schwartz and Kremers' drugs on their

24  formularies?

Page 37

1    MR. DIAMANTATOS:  Objection to form.
2  BY THE WITNESS:
3    A.   Kremers is generics.  Generics is not
4  really a -- that's not really a functionality.
5  It's driven differently.  So, on the brand side, if
6  there was a product -- some products didn't need --
7  they didn't need review.  Some products they wanted
8  to have more clinical data.  So, you would bring in
9  your clinical folks and have that conversation and
10  then you talk to them about the economic piece.
11  BY MR. MELAMED:
12    Q.   Did your managed care visits concern
13  generic drugs at all?
14    A.   No.
15    Q.   And then after you left or you -- was
16  the transition from managed care to what you said,
17  trade only, was that a promotion?
18    A.   How do you define promotion?  It was a
19  change.  I don't remember if there was any change
20  in compensation or not.
21    Q.   Was it a change that you made by choice?
22    A.   I was -- I was picked or chosen I guess.
23    Q.   And what were your responsibilities when
24  you went to what you called trade?

Page 38

1    A.   The trade, so on the brand side, it was
2  helping out the -- as far as if the patients were
3  going into the pharmacies and not able to get a --
4  get the medications that the physician felt was the
5  right medication for them, supporting the sales
6  force with, okay, here's the item numbers at the
7  particular wholesaler, trying to help them through
8  so that the patient could get what the physician
9  felt was their best choice to help them with their
10  ailment.
11    On the generic side, it was -- I think
12  at that time we were launching the -- that was the
13  largest -- largest generic in the world at the time
14  was omeprazole, so it would have been Prilosec.
15  So, we just received approval and there was three
16  of us that were having to manage that throughout
17  the entire country.
18    Q.   And you left -- you said you left by
19  choice Kremers and Schwartz?
20    A.   Yeah.
21    Q.   When they were acquired by UCB, right?
22    A.   Correct.
23    Q.   And you -- at that point you applied to
24  Actavis, correct?

Page 39

1    A.   Yes.
2    Q.   And you were hired in 2007 to be
3  director of national accounts?
4    A.   Yeah, I guess -- is that -- yeah, '7 I
5  guess it would have been.
6    Q.   What was your role as director of
7  national accounts at Actavis?
8    A.   Very similar outside of -- for the most
9  part.  With Actavis it was, best of my
10  recollection, was primarily just generics.  So, it
11  was helping launch, launch products with a -- you
12  know, to a less expensive version of the brand into
13  the -- into the marketplace, calling on chain
14  drugstores, corporates, corporates as well as
15  wholesaler.
16    Q.   What do you mean "corporates as well as
17  wholesaler"?
18    A.   Well, I'm sorry.  So, corporate, for
19  instance, corporate entities, a Walgreens or a CVS,
20  a corporate headquarters as opposed to all 8,000
21  stores or 10,000 stores.
22    Q.   And just to be clear, when you were
23  director -- when you hired on as director of
24  national accounts when you first started working at

Page 40

1  Actavis, did you call solely on the corporate
2  entities of -- of companies like Walgreens or did
3  you also call on individual pharmacies?
4    MR. DIAMANTATOS:  Objection; form.
5  BY THE WITNESS:
6    A.   It's a corporate function.  So,
7  corporately.
8  BY MR. MELAMED:
9    Q.   Did you have any -- did you call on any
10  individual pharmacies?
11    MR. DIAMANTATOS:  Objection; form.
12  BY THE WITNESS:
13    A.   No.
14  BY MR. MELAMED:
15    Q.   Did you have a specific portfolio of
16  generic drugs that you were responsible for when
17  you were hired in your initial role as director of
18  national accounts at Actavis?
19    A.   Everyone was responsible for the same
20  portfolio products.  It's just you -- the only
21  differentiation was the accounts that you called
22  on.
23    Q.   So, the -- everybody -- is it fair to
24  say everybody was responsible for all of Actavis'

Page 41

1 generic drugs?
2     MR. DIAMANTATOS: Objection; form.
3 BY THE WITNESS:
4     A.   Outside of anything I can think of right
5 now? For the most part, yes.
6 BY MR. MELAMED:
7     Q.   And so your portfolio included Actavis'
8 generic opioids, is that correct?
9     A.   There was -- that was amongst the other
10 products that we had, yes.
11     Q.   And then have you -- since being hired
12 in 2007 at Actavis before you transitioned to
13 Teva --
14     A.   Yep.
15     Q.   -- were you -- did you ever change
16 roles?
17     A.   No.  Did not.
18     Q.   So, you remained director of national
19 accounts the entire time?
20     A.   Yes.
21     Q.   Do you recall who you reported to when
22 you were first hired?
23     A.   Mike Perfetto.
24     Q.   And did that reporting hierarchy remain

Page 42

1 the same throughout the entirety of your time at
2 Actavis, at Actavis prior to the transition to
3 Teva?
4     A.   I think so.  I believe so.
5     Q.   And when the Actavis generic entities
6 were acquired by Teva, did your role change?  Did
7 you remain director of national accounts?
8     A.   Yes.
9     Q.   And are you still director of national
10 accounts?
11     A.   Yes.
12     Q.   And who do you report to -- who did you
13 report to when you first transitioned over to Teva?
14     MR. DIAMANTATOS: Objection; form.
15 BY THE WITNESS:
16     A.   Would have been -- I don't know if it
17 was -- oh.  So, under -- so, after Teva, after we
18 closed with Teva?
19 BY MR. MELAMED:
20     Q.   Yes.
21     A.   After Teva -- okay.
22         Mark -- Mark Falcon.
23     Q.   And is that who you currently report to?
24     A.   No.

Page 43

1     Q.   Who do you currently report to?
2     A.   Oh, geez.  I'm drawing a blank.  Sorry.
3 We just had another change.  Oh, my God.  Sorry.
4 I'm not used to having all these eyes on me.
5         Pat.  Macintosh.  Sorry.  Pat Macintosh.
6     Q.   And before Pat Macintosh who did you
7 report to?
8     A.   Before?
9     Q.   Um-hmm.
10     A.   Would have been Mark.  Oh, no.  I'm
11 sorry.  It would have been Chris.  Oh, God.  Chris,
12 Chris.  He's a Phillies fan.
13         It's escaping me right now, but his
14 first name is Chris.
15     Q.   Since Actavis moved over -- the Actavis
16 generic entities moved over to Teva when the
17 acquisition closed, how many different individuals
18 have you reported to?
19     MR. DIAMANTATOS: Objection; form.
20 BY THE WITNESS:
21     A.   Three.  Three.
22 BY MR. MELAMED:
23     Q.   Has the accounts you are responsible for
24 starting in 2007 changed over time?  Have they

Page 44

1 changed between 2007 and today?
2     A.   Yes.
3     Q.   Are there certain accounts that have
4 remained under your -- within your responsibility
5 for that entirety of that time?
6     A.   I don't -- from 2007 till now?
7     Q.   Um-hmm.
8     A.   I don't believe so.
9     Q.   Did you gain new accounts -- let me
10 withdraw that.
11         I'm going to hand you what's been marked
12 Exhibit 2.
13         (WHEREUPON, a certain document was
14             marked as Allergan-Dorsey Exhibit
15             No. 2:  Personnel file;
16             ALLERGAN_MDL_SUPP_0001122 -
17             00001237.)
18     MR. MELAMED:  For the record Exhibit 2 is the
19 personnel file that was produced in this action for
20 Mr. Dorsey.  It starts at Allergan_MDL_SUPP,
21 SUPP_00001122 and concludes at 1237.
22 BY MR. MELAMED:
23     Q.   There's a lot of documents in here.  And
24 as you'll notice, it's four documents per page and

## Page 45

1    double-sided.  So, there is a lot of stuff.  I just
2    want to draw your attention to very specific pages
3    in this.
4         If you could turn to the page that
5    has -- do you understand what I'm talking about
6    when I mention Bates numbers?
7         A.    Lower right?
8         Q.    Yeah.
9         A.    Yeah, yeah.
10        Q.    It's actually the lower right of each
11   because there's four pages of each per page.
12        A.    I got you.  All right.
13        Q.    If you could turn to the Bates number
14   ending 1177.  And you see it says "Confidential,
15   Actavis, Fiscal 2007, Bonus Program"?
16        A.    Yes.
17        Q.    And if you look to 1174, so on the same
18   physical page.
19        A.    Oh.
20        Q.    You'll see that this is an e-mail from
21   somebody named Ellen Predham to Michael Perfetto,
22   and it's talking about enclosing the fiscal -- the
23   Actavis fiscal bonus program with the offer to you.
24        Do you see that?

## Page 46

1         A.    Yep, yes.
2         Q.    So, returning to 1177, was this the
3    fiscal bonus program that was part of your
4    compensation for fiscal 2007?
5         A.    Based upon what's written here, that's
6    where it's pulled from, then yes.
7         Q.    If you turn the page to 1178, this --
8    and you see it says, "Individual Territory Budget
9    for All Actavis Current In-Line Products" and then
10   "National Net Sales Budget for All Territories for
11   Current In-Line and New Products" and "Individual
12   Budget for Focus Products."
13        Do you see that?
14        A.    Yes.
15        Q.    And were those the three elements of
16   your incentive, your bonus incentive compensation?
17        MR. DIAMANTATOS:  Objection; form.
18   BY THE WITNESS:
19        A.    This far out, I'm -- I'm not -- I guess
20   it's not pulling any -- like, remembering, oh,
21   yeah, this was it.  However, if -- if this was, you
22   know, pulled from that document, how it was broken
23   out, then we have to follow.
24   BY MR. MELAMED:

## Page 47

1         Q.    So, of the fiscal 2007 bonus, the first,
2    it says a maximum payment of up to 40% of that
3    bonus is based on each individual account
4    representative achieving sales quotas for current
5    in-line products, and that was based on net sales.
6         Do you see that?
7         MR. ROTH:  Object to form.
8              (Clarification requested by the
9              reporter.)
10        MR. MELAMED:  Somebody said "Object to form."
11        MR. DIAMANTATOS:  Objection to form.
12        MR. ROTH:  Objection to form.
13   BY THE WITNESS:
14        A.    So, do I -- do I see what's in that
15   first paragraph that you read off?  Yes.
16   BY MR. MELAMED:
17        Q.    And do you have any reason to believe
18   that that's inaccurate?
19        MR. DIAMANTATOS:  Objection; form.
20   BY THE WITNESS:
21        A.    Well, you're reading it word for word,
22   so I have to think that it's accurate based upon
23   what we're looking at.
24   BY MR. MELAMED:

## Page 48

1         Q.    Okay.  So, 40% of your bonus
2    compensation as described in this plan was based on
3    your performance versus the sales quota for your
4    individual current in-line products, correct?
5         MR. DIAMANTATOS:  Objection; form.
6    BY THE WITNESS:
7         A.    It says a maximum amount of 40% based
8    upon all in-line products, current in-line
9    products, yes.
10   BY MR. MELAMED:
11        Q.    And there's a caveat that starts with
12   "Additionally."  It says, "Additionally, an
13   indirect sales goal will be developed for indirect
14   sales for each account representative.  The degree
15   of importance for direct and indirect goals will
16   vary by sales rep."
17        Do you see that?
18        MR. DIAMANTATOS:  Objection; form.
19   BY THE WITNESS:
20        A.    Yes, I see that.
21   BY MR. MELAMED:
22        Q.    Can you describe what the difference is
23   between a -- can you describe what's meant by an
24   indirect sales goal?

Page 49

1     MR. DIAMANTATOS:  Objection; form, foundation.
2  BY THE WITNESS:
3     A.   So, indirect is basically it's what --
4  it spells out what it is.
5        So, a customer that buys it from, for
6  instance, another wholesaler.  So they don't have a
7  warehouse, so they will buy it from a wholesaler.
8  It's an indirect purchase because it's going from
9  the wholesaler to the retailer.
10  BY MR. MELAMED:
11     Q.   And then the next, if you continue down
12  to the next bold header on this, on page 1178, it
13  says, "National Net Sales Budget for All
14  Territories for Current In-Line and New Products."
15        The first sentence there says, "Maximum
16  payout up to 40%, per half of annual bonus, is
17  based on USHP Actavis achieving net sales quotas
18  for current in-line products and new products."
19        What does -- do you know what USHP
20  Actavis means?
21     A.   It's -- no, it's not coming to mind.
22     Q.   Okay.  Do you understand this to mean
23  that your -- 40% of your bonus was based on
24  Actavis' performance in achieving its net sales

Page 50

1  quotas for current in-line products and new
2  products?
3        MR. DIAMANTATOS:  Objection; form, foundation.
4  BY THE WITNESS:
5     A.   I see this as a group, a family, working
6  together as a team as far as bonus.
7  BY MR. MELAMED:
8     Q.   So, going back over the two sections
9  we've discussed, the first section is 40% of your
10  total bonus amount is based on your individual
11  performance versus your sales goals, correct?
12        MR. DIAMANTATOS:  Objection; form.
13  BY THE WITNESS:
14     A.   Yes, I would believe that was correct,
15  yes.
16  BY MR. MELAMED:
17     Q.   And then 40% was based on the Actavis
18  group's performance versus its sales goals?
19        MR. DIAMANTATOS:  Objection; form.
20  BY MR. MELAMED:
21     Q.   Is that your understanding?
22        MR. DIAMANTATOS:  Objection; form.
23  BY THE WITNESS:
24     A.   The understanding would be that it is a

Page 51

1  team, kind of a team component versus individual.
2  BY MR. MELAMED:
3     Q.   Okay.  So, 40% individual and 40% team?
4        MR. DIAMANTATOS:  Objection; form.
5  BY THE WITNESS:
6     A.   Yes, as it's laid out here.
7  BY MR. MELAMED:
8     Q.   And then there's a third element which
9  is, "A maximum payout up to 20%, per half of annual
10  bonus, based on each account representative's
11  success of achieving prime placement of the
12  designated half year focus products."
13        Do you see that?
14     A.   Yes.
15     Q.   That would be the final -- is it your
16  understanding that that would be the final
17  component of your bonus calculation?
18        MR. DIAMANTATOS:  Objection; form, foundation.
19  BY THE WITNESS:
20     A.   If doing the math, yes, I think it's --
21  it gets us to 100.
22  BY MR. MELAMED:
23     Q.   Do you recall who was responsible for
24  identifying the focus products that are referred to

Page 52

1  in that final paragraph during your time at
2  Actavis?
3     A.   Specifically, no.
4     Q.   Do you recall -- I'm sorry.  Go ahead.
5     A.   Specifically, no, as far as name-wise,
6  no.
7     Q.   Do you recall that certain products were
8  identified to you as focus products during your
9  time at Actavis?
10     A.   I believe -- yes, yes.
11     Q.   Do you recall whether any of those
12  products ever included any of Actavis' opioid
13  products?
14     A.   No, I do not.
15        MR. DIAMANTATOS:  Objection; form.
16  BY MR. MELAMED:
17     Q.   Do you -- how were the focus products
18  communicated to you?
19        MR. DIAMANTATOS:  Objection; foundation, form.
20  BY THE WITNESS:
21     A.   Presented probably via -- probably an
22  e-mail.
23  BY MR. MELAMED:
24     Q.   You're not sure, but you believe it was

Page 53

1    an e-mail?
2        A.   Yes.
3        Q.   Do you recall who sent -- who would have
4    sent those e-mails?
5        MR. DIAMANTATOS:  Objection; asked and
6    answered.
7    BY THE WITNESS:
8        A.   No.
9    BY MR. MELAMED:
10       Q.   Did you have a -- did you participate --
11   let me withdraw that and restate it.
12           Were you eligible for a bonus program
13   similar to the one described on pages 1177 and 78
14   during the entirety of your time at Actavis prior
15   to its transfer --
16       MR. DIAMANTATOS:  Objection.
17   BY THE WITNESS:
18       Q.   -- to Teva?
19       MR. DIAMANTATOS:  Sorry.  Objection; form,
20   vague.
21   BY THE WITNESS:
22       A.   So, your -- just to make sure I'm
23   understanding, what you're asking is this, this,
24   what's in -- tagged in 177, 178, if that bonus

Page 54

1    carried through all the way through to the Teva
2    acquisition?
3    BY MR. MELAMED:
4        Q.   That wasn't what I'm asking, but you can
5    answer that question.
6        A.   I would -- I would say I highly doubt
7    it.
8        Q.   Do you recall what changes were made to
9    the bonus program after 2007?
10       MR. DIAMANTATOS:  Objection; form, vague.
11   BY THE WITNESS:
12       A.   Outside of conceptually it was more --
13   it was team, team driven.
14   BY MR. MELAMED:
15       Q.   The -- so, am I to understand it
16   correctly that, broadly speaking, the bonus program
17   moved to incentivized team sales more over time?
18       MR. DIAMANTATOS:  Objection; form.
19   BY THE WITNESS:
20       A.   Best of my recollection, yes.  It moved
21   to that.
22   BY MR. MELAMED:
23       Q.   Did individual sales -- did your ability
24   to meet individual sales goals ever fall away

Page 55

1    entirely from the bonus program?
2        MR. DIAMANTATOS:  Objection; form.
3    BY MR. MELAMED:
4        Q.   Prior to when you left.  Prior to when
5    Actavis was acquired by Teva.
6        MR. DIAMANTATOS:  Objection; form.
7    BY THE WITNESS:
8        A.   I believe they had, yes.
9    BY MR. MELAMED:
10       Q.   There was no longer any focus on --
11   there was no longer any bonus -- any percentage of
12   your bonus paid out for reaching individual sales
13   goals, is that correct?
14       A.   Best of my recollection, yes.
15       Q.   Do you recall approximately when that
16   transition was complete that there were no longer
17   any -- there was no longer any focus on individual
18   sales goals as part of your bonus compensation?
19       A.   No, I do not.
20       Q.   Did you receive a document similar to
21   1177, 1178 each year that you were at Actavis that
22   described the bonus program?
23       MR. DIAMANTATOS:  Object to form, vague.
24   BY THE WITNESS:

Page 56

1        A.   I -- 100 percent certainty, I'm not --
2    it's not pulling up that that -- that we did.  It
3    wouldn't surprise me, but I don't remember.
4    BY MR. MELAMED:
5        Q.   You understand that Actavis had
6    responsibility to participate in suspicious order
7    monitoring pursuant to federal regulation?
8        A.   Yes.
9        Q.   Was any part of any -- do you recall
10   whether you ever received any incentive
11   compensation for reporting suspicious orders of
12   opioids?
13       MR. DIAMANTATOS:  Objection; form.  Go ahead.
14   BY THE WITNESS:
15       A.   So, are you asking if -- if we received
16   compensation for doing the right thing?
17   BY MR. MELAMED:
18       Q.   I'm asking whether you ever -- so,
19   the -- in 1177 and 78 --
20       A.   Yeah.
21       Q.   -- sets forth a bonus program adding up
22   to 100 percent?
23       A.   Okay.
24       Q.   And each of the three elements are based

Page 57

1  on sales. Would you agree? If you look at 1178.
2      MR. DIAMANTATOS: Objection; form.
3  BY THE WITNESS:
4      A.  As it lays out, but I am sure there is
5  always some subjective components.
6  BY MR. MELAMED:
7      Q.  Do you ever recall a bonus program
8  during your time at Actavis that incentivized, paid
9  out an incentive for reporting suspicious orders of
10  opioids?
11      MR. DIAMANTATOS: Objection; form, vague.
12  BY THE WITNESS:
13      A.  No.
14  BY MR. MELAMED:
15      Q.  Is that answer the same after the
16  Actavis generic entities moved to Teva?
17      MR. DIAMANTATOS: Objection; form.
18  BY THE WITNESS:
19      A.  The answer would be the same, as far as
20  incentives.
21  BY MR. MELAMED:
22      Q.  Do you have any understanding of what
23  this case is about generally?
24      A.  Outside of what you hear in the, you

Page 58

1  know, the general press, the general public, that's
2  my knowledge.
3      Q.  What is your understanding based on what
4  you've heard?
5      A.  That --
6      MR. DIAMANTATOS: Objection; form, foundation.
7  BY THE WITNESS:
8      A.  That there is -- I really -- I haven't
9  read much about it.  I mean, I've read it and you
10  hear about it on the news, but I guess I haven't,
11  you know -- just trying to culminate an answer.
12      That there's a -- that there is a
13  problem with -- with, you know -- there has been
14  for years, whether illicit or not, problems with
15  drugs in the United States as well as the world.
16      That's I guess kind of a top line, I
17  guess, understanding.
18  BY MR. MELAMED:
19      Q.  Is your understanding that that problem
20  relates specifically to opioids?
21      A.  I think it's a combination of a lot of
22  things.
23      Q.  Is it your understanding that this case
24  relates specifically to opioids?

Page 59

1      A.  That is my understanding.
2      Q.  Have you -- do you have any
3  understanding through the media that you were
4  describing of an opioid epidemic in the country
5  currently?
6      MR. DIAMANTATOS: Objection; form.
7  BY THE WITNESS:
8      A.  That word has been used a lot, yes.
9  BY MR. MELAMED:
10      Q.  Have you seen any effect in your
11  community of the opioid epidemic?
12      MR. DIAMANTATOS: Objection; form.
13  BY THE WITNESS:
14      A.  Personally, no.
15  BY MR. MELAMED:
16      Q.  Has it -- have any of your friends or
17  family been affected by opioid addiction?
18      MR. DIAMANTATOS: Objection; form, vague.
19  BY THE WITNESS:
20      A.  Not to my knowledge, no.
21  BY MR. MELAMED:
22      Q.  Do you know anyone who has ever taken
23  prescription opioids?
24      A.  My -- probably my father-in-law who

Page 60

1  passed away from cancer.
2      Q.  Do you know anyone who's taken
3  prescription opioids for purposes other than those
4  for which the opioids were prescribed?
5      A.  No.
6      Q.  Do you know anyone who's ever taken
7  prescription opioids that weren't prescribed by
8  that person's doctor?
9      A.  No.
10      Q.  Do you know anyone you've worked with
11  who has been addicted to opioids?
12      MR. DIAMANTATOS: Objection; form, asked and
13  answered.
14  BY THE WITNESS:
15      A.  To my knowledge, no.
16  BY MR. MELAMED:
17      Q.  So, I want to talk about your job as
18  national sales director.
19      A.  Okay.
20      Q.  And I understand there are periods of
21  time of which the entity that -- there were changes
22  in the entity you were working for.  I will try to
23  be as clear as possible.
24      A.  Okay.

Page 61

1    Q.  If there is confusion, please let me
2  know and please feel free to explain as we go
3  through how things changed over time.
4    A.  Okay.
5    Q.  As a general matter, part of your job
6  was to increase the sales of the generic products
7  you were selling, correct?
8    MR. DIAMANTATOS:  Objection; form.
9  BY THE WITNESS:
10    A.  I really see my role as matching up our
11  customers' need for their prescriptions that the
12  physicians are writing the approved product for for
13  the patients and matching up my supply chain to
14  what the account's needs are.
15  BY MR. MELAMED:
16    Q.  And you were incentivized for meeting
17  certain sales goals, correct?
18    MR. DIAMANTATOS:  Objection; form.
19  BY THE WITNESS:
20    A.  As a group, it's really a team effort,
21  so it's nothing individual.
22  BY MR. MELAMED:
23    Q.  We just went through at least in 2007
24  there was an individual component, right?

Page 62

1    A.  In 2007, yes.
2    Q.  Okay.  And, so, at least for part of the
3  time you were a national sales director, there
4  was -- you were incentivized individually for
5  meeting certain sales goals?
6    MR. DIAMANTATOS:  Objection; form.
7  BY THE WITNESS:
8    A.  As of that document, that look for 2007,
9  yes, there appears to be one year that there was --
10  there was that individual piece.
11  BY MR. MELAMED:
12    Q.  And do you recall that that was the only
13  year you were incentivized --
14    MR. DIAMANTATOS:  Objection.
15  BY MR. MELAMED:
16    Q.  -- for individual sales goals?
17    MR. DIAMANTATOS:  Sorry.  Objection; form,
18  asked and answered.
19  BY THE WITNESS:
20    A.  I guess I was -- let's put it this way.
21  I was surprised that there was an individual piece.
22  I -- yeah.
23  BY MR. MELAMED:
24    Q.  And starting in 2007 and continuing

Page 63

1  through today you've been incentivized for reaching
2  team sales goals, correct?
3    MR. DIAMANTATOS:  Objection; form.
4  BY THE WITNESS:
5    A.  There's a whole -- there's subjective
6  components.  So, there is a sales component, but
7  there is subjective components and there is
8  managing the accounts.  So, it's a -- pretty well
9  encompassing piece.
10  BY MR. MELAMED:
11    Q.  So, part of that, part of that whole
12  incentive structure has been for reaching team
13  sales goals, right?
14    A.  There is a portion of it, yes.
15    Q.  And that's from 2007 when you were hired
16  through today, is that correct?
17    A.  There is -- I would say without --
18  nothing striking me that would not make that
19  statement correct.
20    Q.  And your -- in your role as national
21  sales director, all of the drugs within your
22  portfolio of drugs you were selling were generic,
23  is that correct?
24    MR. DIAMANTATOS:  Objection; form, time frame.

Page 64

1  BY THE WITNESS:
2    A.  That's -- majority would be, yeah.
3  BY MR. MELAMED:
4    Q.  Were there particular times at which you
5  sold brand name drugs?
6    MR. DIAMANTATOS:  Objection; form.
7  BY THE WITNESS:
8    A.  There may have been some brands and
9  over-the-counter.
10  BY MR. MELAMED:
11    Q.  I'm sorry.  Was that brands and
12  over-the-counter?
13    A.  Yes.
14    Q.  Or brands in over-the-counter?
15    A.  Oh, sorry.  Brands and.
16    Q.  Do you recall which brand drugs you
17  sold?
18    A.  No.  I mean, it's -- again, just as far
19  as point of clarification, when it comes to any
20  interaction with brand, when you're on the trade,
21  the trade side, it's really, it's supporting the
22  prescriptions that a physician is writing for an
23  FDA-approved product for a patient that they deem
24  fit.

Page 65

1     So, it's just making -- it's matching up
2  that the patient is getting what the physician
3  thinks is best for them.  So, it's not really
4  selling.  It's just making sure that the store has
5  that product that the physician deems is best for
6  the patient.
7     Q.   And is that the same -- do you see your
8  role in the same way vis-à-vis generics?
9     A.   Generics are -- are different than --
10  their mechanisms are different than brands.
11     Q.   How so?
12     A.   As you've kind of touched upon, brand is
13  a prescription, it's all driven by what the
14  physician is writing and then they feel that there
15  is an FDA-approved product that's appropriate for
16  their patient's needs and the patient goes to the
17  pharmacy to get it filled.  And there could be
18  multiple products for hypertension, but they think
19  this product is, you know, is best.  So, the store
20  maybe has to carry five different hypertension
21  products.
22          When it comes to generics, for the most
23  part, they only carry one -- one manufacturer.  So,
24  if there is one manufacturer or 12 manufacturers

Page 66

1  and there's an AB-rated product for an item,
2  they'll negotiate the best price and then that's
3  the only one that they will -- for the most part,
4  will stock at their -- at the store.
5     Q.   So, the -- when you are saying "they"
6  would negotiate the best price, you are talking
7  about the pharmacies?
8     A.   Our customers.  So, pharmacy,
9  wholesalers.
10     Q.   So, is -- is it fair to say, then, that
11  Actavis for its generic drugs competed primarily
12  based on price?
13     MR. DIAMANTATOS:  Objection; form.
14  BY THE WITNESS:
15     A.   I wouldn't think that's fair.
16  BY MR. MELAMED:
17     Q.   How did Actavis -- as a -- pertaining to
18  its generic drugs.
19     A.   Okay.
20     Q.   How did Actavis compete against other
21  offerors of AB-rated -- let me withdraw that.
22  That's a very messily stated question.
23     A.   Okay.
24     Q.   So, Actavis manufactured AB-rated

Page 67

1  equivalents for certain brand name drugs,
2  correctly?  Correct?
3     MR. DIAMANTATOS:  Objection; form, time frame.
4  BY THE WITNESS:
5     A.   They did do manufacture, yes.
6  BY MR. MELAMED:
7     Q.   And so did some of Actavis' competitors,
8  correct?
9     MR. DIAMANTATOS:  Objection; form, time frame.
10  BY THE WITNESS:
11     A.   Yes.
12  BY MR. MELAMED:
13     Q.   So, if there are two AB-related opioids,
14  how would Actavis compete to get -- to have -- to
15  increase its sales of its opioid?
16     MR. DIAMANTATOS:  Objection; form, foundation.
17  BY THE WITNESS:
18     A.   It would really follow suit for the
19  whole portfolio.  So, it comes down to a lot of
20  things.  I guess you would have to ask, you know,
21  some of the customers what's most important to them
22  so that they are able to fill these legally written
23  FDA-approved drugs at their stores.  They can't
24  fill their customers unless they have supply.

Page 68

1     So, supply would be an item that is key,
2  and I guess at least the customers have told us
3  that's key for them is they have an ample supply.
4  So, price is -- price is nice but without any
5  product, they are not able to fulfill those
6  prescriptions.
7  BY MR. MELAMED:
8     Q.   Okay.  So, there are at least two --
9  you've mentioned at least two elements, to be
10  clear?
11     A.   Yeah.
12     Q.   You would compete on price and
13  availability, supply of the drug, is that correct?
14     A.   Yeah.
15     Q.   Is there anything else?
16     A.   It's really -- well, supply is really
17  the key thing.  I mean, and sometimes it comes down
18  to how -- how -- how the companies are working
19  together.
20     Q.   Kind of the interpersonal relationship?
21     A.   There is that.
22     Q.   You mentioned for brands, it was -- your
23  role was supporting prescriptions that a physician
24  is writing for an FDA-approved product for a

Page 69

1    patient that they, the physician, sees fit?
2        A.   Yes.
3        Q.   What did you do to determine that the
4    prescriptions the physician is writing were for
5    legitimate reasons?
6        MR. DIAMANTATOS:  Objection; form,
7    mischaracterizes the witness' testimony.
8    BY THE WITNESS:
9        A.   You -- you can't govern.  It's not how
10   it works.  It's the physician.  It's not every --
11   that you see every prescription and then there is a
12   government agency.
13           So, I think as a consumer and as a
14   whole, you look at the physician is doing the right
15   thing and they are diagnosing the patient for what
16   they have.  They are seeking a medication or
17   therapy.  Sometimes it's food and diet that
18   patients can cure their ailments.  And if that's --
19   they're not willing and able to do that, then there
20   is other -- there is other options for them.
21           So, it's -- it's something that you get
22   calls from either the field or there is a request
23   from corporate saying, "Hey, we're not -- what's,
24   you know -- we don't have this product.  Can you

Page 70

1    give me some information on it?"  And so you share
2    that information and then it works through the
3    system.
4    BY MR. MELAMED:
5        Q.   Did you ever individually follow up with
6    any physician concerning any prescription?
7        A.   No.
8        Q.   Do you know -- you had peers as
9    directors of national accounts, is that correct?
10       A.   Yes.
11       Q.   And they had just a different customer
12   base, correct?
13       A.   Correct.
14       Q.   Do you know if any of them ever reached
15   out to a physician to do anything to confirm -- let
16   me withdraw that.
17           Do you know if any of them ever talked
18   to a physician at all concerning any of the drugs
19   that Actavis was selling?
20       MR. DIAMANTATOS:  Objection; form, vague,
21   foundation.
22   BY THE WITNESS:
23       A.   No, I do not.
24   BY MR. MELAMED:

Page 71

1        Q.   You don't recall any of them mentioning
2    to you --
3        A.   Correct.
4        Q.   -- any such conversations, correct?
5        THE WITNESS:  Sorry.
6        MR. DIAMANTATOS:  Same objections.  Go ahead.
7    BY THE WITNESS:
8        A.   Correct.
9    BY MR. MELAMED:
10       Q.   I'm handing you what's been marked
11   Exhibit 3.
12           (WHEREUPON, a certain document was
13           marked as Allergan-Dorsey Exhibit
14           No. 3:  2/12/12 e-mail with
15           attachment; ACTAVIS0323261 -
16           0323277.)
17   BY MR. MELAMED:
18       Q.   Exhibit 3 is an e-mail and attachment.
19   It starts at ACTAVIS0323261 and continues through
20   3277.
21       MR. ROTH:  Matt, just for the record, we had
22   this issue at other depositions.  We re-produced
23   these with confidentiality designations so we need
24   to square that up.

Page 72

1        MR. MELAMED:  Okay.  So, Exhibit 3 has been
2    designated confidential by Allergan.
3        MR. ROTH:  And produced with a different Bates
4    stamp, but we can reconcile that later.
5        MR. MELAMED:  Sorry.  I didn't mean to pull
6    something that wasn't marked.
7    BY MR. MELAMED:
8        Q.   The e-mail is from Michael Perfetto to
9    Jinping McCormick, Rose-Marie Casilli and
10   Karen Steodter, dated February 12, 2012.  Subject
11   is "My presentation," and then the attachment
12   thereto is a presentation with the title slide, it
13   says, "Michael Perfetto, Actavis Sales Meeting,
14   January 11, 2011, Move the Needle."
15           Do you recall this PowerPoint
16   presentation?
17       A.   In its entirety, no.  It was a while
18   back.
19       Q.   Do you recall whether you -- whether you
20   ever saw this presentation?
21       A.   If it was shown to us, then, yes.  I
22   mean, it's not triggering anything from eight years
23   ago but...
24       Q.   Did you have periodic sales meetings

## Page 73

1   with Mr. Perfetto?

2   A.   Yes.

3   Q.   And at those meetings did he ever use

4   PowerPoint presentations?

5   A.   I would think he would, yes.

6   Q.   Do you recall that he did?

7   A.   Yeah, I guess.  Yes.

8   Q.   So, if you look at -- I'm going to use

9   the Bates numbers at the bottom of the page.

10   A.   Okay.

11   Q.   If you look at the one ending 3265.

12   A.   Okay.

13   Q.   The title bar says, "2010 - Another

14   Great Success Story, Two Years in a Row."

15       Do you see that?

16   A.   Yes.

17   Q.   So, this appears to be -- or let me

18   withdraw that.

19       Is it accurate to say that this

20   PowerPoint deck summarizes, at least in part,

21   sales, Actavis sales in 2010?

22       MR. DIAMANTATOS:  Objection; form, foundation.

23   We haven't established the witness recalls this

24   document, was on the e-mail that received it.

## Page 74

1       MR. MELAMED:  You can object but you can't

2   instruct.

3       MR. DIAMANTATOS:  I'm not instructing.  I am

4   laying a foundation.

5       MR. MELAMED:  You just instructed for a full

6   sentence.

7       MR. DIAMANTATOS:  Okay.  Sure.

8   BY THE WITNESS:

9       A.   Can you repeat.

10   BY MR. MELAMED:

11       Q.   Sure.  Does this appear, this slide

12   appear to be a summary of the 2010 Actavis product

13   sales?

14       MR. DIAMANTATOS:  Objection; form, foundation.

15   BY THE WITNESS:

16       A.   As it's -- as it's written and laid in

17   front of us with the 2009 numbers and 2010 numbers,

18   then yes, it appears that way.

19   BY MR. MELAMED:

20       Q.   Okay.  If you turn to the next page,

21   3266, you see the first bullet point identifies key

22   products?

23       A.   Okay.

24       Q.   You see that amongst the key products

## Page 75

1   are oxycodone tabs and fentanyl patches, correct?

2       MR. DIAMANTATOS:  Objection; form, foundation.

3   BY THE WITNESS:

4       A.   Yes, I see that written.

5   BY MR. MELAMED:

6       Q.   Do you recall that oxycodone tabs and

7   fentanyl patches were key products in 2010?

8       A.   No.

9       MR. ROTH:  Object to form.

10   BY MR. MELAMED:

11       Q.   Do you have any reason to doubt that

12   oxycodone tabs were a key product in 2010?

13       MR. DIAMANTATOS:  Objection; form, foundation.

14   BY THE WITNESS:

15       A.   It was a -- what it looks like here, it

16   was a -- looking at the top -- top items and so

17   there was Diltiazem, Gaba caps, Gabapentin tabs,

18   oxy and fentanyl.  So, in essence, they're saying

19   those -- of those five products, those are -- of

20   the portfolio, that's how they're identified, those

21   five products.

22   BY MR. MELAMED:

23       Q.   Meaning that they were -- they were

24   identified as the key products?

## Page 76

1       MR. DIAMANTATOS:  Objection; form, foundation.

2   BY THE WITNESS:

3       A.   Based upon how I guess he's written it

4   up, yeah, there's five products there that he's

5   identified.

6   BY MR. MELAMED:

7       Q.   Okay.

8       A.   Whosoever wrote it.

9       Q.   If you turn to the next page, do you see

10   the header says "Actavis Salesperson for CY 10"?

11       A.   Yep.

12       Q.   And it identifies you, correct?

13       A.   Yeah.

14       Q.   Do you recall being the salesperson for

15   CY 2010 at Actavis?

16       A.   No, I don't, but...

17       Q.   Do you recall seeing this slide before?

18       A.   No.  Still trying to figure out Mr. Torn

19   Blue Jeans.

20       Q.   Do you have any idea what Mr. Torn Blue

21   Jeans means?

22       A.   No, I don't.

23       Q.   If you turn to the next page, 3268, and

24   the header says "2010 Sales Performance (Direct and

## Page 77

1    Indirect)."

2        Do you -- do you understand the

3    information presented on the page, the chart

4    presented on the page?

5        MR. DIAMANTATOS:  Objection; form.

6    BY THE WITNESS:

7        A.   Best that I can at reading it within the

8    last 30 seconds, yes.

9    BY MR. MELAMED:

10       Q.   So, if I just walk through your line, I

11   just want to make sure my understanding squares

12   with yours.

13       A.   Okay.

14       Q.   If it doesn't, I want you to tell me how

15   I'm wrong.

16        So, your line identified by "Dorsey,"

17   the first three columns after that are "Full Year

18   2010 Adjusted Target."  Correct?

19       MR. DIAMANTATOS:  Objection; form, foundation.

20   BY THE WITNESS:

21       A.   The first column, yes, it says, "Full

22   Year 2010 Adjusted Target."

23   BY MR. MELAMED:

24       Q.   Okay.  And so your target for full year

## Page 78

1    2010 for direct sales was -- is noted here as

2    64,809.  Do you see that?

3        MR. DIAMANTATOS:  Objection; form, foundation.

4    BY THE WITNESS:

5        A.   I see that number, yes.

6    BY MR. MELAMED:

7        Q.   And is that in millions?

8        MR. DIAMANTATOS:  Objection; form, foundation.

9    BY THE WITNESS:

10       A.   I would think so.  Yes.

11   BY MR. MELAMED:

12       Q.   You were expected to sell more than

13   $64,809 worth of Actavis pharmaceutical products to

14   direct recipients in 2010, correct?

15       A.   I think the goal --

16       MR. DIAMANTATOS:  Hold on.  Objection; form,

17   foundation.  Go ahead.

18   BY THE WITNESS:

19       A.   I don't know if I'd use the word

20   "expectation."  It was a goal that was...

21   BY MR. MELAMED:

22       Q.   So, is it -- do you believe it correct

23   to say that your goal for direct sales in 2010 was

24   64,809,000 worth of sales?

## Page 79

1        MR. DIAMANTATOS:  Objection; form.

2    BY THE WITNESS:

3        A.   I would have to look at the macro

4    number, but if -- to make sure that matches up, but

5    it would perceive to make sense that it was, yes,

6    64 million and change.

7    BY MR. MELAMED:

8        Q.   And then you had a 73,282,000 target for

9    indirect sales in 2010, correct?

10       MR. DIAMANTATOS:  Objection; form, foundation.

11   BY THE WITNESS:

12       A.   That's how it states, yes.

13   BY MR. MELAMED:

14       Q.   And can you describe again what are

15   indirect sales?

16       A.   Indirect sales would be -- could be an

17   account that doesn't buy direct.  It buys through a

18   wholesaler or it can be a wholesaler who buys

19   direct.  However, they sell on their source program

20   and it comes through as an indirect sale.

21       Q.   And Actavis had information sufficient

22   to identify all the indirect sales?

23       MR. ROTH:  Object to form, foundation, calls

24   for speculation.

## Page 80

1    BY THE WITNESS:

2        A.   They have a mechanism of chargebacks

3    which allows you to see the customer's customer,

4    who they're selling to.

5    BY MR. MELAMED:

6        Q.   Can you explain what chargebacks are?

7        A.   Chargeback is a process in which, for

8    instance, as an example, a wholesaler will buy it

9    at a $10 price.  They will sell it to their

10   customer and then submit a chargeback for the

11   difference between what they sold it and that $10

12   mark.

13       Q.   And did all of your customers have --

14   submit chargebacks?

15       MR. DIAMANTATOS:  Objection; form.

16   BY THE WITNESS:

17       A.   At what juncture, what time frame?

18   BY MR. MELAMED:

19       Q.   Okay.  Did that change over time?

20       MR. DIAMANTATOS:  Objection; form.

21   BY THE WITNESS:

22       A.   I would say yes.

23   BY MR. MELAMED:

24       Q.   Okay.  So, how was it determined which

Page 81

1 customers were able to submit chargebacks?
2     MR. DIAMANTATOS:  Objection; form, foundation.
3 BY THE WITNESS:
4     A.   That's not -- wasn't my expertise as far
5 as how that determination was, and I'm not even
6 sure who came up with it.
7 BY MR. MELAMED:
8     Q.   You were aware of which of your
9 customers could submit chargebacks, correct?
10     MR. DIAMANTATOS:  Objection; form.
11 BY THE WITNESS:
12     A.   For the most -- yeah, for the most part,
13 yes.
14 BY MR. MELAMED:
15     Q.   Okay.  Was there -- how can you explain
16 to me how that process, your understanding of how
17 that process was established?  Was it a contractual
18 relationship?
19     MR. DIAMANTATOS:  Objection; form, foundation.
20 BY THE WITNESS:
21     A.   So I just want to be sure I'm not
22 wasting your time.  When you say do I understand
23 the process of, I'm sorry, what happening?
24 BY MR. MELAMED:

Page 82

1     Q.   Fair enough.  How chargeback, how this
2 chargeback system was set up.  You said some of
3 your customers had -- could seek chargebacks.
4 Other customers couldn't.  Is that correct?  Am I
5 understanding your testimony correct?
6     A.   So, there is -- for the -- for the most
7 part, you can say all -- the major wholesalers have
8 a chargeback system in place.
9     Q.   And when you say "a chargeback system in
10 place," you mean a chargeback system in place with
11 Actavis?
12     A.   With manufacturers.  I'm sorry.
13 Let's -- specific to us.  So, yes, with Actavis.
14     Q.   And is that answer consistent from 2007
15 to present, that the major wholesalers have a
16 chargeback system in place with Actavis?
17     A.   Best of my knowledge, yes.
18     Q.   Who are you defining as the major
19 wholesalers?
20     A.   You have three.
21     Q.   And who are they?
22     A.   Cardinal, McKesson and ABC.
23     Q.   ABC is AmerisourceBergen, correct?
24     A.   Sorry.  Yes.

Page 83

1     Q.   I will probably also refer to them as
2 ABC.  I just want to make sure --
3     A.   Yeah.
4     Q.   -- that the record is clear.
5     Do you recall any other customers that
6 had chargeback accounts with Actavis?
7     MR. DIAMANTATOS:  Objection; form, time frame.
8 BY THE WITNESS:
9     A.   A -- split time, I mean Walgreens used
10 to be direct and then they went indirect.
11 BY MR. MELAMED:
12     Q.   Do you recall when Walgreens went
13 indirect?
14     A.   Somewhere between five and seven years
15 ago maybe.  I'm not -- not quite.
16     Q.   Do you recall any other customers that
17 had chargeback relationships with Actavis between
18 2007 and present?
19     A.   It's not coming to memory, but probably
20 our smaller wholesalers.  So, it's -- wholesalers
21 as a group is -- are ones that have, I think were
22 kind of the pioneers, if you're going to say that,
23 are ones that established there was chargeback
24 relationship between ourselves and them.  Again,

Page 84

1 from what I -- my limited knowledge.
2     Q.   And so, can you explain the purpose -- I
3 think you started to go into this.
4     A.   Okay.
5     Q.   The purpose of the chargeback system.
6 You said, I think if I recall correctly, you said
7 something like the wholesaler, for instance, buys a
8 product at $10 and then sells it at something and
9 then files a chargeback.
10     Can you walk through that transaction,
11 making that more concrete?
12     A.   Like, for instance, just example like
13 with a number?
14     Q.   Sure.
15     A.   I mean, just, again, illustrative
16 purposes only is that we'll just stick with the $10
17 number.  They buy it at WAC, so wholesale
18 acquisition cost.  They buy it from us.  They hold
19 the inventory and then when one of their customers
20 purchases it, it's more than likely it's
21 on their -- could be on their source program, which
22 is a wholesaler preferred program that they have
23 for their customers, or it could be a third-party
24 contract.  They sell it to one of those two

Page 85

1    individuals, let's say, at $9. Then they'll submit
2    a chargeback for $1 back to Actavis.
3        Q.   And in order to submit that chargeback
4    to Actavis, what information does the wholesaler
5    need to provide?
6        MR. DIAMANTATOS:  Objection; foundation.
7    BY THE WITNESS:
8        A.   Not my area of expertise.  From my
9    understanding it's either a HIN number or a DEA
10   number.
11   BY MR. MELAMED:
12       Q.   Do they need to identify the -- does the
13   wholesaler need to identify the customer, its
14   customer that made the purchase --
15       MR. DIAMANTATOS:  Objection.
16   BY MR. MELAMED:
17       Q.   -- at $9, using your explanation?
18       MR. DIAMANTATOS:  Objection; foundation.  Go
19   ahead.
20   BY THE WITNESS:
21       A.   That will come through the DEA number or
22   the HIN number.
23   BY MR. MELAMED:
24       Q.   For any chargeback, Actavis had

Page 86

1    information about the entity that made the purchase
2    from the wholesaler that bought the Actavis
3    product?
4        MR. ROTH:  Objection; form, lacks foundation,
5    calls for speculation.
6    BY THE WITNESS:
7        A.   I have not seen those -- those formats.
8    It's not my area of expertise as far as what is
9    driven, but that's my understanding that's the way
10   that we know where the product is going, through
11   those numbers.
12   BY MR. MELAMED:
13       Q.   Okay.  Do you know whose area of
14   expertise that was at Actavis and from 2007 to --
15   well, let's -- let me withdraw that.
16       A.   Okay.
17       Q.   Do you know whose area or, if multiple
18   people, whose areas of expertise that was between
19   2007 and 2018?
20       MR. DIAMANTATOS:  Objection; form.
21   BY THE WITNESS:
22       A.   Not with a certainty.
23   BY MR. MELAMED:
24       Q.   Who -- if you wanted to understand the

Page 87

1    chargeback more completely than you've been able to
2    describe, as chargebacks were used by Actavis and
3    its certain customers in 2007, who would you ask?
4        MR. DIAMANTATOS:  Objection; form.
5    BY THE WITNESS:
6        A.   So, when you say "understand," to see if
7    I have -- like look at what the sales were or like
8    how many bottles that we -- that were sold during a
9    particular month?
10   BY MR. MELAMED:
11       Q.   Sure.  Start there.  Who would you ask
12   for that information?
13       MR. DIAMANTATOS:  Objection; form.
14   BY THE WITNESS:
15       A.   I think there was reports that were --
16   that they generated for us.  I don't know if it --
17   if it was from a function of a sales, from a sales
18   column or if it came from like the marketing,
19   marketing folks.
20   BY MR. MELAMED:
21       Q.   Were those reports regularly generated?
22       MR. DIAMANTATOS:  Objection; form.
23   BY THE WITNESS:
24       A.   I'm -- by "regular"?

Page 88

1    BY MR. MELAMED:
2        Q.   Let me define that for you to be clear.
3        Regularly generated as opposed to
4    something that was a one-off request for such
5    a report.  Was it something that you received on a
6    periodic basis?
7        MR. DIAMANTATOS:  Objection; form.
8    BY THE WITNESS:
9        A.   We received them.  I just don't know if
10   it was -- if it was a set period or not.
11   BY MR. MELAMED:
12       Q.   Did you make requests for that
13   information?
14       A.   Coming off the top of my head, I'm not
15   aware.  But I may have just to see if a new award,
16   if an account was -- was I guess doing what they --
17   their demand was actual to what they thought it
18   might be.
19       Q.   And did -- I had asked that question
20   initially regarding Actavis in 2007.
21       A.   Okay.
22       Q.   Does that answer change about who you
23   would ask about the information as we go forward in
24   time to 2018?

1       MR. DIAMANTATOS: Objection; form, vague.
2   BY THE WITNESS:
3       A.  It may have.  As far as what department,
4   you know, what department, who -- the who and what
5   is, who or what department may have changed over
6   the course of time as the structures have changed
7   through the acquisitions, yes.
8   BY MR. MELAMED:
9       Q.  And you can't think of any of the
10  individuals -- or let me withdraw that and state it
11  more clearly.
12          Can you think of any individuals you
13  would ask for -- let me withdraw that.
14          You mentioned that you saw chargeback
15  reports at least some of the time, correct?
16      A.  A chargeback report, I think there is
17  probably two different levels.  There is a macro
18  high level, which is, more than likely, what I
19  would -- sorry, what I would -- I would see as far
20  as sales, for instance, okay, your indirects are
21  looking at this and drilled down by account.
22          Anything that starts getting into
23  microfibers, that would be not something of -- that
24  I would interact with.

1       Q.  Do you know who would interact with that
2   micro level information at any time during your
3   employment from 2007 to today?
4       A.  Well, chargebacks, and, again, this is
5   estimate, at best, it would be departments from
6   probably our customer service, would be a --
7   anything related to controls, it would be our SOMS,
8   SOMS team would be actively involved.
9       Q.  What is SOMS team?
10      A.  Suspicious order monitoring.
11          MR. DIAMANTATOS:  Counsel, I don't want to
12  interrupt your line.  But at some point if we could
13  take a break whenever it works with your line of
14  questioning, please.
15          MR. MELAMED:  Sure.  Let me finish this
16  document and we will go.
17          MR. DIAMANTATOS:  Sure.  Thank you.
18  BY MR. MELAMED:
19      Q.  Do you know if Actavis ever made use of
20  chargeback information for marketing purposes?
21          MR. ROTH:  Object to form, lacks foundation,
22  calls for speculation.
23  BY THE WITNESS:
24      A.  For marketing, can you --

1   BY MR. MELAMED:
2       Q.  To identify customers to whom they
3   want -- you wanted to sell more product or
4   customers whose accounts you wanted to push harder
5   at?
6           MR. ROTH:  Same objections.
7           MR. DIAMANTATOS:  Same objections.
8   BY THE WITNESS:
9       A.  Doesn't really work that way.
10  BY MR. MELAMED:
11      Q.  Did you ever use any of the information
12  provided in chargeback reports to -- for any
13  purposes with your customers?
14      A.  There would be more than likely from our
15  marketing team, they would want us to look at
16  the -- if the customers were being compliant,
17  meaning if they said there was permethrin cream,
18  they needed 10,000 tubes a year and they are only
19  buying 5,000, what's going on.  So, in that -- that
20  would be a good example.
21      Q.  And you mentioned that the SOMS team
22  used the chargeback reports?
23      A.  I'm not -- I presume -- they oversee --
24  they oversee as far as the sales data.  So, I'm

1   only presuming that's one of the tools that they
2   use to -- to see -- garner that information.
3       Q.  But you're not sure either way, that's
4   your assumption.  Is that accurate?
5       A.  I'm not sure where they get their data
6   from.
7       Q.  Okay.  Returning to the chart on 3268,
8   so, the full year 2010 adjusted target for you was
9   $138,091,000 in net sales, is that correct?
10          MR. DIAMANTATOS:  Objection; form, foundation.
11  BY THE WITNESS:
12      A.  Per this spreadsheet, yes.
13  BY MR. MELAMED:
14      Q.  According to this spreadsheet.
15          And then skipping over a couple columns,
16  your full year 2010 actual net sales, though the
17  chart notes it's not final if you look at the
18  bottom, but as of the date of the chart were
19  $180,278,000, correct?
20          MR. DIAMANTATOS:  Objection; form, foundation.
21  BY THE WITNESS:
22      A.  Based upon that cell, yes.
23  BY MR. MELAMED:
24      Q.  If you turn to the next page, which is

Page 93

1    3269, it lists a series of customer families.
2         Do you see that?
3    A.   Yes.
4    Q.   Would -- is it your understanding that
5    each of these customers would have chargeback
6    relationships with Actavis at this point in time?
7         MR. DIAMANTATOS:  Objection; form, foundation.
8    BY THE WITNESS:
9    A.   At this particular time I don't know for
10   100 percent certainty which did and which did not.
11   BY MR. MELAMED:
12   Q.   And if you turn to the next page, 2 --
13   I'm sorry.  3270.  This shows Actavis' top ten
14   products ranked by absolute net sales in dollar
15   amount for 2010.  Is that correct?
16        MR. DIAMANTATOS:  Objection; form, foundation.
17   BY THE WITNESS:
18   A.   On this, yeah, I guess on the -- on the
19   document it does say the top ten products for 2010.
20   BY MR. MELAMED:
21   Q.   And, again, is it your understanding
22   that these numbers, if you look at the actual
23   number, for instance, for the first ranked product
24   group, which is oxycodone CR, that the 59,397

Page 94

1    number reflects net sales of $59,397,000?
2         MR. DIAMANTATOS:  Objection; foundation.
3    BY THE WITNESS:
4    A.   It would be -- I guess my assumption
5    would be the same format as the previous, on the
6    268.
7    BY MR. MELAMED:
8    Q.   Do you know what CR stands for in
9    oxycodone CR?
10   A.   Everything is a little different, but I
11   would -- I would go with controlled release.
12   Q.   And then No. 4 says "Oxycodone tabs."
13   Were those not controlled release?
14        MR. DIAMANTATOS:  Objection; form, foundation.
15   BY THE WITNESS:
16   A.   I would have to see the NDC to be
17   specific.  However, 2010, Actavis, so probably
18   would be the IR, the immediate, immediate release.
19   BY MR. MELAMED:
20   Q.   Is controlled release sometimes referred
21   to as extended release?
22   A.   Yeah, I guess it could be, yeah.
23   Q.   If you turn to 3274.  I'm sorry.  Before
24   you get there.  If you just turn to 3271.

Page 95

1    A.   Okay.
2    Q.   There is a title slide that says,
3    "CY 2011 Generic Rx Revenue Target 535 million."
4         Do you see that?
5    A.   Yes.
6    Q.   And then if you turn to 3274, which is
7    titled "Path for Sales Success," first bullet point
8    is "Focus on Needle Movers."
9         Do you see that?
10   A.   Yeah.
11   Q.   What do you understand -- do you have
12   any understanding of what Mr. Perfetto meant by
13   "needle movers"?
14        MR. DIAMANTATOS:  Objection; form, foundation,
15   calls for speculation.
16   BY THE WITNESS:
17   A.   No, I -- I can't -- Mike had some unique
18   tag lines.  So, I don't know specifically how he
19   came up with it or what his intention was with, you
20   know.  I can speculate but that's --
21   BY MR. MELAMED:
22   Q.   What is your -- what's your speculation?
23        MR. DIAMANTATOS:  Objection; form.
24   BY THE WITNESS:

Page 96

1    A.   Well, again, I don't know what --
2    what -- what weight you put on a speculation.  It's
3    a guess to me in my mind.
4         So, products that you're -- well,
5    moves -- so, it would just -- it would be focus on
6    the products that I guess the customers need the
7    most I guess.  It's the key items I guess.  Key
8    products.
9    Q.   Key products for sales success?
10        MR. DIAMANTATOS:  Objection; form,
11   mischaracterizes the witness' testimony.
12   BY THE WITNESS:
13   A.   No.  I'm just saying what it appears
14   here is that what he is saying is, again, it's --
15   I'm guessing at this point.  So, I guess I have a
16   hard time guessing the intent of an author of what
17   they're writing and what they're -- what their full
18   meaning is behind it.
19   BY MR. MELAMED:
20   Q.   How long did you report to Mr. Perfetto?
21   A.   When did I say I started, in 2007?
22   Q.   Um-hmm.
23   A.   I would look -- I don't have the exact
24   date.  Whatever Watson bought Actavis.  That's kind

Page 97

1  of when our -- we -- I stopped -- my reporting
2  structure into Mike ended.
3      Q.  So, it was a series of years that you
4  reported directly to Mr. Perfetto, correct?
5      A.  Yeah.
6      Q.  I'll represent to you that the Watson,
7  the acquisition closed in 2013.
8      A.  Okay.
9      Q.  Does that sound more or less accurate to
10 you?  I'm not asking you.  But do you have an
11 understanding that you reported to Mr. Perfetto for
12 approximately six years?
13     A.  Seem reasonable.
14     Q.  If you turn to the next page, 3275, it
15 identifies "Needle Movers," and do you see the
16 fentanyl patch is listed as a needle mover?
17     MR. DIAMANTATOS:  Objection; form, foundation.
18     BY THE WITNESS:
19     A.  I see it in that cell.
20     BY MR. MELAMED:
21     Q.  Do you understand what the "Current
22 Share" and "Target Share" columns mean?
23     A.  If memory -- well, "Current Share" is
24 pretty self-explanatory.

Page 98

1      I think the -- again, I am thinking here
2  that the "Target Share" means as far as growth.
3  You want to grow at another 5%.
4      Q.  Okay.  So, just to -- so I'm clear on
5  it, current share of 13% for fentanyl patch meant
6  that Actavis had 13% of the current market share
7  for that product?
8      MR. DIAMANTATOS:  Objection; form, foundation.
9      MR. ROTH:  Objection; form.
10     BY THE WITNESS:
11     A.  Of that --
12     BY MR. MELAMED:
13     Q.  You said it was self-explanatory.  I --
14 it's not self-explanatory to me.
15     A.  Yeah.
16     Q.  So I want to make sure I understand.
17     A.  No, fair enough.
18         The fentanyl patch category, all types.
19     Q.  Brand and generics?
20     MR. ROTH:  Object to form, lacks foundation,
21 calls for speculation.
22     BY THE WITNESS:
23     A.  I'm not quite sure if he was including
24 brands in it or it was just the generics, generics

Page 99

1  only.
2  BY MR. MELAMED:
3      Q.  Okay.  And then the "Target Share" would
4  represent the additional percentage, share
5  percentage, that was being set as a target for that
6  product?
7      MR. DIAMANTATOS:  Objection; form, foundation.
8      BY THE WITNESS:
9      A.  I believe what they're doing this for
10 all the -- the products was looking at products
11 that they were able to grow and potentially what
12 they were, kind of the cap based upon supply,
13 supply chain, that what we had that we could
14 potentially, if the customers needed it, what we
15 could support.
16     BY MR. MELAMED:
17     Q.  And, so, the first two needle movers
18 listed on this page are generic opioid product
19 families, correct?
20     A.  I'm sorry.
21     MR. DIAMANTATOS:  Objection.  I'm sorry.  Go
22 ahead.
23     BY MR. MELAMED:
24     Q.  The first two needle movers listed on

Page 100

1  this page are opioid product families, correct?
2      MR. DIAMANTATOS:  Objection; form, foundation.
3      BY THE WITNESS:
4      A.  They are both -- yeah, both C-II
5  products for pain.  If I understand, yeah.
6      BY MR. MELAMED:
7      Q.  What do you mean by C-II?
8      A.  I think it's the DEA.  It's either DEA
9  or FDA regulates the products.  So, it's a control
10 II substance.
11     Q.  Okay.  Is that synonymous with
12 Schedule II?  Have you heard that phrase?
13     A.  Yeah, I guess it would be, yes.
14     Q.  All right.  And if you turn to the next
15 page, 3276, it lists a series of team goals.  And I
16 want to ask about the fourth bullet point.  It
17 says, "Develop by midyear a Suspicious Order Report
18 for all DEA products across all manufacturing
19 sites."
20         Prior to 2011 did Actavis have a
21 suspicious order report for any of its products?
22     MR. DIAMANTATOS:  Objection; form, foundation.
23     BY THE WITNESS:
24     A.  Since it wasn't my area of expertise,

Page 101

1    I'm not quite sure when -- when it came into place.
2    BY MR. MELAMED:
3        Q.   Did you have any role to play in the
4    suspicious order reporting -- let me withdraw that.
5            During the entirety of your time at
6    Actavis, have you had any role in the suspicious
7    order reporting protocols established?
8        A.   Protocols established, no.
9        Q.   Do you have any understanding of why
10   this bullet point talks about developing a
11   suspicious order report across all manufacturing
12   sites?
13       MR. DIAMANTATOS:  Objection; form, calls for
14   speculation, foundation.
15   BY THE WITNESS:
16       A.   No, I don't have that -- I don't have
17   that knowledge.
18   BY MR. MELAMED:
19       Q.   Do you recall any discussion at this
20   time period of a suspicious order report
21   responsibility from the sales side?
22       A.   I'm sorry.  One more time.  I want to
23   make sure I heard it correctly.
24       Q.   Do you recall any discussion at this

Page 102

1    time period of developing a suspicious order report
2    on the sales side?  This bullet refers to
3    manufacturing sites.
4        MR. ROTH:  Object to form, lacks foundation,
5    calls for speculation, completely vague.
6    BY THE WITNESS:
7        A.   Yeah, I've not -- I guess I'm not fully
8    understanding the -- as far as the question because
9    I -- and part and parse of it is because I'm not --
10   I wasn't involved insofar as the suspicious order,
11   the SOMS program.  So, I don't know which
12   departments or which areas that it covered and/or
13   when.
14   BY MR. MELAMED:
15       Q.   So, do you have any understanding of how
16   the suspicious order monitoring program worked at
17   Actavis?
18       MR. DIAMANTATOS:  Objection; form, vague.
19   BY THE WITNESS:
20       A.   So, when you say how it worked, like
21   what captured their attention?  I don't know the
22   mechanisms.  I don't know the metrics.  I don't
23   know I guess how things were set up, what triggers,
24   what -- the microbes, I don't know.

Page 103

1    BY MR. MELAMED:
2        Q.   Did you have any responsibility for
3    communication if something was flagged as a
4    suspicious order?
5        A.   If something was flagged, then there --
6    orders would be held and they would be communicated
7    to the customer and then I sometimes would get
8    involved with a customer just to -- I'm the face of
9    the -- of the company to the customer to say, "All
10   right, these orders are being held.  Here's the
11   reasons why.  We need -- we need to know why this
12   is -- why your demand is higher than in the past."
13   And I said, "With all that information," I said,
14   "nothing is being released."  And I said, "Once we
15   receive that, then the internal team will analyze
16   that to see if that's sufficient or if they -- if
17   it's not, then your orders will be cut."
18       Q.   Did you take part in any of the
19   determination of whether to release an order that
20   had been flagged --
21       A.   No.
22       Q.   -- in the way you're describing?
23       A.   No.
24       Q.   Never?

Page 104

1        A.   No.  It's their way.  They understand
2    it.
3        Q.   Do you ever recall any of your customers
4    having an order that was not released because it
5    had been flagged and the reasons for the order that
6    they provided were not sufficient?
7        A.   Not to a specific customer.  But it's
8    happened over the years, yes.
9        Q.   And you don't -- do you recall
10   approximately how many times it's happened over the
11   years to your customers?
12       A.   No.  I mean, it's -- it's numerous.
13       Q.   It happened a lot?
14       MR. DIAMANTATOS:  Objection; form.
15   BY THE WITNESS:
16       A.   I mean, it's more than once.  I don't
17   know, you know.  Again, it's a number of years that
18   you worked.  There is a number of POs.  There is a
19   number of ways in SOMS.  Let's put it.
20           The short answer of this is once the
21   departments have identified that there's -- that
22   there is a problem, the orders get stopped and they
23   communicate to the customer.
24           And then sometimes I will get involved

1   as the face and explain why you're not getting this
2   product.  Here's the reasons why.  And we need
3   this, this, this and this.  And I said once -- and
4   all decisions are final from our internal
5   department and, you know, if they don't want to
6   share the information, then you know what?  Then
7   they're cut off.
8       Q.   Did any of your customers not want to
9   share the information that you required to consider
10  whether to release an order?
11      A.   I --
12      MR. DIAMANTATOS:  Objection; form.  Sorry.  Go
13  ahead.
14  BY THE WITNESS:
15      A.   I don't remember that occurring of them
16  refusing to share the information.
17  BY MR. MELAMED:
18      Q.   Do you recall any orders that once
19  flagged and the information was then provided by
20  the customer were not shipped?
21      MR. DIAMANTATOS:  Objection; form.
22  BY THE WITNESS:
23      A.   If -- if the information they provided
24  was not sufficient enough to grant comfort for our

1   SOMS person, yes, then it would not be shipped.
2   BY MR. MELAMED:
3       Q.   Do you recall any circumstances where
4   that happened?
5       A.   Specifically, no.
6       MR. MELAMED:  We can go off the record.
7       THE VIDEOGRAPHER:  We are off the record at
8   10:45 a.m.
9           (WHEREUPON, a recess was had
10           from 10:45 to 11:10 a.m.)
11      THE VIDEOGRAPHER:  We are back on the record
12  at 11:10 a.m.
13  BY MR. MELAMED:
14      Q.   Are you familiar with the NACDS,
15  National Association of Chain Drug Stores?
16      A.   Yes.
17      Q.   Can you explain what it is?
18      A.   Best of my knowledge, it's -- it's
19  the -- it's an association of all the national
20  chain drugstores in the -- I think it's primarily
21  the U.S.
22      Q.   Is it a membership organization, if you
23  know?
24      A.   I believe so, yes.

1       Q.   And do you know whether Actavis was a
2   member at any time from 2007 to present?
3       A.   Yes.  They were.
4       Q.   Do you know whether -- was Actavis a
5   member the entirety of the time from 2007 to
6   present?
7       A.   Best of my knowledge, yes.
8       Q.   Okay.  And do you know whether it's a
9   paid membership?
10      A.   That I'm unaware of.
11      Q.   Did you ever attend any NACDS events?
12      A.   Yes.
13      Q.   Did you attend more than one?
14      A.   In what time frame?
15      Q.   From 2007 to present.
16      A.   Okay.  I'm sorry.
17      Q.   That's okay.
18      A.   Yes.
19      Q.   Did you attend NACDS events
20  periodically?
21      A.   I was -- ones I've attended would have
22  been on the annual basis.
23      Q.   Okay.  About how many annual NACDS
24  events did you attend?

1       A.   In 2007 to I guess through '18?
2       Q.   Um-hmm.
3       A.   I would say -- when was my child -- best
4   of my -- we had a hurricane.  I think best to the
5   knowledge, every one with the exception of the year
6   of when my -- my little one was born.  So it would
7   have been 2008.
8       Q.   Can you identify other individuals at
9   Actavis who were active participants in NACDS
10  meetings?
11      MR. DIAMANTATOS:  Objection; form, foundation.
12  BY THE WITNESS:
13      A.   So, you're asking who attended?
14  BY MR. MELAMED:
15      Q.   Well, let me start with this.  Do you
16  know who was primarily responsible for the
17  relationship between Actavis and NACDS?
18      MR. DIAMANTATOS:  Objection; form.
19  BY THE WITNESS:
20      A.   To help me better understand.  What do
21  you mean relationship between the two?
22  BY MR. MELAMED:
23      Q.   Sure.  So, Actavis was a member,
24  correct?  That's what you said?

1    A.   Yes.  We attended the meetings.

2    Q.   Okay.  Who -- was there anybody who was

3    responsible for the decision that Actavis would be

4    a member at NACDS?

5    A.   So, the question, who would be making

6    the decisions if we would attend the meeting?

7    Q.   Let's start with membership.  Like who

8    made the decision, if you know, who made the

9    decision that Actavis be a member of NACDS?

10   A.   Again, I don't know like membership.  I

11   don't know if there is a membership, if --

12   Q.   Okay.

13   A.   How that goes.  So that that piece I'm

14   not -- I don't know how it works.

15   Q.   Fair enough.  Who made the decision that

16   Actavis would attend annual NACDS meetings?

17   A.   I don't.  You know, I don't know if it

18   came from one person or if it was a committee.  So,

19   I'm not sure to be able to answer that question

20   because I'm not sure again if it comes down to one

21   individual or if it's a group of upper management.

22   Q.   Were you told to attend the meetings?

23   Was it a requirement of your job to attend the

24   meetings?

1    MR. ROTH:  Object to form.

2    BY THE WITNESS:

3    A.   I don't know if it was a requirement.

4    It was a meeting that we -- that was -- the group

5    of, you know, obviously chain drugstores and

6    manufacturers.  So, it was a meeting that you, I

7    guess you went to.

8    BY MR. MELAMED:

9    Q.   What happened at those meetings?  In a

10   general sense.  I'm not asking you to remember

11   specific presentations.  But generally, you know,

12   what kind of events occurred during the annual

13   meetings?

14   A.   It's during those -- it's meetings

15   really, it's interactions with -- so, it's a forum

16   which allows really for all members, so that would

17   be the retailers as well as wholesalers that would

18   attend, to effectively and efficiently meet and

19   have business discussions all in one place versus

20   flying all over the nation.

21   Q.   So, is it fair to say that the primary

22   purpose of attending -- of Actavis' attendance at

23   the NACDS annual meetings was to have personal

24   meetings with wholesalers and/or drugstores?

1    MR. DIAMANTATOS:  Objection; form, foundation.

2    BY MR. MELAMED:

3    Q.   I'm sorry.  Not drugstores.  Pharmacies.

4    MR. DIAMANTATOS:  Objection; form, foundation.

5    BY THE WITNESS:

6    A.   Sorry.  Can you just say it one more

7    time.

8    BY MR. MELAMED:

9    Q.   The primary purpose of Actavis -- let

10   me -- I'll restate the question.

11   A.   Okay.

12   Q.   Is your understanding of the primary

13   purpose of Actavis' attendance at the annual

14   meetings to engage in the meetings you were

15   discussing with its -- with your customers?

16   MR. ROTH:  Object to form.

17   BY THE WITNESS:

18   A.   The -- well, the form of it is together,

19   that you have your customers there so you meet with

20   them as well as you have internal meetings

21   because -- we are spread out throughout the nation,

22   so it affords that opportunity for everyone to be

23   together as well.

24   BY MR. MELAMED:

1    Q.   And about how many customers would you

2    meet with at an annual meeting?

3    A.   Personally or as a company?

4    Q.   Let's start with personally.

5    A.   I guess it's depending on my -- who the

6    I guess customer base was.  Could be eight and

7    above, could be more.

8    Q.   And as a company, approximately, again,

9    I'm not asking you to identify each of the entities

10   you met with during any particular meeting, but

11   approximately how many customers would Actavis as a

12   company meet with at one of these annual meetings?

13   A.   Six hours, 12 hours.  Maybe there was,

14   let's say, 18 hours of open -- I don't know.  I'm

15   estimating if it was 18 or 20 in 30-minute time

16   slots.  So, could be up to 40.

17   Q.   And would people -- would there be

18   meetings with multiple customers occurring at the

19   same time period with different Actavis employees?

20   A.   Separately.

21   Q.   Separate meetings.  So, for instance,

22   just to talk about time slots.  If there was a 9:00

23   a.m. time slot and it was a half hour, is it

24   possible that Actavis would meet with more than one

1   customer during that 9:00 a.m. time slot through
2   separate meetings?
3         MR. DIAMANTATOS:  Objection; form, foundation.
4   BY THE WITNESS:
5         A.   There -- what I would have been witness
6   to is like sometimes the booth had two separate
7   meeting areas.  So, potentially, yes, you could
8   have a meeting with one customer in an isolated
9   room and then you have another meeting with a
10  separate, with different Actavis personnel with a
11  separate company in a separate isolated room.
12  BY MR. MELAMED:
13        Q.   Did Actavis ever meet with more than one
14  entity at the same time during these meetings?
15        MR. DIAMANTATOS:  Objection; form, foundation,
16  calls for speculation.
17  BY THE WITNESS:
18        A.   So, what do you mean "more than"?
19  BY MR. MELAMED:
20        Q.   Let me rephrase the question slightly.
21           As far as you know, did Actavis ever
22  meet with more than one of its customers at the
23  same time during these NACDS meetings?
24        MR. DIAMANTATOS:  Same objections.

1   BY THE WITNESS:
2         A.   Separately?
3   BY MR. MELAMED:
4         Q.   No, at the same -- together at the same
5   time.  Like, for instance --
6         A.   In the same room.
7         Q.   Yes.  Did Actavis ever meet with --
8         A.   To my knowledge, no.
9         Q.   Okay.  And what was the purpose of these
10  meetings?
11           To be clear about which meetings I'm
12  talking about, the individual meetings, the
13  one-on-one meetings with your customers that
14  occurred during the NACDS annual meetings.
15        A.   Okay.
16        Q.   What was the purpose of those individual
17  meetings?
18        A.   Okay.  It varied by customer.  I mean,
19  it could be a -- there is some -- there is some
20  back-end, meaning finance, open items that need the
21  proper parties in one room to figure through and
22  negotiate and come to an agreement and then move
23  on.
24           It could be also contractual, maybe new

1   contracts are coming up.  So, again, you have
2   your -- the right personnel in the room to have
3   those discussions and kind of draft out and shift
4   through what both parties are amenable and able to
5   live with.
6           It could also be a, you know, talking
7   about the current -- the current business, and as I
8   think I touched on earlier before, there are some
9   products that potentially they said they needed X
10  amount of product and we manufactured it and the
11  numbers aren't where they are.  So, we need to have
12  just clarification with them to say, all right, do
13  we need to adjust our manufacturing because your
14  demand is not what you thought it would be or is
15  there something, you know, systematically not
16  correct.
17           So, it's -- it's those I guess kind of
18  a -- like would be an example of three different
19  things that we would have a conversation with.
20        Q.   And, to your knowledge, did Actavis --
21  at these annual meetings.
22        A.   Okay.
23        Q.   Did Actavis have individual meetings
24  with McKesson?

1         A.   I personally did not call on McKesson.
2   I would think that we did.
3         Q.   Okay.  AmerisourceBergen?
4         A.   Yes.
5         Q.   And you personally did call on
6   AmerisourceBergen?
7         A.   At a particular time, yes.
8         Q.   What time period did you call on
9   AmerisourceBergen?  And if you don't remember the
10  exact dates, approximate, as close as you can get.
11        A.   I believe it may have started with or
12  close to that of when I was hired in, was it '07?
13  Is that what you said?  In Actavis.  And then may
14  have ended, was it '13 when Watson, is that what
15  you said, bought, bought us?  Whenever Watson
16  bought Actavis, then that -- that is when it kind
17  of ended my -- my calling on AmerisourceBergen.
18        Q.   And so your answer is that, yes, during
19  those annual NACDS meetings somebody from Actavis
20  would meet with somebody from AmerisourceBergen?
21        A.   The likelihood of that we met each time
22  is pretty good, yes.
23        Q.   And were you involved in any of those
24  meetings personally?

Page 117

1   A.  I would have attended those meetings if
2  I would -- yeah, if I was at the NACDS meeting.
3   Q.  What about Cardinal Health?
4   A.  No, I did not have any interaction with
5  them.
6   Q.  Do you know whether Actavis had
7  individual meetings with Cardinal Health during the
8  annual NACDS meetings?
9   A.  At this particular time I don't -- I
10  can't recall like with 100 percent certainty that
11  we did.  It would make sense with your key
12  customers and they're there that you would.
13   Q.  What about Walgreens?
14   A.  Yes, we did.
15   Q.  And did you personally call on Walgreens
16  for a period of time at Actavis?
17   A.  For a period of time at Actavis, yes.
18   Q.  Do you recall that period of time?  Is
19  it the same period of time as AmerisourceBergen?
20   A.  No.  It was later, later on.  But I'm
21  not sure what year that I started calling on
22  Walgreens.
23   Q.  And did that responsibility to call on
24  Walgreens end at the time of the Watson

Page 118

1  acquisition?
2   A.  No, it continued on.
3   Q.  Does it continue through to today?
4   A.  Yes.
5   Q.  Who were your largest customers at
6  Actavis?
7   MR. DIAMANTATOS:  Objection; form.
8  BY MR. MELAMED:
9   Q.  In terms of net sales.
10   MR. DIAMANTATOS:  Same objection.
11  BY THE WITNESS:
12   A.  Okay.  So when you say "you," me
13  personally?
14  BY MR. MELAMED:
15   Q.  Yes.  Who were the largest -- let me
16  rephrase that.
17   A.  Okay.
18   Q.  Who were the largest customers you were
19  responsible for calling on at Actavis in terms of
20  net sales?
21   MR. DIAMANTATOS:  Objection; form.
22  BY THE WITNESS:
23   A.  I don't have the numbers in front of me.
24  One could surmise that it would have been

Page 119

1  AmerisourceBergen and then later on, with the
2  addition of Walgreens to my coverage, then
3  Walgreens.
4  BY MR. MELAMED:
5   Q.  And I asked you before if you could
6  recall -- I'm sorry.  If you're trying to remember
7  something.
8   A.  No, yeah, I'm just trying to think.
9  Walgreens.  May have -- may have CVS.
10   Q.  Did you -- you're not sure whether you
11  had the responsibility to call on CVS as you sit
12  here right now?
13   A.  I -- I called on them during the --
14  during the Actavis time frame.  I'm just -- I'm
15  unclear of when, when that frame was.  But I did
16  call on them.
17   Q.  And is it accurate to say that CVS was
18  a, you know, along with Walgreens and
19  AmerisourceBergen, amongst the largest of your
20  customers that you had responsibility for calling
21  on when you called on them?
22   MR. DIAMANTATOS:  Objection; form.
23  BY THE WITNESS:
24   A.  They are -- they were three of the

Page 120

1  larger, larger customers.  So, if you mirror up
2  your portfolio list and if they choose you to be a
3  partner, yes, they could be three of the largest
4  within.
5   Again, it's just because they're large
6  doesn't mean that they are large within your
7  company, if that makes sense.
8  BY MR. MELAMED:
9   Q.  I just want to understand that
10  clarification.  Just because they're large in the
11  industry doesn't mean they're large in terms of
12  their relationship with Actavis.  Is that what
13  you're saying?
14   A.  Correct, yes.
15   Q.  Do you recall whether they were a large
16  customer of Actavis'?
17   MR. DIAMANTATOS:  Objection; form.
18  BY THE WITNESS:
19   A.  I don't know how we're defining large.
20  I just want to make sure, again, that I'm answering
21  to what you're looking for.
22  BY MR. MELAMED:
23   Q.  That's fair.
24   A.  Okay.

Page 121

1     Q.   You had defined big customers before and
2  you had said AmerisourceBergen, McKesson and
3  Cardinal Health were big customers of Actavis,
4  correct?
5     MR. DIAMANTATOS:  Objection; form,
6  mischaracterizes testimony.
7  BY THE WITNESS:
8     A.   I believe what we were talking about at
9  that time, and I could be wrong, but it was
10  regarding chargebacks and who the large customers
11  would be and those are, like I said, the three big
12  as far as the wholesalers.
13     So, that's I guess is what I am kind of
14  referring to is that when it comes to the
15  chargebacks, those three are the three big
16  wholesalers.
17  BY MR. MELAMED:
18     Q.   Okay.  Do you recall whether CVS had a
19  chargeback relationship with Actavis?
20     MR. ROTH:  Object to form, lacks foundation,
21  calls for speculation.
22  BY THE WITNESS:
23     A.   I -- they were direct, but I believe, if
24  I'm recalling correctly, there was chargebacks for

Page 122

1  indirect contracts loaded at wholesalers.
2  BY MR. MELAMED:
3     Q.   Does that answer mean that there were
4  chargebacks for indirect contracts with CVS?
5     MR. DIAMANTATOS:  Objection; form.
6  BY MR. MELAMED:
7     Q.   I'm just trying to understand.  You
8  said -- let me withdraw and I'm just asking you to
9  explain your answer.
10     Your answer was, "They were direct, but
11  I believe, if I'm recalling correctly, there were
12  chargebacks for indirect contracts loaded at
13  wholesalers," and the question was specific to CVS.
14     Can you explain how -- how that answer
15  pertains to CVS and any chargeback relationship it
16  had or did not have with Actavis?
17     MR. DIAMANTATOS:  Objection; foundation.
18  BY THE WITNESS:
19     A.   So, here's what I do know is that any
20  time there is a, for instance, specific to it could
21  be CVS, anyone, you only have X amount of square
22  footage in your -- in your warehouse, right?  So,
23  you cannot, very rarely are you going to stock
24  every product known to mankind in that space.

Page 123

1     So, it's all about, you know, I'm sure
2  they have metrics, why they decide to load some
3  things in their warehouse and carry direct and
4  others to pull through the wholesaler.
5     So, for those products that did not make
6  sense to bring in direct, then they had their
7  wholesalers stock it and then we would load the
8  indirect contracts.
9     So, the CVS individual stores could get
10  still the product.  They would just pull it from
11  the wholesaler, and then that would create this
12  chargeback that we were kind of talking about
13  before that, oh, you know what, this bottle went to
14  CVS.
15     Q.   Okay.  One further question on the
16  chargebacks.
17     The scenario we were talking about
18  before, do you remember we were -- it was a
19  hypothetical --
20     A.   Okay.
21     Q.   -- where the wholesaler acquired a
22  product from Actavis for $10.
23     A.   Okay.
24     Q.   Sold it for $9 and they would provide

Page 124

1  documentation to get the $1 repayment.  Is that
2  correct?
3     A.   Yes.
4     Q.   Do you know whether those reports would
5  also reflect transactions where the same wholesaler
6  bought the same product for $10 but managed to
7  resell it for a profit?
8     A.   So, in your -- so, profit.
9     Q.   They bought it for $10 and sold it for
10  $11.  Would that show up --
11     A.   Oh.
12     Q.   -- on the report that you received, the
13  chargeback report that you received?
14     A.   I don't know.
15     Q.   Who would know?  Who would be the right
16  person to ask about these chargeback questions?
17     MR. DIAMANTATOS:  Objection; foundation.
18  BY THE WITNESS:
19     A.   I guess whoever was handling
20  chargebacks.  I mean, if you think through how
21  chargebacks work, it's negative, meaning anything
22  below.  There is a delta.
23     So, here's -- I guess ultimately you
24  think through how this works.  You're buying it at,

Page 125

1    let's say yourself, you're buying it at 10.  You
2    sell it at 9.  You're going to want that one
3    dollar, right?  You sell it at 11, you bought it at
4    10.  I -- so, I don't know if that happens.
5        Q.  Right.
6        A.  It's -- you know.
7        Q.  I understand that I wouldn't, in the
8    scenario you are describing, I wouldn't necessarily
9    be entitled to the chargeback.  I was just
10   wondering whether that information concerning that
11   transaction was also provided back to Actavis.
12       A.  I'm unaware.  Yeah, sorry.
13       Q.  Fair enough.  You said before you don't
14   know the individuals who were responsible for the
15   relationship between Actavis and NACDS.  But was
16   there a particular group within Actavis, was it
17   senior management who decided that Actavis should
18   be a member of NACDS?
19       MR. DIAMANTATOS:  Objection; form, foundation,
20   asked and answered.
21   BY THE WITNESS:
22       A.  There -- again, there may have been a
23   group.  I just -- I don't know as far as
24   identifying who within -- who was within that

Page 126

1    group.
2    BY MR. MELAMED:
3        Q.  Did you ever receive any policies or
4    procedures governing your participation in NACDS
5    annual meetings?
6        A.  From?
7        Q.  Did Actavis ever provide you any
8    policies or procedures governing your participation
9    in the NACDS meetings?
10       A.  Not that I'm aware of, no.
11       Q.  Do you know whether the NACDS had any
12   working subcommittees or groups to address
13   industry-wide issues?
14       A.  Personally, I don't know if they did.
15       Q.  I'm going to hand you what's been marked
16   as Exhibit 4.
17           (WHEREUPON, a certain document was
18           marked as Allergan-Dorsey Exhibit
19           No. 4:  4/19/12 e-mail string with
20           attachment; ACTAVIS0302153 -
21           0302161.)
22   BY MR. MELAMED:
23       Q.  Exhibit 4 is an e-mail string and
24   attachment thereto.  The last-in-time e-mail is

Page 127

1    from Jinping McCormick to GRiedl@AMSrep.com, sent
2    April 19, 2012, subject is NACDS Actavis deck.
3        That's ACTAVIS0302153 and then that
4    e-mail string continues through 2156, and then
5    there are attachments thereto.  One is just a
6    signature image at 2157, and then an attachment
7    referred to as NACDS annual Walgreen 4-2012.pdf,
8    which is ACTAVIS0302158 and continues through 2161.
9        A.  Okay.
10       MR. DIAMANTATOS:  Matt, I'm going to just
11   object to the extent that subject line changes.  I
12   think you referred to it by one subject as being
13   the entire subject.  Just note that's not the case
14   on the exhibit.
15       MR. MELAMED:  Fair enough.
16   BY MR. MELAMED:
17       Q.  You see that you are a participant until
18   the last-in-time e-mail in the e-mail exchanges
19   going back.
20       Do you see that?
21       MR. ROTH:  Object to form.
22   BY MR. MELAMED:
23       Q.  Let me clarify.  You're not in all of
24   them.  Let's start on the first page and go back in

Page 128

1    time, and I'll just walk you through.
2        You see that on the e-mail dated
3    April 18, 2012 from George Riedl, you are an
4    addressee, Michael Dorsey and Michael Perfetto.
5    And it says, "Mike can you e-mail a copy of the
6    NACDS deck tomorrow," et cetera.  Correct?
7        A.  So the bottom of the page of 153?
8        Q.  Yes.
9        A.  Yes.
10       Q.  And you see you're also a sender of an
11   e-mail on the middle of the page 154.
12       Do you see that?
13       A.  So, dated April 18, 2012?  That one?
14       Q.  Correct.
15       A.  Okay.  Yes.
16       Q.  And that you are also a recipient of the
17   e-mail at the top of 155 dated April 16, 2012?
18       A.  I see that, yes.
19       Q.  Do you have any reason  -- let me start
20   a different question.
21       Do you recall those -- receiving those
22   e-mails?
23       A.  No.
24       Q.  You have no recollection of these

Page 129

1  e-mails?
2      A.  No.  I mean, outside of seeing it now.
3      Q.  Do you have any reason to believe that
4  you did not receive and send the e-mails that
5  were -- indicate they were received by and sent by
6  you?
7      MR. DIAMANTATOS:  Objection; form.
8  BY THE WITNESS:
9      A.  I mean, as it -- as it states on this,
10  these, you know, documents, I guess I'm -- there
11  are some that I've sent, some that I received.  So,
12  based upon this, how it's submitted, then yeah,
13  I'm -- I would agree that I'm party to receive and
14  send.
15  BY MR. MELAMED:
16      Q.  And concerning your participation in
17  this e-mail exchange, it concerned matters within
18  the scope of your employment at Actavis, correct?
19      A.  I'm sorry.  One more time.
20      Q.  Within -- concerning your participation
21  in this e-mail exchange.
22      A.  Okay.
23      Q.  The content of that exchange related to
24  your job responsibilities at Actavis?

Page 130

1      MR. ROTH:  Object to form.
2  BY MR. MELAMED:
3      Q.  Correct?
4      A.  It's -- it's more -- it's my
5  understanding from skimming this real quick, it's
6  a -- it's a discussion.  So, it's prepping for a --
7  prepping for a meeting that I'm not attending.
8  It's the NACDS annual that I'm not attending.  So,
9  it's looking for inputs is my understanding of
10  this, what this e-mail is.
11      Q.  And providing that input was part of
12  your job at Actavis, correct?
13      A.  Providing, yes, if -- because I'm more
14  of the -- I'm closer to the day-to-day, so if there
15  was anything that would come up, percolate up to
16  senior management, they would like to be aware of
17  it so they could address it.
18      Q.  You mentioned that you were not part of
19  the meeting that this deck was prepared for.  Is
20  that correct?
21      A.  Correct.
22      Q.  Do you know who was?
23      A.  No, not with 100 percent certainty.
24      Q.  So, do you see the last-in-time e-mail,

Page 131

1  which is the first one at the top of 153?
2      A.  Okay.
3      Q.  And it's from Jinping McCormick.  It
4  says, "George, Attached please find the NACDS deck
5  for Walgreens discussion"?
6      A.  Yep.
7      Q.  And do you recall that a few minutes ago
8  you testified that you regularly met with customers
9  during NACDS annual meetings?
10      A.  So, let's just take a pause here.  So,
11  there is two -- so, NACDS, there is an NACDS annual
12  meeting, which is the -- it looks like it was
13  probably sometime in April.  So, that's the -- and
14  that's what I call the bigwigs, anyone that above
15  my -- above myself.
16          And then there is an annual NACDS
17  meeting, which we were kind of -- we were talking
18  about before.  So, it just happens, I guess for
19  lack -- point of clarification, maybe happens once
20  a year and that's more in like the August time
21  frame.  That's the one that I attend with the
22  exception of the birth of my newborn.  Then that's
23  the one I attend.
24          This is the annual -- what they call the

Page 132

1  NACDS annual.  Does that make a little --
2      Q.  It makes sense.  I just want to make
3  sure I understand.
4      A.  Yeah, yeah.
5      Q.  You used "the annual" twice in two
6  different contexts.
7      A.  I know.
8      Q.  I just want to...
9          Am I correct to say that there are two
10  NACDS annual meetings, one is a -- was attended by
11  higher level employees of Actavis than you and one
12  which people at the national sales director level
13  attended and met with Actavis customers?
14      A.  In addition to others above us on
15  August, yes.
16      Q.  And that the August or around
17  August time frame --
18      A.  Yeah.
19      Q.  -- annual meetings were the ones that
20  you personally attended?
21      A.  Correct.
22      Q.  With the exception of when your son was
23  born.
24      A.  Yeah.

Page 133

1    Q.   And the April or thereabouts annual
2  meetings, you did not attend and people above you
3  on the org chart attended on Actavis' behalf?
4    A.   Yes.
5    Q.   Was Ms. McCormick above you in the
6  organizational chart at Actavis?
7    A.   She -- what did she do?  I believe she
8  was the head of our marketing.  So, marketing was,
9  you know, like I think a lot of companies, you have
10  sales, you have sales and marketing.  So, I don't
11  know where to put her.
12    Q.   Do you know whether she attended this
13  April 2012 NACDS meeting?
14    A.   I do not.
15    Q.   Is Mr. Perfetto the hierarchical level
16  of individual who would have attended these -- the
17  April annual meetings on Actavis' behalf?
18    A.   He would, as a, I think it was VP or
19  senior VP, then, yes, it would make sense for him
20  to be at these meetings.
21    Q.   Turning to the attachment, which starts
22  at 2158 and then continues through 2161, did you
23  assist in preparing this attachment at all?
24    A.   This looks like it's a culmination of

Page 134

1  our marketing team putting together a general
2  snapshot of Actavis at that -- at that particular
3  time.  And then who would pull -- I don't know if
4  it would be someone of our analysts then would pull
5  data on the overall sales of this particular
6  customer, which at this time here it's Walgreens,
7  and then what those -- those products are, they
8  would dive down into it and then create this as to
9  a presentation for at the meeting.
10    Q.   And once that presentation was drafted,
11  was it provided to you to review?
12    A.   I believe -- was I on this one?  They
13  would provide -- I mean, there is questions I
14  think, like here it said, when I was asked if there
15  is anything that I would have an input, I said,
16  "Nothing major from my perspective.  Closing the
17  Ropinirole ER today and working on the VIR."
18    So, it's more -- they'll interject when
19  they come to these higher level meetings, they'll
20  ask on, all right, is there any day-to-day
21  information that we should be aware of that should
22  it come up in conversation, we're not blindsided.
23  We have the information.  We can speak to it.
24    Q.   Just to be clear, if you turn to 2155,

Page 135

1  which is in the string of e-mails and the bottom
2  e-mail is from Allison Metz?
3    A.   Yep.
4    Q.   You see it says, "Mike looks forward to
5  meeting with you and your team at NACDS annual on
6  Saturday the 21st at 1:30 p.m."
7    A.   Okay.
8    Q.   Do you understand -- that was not you,
9  that is, the Mike being referred to, is that
10  correct?
11    A.   Correct.  That's not myself.
12    Q.   Do you understand that to be referring
13  to Mike Perfetto?
14    A.   If it's between one of us, two Mikes, it
15  was not me.
16    Q.   Okay.
17    A.   So that would leave Mike.
18    Q.   If you continue and you go one
19  page prior, going forward in time, 2154, there is
20  an e-mail from Michael Perfetto to George Riedl
21  cc'ing John Faerber.
22    A.   Okay.
23    Q.   And Mike Perfetto says, "I will have a
24  prepared presentation.  SOM - is one key issue to

Page 136

1  disx," which I assume is an abbreviation for
2  discuss.
3    Do you have any understanding of why SOM
4  was one key issue to discuss?
5    MR. DIAMANTATOS:  Objection; form, foundation.
6  BY THE WITNESS:
7    A.   No, I do not.
8  BY MR. MELAMED:
9    Q.   Do you remember discussing Actavis'
10  suspicious order monitoring program as it pertained
11  to Walgreens around April 2012?
12    MR. DIAMANTATOS:  Objection; form.
13  BY THE WITNESS:
14    A.   No.  Based upon what I'm reading here
15  and my recollection, no.
16  BY MR. MELAMED:
17    Q.   And then just going back, sorry, to the
18  attachment, the last page of the attachment is
19  2161.  2160 and 61 are labeled "Company Highlights"
20  and the last of the headers on 2161 says, "Robust
21  Advertising and Marketing Programs."
22    Did you participate in any of these
23  marketing or advertising programs described?
24    MR. DIAMANTATOS:  Objection; form.

Page 137

BY THE WITNESS:

A. No. What it appears based upon the document here, it's in a formative conversation to the customers of some of the -- it looks like -- well, I don't want to read it verbatim, but print advertising, direct mail, print and electronic for Clobetasol lotion and shampoo and it's more kind of an informative letting -- letting the market know that there is an inexpensive generic available to the brand in the marketplace.

Q. Do you see the last major bullet point there is labeled "Oxymorphone HCl ER tablets." Do you see that?

A. Yes.

Q. Do you recall any of the advertising and marketing programs that are described in the subbullet point underneath "Oxymorphone HCl ER tablets"?

A. I guess nothing with any clear, you know, clarity as far as, you know, what it all entailed.

Q. Do you remember whether -- let me restate that.

Do you recall a marketing and

Page 138

advertising effort by Actavis time to coincide with the launch of oxymorphone HCl ER tablets to promote those tablets to its customers?

MR. DIAMANTATOS: Objection; form.

BY THE WITNESS:

A. I guess I'm just looking at this now. It's kind of -- it's not triggering anything of, oh, yeah, I remember this. I just -- what I'm looking at, it looks like what it in essence it's doing is that -- so, this must have been Opana ER. It's bringing an awareness.

It's really -- it's used as a cost savings tool for the whole entire market. Instead of an expensive brand, saying there's an FDA-approved, AB-rated product that's less expensive based for the whole system.

So, I believe, based upon what I'm reading here, that's what the intent was.

BY MR. MELAMED:

Q. Do you recall, did you provide any communications to your customers about the existence of an AB-rated Opana ER being introduced by Actavis at or around this time?

A. I don't know if at or around this time,

Page 139

but whenever there is any product that gets -- there is an FDA approval on it, there is notification that goes out to the marketplace and you get -- you field calls from your accounts, your accounts ask questions.

So, under that scenario, yes, our accounts would have known about it and I would have answered their questions.

Q. What kind of questions would you get?

A. Typically of any product, they want to know are you shipping, is it something you think that we could work together on, you know, and depending upon where it goes with that, then it's, you know, pricing comes into play.

Q. What do you mean by -- can you flesh out what you mean by "something we can work together on"? When somebody approached you and said, for instance, about oxymorphone HCl ER tablets hypothetically, customer hears of the launch and they contact you, correct, that's one possible scenario?

A. Yeah.

Q. And in that they say to you, you said they may say something about is this something we

Page 140

can work on, right?

A. Yeah.

Q. What do you mean by "work on" in that context?

A. Well, everyone -- every product takes on its own. I mean, there's -- and, again, I don't know specific whether it be on any of these three. I mean, clobetasol lotion and shampoo are two different ones. So, you launch a product and you know from your supply chain how much that you can -- you're able to support.

And there may be, when you talk with customers, some customers they're interested, oh, like, "You know what, I'm," for whatever reason, "I would -- would prefer you to be my supplier of choice. I've had bad supply. I've had," there is an issue going, whatever.

There is others like, "You know what? We're -- we're not at that level of interest at this particular time."

So, it's just trying to figure that out with the customers of, you know, who wants to, you know, maybe take that, the next step.

Q. And would any of those discussions

Page 141

```
 1   include discussions of pricing for the product?
 2       A.   Eventually.
 3       Q.   So, you would negotiate, you may
 4   negotiate price with a customer for sale of a newly
 5   introduced product?
 6       A.   Well, yeah, they need to find out what
 7   they -- yeah.  So, they're looking for a more
 8   affordable price, yes.
 9       Q.   And what about rebates, would you
10   discuss rebates with customers?
11       MR. ROTH:  Object to form.
12   BY THE WITNESS:
13       A.   I don't believe rebates really -- no, I
14   guess they know -- if there is a rebate structure I
15   think through this, if there is a rebate structure,
16   it is what it is.  There is an agreement on.  Some
17   may have it.  Some may not.  But it's a net price.
18   BY MR. MELAMED:
19       Q.   So, for those who had the rebate
20   structure, were you a participant in negotiations
21   on what those -- what the rebate structure would
22   be?
23       MR. DIAMANTATOS:  Objection; form, foundation.
24   BY THE WITNESS:
```

Page 142

```
 1       A.   That was really, best of my
 2   recollection, kind of it's all driven by pricing
 3   and what the customer -- what the customer -- the
 4   structure they want.  Some customers just want dead
 5   net pricing.  So, you try to work with them.
 6   BY MR. MELAMED:
 7       Q.   And for the customers that wanted
 8   rebates as part of their pricing model, you would
 9   engage in discussions if those customers were
10   customers you called on, is that correct?
11       MR. DIAMANTATOS:  Objection; form.
12   BY THE WITNESS:
13       A.   I would be, I guess, I would look at it
14   as the go-between to seek what their -- what
15   they're asking for and how it's structured and then
16   have that communication with our pricing, pricing
17   team.
18   BY MR. MELAMED:
19       Q.   And who led the pricing team at Actavis
20   when -- in the circumstance where you'd have to
21   negotiate a rebate?
22       A.   It varies.  I mean, whoever was the head
23   of the pricing at, you know, between 2007 and '13.
24   I guess it just changed over -- over time who that
```

Page 143

```
 1   was.
 2       Q.   It changed between 2007 and 2013?
 3       A.   I believe so, yes.
 4       Q.   Do you recall any of the individuals who
 5   were in that role between 2007 and 2013?
 6       A.   I thought Ara Aprahamian.  Who is the
 7   last one?  I'm trying -- there was someone in
 8   the -- I don't remember.  I thought he was towards
 9   the end.  There was someone I believe in before.
10   And I'm just -- I'm unclear.  Sorry.
11       Q.   Just to clarify, when you mean before
12   the end, you mean before the time that Watson took
13   over?
14       A.   Yes.  Sorry.
15       Q.   So, it was Ara?
16       A.   Ara Aprahamian.
17       Q.   Aprahamian, is that correct?
18       A.   Yeah.
19       Q.   For a period of time from 2007 up until
20   the takeover, but there was -- but not all the way
21   up until the takeover by Watson is that my
22   understanding?
23       A.   Flip-flop it.  Sometime I think up and
24   to the takeover.  I just don't know when -- when
```

Page 144

```
 1   the begin date was.
 2       Q.   Got it.
 3       A.   So, work '13 backwards.  I just don't
 4   know what that number is.
 5       Q.   So, just so the record is clear because
 6   I just made a hash of what I was trying to describe
 7   to you.
 8       Ara was the person in charge -- who
 9   would be in charge of those negotiations on
10   Actavis' side from 2013 working backwards until
11   some point in time after 2007?
12       A.   So, I guess -- I just don't want -- so
13   how it would work was that it was -- it was just a
14   combination.  I was the in-between person.  You
15   have the conversation with the account.  This is
16   the -- what they're looking for.  All that
17   information gets feed into kind of the pricing,
18   pricing team.
19       So, Ara heads it up.  However, there is
20   other individuals that fall underneath him and then
21   you get different data points of different
22   customers of what they're requesting and then there
23   is a decision made of, all right, you know what, we
24   can agree to this, we can't agree to this.
```

Page 145

1      So, I hope that answers.
2      Q.   Is there a difference between rebates
3  and chargebacks?
4      A.   To me it's numbers.  I mean, I don't
5  know technically if there is, how it's -- but
6  it's -- I always say if you -- if the net price is
7  $10, whether you start at $12 or you -- and end at
8  10 or start at 10 and end at 10, however you get
9  there, some customers just want it a different way.
10     Q.   So, I think we talked before, and I just
11  want to make sure I understand functionally how the
12  chargeback would work and then I want to ask you
13  how functionally in the parallel scenario how the
14  rebate would work.
15     A.   Okay.
16     Q.   And correct me if I'm wrong.  But
17  functionally how a chargeback would work is
18  hypothetically you have a product you're selling --
19  the wholesaler buys it at 10.  It then resells it
20  at 9.  It provides information back to Actavis, and
21  Actavis provides them the one dollar difference
22  between the $9 resale amount and the $10 initial
23  sale amount, is that correct?
24     MR. ROTH:  Object to form, lacks foundation,

Page 146

1  calls for speculation.
2      MR. DIAMANTATOS:  And asked and answered.
3      THE WITNESS:  I'm sorry.  What?
4      MR. DIAMANTATOS:  Go ahead.  You can answer.
5      THE WITNESS:  Oh, okay.  Sorry.
6  BY THE WITNESS:
7      A.   So, I don't want to -- so, conceptually,
8  yes, like I said, it's on a indirect, indirect
9  contract that they're servicing.  So, under that
10  scenario, they would buy it at WAC at 10, sell it,
11  support that indirect contract at $9, and then
12  submit the chargeback to the company for that
13  dollar.
14  BY MR. MELAMED:
15     Q.   Okay.  And can you walk me through how a
16  rebate scenario would work.  In a hypothetical.
17  I'm not talking about any particular drug.  But
18  just conceptually how it worked when you were at
19  Actavis.
20     MR. DIAMANTATOS:  Objection; form, foundation.
21  Go ahead.
22  BY THE WITNESS:
23     A.   I guess my interaction how I saw it was
24  it was on the -- if you had -- there was a rebate.

Page 147

1  It would be tied to the net, the net amount of
2  units that were -- that were purchased.
3  BY MR. MELAMED:
4      Q.   So, contract -- the WAC.  I think you
5  referred to it, would be -- let's say it's 10.
6      A.   Okay.
7      Q.   At a certain number of units, there
8  would be a rebate paid out by Actavis to the
9  wholesaler.
10     A.   Okay.  Good question.  No.  So, it's not
11  a volume.  At least my recollection, it's not a
12  volume based.  It was on a per unit.
13     So, let's on your scenario, 9 and 10,
14  let's say that there was a 10 cent rebate and they
15  had five units that they purchased in the month,
16  they would get 50 cents.
17     Q.   And were there rebate -- withdraw that.
18     Were there differences in the magnitude
19  of the rebate dependent on the number of sales made
20  to that wholesaler?
21     MR. DIAMANTATOS:  Objection; form.
22  BY THE WITNESS:
23     A.   To my knowledge, no.
24  BY MR. MELAMED:

Page 148

1      Q.   Were there differences in the magnitude
2  of the rebate based on the percentage of Actavis'
3  product as a whole of all AB -- similarly AB-rated
4  products by that wholesaler?
5      MR. DIAMANTATOS:  Objection; form, foundation.
6  BY THE WITNESS:
7      A.   Can you say it one --
8  BY MR. MELAMED:
9      Q.   Sure.
10     A.   I hate -- it's a long one.  I'm sorry.
11  I just want to make sure I'm answering correctly.
12     Q.   So, Actavis sold generic oxycodone,
13  correct?
14     A.   Okay.
15     Q.   And it sold it at 15 milligram strength,
16  correct?
17     A.   Okay.  Yes.
18     Q.   It did, right?
19     A.   Yes.
20     Q.   Just want to use a concrete.  Even
21  though these numbers won't be concrete.  I want to
22  use a drug that's concrete.
23     Let's say it sold oxycodone to
24  AmerisourceBergen.

Page 149

1    A.  Okay.
2    Q.  If it had a rebate contract set up with
3  AmerisourceBergen, would the amount of the rebate
4  differ based on whether AmerisourceBergen's whole
5  purchase of all oxycodone generic 15 milligrams
6  included 50% market share for Actavis' version
7  versus 10% market share of Actavis' version?
8    A.  Okay.
9    MR. DIAMANTATOS:  Objection; form, foundation.
10  Go ahead.
11  BY THE WITNESS:
12    A.  Yeah, so to the best of my knowledge,
13  no, it's not NDC-specific.  So, it would be the
14  whole portfolio of FDA-approved products that
15  Actavis had.
16    And, for instance, on your example,
17  let's just stay with the example of it being
18  AmerisourceBergen, say, ah, you know what, we would
19  like a 2 -- don't give it to us in price.  We'll
20  take it in a rebate, a 2% rebate.  Whether they --
21  whatever our whole portfolio, whether they buy one
22  unit or 10,000 units of all of our products within
23  a certain period, it's 2%.
24  BY MR. MELAMED:

Page 150

1    Q.  I'm going to hand you what's been marked
2  Exhibit 5.
3    (WHEREUPON, a certain document was
4    marked as Allergan-Dorsey Exhibit
5    No. 5:  4/27/11 e-mail string with
6    attachments;
7    Acquired_Actavis_00485597 -
8    00485602.)
9  BY MR. MELAMED:
10    Q.  Exhibit 5 is e-mail string and
11  attachment thereto.  The e-mail most recent in time
12  is from Bob Miranda to Kristen Reabe cc'ing Michael
13  doors and Shateda Davidson dated April 27, 2011,
14  and that starts at Acquired_Actavis_00485597,
15  continues through 599 and then an attachment
16  thereto which is all the same Bates number, which
17  is Acquired_Actavis_00485602.  It's a voluminous
18  single Bates numbered document.
19    I just want you to turn to the
20  second-to-last page of the entire document, and
21  it's -- you see there is a Pharmacy Select logo and
22  then a highlighted chart?
23    A.  I'm sorry.  Is it 5602?
24    Q.  They're all -- unfortunately they're all

Page 151

1  5602, all these, because it's one large Excel
2  spreadsheet.
3    A.  Oh.
4    Q.  But if you look at the screen, it has
5  the correct page.  I just want to make sure you
6  have that page in front of you.
7    A.  Yep.
8    Q.  Okay.  So, first of all, what do you
9  understand the purpose of this document to be?  Do
10  you have any understanding of what the purpose of
11  this long spreadsheet is?  You can return to the
12  e-mail if you need to and then we can return to
13  that page.
14    A.  Okay.
15    Q.  So, now that you have had a chance to
16  review the e-mail, do you understand this to be in
17  reference to a disputed rebate to be provided by
18  Actavis to Pharmacy Select based on purchases?
19    A.  That's what it appears to be, yes.
20    Q.  And I just want to understand, do you
21  understand, returning to the page we were on, which
22  is reflected on the screen, which has -- it's the
23  second-to-last page of 602, it -- there is an
24  Actavis market share calculation.

Page 152

1    Do you see that in the gray box in the
2  middle?
3    A.  Yes.
4    Q.  So, there is a total unit and then an
5  Actavis unit and then from that, they have derived
6  a 19.82% market share.
7    Do you see that?
8    A.  Yep.
9    Q.  Okay.  And do you see that that -- the
10  rebate or the indication is that the rebate to be
11  paid to Pharmacy Select depends on their market
12  share of Actavis units.  Does that appear to be
13  accurate?
14    MR. ROTH:  Object to form, lacks foundation,
15  calls for speculation.
16  BY THE WITNESS:
17    A.  I'd have to see the cells but --
18  roughly, it's 20%.  So roughly, yeah, yeah, yeah.
19  So, roughly, based upon that grayed-in cell, the 39
20  and change is about 20% of the 19, 19.8, yes.
21  BY MR. MELAMED:
22    Q.  Right.  And so, if what Pharmacy Select
23  is saying in this document is if they purchase
24  between 10% -- I'm sorry.

## Page 153

1      If their market share of Actavis units
2  as a percentage of total units is between 10% and
3  19.9%, they get a 1% rebate.  Is that your
4  understanding?
5      A.  As it's laid out here, yes.
6      Q.  And if they -- and then there are
7  different tiers of market share to rebate.  So, the
8  next tier would be if it was the market share was
9  20% or 29.9% Actavis units as a percentage of total
10  units, then the rebate to be 2%.  Do you see that?
11      A.  Yes.
12      Q.  Okay.  Do you recall whether any other
13  customers who you worked with had tiered rebates,
14  whether or not the tiers were the same or the
15  percentages were the same, whereby the amount of
16  their rebate increased with their market share of
17  Actavis?
18      A.  Their market share, not that I'm aware
19  of, no.
20      Q.  Do you recall this particular contract,
21  rebate contract?
22      A.  I'm -- no.  I'm -- 2011.  Yeah, I -- I
23  guess I don't recall us having -- having this type
24  of structured contract in place, this GPO.

## Page 154

1      Q.  You called them a GPO, correct?
2      A.  Yes.
3      Q.  What is a GPO?
4      A.  At least how it's defined within our
5  realm is the group purchase organization.
6      Q.  And what is a group purchase
7  organization?
8      A.  They purchase or they -- well, they're
9  like a -- not really a purchasing agent.  They are
10  the contract negotiator for -- for this specific
11  one would be for independent pharmacies.
12      So, they would negotiate with the
13  manufacturers with a contract price that the
14  individual pharmacies could buy through the
15  wholesaler.
16  BY MR. MELAMED:
17      Q.  You can put that aside.
18      A.  Okay.
19      Q.  I'm handing you a document that's been
20  marked Exhibit 6.
21      (WHEREUPON, a certain document was
22      marked as Allergan-Dorsey Exhibit
23      No. 6: 10/17/11 e-mail string;
24      Acquired_Actavis_00486766 -

## Page 155

1      00486770.)
2  BY MR. MELAMED:
3      Q.  Exhibit 6 is an e-mail string starting
4  at Acquired_Actavis_00486766 and continuing through
5  770, the most recent-in-time being from Michael
6  Dorsey to Soojung Chung and Ara Aprahamian?
7      A.  Aprahamian.
8      Q.  Aprahamian.  Thank you.  Dated
9  October 17, 2011.
10      I have a specific question about this;
11  but before I get to that, do you recall this e-mail
12  exchange?
13      A.  No.  It's a while, a while back.  Can
14  I -- would it make sense for me to read it through
15  before you question or no?
16      Q.  You may read it.  I have a detailed
17  question.
18      A.  Okay.
19      Q.  Why don't you I ask the question.  If
20  you need to read through it --
21      A.  Gotcha.
22      Q.  -- then feel free to.
23      In the last -- in your first e-mail in
24  time, the last sentence.  So, I'm sorry, on the

## Page 156

1  first page, 766.
2      A.  Sorry.
3      Q.  The last sentence is addressed or last
4  paragraph is addressed to Ara.  Do you see that?
5      A.  Yes.
6      Q.  And it says, "Ara, please explain the
7  difference between 867 and chargeback information."
8  And then the parentheses say, "Both provide DEA
9  number, store name, address, et cetera."
10      Do you recall whether Ara responded to
11  you regarding the difference between 867 and
12  chargeback information?
13      A.  I don't recall if he did or not.
14      Q.  Did you ever come to an
15  understanding independent of this e-mail of the
16  difference between an 867 and chargeback
17  information?
18      A.  Technically, no, because I'm not in
19  either of the -- of the -- as far as that
20  department.  So, I'm not an expert on this is what
21  differentiates 67 versus chargeback.
22      Q.  And by "that department" do you mean the
23  pricing department?
24      A.  I don't know if it would be pricing or

## Page 157

1  chargeback.  But one of those two, if I had to take
2  a stab.
3      Q.   In the parentheses you say both the 867
4  and chargeback information, provide the DEA number,
5  store name, address, et cetera.
6      Do you see that?
7      A.   Yes.
8      Q.   And is that on a -- on what -- on a
9  unit-by-unit basis?  On what basis -- so, the
10  chargeback information is presented.
11      A.   Okay.
12      Q.   On what -- and it's for all of X
13  customers purchases for a period of time.  What
14  level of detail does that information go to, the
15  DEA number, store name, address?  Is it on a --
16  that information for their purchase of each drug
17  from Actavis?
18      A.   Okay.  So, by -- by SKU each time, is
19  that what you're asking?
20      Q.   Explain and then I'll -- if I need
21  clarification, I'll continue on.
22      A.   Okay.  Again, it's not -- I've -- don't
23  work as far as with the reports.  But anecdotally,
24  my understanding is that it's -- each and every

## Page 158

1  chargeback has a -- is a separate line that will
2  have that information and will provide that
3  information to the manufacturer.
4      Q.   You may have mentioned this before.  I'm
5  sorry that I don't remember if you did.
6          Who did work with the chargeback reports
7  at Actavis?  And you can go over time like 2007
8  moving forward.
9      A.   I -- I don't know the exact departments.
10  If it was a function of -- I don't know if it came
11  out of -- I know -- I think customer service had
12  access to it.  I just don't know who I guess or
13  which department was responsible for coming up with
14  the chargebacks and processing, if there is any
15  issues that -- I guess I don't recall like who the,
16  what department that it was.
17      Q.   What is an -- what is an 867?
18      MR. ROTH:  Objection to form, calls for
19  speculation, lacks foundation.
20  BY THE WITNESS:
21      A.   My very limited understanding of what it
22  is, it's an EDI.
23  BY MR. MELAMED:
24      Q.   What is an EDI?

## Page 159

1      A.   I know these acronyms.  I'm not quite
2  sure if I know the definition.  Let's go with
3  electronic, but then something maybe information.
4  Electronic digital.  I don't know.
5          So, it's just a designator that my
6  understanding is that the 867 is the sales out.
7      Q.   Got it.  So, 867 reflects sales out of
8  Actavis products to customers on a DEA number,
9  store name, address, et cetera basis.  Is that your
10  understanding?
11      A.   I don't know if I got clarification.
12  That's my thought at that particular time, but I
13  don't know.
14      Q.   Do you know whether there is an 867
15  report generated for each purchase of Actavis,
16  each -- I'm sorry -- each sale of Actavis products
17  going back to when you started at Actavis in 2007?
18      A.   I believe the 867s come -- gosh.  I
19  don't know.  It's coming from I believe the
20  wholesaler segment.  I just don't know the details
21  of it.
22      Q.   Is it your understanding that the 867
23  reports are something that Actavis itself
24  generated?

## Page 160

1      A.   My understanding is that that's
2  customer.
3      Q.   That --
4      A.   Customer generates those and sends those
5  to the manufacturer.
6      Q.   And the customer -- your understanding
7  is that the customers who did that were the
8  wholesalers?
9      A.   Wholesalers.  However, I'm not saying
10  that's limited just to wholesalers.
11      Q.   I have also seen reference in other
12  documents to 852 reports.  Do you know what those
13  references, do you know what an 852 report is?
14      A.   That's probably the only other one I
15  know.  I think I know.  And that's I believe would
16  be whole -- your actual inventory levels that are
17  in a wholesaler, that are in that distribution
18  center.
19      Q.   So, differentiated from the 867 in that
20  the 867 are the -- the -- reflect the sales out to
21  the wholesaler and the 852 represents the
22  cumulative total of their inventory from Actavis,
23  is that accurate?
24      A.   I think -- I may have misheard you.  So

Page 161

1  just point of clarification.
2       867 comes from the customer, i.e., an
3  example would be a wholesaler to the manufacturer,
4  and then the 852 is my understanding then is the
5  tool -- in essence it's the broadcast of
6  information from, again, from the customer to the
7  manufacturer saying this is what I have in my
8  inventory.
9       Q.   And the 852 reflects Actavis' inventory,
10  Actavis' 852 reflects Actavis' inventory?
11       A.   I only receive -- our company -- each
12  manufacturer, to my knowledge, only receives their
13  inventory within that entity that's sending it.
14       Q.   So, the 852, I just want to make sure I
15  understand, reflects Actavis' -- let's say a
16  wholesaler --
17       A.   Yep.
18       Q.   -- has sent Actavis, generated an 852
19  and transmitted it to Actavis.
20       A.   Yeah.
21       Q.   Is that the kind of scenario which the
22  report would be --
23       A.   Would flow through, yes.
24       Q.   And for the 852, that wholesaler would

Page 162

1  tell Actavis how much of Actavis' products it has,
2  it being the wholesaler, has on its -- in its
3  warehouse?
4       A.   Yes.
5       Q.   Okay.  And the 867 would be generated by
6  a customer, a wholesaler.
7       A.   Um-hmm.
8       Q.   And it would say -- it would reflect the
9  actual purchases of Actavis' products by that
10  wholesaler, is that correct?
11       A.   No.  So, you're close up to that point.
12       So, 867 reflect -- again, that report is
13  coming from a wholesaler to the manufacturer and it
14  is stating their sales out to their customers.
15       Q.   Got it.  So, 852, from manufacturer to
16  the -- I'm sorry.  Let me restate that.  Just want
17  to make sure I understand this and have it clear.
18       A.   Okay.
19       Q.   852 is a report generated by a
20  wholesaler customer sent to a manufacturer like
21  Actavis and it reflects how many of Actavis'
22  products the wholesaler has in its inventory at
23  that time?
24       A.   Yes.

Page 163

1       Q.   And the 867 comes from a customer, in
2  all cases a wholesaler?
3       A.   I never like to say all, but this
4  example.
5       Q.   You understand 867s to have been
6  provided by wholesalers to Actavis and the 867 that
7  Actavis received from a wholesaler would reflect
8  the sales of Actavis products from the wholesaler
9  to entities that purchased Actavis products from
10  the wholesaler?
11       A.   Yes.
12       Q.   So, is it accurate to say based on the
13  852 data that Actavis could tell where wholesalers
14  were shipping Actavis' products?
15       MR. DIAMANTATOS:  Objection.
16       MR. ROTH:  Objection; lacks foundation, calls
17  for speculation and form.
18  BY THE WITNESS:
19       A.   So, can you ask one more time.
20  BY MR. MELAMED:
21       Q.   My understanding was the -- I think what
22  you just testified.
23       A.   Okay.
24       Q.   You confirm is my understanding of the

Page 164

1  852s which are that they reflected the -- I'm
2  sorry.  I'm saying the wrong form.
3       A.   That's what got me twisted.
4       Q.   867.
5       A.   Okay.
6       Q.   Is it accurate that based on the 867
7  reports that Actavis knew where wholesalers were
8  shipping Actavis' drugs that wholesalers had bought
9  from Actavis?
10       MR. DIAMANTATOS:  Objection; form, foundation,
11  calls for speculation.
12       MR. ROTH:  Same objections.
13  BY THE WITNESS:
14       A.   All I -- like I said, I think with the
15  867, what I was calling into question is that it's
16  a sales out report and then what -- what's in that
17  exactly, what's in that report, I've -- I don't
18  know.  I've not seen.
19       MR. MELAMED:  Why don't we go off the record.
20       THE VIDEOGRAPHER:  We are off the record at
21  12:17 p.m.
22       (WHEREUPON, a recess was had
23       from 12:17 to 1:05 p.m.)
24       THE VIDEOGRAPHER:  We are back on the record

Page 165

1    at 1:05 p.m.
2         MR. MELAMED:  Welcome back.  I think there was
3    somebody on the phone who wanted to make an
4    objection.
5         MR. SCHOCK:  Yes.  Thank you.  This is Andrew
6    Schock.  I just wanted to note a form objection to
7    earlier questions regarding meetings with
8    AmerisourceBergen and I think there was some
9    follow-up regarding the customer relationship
10   there.
11        MR. MELAMED:  You wanted to note an objection
12   to a question an hour or so ago?
13        MR. SCHOCK:  Yes.  I apologize.  I'm on the
14   phone.  I didn't get to the mute button and didn't
15   want to interrupt the subsequent testimony.  I'm
16   just putting a form objection on the record.
17   BY MR. MELAMED:
18        Q.   Welcome back.
19        A.   You too.
20        Q.   What, if any, training did you receive
21   regarding responsibility to prevent diversion and
22   monitor and support suspicious orders of Actavis
23   opioids?
24        MR. DIAMANTATOS:  Objection; form, timing.

Page 166

1    BY THE WITNESS:
2         A.   Again, as far as any reporting and
3    identifying, I was not.  Really it was outside of
4    my spectrum.  So, I really didn't have that
5    training because it was outside of what I was hired
6    for.
7    BY MR. MELAMED:
8         Q.   Okay.  So, and your counsel interposed
9    an objection as to timing.  I just want to
10   understand.
11        A.   Okay.
12        Q.   Is that answer the same, consistent from
13   2007 to present?
14        A.   That would -- yes.
15        Q.   Whose responsibility was it to monitor
16   and report suspicious orders at Actavis prior to
17   Watson's acquisition?
18        A.   I'm not 100 percent.  It could have been
19   a combination between the customer service.  It may
20   have had an assistant.  I don't know if we -- there
21   was another department linked it.  But I believe
22   customer service was an active participant in it.
23        Q.   And who was -- do you recall who was in
24   charge of the customer service department between

Page 167

1    2007 and approximately the end of 2012?
2         A.   The majority of the time, so, pre- -- or
3    '13 minus, I don't know like when she came on
4    board.  Would have been -- she headed up our
5    customer service was Nancy Baran.
6         Q.   And who was the person in charge of
7    monitoring and reporting suspicious orders once the
8    Watson acquisition was complete?
9         A.   It may have -- I was learning the ropes
10   as far as which department.  So, it may have still
11   carried over with Nancy as she onboarded at Watson.
12   And, again, there could have been other -- other
13   departments or other personnel helping in that.
14        Q.   Are you aware of anyone at Actavis at
15   any time, from 2007 to present, who was ever
16   praised for reporting suspicious order?
17        MR. DIAMANTATOS:  Objection; vague.
18   BY THE WITNESS:
19        A.   To the best of my recollection, I don't
20   know if they were or weren't.
21   BY MR. MELAMED:
22        Q.   I'm sorry.
23        A.   To the best of my recollection, I'm not
24   sure if they were identified.  At least come to my

Page 168

1    knowledge, brought to my attention and remember,
2    I -- I don't.  It's not coming to mind right now.
3         Q.   Okay.  If you could just speak up a
4    little bit.
5         A.   Okay.  I apologize.
6         Q.   The HVAC system right behind us is
7    blowing.
8         A.   Okay.  I apologize.
9         Q.   It's no problem.
10        Do you know if anybody at Actavis from
11   2007 to present was ever disciplined because of a
12   failure to report suspicious orders?
13        MR. DIAMANTATOS:  Objection; form, foundation,
14   vague.
15   BY THE WITNESS:
16        A.   Again, it was outside of my -- really
17   wasn't a department that I had a lot of inter -- it
18   was a need-to-know as far as interactions.  I don't
19   know if there was or wasn't.
20   BY MR. MELAMED:
21        Q.   What do you mean by "it was a
22   need-to-know as far as interactions'"?
23        A.   Meaning if it occurred and it was my
24   account and I needed to have that conversation with

Page 169

1  the account as to, "Hey, look, we're cutting these
2  orders" or "These orders are on hold," then that's
3  I guess what I was saying about I need to know.
4      Q.   And I think you answered this before.
5  But as best you recall, none of your accounts ever
6  had a suspicious order held that wasn't resolved by
7  the information they provided you about the reason
8  for that order, is that correct?
9      MR. DIAMANTATOS: Objection; asked and
10  answered, mischaracterizes prior testimony.
11  BY THE WITNESS:
12      A.   Best of my knowledge, it gets resolved
13  one way or the other.
14  BY MR. MELAMED:
15      Q.   What do you mean "one way or the other"?
16      A.   Either the information is sufficient or
17  the information isn't sufficient and orders are
18  cut.
19      Q.   Do you -- to the best of your
20  recollection, did you ever have -- are you aware of
21  any situation where one of your customers provided
22  information that wasn't sufficient to ship the
23  order?
24      A.   I don't recall anything specific at

Page 170

1  this -- at this time.
2      Q.   You said from sometime after 2007 to
3  2013 at least Nancy Baran was the person you
4  believed in charge of the customer service
5  department who was primarily responsible for
6  suspicious orders, is that right?
7      A.   She was a head of the customer service
8  team and I think she had an active or she had a
9  role in the suspicious ordering, but I -- again, I
10  don't know in what facet that she was engaged.
11      Q.   Do you recall approximately how many
12  employees, during that time period when Nancy Baran
13  was involved in suspicious order monitoring, do you
14  recall how many employees were involved in
15  implementing the systems used to prevent diversion
16  of Actavis opioids?
17      A.   No.
18      MR. DIAMANTATOS: Objection; foundation. I'm
19  sorry. Go ahead.
20  BY THE WITNESS:
21      A.   No, I do not.
22  BY MR. MELAMED:
23      Q.   Or do you know, same period of time, do
24  you know how many employees were involved in

Page 171

1  implementing systems to monitor and report
2  suspicious activity relating to Actavis, sale of
3  Actavis drugs?
4      MR. DIAMANTATOS: Objection; foundation.
5  BY THE WITNESS:
6      A.   Again, since it was outside of my realm,
7  I really don't -- I couldn't answer that question.
8  Sorry.
9  BY MR. MELAMED:
10      Q.   Handing you what's been marked as
11  Exhibit 7.
12          (WHEREUPON, a certain document was
13          marked as Allergan-Dorsey Exhibit
14          No. 7: 3/11/11 e-mail string with
15          attachment; ALLERGAN_MDL_01698571 -
16          01698574.)
17  BY MR. MELAMED:
18      Q.   Which is an e-mail string, brief e-mail
19  string and attachment thereto. E-mail most recent
20  in time is from Jinping McCormick sent March 11,
21  2011 to Michael Perfetto, cc'ing Rachelle Galant
22  and Nancy Baran, and the e-mail string runs from
23  ALLERGAN_MDL_01698571 to 72 and then attached
24  thereto is 8573 and 8574.

Page 172

1      So, if you look at the e-mail second in
2  time, which is at the bottom of the first page from
3  Rachelle Galant on February 15, 2011?
4      A.   Okay.
5      Q.   You see you are a recipient. You're
6  listed as a recipient of this e-mail, correct?
7      A.   Yes, on this document you provided, yes.
8      Q.   Do you recall receiving this e-mail?
9      A.   No. I mean, it doesn't stick in my
10  mind.
11      Q.   Do you have any reason to doubt that you
12  received it?
13      MR. DIAMANTATOS: Objection; form.
14  BY THE WITNESS:
15      A.   I guess my comment is that from eight
16  years ago, it was -- based per this document that
17  was supplied, my name is on it. Okay.
18  BY MR. MELAMED:
19      Q.   Is it your assumption that because your
20  name was on it, it was sent to you?
21      MR. DIAMANTATOS: Objection; form.
22  BY THE WITNESS:
23      A.   I don't know if it was sent to me and
24  received by me. I'm saying per this document my

Page 173

1   name appears to be on -- on copy or on from a
2   string of people.  So, yes, my name appears to --
3   appears to have been sent to me.
4   BY MR. MELAMED:
5       Q.   Okay.  And you see Ms. Galant writes,
6   "Please see attached for a new SOP that has been
7   created for the team - dealing with oxycodone IR
8   suspicious orders."
9           Do you see that?
10      A.   Yes.
11      Q.   Do you recall whether there was a prior
12  SOP dealing with oxycodone IR suspicious orders?
13      A.   I do not know what was -- what was in
14  place before -- before this e-mail.
15      Q.   And SOP is standard operating
16  procedures?
17      A.   The general term of that, so, yes, I
18  would -- I would go with that.
19      Q.   Do you know whether there was another
20  standard operating procedure for suspicious orders
21  of any other controlled substances sold by Actavis
22  as of February 2011?
23          MR. DIAMANTATOS:  Objection; form.
24  BY THE WITNESS:

Page 174

1       A.   So, I'm sorry.  Can you just -- there
2   was a lot of information.  Can you just -- I just
3   want to make sure.
4   BY MR. MELAMED:
5       Q.   So, I asked earlier whether you recall
6   whether there was a prior SOP concerning oxycodone
7   IR before the one that's attached here.
8       A.   Okay.
9       Q.   And now I'm asking as a general matter.
10      A.   Yeah.
11      Q.   Do you know if there was an SOP
12  concerning suspicious orders of any other drugs
13  sold by Actavis?
14          MR. DIAMANTATOS:  Objection; form.
15          MR. ROTH:  Lacks foundation, calls for
16  speculation.
17  BY THE WITNESS:
18      A.   The -- I don't know if and when -- to be
19  100 percent sure, I don't know like when certain
20  things were put into place, for instance, non- --
21  non-controls.  There is limitations that are
22  tracking mechanisms.  You find out they are
23  overbuying, you want to know why.
24          When that started, to what degree,

Page 175

1   what -- and same with the SOP, I just don't have
2   the exact knowledge as to, you know, when and what
3   version.
4   BY MR. MELAMED:
5       Q.   You mentioned something, you mentioned a
6   phrase in your answer, non-controls?
7       A.   Yes.
8       Q.   Can you explain what that means?
9       A.   Items that are not under the schedules
10  that the FDA or DEA comes out with.  So, II through
11  V or I guess it would be I through V technically.
12  So, anything that's not within that.
13      Q.   Okay.  So, just to be clear, your answer
14  is that you don't recall at this point, as of
15  February 15, 2011, whether there existed SOPs for
16  suspicious orders of any Actavis products, is that
17  right?
18          MR. ROTH:  Mischaracterizes testimony, lacks
19  foundation, calls for speculation, form.
20  BY THE WITNESS:
21      A.   I think what I was trying to say before
22  is I -- at this juncture, I don't know, I don't
23  recall what was in place, when it was in place, and
24  to what degree, how everything was divided.

Page 176

1           Unfortunately, with me not being in
2   that -- in that area on a day-to-day basis, I
3   just -- I don't have that history.
4   BY MR. MELAMED:
5       Q.   Let's turn to the attachment, starting
6   on 8573, and this is what Ms. McCormick on Friday,
7   March 11, recirculates to Michael Perfetto,
8   Rachelle Galant and Nancy Baran saying we need to
9   nail this down.
10          And if you look at the title of 8537, it
11  says, "Suspicious Order Report for Oxycodone IR
12  Tablets, Standard Operating Procedure, Commercial."
13  And then it lists "Actions" and "Responsibilities."
14          Do you see that chart?
15      A.   Yes, I do.
16      Q.   So, did you review this standard
17  operating procedure for -- the draft standard
18  operating procedure for suspicious order report for
19  oxycodone IR?
20      A.   Well, it's from eight years ago.  So I
21  don't have 100 percent certainty, but I would have
22  thought that I would have.
23      Q.   Do you see where it's, on
24  "Responsibility" on the right-hand side, it lists

Page 177

1    the position --
2        A.   Yes.
3        Q.   -- who is responsible for a series of
4    steps?
5        A.   Yes.
6        Q.   Would you have been in any of those
7    positions at this time?
8        A.   I would have been on '11 so it would
9    have been within the sales field.
10       Q.   So, on line Item No. 2 where it says
11   "Customer Inquiry" and the responsibility is "Sales
12   Team," is it your understanding that you would have
13   responsibility to contact each of your customers
14   who is on the monthly suspicious order tracking
15   form, either by e-mail, in person or phone,
16   regarding the higher volume orders?
17       A.   My understanding, yeah, based upon this
18   document that that would have been a direction
19   given to me.  Yes.
20       Q.   And then further your responsibility was
21   to note the reasons for the order volume and
22   duration that the orders will be increased, right?
23       A.   That would be provided by the customer,
24   yes.

Page 178

1        Q.   And by your customers, it would be
2    provided to you, is that right?
3        A.   Yeah, to me by, yes.
4        Q.   And then for line item 3, is it your
5    understanding that subparts A, B and C in line item
6    3 would also be your responsibility for your
7    customers?
8        MR. ROTH:  Object to the form.
9    BY THE WITNESS:
10       A.   Yeah, it looks like 3 is really a subset
11   of -- basically is the actionable items on 2.  So,
12   that would make sense, yes.
13   BY MR. MELAMED:
14       Q.   Do you have any responsibility for
15   item -- anything in items 1 or 4 as set forth in
16   this chart?
17       MR. DIAMANTATOS:  Objection; form.
18   BY THE WITNESS:
19       A.   So, any -- any decisions on release/not
20   release were out of my control.
21   BY MR. MELAMED:
22       Q.   So, that's line item No. 4 and the
23   subparts below it, correct?
24       A.   That's 4, yes.  And then 1 was not --

Page 179

1    don't recall as far as myself having to run any --
2    having access to those reports to be run, to be
3    ran.  Excuse me.
4        Q.   Now, this, as I mentioned before, this
5    was a draft standard operating procedure.  If you
6    notice there is a question mark in 4 subpart C, the
7    last -- the very last part.
8            It says, "Keep the open orders and any
9    new orders that come in on the customer location
10   and hold status until clearance from question marks
11   to resume shipping the customer."
12           Do you know whether this standard --
13   something like this standard operating procedure
14   was ever enacted at Actavis?
15       MR. DIAMANTATOS:  Objection; form, calls for
16   speculation, foundation.
17   BY THE WITNESS:
18       A.   I'm not quite sure where they all landed
19   compared to what's being drafted here on, you know,
20   where they are landed on based upon what was being
21   drafted.
22   BY MR. MELAMED:
23       Q.   Do you ever recall reviewing a finalized
24   standard operating procedure for suspicious order

Page 180

1    report for oxycodone IR tablets --
2        MR. DIAMANTATOS:  Objection; form.
3    BY MR. MELAMED:
4        Q.   -- in 2011.
5        MR. DIAMANTATOS:  I'm sorry.  Objection; form,
6    assumes facts, foundation.
7    BY THE WITNESS:
8        A.   Though there is many e-mails that I get
9    and it's eight years ago, I'm not -- I guess it's
10   not top of mind right now that I recall the actual
11   final document.
12   BY MR. MELAMED:
13       Q.   Handing you what's been marked
14   Exhibit 8.
15           (WHEREUPON, a certain document was
16           marked as Allergan-Dorsey Exhibit
17           No. 8:  2/18/11 e-mail string;
18           Acquired_Actavis_01257892 -
19           01257893.)
20   BY MR. MELAMED:
21       Q.   Exhibit 8 is an e-mail string most
22   recent in time from Rachelle Galant to Michael
23   Dorsey, February 18, 2011, subject, "Re:  Draft
24   SOP - suspicious orders Oxy IR tabs."  Bates

Page 181

1    No. starts at Acquired_Actavis_01257892 and runs to
2    893.
3          And if you look at the last e-mail in
4    time, you see it's the same e-mail we were just
5    looking at from Rachelle Galant with the draft --
6    A.    Okay.
7    Q.    -- SOPs, correct?
8          Feel free to go ahead and look at that
9    and confirm.
10   A.    Okay.  I've seen -- yes.
11   Q.    So, you see that the first e-mail in
12   time in Exhibit 8 is the same as the -- is the
13   first e-mail in time in Exhibit 7.  So, the bottom
14   one of each, correct?
15   A.    Yes.
16   Q.    And then in Exhibit 8, the more recent
17   one I handed you, going up -- so, going forward in
18   time, so moving up from the bottom e-mail on the
19   second page, you respond to Ms. Galant, and you
20   said, "Looked good, maybe we want to weigh in on
21   C-II buyers only."
22         C-II is referring to the DEA Schedule II
23   drugs, correct?
24   A.    Based on that, it would make sense, yes.

Page 182

1    Q.    And you say, "Need to make sure they
2    have" -- "the have policies," I assume that's a
3    typo -- "they have policies and procedures in place
4    to ensure their sales are all within guild lines."
5    A.    Guidelines.
6    Q.    For "guild lines," did you mean to type
7    guidelines?
8    A.    Yeah.  Not my strongest suit.
9    Q.    I have plenty of typos as well.
10         And then you see that Ms. Galant
11   responds to you and you respond to her on
12   February 18 and you say, "I was just wondering if
13   we should be extra careful with accounts that just
14   buy C-IIs, ie NuCare."
15         What did you mean by that?
16   A.    I'm not right sure what I meant.  I
17   mean, you should be -- have the same amount of
18   oversight and care whether they're -- they buy your
19   whole portfolio or just C-IIs.  So, I'm not quite
20   sure what I was saying.  Maybe -- I don't know.
21         I mean, when you stand back and look at
22   it, same oversight no matter who it is.  I don't
23   know what I was, you know, trying to, you know,
24   bring to -- bring to the attention or trying to

Page 183

1    really say here, because at the end of the day it
2    should be the same no matter who the -- who the
3    customer is.
4    Q.    Okay.  If you go up to Ms. Galant's
5    response to you, the first-in-time -- I'm sorry --
6    the last-in-time e-mail.  She responds, "Gotcha -
7    yes agreed.  They seem sketchy."
8          Do you understand what she means by
9    "sketchy"?
10   MR. DIAMANTATOS:  Objection; foundation; calls
11   for speculation.  Go ahead.
12   BY THE WITNESS:
13   A.    No.  It's -- as it's coming from -- from
14   Rachelle, I'm not actually sure what she is -- what
15   she's meaning on it.
16   BY MR. MELAMED:
17   Q.    Okay.  Returning to your e-mail that she
18   responded to you saying "They seem sketchy," you
19   say, "I was just wondering if we should be extra
20   careful with accounts that just buy C-IIs."
21         Did you have many customer accounts at
22   this point in time, 2011, that just bought
23   Schedule II drugs from Actavis?
24   A.    Personally I don't think I -- I did.

Page 184

1    Like I said, I don't even recall who this NuCare,
2    who they are or what they -- what they do.  Unless
3    if it's an account that's a -- what's a better word
4    for end of life care?  They have cancer and --
5    it's --
6    Q.    Like palliative care.
7    A.    Yeah.  So maybe that's -- I don't know.
8    I don't know.  Again, I can't recall their business
9    model, what NuCare was.
10         But, again, I think what -- now you take
11   things retrospective, it's more whether, no matter
12   what the size they are, no matter who they are, the
13   process should be the same.  And I -- again, I
14   don't -- I can't remember what I was trying to --
15   Q.    So --
16   A.    -- heighten here.
17   Q.    Sorry to cut you off.
18   A.    Oh, no worries.
19   Q.    Am I understanding you correctly that --
20   well, let me restate this.
21         Is there something more troubling to you
22   as a national sales rep if you have a customer
23   that's buying solely Schedule II drugs versus
24   Schedule II drugs amongst other Actavis offerings?

Page 185

1      A.   I think that's -- that scenario, unless
2  they are an end of life care facility, more
3  often -- plenty more often than not, it's the --
4  it's a blend of schedule/non-schedule products that
5  the customers buy.
6      So, I would say it's a high rarity that
7  if there is somebody that's all they buy, at least
8  from my -- I can recall on our customers that we
9  had.
10     Q.   You can put that aside.
11         Handing you what's been marked
12  Exhibit 9.
13         (WHEREUPON, a certain document was
14             marked as Allergan-Dorsey Exhibit
15             No. 9: 5/23/12 e-mail with
16             attachment;
17             Acquired_Actavis_01825237 -
18             01825239.)
19  BY MR. MELAMED:
20     Q.   Exhibit 9 is an e-mail string -- or an
21  e-mail and two attachments from Rachelle Galant to
22  Michael Dorsey, Kelly Smith, Nancy Baran sent
23  May 23, 2012, subject "Miami pharmacy buying Oxy
24  30 milligrams from ABC."  Bates stamp of the e-mail

Page 186

1  is Acquired_Actavis_01825237 and the attachments
2  thereto are at 238 and 239.
3      Do you recognize this e-mail and the
4  attachments thereto?
5      A.   No.
6      Q.   Do you have any reason to believe you
7  didn't receive them --
8      MR. DIAMANTATOS:  Objection.
9  BY MR. MELAMED:
10     Q.   -- when they were sent?
11     MR. DIAMANTATOS:  Objection; form.
12  BY THE WITNESS:
13     A.   Based upon what's presented with my --
14  in front of me, it has my name on the "To."  So,
15  you would -- you would think logically that it was
16  sent to me.
17  BY MR. MELAMED:
18     Q.   Right.  So, the e-mail from Ms. Galant
19  says, "Our SOM program monitoring the 867 data from
20  our wholesalers has flagged a pharmacy out of Miami
21  purchasing large quantities of Oxy 30 milligrams
22  from ABC - 800 bottles in April and 900 bottles MTD
23  in May."
24     I'll note this e-mail is from May 23.

Page 187

1  So, I assume MTD means month to day.  Do you agree
2  with that?
3      A.   That would be a safe, yes.
4      Q.   She continues, "Besides the high volume,
5  this pharmacy is buying 97% Oxy 30 milligrams."
6      And if you turn to the two exhibits, the
7  two attachments, I'm sorry, at 238 and 239, the one
8  at 238, if you look at towards the top right
9  corner, reflects data from 5/01/2012 to 5/14/2012
10  in which 900 of the 912 total units purchased were
11  oxycodone.
12     Do you see that?
13     A.   Yes.
14     Q.   And then 9 -- 239, I'm sorry, the other
15  attachment, is from April 1, 2012 to April 30,
16  2012, and 800 of 809 total units purchased were
17  oxycodone.
18     Do you see that?
19     A.   Yes.
20     Q.   So, going back to the e-mail.  I just
21  want to ask you some questions about what I read.
22     A.   Yeah.
23     Q.   It says, "Our SOM program monitoring the
24  867 data from our wholesalers has flagged" this

Page 188

1  information.
2      Do you see that?
3      A.   Yes.
4      Q.   And, so, this is the 867 data we
5  discussed before, which is a report provided to
6  Actavis by, in this case, AmerisourceBergen, is
7  that right?
8      MR. ROTH:  Objection; lacks foundation, calls
9  for speculation.
10     MR. SCHOCK:  Object to form.
11  BY THE WITNESS:
12     A.   Based upon this e-mail, it is saying
13  that the store bought it from AmerisourceBergen and
14  867 data would come from -- come from the
15  wholesaler in this instance.
16  BY MR. MELAMED:
17     Q.   So, in this instance the 867 form would
18  have come from AmerisourceBergen?
19     MR. DIAMANTATOS:  Objection.
20     MR. SCHOCK:  Object to form.
21  BY THE WITNESS:
22     A.   I don't -- again, I don't have the --
23  all I can go off is what's presented in front of
24  me.  I don't have the expertise.  I wasn't witness

Page 189

1  to it to see it.
2      So, based upon what the sheet that's in
3  front of me, what it's saying is that they're
4  saying that the 867 was provided.  This Miami
5  pharmacy bought it from ABC so it would have
6  came -- per this, it would have then came from ABC.
7      Q.  Okay.  Did you ever bring this -- this
8  circumstance to the DEA's attention?
9      MR. ROTH:  Object to form.
10  BY THE WITNESS:
11      A.  I personally?
12  BY MR. MELAMED:
13      Q.  Did you ever report that there was a
14  pharmacy out of Miami purchasing large quantities
15  of Oxy 30 milligrams, 800 bottles in April, 900 in
16  May, that comprised 97% of their total purchases
17  during that time period to the DEA?
18      MR. DIAMANTATOS:  Objection; form.
19      MR. SCHOCK:  Object to form.
20  BY THE WITNESS:
21      A.  So, how are you defining "you"?
22  BY MR. MELAMED:
23      Q.  You individually.  Did you ever report
24  this to the DEA?

Page 190

1      A.  Not --
2      MR. DIAMANTATOS:  Same objection.
3  BY THE WITNESS:
4      A.  That is something that generally is not
5  in my as far as responsibilities and what I do on a
6  day-to-day basis.  Best of my knowledge, no.
7  BY MR. MELAMED:
8      Q.  Is there anybody you see in the "From"
9  or the "To" line or the "cc" line of this e-mail
10  who it's your understanding would have had that
11  responsibility to report this to the DEA?
12      MR. ROTH:  Objection; form, assumes facts not
13  in evidence.
14  BY THE WITNESS:
15      A.  When it comes to this, for instance,
16  this scenario where, you know, the way I look at
17  this is the systems were what they had in place
18  caught this happening.  Well, now, instead of
19  letting it flow through, you know what, we need to
20  investigate.
21      So, what happens as far as any
22  reporting, what I call behind, behind what I see, I
23  don't know who on this e-mail or not on this e-mail
24  is the person who would report that then to the

Page 191

1  DEA.
2  BY MR. MELAMED:
3      Q.  If you ever came across a purchase that
4  you believed needed to be reported to the DEA at
5  Actavis, who would you have told?
6      MR. DIAMANTATOS:  Objection; form.
7      MR. ROTH:  Lacks foundation.
8  BY THE WITNESS:
9      A.  I personally in essence -- it's not --
10  it's not my eyes only.  I'm for the most part
11  second or third in line that would see it.  So,
12  it's more -- I may have not said this before.
13      When it occurs, the system picks it up.
14  There is a -- there's a -- and then I -- sometimes
15  then I will get involved with the customer to have
16  that conversation that, hey, something doesn't look
17  right and then work through that customer to -- if
18  they're in agreement, then we work together and the
19  accounts get shut down.  There is no more sales to
20  them.  Or there is additional information that's
21  needed.
22  BY MR. MELAMED:
23      Q.  Correct me if I'm wrong, but I think you
24  testified before that you -- you did not have a

Page 192

1  customer whose accounts were shut down or who the
2  order was not shipped to because of any suspicious
3  orders, report?
4      MR. DIAMANTATOS:  Objection; form,
5  mischaracterizes witness' testimony, asked and
6  answered.
7  BY THE WITNESS:
8      A.  I would not say that that didn't happen.
9  I mean, I --
10  BY MR. MELAMED:
11      Q.  Let me state it a different way.
12      You don't recall that ever happening as
13  you sit here right now, is that correct?
14      MR. DIAMANTATOS:  Objection; form, asked and
15  answered.
16  BY THE WITNESS:
17      A.  So you're asking if I don't recall if we
18  ever shut --
19  BY MR. MELAMED:
20      Q.  Do you ever --
21      A.  -- stopped a shipment.
22      Q.  No.  I'm sorry for interrupting you.
23      Do you ever recall -- it's my
24  understanding -- you just described what would

Page 193

1    happen in a hypothetical scenario --
2       A.   Yeah.
3       Q.   -- where there can be accounts shut
4    down.  I just -- I believe I remember you saying
5    before that for each order from your customers that
6    was held, to the best of your recollection, each of
7    your customers provided sufficient information for
8    you to ship those orders?
9       MR. DIAMANTATOS:  Objection.
10   BY MR. MELAMED:
11      Q.   Is that -- is that correct?
12      MR. DIAMANTATOS:  I'm sorry.  Objection; form,
13   asked and answered.
14   BY THE WITNESS:
15      A.   No.  If I'm hearing you correctly, you
16   felt that what I said is that each time they
17   submitted the -- the requested information that we
18   shipped?
19   BY MR. MELAMED:
20      Q.   Yes.
21      A.   I would not say that's a true statement.
22      Q.   How many times do you believe sitting
23   here today, do you recall sitting here today, you
24   did not end up shipping the order that one of your

Page 194

1    customers made --
2       MR. DIAMANTATOS:  Objection; form.
3    BY MR. MELAMED:
4       Q.   -- due to it being flagged as
5    suspicious?
6       MR. DIAMANTATOS:  Sorry, counsel.
7       MR. MELAMED:  Understood.
8       MR. DIAMANTATOS:  Objection; form, asked and
9    answered.
10   BY THE WITNESS:
11      A.   That I don't have the data in front of
12   me.  I just --
13   BY MR. MELAMED:
14      Q.   Can you identify within a range?  Was it
15   10 times, 20 times, 1,000 times?
16      MR. DIAMANTATOS:  Objection; form, asked and
17   answered.
18   BY THE WITNESS:
19      A.   I think, I think it just skews the
20   answer.  I don't know with any realm of percentage
21   or numbers through the course of time how many --
22   how many got flagged and stopped and canceled.
23   BY MR. MELAMED:
24      Q.   So, if you continue on in the first

Page 195

1    paragraph of the e-mail, the last sentence says,
2    "Based on the product mix purchased and the volume,
3    we need to bring this to ABC's attention to see if
4    it falls within ABC's guidelines of purchasing."
5          And then the last paragraph -- the last
6    paragraph says, "Mike P., Kelly, do you have any
7    guidance on how to approach ABC with this?  Can we
8    forward the reports to the ABC buyer?"
9          Do you see that?
10      A.   Yes.
11      MR. SCHOCK:  Form.
12   BY MR. MELAMED:
13      Q.   Do you know if this was ever brought to
14   AmerisourceBergen's attention?
15      MR. DIAMANTATOS:  Objection; foundation.
16      MR. SCHOCK:  Object to form.
17   BY THE WITNESS:
18      A.   No, since I -- it was directed towards
19   it looks like Mike P and Kelly, I don't know what
20   the next steps were.
21   BY MR. MELAMED:
22      Q.   Did you ever learn from Mike P or Kelly
23   whether ABC was approached with this?
24      MR. DIAMANTATOS:  Objection; form, foundation.

Page 196

1       MR. SCHOCK:  Object to form.
2    BY THE WITNESS:
3       A.   Best of my recollection, again, I don't
4    know what happened after the end of this -- this
5    e-mail conversation.
6    BY MR. MELAMED:
7       Q.   AmerisourceBergen was your client at
8    this point in time, correct?
9       MR. SCHOCK:  Object to form.
10   BY THE WITNESS:
11      A.   Watson was '13.  So, it would make sense
12   based upon this timeline that ABC,
13   AmerisourceBergen, was still an account that I
14   was -- that I was calling on.
15   BY MR. MELAMED:
16      Q.   In the last question in the e-mail asked
17   of Mike P and Kelly says, "Can we forward the
18   reports to the ABC buyer," which I -- well, do you
19   know whether these reports were ever forwarded to
20   the ABC buyer?
21      MR. DIAMANTATOS:  Objection; form, foundation.
22      MR. SCHOCK:  Object to form.
23   BY THE WITNESS:
24      A.   Based upon -- again, to my knowledge,

1    I'm unaware of what the next steps were after the
2    end of this e-mail.
3    BY MR. MELAMED:
4        Q.   Handing you what's been marked
5    Exhibit 10.
6            (WHEREUPON, a certain document was
7                marked as Allergan-Dorsey Exhibit
8                No. 10:  3/18/11 e-mail string;
9                Acquired_Actavis_00237627 -
10               00237628.)
11   BY MR. MELAMED:
12       Q.   Exhibit 10 is an e-mail string, most
13   recent in time from Michael Dorsey to Keith
14   Margolis, dated March 18, 2011, subject, "Re:
15   Oxycodone 15 milligram orders."  The e-mail string
16   runs from Acquired_Actavis_00237627 to 628.
17           Do you recall this e-mail exchange?
18       A.   I would not have before -- before seeing
19   it right in front of me.
20       Q.   Okay.  Do you have any reason to doubt
21   that you participated in the e-mail exchange?
22           MR. DIAMANTATOS:  Objection; form.
23   BY THE WITNESS:
24       A.   Again, I think it's -- goes without

1    saying is that I don't, you know, recall something
2    from almost eight years, years ago specifically.
3            However, based upon what's been
4    presented in front of me and my name's on it, it
5    would -- it would appear that I was -- I was -- I
6    was part of this e-mail chain exchange.
7    BY MR. MELAMED:
8        Q.   If you go to the last e-mail, so
9    first-in-time, which is on 628, you write Keith
10   Margolis and you say, "Bellco ordering" --
11   "Bellco's ordering on the 15 milligram Oxy IR tabs
12   is in excess of the rolling six-month average of
13   324."
14           Was Bellco one of your clients?  I'm
15   sorry.  One of your customers?
16       A.   Bellco, I don't know the exact timeline,
17   but Bellco was purchased by AmerisourceBergen.  So,
18   I don't know at that time if they were under that
19   umbrella or on their own.  But I would have been
20   calling on them either way.
21       Q.   Okay.  And the e-mail continues to say,
22   "Month-to-date, Bellco has been shipped 526
23   bottles.  Based on where we are in the month (52%),
24   this falls under our SOP of suspicious ordering."

1            Do you know how that order of 526
2    bottles based on where we currently were in that
3    month fell under Actavis' SOP of suspicious
4    ordering?
5        A.   So -- I'm sorry.  Do I know how that
6    order -- how it fell under the SOP?
7        Q.   Yes.  Can you explain why that order
8    fell under the SOP for suspicious ordering?
9        A.   Well, again, I'm not -- I didn't develop
10   it.  So, I don't know the metrics all involved.
11   One -- one could take a leap that you have an
12   average and if it's over -- over that average, then
13   it gets in essence kicked out and identified as,
14   all right, we need to -- need to have further
15   information on this as to why.
16       Q.   And at this point in time, in the point
17   in time in the first e-mail where you're reaching
18   out to Keith, had you notified the DEA of this
19   order?
20           MR. DIAMANTATOS:  Objection; form, assumes
21   facts.
22   BY THE WITNESS:
23       A.   I personally -- I did not, no.
24   BY MR. MELAMED:

1        Q.   Do you know whether anybody at Actavis
2    at this point in time, March 17, 2011, had informed
3    the DEA about this order?
4            MR. DIAMANTATOS:  Objection; form, foundation,
5    assumes facts.
6            MR. ROTH:  Lacks foundation.
7    BY THE WITNESS:
8        A.   When it comes to any interaction with
9    the DEA or the SOMS process, I was kind of second
10   or third step after the fact.  So, I'm not privy to
11   if there was or there wasn't.
12   BY MR. MELAMED:
13       Q.   You didn't learn either way whether
14   there was or wasn't any communication with the DEA
15   about it?
16       A.   At this -- at this juncture, correct.
17       Q.   And then the next e-mail, Mr. Margolis
18   responds and it appears he offers an explanation
19   for the increase in the order.
20           So, if you look at the sentence
21   approximately halfway through the paragraph, he
22   says, "As you can see, since the severest supply
23   issues originated in November-December, our overall
24   volume of the 50 Oxy" -- I'm sorry -- "of the 15

Page 201

1  has increased as well."
2      Do you see that?
3      A.  Yes.
4      Q.  And given the subject line and the
5  content of this exchange, do you think "the 15"
6  refers to oxycodone 15 milligrams?
7      A.  It would be a safe assumption that, yes,
8  it is.
9      Q.  Did you make any inquiry of Mr. Margolis
10 as to the reason for the increased overall volume
11 of the oxycodone 15 milligram from Bellco?
12     A.  I'm sorry.  Did I ask why?
13     Q.  Um-hmm.
14     A.  I -- I believe that's -- again, I'm --
15 and I may not be understanding your question, so
16 don't take this the wrong way.  But I thought that
17 was, I was addressing that in the initial e-mail,
18 just asking him that our team noticed that it was
19 higher than normal.  Can you provide?
20     Q.  Right.
21     A.  Is that what you're --
22     Q.  So, you do that.  You ask --
23     A.  Okay.
24     Q.  You say, hey, it's not higher -- higher

Page 202

1  than normal.  It's triggered our suspicious order
2  system.
3      A.  Yeah.
4      Q.  And please explain.  Mr. Margolis writes
5  back and one of the things he says is, "Our overall
6  volume of the 15 has increased as well."
7      And I'm asking whether you did anything
8  to determine why the overall order -- I'm sorry --
9  the overall volume of the 15 had increased?
10     MR. DIAMANTATOS:  Objection; form, foundation,
11 mischaracterizes the e-mail.
12 BY THE WITNESS:
13     A.  No, as far as any other -- any other
14 further investigation into it, myself personally,
15 no.
16 BY MR. MELAMED:
17     Q.  And it continues, Mr. Margolis
18 continues, "That is a normal situation as customers
19 will be ordering this from all of their suppliers
20 to get whatever they can get."
21     Did you follow up with Mr. Margolis to
22 determine why customers would be ordering this from
23 all of their suppliers to get whatever they could
24 get?

Page 203

1      MR. DIAMANTATOS:  Objection; form.
2  BY THE WITNESS:
3      A.  No, I did not -- not follow up with him,
4  you know, asking why they're doing it.  Just -- I
5  guess you look at it, the previous, the previous
6  sentence, and it's talking about there was
7  shortages in November and December.  So,
8  potentially it's backfilling.
9      Q.  Did you reach out to any of the
10 customers to which Mr. Margolis referred as
11 ordering this from all of their suppliers to get
12 whatever they can get to determine why they were
13 ordering whatever they could get?
14     MR. DIAMANTATOS:  Objection; form, assumes
15 facts.
16 BY THE WITNESS:
17     A.  I personally did not.  I think that's
18 not kind of within the realms of what I can -- of
19 what I do.  So, no, I did not.
20 BY MR. MELAMED:
21     Q.  Do you know whether anybody at Actavis
22 did so?
23     MR. DIAMANTATOS:  Objection; form, lacks
24 foundation, assumes facts.

Page 204

1  BY THE WITNESS:
2      A.  Best of my knowledge, I'm not sure if
3  they did or didn't.
4  BY MR. MELAMED:
5      Q.  Do you know whether there was any
6  attempt made to understand whether the increase in
7  overall volume of the Oxy 15 was due to orders by
8  pill mills?
9      MR. DIAMANTATOS:  Objection; form, foundation,
10 assumes facts.
11 BY THE WITNESS:
12     A.  Again, that -- that type of information
13 and delving into it is outside of kind of what I --
14 what I have the ability to do.  So, no, I did not.
15 BY MR. MELAMED:
16     Q.  Did you do anything to follow up to
17 determine whether the overall -- the increase in
18 overall volume of Oxy 15 was due to diversion of
19 prescribed oxycodone to street sales?
20     MR. DIAMANTATOS:  Objection; form, foundation,
21 assumes facts.
22 BY THE WITNESS:
23     A.  Again, once again, I don't even know how
24 you would go about doing that.  Again, it's out of

Page 205

1   my realm of any type of tracking.
2   BY MR. MELAMED:
3        Q.   In response to Mr. Margolis you write,
4   "Keith, thank you - this is perfect."
5        Do you know whether Actavis shipped
6   this -- the order that had been flagged in excess
7   of the rolling six-month average to Bellco based on
8   his explanation?
9        MR. DIAMANTATOS:  Objection; foundation.
10   BY THE WITNESS:
11        A.   No.  Outside of, you know, what's
12   written here, I don't know what the -- what the
13   next steps were.
14   BY MR. MELAMED:
15        Q.   Who would know whether this order
16   shipped?
17        MR. DIAMANTATOS:  Objection; foundation, calls
18   for speculation.
19   BY THE WITNESS:
20        A.   I don't know if it's a who or it would
21   be -- I mean, I think just like any -- any sales,
22   it would be your customer service or a sales
23   report.  I have -- I don't know.  But that's
24   probably what I would think.

Page 206

1   BY MR. MELAMED:
2        Q.   Handing you what's been marked as
3   Exhibit 11.
4        (WHEREUPON, a certain document was
5        marked as Allergan-Dorsey Exhibit
6        No. 11: 11/11/11 e-mail string;
7        ALLERGAN_MDL_02879204 - 02879205.)
8   BY MR. MELAMED:
9        Q.   This is an e-mail exchange, yes, e-mail
10   exchange most recent in time from Michael Dorsey to
11   Brian Schneider at Walgreens dated November 11,
12   2011. Bates range from ALLERGAN_MDL_02879204 to
13   9205.
14        Do you recognize this e-mail exchange?
15        A.   It's -- again, it's from almost seven
16   and a half years ago.  So, I don't recognize.  It's
17   not bringing anything to memory.  But I see it was
18   an exchange between myself and Brian from
19   Walgreens.
20        Q.   And it references an e-mail -- I'm
21   sorry.
22        It references trying to put together a
23   meeting on December 8, 2011.
24        Do you see that?

Page 207

1        A.   Yes.
2        Q.   With you and Mr. Schneider and
3   Mr. Perfetto, correct?
4        A.   Correct.
5        Q.   Do you recall whether that meeting took
6   place?
7        A.   No, I do not know.
8        Q.   And the e-mail first-in-time says,
9   "Brian, we would like to also meet with you" --
10        A.   Probably your.
11        Q.   Thank you.  Probably "your suspicious
12   order monitoring team."
13        Do you see that?
14        A.   Yes.
15        Q.   Do you recall why you wanted to meet
16   with Walgreens' suspicious order monitoring team at
17   this time?
18        A.   I don't, you know, recall the exact
19   rationale or why it was brought up at the time.
20   Again, it's part of the normal business meetings
21   and maybe it was a function, maybe they're
22   fine-tuning or if there was the team, I don't know
23   if they had questions.  I don't know.
24        But, again, there is always -- various

Page 208

1   subject matters that come up and sometimes they
2   just want a draft notification of give them a
3   heads-up who should be involved or who should be,
4   you know, part of -- part of the meeting.
5        Q.   Do you recall meetings with any of your
6   customers regarding suspicious order monitoring?
7        A.   The specifics, no.  However, I know
8   there was meetings that, you know, the subject came
9   up and we -- we had those conversations.
10        Q.   Do you recall approximately when that
11   subject started coming up in your conversations
12   with your customers?
13        A.   No, I don't.  Sorry.
14        Q.   Handing you what's been marked
15   Exhibit 12.
16        (WHEREUPON, a certain document was
17        marked as Allergan-Dorsey Exhibit
18        No. 12: 9/26/12 e-mail string;
19        Acquired_Actavis_00096109 -
20        00096110.)
21   BY MR. MELAMED:
22        Q.   Exhibit 12 is an e-mail exchange most
23   recent in time between Michael Dorsey and Nancy
24   Baran dated September 26, 2012, re "SOM update,"

Page 209

```
1    running from Acquired_Actavis_00096109 to 110.
2         Do you recall this e-mail exchange?
3         A.   No.  It doesn't pop.  It doesn't pop to
4    mind right now.
5         Q.   But you have no reason to doubt that you
6    received and sent the e-mails where indicated on
7    this -- in this string?
8         MR. DIAMANTATOS:  Objection; form.
9    BY THE WITNESS:
10        A.   I think like in the past, it's --
11   it's -- I'm seeing the document presented to me.
12   I'm on the e-mail.  So, it would make sense that it
13   was received by me.
14   BY MR. MELAMED:
15        Q.   Okay.  So I want to start with the
16   first-in-time e-mail from Nancy Baran to a list of
17   recipients including you on September 25, 2012.
18        Do you see that?
19        A.   Yes.
20        Q.   And the e-mail starts, "Sales team,
21   Apparently, the message was not clear on Friday's
22   call.  SOM pertains to all controls, not just Oxy
23   or C-IIs."
24        Do you see that?
```

Page 210

```
1         A.   Yes.
2         Q.   Do you know when Actavis established
3    suspicious order monitoring protocols for all
4    controls?
5         MR. DIAMANTATOS:  Objection; form, foundation,
6    asked and answered.
7    BY THE WITNESS:
8         A.   No, I don't recall when --
9    BY MR. MELAMED:
10        Q.   Do you know --
11        A.   -- that was implemented.
12        Q.   I'm sorry.
13        A.   Sorry.
14        Q.   That was my fault.  I spoke over you.
15        Do you know what Ms. Baran meant by "all
16   controls"?
17        MR. DIAMANTATOS:  Objection; form, foundation,
18   calls for speculation.
19   BY MR. MELAMED:
20        Q.   Let me withdraw that and restate that.
21        Do you have an understanding of what
22   Ms. Baran meant by "all controls"?
23        MR. DIAMANTATOS:  Same objection.
24   BY THE WITNESS:
```

Page 211

```
1         A.   Again, I'm not quite sure due that she's
2    the author, but I think we kind of touched on this
3    before.  All controls are for the most part in our
4    portfolio versus non-controls, so II through Vs.
5    BY MR. MELAMED:
6         Q.   Okay.  If you skip down to the last
7    paragraph on this page, 109, it's in the same
8    e-mail, it says, "We are halfway through our second
9    week with our enhanced SOM model."
10        Do you recall the nature of the
11   enhancement she refers to?
12        MR. DIAMANTATOS:  Objection; form, foundation.
13   BY THE WITNESS:
14        A.   No, I don't.
15   BY MR. MELAMED:
16        Q.   It says, "To date, most communication
17   has been with Dorsey and his accounts.  He has been
18   a great help."
19        Do you see that?
20        A.   Yes.
21        Q.   Do you recall communication between you
22   and your accounts regarding the enhanced SOM model?
23        MR. DIAMANTATOS:  Objection; form, foundation,
24   assumes facts.
```

Page 212

```
1    BY THE WITNESS:
2         A.   At this particular time, no, I don't.
3    BY MR. MELAMED:
4         Q.   If you turn the page, the last paragraph
5    in this first e-mail in time says, "As always,
6    please let me know if you have any questions.  Just
7    a reminder - the SOM team consists of Nancy,
8    Rachelle, Maria, Karen and Vicki Freeman.  Please
9    communicate accordingly."
10        Do you know when the individuals there
11   designated as being part of the SOM team -- let me
12   withdraw that.  It got poorly worded.
13        Do you know when Nancy, Rachelle,
14   Michelle -- I'm sorry -- Nancy, Rachelle, Maria,
15   Karen and Vicki Freeman became the SOM team?
16        MR. DIAMANTATOS:  Objection; form, foundation,
17   assumes facts.
18   BY THE WITNESS:
19        A.   No, I do not.
20   BY MR. MELAMED:
21        Q.   Do you understand Nancy to be Nancy
22   Baran?
23        A.   It would -- it would -- I don't know if
24   we had another one, but I would understand it to be
```

## Page 213

1    Nancy, yes, Baran.
2        Q.   And do you --
3        A.   Nancy Baran.  Sorry.
4        Q.   Again, I cut you off.  I'm sorry.
5            Do you understand Rachelle to be
6    Rachelle Galant?
7        A.   Yeah, must be.  Yeah.  It may be.
8        Q.   Well, do you know any other -- we've --
9        A.   I know.
10       Q.   -- seen this name before spelled
11   R-a-c-h-e-l-l-e and called her Rachelle.  Do you
12   know anybody else at Actavis who spelled their
13   first name --
14       A.   It has to be --
15       MR. DIAMANTATOS:  Let him finish the question.
16       THE WITNESS:  Sorry.
17   BY MR. MELAMED:
18       Q.   Sorry.  Go ahead.
19       A.   So, I'm sorry.  Could you just ask the
20   question.  I'm sorry.
21       Q.   Do you know anybody else at Actavis who
22   spelled her name R-a-c-h-e-l-l-e?
23       A.   Let's put it this way, I have -- I'm not
24   a good speller.  So, when it be Michelle's two Ls,

## Page 214

1    one L, with an E, without an E.  I don't pay a lot
2    of attention.
3            So, with this particular one, it
4    potentially could make sense that it is Rachelle
5    Galant that's part of the team.
6        Q.   Do you know who she meant by Maria?
7        A.   No.
8        Q.   Do you know who she meant by Karen?
9        A.   No.  Not with certainty, no.
10       Q.   Do you see the last name is Vicki
11   Freeman?
12       A.   Yes.
13       Q.   Do you know who Vicki was?  Do you
14   recall who Vicki Freeman was?
15       A.   I remember the name, yes.
16       Q.   Do you recall which department she was
17   in?
18       A.   Not 100 percent certain.  I'm not
19   100 percent certain.  Customer service maybe.
20   Maybe in customer service.
21       Q.   If you go up above in the response to
22   Nancy Baran's e-mail, you send Nancy Baran a
23   response saying, "Nancy, you are doing a nice job.
24   I know it is exhausting and you are meeting

## Page 215

1    resistance.  Stay strong."
2            Do you recall what you meant by "meeting
3    resistance"?
4        A.   I don't know.  She's -- I always was
5    just kind of -- I liked her.  I mean, it was good.
6    She was head of customer service.  She was good at
7    what she did.  So, sometimes if you innovate
8    things, you know, not specific to this e-mail, but,
9    you know, other items, if you're innovating, which
10   is change or modification.
11           So, I really don't know.  I was just
12   probably just writing an encouraging thing probably
13   as a nice thing for her to give me a compliment I
14   guess at the bottom of this page.
15           So, I guess I was just complimenting her
16   for her job because she must be, I'm presuming,
17   spearheading this or one of the leads for it.  So,
18   I'm just encouraging her back to say, "Hey, thanks
19   a lot.  It's probably tough."
20       Q.   Do you know from whom she was meeting
21   resistance?
22       MR. DIAMANTATOS:  Objection; form, assumes
23   facts, calls for speculation.
24   BY THE WITNESS:

## Page 216

1        A.   No, and -- and, again, you know, I think
2    we -- again, this is just me personally.  When you
3    write e-mails at that particular time, it's words
4    that come to mind and it's -- you know, if you
5    reflect back on something now, it's six and a half
6    years later or, you know, whatever the number is,
7    you know, knowing that others are going to read it,
8    would you write things potentially different, use a
9    different word?  Yeah, maybe.
10           So, I don't really know, you know,
11   what -- what that is.  It was more of an
12   encouraging to her, "Hey, great job with this.  You
13   know, I know it's potentially probably a lot of
14   work and, you know, I'm here for you."
15   BY MR. MELAMED:
16       Q.   Right.  You wrote those things.  You
17   wrote, "You are doing a nice job."  You wrote, "I
18   know it's exhausting and it's a lot of work."  And
19   then you also wrote, "You're meeting resistance.
20   Stay strong."
21           So, that implies that somebody or
22   something was resisting.  I'm just asking, yes, no,
23   I don't recall, whether you recall from whom she
24   met resistance.

Page 217

1     MR. DIAMANTATOS:  Objection to form.
2     MR. ROTH:  Objection to form.
3     MR. DIAMANTATOS:  Objection to
4   mischaracterizing the witness' testimony.
5   Objection to instructing the witness how to answer
6   the question.
7   BY THE WITNESS:
8     A.   I don't recall why I would have wrote
9   that.
10   BY MR. MELAMED:
11     Q.   Okay.  She responds, "Thanks for your
12   words of encouragement.  If you only knew what I am
13   up against... I would take an out if that were an
14   option."
15     Do you have any understanding of what
16   she meant when she said, "If you only knew what I
17   am up against"?
18     MR. DIAMANTATOS:  Objection; form, foundation,
19   calls for speculation.
20   BY THE WITNESS:
21     A.   No, I do not.
22   BY MR. MELAMED:
23     Q.   You don't recall her talking to you
24   beyond the words in this e-mail about what she was

Page 218

1   up against?
2     A.   No, I do not recall that.
3     Q.   Handing you what's been marked
4   Exhibit 13.
5     (WHEREUPON, a certain document was
6     marked as Allergan-Dorsey Exhibit
7     No. 13:  1/3/13 e-mail string;
8     Acquired_Actavis_00352198 -
9     00352202.)
10   BY MR. MELAMED:
11     Q.   Exhibit 13 is an e-mail string, most
12   recent in time from Vicki Freeman to Rachelle
13   Galant, Michael Dorsey, Maria Lesny, cc'ing others,
14   dated January 3, 2013, subject, "Re:  ABC orders
15   pended in SOM for Oxy tabs."  String starts at
16   Acquired_Actavis_00352198 and continues through to
17   202.
18     Do you recall this e-mail exchange?
19     A.   It doesn't come to mind before having it
20   presented in front of me.
21     Q.   Do you have any reason to doubt you
22   received the e-mails that were sent to you in this
23   e-mail exchange?
24     MR. DIAMANTATOS:  Objection; form.

Page 219

1   BY THE WITNESS:
2     A.   Again, I don't recall, but I see my name
3   on it so it would make sense that it was -- I was
4   part of it when it came out.
5   BY MR. MELAMED:
6     Q.   Let's start at the last-in-time and then
7   move forward.  So, start on page with the Bates No.
8   ending 2201.
9     And the first e-mail is from Vicki
10   Freeman to you referring to "quantities on orders
11   listed below that have pended in SOM because they
12   have lifted December order amount above anything
13   ordered before."
14     Do you see that?
15     A.   Yes.
16     Q.   And these concern AmerisourceBergen --
17   AmerisourceBergen orders for OxyContin tabs.
18   Correct?
19     MR. SCHOCK:  Object to form.
20   BY THE WITNESS:
21     A.   It says Oxy tabs.  I don't -- did you --
22   BY MR. MELAMED:
23     Q.   If you look at the first sentence of the
24   second paragraph, it says, "Please take a look at

Page 220

1   the 4 of ABC orders for Oxy tabs."
2     A.   Yes.
3     Q.   And it says, "They are all over monthly
4   maximum quantities ever ordered for," two numbers,
5   "and have ordered over maximum for" a third number.
6     Do you see that?
7     A.   Yes.
8     Q.   So, this concerns orders by
9   AmerisourceBergen for OxyContin tablets, correct?
10     MR. SCHOCK:  Object to form.
11   BY THE WITNESS:
12     A.   I don't know if it's OxyContin.
13   Where -- I guess -- you'd have to be identified by
14   an NDC.  So, I'm not sure if it's OxyContin or
15   oxycodone.
16   BY MR. MELAMED:
17     Q.   Okay.  So, it is either for OxyContin or
18   oxycodone.  Is that your understanding?
19     A.   If you want to know I guess what it is,
20   the best thing to know would be the actual NDC.
21   Otherwise it's --
22     Q.   Are the NDC numbers listed here as
23   287811, 2897911, 287911?
24     A.   NDCs are normally an 11, 542.  Normally

Page 221

1  11 digits.
2     Q.   So, Vicki concludes above the listing of
3  the order, she says, "Before I can release I need a
4  valid reason for doing so."
5        Do you see that?
6     A.   Yes.
7     Q.   And, so, you respond in an e-mail
8  spanning from 200 to 201 and you say, "ABC is
9  saying that their inventory is getting low due to
10  customer demand."
11       Do you see that?
12    A.   Yes.
13    MR. SCHOCK:  Object to form.
14  BY MR. MELAMED:
15    Q.   Did you do -- did you inquire further as
16  to the reason for increased customer demand?
17    A.   For Actavis product?
18    Q.   "ABC is saying that their inventory is
19  getting low due to customer demand."
20       So, do you understand that to mean there
21  was increased customer demand at ABC for this
22  product?
23    MR. DIAMANTATOS:  Objection; foundation.
24    MR. SCHOCK:  Object to form.

Page 222

1  BY THE WITNESS:
2     A.   No.  Again -- again, I would have to
3  revisit that conversation because what it could --
4  I guess if you're reading -- reading through it, it
5  could potentially also mean that their inventory is
6  getting low, their inventory on the Actavis
7  products was getting low due to customer demand.
8        There is two other manufacturers that
9  are not filling orders probably because they ran
10  out of quota.
11  BY MR. MELAMED:
12    Q.   Right.
13    A.   Again, that's speculation.  Who knows
14  why they're not shipping or filling orders.
15    Q.   Right.  You have -- there are two -- I
16  agree with you, that your explanation is that there
17  are two reasons you give in response to Vicki.
18  One, the first sentence says, "ABC is saying that
19  their inventory is getting low due to customer
20  demand."
21       Do you see that?
22    A.   Yes.
23    Q.   And then the second sentence, you say,
24  "In addition," another reason, "the other

Page 223

1  manufacturers Mali and Quali are not fulfilling" --
2  "are not fulling filling orders," but fulfilling
3  orders.
4     A.   Yeah.
5     Q.   Right?
6     A.   Correct.
7     Q.   Do you understand that you meant there
8  were two separate reasons that AmerisourceBergen
9  provided you for these increased order amounts?
10    MR. SCHOCK:  Object to form.
11  BY THE WITNESS:
12    A.   I guess my understanding I guess is for
13  the most part how would they -- what they were
14  reporting was that, again, it's the end of the year
15  and there's at times where quotas run out for other
16  manufacturers and there's demand from physicians
17  writing -- writing prescriptions to the -- for the
18  patients that can't be filled through this other
19  product.
20       So, that's -- I guess what I'm gleaning
21  out of this is that's why the Actavis POs were --
22  were greater than what they were in the past.
23  BY MR. MELAMED:
24    Q.   Did you write any of that -- let me

Page 224

1  withdraw that.
2        You just said, "It's the end of the year
3  and there are times when quotas run out for other
4  manufacturers and there is demand from physicians
5  writing prescriptions for patients that can't be
6  filled through this other product.  So, what I'm
7  gleaning out of this is that's the reason why
8  Actavis purchase orders were greater than they were
9  in the past."
10       But that's not what you wrote here.
11  What you wrote here is, "ABC is saying that their
12  inventory is getting low due to customer demand.
13  In addition, the other manufacturers Mali and Quali
14  are not fulfilling orders."
15       Do you see that?
16    A.   Yes.
17    MR. ROTH:  Objection; form, argumentative.
18    MR. SCHOCK:  Form.
19  BY MR. MELAMED:
20    Q.   Did you do anything to determine why
21  inventory at ABC was getting low due to customer
22  demand?
23    MR. DIAMANTATOS:  Objection; form.
24    MR. SCHOCK:  Objection; form.

Page 225

1    MR. DIAMANTATOS:  Foundation, assumes facts.
2  BY THE WITNESS:
3    A.   The only thing what it looks like here
4  is I had a conversation, and this is what -- this
5  was what was communicated back to me why the orders
6  were greater than normal.
7    Q.   And do you see Vicki's response to you?
8    A.   Yes.
9    Q.   And she says, "I struggle with this one.
10  We can't cut the order as that is not allowed."
11       Do you understand why she said that?
12    MR. DIAMANTATOS:  Objection; form, foundation,
13  calls for speculation.
14  BY THE WITNESS:
15    A.   No, I do not.
16  BY MR. MELAMED:
17    Q.   What do you understand that sentence to
18  mean?
19    MR. DIAMANTATOS:  Objection; form.
20    MR. ROTH:  Same objection; asked and answered.
21  BY THE WITNESS:
22    A.   I -- I don't know what she means when
23  she, "Says we can't cut the order."
24  BY MR. MELAMED:

Page 226

1    Q.   She -- presumably she wrote this to you
2  to be communicative.
3    MR. DIAMANTATOS:  Objection.
4  BY MR. MELAMED:
5    Q.   Correct?
6    MR. DIAMANTATOS:  Sorry.  Objection; form.
7    MR. ROTH:  Calls for speculation.
8  BY THE WITNESS:
9    A.   Let me read the...
10       No, I don't see a direction as far as to
11  have that conversation.  I see additional
12  questions.
13       Again, it's a puzzle.  You are trying to
14  figure out what is going on in the marketplace.  So
15  then we don't know why, but two other manufacturers
16  aren't able to fill the orders with 100 percent
17  certainty and then asking Nancy to weigh in on what
18  the -- what her thoughts are.
19  BY MR. MELAMED:
20    Q.   Do you see that Vicki wrote, "I can't
21  help but entertain the possibility that Mali and
22  Quali may have decided that ABC gets no more Oxy
23  this month"?
24    MR. DIAMANTATOS:  Objection; form.

Page 227

1    MR. SCHOCK:  Objection; form.
2    MR. DIAMANTATOS:  Foundation, calls for
3  speculation.
4  BY THE WITNESS:
5    A.   I guess that's potentially, that's what
6  what's in her head, that potential.
7  BY MR. MELAMED:
8    Q.   I just asked whether you see that that's
9  what's written.
10    A.   I see what's -- that's written, yes.
11    Q.   Do you have any understanding of what it
12  means that Mali and Quali may have decided that ABC
13  gets no more Oxy this month?
14    MR. DIAMANTATOS:  Objection; foundation, calls
15  for speculation.
16    MR. SCHOCK:  Form.
17  BY THE WITNESS:
18    A.   No, I do not.
19  BY MR. MELAMED:
20    Q.   How would you interpret that sentence?
21    MR. DIAMANTATOS:  Objection; foundation.
22    MR. SCHOCK:  Object to form.
23    MR. ROTH:  Same objection; asked and answered.
24  BY THE WITNESS:

Page 228

1    A.   I don't know.  I mean, I look for in
2  e-mails here's findings, here's any actionable
3  items, here's questions and I -- I don't know.  I
4  don't know what to think what her thought process
5  was on that question or that thought.
6  BY MR. MELAMED:
7    Q.   So, Maria then responds, and we talked
8  about Maria in a prior e-mail as being part of an
9  SOM monitoring team.  Do you remember that?
10    A.   Yes.
11    Q.   So, do you believe the person meant by
12  Maria in that prior e-mail was Maria Lesny?  It's
13  not in front of you.
14    A.   It was -- I know.  It was back here.
15  Just -- it could have -- may have been, yes.  At
16  SOMs.
17    Q.   And she writes, "Just to add my
18  two cents...ABC has open orders from December 20,
19  2012 that Rachelle did not fill which leads me to
20  believe that they had their fill of Oxy for the
21  month too."
22       Do you see that?
23    A.   Yes.
24    MR. SCHOCK:  Object to form.

Page 229

1    BY MR. MELAMED:
2        Q.   And she continues and the final sentence
3    is, "But how can we express that in SOM terms to
4    release the orders when it is apparent they are
5    ordering from us because they cannot obtain it
6    form," probably means from, "the others."
7            Do you see that?
8        MR. SCHOCK:  Object to form.
9    BY THE WITNESS:
10       A.   Yes, I see it.
11   BY MR. MELAMED:
12       Q.   Do you understand what she's writing in
13   that -- what she means by that sentence?
14       MR. DIAMANTATOS:  Objection; form, foundation,
15   calls for speculation.
16   BY MR. MELAMED:
17       Q.   Let me actually withdraw it and state it
18   a different way.
19           What is your understanding of what that
20   sentence means?
21       MR. ROTH:  Same objection.
22       MR. SCHOCK:  Form.
23   BY THE WITNESS:
24       A.   I don't know.  Again, that SOMs and that

Page 230

1    process and that department and next steps and what
2    they do is not -- I'm not really privy to that.
3    So, I really can't provide comment.
4    BY MR. MELAMED:
5        Q.   Do you know whether DEA was ever
6    notified about this order?
7        MR. DIAMANTATOS:  Objection; form, foundation.
8    BY THE WITNESS:
9        A.   Again, since it's out of my realm of
10   what they -- what they do when they report and
11   that, I don't know.  Sorry.
12   BY MR. MELAMED:
13       Q.   Handing you what's been marked as
14   Exhibit 14.
15           (WHEREUPON, a certain document was
16           marked as Allergan-Dorsey Exhibit
17           No. 14: E-mail string;
18           Acquired_Actavis_00353871 -
19           00353874.)
20   BY MR. MELAMED:
21       Q.   Exhibit 14 is an e-mail string.  Most
22   recent in time has a blank "From" line but it's
23   signed by Rachelle Galant to Nancy Baran, Michael
24   Dorsey, subject, "Re:  Orders on OI hold status

Page 231

1    (Rochester Drug)," runs from Bates
2    No. Acquired_Actavis_00353871 through 874.
3            So, actually, let me start by asking
4    whether you recognize this e-mail string.
5        A.   No, I do not.
6        Q.   You recognize that you are a participant
7    in the messages in this e-mail string?
8        A.   Yes.
9        Q.   Do you have any reason to doubt that you
10   didn't receive the messages that were sent --
11   indicate they were sent to you?
12       A.   Based on what's -- what's presented in
13   front of me, no, it appears that I'm part of that,
14   yes.
15       Q.   Okay.  And there is one e-mail that
16   appears to be from you.  Do you have any reason to
17   believe you didn't send that e-mail?
18       MR. DIAMANTATOS:  Objection; form.
19       MR. ROTH:  Objection; form.
20   BY THE WITNESS:
21       A.   As this particular time, all I can do is
22   comment what's presented in front of me and it
23   would appear.
24   BY MR. MELAMED:

Page 232

1        Q.   First I'll note just from your e-mail
2    address on 872 that it's from
3    Michael.Dorsey@Watson.com as of this date, this is
4    January 22, 2013.
5            Do you recall whether the suspicious
6    order monitoring protocols changed once Watson took
7    over Actavis?
8        MR. ROTH:  Object to form.
9    BY MR. MELAMED:
10       Q.   Let me withdraw that.
11           Do you recall whether the suspicious
12   order monitoring protocols changed once Watson and
13   Actavis merged?
14       A.   I'm -- again, just due to not being a
15   part of it, I don't know what changed, what stayed
16   the same, what modifications.  So, unfortunately,
17   no, I don't know.
18       Q.   So, if you look at the first e-mail in
19   time from Maria Lesny to a series of recipients
20   including you, it mentioned, it discusses three
21   orders on hold.
22           But if you look at the first sentence it
23   says, "Not to lose sight of the couple of OI holds
24   we currently have."

Page 233

1      Do you know what OI means in that
2   sentence?
3      MR. DIAMANTATOS:  Objection; calls for
4   speculation, foundation.
5   BY THE WITNESS:
6      A.  No, I don't.
7   BY MR. MELAMED:
8      Q.   Do you have -- you have no understanding
9   of what OI means?
10      MR. DIAMANTATOS:  Objection.
11   BY THE WITNESS:
12      A.   No.  No.  Sorry.
13   BY MR. MELAMED:
14      Q.   And do you see that Item No. 2 is a
15   Rochester Drug order and it says, "Rachelle
16   reviewed quantity and also believed this to be very
17   high and out of the norm.  Mike Dorsey to contact
18   customer and advise such a high increase in their
19   ordering pattern."
20      Do you see that?
21      A.  Yes.
22      Q.   Then it says, "SOM rep Maria."  Do you
23   know what -- what was the SOM rep's role in this
24   transaction?

Page 234

1      MR. DIAMANTATOS:  Objection; form, foundation,
2   calls for speculation.
3   BY THE WITNESS:
4      A.  I really don't know what -- what her
5   role was with -- as far as it looks like she was
6   within the SOMs, but I'm not quite sure specific
7   how it tied with myself and/or the account.
8   BY MR. MELAMED:
9      Q.   And then Dakota Drug, No. 3, also is on
10   hold for oxycodone, "Mike Dorsey is going to speak
11   with the customer to see if there is a
12   justification (SOM rep Karen)."
13      Do you see that?
14      A.  Yes.
15      Q.   And I didn't mention it, but you see the
16   Rochester Drug order was for oxycodone
17   15 milligrams and 30 milligrams?
18      A.  Yes.
19      Q.   And then you forward a response from
20   Tracy Plouffe at Rochester Drug Cooperative, which
21   explains that "Oxy 15 milligram and 30 milligram
22   purchases have increased through Actavis due to
23   supply shortages and Mallinckrodt and Qualitest are
24   not supplying us on a consistent basis and Actavis

Page 235

1   being closed next week."
2      Do you see that?
3      A.  Yes.
4      Q.   And then Nancy Baran responds to that
5   saying, "We should discuss this one further."
6      A.  Yep.
7      Q.   Do you recall discussing this order
8   further with Nancy Baran?
9      MR. DIAMANTATOS:  Objection; form.
10   BY THE WITNESS:
11      A.   From this particular time, no, I don't
12   remember the discussion.
13   BY MR. MELAMED:
14      Q.   Do you know if that -- the "we" was
15   meant to include you?
16      MR. DIAMANTATOS:  Objection; calls for
17   speculation, form.
18   BY THE WITNESS:
19      A.   Again, I don't know.  I wasn't the
20   author of it.  So, I'm not sure how, what she meant
21   by "we."
22   BY MR. MELAMED:
23      Q.   So, if you continue up and go to the
24   first e-mail in time, which is signed by Rachelle

Page 236

1   Galant but for some reason the from and sent date
2   didn't come through on the header.
3      A.  Okay.
4      Q.   She writes, "See below for my analysis
5   on the Opti-Source current open orders and their
6   historical usage."
7      Do you understand what Opti-Source
8   refers to?
9      A.  Yes.
10      Q.   What is that?
11      A.   Opti-Source is a GPO or like -- it's a
12   buying group.
13      Q.   Okay.  And, so, each of the listed
14   customers in the chart below are members of the
15   Opti-Source buying group?
16      MR. DIAMANTATOS:  Objection; form, foundation.
17   BY THE WITNESS:
18      A.   Based upon -- it's a fluid.  They have
19   changed over time.  So, I'm not sure the time stamp
20   what their wholesale -- wholesale membership made
21   of.  But this looks like a representative of it.
22   BY MR. MELAMED:
23      Q.   And you see in the chart below, it
24   references -- Rochester Drug was one of your

Page 237

1    customers mentioned in the first e-mail in time,
2    correct?
3        A.   Yes.
4        Q.   Okay.  And you see under the oxycodone
5    30 milligram chart, which is the first one,
6    Rochester Drug had an average of 4,344 and went up
7    to 8,640 open and shipped.
8            Do you see that?
9        A.   Yeah, so I see six-month average of
10   4,344 was actual and then the 8,640 is actual plus
11   also open, yes.
12       Q.   And that is for the month of January, if
13   you look back at the other dated e-mails?
14       A.   I just want to make sure.  Okay.  Oh,
15   yes, yes.  I got you.  All right.
16       Q.   So, the "Open Plus Shipped" column in
17   that refers to January open and shipped orders?
18       MR. DIAMANTATOS:  Objection; form, foundation.
19   BY THE WITNESS:
20       A.   I guess the time period I'm not
21   100 percent sure if they're -- if they're tied
22   together just because I didn't -- I don't, yeah.
23   BY MR. MELAMED:
24       Q.   Do you know whether that order shipped?

Page 238

1        MR. DIAMANTATOS:  Objection; form.
2    BY MR. MELAMED:
3        Q.   The 8 --
4        MR. DIAMANTATOS:  Sorry.
5        MR. MELAMED:  Just to be clear and then I will
6    let you make the objection.
7        MR. DIAMANTATOS:  Sure.
8    BY MR. MELAMED:
9        Q.   The 8,640 open and shipped, do you know
10   whether all of those ended up shipping from Actavis
11   to Rochester Drug?
12       MR. DIAMANTATOS:  Objection; form, assumes
13   facts.
14   BY THE WITNESS:
15       A.   No, I do not know that.
16   BY MR. MELAMED:
17       Q.   Do you know whether all of the 1,368
18   open and shipped 15 milligram oxycodone tab orders
19   for Rochester Drug that are listed in the second
20   table shipped?
21       MR. DIAMANTATOS:  Objection; form, foundation,
22   assumes facts.
23   BY THE WITNESS:
24       A.   I'm not quite sure of that number, what

Page 239

1    shipped and what did not.
2    BY MR. MELAMED:
3        Q.   On the first page under those charts do
4    you see "Value Altoona PA"?
5        A.   Yes.
6        Q.   And it's in each of the charts, right?
7        A.   Correct.
8        Q.   Was that your customer?
9        A.   Yes.
10       Q.   Do you know whether those open plus
11   shipped amounts for each of the oxycodone tabs,
12   30 milligram and 15 milligram, shipped?
13       MR. DIAMANTATOS:  Objection; form, foundation,
14   assumes facts.
15   BY THE WITNESS:
16       A.   No, I don't have an understanding of
17   what shipped and what did not ship.
18   BY MR. MELAMED:
19       Q.   I'm handing you what's been marked
20   Exhibit 15.
21           (WHEREUPON, a certain document was
22           marked as Allergan-Dorsey Exhibit
23           No. 15:  10/29/14 e-mail string;
24           Acquired Actavis_00248484 -

Page 240

1            00248489.)
2    BY MR. MELAMED:
3        Q.   Exhibit 15 is an e-mail string most
4    recent in time from Jeffrey Foreman to Michael
5    Dorsey, sent October 29, 2014, subject, "Re:  Hydro
6    Omits."  Bates range Acquired_Actavis_0248484 to
7    8489.
8            Quick question before we go into this
9    exhibit.
10           In the prior exhibit, Exhibit 14, you
11   said you did not know whether certain orders that I
12   asked about shipped.  Do you know who would know
13   that information?
14       MR. DIAMANTATOS:  Objection; form, calls for
15   speculation, vague.
16   BY THE WITNESS:
17       A.   I don't know specifically.  I always
18   start with sometimes anything that ships would
19   probably fall within customer service.
20   BY MR. MELAMED:
21       Q.   And given the identities of the people
22   on the e-mail, would that be -- would Nancy Baran
23   be somebody to ask about that?
24       MR. DIAMANTATOS:  Objection; form.

Page 241

1  BY MR. MELAMED:
2      Q.   She was in customer service at that
3  point, right?
4      MR. DIAMANTATOS:  Objection; foundation, form.
5  BY THE WITNESS:
6      A.   I'm not the expert at it, but Nancy
7  Baran headed up the customer service and looks like
8  also was an integral part with the SOMs.
9  BY MR. MELAMED:
10      Q.   And was Rachelle -- I'm sorry --
11  Rachelle Galant in customer service?
12      A.   No, I -- well, that's who I thought of.
13  Senior product manager.  I always kind of thought
14  of her as like a product manager.
15      Q.   Just to be clear, product management --
16  Rachelle -- because Rachelle Galant is a senior
17  product manager, she was not in the customer
18  service group, right?
19      MR. ROTH:  Objection; lacks foundation, calls
20  for speculation, mischaracterizes the record in
21  this case.
22          (Clarification requested by the
23          reporter.)
24      MR. ROTH:  Lacks foundation, calls for

Page 242

1  speculation, mischaracterizes the record in this
2  case.
3  BY MR. MELAMED:
4      Q.   Just tell -- do you know whether she was
5  in the customer service group?
6      A.   Best of my knowledge, she was product --
7  in the product management only.
8      Q.   And product management was a group
9  separate from customer service?
10      A.   Yes.
11      MR. ROTH:  Lacks foundation.
12  BY THE WITNESS:
13      A.   My understanding, yes.
14  BY MR. MELAMED:
15      Q.   Returning to Exhibit 15, you'll see it
16  starts off with an e-mail from Jeffrey Foreman
17  which says, "When will Actavis get ABDC in stock on
18  Hydro/Apap 5/325?"
19          That's at the -- on page ending 489.  Do
20  you see that?
21      A.   Yes.
22      Q.   And then it continues and there is a
23  series of e-mails, and I apologize for the
24  formatting, but this is the manner we received

Page 243

1  them, where there's a series of listing of tracking
2  information.
3          I want you to skip ahead to the e-mail
4  on 486 where you write to Jeff Foreman at Walgreens
5  and you say that "500 count bottles will be shipped
6  out on Monday," and you include other information
7  about what else is being shipped.
8          And then you say, "A question I'm being
9  asked is this:  Are the stores ordering more than
10  usual?  They should have had over 30 days' worth on
11  their shelves October 6.  Is there a way for you to
12  determine if they are enhancing their ordering
13  compared to their dispensing?  Please let me know
14  if you have any further questions."
15          Do you recall this exchange with
16  Mr. Foreman?
17      A.   Not off the top of my head, but I see
18  it.
19      Q.   Do you have any reason to doubt that you
20  participated in this exchange with Mr. Foreman?
21      MR. DIAMANTATOS:  Objection; form,
22  argumentative.
23  BY THE WITNESS:
24      A.   I mean, based upon what's on presented,

Page 244

1  yes, it appears that we had this.
2  BY MR. MELAMED:
3      Q.   Concerning your comment, "The question I
4  am being asked is this:  Are the stores ordering
5  more than usual?"  Do you recall who was asking you
6  that question?
7      MR. SCHOCK:  Object to form.
8  BY THE WITNESS:
9      A.   Specifically, no.
10  BY MR. MELAMED:
11      Q.   Were you ever asked that question with
12  regard to any of your other customers' orders?
13      MR. DIAMANTATOS:  Objection; form, vague.
14  BY THE WITNESS:
15      A.   I -- I guess nothing comes to mind right
16  now if I was or wasn't.
17  BY MR. MELAMED:
18      Q.   You answered when I asked you if you
19  recalled who asked you that question, you said,
20  "Specifically, no."
21          Is there a general answer, "I was --
22  certain people asked me these types of questions
23  periodically"?
24      MR. DIAMANTATOS:  Objection; form.

Page 245

1    BY MR. MELAMED:
2        Q.   I'm questioning your use of the word
3    "specifically" there.
4        A.   Yeah.
5        MR. DIAMANTATOS:  Objection; form.  Go ahead.
6    BY THE WITNESS:
7        A.   No, I mean, potentially where this would
8    come up is I think similar, we talked about similar
9    examples where could be SOMs, could be customer
10   service, it could be certain -- certain departments
11   that are noticing things that then it works its way
12   to me to have that conversation with the account to
13   find out what, you know, what's behind it.
14   BY MR. MELAMED:
15       Q.   And then the exchange continues,
16   Mr. Foreman says, "Who says they should have had 30
17   days on hand?"
18            And you say, "We have been told in the
19   past that stores have about 30 days on hand," and
20   you continue.
21            And then in the most recent e-mail in
22   time Mr. Foreman says, "Depending on the products
23   we may have had 30 days although that can vary due
24   to a number of factors, however I'm not sure on

Page 246

1    hydros that we did."
2            He says, "It was difficult to bring in
3    extra days of controlled substances because it
4    would have triggered suspicious orders at
5    wholesaler and subject us to being flagged to the
6    DEA."
7            Do you understand what he means by that?
8        MR. DIAMANTATOS:  Objection.
9        MR. SCHOCK:  Form.
10       MR. DIAMANTATOS:  First, mischaracterizes the
11   e-mail exchange and what Mr. Foreman said on his
12   previous e-mail.  Second, foundation, it calls for
13   speculation.
14   BY THE WITNESS:
15       A.   No, I'm trying to think what this was
16   all about as far as omits.
17            So, he starts off, because it looks --
18   it's just a form.
19            Okay.  I believe the overall -- so,
20   obviously, it starts off with a communication about
21   omits, that their stores were ordering X amount and
22   only X amount was shipped.
23            I believe what was going on here with
24   the hydros, and, again, it's -- I'm looking just

Page 247

1    off of what he is writing and what I have -- I
2    wrote.
3            So, this appears to be the period in
4    time that hydrocodone/Apaps move from a C-III to a
5    C-II.  So, it looks like there was a -- and again,
6    I don't remember the full story behind that what we
7    as a manufacturer have to do as far as --
8            (Clarification requested by the
9            reporter.)
10   BY THE WITNESS:
11       A.   I guess I don't remember the full story
12   behind going from a -- in a timing and all the step
13   by step from classifying from a C-III going to a
14   C-II, but it appears that there was a gap in -- gap
15   in supply because I believe, again, as a
16   manufacturer, you need to change your labeling on
17   the bottles from C-IIIs to C-IIs and there is a lot
18   of time for that to be done.
19            So, that could have been why there was
20   gaps and why it was bringing up in questions of
21   where is the product.
22            So, I think that's -- that's really the
23   overall communication here is what's going on and
24   it had to do with, it was all during the transition

Page 248

1    period from a C-III to a C-II.
2    BY MR. MELAMED:
3        Q.   And do you understand Mr. Foreman's most
4    recent e-mail in time to express concern about
5    avoiding triggering suspicious orders at wholesaler
6    and subject Walgreens to being flagged to the DEA?
7        MR. DIAMANTATOS:  Objection; form, foundation,
8    mischaracterizes the e-mail and is asking the
9    witness to speculate.
10   BY THE WITNESS:
11       A.   I'm not quite sure what Jeff is
12   trying -- trying to say here.
13   BY MR. MELAMED:
14       Q.   So, he sent you e-mails that you didn't
15   understand?
16       MR. DIAMANTATOS:  Objection; form,
17   argumentative.  Same objections as above.
18   BY THE WITNESS:
19       A.   I'm not understanding what -- again,
20   it's not a -- it's not my -- I guess in my
21   wheelhouse of day-to-day, so I don't understand
22   what does, what doesn't.  This -- that's from his
23   perspective, from a retailer and chain.  I just
24   know the little piece of the pie that I operate in.

Page 249

1    BY MR. MELAMED:
2        Q.  Handing you what's been marked
3    Exhibit 16.
4            (WHEREUPON, a certain document was
5            marked as Allergan-Dorsey Exhibit
6            No. 16:  7/23/15 e-mail string;
7            Acquired_Actavis_00254144 -
8            00254146.)
9    BY MR. MELAMED:
10       Q.  Exhibit 16 is an e-mail exchange, most
11   recent in time from Michael Dorsey to Violet
12   Saakyan, dated July 23, 2015, subject "Re:
13   Hydrocodone/ibuprofen - new award?"  String runs
14   from Acquired_Actavis_00254144, concludes on 4146.
15           Do you recall this e-mail exchange?
16       A.  No, not before seeing it right here.
17       Q.  Going to the first-in-time, the last
18   one, which starts on 54145, from Violet Saakyan?
19       A.  Close enough.
20       Q.  How do I properly pronounce the name?
21       A.  I was never sure myself.  So, you're as
22   good as I.
23       Q.  She references an order and says, "Has
24   there been any new awards on this SKU?  ABC is

Page 250

1    buying heavy this month.  Sales are not showing in
2    the market cube and there is nothing in our
3    trackers."
4            First, do you know -- do you have any
5    understanding of what market cube refers to?
6        A.  No, I do not know what that is.
7        Q.  Do you have any understanding of what
8    she means by "our trackers"?
9        MR. DIAMANTATOS:  Objection; form, foundation.
10   BY THE WITNESS:
11       A.  No, I guess there was a -- whether it be
12   a tool or whatever you want to frame that, I don't
13   know.  I was not -- did not use that.
14   BY MR. MELAMED:
15       Q.  Okay.  If you look at the chart below,
16   it's -- am I correct that it reflects sales of
17   hydrocodone/ibuprofen 7.5/200 milligram tabs to
18   AmerisourceBergen, and it reflects direct sales
19   from January 2015 to July of 2015?
20       A.  That's what I see as well.
21       Q.  It goes from 100 -- quantity sales of
22   100 in January, to 120 in February, to 132 in
23   March, to 216 in April, to 252 in May, to 300 in
24   June, to 6,060 in July?

Page 251

1        A.  That's what I show.
2        Q.  And do you have any understanding of why
3    Ms. Saakyan would be asking whether there were any
4    new awards on this SKU?
5        MR. DIAMANTATOS:  Objection; form, foundation,
6    calls for speculation.
7        MR. SCHOCK:  Objection; form.
8    BY THE WITNESS:
9        A.  No, I can't -- I don't understand -- I
10   don't know I guess why, since I wasn't the author
11   of the e-mail.
12   BY MR. MELAMED:
13       Q.  Do you know what is meant by the phrase
14   "new awards on this SKU"?
15       A.  Again, not the author.  However, you
16   know, there would -- I guess I would question that
17   maybe is there -- was there a new award for Teva
18   or -- what were we? '15.  So we're probably
19   Actavis.  Was there any new awards for -- was there
20   a customer that awarded this product to us.  I
21   believe that's probably what she's trying to get.
22   There -- if that makes sense.
23   BY MR. MELAMED:
24       Q.  And is your understanding that she is

Page 252

1    asking that because she is trying to determine the
2    reason for the increased quantity in sales of
3    hydrocodone/ibuprofen to AmerisourceBergen Corp.?
4        MR. DIAMANTATOS:  Objection; form, foundation.
5        MR. SCHOCK:  Form.
6        MR. DIAMANTATOS:  Calls for speculation.
7    BY THE WITNESS:
8        A.  Again, she -- she wrote it.  I would
9    hate to have, you know, to think, think what
10   she's -- what she's saying or why she's asking the
11   question.
12   BY MR. MELAMED:
13       Q.  Do you see the response is from a woman
14   named or from someone named Tara Asea and says, "I
15   just checked and wasn't able to locate any new
16   awards.  Maybe Pricing knows?"
17           Do you see that?
18       A.  Yes.
19       Q.  Okay.  And then you respond and you say,
20   "It should be Walgreens - see attached."
21           So, does that indicate that you had an
22   understanding at the time what "new awards" meant?
23       A.  So -- so, what it looks here based upon
24   this e-mail is, again, I'm three and a half, it

Page 253

1  looks like what I'm showing them, because at this
2  time, so 2015, Walgreens was purchasing all their
3  product through AmerisourceBergen.
4       So, I -- "It should be Walgreens - see
5  attached." So, one could take the leap that I
6  attached the award that we -- we received from --
7  from Walgreens and thus the reasoning why ABC would
8  have to -- would be purchasing more to support
9  Walgreens' needs.
10      Q.  And then Ms. Saakyan responds just to
11  you and the second sentence of what -- or I'm
12  sorry -- the second paragraph of her response says,
13  "Also ABC already pulled 6K - why are we doing
14  stuff like this?"
15      And you respond?
16      MR. SCHOCK:  Object to form.
17  BY MR. MELAMED:
18      Q.  You say, "Violet.  Question: How did
19  SOMs not stop this order?  It's a C-II."
20      Do you recall why you believe SOMs
21  should have stopped this order?
22      MR. DIAMANTATOS:  Objection; form, foundation.
23      MR. SCHOCK:  Object to form.
24      MR. DIAMANTATOS:  Assumes facts.

Page 254

1  BY THE WITNESS:
2      A.  So, what I'm glancing out of this is
3  that -- July month delay.  I have a -- we're
4  building inventory.
5       So, it may have been we had the award.
6  However, it wasn't communicated to the plant for as
7  for increased manufacturing to help support, and
8  now Violet is asking me if we can like have a
9  communication discussion with Walgreens, can we
10  delay this -- the effective date of this award
11  because we may not be in a position to support it
12  because it didn't get loaded.  I'm kind of --
13      Q.  Thanks.  I was asking about your
14  understanding of your own question, where you ask
15  here, "How did SOMs not stop this order?  It's a
16  C-II."
17      Do you recall why you asked -- what was
18  the motivation for that question?
19      A.  The only thing I can think of why is
20  that it's probably a -- well, it's probably out of
21  frustration because I know I'm going to have to
22  have a conversation with the customer and saying
23  we're going to be delayed.
24      So, and maybe I'm -- I just trying to

Page 255

1  question if -- if this product was -- was uploaded,
2  and I guess I did not -- I did not get an answer
3  back of if we uploaded this into demand forecast.
4  If not, it appears that we -- I don't know.  I
5  don't know if we did or did not.
6       So, it's probably more of just a
7  question of if we -- if we didn't load this into
8  forecast, you know, I guess what -- how did the
9  order go out or if we -- I guess I'm just -- I'm
10  just trying to find -- I'm trying to get the full
11  picture of information of, okay, did we load this,
12  didn't we load it.  So, I guess that's what I'm
13  interpreting my e-mail to Violet.
14      Q.  Right.  So, going back to the raw
15  numbers, they went from not even a previous six
16  months average but a previous month purchase, which
17  was their highest purchase in the previous six
18  months, of 300 units up to 6,060 units.  Correct?
19      MR. DIAMANTATOS:  Objection; form, foundation,
20  mischaracterizes the exhibit.
21      MR. SCHOCK:  Object to form.
22  BY THE WITNESS:
23      A.  Based upon the cells that are provided
24  in front of me, it went from June, July, went to

Page 256

1  those numbers, yes.
2  BY MR. MELAMED:
3      Q.  Okay.  And so, am I -- and you -- your
4  question the most recent in time is "How did SOMs
5  not stop this order?"  Correct?
6      MR. ROTH:  Object to form, mischaracterizes
7  the document.
8      MR. DIAMANTATOS:  And asked and answered.
9      MR. SCHOCK:  Object to form.
10  BY THE WITNESS:
11      A.  That is -- that was what was written
12  there, yes.
13  BY MR. MELAMED:
14      Q.  So, is it your understanding that SOMs
15  did not in fact stop this order?
16      MR. DIAMANTATOS:  Objection; form, foundation,
17  calls for speculation, asked and answered.
18  BY THE WITNESS:
19      A.  I don't know if they -- again, in the
20  whole process, maybe they saw, oh, it's a new award
21  but demand planning didn't see it.  I don't -- I
22  don't know how.  I don't I guess have the answer
23  for you.
24  BY MR. MELAMED:

Page 257

1    Q.   Yeah.  Just to be clear, I wasn't asking
2  whether there is an explanation.
3    A.   Okay.
4    Q.   Just asking a separate question.
5        Based on your question, which is "How
6  did SOMs not stop this order," do I understand
7  correctly that the fact is that SOMs did not stop
8  this order?
9    MR. DIAMANTATOS:  Objection; form, foundation.
10   MR. ROTH:  Calls for speculation, asked and
11 answered three times now.
12   MR. SCHOCK:  Object to form.
13 BY THE WITNESS:
14   A.   I don't have the -- I don't have the --
15 I guess I don't know what SOMs did or did not do.
16 BY MR. MELAMED:
17   Q.   At this time -- do you read your
18 question as indicating that SOMs did not stop this
19 order?
20   MR. DIAMANTATOS:  Objection; form, foundation,
21 asked and answered.
22 BY THE WITNESS:
23   A.   I'm just -- again, I don't know how do
24 I -- I'm -- I'm looking -- I'm looking for

Page 258

1  information.  I'm trying to figure out what
2  happened.
3        I don't know what the answer was.  I
4  don't know the -- what SOMs saw.  Did they see,
5  okay, this is a new award and it got shipped but
6  our plant didn't see it.
7  BY MR. MELAMED:
8    Q.   Right.
9    A.   I don't know those -- I don't know those
10 answers.
11   Q.   The question I'm asking is based on your
12 question.
13   MR. DIAMANTATOS:  Counsel, I think he's
14 answering you what his understanding was in the
15 e-mail.  I think you're taking what his response is
16 that this is his understanding now.
17       I think he is describing to you now for
18 the fourth time what his answer was in the e-mail,
19 that he's hunting for answers in this e-mail, not
20 now.  Just to be clear.
21 BY MR. MELAMED:
22   Q.   My question, let me just be clear about
23 my question and you can, you know, move on.  I just
24 don't think you've answered it.  Maybe you have and

Page 259

1  I haven't understood it.
2        You ask at the conclusion of this
3  string, "How did SOMs not stop this order?"
4        My question is:  Did SOMs not stop that
5  order?
6    MR. ROTH:  Objection; lacks foundation, calls
7  for speculation, asked and answered four separate
8  times.
9  BY THE WITNESS:
10   A.   Again, at the juncture, I don't know if
11 they did or didn't or the whole process.  So, I
12 just -- I apologize.  I don't know how else to try
13 to answer your question here.
14 BY MR. MELAMED:
15   Q.   If they had stopped -- if you knew that
16 they had stopped this order, would you have asked
17 how they did not stop this order?
18   MR. DIAMANTATOS:  Objection; form.
19 BY THE WITNESS:
20   A.   If they stopped the order -- I'm sorry.
21 If they --
22 BY MR. MELAMED:
23   Q.   If SOMs --
24   A.   Yes.

Page 260

1    Q.   -- stopped, in fact, stopped this
2  order --
3    A.   Okay.
4    Q.   -- would you have asked how it was that
5  they didn't stop the order?
6    MR. DIAMANTATOS:  Objection; form.
7    MR. ROTH:  Lacks foundation, calls for
8  speculation, improper hypothetical.
9  BY THE WITNESS:
10   A.   I guess I'm -- I guess I'm not
11 understanding the question.  If you ask them to
12 stop but they don't stop.  I apologize.
13 BY MR. MELAMED:
14   Q.   If you were to write a question -- if
15 you were to be in a car with somebody and there is
16 a recording device in the car and you say, "How is
17 it that you didn't stop at that red light," is
18 it -- is it fair in your understanding to infer
19 that the person did not in fact stop at that red
20 light?
21   MR. DIAMANTATOS:  Objection; form.
22   MR. ROTH:  Calls for a legal conclusion,
23 improper hypothetical, lacks foundation, calls for
24 speculation.

Page 261

1    BY THE WITNESS:
2        A.   I don't see how the two correlate
3    together.
4    BY MR. MELAMED:
5        Q.   That's not my question, the correlation.
6    Just if somebody said, "I don't see how you didn't
7    stop at that red light," isn't the implication you
8    didn't stop at that red light?
9        MR. ROTH:  Same objections as the last
10   question.
11   BY THE WITNESS:
12       A.   Oh, my God.  Okay.  If I'm
13   understanding, you're asking me if you were in a
14   car with someone and you -- you're with him.  You
15   witness you go through a stoplight and then you ask
16   them why didn't you stop through a stoplight, did
17   they actually go through it?  I'm sorry.
18   BY MR. MELAMED:
19       Q.   You asked a question up here --
20       A.   Yes.
21       Q.   -- that says, "How did they not stop
22   this order?"  Correct?
23       A.   Right.
24       Q.   Is it -- and you cannot say whether in

Page 262

1    fact they stopped this order, is that your
2    understanding?
3        MR. ROTH:  Objection; asked and answered six
4    times.
5    BY THE WITNESS:
6        A.   I'm -- I'm -- I'm -- part of this
7    process is trying to figure out how did we get
8    where we -- where we were.  So, it may have been
9    a -- just trying -- I'm asking questions to garner
10   information.
11       So, it could have been, all right, this
12   new award from Walgreens that ABC was supporting is
13   loaded in the system.  They know about it.
14   BY MR. MELAMED:
15       Q.   I understand that.
16       A.   They see that.
17       Q.   I understand.
18       MR. DIAMANTATOS:  Hold on, Counsel.  Let him
19   finish his answer the question.  You asked a
20   question.  He is answering it.
21       MR. MELAMED:  He is not answering the
22   question.  We're going back.  This is why I keep
23   asking and answered.
24       MR. ROTH:  You want him to say something he is

Page 263

1    not going to say.
2        MR. MELAMED:  No, no.
3        MR. ROTH:  So, just move on.
4        MR. MELAMED:  I want him to answer honestly.
5        MR. DIAMANTATOS:  He is answering honestly.
6        MR. MELAMED:  I want --
7        MR. DIAMANTATOS:  You've asked the question.
8    Hang on.  I've got to make a record on this.
9        MR. MELAMED:  You can make it.
10       MR. DIAMANTATOS:  You've asked the question,
11   Counsel.  He's responded that he doesn't know
12   whether it was stopped, in fact stopped, went out,
13   whatever the case is, and that he's trying to
14   figure out what some possible reasons are.  He's
15   answered that multiple times.
16       MR. MELAMED:  That's your testimony.
17       MR. DIAMANTATOS:  Now we are getting more
18   confused with the car hypotheticals.
19       MR. MELAMED:  I think that's your testimony.
20   I don't think he answered that.
21       MR. DIAMANTATOS:  I have made my objection.
22       MR. MELAMED:  I don't think he answered that.
23       MR. DIAMANTATOS:  I've made my objection.
24       MR. MELAMED:  Okay.  So, I think you just

Page 264

1    testified.  I will answer -- I will ask the
2    question again.
3        MR. DIAMANTATOS:  Okay.
4    BY MR. MELAMED:
5        Q.   Do you know whether this order in fact
6    shipped?
7        MR. DIAMANTATOS:  Objection; form, foundation,
8    asked and answered.  Go ahead.
9    BY THE WITNESS:
10       A.   I don't personally know that I saw the
11   product ship out.
12   BY MR. MELAMED:
13       Q.   I'm not asking whether you saw it
14   shipped.  Do you know whether it shipped?  I'm not
15   saying you were in the facility, the warehouse,
16   watching the pills go out the door.
17       MR. DIAMANTATOS:  Same objections.
18   BY THE WITNESS:
19       A.   At this particular time, the only
20   information that we have is what you presented in
21   the document in 4145.
22   BY MR. MELAMED:
23       Q.   And does that information show that this
24   product shipped?

Page 265

1    A.  It shows how much of the product was
2  shipped during the month of July.
3    Q.  So, your question "How did the SOMs not
4  stop this order," does that question refer to the
5  amount of the product that shipped in July?
6    MR. DIAMANTATOS:  Objection; form, asked and
7  answered, foundation.
8  BY THE WITNESS:
9    A.  My -- what I'm trying to -- again, I'm
10  trying to figure out.  There is two different
11  things here.  What potentially could happen is that
12  SOMs knew of this new award and therefore it was
13  built in the number and they saw the order come in
14  from AmerisourceBergen to support it and shipped
15  it.
16      There is other component where I'm
17  dealing in the previous piece where demand/supply,
18  so our production team is -- it appears like it
19  caught them off guard that, oh, shoot, we have this
20  award.  We don't have this built into our forecast.
21      So, I'm kind of dealing with two
22  different levels here that potentially what could
23  happen is, all right, SOMs knew it, had it
24  uploaded, had this in and knew.  However, my

Page 266

1  forecast team didn't and now I need to have that
2  conversation with -- potential conversation with
3  Walgreens saying we're going to have to wait
4  another 30 days.
5  BY MR. MELAMED:
6    Q.  Regardless of whether there was a
7  justification for this that SOMs knew, is it your
8  understanding looking at this e-mail that this
9  order shipped?
10    MR. DIAMANTATOS:  Objection; form, asked and
11  answered.
12  BY THE WITNESS:
13    A.  I would have to see the POs to
14  understand if this order was tied to -- tied to the
15  AmerisourceBergen's purchase order for -- for this.
16  BY MR. MELAMED:
17    Q.  I'm handing you what's been marked
18  Exhibit 17.
19      (WHEREUPON, a certain document was
20      marked as Allergan-Dorsey Exhibit
21      No. 17: 7/23/15 e-mail string;
22      Acquired_Actavis_00254149.)
23  BY MR. MELAMED:
24    Q.  You might want to keep 16 out next to

Page 267

1  you just for the moment.  Exhibit 17 is an e-mail
2  string most recent in time from Michael Dorsey to
3  Violet Saakyan, July 23, 2015, subject, "Re
4  hydrocodone/ibuprofen - how did ABC orders got
5  through our ordering/SOMs system."  Single --
6  single-page document at Acquired_Actavis_00254149.
7      If you turn to the order information in
8  Exhibit 16, which we were just looking at before
9  this document, and it's on page ending in 145, and
10  then you look at the order Ms. Saakyan is asking
11  about in Exhibit 17, those are the same orders,
12  correct?
13    MR. DIAMANTATOS:  Objection; foundation.
14  BY THE WITNESS:
15    A.  It appears they are the same NDC,
16  product description, product -- or contract entity
17  as well as the months and the units are matching
18  up.
19  BY MR. MELAMED:
20    Q.  Okay.  And so turning to Exhibit 17 now,
21  Ms. Saakyan sends an e-mail to VMI/SOMs team.  Do
22  you know what VMI stands for?
23    A.  No.  I'm just...
24    Q.  Okay.  And then she asks, "Can you

Page 268

1  please let me know how did ABC orders got through
2  our ordering/SOMs system in July."
3    A.  Okay.
4    Q.  Do you see that?
5    A.  Yes.
6    Q.  And you write, "You go girl" in
7  response.
8      Do you see that?
9    A.  Yes.
10    Q.  Do you know whether Ms. Saakyan ever
11  received a response to her inquiry?
12    MR. DIAMANTATOS:  Objection; form, foundation,
13  calls for speculation.
14    MR. SCHOCK:  Object to form.
15  BY THE WITNESS:
16    A.  No, at this -- I don't know if she did
17  or not.
18    MR. MELAMED:  You can put that aside or both
19  of those aside.
20    MR. DIAMANTATOS:  Counsel, we have been on the
21  hour for close to two hours.  Just when you get a
22  chance, if we could take a break soon, that would
23  be great.
24    MR. MELAMED:  Sure.  We can go off the record.

Page 269

1    THE VIDEOGRAPHER:  We are off the record at
2  3:01 p.m.
3          (WHEREUPON, a recess was had
4          from 3:01 to 3:14 p.m.)
5    THE VIDEOGRAPHER:  We are back on the record
6  at 3:14 p.m.
7  BY MR. MELAMED:
8    Q.  I have just handed you what's marked
9  Exhibit 18.
10          (WHEREUPON, a certain document was
11          marked as Allergan-Dorsey Exhibit
12          No. 18:  10/5/15 e-mail string;
13          Acquired_Actavis_00492349 -
14          00492350.)
15  BY MR. MELAMED:
16    Q.  It's an e-mail string, most recent in
17  time from Jennifer Estes at Harvard Drug Group to
18  Michael Dorsey, from October 5, 2015, subject, "FW:
19  Hydro/APAP - adjusted forecast please."  It's
20  two-page e-mail string starting at
21  Acquired_Actavis_00492349 and going through to 50.
22    So, going back to the -- actually, start
23  at the beginning.  Do you recognize this e-mail
24  exchange?

Page 270

1    A.  I guess as presented to me.  I don't --
2  it doesn't strike anything from current memory, but
3  it appears I was part of it.
4    Q.  So, in the first e-mail, which starts at
5  the very bottom of 349 and continues on to 350,
6  it's from you, it's on October 2, to Trevor Eaton
7  and Ryan Derengowski.
8          And to them you write, "Looks like you
9  have been selling more than you anticipated, I'll
10  need an update forecast for production planning and
11  for my SOMs folks.  This will help with the new
12  order in-house."
13          Do you see that?
14    A.  Yes.
15    Q.  And the drug you're referring to there
16  is reflected in the subject line, right?
17    A.  I would believe so, correct.
18    Q.  So, and that's hydrocodone with APAP,
19  correct?
20    A.  Correct.
21    Q.  And e-mail -- you receive an e-mail back
22  from Jennifer Estes which provides Harvard Drug
23  Group's forecast for hydrocodone with APAP.
24          Do you see that?

Page 271

1    A.  Yes.
2    Q.  And this was -- these numbers were --
3  let me withdraw that.
4          These numbers, they're forecasted for
5  hydrocodone/APAP that they were -- that Jennifer
6  Estes provided to you were used by the suspicious
7  order monitoring group to help establish suspicious
8  order monitoring levels for Harvard Drug Group, is
9  that right?
10    MR. DIAMANTATOS:  Objection; form, foundation,
11  calls for speculation.
12  BY THE WITNESS:
13    A.  I don't know what -- I guess what they
14  were used for.  It looks like there is a -- there
15  is a request to find out what, you know, like I
16  said, the selling more than what they anticipated,
17  really digging into it, catching, you know, and our
18  SOMs folks are probably asking, all right, we need
19  to know what's going on here.  So, that's really
20  what this inquiry is about and then reply to
21  that.
22  BY MR. MELAMED:
23    Q.  Do you have any understanding of how the
24  Actavis SOMs group made use of these numbers?

Page 272

1    A.  No, I'm not understanding -- I don't
2  know, you know, what -- what they did with them and
3  how their -- their determination once they received
4  them.
5  BY MR. MELAMED:
6    Q.  And Jennifer Estes' response reflects an
7  updated forecast based on increased sales from
8  where they had been before, is that right?
9    A.  What I --
10    MR. DIAMANTATOS:  Objection.  Sorry.
11  Objection to form.  Go ahead.
12  BY THE WITNESS:
13    A.  Yeah, what I don't know is what's --
14  what consisted of their -- their demand for 2015
15  versus '16.  Was that in anticipation because
16  this -- these guys were -- yeah.
17          Yeah, I don't know what -- if it's -- if
18  it was to their overall book of business or what
19  they're comparing here.  I guess, when I'm looking
20  at it, I'm just not -- I don't know the numbers and
21  what they truly represent.
22  BY MR. MELAMED:
23    Q.  But the reason that you initiated this
24  communication is because Harvard Drug Group had

Page 273

1    been selling more than anticipated, right?
2        A.   Correct.
3        Q.   Did you investigate the reason for their
4    increased sales?
5        MR. DIAMANTATOS:  Objection; form.
6    BY THE WITNESS:
7        A.   I personally, my involvement is probably
8    spelled out here pretty clearly.  I was reaching
9    out to them, what's your rationale, what's your
10   information, again more of a discovery, and then
11   forwarding on this information to the internal
12   team.
13   BY MR. MELAMED:
14       Q.   Okay.  So, because your participation is
15   reflected in this document, are you saying that it
16   didn't go beyond what's reflected in this document?
17       A.   What I'm saying is past this document I
18   don't know what -- where it went after this.
19       Q.   Did you personally conduct any further
20   inquiry with Harvard Drug Group about the reason
21   for their increased sales of hydrocodone/APAP?
22       MR. DIAMANTATOS:  Objection; form.
23   BY THE WITNESS:
24       A.   Best of my recollection, I don't know

Page 274

1    what the next steps were or if I was called upon to
2    seek further information.
3    BY MR. MELAMED:
4        Q.   Just to be clear.  You don't recall
5    whether you were asked to seek additional
6    information, is that right?
7        A.   Correct.
8        Q.   And when you're saying "asked," you are
9    referring to somebody from Actavis asking you, you
10   don't know whether you -- whether anybody at
11   Actavis asked you to seek further information?
12       MR. DIAMANTATOS:  Objection; form.
13   BY THE WITNESS:
14       A.   At this time what company.  It would
15   have been Actavis.
16            Yes, I -- in essence, yes, somebody
17   within -- based upon my best recollection, would
18   have been coming from Actavis seeking additional
19   information.
20   BY MR. MELAMED:
21       Q.   Okay.  And you don't recall whether or
22   not anybody from Actavis asked for additional
23   information about the reason for the increased
24   sales by Harvard Drug Group of hydrocodone/APAP?

Page 275

1        MR. DIAMANTATOS:  Objection; form, foundation,
2    asked and answered.
3    BY THE WITNESS:
4        A.   At this particular, I don't know if
5    there was any further steps or requests for any
6    additional information.
7    BY MR. MELAMED:
8        Q.   Do you recall -- I may have asked this.
9    Apologies.
10            Do you recall whether you made any such
11   inquiries of Harvard Drug Group?
12       MR. DIAMANTATOS:  Objection; form, asked and
13   answered.
14   BY THE WITNESS:
15       A.   I don't recall.
16   BY MR. MELAMED:
17       Q.   I'm going to hand you what's been
18   previously marked as Exhibit 14 for the Clarke
19   deposition.  Just for the record you will see that
20   at the bottom.
21            And for the record -- the Bates stamp is
22   cut off.  I'm sorry.  It is an e-mail and
23   attachment, the e-mail string and attachment.
24            Most recent e-mail in time is Michael

Page 276

1    Clarke to Nancy Baran and John LaRocca, cc'ing
2    Michael Perfetto, Chris Young, Jason Chung John
3    Kaldes, Rachelle Galante, and Doug Plassche, sent
4    September 25, 2012 at 7:13 a.m.  Subject is "Re:
5    2007 letter."
6            There is an attachment which says,
7    "Scanned from a xerox multifunction device001.pdf,"
8    and the e-mail is from Michael Clarke and it says,
9    "Thanks, Nancy."
10           I just want to draw your attention to
11   the attachment which starts on the third page of
12   this exhibit.  If you could take a minute or two to
13   read over this letter.
14           And I'm not going to ask you about any
15   specifics right now.  Just generally so you're
16   familiar with what it's saying.
17           Do you recall whether you have seen this
18   letter before?
19       A.   Best of my recollection, no.
20       Q.   Do you recall ever having discussed this
21   letter, the contents of this letter, with anybody
22   at Actavis before?
23       A.   No, I don't recall.
24       MR. MELAMED:  Let's go off the record, please.

## Page 277

1    THE VIDEOGRAPHER:  We're off the record at
2  3:25 p.m.
3        (WHEREUPON, a recess was had
4        from 3:25 to 3:29 p.m.)
5    THE VIDEOGRAPHER:  We are back on the record
6  at 3:29 p.m.
7        EXAMINATION
8  BY MR. KIEFFER:
9    Q.  Good afternoon, Mr. Dorsey.
10   A.  Good afternoon.
11   Q.  My name is Jon Kieffer.  I represent the
12  Teva Plaintiffs in this case, and I have a few
13  questions for you.  Okay?
14   A.  Okay.
15   Q.  You understand you're still under oath?
16   A.  Yes.
17   Q.  Okay.  And if you would do me a favor, I
18  know we are getting well into the day, if you could
19  try to keep your voice up.
20   A.  Okay.
21   Q.  There is a vent that blows over here.
22   A.  Okay.
23   Q.  I'm hoping your testimony will come
24  through just fine on the audio.

## Page 278

1    A.  Okay.
2    Q.  But it's easier for all of us to hear
3  you if you can try to keep your voice up.  Okay?
4    A.  You bet.
5    Q.  I'm going to do my best to not replow
6  ground that Mr. Melamed covered.
7    A.  Okay.
8    Q.  But inevitably there may be a little bit
9  of duplication because there are some of the
10  same -- a few of the same exhibits I want to ask
11  you about.  Okay?
12   A.  Sure.
13   Q.  All right.  To be clear, you are
14  represented here today by three different law
15  firms, is that correct?
16   A.  Yes.
17   Q.  Okay.  Morgan Lewis, Kirkland & Ellis,
18  and then, as I understand it, your own personal
19  counsel?
20   A.  Yes.
21   Q.  Okay.  And who is your personal counsel?
22   A.  Brian.
23   Q.  Okay.  And where is Brian from?
24     MR. SPAHN:  Godfrey Kahn.

## Page 279

1  BY THE WITNESS:
2    A.  Yeah, Godfrey.  Thank you.
3  BY MR. KIEFFER:
4    Q.  Are you paying the fees of any of those
5  lawyers or law firms?
6    A.  No, I'm not.
7    Q.  Who is paying the fees of these three
8  law firms?
9      MR. DIAMANTATOS:  Objection; foundation.
10  BY THE WITNESS:
11   A.  My understanding is that it is Teva.
12  BY MR. KIEFFER:
13   Q.  Your employer?
14   A.  Yes.
15   Q.  Okay.  And do you have personal counsel
16  in this matter because you have some concern that
17  you might have some sort of personal legal
18  exposure?
19     MR. DIAMANTATOS:  Objection.
20  BY THE WITNESS:
21   A.  No.
22  BY MR. KIEFFER:
23   Q.  Why is it you have personal counsel
24  representing you individually?

## Page 280

1      MR. DIAMANTATOS:  Objection.
2      THE WITNESS:  So, do I -- I mean, is there --
3  you're objecting --
4  BY MR. KIEFFER:
5    Q.  I don't want to know about any
6  conversations between counsel.
7    A.  Yeah.
8    Q.  I just want to know why it is you have
9  personal counsel representing you individually.
10   A.  This is not an everyday event.  So, I'm
11  not -- I don't do this every day so I'm just --
12  it's nice to have someone you can ask questions and
13  bounce things off of.
14   Q.  Okay.  And is that something that you
15  asked for?
16   A.  Yes.
17   Q.  I'm sorry.  Yes?
18   A.  Yes.  Sorry.
19   Q.  You are here today voluntarily, by that
20  I mean you were not served with a subpoena
21  compelling you to be here, is that right?
22   A.  I -- I don't know how I --
23   Q.  Somebody asked you?
24   A.  How did I get here.  Somebody asked me,

Page 281

1    yes.
2        Q.   Your employer or somebody on your
3    behalf, a lawyer, requested you to come and give
4    testimony today?
5        A.   I believe so, yes.
6        Q.   And you complied?
7        A.   Yes.
8        Q.   Okay.  The trial of this matter is set
9    in Federal Court in Ohio.  You understand that your
10   testimony is being videotaped today in the event we
11   need to play part or all of your testimony for the
12   jury?
13       A.   Yes.
14       Q.   If you were asked by your employer or by
15   their counsel to come and appear live and testify
16   before the jury in this case, will you do your best
17   to honor that request?
18       A.   I will do my best.
19       Q.   And the reason I ask you that, if you're
20   not present at trial and the jury has to rely on
21   the videotape instead of your live testimony, I
22   want the jury to understand --
23       A.   Okay.
24       Q.   -- it's not because of any failure on

Page 282

1    the part of the Plaintiffs to bring you or to ask
2    you to come.  Okay?
3        A.   Okay.
4        MR. DIAMANTATOS:  Objection; form to the
5    extent that statement calls for a legal conclusion.
6    BY MR. KIEFFER:
7        Q.   You previously worked for Actavis.  You
8    now work for Teva, right?
9        A.   Correct.
10       Q.   Did you become an employee of Teva when
11   Teva acquired Actavis?
12       A.   Yes.
13       Q.   Your current title is director of
14   national accounts for Teva, correct?
15       A.   Yes.
16       Q.   Are you the only director of national
17   accounts for Teva or are there multiple folks with
18   your same title?
19       A.   Multiple folks.
20       Q.   About how many?
21       A.   Four, four others.  So, five in total.
22       Q.   Five total?
23       A.   Yeah.
24       Q.   Including you?

Page 283

1        A.   Yes.
2        Q.   Okay.  And I think -- I think it's
3    probably self-evident, but I need to ask.
4            As director of national accounts, you
5    are in charge of helping to sell Teva products in
6    the United States.  True?
7        A.   Yes.  Our portfolio of products in
8    the -- in the United States.
9        Q.   Do you handle any sales internationally?
10       A.   Exporting, no.
11       Q.   Okay.  National accounts at Teva
12   include, for example, large drug wholesalers?
13       MR. DIAMANTATOS:  Objection; form.
14   BY THE WITNESS:
15       A.   Myself currently, no.
16   BY MR. KIEFFER:
17       Q.   Okay.  How about in the past?
18       MR. DIAMANTATOS:  Same objection.
19   BY THE WITNESS:
20       A.   In the past I have, yes.
21   BY MR. KIEFFER:
22       Q.   For example, companies like
23   AmerisourceBergen, who goes by the acronym ABC
24   sometimes?

Page 284

1        A.   In the past, yes.
2        Q.   How about Cardinal?
3        A.   No.
4        Q.   Okay.  McKesson?
5        A.   No as well.
6        Q.   Cardinal and McKesson, are those
7    accounts of Teva's, just not accounts of yours?
8        A.   Yes.  Because that would be a --
9        Q.   Okay.  Walgreens?
10       A.   That would be mine.
11       Q.   And is currently yours as well, right?
12       A.   Yes.
13       Q.   CVS?
14       A.   At one point in time.
15       Q.   Okay.  How about now?
16       A.   No.
17       Q.   Are there other large national accounts,
18   wholesalers or otherwise, that might be relatively
19   well known to the average man or woman on the
20   street?
21       MR. DIAMANTATOS:  Objection; form.
22   BY MR. KIEFFER:
23       Q.   For example, we mentioned Walgreens,
24   CVS.  Any others?

Page 285

1    MR. DIAMANTATOS: Objection; form.
2  BY THE WITNESS:
3    A.   Any others of what?  I'm sorry.  I just
4  want to --
5  BY MR. KIEFFER:
6    Q.   Any other large national accounts that
7  you are in charge of --
8    A.   Oh.
9    Q.   -- now or have been in the past.
10    MR. DIAMANTATOS: Objection.  Sorry.
11  Objection; form.  Go ahead.
12  BY THE WITNESS:
13    A.   No, none I can think of.
14  BY MR. KIEFFER:
15    Q.   The term "national accounts" as Teva
16  uses it would also include what is sometimes
17  referred to as wholesale buying groups?
18    MR. DIAMANTATOS: Objection; form, foundation.
19  BY THE WITNESS:
20    A.   I don't -- I'm not sure of the question.
21  What Teva -- can you just one more time?
22  BY MR. KIEFFER:
23    Q.   Let me ask it a little bit differently.
24  Okay.

Page 286

1    A.   Yeah.
2    Q.   There is an entity that shows up in
3  various documents that have been produced to us
4  from Teva's internal files that goes by the acronym
5  WBAD or W-B-A-D.
6    A.   Oh.
7    Q.   Do you know what I'm referring to?
8    A.   Yes.
9    Q.   What is WBAD?
10    A.   Walgreens -- so, it's an acronym.  So,
11  it's Walgreens Boots Alliance Development Company.
12  So, it is a negotiating arm, so like a group
13  purchase organization, negotiated arm that's in
14  Bern and helps negotiate contracts on behalf of
15  AmerisourceBergen, Walgreens and Econdisc, locally
16  or Econdisc here in the States.
17    Q.   Just to be clear on the name.  It's
18  Walgreens Boots Alliance Development?
19    A.   Yes.
20    Q.   Okay.  Based in Bern, Switzerland?
21    A.   Yes.
22    Q.   And it is a buying group that helps
23  negotiate purchases of pharmaceuticals from Teva
24  for Walgreens, AmerisourceBergen and others?

Page 287

1    A.   Yes.
2    Q.   WBAD would be considered a customer of
3  Teva's, correct?
4    A.   We have a contractual relationship with
5  them, yes.
6    Q.   Let me ask you a couple questions just
7  about who Teva is.
8    MR. KIEFFER: Can you pull up what we have
9  identified as Document No. 1.  Tell me if you need
10  the Bates number.
11    MR. GRIMM: If you have it.
12    MR. KIEFFER: It's Teva_091348868 (sic).
13  BY MR. KIEFFER:
14    Q.   Sir, let me hand you what we'll mark as
15  Exhibit No. 19.
16      (WHEREUPON, a certain document was
17      marked as Allergan-Dorsey Exhibit
18      No. 19: PowerPoint,
19      TEVA_MDL_A_09134868.)
20  BY MR. KIEFFER:
21    Q.   Sir, Exhibit 19 is a document that was
22  produced to us from Teva's files.  I don't want to
23  spend much time on it, but the first page just
24  identifies the number under which it was produced

Page 288

1  to us.  It is a packet of materials.  The first
2  page states, "Teva - World's Largest Medicine
3  Cabinet."
4      Do you see that?
5    A.   Yes.
6    Q.   Have you seen occasions in your
7  employment at Teva where in materials like this or
8  otherwise Teva has referred to itself as the
9  "world's largest medicine cabinet"?
10    A.   Not enough that it rings -- it's not
11  like a tag line, so not enough.
12    Q.   Have you heard it before?
13    A.   It's not ringing a bell right now.
14    Q.   Not at all?
15    A.   No.
16    Q.   Teva is a company based in Israel,
17  correct?
18    A.   Correct.
19    MR. DIAMANTATOS: Objection; foundation.  Go
20  ahead.
21  BY MR. KIEFFER:
22    Q.   What interaction do you have in the
23  course of your job with any Teva organization based
24  in Israel?

Page 289

1      A.   Directly nothing, none.
2      Q.   Indirectly?
3      A.   Just none.  I mean, I guess no
4   interaction at all I guess I should say.
5      Q.   You personally?
6      A.   Correct.
7      Q.   Okay.  Teva is currently the world's
8   largest manufacturer -- manufacturer of generic
9   pharmaceuticals, correct?
10       MR. DIAMANTATOS:  Objection; foundation.
11   BY THE WITNESS:
12       A.   I -- from what I've read, it appears
13   that way, yes.
14   BY MR. KIEFFER:
15       Q.   Okay.  Teva is currently the largest
16   manufacturer of generic pharmaceuticals in the
17   United States as well.  Also true?
18       MR. DIAMANTATOS:  Objection; foundation.
19   BY THE WITNESS:
20       A.   I think depending upon -- again, I've
21   not run it, but what I've seen would indicate that,
22   yes.
23   BY MR. KIEFFER:
24       Q.   All right.  In the prescription opioid

Page 290

1   market, Teva is a substantial player.  True?
2       MR. DIAMANTATOS:  Objection; form, vague.
3   BY THE WITNESS:
4       A.   I don't know what substantial, how they
5   rank.
6   BY MR. KIEFFER:
7       Q.   Do you know how they rank?
8       A.   No, I do not.
9       Q.   Any idea at all?
10       A.   None at all.
11       Q.   In the course of your work as a director
12   of national accounts for Teva, do you ever pay
13   attention to where Teva's market share is in terms
14   of other competing companies in the United States?
15       MR. DIAMANTATOS:  Objection; form.
16   BY THE WITNESS:
17       A.   I don't know if you'd say "pay
18   attention."  Have I noticed?  Yeah.
19   BY MR. KIEFFER:
20       Q.   And what do you understand Teva's market
21   share to be here in the U.S.?
22       MR. DIAMANTATOS:  Objection; form, foundation.
23   BY THE WITNESS:
24       A.   Oh, I -- I don't know what overall it

Page 291

1   is.
2   BY MR. KIEFFER:
3       Q.   I'm sorry?
4       A.   I don't know what the I guess the
5   overall, what does Teva represent with all the
6   products.
7       Q.   You don't?
8       A.   No.
9       Q.   Do you have any idea where Teva shakes
10   out in terms of its competition in terms of the
11   prescription opioid market in the United States?
12       MR. DIAMANTATOS:  Objection; form, foundation,
13   asked and answered.
14   BY THE WITNESS:
15       A.   No, I do not.
16   BY MR. KIEFFER:
17       Q.   Do you know whether Teva is the largest
18   manufacturer of generic opioids sold in the U.S.?
19       MR. DIAMANTATOS:  Objection; form, foundation,
20   asked and answered.
21   BY THE WITNESS:
22       A.   No, I do not.
23   BY MR. KIEFFER:
24       Q.   Are you aware of the fact that the vast

Page 292

1   majority of the U.S. opioid market overall is
2   generic?
3       MR. DIAMANTATOS:  Objection; form, foundation.
4   BY MR. KIEFFER:
5       Q.   Over 90%?
6       MR. DIAMANTATOS:  Objection; form, foundation.
7   Go ahead.
8   BY THE WITNESS:
9       A.   No, I do not.
10   BY MR. KIEFFER:
11       Q.   Today is the first time you've heard
12   that?
13       A.   Yes.
14       Q.   Your position in your -- let me just
15   back up.  Strike that.
16       Your employment file was marked early in
17   the day today.  You were shown and asked about just
18   a few parts of it.  Do you recall that?
19       A.   Um-hmm.
20       Q.   Yes?
21       A.   Maybe.
22       Q.   It's Exhibit 2.  It's a thick document.
23       A.   Oh.  Like the initial signing papers,
24   right, or something?

Page 293

1    Q.   Yeah, you were given parts --
2    A.   Yes.  Oh, new employment data form.
3    Q.   I will give you that.
4         (WHEREUPON, a certain document was
5         marked Allergan-Dorsey Exhibit
6         No. 20:  Personnel File;
7         ALLERGAN_MDL_SUPP_00001122 -
8         0000127.)
9    MR. DIAMANTATOS:  Do you want him to refer to
10   Exhibit 2 or no?
11   MR. KIEFFER:  Sorry?
12   MR. DIAMANTATOS:  The personnel file.
13   MR. KIEFFER:  That's I think the whole thing.
14   I think.  I was sitting down here.  I'm not sure I
15   realized it.  The prior exhibit was just a portion
16   of it.
17   MR. DIAMANTATOS:  Okay.
18   BY MR. KIEFFER:
19   Q.   Do me a favor, if you would, sir.  I
20   just want to ask you about a few things in here.
21   Okay?
22   A.   Sure.
23   Q.   I'm not going to spend a lot of time.
24        There is a Bates number, what we call a

Page 294

1    Bates number in the lower right-hand corner of that
2    document.  I'm not going to read all the prefix,
3    but they all start out with Allergan and the first
4    page of this document ends in 1122.
5         Do you see that?
6    A.   Yes.
7    Q.   Turn to page 1139, if you would.
8         Page 1139 is -- begins the offer letter
9    that you got when you were hired by Actavis,
10   correct?
11   A.   That's what it, yes, that's what it
12   appears to be.
13   Q.   Let me focus just briefly on
14   subparagraph C in the middle of the page.  That
15   indicates you will be eligible to participate in
16   the company's sales plan, the plan, for fiscal year
17   2007, and it goes on to describe that plan as
18   providing an incentive to sales staff.
19        Do you see that?
20   A.   Yes.
21   Q.   And there are some criteria metrics that
22   are identified there upon which decisions are made
23   as to whether you receive this incentive
24   compensation, correct?

Page 295

1    A.   That's how it reads, yes.
2    Q.   Okay.  And you have on various occasions
3    received incentive compensation of, for example,
4    $30,000 semiannually, $60,000 annually.
5    MR. DIAMANTATOS:  Objection; form.
6    BY THE WITNESS:
7    A.   That's -- that's a cap.
8    BY MR. KIEFFER:
9    Q.   No, I understand that.
10   A.   Okay.  I'm sorry.  Then I misunderstood
11   your question.
12   Q.   I understand that.  And there are
13   examples, there are documents further in this file
14   we can look at if we need to --
15   A.   Okay.
16   Q.   -- that show periods and years when you
17   received incentive compensation.
18   A.   Okay.
19   Q.   I was just trying to move it along a
20   little bit and find out if you recall.
21        You recall receiving incentive
22   compensation --
23   A.   Oh.
24   Q.   -- at various points in time --

Page 296

1    A.   Okay.
2    Q.   -- to the tune of 30,000 semiannually
3    and 60,000 annually?
4    A.   Everything up to that last part.  I
5    don't know as far as the dollar amount.  But, yes,
6    I think that's part of it.  It's an HR, HR thing I
7    presume that you have to have a -- here's -- have
8    it laid out.
9         So, I don't -- the dollar amount may
10   have changed over the years, but there is -- I
11   believe they spell it out.
12   Q.   Okay.  You recall getting it?
13   MR. DIAMANTATOS:  Objection; form, vague.
14   BY THE WITNESS:
15   A.   If I were to see it again, yes.  It's,
16   again, a little foggy just because it's '17, yeah.
17   BY MR. KIEFFER:
18   Q.   We can take a look here in a minute if
19   we need to.
20   A.   Okay.
21   Q.   Take a look at page 1181, if you would.
22        Page 1181 at the top identifies your job
23   title, correct, and your department as sales?
24   A.   Yes.

Page 297

1    Q.   The job summary there at the bottom of
2  what is blown up on the screen there it's a "Sales
3  position - selling to all sectors of the generic
4  drug industry."  Correct?
5    A.   That's what it says, yes.
6    Q.   And that's your understanding of the job
7  that you have?
8    A.   I wouldn't say that anymore, as far as
9  all sectors.  I mean, that's an umbrella, I think
10  an umbrella statement for -- but I don't think it
11  would really apply.
12    Q.   Okay.  What sectors of the generic drug
13  industry do you not sell to?
14    A.   I personally only sell to -- well, what
15  I not would be some of the I guess true -- like a
16  hospital GPO, anything that's non-commercial in
17  respect.  Those are the two I guess that come to
18  mind right away.
19    Q.   Okay.  Look a little further down the
20  page, if you would.  There is a heading that says
21  "Essential Job Results," and then three things are
22  listed with a percentage of time to the left of
23  them.  Do you see those?
24    A.   Yes.

Page 298

1    Q.   It says, "70% selling, 20% analysis of
2  sales data, and 10% attending meetings and trade
3  shows."
4        Do you see what I just read?
5    A.   Yes, I do.
6    Q.   Is that generally accurate insofar as
7  you're concerned?
8    MR. DIAMANTATOS:  Objection; form.
9  BY THE WITNESS:
10    A.   Generally accurate as far as -- I mean,
11  this appears to be a document, an HR document like
12  describing this position.  So, I guess I'm not
13  understanding.
14        If that -- if this is the actual
15  document that -- that, you know, upon my hiring,
16  then, yes, they got to put down numbers, I guess,
17  to the -- some of these facets of what the job
18  would be entitled.
19  BY MR. KIEFFER:
20    Q.   And you do all three of those things,
21  selling, analysis of sales data, and attending
22  meetings and trade shows?
23    A.   Amongst other things, yes.
24    Q.   Okay.  Selling is identified, at least

Page 299

1  on this document, as being the majority of the time
2  demanded by your job, is that correct?
3    A.   On paper, yes.
4    Q.   In your very early testimony today, you
5  were asked about your office address, and I have to
6  apologize.  I was sitting down the table and the
7  blower was going and your soft was voice.
8    A.   Sorry.
9    Q.   I'm not sure I completely heard you.
10        Do you work out of a home office?
11    A.   I work out of my house, yes.
12    Q.   Out of your house?
13    A.   Yes.
14    Q.   And then did I also hear you say when
15  you're not working out of your house, you're on the
16  road?
17    A.   That would be correct.
18    Q.   Are you on the road a substantial amount
19  of time?
20    A.   Not anymore.
21    Q.   Okay.  Why don't you briefly describe
22  for us upon hiring with Actavis until today.  All
23  right?
24    A.   Okay.

Page 300

1    Q.   The extent to which your job required
2  you to travel and presumably call on clients versus
3  do other things.  Okay?
4    A.   I guess at a high level, the -- if
5  you're asking how -- so, I just want to make sure.
6        You're asking how the travel, my
7  percentage of travel has changed over from
8  beginning to now?
9    Q.   Sure.  Yeah.
10    A.   It's -- generally it's gone down.
11  Thre's consolidation going on in the marketplace.
12    Q.   About what percentage of your time do
13  you travel now?  Let's talk about calendar year
14  2018.
15    A.   I'd have to look at papers.  But it's, I
16  don't know, maybe under 20%.
17    Q.   Under 20%?
18    A.   Yeah.
19    Q.   Okay.  From the time you were hired at
20  Actavis, what was the most you have ever traveled
21  as a percentage of your time?
22    MR. DIAMANTATOS:  Objection; form, vague.
23  BY THE WITNESS:
24    A.   It's hard, I guess it's hard -- it's

## Page 301

1 just hard to look back. '18. I guess 18 years
2 back to '07. No, I'm not doing the math right. 12
3 years. 11 years.
4     I just know it was -- it had to have
5 been more based upon the accounts. I just don't
6 know to I guess what degree.
7 BY MR. KIEFFER:
8     Q. Fair enough. Was there a time when you
9 would estimate you were traveling 50% or more of
10 your time?
11     MR. DIAMANTATOS: Objection; form.
12 BY THE WITNESS:
13     A. Within the -- within Actavis
14 environment?
15 BY MR. KIEFFER:
16     Q. Actavis or Teva.
17     A. Oh, God. I don't know if I traveled
18 that much. I'm not sure if that's -- if that's
19 like the number to land on. But all I can say is
20 that it was more back then, it was more than it is
21 now.
22     Q. Okay. And currently your best estimate
23 is 20% or perhaps a bit less of your time is spent
24 traveling?

## Page 302

1     MR. DIAMANTATOS: Objection; form, asked and
2 answered.
3 BY THE WITNESS:
4     A. Based upon just a quick thought process
5 in this environment, yes.
6 BY MR. KIEFFER:
7     Q. When you're traveling, what are you
8 doing? Give us an example. Calling on clients?
9     A. Yes.
10     Q. Okay. Fostering client relationships?
11     MR. DIAMANTATOS: Objection; form.
12 BY THE WITNESS:
13     A. It's a, you know -- you've been in the
14 industry for a while, as you know, you get -- you
15 know -- you know your customers and they know you.
16     But there is nothing beats being in
17 person and there is sometimes those conversations,
18 there is discussions that need to be, you know, in
19 person so that things can get accomplished as
20 opposed to a conference call where someone is doing
21 this (indicating) and they're not listening.
22     So, sometimes you need that face-to-face
23 to accomplish things. So, that would be part of it
24 or I guess would be industry-wide meetings that we

## Page 303

1 talked about.
2 BY MR. KIEFFER:
3     Q. Okay. In the client meetings, some of
4 the large national clients that you identified a
5 few minutes ago that you either currently have or
6 have had since you were hired at Actavis, would you
7 typically call on those clients on some kind of a
8 regular basis?
9     MR. DIAMANTATOS: Objection; form.
10 BY THE WITNESS:
11     A. I don't know if it was a regular. The
12 only basis would be, it's my philosophy, it's a
13 need basis.
14 BY MR. KIEFFER:
15     Q. I'm sorry. A need basis?
16     A. Need, yes.
17     Q. All right. But you would typically call
18 on them from time to time?
19     A. From time to time.
20     MR. DIAMANTATOS: Objection. Hold on.
21     THE WITNESS: Sorry.
22     MR. DIAMANTATOS: Objection; form. Go ahead.
23 BY MR. KIEFFER:
24     Q. Might not be pre-scheduled. Might not

## Page 304

1 be at regular intervals. But typically you would
2 call on them from time to time?
3     MR. DIAMANTATOS: Objection; form.
4 BY THE WITNESS:
5     A. As a circumstance warranted it for us to
6 have a meeting if there's a reason, then I would.
7 I'm not going to waste their time. So, yes, we
8 would have a meeting.
9 BY MR. KIEFFER:
10     Q. All right. Moving along. Why don't
11 you, if you would, turn to page 1163 for me.
12     At the bottom, sir, of page 1163 there
13 is an e-mail. The subject is, "Fiscal Year 2012
14 First Half Sales Rep Payout - For Your Review and
15 Decision."
16     Do you see that?
17     A. Ending 11 -- I'm sorry. So, from Ban?
18     Q. Yes.
19     A. Yes.
20     Q. That's what it looks like to me.
21     A. Yes.
22     Q. All right. And there is a table there
23 and your name appears it looks like as the third
24 individual down, Mike Dorsey?

Page 305

1    A.   Yes.
2    Q.   And it says, "Max Payout One-Half Year,"
3    and $30,000 is the amount corresponding to that,
4    right?
5    A.   Yes.
6    Q.   Does that refresh your recollection that
7    at least at that point in time you received $30,000
8    in incentive compensation?
9    MR. DIAMANTATOS:  Objection; form.
10   BY THE WITNESS:
11   A.   All it gives, it's a reminder based upon
12   this e-mail and, you know, for 2008 -- or 2012 that
13   that was the maximum amount that could be earned.
14   BY MR. KIEFFER:
15   Q.   Okay.  Turn, if you would, to page 1167
16   of that same document.
17        At the top of page 1167 there's an
18   e-mail dated February 22, 2012.  The subject is
19   "Second Half Sales Rep Payout."
20        Do you see that?
21   A.   Yes.
22   Q.   And it has your name underneath that.
23   It indicates, "Second Half Payout (approved)," and
24   the amount there is $32,400 in incentive

Page 306

1    compensation, correct?
2    A.   That's how it's written, yes.
3    Q.   Okay.  Does that refresh your
4    recollection that at least in the second half of
5    that period you received incentive compensation in
6    that amount?
7    MR. DIAMANTATOS:  Objection; form.  The
8    witness never said his memory was not -- was
9    exhausted.  It's improper to phrase the question
10   that way, Counsel.
11   BY THE WITNESS:
12   A.   I'm reading it right now, but it's not
13   something I remember, "Oh, yeah."  I'm just reading
14   it now as if it's the first time.
15   BY MR. KIEFFER:
16   Q.   Fair enough.  I'm not try to make a
17   bigger deal out of it than it is.  You're not
18   disputing that you got this incentive
19   compensation --
20   MR. DIAMANTATOS:  Objection; form.
21   BY MR. KIEFFER:
22   Q.   -- that's documented in your personnel
23   file.
24   MR. DIAMANTATOS:  Objection; form.

Page 307

1    BY THE WITNESS:
2    A.   Based upon how this is written in the
3    format in this document, it appears, then, yes, I
4    was approved for 32-4.
5    BY MR. KIEFFER:
6    Q.   Okay.  One of the bases upon which you
7    received this incentive compensation is sales that
8    are attributable to you actual versus budgeted,
9    correct?
10   A.   I believe that's what we reviewed
11   earlier, yes.
12   Q.   Turn to page 1171.  The bottom half of
13   the page, there is an e-mail dated August 22, 2011.
14   The subject is "Sales Team Incentive Plan First
15   Half of 2011."
16        Do you see that?
17   A.   Yes.
18   Q.   And, again, beneath that is your name
19   with a payout indicated for you of $28,800?
20   A.   Yes, I see that.
21   Q.   Do you have a memory of receiving that?
22   A.   No, no, I do not.
23   Q.   I take it you don't dispute that you
24   did, though?

Page 308

1    A.   Based upon -- I don't know the exact
2    amount, but based upon this, that's what it appears
3    I got paid out.
4    Q.   Turn, if you would, to page 1184.
5        Actually, I'm sorry, 1183, the prior
6    page.  That's a document the title of it is
7    "Actavis Per4ma."
8        Do you see that?
9    A.   Yes.
10   Q.   Your name is listed there at the top and
11   then the what's called the appraiser further down
12   is Mike Perfetto, VP sales and marketing, right?
13   A.   Correct.
14   Q.   And he's your boss, right?
15   A.   At that time, yes, yes, he was.
16   Q.   Did you say "was"?
17   A.   Well, I'm looking at 2012.
18   Q.   Your answer is a little more precise
19   than my question.
20   A.   Sorry.
21   Q.   Let me try again.
22   A.   Sorry.
23   Q.   Mr. Perfetto was your boss in 2012?
24   A.   Yes.

Page 309

1    Q.   Is he still?
2    A.   No.
3    Q.   Okay.  His title is listed as VP of
4  sales and marketing, right?
5    A.   Yes.
6    Q.   Now, you are -- I think it's been clear
7  through the day, but I want to make it clear on the
8  record now, you only deal with the generic side of
9  Teva's business.  You do not deal with the branded
10  side.  Am I correct about that?
11    A.   That is correct.
12    Q.   Okay.  When you reported to
13  Mr. Perfetto, VP of sales and marketing, was he VP
14  of sales and marketing just for the generic side of
15  the business or also for the branded side?
16    A.   We -- trying to think what the Actavis
17  itself.  So, he was VP of sales and marketing on
18  the trade, like trade relations or the trade
19  component.
20    Q.   Okay.
21    A.   Does that make sense?
22    Q.   You need to explain it.
23    A.   So, trade is sales to the trade channel,
24  wholesalers, like, for instance, wholesalers and

Page 310

1  retailers.
2    Q.   Okay.
3    A.   So, that's -- that was his -- that was
4  the role.  So, we, you know -- we fell under -- we
5  fell under Mike.
6    Q.   So, connecting the dots in what you just
7  said, Mr. Perfetto as VP of sales and marketing in
8  dealing with the trade channels, as you've said,
9  right?
10    A.   Yes.
11    Q.   Wholesalers and did you say retailers as
12  well?
13    A.   Correct.
14    Q.   So, that could include both generic
15  products and branded products?
16    MR. DIAMANTATOS:  Objection; form, foundation.
17  BY THE WITNESS:
18    A.   I don't know.  I can't recall how much
19  we had on as far as brands, if any.  It was
20  primarily a generic, a generic company.  So, I'm
21  not -- it's not ringing up.  I don't even know if
22  we had a brand again sales force.
23       I guess my day-to-day as I envision
24  Actavis was that it was generics Rx's, so

Page 311

1  prescriptions, and then there was some
2  over-the-counters.
3  BY MR. KIEFFER:
4    Q.   Have you ever heard of a product called
5  Kadian?
6    A.   Yes.
7    Q.   Kadian was a branded product, was it
8  not?
9    A.   Yeah, I believe that may have been
10  the -- could it be acquired?  Yes, it was one --
11  may have been the only product.  I'm not quite
12  sure, but there was a brand product, my
13  understanding.
14    Q.   A branded opioid product?
15    A.   It was a branded opioid product, yes.
16    Q.   Turn, if you would, to the next page,
17  1184.
18       And let me ask you a question, because I
19  don't want to bog us down in this.  Is part of this
20  a self-evaluation or was this all performed by
21  Mr. Perfetto basically telling you what you were
22  expected to do and perhaps how you had done?
23    MR. DIAMANTATOS:  Objection; form, foundation.
24  BY MR. KIEFFER:

Page 312

1    Q.   Or do you know?
2    A.   I don't -- I don't.  It may have -- I
3  don't know.  I don't know if it's a joint or
4  single.
5    Q.   Okay.  Fair enough.  Let me ask a more
6  specific question.
7       At the top of page 1184 in the first box
8  it says, "Objective No. 1."
9       Do you see that?
10    A.   Yes.
11    Q.   And there is a question, "What do you
12  need to accomplish this year?"  And it appears the
13  answer is, "Achieve generics prescription sales
14  targets."  Correct?
15    MR. DIAMANTATOS:  Objection; form.
16  BY THE WITNESS:
17    A.   Based upon how it's written, yes.
18  BY MR. KIEFFER:
19    Q.   Okay.  Direct sales target of 125 --
20  127.5 million including new products, right?
21    MR. DIAMANTATOS:  Objection; form.
22  BY THE WITNESS:
23    A.   Yes, that's how it's written.
24  BY MR. KIEFFER:

Page 313

1      Q.   And it also states indirect of
2   114 million includes new products, correct?
3      A.   Again, yes, how it's written, correct.
4      Q.   Any reason to dispute that the No. 1
5   objective for you in that particular period, and
6   that evaluation form is dated January of 2012, was
7   to achieve the generic prescription sales targets
8   that are identified there?
9      MR. DIAMANTATOS:  Objection; form.
10   BY THE WITNESS:
11      A.   I don't know the ranking order as far as
12   the order.  It just happened to be the first one on
13   the list.
14   BY MR. KIEFFER:
15      Q.   If you look further down, there is an
16   Objective 2 and an Objective 3 and an Objective 4
17   and I guess on the next page an Objective 5.
18   Right?
19      A.   Correct.
20      Q.   Okay.  And the first one that is
21   identified, we can agree, is to achieve the generic
22   prescription sales targets, right?
23      A.   The first one listed, yes.
24      Q.   Okay.

Page 314

1      A.   I got it.
2      Q.   All right.  Turn, if you would, to
3   page 1206, still in the same document.
4          At the top of page 1206 in the first box
5   again, it states, Objective No. 1, "What do you
6   need to accomplish this year?"  Do you see that?
7      A.   Yes.
8      Q.   And, again, it states, "Achieve generic
9   Rx sales targets," right?
10      MR. DIAMANTATOS:  Objection; form.
11   BY THE WITNESS:
12      A.   It says -- yes, it's written.  There is
13   a number for -- for direct, yes.
14   BY MR. KIEFFER:
15      Q.   Okay.  There is a number for direct and
16   a number for indirect, right?
17      A.   As it's stated, yes.
18      Q.   Briefly explain for us the difference
19   between direct generic prescription drug sales and
20   indirect generic prescription drug sales.
21      A.   So, direct would be, again, I always
22   understand direct is purchases direct from -- from
23   a customer.  So, point A to point B.
24          Indirect would be in essence it's not

Page 315

1   going directly to the customer.  It's going -- the
2   wholesaler is purchasing it and then it's being
3   sold then to the end customer, the end retailer,
4   yeah, end retailer.
5      Q.   And when you say "the end retailer,"
6   this would be a retailer with a pharmacy that would
7   then ultimately be dispensing the drug to a
8   patient?
9      MR. DIAMANTATOS:  Objection; form, foundation.
10   BY THE WITNESS:
11      A.   My -- yes, my understanding of as far as
12   the indirect, there has to be either a contract
13   from -- with us or a contract -- or with the
14   wholesaler and the pharmacy has to have the DEA
15   license.
16          Again, I don't know what goes into the
17   making.  But, yes, it's a chargeback that we get a
18   record of XYZ Pharmacy, you know, bought these --
19   bought these portfolio products from Actavis.
20   BY MR. KIEFFER:
21      Q.   Okay.  I'm not sure we're communicating
22   on this.
23      A.   Okay.
24      Q.   Let me ask it again.  I'm just trying to

Page 316

1   distinguish really for the benefit of our jury --
2      A.   Yep.
3      Q.   -- the difference between a direct
4   generic prescription drug sale and an indirect one.
5          So, let me tell you what I think the
6   difference is, and I want you to tell me if I'm
7   right or correct me.  Fair enough?
8      A.   Perfect.
9      Q.   Okay.
10      MR. DIAMANTATOS:  Objection; form.
11   BY MR. KIEFFER:
12      Q.   Is a direct generic prescription drug
13   sale where Actavis previously, Teva now, sells a
14   drug essentially to an endpoint pharmacy, Jones
15   Pharmacy in Chicago, Illinois, where a customer can
16   go in and get a prescription filled?
17      MR. DIAMANTATOS:  Objection; form.
18   BY THE WITNESS:
19      A.   My -- maybe let me provide this.  Again,
20   again, I overuse it.  Think of a -- pick out a
21   national chain drug.
22   BY MR. KIEFFER:
23      Q.   Okay.
24      A.   So, that would -- direct would be a sale

Page 317

```
1   from Actavis, now Teva, to that national chain
2   drugstore.
3       Q.   CVS, for example?
4       A.   For instance.
5       Q.   Okay.
6       A.   They have a -- they have their own
7   distribution center.
8       Q.   Okay.
9       A.   They would buy it directly from us into
10  their warehouse and then they would distribute
11  that.  Then the stores would pull from their own
12  warehouse.
13          And then the indirect would be products
14  that don't warrant or for whatever reason they are
15  not bringing it into their own distribution center
16  that these stores, for instance, in this case,
17  simplify it, CVS, chooses to store down on the
18  corner.  It doesn't -- they checked.  They don't
19  have it in the warehouse.  So, then they will buy
20  it from the wholesaler.  And that will be
21  classified as a indirect.
22      Q.   For example, an indirect sale would
23  include things like sales of products from Teva to
24  AmerisourceBergen?
```

Page 318

```
1       MR. DIAMANTATOS:  Objection; form.
2   BY THE WITNESS:
3       A.   Where that -- my understanding, how --
4   how that would be -- be categorized as an indirect
5   would be because the business model of a wholesaler
6   is different than -- than a self-contained of a
7   CVS, in this example, that there would be in
8   essence -- we know direct sales, but it wouldn't be
9   captured.  Direct sales go into ABC,
10  AmerisourceBergen.
11          However, they would submit a chargeback
12  once they sell it to John's Pharmacy, then there
13  would be a chargeback.  So, that would be counted
14  as an indirect sale.
15  BY MR. KIEFFER:
16      Q.   Is there only be a chargeback generated
17  if the wholesaler sells it to their customer for
18  less than they paid Teva for the product?
19      MR. DIAMANTATOS:  Objection; form, foundation.
20  BY THE WITNESS:
21      A.   That's not my -- I don't have
22  100 percent clarity of it if that's -- there is a
23  chargeback, anything that's less than WAC, there is
24  a chargeback created.  That part I'm pretty
```

Page 319

```
1   comfortable with.  Outside of that, I don't know if
2   it goes upside down.
3   BY MR. KIEFFER:
4       Q.   And for the sake of our record, WAC
5   stands for what?
6       A.   Wholesale acquisition cost.
7       Q.   Turn to page 1214 if you would.  This is
8   a similar evaluation form.  This one for 2010 it
9   looks like.  And at the top of the page, Objective
10  No. 1, again states, "Achieve U.S. generic sales
11  targets for fiscal year 2010."
12          Do you see that?
13      A.   Yes.
14      Q.   And it looks like the sales target
15  identified there is $477 million?
16      MR. DIAMANTATOS:  Objection; form.
17  BY THE WITNESS:
18      A.   Oh.
19  BY MR. KIEFFER:
20      Q.   I'm sorry.  $477.5 million.
21      MR. DIAMANTATOS:  Objection; form.
22  BY THE WITNESS:
23      A.   Okay.  So, based upon what, yeah, what's
24  being read for the -- it looks like U.S. generic
```

Page 320

```
1   sales target, yes, that's the number I see.
2   BY MR. KIEFFER:
3       Q.   Okay.  Is that your personal target that
4   year?
5       A.   I hope not.  I don't know if it would
6   have been that high.
7       Q.   All right.  Turn, if you would --
8       A.   That's high.
9       Q.   -- to page 1222.  1222 is a similar
10  evaluation form for 2009.  And, again, Objective
11  No. 1 at the top of the page states, "Achieve sales
12  budget/GP targets for fiscal year 2009."  Correct?
13      A.   Yes.
14      Q.   What's GP stand for?
15      MR. DIAMANTATOS:  Objection; form, foundation.
16  BY THE WITNESS:
17      A.   Not 100 percent sure on this one.
18  BY MR. KIEFFER:
19      Q.   Don't know?
20      A.   Not 100 percent, yeah.
21      Q.   What do you think it is?
22      MR. DIAMANTATOS:  Objection; form, foundation.
23  BY THE WITNESS:
24      A.   It's --
```

Page 321

1      MR. DIAMANTATOS:  Asked and answered.
2   BY THE WITNESS:
3      A.   I don't know.
4      MR. DIAMANTATOS:  Go ahead.
5   BY THE WITNESS:
6      A.   I -- I don't want to venture a guess for
7   it could be wrong.
8   BY MR. KIEFFER:
9      Q.   The customers that you are responsible
10  for selling to, there are a portfolio of products
11  that Teva sells to those customers, correct?
12     MR. DIAMANTATOS:  Objection; form.
13  BY THE WITNESS:
14     A.   Could you say this one more time.
15  BY MR. KIEFFER:
16     Q.   Yeah.  The customers that you are
17  responsible for, there is a portfolio of products
18  that Teva offers to those customers, correct?
19     MR. DIAMANTATOS:  Objection; form.
20  BY MR. KIEFFER:
21     Q.   There's a product line?
22     MR. DIAMANTATOS:  Objection; form.
23  BY THE WITNESS:
24     A.   Based on my knowledge, yes, they're the

Page 322

1   accounts that I call on, I can -- I have a
2   portfolio of products that we -- that we
3   manufacture, yes.
4   BY MR. KIEFFER:
5      Q.   And within that portfolio of products
6   are generic opioids, class IIs.
7      MR. DIAMANTATOS:  Objection; form.
8         (Clarification requested by the
9         reporter.)
10     MR. KIEFFER:  Class IIs.
11     MR. DIAMANTATOS:  Objection; form.
12  BY THE WITNESS:
13     A.   Yes, best of my knowledge, yes.
14  BY MR. KIEFFER:
15     Q.   And generic opioids are not an
16  insignificant part of the portfolio of products
17  that Teva offers to its customers, correct?
18     MR. DIAMANTATOS:  Objection; form, vague,
19  foundation.
20  BY THE WITNESS:
21     A.   I'm not quite sure what you mean by
22  insignificant -- sorry.  Tongue-tied.
23        I don't know.  I mean, it's a portion,
24  but there is also -- there's a big portion as well

Page 323

1   of non-controls.
2   BY MR. KIEFFER:
3      Q.   There's both?
4      A.   We have both.
5      Q.   The controlled substances are not a
6   minimal contributor to sales volume, are they?
7      MR. DIAMANTATOS:  Objection; form, vague,
8   foundation.
9   BY THE WITNESS:
10     A.   I don't have the -- as far as the
11  numbers ahead of me as far as what they -- what
12  those numbers are, what those sales dollars are and
13  what they mean.
14  BY MR. KIEFFER:
15     Q.   No memory at all?
16     MR. DIAMANTATOS:  Objection; form, foundation.
17  BY THE WITNESS:
18     A.   Correct.
19     MR. DIAMANTATOS:  Mischaracterizes the
20  witness' answer.
21  BY MR. KIEFFER:
22     Q.   There are various tools that you and
23  others at Teva are able to use in order to try to
24  sell Teva's products, for example, discounts,

Page 324

1   rebates, things of that nature, correct?
2      MR. DIAMANTATOS:  Objection; form.
3   BY THE WITNESS:
4      A.   Just like -- well, it's a -- I don't
5   know if it's -- it's the market price.  So, you're
6   working with the accounts to find an amenable price
7   point that works for both parties.
8   BY MR. KIEFFER:
9      Q.   Right.  But pricing is a component of
10  your sales strategy, correct?  One way you can get
11  and keep an account is to offer a particular
12  product at a better price or on more favorable
13  financial terms than one of your competitors,
14  right?
15     MR. DIAMANTATOS:  Objection; form.
16  BY THE WITNESS:
17     A.   Best of my understanding, yes, that's
18  one, just one of the aspects.
19  BY MR. KIEFFER:
20     Q.   You've had -- and if we end up with
21  enough time today we'll look at a couple of them,
22  but documents have been produced to us from Teva's
23  internal files in the form of things like e-mails
24  to you from customers asking if you are willing to

Page 325

1    match some competitor's price bid on a particular
2    product.
3         You receive things like that from time
4    to time, correct?
5         MR. DIAMANTATOS: Objection; form, vague. Go
6    ahead and answer.
7    BY THE WITNESS:
8         A.   Yes, from time to time.
9    BY MR. KIEFFER:
10        Q.   Okay.  What does it mean if a Teva
11   product has a 100 percent primary position?
12        MR. DIAMANTATOS: Objection; form, foundation.
13   BY THE WITNESS:
14        A.   Can you be specific of which account?
15   BY MR. KIEFFER:
16        Q.   I can in a moment.
17        A.   Okay.
18        Q.   Is there -- can you give us a general
19   description at all?
20        MR. DIAMANTATOS: Objection; form.
21   BY THE WITNESS:
22        A.   Best of my understanding, without
23   knowing which -- which account that you're speaking
24   of, would be that their formulary choice is that

Page 326

1    you're the only one that -- for them.
2    BY MR. KIEFFER:
3         Q.   And, again -- and that's fair.  My
4    question is at the moment is a general one.  Try to
5    speed us along.
6         A.   Okay.  I'm sorry.
7         Q.   No, no, your answer was fine.
8         A.   Okay.
9         Q.   I just want to bring us full circle
10   before I move on.
11        A.   Okay.
12        Q.   In general terms, insofar as you're
13   aware at Teva for a Teva product, a generic
14   product, to be referred to as 100 percent primary,
15   again as a general rule, it would mean that the
16   particular Teva product is the only product on that
17   customer's shelf in their formulary.  You're not
18   competing against another manufacturer's comparable
19   generic product?
20        MR. DIAMANTATOS: Objection; form.
21   BY THE WITNESS:
22        A.   You are -- so, there's competition and
23   not to say -- so, even -- I guess you could go on.
24   You would have to look at shelves.

Page 327

1         If it's 100 percent formulary, it's not
2    to say that -- that that's their -- that's their
3    No. 1 choice.  That when the physician writes a
4    prescription, the patient brings it in and is
5    looking to have the -- have their medications
6    for -- to help them, that that's the number one
7    choice to be filled.
8         Now, is there another potentially,
9    within stores or warehouse, another product of the
10   same AB-rated?  Yeah, potentially.  But
11   100 percent, best of my knowledge, that's -- you're
12   getting as much as their formulary business.
13   BY MR. KIEFFER:
14        Q.   And to try to -- in those instances
15   where a Teva product might be 100 percent primary,
16   it's usually giving the customer something in
17   exchange for that 100 percent primary position, for
18   example, a better price than its competitor?
19        MR. DIAMANTATOS: Objection; form, vague.
20   BY THE WITNESS:
21        A.   It comes down to a number of different
22   items.  It's not always price.
23   BY MR. KIEFFER:
24        Q.   Okay.  What are some of the other things

Page 328

1    that could result in a Teva product being
2    100 percent primary for a customer?
3         A.   Anecdotally, the account not liking the
4    other manufacturer.
5         Q.   Okay.
6         A.   Not liking the other representative.
7    Could be supply.  I mean, it's really -- it's up to
8    the account to make, make those decisions and
9    sometimes you don't even know why.
10        Q.   Sometimes, though, in your experience it
11   definitely does come down to price, correct?
12        MR. DIAMANTATOS: Objection; form, asked and
13   answered.
14   BY THE WITNESS:
15        A.   I believe, like I said, it's one of the
16   aspects that they -- that they review.
17   BY MR. KIEFFER:
18        Q.   Do you ever get e-mails from customers
19   asking you if you want to submit a bid to protect
20   Teva's position as being 100 percent primary for a
21   given product?
22        MR. DIAMANTATOS: Objection; form.
23   BY THE WITNESS:
24        A.   I would think over the course of my

Page 329

1    time, yes, I would.
2         MR. KIEFFER:  Can you blow up Document No. 10
3    for me.
4              (WHEREUPON, a certain document was
5              marked Allergan-Dorsey Exhibit
6              No. 21: PowerPoint,
7              TEVA_MDL_A_01439745.)
8    BY MR. KIEFFER:
9         Q.  Mr. Dorsey, we've just marked as
10   Exhibit No. 21 a document.  It is a PowerPoint that
11   was obtained from some of your electronic files
12   that were furnished us in this case.
13        The first page of it states, "WBAD
14   Review, October 2, 2017."
15        Do you see that?
16        A.  Yes.
17        Q.  All right.  And WBAD, how do you say
18   that?  Do you say "we-bad"?
19        A.  Say it with a little attitude if you
20   want, but yes.
21        Q.  I'm sorry?
22        A.  I'm joking.  You can say it with a
23   little attitude.  But yes, "we-bad."
24        Q.  Okay.  But that is how it's said instead

Page 330

1    of "W-bad."
2         A.  Yes.
3         Q.  Folks within Teva say, call it "we-bad"?
4         MR. DIAMANTATOS:  Objection; form, foundation.
5    BY THE WITNESS:
6         A.  I don't know how it all started, but the
7    genesis was from Walgreens Boots Alliance
8    Development Company.
9    BY MR. KIEFFER:
10        Q.  Do you refer to it by the acronym?
11        A.  Yes, it's a lot shorter.
12        Q.  And when you personally refer to it, you
13   say "we-bad."
14        MR. DIAMANTATOS:  Objection; asked and
15   answered.
16   BY THE WITNESS:
17        A.  Best of my knowledge, yes.
18   BY MR. KIEFFER:
19        Q.  I just want to call it by the name you
20   all call it by.  It's not controversial.
21        A.  Yeah, I -- probably call it other names.
22   But, yes, I would -- that's probably a high
23   percentage of the time is "we-bad."
24        Q.  All right.  Do you know if you presented

Page 331

1    this PowerPoint?
2         A.  May have had a part, part of it.
3         Q.  Okay.  Do me a favor.  Turn to the
4    second page of that, if you would.
5         A.  Yes.
6         Q.  There is a slide that says "Total Gross
7    Sales."
8         Do you see that?
9         A.  Yes.
10        Q.  I just want to be clear on what's being
11   shown here.  Okay.  There is a -- on the left-hand
12   column there is "Amerisource," "Walgreens" and
13   "Total WBAD"; and there's two columns "Year-to-Date
14   August 17 Sales" and "2017 Projected Sales."  Do
15   you see those?
16        A.  Yes.
17        Q.  Those sales numbers, first of all, am I
18   correct they are gross sales numbers based on the
19   title of this slide?
20        A.  That would be correct.
21        Q.  Those sales, are those sales of Teva to
22   those customers?
23        MR. DIAMANTATOS:  Objection; form, foundation.
24   BY THE WITNESS:

Page 332

1         A.  Best of my knowledge that would have
2    been, yes, that would have been Teva products sold
3    to those three or to those two entities.
4    BY MR. KIEFFER:
5         Q.  Okay.  All right.  And the -- you said
6    earlier this WBAD group, they do purchasing or it
7    does purchasing for both Amerisource and Walgreens?
8         A.  If I did, let me stand corrected or
9    correct that statement.
10        They do the contract negotiations for
11   AmerisourceBergen, Walgreens and then also
12   Econdisc.
13        Q.  They do the contract negotiations that
14   leads to the purchase?
15        A.  Correct.
16        Q.  Okay.
17        A.  Yeah.
18        MR. SCHOCK:  Object to form.
19   BY MR. KIEFFER:
20        Q.  Fair enough.  So, the year-to-date
21   August 2017 sales attributable to the efforts of
22   WBAD were a little over $1.3 billion in Teva
23   products, correct?
24        MR. DIAMANTATOS:  Objection; form.

## Page 333

1    BY THE WITNESS:
2        A.  Based on --
3        MR. DIAMANTATOS:  Foundation.  Go ahead.
4    BY THE WITNESS:
5        A.  Based on this, this slide, yes.
6    BY MR. KIEFFER:
7        Q.  All right.  And the projected 2017
8    sales, according to this presentation at least,
9    were just a little bit under $2 billion?
10       A.  Yes, correct.
11       Q.  All right.  Of Teva products?
12       A.  Correct.
13       Q.  All right.  Now, turn, if you would --
14   let's see.  I'm sorry.  This isn't numbered.  Let's
15   see.  Flip back two pages there.
16       MR. SCHOCK:  Is there a page number for
17   Exhibit 21?
18       MR. KIEFFER:  Sorry?
19       MR. SCHOCK:  Is there a page number for
20   Exhibit 21?
21       MR. KIEFFER:  Yeah, there's -- it's
22   TEVA_MDL_01439745.
23       MR. SCHOCK:  Thank you.
24       MR. KIEFFER:  Yep.  The PowerPoint pages are

## Page 334

1    not numbered, however.
2    BY MR. KIEFFER:
3        Q.  Mr. Dorsey, yeah.  You're on the correct
4    page.  This is a slide entitled "WBAD Volume
5    Incentive Rebate Review."  Did I read that
6    correctly?
7        A.  Yes.
8        Q.  All right.  And the -- there is a couple
9    of columns on the left that talk about -- that are
10   titled "Volume Incentive Goals," "Total Contract
11   Sales" and "Volume Incentive Rebate Percentages."
12           Do you see that?
13       A.  Yes.
14       Q.  And without getting bogged down in
15   individual numbers, it looks as if when the volume
16   sales -- the volume incentive sales goals in the
17   left-hand column increase, the volume incentive
18   rebate percentages in the right-hand column also
19   increase.  Correct?
20       MR. DIAMANTATOS:  Objection; form, foundation.
21   BY THE WITNESS:
22       A.  Yes, basically how this format reads,
23   yes, that's correct.
24   BY MR. KIEFFER:

## Page 335

1        Q.  Then look, if you would, on the
2    right-hand side of that same page, there is a
3    separate chart.  The first column says,
4    "Bonus Rebate Goal (Total Contract Sales)."
5            Do you see that?
6        A.  Yes.
7        Q.  All right.  And there is a "Bonus Rebate
8    Period" identified and then on the right-hand
9    column a "Bonus Rebate Payable."  Correct?
10       A.  Yes.
11       Q.  And from this chart it appears that, for
12   example, if sales attributable to WBAD were
13   1.5 billion in that rebate period, there would be a
14   $9 million rebate payable and, alternatively, if
15   sales attributable to WBAD were 2.025 billion
16   during that rebate period, there would be a
17   $10 million rebate payable.
18           Am I reading that correctly?
19       MR. DIAMANTATOS:  Objection; form, foundation.
20   BY THE WITNESS:
21       A.  Yes, you're reading that how it's
22   stated.
23   BY MR. KIEFFER:
24       Q.  Yes?

## Page 336

1        A.  Yes.
2        Q.  Okay.  Again, without getting too mired
3    in the numbers, what this is describing is an
4    incentive to this large customer WBAD to buy more
5    Teva products during this particular period and, in
6    turn, get a larger dollar amount of rebate?
7        MR. DIAMANTATOS:  Objection; form, foundation.
8    BY THE WITNESS:
9        A.  It's a program, I'm almost certain, that
10   WBAD was looking for it out of their manufacturers
11   to -- as a way to potentially differentiate
12   yourself.  So, you were asking again how -- it's
13   supply.  It's not always price.  But it's supply.
14   It's relationships.
15           So, this -- this structure of a VIR, so
16   volume incentive rebate, was structured between two
17   parties and agreed upon and if there is, you know,
18   sometimes if it's a flip of a coin from one
19   manufacturer to another, you may get the -- you may
20   get the -- the award.
21   BY MR. KIEFFER:
22       Q.  Yeah, understood.
23       A.  Okay.
24       Q.  I appreciate that detail.  My question,

## Page 337

1     honestly, was a little bit more basic than that.
2         What's being described on this slide is
3     an incentive that Teva is offering to WBAD in
4     exchange for higher sales?
5         A.   It's -- we're getting close.  I guess
6     what I'm looking, it's a volume incentive rebate
7     that Teva has agreed to with WBAD.  So, should the
8     business grow, well, then we'll share in -- we'll
9     share in that growth.  If it doesn't, then the
10    rebate would be less.  Is that helpful?
11        Q.   Fair enough.  Yeah, I mean, this is
12    just --
13        A.   Okay.
14        Q.   All I'm trying to get a handle on:  This
15    is one kind of tool in the Teva sales toolkit to
16    promote sales of its branded products to an
17    enterprise like WBAD in hopefully increasing
18    volumes and amounts.  That's the goal, right?
19        MR. DIAMANTATOS:  Hold on.  Objection; form,
20    foundation, asked and answered, calls for
21    speculation.
22    BY THE WITNESS:
23        A.   I guess I don't know how to I guess
24    fine-tune what I've -- I guess my understanding of

## Page 338

1     how, you know, how this came about as far as
2     agreement, you know, between Teva and -- and WBAD.
3     I guess that I've stated before I guess I would
4     stand by as how I perceive this program to be.
5     BY MR. KIEFFER:
6         Q.   Okay.  You were aware of this program
7     before today, right?
8         A.   Oh, yes.
9         MR. DIAMANTATOS:  Objection; form, foundation.
10        THE WITNESS:  Sorry.
11        MR. DIAMANTATOS:  Go ahead.
12    BY MR. KIEFFER:
13        Q.   Yes?
14        A.   Yes.
15        Q.   Okay.  And I think we established
16    earlier, but if I'm wrong, correct me, WBAD is a
17    client of yours?
18        A.   WBAD is, yes, one of my -- one of my
19    accounts I call on.
20        Q.   That you call on?
21        A.   Yes.
22        Q.   Okay.  And, so, I assume things like
23    this volume incentive rebate program are a topic of
24    discussion between you and the WBAD folks from time

## Page 339

1     to time, right?
2         A.   From time to time, yes.
3         Q.   Okay.  And, so, I'm not asking you to
4     speculate.  This is something that you actually
5     deal with hands-on in the course of your job,
6     right?
7         A.   Yes.
8         Q.   Okay.  And, again, just to -- I
9     appreciate I think you're trying to be precise.
10        A.   Yeah.
11        Q.   My question was actually pretty simple
12    and maybe not as looking for the detail that you
13    thought it was.
14        A.   Sorry.
15        Q.   All I want to know is:  Isn't it true
16    this WBAD volume incentive rebate program is one
17    tool in the Teva sales toolkit intended to increase
18    volume of sales and increase dollars of sales of
19    Teva products to its customers?
20        MR. DIAMANTATOS:  Objection; form, foundation,
21    calls for speculation, asked and answered
22    repeatedly.
23    BY THE WITNESS:
24        A.   I guess I would stand by what I've --

## Page 340

1     how I described what my interpretation of what
2     the -- what the program is all about.
3     BY MR. KIEFFER:
4         Q.   Certainly one important part of the
5     program is to sell products and sell more of them,
6     right?
7         MR. DIAMANTATOS:  Objection; form, foundation,
8     vague.
9     BY THE WITNESS:
10        A.   I -- I don't know if you look at it that
11    way.  It's really matching up the needs of the
12    customer to what we -- what we could -- what we're
13    able to manufacture.
14        And, so, that's really the way I look at
15    the simple -- simple -- simpleties of my job is try
16    to mirror up the prescriptions that the physicians
17    are writing, the FDA-approved products that are
18    going to the patient, the patient is now bringing
19    to the store, that the store wants to service
20    because if they can't service that, then they lose
21    their patient.  So, it's important to have.  The
22    supply is really number one.
23        So, this is just a myriad of items
24    that -- that you use as a -- or you work with the

Page 341

1    accounts where some like it, some just want a net
2    price.
3    BY MR. KIEFFER:
4         Q.   But you're not disputing that a
5    significant part of your job and your efforts is
6    aimed at increasing sales of Teva products.  True?
7         MR. DIAMANTATOS:  Objection; form.
8    BY MR. KIEFFER:
9         Q.   I mean, you get evaluated on that basis.
10   You get bonused on that basis.  True?  We've looked
11   at some of those documents already.
12        MR. DIAMANTATOS:  Objection; form, foundation,
13   mischaracterizes the witness' prior testimony,
14   asked and answered.
15   BY THE WITNESS:
16        A.   It's not a -- I'm -- I'm -- I'm not --
17   you live within your base.
18   BY MR. KIEFFER:
19        Q.   I'm sorry?
20        A.   You live within your means.  You live
21   within your base.
22        So, it's not -- I'm not that driven on
23   these as far as any bonus incentive.  So, I look at
24   it -- and, again, it is mirroring up the needs of a

Page 342

1    customer.
2         If my customer is not -- is not in a
3    position or there is not a need, then there is
4    nothing -- there is nothing I can do.
5         If they're looking for a new
6    manufacturer, they're having a supply issue, there
7    is something else going on in the marketplace and I
8    actually can supply them, then everything works
9    great.  If -- if none of that exists, well, then it
10   just doesn't -- it doesn't work out.
11   BY MR. KIEFFER:
12        Q.   Okay.  I'm not sure I understood.  Are
13   you finished?  I don't want to interrupt you.
14        A.   Yeah, I'm good.
15        Q.   I'm not sure I understand the first part
16   of your answer.  You reference, "You live within
17   your means."  Is that a personal comment about you
18   personally or is that a comment about a Teva
19   strategy?
20        A.   Me personally.
21        Q.   Okay.  All right.  I'm not trying to get
22   into your --
23        A.   Okay.
24        Q.   -- personal finances, and I didn't

Page 343

1    mean --
2         A.   Okay.
3         Q.   If you took the question that way --
4         A.   Okay.
5         Q.   -- that wasn't how it was intended.
6         A.   Okay.
7         Q.   We can take the time if we need to.  I
8    am trying to move this along.
9         But you may recall earlier in the day
10   you were shown a PowerPoint that Mr. Perfetto put
11   together that identified you, I believe it was in
12   calendar year as 2010, as the top performing
13   salesperson?
14        A.   Okay.
15        Q.   Some reference to wearing blue jeans
16   with holes in them.  Do you remember that?
17        A.   I do remember the reference, yes.
18        Q.   Okay.  That particular PowerPoint
19   identified you as among several folks and you had
20   exceeded your sales budget target by the most of
21   anybody in that group.  I think you were 130%,
22   i.e., 30% over your --
23        A.   Okay.
24        Q.   -- sales target for that period.  You

Page 344

1    know what I'm talking about?
2         A.   I will take your word on that, that
3    number.
4         Q.   And we can look at it if we need to.
5         A.   Okay.
6         Q.   Assume for the moment that the exhibit
7    you were shown --
8         A.   Okay.
9         Q.   -- includes that information.  Okay?
10        A.   Yeah.
11        Q.   I'm not trying to argue with you.
12        But you don't dispute that one of the
13   expectations Teva has for you and folks in your
14   position is you're going to go out, you're going to
15   roll up your sleeves, you're going to be
16   resourceful, you're going to build relationships
17   and you're going to do what you can to increase
18   sales of Teva products?
19        MR. DIAMANTATOS:  Objection; form, vague,
20   foundation, mischaracterizes the witness' prior
21   testimony, argumentative.
22   BY THE WITNESS:
23        A.   I don't -- as you state it, I guess I
24   don't feel that way.  It's not been my -- my

Page 345

1   experience over -- over my tenure with Actavis and
2   Teva.
3   BY MR. KIEFFER:
4       Q.   Okay.  Well, then I want to make sure
5   before I move on that I have your testimony
6   accurate.
7           Is it your testimony that it is not a
8   part of your job and it is not -- the performance
9   expectation that Teva has for you that you attempt
10  to meet sales targets and increase sales volume and
11  sales dollars to your clients?
12      MR. DIAMANTATOS:  Objection; form, vague,
13  mischaracterizes the witness' prior testimony,
14  asked and answered, argumentative.
15  BY THE WITNESS:
16      A.   I think I feel now it's kind of being
17  twisted a little, bent, bent in a -- in a way that
18  it's not.
19          So, I guess let me try to answer it a
20  simple way.  It's -- it's -- again, we -- for the
21  most part, like I said, I understand we work
22  together in essence as a team.  Everyone has
23  different accounts.  Every account will have
24  different product needs that they -- that they're

Page 346

1   looking for.  Some relationships work.  Some
2   relationships work.
3           Supply, product, a retailer may need
4   this product but we can't support it.  However, now
5   my retailer, different retailer, has a need for a
6   different product due to supply shortage.  Well, I
7   can help them.  So, am I any better than this
8   person?  Well, no, I just got the luck of the draw.
9   I have had a product that we could manufacture.
10          So, it's -- we work together as a team
11  and it's -- you seek, you know, you look -- you
12  have these conversations with your accounts to see
13  if there is -- there is any needs and any pain
14  points and is there anything within the portfolio
15  that we can -- we can assist with.
16  BY MR. KIEFFER:
17      Q.   Thank you.  There was a lot there.  Let
18  me ask a --
19      A.   Sorry.
20      Q.   -- similar but different question.  I
21  just want to get to the bottom of it.  So, just
22  tell me either way.  Okay.
23          As far as you are concerned in your job
24  at Teva.  Okay.  Is it or is it not a part of your

Page 347

1   job to try to go out, where you can, and increase
2   the sales of Teva's generic pharmaceutical
3   products?  Is that a part of your job or not a part
4   of your job?
5       MR. DIAMANTATOS:  Objection; form, vague.
6   BY THE WITNESS:
7       A.   I don't see it as -- I guess I don't see
8   it as that.  It's where the needs are met.  So, if
9   there is a need from the customers, then -- and it
10  happens to grow my business, then it grows the
11  business.  If it falls on the needs from an account
12  coming from another -- another sales rep, then you
13  know, they're going to be it.
14          So, there's five different salespeople,
15  multiple different accounts, and generics -- the
16  demand is going to vary from account to account and
17  which product and if we're able to support it.
18          So, you're making best efforts to
19  identify any opportunities and if there is, you
20  know -- it hasn't happened yet.  But if there is no
21  opportunities and everyone else gets it, well, then
22  your numbers aren't growing but as a team maybe
23  you're growing.
24          So, it's a holistic approach that the

Page 348

1   five of us work together, you know, as a team with
2   our accounts and what our accounts' needs are.
3   BY MR. KIEFFER:
4       Q.   Okay.  Similar but different question.
5           It's true, is it not, that at least one
6   of the performance expectations for you is to meet
7   or exceed sales goals.  That gets tracked and that
8   is a part of how you get evaluated and compensated,
9   as we've saw in some of the documents we looked at
10  a few minutes ago?
11      MR. DIAMANTATOS:  Objection; form.
12  BY MR. KIEFFER:
13      Q.   We can agree on that much?
14      MR. DIAMANTATOS:  Objection; form.
15  BY THE WITNESS:
16      A.   Based upon that -- that example that was
17  provided, that was one of the objectives.
18  BY MR. KIEFFER:
19      Q.   You were asked some questions earlier
20  about the topic of suspicious order monitoring.  Do
21  you recall that general subject area?
22      A.   Yes.
23      Q.   You have an understanding that
24  suspicious order monitoring, and, again, I'm

Page 349

1    talking at a high level, is something that a
2    company like Teva is required to do as it relates
3    to controlled substances?
4        MR. DIAMANTATOS:  Objection; form, foundation.
5    BY THE WITNESS:
6        A.   It's my general understanding, yes.
7    BY MR. KIEFFER:
8        Q.   A company like Teva is required to
9    conduct its own analysis of orders to see if -- and
10    this is my term, okay, fair warning -- to see if
11    anything looks out of the ordinary, out of trend,
12    for example, unusual size, unusual frequency,
13    unusual pattern of orders, those sorts of things?
14        MR. DIAMANTATOS:  Objection; form, foundation.
15    BY THE WITNESS:
16        A.   I'm not -- again, I'm not privy to all
17    the -- I mean, it sounds fair, but I'm not a part
18    of the SOMs and as far as the metrics they create,
19    what they need to look at.  So, I'm not -- I don't
20    have the expertise in that area.
21    BY MR. KIEFFER:
22        Q.   Okay.  And I'm not asking you for the
23    granular detail.  I'm just asking for your general
24    understanding.

Page 350

1        Do you have a general understanding that
2    in doing suspicious order monitoring, some of the
3    things that Teva looks at are things or should look
4    at are things like orders of unusual size,
5    frequency, pattern.
6        I'm not saying there aren't more things
7    in that.  I'm not defining what unusual size is.
8    But are those things you've seen that get looked at
9    within Teva and your time there?
10        A.   It would be my experience that those
11    ones you mentioned were part of what gets reviewed.
12        Q.   Okay.  Have you heard the term at Teva
13    DEF OPS, D-E-F-O-P-S?
14        A.   No.
15        Q.   You don't know what that is?
16        A.   No.
17        Q.   If that is an acronym that refers to
18    Teva's current system of suspicious order
19    monitoring, is that news to you?
20        A.   Yeah.  I don't know.
21        Q.   Don't know?
22        A.   Correct.
23        Q.   Do you know who a gentleman by the name
24    of Joe Tomkiewicz is?

Page 351

1        A.   Yes.
2        Q.   A gentleman that has worked in Teva's
3    DEA compliance area?
4        A.   Correct.
5        Q.   How about a lady by the name of Colleen
6    McGinn.  Do you know who she is?
7        A.   It's not ringing a bell.
8        MR. KIEFFER:  How about Document 13, please.
9        MR. DIAMANTATOS:  Did you say 13?
10        MR. KIEFFER:  It's an internal document
11    number.
12        MR. DIAMANTATOS:  Sorry.
13        MR. KIEFFER:  It's a little cumbersome.  It's
14    going to be Exhibit 22.
15        MR. DIAMANTATOS:  Got it.  Thank you.
16        MR. KIEFFER:  That's okay.
17        (WHEREUPON, a certain document was
18        marked as Allergan-Dorsey Exhibit
19        No. 22:  1/25/16 e-mail;
20        TEVA_MDL_A_01428524 - 01428525.)
21    BY MR. KIEFFER:
22        Q.   Mr. Dorsey, we just handed you what we
23    marked as Exhibit 22.  Exhibit 22 is an e-mail from
24    a lady named Maria Lesny to you and another person.

Page 352

1    It's got a Bates number of TEVA_MDL_01428524 and
2    525.
3        Do you see the document I'm referring
4    to?
5        A.   Yes.
6        Q.   The subject says, "ABC order management
7    revised."
8        Do you see that?
9        A.   Yes.
10        Q.   And the ABC there, does that refer to
11    AmerisourceBergen?
12        A.   Yeah, best of my knowledge, yes.
13        Q.   Okay.  And it states there, "Good
14    afternoon.  Please be advised that following
15    orders have been adjusted for the following
16    reasons:"  And then there are three reasons stated,
17    "Your order exceeds historical trend.  Your order
18    exceeds days on hand.  Your order exceeds your
19    monthly allocation."
20        Do you see that?
21        A.   Yes, I do.
22        Q.   All right.  Why is it that you would
23    receive an e-mail like this?
24        MR. DIAMANTATOS:  Objection; form,

Page 353

1  speculation.
2  BY THE WITNESS:
3      A.  Well, I'm trying to think of.
4  BY MR. KIEFFER:
5      Q.  Let me ask a different question.  Let me
6  withdraw that and ask a different question.
7      A.  Okay.
8      Q.  This e-mail is dated January 25, 2016.
9  Was AmerisourceBergen a client you were responsible
10 to at that point in time?
11     A.  That's what I was just thinking of.
12 MR. DIAMANTATOS:  Objection to form.
13 MR. SCHOCK:  Objection to form.
14 MR. DIAMANTATOS:  Go ahead.
15 BY THE WITNESS:
16     A.  That's what I'm trying to determine.
17 I'm -- I am not sure when Watson.  I don't -- I
18 don't think -- because '16 would have been Watson.
19 So, I don't believe AmerisourceBergen was an
20 account in '16 that I was -- that I was calling on.
21 BY MR. KIEFFER:
22     Q.  Okay.  Well, be that as it may, the part
23 that's highlighted there under "Good afternoon"
24 indicates that for the three reasons stated certain

Page 354

1  orders have been adjusted.  Do you see what I'm
2  referring to?
3      A.  Yes.
4      Q.  Adjusted meaning adjusted downward,
5  correct?
6      A.  More likely how these reports are, yes,
7  they would adjust it from what they were looking
8  for.  So, that would -- the direction would be
9  down.
10     Q.  Adjusted downward and then presumably
11 shipped out, right?
12 MR. DIAMANTATOS:  Objection; form, calls for
13 speculation, foundation.
14 BY THE WITNESS:
15     A.  No.  Best of my knowledge, that it's --
16 it's -- again, I guess I'd have to see, you know,
17 what -- in order to fully understand this is to
18 find out, okay, what did they order, what was --
19 what was being shipped and what was being cut, if
20 that was -- if it's all, some or none.  I just -- I
21 don't know from this -- from this report.
22 BY MR. KIEFFER:
23     Q.  Well, again, I think your -- I
24 appreciate the detail.  I think your answer might

Page 355

1  have been a little different than my question.
2      A.  Okay.  Sorry.
3      Q.  I wasn't asking if everything in the
4  order was cut.
5      A.  Okay.
6      Q.  I'm just -- this particular -- we can
7  agree this Exhibit 22, it doesn't say that the
8  orders have been canceled.  True?
9  MR. DIAMANTATOS:  Objection; form, foundation,
10 calls for speculation.
11 BY THE WITNESS:
12     A.  My -- well, I'm just -- being not the
13 author, I'm just going off of what's on -- on the
14 document.  It says it's been adjusted.
15 BY MR. KIEFFER:
16     Q.  Right.  Doesn't say canceled, frozen,
17 pended, suspensed, on hold, anything like that.  It
18 says "adjusted," past tense, right?
19 MR. DIAMANTATOS:  Objection; form, foundation,
20 calls for speculation, compound, asked and
21 answered.
22 BY MR. KIEFFER:
23     Q.  Did you answer.  I'm sorry?
24     A.  I didn't know it was still open.  I

Page 356

1  guess it would be the same as I said before.  Based
2  upon what how it's read, it says, "The following
3  orders have been adjusted."  Sorry.
4  MR. KIEFFER:  Document 14.
5  BY MR. KIEFFER:
6      Q.  Sir, Document 14, which we have just
7  marked as Exhibit 23.
8          (WHEREUPON, a certain document was
9          marked as Allergan-Dorsey Exhibit
10         No. 23: 5/31/16 e-mail;
11         TEVA_MDL_A_01428583 - 01428584.)
12 BY MR. KIEFFER:
13     Q.  Is an e-mail again from Maria Lesny to
14 you and others with a Bates stamp TEVA_MDL_01428583.
15     Do you have that document in front of
16 you?
17     A.  Yes.
18     Q.  And this one is dated 5/31 of '16.  This
19 also is -- the subject is "ABC order management
20 revised."  And it states, "Please be advised that
21 the following orders have been adjusted for the
22 following reasons:  Your order exceeds your
23 historical trend."
24     Do you see that?

Page 357

1    A.   Correct.
2    Q.   Okay.  And, again, without belaboring
3  it, there is nothing on here that expressly
4  indicates that the order has been canceled,
5  rescinded, pended, suspensed, frozen, put on hold.
6  It just says it's been adjusted, correct?
7    A.   Yes.
8    Q.   Okay.
9    MR. KIEFFER:  Document 15.
10         (WHEREUPON, a certain document was
11         marked Allergan-Dorsey Exhibit
12         No. 24:  12/8/16 e-mail;
13         TEVA_MDL_A_01436277.)
14  BY MR. KIEFFER:
15    Q.   Mr. Dorsey, we're handing you
16  Exhibit 24, and Exhibit 24 is another e-mail from
17  Maria Lesny, this time only to you, dated 12/8 of
18  '16.  It is TEVA_MDL_01436277.  The subject is
19  identified as "Dakota order management revised."
20         Do you see that?
21    A.   Yes.
22    Q.   This one states, "Good morning.  Please
23  be advised that the following orders have been
24  adjusted for the following reasons:"  The reasons

Page 358

1  given are, "Order exceeds normal monthly trend and
2  your order exceeds your monthly allocation."
3         Do you see that?
4    A.   Yes.
5    Q.   Similar questions with respect 24 as
6  with 22 and 23.  Nothing on this exhibit to
7  indicate that these orders have been canceled or
8  rescinded or frozen or pended or put on hold or
9  anything like that.  They have simply been adjusted
10  downward at least in part.  True?
11    A.   I would add to that that it says
12  "adjusted."  But if you look at the second column,
13  it says "Rejected Quantities" and then the third
14  column will tell you the adjusted order quantity;
15  and a lot, vast majority of them are zero.
16    Q.   Okay.  Can we zoom in on that.  Over on
17  the right you're talking about?
18    A.   Yes.
19    Q.   Okay.  So, for example, the first one
20  that's -- let's look -- there is a lot listed
21  toward the bottom for morphine sulfate?
22    A.   Yep.
23    Q.   And there were various quantities
24  ordered, those quantities rejected and zero shipped

Page 359

1  of that, right?
2    A.   Correct.
3    Q.   And then some of the other product,
4  looks like two of the products anyway were -- the
5  quantities ordered were adjusted downward, right?
6    A.   Correct.
7    Q.   Okay.  All right.  And then is it your
8  understanding that once these adjustments are made,
9  the adjusted order is shipped?
10    MR. DIAMANTATOS:  Objection; form, foundation.
11  BY THE WITNESS:
12    A.   I'm not quite sure, you know, since it's
13  not my day-to-day.  I execute it through, but I
14  know that they will cancel those orders and will
15  not ship them.
16  BY MR. KIEFFER:
17    Q.   Will not ship the canceled or the
18  rejected amounts?
19    A.   Correct.
20    Q.   But the adjusted amounts go ahead and
21  ship, correct?
22    MR. DIAMANTATOS:  Objection to form,
23  foundation.
24  BY THE WITNESS:

Page 360

1    A.   Again, it's -- I'm not -- it's not a
2  department I -- it would lend you to believe that,
3  but it's not a department that I'm -- that I
4  follow.
5  BY MR. KIEFFER:
6    Q.   Who makes these adjustments?
7    A.   That would --
8    MR. DIAMANTATOS:  Objection; form, foundation.
9  BY THE WITNESS:
10    A.   I think it's an internal process of --
11  what we're seeing here is an internal process, and
12  I don't know if it's SOMs combined with customer
13  service, but it's an internal process that is
14  looking at what their past ordering pattern is,
15  what it is now, and then making those
16  determinations for those reasons, oh, it's beyond
17  monthly trend or it exceeds your allocation.
18         So, it's kind of the SOMs process
19  working in place when an account was trying to
20  purchase the product.
21    MR. KIEFFER:  Can you pull up document 12.
22         Let me apologize.  I don't have a hard
23  copy of it.  Let me identify it for the record and
24  we can just show it on the screen if it's okay.

Page 361

BY MR. KIEFFER:

1  BY MR. KIEFFER:
2     Q.   Document 12 is an e-mail, the latest
3  from a lady named Nancy Baran.  The latest date of
4  which is October 12, 2012, bears a Bates range of
5  ALLERGAN_MDL_03380657 to 80669.
6        My only question for you, Mr. Dorsey,
7  is -- well, let me --
8     MR. DIAMANTATOS:  Counsel, I'm going to
9  object.  If you are going to ask him questions on
10  the e-mail, I need him to be able to review the
11  entire e-mail exchange before you put a question to
12  him about it.  I'm not trying to be difficult, but
13  this is less than ideal.
14     MR. KIEFFER:  Well, let me ask him one
15  question.  We'll see if we will need to do that.
16     MR. DIAMANTATOS:  No, I'm going -- if you are
17  going to ask him a question from a document, he
18  needs to be able to review the document in its
19  entirety.  That's my objection.
20        If you want to leaf through each of the
21  pages to show him it on the screen and the witness
22  can read it, that's one option.  But I need him to
23  do that before he answers questions.
24     MR. KIEFFER:  I don't need him to read the

Page 362

1  entire string.  There is a particular e-mail I want
2  to inquire about, and if he -- and it's a yes-no
3  question.
4     MR. DIAMANTATOS:  Counsel.
5     MR. KIEFFER:  If he says, "I've got to read
6  it," he can then read it.
7     MR. DIAMANTATOS:  Counsel, you're showing him
8  an exhibit.  I need him to be able to review the
9  exhibit.  You can put however many questions to him
10  that you think are appropriate to the exhibit,
11  whether it's one question, a yes or no, according
12  to you or whatever.
13        Bottom line is he's got to review it.
14  So, if you want to leaf through the pages so he
15  can, that's great.
16     MR. KIEFFER:  I'll tell you what.  We'll look
17  for the exhibit here, but let me -- you can pull
18  that down if you want.
19  BY MR. KIEFFER:
20     Q.   Let me ask you this question, sir:  Has
21  it ever come to your attention or has anyone within
22  Teva or Actavis ever told you that the DEA frowns
23  on cutting orders to quantities to reach a point at
24  which the order is acceptable?  Have you ever heard

Page 363

1  that?
2     MR. ROTH:  Objection; form.
3     MR. DIAMANTATOS:  Objection; form.
4  BY THE WITNESS:
5     A.   Best of my knowledge, doesn't -- no
6  recollection of that.
7  BY MR. KIEFFER:
8     Q.   You have no recollection of that?
9     A.   Correct.
10     Q.   Okay.  And if there are documents from
11  Teva's internal files that would indicate that you
12  received e-mail or e-mails making those statements,
13  is it your testimony you simply don't remember
14  that?
15     MR. DIAMANTATOS:  Objection; form,
16  argumentative.
17  BY THE WITNESS:
18     A.   I'm just saying at this juncture as
19  you're bringing it up without me looking at
20  anything, I think -- it doesn't -- it doesn't -- I
21  guess I don't recollect any of that, correct.
22  BY MR. KIEFFER:
23     Q.   Are you aware of whether by cutting --
24  by Teva cutting orders to reach a point at which

Page 364

1  the order is acceptable, that it causes those
2  orders to not be flagged by Teva's suspicious order
3  monitoring system?
4     MR. DIAMANTATOS:  Objection; form, foundation.
5  BY THE WITNESS:
6     A.   Again, since I'm not part of that, I
7  don't know the full makeup of SOMs and the rules
8  and regulations.  So, I guess the answer would be
9  based upon I don't have that knowledge.  I don't
10  know.
11  BY MR. KIEFFER:
12     Q.   Okay.  Okay.  Just to be clear.  If by
13  Teva cutting a customer's order to a level at which
14  it is deemed acceptable, if by doing that, that
15  causes the particular order to not be flagged by
16  Teva's suspicious order monitoring system, that is
17  not a topic that you know anything about one way or
18  another.  Am I correct?
19     MR. DIAMANTATOS:  Objection; form, foundation,
20  mischaracterizes the witness' testimony, asked and
21  answered.
22  BY THE WITNESS:
23     A.   I -- like I said, I am not integrally
24  involved as far as with the SOMs and how that that

1    whole process.  So, I would I guess -- based upon
2    serving my current memory, yes, I don't know about
3    it.
4    BY MR. KIEFFER:
5        Q.   You don't know about it?
6        A.   Correct.
7        Q.   Okay.  All right.
8        MR. KIEFFER:  Can we pull up Exhibit 13 marked
9    earlier in the day today.
10           I think that was document 13.  This is
11   Exhibit No. 13 that was marked earlier in the
12   examination.
13           I will give it right back to you if I
14   can check the Bates number.
15   BY MR. KIEFFER:
16       Q.   So, we are clear on the record, this
17   Exhibit 13 is document Acquired_Actavis_00352198 to
18   352202.
19           And if you would, sir, turn to the third
20   page in of that document, which is Page No. 352200,
21   and there is an e-mail at the top to you.
22       MR. KIEFFER:  Can we blow up the first
23   paragraph after, "Hi Mike."
24   BY MR. KIEFFER:

1        Q.   This is Vicki Freeman writing to you.
2    Who is Ms. Freeman again?
3        A.   Just -- distribution administrator.  I'm
4    not sure.  I don't know like which department she's
5    under, if it's -- I don't know which department it
6    was.
7        Q.   Okay.
8        A.   Shipping maybe.
9        Q.   Okay.  But she acts as if she's got some
10   familiarity with you because she addresses the
11   e-mail "Hi Mike."  Did you deal with her from time
12   to time?
13       A.   Well, yeah, it's kind of a normal
14   greeting, but yes.
15       Q.   All right.  Fair enough.
16           She states, "I struggle with this one."
17           And let me back up.  The subject is
18   listed as "ABC," or AmerisourceBergen, "orders
19   pended in suspicious order monitoring for Oxy
20   tabs."  Correct?
21       A.   That's how it reads, yes.
22       Q.   And that is -- the e-mail is dated
23   December 27, 2012, right?
24       A.   Yes.

1        Q.   Okay.  And Ms. Freeman's comment is,
2    "I struggle with this one.  We can't cut the order
3    as that is not allowed.  We don't want to cancel
4    because that would require us to report the order
5    to the DEA."
6            Do you see what I just read?
7        A.   I heard, yes.
8        Q.   Okay.
9        A.   And see.
10       Q.   This was addressed specifically to you
11   and copied to others, correct?
12       A.   Yes.
13       Q.   And, briefly, the other folks cc'd on
14   that e-mail, what areas are they in?
15       A.   Okay.  So, it starts with Vicki.  I
16   reply back.  Okay.  And then -- then Vicki is
17   replying back to me.  Right?
18       Q.   Okay.
19       A.   It's a chain of three.
20           Nancy Baran heads up the customer
21   service team.  Rachelle, I believe we landed on
22   product manager.
23       Q.   Okay.
24       A.   Maria, customer service.  Yeah, customer

1    service.  Probably part of the -- looks like I
2    think from a previous document we had something
3    with SOMs attached, like a SOMs rep.
4            Karen, same.  I don't know if she was
5    customer service.  I'm not 100 percent sure of what
6    Karen's role was.
7            And then obviously who falls under the
8    SOM order inquiry and even Violet.
9        Q.   Fair enough.  Going back to her comments
10   that are highlighted here, after she says, "I
11   struggle with this one," the first statement, "We
12   can't cut the order as that is not allowed."
13           What do you understand that to be
14   communicating?
15       MR. DIAMANTATOS:  Objection; form, foundation,
16   calls for speculation, asked and answered.
17   BY MR. KIEFFER:
18       Q.   Let me try to respond to the objection.
19       A.   Okay.
20       Q.   If you have to completely speculate to
21   answer this, you can tell me that.  What I struggle
22   with is she's addressing this directly to you with
23   the presumption that you understand the concern
24   that she's communicating.

## Page 369

1    So, what I want to know is do you
2    understand the concern she's been communicating --
3    that she is trying to communicate here or do you
4    have no idea?
5        MR. DIAMANTATOS:  Same objections.
6        MR. SCHOCK:  Object to form.
7    BY THE WITNESS:
8        A.   Yeah, I don't know.  Since I'm not the
9    author, I'm not sure what she was stating.
10   BY MR. KIEFFER:
11       Q.   And my question -- let me go back to it
12   a little bit.  I know you're not the author, and
13   I'm not asking you to read the mind of the author.
14   But we all every day author e-mails and receive
15   e-mails.  Right?  You probably do.
16       A.   No, not at all.  Yes.
17       Q.   I know I do.  Okay?
18       A.   Yes.
19       Q.   Most of the e-mails that I receive I
20   understand the content that's being communicated.
21   Sometimes I don't, but most of the times I do.
22       As a general rule in your job is that
23   pretty much true?
24       MR. DIAMANTATOS:  Objection; form, vague.

## Page 370

1    BY THE WITNESS:
2        A.   There's -- general answer, yes, you get
3    a lot of -- a lot of e-mails.  Some things make
4    perfect sense and there is some of them that
5    doesn't make perfect sense.
6    BY MR. KIEFFER:
7        Q.   All right.  When she says, "I struggle
8    with this one.  We can't cut the order as that is
9    not allowed," what do you interpret that statement,
10   you interpret that statement to mean, "We can't cut
11   the order as that is not allowed," or do you just
12   have no idea at all what she's trying to
13   communicate here?
14       MR. DIAMANTATOS:  Objection; form, calls for
15   speculation.
16       MR. SCHOCK:  Object to form.
17       MR. DIAMANTATOS:  Asked and answered.
18   BY THE WITNESS:
19       A.   I have no idea what she is saying on
20   this one.
21   BY MR. KIEFFER:
22       Q.   Blank slate?
23       A.   Correct.
24       Q.   Okay.  Next statement, "We don't want to

## Page 371

1    cancel because that would require us to report the
2    order to the DEA."
3        Do you see that?
4        A.   I see it, yes.
5        Q.   You understand what she's communicating
6    there?
7        A.   I don't know the -- as far as the
8    policies.  I'm just reading what she's -- what
9    she's saying.
10       Q.   She believes if the company, in this
11   case Actavis at the time, canceled that order,
12   Actavis would be required to report it to the DEA.
13   At least that's what you interpret she's
14   communicating to you there?
15       MR. DIAMANTATOS:  Objection; form as to what
16   the -- objection; form, calls for speculation,
17   foundation, asked and answered.
18   BY THE WITNESS:
19       A.   It's --
20       MR. SCHOCK:  Object to form.
21   BY THE WITNESS:
22       A.   It would be -- again, I'm not -- because
23   I don't have coverage within there, I don't know
24   the rules and regulations and why she would say,

## Page 372

1    say such a thing, so I don't know.
2    BY MR. KIEFFER:
3        Q.   No idea?
4        A.   No idea.
5        Q.   Blank slate again?
6        MR. DIAMANTATOS:  Objection; form, asked and
7    answered.
8    BY THE WITNESS:
9        A.   Yes.
10   BY MR. KIEFFER:
11       Q.   Okay.  Assume for the moment, without
12   getting into the policies, assume for the moment
13   that Ms. Freeman is correct in her statement and
14   that if Actavis canceled these pended orders for
15   AmerisourceBergen, they could, they being Actavis,
16   would be required to report that to the DEA.  Just
17   assume that for a second.  Okay?
18       MR. DIAMANTATOS:  Objection; form.
19   BY THE WITNESS:
20       A.   I'm listening.
21   BY MR. KIEFFER:
22       Q.   Okay.  If that were the case, what would
23   be wrong with Actavis reporting to the Drug
24   Enforcement Agency suspicious orders that it was

## Page 373

1    required to report?
2        MR. DIAMANTATOS:  Objection; form, foundation,
3    improper hypothetical.
4    BY MR. KIEFFER:
5        Q.   What's the hesitation?  What's the
6    roadblock?
7        MR. DIAMANTATOS:  Objection.  Same objections.
8    BY THE WITNESS:
9        A.   I guess I don't know what else -- it
10   kind of falls in line with the previous comment.  I
11   don't know.  It's not my area of expertise, so I
12   don't know what she's communicating there or what
13   the thoughts are.
14   BY MR. KIEFFER:
15       Q.   Okay.  Do you know, were you -- was
16   AmerisourceBergen one of your clients at the time
17   of this e-mail?
18       MR. SCHOCK:  Object to form.
19   BY THE WITNESS:
20       A.   2012.  I was hired in -- it looks --
21   appears that, yes, they would be.
22   BY MR. KIEFFER:
23       Q.   And you were -- fair warning.  This is
24   my term.

## Page 374

1        Were you kind of the relationship
2    manager between Actavis and AmerisourceBergen at
3    this point in time?
4        MR. DIAMANTATOS:  Objection; form.
5        MR. SCHOCK:  Object to form.
6    BY THE WITNESS:
7        A.   I was the -- I was the representative of
8    Actavis on the -- as far as -- on the I guess sales
9    aspect as well as some other responsibilities
10   for -- from Actavis with kind of the liaison
11   between Actavis and AmerisourceBergen.
12   BY MR. KIEFFER:
13       Q.   At the time of this e-mail in
14   December 2012, for lack of a better term, you were
15   the point man for Actavis on the sales side with
16   AmerisourceBergen?
17       MR. DIAMANTATOS:  Objection; form.
18       MR. SCHOCK:  Object to form.
19   BY THE WITNESS:
20       A.   At this particular time I believe, like
21   I said, I was calling on AmerisourceBergen.  So,
22   there's multiple faces with Actavis and
23   AmerisourceBergen.  But as far as the sales, I was
24   one of -- one of the main -- main persons -- people

## Page 375

1    with that.
2    BY MR. KIEFFER:
3        Q.   All right.  I can't recall if you were
4    asked this specific question before.  So, if you
5    were, I apologize.  You were asked some similar
6    ones.
7            Is it true that in no time while you
8    were at Actavis or at Teva did you ever make any
9    sort of suspicious order report about
10   AmerisourceBergen, whether internally or externally
11   to someone like the DEA?  You never made any report
12   of that kind, right?
13       MR. DIAMANTATOS:  Objection; form.
14       MR. SCHOCK:  Object to form.
15   BY THE WITNESS:
16       A.   Best of my knowledge, no, I did not.
17   BY MR. KIEFFER:
18       Q.   And is it also true that in your time at
19   Actavis and later at Teva you never recommended to
20   anyone that Amerisource -- that a report be made
21   about AmerisourceBergen about suspicious ordering,
22   whether an internal report or externally to someone
23   like the DEA?
24       MR. DIAMANTATOS:  Objection; form.

## Page 376

1        MR. SCHOCK:  Object to form.
2    BY THE WITNESS:
3        A.   My -- basically the history that I have
4    is that the only time -- again, I was not on the
5    front end of SOMS, not on the front end of
6    suspicious ordering process.  That was a whole
7    other department.
8            And I -- the only time I have any touch
9    points with that would be after, after something
10   was identified and I needed -- if there was a
11   conversation or additional information that we
12   needed from -- from the customer to understand
13   better what -- what -- from their vantage point,
14   what was the rationale for the increased request
15   for product.
16   BY MR. KIEFFER:
17       Q.   Okay.  So I think, and I'm not trying to
18   quarrel with you, I think you might have answered a
19   slightly different question.  But let me follow up
20   on your answer.
21       A.   Okay.
22       Q.   There were times -- there had been
23   times, whether at Actavis or at Teva, where a
24   customer's order or orders has been flagged as

## Page 377

1    suspicious and you as the point man on behalf of
2    your employer have reached out to the customer and
3    asked them for a justification or an explanation
4    for the order or orders. That's happened, right?
5        MR. DIAMANTATOS: Objection; form,
6    mischaracterizes the witness' prior testimony.
7    BY THE WITNESS:
8        A.   I think you may have, you know, probably
9    seen some of that, seen some examples earlier today
10   where orders was identified and I was to seek out
11   additional information for -- from the customer.
12   BY MR. KIEFFER:
13       Q.   Okay.  And so -- I'm not trying to take
14   away from that.  Okay?
15       A.   Okay.
16       Q.   There has been times where you have
17   sought out additional information from the customer
18   in relation to suspicious order.  We can agree on
19   that?
20       A.   Additional information, yes.
21       Q.   Okay.  But it's true, is it not, that at
22   no time while you were at Actavis or later at Teva
23   have you ever made any recommendation internally
24   that any customer's order or orders be reported as

## Page 378

1    suspicious, that a report be made that these are
2    suspicious orders, whether an internal report
3    within the company or an external report to
4    somebody like the DEA; you have personally not made
5    such a recommendation.  True?
6        MR. DIAMANTATOS:  Objection; form, asked and
7    answered, mischaracterizes the witness' testimony.
8    BY THE WITNESS:
9        A.   Best of my answer -- or best of my
10   recollection, I think we answered this earlier, was
11   that since that's not my department, I was not
12   reporting, to the best of my knowledge, anything
13   to -- to the DEA.
14   BY MR. KIEFFER:
15       Q.   Did it ever come to your attention that
16   at least as of September of 2012 Teva
17   Pharmaceuticals had never identified a single
18   suspicious order that it made a report on to the
19   DEA?
20       MR. DIAMANTATOS:  Objection; form, foundation.
21   BY THE WITNESS:
22       A.   To my knowledge, no.
23   BY MR. KIEFFER:
24       Q.   That's -- today is the first time you

## Page 379

1    heard that?
2        MR. DIAMANTATOS:  Objection; form, foundation,
3    asked and answered.
4    BY THE WITNESS:
5        A.   Yes, correct.
6        MR. KIEFFER:  Will you pull up Exhibit 14 from
7    earlier today.  You're going to want a Bates
8    number.
9        MR. ROTH:  Can we go off the record for a
10   second.
11       THE VIDEOGRAPHER:  We are off the record at
12   5:08 p.m.
13          (WHEREUPON, discussion was had off
14           the record.)
15       THE VIDEOGRAPHER:  We are back on the record
16   at 5:15 p.m.
17       MR. KIEFFER:  Can you pull up Exhibit 14 that
18   was marked earlier today.
19   BY MR. KIEFFER:
20       Q.   Mr. Dorsey, we're back on the record.
21   Are you ready to proceed?
22       A.   Yes.
23       Q.   Okay.  I'm showing you part of
24   Exhibit 14 that was marked in an earlier portion of

## Page 380

1    the exam today.  It's an e-mail string.  There was
2    discussion in there.
3        MR. KIEFFER:  Can you give us the full screen.
4    BY MR. KIEFFER:
5        Q.   Discussion in there about Rochester Drug
6    with an increase in certain purchases that were
7    flagged.  Do you recall that discussion?
8        A.   Earlier today, yes.
9        Q.   Okay.  It was your testimony that you --
10   you were -- as a part of that e-mail exchange, you
11   were the person that was to contact Rochester Drug
12   and see what additional information you could get
13   about the orders that were flagged as concerning?
14       MR. DIAMANTATOS:  Objection; form.
15   BY THE WITNESS:
16       A.   Yes.  There was a request for me to
17   contact Rochester.
18   BY MR. KIEFFER:
19       Q.   Okay.  And you recall in the e-mail
20   string you were asked about a comment from Nancy
21   Baran where she indicated "We should discuss this
22   one further"?
23       A.   I see that line, yes.
24       Q.   Okay.  And I think your earlier

Page 381

1   testimony was other than that line appearing in the
2   e-mail, you don't have a recollection of that
3   issue, correct?
4       A.  Of this -- like this event?
5       Q.  Yes.
6       A.  Yeah, correct.
7       Q.  Did it ever come to your attention that
8   in 2018, after the DEA opened an investigation into
9   Rochester Drug, Teva terminated sales of all
10  controlled substances to Rochester Drug?
11      A.  Yes, it was brought to my attention.
12      Q.  It was brought to your attention?
13      A.  Yes.
14      Q.  How was that brought to your attention?
15      A.  I think, if I recall correctly,
16  Rochester was asking -- they were asking what they
17  could do, and I was not quite -- so, then I think I
18  reached out to our DEA folks, it may have been Tom,
19  the gentleman mentioned before, just to get a
20  background of what was -- why we -- why we stopped
21  shipping Rochester Drug.
22          So, I just got a very high level.  We
23  stopped shipping them.  That's it.  And we're
24  not -- we're not shipping them controls anymore.

Page 382

1       Q.   And the gentleman you mentioned, was it
2   Mr. Tomkiewicz?
3       A.   I believe that is the gentleman that I
4   had the main conversation with, yes.
5       Q.   Okay.  And did you learn from
6   Mr. Tomkiewicz that Teva terminated sales of
7   controlled substances to Rochester Drug because the
8   DEA had opened an investigation into that company,
9   Rochester Drug?
10          MR. DIAMANTATOS:  Objection; form, foundation.
11  BY THE WITNESS:
12      A.   I don't -- like I said, he was like at a
13  very high level, so I'm not -- I don't know the
14  exact reason why we stopped -- we stopped shipping
15  them controls.
16  BY MR. KIEFFER:
17      Q.   You don't know the reasons why?
18      A.   Correct.
19      Q.   Okay.  But you did contact
20  Mr. Tomkiewicz and you learned as a part of that
21  two things:  one, that Teva was no longer shipping
22  controlled substances to Rochester Drug and, two,
23  that the DEA had an ongoing investigation into
24  Rochester Drug?

Page 383

1           MR. DIAMANTATOS:  Objection; form, foundation.
2   BY THE WITNESS:
3       A.   I remember just top of mind right now
4   that we did stop shipping them.  As to the DEA
5   investigation, I'm not quite sure if that -- I
6   don't remember that right now, if that was also
7   shared at the same time.  It was basically we're
8   done shipping.
9       Q.   Okay.  But you know that now?
10      A.   Yes.
11      Q.   All right.  And you recall learning this
12  in 2018?
13      A.   I don't know the exact time, timeline
14  when it was.  Sorry.
15      Q.   If other evidence and testimony in the
16  case, for example, the testimony of Mr. Tomkiewicz
17  is that it was in 2018 that Teva -- pardon me --
18  that Teva terminated sales of controlled substances
19  to Rochester Drug, do you have a memory different
20  than that?  Do you dispute that?
21          MR. DIAMANTATOS:  Objection; form,
22  argumentative.
23  BY THE WITNESS:
24      A.   Again, since that's not in my -- my -- I

Page 384

1   guess I wouldn't know exactly when it was because
2   it's not in my as far as responsibility.  So, I
3   would not -- would not know if -- when the exact
4   date was.
5   BY MR. KIEFFER:
6       Q.   Okay.  Fair enough.
7           Are you aware of the fact that at no
8   time between the e-mail exchange that you had
9   regarding Rochester Drug back in January of 2013
10  and 2018 when Teva finally suspended sales did
11  anyone at Teva make a report to the DEA about
12  suspicious ordering on the part of Rochester Drug?
13          MR. DIAMANTATOS:  Objection; form, foundation,
14  calls for speculation, asked and answered.
15  BY THE WITNESS:
16      A.   Again, based upon it's outside of my
17  realm of expertise that that -- I was unaware if
18  there was a report or not a report on Rochester
19  Drug in that time frame you explained.
20  BY MR. KIEFFER:
21      Q.   Do you have any recollection back in
22  January of 2013 of discussing internally whether
23  anyone ought to make a report to the DEA about
24  Rochester Drug?

Page 385

1    MR. DIAMANTATOS:  Objection; form, foundation.
2  BY THE WITNESS:
3       A.   At this particular time, no, I don't
4  have any recollection.
5  BY MR. KIEFFER:
6       Q.   Sorry?
7       A.   I said at this particular time, I guess
8  nothing is striking me that I have that
9  recollection.
10      MR. KIEFFER:  Can you pull up document 16 for
11  me.
12          (WHEREUPON, a certain document was
13           marked Allergan-Dorsey Exhibit
14           No. 25:  1/4/17 e-mail string;
15           TEVA_MDL_A_06418852 - 06418855.)
16  BY MR. KIEFFER:
17      Q.   Mr. Dorsey, document 16 -- I'm sorry.
18  What we just handed you is Exhibit 25, and it bears
19  a Bates number in the bottom right-hand corner
20  TEVA_MDL_06418852 to 06418855.  It's an e-mail
21  string.
22          Do you see that?
23      A.   Yes.
24      Q.   Okay.  This e-mail string in the -- on

Page 386

1  the first page of it, the subject line is
2  "Prescription Supply, Inc.," correct?
3       A.   Yes.
4       Q.   If you look at the bottom of the first
5  page of Exhibit 25, there is an e-mail from
6  Mr. Tomkiewicz to a couple of people, carbon
7  copying you and some others.
8           Do you see that?
9       A.   Yes.
10      Q.   Okay.  And it states after the
11  salutation, "Please note that all controlled
12  substance orders for this customer will be placed
13  on hold until we receive the following information
14  from the customer."
15          Do you see that?
16      A.   Yes.
17      Q.   The first item of information indicated
18  is, "An overview of their new customer due
19  diligence process."
20          Do you see that?
21      A.   Yes.
22      Q.   Second item is "Knowledge/materials/etc.
23  indicating the relationship between Intermed
24  Distributors, Inc. and Nazih Jawad," a pharmacist.

Page 387

1           Do you see that?
2       A.   Okay, yes.
3       Q.   And then Item 3, "An acknowledgment that
4  Teva Pharmaceuticals (which includes Actavis), is
5  not comfortable with our controlled substances
6  being sold to the following registrants."  The
7  first registrant is Hope Pharmacy and the second is
8  Intermed Distributors, Inc.
9           Do you see that?
10      A.   Yes.
11      Q.   Okay.  And I neglected to indicate the
12  e-mail is dated January 2 of 2017, correct?
13      A.   January 4 -- sorry.  January 2, yes.
14      Q.   You were working for Teva at that time,
15  right?
16      A.   Yes.
17      Q.   If you go up further on that page to the
18  top, there is an e-mail from Mr. Tomkiewicz
19  directly to you carbon copying several other folks,
20  this one dated January 4, 2017.
21          Do you see that?
22      A.   Yes.
23      Q.   Mr. Tomkiewicz writes, "Mike, thanks for
24  setting up the call with Prescription Supply, Inc.

Page 388

1  Per our conversation, I've reinstated their ability
2  to order controlled substances on our end."
3           Do you see that?
4       A.   Yes.
5       Q.   Then he goes on to indicate to you,
6  "Sarah and I discussed Hope Pharmacy," and he puts
7  their number there, "and based on the information
8  PSI supplied regarding this registrant, please let
9  PSI know that we will not be rejecting chargebacks
10  for Hope, nor will we ask PSI to cease selling
11  controlled substances to them."
12          Do you see that?
13      A.   Yeah, okay.  Yes.
14      Q.   Okay.  What recollection do you have of
15  this call that Mr. Tomkiewicz references that you
16  set up with Prescription Supply?
17      MR. DIAMANTATOS:  Objection; form, foundation.
18  BY THE WITNESS:
19      A.   This whole -- again, I think this looks
20  like what it is.  It's a -- it's a good example of
21  the SOMs process and notifying -- notifying
22  accounts that our accounts are selling to, kind of
23  working together, and then Joe would ask for a like
24  here's the -- here's what's standing out and we

Page 389

1    need to get more information.
2        And then part of that information then
3    was also setting up, setting up a phone call and
4    e-mails work to a certain degree as far as
5    garnering information but sometimes it's better,
6    you know, over a call voice to voice.
7        That's all I remember is that, you know,
8    we, you know, had that call with -- and I don't
9    know.  I believe -- and I'm unsure if I was on it
10   or not.  But there was a call between Joe and PSI
11   or Prescription Supply, Incorporated.
12       Q.   Do you recall anything about the
13   substance of that call?
14       A.   No, not -- not exactly.  It would be
15   centering around, though, the concerns that we --
16   that our SOMs department, that Joe had.
17       Q.   The concerns that the suspicious order
18   monitoring department, Mr. Tomkiewicz had, some of
19   that is laid out in his e-mail here at the bottom
20   of this first page of Exhibit 25, correct?
21       MR. DIAMANTATOS:  Objection.
22   BY MR. KIEFFER:
23       Q.   What we just went through?
24       MR. DIAMANTATOS:  Sorry.  Objection; form,

Page 390

1    foundation, calls for speculation.
2    BY THE WITNESS:
3        A.   All I can do is based -- is like
4    yourself, go off of what's written here and there's
5    three points of information that we're looking --
6    that we're looking for information from the
7    account.
8    BY MR. KIEFFER:
9        Q.   Okay.  And let me focus for a moment on
10   the issue related to Hope Pharmacy.  At the bottom
11   of the page, Item 3, Mr. Tomkiewicz on January 2 of
12   2017, one of the things he wanted was an
13   acknowledgment that Teva Pharmaceuticals was not
14   comfortable with its controlled substances being
15   sold to Hope Pharmacy, right?  Do you see that?
16       A.   Yes, I see that.
17       Q.   Okay.  And he even goes on to say in the
18   last paragraph there, "I've attached recent
19   disciplinary materials on Hope Pharmacy; please
20   forward to Prescription Supply for their records."
21       Do you see that?
22       A.   Yes.
23       MR. KIEFFER:  Can you pull up Exhibit 17 for
24   me.

Page 391

1        (WHEREUPON, a certain document was
2        marked Allergan-Dorsey Exhibit
3        No. 26: Accusation before the
4        State of California Board of
5        Pharmacy; TEVA_MDL_A_02311164 -
6        02311181.)
7    BY MR. KIEFFER:
8        Q.   Do you have Exhibit 26 in front of you?
9        A.   Yes.
10       Q.   Sir, Exhibit 26 bears a Bates No. of
11   TEVA_MDL_02311164, and it is the disciplinary
12   materials that were attached to Mr. Tomkiewicz's
13   e-mail that is Exhibit 25 pertaining to Hope
14   Pharmacy.  All right?
15       A.   Okay.
16       Q.   Okay.  This is a document captioned
17   "Accusation" filed before the Board of Pharmacy for
18   the State of California by Kamala Harris who was
19   then Attorney General of California.
20       Do you see that?
21       A.   Yes, I see that.
22       Q.   Take a look, if you would, sir, at
23   actually page -- original Page No. 9 of Exhibit 26,
24   which is Bates No. 02311172.

Page 392

1        A.   Okay.
2        Q.   Take a look at paragraph 24 there, if
3    you would.
4        A.   All right.
5        Q.   Paragraph 24 indicates that on
6    February 24, 2014, Respondent by the name of Mah
7    e-mailed the board a DEA notification stating that
8    Respondent Hope Pharmacy had lost 1,790 tablets of
9    a hydrocodone product and 1,500 milliliters of
10   another, promethazine with codeine.
11       Do you see that?
12       A.   Yes.
13       Q.   And then if you take a look at paragraph
14   26, a little further down that page.
15       A.   All right.
16       Q.   That references an audit that was
17   conducted and it indicates that Respondent Hope
18   Pharmacy was short 16,919 tablets of HPAP 5/500,
19   19,043 milliliters of promethazine with codeine and
20   16,814 tablets of a hydrocodone product.
21       Do you see that?
22       A.   Yes.
23       Q.   If true, those are concerning
24   allegations, are they not?

Page 393

1     MR. DIAMANTATOS:  Objection; form, foundation,
2  calls for a legal conclusion.
3  BY THE WITNESS:
4     A.  I guess it's -- I don't know how to --
5  how to comment on as far as this report.  First
6  time I've seen it.  So, it looks like employee
7  pilferage.
8  BY MR. KIEFFER:
9     Q.  Okay.  Let me ask a question.  Let me
10  follow up on what you just said.  You said this is
11  the first time you've seen this.
12        Did you not open up what was attached to
13  Mr. Tomkiewicz's e-mail when he raised these issues
14  and requested an acknowledgment that Teva was not
15  comfortable with its controlled substances being
16  sold to Hope Pharmacy?
17     A.  I more than likely just forwarded on per
18  his request to -- to -- I think he wanted me to
19  forward it on to PSI, right?  "Please forward to
20  Prescription Supply for their records."
21        So, since it was a big lengthy document,
22  I don't have any recollection of fully reading this
23  word for word.
24     Q.  Do you know if you opened it and looked

Page 394

1  at it at all?
2     MR. DIAMANTATOS:  Objection; asked and
3  answered.
4  BY THE WITNESS:
5     A.  I don't know.
6  BY MR. KIEFFER:
7     Q.  Don't know?
8     A.  I don't know.
9     Q.  If you take a look at original document
10  page 13, which is Teva MDL 02311176.
11     A.  Okay.
12     Q.  All right.  The large caption about
13  two-thirds of the way down the page says, "First
14  Cause for Discipline."
15        Do you see that?
16     A.  Yes.
17     Q.  And in the parenthetical it says,
18  "Failure to safely and properly prepare, maintain,
19  secure and distribute drugs - Respondents Hope
20  Pharmacy and Mah."
21        Do you see that?
22     A.  Yes.
23     Q.  And then if you -- if you turn the
24  page to the next page, which is original document

Page 395

1  page 14, there is a second cause for discipline
2  identified again against Respondents Hope Pharmacy
3  and Mah for "Failure to maintain records of
4  acquisition, disposition and current drug
5  inventory."
6        Do you see that?
7     A.  Yes.
8     Q.  And then there is a third cause for
9  discipline identified again against Respondents
10  Hope Pharmacy and Mah, "Failure to maintain theft
11  and impairment policies and procedures."
12        Do you see that?
13     A.  Yes.
14     Q.  You told us a moment ago you don't have
15  a recollection of whether you actually even opened
16  and looked at this document when it was forwarded
17  to you by Mr. Tomkiewicz back in 2017, correct?
18     A.  Correct.
19     Q.  Okay.  Having just looked at a portion
20  of it, do these allegations and the disciplinary
21  action that the California Board of Pharmacy was
22  seeking to take against Hope Pharmacy, do they
23  cause you any concern --
24     MR. DIAMANTATOS:  Objection.

Page 396

1  BY MR. KIEFFER:
2     Q.  -- about whether Teva was selling its
3  products to a customer PSI who in turn apparently
4  was selling them to an enterprise where they were
5  being potentially pilfered or diverted?
6     MR. DIAMANTATOS:  Objection; form, foundation,
7  calls for speculation.
8  BY THE WITNESS:
9     A.  It's -- again, it's hard to make any
10  comment.  It's outside of my -- my discipline to
11  really fully understand the scope, and I leave that
12  really for to our internal experts.
13  BY MR. KIEFFER:
14     Q.  Okay.  When you set up this call with
15  Prescription Supply that Mr. Tomkiewicz references
16  here, do you recall whether the -- the accusations
17  by the California Board of Pharmacy against Hope
18  Pharmacy were a topic of discussion?
19     A.  I don't recall what, I guess what was
20  all, you know, specifically what was discussed
21  during, during that phone call.
22     Q.  Okay.  Nothing at all?
23     A.  Correct.
24     Q.  Okay.  Based upon, if we go back to

Page 397

1    Exhibit 25, the first e-mail at the top of the
2    page, Mr. Tomkiewicz's e-mail to you, second
3    paragraph, he has apparently moved past this
4    point his insistence that Teva get an
5    acknowledgment that it's not comfortable with its
6    controlled substances being sold to Hope Pharmacy
7    and he's actually indicating that Teva will not ask
8    PSI to cease selling controlled substances to Hope
9    Pharmacy.  Correct?
10        A.   That's how it reads, yes.
11        Q.   And you don't have any recollection of
12    what information, if any, was shared during that
13    call with Prescription Supply to get Teva over
14    whatever concerns it had just two days earlier
15    about its controlled substances being sold to Hope
16    Pharmacy, correct?
17        MR. DIAMANTATOS:  Objection; form, foundation,
18    calls for speculation, asked and answered.
19    BY THE WITNESS:
20        A.   That is correct.  I don't have any
21    recollection.
22    BY MR. KIEFFER:
23        Q.   Okay.
24        MR. KIEFFER:  Let's go off the record for a

Page 398

1    second.  I think I'm done, but let me take a quick
2    look.
3        THE VIDEOGRAPHER:  We are off the record at
4    5:38 p.m.
5            (WHEREUPON, discussion was had off
6             the record.)
7        THE VIDEOGRAPHER:  We're back on the record at
8    5:39 p.m.
9        MR. KIEFFER:  Mr. Dorsey, just to wrap up.
10    BY MR. KIEFFER:
11        Q.   You were asked at least one question
12    earlier in the day that used the phrase "opioid
13    epidemic."  Do you recall that, that phraseology
14    being used?
15        A.   A long day.  Yes, I think so.  I think
16    so.
17        Q.   Do you believe this country is in the
18    middle of an opioid epidemic?
19        MR. DIAMANTATOS:  Objection; form.
20    BY THE WITNESS:
21        A.   I believe there is a lot of challenges
22    that our country have, whether it's -- you've got
23    illegal -- what you read, you've got synthetic
24    fentanyl coming over from China that we're having

Page 399

1    challenges with.  You've got challenges with
2    individuals that are -- for varied reasons that
3    there is challenges.
4            And it's sad that there is all these
5    deaths due to various illicit drugs or whatever the
6    scenario is.  So, it's -- it's unfortunate, and
7    I'm -- it's sad to hear that there is this -- this
8    going on in this country.
9    BY MR. KIEFFER:
10        Q.   And I appreciate that, and I think we
11    can agree on that.  My question was simply:  Do you
12    personally believe this country is in the middle of
13    an opioid epidemic?
14        MR. DIAMANTATOS:  Objection; form.
15    BY MR. KIEFFER:
16        Q.   Yes or no.
17        MR. DIAMANTATOS:  Objection; form, asked and
18    answered and objection; instructing the witness how
19    to answer.
20    BY THE WITNESS:
21        A.   I don't have enough information.  In
22    order for me to make an informed decision that's a
23    yes-no, you need to have all the facts, all the
24    numbers, how it's -- you're getting to those

Page 400

1    numbers; and I don't have that presented to me to
2    say yes or no that there's an epidemic.
3    BY MR. KIEFFER:
4        Q.   Okay.  And if representatives of the
5    Federal Government as well as other representatives
6    from Teva have given sworn testimony that -- if
7    representatives of the Federal Government have made
8    statements that the country is in the midst of an
9    opioid epidemic and other witnesses from Teva have
10    given sworn testimony that they agree that the
11    country is in the middle of opioid epidemic, would
12    your answer be any different than what you just
13    gave us a moment ago?
14        MR. DIAMANTATOS:  Objection; form.
15    BY MR. KIEFFER:
16        Q.   You'd have to look at all the data
17    first?
18        MR. DIAMANTATOS:  Objection; form, foundation,
19    argumentative.
20    BY THE WITNESS:
21        A.   I think there is that piece and then
22    have conversations with those who -- who are the
23    experts.  I'm not an expert.
24        MR. KIEFFER:  Those all the questions I

Page 401

1    have for you.  Thank you for your time today, sir.
2       THE WITNESS:  Thank you.
3       MR. DIAMANTATOS:  I just want to make a
4    statement for the record.
5          This morning Mr. Kieffer introduced
6    himself as an entity or individual that represents
7    the Teva Plaintiffs.
8          Mr. Kieffer was one of the two
9    Plaintiffs' lawyers questioning the witness today.
10   He began his questioning, according to the
11   videographer's time stamp, at 3:29 p.m., which put
12   us at a point where we were about four hours into
13   the deposition.
14          Mr. Kieffer introduced himself to the
15   witness who is being deposed today as representing
16   the Teva Plaintiffs.
17          On a break I asked Mr. Kieffer who he
18   represents in light of the description to the
19   witness both this morning for the record and then
20   thereafter to the witness as representing the Teva
21   Plaintiffs, I asked for some clarity as to who he
22   represents.
23          Mr. Kieffer said, once again, that he
24   represents the Teva Plaintiffs.

Page 402

1          I'd just like to make a note that
2    according to the deposition protocol entered in
3    this case that governs attendance for the
4    deposition, among other things, as well as the
5    conduct of depositions, among other things,
6    including witness examination, first, with regard
7    to witness attendance under that deposition
8    protocol, which is Docket No. 15569 in MDL -- in
9    the MDL in this case, under Section I.2.e, "Who May
10   be Present.  Unless otherwise ordered under the
11   Federal Rules of Civil Procedure 26(c) and subject
12   to the terms of the protective order entered in the
13   MDL proceedings, only the following individuals may
14   attend depositions:  counsel of record or attorneys
15   and employees of their firms, attorneys
16   specifically engaged by a party for purposes of the
17   deposition, parties or in-house attorneys of a
18   party, court reporters, videographers, the deponent
19   and counsel for the deponent."
20          The paragraph then goes on, but I've
21   read the pertinent part I'd like to put on the
22   record.
23          In addition, under Section 3.II.a of the
24   deposition protocol entered by his Honor in this

Page 403

1    case, "Examination.  Absent extraordinary
2    circumstances, questioning related to the MDL
3    Deposition Notice or cross-examination should be
4    conducted by no more than two MDL examiners for all
5    MDL Plaintiffs in the case of depositions noticed
6    by Plaintiffs.  Likewise, for depositions noticed
7    by Defendants, questioning should be conducted by
8    no more than two attorneys for each Defendant
9    group."
10          The deposition protocol then goes on,
11   but I've read the pertinent part.
12          For the record I would just like to note
13   Mr. Kieffer's absence of his appearance in the MDL,
14   the absence of anybody from his firm's appearance
15   in this MDL and, once again, his refusal other than
16   to say he represents the Teva Plaintiffs in this
17   matter.
18          I, of course, am just stating the
19   objection for the record.  Mr. Kieffer was allowed
20   to question the witness, and I did not interrupt
21   Mr. Kieffer's ability to do that and, in fact, the
22   witness has now been asked questions in excess of
23   seven hours.
24       MR. KIEFFER:  I'll briefly respond to

Page 404

1    counsel's point.
2          I did use the phrase "Teva Plaintiffs."
3    As I explained, when we were off the record, that
4    is probably inartful phraseology by me.  We are
5    Plaintiffs' counsel for multiple Plaintiffs
6    nationwide, our firm.  We are also associated
7    counsel with the Skikos Crawford firm and are a
8    part of the case against the Teva Defendants on
9    behalf of Plaintiffs nationwide.
10          If Teva counsel finds that to be still
11   unsatisfactory, I am happy to engage in whatever
12   further exchange we need, whether formal or
13   informal.
14          It is my understanding, and I'm happy to
15   be corrected now or later, but it is my
16   understanding that multiple lawyers from the Skikos
17   Crawford firm as well as multiple law partners of
18   my own, including Brian Madden and Tom Cartmell,
19   have attended and taken multiple depositions in
20   this case with a substantially similar
21   representation as what I just made, Plaintiffs
22   nationwide.
23          So, to the extent that the term "counsel
24   for the Teva Plaintiffs" caused concern, hopefully

Page 405

1    I've corrected that.
2        Anyway.  That's all I've got.
3        And I'm not sure the witness was
4    questioned in excess of seven hours.  If he was, it
5    was by a minute or two.  But anyway.
6        Nothing further.  Thank you, sir.
7    THE WITNESS:  Thank you.
8        THE VIDEOGRAPHER:  We are off the record at
9    5:46 p.m.
10       (Time Noted:  5:46 p.m.)
11   FURTHER DEPONENT SAITH NAUGHT.
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 406

1        I, CORINNE T MARUT, C S R No 84-1968,
2    Registered Professional Reporter and Certified
     Shorthand Reporter, do hereby certify:
3        That previous to the commencement of the
     examination of the witness, the witness was duly
4    sworn to testify the whole truth concerning the
     matters herein;
5        That the foregoing deposition transcript
     was reported stenographically by me, was thereafter
6    reduced to typewriting under my personal direction
     and constitutes a true record of the testimony
7    given and the proceedings had;
8        That the said deposition was taken
     before me at the time and place specified;
9        That the reading and signing by the
     witness of the deposition transcript was agreed
10   upon as stated herein;
11       That I am not a relative or employee or
     attorney or counsel, nor a relative or employee of
     such attorney or counsel for any of the parties
12   hereto, nor interested directly or indirectly in
     the outcome of this action
13
14       CORINNE T  MARUT, Certified Reporter
15
16       (The foregoing certification of this
     transcript does not apply to any
     reproduction of the same by any means, unless under
17   the direct control and/or supervision of the
     certifying reporter )
18
19
20
21
22
23
24

Page 407

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over
4    carefully and make any necessary corrections.  You
5    should state the reason in the appropriate space on
6    the errata sheet for any corrections that are made.
7        After doing so, please sign the errata
8    sheet and date it.
9        You are signing same subject to the
10   changes you have noted on the errata sheet, which
11   will be attached to your deposition.
12       It is imperative that you return the
13   original errata sheet to the deposing attorney
14   within thirty (30) days of receipt of the
15   deposition transcript by you.  If you fail to do
16   so, the deposition transcript may be deemed to be
17   accurate and may be used in court.
18
19
20
21
22
23
24

Page 408

1        - - - - - -
     E R R A T A
2        - - - - - -
3
4    PAGE  LINE  CHANGE
5    ____  ____  _____
6        REASON: _____
7    ____  ____  _____
8        REASON: _____
9    ____  ____  _____
10       REASON: _____
11   ____  ____  _____
12       REASON: _____
13   ____  ____  _____
14       REASON: _____
15   ____  ____  _____
16       REASON: _____
17   ____  ____  _____
18       REASON: _____
19   ____  ____  _____
20       REASON: _____
21   ____  ____  _____
22       REASON: _____
23   ____  ____  _____
24       REASON: _____

Page 409

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
 4         I, MICHAEL STEPHEN DORSEY, do hereby
 5    certify under oath that I have read the foregoing
 6    pages, and that the same is a correct transcription
 7    of the answers given by me to the questions therein
 8    propounded, except for the corrections or changes
 9    in form or substance, if any, noted in the attached
10    Errata Sheet.
11
12
13    _____
14    MICHAEL STEPHEN DORSEY          DATE
15
16
17    Subscribed and sworn
      to before me this
18    _____ day of _____, 20_____.
19    My commission expires:_____
20
      _____ Notary Public
21
22
23
24
```

Page 410

LAWYER'S NOTES

PAGE  LINE

```
 1
 2
 3    _____  _____   _____
 4    _____  _____   _____
 5    _____  _____   _____
 6    _____  _____   _____
 7    _____  _____   _____
 8    _____  _____   _____
 9    _____  _____   _____
10    _____  _____   _____
11    _____  _____   _____
12    _____  _____   _____
13    _____  _____   _____
14    _____  _____   _____
15    _____  _____   _____
16    _____  _____   _____
17    _____  _____   _____
18    _____  _____   _____
19    _____  _____   _____
20    _____  _____   _____
21    _____  _____   _____
22    _____  _____   _____
23    _____  _____   _____
24    _____  _____   _____
```