Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION


IN RE NATIONAL PRESCRIPTION    | Case No. 17-MD-2804
                               |
OPIATE LITIGATION              | Hon. Dan A. Polster
                               |
APPLIES TO ALL CASES           |


- - -

Friday, November 16, 2018

- - -


HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW

- - -




        Videotaped deposition of CHAD DUCOTE, held
at the offices of Mitchell Williams,
4206 South J.B. Hunt Drive, Suite 200, Rogers,
Arkansas, commencing at 8:04 a.m., on the above
date, before Susan D. Wasilewski, Registered
Professional Reporter, Certified Realtime
Reporter and Certified Realtime Captioner.



- - -


GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

## Page 2

```
 1   APPEARANCES:
 2   CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P C
     BY:  ZACHARY S  BOWER, ESQUIRE
 3       MICHAEL A  INNES, ESQUIRE
     5 Becker Farm Road
 4   Roseland, New Jersey 07068
     (973) 994-1700
 5   zbower@carellabyrne.com
     minnes@carellabyrne.com
 6   Representing Plaintiffs
 7
 8   JONES DAY
     BY:  TARA A  FUMERTON, ESQUIRE
 9       SCOTT B  ELMER, ESQUIRE
     77 West Wacker
10   Chicago, Illinois 60601
     (312) 782-3939
11   tfumerton@jonesday.com
     selmer@jonesday.com
12   Representing Walmart
13
14   PELINI CAMPBELL & WILLIAMS LLC
     BY:  CRAIG M  EOFF, ESQUIRE
15   8040 Cleveland Avenue NW, Suite 400
     North Canton, Ohio 44720
16   (330) 305-6400
     ceoff@pelini-law.com
17   Representing Prescription Supply Inc
18
19   BARBER LAW FIRM
     BY:  M  EVAN STALLINGS, ESQUIRE
20   425 West Capitol Avenue, Suite 3400
     Little Rock, Arkansas 72201
21   (501) 372-6175
     estallings@barberlawfirm.com
22   Representing Cardinal Health
23
24
25
```

## Page 3

```
 1   APPEARANCES VIA TELEPHONE AND STREAM:
 2   REED SMITH LLP
     BY:  LINDSAY A  DeFRANCESCO, ESQUIRE
 3   1301 K Street, N W , Suite 1000 - East Tower
     Washington, D C  20005
 4   (202) 414-9200
     ldefrancesco@reedsmith.com
 5   Representing AmerisourceBergen Drug Corporation
 6
 7   MARCUS & SHAPIRA LLP
     BY:  RICHARD HALPERN, ESQUIRE
 8   One Oxford Centre, 35th Floor
     Pittsburgh, Pennsylvania 15219
 9   (412) 471-3490
     halpern@marcus-shapira.com
     Representing HBC Service Company
10
11   MORGAN, LEWIS & BOCKIUS LLP
     BY:  MATTHEW LADD, II, ESQUIRE
12   101 Park Avenue
     New York, New York 10178-0060
13   (212) 309-6000
     ladd@morganlewis.com
14   Representing Rite Aid
15
16   BARTLIT BECK LLP
     BY:  ALEX HARRIS, ESQUIRE
     1801 Wewatta Street, Suite 1200
17   Denver, Colorado 80202
     (303) 592-3100
18   alex harris@bartlit-beck.com
     Representing Walgreens
19
20   COVINGTON & BURLING LLP
     BY:  MARINA DALIA-HUNT, ESQUIRE
21   3000 El Camino Real, 5 Palo Alto Square, 10th Floor
     Palo Alto, California 94306-2112
22   (650) 632-4700
     mdaliahunt@cov.com
23   Representing McKesson
24   ALSO PRESENT:
     DAN LAWLOR, Videographer
25   JENNIFER B  BECHET, ESQUIRE, Walmart Legal
```

## Page 4

```
 1   - - -
 2   I N D E X
 3   - - -
 4   Testimony of:  CHAD DUCOTE          Page
 5   DIRECT EXAMINATION BY MR  INNES              7
 6   CROSS-EXAMINATION BY MS  FUMERTON          293
 7
 8   E X H I B I T S
 9   (Attached to transcript)
10   CHAD DUCOTE DEPOSITION EXHIBITS          PAGE
11   Walmart -    LinkedIn Web Page - Chad Ducote   19
     Ducote
12   Exhibit 1
13   Walmart -    E-mail - Subject:  REVIEW -       63
     Ducote       Interim SOM Processes
14   Exhibit 2    WMT_MDL_000022832 through 22835
15   Walmart -    E-mail - Subject:  Wal-Mart       69
     Ducote       Stores East, LP, Bentonville, AR
16   Exhibit 3    - 1st Corporate P&P Review Report
                  WMT_MDL_000016251 through 16254
17   Walmart -    E-mail - Subject:  Per your call   73
     Ducote       WMT_MDL_000019447 and 19448
18   Exhibit 4
19   Walmart -    E-mail - Subject:  Som position    92
     Ducote       WMT_MDL_000016686 and 16687
20   Exhibit 5
21   Walmart -    E-mail - Subject:  SOM overview   136
     Ducote       WMT_MDL_000009158 through 9160
22   Exhibit 6
23   Walmart -    E-mail - Subject:  SOM Pilot at   145
     Ducote       DC 6045
24   Exhibit 7    WMT_MDL_000008147 through 8148
25
```

## Page 5

```
 1   E X H I B I T S
 2   (Attached to transcript)
 3   CHAD DUCOTE DEPOSITION EXHIBITS          PAGE
 4   Walmart -    E-mail - Subject:  Updated SOM   151
     Ducote       Overview May 2015.1.pptx
 5   Exhibit 8    WMT_MDL_000019339 and 19340
 6   Walmart -    E-mail - Subject:  (No subject)   238
     Ducote       WMT_MDL_000020060 and 20061
 7   Exhibit 9
 8   Walmart -    E-mail - Subject:  SOM Alerts     262
     Ducote       WMT_MDL_000007345
 9   Exhibit 10
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

**Page 6**

1          ---
2              THE VIDEOGRAPHER:  We are now on the record.
3     My name is Dan Lawlor.  I'm a videographer of
4     Golkow Litigation Services.
5              Today's date is November 16, 2018, and the
6     time is 8:04 a.m.
7              This video deposition is being held in
8     Rogers, Arkansas, in the matter of National
9     Prescription Opiate Litigation, MDL Number 2804.
10    The deponent is Chad Ducote.
11             Counsel will be noted on the stenographic
12    record.
13             The court reporter is Susan Wasilewski and
14    will now swear in the witness.
15             THE COURT REPORTER:  Sir, would you raise
16    your right hand.
17             Do you solemnly swear or affirm the
18    testimony you're about to give will be the truth,
19    the whole truth, and nothing but the truth?
20             THE WITNESS:  Yes.
21             THE COURT REPORTER:  Thank you.
22             CHAD DUCOTE, called as a witness by the
23    Plaintiffs, having been duly sworn, testified as
24    follows:
25

**Page 7**

1                DIRECT EXAMINATION
2     BY MR. INNES:
3          Q.  Good morning, Mr. Ducote.  My name is
4     Michael Innes.  I represent the plaintiffs in this
5     case.  Thank you for being here today.  Thank you
6     for starting a little bit earlier than usual.  I do
7     appreciate that.
8              Could you state your full name for the
9     record.
10         A.  Full name is Chad Edward Ducote.
11         Q.  What is your current occupation?
12         A.  Current occupation is Division Vice
13    President for Supply Chain.
14         Q.  And for what company?
15         A.  Walmart.
16         Q.  Thank you.
17             You understand that you're under oath,
18    right?
19         A.  Yes.
20         Q.  And are you taking any medication or is
21    there any other reason that would interfere with
22    your ability to answer my questions fully and
23    truthfully today?
24         A.  No.
25         Q.  Some basic ground rules -- well, let me

**Page 8**

1     start here.  Have you ever sat for a deposition
2     before?
3          A.  Years ago.
4          Q.  Years ago.  So you might know the ground
5     rules.  I'll go over some basic ones.  If I ask a
6     question you don't understand, please let me know
7     and I'll try to rephrase it.
8          A.  Okay.
9          Q.  If you do answer my question, I'll assume
10    you understand the question.
11             Your answers must be audible, spoken.  The
12    court reporter can't take down a nod, so we just
13    need to have a spoken answer.
14             You said you -- you testified in a
15    deposition years ago?
16         A.  Yes.
17         Q.  Do you recall what that was?
18         A.  It was an employment issue.
19         Q.  And was that related to your employment at
20    Walmart?
21         A.  Yes.
22         Q.  And what particularly did that apply to?
23         A.  It was a litigation regarding an individual
24    that was terminated.
25         Q.  So were you a plaintiff or a defendant in

**Page 9**

1     the case?
2          A.  Walmart was who was being sued.
3          Q.  Walmart was being sued?
4          A.  Yes.
5          Q.  And you were a witness for Walmart?
6          A.  Yes.
7          Q.  Okay.  Did that have anything to do with
8     Schedule II narcotics?
9          A.  No.
10         Q.  Did it have anything to do with dispensing?
11         A.  No.
12         Q.  Who are the people seated with you today?
13         A.  Tara.  I'm sorry, I do not recall --
14             MS. FUMERTON:  He's not going to be
15    offended.
16         A.  Paul?  No.  Sorry.
17             The attorneys that represent me.
18         Q.  Fair question.  And I'm sorry, is the woman
19    at the end of the table --
20         A.  Jennifer.
21             MS. FUMERTON:  I can handle it.  Jennifer
22    Bechet, who was in-house counsel at Walmart.
23    BY MR. INNES:
24         Q.  Mr. Ducote, what did you do to prepare for
25    this deposition today?

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    A.  I had three meetings with attorneys.
2    Q.  How long were those meetings?
3    A.  They ranged from four hours to eight to nine
4  hours.
5    Q.  And when were those meetings?
6    A.  One was yesterday, one was the day before
7  and another was last either Thursday or Friday.  I
8  can't recall exactly.
9    Q.  Who was present at those meetings?
10    A.  The one that was last week was via a Zoom
11  videoconference.  I don't remember everyone who was
12  present.  And Tara was present on that one last
13  week.  The meeting this week, Tara was present,
14  Jennifer was present and there were other attorneys
15  who were present.
16    Q.  Were there any non-attorneys who were
17  present?
18    A.  No.
19    Q.  Were the attorneys all from either Walmart
20  in-house counsel or Jones Day?
21    A.  There were a combination of both.
22    Q.  But there were no attorneys from an entity
23  other than Jones Day or Walmart?
24    A.  No.
25    Q.  Did you review any documents?

Page 11

1    A.  Yes.
2    Q.  Did you review documents with counsel in
3  those meetings?
4    A.  Could you restate that.
5    Q.  Did you review documents with counsel in
6  those meetings?
7    A.  You're referring to the attorneys that were
8  present?
9    Q.  Yes.
10    A.  Yes.
11    Q.  Did you review any documents for preparation
12  for the deposition outside of counsel?
13    A.  No.
14    Q.  Did you review any deposition or trial
15  testimony?
16    A.  No.
17    Q.  Did you review any court documents?
18    MS. FUMERTON:  Objection.  I don't think
19  that is going to -- are you asking outside of the
20  questioning of while we were in the meeting or
21  with the attorneys?
22    MR. INNES:  In general.
23  BY MR. INNES:
24    Q.  The question is did you review any court
25  documents in preparation for today's deposition?

Page 12

1  Yes-or-no question.
2    MS. FUMERTON:  Yeah, but how is that not
3  going to be privileged information?
4    MR. INNES:  It's a yes or no.
5    MS. FUMERTON:  I understand.  But I think to
6  the extent you're asking about what documents he
7  reviewed while he was with counsel --
8    MR. INNES:  So you're objecting to the fact
9  there was a court document?
10    MS. FUMERTON:  No, I'm objecting to the fact
11  that you were asking what documents he was
12  reviewing with counsel.
13  BY MR. INNES:
14    Q.  Did you review any documents -- I apologize.
15  I may have asked this already.
16    Did you review any court documents outside
17  the presence of counsel?
18    A.  Just state it one more time to make sure I
19  fully understand.
20    Q.  Did you review any court documents outside
21  the presence of counsel?
22    A.  No, not that I'm aware of, that there were
23  any court documents.
24    Q.  Have you read the complaint in this case?
25    A.  No.

Page 13

1    Q.  Have you looked at your own personal
2  documents or electronic files, that kind of
3  documents, that might be relevant to this litigation
4  or might refresh your recollection?
5    MS. FUMERTON:  And give just a second to
6  object.
7    Again, I'm going to have a standing
8  objection if you're asking to anything that we
9  had reviewed during our meetings with counsel.
10  But if you're asking about what he may have
11  reviewed outside of meetings with counsel or at
12  the direction of counsel, I have no objection
13    A.  Could you restate that question, then.
14    Q.  Have you looked at any of your own personal
15  paper or electronic files to find documents that
16  might be relevant to this litigation or that might
17  refresh your recollection?
18    MS. FUMERTON:  The question is outside of
19  the context of our review.
20    THE WITNESS:  Okay.  So during the context
21  of the question --
22    MR. INNES:  That's not the question.
23    MS. FUMERTON:  I'm objecting to the question
24  if you're not -- if asking him whether he
25  reviewed documents in the presence of counsel.

4 (Pages 10 to 13)

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    MR. INNES:  Are you instructing him to not
2  answer the question?
3    MS. FUMERTON:  Yes, if that's your question.
4  I thought you were limiting it.
5    I mean, it's a compound -- you asked a
6  compound question, first of all, right.  So if
7  you want to break up the question, then I think
8  that there are parts that could potentially --
9  you can ask the question how you want, but that's
10  a compound question and, as asked, it's asking
11  for potentially privileged information.  If you
12  want to limit it in another way, there may be a
13  nonobjectionable question you can ask.
14  BY MR. INNES:
15    Q.  Outside meetings with counsel, have you
16  reviewed any documents to refresh your recollection
17  relevant to this case?
18    A.  I did not take any documents and review
19  outside of the meetings with counsel.
20    Q.  Have you found any documents in your own
21  personal files that are relevant to this case?
22    MS. FUMERTON:  Objection; form.
23    A.  Could you restate it?
24    Q.  Have you identified any documents in your
25  possession that are relevant to this case?

Page 15

1    MS. FUMERTON:  And again I'm going to object
2  to the question to the extent you're asking about
3  any actions that were taken at the direction of
4  counsel.  If you're asking what he independently
5  did, you can answer the question.
6    A.  I'm a little confused on what the question
7  is, actually, if you could clarify.
8    Q.  That's because multiple people are asking
9  questions.
10    So my question is did you review any -- I'm
11  sorry.  Did you -- strike that.
12    Did you identify any documents in your
13  preparation for today's deposition that are relevant
14  to this case?
15    MS. FUMERTON:  Objection; form.  It has to
16  be outside of meetings with counsel.  So outside
17  meetings with counsel -- I'm not trying to be
18  difficult, but we're not going to answer as to
19  what questions -- any question about what he
20  reviewed while in our meetings with counsel.
21    If you're asking outside of that, that's a
22  different situation.
23    MR. INNES:  Outside.
24  BY MR. INNES:
25    Q.  Outside of your meetings with counsel, have

Page 16

1  you identified any documents that are relevant to
2  this case?
3    A.  The answer to that question, the one that
4  you're asking, is no.
5    MR. INNES:  Can I short-circuit this?  Can I
6  get a representation from you that all documents
7  that he had reviewed and provided to you in this
8  course of this litigation have been produced or
9  have been recorded as privileged?
10    MS. FUMERTON:  Well, no.  So it would be
11  only all relevant documents subject to our other
12  objections.
13    MR. INNES:  Okay.
14  BY MR. INNES:
15    Q.  Did you speak with any representative, any
16  other defendant in this case, prior to your
17  deposition?
18    A.  Could you repeat it.
19    Q.  Sorry, I was going too fast.  I'll break it
20  down.
21    A.  Okay.
22    Q.  Prior to today, did you speak with any
23  representative from any other defendant in this case
24  regarding today's deposition?
25    A.  Just for my clarity, a defendant, I would

Page 17

1  be -- who is a defendant, just to make sure I have
2  that clear?
3    Q.  Sure.  For instance, Purdue.
4    A.  Okay.  So restate the question now that I'm
5  clear on "defendant."
6    Q.  Did you speak with anyone from Purdue Pharma
7  prior to your deposition today --
8    MS. FUMERTON:  Objection.
9  BY MR. INNES:
10    Q.  -- regarding this case?
11    A.  No.
12    Q.  Did you speak with anyone from Cardinal
13  Health prior -- same question.
14    Did you speak with anyone from Cardinal
15  Health prior to your deposition today regarding this
16  case?
17    A.  No.
18    Q.  Are you familiar with who the defendants are
19  in this case?
20    A.  No, not completely.
21    Q.  We're going -- we'll circle back to this
22  question.
23    A.  Okay.
24    Q.  Did you speak with anyone other than counsel
25  prior to the deposition today regarding this case?

5 (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1      A.  They had -- yes, but not regarding the case.
2   About the deposition, that I would not be at work
3   during the time period, that I was going to be out.
4         Is that the question you're asking me or am
5   I confused on the question?
6      Q.  I can clarify.
7      A.  Okay.
8      Q.  Did you speak with anyone other than counsel
9   regarding the subject matter of this case prior to
10  today's deposition?
11     A.  No.
12     Q.  And I'm not --
13     A.  No.
14     Q.  No?
15     A.  I did not.  Just that I was going to be in a
16  deposition and unavailable.
17     Q.  I understand.
18        MS. FUMERTON:  And we're doing okay but
19  let's just -- make sure he gets his whole
20  question out before he answers.  We're talking
21  over each other slightly.
22        THE WITNESS:  I thought he was finished with
23  his question.
24        MS. FUMERTON:  No, that's better.  Just give
25  a slight pause.

Page 19

1   BY MR. INNES:
2      Q.  Did you speak with Mr. Abernathy at all
3   regarding this case?
4      A.  I would say no.  I do speak to Jeff every so
5   often, but I don't recall ever speaking to him about
6   this case.
7         THE COURT REPORTER:  I'll get you a sheet
8   going here.
9      Q.  Mr. Ducote, we're just going to mark an
10  exhibit and then show it to you.  The court reporter
11  is just marking my exhibit tabs for me.
12     A.  So when you do state it to me, do I have to
13  state anything about the exhibit number?
14     Q.  We'll go through that in a minute.
15     A.  Okay.
16        MS. FUMERTON:  No, you don't need to -- he's
17  asking the question.  You don't really have to
18  say anything about anything other than I want a
19  break or I want to talk to Tara, unless he asks
20  you a question.  He has to handle the documents.
21  BY MR. INNES:
22     Q.  And if you do want a break at any time,
23  please let me know.  We'll go off the record.
24        (Ducote Exhibit 1 was marked for
25  identification.)

Page 20

1   BY MR. INNES:
2      Q.  So I'm handing you what's been marked as
3   Plaintiff Exhibit 1.
4      Q.  Take your time, review the document, and
5   when you're done, I'll ask you some questions.
6      A.  I'm done.
7      Q.  Thank you.
8         Mr. Ducote, do you recognize this document?
9      A.  Yes.
10     Q.  Is this -- is this document something that
11  you generated?
12     A.  At the --
13        MS. FUMERTON:  Objection; form.
14     A.  Okay.  Could you restate it to make sure
15  I've got the question correct.
16     Q.  Do you not understand the question?
17     A.  Just restate it just to make sure I heard
18  it.
19     Q.  Is this a document that you generated?
20        MS. FUMERTON:  Same objection.
21  BY MR. INNES:
22     Q.  I'll strike that.
23        Is this your LinkedIn page?
24     A.  Yes.
25     Q.  When did you last update your LinkedIn page?

Page 21

1      A.  I do not recall exactly.
2      Q.  Would you say that this is a -- the current
3   version of your LinkedIn page?
4      A.  The current version, as I'm aware of it, and
5   LinkedIn does at times update things, I find, that
6   didn't necessarily I did.  There may be a word or
7   two change, but the content, the majority of it is.
8      Q.  Okay.  So you graduated from the University
9   of Louisiana Monroe with a Bachelor of Science in
10  Pharmacy?
11     A.  Yes.
12     Q.  And what year was that?
13     A.  That was 1997.
14     Q.  What is a Bachelor of Science in Pharmacy
15  exactly?
16     A.  There are two degrees that qualify you to
17  become a pharmacist in most states.  It's either a
18  bachelor of science or Docket of Pharmacy.  I went
19  to a school that offered a bachelor of science
20  degree.
21     Q.  So you obtained a bachelor of science
22  degree, and that would allow you in some states to
23  become a licensed pharmacist?
24     A.  Yes, that's correct.
25     Q.  And as part of your studies did you take any

6 (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  classes on Schedule II narcotics?
2      A.  Not specifically Schedule II.  There are
3  classes about pharmacy law that encompass that, but
4  it wasn't narrowly just Schedule II narcotics.
5      Q.  Did you take pharmacy law classes?
6      A.  Yes.
7      Q.  Did the pharmacy law classes cover the
8  Controlled Substances Act?
9      A.  I don't recall specifically if it -- the
10  Controlled Substances Act covered.
11      Q.  Were -- and do you recall if any other --
12  any federal regulations related to the sale of
13  pharmaceuticals were covered during your classes?
14      A.  Yes.  Yes.
15      Q.  And what were those statutes or regulations
16  in particular?
17      A.  I don't remember the exact regulations, but
18  what was covered were basically what -- how the drug
19  approval process worked, how the FDA worked to get
20  to a legend drug.
21      Q.  Okay.  Did you cover any statutes,
22  regulations, laws, that would cover the sale or
23  distribution -- strike that -- cover the sale of
24  pharmaceuticals?
25          MS. FUMERTON:  Objection to form.

Page 23

1      A.  I thought you were going to reask the
2  question.  I'm sorry.  Could you state it again.
3      Q.  So one of the ground rules I failed to
4  mention is your counsel can interpose an objection
5  at any time.  If she interposes an objection, you
6  can still answer so long as you understand the
7  question.  That's my primary ground rules.  If you
8  understand the question, please answer it.  If you
9  don't, I'll do my best to rephrase it.
10      A.  I was aware of that.  It just seemed as
11  though you were going to reask the question.  I
12  apologize.  The hesitation caught me off guard.
13      Q.  No problem.  We'll feel this out as we go.
14      A.  Okay.  So maybe once again could you just
15  ask that question.
16      Q.  Sure.
17          In your studies at the University of
18  Louisiana at Monroe to obtain your Bachelor of
19  Science in Pharmacy, did you study laws or
20  regulations that would cover the distribution of
21  pharmaceuticals?
22      A.  I do not recall specifically if that was in
23  the class or not.
24      Q.  Okay.  After you graduated in 1997, you went
25  to the University of Florida where you obtained a

Page 24

1  Master's of Science in Pharmacy Administration,
2  Pharmacy Policy and Regulatory Affairs; is that
3  correct?
4      A.  Yes.
5      Q.  During your studies at the University of
6  Florida to obtain that degree, did you take any
7  classes dealing with the Controlled Substances Act?
8      A.  Yes.
9      Q.  And what were those classes?
10      A.  I do not recall the specific classes, but it
11  was a topic that was covered in at least one of the
12  classes.
13      Q.  Was it a pharmacy law class?
14      A.  I wouldn't characterize it as pharmacy law.
15  It was more just general here's a category and
16  here's topics.  I wouldn't say there was a class
17  that was law and that's what was covered.  I was
18  just part of a class.
19      Q.  What was the focus of your master's degree?
20      A.  The focus for myself of why I went into that
21  program was really the drug approval process.
22      Q.  What's the drug approval process?
23      A.  Really, how a drug goes from being
24  developed, the initial clinical trials, how it's
25  tested, how it's marketed, goes through patents and

Page 25

1  things of that nature.  That's what my focus was
2  during that time period.
3      Q.  So is it fair to say your studies were
4  limited to research and development through the
5  patent process?
6          MS. FUMERTON:  Objection; form.
7      A.  That was the main part of the course.  I
8  mean, there are other subcourses in it, but the
9  majority of the coursework was around FDA drug
10  approval.
11      Q.  So it's my understanding of the
12  pharmaceutical industry that a drug is developed,
13  drug goes through regulatory process for approval,
14  and then that drug is manufactured, and then that
15  drug is sold to the public.
16          I'd like to focus on the last piece of that.
17  Did you take classes dealing with the sale of drugs
18  to the general public?
19          MS. FUMERTON:  Objection; form.
20      A.  I really couldn't answer that question
21  because it's such a broad question.  Could you
22  narrow the question potentially?
23      Q.  Sure.
24          So you would agree that a pharmaceutical
25  company develops a drug, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  A.  Yes.
2  Q.  And they're in the business of manufacturing
3  drugs?
4      MS. FUMERTON:  Objection; form.
5  A.  Some do, some don't.
6  Q.  And then you'd agree that those
7  manufacturers oftentimes sell those drugs to the
8  general public?
9      MS. FUMERTON:  Objection; form.
10  A.  The manufacturers -- the way you're asking
11  the question, I would say manufacturers, no, do not
12  sell to the general public, if that's the question
13  you're asking.
14  Q.  Fair point.
15      A manufacturer puts a drug or a pill into
16  the marketplace that can be prescribed to a patient;
17  is that a fair statement?
18  A.  Yes.
19      MS. FUMERTON:  Objection; form.
20  A.  Yes.
21  Q.  During your studies either at the University
22  of Louisiana Monroe for your bachelor of pharmacy or
23  your studies at University of Florida for your
24  master's and --
25      Did you study any of the laws or regulations

Page 27

1  that governed the prescription -- I'm sorry, the
2  dispensing of a drug to a patient?
3  A.  Could you restate the question for me?
4  Q.  Did you ever study laws or regulations
5  pertaining to the dispensing of drugs to
6  individuals?
7      MS. FUMERTON:  Objection; form.
8  A.  The way I understand your question, the
9  answer would be yes.
10  Q.  And what -- and what were those laws or
11  regulations?
12  A.  Most of those -- most of those laws and
13  regulations relate around state -- state
14  requirements such as -- I'm struggling to remember
15  exact details but, you know, basically that the
16  prescription -- that has been a long time ago.
17      Could you -- I'm sorry to ask you to restate
18  that question.  Could you restate it?
19  Q.  Did you ever study laws or regulations
20  pertaining to dispensing drugs to individuals?
21      MS. FUMERTON:  Objection; form.
22  Q.  I'm sorry, that was one question above.
23      You've testified that you did study -- your
24  testimony today is you have studied laws and
25  regulations pertaining to the dispensing of drugs to

Page 28

1  individuals.
2      My question for you is what are those --
3  what were those regulations or laws that you've
4  studied?
5      MS. FUMERTON:  Objection; form.
6  A.  I could not tell you the specific ones.
7  Q.  Okay.  Controlled Substances Act was one of
8  them, perhaps?
9  A.  Earlier, when you asked the question if that
10  was covered in a class, it was covered in a class.
11  Q.  What's your understanding of the Controlled
12  Substances Act generally?
13  A.  It is a very broad question.
14  Q.  What's your understanding of the Controlled
15  Substances Act as it applies to Schedule II or
16  Schedule III narcotics?
17      MS. FUMERTON:  Objection; form.
18  A.  Just restate one more time.  I think I
19  understood what you said but one more time.
20  Q.  What's your understanding of the Controlled
21  Substances Act as it applies to Schedule II
22  narcotics?
23  A.  Okay.  The way I understood your question is
24  the Controlled Substance Act gives some guidelines
25  as far as how a drug is scheduled, and that's the

Page 29

1  basic premise around Schedule II.  It gives a
2  different guidance on how the drug should be
3  scheduled and if a drug meets that criteria, it's
4  scheduled into a Schedule II.
5  Q.  Following the University of Florida, you
6  went on to Stetson University where you obtained
7  your Master's of Business Administration; is that
8  correct?
9  A.  That's correct.
10  Q.  What was the focus of your studies at
11  Stetson University?
12  A.  General business with more a focus on
13  finance.
14  Q.  Finance as it relates to the pharmaceutical
15  industry?
16  A.  They did cover pharmaceutical industry
17  finance, but it was broader.  It was just finance in
18  general, how things such as -- if I recall
19  correctly, Disney, since they are near Disney's main
20  campus in Orlando, and a few other companies.
21  Q.  Orlando would be a fun town to go to school
22  in.
23  A.  Yeah.
24  Q.  Did you study logistics at Stetson?
25  A.  There was a course that did cover supply

8 (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1   chain. It covered it, from what I recall, two
2   sides, technology systems and there were just basic
3   math of supply chain.
4       Q.   And to be clear, you were enrolled in that
5   class?
6       A.   Could you -- say that again.
7       Q.   You enrolled in that class?
8       MS. FUMERTON:  Objection; form.
9       A.   There were specific courses you had to take.
10  It wasn't an option. It was -- I couldn't tell you
11  the exact title of the course, but the premise of it
12  was basically technology.
13      Q.   Yeah. To be clear, I'm not asking for the
14  exact title or the level number.
15      A.   Okay.
16      Q.   Those can be long in a course book. What
17  I'm asking -- and I want to be clear -- is that
18  course offered at Stetson?
19      A.   Yes.
20      Q.   And you sat in a classroom at Stetson?
21      A.   Potentially not. Some of these courses were
22  online. So some were actually I had to go to
23  Stetson. Some were online. That one could have
24  been online.
25      Q.   Do you recall viewing that class online?

Page 31

1       A.   That, I do not recall exactly.
2       Q.   Do you recall sitting in a classroom for
3   that class?
4       A.   I don't recall. I do -- if I -- it most
5   likely was online for that course. I just don't
6   recall exactly.
7       Q.   What grade did you get in that class?
8       A.   An A. I do recall that.
9       Q.   That's good. You don't recall going to
10  class, but you got an A. I wish I could have done
11  that.
12      A.   I just recall. I think I've made As in all
13  the courses.
14      MS. FUMERTON:  Easy answer, then.
15  BY MR. INNES:
16      Q.   Let's continue right up the page here.
17      A.   Okay.
18      Q.   You were a pharmacy intern, cashier, cart
19  pusher, sales associate, unloader from February '92
20  to December '97.
21      Was that at Walmart?
22      A.   Yes.
23      Q.   You then went to be a pharmacist or pharmacy
24  manager from '97 -- December '97 to June 1999, also
25  at Walmart?

Page 32

1       A.   Yes.
2       Q.   You then rose to the level of manager of
3   pharmacy recruiting June 1999 to August 2002, also
4   at Walmart?
5       A.   Yes.
6       Q.   You then moved to divisional compliance
7   director, also at Walmart, in August 2004?
8       A.   You skipped one role, but yes.
9       Q.   I'm sorry. I did.
10      You were the director of training and
11  development, also at Walmart, from August 2002 to
12  August 2004?
13      A.   Yes.
14      Q.   Thank you for correcting me on that.
15      Then you became a divisional compliance
16  director from August 2004, for about 18 years, to
17  July 2010; is that right?
18      MS. FUMERTON:  No. Objection; form and to
19      the math, I guess.
20  BY MR. INNES:
21      Q.   I'm just reading the document.
22      MS. FUMERTON:  I think that this can be
23      easily clarified.
24      A.   Yes, that's -- I was going to clarify. It
25  was six years. The LinkedIn profile did some odd

Page 33

1   math on that.
2       Q.   To be clear, divisional compliance officer
3   at Walmart from July 2004 to July 2010?
4       A.   Yes.



9 (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review



Page 34

Page 36

1       Q.  Are you aware that the country is in the
2   midst of an opioid epidemic?
3           MS. FUMERTON:  Objection; form.
4       A.  I think there is just a general epidemic of
5   drug abuse, not necessarily just specific opioids.
6   But in general, I think there is an issue with
7   abuse.
8       Q.  Do you believe that that general issue of
9   abuse involves opioids?
10          MS. FUMERTON:  Objection; form.
11      A.  I think it involves a lot.  I think it
12  involves alcohol.  I think it involves different
13  types of medications.  It involves OTC products.  I
14  think it's an addiction issue in general that
15  society faces.
16      Q.  Mr. Ducote, simple question:  Yes or no, do
17  you believe that people are abusing opioids?
18          MS. FUMERTON:  Objection; form.
19      A.  My view is that people abuse a lot of
20  different things, and I think it's unfair to
21  characterize it as specifically just opioids.
22      Q.  Are you aware that 100 people a day are
23  dying from opioids?
24          MS. FUMERTON:  Objection; form.
25      A.  Personally, I think one death is too many,

Page 35

Page 37

1   so if it's more than one, yeah, it is a tragic
2   situation.
3       Q.  And you're aware that 100 people a day are
4   dying?
5           MS. FUMERTON:  Objection; form, misstates
6   testimony.
7       A.  Am I aware that 100 -- I couldn't tell you
8   how many.  I really couldn't.  I can tell you,
9   though, that I do read in papers and things that
10  just abuse across the board is impacting society.
11      Q.  As part of your reading in the papers, did
12  you read any articles about opioids?
13          MS. FUMERTON:  Objection; form.
14      A.  Could you restate it maybe?
15      Q.  Have you read any newspaper articles
16  involving opioids?
17          MS. FUMERTON:  Objection; form.
18      A.  The articles I've read have included
19  opioids, but it was a broader context.
20      Q.  Have you read Dreamland?
21      A.  No, I have not.
22      Q.  You giggled a little bit.
23          Do you know what I mean by Dreamland?
24      A.  No, that just threw me off when you said
25  Dreamland.  It doesn't seem real.

Highly Confidential - Subject to Further Confidentiality Review



Page 38

```
 1        Q.  Have you read a New Yorker article regarding
 2   the Sackler family?
 3        A.  Could you state that again.
 4        Q.  Are you familiar with the periodical The New
 5   Yorker?
 6        A.  Yes, I am.
 7        Q.  Do you read The New Yorker?
 8        A.  No.
 9        Q.  Have you ever read The New Yorker?
10        A.  Yes, I have.
11        Q.  Have you read an article in The New Yorker
12   that involved the Sackler family?
13        A.  No, I have not.
14        Q.  Do you know who the Sackler family is?
15        A.  No.
16        Q.  Do you know who Purdue Pharma is?
17        A.  Yes, I do.
18        Q.  Do you know who owns Purdue Pharma?
19        A.  I don't specifically.
```

Page 40

Page 39

Page 41

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 50

Page 52

1    and that back and forth doesn't necessarily mean
2    that he was not appropriately answering your
3    question.
4        So I agree with the ground rule, but I just
5    want to make sure that we're on both sides
6    applying those.
7    BY MR. INNES:

Page 51

11    Q.   So another ground rule.  If you don't
12    understand the question, tell me you don't
13    understand the question and I'll rephrase it.
14    A.   Okay.
15    Q.   Once I rephrase it, that's the question
16    that's standing; I want you to answer that one.  I
17    want you to answer a compilation of questions.  Just
18    tell me you don't understand it and I'll rephrase
19    it.
20        MS. FUMERTON:  Fair enough.  I agree if you
21    don't understand the question, you shouldn't
22    answer it.
23        Also, if you don't understand his answer,
24    that didn't mean he didn't understand the
25    question.  I just think there's some confusion

Page 53

10        MS. FUMERTON:  Sure.  I apologize.  Should
11    we take -- we've been going an hour.
12        MR. INNES:  I'm trying to think right now.
13    I think we are at a natural breaking point.  So
14    we can just go off the record.
15        THE VIDEOGRAPHER:  Going off the record.
16    The time is 9:01.
17        (Recess from 9:01 a.m. until 9:17 a.m.)
18        THE VIDEOGRAPHER:  Going back on the record.
19    Beginning of Media File Number 2.  The time is
20    9:17.
21    BY MR. INNES:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 62

Page 64

```
1        might ask you to refer to it later, so we'll keep
2        a copy set there.
3     BY MR. INNES:
4        Q.   Take your time, review it, and when you are
5     done, let me know.
6        A.   All right.  I'm done.
```

Page 63

```
21        MR. INNES:  Copies for you.
22        THE WITNESS:  Do I keep this?
23        MS. FUMERTON:  No.  We want to make sure we
24    don't lose this, because that would be bad.
25    We're going to keep a pile right here.  They
```

Page 65

Highly Confidential - Subject to Further Confidentiality Review



Page 66

Page 67

Page 68

12      A.   What this represents is VAWD, verified
13   accredited wholesale distributor, was doing -- there
14   were certain policies and procedures that they
15   recommended that were put in place based on their
16   review, and this was an output of that process.
17      Q.   You referred to the VAWD.  Could you --
18      A.   Verified accredited wholesale distributor.
19      Q.   And it was important -- well, and the VAWD,
20   did they confer accreditations on distributors?
21      A.   I'm not sure from the legal sense exactly
22   how that plays out, but they do give accreditation.
23      Q.   Did Walmart apply for accreditation?
24      A.   Yes.

Page 69

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 78

Page 79

14      MS. FUMERTON:  Okay.  He started to answer
15  and you interrupted him.  So if you're going to
16  ask a question, make sure you give him the
17  ability to answer before you interrupt if you
18  didn't like the direction it was going.  But let
19  him answer the question; and if you need to
20  follow up, you can follow up.

Page 80

Page 81

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 86

2    MS. FUMERTON:  Objection; form, misstates
3    his prior testimony.
4        A.  Oh, I'm sorry.  I thought you were going to
5    reask something.  Could you state --
6        MS. FUMERTON:  No, if I object, which
7    clearly I'm going to --
8        THE WITNESS:  Just --
9        MS. FUMERTON:  -- you can go ahead --
10       THE WITNESS:  Okay.
11       MS. FUMERTON:  -- and just -- and answer --
12       THE WITNESS:  It's just a pause at times, it
13    makes me think that --
14       MS. FUMERTON:  No.  No.  That's okay.  It's
15    not a normal conversation.
16    BY MR. INNES:

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 98

Page 100

21    MS. FUMERTON:  Perhaps this is a good time
22    to take a break?  Then we can take our short
23    break now and take another break at lunch.
24        MR. INNES:  One minute.
25        Let's take a quick break, five -- five

Page 99

Page 101

1     minutes.
2         MS. FUMERTON:  I will keep it as close to
3     five minutes as we can.
4         THE VIDEOGRAPHER:  Going off record, the
5     time is 10:21.
6         (Recess from 10:21 a.m. until 10:31 a.m.)
7         THE VIDEOGRAPHER:  We're going back on the
8     record, beginning of Media File Number 3.  The
9     time is 10:31.
10    BY MR. INNES:

Highly Confidential - Subject to Further Confidentiality Review



Page 102

Page 104

9      Q.  What point in time was that?
10     A.  The -- can I take a pause or -- because of
11 the comment.  I'm a little bit confused between the
12 two of your comments.
13     Q.  There's a question pending.  Do you have --
14 do you --
15        MS. FUMERTON:  There is a question pending.
16 I think it's about privilege.  Can we have a
17 quick -- unless you want to rephrase it.  I think
18 you might be able to rephrase it in a way that
19 possibly doesn't -- or I'm happy to take a quick
20 break and find out what the concern is.
21        MR. INNES:  Just one second.  The screen has
22 stopped moving.
23        I'm going to -- I'll reask the question.
24        MS. FUMERTON:  Okay.
25 BY MR. INNES:

Page 103

Page 105

6      Q.  Who did you receive that training from?
7      A.  That's the part I'm confused on.  So is it
8 privileged, nonprivileged?
9        MS. FUMERTON:  Can we just -- I think --
10 I'll be super quick.  We'll just clear this up.
11 I just -- honestly it's not a big --
12        MR. INNES:  Well, it's a -- it's a yes-or-no
13 question whether or not he had training.
14        MS. FUMERTON:  Well, he answered that.
15        MR. INNES:  He answered that, and now we're
16 asking who he received the training from.
17        MS. FUMERTON:  Yes, but let me just take a
18 quick --
19        MR. BOWER:  Well, let him answer the
20 question first and then you can take a break and
21 you can talk to him.
22        MS. FUMERTON:  Well, he says that he's
23 wondering whether or not the answer would reveal
24 privileged information, so that's why I want to
25 talk --

27 (Pages 102 to 105)

Highly Confidential - Subject to Further Confidentiality Review



Page 106

```
 1        MR. BOWER:  The name -- the name of a
 2   trainer would not reveal privileged information.
 3        MS. FUMERTON:  I don't know what he's
 4   thinking.  I don't know what he's thinking of,
 5   and so I don't want to have --
 6        MR. BOWER:  We're just asking for a name.
 7        MS. FUMERTON:  No.  That's not necessarily
 8   the case.
 9        MR. INNES:  I'll ask it that way.
10   BY MR. INNES:
22        MS. FUMERTON:  So if they're having -- this
23   is my point.  This is why we never -- if you're
24   talking about training, you're talking about
25   something where they are getting legal advice as
```

Page 108

```
 1   the question correctly.
 2        Q.   Did anyone -- did any Walmart attorneys
 3   instruct you regarding the requirements of the DEA's
 4   suspicious order monitoring policies?
 5        MS. FUMERTON:  Yeah.  I -- you can answer
 6   the question.  I'm objecting to that question.
 7        I think you can phrase it another way to get
 8   a yes-no answer in which it wouldn't reveal
 9   potentially privileged information.
10   BY MR. INNES:
```

Page 107

```
 1   to what requirements are, that's legal advice and
 2   attorney-client communication.  That's why I have
 3   the question.  Because you guys might be talking
 4   about different things of what you mean to be
 5   training.
 6        If he received training from somebody
 7   outside of legal, then that's a different
 8   question and, obviously, there is no problem
 9   answering that question, but if what he's
10   thinking of, when you ask, "Did I receive
11   training," did he have communications with
12   lawyers which told him what the requirements
13   were, I think that that can be privileged
14   information.
15        That's what -- that's what -- look, I'm not
16   trying to be difficult.  That's what I'm trying
17   to make a distinction between.
18        MR. INNES:  Let me see if I can navigate it.
19        MS. FUMERTON:  Okay.
20   BY MR. INNES:
21        Q.   Did you receive training from lawyers
22   regarding the DEA's suspicious order monitoring
23   policies?
24        A.   And when you say "training," define to me
25   what you mean by "training" to make sure I answer
```

Page 109

```
17        MS. FUMERTON:  Look, I'm saying I think can
18   we have a two-minute conversation which will make
19   your life a lot more easier right now that off --
20   if we want to take a short break.
21        MR. INNES:  I'll give you -- we'll go off
22   the record for two minutes.
23        MS. FUMERTON:  Okay.
24        THE VIDEOGRAPHER:  Going off the record.
25   The time is 10:40.
```



**Page 110**

1   (Recess from 10:40 a.m. until 10:43 a.m.)
2        THE VIDEOGRAPHER:  Going back on the record,
3   beginning of Media File Number 4.  The time is
4   10:43.
5   BY MR. INNES:
6        Q.  Mr. Ducote, back on the record.

**Page 112**

25        MS. FUMERTON:  Okay.  Objection; form.  And

**Page 111**

**Page 113**

1   I object to the extent that you're asking a
2   privileged question.  He earlier testified he did
3   not read the complaint.  And so the extent that
4   he has learned about what any allegations are in
5   this case from counsel, those communications are
6   privileged.
7        MR. INNES:  Limit the speaking objections,
8   if you don't mind.
9        MS. FUMERTON:  Okay.  Fine.  I'm objecting
10  to that question as privileged and instructing
11  him not to answer.
12  BY MR. INNES:

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 137

```
21        MS. FUMERTON:  Just for a clarification for
22   the record, there is writing on this document,
23   and so didn't -- it looks like an e-mail, so
24   would it have been something that would have come
25   out from ours, but maybe it did; do you know?
```

Highly Confidential - Subject to Further Confidentiality Review



Page 138

```
 1      Q.  I am not going to say for sure but --
 2          MS. FUMERTON:  Are we confident this is not
 3      on there?  We're confident this is not on there.
 4          MR. INNES:  Yeah.
 5          MS. FUMERTON:  Okay.
 6          MR. INNES:  I'm going to clean it up.
 7          I'm confident that that was not on there,
 8      and that's our mistake.  That's a copy of a
 9      draft.  That is not part of the original
10      document.  We can get the original document.
11          MS. FUMERTON:  That's fine, or we can just
12      stipulate for the record.  We don't need to be
13      that complicated.  I just wanted to make sure.
14      We'll stipulate for the record that that --
15          MR. INNES:  I will stipulate for the record
16      that that is a mark that I made and it was copied
17      into the witness's exhibit.
18          MS. FUMERTON:  Okay.  And so just to be
19      clear, it's an arrow on Page 9159 of Exhibit 6.
20      BY MR. INNES:
```

Page 140

Page 139

Page 141

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 150

Page 152

Page 151

2       MR. INNES:  Go off the record for a moment.
3       THE VIDEOGRAPHER:  Going off record.  The
4   time is 11:37.
5       (Recess from 11:37 a.m. until 11:38 a.m.)
6       THE VIDEOGRAPHER:  Going back on record,
7   beginning of Media File 5.  The time is 11:38.
8   BY MR. INNES:

Page 153

39 (Pages 150 to 153)

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 166 / Page 167 / Page 168 / Page 169

16    MS. FUMERTON:  Is this a good time for
17  lunch?
18    MR. INNES:  Yeah, before we get too much
19  further into this I think we can break.
20    MS. FUMERTON:  Okay.
21    THE VIDEOGRAPHER:  Going off record.  The
22  time is 12:02.
23    (Recess from 12:02 p m. until 12:40 p m.)
24    THE VIDEOGRAPHER:  We're going back on
25  record, beginning of Media File Number 6, the

43 (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 178

2      Q.   Right.  I think -- I think we can sort of
3   make our day easier.  I am going to narrow these
4   questions are directed to Schedule II and III
5   opioids.
6          MS. FUMERTON:  Okay.  I just object.  We can
7   do that but some of the questions then are broad,
8   so I think we still might need clarifications to
9   do that.
10      Q.   If you need clarification, you can ask, but
11  for purposes of the suspicious order monitoring
12  process flow, and the context of this case that
13  deals with opioids and distribution of opioids, I
14  think it's easier to speak -- to not have to preface
15  each one of our questions with that.
16         So you can assume my questions are dealing
17  with Schedule II narcotics in the context of this
18  process flow.
19      A.   Okay.
20      Q.   If you have -- but if you -- that does not
21  override my initial instruction, don't understand my
22  questions just ask.
23         MS. FUMERTON:  My only statement in that
24  regard is that because the order monitoring --
25  I'm not testifying but to the extent that there

Page 180

Page 179

1   were other drugs or other medicines that were
2   involved in the process, then it might not be as
3   simple as just making an assumption every time
4   you use that word.
5          MR. INNES:  Are you talking about
6   combination drugs?
7          MS. FUMERTON:  No, I'm just talking more
8   generally, but we can understand that, you know,
9   in general, when you are talking about this, but
10  I still would expect that to have a clear record
11  that we be careful about the language we're
12  using.

Page 181



46 (Pages 178 to 181)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 186

Page 188

Page 187

Page 189

```
 7        MS. FUMERTON:  And so, again, I just caution
 8    the witness.  He mentioned that legal was sitting
 9    at the table.  I think there were communications
10    that were with legal.  That's privileged and I
11    will instruct him to not answer.  To the extent
12    the questions were not -- the answer was not with
13    legal, then you can go ahead and answer.
14        Q.  I want to be sure I understand your
15    instruction.  If legal posed a question to
16    Mr. Ducote and anyone else in the room and they
17    responded, you're saying that would be privileged.
18    But if Mr. Ducote, of his own volition, offered
19    information, that would not be privileged?
20        MS. FUMERTON:  I don't know what he's about
21    to testify, some sort of talk in a hypothetical.
22    So just sort of as general guidance, if the
23    discussion or -- with either the attorneys giving
24    legal advice or the folks seeking legal advice
25    from the attorneys, all of that is considered
```

Highly Confidential - Subject to Further Confidentiality Review



Page 190

1  privileged, but outside of that context, then I
2  think you can respond to the question.

Page 192

Page 191

Page 193

Highly Confidential - Subject to Further Confidentiality Review

Page 194

Page 196

Page 195

2          THE VIDEOGRAPHER:  Going off record.  The
3     time is 1:14.
4          (Recess from 1:14 p.m. until 1:25 p.m.)
5          THE VIDEOGRAPHER:  We're going back on
6     record, beginning of Media File 7.  The time is
7     1:25.
8     BY MR. INNES:

Page 197



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 226

Page 228

21    Q.  I have not -- I have not gotten an answer to
22  this question.
23       MS. FUMERTON:  Well, I disagree, but -- if
24  you can restate your question, but I agree that
25  he's answered this question as much as he can,

Page 227

Page 229

1   and there appears to be confusion here.
2        MR. INNES:  It's very --
3        MS. FUMERTON:  I can't ask your questions
4   for you, but part of the problem --
5        MR. INNES:  I'm not asking you to --
6        MS. FUMERTON:  Well, I know, but part of the
7   problem is that this is -- I'll just say I'll
8   make any objections to form.

58 (Pages 226 to 229)

Highly Confidential - Subject to Further Confidentiality Review



Page 230

Page 231

Q.  Who gave you that advice?
MS. FUMERTON:  Objection to the extent it's
calling for privileged information.
Otherwise, you can answer the question.  If
you can't answer the question without revealing
privileged information, I instruct you not to

Page 232

MS. FUMERTON:  Objection to the form of that
question.
To the extent that question is going to --
if answering that question will reveal privileged
information, I'm instructing you not to answer
that.
You can ask him if he's going to follow my
instruction not to answer the question, but
asking him sort of the legal basis for my
instruction is improper.
So I'm instructing you not to answer that
question.
MR. INNES:  I was waiting for that.
MS. FUMERTON:  Oh, no.  I did.
BY MR. INNES:
Q.  So you're not -- you're not going to answer
the question; is that correct?
A.  I'm going to take advice from counsel.
Q.  Do you recall who was in the room when you
were provided that advice?
MS. FUMERTON:  Objection; form.  You haven't
established what the advice was.  That's the
whole point of --
MR. INNES:  I think we did.

Page 233

MS. FUMERTON:  Well --
MR. INNES:  We definitely --
MS. FUMERTON:  -- this is why --

MS. FUMERTON:  Fine.
MR. INNES:  That's the record.
MS. FUMERTON:  We're not going to get into
the context in which the advice was given.
Look, I'll talk to -- I'll talk -- Michael,
here's my suggestion on this.  I will talk -- I
will talk during a break -- if we take one now, I
think, for the purposes of --
MR. INNES:  Not --
MS. FUMERTON:  -- making things go forward,
then we can take a break and ask if there is a
way that this can be answered, but without taking
a break, based on what was said, I am instructing
him not to answer.
BY MR. INNES:



Page 234

25          MS. FUMERTON:  Objection; form.  That's

Page 235

1      mischaracterizing what his prior testimony was.
2          Well, now, look, because you are -- you are
3      dancing around a privileged issue, and I will
4      protect the privilege --
5          MR. BOWER:  You can object to the form and
6      instruct him not to answer.  That's how you do
7      it.  Okay?  Just move along.
8          MS. FUMERTON:  I am trying to move along.
9          MR. INNES:  Either object --
10         MS. FUMERTON:  There's a way to get through
11     this.
12         MR. INNES:  -- object to the form --
13         MS. FUMERTON:  -- we had a long discussion
14     about this.  We can --
15         MR. BOWER:  Either object to form or
16     object --
17         MS. FUMERTON:  Then I'm instructing him not
18     to answer that question.  The -- object to form
19     and I am instructing him not to answer that
20     question.

Page 236

Page 237

Highly Confidential - Subject to Further Confidentiality Review



Page 238

```
 8          MS. FUMERTON:  Are you switching topics?  Is
 9   this time for a good break?
10          MR. INNES:  No.  I'm going to stay on this
11   topic.
12          (Ducote Exhibit 9 was marked for
13   identification.)
14   BY MR. INNES:
```

Page 240

Page 239

Page 241

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1      MS. FUMERTON:  I'll just make a statement on
2  the record, because this is why I objected to
3  your assumption earlier.  You made a statement
4  earlier that you wanted to assume that your
5  questions only referred to Schedule II opioids.
6  But then you keep asking the witness questions
7  and documents that aren't so limited.  So I just
8  want to make it clear that your assumption
9  apparently no longer applies.
10      MR. INNES:  I'm talking about the metrics
11  that were provided here and comparing them to the
12  metrics that are here.
13      MS. FUMERTON:  Limited to Schedule II
14  opioid, or are you talking about drugs in
15  general?  Because this is my problem with your
16  assumption.
17      MR. INNES:  His testimony was the process
18  applies equally, and we're talking about apples
19  to apples here.  We're talking about a logistics
20  review, and we're talking about --
21      MS. FUMERTON:  But you're asking him about
22  the amount of time.  That's my -- that's the
23  clarification I'm trying to make.  I'm just
24  asking if you're still on the record that that's
25  the assumption that you're asking everybody to

Page 243

1  make when you're talking about -- or as you're
2  talking about --
3      MR. INNES:  I can -- I can make this one
4  very clear.
5      MS. FUMERTON:  Okay.
6  BY MR. INNES:



Page 244

Page 245

Page 246

Page 248

Page 247

```
 2        MS. FUMERTON:  We've been going a little bit
 3   over an hour.  Can we take a break?
 4        MR. INNES:  Yeah.  Can you --
 5        MS. FUMERTON:  Make it short?  Yeah, will
 6   do.
 7        THE VIDEOGRAPHER:  Going off the record, the
 8   time is 2:30.
 9        (Recess from 2:30 p.m. until 2:47 p.m.)
10        THE VIDEOGRAPHER:  Going back on record,
11   beginning of Media File Number 8.  The time is
12   2:47.
13   BY MR. INNES:
14        Q.   Okay, Mr. Ducote.  I think we can maybe make
15   one final push here.
16        A.   Okay.
```

Page 249



Highly Confidential - Subject to Further Confidentiality Review

Page 250



Page 252

1    addictive?
2        A.  I think there is a general agreement that it
3    is, yes.
4        Q.  Do you agree with it?
5        A.  Yes.  I don't have any personal experience
6    with it, but I do agree from what I have read, what
7    I've studied.
8        Q.  Do you agree that opioids are highly
9    addictive?
10       MS. FUMERTON:  Objection; form.
11       A.  They potentially can be.
12       Q.  Do you believe that oxy is highly addictive?
13       MS. FUMERTON:  Objection; form.
14       A.  It potentially can be.
15       Q.  Do you believe that hydrocodone is highly
16   addictive?
17       A.  These are all the same drugs basically that
18   you're asking me about.
19       Q.  Can you -- would you agree that opiates --
20   Schedule II opioids are highly addictive?
21       MS. FUMERTON:  Objection; form.
22       A.  Again, to your question, it's very specific.
23   It can be if not properly used.  And so that
24   question is almost impossible to answer with just a
25   singular answer.

Page 251

13       Q.  You'd agree that opioids are highly
14   addictive; is that correct?
15       MS. FUMERTON:  Objection; form.
16       A.  I think that's the DEA's definition.
17       Q.  You have a degree in pharmacology, do you
18   not?
19       A.  Pharmacy.
20       Q.  Pharmacy?
21       A.  Uh-huh.
22       Q.  And you studied the chemical effects of
23   drugs on the human body?
24       A.  Yes.
25       Q.  Do you agree that heroin is highly

Page 253

1        Q.  These highly addictive drugs have resulted
2    in thousands of deaths across the country?
3        MS. FUMERTON:  Objection; form.
4        A.  What --
5        Q.  Do you agree that these pills have resulted
6    in thousands of deaths across the country?
7        MS. FUMERTON:  Objection; form.
8        A.  I don't have direct knowledge if it has.  I
9    just know what I -- earlier when we talked about
10   reading different things, that's the only piece I
11   could say.  I don't specifically know how many
12   people or anything else that have died from this.

64  (Pages 250 to 253)

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 258

Page 260

Page 259

Page 261

25        MR. INNES:  Let's just mark this.  I'm going

Highly Confidential - Subject to Further Confidentiality Review



Page 262

1      to mark this as Plaintiffs' 10.
2           (Ducote Exhibit 10 was marked for
3      identification.)
4           MR. INNES:  It's a quick one-page e-mail.
5      Could I hold one of those?  I'm sorry.  Tara, I
6      think this is one I didn't make enough copies of.
7           MS. FUMERTON:  That's okay.
8           MR. INNES:  I'll have to take it back.
9           MS. FUMERTON:  That's okay.  Yes.  I haven't
10     written on mine yet.
11          MR. INNES:  Thank you.
12          MS. FUMERTON:  Thanks.
13          THE WITNESS:  Up until you --
14          MS. FUMERTON:  Wait for a question.
15          THE WITNESS:  He did ask me a question.
16     Q.  I didn't ask you a question.
17     A.  Oh, I thought the previous one -- okay.
18     Sorry.

Page 263

Page 264

Page 265

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 278

Page 280

Page 279

7        MR. INNES:  We can go off the record.
8        THE VIDEOGRAPHER:  Going off record, the
9    time is 3:26.
10        (Recess from 3:26 p.m. until 3:35 p.m.)
11        THE VIDEOGRAPHER:  Going back on record,
12    beginning of Media File 9.  The time is 3:35.
13   BY MR. INNES:

Page 281

71 (Pages 278 to 281)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 282

6           MS. FUMERTON:  Yeah.  I think you can answer
7      his question to the extent that it's not
8      revealing communications with legal, but you can
9      say that legal was a -- if that's what your
10     testimony is, if legal was a component, you can
11     say legal and the other folks who were involved.
12          THE WITNESS:  All right.

Page 283

Page 284

Page 285

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 290

Page 292

6       MR. INNES:  I have no further questions at
7   the moment.  Thank you for your time.  I
8   think you have -- it's --
9       MS. FUMERTON:  We can just go right now.  I
10  mean, this will be five minutes.  It won't be
11  that long.
12      MR. INNES:  What we did yesterday is we
13  flipped, so you're on camera.  It does not matter
14  to me.
15      MS. FUMERTON:  I didn't realize that we were
16  on camera.
17      MR. INNES:  We are not.  I am.
18      MS. FUMERTON:  No, well, that's what I
19  meant.  I didn't know the questioner was.  It's
20  up to you.  I'm happy to ask my questions here.
21  I'm happy to flip with you.
22      MR. INNES:  It does not matter to me.
23      MS. FUMERTON:  I've never been on camera
24  before, actually.  Why don't I just stay here.
25  It's going to be five minutes.  If we get into a

Page 291

Page 293

1   longer back and forth, I may be willing to
2   change.
3       THE VIDEOGRAPHER:  Are you still on the
4   record?
5       MS. FUMERTON:  Yeah, we're still on the
6   record.  Sorry.  I'm just going to sit here.
7       CROSS-EXAMINATION
8   BY MS. FUMERTON:

Highly Confidential - Subject to Further Confidentiality Review



Page 294

Page 296

3      MS. FUMERTON:  I have no further questions.
4      MR. INNES:  Okay.
5      THE VIDEOGRAPHER:  That concludes today's
6   deposition.  Going off the record, the time is
7   3:07.
8      (Whereupon, the deposition concluded at
9   3:07 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 295

Page 297

1        C E R T I F I C A T E
2      I, SUSAN D  WASILEWSKI, Registered
3   Professional Reporter, Certified Realtime Reporter,
4   Certified Realtime Captioner, do hereby
5   certify that, pursuant to notice, the deposition of
6   CHAD DUCOTE was duly taken on Friday,
7   November 16, 2018, at 8:04 a m , before me
8      The said CHAD DUCOTE was duly sworn by me
9   according to law to tell the truth, the whole truth
10  and nothing but the truth and thereupon did testify
11  as set forth in the above transcript of testimony
12  The testimony was taken down stenographically by me
13  I do further certify that the above deposition is
14  full, complete, and a true record of all the
15  testimony given by the said witness, and that a
16  review of the transcript was requested
17
18  _____
19  Susan D  Wasilewski, RPR, CRR, CCP, CMRS, FPR, CCR
20  (The foregoing certification of this transcript does
21  not apply to any reproduction of the same by any
22  means, unless under the direct control and/or
23  supervision of the certifying reporter )
24
25

75 (Pages 294 to 297)

Highly Confidential - Subject to Further Confidentiality Review

## Page 298

### INSTRUCTIONS TO WITNESS

1
2
3         Please read your deposition over carefully
4    and make any necessary corrections.  You should
5    state the reason in the appropriate space on the
6    errata sheet for any corrections that are made.
7
8
9         After doing so, please sign the errata sheet
10   and date it.  It will be attached to your
11   deposition.
12
13        It is imperative that you return the
14   original errata sheet to the deposing attorney
15   within thirty (30) days of receipt of the deposition
16   transcript by you.  If you fail to do so, the
17   deposition transcript may be deemed to be accurate
18   and may be used in court.
19
20
21
22
23
24
25

## Page 300

### ACKNOWLEDGMENT OF DEPONENT

1
2
3         I, _____, do hereby
4    acknowledge that I have read the foregoing pages, 1
5    through 300, and that the same is a correct
6    transcription of the answers given by me to the
7    questions therein propounded, except for the
8    corrections or changes in form or substance, if any,
9    noted in the attached Errata Sheet
10
11
12   _____   _____
13   CHAD DUCOTE                    DATE
14
15
16
17
18   Subscribed and sworn to before me this
19   _____ day of _____, 20____
20   My Commission expires: _____
21
22   _____
23   Notary Public
24
25

## Page 299

1         ------
2         E R R A T A
3         ------
4    PAGE  LINE  CHANGE
5    ____  ____  _____
6        REASON: _____
7    ____  ____  _____
8        REASON: _____
9    ____  ____  _____
10       REASON: _____
11   ____  ____  _____
12       REASON: _____
13   ____  ____  _____
14       REASON: _____
15   ____  ____  _____
16       REASON: _____
17   ____  ____  _____
18       REASON: _____
19   ____  ____  _____
20       REASON: _____
21   ____  ____  _____
22       REASON: _____
23   ____  ____  _____
24       REASON: _____
25

## Page 301

### LAWYER'S NOTES

1
2
3    PAGE  LINE
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25   ____  ____  _____