1

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION

3    IN RE:  NATIONAL      :  MDL No. 2804
     PRESCRIPTION OPIATE   :
4    LITIGATION            :  Case No. 17-md-2804
                           :
5    APPLIES TO ALL CASES  :  Hon. Dan A. Polster
                           :
6                          :

7

8                  HIGHLY CONFIDENTIAL

9       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                    - - - -

12                 JANUARY 22, 2019

13                    - - - -

14     VIDEOTAPED DEPOSITION OF WALTER WAYNE DURR,

15   taken pursuant to notice, was held at Marcus &

16   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

17   Pennsylvania 15219, by and before Ann Medis,

18   Registered Professional Reporter and Notary Public in

19   and for the Commonwealth of Pennsylvania, on Tuesday,

20   January 22, 2019, commencing at 8:57 a.m.

21                    - - - -

22             GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
23                 deps@golkow.com

24

25
```

2

```
 1                    A P P E A R A N C E S

 2    On behalf of Plaintiffs

 3            WAGSTAFF & CARTMELL, LLP
              BY:  TYLER HUDSON, ESQUIRE
 4            4740 Grand Avenue, Suite 300
              Kansas City, Missouri  64112
 5            816.701.1100
              thudson@wcllp.com

 6

 7    On behalf of Defendant AmerisourceBergen Drug
      Corporation

 8
              (By Phone/Livestream)
 9            JACKSON KELLY, LLP
              BY:  ANDREW N. SCHOCK, ESQUIRE
10            50 South Main Street, Suite 201
              Akron, Ohio  44308
11            330.252.9078
              anschock@jacksonkelly.com

12

13    On behalf of Defendant Cardinal Health, Inc.

14            PIETRAGALLO GORDON ALFANO BOSICK &
              RASPANTI, LLP
15            BY:  JENNIFER BOURIAT, ESQUIRE
              One Oxford Centre, 38th Floor
16            301 Grant Street
              Pittsburgh, Pennsylvania  15219
17            412.263.2000
              jhb@pietragallo.com

18

19    On behalf of Defendants Endo Pharmaceuticals, Endo
      Health Solutions and Par Pharmaceuticals

20
              (By Phone/Livestream)
21            ARNOLD & PORTER KAYE SCHOLER LLP
              BY:  ERICA GUTHRIE, ESQUIRE
22            601 Massachusetts Avenue, NW
              Washington, DC  20001-37453
23            202.942.5743
              erica.guthrie@arnoldporter.com

24


25
```

                                                                      3

1                A P P E A R A N C E S (Continued)

2    On behalf of Defendant HBC Service Company

3              MARCUS & SHAPIRA, LLP
               BY:  ROBERT M. BARNES, ESQUIRE
4              One Oxford Centre, 35th Floor
               Pittsburgh, Pennsylvania  15219
5              412.471.3490
               rbarnes@marcus-shapira.com

6

7    On behalf of Defendant McKesson Corporation

8              COVINGTON & BURLING, LLP
               BY:  MEGHAN MONAGHAN, ESQUIRE
9              One CityCenter
               850 Tenth Street, NW
10             Washington, DC  20001-4956
               202.662.5807
11             mmonaghan@cov.com

12                (By Phone/Livestream)
               COVINGTON & BURLING, LLP
13             BY:  MICHAEL J. LANOSA, ESQUIRE
               1999 Avenue of the Stars
14             Los Angeles, CA 90067-4643
               424.332.4780
15             mlanosa@cov.com

16

     On behalf of Defendant Walmart
17
                  (By phone/Livestream)
18             JONES DAY
               BY:  RICHARD M. BRODSKY, ESQUIRE
19             150 West Jefferson Avenue, Suite 2100
               Detroit, Michigan  48226
20             313.230.7699
               rbrodsky@jonesday.com

21

22   Also present

23             Tyler Crotty, legal videographer

24

25

4

1                     * I N D E X *

2     WALTER WAYNE DURR                          PAGE

3       EXAMINATION BY MR. HUDSON           7, 176, 207
        EXAMINATION BY MR. BARNES              119, 206
4

5            * INDEX OF HBC-DURR EXHIBITS *

6     NO.                 DESCRIPTION           PAGE
      Exhibit 1   Email, 7/20/09, from J. Hurley    19
7                 to W. Durr, et al., subject: RE
                  Pharmacy controllable substance
8                 location
                  HBC_MDL00128697
9
      Exhibit 2   Email chain, 10/27/09, from A.     21
10                Zelaski to W. Durr, subject: FW:
                  Reporting
11                HBC_MDL00128698

12    Exhibit 3   HBC Service Company's Responses    36
                  to Plaintiffs' (First) Set of
13                Combined Discovery Responses
                  P-HBC-0011 - 0011.20
14
      Exhibit 4   Giant Eagle Inventory Control -    36
15                Suspicious Order Policies with
                  various effective dates
16                HBC_MDL00078638 - 00078639
                  HBC_MDL00078636 - 00078637
17                HBC_MDL00045916 - 00078918
                  HBC_MDL00051908
18                HBC_MDL00043414
                  HBC_MDL00010092 - 00010093
19
      Exhibit 5   Email, 4/9/15, from S. Green to D. 42
20                Stevens, et al., subject: All
                  policies for VAWD reflected as of
21                5:00pm today, attaching various
                  policies
22                HBC_MDL00078594 - 00078668

23    Exhibit 6   Email, 4/10/15, from G. Carlson    42
                  to M. Doerr, subject: FW: HBC
24                VAWD Application and Documents,
                  Part 2, attaching various policies
25                HBC_MDL00133670 - 00133748

5

1               * INDEX OF HBC-DURR EXHIBITS *

2    NO.                    DESCRIPTION                PAGE
     Exhibit 7   Meeting invitation for 8/17/15      56
3                from D. Bertucci to C. Forde,
                 et al., subject: VAWD Physical
4                Inspection Preparation, attaching
                 NABP VAWD Survey Process Guide
5                HBC_MDL00076207 - 00076218

6    Exhibit 8   Email chain, 9/2/15, from E. Hart    56
                 to R. McClune, subject: RE Vault/
7                Refrigeration
                 HBC_MDL00127457 - 00127460
8
     Exhibit 9   Email, 8/28/15, from J. Millward to  79
9                E. Hart, et al., subject: 30-010 -
                 Inventory Control - Suspicious Order
10               Policy FINAL.docx, attaching 30-010 -
                 Inventory Control - Suspicious Order
11               Policy FINAL.docx
                 HBC_MDL00169475 - 00169477
12
     Exhibit 10  DEA Drug Fact Sheet for             115
13               Hydrocodone
                 P-GEN-0086.1 - 0086.2
14
     Exhibit 11  2009 - 2014 cumulative totals of    116
15               hydrocodone dosage units shipped
                 to Cuyahoga and Summit Counties, Ohio
16               and Ohio state
                 P-HBC-0017

17

18                      - - - -

19

20

21

22

23

24

25

6

```
 1                    P R O C E E D I N G S

 2                         - - - -

 3            THE VIDEOGRAPHER:  We are now on the

 4     record.  My name is Tyler Crotty.  I'm a

 5     videographer for Golkow Litigation Services.

 6         Today's date is Tuesday, January 22, 2019,

 7     and the time is 8:57 a.m.

 8         This video deposition is being held at

 9     Marcus & Shapira, LLP, One Oxford Centre,

10     Pittsburgh, PA, in the matter of National

11     Prescription Opiate Litigation MDL, for the Court

12     of the Northern District of Ohio.

13         The deponent is Walter Durr.

14         Will counsel please identify themselves and

15     state whom they represent.

16            MR. HUDSON:  Ty Hudson of Wagstaff &

17     Cartmell for plaintiffs.

18            MS. MONAGHAN:  Meghan Monaghan from

19     Covington & Burling for McKesson.

20            MS. BOURIAT:  Jennifer Bouriat from

21     Pietragallo for Cardinal.

22            MR. BARNES:  Robert Barnes, Marcus &

23     Shapira, for HBC Service Company.

24            THE VIDEOGRAPHER:  Is there any counsel

25     on the phone that could identify themselves,
```

7

1    please?

2              MR. BRODSKY:  This is Richard Brodsky

3    from Jones Day on behalf of Walmart.

4              MS. GUTHRIE:  This is Erica Guthrie from

5    Arnold & Porter on behalf of the Endo and Par

6    defendants.

7              MR. LANOSA:  This is Mike Lanosa from

8    Covington & Burling on behalf of McKesson

9    Corporation.

10             THE VIDEOGRAPHER:  The court reporter is

11   Ann Medis and she will now swear in the witness.

12                   WALTER WAYNE DURR,

13       having been first duly sworn, was examined

14              and testified as follows:

15                      EXAMINATION

16   BY MR. HUDSON:

17       Q.   Good morning, sir.  Could you please

18   state your name.

19       A.   Walter Wayne Durr, D-U-R-R.

20       Q.   And, Mr. Durr, my name is Ty Hudson.  I

21   represent the plaintiffs in this case.  I'm going

22   to be taking your deposition today.

23       Have you had your deposition taken before?

24       A.   Yes.

25       Q.   How many times?

                                                                        8

1          A.   Just once.

2          Q.   In what type of case was it?

3          A.   An insurance case.

4          Q.   And were you a party or just a witness?

5          A.   Witness.

6          Q.   Was it related to your job at Giant

7     Eagle --

8          A.   Yes.

9          Q.   -- or HBC?

10         A.   Giant Eagle.

11         Q.   And when was that case and how recent?

12         A.   It was in the late '80s, I believe.

13         Q.   Well, it sounds like it's been a little

14    while since you've had your deposition taken.  So

15    let's make sure that we understand the ground

16    rules.

17         I'm going to be asking the questions today,

18    and then you're going to be providing answers.

19    From time to time counsel might object for the

20    record.  Unless Mr. Barnes instructs you not to

21    answer, though, I would ask that after the

22    objections you'd answer my questions.

23         Is that fair?

24         A.   Okay.

25         Q.   Also, do you understand that you're

9

1    under oath as if you were in a courtroom in front

2    of a judge and a jury?

3         A.   I do.

4         Q.   And the answers need to be audible just

5    for the court reporter.  So head nods and those

6    things like that are more difficult to pick up.

7    Okay?

8         A.   Okay.

9         Q.   If you need to take a break at any time,

10   let me know, and I'm happy to.  We'll just go off

11   the record, and you can do so.

12        All I would ask is that if there's a pending

13   question, you answer the question before we go on

14   the break.

15        Is that fair?

16        A.   That is.

17        Q.   Before we get going into the substance,

18   let me ask you this:  What did you do to prepare

19   for the deposition today?

20        A.   Had time with Bob yesterday.

21        Q.   And approximately how long would you say

22   that meeting lasted?

23        A.   A few hours.

24        Q.   Anything else that you did to prepare

25   for the deposition?

10

1      A.   No.

2      Q.   Did you talk to anyone?

3      A.   No.

4      Q.   Would that be true about this case in

5   general?  Have you talked to anyone at Giant Eagle

6   about this case?

7           MR. BARNES:  I'll just --

8   BY MR. HUDSON:

9      Q.   Other than lawyers.

10          MR. BARNES:  -- caution you.  Anything

11   related to attorneys for Giant Eagle or for you,

12   excluding that.

13          THE WITNESS:  No.

14   BY MR. HUDSON:

15      Q.   When did you first become aware of this

16   lawsuit?

17      A.   I don't have the exact date.  Sometime

18   in 2018.

19      Q.   And I meant to ask you this before.

20   What is your current address?  Where do you live?

21      A.   111 Dehaven Road, Beaver Falls, PA

22   15010.

23      Q.   So you live in Pennsylvania?

24      A.   Yes.

25      Q.   Tell me, if you could, about your

1     education.

2         A.   I have a bachelor's degree from a local

3     university, Point Park University.

4         Q.   And when you say local, local to where,

5     sir?

6         A.   Local to Pittsburgh.  Sorry.

7         Q.   I'm from Kansas City.

8         A.   All right.

9         Q.   No.  That's okay.

10        So from here in Pittsburgh.

11        A.   Yes, sir.

12        Q.   And any other advanced degrees after you

13    graduated from college?

14        A.   No.

15        Q.   Did you go straight to work after

16    college, graduating from college?

17        A.   I was working while I was going to

18    college.

19        Q.   Could you just describe for me your

20    employment history from when you graduated from

21    college up until today?

22        A.   I worked for a company called Foxmeyer

23    Drug Corporation, who then went bankrupt, and then

24    Giant Eagle took over those operations in 1996.

25    And I've been with Giant Eagle since that time.

1          MR. BARNES:  Ty, I think you may be

2     assuming the traditional "went to college and then

3     began working."  I think it's a little different

4     here.

5     BY MR. HUDSON:

6          Q.   Do you want to just explain that?

7          A.   Out of high school, I went to the -- was

8     in the service.  Spent close to seven years in the

9     service and then got out.  And then went to

10     college, had a family and kids.  And so I was

11     working, going to college, and went from there.

12          Q.   And so you've been at Giant Eagle for

13     close to 30 years?

14          A.   No.

15          Q.   Or 20 years, I mean; right?

16          A.   Yeah.

17          Q.   You had 1996 to 2008, so about 22 years;

18     right?

19          A.   Yes.

20          Q.   And, if you could, just walk me through

21     the roles that you've had at Giant Eagle from 1996

22     to the present.

23          A.   Started out as a selector, rank and

24     file, if you will.  Opportunity -- that was prior

25     to Giant Eagle.

13

1          So I came into Giant Eagle as a supervisor.

2      And within less than a year, I was promoted to a

3      shift manager.  I then took a role as the HR

4      manager.  And then I had an opportunity to become

5      the operations manager.

6          Q.   And is that your current role today?

7          A.   It is.  And there's a time that I had

8      left HBC to fill a different role within Giant

9      Eagle at another facility.

10         Q.   And what was that timeframe?

11         A.   Well, there's two of them.  2003 I was

12     the HR manager for Okay Grocery.

13         Q.   How long did you remain in that role at

14     Okay Grocery?

15         A.   Approximately ten months to a year.  And

16     then that's when I assumed the operations manager

17     role.

18         And then I was asked to go to Fresh Food

19     Manufacturing in 2012.  And I was there until

20     2015.

21         Q.   And then when you came back in 2015, you

22     went back to the operations manager role?

23         A.   For HBC, yes.

24         Q.   For HBC.  And have all of the positions

25     that you've been at when you've been the shift

14

1      manager, the HR manager, and then the operations

2      manager, were those all at the HBC warehouse?

3          A.   No.  As I stated, I started HR at HBC,

4      but then was HR for Okay Grocery Company, which is

5      a subsidiary of Giant Eagle.  And then I was

6      operations manager for Fresh Foods Manufacturing.

7          Q.   Right.  And I'm sorry.  That was a bad

8      question.

9          I meant to -- I meant other than the two

10     times when you left -- I was really more focused

11     on during the time that you were at Giant Eagle or

12     HBC.  During that time period, was it -- were you

13     always located, physically located at the HBC

14     warehouse?

15         A.   Yes.

16         Q.   And were you an employee of HBC or an

17     employee of Giant Eagle, if you know?

18         A.   Technically, it's Giant Eagle.  But HBC

19     is a subsidiary of Giant Eagle.

20         Q.   Did HBC have any employees that you're

21     aware of?  And maybe the legal distinctions don't

22     mean anything to you.  I'm just trying to figure

23     out --

24         A.   Yeah.

25         Q.   -- if there's --

1     A.   The distinctions don't mean anything.

2     Q.   Right.  I mean, I don't know if you've

3  ever looked at payroll --

4     A.   No.

5     Q.   -- or W-2s or things --

6     A.   Ours come from Giant Eagle.

7     Q.   So to your knowledge, are there any --

8  yeah -- are there any employees that are on

9  payroll that are receiving payment from HBC

10  Service Company?

11     A.   No.

12     Q.   To your knowledge, all of the employees

13  at the HBC warehouse would all be employees of

14  Giant Eagle?

15     A.   Yes.

16     Q.   So if you could, let's focus first on

17  your shift manager role at the HBC warehouse.  I

18  think you indicated you came into that role around

19  1997.  How long did you stay in that role?

20     A.   Shift manager, up till 2000 and -- 2000.

21     Q.   2000.  And then how about -- and then at

22  that point you became the HR manager?

23     A.   Correct.

24     Q.   And how long did you stay in that role?

25     A.   Till the end of 2003.  And that's

16

1    inclusive of the Okay Grocery piece.

2        Q.   So you were the HR manager at the HBC

3    warehouse from 2000 until some point in 2003.  And

4    then around that time you were shifted over to

5    Okay Grocery, and then were the HR manager there

6    for, I think you said, about ten months?

7        A.   Yes.

8        Q.   So then we're up to roughly 2004

9    timeframe?

10       A.   Yes.

11       Q.   And then at that point you became the

12   operations manager at the HBC warehouse?

13       A.   Yes.

14       Q.   And how long did you remain in that

15   role?

16       A.   I remained in that role at HBC until

17   2012.  And then I assumed responsibilities as the

18   operations manager for Fresh Foods Manufacturing,

19   Freedom Road, and then returned to HBC in that

20   capacity in 2015.

21       Q.   And from 2012 to 2015, who assumed the

22   role of operations manager at the HBC warehouse?

23       A.   There were two persons who assumed that

24   role.  First was Annmarie Dougherty and Matt

25   Rogos.

17

```
 1        Q.   And do you know how long Ms. Dougherty

 2   remained in that role?

 3        A.   I believe she was right around a year.

 4        Q.   And then Mr. Rogos would have been a

 5   couple years from '13 to '15, in that timeframe?

 6        A.   Yes.

 7        Q.   During the time that you were at Fresh

 8   Foods Manufacturing, did you maintain any contact

 9   with Mr. Rogos or Ms. Dougherty about what was

10   going on at the HBC warehouse?

11        A.   I did have contact primarily with

12   Mr. Rogos for our Get Go distribution.

13        Q.   What is Get Go?

14        A.   Those are convenience stores owned and

15   operated by Giant Eagle.  And we were and are

16   still doing selection, a portion of the selection

17   at HBC and a portion at Fresh Foods.

18        So I did have to have contact with Matt on a

19   regular basis to discuss Get Go.

20        Q.   So in your role at Fresh Foods, a

21   portion of that involved interacting with the HBC

22   warehouse regarding, you know, for lack of a

23   better word, supply or product that was coming

24   from the warehouse to Fresh Foods?

25        A.   For Get Go.
```

18

1      Q.   Right.   For Get Go.   Got it.

2      Any other connection between yourself and

3  Mr. Rogos regarding the HBC warehouse?   And,

4  again, just during that timeframe in 2013 to 2015.

5      A.   Nothing specific, that I can recall.

6  ████████████████████████████████████████████

7  ████████████████████████████████████████

8  ████████████████████████████████

9  ████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ██████████████████████████

13 ██████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████

16 ██████████████████████████████████

17 ████████████

18     Q.   If you could, I want to focus in on the

19 timeframe in 2009.   At some point in 2009, did the

20 HBC Service Company obtain a DEA license to become

21 a distributor of controlled substances?

22     A.   Yes.

23     Q.   And at some point did the HBC Service

24 warehouse begin acting as a distributor of

25 Schedule III, IV, and V controlled substances?

19

1      A.    Yes.

2      Q.    Was that in or around November of 2009?

3      A.    Yes.



1    subject is Pharmacy Controllable Substance

2    Location.

3         Was that an email sent to you back in July of

4    2009?

5         A.   Yes.

6         Q.   And was this during the timeframe when

7    you, Mr. Carlson and others were getting prepared

8    for HBC to become a distributor of controlled

9    substances?

10        A.   Yes.

11        Q.   And if you could, just tell me who was

12   Joseph Hurley.

13        A.   Joseph Hurley, at that time, I believe

14   he was the vice president of distribution.  He's

15   currently our senior vice president of

16   distribution and logistics.

17        Q.   How about Andy Zelaski?

18        A.   Andy Zelaski was a manager who reported

19   to me and was the manager that I put in charge of

20   the pharmacy area.

21        Q.   And then I think we know who Mr. Carlson

22   is.

23        How about the -- it looks like there's three

24   individuals who were copied.  If you could, just

25   tell me who those three individuals are.





23









27

1  substances that was flowing through HBC from 2009

2  to 2016?

3          MR. BARNES:  Object to form.

4      Go ahead.

5          THE WITNESS:  On an HBC report going to

6  the DEA, I would agree on the accuracy.

7  BY MR. HUDSON:

8      Q.  From a policies and procedures

9  perspective, who would be responsible for making

10  sure that the HBC warehouse was meeting all the

11  requirements of the Controlled Substances Act once

12  HBC became a distributor of controlled substances

13  in 2009?

14      A.  It would have been a joint

15  responsibility between the facility itself and

16  Greg Carlson's group.

17      Q.  And what responsibilities would lie with

18  the facility?

19      A.  The operational responsibilities of

20  setup, selection and shipping.

21      Q.  And what responsibilities would fall in

22  Greg Carlson's group?

23      A.  His group was primarily around the

24  actual registration, purchasing from the vendors,

25  and scheduling delivery into HBC.

1      Q.   So if we assume Giant Eagle is on, I

2  guess, what I think of as the buy side, so they're

3  buying controlled substances from certain

4  manufacturers; right?

5      A.   Okay.

6      Q.   And that would be the part that

7  Mr. Carlson and his group would be focused on,

8  would be the purchasing and then the shipping into

9  the HBC warehouse?

10     A.   Yes.

11     Q.   And then the second piece of that would

12 obviously be then the inventory and the handling

13 at the warehouse and then the shipping out from

14 the warehouse to the Giant Eagle retail

15 pharmacies; right?

16     A.   Yes.

17     Q.   And so am I understanding you right that

18 the piece of handling the inventory at the

19 facility and then shipping to the retail

20 pharmacies, those responsibilities would lie more

21 on the facility?

22     A.   Yes.

23     Q.   How about steps taken to make sure that

24 the facility was complying with the requirements

25 of the Controlled Substances Act; who would be

29

1    responsible for that particular piece?

2            MR. BARNES:  Objection.  Asked and

3    answered already.  He already said it was a joint

4    responsibility.

5    BY MR. HUDSON:

6        Q.   You can answer.

7        A.   It was a joint responsibility.

8        Q.   So my question now, because your last

9    answer, I think it would be fair to say, and

10   correct me if I'm wrong, but you were focused more

11   on operationally the flow of the product and who

12   was responsible for it coming in and out of the

13   facility.

14       I guess what I'm more focused on is the

15   policies and procedures that would be focused on

16   complying with the Controlled Substances Act.

17           Would you say that that would be -- your

18   answer would be the same, that for purchases of

19   the product coming into the facility, that would

20   be Mr. Carlson's group, but then what happens at

21   the facility and then the shipping to the retail

22   pharmacies would be the responsibility of the

23   facility itself?

24       A.   I would still say --

25           MR. BARNES:  I'm going to object to

1    form.  That's kind of a really long question.

2        Do you understand the question?

3            THE WITNESS:  I believe so, but if you

4    could break it down.

5    BY MR. HUDSON:

6        Q.   Sure.  Well, you've testified -- and

7    your counsel made the point that it was asked and

8    answered, so you've already apparently answered

9    this, so I was trying to recap what your previous

10   answer was.

11       Is your answer the same from a compliance

12   standpoint?

13       A.   Yes.  There was joint responsibility.

14       Q.   And those joint responsibilities, would

15   they -- would they lie and fall the same way that

16   they would in terms of operationally who was

17   responsible for the product?

18       A.   I would say yes, it was.

19       Q.   So once the controlled substances, the

20   Schedule III, IV, and V controlled substances were

21   shipped into the facility and they were physically

22   located at the facility, it would be your

23   testimony that the facility, yourself and

24   the people underneath you, were responsible for

25   coming up with policies and procedures at the

31

```
 1    facility to comply with the Controlled Substances
 2    Act?
 3              MR. BARNES:  Object to form.
 4              THE WITNESS:  I'll say no.  We would
 5    have a hand in devising or working with Greg and
 6    his group on making sure or ensuring that we were
 7    following the proper process and procedures.
 8    BY MR. HUDSON:
 9        Q.  Well, that's what I'm trying to
10    understand.  You've testified that from a
11    compliance perspective, it was a joint effort
12    between the facility and Mr. Carlson's group.
13        And I guess what I'm trying to figure out is
14    within that joint responsibility, were there
15    certain responsibilities that fell on the facility
16    versus Mr. Carlson's group?
17        How do I figure out who was responsible for
18    what?
19        A.  Yes.  So an example would be cameras and
20    the loss prevention piece that fell to Andy
21    Zelaski and myself, primarily Andy, and working in
22    connection with the DEA on what are either best
23    practices or what was regulatory and needed.
24        Again, that was just an example.
25        Q.  Sure.  And if you could, just walk
```

32

1    through what you believed to be the obligations

2    that arose in 2009 when that facility became a

3    distributor of controlled substances.

4        And just, if you could, describe what you

5    recall about the steps taken by your team or

6    Mr. Carlson's team to put policies, procedures or

7    things in place to comply with the Controlled

8    Substances Act.

9        A.   So we had -- we knew to bring in

10   controlled substances, we had to have a specific

11   area.  And it had to meet DEA requirements of the

12   gauge of steel in the wire for the cage, whether

13   there was a roof on it or not, or ceiling I guess

14   I should say.  It had to be bolted down to the

15   floor.  We had to ensure that the seams were

16   tack-welded and not just bolted.

17       And our Sonitrol system, we had to work with

18   our loss prevention to set that up, ensuring that

19   background checks were covered, drug and alcohol

20   screens were covered.

21       Those are all the things that -- again,

22   working jointly with Greg Carlson and the DEA to

23   get that information to know what direction we

24   should go to properly set up this facility.

25       Q.   Did you personally have any

33

1   communications or discussions with the DEA at this

2   time in 2009 when the facility was being set up?

3        A.   I would have.

4        Q.   And who did you speak with at the DEA?

5        A.   I don't fully remember his last name.

6   His first name was Lou.  I think it started with a

7   C.  It's been quite a few years since.

8        Q.   Sure.  No, I understand.  And I'm just

9   trying to get your best testimony on the record.

10       How many times would you say you spoke to

11  Lou C at the DEA or of the DEA?

12       A.   I would say leading up to opening or

13  starting the operation, maybe two times, maybe

14  three.  I can't speak for how many times he may

15  have spoke with anyone in corporate.

16       Q.   Were those discussions focused on the

17  security requirements, making sure that the

18  facility was meeting the DEA security

19  requirements?

20       A.   Yes.

21       Q.   Do you know if you reached out to him or

22  if he reached out to you?

23       A.   I can't.  I don't remember.

24       Q.   Anything else you can think of that the

25  HBC warehouse did as part of its process of

34

1    becoming a distributor of controlled substances?

2        A.   Not top of mind, no.

3        Q.   Is it fair to say that the measures or

4    the steps or the plan that you implemented for the

5    warehouse were focused on the security

6    requirements of the Controlled Substances Act?

7        A.   It was one of our focuses.

8        Q.   Well, so far you've talked about

9    security cameras being installed; right?

10       A.   Yes.

11       Q.   And then you talked about creating a

12   specific area in the warehouse for controlled

13   substances that was enclosed with steel and bolted

14   down to make sure that it was a secured area;

15   right?

16       A.   Yes.

17       Q.   And then you talked about background

18   checks for employees who would be dealing with the

19   controlled substances; right?

20       A.   Yes.

21       Q.   So can we agree that all of those were

22   steps taken to address either security or theft

23   controls -- I'm sorry -- security or theft

24   concerns?

25       A.   Yes.

35

1      Q.   Anything else you can think of -- I just

2   want to make sure that I've exhausted this

3   topic -- that either your group or Mr. Carlson's

4   group did to prepare the warehouse to become a

5   distributor of controlled substances?

6      A.   One is, as stated in one of the

7   exhibits, was just inventory controls.

8      Q.   And tell me what steps HBC did to

9   address inventory controls.

10      A.   Well, we implemented a more robust

11   counting system than we had out in, I'll say, the

12   general HBC warehouse.

13      Example, and I don't know that I'll get the

14   numbers exactly right, but for the narcotics cage

15   as we refer to it, we would count that prior to

16   anybody selecting every day.  We would count it

17   after -- as the team members were leaving to go to

18   break, the selectors.

19      We would count it before each route left.

20   And then that was for the pick slots.  And then we

21   would count the reserves once a month unless we

22   saw any discrepancies in our pick location.

23      Q.   So the inventory controls that were put

24   in place involved more rigorous and more regular

25   counting of the inventory to make sure that the

36

1   inventory that was supposed to be there was, in

2   fact, there?

3        A.   Yes.

4        Q.   Anything else that you can think of in

5   terms of controls or steps taken at the HBC

6   warehouse to become a distributor of controlled

7   substances?

8        A.   As we talked, our security, we had a fob

9   system around the entire building.  Like we had a

10  specific fob system, Sonitrol system.

11       We regulated who had access to the room

12  itself.  And then we had even more limited access

13  to the narcotics cage itself along with locks, and

14  the cage itself had its own sensors and alarm

15  system specific to the cage.

16       Q.   Anything else you can think of?

17       A.   Not at this time.

18       Q.   I'm going to switch gears a little bit

19  and hand you what I've marked as Exhibits 3 and 4.

20            (HBC-Durr Exhibits 3 - 4 were marked.)

21  BY MR. HUDSON:

22       Q.   Mr. Durr, I'll represent to you that

23  Exhibit 3 is some responses to questions that the

24  plaintiffs asked HBC.

25       And I'm going to turn to page 8 of these

37



38



39





41





43





45





47













53



54



55







58





60





62

```
 1          So you were physically located at the

 2    warehouse in Washington, Pennsylvania; correct?

 3          A.   Yes.

 4          Q.   And then Mr. Millward and the compliance

 5    group was located at Giant Eagle's corporate

 6    offices here in the Pittsburgh area; right?

 7          A.   Yes.

 8          Q.   And how many miles apart are those?

 9          A.   I don't know.  Figure 30 --

10          Q.   Okay.

11          A.   If that.  25.  I don't know.

12          Q.   But there wasn't anyone in the

13    compliance group that was located at the warehouse

14    in Washington, Pennsylvania; correct?

15          A.   Physically located, no.  They have and

16    have always had systems and visibility through the

17    systems.

18          Q.   Okay.

19          A.   And at any time, any one of them could

20    come to the facility.

21          Q.   And that's what I'm getting at.  My

22    question is:  Between 2009 and 2016, are you aware

23    of any initiatives by the Giant Eagle corporate

24    office using its systems to monitor suspicious

25    orders of controlled substances?
```

1      A.   I'm not aware of any from the corporate.

2   That doesn't mean there weren't any.  I'm just not

3   aware of them.

4      Q.   Would it be fair to say then that

5   between 2009 and 2016, there was no coordination

6   between yourself and the Giant Eagle corporate

7   office in terms of using Giant Eagle systems to

8   monitor suspicious orders of controlled

9   substances?

10      A.   That would not be fair.  We -- "we"

11   being my team, Andy Zelaski and Christy Hart --

12   had daily communications with the corporate team

13   via phone and/or through our systems monitoring

14   inventory and communicating inbound/outbound

15   shipments.

16     So we believe we had a system in place.

17      Q.   Yourself, Mr. Zelaski and Erin Hart?

18      A.   Christy Hart.

19      Q.   I'm sorry.  Christy Hart.

20     Was there anyone else at the HBC facility who

21   was involved in communicating with the compliance

22   group?

23      A.   Those were the primaries.  On a day off

24   we had a backup for Christy.  It was typically

25   Dominique McFann.  But Christy and Andy were the

64

1    primaries.

2         Q.   And when did these communications begin?

3         A.   From the moment we opened operations.

4         Q.   From the moment that you began acting as

5    a distributor of controlled substances?

6         A.   Yes.

7         Q.   So from November of 2009 until the

8    present?

9         A.   I would say probably even before that,

10   as you've seen, as we were setting up to go into

11   distribution.

12        Q.   And I guess what I'm focused on is

13   suspicious order monitoring of controlled

14   substances shipments that were going in and out of

15   the warehouse.

16        Is that your understanding of suspicious

17   order monitoring?

18        A.   Yes.

19        Q.   We've looked at -- if we go back to

20   Exhibits 5 and 6 -- well, actually, and Exhibit 4

21   as well, can we agree that HBC did not have any

22   written policies or procedures in effect at least

23   prior to August 1, 2014?

24        A.   No.  We can't agree on that.

25        Q.   Are you aware of written policies or

1    procedures that existed prior to August 1, 2014

2    relating to monitoring of suspicious orders of

3    controlled substances?

4         A.    I would say we had a system in place as

5    it related to suspicious order monitoring.

6         Q.    Okay.  And my question though is more

7    specific.  And we'll get there, and I'll ask you

8    more questions about what that program or system

9    looked like.

10        I guess what I'm focused on right now are

11   just written policies or procedures.  Okay?

12        A.    I believe we had those policies.  Where

13   they are or what happened to them through time, I

14   can't answer that.

15        Q.    You believe that the HBC warehouse had

16   suspicious order monitoring policies or procedures

17   that existed prior to August 1, 2014?

18        A.    I can't say that we had a policy

19   specifically as you're stating it, but I believe

20   we had a system in place and processes and

21   procedures.

22        Q.    Did you have those in writing?

23        A.    I would say that we did, but I don't

24   have them.

25        Q.    When were those policies or procedures

1    put into writing?

2         A.   I would say in 2009, as we were working

3    to set up the facility.

4         Q.   So I asked you previously questions

5    about all the steps that HBC took to prepare the

6    warehouse to become a distributor of controlled

7    substances.

8         Do you remember that?

9         A.   I do.

10        Q.   And I asked you, I think, three or four

11   times because I wanted to try, as best I could, to

12   get an exhaustive list.

13        You talked about securities and cameras.  You

14   talked about the fob that had limited access.  You

15   talked about controlling the specific area with a

16   cage of steel that's bolted down.  You talked

17   about background checks.  And you talked about

18   inventory controls that were put in place to make

19   the counting more robust and more regular at the

20   facility, specifically for controlled substances.

21        Do you remember that testimony?

22        A.   I do.

23        Q.   And at that time, when I asked you those

24   questions, you didn't identify suspicious order

25   monitoring of controlled substances as one of the





69









73







76





78











83





1    recall which one.  But the stores that were

2    putting their orders in would come through DCOPS,

3    and then would interface with Manhattan.

4    Manhattan was the warehouse management system.

5        Q.   Got it.  Thank you for that

6    clarification.

7        So DCOPS or BICEPS was a computer system that

8    existed at the 200 or so retail pharmacies where

9    they would enter the orders.  And then Manhattan

10   was the warehouse system where you had the ability

11   to receive the orders.

12       And then Vocollect would be used with the

13   headset and the electronic device to then go and

14   pick the orders and fill them?

15       A.   Yes.

16       Q.   And --

17       A.   Sorry to belabor this.  But it was DCOPS

18   or BICEPS.  The pharmacy group had their own

19   software system that sent the orders to my system

20   which was Manhattan.

21       Manhattan is what I can speak clearly on.

22       Q.   Sure.  Any other computer systems that

23   were used at the HBC facility between 2009 and

24   2014?

25       A.   There were different components of

86

1    Manhattan that we would use for cycle counting,

2    inventory reconciliation, entering purchase

3    orders, but they were all housed under the

4    Manhattan.

5        Q.   Am I correct though that Manhattan did

6    not have any functionality where the warehouse

7    could set thresholds or quantities of suspicious

8    orders of controlled substances using historical

9    ordering patterns or things of that nature?

10       A.   Not to my knowledge, no.

11       Q.   So in terms of monitoring suspicious

12   orders of controlled substances, is it fair to say

13   that the HBC warehouse did not have any computer

14   systems that were utilized on a systematic -- in a

15   systematic way to monitor orders?

16       A.   No.  I don't believe that's fair to say

17   that.  We could monitor orders.  We knew exactly

18   what was coming in from the stores.  We also knew

19   exactly what was coming in from the vendors.  And

20   there were checks and balances in place.

21       In addition, the corporate team had full

22   visibility of our inventory at all times and could

23   see if there was any fluctuation whatsoever.

24       Q.   So what I'm trying to separate out is

25   corporate, because it's my understanding -- is it

1    fair to say other people who actually were in the

2    corporate office using those computer systems

3    would be more knowledgeable about what corporate

4    did than you did?

5         A.   About what corporate did.

6         Q.   Yes.

7         A.   But, again, our team at HBC was very in

8    tuned or attuned to what was supposed to be on the

9    shelf, what was supposed to come into the

10   building, and what was supposed to go out of the

11   building.

12        But none of those team members made decisions

13   on what to bring in and what to ship out, but they

14   had full visibility to see what was coming in and

15   out.  And if something didn't match in real time,

16   they would see it and/or act upon it.

17        Q.   Right.  And you've discussed -- I mean,

18   those are programs that are used to make sure the

19   inventory count is correct; right?

20        A.   That's one thing that can be derived

21   from it.

22        The other is if you see that an order is or

23   that a quantity has suddenly spiked or dropped

24   from what should be happening, then there would be

25   communication with the corporate offices to what



89

1    counting we were doing or how frequently we were

2    doing the cycle counts, you would immediately see

3    that you were short two selling units.  Or it

4    could be an overage, but using two shorts in this

5    example.

6         What our process or system at that time was,

7    was we would not ship out of the facility until we

8    reconciled where those two units were.

9         Q.   In that example that you gave though,

10   that's an inventory count issue; right?  The

11   inventory is off.

12        A.   Correct.

13        Q.   Let me, I guess, ask you this.  We've

14   talked a lot about suspicious order monitoring

15   today; right?

16        A.   Yes.

17        Q.   What is your understanding of a

18   suspicious order?

19        A.   Anything that rises to the level of

20   being suspect in count or quantity.

21        Q.   And how would something qualify as being

22   suspect?

23        A.   I could only answer for myself

24   personally.

25        You know, for me, the two units may be

90

 1   suspect at the time within our walls.  On a

 2   grander scale, I don't know that I can put the

 3   framework to that.

 4        But if we at HBC saw anything I'll say out of

 5   the ordinary, our first communication is to the

 6   pharmacy group to understand what we're seeing.

 7   I'm not saying that we did, but...

 8        Q.   And that's, I guess, what I'm trying to

 9   get an idea of, is what would be -- what criteria

10   would the warehouse apply under your system or

11   program to try to figure out whether a shipment is

12   out of the ordinary.

13        A.   So we still see it today even outside of

14   the pharmacy area.

15        Our team members in that specific area, the

16   narcotics room, we were very limiting on who went

17   in there.  Typically, no more than two team

18   members a night would be in that room, and most

19   times we tried to keep it to one.

20        They would get attuned to the normalcies, if

21   you will, of orders going in and out of that room,

22   because they're picking the same items over and

23   over again day in and day out.

24        So, for instance, if they see a store

25   typically would get ten selling units of a

1    particular item, and now all of a sudden the store

2    has 50 selling units going out, the team members

3    would bring it to our attention, either Christy

4    Hart or whoever the supervisor is.  And our first

5    call would be to the pharmacy, is this truly an

6    order that was placed and are those quantities

7    that you absolutely want?

8        Q.   So tell me then how HBC is able to

9    figure out that that particular store usually

10   orders ten of that item, and now they're ordering

11   50?

12       A.   A lot of that is just -- I'll categorize

13   it as empirical from the team members -- not from

14   the data, but from the team members working so

15   closely with those products and being in that same

16   area on a regular basis.

17       Q.   So there's not -- so the identifying the

18   suspect orders or the orders that are not

19   ordinary -- I think your words were out of the

20   ordinary -- that would fall on the particular

21   pickers that are working at the facility to fill

22   the orders, and they'd be relying on their

23   experience and knowledge from doing that day in

24   and day out filling orders?

25       A.   As a first line.  I can't answer for



93



94



95





97



98



99







1   that were blocked by the HBC facility?

2       A.   I do not.

3       Q.   Do you know whether or not there were

4   any shipments of controlled substances that were

5   blocked by the HBC facility as being suspicious

6   orders?

7       A.   I do not.

8       Q.   Do you know whether or not there were

9   any orders of controlled substances that were --

10  the shipment was stopped so that an investigation

11  could be conducted as to whether or not the order

12  was legitimate?

13      A.   Again, as time has passed, I do not.

14      Q.   How many pickers are there?  Is that the

15  right term, pickers?

16      A.   Pickers or selectors.

17      Q.   Selectors.  How many pickers or

18  selectors, ballpark range, were there at the

19  facility between 2009 and 2012?

20      A.   Just in the Rx room?

21      Q.   Yeah, exactly.  Sorry.  Yeah, in the

22  controlled substance area.

23      A.    In the controlled -- in the narcotics

24  cages, we called it, again, we tried to limit that

25  to no more than two in there at a time.

103

1       Q.   Okay.

2       A.   And more times than not, we kept it to

3   one.

4       Q.   So one or two selectors or pickers were

5   actually filling the orders?

6       A.   Yes.

7       Q.   Between 2009 and 2012 though, how many

8   total pickers or selectors were there employed by

9   the HBC, employed at that facility that were

10  filling the controlled substance orders?

11      A.   It's hard to answer.  You know, we've

12  had selectors -- we're a union facility.  Across

13  that entire timeframe?  I would -- maybe eight,

14  six to eight, just in the narcotics room.

15      Q.   And that's what I'm just trying to get

16  an idea of, how many were employed at any

17  particular point in time.

18      Meaning, you know, in 2009, if we went and

19  looked at a particular month, how many selectors

20  were employed focused on filling orders in the

21  controlled substance room?

22      A.   Again, still for a day, no more than

23  two, typically, in that room.  But --

24      Q.   But for a week, let's say, or for a

25  shift, in other words --

1      A.   Well, as I'm saying, for a shift you

2  would -- we tried to keep it to one or two, two

3  being the max unless we -- there were -- flu

4  season may create a time where we put three team

5  members in that area.  But, typically, it's one to

6  two.

7      Q.   And I guess what I'm trying -- and I'm

8  not communicating very well, so I apologize.

9      I'm trying to get an idea of in any month,

10  like how many selectors are there that are

11  employed at that facility who, during that month,

12  are filling orders of controlled substances?

13      A.   Well, the team members are on four tens.

14  So in any given month, it would typically be

15  probably no more than four to six team members

16  that could possibly rotate in and out of there.

17  They -- you know, vacation, sick time, whatever,

18  may cause a team member not to be available to

19  select in that room for that day, then we would go

20  to a different team member.

21      Q.   And that's what I'm trying to get at.

22      You, as the operations manager, to have that

23  control room staffed appropriately, to fill the

24  orders that are coming in and out, you needed four

25  to six pickers or selectors --

1          A.   To get through the week, yes.

2          Q.   -- to get through the week.

3          And approximately how much are those pickers

4    and choosers paid, pickers or selectors paid?  Are

5    they paid by the hour?

6          A.   They're hourly employees.

7          Q.   And what do they get paid per hour?

8          A.   I would have to look back at that time.

9    Average wage is probably 16.  Don't quote me on

10   that.

11         Q.   Sure.

12         A.   I haven't seen our contractual binder.

13   But probably at that time around $16 an hour --

14         Q.   And what is --

15         A.   -- on average.

16         Q.   -- the education level of the pickers or

17   selectors?

18         A.   It varies, but I would say the majority

19   are high school, high school graduates.

20         Q.   And were there some that were not high

21   school graduates?

22         A.   At that time -- I won't say this for

23   fact, but I believe you had to have a GED

24   equivalent or above.

25         Q.   And were the pickers, just through

106





108









112



113



114



115

1 ████████████████████████████████████████

2 ███████████████████████████

3 ██████████████████████████████████████

4          (HBC-Durr Exhibit 10 was marked.)

5   BY MR. HUDSON:

6        Q.   I'm going to hand you what's marked as

7   Exhibit 10, and switch to a different topic.

8        Just a couple last questions here and a

9   couple more emails.

10       I'll represent to you this is a drug fact

11  sheet that was pulled from the DEA website

12  sometime when hydrocodone was still a Schedule II,

13  so prior to October of 2014.

14       And it indicates, on the first page,

15  "Hydrocodone is the most frequently prescribed

16  opioid in the United States and is associated with

17  more drug abuse and diversion than any other licit

18  or illicit opioid."

19       Do you have any knowledge or reason to agree

20  or disagree with that statement?

21       A.   I have no knowledge to agree or

22  disagree.

23  BY MR. HUDSON:

24       Q.   Between 2009 and 2014, the HBC facility

25  did act as a distributor of hydrocodone

116

1    combination products; correct?

2        A.   Yes.

3            (HBC-Durr Exhibit 11 was marked.)

4    BY MR. HUDSON:



117



118



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19    BY MR. HUDSON:

20        Q.   And, Mr. Durr, if you go back to

21    Exhibit 10, Exhibit 10 is the DEA fact sheet that

22    indicated that "Hydrocodone is the most frequently

23    prescribed opioid in the United States and is

24    associated with more drug abuse and diversion than

25    any other licit or illicit opioid."

119

1      Are you there on Exhibit 10?

2      A.   Um-hum.

3      Q.   And down in that same paragraph, it says

4  all hydrocodone are combination products; correct?

5      A.   It does.

6      Q.   So any hydrocodone being sold in the

7  United States is going to be sold as part of a

8  hydrocodone combination product; correct?

9      A.   That's what it states.

10 ███████████████████████████████████

11 ████████████████████████████████████████

12 ██████████████████████████████████

13 ████████████████████████████████████████

14 ██████████████████████████████████

15 █████████████████████

16 █████████████████████

17 ████████████████████████████████████████

18 █████████████████████████████████████

19 █████████████████████

20 ██████████████████████████████████████

21 ███████████

22 ███████████████████████████████

23 ████████

24 █████████████████████████

25 ████████████

120



1    Exhibit 11?

2         A.    To a small degree.

3         Q.    Do you know -- assuming that any of

4    these numbers are correct, and I'm qualifying

5    that, but we're not sure -- what happened to these

6    hydrocodone combination products shipped by HBC to

7    the Giant Eagle pharmacies?

8         A.    They would have gone into our

9    pharmacies.

10        Q.    And what happened to them after they

11   went to the pharmacies?

12        A.    They would have filled legal

13   prescriptions.

14        Q.    So, to your knowledge, were they

15   diverted in any way?

16        A.    Not to my knowledge.

17        Q.    Do you know the difference between -- or

18   do you know what the term diversion means?

19        A.    I do.

20        Q.    What does it mean to you?

21        A.    I believe that something is being pulled

22   in a different direction than its intended purpose

23   or intended sale or use.

24        Q.    You mentioned a couple of times in your

25   testimony that HBC -- it's a single warehouse; is

1    that correct?

2         A.   Yes.

3         Q.   Located in Washington, PA?

4         A.   Yes.

5         Q.   Do you know what the size of that

6    warehouse is?

7         A.   305,000 square feet.

8         Q.   And of that 305,000 square feet, how

9    much is dedicated to pharmacy operations?

10        A.   There was 12,000 square feet and an

11   additional 2,000 for a receiving area.  So 14,000

12   total.

13        Q.   14,000 for pharmacy?

14        A.   Yes.

15        Q.   Including all pharmaceutical products,

16   even noncontrolled?

17        A.   Yes.

18        Q.   What portion of that 12,000 square feet

19   were dedicated -- was the narc room, so-called

20   narc room?

21        A.   Maybe 2,000 square feet.

22        Q.   Was the narc room partitioned off in

23   some secure way from even the pharmacy room?

24        A.   Yes.

25        Q.   And was the pharmacy room partitioned

123

 1    off from the rest of the warehouse?

 2         A.   Yes.

 3         Q.   And what was the rest of the warehouse,

 4    the other 292,000 square feet, what was that

 5    dedicated to?

 6         A.   That's health/beauty care items,

 7    cigarettes, tobacco, candy, mints.

 8         Q.   Okay.

 9         A.   General merchandise.

10         Q.   And was all that product shipped to

11    Giant Eagle grocery stores?

12         A.   Yes.

13         Q.   Did the HBC warehouse ship to any

14    entities other than affiliated Giant Eagle grocery

15    stores and Giant Eagle pharmacies?

16         A.   Pharmacies, only Giant Eagle.  For the

17    grocery side, we did have some nonbanners and

18    independent stores.

19         Q.   Independent Giant Eagle stores?

20         A.   Yes.

21         Q.   All right.  But for the pharmacy --

22         A.   Giant Eagle only.

23         Q.   -- was that Giant Eagle only?

24         A.   Yes.

25         Q.   And would that be to pharmacies

124

```
1    throughout the Giant Eagle regional chain?

2         A.   Yes.

3         Q.   Do you know approximately how many

4    pharmacies are in the Giant Eagle regional chain?

5         A.   I believe 200.

6         Q.   About 200?

7         A.   Yeah.

8         Q.   Did Giant Eagle ever -- did the HBC

9    warehouse ever supply any internet pharmacies?

10        A.   No.

11        Q.   Did the HBC pharmacy ever supply

12   Schedule II opioids to any entity, including Giant

13   Eagle?

14        A.   No.

15        Q.   Did the HBC warehouse -- with respect to

16   the drugs at issue in this case, do you understand

17   those to be Schedule II opioids?

18        A.   Yes.

19        Q.   And when Giant Eagle distributed --

20   well, let me back up.

21        Giant Eagle never or the HBC warehouse never

22   distributed Schedule II opioids; is that correct?

23             MR. HUDSON:  Object to form.

24             THE WITNESS:  No.

25
```

125

1    BY MR. BARNES:

2         Q.   Did you understand hydrocodone

3    combination products to be a Schedule III for a

4    period of time before it was reclassified as a II?

5         A.   Yes.

6         Q.   And did the HBC warehouse, while it was

7    a Schedule III, distribute hydrocodone combination

8    products to Giant Eagle pharmacies only?

9         A.   Yes.

10        Q.   And when it was reclassified to a

11   Schedule II, did HBC stop distributing that

12   product?

13        A.   Yes.

14        Q.   Was that approximately in October of

15   2014?

16        A.   I believe so.  Again, I was not there at

17   that time.

18        Q.   You talked a lot about the so-called

19   inbound and outbound controls at the HBC

20   warehouse.  And I want to follow up a little bit

21   on that.

22        By inbound, do you mean the purchasing into

23   the warehouse?

24        A.   Yes.

25        Q.   Now, I want you to focus solely on

126

```
 1    controlled substances.

 2         Were you there when the cage system was set

 3    up at the HBC warehouse in 2009?

 4         A.   Yes.

 5         Q.   And did you have responsibilities in

 6    that role --

 7         A.   Yes.

 8         Q.   -- in getting ready to distribute

 9    Schedule III and IV and V controlled substances?

10         A.   Yes.

11         Q.   And you said that you had some

12    interaction with DEA when doing that?

13         A.   Correct.

14         Q.   Does the name Lou Colissimo ring a bell

15    to you?

16         A.   It does.

17         Q.   And who is he?

18         A.   I believe he was the DEA inspector at

19    the time.

20         Q.   Was he from the regional DEA Pittsburgh

21    office?

22         A.   I believe so, yes.

23         Q.   And did he come out to the facility to

24    assist with setting up the facility for the

25    distribution of Schedule III, VI, and V controlled
```

127

```
 1   substances?

 2        A.   Yes.

 3        Q.   Did he assist with providing DEA input

 4   as to what the DEA wanted the warehouse to do in

 5   order to get a registration and license to

 6   distribute Schedule III, IV, and Vs?

 7        A.   Yes.

 8        Q.   And did that involve -- first, I'll

 9   break it down -- the physical plant itself, what

10   the DEA wanted and required to distribute IIIs,

11   IVs, and Vs?

12        A.   Yes.

13        Q.   And did you meet all those requirements

14   with Agent Colissimo?

15        A.   We did.

16        Q.   Did he or his team inspect the facility

17   before, during, and after construction?

18        A.   Yes.

19        Q.   Did they approve the facility in those

20   inspections?

21        A.   Yes.

22        Q.   Now, beginning in 2009, when HBC first

23   began distributing Schedule III, IV, and V

24   controlled substances, you mentioned the so-called

25   warehouse management system was called Manhattan?
```

1       A.    Yes.

2       Q.    How long had that -- that was a

3  computerized system?

4       A.    It was and is.

5       Q.    And how long had that computerized

6  system been in effect at the warehouse in 2009?

7       A.    2005, we brought that onboard.

8       Q.    And does that control the inventory at

9  the warehouse from beginning to end?

10      A.    Yes.

11      Q.    And does it also interface with the

12  Giant Eagle pharmacy ordering system?

13      A.    It does.

14      Q.    Does the Manhattan system inside the

15  warehouse, does it involve the use of scanners?

16      A.    Yes.

17      Q.    And is that given to all of the pickers?

18      A.    Yes, it is.

19      Q.    And, again, I'm just talking about the

20  pharmacy area.

21      The Vocollect system, is that at the

22  warehouse itself?

23      A.    Yes.

24      Q.    Does that interface with Manhattan?

25      A.    Correct.

129

1      Q.    And does the Vocollect system provide

2    direction electronically to pickers for each order

3    that has come in from the pharmacies?

4      A.    Yes.

5      Q.    And can you explain to us a little bit

6    more in detail how the Vocollect system works.

7      A.     The orders come from the stores.  Again,

8    they come through our system, routing first, and

9    then into the Manhattan system.   They interface

10   with Vocollect.

11       The team members are assigned a particular

12   area in the building, pharmacy being one of those

13   areas, and the narcotics cage being a specific

14   area.

15       The team member would state that they were

16   ready to work in a particular region.  Once they

17   identify the region, they would also identify what

18   printer they were going to work from.

19       From there, the system -- based on some

20   controls, meaning everything in the building is

21   weighed and measured so that we can properly cue

22   the totes in the trailers, the team members would

23   then be given a set of labels that are specific to

24   what should go in that tote.

25       Q.    And what is a tote?  Is that a box of

1   some sort?

2        A.   You could call that a plastic box, if

3   you will, with a lid that folds in from both

4   sides.

5        Q.   Okay.

6        A.   Once they identified the region, the

7   printer, and get their set of labels, then we

8   would dictate how many labels they would get so

9   that we could maintain balance in selection.  We

10  didn't want a particular selector stuck on one

11  store too long, potentially holding up routes.

12       Once that happened, the team member would

13  then be directed to an aisle, a bay, a shelf, a

14  slot.  And then they would be told to pick the

15  quantity that the pharmacy had ordered.

16       As they're picking the quantities, they had a

17  wrist scanner, and they would pass the individual

18  quantities in front of that wrist scanner.

19       Q.   Do you mean the bar codes --

20       A.   Yes.  The bar code.

21       Q.   -- of what was being picked?

22       A.   The bar code of what's being picked.

23       And as they would do that, they would place

24  it in the tote.

25       And then as they were finished, before they

131

1   would get their next order to pick, they would

2   have to scan or call in a check digit of that slot

3   to confirm they were in the right slot.

4       Once they do that, then they would just -- it

5   was redundant after that of selection process.

6       Q.   So is the picking process through

7   Manhattan and the Vocollect system highly

8   computerized and monitored continually throughout

9   the day?

10      A.   Yes.

11      Q.   And does the system specifically tell

12  each picker where exactly -- you said the aisle,

13  the shelf, and the slot -- they're supposed to go

14  to make the pick?

15      A.   Yes.

16      Q.   And as they physically make the pick, it

17  scans right into the system?

18      A.   Yeah.  The team members pushing --

19  pulling it past a scanner.

20      Q.   They scan the bar code on their scanner?

21      A.   Correct.

22      Q.   So then the system knows that it's in a

23  specific tote at that time?

24      A.   Correct.

25      Q.   And what happens to -- when the picker

132

1    is done picking in the narcotics room, what does

2    he do then?

3        A.   So the team members not in the narcotics

4    room would take their tote -- and there was an

5    opening with a conveyor going into the narcotics

6    cage -- they would put their tote on there.  It

7    would go into the narcotics room.  And then the

8    narcotics selector would pick their portion of

9    that order and place it in the tote.

10       Q.   I see.  So not all the pickers in the

11   warehouse were allowed in the narcotics room?

12       A.   Correct.

13       Q.   And you said only one or two at a time?

14       A.   Yes.

15       Q.   And once that picking was done in the

16   narcotics room, what happened -- and it was put

17   into the tote -- what happened to the tote?

18       A.   So once the selection is done and we

19   believe that we are ready to put that on the

20   trailer for shipment, our system has a process

21   where we have to scan every single individual

22   tote.

23       If you for some reason would miss a tote or

24   something was unaccounted for, the system would

25   not allow you to do what's called close load.  It

133

1    then forces you down to a specific tote ID to

2    answer why or where that tote might be.

3         Q.   So did you need to close the load before

4    you shipped?

5         A.   Yes.

6         Q.   And once it was ready for -- the load

7    was closed and was ready for shipment, what

8    happened to the tote?

9         And I guess it was on a pallet of some sort?

10        A.   There would be pallets -- they were

11   already palletized.  The pallet would be

12   shrinkwrapped and then loaded onto the trailer.

13        Q.   And the trailers, who handled the --

14   whose trailers were they?

15        A.   They were Talon Logistic or Giant Eagle

16   trailers.

17        Q.   Did you ever do any shipping with

18   McKesson?

19        A.   McKesson -- we would deliver to

20   McKesson, and then McKesson would deliver out to

21   the pharmacies from there.

22        Q.   Okay.  So that's outgoing inventory.

23        In the process you described, the so-called

24   Manhattan system, through the use of bar codes and

25   scanners, would know every step of the picking

134

1    process all the way up to the close load and is

2    ready for shipment?

3         A.    Yes.

4         Q.    And if there were any discrepancies in

5    that, you couldn't ship?

6         A.    Yeah.  We wouldn't ship.

7         Q.    Now, how about on the inbound side; who

8    determines what's coming into the warehouse?

9         A.    At that time that would have been Greg

10   Carlson's group.

11        Q.    At corporate?

12        A.    At corporate.

13        Q.    And did they manage incoming inventory?

14        A.    Yes.

15        Q.    Corporate?

16        How would the warehouse know what to expect?

17   Trucks just show up or would you be told by

18   corporate that expect --

19        A.    It would be scheduled through the

20   system.  We would know that a vendor or, excuse

21   me, a carrier was coming, and on that particular

22   carrier would be a specific vendor.

23        Q.    By the way, what type of physical

24   barriers or controls did you have for outgoing or

25   incoming shipments of narcotics?

135

1      A.   We had several.  We have the cage

2   itself.  Outside of the cage, we had numerous

3   cameras.  I believe we had probably 30 or 40

4   cameras within that small confine.

5      Q.   30 or 40 cameras --

6      A.   Yes.

7      Q.   -- for the pharmacy room itself?

8      A.   Yes.

9      Q.   How about inside the narc room?

10      A.   I believe we at least had anywhere from

11   eight to 12 different angles looking at it, or

12   beaming into it, or an overlap.

13      Q.   And was that to guard against theft and

14   diversion?

15      A.   Correct.

16      Q.   All right.  And so once it was

17   palletized and ready for shipment, did it just sit

18   in the warehouse next to a crate of oranges?

19      A.   No.  We had two areas that -- it would

20   remain in the pharmacy room or it would be

21   monitored as it was being loaded.

22      Once it was loaded, the door was shut and

23   sealed, and those sealed numbers would be

24   communicated or written down on the outgoing

25   paperwork.

1      Q.   You mean shut and sealed inside the

2  tractor-trailer?

3      A.   Correct.  In the trailer at -- while it

4  was stationed in our door.  And from there, it was

5  leaving.

6      Q.   Were there any precautions taken to

7  avoid people being able to slip in alongside the

8  trailer or under the trailer?

9      A.   Yes.  On a standard trailer in our door

10  50 and 51, they butted up very tightly against the

11  building itself.  And they were at the height

12  where there were no gaps around that.

13      If we had an inbound UPS/Fedex load coming

14  in, those are box trucks that are at a lower

15  level, and they can't use those normal dock.  So

16  what we had there was -- we had bollards, steel

17  bollards that were drilled into the ground.  We

18  had a steel plate welded onto those bollards so

19  that no one could slide up under the truck or

20  right into the building.

21      We also had created a cage where, when the

22  UPS driver or Fedex driver would come, they would

23  pull those cages to the sides of the vehicle.

24  Again, to deter anyone from having quick or easy

25  access into the building.

137

1     If the driver was not delivering something

2   through that door and they had maybe one or two

3   cases and they were delivering them, first they

4   would have to ring a buzzer.

5     We had a camera right there so we could see

6   who was out there and if anybody was around or

7   near them, then make a determination if we were

8   going to let them into the building.

9     If we were going to let them into the

10  building, we then had a secondary cage, if you

11  will, at the door.  That was locked at all times

12  and monitored.  Then we would let them into there,

13  and then decide whether we were just going to

14  transact with them in the cage or let them into

15  the room itself.

16     Q.   This is all related to narcotics

17  transactions?

18     A.   This related to any of the pharmacy

19  items.  Again, the narcotics would have been in

20  the cage separate of that.

21     Q.   Okay.

22     A.   So they weren't coming directly into

23  that narcotics cage.

24     Q.   All of these physical controls, were

25  these something that Agent Colissimo from the DEA

138

```
1    had asked HBC to install, or did this include some
2    of his recommendations and then --
3                MR. HUDSON:  Object to form.
4                THE WITNESS:  I would say they included.
5    BY MR. BARNES:
6        Q.   And was he aware during his inspections,
7    before you began distributing controlled
8    substances, about all these safety precautions?
9        A.   Yes.
10       Q.   Would the warehouse get copies of the
11   purchase orders issued by the buyers or the
12   category managers at corporate?
13       A.   Yes.  We had the ability to print those
14   in-house.
15       Q.   And so if a truck pulled up, you would
16   be able to pull the purchase order?
17       A.   Yes.
18       Q.   And were there controls to match what
19   was being delivered to the purchase order?
20       A.   Yes.  Absolutely.
21       So we had a confined area where we would do
22   the pharmacy receiving, whether it be narcotic or
23   otherwise.
24       If it was a temperature-sensitive item, then
25   we would bring it all the way into the room.  If
```

139





141

1    you counted 25 for that pallet.  You would then

2    scan the license plate next.  And that now marries

3    those units to that license plate number.

4         And from there, when the put-away function is

5    done, the team member would scan that license

6    plate number.  And from there, it would tell them

7    or direct them where to put it away in the

8    facility.

9         Q.   So the put-away function, was that also

10   part of Manhattan?

11        A.   Correct.

12        Q.   And would Manhattan tell the put-away

13   team members exactly where the narcotics needed to

14   go in terms of slots and shelves and aisles in the

15   narcotics room?

16        A.   Yes.

17        Q.   And how was that process monitored to

18   make sure that the team members actually put away

19   what had been received?

20        A.   Through our cycle count process.

21        Q.   Tell us about the cycle count process.

22        A.   So as stated earlier -- again, I may not

23   get the exact numbers, but we were really robust

24   on the cycle counts within the narcotics cage.

25        We were counting at the beginning of the

```
 1    shift.  We were counting when the team members
 2    would go on their breaks.  We were counting at the
 3    end of the selection of each route prior to
 4    loading that route.
 5         So to answer that question about the
 6    put-away, if for some reason there would be a
 7    discrepancy on the pick shelf, then your first
 8    obvious area to look would be up in your reserves
 9    to see if a replenishment was not properly made.
10         Q.   So this cycle counting for narcotics,
11    you said earlier and just now, was done multiple
12    times every day?
13         A.   Yes.  Every day during every selection
14    process.
15         Q.   So let's just take an example of an HCP,
16    Vicodin.  That would get counted at the beginning
17    of a shift?
18         A.   Yes.
19         Q.   In the narcotics room?
20         A.   Yes.
21         Q.   And then at the end of a shift?
22         A.   All through the shift.
23         Q.   All through the shift.
24         A.   Correct.
25         Q.   How would it get counted through the
```

143

 1    shift?

 2        A.    As I stated, when the team members would

 3    go on their breaks, the support staff would stay

 4    and remain back and do a count.

 5        When the selection was done for that route,

 6    we'd go in and count the cage again.

 7        Q.    Oh, at every break and at every

 8    shipment?

 9        A.    Yes.

10        Q.    And then at the end of the day?

11        A.    Correct.

12        Q.    So how many times, for example, would

13    Vicodin get counted in the specific slot and shelf

14    that it was on in the warehouse in any given day?

15        A.    In a number of routes, anywhere from

16    like four to six times.

17        Q.    Why were you doing all that cycle

18    counting?

19        A.    We wanted to ensure the integrity of

20    our -- of our inventory.  But also it gives you an

21    opportunity to catch anything that may be -- that

22    may be amiss.

23        Q.    Would it give you an opportunity to spot

24    theft and diversion?

25        A.    It would.

                                                                        144

1              MR. HUDSON:  Object to the form.

2    BY MR. BARNES:

3        Q.   And was the Manhattan system the

4    computerized system that was monitoring every step

5    of this inbound and outbound process at the

6    warehouse?

7              MR. HUDSON:  Object to the form.

8              THE WITNESS:  Yes.

9    BY MR. BARNES:

10       Q.   Did the DEA come in from time to time

11   and look at the warehouse system and check

12   inventory and ask for records?

13       A.   Yes, they did.

14       Q.   How often did that happen?

15       A.   At least annually.

16       Q.   At least annually.

17       And what would they typically ask for when

18   they came in?

19       A.   They almost always -- I would say they

20   always went to the narcotics cage.  They would

21   show up unannounced, introduce themselves, state

22   the nature of their business.

23       And they would -- I don't know whether they

24   randomly or how they decided on their list, but

25   they would show us or tell us which items they

145

```
 1    wanted to do counts on.  And they would also tell

 2    us what dates they want to see our records from.

 3         Q.   So would they take, for example -- I'll

 4    use Vicodin again.  They'll say, we want all your

 5    records on Vicodin for, what, a month or two-month

 6    or three-month period of time?

 7         A.   Each scenario, they would give us a

 8    specific -- I believe a specific date or week in

 9    the past.  Even they'd say, Show me your records

10    from June of 2010.

11         Q.   And would you give them the records?

12         A.   We would.

13         Q.   Did any of these unannounced inspections

14    ever result in the DEA telling you that you're

15    doing something wrong at the warehouse?

16         A.   No, they did not.

17         Q.   Did the DEA ever find any discrepancies

18    with respect to the controlled substances that HBC

19    was distributing?

20         A.   No, they didn't.

21         Q.   Were the pickers in the narc rooms, were

22    they trained on the Manhattan system?

23         A.   Yes.

24         Q.   On how to use the scanners?  How to

25    pick?  Things of that nature?
```

1      A.   Yes.

2      Q.   The headsets that they were wearing, was

3  Manhattan instructing through the headsets?

4      A.   Vocollect was instructing, yes.

5      Q.   I'm sorry.  Vocollect.

6      I mean, was there like a computerized voice

7  of some sort?

8      A.   Yes.

9      Q.   If I was wearing one, it would say, go

10  to aisle 3, bay 7, shelf 2, slot 7?

11      A.   Yes.

12      Q.   And then as I pick -- I'm a picker -- I

13  go to that slot, and I brush the bar code past my

14  wrist scanner?

15      A.   Correct.

16      Q.   And Manhattan then knows I did what I

17  was just told to do?

18      A.   Correct.

19      Q.   And does Manhattan then track the

20  inventory as it's being loaded into totes and then

21  all the way out the door?

22      A.   Yes.

23      Q.   You talked about the narcotics room

24  pickers.

25      Over time, would they become familiar with

147



148





150



151



152





154



155



156





158



159



160





1    outdated products.

2         Were these policies things that were followed

3    by HBC from 2009 going forward?

4         A.   Yes.

5         Q.   The next policy on page 636 is a damaged

6    and return product policy.

7         Was this a memorialization of a preexisting

8    policy that went all the way back to 2009?

9         A.   Yes.

10        Q.   And what is the purpose of this type of

11   policy?  What is its function?

12        A.   To ensure that any damaged or returned

13   products were being handled properly, and if they

14   required a quarantine, that they were properly

15   quarantined off.

16        Q.   Would this damaged or returned product

17   be monitored by the Manhattan system?

18        A.   Yes.  Just the fact that it says, "All

19   damaged product must be removed from active

20   inventory," you would have to go into Manhattan

21   to remove that from active inventory.

22        Q.   Okay.

23        A.   So there would be a record of that.

24        Q.   The next policy is -- on page 638 is the

25   suspicious order policy.  Do you see that?

163

1        A.   I do.

2        Q.   It says, "Identified individuals from

3    Giant Eagle sourcing, pharmacy compliance, and HBC

4    team members must review pharmacy customer orders

5    and order trends on a regular and for-cause basis

6    to identify suspicious drug orders."

7        Do you see that?

8        A.   I do.

9        Q.   Was that something that was in effect in

10   2009 going forward?

11       A.   Yes.

12       Q.   And were suspicious orders blocked and

13   reported to the appropriate regulatory authority

14   within the timeframe set out in the policy?

15            MR. HUDSON:  Object to the form.

16            THE WITNESS:  I can't say that there

17   were any that were specifically blocked.

18   BY MR. BARNES:

19       Q.   But does this memorialize a preexisting

20   policy?

21       A.   Yes.

22       Q.   Do you know, one way or the other, if an

23   order was flagged as suspicious or as an order of

24   interest to a pharmacy, would the order be held or

25   would it be shipped to the pharmacy?





166



167









171

```
 1        A.   Again, getting rusty, but yes.

 2        Q.   What is the main purpose of the security

 3   requirement, in your understanding?

 4             MR. HUDSON:  Object to the form.  Lack

 5   of foundation.

 6   BY MR. BARNES:

 7        Q.   What does it require?

 8        A.   Theft diversion and suspicious order.

 9        Q.   And do you know whether or not

10   compliance with that regulation is something that

11   is dependent upon the specific facts of each

12   specific distributor?

13             MR. HUDSON:  Object to the form.

14             THE WITNESS:  I would say yes.

15   BY MR. BARNES:

16        Q.   In working with the DEA and during their

17   multiple inspections before, during, and after the

18   HBC narcotics room was set up or any of their

19   surprise audits, did they at any time ever give

20   you any indication that HBC was not in full

21   compliance with the security requirement?

22        A.   No, they did not.

23             MR. HUDSON:  Object to the form.

24   BY MR. BARNES:

25        Q.   What is your understanding of whether or
```

172



173



```
 1        A.   Not really.

 2        Q.   Do you know whether -- you learned at

 3   some point that a threshold system was added to

 4   the system of controls at the warehouse?

 5             MR. HUDSON:  Object to the form.

 6   Misstates his testimony.  He's already testified

 7   he wasn't aware of that.

 8             MR. BARNES:  Pardon me?

 9             THE WITNESS:  I would agree.  At that

10   time I was not aware.

11   BY MR. BARNES:

12        Q.   At what time are we talking about?

13        A.   In '13 and '14.

14        Q.   But when you came back to the HBC

15   facility in 2015, did you learn that there was --

16        A.   At some point I learned that there was

17   something in place.

18        Q.   Involving a threshold system?

19        A.   I wasn't aware of the details of how the

20   system was operating.

21        Q.   Did the DEA get involved when the Giant

22   Eagle Rx distribution center was being

23   constructed?

24        A.   Yes.

25             MR. HUDSON:  Object to the form.
```

175

```
 1        I thought you were stopping me from asking

 2    questions because you said --

 3             MR. BARNES:  I was.  But I didn't want

 4    to leave the record -- since you opened the door

 5    to a little bit of questioning --

 6             MR. HUDSON:  Fair enough.  Proceed.

 7             MR. BARNES:  -- I can't resist walking

 8    through it.

 9             MR. HUDSON:  Sure.

10    BY MR. BARNES:

11        Q.   Did they perform a similar function with

12    respect to advising Giant Eagle as to what they

13    wanted at that facility both in terms of physical

14    and other types of controls?

15        A.   Yes, they did.

16        Q.   And did Giant Eagle follow the DEA's

17    advice and recommendations?

18        A.   Yes, they did.

19        Q.   Did the DEA ever advise you or anybody

20    else at HBC that it had to keep every email or

21    every document or record every phone call ever

22    made with respect to any order?

23        A.   No, they did not.

24        Q.   Are you aware of any policy at all that

25    any of that had to ever be retained?
```

176



177





179



180



1    investigations discussed?

2         A.    No.

3         Q.    One of the things you were asked about

4    is your opinion of whether or not there could be

5    suspicious orders in the system that Giant Eagle

6    and HBC had.

7         Do you remember those questions by HBC's

8    counsel?

9         A.    I do.

10        Q.    What is your idea or your understanding

11   of what a suspicious order is?

12        A.    It's my own personal view of it.

13   Anything that's not in the quantities or in the

14   format that it was intended to be.  Meaning a

15   store called for two units and discovered that it

16   only got one.

17        In itself, that becomes suspect and requires

18   investigation.

19        Q.    Any other examples you can come up with

20   of suspicious orders?

21        A.    Not specifically.

22        Q.    So are you aware of any time when, at

23   HBC, the inventory counts were off?

24        A.    Again, not specifically.  But I've got

25   to believe through the course of our operation,

182

1   there would have been a time where the inventory

2   would have been off.

3       Q.   And in that situation, would that be a

4   potential risk for diversion?

5       A.   No.  I don't believe so.  Again, because

6   of the close circuit or the -- how will I say

7   it -- the fact that we were distributing to

8   ourselves, you know, the next stop or step would

9   have been that it would have gone to a pharmacy,

10  and there were checks and balances at the

11  pharmacy.

12      So there's a lot of layers that it would have

13  to go through.

14      Q.   If a picker went and just went in and

15  took an item and then bar-coded it as if it had

16  or -- in other words, found out some way to -- by

17  the way, was there ever any theft, that you're

18  aware of, that ever occurred at the HBC facility?

19      A.   Yes.

20      Q.   Approximately how many times?

21      A.   One.

22      Q.   And when did that happen?

23      A.   I got to believe it was 2012.

24      Q.   Was that a picker or selector?

25      A.   No.

183

1      Q.   Who was that?

2      A.   It was one of the managers.

3      Q.   What was his or her name?

4      A.   Andy Zelaski.

5      Q.   Andy Zelaski was caught stealing?

6      A.   Yes.

7      Q.   Was it controlled substances?

8      A.   I don't know the form that -- of whether

9  it was or not.  I don't believe it was.

10     Q.   But he was caught stealing narcotics?

11     A.   No.  I don't believe it was.

12     Q.   What was he caught stealing?

13     A.   It was Viagra.

14     Q.   Viagra?

15     A.   Yes.

16     Q.   And that was a manager?

17     A.   Yes.

18     Q.   How long had that been going on?

19     A.   It happened one time, and he was

20  immediately caught by our systems.

21     Q.   Okay.

22     A.   Christy caught it through the counts and

23  immediately reported him.

24     Q.   Do you see, in your mind, a connection

25  between the security requirements or the inventory

184

 1   count issues and monitoring for suspicious orders

 2   of controlled substances?

 3           MR. BARNES:  Object to the form.

 4           THE WITNESS:  I'm not sure I'm following

 5   you on that.

 6   BY MR. HUDSON:

 7       Q.   Well, making sure the inventory count is

 8   right is one of the things you've talked about a

 9   lot today; right?

10       A.   Correct.

11       Q.   But the inventory count can still be

12   right, but you could have a suspicious order;

13   correct?

14           MR. BARNES:  Object to form.

15   BY MR. HUDSON:

16       Q.   Let me try it this way.

17       A.   I would say yes, but through our systems

18   it would still be caught.

19       So if my inventory is correct, the checks and

20   balances on the other side of our closed loop at

21   the pharmacies would detect it.  As soon as they

22   would detect it, because they're checking that

23   inbound order specific to each unit, sell unit,

24   they would call back to us and say, Guys, I was

25   supposed to get two.  I got one.



186





188



189





191







194



195



196



197



198







201





203





205







207

208



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25         MR. BARNES:  I also think, Ty --
```

209

1            MR. HUDSON:  No further questions.

2            MR. BARNES:  -- it's way beyond.

3        No further questions.

4            THE VIDEOGRAPHER:  This marks the end of

5    the testimony given by Walter Durr.  We are going

6    off the record.  The time is 1:29 p.m.

7            (Whereupon, at 1:29 p.m., the taking of

8    the instant deposition ceased.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

210

1　COMMONWEALTH OF PENNSYLVANIA  )

2　COUNTY OF ALLEGHENY　　　　　　)　　SS:

3　　　　　　　　C E R T I F I C A T E

4　　　　　　I, Ann Medis, Registered Professional

5　Reporter, Certified Livenote Reporter and Notary

6　Public within and for the Commonwealth of

7　Pennsylvania, do hereby certify:

8　　　　　　That WALTER WAYNE DURR, the witness

9　whose deposition is hereinbefore set forth, was

10　duly sworn by me and that such deposition is a

11　true record of the testimony given by such

12　witness.

13　　　　　　I further certify the inspection,

14　reading and signing of said deposition were not

15　waived by counsel for the respective parties and

16　by the witness.

17　　　　　　I further certify that I am not related

18　to any of the parties to this action by blood or

19　marriage and that I am in no way interested in the

20　outcome of this matter.

21　　　　　　IN WITNESS WHEREOF, I have hereunto set

22　my hand this 25th day of January, 2019.

23

24　　　　　　_____
　　　　　　　　　　　　Notary Public

25

```
1   COMMONWEALTH OF PENNSYLVANIA   )   E R R A T A
    COUNTY OF ALLEGHENY            )   S H E E T
2

3       I, WALTER WAYNE DURR, have read the foregoing
    pages of my deposition given on January 22, 2019,
4   and wish to make the following, if any,
    amendments, additions, deletions or corrections:
5

6   Page  Line   Change and reason for change:

7   ____  ____   _____

8   ____  ____   _____

9   ____  ____   _____

10  ____  ____   _____

11  ____  ____   _____

12  ____  ____   _____

13  ____  ____   _____

14  ____  ____   _____

15  ____  ____   _____

16  ____  ____   _____

17  ____  ____   _____

18

19  In all other respects, the transcript is true and
    correct.
20

21            _____

22                 WALTER WAYNE DURR

23  _____ day of _____, 2019.

24  _____
                  Notary Public
25
```