1           UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
2                 EASTERN DIVISION
3    IN RE: NATIONAL            )    MDL No. 2804
     PRESCRIPTION OPIATE        )
4    LITIGATION,                )    Case No.
                                )    1:17-MD-2804
5                               )
     THIS DOCUMENT RELATES TO   )    Hon. Dan A.
6    ALL CASES                  )    Polster
                                )
7
8                    __  __  __
9            Thursday, April 25, 2019
                     __  __  __
10
     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11            CONFIDENTIALITY REVIEW
                     __  __  __
12
13
14
15        Videotaped Deposition of DAVID S.
     EGILMAN, M.D., MPH,  held at the Providence
16   Marriott Downtown, 1 Orms Street, Providence,
     Rhode Island, commencing at 9:08 a.m., on the
17   above date, before Debra A. Dibble, Certified
     Court Reporter, Registered Diplomate
18   Reporter, Certified Realtime Captioner,
     Certified Realtime Reporter and Notary
19   Public.
20
                     __  __  __
21
22
23        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | fax 917.591.5672
24            deps@golkow.com

```
 1              A P P E A R A N C E S:
 2
        SPECIAL MASTER:  David A. Cohen
 3
 4      SIMMONS HANLY CONROY, LLC
        BY:  JAYNE CONROY, ESQUIRE
 5           jconroy@simmonsfirm.com
             ELLYN HURD, ESQUIRE
 6           ehurd@simmonsfirm.com
             RICK KROEGER, ESQUIRE
 7           (appearing telephonically)
             rkroeger@simmonsfirm.com
 8           SANFORD SMOKLER, ESQUIRE
             (appearing telephonically)
 9           ssmokler@simmonsfirm.com
             LAURA FITZPATRICK, ESQUIRE
10           (appearing telephonically)
             lfitzpatrick@simmonsfirm.com
11      One Court Street
        Alton, Illinois 62002
12      (618) 259-6621
        Counsel for MDL Plaintiffs
13
14      MOTLEY RICE, LLC
        BY:  DONALD A. MIGLIORI, ESQUIRE
15           dmigliori@motleyrice.com
        28 Bridgeside Boulevard
16      Mt. Pleasant, South Carolina 29464
        (843) 216-9241
17      Counsel for Summit County and
        Plaintiffs
18
19      NAPOLI SHKOLNIK, PLLC
        BY:  SHAYNA E. SACKS, ESQUIRE
20           shayna@napolilaw.com
        360 Lexington Avenue
21      11th Floor
        New York, New York 10017
22      Counsel for Cuyahoga County and
        Plaintiffs
23
24
```

```
 1          HOLLAND & KNIGHT, LLP
            BY:  MATTHEW DONOHUE, ESQUIRE
 2               matthew.donohue@hklaw.com
                 JESSICA FARMER, ESQUIRE
 3               jessica.farmer@hklaw.com
            800 17th Street N.W.
 4          Suite 1100
            Washington, DC 20006
 5          (202) 469-5222
            Counsel for Insys Therapeutics
 6
 7          COVINGTON & BURLING, LLP
            BY: JENNIFER L. SAULINO, ESQUIRE
 8               jsaulino@cov.com
                 GREGORY L. HALPERIN, ESQUIRE
 9               ghalperin@cov.com
                 CLAYTON L. BAILEY, ESQUIRE
10               cbailey@cov.com
            One CityCenter
11          850 Tenth Street, NW
            Washington DC 20001-4956
12          (202) 662-5305
            Counsel for McKesson
13
14          WILLIAMS & CONNOLLY, LLP
            BY:  JOSEPH S. BUSHUR, ESQUIRE
15               jbushur@wc.com
                 (appearing telephonically)
16          725 Twelfth Street, NW
            Washington D.C. 20005
17          (202) 434-5092
            Counsel for Cardinal Health, Inc.
18
19          DECHERT, LLP
            BY:  TIMOTHY C. BLANK, ESQUIRE
20               timothy.blank@dechert.com
                 JENNA NEWMARK, ESQUIRE
21               jenna.newmark@dechert.com
            Three Bryant Park
22          1095 Avenue of the Americas
            New York, New York 10036-6797
23          (212) 698-3500
            Counsel for Purdue Pharma L.P.,
24          Purdue Pharma, Inc.
```

```
 1          JONES DAY
            BY:  TARA FUMERTON, ESQUIRE
 2               tfumerton@jonesday.com
            77 West Wacker
 3          Chicago, Illinois 60601-1692
            (312) 782-1692
 4          Counsel for Walmart
 5
            MARCUS & SHAPIRA, LLP
 6          (appearing telephonically)
            BY:  PAUL MANNIX, ESQUIRE
 7               pmannix@marcus-shapira.com
            301 Grant Street
 8          35th Floor
            Pittsburgh, Pennsylvania 15219-6401
 9          (412) 338-4690
            Counsel for HBC
10
11          KIRKLAND & ELLIS, LLP
            BY:  PRATIK K. GHOSH, ESQUIRE
12               pratik.ghosh@kirkland.com
                 DONNA WELCH, ESQUIRE
13               donna.welch@kirkland.com
            300 North LaSalle
14          Chicago, Illinois 60654
            (312) 862-3671
15          Counsel for Allergan Finance, LLC
16
            MORGAN, LEWIS & BOCKIUS, LLP
17          BY:   BRIAN M. ERCOLE  ESQUIRE
                  brian.ercole@morganlewis.com
18          200 S. Biscayne Boulevard, Suite 5300
            Miami, Florida 33131-2339
19          (305) 415-3416
            Counsel for Teva Pharmaceuticals USA,
20          Inc.; Cephalon, Inc.; Watson
            Laboratories, Inc.; Actavis, LLC;
21          Actavis Pharma, Inc.; f/k/a Watson
            Pharma, Inc.
22
23
24
```

```
 1          ARNOLD & PORTER KAYE SCHOLER, LLP
            (appearing telephonically)
 2          BY:  ANGEL TANG NAKAMURA, ESQUIRE
                 Angel.Nakamura@arnoldporter.com
 3          777 South Figueroa Street
            44th Floor
 4          Los Angeles, California 90017-5844
            (213) 243-4000
 5          Counsel for Endo Health Solutions Inc.;
            Endo Pharmaceuticals Inc.; Par
 6          Pharmaceuticals, Inc.; Par
            Pharmaceutical Companies, Inc. formerly
 7          known as Par Pharmaceutical Holdings,
            Inc.
 8
 9          ROPES & GRAY, LLP
            BY:  JOSH GOLDSTEIN, ESQUIRE
10               joshua.goldstein@ropesgray.com
            800 Boylston Street
11          Boston, Massachusetts 02199-3600
            (617) 951-7000
12          Counsel for Mallinckrodt
13
            MORGAN, LEWIS & BOCKIUS, LLP
14          BY:  ELISA P. MCENROE, ESQUIRE
                 elisa.mcenroe@morganlewis.com
15          1701 Market Street
            Philadelphia, PA 19103-2921
16          (215) 963-5917
            Counsel for Rite Aid
17
18          LOCKE LORD, LLP
            BY:  ANNA K. FINGER, ESQUIRE
19               anna.finger@lockelord.com
            (appearing telephonically)
20          2200 Ross Avenue
            Suite 2800,
21          Dallas, Texas 75201
            (214) 740-8558
22          Counsel for Henry Schein, Incorporated
            and Henry Schein Medical Facility,
23          Incorporated
24
```

```
 1          ZUCKERMAN SPAEDER, LLP
            BY:  PAUL B. HYNES, JR., ESQUIRE
 2               phynes@zuckerman.com
            1800 M Street, Suite 1000
 3          Washington, DC  20036
            Counsel for CVS Indiana LLC and CVS Rx
 4          Services, Inc.
 5
 6          BARTLIT BECK LLP
            BY:  KATHERINE M. SWIFT, ESQUIRE
 7               kate.swift@bartlit-beck.com
            54 West Hubbard Street
 8          Suite 300
            Chicago, Illinois 60654
 9          Counsel for Walgreens
10
            O'MELVENY & MYERS LLP
11          BY:  AMY R. LUCAS, ESQUIRE
                 alucas@omm.com
12          1999 Avenue of The Stars, 8th Floor
            Los Angeles, CA 90067
13          (310) 246-6705
            Counsel for Janssen and Johnson &
14          Johnson
15          BARNES & THORNBURG, LLP
            BY:  WILLIAM A. HAHN, II, ESQUIRE
16               william.hahn@btlaw.com
            11 South Meridian Street
17          Indianapolis, Indiana 46204
            (317) 231-7501
18          Counsel for H.D. Smith
19
20
21     ALSO PRESENT:
22          Jonathan Jaffe
23
24
```

1    APPEARING VIA VIDEO STREAM:

2        Kevin Reardon

         kevin.j.reardon@gmail.com

3

         Jay Lichter

4        jlichter@baronbudd.com

5

         Charles Bachmann

6        cbachmann@seegerweiss.com

7

         Scott Siegel

8        ssiegel@seegerweiss.com

9

10   VIDEOGRAPHER:

11       Bill Geigert

12

                         — — —
13               — — — — — —

14

15

16

17

18

19

20

21

22

23

24

1
2                 I N D E X
3 DAVID S. EGILMAN, M.D., MPH           PAGE

4    EXAMINATION BY MR. DONOHUE        14
    EXAMINATION BY MS. SAULINO       140
5    EXAMINATION BY MR. MCGARRIGLE     423

6

7             E X H I B I T S

     No.             Description       Page
8

     Egilman 1A     Egilman Expert       19
9                  Report and Exhibits,
                 Volume 1 of 3 binder
10

     Egilman 1B     Egilman Expert       19
11                 Report and Exhibits,
                Volume 2 of 3 binder
12

     Egilman 1C     Egilman Expert       19
13                 Report and Exhibits,
                Volume 3 of 3 binder
14

     Egilman 1D     Egilman Opinions     19
15                 Received 4-23-2019
                binder
16

     Egilman 1E     thumb drive,        20
17                 (DECHERT1)
18      Egilman 1F     5-25-19 Report of    20
                David S. Egilman MD,
19                 MPH
20      Egilman 1G     thumb drive         20

21
22
23
24

| | | | |
|---|---|---|---|
| 1 | Egilman 2 | Poster (8.5 x 11 copy) Deconstructing the myth that prescribed opioids have a low risk of addiction by Daniel K. Cho, Mark Hocevar, Brown University | 93 |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | Egilman 3 | IMS Data, David Egilman | 120 |
| 7 | | | |
| | Egilman 4 | Green folder marked 20 - Distribute = Manufacturers | 141 |
| 8 | | | |
| 9 | | | |
| | Egilman 5 | My Assignment | 164 |
| 10 | | | |
| | Egilman 6 | Folder 26 arrow up does = arrow up death | 232 |
| 11 | | | |
| 12 | | | |
| | Egilman 7 | B.85 | 253 |
| 13 | | | |
| | Egilman 8 | Opinion - McKesson blames manufacturers and avoids its own responsibility | 272 |
| 14 | | | |
| 15 | | | |
| 16 | Egilman 9 | Opinion - HDMA was responsible for sale of unapproved opioids | 276 |
| 17 | | | |
| 18 | | | |
| | Egilman 10 | Opinion - Distributor marketing drove sales | 283 |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

| | | | |
|---|---|---|---|
| 1 | Egilman 11 | Opinion - WAG solution to red flagged stores was to find a distributor who would sell to them. All 3 WAG distributor facilities failed to implement SOM procedures | 287 |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| | Egilman 12 | Definition - "Venture" refers to all defendants (including their associated individuals and/or organizations) and covers all aspects of marketing, distribution, and supply they engaged in | 296 |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | Egilman 14 | Opinion - these are the members on the "venture" with two Redweld folders" | 306 |
| 14 | | | |
| 15 | | | |
| | Egilman 15 | Opinion B.489 Redweld folder | 311 |
| 16 | | | |
| 17 | Egilman 16 | The "venture" should have known that higher doses kill and warned about this | 329 |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

| | | | |
|---|---|---|---|
| 1 | Egilman 17 | All for one and one for all - the | 340 |
| 2 | | "venture" knew collective marketing | |
| 3 | | increased the size of the opioid pie. | |
| 4 | | Similarly had any "venture" member | |
| 5 | | broken ranks, the opioid market would | |
| 6 | | have slowed or if the complete truth | |
| 7 | | was told (no efficacy and high | |
| 8 | | addiction risk) the market would have | |
| 9 | | crashed | |
| | Egilman 18 | Opinion - When the FDA tried to limit | 347 |
| 10 | | use in 2001 by changing the label | |
| 11 | | from "more than a few days" to | |
| 12 | | "extended period of time," the "venture" | |
| 13 | | used this language to increase the | |
| 14 | | market | |
| 15 | | | |
| | Egilman 19 | Opinion - the "venture" corrupted | 361 |
| 16 | | the FDA and Salem -- | |
| 17 | | News.com FDA Corruption Worsens | |
| 18 | | as Death Toll Mounts in Drug Epidemic! | |
| 19 | | article | |
| 20 | Egilman 20 | Opinion - "venture" member McKesson | 374 |
| 21 | | marketed opioids | |
| 22 | Egilman 21 | Login to McKesson Connect | 383 |
| 23 | | | |
| | Egilman 22 | Opinion B.385 | 393 |
| 24 | | | |

| | | | |
|---|---|---|---|
| 1 | Egilman 23 | Compilation of Redweld folders | 391 |
| 2 | | | |
| 3 | Egilman 24 | Opinion-McKesson had marketing agreements with Mallinckrodt, | 398 |
| 4 | | Purdue and Teva | |
| 5 | Egilman 25 | Opinion - the "Venture" - | 404 |
| 6 | | McKesson's SOM was inadequate | |
| 7 | | | |
| 8 | Egilman 26 | Dr. Egilman's reference folders | 414 |
| 9 | Egilman 27 | Dr. Egilman's notes | 415 |
| 10 | Egilman 28 | Dr. Egilman's opinion folders with stickies and | 415 |
| 11 | | notations | |
| 12 | Egilman 29 | USA Oxycodone consumption | 417 |
| 13 | | (mg/capita) 1980 -- 2015 | |
| 14 | | | |
| 15 | Exhibit 30 | Opinion- AmerisourceBergen ("ABC") was light on | 439 |
| 16 | | order monitoring. The ABC focus is | |
| 17 | | only on rapid growth, not steady | |
| 18 | | sales  Focus on big accounts only for | |
| 19 | | suspicious order monitoring | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

| | | | |
|---|---|---|---|
| 1 | Egilman 30A | Opinion-AmerisourceBergen | 439 |
| 2 | | ("ABC") was light on order monitoring. | |
| 3 | | The ABC focus is only on rapid | |
| 4 | | growth, not steady sales  Focus on big | |
| 5 | | accounts only for suspicious order | |
| 6 | | monitoring, with revisions | |
| 7 | Egilman 31 | Opinion-AmerisourceBergen | 440 |
| 8 | | ("ABC") wanted to 'low key' (HIDE) its | |
| 9 | | association with Pain Care Forum | |
| 10 | | ("PCF") with attachments | |
| 11 | | PPLP004210521-4210523, | |
| 12 | | PPLP004279424-4279425, | |
| 13 | | PPLP004303453, PPLP004303456-| |
| 14 | | 4303457, PPLPC018001477198- | |
| 15 | | 1477200, PPLPC022000926958- | |
| 16 | | 22000926959, was marked for | |
| 17 | | identification.) | |
| 18 | | — — — — — — | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

```
 1                    PROCEEDINGS
 2               (April 25, 2019 at 9:08 a.m.)
 3               THE VIDEOGRAPHER:  Good
 4          morning.  We are now on the record.
 5          My name is Bill Geigert.  I'm a
 6          videographer for Golkow Litigation
 7          Services.  Today's date is April 25th,
 8          2019, and the time is 9:09 a.m.  This
 9          video deposition is being held in
10          Providence, Rhode Island, in the
11          matter of National Opioid Litigation.
12               The deponent is Dr. David
13          Egilman.  The court reporter is Debbie
14          Dibble, and she will now swear in the
15          witness.
16          DAVID S. EGILMAN, M.D., MPH,
17     having first been duly sworn, was examined
18     and testified as follows:
19                    EXAMINATION
20     BY MR. DONOHUE:
21          Q.    Good morning, Dr. Egilman.  My
22     name is Matt Donohue.  I represent Insys.
23               I apologize, but we do have to
24     do some housekeeping before we start the
```

1    questioning.  So I'm going to ask everybody

2    that's in the room to identify yourself for

3    the court reporter because there are a number

4    of people that she needs to know where you're

5    sitting.  So if you can identify yourself and

6    then endeavor to sit in the same spot

7    throughout the day, that will aid in the

8    accuracy of the transcript.

9                   So I'll start.

10                  Matt Donohue with Holland &

11   Knight representing Insys.

12                  MS. FARMER:  Jessica Farmer

13   with Holland & Knight representing Insys.

14                  MS. SAULINO:  Jennifer Saulino

15   from Covington and Burling for McKesson.

16                  MR. HALPERIN:  Greg Halperin.

17                  MS. SWIFT:  Kate Swift for

18   Walgreens.

19                  MS. McENROE:  Elisa McEnroe

20   from Morgan Lewis for RiteAid.

21                  MR. HYNES:  Paul Hynes of

22   Zuckerman Spaeder, for CVS.

23                  MR. BLANK:  Timothy Blank with

24   Dechert for Purdue.

 1                    MS. NEWMARK:  Jenna Newmark

 2      with Dechert for Purdue.

 3                    MR. ERCOL:  Brian Ercol from

 4      Morgan Lewis for the Teva defendants.

 5                    MS. WELCH:  Donna Welch

 6      Kirkland & Ellis for Allergan defendants.

 7                    MR. JAFFE:  Jonathan Jaffe,

 8      plaintiffs consultant.

 9                    MS. CONROY:  Jayne Conroy,

10           Simmons Hanly Conroy, plaintiffs.

11               MS. LUCAS:  Amy Lucas,

12           O'Melveny and Myers for Janssen and

13           Johnson & Johnson.

14               MS. NAKAMURA:  Angel Nakamura

15           of Arnold and Porter, the Endo and

16           Parr defendants.

17                MS. FULMERTON:  Tara Fulmerton,

18           Jones Day, on behalf of Wal-mart.

19               MR. BAILEY:  Clayton Bailey

20           Covington & Burling for McKesson.

21               MS. SACKS:  Shayna Sacks,

22           Napoli Shkolnik for plaintiffs

23           Cuyahoga County.

24                MR. HAHN:  Bill Hahn, Barnes &

1    Thornburg on behalf of H.D. Smith.

2         MS. HURD:  Ellyn Hurd, Simmons

3    Hanly Conroy for the plaintiffs.

4         MR. MIGLIORI:  Donald Migliori,

5    Motley Rice, on behalf of Summit

6    County and plaintiffs.

7         MR. KROEGER:  Rick Kroeger.

8    Simmons Hanly Conroy on behalf of

9    plaintiffs.

10        MR. GOLDSTEIN:  Josh Goldstein,

11   Ropes & Gray on behalf of

12   Mallinckrodt, LLC.

13        MR. GHOSH:  Pratik Ghosh,

14   Kirkland and Ellis, Allergan

15   defendants.

16        SPECIAL MASTER COHEN:  Special

17   Master David Cohen.

18        Hey, there's air conditioning

19   in this room, and I can tell you that

20   Debbie cannot hear you if you're back

21   there, so speak very loudly, please.

22        MR. DONOHUE:  And then we have

23   a number of people on the telephone,

24   but you already have those, right?

1          THE REPORTER:  Are you all

2     right if I just indicate those on the

3     transcript appearances?

4          MR. DONOHUE:  I'm fine with

5     that.

6          Next, just housekeeping matter

7     is, I want to explain on the record

8     what we've marked as our first

9     exhibit.

10          So marked as Exhibit 1A, is a

11     binder entitled "Egilman Report and

12     Exhibits Volume 1 of 3."  Marked as

13     Exhibit 1B is a black binder entitled

14     "Egilman Report and Exhibits, Volume 2

15     of 3."

16          Marked as Exhibit 1C is a black

17     binder entitled "Egilman Report and

18     Exhibits, Volume 3 of 3."

19          Marked as Exhibit 1D is a

20     binder entitled "Egilman Opinions

21     Revised."  And that captures the

22     revised material that we got produced

23     by plaintiffs.

24          Marked as Exhibit 1E is a flash

1       drive.  It has written on it

2       "Dechert 1," and it contains Excel

3       spreadsheets as part of Dr. Egilman's

4       report.

5              And marked as Exhibit 1G is a

6       black flash drive.  This contains

7       Dr. Egilman's report, exhibits, the

8       notice of deposition, and resource

9       materials.

10             (Whereupon, Deposition Exhibit

11      Egilman 1A, Egilman Expert Report and

12      Exhibits, Volume 1 of 3 binder, was

13      marked for identification.)

14             (Whereupon, Deposition Exhibit

15      Egilman 1B, Egilman Expert Report and

16      Exhibits, Volume 2 of 3 binder, was

17      marked for identification.)

18             (Whereupon, Deposition Exhibit

19      Egilman 1C, Egilman Expert Report and

20      Exhibits, Volume 3 of 3 binder, was

21      marked for identification.)

22             (Whereupon, Deposition Exhibit

23      Egilman 1D, Egilman Opinions Received

24      4-23-2019 binder, was marked for

1          identification.)

2             (Whereupon, Deposition Exhibit

3          Egilman 1E, thumb drive, (DECHERT1),

4          was marked for identification.)

5             (Whereupon, Deposition Exhibit

6          Egilman 1F, 5-25-19 Report of David S.

7          Egilman MD, MPH, was marked for

8          identification.)

9             (Whereupon, Deposition Exhibit

10         Egilman 1G, thumb drive, was marked

11         for identification.)

12        Q.    (BY MR. DONOHUE)  So that was

13   all part of Dr. Egilman's report and

14   accompanying materials.

15         This is -- if anyone needs to

16   look at the report or the exhibits

17   electronically, I have that hooked up to my

18   computer right now.  And so that's what we'll

19   be looking at, 1G, if we do that.

20         And then finally, marked as

21   Exhibit 1F is just the report of Dr. Egilman

22   dated March 25, 2019, and it's in a spiral

23   binding for easy access.

24         Sorry about that distraction.

1               Dr. Egilman, when were you

2     retained in this litigation?

3          A.    November of last year?

4          Q.    Do you recall --

5               UNIDENTIFIED SPEAKER:  Can you

6          speak up please?  We cannot hear you

7          down here.  To the witness.

8               THE WITNESS:  November of last

9          year.

10          Q.    (BY MR. DONOHUE) Do you recall

11     when in November of 2018 you were retained?

12          A.    Second or third week.

13          Q.    Second or third week.

14               Who retained you?

15          A.    Ms. Conroy.

16               SPECIAL MASTER COHEN:  Let me

17          interrupt and ask if there's any way

18          to mic the witness, because this room

19          has that -- the loud air conditioning.

20          It's hard for me to hear him, so I

21          know those folks can't.

22               MR. BLANK:  We can't hear a

23          word.

24               MR. DONOHUE:  I don't know if

1          the videographer has a mic.

2                    UNIDENTIFIED SPEAKER:  It's

3          very difficult to hear on the phone.

4                    MR. DONOHUE:  Let's go off the

5          record for a second and see if we can

6          fix this.

7                    THE VIDEOGRAPHER:  Off the

8          record.  The time is 9:16.

9                    (Recess taken, 9:15 a.m. to

10          9:24 a.m.)

11                    THE VIDEOGRAPHER:  We are back

12          on the record at 9:25.

13          Q.    (BY MR. DONOHUE)  Dr. Egilman,

14     before the break, you had testified that

15     Ms. Conroy retained you in the second or

16     third week of November 2018 for this

17     engagement.  Do I have that right?

18          A.    Yes.

19          Q.    And how did Ms. Conroy retain

20     you?

21          A.    I think it was a phone call.

22          Q.    And what were you retained to

23     do?

24          A.    Somewhere here I have printed

1    assignments.

2              There it is.

3              Okay.  So I was asked to

4    determine within a reasonable degree of

5    medical and scientific certainty whether or

6    not various defendants working together

7    and/or separately were significant factors of

8    causing the opioid epidemic.

9         Q.    Were you retained to do

10   anything else?

11        A.    That was my assignment.

12        Q.    Did you enter into a written

13   engagement with Ms. Conroy?

14        A.    No.

15        Q.    Do you have an oral agreement

16   with respect to your engagement here?

17        A.    Yes.

18        Q.    What are the terms of the oral

19   agreement that you have with Ms. Conroy with

20   respect to your engagement?

21        A.    I'm not sure I understand the

22   question.

23        Q.    Well, with respect to your

24   engagement in this litigation, first of all,

1    what do you understand you are retained to do

2    in the litigation -- strike that.

3              With respect to your engagement

4    in this litigation, what case or cases are

5    you retained as an expert on?

6         A.    In the MDL, Cuyahoga and Summit

7    County case.

8         Q.    Are you retained as an expert

9    by Ms. Conroy in any other case?

10        A.    No.

11             MS. CONROY:  Objection.

12        Q.    (BY MR. DONOHUE)  Are you

13   currently retained as an expert by any of the

14   plaintiffs' firms in the MDL action in any

15   other case?

16        A.    No.

17        Q.    Have you been providing, with

18   respect to your engagement in this

19   litigation, any consulting advice?

20             MS. CONROY:  Objection.

21             THE WITNESS:  I'm not sure I

22        understand the -- what you mean by

23        "consulting advice."

24        Q.    (BY MR. DONOHUE)  is it your

1    understanding that you've been retained in

2    this litigation as a testifying expert?

3          A.    Yes.

4          Q.    Do you understand, if I use the

5    term "consulting expert," what that means?

6          A.    Yes.

7          Q.    Have you been retained as a

8    consulting expert in this litigation?

9          A.    Maybe I understood what it

10   means, because my understanding was that

11   you're either a testifying or a consulting

12   expert.  So if I'm a testifying expert, I

13   can't be a consulting expert at the same

14   time.  So maybe I didn't understand the

15   difference.  But that was my understanding of

16   the difference.

17         Q.    Prior to this engagement, have

18   you done any other engagements with

19   plaintiffs' counsel?

20               MS. CONROY:  Objection.

21               THE WITNESS:  Please define

22         "engagement."

23         Q.    (BY MR. DONOHUE) In other

24   words, have plaintiffs' counsel retained you

1    in the past for expert services in

2    litigation?

3          A.    Do you mean Ms. Conroy?

4          Q.    We can start with Ms. Conroy.

5          A.    Yes.

6          Q.    How many times?

7          A.    I think there were three cases

8    for Federal-Mogul, and there were three

9    opioid cases to 2003, 2005.  Those are Purdue

10   cases.

11               I think that's all I've done at

12   her request working with her.

13         Q.    With respect to the three

14   opioid cases that you were retained by

15   Ms. Conroy's firm, what was the nature of

16   your expert testimony in those cases?

17         A.    Well, do you want the short

18   answer or a long answer?

19         Q.    Well --

20         A.    I mean, I have the transcript

21   of the deposition here.  I have my -- part of

22   my report is incorporated in this report.

23               That's the short answer.  I can

24   give you the long answer that goes through

1    the details of what I can recall testifying

2    about.

3         Q.    No, I don't want the long

4    answer, but if you could tell us what your

5    assignment was in those three opioid cases

6    that you were retained in 2003 to 2005, that

7    would be helpful.

8         A.    I don't remember a specific --

9    what the specific assignment was at this

10   time, but the report, the deposition, there

11   were, I think, several reports and

12   depositions would have been my response to

13   the assignment.  I don't know if I explicitly

14   was asked for my assignment in a deposition,

15   or whether I included that in the report.  I

16   don't recall.

17        Q.    In the past, have you been

18   hired as an expert for litigation services by

19   Motley Rice?

20        A.    I'm not sure who I was retained

21   by, but I was in a case that Motley Rice

22   tried.  I was retained by Orrick, I think, in

23   that case.  And there was the -- I'm sorry,

24   the asbestos trust case against the tobacco

1    companies.

2                    I don't think I've testified in

3    any cases or given depositions in any cases

4    at the request of Motley Rice.  It's possible

5    that there was an asbestos case.

6          Q.     Have you been retained by the

7    past -- excuse me, in the past for litigation

8    services by the law firm of Spangenberg,

9    Sibley & Lancione?

10         A.     Not that I can recall.

11         Q.     Have you been retained in the

12   past for litigation services as an expert by

13   Skikos Crawford?

14         A.     No.

15         Q.     Have you been retained in the

16   past for litigation services by the law firm

17   Mitchell Rafferty & Proctor?

18         A.     Not that I can remember.

19         Q.     Have you --

20         A.     Let me just frame this a little

21   bit, but it's come to my attention over time

22   that law firms have listed me in a case

23   without my knowledge or permission.  So it's

24   possible that that may have happened, but I

1    don't know whether it happened or not.

2              I know there are -- I know of

3    some instances where that's happened, but I

4    was never contacted by any of those firms to

5    work on any cases.  Whether they listed me on

6    cases without any knowledge or consent, I

7    don't know.

8         Q.    Do you recall specifically what

9    law firm listed you without your permission

10   in their case?

11        A.    There are many.  But one of

12   them is Farano.  Farano, I think, listed me

13   in 15,000 cases, as I recall, without my

14   knowledge or consent.

15        Q.    Are there any other instances

16   of where you were listed as an expert without

17   your knowledge and consent other than the

18   Farano case that you can remember?

19        A.    There are others.  I can't

20   remember all of them.

21        Q.    Do you have any understanding

22   why you were listed as an expert without your

23   consent in those cases?

24        A.    I assume they thought adding my

1    name to the list of witnesses would add value

2    to the case for them.

3              But I don't know that.  In some

4    way, shape, or form, they saw some advantage

5    to listing me as a witness.

6         Q.    Have you ever been compensated

7    by a plaintiff's law firm for being listed as

8    an expert in any of those cases?

9              MS. CONROY:  Objection.

10             THE WITNESS:  Which cases are

11        you talking?  The Farano cases?

12        Q.    (BY MR. DONOHUE)  Yes, the

13   Farano cases or other cases where you were

14   listed without your permission or consent.

15   Have you ever been compensated by those

16   plaintiffs' law firms for that act?

17        A.    No.

18        Q.    In the past have you been

19   retained as an expert for litigation services

20   by the Napoli Shkolnik firm?

21        A.    No.

22        Q.    So with respect to this

23   engagement that we're here for today, how

24   many hours have you personally spent?

1    A.    384.

2    Q.    And what is the hourly rate

3  that you're charging for your services in

4  this litigation?

5    A.    For deposition?  $650 an hour.

6          For everything else, it's $600

7  an hour.

8          (Thomas J. McGarrigle from

9          Reed Smith for AmerisourceBergen

10         joined.)

11   Q.    (BY MR. DONOHUE) Have you had

12  others assisting you in this engagement?

13   A.    Yes.

14   Q.    Who have you had assist you in

15  the engagement?

16   A.    I have three or four staff, and

17  I hired some students to do -- to assist.

18   Q.    And could you tell us who are

19  the staff that have assisted you in the

20  engagement?

21   A.    Sure.  Donna Barbarita.

22   Q.    Could you spell the last name

23  for the court reporter, please?

24   A.    B-A-R-B-A-R-I-T-A.

 1          Samson Egilman.

 2          Joan Steffen, S-T-E-F-F-E-N.

 3          Muna Yiman, Y-I-M-A-N.

 4      Q.      Can you do the first name,

 5  spell it, please?

 6      A.      M-U-N-A.

 7          Kevin Reardon.

 8          And Alexis Biccirrilo.  And I

 9  cannot spell her last name.

10          But I could get it to you at a

11  break, probably.

12      Q.      Okay.  So the list of six

13  people --

14      A.      Oh, and one more.

15      Q.      I'm sorry.

16      A.      Triet Tran.  T-R-I-E-T, Tran.

17  T-R-A-N.

18      Q.      So the seven people that you

19  just listed, does that include both staff and

20  students?

21      A.      No, that's staff.

22      Q.      All right.  Could you please

23  list out students that have assisted you in

24  the engagement?

1        A.        Sure.  Emma McMillan, Emma

2     Cavanish, Max Kozlow, Dan Cho.  Lindsay,

3     whose last name I can't remember, but I can

4     get you that at a break.

5                And Mark Hocevar,

6     H-O-E-V-E-N-E-R. (sic)

7        Q.        And I apologize, the first two

8     students that you listed, they were both

9     Emmas?

10        A.        They are both Emmas.

11        Q.        So Emma --

12        A.        It does get confusing.

13        Q.        So with Emma No. 1, what's her

14     last name again?

15        A.        I don't know which order I gave

16     them to you, but one is named McMillan and

17     one is named Cavanish.  Last name.

18        Q.        Now, with respect to the seven

19     staff members that you listed, are those

20     staff that you employ?

21        A.        Yes.

22        Q.        What is Donna Barbarita's

23     position?

24        A.        Office manager.

1          Q.     And how did Ms. Barbarita

2     assist you in the engagement?

3          A.     She did copying.  Organizing of

4     documents.

5                 She may have helped search for

6     some texts.  She did scanning of documents.

7                 That would be, I think, most of

8     the things that she did.

9          Q.     And with respect to Samson

10    Egilman, is that a relation of yours?

11         A.     It is.

12         Q.     And what relation?

13         A.     He is my son.

14         Q.     And what did your son do to

15    assist you with respect to this engagement?

16         A.     Well, he did some of the same

17    things.  He also did some searching on

18    relativity for documents.

19                Helped organize documents.  He

20    did searches for some medical literature, I

21    think.

22         Q.     And what is your son's title?

23         A.     Researcher.

24         Q.     And then with respect to

1    Joan Steffen -- do I have that right?

2         A.     You do.

3         Q.     What's Ms. Steffen's title?

4         A.     Researcher.

5         Q.     And how did Ms. Steffen assist

6    you in this engagement?

7         A.     Similarly.  Did searches of the

8    database.  Or helped organize -- she helped

9    organize the report.

10              They all did similar things.

11   So -- but that's what she did.  She didn't

12   work that much on this case.  She did some

13   work.

14        Q.     And with respect to Muna Yiman?

15        A.     Yiman.

16        Q.     Yiman.  I apologize.

17        A.     No problem.

18        Q.     What's her role?

19        A.     Same as Joan's.  She did some

20   searches, some organizing of documents, some

21   preparation, preparation of the organization

22   that you see in the room.  Sometimes I think

23   she -- sometimes I wanted books ordered and

24   she might order the books.  Go to the

1     library, get articles.

2          Q.     Okay.  With respect to

3     Kevin Reardon, what's his title?

4          A.     Researcher.

5          Q.     And what was his role in

6     assisting you with the engagement?

7          A.     Same thing.  To do searches of

8     the database, organize documents.  He, I

9     think, reviewed some depositions as well.

10    Certainly he -- he read my deposition.

11               And those are the tasks that he

12    did.  They all pretty much do the same thing.

13         Q.     Okay.  Alexis Biccirrilo?

14         A.     Yes.

15         Q.     What's her title?

16         A.     Researcher.

17         Q.     And same tasks as you listed

18    before?

19         A.     Yes.

20         Q.     And Triet Tran?  Is she also a

21    researcher?

22         A.     It's a he, and, yes.

23         Q.     I apologize.

24         A.     No problem.

1    Q.    Same task as you've listed

2  before for the other research?

3    A.    Essentially.  They pretty much

4  all do the same thing.

5    Q.    Are all of the staff that you

6  just listed, those seven people, full-time

7  employees?

8    A.    Yes.

9    Q.    And with respect to their work

10  for you, as your staff, do they only assist

11  in litigation services?  Or do they do other

12  work for you?

13    A.    They do other work for me.

14    Q.    Okay.  What are some of the

15  other things they do if they're not assisting

16  you with your expert work in litigation?

17    A.    They do work on other

18  consulting work for companies, and they also

19  work on writing papers.  Which may not lead

20  to litigation, so they do research on --

21  academic research on various issues.

22         They also help with the

23  non-profit that I run called Global Health

24  Education Training Service.

1          So we also have certain public

2   education efforts, and they do that.

3          So, for example, they're --

4   we've been recent -- I met with the FDA on

5   talc issues, and they helped organize the

6   materials for that presentation.

7          They met with Congress people

8   with respect to talc issues on two occasions.

9   Third occasion coming up, so two.

10          We prepared materials for the

11   congressional subcommittee.

12          We provide information to --

13   they help -- they help -- they all teach my

14   course, or help teach my course at Brown.  So

15   they TA the course.  Help prepare materials

16   for the course.

17          When I give talks, they

18   generally help prepare the materials for the

19   talks, PowerPoints and other things like

20   that.

21          That's most of what they do.

22     Q.    How many hours did your staff

23   collectively work on this engagement?

24     A.    That, I don't know.  I don't

1    have that number.

2         Q.    Can you estimate?

3         A.    No.

4         Q.    Would you say that in the last

5    four months that you've been engaged for this

6    litigation, your staff has worked full time

7    on it?

8         A.    Oh.  My staff usually works

9    more than 40 hours a week.  Not always.  But

10   my staff has been involved in a variety of

11   issues over this time period, not related to

12   the opioids.  So I don't know.  It's

13   conceivable that they worked an average of 30

14   or 40 hours for six or eight or ten of those

15   weeks.

16              Some of them were taking

17   vacations and other things, so I -- I really

18   don't know that.

19         Q.    Are you billing the hours that

20   your staff works on this engagement --

21         A.    Yes.

22         Q.    -- to the plaintiffs?

23         A.    Yes.

24         Q.    And how do you do that billing?

1    Do you prepare monthly bills?

2    A.    No.  We just keep the

3    cumulative hours and usually every three or

4    four months I send the bill.

5    Q.    And how are the cumulative

6    hours kept?

7    A.    Well, I keep them rolling on

8    a -- on a phone.  So when I do hours, I put

9    the total hours of numbers in the day and

10   change the total.

11   Q.    So your staff reports to you on

12   a daily basis the hours they've worked?

13   A.    No.  That's what I do.  I

14   actually don't know how they keep their

15   hours.  I think they do something similar.

16   Q.    How does your staff report to

17   you the hours that they've worked on this

18   engagement?

19   A.    They don't report to me the

20   hours they've worked on the engagement.

21   Q.    How do you know how much to

22   bill your staff out for this occasion?

23   A.    They report to Donna Barbarita,

24   and she generates the bill.

1    Q.    And what are you charging with

2    respect to your staff members with respect to

3    this engagement?

4    A.    I don't know.  Usually 50 to

5    $70 an hour.  I don't know what the billing

6    is really.

7    Q.    So that 50 to $75 an hour would

8    be for the seven people that we've identified

9    as your staff?

10    A.    Correct.

11    Q.    Did you rely on information

12    from your staff to develop the opinions in

13    your report?

14    A.    Sure.  The research that they

15    did formed the basis of some of the opinions

16    in my report.

17    Q.    How does your staff know what

18    to do?  How do you instruct them to assist

19    you in the engagement?

20    A.    Well, we meet and discuss the

21    issue generally to start.  Different staff

22    people are given different areas to do

23    research on.

24    And then they talk to each

1    other about the iterative searches they've

2    done and the work they've done.  And then

3    when I find something, generally I yell at

4    them, out my door, because they're all right

5    outside my door, and I say, "Hey, could

6    somebody go get me this?"  Or "Go check

7    that?"

8            And so that's -- a lot of the

9    direction comes in that form.

10            And they interact with each

11    other as well.  Decide amongst themselves

12    what they think are important, sharing

13    documents back and forth.  And they try to

14    co-create -- as we go through, we try to

15    create various outlines which go in a --

16    well, like this thing.  This 3M thing, we

17    have a sticky thing.  It's not a sticky

18    thing, but I have several sticky ones.  So we

19    might write different topics up, and people's

20    names get attached to those topics.  We do a

21    little research on those things.

22            Sometimes -- I may give you an

23    example.  For example, I was interested in

24    the anthropology of pain and sociology of

1    pain.  So Alexis was a sociology major.  Joan

2    was an anthropology major.  So I had Alexis

3    put together -- or go get me sociology on the

4    anthropology of pain and organize that.

5                    So that's how things happen.

6    It's a fairly non-linear organizational

7    management style, I would say.

8         Q.    Do you provide instructions --

9    written instructions to your staff to assist

10   you in this engagement?

11        A.    No.  I yell at them.

12        Q.    With respect to the flip charts

13   that you mentioned, where their outlines are

14   created, do you have those as part of your

15   file with respect to this engagement?

16        A.    I don't think so.  Because we

17   generally don't keep them up.  I may have one

18   or two.

19        Q.    But you haven't kept the flip

20   charts as part of your expert file?

21        A.    No, not as a -- not on a

22   regular basis.  We may have one in my office

23   now.

24        Q.    Do you ever give your staff

1    instructions by e-mail with respect to

2    engagements?

3         A.    Sometimes.

4         Q.    Did you give your staff any

5    instructions to assist in this engagement?

6         A.    Yes.

7         Q.    Do you still have those

8    e-mails?

9         A.    Well, that wasn't done by

10   e-mail.

11        Q.    Maybe I got confused.  Let me

12   ask again.

13              As part of this engagement, did

14   you provide instructions to your staff on how

15   to assist you?

16        A.    From time to time, over the

17   past four months, I'm sure I've sent them

18   e-mails saying "Get me this" or "Get me

19   that."  But most of my communications with

20   them is by yelling.

21        Q.    With respect to the students

22   that you listed, which I think there were six

23   students, are there --

24        A.    There's a couple of others.  We

 1    did some manual work too, but I don't

 2    remember their names.  I can't spell them.

 3        Q.    Let's talk about the work

 4    that's -- the six students that you mentioned

 5    did.

 6            How did the students assist you

 7    in this engagement?

 8        A.    Well, differently.  They had

 9    different -- they more or less had research

10    tasks.  So -- because I tried to make the

11    work academic for them in their area of

12    interest.

13            So Emma Cavanish had worked at

14    a marketing company, so she helped put

15    together the marketing literature.  So I have

16    a lot of marketing literature.  One of the

17    things she did was organize all of that

18    marketing literature.  And she did some

19    researches -- oh, one of the searches she

20    did, she did -- she came up with a list of

21    sex terms.  And she did searches to the

22    database for sex terms.  Hookers, tootsies,

23    things like that.

24            So she did a specific search

1    for sex terms.

2              And so that was one thing she

3    did.

4              Eva -- Emma McMillan was

5    interested in epidemiology, so I worked with

6    her to look at the whole issue of the

7    pay-for-play, impact in action that generated

8    EERW.  And that criticism of the EERW that's

9    in the report came out of that work.

10              Dan Shaw and Mark Hocevar

11    worked on deconstructing the Fishbain paper

12    from 2008.  And that work resulted in the

13    poster that's here that they presented at the

14    All Ivy conference on Saturday.  And so that

15    was -- that was their work.  So they had to

16    do a lot of digging, because a lot of the

17    citations in the Fishbain work in 2008 were

18    unfindable.  Because I don't know if they

19    existed or not, but he couldn't find two of

20    the 23 papers that he cited as evidence for

21    the dictionaries, and then they did the

22    reanalysis.  So I worked with them on that

23    poster presentation.

24              And they're working on a paper

1    now they were -- draft paper they're working

2    on that will also be submitted along with --

3    after the -- sometime now.

4              So -- was that what you wanted

5    to know?  Think there was something I left

6    out.

7         Q.    Did you get Max and Lindsay?

8         A.    Oh, yeah.  Max.  Max -- Max

9    deconstructed the complaint and went through

10   the complaint.  Tried to make sure we had all

11   the documents that were cited on the

12   complaint.  Tried to organize them by themes.

13             As you know, I -- the

14   complaints had about nine or ten, for want of

15   a better word, bad acts, which I condensed

16   into basically two in my analysis of what was

17   going on.

18             And so he went through the

19   complaint and tried to place those bad -- the

20   way the plaintiffs had done it.  And we also

21   did the Massachusetts complaint, in

22   reorganizing in that portion in the way that

23   I conceived of the -- of the cause of the

24   opioid epidemic.

1          Max also did some -- we did

2     some cross-checking of language.  I think you

3     saw that probably in your report, where

4     duplicate language was taken from Purdue and

5     used in marketing materials produced by some

6     of the front organizations.  So he did some

7     searches, looking for where language was

8     copied directly from manufacturers that went

9     into -- directly into the marketing materials

10    by the -- produced by the front

11    organizations.

12          So he did that.

13          There was one other -- there's

14    one other poster here that he had a -- that

15    was -- that was his find.  So, you know.

16          So that's pretty much what -- I

17    think what Max did.

18          What was the last one?

19    Q.    Before we move to that, Max

20    presented at the All Ivy conference?

21    A.    No. Dan Cho and Mark --

22          Dan Cho presented but the

23    poster was done by he and Mark Hocevar, who

24    are med students at Brown.

1      Q.    And what was the nature of the

2   presentation at the All Ivy conference?

3      A.    I'll get it for you.

4            I should have -- we have a

5   poster on that.  So it should be here.

6            Oh, here it is.  Yeah, here it

7   is.

8            So this is the poster that he

9   did.

10           So this is the -- this is the

11  poster that he just presented.  So it starts

12  with a historical description of the hockey

13  stick and the epidemic.  And -- can I -- ties

14  the epidemic for addiction.  And these are

15  the specific -- this is taken from a

16  published paper.

17           So this ties to the rise of the

18  epidemic for specific marketing acts done by

19  the manufacturers.

20           This is the reconstruction of

21  the Fishbain paper.  Fishbain took 23 papers

22  of which -- they're not really papers.  He

23  took 23 things, two of which we could never

24  find, including communicating within him.  We

1    couldn't find him, I think.

2                And so this is a breakdown of

3    those papers.  And how many patients came

4    from each of those papers.

5                And this is a -- the -- you can

6    see the one study from Fishbain, the

7    Milligan, Passik, and Taub paper, provides

8    56 percent of the total participants and had

9    a very low addiction rate.  But there was

10   another study that was also large and had a

11   stream of zero.

12               So what we did was we tried to

13   use a standard definition for addiction,

14   because the -- where the papers had not

15   really looked for addiction, we threw them

16   out.  So an addiction rate, the reason one

17   had an addiction rate of zero was because it

18   didn't really look for addiction.

19               So when you take the -- this is

20   the Fishbain, original Fishbain results.

21   Original Fishbain results has 2,102 patients,

22   97 percent of which are not addicted.

23   Three percent are addicted, and that's where

24   he came up with the 3.87.

1            But if you look at studies --

2    if you look at the -- if you throw out the

3    studies that you either can't find or --

4    because they either may or may not exist, or

5    you look at the studies where they actually

6    look for addiction, you get a different rate.

7    And that -- that gives you about 750

8    patients, of which 33 percent are addicted.

9            So that's the gist.

10    Q.    Thank you for that.

11            Did Mr. Cho and Mr. Hocevar

12    rely on any information that they reviewed as

13    part of this engagement to make that

14    presentation?

15    A.    They didn't rely on it, because

16    it's confidential.  They couldn't put it in.

17    But they reviewed.

18            Now, there are things in here

19    that -- for example, Fishbain didn't disclose

20    his associations with the litigation and

21    Purdue in particular in the published paper.

22            But what we did get --

23            Now, I probably had this in

24    2006, but at any rate, in relative -- in the

1    database with our documents were his reports

2    for Purdue during the time period that he was

3    preparing and publishing this paper.  And

4    some of those were cited in federal cases.

5    So we cited those federal cases as evidence

6    that he had misrepresented his

7    non-association with the pharmaceutical

8    companies in the end of this -- in the end

9    here.  Okay?

10                But we had more information on

11   his associations with the pharmaceutical

12   manufacturers which we didn't include because

13   it was confidential.

14                It's like we did rely on it in

15   a sense because it supported the construct

16   that he had misrepresented the nature of his

17   relationship with the manufacturers, as in

18   not mentioning it.

19        Q.    How many --

20        A.    Oh, I think one other thing.  I

21   think the students -- before we got the

22   cases, the students e-mailed Fishbain and

23   asked him if during this time period he

24   published this, he had any conflicts of

1    interest.  And he wrote an e-mail back saying

2    no, amongst other things.

3              The other things where he

4    criticized him -- the general anticorporate

5    construct in the -- and cynical views of the

6    medical and scientific views toward

7    corporations.

8         Q.    And do you have that e-mail

9    still?

10        A.    I don't know if I have it, but

11   Dan probably has it.

12        Q.    As part of this engagement,

13   have you kept copies of the e-mails that

14   either the students or staff have sent and

15   received?

16        A.    No, I don't keep any e-mails.

17              You know Jones Day is in the

18   room, right?

19              MR. DONOHUE:  I'll move to

20         strike as nonresponsive.

21        Q.    (BY MR. DONOHUE)  A number of

22   the students that you have had assisting you

23   in the -- in this engagement, how many hours

24   would you estimate that they have worked in

1   the last four months?

2        A.    I don't know.  Not much,

3   because they mostly worked in January during

4   inter-session.  But unfortunately, they

5   actually have to go to school.  Now, Brown is

6   pretty easy, okay?  But they still have to

7   show up for class and do some work.  So they

8   haven't done that much in the last couple of

9   months.

10       Q.    And these are all students from

11  Brown?

12       A.    They're all Brown students.

13       Q.    Are the students compensated

14  for the work that they have done to assist

15  you on the engagement?

16       A.    For some.  They didn't get paid

17  to do the academic work, so.

18             But some of this research they

19  did was for me in preparation for the report.

20  So I paid them for that, but I didn't pay

21  them for doing the poster or for writing up

22  the papers.  That's their own.

23       Q.    So what do you pay the students

24  for with respect to this engagement?

1    A.    Well, I pay them while they're

2  doing research for me related to the

3  litigation.  I don't pay them for work

4  related to generating medical publications or

5  scientific publications.  It's in the

6  disclosure here, so ...

7         It says "DKC and MH worked as

8  paid student researchers for the -- at the

9  request of plaintiffs in opioid litigation.

10  DKC and MH were not compensated by law firms

11  for work on the paper.  The lawyers for the

12  plaintiffs did not review the paper and had

13  no input into the content of the paper.

14  Dr. Egilman serves as an expert witness at

15  the request of cities and counties suing

16  opioid manufacturers and distributors for

17  money to help pay for the financial costs of

18  the opioid epidemic."

19         The reason I'm in here is I'm

20  not an author of this, but they did

21  acknowledge me as helping them prepare the

22  work.

23    Q.    Do you pay the students with an

24  hourly rate?

1        A.    I do.

2        Q.    What's the hourly rate?

3        A.    $20 an hour.

4        Q.    How much have you been paid to

5 date for this engagement?

6        A.    Nothing.

7            Well maybe I got a $10,000

8 retainer, but that's it.

9        Q.    Have you sent any bills to the

10 plaintiffs for your work on this engagement?

11        A.    Just the retainer bill.

12        Q.    How much are you currently owed

13 for the engagement?

14        A.    384 hours times $600.

15        Q.    What about the hours that your

16 staff has worked on the engagement?

17        A.    I don't have that number.

18        Q.    But you'll be asking for

19 compensation with respect to the

20 reimbursement for the hours that your staff

21 has worked; right?

22        A.    Yes.

23        Q.    Can you estimate for us what

24 that would be?

1    A.    No.

2    Q.    Is it more than 384 hours?

3    A.    I don't know.

4    Q.    No idea?

5    A.    I do not have any idea whether

6    it is more or less than 384 hours.

7    Q.    Do you have any idea of what

8    ballpark of the hours is that your staff has

9    worked?

10    A.    I do not.  It's probably

11    several hundred hours, I would say.  It's not

12    ten minutes, but I don't know how many hours.

13    And I may be off.  It may not be several

14    hundred hours.

15    Q.    When it comes time to submit a

16    bill for the hours that your staff has paid,

17    how are you going to figure that out?

18    A.    They keep track of their hours.

19    The hours go to Donna Barbarita.  Donna

20    Barbarita will send a bill.

21    Q.    So you believe Donna Barbarita

22    currently has information about the number of

23    hours your staff has worked on this

24    engagement?

1     A.    I don't think so.

2          MS. CONROY:  Objection.

3          THE WITNESS:  I don't know if

4    they've given her --

5          I don't think they've given her

6    the hours.  So they each have their

7    own hours.

8     Q.    (BY MR. DONOHUE)  And what

9 would you estimate the number of hours that

10 your students have worked on this engagement?

11     A.    Same thing.  I don't have a

12 good idea about that.  But mostly -- I mean,

13 they work -- they work, you know, around 15

14 to 30 hours for three or four weeks in

15 January, and then after that, you know, five

16 to 15 hours, maybe -- I doubt it -- in the

17 next couple of months.

18     Q.    How much of your income last

19 year was from expert work in the litigation?

20     A.    Probably half.

21     Q.    What were your other sources of

22 income for last year?

23     A.    Consulting for companies.

24     Q.    Is that non-litigation

1    consulting?

2         A.    It's confidential consulting.

3         Q.    Any other sources of income for

4    last year?

5         A.    Sure.

6         Q.    What else?

7         A.    Investments.

8               That's about it.

9         Q.    Does Brown pay you anything?

10        A.    A library card.  Discount on

11   that.

12              The library card is probably

13   worth about $50,000 to me, just to give you a

14   number.

15              The year before I got free

16   parking, when I was teaching a course.  They

17   paid for the parking.

18        Q.    Are you currently teaching any

19   courses at Brown?

20        A.    Not this semester.

21        Q.    Do you plan on teaching next

22   semester?

23        A.    I do.  Well, no.  I plan on

24   teaching -- because of this case, I plan on

1    teaching the next spring.

2         Q.    Are you still practicing

3    medicine?

4         A.    I still have a license to

5    practice, and I still occasionally see

6    patients.

7         Q.    How many patients would you say

8    you now see?

9         A.    Well, when I'm doing -- I

10   probably see 10 or 15 consulting patients a

11   year and maybe one or two regular patients

12   who call me up or something I've seen them

13   before for.

14        Q.    Do you have an office where you

15   practice medicine?

16        A.    I do.

17        Q.    Is it the same office you use

18   for your expert litigation?  Or different?

19        A.    It's a slightly different

20   suite.

21             I have -- in my office I have

22   about eight rooms.  In one of the rooms I

23   have a medical setup.

24        Q.    Speaking of the protective

1    order, were you provided the protective order

2    in this case?

3          A.    Yes.

4          Q.    Did you review it?

5          A.    Yes.

6          Q.    And did you sign it?

7          A.    Yes.

8          Q.    And did you agree to be bound

9    by it?

10         A.    Yes.

11         Q.    What about the staff that

12   you've listed as helping you on the case?

13               Did -- were they provided the

14   protective order?

15         A.    Yes.

16         Q.    Did they sign it?

17         A.    Yes.

18         Q.    Did they agree to be bound by

19   it?

20         A.    Yes.

21         Q.    And the students that you

22   mentioned, the six students, did it -- were

23   they provided the protective order?

24         A.    Yes.

1    Q.    Did they sign it?

2    A.    Yes.

3    Q.    And they agreed to be bound by

4  it?

5    A.    Yes.

6    Q.    Do you have a copy of those

7  signed protective orders?

8    A.    Someplace.

9    Q.    Okay.

10   A.    Not on me.

11         I think they were all sent to

12  the plaintiff.  I'm not completely sure that

13  I kept copies.  The lawyers have copies.

14   Q.    We'll follow up on that

15  separately.

16         Have you in the past violated

17  court orders?

18         MS. CONROY:  Objection.

19         THE WITNESS:  I need to look at

20      that settlement agreement to answer

21      that question.  I'm sure that -- I

22      don't recall the language exactly.

23   Q.    (BY MR. DONOHUE) What

24  settlement agreement are you referring to?

1        A.      Between me and Lilly.

2        Q.      I'm sorry, I didn't hear you.

3   Between --

4        A.      Between me and Lilly.

5        Q.      What case was that?

6        A.      Zyprexa.

7        Q.      In the Zyprexa litigation, do

8   you recall whether the Court in that case

9   found that you had violated the Court's

10  protective order?

11       A.      That's in dicta in a case in a

12  ruling on the TRO that I wasn't at, yes.

13  Something like that.

14       Q.      Did you violate the Court's

15  protective order in the Zyprexa case?

16       A.      I need to look at the language

17  that I wrote in the Lilly settlement before I

18  answer that question.  I need to refresh my

19  recollection.

20       Q.      Where is that settlement?

21       A.      Where is that settlement?  It's

22  in my office.

23       Q.      So you have access to it?

24               You can refresh your

1    recollection when you go back to your office?

2         A.    If I went back to my office, I

3    could find the document and I could refresh

4    my recollection.

5         Q.    And what is it that you need to

6    refresh your recollection about with respect

7    to the settlement agreement before answering?

8         A.    Well, that was a finely crafted

9    document.  And I need to recall exactly what

10   was in it.  And I can't recall exactly what

11   was in it.  It's been 9 -- 12 years.  So

12   before I answer questions about that, I want

13   to refresh my recollection of what actually

14   was signed and what happened.

15        Q.    All right.  Are there any other

16   instances you recall where you have violated

17   a Court's order?

18        A.    No.

19        Q.    Do you recall the Ballinger v.

20   Brush Wellman, Incorporated case?

21        A.    Correct.

22        Q.    Do you recall posting materials

23   in violation of the Court's order in that

24   case?

1    A.    That's not what happened.

2    Q.    What did happen?

3    A.    Jones Day hacked my computer,

4    downloaded materials from my computer,

5    illegally, then -- pardon me.  Keller and

6    Heckman in Washington, representing the

7    Society for the Plastic Industries, hacked my

8    computer in a case -- in the Staples case,

9    the vinyl chloride case in Texas.  They then

10   shared the password with Kelly Stewart at

11   Jones Day.  Kelly Stewart of Jones Day then

12   hacked my computer, downloaded materials that

13   were not publicly available because my

14   computer was password-protected.

15            Went to the judge, told the

16   judge I had violated a gag order.  He lied to

17   the judge.  And the judge believed him.

18   Okay?  The judge issued a sanction.  The

19   sanction was more or less reversed by the

20   Colorado Appellate Court, cert. denied to the

21   Supreme Court of Colorado.

22            I filed a lawsuit against

23   Keller and Heckman, and it was thrown out on

24   the law.  It's the lead case in the

1    Millennium hacking statute.  It's Egilman

2    versus Keller and Heckman.

3              I then filed a bar complaint

4    against Kelly Stewart in Dallas.  Kelly

5    Stewart, at the bar complaint, admitted that

6    he had illegally hacked my computer, a

7    federal felony, 10 years in jail and a

8    $50,000 fine, on videotape.  No written

9    record.

10             The bar in Dallas issued a

11   written sanction to him, which was not to be

12   publicly disclosed, for counseling, and found

13   that -- I think the language was that my

14   complaint had merit.  The vote was 4 to 1.

15             So that's what happened in that

16   case.

17        Q.    When is the first time that you

18   gave expert testimony in support of

19   litigation?  Do you recall your first case?

20        A.    Yeah, my first case is Time

21   versus OCF.  It's a Third Circuit case.

22        Q.    What year was that?

23        A.    Third Circuit decision, I think

24   it was '87 or '88.  The case was, I think, in

1     '86.

2          Q.     Do you recall the area that you

3     were giving expert testimony on --

4          A.     Yes.

5          Q.     -- in that case?

6                 What was it?

7          A.     Well, it was the supervisor at

8     the Hess oil refinery in St. Croix who had

9     been exposed to asbestos and developed

10    pleural plaques.

11                He sued Owens Corning and a

12    variety of other asbestos product

13    manufacturers for injuries related for the

14    pleural disease that he got as a result of

15    the exposure.

16                I testified -- there were two

17    trials.  There's -- in the first trial, the

18    first trial only went to -- week and a half,

19    and the judge got sick and unfortunately

20    passed away.

21                I hope that doesn't happen to

22    anybody in this case.

23                And then he -- there was a

24    second trial, and in the second trial I

1    testified on state of the art warnings, risk

2    communication, asbestos medicine, and a

3    variety of other issues.

4         Q.    How many times in your career

5    have you been retained as an expert witness?

6         A.    I don't know about career, but

7    I've been retained as an expert witness in

8    probably over 4 or 500 cases.

9         Q.    And of the 4 or 500 cases that

10   you've been retained as an expert witness,

11   how many of those would you estimate have

12   been as a testifying expert?

13              MS. CONROY:  Object to the

14         form.

15              THE WITNESS:  Well, the ones I

16         gave you, that's the ones based on

17         testifying.

18         Q.    (BY MR. DONOHUE)  Okay.  Would

19   you add to that number if we included

20   retentions as a consulting expert?

21         A.    I've done other consulting

22   expert work, yes.

23         Q.    How many cases would you

24   estimate you'd been retained as a consulting

1    expert?

2          A.     That, I don't know.

3          Q.     Would it be about the same

4    number or less?

5          A.     I do not know.

6                 For example, I might be

7    consulting with someone and I don't know how

8    many cases there are.  Somebody might be

9    sued -- a corporation might be sued for

10   thousands of cases.  My consulting might

11   relate to the general issues relating to

12   thousands of cases.  I don't know the answer

13   to that question.

14         Q.     I'm not asking about the number

15   of cases.  I'm asking about the number of

16   times you've been retained as a consulting

17   expert.

18         A.     Well, okay.  I don't know.  I

19   don't know that either.

20         Q.     Can we go to your expert

21   report?  We've marked one of the copies 1F.

22   Would you like a copy of that?  It's got a

23   spiral binding so it's easy to flip through.

24         A.     Sure.

1          Q.      And would you mind turning to

2    page 139 of your expert report.

3          A.      Okay.

4          Q.      Okay.  Page 139 is entitled

5    "Prior Expert Testimony."  Is this a complete

6    list of the depositions and trial testimony

7    you've given since 2015?

8          A.      As well as I could put it

9    together.

10         Q.      Do you recall testifying in

11   July of 2015 in a case captioned Montgomery

12   v. Home Depot?  It was in the Southern

13   District of California.

14         A.      No, I don't believe I testified

15   in that case.

16         Q.      Okay.  Looking at page 139 --

17         A.      What year was that case?

18         Q.      2015.

19         A.      I don't recall.

20         Q.      Well, if it -- if you do have a

21   memory of it, we could add it into the list,

22   but.

23         A.      I don't have a memory of it.  I

24   can go look.

1          Q.      Turning your attention to

2    page 139 of your expert report.

3                  In each of these listed cases,

4    have you testified on behalf of the

5    plaintiffs?

6          A.      No.

7          Q.      So --

8          A.      I don't testify on behalf of

9    anybody.

10          Q.      Let me rephrase the question.

11                  With respect to the cases

12    listed on page 139 of your report, were you

13    retained by the plaintiffs in each and every

14    one of those cases?

15          A.      I believe so.

16          Q.      You previously testified that

17    you'd estimate you've been retained 4 to 500

18    times as an expert; do you remember that?

19          A.      Yes.

20          Q.      Out of the 4 to 500 times

21    you've been retained as an expert, in each of

22    those cases have you been retained by the

23    plaintiff?

24          A.      No.

1        Q.      How many times have you been

2    retained by the defendant in those 4 to 500

3    cases?

4        A.      Probably 150.  200.

5        Q.      When is the last time you

6    recall being retained by a defendant as an

7    expert in litigation services?

8        A.      Yesterday or the day before.

9        Q.      What case is that?

10       A.      I don't remember the case.

11   It's a Viking Pump case.  I don't know the

12   name.

13       Q.      A Viking Pump?

14       A.      Viking Pump.

15       Q.      And putting aside your

16   retention yesterday, when is the last time

17   you recall being retained by a defendant as

18   an expert?

19       A.      The week before.

20       Q.      In the last four to five years,

21   have you testified on behalf of a defendant?

22       A.      I don't testify on behalf of

23   defendants or plaintiffs.

24       Q.      Have you testified in any case

1    in the past four years where you were

2    retained by a defendant?

3         A.    No, because it would be here.

4    But I have in the past.

5         Q.    So when is the last time you

6    recall testifying as an expert when you've

7    been retained by a defendant?

8         A.    Probably about five --

9    actually, no, there's -- there must be a case

10   missing because I think two years ago, I gave

11   a deposition at the request of a plaintiff in

12   a defense case, so there's one case specific.

13   So that's probably about two years ago.

14        Q.    So your answer said you gave a

15   deposition at the request of a plaintiff in a

16   defense case?

17        A.    Well, I was working for

18   Viking Pump, the defendant.  I was deposed by

19   the plaintiff.

20        Q.    Got it.  You mentioned the

21   Viking Pump cases.  Do you recall any other

22   defendants that have retained you as an

23   expert?

24        A.    Yes.

1       Q.      What other defendants?

2       A.      Well, the ones that I mentioned

3   when I first met Ms. Conroy.  She retained me

4   at the request of Federal-Mogul.  Turner &

5   Newall was the underlying company, but

6   Federal-Mogul, I think was the owner.  So

7   those three cases were Federal-Mogul cases.

8               Then I've done -- I did an A.E.

9   Smith boiler case.

10              I did a variety of workers'

11  compensation cases when I was running the

12  clinic in Braintree.

13              I did a lead case when I was

14  running the clinic in Braintree.

15              I did some other -- I think

16  it's one or two other boiler manufacturer

17  cases.  I'm sorry, pump manufacturer cases.

18              That's what I can remember.

19      Q.      So your testimony is that out

20  of the 4 to 500 cases where you've been

21  retained, approximately 150 to 200 of those

22  you were retained by the defendant to be an

23  expert?

24      A.      Think you're -- the 4 to 500

1   are cases I gave testimony in.  Okay?  The

2   100 to 150, or whatever I gave for a number

3   for the defense cases, the cases I've been

4   retained in, in most of those cases, aside

5   from two or three of those cases, maybe four

6   of them, maybe five, I did not give testimony

7   in those cases.  Those cases settled.  But I

8   was retained and gave reports in all those

9   cases.

10         Q.     Okay.  So let me go back.

11               Out of the 4 to 500 cases where

12   you have testified as an expert, how many of

13   those cases have you testified when you've

14   been retained by a defendant?

15         A.     Probably 10 or so.

16               Well, no, wait.  I gave you

17   some others.  So maybe 10 to 15.

18         Q.     And you mentioned that you

19   believe, putting aside whether you testified

20   as an expert or not, "I've been retained by

21   defendants in 150 to 200 cases"; do I have

22   that right?

23         A.     Correct.  Or more.  I currently

24   have about 50 or 60 cases for Viking Pump.

1    And I've been working for them for five or
2    six years, and probably that's my average
3    caseload for them over that time period.  So
4    I may have underestimated the total number of
5    Viking Pump cases that I've done, I've been
6    retained over the last four or five years,
7    but that's my best estimate.
8         Q.    So how many cases have you been
9    retained as an expert by plaintiffs?
10        A.    That, I don't know.  Mostly --
11   mostly the plaintiff cases I'm retained in, I
12   give depositions and they go to trial.  Not
13   all.  I'd say the overwhelming majority go to
14   trial, so most of that number went to trial.
15             I mean, that's just the way it
16   is.
17        Q.    With respect to your retention
18   in this engagement, how many cases have you
19   been retained as an expert by the plaintiff?
20             In other words, how do you
21   count up the number of cases for this
22   engagement since you testified that you have
23   been engaged in the MDL?
24        A.    Again, I do not know what that

1    question means.

2         Q.     In your past as a testifying

3    expert, has any court excluded your proposed

4    expert testimony?

5         A.     Yes.

6         Q.     How many times has a court

7    excluded your testimony as an expert witness?

8         A.     Once.

9         Q.     And what case was that?

10        A.     That's the popcorn case in

11   Spokane.

12        Q.     Any other time?

13        A.     No.

14        Q.     Have you ever withdrawn as an

15   expert in litigation after you've been

16   retained?

17        A.     I'm not sure I understand that

18   question.

19        Q.     In any of the 4 to 500 cases --

20   no, strike that.

21              In any of the cases where

22   you've been retained as an expert, have you

23   withdrawn from those cases prior to

24   testifying as an expert?

1          A.      Not that I can recall.

2                  I mean, I've not -- in cases

3     that I've been retained and given testimony

4     at a deposition, I've not always testified.

5          Q.      Right.  But I'm wondering if

6     you recall ever, after a, for example, a

7     motion to exclude you has been filed, you

8     withdrawing as an expert in that case.

9          A.      Do you mean me?  Me sending a

10    letter saying I withdraw?  Or me telling a

11    lawyer I withdraw?

12         Q.      Have you ever --

13         A.      Is that what you mean?

14         Q.      Well, let's start with that.

15    Do you recall any case --

16         A.      That's never happened.  That I

17    can recall.

18         Q.      Do you recall any case where,

19    after a motion to exclude has been filed

20    against your proposed testimony, where the

21    lawyer that retained you has withdrawn you

22    from the case?

23         A.      I don't know.

24         Q.      Don't recall?

1           A.      I don't know.

2           Q.      So if we could go to your

3    report again, and what we've marked as

4    Exhibit 1F, which is in front of you.  Could

5    you confirm that this looks to be a complete

6    copy of your report?  I understand there's

7    not the exhibits, but at least your report?

8               MS. CONROY:  Objection.

9               THE WITNESS:  How am I going to

10       do that?

11          Q.      (BY MR. DONOHUE)  Okay.  We'll

12   do it a different way.  Could you turn to

13   page 141?

14              And this is a page entitled

15   "Signature."

16              Is that your signature?

17          A.      It is.

18          Q.      And the first sentence states

19   that this is a report -- excuse me.  "This

20   report is a statement of opinions I expect to

21   express in this matter and the basis and

22   reason for those opinions."

23              Do you see that?

24          A.      Yes.

1      Q.      And is that accurate?

2      A.      You read that correctly, but it

3   should -- understand that these are opinions

4   that I expect to express at this deposition.

5              I don't think I'm going to give

6   these opinions in court.

7      Q.      And why don't you think you're

8   going to give all of the opinions in court?

9      A.      Well, for one thing, I think we

10  don't have five years to try the case.

11             That would be the number one

12  reason.  I know I wouldn't give all of these

13  opinions.

14     Q.      Looking at the opinions in your

15  report, do you know which opinions that you

16  will be testifying at trial about, if

17  allowed?

18             MS. CONROY:  Objection.

19             THE WITNESS:  I -- as you know,

20        I've done some cases with Mr. Lanier,

21        and he always surprises me.

22             So I don't have a clue.

23     Q.      (BY MR. DONOHUE)  So, before we

24  go back to that, let's put on the record what

1    your opinions are in this report so we make

2    sure we're all on the same page.

3              Let's start with the

4    definitions that you use which are on page 51

5    of your report.

6         A.    Okay.

7         Q.    Now, with respect to definition

8    4.4, which is the, quote, Venture, capital V,

9    end quote, you write that "The Venture refers

10   to all defendants in the opioid litigation."

11             Do you see that?

12        A.    I do.

13        Q.    What do you mean by "the opioid

14   litigation"?

15        A.    Well, I mean this case.

16        Q.    Now, are you aware of the

17   opioid manufacturers that are named as

18   defendants in this case?

19        A.    Yes.

20        Q.    What about -- are you aware

21   that there are opioid manufacturers that are

22   not named as defendants in this case?

23        A.    Yes.

24        Q.    Are the opioid manufacturers

1    that are not named as defendants in this case

2    part of the venture as you've defined it?

3         A.    I do not know.

4         Q.    How come you don't know?

5         A.    Because I don't have any

6    information on them.  There's no discovery

7    that I've seen.

8         Q.    Is it possible that opioid

9    manufacturers that are not listed as

10   defendants in this case are part of what

11   you've defined as "the venture"?

12        A.    Yes.  Anything is possible.

13        Q.    So you haven't undertaken any

14   analysis of whether manufacturers of opioids

15   not named as defendants in this case are

16   acting in concert with the manufacturer

17   defendants that are named in this case?

18             MS. CONROY:  Objection.

19             THE WITNESS:  No, I searched

20        the database, but there was -- there

21        are no relevant documents on that

22        issue on -- produced by other parties.

23             I can't know what people were

24        doing unless I have depositions and

1           documents.

2           Q.      (BY MR. DONOHUE)  Well, in any

3   of the depositions and documents that you

4   reviewed as part of this engagement, did you

5   see references to other entities or

6   individuals that were not named as defendants

7   in the case?

8           A.      I don't recall.

9           Q.      And what is the time period

10  that you have used to describe the venture,

11  as you've defined it on page 51 of your

12  report?

13          A.      I didn't use a time period, but

14  I guess there's kind of two time periods.  So

15  I'll go to the hockey stick.

16              So I would say that the time

17  period for the massive overuse began in 1996,

18  the introduction of Purdue's drug.

19              However, there was some

20  beginning activities, by members of the

21  venture, as early as 1984, when Purdue

22  illegally marketed MS CONTIN.

23              So I would say that that --

24  that was the first act that was part of the

1    concerted activity that led eventually do

2    this breakout in 1996.

3        Q.    And what is the date of the

4    first act that you just testified to?

5        A.    It was 9 -- in 1984 Purdue

6    started to market MS CONTIN.  And that was

7    illegally marketed.  It was not an approved

8    drug by the FDA.

9        Q.    And they --

10       A.    And they sold 770,000 pills, I

11   believe, before the FDA caught that.

12            MR. DONOHUE:  I'll move to

13       strike as nonresponsive everything but

14       the date.

15       Q.    (BY MR. DONOHUE)  You said that

16   as part of the first act, members of the

17   venture acted together.  What other members

18   of the venture do you believe acted together

19   in 1984?

20       A.    The only member of the venture

21   in '84 was Purdue.  I believe that was --

22   Purdue was the only member.

23       Q.    If you turn to page 52 of your

24   expert report, marked as Exhibit 1F.

1            And we'll go back to some of

2    these areas.  I just want to get a high-level

3    view of your expert report.

4            So page 52 is entitled "Capsule

5    of Opinions."

6            Do you see that?

7        A.    I do.

8        Q.    Is the capsule of opinions

9    intended to be a summary of your overall

10   expert opinion?

11       A.    Oh, it's kind of like the

12   highlights.

13       Q.    So is it the highlights of what

14   is contained in the following opinions in

15   your expert report?

16       A.    It's the highlights of the

17   entire report.

18            So I guess you could call it,

19   in terms of a movie, the -- like the little

20   things they show to encourage you to go to a

21   movie?

22       Q.    The trailer?

23       A.    Yeah, it's like a trailer.

24       Q.    Then if you'd turn to page 53,

1    you have as numeral 6, a title "In 2004, I

2    warned about the crisis; I was ignored."

3              Do you see that?

4         A.    Yeah.

5         Q.    Is that an opinion that you

6    intend to offer, if allowed, in this case?

7         A.    It's an opinion I have.

8              I don't have any intention -- I

9    don't get to decide what questions are asked,

10   and I don't get to decide if a question is

11   asked whether I'm allowed to answer it.

12             All I have here, just to maybe

13   speed it up is my opinions.  Okay?

14             I don't know what's going to

15   happen in court.

16        Q.    So with respect to No. 6, "In

17   2004, I warned about the crisis; I was

18   ignored," fair to say that's an opinion

19   that -- an expert opinion that you've

20   expressed in your expert report?

21        A.    Correct.

22        Q.    And when did you form that

23   opinion?

24        A.    Well, 19 -- 2004.

1          Q.     Okay.  And then, I just want to

2    make sure I'm reading this right.  So

3    underneath the statement in 2004, I warned

4    about the -- "I warned about the crisis; I

5    was ignored," there's, from page 53 to 61

6    paragraphs.  My question is, are those

7    paragraphs contained in the pages of your

8    report separate opinions?  Or are they

9    supporting material for your opinion about

10   warning of the crisis?

11         A.     I think that's a metaphysical

12   question.  I'm not sure I'm capable of

13   answering it.

14                I would say it certainly

15   supports the opinion in 6, but some of them

16   are separate opinions.  So they're opinions

17   that explain the entire set of what goes into

18   the Opinion 6.

19         Q.     Okay.  And then, with respect

20   to the additional opinions that you have

21   formed since 2004, those start on page 62 of

22   your report.

23                MS. CONROY:  Objection.

24         Q.     (BY MR. DONOHUE)  Do I have

1    that right?

2         A.    I don't know how to answer

3    that.  I have to go through some of these.  I

4    may have said -- I may have had some of these

5    opinions -- this is all of the opinions,

6    right?  -- that you're referring to?  All of

7    the opinions for that question?  All of the

8    rest of the -- all of the rest up to 137 or

9    whatever it is?  Is that a question for all

10   of the opinions from page 62 to 137?

11        Q.    I was attempting to ask if this

12   was the -- all of the opinions that you have

13   since 2004 that are contained in your expert

14   report.

15        A.    Yeah, what I'm saying, I may

16   have had some of those opinions before --

17        Q.    Okay.

18        A.    -- 2004.

19        Q.    Okay.  Could you --

20        A.    I don't recall.

21              I don't recall, and I never

22   analyzed them by date.  So in order to answer

23   that question, I need to go through and read

24   them.

1      Q.      Okay.

2      A.      I think most of these opinions

3   relate to material that I got in discovery in

4   this litigation.  I may have had some of

5   these opinions in a general way before 2004.

6      Q.      Let me ask you this.  Would you

7   please go through the opinions contained on

8   Section 7 in your report and tell us what

9   opinions, if any, you formed prior to this

10  engagement?

11     A.      Well, 7.3, I was certainly

12  aware of prior to this engagement of the

13  $80 million penalty that Walgreens paid for

14  Jupiter and other things.  And that's --

15  could be part of the basis of 7.3.

16            MR. DONOHUE:  Can we take a

17       break, take our first break?

18            MS. CONROY:  Let's just be --

19       I'm fine with a break, but let's just

20       be clear what he's looking for.  You

21       want to know which of the 137 opinions

22       were formed after his retention in

23       this case in November of 2019 -- of

24       2018?

1          THE WITNESS:  The opposite.

2     Before.  He wants to know before.

3          MR. DONOHUE:  Before.

4          MS. CONROY:  And that's what

5     you want him to determine --

6          MR. DONOHUE:  Yes.

7          MS. CONROY:  -- during the

8     break?

9          MR. DONOHUE:  Yes.  If any.

10          THE WITNESS:  No, I'm not going

11     to do that during a break.

12          MR. DONOHUE:  Well, we can take

13     a longer break.

14          THE WITNESS:  I'm not going to

15     do that during a break.  When there's

16     a break, there's a break.  I'm not

17     working during the break.  I have

18     union rules.

19          MR. DONOHUE:  All right.  We'll

20     wait for Special Master Cohen to get

21     back.

22          SPECIAL MASTER COHEN:  I'm

23     right here.

24          You know, if the break is for

1          us to break, it's for us to go to the

2          bathroom and take a rest.  And he

3          doesn't need to spend 10 or 15 or

4          20 minutes, unless you want to take a

5          long break.  But some of that's going

6          to have to take away from your time.

7                MR. DONOHUE:  Okay.  So, in

8          other words, have him do it on the

9          record?

10              SPECIAL MASTER COHEN:  That's

11         probably better.

12              MR. DONOHUE:  All right.

13             So I would like you to do that.

14         I'll just restate the question.

15         Q.    (BY MR. DONOHUE)  Would you

16  please go through your opinions and tell us

17  what opinions, if any, that you formed prior

18  to this engagement?

19         A.    Okay.

20              I'm going to have you help me.

21  I have venture members.

22              [Document review.]

23              MR. DONOHUE:  Do you want to

24          know what?  I will -- Special Master

1          Cohen, I will withdraw the question so

2          we can take a break.

3                    SPECIAL MASTER COHEN:  Okay.

4                    MR. DONOHUE:  Thank you.  Off

5          the record, please.

6                    THE VIDEOGRAPHER:  Off the

7          record.  10:51.

8                    (Recess taken, 10:50 a.m. to

9          11:23 a.m.)

10                   THE VIDEOGRAPHER:  We are back

11         on the record at 11:24.

12                   MR. DONOHUE:  For the record,

13         we're going to mark as Deposition

14         Exhibit No. 2, a copy of the poster

15         board that's entitled "Deconstructing

16         the myth that prescribed opioids have

17         a low risk of addiction" that

18         Dr. Egilman pointed to earlier.  And

19         so we'll get a copy of that, an 8 by

20         11, hopefully, and just mark it for

21         the record as Exhibit No. 2.

22                   MS. CONROY:  And for the

23         record, I will state when you reduce

24         that to 8 by 11, it's illegible.  So

1        if it's -- we can get people an

2        electronic copy or whatever, but just

3        be advised that when you get home and

4        you take a look at it, it can't be

5        read.

6            MR. DONOHUE:  All right.

7        Appreciate that.

8            THE WITNESS:  So you want me to

9        continue my answer?

10           MR. DONOHUE:  No.  I withdrew

11       that question.

12           (Whereupon, Deposition Exhibit

13       Egilman 2, Poster (8.5 x 11 copy)

14       Deconstructing the myth that

15       prescribed opioids have a low risk of

16       addiction by Daniel K. Cho, Mark

17       Hocevar, Brown University, was marked

18       for identification.)

19       Q.    (BY MR. DONOHUE)  With respect

20   to your expert report, did you receive all of

21   the documents that you needed to reach the

22   opinions in your expert report?

23       A.    No.

24       Q.    Okay.  What documents didn't

1    you receive that you needed to reach your

2    opinions?

3         A.    I think I got some -- I think I

4    got an -- okay.  So I got a thing on

5    limitations in my report.  I couldn't review

6    missing or destroyed documents, so they were

7    missing and destroyed documents.

8              I couldn't review documents

9    that were withheld as, quote, nonresponsive.

10   Some of the documents were produced even

11   though confidential with nonresponsive

12   blanks.

13             I couldn't review documents

14   that would help based on a privilege claim.

15             I couldn't review redacted

16   language that was in a lot of the

17   confidential documents.

18             I didn't review correspondence

19   in non-produced personal e-mails.  So there

20   were several participants who had a variety

21   of e-mails that weren't produced.  Something

22   that said text messages.  There were no text

23   messages produced.

24             Purdue had a system of removing

1    information from call notes, so I couldn't

2    review things that were removed.

3                I didn't have access to all of

4    the documents produced in all the state

5    litigation.

6                I didn't have the monitoring

7    reports that were part of the corporate

8    integrity agreements.  I didn't have all of

9    the corporate integrity agreements.  I didn't

10   have any -- oh, I'm sorry, I had Cephalon

11   hotline reports related to the CIA, but I did

12   not have any of the other CIA-associated

13   monitoring reports, ethics hotlines, or other

14   related documents.

15        Q.    So the opinions in your expert

16   report are based on incomplete information?

17                MS. CONROY:  Objection.

18                THE WITNESS:  Well, they're

19            based on the information that I had.

20            I can't know if the information that's

21            been destroyed would have impacted on

22            my opinions one way or the other.

23            It's a limitation that you asked me if

24            I -- I answered the question you

1      asked.  The implications of things I

2      didn't see, I can't answer.  I don't

3      know how they may or may not have

4      altered an opinion I had.

5      Q.    (BY MR. DONOHUE)  Since

6  March 25th, 2019, which is the date of your

7  report, have you formed any additional

8  opinions as an expert?

9      A.    No, but I have additional bases

10  for opinions.

11      Q.    What's the additional bases you

12  have for opinions since March 25, 2019?

13      A.    Well, I may have some

14  additional -- yeah, additional bases, so.

15            Let's see.  There's an

16  additional bases folder here.

17            Well, let me -- I mean, let me

18  go -- we can look for it.

19            I can start with a -- I read

20  the appendix to Perri's report, where he goes

21  through more of the call notes and other

22  communications that companies made to

23  physicians and other parties.  So that's one

24  category.

 1                    I don't think I listed this,

 2      which I call the mushroom document, as part

 3      of the basis for my opinion that the

 4      physicians were not responsible for the

 5      hockey stick.

 6                    This is an e-mail from Kathe

 7      Sackler -- to Kathe Sackler, Wednesday,

 8      August 6, 1997.

 9                    Oh, yes.  Here's the new basis.

10      Do you have that?  She found it.

11                    Okay.  So this is J&J Pain

12      Council Meeting, December 6, 2006.

13                    And then some additional bases

14      for 135, which is a CVS marketing agreement

15      with Endo.

16                    So there's --

17           Q.     Would you do me a favor and

18      just read the Bates numbers of those

19      documents into the record so we'll have a

20      record of what you're referring to?

21           A.     Sure.  JAN-MS-00494367, and

22      then Endo Opioids MDL-06157733.  Then the

23      Insys material that came out during the

24      Boston trial, I haven't seen all of the

1    transcripts of that trial, but I've read

2    reports of that trial, sometimes quotes from

3    testimony from that trial.

4                So that would be additional

5    opinions related to that.

6                And the same thing would be

7    true for the general -- although Rochester is

8    not a defendant in this case, you asked about

9    other people.  I wasn't aware of what

10   Rochester had done until the recent press

11   coverage and pleading against them for

12   various bad acts with respect to the

13   uncontrolled distribution of drugs to their

14   customers.

15               Then I have -- I did bring -- I

16   don't think I brought with me, but I have --

17   as you know, I had the Robert Wood Johnson

18   opinion.  And yesterday I got, probably 4 or

19   5,000 pages of more detail on Robert Wood

20   Johnson Foundation, board of directors, their

21   bios of their contacts with primarily Johnson

22   & Johnson as the corporate entity in terms of

23   the overlapping board of directors of Robert

24   Wood Johnson Foundation.

1            I think the Ohio hockey stick.

2     No. 7.  How about this 6, then.  So this is a

3     Summit County PowerPoint.  And it's -- you

4     know, it came in native form, so I don't have

5     the Bates number.

6            I can identify it -- this is

7     the first page.  It's in the production.  So

8     that's the first page of it.  The first page

9     says "Facing the Opioid Epidemic.  How we got

10    here and what we need to do next."  And it

11    was by Christina Delos Reyes.  It's titled

12    "The Role of the Physician, Prescription Drug

13    Abuse.  Akron General Wellness Center,

14    May 31, 2014."

15            And it has an Ohio-specific

16    hockey stick chart in it, along with the

17    specific -- some of the specific marketing

18    activities that trail the hockey stick.

19            So ...

20        Q.    Does the mushroom document have

21    the Bates number?

22        A.    Mushroom.  Yeah, mushroom.

23            It's over here.  Bates number

24    for the mushroom.  PDD_8801118262.

```
 1
 2              Let's take a quick look.  I
 3   think that's it.
 4        Q.    Okay.  Could we go --
 5        A.    Just let me finish taking a
 6   quick look to see if there's anything else --
 7        Q.    Oh, I apologize.
 8        A.    -- on the table.
 9              Yeah, I think 6 is slide deck.
10              So this is another bases.  I
11   have an opinion on slide deck creation, and
12   this is just another company's same
13   activities.  This is Bates numbers
14   acquired_activists_00367447.
15              Let me see this.  What is that?
16   This is the "See no evil" document.  I think
17   this is not in the report.  This is
18   Endo_0064825.
19              I think that's it.
20        Q.    Okay.  Could we go back to your
21   report, which we've marked as Exhibit 1F.
22   And go to page 29, which is your background
23   and qualifications?
24        A.    Okay.
```

1    Q.    Okay.  And so I think you

2  testified earlier you're currently a -- still

3  a medical doctor; right?

4    A.    Correct.

5    Q.    And if we turn to page 31, you

6  have a paragraph about the middle of the page

7  where you talk about warnings.

8            Would you consider yourself an

9  expert in warnings?

10    A.    Yes.

11    Q.    Are you familiar with TIRF

12  REMS?

13    A.    I'm familiar with REMS

14  programs.

15    Q.    Okay.  What do you know about

16  the REMS program?

17    A.    Well, what I'm -- when

18  evaluated -- there's been several recent

19  papers on the REMS programs in the last year.

20  And -- do you really want me to -- ask me

21  what I know about the REMS program?  Because

22  that's a very, very long answer.

23    Q.    No, I appreciate that.

24    A.    I'd be glad to give you that

1  answer, okay, but --

2       Q.     Let me withdraw that and ask a

3  different question.

4       A.     Okay.

5       Q.     Did you consider the TIRF REMS

6  program in rendering the expert opinions in

7  your report?

8       A.     I think so.

9       Q.     You testified that you consider

10  yourself an expert in warnings.  What other

11  areas do you believe you have expertise in?

12  If any.

13       A.     Well, do you want to define

14  "expert"?

15       Q.     What other areas do you believe

16  you're qualified to testify as an expert in

17  litigation other than warnings?

18       A.     That's the --

19            MS. CONROY:  Objection.  Legal

20       opinion.

21            THE WITNESS:  -- up to the

22       judge.  If you don't want to define

23       expert, I will.

24            My understanding of the

1    definition of expert in this context

2    is that I know more than the layman

3    and can assist the jury in

4    understanding the issues in the case

5    beyond the ability of the normal

6    layman to understand the material that

7    I read, review, consider, and

8    generally summarize.  So that -- if

9    that's the definition of expert, I'll

10   go ahead and answer that question.

11       So an expert in internal

12   medicine.  Occupational environmental

13   medicine and toxicology.  I'm an

14   expert in molecular biology.  I'm an

15   expert in warnings and risk

16   communication.

17       All aspects of public health.

18   Public health includes two, kind of,

19   components.  The first component of

20   public health is trying to figure out

21   what makes people sick, and the second

22   is what makes people healthy.

23       Actually, that's two components

24   of the first question of the public

1    health.

2            The second issue with respect

3    to public health is getting people to

4    change their behavior to use the

5    information in part one.

6            I am an expert in the aspects

7    of part one.  Those aspects being,

8    generally, molecular understanding of

9    cause-effect relationships, the

10   epidemiology, toxicology.  The -- then

11   at a higher level, a social and

12   cultural aspects of the causes of

13   disease.

14           So there's -- which is not a

15   lot of academic work in that area.

16           Then the other part of public

17   health is to take the information that

18   we've gathered from part one, and try

19   to get people to change their

20   behavior, to stop doing things that

21   you've determined cause disease, and

22   to get them to do things that promote

23   health and longevity.

24           And at a patient level -- and

1    there are two levels for those

2    interventions.  At least two levels.

3         One level is with respect to

4    things that impact on the individual

5    at an individual level.  So that

6    involves -- I'll give you the

7    occupational environmental construct

8    of that in hierarchy.

9         So the first thing to do -- and

10   I'll try to give you some relevant

11   examples as we go along.

12         MR. DONOHUE:  I'm only

13   interested in what you think you're as

14   an expert.  So you seem to be straying

15   into a long explanation about those.

16   Can you do it more briefly, please?

17         MS. CONROY:  Objection.

18         THE WITNESS:  Is that -- is

19   that an objection to the answer -- I

20   don't understand what that was.

21   Q.    (BY MR. DONOHUE)  I'm asking

22   you to summarize instead of giving detailed

23   answers in the areas where you believe you

24   have expertise.  So I understand you have

1    expertise, you believe, in public health, and

2    you explained that.

3          A.    I didn't finish explaining

4    that.  There's many aspects of public health,

5    and I've given you the aspects of public

6    health, which --

7          Q.    If you could do it in list

8    form, that would be more helpful and

9    efficient.

10              MS. CONROY:  Objection.

11              THE WITNESS:  Okay.  Well, I'm

12         going to try to give it to you in the

13         form that I understand it.  Okay?  And

14         so they have -- this is how I explain

15         it when I'm in court, for example.

16              So the hierarchy from the --

17         and because this is -- it's an

18         expertise -- the expertise -- I'll

19         start making sense with expertise, to

20         make sure it's exactly relevant.  The

21         expertise is in the first hierarchy of

22         changing what people do is

23         substitution of a safer, for a more

24         dangerous product.

1    So in the case of opioids, it

2  would be the study of the various ways

3  that one could treat pain that would

4  not -- that would diminish the risk of

5  addiction.  That's an expertise.

6  That's a way of looking at

7  cost-benefit analyses, looking at all

8  the side effects, et cetera.

9    So if you don't substitute,

10  then the next level down, which I have

11  expertise in, is in trying to avoid

12  the exposures in an administrative

13  fashion.  And so that would be -- in

14  the case of opioids, figuring out how

15  you can control the use of opioids by

16  controlling physician prescriptions,

17  educating the public, et cetera.

18    And I have expertise in that

19  with respect to opioids and general

20  expertise with respect to public

21  health.

22    So that -- pretty much from an

23  opioid perspective, those are the

24  expertises from public health.  That's

1          at the micro level as it applies to

2          the patient.

3               Then at the macro level, that's

4          changing policy.  Okay?  And so I have

5          some expertise in social change, how

6          social change occurs at a macro level.

7               And I teach about that.

8               And that means how you create

9          social movement to change ideas in the

10         society.  And those general ideas

11         might change the effect of how people

12         get treated in this case for pain.

13         And that involves legislative

14         interventions, community organizing,

15         et cetera.  I have expertise in that.

16               And it also involves, at a

17         macro level, trying to influence ideas

18         in a society about appropriate care

19         and appropriate achievement.

20               And that's done through a

21         variety of mechanisms, the current era

22         that involves an element of social

23         media and academic publication and

24         some combination thereof.

1        So that's roughly the public

2   health expertises that relate to this

3   case.

4        For example, you know, I gave

5   the presentation to the FDA that

6   involves both understanding the

7   mechanism of addiction from a --  the

8   way that -- the relationship of the

9   dosing system to the addiction.  And

10   also I went to the FDA to try to

11   impact on policy.

12        So I'm working on policy issues

13   with respect to talc and other things

14   at a state and local and national

15   level.  So I have expertise in that

16   and I teach about that.

17        I'm an expert in Hill

18   considerations in epistemology,

19   E-P-I-S-T-E-M-O-L-O-G-Y.  And that's

20   how we know what we know.

21        From a scientific perspective.

22   Then this how we know what we believe,

23   that's involves sociology,

24   anthropology aspects and public policy

1    issues.

2            I'm an expert in pharmaceutical

3    and other medical products of

4    marketing practices, and I've

5    published on that.

6            Of course I think we went

7    through I'm an expert on warnings.

8            I'm an expert on evaluating the

9    side effects of pain medications, and

10   using secret corporate documents and

11   data.  That, per se, is an expertise,

12   to try to get information out about

13   the health effects and side effects of

14   pain medications.

15           And I've done a little bit with

16   respect to opioids, to the extent that

17   the documents are not confidential,

18   and I've done a lot with respect to

19   other pain medicines, like Vioxx.

20           I'm also an expert in how

21   corporations evaluate the efficacy of

22   their market and control and follow

23   what they and their competitors say

24   about their products.

1           So, for example, I've reviewed
2      PMRD and research data, analyzed that
3      data and published on that data.
4           I'm an expert --
5           MR. DONOHUE:  I'm going to
6      object.  Special Master Cohen, I'm
7      going to ask you to direct the witness
8      to answer the question in a summary
9      fashion without -- for using words
10     like, "for example," in an attempt to
11     filibuster a question.  Which,
12     although I recognize, as stated was
13     somewhat broad, I have also made it
14     clear that I'm interested in a summary
15     of the areas he believes he has
16     expertise in, not on a what has now
17     been a 15-minute speech.
18          MS. CONROY:  Your Honor, this
19     was not a speech.  It was an answer to
20     a question that was asked by a
21     defendant, and I would also comment
22     that the defendants have made it very
23     clear there will be Daubert motions
24     filed in this case that will directly

1           bear on the expertise of a witness.

2                 And so to try to cut down an

3           answer that you asked with respect to

4           expertise is rather alarming, given

5           what's coming in June.

6                 SPECIAL MASTER COHEN:  So the

7           defendants are free to ask no

8           questions and get no information.  And

9           if they choose to ask a question and

10          limit it, they're allowed to do that.

11                What I think happened here was

12          that the defendant asked for a list of

13          areas of expertise.  Two examples are

14          social policy and epistemology.  I

15          can't say that.  I just said that in

16          five words.

17                So somewhere between a short

18          list and a long explanation of what

19          each one of those means is how this

20          has to happen.

21                They're entitled to ask you to

22          restrict your answers, Dr. Egilman, in

23          a way that provides only what they're

24          asking.  That's their choice.

1          Frankly, maybe it would be better for

2          them to get more information from you,

3          but they're entitled not to do that.

4          So if they want succinct answers,

5          that's what you need to give them.

6          Okay?

7                    THE WITNESS:  Okay.

8                    MS. CONROY:  Thank you.

9                    SPECIAL MASTER COHEN:  Okay.

10         Q.    (BY MR. DONOHUE)  Do you have

11    any other additional areas to list to

12    complete your answer with respect to your

13    expertise?

14         A.    Why don't you go back and

15    re-ask the question.

16         Q.    The question was what areas do

17    you believe that you have expertise in.  And

18    I had asked for a list of those areas.

19         A.    Here, I'm having a little

20    trouble given the ruling.

21                So, you know, I've published on

22    a lot of health effects of a lot of different

23    substances, peer-reviewed papers.  Okay?  So

24    you want me to just say that I've published

1   on the health effects of a lot of substances

2   and the side effects of a lot of things?  Is

3   that all you want?

4        Q.     If that is responsive to the

5   question, if it's true.

6        A.     Well, what's responsive to the

7   question I'm going to give you the detail of

8   each of the substances that I'm an expert in.

9   I'm not an expert in every toxic substance.

10  Okay?  I'm an expert in the ones that I have

11  studied, reviewed, published on.  So

12  that's --

13              I mean, I don't --

14              I mean, I can just -- I mean, I

15  can refer you to my CV.  Why don't I

16  incorporate my CV, and that saves a lot of

17  time?

18       Q.     Okay.

19       A.     In addition to that, I'm an

20  expert on international health and the

21  development of medical schools in developing

22  countries.

23              I'm an expert in minority

24  recruitment to medical schools.

1    I'm an expert in the

2    organization of non-profits, the rules and

3    regulations of non-profits.

4    I think that's it for general

5    categories.

6    Q.    Do you consider yourself an

7    expert on the FDA's regulations concerning

8    pharmaceutical marketing?

9    A.    Yes.

10    Q.    Do you consider yourself an

11    expert in pain management?

12    MS. CONROY:  Objection.

13    THE WITNESS:  Well, I consider

14    myself an expert in treating people

15    who have pain for diseases.

16    Certain diseases.  Not all

17    diseases.

18    Q.    (BY MR. DONOHUE)  Do you have

19    any clinical experience in pain management?

20    A.    Well, I have a lot of clinical

21    experience treating people for pain from

22    various diseases, yes.

23    Q.    Have you done any research

24    relating to pain management and the use of

1    opioids to treat pain?

2         A.    Yes.

3         Q.    What research have you done?

4         A.    Well, in terms of published

5    research?  I have the work I did -- I think I

6    published -- presented APHA in the FDA

7    presentation.  The rest of the research

8    involves reading literature over time and

9    reading the corporate documents, initially

10   the Purdue documents between 2003, 2005, and

11   then the last several years -- well, the last

12   several months reading all of your documents.

13             In addition, I've read --

14   reviewed opioid literature over time.  That's

15   published literature.

16        Q.    As part of this engagement, did

17   you conduct any quantitative analysis to

18   determine whether defendants' marketing

19   influenced any prescribing decision?

20        A.    Do you mean from a particular

21   prescriber?  Or a particular practitioner?

22        Q.    Yes.

23        A.    Yes.

24        Q.    What quantitative analysis did

1    you do?

2         A.    Well, I reviewed the ROI data

3    and the detailed reports from many of the

4    defendants.  And that -- that all -- some of

5    it was specific to specific physicians.

6              I remember it was -- it was one

7    physician whose name came up in the SIG

8    affiliated with impact who was a high user,

9    and somebody saw his name and sent marketing

10   people to that person.  There's the document

11   that talks about no sex, no prostitutes.  So

12   that refers to successful marketing

13   intervention with a particular doctor's name.

14   I don't remember.

15             I don't think that was a

16   formula.  I think it was a particular doctor.

17             So there is a whole slew of --

18   and also some of this is in Perri's report,

19   of indications from detail reps that their

20   work with a rep, with a physician increased

21   that physician's prescribing of opioids.

22        Q.    Are you board certified in

23   internal medicine in preventive occupational

24   medicine?

1          A.      Yes.

2          Q.      And I see from page 30 of your

3     expert report that you say you ran a clinic

4     for 12 to 13 years.

5          A.      Right.

6          Q.      What years were those that you

7     ran the medical clinic?

8          A.      '89 to 2002.

9          Q.      Were you a family medicine

10    doctor during that time in clinic?

11         A.      In part.  I had three general

12    activities.

13         Q.      What were the three general

14    activities?

15         A.      Internal medicine, family

16    medicine, consulting for companies in

17    occupational environmental health issues.

18         Q.      As a doctor, have you treated

19    patients for pain from cancer?

20         A.      Yes.

21         Q.      And as a doctor, have you

22    treated patients for pain for -- or excuse

23    me.  Strike that.

24                 Have you treated patients with

1    chronic non-malignant pain as a doctor?

2              MS. CONROY:  Objection.

3         Q.    (BY MR. DONOHUE)  Do you

4    believe opioids are addictive?

5         A.    Yes.

6         Q.    When did you first learn that

7    opioids are addictive?

8         A.    I don't recall.

9         Q.    Did you know --

10        A.    Maybe when I read a biography

11   of Charles Dickens.  This would have been in

12   the '70s sometime.

13        Q.    Have you prescribed opioids to

14   your patients?

15        A.    Yes.

16        Q.    What opioids have you

17   prescribed to your patients?

18        A.    Well, if you look, it was

19   produced in this case.  I think it's one of

20   the exhibits.

21              Purdue got my IMS data, and two

22   or three year -- about five years of that

23   data is accurate.  So you'd have to go -- let

24   me get that document out and I'll tell you

1    what I prescribed.

2              MR. DONOHUE:  Can you hand that

3         to the court reporter and we'll mark

4         that as Deposition Exhibit 3.

5              (Whereupon, Deposition Exhibit

6         Egilman 3, IMS Data, David Egilman,

7         was marked for identification.)

8              MS. CONROY:  Do you have any

9         copies?

10             MR. DONOHUE:  Sorry, I thought

11        I did, and I'm looking for them right

12        now.

13             THE WITNESS:  Let me just take

14        an aside here.  Do you know using this

15        is illegal based on the contract with

16        IMS.  I just want to make that record.

17        Q.    (BY MR. DONOHUE)  This is a --

18   well, let's identify a document that we've

19   marked as Exhibit 3.







24      Q.     Since August 2001, have you

1  prescribed opioids to any of your patients?

2       A.     I don't think so.  It's

3  possible that I supervised the prescription

4  of opioids when I was supervising residents

5  of family medicine.  But I wouldn't have

6  written those prescriptions, and I don't have

7  any -- but I would have been responsible for

8  those prescriptions.  I don't have any

9  specific recollection of that actually

10  happening.

11       Q.     For the prescriptions that you

12  wrote for opioids when treating your

13  patients, did you prescribe opioids because

14  it was medically necessary?

15       A.     Yes and no.

16       Q.     When were the times you

17  prescribed opioids to your patients when it

18  wasn't medically necessary?

19       A.     Do you see the OxyContins?

20  Okay?  On the second page of the exhibit?

21            I think most of these relate to

22  one patient, and I was -- he was addicted.

23  And I was trying to get him off.

24            So it was medically necessary

1  so he wouldn't go into withdrawal, but that's

2  not a medical necessity in terms of treating

3  the pain.

4  And I tried to get him off, and

5  I failed and therefore I cut him off.

6  Q.  Other than the patient that you

7  just mentioned, are you aware of any other

8  patients that you prescribed opioids to that

9  became addicted?

10  A.  No.

11  Q.  Did you refer to any of your

12  patients' files in reaching the opinions in

13  your expert report that we're here today

14  looking at?

15  A.  I don't have access to my

16  patients' files.

17  Q.  So the answer is no?

18  A.  That's kind of a vague and

19  ambiguous question, but if you're asking just

20  whether I looked in the file, the answer is

21  no.

22  If you're asking whether I

23  relied on information that I gathered while I

24  was treating patients, the answer is yes.

1    But I didn't look at the file.

2         Q.    Do you believe chronic pain is

3    a serious medical condition?

4              MS. CONROY:  Objection.

5              THE WITNESS:  May or may not

6         be.

7         Q.    (BY MR. DONOHUE)  Sometimes it

8    is?

9         A.    Sometimes it is.

10        Q.    How do you --

11        A.    Well, sometimes chronic pain is

12   a symptom of a serious medical condition.

13   And probably, rarely, chronic pain is --

14   well, no.  It's -- it's not in and of

15   itself -- it always comes from something.

16   Okay?  So the something that causes the

17   chronic pain can be a serious medical

18   condition.  Part of the seriousness of the

19   medical condition is the fact that the person

20   is in pain.

21        Q.    Do you believe that chronic

22   pain affects people that are in Summit

23   County, Ohio?

24        A.    I'm sure they -- I'm sure there

1    are people in pain in Summit County, Ohio.

2          Q.      What about Cuyahoga County,

3    Ohio?  Do you believe there are people that

4    are in chronic pain living there?

5          A.      I'm sure there are.

6          Q.      What about in the

7    United States?  What would you estimate is

8    the number of people in the United States

9    that are affected with chronic pain?

10         A.      I don't think there are good

11   estimates of that number.  I don't know.

12         Q.      Would it be millions of people?

13         A.      I don't think so.

14         Q.      Less than a million?

15         A.      I don't have a number.  There's

16   no good studies.

17         Q.      Do you believe there are any

18   risks, medical risks associated with

19   untreated chronic pain?

20               MS. CONROY:  Objection.

21               THE WITNESS:  There are medical

22         risks of not treating the disease

23         that's causing chronic pain.

24         Q.      (BY MR. DONOHUE)  When you

1    treat patients as a medical doctor, do you

2    treat the patients individually?

3         A.    Not always.

4         Q.    What's an example of when you

5    don't treat a patient as an individual?

6         A.    I might treat a family, or a

7    parent and a child.  They might have --

8    particularly with respect to children.

9    There's always someone else who I'm dealing

10   with.

11              In some cases there are issues

12   that I'm treating that relate to the

13   interaction of both parties, both a child and

14   a parent or the parents.

15        Q.    Do you believe there's a single

16   treatment option that would be appropriate

17   for every patient that was suffering from

18   chronic pain?

19        A.    No.

20        Q.    When you treat patients, do you

21   believe it's important to have a variety of

22   treatment options to choose from?

23        A.    Yes and no.

24        Q.    What's the no part?

1          A.      Well, if you come in with a cut

2      finger, I don't need five different ways to

3      fix that cut finger.

4                  Pretty much there's one way to

5      fix that cut finger, depending on how long

6      the cut or how deep it is.  If it's big

7      enough, it's going to need to be sutured.

8      There's going to be no other alternative.  It

9      doesn't help -- there are no other

10     alternatives.

11                 If you come in with an

12     infection and I have an antibiotic that works

13     on that infection, I don't need other

14     options.  I just need the one antibiotic.

15                 So those are examples of where

16     I don't need a lot of options.

17         Q.      Could you turn to page 37 of

18     your report, please?

19                 Actually, I apologize.

20     Page 36.  So at the end of your background

21     and qualifications which runs from page 29 to

22     page 36 of your report, you write that you've

23     reached the conclusions stated below to a

24     reasonable degree of medical probability

1    based on your review of the medical and

2    scientific literature, corporate documents,

3    deposition, and on your years of training and

4    clinical experience.  Do you see that?

5          A.    Yes.

6          Q.    When you are referencing the

7    conclusions stated below, are you referencing

8    the opinions that you give in the remainder

9    of the report?

10         A.    Yes.

11               Reference -- yeah, I'm

12   referencing everything in the report.

13         Q.    Now, with respect to the

14   methodology which starts on page 37 of your

15   report, you write that you base your opinions

16   on the following sources of information.

17               So I want to ask you a couple

18   of questions about that, if that's all right.

19               Review of medical literature.

20   Did you review medical literature in support

21   of your opinions?

22         A.    No.

23         Q.    You did not?

24         A.    I did not do what you just

1    asked.

2         Q.      Okay.  Let me back up, then.

3         A.      Alone.  Okay?  It's a -- okay?

4    I did not do what you just asked.

5         Q.      Are you basing your opinions on

6    your report on a review of medical

7    literature?

8         A.      Yes.

9         Q.      And did you review any medical

10   literature?

11        A.      Yes.

12        Q.      And did you review medical

13   journals?

14        A.      Yes.

15        Q.      Did you --

16        A.      I didn't review journals.  I

17   reviewed journal articles.  Articles that

18   appeared in journals.

19        Q.      Is there anywhere in your

20   report that lists out the medical journal

21   articles that you reviewed that are the bases

22   of your opinions?

23        A.      Well, there's two places there.

24   You have a long list of all of the articles

1    that I searched over.

2         Q.    Okay.

3         A.    And then at the -- in some of

4    the opinions I cite specific medical

5    literature.

6              So it appears in aggregate and

7    then attached to some specific opinions.

8         Q.    Did you select all of the

9    medical journal articles that you reviewed

10   that form the basis of your opinion?

11        A.    Yes.

12        Q.    And if we -- let me just go

13   through this and ask these questions.

14             When you write "Review of

15   medical literature," and then underneath it

16   says "Medical meetings," what does that refer

17   to?

18        A.    Well, you know how impact and

19   action have meetings?  So I got the minutes

20   of those meetings and I reviewed those.  FDA

21   meetings.  I reviewed those.

22             There are some memos, corporate

23   memos of meetings.  So that kind of business.

24        Q.    And if you took the first

1    bullet point, which is your review of medical

2    literature, how many hours would you estimate

3    that you spent reviewing medical literature?

4         A.    No idea.

5         Q.    Can you estimate for us?

6         A.    No.

7         Q.    Well, you spent 384 hours total

8    in the four months that you've been on this

9    engagement; right?

10        A.    Yeah, this isn't limited to the

11   four months I've been involved in this

12   engagement.

13        Q.    What is it comprised of?

14        A.    It's limited to my entire life

15   starting in 1973, probably.  So I've been

16   reviewing this kind of work since 1973.

17              So, you know, it's not -- I

18   didn't start looking at this like last month,

19   November.

20        Q.    So if I wanted to know --

21        A.    I mean, for example, you know

22   that I gave a report, including some of the

23   documents, in 2004 and '5, all of the things

24   in that time frame as well.  Related to the

1    secret documents.

2         Q.    If we wanted to know what

3    medical literature specifically you based

4    your opinions on since you have been engaged,

5    would you be able to answer that?

6         A.    Anything dated since November,

7    I -- is something that I read since I've been

8    engaged.

9         Q.    And are you able to estimate

10   how many hours in the last four months that

11   you have reviewed medical literature?

12        A.    No.

13        Q.    How about review of published

14   books?  Are you able to estimate how many

15   hours in the last four months you've reviewed

16   published books?

17        A.    No.

18        Q.    How about review of corporate

19   documents?  Do you have a list of the

20   productions that you reviewed?  Did you

21   personally review documents from those

22   productions?

23        A.    Yes.

24        Q.    And how many hours in the last

1    four months have you spent reviewing

2    corporate documents?

3         A.    I do not know.

4         Q.    Do you have any guess?

5         A.    Less than 384.

6         Q.    And if you'd turn to page 38,

7    you have a category "Review of other produced

8    documents."

9              Do you see that?

10        A.    I do.

11        Q.    Can you estimate how many hours

12   in the last four months you've reviewed other

13   produced documents?

14        A.    No.

15        Q.    And then you have a review of

16   depositions.  Do you see that?

17        A.    I do.

18        Q.    Can you estimate how many hours

19   in the last four months you've spent

20   reviewing depositions?

21        A.    No.

22        Q.    With respect to your staff, do

23   you know how many hours any member of your

24   staff would have spent on any of the

1    materials reviewed that we just went through?

2         A.    No.

3         Q.    And what about the students?

4    Would you have any idea of the number of

5    hours the students that are working with you

6    have reviewed on any of the materials we've

7    gone through?

8         A.    No.

9         Q.    As part of your engagement in

10   this litigation, have you conducted

11   interviews of witnesses?

12        A.    No.

13        Q.    As part of your engagement,

14   have you discussed the litigation with any

15   other experts?

16        A.    This litigation?

17        Q.    Yes.

18        A.    No.

19        Q.    As part of this litigation and

20   your engagement, have you reviewed any

21   individual patient's information?

22        A.    Yes.

23        Q.    What individual patient

24   information have you reviewed as part of your

1    engagement?

2         A.    Well, if you'll look at the --

3    there's a Butrans ad which involves -- which

4    describes patients.  There's other

5    advertisements and medical information on --

6    in other documents and published papers that

7    relate to individual patient information.

8              There's the Purdue marketing

9    advertisements, and the counter

10   advertisements where patients express their

11   experience using OxyContin initially and then

12   after they became addicted.  So I reviewed

13   those.

14             There's other patient

15   information involved, I think, in some of the

16   call notes.  For example, there's call

17   notes -- oh, there's the death notice of the

18   woman who took half of OxyContin and died of

19   an overdose.

20             So that's a medical report to

21   the FDA by Purdue that includes patient

22   information.

23             So throughout the documents,

24   there's a lot of information about patient

1  histories.

2      Q.    Do you know the volume of

3  medical literature that you considered, read,

4  or reviewed in rendering your opinions in

5  this engagement?

6      A.    By search I think it's about

7  35,000 articles that I produced to you.  So I

8  searched over them, for example, for any

9  documents that related to studies of the

10  efficacy of narcotics, opioids for pain, and

11  a variety of other topics.  So I searched

12  over all of those for most of the things I

13  gave opinions on.  And then the ones that

14  came out, I read the abstracts.  If I thought

15  they were relevant, they got into the

16  article.

17      Q.    And how did you conduct the

18  search through the medical literature?  Is

19  that through a database?

20      A.    PubMed.

21      Q.    PubMed?

22      A.    PubMed.

23      Q.    And do you have any idea of the

24  volume of documents that you've considered as

1   part of this engagement?

2         A.     Well, it's 90 million documents

3   of database.  I did similar searches over the

4   database.  And then there's the 35,000

5   articles in PubMed, and then there's

6   additional documents that I reviewed

7   available.  Some web documents.  Some --

8   there were other documents I think that were

9   produced in the litigation:  the FDA

10  meetings, the two reports on the FDA,

11  government -- GAO report on the FDA.  And

12  there was another report on the FDA that I

13  read.  So there are other documents I read in

14  addition to the database in the medical

15  literature.

16              And of course we did a -- we

17  did a deep dive for that -- for that poster

18  presentation.  Trying to find all those

19  citations because they weren't PubMed, and

20  they -- we went to -- we went to like several

21  different libraries to do that -- to do the

22  dive for the Fishbain missing materials.

23              MR. DONOHUE:  I think now would

24     be a good time to take a lunch break,

1      if that's all right.

2                MS. CONROY:  Sure.

3                THE VIDEOGRAPHER:  Off the

4      record at 12:24.

5                (Recess taken, 12:23 p.m. to

6      1:15 p.m.)

7                THE VIDEOGRAPHER:  We are back

8      on the record at 1:16.

9                THE WITNESS:  Okay.  I just

10     wanted to let you know that exhibit --

11     well, it's not an exhibit, but

12     folder 20 here was additional bases

13     for opinion that I forgot to mention.

14                    EXAMINATION

15  BY MS. SAULINO:

16     Q.    Okay.  Thank you, Dr. Egilman.

17            So as you may have heard

18  earlier, my name is Jennifer Saulino.  I'm

19  with a law firm called Covington & Burling,

20  and I represent McKesson in this litigation.

21            So you are just pointing to a

22  folder that you have numbered as 20 that's in

23  front of you, and you're saying now that that

24  is additional bases for the opinions that you

1    issued signed March 25th, 2019; is that

2    right?

3         A.    Yes.  That was a -- what I did

4    was I added -- I had already given additional

5    bases before.  I omitted this.  I added this

6    to the additional bases.

7         Q.    And when did you determine that

8    these additional bases existed?

9         A.    Sometime between when my report

10   was written and today.

11        Q.    And you didn't feel the need to

12   disclose them to the defendants until this

13   moment?

14        A.    Correct.

15        Q.    Okay.  Let's mark folder 20, as

16   Exhibit --

17              Can I have that, please?

18              Thank you.

19              (Whereupon, Deposition Exhibit

20        Egilman 4, Green folder marked 20 -

21        Distribute = Manufacturers, was marked

22        for identification.)

23        Q.    (BY MS. SAULINO)  So we've

24   identified folder number 20 that was just

1    identified by Dr. Egilman as Exhibit 4 to

2    this deposition.

3              That's all we have for that

4    right now, Dr. Egilman.

5              Dr. Egilman, in your report you

6    detailed two methods that you used to form

7    opinions in this case, the grounded theory

8    approach and the evidence-based method.  Is

9    that right?

10        A.    Can you tell me where you are

11   in the report.

12        Q.    Sir, you wrote the report.  You

13   know what methodology you relied upon?

14        A.    Yes.  Can you tell me where in

15   the report you're reading from?

16        Q.    Sir, do you recall relying on

17   the grounded theory approach and the

18   evidence-based method?

19        A.    Yes.

20        Q.    And those are the two

21   methodologies that you detailed in your

22   report.  Correct?

23        A.    General methodologies for the

24   report, yes.

1        Q.      And those are the only

2   methodologies that you set forth in your

3   report; correct?

4               MS. CONROY:  Objection.

5               THE WITNESS:  No, that's not

6        correct.

7        Q.      (BY MS. SAULINO)  You don't

8   provide any other detail of any methodology

9   anywhere in your report, do you?

10       A.      I don't think that's correct.

11       Q.      Where do you believe that you

12   provide methodology?

13       A.      This whole discussion of EERW

14   methodology, for example.

15               There's other comments on, for

16   example, the quality of the estimates of the

17   number of pain patients.  There are a variety

18   of other report -- other opinions that

19   include the methodologic discussions.

20       Q.      Okay.  Doctor Egilman, you

21   wrote this report; right?

22       A.      Yes.

23       Q.      Did you write it yourself?

24       A.      Yes.

1      Q.    And did the plaintiffs' lawyers

2   help you write it?

3      A.    No.

4      Q.    Not at all?

5      A.    No.

6      Q.    And when you wrote this report,

7   you chose, on pages -- starting at about

8   38 -- do you have your report in front of

9   you?

10     A.    I do.  I'm on page 38.

11     Q.    Okay.  It looks like I might be

12  off by a page.  37.

13           You start with a section called

14  "Methodology."  Am I reading that correctly?

15     A.    Correct.

16     Q.    Okay.  And under your section

17  called "Methodology," you start with the

18  grounded theory approach; right?  Which is --

19  which starts on page 38.

20           Under "State of the art

21  methods"?

22     A.    Correct.

23     Q.    Okay.  And then, if you go to

24  page 40, you explain evidence-based method --

1    evidence-based medicine methods; right?

2           A.     Yes.

3           Q.     Okay.  In your methodology

4    section, you do not detail any other

5    methodologies, do you?

6           A.     That's correct.

7           Q.     Okay.  So your methodology

8    section of your report is incomplete?

9           A.     No.

10          Q.     So you only rely, then, on two

11   methodologies in your report?

12          A.     No.

13                 MS. CONROY:  Objection.

14          Q.     (BY MS. SAULINO) So your

15   methodology section is inaccurate?

16          A.     No.

17          Q.     So where else did you detail

18   your methodologies, Dr. Egilman?

19          A.     Well, I just gave you several

20   other examples.

21          Q.     And why do you not detail them

22   in the methodology section of your report,

23   sir?

24          A.     Excuse me.  Your question was

1    where else do you --

2         Q.    Sir, are you reading the

3    transcript of your own deposition right now?

4         A.    I'm reading your question.

5         Q.    Okay, sir.  I can ask my

6    question again.  I'll just make it clear.

7         A.    I think you cut my answer off.

8    That's my problem.

9         Q.    Sir, I'll withdraw the question

10   that I asked and I'll ask a new one.  Okay?

11        A.    That was my problem, is that

12   you cut my answer off.

13        Q.    I'll withdraw it and ask a new

14   one, then.

15        A.    Great.

16        Q.    Great.  So in Section 3 of your

17   report that you title "Methodology," you and

18   I have already agreed that you only detailed

19   two methodologies there; correct?

20        A.    In that section that outlines

21   the general methodology for the report,

22   correct.

23        Q.    Okay.  And the other

24   methodologies that you now say you also

1  relied on, you did not detail in the

2  methodology section of your report, did you?

3      A.    That's correct.  The specific

4  criticism of some of the epidemiologic

5  studies, approaches and other things were not

6  in the methodology section per se, although

7  they are encompassed by evidence-based

8  medicine methods.

9      Q.    You don't explain that in the

10  methodology section of your report, do you?

11      A.    I'm not sure that's correct.

12      Q.    You don't explain that you're

13  adding other methodologies to your report in

14  the evidence-based medicine methods section

15  of your report, do you?

16      A.    No.  Let me try to help you

17  here.

18            I think in evidence-based

19  medicine, part of this report, the citations

20  certainly, include epidemiology and

21  epidemiologic methods.

22            So some of the opinions later

23  on in the report include more detailed

24  discussion, particular epidemiological

1    methodological issues which are encompassed

2    as part of evidence-based medicine.

3         Q.    So the overall methodology,

4    though, that you were using for those

5    opinions is evidence-based medicine method;

6    correct?

7         A.    Correct.  Which is --

8    encompasses many subfields.

9         Q.    And what you're referring to as

10   appearing, quote, later in your report are

11   simply opinions; right?

12        A.    No, they're bases for opinions,

13   when I talk about -- if you're talking about

14   methods.

15        Q.    And you don't have anywhere

16   else in your report where you lay out, "This

17   is the methodology that I used in order to

18   reach this opinion," do you?

19        A.    I don't think I used that form,

20   but that's there in the substance.

21        Q.    Okay.  Well, we'll look at some

22   of that.

23             Now, you have not documented in

24   your report which opinion of your 490

1    opinions is based on which of the

2    methodologies you lay out here, have you?

3         A.    Not directly by reference,

4    correct.

5         Q.    There is no way to know, from

6    looking at your report, which opinion is

7    based on which method; correct?

8         A.    No.

9         Q.    Where have you listed that,

10   sir?

11        A.    Well, in some cases if I'm

12   discussing epidemiologic methodological

13   issue, that would come under evidence-based

14   medicine methods.

15        Q.    You don't say --

16        A.    That --

17        Q.    Go ahead, sir.

18        A.    In other parts of the report

19   where I'm not dealing with a scientific issue

20   but rather with an analysis of the ways

21   companies influenced physicians, I'm using

22   grounded methods in general.

23        Q.    Okay.

24        A.    In other words, when I discuss

1    minutes, memos, depositions, and review

2    documents related to the corporate conduct,

3    that would be under the general category of

4    grounds or methodology.

5         Q.    What you just described is not

6    written anywhere in your report, is it?

7         A.    Well, no, that's not correct.

8         Q.    Sir, nowhere in your report do

9    you say this opinion is based on grounded

10   theory approach, or this opinion is based on

11   evidence-based medicine methodology; correct?

12        A.    By opinion, do you mean?

13        Q.    Correct.

14        A.    That's correct.  I do not refer

15   back to a particular -- to grounded theory

16   when I use grounded theory in the report,

17   that's correct.

18        Q.    So there's no way for anyone

19   other than you to look at your report and

20   know which methodology you used for each

21   opinion; correct?

22        A.    Wrong.

23        Q.    Where in your report have you

24   provided those bases?

1      A.      Well, the bases for grounded

2  theory method is on page 38 and 39.

3      Q.      Sir, let me clarify my

4  question.

5      A.      And in --

6      Q.      Let me clarify my question.  I

7  obviously was unclear.

8          MS. CONROY:  Let the witness

9      finish the answer before you start

10      another question.

11          MR. DONOHUE:  Then I will

12      withdraw the question and clarify it.

13          MS. CONROY:  And withdraw it by

14      not interrupting the witness.

15      Q.      (BY MS. SAULINO)  Sir, you just

16  answered in response to my question that

17  nowhere in your report do you -- is there any

18  way to know which opinion is based on which

19  method.  You said no.  Correct?

20      A.      I don't think that's correct.

21      Q.      Okay.

22      A.      Certainly -- I don't know

23  which -- you asked about eight related

24  questions.  The previous question was not the

1    question that you just asked.  You withdrew

2    the previous question, and the question --

3    two above that -- I can't see.  I don't think

4    it's the question that would relate to the

5    question you just asked.

6         Q.    If another expert were to take

7    your report and pick it up, they cannot, by

8    reading your report, know which methodology

9    you used for each opinion; correct?

10        A.    No.

11        Q.    That's not correct?

12        A.    That is not correct.

13        Q.    Why do you say that's not

14   correct?

15        A.    Because anybody familiar with

16   grounded theory methods -- and I give you

17   some examples of papers -- could recognize

18   the --

19             Let me give you -- try to give

20   you an example.

21        Q.    Sir, I don't want an example.

22   I just want an answer to my question.

23             MS. CONROY:  Let the witness

24        answer the question.

1        MS. SAULINO:  I am asking for

2     an answer to my question.  I don't

3     want an example, just an answer to my

4     question.

5        THE WITNESS:  Okay.  That's too

6     bad.  I'm going to give you an

7     example.

8        MS. SAULINO:  Sir, I will

9     object to you -- I will object to the

10    discourse here.  You can provide that

11    information on your own counsel's

12    time.  I would like an answer to my

13    question.

14       THE WITNESS:  I'm giving you an

15    answer to your question.

16       SPECIAL MASTER COHEN:  Why

17    don't you reread the question to the

18    witness and see if he can answer it at

19    least first without an example.

20       Q.    (BY MS. SAULINO)  Sir, I asked

21    you if another expert were to take your

22    report and pick it up, they cannot, by

23    reading your report, know which methodology

24    you used for each opinion, correct?

1              And you said no.

2              And I asked you, why do you say

3    that's not correct?

4         A.    I say that's not correct

5    because an expert who is familiar with

6    grounded methods will recognize which

7    opinions in this report were based in

8    grounded methods rather than something else.

9    Like math.

10        Q.    So, sir, what you're saying is

11   that if there is an opinion in this report

12   that's based on math, then it's not based on

13   the grounded theory approach?

14        A.    That was exactly the example I

15   was going to give, yes.

16        Q.    And, sir, nowhere in your

17   report do you lay out which opinion uses

18   which method, do you?

19        A.    Not explicitly.

20        Q.    Now, I want to start with the

21   evidence-based medicine method.  I'd like to

22   ask you some questions about your

23   methodology; okay?

24              You say that the first step in

1    the evidence-based medicine method is the

2    development of answerable questions; right?

3         A.    Yes.

4         Q.    And you developed two such

5    questions; right?

6         A.    I'm not sure what you're

7    referring to.

8         Q.    I'm referring to the answerable

9    questions that you developed in your report.

10        A.    Yes.

11        Q.    The top of page 41?

12        A.    Right.

13        Q.    "What are the treatment options

14   for chronic non-cancer pain?"  Is your first.

15   And your second is "In patients with chronic

16   non-cancer pain, how do opioids and NSAIDs

17   compare in terms of efficacy and adverse

18   effects?"

19             I read those correctly; right?

20        A.    Yeah, but you took them out of

21   context.  You took that -- that question is

22   out of context.

23        Q.    Sir, I read those directly from

24   your report, didn't I?

1        A.      You read them directly from the

2    report, but your initial framing was

3    incorrect.

4        Q.      Well, sir, I'm looking at the

5    section, if you start on page 40, that is

6    titled "Step 1, translation of uncertainty

7    into" answerable -- into "an answerable

8    question."  Right?

9        A.      Yes.

10       Q.      Okay.  And then you go through

11   your explanation of what generally answerable

12   questions are, and then you say, "I asked the

13   following background questions."  And you

14   list one question.  "What are the treatment

15   options for chronic non-cancer pain"; right?

16       A.      Right.

17       Q.      And you say, "I asked the

18   following foreground questions," and you list

19   one question, and it is, "In patients with

20   chronic non-cancer pain, how do opioids and

21   NSAIDs compare in terms of efficacy and

22   adverse effects?"  Right?

23       A.      Yes.

24       Q.      That's an accurate reading of

1    your report; right?

2         A.    Of that section of the report.

3         Q.    Okay.  So those are the two

4    answerable questions that you developed for

5    your report.

6         A.    No.

7         Q.    You developed additional

8    answerable questions that you didn't list in

9    your report?

10              MS. CONROY:  Objection.

11              THE WITNESS:  I had an

12         assignment which I gave you, and that

13         was the -- that was the answerable

14         question that I was addressing in the

15         report.

16              These two questions, as you can

17         see by the framing that I put on them,

18         are background questions.

19         Q.    (BY MS. SAULINO)  So your

20    answerable question was not developed by you.

21    It was an assignment given to you by

22    plaintiff lawyers?

23         A.    Well, it was jointly discussed

24    and developed by me and them together, yes.

 1          Q.      As you explain the

 2    evidence-based medicine method, you say that

 3    it is an evidence that is an approach --

 4          A.      Can you tell me where you're

 5    reading from so I can follow?

 6          Q.      I'm reading your words, sir.

 7          A.      I know.  But --

 8          Q.      Page 40 at the top.

 9                  "It is an approach to medical

10    decision-making meant to integrate individual

11    clinical expertise with the best available

12    external clinical evidence from systematic

13    research"; right?

14          A.      I don't think you read that

15    correctly.

16          Q.      What do you think that I was

17    mistaken about?

18          A.      Well, I'm looking at what she

19    transcribed and what I'm reading and it's

20    different.

21                  I couldn't catch up to the

22    beginning.  That's why I asked you where you

23    were.  But you kept reading and I couldn't

24    follow the language.

1      Q.    Did you hear my question, sir?

2      A.    Yeah, but your question was

3  whether you read it correctly.  In order to

4  know whether you read it correctly, I need to

5  read it.  And I need to listen to what you're

6  saying.

7      Q.    Sir, I actually didn't ask you

8  whether I read it correctly.  I just asked

9  you whether that was the approach that you

10  described in your report.

11      A.    Well, you read it and then said

12  that.  And so in order to know whether it was

13  correctly described, I need to read it.

14      Q.    You don't remember what

15  approach you used in your report, sir?

16      A.    Generally, I do.

17          MS. CONROY:  Objection.

18          THE WITNESS:  But you're asking

19      a specific quote, or attempting to

20      quote it.  I don't know if you're

21      correctly quoting or not.  And I need

22      to read it to see if you're correctly

23      quoting.

24          This is serious business.

1    Q.    (BY MS. SAULINO) Yes, it is,

2    sir, and I'm trying to --

3    A.    If you leave a word out or

4    something and I miss it, that's bad.  I

5    want -- so I want to read it.

6    Q.    Right.  Because if I left a

7    word out, then it might be that someone

8    reading it later on wouldn't be able to

9    understand the full basis of your opinions;

10   right?

11   A.    Anything's possible, but, for

12   example, when you left the framing of the

13   background questions out of what you did

14   before, that was completely misleading.

15         So you might leave a word out,

16   it might not make a difference.  I don't

17   know.  But I'd rather not a take a chance.

18   Q.    Sir --

19   A.    That's why if you're going to

20   read something, I'd like to know where you're

21   reading so I can follow it.

22   Q.    Sir, it sounds like you would

23   agree with me that it's very important that

24   we be able to look at your report, read it,

1    understand the bases for your opinions and

2    methodology, and then replicate it; right?

3    That's what any good expert would do.

4                    MS. CONROY:  Objection.

5                    THE WITNESS:  Okay.  Well,

6            there's two questions there.  Which do

7            you want me to answer?

8            Q.    (BY MS. SAULINO)  Why don't you

9    pick, sir?

10           A.    I don't know.

11           Q.    Sir, according to you,

12   "Evidence-Based Medicine" -- I'm at the top

13   of page 40 again -- "is an approach to

14   medical decision-making meant to integrate

15   individual clinical expertise with the best

16   available external clinical evidence from

17   systematic research"; right?

18           A.    Correct.  With quotes between

19   individual and research -- I think it's a

20   David Sackett quote.

21           Q.    Are you agreeing with

22   Mr. Sackett, Dr. Sackett?

23           A.    I am.

24           Q.    Okay.

1              And the practice of

2    evidence-based medicine can be outlined in

3    five basic steps; right?

4         A.     Yes.

5         Q.     The translation of uncertainty

6    to an answerable question is the first step;

7    right?

8         A.     That's the one he numbered

9    number one.

10        Q.     Okay.  And that is one of the

11   steps that should be done by the clinical

12   expert; right?

13             MS. CONROY:  Objection.

14             THE WITNESS:  If possible.

15   It's not always possible.

16        Q.     (BY MS. SAULINO)  Are you

17   saying that was not possible in this case?

18        A.     No.  I'm saying it's not always

19   possible.  You asked a general question, you

20   get a general answer.

21        Q.     Okay.  And it was possible in

22   this case for you, as the clinical expert, to

23   translate uncertainty to an answerable

24   question.  Right?

1          A.     To the extent that there was

2    uncertainty, yes.

3          Q.     Okay.  But you didn't do that

4    yourself.  The plaintiffs' lawyers handled

5    that for you; right?

6          A.     No.

7          Q.     Well, I'm basing this on your

8    testimony just a couple of minutes ago.  You

9    told me that your answerable question here

10   was the assignment you were given by

11   plaintiffs' lawyers; right?

12         A.     No.

13                MS. CONROY:  Objection.

14                THE WITNESS:  I said it was an

15          assignment that we discussed and

16          talked about and agreed to together.

17         Q.     (BY MS. SAULINO) When was that,

18   sir?

19         A.     That was discussed three months

20   ago.

21         Q.     You don't remember when?

22         A.     No.

23         Q.     Okay.  So it wasn't an

24   assignment; it was an agreed-to research?

1      A.      The same difference, to me.

2      Q.      Okay.  And that was the only

3  question that you were trying to answer here?

4      A.      That was the only question I

5  was asked to answer here.  There may have

6  been other questions that came up that were

7  also answered.

8      Q.      Okay.  And precisely what was

9  that question, just so we have it here in

10  your methodology?

11      A.      I was asked to determine within

12  a reasonable degree of medical and scientific

13  certainty whether or not various defendants

14  working together and/or separately were

15  significant factors in causing the opioid

16  epidemic.

17      Q.      Okay.  Let's mark that as an

18  exhibit.

19          (Whereupon, Deposition Exhibit

20      Egilman 5, My Assignment, was marked

21      for identification.)

22      Q.      (BY MS. SAULINO)  And again,

23  the way that you just stated that, it says,

24  "I was asked"; right?

1          A.      That's correct.

2          Q.      Okay.  So we've marked as

3     Exhibit 5, what you've titled "My

4     Assignment," which you just read into the

5     record.

6                  And just so we're clear, you

7     didn't record that question in your report;

8     right?

9          A.      That's correct.

10         Q.      Why did you not put that in

11    your report?

12         A.      No reason --

13         Q.      You didn't --

14         A.      -- in particular.

15         Q.      You didn't think it was

16    important to put down the answerable question

17    that was step 1 in your evidence-based

18    medicine method?

19         A.      That's correct.

20         Q.      And then you added your

21    background and foreground question; correct?

22         A.      Correct.

23         Q.      Your background question is

24    "What are the treatment options for chronic

1    non-cancer pain?"  Right?

2         A.     Correct.

3         Q.     Your foreground question is "In

4    patients with chronic non-cancer pain, how do

5    opioids and NSAIDs compare in terms of

6    efficacy and adverse effect?"  Right?

7         A.     Correct.

8         Q.     Neither of those answers the

9    question whether or not various defendants

10   working together or separately were

11   significant factors in causing the opioid

12   epidemic; correct?

13        A.     Not by themselves, but they are

14   a part of the answer.

15             MS. CONROY:  Objection.

16        Q.     (BY MS. SAULINO) You don't list

17   any other background or foreground questions

18   that you were exploring; correct?

19        A.     That's correct.

20        Q.     So there's no way for us to

21   know what those were?

22        A.     Correct.

23        Q.     Now, your next step is

24   systematic retrieval of best evidence

1    available; right?

2        A.    Correct.

3        Q.    You say, "Once an answerable

4    question has been posed, the researcher must

5    select an evidence resource, execute a search

6    strategy, and then evaluate the evidence

7    summary"; right?

8        A.    Correct.

9        Q.    And you say your evidence

10   resource included medical literature and

11   company documents; right?

12       A.    And depositions.

13       Q.    Okay.

14             And you --

15       A.    And other documents.  I think I

16   mentioned that already.  Institute of

17   Medicine reports, FDA reports, GAO reports.

18   Those are all probably incorporated into

19   company documents as well.

20       Q.    I'm looking at step 2 that

21   you've listed in your report.

22             And here under "Systematic

23   retrieval of the best evidence available,"

24   you first list where you went to review

1    medical evidence; right?

2            You say, "I conducted computer

3    searches of several different databases";

4    right?

5        A.    Yes.

6        Q.    And then you say, "I also

7    searched corporate records for unpublished

8    studies"; right?

9        A.    Yes.

10       Q.    And then you identify some

11   search terms that you used; right?

12       A.    Yes.

13       Q.    Those are the only sources that

14   you list under step 2; right?

15       A.    Correct.

16       Q.    Okay.  So you're now adding to

17   the sources that you used under step 2?

18       A.    I'm not sure what you mean by

19   "adding to sources."

20       Q.    Well, you said "and

21   depositions, and other documents."  Those

22   aren't listed here in step 2; right?

23       A.    No.  They're listed elsewhere.

24   Other -- as I said, all of the government

1    documents I relied on I believe were also

2    corporate documents, but I wanted to

3    distinguish to be clear.  They weren't

4    generated by the companies but the companies

5    had them.

6              So that's a distinction without

7    a difference.

8              Depositions, I didn't include

9    them, but I think I included them in the

10   introductory materials before this section in

11   this report.  I think they're on the first or

12   second page.

13        Q.    You did.  But here, where you

14   talked about your systematic retrieval of the

15   best evidence available, you didn't list

16   them, did you?

17        A.    Correct.  I only listed them at

18   the beginning.  It was a mistake.  I should

19   have relisted depositions here.

20        Q.    Okay.  And let's look at your

21   reference to corporate records here on

22   page 41.

23        A.    Okay.

24        Q.    You say, "In addition to

1 published evidence, I also searched corporate

2 records for unpublished studies"; right?

3     A.    Right.

4     Q.    Not for anything else; right?

5     A.    No.  I searched for all kinds

6 of other things.

7     Q.    Well, you qualify it here by

8 saying you simply searched corporate record

9 for unpublished studies in step 2 of your

10 evidence-based methodology, don't you?

11     A.    Yeah, but if you look at the

12 search terms, it's obvious I was searching

13 for other things.

14     Q.    Sir, there's nothing obvious

15 about that.  Those search terms could easily

16 be found in unpublished studies, couldn't

17 they?

18     MS. CONROY:  Objection.

19     THE WITNESS:  I don't think so.

20     Q.    (BY MS. SAULINO)  So it's your

21 testimony --

22     A.    Not all of them.  I don't think

23 so.

24     Q.    So it's your testimony, sir,

1    that while you didn't say that you used more

2    than one -- that you used corporate records

3    for more than unpublished studies, and in

4    fact said exactly the opposite here, we

5    should have known based on the search terms

6    you listed?  That's your testimony?

7         A.    No.  I think elsewhere in the

8    report I explained that I reviewed all of the

9    documents in the repository, and I said that

10   in that section.  It says, "I have accessed

11   the entire repository documents."  Okay?  And

12   so the -- the -- it says, "In addition to

13   published literature, I also searched

14   corporate records for unpublished studies."

15   There's a period.  And then "I also had

16   access to the entire repository documents

17   listed in this litigation."  Another period.

18              So the rest of that paragraph

19   or bullet points in the bullet points of 42,

20   are the other topics for which I searched the

21   entire database.

22         Q.    Sir, with respect --

23         A.    Not respective of whether or

24   not they were an unpublished study.

1  Q.    Sir, with respect, that's not

2  what that paragraph says, is it?

3  A.    Well, with respect, it is what

4  it says.

5  Q.    Sir, you say you "searched

6  corporate records for unpublished studies."

7  You then list the corporate records that you

8  searched, and you list the search terms that

9  you used in order to find unpublished

10  studies.  That is what you say in your

11  report; right?

12          MS. CONROY:  Objection.

13          THE WITNESS:  No.  The second

14      sentence says, "I have had access to

15      the entire repository of documents

16      produced in the litigation," and it

17      goes through what documents -- who

18      provided those documents, and then it

19      also has another sentence, okay?

20      Which includes the search terms,

21      without reference or limitation, to

22      published studies.  Unpublished

23      studies.

24  Q.    (BY MS. SAULINO)  You'd agree

1    with me all of that is qualified by the

2    paragraph that you start with that

3    specifically identifies unpublished studies

4    as what you were looking for?

5         A.    I do not agree with you,

6    because that is a second -- a different

7    sentence.

8         Q.    Okay.

9         A.    I had a "none" once and I'd

10   have to defer to the "none" as to whether or

11   not the sentence before the definition of

12   search terms is an independent clause rather

13   than the initial paragraph which is separated

14   from that sentence by a list of companies

15   whose documents were produced.

16        Q.    Let's look at your search

17   terms, sir.

18              You would agree with me that

19   it's important to get key terms right,

20   because otherwise you might miss relevant

21   documents in your searches?

22        A.    Well, if you limit it to terms,

23   that would be true.  I didn't limit it to

24   those terms.

1        Q.      So there are other terms that

2   you used that you did not list here in your

3   report?

4        A.      Sure.  It's an iterative

5   search.  I mentioned the -- when the lawyer

6   for Insys was asking.  We did all kinds of

7   sex terms.  And I didn't mention that in here

8   either.  This is an iterative process.

9   That's what grounded theory is.  You find

10  something, then you pursue other things

11  related to what you found.  And you do a

12  variety of searches based on what you find in

13  previous searches.

14       Q.      Sir, I'm looking at the

15  evidence-based medicine methodology right

16  now, not the grounded theory methodology.

17       A.      That's fine.  I'm just telling

18  you what -- that that's what I did.  The

19  grounded theory applies to how I reviewed

20  this evidence-based medicine.  Remember,

21  evidence-based medicine is pretty much

22  limited to evidence, not as it's written.  So

23  I'm adopting that method as a basis for using

24  grounded theory method, which allows me to do

1    a broader analysis beyond the confines of

2    published medical evidence.

3        Q.    And what you just said is not

4    written anywhere in your report, is it?

5        A.    That's correct.

6        Q.    So there was no way for us to

7    know that until you just told me right now;

8    right?

9        A.    No.  Not at all.

10       Q.    Now, you said that -- you say

11   in your report, "I initially searched the

12   sources above for" --

13       A.    Wait.  Will you tell me where

14   you're reading from?

15       Q.    Page 42, your words, sir.

16       A.    Okay.  Go ahead.

17       Q.    "I initially searched the

18   sources above for key terms identified by me

19   including," and you list them; right?

20       A.    Correct.

21       Q.    You identified these terms

22   yourself?

23       A.    Correct.

24       Q.    No one helped you?

1        A.      Well, I discussed them all with

2   the staff, so we had a group discussion.  But

3   I think pretty much these are mine.

4        Q.      Okay.

5                And --

6        A.      It could be that one of my

7   staff suggested one or another one.

8        Q.      And you just told me there are

9   a number of other terms that you used; right?

10       A.      Sure.

11       Q.      But you don't list them here?

12       A.      Correct.

13       Q.      And you don't list them

14   anywhere else in the report?

15       A.      That's correct.

16       Q.      And so there's no way for us to

17   know what other search terms you used; right?

18       A.      That's correct.

19       Q.      Now, is it the case --

20       A.      I got a list of the sex terms,

21   I think.

22       Q.      Sir, I understand that you want

23   to talk about the sex terms, but I'd like to

24   talk about your report.

1           MS. CONROY:  Objection.

2      Q.    (BY MS. SAULINO)  So you list

3  here a set of terms; right?

4            Is it fair to say that these

5  are the first terms that you put through the

6  database?

7      A.    Yes.

8      Q.    Okay.  So your initial search

9  was based on these terms; right?

10     A.    Yes.

11     Q.    Okay.  And then from there, you

12  added additional terms after?

13     A.    Sure.

14     Q.    Okay.  So, isn't it true that

15  anything that wouldn't be caught by these

16  initial search terms, you then wouldn't have

17  later reviewed?

18     A.    No.

19     Q.    So you did the initial search

20  over again with additional terms?

21     A.    You can only do an initial

22  search once, so the answer to that is no.

23     Q.    I'm asking you about your

24  process, sir.

1           Do you have any way to describe

2   the process that you used with your initial

3   search terms?

4       A.     Sure.  You get -- you do the

5   initial search, you read the documents.

6   Then, for example, if you find -- let's say

7   you find some document with Sade name on it.

8   Okay?  So then you do a search by Sade's

9   name, because you want to know what else Sade

10  is involved in.

11          Or you find Katz's name.  So

12  you put Katz name in.  What else can you find

13  out about Katz.  Or you do a search and

14  you'll find the word "impact."  And then you

15  do a search by impact.

16          So you search by individual

17  names, you search by entities, you -- you

18  know, then you find the American Pain

19  Foundation and the result.  And then you do a

20  search by that.  And then if you find

21  something in those documents, you do

22  subsequent searches.  It's an iterative

23  process.

24      Q.     Okay.  I understand that you're

1    saying it is an iterative process, which is

2    the grounded theory approach; right?

3         A.    Yes.

4         Q.    And you used the grounded

5    theory method in combination with the

6    evidence-based medicine approach?  Is that

7    what we're now understanding?

8              MS. CONROY:  Objection.

9              THE WITNESS:  I used the

10             evidence-based medicine approach

11             primarily for evidence, but I

12             incorporated aspects of the

13             evidence-based approach in the

14             grounded theory method.  Because some

15             of what I was doing in evidence-based

16             medicine was looking at evidence.  In

17             order to understand some of the

18             development of evidence, you have to

19             use grounded theory.  Particularly

20             when you're looking at manipulation of

21             study data, or influencing

22             researchers, things that are not

23             within the four corners of what

24             Sackett and others would generally, at

1    the time frame, have considered

2    important to evidence.  But which now

3    turns out to be a whole subfield of

4    evidence.  So you have to combine them

5    both.

6         Q.    (BY MS. SAULINO)  What you have

7    just been referring to as evidence in your

8    answer, you mean by that data generated from

9    quantitative studies; right?

10        A.    In part.

11        Q.    I'm trying to understand your

12   previous answer, sir.  And you said you used

13   the evidence-based medicine approach

14   primarily for evidence, but then you

15   explained that you had to incorporate the

16   grounded theory method for things that aren't

17   typically a part of evidence.

18             And so I'm trying to understand

19   what evidence is to you.

20        A.    Well, everything in my report

21   is evidence, if you want a short answer.  The

22   bases of my opinions are evidence, that

23   support my opinions.  But in this particular

24   case, if you want this distinction, mostly in

1    medicine, you're looking at, say, a

2    randomized controlled trial.  Let's look at

3    the Roth study.

4              So you look at the Roth study.

5         Q.    Sir, I don't need an example,

6    just an answer to the question.

7              MS. CONROY:  Please don't

8         interrupt the witness when he's in the

9         middle of a --

10             SPECIAL MASTER COHEN:  She's

11        allowed to say that.

12             THE WITNESS:  Okay.  Well, your

13        question was -- and so I'm trying to

14        understand what evidence is to you.

15        Okay?  So --

16        Q.    (BY MS. SAULINO)  And I think

17   you've answered that, sir.  You were about to

18   give an example, but you had answered it;

19   right?

20             MS. CONROY:  Objection.

21             THE WITNESS:  I gave an

22        incomplete answer, but the judge has

23        ruled so you can go on.

24             SPECIAL MASTER COHEN:  So just

1    let me just step in there and offer an

2    observation.  This is a discovery

3    deposition.  It's not de bene esse.

4    You're not testifying in court.  If

5    you were testifying in court, you

6    would be allowed to give a complete

7    answer.  You would be allowed to

8    finish your answer.

9         But this is a discovery

10   deposition, and they control what it

11   is they want to discover, including,

12   as I said earlier, a decision not to

13   discover some things, for example, the

14   examples you want to give to better

15   explain your answer.

16        That's their choice.

17        So she is allowed to say, all I

18   want is a "yes" or "no" answer, even

19   if it's not really a "yes" or "no"

20   answerable question.  Okay?

21        THE WITNESS:  Well, Your Honor,

22   if she'd asked the yes-or-no question,

23   I would give a "yes" or "no" answer.

24   Her question was --

1          SPECIAL MASTER COHEN:  In that

2    case --

3          THE WITNESS:  My interpretation

4    of what evidence-based evidence was.

5    She didn't ask a yes-or-no question.

6          SPECIAL MASTER COHEN:  I agree

7    with you in that case.  There are

8    questions she has asked which are

9    "yes" or "no" answers.

10          THE WITNESS:  And I tried to

11    answer them all "yes" or "no."

12          SPECIAL MASTER COHEN:  I'm just

13    giving you guidance.  I'm not scolding

14    you.  I'm trying to make this go more

15    smoothly.

16          THE WITNESS:  I understand.

17          SPECIAL MASTER COHEN:  I will

18    also add that there are certain

19    courtesies that you can give to the

20    deponent, such as telling him what

21    page you're reading from, and perhaps

22    asking with less vigor some of your

23    questions.

24          MS. SAULINO:  Fair enough,

1          Your Honor.  Thank you.

2          Q.     (BY MS. SAULINO)  Let's move on

3     to step 3.  "Critical appraisal of evidence

4     for quality clinical relevance and

5     applicability."  I'm on page 42 where we just

6     were.

7          A.     Sure.

8          Q.     Okay.  You say, "First, the

9     researcher must consider the type of study

10    returned."  Right?

11         A.     Yes.

12         Q.     "And different guidelines may

13    be used to critically appraise different

14    types of studies"; right?

15         A.     Yes.

16         Q.     "I used each of these where

17    appropriate to inform my analysis"; right?

18         A.     Yes.

19         Q.     And then you have following for

20    a couple of pages a list of about 32

21    questions; right?

22         A.     I didn't count them, but I'll

23    take your word for it.

24         Q.     Okay.  Now, you say, as we just

1  read, "I used each of these where appropriate

2  to inform my analysis"; right?

3       A.    Yes.

4       Q.    You don't anywhere in your

5  report provide any indication of which

6  questions were used to inform your analysis

7  for which opinion; right?

8       A.    Not by number.  That's correct.

9  But I did refer to certain of these in

10  certain opinions.

11       Q.    So unless we see one of these

12  questions listed as the basis for one of your

13  opinions, there's no way for us to know which

14  questions you used in order to form that

15  opinion; right?

16            MS. CONROY:  Objection.

17            THE WITNESS:  No.

18       Q.    (BY MS. SAULINO)  I'm not

19  right?

20       A.    You are not correct.

21       Q.    Okay.  What is not correct

22  about what I just said?

23       A.    In some cases, in some

24  opinions, I have made explicit reference to

1    some of the questions in pages 42 to 45.

2              In other cases, if you were

3    well-versed in epidemiology or in analysis of

4    medical literature, you could know when I was

5    using one of these methods, even if I didn't

6    explicitly refer to a particular technique.

7         Q.    All right.  But unless you

8    actually list it as one of -- as a part of

9    the bases for your opinions, there are -- I

10   agree with you, there are some where you do

11   list a question or some questions as part of

12   the bases for your opinion; right?  As you

13   just said.

14              You and I are agreeing, sir.

15        A.    I know.  I'm just trying to

16   understand.  I'm trying to read the --

17              Yes.

18        Q.    Okay.

19        A.    Yes.

20        Q.    So unless you've listed it,

21   there's no way for us to know for sure what

22   questions you were using for your critical

23   appraisal of evidence for validity of

24   clinical relevance and applicability; right?

1          MS. CONROY:  Objection.

2          THE WITNESS:  No.

3     Q.    (BY MS. SAULINO)  And you say

4  no because if we are versed in epidemiology,

5  we should be able to figure out precisely

6  which questions you were using; right?

7          MS. CONROY:  Objection.

8          THE WITNESS:  In part.  You

9      also have an opportunity for 14 hours

10      today and tomorrow to ask anything you

11      want about them what relates to what.

12     Q.    (BY MS. SAULINO)  I see.  But

13  you didn't see that it was necessary to spell

14  that out in your report; right?

15     A.    I -- that's correct.  I didn't

16  think I needed to reference a particular

17  question to a particular opinion.

18     Q.    Now, you list more than

19  36,000 pieces of literature in Exhibit C;

20  right?

21     A.    Yes.

22     Q.    You certainly didn't go through

23  this critical analysis for all 36,000-plus

24  pieces of literature there, did you?

1     A.     That's correct.

2     Q.     There is no way for us to know

3  which pieces of literature of those 36,000

4  you did use the critical analysis for; right?

5     A.     Not by reading the report,

6  that's correct.

7     Q.     So if an expert, for instance,

8  for the defendants, wanted to take your

9  report and replicate your work in that

10  regard, there's no way to do that; right?

11         MS. CONROY:  Objection.

12         THE WITNESS:  No.

13     Q.     (BY MS. SAULINO)  Not based on

14  your report, is there?

15     A.     Sure there is.  They could go

16  through the literature and see if I missed

17  something as a basis of an opinion for --

18             I mean, most of that literature

19  I was looking at, these questions related to

20  whether or not opioids were effective for

21  chronic pain.  That was a big issue.

22             And the big issues would be

23  easy to check.  We just searched that

24  database for chronic non-malignant pain

1   opioids, you won't find much in those

2   searches.  Somebody could do that search and

3   see if I missed it.  That's one example.

4       Q.    Sir, the searching the database

5   for chronic -- I'm sorry, what was --

6       A.    Chronic non-malignant pain.

7       Q.    Non-malignant pain and opioids

8   is not one of the questions that's listed

9   here that you used where appropriate for your

10  critical appraisal; right?

11      A.    That specific question is not

12  there, but it's in the opinions.

13      Q.    Okay.  So you used additional

14  questions to make your critical appraisal?

15      A.    Sure.  Those are just the

16  background questions.

17      Q.    I see.  But you would agree

18  with me that on page 42, under step 3 --

19      A.    Right.

20      Q.    -- you say, "I used each of

21  these where appropriate to inform my

22  analysis," and then you follow that with

23  several pages of questions; right?

24      A.    Are we on the -- you're at

1    page 42?

2         Q.    Mm-hmm.

3         A.    333.1?

4         Q.    I was reading the sentence that

5    just precedes 333.1.

6         A.    Right.

7         Q.    Okay.  So when you -- when you

8    indicated here in your report, "I used each

9    of these where appropriate to inform my

10   analysis" and followed that with several

11   pages of the types of questions that you used

12   where appropriate, you didn't think it was

13   necessary -- it was important to put in all

14   of the questions that you were using?

15        A.    Correct.

16        Q.    And nowhere is that written

17   down?  All the questions that you were using?

18        A.    Correct.

19        Q.    Okay.

20              Now, the searches that you ran

21   on the 36,292 pieces of medical literature

22   that you list on Exhibit C, did you run those

23   searches yourself?

24        A.    Yes.

1      Q.      All of them?

2      A.      Yes.

3      Q.      So you didn't rely on your

4    students or staff for those searches?

5      A.      No, they checked some of it.

6      Q.      And once the results were

7    returned, you reviewed the abstracts, study

8    descriptions or results to determine whether

9    each study addressed your questions; right?

10     A.      Correct.

11     Q.      And you did that with respect

12   to everything that was returned by your

13   search terms?

14     A.      Correct.

15     Q.      Do you know how many pieces of

16   medical literature were returned by your

17   search terms?

18     A.      No.

19     Q.      But you do know that you

20   reviewed them all yourself?

21     A.      I did iterative searches after

22   the initial search.

23     Q.      Again, which you don't document

24   in your report; right?

1    A.    Correct.

2    Q.    Now, earlier you said that

3  you've spent 384 hours on this litigation;

4  right?

5    A.    Correct.

6    Q.    How many of those 384 hours did

7  you use for this running of search terms,

8  iteratively rerunning them and reviewing

9  critically the published literature that

10  resulted?

11    A.    No idea.

12    Q.    Can you give me any kind of

13  estimate?

14    A.    No.

15    Q.    Do you remember doing it at

16  all?

17    A.    Sure.

18    Q.    And about how many hours do you

19  remember doing it?

20    A.    I don't remember how many

21  hours.

22    Q.    Do you know how many pieces of

23  literature you ultimately reviewed

24  critically?

1      A.     No.

2      Q.     Can you give me any estimate at

3   all?

4      A.     No.

5      Q.     You would agree with me it

6   would have been tough for you to review

7   36,292 pieces of literature in 384 hours;

8   right?

9      A.     To read them all?  Yes.

10   Impossible.

11      Q.     But you can't give me any

12   estimate as to how many of them you did read?

13      A.     No.  I could tell you that the

14   search for, for example, chronic

15   non-malignant pain and opioids probably comes

16   up with less than 20 papers, I think.

17      Q.     Okay.

18      A.     Those, I read them all.

19             So then others, there were lots

20   of papers that I didn't consider to be

21   relevant.  They didn't come up in the search

22   or there weren't many.

23      Q.     Okay.  But you choose not to

24   identify in Exhibit C or anywhere else which

1      papers it was you did actually read; right?

2              MS. CONROY:  Objection.

3              THE WITNESS:  No, it's some

4         cases.  For example, the chronic

5         non-malignant pain, for the number of

6         people who have pain, I think there's

7         specific literature cited for the EERW

8         section.  There's lot of literature

9         mentioned.

10             In other cases there's specific

11        literature mentioned.

12        Q.    (BY MS. SAULINO)  Are you

13   testifying that unless -- that every piece of

14   specific literature that you reviewed and

15   relied on is listed somewhere in your report?

16        A.    No.

17        Q.    So there are some missing?

18             MS. CONROY:  Objection.

19             THE WITNESS:  I'm -- well,

20        first of all, there's 35,000, 36,000

21        articles that were part of the general

22        search.  Aside from giving you the

23        titles, I didn't cite them because

24        most of them I didn't rely on.

1          Although, I reviewed them to the

2          extent that searching the abstracts

3          and key words reviews them.

4               There are other sections where

5          there is detail on the number of

6          papers and cites.  For example, the

7          impact of marketing on physician

8          behavior and conduct.  There's a lot

9          of cites there.  Probably not all of

10         them.

11              There's two papers that came

12         out last week -- oh, I should have

13         mentioned those before.  They would be

14         supplemental bases for my opinion, one

15         that came out, I think yesterday.

16         So -- that are relevant.  And those

17         are not in the report for obvious

18         reasons.  They didn't exist.

19         Q.    (BY MS. SAULINO)  So those are

20    additional new bases for your opinions?

21         A.    They're additional new bases

22    for my opinions.

23         Q.    And they're not included in

24    anything you've testified to already; right?

 1          A.      Correct.  Forgot about those

 2     two.

 3          Q.      What are the names of those

 4     articles?

 5          A.      One came out of Yale, was --

 6     Ross is one of the authors.  That paper deals

 7     with -- correlates the money spent to

 8     influence physicians with the dose of opioids

 9     used by physicians.

10                  And the other one correlates

11     death rates to higher dose.  It's kind of

12     like a matched set.  They're both in JAMA, I

13     think.  Ross is in JAMA.  I think the other

14     one is also in JAMA.

15          Q.      Now, if you look at page 48 of

16     your report, at the top.

17          A.      Okay.

18          Q.      You have a section titled

19     "Evaluation of funding source and conflicts

20     of interest"; right?

21          A.      I do.

22          Q.      And there you say, "In addition

23     to the factor reviewed above" -- I believe

24     you meant to say "factors" there, right?

1    A.    Correct.  That's a

2    typographical error.

3    Q.    "Funding source and conflicts

4    of interest should be reviewed and considered

5    for all studies"; right?

6    A.    Yes.

7    Q.    Okay.  And you say that because

8    you believe -- and I'm now quoting from the

9    top of page 49 of your report -- that "There

10   is a high risk of bias when the producers of

11   evidence have an invested interest in the

12   results."

13   A.    Where are you now?

14   Q.    I'm looking at the second line

15   of the top of page 49.

16   A.    Okay.  Halfway through the

17   sentence.  Yes.  That's part of that

18   sentence.

19   Q.    Okay.  I'm just asking whether

20   you believe that to be true?

21   A.    Let me read the whole sentence.

22   Q.    Well, sir, I'm not really

23   asking you whether you believe the sentence

24   to be true.  I'm just asking whether you

1  believe that there is a high risk of bias

2  when the producers of evidence have an

3  invested interest in the results.  I actually

4  thought that would be an easy one for you.

5       MS. CONROY:  Objection.

6       THE WITNESS:  That's a more

7       complicated question than you might

8       think.  That's true, but there's

9       evidence that disclosure also induces

10      misrepresentation.  So it goes both

11      ways.

12      Q.    (BY MS. SAULINO)  Okay.  Well,

13  you also believe that whoever funds your

14  organization owns it; right?

15      A.    Are you reading from someplace?

16      Q.    It is something that you

17  included in one of your opinions, but I'm

18  just asking you whether you believe that.

19      A.    Out of context?  No.

20      Q.    So it's not something you

21  generally believe?

22      MS. CONROY:  Objection.

23      THE WITNESS:  Yeah, I don't

24      have a statistic on that.  It's

 1             certainly not always true.

 2             Q.      (BY MS. SAULINO)  In any event,

 3     for the reasons of potential bias, you

 4     included funding source and industry bias as

 5     one of the factors that would decrease your

 6     confidence in a particular source of

 7     evidence; right?

 8             A.      That's generally the direction

 9     of the medical literature, correct.

10             Q.      Okay.  And there, I wasn't

11     quoting but I was looking at the very last

12     sentence of 333.5.

13                     Just letting you know where I

14     was looking, sir.

15             A.      Okay.

16             Q.      Okay?

17             A.      There's no question.

18             Q.      So you are agreeing that you

19     included funding source and industry bias as

20     one of the factors that would decrease your

21     confidence in a particular source of

22     evidence?

23             A.      Unless it was a statement

24     against interest.

1    Q.    Okay.  You didn't say that

2    here, did you?

3    A.    That's correct.  I just

4    modified it.

5    Q.    And have you modified your

6    thinking on that since March 25th?

7    A.    No.  It was incomplete, this

8    sentence.  I didn't incorporate the entire

9    idea.

10    Q.    Now, you testified earlier that

11    while you haven't been paid yet in this case,

12    you are owed $600 times 384 hours to date;

13    right?

14    A.    Correct.

15    Q.    Probably more for today because

16    it would be 650 for today; is that right?

17    650 per hour?

18    A.    Correct.

19    Q.    Okay.  And that, I did it on a

20    calculator and I got $230,400 owed up until

21    this morning.  Does that sound right to you?

22    A.    I didn't do the math.  I'll

23    take your word for it.

24    Q.    And that's just for your hours;

1   right?

2       A.    Correct.

3       Q.    So we then need to add to that

4   all of the hours that have been spent by your

5   staff and students; right?

6       A.    Correct.

7       Q.    At their hourly rates; right?

8       A.    Correct.

9       Q.    And do you get some of that

10  money as well?

11      A.    That money is all paid to me

12  and then I pay them.

13      Q.    Is it a complete pass-through

14  or do you keep some of it?

15      A.    There's no way to complete

16  pass-through.  I pay benefits, vacation,

17  things like that.  So I -- there's no way for

18  me to calculate what the overage is.  It's

19  not a complete pyramid scheme like a law firm

20  might run.

21      Q.    So they each make their own

22  hourly rate that's not the same as you're

23  charging the plaintiffs?

24      A.    They make an hourly rate and

1  time and a half for overtime that's -- I have

2  a fixed rate for the plaintiffs.

3       Q.    What is your hourly rate for

4  your students?

5       A.    I don't -- the students are $20

6  an hour.

7       Q.    No, I know.  That you pay them.

8       A.    $20 an hour.

9       Q.    And what about for each of your

10  staff members?

11       A.    What their hourly rates are?

12       Q.    Yes.

13       A.    I don't recall.

14       Q.    Less than $70 an hour?

15       A.    Well, I think their rate's

16  generally between 25 and 35 or 40.  But when

17  they're working time and a half or

18  double-time, which happens, then they could

19  get up to 60 or $70 an hour.

20       Q.    Do you charge the plaintiffs

21  overtime?

22       A.    No.  Plaintiffs get a fixed

23  rate.  So that's why I'm saying I -- the

24  overage I get from them is not much, usually,

1    because I don't -- they're billed at a fixed

2    rate.

3         Q.    Okay.  In addition to that, you

4    have previously testified that you've made

5    certainly more than 5 million, probably more

6    than $6 million from testimony that you have

7    given for plaintiffs over the years; right?

8         A.    Well, in litigation, I think

9    it's both at the request of plaintiffs and

10   defendants, yes.

11        Q.    Well, earlier you said that of

12   your -- I think you said 4 to 500 times

13   testifying, although previously you've said 6

14   to 700 times testifying -- that the vast

15   majority of that was testimony that the

16   plaintiffs had been retained -- had retained

17   you to do; right?

18        A.    That's correct.

19        Q.    And you've previously testified

20   to that as well; right?

21        A.    Yes.

22        Q.    Now, you've never testified on

23   behalf of a pharmaceutical company in

24   litigation, where a plaintiff is alleging a

1  personal injury, have you?

2       A.    I don't testify on behalf of

3  anybody, and I've not been retained by a

4  pharmaceutical company in any cases.

5       Q.    Okay.  And you've not been

6  retained by a pharmaceutical distributor in

7  any cases?

8       A.    Correct.

9       Q.    And you've not been retained by

10  a pharmacy in any cases; right?

11       A.    Correct.

12       Q.    But you have said publicly that

13  you believe that companies deserve full

14  credit for lying, cheating, and endangering

15  people's health; right?

16       A.    Correct.

17       Q.    You've also said that you

18  believe that "Every day executives from

19  corporations spanning the pharmaceutical and

20  medical device industry, preoccupied with

21  increasing profits and maintaining status as

22  viable competitors in the industry, knowingly

23  market unsafe or inadequately tested drugs

24  and medical devices to raise their bottom

1    line"; right?

2         A.    I think that's a correct quote.

3    It's from the science article?

4         Q.    It is a quote from an article

5    by you and Dr. Ardolino?

6         A.    Oh.  So that's a published

7    paper.  That's a published book chapter now.

8    Correct.

9         Q.    You do hold that belief,

10   though; right?

11        A.    True.

12        Q.    And you've made a lot of money

13   off of those beliefs that you hold; right?

14             MS. CONROY:  Objection.

15             THE WITNESS:  No.

16        Q.    (BY MS. SAULINO)  Well, you've

17   made certainly more than 5 million, probably

18   more than 6 million up until this litigation,

19   and then another couple hundred thousand so

20   far; right?

21        A.    That's correct.  Those are not

22   related ideas.

23        Q.    So you're saying that your work

24   for the plaintiffs in this case and in other

1    cases where you've testified holds no

2    relationship to your beliefs that we just

3    recounted?

4         A.    No.  It doesn't relate to my

5    beliefs.  That's correct.  It relates to the

6    fact that led to my beliefs.

7         Q.    I see.  And so isn't it true,

8    though, sir, based on your own logic that you

9    explain in your report, that all of the

10   hundreds of thousands of dollars you've made

11   in this case and the millions of dollars

12   you've made over the years, testifying for --

13   as having been retained by plaintiffs'

14   lawyers is a factor that should lead jurors

15   to decrease their confidence in the evidence

16   that you present?

17        A.    It's certainly something they

18   should consider in evaluating my testimony.

19        Q.    Okay.

20        A.    There is a difference between

21   this and the other biases discussed in the

22   medical literature.  That difference is this

23   process, and it is not a trivial difference.

24        Q.    When you say "That difference

1    is this process," you mean your

2    evidence-based medicine combined with

3    grounded theory approach that you have been

4    discussing today?

5        A.    No.  I mean your

6    cross-examination.  I mean your ability to

7    research and review everything I've written.

8              This room full of lawyers who

9    are looking for any and every mistake I may

10   have made limits my ability to twist, slant,

11   or in any other way deviate from the facts.

12   This process is much more rigorous, not even

13   close, to peer review, to dissertation review

14   or anything else.  So when I prepare reports

15   or testimony for this process, it's in

16   anticipation of being reviewed in immense

17   detail.

18              And not only that.  I

19   understand that everything that I've said in

20   my entire life will be reviewed and will be

21   compared to the opinions that I give in this

22   litigation, as we sit here today.

23              So there's nothing like this

24   process in the other areas or aspects of

1    bias.  And so when I know -- when you know

2    you're in this process, and I know I'm in

3    this process, there's a lot of reasons that I

4    want to stick to the truth as much as

5    possible and not spin anything, or take

6    anything out of context.  Because I have

7    great faith that you will be able, with all

8    of your resources and with your great

9    intelligence, to try to catch every minor or

10   major error I make.

11         Q.    So those reasons that you just

12   laid out would also lead you, wouldn't they,

13   sir, to want to detail in your report every

14   step that you took in order to get to each of

15   the conclusions that you made?

16         A.    No.  Can't do that.  I don't

17   have enough time.  I'd be dead by the time

18   the report was written.

19         Q.    So you're agreeing with me,

20   sir, that you choose here not to detail each

21   of the steps that you took to reach each of

22   the conclusions that you made?

23              MS. CONROY:  Objection.

24              THE WITNESS:  Correct.  I

1          had -- I detailed what I thought were

2          the bases of my opinions that could be

3          evaluated, as you have been evaluating

4          them, if it was a way that was

5          sufficient for someone to understand

6          what I did and look at what I did and

7          evaluate whether it was compatible

8          with the data that I reviewed.

9                 And I am sure that if there was

10         something that I said that was wrong,

11         you will find it and you will correct

12         it.

13                In some ways, I very much value

14         this process because if I made a

15         mistake, I don't want to make a

16         mistake.  And so if you find someplace

17         where I made a mistake, I want to

18         correct it.  I certainly want to say

19         it in a public forum.

20         Q.     Now, sir, you just -- I'm sure

21    you were joking, but you just said "I would

22    be dead if I wrote down each of the steps

23    that I took."  Right?  Meaning that it would

24    take a long time to write that down?

1          A.      Hopefully I'm going to live

2    long enough, yes.  That's correct.

3          Q.      Okay.

4          A.      Yes.

5          Q.      But you're saying that they are

6    steps that you did take, right?

7          A.      Well, yes.  I take a lot of

8    steps in my head that I don't write down.

9          Q.      And these are steps that you've

10   taken in less than four months; right?

11         A.      No.

12         Q.      Well, you were retained in

13   November of 2018; right?

14         A.      Yes.

15         Q.      You were presented with your

16   assignment in November of 2018; right?

17         A.      Yes.

18         Q.      And that was the answerable

19   question that you then applied your

20   methodology to; right?

21         A.      Yes.

22         Q.      And that was about four months

23   ago, wasn't it?

24         A.      Those facts individually are

1   correct.  But remember, I've been working on

2   this case and had access to some of these

3   documents since 2003.

4                I've been reviewing opioid

5   literature and studying opioids and pain

6   since 1974.

7                So a lot of the information

8   that goes into the report dates from 1974.

9        Q.     And there's no way for us to

10  know what in the report dates from 1974 and

11  what in the report is something that you

12  reviewed in connection with this litigation?

13       A.     Well, you can assume anything

14  that I read after November, okay? -- was at

15  least in part -- that I incorporated into the

16  report -- was in part related to my work in

17  this case.  Although, some of that literature

18  I would have seen and read otherwise.

19                In other words, the Ross paper

20  that I mentioned.  Well, that was e-mailed to

21  me last night by my other kid who's at Yale.

22                So -- because it just came out

23  yesterday.

24                So now that, I would not have

1    read that last night had he not sent it to

2    me.

3         Q.    You say we can assume anything

4    that you read after November was a part of

5    the -- or related to your work on the report;

6    right?

7         A.    I think that's fair.

8         Q.    Okay.  Where do you list that?

9         A.    I don't list it.  You go by the

10   dates.

11        Q.    Oh, I see.  So anything written

12   after November?

13        A.    Correct.  Yeah.  Anything

14   written after November after I was retained

15   in the case that was related to the case

16   that's in the report, I read it in relation

17   to the case.

18        Q.    That's not terribly specific

19   guidance, is it?

20             MS. CONROY:  Objection.

21        Q.    (BY MS. SAULINO)  Not much of

22   your opinion is based on things that were

23   written after November of 2018; isn't that

24   right?

1    A.    I don't -- I imagine most of

2  what I wrote is based on things written

3  before.

4    Q.    Okay.  So what I'm asking you

5  is, you said it would take a really long time

6  for you to write down all of the steps you

7  took in order to answer the question that you

8  were asked in this litigation and then

9  applied your methodology to; right?

10          We've been talking about you

11  would be dead by then, but we all know you

12  were joking, and we all hope that doesn't

13  happen, so it took a really long time is what

14  I said.

15    A.    Right.  We could take a vote on

16  whether anybody hopes it doesn't happen, but

17  that's correct.  I bet you it won't be

18  unanimous.

19          SPECIAL MASTER COHEN:  I'm

20      neutral, I don't vote.

21          MR. MIGLIORI:  Can some of us

22      vote twice?  I'd like to vote twice.

23    Q.    (BY MS. SAULINO)  But we can

24  agree to what you were saying there.

1       A.      And that includes plaintiff

2   lawyers.  I guarantee that.

3       Q.      Fair enough.  We can discuss

4   this at a break.

5               So what you were saying there

6   is it would take you a really long time to

7   write down all of the steps that you took;

8   correct?

9       A.      Correct.

10      Q.      But these are steps that you

11  took in four months; right?  That's what I'm

12  trying to get at.

13      A.      No, No.  A lot of the steps

14  began, as I said in 1974.  I've been reading

15  literature --

16              Look, I did the reports in 2004

17  in the Purdue literatures.  I did the FDA

18  presentation in 2013.  I wasn't involved in

19  any litigation between 2005, 2013 till

20  November; right?  I obviously had been

21  staying up with the literature.  Okay?

22  Because -- and I was staying up with the

23  issue because I, on my own, did the paper and

24  presentation at FDA.

 1          Also, I brought that story to

 2    the L.A. Times.  The L.A. Times story, that

 3    was based on my bringing that stuff to them.

 4          Q.     Okay.

 5          A.     So, I mean, I've been doing

 6    things got nothing to do with the litigation.

 7    I've been concerned about this issue for a

 8    long time.  I've been reading about this

 9    issue for a long time, applying this same

 10   methodology.

 11          Q.     Okay.  So but I'm asking you

 12   about your expert work in this case.  Your

 13   methodology requires you to start with an

 14   answerable question, which you got in

 15   November of 2018; right?

 16          A.     I got that -- but that question

 17   is the question I've been applying --

 18          That question came from me,

 19   modified slightly by the lawyers.  And that's

 20   the question I've been asking all the time.

 21   It's a similar question to what I ask -- I

 22   develop in every case I do.

 23          In other words, it's -- that's

 24   the -- the question of -- it's really a

1    general -- a more general question is, you

2    know, why did this person get addicted and

3    die?  That's the question.

4              I mean, it's a simple question,

5    really.

6         Q.    Okay.

7         A.    But it's translated into kind

8    of a more bite-sized piece there.  Because

9    when I go to the why question, you -- most

10   people stop at the patient level.  I don't

11   stop at the patient level.

12             Okay?  I ask that question all

13   the way to the generators of the

14   manufacturers of the product, the

15   distributors of the product, et cetera.

16        Q.    Okay.

17        A.    So that's just how I frame the

18   question.

19        Q.    All right, sir.  So --

20        A.    Sorry, go ahead.

21        Q.    It is fair to say that you

22   didn't have access to the database of

23   documents produced by defendants until

24   November 2018; right?

1    A.    No.  I had some of them in
2  2003, 2004, and 2005.
3    Q.    And those were Purdue
4  documents?
5    A.    Purdue and others.  Because
6  they produced other documents.  I think they
7  probably had some of the front group
8  documents that were in that mix.
9    Q.    Tell me something, sir.  Did
10  the protective orders that you signed in
11  those cases require you to destroy those
12  documents after the litigation was over?
13    A.    The Purdue documents?
14    Q.    Uh-huh.
15    A.    I don't think so.  I don't
16  recall.
17    Q.    Well, clearly, you didn't.  You
18  kept them; right?
19    A.    Yeah.  There were five CDs of
20  documents that were released by the attorney
21  general of Florida.  I got those CDs.  Those
22  are not confidential.
23    Q.    So nowhere in your report do
24  you give us any idea of which of your

1    opinions are based on things that you've

2    known since 1970 and which of your opinions

3    are based on things that you've learned since

4    November of 2018; right?

5              MS. CONROY:  Objection.

6              THE WITNESS:  Yes, as I

7         modified before.

8              MS. SAULINO:  Okay.

9         Q.    (BY MS. SAULINO)  Now, you say

10   that step 4 of the evidence-based medicine

11   method, which you list on page 49, you say,

12   "This step speaks for itself.

13              "Once a critical analysis of

14   the evidence has been completed, the findings

15   can be applied to the situation at hand";

16   right?

17        A.    Correct.

18        Q.    And you don't document what the

19   situation at hand is, right?

20        A.    Well, the situation at hand

21   would be the assignment, yeah.

22        Q.    Okay.  And you didn't write

23   that down here, did you?

24        A.    I did not write that down.

1    Q.    And step 5 is a

2  self-evaluation; right?  An evaluation of

3  performance?

4    A.    Correct.

5    Q.    And you say, "Guidelines exist

6  for self-evaluation of each of the previous

7  steps of EBM practice"; right?

8    A.    Right.

9    Q.    And then you said -- you then

10  list seven questions for self-evaluation of

11  finding the best external evidence; right?

12          Or sorry -- for ask -- you

13  start with asking answerable questions.

14  There's a self-evaluation for that; right?

15          I apologize.  I skipped ahead.

16    A.    You skipped a section.  That's

17  right, yes.

18    Q.    Right.  So you start with your

19  self-evaluation for answering answerable

20  questions; right?

21    A.    Right.

22    Q.    You then list a number of

23  questions, but you say, "Not all of these

24  questions applied to my practice of EBM in

1  this context.  Of those which did apply, I

2  found that my performance was satisfactory";

3  right?

4        A.     Correct.

5        Q.     Which ones applied?

6        A.     Am I asking any clinical

7  questions at all that apply?  And am I asking

8  well-formulated questions based on the

9  guidance reviewed above?  I think I apply.

10  Am I using a map to locate my knowledge gaps

11  and articulate questions?  I didn't do that

12  explicitly.  I don't think that's doable in

13  this situation because of the grounded theory

14  method doesn't really apply to that kind of

15  construct.

16              Can I get myself unstuck when

17  asking questions?  Doesn't really apply.

18  More clinical -- limited clinical stuff.

19              Am I modeling the asking of

20  answerable questions for my learners?  I did

21  not do that.  That's really related to

22  teaching.

23              Am I writing any educational

24  prescriptions in my teaching?  Are they being

1    filled?  I didn't do that.  It's not part of

2    my role here.

3              Are we incorporating questions

4    asking and answering it to everyday

5    activities?  No.  Not part of my role here.

6    Well, because I'm blocked from doing that

7    because of the confidentiality orders.

8              How well am I guiding my

9    learners in the questions that -- in their

10   question asking?  Well, I did discuss the

11   assignment, and when they got my report, the

12   plaintiff lawyers asked a lot of questions

13   about the report and the -- we discussed the

14   nature of the report.

15             Are my learners writing

16   educational prescriptions for me?  No.  The

17   plaintiff lawyers didn't write me any

18   educational prescriptions.  So those are the

19   ones that didn't.

20        Q.    So of your one, two, three,

21   four, five, six, seven, eight, nine, ten

22   questions here, three of them applied in this

23   context?

24        A.    I guess so, if you counted

1    right.

2         Q.    And you chose, however, to list

3    all of these questions and not give us any

4    indication of which ones you were actually

5    using.

6         A.    Correct.  I didn't explicitly

7    state.

8         Q.    Now, you have a -- the next

9    self-evaluation is finding the best external

10   evidence, which I accidently skipped to

11   earlier; right?

12        A.    Correct.

13        Q.    Okay.

14        A.    No demerit points for that.  Go

15   ahead, skip anything you want.

16        Q.    And you list a number of

17   questions here; right?

18        A.    Correct.

19        Q.    Now, here you just say, "I

20   found that my performance was satisfactory";

21   right?

22        A.    Right.

23        Q.    So you didn't skip any of

24   those?

1        A.      No, I didn't skip any of those,
2   but the test is yours.

3        Q.      I'm sorry?

4        A.      The test is yours.  Better than
5   the self-evaluation is this two days.

6        Q.      You then -- well, you -- you
7   say here in your report you performed a
8   self-evaluation, sir; right?

9        A.      Correct.

10       Q.      That's what I'm asking you
11  about right now.

12       A.      That's correct.  But what I'm
13  saying is this external evaluation is much
14  better than my own.

15       Q.      You then say, "Self-Evaluation
16  for critically appraising the evidence for
17  its validity and potential usefulness";
18  right?

19       A.      Correct.

20       Q.      Here again, not all of the
21  questions applied, but you chose to write
22  them all down and not give us any indications
23  of which ones you used; right?

24       A.      Correct.

1          MS. CONROY:  Objection.

2      Q.      (BY MS. SAULINO)  And then

3  self-evaluation for applying results in

4  practice; right?

5      A.      Right.

6      Q.      And again, not all of them

7  applied.  You wrote them all down and didn't

8  give us any indication of which ones you

9  used; right?

10     A.      None of these apply to practice

11 because there's a confidentiality order in

12 the case.

13     Q.      Well you say here of those

14 which did apply, I found that my performance

15 was satisfactory.

16     A.      Let me just --

17             Well, the second one applies,

18 but it's not really relevant to this process.

19             It does apply, but not relevant

20 to what we're doing here today.

21     Q.      All right.  Well, let me ask

22 you:  Your evaluations, your self-evaluations

23 that you performed here, where are those

24 documented?

1          A.      They're not documented.

2          Q.      They're not documented

3    anywhere?

4          A.      Correct.

5          Q.      Okay.  So there's no way for us

6    to replicate them?

7          A.      No.  You can go through this

8    process.  I mean, that's what -- I have no

9    doubt that you have taken great effort over

10   the past four weeks to attempt to replicate

11   and test every opinion I've given and every

12   basis.  So there's plenty -- I imagine that's

13   what we're going to spend most of the day

14   doing.

15             So you can certainly critically

16   evaluate what I've done, based on your access

17   to the database and the literature, the same

18   as I have.

19         Q.      Sir, what you seem to be saying

20   is, I too can look at the database and the

21   literature that you -- the massive database

22   that you've listed and the massive set of

23   literature that you've listed and I can come

24   to the same conclusions you did.  That's what

1   you're saying?

2          A.     No.  You can criticize -- I

3   don't think you want to do that.  That would

4   probably not be in your client's best

5   interest.

6                 What I'm saying is you can look

7   at the data.  You can talk to your client.

8   You can talk to lots of experts, and you can

9   evaluate what I've written and criticize me,

10  based on the same data sets I have.

11         Q.     So, sir --

12         A.     And I expect that you've done

13  that, and that we'll see the results.

14         Q.     You understand that you're

15  being offered as an expert in this

16  litigation; right?

17         A.     Right.

18         Q.     That you have some expertise to

19  offer to bring to bear on this methodology

20  that you've laid out and the approaches that

21  you've taken; right?

22         A.     Correct.

23         Q.     That you have something above

24  and beyond what other people have; right?

1          A.     I have something beyond --

2     above and beyond what a layman has.

3          Q.     I see.  But anyone else who has

4     a little more knowledge of looking at legal

5     databases could do what you do?

6          A.     I don't know what they could

7     do.

8          Q.     Okay.  What I'm asking you,

9     sir, is --

10          A.     That's not what I referred to

11     before.  I referred to you folks.

12          Q.     Let me be more clear.  What I'm

13     asking you, sir, is I have asked you a number

14     of questions about how to replicate

15     statements you've made in your report as an

16     expert; right?

17          A.     Yes.

18          Q.     And your response has been

19     repeatedly that you're sure I'm doing that

20     already; right?

21               MS. CONROY:  Objection.

22               THE WITNESS:  No, that's not

23          exactly true.  You didn't ask that

24          question explicitly.  If you want to

1    know how to replicate what I did, you

2    take an opinion, okay?  Take a sample

3    opinion.  Okay?





████ ██████████ ████████████████████████████

████ ███████████████████████

████ ██ ███████████████████

████ ███████████████████████████ ██████ ████████

████ █████████████████ █████████████████

████ ███████████████████████████████████████

████ ███████████████████████████████████████

████ ████████████████████████████

████ ███████████ █████████████████████████

████ █████████████████████████████

████ ██████ ████████████████████████████████

12          Q.      And nowhere in your report do

13    you provide us the ability to do that for any

14    particular opinion, do you?

15          A.      No.  You have that opinion

16    because you -- ability because you have the

17    same access to the same data I have plus

18    more.  You have all of the privileged and

19    confidential documents.

20          Q.      Sir.

21          A.      You have the ability to talk to

22    the -- to your own clients.

23          Q.      I was asking a different

24    question.

1           Nowhere in this report do you

2    provide us the ability to replicate what you

3    did in order to come to any particular

4    opinion.

5           A.    Wrong.

6           Q.    Nowhere in this report do you

7    provide us the ability to look at one opinion

8    and know what you looked at, what iterative

9    searches you made, what conclusions you came

10   to, how you challenged them, how you

11   self-appraised them, none of that; right?

12          A.    In detail, that's correct.

13          Q.    Okay.  That's all I was asking.

14          A.    All right.

15                THE WITNESS:  Can we take a

16          break?

17                MS. SAULINO:  Yeah, I think now

18          is a good time for a break.

19                THE VIDEOGRAPHER:  Off the

20          record.  2:41.

21                (Recess taken, 2:41 p.m. to

22          3:10 p.m.)

23                THE VIDEOGRAPHER:  We are back

24          on the record at 3:11.

1           THE WITNESS:  Okay.  So these

2      are the two articles that I mentioned

3      that came up this week as new bases.

4      Q.    (BY MS. SAULINO)  Okay.  So

5 thank you, Doctor.  You're looking at a

6 folder that you have marked 26, which is a

7 red folder and we're going to mark as

8 Exhibit 6 to your deposition.

9           (Whereupon, Deposition Exhibit

10      Egilman 6, Folder 26 arrow up does =

11      arrow up death, was marked for

12      identification.)

13      Q.    (BY MS. SAULINO)  All right.

14 Dr. Egilman, I'd like to turn to the grounded

15 theory approach, which you begin discussing

16 on the bottom of page 38 of your report.

17      A.    Okay.

18      Q.    Now, you say that "Grounded

19 theory is an inductive method which allows

20 analytical categories to emerge from the data

21 presented"; right?

22           Second sentence.

23      A.    38?

24      Q.    Yeah.  Second sentence under

1    "State of the art methods."  The portion

2    where you start talking about the grounded

3    theory approach.

4         A.    Oh, yeah, right.  Go ahead.

5         Q.    Okay.  And you then two

6    sentences later say, "The grounded theory

7    approach recognizes that data collection and

8    analysis are inherently interrelated

9    processes and calls for analysis to begin at

10   the time of first data collection"; right?

11        A.    Correct.

12        Q.    And the grounded theory

13   approach -- and I'm not reading right now,

14   but based on what I have seen in your report,

15   is it fair that the grounded theory approach

16   entails an initial formulation of hypotheses

17   and then you -- as you've said over and over

18   today, you constantly revise those during the

19   course of research; right?

20        A.    Well, you start with a -- you

21   just start with a question.  And then not

22   necessarily a hypothesis.

23        Q.    Well, then let's look at your

24   report.  You say towards the bottom of

1   page 38, "As described by Corbin and Strauss,

2   the hypotheses are constantly revised during

3   the course of the research, until they hold

4   truth of the phenomena under study as

5   evidence in repeated interviews, observations

6   or documents"; right?

7        A.     Right.

8        Q.     Do you agree with that

9   statement?

10       A.     Well, I would say hypotheses

11  are questions.

12       Q.     Okay.  Do you see a distinction

13  between the two?

14       A.     I think you could perhaps --

15  yeah, there's a distinction because

16  hypothesis generally is a -- generally

17  used --

18              Well, in science use a null

19  hypothesis, which implies a non-causal

20  relationship between two items.  And a

21  question is broader than that.

22       Q.     Okay.  With respect to the

23  grounded theory approach, which you discuss

24  here on pages 30 -- starting on 38 and moving

1    on to 39, you don't list either initial

2    hypotheses or initial questions, do you?

3           A.    No, not exactly.

4           Q.    And you don't list your initial

5    hypotheses or questions to be used in the

6    grounded theory approach anywhere in your

7    report, do you?

8           A.    No.  Not correct.

9           Q.    Where do you list them?

10           A.    Well, we've gone over some of

11    them.  Some of the background questions were

12    listed.  And then I think in the EERW

13    section, I think there are hypotheses or

14    questions listed there.

15                 In the critique of the

16    Rappaport, chicken and egg constructs, I

17    think in the chronic pain analysis with

18    respect to opioid treatment.

19                 Off-label promotion.  And the

20    12-hour dosing regimens, I think certainly

21    those incorporate questions.

22           Q.    You're talking about particular

23    opinions that you remember?

24           A.    Correct.

1    Q.    Okay.  So with respect to

2  particular opinions, if we see questions --

3  if we see initial questions or initial

4  hypotheses listed there, then you intended

5  those to be an indication of the initial

6  questions or hypotheses that you were using

7  with the grounded theory approach?

8    A.    Or questions, yes.

9    Q.    You said "or questions"?

10  Sorry?

11    A.    Or questions, yes.

12    Q.    And I said "initial hypotheses

13  or questions."  Yes.  So I think we're saying

14  the same thing.  If we see them listed with

15  respect to an opinion, hypotheses or a

16  question, you intended that to be a question

17  of what you used as your initial question or

18  hypothesis for the grounded theory approach?

19    A.    Yes.  Or the evidence-based

20  medicine question, depending on what the

21  issue was.

22    Q.    But again, even for the

23  opinions where you do list questions or

24  hypotheses, you don't tell us which approach

1    you're using explicitly in the report.

2        A.    It's not written explicitly,

3    that's correct.

4        Q.    Okay.  And for -- and

5    otherwise, we have no way of knowing what

6    your initial hypotheses or questions were;

7    right?

8          MS. CONROY:  Objection.

9        Q.    (BY MS. SAULINO)  For the

10    grounded theory approach?

11        A.    No.

12        Q.    No, we do not?

13        A.    No, I don't agree with your

14    statement/question.

15        Q.    Will you agree with me that

16    only a few of your opinions list initial

17    questions or hypotheses; right?

18        A.    No, not necessarily.  I gave

19    you the ones I could remember.  I'd have to

20    go through them all to see.

21        Q.    Okay.  Well, is it fair to say

22    that for those that do not list an initial

23    hypothesis or question, there's no way for us

24    to know what it was?

1          A.      No.

2          Q.      How would we be able to find

3    that in your report?

4          A.      Well, if you look at

5    Opinion 185, Purdue trained Walgreens'

6    pharmacists.  So that would be the question.

7    Did Purdue train Walgreens' pharmacists?

8    That's the question that I was answering, for

9    example.

10               186.  Did Purdue use friend

11   groups?  I put Purdue use friend groups.  You

12   just put a "did" in front and that's your

13   question.

14         Q.      So for each and every one of

15   your opinions, we should assume, then, that

16   the opinion turned out to be what the initial

17   question was?

18               That's what you're saying?

19         A.      No.

20         Q.      So again I ask you, sir, how do

21   we know for any individual opinion what the

22   initial question or hypothesis was if you

23   didn't list it for us?

24         A.      I gave you two examples.  I can

1    go through each opinion.

2          Q.    Well, sir --

3          A.    And give you -- and go through

4    them if you want.  I don't think you want me

5    to do that.

6          Q.    The two examples that you just

7    gave me were 185 and 186.

8                And for each of those examples,

9    you read the opinion and put a did in front

10   of it.  Right?

11         A.    Correct.

12         Q.    Which means, then, that you

13   started with the question that ended up being

14   your opinion; right?

15         A.    No.  It means there was a

16   question and I gave the answer.

17         Q.    I see.  For any of your

18   opinions, was there -- is there a way to see

19   that you started with a question that is

20   different than where you ended up?

21         A.    I think so.

22         Q.    Is there a way to see it in

23   your report?

24         A.    I think so.

1    Q.    Okay.  So we would do that by

2    looking at your opinion, looking at the

3    basis, and if we see a question there, we'll

4    know what question you started with; right?

5    A.    That would be true.

6    Q.    Okay.  If we look at the

7    opinion, look at your report, there is no

8    question there, we don't have any way of

9    knowing whether you started with something

10   different than where you ended up; right?

11   A.    No.

12   Q.    We don't have any way of

13   knowing one way or the other, do we?

14   A.    No, you do.  I gave you some

15   examples.

16   Q.    Well, sir, I -- I see your

17   examples.  Example 185 you said, your opinion

18   is Purdue trained Walgreens pharmacists.  And

19   that we should then assume that your question

20   was, did Purdue train Walgreens pharmacists;

21   correct?

22   A.    Correct.

23   Q.    So what you're telling me is

24   that for each and every one of your opinions,

1    unless you otherwise list a question or

2    hypothesis, we should assume, then, that the

3    question you asked was the opinion you ended

4    up with; right?

5         A.    No.

6         Q.    Well then how else will we know

7    how to figure it out?

8         A.    Well, it's going to be

9    different for different opinions.  I'd have

10   to go through each and every one.

11        Q.    And you didn't provide that

12   information in your report; right?

13        A.    It's not explicit.  It's

14   implicit.  You would have to infer that when

15   I wrote "Purdue trained Walgreens'

16   pharmacists," that that was a relevant answer

17   to a question about whether Purdue was

18   involved in the training of Walgreens'

19   pharmacists.

20        Q.    You say that's implicit?

21        A.    Yes.

22        Q.    There's no indication in your

23   report that your question was did Purdue

24   train Walgreens pharmacists, is there?

1        A.      That question is not part of

2    that opinion.

3        Q.      So, again, unless you list an

4    actual question in the bases for your

5    opinion, we have no way of knowing where you

6    started.

7                MS. CONROY:  Objection.

8                THE WITNESS:  No.

9        Q.      (BY MS. SAULINO)  How will we

10   know by looking at your report?

11       A.      It's obvious in the case of

12   many of the answers, if not all of them.

13       Q.      Sir, if it's obvious then why

14   did it require expertise?

15               MS. CONROY:  Objection.

16               THE WITNESS:  The formulation

17          of the question required expertise.

18          The understanding of what the question

19          was may also require expertise.

20       Q.      (BY MS. SAULINO)  If the

21   formulation of the question required

22   expertise, then wouldn't we need to see your

23   expertise in order to know what the question

24   was?

1        A.       I'm not sure I understand that

2   question.  The answer, I think, is no, beyond

3   knowing what I've already told you about my

4   expertise.

5        Q.       So you can't give me any other

6   way to figure out what question you began

7   with for any opinion for which you don't list

8   a question.

9        A.       I said I think it's obvious

10  from most of the opinions what the question

11  was.

12       Q.       Okay.

13       A.       Remember that the overriding

14  question is the assignment.  So all of these

15  are subanswers to the assignment question.

16              So the question for all of

17  these is the assignment, and then all of

18  these are answers to the assignment.

19              Now, there are implicit

20  subquestions that require expertise, and

21  that's what all of these opinions are.

22       Q.       Okay.  You didn't say anywhere

23  in Section 3.2, starting on page 38, that

24  your overall question that you were answering

1    was the assignment that you've now given us;

2    right?

3         A.    Correct.

4         Q.    And you do say, though, on

5    page 39 at the bottom --

6         A.    Hang on one sec.

7               Go ahead.

8         Q.    On page 39 at the bottom, you

9    do say that after -- so you -- you list some

10   search terms that you used; right?

11        A.    In the middle?

12        Q.    Mm-hmm.

13        A.    Yes.

14        Q.    And then you say, "After the

15   emergent" set of -- I'm sorry -- emergent

16   "subset of documents was reviewed, key themes

17   and concerns were identified, including

18   documents specifically pertaining to

19   evidence-based medicine, third-party interest

20   groups, public/private partnerships, EERW

21   study design, chronic pain treatment, return

22   on investment for marketing techniques,

23   hospital licensing and accreditation, state

24   medical board licensing, off-label promotion,

1    diversion, and 12-hour dosing regimens";

2    right?

3            A.      Yes.

4            Q.      You don't list what the key

5    themes and concerns were that you identified;

6    right?

7            A.      You just read them.

8            Q.      So those are the key themes and

9    concerns?

10           A.      Those were some, probably not

11   all of the key themes and concerns.

12           Q.      And there's no way for us to

13   see from your report what all of your key

14   themes and concerns were; right?

15           A.      No.  All of the ones -- they

16   were all in the report.  So anything in the

17   report you can assume is a key theme or

18   concern.

19           Q.      And the only way that we would

20   be able to get there from your report is just

21   by making an assumption?

22                   MS. CONROY:  Objection.

23                   THE WITNESS:  No.

24           Q.      (BY MS. SAULINO)  Well, if I

1    wanted to identify all of the key themes and

2    concerns that you identified when you

3    reviewed the emergent subset of documents

4    that came out of the search terms that you

5    identify on page 39, I would start with the

6    list you provide here.  And where else would

7    I find the rest of them?

8         A.    If there are others that are

9    not mentioned here, they would be in the

10   opinions.

11        Q.    So -- but there is no way for

12   us to know precisely which opinions contain a

13   key theme or concern that you identified

14   after reviewing the documents that emerged

15   from your search using the key terms

16   identified on page 39.

17        A.    No.

18        Q.    There is a way for us to know?

19        A.    Yes.

20        Q.    And what is that way?

21        A.    They all came out of the

22   searches.  It's not that -- they weren't -- I

23   didn't dream them like Kaiko dreamed that,

24   you know, OxyContin was a 12-hour drug.  That

1   all came out of the searches.

2          Q.     Well, you'd agree with me,

3   wouldn't you, sir, that grounded theory

4   approach is an iterative process?

5          A.     Yes.

6          Q.     So you do one set of searches.

7   You come up with key themes and concerns.

8   You do more searches.  You continue to test;

9   right?

10         A.     Yes.

11         Q.     Testing and repetition is

12  important to the grounded theory approach;

13  right?

14         A.     Well, it may or may not be

15  important.  There's no real -- in general,

16  yes.

17         Q.     You and I just looked on

18  page 38 at a quote you put in your report

19  from Corbin and Strauss that says, "The

20  hypotheses are constantly revised during the

21  course of research until they hold true for

22  the phenomena under a study as evidenced in

23  repeated interviews, observations or

24  documents"; right?

1          So repetition is important;

2    right?

3          A.    Correct.

4          Q.    All right.  So what you're

5    telling me now is that in order to figure out

6    what key themes and concerns you started with

7    and then tested with your repeated process,

8    we just look at the opinions and every

9    opinion is a key theme or concern that you

10   started with?

11         A.    No.  It doesn't say what you

12   start with.  It says -- this is an iterative

13   process, and it says -- this sentence that

14   you just didn't read says they're constantly

15   revised.

16         Q.    Right.

17         A.    So the end revision of whatever

18   the key theme or concern is is what appeared

19   in the report as an opinion.

20         Q.    And I'm asking how we figure

21   out where you started, sir.

22         It's not in the report, is it?

23         A.    Yes, it is.  You start on

24   page 39 in the middle with all those

1    searches.

2         Q.    Okay.

3         A.    And then those searches

4    resulted in a subset of other items, not --

5    this is not a complete list of all the other

6    items but many of these.  And then all of

7    these then resulted in opinions.

8         Q.    Okay.  And what I'm looking for

9    is where you list the subset of other items

10   that you were just talking about.  Some of

11   them are listed here, as you just

12   acknowledged, but not all of them.

13        A.    I don't think all of them, but

14   I -- you know, it's possible that all of the

15   opinions are subsets of these opinions.

16        Q.    You don't know one way or the

17   other sitting here today?

18        A.    I haven't evaluated it for that

19   question.  That's not something I did.

20        Q.    And then you say, "Additional

21   searches were conducted to explore these and

22   other more specific topic areas as they

23   arose."  Right?

24        A.    Correct.

1          Q.     You don't give us any search

2    terms or parameters for those additional

3    searches that you conducted; right?

4          A.     That's correct.

5          Q.     Okay.  So there's no way for us

6    to know what those were?

7          A.     That's correct.

8          Q.     Okay.  And then you say, "This

9    iterative analysis formed the basis for my

10    state-on-the-art opinions in this case."

11          A.     That's correct.

12          Q.     Did you mean "state of the

13    art"?

14          A.     Yes.

15          Q.     Okay.  And you believe that

16    your opinions are state of the art; right?

17          A.     What do you mean by "state of

18    the art"?

19          Q.     I'm using your words, sir.

20          A.     My words are they're state of

21    the art -- there's various definitions of

22    state of the art.  There's a medical state of

23    the art, and then there's this -- this

24    description of state of the art which

1  generally is historical analysis of what went

2  on and why.  And that's what this is.

3       Q.    Okay.  But again, you don't

4  provide us a roadmap to your historical

5  analysis of what went on and why; right?

6            MS. CONROY:  Objection.

7            THE WITNESS:  That's not true.

8       I think it's incorporated in the

9       opinions.

10      Q.    (BY MS. SAULINO)  Other than

11 assumptions that one would make by looking at

12 the opinions, you don't provide a roadmap to

13 us about how you've used your process to get

14 there; right?

15           MS. CONROY:  Objection.

16           THE WITNESS:  No.

17      Q.    (BY MS. SAULINO)  You do

18 provide a roadmap?

19      A.    Well, I provide in some cases a

20 specific roadmap.  In other cases, I give you

21 a general idea of where to go.





















7        Do you have the McKesson

8     Redweld?

9        MS. SAULINO:  Okay.  Can I see

10    what you're giving him right now?

11       Q.   (BY MS. SAULINO)  So,

12    Dr. Egilman, what you have just asked the

13    plaintiffs' lawyers to provide you is what

14    you called the McKesson Redweld?

15       A.    Correct.

16       Q.    And I only just briefly flipped

17    through what you called the McKesson Redweld,

18    but is the McKesson Redweld a compilation of

19    documents that mention McKesson?

20       A.    Correct.

21       Q.    So what you're saying is that

22    in order to figure out the basis for any one

23    of your opinions that reference McKesson, we

24    need to look at all of your opinions that

 1    reference McKesson?

 2         A.    Not necessarily.  But --

 3         Q.    Okay.

 4         A.    Not necessarily, no.

 5         Q.    Then how would we know, from

 6    looking at your report, sir, anything but

 7    other than the one document that you list in

 8    Exhibit B.85 which you list as the only

 9    support for your Opinion 85?

10         A.    You would ask me here.  Okay?

11    Or you could search the report for all of the

12    McKesson opinions, which are searchable by

13    McKesson.

14              You could pull the documents,

15    as I have done, and put them all in a

16    Redweld, and then you'd have everything that

17    I wrote that might be relevant to all of my

18    McKesson opinions.

19         Q.    Okay.  So what you're saying

20    is, if I took everything in your report that

21    mentioned McKesson, each of the McKesson

22    opinions, and put them together, I would have

23    the basis for any one of your McKesson

24    opinions?

1     A.      No, not necessarily.

2             If you wanted to know if there

3     were other opinions that related to this

4     opinion, then you'd look at the other

5     opinions and say, "Oh, I see.  That's related

6     too," because there's a contract between

7     Purdue and McKesson for marketing services,

8     which is obviously related to this Redweld.

9     Q.      You don't provide that roadmap

10    in your report, do you?

11    A.      No.  You'd have to actually

12    search for all of the McKesson opinions and

13    assume and find the contract between McKesson

14    and its distributors showing that they were

15    marketing for them.

16    Q.      Okay.

17            Now, are you willing to agree,

18    sir, that if we take the compilation of each

19    of the opinions that mentions McKesson, then

20    we would have the full set of pieces of

21    evidence that you relied on for -- that you

22    possibly relied on for any one McKesson

23    opinion?

24    A.      No.

1          Q.     So there's no way for us to

2     know the full set of evidence that you relied

3     on for any one McKesson opinion?

4          A.     No.  Not true.

5          Q.     You don't believe that's true?

6          A.     Correct.

7          Q.     There is a way for us to know

8     the full set of evidence that you relied on

9     for any one McKesson opinion?

10         A.     True.

11         Q.     In your report you say that

12    somewhere?

13         A.     No.

14                It depends on the opinion.

15                Maybe.  Yes and no.  Probably

16    "yes" and "no" is the answer to that

17    question.

18         Q.     When you say "It depends on the

19    opinion," what do you mean?

20         A.     I mean, some opinions may have

21    all of the documents that I could find

22    relevant to that opinion.

23                Other opinions may -- may be

24    supported by other opinions also in the

 1    report.

 2         Q.    You don't tell us in any of

 3    your opinions that this opinion also relies

 4    on evidence related to another opinion;

 5    right?

 6              There's no -- there's no

 7    opinion that says that?

 8         A.    There's no cross-reference

 9    opinion.  I think that's -- I think there are

10    a couple of cross-reference opinions, but in

11    general that's correct.

12         Q.    And there's no way for us to

13    know if we're looking at any one opinion,

14    that this happens to be one of the opinions

15    that lists all of the information that you

16    relied on?

17         A.    Well, that's true.  Absolutely.

18    Because all of the opinions -- all of the

19    information I relied on is all the

20    information that I reviewed, all of the

21    database.  I didn't put that in every

22    opinion.

23         Q.    You relied on the entire

24    database to come to each and every one of

1    your opinions?

2        A.    Sure.  I searched the entire

3    database.  That means I relied and considered

4    the documents in the database.  The same with

5    the medical literature.

6        Q.    And you did all of that in four

7    months?

8        A.    Sure.

6        Q.      Okay.  So --

7        A.      I'm not trying in each of these

8   opinions to give you every piece of evidence

9   that may support the opinion.  I didn't have

10  enough time to do that.

11       Q.      Well, you had enough time to

12  come to the conclusion; right?

13       A.      I did.

14       Q.      You had enough --

15       A.      With the evidence that I

16  thought I had.

17       Q.      And you had enough time to

18  figure out that you had enough evidence for

19  that conclusion; right?

20       A.      Right.

21       Q.      So surely you had looked at the

22  evidence in order to come to that conclusion;

23  right?

24       A.      Right.

1      Q.     But you didn't have time to

2   then simply note the documents?

3             MS. CONROY:  Objection.

4             THE WITNESS:  I couldn't note

5         for every opinion all the evidence

6         that I looked at to -- that related to

7         that particular opinion.  It would

8         take too long and it would be too

9         voluminous.

10      Q.     (BY MS. SAULINO)  We looked

11   earlier today at your steps of your

12   evidence-based medicine method; right?

13      A.     Correct.

14      Q.     Okay.  And on page 41, you list

15   step 2.  3.3.2.

16      A.     Hang on one second.

17             What page?

18      Q.     Page 41.

19      A.     Okay.

20      Q.     Step 2 is "Systematic retrieval

21   of best evidence available"; right?

22      A.     Correct.

23      Q.     So you didn't do that here?

24             MS. CONROY:  Objection.

1          THE WITNESS:  Well, I did the

2     best I could with the time I had.

3          Q.    (BY MS. SAULINO)  So you're

4  saying you didn't have enough time to provide

5  an adequate expert report?

6          A.    No.

7          I -- what I'm saying is, I

8  got -- what I gave you, in combination with

9  that last example, is the best evidence that

10  I could find.











7    Q.    All right.  Let's look at --

8    A.    Did you want to mark this one

9    or no?

10   Q.    We did mark it.  I gave you the

11   marked copy.

12   A.    Oh, I'm sorry.

13         Do you want to take -- hang on

14   one second while I give this to the court

15   reporter.

16         MS. SAULINO:  Sure.

17   Q.    (BY MS. SAULINO)  Let's look at

18   Exhibit -- let's look at page 77 of your

19   report.

20   A.    Okay.

21   Q.    Do you see Opinion 7.100?

22   A.    I do.

23   Q.    Opinion "Healthcare

24   Distribution Management Association, HDMA,

 1    now HDA, was responsible for sale of

 2    unapproved opioids"; right?

 3         A.    Correct.

 4         Q.    And you say, "See Exhibit B.100

 5    hereto attached"; right?

 6         A.    Correct.

 7         Q.    And we -- I'm going to hand you

 8    Exhibit B.100, unless you have a different

 9    version of it.

10         A.    Which number is it?

11         Q.    100.

12         A.    I have a different version.

13         Q.    Okay.  Shall we mark that one?

14         A.    If you like.

15         Q.    Okay.  So I've handed you what

16    we've marked as Exhibit 9 to your deposition,

17    which is your version of Exhibit 100 to your

18    report.

19         A.    Right.

20               (Whereupon, Deposition Exhibit

21         Egilman 9, Opinion - HDMA was

22         responsible for sale of unapproved

23         opioids, was marked for

24         identification.)

1    Q.    (BY MS. SAULINO)  And again,

2  here, for Opinion 100, you cite a single

3  exhibit; right?

4    A.    Well, I cite a single exhibit,

5  but it references several FDA documents.

6    Q.    Your opinion does not reference

7  several FDA documents; right?  The exhibit

8  itself does?

9    MS. CONROY:  Objection.

10    THE WITNESS:  The exhibit,

11    which is the basis of the opinion,

12    references several FDA documents.

13    Q.    (BY MS. SAULINO)  And when I

14  say, "The exhibit itself does," I mean not

15  your writing, but in fact the e-mail chain

16  dated Monday April 27, 2009.

17    A.    That's correct.

18    Q.    Okay.  So you're saying that

19  the FDA documents that are referenced in the

20  document that you have screenshotted into

21  Exhibit 100 should also be considered part of

22  the basis of your opinion?

23    A.    Yes.

24    Q.    Okay.  And that's everything

1    that is the basis of your Opinion 100?

2         A.    Correct.

3         Q.    And so there were no other

4    interviews that supported this opinion?

5         A.    Correct.  I didn't know I could

6    interview your personnel.

7         Q.    No deposition testimony?

8         A.    Correct.  I can't take

9    depositions for sure.

10        Q.    Well, you said you read a

11   number of them, sir.

12        A.    Right.  There's no deposition

13   testimony on this issue.

14        Q.    Did you look?

15        A.    Yes.

16        Q.    And so you don't cite any

17   deposition testimony about the HDMA at all

18   here, right?

19        A.    Not on this opinion.  That's

20   right.

21        Q.    Okay.

22              There's no other data listed

23   here; right?

24              MS. CONROY:  Objection.

1           THE WITNESS:  Correct.

2      Q.      (BY MS. SAULINO)  No documents

3  other than those we've just talked about;

4  right?

5      A.      Correct.

6      Q.      There's no way that we can see

7  your original question or hypothesis for this

8  opinion; right?

9      A.      Right.  You'd have to put a

10  "did" in front of the opinion.

11      Q.      But you don't tell us here;

12  right?

13      A.      I didn't put the "did" in.

14      Q.      You didn't give us any

15  indication that we were supposed to assume a

16  "did"; right?

17      A.      Correct.

18      Q.      And there's no indication here

19  that you've revised your hypothesis or

20  ensured it held true under repeated study;

21  right?

22      A.      Except for checking the

23  underlying of FDA documents, right.

24      Q.      So by checking the underlying

1    FDA document, we would know that you started

2    with a different original hypothesis and

3    revised it?

4           A.     No.

5           Q.     Okay.  Well, that was my

6    question.

7           A.     No, it wasn't.

8           Q.     There's no way for to us know

9    if you started with a different original

10   hypothesis and revised it; right?

11          A.     That's correct.

12          Q.     And you say checking the

13   underlying FDA documents.  What do you

14   believe that would provide us?

15          A.     Well, that was under the

16   question about whether you'd done -- checked

17   other supporting documents or contradictory

18   evidence that indicated that this was not

19   true.

20          Q.     And so you're saying you

21   checked the FDA documents that were cited in

22   this e-mail --

23          A.     Correct.

24          Q.     -- as contradictory evidence?

1        A.     No.  As either confirmatory or

2   contradictory.

3        Q.     Which one was it?

4        A.     Confirmatory.

5        Q.     But you didn't provide those

6   documents here?

7             MS. CONROY:  Objection.

8             THE WITNESS:  No, I just cited

9        them in the context of -- they were in

10       the document that was the basis of the

11       opinion.

12       Q.     (BY MS. SAULINO)  And you

13   didn't explain how those documents were

14   confirmatory of your opinion.  Right?

15       A.     No, I didn't explain that, but

16   there's a quote from the documents that's a

17   correct quote in this e-mail.

18       Q.     In the e-mail that you're

19   citing, there is a quote from one of the FDA

20   documents?  That's what you're saying?

21       A.     Correct.

22       Q.     Okay.  That's not your quote.

23   That's not something you pulled out; right?

24             MS. CONROY:  Objection.

1          THE WITNESS:  That's correct.

2     It says it's an FDA quote.

3          Q.    (BY MS. SAULINO)  And you're

4     aware, correct, Dr. Egilman, that the HDMA is

5     a trade association?

6          A.    I am.

7          Q.    And the HDMA doesn't actually

8     sell anything?

9          A.    Do you mean sell any product?

10         Q.    Right.

11         A.    That's correct.

12         Q.    Okay.

13         A.    Are you done with this one?

14         Q.    I am.  Thank you.

15         A.    I've been accused of stealing

16    exhibits before, so I just wanted to make

17    sure I give them to the court reporter.

18         Q.    I'm sure she appreciates it.

19               Let's look at page 82 of your

20    report.

21         A.    Okay.

22               Okay.









23      If I could look at page 65 of

24  your report, please.  The top?

1      A.     Okay.

2      Q.     Do you see Opinion 7.21?

3      A.     I do.

4      Q.     And your opinion there is

5  "Walgreens' solution to red flag stores was

6  to find a distributor who would sell to them.

7  All three Walgreens distributor facilities

8  failed to implement SOM procedures"; right?

9      A.     Correct.

10     Q.     Okay.  And then you refer to

11  Exhibit B.21; right?

12     A.     Correct.

13     Q.     Okay.  I have a copy if you

14  would like it.

15     A.     Okay.  I'll use yours.

16     Q.     Okay.  I'm handing you what's

17  been marked as Exhibit 11.

18           (Whereupon, Deposition Exhibit

19           Egilman 11, Opinion - WAG solution to

20           red flagged stores was to find a

21           distributor who would sell to them.

22           All 3 WAG distributor facilities

23           failed to implement SOM procedures,

24           was marked for identification.)

1          Q.     (BY MS. SAULINO)  And looking

2    at Exhibit 11 --

3          A.     Okay.

4          Q.     -- it appears that you cite for

5    this opinion one document; right?

6          A.     Correct.

7          Q.     And it is an e-mail that you

8    have screenshotted onto the page; right?

9          A.     Correct.

10         Q.     Okay.  And you provided some

11   red arrows there; right?

12         A.     Correct.

13         Q.     You don't list any other

14   documents; right?

15         A.     Not for this opinion -- not in

16   this -- not in Opinion B.21, but there are a

17   lot of other documents that relate to this

18   issue in the other opinions.

19         Q.     Okay.  You don't provide any

20   cross-referencing of those other opinions;

21   right?

22         A.     Correct.  You'd have to read

23   them.

24         Q.     You don't provide any way --

1    any roadmap that would tell us precisely

2    which of your other 490 opinions we should be

3    looking at; right?

4              MS. CONROY:  Objection.

5              THE WITNESS:  No.

6              I think it's pretty clear when

7         you look at the documents that they

8         relate to the -- this situation

9         between Walgreens, Jupiter, Cardinal,

10        and ABC.  You know, there's a whole

11        narrative there.

12        Q.    (BY MS. SAULINO)  You don't

13   write anywhere in this report or its attached

14   exhibits what you believe is obvious about

15   the situation you just described; right?

16        A.    No.

17        Q.    You don't provide any kind of

18   roadmap to your initial hypotheses; right?

19              MS. CONROY:  Objection.

20              THE WITNESS:  That's true.

21        Q.    (BY MS. SAULINO)  You don't

22   provide the question that you were looking to

23   answer; right?

24        A.    That comes under the assignment

1    question generally, so that's -- that's where

2    that question is.

3          Q.    Well, you didn't provide the

4    assignment question in your report either,

5    did you?

6          A.    That's correct.

7          Q.    Okay.

8                You don't show us any

9    re-evaluation from other data or documents in

10   this opinion; right?

11         A.    No.  There are other documents

12   that relate to this situation.

13         Q.    But you don't list them here;

14   right?

15         A.    They're not listed in B.21, but

16   they are otherwise in the report, including

17   reference to Jupiter Walgreens.

18               I cite the Walgreens

19   $80 million payment for violating DEA rules

20   on selling and a variety of other documents.

21         Q.    You don't cite that here?  In

22   Exhibit B.21?

23         A.    I do not cite those other

24   opinions that relate to this opinion in this

1    agreement.  That is correct.

2          Q.    Nowhere do you tell us that

3    those other opinions relate to this opinion,

4    explicitly in your report.  Right?

5          A.    That's correct.

6          Q.    You don't cite any deposition

7    testimony here; right?

8          A.    Correct.

9          Q.    Okay.  And this single document

10   that we're looking at right here, that you

11   provide here, as support for your opinion,

12   doesn't even mention anywhere in it SOM

13   procedures; right?

14         A.    By name, correct.

15               MS. SAULINO:  Okay.  We can go

16         off the record.

17               THE VIDEOGRAPHER:  Off the

18         record.  4:13.

19               (Recess taken, 4:12 p.m. to

20         4:25 p.m.)

21               THE VIDEOGRAPHER:  We are back

22         on the record at 4:26.

23         Q.    (BY MS. SAULINO)  Okay.

24   Dr. Egilman, a number of your opinions in

1    your report pertain to what you call "the

2    venture."  Correct?

3         A.    Yes.

4         Q.    And on page 51 of your report,

5    you define the venture at 4.4; right?

6         A.    Correct.

7         Q.    And you say, "As referred to

8    herein, 'the venture' refers to all

9    defendants in the opiate litigation,

10   including their associated individuals and/or

11   organizations acting in a concerted fashion

12   separately or together to effect a particular

13   objective"; right?

14        A.    Correct.

15        Q.    That's a definition that you

16   came up with; right?

17        A.    I'm sure I discussed it with

18   the lawyers.

19        Q.    Okay.  Do you remember when

20   that was?

21        A.    Over the last two or three

22   months.

23        Q.    And was that a definition that

24   you came up with or that they gave you?

1        A.        It was a discussed definition

2    between the two of us.  I don't know -- I

3    can't tell you which words came from whom.

4        Q.        Okay.  So this definition is

5    not something that was the result of your

6    iterative process of research?

7        A.        Well, that's not necessarily

8    true, no.

9        Q.        Well, you just said that it

10   came from a discussion with the plaintiffs'

11   lawyers; right?

12       A.        Yeah, but it also -- my part of

13   that came from reading the documents and

14   trying to figure out what had gone on.

15       Q.        Are discussions with

16   plaintiffs' lawyers typically a part of your

17   expert process?

18       A.        Certainly they are.  Depends on

19   what the issues are.  For example, I was

20   asking for depositions --

21       Q.        Okay.

22       A.        -- to be taken.  I was asking

23   for further discovery to be taken.

24       Q.        You've answered my question,

1    sir.  You said, "Certainly they are."

2          A.    Yeah, but I have to -- it's not

3    everything.  It's limited to certain areas.

4          Q.    Okay.

5          A.    So it's just "Certainly they

6    are" is a misleading little snippet.  Which I

7    prefer not to leave on the record alone.

8          Q.    Well, sir, I asked you:  "Are

9    discussions with plaintiffs' lawyers

10   typically a part of your expert process?"

11              And your answer was, "Certainly

12   they are.  Depends on what the issues are,"

13   and then you started giving examples.

14              I don't think we need any

15   further examples.  I understand your answer.

16   Okay?

17         A.    No.  But go right ahead.

18         Q.    My next question for you,

19   though, is --

20         A.    Just let my put on the record

21   my answer is incomplete.  Now go ahead.

22         Q.    My question for you, sir, is

23   your definition for "the venture," do you

24   document anywhere here the iterative process

1    that you went through to come up with this

2    definition?

3         A.    No.  And there's -- there's, I

4    think there are at least three different

5    times when I discussed the venture in the

6    report, and it's expanded on in at least one

7    of those times.

8         Q.    Okay.  So looking at the

9    definitions that you provide on page 51, we

10   can't rely on that definition?

11             MS. CONROY:  Objection.

12             THE WITNESS:  No, you can rely

13        on that definition.  There's an

14        expanded version of this definition --

15        well, first of all, let me see

16        Exhibit 473.  Maybe we're talking

17        about the same thing.

18        Q.    (BY MS. SAULINO)  We will get

19   to Exhibit 473.  I'm just looking at the

20   definition that you put here in your report

21   here, sir, under the section called

22   "Definitions."

23        A.    Okay.  Well, hold on one

24   second.

1    Q.    I have a copy if you need it.

2    A.    Sure.

3    Q.    I've handed you Exhibit 12 to

4    your deposition, Dr. Egilman.

5              (Whereupon, Deposition Exhibit

6         Egilman 12, Definition - "Venture"

7         refers to all defendants (including

8         their associated individuals and/or

9         organizations) and covers all aspects

10        of marketing, distribution, and supply

11        they engaged in, was marked for

12        identification.)

13             THE WITNESS:  Right.  So this

14        is exactly what I was referring to.

15        This is -- the opinion's not limited

16        to the definition in 4.4, but there's

17        an expanded basis for the opinion

18        which elaborates more -- elaborates on

19        what that means.

20    Q.    (BY MS. SAULINO)  I see that,

21    sir.

22             This does not provide us any

23    information about how you came to the

24    opinion; correct?

1          A.      You mean came to the

2    definition?  Or the opinion?

3                  It's not an opinion; it's a

4    definition.

5          Q.      Okay.  Actually, sir, it is

6    both.  If you look at page 133 of your report

7    at 7.473?

8          A.      What page?

9                  What page?

10         Q.      133.

11         A.      Okay.  Where?

12         Q.      I'm looking at 7.473, which

13   also refers to Exhibit B.473, which is the

14   exhibit that we're looking at right now which

15   is Exhibit 12 to your deposition.

16         A.      This is a different issue.

17         Q.      Okay.

18         A.      This is -- this is called

19   "Opinion definitions."  It's really a

20   definition.  I mean, so you could call that

21   an error or a typo.

22                 This should be "Definition."

23         Q.      Well, it's listed in your

24   Opinions section as 473, right?

1        A.        Yeah, it's listed as 473 as an

2   opinion, but if you'll look at the actual

3   opinion, it's listed as a definition.

4        Q.        Okay.  So this is not an

5   opinion?

6        A.        It's a definition.  If you want

7   to call it an opinion, I'm not offended.

8        Q.        Sir, I'm looking at what you

9   put in your report, which says that it was an

10   opinion, and it's in the opinion section, and

11   it cites the very same document that is cited

12   in the "Definitions" section.

13        A.        Well, the same document is --

14   has two different headings to it.  In the

15   summary of opinions, it's listed as an

16   opinion.  But if you look at 473, the word

17   "opinion" doesn't appear.  Okay?  Whereas

18   most of my opinions actually have the word

19   "opinion."  Here, it calls it -- it says

20   "Definition."

21             So I would say that what you

22   see on 133, the word "opinion" -- I mean, it

23   doesn't really matter, to tell you the truth.

24   You can call it an opinion.  You can call it

1    a definition.  Because the definition is

2    probably an opinion.  But it's definitely --

3    I meant it to frame what I was referring to

4    when I used the word "venture."

5        Q.    Okay.  Well, as you noted,

6    these two definitions on page 133 and on

7    page 51 actually say different things; right?

8        A.    Not really.  I mean, because

9    one says "Opinion-Definition" and the other

10   says "Definition" without "Opinion."

11       Q.    I'm referring to what happens

12   after the word "Definition."

13       A.    Yeah, there's a modifying

14   sentence in 473 that doesn't appear in --

15   that appears in 473 that was not typed into

16   the same opinion when it was typed that

17   appears on page 133.

18       Q.    Did you do that typing

19   yourself, sir?

20       A.    I don't think I did that

21   typing.

22       Q.    Who did?

23       A.    I don't know.  Probably one of

24   my staff did the typing.

1        Q.      Okay.  And so you're saying now

2    that you did not intend 7.473 to be an

3    opinion in your report?

4        A.      No, I intended 473 to be what

5    473 says.

6        Q.      Which is a definition?

7        A.      Which is a definition.

8                I also intended 473, the

9    summary of 473 to be identical to the actual

10   opinion -- the actual definition 473, so

11   what's in this summary of opinions is missing

12   the last sentence.

13       Q.      Okay.

14               And then under -- and then you

15   provide a basis; right?  For the definition?

16       A.      Correct.

17       Q.      Okay.  And the basis for the

18   definition is -- you provide two sentences,

19   and then the second sentence has an A, B, and

20   C; right?

21       A.      Correct.

22       Q.      Okay.  You don't cite any

23   documents; right?

24       A.      Not in this definition,

1    correct.

2         Q.    Well, not in -- not on page 51

3    in the "Definitions" sections; right?

4         A.    Correct.

5         Q.    Well, except for Exhibit B.473.

6         A.    Correct.

7         Q.    And not on page 132 under

8    opinion -- I'm sorry, and not on page 133,

9    under Opinion 7.473; right?

10        A.    Correct.

11        Q.    Except for Exhibit B.473;

12   right?

13        A.    Correct.

14        Q.    And then if we look at

15   Exhibit B.473, there are no documents cited

16   here either; right?

17        A.    Correct.

18        Q.    Okay.  You also don't cite to

19   any deposition testimony; right?

20        A.    Correct.

21        Q.    You also don't cite to any

22   literature; right?

23        A.    Not here.

24        Q.    Right.  You don't cite to any

1    literature here, right?

2         A.    Not in this opinion, not in

3    473.  There's other literature cited to that

4    describes the same activity by Saper.

5    Saper's speech.

6         Q.    Okay.

7         A.    He didn't call it a venture.

8    He called it a narco pharma.

9         Q.    Okay.  And you don't link that

10   citation to this definition; right?

11        A.    I didn't use "narco pharma."

12        Q.    So you don't link that citation

13   to this definition in your report; right?

14        A.    Correct.  But he describes the

15   same activities in his 2008-2009 talk, where

16   he calls what I call the venture, narco

17   pharma.

18        Q.    So you don't provide anywhere

19   in either of the places where you cite the

20   definition nor in Exhibit B.473, anywhere to

21   look to see how you came to the conclusion

22   that this was the definition for venture;

23   right?

24        A.    No, it's my definition for

1    venture.

2         Q.    Well, it's yours and the

3    plaintiffs' lawyers; right?

4         A.    Yeah, they agreed with this

5    definition of venture.

6         Q.    And if they had disagreed, you

7    would have changed it?

8         A.    No.  You don't know me very

9    well.

10        Q.    Well, you told me just a couple

11   of minutes ago that this was a definition

12   that was created in combination with them;

13   right?

14        A.    In conversation with them, but

15   if they disagreed with something that I

16   thought should be here, I wouldn't change it.

17             MS. SAULINO:  Whoever is on the

18        phone, can you mute, please?

19        Q.    (BY MS. SAULINO)  Well, now,

20   let's look at --

21        A.    Are you done with this one?

22        Q.    For now, but don't give it

23   away.  Keep it nearby.

24             MS. SAULINO:  And, Debbie,

1    we're out of stickers.

2         Q.    (BY MS. SAULINO)  If you could

3    look at page 135 of your report.

4         A.    Sure.

5         Q.    The very last opinion on that

6    page.

7         A.    Yeah.

8         Q.    Are you there?

9         A.    I just want to -- these --

10   these things are all being named Egilman?

11   All of these exhibits?

12              MS. SAULINO:  Oh, I hadn't

13        noticed that.

14              THE WITNESS:  Yeah, I did

15        notice that.  Is that how you want it

16        to be?

17              MS. SAULINO:  We probably

18        should correct it to just Egilman.

19              THE WITNESS:  That would be my

20        thought, but I'm not thinking here.

21              MS. SAULINO:  Okay.  Well,

22        thank you for that.

23              (Discussion off the record.)

24              MS. SAULINO:  Thank you.  We'll

1           discuss it with the court reporter at

2           the next break and we'll work it out.

3           Thank you.

4                   THE WITNESS:  No problem.

5           Sorry to interrupt.

6           Q.    (BY MS. SAULINO)  So last

7      opinion on page 135.  7.488.

8                   "Opinion, these are the members

9      of the venture."  Do you see that?

10          A.    Correct.

11          Q.    Okay.  I have a copy of

12     Exhibit B.488.  If you'd like it.

13          A.    Right.  You've got to include

14     489, because that also includes additional

15     members of the venture.

16          Q.    Well, you don't cross-reference

17     those two --

18          A.    No, they're just sequential.

19          Q.    Okay.  But you told me earlier

20     that they weren't necessarily sequential when

21     they went together; right?

22          A.    They aren't.  In this case

23     they're sequential.

24          Q.    And so there was no way for us

1    to know that those two were supposed to be

2    read together except that they were

3    sequential?

4         A.    No.

5         Q.    You don't say anywhere in your

6    report that those two opinions are supposed

7    to be read together; right?

8         A.    Explicitly in those words?  No.

9         Q.    Okay.

10             Well, let's look at 4.88 first.

11             Do you want it or do you have

12   your own copy?

13        A.    I don't think it matters.  I'll

14   have this one.

15        Q.    Okay.

16             MS. SAULINO:  It's marked as

17        Exhibit 14.

18             (Whereupon, Deposition Exhibit

19        Egilman 14, Opinion - these are the

20        members on the "venture" with two

21        Redweld folders", was marked for

22        identification.)

23             MS. SAULINO:  I think we

24        realized that we were missing a 13.

1          THE WITNESS:  13 is always good

2     to be left out.

3          Q.    (BY MS. SAULINO)  If you look

4     at Exhibit 4.88 under "Basis," you provide a

5     spreadsheet with colors; right?

6          A.    Correct.

7          Q.    And it is four pages long and

8     then you provide some citations on page 5;

9     right?

10          A.    Right.

11          Q.    Okay.  So these are the members

12     of the venture; is that right?

13          A.    Across the top.

14          Q.    Across the top of what?

15          A.    Across the top.  Name, type.

16     The companies across the top are the members

17     of the venture.  And they were also in red.

18          Q.    And where do you explain that

19     in your report or in this exhibit?

20          A.    I don't.

21          Q.    So there was --

22          A.    Except elsewhere where I name

23     the defendants in the case as the members of

24     the venture.

1        So it's -- they're here, by the

2   same name that they're in the case.

3        Q.    Do you believe that these are

4   the only defendants in the case?

5        A.    No.  They're also in 489.

6        Q.    Okay.  So when you say, in

7   Opinion 4.88, "These are the members of the

8   venture," you don't actually mean that?

9        A.    No, I mean it.  You've got

10  names across the top, and then you've got in

11  red.  And what I said explicitly elsewhere

12  is -- and we've read that already -- that the

13  defendants in the case -- we read that

14  several times during this deposition -- are

15  members of the venture.

16       Q.    Well, I understand that you say

17  different things in different places about

18  who makes up the venture, Dr. Egilman, which

19  is why I'm asking you these questions,

20  because it's unclear to me from your report

21  who makes up the venture.

22       A.    Okay.  Do you want to ask that

23  question?

24       Q.    From looking at Document 7.488,

1    when you say, "These are the members of the

2    venture," you're now telling me that this is

3    not -- that that opinion is incomplete?

4         A.    Well, I said you had to

5    conclude -- you had to include 4.89, for one

6    thing.

7         Q.    All right.

8         A.    And I've already said elsewhere

9    that the members of the venture were the

10    manufacturers and distributors in the case.

11         Q.    But you don't say that in

12    Opinion 7.488; right?

13         A.    I don't say that in

14    Opinion 4.88 explicitly, that's right.

15         Q.    But you don't say it

16    explicitly, nor do you say it implicitly,

17    sir; right?  You say "These are the members

18    of the venture," not "These are some of the

19    members of the venture"; right?

20         A.    That's correct.

21         Q.    Okay.

22         A.    That one should have been

23    clear.

24              This had a different purpose

1  originally, this document.

2      Q.    All right.  Dr. Egilman, I'm

3  trying to get you Exhibit 489.  We seem not

4  to have it in our little box here.

5      A.    Do you want me to see if I have

6  it in my box?

7      Q.    Oh, it is in the binder that is

8  Exhibit 1.  And there may be other copies

9  your counsel have.  But I won't be able to

10  provide Ms. Conroy a copy from me.

11         MS. SAULINO:  Okay.  Let's go

12     off the record for about a minute.

13         THE VIDEOGRAPHER:  Off the

14     record.  4:46.

15         (Recess taken, 4:45 p.m. to

16     4:47 p.m.)

17         THE VIDEOGRAPHER:  Back on the

18     record at 4:48.

19      Q.    (BY MS. SAULINO)  Okay.

20  Dr. Egilman, I'm going to give you an exhibit

21  sticker, or I can put it on if you'd like.

22         So we're marking as Exhibit 15,

23  Exhibit 4.89 to your report?

24         (Whereupon, Deposition Exhibit

1          Egilman 15, Opinion B.489 Redweld

2          folder, was marked for

3          identification.)

4          Q.     (BY MS. SAULINO)  Which is --

5          A.     4.89 is actually this and that.

6          Q.     I'm sorry, when you say "this

7     and that," I have one page that is 4.89.

8     That was what was produced to us.  You have

9     something else?

10         A.     Yeah.  I think you were

11    supplied all these underlying documents.

12              MS. CONROY:  I don't think the

13         notebooks have all of the underlying

14         documents.

15              THE WITNESS:  You don't have

16         the underlying documents.  You weren't

17         given all of this.

18         Q.     (BY MS. SAULINO)  Dr. Egilman,

19    I'm just looking at the one page that we've

20    marked as Exhibit 15.  I want to work through

21    this, so let me figure this out.

22              So Exhibit 15 in front of you

23    is one page; right?

24         A.     Yeah, that's correct.

1    Q.    So -- and you'd agree with me

2  that there are no documents cited here;

3  right?

4    A.    That's correct.  They were

5  provided separately as attached to

6  Exhibit 15.

7    Q.    But that's not indicated

8  anywhere here on --

9    A.    They were provided with the

10  opinion, digitally.

11    MS. CONROY:  They're attached

12    electronically to the document.

13    Q.    (BY MS. SAULINO)  So it's your

14  testimony that there were supposed to be

15  documents that went along with opinion 4.89,

16  Exhibit B.489?

17    A.    Yeah.  All of these.

18    Q.    But that they're not cited on

19  the page that is the basis for your opinion?

20    A.    Well, that's the index,

21  basically, to these documents.

22    Q.    I see what you're saying, sir,

23  but I'm trying to figure out what you relied

24  on here.  Because we didn't have those

1   documents as being associated with your

2   opinion.

3            MS. CONROY:  Objection.

4            THE WITNESS:  Well, I don't

5        know that that's the case or not.

6        Q.    (BY MS. SAULINO)  Okay.

7        A.    I'm telling you that the way

8    the report was delivered by me, it included

9    the documents in my hands.

10       Q.    All right.  Can I see those

11   documents?

12       A.    Sure.

13       Q.    Can I have the little Redweld

14   so I don't --

15       A.    Sure.

16       Q.    All right.  So let's make

17   Exhibit 15 to your deposition what you are

18   calling Exhibit 4.89, which is the one

19   page -- I think it's in that blue folder.

20       A.    Right.

21       Q.    Okay.  Which is the one page

22   that you're calling an index, plus the

23   Redweld that you're saying is the backup?

24            We'll make that all Exhibit 15

1    to your deposition.

2         A.    Sure.

3         Q.    Okay.

4         A.    Do you want to put the sticker

5    on the folder?

6         Q.    Yeah.  That's what I'm going to

7    do.

8              Okay.  And your Opinion 4.89 is

9    "Members of the venture entered agreements

10   with the DEA and DOJ for violating the law";

11   right?

12        A.    Correct.

13        Q.    And you say that -- you say now

14   that this opinion was supposed to be read in

15   combination with Opinion 4.88 as comprising

16   all of the members of the venture?

17        A.    Yes.

18        Q.    Okay.  But, again, the Redweld

19   that you just handed me still doesn't tell us

20   that, does it?

21             MS. CONROY:  Objection.

22             THE WITNESS:  This says

23        "Members of the venture entered

24        agreements with the DEA and DOJ for

1          violating the law," so I think it does

2          say that.

3          Q.     (BY MS. SAULINO)  Well, I agree

4    that you read what the opinion says, but it

5    doesn't say that it should be read together

6    with 4.88 to comprise the members of the

7    venture; right?

8          A.     That's correct.

9          Q.     Okay.

10         Now, do you still have B.473

11    that I asked you to hang on to?

12         I believe it's Exhibit 12.

13         A.     Yes, I do.

14         Q.     Okay.

15         Exhibit 12 to your deposition?

16         A.     Yes.

17         Q.     So I'm still trying to figure

18    out what the basis is for your determining

19    who made up the venture other than the words

20    that you use here on Exhibit 12.

21         You don't cite any documents in

22    Exhibit 12, as we've already agreed; right?

23         A.     That's correct.

24         Q.     Okay.  We've already agreed you

1    don't cite any kind of evidence; right?

2         A.    For the definition.  Correct.

3         Q.    Okay.

4               And so there's no way for us to

5    reconstruct from your written opinion or the

6    exhibits to your written opinion how you came

7    to determine who the members of the venture

8    were; right?

9         A.    No.

10        Q.    There is a way for us to

11   reconstruct that?

12        A.    Yes.

13        Q.    From your written materials?

14        A.    Yes.

15        Q.    And what is that method?

16        A.    Well, first I named them

17   "Members of the venture."  And then if you

18   want to know how they got to be members of

19   the venture, you look at the definition.

20   They relied on each other's lies about

21   addiction and treating mild pain to push the

22   drugs.  They worked together to influence

23   public perceptions of the class of narcotic

24   drugs with respect to drug toxicity, quote

1    untreated pain, closed quote, and they

2    encouraged the use of narcotics instead of

3    non-medication treatments or less addictive

4    drugs.

5           So that -- that's the main

6    activities.

7           Now, you know, elsewhere, I --

8      Q.    So I think --

9      A.    I think elsewhere --

10     Q.    I think we're good there, sir.

11          So you started with saying,

12   "First, I named the members of the venture."

13   And as we've just seen, you named them

14   differently in different places; right?

15     A.    I'm just saying my answer is

16   incomplete.  Now go ahead.

17     Q.    You named them differently in

18   different places; right?

19     A.    That's correct.

20     Q.    And here, the basis that you

21   just read to us doesn't have any citation of

22   any kind of support; right?

23     A.    The basis for the definition

24   doesn't have any cites.

1    Q.    So there are no --

2    A.    But the -- but there are lots

3    of citations, examples, et cetera, for how

4    various members of the venture met the

5    definition I laid out here.

6    Q.    Well, I realize that you are

7    testifying to that, sir, but there's no way

8    for us to see how you came to that conclusion

9    by looking at the definition of the venture

10   presented in B.473; right?

11   A.    Wrong.

12   Q.    And why do you say that's

13   wrong?

14   A.    Well, because we could start

15   with B7.  If you look at B7 --

16   Q.    Sir, my question was about

17   B.473.

18   A.    You asked, "Why do you say

19   that's wrong?"  Okay?  That's a wide

20   question.  That is not a yes-or-no question,

21   as far as I can determine it.

22   Q.    Respectfully --

23   A.    I cannot answer that question

24   "yes" or "no."

1      Q.     Respectfully, sir --

2      A.     If I cannot answer the

3  question, then no problem.  So I have no

4  answer that's not -- because it's not a

5  yes-or-no question.  I can't answer the

6  question.  Go ahead.

7      Q.     Respectfully, sir, my question

8  was:  "There's no way for us to see how you

9  came to that conclusion by looking at the

10  definition of venture presented in B.473;

11  right?"

12              And your answer to that was

13  "Wrong."

14              We were looking at B.473 --

15      A.     Well, now you have like four

16  questions above.

17      Q.     Looking at --

18      A.     Go ahead.

19      Q.     Looking at --

20      A.     Start again.

21      Q.     Looking at B.473 --

22      A.     Right.

23      Q.     -- there's no way for us to

24  know how you came to the conclusions listed

1    in B.473 by looking at the definition of the

2    venture presented in B.473; right?

3              MS. CONROY:  Objection.

4              THE WITNESS:  There's no

5         conclusions in B.473, so I don't

6         understand the question.

7         Q.    (BY MS. SAULINO)  Okay.  And

8    what you said just prior to that is "There

9    are lots of citations, examples, et cetera

10   for how various members of the venture met

11   the definition I laid out here."

12             But we don't see those

13   citations, examples, et cetera, listed in

14   your definitions for venture where they

15   appear in your report; right?

16        A.    You don't see those examples in

17   4.73?  Correct.

18        Q.    Or 4.88?

19        A.    Or --

20             Well, no, 4.88's got examples.

21   Okay?

22             4.88's got examples.  It has a

23   Redweld folder full of legal violations where

24   the members of the venture paid fines for

1    violating the law.

2         Q.     Respectfully, sir, that was

3    4.89, but --

4         A.     Oh, I'm sorry.

5         Q.     -- I take your point.

6         A.     4.89.  Sorry.

7         Q.     Sitting here today, can you

8    name each member of the venture?

9         A.     Not without looking at the

10   notes, without making a mistake, no.

11              Maybe I can.  Let me see.  I

12   had two card stocks.

13        Q.     What are you looking at right

14   now?

15        A.     Looking at the members of the

16   venture.

17        Q.     I'm just asking you whether,

18   without looking at your notes and other lists

19   that you have there, whether you can name the

20   members of the venture.  It's a yes-or-no

21   question.

22        A.     Do you mean as a closed -- as a

23   closed-book test?

24              Maybe I can, maybe I can't.  I

1  don't know.  But I'm not going to guess.

2        Q.     All right.  So looking back at

3  B.473, which is Exhibit 12, number 1, you

4  say, "They relied on each other's lies about

5  addiction and treating mild pain to push the

6  drugs."

7        A.     Correct.

8        Q.     That's a conclusion; right?

9        A.     No, that's not a conclusion.

10  That's how you qualify for the membership.

11        Q.     And you don't provide any way

12  for us to know how you came to that

13  conclusion that that is how you qualify for

14  membership; right?

15        A.     I do not explain why that is

16  part of the definition for venture, that's

17  correct.  But I do provide examples or

18  evidence that the venture lied about

19  addiction and treating mild pain to push the

20  drugs.  That's what the whole report is

21  about, more or less.

22        Q.     You don't lay out here any way

23  for the defendants to pick up your report,

24  take your definition, reconstruct the work

1    that got you to your conclusion; right?

2         A.    Wrong.

3         Q.    You don't explicitly in writing

4    provide any way to do that, do you?

5         A.    No, that's not exactly true

6    either.  I gave you the methodology.  If you

7    look at the grounded method, there's the

8    methodology there, there's the beginning of

9    search terms.  You could then do the same

10   iterative process I did.

11        Q.    Absolutely, sir.  You and I

12   have talked at length today about the

13   processes that you used and how you didn't

14   document many steps of those processes;

15   right?

16        A.    Right.

17        Q.    Okay.

18              So there's no way for us to

19   pick up your report and recreate what brought

20   you to this conclusion.

21        A.    Well, it's an iterative

22   process.  It's never going to be the same.

23              We do it two or three times,

24   and there will be certainly minor differences

1    in what search terms you come up with and

2    what you pursue.

3              So you know, there's -- there's

4    no way to have a -- you can reproduce the

5    method.  You can reproduce the search terms,

6    and you can then look at the documents and

7    then do other iterative searches.

8         Q.    By my count, more than a third

9    of your 489 or 490 opinions pertain to the

10   venture.  Do you have any reason to disagree

11   with that?

12        A.    No reason to agree or disagree.

13        Q.    Is it your view that each and

14   every one of the opinions that is cited for

15   the venture applies to each and every

16   defendant in the opiate MDL?

17        A.    I'm not sure.

18              In the aggregate, yes.  I don't

19   know about each --

20              Well, here's a situation.

21   Depends how you define "applied to."

22              I can give you a definition

23   where I think the answer would be yes, and if

24   that's the definition you accept, the answer

1    is yes.

2         Q.    Why don't we start with my

3    first question.  Is it your view that each

4    and every one of the opinions that is cited

5    for the venture applies to each and every

6    defendant in the opiate MDL?

7         A.    Based on my understanding of

8    membership in the venture, participation in

9    the venture, yes.

10        Q.    So if we look at any one

11   opinion about the venture, we should be able

12   to find support for every defendant in the

13   opiate MDL for that opinion?

14        A.    Oh, no.  Not necessarily.

15   That's not how it works.

16        Q.    Well, so how is there any way

17   for us to understand how you applied that

18   opinion to every member of the venture?

19        A.    Works like a bank robbery.  One

20   person -- or a series -- a bank robbery

21   network.

22             So you have lots of different

23   people.  You have the guy outside watching.

24   You've got the guy inside with the gun.

1    You've got the teller who may be complicit.

2    You've got the guys in the car, the getaway

3    car, and you've got some people looking out

4    for the cops.  Okay?

5              So they're all 100 percent

6    responsible for robbing that bank.  And in

7    this case, that means destroying these

8    communities, costing them misery and some

9    money.

10              And then it goes forward and

11   back.  So in other words, that bank -- that

12   group of bank robbers, okay?  One of those

13   guys was robbing banks since 1984, okay?

14              But the other bank robbers

15   joined 1996, 1997.  Once they agree to the

16   same purpose of continuing to rob banks,

17   they're also responsible for the bank

18   robberies that go back to 1994.  And the same

19   thing going forward.

20              So by that definition of

21   concerted action, they're all participants.

22   They all don't have to hold a gun to the

23   teller's head.  They didn't all have to be

24   the guard.  They're all 100 percent

1    responsible.

2         Q.    The definition of concerted

3    action that you just laid out in your

4    testimony is not stated anywhere in your

5    report, is it?

6         A.    Correct.

7         Q.    And you haven't provided

8    anywhere in your report your basis for

9    believing that that definition applies to the

10   defendants in the opiate MDL; right?

11        A.    That's correct.

12        Q.    I'd like to look at some of

13   your venture opinions.

14              Let's look at Opinion 81 which

15   is on page 75 of your report.

16        A.    Why don't you wait a second

17   while he yanks the whole opinion.

18        Q.    Well, I can give you a copy of

19   the whole exhibit.

20        A.    Yeah.  But the exhibit books

21   have got --

22        Q.    This is the exhibit.  It's one

23   page.  Would you like it?

24        A.    I don't think so.

1           MS. CONROY:  Objection.

2           THE WITNESS:  But we'll see.

3           Okay.  You're correct.

4       Q.    (BY MS. SAULINO)  What made you

5  think that this exhibit should be more than

6  one page, Dr. Egilman?

7       A.    First, it's two pages.

8       Q.    I was only given one page,

9  Dr. Egilman, so could I see what you have?

10      A.    Sure.

11      Q.    I'm looking at what was

12  produced to us two days ago.

13      A.    Well, I'm looking at my opinion

14  that should have been produced to you.

15      Q.    Right.  Okay.  What you have

16  here, Dr. Egilman, the second page that you

17  have here is what was originally produced to

18  us which was cut off.  And so the first page

19  is what was reproduced to us.  Both were

20  represented to be the same document.

21           Is that your understanding?

22      A.    I don't have any understanding

23  about that.

24      Q.    Okay.  Well, looking at

1    Exhibit B.81, is that the basis for your

2    opinion, "The venture should have known that

3    higher doses kill and warned about this"?

4         A.     Correct.

5         Q.     Okay.  And let's mark that as

6    Exhibit 16 to your deposition.

7                (Whereupon, Deposition Exhibit

8          Egilman 16, The "venture" should have

9          known that higher doses kill and

10         warned about this, was marked for

11         identification.)

12        Q.     (BY MS. SAULINO)  You can mark

13   both pages.  And so as I just explained, the

14   first page was what was reproduced to us.

15   The second page is what we originally got,

16   which was cut off.

17               It's my understanding those

18   were supposed to be the same.

19        A.     Yes.  Okay.  I'm not fighting.

20        Q.     Okay.  So what we have here as

21   the basis for Opinion 81, first, let's look

22   at what Opinion 81 is, and that is "The

23   venture should have known that higher doses

24   kill and warned about this"; right?

1          A.     Right.

2          Q.     And here you have a screenshot

3   of the first page of an article; right?

4          A.     Correct.

5          Q.     And that's all you provide as

6   the basis for this opinion.  Right?

7          A.     Correct.

8          Q.     Okay.  You don't actually

9   attach the full article; right?

10         A.     That's apparently correct.

11         Q.     Okay.  And your opinion here,

12  the way that you have phrased it said "The

13  venture should have known that higher doses

14  kill and warned about this"; right?

15         A.     Correct.

16         Q.     You don't give a date at which

17  they should have known; right?

18         A.     No.  This is known for a long

19  period of time.

20         Q.     Okay.

21         A.     This is -- I mean, this is

22  known since, you know, probably 3500 in the

23  Greek scrolls, in the Greek, you know,

24  writing.

1    Q.    You would agree with me,

2    Dr. Egilman, that the bottom of the first

3    page of this article is cut off; right?

4    A.    Correct.

5    Q.    Okay.  Would you have any

6    reason to doubt me if I told you that this

7    article that you screenshotted here was

8    published in 2016?

9    A.    No.

10    Q.    And that is the only basis that

11    you provide for Opinion 81?

12    A.    That's the only basis listed in

13    this opinion.

14    Q.    And you don't --

15    A.    This is -- I mean, this is just

16    documenting in numbers what's been known

17    forever.

18    Q.    Well, you don't provide any

19    detail about what you believe has been known

20    forever here in Opinion 81; right?

21    A.    That's correct.

22    Q.    You don't provide any roadmap

23    to where we should look to find what you

24    believe has been known forever; right?

1        A.      That's correct.

2        Q.      You don't provide any original

3    hypothesis that you used in order to come to

4    this opinion; right?

5        A.      Correct.

6        Q.      You don't provide us any

7    roadmap of how you tested that hypothesis;

8    right?

9        A.      Correct.

10       Q.      You don't cite to any

11   deposition testimony that discusses this

12   opinion; right?

13       A.      That's correct.

14       Q.      So other than this screenshot

15   of the first page of an article from 2016, we

16   have nothing written in your report that

17   shows us how you came to the opinion in

18   Opinion 81?

19       A.      That's correct.

20       Q.      All right.

21               All right.  So let's look at

22   Opinion No. 8, which is at page 63 of your

23   report.

24               Do you have your report?

1     A.     I have the index to the report.

2     Q.     I'm sorry?

3     A.     I have the index to the report.

4     Q.     What do you mean, sir?

5     A.     Well, you keep referring to

6   this as "the report."  I think this is -- the

7   report is 35, 400 pages, I think.  So as

8   we've been going through things, you can see

9   this is not the entire report.

10     Q.     So what you are looking at in

11   front of you -- I just want to make sure on

12   the record we have -- so what's it been

13   marked as for your deposition?

14     A.     It's been marked as "Report of

15   David S. Egilman, M.D. MPH."

16     Q.     For your deposition, sir.

17   Exhibit 1F?

18     A.     Exhibit 1F.

19     Q.     So Exhibit 1F, which you were

20   handed this morning --

21     A.     Right.

22     Q.     -- which is named on the title

23   page "Report of David S. Egilman, M.D. MPH."

24     A.     Right.

1          Q.     You're telling me that that's

2     not a report.  That's just an index?

3          A.     This is the -- this is the

4     beginning of a report that's 3,200,

5     3,300 pages; correct.  With all the

6     associated documents which have even more

7     pages.

8                  That's the whole report.  Do

9     you see that?  All these boxes?  That's the

10    report.  That's what was shipped to you.

11         Q.     Actually, sir, nothing was

12    shipped to us.

13         A.     That was what was digitally

14    transmitted to you.

15         Q.     I understand what you're trying

16    to say here.  Is there any way that we would

17    know from looking at this document that is

18    titled "Report of David S. Egilman," that

19    this is not actually your report?

20                 MS. CONROY:  Objection.

21                 THE WITNESS:  It's part of the

22         report.  Do you want the whole report?

23                 Well, one way would be to say

24         oh, there's all these exhibits listed.

1    Okay?  In there.

2            And so those are obviously --

3            I'm sorry.

4            MS. SAULINO:  We need to take a

5    time out.

6            THE VIDEOGRAPHER:  Off the

7    record.  5:12.

8            (Recess taken, 5:11 p.m. to

9    5:17 p.m.)

10           THE VIDEOGRAPHER:  We're back

11    on the record at 5:18.

12           THE WITNESS:  Do you want me to

13    keep going with the answer?

14           MS. SAULINO:  Do you remember

15    where you were?

16           THE WITNESS:  I think so.

17           MS. SAULINO:  Okay.  Well --

18           THE WITNESS:  The question was

19    how would someone know that this was

20    not the entire report?

21           The answer that I gave already

22    was well, there's exhibit numbers

23    attached under -- cited in each of the

24    opinions.  So you'd know there'd be

 1          that.  And that's number one reason.

 2               Number 2A is, I think that's

 3          how it was transmitted digitally,

 4          although I didn't do the transmission.

 5          Q.    (BY MS. SAULINO)  Okay.  So I

 6     just want to clarify, Dr. Egilman.  You've

 7     referred to this document that we have marked

 8     as Exhibit 1F to your deposition as the index

 9     to your report.

10               And I'm trying --

11          A.    It's the introduction and index

12     to the opinions.

13          Q.    And so then we need to add

14     everything in B1 through 4.89, Exhibits B1

15     through 4.89.

16          A.    And the attached documents

17     which were also submitted, that in many cases

18     are supplemental to the few pages that are in

19     the "opinion" opinion.

20          Q.    Okay.

21          A.    Like we went through on that

22     Exhibit 15 that's marked here.

23          Q.    I'm following you.

24               And so if we look at what

1    you're now calling the index to your

2    opinions, we see the name of the opinion, and

3    then we go to the exhibit that matches that

4    number, and we see the support for the

5    opinion; right?

6         A.    Well, first, I don't agree with

7    the predicate.

8         Q.    I'm sorry, which predicate?

9         A.    What you're now calling the

10   index to your opinions.

11        Q.    Dr. Egilman, that was something

12   you said just before the break.

13        A.    And I just corrected it and

14   said it's the introductory materials and the

15   index.

16              And so -- next question.

17        Q.    Your report is the opinions

18   that you list in Deposition Exhibit 1F plus

19   all of the exhibits in Exhibit B1 through

20   4.89 and their attached documents.  That's

21   your report?

22        A.    No.

23        Q.    What else is a part of your

24   report?

1        A.       The methodology sections and

2     the other sections in Exhibit 1F.

3        Q.       Right.  Those are already in

4     1F; right?

5        A.       Yeah, but you didn't say it

6     that way.  When you gave your question, you

7     limited it to things called opinions.  And I

8     wanted to make sure that the record was clear

9     that it was everything in 1F.

10        Q.       I appreciate that, Dr. Egilman.

11                 Is there anything else that you

12     consider to be part of your report that is

13     not Exhibit 1F or all of the exhibits

14     attached to Exhibit B and their attached

15     documents?

16        A.       No.

17        Q.       Okay.  Let's look at page 63,

18     Opinion 7.8.

19        A.       Okay.

20        Q.       Opinion 7.8 is "All for one and

21     one for all.  The venture knew collective

22     marketing increased the size of the opioid

23     pie.  Similarly, had any venture member

24     broken ranks, the opioid market would have

1  slowed or if the complete truth was told, no

2  efficacy and high addiction risk, the market

3  would have crashed."

4              Right?

5      A.    Yes.

6      Q.    You wrote that opinion?

7      A.    I did.

8      Q.    Before we even get to

9  Exhibit B8, you hold the opinion that opioids

10 have no efficacy?

11     A.    No efficacy for chronic

12 non-malignant pain.

13     Q.    I see.  You don't say that

14 here, though; right?

15     A.    I left that part out.

16     Q.    All right.  Now let's look at

17 Exhibit B8.  I have a copy here if you need

18 it.

19             Do you want --

20             Okay.  I didn't know if you

21 wanted to use your own copy.

22             THE WITNESS:  Jayne, do you

23     want to see if I've got marks on mine.

24     Q.    (BY MS. SAULINO)  So I'm

1   marking this as Exhibit 17 to your --

2              MS. SAULINO:  There's a

3        different version?

4              MS. CONROY:  There's an arrow

5        on this one.

6              (Whereupon, Deposition Exhibit

7        Egilman 17, All for one and one for

8        all - the "venture" knew collective

9        marketing increased the size of the

10       opioid pie.  Similarly had any

11       "venture" member broken ranks, the

12       opioid market would have slowed or if

13       the complete truth was told (no

14       efficacy and high addiction risk) the

15       market would have crashed, was marked

16       for identification.)

17             Q.    (BY MS. SAULINO)  Okay.  So

18   I've marked as Exhibit 17 to your deposition,

19   our copy of Exhibit B8.  Your copy that

20   Ms. Conroy just handed you has an arrow

21   pointing at the far left -- the far right,

22   sorry.  I had to reverse myself --

23   description under the far right green box; is

24   that right?

1    A.    Right.

2    Q.    And otherwise, they're the

3  same?

4    A.    Right.  But the whole document,

5  I think, is provided.  So here's the whole

6  opinion, I think.  Maybe not.  The whole

7  opinion is the whole document.  Apparently,

8  that wasn't sent, but this is enough.

9    Q.    So Dr. Egilman, your basis for

10 this opinion is again one document; right?

11   A.    Correct.

12   Q.    You don't identify any

13 deposition testimony; right?

14   A.    Correct.

15   Q.    You don't identify any other

16 documents that led to this opinion; right?

17   A.    Correct.

18         The basis for my opinion as

19 stated in this opinion is one document.

20 There is other bases elsewhere in the report.

21         But go ahead.

22   Q.    Okay.  But you don't state any

23 of those other bases here under your opinion;

24 right?

1    A.    Correct.

2    Q.    You don't provide us any kind

3 of cross-reference that would allow us to

4 know where else in your report you provide

5 bases for this opinion; right?

6         MS. CONROY:  Objection.

7         THE WITNESS:  Correct.

8    Q.    (BY MS. SAULINO)  Now, breaking

9 this opinion down, because it seems to have

10 several parts.  Would you agree with me on

11 that?

12    A.    Sure.

13    Q.    Okay.  You first say, "The

14 venture knew collective marketing increased

15 the size of the opioid pie"; right?

16    A.    Correct.

17    Q.    And we've just established you

18 cite one document for that; right?

19    A.    In this opinion, correct.

20    Q.    Okay.  And this document

21 doesn't actually name any members of the

22 venture; right?

23    A.    Well, it's a Janssen document.

24    Q.    Well, it's simply --

1       A.      And the name's OxyContin, which
2   is a Purdue product.
3       Q.      Well, sir, when you say it's a
4   Janssen document, all you know is that it was
5   produced by Janssen; right?
6       A.      No, I think it's a Janssen
7   document.  If you look at the document, it's
8   a Janssen document.
9       Q.      Okay.  I'm looking at your
10  Exhibit 8.
11      A.      Yeah.  I say if you look at
12  the -- if you look at the Bates numbered
13  actual document, it's a Janssen document.
14  That's my recollection.
15      Q.      A document that was produced by
16  Janssen?
17      A.      Written -- yeah.  It's not an
18  FDA document produced by Janssen.  It's a
19  Janssen document produced by Janssen.
20      Q.      Do you have any basis for that
21  knowledge?
22      A.      I think it says it on the
23  document.
24      Q.      Did you see any deposition

1    testimony to that effect?

2         A.    No.

3         Q.    Did you do any research to that

4    effect?

5         A.    No.

6         Q.    And you say similar -- your

7    next piece of your opinion is "Similarly, had

8    any venture members broken ranks, the"

9    opinion marked -- I'm sorry -- "Had any

10   venture member broken ranks, the opioid

11   market would have slowed or if the complete

12   truth was told, no efficacy and high

13   addiction risk, the market would have

14   crashed."  Right?

15        A.    Right.

16        Q.    And you base that again on this

17   one screenshotted document that you have here

18   on B8?

19        A.    No.  There's other documents

20   that --

21             MS. CONROY:  Objection.

22             THE WITNESS:  There's other

23        documents that support that as well

24        elsewhere in the report.  But the --

1         So there's other documents.

2     There's other bases for that opinion.

3     Q.   (BY MS. SAULINO)  Nothing

4  listed here; right?

5     A.     Correct.

6         Not in this opinion.

7     Q.     And there's nothing on this

8  document that talks about breaking ranks, is

9  there?

10    A.     That's correct.

11    Q.     Okay.  And you don't cite to

12  any deposition testimony that leads to that

13  conclusion; right?

14    A.     Correct.

15    Q.     Okay.  Let's look at

16  Opinion 62, which is on page 71.

17    A.     Okay.

18    Q.     In Opinion 62 you say,

19  "Opinion.  When the FDA tried to limit use in

20  2001 by changing the label from more than a

21  few days to extended period of time, the

22  venture used this language to increase the

23  market"; right?

24    A.     Correct.

1          Q.     Okay.

2                 And if you then look at

3     Exhibit B62 -- I can hand it to you.

4                 Oh.  What do you have there?

5          A.     B62.

6          Q.     All right.  Well, let me make

7     sure that your B62 and mine are the same.

8                 You have a Redweld as well?

9                 MS. CONROY:  Of the Bates

10        documents.

11                THE WITNESS:  This is the

12        online Bates document.

13         Q.     (BY MS. SAULINO)  Okay.  Let

14    me -- I will hand you the exhibit,

15    Dr. Egilman.  I'm just trying to make sure I

16    understand what you have here.

17         A.     I think I've got a mark on

18    mine, so.

19         Q.     I'm sorry?

20         A.     I've got -- this is the one I

21    read and marked.

22         Q.     Okay.

23                Would you like a sticker?

24         A.     Sure.

1          Q.     You have it for 18?

2                 (Whereupon, Deposition Exhibit

3          Egilman 18, Opinion - When the FDA

4          tried to limit use in 2001 by changing

5          the label from "more than a few days"

6          to "extended period of time," the

7          "venture" used this language to

8          increase the market, was marked for

9          identification.)

10         Q.     (BY MS. SAULINO)  Can you show

11    me what you've marked?

12         A.     Okay.

13         Q.     All right.  So looking at

14    Exhibit 62 --

15                MS. CONROY:  Exhibit 18.  B62.

16                MS. SAULINO:  Sorry,

17         Exhibit 18.  B62.

18         Q.     (BY MS. SAULINO)  On the first

19    page of Exhibit 18, you quote from a CBS News

20    article; right?

21                It's the "60 Minutes."

22         A.     Correct, the "60 Minutes"

23    piece.

24         Q.     Right, a "60 Minutes" piece,

1    but it's from cbsnews.com; right?

2           A.    Correct.  It's a transcript of

3    the "60 Minutes" TV show.

4           Q.    Well, it's a portion of a

5    transcript; right?

6           A.    Correct.

7           Q.    There's no Bates number listed

8    there; right?

9           A.    Correct.

10          Q.    Okay.

11                And then, you then attach a --

12   one single e-mail chain; right?

13          A.    Correct.

14          Q.    That's an internal e-mail chain

15   from Purdue; right?

16          A.    Correct.

17          Q.    Those are the two pieces of

18   evidence that you cite for saying that the

19   venture used this language to increase the

20   market.

21          A.    Correct.

22          Q.    You don't cite to any other

23   documents; right?

24          A.    Not in this opinion.

1    Q.    And you don't cite to any

2  deposition testimony; right?

3    A.    Correct.

4    Q.    And you don't provide us the

5  question that you were seeking to answer;

6  right?

7    A.    Well, that's again the

8  assignment.

9    Q.    You don't provide us the

10  question that resulted in this opinion;

11  right?

12    A.    Not the specific question that

13  resulted in this opinion.  I gave you the

14  methodology that resulted in this opinion.

15    Q.    Well, sir, you actually haven't

16  given us the methodology that resulted in

17  this opinion.  That's not written here, is

18  it?

19    A.    It's not on the opinion.

20    Q.    And you agreed with me earlier

21  that you used different types of methodology

22  for different opinions; right?

23    A.    No.  It's the same methodology.

24  It's the same search techniques and review of

1    documents for all of the non, say, medical

2    opinions.  The medical opinions are based on

3    evidence-based medicine to the extent

4    possible.  That's mostly the efficacy, other

5    things like that.

6              And the non-medical opinions --

7    non-medical drug efficacy opinions are based

8    on grounded method theory.

9         Q.    Well, okay.  So that's a bit

10   different than what you told me earlier.

11             So where in your report have

12   you indicated which are the medical opinions

13   based on evidence-based medicine and which

14   are the other opinions that are based on

15   grounded method theory?

16             MS. CONROY:  Objection.

17             THE WITNESS:  First, I don't

18        think that's different from what I

19        told you before.  I think I told you

20        that specifically before.  And you

21        need to obviously -- when I'm talking

22        about EERW, I'm talking about medical

23        opinions.  If I'm talking about the

24        Roth paper, I'm talking about medical

1    evidence.

2         If I'm talking about the

3    efficacy of opioids for chronic

4    non-malignant pain, I'm talking about

5    medical opinions.

6         Q.    (BY MS. SAULINO)  Let's just

7    talk --

8         A.    If I'm talking about policy

9    issues of how the companies marketed, took

10   advantage of FDA language, that's a grounded

11   theory opinion.

12        Q.    And this breakdown appears

13   nowhere in your report; correct?

14        A.    I think it's pretty clear if we

15   look at the methodology.  Evidence-based

16   medicine deals with medical questions.  If

17   you look at the rest of that section, it

18   deals with cause-effect relationships,

19   choice-of-treatment modalities, efficacy,

20   side effects, et cetera.

21             I think it's clear that

22   marketing and other related, over --

23   overselling, things like that, that's not

24   based on a similar kind of evidence base that

1    will determine whether or not you use opioids

2    for chronic non-malignant pain.

3         Q.    The explanation you just gave

4    does not appear in your report; correct?

5              MS. CONROY:  Objection.

6              THE WITNESS:  Those words do

7         not appear, but I think it's clear if

8         you read the introduction to the

9         report, that that's a distinction.  It

10        doesn't need an explicit definition

11        since evidence-based medicine is

12        titled evidence-based medicine.

13             And I gave you examples.  If

14        you look at the grounded theory of

15        five or six papers that I published on

16        grounded theory, and if you look at

17        just the titles of those papers, you

18        see that they're dealing with other

19        issues, similar ones I deal with here.

20        Off-label marketing.  Promotion.

21        Illegal promotion.  False and

22        misleading advertising.  That kind of

23        activity.  That's all grounded

24        theory-based.  And there's examples in

1        the introduction that -- for both.

2        Q.    (BY MS. SAULINO)  So if we

3  wanted to figure out which methodology you

4  used for which opinion, we'd have to guess

5  whether it was a medical opinion or a

6  marketing opinion.

7        A.    If you think that's a guess,

8  then I guess you could call it a guess.  I

9  wouldn't call it a guess.  I think it's

10  obvious.

11        Q.    Okay.  Let's look at the one --

12  let's look at Exhibit 15 to your deposition,

13  the one we were just looking at, No. 8.

14        A.    Right.

15        Q.    You'd agree with me that

16  that --

17        A.    Wait a minute.  15, did you

18  say?

19              MS. CONROY:  17.

20              MS. SAULINO:  17.  Sorry.

21        Exhibit 17.  It's getting a little

22        late.  I apologize.

23              THE WITNESS:  You did say 15.

24              MS. SAULINO:  I'm sure I did,

1     sir.  I apologize.  I misspoke.

2             THE WITNESS:  I'm on 17.

3         Q.    (BY MS. SAULINO)  17, Opinion

4     No. 8.

5         A.    Okay, right.

6             This is obviously a grounded

7     theory-based issue.  There's no math modeling

8     here.  There's no data that was collected by

9     anybody that I know that shows, quote,

10    business expansion is driven by OxyContin.

11        Q.    Dr. Egilman, I haven't asked my

12    question yet.  Could I ask my question?

13        A.    Go ahead.

14        Q.    You would agree with me that

15    this opinion discusses efficacy and high

16    addiction risks; right?

17        A.    Correct.

18        Q.    An opinion that you hold based

19    on your medical experience; right?

20        A.    No.  This is dealing with those

21    that -- those efficacy and high addiction

22    risks as it should have been told by the

23    companies.  This is a breaking ranks opinion.

24        Q.    But your belief that it should

1    have been told that way by the companies is

2    based on your medical opinion; correct?

3         A.    Probably true.

4         Q.    Okay.

5         A.    Okay.  But -- but that --

6         Q.    So for this opinion, you would

7    have --

8              MS. CONROY:  Let him finish his

9         answer.

10             MS. SAULINO:  He did answer.

11             THE WITNESS:  Go ahead.  My

12        answer is incomplete.  Go ahead.

13        Q.    (BY MS. SAULINO)  So for this

14   opinion, we would have to guess whether you

15   used the grounded theory approach or the

16   evidence-based medicine opinion; right?

17             MS. CONROY:  Objection.

18             THE WITNESS:  No.  Not at all.

19        Q.    (BY MS. SAULINO)  You think

20   it's obvious?

21        A.    I think it's obvious.

22        Q.    But you don't list it anywhere

23   here?

24        A.    Because it's obvious.

1      Q.     You don't list, for any

2   opinion, which approach you took; correct?

3      A.     Explicitly, no.  But I think

4   it's obvious.

5      Q.     So earlier when you testified

6   that you were actually using a combination of

7   the two, that was inaccurate?

8      A.     No, that was for the whole

9   report.

10      Q.     When I was asking you questions

11   about the evidence-based medicine approach

12   and you were bringing in part of the grounded

13   theory approach, and I asked you why you were

14   doing that, and you said because you used

15   them in combination, that's not actually what

16   happened?

17            MS. CONROY:  Objection.

18            THE WITNESS:  The only

19        combination would be if -- what you

20        just did with this opinion, right, the

21        evidence-based medicine leads to

22        the -- to the conclusion that the

23        drugs are not efficacious and they're

24        addictive.  Right?

1          So to the extent that you're --

2      to the extent that you're correct,

3      that that's an evidence-based medical

4      derived opinion, which it probably is,

5      okay? -- that's a component of this

6      grounded theory opinion, but for the

7      most part, this is basically a

8      grounded theory opinion.

9          Q.    (BY MS. SAULINO)  Okay.  So

10   your testimony earlier when you were

11   explaining to me how you combined the two

12   methodologies was not accurate?

13          MS. CONROY:  Objection.

14          THE WITNESS:  I don't recall it

15      completely.  I just told you an

16      example of where it would be accurate.

17          It doesn't -- I didn't use them

18      in combination all the time.  Okay?

19      And I didn't even think about the

20      example you just pointed out so

21      deftly, and where they were used in

22      combination.

23          Q.    (BY MS. SAULINO)  Well, about

24   five minutes ago, you told me it was obvious

1   this was the grounded theory approach.  So

2   that's not true either; right?

3          A.     Sure it is.  This is obviously

4   a grounded theory approach.  The small

5   component of this is that there's a high

6   addiction risk.  You don't need to do

7   evidence-based medicine for that.  Okay?

8   That -- that's -- that's -- that was obvious,

9   I think, to the -- to the venture members for

10  a long time.

11         Q.     Efficacy is also a medical

12  opinion; right?

13         A.     No efficacy?  Yeah, that's

14  true, and that was also known to them.

15  That's an easy one.  There's no studies to

16  date that show that these drugs worked for

17  chronic, non-malignant pain.

18         Q.     The fact of the matter is,

19  Dr. Egilman, there is no way for us to look

20  at your report and by reading your report

21  know which theory you used to come to which

22  opinion; right?

23              MS. CONROY:  Objection.

24              THE WITNESS:  Wrong.

1    Q.    (BY MS. SAULINO)  We'd have to

2    assume?

3         A.    No.

4              MS. CONROY:  Objection.

5              THE WITNESS:  It's obvious.  If

6         I'm giving an opinion about EERW or

7         technical epidemiologic analysis, or

8         criticizing the methodology used to

9         come up with 100 million untreated

10        pain patients, that's -- that's an

11        epidemiologic evidence-based medical

12        criticism.

13        Q.    (BY MS. SAULINO)  You don't say

14   that in your report, do you?

15        A.    If I'm giving an opinion like

16   I -- like this one that -- that the business,

17   that is, the opioid business was driven by

18   OxyContin sales, that's based on grounded

19   theory and these documents.

20              It's not based on any

21   epidemiologic study.

22        Q.    You don't say any of that in

23   your report, do you?

24        A.    Not explicitly.  You would have

1  to actually read the introduction and apply

2  the correct theory to what's the obvious

3  correct opinion.

4      Q.  All right.  Let's look at

5  Opinion 69, which is on page --

6      A.  72.

7      Q.  Thank you.  And you have a

8  different 69 than I do for Exhibit B69?

9      A.  I do.  And this is also

10  incomplete.

11      But it's one I corrected the

12  opinion on.

13      Q.  Okay.  Well, let's just break

14  this down.

15      So can I see what you are

16  looking at right now?

17      Okay.  So what you are looking

18  at -- okay -- is Exhibit B69 with your

19  handwriting on it, which is a copy of what we

20  were given as Exhibit B69, which you have

21  changed.  Correct?

22      A.  Correct.

23      Q.  So let's mark that.

24      A.  But also the entire article was

1    given to you and is in my right hand.

2           Q.    Okay.

3                 Sir, I don't know what you

4    think was given to us, but the one page that

5    has just been marked as Exhibit 19 to your

6    deposition is what the defendants received as

7    Exhibit B69.

8                 (Whereupon, Deposition Exhibit

9                 Egilman 19, Opinion - the "venture"

10                corrupted the FDA and Salem --

11                News.com FDA Corruption Worsens as

12                Death Toll Mounts in Drug Epidemic!

13                article, was marked for

14                identification.)

15                MS. CONROY:  Can I see

16                Exhibit 19?

17           Q.    (BY MS. SAULINO)  And you've

18   now written over that and changed the

19   opinion; is that right?

20           A.    Right.

21           Q.    Okay.  What have you changed

22   the opinion to say?

23           A.    I changed it to the FDA was --

24   in -- in -- over -- it should be overworked,

1    understaffed, underpaid, and had a revolving

2    door.

3         Q.    Okay.  And you've not disclosed

4    that new opinion to the defendants until just

5    this moment when I asked about it?

6         A.    Right.  I changed it last

7    night.

8              MS. CONROY:  Objection.

9         Q.    (BY MS. SAULINO)  You changed

10   it last night?

11        A.    Yes.

12        Q.    Did you change any of your

13   other opinions yesterday?

14        A.    Did I change any of them?  I

15   don't think so.  I mean, I wrote notes on a

16   lot of them.

17        Q.    So to your recollection, this

18   is the only opinion that you have changed?

19        A.    Correct.

20        Q.    Okay.  And there's no way for

21   us to know -- if you've changed any others,

22   there's no way for us to know except that you

23   don't currently recall changing any others?

24        A.    No. I've got them all in this

1   box.  You can mark the box.  You've been

2   going through the box during some of the

3   breaks.  I don't think there's any others.

4         Q.    Okay.  And your original

5   opinion here was that the venture corrupted

6   the FDA --

7         A.    Correct.

8         Q.    -- right?

9               And you now don't believe that

10  that opinion holds?

11        A.    Let's say it's -- it depends

12  how you define "revolving door" and what went

13  on in the revolving door.

14        Q.    I --

15        A.    So --

16        Q.    How did we get to a revolving

17  door?  I was looking at your original

18  opinion.

19        A.    Okay.  But you didn't ask that.

20        Q.    Yeah, I did.

21        A.    No, you said -- you just -- you

22  didn't --

23              Your original opinion [sic] was

24  that the venture corrupted the FDA?

1          Right.

2          And now you don't believe that

3    opinion holds was your question.

4     Q.     Correct.

5     A.     That was not a reference to

6    this opinion.  That was a general question

7    about what my opinion was now.

8     Q.     Okay.  Well, I apologize if you

9    found that unclear in some way.

10         You no longer --

11    A.     I didn't find it unclear at

12   all.  I was answering it.

13    Q.     Let me change the question,

14   Dr. Egilman.

15         You no longer believe the

16   venture corrupted the FDA?

17    A.     No longer willing to say that

18   this evidence is complete support for that

19   opinion.

20    Q.     Okay.  But the evidence that is

21   cited on B69, you believe is complete support

22   for your new opinion that the FDA was

23   overworked, understaffed, underpaid, and had

24   a revolving door --

1    A.    Correct.

2    Q.    -- is that right?

3          Okay.  And your complete

4    support for that is found in Exhibit B69?

5    A.    Correct.

6    Q.    No deposition testimony in

7    addition to this?  Right?

8    A.    No, there's other --

9          Well, no.  I have a lot of

10   other support for this with respect to --

11   this all refers to -- this refers to

12   Rappaport and Curtis Wright.  So there's a

13   lot of other evidence for this.  It's not in

14   the opinion, but there's a lot of other

15   evidence in other opinions, particularly

16   about Rappaport.

17   Q.    When you say "This refers to

18   Rappaport and Curtis" Knight --

19   A.    Curtis Wright, right.

20   Q.    Right.  What do you mean

21   "this"?

22   A.    This opinion.  It cites them.

23   Q.    The opinion cites a single

24   Salem News article, sir; right?

1        A.      The single Salem News article

2    describes what happened with the approval of

3    Zohydro, and it also talks about

4    Curtis Wright.  And the revolving door with

5    Curtis Wright.

6        Q.      Okay.  But you don't cite to

7    anything else besides this single Salem News

8    article; right?

9        A.      Those things are in here.

10   That's correct.

11       Q.      In the news article?

12       A.      That's correct.

13       Q.      Written by someone at the Salem

14   News; right?

15       A.      Correct.

16       Q.      Not written by you?

17       A.      Correct.  I didn't write the

18   article.

19               What do you want me to do with

20   the complete article that was supposed to be

21   attached?

22       Q.      Okay.  When you say "the

23   complete article that was supposed to be

24   attached," what are you handing me right now?

1          MS. CONROY:  It's the link.

2      It's the printout of the link that is

3      on the exhibit.

4          Q.    (BY MS. SAULINO)  So rather

5  than a third-page snippet that's on

6  Exhibit B69, you actually meant for the whole

7  page in a third article to be included on

8  B69?

9          A.    That's why I gave you the link.

10          Q.    Okay.  So why don't we attach

11  that to Exhibit 19.

12          A.    I did.

13          Q.    But there's nothing else that

14  you intended to attach to Exhibit 19; right?

15          A.    No.  There's other opinions

16  that relate to that opinion.

17          Q.    And you don't cross-reference

18  other opinions in that opinion; right?

19          A.    Correct.

20          Q.    And when we say "that opinion,"

21  we mean Opinion 69; right?  Which has now

22  been rewritten?

23          A.    Correct.

24          Q.    And you don't provide any

1    roadmap in your report that would show us

2    what other opinions support Opinion 69;

3    right?

4              MS. CONROY:  Objection.

5              THE WITNESS:  I don't have a

6         roadmap, but the Zohydro story with

7         Rappaport is in other documents that

8         are in my opinions.

9         Q.    (BY MS. SAULINO)  There's no

10   way for us to look at your opinions and know

11   which other opinions relate to this opinion;

12   right?

13        A.    You'd have to search for

14   Rappaport and Zohydro and then you'd find

15   them.

16        Q.    In all of the 23 boxes that are

17   behind me, that's what we'd have to do?

18        A.    No, you'd do it digitally

19   pretty quickly.

20        Q.    But the digital version of the

21   23 boxes that are behind me --

22        A.    Yes.

23        Q.    -- we'd have to search for

24   those two names in the 23 boxes that are

1    behind me, and then we would know the other

2    basis for your opinion?

3         A.    Well, then you'd know other

4    supporting evidence, right.

5         Q.    But not any -- but not all of

6    the other bases for your opinion?

7         A.    No.  Not all of the other bases

8    for my opinion.  I reviewed a lot of other

9    documents.  There's a lot of other support

10   for that opinion.  I mean, I've read

11   Curtis Wright's depositions.  I've read a lot

12   of Purdue documents.

13            Some of them -- some of those

14   are included in the introductory materials on

15   Purdue with respect to Curtis Wright,

16   Curtis Wright's approvals, Curtis Wright's

17   actions at the FDA in approving OxyContin

18   initially.  So that's all -- a lot of that is

19   in there and pretty obvious.

20        Q.    None of what you just said is

21   in your report; right?

22            MS. CONROY:  Objection.

23            THE WITNESS:  No.

24            MS. SAULINO:  I know our

1      Special Master needs to leave soon,

2      and wanted to put something on the

3      record.

4            SPECIAL MASTER COHEN:  Do you

5      want to take a moment to do that now?

6            MS. SAULINO:  Yeah.  Why don't

7      we take a moment to do that.

8            SPECIAL MASTER COHEN:  Okay.

9            I'm here just today.  I'm not

10     here tomorrow.  I have very

11     purposefully tried not to insert

12     myself into this deposition unless I

13     was either asked to or it became very

14     clear I needed to because I won't be

15     here tomorrow, and so I won't be in a

16     position to assert myself.

17           What I want to do now is just

18     make a little speech so that hopefully

19     I won't get a lot of phone calls

20     tomorrow because I'm going to be in

21     another deposition doing the same

22     thing in Washington, D.C.  And what I

23     want to remind everybody is, first of

24     all, I'm going to turn to you,

1    Dr. Egilman, and ask you to remember

2    tomorrow all the things that I said

3    today.  That your answers can and

4    should be succinct.  If you were to do

5    a review of all of your answers today,

6    the longest one was probably a minute,

7    and most of them were probably about

8    20 seconds or less.

9         That's how it should be

10   tomorrow, the same way.

11        There's no reason to interrupt

12   each other.  I think it will help if

13   everybody just lets everybody answer

14   the question.  And so it's my hope

15   that I don't receive any calls for

16   help tomorrow in settling disputes.

17   It's clear that you can do this

18   without me.

19        Any questions?

20        Okay.  And I'm going to leave

21   in about 15 minutes because I have to

22   get to the airport to go to D.C. That

23   doesn't mean you all have to stop.

24   And thank you for buying me lunch, and

1        I'll see you again soon, I'm sure.

2                MS. CONROY:  Thank you.

3                MS. SAULINO:  Thank you.

4                (Discussion off the record.)

5                MS. SAULINO:  There have been a

6        few minutes that were used for

7        plaintiffs.

8                MS. CONROY:  I think two

9        minutes is an exaggeration.

10               THE WITNESS:  You can have an

11       extra two minutes.

12       Q.    (BY MS. SAULINO)  Let's look at

13  Opinion 129.

14       A.    Let me just tell you what my

15  desire is, while the Special Master is here,

16  is to go to seven hours today, to take a

17  dinner break, and then come back and do

18  another two or three hours.

19               MS. SAULINO:  Okay.  We can

20       talk about that at the next break.

21               I appreciate you telling me,

22       but I'd like to -- for not to eat up

23       time right now figuring that out.

24               SPECIAL MASTER COHEN:  That's

1          not my call.

2                    THE WITNESS:  Okay.























13    McKesson Connect web page?

14         A.    I think so.

15         Q.    Okay.

16               Handing you what's been marked

17    as Exhibit 21 to your deposition.

18               (Whereupon, Deposition Exhibit

19         Egilman 21, Login to McKesson Connect,

20         was marked for identification.)

21         Q.    (BY MS. SAULINO)  Which is the

22    log-in page for McKesson Connect.

23         A.    Okay.

24         Q.    Is this what you saw?

1          A.      I think so.

2          Q.      Okay.  And you couldn't get

3    access; right?

4          A.      Correct.  Because I don't have

5    Jones Day's skills.

6          Q.      Because this site is for

7    McKesson partners and customers only; right?

8    As it says here?

9          A.      Correct.

10         Q.      And physicians are not McKesson

11   customers; right?

12              MS. CONROY:  Objection.

13              THE WITNESS:  Depends how you

14         define "customer."

15         Q.      (BY MS. SAULINO)  You as a

16   physician could not get access to this web

17   portal; correct?

18         A.      Correct.

19         Q.      You don't know any physician

20   who could get access to this web portal;

21   correct?

22              MS. CONROY:  Objection.

23              THE WITNESS:  I don't know any

24         who have tried.

1          Q.      (BY MS. SAULINO)  And

2     physicians are not McKesson partners;

3     correct?

4              MS. CONROY:  Objection.

5              THE WITNESS:  Do you mean as

6          defined in your -- on your web portal?

7          Q.      (BY MS. SAULINO)  Yes,

8     Dr. Egilman.

9          A.      That's my understanding.













19     Q.     And the McKesson Redweld that

20  you're talking about is actually a stack of

21  Redwelds; right?

22     A.     Right.

23     Q.     Okay.  And we're going to mark

24  that stack as Exhibit 23.

1       A.      There was one Redweld for all

2    of these.  No?

3               (Whereupon, Deposition Exhibit

4          Egilman 23, compilation of Redweld

5          folders, was marked for

6          identification.)

7          Q.      (BY MS. SAULINO)  There was?

8          A.      I thought so, but maybe I'm

9    wrong.  I didn't do this part.

10         Q.      Well, we'll mark that stack

11   as --

12         A.      The lawyers did this part.

13         Q.      We'll mark that stack as

14   Exhibit 23.

22               (Reporter asked for

23   clarification.)

24               THE WITNESS:  That McKesson was

1    marketing opioids for manufacturers of

2    opioids.

3    Q.    (BY MS. SAULINO)  Okay.  And

4    you don't provide that stack -- that listing

5    of that stack in your report anywhere; right?

6    A.    The listing of the stack is not

7    here.  Each of the individual documents and

8    opinions is in the report.

9    Q.    All right.  Let me ask you

10   this, Dr. Egilman.

11          You've not ever seen any

12   talking points that McKesson used to market

13   directly to doctors, have you?

14   A.    No.

15          Just an administrative

16   question.  Did you want this Exhibit 22 to

17   include the entire Redweld or just this

18   document?

19   Q.    Yes.  Let's make Exhibit 22

20   include the entire Redweld, which you're now

21   saying is your complete Exhibit 22 -- the

22   complete version of Exhibit 22; right?

23          MS. CONROY:  Objection.

24          (Whereupon, Deposition Exhibit

1          Egilman 22, Opinion B.385, was marked

2          for identification.)

3                    THE WITNESS:  No problem.  Just

4          asking.

5          Q.    (BY MS. SAULINO)  Now,

6     Dr. Egilman, do you hold yourself out to be

7     an expert in FDA regulations?

8          A.    Based on my definition of

9     "expert," yes.

10          Q.    Okay.  Have you ever been

11     qualified by a court as an expert in FDA

12     regulations?

13          A.    I've testified in court on FDA

14     regulations.

15          Q.    Have you ever been qualified by

16     a court as an expert in FDA regulations?

17          A.    I assume if I testified, I was

18     qualified.

19          Q.    Okay.  So you don't know?

20          A.    Well, normally -- I don't

21     recall -- I'm not -- not usually there when

22     the motions in limine are made.  And so I

23     assume if I come to court and I testify about

24     FDA regulations, that that's all been dealt

1    with before, that a judge has approved my

2    testimony about FDA regulations.

3         Q.    You would agree with me that

4    pharmaceutical manufacturers have to follow

5    FDA regulations; right?

6         A.    What do you mean by "have to"?

7         Q.    You find the question

8    ambiguous?

9         A.    I do.

10              You know, there's lots of cases

11   where manufacturers have not followed FDA

12   regulations.  Right?  I've got -- or

13   distributors.  I've got all kinds of examples

14   here.

15              So when you say "have to," I

16   know that there are laws that say they should

17   or shall, and I know that generally when they

18   don't, there's no penalty.

19        Q.    You would agree with me that

20   FDA regulations hold the force of law for

21   pharmaceutical manufacturers; right?

22        A.    Some do.

23        Q.    And since you are holding

24   yourself out as an expert in FDA regulations,

1    you would agree with me that the message --

2    the marketing messaging that pharmaceutical

3    manufacturers use is something that has to be

4    approved by the FDA; right?

5               MS. CONROY:  Objection.

6               THE WITNESS:  No, not exactly.

7          Q.    (BY MS. SAULINO)  What is your

8    disagreement with that statement?

9          A.    That's not what happens.

10              Marketing messages get sent to

11   the FDA.  The FDA reviews a small percentage

12   of them, but they never send an approval

13   letter out for the ones they don't look at.

14   So marketing for the most part, the FDA works

15   on a snitch system where one company snitches

16   on another company, and that's how they find

17   out that somebody's violating the off-label

18   rules generally, and then they may clamp

19   down.

20              But the FDA, by itself, has

21   very little staff, and they certainly don't

22   review all of the marketing messages and

23   approve them.  They get them.

24         Q.    What's the basis for what you

1    just said?

2         A.    Well, I was at a conference

3    where the FDA people spoke, and I sat at a

4    table with the people from DDMAC who told me

5    what the process was.  That was around 2003,

6    2004.

7         Q.    And the officials from DDMAC

8    told you --

9         A.    Excuse me, I'm not done with

10   that answer.  You said what's the basis for

11   that.  Okay?

12        Q.    I'd like to know what the

13   officials from DDMAC told you.

14        A.    Do you want the incomplete

15   answer, I'm done with the answer.  No

16   problem.  Just it's incomplete.

17              If you want to cut me off, no

18   problem.

19        Q.    The officials from DDMAC told

20   you that the FDA process is based on a snitch

21   system?

22        A.    They said that that was -- that

23   generated most of their actions.

24        Q.    Okay.  And they told you --

1    A.    And they told me they had six

2  staff to review all of the marketing messages

3  that were submitted annually at that time,

4  and they didn't -- they didn't review them.

5    Q.    So your --

6    A.    They didn't review nearly all

7  of them.

8    Q.    So you're basing this expertise

9  on one conversation you had at a dinner?

10    MS. CONROY:  Objection.

11    THE WITNESS:  No.  There was a

12    whole conference on this issue.  It

13    was discussed at the conference.

14    Abrams was speaking at the conference,

15    and a lot of people -- because of the

16    lunch, I had a lot of time to have

17    side conversations and more detailed

18    conversations about the process than

19    just what was in the lecture series.

20    Q.    (BY MS. SAULINO)  So you're

21  basing this opinion on one conference that

22  you went to several years ago?

23    A.    No.  I've read other things

24  about this process.  I've read documents

1    about this process in the Vioxx litigation,

2    the Actos litigation, in the Zyprexa

3    litigation, in the Purdue litigation.

4            So, I mean, I've seen how the

5    FDA doesn't regulate marketing over time.

6        Q.    Okay.  Your opinion at

7    page 126, 7.430?

8        A.    7 which?

9        Q.    430.  Bottom of page 126.

10       A.    Okay.



























19      Q.      Okay.  Dr. Egilman, before we

20   conclude today, I want to make sure to mark a

21   number of things.

22      A.      Are we concluding today?

23      Q.      Well, at least concluding

24   before the break and then we can talk about

1    your request for coming back after dinner.

2              So first, you have a number of

3    colored folders that have numbers on them

4    that you have sat in front of you here today;

5    right?

6         A.    I do.  I also have some notes.

7         Q.    Some notes.  Okay.

8              And you brought those intending

9    to use these colored folders and notes during

10   your deposition today?

11             MS. CONROY:  Objection.

12             THE WITNESS:  No.  Not

13        necessarily.

14        Q.    (BY MS. SAULINO)  Well, you've

15   laid them out very carefully, taken up a good

16   amount of our precious space here at the

17   table.  So you brought them for a reason;

18   right?

19        A.    I thought they would be helpful

20   from time to time, yes.

21        Q.    Okay.

22        A.    They have been helpful from

23   time to time.  But I can't predict what the

24   question is, so I brought things that I

1    thought you might ask about that might be

2    helpful as answers.

3         Q.    And you've numbered them 1

4    through -- it looks like 32; is that right?

5    Is new bias?

6         A.    I don't know.

7         Q.    Okay.  Can we move your

8    McKesson Redweld?

9         A.    Sure.

10        Q.    Okay.  And I think this is part

11   of your McKesson Redweld.

12              All right.  And I think that

13   was Exhibit B62.

14        A.    Well, it's empty now.

15        Q.    I'm looking at the title of the

16   blue folder.

17              MS. CONROY:  Give it to me.

18        Q.    (BY MS. SAULINO)  Okay.  So

19   these colored folders, you had intended to

20   rely on these in your deposition?

21        A.    I did rely on them.

22        Q.    Okay.  I'd like to mark these

23   as an exhibit to your deposition.

24              And --

1    A.    Fine with me.

2    Q.    We can mark them as one

3  exhibit.  I'm guessing you want to leave them

4  laid out here until you're done testifying

5  tomorrow; is that right?

6    A.    That would be my preference.

7    Q.    Okay.  So why don't we mark

8  these colored folders collectively as 26?

9          (Whereupon, Deposition Exhibit

10         Egilman 26, Dr. Egilman's reference

11         folders, was marked for

12         identification.)

13   Q.    (BY MS. SAULINO)  And what is

14  that sort of technicolor folder there?

15   A.    That's the one with five bad

16  acts and limitations.

17   Q.    Okay.

18         So --

19   A.    Here's my notes.  Do you want

20  my notes too?

21   Q.    Yes.  Why don't we mark those

22  as Exhibit 27.  So let's give our court

23  reporter a minute to give us the numbers.

24         I just wanted to mark the notes

 1    as 27.

 2              So the notes are 27.

 3              (Whereupon, Deposition Exhibit

 4         Egilman 27, Dr. Egilman's notes, was

 5         marked for identification.)

 6              MS. SAULINO:  And we'll figure

 7         out where to put the sticker for 26 at

 8         the break.

 9              So Exhibit 28, then, I'd like

10         to mark your box of your copies of the

11         exhibits that you have been

12         referencing.

13              MS. CONROY:  I put the folders

14         back in it.

15              (Whereupon, Deposition Exhibit

16         Egilman 28, Dr. Egilman's opinion

17         folders with stickies and notations,

18         was marked for identification.)

19              MS. SAULINO:  Okay.

20              Okay.  Now, the colored folders

21         in front of you we've made Exhibit 26.

22         Your box with your notes on some

23         exhibits is 28.

24              Your notes are Exhibit 27.

1          Is there anything else that you

2      have in your vicinity here that you

3      intended to use today to testify?

4          THE WITNESS:  No.

5      Q.    (BY MS. SAULINO)  Okay.  Now,

6  the posters behind you --

7      A.    Oh, yeah, the posters.

8      Q.    You have a number of posters

9  there.

10     A.    Yeah, the posters.

11     Q.    You brought a number of posters

12 here?

13     A.    Yeah.  About 15 posters.

14     Q.    Why did you bring 15 posters?

15     A.    No reason for 15, but you saw

16 we used one that was relevant.

17          These are some of the more

18 important documents in my view.  So.

19     Q.    I see.  So the poster boards

20 behind you are some of the more important

21 documents?

22     A.    And also the poster that was

23 presented on Saturday wasn't given to you.

24 So we can't read it on a small copy.  So I

1  brought that.

2      Q.    Are any of the other posters

3  representing something that wasn't given to

4  us?

5      A.    I don't think so.

6      Q.    So we're going to ask at the

7  break or overnight to get paper copies of the

8  posters so that we can mark them.  Okay?

9      A.    They all have Bates numbers on

10  them.

11      Q.    Okay.  Well, then we can mark

12  them.

13          All right.

14          MS. SAULINO:  I think this is a

15  good time for a break.

16          THE WITNESS:  Okay.

17          THE VIDEOGRAPHER:  We're off

18  the record at 6:40.

19          (Recess taken, 6:39 p.m. to

20  7:05 p.m.)

21          THE VIDEOGRAPHER:  We are back

22  on the record at 7:06.

23          (Whereupon, Deposition Exhibit

24  Egilman 29, USA Oxycodone consumption

1          (mg/capita) 1980 -- 2015, was marked

2          for identification.)

3          Q.     (BY MS. SAULINO)  Dr. Egilman,

4     we have marked as Exhibit 29 what I

5     understand from your counsel to be a

6     compilation of paper copies of the posters

7     that you brought with you today.

8          A.     She's not my counsel, but

9     that's terrific.  These are copies of the

10    posters.

11         Q.     Those are the copies of the

12    posters, you agree?

13         A.     But Ms. Conroy is not my

14    counsel.

15         Q.     So you agree that's what

16    Exhibit 29 is, though?

17         A.     Right.

18         Q.     Dr. Egilman, you said earlier

19    that there is not anything else that you

20    consider to be a part of your report other

21    than Exhibit 1F and Exhibits B1 through B489,

22    and all of their attached documents; right?

23         A.     Right.  And cited documents.

24         Q.     In B1 to B489; right?

1         A.      Correct.

2         Q.      Okay.

3         A.      You've attached all of this

4    material, some of which is included there.

5    Some of which is, as I stated earlier,

6    supplemental bases to opinions and some of

7    which would be -- and that would be a

8    category.  Some of the articles, for example,

9    came out this week.

10                So I don't know whether you

11   were going to call this part of the report or

12   not.  But it's here.  It's marked at the

13   deposition.

14        Q.      So for the record what you are

15   pointing at and saying is "this," is

16   Exhibit 26, which are the colored folders

17   that you brought with you today?

18        A.      Yes.  I would say the material

19   in the folders, yes.

20        Q.      And you previously had

21   testified to additional bases that you had in

22   one of the folders; right?

23        A.      No, I think I went through

24   three or four folders of additional bases.

1    There was the -- remember, I -- you took me

2    on -- you put me on plaintiff time, so there

3    were two plaintiff time breaks.  So there

4    were additional bases one, and there was

5    plaintiff time break two.  That was

6    additional bases.  And plaintiff time two

7    which is additional bases.

8         Q.    Okay.

9               Other than those additional

10   bases that we talked about earlier today, do

11   you have more additional bases sitting here

12   in front of us?

13        A.    No.

14        Q.    So your complete report and

15   bases are found in Exhibit 1F, Exhibits B1

16   through B489, the documents cited in

17   Exhibits B1 through B489, and the two

18   additional bases packets that you showed us

19   today; right?

20        A.    Three additional bases packets.

21              MS. CONROY:  That are reflected

22              in the transcript.  They were already

23              gone through the transcript this

24              morning.

1        MS. SAULINO:  So we've --

2        Q.     (BY MS. SAULINO)  So

3    Exhibit 1F, Exhibits B1 through B489, the

4    exhibits -- the documents cited in Exhibits

5    B1 through B4.89, and the three additional

6    bases pieces that you cited earlier today

7    constitute your complete report; right?

8        A.     Correct.

9        Q.     Now, does the report,

10   Deposition Exhibit 1F and the attached

11   Exhibits B1 through B14 reflect a complete

12   set of the opinions you will express in this

13   case?

14       A.     Those are a complete set of the

15   opinions that I'm expressing now at this

16   deposition.

17            I don't know what anybody else

18   is going to ask.  For example, I think other

19   opinions have been elicited during this

20   deposition, during questioning.  So I can't

21   predict what any of the defendants might ask

22   that might elicit other opinions.

23       Q.     Dr. Egilman, as an expert in

24   this case, the opinions that you are offering

1    as opinions that you are offering under your

2    expertise are contained in Deposition

3    Exhibit 1F and the attached Exhibits B1

4    through B489; correct?

5        A.    Right.  These are the opinions

6    I'm offering today.

7        Q.    And you intend to offer

8    additional opinions at trial that you are not

9    disclosing today?

10            MS. CONROY:  Objection.

11            THE WITNESS:  No.

12       Q.    (BY MS. SAULINO)  Do the

13   documents and other evidence that you cite in

14   Exhibits B1 through B489 to your report

15   constitute a complete list of all of the

16   bases and reasons for your opinions?

17       A.    And now you left things out.

18   If you go back to the original summary that I

19   agreed to, yes.

20       Q.    Okay.  Fair enough.  Do the

21   documents and other evidence that you cite in

22   Exhibits B1 through B489 plus the three

23   additional bases that we discussed earlier

24   today constitute a complete list of all of

1    the bases and reasons for your opinions?

2         A.    Yes.

3              MS. SAULINO:  Okay.  All right.

4         I'm handing over the mic.

5                   EXAMINATION

6    BY MR. MCGARRIGLE:

7         Q.    Good evening, Doctor.

8         A.    How are you doing?

9         Q.    I'm doing fine.  My name is

10   Tom McGarrigle.  I work with Reed Smith, and

11   we represent Amerisource in this deposition.

12   I'm going to have a few questions.  And I'm

13   going to hope that you are succinct in giving

14   us your answers.

15              When you were assigning your

16   office and your staff and your students, were

17   they assigned to any particular defendant?

18   So were there certain students and certain

19   staff members that were designated to focus

20   solely on one particular or group of

21   defendants?

22        A.    Well, do you know what?  I

23   forgot one student.  Lena Milton.  And she

24   worked on a couple of things, but she also

1    particularly worked on, I think, Allergan.

2          Q.     Okay.

3          A.     But otherwise, no.

4          Q.     Was your staff or students

5    assigned to any particular issue?

6          A.     Well, sure over the time,

7    different staff worked on different issues.

8          Q.     Okay.  Did you rely on your

9    staff to review deposition transcripts?

10         A.     I think some, yes.

11         Q.     Did you personally review every

12   deposition transcript in this litigation?

13         A.     Oh, no.

14         Q.     I want to direct your attention

15   to your report, page 110 of your report.  Our

16   7.324.

17               Do you have that in front of

18   you?  Do you have a copy of -- can we get it?

19         A.     It was here.

20               MS. CONROY:  Yeah, where did it

21   go?  With the actual report itself.  We had

22   that.

23               It was 1F.  Is it in the

24   exhibits, then?

1    Q.    (BY MR. MCGARRIGLE)  Doctor,

2    while you're looking at that you might want

3    to look to see if you have a copy of the

4    corresponding exhibit and whether it has been

5    changed or whether it has any notes on it.

6              MS. CONROY:  324?

7              MR. MCGARRIGLE:  Yes.

8              THE WITNESS:  Do you have the

9         324?

10             Okay.

11             Oh, she's looking at that.

12             MS. CONROY:  I'm going to tell

13        you.

14             Yeah.  You've got writing on

15        it.

16    Q.    (BY MR. MCGARRIGLE)  Let's get

17   this on the record.

18             Doctor, in opinion offered on

19   page 110 of your report, 7.3.24, it says

20   "AmerisourceBergen (ABC) was light on order

21   monitoring.  The ABC focuses only on rapid

22   growth, not steady sales, and the focus on

23   big accounts only for suspicious order

24   monitoring."

1           Did I read that correctly?

2     A.    You did.

3     Q.    And it's a reference to

4  Exhibit D324 hereto attached; right?

5     A.    Correct.

6     Q.    I'm going to have marked as an

7  exhibit, Exhibit No. 30, that report --

8  excuse me, that Exhibit B324.

9     A.    Do you want the one with my

10  handwritten notes?

11     Q.    And did you put some

12  handwriting on it?

13           Let me ask you, first of all,

14  did you -- have you changed your opinion?

15     A.    No.

16     Q.    Okay.  And have you noted --

17  made notes on the exhibit?

18     A.    Yes.

19     Q.    May I see it?

20     A.    Sure.

21     Q.    Can you read for me the notes

22  that you wrote at the bottom?

23     A.    Yeah.  Walgreens --

24     Q.    Of the exhibit?

1    A.    "Walgreens had data on all

2  store sales."

3    Q.    Now, in support of the opinion

4  offered in your report, the only support that

5  you cite is this Exhibit B324; is that

6  correct?

7    A.    The only opinion -- the only

8  support for this particular opinion cited in

9  this opinion is the one document.  There are

10  other documents, the Cardinal back-and-forth

11  with Walgreens, and AmerisourceBergen

12  stepping in, for example, that also relates

13  to this.

14    Q.    Well, there's no reference in

15  this to any cross-referencing to any other

16  documents.  Is that fair to say?

17    A.    Correct.

18    Q.    Is it also fair to say that

19  there's no indication that you looked at any

20  deposition testimony to support this opinion;

21  correct?

22    A.    Correct.

23    Q.    There is no indication that you

24  looked at any other documents?

```
 1        A.      On this opinion?

 2        Q.      On this opinion.

 3        A.      Written on the opinion?  That's

 4   correct.

 5        Q.      So the only thing that you

 6   relied upon in coming up with this opinion is

 7   this e-mail from Tasha Polster of Walgreens

 8   dated October the 31st, 2013; is that

 9   correct?

10        A.      No.

11        Q.      In addition to that, what else

12   have you relied upon in reaching this

13   opinion?

14        A.      Do you want give to me the

15   AmerisourceBergen section?

16                There are other documents, but

17   the main narrative here is when Walgreens got

18   hit with the $80 million penalty for

19   overselling, they went to Cardinal to take

20   over the Jupiter and supply and also the

21   other six.  Cardinal basically refused to do

22   that, and they said it's not just six

23   pharmacies that have problems.  It's 374

24   pharmacies that have problems.
```

1          And since Cardinal refused to

2    step in, Walgreens went to AmerisourceBergen,

3    and Bergen stepped in and agreed to supply

4    all of those stores and take over the Jupiter

5    facility for Walgreens.

6          Notwithstanding Cardinal's

7    evaluation of the fact that those orders from

8    those pharmacies were not proper.  And

9    subsequent to that, Walgreens bought

10   26 percent of Amerisource.  So that's the

11   gist of it.  That's in the other documents.

12        Q.    And I note that the

13   Special Master has gone, and ever since he's

14   gone, your answers are getting longer and

15   more nonresponsive, so I'm going to ask you

16   to focus on my questions.

17        This opinion that you're

18   offering is an opinion about the Amerisource

19   Order Monitoring Program; isn't that correct?

20        A.    Correct.

21        Q.    And your opinion about that

22   program is that it was late on order

23   monitoring, that it focused only on rapid

24   growth, not steady sales.  And your only

1    basis for those opinions on the Order

2    Monitoring Program is based on this e-mail.

3    This is the only thing that you put in your

4    report that allowed to us figure out what is

5    the doctor relying on.  Is that fair?

6         A.    No.

7         Q.    Is there anything in your

8    report with respect to this opinion that

9    allows us to know what the -- what the

10   hypotheses that you started with?  The

11   question that you asked?  Is there anything

12   that I missed when I read your report and

13   when I read your exhibit that tells me what

14   the beginning hypotheses was?

15        A.    Well, the hypotheses -- is it

16   explicitly stated here?  No.

17        Q.    Okay.  And is there anything in

18   this report that tells me whether or not you

19   revised your hypotheses during the course of

20   your investigation and your study?

21        A.    No.

22        Q.    Okay.

23              Is it fair to say that the

24   basis for the statement that ABC focuses only

 1   on rapid growth is in -- is based upon the

 2   second paragraph of Tasha Polster's e-mail,

 3   where it states "Investigators look at rapid

 4   growth for a location and whether the order

 5   triggers a threshold."

 6           Do you see that?

 7           The second sentence.

 8       A.    I see that.  You asked a

 9   question.

10       Q.    Yeah.

11       A.    Do you want me to answer

12   that did you read it correctly or do you want

13   me to answer the question?

14       Q.    You can answer the question.

15       A.    No.

16       Q.    Okay.  The e-mail that you

17   cited as support refers to rapid growth.

18   Your opinion, however, adds the word "only";

19   correct?

20       A.    Correct.

21       Q.    So Walgreens wasn't saying that

22   Amerisource's program only focused on rapid

23   growth.  That's something that you came up

24   with; correct?

1        A.      No.

2        Q.      Okay.  Is it fair to say that

3   in the Walgreen e-mail, they do not limit the

4   rapid growth by the word "only"?

5        A.      Yes.

6        Q.      Is it also fair to say that

7   the -- that the basis for your opinion that

8   the focus of the Amerisource Order Monitoring

9   Program is on big accounts only is the

10  statement that is highlighted on your exhibit

11  that they really only focus on heavy hitters?

12       A.      Yes.

13       Q.      Okay.  And is it -- did you

14  write this or did one of your students write

15  this or did one of your staff members write

16  this opinion?

17       A.      I wrote this.

18              MS. CONROY:  Objection.

19       Q.      (BY MR. MCGARRIGLE)  And when

20  you were writing this opinion, did you

21  attempt to be very careful and be very

22  accurate?

23       A.      I tried to be as accurate as

24  possible.

1      Q.     Okay.  Is it fair to say that

2  you took the sentence, "They really only

3  focus on heavy hitters" to mean a reference

4  to a customer?

5             Is that how you interpreted

6  this?

7      A.     Yes.

8      Q.     Yeah, because -- I want you to

9  be really careful here, because this opinion

10  is based on double hearsay, isn't it?

11             This is -- this is

12  Tasha Polster writing something based on a

13  discussion that she had with a Joe Tomkiewicz

14  of Amerisource; isn't that right?

15             MS. CONROY:  Objection.

16             THE WITNESS:  No.

17      Q.     (BY MR. MCGARRIGLE)  Okay.

18  This isn't a case where Ms. Polster is

19  talking -- is reporting back of her meeting

20  with Joe Tomkiewicz at Amerisource and

21  talking about the Order Monitoring Program?

22      A.     Not only, no.

23      Q.     With respect to the sentence

24  that you have highlighted in red, right after

1   the sentence "They really only focus on the

2   heavy hitters" that you interpreted to mean

3   the customers, the next sentence says "OxyIR

4   30 MK combinations of cocktails with

5   hydrocodone and/or oxycodone advantage of our

6   system that we monitor CS or controlled

7   substance."

8               Are you familiar with opioid

9   cocktails?  Are you familiar with opioid

10  cocktails?

11       A.    Mixtures?  Yes.

12       Q.    What's a Trinity?

13       A.    That, I don't know.

14       Q.    What's a Las Vegas?

15       A.    That, I don't know.

16       Q.    Did you ever hear that a

17  Trinity opioid cocktail was a combination of

18  a mixture of either hydrocodone or oxycodone

19  and benzodiazepine and a muscle relaxer?

20       A.    No.

21             MS. CONROY:  Objection.

22       Q.    (BY MR. MCGARRIGLE)  You don't

23  know anything about that.  How about a Las

24  Vegas being a mixture of either hydrocodone

1    or oxycodone and benzodiazepine?  Did you

2    ever hear that?

3              MS. CONROY:  Objection.

4              THE WITNESS:  No.

5         Q.    (BY MR. MCGARRIGLE)  Do you

6    think there's anything wrong with an order

7    monitoring system that takes opioid cocktails

8    that are used out on the street and looks at

9    combinations when orders are coming in of

10   both an opioid with benzo?  Do you think

11   there's anything wrong with a system that

12   looks at that?

13             MS. CONROY:  Objection.

14             THE WITNESS:  That's certainly

15        something that should be looked at.

16        Q.    (BY MR. MCGARRIGLE)  So you're

17   not being critical of the ABC Order

18   Monitoring Program that is focusing and

19   looking at cocktail combinations, are you?

20        A.    I'm not criticizing that part

21   of the sentence.  Correct.  I'm criticizing

22   the first part of the sentence.

23        Q.    Right.  And that's because you

24   misunderstood what Ms. Polster was talking

1    about when she was talking about the heavy

2    hitters.  She's not talking about customers.

3    She's talking about drugs and drug

4    combinations, oxy, hydro, Trinities.

5         A.    No, that's exactly what I

6    interpreted.

7              MS. CONROY:  Objection.

8         Q.    (BY MR. MCGARRIGLE)  Oh.  Okay.

9    So now you agree with me that the heavy

10   hitter reference that's being made is not to

11   heavy hitter customers, not big customers,

12   not major customers, but in fact is a

13   reference to the drugs that are -- that are

14   the more powerful opioids that have been

15   abused; is that your testimony?

16        A.    No.  This reference to heavy

17   hitters is to OxyIR, a combination of

18   cocktails with hydrocodone, and/or oxycodone.

19        Q.    Okay.  So you agree with me

20   that the reference to heavy hitters refers to

21   the drug; correct?

22        A.    In that section, that's

23   correct.

24        Q.    Okay.  And you've inserted the

1    word, in your opinion, "only rapid growth."

2    Isn't that correct?

3              MS. CONROY:  Objection, asked

4         and answered.

5         Q.    (BY MR. MCGARRIGLE)  I'm happy

6    with the answer.

7              Let's talk to -- in coming up

8    with this opinion, being critical of ABC's

9    Order Monitoring Program, did you -- can you

10   tell me what the OMP is for ABC?

11        A.    No.

12        Q.    Is that just too many letters

13   to deal with?  Do you want me to break it

14   down?

15        A.    Go ahead.

16        Q.    All right.  Order Monitoring

17   Program.

18        A.    Right.

19        Q.    Do you know Amerisource's Order

20   Monitoring Program?

21        A.    Do I know how --

22        Q.    Do you know -- can you give me

23   the details of it?

24        A.    They do it.

1    Q.    Yes.

2    A.    No.

3    Q.    Do you --

4    A.    It's changed over time.  So

5  you've got to give me a time.  But I don't

6  know what -- as I sit here today without

7  reviewing it for any period of time.

8    Q.    For any of the periods of time.

9  Do you know how they -- how the Amerisource

10  Order Monitoring Program calculates

11  thresholds?

12         That's a yes, no?

13    A.    Do you mean at any point in

14  time?

15    Q.    Now.  Can you tell me that?

16    A.    No.

17    Q.    Can you tell me, Doctor, can

18  you tell me if you are aware that under the

19  Order Monitoring Program, the focus is on

20  looking at all sales, whether the sales come

21  from a small, a medium, or a large customer?

22  Do you know that?

23    A.    That's not what this says.

24    Q.    Well, this is coming from

1     Walgreens, right?

2          A.     That's a Walgreens memo based

3     on a meeting with Amerisource.

4          Q.     Now, I want you to take a look

5     at another document.

6                 This will be -- looking at your

7     report --

8          A.     Did you mark this?

9          Q.     That was -- that was marked and

10    given --

11                MR. MCGARRIGLE:  Let's make

12          that 30 and that 30A.

13                (Whereupon, Deposition Exhibit

14          Egilman 30, Opinion- AmerisourceBergen

15          ("ABC") was light on order monitoring.

16          The ABC focus is only on rapid growth,

17          not steady sales  Focus on big

18          accounts only for suspicious order

19          monitoring, was marked for

20          identification.)

21                (Whereupon, Deposition Exhibit

22          Egilman 30A, Opinion-

23          AmerisourceBergen ("ABC") was light on

24          order monitoring.  The ABC focus is

1          only on rapid growth, not steady sales

2          Focus on big accounts only for

3          suspicious order monitoring, with

4          revisions, was marked for

5          identification.)

6          Q.    (BY MR. MCGARRIGLE)  All right.

7    Doctor, look at your report, page 80,

8    paragraph 7121.  "Opinion.  Amerisource

9    Bergen wanted to low key" -- in

10   parenthesis -- "hide its association with

11   pain care forum, PCF."

12             Do you see that?

13         A.    I do.

14         Q.    And in support of that, you

15   cite us to Exhibit B121.  I'll have that

16   marked as Exhibit 31.

17             (Whereupon, Deposition Exhibit

18         Egilman 31, Opinion-AmerisourceBergen

19         ("ABC") wanted to 'low key' (HIDE) its

20         association with Pain Care Forum

21         ("PCF") with attachments

22         PPLP004210521-4210523,

23         PPLP004279424-4279425, PPLP004303453,

24         PPLP004303456-4303457,

1          PPLPC018001477198-1477200,

2          PPLPC022000926958-22000926959, was

3          marked for identification.)

4          Q.     (BY MR. MCGARRIGLE)  Did either

5     your student or your staff member write this

6     opinion?

7          A.     No.

8                 MS. CONROY:  Objection.

9          Q.     (BY MR. MCGARRIGLE) Do you have

10    a corresponding exhibit and has it changed or

11    does it have any notes or modifications on

12    it?

13                MS. CONROY:  There are no notes

14         or modifications.

15         Q.     (BY MR. MCGARRIGLE)  Okay.  So

16    it's clean, and you haven't changed your

17    opinion; correct?

18         A.     No.

19         Q.     And in this, you're actually --

20    is this one or two opinions?  Is this an

21    opinion, 1, that AmerisourceBergen is

22    associated with a pain care forum, and 2,

23    it's trying to hide that association?

24                MS. CONROY:  Do you have a copy

1    of the exhibit for me?

2            MR. MCGARRIGLE:  Probably not.

3            There you go.

4            MS. CONROY:  Thank you.

5            THE WITNESS:  Two --

6            I think --

7        Q.    (BY MR. MCGARRIGLE)  The

8    question is --

9        A.    I think it could be either 1 or

10   2.

11       Q.    Okay.

■

■

■

■

■

■

18       Q.    (BY MR. MCGARRIGLE)  Do you

19   know if either Mr. Rosen or Ms. Norton were

20   deposed in this litigation?

21       A.    I think Rosen was.

22       Q.    Did you read his deposition?

23       A.    I can't recall.  It's possible.

■

5    Q.    Do you know if Ms. Norton was

6  deposed in that case?

7    A.    That, I don't know.

13        THE WITNESS:  I was pretty sure

14        they weren't deposed on it.

15    Q.    (BY MR. MCGARRIGLE)  Well,

16  whatever, Mr. -- I will tell you, and I'll

17  represent to you that -- I want you to assume

18  that Ms. Norton was in fact deposed.

19    A.    That, I understand.  But

20  whether she was deposed on this topic, I

21  don't think so.

22    Q.    Did you ever ask your students

23  or your staff members to go review

24  Mr. Rosen's deposition testimony or

1     Ms. Norton's deposition testimony before you

2     came up with the opinion that ABC was

3     associated with the pain care forum and

4     really wanted to hide that association?

5              Did you do that?

6        A.     Rosen, I think I read.  Not

7     Norton.

8        Q.     Okay.  Not Norton.

9              In fact, a large part of your

10    opinion to hide is based on the fact that

11    Ms. Norton used the word "low key"; correct?

12       A.     Correct.

13       Q.     Among your many specialties and

14    areas of expertise, do you include the

15    English language?

16              It's not meant to be a joke.

17    Do you include the English language as an

18    area where you're an expert.

19       A.     I think I'm fluent in English.

20       Q.     All right.  What definition did

21    you use to equate the word "low key" with the

22    word "hide"?

23       A.     I didn't get a dictionary

24    definition.

1          Q.     Why did you use the word

2    "hide"?  "Hide" sounds sinister.  It sounds

3    like you did something wrong and you're

4    trying to hide something.  Is that what you

5    were trying to imply in your opinion?

6          A.     Something sinister?

7          Q.     Yeah.

8          A.     No.  Just stating a fact.

9          Q.     People that hide usually are

10   trying to cover up something, aren't they?

11         A.     Not necessarily.

12         Q.     Do you know the definition of

13   low key means laid back?  It means not

14   elaborate, not showy, not intense,

15   restrained.  Low profile.  Relaxed.

16   Easygoing.  Calm.

17                Do you accept those definitions

18   of the word "laid back"?

19                Do you accept those

20   definitions --

21         A.     Sure.

22         Q.     -- of the word "laid back"?

23         A.     Sure.

24         Q.     What I don't see as the

1    definition of laid back, however, is the word

2    "hide."

3         A.    I don't know.  I haven't

4    looked.







19    Q.    What about in your folders back
20  there because I'm sure they have this in
21  there.
22    A.    Let's see that.
23    Q.    Could you -- did you have a
24  chance to look at those?

1          A.      I've got it.

2          Q.      They should be the exhibits.

3          A.      I've got it.

4          Q.      So in support of this opinion

5     that in 2008, ABDC was associated with the

6     pain care forum and was trying to hide it,

7     you say six documents dated July 2010, two

8     years after this e-mail, 2012, four years

9     after the e-mail, three of them dated 2016,

10    which was eight years after the e-mail, and

11    2017, nine -- almost nine years after the

12    e-mail, how desperate were you to support

13    this opinion by using documents that occurred

14    almost a decade after this supposed event?

15              MS. CONROY:  Objection.

16              THE WITNESS:  Not at all.

17         Q.      (BY MR. MCGARRIGLE)  Do any of

18    those documents, any of those six documents

19    even have the name "Amerisource" on them?

20         A.      Let's see.

21              MS. WELCH:  Counsel, if you're

22    not done, we need to take a break.

23              MS. CONROY:  We're in the

24              middle of an answer here.

1      MS. WELCH:  Sorry, I thought he

2          had answered it.

3      Q.    (BY MR. MCGARRIGLE)  I want you

4  to assume, Doctor -- I'll help you out a

5  little bit because we're pressed for time.

6  There's 110 names on that e-mail, not one

7  from Amerisource.

8      A.    On the cover, you mean?

9      Q.    Yes.

10     A.    Well, I'm looking.

11         [Document review.]

12         THE WITNESS:  Well, this is

13         a -- first of all, it's an HDMA.net

14         document.  So it's an HDMA document of

15         which Amerisource was a member.

16         The side e-mail also refers to

17         HDMA testimony, of which

18         AmerisourceBergen was a member.

19     Q.    (BY MR. MCGARRIGLE)  Well,

20  that's not your opinion.  Your opinion isn't

21  that HDMA was trying to hide their

22  association with the forum, that Amerisource

23  was.  Correct?

24     A.    Let me just see what the

1    question was before you interrupted the

2    answer.

3              [Document review.]

4              THE WITNESS:  Well, this says

5         HDMA -- this is referring to McKesson

6         joining the pain care forum.

7              Bert Rosen says, if you're a

8         member of HDMA, you're already a

9         member of the pain care forum.

10        AmerisourceBergen was a member of

11        HDMA, so according to Bert Rosen, they

12        were members of the pain care forum

13        through their membership in HDMA.  And

14        AmerisourceBergen is on the next

15        document in an e-mail; Norton, in

16        fact.

17             Q.    (BY MR. MCGARRIGLE)  And that's

18   dated what date?

19             A.    2017.

20             And this is -- I think

21   Bert Rosen acting in his role as the pain

22   care forum lobbyist.

23             [Document review.]

24             That's it.

1          MR. MCGARRIGLE:  And that's it

2     for me.  Thanks.

3          THE VIDEOGRAPHER:  Going off

4     the record.  The time is 7:43 p.m.

5          (Proceedings recessed at

6     7:43 p.m.)

7                --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    CERTIFICATE
 2            I, DEBRA A. DIBBLE, Registered
    Diplomate Reporter, Certified Realtime
 3  Reporter, Certified Realtime Captioner,
    Certified Court Reporter and Notary Public,
 4  do hereby certify that prior to the
    commencement of the examination, DR. DAVID
 5  EGILMAN was duly sworn by me to testify to
    the truth, the whole truth and nothing but
 6  the truth.
 7            I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
 8  testimony as taken stenographically by and
    before me at the time, place and on the date
 9  hereinbefore set forth, to the best of my
    ability.
10
              I DO FURTHER CERTIFY that pursuant
11  to FRCP Rule 30, signature of the witness was
    not requested by the witness or other party
12  before the conclusion of the deposition.
13            I DO FURTHER CERTIFY that I am
    neither a relative nor employee nor attorney
14  nor counsel of any of the parties to this
    action, and that I am neither a relative nor
15  employee of such attorney or counsel, and
    that I am not financially interested in the
16  action.
17
18
19  _____
    DEBRA A. DIBBLE, RDR, CRR, CRC
20  NCRA Registered Diplomate Reporter
    NCRA Certified Realtime Reporter
21  Certified Court Reporter
22
    Dated: 1 May 2019
23
24
```

1          INSTRUCTIONS TO WITNESS

2

3          Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the

6    appropriate space on the errata sheet for any

7    corrections that are made.

8          After doing so, please sign the

9    errata sheet and date it.

10          You are signing same subject to

11   the changes you have noted on the errata

12   sheet, which will be attached to your

13   deposition.

14          It is imperative that you return

15   the original errata sheet to the deposing

16   attorney within thirty (30) days of receipt

17   of the deposition transcript by you.  If you

18   fail to do so, the deposition transcript may

19   be deemed to be accurate and may be used in

20   court.

21

22

23

24

1                          ERRATA

2      Page   LINE   CHANGE

3      _____  _____  _____

4             REASON: _____

5      _____  _____  _____

6             REASON: _____

7      _____  _____  _____

8             REASON: _____

9      _____  _____  _____

10            REASON: _____

11     _____  _____  _____

12            REASON: _____

13     _____  _____  _____

14            REASON: _____

15     _____  _____  _____

16            REASON: _____

17     _____  _____  _____

18            REASON: _____

19     _____  _____  _____

20            REASON: _____

21     _____  _____  _____

22            REASON: _____

23     _____  _____  _____

24            REASON: _____

1      ACKNOWLEDGMENT OF DEPONENT

2

3

4           I, DAVID S. EGILMAN, M.D., MPH, do

   hereby certify that I have read the foregoing

5  pages and that the same is a correct

   transcription of the answers given by me to

6  the questions therein propounded, except for

   the corrections or changes in form or

7  substance, if any, noted in the attached

   Errata Sheet.

8

9

10

11

12  _____

    DAVID S. EGILMAN, M.D., MPH          DATE

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  _____

20  Notary Public

21

22

23

24

1

                        LAWYER'S NOTES

2

3      page      LINE

4     \_\_\_\_\_     \_\_\_\_\_    _____

5     \_\_\_\_\_     \_\_\_\_\_    _____

6     \_\_\_\_\_     \_\_\_\_\_    _____

7     \_\_\_\_\_     \_\_\_\_\_    _____

8     \_\_\_\_\_     \_\_\_\_\_    _____

9     \_\_\_\_\_     \_\_\_\_\_    _____

10    \_\_\_\_\_     \_\_\_\_\_    _____

11    \_\_\_\_\_     \_\_\_\_\_    _____

12    \_\_\_\_\_     \_\_\_\_\_    _____

13    \_\_\_\_\_     \_\_\_\_\_    _____

14    \_\_\_\_\_     \_\_\_\_\_    _____

15    \_\_\_\_\_     \_\_\_\_\_    _____

16    \_\_\_\_\_     \_\_\_\_\_    _____

17    \_\_\_\_\_     \_\_\_\_\_    _____

18    \_\_\_\_\_     \_\_\_\_\_    _____

19    \_\_\_\_\_     \_\_\_\_\_    _____

20    \_\_\_\_\_     \_\_\_\_\_    _____

21    \_\_\_\_\_     \_\_\_\_\_    _____

22    \_\_\_\_\_     \_\_\_\_\_    _____

23    \_\_\_\_\_     \_\_\_\_\_    _____

24    \_\_\_\_\_     \_\_\_\_\_    _____