```
 1             UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3   IN RE: NATIONAL          )   MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION,              )   Case No.
                              )   1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6   ALL CASES                )   Polster
                              )
 7
 8                    __ __ __
 9             Friday, April 26, 2019
                      __ __ __
10
      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11             CONFIDENTIALITY REVIEW
                      __ __ __
12
13
14
15        Videotaped Deposition of DAVID S.
     EGILMAN, M.D., MPH, held at the Providence
16   Marriott Downtown, 1 Orms Street, Providence,
     Rhode Island, commencing at 9:08 a.m., on the
17   above date, before Debra A. Dibble, Certified
     Court Reporter, Registered Diplomate
18   Reporter, Certified Realtime Captioner,
     Certified Realtime Reporter and Notary
19   Public.
20
                      __ __ __
21
22
23           GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
24                deps@golkow.com
```

```
 1                A P P E A R A N C E S:
 2
        SIMMONS HANLY CONROY, LLC
 3      BY:  JAYNE CONROY, ESQUIRE
             jconroy@simmonsfirm.com
 4           ELLYN HURD, ESQUIRE
             ehurd@simmonsfirm.com
 5           RICK KROEGER, ESQUIRE
             (appearing telephonically)
 6           rkroeger@simmonsfirm.com
             SANFORD SMOKLER, ESQUIRE
 7           (appearing telephonically)
             ssmokler@simmonsfirm.com
 8           LAURA FITZPATRICK, ESQUIRE
             (appearing telephonically)
 9           lfitzpatrick@simmonsfirm.com
        One Court Street
10      Alton, Illinois 62002
        (618) 259-6621
11      Counsel for MDL Plaintiffs
12
        MOTLEY RICE, LLC
13      BY:  JENNA FORSTER, ESQUIRE
             jforster@motleyrice.com
14           (appearing telephonically)
        28 Bridgeside Boulevard
15      Mt. Pleasant, South Carolina 29464
        (843) 216-9241
16      Counsel for Summit County and
        Plaintiffs
17
18      NAPOLI SHKOLNIK, PLLC
        BY:  SHAYNA E. SACKS, ESQUIRE
19           shayna@napolilaw.com
        360 Lexington Avenue
20      11th Floor
        New York, New York 10017
21      Counsel for Cuyahoga County and
        Plaintiffs
22
23
24
```

```
 1        HOLLAND & KNIGHT, LLP
          BY:  MATTHEW DONOHUE, ESQUIRE
 2             matthew.donohue@hklaw.com
               JESSICA FARMER, ESQUIRE
 3             jessica.farmer@hklaw.com
          800 17th Street N.W.
 4        Suite 1100
          Washington, DC 20006
 5        (202) 469-5222
          Counsel for Insys Therapeutics
 6
 7        COVINGTON & BURLING, LLP
          BY: JENNIFER L. SAULINO, ESQUIRE
 8             jsaulino@cov.com
               GREGORY L. HALPERIN, ESQUIRE
 9             ghalperin@cov.com
               CLAYTON L. BAILEY, ESQUIRE
10             cbailey@cov.com
          One CityCenter
11        850 Tenth Street, NW
          Washington DC 20001-4956
12        (202) 662-5305
          Counsel for McKesson
13
14        WILLIAMS & CONNOLLY, LLP
          BY:  A. JOSHUA PODOLL, ESQUIRE
15             apodoll@wc.com
               (appearing telephonically)
16        725 Twelfth Street, NW
          Washington D.C. 20005
17        (202) 434-5092
          Counsel for Cardinal Health, Inc.
18
19        DECHERT, LLP
          BY:  TIMOTHY C. BLANK, ESQUIRE
20             timothy.blank@dechert.com
               JENNA NEWMARK, ESQUIRE
21             jenna.newmark@dechert.com
          Three Bryant Park
22        1095 Avenue of the Americas
          New York, New York 10036-6797
23        (212) 698-3500
          Counsel for Purdue Pharma L.P.,
24        Purdue Pharma, Inc.
```

```
 1        JONES DAY
          BY:  TARA FUMERTON, ESQUIRE
 2             tfumerton@jonesday.com
          77 West Wacker
 3        Chicago, Illinois 60601-1692
          (312) 782-1692
 4        Counsel for Walmart
 5
          MARCUS & SHAPIRA, LLP
 6        (appearing telephonically)
          BY:  PAUL MANNIX, ESQUIRE
 7             pmannix@marcus-shapira.com
          301 Grant Street
 8        35th Floor
          Pittsburgh, Pennsylvania 15219-6401
 9        (412) 338-4690
          Counsel for HBC
10
11        KIRKLAND & ELLIS, LLP
          BY:  PRATIK K. GHOSH, ESQUIRE
12             pratik.ghosh@kirkland.com
               DONNA WELCH, ESQUIRE
13             donna.welch@kirkland.com
           300 North LaSalle
14         Chicago, Illinois 60654
           (312) 862-3671
15         Counsel for Allergan Finance, LLC
16
          REED SMITH, LLP
17        BY:  THOMAS J. McGARRIGLE, ESQUIRE
               tmcgarrigle@reedsmith.com
18        Three Logan Square
          1717 Arch Street, Suite 3100
19        Philadelphia, Pennsylvania 19103
          (215) 851-8220
20        Counsel for AmerisourceBergen Drug
          Corporation
21
22
23
24
```

```
 1              MORGAN, LEWIS & BOCKIUS, LLP
                BY:  BRIAN M. ERCOLE, ESQUIRE
 2                   brian.ercole@morganlewis.com
                200 S. Biscayne Boulevard, Suite 5300
 3              Miami, Florida 33131-2339
                (305) 415-3416
 4              Counsel for Teva Pharmaceuticals USA,
                Inc.; Cephalon, Inc.; Watson
 5              Laboratories, Inc.; Actavis LLC;
                Actavis Pharma, Inc.; f/k/a Watson
 6              Pharma, Inc.
 7
                ARNOLD & PORTER KAYE SCHOLER, LLP
 8              (appearing telephonically)
                BY:  ANGEL TANG NAKAMURA, ESQUIRE
 9                   Angel.Nakamura@arnoldporter.com
                777 South Figueroa Street
10              44th Floor
                Los Angeles, California 90017-5844
11              (213) 243-4000
                Counsel for Endo Health Solutions
12              Inc.; Endo Pharmaceuticals Inc.; Par
                Pharmaceuticals, Inc.; Par
13              Pharmaceutical Companies, Inc.
                formerly known as Par Pharmaceutical
14              Holdings, Inc.
15
                ROPES & GRAY, LLP
16              BY:  JOSH GOLDSTEIN, ESQUIRE
                     joshua.goldstein@ropesgray.com
17              800 Boylston Street
                Boston, Massachusetts 02199-3600
18              (617) 951-7000
                Counsel for Mallinckrodt
19
20              MORGAN, LEWIS & BOCKIUS, LLP
                BY:  ELISA P. MCENROE, ESQUIRE
21                   elisa.mcenroe@morganlewis.com
                1701 Market Street
22              Philadelphia, PA 19103-2921
                (215) 963-5917
23              Counsel for Rite Aid
24
```

```
 1          LOCKE LORD, LLP
            BY:  ANNA K. FINGER, ESQUIRE
 2               Anna.K.Finger@lockelord.com
                 (appearing telephonically)
 3          2200 Ross Avenue
            Suite 2800
 4          Dallas, Texas 75201
            (214) 740-8558
 5          Counsel for Henry Schein,
            Incorporated and Henry Schein
 6          Medical Facility, Incorporated
 7
            ZUCKERMAN SPAEDER, LLP
 8          BY:  PAUL B. HYNES, ESQUIRE
                 phynes@zuckerman.com
 9          1800 M Street, Suite 1000
            Washington, DC  20036
10          Counsel for CVS Indiana LLC and CVS
            Rx Services, Inc.
11
12
            BARTLIT BECK LLP
13          BY:  BRIAN SWANSON, ESQUIRE
                 brian.swanson@barlit-beck.com
14          54 West Hubbard Street
            Suite 300
15          Chicago, Illinois 60654
            Counsel for Walgreens
16
17          O'MELVENY & MYERS LLP
            BY:  AMY R. LUCAS, ESQUIRE
18               alucas@omm.com
            1999 Avenue of The Stars, 8th Floor
19          Los Angeles, California 90067
            (310) 246-6705
20          Counsel for Janssen and Johnson &
            Johnson
21
22
23
24
```

```
 1          BARNES & THORNBURG, LLP
            BY:    WILLIAM A. HAHN, II, ESQUIRE
 2                 william.hahn@btlaw.com
            11 South Meridian Street
 3          Indianapolis, Indiana 46204
            (317) 231-7501
 4          Counsel for H.D. Smith
 5           ALSO PRESENT:
 6          Jonathan Jaffe
 7
 8
 9          APPEARING VIA VIDEO STREAM:
10          Kevin Reardon
            kevin.j.reardon@gmail.com
11
12          Jay Lichter
              jlichter@baronbudd.com
13
14          Charles Bachmann
            cbachmann@seegerweiss.com
15
16          Scott Siegel
            ssiegel@seegerweiss.com
17
18          VIDEOGRAPHER:
19          Bill Geigert
20

                        __ __ __
21                 __ __ __ __ __ __
22
23
24
```

```
 1                    I N D E X
 2   DAVID S. EGILMAN, M.D., MPH                    PAGE
 3        EXAMINATION BY MS. NEWMARK                 544
          EXAMINATION BY MS. LUCAS                   608
 4        EXAMINATION BY MS. NAKAMURA                641
          EXAMINATION BY MR. ERCOLE                  660
 5        EXAMINATION BY MS. WELCH                   696
          EXAMINATION BY MR. SWANSON                 710
 6        EXAMINATION BY MR. HYNES                   753
          EXAMINATION BY MS. MCENROE                 774
 7        EXAMINATION BY MS. FUMERTON                785
          EXAMINATION BY MR. PODOLL                  796
 8        EXAMINATION BY MS. FINGER                  811
          EXAMINATION BY MS. SAULINO                 812
 9
10                 E X H I B I T S
11   No.                Description              Page
```



```
     Egilman 33   OTHER/OxyContin Tablets NDA    563
16                #20-553,
                  PDD1501603661-1501603669
```

| | | | |
|---|---|---|---|
| 1 | Egilman 35 | FDA and Opioids: What's a Regulator to Do?  Pain Care Forum.  Douglas C. Throckmorton, MD PowerPoint, ENDO-Opioid_MDL-02791998 | 607 |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | Egilman 36 | Opinion-Around 1997, "Venture" members Ortho-McNeil (Johnson & Johnson) and Purdue began co-promoting Ultram SR, intended for the use of more moderate pain | 627 |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | Egilman 37 | Non-Malignant Pain Consensus Guidelines, PKY181320029- 181320030 | 630 |



| | | | |
|---|---|---|---|
| 13 | Egilman 39 | Exhibit B.77, David S. Egilman Report Opiate Litigation | 633 |
| 14 | | | |
| 15 | Egilman 40 | Exhibit B.136, David S. Egilman Report Opiate Litigation | 652 |
| 16 | | | |
| 17 | Egilman 41 | Opinion-ENDO was either too cheap to add its opioid labels to the 2014 PDR or completely irresponsible for this failure to warn doctors of any data concerning these dangerous drugs | 654 |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | Egilman 42 | B1, B49, B50, B94, B310, B398, and B454 | 669 |
| 22 | | | |
| 23 | Egilman 43 | B.6 Redweld | 697 |
| 24 | Egilman 44 | B.123 Redweld | 697 |
| | Egilman 45 | Tab 22, Exhibit 385 | 697 |

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Egilman 46  B.426 Redweld              697
 2      Egilman 47  B.444 Redweld              697
 3      Egilman 48  B.480 Redweld              697
 4      Egilman 49  February 2010 e-mail chain. 698
                    Subj: RE: Call this
 5                  Afternoon with attachments,
                    Acquired_
 6                  Actavis_00367447-367452
                    plus 3 more pages
 7
        Egilman 50  B.487                      777
 8
        Egilman 51  Opinion-Walmart helped     789
 9                  Actavis Market Opioids
10      Egilman 52  Opinion-Ohio Medicaid      810
                    depended on the PBMs for
11                  formulary drug
                    selection/handwritten
12                  notations "had its own
                    committee"
13
14                     — — — — — —
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    PROCEEDINGS

 2           (April 26, 2019 at 9:08 a.m.)

 3                THE VIDEOGRAPHER:  Good

 4        morning.  We are back on the record.

 5        Today's date is April 26, 2019, and

 6        the time is 9:08 a.m.

 7                This is the continuation of the

 8        deposition of Dr. David Egilman.

 9        Counsel will be noted on the

10        stenographic record.

11                Sir, I want to remind you you

12        are still under oath.

13                Counsel, please proceed.

14           DAVID S. EGILMAN, M.D., MPH,

15     having been previously duly sworn, was

16     examined and testified as follows:

17                DIRECT EXAMINATION

18     BY MR. BLANK:

19        Q.    Good morning, Dr. Egilman.  I

20     am Tim Blank with the law firm of Dechert.

21     You recognize that you're still under oath.

22     Yes?

23        A.    Yes.

24        Q.    Dr. Egilman, do you purport to
```

1    be an expert on compliance with suspicious

2    order monitoring?

3          A.     By the definition of expert

4    that I gave yesterday?  Yes.

5          Q.     By any other definition?

6          A.     Give me another definition.

7          Q.     So by your definition, you

8    purport to be an expert in suspicious order

9    monitoring?

10         A.     By the definition that I gave

11   yesterday, I'm an expert in suspicious order

12   monitoring.  I'm not an expert in all aspects

13   of suspicious order monitoring, but I'm

14   familiar with any aspects of suspicious order

15   monitoring.

16         Q.     Are you familiar with any

17   regulations that govern the obligations with

18   respect to suspicious order monitoring?

19         A.     The Controlled Substances Act

20   and --

21         Q.     Which section of the Controlled

22   Substances Act?

23         A.     I don't recall.  The Marino

24   bill which modified the DEA's ability to

Highly Confidential - Subject to Further Confidentiality Review

1      enforce suspicious order monitoring

2      violations.

3            So I'm familiar with some of

4      the enforcement actions with respect to

5      suspicious order monitoring.

6         Q.      And in your expert report, you

7      criticize the performance of various

8      defendants, manufacturers, distributors,

9      others, with respect to their compliance with

10      suspicious monitoring obligations --

11      suspicious order monitoring obligations; is

12      that right?

13         A.      Yes.

14         Q.      What is the regulation that

15      governs suspicious order monitoring?

16         A.      Do you mean under the

17      Controlled Substances Act?

18         Q.      In the Code of federal

19      regulations.

20         A.      I don't know the number.

21         Q.      And do you consider yourself a

22      Drug Enforcement Agency expert?

23         A.      I know more than the layman

24      about that. I know a lot about the DEA's

Highly Confidential - Subject to Further Confidentiality Review

1   actions or inactions in the -- with respect

2   to the defendants in this case.

3          Q.    Do you have any experience with

4   respect to DEA law enforcement?

5                THE WITNESS:  Do you have

6          the -- my LiveNote.

7                (Discussion off the record.)

8          A.    Do you mean personal

9   experience?

10         Q.    Yes.

11         A.    No.

12         Q.    Do you know how the DEA applies

13  its regulations concerning suspicious order

14  monitoring?

15         A.    I'm familiar with examples

16  in -- that I've read in its relation to the

17  companies involved in this case.

18         Q.    Do you know what data inputs

19  the DEA looks at and considers in applying

20  the SOMs, suspicious order monitoring

21  regulations?

22         A.    Some of them.  They use the

23  ARCOS database to look at sales and

24  distribution.  They also control the amount

Highly Confidential - Subject to Further Confidentiality Review

1    of basic raw materials that can come into the

2    country.  Control the amount of sales which

3    relates to eventually downstream, the number

4    of narcotics that can be suspiciously

5    ordered.

6              The -- so yes.  I can just say

7    yes.

8         Q.    How does the DEA assess the

9    data inputs to determine whether an order is

10   suspicious or not?

11        A.    I think that's changed over

12   time.

13        Q.    How do they do it?

14        A.    Well, they do it a variety of

15   ways.  One way is they rely on reports from

16   companies about suspicious order monitoring.

17   Another is they can look at the database that

18   they have of orders over time and location.

19             They also get reports from the

20   field from a variety of law enforcement

21   agencies, press reports, which then can

22   trigger investigations about suspicious order

23   monitoring.

24        Q.    Are you aware of any -- any

1    calculations that the DEA performs to

2    determine whether an order is suspicious?

3                    MS. CONROY:  Objection.

4                    THE WITNESS:  Well, I think

5         they compare -- yes.

6         Q.    (BY MR. BLANK)  And what are

7    you aware of in that respect?

8         A.    Well, they compare orders over

9    time to different -- by different

10   distributors to different locations.

11        Q.    How do they do that?

12        A.    It's different.  It's changed

13   over time.

14        Q.    How do they currently do it?

15        A.    That, I don't know.

16        Q.    When did it last change?

17        A.    That, I don't know.

18        Q.    How did they do it the last

19   time you knew how they did it?

20        A.    They set a base and they look

21   for overage over that base by some standard

22   increase over time.

23        Q.    And do you know what that

24   standard increase is?

```
1       A.      No.  It's changed over time.

2       Q.      Are you familiar with the

3  algorithm that is used to detect suspicious

4  orders?

5       A.      No.

6               MS. CONROY:  Objection.

7       Q.      (BY MR. BLANK)  Do you know how

8  any of the defendants in this case implement

9  their suspicious order monitoring practices?

10      A.      Yes.

11      Q.      Have you spoken to any of the

12  defendants in this regard?

13      A.      No.  I didn't know I was

14  allowed to.  But I would be glad to.

15      Q.      Have you ever consulted for the

16  Drug Enforcement Agency?

17      A.      No.

18      Q.      Have you ever worked for any

19  entity in the capacity of reviewing standard

20  suspicious order monitoring --

21      A.      No.

22      Q.      -- practices?

23      A.      No.  Sorry.

24      Q.      Have you ever assisted anybody
```

1    in developing a suspicious order monitoring

2    system?

3          A.     No.

4          Q.     Have you ever assisted anybody

5    in interpreting regulations relating to SOMs?

6          A.     No.

7          Q.     What are the U.S. Code sections

8    that apply to SOMs?

9          A.     I do not know.

10          Q.     What are the specific

11    requirements with respect to manufacturers?

12          A.     Manufacturers are responsible

13    to report suspicious orders.  There's no

14    specific delineation, as I understand it, for

15    how that's done.

16          Q.     Have you reviewed DEA guidance

17    on SOM policies?

18          A.     Yes.

19          Q.     When?

20          A.     Over the last several months.

21          Q.     Which ones?

22          A.     I don't recall.

23          Q.     Do you reference them in your

24    report?

1    A.    I don't think so.

2    Q.    By being --

3    A.    Well, they are referenced in --

4          In the report, as you know, I

5    summarize the -- and then I thought provided

6    to the Department of Justice, violations of

7    suspicious order monitoring rules by many of

8    the companies, and some of that information

9    was included in the DOJ decisions.

10   Q.    Yeah, I'm talking about DEA

11   guidance on SOM policies.

12   A.    Right.

13   Q.    Okay.  And then tell me once

14   again, because I can't recall if you told me

15   already.  What is the basis for your claim to

16   be an expert on whether any of these

17   defendants are complying with their SOM

18   obligations?

19   A.    I used the methodology

20   explained in my report to review the

21   documents, to look at that issue.  And I

22   examined, for example, the violations of SOM

23   procedures, e-mails, other documents, and

24   made conclusions about SOM violations based

1    on statements made by company officials in

2    e-mails and memos, and in some cases,

3    deposition testimony.  And the compliance

4    enforcement actions of the DEA.

5         Q.    But just because you did that

6    doesn't make you an expert.  I want to know

7    what makes you an expert.

8              MS. CONROY:  Objection.

9              THE WITNESS:  Okay.  I'm

10             telling you that what I just said

11             makes me an expert by my definition of

12             an expert.  Very few people,

13             independent of the companies, have

14             been able to review the e-mails,

15             communications, documents, and detail

16             related to the company's lack of

17             adequate enforcement of suspicious

18             order monitoring rules, regulations,

19             procedures.  So that means I know more

20             about it than a layman.  And that

21             means -- and I can explain it to a

22             layman.

23                  So by my definition of an

24             expert, which may be different than

1          your definition of an expert, that is

2          my expertise.

3          Q.     (BY MR. BLANK)  Did anybody

4     except the plaintiffs in this case ever ask

5     you for your expert opinion on SOM

6     compliance?

7               MS. CONROY:  Objection.

8               THE WITNESS:  No.

9          Q.     (BY MR. BLANK)  Doctor Egilman,

10    did you do anything to prepare for your

11    deposition today?

12         A.     Yes.

13         Q.     And yesterday?

14         A.     Yes.

15         Q.     What did you do?  Specifically

16    to prepare for the deposition.

17         A.     I reread the report.  Took

18    notes.  Made notes on them.

19               I spent a couple days with the

20    plaintiff lawyers two days before the

21    deposition.

22         Q.     Which -- when did you meet with

23    the plaintiffs' lawyers?

24         A.     On Tuesday and Wednesday.

```
 1          Q.     Full days?

 2          A.     Five, six hours each day.

 3          Q.     Where?

 4          A.     Here.

 5          Q.     Where exactly?  In this hotel?

 6          A.     In this hotel.

 7          Q.     Who was present?

 8          A.     Different people different

 9   days.  Ed Wallace the first day.  Jayne

10   Conroy the second day.  Ellyn Hurd both days.

11   Erin Dickinson the first day.  Dave Buchanan

12   the second day.  Jonathan Jaffe.

13          Q.     Were they all lawyers?

14          A.     Mr. Jaffe is not a lawyer.

15          Q.     So you met with five lawyers

16   and Mr. Jaffe?

17          A.     Yes.

18          Q.     Anybody else?

19          A.     That's all I can recall.  There

20   may have been other lawyers whose names have

21   escaped.

22          Q.     Were lawyers also on the phone

23   from time to time?

24          A.     Not that I know of.
```

```
1        Q.      Were any of your staff or
2   student research assistants present?
3        A.      They were in and out for some
4   part of the time, yes.
5        Q.      They travel from your office to
6   this hotel to meet?
7        A.      Right.  Well, not -- they
8   schlepped a lot of material here, so yes.
9        Q.      Did you make any notes with --
10  in connection with your preparation?
11       A.      Yes.
12       Q.      Have you shared those with us?
13       A.      Yes.
14       Q.      Are there any notes that you
15  have not shared with us from your
16  preparation?
17       A.      I don't think so.
18       Q.      When you were retained by the
19  plaintiffs in November of 2018, what were you
20  told about the litigation?
21       A.      I don't recall specifically.
22       Q.      How about generally?
23       A.      Generally?  I was told of the
24  lawsuits by cities and counties from around
```

Highly Confidential - Subject to Further Confidentiality Review

1    the country.  And that they had sued

2    manufacturers and distributors for two

3    claims, the nuisance claim and the RICO

4    claim.  And that the suit was based on the

5    harms, the cost of the harms done to the

6    plaintiffs in the case, costs of those harms.

7    And that's basically it.  Generally.

8          Q.      And who told you that?

9          A.      Probably Ms. Conroy.

10         Q.      Pardon?

11         A.      Ms. Conroy.

12         Q.      Anybody else?

13         A.      Not in November.

14         Q.      Which -- have you read the

15   complaint in the action in which you are

16   purporting to testify as an expert?

17         A.      Yes.

18         Q.      Which complaint have you read?

19         A.      Read the complaint in this

20   case.  I read the complaint in the

21   Massachusetts case.  I read the complaint in

22   the New York case.  I think I read some of

23   the complaint in the Oklahoma case.

24         Q.      Did you read the entire

1    complaint in this case?

2         A.    Yes.

3         Q.    Can you recall what it says in

4    that complaint about MS Contin?

5         A.    No.

6         Q.    Do you recall if it says

7    anything about MS Contin?

8         A.    I think MS Contin was not

9    mentioned in the complaint.

10        Q.    And I believe yesterday you

11   testified about many of the documents that

12   you reviewed in preparing your expert report.

13   Were you sent any documents specifically

14   relating to Cuyahoga or Summit counties?

15        A.    Yes.

16        Q.    Which ones?

17        A.    Well, I read the depositions

18   through the Summit, Cuyahoga County people

19   responsible for the health plans.  And I read

20   the deposition of the Medicaid person for the

21   state of Ohio with respect to the

22   formularies.

23             I gave you a Summit County --

24   or there was a Summit County PowerPoint.

Highly Confidential - Subject to Further Confidentiality Review

1    There were documents in the database that I

2    had that weren't sent to me, but they were in

3    the database.  One of those is a Summit

4    County PowerPoint that I mentioned yesterday.

5    So there were other Summit Cuyahoga County

6    documents.  For example, there is an ROI

7    squared document that deals with Cleveland

8    Clinic and KOLs in Cuyahoga County.

9            And I've got documents related

10   to physicians who've been accused of and

11   sometimes convicted of overprescribing.  So I

12   had those documents.

13       Q.    Were -- those physicians were

14   from Summit or Cuyahoga counties?

15       A.    I think so.

16       Q.    Do you remember the names?

17       A.    No, but they're in the --

18   they're in my report.

19       Q.    Did you --

20       A.    Can I just finish my answer?

21            You asked me for all of the

22   documents that I reviewed.

23       Q.    Okay.  You can -- I'm satisfied

24   with what you've said so far.  I'd like to

Highly Confidential - Subject to Further Confidentiality Review

1    follow up on some of the things you've said.

2         A.    That's great.  So my answer is

3    incomplete.

4         Q.    Well, when was -- have you ever

5    been to Ohio?

6         A.    Yes.

7         Q.    When was the last time you

8    went?

9         A.    To Ohio?  Probably 2005, 2006

10   time period.

11        Q.    Have you -- and during that

12   trip to Summit -- or Ohio, did you go to

13   Summit or Cuyahoga County?

14        A.    Not on that trip.

15        Q.    Since you've been retained in

16   this case, which was November of 2018, you

17   have not been to Ohio; correct?

18        A.    That's correct.

19        Q.    Have you interviewed any

20   prescribers from Summit or Cuyahoga counties

21   in Ohio?

22        A.    Not since -- not in the last

23   several years.

24        Q.    Pardon?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     Not in the last several years.

2          Q.     Have you ever interviewed any

3    prescribers from Summit or Cuyahoga counties

4    in Ohio?

5          A.     I believe so.

6          Q.     When?

7          A.     I can't recall the year, but I

8    attended a conference in Cleveland and there

9    were prescribers there and I spoke to them.

10         Q.     Did you -- yeah, do you recall

11   their names?

12         A.     No.

13         Q.     How long did you speak with

14   them for?

15         A.     I think it was a one-day

16   conference, so that day.

17         Q.     You spoke with them all day?

18         A.     Well, I was speaking to lots of

19   people from Cleveland at that time.  They

20   were mostly physicians.

21         Q.     How many?

22         A.     I don't recall.

23         Q.     And did you -- did you discuss

24   opioid prescriptions with them?
```

```
 1              A.     I can't recall.

 2              Q.     Since you've been retained in

 3    this case, have you discussed with any

 4    prescriber from Cuyahoga or Summit County

 5    whether they saw any marketing messages by

 6    any defendants in this case that they say

 7    were misleading?

 8              A.     No.

 9              Q.     Have you ever had such a

10    discussion with any such prescribers for

11    Summit or Cuyahoga counties?

12              A.     No.

13              Q.     So I take it, then, you've

14    never asked any of such prescribers from

15    Cuyahoga or Summit County whether they've

16    relied on any marketing messages by any of

17    the defendants in this case in making

18    prescriptions decisions; correct?

19              A.     No.

20              Q.     That's incorrect?

21              A.     Correct.

22              Q.     Have you ever asked or spoken

23    with any prescribers from Cuyahoga or Summit

24    counties whether they wrote any medically
```

1    unnecessary opioid prescriptions for anyone

2    in either of those two counties based on

3    misleading marketing messages?

4                    MS. CONROY:  Objection.

5                    THE WITNESS:  Do you mean

6         personally asked?

7         Q.    (BY MR. BLANK)  Correct.

8         A.    No.

9         Q.    Have you interviewed any

10   patients who received opioid prescriptions in

11   Cuyahoga or Summit County?

12        A.    No.

13        Q.    When you were retained in this

14   case, did you receive any summaries of any

15   type from plaintiffs' counsel?

16        A.    Aside from the complaints?  No.

17        Q.    Well, the complaint's not a

18   summary.  I meant a summary where a -- the

19   plaintiffs' lawyers have summarized issues or

20   summarized deposition testimony or summarized

21   documents for you.

22        A.    Not that I can recall.

23        Q.    Did you receive any medical

24   literature from plaintiffs' counsel?

```
 1          A.      No.

 2          Q.      Have you received any summaries

 3     of testimony from plaintiffs' counsel,

 4     whether those summaries are verbal or

 5     written?

 6          A.      We've discussed the testimony

 7     given in the case, yes.

 8          Q.      What's the -- you discussed the

 9     testimony you've given so far in this case?

10          A.      Discussed the testimony?  Have

11     I discussed the testimony that I gave

12     yesterday?

13          Q.      No.  Have you discussed with

14     plaintiffs' counsel the testimony given by

15     other witnesses in this case?

16          A.      Yes.

17          Q.      Which witnesses did you

18     discuss?

19          A.      I think Rosen, Sade,

20     Kathe Sackler, Richard Sackler.

21                  And some other testimony that I

22     think I cited in the report.

23          Q.      What were you told --

24          A.      We probably discussed that.
```

```
 1          Q.     What were you told about

 2   Rosen's testimony?

 3          A.     I don't recall.

 4          Q.     What were you told about Sade's

 5   testimony?

 6          A.     I don't recall.

 7          Q.     What were you told about

 8   Kathe Sackler's testimony?

 9          A.     I don't recall.

10          Q.     What were you told about

11   Richard Sackler's testimony?

12          A.     I don't recall.

13          Q.     Just to confirm, you were not

14   given any written summaries of any of the

15   testimonies?

16          A.     I got full depositions.

17          Q.     Full transcripts but not

18   summaries from counsel?

19          A.     Right.

20          Q.     Dr. Egilman, are you familiar

21   with 21 CFR -- that's the Code of Federal

22   Procedure, Section 1301.74?

23          A.     Not by number.

24          Q.     So you don't know what that is?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Not by number.

2    Q.    That number doesn't ring a bell

3    with you?

4    A.    The number doesn't ring a bell

5    to me.

6    Q.    Dr. Egilman, would you agree

7    that chronic pain is a serious medical

8    condition?

9         MS. CONROY:  Objection.

10        THE WITNESS:  Yes and no.

11   Q.    (BY MR. BLANK)  Would you agree

12   that chronic pain affects millions of people

13   in the United States?

14   A.    Probably, but I'm not sure.

15   Q.    Would you agree that chronic

16   pain affects people in Summit County, Ohio?

17   A.    Yes.

18   Q.    Would you agree that chronic

19   pain affects people in Cuyahoga County, Ohio?

20   A.    Yes.

21   Q.    Do you agree that there are

22   risks associated with untreated chronic pain?

23   A.    From the underlying disease

24   that causes the pain, yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Do you agree that every patient

2   should be treated individually?

3      A.      No.

4      Q.      Do you agree that there is no

5   single treatment option that is appropriate

6   for every chronic pain patient?

7      A.      Yes.

8      Q.      Do you agree that it is

9   important for physicians to have a variety of

10  treatment options to choose from when

11  treating a medical condition?

12     A.      I answered that one yesterday,

13  and let me accept the same answer.  But I can

14  repeat --

15     Q.      I do recall you did answer that

16  yesterday.  I don't need to hear it again.

17             Do you agree that all

18  treatments for chronic pain have risks?

19     A.      No.

20     Q.      Do you agree that's the role of

21  the prescribing physician, to weigh risks and

22  benefits of any pain medication when treating

23  an individual patient?

24     A.      When they can.

1    Q.    Do you agree that a physician

2    should use his or her best judgment when

3    deciding whether to prescribe a medication

4    for pain?

5    A.    I'm not sure.  It's too broad.

6    It includes all physicians.  Physicians have

7    different judgments.

8    Q.    Do you think some physicians

9    should not use their best judgment?

10   A.    I think some physicians don't

11   have good judgment.  I can't evaluate -- I

12   can't answer that question without, you know,

13   some physicians are addicted to opioids, for

14   example.  When you're addicted to opioids,

15   you lose good judgment.

16   Q.    Okay.

17   A.    You may use the best judgment

18   that you have, but because you're addicted to

19   opioids, your best judgment may not be

20   adequate for treating the patient.  So there

21   are -- it's a more complicated question than

22   just that answer would imply.

23   Q.    Sir, would you -- understood.

24   But you agree that a physician should use the

Highly Confidential -- Subject to Further Confidentiality Review

1    best judgment that he or she has when

2    deciding whether to prescribe a medication

3    for pain; correct?

4          A.     No.  Same answer.

5          Q.     Whatever the best judgment of

6    that physician is, shouldn't that physician

7    use that best judgment?

8          A.     If you are an -- if you are an

9    opioid addict physician, right, I don't think

10   you should be using any judgment.  I don't

11   think you should be prescribing or

12   practicing.  Okay?

13              So best judgment, medium

14   judgment, low judgment doesn't matter.  Some

15   physicians are not -- because of their

16   vocation, their personal problems, other

17   medical issues, other issues, should not be

18   using any judgment, should not be

19   prescribing.

20          Q.     So for -- let's carve out those

21   physicians that you claim are incapable of

22   having appropriate judgment.  And of the

23   physicians that do have judgment, do you

24   agree they should use their best judgment

1    when prescribing medicine for pain?

2              MS. CONROY:  Objection.

3              THE WITNESS:  I think it's too

4         vague a question for me, because I

5         don't know how to assess best judgment

6         for all physicians.

7         Q.    (BY MR. BLANK)  I'm not asking

8    you to.  I'm just asking you whether you

9    agree that the physicians who have judgment

10   should use the best of that judgment when

11   prescribing pain medications for their

12   patients.

13        A.    Sorry.

14             MS. CONROY:  Objection.

15             THE WITNESS:  It's a vague and

16        ambiguous question.

17             I have good judgment, but you

18        don't want me operating on your

19        coronary arteries.  No matter what my

20        judgment is, I shouldn't be doing

21        that.

22        Q.    (BY MR. BLANK)  You said

23   yesterday that you prescribed opioids to one

24   of your patients; correct?

```
 1              A.      In part.

 2              Q.      You said yesterday, I believe,

 3      that you prescribed opioids to one of your

 4      patients who was an addict.  Correct?

 5              A.      That's what I believed at the

 6      time, yes.

 7              Q.      Okay.  And were you using your

 8      best judgment when you did that?

 9              A.      Yes.  I was trying to get him

10      off the opioids.  I couldn't just stop them.

11      Put him in withdrawal.

12              Q.      Dr. Egilman, do you agree that

13      students in medical school learn that opioids

14      are addictive?

15              A.      When?

16              Q.      Ever.  In medical school.

17              MS. CONROY:  Objection.

18              THE WITNESS:  Do you mean

19          medical school now?  Or medical school

20          when I went to medical school?  Or

21          medical school when someone else went

22          to medical school in 1960?

23              Q.      (BY MR. BLANK)  Now.

24              A.      I don't think all of them do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I don't think it's a uniform part of the
 2    curriculum, per se.
 3           Q.    Did you?
 4           A.    I had no lecture on opioid
 5    addiction that I can recall in medical
 6    school.
 7           Q.    Did you learn it otherwise in
 8    medical school?
 9           A.    No.  I think I learned it
10    otherwise, not in medical school.
11           Q.    So you did not --
12           A.    I did not in medical school.
13           Q.    So you did not learn in medical
14    school that opioids are addictive?
15           A.    No.  I learned it was -- I knew
16    opioids were addictive before I went to
17    medical school.  I didn't have a lecture on
18    opioid addiction in medical school that I can
19    recall.
20           Q.    Dr. Egilman, are you a pain
21    management specialist?
22           A.    I manage patients with pain.
23    That's what I've done my whole life.
24           Q.    Are you a pain management
```

Highly Confidential - Subject to Further Confidentiality Review

1  specialist in your view?

2       A.    I manage patients with pain all

3  the time.

4       Q.    Are you a specialist in that

5  field?  "Yes" or "no"?  Or I don't know?

6  Which of those?

7       A.    Do you want a "yes" or "no"?

8  Yes, I manage patients with pain all the

9  time.

10      Q.    Okay.  Listen to my question,

11  then.  Are you a pain management specialist?

12      A.    Yes.  I manage pain all the

13  time in my practice.  When I was practicing.

14      Q.    Are you an addiction expert?

15      A.    Yes.

16      Q.    On what basis?

17      A.    I've taken -- I've learned

18  about addiction in my residency and training.

19  I've treated patients who were addicted.

20  I've developed programs to treat addiction.

21  I've treated a lot of patients with

22  addiction.  I had to get them unaddicted.  On

23  that basis.  And I've studied addiction and

24  addiction issues relatively intensively since

Highly Confidential - Subject to Further Confidentiality Review

1    the late 1990s.

2         Q.    Are you board certified?

3         A.    Yes.

4         Q.    In addiction?

5         A.    No.

6         Q.    Are you board certified in pain

7    management?

8         A.    No.

9         Q.    Are you a toxicologist?

10        A.    I practice toxicology.  I

11   evaluate toxicology as a part of occupational

12   environmental medicine.

13        Q.    Are you board certified?

14        A.    In toxicology?  I don't -- no,

15   I'm not.

16        Q.    What are you board certified

17   in?

18        A.    Internal and occupational

19   medicine.  In preventive occupational

20   medicine, and I'm board eligible in

21   preventive medicine.

22        Q.    Are you a board-certified

23   epidemiologist?

24        A.    There is no board in

Highly Confidential - Subject to Further Confidentiality Review

1    epidemiology.

2         Q.     Do you consider yourself a

3    regulatory expert?

4         A.     Yes.

5         Q.     On what basis?

6         A.     Well, I took two courses at the

7    Harvard Law School on regulations of

8    occupational environmental health.  That was

9    one course taught by Nick Ashford,

10   A-S-H-F-O-R-D.

11              And a second law school course

12   taught by him on environmental law and

13   regulation and all aspects of those.

14              I teach about FDA regulation in

15   my course.  I've published about FDA

16   regulation or lack thereof in published

17   papers.

18              I've testified in front of FDA

19   regulatory bodies.

20        Q.     More than once?

21        A.     Can I finish my answer before

22   you interrupt?

23              You're a lawyer.  You can cut

24   me off anytime you like, so -- according to

1    the judge's rule, but you can just say you've

2    heard enough and I'll stop.

3           Q.    Are you close to finishing?

4           A.    I don't know.  Probably not.

5           Q.    Okay.  Did you testify -- then

6    I'll -- you -- I'll take what you've said so

7    far.

8           A.    Okay.  Then let me just put on

9    the record that the answer is incomplete.

10          Q.    How many times did you testify

11   before the FDA?

12          A.    I think two or three times.

13          Q.    When was the last time?

14          A.    The last time was 2013.

15          Q.    How long did you testify for?

16          A.    It was testimony by video, so

17   if I remember all the video and PowerPoints,

18   five or ten minutes.

19          Q.    And you included the transcript

20   in your report; correct?

21          A.    Yes.  And the PowerPoint that

22   went with it.

23          Q.    And it looked to me like your

24   testimony lasted maybe ten minutes?  Does

```
1    that sound about right?

2         A.    Could be.

3         Q.    And I didn't see that you were

4    asked any questions.

5         A.    Well, I was in Grenada teaching

6    an occupational health course.  I wasn't at

7    the DFA meeting.  I sent them the testimony,

8    and it was played on a video, so.

9         Q.    It wasn't live?

10        A.    It was on the video.  I was

11   live in Grenada teaching at a medical school

12   when the testimony went on.

13        Q.    Was your testimony live or was

14   it recorded and then delivered to the FDA?

15        A.    I recorded it and submitted it

16   and it was played at the FDA hearing.

17        Q.    Are you currently employed?

18        A.    Yes.

19        Q.    By whom?

20        A.    Never Again Consulting.

21        Q.    Anybody else?

22        A.    Well, I teach at Brown, so

23   that's kind of -- that's an employment

24   contract, I guess.
```

```
1         Q.      Who owns Never Again
2    Consulting?
3         A.      I do.
4         Q.      Anybody else own it?
5         A.      No.
6         Q.      Do you have W-2 employees?
7         A.      Do you mean do I issue W-2s to
8    people who work for me?
9         Q.      Yeah.
10        A.      Yes.
11        Q.      How many?
12        A.      10.  12.
13        Q.      And of any of the people that
14   assisted you in the preparation of your
15   report that you named yesterday, are those --
16   any of those W-2 employees?
17        A.      Yeah.  They get paid and we
18   issue W-2s to them.
19        Q.      Okay.  And how about the
20   students who assisted you?  You paid them;
21   correct?
22        A.      Yes.
23        Q.      Did you issue W-2s to them?
24        A.      We haven't -- it's not time to
```

Highly Confidential - Subject to Further Confidentiality Review

1    issue W-2s.  They were working in January and

2    late December.  I don't think -- maybe -- I

3    don't think they got paid in December, so it

4    would have been next year.

5         Q.    Next year do you expect to

6    issue W-2s to them?

7         A.    I don't know.  I assume so.

8         Q.    Do they --

9         A.    If they make less than 6 or

10   $700, we don't have to issue W-2s.  But if

11   they make more than that, we do have to issue

12   W-2s.  So it will depend how much money they

13   made.

14        Q.    Do you consider them to be your

15   employees?

16        A.    I consider them to be contract

17   workers who are working for they.  I'm not

18   sure what the -- I direct what they do.  I

19   think they would be considered part-time

20   employees while they're working for me, yes.

21        Q.    Yesterday you testified about

22   the hourly rates that you pay your employees

23   and these -- some of the students that work

24   for you.  Is the amount that you pay them the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    same amount that you charge the plaintiffs?
 2         A.    No, I charge the plaintiffs
 3    much more than what I charge them because I
 4    bill for my time.
 5         Q.    No, but if you pay an employee
 6    $40 an hour, what do you bill the plaintiffs?
 7         A.    I don't know.  Something more
 8    than that.
 9         Q.    How much more?
10         A.    I don't know.  60 or $70 an
11    hour, something like that.
12         Q.    So you have a 50 to 75 percent
13    markup on hourly rates?
14              MS. CONROY:  Objection.
15              THE WITNESS:  No.
16         Q.    (BY MR. BLANK)  What's --
17              So you do mark up the hourly
18    rates.  That is, you charge the plaintiffs
19    more for every hour that the students work
20    that you pay them; correct?
21              MS. CONROY:  Objection.
22              THE WITNESS:  No.
23         Q.    (BY MR. BLANK)  If you pay a
24    student $40 an hour, what do you charge the
```

Highly Confidential - Subject to Further Confidentiality Review

1    plaintiffs?

2         A.     Students don't get paid $40 an

3    hour.  Students get paid $20 an hour.  My

4    full-time employees get paid about $40 an

5    hour sometimes.

6         Q.     Okay.  But you mark up both;

7    correct?

8         A.     No.  We haven't billed on the

9    students yet, so I don't think --

10              We'll probably --

11              I wouldn't call it a markup.

12   But do we charge exactly what they pay them

13   in a W-2?  No because we pay benefits.  I

14   give bonuses.  When they -- we do a fixed

15   rate.  So if they're working time and a half

16   or double time, then they're making 60, 70,

17   $80 an hour, plus benefits, which is another

18   20 percent.

19              Plus, for example, I take my

20   entire staff on vacations.  That gets

21   covered.  I pay bonuses to the staff.  So all

22   in all, it's pretty much a wash.  They're not

23   a major profit center for me.

24        Q.     What's your current title at

Highly Confidential - Subject to Further Confidentiality Review

1    Brown?

2         A.    Clinical professor, department

3    of family medicine.

4         Q.    And I can't remember if you

5    testified to this.  Do you get paid by Brown?

6         A.    I get a library card, which is

7    probably worth about $50,000 to me.  And when

8    I'm teaching a course in the school of public

9    health, they paid my parking.

10        Q.    Do you get tax on that $50,000

11   library card?

12        A.    I do not.

13        Q.    Do you currently have any

14   practicing privileges at any hospitals?

15        A.    No.

16        Q.    Do you have admitting

17   privileges at any hospitals?

18        A.    No.

19        Q.    Are you currently seeing any

20   patients at any hospitals?

21        A.    No.

22        Q.    Are you currently seeing any

23   patients anywhere?

24        A.    Right.  We went over that

1   yesterday.  Do you want me to repeat that

2   testimony?

3        Q.    No.

4              What are the professional

5   organizations in which you are currently a

6   member?

7        A.    AMA, APHA, AHRP, a couple of

8   geological societies.  I have to look at my

9   CV to remember them all.

10       Q.    But that's where they're

11  listed?

12       A.    They're there.

13             I have my CV here someplace.

14       Q.    I have it too.  It's okay.

15  We'll get to that.

16             Do you consider yourself an

17  expert in marketing?

18       A.    Yes.

19       Q.    And do you consider yourself

20  specifically an expert in pharmaceutical

21  marketing?

22       A.    And device.  Medical marketing.

23       Q.    Medical marketing.  That's

24  pharmaceuticals and devices?

```
 1              A.      Correct.

 2              Q.      And is that because you believe

 3     you know more than the layperson in those

 4     fields?

 5              A.      That would be a beginning.

 6     It's also because I've studied marketing

 7     practices.  I've published peer-reviewed

 8     papers on marketing practices.  I teach on

 9     marketing practices.  I give lectures on

10     marketing practice at APHA and other

11     universities.  I've written book chapters on

12     marketing practices in I think two or three

13     books.

14                      So there's a lot of different

15     bases for why I think I'm an expert on

16     marketing practices of pharmaceutical

17     companies.

18              Q.      Do you consider yourself an

19     expert in pharmaceutical labeling?

20              A.      Yes.

21              Q.      Do you consider yourself an

22     expert in warnings on such labels?

23              A.      Yes.

24              Q.      On what basis?
```

```
 1            A.     Well, I wrote two chapters in

 2      the book "Handbook of Warnings and Risk

 3      Communication."  And then all the other

 4      things that I just said, which I will be glad

 5      to repeat.  I've published in

 6      peer-reviewed --

 7            Q.     No need.

 8            A.     Okay.  My answer is incomplete.

 9      Go ahead.

10            Q.     No, I said no need to repeat

11      it, because you've referenced it.  You

12      referenced the two chapters.  Anything else

13      besides what you've already testified about?

14            A.     I've given talks on warnings

15      and risk communication.

16            Q.     Do you consider yourself an

17      expert in the drug approval process?

18            A.     Yes.

19            Q.     Do you know which government

20      agencies regulate drug approvals?

21            A.     Yes.

22            Q.     Which ones?

23            A.     FDA.

24            Q.     Any others?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Well, for some -- some --

 2      depends what you consider drug, but Consumer

 3      Product Safety Commission might regulate some

 4      over-the -- some cosmetics, which can be

 5      advertised as having medical benefits.

 6      Generally they'd regulate them to say you

 7      can't say that, so they regulate that.

 8              Q.      Are you familiar with the new

 9      drug application process at the FDA?

10              A.      Yes.

11              Q.      We will refer to that as NDA.

12      Is that all right?

13              A.      Yes.

14              Q.      Have you ever worked on a new

15      drug application with the FDA?

16              A.      No.

17              Q.      Have you ever worked with the

18      FDA on any drug approval?

19              A.      No.

20              Q.      Have you ever reviewed a new

21      drug application?

22              A.      For the FDA?

23              Q.      Yes.

24              A.      No.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Have you ever been involved in

2    submitting an NDA?

3    A.    No.

4    Q.    Do you know what an NDA

5    submission entails?

6    A.    Yes.

7    Q.    What is required?

8    A.    Well, NDA submissions are

9    hundreds of boxes of material.  So you -- you

10   first of all, before the NDA process starts,

11   the company has to negotiate with the FDA the

12   kinds and quality and size of the studies

13   that are going to be done to get the drug

14   approved.  And that's a negotiated process.

15           Then there's usually three

16   levels of -- three levels of studies that are

17   done.  Some toxicity studies to start, then

18   level two studies, which would involve small

19   trials that might look for benefit, and then

20   the third level would be randomized

21   controlled trials, then you'd focus on

22   benefits.

23           Generally the organization

24   standards would say that those studies have

Highly Confidential - Subject to Further Confidentiality Review

1    to include at least 2 to 300 patients.  The

2    FDA generally requires two RCTs that are --

3    have a statistically significant result.  And

4    what's not required is that the company

5    doesn't have to turn over all of the studies.

6    The company may do 30 studies.  Of those

7    studies produce two that were positive and

8    just submit those two and not submit the

9    others.

10         Q.    I'm going to stop you here and

11    I'll note for the record that your answer is

12    not complete, because I want to move on to

13    the next question.

14               Do you agree that the FDA has

15    to approve the label for every drug?

16         A.    The label is negotiated, and

17    the approval is agreed to by the company and

18    the FDA.

19         Q.    But if the FDA doesn't approve

20    the label, it does not go on the packaging;

21    correct?

22         A.    If the FDA doesn't finally --

23    they generally -- the letter that --

24         Q.    It's a yes-or-no question.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. CONROY:  Objection.

 2        Q.     (BY MR. BLANK)  Can you answer

 3   it "yes" or "no"?

 4        A.     No.

 5        Q.     So there are labeled -- drug

 6   labels on drug packaging that have not been

 7   approved by the FDA in the United States?

 8   Prescription drugs?

 9        A.     There are prescription drugs

10   that when packaged and given to the patient

11   include information that's not been approved

12   by the FDA.

13              A lot of pharmaceutical

14   company -- a lot of pharmacies put their own

15   short version instructions on the label -- on

16   the packaging in the bag that the patient

17   gets.  That's not, as far as I understand,

18   approved by the FDA.

19        Q.     But the manufacturer's label is

20   approved by the FDA; correct?

21        A.     That is correct.  That wasn't

22   the question you asked.

23        Q.     I just asked it.

24        A.     That's correct.  I'm just
```

Highly Confidential - Subject to Further Confidentiality Review

1    saying it wasn't the question you asked

2    before.

3         Q.    And you understand that the FDA

4    regulates prescription drug promotion in this

5    country?

6         A.    Yes and no.

7         Q.    Have you communicated with

8    anyone at the FDA about Purdue?

9              MS. CONROY:  Objection.

10             THE WITNESS:  Aside from the

11        FDA presentation I gave?  No.

12        Q.    (BY MR. BLANK)  That was the

13   videotaped recording?

14        A.    Right.

15        Q.    Are you aware whether the FDA

16   has found that any manufacturer of any opioid

17   has committed fraud on the FDA with respect

18   to its labeling?

19        A.    Do you mean a labeling that

20   goes in the package?

21        Q.    Correct.

22        A.    No.

23        Q.    Have you ever done any work for

24   the Federal Trade Commission?

```
1              A.     No.

2              Q.     Do you know what unbranded

3      promotion is?

4              A.     Yes.

5              Q.     Do you know whether the Federal

6      Trade Commission regulates unbranded

7      promotion?

8              A.     Do you mean of drugs?

9              Q.     Yes.

10             A.     Not that I can recall.

11             Q.     Have you ever worked for or

12     consulted with the Federal Trade Commission?

13             A.     No.

14             Q.     Have you ever been employed by

15     a pharmaceutical company?

16             A.     No.

17             Q.     Have you ever consulted for a

18     pharmaceutical company?

19             A.     Kind of, sort of.

20             Q.     Who?

21             A.     Confidential.

22             Q.     You can tell me.  We have a

23     protective order.

24             A.     It doesn't matter.  I don't
```

1    want to disclose it.

2           Q.      Why not?

3           A.      Because it's confidential.

4           Q.      We have a protective order that

5    governs this deposition.

6           A.      Thank you.  Great.  I don't

7    want to disclose it.

8           Q.      What was the nature of the work

9    that you did?

10          A.      I don't want to discuss that

11   either.

12          Q.      Was it related to prescription

13   drugs for pain?

14          A.      No.

15          Q.      Was it related to opioids at

16   all?

17          A.      No.

18          Q.      When was it?

19          A.      Maybe five, six years ago.

20          Q.      How long did you consult for?

21          A.      Not long.

22          Q.      How long?

23          A.      I think two or three

24   conversations.

```
1        Q.      Did you get paid?

2        A.      No.

3        Q.      Did you choose to end the

4   consultancy?

5        A.      I would say that it wasn't a

6   very formal consultancy, so.

7                There was an issue.  We

8   discussed it.  The issue was -- that was it.

9        Q.      Are you familiar with DDMAC?

10       A.      Yes.

11       Q.      What is or was DDMAC?

12       A.      The -- they're in charge of but

13  do not regulate in an effective manner

14  advertising of pharmaceuticals.

15       Q.      It's your opinion that they do

16  not effectively regulate pharmaceutical

17  advertising; is that right?

18               MS. CONROY:  Objection.

19               THE WITNESS:  That's certainly

20       my opinion, yes.

21       Q.      (BY MR. BLANK)  Did DDMAC

22  change its name?

23       A.      Well, the FDA changed its names

24  many times.  I don't know all of the names of
```

1     that organization.

2           Q.      Okay.  So do you know what the

3     new name is?

4           A.      No.

5           Q.      Have you heard of the Office of

6     Prescription Drug Promotion?

7           A.      Yes.

8           Q.      Have you ever worked for DDMAC

9     or OPDP?

10          A.      No.

11          Q.      Have you ever spoken to anybody

12    at DDMAC?

13          A.      Yes.

14          Q.      How many times?

15          A.      That was what I discussed

16    yesterday during the deposition.  I went to a

17    meeting --

18          Q.      You don't need to repeat that.

19    Anything besides what you discussed

20    yesterday?

21          A.      I think that's it.

22          Q.      Have you reviewed any of

23    Purdue's submissions to the FDA regarding

24    pharmaceutical promotion?

1       A.      Yes.

2       Q.      Which ones?

3       A.      I can't recall specifically.

4       Q.      Have you ever --

5       A.      Certainly the approval label,

6    and a variety of -- I mean, I have it in my

7    report.

8       Q.      Have you --

9       A.      I have it in the report, the

10   FDA letter sanctioning Purdue's marketing, so

11   those examples.  I've certainly reviewed

12   those.

13      Q.      I was asking about Purdue's

14   submissions.

15      A.      Well, those were submitted, I

16   think.  And then later on, the FDA read them

17   and found them to be in violation of their

18   rules and regulations.

19      Q.      Have you reviewed any other

20   manufacturer's submissions to the FDA

21   regarding pharmaceutical promotion?

22      A.      Yes.

23      Q.      Which defendants?

24              I'm sorry, which manufacturing

1    defendants?

2         A.    I think I've seen them for

3    Endo, Insys, probably several others.

4         Q.    Have you done any research into

5    how DDMAC or OPDP reviews promotional

6    materials?

7         A.    Yes.

8         Q.    And what did your research

9    show?

10        A.    That they don't review them.

11   They -- the advertising promotion materials

12   get sent to DDMAC, and DDMAC, you know,

13   doesn't send them -- and we read this and

14   then we okay it.  They just filed it.  And

15   then they occasionally review.

16             But as they see things, for

17   example, at that meeting I had that some of

18   the DDMAC people commented in effect they

19   were just watching TV, and they saw some ads

20   that they thought were wrong and that

21   triggered an investigation.

22        Q.    Who was that?

23        A.    I don't remember the name of

24   the people, but I'm not done with my answer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    You interrupted my answer.

 2              Do you want me to stop the

 3    answer?

 4         Q.    No.

 5         A.    Okay.  You just wanted to

 6    interrupt the answer?  No problem.

 7              Sometimes I can't tell whether

 8    you just want to interrupt or whether you

 9    want to stop.

10         Q.    I'll ask you to stop there and

11    your answer is incomplete because you're

12    taking way too long, and we don't have much

13    time for your 489 opinions in this case.

14              MS. CONROY:  Objection.  It was

15         a four-second stop.

16         Q.    (BY MR. BLANK)  Can you

17    describe the --

18         A.    Was that a question?

19              Did you just ask me a question?

20         Q.    I'm about to.

21         A.    Oh, okay.  You were just making

22    a gratuitous comment?  Go right ahead.

23         Q.    Can you just -- are you

24    familiar with the DDMAC review process of
```

1    promotional materials?

2        A.     Yes.

3        Q.     Do you believe that they review

4    the promotional materials?

5        A.     No.  Generally not, maybe

6    occasionally.  They may take maybe a small

7    sample, but they don't look at all the ones

8    that get submitted.

9        Q.     Do you believe that they're

10   supposed to review the promotional materials?

11            MS. CONROY:  Objection.

12            THE WITNESS:  I don't think so.

13            I think they're -- they're authorized

14            to review them, but there's no

15            requirement in the law that they read

16            them all.

17       Q.     (BY MR. BLANK)  So do you know

18   for sure whether they're responsible for

19   reviewing promotional materials?

20       A.     Sure, they're responsible for

21   reviewing them, but that's different from

22   saying that they review them all.

23       Q.     Understood.

24            Have you ever reported any

Highly Confidential - Subject to Further Confidentiality Review

1      OxyContin promotional activities to the FDA

2      through the FDA Bad Ad Program?

3           A.      No.

4           Q.      Have you reported any other

5      opioid promotional activities to the FDA

6      through the FDA's Bad Ad Program?

7           A.      No.

8           Q.      Have you reviewed FDA guidance

9      on pharmaceutical promotion?

10          A.      Yes.

11          Q.      Which guidance?

12          A.      Do you mean by document number?

13          Q.      Yeah.

14          A.      I don't recall.

15          Q.      How about document type?

16          A.      I'm not sure what you mean by

17     that.

18          Q.      When did you last review such

19     guidance?

20          A.      I don't know.  Probably in the

21     last several months.

22          Q.      Have you reviewed any FDA

23     guidance on unbranded promotional materials?

24          A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.     Which ones?

 2          A.     I don't recall.  That was

 3    longer ago.

 4          Q.     Prior to your engagement in

 5    this case?

 6          A.     Oh, yeah.

 7          Q.     What regulations apply to

 8    promotion of prescription drugs?

 9          A.     Do you mean by Code of Federal

10    Regulations numbers?

11          Q.     Correct.

12          A.     I don't know.

13          Q.     How about by name?

14          A.     By name?

15          Q.     Yeah.

16          A.     I don't know what the current

17    name is of those regulations.

18          Q.     Are you familiar with the

19    regulations that govern the distribution of

20    branded materials?

21          A.     I've read them in the past,

22    yes.

23          Q.     Okay.  Yeah.  Which -- which

24    regulations?

1        A.      I don't recall.

2        Q.      You don't --

3        A.      I don't recall the number or

4    the name.

5        Q.      Are you familiar with the

6    regulations governing non-branded materials?

7        A.      Same thing.  I've read them.

8        Q.      Can't --

9        A.      I don't know the -- I don't

10   know the name or the number.

11       Q.      Are you familiar with how the

12   FDA enforces those regulations?

13       A.      Yes.

14       Q.      How do they do it?

15       A.      They generally don't do it.

16       Q.      Pardon?

17       A.      They generally don't do it.

18               Why don't we take a quick

19   break.

20               MR. BLANK:  Okay.

21               THE VIDEOGRAPHER:  Going off

22        the record at 10:21 a.m.

23               (Recess taken, 10:22 a.m. to

24        10:41 a.m.)

```
 1                 THE VIDEOGRAPHER:  We are back

 2        on the record at 10:42.

 3        Q.     (BY MR. BLANK)  Thank you.

 4   Dr. Egilman, I want to go back to an area we

 5   touched on earlier today, because one of the

 6   questions I asked I got -- I may have been --

 7   misunderstood your answer or you may have

 8   misunderstood my question, so I want to ask

 9   it again.

10               And it relates to the questions

11   that I asked you about whether you had had

12   any conversations with any prescribers in

13   Cuyahoga or Summit County, Ohio.

14               And the question that I would

15   like to ask you is whether you have ever

16   spoken with any prescribers -- strike that.

17               Whether you ever asked any

18   prescribers in Cuyahoga or Summit counties

19   whether they wrote any medically

20   unnecessary -- strike that.

21               Have you asked any prescribers

22   from Cuyahoga or Summit County, whether

23   they've relied on any marketing messages by

24   any of the defendants in this case in making
```

```
 1     prescription decisions?

 2          A.      No.

 3          Q.      Now, I looked at your CV, and

 4     you did not go to law school; is that

 5     correct?

 6          A.      I did not apply to law school.

 7     I went -- I took two law school courses.

 8          Q.      Do you consider yourself a

 9     legal expert?

10          A.      Certain areas of the law, yes.

11          Q.      Do you consider yourself a

12     legal expert in spoliation?

13          A.      I know what it is.

14          Q.      Do you know what the legal

15     elements of spoliation are?

16          A.      It's different in different

17     states.

18          Q.      What is it in Ohio?

19          A.      That, I don't know.

20          Q.      What is it in Massachusetts?

21          A.      I do not know.

22          Q.      What is it in Rhode Island?

23          A.      I do not know.

24          Q.      Do you know what it is in any
```

```
 1   state?

 2        A.     California.

 3        Q.     The legal elements of

 4   spoliation?

 5        A.     I think so.

 6        Q.     What are they?

 7        A.     That's destroying documents

 8   that should be preserved after you're on

 9   notice that there may be a legal action.

10        Q.     So the notice is an important

11   part of any claim of spoliation?

12        A.     Well, in California, in some

13   places if you reasonably anticipate

14   litigation, whether or not there's been

15   specific notice or not, if you destroy

16   documents in anticipation of litigation, you

17   wouldn't need specific notice.

18               But, for example, a lawsuit

19   would be specific notice.

20        Q.     And do you know whether you're

21   being offered as a legal expert in this case?

22        A.     No.

23        Q.     To your knowledge, are you

24   being offered as a legal expert in this case?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.     No.

2              Q.     In your report, Dr. Egilman,

3    you accuse Purdue of destroying documents;

4    correct?

5              A.     Correct.

6              Q.     And I noticed several opinions

7    in exhibits.  Do you have access to those

8    exhibits?

9              A.     Yes.

10             Q.     Can I ask -- I don't have all

11   of the copies, but I know you have access.

12             MR. BLANK:  Can we pull

13             Exhibits 88, 162, 278, and 466 and

14             hand them to Dr. Egilman, please?

15             Q.     (BY MR. BLANK)  While they're

16   doing that, Dr. Egilman, have you done any

17   forensic analysis to determine whether Purdue

18   has done any spoliation of evidence?

19             MS. CONROY:  Objection.

20             THE WITNESS:  No.

21             Q.     (BY MR. BLANK)  Have you done

22   any forensic analysis to determine whether

23   any defendant has spoliated evidence?

24             A.     No.
```

Highly Confidential - Subject to Further Confidentiality Review



1          Q.      Thank you very much.

2                  Dr. Egilman, your assistant --

3          somebody -- has handed you some of the

4          exhibits I identified.  The first one I'd

5          like you to look at is Exhibit B88.

6          A.      I have it.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



```
 8       Q.    Would you take a look at
 9   Exhibit 162?
10       A.    Did you want to mark this or
11   not?
12       Q.    No.
13       A.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review





```
12          Q.      Can you turn to Exhibit 278.

13          A.      Okay.

14          Q.      This is your opinion 278?

15          A.      Right.

16          Q.      Titled -- well, it doesn't say

17    "Opinion" on the top of my page.  Does it say

18    "Opinion" on the top of your page?

19          A.      No.

20          Q.      Is this an opinion of yours?

21          A.      Yes.

22          Q.      So it's an opinion, not a fact?

23          A.      I think it's both.

24          Q.      Okay.  But it is your opinion?
```

1       A.      Yes.

2       Q.      There was Purdue spoliation?

3       A.      Yes.

4       Q.      And this is an e-mail with some

5   red arrows on it; correct?

6       A.      Correct.

7       Q.      Are those your red arrows?

8       A.      Yes.

9       Q.      And what are you pointing to?



Highly Confidential - Subject to Further Confidentiality Review

█   █   ████████████████████████

█   ████████████████████

█   █   ████████████████████

4          Q.      And have you done any analysis

5     of any of the hard drives of any Purdue

6     employees to determine whether documents were

7     permanently deleted?

8          A.      No.  I asked the plaintiffs to

9     get those hard drives, historically, since

10    1995, and they didn't get them.

11         Q.      And is there any other

12    information produced in this litigation that

13    would lead you to conclude that documents

14    were destroyed?

15         A.      Yes.

16         Q.      What?

17         A.      Well, I'm not sure if it was

18    produced in the litigation, but you see under

19    278, you have the self-destructing document

20    e-mail messaging system patented by

21    Purdue Pharma employees.

22         Q.      Do you think that --

23         A.      It seems like that would be a

24    system that would be set up to routinely

Highly Confidential - Subject to Further Confidentiality Review

1    destroy e-mails and documents.

2         Q.      And do you believe there was

3    sinister intent in deleting e-mails?

4         A.      Well, this patent is in 2007.

5    In 2007, this company had already pled guilty

6    to several crimes and been investigated and

7    been sued in civil litigation.  So I think

8    there is an obligation for a company to

9    preserve e-mails after they've been sued and

10   after they've pled guilty to crimes.

11        Q.      Well, you --

12        A.      And so I would say that

13   planning a system to destroy documents would

14   not be good intent in that context.

15        Q.      Have you ever destroyed a

16   document?

17        A.      Sure.

18        Q.      Have you ever deleted an

19   e-mail?

20        A.      Sure.

21        Q.      Have you broken the law by

22   doing so?

23        A.      No.

24        Q.      I want to go back to your --

Highly Confidential - Subject to Further Confidentiality Review

```
1    some of the questions we asked about your

2    experience in pain management.

3              Have you ever assessed a

4    patient for pain?

5         A.    Yes.

6         Q.    When was the last time?

7         A.    This week.

8         Q.    Who?

9              Never mind.  Were they a -- I

10   don't want to know their name.

11        A.    That's good.  I'm not going to

12   give you that name.

13        Q.    And how did you assess the

14   pain?

15        A.    I discussed it with them.

16        Q.    Are you familiar with the pain

17   scale?

18        A.    Yes.

19              There are various pain scales,

20   but yes.

21        Q.    Well, the 1 to 10?

22        A.    Yes.  There's also 1 to 4.  The

23   Roth study was a 1 to 4.

24        Q.    Have you treated patients with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     cancer-related pain?

 2         A.     Yes.

 3         Q.     When was the last time?

 4         A.     Sometime in the probably 2000,

 5     2001 period.

 6         Q.     So roughly 18, 19 years ago?

 7         A.     Right.  I probably supervised

 8     patients who were treated for cancer pain

 9     when I was in family medicine as well.

10         Q.     Have you --

11         A.     That would have been in the

12     last ten years -- last five to ten years.

13         Q.     Have you treated patients with

14     chronic non-cancer pain?

15         A.     Yes.

16         Q.     Do you currently?

17         A.     No.

18         Q.     When was the last time?

19         A.     Probably regularly when I was

20     at the clinic, 2001, 2002.

21         Q.     So around 18 or 19 years ago?

22         A.     Yes.

23                I supervised patients --

24     supervised patient care when I was in family
```

```
 1    medicine with chronic non-malignant pain

 2    treatments.  But that would have been in the

 3    last three years.

 4         Q.    Have you treated patients for

 5    any sort of addiction?

 6         A.    Yes.

 7         Q.    How many?

 8         A.    Hundreds.  Probably thousands.

 9               Certainly hundreds.

10         Q.    Were any of those patients

11    addicted to opioids?

12         A.    Some.

13         Q.    How many?

14         A.    Not many.  Probably less than a

15    dozen.

16         Q.    Sorry, less than a dozen?

17         A.    Probably.

18         Q.    And were those -- were those

19    dozen patients or so addicted to prescription

20    opioids?

21         A.    Yes.

22         Q.    All of them?

23         A.    Yes.

24         Q.    When was the last time you've
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    treated such a patient?

 2          A.     2001.

 3                 Aside from supervising some

 4    similar patients in family medicine.

 5                 That's supervising the care of,

 6    by supervising residents who were taking care

 7    of similar patients.

 8          Q.     Earlier I think you testified

 9    you had a patient who was addicted to

10    OxyContin; correct?

11          A.     Correct.

12          Q.     Is this the -- was there only

13    one?  Or was there more than one?

14          A.     I can only recall one, but

15    there may have been more.  They were -- it

16    looks like from the IMS data, there may have

17    been two, but I can only recall one.

18          Q.     And was that patient that you

19    can recall, was he or she taking OxyContin as

20    prescribed?

21          A.     I don't know.  I suspected not.

22          Q.     Do you have any records

23    relating to that patient?

24          A.     All the ones I have are the
```

1    ones Purdue gave me.

2            Q.      On the patient record?

3            A.      On the IMS data that Purdue

4    illegally used in my deposition.

5            Q.      And you don't have any

6    professional records of treating that

7    patient?

8            A.      Correct.

9            Q.      Destroyed?

10           A.      I don't know.  I don't work at

11   the -- I sold the clinic 2002, and I don't

12   know what happened to the records.

13                   The records were part of the

14   sale.

15           Q.      What is iatrogenic addiction?

16           A.      Caused by medical care.

17           Q.      What is the risk of iatrogenic

18   addiction resulting from prescription opioid

19   use?

20           A.      There's no single answer to

21   that question.

22           Q.      Can you quantify it?

23           A.      Well, it's not quantifiable as

24   asked.  There are a variety of situations and

Highly Confidential - Subject to Further Confidentiality Review

1    settings where doctors prescribing drugs can

2    result in addiction.

3                    I can quantify it in different

4    settings.  There's not good data for most --

5    there's no long -- there's no epidemiologic

6    studies that are of reasonable quality that

7    look at that question under any settings, but

8    there's a variety of reports -- mostly case

9    reports, sometimes clinical series -- that

10   look at that issue in various populations.

11        Q.    Do you currently prescribe

12   opioids to any patients?

13        A.    No.

14        Q.    Have you ever prescribed

15   OxyContin?

16        A.    Yes.  In your IMS data that you

17   provided.

18        Q.    And when was the last time?

19        A.    Probably in that IMS data.

20        Q.    From 2001?

21        A.    Correct.

22        Q.    Not since?

23        A.    Not since.

24                    And the 2002 data is not mine,

```
 1    just to be clear.

 2              MR. BLANK:  Dr. Egilman, my

 3         colleague Jenna Newmark is going to

 4         ask you some questions about your

 5         specific opinions.

 6                   EXAMINATION

 7    BY MS. NEWMARK:

 8         Q.    Hi, Dr. Egilman.  I'm

 9    Jenna Newmark from Dechert.  I am Tim's

10    colleague on behalf of Purdue.  I'm going to

11    ask you some questions about -- specifically

12    let's start with your report.

13              Can you please turn to page 53

14    of what's been marked as Exhibit 1F?

15         A.    Okay.

16         Q.    Okay.  And it says at the top

17    there, "In 2004, I warned about the crisis; I

18    was ignored."

19              Did I read that correctly?

20         A.    You did.

21         Q.    Is that one of your opinions

22    that you intend to offer in this case?

23         A.    Yes.

24              Well, it's -- excuse me.  It's
```

1    an opinion I have offered in this case.

2         Q.    And you testified earlier that

3    these are opinions that you gave in prior

4    cases; right?

5              MS. CONROY:  Objection.

6              THE WITNESS:  Do you mean the

7         following pages?  Yes.

8         Q.    (BY MS. NEWMARK)  Yes.

9         A.    That go with No. 6?  Yes.

10        Q.    Would that be pages 53 to 61?

11        A.    Right.

12              There's more too, but that's

13   what I put in here.

14        Q.    What do you mean "There's

15   more"?

16        A.    Well, I gave deposition

17   testimony.  There were other reports.  I

18   retyped this section of one of the early

19   reports and put it in as this opinion,

20   because there were other things that I told

21   Purdue during that case -- during the three

22   cases I consulted on with respect to their

23   marketing practices with respect to

24   OxyContin.

Highly Confidential - Subject to Further Confidentiality Review

1   Q.    So what's on pages 53 to 61

2   were in prior words that you submitted in

3   prior cases involving Purdue; right?

4   A.    Correct.

5   Q.    Did those include the Taylor

6   and the Freund cases?

7   A.    I can't remember the case

8   names.

9   Q.    Okay.  But they're from 2004;

10  right?

11  A.    I think so.

12  Q.    And these are all opinions that

13  you formed in or before 2004?

14  A.    Yes.

15  Q.    And these are the exact

16  opinions that you rendered in 2000 -- in or

17  around 2004?

18           MS. CONROY:  Objection.

19           THE WITNESS:  This is some of

20      the retyped version of the opinions

21      that I'd offered in 2004.

22           I mean, this document actually

23      is -- was produced by Purdue in the

24      production.  In addition to this, I

```
 1          have PowerPoints that were produced in

 2          production.  My deposition, Purdue

 3          produced in production.  So all these

 4          documents, and there are other reports

 5          from other cases that Purdue produced

 6          in production so they have them.

 7     Q.     (BY MS. NEWMARK)  What

 8  materials did you rely upon for the opinions

 9  that appear on pages 53 to 61?

10     A.     I think they're all -- all the

11  cites are in.

12     Q.     So is it only what's in the

13  footnotes?

14     A.     No, it's probably more.  I

15  reviewed many, many more things.  But I think

16  I have a cite here for more or less every

17  sentence.  There may have been other

18  supporting documents that also supported

19  those facts that were the bases of my opinion

20  in 2004.

21     Q.     And what do you mean by, quote,

22  in 2004, I warned about the crisis?

23     A.     I mean, in 2000 --

24          Do you want to know what I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    mean?

 2         Q.    Yes.

 3         A.    Okay.  That's not a yes-or-no

 4    question.  You're aware of that?

 5         Q.    What do you mean by "In 2004, I

 6    warned about the crisis"?

 7         A.    Okay.  Do you want the short

 8    answer or the long answer?

 9         Q.    I'd like you to please give me

10    an answer in accordance with Special Master

11    Cohen's directive yesterday.

12              MS. CONROY:  Objection.  Then

13         you better state what that directive

14         is, because I think we understand it,

15         but I'm not sure you do.

16         Q.    (BY MS. NEWMARK)  Dr. Egilman,

17    what do you mean by "In 2004, I warned about

18    the crisis"?

19         A.    Okay.  My understanding, given

20    your admonition of Special Master Cohen's

21    ruling, was that you can cut me off anytime

22    you want once I start answering a question.

23              So that's -- and that's how

24    I'll answer the question.  But then I'm
```

1    otherwise allowed to answer --

2         Q.    Dr. Egilman, I just asked you a

3    question.  "In 2004, I warned about the

4    crisis."  What do you mean by that?

5         A.    Okay.  I mean that I told

6    Purdue Pharma the following facts and

7    opinions.

8              And the first paragraph, "The

9    drug was originally marketed for managing

10   severe pain; however, Purdue aggressively

11   marketed OxyContin through an advertising

12   campaign" --

13        Q.    Okay, Dr. Egilman, we have the

14   report in front of us, so I'm going to note

15   that your answer is incomplete.

16              Is it fair to say that --

17              MS. CONROY:  I object to the

18         way this questioning is going.  Go

19         right ahead, but that's not the way

20         the Special Master intended

21         interruptions to take place.

22        Q.    (BY MS. NEWMARK)  What do you

23   mean by "crisis"?

24        A.    I mean that there were -- well,

1    yeah.  This is what I mean by crisis.

2              So you've got OxyContin

3    prescriptions going up, and you have

4    concomitantly addiction going up, and deaths

5    going up.  And that that started when

6    OxyContin's marketing entered.

7              In addition to that, you have

8    the generation of a variety of pill mills

9    that Purdue promoted and allowed to occur,

10   resulting in the dispersion of OxyContin

11   throughout the population with and without

12   prescriptions.

13             And that as a result of

14   Purdue's actions, OxyContin was overused by

15   the medical community and people got addicted

16   and died.  And that that became a crisis

17   because the number of people who were

18   addicted and died increased dramatically once

19   Purdue began its marketing campaign.

20        Q.    And, Dr. Egilman, you just

21   pulled out a chart.  May I see the chart,

22   please?

23             Is this a chart that you

24   created?

1        A.      No.

2        Q.      Is this a chart that you showed

3   Purdue in 2004?

4        A.      No.

5        Q.      All of these opinions on page

6   53 to 61 which you've testified were opinions

7   that you rendered in 2004, did you give those

8   opinions to the FDA?

9        A.      No.  I was not allowed.  There

10  was a confidentiality order in the case.

11       Q.      Did you give those opinions to

12  the DEA?

13       A.      Same answer.  I was not

14  allowed.  There was a confidentiality order

15  in the case.  And I had already gotten in

16  trouble for releasing documents under a

17  confidentiality order at the time I came in

18  possession of these documents.

19       Q.      In 2004, did you have concerns

20  about opioid prescribing generally?

21       A.      Yes.

22       Q.      Apart from things that you

23  learned over the course of the cases that you

24  worked on?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.      Yes.

2        Q.      And did you describe those

3   concerns apart from the cases that you worked

4   on to the FDA?

5        A.      No.  Those concerns were based

6   on publicly available information.

7        Q.      Did you tell the FDA at all

8   that you were concerned based on the publicly

9   available information?

10        A.      Not -- no.

11        Q.      So you only expressed those

12   concerns when you were retained by

13   plaintiffs' counsel; correct?

14        A.      No.

15              MS. CONROY:  Objection.

16              THE WITNESS:  I only expressed

17          those concerns when I got the

18          documents that indicated how Purdue

19          was illegally marketing and promoting

20          the use of its drugs and causing

21          overuse of those drugs.

22        Q.      (BY MS. NEWMARK)  Let's look at

23   paragraph 1 on page 53.  The fifth line down

24   begins a sentence almost toward -- after the
```

1    bolded part, reading "However, Purdue Pharma

2    aggressively marketed OxyContin through an

3    advertising campaign that misled health

4    providers and the public about the dangers of

5    OxyContin."

6                Did I read that right?

7         A.    You did.

8         Q.    And when you say "Purdue Pharma

9    aggressively marketed OxyContin," what do you

10   mean by "aggressive"?

11        A.    Well, I think that probably a

12   lot of that is in the next five or six pages

13   here, but some things may not have been

14   included here.

15              They had a very large sales

16   force.  They encouraged the sales force to

17   tell physicians that the addiction rates were

18   low, less than 1%.  They encouraged the sales

19   force to use the drug for chronic

20   non-malignant pain which was not an

21   indication in the label.

22              They encouraged the sales force

23   to increase the dosing so that profits would

24   increase.  So they wanted it as a specific

1    program to get people to switch to

2    80 milligrams.

3              They aggressively misled the

4    physician community about Q12 dosing.  And

5    that Q12 dosing by itself was an

6    addiction-generating machine.

7              So those are -- those are some

8    of the things that they did that were

9    aggressive.

10             They also off-label marketed.

11   They were cited for some of that off-label

12   marketing by the FDA, and then pled guilty

13   to -- well, actually, the non-functioning

14   entity subsidiary pled guilty to criminal

15   conduct for the acts of the parents, and that

16   the pleadings indicated a variety of other

17   specific aggressive marketing techniques that

18   were used to mislead information and

19   encourage prescribing.

20             They were aware of pill mills,

21   and they didn't do anything to stop pill

22   mills from prescribing.  They didn't have any

23   suspicious order monitoring program.

24             For example, when Seid found

1   that ordering increased dramatically, he

2   would review --

3        Q.    Dr. Egilman, I asked you how

4   you defined aggressive.  So I move to strike

5   everything from 88:15 on.

6             And I'll note that your answer

7   is incomplete.

8             How do you define "aggressive"?

9        A.    In this case I defined it by

10  the acts that I just started to try to

11  describe.

12       Q.    And you talked earlier about

13  the size of Purdue's sales force.  How big

14  was Purdue's sales force at the launch of

15  OxyContin?

16       A.    I think I've got a sales force

17  overtime document on that that I've seen.  I

18  think probably 2 or 300 at the beginning,

19  something like that.

20       Q.    Have you ever done any analysis

21  of Purdue's sales force as compared to the

22  sales forces of other manufacturers of

23  Schedule II narcotics at around the same time

24  period?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      No.

2      Q.      Have you ever done any analysis

3   comparing sales practices of OxyContin to

4   sales practices and marketing practices of

5   manufacturers of other opioids at around the

6   same time period?

7      A.      Yes.

8      Q.      And what analysis was that?

9      A.      Well, I reviewed the sales

10  practices of a lot of the other companies

11  involved in litigation.

12              For example, Roxane, which had

13  a similar drug, kind of approved in 1998 but

14  not sold, and then approved again and sold in

15  2000, 2001.  And they didn't have, as I

16  recall, a very aggressive marketing program.

17  They didn't have any advertisements in JAMA

18  that were illegal, for example, or in any

19  other medical magazines I can recall.

20              The only narcotic

21  advertisements that I can recall seeing

22  during that time period were Purdue Pharma

23  advertising in journals.  I don't recall any

24  other pharmaceutical company with opioid

1    marketing programs in the general medical

2    journals that I subscribed to.

3         Q.    Have you done any quantitative

4    analysis comparing the sales practices,

5    including the size of the sales force of

6    Purdue, for OxyContin at the launch of

7    OxyContin to other manufacturers of

8    Schedule II narcotics at around the same

9    time?

10        A.    No, but that's difficult to do

11   because Purdue is relatively unique in

12   that --

13        Q.    Dr. Egilman, I asked you a

14   yes-or-no question, and you answered no.  So

15   we'll move on.

16             MS. CONROY:  Objection.

17             THE WITNESS:  Great.  Just note

18        that my answer was incomplete.

19             MS. NEWMARK:  I'll note that

20        your answer was incomplete.

21        Q.    (BY MS. NEWMARK)  You also

22   referred to, on page 53, paragraph 1, a

23   marketing piece that Purdue developed called

24   "Myths About Opioids"; correct?

```
1          A.      Correct.

2          Q.      And you criticized that piece,

3    "Myths About Opioids"; correct?

4          A.      Yes.

5          Q.      And in general, I'm going to

6    sum, in the interest of time, you think that

7    it was misleading; correct?

8          A.      I certainly agree that it was

9    misleading, among other things.
```



11          Q.      And is this a submission for

12     the "Myths About Opioids" brochure to the FDA

13     pursuant to 2253?

14          A.      It is.

15          Q.      So through the 2253 process,

16     the FDA is to review these submissions;

17     correct?

18                  MS. CONROY:  Objection.

19                  THE WITNESS:  No.

20          Q.      (BY MS. NEWMARK)  What is your

21     understanding of the 2253 process?

22          A.      The companies have to submit

23     them to the FDA.  The FDA looks at a

24     teeny-weeny portion of them, and evaluates

Highly Confidential - Subject to Further Confidentiality Review

1    them.

2              Generally they only evaluate

3    for critical review advertisements where one

4    company squeals on another company and

5    complains about its illegal marketing based

6    on the -- based on the marketing campaign

7    that results.

8         Q.    Has the FDA ever issued any

9    sort of official statement saying that it

10   only reviews a small portion, or in your

11   words a teeny-weeny portion, of the 2253

12   submissions it receives?

13        A.    I think Gottlieb said something

14   like that in a public statement when he was

15   talking about opioids.

16              That's all I can recall from

17   the FDA per se.

18        Q.    And that wasn't in -- that

19   wasn't in 1996, was it?

20        A.    No.



███████████

███      ███      ███

3              MS. CONROY:  Objection.

4              THE WITNESS:  Everybody in the

5         business knows the FDA doesn't look at

6         them.  It doesn't have the staff to

7         look at them.  In 2004, they had six

8         people to do all the reviews of 30 to

9         50,000 submissions.

10             Q.    (BY MS. NEWMARK)  Well, you

11   don't know what the expectation was of Purdue

12   or any pharmaceutical company with respect to

13   what the FDA would or wouldn't do; right?

14             A.    That's not true.

15             Q.    Are you aware that the FDA can

16   tell a pharmaceutical company not to use

17   certain marketing materials if the FDA

18   believes those marketing materials are

19   misleading?

20             A.    Yes.

███      ███      ██████████████

███   ██████████████████████

███   █████████████████████

███      ███      ███

1           Q.      Let's move on to paragraph

2    of -- on page 53 of Exhibit 1F.

3                   You state in this paragraph

4    that you reviewed the Physicians' Desk

5    Reference; correct?

6           A.      Correct.

7           Q.      And that was for OxyContin?

8           A.      Correct.

9           Q.      What's a Physicians' Desk

10   Reference?

11          A.      It's a compilation of

12   FDA-approved labels that are mailed to all

13   practicing physicians in the country for

14   free.

15                  But in order to get into the

16   PDR, the company has to pay for the space.

17   So it doesn't include all labels.

18          Q.      And in paragraph 3 you said

19   that you reviewed the product labeling for

20   OxyContin from 1999 to 2001; right?

21          A.      Correct.

22          Q.      Why did you review the labeling

23   only from 1999 to 2001?

24                  MS. CONROY:  Objection.

```
 1              THE WITNESS:  Because that's
 2         when I started to consider using the
 3         drug.
 4         Q.    (BY MS. NEWMARK)  Have you ever
 5    seen the initial label for OxyContin?
 6         A.    In 1996?  Yes.
 7         Q.    Have you reviewed that label in
 8    detail?
 9         A.    Yes.
10              MS. NEWMARK:  I'm going to mark
11         as Exhibit 33.
12              (Whereupon, Deposition Exhibit
13         Egilman 33, OTHER/OxyContin Tablets
14         NDA #20-553, PDD1501603661-1501603669,
15         was marked for identification.)
16         Q.    (BY MS. NEWMARK)  Dr. Egilman,
17    do you recognize this document that's been
18    marked as Exhibit 33?
19         A.    Yes.
20         Q.    And what is it?
21         A.    It's the initial approved
22    label --
23         Q.    And you --
24         A.    -- for OxyContin.
```

1       Q.      And you said that you've

2    reviewed this before; right?

3       A.      Correct.

4       Q.      Are you aware that the FDA must

5    approve all labels for prescription drugs?

6       A.      It's a negotiated process and

7    final approval has to be done by the FDA.

8       Q.      And the negotiated process can

9    sometimes take a long time; right?

10      A.      Yes.

11      Q.      Do you know why the process

12   takes a long time?

13      A.      Yes.

14      Q.      Why is that?

15      A.      Because generally the companies

16   want language that's favorable to them that

17   minimizes side effects and enhances benefits,

18   and the FDA doesn't agree and they have a

19   struggle about that.  The company wants to be

20   able to use a label as favorable to them as

21   possible with respect to how much money they

22   can make using the label to sell the

23   products.

24      Q.      And you testified yesterday

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that someone needs a prescription from a

 2    doctor to obtain prescription opioids;

 3    correct?

 4              Legally; correct?

 5        A.    Legally, correct.

 6        Q.    And would you agree that the

 7    doctor serves as the learned intermediary, to

 8    use a legal term, between the drug company

 9    and the patient receiving the pharmaceutical?

10              MS. CONROY:  Objection.

11              THE WITNESS:  No.  Not in these

12        cases.

13        Q.    (BY MS. NEWMARK)  In general,

14    do you agree --

15              MS. CONROY:  Objection.

16        Q.    (BY MS. NEWMARK) -- that the

17    doctor serves as the person who's supposed to

18    use their judgment to decide whether a drug

19    is beneficial for the patient receiving it?

20              MS. CONROY:  Objection.

21              THE WITNESS:  I wouldn't put it

22        exactly that way, no.

23        Q.    (BY MS. NEWMARK)  For any drug,

24    would you agree that a doctor is supposed to
```

Highly Confidential - Subject to Further Confidentiality Review

1    know what is in the label for any drug that

2    they're prescribing?

3          A.    Can't happen.  It's not

4    possible.  Not -- it's not possible.  It may

5    be a supposed to, but it's not possible.

6          Q.    Well, when you -- strike that.

7                You said that you've treated

8    patients in the past; right?

9          A.    Yes.

10         Q.    And you've prescribed them

11   drugs; right?

12         A.    Yes.

13         Q.    And for the drugs that you

14   prescribed, did you know what was in the

15   label for those drugs?

16         A.    For -- in a general way?  Yes.

17   Did I --

18                These labels are usually 6-type

19   print and, you know, 15 to 20 pages.  So I

20   wouldn't know everything that was in them.

21   When I was writing the prescription, I would

22   generally refer, first, look at the black

23   box.  Then you look at the dose.  Then you

24   look at the indication.  And you look at the

1   major -- the contraindications, warnings.

2          You certainly generally

3   wouldn't look at the long list that used to

4   be in the label of adverse events reported

5   during the studies.  Most people ignore that

6   section.  It's appropriate, probably, to

7   ignore that section.

8          So, you know, you look at some

9   parts of the label.

10         You know, it takes you more

11  than 15 minutes to read this label.  Maybe

12  more than a half an hour to read it.  And

13  actually, probably take more than a half an

14  hour to read this label.  Most physicians

15  have 10 to 15 minutes per patient.  Some

16  patients may get -- most patients get more

17  than one drug.  So you don't spend three

18  hours with each patient reviewing the label

19  every time you give them a drug.

20      Q.    But you were saying you

21  don't -- just because you don't review the

22  full label doesn't mean doctors shouldn't

23  review the full label; right?

24      A.    I don't know any physician who

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I've ever spoken to who's has read the full
 2    label on every drug they've -- on any drug
 3    they've written when they write the drug.
 4    And you've got to remember, unless you do
 5    that, you're not necessarily reading the
 6    right label because these labels can change
 7    during the year.
 8              So if I'm reading a PDR from
 9    this year, there may have been an update sent
10    by mail for one or more of the drugs in there
11    that I may be using.  There's no way to fit
12    that in.
13              If it's not a drug I use often,
14    I'm not going to read it, if it's a drug that
15    I may use that drug during the year.  So
16    that's what the real practice of medicine is.
17        Q.    Have you taken any surveys of
18    any doctors in Cuyahoga or Summit County and
19    asked them how much of a label they review?
20        A.    No.
21        Q.    Let's turn back to Exhibit 1F.
22              Let's turn to pages 53 and 54.
23              Starting on page -- on page 53,
24    paragraph 3, and then continuing on to 54,
```

```
1    you list a number of omissions and

2    misrepresentations that you think that Purdue

3    either omitted from or misrepresented from

4    the label; right?

5           A.      Correct.

6           Q.      And what's the basis for your

7    opinion -- strike that.

8                   Let's start with the omissions,

9    towards the top of page 54.

10          A.      I'm there.

11          Q.      You list four omissions, A, B,

12   C, and D; right?

13          A.      Correct.

14          Q.      What is the basis for your

15   opinion that A, B, C, and D should have been

16   included in the label for OxyContin?

17          A.      Prior drug addiction is a --

18   should be listed as a contraindication.  I

19   think there's literature that shows a prior

20   drug addiction is a contraindication to the

21   use of opioids.

22                  And so that's my basis for

23   that.  I don't think that's very

24   controversial.
```

 1                    Second one --

 2                    Did you just ask for the first

 3       one?

 4           Q.      Well, we --

 5           A.      I mean --

 6           Q.      Let's do --

 7           A.      Oh, you asked for all four.  So

 8       do you want to go to the next one now?

 9           Q.      Let's -- I'll take your answer

10       for A.

11                    Let's go to B, "Purdue failed

12       to include the risk of addiction in the

13       label's warning or precautions section."

14                    Did I read that right?

15           A.      You did.

16           Q.      Let's turn back to the 1996

17       label for OxyContin that I showed you as

18       Exhibit 33.

19           A.      Okay.

20           Q.      And if you turn to the third

21       page, PDD1501603663.  When you flip the page,

22       it will be facing you.

23           A.      Got it.

24           Q.      And can you please read to me

1    what it says, third line down from the very

2    top?

3          A.      "Cmax the extent of absorption

4    AUC.  See table 1 below"?

5          Q.      From the very, very top.

6    Sorry.

7                  Starting underneath the line.

8    Then there's three lines of text?

9          A.      Oh, okay.  It says "OxyContin

10   10 milligrams, 20 milligrams, 40 milligrams.

11   Oxycodone hydrochloride controlled release.

12   Warning:  May be habit-forming."

13         Q.      But you think there's no risk

14   of addiction in the label itself that should

15   have been in there?

16         A.      Right.  I mean, "Warning:  May

17   be habit-forming" goes with bubble gum.  I

18   have a big tub of bubble gum in my office,

19   it's habit-forming.  It's not addicting, but

20   it's habit-forming.  A habit is not an

21   addiction.

22         Q.      But that's your opinion?

23         A.      That a habit is not an

24   addiction?  I agree.  I have a habit of

Highly Confidential -- Subject to Further Confidentiality Review

```
1      getting up in the morning and exercising.

2      I'm not addicted to it, unfortunately.

3            Q.     Let's --

4            A.     I have a lot of other bad

5      habits too.  Probably we can leave that one

6      as an opinion not finished.

7            Q.     Let's turn to page

8      PDD1501603667.

9            A.     667?

10           Q.     Yes.

11           A.     Okeydokey.

12           Q.     Let's go to the middle of the

13     page where it says "Drug abuse and

14     dependence."

15           A.     Right.

16           Q.     What does it say in

17     parentheses?

18           A.     "Addiction."

19           Q.     And then can you please read

20     the first sentence?

21           A.     "OxyContin is a mu agonist

22     opioid with an abuse liability similar to

23     morphine and is a Schedule II controlled

24     substance."
```

1    Q.    What's a Schedule II controlled

2    substance?

3    A.    It's a narcotic that's labeled

4    Schedule II which means it has specific

5    requirements for distribution from a

6    manufacturer's standpoint.  It's got to be

7    locked vaults, et cetera.  And at the

8    patient-physician level, usually there's a --

9    you have to do a specific -- now you'd have

10   limitations on how many pills you can give

11   and triple prescription writing and things

12   like that.

13   Q.    And --

14   A.    But that wasn't true when I was

15   practicing necessarily.  So in the initial

16   time when I was practicing, you could write a

17   Schedule II on a regular prescription.  But

18   that's because I'm an old person.

19   Q.    Is it one of the features of a

20   Schedule II drug that it does have abuse

21   potential?

22   A.    Sure.

23   Q.    And what you just read, the

24   sentence underneath "Drug abuse and

1    dependence," isn't that a warning relating to

2    addiction?

3         A.    Doesn't say warning.

4         Q.    Does it have to say warning to

5    be a warning?

6         A.    It's awful helpful to say

7    warning when it's a warning.  And it's also

8    substantively wrong.  It's misleading on its

9    face.

10             And intentionally misleading on

11    its face.

12        Q.    Dr. Egilman, I'm going to move

13    to strike that entire answer.  I asked you a

14    yes-or-no question.

15             Does it have to say warning to

16    be a warning?

17        A.    What's "it" refer to?

18        Q.    Does what we read -- just read

19    in the label have to be -- have to say

20    warning to be a warning?

21        A.    Yes, a warning has -- is

22    specific language in the context of an FDA

23    label.  It has a specific meaning, and it

24    must be there to -- for that purpose.  It's a

Highly Confidential -- Subject to Further Confidentiality Review

1    specific requirement to put a warning in.

2    It's a negotiated process, and it has to be

3    there.

4              In this context, in order to be

5    a warning, it must start with the word

6    "warning."

7    Q.    You -- on page 54, paragraph 3,

8    Section D, you also state "Purdue failed to

9    list any of the symptoms of opioid

10   withdrawal."

11             Did I read that right?

12   A.    Right.

13   Q.    Let's turn to page -- and I'll

14   shorten it -- 3665 in Exhibit 33.

15   A.    Okay.

16   Q.    Can you please read for me

17   the -- starting from the very, very bottom of

18   the second column.  Starting at "Physical

19   dependence."

20   A.    "Tolerance and physical

21   dependence"?

22   Q.    And please read for me the

23   second-to-last line in that column for the

24   record.

1        A.      "Tolerance to the analgesic

2   effect of opioid" --

3        Q.      The -- the second-to-last

4   sentence in that column at the bottom.

5        A.      I was reading the -- I was

6   reading second-to-the-last sentence.

7        Q.      Starting --

8        A.      The last sentence starts

9   "Physical dependence."

10       Q.      I'm sorry, "Physical

11  dependence," the second-to-the-last line?

12       A.      I was reading -- the

13  second-to-the-last line starts with

14  "Tolerance."

15       Q.      Beneath that.

16       A.      That's the last line.

17       Q.      The last line.  "Physical

18  dependence."

19       A.      Okay.  "Physical dependence

20  results" -- remember, I was challenged on my

21  English reading ability.

22       Q.      Okay.

23       A.      "Physical dependence results in

24  withdrawal symptoms in patients who abruptly

1    discontinue a drug or may be prescribed

2    through the administration of drugs with

3    opioid antagonist activity, open parenthesis,

4    see overdosage, all caps, closed parenthesis,

5    period."

6          Q.      Please keep reading.

7          A.      "If OxyContin is abruptly

8    discontinued in a physically dependent

9    patient, an abstinence syndrome may occur.

10   This is characterized by some or all of the

11   following:  Restlessness, lacrimation,

12   rhinorrhea, yawning, respiration [sic],

13   chills, myalgia and mydriasis."

14         Q.      Okay.

15         A.      "Other symptoms may also

16   develop including:  Irritability, anxiety,

17   backache, joint pain, weakness, abdominal

18   cramps, insomnia, nausea, anorexia, vomiting,

19   diarrhea, or increased blood pressure,

20   respiratory rate, or heart rate.  If signs

21   and symptoms of withdrawal occur, patients

22   should be treated by reinstitution of opioid

23   therapy followed by a gradual tapered dose

24   reduction of OxyContin combined with

1    symptomatic support, open parenthesis, see

2    dosage administration in all caps, cessation

3    of therapy, closed parenthesis."

4         Q.    Okay.  Dr. Egilman, what you

5    just read there, aren't those signs and

6    symptoms of withdrawal?

7         A.    They are.

8         Q.    And yet on page 54, under

9    omissions D, you say failed -- "Purdue failed

10   to list any of the symptoms of opioid

11   withdrawal"; right?

12        A.    Correct.

13        Q.    So is that statement D wrong?

14        A.    Yes.

15              She went to Brown.  Very good.

16   She didn't take my course.  She would have

17   been better.

18        Q.    Move to strike that.

19              Part of that.  The second part.

20              Okay.  On page 54, you also

21   list in the middle of the page -- at page 54

22   of Exhibit 1, you also list in the middle of

23   the page "Misrepresentations"; right?

24        A.    I do.

```
1        Q.      And to -- in the interest of
2    time I'm just going to paraphrase.  One of
3    the misrepresentations you claim are in the
4    label relate to delayed absorption; right?
5                MS. CONROY:  Objection.
6                THE WITNESS:  Correct.
7        Q.      (BY MS. NEWMARK)  And the --
8    specifically the line "Delayed absorption as
9    provided by OxyContin tablets is believed to
10   reduce the abuse liability of the drug";
11   right?
12       A.      In combination with the
13   previous question, yes.
14       Q.      This -- this is what -- I'm
15   going to refer to that line as delayed
16   absorption language; is that okay?
17       A.      Sure.
18       Q.      This delayed absorption
19   language within the label, right?
20       A.      It's a quote from the label,
21   and it's cited from the label.
22       Q.      Are you aware that this label
23   was fully considered and vetted by the FDA?
24                MS. CONROY:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    THE WITNESS:  No.

2          Q.     (BY MS. NEWMARK)  Have you

3    reviewed the package insert submission to the

4    FDA from 1994?

5          A.     Yes.

6          Q.     And are you aware that there

7    was correspondence between Purdue and the FDA

8    on the delayed absorption language?

9          A.     Yes.

10          Q.     And ultimately this was the

11    language that the FDA approved; correct?

12          A.     They allowed it to go on the

13    label, right.

14          Q.     Do you disagree with the FDA's

15    approval of this language?

16          A.     Yes.

17          Q.     And let's look at exhibit --

18    the exhibit to your report B462.

19                    And I can show you my copy.

20                    Dr. Egilman, is that your

21    version of Exhibit 462?

22          A.     Yes.

23          Q.     And do you have notes on that

24    version?
```

1      A.     I do.

2      Q.     And what are those notes?

3      A.     Do you want me to read them?

4      Q.     Yes, please.

5      A.     Dash MS Contin, dash Roxane,

6  dash 160-milligram dose, dash EERW, dash

7  Action, dash Impact, and more.

8      Q.     What is Exhibit B462?

9      A.     Do you mean do you want me to

10 read the title?

11     Q.     Sure.

12     A.     "Opinion.  This is the timeline

13 of FDA activity that FDA created of its

14 activities related to opioid addiction.  It

15 omits regulatory capture."  And all those

16 other things I put down in notes.

17     Q.     Can you please turn to page 2

18 of 38 of Exhibit B462?

19     A.     Sure.

20     Q.     And this is a document that you

21 pulled from the website listed here; right?

22     A.     I think so.

23     Q.     On the first page?

24            Okay.  So this is on the FDA's

1    website; right?

2         A.    That's my understanding.

3         Q.    Can you --

4         A.    It was when I pulled it off.

5         Q.    I'm going to represent to you

6    that this is still on the FDA's website

7    today.  Or as of when I last checked last

8    week.  Okay?

9         A.    No problem.  I wasn't

10   challenging that.  I'm just trying to answer

11   the questions.

12        Q.    Okay.  Can you please read, on

13   page 2 of 38, towards the bottom.  There are

14   two bullet points.  Can you please read the

15   first bullet point, the first sentence of the

16   first bullet point?

17        A.    "At the time of approval, FDA

18   believed the controlled release formulation

19   of OxyContin would result in less abuse

20   potential since the drug would be absorbed

21   slowly and therefore would not be an

22   immediate, open quote, rush, closed quote, or

23   a high that would promote abuse."

24        Q.    And this is on the FDA's

```
 1    website; right?

 2         A.     Correct.

 3         Q.     And you disagree with what the

 4    FDA has as -- currently has on its website?

 5         A.     Do you want to limit that to

 6    this paragraph and that sentence?  They have

 7    a lot of things on their website.  It's a

 8    very large website.

 9         Q.     I'll re-ask the question.

10               You said earlier that you

11    disagree with the FDA's decision to approve

12    the controlled release formulation part of

13    the label; right?

14         A.     Yes.

15         Q.     And here, the FDA talks about

16    how it believed the controlled release

17    formulation would result in less abuse

18    potential; right?

19         A.     That's what they say they

20    believed.

21         Q.     Do you have any reason to

22    disagree with that?

23         A.     Yes.

24         Q.     But the FDA still has this on
```

1    its website?

2            A.      Yes.

3            Q.      Have you ever told the FDA that

4    you disagree with what's on its website?

5            A.      Not with what is on its

6    website, but this specific item, yes.

7            Q.      And when did you tell the FDA

8    that you disagreed with that specific item?

9            A.      In 2013 when I gave that

10   presentation at the FDA hearing on opioids.

11           Q.      Are you referring to the

12   testimony before the FDA Center for Drug

13   Evaluation and Research in 2013?

14           A.      Yeah.  It's only one testimony

15   made in that year, so if that's --

16                   I don't remember what the name

17   of the committee was, but yeah.

18           Q.      And was that titled "Impact of

19   approved drug labeling on chronic opioid

20   therapy"?

21           A.      Do you mean if that was the

22   title of the hearing?  Yes.  I believe.

23                   Something like that.  It was on

24   labeling.

1    Q.    And did the FDA take any action

2  with respect to the -- with respect to your

3  concerns about that part of the label after

4  you testified before the FDA?

5    A.    Nope.

6    Q.    Let's turn to page 58 of

7  Exhibit 1F.  And look at paragraphs 13 and

8  14.

9    A.    Okay.

10   Q.    And I'm going to paraphrase

11  here and you can tell me if I'm wrong.  I'm

12  just trying to save some time for my

13  colleagues down the table.

14         These paragraphs relate to your

15  disagreement with the use of OxyContin for

16  Q12-hour dosing; right?

17         MS. CONROY:  Objection.

18         THE WITNESS:  Paragraphs 13 and

19     which one?  13 and 14?

20   Q.    (BY MS. NEWMARK)  13 and 14.

21   A.    Correct.

22   Q.    Are you aware that the FDA

23  approved OxyContin for Q12-hour dosing?

24   A.    Yes.

1    Q.    And let's turn to Exhibit 33,

2    the page ending in 3668.

3    A.    Okay.

4    Q.    The first paragraph -- the

5    first full paragraph on the left column, can

6    you please read the second sentence?

7    A.    The controlled release nature

8    of the formulation allows it to be

9    effectively administered every 12 hours.

10   Open parenthesis, see clinical pharmacology,

11   semicolon, pharmacokinetics and metabolism,

12   period, closed parenthesis.

13   Q.    And this is in the labeling

14   that was approved by the FDA; right?

15   A.    Yes.

16   Q.    Do you disagree with that

17   language?

18   A.    Yes.

19   Q.    I'm going to hand you what's

20   going to be marked as Exhibit 34.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentality Review



```
 5          Q.      Are you aware that the FDA has

 6    to approve promotional materials for a drug

 7    when the drug is launched?

 8          A.      The FDA has to -- promotional

 9    materials --

10                  The answer is no.  They don't

11    do that.

12                  There's no approval -- there's

13    no letter coming back from the FDA saying "We

14    approve your promotional materials" that I've

15    seen.
```

12          Q.      Are you -- withdrawn.

13                  You testified earlier that you

14   know the FDA can tell a company not to -- not

15   to use certain marketing materials if they

16   believe them to be false or misleading;

17   right?

18          A.      They can do that.

19          Q.      And the FDA certainly could

20   have done that here; right?

21          A.      They could have done that.

22          Q.      Especially if it found the

23   Q12-hour dosing language misleading; right?

24          A.      They could have done that, if

```
1    they --

2         Q.     Did they --

3         A.     If they read it, they could

4    have done that.

5         Q.     Did they tell Purdue not to use

6    these promotional materials here?

7         A.     They gave no comment on this

8    submission.  They did not write a letter

9    saying this is okay, and they did not write a

10   letter saying this is not okay.

11        Q.     So the FDA never told Purdue

12   not to use these promotional materials?

13        A.     They never told them it was

14   okay, and they never told them it wasn't.

15        Q.     You've made your opinions about

16   12-hour dosing known to the FDA; right?

17        A.     I did.

18        Q.     And that was during the 2013

19   testimony before the Center for Drug

20   Evaluation and Research?

21        A.     Correct.  It was delayed six

22   years.

23        Q.     Did the FDA instruct Purdue to

24   change any of its labeling in light of your
```

1    testimony?

2         A.    No.

3         Q.    Did you ever express any

4    concerns to the FDA about MS Contin?

5         A.    No.  Do you mean the fact that

6    Purdue was selling it unapproved?  Is that

7    what you mean?

8         Q.    I asked you if you expressed

9    any concerns to the FDA about MS Contin?

10        A.    No.

11        Q.    One of your opinions relates

12   to -- and I'm going to paraphrase again in

13   the interest of time.  -- you think that the

14   MS Contin label shows that the -- that

15   OxyContin was underwarned; right?

16        A.    I'm not sure what you're

17   referring to.  I don't understand that

18   question.

19        Q.    I'll withdraw that in the

20   interest of time.

21             On page 85 of your report,

22   Exhibit B156.  You express the opinion that

23   "Purdue misled physicians about the potency

24   of OxyContin"; right?

1          A.       Oh, you mean the mushroom

2     document?   Yes.

3          Q.       Is it your opinion that doctors

4     were not aware of the potency of OxyContin?

5          A.       Yes.

6          Q.       What is the basis for this

7     statement?

█       █         ████████████████

█      ███████████████████████

█     ███████████████████████

█          ███████████████████

█     █████████████████████████

█     █████████████████████████

█     ██████████████████████

█     █████   █████████████████████████

█     ██████████████████████

█     ███████████████████

█     ████████████████████████

█     ██████████████████████████████

█     █████████████

21          Q.       Dr. Egilman?

22          A.       "Since OxyContin" --

23          Q.       Dr. Egilman, does that document

24     have a Bates number on it?

1    A.    Yeah.  Can I -- do you want

2    to --

3              Here, let me try this.  You can

4    tell me anytime you want you've heard enough

5    of the answer and I'll stop.  Okay?

6              What I do not want you to do is

7    interrupt my answer except to tell me you've

8    heard enough of the answer.

9    Q.    Okay.  Dr. Egilman --

10   A.    I don't want to be interrupted.

11   Q.    Dr. Egilman --

12   A.    You can stop me, no problem,

13   but you can't interrupt me with other

14   questions because I can only answer one

15   question at a time.  Otherwise, the record

16   gets confused.

17   Q.    Dr. Egilman, does that -- I'm

18   going to note that your answer was

19   incomplete.

20              Does that document have a Bates

21   number?

22   A.    It does.

23   Q.    And does that appear in your

24   report?

1      A.      It does.

2      Q.      What's the Bates number on that

3  document?

4      A.      PDD8801118262.

5      Q.      May I see it, please?

6      A.      Sure.

7      Q.      Is this document the same

8  document that appears at Exhibit B156 to your

9  report?

10      A.      I don't know.

11              (Witness was handed copies.)

12      Q.      And what is your opinion at

13  B156?

14      A.      "Physicians had the

15  misimpression that OxyContin was less potent

16  than MS Contin.  Instead of correcting this,

17  Purdue took advantage of this ignorance to

18  encourage inappropriate use of opioids.  And

19  I might add in, from the label, Purdue gave

20  the impression that more -- that MS Contin

21  and OxyContin had equal potency."

22      Q.      Is that a new opinion that you

23  have in this case?

24      A.      New basis for that same

1    opinion.

2                    I missed that before.  I just

3    reread it when you gave me the label to read.

4    So that was your contribution, and I

5    appreciate it.

6         Q.    You said that physicians have

7    the misimpression that OxyContin was less

8    potent than MS Contin; right?

9         A.    Yes.  When it was actually more

10   potent than MS Contin.

11        Q.    Besides this one e-mail that

12   you cite in Exhibit B156, do you have any

13   other documents that form the basis for this

14   opinion?

15        A.    Yes.

16        Q.    Are those included in your

17   report?

18        A.    I think so, and then some of

19   them will be in this pile to my right.

20        Q.    Are you referring to --

21   withdrawn.

22                    Did you do any surveys of any

23   doctors to see if they had an impression that

24   OxyContin and MS Contin had equal potency?

```
 1           A.     No.

 2           Q.     Did you see any marketing

 3   materials that said that OxyContin and

 4   MS Contin had equal potency?

 5           A.     Yes.

 6           Q.     Which marketing materials were

 7   those?

 8           A.     Let's start with the label.

 9   Right here.  Exhibit 33.

10           Q.     I asked you about marketing

11   materials.

12                  MS. CONROY:  Objection.

13           Q.     (BY MS. NEWMARK)  So let's

14   start with marketing materials.

15                  MS. CONROY:  Objection.

16           Q.     (BY MS. NEWMARK)  Which

17   marketing materials gave the impression that

18   MS Contin and OxyContin had equal potency?

19           A.     Sorry, the label is marketing

20   materials.

21           Q.     Besides the label, which

22   marketing materials said that OxyContin and

23   MS Contin had equal potency?

24           A.     Oh, none that I'm aware of.
```

1    Besides the label.

2         Q.     Do you know of any physician

3    who wrote a medically inappropriate or

4    unnecessary prescription based on a

5    misperception about the potency of OxyContin?

6         A.     Personally?

7         Q.     Yes.

8         A.     No.

9         Q.     Have you taken any surveys to

10   determine whether any physicians wrote any

11   medically unnecessary prescriptions based on

12   a misperception about the potency of

13   OxyContin?

14        A.     No.

15        Q.     Let's turn to the label.  Bates

16   number ending in 3668.

17        A.     How about before your next

18   question, we just take a quick break.

19        Q.     I'm almost done, Dr. Egilman,

20   and then we'll have a lunch break.

21        A.     Well, how much more have you

22   got?

23        Q.     I'm almost done.

24        A.     How much more do you have?

```
 1          Q.     I'm almost done.

 2          A.     What does that mean?  In

 3   English?

 4          Q.     It depends on --

 5                 MS. CONROY:  How much time do

 6          you have left --

 7                 MS. NEWMARK:  -- how long your

 8          answers are.  I have about five

 9          minutes.

10                 THE WITNESS:  How much?

11                 MS. NEWMARK:  Five minutes.

12                 THE WITNESS:  Well, why don't

13          we take a quick break.  Because I

14          don't think your five minutes will be

15          good for five minutes.

16                 THE VIDEOGRAPHER:  Off the

17          record, 12:08.

18                 (Recess taken, 12:11 p.m. to

19          12:12 p.m.)

20                 THE VIDEOGRAPHER:  We're back

21          on the record at 12:13.

22          Q.     (BY MS. NEWMARK)  Dr. Egilman,

23   when we -- when we took a break, I asked you

24   to look at the label again, the page ending
```

```
 1    in 3668.

 2         A.     Okay.

 3         Q.     Can you please look in the

 4    middle column about two-thirds of the way

 5    down where it says "Table 3"?

 6         A.     Right.

 7         Q.     Do you know what this table is?

 8         A.     Yeah.  It's a conversion table.

 9         Q.     What is it a conversion table

10    of?

11         A.     These are rough morphine

12    equivalents for various opioids.

13         Q.     Would you say here that it

14    is -- this table compares the morphine

15    equivalence of OxyContin -- withdrawn.

16                Would you say that this

17    compares different opioids, including

18    oxycodone?

19         A.     In as mis -- yes, in as

20    misleading a fashion as possible.

21         Q.     What is the basis for saying

22    "in as misleading fashion as possible"?

23         A.     Because most people are going

24    to look at this, look at -- do numbers in
```

1    sequence from low to high or high to low.

2            And you see how the numbers

3    here are more or less random?  Based on the

4    alphabetical order of the drug on the left,

5    but the relevant question for a physician in

6    looking at this is to know what's the

7    relative morphine equivalent.  And you want

8    to know that first.  So this should be

9    ordered by morphine equivalent dose.  So I

10   would start with the most potent and end with

11   the least potent.

12           And if you did that, then you

13   could more easily compare OxyContin --

14   oxycodone to morphine sulfate, for example,

15   than the others.

16       Q.    Well, this is in the label that

17   the FDA approved for OxyContin at its launch;

18   right?

19       A.    Correct.

20       Q.    So that means the FDA also

21   approved Table 3; right?

22       A.    Correct.

23       Q.    And do you disagree with the --

24   with the FDA's approval of this table in the

1    label?

2          A.    Yes.

3          Q.    But that's your opinion; right?

4          A.    That's my opinion based on --

5    and based on Sackler's e-mail, this one --

6    one could -- one could infer that this was

7    done this way, particularly with the language

8    that I mentioned before, that you definitely

9    pointed out earlier, that this was done on

10   purpose with morphine at the bottom and

11   oxycodone at the top, rather than just --

12   you're talking here about two -- in the

13   label, there's two drugs mentioned:  Morphine

14   and OxyContin.

15              So the relevant information

16   from giving people information about risks

17   and benefits is to compare those two drugs.

18   So in the table, I would have started with a

19   comparison of oxycodone and morphine,

20   comparative potency.  And then it would have

21   been obvious.  Oxycodone would have been a 1

22   and morphine was a .5.

23              Part of the reason that the

24   Purdue team -- not just Kathe Sackler, but

1    the Purdue team believed that physicians were

2    in the dark, as it were, is because this

3    table was set up the way it was, making it

4    hard for a physician to juxtapose oxycodone

5    and morphine potency.

6         Q.    Dr. Egilman, as you said

7    earlier, though, that this was -- that the

8    table was done in some misleading way is just

9    an inference; right?

10        A.    No.  We know the results where

11   there was misleading.

12             MS. CONROY:  Objection.

13             THE WITNESS:  It's not an

14        inference.  It's that this label, the

15        text that you deftly pointed out

16        before, and this table that you have

17        now pointed out are part of the reason

18        that physicians were kept in the dark,

19        or entered the dark and kept in the

20        dark with respect to the relative

21        potency of oxycodone and morphine.

22        Q.    (BY MS. NEWMARK) Dr. Egilman,

23   have you done any surveys of physicians about

24   their understanding of Table 3?

1          A.     No.

2          Q.     So you don't know what

3    physicians' actual understanding of Table 3

4    was, right?

5          A.     No.  We only know what

6    physicians' actual understanding of the

7    relative potency of morphine and oxycodone

8    was based on Purdue's information garnered

9    from physicians.

19         Q.     (BY MS. NEWMARK)  Dr. Egilman,

20   during your testimony today, you've testified

21   about a lot of things that you would change

22   in the label.  Is that fair to say?

23              MS. CONROY:  Objection.

24              THE WITNESS:  I mean, I've

```
 1            testified about what I've testified

 2            about.  I don't know how to summarize

 3            that.

 4            Q.     (BY MS. NEWMARK)  You

 5    understand that there's a citizen's petition

 6    process by which anyone can petition the FDA

 7    to change a label for a pharmaceutical?

 8            A.     That's correct.

 9            Q.     Have you ever done that for

10    OxyContin?

11            A.     No.

12            Q.     Did you ever do that for

13    MS Contin?

14            A.     No.

15            Q.     Did you ever do that for any of

16    the opioids manufactured by any of the

17    defendants in this case?

18            A.     No.

19            Q.     Are you aware that a citizen's

20    petition actually was filed with the FDA for

21    OxyContin?

22            A.     Yes.  Kolodny.

23            Q.     Do you know what happened with

24    that petition?
```

```
1          A.     Yeah.  The FDA took the

2    opportunity to petition to reinforce all

3    the -- all of the wrong decisions that have

4    been made over the years.

5          Q.     So you think that the FDA has

6    made a series of wrong decisions over the

7    years?

8          A.     Yes.

9                 MS. NEWMARK:  Okay.  I have no

10               further questions.

11                MR. BLANK:  Before we break, I

12               would just want to make a statement

13               for the record that Dr. Egilman's

14               opinion and expert report contains 489

15               numbered opinions plus pages of

16               additional opinions, plus I think

17               33,000 related documents in support of

18               that.

19                   We are all here to take

20               Dr. Egilman's deposition.  Under the

21               protocol, we have two days.

22               Obviously, given the number of

23               defendants and the number of opinions,

24               it is impossible for any one defendant
```

```
 1          to ask Dr. Egilman about each of the

 2          opinions he purports to offer.  We're

 3          doing the best that we can.  We've

 4          allotted time amongst the defendants

 5          to give each defendant some amount of

 6          time for Dr. Egilman, but on behalf of

 7          Purdue, we think this is inadequate by

 8          a long shot.

 9              Even if we were the only

10          examiners over the two days, we could

11          not get through the opinions related

12          specifically to Purdue, and I think

13          the other defendants are in the same

14          situation.

15              So with that, we'll take the

16          lunch break now and resume with some

17          of the other defendants.

18              THE WITNESS:  Let me just say

19          I'll be glad to answer any questions

20          that any of the defense have anytime

21          they want to call me up or meet with

22          me.  No problem.  I'm available.  You

23          don't have to pay me for it.

24              MR. BLANK:  Excellent.
```

Highly Confidential – Subject to Further Confidentiality Review

```
1                    THE VIDEOGRAPHER:  Off the
2          record at 12:22.
3                    (Recess taken, 12:22 p.m. to
4          1:19 p.m.)
5                    THE VIDEOGRAPHER:  We are back
6          on the record at 1:20.
7                    THE WITNESS:  Before you start,
8          I have another plaintiff time
9          document.  So there's my plaintiff
10         time document.
11                   MS. LUCAS:  Thanks,
12         Dr. Egilman.  Is this a document that
13         we've not seen before?
14                   THE WITNESS:  This is a
15         document I've not brought before.
16                   MS. LUCAS:  Can we please mark
17         this document for the record as
18         Exhibit 35.
19                   (Whereupon, Deposition Exhibit
20         Egilman 35, FDA and Opioids: What's a
21         Regulator to Do?  Pain Care Forum.
22         Douglas C. Throckmorton, MD
23         PowerPoint, ENDO-Opioid_MDL-02791998,
24         was marked for identification.)
```

```
 1                    EXAMINATION

 2   BY MS. LUCAS:

 3        Q.    Dr. Egilman, I have been

 4   granted very limited time to ask you

 5   questions even though I have a lot of

 6   questions for you, so I'm going to ask you a

 7   lot of yes-or-no questions and I would like a

 8   yes-or-no answer from you whenever possible.

 9               Will you do that for me?

10        A.    Sure.

11        Q.    Thank you.  Were you asked to

12   make any assumptions in forming your opinions

13   in this case?

14        A.    No.

15        Q.    Did you make any assumptions in

16   forming your opinions in this case?

17        A.    I'm not sure I understand that

18   question.

19        Q.    Well, regardless if anyone

20   asked you to make any assumptions, did you in

21   fact make any assumptions in this case in

22   forming your opinions?

23        A.    Out of context, I'm not sure

24   what that refers to.
```

1    Q.    Did you assume that the

2    plaintiffs will prove any particular facts in

3    forming your opinions in this case?

4    A.    No.

5    Q.    Have you been retained by

6    plaintiffs' counsel in any other opioids

7    litigations other than the MDL?

8    A.    Yes.

9    Q.    How many?

10   A.    The three that we talked about

11   yesterday.

12   Q.    And which three are those?

13   A.    I don't remember the names of

14   the cases.  They're 2004 cases.

15   Q.    Have you been retained in any

16   post 2004 opioids litigations?  And I'm

17   talking about opioids litigations in the last

18   few years other than the MDL?

19   A.    No.

20   Q.    You've never spoken to any

21   other counsel for any of the other plaintiffs

22   who are not in the MDL; is that correct?

23        MS. CONROY:  Objection.

24        MS. LUCAS:  Let me rephrase.

```
 1          Q.      (BY MS. LUCAS)  "Yes" or "no,"

 2    have you spoken about any non-MDL opioids

 3    litigations going on in the last few years

 4    with counsel for any of the opioids

 5    plaintiffs other than the MDL counsel?

 6          A.      Yes.

 7                  MS. CONROY:  Objection.

 8          Q.      (BY MS. LUCAS)  How many

 9    counsel other than the MDL counsel have you

10    spoken with?

11                  MS. CONROY:  Objection.

12          Q.      (BY MS. LUCAS)  I'll cut this

13    short.  Have you spoken with any of the

14    Oklahoma plaintiffs' counsel about the

15    opioids litigation?

16          A.      Yes.

17          Q.      Which ones?

18          A.      Which ones what?  What lawyer?

19          Q.      Correct.

20          A.      I don't remember his name.

21          Q.      Have you spoken with Brad

22    Beckworth?

23          A.      No.

24          Q.      Reggie Whitten?
```

1        A.      No.

2        Q.      Any other names that you can

3   think of that's --

4        A.      I can't remember the guy's

5   name.

6        Q.      And did they retain you?

7        A.      No.

8        Q.      Did you ever consult for them?

9        A.      Consult.  I sent them material.

10       Q.      What material did you send

11  them?

12       A.      The two boxes of Johnson &

13  Johnson bad acts documents that I brought

14  here.

15       Q.      Oh, the bad acts documents that

16  say "Johnson & Johnson bad acts"?

17       A.      Yes.

18       Q.      I saw those.  You sent that box

19  to the Oklahoma plaintiffs' counsel?

20       A.      It's two boxes.  I sent I think

21  a digital version.

22       Q.      Are any of the documents inside

23  that box subject to a protective order?

24       A.      I don't think so.

1      Q.      Did you check?

2      A.      As far as I know, they're not.

3      Q.      You are of the opinion in this

4  litigation, the MDL, that all the defendants

5  in the opioids litigation, including their

6  associated individuals and/or organizations,

7  are in a venture where they're acting in a

8  concerted fashion separately or together to

9  effect a particular result; correct?

10     A.      Correct.

11     Q.      And although Purdue was the

12 only member of that venture in 1984 in your

13 opinion, others joined around 1996 or '97;

14 correct?

15     A.      No.  I left out Duragesic.

16 That was also in the early '80s.  That was a

17 Janssen product.  I forgot them yesterday.

18     Q.      Oh, you forgot them yesterday.

19 The early what?

20     A.      Early '80s.

21     Q.      The early '80s.  And so would

22 you like to amend your testimony from

23 yesterday?

24     A.      I just did.

1    Q.    So your contention is that

2  Janssen joined the venture in the early

3  1980s; is that correct?

4    A.    Janssen started to sell an

5  opioid which led to the hockey stick in part

6  beginning in the early '80s.

7    Q.    And by "an opioid," you mean

8  Duragesic; correct?

9    A.    Correct.

10    Q.    Was there an objective to the

11  venture?

12    A.    Yes.

13    Q.    What was the objective of the

14  venture in your opinion?

15    A.    Make as much money as possible.

16    Q.    Is that the only objective to

17  the venture in your opinion?

18    A.    Yes.

19    Q.    Other than Janssen, you're also

20  of the opinion that Johnson & Johnson was in

21  the venture; correct?

22    A.    Correct.

23    Q.    What year did Johnson & Johnson

24  join the venture, in your opinion?

1        A.      Well, Johnson & Johnson's

2    responsible for Janssen.  They own Janssen.

3    So whatever Janssen did, Johnson & Johnson is

4    now responsible for.

5        Q.      Is it your opinion that Johnson

6    & Johnson was in the venture in the early

7    '80s as well?

8        A.      Independently?

9                Johnson & Johnson had a joint

10   marketing agreement with Ultram, or Ultram

11   with Purdue, as I recall.  So whenever that

12   dates, that would have been joining with

13   other members of the venture to promote

14   opioid sales.

15       Q.      So you're of the opinion that

16   J&J did not join the venture until there was

17   a joint marketing agreement related to

18   Ultram; is that correct?

19       A.      No.

20       Q.      Well you said, you told me

21   independently Johnson & Johnson had a joint

22   marketing agreement with Ultram.  Or Ultram

23   with Purdue, as I recall.

24               "So whenever that dates, that

1    would have been joining with other members of

2    the venture to promote opioid sales."

3         A.     That's correct.

4         Q.     Then what is the date that you

5    contend Johnson & Johnson joined the venture?

6         A.     Well, Duragesic was a Janssen

7    product in the early '80s.  It would have

8    been then, because Johnson & Johnson is

9    responsible for Duragesic now.

10        Q.     So you are of the opinion that

11   J&J joined in the early '80s because of

12   Janssen; correct?

13        A.     They own Janssen.  Janssen

14   participated in the early '80s.  Johnson &

15   Johnson is now Janssen.  Or Janssen is now

16   Johnson & Johnson, yes.

17        Q.     Yes.  That's a yes?

18        A.     That's a yes.

19        Q.     Thank you.

20               Do you believe that Janssen is

21   still a member of the venture today, "yes" or

22   "no"?

23               MS. CONROY:  Objection.

24               THE WITNESS:  Yes.

```
 1          Q.      (BY MS. LUCAS)  Do you believe

 2     that J&J is still a member of the venture

 3     today, "yes" or "no"?

 4          A.      Yes.

 5          Q.      Other than Duragesic, do you

 6     know what opioid medications Janssen has

 7     manufactured?

 8          A.      Well, they originally developed

 9     fentanyl.  That's --

10          Q.      This is a "yes" or a "no"?

11          A.      Oh, I'm sorry.

12          Q.      That's all right.

13          A.      Yes.  Some of them.

14          Q.      You're a very experienced

15     expert, Dr. Egilman.  And I don't have much

16     time, so unfortunately I have to ask a lot of

17     "yes" or "no" questions.

18              MS. CONROY:  Objection, move to

19          strike.

20          Q.      (BY MS. LUCAS)  So you do know

21     what opioid medications Janssen has

22     manufactured.  I would like a list of the

23     opioid medications that Janssen has

24     manufactured to your knowledge.
```

```
 1            A.      Janssen apart from J&J?

 2            Q.      Yes.

 3            A.      Let's see what the list says.

 4            Q.      I would like you to give me

 5      that list without reference to your notes,

 6      please.

 7            A.      Well, that's good, but let me

 8      look at my notes.

 9                    MS. LUCAS:  Then I'm going to

10            put on the record that Dr. Egilman is

11            incapable of telling me what Janssen's

12            medications were without looking at

13            his notes.

14                    And for the record,

15            Dr. Egilman's reading a green piece of

16            paper that looks to be a list of some

17            kind.

18                    THE WITNESS:  It's a list of

19            some kind.

20                    So Janssen's got the fentanyl

21            that I mentioned, and then Nucynta and

22            Nucynta SR.

23                    And then -- so that's the

24            Janssen participants.
```

```
1          Q.      (BY MS. LUCAS) What does "SR"

2    stand for?

3          A.      Slow release.

4          Q.      Do you know when the Duragesic

5    transdermal system was first approved for the

6    market in the United States by the FDA?

7          A.      No.

8          Q.      Do you know if Janssen

9    continues to market Duragesic in the

10   United States today?

11         A.      I believe they do.

12         Q.      Do you know when Nucynta IR was

13   first approved for market in the U.S. by the

14   FDA?  And by "IR," I mean immediate release.

15         A.      No.

16         Q.      Do you know whether Janssen

17   still markets Nucynta IR?

18         A.      Did I say Nucynta ER?  SR?

19         Q.      You said SR?

20         A.      It's ER.

21         Q.      Correct.

22         A.      I'm sorry.  I made a mistake.

23         Q.      That's all right.

24         A.      It's extended release.
```

1    Q.    I'll start again.

2          Do you know whether Janssen

3    still continues to market Nucynta IR today in

4    the United States?

5    A.    I think so.

6    Q.    Do you know whether Janssen

7    still continues to market Nucynta ER in the

8    United States today?

9    A.    I think so.

10   Q.    And do you know when Nucynta ER

11   was first approved for market in the

12   United States by the FDA?

13   A.    No.

14   Q.    Do you know Janssen's total

15   market share for all three of those opioids

16   Nucynta IR, Nucynta ER and Duragesic?

17         MS. CONROY:  Objection.

18         THE WITNESS:  No.

19   Q.    (BY MS. LUCAS)  Do you know

20   Janssen's total market share of all opioid

21   prescriptions in Summit County between 1997

22   and 2017?

23   A.    I need to look at the Summit

24   County document to give you that.

```
 1              Q.     Well, unfortunately, we don't
 2      have time for you to look through your
 3      documents.  So without looking at documents,
 4      do you know Janssen's total market share of
 5      all opioid prescriptions in Summit County
 6      between '97 and 2017?
 7                     MS. CONROY:  Objection.  Like
 8          do a memory test?
 9                     MS. LUCAS:  Do you want to give
10          me more time?
11                     MS. CONROY:  The Court has
12          granted the time here.
13                     MS. LUCAS:  Then yes.
14              Q.     (BY MS. LUCAS)  So without
15      looking at your documents, do you know
16      Janssen's total market share of all opioid
17      prescriptions in Summit County between '97
18      and 2017?
19              A.     No.
20              Q.     Without looking at your notes,
21      do you know Janssen's total market share of
22      all opioid prescriptions in Cuyahoga County
23      between 1997 and 2017?
24              A.     No.
```

```
1          Q.     So you offered 800 -- 489

2    separate opinions in Exhibits B1 through B489

3    of your report, give or take; correct?

4          A.     Take.  Correct.  There are a

5    few that have a lot of duplicates in them.

6          Q.     Okay.  So around 480 opinions

7    are in Exhibits B1 through B489; correct?

8          A.     I think there's more dups of

9    that.  It's probably in the 470 range.

10         Q.     I'll go with that.  So you

11   offered around 470 separate opinions in

12   Exhibits B1 through B489 of your report;

13   correct?

14         A.     No, there's -- some of them

15   have more than one opinion.  No.

16         Q.     So how many total opinions do

17   you believe you've offered in those exhibits?

18         A.     I don't know.

19         Q.     Is it around 470, between 470

20   and 480?

21         A.     I don't know.

22         Q.     Is it more than 500?

23         A.     I do not know.

24         Q.     You have no idea?
```

```
 1              A.      No, I don't have -- I have an

 2     idea.  It's between 470, probably, and 600, I

 3     would say on the high end.  But you're not

 4     including all of the opinions that are in the

 5     preliminary sections -- some of which we just

 6     went over with Purdue.

 7              Q.      Correct.

 8              A.      Which are not numbered.

 9              Q.      Correct.  I'm interested right

10     now in only the exhibits.

11                      So in B1 through B489, you've

12     offered between 470 and 600 separate

13     opinions; correct?

14              A.      That's a rough estimate, yes.

15     I could be wrong.

16              Q.      Of those between 470 to 600

17     opinions, around 14 of them specifically

18     mentioned either Janssen or J&J in the title;

19     correct?

20              A.      I don't know.  I haven't

21     counted them by company.

22              Q.      Do you have any reason to

23     dispute that 14 of those opinions mentioned

24     Janssen or Johnson & Johnson?
```

1        A.      I have no reason to agree or

2    disagree because I haven't done that count.

3        Q.      Is that a no?

4        A.      No, that's not a no.

5        Q.      Do you have any reason to

6    dispute that there are 14 Janssen or Johnson

7    & Johnson mentions in the opinions in

8    Exhibits B1 through B489?

9        A.      I have no reason to agree or

10   disagree because I haven't done that count.

11       Q.      Okay.  But you have no reason

12   to say differently; correct?

13       A.      I have no reason to agree or

14   disagree because I have not done that count.

15       Q.      Okay.

16              Now, by our count -- and I

17   understand you haven't done the count --

18   another 42 of those opinions in Exhibits B1

19   through 489 cite Janssen documents.

20              Do you have any reason to

21   disagree with that?

22       A.      I have no reason to agree or

23   disagree because I have not done that count.

24       Q.      All right.  So even though you

1    haven't counted, you don't have any reason to

2    agree or disagree that there are 14 opinions

3    that mention Janssen or J&J in the title and

4    another 42 that cite documents from Janssen;

5    correct?

6         A.    No.

7         Q.    Do you have any reason to

8    dispute that a total of 56 of your opinions

9    involve Janssen or Johnson & Johnson either

10   by name or by document?

11        A.    Yes.

12        Q.    Why is that?

13              Strike that.

14              How many opinions in your

15   report do you think mention J&J or Janssen by

16   name, or cite their documents?

17              Your best estimate.

18        A.    I do not know.

19        Q.    You have no idea?

20        A.    I have not done that count.

21        Q.    Would you dispute it if I said

22   56?  "Yes" or "no."

23        A.    Same answer.  I have not done

24   the count.  I have no reason to agree or

1    disagree.

2         Q.    So you're an expert.  Let's

3    assume that there are 56 opinions that

4    involve Janssen and Johnson & Johnson.

5              Can you do that?

6         A.    Yes.  That's a different

7    assumption from the last question.

8         Q.    Correct.

9         A.    You'll recall.

10        Q.    So that's a yes?

11        A.    That's correct.  I just want to

12   make it clear that that's different from

13   mentioning documents and opinions that

14   mention the name "Janssen."

15        Q.    Understood.

16              Of the 384 hours that you've

17   spent on this case, do you know how much time

18   you've spent reviewing Janssen and Johnson &

19   Johnson evidence?  "Yes" or "no"?

20        A.    No.

21        Q.    Do you know how many Janssen

22   and Johnson & Johnson documents you have read

23   in the 384 hours you've spent on this case,

24   "yes" or "no"?

```
1              A.      No.

2              Q.      Are you able to give an

3      estimate of how many Janssen or J&J documents

4      you've read in the 384 hours you've spent on

5      this case?

6              A.      No.

7              Q.      Do you think you've reviewed

8      over 100 documents?

9              A.      Yes.

10             Q.      Do you think you've reviewed

11     over 100 Janssen and Johnson & Johnson

12     documents?

13             A.      Yes.

14             Q.      Do you think you've reviewed

15     over 1,000 Janssen and Johnson & Johnson

16     documents?

17             A.      Yes.

18             Q.      Do you think you've reviewed

19     over 10,000 Janssen and Johnson & Johnson

20     documents?

21             A.      Not individually, but by

22     search, yes.

23             Q.      So somewhere between 1,000 and

24     10,000 are documents you've actually reviewed
```

1    that were produced by Janssen and Johnson &

2    Johnson; correct?

3              MS. CONROY:  Objection.

4              MS. LUCAS:  You can answer.

5              THE WITNESS:  Yes, as described

6         above.

7         Q.    (BY MS. LUCAS)  So let's talk

8    about a couple of these opinions.  And we do

9    not have time to go through all 56 because my

10   colleagues here would come after me with

11   pitchforks.  So let's turn first to --

12        A.    I'm sure they're not that mean.

13        Q.    I don't know.  They have a lot

14   of questions.

15              Let's turn to what I'm going to

16   mark as Exhibit 36.

17              (Whereupon, Deposition Exhibit

18        Egilman 36, Opinion-Around 1997,

19        "Venture" members Ortho-McNeil

20        (Johnson & Johnson) and Purdue began

21        co-promoting Ultram SR, intended for

22        the use of more moderate pain, was

23        marked for identification.)

24        Q.    (BY MS. LUCAS) This is opinion

```
 1    B397.  "Opinion.  Around 1997 Venture members

 2    Ortho-McNeil, parenthesis, Johnson & Johnson,

 3    and Purdue began co-promoting Ultram SR,

 4    intended for the use of more moderate pain."

 5              Did I read that correctly?

 6        A.    Yes.

 7        Q.    And this is your opinion;

 8    correct?

 9        A.    Yes.

10        Q.    Ultram is the brand name for

11    tramadol; correct?

12        A.    Yes.

13        Q.    This opinion relates to Ultram;

14    is that right?

15        A.    In part.

16        Q.    In part?

17        A.    Yes.

18        Q.    Do you know whether Ultram is

19    at issue in this litigation?

20        A.    I'm not sure I understand that

21    question.  Do you mean is it one of the named

22    drugs in the complaint?  Is that the

23    question?

24        Q.    No.  I want to know, do you
```

 1    know today whether the Court has ruled that

 2    Ultram is or is not at issue in this

 3    litigation?

 4            A.     I do not know.

 5                   MS. CONROY:  Objection.

 6            Q.     (BY MS. LUCAS) You do not know.

 7    If the Court had ruled that Ultram is not at

 8    issue in this litigation, would this change

 9    your opinion at all?

10            A.     This opinion?  No.

11            Q.     Not at all?  Even when

12    confronted with evidence that something in

13    your opinion is simply not at issue, you're

14    not going to change the opinion?

15            A.     Correct.

16            Q.     Okay.  Now before we move on --

17    keep that with you real quick.  The two

18    documents that you cite are two Purdue

19    documents; correct?

20            A.     That's correct.

21            Q.     One is PKY181320029?

22            A.     Yes.

23            Q.     And the other is PKY183033731;

24    correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     Yes.

2                 MS. LUCAS:  Mark those as 37

3          and 38.

4          Q.     (BY MS. LUCAS) Now, I don't

5    want you to take all of your time reading

6    these documents because we don't have time,

7    but have you read these documents in coming

8    to your opinions?

9          A.     Yes.

10                (Whereupon, Deposition Exhibit

11         Egilman 37, Non-Malignant Pain

12         Consensus Guidelines, PKY181320029-

13         181320030, was marked for

14         identification.)
```







```
20         Q.     (BY MS. LUCAS) Do you know

21   whether either Exhibits 37 or 38 says

22   anything about Ortho-McNeil?

23         A.      Not without reading the

24   documents.
```

1        Q.       You would have to read the

2    document to tell me?

3        A.       Yes.

4        Q.       And you can't tell me where in

5    the document Johnson & Johnson is mentioned?

6        A.       Correct -- without reading

7    them?  Correct.

8        Q.       I've read these documents, and

9    I can't find Ortho-McNeil or Johnson &

10   Johnson in either one of them.

11            Did you intend to base your

12   opinion about Johnson & Johnson on a document

13   that didn't mention J&J?  "Yes" or "no."

14       A.       I need to read the documents to

15   answer the question.

16       Q.       Well, did you -- would you

17   intend to base an opinion about J&J on a

18   document that has nothing to do with J&J?

19            MS. CONROY:  Objection.

20            THE WITNESS:  Oh, no.

21       Q.       (BY MS. LUCAS)  And would you

22   intend --

23       A.       Well, actually, nothing to do

24   with J&J?  Correct.  No, I wouldn't do that.

1    Q.    And would you intend to base

2    your opinion on documents that don't mention

3    Ultram if your opinion is about Ultram?

4    A.    Depends on the context.

5    Q.    Well, I've read these

6    documents, and I can't find Ultram either.

7         So would you intend to base an

8    opinion about Ultram on documents that don't

9    mention it?

10   A.    Depends on the context.

11   Obviously in this case, yes.

12   Q.    Yes.  Okay.

13        All right.  I want to mark as

14   39, your opinion No. 77.  B77.

15        "Opinion.  Janssen targeted

16   youth and athletes.  Johnson & Johnson was

17   part of pain coalition with Janssen that

18   targeted youth.  Pain is not a disease.

19   Johnson & Johnson and Janssen engaged in

20   actions targeted at directly influencing

21   potential patients and children."

22        Is that your opinion,

23   Dr. Egilman?

24   A.    Yes.

```
 1                    (Whereupon, Deposition Exhibit

 2             Egilman 39, Exhibit B.77, David S.

 3             Egilman Report Opiate Litigation, was

 4             marked for identification.)

 5             Q.    (BY MS. LUCAS)  "Yes" or "no."

 6   Do you know what the pain coalition was?

 7             A.    Yes.

 8             Q.    And your opinion in No. 77,

 9   Exhibit 39, is based on this Janssen Bates

10   number that's cited; correct?

11             A.    Yes.

12             Q.    "Yes" or "no," do you know

13   which Janssen employees were involved in the

14   pain coalition?

15             A.    Not without looking at the

16   documents.

17             Q.    Did you read any depositions in

18   forming this opinion?  "Yes" or "no"?

19             A.    No.

20             Q.    Do you know whether any of the

21   programs mentioned in the pain coalition

22   documents were actually launched to the

23   public?

24             A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You do?  Do you know if any of

2  the youth programs mentioned in the pain

3  coalition documents were actually launched to

4  the public?

5    A.    Yes.

6    Q.    Do you believe that they were

7  launched?

8    A.    Yes.

9    Q.    What's the basis for that

10  belief?

11    A.    There's e-mails back and forth

12  about a nurse who was conducting the training

13  in elementary schools, getting more

14  wristbands to promote the program with

15  elementary school kids.

16    Q.    Are you sure about that?

17    A.    I think so.

18    Q.    Why isn't that document cited

19  here, Dr. Egilman?

20    A.    I don't know.

21    Q.    Strike that.

22          That document is not cited

23  there, is it?

24    A.    Correct.

1        Q.    Do you know of any other youth

2  programs that Janssen or Johnson & Johnson

3  launched targeting youth?

4        A.    Besides this one?  No.

5        Q.    You're not aware of any other

6  programs targeting youth that actually

7  launched; correct?

8             MS. CONROY:  Objection.

9             THE WITNESS:  With respect to

10       pain, you're talking?

11        Q.   (BY MS. LUCAS)  With respect to

12  prescription medication or opioids.

13             MS. CONROY:  Objection.

14             THE WITNESS:  That's correct.

15        Q.   (BY MS. LUCAS)  Have you ever

16  heard of Smart Moves, Smart Choices?

17        A.    No.

18        Q.    Never heard of it?

19        A.    Correct.

20        Q.    Are you aware that Janssen

21  partnered with the National Association of

22  School Nurses to launch a program called

23  Smart Moves, Smart Choices?  "Yes" or "no"?

24        A.    I know there were nurses giving

1  talks.  Paid for by Janssen.  I don't

2  remember the name of the program.

3      Q.    Are you aware that Smart Moves,

4  Smart Choices involved a program with nurses

5  where the point was to warn kids about the

6  dangers of opioids and other prescription

7  drugs, "yes" or "no"?

8      A.    No.

9      Q.    Are you aware that that program

10  was so popular with nurses, parents, and

11  educators, and schools that it continued for

12  six years and the website is still up today?

13  "Yes" or "no"?

14      A.    No.

15      Q.    Now, of all of the opinions

16  that you have that involve Janssen or Johnson

17  & Johnson, we counted up the documents that

18  you cited as the basis for your opinions.  Do

19  you know how many documents you cited as the

20  basis for your opinions against Janssen and

21  J&J?

22      A.    No.

23      Q.    We came up with 274 in

24  Exhibits B1 through B489.

1              Does that sound like something

2    you would dispute?

3         A.     Yes.

4         Q.     Do you think there was more?

5    "Yes" or "no"?

6         A.     Yes, I think there's more.

7         Q.     How many more do you think

8    there are?

9         A.     I do not know.

10         Q.     Do you think there's more than

11    300?

12         A.     Yes.

13         Q.     Do you think there's more than

14    a thousand?

15         A.     Probably.

16         Q.     In Exhibits B1 through B489;

17    correct?

18         A.     And the attached materials,

19    yes.

20         Q.     All right.  If I'm right, and

21    there's only 274, you found those documents

22    by running search terms listed in Exhibit D

23    to your report; correct?

24         A.     No.

```
 1              Q.      Let me rephrase that.

 2                      You found documents by running

 3      the search terms in Exhibit D and that you

 4      talked about yesterday across the documents

 5      listed in Exhibit D.

 6                      Oh, strike that.

 7                      You found documents by running

 8      search terms across the documents located and

 9      listed in Exhibit D; correct?

10                      Exhibit D are the documents

11      that you searched; right?

12              A.      I don't think -- what's

13      Exhibit D?

14              Q.      The documents that you

15      searched.

16              A.      No, the documents I searched is

17      the entire database.  I don't think that's --

18              Q.      Oh, the entire -- so you

19      searched the entire database.  Everything;

20      right?

21              A.      That's what the searches were

22      run on.

23              Q.      Got it.

24                      So if you've searched the
```

1    entire Janssen production, that's over

2    700,000 documents.  Do you have any reason to

3    dispute that?

4         A.    No.  I didn't do that count

5    either.

6         Q.    You wanted your searches to be

7    accurate; correct?

8              MS. CONROY:  Objection.

9              THE WITNESS:  Correct.

10        Q.    (BY MS. LUCAS)  You wanted your

11   searches to be comprehensive; correct?

12        A.    I wanted them to be relevant

13   more than comprehensive.

14        Q.    You wanted your searches to be

15   relevant; correct?

16        A.    Yes.

17        Q.    You didn't want to cherry-pick

18   anything for your opinions; correct?

19        A.    Correct.

20        Q.    So if you're citing 274

21   documents out of over 700,000, are you aware

22   that that's 0.048 percent of the documents in

23   Janssen's database?

24        A.    No.

1    Q.    And are you aware that your

2  opinions do not cite 99.9 percent of

3  Janssen's documents?

4    A.    No.

5    Q.    And if given the chance, are

6  you going to sit down in the witness chair

7  and take an oath to tell the truth and tell

8  the jury that you haven't taken anything out

9  of context as to Janssen or Johnson &

10  Johnson?  Is that what you will do?

11    A.    I don't think I'm going to be

12  answering that question unless you ask it.

13        And if you ask it, I had no

14  intent to take anything out of context.

15        MS. LUCAS:  Thank you.  I have

16  no more questions.

17        THE VIDEOGRAPHER:  Off the

18    record at 1:52.

19        (Recess taken, 1:53 p.m. to

20    1:53 p.m.)

21        THE VIDEOGRAPHER:  We are back

22    on the record at 1:53 p.m.

23        *   *   *

24        *   *   *

```
 1                    EXAMINATION

 2   BY MS. NAKAMURA:

 3        Q.    Good afternoon, Dr. Egilman.

 4   My name is Angel Nakamura, and I represent

 5   the Endo and Parr defendants in this case.

 6              In reviewing your opinions in

 7   detail, particularly over the last couple of

 8   days, I see that your report doesn't include

 9   any specific opinions regarding Parr

10   Pharmaceuticals; is that right?

11        A.    I think there's some Endo

12   opinions.

13        Q.    Correct.  There are no specific

14   opinions to Parr; correct?

15        A.    Not that I can recall.

16        Q.    You don't cite any documents or

17   refer to documents that are specific to the

18   Parr defendant; correct?

19        A.    Apart from the Endo documents,

20   correct.

21        Q.    And you're not offering any

22   opinions regarding Parr Pharmaceuticals in

23   this action; is that right?

24              MS. CONROY:  Objection.
```

```
1                THE WITNESS:  I think any

2         opinions that relate to Endo relate to

3         Parr.

4         Q.    (BY MS. NAKAMURA)  You don't

5    see Parr as a separate entity from Endo?

6         A.    I'm not -- to the extent that

7    Endo and --

8              I'm not making any

9    determinations about who the proper defendant

10   is.  So my opinions relate to the drug and

11   what was done with the drug.  Somebody else

12   is going to have to figure out who was

13   responsible for that activity at different

14   points of time.

15        Q.    Does your opinion refer to any

16   Parr Pharmaceutical documents?

17        A.    Not that I recall.

18        Q.    Your report and supporting

19   documents reference the Endo products

20   Opana ER and Percocet; is that right?

21        A.    Correct.

22        Q.    And your opinions don't relate

23   to any other Endo opioid products?

24        A.    Let's see.
```

1    Q.    Let me just ask.

2    A.    I think that's not correct.

3    Q.    Do you intend to offer any

4 opinions about any other Endo products other

5 than Opana and Percocet?

6    A.    The opinions that I have on --

7 probably by inference, yes.

8    Q.    What does that mean, "probably

9 by inference"?

10    A.    My mic just fell.

11    Q.    Let me ask you a different

12 question, Dr. Egilman.

13        Does your expert report include

14 any opinions on products other than Opana and

15 Percocet with respect to Endo?

16    A.    Yes.  There are opinions with

17 respect to --

18        Yes.  Sorry.

19    Q.    And you were saying which

20 other -- which other Endo opioid products are

21 referenced in your expert report?

22    A.    Well, there are references to

23 hydromorphone, and oxycodone in the report.

24    Q.    And do you have any expert

Highly Confidential - Subject to Further Confidentiality Review

1    opinions regarding hydromorphone and

2    oxycodone?

3          A.      Yes.  I think they're in the

4    report.

5          Q.      Have you ever prescribed

6    Opana ER?

7          A.      No.

8          Q.      Have you ever prescribed

9    Percocet?

10         A.      Percocet?  Yes, I think I've

11   used Percocet.

12         Q.      Do you continue to prescribe

13   Percocet?

14         A.      No.

15         Q.      Do you recall the last time you

16   prescribed Percocet?

17         A.      If you look at the IMS data, I

18   think it's there.

19         Q.      Sitting here today, do you

20   recall the last time you prescribed Percocet?

21         A.      No.  You'd have to go to the

22   IMS sheets.

23         Q.      And did you prescribe Percocet

24   based on any marketing that you received from

Highly Confidential - Subject to Further Confidentiality Review

1    the Endo sales representatives?

2         A.    Not from a representative, no.

3         Q.    Have you ever been detailed by

4    an Endo sales representative?

5         A.    Not that I can recall.

6         Q.    Do you recall ever speaking

7    with any representative of Endo and telling

8    them that their promotion or marketing

9    practices were false and misleading?

10        A.    No.

11        Q.    You have not interviewed or

12   surveyed prescribers to determine whether any

13   doctor received or relied upon marketing

14   materials by Endo regarding its opioid

15   products; correct?

16        A.    Correct.

17        Q.    So you can't identify any

18   specific prescriber who wrote an improper

19   opioid prescription based on Endo's conduct?

20        A.    No, that's not correct.

21        Q.    Can you clarify that answer,

22   please?

23        A.    Sure.

24        Q.    What do you mean?  Can you --

1    are you able to identify any specific

2    prescriber who wrote an improper opioid

3    prescription based on Endo's conduct?

4           A.      I think so.

5           Q.      Who is that?

6           A.      I don't have the name.

7           Q.      You don't have a specific

8    reference to a doctor?

9           A.      I don't remember the name.  I'm

10   not sure if I have a name.  I may have a

11   reference to a physician, per se, in these

12   counties.

13          Q.      And what is the reference to

14   the physician?

15          A.      Well, that would be in the call

16   notes.  If they were in call notes that

17   relate to and describe that activity, then

18   I'd have evidence.

19                  And I have them somewhere in

20   the call notes in that pile.

21          Q.      Sitting here today, can you

22   think of or recall a call note that gave you

23   any indication that a physician adjusted his

24   prescription practices based on Endo

```
1   marketing?

2        A.    No, I can't remember a

3   particular instance as I sit here today.

4        Q.    And you stated earlier you

5   haven't interviewed or surveyed any patients

6   to determine whether anyone has received a

7   medically unnecessary opioid prescription as

8   a result of Endo's conduct; correct?

9            MS. CONROY:  Objection.

10           THE WITNESS:  That's correct.

11       Q.    (BY MS. NAKAMURA)  So you can't

12  identify any specific patient who received an

13  improper prescription based on Endo's

14  conduct; correct?

15       A.    No.  Not necessarily.

16       Q.    And what does that mean?  Can

17  you -- can you identify a specific patient

18  who received an improper prescription based

19  on Endo's conduct?

20       A.    There's two questions there.

21  Which one do you want answered?

22       Q.    Are you able to identify any

23  specific patient sitting here today who

24  received an improper prescription based on
```

1    Endo's conduct?

2         A.    Not by name.

3         Q.    Is that a "no"?

4         A.    No, it's a "not by name."

5              THE VIDEOGRAPHER:  I apologize.

6         Can we go off the record for a second?

7              Going off the record at

8         2 o'clock p.m.

9              (Recess taken, 2:00 p.m. to

10        2:01 p.m.)

11             THE VIDEOGRAPHER:  We are back

12        on the record at 2:01 p.m.

13        Q.    (BY MS. NAKAMURA)  Are you able

14   to identify, Dr. Egilman, any specific

15   patient who received an improper prescription

16   based on Endo's comment?

17        A.    No, not by name.

18        Q.    You can't say that the opioid

19   crisis in Summit and Cuyahoga counties would

20   look any different if Endo had not marketed

21   or sold opioids; correct?

22        A.    No, not necessarily.

23        Q.    What does that mean?

24        A.    Well, that means if Endo had

1  come out and said, "We're no longer going to

2  sell oxycodone," for example, "or Opana ER

3  because doctors are overprescribing, the

4  drugs are being diverted, there's an opioid

5  epidemic that our drugs are contributing to

6  and that the whole industry's drugs are

7  contributing to," then that would have

8  impacted on the opioid epidemic in these two

9  counties and in the United States.

10      Q.     You can't say that a patient

11  would not have received a prescription for

12  another opioid medication if Endo had not

13  manufactured or marketed its opioid, could

14  you?

15      A.     If they withdrew it for the

16  reason I said, and said what I said, then

17  some patients would not have gotten these

18  opioids.

19      Q.     And what's your opinion on how

20  the crisis would look different if Endo had

21  not marketed its opioid products?

22      A.     If they had not marketed and

23  explained the reason for not marketing the

24  way I just described it, then that would have

1    significantly decreased the number of

2    prescriptions given, the amount of diverted

3    prescriptions, and it would have cut the

4    hockey stick off.

5         Q.    Can you quantify what you mean

6    by "significantly decreased"?

7         A.    Depends how strong that they

8    said what they said.  But if they said what I

9    said and it was a statement against interest

10   by an opioid manufacturer, it would have gone

11   right back to where it was in 1996.

12        Q.    If Endo had stopped marketing

13   its opioid products?

14        A.    Not just stopped marketing.  If

15   they'd given the reason for stop marketing or

16   the reason that I gave, it would have knocked

17   the hockey stick off.

18        Q.    Have you done any analysis to

19   determine what portion of the epidemic was

20   caused by Endo?

21             MS. CONROY:  Objection.

22             THE WITNESS:  Yes.

23        Q.    (BY MS. NAKAMURA)  What have

24   you done?

```
 1          A.     All of it.  Everybody's

 2    responsible for all of it.  Everybody's

 3    equally responsible.

 4          Q.     Everyone is equally

 5    responsible?  Is there any attribution to

 6    Endo that you would have -- excuse me, strike

 7    that.

 8                 Are you able to tell me what

 9    portion of the opioid crisis was caused by

10    Endo?

11          A.     Everybody is equally

12    responsible.  It's the bank robbery.

13    Somebody's outside watching for the cops.

14    Somebody's inside with the gun.  Everybody is

15    equally responsible for the community being

16    harmed.

17          Q.     Would you mind turning to

18    page 82 of your report and taking a look at

19    opinion 7.136?

20          A.     Got it.

21          Q.     And that opinion states that

22    "Endo sought to influence formulary decisions

23    by finding people to influence"; correct?

24          A.     Correct.
```

```
1          Q.     And in support of your opinion,

2    you rely on one cited document; is that

3    right?

4          A.     I need to look at 136 to answer

5    that question.

6                 (Whereupon, Deposition Exhibit

7          Egilman 40, Exhibit B.136, David S.

8          Egilman Report Opiate Litigation, was

9          marked for identification.)

10         Q.     (BY MS. NAKAMURA)  And in this

11   e-mail -- or in this exhibit, I'm sorry, you

12   pasted an internal Endo e-mail; correct?

13         A.     Correct.

14         Q.     And other than this e-mail, you

15   cite to no other documents in support of this

16   opinion; right?

17         A.     Not in this opinion, that's

18   correct.

19         Q.     Do you cite to --

20                Okay.  Scratch that.

21                You don't list any interviews

22   that support this opinion; right?

23         A.     No.

24         Q.     You don't cite any deposition
```

```
 1    testimony in support of this opinion?

 2         A.     Correct.

 3         Q.     And you don't set forth the

 4    original question that you sought to answer;

 5    right?

 6              MS. CONROY:  Objection.

 7              THE WITNESS:  Well, you can add

 8         a "did" to the beginning and that's

 9         the question.

10         Q.     (BY MS. NAKAMURA)  Right.  But

11    that isn't in -- anywhere in your expert

12    report; correct?

13         A.     There's no "did" in front of

14    the opinion, that's correct.
```

Highly Confidential - Subject to Further Confidentiality Review



17    Q.    Let's take a look at

18  opinion 7.137, please.

19          It's also still on page 82 of

20  your report.

21          (Whereupon, Deposition Exhibit

22      Egilman 41, Opinion-ENDO was either

23      too cheap to add its opioid labels to

24      the 2014 PDR or completely

Highly Confidential - Subject to Further Confidentiality Review

```
1        irresponsible for this failure to warn

2        doctors of any data concerning these

3        dangerous drugs, was marked for

4        identification.)
```



Highly Confidential - Subject to Further Confidentiality Review



    21          MS. CONROY:  Objection.

    22          Q.    (BY MS. NAKAMURA)  Have you

    23    ever reviewed any internal Endo

    24    communications discussing whether Opana ER

1    would be included in the 2014 PDR?

2          A.      No.

3          Q.      The PDR is a compendium of

4    FDA-approved labels for pharmaceutical

5    products; right?

6          A.      Plus more, but yes.

7          Q.      It contains --

8          A.      It also includes pictures of

9    the drugs and a variety of other information.

10         Q.      Thank you.

11                 So it contains copies of

12   FDA-approved product labeling?

13         A.      Correct.

14         Q.      And those labels are actually

15   found on the products themselves; correct?

16         A.      Well, they're passed out to the

17   patient when the patient gets the drug.

18         Q.      Right.  As part of the package

19   insert?

20         A.      Right.  It's usually 4 to

21   6-point type, yes.

22         Q.      And the product labeling and

23   the package insert is also available on the

24   FDA's website; right?

```
 1        A.     It is now.  I'm not sure when

 2   it first became available on the FDA web

 3   site.

 4        Q.     And there's no requirement that

 5   a manufacturer submit its product label for

 6   inclusion in the PDR; correct?

 7        A.     A label requirement?

 8        Q.     An FDA requirement.

 9        A.     I don't think so.

10        Q.     There's no legal requirement

11   either that a manufacturer submit its label

12   for inclusion in the PDR; correct?

13        A.     Do you mean statutory?

14        Q.     Yes.

15        A.     Correct.  There's no statute

16   that says you have to do that.

17        Q.     Other than the PDR, a physician

18   can obtain the product labeling through other

19   sources; right?

20             MS. CONROY:  Objection.

21             THE WITNESS:  Not so easy.

22        Q.     (BY MS. NAKAMURA)  It's

23   available on the FDA website as you

24   previously testified?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. CONROY:  Objection.

 2              THE WITNESS:  I don't know when

 3         it went on.  They're on the website

 4         now.  I don't know if they were on the

 5         website in 2014 or not.

 6         Q.    (BY MS. NAKAMURA)  It's also on

 7    the product itself; correct?

 8         A.    Yeah.  The physician doesn't

 9    get the product.  The patient gets the

10    product.

11         Q.    It's also available on the

12    manufacturer's website?

13         A.    I don't know.  I didn't check

14    the 2014 Endo website.  May or may not have

15    been.

16         Q.    And if it was on the Endo

17    website, a physician would have access to it

18    if he searched; correct?

19         A.    If he or she searched the Endo

20    website and if it was on there, he or she

21    probably could have found it.

22              MS. NAKAMURA:  Thank you.

23              THE VIDEOGRAPHER:  Going off

24         the record at 2:11.
```

```
 1              (Recess taken, 2:10 p.m. to

 2        2:12 p.m.)

 3              THE VIDEOGRAPHER:  We are going

 4        back on the record at 2:13 p.m.

 5                   EXAMINATION

 6  BY MR. ERCOLE:

 7        Q.    Doctor, again, given the

 8  shortness of time, I'd ask that you keep your

 9  answers to "yes" or "no" unless they call for

10  a different answer.

11              Sir, "yes" or "no," can you

12  identify for me -- strike that.

13              Sir, you are not giving an

14  opinion about any marketing by Watson

15  Laboratories, are you?

16        A.    Correct.

17              MS. CONROY:  Can you identify

18        yourself and who you represent.

19              MR. ERCOLE:  Bryan Ercole from

20        Morgan Lewis.

21              MS. CONROY:  Who do you

22        represent?

23              MR. ERCOLE:  You're taking up

24        time.  Do you want to cut this off?
```

```
 1              MS. CONROY:  I'll give you just
 2         a minute if you tell me who you
 3         represent.
 4              MR. ERCOLE:  I represent the
 5         Actavis and Teva defendants.
 6              MS. CONROY:  Thank you.
 7         Q.    (BY MR. ERCOLE)  Sir, are you
 8    giving any opinion about any marketing by
 9    Actavis LLC?
10         A.    You know, with respect to both
11    the previous opinion and this opinion, I'm
12    giving opinions about the drugs and how they
13    were marketed and not -- not who owned them
14    at different points in time.
15         Q.    Sir, "yes" or "no."  Are you
16    giving an opinion about any marketing by
17    Actavis LLC?
18         A.    I don't know.
19         Q.    Can you identify for me any
20    marketing statement about opioids made by
21    Actavis LLC in Cuyahoga County or Summit
22    County?
23         A.    I have to look.
24         Q.    Sitting here right now, can you
```

1    identify for me any marketing statement about

2    opioids made by Actavis LLC in Cuyahoga

3    County or Summit County?

4              MS. CONROY:  By memory?

5              THE WITNESS:  Sitting here

6         right now, I have to look at the

7         marketing materials that relate to the

8         products that Teva was selling, Actiq

9         and Fentora, which are ones that are

10        included in the report and see exactly

11        who authored them.  I don't remember

12        who authored them at various points in

13        time.  So to answer that question, I

14        have to go back and look at the

15        documents generally by looking at the

16        Bates numbers.

17        Q.    (BY MR. ERCOLE)  Sir, I was not

18   asking any questions about Teva.  My question

19   was about Actavis LLC.  Do you know what

20   opioid medicines, if any, they market?

21        A.    Yes.

22        Q.    Okay.  What medicines are they?

23   Just a list of them.

24        A.    Norco, which is hydrocodone

1    bitartrate and Tylenol.

2          Q.    And, sir, you're -- I'll cut

3    you off and say that your answer is

4    incomplete, but you're reading off of a list

5    of drugs that you have; is that correct?

6          A.    That's correct.

7          Q.    Okay.  Thank you.

8          A.    So you don't want any more?

9          Q.    No, I do not want any more than

10   that.

11               Do you have -- sitting here

12   today -- well, do you have a Redweld

13   concerning Actavis?

14         A.    I think so.

15         Q.    Okay.  Can you ask your team to

16   provide that Redweld right now?

17         A.    They're not my team.  They're

18   the lawyers on the case.

19         Q.    Fair enough.  Can you provide

20   that Redweld for me?

21         A.    I'm not in control of them.

22   Okay?  So you can ask them.

23               MR. ERCOLE:  Can you provide

24         the Redweld of Actavis documents?

```
1              MS. CONROY:  What do you

2         actually mean by "Actavis"?  Do you

3         want the opinions --

4              If you would like the opinion

5         numbers, if you list the opinion

6         numbers.

7              MR. ERCOLE:  Sure.  I don't

8         want to object because we're taking up

9         time, but you said you believe you

10        have a Redweld Actavis document, and

11        I'd like to see what that Redweld is.

12        So can you please provide that Redweld

13        to the extent one exists.

14             MS. CONROY:  And each Redweld

15        corresponds to an opinion.  So you

16        need to provide the opinion number so

17        out of these boxes, we can identify it

18        and give you the Redweld.

19             MR. ERCOLE:  Okay.  Well,

20        you've done -- for other defendants

21        you've provided entire boxes of all of

22        the opinions there.

23             MS. CONROY:  When they have

24        identified an opinion number.
```

1          MR. ERCOLE:  Okay.

2          Let me keep moving forward.

3      Q.    (BY MR. ERCOLE)  Sir, sitting

4  here today, can you identify any Summit or --

5  Summit County or Cuyahoga County prescriber

6  who wrote an opioid preparation because of a

7  false or misleading statement by any Actavis

8  entity?

9          MS. CONROY:  Objection.

10         THE WITNESS:  I don't know.

11  I'd have to go check the call notes.

12  I think I have call notes by Actavis.

13  So the answer is probably yes.

14     Q.    (BY MR. ERCOLE)  You believe

15  you have call notes concerning Actavis; is

16  that correct?

17     A.    Correct.

18     Q.    Okay.  Sitting here today, can

19  you identify for me any -- the name of any

20  prescriber?

21     A.    I don't think the names are in

22  there, but I feel I've got an opinion on

23  this.  I think it's B7.  B7's going to list

24  the documents which I think include Actavis

1    documents that identify people who could be

2    characterized the way you characterize them.

3    That is, they were misled by Actavis

4    advertising or marketing.  And you need to go

5    through that opinion and find them.  I think

6    I have them broken down by company.

7          Q.    Well, that's exactly what I've

8    asked.  You said you've broken it down by

9    company.

10          Sir, it's a yes-or-no answer.

11   Sitting here right now, can you identify for

12   me any prescriber who was in Cuyahoga or

13   Summit County that was misled by any

14   statement by Actavis?

15          A.    Not without looking at the

16   Actavis exhibits that are cited in B7.

17          Q.    Okay.  Thank you.

18          Sitting here today, can you --

19   sitting here right now, can you identify for

20   me any prescriber in Cuyahoga or Summit

21   County that was misled by any statement from

22   Cephalon?

23          A.    Same answer.  I have to go back

24   to the call notes.  I think there's evidence

1    of that in the call notes.  So I have to look

2    at the call notes by Cephalon.

3           Q.     Fair enough.  And would that

4    same answer apply to Teva USA too?

5           A.     Correct.

6           Q.     Okay.  Sir, do you -- you are

7    not giving an opinion on the TIRF REMS

8    program; is that correct?

9           A.     Except that they don't work.

10          Q.     Okay.  That is not listed in --

11   the TIRF REM -- do you know what a TIRF

12   medicine is?

13          A.     Yes.  It's the transdermal

14   fentanyls.

15          Q.     Are you aware, sir, that before

16   a prescription can be written under the TIRF

17   REMS program, a prescriber must sign an

18   agreement with the patient stating that he or

19   she has counseled the patient about the risk,

20   benefits, and appropriate use of TIRF

21   medicines?

22          A.     That's what they're supposed to

23   do, that's right.

24          Q.     And are you aware that under

1    the TIRF REMS program, prescribers must be

2    aware of the risks of any TIRF REM -- TIRF

3    medicine before they write a prescription for

4    one of those medicines?

5         A.    That's generally true under any

6    program, yes.

7         Q.    And are you aware under the

8    TIRF REMS program, a doctor must agree to

9    assess his or her patient for signs of misuse

10   or abuse?

11        A.    Yes.

12        Q.    You do not list any specific

13   opinions in your report about the TIRF REMS

14   program, do you?

15        A.    I think that's correct.

16        Q.    Sir, do you have a Redweld for

17   Teva that contains the opinions that you're

18   giving about Teva in this case?

19        A.    Well, I have -- I have Teva

20   opinions, and they have them in Redwelds back

21   there.

22        Q.    Okay.  And are they grouped

23   together?

24        A.    I don't know.  I didn't do that

1    part of the organizing.

2         Q.    Fair enough.  I'm going to --

3    why don't I give you a composite exhibit of

4    documents here.

5              I will represent to you that

6    they are documents B1, B49, B50, B94, B310,

7    B398, and B454.

8              And by "documents," I mean the

9    Exhibits B to your report.

10             (Whereupon, Deposition Exhibit

11        Egilman 42, B1, B49, B50, B94, B310,

12        B398, and B454, was marked for

13        identification.)

14             MS. CONROY:  And you want

15        counsel to pull those folders?

16             THE WITNESS:  I don't -- I

17        mean, if they -- I'll represent to you

18        those are the documents that were in a

19        box over there marked "Teva," and

20        these are the opinions that are

21        reflected in that box over there.

22             So if you want to pull them,

23        you can pull them.

24             MS. CONROY:  No, we're only

```
1         going to pull them if you want them.

2              MR. ERCOLE:  I'm just going to

3         move forward with my questions.

4              MS. CONROY:  Don't pull them,

5         then.

6              THE WITNESS:  I'm going to want

7         them.

8              MS. CONROY:  You want them?

9         Then fine, we will pull them.

10             MR. ERCOLE:  If he needs them,

11        I'd like to go off the record so we're

12        not taking up time doing that.

13             MS. CONROY:  No, we're not

14        going off the record.  These are

15        opinions that were provided to you

16        with the basis, and we have time -- we

17        have ourselves brought them here, and

18        if the doctor would like to refer to

19        them.  You can tell him not to refer

20        to them.

21             MR. ERCOLE:  They're right in

22        front of him.

23             MS. CONROY:  No, that is not

24        the full opinion.
```

```
 1                   MR. ERCOLE:  Sure.  Feel free
 2          to pull the exhibits for those.
 3          Q.    (BY MR. ERCOLE)  Sir, these are
 4   Exhibits B -- the composite exhibit I showed
 5   you reflect Exhibits B1, B49, B50, B94, B310,
 6   B398, and B45.
 7                   Excuse me, B454 of your report.
 8                   Do you see that?
 9          A.    You said 398 and 454?
10          Q.    Yes, sir.
11          A.    That's what I've got.
12          Q.    Okay.
13                   Looking at those documents --
14   and you refer to Teva in those documents?
15                   Do you see that?
16          A.    I do.
17          Q.    Okay.
18                   What Teva entity are you
19   referring to?
20          A.    Well, for the first one, it
21   would be the Teva that was subject to the CIA
22   in 2010.
23          Q.    Sir, and -- do you know that
24   with respect to each of the exhibits that I
```

1    provided to you, that Teva Pharmaceuticals

2    USA is not referenced in any of these -- any

3    of the documents that you have cut and pasted

4    or quoted from in connection with those

5    opinions?

6         A.    Well, I don't think that's

7    correct.

8         Q.    Okay.  Do you know that all of

9    the documents referenced therein refer to

10   conduct by Cephalon as opposed to Teva

11   Pharmaceuticals?

12             MS. CONROY:  Objection.

13             THE WITNESS:  No, not exactly.

14        Q.    (BY MR. ERCOLE)  Do you know

15   the relationship between Cephalon and Teva

16   Pharmaceuticals USA?

17        A.    I think Teva bought Cephalon.

18        Q.    And that's your understanding?

19        A.    They own them in some way.

20   That's my understanding based on the fact

21   that all these documents that we are

22   discussing have Teva Bates numbers on them.

23   They were produced by Teva, not Cephalon.

24        Q.    With respect to the opinions

Highly Confidential - Subject to Further Confidentiality Review

1    that I've given you in that composite

2    exhibit, there is no deposition testimony

3    from this case to -- that is cited in those

4    exhibits to support those opinions; correct?

5         A.    Correct.

6         Q.    And there are no interviews of

7    prescribers or patients that have been

8    provided to support those opinions; correct?

9         A.    Do you mean by me?

10        Q.    Yes.

11        A.    Correct.

12        Q.    There is no specific written

13   narrative in connection in -- with these

14   exhibits, the composite exhibit I gave you to

15   support the opinions that you're giving;

16   correct?

17              MS. CONROY:  Objection.

18              THE WITNESS:  No.

19        Q.    (BY MR. ERCOLE)  That's

20   incorrect?

21        A.    Correct.

22        Q.    Okay.

23              You have not provided any

24   independent analysis in connection with the

Highly Confidential - Subject to Further Confidentiality Review

1    opinions that I'm showing you linking any of

2    the conduct that is described in these

3    opinions to any prescriber in Ohio; correct?

4                    MS. CONROY:  Objection.

5                    THE WITNESS:  Not necessarily.

6         Q.    (BY MR. ERCOLE)  Sir, have you

7    provided any written analyses, you

8    independently writing something in connection

9    with these opinions, that links any of the

10   conduct described in these opinions to any

11   opioid prescription in Ohio?

12                   MS. CONROY:  Objection.

13        Q.    (BY MR. ERCOLE)  I'm not asking

14   whether or not they quote documents or not.

15   Is there any narrative that you've offered

16   for these opinions linking anything, any of

17   the conduct described therein, to any opioid

18   prescription in Ohio?

19        A.    There's no narrative by me.

20                   MS. CONROY:  Objection.

21                   MR. ERCOLE:  Okay.

22        Q.    (BY MR. ERCOLE)  And there's no

23   narrative by you --

24        A.    Hang on one second.  Are you

Highly Confidential -- Subject to Further Confidentiality Review

```
 1    doing all five opinions?

 2         Q.    Yes.

 3         A.    Okay.  Let's -- let me look at

 4    them all, then.

 5         Q.    Sir, I'll withdraw the

 6    question, because we just -- in all due

 7    respect -- with all due respect, we don't

 8    have enough time for you to complete that

 9    analysis.

10              Any --

11              MS. CONROY:  Objection, move to

12         strike.

13         Q.    (BY MR. ERCOLE)  Any opinion

14    that you are giving -- strike that.

15              Any of these opinions say

16    specifically that Cephalon or Teva USA caused

17    the opioid crisis in Ohio?

18              MS. CONROY:  Objection.

19              THE WITNESS:  Yes.

20         Q.    (BY MR. ERCOLE)  Sir, do any of

21    the opinions I just showed you expressly

22    state that Cephalon or Teva USA caused the

23    opioid epidemic in Ohio?

24              MS. CONROY:  Objection.
```

```
 1                THE WITNESS:  No.

 2          Q.     (BY MR. ERCOLE)  Okay.  Do any

    of the opinions I just showed you expressly

 4  state that Cephalon or Teva USA caused any

 5  prescriber in Ohio to write an improper

 6  opioid prescription?

 7          A.     No.

 8          Q.     Do any of the opinions I just

 9  showed you expressly state that Cephalon or

10  Teva USA caused any patient to be harmed by

11  any opioid prescription in Ohio?

12          A.     Now I have to look at them.

13          Q.     Sir, I'll withdraw the

14  question.

15                The title of your -- none --

16  none of the opinions that are titled say

17  anything about Teva or Cephalon causing any

18  patient to be harmed by any opioid

19  prescription in Ohio; correct?

20          A.     The titles?

21          Q.     Yes.

22          A.     Correct.  Well, let me look at

23  the titles and answer.

24          Q.     Sir, I'll withdraw the
```

```
1    question.  The titles will speak for

2    themselves.

3                  With respect to -- let me ask

4    this.

5                  With respect to any of the

6    Teva, Cephalon or Actavis opinions that

7    you're giving in this case, is there anything

8    that would prevent a juror from reading the

9    documents that you cite in your opinions and

10   then reaching the same opinion?

11                 MS. CONROY:  Objection.

12                 THE WITNESS:  Depends on the

13       juror.

14         Q.    (BY MR. ERCOLE)  There may be

15   some that would be able to certainly reach

16   the same opinion?

17         A.     Certainly if there was someone

18   with my training and expertise, they -- but

19   they wouldn't have time to read them during

20   the course of a short trial.  So they

21   couldn't -- they couldn't -- it would be

22   like -- I mean, what I --

23                 They couldn't -- they wouldn't

24   have time to read them all, and so that would
```

1    not be possible during a trial.

2              I mean, if they were board

3    certified in internal medicine with training

4    in epidemiology and public health --

5        Q.    Sir, it was a -- it was a

6    "yes/no" question.

7        A.    Okay.  Well, depends on the

8    juror, then.

9        Q.    Okay.  And --

10       A.    And how much time they have

11   during the trial.

12       Q.    Do you -- sir, are you -- are

13   you aware that with respect to the opinions

14   that you are giving as to Teva, Cephalon, any

15   Actavis entity, that the total number of

16   documents that you've cited in connection

17   with those opinions is less than 30?

18       A.    I don't think that's correct.

19       Q.    Okay.  So you're not aware of

20   that, then?

21       A.    I think it's wrong.

22            MR. ERCOLE:  Okay.  Great.

23            And I'll -- just continue to

24       note on the record that to be honest

```
 1        with you, this is absolutely

 2        ridiculous that we're forced to have

 3        to ask questions in the way that I did

 4        concerning multiple entities.  So I

 5        appreciate your position on that, but

 6        I just want to make it clear on the

 7        record, we certainly object and

 8        believe our due process rights are

 9        being infringed upon.

10             Thank you.

11             THE VIDEOGRAPHER:  Off the

12        record.  2:33.

13             (Recess taken, 2:32 p.m. to

14        2:51 p.m.)

15             THE VIDEOGRAPHER:  We are back

16        on the record at 2:52.

17                  EXAMINATION

18   BY MR. GOLDSTEIN:

19        Q.    My name is Josh Goldstein.  I

20   represent Mackenrodt LLC in this case.

21        A.    Good afternoon.

22        Q.    Now, you just testified to

23   Mr. Ercole that your opinions relate to

24   particular drugs and how they were marketed
```

1    and not who owned those particular drugs.

2                    Is that accurate?

3         A.      No.

4         Q.      Okay.  Would you like to

5    correct your prior testimony?

6         A.      I don't think that's my prior

7    testimony.

8         Q.      Does the definition that you

9    provide of venture only apply to companies

10   and not drugs?

11        A.      No, it applies to the companies

12   I mentioned and the opioid drugs that they

13   manufacture.

14        Q.      And if those drugs are

15   manufactured by a non-defendant, they would

16   not apply to the venture?

17        A.      I don't know if they would or

18   wouldn't.  I don't have documents on a

19   company that's not in the litigation.

20        Q.      Now, are you offering a legal

21   opinion of whether the defendants in this

22   litigation are engaged in a venture?

23        A.      I don't know -- if I'm offering

24   an opinion, it's not a legal opinion.  I'm

```
 1    not a lawyer or a judge.

 2         Q.    Have you ever been provided

 3    with a legal definition of the word

 4    "venture"?

 5         A.    No.

 6         Q.    And what about a conspiracy?

 7    Are you offering a legal opinion about

 8    whether the defendants are engaged in a

 9    conspiracy?

10         A.    No, I don't think -- I don't

11    use the word "conspiracy" at all.

12         Q.    And have you ever been provided

13    in connection with your work in this case a

14    legal definition of the word "conspiracy"?

15         A.    No.

16         Q.    Now, you testified earlier --

17    I'm going to hand you what's been marked as

18    Exhibit 5 to your deposition.

19              And that's your assignment in

20    this case; correct?

21         A.    Correct.

22         Q.    And that assignment refers to,

23    in part, analyzing whether defendants worked

24    together and/or separately; do you see that?
```

1          A.      Yes.

2          Q.      Are there any defendants who

3    worked only separately?  Did not work

4    together as part of this venture?

5          A.      No.

6          Q.      So it would be fair to delete

7    the -- where you see it says "together and/or

8    separately," would it be accurate to delete

9    the "or"?

10         A.      No.

11         Q.      Are there any defendants who

12   were part of the venture but did not work in

13   concert with other defendants?

14         A.      At some point in time, no.

15         Q.      Okay.

16         A.      Let me -- I'm not sure if

17   that's a clear answer to that question.

18                 All of the members of the

19   venture at one point in time or another were

20   members of the same organization or

21   organizations that met the definition for the

22   venture.

23                 Some of them acted

24   independently.  That is, they did not -- some

```
 1    of the actions that the individual venture

 2    member did were done independently of the

 3    venture, and I have no evidence that the

 4    venture knew about what they did when they

 5    did it.

 6            Q.    Did you distinguish in your

 7    report between when a defendant was acting

 8    together versus when a defendant was acting

 9    separately in furtherance of the venture?

10            A.    In some cases, it's -- I think

11    it's almost always obvious, because I'm

12    either talking about acting through

13    organizations or KOLs, or I'm talking about

14    specific things that only one company would

15    know about.

16            Q.    So that's the distinction you

17    would draw between acting together and

18    separately?

19            A.    I didn't make a distinction.  I

20    said "and/or."  That's not a distinction.

21            Q.    No, your testimony that you

22    just provided, that's the distinction you

23    would draw?

24                  Or strike that.
```

1          That's how you -- your

2     testimony is that's how you determined or set

3     forth in your report when a defendant was

4     acting together and when a defendant was

5     acting separately?

6          A.     Well, what do you mean by

7     "That's how"?

8          Q.     I'll strike the question.

9          You're aware that there are

10    manufacturers of opioids that are not

11    defendants in this case?

12         A.     Yes.

13         Q.     Now, putting aside the fact

14    that they're not defendants, but for that

15    fact, are they participants in the venture?

16         A.     I do not know.

17         Q.     And why is that?

18         A.     Because I haven't seen their

19    documents.  I haven't seen or reviewed their

20    materials.

21         I haven't reviewed their call

22    notes.  I haven't done the things I've been

23    able to do with participants in the

24    litigation.

Highly Confidential -- Subject to Further Confidentiality Review

```
1          Q.      So it's possible to be a

2     manufacturer of prescription opioids and not

3     be a member of the venture, putting aside the

4     fact that your term is limited to defendants?

5          A.      Anything is possible.

6          Q.      But it just so happens that all

7     of the defendants are also all members of the

8     venture?

9                  Is that right?

10                 MS. CONROY:  Objection.

11                 THE WITNESS:  No.

12         Q.      (BY MR. GOLDSTEIN)  If you

13    turn -- I'm going to hand you what's

14    previously been marked as Exhibit 12.

15                 And I want to refer you to

16    subparagraph (2).  You say "They" -- they

17    being the members of the venture -- is that

18    right?

19         A.      Yes.

20         Q.      "Worked together to influence

21    public perceptions of the class of narcotic

22    drugs," and then you list "drug toxicity,

23    untreated pain and encouraged use of

24    narcotics instead of non-medication
```

1    treatments or less addictive drugs."

2            Do you see all of that?

3    A.    Yes.

4    Q.    Did all of the members of the

5    venture work together to influence public

6    perceptions of the class of narcotic drugs

7    with respect to the drug toxicity?

8    A.    All of the members of the

9    venture worked in organizations or separately

10   to minimize drug toxicity.

11   Q.    That wasn't my question.  My

12   question was whether they all worked together

13   to influence public perceptions of the class

14   of narcotic drugs with respect to the drug's

15   toxicity?

16   A.    All of the members of the

17   venture worked in organizations or separately

18   to influence public perceptions of the class

19   of narcotic drugs with respect to the drug's

20   toxicity.

21   Q.    And is that true with respect

22   to untreated pain?

23            MS. CONROY:  Objection.

24            THE WITNESS:  Yes.

```
1           Q.      (BY MR. GOLDSTEIN)  And same

2    for subparagraph (c)?

3           A.      Yes.

4           Q.      And is it your testimony that

5    your report sets forth the ways in which each

6    defendant did each of these three things?

7    2(a), (b), and (c) of Exhibit 12?

8           A.      In the way that I described

9    before, yes.

10                  And by that, I mean my

11   definition of "together and separately."

12          Q.      Understood.

13                  Now, you would agree with me

14   that there's no written explanation in your

15   report for when -- that defines when each

16   manufacturer that's a member of the venture

17   became a member of the venture.

18          A.      It exists for some, probably

19   not for all.

20          Q.      So just by reading your report,

21   each member of the venture could not look at

22   the report and determine when they became a

23   member of the venture?

24          A.      No, they could know when they
```

```
 1    were a member of the venture.  But when they
 2    first became a member of the venture, that --
 3    I didn't have data on that for all the
 4    companies.
 5         Q.    You --
 6         A.    So in other words, when they
 7    joined the American Pain Foundation, that
 8    would be a joining of the venture.  Or when
 9    they joined the Pain Care Forum, that would
10    be joining an activity of the venture.  Or
11    when they joined an activity --
12         Q.    I think I understand your
13    testimony.
14         A.    -- of JACHO --
15         Q.    I think I understand your
16    testimony.
17         A.    So the answer is incomplete.
18    No problem.
19         Q.    So my question -- so you said
20    you didn't have the data for each company on
21    when they became a member of the venture;
22    right?
23         A.    I didn't include the data for
24    membership.
```

```
1        Q.    Oh.  So --

2        A.    It wasn't like the Communist

3   Party.  They didn't give out cards.

4        Q.    So you have the data; you just

5   didn't include it in your report?

6        A.    For some, I may have the data,

7   and for some, I don't have the data.

8        Q.    So for some, even you have no

9   idea when the defendant became a member of

10  the venture?

11             MS. CONROY:  Objection.

12             THE WITNESS:  I don't know, for

13        example, when -- and I don't know if I

14        have this or not -- when Purdue first

15        became a member of the Pain Care

16        Forum, or when Endo first joined HDMA.

17        Q.    (BY MR. GOLDSTEIN)  That's not

18  my question.

19        A.    I don't have that data.

20        Q.    That's not my question.  My

21  question is even you do not know when each

22  defendant that's a member of the venture

23  became a member of the venture.

24             MS. CONROY:  Objection.
```

```
 1                THE WITNESS:  Well, I think I
 2          have -- most of that information is in
 3          the documents, but I certainly didn't
 4          put it in the report by date.
 5          Q.    (BY MR. GOLDSTEIN)  Okay.  Do
 6     you have an understanding that manufacturers
 7     of prescription opioids manufacture different
 8     types of prescription opioids; right?
 9          A.     Yes.
10          Q.     And those prescription opioids
11     have different benefits and risks associated
12     with them?
13          A.     No, not necessarily.
14          Q.     Do they have different
15     benefits?
16          A.     Some do, some don't.  Some have
17     the same benefits.  After all, you have some
18     generics.  They all are addictive, so that's
19     the same risk.
20          Q.     So the ones --
21          A.     They all work for short-term
22     pain, for some short-term pain.  So there's a
23     wide range of overlap between different
24     opioids.
```

```
 1              Q.      Is it fair to say that

 2    manufacturers of prescription opioids found

 3    in certain cases compete against each other

 4    in manufacturing different products that they

 5    bring to the market?

 6              A.      Yes.

 7              Q.      And if a manufacturer -- strike

 8    that.

 9                      Are you -- you're aware that

10    some prescription opioids are not intended to

11    be used by patients who are not already

12    taking a prescription opioid?

13              A.      Who have not developed

14    tolerance to prescription opioids.  That

15    would be the TIRF REMS thing, for example.

16              Q.      In an instance where a

17    manufacturer manufactures an opioid that's

18    intended to be used by a patient who's

19    already taking a different opioid, would you

20    agree that the -- that that manufacturer is

21    not manufacturing the opioid to be used by a

22    patient who's not already taking an opioid?

23                      MS. CONROY:  Objection.

24                      THE WITNESS:  No.
```

```
 1              Q.      (BY MR. GOLDSTEIN)  Now,

 2   you've --

 3              A.      No, look at Insys.

 4              Q.      You previously testified that

 5   you prescribed opioids.

 6                      Do you recall that testimony?

 7              A.      Yes.

 8              Q.      Before prescribing opioids, do

 9   you agree that prescribers should always

10   ensure that the benefits outweigh the risks?

11              A.      When possible.

12                      It's not possible in all

13   situations.

14              Q.      Is that what you did when you

15   prescribed opioids?  You always evaluated

16   whether the benefits outweighed the risks?

17              A.      No.  I relied on the

18   information available to me to do that.

19                      I could not -- I could not

20   evaluate risks and benefits because the

21   companies misrepresented risks and

22   benefits --

23              Q.      I'm saying based on the

24   information --
```

```
 1          A.     Excuse me.  Let me finish my
 2   answer.
 3          Q.     I'll strike the question.
 4                 Based on the information that
 5   was available to you at the time you
 6   prescribed opioids, did you always ensure
 7   that the benefits outweighed the risks as you
 8   understood them?
 9          A.     I tried to do that.
10          Q.     And in trying to do that, you
11   relied on your medical training and
12   experience; correct?
13          A.     In part.
14          Q.     And on medical research and
15   scientific studies?
16          A.     In part.
17          Q.     On CMEs?
18          A.     I don't think I had any CMEs on
19   opioids when I was prescribing.
20          Q.     Are you aware that other
21   prescribers rely on CMEs?
22                 MS. CONROY:  Objection.
23          Q.     (BY MR. GOLDSTEIN)  I'll strike
24   the question.
```

```
1                   You relied on the contents of

2        the FDA-approved label when you prescribed

3        opioids?

4             A.     Yes.

5             Q.     And when you considered the

6        risks, you considered the patient's medical

7        history?

8             A.     Yes.

9             Q.     And you considered -- strike --

10       and when you considered the risks and

11       benefits, you considered the patient's

12       presentation based on your examination and

13       interview with that patient?

14            A.     Yes.

15            Q.     And you considered whether the

16       patient -- strike that.

17                   Are you aware that particular

18       patients have a disproportionate risk of

19       developing an opioid-related substance abuse

20       or dependence?

21                   Are some patients more likely

22       to develop a substance abuse dependence than

23       others?

24                   MS. CONROY:  Objection.
```

1           THE WITNESS:  Certainly those

2        with a previous history of substance

3        abuse, yes.

4        Q.     (BY MR. GOLDSTEIN)  And is that

5     something you consider when prescribing

6     opioids?

7           MS. CONROY:  Objection.

8           THE WITNESS:  Well, I tried to

9        consider that.  That's something

10        patients often don't tell the truth

11        about.

12        Q.     (BY MR. GOLDSTEIN)  What are

13     the factors that you would look to to

14     determine whether a patient was a particular

15     risk of developing a substance abuse disorder

16     or dependence?

17        A.     Basically whether they said

18     they'd had a substance abuse disorder in the

19     past.  You asked that question.  You asked

20     about the history of a use of opioids.

21           MR. GOLDSTEIN:  We can go off.

22           THE VIDEOGRAPHER:  Off the

23        record at 3:09.

24           (Recess taken, 3:08 p.m. to

```
 1            3:10 p.m.)

 2                 THE VIDEOGRAPHER:  We are back

 3        on the record at 3:11.

 4                     EXAMINATION

 5   BY MS. WELCH:

 6        Q.    Good afternoon, Dr. Egilman.

 7   My name is Donna Welch.  I represent the

 8   Allergan defendants.

 9        A.    Good afternoon.

10        Q.    Thank you.

11              The first thing I want to try

12   to do is fairly efficiently make sure that I

13   have a record for my client of all of the

14   documents and other material that forms the

15   bases for your opinions as they specifically

16   relate to Actavis or Allergan.

17              I have identified opinions 6,

18   123, 385, 426, 444 and 480, as specifically

19   referring to Actavis and/or Allergan.  And

20   I've had counsel pull the support materials

21   for those opinions.

22              Am I correct, Dr. Egilman, that

23   the materials included in those exhibits,

24   which we've marked as Egilman 43 through
```

1    Egilman 48, as well as any documents that are

2    contained in the colored folders that were

3    marked as Group Exhibit 26 yesterday, contain

4    all of the bases for your opinions 6, 123,

5    385, 426, 444, and 480?

6                    (Whereupon, Deposition Exhibit

7            Egilman 43, B.6 Redweld, was marked

8            for identification.)

9                    (Whereupon, Deposition Exhibit

10           Egilman 44, B.123 Redweld, was marked

11           for identification.)

12                   (Whereupon, Deposition Exhibit

13           Egilman 45, Tab 22, Exhibit 385, was

14           marked for identification.)

15                   (Whereupon, Deposition Exhibit

16           Egilman 46, B.426 Redweld, was marked

17           for identification.)

18                   (Whereupon, Deposition Exhibit

19           Egilman 47, B.444 Redweld, was marked

20           for identification.)

21                   (Whereupon, Deposition Exhibit

22           Egilman 48, B.480 Redweld, was marked

23           for identification.)

24                   THE WITNESS:  Yeah.  I think

```
 1            that's correct, but I think if you're

 2            delineating it by your initial

 3            prologue, it would also include B7 and

 4            the Perry appendices that I mentioned

 5            yesterday that I brought today.

 6            Q.    (BY MS. WELCH)  Thank you for

 7    that.

 8                  Including, then, B7 and the

 9    Perry appendices that you referenced, do the

10    materials marked in Egilman 4 through 48 and

11    Egilman 26 together contain all of the bases

12    for the opinions that I just identified?

13            A.    I believe so.

14            Q.    Thank you.

15                  I am also going to hand you

16    what I've marked as Exhibit 49.

17                  Jayne, I'm going to read the

18    Bates numbers and then hand you the other

19    copy.

20                  (Whereupon, Deposition Exhibit

21            Egilman 49, February 2010 email chain.

22            Subj: RE: Call this Afternoon with

23            attachments, Acquired_

24            Actavis_00367447-367452 plus 3 more
```

1          pages, was marked for identification.)

2          Q.      (BY MS. WELCH)   This is an

3    e-mail dated 2-17-2010 that bears the Bates

4    label 7447, and it has two attachments.

5                   Egilman 49, Dr. Egilman, I will

6    represent was one of the documents that you

7    identified yesterday as being contained in

8    Group Exhibit 26.

9                   These documents reference a

10   Kadian speaker's program; correct?

11         A.      Correct.

12         Q.      Did you do anything, one way or

13   another, to determine if a Kadian speaker's

14   program was ever implemented by Actavis or

15   Allergan?

16         A.      Apart from these documents?

17   No.

18         Q.      So you do not know, one way or

19   another, whether a Kadian speaker's program

20   was implemented; correct?

21         A.      No.  I'd have to look at the

22   documents.

23                   My recollection is it was one,

24   but I'd need to look to be sure.

```
 1              Q.      I'll represent to you,

 2    Dr. Egilman, that these refer to a proposed

 3    Kadian speaker's program and a proposed

 4    budget.  I just want to make sure that I

 5    understand correctly that other than these

 6    documents, you have no information to support

 7    an opinion that a Kadian speaker's program

 8    was actually ever implemented; correct?

 9    Other than these documents.

10              A.      I don't think that's correct.

11    I have the KOL opinion, with -- which

12    included some funding from Kadian, which --

13    some of which, I think, went for speakers.

14    Now, whether those speakers were under this

15    program or another program, I don't recall.

16              Q.      I'm going to have you turn to

17    page 129 in your report.  And I want to ask

18    you about opinion 444.  7.444.

19              A.      What page?

20              Q.      129.

21              A.      Okay.

22              Q.      Opinion 444 says "Allergan did

23    many bad things, such as lying about

24    addiction, expanding the opioid market,
```

1    claimed pain was a disease, and entered into

2    settlements and guilty pleas."

3              Do you see that?

4    A.    I do.

5    Q.    You used the term "many bad

6    things."

7              Is that a term of art in your

8    areas of expertise?

9    A.    No.

10   Q.    Is there some technical

11   definition or meaning to "bad things" that

12   you can explain for me?

13   A.    Sure.  It would be defined by

14   the specific examples listed in the documents

15   that were listed below.

16   Q.    Would you agree with me that

17   your report that has been marked by -- as an

18   exhibit in a case does not contain any

19   written analysis describing how you came to

20   that opinion?

21            MS. CONROY:  Objection.

22            THE WITNESS:  Do you mean by

23        me?

24   Q.    (BY MS. WELCH)  Correct.

1    A.      I think that's correct.

2    Q.      Would you agree with me that

3  your report does not contain any written

4  analysis by you explaining how the referenced

5  or cited documents support the opinion that

6  Allergan did many bad things?

7    A.      Correct.

8    Q.      Would you agree with me that

9  your report does not contain any written

10  explanation by you why you believe that those

11  documents constitute the best evidence

12  regarding your opinion 7.444?

13    A.      Correct.

14    Q.      What was the answerable

15  question that was the underpinning for

16  opinion 7.444?

17    A.      The same issue, the general --

18  my general assignment.

19    Q.      What was the specific

20  uncertainty that you translated to the

21  answerable question for purposes of coming to

22  your expert opinion 7.444?

23    A.      It's my assignment in the case.

24    Q.      The specific uncertainty and

1    the answerable question that underpin

2    opinion 7.444 are the assignment in the case

3    that you read yesterday from a piece of paper

4    and which was marked as an exhibit?

5         A.    Correct.

6         Q.    Exhibit -- I'm sorry,

7    opinion 7.444 lists four specific things:

8    "Lying about addiction, expanding the opioid

9    market, claiming pain was a disease, and

10   entering into settlement and guilty pleas."

11            Are there any other specific

12   things that you claim Allergan did that you

13   contend were bad things that you intend to

14   offer an opinion on?

15        A.    Sure.  Because that phrase

16   starts with "such as."  So there are just

17   four examples.

18        Q.    I have a limited amount of

19   time, Dr. Egilman, so I'd like you to list as

20   succinctly as you can the other bad things

21   you claim Allergan did that you intend to

22   offer an opinion on in this case?

23        A.    Well, they're going to be in

24   these documents attached.

1    Q.    Can you list for me,

2  Dr. Egilman, the other bad things that you

3  contend Allergan did that you intend to offer

4  as opinions in this case?

5    A.    I can certainly list some of

6  them by going through the documents.

7    Q.    Can you tell me what they are?

8    A.    Sure.

9          Actavis offered a rebate

10 program to Kroger for encouraging the sale --

11   Q.    I don't need more details about

12 the rebate program.

13         Other than the four things

14 identified and offering a rebate program to

15 Kroger, can you list any other allegedly bad

16 things done by Allergan on which you intend

17 to offer an opinion?

18   A.    Sure.  I can go through them.

19   Q.    And, Dr. Egilman, in the very

20 limited time I have available, I don't have

21 time, unfortunately, for you to go through

22 the documents.

23         Without going through the

24 documents, can you identify any other bad

1  things that Allergan -- you claim Allergan
2  did on which you intend to offer an opinion?
3      A.    Without looking at the
4  documents?  No, I can't do that.
5      Q.    Okay.
6            You cite to two settlement
7  agreements in your reference materials.  Both
8  are dated 2010, and I will reference and
9  represent to you that neither of them related
10 to opioids.
11           Are you aware of any other
12 Actavis or Allergan settlement agreements
13 that relate to opioids?
14     A.    No.
15     Q.    Are you aware of any Allergan
16 or Actavis guilty pleas?
17     A.    No.
18     Q.    During what specific time
19 period is it your opinion that the opioid
20 market was expanded?
21     A.    That's the hockey stick.  So
22 that goes from 1996 to about 2016, with a
23 drop-off in 2016 because certain Class II
24 drugs were made Class III drugs.

```
1        Q.     So it's your expert opinion
2   that market expansion for opioids continued
3   through 2016; is that correct?
4        A.     Well, they may have continued
5   after, but there's a -- there's a
6   complication in the data because Class III
7   drugs -- Vicodin, Vicodin was changed from a
8   Class III to Class II, so it's hard --
9        Q.     Dr. Egilman, I hate to
10  interrupt, but you've actually answered my
11  question with respect to time period.  I
12  appreciate that.
13       A.     No problem.
14       Q.     Do you intend to offer an
15  opinion on the specific amount by which you
16  believe Allergan expanded the opioids market?
17       A.     Per se, Allergan?
18       Q.     Yes.
19       A.     No.  My opinion is that, again,
20  everybody's 100 percent responsible.
21       Q.     You cite a number of Kadian
22  marketing materials as the basis for your
23  opinions.  Do you know for any those
24  materials whether Actavis or Allergan or its
```

1  outside sales force ever used those marketing

2  materials after they acquired Kadian in

3  December 2008?

4      A.    That would be in the call notes

5  somewhere, so I would have to look at them by

6  date.

7      Q.    Did you review call notes

8  summaries for Actavis or Allergan that

9  included references to specific use of

10  marketing materials?

11      A.    I think so, but I don't recall

12  specifically.

13      Q.    Am I correct that you have not

14  attempted to determine whether any prescriber

15  in Ohio relied on any of the marketing

16  materials you reference in writing a

17  prescription for an opioid?

18      A.    No.

19      Q.    You have attempted to determine

20  whether a prescriber in Ohio relied on any of

21  those marketing materials in writing a

22  prescription for opioids?

23      A.    Yes.

24      Q.    What did you do to determine

1    whether a specific prescriber relied on those

2    specific marketing materials in writing a

3    prescription?

4         A.    Read the call notes where there

5    are references to that or if there are some

6    e-mails where sales representatives are

7    congratulated for getting a particular

8    prescriber --

9         Q.    Other than referencing a call

10   note or an e-mail, did you do anything to

11   determine whether a prescriber in Ohio relied

12   on the materials in writing a prescription?

13        A.    A particular prescriber?

14        Q.    Yes.

15        A.    No.

16        Q.    You also cite to a

17   February 2010 warning letter from the FDA to

18   Allergan; correct?

19        A.    Yes.

20        Q.    You don't cite to any of the

21   corrective action plan -- you do not cite to

22   the corrective action plan approved by the

23   FDA and implemented by Allergan; correct?

24        A.    Well, the first part is

1    correct.  The second part, I don't know if

2    that happened.

3         Q.    You'll agree with me that you

4    didn't cite to the corrective action plan;

5    correct?

6         A.    Correct.

7         Q.    And you didn't review the

8    corrective action plan?

9         A.    I think I may have reviewed it.

10        Q.    Can you explain how your

11   systematic retrieval of the best evidence

12   available regarding my client didn't include

13   a citation to evidence relating to the

14   corrective action plan?

15        A.    I had no evidence that the

16   corrective action plan was ever implemented.

17             MS. WELCH:  Dr. Egilman, I want

18        to make a statement for the record.

19        There are 220 Allergan documents

20        referenced in your report by my review

21        of the record.  Nowhere in your report

22        do you explain how those documents

23        were retrieved, how they constitute

24        the best evidence, or how they support

```
 1          your opinion.

 2               I don't have time to question

 3          you about any of your other opinions

 4          at this time.  I reserve all rights to

 5          seek additional time from the Court to

 6          question you about the basis for those

 7          opinions.

 8               MS. CONROY:  Objection, move to

 9          strike.

10               THE VIDEOGRAPHER:  Off the

11          record at 3:26.

12               (Recess taken, 3:25 p.m. to

13          3:28 p.m.)

14               THE VIDEOGRAPHER:  We are back

15          on the record at 3:29 p.m.

16                    EXAMINATION

17     BY MR. SWANSON:

18          Q.    Good afternoon, Dr. Egilman.

19     My name is Brian Swanson, and I represent

20     Walgreens.

21          A.    Good afternoon.

22          Q.    Good afternoon.

23               As Ms. Welch said, I wanted to

24     just begin with a housekeeping matter, but I
```

1    think, given the scope of your opinions, the

2    Walgreens house is a little bit bigger.  So

3    I'm going to have to do this a little bit

4    differently, I think.

5                    By my count, you have roughly

6    50 opinions cited in your report and appendix

7    that relate directly to Walgreens and

8    Walgreens' conduct.  Does that sound

9    generally accurate to you, sir?

10        A.     I haven't done any counts.

11        Q.     No counts.  Okay.  Now, have

12   your team endeavored to put together a

13   Redweld to the opinions that relate

14   specifically to Walgreens?

15        A.     They're not my team.  Those are

16   plaintiff lawyers in the case.

17        Q.     Okay.  Have the plaintiffs'

18   lawyers endeavored to put together a Redweld

19   of the opinions that you have provided that

20   are specific to Walgreens?

21        A.     I don't know.

22        Q.     Am I correct, sir, that all of

23   the evidence that you rely on as the bases

24   for your opinions directed specifically to

1    Walgreens are included in Exhibits B1 to B489

2    of your report?

3           A.    I don't know.

4           Q.    Does your report and the

5    attached appendices include all of the bases

6    for your opinions that are directed

7    specifically to Walgreens?

8           A.    That I have in this litigation?

9    Yes.

10          Q.    Yes, sir.

11                Now, in arriving at those

12   opinions that you have directed specifically

13   to Walgreens, can you tell me how many

14   documents you personally reviewed that were

15   produced by Walgreens?

16          A.    No.

17          Q.    Was it more than 100?

18          A.    I don't know.

19          Q.    Was it more than a thousand?

20          A.    I don't know.

21          Q.    What is your best estimate

22   within 500 documents?

23          A.    I don't have one.

24          Q.    Can you tell me how many pages

1    of Walgreens materials you reviewed?

2         A.    No.

3         Q.    Did you personally review every

4    Walgreens document that you included in your

5    report as support for your opinions directed

6    to Walgreens?

7         A.    Yes.

8         Q.    Did you personally review the

9    entire document?

10        A.    To the extent that I had the

11   entire document, yes.  I'm not sure I had the

12   entire document in all cases, though.  I

13   think there may have been some documents that

14   were redacted, et cetera.

15        Q.    Okay.  And the reason I ask is

16   that some of your appendices include excerpts

17   from Walgreens documents.  You're aware of

18   that, correct, sir?

19             MS. CONROY:  Objection.

20             THE WITNESS:  That's correct.

21        Q.    (BY MR. SWANSON)  And for those

22   exhibits where you've only included an

23   excerpt from a document, did you review the

24   entire document in arriving at your opinion?

1          A.      Yes.

2          Q.      Your report says, at page 38,

3    that you reviewed depositions taken in the

4    case.  Is that a true statement?

5          A.      Yes.

6          Q.      If you relied, sir, on

7    deposition testimony of any Walgreens

8    employee as a basis for any of your opinions

9    on Walgreens' account, you cited that

10   deposition testimony somewhere in your

11   report; correct?

12         A.      Correct.

13         Q.      Can you testify today that you

14   personally read any deposition from any

15   Walgreens employee current or former?

16         A.      I don't have any specific

17   recollection of reading any Walgreens

18   depositions.

19         Q.      Did you have any discussions

20   with any plaintiffs' lawyers about the

21   testimony of any Walgreens employees?

22         A.      I may have.

23         Q.      What do you recall

24   specifically, if anything, about that

 1    conversation?

 2         A.    Nothing.

 3         Q.    Do you recall which witness

 4    testimony you may have discussed with

 5    plaintiffs' lawyers?

 6         A.    No.

 7         Q.    Did you review any discovery

 8    responses that were provided by Walgreens?

 9         A.    I've read responses to the

10    complaint.  I can't recall if I read

11    Walgreens' responses or other responses.  I

12    read responses to the complaint.

13         Q.    How about any responses to

14    interrogatories that Walgreens provided?

15         A.    I can't recall, but I --

16    probably.

17               I've gotten some responses,

18    interrogatories but not all.

19         Q.    Sitting here today, you just

20    can't recall one way or the other?

21         A.    Correct.

22         Q.    In your report, there are

23    references to the DEA and the DOJ; correct?

24         A.    Yes.

1      Q.      And specifically you refer to a

2    settlement between Walgreens and the DOJ and

3    the DEA; right?

4      A.      Yes.

5      Q.      Did you speak with any current

6    or former members of the DEA or DOJ in the

7    process of forming your opinions in this

8    case?

9      A.      No.

10     Q.      Are you familiar with

11   Dr. Joseph Rannazzisi?

12     A.      Yes.

13     Q.      Have you ever met him?

14     A.      No.

15     Q.      Other than discussions that you

16   may have had with plaintiffs' lawyers and

17   your students and staff, are there any

18   discussions that you had with anyone that

19   form the bases of any of your opinions in

20   this case against Walgreens?

21     A.      No.

22     Q.      Earlier this morning, Mr. Blank

23   went through some general questions with you

24   regarding your experience with suspicious

1    order monitoring systems.  You recall that

2    generally; correct?

3         A.    Yes.

4         Q.    What I want to do is not

5    retread those grounds, but I want to ask you

6    specifically about your experience with the

7    Walgreens specific order monitoring systems,

8    okay?

9         A.    Yes.

10        Q.    I think it's true and you

11   testified this morning you've never seen a

12   live version of the Walgreens suspicious

13   order monitoring system; right?

14        A.    Yes.

15        Q.    That's correct?

16        A.    Yes.  I answered it yes.

17        Q.    Yeah.  Okay.

18             And you also didn't evaluate

19   any design documents for the Walgreens

20   suspicious order monitoring system in

21   arriving at your opinions in this case;

22   correct?

23        A.    I'm not sure that's correct.

24   There's a PowerPoint I referred to, I think,

1    that Walgreens implemented that effectively

2    reduced OxyContin prescriptions, and that may

3    have referred in part to SOM programs.

4         Q.    Well, I'm not asking about

5    documents that referred to the system.  I'm

6    asking about specific design documents for

7    the system itself.

8              You didn't review any of those

9    in reaching your opinions on the Walgreens --

10        A.    I read something that said

11   design.

12        Q.    Can I finish my question,

13   please?

14        A.    Sure.

15        Q.    I'm asking you about specific

16   design documents for the Walgreens SOM system

17   itself.  You didn't review any of those in

18   reaching your opinions on Walgreens'

19   suspicious order monitoring system; true?

20        A.    I don't know if that's true or

21   not.  I've read documents that review the

22   Walgreens suspicious order monitoring system

23   which included how it was or wasn't operating

24   at different points in time.  That would have

1    included elements of design.

2         Q.    In the monitoring orders in the

3    Walgreens suspicious order monitoring system,

4    is that done at the store level or a

5    distribution level?

6         A.    I think it was done at the

7    distribution level.  At least when the

8    Jupiter fiasco occurred, that's what was

9    done.  Whether it's changed now or not, I

10   can't recall.

11        Q.    Have you done any evaluation of

12   whether the Walgreens suspicious order

13   monitoring system has changed or evolved over

14   time?

15        A.    I'm sure it did after they paid

16   the $80 million fine.

17             MR. SWANSON:  I'll move to

18        strike that.

19        Q.    (BY MR. SWANSON)  It's a

20   yes-or-no question.

21             Have you done any evaluation of

22   whether the Walgreens suspicious order

23   monitoring system has changed or evolved over

24   time?  "Yes" or "no."  Have you done that

1    analysis?

2         A.    Yes.

3         Q.    Describe for me how the system

4    or technology changed over time.

5         A.    Oh, I don't remember the

6    specific changes.

7         Q.    Well, what evaluation did you

8    do that you can testify about, sir?

9         A.    Well, I think there was

10   specific changes in the SOM system after the

11   $80 million cite that I mentioned as part of

12   the settlement agreement.

13        Q.    What does the Walgreens

14   suspicious order monitoring system track?  Is

15   it the dispensing of pharmaceuticals or

16   orders or something else?

17             MS. CONROY:  Objection.

18             THE WITNESS:  It depends on the

19        point in time.  At one point in time,

20        it looked at shipments from the

21        distribution sites, although it didn't

22        really look at them.  It was designed

23        to look at them.  Walgreens is capable

24        of looking at orders at the pharmacy

```
 1            level.  I don't -- at least until the

 2            Jupiter citation or payment, they

 3            didn't look at things at the pharmacy

 4            level.

 5                  At least to some extent, based

 6            on the program they implemented for

 7            OxyContin, they did look at the

 8            pharmacy level.

 9            Q.    (BY MR. SWANSON)  You're

10     saying --

11            A.    After that point in time.

12            Q.    The suspicious order monitoring

13     system did?  That's your testimony?

14            A.    Well, Walgreens did.  I'm not

15     sure if it was technically called part of the

16     suspicious order monitoring system or if it's

17     just something Walgreens was doing as part of

18     its attempt to reduce OxyContin

19     prescriptions.

20            Q.    Okay.  My question is directed

21     specifically to the suspicious order

22     monitoring system.  Does that system track

23     dispensing of pharmaceuticals or orders for

24     pharmaceuticals or something else?  If you
```

1   know.

2               MS. CONROY:  Objection.

3               THE WITNESS:  It used to just

4          track orders from the distribution

5          sites, as I recall.

6               I think now they look at

7          pharmacy works, at least in certain

8          circumstances.  Whether that's

9          included as part of SOM or the

10         particular program that I talked

11         about, I don't know.

12         Q.    (BY MR. SWANSON)  Do you know

13    how the thresholds or limits are set in the

14    Walgreens suspicious order monitoring system?

15              MS. CONROY:  Objection.

16              THE WITNESS:  No.

17         Q.    (BY MR. SWANSON)  Do you know

18    that the plaintiffs' lawyers deposed several

19    Walgreens individuals regarding the Walgreens

20    suspicious order monitoring system?

21         A.    Yes.

22         Q.    Did you review any of that

23    testimony to inform your opinions regarding

24    the suspicious order monitoring system?

1          A.     No.

2          Q.     As you sit here today, do you

3    believe that you have a better understanding

4    of the Walgreens suspicious order monitoring

5    system than the architects of that system?

6          A.     No.

7          Q.     Now, I want to ask you about a

8    few of your opinions.  I'm not going to have

9    time to go through all of them.

10              I'd like to begin with

11   opinion 7.3.  Do you have your report in

12   front of you so you can look at it?

13         A.     I do.

14         Q.     Okay.  And -- while we do that,

15   it's on page 62.

16              Are you there?  7.3?

17         A.     Yes.

18         Q.     Okay.  Opinion 7.3 reads

19   "Opinion.  Walgreens' systems could be

20   manipulated to allow stores to circumvent

21   quantity restrictions -- known issue -- this

22   is how the system always worked."

23              Did I read that correctly?

24         A.     No.

1          Q.     I did not?

2          A.     That's correct.

3          Q.     Can you tell me what I read

4     incorrectly?

5          A.     You left the quotes off of

6     "This is how the system always works."

7          Q.     Okay.

8          A.     That's a quote from the

9     document.

10         Q.     Okay.  That's fair.  I'll read

11    it again.

12                Exhibit -- or opinion 7.3.

13    "Opinion.  Walgreens systems could be

14    manipulated to allow stores to circumvent

15    quantity restrictions -- known issue -- quote

16    This is how the system always worked, closed

17    quote."

18                Is that your opinion?

19         A.     Yes.

20         Q.     And then you say "See Exhibit

21    B3 hereto attached"; right?

22         A.     Correct.

23         Q.     So can we look at Exhibit B3?

24    I have a copy or you can be provided with

```
1    one.  It makes no difference to me.

2         A.    Do you have a copy for me?

3         Q.    Sure.  Or do you want --

4               Go ahead.

5               In support of your opinion 7.3,

6    you cite a single document.  That's

7    WAGFLDEA1032; correct?

8         A.    Correct.

9         Q.    And then, you excerpt from that

10   document in your Exhibit B3; right?

11        A.    Correct.

12        Q.    Okay.  Now, you call Exhibit 73

13   an opinion.  But what you're really doing is,

14   as you're noted, you're pulling quotes from a

15   Walgreens document; right?

16             MS. CONROY:  Objection.

17             THE WITNESS:  Part of it's a

18        quote; part of it's an opinion.

19        Q.    (BY MR. SWANSON)  Can you tell

20   me what part of it, then, is an opinion?

21        A.    "Walgreens' systems could be

22   manipulated to allow stores to circumvent

23   quantity restrictions."

24        Q.    So that's your opinion in 7.3,
```

 1    and then the quote is -- is what, a fact?

 2              MS. CONROY:  Objection.

 3              THE WITNESS:  Well, the rest --

 4         the rest is the -- is the facts.

 5         Okay?

 6              I mean, the quote -- the quote

 7         is a fact, and that's part of the

 8         basis of the opinion, but the basis of

 9         the opinion is the rest of the

10         document.

11         Q.    (BY MR. SWANSON)  Okay.  So

12    when you refer to Walgreens' systems in your

13    opinion, what systems are you referring to

14    specifically?

15         A.    Well, here the AS400 ordering

16    system.

17         Q.    Is that different from the SOMS

18    system we were just talking about?

19         A.    I don't know.

20         Q.    I take it you've never seen the

21    Walgreens ordering system that you are

22    opining on in 7.3; correct?

23         A.    If it's different from the

24    ordering system, yes.

```
1         Q.     What do you mean "If it's

2    different from the ordering system."  Do you

3    mean if it's different from the SOMS system?

4         A.     No.

5                This document refers to the

6    ordering system.

7         Q.     Correct.

8         A.     Okay?  So if the suspicious

9    order monitoring system is separate from the

10   ordering system and not interact -- it does

11   not interact with the ordering system, then

12   you're correct.

13        Q.     Right.  And I'm asking do you

14   know if it does or does not?

15        A.     Interact with the ordering

16   system?

17        Q.     Yes, sir.

18        A.     I don't know.

19        Q.     And you can't tell me how

20   orders are entered into the Walgreens

21   ordering system at the pharmacy level, that

22   ordering system that's explained or described

23   in 7.3; right?

24        A.     No, this describes how they're
```

1    enter -- or how the ordering system is

2    circumvented.

3         Q.     You personally have never

4    entered orders into the Walgreens' system;

5    right?

6         A.     That's correct.

7         Q.     So when you talk about the

8    ability to manipulate, what you're doing is

9    you're reading a quote from somebody else who

10   has entered orders into that system; true?

11        A.     No.  This is Christine Atwell

12   who's describing how a particular store is

13   manipulating the AS400 ordering system.

14   She's not necessarily the person -- she's not

15   the person manipulating the system or

16   entering orders.

17        Q.     I'm trying to understand what

18   expertise you believe you bring to bear on

19   this opinion.

20             You personally have never

21   entered orders into a Walgreens ordering

22   system; right?

23        A.     That's correct.

24        Q.     Okay.  And in 2011, you didn't

1    know how to do it, and you personally didn't

2    know how to quote/unquote manipulate the

3    system; right?

4         A.    That's correct.

5         Q.    What you're doing instead is

6    you're reading a quote from somebody at

7    Walgreens, and you're offering that quote as

8    your opinion.  True?

9              MS. CONROY:  Objection.

10             THE WITNESS:  That's correct.

11        Q.    (BY MR. SWANSON)  Now, do you

12   provide any analysis, expert analysis that

13   would connect your opinion to the quote from

14   the Walgreens employee?

15        A.    The expert --

16             Yes.

17        Q.    I'm sorry, I don't understand

18   your answer.  The expert --

19        A.    The answer was yes.

20        Q.    And --

21        A.    I cut my answer off to give you

22   a yes.

23        Q.    Thank you.  What --

24        A.    No problem.

1      Q.     What written analysis do you

2   provide connecting your opinion in 7.3 to the

3   document that you claim supports it?

4      A.     None.

5      Q.     When it comes to describing how

6   the Walgreens ordering system works that's

7   described in Exhibit B3, would you agree that

8   the architects of that system are better able

9   to explain how it works than you are?

10     A.     I don't know.

11     Q.     Do you know who Barb Martin is?

12     A.     No.  She's the manager of

13   inventory for drugstore in this document.

14     Q.     Right.  And do you see that

15   she's -- she is an author of the bottom

16   e-mail in Exhibit B3?

17     A.     Correct.

18     Q.     And she's the one who is

19   talking about how the system has always

20   worked?

21     A.     Yes.

22     Q.     And do you know that Ms. Martin

23   was deposed in this case?

24     A.     No.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Do you know who

 2    Christine Atwell is other than that she's the

 3    recipient of an e-mail?

 4            A.     Well, she's controlled

 5    substances function manager, apparently.

 6            Q.     Do you know what that means?

 7            A.     No.

 8            Q.     Do you know what her job --

 9            A.     I don't know what her job

10    description is.

11            Q.     Let me ask you about a related

12    exhibit.  It's Exhibit 56, if you could,

13    please.

14            A.     Are you done with this one?

15            Q.     I am.

16                   So we can begin, I guess, by

17    looking in your report at page -- page 70,

18    you have opinion 7.56; correct?

19            A.     Correct.

20            Q.     "Opinion.  Walgreens knew

21    pharmacists could manipulate quantities with

22    the AS400 software, and they knew this could

23    result in criminal not just civil actions."

24                   Is that your opinion?
```

```
 1          A.     Correct.

 2          Q.     And then you direct us to

 3   Exhibit B56; right?

 4          A.     Yes.

 5          Q.     Are you ready?

 6          A.     I think so.

 7          Q.     Okay.  The --

 8          MS. CONROY:  No.

 9          Q.     (BY MR. SWANSON)  The only

10   document you cite as the basis for your

11   opinion 56 is a Walgreens document Bates

12   stamped WAGMDL658246; correct?

13          A.     Correct.

14          Q.     And is that the document that

15   has been excerpted below the Bates number in

16   the exhibit?

17          A.     Yes.

18          Q.     And you don't cite any

19   deposition testimony or other testimony from

20   any Walgreens employees regarding this

21   opinion; true?

22          A.     Correct.

23          Q.     Do you know who Rex Swords is?

24          A.     I don't know what his job title
```

Highly Confidential -- Subject to Further Confidentiality Review

```
 1     is.
 2            Q.     Okay.  Do you know if Rex
 3     Swords was deposed?
 4            A.     No.
 5            Q.     Do you know if Tasha Polster
 6     was deposed?
 7            A.     No.
 8            Q.     Do you know if Dwayne Pinon was
 9     deposed?
10            A.     No.
11            Q.     Do you know if Kermit Crawford
12     was deposed?
13            A.     No.
14            Q.     You've never read the testimony
15     of any of those individuals; is that true?
16            A.     Correct.
17            Q.     The -- Mr. Swords in this
18     e-mail describes a meeting that he had with
19     the -- with Mr. Rannazzisi; is that right?
20            A.     Correct.
21            Q.     And what you've done is you say
22     your opinion is that "Walgreens knew this
23     could result in criminal, not just civil
24     actions"; right?
```

1    A.    That's part of what my opinion

2    is.

3    Q.    Okay.  Well, let me ask you.

4    Your initial -- the first part of your

5    opinion is that "Walgreens knew pharmacists

6    could manipulate quantities with the AS400

7    software"; right?

8    A.    Correct.

9    Q.    Is there anything in this

10   document that you cite as the sole basis for

11   this opinion that relates to pharmacists'

12   so-called ability to manipulate quantities?

13   A.    No.  That's in the other

14   document.

15   Q.    The -- all right.  So I want to

16   focus what's on the -- what's on the document

17   that's in front of us.  Okay?

18          Do you see that Mr. Swords

19   provides a bullet list of statements from a

20   meeting that he had with Mr. Rannazzisi.

21   A.    Yes.

22   Q.    Now, you, in your opinion, you

23   quote a -- one of the lines from that bullet

24   point list; right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Yes.

 2              Q.      And it's the last one.  "If

 3      this continues, they won't be accessing [sic]

 4      civil penalties.  There may be criminal

 5      penalties"; right?

 6              A.      Correct.

 7              Q.      Who made that statement?

 8              A.      Rannazzisi.

 9              Q.      And what's your basis for

10      saying that Rannazzisi made that statement?

11              A.      The lead sentence.  "Rannazzisi

12      presented a large PowerPoint deck on

13      prescription drug trafficking and abuse for

14      approximately two hours."  Comments, quote.

15              Q.      Right.  I understand.

16                      The -- some of the bullet

17      points have quotation marks around them;

18      right?

19              A.      Yes.

20              Q.      And others don't; right?

21              A.      Correct.

22              Q.      Okay.  What's the difference

23      between those in quotes and those that aren't

24      in quotes?
```

```
 1           A.     That's it.  Some were in

 2    quotes.  I assume the ones in quotes were

 3    from the presentation, but I don't know.  But

 4    they're all -- they were all things that, in

 5    my opinion, Rannazzisi presented.

 6           Q.     Well, it's not your opinion.

 7    It's your speculation; right?

 8                  MS. CONROY:  Objection.

 9                  THE WITNESS:  No.

10           Q.     (BY MR. SWANSON)  Okay.  The --

11    why do you not provide any written analysis

12    connecting your opinion to the document that

13    you claim supports it?

14           A.     Because I think it's obvious on

15    its face.  It's a quote from the document.

16    And the other document's also obvious on its

17    face.  It says "Someone's manipulating the

18    system to increase orders appropriately."

19    The document says that.  Okay.  I mean, I

20    could write the document says that the AS400

21    system can be manipulated to increase orders

22    beyond those permissible.  And this document

23    says "Rannazzisi told them that there could

24    be civil and criminal penalties for that kind
```

1    of activity."

2         Q.    So what expertise do you then

3    bring to bear on this document if all one

4    needs to do is read the quote that you

5    believe comes from Rannazzisi but can't

6    confirm?

7         A.    Well, the expertise is finding

8    the document in the first place.  Doing the

9    analysis to find the document.  Putting it in

10   the context of everything else that was going

11   on at the time with respect to Walgreens.

12   Knowing about the Jupiter situation and the

13   other associated e-mails and conduct.

14              So it's -- it's finding

15   material and putting it in some kind of a

16   context and then explaining it.  And

17   explaining the meaning of it.

18        Q.    The -- all right.  So

19   explaining the meaning and the context of the

20   quote you've cited there, you know that

21   Mr. Swords actually attended the meeting that

22   he's writing about; correct?

23        A.    Yes.

24        Q.    So the best evidence of what

1    happened at the meeting and what was stated

2    at the meeting would come from Mr. Swords,

3    not from you; right?

4         A.    I don't know.

5         Q.    Let me ask you -- you can put

6    that one aside.

7               There's been a lot of -- you've

8    given a lot of testimony about what you've

9    called or termed "the venture," and I don't

10   want to repeat that testimony.

11              Your opinion is that Walgreens

12   is a member of what you call the venture;

13   right?

14        A.    Correct.

15        Q.    And your report doesn't

16   identify it, when it is that you claim

17   Walgreens became a member of what you called

18   the venture; right?

19        A.    Correct.

20        Q.    Do you know when Walgreens

21   became a member of what you call the venture?

22        A.    No.  There's no date specific.

23        Q.    Do you have a year specific?

24        A.    No.  Because the time goes

1    forward and back, in my understanding of a

2    bank robbery collective.

3              In other words, if I join a

4    group of bank robbers today, and they've been

5    robbing banks for 20 years, I'm responsible

6    for the 20 years of bank robberies before I

7    joined, and I'm responsible for anything

8    after I join --

9         Q.    I'm going to interrupt you.

10   You gave your answer to a yes-or-no question

11   as no, and I'll move to strike everything

12   after that.

13             What act do you claim --

14             MS. CONROY:  Objection.

15        Q.    (BY MR. SWANSON) --  was the

16   act that brought Walgreens within what you

17   call the venture?

18             What was the initial act?

19        A.    I don't have an initial act.

20        Q.    Do you claim that Walgreens

21   remains a member of what you call the

22   venture?

23        A.    Yes.

24        Q.    What was the last action that

1    Walgreens took to maintain its status as a

2    member of what you call the venture?

3         A.    I don't know.

4         Q.    You don't say anywhere in your

5    report when Walgreens began distributing

6    opioids to its pharmacies in Cuyahoga and

7    Summit counties; right?

8         A.    Correct.

9         Q.    Do you know?

10        A.    No.

11        Q.    Do you know when Walgreens

12   began distributing to any of its pharmacies

13   in Cuyahoga or Summit counties?

14        A.    No.

15        Q.    Do you even know what decade it

16   was?

17        A.    Began?  No, I don't know.

18        Q.    Is that something that you

19   never tried to find out when you were

20   coming -- putting together your opinions?

21        A.    Correct.

22        Q.    Do you know how many pharmacies

23   Walgreens has in Summit County today?

24        A.    No.

1    Q.    Do you know how many it has in

2    Cuyahoga County?

3    A.    No.

4    Q.    Okay.  I want to turn back to

5    your opinions, and I want to ask you about

6    opinion 7.155, which is on page 85.

7    A.    Okay.

8    Q.    Okay.  You say, "Opinion.

9    Pharmacies could have reduced the opioid

10   problem" and then you say "See Exhibit B155

11   hereto attached."  Right?

12   A.    Correct.

13   Q.    Okay.  So can we look at

14   Exhibit B155?

15        Okay.  So Exhibit B155 is your

16   opinion that pharmacies could have reduced

17   the opioid problem; right?

18   A.    Correct.

19   Q.    Correct.  And then the only

20   document you cite in support of that opinion

21   is the document WAGMDL655767; true?

22   A.    In this opinion, but they have

23   the whole PowerPoint with Walgreens reducing

24   the sale of OxyContin and describing the

1    entire program that they implemented

2    elsewhere --

3         Q.     Okay.

4         A.     -- in the report.

5         Q.     Let's focus on the page that

6    you've excerpted in Exhibit B155.

7              You've put some -- or some of

8    your helpers have put some arrows in the

9    document; right?

10        A.     Right.

11        Q.     And it's a little difficult to

12   read.  I'm going to try and you tell me if I

13   get it right; is that fair?

14        A.     Sure.

15        Q.     This is titled "National

16   Target, Good Faith Dispensing Checklist";

17   right?

18        A.     Correct.

19        Q.     And then the first arrow points

20   to a box that reads "Additional checklist

21   requirements.  Every" --

22        A.     Wait, wait, wait.  Are we

23   looking at the same thing?

24        Q.     I'm looking at B155?

```
 1          A.     Oh, you gave me 55.

 2          Q.     Oh.

 3          A.     Sorry.

 4          Q.     That's okay.  155, please.

 5          A.     That's a related document.

 6          Q.     Okay.  Now are we on the same

 7     page?

 8          A.     Now we're on the same page.

 9          Q.     And you are looking at a

10     PowerPoint slide from WAGMDL655767; right?

11          A.     Right.

12          Q.     The Powerpoint slide is

13     entitled "Target Drug GFD Checklist"; right?

14          A.     Yeah.  The --

15          Q.     I'm looking at B155.

16          A.     The slide that's extracted,

17     yes.

18          Q.     This is the one you put in your

19     report; right?

20          A.     Well, I have the entire Bates

21     document.

22          Q.     I'm talking about what you put

23     in your report.  It's the one slide.  Right?

24     That's what I want to focus on with you.
```

```
 1              MS. CONROY:  Objection.  The
 2        report contains the entire document.
 3              THE WITNESS:  The report
 4        contains the entire document.  The
 5        entire Bates document is cited here.
 6        Q.    (BY MR. SWANSON)  Can you look
 7   at the slide on the exhibit you attached?
 8   That's what I want to ask you about.
 9        A.    Yeah.  I don't want you to --
10   mislead you --
11        Q.    I'm not misleading anyone, sir.
12        A.    No, I said I didn't want to
13   mislead you.
14        Q.    Let's focus on it.
15        A.    It says the entire document --
16        Q.    We're good.
17        A.    -- is the basis of the opinion.
18        Q.    Got it.
19              The slide is entitled "Target
20   Drug GFD Checklist"; right?
21        A.    Correct.
22        Q.    And then either you or your
23   helper has put in a couple of red arrows;
24   right?
```

```
 1            A.      Correct.

 2            Q.      And I want to focus on the red

 3    arrow on the right and what it points to.

 4            A.      Okay.

 5            Q.      It says "Additional checklist

 6    requirements.  Every quote/unquote no is a

 7    red flag.  Use your professional judgment to

 8    assess the prescription."

 9            A.      Correct.

10            Q.      Okay.  And then underneath it

11    says -- there's a line 4; right?

12            A.      Correct.

13            Q.      It says "The patient has

14    received the prescription from Walgreens

15    before."

16            A.      Correct.

17            Q.      And if that's checked no, then

18    it directs the pharmacist to use his or her

19    professional judgment to assess the

20    prescription; right?

21            A.      Correct.

22            Q.      And then the same goes from the

23    other criteria that are underneath it; right?

24            A.      Any no goes to that bolded
```

1    language.

2         Q.    Now, I take it you don't take

3    issue with Walgreens for instructing its

4    pharmacists to exercise their professional

5    judgment; right?

6         A.    No, I -- I say this is a very

7    good program.  That's what I cite it for.

8         Q.    Okay.  And that was going to be

9    my next question you got there.  You've cited

10   this Walgreens document because you believe

11   that Walgreens' good faith dispensing

12   checklist was a valuable program that helped

13   reduce opioid overprescriptions; right?

14        A.    Exactly.

15        Q.    Okay.  And the -- you don't

16   cite any documents that describe or discuss

17   how Walgreens instructed its pharmacists

18   before this document was created; right?

19        A.    That's correct.

20        Q.    Okay.  Do you know what

21   Walgreens policies or procedures were with

22   respect to dispensing prior to the good faith

23   dispensing checklist that you've identified

24   in Exhibit 155?

```
 1              A.     No.  I only know the results.

 2              Q.     But you don't know, for

 3       example, if before 2013, it was Walgreens'

 4       policy to direct their pharmacists to use

 5       their professional judgment in assessing

 6       prescriptions that they were asked to fill;

 7       right?

 8              A.     I'm sure that general language

 9       was somewhere in Walgreens' policy book.

10              Q.     Now -- well, and do you know if

11       prior to 2013, pharmacists at Walgreens had

12       different practices when it came to filling

13       prescriptions for opioids?  Do you know that

14       just one way or the other?

15              A.     Yes.

16              Q.     There were different practices

17       within Walgreens before 2013; is that your

18       testimony?

19                     MS. CONROY:  Objection.

20                     THE WITNESS:  That's my belief.

21              Q.     (BY MR. SWANSON)  But I want to

22       know what your testimony -- what you know,

23       not what you believe.  Do you know if there

24       were different practices at Walgreens before
```

```
 1    2013?

 2         A.     Yes.

 3         Q.     What were the policies at

 4    Walgreens with regard to dispensing -- good

 5    faith dispensing prior to 2013?

 6         A.     I don't know what they were.  I

 7    just know what the effect was.

 8         Q.     You're not a pharmacist; right?

 9         A.     Correct.

10         Q.     You've never been trained as a

11    pharmacist?

12         A.     Correct.

13         Q.     You haven't offered any

14    opinions and don't intend to offer any

15    opinions on the specific rules and

16    regulations that govern the pharmacy

17    profession; right?

18         A.     Correct.

19         Q.     You've testified a few times in

20    the deposition that you have prescribed

21    opioids to your patients in the past; right?

22         A.     Yes.

23         Q.     And when you prescribe these

24    opioids to your patients, you expect
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    pharmacists to review your prescription and

2    fill it; right?

3          A.     Yes.

4          Q.     And in general, it would be a

5    problem for you if your patients -- and for

6    your patients if the pharmacist didn't fill

7    your legitimate prescriptions; right?

8               MS. CONROY:  Objection.

9               THE WITNESS:  Not necessarily.

10         Q.     (BY MR. SWANSON)  Well, as a

11   physician, sir, do you expect a pharmacist to

12   fill a legitimate prescription that you write

13   based on your assessment of patient's need;

14   right?

15         A.     Not by itself, no.

16         Q.     What did you mean "not by

17   itself"?

18         A.     I mean the pharmacy -- there's

19   a physician role and there's a pharmacist

20   role.  The pharmacist may have additional

21   information that I don't have about the

22   patient.  And that -- you don't even restrict

23   that to opioids.  For example, a patient may

24   be on --
```

```
1         Q.     Let me withdraw the question,
2    then, and restrict it to opioids so we're
3    keeping on focus here.
4              As a physician, you expect a
5    pharmacist to fill a legitimate prescription
6    for opioids that you write based on your
7    assessment of your patient's need; right?
8         A.     No.
9         Q.     Why not?
10         A.     Because they have an
11   independent responsibility to evaluate
12   whether or not that's an appropriate drug for
13   that patient.  They have independent
14   information that I don't have access to to
15   evaluate that question.
16         Q.     Let me ask a slightly more
17   nuanced question.
18              As a physician, you expect a
19   pharmacist to exercise his or her
20   professional judgment to evaluate whether to
21   fill a legitimate opioid description that you
22   write based your assessment of a patient's
23   needs; right?
24         A.     That's a beginning, yes.  I
```

1    expect more than that.

2         Q.    What more do you expect of a

3    pharmacist than that he or she exercises his

4    or her professional judgment?

5         A.    I expect the pharmacist to

6    check to see what other drugs that person is

7    on.  What other prescriptions they've been

8    getting.  Whether they've been getting

9    similar prescriptions from other

10   practitioners in the current era.

11            I expect the pharmacist to

12   check to see whether that patient has been

13   getting drugs from other pharmacies not

14   related to his or her pharmacy in a way that

15   would lead to abuse or addiction.

16        Q.    And those are the sorts of

17   assessments that Walgreens documented in its

18   target drug good faith dispensing checklist

19   that you recommended; correct?

20        A.    In 2015, correct.

21        Q.    In what year?

22        A.    In 2015, I think.  Wasn't it?

23        Q.    It's your opinion.

24        A.    No, it's a fact.  Can we look

```
 1    at a document?

 2         Q.     There are facts that aren't

 3    opinions.

 4         A.     If I got the year wrong, I'll

 5    correct the year.

 6         Q.     All right.

 7         A.     No.  This is 2013.

 8                Why don't we take a break.

 9         Q.     You know, I might be done, or I

10    might have one or two more questions.

11         A.     Well, if you're done, then we

12    get a break.  No problem.

13                You know, they've called me

14    experienced.  The one thing I'm experienced

15    with --

16         Q.     You know when you're about

17    done?

18         A.     No, I know when a attorney says

19    "One more question," it's usually 25 to 30

20    questions.

21                MR. SWANSON:  I'll pass the

22    witness.

23                THE WITNESS:  Why don't we take

24         a break.
```

```
 1                    THE VIDEOGRAPHER:  Going off
 2          the record at 4:11.
 3                    (Recess taken, 4:10 p.m. to
 4          4:35 p.m.)
 5                    THE VIDEOGRAPHER:  We are back
 6          on the record at 4:36.
 7                         EXAMINATION
 8   BY MR. HYNES:
 9          Q.    Good afternoon again.  My name
10   is Paul Hynes.  I represent CVS Indiana LLC
11   and CS Rx Services, Inc.  Those are the CVS
12   entities who are defendants in this case.
13   And I want to as a preliminary question ask
14   whether your opinions where you state CVS, do
15   they relate to one or both of those entities?
16          A.    That would be my assumption,
17   yes.
18          Q.    That's your assumption.
19                We can refer, throughout my
20   examination, to those entities as CVS, if
21   that's easier.
22          A.    Right.  There may be an
23   exception to that.  I think I make reference
24   to that.  I think I make reference to the CVS
```

```
 1    PBM that did the formularies for Summit and

 2    Cuyahoga County.

 3         Q.    Can you tell me where you refer

 4    to the CVS PBM in your report?

 5         A.    I think it's mentioned.

 6         Q.    You think it's mentioned?

 7         A.    I think so.

 8         Q.    Can you point me to a section

 9    or a page number or an exhibit?

10         A.    No.  But there's one opinion

11    that's wrong that's titled "EBMs"  thanks for

12    reminding me.

13               For the Medicaid, the state

14    Medicaid did not use an external EBM for its

15    formulary.  It used a -- its own formulary

16    committee.

17               The Cuyahoga and Summit County

18    used CVS, and two others.  I think I've got a

19    list of them here.  And there's a deposition

20    testimony of Woods in the case of Cuyahoga

21    County, at least I think referenced in the

22    report.

23         Q.    Okay.

24               MR. HYNES:  Can we go off the
```

1      record for one minute?

2              THE VIDEOGRAPHER:  Sure.  Off

3      the record at 4:38.

4              (Recess taken, 4:37 p.m. to

5      4:38 p.m.)

6              THE VIDEOGRAPHER:  We are back

7      on the record at 4:39.

8              MR. HYNES:  And just for the

9      record, I will reserve some time to

10     address that opinion later in the day,

11     time permitting.

12     Q.     (BY MR. HYNES) Dr. Egilman, can

13  you please turn to page 134 of your report?

14     A.     Okay.

15     Q.     Showing you Section 7.479

16  states that "CVS's suspicious order

17  monitoring program did not monitor suspicious

18  orders."

19             Is that an opinion that you're

20  rendering in this case?

21     A.     Yes.

22     Q.     Did you consult with any

23  plaintiffs' lawyers in arriving at this

24  opinion?

```
 1            A.     No.

 2            Q.     Okay.  The next sentence states

 3      "CVS's SOM policy specified that if multiple

 4      orders for the same store are flagged during

 5      the same month, all orders after that first

 6      order will not be investigated and will be

 7      released based on the release of the first

 8      order."

 9                   Did read that correctly?

10            A.     No.

11            Q.     What did I not read correctly?

12            A.     The last phrase where it's got

13      the word "automatically."

14            Q.     Okay.  "Will be automatically

15      released based on the release of the first

16      order."  Is that what you're referring to?

17            A.     Yes, that's the part that you

18      read incorrectly.

19            Q.     Okay.  That statement refers to

20      CVS's SOM policy; correct?

21            A.     Correct.

22            Q.     You don't cite any CVS SOM

23      policies in support of this opinion, do you?

24            A.     Can I see 479?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      Sure.  Do you have it?

 2              A.      Just let me be clear, here,

 3      when you say "do I have it," in the notice of

 4      this deposition, I was not asked to bring a

 5      single piece of paper.  But I have it.

 6              Q.      Okay.  Well, then let's look at

 7      it.

 8              A.      You're welcome.

 9              Q.      Is the document in front of you

10      a CVS SOM policy?

11              A.      I don't have the whole --

12                      Do you have the whole document?

13                      I don't know.  I have to look

14      at the whole document.

15              Q.      Are you aware that CVS has

16      policies governing its suspicious order

17      monitoring system?

18              A.      Yes.

19              Q.      Did you review any of those

20      policies in preparing the report?

21              A.      Yes.

22              Q.      Which policies did you review?

23              A.      I don't recall.

24              Q.      To the best of your
```

1    recollection, is the document that you

2    excerpted in Exhibit B.479 a CVS SOM policy?

3         A.    I have to look at it.  I don't

4    remember.

5         Q.    To the best of your

6    recollection?

7         A.    To the best of my recollection,

8    I need to look at the document.

9         Q.    I will represent to you that

10   document that you've excerpted there is an

11   attachment to a November 2012 e-mail from

12   ███████████████.

13            Do you know who prepared that

14   document?

15        A.    The document that you're not

16   showing me that I don't have?  No.

17        Q.    Okay.  Do you know who

18   Mr. ███████████ is?

19        A.    No.

20        Q.    Do you know whether he was a

21   member of CVS's suspicious order monitoring

22   team?

23        A.    No.

24        Q.    Do you know what his position

```
 1    at CVS was?

 2         A.     No.

 3         Q.     Do you know if he was deposed

 4    in this case?

 5         A.     No.

 6         Q.     Did you attempt to review any

 7    deposition testimony about that document that

 8    is excerpted in that exhibit?

 9         A.     No.

10         Q.     How did you find that document?

11         A.     Through a search.

12         Q.     Who performed the search?

13         A.     I did or my staff did.

14         Q.     What did you do to confirm that

15    the excerpted language from that document

16    accurately reflected how CVS's suspicious

17    order monitoring system operated?

18              MS. CONROY:  Objection.

19              THE WITNESS:  We looked for

20         other documents around that document

21         in the search.

22         Q.     (BY MR. HYNES)  Did you find

23    any?

24         A.     I don't think so.
```

```
1          Q.      Okay.  Are you familiar with

2    CVS's suspicious order monitoring system?

3          A.      Not specifically, no.

4          Q.      So you're not familiar with the

5    algorithms that were used to flag orders?

6          A.      Correct.  Except to the extent

7    that they're mentioned here.

8          Q.      So is that the only document

9    you recall reviewing related to CVS's

10   suspicious order monitoring system?

11         A.      No.

12         Q.      What documents did you review?

13         A.      I can't recall.

14         Q.      How many documents related to

15   CVS's suspicious order monitoring system did

16   you review?

17         A.      I can't recall.

18         Q.      What's your best guess?

19         A.      No guess.

20         Q.      Less than 100?

21         A.      No guess.

22         Q.      Are you familiar with the

23   report called the "Item Review Report"?

24         A.      No.  Not by name.
```

```
 1            Q.     Are you --

 2            A.     If you could show it to me.

 3            Q.     Are you familiar --

 4            A.     Could I finish?  If you show it

 5    to me, I may be familiar with it.

 6            Q.     Understood.

 7            A.     I can't recall it by name.

 8            Q.     Are you familiar with CVS's SOM

 9    policies?

10            A.     Not in detail --

11            Q.     Can you tell me --

12            A.     -- without looking at them.

13            Q.     Can you tell me what they said

14    about how to perform due diligence on orders?

15            A.     Not without looking at them.

16            Q.     Are you familiar with what

17    information CVS staff had available to them

18    to do due diligence on flagged orders?

19            A.     Not without looking at the

20    procedures, no.

21            Q.     Are you familiar with the micro

22    strategy database?

23            A.     No.

24            Q.     The infomatic database?
```

```
 1            A.      Not at -- not by memory.

 2            Q.      The store metrics report?

 3            A.      No.

 4            Q.      Did you review any documents

 5     relating to training that CVS SOM team

 6     members received on SOM?

 7            A.      I think so.

 8            Q.      What can you tell me about the

 9     training they received?

10            A.      Nothing without looking at the

11     documents.

12            Q.      Okay.  Can you identify any

13     suspicious orders of prescription opioids

14     that CVS shipped to Summit or Cuyahoga

15     County?

16            A.      No.

17            Q.      Do you even know what

18     prescription opioids CVS shipped to Cuyahoga

19     and Summit counties?

20            A.      I don't think I have a list of

21     them in my possession, but I could find that

22     out through the ARCOS database that we have

23     access to.

24            Q.      Well, sitting here today,
```

1    what's your best recollection?

2          A.     I don't have a recollection.

3          Q.     Do you know whether CVS shipped

4    oxycodone to CVS retail pharmacies in Summit

5    and Cuyahoga County?

6          A.     I do not have a recollection.

7          Q.     Do you know whether they

8    shipped fentanyl?

9          A.     I do not know.

10         Q.     Do you know whether they

11   shipped hydrocodone combination products?

12         A.     I do not know.

13         Q.     Do you know the names of the

14   people who staffed CVS's SOM team?

15         A.     No.

16         Q.     Do you know who managed the

17   team?

18         A.     No.

19         Q.     Do you know where the team was

20   located?

21         A.     No.

22         Q.     Did you attempt to review

23   depositions of any staff members who worked

24   on CVS's SOM team?

```
 1            A.     No.
 2            Q.     I want to talk about the
 3      venture that's discussed in your report.
 4                   Your opinion states that -- or
 5      is your opinion that CVS joined the venture?
 6      Or was a member of the venture?
 7            A.     Yes.
 8            Q.     Which CVS entities in your
 9      opinion were a member of the venture?
10            A.     I didn't distinguish any.  So.
11                   I'm talking about -- when I
12      talk about CVS, I'm talking about the
13      corporate parent.  I didn't break it into
14      subsidiaries.
15            Q.     So your opinion is not that CVS
16      Indiana LLC was a member of the venture?
17            A.     My opinion is that CVS and its
18      subsidiaries were a member of the venture.
19            Q.     Your report doesn't state when
20      CVS and its subsidiaries became members of
21      the venture, does it?
22            A.     Correct.
23            Q.     It also doesn't state when
24      Walmart became a member of the venture, does
```

1    it?

2          A.    Correct.

3          Q.    And it doesn't state when

4    Rite Aid became a member of the venture, does

5    it?

6          A.    Correct.

7          Q.    Do you have an opinion on when

8    CVS or its subsidiaries became members of the

9    venture?

10          A.    No.

11          Q.    Do you have an opinion of when

12    Walmart became a member of the venture?

13          A.    No.

14          Q.    Same question for Rite Aid.

15          A.    Same answer.

16          Q.    Your report doesn't cite any

17    evidence indicating that CVS agreed to become

18    a member of the venture, does it?

19          A.    I'm not sure what you mean by

20    that.

21          Q.    You don't cite any evidence or

22    any conduct showing that CVS agreed,

23    voluntarily agreed to become a member of the

24    venture, do you?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Well, they were members of the
 2   HDMA, and the HDMA was one of the
 3   organizations that was part of the venture.
 4          Q.      Does your report cite any
 5   documents or testimony indicating that CVS
 6   was a member of HDMA?
 7          A.      I think so.  I think I have a
 8   list of members of the HDMA.
 9          Q.      And that's your only basis for
10   concluding that a CVS entity was a member of
11   the venture?
12              MS. CONROY:  Objection.
13              THE WITNESS:  No.  CVS did --
14              No.
15          Q.      (BY MR. HYNES)  Okay.  What
16   other conduct do you believe CVS took -- or
17   undertook as a member of the venture?
18          A.      CVS contributed to the
19   overprescription of opioids in these two
20   counties.
21          Q.      And what did it do to
22   contribute to the overprescription of opioids
23   in these two counties?
24          A.      It filled prescriptions for
```

1    those drugs.

2         Q.    Would you agree that filling

3    prescriptions is part of the normal business

4    activity for CVS?

5         A.    Yes.

6         Q.    Would you agree that it happens

7    every day?

8         A.    Yes.

9         Q.    Would you agree that it may

10   happen even with respect to prescriptions

11   that you have written for your patients?

12        A.    Yes.

13        Q.    Would you agree that there is

14   nothing inherently wrong with filling

15   prescriptions for prescription opioids?

16        A.    Yes.

17        Q.    You testified earlier that you

18   read the complaint in this case; right?

19        A.    Correct.

20        Q.    Are you familiar with

21   plaintiffs' claims against CVS?

22        A.    I don't -- I haven't separated

23   them out, no.

24        Q.    Are you aware that plaintiffs'

1    claims against CVS do not relate to its

2    dispensing of prescription opioids?

3         A.    Yes.

4         Q.    So you know that its claims --

5    plaintiffs' claims relate only to CVS's

6    distribution of prescription opioids?

7         A.    Yes.

8         Q.    Is it -- besides joining HDMA

9    and filling prescriptions for prescription

10   opioids, are you aware of any -- or is it

11   your opinion that CVS did anything else or

12   took any other action in furtherance of the

13   so-called venture?

14        A.    Yes.

15        Q.    What else?

16        A.    It remained silent as to the

17   nature of the opioid epidemic, the

18   overprescription of opioids and the addiction

19   epidemic.

20        Q.    So --

21        A.    CVS failed to act on the

22   information available to it about upstream

23   orders, downstream sales, physician -- CVS,

24   unlike some other distributors, had the

Highly Confidential -- Subject to Further Confidentiality Review

1    ability to get data all the way down to the

2    patient level.  So CVS had the capability,

3    which they did not use, to determine which

4    physicians were overprescribing and which

5    patients were over -- being overprescribed.

6    CVS failed to take action on it.

7        Q.    And how do you know CVS had

8    access to that data?

9        A.    Because that data is

10    available -- because, first of all, CVS

11    participates in selling that data to IMS and

12    other entities.  So they certainly have data

13    on what they sell.

14            CVS can get data from IMS

15    that's broader than just its own sales, so

16    they can look at IMS data over the entirety

17    of these two counties and determine how many

18    prescriptions for opioids are going out the

19    door.  They can determine from their own data

20    on their own patients how many of those

21    patients are getting prescriptions from

22    multiple pharmacies, multiple physicians.

23    They can see which physicians are

24    overprescribing from their pharmacy data

1    downstream.

2              So while all of the

3    distributors could do that and track orders

4    right down to the pharmacy level out the

5    door, CVS, because it was a vertically

6    oriented distributor pharmacy operation, had

7    more access to that data, more easily

8    acquired, and more easily used than some of

9    the distributors would have had to take it an

10   extra step.

11        Q.    But none of those opinions are

12   reflected in your report, are they?

13        A.    No, I think they are.

14        Q.    Where?

15        A.    I think the whole idea that

16   the --

17              Well, first of all, they had

18   that general opinion that we went through

19   before.  That had any of the participants in

20   the venture --

21        Q.    Sir, your opinion you just

22   stated about CVS's failure to act based on

23   information it had at its disposal is not

24   stated in your report; is that right?

```
 1                 MS. CONROY:  Objection.

 2          Q.     (BY MR. HYNES)  That's a

 3    yes-or-no question.

 4          A.     I answered it.

 5          Q.     You --

 6          A.     Your last question was where,

 7    okay?

 8                 I answered that question

 9    before.  You asked, and I said, "No, I think

10    they are."

11                 Your next question was "Where"?

12    I was answering the "where" question which

13    you interrupted, which is perfectly --

14          Q.     Can you point me to the section

15    number?

16          A.     -- which is perfectly fine.  I

17    have no problem with you interrupting my

18    answer.  That's what the judge ruled.  It

19    just means my answer is incomplete.

20          Q.     That's fine.  Your answer is

21    incomplete.

22                 Can you point me to a section

23    or page number where that opinion is stated

24    in your report?
```

1          A.      The opinion -- I cannot without

2    looking at the report give you the page

3    number and the opinion number.  I can tell

4    you generally, for example, the opinion that

5    I discussed --

6          Q.      I don't need to hear --

7                  That's fine.

8          A.      Okay.  My opinion is

9    incomplete.

10         Q.      That's fine.

11         A.      My answer is incomplete.

12         Q.      Sir, your opinion at

13   Exhibit B.489 cites a DEA settlement CVS

14   entered into on March 28, 2013.  Is that

15   correct?

16         A.      What opinion number is it?

17         Q.      Exhibit No. B.489.

18         A.      What page?

19         Q.      I'll just show it to you.

20         A.      That's correct.

21         Q.      Did you review that settlement

22   agreement?

23         A.      Yes.

24         Q.      Are you aware that it relates

1    to conduct occurring in Oklahoma?

2         A.     Yes.

3         Q.     So you're aware that it

4    relates -- that it does not relate to conduct

5    occurring in Cuyahoga or Summit County?

6              MS. CONROY:  Objection.

7              THE WITNESS:  Well, the

8         citation's specific to Oklahoma.

9         Q.     (BY MR. HYNES)  Okay.

10        A.     That's correct.

11        Q.     Are you aware the settlement

12   relates to conduct occurring at CVS retail

13   pharmacies?

14        A.     Yeah, let me look at it so I

15   don't make any mistakes.

16              MS. CONROY:  What's the number,

17        4.89?

18              MR. HYNES:  B.489.

19        Q.     (BY MR. HYNES)  Sir, while

20   we're looking for the document, I'll ask some

21   questions.  We're short on time.

22              On the course of your --

23        A.     Do you want to withdraw the

24   previous question?

```
 1            Q.      Yeah.  I'll go back to it.

 2            A.      Do you want to withdraw it?

 3            Q.      It's withdrawn.

 4                    In the course of your work on

 5     this engagement, did you review any DEA

 6     settlements with CVS related to distribution

 7     of prescription opioids to Cuyahoga or Summit

 8     County?

 9            A.      No.

10                    MR. HYNES:  We're good, then.

11                    THE VIDEOGRAPHER:  Off the

12            record at 4:57.

13                    MR. HYNES:  Pass the witness.

14                    (Recess taken, 4:56 p.m. to

15            4:58 p.m.)

16                    THE VIDEOGRAPHER:  We are back

17            on the record at 4:59.

18                         EXAMINATION

19     BY MS. MCENROE:

20            Q.      Dr. Egilman, I have very little

21     time with you, so I'm going to try and just

22     do some "yes" or "no" questions like you did

23     with some of my colleagues earlier today.

24                    You're a medical doctor;
```

1    correct?

2         A.    Yes.

3         Q.    And you testified earlier today

4    or yesterday about a specific patient you had

5    who was addicted to opioids to whom you

6    prescribed opioids; is that correct?

7              That's a yes-or-no question.

8              MS. CONROY:  While he's

9         answering, could you identify who you

10        represent on the record.

11             MS. MCENROE:  Yes,

12        Elisa McEnroe from Morgan Lewis for

13        Rite Aid.

14             THE WITNESS:  Yes.

15        Q.    (BY MS. MCENROE)  If the

16   pharmacy had refused to fill that

17   prescription for that particular patient,

18   could that have brought that patient harm?

19        A.    Anything is possible.  I don't

20   think so.

21        Q.    You wrote those prescriptions

22   for that addicted patient because you said

23   that he needed them because of his withdrawal

24   symptoms; correct?

1      A.      No.

2      Q.      Okay.  The record will stand

3   with what you testified to yesterday.

4              Today you're going to be asked

5   some questions about Rite Aid of Maryland,

6   Inc., doing business as Mid Atlanta Customer

7   Support Center.  I'm going to call that

8   Rite Aid.  Okay?

9      A.      Yes.

10     Q.      You understand that's the

11  Rite Aid entity that's been sued in this

12  litigation?

13     A.      I'll take your word for it.

14     Q.      Okay.

15     A.      I have no independent

16  understanding of that.

17     Q.      Have you read the complaint in

18  this case?

19     A.      Yes.

20     Q.      I'd like to direct your

21  attention to Exhibit 1F.  I think that's your

22  report.  You have it in front of you.

23     A.      I do.

24     Q.      And in particular to opinion

```
1      487.

2           A.      What page?

3           Q.      On page 135.

4           A.      Okay.

5           Q.      You'll see it says "Opinion.

6    Rite Aid provided marketing services to

7    Teva," and then there's a cite to

8    Exhibit B487.  Do you see that?

9           A.      I do.

10          Q.      Did I read that correctly?

11          A.      You did.

12                  (Whereupon, Deposition Exhibit

13              Egilman 50, B.487, was marked for

14              identification.)

15          Q.      (BY MS. MCENROE)  We're handing

16   you what's been marked as Exhibit 50 which is

17   also Exhibit B487 from your report.  You've

18   been handed two folders; a green folder and a

19   Redweld.  Can you describe to me what's in

20   front of you?

21                  MS. CONROY:  Do you have a copy

22          of the exhibit for me?

23                  MS. MCENROE:  Oh, I do.  Two,

24          if you want.
```

1          MS. CONROY:  One is fine.

2          MS. MCENROE:  Great.

3      Q.   (BY MS. MCENROE)  What is in

4  front of you, Dr. Egilman, that was handed to

5  you by plaintiffs' counsel?

6      A.    Same exhibits.

7      Q.    Is there anything different

8  about the documents you were handed in those

9  folders?

10     A.    It doesn't appear to be.

11     Q.    And do you have a copy of that

12 exhibit for which you have handwriting or

13 sticky notes like you described yesterday in

14 the box that you have brought with you?

15         MS. CONROY:  There are no notes

16    or stickers on the document.

17         MS. MCENROE:  Great.  Okay.

18     Q.    (BY MS. MCENROE)  So that's the

19 only exhibit you have with respect to opinion

20 487 regarding Rite Aid; correct?

21     A.    Correct.

22     Q.    Do you have any other opinions

23 naming Rite Aid in your report?

24     A.    I don't recall.

1      Q.      If you had, would that have

2   been included in the material plaintiffs just

3   handed you?

4      A.      Not necessarily.

5      Q.      Would you expect that it would

6   have been?

7      A.      No.

8      Q.      Can you identify for me any

9   other single opinion that identifies Rite Aid

10  in your report as we sit here today?

11     A.      No.

12     Q.      Taking a look at the attachment

13  you have or the exhibit that you have for

14  opinion 487, you'll see that the top says

15  "Teva Fentanyl Patches IVR, Statement of

16  Work."  Do you see that?

17     A.      Yes.

18     Q.      Okay.  Did you read this

19  document before?

20     A.      Yes.

21     Q.      Did you pick this document out

22  of the database?

23     A.      Well, I picked it to be in the

24  report.  I don't think I did the search that

1    found the document.

2         Q.    Did you actually type the words

3    into your report, "Opinion.  Rite Aid

4    provided marketing services to Teva"?  Did

5    you type those words?

6         A.    I think so, yes.

7         Q.    Did you do that based on this

8    exhibit?

9         A.    Yes.

10        Q.    Did you do it based on anything

11   else?

12        A.    Not that I can recall.

13        Q.    Can you identify anything else

14   as we sit here today that you did that on

15   behalf of?

16        A.    No.

17        Q.    Take a look at the last page of

18   this document.

19        A.    Right.

20        Q.    It's unsigned; correct?

21        A.    Correct.

22        Q.    Have you ever seen a signed

23   copy?

24        A.    No.

1    Q.    Do you have any other evidence

2    supporting your opinion that Rite Aid

3    provided marketing services to Teva?

4    A.    No.

5    Q.    You testified a little bit

6    earlier that each defendant in this case is

7    100% responsible for the opioid crisis; is

8    that correct?

9    A.    Yes.

10    Q.    So you're taking the opinion

11    that Rite Aid is 100% responsible for the

12    opioid crisis on the basis of one unsigned

13    contract; is that right?

14    A.    No.

15    Q.    What other evidence have you

16    provided with your report that says that

17    Rite Aid is responsible for 100% of the

18    opioid crisis?

19    A.    All of the evidence that I

20    provided in my report relates to what was

21    known or knowable by Rite Aid with respect to

22    the venture.

23    Q.    And that was true of yourself

24    at the same time; correct, Dr. Egilman?

Highly Confidential — Subject to Further Confidentiality Review

```
 1          A.      Let me just say my answer is
 2   incomplete.
 3          Q.      Fine.  That's fine.
 4          A.      Now you can interrupt and ask
 5   the other question.
 6          Q.      That's true of yourself as
 7   well, right, just as much as it's true of
 8   Rite Aid?
 9              MS. CONROY:  Objection.
10              THE WITNESS:  Which is true?
11          Q.      (BY MS. MCENROE)  The
12   information that you said was available to
13   Rite Aid was equally available to yourself to
14   make it 100 percent responsible for the
15   opioid crisis.
16          A.      No, it wasn't.
17          Q.      Do you know what, if any,
18   opioids Rite Aid distributed into Cuyahoga or
19   Summit counties?
20          A.      I don't know which ones they
21   distributed, no.
22          Q.      Do you know if they ever did
23   distribute opioids into Cuyahoga or Summit
24   County?  For a fact?
```

1    A.    For a fact?  I assume they did.

2    Q.    You assume so, but do you know

3    that?

4    A.    I haven't seen the data on

5    their sales --

6    Q.    Okay.

7    A.    -- into the county.

8    Q.    Do you know --

9    A.    But if they didn't sell, I

10   would assume you wouldn't be sitting there.

11   It's an easy summary judgment motion.

12   Q.    So you testified earlier that

13   you did not base your opinions on any

14   assumptions; is that correct?

15   A.    Correct.

16   Q.    But you have made some

17   assumptions at the very least; correct?

18   A.    Do you mean that last one?

19   Q.    Question withdrawn.

20   A.    That you -- that you're -- that

21   Rite Aid is still in the case?

22   Q.    Well, I'm just trying --

23   A.    And I don't think that's --

24   Q.    I withdrew my question.

```
 1    There's no question pending.
 2              I just want to understand your
 3    knowledge base for my client Rite Aid, and it
 4    seems to extend just as one unsigned
 5    contract.  So I'm hoping that you can tell me
 6    a little bit more about what you know
 7    specifically about Rite Aid, if anything, and
 8    I'm not seeing anything else in your report.
 9         A.    Well.
10         Q.    Is there anything else in your
11    report --
12         A.    Is that a question?
13         Q.    Yeah.  Is there anything else
14    in your report about Rite Aid?
15         A.    That specifically mentioned
16    Rite Aid?
17         Q.    Correct.
18         A.    I don't think so.
19              MS. MCENROE:  I have no further
20         questions.
21              Can we go off the record?
22              THE VIDEOGRAPHER:  Off the
23         record at 5:06.
24              (Recess taken, 5:06 p.m. to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           5:07 p.m.)

2                THE VIDEOGRAPHER:  We are back

3           on the record at 5:08.

4                      EXAMINATION

5    BY MS. FUMERTON:

6           Q.    Good afternoon, Dr. Egilman.

7    My name is Tara Fumerton, and I represent

8    Walmart in this litigation.

9           A.    Good afternoon.

10          Q.    Do you have your report in

11   front of you?

12          A.    I do.

13          Q.    And could you please turn to

14   page 134 of your report, and I'm going to

15   focus you on opinion 7.480.

16          A.    Okay.

17          Q.    And so opinion 7.480 is that,

18   quote, Walmart helped Actavis market opioids.

19   End quote; correct?

20          A.    Correct.

21          Q.    And this is your only

22   Walmart-specific opinion in your report;

23   correct?

24          A.    I don't know.
```

```
1        Q.     How would you answer that
2    question, then?
3               In other words, you don't know
4    the answer as to whether or not you have
5    other Walmart-specific opinions in your
6    report?
7        A.     For the Walmart specifically
8    mentioned, you could search the report.  I
9    haven't done that by every company.
10       Q.     You haven't.  So you have a
11   folder back there that's specific to Walmart.
12   Should we -- would that help you determine
13   whether or not there are other
14   Walmart-specific opinions?
15               MS. CONROY:  Objection.
16               THE WITNESS:  You know more
17           than I do.  Those are not my
18           documents.  Those are the plaintiff
19           documents that they brought to the
20           deposition.  So I don't know if they
21           have a folder named Walmart or not.
22       Q.     (BY MS. FUMERTON)  Sitting
23   here, can you identify any other
24   Walmart-specific opinions in your report?
```

Highly Confidential -- Subject to Further Confidentiality Review

```
1        A.     No.

2        Q.     And to conclusively answer my

3    question as to whether or not there were any

4    other Walmart-specific questions -- or

5    specific opinions in your report, you would

6    need time to review your report; is that

7    right?

8        A.     No.  I'd need to do a search in

9    a PDF.

10       Q.     And so if I did a search in the

11   PDF and Walmart did not show up in any of the

12   titles in your report, could we conclude that

13   opinion 7.480 is the only opinion that is

14   Walmart specific in your report?

15       A.     It's the only opinion that

16   names Walmart in the opinion, yes.

17       Q.     So how would you do the search

18   of the PDF to determine whether or not there

19   were any other Walmart-specific opinions in

20   your report?

21       A.     Well, I'd search it for Walmart

22   first, and then there's a Walmart coding

23   because Walmart documents may have been used

24   for other opinions.  And then you could do a
```

Highly Confidential - Subject to Further Confidentiality Review

1   search, you know, whatever the code is,

2   asterisk, and then find any other Walmart

3   documents that were cited in the report.

4        Q.     So if there's any Walmart

5   documents cited in the report, is it your

6   testimony that that, then, is referring to a

7   Walmart opinion?

8        A.     I don't know.  I'd have to look

9   at them.

10       Q.     So I'll go back to my original

11  question.  In order to determine whether

12  there were any other Walmart-specific

13  opinions in your report, you'd have to review

14  not just the report but all of the documents?

15       A.     Yeah.  The report is the report

16  and the documents, correct.

17       Q.     All right?

18       A.     You'd have to read the whole

19  thing.

20       Q.     Let's look at page 134 of your

21  report.  You cite Exhibit B.480 in support of

22  your opinion that Walmart helped Actavis

23  market opioids; correct?

24       A.     Right.

1    Q.    Do you have a copy?  I do have

2  a copy.  I didn't want to mark it as another

3  exhibit, but I can do so if we need to.

4    A.    I've probably got it in this

5  box here.

6    Q.    And I also just wanted to

7  confirm that I think it's worthwhile to get

8  that to make sure that your copy of

9  Exhibit B.480 is the same that I have.

10         So why don't we go ahead and

11  just mark this, then, as an exhibit?

12         (Whereupon, Deposition Exhibit

13         Egilman 51, Opinion-Walmart helped

14         Actavis Market Opioids, was marked for

15         identification.)

16    Q.    (BY MS. FUMERTON)  Dr. Egilman,

17  is what we just marked as Exhibit 51 the same

18  thing as Exhibit B.480 in your report?

19    A.    Yes.

20    Q.    And is Exhibit B.480 the best

21  evidence that you saw to support your opinion

22  that Walmart helped Actavis market opioids?

23    A.    Yes.

24    Q.    In fact, there was no other

1    evidence that you relied on as the basis of

2    your opinion 7.480; correct?

3            A.      Correct.

4            Q.      Now, Exhibit B.480 is a

5    PowerPoint slide deck dated May 2014 titled

6    "Joint Business Planning" and was produced by

7    ANDA; correct?

8            A.      Correct.

9            Q.      There are no references to

10   marketing opioids in this document; correct?

11           A.      Not correct.

12           Q.      And where are there references

13   to marketing opioids in this document?

14           A.      Bates No. 1126042.

15                   That's one place.

16           Q.      And --

17           A.      And then 1126043.  And then

18   1126049.

19                   [Document review.]

20           Q.      (BY MS. FUMERTON)  I'm going

21   to, just because I'm so short on time, stop

22   you with those examples right now and we can

23   discuss them.  If we need to go to more, we

24   can do so.

```
 1          A.      Okay.  Can I just make a record

 2    that the answer is incomplete.

 3          Q.      Sure.  So let's go back to

 4    page 6042, which I think is the first

 5    instance that you indicated referenced

 6    marketing opioids; is that right?

 7          A.      Correct.

 8          Q.      And where do you see the words

 9    "marketing" on this page?

10          A.      The word "marketing" is not on

11    this page.

12          Q.      And so nowhere in this page

13    does it discuss marketing opioids; correct?

14                  MS. CONROY:  Objection.

15                  THE WITNESS:  Not true.

16          Q.      (BY MS. FUMERTON)  Is it your

17    opinion that because this page references

18    sales of opioids that that is the same thing

19    as marketing opioids?

20          A.      No, not exactly.

21          Q.      So explain to me how this page

22    refers to marketing of opioids.

23          A.      This says -- it says planned

24    unit growth to translate in sales and gross
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    profit, or GP, improvements.

 2              And it indicates estimated

 3    increases in sales, and it includes

 4    specifically hydromorphone and buprenorphine

 5    analogs as part of the drugs that are going

 6    to increase gross profit.

 7         Q.    And whose gross profit is being

 8    referred to there, do you know?

 9         A.    Well, it's a joint business

10    planning, so it appears to be both companies.

11         Q.    And you're just basing that off

12    of the title of the document; correct?

13         A.    That's true.  I'm basing it on

14    the title of the document, and I think

15    there's other --

16              That's not necessarily true.

17              I think there's other documents

18    in here that indicate increases in gross

19    profit that may segregate out who's

20    specifically --

21              Yeah, for example, if you look

22    at page 6 of the document, 1126044.

23              Strategy one, products either

24    launched or have been pushed out to Walmart.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Fiscal 2015, and that's indicating an

2    increase.  So if you're pushing out more

3    sales to Walmart by Actavis, presumably

4    that's being done to increase Actavis'

5    profits.

6           Q.    And so let me ask you --

7           A.    And of course if -- and

8    similarly, if Walmart is -- what goes -- what

9    gets pushed from Actavis to Walmart doesn't

10   get stuck in Walmart.  It gets sold by

11   Walmart into the community.  Otherwise there

12   would be a big backup of opioids at the

13   Walmart stores.

14          Q.    In that lengthy explanation

15   that you just gave you did not once use the

16   term "market"; correct?  Or "marketing";

17   correct?

18          A.    That's true.

19          Q.    And in reaching your opinion,

20   based solely on the single document, that

21   Walmart helped Actavis market opioids, you

22   did not consider the testimony of the Walmart

23   employees who testified that Walmart did not

24   market opioids; correct?

Highly Confidential -- Subject to Further Confidentiality Review

1        A.      That's correct.

2        Q.      And you also did not consider

3    in formulating your opinion the testimony of

4    Patsy Little, where she described these joint

5    business planning meetings to be a program

6    that was just in place for a couple of years

7    for the purpose of trying to get a lower cost

8    of goods and get supply on items that were

9    hard to supply in the market; correct?

10       A.      Correct.

11              MS. FUMERTON:  So I'm going to

12          pass the witness at this time.  I

13          think that -- I want to put on the

14          record an objection that I think the

15          time that has been allocated to each

16          defendant has been woefully deficient,

17          given the lengthy opinions and the

18          fact that specifically to Walmart, the

19          witness was unable to answer the

20          question as to whether or not there

21          were any other additional

22          Walmart-specific opinions in his

23          report.  But given the amount of time

24          that we've been allocated, I have to

1       pass the witness so that other

2       defendants can ask questions as well.

3               Let's go off the record.

4               MS. CONROY:  No, I'm not ready

5       to go off the record.  Objection, the

6       plaintiffs did not allocate the time

7       among the defendants.  You did that

8       yourselves.  So we are not responsible

9       for that.

10              MS. FUMERTON:  So are you

11      agreeing to expand the deposition

12      beyond 14 hours?

13              MS. CONROY:  Absolutely not.

14      You go to the Court and seek an

15      additional -- any additional time.

16      But we did not allocate time among the

17      defendant or determine how much time

18      Walmart would have versus another

19      defendant.

20              MS. FUMERTON:  And my objection

21      stands, and let's go off the record.

22              THE VIDEOGRAPHER:  Off the

23      record.  5:21.

24              (Recess taken, 5:20 p.m. to

```
 1              5:21 p.m.)

 2                   THE VIDEOGRAPHER:  We are back

 3         on the record at 5:22.

 4                   THE WITNESS:  I have to start

 5         with the plaintiff time.

 6                   The opinion that I wrote for

 7         453 was incorrect.  The opinion should

 8         be "Ohio Medicaid had its own

 9         formulary committee."

10                   Off plaintiff time.

11                   EXAMINATION

12    BY MR. PODOLL:

13         Q.     Good afternoon, Dr. Egilman.

14    Josh Podoll on behalf of Cardinal Health from

15    Williams and Connolly.

16         A.     Oh, good afternoon.

17         Q.     Sir, could you turn to page 63

18    of your report?

19         A.     Sure.

20         Q.     You opine in opinion 7.12 that

21    "Cardinal Health failed to take action for

22    suspicious orders"; correct?

23         A.     Correct.

24         Q.     You don't provide any written
```

1    analysis regarding how you reached that

2    opinion; correct?

3         A.    Can I see B12?

4               MS. CONROY:  Sure.

5               MR. PODOLL:  That's B12 there

6         if you want a copy, here's a copy.

7               MS. CONROY:  Thank you.

8               THE WITNESS:  Well, I provide

9         the excerpt of a document that

10        basically -- that says that.

11        Q.    (BY MR. PODOLL)  Beyond the

12   excerpt of the document that you cite in B12,

13   you don't provide any written analysis

14   regarding how you came to that opinion;

15   right?

16        A.    Correct.

17        Q.    You don't provide any written

18   analysis regarding how the cited document

19   supports your opinion; correct?

20        A.    No.  I've got all kinds of

21   arrows showing you what new document supports

22   the opinion.

23        Q.    That was my next question.

24               Are the arrows in the opinion

1   the portions of this document that you

2   believe support your opinion?

3        A.     They're the -- the whole

4   document supports the opinion.

5             MS. CONROY:  It's the rest of

6        that.

7             THE WITNESS:  The whole

8        document supports the opinion, but

9        certainly the arrows point to the most

10       salient parts of the document that

11       support the opinion.

12       Q.     (BY MR. PODOLL)  Aside from the

13  documents excerpted in B12, you cite no other

14  documents to support your opinion that

15  Cardinal failed to take action for suspicious

16  orders; correct?

17       A.     In this opinion, you mean?

18       Q.     Correct.

19       A.     That's correct.  But there are,

20  I think, other documents including Cardinal's

21  fines paid, et cetera, that are cited

22  elsewhere.

23            MR. PODOLL:  Move to strike

24       everything after -- oh, our live feed

```
1      is gone.  Move to strike at --
2             Let's go off the record and fix
3      the live feed.
4             THE VIDEOGRAPHER:  Off the
5      record at 5:25.
6             (Recess taken, 5:25 p.m. to
7      5:25 p.m.)
8             THE VIDEOGRAPHER:  We are back
9      on the record at 5:27.
10            MR. PODOLL:  Move to strike
11     everything in the prior answer after
12     "That's correct."
13        Q.    (BY MR. PODOLL)  You cite no
14  deposition testimony to support the opinion
15  that Cardinal failed to take action for
16  suspicious orders; correct?
17        A.    Correct.
18        Q.    You don't say what methodology
19  you used to reach the opinion that Cardinal
20  failed to take action for suspicious orders;
21  correct?
22        A.    No.
23        Q.    In Exhibit B12, you don't say,
24  in writing, what methodology you use to
```

1    support the opinion that Cardinal failed to

2    take action for suspicious orders; correct?

3          A.      Correct.

4          Q.      You created the -- what is

5    Exhibit B12 to your report; correct?

6          A.      Correct.

7          Q.      You did that by copying and

8    pasting from a document?

9                  MS. CONROY:  Objection.

10         Q.      (BY MR. PODOLL)  From two

11   documents?

12         A.      And putting the box and arrows

13   on it.

14         Q.      Fair enough.  And putting in

15   boxes and arrows.

16                 The first box that I see on the

17   page is around a quotation under the

18   signature block of Kimberly Anna-Soisson; is

19   that right?

20         A.      Correct.

21         Q.      Do you know who Kimberly

22   Anna-Soisson is?

23         A.      At the time she was the manager

24   of regulatory management.

```
 1           Q.      Do you know what her

 2   responsibilities were with respect to

 3   Cardinal's suspicious order monitoring system

 4   at the time of this e-mail?

 5           A.      I don't know what her job

 6   description was at the time of this e-mail,

 7   no.

 8           Q.      Did you even try and find out?

 9           A.      I don't think there were any

10   job descriptions or personnel files in any of

11   the production.

12           Q.      Did you ask to read her

13   deposition?

14           A.      No.

15           Q.      Did you read her deposition?

16           A.      No.

17           Q.      The excerpts cited in

18   Exhibit B12 refer to a K-Mart store.

19                   Do you see that?

20           A.      Correct.

21           Q.      Do you know where that K-Mart

22   store is located?

23           A.      No.

24           Q.      Do you know what that K-Mart
```

1    store's thresholds are?

2          A.     No.

3          Q.     Exhibit B12 does not mention

4    any specific order of opioids; correct?

5                 I'll withdraw the question.

6                 Do you know whether Cardinal

7    today has a suspicious order monitoring

8    system?

9          A.     Yes, they do.

10         Q.     Do you know when that system

11   was put in place?

12         A.     The current system?

13         Q.     Yes.

14         A.     No, I do not.

15         Q.     Do you know when any suspicious

16   order monitoring system was put in place for

17   Cardinal Health?

18         A.     Sometime after 2007, 2008.

19         Q.     Do you know whether Cardinal

20   Health had a suspicious order monitoring

21   system before 2007 or 2008?

22         A.     Not the one that was effective.

23   Maybe a paper program.

24                MR. PODOLL:  Move to strike.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    (BY MR. PODOLL) Do you know

2    whether Cardinal Health had any system to

3    monitor suspicious orders before 2007 and

4    2008, "yes" or "no"?

5    A.    Not a functioning system.

6    Q.    Is it your testimony that

7    Cardinal Health had no system to monitor

8    suspicious orders before 2007 or 2008?

9    A.    No.

10    Q.    Is it your testimony that

11    Cardinal Health did have a system to monitor

12    suspicious orders before 2007 or 2008?

13    A.    Yes.  Not a functioning system.

14    MR. PODOLL:  Move to strike

15    everything after "Yes."

16    Q.    (BY MR. PODOLL)  Do you know

17    how Cardinal Health flagged suspicious orders

18    at any time?

19    A.    They had a baseline, and if you

20    went over the baseline by a certain amount,

21    they get a flagged order.

22    Q.    Do you know what criteria

23    Cardinal Health used to set that baseline?

24    A.    Well, that's changed over time,

1    but the answer is I don't recall it for any

2    particular point in time.

3            Q.    Do you know who was --

4            MS. CONROY:  There are

5        handwritten notes on the exhibit that

6        you -- that are already marked as

7        Exhibit 28.

8            MR. PODOLL:  Thank you,

9        Counsel.  Could I see that?

10            THE WITNESS:  And there's

11        actually new stuff in this one.

12            It's the Brown alumni folder.

13            MR. PODOLL:  All right.  I am

14        going to reserve some time to deal

15        with this, but I'm going to keep going

16        for now.  Thank you, Counsel.

17            MS. CONROY:  Let me put it back

18        in the exhibit, then.

19            MR. PODOLL:  I appreciate it.

20            Q.    (BY MR. PODOLL)  Do you know

21    who was responsible for Cardinal Health's

22    suspicious order monitoring system in 2012?

23            A.    The CEO.

24            Q.    Do you know which employee had

```
 1    direct supervisory responsibility for

 2    Cardinal Health's suspicious order monitoring

 3    system in 2012?

 4              Strike that.

 5              Do you know which Cardinal

 6    Health employee had day-to-day responsibility

 7    for Cardinal Health's suspicious order

 8    monitoring system in 2012?

 9         A.   No.

10              Can we stop for a second

11    because mine is not working?

12         Q.   Yes.  Let's go off the record.

13              THE VIDEOGRAPHER:  Off the

14         record at 5:32.

15              (Recess taken, 5:31 p.m. to

16         5:32 p.m.)

17              THE VIDEOGRAPHER:  We are back

18         on the record at 5:33.

19         Q.   (BY MR. PODOLL)  Do you know

20    which Cardinal Health employee had day-to-day

21    responsibility for Cardinal Health's

22    suspicious order monitoring system in 2016?

23         A.   No.

24         Q.   Do you know how many employees
```

```
 1      had day-to-day responsibility -- how many

 2      Cardinal Health employees had day-to-day

 3      responsibility for suspicious order

 4      monitoring at any time?

 5            A.      No.

 6            Q.      Did you review the deposition

 7      testimony of Cardinal Health employees who

 8      were responsible day to day for suspicious

 9      order monitoring?

10            A.      No.

11            Q.      Did you review the deposition

12      testimony of any Cardinal Health employees?

13            A.      No.

14            Q.      I'd like you to turn to

15      page 106 of your report.  And tell me when

16      you're there.

17            A.      I am there.

18            Q.      Your opinion 7.299 is "The

19      wholesale or performance agreement between

20      Purdue and Cardinal was a concerted action to

21      sell and promote opioids."

22                    Is that right?

23            A.      Correct.

24            Q.      Your support for that is
```

```
1    Exhibit B299; right?

2               Opinion B 299; correct?  Which

3    I am handing you.

4         A.    Right.

5               Can you hand me the whole Bates

6    number document?

7         Q.    Sure.  Here is the entire

8    document.

9         A.    Okay.  Great.  Thanks.

10              I've got the whole thing.

11              Very good.

12              Brown alumni have good lawyers.

13        Q.    I wish I'd gone to Brown.  I

14   went to a rival school.

15        A.    No problem.

16              He's on the Brown board of

17   trustees.  President of Cardinal.

18        Q.    You're not a lawyer; correct?

19        A.    Correct.

20              I don't play one on TV.

21        Q.    You're not offering a legal

22   opinion related to the meaning of concerted

23   action; correct?

24        A.    Correct.
```

1    Q.    You've never consulted with

2  respect -- with an industry -- with Cardinal

3  Health, Purdue, or any other distributor or

4  manufacturer with respect to wholesaler

5  performance agreements; correct?

6    A.    Correct.

7    Q.    The excerpt from the document

8  that -- your opinion B99 doesn't mention

9  opioids, does it?

10          Withdrawn.

11          I'd like to point you to the

12  sentence above the key terms that you've

13  boxed in red.  Are you there?

14    A.    Correct.

15    Q.    That sentence says:  Set forth

16  below are the key proposed financial terms

17  that may form the basis of any future

18  distributor agreements between the parties.

19  Open parenthesis, collectively, quote, term

20  sheet, closed quote, closed parenthesis.

21          Did I read that correctly?

22    A.    Yes.

23    Q.    Do you know whether any such

24  agreements in fact were entered?

```
1           A.      No.

2           Q.      Do you know the terms of any

3    agreements between Purdue and Cardinal Health

4    that were in fact entered?

5           A.      Well, there are other marketing

6    agreement documents, as I recall, that are

7    elsewhere in the report.  And I think they're

8    Cardinal-Purdue documents.

9           Q.      Can you point me, sitting here

10   today, to the terms of any -- of any

11   distributor performance agreement between

12   Cardinal Health and Purdue?

13          A.      No.

14          Q.      Do you have any knowledge about

15   this agreement that I couldn't get by

16   performing the searches you performed and

17   reading the documents you read?

18          A.      No.

19                  MR. PODOLL:  All right.  Let's

20          go off the record.

21                  THE VIDEOGRAPHER:  Off the

22          record at 5:38.

23                  (Recess taken, 5:37 p.m. to

24          5:37 p.m.)
```

```
 1              MR. PODOLL:  I just want to

 2         make the record that we object to the

 3         amount of time allotted for this

 4         deposition.  So we can just note that

 5         on the stenographic record.

 6              THE WITNESS:  I just say,

 7         anyone's free to call me up anytime

 8         you want.  Ask me any questions you

 9         want.  Chat any time.

10              MR. PODOLL:  Appreciate it.

11              THE WITNESS:  My pleasure.

12              (Whereupon, Deposition Exhibit

13         Egilman 52, Opinion-Ohio Medicaid

14         depended on the PBMs for formulary

15         drug selection/handwritten notations

16         "had its own committee," was marked

17         for identification.)

18              (Recess taken, 5:39 p.m. to

19         5:40.

20              THE VIDEOGRAPHER:  We are back

21         on the record at 5:40:

22              MS. CONROY:  This is Jayne

23         Conroy.  We're going to be marking as

24         Exhibit 52, opinion B453, which was
```

1       corrected on the record by

2       Dr. Egilman.

3                       EXAMINATION

4   BY MS. FINGER:

5       Q.      Dr. Egilman, my name is Anna

6   Finger.  I'm at Locke Lord, and I represent

7   Henry Schein, Incorporated and Henry Schein

8   Medical Facility, Incorporated.  I'm going to

9   refer to them herein as Henry Schein or the

10  Henry Schein defendants.  Is that okay?

11      A.      Sure.

12      Q.      And so you had access to review

13  all documents produced by Henry Schein in

14  this litigation; correct?

15      A.      Right.  I think they came in

16  late, though.  So I didn't have that much

17  time on those documents.

18      Q.      Okay.  But you had access to

19  all of their documents; correct?

20      A.      Right.  At some point in time.

21      Q.      Okay.  And you do not list any

22  opinions in your report that specifically

23  mention Henry Schein; correct?

24      A.      Correct.

1    Q.    And Henry Schein is not

2    specifically identified as a member in what

3    you call "the venture"; correct?

4    A.    Correct.

5          MS. FINGER:  That's all I have.

6    I'll pass the witness.

7          THE WITNESS:  Great job.

8               EXAMINATION

9    BY MS. SAULINO:

10   Q.    Dr. Egilman, it's Jennifer

11   Saulino for McKesson again.  I'm back.

12   A.    Welcome back.

13   Q.    Thank you.

14         So first, because you've kindly

15   made this offer to us several times, I'd like

16   to ask you, on the record, whether you are

17   willing to sit for additional hours of the

18   deposition so that all of the defendants can

19   have sufficient time to explore your numerous

20   opinions.

21   A.    No.  Unless ordered by the

22   judge.

23   Q.    Okay.  So you are only willing

24   to talk by telephone with us?

```
1        A.      Or in person.

2        Q.      Or in person?

3        A.      If you want to buy me dinner,

4   I'd be glad to go to dinner with you.

5        Q.      Okay.

6        A.      Particularly if it's one of the

7   Italian restaurants in Federal Hill.  Or one

8   of my staff seems to like Chicken McNuggets,

9   but I have a more expensive palate than she

10  does.

11       Q.      Okay.  And --

12       A.      And yet I would be glad to talk

13  to you without.  And I don't drink, so that's

14  a cheap date in terms of alcohol.

15       Q.      Would it be all right if we

16  brought a court reporter to the dinner?

17       A.      I'd prefer not.

18       Q.      Okay.  But that's something we

19  could talk about, then?

20       A.      Correct.

21       Q.      So your objection is just to a

22  formal notice of deposition?  Is that --

23       A.      My objection is to a formal

24  proceeding that --
```

```
 1            I don't know if you know this

 2    or not, but I've been here for about 14 hours

 3    straight, and -- well, I've enjoyed myself.

 4    It is a little bit tiring and stressful.  And

 5    so I prefer a more informal setting and

 6    conversation and a back-and-forth.

 7            This involves a question and an

 8    answer, unidirectional and not a discussion.

 9            So I think discussions are

10    generally more fruitful in terms of figuring

11    out what really is going on, what my opinions

12    really are, et cetera.

13            But, you know, that's just --

14    that's my view about how things work.

15        Q.    You'd agree with me, Doctor,

16    wouldn't you, that we just haven't had

17    sufficient time to explore what's really

18    going on with your opinions and what your

19    opinions really are?

20        A.    No.

21            MS. CONROY:  Objection.

22            THE WITNESS:  I think you had

23        plenty of time to do that.  I don't

24        think you came quite prepared to do
```

Highly Confidential - Subject to Further Confidentiality Review

1       it, but you had plenty of time to do

2       it.

3              Q.     (BY MS. SAULINO)  You'd agree

4       with me that we have not discussed every

5       single one of your 490 opinions in the last

6       two days, have we?

7              A.     Not specifically, correct.

8              Q.     You'd also agree with me,

9       Doctor, that unless specifically referenced

10      in an opinion, you have not reviewed

11      deposition testimony for any particular

12      opinion, unless it's specifically referenced

13      in your -- in your report.

14             A.     No.

15             MS. CONROY:  Objection.

16             Q.     (BY MS. SAULINO)  You would

17      agree with me, however, that there's no way

18      for us to know what deposition testimony you

19      may have reviewed for any particular opinion

20      unless you cite it?

21             MS. CONROY:  Objection.

22             THE WITNESS:  No.

23             Q.     (BY MS. SAULINO)  There is a

24      way for us to know?

1      A.      Well, there was a way for you

2   to know.  It's called a depo notice.  The

3   depo notice could include a request for me to

4   give you a list of all the depositions I

5   reviewed.  You didn't do that.  So I didn't

6   bring the list of all of the depositions I

7   reviewed because you didn't ask for it.

8      Q.      Well, Doctor --

9      A.      I did bring lot of other

10   things, but I didn't bring that.

11      Q.      Dr. Egilman, in fact, in your

12   report you say that you reviewed all of the

13   depositions.

14      A.      No, I don't.  I say I reviewed

15   depositions.  I didn't say all of the

16   depositions.

17      Q.      Are you now agreeing to provide

18   a list of each deposition that you reviewed

19   with respect to each opinion?

20      A.      No.  I'm not agreeing to

21   anything.

22      Q.      Okay.  And you would agree --

23      A.      You asked a different question.

24   You asked if there was a way you could have

1    found out what depositions I reviewed before

2    the deposition.  And there was.  You could do

3    a notice of deposition.  You could make that

4    request, and I would have complied with that

5    request.

6                You didn't do that.

7    Q.      You would agree with me that

8    that is not anywhere listed in your report

9    except for particular opinions that do -- a

10   few particular opinions that do cite

11   depositions; right?

12   A.      The "no" there is depositions I

13   reviewed?  Correct.  The question is

14   ambiguous.  I just cleared it up in my

15   answer.

16   Q.      All right.  Dr. Egilman, just

17   so we're clear, on the record, you would

18   agree with me that there is nowhere in your

19   report where you have listed with respect to

20   any particular opinion that a deposition was

21   something that you reviewed for that opinion

22   except for the few opinions where you do cite

23   to a deposition.  Right?

24   A.      That's correct.

1    Q.    Okay.  And you would agree with

2    me, Dr. Egilman, that in none of your

3    individual opinions do you provide specific

4    information for that opinion about how you

5    retrieved the document or documents that you

6    list as support for that opinion; right?

7    A.    That's correct.  I didn't give

8    you the complete trail of iterative searches

9    for each document.

10    Q.    And you would agree with me,

11    that in none of your individual opinions do

12    you provide specific information about how

13    you determined what constituted the best

14    evidence for that particular opinion; right?

15    A.    Correct.  It's the best

16    evidence that I could find that supported the

17    opinion.

18    Q.    Okay.  Just so I make sure I

19    understand what you're saying, the evidence

20    that you provide in support of any particular

21    opinion is your best evidence for that

22    opinion?

23    A.    It's the best evidence --

24          Well, a lot of the opinions

1    relate to each other.  So the report has to

2    be taken as a -- as a package.  And we've

3    gone through this over the past two days, and

4    I --

5         Q.    I know.

6         A.    -- I've said this many times.

7    So there are opinions that relate to each

8    other that support each other.  So for any

9    particular opinion, there's other --

10   generally other opinions that support that

11   opinion.

12        Q.    And as you and I have discussed

13   previously, you didn't provide us any

14   cross-referencing for those opinions that

15   support each other; right?

16        A.    That's correct.  You'd have to

17   read the whole report.

18        Q.    And figure it out for

19   ourselves; right?

20             MS. CONROY:  Objection.

21             THE WITNESS:  Well, I think --

22        that's correct.  You would have to

23        read and understand the report.

24        Q.    (BY MS. SAULINO)  Okay.  But

1     you did not provide us with any documentation

2     about which opinions you believe support one

3     another; right?

4                    Would you like me to add the

5     word "specifically"?  Would that help?

6          A.      Yeah, sure.  If you add

7     "specific," I can give you an easier answer.

8          Q.      Okay.

9          A.      That's a yes.

10         Q.      Okay.

11         A.      Can we just take a quick break?

12         Q.      Sure.  We only have a couple of

13    minutes left.

14         A.      How many have you got?

15         Q.      Like five.

16         A.      Go ahead.

17         Q.      Okay.  I mean, if you need a

18    break, Doctor.

19         A.      I understand.  Go ahead.

20                 It was a smaller cup of coffee.

21         Q.      Okay.

22         A.      If it was another tall, okay?

23    But I can give you another five with a

24    smaller cup.

Highly Confidential -- Subject to Further Confidentiality Review

```
 1              Q.      Okay.  So, Doctor, in -- you

 2    recall that in 2013, you presented at an FDA

 3    public hearing on chronic opioid therapy?

 4              A.      I do.

 5              Q.      And that was an opportunity to

 6    reach doctors, scientists, FDA officials and

 7    even the public?

 8              A.      Well, some of them, yes.

 9              Q.      At no point during that

10    presentation did you sound the alarm about

11    the role of distributors or pharmacies in the

12    opioid epidemic, did you?

13              A.      That's correct.

14              Q.      You've also served as an expert

15    in litigation involving opioids; right?

16              A.      Correct.

17              Q.      You've written expert reports

18    and you've given depositions; right?

19              A.      Correct.

20              Q.      But until you were retained as

21    an expert in this case, you never offered an

22    opinion that any distributors' or pharmacies'

23    marketing led to the abuse or misuse of any

24    opioid medication; right?
```

 1     A.     Until I saw the documents that

 2   were produced in this litigation, correct.

 3     Q.     In 2006 you published a book

 4   chapter about anti-warnings that contained a

 5   discussion about opioids; right?

 6     A.     Correct.

 7     Q.     And you did not place any blame

 8   on any distributor or any pharmacy for what

 9   you called the opioid public health problem;

10   right?

11     A.     Correct.

12          MS. SAULINO:  So, Doctor, right

13       now I'd like to put on the record a

14       standing objection on behalf of all of

15       the defendants in this litigation,

16       that we were limited to 14 hours total

17       of time.  And while we did allocate

18       that time amongst ourselves, it was

19       not sufficient time for us

20       collectively to each sufficiently

21       explore all of your opinions, all 490

22       of your opinions in your report, plus

23       the additional bases that you've

24       provided to us over the last couple of

```
 1          days.

 2                And so on behalf of all

 3          defendants, we object to the time

 4          that's been allotted, and we'd like to

 5          keep this deposition open in order to

 6          have sufficient time to explore your

 7          opinions so that we can understand all

 8          of the many, many bases and your

 9          criteria for your opinions that you

10          yourself have admitted during this

11          deposition is not specifically listed

12          anywhere in your report.

13                THE WITNESS:  Is that a

14          question?

15                Was that a question?

16                MS. SAULINO:  No.  It was not.

17                Further, Dr. Egilman, we will

18          note for the record that you have

19          26 boxes behind you filled with

20          materials.  You came with additional

21          bases that you evidently created the

22          night before the deposition that are

23          stacked in front of us and are now

24          marked as Exhibit 28.  We were given
```

```
1        no notice of the additional bases and

2        opinions, unless and until we happened

3        upon them when we were asking

4        questions.

5             And so on behalf of all of the

6        defendants, I will also object to that

7        issue.

8             THE WITNESS:  Is that a

9        question for me?

10            MS. SAULINO:  No, it is not,

11       Dr. Egilman.

12            THE WITNESS:  So are we done,

13       then?

14            MS. SAULINO:  If you can give

15       me one moment, Dr. Egilman.

16            MS. FUMERTON:  Can we just mark

17       those boxes?

18            MS. SAULINO:  The court

19       reporter is going to kill us.

20            I do want to -- sorry, are we

21       back on the record?

22            I do want to confirm,

23       Dr. Egilman, that the box that we

24       marked as Exhibit 26 is the
```

Highly Confidential -- Subject to Further Confidentiality Review

```
 1          entirety -- plus Exhibit 28, which is

 2          the folders in front of you -- is the

 3          entirety of things that you have

 4          written notes on in order to bring to

 5          the deposition?

 6                  MS. CONROY:  It's the opposite.

 7          28, and then 26 are the folders here.

 8                  MS. SAULINO:  I apologize.

 9          Thank you for correcting that.

10                  But those two exhibits are all

11          of what you wrote notes on in order to

12          bring to this deposition?

13                  THE WITNESS:  No.  They were

14          all I wrote notes on.

15                  It had nothing to do with

16          bringing it to the deposition.  I

17          wrote notes on them, and I brought

18          them to the deposition because I

19          thought it would facilitate the

20          deposition.

21          Q.    (BY MS. SAULINO)  Did you bring

22     any --

23          A.    Make it go fast.

24          Q.    Did you bring anything else
```

1    that you thought would facilitate the

2    deposition that maybe you didn't write notes

3    on that we haven't marked as an exhibit?

4         A.    Yeah, the only thing you didn't

5    mark are the appendices to the Perry report.

6                Oh, and the J&J bad acts boxes.

7                And the books.  I brought

8    books.  You didn't mark the books.

9                MS. SAULINO:  All right.  With

10               all of that said, I have no more

11               questions today.

12               MS. CONROY:  We do --

13               plaintiffs' counsel, we do not agree

14               to keep this deposition open until

15               there is a court order that there

16               would be any additional time with

17               Dr. Egilman.

18               With respect to the boxes, that

19               was my law firm that brought the

20               copies of exhibits, and the documents

21               to Dr. Egilman's report.  And as far

22               as I could tell, counsel here for the

23               most part did not have copies of

24               either the report or the exhibits that

1    related to them.  They're all here,

2    and they were available for both the

3    doctor and for counsel.

4         MS. SAULINO:  Okay.  Just to

5    correct the record on that, we did

6    mark, actually, at the very beginning

7    of the first day, binders with all of

8    his opinions and the support that we

9    had been given, at least, but those

10   were a little unwieldy.  You had your

11   staff back there, and so we took him

12   up on the offer to hand the exhibits

13   to him.  But we did have them.

14        THE WITNESS:  Excuse me.  Just

15   not to interrupt this, and I know I'm

16   enjoying it, but can we go off the

17   video record?  I think I'm done.

18   Right?

19        MS. CONROY:  I'm just about

20   done.

21        THE WITNESS:  The time is up.

22        MS. CONROY:  It did not have

23   the full documents.  It just had

24   the -- it did not have the full Bates

```
1         documents printed in those notebooks.
2              MS. SAULINO:  And Dr. Egilman
3         did not provide any indication in his
4         report that those were -- those full
5         Bates documents that were simply cited
6         under the opinions were intended to be
7         considered a part of his report as he
8         defined for me later yesterday.
9              MS. CONROY:  I think it's quite
10        clear that that's not true.
11             THE WITNESS:  Okay.  So I --
12        we're done time-wise, right?
13             MS. SAULINO:  Do you have any
14        questions, Ms. Conroy?
15             THE WITNESS:  We're over 14
16        hours.
17             MS. SAULINO:  Ms. Conroy, do
18        you have any questions?
19             MS. CONROY:  I have no
20        questions.
21             MS. SAULINO:  If she has
22        questions, then she's allowed to use
23        more time.
24             THE WITNESS:  I know.  That's
```

```
 1          why I asked.

 2               THE VIDEOGRAPHER:  That

 3       concludes today's deposition.  The

 4       time is 5:56 p.m.

 5               (Proceedings recessed at

 6       5:56 p.m.)

 7                    --o0o--

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2           I, DEBRA A. DIBBLE, Registered
      Diplomate Reporter, Certified Realtime
 3    Reporter, Certified Realtime Captioner,
      Certified Court Reporter and Notary Public,
 4    do hereby certify that prior to the
      commencement of the examination, DAVID S.
 5    EGILMAN, M.D., MPH was duly sworn by me to
      testify to the truth, the whole truth and
 6    nothing but the truth.
 7           I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
             I DO FURTHER CERTIFY that pursuant
11    to FRCP Rule 30, signature of the witness was
      not requested by the witness or other party
12    before the conclusion of the deposition.
13           I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
14    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
15    employee of such attorney or counsel, and
      that I am not financially interested in the
16    action.
17
18
19    _____
      DEBRA A. DIBBLE, RDR, CRR, CRC
20    NCRA Registered Diplomate Reporter
      NCRA Certified Realtime Reporter
21    Certified Court Reporter
22
      Dated: 1 May 2019
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3           Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8               After doing so, please sign the

 9    errata sheet and date it.

10               You are signing same subject to

11    the changes you have noted on the errata

12    sheet, which will be attached to your

13    deposition.

14               It is imperative that you return

15    the original errata sheet to the deposing

16    attorney within thirty (30) days of receipt

17    of the deposition transcript by you.  If you

18    fail to do so, the deposition transcript may

19    be deemed to be accurate and may be used in

20    court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          ERRATA

 2     PAGE   LINE   CHANGE

 3     _____  _____  _____

 4            REASON: _____

 5     _____  _____  _____

 6            REASON: _____

 7     _____  _____  _____

 8            REASON: _____

 9     _____  _____  _____

10            REASON: _____

11     _____  _____  _____

12            REASON: _____

13     _____  _____  _____

14            REASON: _____

15     _____  _____  _____

16            REASON: _____

17     _____  _____  _____

18            REASON: _____

19     _____  _____  _____

20            REASON: _____

21     _____  _____  _____

22            REASON: _____

23     _____  _____  _____

24            REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4              I, DAVID S. EGILMAN, MD, MPH, do
        hereby certify that I have read the foregoing
 5      pages and that the same is a correct
        transcription of the answers given by me to
 6      the questions therein propounded, except for
        the corrections or changes in form or
 7      substance, if any, noted in the attached
        Errata Sheet.

 8

 9

10

11

12      _____
         DAVID S. EGILMAN, M.D., MPH          DATE
13

14

15      Subscribed and sworn to before me this

16      _____ day of _____, 20 _____.

17      My commission expires: _____

18

19      _____
20      Notary Public

21

22

23

24
```

```
 1                        LAWYER'S NOTES

 2

 3      PAGE      LINE

 4      _____     _____     _____

 5      _____     _____     _____

 6      _____     _____     _____

 7      _____     _____     _____

 8      _____     _____     _____

 9      _____     _____     _____

10      _____     _____     _____

11      _____     _____     _____

12      _____     _____     _____

13      _____     _____     _____

14      _____     _____     _____

15      _____     _____     _____

16      _____     _____     _____

17      _____     _____     _____

18      _____     _____     _____

19      _____     _____     _____

20      _____     _____     _____

21      _____     _____     _____

22      _____     _____     _____

23      _____     _____     _____

24      _____     _____     _____
```