Highly Confidential - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION


IN RE:  NATIONAL PRESCRIPTION )

OPIATE LITIGATION            ) MDL NO. 2804

-----------------------------) HON. DAN A. POLSTER

THIS DOCUMENT RELATES TO      ) Case No. 1:17-md-2804

ALL CASES                    )

-----------------------------)


HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW


        The videotaped 30(b)(6) deposition of H.D.

SMITH by and through GEORGE EUSON, called for

examination, taken pursuant to the Federal Rules of

Civil Procedure of the United States District Courts

pertaining to the taking of depositions, taken before

JULIANA F. ZAJICEK, a Registered Professional Reporter

and a Certified Shorthand Reporter, at the offices of

Brown, Hay & Stephens, LLP, Suite 800, 205 South Fifth

Street, Springfield, Illinois, on November 27, 2018,

at 9:13 a.m.

Highly Confidential - Subject to Further Confidentiality Review

## Page 2

```
 1    PRESENT:
 2    ON BEHALF OF THE PLAINTIFFS:
 3      MORGAN & MORGAN
          76 South Laura Street, Suite 1100
 4        Jacksonville, Florida 32202
          904-361-0012
 5      BY:  JAMES D  YOUNG, ESQ
          jyoung@forthepeople com;
 6        RENEE COOK, ESQ
          rcook@forthepeople com;
 7
          -and-
 8
        MORGAN & MORGAN
 9        201 North Franklin Street
          Tampa Florida 33602
10        813-679-9217
          JUAN MARTINEZ, ESQ
11        juanmartinez@forthepeople com
12
      ON BEHALF OF THE H D  SMITH ENTITIES:
13
        BARNES & THORNBURG LLP
14        11 South Meridian Street
          Indianapolis, Indiana 46204
15        317-231-7501
      BY:  WILLIAM E  PADGETT, ESQ
16        william padgett@btlaw com;
          WILLIAM J  LEEDER, III, ESQ
17        bill leeder@btlaw com
18
      ON BEHALF OF AMERISOURCEBERGEN CORPORATION AND
19    AMERISOURCEBERGEN DRUG CORPORATION:
        REED SMITH LLP
20        10 South Wacker Drive, 40th Floor
          Chicago, Illinois 60606-7502
21        312-207-2834
      BY:  M  PATRICK YINGLING, ESQ
22        mpyingling@reedsmith com
23
24
```

## Page 3

```
 1    PRESENT: (Continued)
 2    ON BEHALF OF MALLINCKRODT LLC AND SPECGX LLC:
 3      ROPES & GRAY LLP
          1211 Avenue of the Americas
 4        New York, NY 10036-8704
          212-596-9451
 5      BY:  HAYDEN MILLER, ESQ  (Telephonically)
          hayden miller@ropesgray com
 6
 7    ON BEHALF OF CARDINAL HEALTH, INC :
 8      WILLIAMS & CONNOLLY LLP
          725 Twelfth Street, N W
 9        Washington, D C  20005
          202-434-5000
10      BY:  ANDREW C  McBRIDE, ESQ
          amcbride@wc com
11
12    ON BEHALF OF PRESCRIPTION SUPPLY, INC :
13      PELINI CAMPBELL & WILLIAMS LLC
          8040 Cleveland Avenue NW, Suite 400
14        North Canton, Ohio 44720
          330-305-6400
15      BY:  KRISTEN E  CAMPBELL, ESQ  (Telephonically)
          kec@pelini-law com
16
17    ON BEHALF OF McKESSON:
18      COVINGTON & BURLING, LLP
          850 Tenth Street, NW
19        Washington, D C  20001
          202-662-5531
20      BY:  MEGHAN MONAGHAN, ESQ  (Telephonically)
          mmonaghan@cov com
21
22
23
24
```

## Page 4

```
 1    PRESENT: (Continued)
 2    ON BEHALF OF WALMART INC :
 3      JONES DAY
          77 West Wacker Drive
 4        Chicago, Illinois 60601-1692
          312-269-4164
 5      BY:  NICOLE LANGSTON, ESQ  (Telephonically)
          nlangston@jonesday com
 6
 7    ON BEHALF OF HBC SERVICES:
 8      MARCUS & SHAPIRA LLP
          One Oxford Centre, 35th Floor
 9        Pittsburgh, Pennsylvania 15219
          412-471-3490
10      BY:  PAUL M  MANNIX, ESQ  (Telephonically)
          pmannix@marcus-shapira com
11
12
13
14    THE VIDEOGRAPHER:
15      MR  ANTHONY MICHELETTO,
        Golkow Litigation Services
16
17
18
19
20    REPORTED BY:  JULIANA F  ZAJICEK, C S R  NO  84-2604
21
22
23
24
```

## Page 5

```
 1              I N D E X
 2    WITNESS:               PAGE:
 3    GEORGE EUSON
 4      EXAM BY MR  YOUNG          13
 5
 6              *****
 7
 8      PREVIOUSLY MARKED EXHIBITS
 9    EXHIBIT         FIRST TIME REFERRED TO
10    HDS-EUSON-A    Amended First Notice of     17
        Deposition Pursuant to Rule
11      30(b)(6) and Document
        Request Pursuant to Rule
12      30(b)(2) and Rule 34 to
        Defendant Miami-Luken, Inc
13
14    HDS-EUSON-B    Amended Second Notice of    17
        Deposition Pursuant to Rule
15      30(b)(6) and Document
        Request Pursuant to Rule
16      30(b)(2) and Rule 34 to
        Defendant H S  Smith, LLC,
17      d/b/a HD Smith
18    HDS-EUSON-001  Schedule II Controlled      18
        Substances Definition;
19      HDS_Euson_00001 - 003
20    HDS-EUSON-002  Controlled Substances Act,  28
        Title 21 USC Section
21      823(b)(1) - (b)(5);
        HDS_Euson_00004 - 012
22    HDS-EUSON-003  Security Requirements for   39
        Controlled Substances, Title
23      21 CFR Section 1301 71(a);
        HDS_Euson_00013 - 014
24
```

Highly Confidential - Subject to Further Confidentiality Review

## Page 6

| | |
|---|---|
| 1 | PREVIOUSLY MARKED EXHIBITS (Continued) |
| 2 | EXHIBIT                    FIRST TIME REFERRED TO |
| 3 | HDS-EUSON-004  Security Requirements for    45 |
| | Controlled Substances, Title |
| 4 | 21 CFR Section 1301 74(b); |
| | HDS_Euson 00015 -016 |
| 5 | |
| 6 | HDS-EUSON-005  Letter from Joseph        64 |
| | Rannazzisi dated 9/27/06; |
| | HDS_Euson_00017 - 020 |
| 7 | |
| 8 | HDS-EUSON-007  Report of Investigation by  106 |
| | the DEA for H D  Smith |
| 9 | excessive purchases by |
| | Paragould Pharmacy, Semo |
| 10 | Drugs of Kennett, SafeScript |
| | Pharmacy, and Max Care |
| 11 | Pharmacy for March 2006; |
| | HDS_Euson_00023 - 025 |
| 12 | HDS-EUSON-008  Report of Investigation by  107 |
| | the DEA for H D  Smith |
| 13 | excessive purchases by |
| | Paragould Pharmacy, |
| 14 | SafeScript Pharmacy, Semo |
| | Drugs of Kennett, and Semo |
| 15 | Drugs/Senath for April 2006; |
| | HDS_Euson_00026 - 028 |
| 16 | |
| 17 | HDS-EUSON-014  October 5, 2005 e-mail from  111 |
| | Danny Avila to Angelo |
| 18 | Grande, Dale Smith and Chris |
| | Smith; HDS_Euson_00059 |
| 19 | HDS-EUSON-015  Controlled Substance     118 |
| 20 | Monitoring policy, signed by |
| | Dale Smith; |
| 21 | HDS_Euson_00060 - 061 |
| 22 | HDS-EUSON-017  E-mail from sales         181 |
| | representative Brandon |
| 23 | Salyer to P J  Little dated |
| | 4-20-09 - $3 million |
| 24 | account; Hydro 15x; |
| | HDS_Euson_00063 - 066 |

## Page 7

| | |
|---|---|
| 1 | PREVIOUSLY MARKED EXHIBITS (Continued) |
| 2 | EXHIBIT                    FIRST TIME REFERRED TO |
| 3 | HDS-EUSON-018  Draft summary of the HDMA,   192 |
| | DEA Meeting held on Oct 16 |
| 4 | and 17, 1007; |
| | HDS_Euson_00067 - 071 |
| 5 | |
| 6 | HDS-EUSON-019  October 22, 2007 letter from  191 |
| | George Euson to Kyle Wright |
| 7 | at the DEA; |
| | HDS_MDL_00036303 - 304 |
| 8 | HDS-EUSON-021  DEA Chemical Handler's    148 |
| | Manual dated June 2002; |
| 9 | HDS_Euson_00078 - 079 |
| 10 | HDS-EUSON-022  HDMA Industry Compliance   158 |
| | Guidelines for reporting |
| 11 | suspicious orders and |
| | preventing diversion of |
| 12 | controlled substances; |
| | HDS_Euson_00080 - 092 |
| 13 | |
| 14 | HDS-EUSON-023  AmerisourceBergen e-mail    197 |
| | George Euson sent to Scott |
| 15 | Garriott dated 7-9-07; |
| | HDS_Euson_00093 - 095 |
| 16 | HDS-EUSON-024  Brief Overview of H D      201 |
| 17 | Smith's Controlled Substance |
| | Order Monitoring Program or |
| 18 | CSOMP; HDS_Euson_00096 - 101 |
| 19 | HDS-EUSON-025  CSOMP Division Procedures   207 |
| | dated March 22, 2008, |
| 20 | revised May 7, 2008; |
| | HDS_Euson_00102 - 109 |
| 21 | HDS-EUSON-026  CSOMP Divisional Policy    212 |
| | dated May 7, 2008; |
| 22 | HDS_Euson_00110 - 118 |
| 23 | |
| 24 | |

## Page 8

| | |
|---|---|
| 1 | PREVIOUSLY MARKED EXHIBITS (Continued) |
| 2 | EXHIBIT                    FIRST TIME REFERRED TO |
| 3 | HDS-EUSON-027  E-mail chain from Operations  215 |
| | Manager, Dan Howard, and |
| 4 | corporate compliance on |
| | April 29, 2010; |
| 5 | HDS_Euson_00119 - 122 |
| 6 | HDS-EUSON-028  E-mail from George Euson    218 |
| | dated May 7, 2008 re: |
| 7 | Adjustments made to Keller's |
| | URLs based on division |
| 8 | recommendations, Oxy URL 12x |
| | the average; |
| 9 | HDS_Euson_00123 - 124 |
| 10 | HDS-EUSON-030  SOP Due Diligence and SOM   229 |
| | dated November 2008; |
| 11 | HDS_Euson_00126 - 129 |
| 12 | HDS-EUSON-033  H D  Smith's Compliance    238 |
| | Training dated 4/28/11 at |
| 13 | the New Hampshire |
| | Distribution Center; |
| 14 | HDS_Euson_00133 - 137 |
| 15 | HDS-EUSON-034  September 6, 2012 -       251 |
| | Prescription Drug Fraud and |
| 16 | Abuse - Sales Training by |
| | George Euson and Debbie |
| 17 | Komoroski Regional |
| | Compliance Manager; |
| 18 | HDS_Euson_00138 - 143 |
| 19 | HDS-EUSON-035  April 27, 2010 letter from   240 |
| | George Euson to the DEA re |
| 20 | their meeting on Friday, |
| | April 23, 2010; |
| 21 | HDS_Euson_00144 - 146 |
| 22 | HDS-EUSON-036  Unsigned Memorandum of     256 |
| | Understanding between the |
| 23 | DEA and H D  Smith; |
| | HDS_Euson_00147 - 152 |
| 24 | |

## Page 9

| | |
|---|---|
| 1 | PREVIOUSLY MARKED EXHIBITS (Continued) |
| 2 | EXHIBIT                    FIRST TIME REFERRED TO |
| 3 | HDS-EUSON-037  December 5, 2006, scheduled  258 |
| | DEA regulatory investigation |
| 4 | at H D  Smith; |
| | HDS_Euson_00153 - 176 |
| 5 | |
| 6 | HDS-EUSON-038  Compliance audit dated     263 |
| | January 5, 2010; |
| 7 | HDS_Euson_00177 - 182 |
| 8 | HDS-EUSON-039  SOM audit - summary report   271 |
| | dated March 29, 2012 between |
| 9 | H D  Smith and Mallinckrodt; |
| | HDS_Euson_00183 - 184 |
| 10 | HDS-EUSON-041  Letter to H D  Smith from   278 |
| | DEA dated 11/21/14 - TX; |
| 11 | HDS_Euson_00197 - 198 |
| 12 | HDS-EUSON-042  CSOMP improvement Project   287 |
| | initiation form request date |
| 13 | 5-6-15; HDS_Euson_00199 |
| 14 | HDS-EUSON-043  March 23, 2015 e-mail to    293 |
| | Tracey Hernandez re: CSOMP |
| 15 | Fixes and Modifications |
| | Required; |
| 16 | HDS_Euson_00200 - 204 |
| 17 | HDS-EUSON-046  HDMA's Amicus Brief in      299 |
| | support of Cardinal Health |
| 18 | dated May 9, 2012; |
| | HDS_Euson_00214 - 279 |
| 19 | |
| 20 | HDS-EUSON-054  Mallinckrodt and H D        309 |
| | Smith - Confidentiality and |
| 21 | Restricted Use Agreement; |
| | HDS_Euson_00306 - 312 |
| 22 | |
| 23 | |
| 24 | |

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
 1        PREVIOUSLY MARKED EXHIBITS (Continued)
 2  EXHIBIT           FIRST TIME REFERRED TO
 3  HDS-EUSON-055  E-mail dated September 7,    313
            2017, from Teva to H.D.
 4          Smith requesting information
            from 3 of H.D. Smith's
 5          customers - unable to
            release Oxy;
 6          HDS_Euson_00313 - 317
 7  HDS-EUSON-057  Profit Sharing of Fentanyl   321
            between Actavis and H.D.
 8          Smith; HDS_Euson_00668 - 673
 9  HDS-EUSON-058  E-mail dated April 19, 2006  323
            to George Euson from
10          Diversion Investigator Lynda
            Eleazer re: Budget Drug &
11          Wellness Center's Suspended
            DEA Numbers;
12          HDS_Euson_00674 - 675
13  HDS-EUSON-060  US Court of Appeals Opinion  325
            re: Masters vs. DEA, Decided
14          June 30, 2017;
            HDS_Euson_00685 - 722
15
16
17
18
19
20
21
22
23
24
```

Page 12

```
 1       MR  PADGETT:  Bill Padgett on behalf of
 2  H D  Smith and George Euson to the extent it wades
 3  into individual questions
 4       THE COURT REPORTER:  If there is anyone on the
 5  phone, would you please introduce yourselves
 6       MR  MILLER:  Well, yeah, Hayden Miller from
 7  Ropes & Gray on behalf of Mallinckrodt and SpecGx
 8       MS  LANGSTON:  Nicole Langston from Jones Day on
 9  behalf of Walmart
10       MR  MANNIX:  Paul Mannix on behalf of HBC
11  Services
12       MS  MONAGHAN:  Meghan Monaghan from Covington on
13  behalf of McKesson
14       MS  CAMPBELL:  Kristen Campbell for Prescription
15  Supply, Inc
16       THE VIDEOGRAPHER:  Our witness today is George
17  Euson  Our court reporter is Juliana Zajicek  Please
18  swear in the witness
19           (WHEREUPON, the witness was duly
20            sworn )
21          GEORGE EUSON,
22  called as a witness herein, having been first duly
23  sworn, was examined and testified as follows:
24          EXAMINATION
```

Page 11

```
 1       THE VIDEOGRAPHER:  We are now on the record.  My
 2  name is Anthony Micheletto.  I am a videographer for
 3  Golkow Litigation Services.
 4       Today's date is November 27th, 2018.  The
 5  time is 9:13 a.m. as indicated on the video screen.
 6       This video deposition is being held in
 7  Springfield, Illinois in the matter of In Re National
 8  Prescription Opiate Litigation, MDL 2804, in the
 9  United States District Court for the Northern District
10  of Ohio, Eastern Division.
11       Will counsel please identify themselves
12  for the video record.
13       MR. YOUNG:  James Young on behalf of the
14  Plaintiffs.
15       MS. COOK:  Renee Cook on behalf of the
16  Plaintiffs.
17       MR. MARTINEZ:  Juan Martinez on behalf of the
18  Plaintiffs.
19       MR. McBRIDE:  Andrew McBride on behalf of
20  Cardinal.
21       MR. YINGLING:  Patrick Yingling for
22  AmerisourceBergen.
23       MR. LEEDER:  Bill Leeder on behalf of
24  H.D. Smith.
```

Page 13

```
 1  BY MR. YOUNG:
 2       Q.  Good morning, Mr. Euson.  My name is James
 3  Young and I am here on behalf of the Plaintiffs in the
 4  national opioid litigation, as the videographer just
 5  relayed.
 6       Can you state and spell your last name for
 7  the record?
 8       A.  Yes.  It is Euson, E-u-s-o-n.
 9       Q.  And you're appearing here today as the
10  corporate designee for H.D. Smith LLC, is that
11  correct?
12       A.  Correct.
13       Q.  And you're familiar with Rule 30(b)(6)?
14       A.  I am.
15       Q.  You've appeared as a corporate designee
16  under Rule 30(b)(6) for H.D. Smith in previous
17  litigation?
18       A.  I have.
19       Q.  How many occasions did you testify as the
20  30(b)(6) witness for H.D. Smith previously?
21       A.  Twice, I believe.
22       Q.  I'm going to just go through a few basic
23  rules just to -- I -- I know you've been deposed
24  several times.  I just want to make sure that you're
```

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    up to snuff on -- on how this will go.  We'll try not
2    to speak over each other.  I know from reading your
3    prior transcripts that's not really an issue with you.
4           You want to give your counsel and any
5    other counsel appearing here today a chance to make an
6    objection, though unless they specifically instruct
7    you not to answer, you should proceed with answering
8    the question that's asked.
9           This is videotaped, as you can see by the
10   cameras around.  You are certainly welcome to make any
11   facial gestures and nod or shrug your shoulders, but
12   we'd ask that you always give a verbal response to
13   every question.  There may come times when I ask a
14   question that doesn't make sense, that my wife reminds
15   me about all of the time.  I'll try to rephrase it in
16   a way that makes sense for you, just let me know you
17   don't understand the question and I'm certainly try to
18   rephrase it in a way that -- that helps you get to an
19   answer.
20          If you don't know the answer to a
21   question, let me know that as well and we'll try to
22   identify through your testimony the correct person who
23   is in a position to answer that for H.D. Smith.
24          And -- and finally, if -- if you need a

Page 15

1    break at any time, you know, bathroom break or water
2    or collect your thoughts or you want to talk to
3    counsel, just let us know and we'll try to facilitate
4    that as quickly as possible.
5           Tomorrow we are scheduled to take your
6    deposition on an individual basis as a fact witness.
7    So today I'd ask you to frame your answers on behalf
8    of H.D. Smith.  In essence, you are H.D. Smith today.
9           There may come times in these questions
10   where we are going to seek testimony of George Euson
11   the individual to color some of the background of your
12   answers, so I know that's -- that can be a bit
13   confusing.  I'm going to try my best to make it clear
14   that we are seeking H.D. Smith testimony today and
15   tomorrow will be George Euson testimony.
16          Any questions before we dig in?
17   A.   No.
18   Q.   Okay.  You have seen, I assume, the
19   Amended First and Amended Second 30(B)(6) Notices of
20   Deposition before today?
21   A.   I have.
22   Q.   And you're prepared today to answer
23   questions, I think all of the questions -- or -- or
24   subjects that were framed in the Amended First Notice

Page 16

1    of Deposition, is that correct?
2        MR. PADGETT:  A through N?
3        MR. YOUNG:  Yes, A through N.
4    BY THE WITNESS:
5    A.   Yes.
6    BY MR. YOUNG:
7    Q.   And in the Amended Second Notice you are
8    prepared or your -- your -- your counsel has agreed to
9    answer certain of those questions in writing, and
10   you're here today to answer a subset of those
11   questions.  And I have those designated as 5, 6, 7,
12   10, 11, 12, 15 through 21.
13         Is that your recollection as well?
14       MR. PADGETT:  He'd -- he'd have to see them.
15       THE WITNESS:  Yeah.
16   BY MR. YOUNG:
17   Q.   And that was -- that was going to be the
18   next step I'm going to -- I'm going to hand you a
19   copy of the Amended Second Notice of Deposition, if
20   you can just take a look at that.  And see if that
21   refreshes your recollection about what you are
22   prepared to --
23       THE WITNESS:  What's the topic?
24       MR. PADGETT:  5, 6, 7, 10, 11, 12.

Page 17

1        THE WITNESS:  Is that 15?
2        On this?  These here?
3        MR. PADGETT:  Um-hum.
4    BY THE WITNESS:
5    A.   Okay.
6    BY MR. YOUNG:
7    Q.   Okay.  And I'm going to hand you also just
8    a copy of the Amended -- you can keep that one.
9    A.   Okay.
10   Q.   This is the Amended First Notice.  This is
11   the A through N that you are prepared to testify on.
12          And we had premarked -- we are going to go
13   through a number of documents today.  We have
14   premarked them and numbered them as exhibits that go
15   in seq -- sequential order and we overlooked these two
16   documents in that numbering, so we've asked the court
17   reporter to number and attach these as an exhibit to
18   this deposition calling these Exhibits A and B, but
19   all other exhibits are going to be referred to in
20   numerical sequence from 1 through 60.
21          So just -- just so you know, when I refer
22   to an exhibit, and I'll -- I'll either hand you a
23   document or -- or refer to one that's in front of you,
24   it will be Euson Exhibit 001, I'll just call it

5 (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  Exhibit 1.
2      A.  Okay.
3      Q.  Okay.  So, before we jump into the
4  documents, I just want to touch briefly on your
5  background, just to understand a little bit how you
6  got to H.D. Smith and what puts you in the position to
7  answer as the corporate designee under Rule 30(b)(6).
8          Did you happen to bring a copy of your CV
9  or resume with you today?
10     A.  I did not.
11     Q.  Is that something -- and -- and -- and
12  maybe this is better asked of counsel.
13     MR. YOUNG:  Is that something that has been
14  previously introduced in -- in discovery?  Do we have
15  a copy of his --
16     MR. PADGETT:  I don't think it's been requested.
17     MR. LEEDER:  Yeah, I don't think it's been
18  requested, but the answer is no, we haven't produced
19  it.
20  BY MR. YOUNG:
21     Q.  Okay.
22         So it's my understanding that you actually
23  have a few different time periods where you were with
24  H.D. Smith and then you left and went and did

Page 19

1  something else.
2          Could you just ex -- explain for us how
3  you came to H.D. Smith and when you left, which
4  periods of time?
5      A.  I came to H.D. Smith in -- in November
6  of 2005.  Prior to that I worked about four years as
7  director of security and compliance for a company
8  called D&K Healthcare in St. Louis.  And in '05 they
9  were purchased by McKesson Corporation.
10         I then went to work for H.D. Smith as
11  director of security and compliance.  I was there from
12  November 2005 to end of May 2008.  And then I went
13  into a private business, family business, until
14  April 2009.  I came back to H.D. Smith.
15         Just to clarify, during that time that I
16  was gone, I was under a consulting contract with
17  H.D. Smith.  So I left but I was still involved with
18  H.D. Smith.
19         I worked at H.D. Smith from April of 2009
20  until October of 2013.  I then left for another
21  business within the industry called Pro Compliance.  I
22  worked there for about a year and then I started my
23  own consulting company in the pharmaceutical area.
24         Also during that time when I was -- when I

Page 20

1  was gone from H.D. Smith I was under a consulting
2  contract also.  And then I went back to H.D. Smith in
3  May of 2016 to present.
4      Q.  And you are currently employed by
5  H.D. Smith LLC?
6      A.  I am.
7      Q.  And what is the title that you hold at
8  H.D. Smith?
9      A.  Vice president of corporate compliance and
10  security.
11     Q.  Is that the title that you held prior to
12  your most recent departure?
13     A.  The first time and second time I was
14  director of -- of corporate compliance and security.
15     Q.  Did your job duties change with this new
16  title?
17     A.  Not necessarily.
18     Q.  It was just a promotion?
19     A.  Promotion, yeah.
20     Q.  What are your current duties for
21  H.D. Smith as the vice president of compliance?
22     A.  I oversee all -- all compliance as far as
23  related to due diligence, our order monitoring
24  program.  I also oversee our licensing, which is all

Page 21

1  of our facility licensing, accreditation, such as VAWD
2  accreditations throughout all of our facilities.
3          One of the people that work for me also is
4  in charge of recalls.  We do ARCOS reporting for the
5  company.  And then we also complete all of the -- if
6  we get subpoenas or requests for information in from
7  either industry or government, I have people that work
8  for me that -- that put that information together.
9          And then we also do -- we are also in
10  charge of internal compliance at our facilities.  So
11  we -- we are in charge of doing audits of our
12  facilities to make sure that they are in compliance
13  either with DEA, OSHA, FDA requirements, such as that.
14         So pretty much anything -- and -- and then
15  physical security of all of our facilities.
16     Q.  Is it fair to say that you are the most
17  senior person at H.D. Smith with compliance
18  responsibilities?
19     A.  Yes.
20     Q.  Who do you report to?
21     A.  Right now I report to David May at
22  AmerisourceBergen.  He is the vice president of
23  diversion control.  Previously I had reported to Tom
24  Twitty who was the senior vice president at

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  H.D. Smith.
2     Q.  Is Tom Twitty still with H.D. Smith?
3     A.  Yes.
4     Q.  Is he in a compliance capacity?
5     A.  Not necessarily.  He is mostly operations,
6  limited regulatory, compliance responsibilities.  I
7  just reported to him.
8     Q.  Okay.  And, but you would -- you're --
9  you're of the belief that you have more background
10 information about compliance as it pertains to
11 H.D. Smith than Tom Twitty?
12    A.  Yes.
13    Q.  Okay.  You mentioned Pro Compliance.
14        Is Pro Compliance a -- a contractor or a
15 vendor for H.D. Smith?
16    A.  It is.
17    Q.  And at some point you went and worked for
18 Pro Compliance.
19        Did you ever consider that to be a
20 potential conflict --
21    A.  No.
22    Q.  -- between Pro Compliance and H.D. Smith?
23        MR. PADGETT:  Object to form.
24        He answered.

Page 23

1  BY MR. YOUNG:
2     Q.  I'm sorry.  Was it?
3     A.  No, it was not.
4     Q.  Was the acquisition of H.D. Smith by
5  Amerisource, do you -- and I -- I think you mentioned
6  that you now report to an Amerisource employee.
7        Do you know whether or not you are going
8  to maintain your position as vice president of
9  compliance at H.D. Smith?
10        Has anyone mentioned that -- that to you?
11    A.  Not right now.  The -- I'm retained until
12 August 2nd of 2019 in that capacity.
13    Q.  And -- and what will happen after
14 August 2nd?
15    A.  I don't know.
16    Q.  Okay.  Okay.  Fair enough.
17        So H.D. Smith is in the business of
18 distributing pharmaceutical products.  Is that fair
19 and accurate?
20    A.  Pharmaceutical products, OTC, health and
21 beauty, pretty much anything you would find in a
22 pharmacy.
23    Q.  Is H.D. Smith LLC in any other type of
24 businesses beyond the distribution of pharmaceuticals

Page 24

1  and OTC and the other products you just mentioned?
2     A.  No.
3     Q.  And --
4     A.  We -- caveat that.  I mean, there --
5  we've -- there are some ancillary businesses.  I think
6  they did a little bit of packaging.  There was a
7  specialty division that they had, a third-party
8  network that was part of the company that no longer
9  is.
10    Q.  So the current iteration of H.D. Smith LLC
11 is only in the distribution business?
12    A.  Yes, sir.
13    Q.  Okay.  What type of pharmaceutical
14 products does H.D. Smith distribute, just -- just
15 generally?  I know that there is a vast array of
16 products that are out there.  If you could just
17 briefly describe.
18    A.  Pretty much most of the brand or generic
19 pharmaceutical products that are in the market,
20 including controlled substances and non-controlled
21 substances.
22    Q.  Is there --
23    A.  Full line wholesaler, full line.
24    Q.  Sorry.

Page 25

1     A.  I'm sorry.  I didn't mean to walk over
2  you.
3     Q.  I think I did it to you.  Apologies.
4        Is there any type of regulation over these
5  products, government regulation?
6     A.  Which products are you talking about?
7     Q.  Pharmaceutical products.
8     A.  Yes.
9     Q.  What type of regulations exist for these
10 products?
11        MR. PADGETT:  Object to form.
12 BY THE WITNESS:
13    A.  Can you be a little bit more specific,
14 because there is a lot of them?
15 BY MR. YOUNG:
16    Q.  Sure.
17        So, let's begin with schedules of
18 pharmaceutical products.
19        Does H.D. Smith distribute any Schedule II
20 pharmaceutical products?
21    A.  Yes.
22    Q.  Are there particular regulations that
23 apply to Schedule II pharmaceutical products?
24    A.  There is a lot of different regulations as

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    far as storage, security, you know, from -- from
2    receiving to -- to distribution.
3        Q.   And -- and which are the entities that
4    regulate Schedule II pharmaceutical products?
5        A.   DEA and FDA.
6        Q.   Are there any state entities that
7    specifically regulate Schedule IIs?
8        A.   There are state regulations that -- that
9    touch on the requirements for -- for scheduled drugs.
10   DEA is the main regula- -- regulatory agency that
11   controls Schedule IIs.
12       Q.   I'm going to show you a document that
13   is -- been premarked as Euson Deposition Exhibit 1,
14   0001.
15           I'm going to give you a little bit of
16   time.
17       A.   Is there something you specifically wanted
18   me to look at?
19       Q.   I was going to give you some time to take
20   a look at it.
21       A.   Oh, okay.
22       Q.   Are you familiar with the information
23   contained in Exhibit 1?
24       A.   Yes.

Page 27

1        Q.   On Page 2 of Exhibit 1, there is a
2    definition of controlled substances that has been
3    pre-highlighted on the copy that you have.
4            Can you read that into the record for us?
5        A.   "Schedule II/IIN Controlled Substances
6    (2/2N): Substances in this schedule have a high
7    potential for abuse which may lead to severe
8    psychological or physical dependence.  Examples of
9    Schedule II narcotics include:  hydromorphone
10   (Dilaudid), methadone, meperidine, oxycodone
11   (Percocet) and fentanyl.  Other Schedule II narcotics
12   include:  morphine, opium, codeine and hydrocodone.
13   Examples of IIN stimulants include" -- do you want me
14   to read that or just that?
15       Q.   That's fine.  Thank you.  Just the
16   highlighted portion.
17       A.   All right.
18       Q.   Does H.D. Smith have any reason to
19   disagree or dispute with the statements that are made
20   on Exhibit 1 about controlled substances?
21       A.   With regards to the highlighted areas?
22       Q.   Yes.
23       A.   No.
24       Q.   So H.D. Smith agrees that controlled

Page 28

1    substances under Schedule II have a high potential for
2    abuse which may lead to severe psychological or
3    physical dependence?
4        A.   Yes.
5        Q.   Okay.  I'm next going to show you a
6    document that has been premarked as Exhibit 2, and it
7    is actually a bit hard to --
8        MR. PADGETT:  Do you want these back?
9        MR. YOUNG:  You -- actually, yeah, I'll take
10   them back.  You already have a copy?  Yes, I'll take
11   them back.
12   BY MR. YOUNG:
13       Q.   This next one is been premarked as
14   Exhibit 2, and it is a bit longer than the last one,
15   though, again, it has been pre-highlighted.  I'm just
16   going to give you a chance just to take a look at the
17   highlighted portions.
18           I should mention, by the way, that the
19   last exhibit that you looked at was actually from the
20   DEA Diversion Control website, and this exhibit is
21   also from the DEA Diversion Control website.
22           Just let me know when you're --
23       A.   Okay.
24           Just that one page?

Page 29

1        Q.   I believe so, yes.
2            Can you tell me -- the highlighted
3    section, which this is from Title 21 USC Section 823
4    sub (b), sub (1) through (5), can you tell me whether
5    or not that section, and we'll read it in a second,
6    whether or not it applies to H.D. Smith?
7        A.   It would.
8        Q.   Is H.D. Smith a -- a registered
9    distributor of Schedule II pharmaceutical products in
10   the United States?
11       A.   We are.
12       Q.   Can you read for us the first paragraph of
13   subsection (b) which is highlighted on Exhibit 2?
14       A.   Subsection (b):  Distributors of
15   controlled substances in Schedule I or II.  And it
16   says:
17           "The Attorney General shall register an
18   applicant to distribute a controlled substance in
19   Schedule I or II unless he determines that the
20   issuance of such a registration is inconsistent with
21   the public interest.  In determining the public
22   interest, the following factors shall be considered:
23           "(1) maintenance of effective controls
24   against diversion of particular controlled substances

8 (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    into other than legitimate medical, scientific, and
2    industrial channels;
3         "(2) compliance with applicable State and
4    local law;
5         "(3) prior conviction record of applicant
6    under Federal or State laws relating to the
7    manufacture, distribution, or dispensing of such
8    substances;
9         "(4) past experience in the distribution
10   of controlled substances," excuse me, "and
11        "(5) such other factors as may be relevant
12   to and consistent with the public health and safety."
13        Q.   And, again, H.D. Smith has no reason to
14   dispute or disagree that these are the requirements
15   for distributors like H.D. Smith?
16        A.   Yes.
17        Q.   And we are going to dig into a little bit
18   more throughout the documents and throughout your
19   deposition today whether or not H.D. Smith maintained
20   effective controls against diversion, it's a central
21   tenet of this case, but I'm just curious preliminarily
22   if you have an opinion on behalf of H.D. Smith whether
23   or not H.D. Smith, in fact, maintained effective
24   controls against diversion for Schedule II products

Page 31

1    throughout its tenure?
2         MR. PADGETT:  I'll object to form.  He can
3    answer.
4    BY THE WITNESS:
5         A.   Could you repeat that?
6    BY MR. YOUNG:
7         Q.   Sure.
8         Is it your opinion here today or your --
9    your testimony today that H.D. Smith maintained
10   effective controls against diversion of Schedule II
11   controlled substances throughout its tenure as a
12   pharmaceutical distributor?
13        MR. PADGETT:  Same objection.
14   BY THE WITNESS:
15        A.   We take our responsibility to maintain
16   effective controls against diversion and we have done
17   so.
18   BY MR. YOUNG:
19        Q.   Has there ever been an instance in which
20   H.D. Smith has failed to maintain effective controls
21   against diversion?
22        A.   Not to my knowledge.
23        Q.   Has H.D. Smith ever failed to comply with
24   applicable state or local law with regard to being a

Page 32

1    registered distributor of Schedule II controlled
2    substances?
3         MR. PADGETT:  Object to form, scope.
4    BY THE WITNESS:
5         A.   Could you repeat that again?
6    BY MR. YOUNG:
7         Q.   Sure.
8         Has H.D. Smith ever failed to comply with
9    applicable state and local laws which apply to the
10   distribution of Schedule II controlled substances?  It
11   is Section 2 of that section that I just read.
12        MR. PADGETT:  Same objection.
13   BY THE WITNESS:
14        A.   Could you be a little bit more specific to
15   that?
16   BY MR. YOUNG:
17        Q.   Is H.D. Smith aware of any prior instances
18   where it failed to comply with state laws?
19        MR. PADGETT:  Go ahead.
20   BY THE WITNESS:
21        A.   I'm trying to think.  You know, I don't
22   know how specific you want to get on that, on state
23   laws.  I mean, there has been issues in some states
24   where we have been cited for some violations.

Page 33

1    BY MR. YOUNG:
2         Q.   So H.D. Smith has violated state laws
3    before?
4         MR. PADGETT:  Object to form.
5         He can answer.
6    BY THE WITNESS:
7         A.   We have been cited for that.
8    BY MR. YOUNG:
9         Q.   Is it your testimony today that you
10   resolved those investigations or enforcement actions
11   but did not actually violate the laws?
12        MR. PADGETT:  Same objection.
13   BY THE WITNESS:
14        A.   We received citations.  We did not have
15   any actions against our registration or -- any actions
16   against our registration.
17   BY MR. YOUNG:
18        Q.   Has H.D. Smith ever had its license
19   suspended or revoked in any state?
20        A.   It has not.
21        Q.   Has the DEA or FDA or Department of
22   Justice ever instituted an enforcement action or
23   investigation against H.D. Smith?
24        A.   Can you be more specific?

9 (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    Q.   Are you aware of any instance in which the
2  DEA has instituted an enforcement action or
3  investigation against H.D. Smith?
4      MR. PADGETT:  I'll object to form.
5  BY THE WITNESS:
6      A.   DEA in -- instituted an investigation in
7  our Kentucky facility, our Kentucky distribution
8  center back in 2010 with an administrative inspection
9  warrant.
10  BY MR. YOUNG:
11     Q.   And --
12     A.   -- and subpoena.
13     Q.   And what was the result of that action?
14     A.   No action taken.
15     Q.   Is that the only instance in which the DEA
16  has investigated H.D. Smith?
17     A.   We've had cyclical routine inspections.
18  And I don't know how -- what DEA considers those, if
19  they are investigations.  You know, to us they were
20  cyclic inspections.  There was a -- a lawsuit that we
21  were involved with with -- with DEA, SafeScript case.
22  I don't know if I'd consider that an investigation or
23  not.
24     Q.   How about the state enforcement

Page 35

1  authorities, whatever they may be called, in -- in
2  some states I think it's the Board of Pharmacy, in
3  other states I think it may be called something else.
4      Have any state regulators or enforcers
5  instituted an investigation or litigation against
6  H.D. Smith?
7      MR. PADGETT:  Object to form.
8  BY THE WITNESS:
9      A.   We've had citations in California for --
10  for some violations of not getting a pharmacist
11  signature on deliveries, such as that.  Other than
12  that, unless you can be more specific --
13  BY MR. YOUNG:
14     Q.   Sure.
15     A.   -- nothing is really coming to mind.
16     Q.   How about the State of West Virginia, has
17  the State of West Virginia Attorney General's office
18  or Board of Pharmacy or any other regulatory entity
19  instituted an investigation or enforcement action
20  against H.D. Smith?
21      MR. PADGETT:  Object to form.
22  BY THE WITNESS:
23     A.   We were involved in litigation with the
24  State of West Virginia.

Page 36

1  BY MR. YOUNG:
2      Q.   What was the basis of that litigation?
3      MR. PADGETT:  I'll object to form.
4  BY THE WITNESS:
5      A.   I'm not a -- I'm not ex -- exactly sure.
6  BY MR. YOUNG:
7      Q.   Let's go at it a different way.
8      A.   So if you can --
9      Q.   Were you the chief compliance officer of
10  H.D. Smith at the time that that West Virginia
11  enforcement action was instituted?
12      MR. PADGETT:  Object to form.
13  BY THE WITNESS:
14     A.   I can't remember the exact dates that --
15  that that litigation covered and I was at H.D. Smith
16  for part of it and some not.
17  BY MR. YOUNG:
18     Q.   So what was your understanding in your
19  compliance capacity as to why the State of West
20  Virginia Attorney General was bringing an
21  investigation or action against H.D. Smith?
22      MR. PADGETT:  Object to form and scope.
23  BY MR. YOUNG:
24     Q.   Do you not recall?

Page 37

1      A.   I'm just -- I -- it has been a while for
2  that.  It was -- it was regarding controlled
3  substances in the state with the -- concerning the
4  opioid epidemic --
5      Q.   Do you --
6      A.   -- in the state.
7      Q.   Do you know the allegations that the
8  Attorney General made in its Complaint against
9  H.D. Smith?
10     A.   I believe one of them was a -- a failure
11  to report suspicious orders to the state.
12     Q.   And as the -- and I'm going to use the
13  phrase "chief compliance officer."  I understand at
14  the time that you may not have held that title but
15  that's essentially the role that you filled.
16      As the chief compliance officer for
17  H.D. Smith, what, if anything, did you do when you
18  learned of these allegations?
19     A.   Well, as far as the allegation of failure
20  to report suspicious orders to the state, it was our
21  understanding that we were not required to as an
22  out-of-state wholesale distributor.  I know that,
23  yeah, there was a lawsuit filed and went through the
24  same -- same steps as we are doing through here.

10  (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    Q.   By "here," you mean the litigation that we
2    are here for?
3        A.   This litigation, yes.
4        Q.   Do you know the result of that litigation,
5    the West Virginia litigation?
6        A.   H.D. Smith paid a -- a fine.  I'm not
7    exactly sure how much it was.
8        Q.   You're familiar with the Controlled
9    Substances Act of 1971?
10       A.   Yes.
11       Q.   And is the Controlled Substances Act of
12   1971 something that H.D. Smith must comply with?
13       A.   It is our responsibility to comply.
14       Q.   Does H.D. Smith recognize that if you
15   don't follow the rules in the Controlled Substances
16   Act that you can be fined by the Federal Government?
17       A.   Yes.
18       Q.   And similar question with regard to the
19   state Controlled Substances Act.  Various states have
20   enacted their own versions of a Controlled Substances
21   Act.
22            Is H.D. Smith of the opinion that it must
23   comply with the state Controlled Substances Acts in
24   the states in which it operates?

Page 39

1        A.   Yes.
2        Q.   And failure to comply with those laws or
3    rules would result in fines or license revocation.
4            Is that accurate?
5        A.   I believe that that can be the -- the
6    result.
7        Q.   I'm going to show you another exhibit,
8    which is Exhibit 3.
9            This exhibit is also from the DEA
10   Diversion Control website and it has a very brief
11   highlighted section at the top.
12           I'd just ask you to read the highlighted
13   portion into the record and we can talk about it.
14       A.   Okay.
15       Q.   Can you read the highlighted portion into
16   the record, please?
17       A.   "All applicants and registrants shall
18   provide effective controls and procedures to guard
19   against theft and diversion of controlled substances."
20       Q.   Are you familiar with this language of
21   this section?
22       A.   I am.
23       Q.   And has H.D. Smith complied with this
24   requirement throughout its tenure as a pharmaceutical

Page 40

1    distributor?
2        A.   Our responsibility is to provide effective
3    controls against theft and diversion.
4        Q.   That wasn't my question.
5            My question is:  Has H.D. Smith complied
6    with this throughout its tenure as a pharmaceutical
7    distributor?
8        MR. PADGETT:  Object to form.
9    BY MR. YOUNG:
10       Q.   In other words, have there been occasions
11   in which H.D. Smith has failed to provide effective
12   controls and procedures to guard against theft and
13   diversion of controlled substances?
14       MR. PADGETT:  Same objection.
15   BY THE WITNESS:
16       A.   To the best of my knowledge, we have
17   complied with this regulation.
18   BY MR. YOUNG:
19       Q.   The highlighted section uses the word
20   "diversion."
21           What is your understanding of the term
22   "diversion," what does that mean?
23       A.   Diversion can -- basically it's illegal,
24   when you are talking about controlled substances, it

Page 41

1    is an illegal -- acts or any -- anything pertaining to
2    the controlled substances that would be illegal.  It
3    could be theft, it could be abuse.
4        Q.   The section uses the -- the phrase "theft
5    and diversion."  So separating out theft from
6    diversion, what's your understanding of diversion?
7        A.   The controlled substances going into
8    illicit channels, illegal use of controlled
9    substances.
10       Q.   You -- you used the phrase "illicit
11   channels."  Can you be more specific what you mean by
12   that?
13       A.   It could be channels in the supply chain
14   that are -- you know, it could be counterfeit, it
15   could be, you know, criminal type, you know, sale --
16   illicit sales, illegal sales of controlled substances,
17   illegal use of controlled substances.
18       Q.   Would diversion include obtaining
19   prescriptions through forged prescriptions?
20       A.   Yes.
21       Q.   Would diversion include -- I think you --
22   you mentioned it, but just to clarify, would diversion
23   include the resale of legally-obtained prescription
24   controlled substances?  So in other words --

11  (Pages 38 to 41)

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    A.   Obtained legally and then illegally sold?
2    Q.   Yes.
3    A.   On the street or what have you, yes.
4    Q.   Have there been occasions in which
5 H.D. Smith has uncovered, using your definition of
6 diversion, the diversion of controlled substances in
7 its tenure as a registrant under the Controlled
8 Substances Act?
9        MR. PADGETT:  Object; form.
10 BY THE WITNESS:
11   A.   I can -- I can say that we may have
12 suspected diversion.  We don't do criminal
13 investigations.  We -- we may suspect diversion, we
14 may report it.  The end result may be down the line
15 that there was illegal diversion, you know, a fact
16 that someone, you know, was criminally prosecuted,
17 but, you know, our responsibility is -- is -- is not
18 to conduct criminal investigations.  So I can't say
19 for -- for a fact that, you know, what you asked.
20 BY MR. YOUNG:
21   Q.   In your role as chief compliance officer,
22 have you had occasion to investigate a pharmacy that
23 you suspected was diverting controlled substances?
24   A.   When you say "investigate," what --

Page 43

1 what -- can you define that a little bit more?
2    Q.   Gather information or inquire.
3    A.   We would gather information, we would
4 conduct our due diligence, and then if we would have a
5 reason to believe that there may be diversion taking
6 place, then that would -- that would be reported, but
7 we wouldn't necessarily go any further in -- into any
8 kind of criminal investigation because that's not
9 our -- our place.
10   Q.   Okay.  But there have been occasions in
11 which H.D. Smith has concluded that diversion is
12 likely at a pharmacy that it supplies?
13       MR. PADGETT:  Object to form.
14 BY THE WITNESS:
15   A.   When we have reason to believe that there
16 may be diversion taking place.
17 BY MR. YOUNG:
18   Q.   Can you say -- and this is a difficult
19 question, can you say approximately how many
20 pharmacies that you identified as reason to believe
21 that diversion was taking place?
22   A.   We've probably -- I'll take a wild guess,
23 2- or 300 pharmacies, maybe more, that we have -- have
24 reason to believe there may be diversion and we've

Page 44

1 either cut off entirely or at least cut off the -- the
2 purchase of controls.
3    Q.   And specifically with regard to what we
4 will call CT-1 jurisdictions, which CT-1 jurisdictions
5 include Cuyahoga County, the City of Cleveland, Summit
6 County and the City of Akron, with regard to those
7 four geographic communities, are you -- is H.D. Smith
8 aware of suspected diversion taking place at
9 pharmacies that it served as a distributor?
10       MR. PADGETT:  Object to form to the extent
11 suggesting we are a defendant in Summit County or
12 Akron.
13       MR. YOUNG:  Yeah, fair enough.
14 BY MR. YOUNG:
15   Q.   So with regard to Cuyahoga and the City of
16 Cleveland, has H.D. Smith ever identified pharmacies
17 that it suspected were diverting controlled
18 substances?
19   A.   No.
20   Q.   Have you undertaken investigations of
21 pharmacies in Cuyahoga County or Cleveland and that
22 you initially suspected were diverting controlled
23 substances and concluded that they, in fact, were not
24 diverting controlled substances?

Page 45

1        MR. PADGETT:  Object to form.
2 BY THE WITNESS:
3    A.   I'd probably like to get a little bit
4 better idea of what you consider an investigation
5 because -- or I can give you what our determinant --
6 or what we believe any -- any of our due diligence we
7 consider part of an investigation.
8        In our due diligence we look at the
9 totality of all circumstances.  And we never suspected
10 or had reason to believe that any pharmacies in
11 Cuyahoga County or Cleveland were diverting.
12 BY MR. YOUNG:
13   Q.   Fair enough.
14       I'm going to show you now what's been
15 premarked as Plaintiff's Exhibit -- or Euson
16 Deposition Exhibit 4.  This is another printout from
17 the DEA Office of Diversion Control.  It has a
18 highlighted portion.
19       I'm going to ask you to take a look at
20 that and then read it into the record.
21   A.   Do you want me to state the code or any --
22 and the part or anything?
23   Q.   Ah, sure.  That would be great.
24   A.   Okay.

12  (Pages 42 to 45)

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1     Q.  I failed to do so with the prior exhibit,
2  so that's probably a good idea.
3     A.  Title 21 Code of Federal Regulations,
4  Part 1301, Registration of Manufacturers,
5  Distributors, and Dispensers of Controlled Substances.
6  Security Requirements.  This is 1301.74,
7  subsection (b).
8         "The registrant shall design and operate a
9  system to disclose to the registrant suspicious orders
10  of controlled substances.  The registrant shall inform
11  the Field Office of the Administration in his area of
12  suspicious orders when discovered by the registrant.
13  Suspicious orders include orders of unusual size,
14  orders deviating substantially from a normal pattern,
15  and orders of unusual frequency."
16     Q.  Are you familiar with the language in
17  1301.74(b)?
18     A.  Yes.
19     Q.  And what do you refer to or how -- how do
20  you refer to this language, this requirement?
21     MR. PADGETT:  Object to form.
22  BY MR. YOUNG:
23     Q.  Within H.D. Smith, does it have a certain
24  nomenclature or is this just a known --

Page 47

1     A.  What time period are you talking about?
2     Q.  Currently.
3     A.  Currently, we have -- if this is what you
4  are asking, we have an automate --
5     MR. PADGETT:  Same objection.
6     Go ahead.
7  BY THE WITNESS:
8     A.  We have an automated system called our
9  Controlled Substance Order Monitoring Program, CSOMP
10  for short.
11         Is that what you were referring to?
12  BY MR. YOUNG:
13     Q.  Not -- not exactly.
14     A.  Okay.
15     Q.  This is -- this is part of the Controlled
16  Substances Act requirements for registrants.  And I
17  was just curious if you had some nomenclature or would
18  refer to this particular provision in a certain way?
19  And specifically talking about the "suspicious orders
20  include orders of unusual size, deviating
21  substantially from a normal pattern, and orders of
22  unusual frequency," that requirement.
23         You have no particular nomenclature you
24  use in the industry?

Page 48

1     A.  Not --
2     Q.  Okay.
3     A.  -- not particularly.
4     Q.  In your opinion, did H.D. Smith comply
5  with this requirement throughout your tenure with the
6  company?
7     A.  Yes, we did.
8     Q.  Did H.D. Smith always have in place
9  systems to identify suspicious orders as defined here
10  in subsection (b) which you just read?
11     MR. PADGETT:  Object to scope.
12  BY THE WITNESS:
13     A.  We had a manual system and then we had an
14  automated system.  We had several iterations of that.
15  BY MR. YOUNG:
16     Q.  And we'll dig into the details of those
17  systems shortly, but is it your testimony today that
18  at all times H.D. Smith complied with this
19  requirement?
20     A.  Yes.
21     Q.  That includes during the manual system as
22  well as the automated system?
23     A.  Yes, sir.
24     Q.  Who was responsible for ensuring that

Page 49

1  H.D. Smith complied with this provision, Section B?
2     MR. PADGETT:  Object to form.
3  BY MR. YOUNG:
4     Q.  Is that -- is that your job?
5     A.  What time period?
6     Q.  Throughout your tenure, if there is
7  someone that was more senior than you and was
8  responsible for compliance with this provision, I'd
9  like to know them, but I'd also like to know whether
10  or not this was your job?
11     A.  When I first came to H.D. Smith in
12  November of 2005 until -- when I first came there, it
13  was the -- it was the responsibility of the individual
14  distribution center managers, the operations managers
15  to report suspicious orders to the field office in
16  their area.  That continued on until spring of 2008
17  when we got our -- our automated system running, and
18  then that was brought in -- into the corporate office
19  and under my responsibility.
20     Q.  When you first got to H.D. Smith, was
21  H.D. Smith in compliance with this provision?
22     A.  I believe so.
23     Q.  When you first got to H.D. Smith, was
24  H.D. Smith reporting suspicious orders to the DEA when

13  (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    they were discovered?
2        A.   At that --
3        MR. PADGETT:  Object to form.
4    BY THE WITNESS:
5        A.   At that -- at that time the -- the
6    industry standard and the expectation from DEA was
7    that orders were basically reported after the fact.
8    They were -- if -- if we discovered an order
9    beforehand, it would be reported before the sale.
10       Other than that, the operations managers
11   reviewed orders at the end of each month and anything
12   that they thought was unusual they would send that to
13   the DEA.  And that was the industry standard and the
14   expectation at that time, which has changed over time.
15   BY MR. YOUNG:
16       Q.   And -- and we'll get into that a little
17   bit later, but with regard to the requirements as you
18   read them in -- in Section B, is it your testimony
19   that H.D. Smith was in or out of compliance with
20   specifically reporting suspicious orders when they
21   were discovered by the registrant?
22       So not with the DEA, I think your
23   testimony was that the DEA allowed it to be done a
24   certain way, but -- but I want to know with specific

Page 51

1    reference to this provision as it's written and as you
2    read, was H.D. Smith in compliance?
3        MR. PADGETT:  Object to form.
4    BY THE WITNESS:
5        A.   Even if it was after the fact that our
6    operations manager reported it, that was reported when
7    discovered.
8    BY MR. YOUNG:
9        Q.   Okay.  So there were no delays between
10   when an order was discovered and when it was reported
11   to the DEA throughout the tenure of H.D. Smith as a
12   registrant?
13       MR. PADGETT:  Object to form.
14   BY THE WITNESS:
15       A.   What time period are you talking?
16   BY MR. YOUNG:
17       Q.   Throughout H.D. Smith's history, are you
18   aware of any instance in which H.D. Smith failed to
19   report a suspicious order when it was discovered?
20       MR. PADGETT:  Object to form.
21   BY THE WITNESS:
22       A.   No.
23   BY MR. YOUNG:
24       Q.   Okay.  You mentioned a transition from

Page 52

1    when you got there to H.D. Smith and the way that
2    things were done and the changes that were made.
3        Did the senior management or board of
4    directors of H.D. Smith have involvement or input over
5    those changes?
6        A.   Not necessarily.
7        Q.   How were those changes implemented?  In
8    other words, you get there and you noticed things were
9    being done in a certain way and you had
10   recommendations to change them.
11       How is -- how are you able to implement
12   those changes?
13       A.   Shortly after I got there we had a meeting
14   with DEA and I had consistent contact with DEA and
15   headquarters.  We -- any changes to the programs
16   and -- and how we did things as we went along were --
17   there was never any interference from anyone, any
18   management at H.D. Smith.
19       Q.   So was there someone more senior than you
20   that made it clear that whatever George recommends for
21   compliance changes should be followed?
22       A.   I -- I don't know that it was that rigid.
23   They considered me as their compliance expert and they
24   let me put in the -- the processes in place to -- that

Page 53

1    needed to be put in and improvements.
2        Q.   H.D. Smith acknowledges that Section B of
3    Part 1301 is a requirement that it's obligated to
4    comply with, is that correct?
5        A.   It's our responsibility to put -- comply
6    with the law.
7        Q.   And H.D. Smith acknowledges that as a
8    registrant or distributor of controlled substances it
9    must exercise due diligence to avoid filling
10   suspicious orders, is that accurate?
11       A.   Repeat that.
12       Q.   Does H.D. Smith acknowledge that it must
13   exercise due diligence to avoid filling suspicious
14   orders?
15       MR. PADGETT:  Object to form.
16   BY THE WITNESS:
17       A.   It is our responsibility, you know, within
18   our -- our place in the supply chain to maintain
19   effective controls against diversion and report
20   suspicious orders when discovered as -- as to this
21   regulation.
22   BY MR. YOUNG:
23       Q.   And must H.D. Smith exercise due diligence
24   in that regard?

14  (Pages 50 to 53)

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    MR. PADGETT: Object to form.
2    BY THE WITNESS:
3    A.   Can you clarify due diligence?
4    BY MR. YOUNG:
5    Q.   Well, I'm -- I'm trying to understand
6    what's the basis of H.D. Smith's compliance with
7    these, with these laws, and you're the chief
8    compliance officer.  So I want to understand from
9    H.D. Smith's perspective how should it comply with
10   these laws?  Should it do it willy-nilly or should it
11   do it with due diligence?
12   MR. PADGETT: Object to form.
13   BY THE WITNESS:
14   A.   You know, part -- our -- our process and
15   our procedures, you know, include due diligence to
16   know our customers.  You know, we put processes and
17   procedures in place to get -- to understand the
18   totality of circumstances and -- and the -- and to
19   know our customers, their needs, if that is -- if
20   that's what you are looking for.
21   BY MR. YOUNG:
22   Q.   Yeah.  No, that's -- that's fair.
23   A.   Okay.
24   Q.   In these three or four sections of

Page 55

1    regulations and laws that -- that we've discussed,
2    Exhibits 1 through 4, what's the purpose of these,
3    these laws?
4    Does H.D. Smith have an opinion as to the
5    purpose of the Controlled Substances Act and the
6    attendant regulations?
7    MR. PADGETT: I'll object to form.
8    BY THE WITNESS:
9    A.   You know, our responsibility is to comply
10   with the -- with the regulations.
11   BY MR. YOUNG:
12   Q.   Well, why do these laws exist?
13   MR. PADGETT: Same objection.
14   BY THE WITNESS:
15   A.   I wasn't there when they put the laws
16   together.
17   BY MR. YOUNG:
18   Q.   Does H.D. Smith have an opinion as to why
19   these laws exist?
20   MR. PADGETT: Same objection.
21   BY THE WITNESS:
22   A.   We comply with the regulations.
23   BY MR. YOUNG:
24   Q.   Does H.D. Smith acknowledge that if it

Page 56

1    distributes controlled substances in this case,
2    specifically opioids, that result in diversion, that
3    the public could suffer harm?
4    MR. PADGETT: Object to form.
5    BY THE WITNESS:
6    A.   Again, our -- our responsibility within
7    the supply chain is -- is to maintain effective
8    controls against diversion.  Diversion comes in many
9    forms and there is many forms of diversion that we
10   have no control over.
11   BY MR. YOUNG:
12   Q.   Does H.D. Smith acknowledge that if they
13   distribute opioid orders deviating from a normal
14   pattern and fails to report those to the DEA, that
15   that would result in diversion?
16   MR. PADGETT: Object to form.
17   BY MR. YOUNG:
18   Q.   In other words, let me rephrase that, that
19   was an inartful question.
20   There are three types of suspicious orders
21   that are defined or described in the section that you
22   just read, Section B, and they are orders of unusual
23   size, orders deviating substantially from a normal
24   pattern, and orders of unusual frequency, right?  So

Page 57

1    we've got size, pattern and frequency.
2    When there is a suspicious order that
3    deviates from a normal pattern, if H.D. Smith were to
4    fail to report that suspicious order to the DEA, would
5    that result in diversion?
6    MR. PADGETT: Object to form.
7    BY THE WITNESS:
8    A.   I don't believe you can say a blanket
9    statement like that.
10   BY MR. YOUNG:
11   Q.   Is it possible?
12   MR. PADGETT: Same objection.
13   BY THE WITNESS:
14   A.   Diversion is possible throughout the in --
15   throughout the supply chain.
16   BY MR. YOUNG:
17   Q.   Is H.D. Smith aware of the great demand
18   for opioid products through illicit channels like you
19   described earlier?
20   MR. PADGETT: Object to form.
21   BY THE WITNESS:
22   A.   Can you be a little bit more specific?
23   BY MR. YOUNG:
24   Q.   Is H.D. Smith aware that there is a demand

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  on the street for opioids?
2      A.   Yeah, through our experience, yes, there
3  is a -- there has been a demand for -- for opioids.
4      Q.   Is H.D. Smith aware that the country is
5  currently undergoing an addiction, an opioid addiction
6  epidemic?
7      MR. PADGETT:  Object to form.
8  BY THE WITNESS:
9      A.   You know, we stay -- stay abreast of -- of
10  issues and I know CDC has called it an epidemic.  I
11  don't know the exact definition of an epidemic.
12  BY MR. YOUNG:
13      Q.   Does H.D. Smith have an opinion on the
14  current state of opioid addiction in the
15  United States?
16      MR. PADGETT:  Object to form.
17  BY THE WITNESS:
18      A.   Can you rephrase that?
19  BY MR. YOUNG:
20      Q.   Does H.D. Smith have an opinion on what's
21  been described as the opioid epidemic?  So I think
22  you -- you didn't want to use the word "epidemic," so
23  how would you define the current state of affairs with
24  regard to opioid addiction in America?

Page 59

1      MR. PADGETT:  Object to form.
2  BY THE WITNESS:
3      A.   I didn't say I didn't want to use the word
4  "epidemic."  I said CDC has claimed it is an epidemic.
5  And I don't know the exact definition of an epidemic.
6           I think that's subjective.  But I do know
7  that there is -- there are issues with opioids, there
8  is issues with illicit fentanyl, there is issues with
9  heroin, so yes.
10  BY MR. YOUNG:
11      Q.   Does H.D. Smith acknowledge that opioids
12  are addictive?
13      A.   I believe they can be addictive.
14      Q.   Does H.D. Smith acknowledge that opioids
15  are dangerous in the wrong hands?
16      MR. PADGETT:  Object to form.
17  BY THE WITNESS:
18      A.   You'd have to define dangerous and be a
19  little bit more specific on that.
20      Q.   Well, H.D. Smith --
21      A.   And what the wrong hands are.
22      Q.   H.D. Smith distributes opioids and we've
23  agreed or you've admitted that opioids are addictive.
24           Is it your testimony that opioids which

Page 60

1  are addictive are not dangerous in the wrong hands or
2  are dangerous in the wrong hands?
3      MR. PADGETT:  Object to form.
4  BY THE WITNESS:
5      A.   Again, clarify that, I -- I said that they
6  can be addictive.
7  BY MR. YOUNG:
8      Q.   Okay.
9      A.   Okay.
10           And can you repeat your question again
11  then?
12      Q.   Sure.
13           These -- these drugs, these controlled
14  substances, in this case opioids, if they were to
15  reach the wrong hands, does their potential to be
16  addictive, is that dangerous?
17      MR. PADGETT:  Object to form.
18  BY THE WITNESS:
19      A.   I'm not really clear on what you are
20  asking.  I mean --
21  BY MR. YOUNG:
22      Q.   Okay.
23      A.   -- what -- where -- you know, dangerous to
24  the person, dangerous to society?

Page 61

1      Q.   No, that's fair.
2      A.   Yeah.
3      Q.   As I mentioned at the outset, I may ask
4  many a question that -- that doesn't make sense to you
5  and I appreciate you letting me know.
6           Does H.D. Smith have an opinion as to
7  whether or not pharmaceutical products, in this
8  instance opioids, the type that it distributes, have
9  caused harm in the State of Ohio?
10      MR. PADGETT:  Object to form.
11  BY THE WITNESS:
12      A.   I -- I can't say for certain that the
13  drugs that we have distributed have caused harm to
14  anyone.
15  BY MR. YOUNG:
16      Q.   And I should have been more clear.
17           I don't mean specifically the drugs that
18  you delivered but the types of drugs that you
19  delivered, the controlled substance opioids have
20  caused harm to the State of Ohio or in the State of
21  Ohio?
22      MR. PADGETT:  Object to form, scope.
23  BY THE WITNESS:
24      A.   I'm still not exactly sure where you are

16  (Pages 58 to 61)

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    going with that, but, I mean, opioids, you know, can
2    be addictive, they can cause overdose deaths if -- if
3    used incorrectly, if that's what you are getting at.
4    BY MR. YOUNG:
5        Q.   Well, I -- I want to understand
6    H.D. Smith, as a distributor of opioids, whether or
7    not it has an opinion as to whether or not opioids
8    have caused harm to, in this case, I'll even limit it
9    further, the City of Cleveland and Cuyahoga County.
10        Have the City of Cleveland or Cuyahoga
11   County residents and the government entities
12   themselves suffered harm as a result of prescription
13   opioids?
14        MR. PADGETT:  Object to form.
15   BY THE WITNESS:
16        A.   I'm still not clear exactly what harm you
17   are asking about.  You know, these -- you know, these
18   drugs that -- that -- these opioid drugs that are
19   distributed, you know, are -- that are used by -- by
20   patients can be, you know, lifesaving, you know, drugs
21   can -- can relieve people of pain, which they are
22   intended to do, you know, for legitimate use and --
23   and legitimate patients.
24   BY MR. YOUNG:

Page 63

1        Q.   Sure.  And that wasn't my question.  My
2    question is the opposite of that.
3        It's have those same drugs caused harm.
4    You've mentioned some of the benefits and I want to
5    know about some of the harmful effects.
6        So does H.D. Smith have an opinion as to
7    whether or not these prescription opioids that we are
8    talking about generally, not the ones that it
9    specifically distributed, but the type, whether or not
10   that has caused harm in Cleveland and Cuyahoga County?
11        MR. PADGETT:  Object to form.
12   BY THE WITNESS:
13        A.   I don't know the specifics you are talking
14   about, but can opioids be abused, can people die of
15   overdoses, yes, if that's the harm you are talking
16   about, my assumption is in Cuyahoga County people have
17   died of -- of drug overdoses.
18   BY MR. YOUNG:
19        Q.   And do you know whether or not Cleveland
20   and Cuyahoga County drug overdoses have been the
21   result of prescription opioids or I think you
22   mentioned heroin and illicit fentanyl?  Have you
23   researched or have you come to a conclusion as to
24   whether or not prescription opioids are part of that

Page 64

1    cause?
2        MR. PADGETT:  Objection; scope.
3    BY THE WITNESS:
4        A.   I don't know specifically.
5    BY MR. YOUNG:
6        Q.   You haven't -- H.D. Smith hasn't done any
7    research to determine whether or not Cleveland or
8    Cuyahoga County has suffered harm as a result of
9    prescription opioids?
10        MR. PADGETT:  Objection; scope.
11   BY THE WITNESS:
12        A.   I'm -- I'm still not sure what you mean by
13   harm, but my assumption would be that there probably
14   have been people that have died of overload -- of
15   prescription drug overdoses in Cuyahoga County.
16   BY MR. YOUNG:
17        Q.   Okay.  I'm going to show you what's been
18   marked as Exhibit 5, and this I'll give you in just a
19   second, I'm sure that you are familiar with it, it has
20   been pre highlighted, it is on DEA letterhead and it
21   is dated September 27th, 2006.
22        Does that exhibit look familiar to you?
23        A.   Yes, sir.
24        Q.   This letter is from Joe Rannazzisi.

Page 65

1        Are you familiar with Mr. Rannazzisi?
2        A.   Yes.
3        Q.   Have you met him before?
4        A.   I have.
5        Q.   On how many occasions?
6        A.   Maybe a couple.
7        Q.   Did you receive this letter on behalf of
8    H.D. Smith in approximately September of 2006?
9        A.   This was sent to our distribution center,
10   it would have been forwarded to me.
11        Q.   So sometime thereafter you would have
12   received it?
13        A.   Yes.
14        Q.   Do you recall receiving this letter
15   specifically?
16        A.   Not specifically.
17        Q.   Can you read Paragraph 1 of that letter?
18        A.   Not highlighted, the very first paragraph?
19        Q.   Yeah.
20        A.   Okay.
21        "This letter is being sent to every
22   commercial entity in the United States registered with
23   the Drug Enforcement Administration (DEA) to
24   distribute controlled substances.  The purpose of this

17  (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  letter is to reiterate the responsibilities of
2  controlled substance distributors in view of the
3  prescription drug abuse problem our nation currently
4  faces."
5       Q.   Mr. Rannazzisi references a prescription
6  drug abuse problem the nation currently faces in
7  September of 2006.
8            Did H.D. Smith have reason to disagree
9  that a prescription drug abuse problem existed in
10  2006?
11       A.   No.
12       Q.   Do you know what Mr. Rannazzisi was
13  referring to when he described the prescription drug
14  abuse problem the nation currently faces?
15       MR. PADGETT:  Object to form.
16  BY THE WITNESS:
17       A.   I am assuming that it is controlled
18  substances since it's from -- since he is from DEA.
19  BY MR. YOUNG:
20       Q.   So you were the compliance officer of
21  H.D. Smith, a licensed drug distributor, you've
22  received this letter in 2006, and your testimony today
23  is you're not sure what the prescription drug abuse
24  problem the nation faced was?

Page 67

1       MR. PADGETT:  Object to form.
2  BY MR. YOUNG:
3       Q.   You are un -- are you unclear?
4       A.   I didn't say that.  I said that the -- it
5  is a prescription drug abuse problem.  Prescription
6  drug abuse can be anything.  But I'm assuming it's --
7  what -- what he is referencing is controlled substance
8  abuse.
9       Q.   Yeah, fair enough.  The -- and the letter
10  does go on to -- to state that.
11            Can you turn to Page 2, there is a
12  highlighted portion.  And I want to circle back to
13  some of your earlier testimony where you talked about
14  the DEA and sort of their understanding of
15  interpretations of the laws and whatnot.  And we'll
16  get to that in a second, but first, can you read for
17  us the highlighted portions of Page 2?
18       A.   "Thus, in addition to reporting all
19  suspicious orders, a distributor has a statutory
20  responsibility to exercise due diligence to avoid
21  filling sup" -- "suspicious orders that might be
22  diverted into other than legitimate medical,
23  scientific, and industrial channels."
24       Q.   Okay.  So does H.D. Smith agree, disagree,

Page 68

1  or not have an opinion as to the accuracy of that
2  statement?
3       MR. PADGETT:  Object to form.
4  BY MR. YOUNG:
5       Q.   That a distributor has a statutory
6  responsibility to exercise due diligence to avoid
7  filling suspicious orders that might be diverted into
8  other than legitimate medical, scientific and
9  industrial channels?
10       MR. PADGETT:  Same objections.
11  BY THE WITNESS:
12       A.   We do exercise our due diligence.
13  BY MR. YOUNG:
14       Q.   So H.D. Smith agrees that it has a
15  statutory responsibility?
16       MR. PADGETT:  Same objection.
17  BY THE WITNESS:
18       A.   I'm not sure about the statutory
19  responsibility, but we do, as a practice, exercise our
20  due diligence.
21  BY MR. YOUNG:
22       Q.   So what part of the statutory
23  responsibility does H.D. Smith disagree with?
24       MR. PADGETT:  Same objection.

Page 69

1  BY THE WITNESS:
2       A.   I'm saying I'm not sure of a statutory
3  responsibility, but we -- of -- to exercise due
4  diligence, but we do, as a practice, exercise due
5  diligence.
6  BY MR. YOUNG:
7       Q.   So you disagree that there is a statutory
8  responsibility to exercise due diligence when filling
9  suspicious orders?
10       MR. PADGETT:  Object to form.
11  BY THE WITNESS:
12       A.   I don't disagree.  I'm saying that we do
13  exercise our due diligence.
14  BY MR. YOUNG:
15       Q.   That wasn't my question.
16            My question is whether or not you agree or
17  disagree that there is a statutory responsibility to
18  do so?
19       MR. PADGETT:  Object to form, asked and
20  answered.
21  BY MR. YOUNG:
22       Q.   You can answer.
23       A.   Oh, okay.
24            What I'm saying is I'm not clear about

18  (Pages 66 to 69)

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1   when they say a statutory responsibility for due
2   diligence.  We --
3   BY MR. YOUNG:
4       Q.   So you are the chief compliance officer of
5   H.D. Smith, I think your testimony has been that you
6   are the senior-most person charged with compliance
7   responsibility for H.D. Smith, and as we sit here
8   today, you are not sure whether or not there is a
9   statutory responsibility to exercise due diligence?
10      A.   We exercise due diligence and our
11  responsibility is to maintain effective controls
12  against diversion, which we do, and we abide by the
13  regulations.
14      Q.   Okay.  And I -- I guess we are in a bit of
15  a echo chamber.
16           What I need to understand is whether or
17  not H.D. Smith is of the opinion that there is a
18  statutory responsibility to do those things?  Because
19  I'm still not getting a clear answer from you as to
20  whether or not it is statutory in nature.  So I'll ask
21  it as clearly and cleanly as possible.
22           Is there a statutory responsibility, a
23  legal obligation to exercise due diligence to avoid
24  filling suspicious orders?

Page 71

1       MR. PADGETT:  Object to form.
2   BY THE WITNESS:
3       A.   I -- I don't -- I don't -- the statutory
4   responsibility I'm not sure of.  We do exercise due
5   diligence.  That's what we do as a practice, a
6   process, a procedure when -- regarding suspicious
7   orders.
8   BY MR. YOUNG:
9       Q.   Why -- why do you do that?  If there is
10  not a statutory responsibility, why would you do that?
11      MR. PADGETT:  Object to form.
12  BY THE WITNESS:
13      A.   As part of our effort to maintain controls
14  against diversion.
15  BY MR. YOUNG:
16      Q.   Which is based in law or you just decide
17  to do that on your own?
18      A.   No.  It's our responsibility to comply
19  with the law and the regulations.
20      Q.   So there is law and regulations that
21  require the exercise of due diligence?
22      MR. PADGETT:  Same objection.
23  BY THE WITNESS:
24      A.   What I'm telling you is I'm not sure what

Page 72

1   the statutory verbiage is regarding due diligence.
2   BY MR. YOUNG:
3       Q.   Okay.  That's fair enough.
4            The next paragraph that's highlighted
5   there, can you read that for us?
6       A.   "In a similar vein" -- "in a similar vein,
7   given the requirement under Section 823(e) that a
8   distributor maintain effective controls against
9   diversion, a distributor may not simply rely on the
10  fact that the person placing the suspicious order is a
11  DEA registrant and turn a blind eye to the suspicious
12  circumstances.  Again, to maintain effective controls
13  against diversion as Section 823(e) requires, the
14  distributor should exercise due care in confirming the
15  legitimacy of all orders prior to filling."
16      Q.   Is there anything in that section that
17  H.D. Smith disagrees with?
18      A.   No.
19      Q.   There is another section in here -- where
20  is -- can we come back to Page 1 of this document, and
21  under Background, the second full paragraph, it begins
22  with:  "The CSA was designed."
23      A.   "The CSA was designed" -- do you want me
24  to read it?

Page 73

1       Q.   Yes, can you read it, please.  Sorry.
2       A.   "The CSA was designed by Congress to
3   combat diversion by providing for a closed system
4   of drug distribution, in which all legitimate handlers of
5   controlled substances must obtain a DEA registration
6   and, as a condition of maintaining such registration,
7   must take reasonable steps to ensure that their
8   registration is not being utilized as a source of
9   diversion.  Distributors are, of course, one of the
10  key components in the distribution chain.  If the
11  closed system is to function properly as Congress
12  envisioned, distributors must be vigilant in deciding
13  whether a prospective customer can be trusted to
14  deliver controlled substances only for lawful
15  purposes.  This responsibility is critical, as
16  Congress has expressly declared that the illegal
17  distribution of controlled substances has a
18  substantial and detrimental effect on the health and
19  general welfare of the American people."
20      Q.   So, and I appreciate you reading that.  It
21  was lengthy, I know, and -- and there is a lot there,
22  but what I want to know is whether or not there is
23  anything in that paragraph that H.D. Smith disagrees
24  with?

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    MR. PADGETT: I'll object to form.
2  BY THE WITNESS:
3    A.  I'm rereading it.
4  BY MR. YOUNG:
5    Q.   Yeah, and if you want, we can do it -- we
6  can do it sentence by sentence.
7      So the first sentence is --
8    A.   Can I -- can I reread it first?
9    Q.   Sure.
10   A.   Thanks.
11      Okay.
12   Q.   Okay.  So, just after you read it a second
13  time, is there any part of that that H.D. Smith
14  disagrees with?
15    MR. PADGETT:  Object to form.
16  BY MR. YOUNG:
17   Q.   We can go sentence by sentence if you'd
18  like?
19   A.   It's not necessarily disagree, just, you
20  know, some of the -- you know, when Congress
21  envisioned, you know, I -- I don't know what was going
22  through Congress's mind back then.
23   Q.   Okay.  Yeah, fair enough.
24      Do you have an understanding or belief as

Page 75

1  to what, other than described in this letter, what
2  Congress may have envisioned distributors doing under
3  the Controlled Substances Act?
4      In other words, do you have some
5  disagreement with the conclusion here or are you just
6  unaware?
7    A.   I don't have any specific disagreement.
8    Q.   The letter describes the distribution
9  chain as a closed system.
10      Are you familiar with that phrase?
11   A.   Yes.
12   Q.   Can you explain to us what the closed
13  system means?
14   A.   Basically it's a -- closed system is
15  from -- you know, DEA sets quotas for manufacturers of
16  controlled substances on what they can manufacture.
17  The manufacturer then, if -- if you go -- simplify the
18  supply chain, sells product to distributors, all of
19  that's recorded so that -- so that there is no
20  diversion or theft inside that supply chain from
21  manufacturer/distributor.
22      Same way, and you have to be registered
23  with the DEA to handle controlled substances, the
24  manufacturers are registered, the DEA distributor such

Page 76

1  as H.D. Smith are registered with the DEA.
2      Anyone then that we would sell to, whether
3  it be a hospital, pharmacy, doctor, has to be a -- a
4  registered -- registered with DEA also to handle
5  controlled substances.
6      So we can only sell to DEA registrants,
7  and that's all recorded.  So it -- it keeps the system
8  so that there is no introduction of other products,
9  there is no -- if -- if -- you know, if there is
10  theft, that would be discovered.  And then on down to
11  where we would sell to, again, a DEA registrant.
12      You've got a DE -- DEA registered
13  practitioner that would be writing prescriptions
14  filled at a DEA pharmacy -- or DEA registered pharmacy
15  on until that it is dispensed to a patient, and all of
16  that -- all -- all of that is tracked through the
17  system in a -- what's considered a closed system.
18   Q.   Perfect.  Thank you.
19      I want to turn back to Page 2 of this
20  document.  It's -- Paragraph 2 says -- it -- it begins
21  with "DEA recognizes," and -- and I'm just going to
22  read it briefly to -- to get you acquainted with it.
23  It's the third sentence.
24      "Nonetheless, given the extent of

Page 77

1  prescription drug abuse in the United States."
2      Can you -- can you read that for us?
3    A.   "Nonetheless, given the extent of
4  prescription drug abuse in the United States, along
5  with the dangerous and potentially lethal
6  consequences" -- "consequences of such abuse, even
7  just one distributor that uses its DEA registration to
8  facilitate diversion can cause enormous harm."
9    Q.   Does H.D. Smith agree or disagree with
10  that statement?
11    MR. PADGETT:  Object to form.
12  BY THE WITNESS:
13    A.   Based on circumstances, it could.
14  BY MR. YOUNG:
15    Q.   Is it your testimony that one distributor
16  that uses its DEA registration to facilitate diversion
17  can cause enorm- -- enormous harm?
18    A.   Yes.
19    Q.   The sentence also talks about the extent
20  of prescription drug abuse in the United States.  I
21  know we've kind of talked about this a little bit, but
22  does H.D. Smith have reason to dispute that at least
23  in 2006 there was a prescription drug abuse problem in
24  the United States?

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  A.  I don't dispute that.
2  Q.  There is another section in here I want to
3  draw your attention to, and, again, this is a letter
4  that all distributors received from Joe Rannazzisi and
5  you previously testified that you received this.
6  The third-to-last paragraph -- oh, no.
7  You already read that.  I'm sorry.
8  The -- the third-to-last paragraph which
9  is highlighted on your sheet that you previously read,
10  I think I've asked this, but does H.D. Smith
11  acknowledge that there are additional responsibilities
12  of distributors beyond just reporting suspicious
13  orders?
14  A.  You are referring to where it says:
15  "Thus, in addition"?
16  Q.  Yes.
17  A.  Okay.
18  MR. PADGETT:  Object to form.
19  BY MR. YOUNG:
20  Q.  So, and -- and -- and I'll break it down,
21  this section of the letter actually describes the
22  reporting requirement as well as the duty to exercise
23  due diligence to avoid filling the order.
24  Does H.D. Smith recognize and acknowledge

Page 79

1  that that is a requirement under the rules,
2  regulations and laws which govern drug distribution?
3  MR. PADGETT:  Object to form.
4  BY THE WITNESS:
5  A.  The regulation is -- as written is a
6  regulatory responsibility to report suspicious orders.
7  BY MR. YOUNG:
8  Q.  Okay.  So does H.D. Smith disagree that
9  there is also a responsibility to avoid filling
10  suspicious orders?
11  MR. PADGETT:  Object to form.
12  BY THE WITNESS:
13  A.  My understanding is that the regulation
14  refers to reporting suspicious orders.  We, as a
15  practice, would not fill a suspicious order.
16  BY MR. YOUNG:
17  Q.  So as the chief compliance officer of
18  H.D. Smith, it is your testimony today that H.D. Smith
19  could, if they so chose, fill a suspicious order?
20  MR. PADGETT:  Object to form.
21  BY MR. YOUNG:
22  Q.  And not violate the Controlled Substances
23  Act?
24  MR. PADGETT:  Same objection.

Page 80

1  BY THE WITNESS:
2  A.  The regulation states that you must report
3  suspicious orders.  There is -- there is not a
4  shipping regulation.
5  BY MR. YOUNG:
6  Q.  Okay.  So, and I don't want to testify for
7  you, I just want to make sure that I get some clarity
8  from you on this.
9  It is your testimony that there is no
10  obligation of a drug distributor to halt a suspicious
11  order?
12  MR. PADGETT:  Object to form.
13  BY THE WITNESS:
14  A.  By regulation there is not.  By practice
15  and procedure and process, H.D. Smith does not ship
16  any orders that we have identified as suspicious.
17  BY MR. YOUNG:
18  Q.  Has it ever done so in the past?
19  A.  Which time period?
20  Q.  To your knowledge as a representative of
21  H.D. Smith, has H.D. Smith ever shipped an order that
22  it identified as suspicious?
23  A.  Prior to our automated system when we were
24  on a manual system, as was industry practice, there

Page 81

1  may have been orders that were reported after the fact
2  that had already been shipped.
3  Q.  And what happens to those orders?  So once
4  they are sent to a pharmacy and they are later
5  identified as suspicious, what, if anything, does
6  H.D. Smith do about that?
7  MR. PADGETT:  Object to form.
8  BY THE WITNESS:
9  A.  At that time -- in that time period?
10  BY MR. YOUNG:
11  Q.  At any time period.
12  MR. PADGETT:  Object to form.
13  BY THE WITNESS:
14  A.  It has changed throughout the years.
15  BY MR. YOUNG:
16  Q.  So let's begin with your initial or first
17  understanding of the way things were at H.D. Smith.
18  If H.D. Smith were to ship an order that
19  was subsequently identified as suspicious, what is
20  your first understanding of what they did with that
21  order afterwards or -- with that pharmacy/customer
22  afterwards?
23  MR. PADGETT:  Object to form.
24  BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    A.  You know, our responsibility was to report
2  suspicious orders and by industry practice and -- and
3  at the time and what was expected by DEA, we were
4  complying with what -- what was expected and what was
5  industry practice, which was report the suspicious
6  order and it would have been after the fact at that
7  time prior to the spring of 2008.
8  BY MR. YOUNG:
9    Q.  Okay.  And what I want to know is did
10  H.D. Smith take any action, and they may not have, I
11  don't know, did they take any action once they
12  recognized that a suspicious order went out the door?
13    MR. PADGETT:  Object to form.
14  BY THE WITNESS:
15    A.  I'm not sure prior to me coming there.
16  BY MR. YOUNG:
17    Q.  How about under your tenure?
18    A.  We did investigate those when they were
19  brought to my attention.
20    Q.  Is there any ability to retract an order
21  from a pharmacy that was shipped?
22    A.  Not to my knowledge.
23    Q.  Did you ever make an attempt to contact a
24  pharmacy and explain that you mistakenly shipped an

Page 83

1  order in excess of what they were entitled to receive?
2    A.  At that time, again, we need to talk about
3  time periods, at that time there was no limit or
4  whatever.
5    Q.  Going back to this letter, this Rannazzisi
6  letter from September of 2006, what, if anything, did
7  you do with this letter?  Did you distribute it, did
8  you condense it to a memo, did you share it with
9  anyone?  What did you do with it?
10    A.  Prior to this letter coming out, the --
11  again, I had had a -- this came out in September 2006.
12  I had a meeting with DEA in January of 2006 that
13  discussed much of the information that was in here.
14  This letter is pretty much pertaining to internet-type
15  pharmacies, the same way as the -- the meeting I had
16  with DEA.
17    So we had already acted upon that.  We
18  had -- I had developed a presentation.  I actually
19  used much of the -- the presentation that DEA had
20  provided me and provided that to our -- our
21  distribution centers, our sales reps, our operations
22  people to better inform them of what to look for
23  regarding internet-type pharmacies.
24    Q.  But specifically with regard to this

Page 84

1  letter, did you do anything with it or did you just
2  read it and file it away?
3    A.  We were already addressing the concerns
4  that were in this -- when this letter came.  So it's
5  not like it just got filed away.  We were already, you
6  know, taking this to our people, to our salespeople at
7  all of our divisions, to our operations people to
8  inform them of things to look for, the things that
9  are -- that are listed on -- on Page 3.  We -- we
10  started to put together a -- we started to explore an
11  automated system that we could use to better adhere to
12  our responsibilities.
13    Q.  And we'll get into the automated system
14  and whatnot, but I want to know, you know, practically
15  speaking, when you received this letter, I know it was
16  forwarded to you because it wasn't addressed to the --
17  to you at your -- at your office, after you received
18  this specific letter, what you did with it?  So not
19  the information in it, but the letter itself, did you
20  forward it to anyone?
21    A.  I could have.
22    Q.  You don't recall?
23    A.  (Nodding head).
24    Q.  Do you know whether or not senior

Page 85

1  management, so management at a -- at a status or
2  hierarchy above yours received a copy of this letter?
3    A.  These letters were -- were shipped to DEA
4  registrants which would have been our -- our
5  warehouses.  Our corporate office is not a
6  registered -- a registrant with DEA.  They would not
7  have received this.  I can't tell you for sure.  My
8  assumption is I would have forwarded it to upper
9  management.  I can't tell you for sure.
10    Q.  Do you recall any specific conversations
11  that you had with senior management about the contents
12  of this letter?
13    And I don't mean your prior meeting with
14  DEA, you mentioned that January meeting, but
15  specifically this letter?
16    A.  No.  I don't recall.
17    Q.  Do you recall whether or not this letter
18  was distilled or condensed in any form for sharing
19  with other people in the compliance department?
20    MR. PADGETT:  Object to -- object to form.
21  BY THE WITNESS:
22    A.  I don't know what you mean by that
23  question.
24  BY MR. YOUNG:

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Q.   Were there other people in the compliance
2    department at the time you received this letter?
3    A.   I think one.
4    Q.   Who was that?
5    A.   P.J. VanDermeersch, P.J. Little at the
6    time.
7    Q.   Do you know whether P.J. received a copy
8    of this letter either from you or from some other
9    source?
10   A.   I'm sure she did.
11   Q.   Do you recall discussing the contents of
12   this letter with P.J.?
13   A.   I don't.
14   Q.   Okay.
15   MR. YOUNG:   Now is probably a good time to take
16   a break.  I think we've been going a little bit.  I
17   don't know if you need to use the restroom, but we'll
18   go off the record.
19   THE VIDEOGRAPHER:   We are off the record at
20   10:44 a.m.
21   (WHEREUPON, a recess was had
22       from 10:44 to 10:55 a.m.)
23   THE VIDEOGRAPHER:   We are back on the record at
24   10:55 a.m.

Page 87

1    BY MR. YOUNG:
2    Q.   Mr. Euson, we -- we just took a break and
3    I -- I know that you had a chance to communicate with
4    your counsel.  I don't want to know any of the content
5    of what you may have discussed with them, but is there
6    anything that you learned or were instructed that
7    might change your testimony from the prior session
8    that we just had?
9    A.   No.
10   Q.   So when we just left, we were looking at
11   the Rannazzisi -- what I call Rannazzisi 1, the first
12   letter.  And I want to show you what I call
13   Rannazzisi 2, which is another letter from
14   Mr. Rannazzisi.  This one is dated December 27th,
15   2007th -- 2007, and I'd just ask you to take a look at
16   that.
17   Just like with regard to the first letter,
18   I'll ask:  Do you recall receiving a copy of this
19   letter?
20   A.   Yes.
21   Q.   Is it your recollection that you received
22   it around the time that it was dated in December
23   of 2007?
24   A.   I would assume.

Page 88

1    Q.   The other thing I'd ask is:  Do you recall
2    what you did with this letter after you received it?
3    Just like we discussed with the prior letter, did this
4    letter receive the same treatment or different
5    treatment as the prior Rannazzisi letter?
6    A.   I don't recall exactly what I did with it.
7    Q.   There is a highlighted portion of this
8    letter.  It begins in Paragraph 3, if I could ask you
9    to read that into the record, please.
10   A.   Do you want just the highlighted part?
11   Q.   Yes.
12   A.   "Filing a" -- "Filing a monthly report of
13   completed transactions (such as, excessive purchase
14   report or high unit purchases) does not meet the
15   regulatory requirement to report suspicious orders."
16   Q.   Okay.  Does H.D. Smith agree or disagree
17   with that statement?
18   MR. PADGETT:   Object to form.
19   BY THE WITNESS:
20   A.   You know, this was part of the
21   ever-changing guidance and interpretation by DEA and
22   this was -- I agree with it, and this was right at
23   the time when we were putting together our automated
24   suspicious order monitoring program, our Controlled

Page 89

1    Substance Order Monitoring Program, so...
2    BY MR. YOUNG:
3    Q.   Did the laws or regulations change over
4    time or the -- the changes that you are talking about
5    are interpretations of the law?
6    MR. PADGETT:   Object to form.
7    BY THE WITNESS:
8    A.   The laws them -- the laws themselves, the
9    regulation?
10   BY MR. YOUNG:
11   Q.   Yes.
12   A.   The verbiage did not change.  The
13   interpretation and the -- of -- of how that regulation
14   was complied with did change over time.
15   Q.   And what did H.D. Smith rely upon to
16   change the way it interpreted those laws?  In other
17   words, did you receive something in writing from the
18   DEA which said:  This is how you should conduct your
19   program?
20   A.   There was a series of events that happened
21   and especially in 2007, we -- there was an industry
22   conference in September that year in which a DEA
23   representative gave a presentation on expectations of
24   compliance with the regulation.

23  (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    At that meeting I was invited to come up
2    to DEA headquarters in October of 2007 to discuss
3    H.D. Smith developing an automated system and we met
4    with DEA headquarters in October of that year and we
5    began -- we -- we had started to develop an automated
6    system but it wasn't -- we could never get it to work
7    right.
8         We revamped it after that meeting and --
9    and after -- during that presentation and in
10   September, DEA and a -- person with A --
11   AmerisourceBergen put on a -- a joint discussion on
12   order monitoring, and so we tried to fashion our order
13   monitoring system to make it similar to
14   AmerisourceBergen's and I had constant contact with
15   DEA headquarters, Kyle Wright with the DEA, as we were
16   developing it.
17        So I'm not sure exactly if this was your
18   question, but this is where I'm going with it, so you
19   know, by -- from October to -- to April or March we
20   were developing our system to -- to role out our
21   automated system to better comply with the new
22   interpretation or -- of -- of the regulation.
23   Q.   And is it your position today that
24   H.D. Smith was not obligated to comply with the letter

Page 91

1    of the law prior to the rollout of the automated
2    system because of direction -- directives from the
3    DEA?
4    MR. PADGETT:  Object to form.
5    BY THE WITNESS:
6    A.   Our obligation was to comply with the
7    regulation, and based on industry standard and the
8    interpretation and with working with DEA at the time
9    before our automated system, we believed we were
10   complying with the regulation of reporting orders when
11   discovered.
12   BY MR. YOUNG:
13   Q.   So the -- prior to the implementation of
14   your automated system, and that's under the manual
15   system that -- that you described earlier, the manual
16   system did not meet the requirements that are
17   enunciated in the Rannazzisi '07 letter, did they?
18   A.   We reported suspicious --
19   MR. PADGETT:  Object to form.
20        Go ahead.
21   BY THE WITNESS:
22   A.   We reported orders that we -- that our
23   operations managers deemed as potentially suspicious
24   to DEA after the fact, after they had been shipped, as

Page 92

1    was industry standard, and we were in compliance with
2    what we believed was DEA's expectation of complying
3    with that regulation.
4    BY MR. YOUNG:
5    Q.   Okay.  But that was not technically in
6    compliance with the law as it was written, is that
7    true?
8    MR. PADGETT:  Object to form.
9    BY THE WITNESS:
10   A.   We believe we were in compliance with the
11   regulation.
12   BY MR. YOUNG:
13   Q.   And what was the basis for that belief?
14   Did the DEA send you a letter blessing or sanctioning
15   your program?
16   A.   DEA will not do that.
17   Q.   Did you rely upon the advice of outside
18   counsel to lead you to conclude that your system was
19   in compliance with the law?
20   MR. PADGETT:  Ob- -- object to form.
21        I'll instruct you not to answer any
22   attorney/client communications.
23   MR. YOUNG:  On the development of CSOMP?
24   MR. PADGETT:  Excuse me?

Page 93

1    MR. YOUNG:  On the development of the suspicious
2    order monitoring system?
3    MR. PADGETT:  That wasn't your question.
4    BY MR. YOUNG:
5    Q.   Did your system -- the automated system
6    that you developed, were you under the impression that
7    the automated system, which we'll talk about shortly,
8    that that was in compliance with the letter of the law
9    of the Controlled Substances Act?
10   MR. PADGETT:  Object to form.
11   BY THE WITNESS:
12   A.   Regarding the section on -- on reporting
13   suspicious orders?
14   BY MR. YOUNG:
15   Q.   On any and every section of the Controlled
16   Substances Act, was your automated system in
17   compliance with that?
18   MR. PADGETT:  Object to form.
19   BY THE WITNESS:
20   A.   We believed it was.
21   BY MR. YOUNG:
22   Q.   Now, you -- you seemed to hesitate that
23   you believed that it was.  Is it -- is it 100 percent
24   that it was in compliance or are you unclear as to

24  (Pages 90 to 93)

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1  whether or not it was in compliance?
2  MR. PADGETT: Object to form.
3  BY THE WITNESS:
4  A.  I'm not unclear.  My -- we believed that
5  we were in compliance.  We developed that automated
6  system to somewhat mirror AmerisourceBergen's system
7  that -- DEA won't bless or -- or say that any
8  system -- there is -- there is no definition of a
9  system that is authorized or -- or blessed by DEA.
10  You know, I knew that DEA was involved with the
11  development of AmerisourceBergen's.  And then when we
12  met with DEA at headquarters in October of 2007, I was
13  in constant communication with DEA headquarters, Kyle
14  Wright specifically at DEA headquarters, letting him
15  know all along the way how we were developing that
16  system.  Would he give a blessing on it and say
17  that's -- that's exactly what they want?  No, they
18  won't do that.  So our belief, my belief is that we
19  were in compliance with the regulation.
20  BY MR. YOUNG:
21  Q.  Did anyone give you an opinion, a
22  regulatory opinion, a -- a government opinion about
23  whether or not your system was in compliance with the
24  CSA entirely?

Page 95

1  A.  No, but we also -- numerous cyclical
2  inspections by DEA at all of our distribution centers
3  and there was never anything brought up that our
4  system was out of compliance.
5  Q.  There is another highlighted section in
6  this letter.  It's a -- just a part of a sentence I'd
7  just like you to read.  It says -- it begins with:
8  "Registrants must conduct."
9  Can you read that into the record?
10  A.  Just the highlighted part --
11  Q.  No, the whole sentence.
12  A.  -- out of context?
13  Q.  That sentence.
14  A.  Pardon me?
15  Q.  That sentence:  "Registrants must
16  conduct."
17  A.  "Registrants must conduct an independent
18  analysis of suspicious orders prior to completing a
19  sale to determine whether the controlled substances
20  are likely to be diverted from legitimate channels."
21  Q.  Okay.  So do you agree or disagree that
22  that is a requirement under the Controlled Substances
23  Act?
24  MR. PADGETT: Object to form.

Page 96

1  BY THE WITNESS:
2  A.  The requirement is to report suspicious
3  orders and the requirement is for us to maintain
4  effective controls against diversion.
5  BY MR. YOUNG:
6  Q.  Okay.  That's not my question.
7  My question is:  This sentence that is in
8  the Rannazzisi letter to all registrants, does
9  H.D. Smith agree that this is a requirement or does it
10  disagree that that's a requirement?
11  MR. PADGETT: Same objection.
12  BY MR. YOUNG:
13  Q.  And I would focus your attention on the
14  temporal aspect, the "prior to completing a sale"
15  provision.
16  MR. PADGETT: Object to form.
17  BY THE WITNESS:
18  A.  I -- I think that -- can you reword that
19  question, because I --
20  BY MR. YOUNG:
21  Q.  Sure.
22  A.  This -- you know, there is also, you know,
23  analysis of suspicious orders prior to completion of
24  sales.  You -- I need a little bit more context and a

Page 97

1  little bit more definition of exactly what you are
2  looking for.
3  Q.  So, as the chief compliance officer of
4  H.D. Smith, as the corporate designee of H.D. Smith,
5  what I would like to know is whether or not H.D. Smith
6  views that sentence as a regulatory requirement that
7  it is currently and historically complying with or
8  not?  If it dis -- if you disagree with it, that's
9  fine, but I want to know whether or not you have been
10  and are in compliance with that requirement,
11  conducting an independent analysis of suspicious
12  orders prior to completing a sale?
13  A.  You --
14  MR. PADGETT: Object to -- object to -- object
15  to form and scope.
16  BY THE WITNESS:
17  A.  This -- this letter is not law and it is
18  not regulation.  We comply with the regulation
19  regarding reporting suspicious orders and we comply
20  with the regulation of maintaining effective controls
21  against diversion.
22  BY MR. YOUNG:
23  Q.  And -- and -- and I appreciate your
24  testimony that this letter is not the law.  I just

25 (Pages 94 to 97)

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    want to know whether or not you disagree with the
2    statement.
3         Do you disagree that registrants must
4    conduct an independent analysis of suspicious orders
5    prior to completing a sale?
6         MR. PADGETT:  Object to form.
7    BY THE WITNESS:
8         A.  I -- I don't know what else to tell you,
9    we -- we comply with the law as written and we
10   consider these guidance documents.
11   BY MR. YOUNG:
12        Q.  Okay.  So is this a guidance document that
13   H.D. Smith relies upon in interpreting and executing
14   its responsibilities under the Controlled Substances
15   Act?
16        A.  We do analyze orders and if we discover a
17   suspicious order we report it and we also do
18   independent investigation on those orders.
19        Q.  Okay.  So H.D. Smith then conducts an
20   independent analysis of suspicious orders prior to
21   completing sales?
22        A.  What time period?
23        Q.  Let's start in 2008.  Did it -- did it do
24   that in 2008?

Page 99

1         A.  Once we had our automated system up, yes,
2    it was prior to the sale.
3         Q.  Okay.  So prior to the implementation of
4    the automated system, it did not do this, H.D. Smith
5    did not do an independent analysis of suspicious
6    orders prior to completing sales?
7         Is that your testimony?
8         MR. PADGETT:  Object to form.
9    BY THE WITNESS:
10        A.  With our -- with our manual system, there
11   were times when orders were discovered prior to sale
12   that were considered suspicious and reported and there
13   were times it was after the sale at the end of the
14   month when our operations managers went through prior
15   sales and reported them as potential suspicious
16   orders, but they were shipped out, it was after the
17   fact.
18   BY MR. YOUNG:
19        Q.  So this letter, the part which you
20   initially read, filing a monthly report of completed
21   transactions does not meet the regulatory requirement
22   to report suspicious orders, is that a -- an accurate
23   depiction of what H.D. Smith did prior to
24   implementation of its automated system, the filing a

Page 100

1    monthly report of completed transactions, or was it
2    something different?
3         A.  Yeah, we are -- our operations managers at
4    the time prior to our automated system would go
5    through monthly reports at the end of the month and if
6    they deemed that there was a pos -- a potential
7    suspicious order, they would report that to DEA.  It
8    was after the fact.  And then this letter was a
9    guidance letter saying that we are not doing that
10   anymore, now we are doing it before the sale.
11        Q.  And -- and that's real -- really what I
12   wanted to know is whether or not this letter was the
13   initial indication to H.D. Smith that what it was
14   doing was not sufficient.
15        Is this the first instance when H.D. Smith
16   learned of that?
17        A.  I wouldn't class -- I wouldn't say that it
18   was insufficient.  That was the industry standard and
19   that was the expectation at the time.  When I had the
20   discussion with DEA, with our industry -- the industry
21   meeting in September 2007, it was brought to people's
22   attention at that conference, which is for
23   distributors.
24        My individual meeting with DEA in October

Page 101

1    of 2007, they also brought it up before this letter,
2    and that's when we started working diligently on our
3    automated system so that we could comply with the new
4    interpretation and expectation of DEA.
5         Q.  Okay.  So what was the first instance -- I
6    think you mentioned three different points in time
7    there.
8         What was the first instance in which
9    H.D. Smith became aware that filing monthly reports
10   after the fact does not meet the regulatory
11   requirements?
12        MR. PADGETT:  Object to the form.
13   BY MR. YOUNG:
14        Q.  It might have been a phone call, it may
15   have been an e-mail, it may have been a letter.
16        A.  It was sometime at the end of 2007.
17        Q.  Do you recall what it was, was it a
18   letter?
19        A.  I -- I don't specifically recall.  It
20   was -- you know, we talked about it at our meeting
21   that we had in October and that's when we were going
22   to develop our system.  That's not something you can
23   develop overnight, and DEA was well aware of that and
24   knew that it would be springtime before we were able

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1   to get our automated system up and running to comply
2   with the expectations, their expectations and the
3   expectations of this letter, because that was not the
4   industry standard and the expectation up to this
5   point.
6       Q.   The Rannazzisi letter also references on
7   Page 2, I believe -- I think it is Page 2, yes. On
8   the last paragraph it mentions a case. And it says:
9           "I refer you to the recent final order
10  issued by the Deputy Administrator, DEA, in the matter
11  of Southwood Pharmaceuticals," and it gives a -- a
12  case citation.
13          Did you ever review the final order issued
14  by the DEA in the Southwood Pharmaceuticals case?
15      A.   Yes.
16      Q.   What did you conclude after reviewing that
17  final order?
18      A.   It has been a while since I read
19  Southwood, but my recollection is that it had to do
20  mainly with they were supplying internet pharmacies
21  with a lot of hydrocodone, if I recall correctly, and
22  they were not reporting those orders to DEA, and
23  consistently sold them even after they had been warned
24  by DEA. That's my general recollection of it, so...

Page 103

1       Q.   Did -- did you only review the Southwood
2   Pharmaceuticals final order because of this Rannazzisi
3   letter or were you otherwise aware of it?
4       A.   I don't know exactly when I was aware of
5   this. I think this final ruling, it looks like it was
6   in 2007, so I don't know when that came out.
7       Q.   Did you do anything with the Southwood
8   Pharmaceuticals final order that you reviewed, did you
9   share it with anyone at H.D. Smith?
10      A.   I don't know if I exactly -- I -- I don't
11  recall if I shared the actual ruling, but it was -- it
12  was discussed at -- in compliance meetings and such
13  that we would have had with -- with the divisions. We
14  did annual compliance trainings with our sales reps
15  and our divisions. And I know it was part of -- part
16  of a PowerPoint that I would have had that -- that --
17  and I would have explained the gist of the Southwood
18  ruling, that they had their registration revoked due
19  to internet sales.
20      Q.   Did they -- did H.D. Smith senior
21  management express any concerns to you about being in
22  violation of the CSA after learning about the
23  Southwood Pharmaceuticals final order?
24      A.   No.

Page 104

1       Q.   Did you have concerns about being in
2   violation of the CSA after reading the Southwood case?
3       A.   Not that I believe, no.
4       Q.   Was H.D. Smith of the belief that once it
5   implemented its automated system that it would be in
6   compliance with the DEA's expectations and
7   interpretations of the CSA?
8       A.   Yes.
9       Q.   So prior to implementation of that, for
10  the time period between when you first learned that
11  you were not sufficiently complying with the letter of
12  the law until you implemented the automated system,
13  for that period of time isn't it true that you were in
14  violation of the CSA?
15          MR. PADGETT: Object to form.
16  BY THE WITNESS:
17      A.   I don't believe so.
18  BY MR. YOUNG:
19      Q.   Why not?
20      A.   The DEA knew what we were doing, we had
21  done some beta testing, we were trying to look at
22  orders, we were reporting some when discovered, even
23  though they may have been after the fact, but, you
24  know, until we had our automated system up and

Page 105

1   running, you know, and we -- we did not have the
2   ability to do that as far as the prior to sale.
3       Q.   So am I to understand that H.D. Smith's
4   inability to comply with the law somehow made it okay?
5       A.   That's not what I'm saying.
6       Q.   Okay.
7       A.   I'm saying that we --
8           MR. PADGETT: I'll object to form.
9           Go ahead.
10  BY THE WITNESS:
11      A.   We believed that we were in compliance
12  with the law and the expectation from DEA in the way
13  we were operating and we were never told anything
14  differently. We had numerous dealings with DEA, we
15  had numerous inspections by DEA, and nothing was
16  brought up that we were in violation of -- of the --
17  of this regulation.
18          There were many pharmacies that we had
19  reported that we do our due diligence where we can
20  stop selling controlled substances to them and still
21  nothing was ever mentioned that we were in violation
22  of the regulation. And we did not believe that we
23  were.
24  BY MR. YOUNG:

Highly Confidential - Subject to Further Confidentiality Review



Page 106

1      Q.   I'm going to show you what's been marked
2  as Euson Deposition Exhibit 7.  This is a DEA report
3  of investigation of July 13th, 2006.  It is of a
4  Paragould Pharmacy, Semo Drugs of Kennett, SafeScript
5  Pharmacy and Max Care Pharmacy.
6          Does that report look familiar to you?
7  Have you seen that before?
8      A.   I have never seen it.
9      Q.   Is this the type of report that you would
10  receive a copy of?
11      A.   It looks like an internal DEA report.  We
12  would not -- I have never seen this, nor have I seen a
13  report similar to this.
14      Q.   This -- this report references -- where is
15  this name -- you have never seen this exhibit before.
16          So have you ever seen this type of report
17  before?
18      A.   I have not.
19      Q.   Do you know who Scott Garriott is?
20      A.   Yes.
21      Q.   How do you know Scott Garriott?
22      A.   He is a diversion investigator that -- out
23  of the Springfield field office, Springfield,
24  Illinois.

Page 107

10      Q.   Okay.  I'm going to show you an
11  investigative -- you've probably never seen any of
12  these reports, but I'm going to show you the next one
13  which is a similar report.  That is Exhibit 8.  And it
14  is also involving the same entities.
15          In this report it suggests on it that
16  H.D. Smith submitted a suspicious order analysis
17  report for the month of April 2006.
24      Q.   Okay.  That might just be the phrase that

Page 108

1  DEA is referring to.
2      A.   Okay.
16  reporting of suspicious orders to the DEA at the -- at
17  the time that this report was received by the DEA?
18      A.   Our operation managers would report to the
19  field office in -- in their area, so in -- in this
20  case it's -- it's our Springfield, Illinois
21  distribution center.  So our operations manager would
22  have reported to Scott Garriott who is the diversion
23  investigator in the field office.  So looking at this
24  report, I -- I -- I don't know what to tell you about

Page 109

1  it.  I mean --
2      Q.   You have no -- no recollection about this?
3      A.   No.
4      Q.   Okay.
5      A.   You know, as time went on, we had our
6  operations managers send us reports any time they had
7  contact with regulatory agencies, whether it was
8  sending us a suspicious order or not.  I don't know if
11      Q.   But earlier you referred to a manual
12  system and then the automated system.
13          This would have been during the manual
14  system at H.D. Smith?
15      A.   Yes, sir.
16      Q.   And at some point in time H.D. Smith
17  changed its reporting of suspicious orders from the
18  operations managers that you just described, is that
19  right?
20      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 ████████████████████████
2 ████████████████████████
3     Q.   And were you always reporting to the same
4 person at the DEA or was it -- was it a different
5 person each time or how did that work?
6     A.   We were under instructions -- the CFR, the
7 regulation says to report to the field office where
8 the -- your distribution center is located.  We were
9 under instructions by DEA headquarters after we had
10 gone up there in October of 2007 to report directly to
11 headquarters.  And there were -- there was -- there
12 were several different people that we would have
13 reported to, basic -- you know, based on who was in
14 what position at the time, whoever we were told to
15 send it to, but it was to DEA headquarters for a time.
16     Q.   And how were these submitted, were these
17 faxed, mailed, e-mailed?
18     A.   E-mail.
19     Q.   Was there a time when you were faxing
20 suspicious orders to the DEA?
21     A.   I'm an -- I -- I don't know.
22     Q.   Okay.
23     A.   I'm assuming that before -- before -- in
24 2008 when we had our automated system it was e-mail.

Page 111

1 I don't know how they were submitted by the divisions
2 prior to that.
3     Q.   Was there a protocol under the manual -- a
4 policy, a procedure or protocol under the manual
5 system which required internal copies of those reports
6 to anyone else?  I know you mentioned you didn't
7 receive them, but did anyone else receive them?
8     A.   Not that I'm aware of.
9     Q.   Okay.  I'm going to show you a one-page,
10 Exhibit 14, so skipping over quite a few since -- just
11 take a look at that.
12         Have you seen this e-mail before?
13     A.   This would have been before my time at
14 H.D. Smith, so I have not seen this before.
15     Q.   Okay.  I didn't know if -- if maybe your
16 counsel had provided it to you or if you've seen it
17 just in the course of business.
18         Okay.  Do you recognize the --
19 original sender of this e-mail, Danny Avila, Avila?
20     A.   Yes.
21     Q.   Do you recognize an Agent Barnes, it says:
22 "We called Agent Barnes from our local DEA office."
23         Do you know who that is?
24     MR. PADGETT:  I'm going to object to scope based

Page 112

1 on the exhibit's date.
2         You may answer.
3 BY THE WITNESS:
4     A.   Well, Danny Avila was in Florida, so --
5 and I think that's Agent Barnes -- or so it would be a
6 Diversion Investigator Barnes, and I -- if it's the
7 same person, I know her, but I -- I don't -- without a
8 first name, I know Barnes is kind of a common name,
9 so...
10 BY MR. YOUNG:
11     Q.   Okay.  Danny Avila in the -- in the e-mail
12 says in his last sentence:
13         "These orders would not be caught by the
14 suspicious order utility since they were keyed
15 in-house (is my understanding)."
16         Do you understand what Danny is referring
17 to there?  I understand this is before your tenure,
18 but I just want to know whether you are familiar?
19     MR. PADGETT:  Let the record reflect a
20 continuing objection based on scope, date of the
21 exhibit.
22 BY THE WITNESS:
23     A.   I do not know what that is.
24 BY MR. YOUNG:

Page 113

1     Q.   Okay.
2         The phrase "suspicious order utility,"
3 does that mean anything to H.D. Smith?  Does that have
4 a particular meaning?
5     A.   I -- I don't know what that is.  I have
6 never heard that term.
7     Q.   Okay.
8         The top part of the e-mail which is the --
9 I know the -- the headings are, I guess, cut off, this
10 is just how it was produced to us, but it is from an
11 Angelo Grande.
12         Do you know Angelo Grande?
13     A.   Yes.
14     Q.   Who is Angelo Grande?
15     A.   Currently he is in charge of our Valley
16 Wholesale division in Stockton, California.  Prior to
17 that he was vice president division manager of our
18 Carson, California division, which before that was in
19 Inglewood.  And it was a -- acquisition.  So he
20 came from an acquisition.  I believe it was Barnes
21 Wholesale that was acquired before my time.
22     Q.   Okay.  The second sentence of Angelo's
23 response to Danny is:
24         "You are correct.  It's my understanding

Page 114

1  also that all keyed items are excluded from the
2  reporting utility and those items are reviewed
3  manually with a report that is generated from the
4  AS400, showing control drugs sales history by item,
5  date, and by customer."
6          Do you know what he is referring to there
7  by the AS400?
8      A.  Let me read this through real quick.
9      Q.  Sure.
10     A.  I -- I don't know what he is talking
11 about.  I mean, I know what the AS400, that was our
12 sys -- that was our, I don't know what you call it,
13 our system, computer system, software companywide at
14 the time.
15     Q.  Who would be the --
16     A.  I can't -- I can only speculate what it
17 is.  I don't know what it is.
18     Q.  Okay.  Who would be the person who would
19 have the most knowledge about the AS400's suspicious
20 order utility?
21     MR. PADGETT:  Object to form.
22 BY THE WITNESS:
23     A.  I would have no idea.  I don't think -- we
24 haven't used AS400 since 2013, and I doubt there is

Page 115

1  anyone at H.D. Smith around anymore that would have
2  any expertise in it.
3  BY MR. YOUNG:
4      Q.  Who was in charge of compliance at the
5  time of this e-mail?
6      A.  Each -- each division was in charge of
7  their own compliance.
8      Q.  There was no central compliance function
9  in headquarters?
10     A.  Not that I'm aware of.  I was first.
11     Q.  Did -- I noticed that Dale Smith and Chris
12 Smith are both copied on Danny's original e-mail.
13         Why would they -- I'm sorry.  They are not
14 copied, they are actually direct addressees.
15         Who on -- why would they be included in a
16 compliance e-mail like this?
17     A.  I have no idea.
18     MR. PADGETT:  Object to form.
19 BY MR. YOUNG:
20     Q.  Did Dale Smith, Junior have any -- I
21 assume this is Dale Smith, Junior in this e-mail, is
22 that your opinion?
23     A.  It would be my opinion.
24     Q.  Yeah.  Did Dale Smith, Junior have any

Page 116

1  role in the compliance function of H.D. Smith at the
2  time of this e-mail?
3      A.  I don't know what his function was at this
4  time.
5      Q.  Do you know whether or not Dale Smith,
6  Junior ever authored any compliance-related policies
7  or procedures for H.D. Smith?
8      A.  I believe there is one policy regarding
9  orders.
10     Q.  That was authored by Dale Smith, Junior?
11     A.  Yes.
12     Q.  Do you know whether Chris Smith had any
13 role or involvement in authoring any policies or
14 procedures relating to compliance functions?
15     A.  Not that I'm aware of.
16     Q.  If we were to try to seek through your
17 information technology the either report or data
18 attendant to the report that's referenced here, who
19 would we be best to talk to about that?  And you may
20 not know.  I just --
21     A.  I -- I can only speculate.  Rob Kash- --
22     MR. PADGETT:  Let me reiterate my continued
23 objection.
24 BY THE WITNESS:

Page 117

1      A.  Rob Kashmer was the head of our IT at one
2  time.  I don't know if at this time.
3  BY MR. YOUNG:
4      Q.  Okay.
5          The last sentence, and, again, I realize
6  this is before your -- your tenure with the company,
7  but the last sentence of Angelo's response is, and
8  I'll -- and I'll read it:
9          "It's my understanding that this
10 monitoring requirement is all a matter of alerting and
11 assisting the DEA with abusers even though they are
12 already getting some of that data on a regular basis
13 through ARCOS."
14         What's the -- what is the reference to
15 ARCOS there, what does that mean?
16     A.  We report ARCOS data to DEA on a -- a
17 monthly basis through all of our distribution centers.
18 It is all of our C-IIs and C-III narcotic products
19 that are either purchased -- you know, either we
20 receive in or we distribute out.  It is part of the
21 closed loop system.
22     Q.  And the date of this e-mail is
23 October 5th, 2005.
24         Have there been any changes since the date

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    of this e-mail with regard to the way H.D. Smith
2    reports to the DEA on the ARCOS system?
3        A.   We -- we have central reporting now
4    through my office, through the corporate office.
5        Q.   Was that part of the automated system that
6    you've earlier described or is that something
7    different?
8        A.   No.  It's -- it's separate.
9        Q.   Okay.
10       I will now show you Plaintiff's Exhibit 15
11   with three highlighted sections on it.  Take your
12   time.  I think that this is the -- the policy that you
13   just referenced which was authored by Dale Smith,
14   Junior, but I want to -- want to hear from you, so
15   take a minute to familiarize yourself with it.
16       A.   This was the one I was referencing.
17       Q.   Okay.  Was this the policy for controlled
18   substance monitoring that was in place at the time you
19   joined H.D. Smith?
20       A.   Yes.
21       Q.   I understand that this was written before
22   you got there, but have you since getting there
23   learned when this policy was authored?  I think
24   it's -- it's not dated.

Page 119

1        A.   I have no idea.
2        Q.   Do you know how long it was in place when
3    you got there?
4        A.   I do not.
5        Q.   When you were hired at H.D. Smith, was
6    part of your responsibility to take ownership over the
7    policies and procedures relating to controlled
8    substance monitoring?
9        A.   When I was first hired?
10       Q.   Yes.
11       A.   No.
12       Q.   So when you were first hired with
13   H.D. Smith, you had no responsibility relating to
14   controlled substance monitoring policies and
15   procedures?
16       A.   It was -- it was an evolution.
17       Q.   Am I to understand your -- your initial
18   focus was on security more than controlled substance
19   monitoring?
20       A.   Originally my title was director of
21   security.  It morphed into director of security and
22   compliance.  By it was more of, yeah, security-related
23   audits of facilities.
24       Q.   The policy that's contained within

Page 120

1    Exhibit 15 describes an operations manager as the
2    controlled substances coordinator.
3            When did that definition or assignment to
4    the operations manager end, do you know the particular
5    date?
6        A.   It would have been when we rolled out
7    our -- our automated system which was rolled out
8    throughout the spring of 2008 to our various
9    distribution centers.
10       Q.   This policy references what I would call
11   paraphrasing of the regulations, and I'd just -- I'd
12   like you to read that first paragraph that's
13   highlighted there, "The monthly review"?
14       A.   Read it?
15       Q.   Yes.
16       A.   "The monthly review will consist of
17   comparing previous orders to determine frequency of
18   ordering, size of orders on specific products and
19   deviation from typical purchasing patterns.
20   Evaluations will be made from these reports to
21   determine if account should be brought to DEA's
22   attention."
23       Q.   So this was the policy that was in place
24   at the time you began at H.D. Smith, right?

Page 121

1        A.   Yes.
2        Q.   Is H.D. Smith of the opinion that this
3    policy complied or failed to comply with the
4    Controlled Substances Act as of 2005?
5        A.   Ask me that question again.
6        Q.   Did -- did the -- this policy, the
7    controlled substance monitoring policy, did this meet
8    the requirements of the CSA or did it fail to meet
9    those requirements?
10       A.   We be --
11       MR. PADGETT:  Object to form.
12   BY THE WITNESS:
13       A.   We believe that it did.
14   BY MR. YOUNG:
15       Q.   And I just want to reference back to your
16   earlier testimony.
17           Do you mean to say that you believe that
18   it met the requirements as interpreted by the DEA or
19   under the letter of the law?
20       MR. PADGETT:  Object form.
21   BY THE WITNESS:
22       A.   Both.  We were reporting orders when they
23   were discovered.  At this point it was discovered
24   during the monthly reviews.

31 (Pages 118 to 121)

Highly Confidential - Subject to Further Confidentiality Review

Page 122

BY MR. YOUNG:

1  Q.   What's a -- a picker?  This policy

2  references experienced pickers.

3       What's the -- I don't know if that's a

4  term of art, or what H.D. Smith...?

5  A.   In a -- in a warehouse environment, it is

6  the actual people that go to get the product for the

7  order.

8       So in a -- in a work -- in a

9  pharmaceutical warehouse, Schedule II products are

10  kept in a vault, III through Vs are kept in a -- in a

11  DEA-mandated cage.  Only certain people have authority

12  to go in those vaults and cages.  We put our most

13  experienced people in there to reduce errors and so we

14  have consistency of people looking at orders that

15  could possibly identify something that may be out of

16  the ordinary.

17      And so the picker actually has -- in the

18  old days it was paper, these days it is all

19  electronic, but basically it's just picking the

20  orders, you know.

21

22

23

24

Page 123

1  MR. PADGETT:  Object to form.

2  BY THE WITNESS:

3

4

5

6

7

8

9

10

11

12

13  Q.   And if they didn't make that observation,

14  if they -- if they failed to bring a otherwise

15  suspicious order to the attention of the manager, is

16  there some other mechanism in place at the time, this

17  is going back to '05, that would have caught

18  suspicious orders or unusual orders other than the

19  pickers?

20  A.   Not to my knowledge.

21  Q.   Do you know how effective this policy was

22  at H.D. Smith in identifying suspicious orders?

23  MR. PADGETT:  Object to form.

24  BY THE WITNESS:

Page 124

1  A.   We had orders that -- that pickers had

2  identified as potentially suspicious that were

3  reported and then the monthly reviews by the

4  operations managers that were, again, familiar with

5  the customers and, you know, we -- you know, and then

6  they would -- if they saw something that -- that they

7  thought may be suspicious, they would report it to

8  DEA.

9  BY MR. YOUNG:

10  Q.   If the DEA never had meetings in D.C. and

11  Rannazzisi never sent those two letters, would

12  H.D. Smith have continued this type of policy for

13  controlled substance monitoring?

14  A.   I can't speculate on that.

15  MR. PADGETT:  Object to form.

16  BY MR. YOUNG:

17  Q.   I just want to make sure I understand

18  whether or not the DEA is what triggered the change in

19  the evolution of your system or was it self awareness,

20  self observation?

21  A.   There is -- there is no regulation that

22  says you have to have an automated system or a manual

23  system.  There is still people today, there is

24  warehouses out there, there's people that have manual

Page 125

1  systems in place.

2       As evolution of -- of -- over time, you

3  know, when we had our first meeting, you know, I

4  started in November of 2005, had a meeting with DEA in

5  January of 2006, we started to explore a -- an

6  automated system so that we could constantly, you

7  know, try to improve our processes to maintain

8  effective controls against diversion.  You know, the

9  whole industry has evolved.

10  Q.   This policy was in place until what, what

11  time period?

12  A.   I don't know that it was -- it would have

13  been when we put a policy out in 2008 for order

14  monitoring.

15  Q.   Okay.  And prior to the implementation of

16  the 2008 policy, who -- who at H.D. Smith was

17  responsible for monitoring controlled substances?

18       So this policy references operations

19  managers and pickers.  Was there an -- an -- was there

20  anyone else that was involved in that process?

21  A.   I -- I -- I can't -- I can't -- I can't

22  say.  I mean, the operations manager was the

23  controlled substance coordinator.  He was the one that

24  was in charge of the warehouse, everything that went

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  on in the warehouse, so he would have been, you know,
2  the main person.
3      Q.   Was there an internal auditing function
4  that tested compliance with these policies and
5  procedures?
6      A.   Not that I'm aware of.
7      Q.   When you came onboard, and I understand
8  there is an evolution of your responsibilities, was
9  there a point in time in which you tested or called
10  into question the efficacy of this policy?
11      A.   I don't know if it was to call into
12  question.  We were just con -- we were just always
13  trying to him prove our processes and our procedures.
14      Q.   So did you evaluate this policy from a
15  compliance perspective?
16      A.   I wouldn't say I evaluated -- I evaluated
17  this policy.
18      Q.   Were there, I'm going to use the word
19  "thresholds," are you familiar with the word
20  "threshold" --
21      A.   I am.
22      Q.   -- in the context of registrants?
23          Were there thresholds in place for
24  pharmacy customers at the time of this policy?

Page 127

1      A.   Not that I'm aware of.
2      Q.   So the only -- what was the basis for a
3  picker to determine whether or not an order was
4  excessive?  Just their memory of the prior month's
5  order?
6      A.   It would have been their knowledge of
7  the -- of the customer, their ordering history, their
8  day-to-day, everyday phone orders.
9      Q.   I think you mentioned that this was a -- a
10  very veteran person in the company, there was not
11  much -- much turnover among the pickers?
12      A.   Not to my knowledge, no.
13      Q.   Was this a highly compensated position?
14      A.   I don't know if it would be highly
15  compensated.  It was -- you know, there were veteran
16  or, you know, experienced people that had had many
17  years on, so I don't know exactly, you know, how they
18  were compensated, if they got increases in wages when
19  they went into the cage or vault.  I can't answer
20  that.
21      Q.   How many pharmacy customers did each
22  picker pick for in a given month?  Was it -- did they
23  have designated customers they always picked for or
24  was it an order came in and you just handled that

Page 128

1  order?
2      A.   They would handle the orders as they came
3  in.
4      Q.   How many customers did H.D. Smith have in
5  2005, approximately?
6      A.   It would -- well, it would depend on what
7  distribution center you are talking about.  The
8  Springfield or -- or --
9      Q.   Nationally how many customers?
10      A.   In 2005, I -- I don't have any idea.  I --
11  we had -- I'm not even sure how many distribution
12  centers we had at that time because there was a period
13  of time where we were opening or making acquisitions
14  or what have you.
15      Q.   Okay.  But if a picker doesn't have the
16  regular customer that they are picking for each month,
17  how is it that they are going to know whether or not
18  an order on any given month is excessive?  In other
19  words, one month they may get Pharmacy X and the next
20  month they may get Pharmacy Y, how can they compare
21  the two?
22      A.   Usually our customers order every day.
23      Q.   Okay.  So how is it that a picker -- is
24  there some reference manual, is there some database,

Page 129

1  is there -- is there someplace for a picker to go when
2  they get an order for a customer they are not familiar
3  with to determine whether or not that order is
4  unusual?  And specifically I ask that because of your
5  prior testimony indicating there was no threshold for
6  these customers.  So how -- how are they to know,
7  what's the -- what's the basis?
8      A.   I can't answer that.
9      Q.   Okay.  Let's see.
10          Do you know whether or not there was any
11  training provided to operations managers for their
12  role as the controlled substance coordinators?
13      A.   What time period?
14      Q.   In '05, it's admittedly prior to when you
15  got there.
16      A.   I -- I don't know.
17      Q.   How about in '06?
18      A.   I implemented training in 2006 after
19  our -- our meeting with DEA in January of 2006.
20      Q.   What type of training did you undertake
21  for the operations managers?
22      A.   It was mainly regarding orders related to
23  internet pharmacies which was the basis of our
24  discussion in 2006, January of 2006 with DEA.  I

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    used -- I may have used their whole PowerPoint that
2    they presented to me in addition to other information
3    I would have had to try to educate them on looking
4    at -- at orders that may be suspicious.
5        Q.   That PowerPoint, do you know if it was
6    shared with them via e-mail or was it something that
7    you put on live on the screen?
8        A.   I went to each distribution center.
9
10
11
12
13
14   manager making decisions, did the operation managers
15   have access to data, a database or a system that they
16   could use to compare prior months' orders?
17       A.   I believe the way that -- the way that
18   their reports came out at the end of each month they
19   would have access to monthly reports on controlled
20   substances purchased by our customers.  So they could
21   reference previous months if they wanted to.
22       Q.   And was there any type of formula or
23   algorithm used by the company to determine whether or
24   not an order was excessive as compared to prior

Page 131

1    months?
2        A.   Not at that time.
3        Q.   But at some point I guess with the role of
4    the automated system there was a calculation or
5    algorithm?
6        A.   Yes.
7        Q.   And we'll -- we'll talk about that in just
8    a sec.
9            Do you know whether or not there were --
10   other than the -- the typical monthly review that's
11   contemplated by this policy, were there ad hoc reviews
12   done by operation managers of pharmacies?
13       MR. PADGETT:  Object to form.
14   BY MR. YOUNG:
15       Q.   For -- for purposes of the controlled
16   substance monitoring, I should mention.
17       MR. PADGETT:  Same objection.
18   BY THE WITNESS:
19       A.   I -- I don't know.  You know, I was in
20   communication with -- with the operations managers.
21   What we discussed, if I -- we discussed certain
22   accounts, I -- I just -- I'm not -- I can't tell you.
23   I can't remember.
24   BY MR. YOUNG:

Page 132

1        Q.   And at the time of this policy, while this
2    was in place, it was the practice of H.D. Smith to
3    ship orders and later review whether or not they would
4    be reported to the DEA.
5            Is that accurate?
6        A.   It was a policy that if -- if pickers
7    would identify orders beforehand they could be
8    reported to DEA as suspicious, but also, you know, as
9    the policy says, there was a monthly review, as was
10   industry standard and the expectation from DEA.
11       Q.   But the -- the order that the picker
12   identified, was that shipped or was that held?
13       A.   You'd have to be more specific on what --
14   what our -- it would more like -- my understanding, it
15   would be held until we would discuss it with DEA.
16       Q.   Was that in the policy somewhere?
17       A.   I think it's in here somewhere about
18   discussing with DEA field office.
19       Q.   Yeah, I think the --
20       A.   It is right below your highlighted --
21       Q.   Yeah.
22       A.   -- part on the second page.
23       Q.   Yeah, let's -- let's dig into that a
24   little bit.

Page 133

1            There is a -- a highlighted portion
2    that -- can you read that for us?
3        A.   On Page 2?
4        Q.   Yes.
5        A.   "If while picking, an excessive purchase
6    is discovered it will be brought to the attention of
7    the Controlled Substance Coordinator.  A check with
8    the local DEA office will be made before shipping of
9    the individual order."
10       Q.   So there was a policy in place at the
11   time, this policy, that says if you identify an
12   excessive purchase, check with the operations manager
13   who is the controlled substances coordinator, right?
14       A.   Correct.
15       Q.   And it doesn't really say who.  I assume
16   it's the operations manager.  It says:  "A check with
17   the local DEA office will be made before shipping of
18   the individual order."
19           That's your recollection of what took
20   place in 2005?
21       A.   That's my understanding.  And I think --
22       MR. PADGETT:  Object to form.
23           Go ahead.
24   BY THE WITNESS:

34  (Pages 130 to 133)

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1      A.  -- that's what's in the policy.
2   BY MR. YOUNG:
3      Q.  Do you know how long it took to hear back
4   from the DEA when you reported suspicious orders at
5   the time?
6      A.  To my knowledge, we would never hear back
7   from DEA.
8      Q.  Okay.  So if you were to check with the
9   DEA before shipping and you never heard back from the
10  DEA, I take it that, then, the order never shipped?
11     MR. PADGETT:  Object to form.
12  BY MR. YOUNG:
13     Q.  Is that accurate?
14     A.  No, that is not necessarily true.
15     A check with the local DEA, that would --
16  in my mind that means you would call the DEA, check --
17  in this case you would try to talk to Garriott and
18  discuss the order with him.  Now, I wasn't there.  I
19  don't know exactly what happened, but that's -- that
20  would be my assumption.
21     And then it says, you know, in the next --
22  next paragraph:  "If" -- "If the local DEA office
23  cannot be contacted before shipping, it should be
24  brought to their attention as soon as possible."

Page 135

1      So it was still the expect -- the --
2   the -- the expectation of the DEA and the way this
3   policy is written is that, you know, that -- that
4   order, if they could not get ahold of the DEA to
5   discuss it with them, my assumption is it would be
6   shipped and then discussed with DEA at a later time.
7      Q.  And this policy was in place for part of
8   your initial tenure with H.D. Smith, right?
9      A.  It was.
10     Q.  So from the time that you got to
11  H.D. Smith until you implemented the new policy, what
12  you just described is what occurred, right, that the
13  order would -- would be shipped?
14     MR. PADGETT:  Object to form.
15  BY THE WITNESS:
16     A.  It depends on what the circumstance was
17  and if they were able to get ahold of -- of Garriott,
18  and I don't know if the order was -- first of all,
19  you'd have to be specific on what order and I don't
20  know if it was shipped or it wasn't.
21  BY MR. YOUNG:
22     Q.  Yeah.  And I'm --
23     A.  I'm only going by the policy.
24     Q.  And admittedly I'm speaking in

Page 136

1   generalities.  I want to understand what H.D. Smith
2   did generally.
3      So when -- under this policy when a picker
4   identified an excessive purchase and brought it to the
5   attention of the controlled substances coordinator,
6   who was the operations manager, it was the policy to
7   check with the DEA office.  And what I want to know
8   is, prior to the new policy, under this policy,
9   whether or not generally orders shipped or did not
10  ship?  If you can't say, you can't say.
11     A.  I -- I don't know.
12     Q.  Yeah.  Okay.
13     I had previously showed you some -- some
14  DEA investigation reports.  I know you weren't
15  familiar with them, but those order -- those
16  investigation reports indicated that those orders
17  which were reported as suspicious had, in fact, been
18  shipped.
19     Does that surprise you or is that
20  consistent with your recollection of what occurred at
21  H.D. Smith prior to implementation of the automated
22  pol- -- policy?
23     MR. PADGETT:  Object to the form.
24     You can answer.

Page 137

1   BY THE WITNESS:
2      A.  It wouldn't surprise me.  You know, the
3   enclosure down here says DEA purchase report, you
4   know, for a month's time, and -- and this is a period
5   later, so I'm assuming that they were shipped.  I
6   don't know for a fact.
7   BY MR. YOUNG:
8      Q.  Okay.  Do you know whether or not there
9   was consistent implementation and execution of this
10  policy at each of the distribution centers?
11     MR. PADGETT:  Object to form, scope.
12  BY MR. YOUNG:
13     Q.  From -- from '05 to '08?
14     A.  That was the expectation.
15     Q.  But you didn't test or verify whether or
16  not each of the distribution centers was complying
17  with this policy?
18     A.  No.
19     Q.  Was there anyone charged with auditing or
20  testing whether or not there was compliance with this
21  policy?
22     A.  Not to my knowledge.
23     Q.  Do you know whether or not operations
24  managers prior to your PowerPoint training were aware

35  (Pages 134 to 137)

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    of the statutory definition of suspicious orders?
2        MR. PADGETT:  Object to form.
3    BY THE WITNESS:
4        A.   I would have -- I would have no way of
5    knowing that.
6    BY MR. YOUNG:
7        Q.   Really what I'm asking is, other than this
8    policy, was there any other information that was given
9    to operations managers about compliance with the
10   Controlled Substances Act reporting requirements?
11       A.   Prior to me arriving there, I do not know.
12       Q.   How about after you arrived and except
13   your PowerPoint instruction?
14       A.   Well, I conducted an annual compliance
15   meetings at all of our distribution centers.
16       Q.   The -- you -- H.D. Smith maintained a
17   Louisville, Kentucky distribution center during this
18   time.
19           Is that accurate?
20       A.   Which time period?
21       Q.   '06 through '08.
22       A.   I don't think the Louisville distribution
23   center opened until 2007.
24       Q.   Okay.

Page 139

1        A.   I don't know the exact date.
2        Q.   Fair enough.
3            Do you know whether or not the Louisville,
4    Kentucky distribution center would have been the
5    center to ship into Ohio, the State of Ohio?
6        A.   Again, it would depend on the time period.
7    Prior -- I don't know --
8        Q.   Let me rephrase it.
9        A.   It would depend on the time period.
10       Q.   Let me rephrase it.
11           In 2007, where would Ohio pharmacies who
12   are customers of H.D. Smith have obtained their
13   products from, which center?
14       A.   It would probably, and I don't even know
15   if they had Ohio customers in 2006, but it would
16   probably be Illinois or Louisville.
17       Q.   And do you know today where Ohio customers
18   get their products from?
19       A.   More than likely Louisville.  They could
20   be some coming from New York metro and -- and Illinois
21   could have some and we used to have a Smith Medical
22   Partners that's no longer around that would have
23   shipped possibly into Ohio.  They were licensed in
24   Ohio.

Page 140

1        Q.   After an operations manager made a report
2    to the DEA about a suspicious order, do you know
3    whether or not they would inform the pharmacy customer
4    of that report to the DEA?  Was that --
5        A.   The practice was to not.
6        Q.   But it's possible that they did have those
7    conversations?
8        MR. PADGETT:  Object to the form.
9    BY THE WITNESS:
10       A.   I highly doubt it.
11   BY MR. YOUNG:
12       Q.   Do you know whether or not the sales --
13   I'll refer to them as the sales staff.
14           Does H.D. Smith have sales staff?
15       A.   Yes.
16       Q.   Do you know whether or not the sales staff
17   enter -- whether or not the sales staff ever
18   intervened on behalf of a pharmacy customer to prevent
19   the reporting of a suspicious order?
20       A.   Not to my knowledge.
21       Q.   Okay.  Moving right along.
22       MR. PADGETT:  What time do you want to break for
23   lunch?
24       MR. YOUNG:  Oh, what time is it?

Page 141

1        MR. PADGETT:  It is 12:05 right now.  But if you
2    go to 12:15, that would be another hour,
3    hour-and-a-half block.
4        MR. YOUNG:  I'm just trying to see where we can
5    find a nice, natural break here.  I guess we can -- I
6    guess let's do it now.  How long have we been going
7    since the last break?
8        MR. PADGETT:  About an hour.
9        MR. LEEDER:  A little over an hour.
10       MR. PADGETT:  About an hour and ten.
11       MR. YOUNG:  All right.  Let's do it.  We have to
12   keep the witness fed.
13       THE VIDEOGRAPHER:  We are off the record at
14   12:04 p.m.
15           (WHEREUPON, a recess was had
16            from 12:04 to 1:02 p.m.)
17       THE VIDEOGRAPHER:  We are back on the record at
18   1:02 p.m.
19   BY MR. YOUNG:
20       Q.   Mr. Euson, we just broke for lunch.
21           During lunch did you have occasion to
22   speak with your counsel?
23       A.   I did.
24       Q.   Did any of the communications between you

36  (Pages 138 to 141)

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    and your counsel affect or impact the testimony that
2    you've already provided?
3        A.   I wanted to make a clarification on a
4    previous testimony.
5        Q.   Okay.  We'll get to that in a second.
6        A.   Okay.
7        Q.   Did any of the communications with your
8    counsel serve to prepare you further for the rest of
9    the deposition for 30(b)(6) purposes?
10       A.   No.
11       Q.   There was no preparatory comments or get
12   ready for this or expect this?
13       A.   No.
14       Q.   So you mentioned you wanted to clarify
15   something.  What is it?
16       A.   You had asked me about West Virginia and I
17   had -- I had misspoke and I wanted to clarify.  I said
18   it was a fine in West Virginia.  It was a settlement
19   with no admission of any wrongdoing.
20       Q.   And that's your recollection or your
21   attorneys informed you of that?
22       A.   Well, I asked them for the clarification.
23       Q.   Were you involved in the, I don't want to
24   say the legal aspect of it, but were you as the chief

Page 143

1    compliance officer personally involved in the
2    settlement that was negotiated between the West
3    Virginia AG and H.D. Smith?
4        A.   I was not.
5        Q.   Okay.
6            Okay.  So, where we left off was sort of
7    the first generation of your compliance process and
8    policies and we called that the manual phase, I think,
9    or the manual program, prior to the automated program,
10   right?
11           And so I want to now veer into the
12   automated program and -- and learn a little bit about
13   that.
14           The -- when was the first instance in
15   which H.D. Smith determined that it needed to create
16   an automated program?
17       A.   When you say "needed," do you -- do you
18   reference that as some type of a requirement?
19       Q.   Let me -- let me rephrase it.
20           When did H.D. Smith decide that it wanted
21   to create an automated compliance program?
22       A.   Probably mid 2006.
23       Q.   And what were the factors that H.D. Smith
24   considered in making that decision?

Page 144

1        A.   To develop a better process and procedure.
2        Q.   Did H.D. Smith determine that it was --
3    its current practices were in violation of the
4    Controlled Substances Act without implementing an
5    automated system?
6        A.   No.
7        Q.   So H.D. Smith could have, if it so chose,
8    have continued with the manual version of its
9    compliance program without violating the CSA?
10           MR. PADGETT:  Object to form.
11   BY THE WITNESS:
12       A.   There is no -- there is no regulation that
13   an -- that an auto monitoring system has to -- or
14   program has to be manual or automated.
15   BY MR. YOUNG:
16       Q.   And -- and I want to be clear in my
17   question.  I'm not just referring to the manual versus
18   automated functionality, but all of the elements of
19   what H.D. Smith did in complying with the CSA prior to
20   implementation of the automated program, when
21   H.D. Smith made the decision to go to the automated
22   program, did it determine whether or not its existing
23   or prior program was in or out of compliance with the
24   CSA?

Page 145

1            MR. PADGETT:  Object to form.
2    BY THE WITNESS:
3        A.   We were -- we were in compliance with CSA.
4    We wanted to improve the process.
5    BY MR. YOUNG:
6        Q.   Okay.  So H.D. Smith has never violated
7    the Controlled Substances Act?
8            MR. PADGETT:  Object to form.
9    BY THE WITNESS:
10       A.   What part of it?
11   BY MR. YOUNG:
12       Q.   Any part of it.
13       A.   Not to my knowledge.
14       Q.   Okay.
15       A.   No.
16       Q.   The -- when did the -- I'm going to call
17   it the CSOMP program, and I don't mean to -- to coin
18   that phrase, but I think that's the phrase that
19   H.D. Smith uses, right?
20       A.   It is for our automated system.
21       Q.   And what does CSOMP stand for?
22       A.   Controlled Substance Order Monitoring
23   Program.
24       Q.   When was that program live, when did it go

37  (Pages 142 to 145)

Highly Confidential - Subject to Further Confidentiality Review



Page 146

1   live?
2     A.  It was -- it was rolled out to our
3   different DCs in the spring of 2008, I believe, from
4   beginning of March through the end of May. I don't
5   have the exact dates, but it was by divi--- you know,
6   division by division.
7     Q.  Do you -- do you recall which division you
8   rolled out to first?
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 147

1
2
3
4
5
6
7
8
9
10     Q.  Did he share with you the details or the
11   content of what went into their system?
12     A.  More of the concept, not specific details.
13   At the same time I was in communication with -- with
14   Kyle Wright at the DEA. I believe Kyle Wright and --
15   and head of diversion at the time Mike Mapes, were
16   working with AmerisourceBergen on that also, so it --
17   it was more a conceptual, not the specific details of
18   it.
19     Q.  Are you familiar with a -- a document
20   called the Chemical Handler's Manual?
21     A.  I am.
22     Q.  How -- how do you know the Chemical
23   Handler's Manual?
24     A.  It is a manual concerning List I

Page 148

1   chemicals, and also at the time, again, you have to
2   reference the time period, at the time there was a
3   part of the Chemial -- Chemical Handler's Manual that
4   referred to suspicious orders and a loose template
5   on -- regarding that.
6     Q.  Was the Chemical Handler's Manual
7   something that Amerisource had relied upon in
8   developing its system, if you know?
9     A.  I do not know that.
10     Q.  Is it something that you discussed with
11   Mr. Zimmerman from Amerisource?
12     A.  I don't recall.
13     Q.  I'm going to show you what was premarked
14   as Euson Deposition Exhibit 21. It's -- frankly, it's
15   an excerpt. We don't have the full manual. There is
16   a -- a cover page and then there is an Appendix E-3.
17   I'll show you that.
18     MR. PADGETT: Sorry. Which exhibit?
19     MR. YOUNG: 21, I believe. It should be.
20     Yeah. Here you go.
21   BY MR. YOUNG:
22     Q.  Does that exhibit look familiar to you?
23     A.  Yes.
24     Q.  The Page 2 of the exhibit, Appendix E-3,

Page 149

1   it -- it's a list of terms and definitions.
2
3
4
5     A.  Can you give me a second to read this?
6     Q.  Sure.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

38 (Pages 146 to 149)

Highly Confidential - Subject to Further Confidentiality Review



Page 150

8   Q.  I gotcha.

13   Q.   Okay.  Prior to the implementation of your
14   automated system, your CSOMP system, did you have
15   established customer thresholds that they could order?
16   A.   Before CSOMP?
17   Q.   Yes.
18   A.   Yeah, I think it does describe before that
19   we did not.
20   Q.   I just want to make sure.
21       And part of the implementation of CSOMP
22   was creating customer thresholds, is that correct?
23   A.   Yes, that was one of the things that we
24   did with the system.

Page 151

1   Q.   And I'm just sort of taking your prior
2   testimony and your testimony about the adoption of the
3   Chemical Handler's Manual.

9   Q.   Okay.

16   MR. PADGETT: I'll object to form.
17   BY THE WITNESS:

23   BY MR. YOUNG:
24   Q.   Okay.  Let me -- let me stop you there.

Page 152

1   A.   Okay.
2   Q.   We'll -- we'll just kind of build it as we
3   go.

Page 153

13   Q.   And that was also something that was new
14   to H.D. Smith, you hadn't done that in the manual
15   system, right?
16   A.   No.
17   Q.   And you hadn't used families under the
18   manual system either?
19   A.   Not specifically, but I think the -- the
20   reports that the managers went through every month,
21   they were grouped somehow.  I got all controlled
22   substances.  I don't know if they were grouped
23   alphabetically or by different classes, but there
24   would be a -- it would have been the first time we



### Page 154

1    would have defined customers by volume and defined
2    families of drugs.
3         Q.   Okay.  So you got the customer size and
4    type and you've got the families.
5             What are the other factors that went into
6    determining whether an order was potentially
7    suspicious?
8         A.   These are factors on how we designed our
9    system.
10        Q.   Okay.
11        A.   Not factors that pointed to a suspicious
12   order.
13        Q.   Got you.
14        A.   A potentially suspicious order.
15        Q.   Let's -- let's go into building the system
16   first.
17        A.   Okay.
18
19
20
21
22
23
24

### Page 156

1    basis was what you just described and it could change
2    over time with the purchases of the pharmacy customer?
3         A.   Yes.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20        Q.   Do you know --
21        A.   And this is no longer in the Chemical
22   Handler's Manual.
23        Q.   Okay.
24             Do you know whether or not Cardinal or

### Page 155

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19        Q.   Okay.
20
21
22
23        Q.   Sure.  Under -- understood.
24             But that was the original -- the original

### Page 157

1    McKesson similarly adopted CSOMP systems of their own
2    at that time?
3         MR. PADGETT:  Object to form.
4    BY THE WITNESS:
5         A.   I don't know.
6    BY MR. YOUNG:
7         Q.   Were you a member of the Healthcare
8    Distribution Management Association at the time?
9         A.   I was.
10        Q.   Did you serve on any committees or
11   subcommittees or boards or panels for the HDMA?
12        A.   I was on two committees, regulatory
13   affairs committee and the state government affairs
14   committee.
15        Q.   And did your work on those committees
16   touch upon the development of these types of systems,
17   the CSOMP system?
18        A.   It -- it did.  Again, there was -- as I
19   stated before, there was no -- there is no system that
20   DEA endorses.  There is no -- there was no template
21   for it.  And -- and -- and even with a trade
22   association, you've got antitrust issues and such as
23   far as how much you can discuss with competitors.
24        Q.   Were there representatives from

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    Amerisource on the committee that you described that
2    touched on this compliance work?
3         A.   I believe Chris Zimmerman was on that.
4         Q.   Were there representatives from McKesson
5    on that committee?
6         A.   I believe so.
7         Q.   Were there representatives from Cardinal?
8         A.   I believe so.
9         Q.   And so did you meet regularly as a
10   committee?
11        A.   There were periodic calls and there was a
12   one-time-a-year face-to-face meeting that sometimes I
13   made, sometimes I didn't, and other members the same
14   way.
15        Q.   Were there other representatives from
16   H.D. Smith who would attend a committee meeting in
17   your absence?
18        A.   Again, it depends on the time period.
19   There were other people in my position when I was not
20   at the company and there were other people that
21   were -- could have gone to those meetings and in lieu
22   of me going.
23        Q.   I'm going to show you what was premarked
24   as Euson Exhibit 22.  It's a longer document than

Page 159

1    we've been handing you.  So it might take you a bit to
2    look at it.
3         Let me know if you are familiar with this
4    document?
5         A.   I'm familiar.
6         Q.   How are you familiar with this document?
7    Where do you know it from?
8         A.   It's from HDMA.
9         Q.   Did you have a hand, through your
10   committee work, in creating this document?
11        A.   I believe that the -- I -- I don't even
12   know which committee.  It may have been the regulatory
13   affairs committee that may have had a hand in -- in --
14   in this.  I know they also worked with some outside
15   consultants.
16        Q.   Do you recall receiving drafts or
17   participating in the drafting yourself of this end
18   product?
19        A.   I probably did.  I can't say specifically.
20        Q.   Do you know whether or not the CSOMP
21   system that H.D. Smith implemented in the spring
22   of 2008 met the guidelines that HDMA developed in this
23   document?
24        MR. PADGETT:  Object to form.

Page 160

1    BY THE WITNESS:
2         A.   I would have to study this again and get
3    into the weeds with it to --
4    BY MR. YOUNG:
5         Q.   All right.  Let's -- let's walk through a
6    little bit of the document.
7         A.   Okay.
8         Q.   So let's turn to page -- I think it's --
9    keep going -- page, what page is that?  6 of 13.
10   There is a Roman numeral section:  Monitoring for
11   Suspicious Orders, System Design.
12        A.   Monitoring for Suspicious Orders?
13        Q.   Yes.
14        A.   Okay.
15        Q.   Okay.  So that section, it looks like it
16   says:  "It is recommended that a distributor develop
17   an electronic system..."
18             H.D. Smith did that, right?
19        A.   Yes.
20        Q.   "...with accompanying written standard
21   operating procedures."
22             Do you know whether there were SOPs at
23   H.D. Smith at the time the CSOMP rolled out?
24        A.   We did develop SOPs at the time.

Page 161

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15        Q.   Okay.  Because it is such a small part of
16   the business, is that why?
17        A.   I can't tell you why our system doesn't
18   identify it.
19        Q.   Okay.
20             All right.  Let's flip the page.  The next
21   section, let's just pull this down here, it says:
22
23
24

41 (Pages 158 to 161)

Highly Confidential - Subject to Further Confidentiality Review



Page 162

12 Q. So, but beneath that bulleted point there
13 are some other options to identify families and I -- I
14 didn't know if you had used one of those to develop
15 your -- your system.
16 The second one is using the NTIS system or
17 the NDC number for the active ingredients.
18 Do you recall?
19 A. We -- we originally, when we beta tested
20 our system in 2006 and '7, we tried to use the NDC
21 code, and there are so many variables of the same drug
22 using the NDC code it became unusable in our --
23 Q. Okay.
24 A. -- system.

Page 163

1 Q. Okay. Section C is: "Develop thresholds
2 to identify orders of interest."

7 Q. The third paragraph of this section says:
8 "Distributors are encouraged to update these
9 quantities for determining averages by evaluating
10 schedules, products or families of products and other
11 information made available by the agency to determine
12 an appropriate benchmark for identifying controlled
13 substance orders of interest."
14 That's not so much of a system expectation
15 as it is a sort of policy or procedure expectation of
16 H.D. Smith.

Page 164

8 Q. Can you put some date connection to these
9 changes in the system, if you recall? So let's --
10 let's start with the first change.
11 The system began with a three times
12 multiplier. What was the first change to that three
13 times multiplier, when did that occur?
14 A. It had to have been after I came back,
15 because I left -- after we rolled out CSOMP to our
16 last distribution center, I left about a month after
17 that.
18 Q. Okay.
19 A. So it would have been sometime after I
20 came back, so sometime in 2009.
21 Q. Did the change to CSOMP when you returned,
22 was that because of something that you learned when
23 you were away from H.D. Smith?
24 A. No. It was -- it was more trying to

Page 165

1 constantly evolve and -- and make our system better
2 and -- and better meet our -- our customers' needs
3 and -- and their legitimate, you know -- you know,
4 sup- -- supply of drugs.
5 Q. One of the examples that this HDMA
6 guidance document includes is the geographical area,
7 the uniqueness of the geographical area.

23 Q. At some point did you move away from that
24 approach or is that how it is today?

Highly Confidential - Subject to Further Confidentiality Review



Page 166

9    Q.   When was the first time that that change
10   was incorporated into the system?
11        A.   I'm not sure.  It would have been before I
12   left in 2013, but I just don't -- I don't have the
13   specific date.  I could find it, but I just --
14        Q.   Do you -- that's okay.
15        Do you know the geographic area that -- or
16   areas that you considered in -- in making this change?
17   In other words, was it one part of the country that
18   you thought was skewing things or was it multiple
19   parts?
20        A.   It was -- it was different parts of the
21   country and different drugs that were at issue.
22        Q.   Do you recall which parts of the country
23   it was?
24        A.   You know, Florida had a -- an oxycodone

Page 167

1    problem, not a hydrocodone problem.  The Houston area
2    in Texas had a hydrocodone problem.  Middle Tennessee,
3    you know, had an oxycodone problem.  California had a
4    hydo -- a hydrocodone problem and promethazine with
5    codeine problem.
6         So we tried to keep track of the different
7    issues in different areas and tried to -- again, we
8    were always trying to improve our -- our system and
9    the processes that we were using.
10        Q.   Do you recall if Ohio was one of the
11   geographic areas that had a problem that was
12   considered here?
13        A.   Where specifically in Ohio?
14        Q.   Anywhere in Ohio?
15        A.   There is -- down in the southeast portion
16   of the state, Portsmouth area was a problem, Columbus
17   area was a problem.
18        Q.   And how did you determine that the
19   southeast part of Ohio was a problem?  What was the
20   basis for that conclusion?
21        A.   Research --
22        Q.   What --
23        A.   -- news articles.  You know, I -- I get
24   daily feeds from Google alerts, you know, on -- on

Page 168

1    various things.  There is books out about it.  There
2    is a -- there were certain physicians, practitioners
3    that we identified in certain areas of -- of the
4    country.  And where we found those practitioners with
5    what we would consider questionable prescribing
6    habits, that's where there would be issues.
7         Q.   And you said this was in 2013?
8         A.   When we made the change?
9         Q.   Yes.
10        A.   I -- I am getting on that.
11        Q.   Okay.  I won't hold you to it.  I don't --
12   I don't want you to guess.
13        So let's just pull this down here.  Going
14   on to Page 8 of that guideline document from HDMA,
15   it -- it also says that:
16        "Distributors are encouraged to consider
17   the following when developing 'thresholds.'"  And I
18   just want to tick down this bullet list to see if
19   HDA -- if H.D. Smith incorporated these
20   considerations.
21        The first one is:  "Quantities of products
22   the dispenser initially indicated during the 'Know
23   Your Customer' due diligence phase it expected to
24   purchase."

Page 169

Highly Confidential - Subject to Further Confidentiality Review



Page 170

```
10      Q.   Was it common for pharmacies to purchase
11   controlled substances from more than one distributor?
12      A.   Yes.
13      Q.   Would -- would it also be common for
14   distributors to discontinue doing business with
15   customers that order too much controlled substances?
16      A.   What do you mean by too much?
17      Q.   Suspicious orders.  So if a distributor
18   like H.D. Smith determined that its customers were
19   submitting suspicious orders, would H.D. Smith
20   discontinue doing business with that customer?
21      A.   It was commonly our practice that if we
22   identified orders that were suspicious and we reported
23   them to DEA -- and part of our investigation, again,
24   would be to go to the pharmacy, get dispensing
```

Page 171

```
1   information, you know, launch an investigation.  And I
2   would say more -- more times the norm would have been
3   that we would discontinue controlled substances to
4   that pharmacy if we had reason to believe there may be
5   diversion going on.
6      Q.   And do you know whether or not that
7   pharmacy would seek to obtain the controlled
8   substances that it sought from H.D. Smith from another
9   distributor?  In other words, was there communication
10   among distributors about these suspicious ordering
11   pharmacies?
12      A.   No.  There were -- at one time DEA was
13   sending out a list of pharmacies that other
14   wholesalers had either closed or declined to do
15   business with.  That practice was discontinued after a
16   short time.
17      Q.   Okay.  Turning back to this guideline,
18   Section (d) talks about -- (d) talks about "Cumulative
19   Reviews Or Thresholds."  It says:
20          "The system should contain a mechanism for
21   periodic review of cumulative orders from the same
22   customer over time, to evaluate trends in purchasing
23   patterns."
24
```

Page 172

Page 173

Highly Confidential - Subject to Further Confidentiality Review



**Page 174**

4    Q.   What type of evidence would exist in
5  H.D. Smith's records that would allow us to discern
6  whether or not a pharmacy was subject to a deeper dive
7  for being over the 20 percent?
8    A.   We have due diligence records on all of
9  our customers.
10    Q.   Okay.  So if we were to look at the due
11  diligence documents for a pharmacy that was at some
12  point in time over 20 percent controlleds to
13  non-controlleds, we should see some record in the due
14  diligence file of an evaluation?
15    A.   I -- I can't tell you that there would
16  always be one there.
17    Q.   But there --
18    A.   We did -- we did these, these were --
19  these were manual processes that we went through to
20  identify customers that we could have -- you know,
21  there may be a concern.
22    Q.   There was no automation of this in the new
23  CSOMP system?
24    A.   It was not a part of CSOMP.  It was --

**Page 175**

1  that was different.
2    Q.   Is there any --
3    A.   The audit was orders.
4    Q.   Sorry.
5    Is there any automation of this process
6  now?
7    A.   No, other than periodic reviews.
8    Q.   Okay.  The next section, Section (e) talks
9  about stopping shipments of orders of interest.  It
10  says:
11    "If an order meets or exceeds a
12  distributor's threshold, as defined in the monitoring
13  system, or otherwise characterized by the distributor
14  as an order of interest, the distributor should not
15  ship to the customer, in fulfillment of that order,
16  any units of the specific drug code product as to
17  which the order met or exceeded a threshold or as to
18  which the order was otherwise characterized as an
19  order of interest."
20    It is a rather long sentence that
21  basically says you shouldn't ship controlleds to
22  people that are over their threshold.
23    Is that true?
24    A.   Not exactly how you just characterized

**Page 176**

1  that.
2    Q.   Okay.  How would you characterize that?
3    A.   Our system is designed --

**Page 177**

17    Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review



Page 178

Page 180

2 schedule -- you know, it could be -- it depends.
2 Our -- you know, there's different phases of our
3 investigation.
4 If we were going to do a site visit, the
5 sales rep would be the -- the person that would
6 communicate that and say that, you know, our
7 compliance staff is going to come out and do a -- a
8 site visit with you and schedule that because we
9 don't -- we don't want to do -- we are not going to
10 fly across the country and the pharmacy owner or pick
11 is not there.  We want the people that are decision
12 makers to be there so we can discuss the concerns we
13 have.
14 Q.   Has H.D. Smith ever considered that the
15 salesperson might be in a conflict with the compliance
16 function in the example that you just discussed?
17 MR. PADGETT:  Object to form.
18 BY MR. YOUNG:
19 Q.   In other words, the salesperson is
20 motivated to have the sale go through and the
21 compliance person is motivated to make sure that the
22 wrong type of sale does not go through and those two
23 things are in conflict with each other?
24 A.   The sales rep's main job is to sell, but

Page 179

Page 181

1 we want to sell to good customers, good, compliant,
2 legitimate customers.  You know, they have no say-so
3 in compliance decisions.
4 Q.   Okay.
5 A.   All we are using them for is a conduit for
6 the discussion.
7 Q.   I want to show you Euson Deposition
8 Exhibit 17, which is essentially a collection of
9 documents.  It's -- it's two e-mails, a printout
10 and -- a printout of, like, a ledger and then a
11 Q.   That's never happened?        11 printout of a spreadsheet, I think.  I'll give you a
12 A.   No, not to my knowledge.      12 minute to look at that.
13 Q.   Do you know if salespeople would have had  13 A.   I can hardly read that.
14 such a conversation?               14 Q.   You can't read it?  I had -- we can -- I
15 A.   I -- I cannot say that for sure.          15 had that same problem.  We can only copy what we
16 Q.   Do you know the extent of communications  16 receive.
17 that the sales staff has with pharmacies when they are 17 Is that better?
18 subject to investigations for hitting their           18 A.   Yeah.  The focus is -- that -- that's
19 thresholds?                        19 fine.  It's the copy, I think.
20 A.   They have communication with them because 20 Q.   Are you able to read that?
21 we allow them to communicate what we are doing with   21 A.   I -- I can read it.
22 their account.  You know, they'll communicate to the  22 Q.   Okay.
23 pharmacy that, Hey, you are blocked from oxycodone and 23 A.   It will just take me a second.
24 we need to get a dispensing report and we are going to 24 Q.   Sure.

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    A.   Do you want me to read further?  I can see
2  that.
3    Q.   Oh, no.  Just familiarize yourself with
4  the first page.  We'll just focus on that first and
5  then we can talk about the rest of it.
6         Have you seen this document before?
7    A.   I don't recall.  It was just -- I'm sure I
8  have, but I don't recall seeing it lately.
9    Q.   So this purports to be an e-mail from
10  Brandon Sail -- Salyer?
11   A.   Salyer.
12   Q.   Salyer.  You're familiar with Brandon?
13   A.   Yes.
14   Q.   Is he still with the company?
15   A.   No.
16   Q.   And, I mean, obviously the document speaks
17  for itself, but -- but Brandon is a sales
18  representative in the -- in the Louisville
19  distribution center, is that right?
20   A.   Yes, he was.
21   Q.   And this is to P.J. Little who I think you
22  testified earlier was your colleague in the compliance
23  division?
24   A.   Right.

Page 184

Page 183

Page 185

12   Q.   Okay.
13   A.   I'm not sure what order those e-mails were
14  in.
15   Q.   Yep, and there -- I believe --
16   MR. PADGETT:  Is there a date?
17   MR. YOUNG:  Yes, I believe it is cut off.  These
18  were produced by you all.
19  BY THE WITNESS:
20   A.   It sounds like the first e-mail --
21  BY MR. YOUNG:
22   Q.   Yeah.
23   A.   -- was the history she was asking for.
24   Q.   So the next page is a printout on



Highly Confidential - Subject to Further Confidentiality Review



Page 186

1    H.D. Smith letterhead. Do you -- do you recognize
2    this type of -- and it is obviously just an excerpt
3    from -- from some printout, but do you recognize this
4    type of document?
5      A.   Yes. We called this our comment sheet.
6      Q.   Okay.
7      A.   It is basically a -- a chronological
8    record of any changes that we would have made with
9    different accounts.
10      Q.   And what is the date of this entry?
11      A.   April 22nd, 2009.
12      Q.   And LAK, does that signify Lori Kirbach?
13      A.   Yes.
14
15
16
17
18
19
20
21
22
23
24

Page 187

1
2
3
4
5
6    MR. PADGETT: Object to form.
7    BY THE WITNESS:
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 188

1
2
3
4
5
6
7
8
9
10
11      Q.   And as far as the reports or records of
12    H.D. Smith that would serve as evidence of these
13    examples, other than the due diligence files, is there
14    some type of report or repository or database that we
15    could look to to find instances where sales reached
16    out to compliance and compliance increased URLs?
17      A.   It was communication through e-mails.
18      Q.   It would all be e-mail, okay.
19
20
21
22
23      Q.   Sure. I just figured it was worth a shot,
24    if they were on your radar or not.

Page 189

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

48 (Pages 186 to 189)

Highly Confidential - Subject to Further Confidentiality Review



Page 190

Page 192

```
1      the DEA and HDMA, is that correct?
2          A.   Not HDMA.  This was the meeting we had
3      with Kyle Wright and Mike Mapes at DEA headquarters in
4      October --
5          Q.   Okay.
6          A.   -- 2007.
7          Q.   Did you attend a HDMA meeting on
8      October 16th and 17th of 2007?
9          A.   I -- I don't know.
10         Q.   Okay.  Let me -- let me go back one -- one
11     exhibit to Exhibit 18.  I will show you what is
12     labeled a Draft Summary of HDMA DEA Meeting October 16
13     and 17.  See if that refreshes your recollection.
14             And I'd -- I'd specifically direct your
15     attention to the last page of this exhibit, that lists
16     the attendees, under "HDMA Members in Person" you are
17     the third name.
18         A.   Then I guess I was.
19         Q.   Okay.  Fair enough.
20             So you attended this meeting of the HDMA
21     and DEA.  You -- you don't recall the meeting
22     specifically?
23         A.   Not specifically.
24         Q.   Okay.
```

Page 191

Page 193

```
1          A.   I do remember a meeting with Kyle Wright
2      there, so it may have been this one.
3          Q.   And subsequent to this, I'll just refer
4      back to Exhibit 19, which is the -- your letter to
5      Kyle Wright, so you sent Kyle Wright a piece of
6      correspondence, a letter, and it begins with: "Thank
7      you for taking the time to meet with Larry Mackey,
8      Brian Landry and me at DEA headquarters" and you are
9      following up on issues.
10             There is a -- a highlighted portion on
11     this first page.  Can you just read that sentence for
12     us?
13         A.   "In addition, our division management will
14     be instructed to review any orders they deem
15     suspicious and stop shipment until investigated."
16         Q.   And I -- you know, I -- I can't tell from
17     that sentence, in contrast to your prior testimony,
18     was that the practice prior to sending this letter or
19     was this a new development?
20         A.   Rephrase that.
21         Q.   Prior to writing this letter or prior to
22     meeting with Kyle Wright, was division management
23     instructed to review any order they deem suspicious
24     and stop shipment until investigated?
```

```
17         Q.   Okay.  That's fair enough.
18             I want to switch to Euson Deposition
19     Exhibit 19, which is actually a letter from you,
20     October 22nd, 2007, to Kyle Wright.  I'll give you a
21     minute to take a look at it.
22         A.   I'm familiar with it.
23         Q.   Okay.
24             You wrote this letter after meeting with
```

49 (Pages 190 to 193)

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1  A.  Well, as we've discussed before, the --
2  the practice was to look at orders at the end of the
3  month.  This was in the transition phase of -- of, you
4  know, when we are going from the manual system to the
5  automated system and it was just a reminder to our
6  division management that, you know, that we are
7  developing this system and that this is -- you know,
8  that -- that basically that's going to be the practice
9  going forward.
10  Q.  Did -- did Kyle Wright tell you during
11  your meetings with him that the way you were doing
12  things prior to CSOMP were insufficient?
13  A.  Not that I recall.
14  Q.  So what was the impetus to make the
15  change?
16  A.  As I said, we were already exploring an
17  automated system in 2006 and 2007 to improve our
18  processes and when we met with DEA in October, they
19  asked us if we would put an automated system together.
20  And I told them that we had been exploring it but that
21  we would make it our priority to put an automated
22  system together and -- and put it in practice by
23  spring of 2008.
24  Q.  Okay.  You also in this letter describe

Page 195

1  new customer due diligence forms and I think you
2  previously talked about this in answering another
3  question.
4  But who developed these forms, was it --
5  was it just you or was there a committee of people?
6  A.  It -- it was just me but it was with
7  reference to other materials, materials that DEA had
8  given me, materials that I had garnered from HDMA.
9  So, you know, all of the wholesalers questionnaires
10  were a little bit different, but basically on the same
11  theme.
12  Q.  You say in this letter that you are going
13  to send these examples of the new forms to Kyle for a
14  review.
15  Does -- was it your expectation that he
16  was going to comment or edit these forms for you?
17  A.  No.  Historically in communications with
18  DEA they give little to no guidance and it had been my
19  practice to, when I had discussed something with DEA,
20  whether it was a diversion investigator, Kyle Wright,
21  I would then put an e-mail together, send it to them
22  saying, This is what I understand our discussion was.
23  Usually I'd hear nothing, and to me nothing was good.
24  There was a practice at one time about

Page 196

1  sending letters to DEA saying this is what you are
2  going to -- this is what we are going to do and if you
3  don't hear -- and if we don't hear different we
4  consider that a yes.  So that was the premise that I
5  operated under.
6  So when I sent these -- these forms to
7  them to take a look at, the same way when I informed
8  them along the way on how we were developing our
9  system, my expectation is if he had an issue with
10  something, he would bring it to my attention, not that
11  he was going to endorse what we were doing, but if
12  there was something that we either misunderstood or
13  there was something we were doing wrong, my
14  expectation is that he would let us know that, Hey,
15  that's not right.
16  Q.  Okay.  You close your letter with a
17  commitment to implement all reasonable controls to
18  prevent diversion of controlled substances for illicit
19  use.
20  Did you have something specific in mind
21  when you -- when you referred to implementing all
22  reasonable controls?  Or are you just talking about
23  CSOMP or something more than that?
24  A.  No.  Just our -- our everyday commitment

Page 197

1  to -- to, you know, implement controls to -- to --
2  against diversion, not only CSOMP.
3  Q.  Did you ever hear back from Kyle about the
4  customer due diligence forms?  Do you know, did he
5  ever, like, say, Hey, good job or --
6  A.  I don't think so, no.
7  Q.  Okay.
8  Okay.  Let's see.  You -- I'm going to
9  turn to Euson Deposition Exhibit 23, which is an
10  e-mail, handwritten like a journal entry and, of
11  course, a redacted handwritten entry, I'm hoping that
12  maybe you'll be able to read.  It is also pretty
13  difficult to -- to read.
14  Once you are ready to talk about that, let
15  me know.
16  A.  Is there something redacted out of that
17  e-mail after "order" and the -- it is a little hard to
18  follow.
19  Q.  Which one?  After "order" there is, like,
20  a space and a period?
21  A.  Yeah, and then it goes into a monitoring
22  program.  I guess we don't know what that says.
23  Q.  Yeah, I don't know.  This is how we
24  received it, so.

Highly Confidential - Subject to Further Confidentiality Review



Page 198

1   A.   Okay.
2   Q.   So this e-mail is from you dated July 9th,
3   2007, to Scott Garriott.  I think you -- you
4   previously testified that Scott was a DEA employee,
5   right?
6   A.   Diversion investigator in Springfield,
7   Illinois.
8   Q.   And what was your purpose in sending this
9   e-mail to Scott?
10  A.   Can I finish reading it?
11  Q.   Sure.
12  A.   My purpose was just to let him know that
13  we were working on a -- on an automated system.  It
14  did not go as scheduled in this e-mail.  We had -- we
15  had issues in the initial development of the system to
16  make it work the way we wanted it to work.  So that --
17  that highlighted area "beginning Ju-" -- "July 1"
18  never occurred.
19  Q.   So I -- I -- I don't want to testify for
20  you, but I take it from this e-mail that that section
21  is actually part of what Amerisource sent in its
22  e-mail.
23      Is -- that your recollection as well?
24  Because your e-mail begins with:  "This is a

Page 199

1   communication that Amerisource sent out to their
2   customers.  We are close to implementing our system
3   but may need to tweak it based on the below."
4       And that's what I wanted to understand was
5   whether "all of the below" was the Amerisource
6   content?  I think that -- and that may also explain
7   the cutting and pasting or the redaction you were
8   asking about.
9       MR. YINGLING:  Objection to form.
10  BY THE WITNESS:
11  A.   Yeah, I'm speculating that it is.
12  BY MR. YOUNG:
13  Q.   Okay.
14  A.   Based on the corporate security and
15  regulatory affairs stuff.
16
17
18
19
20
21
22
23
24

Page 200

4   Q.   Okay.  There is some handwritten notes on
5   the bottom of this e-mail.  It says:  "Verbal
6   response:  Format is not required but Smith should
7   give it serious consideration."
8       Do you know whose handwriting that is?
9   A.   I don't.
10  Q.   I'm going to turn to Page 2 and ask if you
11  can identify, is that your handwriting?
12  A.   No.
13  Q.   Do you recognize that handwriting?  Would
14  you -- have you seen this document before or that
15  entry?
16  A.   I do not know whose handwriting that is.
17  Q.   Okay.
18  A.   I can only make an assumption that it
19  might be Garriott's.
20  Q.   Okay.  I'm not sure how we obtained it
21  from you all.
22      Okay.  That -- that's all from that
23  exhibit.
24      I want to turn to -- and I'm going to give

Page 201

1   you this one, it's -- because it's got the flags on
2   it.
3       MS. COOK:  Okay.
4       MR. YOUNG:  And you look -- we'll give them that
5   one, that version.
6   BY MR. YOUNG:
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

51  (Pages 198 to 201)

Highly Confidential - Subject to Further Confidentiality Review



Page 202

15    BY THE WITNESS:
16        A.   It would -- it would depict my --
17    BY MR. YOUNG:
18        Q.   Interpretation?
19        A.   -- opinion -- interpretation.
20        Q.   So, I think it's 4 --
21    MR. PADGETT:  You should have been a lawyer.
22    THE WITNESS:  Before we get into that --
23    MR. YOUNG:  Yeah.
24    THE WITNESS:  -- can we take a break?

Page 203

1    MR. YOUNG:  Oh, sure, by all means.  Any time
2    you feel the urge, let us know.
3    MR. PADGETT:  It is almost an hour 15.
4    MR. YOUNG:  Can we go off the record.
5    THE VIDEOGRAPHER:  We are off the record at
6    2:25 p.m.
7        (WHEREUPON, a recess was had
8        from 2:25 to 2:31 p.m.)
9    THE VIDEOGRAPHER:  We are back on the record at
10   2:31 p.m.
11   BY MR. YOUNG:
12       Q.   When we left off and took a break, we were
13   talking about the brief overview that you had drafted.
14   You've today looked at it a little bit, but you are
15   the author of it.
16
17
18
19
20
21
22
23
24       Q.   Okay.  That's -- that's a better way of

Page 204

1    going about it, frankly.
2        There is reference made in this document
3    and other documents, and I think your testimony today
4    included this phrase "know your customer."
5        Do you know the origin of the "know your
6    customer" phrase?
7        A.   I'm not exactly sure.  I think it is in
8    the Chemical Handlers book.
9        Q.   But --
10       A.   There may be other reference to it.  It's
11   kind of a, I don't know, it's -- it's a -- it is -- it
12   is something that's kind of the industry DEA expects
13   you to know your customer.
14
15
16
17
18
19
20
21
22
23
24

Page 205

7    BY MR. YOUNG:

Highly Confidential - Subject to Further Confidentiality Review



Page 206

4      Q.   Is H.D. Smith aware of instances in which
5   a pharmacy ordered and received more controlled
6   substances than it should have been allowed to?
7      MR. PADGETT:  Object to form.
8   BY THE WITNESS:
9      A.   You'd have to define that.
10  BY MR. YOUNG:
11     Q.   Is H.D. Smith aware of instances in which
12  any pharmacy in the country received an order of
13  controlled substances that should -- it should not
14  have shipped?
15     A.   If we identified orders that were
16  suspicious, we would not have shipped them.
17     Q.   And I want to clarify.  This is for the
18  duration of H.D. Smith including before your tenure
19  whether or not any customer received an order from
20  H.D. Smith that should not have shipped?
21     MR. PADGETT:  Objection; form, scope.
22  BY THE WITNESS:
23     A.   You'd have to identify the order and --
24  and give me more -- more details on that order.

Page 207

1   BY MR. YOUNG:
2      Q.   But you as the chief of compliance have
3   not identified any such order?
4      A.   No.
5      Q.   I'm going to show you Exhibit 25.  We
6   won't spend a lot of time on it.  It's --
7      A.   Are we done with that?
8      Q.   Oh, yeah, we are done with that one.
9           That is the -- let me take that one back.
10  That's my copy.

Page 208

Page 209

Highly Confidential - Subject to Further Confidentiality Review



Page 210

24    Q.    Okay.  And the current authorized users to

---

Page 211

1    do that are who?
2         A.    Currently, I have one compliance
3    coordinator that is still working at H.D. Smith.  Her.
4    Probably P.J.
5         Q.    Is -- is that because of the
6    acquisition --
7         A.    Yes.
8         Q.    -- by Amerisource?
9         A.    Yes.
10        Q.    Okay.
11        A.    There has been -- there has been
12    transitions into other roles.
13        Q.    I should have asked.  Prior to the
14    acquisition by Amerisource, who had the authority to
15    increase URLs at H.D. Smith?
16        A.    It would have been P.J. VanDermeersch,
17    she's the -- she would have been the compliance
18    manager, she was over licensing but she had
19    overreaching duties and responsibilities.  It would
20    have been Kyle Rieger, who was our compliance manager,
21    and then Tyler Walsh, who would have been our
22    compliance analyst, and Christina Wools, who is our
23    compliance coordinator.
24        Q.    That's quite a few people that you've

---

Page 212

1    described, which is different than when you first
2    started with H.D. Smith.
3              Is that, that assemblage of people, is
4    that the largest the compliance department has been or
5    was it larger?
6         A.    I still at the time had three compliance
7    managers in the field.  I had a licensing coordinator.
8    I had a couple of people at Valley that reported to
9    me.  I think I might have -- there may have been ten
10   or eleven total in the compliance department.
11        Q.    Was there any point in time in which you
12   asked for additional staff in compliance but were not
13   given authority to hire additional staff?
14        A.    No.
15        Q.    During your tenure in the compliance
16   department, is it your opinion that it was adequately
17   staffed at all times?
18        A.    I believe so.
19        Q.    I'm going to show you what was marked as



---

Page 213



---

Highly Confidential - Subject to Further Confidentiality Review



Page 216

```
22        Q.   I see.
```

Page 215

```
 3        Q.   Okay.  I was just curious about when we
 4   dig into the data how we would be able to identify
 5   those, but I'm not sure that's possible.
 6        Okay.  That's all for that exhibit.
 7        The next exhibit is No. 27 which is a -- a
 8   thread, I guess, or a collection of e-mails.  It is
 9   also somewhat small, hard to read.  Apologies in
10   advance.
11        A.   This one is easier.
12        Q.   Okay.  So this is a thread, it includes
13   you, the -- the -- the top entry is actually to you
14   from Dan Howard.  It designates Dan Howard as the
15   manager of operations in Pompano Beach.
16        Is that still the case, is Dan with the
17   company still?
18        A.   He has transitioned to MWI, a division of
19   AmerisourceBergen.
20        Q.   Okay.  So I want to just talk a little bit
21   about this thread.
```

Page 217

Highly Confidential - Subject to Further Confidentiality Review



Page 218

5     Q.  Okay.  So would it be -- this be an
6   unusual situation?
7     MR. PADGETT:  Object to form.
8   BY THE WITNESS:
9     A.  I -- I don't know.  I don't know what this
10  is.  I would have to get more information around this.
11  BY MR. YOUNG:
12     Q.  Would it be unusual for an operations
13  manager to be able to release held orders?
14     A.  They could have the ability, but it would
15  either be under the -- the restrictions that we put on
16  them that were in the previous policy or they may have
17  con -- they may have been in contact with Lori or
18  myself.  I just don't recall, but they are not going
19  to -- the divisions did not just release orders.
20     Q.  Evidence of that would be found in the due
21  diligence file for these customers?
22     A.  It should be.
23     Q.  Okay.  The next one is Exhibit 28.  This
24  is -- again, is a little easier to read, a shorter

Page 219

1   e-mail.  This is actually dated the same date that the
2   CSOMP divisional policy was created.
3     And I guess it probably makes sense to
4   start with the initial communication in the thread,
5   the -- the actual original -- what's going on here --
6   the original message was not included here.  I don't

Page 220

5     Q.  Do you recall this particular thread?
6     A.  I don't recall the thread, I recall the
7   pharmacy.

Page 221

3     Q.  So at the very top -- well -- well, first,
4   there is a -- a response from Bryce to your e-mail
5   where he says:  "Can we suggest to the customer to
6   call the DEA diversion for their questions?"
7     And I, you know, we are -- we are at a
8   disadvantage because we don't have the original e-mail
9   that they are referring to here, but your response to
10  that suggestion is at the top.  And it's -- can you
11  read that for us?  It begins with, "No I wouldn't."
12     A.  Can I read the rest of this first?
13     Q.  Sure.
14     A.  Okay.  What's your question?

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 226

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21      Q.   Do you share your information about
22  pharmacies that you've identified as suspicious with
23  your other distributor companies, with competitors?
24      A.   With DEA.
```

Page 228

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20      Q.   Does HDMA have any type of information
21  sharing between and among distributors about suspect
22  or problem pharmacies?
23      A.   No.
24      Q.   And you've never had -- you in your role
```

Page 227

```
 1      Q.   Just with DEA.  Do you know --
 2      A.   Any time that we block a -- a pharmacy
 3  from controls or we exit the company -- the pharmacy
 4  altogether based on compliance concerns or if we've
 5  identified doctors in our -- in our research, we
 6  notify DEA of that.
 7      Q.   When you take on a new customer, are you
 8  able to discern whether or not that customer was
 9  ordering too many controlleds from its prior
10  distributor?
11      A.   We don't have any way of knowing that.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 229

```
 1  as a chief of compliance for H.D. Smith have never had
 2  communications with any other distributor about
 3  problem pharmacies?
 4      A.   Now that we've been acquired by
 5  AmerisourceBergen, we will share a list of customers
 6  that we have discontinued selling controlled
 7  substances to.
 8      Q.   With Amerisource?
 9      A.   Yes.
10      Q.   But not with other distributors?
11      A.   No.
12      Q.   Do you think that's something that -- that
13  distributors should be able to do?
14      A.   I would welcome any additional cooperation
15  from DEA with the distributors to assist us in this.
16      Q.   All right.  I'm going to turn to -- one
17  moment.  This is Euson Deposition Exhibit 30.  I'll
18  give you this one.  That's fine.  Let me give you this
19  one.
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Page 230

12    Do you see that?
13    A.   Yes.
14    Q.   Can you read that for us?

Page 231

Page 232

Page 233

59 (Pages 230 to 233)

Highly Confidential - Subject to Further Confidentiality Review



Page 235

```
 7    Q.   Okay.
 8    A.   When I came back in April 2009 after
 9  getting up to speed with policies and -- and
10  procedures, we continued to improve our processes.
11    Q.   Okay.
12    A.   But all of these things that are on these
13  bullet points are things that we do on a regular
14  basis.
```

Highly Confidential - Subject to Further Confidentiality Review



Page 238

23    Q.   Okay.
24         I want to show you, this is Exhibit 33.

Page 239

1    And this may be something you referred to earlier.
2    This is -- it looks like a PowerPoint.  Take a look
3    and see if that looks familiar to you?
4         A.   It is familiar to me.  I'm not sure if I
5    was the one that presented this or not.
6         Q.   Okay.  Is that somewhat consistent with
7    the compliance training PowerPoint you described
8    earlier?
9         A.   Yeah, it's some of the information
10   that's -- that's usually in our --
11        Q.   Okay.  And turn to -- yours is flagged.
12   Let's see.  Go to Page 4.  It says, "Recent DEA
13   Actions.  H.D. Smith response in Florida Division."
14        What is that referring to?
15        Do you recall?
16        A.   In light of the oxycodone issues that were
17   occurring in Florida, and specifically South Florida
18   where we had a facility in Pompano Beach, we had been
19   in contact -- you know, constant contact, actually,
20   with -- with DEA personnel in Florida regarding the --
21   the issues of oxycodone.  And in response to some
22   discussions that I had with DEA, Chris Smith made a
23   decision to halt all oxycodone sales into Florida
24   until every single account of ours could be visited.

Page 240

1    And so that's what a lot of this pertains to.
2         Q.   Okay.  I want to understand a little bit
3    about that decision.
4         H.D. Smith decided that it should
5    discontinue oxycodone sales into Florida of its own
6    accord?
7         A.   Yes.
8         Q.   Did the DEA have any influence over that
9    decision?
10        A.   No, only through discussions I had with
11   DEA about the issues with -- with oxycodone and with
12   us being in South Florida, which was kind of the
13   epicenter of that issue, that was something that --
14   that Chris Smith decided that H.D. Smith should do and
15   we did it on our own accord.
16        Q.   Okay.  I want to show you Euson
17   Exhibit 35.  I'm going to come back -- well, we don't
18   need to come back to that one, but this is a letter, I
19   believe, from you to Leonard Levin at the DEA dated
20   April 27th, 2010.
21        So, do you recall this letter?
22        A.   Yes.  I'd have to reread it all --
23        Q.   Sure.
24        A.   -- if you want me to answer about it.

Page 241

1         Q.   And we don't need to do that.  I'm just
2    going to address some -- some particular points.
3         But this references a meeting.  And it
4    says: "This follows our meeting on Friday,
5    April 23rd," which would have been the prior week of
6    the -- of this letter.  And it says in the highlighted
7    portion, can you read that for us:  "However"?
8         A.   "However, given the tone and rhetoric of
9    your statements during Friday's meeting, we are also
10   concerned that the company is at risk for regulatory
11   action by the DEA if it does not reduce sales of
12   certain drugs to some of its customers in Florida.
13   Accordingly, this letter is to inform you that
14   H.D. Smith will immediately reduce sales of oxycodone
15   and other controlled substances, as appropriate, to
16   the customers you identified during the meeting on
17   Friday."
18        Q.   Okay.  So there was a meeting, I take it,
19   between you and Mr. Levin on April 23rd, 2010.
20        Do you recall that?
21        A.   Um-hum, yes.
22        Q.   At that meeting, just based on your letter
23   here, it appears that Mr. Levin identified for you and
24   for H.D. Smith particular pharmacy customers that it

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    was asking you to reduce sales of oxycodone to.
2         Is that correct?
3         A.   We had a meeting called by DEA.  Leonard
4    Levin was in headquarters.  Also Susan Langston, who
5    at the time I think was the group supervisor in the
6    Miami district, field office.  And I think Gayle Lane
7    who was a -- a division -- diversion investigator at
8    the time had a meeting and it was -- it was -- there
9    was a discussion about the issues with the oxycodone
10   in -- in Florida.  And, you know, they -- it was a --
11   it was a discussion about customers of ours and
12   customers in general and -- and the oxycodone issues
13   in general.
14        Q.   The -- the sentence that you read before
15   references tone and rhetoric of statements made at the
16   meeting by the DEA.
17        Do you recall specifically either the tone
18   or the rhetoric that the DEA had at that meeting?
19        A.   It -- it wasn't threatening, but it was to
20   the point.
21        Q.   A decision was made after that meeting,
22   which is what this letter is memorializing, to
23   immediately reduce sales of oxycodone and other
24   controlleds to the customers DEA identified.

Page 243

1         You mentioned previously that Chris Smith
2    made a decision to no longer sell oxycodone in Florida
3    at all.
4         Did the April 23rd meeting with the DEA
5    have any influence on that decision?
6         A.   Just they did identify a few accounts of
7    ours that they had issues with and we needed to do
8    more due diligence on.  There were already accounts in
9    Florida that we had been shutting down due to
10   oxycodone sales.  And then after that, not only
11   through this letter with -- with -- with Leonard
12   Levin, I was also in constant contact with Susan
13   Langston in -- in the Miami field office and we had
14   had discussions about the oxycodone issues in general,
15   and it was sometime after this, it wasn't as a direct
16   result of this meeting, but it was sometime after this
17   that -- that Chris Smith decided that we were going to
18   halt all sales of oxycodone until we could get into
19   every single customer and do complete new due
20   diligence on it, on every customer that we had in
21   Florida.
22        Q.   Do you recall whether or not the customers
23   that the DEA identified at that April 23rd meeting
24   which you subsequently reduced their oxycodone supply,

Page 244

1    do you recall whether or not H.D. Smith had conducted
2    a Level II investigations of any of those customers?
3         A.   At the time?
4         Q.   Yes.
5         A.   I -- I don't know.
6         Q.   Do you recall in the aftermath of this
7    meeting evaluating the specifically identified
8    customers identified by the DEA?
9         A.   I can only speculate that we did.  I would
10   have to check our due diligence files.
11        Q.   Do you know if there was a particular
12   report that would have been prepared or a memorandum
13   that would have been prepared reflecting that
14   evaluation of these specifically identified customers
15   in Florida?
16        A.   It would be in our due diligence files.
17        Q.   Just the individual due diligence file of
18   that customer but not a more general document?
19        A.   I don't know about those specific
20   pharmacies.  When we -- when we decided to halt all
21   sales of oxycodone in Florida, we had kept a -- kind
22   of a running spreadsheet on what our due diligence
23   efforts are because we had also brought in some
24   outside consultants to do site visits.  We were, you

Page 245

1    know, trying to get access to dispensing reports.  You
2    know, we were doing our own visits.  So there was a
3    lot of moving parts and so we tried to keep it
4    organized with a -- with a spreadsheet and we had
5    weekly meetings to discuss the accounts with the
6    division and what -- what our actions were.
7         Q.   Do you know whether or not -- or do you
8    recall whether or not the DEA opined that your
9    policies and procedures or systems to identify
10   suspicious drug orders were insufficient at that
11   meeting?
12        A.   They did not, that I recall.
13        Q.   Did they make particular feedback to you
14   about your policies, procedures or systems to identify
15   suspicious orders at that meeting?
16        A.   Not that I recall.
17        Q.   Can you read for me the sentence which
18   immediately follows the highlighted portion that
19   begins with: "In light of"?
20        A.   Wait.  Where are you at?
21        Q.   The first highlighted portion, it sort of
22   ends with "and will continue to review orders of other
23   customers."  The next sentence there, it is not
24   highlighted, it says: "In light of the meeting on

Page 246

1  Friday."
2      A.  "In light of the meeting on Friday,
3  H.D. Smith will take and apply the DEA's fade" --
4  "feedback to the company's overall policies and
5  procedures for identifying suspicious drug orders."
6      Q.  So reading that, does that refresh your
7  recollection about any feedback that the DEA may have
8  given you at that meeting about your policies and
9  procedures?
10      A.  I don't recall, but I also -- they would
11  not have -- they wouldn't even know what our policies
12  and procedures were.
13      Q.  Do you know if your policies and
14  procedures and systems, including the CSOMP that were
15  in place in April of 2010, identified any of the
16  pharmacy customers which were named by the DEA at that
17  April 23rd meeting as suspect or suspicious customers
18  in terms of their controlled ordering?  In other
19  words, were they on your radar?
20      A.  I don't know without looking at that.
21      Q.  Okay.  Can you read the -- the next
22  sentence, which is:  "We heard"?
23      A.  "We heard and understood the DEA's concern
24  Friday regarding prescribing issues in Florida."

Page 247

1      Q.  And -- and you can go ahead and finish it?
2      A.  "And we at H.D. Smith hope to work in
3  collaboration with the DEA to help address the
4  issues."
5      Q.  That seems to be a larger reference than
6  just the pharmacy customers the DEA identified
7  prescribing issues in Florida.
8          Do you know whether or not those concerns
9  are what informed Chris Smith's decision to no longer
10  sell oxycodone in Florida?
11      A.  I believe that what they were referencing
12  was the issue with pain clinics, the proliferation of
13  pain clinics in Florida.  We never sold directly to
14  pain clinics, but prescriptions that were written by
15  those pain clinic doctors would have filtered out and
16  been filled by some of our customers.  So -- and the
17  reason why we, you know, were insistent on looking at
18  prescription data, so that we could identify doctors
19  that may have questionable prescribing habits that
20  would be filled at our pharmacies.
21      Q.  You had access to the data to be able to
22  identify the providers that were writing the
23  prescriptions?
24      A.  Sometimes we did, sometimes we didn't.

Page 248

1  We -- we could not go in to a pharmacy and look at
2  prescriptions, that's a HIPAA violation.
3      Q.  Would a DUR report contain the prescriber
4  DEA number?
5      A.  It depended.  At this time -- it depends
6  on the timing.
7      Q.  In -- in 2010?
8      A.  Sometimes a pharmacy could give us that
9  information, sometimes it was not easy to discern the
10  prescriptions or the combinations.  We could get a
11  list of doctors that they were filling for, but not
12  the detail.  Some pharmacies were able to give that to
13  us, some only gave us utilization reports that didn't
14  have any doctor information on it and we had to ask
15  them and hope that they were telling us the truth
16  because we didn't have access to those records.
17          Once we were a -- you know, able to get
18  Pro Compliance reports, that does identify the doctor
19  that prescribes by prescription and that de-identifies
20  any of the HIPAA information so there is no HIPAA
21  violations.
22      Q.  Were these issues isolated in a particular
23  geographic region of Florida or was it just endemic to
24  Florida?

Page 249

1      A.  Population centers.  South Florida mainly,
2  but over in Tampa, Orlando, Jacksonville.
3      MR. PADGETT:  The big cities.
4  BY MR. YOUNG:
5      Q.  Okay.  One more thing on this one.
6          On Page 2, the second -- well, the first
7  full paragraph, it begins with:  "While H.D. Smith was
8  developing and implementing."
9          Could you read those two sentences for us?
10      A.  "While H.D. Smith was developing and
11  implementing new and enhanced procedures for SOM,"
12  which would be suspicious order monitoring,
13  "H.D. Smith provided detailed information to DEA about
14  its SOM.  The DEA even requested that H.D. Smith enter
15  into a memorandum of understanding regarding the SOM."
16      Q.  Did H.D. Smith ever enter into that
17  memorandum un -- of understanding or MOU?
18      A.  That would be subject to interpretation.
19  We had a memorandum of -- of understanding as a result
20  of our meeting in October of 2007 where DEA wanted us
21  to report suspicious orders to headquarters as opposed
22  to the field office as per regulation and then also
23  wanted us to report daily sales of all controlled
24  substances to DEA on a daily basis.  So we complied

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    with that.  We signed the memorandum of understanding.
2    We complied with all aspects of it and DEA never
3    signed it and they lost it.
4        Q.   Okay.  But it was your intention to enter
5    into MOUs?
6        A.   Yes, operated under the what we thought we
7    were supposed to do under the memorandum of
8    understanding.
9        Q.   Do you know, was that typical for the DEA
10   to seek MOUs with distributors?
11       A.   I don't know.
12       MR. PADGETT:  Object to form.
13   BY MR. YOUNG:
14       Q.   Was it discussed at any of the meetings
15   that -- the larger meetings, not the individual
16   meetings that you had with the DEA, this idea of
17   entering MOUs?
18       A.   I -- I don't know.  I believe there are
19   some other wholesalers that -- that do daily
20   controlled sales to DEA, but I -- I -- I don't know
21   that for sure.
22
23
24

Page 252

Page 251

Page 253

6    BY MR. YOUNG:
7        Q.   Okay.
8        A.   It was just a reiteration of what we were
9    already doing.
10       Q.   There is a -- a bullet point beneath there
11   which says:  "It is extremely important that we know
12   our customers" and then there is a reference to
13   promotion purchases.
14           What is that referring to?
15       A.   Without further reference, I'm not exactly
16   sure.
17       Q.   Are you familiar with, like, a summer
18   sales promotion program?
19       A.   There was promotions that -- that the --
20   that the company would put on, you know, occasionally
21   throughout the year.
22       Q.   Was H.D. Smith concerned from a compliance
23   standpoint that promotional purchases that exceed the
24   URL would artificially inflate the URL based on your



Highly Confidential - Subject to Further Confidentiality Review

Page 254

1   formula?
2       A.   Early on in my tenure there we stopped any
3   controlled substances being offered on promotion.
4       Q.   Okay.  So promotion purchases then
5   wouldn't impact suspicious order monitoring?
6       A.   No, because there were no controlled
7   substances that were on promotion.
8       Q.   Yet under the suspicious order monitoring
9   slide of this training module it is specifically
10  mentioned?
11      A.   Again, it was probably just a reiteration
12  of what we already had in place.
13      Q.   Okay.
14      A.   And that there were no promotion purchases
15  or, you know, there were no promotional -- controlled
16  substances were not included in any promotional-type
17  sales events.
18      Q.   And then finally, it talks about
19  assistance of the sales team and ongoing
20  communication.
21          Do you recall what kind of message you
22  gave during this training about ongoing communication
23  with pharmacies from the sales team for suspicious
24  order monitoring purposes?

Page 255

1       A.   I'm going to assume that it's -- it's --
2   it's an ongoing communication with the sales staff
3   because as I said we used them as our -- to
4   communicate with the -- the pharmacies.  They had
5   the -- the personal relationship with the pharmacies,
6   so any time we needed additional information, whether
7   it was dispensing information or we were going to do
8   an onsite visit, we coordinated that with sales staff.
9   Occasionally sales came with us so they could see what
10  we were doing when we did our site -- our onsite
11  visits, sometimes they didn't, but it was all -- any
12  contact with the customers is coordinated through the
13  sales rep that was responsible for that account.
14
15
16
17
18
19
20
21
22
23
24

Page 256

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19      Q.   Okay.  I -- I have the memorandum of
20  agreement that we talked about before and I want to
21  share this with you for one lim-- -- very limited
22  purpose.  This is Exhibit 36.
23          And is that the document that you recall,
24  the unsigned MOU between H.D. Smith and the DEA?

Page 257

1       A.   I believe this is.
2       Q.   And really I just want to use this
3   document to refresh your recollection about the timing
4   of the implementation of the CSOMP program.
5           On the last page there is a reference to
6   what I think are your divisions or distribution
7   locations.  It is called Exhibit 1.  And it has dates
8   next to them.
9           Is that -- well, let me ask you this way:
10  What do these locations and dates represent to you?
11      A.   Well, it is not all of our distribution
12  centers, so I'm not exactly sure, but I -- if -- if I
13  could compare this with our documents, I would assume
14  that this is when we rolled out CSOMP to our -- these
15  divisions, but there were -- there are more divisions,
16  so I don't know.
17      Q.   Sure.
18          But I guess at the time that this document
19  was created, this was the -- the state of affairs?
20      MR. PADGETT:  Object to form.
21  BY THE WITNESS:
22      A.   I can only assume, because it's not a
23  complete list, that this is the timeline that we
24  reported to DEA that we would roll out our CSOMP



Highly Confidential - Subject to Further Confidentiality Review

Page 258

```
 1   system to the various divisions.
 2   BY MR. YOUNG:
 3      Q.  Okay.  Okay.  Thank you.
 4          We are getting there.  Are you okay as far
 5   as -- everyone at the end?
 6      A.  I'm fine.
 7      Q.  Bladders are nice and dry.
 8          This next document, which is Exhibit 37,
 9   it is a little lengthier, and let's give him that
10   version.  I want to use this one.
11          So this, again, may be a document that you
12   have never seen, but that nonetheless has been
13   provided to us, which is a report of investigation by
14   the DEA.
15          Have you ever seen that document?
16      A.  I think I've -- it -- I think this -- I've
17   seen this in -- in connection with SafeScript cases.
18      Q.  Okay.  I want to direct your attention to
19   Page 13 of this document regarding ARCOS reporting.
20      A.  I think there were numbers somewhere.  Oh.
21          MR. PADGETT:  Page 13 of 24?
22          MR. YOUNG:  I believe so.  That's what my notes
23   reflect.
24          MS. COOK:  HDS_Euson_00165 -- 166.
```

Page 259

```
 1          MR. YOUNG:  Ah, there we are, yes.
 2          MR. MARTINEZ:  Bates No. 166.
 3   BY MR. YOUNG:
 4      Q.  So I'm sorry.  It's Page 14 of 24, and
 5   it's Section H, ARCOS Reporting.  This report
 6   references errors in H.D. Smith's reporting of its
 7   ARCOS data to the DEA.
 8          Are you familiar with that issue from
 9   2006?
10      A.  Yes.
11      Q.  Do you recall the cause of the problem
12   with the ARCOS reporting in 2006?
13      A.  My understanding, it was something to do
14   with an IT glitch in our system that had -- that was
15   corrected, but that was -- I don't know all of the
16   technical parts of it.
17      Q.  Sure.
18          Are you familiar with any other glitches
19   in ARCOS reporting from H.D. Smith to the DEA aside
20   from the -- the one referenced here in 2006?
21      A.  There is -- there is occasional errors
22   in -- in reporting, and it can be a variety of
23   different reasons for it.  It could be, you know, an
24   ND -- a new product that DEA doesn't have a record of
```

Page 260

```
 1   in their NDC files and we report it and they send it
 2   back as an error.  There is a -- it -- it's a -- we
 3   report monthly for all of our DCs and there is
 4   always -- I don't want to say always, but it is not
 5   uncommon to have errors in ARCOS reporting.
 6      Q.  But in your role as chief of compliance
 7   during your tenure, have you uncovered more than a
 8   one-off type ARCOS reporting problem?
 9      A.  No.
10      Q.  So the data that the DEA has in its ARCOS
11   database regarding H.D. Smith transactions would be
12   accurate aside from a handful of errors you described?
13      A.  I can't speak to the accuracy of DEA
14   records.
15      Q.  The -- the data that you reported to the
16   DEA in the ARCOS data stream, upstream to the DEA,
17   that would be accurate for the most part?
18      A.  To the best of my knowledge.
19      Q.  The -- this document also references, I
20   think it's -- I'll find it in a sec -- oh, here it is.
21   On Page 4 of this document, it references DEA reg --
22   oh, wait, I'm sorry.  That's not correct.  I'm looking
23   for the section that has the 12 vendors that were no
24   longer -- this right here.
```

Page 261

```
 1          We'll find this reference in just a
 2   second, but the DEA notified H.D. Smith that 12 of its
 3   customers' DEA registration numbers were no longer
 4   valid.
 5          Is that -- is that typical, obviously we
 6   are --
 7      A.  Can you show me where --
 8      Q.  Yeah, we will, but --
 9          MS. COOK:  HDS_EUSON_00167 on the top of the
10   page.
11          MR. YOUNG:  Page 15 of 24.
12   BY THE WITNESS:
13      A.  Page what?  I'm sorry.
14   BY MR. YOUNG:
15      Q.  It's in the -- it's in the continuation of
16   that ARCOS section, I believe.  It is the last two
17   sentences:
18          "H.D. Smith had also been notified by
19   ARCOS of approximately 12 vendors and a few customers
20   whose DEA registration were being used to report
21   transactions were no longer valid.  These problems are
22   in violation of 21 CFR 1304.33."
23          Is that the only instance of this that you
24   are aware of or is this fairly common that people lose
```

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    their DEA registration numbers and they don't notify
2    H.D. Smith and so you keep doing business with them?
3        A.   I know what the issue with the vendors
4    was.  We had, and it was a rela- -- relatively new
5    process of manufacturers using third-party logistics
6    companies back in 2006.  So if we had a manufacturer
7    that we were purchasing from, at this point we had
8    their DEA -- their DEA registration on file.  We were
9    purchasing from them.  They, in turn, instead of
10   shipping it from their DEA-registered site would ship,
11   have it shipped from a third-party logistics company,
12   which could be UPS.
13       Q.   I see.
14       A.   And it would come in from UPS, it would
15   have an -- and according to regulation, you have to
16   buy -- or you -- you have to reflect the DEA
17   registration from who you received the product from.
18   So it was inaccurate reflection of -- that we got the
19   product from, say, UPS instead of from Mallinckrodt.
20   I'm just -- I'm throwing those examples out.  That was
21   the issue with these.
22       Q.   No, I understand.
23       A.   And we did correct it and we made -- we
24   made modifications to our paperwork that our

Page 263

1    purchasing department used to make sure that we knew
2    where the product was coming from, if it wasn't coming
3    from the -- the actual manufacturer's registered
4    facility but it was coming from a third-party
5    logistics or a contract manufacturer, there is a lot
6    of different variables in there, but...
7            And the customers, I don't know the exact
8    issue with that.  We do now have a a -- daily feed
9    of -- from a company called NTIS.  They work with DEA.
10   And those -- those numbers daily are bounced against
11   our customer lists and if anyone -- if there is an
12   issue, our system automatically stops any sales to
13   that customer.
14       Q.   When did that contract with NTIS begin?
15       A.   We've had it for a while.  I believe at
16   one point it was a weekly feed and then they offered a
17   daily feed and we went to the daily feed and I don't
18   know if that's why there was a a -- issue with a few
19   customers here.  I'd -- I'd have to look into it
20   further to -- to give you a better explanation.
21       Q.   Okay.  I'm going to turn to Exhibit 38.
22   Exhibit 38, why don't you take a look.  I think you
23   authored this document.
24           Well, I'm sorry, you didn't author.  This

Page 264

1    is actually to you.
2        A.   Right.
3        Q.   Are you familiar with this document?
4        A.   Not particularly.  I know it's addressed
5    to me and I'm sure that I got it back in 2010.  I know
6    Andrew Burchard was a -- at the time we had an
7    internal audit team.
8        Q.   I direct your attention to the second
9    page of the document.  It talks about missing customer
10   due diligence profiles and site visit limitations.
11   And let's just kind of walk through these highlighted
12   portions here.  The first one is titled "Missing
13   Customer Due Diligence Profiles."
14           Can you read that?
15       A.   "None of Division 3 Smith Medical Partner
16   profiles have been completed" -- "completed at this
17   time."
18       Q.   What is Division 3?
19       A.   Smith Medical Partners was our
20   specialty -- our specialty division that service
21   mainly doctors' offices.
22       Q.   And the next highlighted section says:
23   "Profiles have not been completed for the Smartsource
24   customers in the CA," I don't know if that's

Page 265

1    California division?
2        A.   Yes.
3        Q.   What is Smartsource customers?
4        A.   Smartsource is a generic program run by
5    H.D. Smith to increase sales of generics.  And I'm not
6    avoiding your question.  I'm getting my head around
7    it --
8        Q.   Yeah.
9        A.   -- Smartsource.  It's a -- it's not a --
10   it's not a separate division.  It's a program where
11   they have -- market to -- to customers to increase
12   generic sales.
13       Q.   Did that include controlled substances
14   like opioids?
15       A.   They are not -- they do not sell C-IIs.
16       Q.   Okay.  So no Smartsource customers receive
17   C-IIs?
18       A.   And they weren't allowed to have -- we
19   wouldn't sell them controlled substances unless we had
20   profiles and vetted them out first.
21       Q.   Okay.
22       A.   So there may not have been profiles done
23   on all of them, but they weren't buying controls.
24       Q.   Without the profiles --

67 (Pages 262 to 265)

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1      A.   Yes.
2      Q.   -- they can't get controlleds?
3           Okay.  So I want to skip down to the Site
4   Visit Limitations section just below there.
5           It says -- are you -- go -- can you go
6   ahead and read that paragraph for us?
7      A.   "It was determined through testing that
8   the customer site visit control is effective.
9   However, with current resources the compliance team is
10  unable to complete all needed site visits within the
11  year.  Current high risk customer population was
12  estimated at 200, but is likely substantially larger
13  than that.  Only 37.5 percent of the current high risk
14  customer population can be visited with current
15  resources."
16     Q.   Do you agree with that site visit
17  limitation assessment from Mr. Burchard?  "You"
18  meaning H.D. Smith.  I should clarify.
19     A.   Yeah, I -- I understand.
20     MR. PADGETT:  Object to the form.
21  BY THE WITNESS:
22     A.   I don't -- without more context around
23  this, I don't recall what he was talking about here
24  and what he was considering high risk customers and

Page 267

1   how he estimated it at 200.  I don't know what
2   criteria he was using.  He was an internal auditor
3   with no compliance experience.
4      Q.   How many site visits could the compliance
5   team conduct within one year in the year 2010, as
6   staffed in 2010?
7      A.   I can't recall how many we had.
8           The only way I can answer that is that
9   I -- that's a -- site visits were -- were performed
10  as -- on an as-needed basis for customers that we
11  determined that we needed to go visit to do additional
12  due diligence on and we did those in a timely manner.
13  You know, they were -- I -- I had people in
14  California, I had people in Florida, I had people up
15  in the northeast, myself in the Midwest.  We've used
16  outside sources at times to do due diligence.  So we
17  were adequately staffed --
18     Q.   Okay.  So --
19     A.   -- in my opinion.
20     Q.   -- do you disagree with the audit
21  recommendation about additional staffing for
22  completing customer profiles and visits?
23     A.   That's a loaded question because I thought
24  we were adequately staffed, but if this would provide

Page 268

1   me with more staffing, I'd take it.
2      Q.   Okay.  I think earlier I asked you whether
3   you had ever requested and were denied more staffing
4   and your answer was no, right?
5      A.   No.  We continually through my tenure
6   increased our staff.
7      Q.   At the time that this audit was done
8   the findings clearly were routed to you, you were
9   identified on the document as management owner and it
10  was addressed to you, there is an audit recommendation
11  of additional staffing to conduct these site visits.
12          Do you recall whether or not an
13  additional staffing was provided to you to achieve
14  these site visits?
15     A.   I would have to have the dates of
16  engagement, but I know that, you know, our -- from
17  2010 our staffing did increase.
18     Q.   Do you know whether or not the high risk
19  customer population which in this report is estimated
20  at 200, whether or not that customer population was
21  visited within the year?
22     A.   I would not know that without knowing who
23  those customers are and I -- I don't know what his
24  definition of the high risk customer base is.

Page 269

1      Q.   If you received this recommendation about
2   your department compliance that used the term "high
3   risk customer population," would you inquire of the
4   auditor what he means by that?
5      A.   Without seeing my response, I don't know,
6   but I'm assuming I would.
7      Q.   You don't recall sitting here how you
8   handled the receipt of this report?
9      A.   No.
10     Q.   You have not used the term "high risk" to
11  refer to your pharmacy customers, that's not a phrase
12  that compliance uses?
13     A.   I -- I can't be certain that term has
14  never been used.
15     Q.   By you?
16     A.   I may have.
17     Q.   Is there another term of art or euphemism
18  that you might use within the compliance department to
19  refer to customers that someone else may refer to as
20  high risk?
21     A.   If someone referred a customer to me that
22  they thought was high risk, it would be someone that
23  we would do extensive due diligence, again --
24     Q.   What is another --

68  (Pages 266 to 269)

Highly Confidential - Subject to Further Confidentiality Review



Page 270

```
 1      A.   -- depending on who it was.
 2      Q.   What is another term that you would use to
 3  describe such a customer?
 4      A.   If I was to use the term "high risk," I
 5  would assume that they most likely would not be a
 6  customer of ours anymore.  I just -- I can't tell you
 7  that that's a normal --
 8      Q.   Let me give you a better, more concrete
 9  example.
10
11
12
13
14
15
16
17
18
19
20      A.   You know, and -- and it depended on
21  various times of our investigation of them and our --
22  our investigation around the -- the -- primary
23  prescriber, the pharmacy itself.
24          When we decided to stop doing business
```

Page 272

```
 1      A.   No.
 2      Q.   And --
 3      A.   Now I'm thinking that Mallinckrodt
 4  instituted it.  I don't know of -- I know -- I see
 5  this date, 2012.  I don't know where in the process,
 6  if that was the beginning of when they instituted
 7  these meetings, but, you know, they reached out to us
 8  to meet with them and we met with them on a -- on a
 9  regular basis.  We had conversations with them
10  regularly.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 271

```
 1  with a customer or blocked our controls, when we
 2  contacted DEA, we didn't use the term "high risk," we
 3  used -- we just said that due to our -- basically due
 4  to our compliance review, we were no longer going to
 5  con- -- provide this pharmacy with controlleds.
 6
 7
 8
 9
10      Q.   Okay.
11
12
13
14
15
16          Do you recall receiving this document?
17      A.   I'm sure I did.
18      Q.   Do you recall attending a meeting with
19  Mallinckrodt about suspicious order monitoring?
20      A.   I attended several meetings with
21  Mallinckrodt to discuss accounts and controlled
22  substances in general.
23      Q.   Was that typical among your manufacturer
24  vendors?
```

Page 273

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 274

8    Q.   Yeah, and I'm specifically referring to,
9  like, a compliance issues?
10   A.   No.
11   Q.   No.
12   A.   We just did this as we agreed to meet with
13  them.
14   Q.   Mallinckrodt approached you about
15  meeting --
16   A.   They did.
17   Q.   -- about suspicious order monitoring?
18   A.   About controls, not about suspicious order
19  monitoring.
20   Q.   Do you know the impetus, why Mallinckrodt
21  decided to start doing that?  Did they share that with
22  you?
23   A.   I do not know.
24   MR. MILLER:  Hayden Miller on behalf of

Page 275

1  Mallinckrodt objecting to the form and scope.
2  BY MR. YOUNG:
3    Q.   I'm sorry.  I didn't hear your answer.
4    A.   I do not know.

Page 276

Page 277

1    Q.   Do you use drug utilization reports on
2  pharmacies that have multiple distributors, is that
3  like a -- if -- if the pharmacy has multiple
4  distributors, then you do a drug utilization report or
5  is there no connection between the two?
6    A.   It would depend on the circumstances.
7  Many times we wouldn't know that information.
8    Q.   Okay.  We'll shift gears to another
9  document.
10   MR. PADGETT:  Maybe a --
11   MR. YOUNG:  Break?
12   MR. PADGETT:  -- heading down the stretch break?
13  We've been going a good --
14   MR. YOUNG:  Do you guys want to take a break?
15   THE WITNESS:  Sure.
16   MR. PADGETT:  Yeah.
17   MR. YOUNG:  Go off the record.
18   THE VIDEOGRAPHER:  We are off the record at
19  4:13 p.m.
20       (WHEREUPON, a recess was had
21        from 4:13 to 4:24 p.m.)
22   THE VIDEOGRAPHER:  We are back on the record at
23  4:24 p.m.
24  BY MR. YOUNG:



Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    Q.   Mr. Euson, do you recall your Texas
2  facility, I'll call it H.D. Smith Texas division,
3  receiving a -- a DEA, what do we call this, a Formal
4  Notification of Deficiencies in 2014?
5    A.   You'd have to show it to me.
6    Q.   I -- I will certainly do so.  I just
7  wanted to see if you recall before I did.  I'm handing
8  you Exhibit 41, which is a letter to H.D. Smith from
9  the DEA dated November 21, 2014.
10   A.   I don't recall seeing this.  This -- I
11  wasn't at H.D. Smith at the time.
12   Q.   Okay.  When you returned to H.D. Smith
13  most recently, is this something that you would have
14  been made aware of or just it happened while you were
15  gone and you would never learn of it?
16   A.   I'd have to read through this to see
17  exactly what it is detailing.
18   Q.   If you're not familiar with the substance
19  of this violation letter -- let me ask you:  What did
20  you do to prepare for today's deposition?
21   A.   I went through --
22   MR. PADGETT:  Object to form.
23  BY MR. YOUNG:
24   Q.   Well, I'm concerned because this is a

Page 279

1  letter from the DEA indicating violations at a Texas
2  facility and a representative from H.D. Smith needs to
3  be here today to talk about CSOMP and its suspicious
4  order monitoring violations and you're not familiar
5  with this -- this incident in H.D. Smith's history.
6       And I want to understand is that because
7  this was overlooked or because it happened while you
8  were gone, did you fail to prepare for the -- this
9  type of information?  This document was provided to us
10  by your counsel.
11   MR. PADGETT:  Object to form.
12       You can answer.
13  BY THE WITNESS:
14   A.   That wasn't my answer.  My answer was,
15  yeah, I'd have to -- I said I'd have to read through
16  this to see what -- what the -- the violations are.  I
17  may have when I came back seen this, I may not have.
18  I don't recall.  But that doesn't mean that -- if I
19  read through this, I may be able to answer some of
20  your questions.
21  BY MR. YOUNG:
22   Q.   Sure.  Please take the time to read
23  through it.
24   MR. PADGETT:  In light of the -- kind of the

Page 280

1  statement you made, which topic are you aligning with
2  this Exhibit 41?
3    MR. YOUNG:  What do you mean which topic, which
4  30(b)(6)?
5    MR. PADGETT:  Which 30(b)(6) topic that you are
6  suggesting he wasn't adequately prepared for.
7    MR. YOUNG:  Sure.  Relating -- well, hold on a
8  minute here.
9    MR. PADGETT:  It doesn't really seem to fit
10  under administrative actions.
11   MR. YOUNG:  Your interact -- No. 7:  "Your
12  interaction with the DEA related to the scheduling of
13  controlled substances."
14   MR. PADGETT:  Scheduling, that's not even close.
15   MR. YOUNG:  I'm just going through them one by
16  one.
17   MR. PADGETT:  There is nothing to prep on that.
18   MR. YOUNG:  Hold on.  I've got to go to the
19  first one.  While you are reading that.
20   MR. PADGETT:  Sorry.  I'm pretty anal about
21  30(b)(6) reps.
22   MR. YOUNG:  Oh, we'll -- we'll present this
23  tomorrow, too, sorry.  Don't worry.
24       Where is my little guy.  Here we go.  I've

Page 281

1  got it.
2       The First Amended Notice, Letter H, Letter
3  G, Letter A, Letter I, Letter J, specifically
4  Letter M.  That ought to do it.
5  BY MR. YOUNG:
6    Q.   Are you familiar with the document?
7    A.   I know what it is.  I'm not familiar with
8  it.  I -- I may have seen it, I may not have.
9       Do you have any other information as far
10  as like the -- the response that we would have written
11  within 30 days?
12   Q.   I'm really limited to what your counsel
13  provides to me, so I'm not --
14   A.   I mean, this -- I mean, this is not like a
15  formal action.  It's a -- you know, it's a
16  notification, you have time to -- you have 30 days to
17  address what they have noted in here, and I don't know
18  just from this letter, like as with three, with --
19  with the order monitoring, you know, what -- what the
20  reference is.
21   Q.   Yeah, that's -- that's really what I
22  wanted to -- to focus on was No. 3.
23   A.   I don't know if there were specific
24  details that they gave the division that -- that

71 (Pages 278 to 281)

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    brought them to this conclusion.  I -- I do not know
2    that based on the information that -- that's here in
3    this letter.
4        Q.    So earlier in the very beginning of this
5    deposition I asked you whether or not H.D. Smith had
6    ever been in violation of the CSA requirements, and I
7    believe your testimony was, no, it had not.  Yet in
8    No. 3 of this letter, the DEA says:
9        "The firm did not operate a system to
10   disclose to the registrant suspicious orders of
11   controlled substances in violation of 21 USC 827(d)
12   and 1301.74(b)(2)."
13       So I understand your testimony today is
14   you're not familiar with this and you don't have a
15   background in understanding what happened in Texas,
16   but in light of this letter and what I've just read to
17   you, do you wish to change your testimony with regard
18   to whether or not H.D. Smith has always been in
19   compliance with the CSA?
20       A.    No, because this -- this letter doesn't
21   give us enough information to know where they are
22   going with this.  You have -- you have 30 days to
23   respond.  I don't recall that there was any official
24   letter of admonition or anything else that would have

Page 283

1    gone with this.  So I don't know if this was explained
2    away, if it was, you know, satisfactory to DEA.  There
3    is not enough information to answer your question just
4    based on this document.
5        Q.    That's what I was hoping to obtain from
6    your testimony today, but you're not familiar enough
7    to give me testimony.
8        A.    Well, not without knowing what the
9    response was and getting more background into this.
10       Q.    How about with regard to No. 1 of this
11   letter:
12       "A controlled substance accountability
13   audit revealed the firm did not maintain complete and
14   accurate records of controlled substances distributed
15   by the firm.  This is a violation of 21 USC 827(a)(3)
16   and 21 CFR 1304.21(a)."
17       Do you have any recollection as to whether
18   or not H.D. Smith responded to this particular aspect
19   of this Texas violation?
20       A.    I'm assuming they did.
21       Q.    Who would it have been at H.D. Smith that
22   would have responded?
23       A.    November 2014, I don't know.
24       Q.    Would this type of letter be a big deal to

Page 284

1    H.D. Smith?
2        A.    Yes.
3        Q.    This is a pretty significant finding by
4    the D -- DEA?
5        A.    Any -- any time --
6        MR. PADGETT:  Object to form.
7    BY THE WITNESS:
8        A.    -- if you were to get any type of letter
9    like this we would take it seriously, because we take
10   our responsibility seriously.
11   BY MR. YOUNG:
12       Q.    Do you recall during your tenure, so only
13   the time when you were there, receiving a letter like
14   this from the DEA?
15       A.    Not particularly.
16       Q.    When did you return to H.D. Smith?
17       A.    During this time period?
18       Q.    Yes, sir, after this letter.
19       A.    May 31st, 2016.
20       Q.    And you don't recall in 2016 or any point
21   thereafter discussing issues out of the Fort Worth
22   division relating to this DEA letter?
23       A.    Not specifically, no.
24       Q.    Who -- who held your position at the time

Page 285

1    of this letter, November 21, 2014?
2        A.    There -- prior to my coming back a Tracey
3    Hernandez was the vice president of compliance and
4    security.  I do not know her dates of -- of -- of
5    employment.  I know after I left in 2013, one of my
6    compliance managers, Bill Stivers, assumed some of the
7    duties that I was doing, but without further
8    information regarding this, I can't answer that
9    question as to who would have responded to this.
10       Q.    Is this type of document something which
11   would have triggered a review by attorneys for
12   H.D. Smith, either internal or external?
13       MR. PADGETT:  I'll object to form.
14       Go ahead.
15   BY THE WITNESS:
16       A.    Again, without the proper context on these
17   three items, I can't answer that.  I don't know.
18   BY MR. YOUNG:
19       Q.    If you received a letter like this when
20   you were the chief of compliance, what would you do
21   with it?
22       A.    I would have investigated it.  I would
23   have gotten with the -- Tim Van Bakel who was the
24   operations manager at that division and discussed what

Page 286

1   the findings were --
2       Q.   Is Mr. Van Bakel --
3       A.   -- and all of the situa- -- you know, the
4   situation surrounding it.
5       Q.   Is he still with the company?
6       A.   He is.
7       Q.   Do you know whether or not he is still in
8   charge of the Texas division?
9       A.   He is.  They have since moved.
10      Q.   If you received a letter like this, would
11  you refer this or forward it to inside or -- or
12  outside counsel for the company?
13      A.   Again, it would have -- it would have
14  depended on the circumstances surrounding this and if
15  there was explanations or remedies, it -- it -- it
16  would all depend.
17      Q.   I want to show you -- I'm going to move
18  off of this document.  You don't have any particular
19  knowledge about it.
20      MR. YOUNG:  I may want to revisit this document.
21  I think we are going to reserve our rights to revisit
22  this particular topic.  It may be isolated to Texas.
23  I don't know.  But obviously we want to talk about the
24  violations in Texas and what was done with them and

Page 287

1   the witness isn't prepared today to talk about that.
2   So we are going to reserve our rights to revisit that
3   particular issue.
4       MR. PADGETT:  I'm going to object to the
5   assumption of violations -- the allegations of
6   violations.
7   BY MR. YOUNG:
8       Q.   Okay.  So, I want to show you now
9   Exhibit 42-ish.  Yes, Exhibit 42, if you will.
10          And that one is particularly small.  I
11  apologize.  You might be better served looking at the
12  screen, although I'm not even sure that's a very good
13  copy.
14
15
16
17
18
19
20
21
22
23
24



Page 288

Page 289

Highly Confidential - Subject to Further Confidentiality Review



Page 290

Page 291

Page 292

Page 293

```
5   Q.   But it wasn't -- it wasn't part of the
6   system prior to your departure?
7   A.   No.
```

74 (Pages 290 to 293)

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS



Page 298

Page 299

17  Q.  Okay.  That's it for that document.
18      Hold on.  We are going to skip ahead a
19  little bit.  46.  Okay.
20      I'm going to hand you Exhibit 46.  Which
21  is a lengthy document.  It is the amicus brief of the
22  HDMA in support of Cardinal Health.
23      Have you seen that amicus brief before?
24  A.  I have.

Page 300

1  Q.  When did you -- when did you first see
2  that?
3  A.  I don't know when I originally first saw
4  it.  I had reviewed it.
5  Q.  There is a section in that brief on Page 2
6  which says:  "HDMA's members have not only statutory
7  and regulatory responsibilities to detect and prevent
8  diversion of controlled prescription drugs" --
9  A.  Wait.  Wait.  Where -- where are you --
10  MR. PADGETT:  This, Page 2.
11  BY MR. YOUNG:
12  Q.  Yeah, Page 2.  It should be highlighted on
13  your -- your copy.  That "HDMA's members."
14  A.  Okay.
15  Q.  Okay.  Can you go ahead and read that
16  paragraph for us?  And then I want to ask you about
17  H.D. Smith's opinions about that paragraph.
18  A.  "HDA's" -- "HDMA's members have not only
19  statutory and regulatory responsibilities to detect
20  and protect diversion of controlled prescription
21  drugs, but undertake such efforts as responsible
22  members of society.  The public health dangers
23  associated with the diversion and abuse of controlled
24  prescription drugs have been well recognized over the

Page 301

1  years by Congress, DEA, HDMA and its members, and
2  public health authorities."
3  Q.  Okay.  Does H.D. Smith acknowledge a
4  statutory and regulatory responsibility to detect and
5  prevent diversion of controlled prescription drugs in
6  order to protect society?
7  MR. PADGETT:  Object to form.
8  BY THE WITNESS:
9  A.  We have a regulatory responsibility to
10  maintain effective controls against diversion.
11  BY MR. YOUNG:
12  Q.  That wasn't my question.
13      The HDMA issued this amicus brief in
14  support of one of its members, Cardinal Health, and I
15  want to know to what extent you agree or disagree with
16  the positions espoused by the HDMA in this brief.
17      The first sentence says "HDMA members,"
18  and so here we are going to say, H.D. Smith has not
19  only a statutory and regulatory responsibility to
20  detect and prevent diversion of controlled
21  prescription drugs, but undertakes such efforts as
22  responsible members of society.
23      Do you agree or disagree with that
24  statement?

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1     MR. PADGETT: Object to form.
2  BY THE WITNESS:
3     A.   Again, in -- in our place in the supply
4  chain, our responsibility and our regulatory
5  responsibility is to maintain effective controls
6  against diversion.
7  BY MR. YOUNG:
8     Q.   Do you agree or disagree with the next
9  sentence: "The public health dangers associated with
10  diversion and abuse have been well recognized over the
11  years."
12    A.   I agree with that.
13    Q.   Let's see.  There is another highlighted
14  section.
15         Can you turn to Page 3 with the
16  highlighted section that begins, "With the agency,"
17  and in this case the agency being the DEA.
18         Can you read that for us?
19    A.   "The agency has failed to provide
20  meaningful guidance to assist the regulated industry
21  in complying with DEA's interpretation of its
22  implementing regulations.  HDMA respectfully submits
23  that, despite the agency's oft-recited refrain that
24  the regulations are 'clear,' the regulated industry

Page 303

1  does not know the rules of the road because DEA has
2  not adequately explained them."
3     Q.   Does H.D. Smith agree or disagree with
4  that statement?
5     MR. PADGETT:  Object to form.
6  BY THE WITNESS:
7     A.   I would agree that DEA has not
8  historically given clear guidance and has given
9  shifting guidance and -- to the regulated industry.
10  BY MR. YOUNG:
11    Q.   You testified earlier about receiving the
12  two Joe Rannazzisi letters from the DEA, correct?
13    A.   Correct.
14    Q.   And I think you testified actually that
15  those were forms of guidance, right?
16    A.   Yes.
17    Q.   Is there something in the Rannazzisi
18  letters that you received in, is it '08 and '07, that
19  was unclear to H.D. Smith?
20    MR. PADGETT:  'It was '06 and '07.
21  BY MR. YOUNG:
22    Q.   '06 and '07.  Sorry.
23    MR. PADGETT:  Object to form.
24  BY THE WITNESS:

Page 304

1     A.   What I'm referring to is -- is guidance
2  that -- that we have asked for and not gotten.  You
3  know, there are -- there are different, you know,
4  communications I've had with DEA where we have not
5  gotten clear guidance, there has been a shifting
6  interpretation of the order monitoring regulation
7  that's been in place for decades, and, you know, still
8  today we ask for assistance and get limited assistance
9  and guidance from DEA, who regulates us.
10  BY MR. YOUNG:
11    Q.   Was the directive by the DEA to H.D. Smith
12  to create a suspicious order monitoring program to
13  identify and report suspicious orders, was that clear
14  to H.D. Smith, those obligations to create a -- a SOM
15  program, or was that unclear?
16    A.   Are you talking about the automated system
17  that we put in place?
18    Q.   Yes.
19    A.   That was not a mandate.  We voluntarily
20  created that system.
21    Q.   Okay.  Were -- were the laws, the
22  Controlled Substances Act and attendant regulations,
23  were those clear or unclear to H.D. Smith at the time
24  that it implemented its CSOMP program?

Page 305

1     A.   It was unclear to the way the DEA was
2  interpreting them and what DEA -- and what industry
3  practice was at the time.

Highly Confidential - Subject to Further Confidentiality Review



Page 306

12     Q.   Was pattern a required element of the
13   CSOMP program in 2010, the pattern of orders from
14   customers?
15     MR. PADGETT:  I'll object to form.
16   BY THE WITNESS:
17     A.   I'm not clear what you are asking.
18   BY MR. YOUNG:
19     Q.   In 2010, after implementation of your
20   CSOMP program, there were instructions, or -- or I
21   should say communications with the DEA.
22      Is there anything that the DEA shared with
23   H.D. Smith that led H.D. Smith to conclude that it did
24   not have to include pattern or frequency in its CSOMP

Page 307

1   program?
10     Q.   But you've got no -- nothing in writing
11   from the DEA saying that that was acceptable?
12     A.   They won't put anything in writing.
13     Q.   Again, you don't have anything in writing
14   from the DEA?
15     A.   I don't.
16     Q.   You don't have anything in writing from
17   Congress that says that that was acceptable, right?
18     A.   I don't.

Page 308

1     Q.   Okay.  Turning to Page 10 of this brief,
2   there is another highlighted section.  Can you read
3   that for us?
4     A.   "The societal costs of prescription drug
5   abuse are huge, and the development and implementation
6   of practices and procedures to detect and prevent
7   diversion are burdens that HDMA members willingly
8   bear."
9     Q.   Do you agree that the societal costs of
10   prescription drug abuse are huge?
11     MR. PADGETT:  Object to form.
12   BY THE WITNESS:
13     A.   Define what the societal costs are.  Are
14   we talking monetary or --
15   BY MR. YOUNG:
16     Q.   HDMA, an organization that H.D. Smith is a
17   member of and serves on committees for and supports,
18   prepared this brief and this brief made this remark.
19   And I'm asking whether or not you an -- you agree or
20   disagree with this remark: "The societal costs of
21   prescription drug abuse are huge"?
22     A.   And I'm trying to get more clarification
23   on what the definition of the societal costs are.  I
24   was not there when this was drafted.

Page 309

1     Q.   Okay.  So do you opine that the societal
2   costs of prescription drug abuse are not huge?
3     A.   I'm just trying to get a better
4   clarification of what the societal costs are.  If you
5   mean the societal costs are deaths of overdose, of
6   drug abuse, there is -- you know, statistically there
7   is an increasing number of people that die from
8   prescription drug overdoses and opioid overdoses
9   altogether.
10     Q.   And would you call those societal costs?
11     A.   It would be one of the definitions, yes.
12     Q.   And would you refer to those as huge or
13   not huge?
14     MR. PADGETT:  Object to form.
15   BY THE WITNESS:
16     A.   I -- I do think they are huge.  We -- you
17   know, we have a -- you know, we take our
18   responsibility serious.

Highly Confidential - Subject to Further Confidentiality Review



| Page 310 | Page 312 |
|---|---|

**Page 312**

1 business with them as a result of this information
2 sharing with Mallinckrodt?
3     A.   We had, like, quarterly discussions with
4 Mallinckrodt about customers, we would conduct due
5 diligence on customers they brought to our attention,
6 additional due diligence.  There were also notices
7 that Mallinckrodt would put out on certain customers
8 that they were denying chargebacks to and many times
9 it would not be customers of ours but we would block
10 them in our system to make sure that they did not
11 become customers of ours.
12     Q.   Was Mallinckrodt the only manufacturer
13 or -- or -- or vendor of yours that provided this
14 level of information?
15     A.   We had meetings fairly regular for a time
16 with Purdue Pharma.
17     Q.   Do you know whether or not Purdue Pharma
18 shared information with H.D. Smith that resulted in
19 H.D. Smith discontinuing servicing pharmacies?
20     A.   I can't -- I can't answer that
21 specifically.  We did share information about
22 pharmacies.  They may have resulted, after we did
23 additional due diligence where we would have
24 discontinued selling controlled, but unless we get

**Page 311**

7 BY MR. YOUNG:
8     Q.   Is that a two-way sharing, does H.D. Smith
9 send information to Mallinckrodt only or does it also
10 receive information from Mallinckrodt?
11     A.   I don't know.
12     Q.   Who at H.D. Smith is in charge of the
13 information sharing with Mallinckrodt?
14     A.   I don't know if we have anybody at
15 H.D. Smith anymore that does that.
16     Q.   Historically, who -- is there one
17 person --
18     A.   We had a -- we had a department that was a
19 chargeback department but they are no longer.
20     Q.   And who was the person that headed up the
21 chargeback department, if you recall?
22     A.   I -- I don't know.
23     Q.   Do you know whether or not any pharmacy
24 customers were identified and you ceased doing

**Page 313**

1 specific, I wouldn't know that answer.
2     Q.   Those are the only two companies,
3 Mallinckrodt and Purdue, that you recall H.D. Smith
4 having this level of communication with?
5     A.   We've had conversations in the past with
6 other -- other manufacturers where orders of ours may
7 have hit their suspicious order monitoring program,
8 the manufacturers, and they would have called us to
9 discuss that.  I remember having discussions with
10 Watson.  I can't recall the others.

79 (Pages 310 to 313)

Highly Confidential - Subject to Further Confidentiality Review



Page 314

Page 316

11     Q.   Okay.  We'll -- we'll -- we'll blow
12  through some questions here pretty quickly, I think.
13         Did H.D. Smith ever undertake interaction
14  or communication with the FDA relating to the
15  scheduling of drugs?  I assume not, but I have to ask.
16     A.   We don't.
17     Q.   How about with regard to the setting of
18  quotas?
19     A.   We don't have anything to do with that.
20     Q.   Production of quotas.
21         I just had to make sure.
22         Did H.D. Smith ever sell controlled
23  substances in Cuyahoga County or Cleveland without
24  first having them complete a customer profile form?

Page 315

Page 317

1     A.   Not to my knowledge, but I'd have to check
2  our -- our due diligence files.
3     Q.   Do you recall whether H.D. Smith ever
4  shipped an order into Cuyahoga County or Cleveland
5  which was later reported to the DEA as a suspicious
6  order?
7     A.   No.
8     Q.   Has H.D. Smith conducted any type of
9  retrospective analysis of past orders of controlled
10  substances from Cuyahoga County or Cleveland which
11  identified unreported or undetected suspicious orders?
12     A.   No.
13     Q.   Has H.D. Smith conducted site visits of
14  its pharmacy customers in Cleveland or Cuyahoga County
15  within the last five years?
16     A.   I would have to check our files to know
17  precisely.
18     Q.   Would that be the due diligence files
19  again?
20     A.   Yes.
21     Q.   That's the central?
22     A.   Yes.
23     Q.   Okay.  At any point in time has H.D. Smith
24  re -- reviewed, assessed or analyzed the URLs for

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1  Cleveland or Cuyahoga County pharmacy customers?
2      A.  Yes.
3      Q.  Have you done so within the last
4  18 months?
5      A.  Again, I'm not certain on the dates.
6      Q.  Online pharmacies, does H.D. Smith still
7  do business with online pharmacies?
8      A.  We don't do business with online
9  pharmacies.
10      Q.  Have you ever done business with online
11  pharmacies?
12      A.  Not knowingly.
13      Q.  I think you mentioned before that was
14  something that the DEA was very focused on?
15      A.  Yes.
16      Q.  In the early 2000s.
17          Did the DEA help H.D. Smith to identify
18  online pharmacies that it was unknowingly doing
19  business with?
20      A.  I don't think -- not in particular.
21      Q.  How did H.D. Smith identify online
22  pharmacies that it was unknowingly doing business
23  with?
24      A.  There was various ways.  I mean, we -- we

Page 319

1  got -- if we had any documentation, I told you that we
2  used to get -- Kyle Wright used to send out an e-mail
3  on pharmacies that had been -- where another
4  wholesaler had -- had stopped doing business with a
5  particular pharmacy and we would make sure that we did
6  not do business with those pharmacies.
7          We -- you know, we -- just as -- as I
8  answered, we never did any business with an online
9  pharmacy that I am aware of.
10      Q.  Is H.D. Smith aware that prescription
11  opioids dispensed in one city can end up in other
12  cities?
13      A.  That's a --
14      Q.  You can answer.  That's a terrible
15  question.
16      MR. PADGETT:  I'll object to form.  I join your
17  objection.
18  BY THE WITNESS:
19      A.  Yes.
20  BY MR. YOUNG:
21      Q.  Let me ask it a different way.
22          Are you familiar with the phrase "the oxy
23  express"?
24      A.  Yes.

Page 320

1      Q.  What does that mean?
2      A.  In my mind it refers to prescriptions in,
3  for example, in Florida, in South Florida that may
4  have been -- people from other areas of the country
5  would visit pain clinics in Florida, get
6  prescriptions, get them filled and go back.
7
8
9
10
11      A.  Nothing definitive.  You know, even if we
12  had dispensing information and a -- a pharmacy in
13  South Florida was dispensing a prescription for
14  someone that we -- we identified coming from 100 miles
15  away, we don't know if that's in Florida or not.  You
16  know, we have done surveillance at pharmacies, I have
17  done surveillance at pain clinics, I've seen
18  out-of-state plates.
19          Again, we don't conduct criminal
20  investigations, so I will -- to be definitive, I can't
21  give you an answer.  My assumption would be that there
22  was -- that was going on.
23      Q.  Do you recall whether any of the license
24  plates that you observed in Florida pharmacies were

Page 321

1  from Ohio?
2      A.  They could have been.
3      Q.  But you don't recall specifically?
4      A.  Not specifically.
5      Q.  Would there be evidence in the due
6  diligence files of the South Florida pharmacies that
7  you investigated that indicated the state of origin of
8  the license plate?
9      A.  If it would have been specifically
10  identified by the investigator.
11      Q.  Okay.  Just two more, two more items.
12
13
14
15
16
17
18
19
20
21
22
23
24

81 (Pages 318 to 321)

Highly Confidential - Subject to Further Confidentiality Review



Page 322

Page 324

```
1        Do you recall that particular pharmacy
2   customer or -- or customer, I should say?
3   A.   Can you give me a second?
4   Q.   Sure.
5   A.   I don't necessarily remember this specific
6   customer.
```

Page 323

```
8   Q.   Who would be the department within
9   H.D. Smith that would?  Is that regulatory, legal?
10  A.   I -- I don't know if we have anybody left.
11  Q.   Okay.  Let me just take a look at this
12  one.
```

Page 325

```
15  attention, final exhibit, final line of questions, get
16  excited everybody, this is regarding the Master
17  Pharmaceutical case or Masters Pharmaceutical case
18  which is a late entry, handwritten, No. 60 for you
19  keeping track.
20        Are you familiar with the Masters case?
21  A.   I am.
22  Q.   How are you familiar, how did you come to
23  know about the Masters case?
24        Do you recall the first instance?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1    A.   It -- it -- it -- I don't recall the first
2    instance.  It was -- it went on for a while.  I've
3    read this, I've read the 300-page part of it, so...
4         Q.   In preparation for today's deposition, did
5    you specifically go back and read the Masters opinion?
6         A.   I did.
7         Q.   Oh, you did, okay.
8              Does -- well, let's -- let's start on
9    Page 4 of the opinion.  There should be a
10   highlighted --
11             MR. YOUNG:  You don't have it?  Oh, you don't
12   have yours.  Oh.
13             MR. PADGETT:  I can look off of with him.
14             MR. YOUNG:  Okay.
15             MR. PADGETT:  Do you want it on for the Elmo?
16             MR. YOUNG:  The Elmo, yeah.
17   BY MR. YOUNG:
18        Q.   Sorry.  Page 4, last paragraph, it should
19   be highlighted.
20             Can you read that for us?
21        A.   "The 'security requirement' at the heart
22   of this case mandates that distributors 'design and
23   operate a system' to identify 'suspicious orders of
24   controlled substances' and report those orders to DEA

Page 327

1    (the Reporting Requirement).  21 CFR 1301.74(b).  The
2    Reporting Requirement is a relatively modest one.  It
3    requires only that a distributor provide basic
4    information about certain orders to DEA, so that DEA
5    investigators in the field can aggregate reports from
6    every point along the legally-regulated supply chain
7    and use the information to ferret out potential
8    illegal activity.  Southwood" --
9         Q.   You can skip that.
10        A.   Okay.
11             "Once a distributor has reported a
12   suspicious order, it must make one of two choices:
13   decline to ship the order, or conduct 'due diligence'
14   and if it is able to determine that the order is not
15   likely to be diverted into illegal channels, ship the
16   order (the Shipping Requirement)."
17        Q.   So does H.D. Smith acknowledge that that
18   provision that you just read is the reporting
19   requirement under federal regulations?
20             MR. PADGETT:  I'll object to form.
21   BY THE WITNESS:
22        A.   The regulation states that we have to
23   report suspicious order when we discover.
24   BY MR. YOUNG:

Page 328

1         Q.   So the provision that you just read, do
2    you agree or disagree that that is the reporting
3    requirement under federal regulations?
4         A.   "Design and operate a system and identify
5    suspicious orders of controlled substance," I agree
6    with that.
7         Q.   It -- does it also include the shipping
8    requirement under federal regulations?
9         A.   There is not a shipping requirement.
10             MR. PADGETT:  Object to form.
11   BY MR. YOUNG:
12        Q.   Okay.  So the -- the parenthetical at the
13   end of the paragraph you just read says "the shipping
14   requirement."
15             Is it your testimony here today that there
16   is no such shipping requirement?
17             MR. PADGETT:  Object to form.
18   BY THE WITNESS:
19        A.   My understanding is in federal regulation
20   there is no shipping requirement.
21   BY MR. YOUNG:
22        Q.   Okay.  So the second half of the provision
23   that you just read, which the court has labeled "the
24   shipping requirement," H.D. Smith disagrees with?

Page 329

1         A.   It has been our -- you know, our practice
2    that when we discover a suspicious order and we
3    identify a suspicious order and we report that order
4    to DEA, we do not ship that.
5         Q.   Yeah.  That's not my question.
6              My question is whether or not H.D. Smith
7    disagrees with the court's encapsulation of what it
8    calls "the shipping requirement" under federal
9    regulations?
10             MR. PADGETT:  Object to form.
11   BY THE WITNESS:
12        A.   To my knowledge in the federal regulations
13   there is no shipping requirement.
14   BY MR. YOUNG:
15        Q.   Okay.  And what is the basis for the
16   conclusion that there is no shipping requirement?  Is
17   it your individual interpretation or has H.D. Smith
18   reached a formal position or opinion on whether or not
19   the shipping requirement exists or doesn't exist?
20        A.   It -- there is nothing in the federal
21   regulation that -- that specifies anything about a
22   shipping requirement.
23        Q.   If H.D. Smith fails to follow the
24   reporting requirement, is that a violation of the law?

83  (Pages 326 to 329)

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1     A.   If we fail to follow --
2     Q.   Report -- the reporting requirement?
3     A.   Suspicious order when we identify it?
4     Q.   Um-hum.
5     A.   It would be in violation of the
6   regulation.
7     Q.   And if H.D. Smith reports a suspicious
8   order and ships it, is that a violation of the federal
9   requirements, federal regulations?
10    MR. PADGETT:  Object to form.
11  BY THE WITNESS:
12    A.   Again, what time period are we talking?
13  BY MR. YOUNG:
14    Q.   At any time period.
15    A.   Well, as we discussed, before our order
16  monitoring program went into place, there were orders
17  that were shipped and reported as suspicious after the
18  fact as per the -- the industry standard and according
19  to what we -- we were under the assumption that DEA,
20  that was their interpretation and what we should be
21  doing.  Once we had our order monitoring system in
22  place, we did not ship any orders that we identified
23  as suspicious.
24  BY MR. YOUNG:

Page 331

1     Q.   So the provision of the Masters case,
2   which you disagree with, essentially says what you
3   just described, but you disagree with it and I want to
4   just make sure because this is an important aspect of
5   this case.  It's important for the court and the jury
6   to understand whether or not H.D. Smith recognizes and
7   agrees with the Masters opinion on a shipping
8   requirement or disagrees with it.  So you have to
9   indulge me while we revisit this one more time.
10       What the -- what the opinion says is once
11  a distributor has reported a suspicious order, so the
12  suspicious order has been reported, it must make one
13  of two choices, decline to ship the order or conduct
14  some due diligence and if it is able to determine that
15  the order is not likely to be diverted into illegal
16  channels, ship the order.
17       Do you agree or disagree that that is the
18  law under federal regulations?
19    MR. PADGETT:  Object to form.
20  BY THE WITNESS:
21    A.   As a practice, if we report a suspicious
22  order, we do not ship it.  As far as a -- a shipping
23  requirement in the federal regulations, there isn't
24  one.

Page 332

1   BY MR. YOUNG:
2     Q.   Sir, again, that is not my question.  My
3   question is whether you agree or disagree with the
4   statement I just made, that once an order has been
5   reported as suspicious, you must make one of two
6   choices, decline to ship or conduct due diligence and
7   eventually ship?
8     A.   And we decline to ship.
9     MR. PADGETT:  Objection to form; asked and
10  answered.
11  BY MR. YOUNG:
12    Q.   I'm sorry?
13    A.   And we decline to ship.
14    Q.   Has there ever been an occasion in which
15  H.D. Smith has reported a suspicious order yet shipped
16  the suspicious order?
17    MR. PADGETT:  Objection; asked and answered.
18  BY THE WITNESS:
19    A.   What time period?
20  BY MR. YOUNG:
21    Q.   At any time.
22    A.   As we discussed earlier, before our
23  automated system it was an after-the-fact review by
24  the operations manager and we reported orders as

Page 333

1   suspicious and they had already been shipped.
2     Q.   So your testimony is that H.D. Smith has
3   never identified a suspicious order and shipped a
4   suspicious order?
5     A.   If we identified a suspicious order, we
6   did not ship it.
7     Q.   So any occasion in which we found a
8   suspicious order or an order that met the definition
9   of suspicious and H.D. Smith shipped it, that would be
10  a violation of the CSA?
11    MR. PADGETT:  Object to form.
12  BY THE WITNESS:
13    A.   Who is making the definition -- who is
14  making the determination of whether it is suspicious?
15  BY MR. YOUNG:
16    Q.   Any occasion in which an order meets the
17  criteria identified by the regulations as a suspicious
18  order and was shipped by H.D. Smith, that would be a
19  violation of the CSA?
20    MR. PADGETT:  Object to form.
21  BY THE WITNESS:
22    A.   Our -- our system was designed to -- to
23  identify potential orders that may be suspicious.
24  Because they hit our system did not make them

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1  suspicious.  It was after we determined whether they
2  were suspicious or not.
3  BY MR. YOUNG:
4      Q.   Is the determination of whether an order
5  is suspicious or not solely within the purview of the
6  distributor or is it an objective evaluation?
7      MR. PADGETT:  Object to form.
8  BY THE WITNESS:
9      A.   There is no definitive definition of what
10  constitutes a suspicious order.
11  BY MR. YOUNG:
12      Q.   And one final question.  For the time
13  period that H.D. Smith's CSOMP program did not include
14  pattern or frequency, so it was only a threshold
15  basis, if there were orders that deviated
16  substantially on pattern or frequency and yet were
17  shipped, would that be a violation of the CSA?
18      MR. PADGETT:  Object to form.
19  BY THE WITNESS:
20      A.   To my knowledge we never shipped an order
21  that we identified as suspicious during the CSOMP
22  program.
23  BY MR. YOUNG:
24      Q.   That wasn't my question.

Page 335

1      The CSOMP program did not have pattern and
2  frequency, at least until 2015, as elements of it.  So
3  did H.D. Smith ship orders that deviated substantially
4  under the regulations, under the CSA on pattern and
5  frequency, not -- not threshold, on pattern and
6  frequency, did it ship those orders?
7      MR. PADGETT:  Object to form.
8  BY THE WITNESS:
9      A.   I can't answer that definitively and/or if
10  they would have been identified as suspicious or not.
11      MR. YOUNG:  Okay.  No further questions.
12      MR. PADGETT:  No questions here.
13      MR. YOUNG:  All right.  Prepare for Day 2.
14      THE VIDEOGRAPHER:  We are off the record at
15  5:42 p.m.
16      (Time Noted:  5:42 p.m.)
17      FURTHER DEPONENT SAITH NOT.
18
19
20
21
22
23
24

Page 336

1      REPORTER'S CERTIFICATE
2
3      I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,
4  a Certified Shorthand Reporter, do hereby certify:
5      That previous to the commencement of the
6  examination of the witness herein, the witness was
7  duly sworn to testify the whole truth concerning the
8  matters herein;
9      That the foregoing deposition transcript
10  was reported stenographically by me, was thereafter
11  reduced to typewriting under my personal direction and
12  constitutes a true record of the testimony given and
13  the proceedings had;
14      That the said deposition was taken before
15  me at the time and place specified;
16      That I am not a relative or employee or
17  attorney or counsel, nor a relative or employee of
18  such attorney or counsel for any of the parties
19  hereto, nor interested directly or indirectly in the
20  outcome of this action.
21      IN WITNESS WHEREOF, I do hereunto set my
22  hand on this 29th day of November, 2018.
23
24      JULIANA F. ZAJICEK, Certified Reporter

Page 337

1      DEPOSITION ERRATA SHEET
2
3  Assignment No.  200754
4  Case Caption:  In Re: Opiate Litigation
5
6      DECLARATION UNDER PENALTY OF PERJURY
7
8      I declare under penalty of perjury that I
9  have read the entire transcript of my Deposition taken
10  in the captioned matter or the same has been read to
11  me, and the same is true and accurate, save and except
12  for changes and/or corrections, if any, as indicated
13  by me on the DEPOSITION ERRATA SHEET hereof, with the
14  understanding that I offer these changes as if still
15  under oath.
16
17      GEORGE EUSON
18
19
20  SUBSCRIBED AND SWORN TO
21  before me this      day
22  of          , A.D. 20__.
23
24      Notary Public

Highly Confidential - Subject to Further Confidentiality Review

Page 338

```
 1        DEPOSITION ERRATA SHEET
 2    Page No _____ Line No _____ Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No _____ Line No _____ Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No _____ Line No _____ Change to:_____
 9    _____
10    Reason for change:_____
11    Page No _____ Line No _____ Change to:_____
12    _____
13    Reason for change:_____
14    Page No _____ Line No _____ Change to:_____
15    _____
16    Reason for change:_____
17    Page No _____ Line No _____ Change to:_____
18    _____
19    Reason for change:_____
20    Page No _____ Line No _____ Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24            GEORGE EUSON
```

Page 339

```
 1        DEPOSITION ERRATA SHEET
 2    Page No _____ Line No _____ Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No _____ Line No _____ Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No _____ Line No _____ Change to:_____
 9    _____
10    Reason for change:_____
11    Page No _____ Line No _____ Change to:_____
12    _____
13    Reason for change:_____
14    Page No _____ Line No _____ Change to:_____
15    _____
16    Reason for change:_____
17    Page No _____ Line No _____ Change to:_____
18    _____
19    Reason for change:_____
20    Page No _____ Line No _____ Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24            GEORGE EUSON
```

**A**

**A.D** 337:22
**a.m** 1:24 11:5
  86:20,22,24
**abide** 70:12
**ability** 82:20
  105:2 152:24
  210:12,13
  218:14 289:2
  297:6 306:11
**able** 52:11
  101:24 135:17
  164:5 172:12
  178:1,7 179:3
  181:20 184:24
  189:11 197:12
  213:3 215:4
  217:17 218:13
  227:8 229:13
  247:21 248:12
  248:17 279:19
  287:22 288:12
  288:14 298:5
  310:21 327:14
  331:14
**abreast** 58:9
**absence** 158:17
**absolutes** 178:12
**abuse** 8:16 27:7
  28:2 41:3 66:3
  66:6,9,14,23
  67:5,6,8 77:1,4
  77:6,20,23
  300:23 302:10
  308:5,10,21
  309:2,6
**abused** 63:14
**abusers** 117:11
**acceptable**
  307:11,17,22
**access** 130:15,19
  245:1 247:21
  248:16 296:15
  296:16
**accommodate**
  185:4 223:14

**accompanying**
  160:20
**accord** 240:6,15
**account** 6:23
  120:21 165:9
  179:22 183:4,5
  185:2,6 188:21
  189:15 219:16
  220:2 239:24
  255:13 288:7
  291:15,21
  292:10,16
  293:1 298:24
  299:3,6,8,10
  299:16
**accountability**
  283:12
**accounts** 131:22
  186:9 217:7
  218:3 243:6,8
  245:5 271:21
  291:22,23
  292:8
**accreditation**
  21:1 213:3
**accreditations**
  21:2
**accuracy** 68:1
  260:13
**accurate** 23:19
  39:4 53:10
  99:22 132:5
  134:13 138:19
  187:23 212:22
  227:16 260:12
  260:17 273:1
  283:14 289:8
  337:11
**accurately**
  202:11 203:19
  292:12
**acetaminophen**
  162:10
**achieve** 268:13
**acknowledge**
  53:12 55:24

56:12 59:11,14
  78:11,24 301:3
  327:17
**acknowledges**
  53:2,7
**acquainted**
  76:22
**acquired** 113:21
  229:4
**acquires** 238:14
**acquisition** 23:4
  113:19,20
  211:6,14
**acquisitions**
  128:13
**acronyms** 292:4
**act** 5:19 38:9,11
  38:16,19,21
  42:8 47:16
  55:5 75:3
  79:23 93:9,16
  95:23 98:15
  121:4 138:10
  144:4 145:7
  188:9 304:22
  325:11
**Actavis** 10:7
  321:14
**acted** 83:17
**action** 33:22
  34:2,13,14
  35:19 36:11,21
  82:10,11
  241:11 281:15
  336:20
**actions** 33:10,15
  33:15 220:3
  239:13 245:6
  280:10
**active** 162:17
**activity** 153:1
  161:11 327:8
**acts** 38:23 41:1
**actual** 103:11
  122:7 146:17
  219:5 263:3

**ad** 131:11
**add** 155:16
  164:4,5 288:1
  291:19
**addiction** 58:5,5
  58:14,24
**addictive** 59:12
  59:13,23 60:1
  60:6,16 62:2
**addition** 67:18
  78:15 130:2
  193:13 233:7
**additional** 78:11
  212:12,13
  229:14 255:6
  256:3 267:11
  267:21 268:11
  268:13 312:6
  312:23
**address** 241:2
  247:3 281:17
**addressed** 84:16
  264:4 268:10
  313:19
**addressees**
  115:14
**addressing** 84:3
**adequately**
  212:16 267:17
  267:24 280:6
  303:2
**adhere** 84:11
**adhered** 235:1
**adjustments** 8:7
  222:5
**Administration**
  46:11 65:23
**administrative**
  34:8 280:10
**Administrator**
  102:10
**admission**
  142:19
**admitted** 59:23
**admittedly**
  129:14 135:24

**admonition**
  282:24
**adopt** 150:9
**adopted** 157:1
**adoption** 151:2
**advance** 215:10
**advice** 92:17
**affairs** 58:23
  147:9 157:13
  157:13 159:13
  199:15 257:19
**affect** 142:1
**affiliates** 313:22
**after-the-fact**
  332:23
**aftermath** 244:6
**afternoon** 295:8
**AG** 143:3
**agencies** 109:7
**agency** 26:10
  163:11 302:16
  302:17,19
**agency's** 302:23
**Agent** 111:21,22
  112:5
**aggregate** 327:5
**ago** 237:1
  323:17
**agree** 67:24
  69:16 77:9
  88:16,22 95:21
  96:9 219:11,13
  219:17 266:16
  290:4,13
  301:15,23
  302:8,12 303:3
  303:7 308:9,19
  328:2,5 331:17
  332:3
**agreed** 16:8
  59:23 274:12
**agreement** 9:20
  256:20 274:1,2
  309:24 310:2
  313:20 314:1,4
  321:14,20

322:5,23,24
323:4
**agreements**
321:23 322:11
322:12 323:6
**agrees** 27:24
68:14 331:7
**Ah** 45:23 209:24
259:1
**ahead** 32:19
47:6 91:20
105:9 133:23
154:24 184:6
189:7 227:19
228:7,11 247:1
266:6 285:14
289:10 290:18
299:18 300:15
**ahold** 135:4,17
**aid** 161:24
**Akron** 44:6,12
**alerting** 117:10
**alerts** 167:24
**algorithm**
130:23 131:5
**aligning** 280:1
**allegation** 37:19
**allegations** 37:7
37:18 287:5
**allow** 174:5
179:21 294:2
**allowed** 50:23
205:24 206:6
209:18 265:18
**alphabetically**
153:23
**alternative**
177:13
**altogether** 227:4
309:9
**amcbride@wc...**
3:10
**Amended** 5:10
5:13 15:19,19
15:24 16:7,19
17:8,10 281:2

**amendment**
321:13
**America** 58:24
**American** 73:19
**Americas** 3:3
**Amerisource**
23:5,6 147:7
148:7,11
152:12 156:4,7
156:10 158:1
183:6 198:21
199:1,5,17
208:8 211:8,14
229:8
**Amerisource's**
200:2
**AmerisourceB...**
2:18,19 7:13
11:22 21:22
90:11 146:22
147:1,16
151:20 215:19
229:5
**AmerisourceB...**
90:14 94:6,11
**amicus** 9:17
299:21,23
301:13
**amount** 177:10
189:24 299:5
**amounts** 184:12
184:15 292:17
**anal** 280:20
**analysis** 95:18
96:23 97:11
98:4,20 99:5
107:16,21
233:15,16
235:22 317:9
**analyst** 211:22
**analysts** 237:16
**analytic** 172:11
**analytical**
238:19
**analyze** 98:16
237:15

**analyzed** 314:19
317:24
**ancillary** 24:5
**and-** 2:7
**and/or** 298:15
299:7 335:9
337:12
**Andrew** 3:10
11:19 264:6
**Angelo** 6:17
113:11,12,14
**Angelo's** 113:22
117:7
**annual** 103:14
138:14
**answer** 14:7,19
14:20,23 15:22
16:9,10 18:7
18:18 31:3
33:5 69:22
70:19 92:21
112:2 127:19
129:8 136:24
189:20 214:1
218:1 235:5
240:24 267:8
268:4 275:3
279:12,14,14
279:19 283:3
285:8,17 298:6
305:22 312:20
313:1 319:14
320:21 323:1
335:9
**answered** 22:24
69:20 319:8
332:10,17
**answering** 14:7
195:2
**answers** 15:7,12
310:7
**Anthony** 4:15
11:2
**antitrust** 157:22
**anybody** 311:14
323:10

**anymore** 100:10
115:1 209:23
210:5 270:6
311:15
**APEX** 215:23
216:10
**apologies** 25:3
215:9 251:14
**apologize**
287:11
**Apothecary**
219:9 220:9
223:17 224:7
224:21 270:10
270:15 271:8
**Appeals** 10:13
**appeared** 13:15
223:12
**appearing** 13:9
14:5
**appears** 241:23
275:5 298:10
298:11
**Appendix**
148:16,24
**apples** 155:4,4
**applicable** 30:3
31:24 32:9
**applicant** 29:18
30:5
**applicants** 39:17
**applies** 29:6
**apply** 25:23 32:9
246:3
**appreciate** 61:5
73:20 97:23
**approach**
165:24
**approached**
274:14
**appropriate**
161:5 163:12
241:15
**approving**
217:22
**approximately**

43:19 65:8
128:5 261:19
**April** 6:15 8:4
8:19,20 10:9
19:14,19 90:19
107:17 186:11
235:8 240:20
241:5,19 243:4
243:23 246:15
246:17 324:10
**architect** 146:15
297:17,18,18
**ARCOS** 21:4
117:13,15,16
118:2 258:16
259:5,7,12,19
260:5,8,10,16
261:16,19
**area** 19:23 46:11
49:16 108:19
165:6,7 166:15
167:1,16,17
169:16 198:17
224:24 226:4
**areas** 27:21
166:5,16 167:7
167:11 168:3
276:18,23
295:6 320:4
**Arkansas** 107:2
108:12
**arranged** 153:3
**array** 24:15
**arrived** 138:12
**arriving** 138:11
**art** 122:5 269:17
271:7
**articles** 167:23
**artificially**
253:24
**as-needed**
267:10
**AS400** 114:4,7
114:11,24
172:9
**AS400's** 114:19

Highly Confidential - Subject to Further Confidentiality Review

**aside** 259:19
260:12
**asked** 14:8
17:16 18:12
42:19 69:19
78:10 142:16
142:22 169:13
194:19 211:13
212:12 256:9
268:2 282:5
304:2 332:9,17
**asking** 47:4
60:20 62:17
138:7 185:23
191:5 199:8
242:1 306:17
308:19
**aspect** 96:14
142:24 179:7
205:2 216:18
283:18 331:4
**aspects** 149:13
210:2 250:2
**assemblage**
212:3
**Assess** 291:14
291:21
**assessed** 317:24
**assessment**
256:5 266:17
**assigned** 299:3
**assignment**
120:3 337:3
**assist** 208:3
214:3 229:15
302:20
**assistance**
207:24 208:2
254:19 304:8,8
**assisting** 117:11
**associated**
300:23 302:9
**Associates** 187:2
187:13,16,18
188:19 190:14
190:19

**association**
157:8,22
**assume** 15:18
87:24 115:21
133:15 187:17
207:20 223:21
255:1 257:13
257:22 270:5
293:19 299:2
316:15
**assumed** 285:6
**assuming** 66:17
67:6 110:23
137:5 207:17
269:6 274:5
283:20
**assumption**
63:16 64:13
85:8 134:20
135:5 200:18
287:5 320:21
330:19
**attach** 17:17
**attached** 202:2
**attempt** 82:23
163:24
**attend** 158:16
192:7
**attendant** 55:6
116:18 304:22
**attended** 192:20
271:20
**attendees**
192:16
**attending**
271:18
**attends** 314:3
**attention** 78:3
82:19 96:13
100:22 120:22
123:11,15
133:6 134:24
136:5 176:4
192:15 196:10
231:24 258:18
264:8 293:12

309:20 312:5
322:4 325:15
**attorney** 29:17
35:17 36:20
37:8 336:17,18
**attorney/client**
92:22
**attorneys**
142:21 285:11
307:20
**atypical** 186:23
**audit** 9:5,7
175:3 264:7
267:20 268:7
268:10 271:14
283:13
**auditing** 126:3
137:19
**auditor** 267:2
269:4
**audits** 21:11
119:23
**August** 23:12,14
**author** 203:15
229:24 263:24
289:23 299:2
**authored** 116:6
116:10 118:13
118:23 201:9
203:22 230:3,8
263:23
**authoring**
116:13 201:11
**authorities** 35:1
301:2
**authority**
122:12 210:21
211:14 212:13
**authorized** 94:9
210:23,24
324:9
**auto** 144:13
**automate** 47:4
**automated** 47:8
48:14,22 49:17
80:23 84:11,13

88:23 90:3,5
90:21 91:1,9
91:14 93:5,7
93:16 94:5
99:1,4,24
100:4 101:3
102:1 104:5,12
104:24 109:12
109:21 110:1
110:24 118:5
120:7 124:22
125:6 131:4
136:21 143:9
143:12,16,21
144:5,14,18,20
144:21 145:20
149:4 150:14
156:18,19
194:5,17,19,21
198:13 289:16
304:16 332:23
**automatically**
216:19 230:17
263:12
**automation**
174:22 175:5
216:18
**available** 163:11
172:12 228:14
**Avenue** 3:3,13
**average** 8:8
155:12,14,16
173:6,8,8,8,12
204:16 222:10
222:24 223:1
**averages** 163:9
222:3
**Avila** 6:17
111:19,19
112:4,11
**avoid** 53:9,13
67:20 68:6
70:23 78:23
79:9
**avoiding** 265:6
**aware** 32:17

34:1 44:8
51:18 57:17,24
58:4 101:9,23
103:3,4 107:6
107:8,19 111:8
115:10 116:15
126:6 127:1
137:24 205:6
206:4,11
208:13,19
209:20 238:5
238:12 261:24
278:14 314:4
319:9,10 325:1
**awareness**
124:19

**B**

**b** 5:20 17:18
29:4,13,14
46:7 48:10
49:1 50:18
53:2 56:22
**back** 19:14 20:2
28:8,10,11
34:8 67:12
72:20 74:22
76:19 83:5
86:23 121:15
123:17 134:3,6
134:9 141:17
164:14,20
171:17 192:10
193:4 197:3
203:9 207:9
216:3,7,7
219:23 235:8
237:1 240:17
240:18 251:16
256:9,16 260:2
262:6 264:5
277:22 279:17
285:2 287:17
292:21 309:21
320:6 326:5
**background**

Highly Confidential - Subject to Further Confidentiality Review

15:11 18:5
22:9 72:21
202:11 234:18
282:15 283:9
**backup** 185:7
**Bakel** 285:23
286:2
**Barnes** 2:13
111:21,22
112:5,6,8
113:20
**barometer**
173:3
**base** 268:24
**based** 8:7 71:16
77:13 91:7
110:13 111:24
112:20 163:4
163:21,22
164:1,7 189:14
190:4 199:3,14
199:17 220:1
222:3,5 225:12
227:4 241:22
253:24 282:2
283:4 288:6
298:22 299:16
306:2
**basic** 13:22
110:13 327:3
**basically** 40:23
50:7 75:14
122:20 153:9
155:4 162:8
169:5 175:21
186:7 194:8
195:10 271:3
**basis** 15:6 36:2
54:6 92:13
117:12,17
127:2 129:7,23
150:10,11
156:1 166:1
167:20 190:1
232:16 234:8
235:14 249:24

252:7 267:10
272:9 290:7
307:5,6 322:8
329:15 334:15
**Bates** 232:3
259:2
**bathroom** 15:1
**Beach** 215:15
239:18
**bear** 308:8
**beauty** 23:21
**becoming**
314:22 316:9
**began** 90:5
120:24 164:11
**beginning** 146:4
198:17 272:6
282:4
**begins** 72:21
76:20 88:8
95:7 183:17
193:6 198:24
219:10 221:11
232:4 245:19
249:7 294:13
302:16 310:9
**behalf** 2:2,12,18
3:2,7,12,17 4:2
4:7 11:13,15
11:17,19,23
12:1,7,9,10,13
13:3 15:7
30:22 65:7
140:18 274:24
311:1
**belief** 22:9 74:24
92:13 94:18,18
104:4
**believe** 13:21
29:1 37:10
39:5 43:5,15
43:20,24 45:6
45:10 49:22
57:8 59:13
92:10 102:7
104:3,17

105:22 107:23
108:13 113:20
116:8 121:13
121:17 130:17
146:3 147:14
148:19 152:8
153:4 158:3,6
158:8 159:11
171:4 185:15
185:17 191:5
201:18 202:5
212:18 240:19
247:11 250:18
257:1 258:22
261:16 263:15
272:21 282:7
290:16,20
291:3 294:21
295:21,23
298:9 314:14
**believed** 91:9
92:2 93:20,23
94:4 105:11
**benchmark**
163:12
**beneath** 162:12
253:10
**benefits** 63:4
**benzo** 184:16
185:3 186:16
189:3 222:7
**benzodiazepin...**
183:21
**benzos** 187:19
**best** 15:13 40:16
116:19 123:6
224:23 228:19
260:18
**beta** 104:21
162:19
**better** 18:12
45:4 83:22
84:11 90:21
144:1 149:7
165:1,2 181:17
203:24 223:10

263:20 270:8
287:11 291:11
309:3
**beyond** 23:24
78:12 256:5
**big** 183:1,4
249:3 283:24
**bigger** 190:5
**Bill** 11:23 12:1
285:6
**bill.leeder@bt...**
2:17
**bit** 15:12 18:5
24:6 25:13
26:15 28:7,14
30:17 32:14
43:1 45:3
50:17 57:22
59:19 70:14
77:21 86:16
96:24 97:1
132:24 143:12
146:12 151:8
151:10 159:1
160:6 195:10
203:14 213:15
215:20 222:19
240:2 289:18
299:19
**black** 213:15
**Bladders** 258:7
**blanket** 57:8
273:23
**bless** 94:7
**blessed** 94:9
**blessing** 92:14
94:16 156:12
**blind** 72:11
**block** 141:3
177:6 178:13
227:2 231:10
231:13 312:9
**blocked** 176:24
179:23 230:17
271:1 294:10
**blow** 316:11

**blue** 213:20
**board** 35:2,18
52:3 225:18,19
307:20
**boards** 157:11
178:18
**book** 170:9
204:8
**books** 168:1
**bot-** 275:11
**bottom** 200:5
219:11 232:4
275:11 310:8
**bought** 190:6
**bounced** 263:10
**box** 213:15,18
291:19
**boy** 314:7
**brand** 24:18
**Brandon** 6:22
182:10,12,17
184:22,22
186:17,19
191:5
**break** 15:1,1
78:20 86:16
87:2 140:22
141:5,7 152:20
202:24 203:12
277:11,12,14
**Brian** 193:8
**brick-and-mo...**
169:17
**brief** 7:16 9:17
39:10 203:13
203:16,19
299:21,23
300:5 301:13
301:16 308:1
308:18,18
**briefly** 18:4
24:17 76:22
238:10
**bring** 18:8
123:10,14
196:10 238:18

255:21
**bringing** 36:20
169:7 170:2
**broader** 275:23
**broke** 141:20
**broken** 155:2
293:22 294:4,5
296:2,5,23
**brought** 49:18
82:19 95:3
100:21 101:1
105:16 120:21
133:6 134:24
136:4 244:23
282:1 312:5
**Brown** 1:22
**Bryce** 219:8
221:4
**Bryce's** 221:16
**budget** 10:10
130:9,12
323:23 324:7
324:12
**build** 152:2
297:20
**building** 149:3
154:15,18
156:11 169:17
**bulk** 315:17,18
**bullet** 168:18
169:19 233:5,9
235:13 253:10
287:23 288:22
289:3 291:14
291:18,20
292:24
**bulleted** 162:12
293:21
**bump** 183:20
**Burchard** 264:6
266:17
**burdens** 308:7
**BURLING** 3:18
**business** 19:13
19:13,21 23:17
24:11 111:17

153:1,11
161:11,16
170:9,14,20
171:15 172:11
173:23 183:22
219:23 220:17
220:21 222:2
222:14 223:11
223:23 224:1,5
224:17,22
233:18 235:20
262:2 270:13
270:24 272:14
272:24 273:5
312:1 318:7,8
318:10,19,22
319:4,6,8
**businesses** 23:24
24:5
**buy** 262:16
315:17,18
320:10
**buyer** 314:14
**buying** 170:8
227:14 265:23
**buys** 153:7

---

**C**

**C** 3:10 163:1
**C-II** 149:22
**C-III** 117:18
**C-IIs** 117:18
265:15,17
**C.S.R** 4:20
336:3
**CA** 264:24
**cage** 122:12
127:19
**cages** 122:13
**calculating**
149:9
**calculation**
131:4
**calculations**
150:3
**calendar** 204:23

**California** 35:9
113:16,18
167:3 265:1
267:14
**call** 17:24 44:4
87:11,12
101:14 114:12
120:10 126:11
134:16 145:16
155:13 169:5,6
191:12 221:6
221:16,17,22
256:2,3 278:2
278:3 309:10
**called** 1:16
12:22 19:8,21
35:1,3 47:8
58:10 111:22
126:9 143:8
147:20 186:5
236:8 242:3
252:17 257:7
263:9 271:14
287:18 313:8
323:23
**calling** 17:18
**calls** 158:11
179:2,6 329:8
**cameras** 14:10
**Campbell** 3:13
3:15 12:14,14
**campus** 174:1
**cancel** 216:15
217:1
**Canton** 3:14
**capability**
210:22
**capacity** 22:4
23:12 36:19
108:7
**Caption** 337:4
**captioned**
337:10
**Cardinal** 3:7
9:17 11:20
156:6,24 158:7

299:22 301:14
**care** 6:10 72:14
106:5 183:5
**careful** 219:14
**Carson** 113:18
**case** 1:8 30:21
34:21 56:1
60:14 62:8
102:8,12,14
104:2 108:20
134:17 215:16
226:2 294:22
299:1 302:17
325:17,17,20
325:23 326:22
331:1,5 337:4
**cases** 1:9 226:3
258:17 299:4
**cash** 224:21,24
225:8,9,10,14
276:6
**catered** 220:11
220:11
**caught** 112:13
123:17 177:12
**cause** 62:2 64:1
77:8,17 259:11
299:4 324:22
**caused** 61:9,13
61:20 62:8
63:3,10
**caveat** 24:4
**CC** 216:7
**cc'd** 184:3 217:5
**CDC** 58:10 59:4
**cease** 224:5
**ceased** 220:21
224:1 311:24
**ceasing** 220:17
**center** 8:13 34:8
49:14 65:9
108:21 110:8
128:7 130:8
138:17,23
139:4,5,13
164:16 182:19

323:24
**Center's** 10:11
**centers** 83:21
95:2 117:17
120:9 128:12
137:10,16
138:15 249:1
257:12
**central** 30:20
115:8 118:3
317:21
**Centre** 4:8
**certain** 16:9
46:23 47:18
50:24 52:9
61:12 122:12
131:21 154:23
164:6 166:7
168:2,3 236:20
241:12 269:13
276:18 295:1
310:3 312:7
318:5 327:4
**certainly** 14:10
14:17 278:6
**certainty** 235:5
**CERTIFICA...**
336:1
**certified** 1:21
225:19 336:4
336:24
**certify** 336:4
**cessation** 324:22
**CFR** 5:23 6:4
110:6 261:22
283:16 327:1
**chain** 8:3 41:13
53:18 56:7
57:15 73:10
75:9,18,20
302:4 327:6
**chamber** 70:15
**chance** 14:5
28:16 87:3
**change** 20:15
52:10 87:7

89:3,12,14,16
124:18 156:1
164:10,12,21
166:9,16 168:8
173:4 194:15
203:18 208:15
252:5 282:17
338:2,4,5,7,8
338:10,11,13
338:14,16,17
338:19,20,22
339:2,4,5,7,8
339:10,11,13
339:14,16,17
339:19,20,22
**changed** 50:14
81:14 109:17
155:20 231:18
292:11
**changes** 52:2,5,7
52:12,15,21
89:4 117:24
164:9 185:7
186:8 337:12
337:14
**channels** 30:2
41:8,11,13
57:18 67:23
68:9 95:20
327:15 331:16
**characterize**
176:2 237:8
**characterized**
175:13,18,24
230:16 232:15
234:7
**charge** 21:4,10
21:11 113:15
115:4,6 125:24
130:11 286:8
311:12
**chargeback**
310:13,19,21
311:19,21
**chargebacks**
312:8

**charged** 70:6
137:19
**check** 133:7,12
133:16 134:8
134:15,16
136:7 244:10
317:1,16
**checks** 289:13
289:14,14
**Chemial** 148:3
**Chemical** 7:8
147:20,22
148:3,6 149:19
151:3 156:16
156:21 163:4
204:8
**chemicals** 148:1
149:21 150:6
**Chicago** 2:21
4:4
**chief** 36:9 37:13
37:16 42:21
54:7 70:4
79:17 97:3
142:24 207:2
229:1 233:13
260:6 285:20
**choices** 327:12
331:13 332:6
**chose** 79:19
144:7
**Chris** 6:17
115:11 116:12
147:5 158:3
239:22 240:14
243:1,17 247:9
272:16
**Christina**
211:22
**chronological**
186:7
**circle** 67:12
**circumstance**
135:16 238:1
**circumstances**
45:9 54:18

72:12 77:13
224:14 226:6
231:13 277:6
286:14
**circumvent**
219:15
**citation** 102:12
**citations** 33:14
35:9
**cited** 32:24 33:7
**cities** 249:3
319:12
**city** 44:5,6,15
62:9,10 319:11
**Civil** 1:18
288:22
**claimed** 59:4
**clarification**
142:3,22
308:22 309:4
**clarify** 19:15
41:22 54:3
60:5 142:14,17
204:21 206:17
209:15 266:18
**clarity** 80:7
**class** 100:17
153:1 154:24
155:8,13 222:4
**classes** 153:23
155:21 161:5
190:3
**classify** 161:4
**cleanly** 70:21
**clear** 15:13
52:20 60:19
61:16 62:16
69:24 70:19
144:16 207:12
303:8 304:5,13
304:23 305:5,9
305:17 306:17
**clear,'** 302:24
**clearly** 70:21
268:8 305:12
306:3

**Cleveland** 3:13
44:5,16,21
45:11 62:9,10
63:10,19 64:7
316:23 317:4
317:10,14
318:1
**clinic** 220:12
224:8 247:15
**clinics** 161:9
247:12,13,14
320:5,17
**close** 156:14
196:16 199:2
224:8 280:14
**closed** 73:3,11
75:9,12,14
76:17 117:21
171:14
**closing** 299:13
**coach** 219:14
**code** 45:21 46:3
161:24 162:5
162:21,22
175:16 296:15
296:22 298:6
**coded** 215:1
**codeine** 27:12
167:5
**codes** 297:8
**coding** 213:20
**coin** 145:17
**collaboration**
247:3
**colleague** 182:22
**collect** 15:2
**collection** 181:8
184:21 187:3
215:8 219:8
313:15
**color** 15:11
213:19
**Columbus**
167:16
**combat** 73:3
**combination**

251:24
**combinations**
225:22,23
248:10
**combined** 183:7
**come** 14:13 15:9
63:23 72:20
90:1 123:7
155:12 180:7
219:23 240:17
240:18 262:14
325:22
**comes** 56:8
293:24 295:8
295:10,11
**comfortable**
222:10
**coming** 35:15
82:15 83:10
139:20 155:21
226:1 256:13
263:2,2,4
285:2 294:17
295:19 320:10
320:14
**commencement**
336:5
**comment** 186:5
190:12 195:16
232:23 289:22
290:1
**comments**
142:11
**commercial**
65:22
**commitment**
196:17,24
**committee**
157:13,14
158:1,5,10,16
159:10,12,13
195:5
**committees**
157:10,12,15
308:17
**common** 112:8

Highly Confidential - Subject to Further Confidentiality Review

170:10,13
261:24
**commonly**
170:21
**communicate**
87:3 179:21,22
180:6 255:4
**communicated**
147:2 305:13
307:2
**communication**
94:13 131:20
147:13 171:9
179:20 186:19
188:17 199:1
201:20 219:4
254:20,22
255:2 307:6,7
313:4 316:14
**communicatio...**
92:22 141:24
142:7 178:19
179:16 195:17
229:2 238:9
304:4 305:9
306:21
**communities**
44:7
**companies**
226:23 262:6
313:2
**company** 19:7
19:23 21:5
24:8 48:6
117:6 127:10
130:23 158:20
182:14 210:17
210:19 215:17
227:3 230:2
241:10 253:20
262:11 263:9
286:5,12
287:16 289:4
291:9 297:1
298:3
**company's**

246:4
**companywide**
114:13
**compare** 128:20
130:16 155:4
257:13
**compared**
130:24
**comparing**
120:17
**compensated**
127:13,15,18
**competitor**
156:5
**competitors**
157:23 226:23
**compile** 226:8
**Complaint** 37:8
**complete** 21:5
177:1 217:20
243:19 257:23
266:10 283:13
316:24
**completed** 88:13
99:20 100:1
190:16 202:1
264:16,16,23
314:18
**completing**
95:18 96:14
97:12 98:5,21
99:6 267:22
**completion**
96:23
**compliance** 7:10
8:4,12,17 9:5
19:7,11,21
20:9,14,21,22
21:10,12,17
22:4,6,10,13
22:14,18,22
23:9 30:3 36:9
36:19 37:13,16
42:21 49:8,21
50:19 51:2
52:21,23 54:6

54:8 66:20
70:4,6 79:17
85:19 86:1
89:24 92:1,6
92:10,19 93:8
93:17,24 94:1
94:5,19,23
95:4 97:3,10
103:12,14
104:6 105:11
108:7 115:4,7
115:8,16 116:1
116:14 119:22
126:4,15
130:10 137:20
138:9,14 143:1
143:7,21 144:9
144:23 145:3
158:2 180:7,15
180:21 181:3
182:22 186:20
187:21 188:16
188:16 205:17
207:2 208:1
210:7,9,14,18
211:2,17,20,22
211:23 212:4,6
212:10,12,15
216:8 217:22
227:4 229:1
230:6 233:13
235:2 237:12
238:10,12
239:7 248:18
253:22 256:6
256:16 260:6
266:9 267:3,4
269:2,12,18
271:4 274:4,9
282:19 285:3,6
285:20 297:3,5
322:18 323:5
**compliance-re...**
116:6 256:7
**compliant** 181:1
306:9

**complied** 39:23
40:5,17 48:18
49:1 89:14
121:3 249:24
250:2
**comply** 31:23
32:8,18 38:12
38:13,23 39:2
48:4 53:4,5
54:9 55:9,22
71:18 90:21,24
91:6 97:18,19
98:9 101:3
102:1 105:4
121:3
**complying** 82:4
91:10 92:2
97:7 104:11
137:16 144:19
291:3 302:21
**components**
73:10
**computer**
114:13 237:9
**computers**
238:4
**con** 126:12
218:17 235:24
**con-** 271:5
**concentrate**
273:12
**concept** 147:12
200:1
**conceptual**
147:17
**concern** 174:21
246:23
**concerned**
241:10 253:22
278:24
**concerning** 37:3
147:24 336:7
**concerns** 84:3
103:21 104:1
180:12 227:4
247:8 276:7

**conclude** 92:18
102:16 177:5
306:23
**concluded** 43:11
44:23
**concluding**
297:9
**conclusion**
63:23 75:5
167:20 230:21
282:1 290:5,14
291:2 297:2
329:16
**concrete** 270:8
**condense** 83:8
**condensed** 85:18
**condition** 73:6
**conduct** 42:18
43:4 89:18
95:8,16,17
98:4 214:23
255:15 256:7
267:5 268:11
312:4 320:7,19
327:13 331:13
332:6
**conducted**
138:14 233:1
244:1 317:8,13
**conducting**
97:11 178:9
**conduction**
233:2
**conducts** 98:19
**conduit** 181:5
**conference**
89:22 100:22
156:9
**CONFIDENT...**
1:12
**Confidentiality**
1:13 9:20
309:23
**confirming**
72:14
**conflict** 22:20

180:15,23
confusing 15:13
Congress 73:2
73:11,16 74:20
75:2 301:1
307:17
Congress's
74:22
conjunction
146:23 251:24
connection
164:8 258:17
277:5
CONNOLLY
3:8
consequences
77:6,6
consider 22:19
34:22 45:4,7
98:10 168:5,16
176:16 196:4
205:14 224:20
253:1 255:19
consideration
163:18 169:2
200:7
considerations
168:20
considered
29:22 52:23
76:17 99:12
143:24 149:3
166:16 167:12
180:14
considering
266:24
considers 34:18
consist 120:16
consistency
122:15
consistent 30:12
52:14 136:20
137:9 201:20
230:23 231:2,4
239:6 307:6
consistently

102:23 235:1
constant 90:14
94:13 201:20
239:19 243:12
constantly 125:6
163:19 165:1
constitutes
334:10 336:12
consult 208:8
consultant 208:9
consultants
159:15 244:24
consulting 19:16
19:23 20:1
contact 52:14
82:23 90:14
109:7 218:17
239:19,19
243:12 255:12
contacted
134:23 271:2
contain 171:20
223:19 248:3
contained 26:23
119:24
contemplated
131:11 233:2
content 87:4
147:11 199:6
contents 85:11
86:11
context 95:12
96:24 126:22
216:1 218:1
266:22 285:16
continually
214:20 268:5
continuation
261:15
continue 176:21
178:5 224:22
227:14 245:22
continued 3:1
4:1 6:1 7:1 8:1
9:1 10:1 49:16
116:22 124:12

144:8 235:10
273:21 325:3,8
325:13
continuing
112:20 172:6
322:6
continuous
232:19 234:1,2
234:8
contract 19:16
20:2 263:5,14
contractor
22:14
contrast 193:17
control 21:23
28:20,21 39:10
45:17 56:10
114:4 266:8
289:2
controlled 5:17
5:19,22 6:3,19
7:12,16 24:20
27:2,5,20,24
29:15,18,24
30:10 31:11
32:1,10 37:2
38:8,11,15,19
38:20,23 39:19
40:13,24 41:2
41:7,8,16,17
41:24 42:6,7
42:23 44:17,22
44:24 46:5,10
47:9,15 53:8
55:5 56:1
60:13 61:19
65:24 66:2,17
67:7 73:5,14
73:17 75:3,16
75:23 76:5
79:22 88:24
93:9,15 95:19
95:22 98:14
105:20 108:6
118:17 119:7
119:14,18

120:2 121:4,7
124:13 125:17
125:23 129:12
130:19 131:15
133:7,13 136:5
138:10 144:4
145:7,22
149:21,23
150:6 151:5,21
152:6,14
153:21 155:11
161:23 162:5
163:12 170:11
170:15 171:3,7
172:20 173:6
173:15 176:23
177:15 178:8
196:18 204:16
205:10 206:5
206:13 225:9
225:15 227:22
228:16 229:6
231:6 241:15
246:18 249:23
250:20 254:3,6
254:15 265:13
265:19 271:21
273:15 280:13
282:11 283:12
283:14 293:24
300:8,20,23
301:5,20
304:22 310:14
310:22 312:24
316:22 317:9
323:22 324:12
325:11 326:24
328:5
controlleds
173:19 174:12
175:21 190:8
190:17 205:20
223:16 224:18
225:4,11 227:9
227:15 228:2
231:7,14 236:2

237:22 238:6
242:24 266:2
271:5 273:22
324:10
controls 26:11
29:23 30:20,24
31:10,16,20
39:18 40:3,12
44:2 53:19
56:8 70:11
71:13 72:8,12
96:4 97:20
125:8 169:11
172:14,17
173:2 177:6
178:13 190:6
196:17,22
197:1 227:3
236:18 265:23
271:1 274:18
301:10 302:5
conversation
179:14
conversations
85:10 140:7
272:9 313:5
314:1
conviction 30:5
Cook 2:6 11:15
11:15 201:3
258:24 261:9
cooperation
229:14
coordinated
255:8,12
coordinator
120:2 125:23
133:7,13 136:5
211:3,23 212:7
216:9
coordinators
129:12
copied 115:12
115:14
copies 111:5
copy 16:19 17:8

18:8,15 27:3
28:10 85:2
86:7 87:18
106:10 181:15
181:19 207:10
230:11 287:13
300:13
**corner** 174:2
**corporate** 8:4
13:10,15 18:7
20:9,14 49:18
85:5 97:4
118:4 147:9
199:14 216:7
229:21 275:7
**Corporation**
2:18,19 19:9
**correct** 13:11,12
14:22 16:1
53:4 113:24
133:14 150:22
163:5 192:1
242:2 260:22
262:23 303:12
303:13
**corrected**
259:15
**corrections**
337:12
**correctly** 102:21
**correspondence**
193:6
**costs** 308:4,9,13
308:20,23
309:2,4,5,10
**counsel** 11:11
14:4,5 15:3
16:8 18:12
87:4 92:18
111:16 141:22
142:1,8 279:10
281:12 286:12
314:10 336:17
336:18
**counterfeit**
41:14 238:21

**country** 58:4
165:12 166:6
166:17,21,22
168:4 180:10
206:12 276:19
320:4
**County** 44:5,6
44:11,21 45:11
62:9,11 63:10
63:16,20 64:8
64:15 316:23
317:4,10,14
318:1
**couple** 65:6
185:9 212:8
310:5
**course** 73:9
111:17 197:11
270:14
**court** 1:1 10:13
11:9 12:4,17
17:16 328:23
331:5
**court's** 329:7
**Courts** 1:18
**cover** 148:16
**covered** 36:15
**Covington** 3:18
12:12
**create** 143:15,21
304:12,14
**created** 151:21
219:2 257:19
304:20 306:1
**creating** 150:22
159:10
**criminal** 41:15
42:12,18 43:8
320:19
**criminally** 42:16
**criteria** 234:1,23
267:2 333:17
**critical** 73:15
**CSA** 72:22,23
73:2 94:24
103:22 104:2,7

104:14 121:8
144:9,19,24
145:3 282:6,19
325:4 333:10
333:19 334:17
335:4
**CSOMP** 7:17,18
7:21 9:12,14
47:9 92:23
145:17,21
146:14,16,20
147:2 149:4
150:14,16,21
153:3 157:1,17
159:20 160:23
161:6 162:3
164:15,21
165:8,11 169:1
169:3 171:24
172:1,5 174:23
174:24 184:18
194:12 196:23
197:2 199:16
203:20 204:15
205:2,9,19
207:12,14
208:21 216:14
219:2 246:14
252:11,22
257:4,14,24
279:3 287:20
288:3,5 292:9
293:13,22
294:1,5,9,18
294:19 295:9
296:4,17,24
297:1,10,13,15
297:18 298:6
298:13,17
299:11,16
304:24 305:5,8
305:16,19
306:7,13,20,24
307:4,7,8,23
334:13,21
335:1

**CT-1** 44:4,4
**cumulative**
171:18,21
**curious** 30:21
47:17 215:3
**current** 20:20
24:10 58:14,23
144:3 210:24
266:9,11,13,14
288:19 290:1
290:14
**currently** 20:4
47:2,3 58:5
66:3,6,14 97:7
113:15 211:2
294:15 295:16
**customer** 73:13
114:5 127:7
128:16 129:2
140:3,18
150:15,22
151:14 153:7
153:10,12
154:3 156:2
169:5,6 170:2
170:20 171:22
173:5,17,22
175:15 177:6
178:14 179:7
186:22 188:2
188:20 189:19
189:21,23
190:4,5,16
195:1 197:4
204:4,6,13
206:19 221:5
221:16,21,22
222:4 227:7,8
228:4 229:20
233:6,18
235:19 243:19
243:20 244:18
255:20,21,22
255:24 256:4,6
263:11,13
264:9,13 266:8

266:11,14
267:22 268:19
268:20,24
269:3,21 270:3
270:6,16 271:1
276:15 299:4,7
316:24 324:2,2
324:6,17
**Customer'**
168:23
**customer's**
232:14 234:6
**customers** 10:5
54:16,19 123:8
124:5 126:24
127:21,23
128:4,9,22
129:6 130:20
139:12,15,17
151:5 153:3,10
154:1,22,23
155:7,9,10,21
161:4,7 163:24
164:6 165:16
165:19,20,22
169:8 170:15
170:18 172:7
172:16,16
174:9,20
178:20 181:1,2
188:5,6 190:3
190:7 199:2,18
218:21 219:14
224:21 226:8
228:13 229:5
233:23,24
234:20 241:12
241:16,24
242:11,12,24
243:22 244:2,8
244:14 245:23
246:16,17
247:6,16
253:12 255:12
255:15 261:19
263:7,19

Highly Confidential - Subject to Further Confidentiality Review

Page 349

264:24 265:3
265:11,16
266:24 267:10
268:23 269:11
269:19 289:15
291:23 299:15
306:14 310:14
310:16,22
311:6,24 312:4
312:5,7,9,11
314:16 315:4,4
315:6,17
317:14 318:1
**customers'**
  150:2 163:22
  165:2,13 261:3
  306:11
**customize**
  163:24
**cut** 44:1,1 113:9
  185:17 236:1
**cutting** 199:7
**Cuyahoga** 44:5
  44:15,21 45:11
  62:9,10 63:10
  63:16,20 64:8
  64:15 316:23
  317:4,10,14
  318:1
**CV** 18:8
**cyclic** 34:20
**cyclical** 34:17
  95:1

_____
**D**
_____

**d** 2:5 5:1 171:18
  171:18 284:4
**D&K** 19:8
**D.C** 3:9,19
  124:10
**d/b/a** 5:16
**daily** 167:24
  217:9 249:23
  249:24 250:19
  263:8,10,17,17
**Dale** 6:17,20

115:11,20,21
115:24 116:5
116:10 118:13
**Dan** 1:7 8:3
  215:14,14,16
  215:22 217:14
  217:17
**dangerous** 59:15
  59:18 60:1,2
  60:16,23,24
  77:5 225:23
**dangers** 299:10
  300:22 302:9
**Danny** 6:17
  111:19 112:4
  112:11,16
  113:23
**Danny's** 115:12
**data** 116:17
  117:12,16
  130:15 165:13
  187:11 215:4
  233:6,14,15
  234:17,18
  238:1,3,14
  247:18,21
  259:7 260:10
  260:15,16
  274:6 275:12
  297:17 311:4
  314:19
**database** 128:24
  130:15 188:14
  260:11
**date** 9:12 11:4
  112:1,20 114:5
  117:22,24
  120:5 139:1
  164:8 166:13
  184:17 185:16
  186:10 201:24
  202:6 207:16
  207:19,19
  219:1 272:5
  288:2 338:23
  339:23

**dated** 6:6,22 7:8
  7:14,19,21 8:6
  8:10,12 9:5,8
  9:10,18 10:3,9
  64:21 87:14,22
  118:24 198:2
  202:1 219:1
  220:22 229:22
  240:19 271:14
  278:9 287:15
  293:14
**dates** 36:14
  146:5 257:7,10
  268:15 285:4
  287:20 318:5
**David** 21:21
**day** 4:3 12:8
  123:6,7 128:22
  177:24 234:20
  295:11,11
  335:13 336:22
  337:21
**day-to-day**
  127:8
**days** 122:19,19
  281:11,16
  282:22
**DCs** 146:3 260:3
**de** 76:12 297:16
**de-identifies**
  248:19
**DEA** 6:8,12 7:3
  7:6,8 8:19,23
  9:3,10 10:11
  10:13 21:13
  26:5,10 28:20
  28:21 33:21
  34:2,6,15,18
  34:21 39:9
  45:17 49:24
  50:6,13,22,23
  51:11 52:14,14
  56:14 57:4
  64:20 65:23
  66:18 67:14
  72:11 73:5

75:15,23,24
76:1,4,6,11,12
76:14,14,21
77:7,16 82:3
83:12,16,19
85:3,6,14
88:21 89:18,22
90:2,4,10,15
90:15 91:3,8
91:24 92:14,16
94:7,9,10,12
94:13,14 95:2
100:7,20,24
101:4,23
102:10,14,22
102:24 104:20
105:12,14,15
106:2,11 107:7
107:22 108:1,4
108:16,17
110:4,9,15,20
111:22 117:11
117:16 118:2
121:18 124:8
124:10,18
125:4 129:19
129:24 132:4,8
132:10,15,18
133:8,17 134:4
134:7,9,10,15
134:16,22
135:2,4,6
136:7,14 137:3
140:2,4 146:24
147:14 149:9
152:14 153:1
156:8,9,12,14
157:20 161:11
161:22 170:23
171:12 173:6
173:13 176:21
177:5,7 178:4
178:17 192:1,3
192:12,21
193:8 194:18
195:7,18,19

196:1 198:4
202:12 204:12
208:9 219:20
220:4 221:6,17
221:21,22
222:2,11
226:24 227:1,6
228:14,18
229:15 230:20
239:12,20,22
240:8,11,19
241:11 242:3
242:16,18,24
243:4,23 244:8
245:8 246:7,16
247:3,6 248:4
249:13,14,20
249:24 250:2,9
250:16,20
256:24 257:24
258:14 259:7
259:19,24
260:10,13,16
260:16,21
261:2,3,20
262:1,8,8,16
263:9 271:2
278:3,9 279:1
280:12 282:8
283:2 284:4,14
284:22 288:20
290:2,15,20
291:14,21
292:12,24
299:10 301:1
302:17 303:1,7
303:12 304:4,9
304:11 305:1,2
305:9,10,13,23
306:21,22
307:7,11,14
317:5 318:14
318:17 323:21
324:7,20,23
326:24 327:4,4
329:4 330:19

**DEA's** 92:2
104:6 120:21
161:23 222:3
246:3,23
302:21
**DEA-mandated**
122:12
**DEA-registered**
262:10
**deal** 172:18
283:24
**dealings** 105:14
**deaths** 62:2
309:5
**Debbie** 8:16
251:23
**decades** 304:7
**December** 9:3
87:14,22
**deception**
238:13
**decide** 71:16
143:20 235:19
**decided** 10:13
223:23 240:4
240:14 243:17
244:20 270:24
274:21
**deciding** 73:12
**decision** 143:24
144:21 180:11
222:3 224:17
239:23 240:3,9
242:21 243:2,5
247:9 270:12
307:5
**decisions** 130:14
181:3 219:23
220:1 237:18
**DECLARATI...**
337:6
**declare** 337:8
**declared** 73:16
**decline** 327:13
331:13 332:6,8
332:13

**declined** 171:14
**decrease** 237:23
**deem** 176:17,19
193:14,23
214:8
**deemed** 91:23
100:6
**deeper** 173:17
173:20 174:6
**defendant** 5:12
5:16 44:11
**Deficiencies**
278:4
**define** 43:1
58:23 59:18
206:9 308:13
**defined** 48:9
56:21 154:1,1
175:12 214:5
**defines** 213:22
**definite** 178:23
**definition** 5:18
27:2 42:5
58:11 59:5
94:8 97:1
120:3 138:1
268:24 308:23
333:8,13 334:9
**definitions**
149:1,3 309:11
**definitive** 214:1
320:11,20
323:1 334:9
**definitively**
335:9
**delays** 51:9
**deliver** 73:14
295:5
**delivered** 61:18
61:19
**deliveries** 35:11
295:4
**demand** 57:17
57:24 58:3
**Dena** 322:13
**denied** 177:11

178:24 268:3
**denying** 312:8
**department**
33:21 85:19
86:2 210:7,9
212:4,10,16
235:2 263:1
269:2,18
297:19 307:19
311:18,19,21
323:8
**departure** 20:12
230:24 293:6
**depend** 128:6
139:6,9 206:3
237:24 277:6
286:16
**depended** 170:1
173:5 248:5
270:20 286:14
**dependence**
27:8 28:3
**depending**
231:12 270:1
**depends** 135:16
158:18 169:24
173:22 174:3
180:1 231:15
236:23 248:5
**depict** 202:11,16
**depiction** 99:23
**DEPONENT**
335:17
**deposed** 13:23
**deposition** 1:15
5:10,14 11:6
15:6,20 16:1
16:19 17:18
26:13 30:19
45:16 106:2
142:9 148:14
181:7 191:18
197:9 229:17
278:20 282:5
326:4 336:9,14
337:1,9,13

338:1 339:1
**depositions** 1:19
**Deputy** 102:10
**Deris** 276:4,5,10
**describe** 24:17
150:18 194:24
236:11 270:3
270:16,19
**described** 56:21
57:19 58:21
66:13 75:1
91:15 109:18
118:6 135:12
156:1 158:1
161:2,3 212:1
239:7 260:12
295:22 320:9
331:3
**describes** 75:8
78:21 120:1
213:19 232:7
233:7
**describing**
169:19 291:16
295:14
**description**
212:22
**descriptor** 271:7
**design** 46:8
160:11 326:22
328:4
**designated**
16:11 109:24
127:23
**designates**
215:14
**designation**
161:23 214:11
292:2
**designed** 72:22
72:23 73:2
154:8 176:3,9
214:2 290:6
292:10,10
296:1 333:22
**designee** 13:10

13:15 18:7
97:4
**desired** 199:22
**despite** 302:23
**detail** 203:21
248:12 310:19
**detailed** 249:13
**detailing** 278:17
**details** 48:16
147:10,12,17
206:24 281:24
**detect** 298:14,21
300:7,19 301:4
301:20 306:3
307:9 308:6
**determinant**
45:5
**determination**
224:4 236:6
333:14 334:4
**determine** 64:7
95:19 120:17
120:21 122:22
127:3 129:3
130:23 144:2
144:22 151:6
163:11 167:18
203:22 214:18
235:22 237:20
252:13 253:3
327:14 331:14
**determined**
143:15 151:13
170:18 176:15
177:4 178:3
214:24 230:22
231:5 266:7
267:11 334:1
**determines**
29:19
**determining**
29:21 152:22
154:6 163:9
**detrimental**
73:18
**develop** 90:5

101:22,23
144:1 146:13
146:20 160:16
160:24 162:6
162:14 163:1,3
221:23
**developed** 83:18
93:6 94:5
152:9 159:22
163:20 189:10
195:4 305:8
**developing** 90:3
90:16,20 94:15
146:22 148:8
151:20 161:24
168:17 194:7
196:8 249:8,10
306:3
**development**
92:23 93:1
94:11 147:2
157:16 193:19
198:15 231:3
307:7 308:5
**deviated** 334:15
335:3
**deviates** 57:3
**deviating** 46:14
47:20 56:13,23
**deviation** 120:19
**die** 63:14 309:7
**died** 63:17 64:14
**differed** 155:22
**difference**
223:24
**different** 18:23
25:24 36:7
88:4 100:2
101:6 110:4,12
118:7 146:3
149:18 152:6
152:10 153:6
153:23 161:5
166:5,20,21
167:6,7 173:13
173:13 175:1

177:13 180:2
185:9 186:9
195:10 196:3
209:2,15 212:1
214:6 226:5,19
236:4,13 238:2
259:23 263:6
272:18 273:11
274:6 291:23
304:3 319:21
**differentiate**
152:24
**differentiated**
213:19
**differently**
105:14
**difficult** 43:18
184:4,24
197:13 237:1,8
**dig** 15:16 30:17
48:16 132:23
215:4 310:18
**Dilaudid** 27:10
**diligence** 8:10
20:23 43:4
45:6,8 53:9,13
53:23 54:3,11
54:15 67:20
68:6,12,20
69:4,5,8,13
70:2,9,10,23
71:5,21 72:1
78:23 105:19
168:23 169:4
172:6 174:8,11
174:14 187:12
187:15 188:8
188:13 190:16
190:19,22
191:2 195:1
197:4 218:21
220:16,24
223:8,19
226:20 229:20
233:16,19,22
234:11 243:8

243:20 244:10
244:16,17,22
255:19 256:4
264:10,13
267:12,16
269:23 273:7
275:15,17
276:9,11,14
312:5,6,23
317:2,18 321:6
331:14 332:6
**diligence'**
327:13
**diligently** 101:2
**direct** 115:14
176:4 192:14
231:24 243:15
258:18 264:8
293:12 322:4
325:14
**direction** 91:2
336:11
**directive** 304:11
**directives** 91:2
**directly** 110:10
247:13 336:19
**director** 19:7,11
20:14 119:20
119:21 230:6
**directors** 52:4
**dis** 97:8
**disadvantage**
221:8
**disagree** 27:19
30:14 66:8
67:24 68:23
69:7,12,17
74:19 77:9
79:8 88:16
95:21 96:10
97:8 98:1,3
267:20 273:3
290:4,13 291:1
301:15,23
302:8 303:3
308:20 328:2

331:2,3,17
332:3
**disagreement**
75:5,7
**disagrees** 72:17
73:23 74:14
328:24 329:7
331:8
**discern** 174:5
227:8 248:9
**discipline**
225:18
**disclose** 46:9
282:10
**discontinue**
170:14,20
171:3 240:5
**discontinued**
171:15 229:6
312:24
**discontinuing**
312:19
**discover** 98:16
327:23 329:2
**discovered**
46:12 50:1,8
50:21 51:7,10
51:19 53:20
76:10 91:11
99:11 104:22
121:23,23
133:6
**discovery** 18:14
**discuss** 90:2
132:15 134:18
135:5 157:23
180:12 226:17
245:5 271:21
273:20 292:19
313:9
**discussed** 55:1
83:13 87:5
88:3 103:12
131:21,21
135:6 148:10
180:16 186:17

194:1 195:19
250:14 272:17
285:24 293:2
299:1 313:23
330:15 332:22
**discussing** 86:11
132:18 284:21
**discussion** 90:11
100:20 129:24
181:6 185:5
191:14,15
195:22 223:10
242:9,11
**discussions**
152:13 173:13
239:22 240:10
243:14 275:16
312:3 313:9
**dispense** 236:16
324:9
**dispensed** 76:15
172:24 173:1
319:11
**dispenser**
168:22
**Dispensers** 46:5
**dispensing** 30:7
163:23 170:6,6
170:7,24
172:18,23
179:24 215:24
217:16 225:12
225:13 233:15
234:18 236:8,9
236:20 237:6
237:13 245:1
255:7 273:19
275:12,18
320:12,13
**dispute** 27:19
30:14 77:22
78:1
**disseminate**
201:17
**distances** 226:1
**distilled** 85:18

Highly Confidential - Subject to Further Confidentiality Review

**distribute** 24:14
25:19 29:18
56:13 65:24
83:7 117:20
**distributed**
61:13 62:19
63:9 283:14
289:5
**distributes** 56:1
59:22 61:8
**distributing**
23:18
**distribution**
8:13 23:24
24:11 26:2
30:7,9 32:10
34:7 49:14
65:9 73:4,10
73:17 75:8
79:2 83:21
95:2 108:21
110:8 117:17
120:9 128:7,11
130:8 137:10
137:16 138:15
138:17,22
139:4 157:8
164:16 182:19
257:6,11
**distributor** 29:9
31:12 32:1
37:22 40:1,7
44:9 53:8 62:6
66:21 67:19
68:5 72:8,9,14
75:24 77:7,15
80:10 160:16
161:22 170:11
170:17 171:9
175:13,14
226:23 227:10
227:15,23
228:3 229:2
315:1 327:3,11
331:11 334:6
**distributor's**

175:12
**distributor/w...**
310:17
**distributors**
29:14 30:15
46:5 66:2 73:9
73:12 75:2,18
78:4,12 100:23
163:8 168:16
170:14 171:10
202:12 228:1
228:15,21
229:10,13,15
250:10 276:8,9
276:16 277:2,4
310:23 322:20
326:22
**distributors/w...**
310:15
**district** 1:1,2,18
11:9,9 242:6
**dive** 173:17,20
174:6
**diversion** 7:11
10:10 21:23
28:20,21 29:24
30:20,24 31:10
31:16,21 39:10
39:19 40:3,13
40:20,22,23
41:5,6,6,18,21
41:22 42:6,6
42:12,13,15
43:5,11,16,21
43:24 44:8
45:17 53:19
56:2,8,8,9,15
57:5,14 70:12
71:14 72:9,13
73:3,9 75:20
77:8,16 96:4
97:21 106:22
108:22 112:6
125:8 147:15
171:5 178:16
195:20 196:18

197:2 198:6
221:6 223:13
235:24 242:7
300:8,20,23
301:5,10,20
302:6,10 308:7
323:21
**diverted** 67:22
68:7 95:20
327:15 331:15
**diverting** 42:23
44:17,22,24
45:11
**divi-** 146:5
**division** 1:3 7:18
8:7 11:10 24:7
113:16,17,18
115:6 146:6,6
146:7 161:8
165:11,11,13
165:18,19,21
182:23 193:13
193:22 194:6
210:11 215:18
222:6 239:13
242:7 245:6
264:15,18,20
265:1,10 278:2
281:24 284:22
285:24 286:8
**divisional** 7:21
207:15 209:16
219:2
**divisions** 84:7
103:13,15
111:1 201:16
209:19 210:4
218:19 257:6
257:15,15
258:1 295:3
**doc'** 272:15,24
**docs** 273:5
**doctor** 76:3
219:18 220:12
222:15 223:6
223:10,12

226:2,3,13,17
248:14,18
273:24
**doctor's** 220:12
**doctors** 161:9
225:14,16
226:14 227:5
234:19 247:15
247:18 248:11
273:16,18,19
**doctors'** 264:21
**document** 1:8
5:11,14 17:23
26:12 28:6
72:20 76:20
98:12 147:19
156:17 158:24
159:4,6,10,23
160:6 165:6
168:14 182:6
182:16 184:9
186:4 200:14
201:12 204:2
207:13 208:4
229:23 230:9
233:17 244:18
251:20 252:1
256:23 257:3
257:18 258:8
258:11,15,19
260:19,21
263:23 264:3,9
268:9 271:11
271:12,16
272:12 275:5
277:9 279:9
281:6 283:4
285:10 286:18
286:20 287:14
288:18 298:10
299:17,21
**documentation**
153:5 185:6
187:9 191:6,6
319:1
**documented**

146:9
**documents**
17:13,16 18:4
30:18 98:10
174:11 181:9
187:3 204:3
257:13
**doing** 21:11
37:24 75:2
100:9,10,14
104:20 147:3
152:13 156:10
170:14,20
172:23 179:21
194:11 196:11
196:13 201:14
201:23 220:17
220:21 224:1,5
224:22 234:18
245:2 252:10
253:9 255:10
262:2 270:24
274:21 275:8
275:15 285:7
289:13 311:24
318:18,22
319:4 330:21
**Don** 297:23
**door** 82:12
256:13
**dosage** 155:2,15
216:11,12
236:21
**double** 299:4
**doubt** 114:24
140:10
**Doug** 217:5,6
218:2
**dozen** 154:23
**draft** 7:3 192:12
207:22
**drafted** 203:13
308:24
**drafting** 159:17
208:4
**drafts** 159:16

draw 78:3
**Drive** 2:20 4:3
**drug** 2:19 8:15
  10:10 63:17,20
  64:15 65:23
  66:3,6,9,13,21
  66:23 67:5,6
  73:4 77:1,4,20
  77:23 79:2
  80:10 152:20
  155:1,11
  161:24 162:5,6
  162:21 175:16
  176:23,23
  187:19 202:12
  236:12 237:21
  245:10 246:5
  256:14 277:1,4
  293:24 294:10
  294:11 296:8
  296:13 308:4
  308:10,21
  309:2,6,8
  323:23 324:7
  324:12
**drug's** 161:23
**drugs** 6:9,14
  26:9 60:13
  61:13,17,18
  62:18,18,20
  63:3 106:4
  114:4 152:10
  154:2 164:6
  165:4 166:7,21
  225:11,22
  236:16,17,19
  241:12 300:8
  300:21,24
  301:5,21
  316:15
**Drugs/Senath**
  6:15
**dry** 258:7
**due** 8:10 20:23
  43:4 45:6,8
  53:9,13,23

54:3,11,15
67:20 68:6,12
68:20 69:3,4,8
69:13 70:1,9
70:10,23 71:4
71:21 72:1,14
78:23 103:18
105:19 168:23
169:4 172:6
174:8,10,13
187:12,15
188:8,13
190:15,19,22
191:2 195:1
197:4 218:20
220:15,24
223:8,19
226:19 229:20
233:16,19,22
234:11 243:8,9
243:19 244:10
244:16,17,22
255:19 256:4
264:10,13
267:12,16
269:23 271:3,3
273:7 275:15
275:17 276:8
276:11,14
312:4,6,23
317:2,18 321:5
327:13 331:14
332:6
**duly** 12:19,22
  336:7
**DUR** 237:4
  238:7,14 248:3
**duration** 206:18
**duties** 20:15,20
  211:19 285:7
  323:5
**duty** 78:22
  256:16

_____
**E**
_____
**e** 2:15 3:15 5:1

175:8
**E-3** 148:16,24
**e-mail** 6:16,21
  7:13 8:3,6 9:14
  10:3,9 101:15
  110:18,24
  111:12,19
  112:11 113:8
  115:5,12,16,21
  116:2 117:22
  118:1 130:6
  182:9 183:3
  184:17,21
  185:20 188:18
  191:1,5,15
  195:21 197:10
  197:17 198:2,9
  198:14,20,22
  198:24 200:5
  202:2 217:3,20
  219:1 221:4,8
  223:7 293:10
  313:14,17
  314:11,15
  319:2 322:13
  323:14,17,20
**e-mailed** 110:17
**e-mails** 181:9
  185:13 188:17
  215:8 313:15
**E-u-s-o-n** 13:8
**earlier** 57:19
  67:13 91:15
  109:11 118:6
  121:16 161:3
  182:22 239:1,8
  268:2 270:11
  272:17 282:4
  297:4,17
  298:12 303:11
  332:22
**early** 146:21
  254:2 318:16
**easier** 215:11
  218:24 237:18
**easily** 237:15

**Eastern** 1:3
  11:10
**easy** 155:7 248:9
**echo** 70:15
**edit** 195:16
**educate** 130:3
**educated** 190:12
  237:18
**effect** 73:18
**effective** 29:23
  30:20,23 31:10
  31:16,20 39:18
  40:2,11 53:19
  56:7 70:11
  72:8,12 96:4
  97:20 123:21
  125:8 266:8
  301:10 302:5
**effects** 63:5
**efficacy** 126:10
**effort** 71:13
**efforts** 244:23
  300:21 301:21
**eight** 217:6
  218:2 233:10
  234:23
**either** 17:22
  21:7,13 44:1
  86:8 116:17
  117:19,19
  153:18 171:14
  176:15 196:12
  218:15 242:17
  285:12 307:2
**Eleazer** 10:10
  323:14
**electronic**
  122:20 160:17
**element** 306:12
**elements** 144:18
  146:13 161:1
  288:3 305:18
  306:7 307:4
  335:2
**eleven** 212:10
**Elmo** 326:15,16

**employ** 237:11
**employed** 20:4
**employee** 23:6
  198:4 336:16
  336:17
**employees**
  210:11
**employment**
  285:5
**enacted** 38:20
**encapsulation**
  329:7
**enclosure** 137:3
**encouraged**
  163:8 168:16
**ended** 178:15
  270:11
**endemic** 248:23
**endorse** 196:11
**endorses** 157:20
**ends** 177:6
  245:22
**enforcement**
  33:10,22 34:2
  34:24 35:19
  36:11 65:23
**enforcers** 35:4
**engagement**
  268:16
**enhance** 298:13
  306:3
**enhanced**
  249:11
**enhancement**
  289:15 290:8
  293:3
**enhancements**
  299:12
**enorm-** 77:17
**enormous** 77:8
  77:17
**ensure** 73:7
**ensuring** 48:24
**enter** 140:17
  249:14,16
  250:4

| | | | | |
|---|---|---|---|---|
| **entered** 187:18 | 181:8 227:13 | **evidence** 174:4 | 262:20 | 111:10 112:21 |
| **entering** 250:17 | 331:2 | 188:12 218:20 | **exceed** 219:16 | 118:10 120:1 |
| **entire** 337:9 | **established** | 222:12 233:23 | 253:23 | 148:14,18,22 |
| **entirely** 44:1 | 150:15 | 321:5 | **exceeded** 175:17 | 148:24 158:24 |
| 94:24 313:16 | **estimated** | **evolution** 119:16 | 187:18 | 181:8 187:3 |
| **entities** 2:12 | 266:12 267:1 | 124:19 125:2 | **exceeding** 187:4 | 189:1 190:14 |
| 26:3,6 62:11 | 268:19 | 126:8 164:2 | **exceeds** 175:11 | 191:19 192:11 |
| 107:14 313:21 | **euphemism** | 210:1 | 176:11 230:15 | 192:11,15 |
| **entitled** 83:1 | 269:17 271:7 | **evolve** 161:12 | 232:14 234:7 | 193:4 197:9 |
| **entity** 35:18 | **Euson** 1:16 5:3 | 165:1 | **excerpt** 148:15 | 200:23 201:7,9 |
| 65:22 | 7:6,14 8:6,16 | **evolved** 125:9 | 186:2 | 207:5,11 |
| **entries** 213:20 | 8:19 10:9 12:2 | 170:5 | **excess** 83:1 | 212:20 215:6,7 |
| **entry** 186:10 | 12:17,21 13:2 | **evolving** 163:19 | 187:4 | 218:23 229:17 |
| 197:10,11 | 13:8 15:10,15 | 164:5 233:20 | **excessive** 6:8,13 | 238:24 240:17 |
| 200:15 215:13 | 17:24 26:13 | **ex** 19:2 36:5 | 88:13 122:23 | 251:9 256:22 |
| 325:18 | 45:15 87:2 | **exact** 36:14 | 127:4 128:18 | 257:7 258:8 |
| **enunciated** | 106:2 141:20 | 58:11 59:5 | 130:24 133:5 | 263:21,22 |
| 91:17 | 148:14 158:24 | 139:1 146:5 | 133:12 136:4 | 271:12 278:8 |
| **environment** | 181:7 191:18 | 202:5 263:7 | 177:10 179:1 | 280:2 287:9,9 |
| 122:6 | 197:9 229:17 | **exactly** 36:5 | 252:3,18 253:2 | 293:8,8,10,13 |
| **envisioned** | 240:16 278:1 | 38:7 47:13 | **exchange** 275:14 | 299:20 309:22 |
| 73:12 74:21 | 337:17 338:24 | 61:24 62:16 | 313:22 | 313:12 321:12 |
| 75:2 | 339:24 | 88:6 90:17 | **excited** 325:16 | 322:7 323:13 |
| **epicenter** 240:13 | **evaluate** 126:14 | 94:17 97:1 | **excluded** 114:1 | 325:15 |
| **epidemic** 37:4 | 171:22 225:3,8 | 103:4,10 | **excuse** 30:10 | **exhibit's** 112:1 |
| 58:6,10,11,21 | 228:3,9,13 | 127:17 134:19 | 92:24 149:22 | **exhibits** 5:8 6:1 |
| 58:22 59:4,4,5 | 233:17 | 175:24 189:16 | **executing** 98:13 | 7:1 8:1 9:1 |
| **equals** 299:6 | **evaluated** | 201:15 204:7 | **execution** 137:9 | 10:1 17:14,18 |
| **ERRATA** 337:1 | 126:16,16 | 232:18 253:15 | **exercise** 53:9,13 | 17:19 55:2 |
| 337:13 338:1 | 230:19 | 257:12 278:17 | 53:23 67:20 | **exist** 25:9 55:12 |
| 339:1 | **evaluating** 163:9 | 307:8 | 68:6,12,19 | 55:19 174:4 |
| **error** 203:18 | 224:12 244:7 | **EXAM** 5:4 | 69:3,4,8,13 | 329:19 |
| 260:2 | **evaluation** | **examination** | 70:9,10,23 | **existed** 66:9 |
| **errors** 122:14 | 174:14 244:14 | 1:17 12:24 | 71:4,21 72:14 | **existing** 144:22 |
| 259:6,21 260:5 | 256:6 334:6 | 336:6 | 78:22 | **exists** 329:19 |
| 260:12 | **Evaluations** | **examined** 12:23 | **exhibit** 5:9 6:2 | **exit** 227:3 |
| **escaping** 297:24 | 120:20 | **example** 154:22 | 7:2 8:2 9:2 | **expect** 135:1 |
| **especially** 89:21 | **events** 89:20 | 155:10 165:15 | 10:2 17:17,22 | 142:12 |
| 276:22 288:21 | 254:17 | 165:16 176:11 | 17:24 18:1 | **expectation** 50:6 |
| 290:2 | **eventually** 332:7 | 177:19 178:23 | 26:13,23 27:1 | 50:14 92:2 |
| **espoused** 301:16 | **ever-changing** | 180:16 186:18 | 27:20 28:6,14 | 100:19 101:4 |
| **ESQ** 2:5,6,10,15 | 88:21 | 190:13 224:8 | 28:19,20 29:13 | 102:4 105:12 |
| 2:16,22 3:5,10 | **everybody** | 270:9 320:3 | 39:7,8,9 45:15 | 123:9 132:10 |
| 3:15,20 4:5,10 | 325:16 | **examples** 27:8 | 45:16 46:1 | 135:2 137:14 |
| **essence** 15:8 | **everyday** 127:8 | 27:13 165:5 | 64:18,22 106:2 | 163:14,15 |
| **essentially** 37:15 | 196:24 | 188:13 195:13 | 106:15 107:13 | 195:15 196:9 |

196:14
**expectations**
89:23 102:2,2
102:3 104:6
**expected** 82:3,4
168:23 169:10
**expects** 204:12
**experience** 30:9
58:2 267:3
**experienced**
122:3,14 123:4
127:16
**experiencing**
166:6 238:13
**expert** 52:23
**expertise** 115:2
**explain** 19:2
75:12 82:24
199:6 220:3
310:20
**explained**
103:17 283:1
303:2
**explanation**
263:20
**explanations**
286:15
**explore** 84:10
125:5
**exploring**
194:16,20
**express** 103:21
319:23
**expressly** 73:16
**extensive** 220:15
269:23
**extent** 12:2
44:10 76:24
77:3,19 179:16
219:11,13
234:11 288:17
301:15
**external** 285:12
**extremely**
253:11 297:2
**eye** 72:11

**F**

**F** 1:20 4:20
336:3,24
**face-to-face**
158:12
**faced** 66:24
**faces** 66:4,6,14
**facial** 14:11
**facilitate** 15:3
77:8,16
**facilities** 21:2,10
21:12,15
119:23
**facility** 21:1
34:7 239:18
263:4 278:2
279:2 323:23
**fact** 15:6 30:23
42:15,19 44:23
50:7 51:5
72:10 81:1
82:6 91:24
99:17 100:8
101:10 104:23
136:17 137:6
178:17 330:18
**factor** 150:3
155:17
**factors** 29:22
30:11 143:23
154:5,8,11
163:22 224:11
224:13,15,16
224:22 225:2,6
225:7 226:19
235:22 237:16
**facts** 191:16
**fade** 246:3
**fail** 57:4 121:8
279:8 330:1
**failed** 31:20,23
32:8,18 40:11
46:1 51:18
121:3 123:14
302:19
**fails** 56:14

329:23
**failure** 37:10,19
39:2
**fair** 21:16 23:16
23:18 44:13
45:13 54:22
61:1 67:9 72:3
74:23 139:2
191:17 192:19
324:11
**fairly** 224:24
261:24 312:15
**familiar** 13:13
26:22 38:8
39:20 46:16
64:19,22 65:1
75:10 106:6
107:1,20
108:12 112:18
124:4 126:19
129:2 136:15
147:19 148:22
159:3,5,6
182:12 191:22
229:23,24
232:9 239:3,4
253:17 259:8
259:18 264:3
278:18 279:4
281:6,7 282:14
283:6 294:4
310:6 319:22
321:20 323:18
325:20,22
**familiarize**
118:15 182:3
**families** 151:21
152:4,10,17
153:17 154:2,4
155:1 162:3,4
162:7,13
163:10 183:21
184:7 185:3,4
187:19 294:11
**family** 19:13
152:7,7,8,18

152:21 162:1
162:11 176:24
177:10,13
189:18,19
225:10 231:8
231:11 294:2
294:10 296:8
296:13
**far** 20:22 26:1
37:19 105:2
150:1 156:17
157:23 188:11
218:2 219:20
226:1 258:4
281:9 331:22
**fashion** 90:12
236:23
**fat** 208:23
**fax** 237:7
**faxed** 110:17
**faxing** 110:19
**FDA** 21:13 26:5
33:21 316:14
**February**
293:15 296:4
**fed** 141:12
**federal** 1:17
30:6 38:16
46:3 327:19
328:3,8,19
329:8,12,20
330:8,9 331:18
331:23
**feed** 263:8,16,17
263:17
**feedback** 245:13
246:4,7
**feeds** 167:24
**feel** 203:2
**fentanyl** 10:7
27:11 59:8
63:22
**ferret** 327:7
**field** 46:11 49:15
106:23 108:19
108:23 110:7

132:18 212:7
242:6 243:13
249:22 327:5
**Fifth** 1:22
**figure** 173:7
231:17 289:22
**figured** 146:11
188:23
**file** 84:2 174:14
187:12,15
218:21 223:8
224:3 244:17
262:8
**filed** 37:23 84:5
**files** 188:13
220:16,24
223:19 233:22
234:11 244:10
244:16 260:1
276:1,14 317:2
317:16,18
321:6
**filing** 88:12,12
99:20,24 101:9
**fill** 79:15,19
169:8 255:22
273:11,21
**filled** 37:15
76:14 220:15
247:16,20
320:6
**filling** 53:9,13
67:21 68:7
69:8 70:24
72:15 78:23
79:9 123:6
222:16 223:15
226:16 238:20
248:11 273:9
**filtered** 247:15
**final** 102:9,13
102:17 103:2,5
103:8,23 224:2
224:4,4 289:3
325:15,15
334:12

Highly Confidential - Subject to Further Confidentiality Review

finally 14:24
254:18
find 23:21 141:5
166:4,13
188:15 222:14
226:16 260:20
261:1
finding 284:3
296:23
findings 233:17
268:8 286:1
292:19
fine 27:15 38:6
97:9 142:18
181:19 229:18
258:6 288:23
fined 38:16
fines 39:3
finger 209:1
fingered 208:23
finish 172:3
198:10 247:1
finished 214:17
firm 282:9
283:13,15
first 5:9,10 6:2
7:2 8:2 9:2
10:2 12:22
15:19,24 17:10
20:13 29:12
49:11,12,20,23
65:18 67:16
74:7,8 81:16
81:20 87:11,17
100:15 101:5,8
104:10 112:8
115:10 119:9
119:12 120:12
125:3 135:18
143:7,14 146:8
151:20 152:9
152:11 153:24
154:16 161:2
163:20 164:10
164:12 166:9
168:21 182:4,4

185:20 189:1
189:10 193:11
204:23 209:14
212:1 219:7,11
221:3,12,20
245:21 249:6
264:12 265:20
272:12 280:19
281:2 287:23
291:19,19
293:21,22
294:12,18
295:12,19
300:1,3 301:17
310:1 316:24
325:24 326:1
fit 189:19 280:9
five 209:5
213:13 273:13
317:15
fixed 296:3
Fixes 9:15
293:14
flag 256:13
flagged 239:11
251:1
flags 201:1
252:12
flip 161:20
Flon 273:5
Floor 2:20 4:8
Florida 2:4,9
112:4 166:24
239:13,17,17
239:20,23
240:5,12
241:12 242:10
243:2,9,21
244:15,21
246:24 247:7
247:10,13
248:23,24
249:1 267:14
272:15,24
273:6,8,20,24
320:3,3,5,8,10

320:13,15,24
321:6
fly 180:10
focus 96:13
119:18 181:18
182:4 281:22
288:15 289:20
focused 318:14
follow 38:15
197:18 329:23
330:1
follow-ups
275:10,12
followed 52:21
following 29:22
168:17 193:9
233:8
follows 12:23
241:4 245:18
foregoing 336:9
forged 41:19
forget 219:21
236:8 292:1
form 9:12 22:23
25:11 31:2
32:3 33:4 34:4
35:7,21 36:3
36:12,22 40:8
42:9 43:13
44:10 45:1
46:21 49:2
50:3 51:3,13
51:20 53:15
54:1,12 55:7
56:4,16 57:6
57:20 58:7,16
59:1,16 60:3
60:17 61:10,22
62:14 63:11
66:15 67:1
68:3 69:10,19
71:1,11 74:1
74:15 77:11
78:18 79:3,11
79:20 80:12
81:7,12,23

82:13 85:18,20
88:18 89:6
91:4,19 92:8
92:20 93:10,18
94:2 95:24
96:16 97:15
98:6 99:8
101:12 104:15
105:8 114:21
115:18 121:11
121:20 123:1
123:23 124:15
131:13 133:22
134:11 135:14
136:23 137:11
138:2 140:8
144:10 145:1,8
151:16 155:2
157:3 159:24
169:13 180:17
187:6 189:6
199:9 202:13
205:4,12 206:7
206:21 218:7
227:18 228:6
235:3 237:15
250:12 252:20
257:20 266:20
275:1 278:22
279:11 284:6
285:13 287:19
289:9 290:17
291:6 298:12
298:19 301:7
302:1 303:5,23
305:6,20
306:15 308:11
309:14 310:24
315:22 316:24
319:16 324:14
327:20 328:10
328:17 329:10
330:10 331:19
332:9 333:11
333:20 334:7
334:18 335:7

formal 278:3
281:15 329:18
Format 200:6
forms 56:9,9
195:1,4,13,16
196:6 197:4
236:13 303:15
314:18
formula 130:22
149:7,15 254:1
Fort 284:21
forward 84:20
194:9 286:11
forwarded
65:10 84:16
85:8
forwarding
184:1
found 168:4
190:4 218:20
273:13 296:24
333:7
four 19:6 44:7
54:24 209:13
222:7 251:2
276:8,16,20,20
frame 15:7
framed 15:24
Franklin 2:9
frankly 148:14
204:1
Fraud 8:15
fraudulent
238:20
frequency 46:15
47:22 56:24
57:1 120:17
288:1,3,8,21
289:13 290:3,8
291:20 298:14
298:18,22
305:5,18 306:4
306:7,24 307:4
307:23 334:14
334:16 335:2,5
335:6

Highly Confidential - Subject to Further Confidentiality Review

**Friday** 8:20
241:4,17 246:1
246:2,24
**Friday's** 241:9
**friend** 210:19
**front** 17:23
222:11
**fulfillment**
175:15
**full** 24:23,23
72:21 148:15
226:9 249:7
294:12
**function** 73:11
115:8 116:1,3
126:3 172:5,6
180:16 217:20
**functionality**
144:18 293:22
294:5,9 296:3
296:24
**functions**
116:14
**further** 1:13
43:7 62:9
142:8 155:2
182:1 190:21
253:15 263:20
285:7 335:11
335:17
**fuzzy** 288:13

**G**

**G** 281:3
**game** 238:6
**gap** 299:13
**garnered** 195:8
**Garriott** 7:14
106:19,21
108:22 134:17
135:17 198:3
**Garriott's**
200:19
**gather** 43:2,3
**Gayle** 242:6
**gears** 277:8

**general** 29:17
36:20 37:8
73:19 102:24
151:8 200:1
242:12,13
243:14 244:18
271:22 307:20
**General's** 35:17
**generalities**
136:1
**generally** 24:15
63:8 136:2,9
**generated** 114:3
**generation**
143:7
**generic** 24:18
152:19 162:8
265:4,12
**generics** 265:5
**geographic** 44:7
166:15 167:11
248:23
**geographical**
165:6,7
**George** 1:16 5:3
7:6,14 8:6,16
8:19 10:9 12:2
12:16,21 15:10
15:15 52:20
216:15 337:17
338:24 339:24
**gestures** 14:11
**getting** 35:10
62:3 70:19
117:12 118:22
154:24 168:10
173:24 235:9
258:4 265:6
283:9 292:4
**gist** 103:17
**give** 14:4,12
26:15,19 28:16
45:5 64:18
94:16,21 149:5
156:12 165:15
172:13 178:22

181:11 183:22
188:1 189:19
190:12 191:20
195:18 199:21
200:7,24 201:4
201:18 206:24
208:16 214:1
229:18,18
235:23 236:22
248:8,12 258:9
263:20 270:8
282:21 283:7
294:23 313:12
320:21 323:1
324:3
**given** 72:7 76:24
77:3 127:22
128:18 138:8
195:8 212:13
213:22,24
241:8 246:8
303:8,8 307:21
336:12
**gives** 102:11
172:22 216:11
233:9 296:15
**giving** 188:5
**glad** 177:8
**glitch** 259:14
**glitches** 259:18
**go** 13:22 14:1
17:12,14 32:19
36:7 43:7 47:6
67:10 74:17
75:17 86:18
91:20 100:4
105:9 122:7,13
129:1 133:23
141:2 144:21
145:24 148:20
152:3 154:15
170:24 180:20
180:22 184:6
189:7 192:10
198:14 203:4
203:21 216:3,4

226:19 227:19
228:7,11
235:21 236:24
239:12 247:1
248:1 266:5,5
267:11 277:17
280:18,24
285:14 289:10
290:18 293:9
293:11 294:2
295:12 300:15
320:6 326:5
**goes** 152:21
197:21 212:21
314:11
**going** 13:22
15:10,13 16:17
16:18,18 17:7
17:12,19 23:7
26:12,15,19
28:5,16 30:17
37:12 39:7
41:7 45:14,19
62:1 64:17
74:21 76:21
83:5 86:16
90:18 101:21
106:1 107:10
107:12 111:9
111:24 123:17
126:18 128:17
135:23 141:6
145:16 148:13
155:21 158:22
158:23 160:9
168:13 171:5
173:9 176:7
178:11 179:24
180:4,7,9
188:7,8 194:4
194:8,9 195:12
195:16 196:2,2
196:11 197:8
200:10,24
201:19,23
204:1 207:5

212:19 218:18
219:5 221:21
221:22 229:16
234:12 240:17
241:2 243:17
250:22 255:1,7
256:9,14
263:21 271:4
277:13 280:15
282:22 286:17
286:21 287:2,4
294:19 299:18
299:20 301:18
305:10 307:9
309:21 311:5
313:11 314:6
315:1,20
320:22
**Golkow** 4:15
11:3
**good** 13:2 46:2
86:15 181:1,1
189:20 195:23
197:5 219:24
277:13 287:12
293:3
**Google** 167:24
**gotcha** 150:8
**gotten** 226:13
285:23 304:2,5
**govern** 79:2
**government**
21:7 25:5
38:16 62:11
94:22 157:13
**Grande** 6:17
113:11,12,14
**Gray** 3:3 12:7
**great** 45:23
57:17 238:4
310:19
**green** 251:5
**group** 153:10
161:4 242:5
314:2,5,8
**grouped** 153:21

Highly Confidential - Subject to Further Confidentiality Review

153:22
**guard** 39:18
40:12
**guess** 43:22
70:14 113:9
131:3 141:5,6
166:5 168:12
192:18 197:22
209:1,5 215:8
217:13 219:3
257:18
**guidance** 88:21
98:10,12 100:9
146:23 154:21
156:17 165:6
195:18 219:22
233:8 302:20
303:8,9,15
304:1,5,9
305:11
**guideline** 149:8
149:11,13,14
149:17,24
150:7 151:19
168:14 171:17
176:6
**guidelines** 7:10
159:22
**guy** 280:24
**guys** 277:14

**H**
**H** 259:5 281:2
**H.D** 1:15 2:12
6:8,12 7:16
8:12,23 9:4,8
9:10,19 10:3,4
10:7 11:24
12:2 13:10,16
13:20 14:23
15:8,8,14 18:6
18:24 19:3,5
19:10,14,17,18
19:19 20:1,2,5
20:8,21 21:17
22:1,2,11,15

22:22 23:4,9
23:17,23 24:10
24:14 25:19
27:18,24 29:6
29:8 30:13,15
30:19,22,23
31:9,20,23
32:8,17 33:2
33:18,23 34:3
34:16 35:6,20
36:10,15,21
37:9,17 38:6
38:12,14,22
39:23 40:5,11
42:5 43:11
44:7,16 46:23
48:4,8,18 49:1
49:11,20,21,23
49:24 50:19
51:2,11,17,18
52:1,4,18 53:2
53:7,12,23
54:6,9 55:4,18
55:24 56:12
57:3,17,24
58:4,13,20
59:11,14,20,22
61:6 62:6 63:6
64:6 65:8 66:8
66:21 67:24
68:14,23 70:5
70:7,17 72:17
73:23 74:13
76:1 77:9,22
78:10,24 79:8
79:18,18 80:15
80:21,21 81:6
81:17,18 82:10
88:16 89:15
90:3,24 96:9
97:4,4,5 98:13
98:19 99:4,23
100:13,15
101:9 103:9,20
104:4 105:3
107:4,16 108:3

108:8 109:14
109:16 111:14
113:3 115:1
116:1,7 118:1
118:19 119:5
119:13 120:24
121:2 122:5
123:22 124:12
125:16 128:4
132:2 135:8,11
136:1,21
138:16 139:12
140:14 143:3
143:15,20,23
144:2,7,19,21
145:6,19 149:3
151:4,13
153:14 158:16
159:21 160:18
160:23 163:16
163:17 164:23
168:19 170:18
170:19 171:8
172:1 174:5
178:20 179:1,6
179:7 180:14
183:7 186:1
188:12,20
205:1,8,17
206:4,11,18,20
208:3,5,13,19
210:3 211:3,15
212:2 221:21
223:2 224:11
227:14 229:1
230:24 232:19
234:11 235:2
237:20 239:13
240:4,14
241:14,24
244:1 246:3
247:2 249:7,10
249:13,14,16
253:22 255:21
256:24 259:6
259:19 260:11

261:2,18 262:2
265:5 266:18
271:14 272:13
273:4 275:12
278:2,8,11,12
279:2,5 282:5
282:18 283:18
283:21 284:1
284:16 285:12
296:4 298:5
300:17 301:3
301:18 303:3
303:19 304:11
304:14,23
305:17 306:6
306:23,23
307:3 308:16
311:4,8,12,15
312:18,19
313:3,20
314:12,16,18
315:3,16,20
316:13,22
317:3,8,13,23
318:6,17,21
319:10 320:7
321:14,21
322:10,12,15
322:16 323:9
324:11,21
327:17 328:24
329:6,17,23
330:7 331:6
332:15 333:2,9
333:18 334:13
335:3
**H.S** 5:16
**habits** 168:6
247:19 273:18
**half** 328:22
**halt** 80:10
239:23 243:18
244:20
**Hampshire** 8:13
**hand** 16:18 17:7
17:22 159:9,13

299:20 309:22
323:13 336:22
**handful** 260:12
297:5
**handing** 159:1
278:7
**handle** 75:23
76:4 128:2
**handled** 127:24
269:8
**Handler's** 7:8
147:20,23
148:3,6 149:20
151:3 156:16
156:22 163:4
**handlers** 73:4
204:8
**hands** 59:15,21
60:1,2,15
**handwriting**
200:8,11,13,16
**handwritten**
184:8 189:2
197:10,11
200:4 325:18
**happen** 18:8
23:13
**happened** 89:20
134:19 179:11
278:14 279:7
282:15
**happens** 81:3
209:10
**hard** 28:7
197:17 215:9
216:2
**harm** 56:3 61:9
61:13,20 62:8
62:12,16 63:3
63:10,15 64:8
64:13 77:8,17
**harmful** 63:5
**Hay** 1:22
**Hayden** 3:5 12:6
274:24
**hayden.miller...**

3:5
**Hazelwood**
271:15
**HBC** 4:7 12:10
**HD** 5:16
**HDA** 168:19
**HDA's** 300:18
**HDMA** 7:3,10
157:11 159:8
159:22 165:5
168:14 176:6
192:1,2,7,12
192:16,20
195:8 228:20
299:22 301:1
301:13,16,17
302:22 308:7
308:16
**HDMA's** 9:17
300:6,13,18
HDS-EUSON...
5:17
HDS-EUSON...
5:19
HDS-EUSON...
5:22
HDS-EUSON...
6:3
HDS-EUSON...
6:5
HDS-EUSON...
6:7
HDS-EUSON...
6:12
HDS-EUSON...
6:16
HDS-EUSON...
6:19
HDS-EUSON...
6:21
HDS-EUSON...
7:3
HDS-EUSON...
7:5
HDS-EUSON...
7:8

HDS-EUSON...
7:10
HDS-EUSON...
7:13
HDS-EUSON...
7:16
HDS-EUSON...
7:18
HDS-EUSON...
7:21
HDS-EUSON...
8:3
HDS-EUSON...
8:6
HDS-EUSON...
8:10
HDS-EUSON...
8:12
HDS-EUSON...
8:15
HDS-EUSON...
8:19
HDS-EUSON...
8:22
HDS-EUSON...
9:3
HDS-EUSON...
9:5
HDS-EUSON...
9:7
HDS-EUSON...
9:10
HDS-EUSON...
9:12
HDS-EUSON...
9:14
HDS-EUSON...
9:17
HDS-EUSON...
9:19
HDS-EUSON...
10:3
HDS-EUSON...
10:7
HDS-EUSON...
10:9

HDS-EUSON...
10:13
**HDS-EUSON-A**
5:10
**HDS-EUSON-B**
5:13
HDS_Euson_...
5:18
HDS_Euson_...
5:21
HDS_Euson_...
5:23
HDS_Euson_...
6:4
HDS_Euson_...
6:6
HDS_Euson_...
6:11
HDS_Euson_...
6:15
HDS_Euson_...
6:18
HDS_Euson_...
6:20
HDS_Euson_...
6:24
HDS_Euson_...
7:4
HDS_Euson_...
7:9
HDS_Euson_...
7:12
HDS_Euson_...
7:15
HDS_Euson_...
7:17
HDS_Euson_...
7:20
HDS_Euson_...
7:22
HDS_Euson_...
8:5
HDS_Euson_...
8:9
HDS_Euson_...
8:11

HDS_Euson_...
8:14
HDS_Euson_...
8:18
HDS_Euson_...
8:21
HDS_Euson_...
8:23
HDS_Euson_...
9:4
HDS_Euson_...
258:24
HDS_EUSON...
261:9
HDS_Euson_...
9:6
HDS_Euson_...
9:9
HDS_Euson_...
9:11
HDS_Euson_...
9:13
HDS_Euson_...
9:16
HDS_Euson_...
9:18
HDS_Euson_...
9:21
HDS_Euson_...
10:6
HDS_Euson_...
10:8
HDS_Euson_...
10:12
HDS_Euson_...
10:14
**HDS_Euson_1**
232:4
**HDS_MDL_0...**
7:7
**head** 84:23
117:1 146:10
147:15 205:17
219:22 265:6
**headed** 311:20
**heading** 277:12

**headings** 113:9
**headquarters**
52:15 90:2,4
90:15 94:12,13
94:14 110:9,11
110:15 115:9
192:3 193:8
210:8 242:4
249:21
**heads** 187:24
**health** 3:7 9:17
23:20 30:12
73:18 299:22
300:22 301:2
301:14 302:9
**Healthcare** 19:8
157:7
**hear** 118:14
134:3,6 195:23
196:3,3 197:3
275:3
**heard** 113:6
134:9 246:22
246:23 321:22
**heart** 326:21
**held** 7:3 11:6
20:11 37:14
132:12,15
176:12,14,16
177:20 214:7
216:13,23
218:13 234:15
252:13 284:24
295:12
**help** 247:3
313:11 318:17
**helps** 14:18
166:3 188:6
**hereof** 337:13
**hereto** 336:19
**hereunto** 336:21
**Hernandez** 9:14
285:3 289:23
292:20 293:10
**Hernandez's**
290:14 291:1

63:22
**hesitate** 93:22
**Hey** 173:16
179:23 196:14
197:5
**hierarchy** 85:2
**high** 27:6 28:1
88:14 190:10
225:24 266:11
266:13,24
268:18,24
269:2,10,20,22
270:4,17 271:2
**Higher** 276:6
**highlighted**
27:16,21 28:17
29:2,13 39:11
39:12,15 40:19
45:18 64:20
65:18 67:12,17
72:4 78:9 88:7
88:10 95:5,10
118:11 120:13
132:20 133:1
183:2,12,16
189:2 193:10
198:17 230:10
241:6 245:18
245:21,24
252:2,3 264:11
264:22 300:12
302:13,16
308:2 310:8
326:10,19
**highly** 1:12
127:13,14
140:10
**HIPAA** 248:2
248:20,20
**hire** 212:13
**hired** 119:5,9,12
**historic** 151:5
**historically** 97:7
195:17 303:8
311:16
**history** 51:17

114:4 127:7
169:20,21
185:23 279:5
289:14 323:22
**hit** 176:10 179:8
209:2 214:4
252:23 313:7
333:24
**hits** 209:2
226:11 315:1
**hitting** 179:18
209:12
**hoc** 131:11
**hold** 20:7 168:11
177:18 219:21
231:7 280:7,18
294:18 295:20
296:9,9,17,18
297:1,10,13
298:6 299:18
315:5
**holds** 216:21
**HON** 1:7
**hope** 179:3
247:2 248:15
**hoping** 197:11
283:5
**hospital** 76:3
153:2 174:1
190:7
**hour** 141:2,8,9
141:10 203:3
**hour-and-a-half**
141:3
**Houston** 167:1
**Howard** 8:3
215:14,14
217:14,17
**Huckstep**
297:23
**huge** 308:5,10
308:21 309:2
309:12,13,16
**hydo** 167:4
**hydro** 6:23
184:16 185:3

186:16 189:3
**hydrocodone**
27:12 102:21
152:7,16
155:15 167:1,2
167:4 177:13
177:15 179:9
183:21 187:20
**hydromorpho-**
27:9 222:8

**I**

**I.3** 208:11
**idea** 45:4 46:2
114:23 115:17
119:1 128:10
223:10 250:16
**identified** 43:20
44:16 80:16,22
81:5,19 124:2
132:12 136:4
150:1 168:3
170:22 205:1,8
205:17 206:15
207:3 216:23
222:1 226:22
227:5 238:22
241:16,23
242:24 243:23
244:7,8,14
246:15 247:6
256:11 268:9
289:24 311:24
314:16 317:11
320:14 321:10
330:22 333:3,5
333:17 334:21
335:10
**identifies** 108:4
275:20
**identify** 11:11
14:22 48:9
122:16 132:7
133:11 161:18
162:3,13 163:2
165:22 166:4

174:20 199:22
200:11 206:23
215:4 216:19
221:24 228:15
243:6 245:9,14
247:18,22
248:18 298:4
304:13 310:13
310:21 318:17
318:21 322:19
326:23 328:4
329:3 330:3
333:23
**identifying**
123:22 150:10
150:11 163:12
214:3 246:5
256:11
**identities** 228:18
**II** 5:17 25:19,23
26:4 27:9,11
28:1 29:9,15
29:19 30:24
31:10 32:1,10
122:10 232:7,9
232:12,16
233:2 234:12
234:24 235:16
235:18 244:2
**II/IIN** 27:5
**III** 2:16 122:11
**IIN** 27:13
**IIs** 26:7,11
**illegal** 40:23
41:1,2,8,16,17
42:15 73:16
327:8,15
331:15
**illegally** 42:1
**illegitimate**
289:5
**illicit** 41:8,10,16
57:18 59:8
63:22 196:18
**Illinois** 1:23
2:21 4:4 11:7

106:24 108:20
139:16,20
165:20,21
198:7
**image** 217:11
**immediately**
230:19 241:14
242:23 245:18
324:8
**impact** 142:1
254:5 288:11
289:8
**impacts** 289:6
289:18
**impetus** 194:14
274:20
**implement**
52:11 196:17
197:1
**implementation**
91:13 99:3,24
104:9 125:15
136:21 137:9
144:20 150:13
150:21 184:18
207:19 208:20
257:4 305:16
306:19 308:5
**implemented**
52:7 104:5,12
129:18 135:11
159:21 207:13
207:15 291:6,8
304:24
**implementing**
144:4 196:21
199:2 249:8,11
302:22
**implicated**
289:7
**important**
253:11 331:4,5
**impression** 93:6
**improve** 125:7
145:4 167:8
194:17 233:20

Highly Confidential - Subject to Further Confidentiality Review

235:10
**improvement**
9:12 298:12
**improvements**
53:1 287:20
**in-house** 112:15
**inability** 105:4
**inaccurate**
262:18
**inartful** 56:19
**incident** 279:5
**include** 27:9,12
27:13 41:18,21
41:23 44:5
46:13 47:20
54:15 152:18
161:12,13
169:9 185:8
190:7 265:13
298:18 306:24
307:22 328:7
334:13
**included** 115:15
204:4 219:6
252:24 254:16
275:18
**includes** 48:21
165:6 215:12
**including** 14:20
206:18 246:14
307:4
**inconsistent**
29:20
**incorporate**
166:5 172:1
**incorporated**
166:10 168:19
**incorrectly** 62:3
**increase** 184:15
185:2 186:21
187:22 189:4
191:2 210:13
210:21 211:15
265:5,11
268:17 297:6
**increased** 185:4

186:16 188:16
210:11 223:2
268:6
**increases** 127:18
189:22
**increasing**
190:16 309:7
**independent**
95:17 97:11
98:4,18,20
99:5
**Indiana** 2:14
**Indianapolis**
2:14
**indicated** 11:5
136:16 168:22
321:7 337:12
**indicating** 129:5
279:1
**indication**
100:13
**indicators**
256:13
**indicia** 233:23
**indigent** 292:2
**indirectly**
336:19
**individual** 12:3
15:6,11 49:13
100:24 133:9
133:18 164:1
174:3 237:24
244:17 250:15
329:17
**indulge** 331:9
**industrial** 30:2
67:23 68:9
**industry** 7:10
19:21 21:7
47:24 50:6,13
80:24 82:2,5
89:21 91:7
92:1 100:18,20
100:20 102:4
125:9 132:10
204:12 209:4

302:20,24
303:9 305:2
306:1 314:2,5
314:8 330:18
**inflate** 253:24
**influence** 240:8
243:5
**influenced**
166:8
**inform** 46:10
83:22 84:8
140:3 241:13
**information**
10:4 21:6,8
22:10 26:22
43:2,3 83:13
84:19 116:17
130:2 138:8
163:11 170:3,6
171:1 172:14
172:18 185:6,8
188:1,1,5,22
189:15 190:11
190:21 218:10
223:20 226:7
226:21 228:18
228:20 237:9
237:14 238:17
239:9 248:9,14
248:20 249:13
255:6,7 273:19
274:3 275:14
276:12 277:7
279:9 281:9
282:2,21 283:3
285:8 311:9,10
311:13 312:1
312:14,18,21
313:23 315:2
316:5,7 320:12
327:4,7
**informed** 142:21
196:7 247:9
**Inglewood**
113:19
**ingredients**

162:8,17
**inherently** 288:9
298:21
**initial** 81:16
100:13 119:17
135:8 198:15
219:4 255:19
256:3,5
**initially** 44:22
99:20 168:22
**initiate** 233:14
**initiated** 232:17
**initiation** 9:12
233:5 287:18
291:6
**input** 52:4
**inquire** 43:2
269:3 298:7
**inside** 75:20
169:15 286:11
**insight** 117:22
**insistent** 247:17
**inspection** 34:8
256:2
**inspections**
34:17,20 95:2
105:15 255:15
255:16,17
256:8
**instance** 31:19
34:1,15 51:18
61:8 100:15
101:5,8 143:14
187:20 205:18
205:22 206:1
261:23 325:24
326:2
**instances** 32:17
188:15 205:1,8
206:4,11
232:14
**instituted** 33:22
34:2,6 35:5,19
36:11 272:4,6
**instruct** 14:6
92:21

**instructed** 87:6
193:14,23
**instruction**
138:13
**instructions**
110:6,9 306:20
**insufficient**
100:18 194:12
245:10
**intended** 62:22
209:2
**intention** 250:4
**interact** 280:11
**interaction**
280:12 316:13
**interest** 29:21
29:22 163:2,13
166:4 175:9,14
175:19 176:17
230:16 232:5
232:16 234:8
**interested**
336:19
**interference**
52:17
**internal** 21:10
106:11 111:5
126:3 226:15
264:7 267:2
285:12
**internet** 102:20
103:19 129:23
**internet-type**
83:14,23
**interpretation**
88:21 89:13
90:22 91:8
101:4 202:18
202:19 249:18
302:21 304:6
329:17 330:20
**interpretations**
67:15 89:5
104:7
**interpreted**
89:16 121:18

interpreting 98:13 305:2
intervened 140:18
introduce 12:5
introduced 18:14
introduction 76:8
investigate 42:22,24 82:18
investigated 34:16 178:21 187:2,3,14 193:15,24 214:7 230:20 285:22 321:7
investigating 270:12
investigation 6:7 6:12 9:3 33:23 34:3,6,22 35:5 35:19 36:21 43:8 45:4,7 98:18 106:3 136:14,16 170:23 171:1 176:22 177:2,5 177:24 178:5,6 178:9,10,12,21 179:3 180:3 214:17,23 230:21 231:16 232:5,8,17 233:2,12,24 234:9,13,16,24 235:16,18 236:1,4,5 258:13 270:14 270:21,22
investigations 33:10 34:19 42:13,18 44:20 179:18 232:10 234:19 244:2 255:17 256:8

320:8,20
investigative 107:11 233:8
investigator 10:10 106:22 108:23 112:6 195:20 198:6 242:7 321:10 323:21
investigators 327:5
invited 90:1
involved 19:17 34:21 35:23 94:10 125:20 142:23 143:1 219:23 323:6
involvement 52:4 116:13 219:21
involves 321:21
involving 107:14
Ira's 216:12
isolated 248:22 286:22
issuance 29:20
issue 14:3 166:21 196:9 240:13 247:12 259:8 262:3,21 263:8,12,18 287:3 295:2 299:1 322:19
issued 102:10,13 108:8 225:24 301:13
issues 32:23 58:10 59:7,8,8 157:22 166:6 167:7 168:6 193:9 198:15 239:16,21 240:11 242:9 242:12 243:7 243:14 246:24

247:4,7 248:22 274:9 284:21 292:13 293:22
item 114:4 298:24
items 114:1,2 285:17 294:16 294:17 295:17 295:18 321:11
iteration 24:10
iterations 48:14

___ J ___

J 2:16 281:3
Jacksonville 2:4 249:2
James 2:5 11:13 13:2
January 9:6 83:12 85:14 125:5 129:19 129:24
Jersey 314:7
job 20:15 49:4 49:10 180:24 197:5 323:5
Joe 64:24 78:4 303:12
join 319:16
joined 118:19
joint 90:11
Jones 4:3 12:8
Joseph 6:5
journal 197:10
Ju- 198:17
Juan 2:10 11:17
juanmartinez... 2:11
Juliana 1:20 4:20 12:17 336:3,24
July 106:3 198:2 198:17 216:5
jump 18:3
June 7:8 10:14
Junior 115:20

115:21,24 116:6,10 118:14
jurisdictions 44:4,4
jury 331:5
Justice 33:22 307:19
justification 185:7
justify 220:4
justifying 222:11
jyoung@forth... 2:5

___ K ___

Kash- 116:21
Kashmer 117:1 297:23
kec@pelini-la... 3:15
keep 17:8 141:12 160:9 167:6 226:14 245:3 262:2
keeping 325:19
keeps 76:7
Keller 219:9 220:9
Keller's 8:7 222:1,5,6 223:17,23 224:7,18,21 225:3 227:12 227:22 270:10 270:15 271:8
Kennett 6:9,14 106:4
Kentucky 34:7,7 138:17 139:4 165:18,19
kept 122:11,11 164:5 244:21
key 73:10 209:2
keyed 112:14

114:1
kind 43:8 77:21 112:8 152:2 169:16 173:11 173:14,14 201:22 204:11 204:12 209:4 226:15 240:12 244:21 254:21 264:11 279:24
Kirbach 184:2 186:12 216:8
knew 94:10 101:24 104:20 151:19 156:7,7 156:14 169:15 173:12 263:1 305:23 307:8 314:6 324:20 325:5,7,12
know 13:23 14:2 14:16,20,21 15:1,3,12 17:21 23:7,15 24:15 26:1 28:22 32:21,22 34:18,19,22 37:7,22 38:4 41:14,15,15 42:15,16,17,19 49:9,9 50:24 52:22 53:17 54:14,15,16,16 54:19 55:9 58:9,10,11 59:5,6 60:23 61:5 62:1,17 62:17,19,20,20 62:22 63:5,13 63:19 64:4 66:12 73:21,22 74:20,20,21,21 75:15 76:9 77:21 82:1,9 82:11 84:6,14 84:14,15,24

| | | | | L |
|---|---|---|---|---|
| 85:22 86:7,17 | 160:22 162:14 | 233:18 234:10 | 313:1,24 314:8 | |
| 87:3,4 88:20 | 163:17 165:3,3 | 234:24 237:7 | 314:9,13,23 | **L.A** 276:24 |
| 90:19 94:10,15 | 166:15,24 | 237:18 238:16 | 315:5,19,24 | **labeled** 192:12 |
| 96:22,22 97:5 | 167:3,23,24 | 238:22 239:19 | 316:3,4 317:16 | 212:24 328:23 |
| 97:9 98:1,8 | 168:22 169:9 | 242:10 244:5 | 319:7 320:11 | **LAK** 186:12 |
| 100:12 101:20 | 169:10 170:3,4 | 244:11,19 | 320:15,16 | **Landry** 193:8 |
| 103:4,6,10,15 | 170:4 171:1,6 | 245:1,2,7 | 321:15,24 | **Lane** 242:6 |
| 104:24 105:1 | 172:16,19,20 | 246:11,13,20 | 322:16,17,23 | **Langston** 4:5 |
| 106:19,21 | 172:24 173:11 | 247:8,17 | 323:10,16 | 12:8,8 242:4 |
| 107:21,22 | 173:16,23 | 248:17 250:9 | 324:18 325:23 | 243:13 |
| 108:24 109:5,8 | 174:1,20 | 250:11,18,20 | 329:1 | **language** 39:20 |
| 110:13,21 | 176:16 179:2 | 251:19,22 | **knowing** 138:5 | 46:16,20 |
| 111:1,6,15,23 | 179:13,16,22 | 252:12,15 | 189:16,17 | **largely** 213:14 |
| 112:7,8,18,23 | 180:1,2,6 | 253:11,20 | 191:16 227:11 | **larger** 212:5 |
| 113:5,9,12 | 181:2 183:2,11 | 254:15 256:3 | 268:22 283:8 | 247:5 250:15 |
| 114:6,10,11,12 | 184:9 185:10 | 256:11,12,17 | **knowingly** | 266:12 |
| 114:17 116:3,5 | 187:1 188:4,6 | 257:16 259:15 | 318:12 | **largest** 212:4 |
| 116:12,20 | 188:6,19 | 259:23 262:3 | **knowledge** | **Larry** 193:7 |
| 117:2,19 119:2 | 190:11,13,15 | 263:7,18 264:4 | 31:22 40:16 | **late** 325:18 |
| 120:4 122:4,21 | 191:11,13,14 | 264:5,24 267:1 | 80:20 82:22 | **lately** 182:8 |
| 123:3,21 124:5 | 192:9 193:16 | 267:13 268:16 | 114:19 123:20 | **launch** 171:1 |
| 124:5 125:3,3 | 194:4,6,7 | 268:16,18,22 | 127:6,12 134:6 | **Laura** 2:3 |
| 125:7,8,12 | 195:9 196:14 | 268:23 269:5 | 137:22 140:20 | **law** 30:4 31:24 |
| 126:1,11 | 197:1,4,15,22 | 270:18,20 | 145:13 179:12 | 53:6 71:16,19 |
| 127:14,15,16 | 197:23 198:12 | 272:4,4,5,7,24 | 190:20 224:23 | 71:20 89:5 |
| 127:17,17 | 200:8,16 | 273:2,7,8,8,10 | 260:18 286:19 | 91:1 92:6,19 |
| 128:17 129:6 | 201:15,20,20 | 274:20,23 | 296:7 297:12 | 93:8 97:17,24 |
| 129:10,16 | 201:24 202:5 | 275:4,24 | 298:5 299:14 | 98:9 104:12 |
| 130:5,9 131:9 | 203:2 204:4,5 | 276:13 277:7 | 305:24 311:4 | 105:4,12 |
| 131:19,19 | 204:5,11,13 | 281:7,15,17,19 | 316:5 317:1 | 121:19 329:24 |
| 132:8 134:3,19 | 214:2,2,6,20 | 281:23 282:1 | 322:11 329:12 | 331:18 |
| 134:21 135:3 | 215:2 216:10 | 282:21 283:1,2 | 334:20 | **lawful** 73:14 |
| 135:18,20 | 216:24 217:24 | 283:23 285:4,5 | **known** 46:24 | **laws** 30:6 32:9 |
| 136:7,11,14 | 218:2,9,9 | 285:17 286:3,7 | **Komoroski** 8:17 | 32:18,23 33:2 |
| 137:2,4,6,8,23 | 219:7 220:1,20 | 286:23 288:2 | 251:23 | 33:11 39:2 |
| 138:11 139:1,3 | 220:23 221:7 | 288:18 291:5 | **Kristen** 3:15 | 54:7,10 55:1,3 |
| 139:7,14,17 | 223:2,5,5,6,7,8 | 291:16 292:14 | 12:14 | 55:12,15,19 |
| 140:2,12,16 | 223:11 224:6 | 295:1 296:2,5 | **Kyle** 7:6 90:15 | 67:15 79:2 |
| 146:5,23,23 | 225:8,9,12,13 | 296:18,20 | 94:13 147:14 | 89:3,8,8,16 |
| 147:22 148:8,9 | 225:17,17,18 | 297:7,10 298:7 | 147:14 191:20 | 304:21 |
| 149:2,10,22 | 225:19,20 | 300:3 301:15 | 192:3 193:1,5 | **lawsuit** 34:20 |
| 150:2 152:18 | 226:10,11,12 | 303:1 304:3,3 | 193:5,22 | 37:23 |
| 153:22 155:15 | 226:14 227:1 | 304:7 309:6,17 | 194:10 195:13 | **lawyer** 202:21 |
| 156:9,12,20,24 | 228:1,13,17 | 309:17 310:7 | 195:20 197:3 | **lays** 149:14 |
| 157:5 159:3,7 | 230:3,4,5,7 | 311:11,14,22 | 201:17 208:9 | **lead** 27:7 28:2 |
| 159:12,14,20 | 232:20,22 | 311:23 312:17 | 211:20 319:2 | 92:18 |

**LEADER**
251:11
**learn** 143:12
278:15
**learned** 37:18
87:6 100:16
104:10 118:23
164:22
**learning** 103:22
**leave** 216:13
**led** 306:23
**ledger** 181:10
**Leeder** 2:16
11:23,23 18:17
141:9
**left** 18:24 19:3
19:17,20 87:10
143:6 164:15
164:16 166:12
203:12 285:5
323:10
**legal** 70:23
142:24 323:9
**legally** 42:1
**legally-obtained**
41:23
**legally-regulat...**
327:6
**legitimacy** 72:15
**legitimate** 30:1
62:22,23 67:22
68:8 73:4
95:20 164:7
165:3 181:2
223:12
**lengthier** 258:9
**lengthy** 73:21
299:21
**Leonard** 240:19
242:3 243:11
**let's** 25:17 36:7
81:16 98:23
129:9 132:23
132:23 141:6
141:11 154:15
154:15 160:5,5

160:8 161:20
161:21 164:9
164:10 168:13
173:16 177:19
197:8 209:24
216:6,6 239:12
258:9 264:11
293:9,20
302:13 326:8,8
**lethal** 77:5
**letter** 6:5 7:5
8:19 9:10
64:24 65:7,14
65:17,21 66:1
66:22 67:9
75:1,8 78:3,21
83:5,6,7,10,14
84:1,4,15,18
84:19 85:2,12
85:15,17 86:2
86:8,12 87:12
87:13,17,19
88:2,3,4,5,8
90:24 91:17
92:14 93:8
95:6 96:8
97:17,24 99:19
100:8,9,12
101:1,15,18
102:3,6 103:3
104:11 121:19
191:19,24
193:4,6,18,21
194:24 195:12
196:16 240:18
240:21 241:6
241:13,22
242:22 243:11
278:8,19 279:1
281:2,2,3,3,3,4
281:18 282:3,8
282:16,20,24
283:11,24
284:8,13,18,22
285:1,19
286:10

**letterhead** 64:20
186:1 271:13
**letters** 85:3
124:11 196:1
303:12,18
**letting** 61:5
94:14
**level** 189:17
232:7,9,12,16
233:2 234:12
234:15,24
235:16,18
244:2 312:14
313:4
**levels** 222:12
**Levin** 240:19
241:19,23
242:4 243:12
**license** 33:18
39:3 289:2
320:23 321:8
**licensed** 66:21
139:23
**licensing** 20:24
21:1 211:18
212:7
**lieu** 158:21
**lifesaving** 62:20
**light** 239:16
245:19,24
246:2 279:24
282:16
**lim-** 256:21
**limit** 62:8 83:3
**limitation**
266:17
**limitations**
264:10 266:4
**limited** 22:6
228:19 256:21
281:12 297:2
304:8
**limits** 183:20
190:23 223:14
**line** 24:23,23
42:14 325:15

338:2,5,8,11
338:14,17,20
339:2,5,8,11
339:14,17,20
**lines** 256:13
**lingo** 209:4
**liquid** 155:3
**list** 147:24 149:1
149:20 168:18
171:13 226:14
226:15,15
229:5 233:9
236:19 248:11
257:23 273:16
297:3
**listed** 84:9 184:7
**lists** 108:4,5
192:15 263:11
**litigation** 1:6
4:15 11:3,8
13:4,17 35:5
35:23 36:2,15
38:1,3,4,5
337:4
**little** 6:22 18:5
24:6 25:13
26:15 30:17
32:14 43:1
45:3 50:16
57:22 59:19
77:21 86:5,16
96:24 97:1
110:2 132:24
141:9 143:12
146:12 151:8
151:10 160:6
182:21 195:10
195:18 197:17
203:14 213:15
215:20 218:24
219:22 222:19
240:2 251:7
258:9 280:24
289:18 299:19
**live** 130:7
145:24 146:1

**LLC** 3:2,2,13
5:16 13:10
20:5 23:23
24:10
**LLP** 1:22 2:13
2:20 3:3,8,18
4:8
**loaded** 267:23
**local** 30:4 31:24
32:9 111:22
133:8,17
134:15,22
**locally** 217:8
**located** 110:8
**location** 292:15
**locations** 257:7
257:10
**logistics** 262:5
262:11 263:5
**long** 119:2 134:3
141:6 175:20
214:21 298:2
**long-term** 183:5
**longer** 24:8
28:14 139:22
156:21 158:24
210:3 223:23
224:17 243:2
247:9 260:24
261:3,21
270:12 271:4
298:1,2 311:19
**longest** 123:5
**look** 16:20 26:18
26:20 28:16
45:8,19 64:22
83:22 84:8
87:15 104:21
106:6 111:11
148:22 153:5
155:10 159:2
173:17 174:10
181:12 188:15
190:11 191:21
194:2 196:7
201:4,7,19

Highly Confidential - Subject to Further Confidentiality Review

222:13 224:15
225:14,16
226:5 237:16
238:1 239:2
248:1 263:19
263:22 321:14
323:11 326:13
**looked** 28:19
169:16 173:3
203:14 256:14
**looking** 54:20
87:10 97:2
108:23 122:15
130:3 246:20
247:17 260:22
287:11 298:11
322:6
**looks** 103:5
106:11 160:15
233:10 238:3
239:2,3 251:20
287:20
**loop** 117:21
**loose** 148:4
**Lori** 184:2,3
186:12,14
216:8,20,24
217:6 218:17
**Lori's** 184:10
**lose** 261:24
**loss** 289:1
**lost** 250:3
**lot** 25:14,24
73:21 102:21
146:21 169:12
170:1 207:6
225:1 226:7
236:3 240:1
245:3 256:15
263:5
**Louis** 19:8
220:10
**Louisville**
138:17,22
139:3,16,19
182:18

**low** 190:7
224:24
**LTC** 183:4
**lunch** 140:23
141:20,21
**Lynda** 10:10
323:14
**Lynne** 314:12
314:13

_____
**M**
**M** 2:22 4:10
281:4
**Mackey** 193:7
**mailed** 110:17
**main** 26:10
126:2 180:24
**maintain** 23:8
31:15,20 53:18
56:7 70:11
71:13 72:8,12
96:3 125:7
283:13 301:10
302:5
**maintained**
30:19,23 31:9
138:16
**maintaining**
73:6 97:20
**maintenance**
29:23
**majority** 161:7
**makers** 180:12
**making** 128:13
130:14 143:24
166:16 315:3
333:13,14
**Mallinckrodt**
3:2 9:8,19 12:7
262:19 271:13
271:13,19,21
272:3 274:2,14
274:20 275:1,5
275:13,16,22
276:8,12
309:21 310:9

310:12,20
311:1,5,5,9,10
311:13 312:2,4
312:7,12 313:3
**Mallinckrodt's**
272:22
**Man** 149:20
**manage** 217:7
**managed** 205:18
**management**
52:3,18 85:1,1
85:9,11 103:21
157:8 193:13
193:22 194:6
202:9 220:13
223:5 225:19
268:9 273:17
**manager** 8:3,17
51:6 108:21
113:17 120:1,4
123:11,15
125:22 130:14
133:12,16
136:6 140:1
211:18,20
215:15 218:13
285:24 332:24
**managers** 49:14
49:14 50:10
91:23 99:14
100:3 108:18
109:6,18 124:4
125:19 129:11
129:21 130:14
131:12,20
137:24 138:9
153:20 212:7
285:6
**mandate** 304:19
**mandated**
221:23
**mandates**
326:22
**Mando** 322:14
**manipulated**
205:2,23

299:15
**manipulating**
205:21
**manner** 267:12
**Mannix** 4:10
12:10,10
**manu-** 314:24
**manual** 7:8
48:13,21 80:24
91:14,15 99:10
109:11,13
111:3,4 124:22
124:24 128:24
143:8,9 144:8
144:14,17
147:20,23,24
148:3,6,15
149:20 151:3
153:14,18
156:16,22
163:5 174:19
194:4 216:20
**manually** 114:3
**manufacture**
30:7 75:16
**manufacturer**
75:17 262:6
263:5 271:23
312:12 314:20
321:21
**manufacturer's**
263:3
**manufacturer...**
75:21 321:23
**manufacturers**
46:4 75:15,24
262:5 274:7
313:6,8 314:23
315:4 322:12
322:19 323:6
**Mapes** 147:15
192:3
**March** 6:10 7:19
9:8,14 90:19
146:4 202:3
207:16 271:15

**MARCUS** 4:8
**Marianne**
314:12
**mark** 216:15
217:1
**marked** 5:8 6:1
7:1 8:1 9:1
10:1 64:18
106:1 212:19
**market** 24:19
265:11
**Martinez** 2:10
11:17,17 259:2
**Master** 325:16
**Masters** 10:13
325:17,20,23
326:5 331:1,7
**materials**
146:19 195:7,7
195:8
**matter** 11:7
102:10 117:10
337:10
**matters** 336:8
**Max** 6:10 106:5
**maximum**
169:21 217:10
**McBRIDE** 3:10
11:19,19
**McKESSON**
3:17 12:13
19:9 156:6
157:1 158:4
288:23
**MDL** 1:6 11:8
**mean** 24:4 25:1
32:23 38:1
40:22 41:11
60:20 61:17
62:1 64:12
85:13,22 109:1
113:3 114:11
117:15 121:17
125:22 145:17
149:16 152:5
169:12 170:16

182:16 188:7
189:24 190:1
201:19 251:22
279:18 280:3
281:14,14
309:5 318:24
320:1
**meaning** 113:4
266:18
**meaningful**
302:20
**means** 75:13
134:16 203:1
232:18 233:4
269:4
**meant** 209:5
213:1
**mechanism**
123:16 171:20
**Med** 187:2,13,16
187:18 188:19
190:14,19
**Medicaid** 225:1
**medical** 30:1
67:22 68:8
139:21 264:15
264:19
**meet** 88:14
91:16 99:21
101:10 121:7,8
158:9 165:2
193:7 272:8
274:12 288:20
290:2,15,16
**meeting** 7:3 8:20
52:13 83:12,15
85:13,14 90:1
90:8 100:21,24
101:20 125:3,4
129:19 158:12
158:16 191:24
192:2,7,12,20
192:21 193:1
193:22 241:3,4
241:9,16,18,22
242:3,8,16,18

242:21 243:4
243:16,23
244:7 245:11
245:15,24
246:2,8,17
249:20 271:18
274:15 290:20
**meetings** 103:12
124:10 138:15
158:21 194:11
245:5 250:14
250:15,16
271:20 272:7
312:15
**meets** 175:11
230:15 232:14
234:6 314:2
333:16
**Meghan** 3:20
12:12
**member** 157:7
308:17
**members** 158:13
192:16 300:6
300:13,18,22
301:1,14,17,22
308:7
**memo** 83:8
**memoranda**
292:23
**memorandum**
8:22 244:12
249:15,17,19
250:1,7 256:19
**memorialize**
191:15
**memorializing**
242:22
**memory** 127:4
**mention** 28:18
131:16 217:19
**mentioned**
22:13 23:5,10
24:1 41:22
51:24 61:3
63:4,22 85:14

101:6 105:21
111:6 127:9
142:14 172:8
177:8 202:7
204:14 223:22
225:3,6 236:7
237:11,17
243:1 254:10
316:8 318:13
**mentions** 102:8
276:4
**meperidine**
27:10
**Meridian** 2:14
**message** 219:6,7
254:21
**met** 65:3 90:3
94:12 121:18
159:22 175:17
194:18 234:1
272:8 333:8
**methadone**
27:10 152:8
222:8
**metro** 139:20
276:23
**metropolitan**
295:6
**Miami** 242:6
243:13
**Miami-Luken**
5:12
**Micheletto** 4:15
11:2
**mid** 143:22
**middle** 167:2
232:13 294:12
**midst** 306:2
**Midwest** 267:15
**Mike** 147:15
192:3
**miles** 226:4
320:14
**Miller** 3:5 12:6,6
274:24,24
310:24

**million** 6:23
183:6 288:24
**mind** 35:15
74:22 134:16
196:20 320:2
**minimum**
169:20 288:20
290:2,15
**minute** 118:15
181:12 191:21
272:19 280:8
**mirror** 94:6
200:3
**misrepresenting**
237:21
**missing** 264:9
264:12
**Missouri** 271:15
**misspoke** 142:17
**mistake** 203:17
**mistakenly**
82:24
**misunderstood**
196:12
**mixed** 150:5,5
**mmonaghan...**
3:20
**modest** 327:2
**modifications**
9:15 262:24
293:14
**module** 254:9
**mom-and-pop**
174:2
**moment** 229:17
**Monaghan** 3:20
12:12,12
**monetary**
288:23 308:14
**monitor** 305:4
306:11
**monitoring** 6:19
7:17 20:23
47:9 88:24
89:1 90:12,13
93:2 117:10

118:18 119:8
119:14,19
121:7 124:13
125:14,17
131:16 144:13
145:22 160:10
160:12 175:12
197:21 201:14
226:11 229:21
249:12 254:5,8
254:24 271:19
274:17,19
279:4 281:19
290:24 304:6
304:12 305:24
313:7 314:24
330:16,21
**monotony**
225:21
**month** 50:11
99:14 100:5
107:17 127:22
128:16,18,19
128:20 130:18
153:8,20 155:8
155:16,20
164:16 178:1
183:6 194:3
204:19,24
**month's** 127:4
137:4 273:12
**monthly** 88:12
99:20 100:1,5
101:9 117:17
120:13,16
121:24 124:3
130:19 131:10
132:9 153:3,6
190:1 260:3
**months** 130:21
131:1 155:11
169:20,21
228:17 318:4
**months'** 130:16
**MORGAN** 2:3,3
2:8,8

**morning** 13:2 295:6,7
**morphed** 119:21 173:14
**morphine** 27:12 152:8 222:9
**motivated** 180:20,21
**MOU** 249:17 256:24
**MOUs** 250:5,10 250:17
**move** 165:23 286:17 296:14
**moved** 155:20 286:9
**moving** 140:21 204:16 245:3 271:11
**mpyingling@...** 2:22
**multiple** 150:9 166:18 276:18 277:2,3 292:16 298:24 310:15 310:23
**multiple-day** 295:4
**multiplied** 151:6
**multiplier** 163:21 164:3 164:12,13 189:13 190:10 204:15
**multipliers** 164:4 189:11 189:12
**multiply** 155:17
**MWI** 215:18

**N**

N 5:1 16:2,3 17:11
**N.W** 3:8
**Nah** 315:11
**name** 11:2 13:2

13:6 106:15 112:8,8 188:21 192:17 251:22 297:24 314:5,8 323:18
**named** 246:16
**narcotic** 117:18
**narcotics** 27:9 27:11
**nation** 66:3,6,14 66:24
**national** 1:5 11:7 13:4 166:1
**Nationally** 128:9
**natural** 141:5
**nature** 70:20
**navigate** 205:18
**ND** 259:24
**NDC** 162:17,20 162:22 199:21 260:1
**ne-** 217:13
**necessarily** 20:17 22:5 43:7 52:6 74:19 107:9 134:14 162:4 169:3 188:7 324:5
**need** 14:24 70:16 83:2 86:17 96:24 179:24 183:15 183:20 188:22 199:3 240:18 241:1 298:13 310:4,18
**needed** 53:1 143:15,17 199:17,22,23 226:10 237:10 243:7 255:6 266:10 267:11
**needs** 54:19 163:22 164:1,7

165:2,22 279:2 297:2
**negotiated** 143:2
**network** 24:8
**never** 45:9 52:17 90:6 95:3 105:13 106:8 106:12,15 107:11 108:11 113:6 124:10 124:11 134:6,9 134:10 145:6 176:20 179:11 198:18 210:12 228:24 229:1 247:13 250:2 252:14 258:12 269:14 278:15 305:11 319:8 321:18 333:3 334:20
**new** 3:4 8:13 20:15 90:21 101:3 135:11 136:8 139:20 153:13 174:22 193:19 195:1 195:13 217:7 218:3 227:7 228:3,13 231:3 243:19 249:11 252:5,9 259:24 262:4 276:23 314:7
**news** 167:23
**nice** 141:5 258:7
**Nicole** 4:5 12:8
**night** 295:5
**nlangston@jo...** 4:5
**nod** 14:11
**Nodding** 84:23
**nomenclature** 46:24 47:17,23
**non-controlled** 24:20

**non-controlleds** 173:19 174:13 223:17 225:4 237:23
**non-controls** 172:15 173:2
**norm** 171:2
**normal** 46:14 47:21 56:13,23 57:3 222:9,23 270:7
**North** 2:9 3:14
**northeast** 267:15
**Northern** 1:2 11:9
**Notary** 337:24
**notations** 184:8
**note** 186:15,21 276:5,7
**noted** 281:17 335:16
**notes** 149:23 189:3 200:4 258:22
**notice** 5:10,13 15:24 16:7,19 17:10 199:17 281:2
**noticed** 52:8 115:11 212:23
**notices** 15:19 312:6
**notification** 278:4 281:16
**notified** 261:2 261:18
**notify** 227:6 262:1
**notifying** 256:10
**November** 1:23 8:10 11:4 19:5 19:12 49:12 125:4 229:22 278:9 283:23 285:1 336:22

**NTIS** 162:16 263:9,14
**number** 17:13 17:17 161:24 162:5,17 163:22 169:11 188:21 189:12 216:11 225:7 226:18 248:4 291:15,15,21 291:21 292:11 292:12,16,24 293:1 298:24 299:3 309:7 324:20,23
**numbered** 17:14
**numbering** 17:16
**numbers** 10:11 155:7 228:17 258:20 261:3 262:1 263:10 299:6,10,11,16 324:8 325:2
**numeral** 160:10
**numerical** 17:20
**numerous** 95:1 105:14,15 305:9
**NW** 3:13,18
**NY** 3:4

**O**

**oath** 337:15
**Ob-** 92:20
**object** 22:23 25:11 31:2 32:3 33:4 34:4 35:7,21 36:3 36:12,22 40:8 42:9 43:13 44:10 45:1 46:21 48:11 49:2 50:3 51:3 51:13,20 53:15 54:1,12 55:7

| | | | | |
|---|---|---|---|---|
| 56:4,16 57:6 | 308:11 309:14 | occasion 42:22 | 70:4 79:17 | 112:11 113:1,7 |
| 57:20 58:7,16 | 315:22 319:16 | 141:21 332:14 | 97:3 143:1 | 113:22 114:18 |
| 59:1,16 60:3 | 322:1,1 324:14 | 333:7,16 | offices 1:21 | 117:4 118:9,17 |
| 60:17 61:10,22 | 327:20 328:10 | occasional | 264:21 | 125:15 128:15 |
| 62:14 63:11 | 328:17 329:10 | 259:21 | official 282:23 | 128:23 129:9 |
| 66:15 67:1 | 330:10 331:19 | occasionally | oft-recited | 134:8 136:12 |
| 68:3 69:10,19 | 333:11,20 | 147:4 253:20 | 302:23 | 137:8 138:24 |
| 71:1,11 74:1 | 334:7,18 335:7 | 255:9 291:22 | oh 26:21 69:23 | 140:21 142:5,6 |
| 74:15 77:11 | objecting 275:1 | 314:3 | 78:6 140:24 | 143:5,6 145:6 |
| 78:18 79:3,11 | objection 14:6 | occasions 13:19 | 182:3 203:1 | 145:14 149:12 |
| 79:20 80:12 | 31:13 32:12 | 40:10 42:4 | 207:8 210:9 | 150:13 151:9 |
| 81:7,12,23 | 33:12 40:14 | 43:10 65:5 | 232:2 251:13 | 151:12,24 |
| 82:13 85:20,20 | 47:5 55:13,20 | 185:9 | 258:20 260:20 | 152:1,20 154:3 |
| 88:18 89:6 | 57:12 64:2,10 | occur 164:13 | 260:22 280:22 | 154:10,17 |
| 91:4,19 92:8 | 68:16,24 71:22 | 299:7 | 292:4 314:7 | 155:5,19 156:4 |
| 92:20 93:10,18 | 79:24 96:11 | occurred 135:12 | 326:7,11,12 | 156:23 160:7 |
| 94:2 95:24 | 112:20 116:23 | 136:20 198:18 | Ohio 1:2 3:14 | 160:14,15 |
| 96:16 97:14,14 | 131:17 199:9 | occurring | 11:10 61:9,20 | 161:1,15,19 |
| 97:14 98:6 | 206:21 310:24 | 239:17 | 61:21 139:5,5 | 162:23 163:1 |
| 99:8 101:12 | 311:2 319:17 | Oct 7:3 | 139:11,15,17 | 164:18 166:14 |
| 104:15 105:8 | 322:7,21 332:9 | October 6:16 | 139:23,24 | 168:11 171:17 |
| 111:24 114:21 | 332:17 | 7:5 19:20 90:2 | 167:10,13,14 | 173:18 174:10 |
| 115:18 121:11 | objections 68:10 | 90:4,19 94:12 | 167:19 321:1 | 175:8 176:2,8 |
| 121:20 123:1 | objective 334:6 | 100:24 101:21 | okay 15:18 17:5 | 177:17,23 |
| 123:23 124:15 | objectives | 110:10 117:23 | 17:7,9 18:2,3 | 181:4,22 |
| 131:13 133:22 | 287:23,24 | 191:20 192:4,8 | 18:21 22:8,13 | 183:23 184:14 |
| 134:11 135:14 | obligated 53:3 | 192:12 194:18 | 23:16,16 24:13 | 184:20 185:12 |
| 136:23 137:11 | 90:24 | 249:20 | 26:21 28:5,23 | 186:6,18 187:1 |
| 138:2 140:8 | obligation 70:23 | offer 219:22 | 39:14 43:10 | 187:17 188:18 |
| 144:10 145:1,8 | 80:10 91:6 | 337:14 | 45:24 47:14 | 190:24 191:17 |
| 151:16 157:3 | obligations | offered 254:3 | 48:2 51:9,24 | 191:23 192:5 |
| 159:24 180:17 | 304:14 | 263:16 | 54:23 60:8,9 | 192:10,19,24 |
| 187:6 189:6 | observation | office 35:17 | 60:22 64:17 | 194:24 196:16 |
| 202:13 205:4 | 123:13 124:20 | 45:17 46:11 | 65:20 67:24 | 197:7,8 198:1 |
| 205:12 206:7 | observed 320:24 | 49:15,18 84:17 | 69:23 70:14 | 199:13 200:4 |
| 218:7 227:18 | obtain 73:5 | 85:5 106:23 | 72:3 74:11,12 | 200:17,20,22 |
| 228:6 235:3 | 161:23 171:7 | 108:19,23 | 74:23 78:17 | 201:3 202:4 |
| 250:12 252:20 | 227:22 237:3 | 110:7 111:22 | 79:8 80:6 82:9 | 203:24 207:21 |
| 257:20 266:20 | 283:5 292:16 | 118:4,4 132:18 | 86:14 88:16 | 209:9,14,17,24 |
| 278:22 279:11 | obtained 42:1 | 133:8,17 | 92:5 95:21 | 210:24 211:10 |
| 284:6 285:13 | 139:12 200:20 | 134:22 136:7 | 96:6 98:12,19 | 215:3,6,12,20 |
| 287:4 289:9 | obtaining 41:18 | 242:6 243:13 | 99:3 101:5 | 216:6 217:4 |
| 290:17 298:19 | obviously | 249:22 | 105:4,6 107:10 | 218:5,23 220:8 |
| 301:7 302:1 | 182:16 186:2 | officer 36:9 | 107:24 108:2 | 221:14,15 |
| 303:5,23 305:6 | 213:17 261:5 | 37:13,16 42:21 | 109:4 110:22 | 222:17,18 |
| 305:20 306:15 | 286:23 | 54:8 66:20 | 111:9,15,18 | 230:9 231:24 |

Highly Confidential - Subject to Further Confidentiality Review

232:6,19 235:7
235:11 238:23
239:6,11 240:2
240:16 241:18
246:21 249:5
250:4,22 252:1
252:16 253:7
254:4,13
256:19 258:3,3
258:4,18
263:21 265:16
265:21 266:3
267:18 268:2
271:10,11
273:3 274:1
276:2 277:8
278:12 287:8
287:18 288:10
289:21 292:4
293:8,16,20
295:15,24
296:11,14,21
297:12 298:8
299:17,19
300:14,15
301:3 304:21
308:1 309:1,20
310:4 313:13
314:9,15
315:13,15
316:2,11
317:23 321:11
323:11 324:20
325:14,14
326:7,14
327:10 328:12
328:22 329:15
335:11
**old** 122:19
**onboard** 126:7
**once** 81:3 82:11
99:1 104:4
197:14 214:13
214:14 248:17
252:22,22
327:11 330:21

**opine** 309:1
**opined** 245:8
**opinion** 10:13
30:22 31:8
38:22 48:4
55:4,18 58:13
58:20 61:6
62:7 63:6 68:1
70:17 94:21,22
94:22 115:22
115:23 121:2
202:19 212:16
267:19 326:5,9
329:18 331:7
331:10
**opinions** 300:17
**opioid** 13:4 37:4
56:13 57:18
58:5,14,21,24
62:18 309:8
**opioids** 56:2
58:1,3 59:7,11
59:14,22,23,24
60:14 61:8,19
62:1,6,7,13
63:7,14,21,24
64:9 152:15
228:16 265:14
319:11
**opium** 27:12
**opposed** 156:5
249:21
**opposite** 63:2
295:22
**optional** 208:15
**options** 162:13
209:13
**order** 7:17 17:15
20:23 47:9
50:8 51:10,19
57:2,4 72:10
78:23 79:15,19
80:11,21 81:18
81:21 82:6,12
82:20 83:1
88:24 89:1

**Opiate** 1:6 11:8
337:4

90:12,12 93:2
98:17 100:7
102:9,13,17
103:2,8,23
107:5,7,16,21
108:3 109:8
112:14 113:2
114:20 122:8
122:23 123:15
125:13 127:3,5
127:24 128:1
128:18,22
129:2,3 130:24
132:11 133:9
133:18 134:10
134:18 135:4
135:13,18,19
136:15 140:2
140:19 145:22
150:15 151:7
151:15 154:6
154:12,14
170:15 175:11
175:14,15,17
175:18,19
176:10,12,13
176:14,16,16
176:17,18,19
176:20 177:4
177:13,18,21
178:2,3 179:1
179:4 185:13
187:18 193:23
197:17,19
201:14 205:10
205:24 206:2,3
206:12,19,23
206:24 207:3
208:15,24
209:5,11,13
214:8,12,13,14
214:18,19
217:9 226:11
229:21 230:15
230:16,17,18
231:6,9 232:14

232:15 234:6,8
234:14,16
236:19 249:12
254:5,8,24
271:19 274:17
274:18 279:4
281:19 290:24
292:9 293:24
294:2,3,10,16
294:17,18
295:7,7,8,10
295:12,17,19
295:19 296:7,8
296:9,10,12
301:6 304:6,12
305:24 313:7
314:23 315:2,6
315:20 316:6
317:4,6 327:12
327:13,14,16
327:23 329:2,3
329:3 330:3,8
330:15,21
331:11,12,13
331:15,16,22
332:4,15,16
333:3,4,5,8,8
333:16,18
334:4,10,20
**ordered** 177:10
205:19 206:5
209:5 216:11
216:12 228:16
230:17
**ordering** 120:18
127:7 171:10
179:9 187:4
189:16 227:9
228:2 246:18
**orders** 7:11
37:11,20 46:9
46:12,13,13,14
46:15 47:19,20
47:21 48:9
49:15,24 50:7
50:11,20 53:10

**one-off** 260:8
**one-page** 111:9
**one-time-a-year**
158:12
**ones** 63:8
**ongoing** 254:19
254:22 255:2
**online** 318:6,7,8
318:10,18,21
319:8
**onsite** 234:18
**opened** 138:23
**opening** 128:13
**operate** 46:8
282:9 326:23
328:4
**operated** 196:5
250:6 305:13
**operates** 38:24
**operating**
105:13 160:21
**operation**
108:18 130:14
131:12
**operations** 8:3
22:5 49:14
50:10 51:6
83:21 84:7
91:23 99:14
100:3 108:21
109:6,18 120:1
120:4 123:11
124:4 125:18
125:22 129:11
129:21 130:13
131:20 133:12
133:16 136:6
137:23 138:9
140:1 215:15
217:17 218:12
253:4 285:24
332:24

331:10 332:4

53:14,20 56:13
56:20,22,23,24
67:19,21 68:7
69:9 70:24
71:7 72:15
78:13 79:6,10
79:14 80:3,16
81:1,3 82:2
88:15 91:10,22
93:13 95:18
96:3,23 97:12
97:19 98:4,16
98:18,20 99:6
99:11,16,22
102:22 104:22
108:16 109:17
109:22 110:20
112:13 116:9
120:17,18
121:22 122:15
122:21 123:7,7
123:8,18,18,22
124:1 127:8
128:2 129:22
130:4,16 132:3
132:7 134:4
136:9,16 138:1
148:4 149:10
150:10,12
152:22 160:11
160:12 163:2
163:13 166:4
170:17,19,22
171:21 175:3,9
177:21 178:23
193:14 194:2
199:22 206:15
208:12 209:19
210:5,6 213:22
213:23,24
214:4,7,7
216:13,19,21
217:18 218:13
218:19 221:24
222:1 231:11
232:5 245:10

245:15,22
246:5 249:21
252:3,15,18,23
282:10 294:17
295:5,18
296:12 298:14
298:21 304:13
306:13 313:6
315:3,16 317:9
317:11 326:23
326:24 327:4
328:5 330:16
330:22 332:24
333:23 334:15
335:3,6
ordinary 122:17
122:23 189:22
organization
308:16
organized 245:4
origin 204:5
321:7
original 111:19
115:12 155:24
155:24 204:14
216:5 219:5,6
221:8 288:5
originally
119:20 150:1
162:19 172:7
199:19,20
289:16 292:10
297:21 300:3
Orlando 249:2
OSHA 21:13
OTC 23:20 24:1
ought 281:4
out-of-state
37:22 320:18
outcome 336:20
outline 201:13
outset 61:3
outside 92:17
159:14 169:15
208:3,5,9
210:18 244:24

267:16 286:12
over-reporting
237:23
overall 169:4
225:13 246:4
overdose 62:2
309:5
overdoses 63:15
63:17,20 64:15
309:8,8
overload 64:14
overlooked
17:15 279:7
overnight
101:23
overreaching
211:19
oversee 20:22,24
overseen 233:1
oversight 202:12
overstated
289:18
overstating
289:8
overview 7:16
201:18 203:13
203:17,19
owner 180:10
238:2 268:9
289:24
ownership
119:6
owns 210:20
Oxford 4:8
oxy 8:8 10:5
177:18 185:3
216:12,13
319:22
oxycodone
27:10 152:7,16
152:18,19
162:10,11
166:24 167:3
176:11,12,14
177:11,19,22
178:2,7,23,24

179:8,23
183:21 187:20
222:9,20,20
239:16,21,23
240:5,11
241:14 242:1,9
242:12,23
243:2,10,14,18
243:24 244:21
247:10 272:14
272:23 273:4
314:17 315:20
OxyContin
152:19
_____
P
P.J 6:22 86:5,5,7
86:12 110:2
182:21 183:24
184:1,15,22
186:17,20
191:5 207:24
208:2 211:4,16
219:8
P.J.'s 184:9,13
p.m 141:14,16
141:18 203:6,8
203:10 277:19
277:21,23
335:15,16
package 236:15
packaging 24:6
Padgett 2:15
12:1,1 16:2,14
16:24 17:3
18:16 22:23
25:11 28:8
31:2,13 32:3
32:12,19 33:4
33:12 34:4
35:7,21 36:3
36:12,22 40:8
40:14 42:9
43:13 44:10
45:1 46:21
47:5 48:11

49:2 50:3 51:3
51:13,20 53:15
54:1,12 55:7
55:13,20 56:4
56:16 57:6,12
57:20 58:7,16
59:1,16 60:3
60:17 61:10,22
62:14 63:11
64:2,10 66:15
67:1 68:3,10
68:16,24 69:10
69:19 71:1,11
71:22 74:1,15
77:11 78:18
79:3,11,20,24
80:12 81:7,12
81:23 82:13
85:20 88:18
89:6 91:4,19
92:8,20,24
93:3,10,18
94:2 95:24
96:11,16 97:14
98:6 99:8
101:12 104:15
105:8 111:24
112:19 114:21
115:18 116:22
121:11,20
123:1,23
124:15 131:13
131:17 133:22
134:11 135:14
136:23 137:11
138:2 140:8,22
141:1,8,10
144:10 145:1,8
148:18 151:16
157:3 159:24
180:17 185:16
187:6 189:6
202:13,21
203:3 205:4,12
206:7,21 218:7
227:18 228:6

235:3 249:3
250:12 251:9
251:12 252:20
257:20 258:21
266:20 277:10
277:12,16
278:22 279:11
279:24 280:5,9
280:14,17,20
284:6 285:13
287:4 289:9
290:17 298:19
300:10 301:7
302:1 303:5,20
303:23 305:6
305:20 306:15
308:11 309:14
311:2 315:22
319:16 321:16
322:1,6,21
324:14 326:13
326:15 327:20
328:10,17
329:10 330:10
331:19 332:9
332:17 333:11
333:20 334:7
334:18 335:7
335:12
**page** 5:2 27:1
28:24 67:11,17
72:20 76:19
84:9 102:7,7
132:22 133:3
148:16,24
160:8,9,9
161:20 168:14
182:4 184:20
185:24 189:1
192:15 193:11
200:10 208:11
213:6,7,12,14
215:22 217:14
219:12 230:9
232:2,3,3
239:12 249:6

251:3,8 252:1
257:5 258:19
258:21 259:4
260:21 261:10
261:11,13
264:9 293:12
300:5,10,12
302:15 308:1
310:8 326:9,18
338:2,5,8,11
338:14,17,20
339:2,5,8,11
339:14,17,20
**pages** 232:1
**paid** 38:6
**pain** 62:21
220:13 223:5
224:8 225:19
247:12,13,14
247:15 272:15
272:24 273:5
273:17,24
320:5,17
**panels** 157:11
**paper** 122:19
**paperwork**
255:23 262:24
**Paragould** 6:9
6:13 106:4
107:1,2,5,19
108:5,12
109:10
**paragraph**
29:12 65:17,18
72:4,21 73:23
76:20 78:6,8
88:8 102:8
120:12 134:22
163:7 232:13
249:7 266:6
272:13 294:13
300:16,17
326:18 328:13
**parameters**
219:17
**paraphrasing**

120:11
**Pardon** 95:14
**parenthetical**
328:12
**parking** 256:15
**part** 24:8 36:16
45:7,22 46:4
47:15 53:3
54:14 63:24
68:22 71:13
74:13 88:10,20
95:6,10 99:19
103:15,15
113:8 117:20
118:5 119:6
132:22 135:7
145:10,12
148:3 150:21
161:15 163:4
166:17 167:19
169:3,23
170:23 174:24
177:9 191:4
198:21 213:1
219:10 231:20
231:21 255:18
256:17 260:17
273:7 293:5
299:15 314:11
323:5 326:3
**partially** 219:19
**participating**
159:17
**particular** 25:22
29:24 47:18,23
113:4 120:4
149:13 153:10
176:23 177:10
186:22 220:5
222:24 225:10
226:17 231:5
241:2,24
244:11 245:13
248:22 271:6
275:20 283:18
286:18,22

287:3 292:24
315:5,20
318:20 319:5
323:23 324:1
325:2
**particularly**
48:3 264:4
276:18 284:15
287:10
**particulars**
191:12
**parties** 336:18
**Partner** 264:15
**Partners** 139:22
264:19
**parts** 166:19,20
166:22 238:15
245:3 259:16
**pass** 295:9
**pasting** 199:7
**patient** 76:15
**patients** 62:20
62:23 220:14
223:5 225:1
226:1 289:4
292:2
**Patrick** 2:22
11:21
**pattern** 46:14
47:21 56:14,24
57:1,3 288:1,3
288:7,21 290:2
290:7 291:19
298:15,18,22
305:4,18 306:4
306:6,12,13,24
307:4,22
334:14,16
335:1,4,5
**patterns** 120:19
171:23 289:13
**Paul** 4:10 12:10
**pay** 224:21,24
225:9,10
**PELINI** 3:13
**penalty** 288:23

337:6,8
**pend** 294:16
295:18
**pended** 294:1
**pending** 294:3
**Pennsylvania**
4:9
**people** 21:3,7
62:21 63:14,16
64:14 73:19
83:22 84:6,7
85:19 86:1
110:12 122:7
122:12,14,15
123:4 124:23
124:24 127:16
158:19,20
175:22 180:11
195:5 202:9
211:24 212:3,8
219:8 261:24
267:13,14,14
296:24 297:24
309:7 320:4,9
**people's** 100:21
**percent** 93:23
173:7,15,16,18
174:7,12
222:15 266:13
**percentage**
169:11 172:14
172:17 190:8
224:20 225:9
225:11 236:18
**Percocet** 27:11
152:19 162:10
**Perfect** 76:18
**perform** 233:16
**performed**
267:9 288:11
289:7
**performing**
233:11
**period** 47:1 49:5
51:15 80:19
81:9,11 98:22

104:10,13
125:11 128:12
129:13 137:4
138:20 139:6,9
148:2 158:18
197:20 209:20
236:20,24
275:24 284:17
324:18 330:12
330:14 332:19
334:13
**periodic** 158:11
171:21 175:7
**periods** 18:23
19:4 83:3
**perjury** 337:6,8
**permitted** 299:5
**person** 14:22
21:17 60:24
70:6 72:10
90:10 110:4,5
112:7 114:18
126:2 127:10
180:5,21
192:16 210:17
298:4 311:17
311:20 322:10
322:13
**personal** 255:5
336:11
**personally** 143:1
**personnel**
210:16 239:20
297:3,5
**perspective** 54:9
126:15 322:18
**pertaining** 1:19
41:1 83:14
**pertains** 22:10
240:1 323:1
**Pharma** 312:16
312:17
**pharmaceutical**
19:23 23:18,20
24:13,19 25:7
25:18,20,23

26:4 29:9
31:12 39:24
40:6 61:7
122:10 325:17
325:17
**pharmaceutic...**
23:24 102:11
102:14 103:2,8
103:23
**pharmacies**
43:20,23 44:9
44:16,21 45:10
83:15,23
102:20 105:18
129:23 131:12
139:11 161:8
170:10 171:11
171:13 179:17
205:3,9,23
224:12 225:3,8
226:22 228:2
228:22 229:3
236:22 237:2
237:19 238:13
244:20 247:20
248:12 254:23
255:4,5 256:8
271:7 273:5,8
273:20,23
275:18 276:17
276:23 277:2
307:20 312:19
312:22 315:21
316:3 318:6,7
318:9,11,18,22
319:3,6 320:8
320:16,24
321:6
**pharmacist**
35:10 237:9
238:2
**pharmacy** 6:9
6:10,10,13,14
23:22 35:2,18
42:22 43:12
76:3,14,14

81:4 82:21,24
106:4,5,5
107:2,5,19
108:5,12
109:10 126:24
127:21 128:19
128:20 140:3
140:18 153:2
156:2 169:8,15
170:7,24 171:4
171:7 172:21
173:8 174:3,6
174:11 176:11
177:1,9 178:5
178:18,20,23
179:2,23
180:10 205:18
206:5,12
210:20 219:20
220:7,8,11,13
220:15,16,18
222:24 223:4,9
223:15 224:8
226:8,9,12,16
226:18 227:2,3
227:12,21
228:15 231:8
231:14,15
233:12,23
236:2,15 237:5
237:14,21
238:3,5,20
241:24 246:16
247:6 248:1,8
255:15 256:1
269:11 270:10
270:23 271:5
272:14,23
273:10,14,21
275:13,20,22
276:4,5,5,7,11
276:15 277:3
291:23,24
292:13,15
310:13,16,21
311:6,23 316:6

317:14 318:1
319:5,9 320:12
324:1 325:2
**pharmacy's**
219:19 231:6
**pharmacy/cus...**
81:21
**phase** 143:8
168:23 194:3
**phases** 180:2
**phone** 12:5
101:14 127:8
191:12,14
201:21 309:22
**photographs**
169:15
**photos** 256:1
**phrase** 37:13
41:4,10 75:10
107:24 113:2
145:18,18
204:4,6 269:11
319:22 321:22
**physical** 21:15
27:8 28:3
**physicians**
168:2 273:11
**pick** 127:22
180:10 290:7
**picked** 127:23
**picker** 122:2,18
122:22 127:3
127:22 128:15
128:23 129:1
132:11 136:3
**pickers** 122:3
123:3,19 124:1
125:19 127:11
132:6
**picking** 122:20
128:16 133:5
**picture** 213:18
**piece** 193:5
**pieces** 150:7
**pill** 155:3
**pills** 320:10

**Pittsburgh** 4:9
**place** 43:6,9,16
43:21 44:8
48:8 52:24
53:18 54:17
109:9 110:1
118:18 119:2
120:23 123:16
125:1,10
126:23 132:2
133:10,20
135:7 178:17
219:17 228:12
231:19 232:20
234:22 246:15
254:12 302:3
304:7,17
315:16 324:22
330:16,22
336:15
**placed** 216:14
219:18 294:18
295:20 296:9
**placing** 72:10
**Plaintiff's** 45:15
118:10
**Plaintiffs** 2:2
11:14,16,18
13:3
**planning** 201:22
**plate** 321:8
**plates** 320:18,24
**played** 224:16
**please** 11:11
12:5,17 39:16
73:1 88:9
185:5,7,10
279:22 310:11
**pmannix@ma...**
4:10
**point** 22:17
102:5 109:16
121:23 126:9
131:3 162:12
165:23 174:12
176:22 191:8

208:20 210:10
212:11 216:17
220:20 223:22
223:24 231:15
242:20 252:14
253:10 262:7
263:16 270:11
284:20 287:23
288:22 289:3
291:14,18
292:24 317:23
327:6
**pointed** 154:11
**points** 101:6
169:19 233:5
235:13 241:2
**pol-** 136:22
**policies** 116:6,13
119:7,14 126:4
143:8 171:24
213:2 235:9
245:9,14 246:4
246:8,11,13
275:7 324:21
**policy** 6:19 7:21
111:4 116:8
118:12,17,23
119:24 120:10
120:23 121:3,6
121:7 122:2
123:21 124:12
125:10,13,16
125:18 126:10
126:14,17,24
131:11 132:1,6
132:9,16
133:10,11
134:1 135:3,7
135:11,23
136:3,6,8,8,22
137:10,17,21
138:8 163:15
212:20,23
218:16 219:2
230:24 231:8
231:18,18,21

232:20 233:3
234:22 235:1
252:6,9 272:16
275:6
**POLSTER** 1:7
**Pompano**
215:15 239:18
**poor** 202:14
**population**
249:1 266:11
266:14 268:19
268:20 269:3
**portion** 27:16
39:13,15 45:18
67:12 88:7
133:1 167:15
183:16 189:2
193:10 230:10
241:7 245:18
245:21 252:2
310:8
**portions** 28:17
67:17 183:2
264:12
**Portsmouth**
167:16
**pos** 100:6
**position** 14:23
18:6 23:8
90:23 110:14
127:13 158:19
284:24 329:18
**positions** 301:16
**possible** 15:4
57:11,14 70:21
134:24 140:6
149:10 215:5
**possibly** 122:16
139:23 178:8
**potential** 22:20
27:7 28:1
60:15 99:15
100:6 150:11
156:11,18
166:4 214:3
327:7 333:23

**potentially** 77:5
91:23 124:2
151:7,14
152:22 154:6
154:14 183:22
**powders** 155:3
**PowerPoint**
103:16 130:1,5
137:24 138:13
239:2,7 251:21
**practically**
84:14
**practice** 68:19
69:4 71:5
79:15 80:14,24
82:2,5 132:2
140:5 170:21
171:15 190:22
193:18 194:2,8
194:22 195:19
195:24 231:10
236:17 305:3
329:1 331:21
**practices** 144:3
308:6
**practitioner**
76:13 233:16
**practitioners**
168:2,4
**pre** 64:20
**pre-highlighted**
27:3 28:15
**precipitated**
191:13
**precisely** 317:17
**predecessor**
313:21
**preliminarily**
30:21
**premarked**
17:12,14 26:13
28:6,13 45:15
148:13 158:23
**premise** 196:4
**prep** 280:17
**preparation**

326:4
**preparatory**
142:11
**prepare** 142:8
278:20 279:8
335:13
**prepared** 15:22
16:8,22 17:11
244:12,13
251:21 280:6
287:1 308:18
**prescriber** 248:3
270:23
**prescribers**
273:13,14
**prescribes**
248:19
**prescribing**
168:5 225:21
225:22 246:24
247:7,19
273:15,18
**prescription** 1:5
3:12 8:15 11:8
12:14 41:23
62:12 63:7,21
63:24 64:9,15
66:3,5,9,13,23
67:5,5 77:1,4
77:20,23
235:22 247:18
248:19 300:8
300:20,24
301:5,21 308:4
308:10,21
309:2,8 319:10
320:13
**prescriptions**
41:19,19 76:13
173:24 220:14
223:12,15
225:10,16,24
226:16 236:21
247:14,23
248:2,10 273:9
273:11,22

320:2,6
**present** 2:1 3:1
4:1 20:3
280:22
**presentation**
83:18,19 89:23
90:9 156:10
**presentations**
173:14
**presented** 130:2
239:5
**president** 20:9
20:21 21:22,24
23:8 113:17
147:8 210:19
285:3
**pretty** 21:14
23:21 24:18
83:14 152:15
197:12 280:20
284:3 316:12
**prevent** 140:18
196:18 300:7
301:5,20 308:6
**preventing** 7:11
**previous** 13:16
120:17 130:21
142:4 155:11
218:16 250:24
336:5
**previously** 5:8
6:1 7:1 8:1 9:1
10:1 13:20
18:14 21:23
78:5,9 136:13
162:2 195:2
198:4 243:1
313:23
**price** 276:24
**primary** 270:22
**principal** 146:15
**printout** 45:16
181:9,10,11
185:24 186:3
**prior** 14:3 19:6
20:11 30:5

32:17 46:1
72:15 80:23
82:7,15 83:10
85:13 87:7
88:3,5 91:1,13
95:18 96:14,23
97:12 98:5,20
99:2,3,6,11,14
99:23 100:4
104:9 105:2
111:2 113:16
125:15 127:4
129:5,14
130:16,24
136:8,21
137:24 138:11
139:7 143:9
144:19,23
150:13 151:1
187:2 193:17
193:18,21,21
194:12 211:13
227:9 230:24
231:18 241:5
252:16,17
285:2 288:2
291:8 293:6
**priority** 194:21
**private** 19:13
**Pro** 19:21 22:13
22:14,18,22
237:12 238:10
238:12 248:18
**probably** 43:22
45:3 46:2
64:13 86:15
107:11 139:14
139:16 143:22
159:19 189:22
211:4 214:16
219:3 254:11
297:14 322:13
**problem** 66:3,6
66:9,14,24
67:5 77:23
167:1,1,2,3,4,5

167:11,16,17
167:19 181:15
188:4 228:22
229:3 259:11
260:8
**problems**
261:21
**procedure** 1:18
71:6 80:15
111:4 144:1
163:15 208:14
208:20 210:2
212:21
**procedures** 7:18
39:18 40:12
54:15,17 116:7
116:14 119:7
119:15 126:5
126:13 160:21
172:1 207:11
207:15 208:4
209:15,16
229:22 233:8
235:10 245:9
245:14 246:5,9
246:12,14
249:11 308:6
324:21
**proceed** 14:7
**proceedings**
336:13
**process** 54:14
71:6 80:15
125:20 130:13
143:7 144:1
145:4 152:22
169:4 175:5
213:4 216:20
226:20 228:12
262:5 272:5
291:10
**processes** 52:24
54:16 125:7
126:13 167:9
174:19 194:18
233:20 235:10

**produced** 18:18
113:10 149:9
185:18
**product** 75:18
122:7 159:18
162:9 175:16
230:18 259:24
262:17,19
263:2 289:4
**Production**
316:20
**products** 23:18
23:20 24:1,14
24:16,19 25:5
25:6,7,10,18
25:20,23 26:4
29:9 30:24
57:18 61:7
76:8 117:18
120:18 122:10
139:13,18
152:17 153:8
163:10,10,21
168:21 289:2
311:5
**Professional**
1:20
**profile** 169:5,6
226:9 255:22
255:24 316:24
**profiles** 264:10
264:13,16,23
265:20,22,24
267:22
**profit** 10:7
321:22 322:5
**profits** 322:19
**program** 7:17
20:24 47:9
88:24 89:1,19
92:15 143:9,9
143:12,16,21
144:9,14,20,22
144:23 145:17
145:23,24
149:4 161:6

172:6 197:22
201:14 219:15
238:19 253:18
257:4 265:4,10
288:4,5,20
290:1,15
296:22 297:15
304:12,15,24
305:5,8,17,19
306:7,13,20
307:1,5,8,8,23
313:7 330:16
334:13,22
335:1
**programs** 52:15
172:12 229:21
**project** 9:12
287:18,19,22
287:23 288:11
289:7,24 291:5
298:12
**proliferation**
247:12
**promethazine**
167:4
**promotion**
20:18,19
253:13,18
254:3,4,7,14
**promotional**
253:23 254:15
**promotional-t...**
254:16
**promotions**
253:19
**proper** 285:16
**properly** 73:11
**prosecuted**
42:16
**prospect** 255:20
**prospective**
73:13
**protect** 300:20
301:6
**protocol** 111:3,4
**prove** 126:13

**provide** 39:18
40:2,11 185:5
267:24 271:5
275:12,19
302:19 323:21
327:3
**provided** 83:20
83:20 111:16
129:11 142:2
249:13 258:13
268:13 279:9
312:13
**providers**
247:22
**provides** 281:13
**providing** 73:3
**provision** 47:18
49:1,8,21 51:1
96:15 327:18
328:1,22 331:1
**proximity** 224:9
225:5
**psychological**
27:8 28:2
**public** 29:21,21
30:12 56:3
300:22 301:2
302:9 337:24
**published** 173:6
**pull** 161:21
168:13
**purchase** 44:2
88:13 133:5,12
136:4 137:3
168:24 170:10
172:13 183:5
234:17 235:19
289:14 322:12
323:21 324:9
**purchased** 19:9
117:19 130:20
172:21 173:1
225:12
**purchases** 6:8
6:13 88:14
108:6 151:5

Highly Confidential - Subject to Further Confidentiality Review

152:21 155:11
156:2 185:5
204:16 253:13
253:23 254:4
254:14 306:11
**purchasing**
120:19 150:2
169:10 171:22
189:24 262:7,9
263:1 310:14
310:16,22
**Purdue** 312:16
312:17 313:3
**purports** 182:9
184:21
**purpose** 55:2,5
65:24 198:8,12
201:11,13
238:8 256:22
**purposes** 73:15
131:11 142:9
254:24
**pursuant** 1:17
5:10,11,14,15
**purview** 334:5
**put** 21:8 52:24
53:1,5 54:16
55:15 84:10
90:11 109:24
122:13 125:13
130:7 150:4
162:10 164:8
189:11,12,13
194:19,21,22
195:21 218:15
237:14 253:20
296:9 304:17
307:12 312:7
**puts** 18:6
**putting** 88:23

_____Q_____
**quantities** 163:9
168:21 225:23
**quantity** 208:15
**quarterly** 312:3

**question** 14:8,13
14:14,17,21
38:18 40:4,5
43:19 56:19
60:10 61:4
63:1,2 69:15
69:16 85:23
90:18 93:3
96:6,7,19
121:5 126:10
126:12 144:17
177:9 195:3
202:14 207:18
208:18 218:1
221:14 234:21
234:22 265:6
267:23 283:3
285:9 290:12
290:13 296:16
301:12 305:15
305:15 315:9
319:15 329:5,6
332:2,3 334:12
334:24
**questionable**
168:5 247:19
273:18
**questionnaire**
169:6,9
**questionnaires**
195:9
**questions** 12:3
15:9,16,23,23
16:9,11 169:12
169:13 185:11
221:6 279:20
310:6 316:12
322:7 325:15
335:11,12
**quick** 114:8
210:1 236:23
291:12
**quickly** 15:4
251:20 293:21
316:12
**quite** 111:10

211:24
**quotas** 75:15
316:18,20

_____R_____
**radar** 188:24
246:19 316:4
**raided** 226:13
**raise** 184:6
190:23
**raised** 191:7
219:15 223:14
**raising** 220:2
222:11
**ran** 172:15
**range** 165:17
**Rannazzisi** 6:6
64:24 65:1
66:5,12 78:4
83:5 87:11,11
87:13,14 88:5
91:17 96:8
102:6 103:2
124:11 303:12
303:17
**ratio** 173:2,3,15
173:19 223:16
225:4 237:23
**raw** 238:18
**rcook@forthe...**
2:6
**reach** 60:15
**reached** 188:15
272:7 329:18
**read** 27:4,14
29:5,12 32:11
39:12,15 45:20
48:10 50:18
51:2 56:22
65:17 67:16
72:5,24 73:1
74:12 76:22
77:2 78:7,9
84:2 88:9 95:7
95:9 99:20
102:18 114:8

117:8 120:12
120:14 133:2
149:5 181:13
181:14,20,21
182:1 183:1,23
184:23,24
193:11 197:12
197:13 208:16
215:9 218:24
219:10 221:11
221:12,15
226:11 230:14
231:23 241:7
242:14 245:7
246:21 249:9
264:14 266:6
272:19 278:16
279:15,19,22
282:16 287:22
288:10,12,14
288:16 296:19
300:15 302:18
308:2 310:4,10
310:11 315:7
315:11 326:3,3
326:5,20
327:18 328:1
328:13,23
337:9,10
**readily** 238:21
**reading** 14:2
73:20 104:2
172:3 198:10
232:22 246:6
280:19
**readjusted**
204:19
**ready** 142:12
197:14 321:15
**real** 100:11
114:8 210:1
291:12
**realize** 117:5
**really** 14:3
35:15 60:19
100:11 133:15

138:7 231:15
257:2 280:9
281:12,21
310:5
**reask** 315:14,15
**reason** 27:18
30:13 43:5,15
43:20,24 45:10
66:8 77:22
152:11 171:4
178:15 209:12
247:17 294:21
338:4,7,10,13
338:16,19,22
339:4,7,10,13
339:16,19,22
**reasonable** 73:7
178:16 196:17
196:22
**reasonably**
235:23
**reasons** 214:6
259:23
**recall** 36:24
65:14 84:22
85:10,16,17
86:11 87:18
88:1,6 101:17
101:19 102:21
103:11 109:9
146:7,10
148:12 159:16
162:18 164:9
166:22 167:10
182:7,8 192:21
194:13 202:8
203:17 207:14
218:18 220:5,6
220:6,9 223:16
223:18 225:6
233:11 239:15
240:21 241:20
242:17 243:22
244:1,6 245:8
245:12,16
246:10 254:21

256:23 259:11
266:23 267:7
268:12 269:7
271:6,16,18
275:8,21
276:10 278:1,7
278:10 279:18
282:23 284:12
284:20 293:18
311:21 313:3
313:10 317:3
320:23 321:3
323:16,17
324:1 325:24
326:1
**recalls** 21:4
**receipt** 269:8
**receive** 65:7
  83:1 88:4
  89:17 106:10
  111:7,7 117:20
  181:16 206:1
  265:16 311:10
  314:18
**received** 33:14
  65:12 66:22
  78:4,5 84:15
  84:17 85:2,7
  86:2,7 87:21
  88:2 108:17
  197:24 206:5
  206:12,19
  228:18 262:17
  269:1 285:19
  286:10 303:18
  305:11
**receiving** 26:2
  65:14 87:18
  159:16 271:16
  278:3 284:13
  303:11 323:17
**recess** 86:21
  141:15 203:7
  277:20
**recognize** 38:14
  78:24 111:18

111:21 186:1,3
200:13
**recognized**
82:12 300:24
302:10
**recognizes** 76:21
331:6
**recollection**
16:13,21 87:21
102:19,24
109:2 133:19
136:20 142:20
184:11 192:13
198:23 222:21
246:7 257:3
283:17 299:9
**recommend**
222:14
**recommendati...**
176:5 267:21
268:10 269:1
**recommendati...**
8:8 52:10
222:6
**recommended**
160:16 169:22
184:15
**recommends**
52:20
**record** 11:1,12
13:7 27:4 30:5
39:13,16 45:20
86:18,19,23
88:9 95:9
112:19 141:13
141:17 174:13
186:8 203:4,5
203:9 259:24
277:17,18,22
335:14 336:12
**recorded** 75:19
76:7
**recordkeeping**
191:9
**records** 170:6
174:5,8 188:11

248:16 260:14
283:14
**red** 213:20
214:11,14,15
214:16 256:12
**redacted** 197:11
197:16
**redaction** 199:7
**reduce** 122:14
241:11,14
242:1,23
**reduced** 243:24
336:11
**REED** 2:20
**Reevaluate**
276:6
**refer** 17:21,23
46:19,20 47:18
102:9 140:13
193:3 269:11
269:19,19
270:15 286:11
309:12
**reference** 51:1
117:14 121:15
128:24 130:21
143:18 146:19
148:2 149:22
191:4 195:7
204:2,10
208:23 247:5
253:12,15
257:5 261:1
281:20
**referenced**
116:18 118:13
149:9 259:20
**references** 66:5
102:6 106:14
120:10 122:3
125:18 241:3
242:15 259:6
260:19,21
**referencing** 67:7
118:16 247:11
272:16

**referred** 5:9 6:2
7:2 8:2 9:2
10:2 17:19
109:11 148:4
196:21 239:1
269:21
**referring** 47:11
66:13 78:14
108:1 112:16
114:6 144:17
149:16 221:9
233:4,6 239:14
253:14 274:8
304:1
**refers** 79:14
320:2
**reflect** 112:19
187:13 203:19
258:23 262:16
288:17 292:12
**reflecting**
244:13
**reflection**
262:18
**refrain** 302:23
**refresh** 246:6
257:3 299:9
**refreshes** 16:21
192:13
**refused** 273:4
**refuses** 272:13
272:23
**refusing** 314:17
**reg** 260:21
**regard** 31:24
38:18 44:3,6
44:15 50:17
53:24 58:24
83:24 87:17
118:1 187:24
276:10 282:17
283:10 316:17
321:23
**regarding** 37:2
71:6 72:1
83:23 93:12

97:19 116:8
129:22 147:2
148:5 185:6
219:9 239:20
246:24 249:15
258:19 260:11
285:8 313:22
325:16
**regards** 27:21
**region** 248:23
**Regional** 8:17
**regionally**
165:22
**regions** 165:12
**register** 29:17
**registered** 1:20
29:8 32:1
65:22 75:22,24
76:1,4,4,12,14
85:6 263:3
**registrant** 42:7
46:8,9,10,12
50:21 51:12
53:8 72:11
76:11 85:6
282:10
**registrants**
39:17 47:16
76:6 85:4 95:8
95:15,17 96:8
98:3 126:22
**registration**
29:20 33:15,16
46:4 73:5,6,8
77:7,16 103:18
219:24 261:3
261:20 262:1,8
262:17 325:12
**regula-** 26:10
**regular** 117:12
128:16 235:13
272:9 312:15
**regularly** 158:9
172:15,17
272:10
**regulate** 26:4,7

regulated
302:20,24
303:9
regulates 304:9
regulation 25:4
25:5 40:17
53:21 79:5,13
80:2,4,14 89:9
89:13,24 90:22
91:7,10 92:3
92:11 94:19
97:18,18,20
105:17,22
110:7 124:21
144:12 249:22
262:15 304:6
306:10 327:22
328:19 329:21
330:6
regulations 25:9
25:22,24 26:8
46:3 55:1,6,10
55:22 70:13
71:19,20 79:2
89:3 120:11
291:4 302:22
302:24 304:22
327:19 328:3,8
329:9,12 330:9
331:18,23
333:17 335:4
regulators 35:4
regulatory 9:3
22:6 26:10
35:18 79:6
88:15 94:22
97:6 99:21
101:10 109:7
147:9 157:12
159:12 199:15
241:10 288:19
300:7,19 301:4
301:9,19 302:4
323:9
reiterate 66:1
116:22

reiterating
252:10
reiteration
253:8 254:11
rejection 296:15
297:8
rela- 262:4
relabeled 213:2
related 20:23
129:22 207:12
280:12 313:21
RELATES 1:8
relating 30:6
116:14 119:7
119:13 172:1
280:7 284:22
316:14
relationship
227:13 255:5
relationships
233:18
relative 336:16
336:17
relatively 231:4
236:23 262:4
327:2
relayed 13:5
release 10:5
179:4 187:21
208:14 209:13
210:4,6 217:18
218:13,19
294:19 295:20
296:16 297:1
314:17 315:2
released 176:15
214:14 215:23
217:15
releasing 208:12
209:19
relevance
209:21
relevant 30:11
relied 148:7
relies 98:13
relieve 62:21

rely 72:9 89:15
92:17 256:6
307:3
remained
214:17
remark 308:18
308:20
remedies 286:15
remember 36:14
131:23 193:1
313:9 324:5
reminder 194:5
reminds 14:14
Renee 2:6 11:15
rep 180:5
186:17 255:13
rep's 180:24
repeat 31:5 32:5
53:11 60:10
208:18
rephrase 14:15
14:18 56:18
58:18 139:8,10
143:19 193:20
224:18
replacement
232:11
report 6:7,12
9:7 21:20,21
23:6 37:11,20
42:14 49:15
51:19 53:19
56:14 57:4
79:6 80:2 82:1
82:5 88:12,14
88:15 96:2
98:17 99:20,22
100:1,7 106:2
106:6,9,11,13
106:14,16
107:13,15,17
107:21,22
108:3,4,8,17
108:18,24
110:7,10 114:3
116:17,18

117:16 124:7
137:3 140:1,4
177:4,7 178:17
179:24 187:12
188:14 235:21
236:2,12,14
237:6,22
244:12 248:3
249:21,23
256:15 258:13
259:5 260:1,3
261:20 268:19
269:8 272:22
275:18 277:4
293:13 304:13
326:24 327:23
329:3 330:2
331:21
reportable
189:17
reported 4:20
21:23 22:7
43:6 50:7,9
51:6,6,10 81:1
91:18,22 99:12
99:15 105:19
107:4,6 108:22
110:13 124:3
132:4,8 134:4
136:17 170:22
176:21 178:4
212:8 222:2
230:19,20
257:24 260:15
317:5 327:11
330:17 331:11
331:12 332:5
332:15,24
336:10
reporter 1:20,21
12:4,17 17:17
336:4,24
REPORTER'S
336:1
reporting 7:10
21:4 49:24

50:20 67:18
78:12,22 79:14
91:10 93:12
97:19 102:22
104:22 108:16
109:17,22
110:3 114:2
118:3 121:22
138:10 140:19
258:19 259:5,6
259:12,19,22
260:5,8 327:1
327:2,18 328:2
329:24 330:2
reports 100:5
101:9 107:12
109:6 111:5
118:2 120:20
130:18,19
136:14,16
153:20 163:23
172:13 188:11
225:13 236:7,9
245:1 248:13
248:18 277:1
292:22 327:5
330:7
repository
188:14
represent
257:10
representative
6:22 80:20
89:23 182:18
279:2
representatives
157:24 158:4,7
158:15
reps 83:21
103:14 169:7
169:14 280:21
reputation
289:4
request 5:11,15
9:12 323:20
requested 18:16

18:18 188:9
249:14 268:3
**requesting** 10:4
187:21 234:17
276:8
**requests** 21:6
275:11
**require** 71:21
**required** 9:15
37:21 111:5
200:6 233:9
234:9,23
255:22,24
293:14 305:18
306:7,12
**requirement**
39:24 46:20
47:22 48:5,19
53:3 72:7
78:22 79:1
88:15 95:22
96:2,3,9,10
97:6,10 99:21
117:10 143:18
191:10 213:1
305:4 327:1,2
327:16,19
328:3,8,9,14
328:16,20,24
329:8,13,16,19
329:22,24
330:2 331:8,23
**requirement'**
326:21
**requirements**
5:22 6:3 21:13
26:9 30:14
46:6 47:16
50:17 91:16
101:11 121:8,9
121:18 138:10
282:6 288:20
290:2,15,21
330:9
**requires** 72:13
327:3

**reread** 74:8
240:22
**rereading** 74:3
**resale** 41:23
**research** 64:7
167:21 227:5
**researched**
63:23
**reserve** 286:21
287:2
**residents** 62:11
**resolved** 33:10
**resources** 266:9
266:15
**respectfully**
302:22
**respond** 282:23
**responded**
283:18,22
285:9
**responds** 217:6
**response** 14:12
113:23 117:7
183:24 200:6
221:4,9,15
239:13,21
269:5 281:10
283:9
**responsibilities**
21:18 22:6
66:1 78:11
84:12 98:14
126:8 211:19
300:7,19
**responsibility**
31:15 38:13
40:2 42:17
49:13,19 53:5
53:17 55:9
56:6 67:20
68:6,15,19,23
69:3,8,17 70:1
70:7,9,11,18
70:22 71:4,10
71:18 73:15
79:6,9 82:1

119:6,13
219:19 284:10
301:4,9,19
302:4,5 309:18
**responsible**
48:24 49:8
109:22 125:17
169:7 220:2
255:13 273:14
300:21 301:22
**rest** 142:8 172:3
182:5 213:9
217:10 221:12
251:3
**Restricted** 9:20
309:23
**restrictions**
218:15
**restroom** 86:17
**result** 34:13
38:4 39:3,6
42:14 56:2,15
57:5 62:12
63:21 64:8
186:20 217:14
243:16 249:19
312:1
**resulted** 312:18
312:22
**results** 199:22
**resume** 18:9
**retail** 291:24
**retained** 23:11
**retract** 82:20
**retrospective**
317:9
**return** 284:16
291:8
**returned** 164:21
232:19 278:12
**revamped** 90:8
**reveal** 220:24
**revealed** 283:13
320:9
**revenue** 154:23
155:8,13,21

165:17 190:3
222:4
**review** 1:13
102:13 103:1
120:13,16
131:10 132:3,9
171:21 173:21
193:14,23
195:14 216:21
224:3 233:15
234:10,16,18
235:19 245:22
271:4 285:11
292:22 323:4
332:23
**reviewed** 50:11
103:8 114:2
185:2 216:24
275:6 300:4
317:24
**reviewing**
102:16 323:6
**reviews** 121:24
124:3 131:11
171:19 172:23
175:7
**revised** 7:19
212:23 232:21
**revisit** 286:20,21
287:2 331:9
**revocation** 39:3
**revoked** 33:19
103:18
**reword** 96:18
**rhetoric** 241:8
242:15,18
**Rieger** 211:20
**right** 21:21
23:11 27:17
56:24 88:22
90:7 108:9,13
109:19 120:24
123:10 132:20
133:13 135:8
135:12 140:21
141:1,11

143:10 145:19
153:15 160:5
160:18 161:20
182:19,24
186:14 196:15
198:5 204:17
209:3 217:2
222:6 224:6
229:16 238:10
251:18 255:16
260:24 264:2
268:4 297:6
298:5,18
303:15 307:17
316:9 323:15
324:23 325:4,9
335:13
**rights** 286:21
287:2
**rigid** 52:22
**risk** 241:10
266:11,13,24
268:18,24
269:3,10,20,22
270:4,17 271:2
288:19 289:3
**risks** 289:8
**road** 303:1
**Rob** 116:21
117:1 297:23
**Robby** 230:7
**Robinson** 230:7
**rock** 183:17,19
**role** 37:15 42:21
90:20 108:15
116:1,13
129:12 131:3
147:6 185:10
228:24 260:6
**roles** 211:12
**roll** 201:23
257:24
**rolled** 120:6,7
146:2,8 160:23
164:15 165:11
204:23 257:14

**rolling** 204:22
**rollout** 91:1
  252:18
**Roman** 160:10
**Ropes** 3:3 12:7
**routed** 268:8
**routine** 34:17
  169:23
**routing** 108:15
**Rule** 5:10,11,12
  5:14,15,15
  13:13,16 18:7
**rules** 1:17 13:23
  38:15 39:3
  79:1 303:1
**ruling** 103:5,11
  103:18
**run** 172:12,13
  238:18 265:4
**running** 49:17
  102:1 105:1
  244:22 252:23
**Rx** 183:6

**S**

**SafeScript** 6:9
  6:14 34:21
  106:4 258:17
**safety** 30:12
**Sail** 182:10
**SAITH** 335:17
**sale** 41:15 50:9
  95:19 96:14
  97:12 98:5
  99:2,11,13
  100:10 105:2
  180:20,22
**sales** 6:21 8:16
  41:16,16 83:21
  96:24 98:21
  99:6,15 103:14
  103:19 114:4
  140:12,13,14
  140:16,17
  153:4,6 169:7
  169:14,20,21

179:17 180:5
180:24 182:17
186:17,19
187:21 188:1,5
188:15 191:1
239:23 240:5
241:11,14
242:1,23
243:10,18
244:21 249:23
250:20 252:17
252:18 253:4
253:18 254:17
254:19,23
255:2,8,9,13
255:14 256:7
256:14 263:12
265:5,12 274:6
276:7
**salespeople** 84:6
  179:13
**salesperson**
  180:15,19
**Salyer** 6:22
  182:10,11,12
  186:17
**sanctioning**
  92:14
**SAP** 172:10
  296:22
**satisfactory**
  283:2
**save** 337:11
**saw** 123:9 124:6
  273:19 300:3
**say-so** 181:2
**saying** 69:2,12
  69:24 100:9
  105:5,7 195:22
  196:1 217:15
  218:2 307:11
  323:15
**says** 29:16 76:20
  78:14 95:7
  102:8 110:7
  111:21 112:12

124:22 132:9
133:11,16
134:21 137:3
160:16 161:21
163:7 168:15
171:19 175:10
175:21 179:2,8
183:9 184:5
189:3 197:22
200:5 215:22
217:3 221:5
232:13 234:23
239:12 241:4,6
245:24 252:2,3
253:11 264:22
266:5 272:13
275:11 276:6,7
282:8 288:22
289:1 291:14
291:20 293:23
294:14 295:16
298:13 300:6
301:17 307:17
307:22 328:13
331:2,10
**scenario** 325:10
**schedule** 5:17
  25:19,23 26:4
  26:7,11 27:5,6
  27:9,11 28:1
  29:9,15,19
  30:24 31:10
  32:1,10 122:10
  180:1,8
**scheduled** 9:3
  15:5 26:9
  198:14
**schedules** 25:17
  163:10
**scheduling**
  280:12,14
  316:15
**scientific** 30:1
  67:23 68:8
**scope** 32:3 36:22
  48:11 61:22

64:2,10 97:15
111:24 112:20
137:11 206:21
275:1 310:24
322:2,8
**Scott** 7:14
  106:19,21
  108:22 198:3,4
  198:9
**screen** 11:5
  130:7 213:18
  287:12
**script** 233:5,14
**scripts** 222:16
  238:20,21
**scrutinize**
  219:20
**scrutiny** 219:17
**se** 255:18
**sec** 131:8 260:20
**second** 5:13
  15:19 16:7,19
  20:13 29:5
  64:19 67:16
  72:21 74:12
  113:22 132:22
  142:5 149:5
  162:16 169:20
  181:23 187:17
  208:16 217:14
  232:2 249:6
  261:2 264:8
  272:12 291:14
  291:18 294:2
  294:23 295:19
  296:19 315:7
  324:3 328:22
**section** 5:20,23
  6:4 29:3,3,5
  32:11,11 39:11
  39:21 40:19
  41:4 49:1
  50:18 53:2
  56:21,22 72:7
  72:13,16,19
  78:2,21 93:12

93:15 95:5
160:10,15
161:2,21 163:1
163:7 171:18
175:8,8 186:15
198:20 208:11
259:5 260:23
261:16 264:22
266:4 272:13
288:11 291:13
293:21,23
296:3,14 300:5
302:14,16
308:2
**sections** 54:24
  118:11 149:15
**security** 5:22 6:3
  19:7,11 20:10
  20:14 21:15
  26:1 46:6
  119:18,21,21
  147:9 199:14
  229:22 285:4
  326:21
**security-related**
  119:22
**see** 14:9 16:14
  16:20 108:6
  123:7,8 129:9
  141:4 168:18
  170:7 172:23
  173:1 174:13
  182:1 192:13
  197:8 213:17
  216:22 217:12
  217:22 225:16
  230:12 232:12
  233:23 234:3
  234:12 236:18
  239:3,12 255:9
  262:13 272:4
  273:9 278:7,16
  279:16 288:16
  291:12 293:9
  300:1 302:13
  313:11 324:16

Highly Confidential - Subject to Further Confidentiality Review

seeing 182:8
   187:8 269:5
   278:10 316:10
seek 15:10
   116:16 171:7
   250:10
seeking 15:14
seen 15:18 106:7
   106:8,12,12,15
   106:16 107:11
   111:12,14,16
   182:6 200:14
   258:12,15,17
   279:17 281:8
   287:14,17
   293:17 299:23
   310:1 313:17
   320:17 321:13
   321:18
self 124:19,20
sell 76:2,6,11
   180:24 181:1
   243:2 247:10
   265:15,19
   272:14,23
   273:4,22 289:2
   316:22
selling 105:20
   229:6 312:24
sells 75:18
Semo 6:9,14,14
   106:4
send 50:12
   92:14 109:6
   110:15 195:13
   195:21 260:1
   311:9 319:2
sender 111:19
sending 109:8
   171:13 193:18
   196:1 198:8
senior 21:17,24
   49:7 52:3,19
   84:24 85:11
   103:20 202:9
   210:17

senior-most
   70:6
sense 14:14,16
   61:4 219:3
   225:20 226:5
sent 7:14 65:9
   65:21 81:4
   124:11 184:1
   193:5 196:6
   198:21 199:1
   199:18 201:15
   201:15,16
   255:24
sentence 74:6,6
   74:7,17,17
   76:23 77:19
   95:6,11,13,15
   96:7 97:6
   112:12 113:22
   117:5,7 175:20
   193:11,17
   242:14 245:17
   245:23 246:22
   294:13 301:17
   302:9
sentences 249:9
   261:17
separate 118:8
   161:4 265:10
   292:8 293:24
   294:17 295:18
separated
   161:10
separating 41:5
September 8:15
   10:3 64:21
   65:8 66:7 83:6
   83:11 89:22
   90:10 100:21
   172:9 324:8,10
seq 17:15
sequence 17:20
   251:14
sequential 17:15
series 89:20
serious 200:7

309:18
seriously 284:9
   284:10
serve 142:8
   157:10 188:12
served 44:9
   276:16 287:11
serves 308:17
service 264:20
   291:24
serviced 165:19
   165:21
Services 4:7,15
   11:3 12:11
servicing 312:19
session 87:7
set 294:15 295:4
   295:17 336:21
sets 75:15
setting 218:4
   316:17
settlement
   142:18 143:2
seven 233:10
   234:23
severe 27:7 28:2
SHAPIRA 4:8
share 83:8 103:9
   147:10 226:21
   229:5 256:21
   274:2,21
   275:17 312:21
shared 103:11
   130:6 275:6,22
   276:1,11
   306:22 312:18
shares 311:4
sharing 10:7
   85:18 228:21
   311:8,13 312:2
   321:22 322:5
   322:19
sheet 78:9 186:5
   337:1,13 338:1
   339:1
shift 277:8

shifting 303:9
   304:5
ship 80:15 81:18
   132:3 136:10
   139:5 175:15
   175:21 177:14
   177:21 183:17
   183:19 214:9
   217:8,9 262:10
   295:13 325:3,8
   325:13 327:13
   327:15 329:4
   330:22 331:13
   331:16,22
   332:6,7,8,13
   333:6 335:3,6
shipment 193:15
   193:24 295:10
shipments 175:9
   231:7
shipped 80:21
   81:2 82:21,24
   85:3 91:24
   99:16 132:12
   134:10 135:6
   135:13,20
   136:9,18 137:5
   139:23 176:13
   176:20 206:14
   206:16,20
   213:22,23
   230:18 252:4
   252:14,15,19
   253:2 262:11
   316:6 317:4
   324:12,17
   330:17 332:15
   333:1,3,9,18
   334:17,20
shipping 80:4
   133:8,17 134:9
   134:23 262:10
   324:22 327:16
   328:7,9,13,16
   328:20,24
   329:8,13,16,19

329:22 331:7
   331:22
ships 330:8
shop 276:24
short 47:10
   171:16 297:3
shorter 218:24
Shorthand 1:21
   336:4
shortly 48:17
   52:13 93:7
shot 188:23
   213:18
shoulders 14:11
show 26:12 28:5
   39:7 45:14
   64:17 87:12
   106:1 107:10
   107:12 111:9
   118:10 148:13
   148:17 158:23
   181:7 192:11
   207:5 212:19
   213:8 238:24
   240:16 250:22
   261:7 278:5
   286:17 287:8
showed 136:13
showing 114:4
shows 236:16
shrug 14:11
shutting 243:9
signature 35:11
   338:23 339:23
signed 6:19
   250:1,3
significant
   284:3 288:19
significantly
   219:16
signify 186:12
silo 152:16
similar 38:18
   72:6,6 90:13
   106:13 107:13
   154:20

Highly Confidential - Subject to Further Confidentiality Review

| | | | | |
|---|---|---|---|---|
| **similarities** 146:22 | 6:8,12,17,18 | 79:18 80:15,21 | 223:2 224:11 | 330:7 331:6 |
| **similarly** 157:1 | 6:20 8:23 9:4,8 | 80:21 81:6,17 | 227:14 229:1 | 332:15 333:2,9 |
| **simplify** 75:17 | 9:10,20 10:4,8 | 81:18 82:10 | 230:24 232:19 | 333:18 335:3 |
| **simply** 72:9 | 11:24 12:2 | 88:16 89:15 | 234:11 235:2 | **Smith's** 7:16 |
| **single** 239:24 | 13:10,16,20 | 90:3,24 96:9 | 237:20 239:13 | 8:12 10:4 |
| 243:19 292:15 | 14:23 15:8,8 | 97:4,4,5 98:13 | 239:22 240:4 | 51:17 54:6,9 |
| **sir** 24:12 48:23 | 15:14 18:6,24 | 98:19 99:4,23 | 240:14,14 | 105:3 149:3 |
| 64:23 109:15 | 19:3,5,10,14 | 100:13,15 | 241:14,24 | 174:5 247:9 |
| 284:18 332:2 | 19:17,18,19 | 101:9 103:9,20 | 243:1,17 244:1 | 259:6 279:5 |
| **sit** 70:7 | 20:1,2,5,8,21 | 104:4 107:4,16 | 246:3 247:2 | 300:17 334:13 |
| **site** 163:22 | 21:17 22:1,2 | 108:3,8 109:14 | 249:7,10,13,14 | **snapshot** 237:17 |
| 180:4,8 244:24 | 22:11,15,22 | 109:16 111:14 | 249:16 253:22 | **snuff** 14:1 |
| 255:10,17 | 23:4,9,17,23 | 113:3 115:1,11 | 255:21 256:24 | **societal** 308:4,9 |
| 256:2 262:10 | 24:10,14 25:19 | 115:12,20,21 | 259:19 260:11 | 308:13,20,23 |
| 264:10 266:3,8 | 27:18,24 29:6 | 115:24 116:1,5 | 261:2,18 262:2 | 309:1,4,5,10 |
| 266:10,16 | 29:8 30:13,15 | 116:7,10,12 | 264:15,19 | **society** 60:24 |
| 267:4,9 268:11 | 30:19,22,23 | 118:1,13,19 | 265:5 266:18 | 300:22 301:6 |
| 268:14 317:13 | 31:9,20,23 | 119:5,13 | 271:14 272:13 | 301:22 |
| **sitting** 269:7 | 32:8,17 33:2 | 120:24 121:2 | 272:16 273:4 | **software** 114:13 |
| **situa-** 286:3 | 33:18,23 34:3 | 122:5 123:22 | 275:12 278:2,8 | 236:15 238:17 |
| **situation** 188:2 | 34:16 35:6,20 | 124:12 125:16 | 278:11,12 | **Soja** 314:12 |
| 218:6 286:4 | 36:10,15,21 | 128:4 132:2 | 279:2 282:5,18 | **sold** 42:1 102:23 |
| **six** 169:20 | 37:9,17 38:6 | 135:8,11 136:1 | 283:18,21 | 161:9 247:13 |
| 184:16 189:3 | 38:12,14,22 | 136:21 138:16 | 284:1,16 | **solely** 334:5 |
| 228:17 273:13 | 39:23 40:5,11 | 139:12,21 | 285:12 296:4 | **SOM** 8:10 9:7 |
| **size** 46:13 47:20 | 42:5 43:11 | 140:14 143:3 | 298:5 301:3,18 | 249:11,14,15 |
| 56:23 57:1 | 44:7,16 46:23 | 143:15,20,23 | 303:3,19 | 252:2 271:14 |
| 120:18 153:10 | 48:4,8,18 49:1 | 144:2,7,19,21 | 304:11,14,23 | 304:14 |
| 154:3 189:14 | 49:11,20,21,23 | 145:6,19 151:4 | 305:17 306:6 | **somebody** |
| 189:21,23 | 49:24 50:19 | 151:13 153:14 | 306:23,23 | 297:14 |
| 190:4 | 51:2,11,18 | 158:16 159:21 | 307:3 308:16 | **someplace** 129:1 |
| **skewing** 166:18 | 52:1,4,18 53:2 | 160:18,23 | 311:4,8,12,15 | **somewhat** 94:6 |
| **skip** 266:3 | 53:7,12,23 | 163:16,17 | 312:18,19 | 215:9 239:6 |
| 299:18 327:9 | 55:4,18,24 | 164:23 168:19 | 313:3,20 | **soon** 134:24 |
| **skipping** 111:10 | 56:12 57:3,17 | 170:18,19 | 314:12,16,18 | **SOP** 8:10 |
| 321:12 | 57:24 58:4,13 | 171:8 172:1 | 315:3,16,20 | **SOPs** 160:22,24 |
| **slide** 254:9 | 58:20 59:11,14 | 178:20 179:1,6 | 316:13,22 | **sorry** 23:2 24:24 |
| **small** 161:15 | 59:20,22 61:6 | 179:7 180:14 | 317:3,8,13,23 | 25:1 73:1 78:7 |
| 215:9 287:10 | 62:6 63:6 64:6 | 183:7 186:1 | 318:6,17,21 | 115:13 148:18 |
| 297:5 | 65:8 66:8,21 | 188:12,20 | 319:10 320:7 | 175:4 179:8 |
| **Smartsource** | 67:24 68:14,23 | 200:6 205:1,8 | 321:14,21 | 183:2,24 |
| 264:23 265:3,4 | 70:5,7,17 | 205:17 206:4 | 322:10,12,15 | 184:22 216:4 |
| 265:9,16 299:7 | 72:17 73:23 | 206:11,18,20 | 323:9 324:11 | 217:4 228:11 |
| **Smith** 1:16 2:12 | 74:13 76:1 | 208:3,5,13,19 | 324:21 327:17 | 232:2 234:2 |
| 2:20 5:16,16 | 77:9,22 78:10 | 210:3 211:3,15 | 328:24 329:6 | 259:4 260:22 |
| | 78:24 79:8,18 | 212:2 221:21 | 329:17,23 | 261:13 263:24 |

275:3 280:20
280:23 292:7
303:22 326:18
332:12
**sort** 67:14 143:6
151:1 163:15
186:19 245:21
272:12 313:22
**sought** 171:8
**sounds** 185:20
**source** 73:8 86:9
238:17
**sources** 267:16
289:5
**South** 1:22 2:3
2:14,20 239:17
240:12 249:1
320:3,8,10,13
321:6
**southeast**
167:15,19
**Southwood**
102:11,14,19
103:1,7,17,23
104:2 327:8
**space** 156:5
197:20
**speak** 14:2
141:22 260:13
**speaking** 84:15
135:24
**speaks** 182:16
**SpecGx** 3:2 12:7
**specialized**
220:13
**specialty** 24:7
225:20 264:20
264:20
**specific** 25:13
32:14,22 33:24
35:12 41:11
50:24 57:22
59:19 75:7
84:18 85:10
120:18 132:13
135:19 147:12

147:17 151:10
152:15 161:1
166:13 175:16
196:20 244:19
281:23 296:16
313:1 315:3,17
324:5
**specifically** 14:6
26:7,17 44:3
47:19 50:20
56:2 61:17
63:9 64:4
65:15,16 83:24
85:15 94:14
101:19 129:4
149:20 151:13
153:19 159:19
167:13 192:14
192:22,23
213:21 239:17
242:17 244:7
244:14 254:9
274:8 275:16
281:3 284:23
287:19 293:18
312:21 313:24
314:4 316:6
321:3,4,9
326:5
**specifics** 63:13
**specified** 336:15
**specifies** 329:21
**speculate** 114:16
116:21 124:14
189:20 244:9
**speculating**
199:11
**speed** 235:9
**spell** 13:6
**spend** 207:6
**spreadsheet**
181:11 244:22
245:4
**spring** 49:16
82:7 120:8
146:3 159:21

194:23
**Springfield** 1:23
11:7 106:23,23
108:20 128:8
198:6
**springtime**
101:24
**St** 19:8 220:10
**staff** 109:24
140:13,14,16
140:17 179:17
180:7 212:12
212:13 255:2,8
255:14 256:7
268:6 293:3
**staffed** 212:17
267:6,17,24
**staffing** 267:21
268:1,3,11,13
268:17
**staged** 295:9
**stamped** 232:3
**stand** 145:21
**standard** 50:6
50:13 91:7
92:1 100:18
102:4 132:10
160:20 173:3
299:8 314:22
330:18
**standing** 222:11
**standpoint**
253:23
**start** 98:23
164:10 216:6
219:4 221:18
274:21 305:11
326:8
**started** 19:22
84:10,10 90:5
101:2 125:4,5
170:5 199:20
212:2 222:4
252:11
**state** 13:6 26:6,8
30:3,6 31:24

32:9,18,22
33:2,19 34:24
35:4,16,17,24
36:19 37:3,6
37:11,20 38:19
38:23 45:21
58:14,23 61:9
61:20,20 67:10
139:5 157:13
167:16 178:18
257:19 307:20
307:20 320:10
321:7
**stated** 157:19
252:22
**statement** 57:9
68:2 77:10
88:17 98:2
252:6,8 273:1
273:3,23 280:1
301:24 303:4
332:4
**statements**
27:19 241:9
242:15
**states** 1:1,18
11:9 29:10
32:23 35:2,3
38:19,24 58:15
65:22 77:1,4
77:20,24 80:2
327:22
**static** 164:6
**statistically**
309:6
**status** 85:1
178:21
**statutory** 67:19
68:5,15,18,22
69:2,7,17 70:1
70:9,18,20,22
71:3,10 72:1
138:1 300:6,19
301:4,19
**stay** 58:9,9
**stenographica...**

336:10
**step** 16:18
314:21
**Stephens** 1:22
**steps** 37:24 73:7
236:4
**Steve** 219:8
**stimulants** 27:13
**Stivers** 285:6
**Stockton** 113:16
**stop** 105:20
151:24 193:15
193:24 230:17
236:1,5 270:24
**stopped** 252:4
252:19 253:2
254:2 319:4
**stopping** 175:9
**stops** 263:12
**storage** 26:1
**store** 223:6
**straw** 224:2
**stream** 260:16
**street** 1:23 2:3,9
2:14 3:8,18
42:3 58:1
174:2
**stretch** 277:12
**strict** 164:3
**strictly** 163:20
**strong** 222:12
**study** 160:2
**stuff** 199:15
**sub** 29:4,4
**subcommittees**
157:11
**subject** 1:13
174:6 179:18
217:21 249:18
**subjective** 59:6
**subjects** 15:24
**submit** 213:3
**submits** 302:22
**submitted**
107:16 110:16
111:1

Highly Confidential - Subject to Further Confidentiality Review

**submitting**
151:14 170:19
**subpoena** 34:12
**subpoenas** 21:6
**SUBSCRIBED**
337:20
**subsection** 29:13
29:14 46:7
48:10
**subsequent**
176:13 177:21
193:3 231:11
294:11 296:12
**subsequently**
81:19 243:24
**subset** 16:10
**substance** 6:19
7:16 29:18
47:9 61:19
66:2 67:7 89:1
118:18 119:8
119:14,18
121:7 124:13
125:23 129:12
131:16 133:7
145:22 152:14
161:24 163:13
173:6,15 231:6
278:18 283:12
328:5
**substances** 5:18
5:19,22 6:3
7:12 24:20,21
27:2,5,6,20
28:1 29:15,24
30:8,10 31:11
32:2,10 37:3
38:9,11,15,19
38:20,23 39:19
40:13,24 41:2
41:7,9,16,17
41:24 42:6,8
42:23 44:18,23
44:24 46:5,10
47:16 53:8
55:5 56:1

60:14 65:24
66:18 73:5,14
73:17 75:3,16
75:23 76:5
79:22 93:9,16
95:19,22 98:14
105:20 108:6
120:2 121:4
125:17 130:20
133:13 136:5
138:10 144:4
145:7 149:21
149:23 150:6
151:6,22 152:6
153:22 170:11
170:15 171:3,8
172:20 178:8
196:18 205:10
206:6,13
227:22 229:7
241:15 249:24
254:3,7,16
265:13,19
271:22 280:13
282:11 283:14
304:22 310:14
310:22 316:23
317:10 323:22
324:13 325:11
**substances'**
326:24
**substantial**
73:18
**substantially**
46:14 47:21
56:23 266:12
334:16 335:3
**subtract** 164:4
**suffer** 56:3
**suffered** 62:12
64:8
**sufficient**
100:14
**sufficiently**
104:11
**suggest** 221:5

**suggesting** 44:11
280:6
**suggestion**
221:10,16
**suggests** 107:15
314:15
**Suite** 1:22 2:3
3:13
**summary** 7:3
9:7 192:12
323:22
**summer** 253:17
**Summit** 44:5,11
**sup** 67:21
**sup-** 165:4
**supervisor**
123:12 242:5
**supplies** 43:12
**supply** 3:12
12:15 41:13
53:18 56:7
57:15 75:18,20
165:4 243:24
302:3 327:6
**supplying**
102:20
**support** 9:17
191:6 298:11
299:22 301:14
**supports** 308:17
**supposed** 250:7
**sure** 13:24 21:12
25:16 31:7
32:7 35:14
36:5 38:7
45:23 60:12
61:24 63:1
64:12,19 66:23
68:18 69:2
70:8 71:4,24
74:9 80:7
82:15 85:7,9
86:10 90:17
96:21 114:9
124:17 128:11
146:9 149:6

150:20 155:23
166:11 172:4
179:15 180:21
181:24 182:7
184:23 185:13
188:23 198:11
200:20 202:7
203:1 204:7
208:17 215:5
221:13 232:18
239:4 240:23
250:21 253:16
257:12,17
259:17 263:1
264:5 271:17
272:20 277:15
279:22 280:7
287:12 294:6
294:24 312:10
313:16,18
315:8 316:21
319:5 323:18
324:4 331:4
**surprise** 136:19
137:2
**surrounding**
286:4,14
**surveillance**
320:16,17
**Susan** 242:4
243:12
**suspect** 42:13
169:18 212:20
228:21 246:17
**suspected** 42:12
42:23 44:8,17
44:22 45:9
**suspend** 217:10
219:24
**suspended**
10:11 33:19
208:12,15
209:11,13
214:11,13,16
214:17,21
294:10 324:8

324:21 325:2,7
325:13
**Suspension**
289:1
**suspicion**
178:16 223:13
**suspicious** 7:11
37:11,20 46:9
46:12,13 47:19
48:9 49:15,24
50:20 51:19
53:10,13,20
56:20 57:2,4
67:19,21 68:7
69:9 70:24
71:6 72:10,11
78:12 79:6,10
79:14,15,19
80:3,10,16,22
81:5,19 82:2,5
82:12 88:15,24
91:18,23 93:1
93:13 95:18
96:2,23 97:11
97:19 98:4,17
98:20 99:5,12
99:15,22 100:7
107:5,6,16,21
108:3,16 109:8
109:17,22
110:20 112:14
113:2 114:19
123:15,18,22
124:2,7 130:4
132:8 134:4
136:17 138:1
140:2,19 148:4
149:10 150:10
151:7,14
152:22 154:7
154:11,14
160:11,12
170:17,19,22
171:10 176:17
176:18,19
177:4 178:4

Highly Confidential - Subject to Further Confidentiality Review

193:15,23
206:16 214:3,5
214:9,18,19
215:1 216:16
217:1 221:24
222:1 226:22
229:21 230:19
230:22 231:6,9
245:10,15
246:5,17
249:12,21
252:14 253:3,4
254:5,8,23
271:19 274:17
274:18 279:3
282:10 304:12
304:13 313:7
317:5,11
326:23 327:12
327:23 328:5
329:2,3 330:3
330:7,17,23
331:11,12,21
332:5,15,16
333:1,3,4,5,8,9
333:14,17,23
334:1,2,5,10
334:21 335:10
**swear** 12:18
**switch** 191:18
**switching** 185:8
**sword** 219:21
**sworn** 12:20,23
336:7 337:20
**sys** 114:12
156:18
**sys-** 153:2
**system** 46:9 47:8
48:13,14,21,22
49:17 73:3,11
75:9,13,14
76:7,17,17
80:23,24 84:11
84:13 90:3,6
90:13,20,21
91:2,9,14,15

91:16 92:18
93:2,5,5,7,16
94:6,6,8,9,16
94:23 95:4
99:1,4,10,24
100:4 101:3,22
102:1 104:5,12
104:24 109:12
109:12,14,21
110:1,24 111:5
114:13,13
117:21 118:2,5
120:7 124:19
124:22,23
125:6 130:15
131:4 144:5,13
145:20 146:16
146:20 147:11
148:8 150:4,14
150:14,24
151:20 152:24
153:3,15,18
154:9,15,19
156:8,11,13,18
156:19 157:17
157:19 159:21
160:11,17
161:1,12,17
162:15,16,20
162:24 163:14
163:19 164:9
164:11 165:1
166:8,10 167:8
170:5 171:20
171:24 172:9
172:10 174:23
175:13 176:3,9
176:13,24
177:12,20
189:10,13
194:4,5,7,17
194:19,22
196:9 198:13
198:15 199:2
199:16,23
200:2 201:19

203:20 204:14
204:15,22
205:2,10,15,19
205:22,23
210:21 213:18
214:2,5,15
216:18,23
221:23 226:11
234:15 238:6
252:12,24
258:1 259:14
263:12 282:9
289:12,15,17
290:6,10,24
293:4,6 294:2
294:13,15,22
295:16 296:1
297:20 299:11
299:16 304:16
304:20 305:10
305:10,12,13
305:22,23,24
306:10 310:13
310:19,21
312:10 315:1
328:4 330:21
332:23 333:22
333:24
**system'** 326:23
**systematically**
153:2
**systems** 48:9,17
125:1 157:1,16
245:9,14
246:14 306:1
314:24

--- T ---

**tab** 213:10 251:5
251:5,7
**tabbed** 213:6,7
**take** 15:5 16:20
26:19 28:9,10
28:16 31:15
43:22 45:19
73:7 82:10,11

86:15 87:15
111:11 118:11
118:15 119:6
134:10 155:9
159:1 173:17
181:23 191:21
196:7 198:20
201:7 202:24
207:9 213:19
227:7 239:2
241:18 246:3
263:22 268:1
273:10 277:14
279:22 284:9,9
288:7 309:17
314:20 321:14
321:16 323:11
**taken** 1:17,19
34:14 151:18
151:18 336:14
337:9
**talk** 15:2 39:13
83:2 93:7
116:19 131:7
134:17 182:5
190:15 197:14
209:24 215:20
251:19 272:11
279:3 286:23
287:1 321:15
**talked** 67:13
77:21 101:20
147:4 172:8
189:9 195:2
256:20 270:11
**talking** 25:6
40:24 47:1,19
51:15 63:8,13
63:15 89:4
114:10 128:7
196:22 203:13
205:21 216:2
236:24 266:23
294:6 296:15
298:12 304:16
308:14 330:12

**talks** 77:19
171:18,18
175:8 208:11
254:18 264:9
**Tampa** 2:9
249:2
**team** 254:19,23
264:7 266:9
267:5
**technical** 259:16
**technically** 92:5
**technology**
116:17
**Telephonically**
3:5,15,20 4:5
4:10
**tell** 29:2,4 85:7,9
98:8 108:24
131:22 156:13
161:17 174:15
183:10 184:14
190:21 191:16
193:16 194:10
221:21 224:5
270:6
**telling** 71:24
248:15
**template** 148:4
157:20
**temporal** 96:14
**ten** 141:10 155:7
155:9 165:16
212:9 237:1
**tenet** 30:21
**Tennessee** 167:2
**Tenth** 3:18
**tenure** 31:1,11
39:24 40:6
42:7 48:5 49:6
51:11 82:17
112:17 117:6
135:8 206:18
212:15 233:13
235:2 254:2
260:7 268:5
284:12 297:5

Highly Confidential - Subject to Further Confidentiality Review

**term** 40:21
107:20 113:6
122:5 269:2,10
269:13,17
270:2,4,15,18
271:2,6
**terminated**
227:13
**terms** 130:13
149:1,2,7
246:18
**terrible** 319:14
**test** 137:15
295:9
**tested** 126:4,9
162:19
**testified** 12:23
78:5 108:13
162:2 163:3
182:22 198:4
297:4,16
298:16 303:11
303:14
**testify** 13:19
17:11 80:6
198:19 336:7
**testimony** 14:22
15:10,14,15
31:9 33:9
48:17 50:18,23
59:24 66:22
67:13 70:5
77:15 79:18
80:9 87:7
97:24 99:7
121:16 129:5
142:1,4 151:2
151:2 177:14
193:17 204:3
282:7,13,17
283:6,7 328:15
333:2 336:12
**testing** 104:21
137:20 266:7
**Teva** 10:3
313:21 314:1,3

314:12,15
315:5,16,19
**Teva's** 316:4
**Texas** 167:2
278:1,2 279:1
282:15 283:19
286:8,22,24
**Thank** 27:15
76:18 193:6
258:3
**Thanks** 74:10
**theft** 39:19 40:3
40:12 41:3,4,5
75:20 76:10
**theme** 195:11
**thing** 88:1 149:8
221:20 231:23
232:23 249:5
298:8 310:5
**things** 52:2,8,16
70:18 81:17
84:8,8 150:23
152:12,23
163:23 166:18
168:1 180:23
194:12 209:22
214:4 233:10
233:12,21
234:19 235:12
235:13 272:11
**think** 15:23
18:16,17 23:5
24:5 25:3
32:21 35:2,3
41:21 50:22
58:21 59:6
63:21 70:5
78:10 86:3,16
96:18 101:6
102:7 103:5
112:5 114:23
118:12,23
123:10 127:9
132:17,19
133:21 138:22
143:8 145:18

147:8 149:15
150:18 152:9
153:5,19 160:8
161:3 162:2
163:3 177:14
181:11,19
182:21 184:3
195:1 197:6
198:3 199:6,19
202:2,20 204:3
204:7 205:22
212:9 225:5
229:12 232:1
242:5,6 250:22
252:9,16 257:6
258:16,16,20
260:20 263:22
268:2 286:21
287:15 288:17
289:6,17,17
292:3 293:9
295:1 297:16
303:14 309:16
313:14 314:3,9
315:9 316:8,12
318:13,20
**thinking** 272:3
292:6
**third** 76:23
163:7 192:17
217:13
**third-party** 24:7
262:5,11 263:4
**third-to-last**
78:6,8
**THORNBURG**
2:13
**thought** 50:12
124:7 166:3,18
250:6 267:23
269:22 273:17
293:3 306:9
**thoughts** 15:2
**thread** 215:8,12
215:21,22
216:3 217:21

217:22 219:4
220:5,6 313:14
313:15 314:11
**threatening**
242:19
**three** 54:24
56:20 101:6
118:11 150:3,9
151:6 155:17
163:20 164:3
164:11,12
187:19 189:10
190:9 204:15
212:6 222:10
222:23 251:2
281:18 285:17
297:24 299:5,6
314:16 315:6
315:21
**threshold**
126:20 129:5
155:18 156:18
175:12,17,22
176:10,12
179:8 186:21
187:19 189:5
205:24 230:15
232:15 234:7
253:1 288:5
289:12,17
290:7 292:16
298:22 305:10
306:2 334:14
335:5
**threshold-based**
305:23 306:10
**thresholds**
126:19,23
150:15,22
163:1,4,24
164:6 165:14
171:19 179:19
187:4,5,22
210:11
**thresholds.'**
168:17

**throwing** 262:20
**tick** 168:18
**Tim** 285:23
**time** 5:9 6:2 7:2
8:2 9:2 10:2
11:5 14:15
15:1 18:23
19:4,15,24
20:13,13 26:16
26:19 36:10
37:14 47:1
49:5 50:5,14
50:14 51:15
74:13 80:19
81:9,9,11 82:3
82:7 83:2,3,3
86:2,6,15
87:22 88:23
89:4,14 91:8
98:22 100:4,19
101:6 104:10
104:13 108:8
108:17 109:5,6
109:9,16,24
110:5,14,15,19
111:13 113:21
114:14 115:5
116:2,4 117:2
117:2 118:12
118:18 120:24
123:16 125:2
125:11 126:9
126:24 128:12
128:13 129:13
131:2 132:1
133:11 134:5
135:6,10 137:4
138:18,20
139:6,9 140:22
140:24 147:8
147:13,15
148:1,2,2
152:9,13
153:24 156:2
157:2,8 158:18
160:23,24

166:9 170:4,4
171:12,16,22
173:4 174:12
176:9 178:11
178:12 191:13
193:7 195:24
202:4 203:1,23
207:6 209:20
210:10 212:6
212:11 213:5
214:21 216:17
220:1,21
222:19 223:7
223:11,17,22
224:1 227:2
230:6 231:1
232:21 234:14
236:5,20,24
242:5,8 244:3
248:5 255:6
257:18 264:6
264:17 268:7
273:12 275:24
276:3,3,16
278:11 279:22
281:16 284:5
284:13,17,24
294:21,22
298:17 304:23
305:3 310:1
312:15 317:23
321:16 324:18
330:12,14
331:9 332:19
332:21 334:12
335:16 336:15
**timeline** 257:23
**timely** 267:12
**times** 13:24
14:13 15:9
48:18 99:11,13
150:3,9 151:6
163:21 164:3
164:11,13
171:2 177:3
184:16,16

189:3,3,11
190:5,9 204:15
212:17 222:7,7
222:8,8,9,10
222:20,23,24
223:3,9 231:12
267:16 270:21
277:7 299:6
312:8
**timing** 248:6
257:3
**title** 5:20,22 6:3
20:7,11,16
29:3 37:14
46:3 119:20
147:6
**titled** 229:20
264:12 293:13
**today** 12:16 13:9
14:5 15:7,8,14
15:20,22 16:10
17:13 18:9
30:19 31:8,9
33:9 48:17
66:22 70:8
79:18 90:23
124:23 139:17
161:13 165:24
203:14,18
204:3 208:13
216:12,13,14
279:3 282:13
283:6 287:1
304:8 328:15
**today's** 11:4
278:20 326:4
**told** 105:13
110:14 165:10
194:20 199:19
221:21 319:1
**Tom** 21:23 22:2
22:11
**tomorrow** 15:5
15:15 216:14
280:23
**tone** 241:8

242:15,17
**tools** 228:14
298:14,18
**top** 39:11 113:8
146:10 172:16
172:16 213:16
215:13 221:3
221:10 225:16
236:16 261:9
273:12
**topic** 16:23
280:1,3,5
286:22
**total** 170:9
212:10 231:22
**totality** 45:9
54:18 224:14
226:5 231:12
**touch** 18:4 26:9
157:16
**touched** 158:2
**tourist** 275:13
**Tracey** 9:14
285:2 289:23
290:14 291:1
292:20 293:10
299:2
**track** 167:6
325:19
**tracked** 76:16
**trade** 157:21
161:5
**trained** 209:18
256:12,17
**training** 8:12,16
129:11,18,20
137:24 239:7
252:16,17,17
252:18 253:5
254:9,22
256:10
**trainings** 103:14
**transactions**
88:13 99:21
100:1 260:11
261:21

**transcript** 336:9
337:9
**transcripts** 14:3
**transition** 51:24
194:3
**transitioned**
215:18
**transitions**
211:12
**transmitted**
274:6
**treatment** 88:4,5
**trends** 171:22
**tried** 90:12
152:16 162:20
167:6,7 200:2
245:3
**trigger** 173:20
173:21 191:1
292:11
**triggered** 124:18
285:11
**triple** 299:5
**trouble** 226:14
**true** 92:7 104:13
134:14 175:23
295:23 297:7
336:12 337:11
**trusted** 73:13
**truth** 248:15
336:7
**try** 14:1,15,17
14:21 15:3,13
116:16 125:7
130:3 134:17
179:9 236:17
**trying** 32:21
54:5 104:21
126:13 141:4
164:24 165:21
167:8 199:20
223:10 225:5
231:17 233:20
238:5 245:1
288:15 289:22
308:22 309:3

**turn** 67:11 72:11
76:19 160:8
197:9 200:10
200:24 201:7
213:7 214:14
227:15 229:16
239:11 262:9
263:21 302:15
309:20
**Turning** 171:17
184:20 308:1
**turnover** 127:11
**tweak** 199:3,17
199:23
**Twelfth** 3:8
**Twice** 13:21
**Twitty** 21:24
22:2,11
**two** 17:15
124:11 128:21
157:12 180:22
181:9 209:15
232:1 238:15
249:9 251:2
261:16 272:11
276:6 277:5
292:8 303:12
313:2 321:11
321:11 327:12
331:13 332:5
**two-page** 271:12
**two-way** 311:8
**TX** 9:10
**Tyler** 211:21
**type** 23:23 24:13
25:4,9 41:15
61:8 63:9
106:9,16
124:12 129:20
130:22 143:18
154:4 169:11
174:4 180:22
186:2,4 188:14
189:4 205:16
228:20 233:24
234:12 252:5

260:8 279:9
283:24 284:8
285:10 293:13
317:8 323:4
**types** 56:20
61:18 152:6,17
153:6 157:16
**typewriting**
336:11
**typical** 120:19
131:10 186:23
189:4 209:7,8
209:12 213:23
224:7 236:14
237:8 238:2
250:9 261:5
271:23 273:10
275:14 276:15
276:17,20,24
316:9

_____
**U**
**ultimately** 224:1
**Um-hum** 17:3
221:2 241:21
330:4
**un** 67:3 249:17
**unable** 10:5
266:10
**unaware** 75:6
**unclear** 67:3
93:24 94:4
303:19 304:15
304:23 305:1,5
305:17
**uncommon**
186:23,24
260:5
**uncovered** 42:5
260:7 292:14
**undergoing** 58:5
**underneath**
288:10
**underreporting**
237:22 238:6
**understand**

14:17 18:5
37:13 54:5,8
54:17 62:5
70:16 105:3
112:16,17
118:21 119:17
124:17 126:7
136:1 146:12
151:4 176:5
195:22 199:4
216:1,2 240:2
262:22 266:19
279:6 282:13
290:11 294:20
315:8 331:6
**understanding**
8:22 18:22
36:18 37:21
40:21 41:6
67:14 74:24
79:13 81:17,20
112:15 113:24
117:9 132:14
133:21 230:23
249:15,17,19
250:1,8 259:13
282:15 328:19
337:14
**understood**
155:23 246:23
**undertake**
129:20 300:21
316:13
**undertaken**
44:20
**undertakes**
301:21
**undetected**
317:11
**uniqueness**
165:7
**unit** 88:14
189:17
**United** 1:1,18
11:9 29:10
58:15 65:22

77:1,4,20,24
**units** 155:15
175:16 216:12
216:13 236:21
**unknowingly**
318:18,22
**unpack** 222:18
**unreported**
317:11
**unsigned** 8:22
256:24
**unusable** 162:22
**unusual** 46:13
46:15 47:20,22
50:12 56:22,24
122:24 123:18
129:4 191:1
218:6,12
298:14,22
314:20
**update** 163:8
**updated** 213:4
**upper** 85:8
**UPS** 262:12,14
262:19
**upstairs** 226:3
**upstream**
260:16
**UR** 189:17
**urban** 220:10
226:4 276:23
**urge** 203:2
**URL** 8:8 185:3
186:16,21
189:5,18
190:17 191:2,7
209:12 213:22
217:7,8,9
218:3 222:9,23
253:24,24
299:3,5,6
**URLs** 8:7 184:7
187:22 188:16
189:17 210:10
210:13 211:15
213:24 218:4

222:3,5,6,19
223:3 224:12
297:6 317:24
**usable** 237:15
**usage** 233:16
235:21
**USC** 5:20 29:3
282:11 283:15
**use** 9:20 37:12
41:8,17 47:24
58:22 59:3
62:22 84:11
86:17 126:18
130:16 146:20
150:4 154:22
161:22 162:4,6
162:20 176:10
177:19 178:11
196:19 224:13
225:7 237:13
257:2 258:10
269:18 270:2,4
270:16 271:2
276:17 277:1
309:23 327:7
**users** 210:23,24
**uses** 40:19 41:4
77:7,16 145:19
269:12
**usual** 224:7
**usually** 128:22
173:7 177:6
195:23 236:15
239:10 273:13
**utility** 112:14
113:2 114:2,20
**utilization** 236:7
236:12,14
237:21 248:13
277:1,4
**utilize** 255:14
**utilized** 73:8

_____
**V**
**V** 149:22
**vacuum** 216:1

**valid** 261:4,21
**Valley** 113:15
212:8
**Van** 285:23
286:2
**VanDermeersch**
86:5 110:2
211:16
**variables** 162:21
263:6
**variety** 259:22
**various** 38:19
120:8 165:12
168:1 169:14
258:1 270:21
318:24
**vast** 24:15 161:7
**vault** 122:11
127:19
**vaults** 122:13
**VAWD** 21:1
213:1,3
**veer** 143:11
**vein** 72:6,6
**vendor** 22:15
237:13 312:13
**vendors** 260:23
261:19 262:3
271:24
**verbal** 14:12
200:5
**verbatim** 150:5
**verbiage** 72:1
89:12
**verify** 137:15
298:16
**version** 144:8
147:3 201:5
258:10
**versions** 38:20
**versus** 144:17
299:10
**veteran** 127:10
127:15
**vetted** 265:20
**vial** 155:3

Highly Confidential - Subject to Further Confidentiality Review

**vice** 20:9,21
21:22,24 23:8
113:17 147:8
285:3
**video** 11:5,6,12
**videographer**
4:14 11:1,2
12:16 13:4
86:19,23
141:13,17
203:5,9 277:18
277:22 335:14
**videotaped** 1:15
14:9
**view** 66:2 306:6
**views** 97:6
**vigilant** 73:12
256:10
**violate** 33:11
79:22
**violated** 33:2
145:6
**violating** 144:9
**violation** 103:22
104:2,14
105:16,21
144:3 208:19
234:1 248:2
261:22 278:19
282:6,11
283:15,19
325:3,11
329:24 330:5,8
333:10,19
334:17
**violations** 32:24
35:10 208:14
248:21 279:1,4
279:16 286:24
287:5,6
**Virginia** 35:16
35:17,24 36:10
36:20 38:5
142:16,18
143:3
**visit** 180:4,8

255:8 264:10
266:4,8,16
267:11 320:5
**visited** 223:9
239:24 266:14
268:21
**visits** 163:23
244:24 245:2
255:11 266:10
267:4,9,22
268:11,14
317:13
**volume** 153:4,6
153:11 154:1
**volumes** 155:22
310:15
**voluntarily**
304:19
**vs** 10:13 122:11
**vulnerabilities**
205:9,14
**vulnerability**
205:16

⎯⎯⎯ **W** ⎯⎯⎯
**Wacker** 2:20 4:3
**wades** 12:2
**wages** 127:18
**wait** 245:20
260:22 300:9,9
**walk** 25:1
151:12 160:5
264:11 293:20
**Walmart** 4:2
12:9
**Walsh** 211:21
**want** 13:24 14:4
15:2 18:4
27:13 28:8
32:22 45:21
50:24 54:8
58:22 59:3
62:5 63:4
67:12 72:23
73:22 74:5
76:19 78:2

80:6,7 82:9
84:14 87:4,12
88:10 94:17
97:9 98:1
112:18 118:14
118:14 121:15
124:17 136:1,7
140:22 142:23
143:11 144:16
146:12 150:20
166:7 168:12
168:18 176:5
180:9,11 181:1
181:7 182:1
183:17,19
191:14,18
198:19 200:24
206:17 209:14
213:21 215:20
216:15 222:18
234:10,24
235:20 236:18
238:24 240:2
240:16,24
251:16,19
253:1 256:20
257:2 258:10
258:18 260:4
266:3 272:11
277:14 279:6
286:17,20,23
287:8 298:16
300:16 301:15
309:20 310:10
313:11 315:2
315:11 325:14
326:15 331:3
**wanted** 26:17
100:12 130:21
142:3,14,17
143:20 145:4
198:16 199:4
210:19 214:10
216:10 249:20
249:23 255:20
256:15 278:7

281:22 310:5
**wants** 216:24
227:14
**warehouse**
122:6,10
125:24 126:1
**warehouses** 85:5
124:24
**warned** 102:23
**warrant** 34:9
**Washington** 3:9
3:19
**wasn't** 40:4
55:15 63:1
69:15 84:16
90:6 93:3
130:11 134:18
135:20 152:14
152:14 169:3
172:5 207:12
234:21 242:19
243:15 256:16
263:2 278:11
279:14 280:6
293:5,5 301:12
305:15 334:24
**watch** 226:15,15
**water** 15:1
**Watson** 313:10
**way** 14:16,18
28:18 36:7
47:18 50:24
52:1,9 75:22
81:17 83:15
89:16 94:15
105:12 118:1
130:17,17
135:2 138:4
151:19 158:14
172:19 194:11
196:7,8 198:16
203:24 205:19
216:4 227:11
227:17,21
234:17 238:1,2
238:22 257:9

267:8 290:6
292:9 296:1
305:1 307:2
319:21
**ways** 318:24
**we'll** 14:1,21
15:3 29:5
48:16 50:16
67:15 84:13
86:17 93:7
131:7,7 142:5
152:2,2 182:4
201:4 261:1
277:8 280:22
280:22 316:11
316:11,11
**we've** 17:16 24:5
34:17 35:9
43:22,24 55:1
57:1 59:22
77:21 86:16
159:1 190:14
190:14 194:1
227:4 229:4
252:3,10,10
263:15 267:15
277:13 298:11
305:8 313:5
314:1
**website** 28:20,21
39:10 161:22
**weeds** 160:3
**week** 179:4
241:5
**weekly** 245:5
263:16
**welcome** 14:10
229:14
**welfare** 73:19
**Wellness** 10:11
323:23 324:7
324:12
**went** 18:24
19:10,12 20:2
22:17 37:23
52:16 82:12

99:14 109:5,21
125:24 127:19
130:8 147:11
153:20 154:5
154:18 164:3
170:4 172:10
174:19 201:17
202:8,8 253:1
263:17 278:21
326:2 330:16
**weren't** 136:14
214:5 252:15
265:18,23
294:20
**West** 4:3 35:16
35:17,24 36:10
36:19 38:5
142:16,18
143:2
**whatnot** 67:15
84:14
**WHEREOF**
336:21
**wholesale** 37:22
113:16,21
**wholesaler**
24:23 170:2
172:22 185:9
319:4
**wholesalers**
171:14 188:3
195:9 250:19
274:7 276:18
**wife** 14:14
**wild** 43:22
**WILLIAM** 2:15
2:16
**william.padge...**
2:16
**WILLIAMS** 3:8
3:13
**willing** 222:13
**willingly** 308:7
**willy-nilly** 54:10
**wish** 282:17
**witness** 5:2

12:16,18,19,22
13:20 15:6
16:4,15,23
17:1,4 25:12
31:4,14 32:4
32:13,20 33:6
33:13 34:5
35:8,22 36:4
36:13 40:15
42:10 43:14
45:2 47:7
48:12 50:4
51:4,14,21
53:16 54:2,13
55:8,14,21
56:5 57:7,13
57:21 58:8,17
59:2,17 60:4
60:18 61:11,23
62:15 63:12
64:3,11 66:16
68:11,17 69:1
69:11 71:2,12
71:23 74:2
77:12 79:4,12
80:1,13 81:8
81:13,24 82:14
85:21 88:19
89:7 91:5,21
92:9 93:11,19
94:3 96:1,17
97:16 98:7
99:9 104:16
105:10 112:3
112:22 114:22
116:24 121:12
121:21 123:2
123:24 131:18
133:24 135:15
137:1 138:3
140:9 141:12
144:11 145:2,9
151:17 157:4
160:1 185:19
187:7 189:8
199:10 202:15

202:22,24
205:5,13 206:8
206:22 218:8
228:8 235:4
251:4,15
252:21 257:21
261:12 266:21
277:15 279:13
284:7 285:15
287:1 289:11
290:19 298:20
301:8 302:2
303:6,24 305:7
305:21 306:16
308:12 309:15
311:3 315:23
319:18 321:17
322:22 324:15
327:21 328:18
329:11 330:11
331:20 332:18
333:12,21
334:8,19 335:8
336:6,6,21
**Wools** 211:22
**word** 40:19
58:22 59:3
126:18,19
255:16
**worded** 315:9
**words** 40:10
41:24 52:8
56:18 75:4
89:17 128:19
166:17 171:9
178:22 180:19
203:18 210:18
237:22 246:19
273:2
**work** 19:10 21:3
21:7 90:6
110:5 122:9
146:18 156:4
157:15 158:2
159:10 198:16
198:16 237:9

247:2 263:9
297:19
**worked** 19:6,19
19:22 22:17
159:14 237:12
238:10 298:1
**working** 91:8
101:2 147:16
156:8,14 170:5
198:13 199:24
211:3
**works** 297:14
**worries** 146:11
**worry** 280:23
**worth** 188:23
284:21
**wouldn't** 43:7
100:17,17
126:16 137:2
216:18 221:11
221:18,20
238:21 246:11
254:5 256:2
265:19 277:7
313:1 316:4,5
**Wright** 7:6
90:15 94:14
147:14,14
191:20 192:3
193:1,5,5,22
194:10 195:20
201:17 208:9
319:2
**writing** 16:9
76:13 89:17
184:13 193:21
201:22 213:15
222:15,19
225:15 247:22
298:17 307:10
307:12,13,16
307:21
**written** 51:1
79:5 92:6 98:9
118:21 135:3
160:20 184:12

185:5 247:14
274:2,5 281:10
292:23
**wrong** 59:15,21
60:1,2,15
180:22 196:13
**wrongdoing**
142:19
**wrote** 191:24
222:20 292:23

---

### X
**X** 5:1 128:19

---

### Y

**Y** 128:20
**yeah** 12:6 16:15
18:17 20:19
28:9 37:23
44:13 54:22
58:2 61:2
65:19 67:9
74:5,23 100:3
115:24 119:22
132:19,21,23
135:22 136:12
146:17 148:20
150:18 176:7
181:18 183:11
183:14 185:22
197:21,23
199:11 202:23
207:8,18
217:24 223:4
233:7,21 234:4
234:21 239:9
250:23 251:7
251:10 252:17
261:8 265:8
266:19 272:21
274:8 277:16
279:15 281:21
290:9 292:7,7
297:10 300:12
315:8 326:16
329:5
**year** 19:22 89:22

90:4 253:21
266:11 267:5,5
268:21
**years** 19:6 81:14
127:17 237:1
301:1 302:11
317:15
**yellow** 213:20
213:21,22,23
214:14 215:1
**Yep** 185:15
**Yingling** 2:22
11:21,21 199:9
**York** 3:4 139:20
276:23
**Young** 2:5 5:4
11:13,13 13:1
13:3 16:3,6,16
17:6 18:13,20
23:1 25:15
28:9,12 31:6
31:18 32:6,16
33:1,8,17
34:10 35:13
36:1,6,17,23
40:9,18 42:20
43:17 44:13,14
45:12 46:22
47:12 48:15
49:3 50:15
51:8,16,23
53:22 54:4,21
55:11,17,23
56:11,17 57:10
57:16,23 58:12
58:19 59:10
60:7,21 61:15
62:4,24 63:18
64:5,16 66:19
67:2 68:4,13
68:21 69:6,14
69:21 70:3
71:8,15 72:2
74:4,16 77:14
78:19 79:7,16
79:21 80:5,17

81:10,15 82:8
82:16 85:24
86:15 87:1
89:2,10 91:12
92:4,12,23
93:1,4,14,21
94:20 96:5,12
96:20 97:22
98:11 99:18
101:13 104:18
105:24 112:10
112:24 115:3
115:19 117:3
121:14 122:1
124:9,16
131:14,24
134:2,12
135:21 137:7
137:12 138:6
140:11,24
141:4,11,19
144:15 145:5
145:11 148:19
148:21 151:23
157:6 160:4
180:18 185:17
185:21 187:10
199:12 201:4,6
202:14,17,23
203:1,4,11
205:7 206:10
207:1 213:9,11
218:11 227:20
228:10 235:6
249:4 250:13
251:3,6,10,13
251:17 253:6
258:2,22 259:1
259:3 261:11
261:14 275:2
277:11,14,17
277:24 278:23
279:21 280:3,7
280:11,15,18
280:22 281:5
284:11 285:18

286:20 287:7
289:19 290:22
298:23 300:11
301:11 302:7
303:10,21
304:10 305:14
306:5,18
308:15 309:19
311:7 316:1
319:20 321:19
322:3,9 323:3
324:19 326:11
326:14,16,17
327:24 328:11
328:21 329:14
330:13,24
332:1,11,20
333:15 334:3
334:11,23
335:11,13

---
**Z**

**Z5** 296:17,18,20
297:1,8,10,13
298:6
**Zajicek** 1:20
4:20 12:17
336:3,24
**zero** 153:7,8
**Zimmerman**
147:5 148:11
158:3

---
**0**

**0001** 26:14
**001** 17:24
**00129** 232:4
**003** 5:18
**012** 5:21
**014** 5:23
**016** 6:4
**020** 6:6
**025** 6:11
**028** 6:15
**05** 19:8 123:17
129:14 137:13
324:10

**06** 129:17
138:21 303:20
303:22 324:11
**061** 6:20
**066** 6:24
**07** 91:17 303:18
303:20,22
**071** 7:4
**079** 7:9
**08** 137:13
138:21 202:5
220:22 303:18
**092** 7:12
**095** 7:15

---
**1**

**1** 17:20 18:1
26:13,23 27:1
27:20 29:4,23
55:2 65:17
72:20 87:11
149:15 198:17
257:7 283:10
296:3 310:8
**1:02** 141:16,18
**1:17-md-2804**
1:8
**10** 2:20 16:12,24
153:5 308:1
**10-** 153:9 165:17
**10,000** 153:8
**10:44** 86:20,22
**10:55** 86:22,24
**100** 93:23
320:14
**10036-8704** 3:4
**1007** 7:4
**101** 7:17
**106** 6:7
**107** 6:12
**109** 7:20
**11** 2:14 16:12,24
**11/21/14** 9:10
**1100** 2:3
**111** 6:16
**118** 6:19 7:22

**12** 16:12,24
153:6 155:9,11
222:7,8,9,20
222:24 223:3
260:23 261:2
261:19
**12:04** 141:14,16
**12:05** 141:1
**12:15** 141:2
**1200** 215:23
217:15
**1211** 3:3
**122** 8:5
**124** 8:9
**129** 8:11 232:3
**12th** 324:8,10
**12x** 8:8
**13** 5:4 160:9
173:7 258:19
258:21
**1301** 46:4 53:3
**1301.71(a)** 5:23
**1301.74** 46:6
**1301.74(b)** 6:4
46:17 327:1
**1301.74(b)(2)**
282:12
**1304.21(a)**
283:16
**1304.33** 261:22
**137** 8:14
**13th** 106:3
324:10
**14** 111:10 259:4
**143** 8:18
**146** 8:21
**148** 7:8
**15** 16:12 17:1
118:10 120:1
184:16 203:3
261:11 287:21
**150** 288:24
**152** 8:23
**15219** 4:9
**158** 7:10
**15x** 6:23

Highly Confidential - Subject to Further Confidentiality Review

**16** 7:3 189:3
    192:12 222:8
**166** 258:24
    259:2
**16th** 192:8
**17** 5:10,13 7:4
    181:8 187:3
    192:13
**176** 9:4
**17th** 192:8
**18** 5:17 192:11
    318:4
**181** 6:21
**182** 9:6
**184** 9:9
**18th** 293:15
    296:4
**19** 10:9 191:19
    193:4
**191** 7:5
**192** 7:3
**197** 7:13
**1971** 38:9,12
**198** 9:11

_____
**2**
**2** 27:1 28:6,14
    29:13 30:3
    32:11 67:11,17
    76:19,20 87:13
    102:7,7 133:3
    148:24 200:10
    215:22 249:6
    300:5,10,12
    335:13
**2-** 43:23
**2/2N** 27:6
**2:25** 203:6,8
**2:31** 203:8,10
**20** 173:15,16,18
    174:7,12
    337:22
**200** 266:12
    267:1 268:20
**20001** 3:19
**20005** 3:9

**2000s** 318:16
**2002** 7:8
**2005** 6:16 19:6
    19:12 49:12
    117:23 121:4
    125:4 128:5,10
    133:20 324:8
**2006** 6:10,15 9:3
    10:9 64:21
    65:8 66:7,10
    66:22 77:23
    83:6,11,12
    106:3 107:4,17
    125:5 129:18
    129:19,24,24
    130:10 139:15
    143:22 162:20
    194:17 259:9
    259:12,20
    262:6
**2007** 7:5 87:15
    87:23 89:21
    90:2 94:12
    100:21 101:1
    101:16 103:6
    110:10 138:23
    139:11 146:24
    191:20 192:6,8
    194:17 198:3
    200:1 249:20
**200754** 337:3
**2007th** 87:15
**2008** 7:19,19,21
    8:6,10 19:12
    49:16 82:7
    98:23,24 110:1
    110:24 120:8
    125:13,16
    146:3 159:22
    194:23 208:14
    209:20,21
    229:22 234:22
    237:3
**2009** 19:14,19
    164:20 186:11
    235:8

**201** 2:9 7:16
**2010** 8:4,19,20
    9:6 34:8
    216:17 240:20
    241:19 246:15
    248:7 264:5
    267:5,6 268:17
    305:5,16 306:8
    306:13,19
**2012** 8:15 9:8,18
    252:15 271:15
    272:5
**2013** 19:20
    114:24 166:12
    168:7 172:10
    285:5
**2014** 278:4,9
    283:23 285:1
**2015** 9:14
    293:15 296:4
    335:2
**2016** 20:3
    284:19,20
**2017** 10:3,14
**2018** 1:23 11:4
    336:22
**2019** 23:12
**202-434-5000**
    3:9
**202-662-5531**
    3:19
**204** 9:16
**205** 1:22
**207** 7:18
**21** 5:20,23 6:4
    16:12 29:3
    46:3 148:14,19
    261:22 278:9
    282:11 283:15
    283:16 285:1
    327:1
**212** 7:21
**212-596-9451**
    3:4
**215** 8:3
**218** 8:6

**22** 7:5,19 158:24
**2200** 215:23
    217:15
**229** 8:10
**22nd** 186:11
    191:20 207:16
**23** 8:20 9:14
    197:9
**238** 8:12
**23rd** 241:5,19
    243:4,23
    246:17
**24** 169:21 201:7
    201:9 258:21
    259:4 261:11
**240** 8:19
**25** 155:8 207:5
    207:11
**25,000** 153:9
    165:17
**251** 8:15
**256** 8:22
**258** 9:3
**26** 212:20
**263** 9:5
**27** 1:23 8:19
    215:7
**271** 9:7
**278** 9:10
**279** 9:18
**27th** 11:4 64:21
    87:14 240:20
**28** 5:19 152:10
    155:1 218:23
**2804** 1:6 11:8
**287** 9:12
**29** 8:4 9:8
**293** 9:14
**299** 9:17
**29th** 216:5
    271:15 336:22
**2nd** 23:12,14

_____
**3**
**3** 6:23 10:4 30:5
    39:8 84:9 88:8

**183:6** 230:9
    264:15,18
    281:22 282:8
    296:14 302:15
**30** 10:14 229:17
    281:11,16
    282:22
**30-day** 204:22
**30(b)(2)** 5:12,15
**30(b)(6)** 1:15
    5:11,14 13:13
    13:16,20 15:19
    18:7 142:9
    280:4,5,21
    292:6
**300** 43:23
**300-page** 326:3
**304** 7:7
**309** 9:19
**312** 9:21
**312-207-2834**
    2:21
**312-269-4164**
    4:4
**313** 10:3
**317** 10:6
**317-231-7501**
    2:15
**31st** 284:19
**321** 10:7
**32202** 2:4
**323** 10:9
**325** 10:13
**33** 238:24
**330-305-6400**
    3:14
**33602** 2:9
**34** 5:12,15
    251:10,13
**340B** 292:1,1,3
    299:7
**35** 240:17
    250:23 251:10
    251:10,11,12
**35th** 4:8
**36** 251:13

256:22
**37** 258:8
**37.5** 266:13
**38** 263:21,22
**39** 5:22 271:12

---

**4**
**4** 30:9 45:16
55:2 202:20
239:12 260:21
276:7 293:12
326:9,18
**4-20-09** 6:23
**4/28/11** 8:12
**4:13** 277:19,21
**4:24** 277:21,23
**400** 3:13
**40th** 2:20
**41** 278:8 280:2
**412-471-3490**
4:9
**42** 287:9
**42-ish** 287:9
**43** 293:8,10
**44720** 3:14
**448** 296:24
**45** 6:3
**46** 299:19,20
**46204** 2:14

---

**5**
**5** 5:20 6:16 9:3,6
16:11,24 29:4
30:11 64:18
149:15 213:14
251:3,8 252:1
298:13
**5-6-15** 9:13
**5,000** 155:15
**5/6** 287:21
**5:42** 335:15,16
**50** 226:4
**50,000** 155:8
**500-page** 237:7
**54** 309:22
**5400** 216:11
**55** 209:6 313:12

**57** 321:12
**58** 323:13
**5th** 117:23

---

**6**
**6** 8:15 16:11,24
160:9 208:11
298:24
**6-** 273:11
**60** 17:20 325:18
**60601-1692** 4:4
**60606-7502** 2:21
**64** 6:5
**673** 10:8
**675** 10:12

---

**7**
**7** 7:19,21 8:6
10:3 16:11,24
106:2 162:20
280:11
**7-9-07** 7:14
**700** 273:11
**722** 10:14
**725** 3:8
**76** 2:3
**77** 4:3

---

**8**
**8** 107:13 168:14
**80** 222:15
**800** 1:22
**8040** 3:13
**810-V** 212:24
**813-679-9217**
2:10
**823** 29:3
**823(b)(1)** 5:20
**823(e)** 72:7,13
**827(a)(3)** 283:15
**827(d)** 282:11
**84-2604** 4:20
336:3
**850** 3:18

---

**9**
**9** 9:18

**9/27/06** 6:6
**9:13** 1:24 11:5
**904-361-0012**
2:4
**9400** 216:12
**9th** 198:2