```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
                          -  -  -
 3
    IN RE:  NATIONAL        :  HON. DAN A. POLSTER
 4  PRESCRIPTION OPIATE     :  MDL NO. 2804
    LITIGATION              :
 5                          :
    APPLIES TO ALL CASES    :  NO.
 6                          :  1:17-MD-2804
 7            - HIGHLY CONFIDENTIAL -
 8     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9                     -  -  -
                   December 6, 2018
10                     -  -  -
11
12          Videotaped sworn deposition of
13       RICHARD J. FANELLI, Ph.D., taken
14       pursuant to notice, was held at DECHERT,
15       LLP, 1095 6th Avenue, New York, New
16       York, beginning at 9:09 a.m., on the
17       abovedate, before Margaret M. Reihl, a
18       Registered Professional Reporter,
19       Certified Shorthand Reporter, Certified
20       Realtime Reporter, and Notary Public.
21
                          -  -  -
22
             GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24
```

## Page 2

A P P E A R A N C E S:

CRUEGER DICKINSON, LLC
BY: ERIN DICKINSON, ESQUIRE
    CHARLES J. CRUEGER, ESQUIRE
4532 N. Oakland Avenue
Whitefish Bay, Wisconsin 53211
(414) 210-3900
cjc@cruegerdickinson.com
Representing the Plaintiffs

SIMMONS HANLY CONROY, LLC
BY: JO ANNA POLLOCK, ESQUIRE
One Court Street
Alton, Illinois 62002
(618) 259-6365
jpollock@simmonsfirm.com
Representing the Plaintiffs

THE DUGAN LAW FIRM, LLC
BY: BONNIE KENDRICK, ESQUIRE
One Canal Place
365 Canal Place, Suite 1000
New Orleans, Louisiana 70130
(504) 648-0180
bonnie@dugan-lawfirm.com
Representing the Plaintiffs

BRANSTETTER, STRANCH & JENNINGS, PLLC
BY: MICHAEL G. STEWART, ESQUIRE
The Freedom Center
223 Rosa L. Parks Avenue
Suite 200
Nashville, Tennessee 37203
(615) 254-8801
mstewart@bsjfirm.com
Representing the Tennessee Plaintiffs

## Page 3

A P P E A R A N C E S: (cont'd)
DECHERT LLP
BY: ERIK SNAPP, ESQUIRE
35 West Wacker Drive, Suite 3400
Chicago, Illinois 60601-1634
(312) 646-5828
erik.snapp@dechert.com
    - AND -
BY: ALYSSA CLARK, ESQUIRE
1095 Avenue of the Americas
New York, New York 10036-6797
(212) 641-5673
alyssa.clark@dechert.com
Representing the Defendant,
Purdue and the witness

WILLIAMS & CONNOLLY LLP
BY: COLLEEN MCNAMARA, ESQUIRE
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5186
cmcnamara@wc.com
Representing the Defendant,
Cardinal Health

JONES DAY
BY: MARK W. DEMONTE, ESQUIRE
77 West Wacker
Chicago, Illinois 60601-1692
(312) 269-4232
mdemonte@jonesday.com
Representing the Defendant, Walmart

COVINGTON & BURLING LLP
BY: ALEXANDER SETZEPFANDT, ESQUIRE
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1285
asetzepfandt@cov.com
Representing the Defendant,
McKesson Corporation

## Page 4

A P P E A R A N C E S: (cont'd)

ALLEGAERT BERGER & VOGEL LLP
BY: CHRISTOPHER ALLEGAERT, ESQUIRE
    LUCY N. ONYEFORO, ESQUIRE
111 Broadway, 20th Floor
New York, New York 10006
(212) 616-7050
callegaert@abv.com
Representing the Defendant,
Rochester Drug Co-operative, Inc.

ARNOLD & PORTER KAYE SCHOLER LLP
BY: SAMUEL LONERGAN, ESQUIRE
250 West 55th Street
New York, New York 10019-9710
(212) 836-7591
samuel.lonergan@arnoldporter.com
Representing the Defendants, Endo
Health Solutions; Endo
Pharmaceuticals, Inc.; Par
Pharmaceutical Companies, Inc. f/k/a
Par Pharmaceutical Holdings, Inc.

ALSO PRESENT: HENRY MARTE, VIDEOGRAPHER

        – – –

## Page 5

TELEPHONIC APPEARANCES:

HUGHES HUBBARD & REED LLP
BY: TINA M. SCHAEFER, ESQUIRE
2345 Grand Boulevard, Suite 2000
Kansas City, Missouri 64108-2663
(816) 709-4159
tina.schaefer@hugheshubbard.com
Representing the Defendant,
UCB, Inc.

OFFICE OF THE SOUTH CAROLINA
ATTORNEY GENERAL
BY: ANNEMARIE B. MATHEWS, ESQUIRE
    REBECCA MCCORMACK, ESQUIRE
Assistant Attorney General
Consumer Protection and
Antitrust Division
P.O. Box 11549
Columbia, South Carolina 29211-1549
803-734-3679
AMathews@scag.gov
Representing the State of South Carolina

REED SMITH LLP
BY: SAMANTHA L. ROCCHINO, ESQUIRE
Three Logan Square
1717 Arch Street
Philadelphia, Pennsylvania 19103
(215) 851-8262
srocchino@reedsmith.com
Representing the Defendant,
AmerisourceBergen Drug Corp.
NELSON MULLINS
BY: AMANDA S. KITTS, ESQUIRE
Meridian, 17th Floor
1320 Main Street
Columbia, South Carolina 29201
(803) 255-9594
amanda.kitts@nelsonmullins.com
Representing the Defendants, Purdue Pharma L.P.;
Purdue Pharma, Inc.; The Purdue Frederick Company

1 TELEPHONIC APPEARANCES (cont'd)
2
3 ROPES & GRAY LLP
  BY: SEAN B. KENNEDY, ESQUIRE
  Prudential Tower
4 800 Boylston Street
  Boston, Massachusetts 02199
5 sean.kennedy@ropesgray.com
  (617) 951-7282
6 Representing the Defendant,
  Mallinckrodt
7
8 FOX ROTHSCHILD, LLP
  BY: MAURA L. BURKE, ESQUIRE
9 2000 Market Street
  20th Floor
10 Philadelphia, Pennsylvania 19103-3222
  mburke@foxrothschild.com
11 (215) 299-2872
  Representing the Defendant,
12 Validus Pharmaceuticals
13
  CLARK MICHIE LLP
14 BY: BRUCE CLARK, ESQUIRE
     CHRISTOPHER J. MICHIE, ESQUIRE
15 220 Alexander Street
  Princeton, New Jersey 08540
16 (609) 423-2142
  Representing the Defendant,
17 Pernix Therapeutics Holdings, Inc.
18
19
20
21
22
23
24

1           I N D E X
2 WITNESS                    PAGE
3 RICHARD J. FANELLI, Ph.D.
4     By Ms. Dickinson       17
5     By Mr. Stewart        248
6         E X H I B I T S
7 NO.     DESCRIPTION        PAGE
8 Purdue
9 Fanelli-1   Amended Notice of
              Deposition Pursuant to
10            Rule 30(B)(6) and Document
              Request Pursuant to Rule
11            30(B)(2) and Rule 34 to
              Defendants Purdue Pharma,
12            L.P., Purdue Pharma Inc,
              and The Purdue Frederick
13            Company            20
14 Purdue
   Fanelli-2   Skipped
15 Purdue
   Fanelli-3   Skipped
16
17 Purdue
   Fanelli-4   Curriculum Vitae of
18            Richard J. Fanelli, Ph.D.
              PPLPC001000074386      19
19 Purdue
   Fanelli-5   Purdue's Supplemental
20            Responses and Objections
              to Plaintiff's Amended
21            Notice of Deposition Pursuant
              to Rule 30(B)(6) and Document
22            Request Pursuant to Rule
              30(B)(2) and Rule 34    24
23 Purdue
   Fanelli-6   Box of documents produced
24            at deposition by witness   26

1        E X H I B I T S (cont'd)
2 NO.     DESCRIPTION        PAGE
3 Purdue
  Fanelli-7   Second Amended Corrected
4            Complaint          37
5 Purdue
  Fanelli-8   The Purdue Frederick Company
6            & Associated Companies
             Organizational Charts
7            dated June 1995
             PKY181872592        46
8
9 Purdue
  Fanelli-9   Purdue Organizational Charts
10           August 2004
             PURCHI-003290806     56
11 Purdue
   Fanelli-10  Purdue Organizational Charts
12            January 2007
              PURCHI-003290143    70
13
14 Purdue
   Fanelli-11  Purude Organizational Charts
15            January 2010
              PURCHI-000000454    74
16 Purdue
   Fanelli-12  Original lable for OxyContin
17            PKY183226682        78
18 Purdue
   Fanelli-13  Information
19            United States of America
              v. The Purdue Frederick
20            Company, et al.      82
21 Purdue
   Fanelli-14  Plea Agreement
22            United States of America
              v. The Purdue Frederick
23            Company, et al.      82
24

1        E X H I B I T S (cont'd)
2 NO.     DESCRIPTION        PAGE
3 Purdue
  Fanelli-15  Agreed Statement of Facts
4            United States of America
             v. The Purdue Frederick
5            Company, et al.      82
6 Purdue
  Fanelli-16  The New York Times Article,
7            "Origins of an Epidemic:
             Purdue Pharma Knew Its
8            Opiods Were Widely Abused"
             dated May 29, 2018   89
9
10 Purdue
   Fanelli-17  Freedom of Information Act
11            request, with NDA documents
              for the original Oxycontin
12            dated January 11, 1996
              PURCHI-000667209    104
13 Purdue
   Fanelli-18  E-mail string, top one
14            dated 6/16/99
              Subject, RE: INATE OxyContin/
15            Studies
              PKY181376452        127
16
17 Purdue
   Fanelli-19  Spreadsheet, OxyContin studies
18            PPLPC016000115515   143
19 Purdue
   Fanelli-20  Oxycontin clinical studies
20            PPLPC013000138890   149
21 Purdue
   Fanelli-21  Memo dated 4/4/95
22            Subject, Launch Team Meeting
23            3/31/95 Minutes (no Bates) 153
24

**Page 10**

E X H I B I T S (cont'd)
NO.        DESCRIPTION        PAGE

Purdue
Fanelli-22  Protocol No. OC88-ll05
dated 2/14/89
PKY181908491        157

Purdue
Fanelli-23  Topic No. 10: Identification
of policies and procedures
for interacting with the
FDA, DEA, and DOJ and the
identity of those responsible
for doing so (no Bates)        167

Purdue
Fanelli-24  NOA/ANDA/SNDA Regulatory
Requirements dated 11/22/16
PPLP004390691        168

Purdue
Fanelli-25  Initial IND Submission -
Regulatory Requirements
dated 11/22/16
PPLP004390687        168

Purdue
Fanelli-26  Preparing and Submitting
Advertising and Promotional
Labeling to the FDA
PPLP004404325        168

Purdue
Fanelli-27  Slide deck, Program
Management
FDA Advisory Committee
Meeting Playbook
dated 12/15/15
PPLPC001000254384        168

Purdue
Fanelli-28  Finance & Accounting
Standard Operating Procedures
Manual, Revision dated
3/12/03

**Page 11**

E X H I B I T S (cont'd)
NO.        DESCRIPTION        PAGE

Purdue
Fanelli-29  Identifying, Evaluating
and Reporting Suspicious
Orders, 9/25/17
PPLP004385464        183

Purdue
Fanelli-30  SOP, Subject: Abuse and
Diversion Detection
effective September 2015
PPLP004035073        183

Purdue
Fanelli-31  SOP, Subject: Order
Management System
effective 2/29/16
PPLPD000006141        183

Purdue
Fanelli-32  SOP, Subject: Abuse and
Diversion Detection
effective 6/15/07
PPLP003429997        199

Purdue
Fanelli-33  SOP, Subject: Indicators
of Possible Diversion
effective 11/1/02
PPLP003430434        200

Purdue
Fanelli-34  Warning Letter dated
11/20/96 MS Contin
(no Bates)        209

Purdue
Fanelli-35  FDA letter dated
5/11/00 (no Bates)        212

Purdue
Fanelli-36  FDA Fax and letter 5/15/00
PPLPC005000006728        215

**Page 12**

E X H I B I T S (cont'd)
NO.        DESCRIPTION        PAGE

Purdue
Fanelli-37  Purdue Response to
FDA Comments dated
5/25/00
PPLPC029000048298        215

Purdue
Fanelli-38  FDA Fax and letter
6/28/00
PKY182037715        215

Purdue
Fanelli-39  FDA Fax and warning letter
12/24/02
PDD8013020701        219

Purdue
Fanelli-40  Letter dated 1/14/03
Re: OxyContin Professional
Advertising
PKY181434547        223

Purdue
Fanelli-41  FDA Warning letter
1/17/09
PKY183262725        223

Purdue
Fanelli-42  Purdue Response to
FDA Letter, dated 1/24/03
PDD1501755008        223

Purdue
Fanelli-43  FDA letter 1/29/03
PKY181712928        223

Purdue
Fanelli-44  FDA letter 1/28/03
PKY181712931        223

**Page 13**

E X H I B I T S (cont'd)
NO.        DESCRIPTION        PAGE

Purdue
Fanelli-45  Purdue Sales memo
dated 2/4/03
PKY181928823        223

Purdue
Fanelli-46  Purdue Regulatory
Affairs fax dated
3/6/03, with Dear
Healthcare Practitioner
letter dated January 2003
PD08013023433        223

Purdue
Fanelli-47  REG-SOP-0060 dated
8/1/16
PPLP004385528        233

Purdue
Fanelli-48  Brochure, "Partners Against
Pain"
PPLP000135167        248

Purdue
Fanelli-49  Brocure, "A Policymaker's
Guide to Understanding
Pain & Its Management"
(no Bates)        248

Purdue
Fanelli-50  Brochure, "Treatment Options:
A Guide for People Living
with Pain"        248

Purdue
Fanelli-51  "Complexities of Caring for
People in Pain"
PTN000005311        248

E X H I B I T S (cont'd)

NO.      DESCRIPTION      PAGE

Purdue
Fanelli-52  "Exit Wounds" by
Derek McGinnis
PTN000023058      248

Purdue
Fanelli-53  Purdue letter dated
5/28/13
PPLP000233078      265

Purdue
Fanelli-54  Appendix C
Epidemiologic and Other
Studies of the Real World
Impact of Reformulated
OxyContin, with Exhibits
C-1 through C-15
PPLP000238101      285

Purdue
Fanelli-55  Purdue General Correspondence:
Notification of Citizen
Petition with Exhibits
Attached, dated 10/25/13
PPLP000238281      286

Purdue
Fanelli-56  Purdue's Response to FDA's
Information Request
PPLP000473812      292

Purdue
Fanelli-57  E-mail string, top one
dated 4/18/02
8839149154      306

E X H I B I T S (cont'd)

NO.      DESCRIPTION      PAGE

Purdue
Fanelli-58  Purdue General Correpondence:
Evaluation of the
Relationship Between Prescribed
Opioid Dose and Risk of
Opioid Overdose in Patients
PPLP000236539      327

Purdue
Fanelli-59  E-mail string, top
one dated 2/26/16
PPLPC005000224837      332

– – –

THE VIDEOGRAPHER:  We are now on the record.  My name is Henry Marte, I'm a videographer with Golkow Litigation Services.  Today's date is December 6, 2018, and the time is 9:09 a.m.  This videotaped deposition is being held at 1095 Avenue of the Americas, New York, New York in the matter of National Prescription Opiate Litigation.

The deponent today is Richard Fanelli.  All appearances will be noted on the stenographic record.  The court reporter will now administer the oath to the witness.

... RICHARD J. FANELLI, PH.D., having been duly sworn as a witness, was examined and testified as follows:

MR. SNAPP:  Before we get started, can I just confirm that everyone who is present either in person or on the phone agrees to be bound by the terms of the confidentiality protective orders either in the MDL or in the applicable state court

litigation.  If that's not the case, please speak up now.

Hearing nothing, please proceed.

MS. DICKINSON:  Thanks.

BY MS. DICKINSON:

Q.    Dr. Fanelli, my name is Erin Dickinson.

We haven't met before today, correct?

A.    Correct.

Q.    Okay.  I represent the plaintiffs in the piece of litigation that the court reporter just read off at the beginning of this deposition.

Do you understand that?

A.    Yes.

Q.    Okay.  Have you ever been deposed before?

A.    Yes.

Q.    Okay.  How many times?

A.    Twice.

Q.    Okay.  And in what cases?

A.    There were two patent litigation cases.

1 Q. Okay. Do you recall roughly what
2 years?
3 A. Probably within the last three
4 years.
5 Q. And who is your current employer?
6 A. Purdue Pharma.
7 Q. Since you've been deposed on
8 several different occasions, you may remember
9 some of the basic rules, but I typically go over
10 them at the beginning, just to make sure we
11 understand each other, okay?
12 A. Yes.
13 Q. We have to give verbal answers to
14 the questions so the court reporter can take
15 them down.
16 Do you understand that?
17 A. Yes, I do.
18 Q. Nods of the head or uh-uhs or
19 uh-huhs do not work, correct?
20 A. That's right.
21 Q. Okay.
22 A. I may do them but...
23 Q. We're not doing a great job so
24 far, but we can't talk over each other as well.

1 So if you will wait until I finish my question
2 and you start your answer after that, I will try
3 to do the same. I know it's very hard, okay?
4 A. Got it.
5 Q. If you at any point don't
6 understand the questions I'm asking, please ask
7 me to rephrase the question. I will assume if
8 you answer that you've understood what I'm
9 asking.
10 Is that fair?
11 A. Yes.
12 Q. Okay. All right. And we're
13 going to have to do a little shuffling with the
14 exhibits today. We're really far across the
15 table from each other.
16 So we're going to hand you what's
17 been marked as Exhibit 4 to your deposition.
18 (Document marked for
19 identification as Exhibit
20 Purdue-Fanelli-4.)
21 BY MS. DICKINSON:
22 Q. And I believe in Exhibit 4 is a
23 copy of your CV; is that correct?
24 A. Yes.

1 Q. Is that a current, accurate copy
2 of your CV?
3 A. Yes.
4 MR. SNAPP: Do you have a copy
5 for me?
6 THE WITNESS: I'm noticing --
7 MS. DICKINSON: Oh, here.
8 MR. SNAPP: Thanks.
9 THE WITNESS: I don't know if I
10 updated my CV, but as of 2014, my title
11 is now head of regulatory affairs.
12 BY MS. DICKINSON:
13 Q. Okay. Other than that change,
14 does the work history summarized in this CV,
15 Exhibit 4, accurately represent your employment
16 history?
17 A. Yes.
18 Q. Okay. I'm going to hand you
19 what's been marked as Exhibit 1.
20 (Document marked for
21 identification as Exhibit
22 Purdue-Fanelli-1.)
23 THE WITNESS: Do you need these
24 back?

1 BY MS. DICKINSON:
2 Q. You may keep those. Here come
3 the copies.
4 A. That's for you.
5 Q. Okay. Dr. Fanelli, you
6 understand you've been designated on behalf of
7 several entities, Purdue Pharma, L.P., Purdue
8 Pharma, Inc. and the Purdue Frederick Company to
9 provide those corporations' testimony under
10 Federal Rule of Civil Procedure 30(b)(6),
11 correct?
12 A. Yes.
13 Q. Okay. And can we have an
14 agreement today that when I use the term Purdue,
15 that that references those three entities so I
16 don't have to continually say the names of those
17 companies over and over again; is that okay?
18 A. Yes.
19 Q. Okay. If one of your answers
20 requires a specific response as to a specific
21 company, certainly let me know, but we're just
22 trying to make this a little cleaner and easier
23 today; is that okay?
24 A. Yes.

1    Q.    Okay.  You understand that the
2  testimony you're going to give today is the
3  testimony of those three corporate entities,
4  Purdue Pharma, L.P., Purdue Pharma, Inc. and the
5  Purdue Frederick Company, not testimony just
6  based on your individual knowledge, correct?
7    A.    Yes.
8    Q.    You understand that the answers
9  you're going to give today under oath will be
10  binding on those three companies, correct?
11    A.    Yes.
12    Q.    All right.  I've handed you what
13  we've marked as Exhibit 1.  That document is the
14  Amended Notice of Deposition pursuant to Rule
15  30(b)(6) and document request pursuant to Rule
16  30(b)(2) and Rule 34 to defendants, Purdue
17  Pharma, L.P., Purdue Pharma, Inc. and the Purdue
18  Frederick Company.
19         Do you see that?
20    A.    Yes.
21    Q.    Okay.  Were you provided with a
22  copy of that notice that we've marked as Exhibit
23  1?
24    A.    Yes.

1    Q.    When were you provided with that?
2    A.    Prior -- I don't remember the
3  exact date.  It was several months ago when I
4  met with the attorneys here from Dechert.
5    Q.    And is it your understanding that
6  you are being offered to provide Purdue's
7  testimony on topics I have 7, 10, 30, 37, 38 and
8  44 of that notice?  I'll get to --
9    A.    Okay.
10    Q.    -- the topic we talked about this
11  morning in just a minute.
12    A.    Yes.
13    Q.    Okay.  And prior to the
14  deposition, counsel informed me that you had
15  also been designated I think several weeks ago
16  on topic --
17         MS. DICKINSON:  Can you remind
18    me, was it --
19         MR. SNAPP:  Twenty-nine.
20         MS. DICKINSON:  Twenty-nine.
21  BY MS. DICKINSON:
22    Q.    Okay.  Counsel and I had a
23  discussion this morning that we would continue
24  your 30(b)(6) testimony just on that particular

1  topic till tomorrow.
2         MS. DICKINSON:  And, counsel, is
3    that our agreement?
4         MR. SNAPP:  Yes.
5  BY MS. DICKINSON:
6    Q.    Okay.  Today we're going to cover
7  topics 7, 10, 30, 37, 38 and 44 of the notice,
8  okay?
9    A.    Okay.
10    Q.    Okay.  And counsel also asked,
11  for the record, if I would mark Purdue's
12  supplemental responses and objections to the
13  notice that is Exhibit 1.  I have marked it as
14  Exhibit 5 to your deposition, and we'll pass
15  that to you now.  I don't have copies of this.
16         (Document marked for
17    identification as Exhibit
18    Purdue-Fanelli-5 )
19  BY MS. DICKINSON:
20    Q.    Dr. Fanelli, is there anything
21  today that would prevent you from giving
22  accurate testimony?
23    A.    No.
24    Q.    Let's briefly, and I mean

1  briefly, go through what you did to prepare for
2  the testimony on these topics.
3         First, did you meet with counsel?
4    A.    Yes.
5    Q.    On how many times?
6    A.    A handful.  I wasn't counting.
7  Under ten, I would think.
8    Q.    And over the last several months?
9    A.    Yes, started late summer, I think
10  because my original deposition was scheduled
11  prior to this date.
12    Q.    Did you review any documents in
13  preparation for your deposition?
14    A.    Yes.
15    Q.    Okay.  Exhibit 1 has a schedule,
16  Schedule B, and it's -- that Schedule B asks you
17  to bring all documents which the deponent,
18  that's you, has consulted or reviewed or plans
19  to consult in preparation for his or her
20  deposition and has relied upon or will rely upon
21  for testimony on the above deposition topics.
22         Do you see that, Schedule B is on
23  page 22 of Exhibit 1?
24    A.    Sorry.

Page 26

1  Q.   Take your time.
2  A.   Yes.
3  Q.   Okay.  And have you brought those
4  documents here today?
5  A.   Yes.
6      (Document marked for
7      identification as Exhibit
8      Purdue-Fanelli-6.)
9  BY MS. DICKINSON:
10  Q.   Okay.  The record will reflect
11  the witness brought several boxes of documents
12  here today and they were provided to us this
13  morning.  We have marked those documents as
14  Exhibit 6, and the court reporter will copy
15  those documents that Dr. Fanelli brought with
16  him today as Exhibit 6.
17      Generally, what are -- what is in
18  that file that you brought with you today?
19  A.   Documents that I looked at when
20  meeting with the attorneys.  It lists that are
21  related to these 30(b)(6) topics.
22      MR. SNAPP:  I'm sorry to
23      interrupt.  I heard someone beep in.
24      Did someone join on the phone?

Page 27

1  BY MS. DICKINSON:
2  Q.   And are there any documents that
3  you reviewed or relied upon in getting ready for
4  your testimony today that are not included in
5  Exhibit 6?
6  A.   No.
7  Q.   If at any time during your
8  testimony you need to refer to documents in that
9  box, will you please let me know what it is you
10  are referring to so the record could show what
11  we're looking at; is that fair?
12  A.   Yes.
13  Q.   All right.  We discussed a few
14  minutes ago that you're here to testify on
15  behalf of Purdue on certain topics.  I think
16  we're going to start and just go through those
17  topics, and that's what we're going to do for
18  the balance of today.
19      The first one that you've been
20  identified to testify about is topic 7.  Could
21  you turn to that topic, or if you have a list of
22  the topics, that's fine.
23  A.   I have.
24  Q.   And I'm just going to read in for

Page 28

1  the record the language of that topic that you
2  will be providing testimony on.
3      Topic 7 says, the identity of all
4  persons who were responsible for testing the
5  safety and efficacy of opioid products for
6  long-term use or for chronic pain, or who
7  received reports, test results, studies or any
8  other documentation regarding the testing of
9  safety and efficacy of opioid products for
10  long-term use or chronic pain -- I'm sorry --
11  for chronic pain or long-term use and the
12  results of any such testing.
13      Have I now read that accurately,
14  with the last mistake there at the end?
15      MR. SNAPP:  Just to clarify, I
16      don't want to interrupt, but our
17      objections that we marked as Deposition
18      Exhibit 5 used slightly different
19      language in our response and our
20      designation of Dr. Fanelli, so he's
21      prepared to testify consistent with the
22      language that's included in our
23      supplemental responses and objections
24      that have been marked as Deposition

Page 29

1  Exhibit 5.
2      MS. DICKINSON:  Okay.
3  BY MS. DICKINSON:
4  Q.   So, Dr. Fanelli, you are not here
5  today prepared to testify on topic 7 as written;
6  is that correct?
7  A.   It's -- yes, it's slightly
8  modified.
9      MS. DICKINSON:  I'm probably
10      going to need the copy of your
11      objections back, since we only have one.
12      And, for the record, counsel
13      stated that Dr. Fanelli is not here
14      prepared to testify on topic 7 as
15      written, but that he is here prepared to
16      testify on topic 7 as rewritten in
17      response to topic number 7 contained in
18      Exhibit -- is it 5?  Five, that were
19      served on November 15th, 2018.
20      That response reads, Purdue
21      designates Richard Fanelli, Ph.D. to
22      provide testimony regarding the identity
23      of those responsible for, or who
24      received reports, test results, studies

1 or other documentation regarding the
2 testing of the safety and efficacy of
3 OxyContin, Hysingla and Butrans for
4 long-term use or for chronic pain.
5 Counsel, could you please
6 summarize what the limitation that
7 you're placing on his testimony of topic
8 7 is, please.
9 MR. SNAPP: I'm not putting any
10 limitation other than what's included in
11 our objections that are marked as
12 Deposition Exhibit 5, so he's prepared
13 to testify on topic 7 as well as topics
14 10, 29, 30, 37, 38 and 44 as worded in
15 our supplemental responses and
16 objections served on November 15th that
17 have been marked as Deposition Exhibit
18 5.
19 MS. DICKINSON: But he is not
20 here prepared to testify on topic number
21 7 as written in the amended notice
22 marked as Exhibit 1, correct?
23 MR. SNAPP: He's here to testify
24 consistent with Exhibit 5.

1 MS. DICKINSON: Well, I think
2 we'll start asking questions, and where
3 he's not prepared, you can let me know.
4 It's the best way I can think to go
5 about this. We may have to come back,
6 but we'll try.
7 BY MS. DICKINSON:
8 Q. Dr. Fanelli, we're going to start
9 with topic 7. We're going to try to break it up
10 in pieces, so it's a long topic and it has
11 varying subparts. If you're not prepared to
12 testify about a certain subpart, then you can
13 let me know, okay?
14 A. Yes.
15 Q. Let's talk about a couple
16 preliminary matters related to this particular
17 topic.
18 Would you agree with me that a
19 pharmaceutical company like Purdue has a
20 responsibility to ensure the safety and efficacy
21 of the drugs that they sell?
22 A. Yes.
23 Q. Would you agree with me that a
24 pharmaceutical company like Purdue who markets

1 and sells a drug has the primary responsibility
2 to ensure that the drugs that they are selling
3 are safe and efficacious?
4 A. The pharmaceutical company
5 presents evidence of the safety and efficacy of
6 its products that the FDA evaluates in a
7 benefit-risk assessment in the approval of the
8 product.
9 Q. I'm asking a little different
10 question.
11 I understand the FDA exists, but
12 I'm asking does a pharmaceutical company who
13 intends to market and sell a drug, does that
14 company bear the primary responsibility of
15 ensuring that a drug is safe and efficacious?
16 MR. SNAPP: Object to the form,
17 scope.
18 THE WITNESS: The pharmaceutical
19 company's responsibility is to provide
20 the evidence, investigate of their
21 products.
22 BY MS. DICKINSON:
23 Q. Do you disagree that the
24 pharmaceutical company like Purdue who markets

1 and sells a drug has the primary responsibility
2 for its safety and efficacy?
3 MR. SNAPP: Object to the form.
4 Beyond the scope.
5 THE WITNESS: Could you repeat
6 the question. Sorry.
7 BY MS. DICKINSON:
8 Q. I'm trying to get at who has the
9 ultimate responsibility for the safety and
10 efficacy of the drugs that Purdue is selling?
11 MR. SNAPP: Object to the form.
12 THE WITNESS: I would -- yes, the
13 pharmaceutical company is responsible
14 for demonstrating the safety and
15 efficacy.
16 BY MS. DICKINSON:
17 Q. Let's turn to topic 7, and I'm
18 going to turn to topic 7 in the notice marked as
19 Exhibit 1 so we're consistent here.
20 In topic 7 there are some
21 capitalized terms, opioid and opioid products.
22 Did you see that?
23 A. Yes, I see it.
24 Q. Okay. And do you understand what

Page 34

1 the definition of the capitalized term opioid
2 products in that topic is asking about?
3     A.    Yes.
4     Q.    Okay.  And what are those
5 products?
6     A.    Opioid products are products that
7 contain opiate pharmaceutical agent.
8     Q.    I'm sorry, I wasn't very clear.
9 For the purpose of this topic, opioid products
10 is a capitalized term and has a definition
11 contained in this notice and lists what we're
12 talking about here.
13            Were you provided by counsel or
14 did you come to understand what that defined
15 term means when we're asking about that in this
16 topic?
17     A.    Yes.
18     Q.    Okay.  And what are the drugs
19 we're talking about with respect to this topic?
20        MR. SNAPP:  I'm sorry.  Just so
21        the record is clear, do you want him to
22        look at the opioid products definition
23        on page 3 of the document?
24        MS. DICKINSON:  Well, I assume

Page 35

1        he's here prepared to answer the
2        question, so I was trying to make it a
3        little easier.
4 BY MS. DICKINSON:
5     Q.    If you have an understanding of
6 what products we're talking about today, that
7 would be helpful for you to give it to me;
8 otherwise, we can go back and read the
9 definitions.
10     A.    I'd like to go back and look at
11 the definition.
12     Q.    Okay.  All right.  So let's turn
13 to page 3.  I'm sorry, that's not correct.
14 Definitions are starting at Schedule A and
15 paragraphs 15 and 16.
16            Do you see that?
17     A.    Yes.
18     Q.    Okay.  And there is in paragraph
19 15 a definition of opioid, correct?
20     A.    Yes.
21     Q.    In paragraph 16 there's a
22 definition of opioid products, and that
23 definition for the purpose of this notice refers
24 to the opioids that you, that means Purdue,

Page 36

1 sold, promoted, marketed, manufactured, or
2 distributed.  This includes coatings, capsule
3 configurations, delivery systems or mechanisms
4 that include but are not limited to anti-abuse,
5 tamper resistance and crush-proof mechanisms and
6 mechanisms to deter immediate release.  Opioid
7 products is also intended to include rescue
8 medication for break through pain.
9            Have I read that correctly?
10     A.    Correct.
11     Q.    And the definition in 16 refers
12 to opioids as a capitalized term, correct?
13     A.    Yes.
14     Q.    So that capitalized term is
15 defined in 15, correct?
16     A.    Yes.
17     Q.    And in that term "opioid refers
18 to that class of drugs, legal or illegal,
19 natural or synthetic, used to control pain,
20 including, but not limited to, the drugs
21 referenced in Plaintiffs' Complaints in the
22 above-referenced matter."
23            Do you see that?
24     A.    Yes.

Page 37

1     Q.    Okay.  And were you provided with
2 the list of the drugs that Purdue marketed and
3 sold that are contained in the Complaint
4 referenced in the above-referenced matter?
5     A.    Yes.
6     Q.    Okay.  And what are those drugs?
7     A.    OxyContin, Butrans and Hysingla.
8     Q.    Okay.  I'm going to hand you what
9 has been marked as Exhibit 7.
10        (Document marked for
11        identification as Exhibit
12        Purdue-Fanelli-7.)
13 BY MS. DICKINSON:
14     Q.    Dr. Fanelli, I'll represent to
15 you that Exhibit 7 is the Second Amended
16 Corrected Complaint filed in this matter.
17            Do you see that?
18     A.    Yes.
19     Q.    And let's turn to, if you would,
20 paragraph 40.
21            Do you see that?
22     A.    Yes.
23     Q.    Okay.  And in paragraph 40 the
24 drugs that are listed for Purdue in the Amended

1  Complaint are OxyContin, MS Contin, Dilaudid,
2  Dilaudid HP, Butrans, Hysingla ER and Targiniq
3  ER.
4         Do you see that?
5     A.  Yes.
6     Q.  Okay.  Are you prepared to offer
7  testimony on these topics on all of those drugs?
8     A.  Yes.
9     Q.  Let's talk briefly about when
10 each of those drugs were sold.  MS Contin was
11 sold from 1987 to roughly what date?
12        MR. SNAPP:  Objection, beyond the
13     scope.
14        Go ahead.
15 BY MS. DICKINSON:
16    Q.  Go ahead.
17    A.  MS Contin is currently being
18 marketed.
19    Q.  So 1987 to present would be
20 accurate?
21    A.  I'm not a -- I'm not exactly sure
22 of the launch date of the product.
23    Q.  Do you know roughly the dates
24 OxyContin has been sold?

1     A.  It was approved in '95 and
2  continues to be sold, a reformulated version of
3  OxyContin.
4     Q.  Butrans was sold from roughly
5  2010 to present; is that correct?
6     A.  Correct.
7     Q.  Do you know roughly the years
8  Dilaudid was sold by Purdue?
9     A.  I don't remember -- Purdue end
10 licensed Dilaudid from Abbott, I believe, and I
11 don't remember the years.
12    Q.  Would 1984 to present sound
13 reasonable to you?
14        MR. SNAPP:  Object to the form.
15        THE WITNESS:  I don't remember
16     the date it started.
17 BY MS. DICKINSON:
18    Q.  What about Hysingla, when has
19 Hysingla been sold and marketed by Purdue?
20    A.  Hysingla is currently continues
21 to be sold.  I don't remember the approval date.
22    Q.  I have 2014.
23        Does that sound accurate to you?
24    A.  It does.

1     Q.  I also have 2014 to present as
2  the dates that Targiniq was sold.
3         Does that sound accurate?
4     A.  That is not accurate.
5     Q.  Okay.  How is it -- what dates
6  was that product sold between?
7     A.  Targiniq has not been
8  commercialized or sold.
9     Q.  So today, just to make it easier,
10 when I'm asking you about a particular drug,
11 let's take OxyContin, unless I specify
12 otherwise, you know, by giving you a date, I'm
13 asking you for your answer regarding the entire
14 time period for that drug.
15        Does that make sense?
16    A.  Yes.
17    Q.  Okay.  And can we agree that's
18 what I'm asking unless I ask you about specific
19 years or dates?
20    A.  Yes.
21    Q.  Okay.  All right.  Let's talk
22 about -- we're going to break this up in pieces,
23 topic 7.  Part of topic 7 asked you to identify
24 all persons who were responsible for the testing

1  for safety and efficacy of these drugs we just
2  talked about, correct?
3     A.  Yes.
4     Q.  Okay.  Who -- who are the
5  persons -- and let's talk about this, I want
6  this to be as efficient as possible.  We could
7  start at the department level, if that makes
8  sense.  If it's literally a person or persons,
9  you can let me know, but let's start with the
10 departments that are responsible for the testing
11 regarding safety and efficacy, and we'll just
12 run through each of the drugs.
13        Is that okay?
14    A.  Sure.
15    Q.  Okay.  So who was responsible for
16 the testing of the safety and efficacy for MS
17 Contin?
18        MR. SNAPP:  Object to the form.
19        THE WITNESS:  What would be
20     helpful is to refer to the org charts
21     that we presented.
22 BY MS. DICKINSON:
23    Q.  Sure.
24    A.  And especially around

1 departments. As you stated, there's a long, you
2 know, period of time and individuals and
3 departments varied over the history, and I think
4 that would be helpful.
5     Q.    Absolutely, if you need to refer
6 to a document, let's look.
7        MR. SNAPP: So what time period
8 do you want him to ask -- answer the
9 question for?
10        MS. DICKINSON: I'm asking for
11 the entire time period for MS Contin who
12 was responsible, what department for the
13 safety -- the testing for safety and
14 efficacy for that product.
15        MR. SNAPP: So do you want him to
16 start with the '95 --
17        THE WITNESS: When it was
18 approved --
19        MR. SNAPP: -- org charts and
20 work all the way through the 2017 org
21 charts?
22        MS. DICKINSON: Sure. I mean,
23 I'm just asking for the answer. I don't
24 know what I want him to look at. He's

1 the one that looked at the documents.
2 BY MS. DICKINSON:
3     Q.    I don't know what you need to
4 look at.
5        MR. SNAPP: Well, to be fair, he
6 wasn't designated to testify on MS
7 Contin. He testified earlier that he's
8 prepared to do it, but he was not
9 designated to testify on MS Contin.
10        MS. DICKINSON: So are you going
11 to provide a different witness to
12 testify on that part of the topic?
13        MR. SNAPP: No, we're standing by
14 our objections.
15        MS. DICKINSON: So he's not going
16 to answer the question -- any questions
17 today on any of these topics with
18 respect to MS Contin?
19        MR. SNAPP: I didn't say that.
20 He told -- he testified earlier that
21 he's prepared to testify on those
22 topics. I'm saying that it's beyond the
23 scope of the designated -- his
24 designation so --

1        MS. DICKINSON: Then we'll move
2 on.
3        MR. SNAPP: If you want him to
4 testify on it, he can go through each of
5 the org charts, that's fine. Do you
6 want him to start with '95?
7 BY MS. DICKINSON:
8     Q.    Dr. Fanelli, can I ask you just a
9 question, is the -- are the departments
10 responsible going to change if -- by drug?
11     A.    Generally not.
12     Q.    Okay. Because that may make it
13 faster, because we have a number of drugs here,
14 ones we read off a few minutes ago that were in
15 the Complaint, right, and if the answer is that
16 the same departments and people were generally
17 responsible for the testing regarding safety and
18 efficacy, I don't want to have to go through
19 each, if that's possible.
20        Is that fair?
21     A.    Yes.
22     Q.    Okay. So why don't we try to do
23 this generally with respect to the drugs that we
24 listed in the Complaint, and if there is a time

1 when the responsibility lies outside of that
2 department you were describing, could you let me
3 know?
4     A.    Yes.
5     Q.    Okay. Let's try that. Okay. So
6 let's start in 1995. What were the departments
7 that were responsible for the testing of the
8 safety and efficacy of Purdue's opioid products
9 at that time?
10     A.    Do you have --
11     Q.    I don't have, but I think I'm
12 about to get a copy of whatever it is you're
13 looking at.
14     A.    So if we -- can I refer to the
15 index of this is the org chart from 1995.
16     Q.    Can I hand you an exhibit
17 sticker, please, to put on that document you're
18 looking at?
19        MR. SNAPP: What exhibit number
20 is this?
21        MS. DICKINSON: I just handed you
22 or you handed me but now we've marked a
23 document as Exhibit 8.
24        (Document marked for

Page 46

1    identification as Exhibit
2    Purdue-Fanelli-8.)
3    BY MS. DICKINSON:
4        Q.    And what is this document?
5        A.    This is an org chart from Purdue,
6    the Purdue Frederick Company from June of 1995.
7        Q.    Okay.  And we were talking about
8    the departments in 1995 who were responsible for
9    the testing for the safety and efficacy of
10   Purdue's opioid products.  So starting in 1995,
11   what were those departments?
12       A.    So the safety and efficacy, so
13   that includes both -- the majority of that,
14   those individuals were in the research and
15   development department and the -- if you look
16   under -- I was referring to the index.
17       Q.    Okay.
18       A.    All in the scientific and medical
19   affairs grouping.  So the clinical research
20   group would be the ones designing the clinical
21   trials.  Research and development are related to
22   early development of products, so the -- from
23   all the way from testing in nonhuman subjects,
24   animal studies all the way through -- all the

Page 47

1    way through the beginning of testing in humans.
2    That includes things like formulation,
3    development and so forth.
4            There's biostatistics and
5    clinical data management individuals.  Clinical
6    research would be running those trials, and the
7    group, the biostatistics would be analyzing
8    those trials and reporting on them.
9            And then regulatory affairs and
10   compliance while not conducting those -- you
11   were asking about conducting, so they wouldn't
12   be doing the trials, so I guess it would reside
13   in those departments.
14       Q.    What was the -- what is the
15   responsibility of the regulatory affairs
16   department with respect to clinical trials?
17       A.    Just clinical trials?  So --
18       Q.    I'm sorry, with respect to
19   testing or studies or clinical trials, I'm
20   talking pretty broadly here.
21       A.    Sure.  So testing -- prior to
22   testing in humans, so in animal studies, lab in
23   vitro studies and so forth, there's not much
24   oversight in regulatory affairs, although

Page 48

1    regulatory affairs would be involved in team
2    meetings and designing and looking at those
3    trials.  Regulatory affairs gets involved once
4    the studies are in humans, so in a more direct
5    way, because those studies cannot be conducted
6    without an investigational new drug application
7    in effect with the FDA, those are required.
8            So all of the protocols and so --
9    and information, including the nonclinical
10   information, is submitted to FDA prior to those
11   studies and all the protocols, so that's when
12   regulatory -- the bulk of regulatory's
13   involvement in that testing occurs.
14           In the compliance group it varies
15   over -- this is -- you asked about throughout
16   time and studies, at this time a compliance
17   group resided within regulatory affairs, it no
18   longer does, but that group is -- does auditing
19   of results but also monitors clinical trials for
20   conduct.
21       Q.    Okay.
22       A.    I think that's -- yeah, on this
23   sheet.  Do you want to --
24       Q.    Are there any other departments

Page 49

1    who have responsibility for the testing of the
2    safety and efficacy of opioid products other
3    than those we just talked about under scientific
4    and medical affairs at this point in time?
5            MR. SNAPP:  Object to the form.
6    BY MS. DICKINSON:
7        Q.    1995.
8        A.    I was going to ask what do you
9    mean by "responsibility"?
10       Q.    I'm just trying to find out who
11   had involvement.  So the topic basically -- and
12   I'll tell you where I'm going with this, if it
13   will make it easier.
14           We want to know the persons --
15   and by persons we can start with departments and
16   we can talk about how many people are in those
17   departments, that had involvement with the
18   testing for the safety and efficacy of Purdue's
19   opioid products.  That's just what we want to
20   find out is who at the company was involved in
21   that subject area.
22       A.    Understand.
23       Q.    So we know that the folks in
24   scientific and medical affairs were, and all I

Page 50

1 want to know is are there other departments at
2 this time in 1995 that would have been involved
3 in that subject area?
4    A.    So there are individuals and
5 executive -- I have to look at the chart. I
6 joined in 2000, but I -- so I have
7 understanding, though. There may have been some
8 executives who would not conduct or design but
9 might be involved in oversight or making
10 decisions, for instance, on direction of plan
11 and so forth.
12    Q.    And who would those executives
13 be?
14    A.    So let me look at -- there --
15 they would be heads of the departments. There's
16 an executive committee. I don't remember back
17 in '95, but I know when I joined it was in
18 existence, that included the heads of all the
19 departments, the vice presidents that are listed
20 there.
21    Q.    And when you say "there," where
22 are we looking?
23    A.    I'm sorry, on page -- doesn't
24 have a page number. It's the third page.

Page 51

1    Q.    Okay. Third page that's got a
2 number at the bottom --
3    A.    Actually, sorry.
4    Q.    Okay. Go ahead.
5    A.    The -- if you look at the -- yes,
6 I'm sorry, yeah, I see the numbers now. There's
7 three different numbers.
8    Q.    We can pick one.
9    A.    Pick the bottom one. The bottom
10 one that starts with PKY.
11    Q.    Sure.
12    A.    The last three numbers are 594.
13    Q.    Okay. And, for the record,
14 you're looking at PKY181872594?
15    A.    Correct.
16    Q.    And I'm sorry, your answer was
17 that some of the individuals on this page may
18 also had involvement in the testing for the
19 safety and efficacy of Purdue's opioid products
20 in some way?
21    A.    Not in the testing. So if we're
22 restricting to that, they wouldn't have done any
23 testing.
24    Q.    Did they receive results of

Page 52

1 testing?
2    A.    In instances where programs were
3 being assessed or decisions, high level
4 decisions, in other words, go, no go decisions
5 were made, they might have received summaries of
6 results.
7    Q.    When you're talking about go, no
8 go decisions, are you talking about
9 product-based decisions or test-based decisions?
10    A.    Product-based decisions.
11    Q.    And --
12    A.    For this level.
13    Q.    Who on this list on the page we
14 were just talking about that ends in 594 would
15 have been involved in those types of decisions?
16    A.    I'm not aware of the specifics
17 during this time period.
18    Q.    Okay. What do you mean by "this
19 time period"?
20    A.    In 1995.
21    Q.    Okay. You haven't prepared or
22 asked anyone in preparation for your deposition
23 about the time period 1995 to when you arrived
24 in 2000?

Page 53

1        MR. SNAPP: Object to the form.
2        THE WITNESS: Just this -- on
3    this particular issue, I didn't ask.
4 BY MS. DICKINSON:
5    Q.    Okay. Other than some of the
6 individuals on this page, 594, may have had
7 involvement with regarding testing as to safety
8 and efficacy and the department we talked about,
9 the scientific and medical affairs department.
10       In the time period 1995, were
11 there other departments at Purdue that had
12 involvement with testing for safety and efficacy
13 of Purdue's opioid products?
14    A.    Not that I'm aware of.
15    Q.    Okay. Your answers about the
16 1995 time period, how long were the departments
17 you identified responsible for the testing
18 regarding safety and efficacy? I'm just trying
19 to figure out where we're going next.
20    A.    So those departments or functions
21 were responsible throughout. So they may be --
22 the example I gave was compliance is no longer
23 in regulatory affairs; however, they're still
24 involved, but they're under drug safe -- a

Page 54

1 different department. So those functions are --
2 continue to be involved.
3    Q.   Got it.
4       How -- do you know how many
5 people in the scientific and medical affairs
6 department were involved in the testing for the
7 safety and efficacy of Purdue's opioid products?
8       MR. SNAPP: Object to the form.
9       THE WITNESS: We could look at
10    the -- these org charts. As I said, it
11    varied over time, but I don't have a
12    number in mind.
13 BY MS. DICKINSON:
14    Q.   So when we're trying to identify
15 all the persons who were responsible for testing
16 for the safety and efficacy of those products,
17 we can't identify those persons?
18    A.   We can from these org charts if
19 you want to look.
20    Q.   Okay. Let's do our best to try
21 and do that. Okay.
22       So to back up a minute, you said
23 from 1995 throughout the time period, do you
24 mean 1995 to present where these functions

Page 55

1 generally were the ones that touched safety and
2 efficacy testing; is that right?
3    A.   Yes, correct.
4    Q.   Okay. They may have moved -- for
5 example, compliance may have moved outside of
6 scientific and medical affairs, but compliance
7 still did touch upon safety and efficacy
8 testing; is that right?
9    A.   Correct.
10    Q.   Okay. Let's then go to -- you
11 said you had to refer to some other org charts
12 to tell me where the actual positions or persons
13 would reside that -- that were responsible for
14 testing of safety and efficacy, right?
15    A.   Correct.
16    Q.   Okay. Where do we look?
17    A.   Can I ask, can we look at an org
18 chart from when I joined Purdue or shortly
19 thereafter? Those individuals -- I mean, I know
20 many of these, but I'd be much more familiar and
21 be able to answer directly.
22    Q.   Sure, yeah, absolutely.
23    A.   So perhaps 2002, something. Is
24 that all right?

Page 56

1       MS. CLARK: How about 2001 or
2 2004?
3       THE WITNESS: 2004.
4       MR. SNAPP: Erin, would you like
5 to mark this?
6       MS. DICKINSON: Yes, please. And
7 I'll need a copy as well, if you don't
8 mind.
9       (Document marked for
10    identification as Exhibit
11    Purdue-Fanelli-9.)
12 BY MS. DICKINSON:
13    Q.   Dr. Fanelli, can I ask you a
14 quick question before we move on to what we've
15 just marked as Exhibit 9. Can I ask you a
16 question about Exhibit 8, the one we were just
17 looking at, the early 1995 organizational chart?
18    A.   Yes.
19    Q.   Okay. Where do I find the
20 corporate structure of the scientific and
21 medical affairs division on that org chart? It
22 appears to me to be page ending in 566, but am I
23 right about that?
24       MR. SNAPP: I think you switched

Page 57

1    sets of Bates numbers.
2       MS. DICKINSON: Oh, I'm sorry.
3       THE WITNESS: Yes.
4 BY MS. DICKINSON:
5    Q.   The set ending in 601.
6    A.   Yes.
7    Q.   Okay. For the record, we're
8 looking at PKY181872601; is that right?
9    A.   Correct. And...
10    Q.   Okay. And that page depicts the
11 individuals in the scientific and medical
12 affairs group at Purdue Pharma back in 1995; is
13 that right?
14    A.   Yes.
15    Q.   Okay. Are there any other
16 individuals that were in that division at that
17 time at Purdue that would not be depicted on
18 this page?
19    A.   Yes. If you -- on subsequent
20 pages there's drill down to -- if you look at
21 the header -- let's take the example of Robert
22 Kaiko on the far left there. If you look on the
23 next page, there's individuals under Robert
24 Kaiko, clinical research, that those individuals

1 are in his -- and there are subsequent pages
2 where those are described.
3    Q.    Okay.  And so we're clear, it
4 looks like all subsequent pages in this org
5 chart following the page that ends in 601 are
6 individuals in the scientific and medical
7 affairs group; is that right?
8    A.    I'll have to check each page.
9 Yes.
10    Q.    Okay.  So if I wanted to find all
11 of the persons that touched the safety and
12 efficacy testing for the opioid products, these
13 pages from PKY181872601 through the page that
14 ends in 608, that's where I find the totality of
15 those individuals; is that right?
16    A.    Correct.
17    Q.    Okay.
18    A.    Now, some of the individuals,
19 administrative assistants, you know, wouldn't
20 have done testing, of course, and so forth.
21    Q.    But it's not more than the
22 individuals --
23    A.    Correct.
24    Q.    -- listed in here, correct?

1    A.    Right.  It's a sub --
2    Q.    Okay.  Might be less?
3    A.    Correct.
4    Q.    Okay.  So if I wanted to know how
5 many folks at Purdue in the 1995 time period
6 spent time on testing for safety and efficacy,
7 it would be -- I could add up the folks on these
8 pages and it would be some number less than
9 that; is that accurate?
10    A.    That's accurate.
11    Q.    Okay.  All right.  Do you know
12 how long the organizational structure that is
13 listed in Exhibit 8 was in place?  I'm trying to
14 figure out where the next point in time was that
15 the medical affairs department, for example,
16 would have changed.
17    A.    I would -- I don't know when it
18 changed.
19    Q.    Okay.  Let's look at Exhibit 9,
20 and let's do the same thing for Exhibit 9, if
21 you would, in telling me what departments at
22 Purdue in this time period and it looks like
23 this time period, this is a chart from August of
24 2004; is that right?

1    A.    Yes, correct.
2    Q.    Okay.  And, if you would, tell me
3 the departments at this time that were
4 responsible for testing for safety and efficacy
5 of Purdue's opioid products.
6    A.    So, sorry, I'm trying to locate.
7    Q.    No, that's okay.
8    A.    This one doesn't have a table of
9 contents.
10        There's an R&D -- so if I just
11 look at the -- what's the number at the bottom?
12 It ends in 807, so the second page.
13    Q.    Okay.  And, for the record, we're
14 looking at the Bates number PURCHI003290807,
15 correct?
16    A.    Correct.
17    Q.    Okay.
18    A.    So if you look, individuals
19 reporting up to the chief executive officer,
20 Michael Friedman at the time, Fred Sexton's
21 department, technical operations would be
22 involved.  Those folks do some of the testing
23 around formulations and so forth.  And the -- it
24 says vacant at this time, executive vice

1 president, worldwide R&D and chief scientific
2 officer would be responsible for the other --
3 the clinical and so forth.
4        And then the regulatory at this
5 time were they in -- I believe we can look
6 further, but I think they were in that
7 department as well.
8    Q.    Okay.  Can I ask you, this
9 document is 2004.
10    A.    Mm-hmm.
11    Q.    You got to the company in 2000;
12 is that right?
13    A.    Correct.
14    Q.    Was the basic organizational
15 structure from 2000 to 2004 similar to what
16 we're looking at on this page that ends in 807?
17    A.    Yes.
18    Q.    Okay.
19    A.    Right.
20    Q.    So when I'm asking you questions
21 about the departments that had responsibility
22 for testing for safety and efficacy, that would
23 be true from at least 2000 to at what point in
24 time?

Page 62

1    A.    Around this time.  I believe
2  shortly after this, there was -- there were some
3  changes.
4    Q.    Okay.  So from 2000 to roughly
5  mid-2004, your answers will be the same,
6  correct?
7    A.    Yes.
8    Q.    Okay.  And you've identified the
9  R&D department and technical operations as the
10  two departments that would have been involved in
11  that, correct?
12    A.    Yes, right.
13    Q.    Previously medical affairs had
14  been the department that oversaw testing for
15  safety and efficacy, correct?  Scientific and
16  medical affairs, correct?
17    A.    Yes, I knew there was another
18  term, yeah.
19    Q.    And previous to the 2000 time
20  frame, Paul Goldenheim had headed up that
21  division, scientific and medical affairs; is
22  that right?
23    A.    Correct.
24    Q.    Is he still with the company?

Page 63

1    A.    No.
2    Q.    When did he leave?
3    A.    I believe it was around 2007
4  or -- I don't have an exact date.
5    Q.    Okay.  This org chart says that
6  the executive vice president in charge of
7  research and development and the chief
8  scientific officer position was vacant as of
9  2004, but between 2000 and 2004, generally, who
10  sat in that seat?
11    A.    That would have been Paul
12  Goldenheim.
13    Q.    Okay.  Essentially, did the
14  medical -- or the scientific and medical affairs
15  division get renamed as research and
16  development; is that fair to say?
17    A.    I would -- I would characterize
18  it as the departments were -- became
19  independent, not independent, but separate
20  departments.
21       Research and development and
22  medical affairs and as we -- for instance,
23  today, that we have R&D is one group, medical
24  affairs, both reporting in to -- to the

Page 64

1  executive department, group.
2    Q.    Okay.  And at this point in time
3  between 2000 and 2004, medical affairs no longer
4  had involvement in the clinical -- or in the
5  testing for safety and efficacy of opioid
6  products; is that true?
7    A.    I'm sorry, can you -- what time
8  period?
9    Q.    The 2000 to 2004 time frame that
10  we're looking at an org chart that would
11  represent the structure in that time period.
12    A.    Those responsibilities rely --
13  lie in the R&D part of it.  Medical affairs
14  depends on, you know, as I say, they move -- if
15  you take the medical affairs function, they're
16  responsible for post approval, scientific and
17  communica -- and those kinds of functions.  So
18  testing for medical affairs is along those time
19  frame, so after approval of a product.
20    Q.    Where do I find the medical
21  affairs division in this org chart?
22    A.    I think if you -- sorry, let
23  me -- there it is.  Should I read you the
24  number?

Page 65

1    Q.    Yes, please.
2    A.    Can I read you the last three, or
3  do you want --
4    Q.    Last three is fine.
5    A.    Okay.  821.
6    Q.    Okay.  And we're looking at the
7  page that ends in 821 contained in Exhibit 9,
8  and that would be a depiction of all the
9  individuals in the medical affairs department;
10  is that what you're telling me?
11    A.    Correct.  It includes both
12  medical affairs and pharmacovigilance or drug
13  safety as well.
14    Q.    And those folks would have
15  involvement with safety and efficacy testing, it
16  would just be post product approval, correct?
17    A.    I wouldn't characterize --
18  they're more on the safety side.  They could
19  conduct efficacy trials, but those are generally
20  conducted prior to approval, but there are cases
21  where if it's related to a new indication or
22  demonstration, it could -- it could go both R&D
23  and medical affairs at that time period.
24    Q.    Okay.  Where do I find the R&D

Page 66

1 piece of the individuals in this org chart that
2 worked in R&D?
3     A.    Looking for that.  Part of it
4 is -- let me look at this.  Bates number or
5 whatever that, ends in 827.
6     Q.    Okay.
7     A.    There are -- it lists folks, I
8 can't read the dark print there, but those are
9 some of the folks who did the early testing,
10 animal testing, says toxicologists and some of
11 the project managers, I talked about that
12 department being involved, they organize the
13 department, so that's part of it.
14         MR. SNAPP:  Erin, we've been
15     going an hour, can we take a couple
16     minutes break.
17         MS. DICKINSON:  Yeah, let's just
18     finish this up quickly.
19         THE WITNESS:  Sure.  I don't see
20     on this particular grouping the drill
21     down to those other individuals.
22 BY MS. DICKINSON:
23     Q.    You mean you don't see the
24 individual drilled down on the research and

Page 67

1 development department?
2     A.    Correct.
3     Q.    Okay.  Where would I go to find
4 out in the time period 2000 to 2004 who was in
5 the research and development department that was
6 responsible for safety or efficacy testing
7 regarding opioid products?
8     A.    Perhaps I think the best would be
9 to look at a different org chart.
10     Q.    Okay.
11         MS. DICKINSON:  Why don't we take
12     a break there.
13         THE WITNESS:  Okay.
14         THE VIDEOGRAPHER:  Stand by,
15     please.  Remove your microphone.  Okay.
16     The time is 10:12 a.m. going off the
17     record.
18         (Brief recess.)
19         THE VIDEOGRAPHER:  Okay.  We are
20     back on the record.  The time is
21     10:20 a.m.
22 BY MS. DICKINSON:
23     Q.    Dr. Fanelli, we're back on the
24 record after a short break.

Page 68

1         I want to just see if we can
2 round out this topic in a little bit more
3 efficient way since we've taken a break.  We
4 were going through the departments that had
5 responsibility for safety and efficacy testing,
6 and I understood your testimony this morning to
7 say that generally medical affairs and research
8 and development were the departments that those
9 responsibilities would lie within over the
10 entire period of time; is that accurate?
11     A.    Yes.
12     Q.    Okay.  Can we talk about who
13 headed up those two departments over time, and
14 maybe we can be done with it then.
15     A.    Okay.
16     Q.    I assume then I can find the
17 individuals that worked within those departments
18 within the org charts that you've brought with
19 you today; is that right?
20     A.    Generally.  Like I said, it
21 may -- it depends on which one, how far down
22 they drilled into the individuals.  We have a
23 good example that was more complete in -- what
24 was it, 2000 and --

Page 69

1         MR. SNAPP:  One.
2         THE WITNESS:  2001 you can see
3     that, that gives you a good
4     representation of those individuals.
5 BY MS. DICKINSON:
6     Q.    Okay.
7     A.    Yeah.
8     Q.    And we talked about that
9 Mr. Goldenheim headed up the scientific and
10 medical affairs division from roughly 1995 to
11 2000; is that right?
12     A.    I believe that's correct.
13     Q.    Okay.  And you thought that he
14 likely headed up the R&D department in the years
15 roughly 2000 to 2004 time period; is that
16 correct?
17     A.    I believe that's correct.
18     Q.    Okay.  We know that the seat was
19 vacant in 2004.
20     A.    Right.
21     Q.    But then who is the person that
22 headed up the R&D department going forward after
23 2004?
24     A.    I'd have to look at the next one.

1    Q.   Okay.
2    A.   And I can --
3    Q.   Let's see if we can quickly do
4 that.
5    A.   Yeah, yeah.
6    I have -- is it okay?  So I'm
7 looking at -- and this is a good example of what
8 I was talking about before, the organization
9 chart from January of 2007.
10    MS. DICKINSON:  I ask you to give
11    him that exhibit sticker.
12 BY MS. DICKINSON:
13    Q.   We're going to mark as Exhibit 10
14 the organizational chart for Purdue for January
15 2007; is that accurate?
16    A.   Correct.
17    (Document marked for
18    identification as Exhibit
19    Purdue-Fanelli-10.)
20 BY MS. DICKINSON:
21    Q.   And that is a true and accurate
22 copy of Purdue's organizational chart dated
23 January 2007?
24    A.   Yes.

1    Q.   And who at that time period sat
2 at the head of both medical research and R&D?
3    A.   If you look at -- there's no
4 number -- oh, yeah, there is, sorry.  The second
5 page, 144 on the bottom.
6    Q.   Mm-hmm.
7    A.   This is reporting in to Michael
8 Friedman at the time, and it's a good example of
9 how things change and but where the
10 responsibilities still lie.  If you look on the
11 left side, four down is medical research, so
12 it's now -- now at this current time research
13 and development is split into two groups at
14 least, maybe three, at least on that org chart.
15 You see Craig Landau who is our current CEO, at
16 this time was the vice president of medical
17 research, so those are the individuals who
18 conducted the clinical trials.
19    If you look on the right, almost
20 right across from that but a little up, it's
21 Robert Kaiko.  He's the vice president of R&D
22 portfolio development, so that would be the
23 folks before the clinical development that we
24 talked about earlier, so lab testing, animal

1 testing.  So during this time period, those are
2 the two groups doing the primary -- or
3 responsible for the scientific preclinical and
4 clinical testing.
5    As I mentioned, regulatory
6 affairs is involved to a certain extent, not in
7 the testing, of course, but in reporting or
8 providing guidance, and that's headed by Tony
9 Santopolo down there.
10    And, again, Fred Sexton's
11 department, which I mentioned before, technical,
12 at this point that's -- we talked about that
13 very -- just formulation, so those individuals
14 might be doing some formulation testing.
15    Q.   Okay.  And all of those divisions
16 reported generally to the president and CEO at
17 that time, Michael Friedman; is that correct?
18    A.   Correct.
19    Q.   And the org charts we took a look
20 at earlier, those positions also reported to the
21 president and CEO, who in between '95 and what
22 we're looking at here in '07, was Michael
23 Friedman; is that right?
24    A.   Not in '95.  I don't remember --

1    Q.   Okay.
2    A.   -- but it's on the org charts is
3 my understanding.
4    Q.   Okay.  What -- we're up to 2007.
5    A.   Yep.
6    Q.   I want to know who headed the
7 divisions that had responsibility for safety and
8 efficacy testing or had involvement in that from
9 '07 to present.  What's the next document we
10 need to look at to talk about that?
11    A.   I don't remember when it changed
12 again.  What's the next one you have?
13    MR. SNAPP:  2010.
14    THE WITNESS:  I'm consulting
15    '10 to see if it's different, and I'll
16    let you know.
17 BY MS. DICKINSON:
18    Q.   Okay.
19    A.   This is in January of 2010, it's
20 relatively similar.  I mean, medical research
21 now has clinical, medical and regulatory, all
22 together.  Sorry.
23    (Document marked for
24    identification as Exhibit

1    Purdue-Fanelli-11.)
2  BY MS. DICKINSON:
3    Q.   I'm going to hand you what's an
4  exhibit sticker, we're going to mark that as
5  Exhibit 11, and what is Exhibit 11?
6    A.   It's the organization chart from
7  January of 2010.
8    Q.   Okay.  And at that point in time,
9  what were the divisions that were responsible
10 for the testing of safety and efficacy of
11 Purdue's opioid products, and who headed those
12 divisions?
13   A.   So if you look on the -- sorry.
14 457, last three numbers, Craig Landau was still
15 vice president, head of medical research, but
16 under his department medical and regulatory have
17 now been joined, so they're under -- in that
18 department.
19        And there's an open position, I'm
20 not sure what that is at the time.  It's a vice
21 president of R&D.  So in that group is the R&D
22 group that would have been -- it doesn't have a
23 name assigned to it at the time.
24        Here we go.  I just want to see

1  if I was on the org chart.  I don't see --
2        MR. SNAPP:  Is there another
3    question?  I think he answered the
4    question.
5        MS. DICKINSON:  I don't know.  I
6    thought you were looking for something.
7        MR. SNAPP:  The divisions and who
8    headed the divisions.
9        THE WITNESS:  Yeah, I don't see
10   the breakouts all the way down, but
11   that's the department.
12 BY MS. DICKINSON:
13   Q.   That's 2010?
14   A.   Yes.
15   Q.   What do we need to look at to
16 take us through the present on who was
17 responsible for the testing and safe -- of
18 safety and efficacy for your opioid products?
19   A.   I can tell you today, and I think
20 it's been this way -- I can't remember when it
21 became, but it's been for a number of years,
22 there's a vice president of R&D, so the research
23 and development department, and that includes at
24 the current time all the clinical research,

1  preclinical research down to the bench,
2  analytical testing is all in that R&D
3  department.
4        And the medical affairs
5  department is separate and as we talked about
6  the difference between those two
7  responsibilities.
8        Now, testing -- statistics, that
9  group is also in R&D currently, and I think
10 you'll find all the individuals there.
11   Q.   Who has headed R&D from roughly
12 2010 to present?
13   A.   Currently, it's John Ringer is
14 the head of R&D for the last -- I think it's
15 been a year and a half or so.
16        Prior to that it was Gary Styles,
17 I think Gary Styles.  I'd have to look.
18        And prior to that it was Todd
19 Baumgartner, anyway.
20        And then I think we're -- I can't
21 remember where we left off going the other way.
22   Q.   That's okay.  Who has headed
23 medical affairs from roughly 2010 to 2017 -- or
24 I'm sorry -- to present?

1    A.   Currently head of medical affairs
2  is Marcelo Bigal is his name, he's recently a
3  recent hire.
4        Prior to Marcelo, Monica
5  Kwarcinski was the head for the interim period.
6        Prior to that it was Gail
7  Cawkwell was the head of medical affairs.
8        Robert Reeder was way back, I
9  can't remember if there were folks in between.
10 I'd have to look at the charts.
11   Q.   Okay.
12   A.   But those are representative.
13   Q.   And all of the org charts you've
14 reviewed in getting ready for your testimony are
15 in the boxes we marked as Exhibit 6 at the
16 beginning of the day; is that right?
17   A.   Correct.
18   Q.   Okay.  All right.  Let's move on
19 from this subject.
20        We're going to talk about the
21 rest of the parts of the topic 7 that we have
22 here, because one part was the identity of the
23 persons who were responsible for the testing,
24 but also who received the reports and the

Page 78

1 testing and the results of those reports, right?
2    A.    Correct.
3    Q.    Okay.  So we're going to move on
4 to that second part.  We've talked about the
5 people who were responsible.  Now we're going to
6 kind of move on, but we're still on topic 7.
7         Let's talk about 1996 and
8 OxyContin.  1996 OxyContin had been approved,
9 correct?
10    A.    Yes, the original formulation.
11    Q.    Correct, the original formulation
12 of OxyContin had been approved by the FDA; is
13 that right, in 1996?
14    A.    '95.
15    Q.    Correct, okay.
16         And I'm going to hand you what
17 has been marked as Exhibit 12.
18         (Document marked for
19         identification as Exhibit
20         Purdue-Fanelli-12.)
21 BY MS. DICKINSON:
22    Q.    And that is a document that was
23 produced to us by Purdue in this litigation
24 beginning with the Bates number -- when I say

Page 79

1 "Bates number," the number at the bottom,
2 PKY183226682.
3         That is -- does this appear to be
4 a true and accurate copy of the label, the
5 original label for OxyContin?
6    A.    Just checking the date.
7    Q.    Sure.
8    A.    Yes, it does.
9    Q.    Okay.  And then let's turn to the
10 page that ends in 87 in the middle of Exhibit
11 12.  Tell me when you're there.
12    A.    Okay, I'm there.
13    Q.    Okay.  And in the middle of that
14 page, there is a section called "Drug Abuse and
15 Dependence" and in parentheses "Addiction."
16         Do you see that?
17    A.    Yes.
18    Q.    Okay.  And in the first paragraph
19 of that section, the last sentence has a
20 sentence that reads, "Delayed absorption, as
21 provided by OxyContin tablets, is believed to
22 reduce the abuse liability of a drug."
23         Have I read that correctly?
24    A.    Yes.

Page 80

1    Q.    Okay.  And that sentence appears
2 in the label that Purdue had negotiated with the
3 FDA in 1995 or beforehand; is that right?
4    A.    Yes, this is the approved version
5 by FDA, FDA's approval, yes.
6    Q.    Okay.  And one of Purdue's
7 messages in marketing was the message that
8 because of the extended-release formulation that
9 OxyContin had less abuse potential than other
10 pain medications, correct?
11         MR. SNAPP:  Objection, beyond the
12    scope.
13 BY MS. DICKINSON:
14    Q.    Correct?
15         MR. SNAPP:  Same objection.
16 BY MS. DICKINSON:
17    Q.    You can answer.
18    A.    Could you repeat the question.
19    Q.    Sure.  And one of Purdue's
20 messages in marketing was that because of the
21 extended-release formulation of OxyContin, that
22 OxyContin had less abuse potential than other
23 pain medications, correct; that was one of the
24 marketing messages for OxyContin?

Page 81

1         MR. SNAPP:  Object to the form.
2 BY MS. DICKINSON:
3    Q.    Correct?
4         MR. SNAPP:  And beyond the scope.
5         THE WITNESS:  There was -- there
6    were statements regarding that the
7    delayed absorption was believed to
8    reduce the abuse liability.
9 BY MS. DICKINSON:
10    Q.    Okay.  Statements in marketing,
11 correct?
12         MR. SNAPP:  Object to the form,
13    beyond the scope.
14         THE WITNESS:  The exact
15    statements I'd have to see the
16    materials.  I'm not responsible for
17    those materials.
18 BY MS. DICKINSON:
19    Q.    I'm just asking you whether you
20 know whether that message was delivered in
21 marketing?
22         MR. SNAPP:  Object to the form,
23    beyond the scope.
24         THE WITNESS:  Not that -- I'm not

Page 82

1  aware that that exact message.
2       MS. DICKINSON: Okay. We can
3  take a look.
4       I'm going to hand this to you all
5  together. Give me just a moment. I'm
6  going to hand you a series of exhibits
7  marked Exhibit 13, 14 and 15. Copies
8  for your counsel are behind there.
9       (Documents marked for
10      identification as Exhibit
11      Purdue-Fanelli-13, 14 and 15.)
12 BY MS. DICKINSON:
13      Q.   If you could put Exhibits 13, 14
14 and 15 in front of you, that would be great.
15      Okay. So for the record, Exhibit
16 13, 14 and 15 are a series of documents filed in
17 the case in which the United States Department
18 of Justice charged Purdue with criminal charges
19 over the false marketing of OxyContin.
20      Are you familiar with that case?
21      A.   Familiar with the case.
22      Q.   Okay.
23      A.   Well, yes.
24      Q.   Are you familiar with the fact

Page 83

1  that Purdue was charged in that case, shown in
2  13, 14 and 15, with felony misbranding of its
3  drug OxyContin.
4       MR. SNAPP: Object to the form,
5       object as beyond the scope of the
6       noticed deposition topics. He's not
7       been designated to testify about the
8       plea. He's not authorized on behalf of
9       the company to speak on behalf of the
10      company with respect to the plea.
11 BY MS. DICKINSON:
12      Q.   Go ahead and answer.
13      A.   Could you repeat the question,
14 please.
15      Q.   Are you familiar with the fact
16 that Purdue was charged with felony misbranding
17 of its drug OxyContin?
18      MR. SNAPP: Same objections.
19 BY MS. DICKINSON:
20      Q.   In the year 2007?
21      A.   I'm familiar that there was a
22 case, but the details of what the charges were
23 or what the plea was are not part of my
24 responsibility or legal understanding.

Page 84

1      Q.   Okay. You're familiar that there
2  was a case, and do you understand that Purdue
3  pled guilty to the charges in that case?
4       MR. SNAPP: Same objection,
5       beyond the scope.
6       THE WITNESS: Yes.
7  BY MS. DICKINSON:
8       Q.   Okay. All right. And let's take
9  a look at -- for the record, let's just identify
10 Exhibit 13 is a document called the Information
11 in the federal criminal case that we were just
12 talking about.
13      Do you see that title?
14      A.   Yes.
15      Q.   Okay. The document we marked as
16 Exhibit 14 is Purdue's Plea Agreement.
17      Do you see that?
18      A.   Yes.
19      Q.   And the document we marked as
20 Exhibit 15 is an Agreed Statement of Facts in
21 that same case, correct?
22      A.   Correct.
23      Q.   I'd like you to take Exhibit 15,
24 please, the Agreed Statement of Facts, and turn

Page 85

1  to paragraph 20.
2       Tell me when you're there.
3       A.   I'm there.
4       Q.   Okay. That paragraph reads,
5  "Beginning on or about December 12th, 1995, and
6  continuing until on or about June 30th, 2001,
7  certain Purdue supervisors and employees, with
8  the intent to defraud or mislead, marketed and
9  promoted OxyContin as less addictive, less
10 subject to abuse and diversion, and less likely
11 to cause tolerance and withdrawal than other
12 pain medications, as follows."
13      Did I read that correctly?
14      A.   Yes.
15      Q.   Okay. And that is an agreed
16 statement of fact that Purdue agreed to,
17 correct?
18      MR. SNAPP: Object to the form,
19      beyond the scope.
20      THE WITNESS: So, again, I'm
21      not -- my responsibility is not with law
22      and interpretation, so I'd have to -- I
23      haven't seen this document prior.
24 BY MS. DICKINSON:

Page 86

1    Q.    Okay.  Can you turn to the last
2  page.
3    A.    Yeah.
4    Q.    Or, actually, I'm sorry, could
5  you turn to page 27 at the bottom.
6    A.    Twenty-seven of the page ID?
7    Q.    Yes.
8    A.    Okay.
9    Q.    And that page contains and it
10 says for the defendant, Purdue Frederick
11 Company, and it contains the signature of Robin
12 Abrams, below it Michael Friedman, below it
13 Howard Udell, correct?
14   A.    Correct.
15   Q.    And those -- Mr. Abrams,
16 Mr. Friedman and Mr. Udell were all employed by
17 Purdue Frederick Company at the time, correct?
18   A.    It's Ms. Abrams, but, yes.
19   Q.    So according to the paragraph we
20 just read in the Information, that between 1995
21 and 2001, Purdue, with the intent to defraud or
22 mislead, marketed and promoted OxyContin as less
23 addictive and less subject to abuse and
24 diversion, according to this document, the

Page 87

1  Agreed Statement of Facts, correct?
2        MR. SNAPP:  Object to form,
3     beyond the scope.
4        THE WITNESS:  It says certain
5     Purdue supervisors and employees, that's
6     what it says, yes.
7  BY MS. DICKINSON:
8     Q.    Okay.  And the years 1995 to
9  2001, that was the first six years of the
10 marketing of OxyContin; is that right?
11       MR. SNAPP:  Object to the form.
12       THE WITNESS:  Purdue was
13    approved -- I think that's the date of
14    approval.  I'd have to look.  I'm not
15    sure when the marketing began.  Usually
16    they're not -- it's not marketed the day
17    of approval.  It takes some time.
18 BY MS. DICKINSON:
19    Q.    Fair enough.  Marketing would
20 probably commence shortly after approval,
21 correct?
22    A.    Correct.
23    Q.    Okay.  And the years 1995 to
24 2001, Purdue was selling OxyContin, correct?

Page 88

1    A.    Shortly after, yes, through 2001
2  until today.
3    Q.    Let's just --
4    A.    I don't know if we launched until
5  January -- you said 2000.
6    Q.    Let's do it this way:  The years
7  1996 to 2001 --
8    A.    Correct.
9    Q.    -- Purdue was selling OxyContin
10 during those years, correct?
11   A.    Correct.
12   Q.    In between those years, Purdue
13 dispensed over a billion pills of OxyContin; is
14 that right?
15       MR. SNAPP:  Object to the form,
16    also beyond the scope.
17       THE WITNESS:  I have -- I don't
18    have any knowledge of the number of
19    pills.
20 BY MS. DICKINSON:
21    Q.    Do you have any ballpark idea
22 what they sold in the first five years?
23    A.    No.
24       MR. SNAPP:  Same objections.

Page 89

1  BY MS. DICKINSON:
2     Q.    Okay.  You can put that aside for
3  a moment, but let's keep it handy.
4     A.    All three or --
5     Q.    Just keep all three, if you
6  would.
7     A.    Okay.
8        Document marked for
9        identification as Exhibit
10       Purdue-Fanelli-16.)
11 BY MS. DICKINSON:
12    Q.    Dr. Fanelli, we're going to talk
13 about some of the reports and studies that
14 Purdue either was or wasn't aware of in the 1995
15 to 2001 time frame, okay?
16    A.    Okay.
17    Q.    I've handed you what has been
18 marked as Exhibit 16.
19       This is an article that appeared
20 in the New York Times dated May 29th, 2018.
21       Have you seen this article?
22    A.    I believe I have.
23    Q.    Okay.  Let's turn to -- trying to
24 find a page here -- oh, page 4, at the top there

Page 90

1  are pages.
2      A.    Yes.
3      Q.    If you turn to page 4.  The
4  second to last paragraph, if you would just
5  quickly read that.
6      A.    (Witness reviews document.)
7  Okay.
8      Q.    Okay.  This article describes
9  that in 1996, okay, so '96 just months after
10 Purdue started selling OxyContin, that Purdue
11 started learning that drug abusers were seeking
12 out OxyContin and Purdue's other long-acting
13 opioid MS Contin.
14         Was Purdue receiving those kind
15 of reports in 1996?
16         MR. SNAPP:  Object to the form
17     and beyond the scope.
18 BY MS. DICKINSON:
19     Q.    Go ahead.
20     A.    What kind of reports?  I'm sorry.
21     Q.    The article talks about Purdue
22 receiving reports that in 1996 that there were
23 drug abusers seeking out OxyContin and MS
24 Contin?

Page 91

1         MR. SNAPP:  Object to the form
2     and beyond the scope.
3  BY MS. DICKINSON:
4     Q.    Was Purdue -- I'm asking is that
5  accurate, was Purdue receiving those kinds of
6  reports in 1996?
7         MR. SNAPP:  Object to the form
8     and beyond the scope.
9         THE WITNESS:  I'm not aware of
10     whether or not Purdue received -- we
11     would have received adverse event
12     reports, and that's part of our
13     pharmacovigilance, but I'm not aware of
14     what were received during that time
15     period.
16 BY MS. DICKINSON:
17     Q.    Okay.  Who would know?
18         MR. SNAPP:  Same objections,
19     beyond the scope.
20         THE WITNESS:  I'm not aware.  I
21     don't know who would have received those
22     at the time.
23 BY MS. DICKINSON:
24     Q.    Okay.  Further down, the second

Page 92

1  to last paragraph on this page, page 4, it says,
2  "In May 1996, five months after OxyContin's
3  approval, Richard Sackler and Mr. Udell were
4  sent an older medical journal article describing
5  how drug abusers were extracting Morphine from
6  MS Contin tablets in order to inject the drug,
7  prosecutors reported.  A Purdue" -- I'm sorry,
8  we don't need to read the next sentence yet.
9         Was Purdue in 1996 sent medical
10 journal articles describing how drug abusers
11 were extracting Morphine from MS Contin tablets
12 in order to inject the drug?
13         MR. SNAPP:  Object to the form
14     and beyond the scope.
15         THE WITNESS:  I do not know.
16 BY MS. DICKINSON:
17     Q.    We'd have to ask Mr. Sackler and
18 Mr. Udell; is that right?
19         MR. SNAPP:  Object to the form.
20         THE WITNESS:  I'm not sure of the
21     source or how to -- you know, how you
22     would ask.
23 BY MS. DICKINSON:
24     Q.    Well, this article says that

Page 93

1  Mr. Sackler and Mr. Udell were sent the journal
2  article.  So to verify whether that's true or
3  not, I would have to ask those two individuals;
4  is that right?
5         MR. SNAPP:  Object to the form,
6     beyond the scope.
7         THE WITNESS:  It's a report from
8     the prosecutors, not from those
9     individuals so...
10 BY MS. DICKINSON:
11     Q.    I'm not trying to be difficult.
12         I have not seen this document
13 produced in this case, so I'm trying to figure
14 out if this fact is accurate, and this reports
15 that Mr. Sackler and Mr. Udell received a
16 document.  I'm trying to figure out who at
17 Purdue could tell me if they actually received
18 this document, and I assume Mr. Sackler is one
19 of those people, correct?
20         MR. SNAPP:  Object to form,
21     object as beyond the scope.
22         THE WITNESS:  I don't know if it
23     came to others but if -- so what you
24     said is correct.

1 BY MS. DICKINSON:

2 　　Q.　　And if someone received this
3 information in 1996, that was after OxyContin
4 was on the market with the label that said
5 delayed absorption is believed to reduce the
6 abuse liability of the drug, correct?
7 　　　　MR. SNAPP:　Object to the form.
8 Object as beyond the scope.
9 　　　　THE WITNESS:　What year?　I'm
10 sorry.
11 BY MS. DICKINSON:
12 　　Q.　　1996, May of 1996.
13 　　A.　　So we looked at the label
14 approved by FDA in '95, so that was in there.
15 　　Q.　　Okay.　So --
16 　　A.　　Upon approval.
17 　　Q.　　Okay.　So that -- this -- if this
18 document exists, that would have been after the
19 label -- after OxyContin went on the market with
20 its label that said "delayed absorption is
21 believed to reduce the abuse liability of the
22 drug," right?
23 　　　　MR. SNAPP:　Object to the form.
24 BY MS. DICKINSON:

1 　　Q.　　That's after?
2 　　　　MR. SNAPP:　Object to the form.
3 Object as beyond the scope.
4 　　　　THE WITNESS:　Yes, correct.
5 BY MS. DICKINSON:
6 　　Q.　　Do you know if Purdue or its
7 executives told the FDA in 1996 about reports of
8 abuse of its extended-release products?
9 　　　　MR. SNAPP:　Objection, beyond the
10 scope.
11 　　　　THE WITNESS:　I don't know when
12 　　conversations were held with FDA, at
13 　　what time, actually.
14 BY MS. DICKINSON:
15 　　Q.　　You're not prepared to talk about
16 that today?
17 　　　　MR. SNAPP:　Object to the form.
18 　　　　THE WITNESS:　Correct.
19 BY MS. DICKINSON:
20 　　Q.　　All right.　Let's go to the next
21 page, page 5.　The very top paragraph says, "by
22 the following year," and I assume that means
23 1997 because we were just talking about 1996.
24 　　A.　　Okay.

1 　　Q.　　"Prosecutors wrote, that Purdue
2 Pharma learned that drug addicts in Australia
3 and New Zealand were abusing MS Contin and
4 Dr. Goldenheim was sent an article from the
5 American Family Physician, a publication, about
6 the ease of extracting Morphine from MS Contin."
7 　　　　Do you know if in 1997 Purdue was
8 receiving reports that drug addicts in Australia
9 and New Zealand were abusing MS Contin?
10 　　　　MR. SNAPP:　Objection, beyond the
11 　　scope.
12 　　　　THE WITNESS:　I do not know.
13 BY MS. DICKINSON:
14 　　Q.　　Okay.　And do you know if
15 Dr. Goldenheim was sent an article from the
16 American Family Physician about the ease of
17 extracting Morphine from MS Contin in 1997?
18 　　　　MR. SNAPP:　Objection, beyond the
19 　　scope.
20 　　　　THE WITNESS:　I do not know.
21 BY MS. DICKINSON:
22 　　Q.　　And Dr. Goldenheim at that point
23 in time, I believe we saw in the organizational
24 charts we looked at this morning, was the head

1 of medical affairs; is that right?
2 　　A.　　I'm not -- he was head of R&D.
3 Whether those were combined at the time, I'm not
4 sure.
5 　　Q.　　He was the head of --
6 　　A.　　Research and development.
7 　　Q.　　-- research and development,
8 correct?
9 　　A.　　Correct.
10 　　Q.　　And then let's go to the next
11 paragraph, "Then in 1998, as OxyContin's
12 marketing campaign was taking off, Purdue Pharma
13 learned of a medical journal study that appeared
14 to undercut its central message - that
15 OxyContin, as a long-acting opioid, had less
16 appeal to drug abusers."
17 　　　　It goes on to say, "In the study,
18 which was published in the Journal of Canadian
19 Medical Association, researchers from the
20 University of British Columbia in Vancouver
21 interviewed local drug dealers and abusers to
22 learn what legal drugs sold for on the black
23 market.　They found that MS Contin commanded the
24 highest price of any prescription opioid with a

1  30-milligram tablet that cost $1 at a pharmacy
2  bringing up to $40 on the street."
3          Did I read that accurately?
4      A.    Yes.
5      Q.    Okay.  Do you know in 1998 if
6  Purdue Pharma was provided with that Canadian
7  study that the article discusses?
8          MR. SNAPP:  Objection, beyond the
9      scope.
10         THE WITNESS:  I do not know.
11 BY MS. DICKINSON:
12     Q.    Do you know if Purdue Pharma was
13 aware of that Canadian study that the article
14 discusses?
15         MR. SNAPP:  Objection, beyond the
16     scope.
17         THE WITNESS:  No, I don't know.
18 BY MS. DICKINSON:
19     Q.    All right.  The article goes on
20 to say, "In an accompanying editorial, a
21 Canadian physician, Dr. Brian Goldman, wrote
22 that the findings turned thinking about the
23 supposed safety of long-acting opioids like
24 OxyContin on its head by showing that drug

1  abusers 'coveted' such drugs.  'This should ring
2  alarm bells,' Dr. Goldman, who was then a paid
3  speaker for Purdue Pharma, wrote in the
4  editorial."
5          Do you know if in 1998 Purdue
6  Pharma received a copy of that editorial?
7          MR. SNAPP:  Objection, beyond the
8      scope.
9          THE WITNESS:  I do not know if we
10     did.
11 BY MS. DICKINSON:
12     Q.    Do you know if Purdue Pharma ever
13 provided a copy of either the Canadian study or
14 the editorial to the FDA?
15         MR. SNAPP:  Objection, beyond the
16     scope.
17         THE WITNESS:  I do not know.  We
18     would -- I would have to look at our
19     pharmacovigilance reports.  Following
20     approval of any drug, we send to FDA for
21     the first three years a collection of
22     adverse events that occur and then at
23     least annually thereafter, so those
24     kinds of reports would be included in

1  those reports to the FDA, but I'm not
2      aware of this particular.
3  BY MS. DICKINSON:
4      Q.    So this is the kind of thing that
5  would be included in an adverse event
6  pharmacovigilance follow-up after approval; is
7  that correct?
8      A.    Potentially.  It depends on the
9  characteristics of the report.
10     Q.    Okay.  And where would I look to
11 see if that was submitted to the FDA?
12         MR. SNAPP:  Objection, beyond the
13     scope.
14         THE WITNESS:  It would be in the
15     adverse -- we call them PSURs, periodic
16     safety update reports, they've changed
17     in what they've been termed over time,
18     the reports submitted to FDA.
19 BY MS. DICKINSON:
20     Q.    Do you know -- this article says
21 that Purdue did not send the Canadian study to
22 the FDA or tell its sales representatives about
23 that.
24         Do you know if that's accurate?

1          MR. SNAPP:  Objection, beyond the
2      scope.
3          THE WITNESS:  I do not know if
4      that's accurate or not.
5  BY MS. DICKINSON:
6      Q.    Okay.  Do you know if Purdue took
7  the position it was not required to send the FDA
8  the Canadian study or the editorial?
9          MR. SNAPP:  Objection, beyond the
10     scope.
11         THE WITNESS:  I do not know what
12     was said.
13 BY MS. DICKINSON:
14     Q.    Do you know at this point in time
15 in 1998 whether Purdue was going to the FDA and
16 say -- and telling the FDA that they thought the
17 label that delayed absorption is believed to
18 reduce abuse liability of a drug should be
19 changed?
20         MR. SNAPP:  Objection, beyond the
21     scope.
22         THE WITNESS:  I'm not aware of
23     the -- you know, the label was changed
24     around 2001, and there were discussions,

1  but I'm not aware of where the exact
2  dates of those discussions began.
3  BY MS. DICKINSON:
4      Q.    So the label took that statement
5  out, the delayed absorption is believed to
6  reduce the abuse liability of the drug in 2001;
7  is that right?
8      A.    I believe that was the date.  I'd
9  have to check the exact date.
10     Q.    Do you know if in 1996 or '97 or
11  '98, Purdue was telling the FDA that label --
12  that part of the label should be changed?
13         MR. SNAPP:  Objection, beyond the
14         scope.
15         THE WITNESS:  I'm not aware that
16         Purdue was doing that.
17  BY MS. DICKINSON:
18     Q.    But what we do know is that at
19  least between December 12th, 1995 and continuing
20  until about June 30th, 2001, certain Purdue
21  supervisors and employees, with the intent to
22  defraud or mislead, marketed and promoted
23  OxyContin as less addictive, less subject to
24  abuse and diversion and less likely to cause

1  tolerance and withdrawal than other pain
2  medications.  That's what we looked at in the
3  previous document, correct?
4         MR. SNAPP:  Object to the form
5         and objection beyond the scope.
6         THE WITNESS:  That is what's
7         stated in that document, yes.
8  BY MS. DICKINSON:
9      Q.    That document that was signed by
10  officials at Purdue, correct?
11         MR. SNAPP:  Same objections.
12         THE WITNESS:  Yes.
13  BY MS. DICKINSON:
14     Q.    All right.  Let's move on to talk
15  about the study submitted to the FDA.
16         MR. SNAPP:  Are you done with
17         Exhibits 13, 14 and 15?
18         MS. DICKINSON:  Let's just keep
19         them.  I think so, but if you don't mind
20         keeping those three somewhere in the
21         vicinity.  I think we're done with the
22         other stuff that we've looked at here.
23         (Document marked for
24         identification as Exhibit

1  Purdue-Fanelli-17.)
2         MS. DICKINSON:  I'll hand you
3  this monster copy of something we're
4  going to look at one page of, but I'm
5  sorry, it was the complete document, and
6  I certainly don't want to start pulling
7  stuff out of documents that were
8  produced to us, so here it comes.  I'm
9  really sorry, this is going to be a
10  little heavy.
11  BY MS. DICKINSON:
12     Q.    Okay.  I'm going to hand you what
13  has been marked as Exhibit 17.
14         And this is a document produced
15  to us by Purdue in this litigation that at the
16  start of the document bears the Bates number
17  PURCHI000667209.
18         Do you see that?
19     A.    Yes.
20     Q.    Okay.
21     A.    Sorry.
22     Q.    And what I believe this is is a
23  portion of documents that were submitted to the
24  FDA regarding OxyContin.

1         Is that a fair way to
2  characterize what this appears to be in this
3  document?
4      A.    I believe this comes from the
5  Freedom of Information office at FDA.
6      Q.    Okay.
7      A.    I believe what this is -- I have
8  to see the -- maybe the request was in here.
9  Oh, here it is.  No, that's not it.
10         I believe -- and on page 3 it
11  says NDA 20553, which is the NDA for the
12  original OxyContin.  I believe this is the
13  Freedom of Information information that's
14  provided upon approval of an NDA.
15     Q.    Fair enough.
16     A.    Yeah.
17     Q.    And I think it matters little for
18  the purpose of this discussion --
19     A.    Okay.
20     Q.    -- but I just want to make sure
21  we're clear that the best place or the smallest
22  place I can find what I'm going to be talking
23  about with you --
24     A.    Okay.

1    Q.    -- was in this document.
2         So this appears to be a Freedom
3    of Information Act request that was responded to
4    by producing parts of the NDA for the original
5    OxyContin; is that right?
6    A.    Yes.
7    Q.    Okay.
8    A.    Yes.
9    Q.    Can we take a look at page
10   PURCHI000667249.  So 7249 are the last four
11   numbers.
12   A.    Okay, I'm there.
13   Q.    Okay.  I'm not.  Sorry, just give
14   me a second.  Okay.  I'm sure my exhibit has the
15   right page.
16        Okay.  Who at Purdue decided
17   which studies would be submitted to FDA for the
18   original OxyContin?
19        MR. SNAPP:  Objection, beyond the
20   scope.
21        THE WITNESS:  There were
22   discussions between FDA and Purdue about
23   the development and -- development
24   program, including the studies, and what

1    would be part of the NDA.  Today we
2    have, now the PDUFA is here, pre-NDA
3    meetings.  Back then it was much less
4    formal, but there were discussions back
5    and forth with FDA that I'm -- even
6    before I joined that I'm aware of on
7    what was required for the approval.
8    BY MS. DICKINSON:
9    Q.    Okay.  Do you know who was
10   involved in that process at -- from the Purdue
11   side?
12        MR. SNAPP:  Objection, beyond the
13   scope.
14        THE WITNESS:  Which process, the
15   discussions with FDA?
16   BY MS. DICKINSON:
17   Q.    Who was involved in deciding what
18   studies would be submitted to the FDA at Purdue,
19   not from the FDA side?
20        MR. SNAPP:  Objection, beyond the
21   scope.
22        THE WITNESS:  So that would have
23   been -- we talked about in R&D, but
24   regulatory affairs function is to --

1    we'll talk about that, but -- I mean, we
2    could talk about that -- is to interpret
3    FDA regulations, what the requirements
4    for submissions and so forth.  So
5    regulatory affairs would be involved and
6    so would all the individuals responsible
7    for conducting those trials in R&D
8    mostly, but it could have been other
9    folks as well.
10   BY MS. DICKINSON:
11   Q.    Do you know who specifically at
12   Purdue was involved in the process of deciding
13   which studies would get submitted to the FDA
14   with respect to the original OxyContin?
15        MR. SNAPP:  Object to the form,
16   objection as beyond the scope.
17        THE WITNESS:  It would have been
18   the individuals that we talked about in
19   that time period in regulatory affairs
20   and R&D who were on that project.
21   BY MS. DICKINSON:
22   Q.    And do you know who that is?  We
23   can look.
24        MR. SNAPP:  Objection, beyond the

1    scope.
2        THE WITNESS:  Do you want to look
3    at the org chart?
4    BY MS. DICKINSON:
5    Q.    If you can -- well -- so at that
6    time period back in 1996, I assume we'd be
7    talking about the 1995 org chart that we marked
8    earlier as Exhibit 8; is that correct?
9    A.    Yes.
10   Q.    Okay.
11   A.    Well, I'm not sure if there were
12   changes, what time period, but that would be a
13   good place to look.
14   Q.    Okay.  And we said that the
15   scientific and medical affairs group started at
16   the page that starts 601 headed by Paul
17   Goldenheim.
18        I'm just trying to figure out for
19   the studies that we see on the document we were
20   just looking at that were submitted to the FDA,
21   who on this org chart was responsible for
22   deciding what got submitted to the FDA?
23        MR. SNAPP:  Objection, beyond the
24   scope.

1 THE WITNESS: So for -- I'm not
2 aware of that, but I can tell you the
3 positions that would have been
4 responsible. There's a project manager
5 and there are several individuals. I'm
6 not sure who was the project manager at
7 the time. So under Paul Goldenheim,
8 there are project managers and then
9 within each product, you talked about MS
10 Contin, OxyContin, there's a team that
11 would be the ones determining what
12 studies go into an NDA application,
13 including the regulatory -- the main
14 functions involved in that would be the
15 clinical representative, the R&D, you
16 know, the regulatory and then the team
17 in general.
18 BY MS. DICKINSON:
19 Q. Okay. Just so I understand, you
20 don't know specifically for OxyContin who those
21 people were that decided on the studies, but,
22 typically, for a drug like OxyContin, there
23 would be a team of people, one person would --
24 and they would be in this case under Paul

1 Goldenheim, right?
2 MR. SNAPP: Object to the form.
3 THE WITNESS: As the head of the
4 R&D group at the time, yes.
5 BY MS. DICKINSON:
6 Q. Okay. And that would include
7 positions like the project manager that was
8 assigned to OxyContin; is that right?
9 A. Yes.
10 Q. And a -- I think you said
11 clinical representative?
12 A. Clinical or medical, you know,
13 depends on, you know, what their -- clinical
14 scientists.
15 Q. Okay. And someone else from R&D;
16 is that correct?
17 A. Regulatory would be involved in
18 providing guidance on what, you know, FDA's
19 guidances or requirements were for a particular
20 agent.
21 Q. How do I find out who the people
22 were that participated in deciding what studies
23 were submitted to the FDA?
24 MR. SNAPP: Objection, beyond the

1 scope.
2 THE WITNESS: There -- and what
3 time frame are we talking about?
4 BY MS. DICKINSON:
5 Q. This is OxyContin, so 1995ish.
6 A. If there were formal
7 conversations between the company and FDA, they
8 would be in records in the regulatory
9 department, we call them contact reports, and
10 that might provide those -- that information.
11 Q. Is there someone that signs off
12 on the studies that are submitted to the FDA at
13 the end of the day?
14 A. Yes, on the individual studies
15 someone signs, yes.
16 Q. Who is that?
17 A. Usually it's the clinical leader,
18 the one that I mentioned on the particular
19 product, the statistician who was part of that
20 project, and those are the prime individuals who
21 would sign off on the document.
22 Regulatory is on there, depends
23 on the document at the time.
24 Q. Who signs --

1 A. That's the authors.
2 Q. Sorry. Are you finished with
3 your answer?
4 A. Sorry.
5 Q. Who signs off on the NDA
6 submission?
7 A. The actual sign person on the
8 cover letter and the form, the FDA form is the
9 regulatory representative.
10 Q. Okay.
11 A. And those forms, for an NDA it's
12 a 365H FDA form, and that's just an -- it's the
13 person -- mainly the contact person on that, but
14 that's where the sign-off for the entire NDA
15 occurs.
16 Q. Okay. And is there anyone else
17 that would have had to sign off on the table of
18 studies that was listed in the NDA for
19 OxyContin?
20 MR. SNAPP: Object to the form,
21 objection as beyond the scope.
22 THE WITNESS: I'm not aware of at
23 that time what the procedure was, but
24 those decisions are made at the

1  recommendation and decisions are made at
2  a project team level but approved by
3  or -- approved by the head of R&D.  In
4  other words --
5  BY MS. DICKINSON:
6      Q.    So at that time, that was Paul
7  Goldenheim?
8      A.    Correct.
9      Q.    All right.  Let's talk for a
10 minute about the table of studies.
11         And that, again, for the record,
12 is contained within Exhibit 17, the last page or
13 last few numbers ending in 249.
14         On that page it summarizes or
15 Purdue summarizes the totality of the controlled
16 clinical trials that were submitted to FDA when
17 Purdue was asking FDA to approve OxyContin as
18 safe and effective for the treatment of chronic
19 pain, correct?
20         MR. SNAPP:  Object to the form.
21 Objection as beyond the scope.
22         Can you give the witness a chance
23 to look at the document also?
24         MS. DICKINSON:  Of course.

1          THE WITNESS:  And, actually, I
2  think you said Purdue -- this is the
3  report of the medical officer at FDA, so
4  this is -- what we're looking at is when
5  an NDA is approved, FDA writes up --
6  they used to be called the summary basis
7  of approval.  Now it's just a review on
8  the website, but, anyway, that's what
9  this is so this --
10 BY MS. DICKINSON:
11     Q.    Fair point, actually.  Can I
12 clean it up?
13     A.    Yeah.
14     Q.    This is a part of what we call
15 the medical officer review, right?
16     A.    Correct.
17     Q.    It's commonly referred to as the
18 MOR, right?
19     A.    Correct.
20     Q.    Okay.  And so this piece is a
21 summary by the medical officer review, whoever
22 did that, I think it was Curtis Wright in this
23 case --
24     A.    That's correct.

1      Q.    -- of the clinical studies that
2  were submitted to the FDA by Purdue when
3  OxyContin was being approved, correct?
4      A.    Correct.
5      Q.    Okay.  And under "Clinical
6  Studies" we see a section called "Controlled
7  Trials."
8          Do you see that?
9      A.    Yes.
10     Q.    And underneath that are listed
11 six studies -- or six controlled trials,
12 correct?
13     A.    Yes.
14     Q.    Okay.  Would you agree with me
15 that randomized, double-blind, controlled
16 studies are generally considered to be the gold
17 standard of clinical studies that can be
18 performed?
19         MR. SNAPP:  Object to form.
20 Objection as beyond the scope.
21         THE WITNESS:  Repeat -- so the
22 science says for approval of drugs has
23 changed over time, especially in this
24 area, understanding, you know, what

1  trials need to be provided to
2  demonstrate safety and efficacy have
3  evolved over time, and it depends on
4  when we're talking about what is
5  considered appropriate at those various
6  times.
7  BY MS. DICKINSON:
8      Q.    I'm trying to ask a little bit
9  more basic question.
10         There are different types of
11 trials and studies, correct?
12     A.    That's correct.
13     Q.    What I've been told, and I just
14 want to see if I'm accurate, is that randomized,
15 double-blind, controlled studies, that type of
16 study -- that's a type, correct?
17     A.    Yes.
18     Q.    And those are typically
19 considered to be the gold standards of clinical
20 trials, correct?
21         MR. SNAPP:  Object to the form.
22 Objection beyond the scope.
23         THE WITNESS:  Yes, those are
24 trials if -- you know, again, as I say,

Page 118

1  the requirements -- for instance, you
2  can't do a double-blind study in
3  oncology, you know, because you're not
4  going to give someone who doesn't have
5  cancer a chemotherapeutic, for instance.
6      So it really depends what the
7  gold standard for a particular time and
8  indication varies.
9  BY MS. DICKINSON:
10     Q.   Okay.  Let's just talk about this
11 indication.
12     A.   Sure.
13     Q.   Chronic pain.
14         At that time and for that
15 indication, randomized, controlled clinical
16 trials, those would have been the gold standard
17 at that time, correct?
18         MR. SNAPP:  Object to the form.
19 Objection as beyond the scope?
20         THE WITNESS:  There were
21 discussions with FDA about what -- how
22 to do these kinds of trials and what the
23 appropriate patients -- whether -- you
24 notice there are some cancer trials

Page 119

1  here, what the appropriate design of
2  those would be.
3      So I wouldn't say that a
4  particular design was the gold standard.
5  BY MS. DICKINSON:
6      Q.   Okay.
7      A.   It's a collection of studies.
8      Q.   So you don't believe that random,
9  controlled clinical trials are sort of at the
10 top or the most reliable set of studies; you
11 don't believe that?
12         MR. SNAPP:  Object to the form.
13         THE WITNESS:  No.  I -- they are
14 important clinical trials, and if
15 they're possible and necessary, they
16 provide evidence, strong evidence.
17 BY MS. DICKINSON:
18     Q.   Okay.  And to get approval for a
19 drug, a company has to submit adequate and
20 well-controlled studies to support its
21 application, correct?
22     A.   That's correct.
23         MR. SNAPP:  Object to the form.
24 Objection as beyond the scope.

Page 120

1  BY MS. DICKINSON:
2      Q.   That means submitting clinical --
3  controlled clinical trials, correct?
4          MR. SNAPP:  Same objections.
5          THE WITNESS:  Yes.
6  BY MS. DICKINSON:
7      Q.   Okay.  And Purdue submitted six
8  clinical trials for OxyContin, correct?
9          MR. SNAPP:  Objection, beyond the
10 scope.
11         THE WITNESS:  So this whole --
12 controlled clinical trials is what
13 you're saying because this whole table
14 is all the -- there are many
15 pharmacokinetic studies.  The whole
16 list, there's more than six.
17 BY MS. DICKINSON:
18     Q.   Fair.  Can I ask a different
19 question?
20     A.   Yes.
21     Q.   That is a fair point.
22         Purdue submitted six controlled
23 trials in support of its application for
24 approval for OxyContin, correct?

Page 121

1          MR. SNAPP:  Objection, beyond the
2  scope.
3          THE WITNESS:  That's correct.
4          MR. SNAPP:  Okay.  We've been
5  going a little more than an hour.
6          MS. DICKINSON:  I think we'll
7  take a break when we're finished with
8  this document, if that's okay, and then
9  we can talk about eating.
10         THE WITNESS:  Sounds good.
11         MS. DICKINSON:  Not trying to
12 starve you.
13 BY MS. DICKINSON:
14     Q.   Okay.  So I just want to make
15 sure when I look at these documents that I have
16 an understanding.
17         This would be the totality of the
18 controlled trials that Purdue submitted in
19 support of the safety and efficacy of OxyContin
20 for long-term use; is that right?
21         MR. SNAPP:  Objection, beyond the
22 scope.
23         THE WITNESS:  I believe that's
24 true.  To know for certain, I would look

1 at Purdue's table of contents. This is,
2 again, the medical reviewer. I haven't
3 studied this to know whether Dr. Wright
4 left one out.
5 BY MS. DICKINSON:
6 Q. Okay.
7 A. But I believe this is the list.
8 Q. Fair enough. Unless Dr. Wright
9 made a mistake --
10 A. Correct.
11 Q. -- this is the list of the
12 controlled trials in support of safety and
13 efficacy of OxyContin for long-term use that
14 Purdue submitted to the FDA; correct?
15 MR. SNAPP: Object to the form.
16 Objection as beyond the scope.
17 THE WITNESS: Correct.
18 BY MS. DICKINSON:
19 Q. Okay. This is the list of the
20 controlled trials in support of the safety and
21 efficacy of OxyContin to treat chronic pain as
22 well, correct?
23 MR. SNAPP: Same objections.
24 THE WITNESS: The controlled

1 trials, yes.
2 BY MS. DICKINSON:
3 Q. Okay. And chronic pain is
4 commonly defined as lasting for longer than
5 three months; is that right?
6 MR. SNAPP: Objection as beyond
7 the scope.
8 THE WITNESS: It depends on what
9 definition you're -- you know, we're
10 talking about. Definition in terms of
11 diagnostic criterion in a physician's
12 office or regulatory -- you know,
13 they're different.
14 FDA's definition has also evolved
15 over time. At one -- the indication for
16 these products at one time just said
17 weeks, you know, and then it's weeks,
18 months or longer, and now it's long
19 term. So the regulatory standard has
20 changed for these trials.
21 BY MS. DICKINSON:
22 Q. Back in 1996 was the accepted
23 definition of chronic pain pain that lasted
24 longer than 90 days?

1 MR. SNAPP: Object to the form.
2 Objection as beyond the scope.
3 THE WITNESS: I'm not aware of in
4 that year what the definition of chronic
5 pain was.
6 BY MS. DICKINSON:
7 Q. Okay. Let's look quickly at the
8 controlled trials. There is a column that talks
9 about the duration of those controlled trials.
10 Do you see that?
11 A. Yes.
12 Q. And the first controlled trial
13 that's listed, it was studied on patients that
14 took OxyContin for five days; is that correct?
15 MR. SNAPP: Objection, beyond the
16 scope.
17 THE WITNESS: It says five days
18 plus or minus, I'm not sure what the
19 plus or minus indicates. I could look
20 at the --
21 BY MS. DICKINSON:
22 Q. Okay. And the duration for the
23 second clinical trial or controlled trial was
24 also listed at five days, and I see plus or

1 minus, correct?
2 A. That's correct.
3 Q. All right. The third was
4 seven-day clinical -- or controlled trial.
5 Do you see that?
6 A. Correct.
7 Q. The fourth was a 14-day
8 controlled trial, correct?
9 A. That's correct.
10 Q. The fifth was a seven-day
11 controlled trial?
12 A. It says -- yes, seven days. I'm
13 not sure what XO stands for.
14 Q. Okay. And the last, sixth
15 controlled trial was a study on patients who
16 just took a single dose; is that right?
17 MR. SNAPP: Object to the form.
18 THE WITNESS: That's correct.
19 BY MS. DICKINSON:
20 Q. Okay. So the longest duration of
21 the controlled studies that Purdue submitted to
22 the FDA in support of safety and efficacy of
23 OxyContin for treatment of chronic pain was 14
24 days, correct?

1    MR. SNAPP: Object to the form.
2  Objection as beyond the scope.
3    THE WITNESS: In the initial
4  clinical -- the controlled trials the
5  longest is 14 days, correct.
6  BY MS. DICKINSON:
7    Q.   Okay. So none of the controlled
8  studies submitted to the FDA showed safety or
9  efficacy beyond 14 days, correct?
10    MR. SNAPP: Object to the form.
11  Objection as beyond the scope.
12    THE WITNESS: That's correct.
13    MS. DICKINSON: I think this is a
14  good time to take a break.
15    THE VIDEOGRAPHER: Standby,
16  please. Remove your microphones. The
17  time is 11:29 a.m. Going off the
18  record.
19    (Brief recess.)
20    THE VIDEOGRAPHER: All right. We
21  are back on the record. The time is
22  11:42 a.m.
23  BY MS. DICKINSON:
24    Q.   Dr. Fanelli, we're back on the

1  record.
2    A.   Yes.
3    Q.   We talked before going off camera
4  about the clinical studies and the controlled
5  studies that were done and submitted regarding
6  OxyContin. We're going to stay on the subject
7  of OxyContin, but let's talk about the studies
8  that were not done at the time of OxyContin
9  approval.
10    At the time of approval of
11  OxyContin in 1995, Purdue had not conducted
12  clinical studies on how addictive or prone to
13  abuse OxyContin might be; is that right?
14    MR. SNAPP: Object to the form.
15  Objection as beyond the scope.
16    THE WITNESS: That's correct.
17  BY MS. DICKINSON:
18    Q.   Okay. I'm going to hand you what
19  has been marked as Exhibit 18, and it's coming
20  around.
21    (Document marked for
22    identification as Exhibit
23    Purdue-Fanelli-18.)
24  BY MS. DICKINSON:

1    Q.   And, for the record, Exhibit 18
2  is an e-mail chain. It starts with Bates number
3  PKY181376452. That e-mail chain is dated
4  June 16th, 1999. At the top it is from David
5  Gordon to Dr. Robert Kaiko.
6    And a little bit further down the
7  page, there was an earlier e-mail in the chain
8  from Dr. Kaiko to a number of individuals,
9  Dr. Lloyd Haskell, David Gordon, Teresa Baker
10  and Marco Ermini, I think. It copies Mike
11  Innaurato, Ellen?
12    A.   Ingber.
13    Q.   I'm really do not do well with
14  her name, Ingber.
15    A.   It's Ellen Ingber.
16    Q.   And Andrew Albright.
17    Do you see that?
18    A.   Yes.
19    Q.   Okay. And that part of the
20  e-mail chain is -- from Dr. Kaiko is dated
21  June 15th, 1999, correct?
22    A.   Yes.
23    Q.   Who is Dr. Kaiko?
24    A.   We mentioned him previously as

1  the head of one of the R&D departments or one of
2  the Purdue departments, I can't remember what it
3  was at that time.
4    Q.   Was he the chief scientist in R&D
5  back in 1999?
6    A.   I believe that's correct.
7    Q.   And if you would, just take a
8  minute to review Dr. Kaiko's portion of the
9  e-mail chain. I don't think you need to read
10  every word, but I'll tell you what my question
11  is going to be.
12    In this e-mail chain, is
13  Dr. Kaiko proposing a study program for
14  OxyContin is going to be my question, so take a
15  minute to review the e-mail.
16    A.   (Witness reviews document.)
17    I've looked at it quickly.
18    Q.   My question is in the e-mail
19  generally is Dr. Kaiko proposing a study program
20  for OxyContin?
21    A.   Yes, it appears so.
22    Q.   Okay. Then that's on page 2
23  there's a section called "Proposed Study
24  Program," correct?

1    A.    Correct.

2    Q.    Okay.  And on page 2 at the top,

3  Dr. Kaiko identifies the reasons that would

4  support further investment in OxyContin,

5  including the following, and he says, OxyContin

6  has better patent protection than any of the

7  other analgesics and any such investment in the

8  growth of OxyContin is also relatively

9  protected.

10          His second reason is that

11  OxyContin has a reasonable number of

12  differentiating properties from other

13  analgesics, but these differentiating properties

14  have not been sufficiently studied or exploited.

15          Three, the acceptance of this

16  strong analgesic in non-cancer pain is also

17  quite unique and begs for further development in

18  that very large market.

19          Do you see that?

20    A.    Yes.

21    Q.    Did I read that correctly?

22    A.    Yes.

23    Q.    And Dr. Kaiko here is identifying

24  those three reasons as the business reasons for

1  wanting to run additional studies, correct?

2          MR. SNAPP:  Object to the form.

3          THE WITNESS:  It says these are

4      the reasons to support investment, yes.

5  BY MS. DICKINSON:

6    Q.    Okay.  And that investment would

7  be an investment through conducting the proposed

8  study program that he proposes, correct?

9          MR. SNAPP:  Object to the form.

10          THE WITNESS:  It includes budget,

11      right.

12  BY MS. DICKINSON:

13    Q.    I'm sorry.  I think we were

14  probably talking over each other.  What was your

15  answer?

16    A.    I'm sorry.  That's correct.

17    Q.    Okay.  None of those three

18  reasons that Mr. Kaiko at least is identifying

19  here for wanting to run this proposed study

20  program has to do with safety, correct?

21          MR. SNAPP:  Object to the form.

22          THE WITNESS:  It's not clear

23      whether or not they're safety.

24  BY MS. DICKINSON:

1    Q.    The three reasons he offers in

2  this first paragraph, none of those have to do

3  with safety, correct?

4          MR. SNAPP:  Object to the form.

5          THE WITNESS:  Differentiating

6      properties could refer to safety.

7  BY MS. DICKINSON:

8    Q.    Okay.  Other than the

9  differentiating properties which you think might

10  refer to safety, do you see anything else about

11  safety in the reasons that Dr. Kaiko is offering

12  for the support of further investment in

13  OxyContin?

14          MR. SNAPP:  Object to the form.

15          THE WITNESS:  So this is -- it

16      doesn't specifically state that, but a

17      strong analgesic in non-cancer pain may

18      have some safety issues related to it.

19  BY MS. DICKINSON:

20    Q.    Okay.  Let's go down to under the

21  proposed study program.  There's a section

22  called "Therapeutic Trials."

23          Do you see that?

24    A.    On the same -- yes.

1    Q.    And number one on Dr. Kaiko's

2  list is -- and one of the proposed study program

3  therapeutic trials he is proposing to run is on

4  iatrogenic addiction in non-cancer pain

5  patients.

6          Do you see that?

7    A.    Yes.

8    Q.    And he proposes to conduct that

9  study in the year 2000 or 2001, correct?

10    A.    Yes, that's what it says.

11    Q.    And we talked about -- well, we

12  didn't talk about it earlier, but Purdue did not

13  take his recommendation and conduct that study

14  in the year 2000 or 2001, correct?

15          MR. SNAPP:  Object to the form.

16      Objection as beyond the scope.

17          THE WITNESS:  I'm not aware, you

18      know, whether Purdue did or not.

19  BY MS. DICKINSON:

20    Q.    Are you aware at any time between

21  1995 and 2017 whether Purdue conducted any

22  clinical studies on iatrogenic addiction with

23  respect to OxyContin?

24          MR. SNAPP:  Objection, beyond the

1    scope.
2         THE WITNESS:  So Purdue is
3    conducting postmarketing required
4    studies of currently -- what are the
5    years that you asked?
6  BY MS. DICKINSON:
7    Q.    I asked you from 1995 to 2017.
8    A.    So we have postmarketing required
9  studies both for OxyContin and for the class to
10 study misuse, abuse, addiction, overdose and
11 death as required by those postmarketing
12 studies.  So those studies have been going on, I
13 can't remember the year they started, at least
14 five years, to study.
15   Q.    Okay.  And those were the studies
16 that were required by the FDA, correct?
17   A.    It was part of a postmarketing
18 requirement, yes.
19   Q.    Okay.  So I just want to clear up
20 the history.
21        The FDA at some point in time,
22 you think it was about five years ago, required
23 Purdue to conduct postmarketing studies on
24 addiction and abuse with respect to OxyContin;

1  is that correct?
2    A.    I don't remember the exact year
3  starting, but, yes, it's part of a postmarketing
4  commitment.
5    Q.    Okay.  Up until the time that the
6  FDA required those studies, had Purdue conducted
7  any studies on addiction or abuse with respect
8  to OxyContin?
9         MR. SNAPP:  Objection, beyond the
10        scope.
11        THE WITNESS:  We had -- in the
12        reformulated OxyContin has abuse
13        deterrent properties, so we have
14        clinical trials looking at the effect of
15        that reformulation.
16 BY MS. DICKINSON:
17   Q.    I'm just talking about the
18 original formulation.
19   A.    Okay.
20   Q.    If I could.
21   A.    Yes.
22   Q.    The original formulation, to your
23 knowledge prior to the FDA requiring these
24 addiction and abuse studies, whenever that was,

1  the last five years sometime, had Purdue ever
2  conducted any studies on the original
3  formulation regarding iatrogenic addiction?
4         MR. SNAPP:  Object to the form,
5        objection as beyond the scope.
6         THE WITNESS:  Not that I'm aware
7        of.
8  BY MS. DICKINSON:
9    Q.    So Purdue from the time of this
10 e-mail in 1999 to roughly five years ago, when
11 it was required to do so by the FDA, did not
12 take Dr. Kaiko's recommendation and conduct
13 studies on iatrogenic addiction with respect to
14 the original formulation of OxyContin, correct?
15        MR. SNAPP:  Object to the form.
16        Objection as beyond the scope.
17        THE WITNESS:  Could you repeat
18        the question.  I'm sorry.
19 BY MS. DICKINSON:
20   Q.    Yes.  I'm just confirming what I
21 think you told me a minute ago.
22        So Purdue from 1999, when
23 Dr. Kaiko was recommending doing a study on
24 iatrogenic addiction in non-cancer patients,

1  from that time in 1999 up until the FDA required
2  it to several years ago, Purdue did not take
3  Dr. Kaiko's recommendation and conduct this
4  study that he was proposing, correct?
5         MR. SNAPP:  Same objections.
6         THE WITNESS:  Again, I'm not
7        aware, so I assume, you know, the design
8        and science around those studies is an
9        evolving science, but, as far as I know,
10        no, those studies were not conducted.
11 BY MS. DICKINSON:
12   Q.    Okay.  Let's go to the page that
13 talks about this proposed iatrogenic addiction
14 study, which at the bottom is PKY181376455, so
15 it's a couple pages beyond that.
16   A.    I got it.
17   Q.    Do you see it?
18   A.    Yes.
19   Q.    Okay.  And Dr. Kaiko here in the
20 iatrogenic addiction section, he talks about the
21 rationale for conducting such a study.
22        He says, "The around-the-clock
23 use of opioids in the management of chronic
24 non-cancer pain remains controversial; there is

1 certainly not a consensus within the medical or
2 regulatory communities in most territories.
3 Long-term, well-controlled studies demonstrating
4 either no or an insignificant incidence of
5 iatrogenic addiction and drug diversion would
6 encourage earlier and more prolonged use of
7 OxyContin in chronic non-cancer patients in whom
8 non-opioids are not sufficiently safe and/or
9 effective."
10     Did I read that correctly?
11     A.    Yes.
12     Q.    Okay.  And the study that
13 Dr. Kaiko was proposing was a means of resolving
14 that lack of consensus; was it not?
15         MR. SNAPP:  Object to the form.
16     Objection as beyond the scope.
17         THE WITNESS:  The design was to
18     investigate that rationale.  I don't
19     know about resolving a consensus.
20 BY MS. DICKINSON:
21     Q.    Okay.  And the study was --
22     A.    Providing evidence.
23     Q.    The study was needed because
24 Purdue had not conducted prior studies on that

1 subject, correct?
2         MR. SNAPP:  Objection, beyond the
3     scope.
4         THE WITNESS:  There were no data
5     regarding that on that particular topic.
6 BY MS. DICKINSON:
7     Q.    Okay.  And until the study that
8 Purdue is currently working on, Purdue has no
9 data on that particular topic as well, correct?
10         MR. SNAPP:  Object to the form.
11     Objection as beyond the scope.
12         THE WITNESS:  There is no -- what
13     we talked about was a clinical trial
14     design.  There is information related to
15     abuse and addiction, but there's no
16     clinical trial.
17 BY MS. DICKINSON:
18     Q.    Fair.
19     A.    As is stated, yes.
20     Q.    And that was true when Purdue was
21 marketing OxyContin as believed to reduce the
22 abuse potential of the drug, the
23 extended-release formulation, correct?
24         MR. SNAPP:  Object to the form.

1     Objection as beyond the scope.
2         THE WITNESS:  So what was true,
3     that there was no clinical?
4 BY MS. DICKINSON:
5     Q.    That there was no clinical trial,
6 correct?
7     A.    Correct.
8         MR. SNAPP:  Same objections.
9 BY MS. DICKINSON:
10     Q.    Let's look back at -- you may
11 have to dig for this for a minute -- Exhibit 15,
12 the Agreed Statement of Facts in the criminal
13 case against Purdue by the United States
14 Department of Justice.  That's Exhibit 15.
15     A.    Mm-hmm.
16     Q.    Can we take a look at paragraph
17 14.  Let's start with the first capitalized
18 Purdue.
19         "Purdue did not have, and did not
20 provide the FDA with, any clinical studies
21 demonstrating that OxyContin was less addictive,
22 less subject to abuse and diversion, or less
23 likely to cause tolerance and withdrawal than
24 other pain medications."

1         Do you see that in the Agreed
2 Statement of Facts that Purdue signed in 2007?
3     A.    Just want to confirm which
4 document we're looking at.
5         Fourteen, is that --
6     Q.    Yes.
7     A.    Yeah.  (Witness reviews
8 document.)
9         Yes, I see that.
10     Q.    Okay.  And do you believe that to
11 be true, that Purdue did not have and did not
12 provide the FDA with any such clinical studies?
13         MR. SNAPP:  For completeness, can
14     you read the first part of that sentence
15     as well.
16         MS. DICKINSON:  Sure.
17 BY MS. DICKINSON:
18     Q.    Let's -- I'll back it up in just
19 a second.
20         But do you believe that that
21 statement is accurate "and Purdue did not have,
22 and did not provide the FDA with, any clinical
23 studies demonstrating that OxyContin was less
24 addictive, less subject to abuse and diversion,

1 or less likely to cause tolerance and withdrawal
2 than other pain medications"?
3          MR. SNAPP:  Object to the form.
4     Objection as beyond the scope.
5          THE WITNESS:  What this talks
6     about is clinical studies only, and
7     that's what it says, yeah.
8 BY MS. DICKINSON:
9     Q.    And that was true, there were no
10 such clinical studies; we just talked about that
11 a minute ago, correct?
12          MR. SNAPP:  Same objections.
13          THE WITNESS:  Correct.
14 BY MS. DICKINSON:
15     Q.    Okay.  But even though there were
16 no such clinical studies, let's turn to
17 paragraph 20 again.
18     A.    The same document?
19     Q.    Yep.
20     "Beginning on or about
21 December 12th, 1995, and continuing until on or
22 about June 30th, 2001, certain Purdue
23 supervisors and employees, with the intent to
24 defraud or mislead, marketed and promoted

1 OxyContin as less addictive, less subject to
2 abuse and diversion, and less likely to cause
3 tolerance and withdrawal than other pain
4 medications."
5     That fact was a fact that Purdue
6 signed off on in its Agreed Statement of Facts
7 in its criminal case, correct?
8          MR. SNAPP:  Object to the form.
9     Objection as beyond the scope.
10          THE WITNESS:  That is correct.
11 BY MS. DICKINSON:
12     Q.    All right.  Put that aside for a
13 moment.
14     A.    Excuse me, this e-mail too?
15     Q.    You can put aside that e-mail as
16 well.
17     A.    Okay, thanks.
18     (Document marked for
19     identification as Exhibit
20     Purdue-Fanelli-19.)
21 BY MS. DICKINSON:
22     Q.    All right.  So I'm going to hand
23 you what's been marked as Exhibit 19.  And
24 Exhibit 19 is a spreadsheet that was produced to

1 plaintiffs by Purdue in this case.  It bears the
2 Bates number at the bottom PPLCC016000115515 as
3 the starting Bates number; is that correct?
4     A.    Yes.
5     Q.    Did I read that number correctly?
6     A.    Yes.
7     Q.    This appears to be a spreadsheet
8 containing the clinical trials for OxyContin,
9 correct?  If you want to take a minute to look
10 through it.
11     A.    I have it.
12     Q.    Actually, I'm not sure I said
13 that right.  It appears to be a spreadsheet that
14 lists studies that were done with respect to
15 OxyContin, correct, not just clinical trials?
16     A.    Let me look through.
17     (Witness reviews document.)
18     Yes, that's what it appears to
19 be.
20     Q.    Okay.  And it lists a number of
21 studies, correct?
22     A.    Yes.
23     Q.    Okay.  More than the six clinical
24 trials that were submitted to the FDA,

1 obviously, right?
2          MR. SNAPP:  Object to the form.
3          THE WITNESS:  There's many.  I'm
4     not -- yes.
5 BY MS. DICKINSON:
6     Q.    Okay.  And it has a column on I
7 guess kind of in the -- or actually towards the
8 right-hand side that notes whether each study
9 was published, correct?
10     A.    Looking at "Report"?  Is that the
11 column, it says Report (CSR --
12     Q.    I'm sorry.  There's one that says
13 "Publication" right next to --
14     A.    Oh, yes.
15     Q.    -- the left of "Report."
16     A.    Yeah.
17     Q.    Do you see that?
18     So it has a column noting if each
19 study was published; is that right?
20     A.    I would have to assume.  I
21 haven't seen this before, and there aren't a lot
22 of descriptions of what those -- I don't know if
23 it means in a scientific publication or just
24 produced as a final document.

1    Q.    Okay.  And I guess whatever it
2  means, there are nos in the publication column
3  for some of these studies, correct?
4    A.    Yes.
5    Q.    And the "Report" column has "CSR
6  and/or literature" in parentheses.  What does
7  CSR and/or literature mean to you?
8    A.    CSR is a clinical study report,
9  and literature -- and I see like the first one
10  lists Journal of Clinical Psychopharmacology,
11  whether or not it was in a literature journal.
12    Q.    Okay.  So that column appears to
13  tell which studies regarding OxyContin were
14  either -- either did not have a clinical study
15  report written up or if they were published,
16  where it was published, correct?
17        MR. SNAPP:  Object to the form.
18        THE WITNESS:  That's what that
19     column says.  I'm not aware -- you know,
20     I can't tell from this if all these
21     studies were conducted or they were just
22     protocols, plan, so I'm not -- it
23     doesn't have enough context.
24  BY MS. DICKINSON:

1    Q.    Who would I ask to find out
2  whether any of these studies were conducted,
3  finished, that sort of thing, who would I ask?
4    A.    Whoever produced this table, but
5  it doesn't have an author.
6    Q.    All I have is Purdue Pharma as
7  the author, so I'm asking you, do you have any
8  idea who at the company for OxyContin might know
9  which studies were not finished or not
10  completed, which studies were published, facts
11  of that nature?
12    A.    The clinical -- the clinical
13  research, when we looked at the org chart, the
14  clinical research individuals would be -- are
15  responsible for these trials, and I'm -- I
16  haven't read every line, but I'm assuming these
17  are all clinical trials.  But the clinical
18  research group or medical research, those
19  individuals.
20    Q.    Okay.  This appears to list
21  studies between 1988 and 2005.  In that time
22  frame for OxyContin, who might be the person
23  that might have the most knowledge about whether
24  studies were completed, why they weren't

1  completed and facts of that nature?
2        MR. SNAPP:  Object to the form.
3     Objection as beyond the scope.
4        THE WITNESS:  The clinical
5     research group.
6  BY MS. DICKINSON:
7    Q.    And there are a number of studies
8  on this table that have the notation under
9  publication of no, correct?
10        MR. SNAPP:  Object to the form.
11        THE WITNESS:  There's -- I see no
12     CSR.
13  BY MS. DICKINSON:
14    Q.    Under publication, though, where
15  it says yeses and nos, there are a number of
16  notations where it reflects --
17    A.    Oh, I see, sorry.  I was on the
18  wrong column.
19    Q.    -- no in the publication column.
20        Is that accurate?
21        MR. SNAPP:  Same objection.
22        THE WITNESS:  I see no with an
23     asterisk, and I see nos as well, that is
24     correct.

1  BY MS. DICKINSON:
2    Q.    Okay.  And under the report
3  column, the only journal notation I see in the
4  report column is that very first study that's
5  listed in this table; is that accurate?
6    A.    Yes.
7    Q.    Okay.  Put those aside.
8        (Document marked for
9     identification as Exhibit
10     Purdue-Fanelli-20.)
11  BY MS. DICKINSON:
12    Q.    I'm going to hand you what I have
13  marked as Exhibit 20, coming around.
14        Okay.  And Exhibit 20 is another
15  document that was produced to us by Purdue in
16  this matter bearing the Bates number at the
17  bottom PPLPC013000138890.
18        Do you see that?
19    A.    Yes.
20    Q.    Okay.  And the title on this
21  document is "OxyContin Clinical Studies."
22        Do you see that?
23    A.    Yes.
24    Q.    Okay.  This document appears to

Page 150

1 list studies ranging from 1988 to 2005; is that
2 accurate?
3     A.    Yes.
4     Q.    Okay.  And this document also
5 indicates for each study whether the study was
6 completed and if it was published in a journal
7 where it was published.
8         Do you see that?
9     A.    Yes.
10    Q.    And there are a number of studies
11 that I believe are all highlighted in gray, but
12 at least the first few are, where it notes that
13 the study was completed but no CSR was written.
14        Do you see that?
15    A.    Yes.
16    Q.    And a CSR is the clinical study
17 report, correct?
18    A.    Correct.
19    Q.    So those notations would mean
20 that studies were completed but no report was
21 actually written up on the study; is that right?
22        MR. SNAPP:  Object to the form.
23        THE WITNESS:  The subheading of
24     the beginning of this says "Listed in

Page 151

1     IND Annual Reports," so I assume these
2     were pulled out, that's where the source
3     for these.  So in the annual report, it
4     must -- it stated that, that at that
5     time in that annual report.  I can't --
6     I don't know if a CSR subsequent or
7     outside of the annual report appears
8     somewhere else.
9 BY MS. DICKINSON:
10    Q.    Okay.  What is the IND annual
11 report?
12    A.    So once investigation of new drug
13 application is submitted, every year you have to
14 update the FDA on the safety -- mostly around
15 safety, but conduct of studies is also a part of
16 that requirement, so those would be listed in
17 there, what studies were conducted.
18    Q.    And who is in charge of the IND
19 annual reports at Purdue in this time frame?
20 Let's even just say 1995 to 2005.
21    A.    So regulatory affairs would
22 submit it.  The individuals, each of the
23 disciplines responsible for the different
24 sections, so pharmacovigilance would give a

Page 152

1 report of adverse events that were reported
2 during that year.  There's a time period, of
3 course, 12-month time period.  Medical affairs
4 or clinical, clinical research, the same folks
5 we were talking about, would report on ongoing
6 clinical trials.  There's a section of the IND
7 annual report that talks about ongoing clinical
8 trials, where you list any adverse event -- you
9 know, the listing, discontinuations and so forth
10 that are part of that annual report.
11    Q.    Okay.  And this document notes
12 that there are several studies, we'll just take
13 the examples on the first page, that -- where
14 the study had been terminated, correct?
15    A.    Yes, I see that.
16    Q.    Okay.  And there are several
17 other entries on the -- one on the next page and
18 one on the following page about study
19 terminated.
20        Do you see that?
21    A.    Yes.
22    Q.    And that means the study was not
23 finished, correct?
24    A.    I believe that's what that means,

Page 153

1 yes.
2     Q.    Okay.  And there are a number of
3 entries that do not list a publication source
4 for the studies listed in this document,
5 correct?
6     A.    That's correct.
7     Q.    Okay.  Put that aside.
8         (Document marked for
9         identification as Exhibit
10        Purdue-Fanelli-21.)
11 BY MS. DICKINSON:
12    Q.    I'm going to hand you what I've
13 marked as Exhibit 21.
14        Exhibit 21, what we've marked as
15 Exhibit 21 is a memo from April 10, 1995 to the
16 OxyContin Launch Team.
17        Do you see that?
18    A.    Yes.
19    Q.    And the first or second
20 paragraph, little bigger paragraph ends with a
21 couple statements to the OxyContin launch team
22 that says, "OxyContin's positioning statement is
23 all the analgesic efficacy of immediate-release
24 Oxycodone, with convenient Q12 dosing.  The

1 proposed features and benefits of OxyContin were
2 listed. The convenience of Q12 dosing was
3 emphasized as the most important benefit."
4         Do you see that?
5     A.    Yes.
6     Q.    And a large part of Purdue's
7 marketing of its OxyContin product was the Q12
8 dosing aspect, correct?
9         MR. SNAPP: Object to the form.
10 Objection as beyond the scope.
11        THE WITNESS: I'm actually not
12 aware of the -- I wasn't there at the
13 time, but, also, of what the commercial
14 launch campaign was.
15        Statements such as positioning
16 statements are not -- positioning -- I
17 mean, it's not meant to be a claim, I
18 mean, not meant to appear. It's how
19 plans are designed around those
20 statements, and this is a meeting --
21 meeting minutes of what was discussed
22 there.
23 BY MS. DICKINSON:
24    Q.    I don't think we need to belabor

1 the point.
2         Was OxyContin marketed for
3 12-hour relief?
4         MR. SNAPP: Objection to form.
5         THE WITNESS: Of course.
6 BY MS. DICKINSON:
7    Q.    That was really all I was getting
8 at.
9         That was a key aspect of the
10 drug's properties in marketing, correct?
11        MR. SNAPP: Objection, beyond the
12 scope.
13        THE WITNESS: Again, it's not --
14 I don't know, you know, was it a key
15 element? It was part of the promotional
16 message.
17 BY MS. DICKINSON:
18    Q.    You don't know, sitting here
19 today, whether 12-hour relief was a part -- a
20 key part of the marketing messages for
21 OxyContin?
22        MR. SNAPP: Object to the form.
23 Objection as beyond the scope.
24        THE WITNESS: It was part of the

1 marketing messages, yes.
2 BY MS. DICKINSON:
3    Q.    And it was a big part, right?
4         MR. SNAPP: Objection to form.
5         THE WITNESS: The 12-hour dosing
6 --
7         MR. SNAPP: Wait, let me get the
8 objection in.
9         THE WITNESS: Sorry.
10        MR. SNAPP: Object to the form.
11 Objection as beyond the scope.
12        THE WITNESS: The
13 extended-release form 12-hour was an
14 important part of the message.
15 BY MS. DICKINSON:
16    Q.    Okay. Purdue had information in
17 the first few years of OxyContin's sale that the
18 12-hour dosing didn't work, that patients would
19 have to dose more frequently, correct?
20        MR. SNAPP: Objection, beyond the
21 scope.
22        THE WITNESS: I don't know what
23 information Purdue had related to that.
24 BY MS. DICKINSON:

1    Q.    Do you know whether Purdue had in
2 its possession a study that was done in 1989 on
3 some of the first patients to use OxyContin in
4 Puerto Rico?
5         MR. SNAPP: Object to the form.
6         THE WITNESS: I'm not aware of
7 that.
8         MR. SNAPP: Did you say '89?
9         MS. DICKINSON: Yes, that's what
10 it says.
11        Here, let's make this easier.
12 That's not the right exhibit number.
13 Hold on just a second. Can you tell me
14 what the last exhibit number was?
15        MR. SNAPP: Twenty-one.
16        MS. DICKINSON: Twenty-one, okay.
17 Here we go, okay.
18        (Document marked for
19 identification as Exhibit
20 Purdue-Fanelli-22.)
21 BY MS. DICKINSON:
22    Q.    I'm going to hand you what's been
23 marked Exhibit 22 and some copies of that.
24        And Exhibit 22 is a study -- is a

Page 158

1 copy of a double-blind, randomized, single dose,
2 parallel group study bearing the date
3 February 14, 1989.
4     Do you see that?
5   A.  Yes.
6   Q.  Okay.  And have you ever seen
7 this study before?
8   A.  No.
9   Q.  You're not familiar --
10   A.  I don't remember seeing this.
11 This is dated '89.  I joined Purdue in 2000.  I
12 don't remember this particular document.
13   Q.  But you didn't prepare for the
14 topic 7 regarding the results of any such
15 testing at Purdue for purposes of your
16 deposition today, correct?
17     MR. SNAPP:  Object to the form.
18     I'm not sure this has to do with a
19     Purdue product, first of all.
20     MS. DICKINSON:  He can answer the
21     question.
22 BY MS. DICKINSON:
23   Q.  You didn't prepare for this topic
24 7 by reviewing this study and the results for

Page 159

1 the purposes of your deposition today?
2     MR. SNAPP:  Object to the form.
3 BY MS. DICKINSON:
4   Q.  Correct?
5   A.  I didn't review this document.
6   Q.  Okay.  Did you, in preparing to
7 talk about the results of testing at Purdue
8 regarding its opioid products, ever discuss with
9 anyone the results of this study done in Puerto
10 Rico on women who were using OxyContin?
11     MR. SNAPP:  Object to the form.
12     Object as beyond the scope.
13     THE WITNESS:  No, I did not.
14 BY MS. DICKINSON:
15   Q.  Do you know if in this study more
16 than a third of the women that were given
17 OxyContin started complaining about pain in the
18 first eight hours; do you know?
19     MR. SNAPP:  Object to the form.
20     Object as beyond the scope.
21     Do you want him to read the
22     study?
23 BY MS. DICKINSON:
24   Q.  Do you know?

Page 160

1   A.  Not without looking at the study.
2   Q.  And you hadn't looked at the
3 study to prepare for today, correct?
4   A.  Correct.
5   Q.  Okay.  Do you know if Purdue ever
6 submitted this study to the FDA?
7     MR. SNAPP:  Object to the form.
8     Object as beyond the scope.
9     THE WITNESS:  I do not know.  I
10     can't tell from this.
11 BY MS. DICKINSON:
12   Q.  Do you know if Purdue had
13 information that its OxyContin product was not
14 lasting for 12 hours?
15     MR. SNAPP:  Objection, beyond the
16     scope.
17     THE WITNESS:  What do you mean by
18     "information"?
19 BY MS. DICKINSON:
20   Q.  Any information, do you know if
21 Purdue at any point in time regarding the
22 original formulation OxyContin product had
23 knowledge that its product was not lasting for
24 12 hours?

Page 161

1     MR. SNAPP:  Same objection.
2     THE WITNESS:  So the approved
3     package insert talks about 12-hour
4     dosing of the product.  That's the
5     evidence that was provided in the NDA,
6     and that's what FDA approved.
7     Individual reports -- obviously,
8     individual patients' response,
9     pharmacological, pharmacodynamic
10     response varies.  I don't know if there
11     were reports of -- it would be an
12     adverse event if the drug didn't last
13     that could be reported.  Those -- that
14     information would have been reported to
15     Purdue, but I'm not aware of it,
16     specifically, specific cases.
17 BY MS. DICKINSON:
18   Q.  Okay.  So the product OxyContin
19 was approved for 12-hour dosing, correct?
20   A.  Yes.
21   Q.  And you're not aware of Purdue
22 receiving information that OxyContin was wearing
23 off in patients before 12 hours; is that what
24 you're saying?

Page 162

1    MR. SNAPP:  Objection, beyond the
2  scope.
3    THE WITNESS:  I'm saying I'm not
4  aware of the specific incidence of that
5  report, that kind of reporting.
6  BY MS. DICKINSON:
7    Q.    If Purdue received that kind of
8  information, should it have submitted it to the
9  FDA?
10    MR. SNAPP:  Objection, beyond the
11  scope.
12    THE WITNESS:  It depends on how
13  it was reported.  There are requirements
14  around adverse events, and it has to,
15  you know, raise to that level of a
16  serious adverse event, we would have
17  reported it.
18  BY MS. DICKINSON:
19    Q.    Would --
20    A.    But, again, depends on the nature
21  of the report.
22    Q.    Are you suggesting that Purdue
23  would only have provided that sort of
24  information if it rose to the level of the

Page 163

1  requirement?
2    MR. SNAPP:  Object to the form.
3  Objection as beyond the scope.
4    THE WITNESS:  We would report
5  issues that were a serious adverse event
6  and deemed so by our pharmacovigilance
7  group.
8  BY MS. DICKINSON:
9    Q.    And how is something deemed to be
10  a serious adverse event at Purdue?
11    A.    That's under the purview of the
12  pharmacovigilance department.  It, you know,
13  review of individual cases, but if a product is
14  not performing as stated in the package insert,
15  that's part -- that would be part of the
16  reporting.
17    Q.    If a product is not performing as
18  stated in the package insert, it would be
19  important to provide any information about that
20  failure of performance to the FDA, correct?
21    MR. SNAPP:  Object to the form.
22  Objection as beyond the scope.
23    THE WITNESS:  Yes, that's
24  correct.

Page 164

1  BY MS. DICKINSON:
2    Q.    Okay.  We're going to move on to
3  the next topic, and I hope to do it fairly
4  quickly, and then we'll take a lunch break.
5  That's topic 10.
6    So if we could pull out the
7  notice again, just real quick, that first
8  exhibit.  Topic 10 for which you are identified
9  to testify on behalf of Purdue states, the
10  identification of your, and that's Purdue's,
11  policies and procedures for and the identity of
12  all persons responsible for interacting with the
13  Food and Drug Administration, FDA, the DEA, the
14  US Department of Justice or other state and
15  federal government agencies.
16    Did I read that topic correctly?
17    A.    Yes, this part.
18    MR. SNAPP:  It's right here.
19    THE WITNESS:  I know but it's not
20  here.
21  BY MS. DICKINSON:
22    Q.    And are you prepared to testify
23  on that topic today on behalf of Purdue?
24    MR. SNAPP:  Just to be clear,

Page 165

1  he's prepared to testify as to topic 10
2  as stated in our November 15th filing
3  that I think has been marked as Exhibit
4  5, if I remember correctly.
5  BY MS. DICKINSON:
6    Q.    Okay.  And, for the record, you
7  are not prepared to testify on topic 10 as
8  written, by statement of your counsel, correct?
9    MR. SNAPP:  Do you want to --
10    THE WITNESS:  Correct.
11    MR. SNAPP:  -- look at the
12  definition and compare them, and you'll
13  see that they're incredibly similar.
14    MS. DICKINSON:  Fair enough.
15  BY MS. DICKINSON:
16    Q.    I'm asking, though, are you
17  prepared to talk -- prepared today to testify on
18  topic 10 for Purdue as written?
19    A.    I'm prepared with the minor
20  modification.
21    Q.    So the answer is, no, you're not
22  prepared to testify as written in topic 10,
23  correct?
24    A.    Correct.

1    Q.   Okay.  All right.  What is the
2  minor modification that your counsel has made to
3  topic 10 in the objections that are marked as
4  Exhibit -- I'm sorry.
5       MR. SNAPP:  Five.
6  BY MS. DICKINSON:
7    Q.   Five.
8    A.   The exclusion of other state and
9  federal government agencies.
10   Q.   Okay.  So you are not here
11 prepared to testify on behalf of Purdue as to
12 that portion of the topic, correct?
13   A.   Correct.
14   Q.   Okay.  Let's take the policies
15 and procedures for interacting with the FDA
16 first.
17       Do you have a list of the
18 policies and procedures that exist at Purdue or
19 have existed at Purdue from 1995 to present
20 regarding interacting with FDA?
21   A.   Yes.
22       MS. DICKINSON:  Okay.  Can we
23   mark that list.  First, I'm sending it
24   around.  Can we mark the list as Exhibit

1    23.
2        (Document marked for
3        identification as Exhibit
4        Purdue-Fanelli-23.)
5  BY MS. DICKINSON:
6    Q.   A very helpful list, thank you.
7        Okay.  We've marked as Exhibit 23
8  what I believe to be the Purdue's answer to
9  topic 10 with respect to the FDA and the DEA; is
10 that correct?
11   A.   Yes.
12   Q.   Okay.  Topic -- or Exhibit 23
13 identifies it looks like four policies and
14 procedures for interacting with the FDA at
15 Purdue.
16       Do you have copies of those
17 policies and procedures with you as well?
18   A.   Yes.
19       MS. DICKINSON:  Okay.  Could we
20   maybe mark those?  If I could get a copy
21   of all of those four policies, that
22   would be helpful.  Do you have those
23   coming?
24       MR. SNAPP:  Do you want to pass

1  the exhibit stickers over?
2        MS. DICKINSON:  Sure, that might
3  be --
4        MR. SNAPP:  That might be easier,
5  yeah.
6        MS. DICKINSON:  I'm going to pass
7  them, not throw them.  You can pass them
8  back.
9        So we're starting with 24 for the
10 first one, okay.  I'm sorry, here's 24,
11 coming around.
12       (Documents marked for
13       identification as Exhibits
14       Purdue-Fanelli-24 through 27.)
15 BY MS. DICKINSON:
16   Q.   Okay.  Let's just take -- and
17 we're talking again about the policies and
18 procedures that exist at Purdue for interacting
19 with the FDA first.
20       And the first one of those that
21 Purdue has identified is Exhibit 24; is that
22 right?
23   A.   Yes.
24   Q.   Okay.  And what is Exhibit 24?

1    A.   It describes a standard operating
2  procedure for interacting with FDA regarding an
3  NDA or a ANDA or supplemental new drug
4  application.
5    Q.   Okay.  And is this the policy
6  that is in place currently today?
7    A.   Yes.
8    Q.   Okay.  Was there a previous
9  policy similar to this policy?
10   A.   Yes, this is version, as it says
11 in the back, 4.0, so this procedure has been in
12 effect.
13   Q.   How -- I assume there's a 1.0, a
14 2.0 and 3.0; is that right?
15   A.   I'm assuming as well, but I'm not
16 -- I don't -- yes, that's how we mark them.
17   Q.   Do you know how far back a policy
18 of this type went at Purdue, i.e., when was 1.0
19 put into effect?
20   A.   I don't know the exact date.  I
21 know that the policies were always in place.  I
22 don't know if it was written down as a specific
23 standard operating procedure in this way and how
24 long that was.

1    Q.    Okay.  Do you know when the first
2 time that the policies addressed in Exhibit 24
3 were written down?
4    A.    No, I don't know the exact date.
5 I know the policy has been in place throughout
6 Purdue's existence.
7    Q.    So whether it was written down or
8 not, the policy that is written down in Exhibit
9 24 has always been in place at Purdue?
10    A.    Yes.
11    Q.    Okay.  And what is the -- I'm
12 sorry.  You said that this was the policy that
13 governed Purdue's interactions with respect to
14 the NDA; is that right?
15    A.    This is actually related to the
16 submissions of an NDA.
17    Q.    Okay.  Does the policy cover any
18 other topic or subject?
19    A.    This one is about or supplements
20 and talking about that that -- what it's
21 referring to is the federal regulation that we
22 follow in order to file an NDA.  That's what
23 this is about.
24    Q.    Okay.  The second policy that I

1 believe has been marked as Exhibit 25 is --
2    A.    Correct.
3    Q.     -- it says REGSOP0035; is that
4 right?  What's Exhibit 25 in front of you?  I'm
5 sorry.
6    A.    So the difference -- the first
7 one is an NDA.  The second one is about filing
8 an IND.
9    Q.    Okay, sorry.  So Exhibit 25 is
10 the second item on your list that was marked as
11 Exhibit 23, and it is the initial IND submission
12 standard operating procedure; is that right?
13    A.    Yes.
14    Q.    And what does this policy cover?
15    A.    It talks about the filing of the
16 initial IND, so the opening of an IND in order
17 to conduct clinical trials.
18    Q.    Okay.  And this is the policy
19 that is currently in effect at Purdue, correct?
20    A.    Yes.
21    Q.    And similar to the last policy in
22 Exhibit 24, has the policy, as it's outlined in
23 Exhibit 25, always been the same at Purdue,
24 whether it was written down or not?

1    A.    Correct.
2    Q.    And do you know when the first
3 written version of this policy was?
4    A.    I do not.
5    Q.    Okay.  Exhibit 26, what is
6 Exhibit 26?
7    A.    This talks about submissions of
8 promotional material to FDA.
9    Q.    Okay.  And --
10    A.    Advertising and promotional.
11    Q.    Exhibit 26 is the third item on
12 Purdue's list listed on Exhibit 23 in its
13 response to topic 10; is that right?
14    A.    Yes.
15    Q.    Okay.  And this is the policy
16 that is currently in existence at Purdue,
17 correct?
18    A.    Yes.
19    Q.    Is it also the same as the other
20 two policies we've talked about, where the
21 information in this policy has always been the
22 policy at Purdue, whether it was written down or
23 not?
24    A.    Correct.

1    Q.    Okay.  And do you have any idea
2 when the first written version of this policy
3 was put into effect?
4    A.    No, I do not.
5    Q.    Okay.  Let's talk about Exhibit
6 27.  What is Exhibit 27?
7    A.    So one of the interactions we
8 have with FDA is an advisory committee, and this
9 is a document that describes the processes,
10 roles and responsibilities around responding to
11 an advisory committee or preparing -- preparing
12 for an advisory committee.
13    Q.    Okay.  And this policy was or
14 this playbook was -- is dated December 15, 2015;
15 is that right?
16    A.    Yes.
17    Q.    Is this a playbook that's
18 currently used at Purdue?
19    A.    Yes.
20    Q.    And how long has it been used?
21    A.    Well, this playbook was produced
22 in December of 2015.  There was no -- nothing
23 written down to this, but similar to the others,
24 these were the procedures that we followed.  It

1 was after an advisory committee that we had, a
2 project to just provide this information as a
3 guide to how to prepare for another advisory
4 committee.
5     Q.    Okay.  And this first time this
6 policy or playbook was committed to writing was
7 in 2015?
8     A.    Correct.
9     Q.    Okay.  Do you know similar --  I
10 know on this Exhibit 23 you listed the persons
11 most responsible for interacting with the DEA.
12          Do you know who the persons most
13 responsible for interacting with the FDA are at
14 Purdue?
15    A.    Yes.
16    Q.    Okay.  Who are they?
17    A.    So FDA, you can imagine, there's
18 many, many pharmaceutical companies, many
19 sponsors, so similar practice at both sponsors
20 and FDA is there is one person, and part of my
21 title is FDA liaison, so one person at the
22 company who is the interface with the FDA.
23 That's the person the FDA will call.  That's the
24 person that signs the cover letters.  Remember I

1 said about the forms?
2     Q.    Yes.
3     A.    So those folks reside in
4 regulatory affairs department.
5     Q.    Okay.
6     A.    So it's the -- we call them
7 RAPMs, regulatory affairs project managers or
8 FDA liaisons, so that's the prime person for
9 contact for FDA.
10    Q.    Okay.  Has it always been true
11 over, let's say, since 1995 when OxyContin was
12 launched that there was always a primary person
13 for a drug that would interact with FDA?
14    A.    Absolutely.
15    Q.    Okay.  And where could I find who
16 those people are for the particular drugs?
17    A.    So any -- if you look in those
18 regulatory affairs, some of those org charts
19 split out.  Actually, there's a group that's
20 called FDA liaison or project managers, those
21 are the individuals.  And usually, it depends on
22 the history of Purdue, but usually in any
23 documents you look, the person signing the cover
24 letter, so if you look at OxyContin documents,

1 you'll see the person on the cover letters and
2 it says regulatory affairs, that's the prime
3 person.
4     Q.    Okay.  Great.  You don't have a
5 list of the primary people for OxyContin, for
6 example, with you today?
7     A.    We could look at the org charts.
8 I know -- I don't remember in '95, but they're
9 folks like Chris Prue, Beth Conley, and
10 currently it's myself.
11    Q.    When did you take on the primary
12 responsibility of interacting with the FDA with
13 respect to OxyContin?
14    A.    About when Beth Conley left the
15 company, which is only -- it's not a year yet.
16 Beth Conley -- again, looking at that org chart,
17 starting -- well, now in 2014, I'm the head of
18 the entire department.
19          Before that, for about I think
20 three or four years, I was a head of that entire
21 group.  So all those folks reported to me.  So I
22 would, again, not be the prime person, but I
23 would be involved in all the conversations or
24 all the interactions.

1     Q.    Okay.  Do you know who the
2 primary person was for OxyContin starting from
3 its launch in 1995?
4     A.    I don't think Chris joined --
5 when I came, Chris Prue was responsible in 2000.
6 If I could look at that org chart, I could
7 figure out who it was.
8     Q.    Sure, could you quickly.  I just
9 want to make sure I understand who the persons
10 are that were responsible for interacting with
11 FDA with respect to OxyContin?
12    A.    You know -- well, I don't know if
13 we have it.  It would be on the submission cover
14 letter.  Do you have the next one?  The big one
15 we were looking at has more detail.  In 1995 the
16 head of the group was Jim Conover at that time.
17 He was the head of the group that included some
18 of those individuals.
19          I'm not sure who the -- if
20 someone reporting to him might have been
21 involved, but I would say Jim Conover is a good
22 -- yeah, this is '95 -- would be involved in all
23 those correspondence.
24    Q.    Are there also sections of the

1 company in terms of governmental affairs, you
2 know, sort of the lobbying side of things that
3 interact with the FDA? Do you have that segment
4 of the company at Purdue?
5     A.    There is a group government
6 affairs, but they -- unless regulatory is
7 involved, they are more speaking congressional
8 members, they don't really speak to FDA, per se.
9 Now, there are other individuals outside of
10 regulatory who talk -- like in large groups, so
11 if we have a conference call with FDA, I have
12 one Monday, you know, all the disciplines that
13 that conversation is about would be on a
14 teleconference or go to a meeting. So if we're
15 talking about, you know, a clinical trial, the
16 clinical representative would be there.
17         But without going through the
18 regulatory department individual, there's not
19 usually direct connection, you know, so they
20 wouldn't call someone in the pharmacokinetics
21 group at FDA without having a person in
22 regulatory, unless that's arranged with FDA.
23         There are times during a review,
24 FDA may say, go ahead and have your formulation

1 guy call mine, you know, that kind of thing, but
2 that's rare.
3     Q.    I'm trying to figure out if, for
4 example, new regulations are being passed or
5 something of that nature --
6     A.    Sure.
7     Q.    -- is there a group at Purdue
8 that would interact from the government
9 relations standpoint with FDA?
10     A.    Yes, yes, they might at a high
11 level.
12     Q.    Who would those folks be?
13     A.    You know, folks in that
14 government relations, but it's rare that -- as I
15 say, they talk to FDA, but there have been
16 conversations with FDA leadership on occasion,
17 not usually the division directors, so the folks
18 dealing with a particular therapeutic class,
19 it's more broad levels where they might be
20 involved.
21     Q.    Okay. Do you know if Purdue
22 hires lobbyists or outside governmental affairs
23 consultants whose job it was to interact with
24 FDA?

1     A.    I'm not aware of that.
2     Q.    Okay. Let's turn to the
3 interactions with the DEA and the policies with
4 respect to interacting with DEA, okay?
5     A.    Sure.
6     Q.    So you have listed three policies
7 and procedures that exist at Purdue with respect
8 to interacting with DEA on Exhibit 23; is that
9 correct?
10     A.    Yes.
11     Q.    Okay. And one says SOM program
12 SOP, and it lists SOP 000 and then a 17. The
13 other lists the SOP 1.7.1, and the third is an
14 SOP that's 7.1; is that correct?
15     A.    Yes.
16         MR. SNAPP: Do you want to mark
17     these?
18         MS. DICKINSON: Well, yes, just a
19     second, though.
20 BY MS. DICKINSON:
21     Q.    So today we were for the first
22 time provided with SOP 7.7 on "System to
23 Disclose Suspicious Orders of Controlled
24 Substances."

1         Is that policy on this list and
2 I'm just not understanding that it is, or is
3 that an additional policy that should be on this
4 list?
5     A.    Could you -- can we take a look?
6     Q.    Sure. I'm going to mark as
7 Exhibit 28.
8         (Document marked for
9     identification as Exhibit
10     Purdue-Fanelli-28.)
11 BY MS. DICKINSON:
12     Q.    A copy of what was produced to us
13 this morning for the first time or two days ago,
14 I'm sorry, two days ago, not this morning, by
15 Purdue that is titled SOP, title, "System to
16 Disclose Suspicious Orders of Controlled
17 Substances."
18         Do you see that?
19     A.    Yes.
20     Q.    Okay. And is that a policy that
21 is on this list that you have in Exhibit 23 of
22 the policies and procedures that exist at Purdue
23 for interacting with DEA?
24     A.    I have to -- if you give me some

1 time to look at that, but if you look at the S
2 -- the one that starts with SOM program.
3     Q.    Okay.
4     A.    The purpose of this SOP is to
5 provide guidance on identifying, reviewing,
6 documenting and reporting suspicious orders in
7 compliance with the Controlled Substance Act, so
8 I believe --
9     Q.    Let's mark the other three, then
10 maybe we can go at it that way, and I'll do 7.7
11 last, how about that?  I will hand you around
12 the exhibit stickers.  If you wouldn't mind
13 marking the three that are listed on Exhibit 23.
14     A.    Okay.  Oh, you have them?  Can I
15 keep this one?
16     Q.    Sorry.  Which one are we talking
17 about?
18     A.    The one -- 28 you handed me.
19     Q.    So we've marked Exhibit 28, and
20 that's the policy I handed you.
21     A.    Yes.
22     MS. DICKINSON:  But then let's
23     mark the three on your list on Exhibit
24     23 as 29, 30 and 31, if you would.

1     (Documents marked for
2     identification as Exhibits
3     Purdue-Fanelli-29, 30 and 31.)
4     MR. SNAPP:  They're marked.
5 BY MS. DICKINSON:
6     Q.    Okay.  And let's -- can I have
7 copies, 29, 30 and 31.
8     So let me understand what we've
9 now marked as -- so Exhibit 29 is the first SOM
10 policy on your list; is that right?  Has that
11 been marked as the --
12     A.    That is the SOM program, yes.
13     Q.    Okay.  So what is Exhibit 29?
14     A.    It's a standard operating
15 procedure to identify, review, document and
16 report suspicious orders in compliance with the
17 Controlled Substance Act.
18     Q.    Okay.  And that policy has a
19 release date of September of 2017; is that
20 right?
21     A.    Yes.
22     Q.    And that document version says
23 it's 1.0, so that's the first time such a policy
24 was in writing, correct?

1     A.    Yes -- well, if I'm looking at
2 this document, which is from Purdue as well,
3 it's similar, but this particular policy, with
4 that identifier, yes, it's the first version.
5     Q.    Okay.  So the first version of a
6 policy for identifying, evaluating and reporting
7 suspicious orders as set forth in Exhibit 29 was
8 done on September 25th, 2017, correct?
9     MR. SNAPP:  Object to the form.
10     THE WITNESS:  It appears there
11     were policies prior to this, but this is
12     the current policy, as stated.
13 BY MS. DICKINSON:
14     Q.    Okay.  And you're here today to
15 testify about the policies that existed at
16 Purdue with interacting with DEA, and I just
17 want to make sure I'm getting the full range of
18 those policies as they exist.
19     You have three listed on here,
20 and that list did not include what I handed and
21 marked to you that we received two days ago as
22 Exhibit 28; is that correct?
23     A.    That is correct.
24     Q.    Do you know why Exhibit 28 wasn't

1 provided to you or that you didn't provide it on
2 this list?
3     A.    I do not know.
4     Q.    Okay.  How did you go about
5 collecting the policies that are on this list?
6     A.    They were collected by
7 interacting with -- we have -- especially with
8 interacting with DEA as the question, the folks
9 that are listed there are responsible for that.
10 It doesn't reside in regulatory affairs, so we
11 reached out to them for -- and to our law
12 colleagues for the policies that are related to
13 that.
14     Q.    Who was actually the person that
15 collected and gave you the policies?
16     A.    I'm not -- I don't know who the
17 exact person is.
18     Q.    Okay.  Do you know how you
19 received them?
20     A.    I think our colleagues at Dechert
21 reached out to our law group.
22     Q.    Okay.  And you received this list
23 from --
24     A.    In preparation.

1    Q.    -- your lawyers?
2    A.    Yes.
3    Q.    Okay.  And that list does not
4  include the policy that was produced to us two
5  days ago that is marked as Exhibit 28, correct?
6         MR. SNAPP:  Object to the form.
7         THE WITNESS:  Correct.
8  BY MS. DICKINSON:
9    Q.    Okay.  So we've talked about
10 Exhibit 29.
11         What is Exhibit 30?
12    A.    This is a procedure that resides
13 in the law department, and it relates to a
14 program, we refer to it as the ADD program, and
15 that's how it's listed on your list there, to
16 look at concerns around abuse and diversion, if
17 there are observations related to that.  It
18 details assessment of that and reporting of it.
19    Q.    Okay.
20    A.    And how it gets to DEA.
21    Q.    And the date on this policy is
22 September 2015, correct?
23    A.    Yes.
24    Q.    And it says it supersedes a

1  June 2007 policy, correct?
2    A.    Yes.
3    Q.    Okay.  And so this policy, is it
4  safe to assume, was in effect from 2007 to 20 --
5  or to the present?  Or I'm sorry, I'm sorry,
6  that's not at all correct.
7         This policy was in effect as of
8  2015 going forward, correct?
9    A.    This particular one, yes.
10    Q.    Okay.  And there was a separate
11 policy that was in effect from June of 2007 to
12 2015, correct?
13    A.    Correct, an earlier version.
14    Q.    Okay.  Do you have the earlier
15 version with you?
16    A.    I do not.
17    Q.    Okay.  Do you know if there was
18 an earlier version earlier than 2007?
19    A.    I do not know.
20    Q.    So you're not here prepared to
21 testify on any of the policies prior to 2015
22 with respect to interacting with the DEA
23 regarding the abuse and diversion detection
24 program; is that right?

1         MR. SNAPP:  Object to the form,
2    misstates prior testimony.  He's here --
3    beyond the scope.
4         MS. DICKINSON:  Let the witness
5    testify, please.
6         MR. SNAPP:  I am.
7  BY MS. DICKINSON:
8    Q.    Are you here to testify about the
9  abuse and the diversion detection program prior
10 to 2015?
11    A.    Yes.
12         MR. SNAPP:  Object to the form.
13 BY MS. DICKINSON:
14    Q.    Okay.  But yet you don't have the
15 written policies with you?
16         MR. SNAPP:  Object to the form,
17    calls for -- beyond the scope.
18         THE WITNESS:  That's correct.
19 BY MS. DICKINSON:
20    Q.    Okay.  So when -- I'm a little
21 unclear as to how you're going to testify about
22 the policies if we don't have them to look at.
23         MR. SNAPP:  Object to the form.
24         THE WITNESS:  I'm aware of the

1    policy, I just don't have the written
2    documentation of those exact policies.
3  BY MS. DICKINSON:
4    Q.    And is the policy or was the
5  policy prior to 2015 identical to the one we're
6  looking at here on Exhibit 30?
7         MR. SNAPP:  Object to the form,
8    beyond the scope.
9         THE WITNESS:  It was consistent
10    with this policy.  I don't know if it's
11    identical in every way.
12 BY MS. DICKINSON:
13    Q.    And we don't know because we
14 can't look at it here, as we're sitting here
15 today, right?
16         MR. SNAPP:  Object to the form.
17    Can we take a break after this question,
18    please.
19         THE WITNESS:  We don't have it,
20    yes.
21         MS. DICKINSON:  Okay, I have
22    about ten more minutes probably on these
23    topics.  Do you want to keep -- do you
24    really want to take a break, or do you

1  just want to do ten minutes?  I mean --
2      MR. SNAPP:  No, I want to take a
3  break.
4      MS. DICKINSON:  Okay.  Well, then
5  we might as well take a lunch break.
6      MR. SNAPP:  We've been going for
7  an hour and 15 minutes.
8      MS. DICKINSON:  Well, no, I'm
9  just trying to get to a normal stopping
10  place.  I have about 10 minutes.  I
11  mean, we can do the --
12      MR. SNAPP:  I understand, but I
13  think we should take a lunch break at
14  this point.  We've been going for 75
15  minutes.
16      MS. DICKINSON:  Okay, fair
17  enough.  Take a lunch break.  Come back
18  on topic 10.
19      THE VIDEOGRAPHER:  Remove your
20  microphones.  The time is 12:58 p.m.
21  Going off the record.
22      (Luncheon recess.)
23      THE VIDEOGRAPHER:  The time is
24  1:47 p.m., back on the record.

1  BY MS. DICKINSON:
2      Q.    Dr. Fanelli, we're back on the
3  record.  I just wanted to go through a couple
4  things on topic 10 before we leave that topic.
5          Topic 10 asks for identification
6  of Purdue's policies and procedures regarding
7  interacting with the DEA for the time period
8  1990 to present.
9          Is that your understanding of the
10  topic that you were supposed to provide
11  testimony on today?
12      MR. SNAPP:  Object to the form.
13      THE WITNESS:  My understanding
14      was that we would be discussing these
15      policies and procedures, yes, during
16      that time frame, not presenting, you
17      know, handing them, but discussing them,
18      yes.
19  BY MS. DICKINSON:
20      Q.    Okay.  So your understanding was
21  that we were going to discuss the policies and
22  procedures but not necessarily look at the
23  physical documents from 1998 to present?
24      A.    Correct.

1      Q.    Is that correct?
2      MR. SNAPP:  Object to the form.
3  BY MS. DICKINSON:
4      Q.    Okay.  Are you here today
5  prepared to identify all policies and procedures
6  at Purdue from 1990 to present for interacting
7  with the DEA?
8      MR. SNAPP:  Object to the form.
9      THE WITNESS:  No.
10  BY MS. DICKINSON:
11      Q.    Okay.  What portion of that topic
12  are you prepared to address?
13      A.    I can address the individuals and
14  the policies and procedures that were in place
15  for reporting to the DEA.  I don't have the
16  specific SOPs of those.
17      Q.    Okay.  So you're not here
18  prepared to give the corporation's answer
19  identifying the universe of the SOPs that have
20  existed for interacting with the DEA at Purdue?
21  That's what I'm trying to get at.
22      A.    Okay.
23      MR. SNAPP:  Object to the form.
24      THE WITNESS:  I can describe the

1      procedures that were involved and the
2      individuals who report to DEA.  I don't
3      have the document, you know -- as we
4      talked before, some of our procedures
5      are not written down in documents or I
6      don't have them, you know, the specific
7      writing -- write-up of those procedures.
8  BY MS. DICKINSON:
9      Q.    What did you do to prepare for
10  this topic?
11      A.    I spoke to Mark Geraci, who is
12  the head of our corporate security, about these
13  policies and reviewed the documents that we
14  presented.
15      Q.    And those are the three documents
16  that are listed on Exhibit 23?
17      A.    Yes.
18      Q.    And what did you talk to
19  Mr. Geraci about?
20      A.    The specifics of those policies.
21  As we talked before, regulatory affairs doesn't
22  deal directly with the DEA, that's Mark, the
23  corporate security is the lead interaction with
24  DEA.  When there are inspections in our

1 facilities, manufacturing facilities, that's
2 folks like Monte Phipps, our technical -- you
3 know, the technical folks that's on your list,
4 and Gwen Mack is related to diversion control,
5 monitoring of shipments and those kinds of
6 things. Anyway, those individuals are the ones
7 that we talked to, and Mark and I look --
8 discussed those SOPs as well.
9        Q.    Okay.  How long was your
10 conversation with Mr. Geraci?
11       A.    I don't recall.  It was on a one
12 day.  It didn't last a whole day.
13       Q.    More or less than an hour?
14       A.    Approximately an hour, I would
15 think, but I don't recall so much.
16       Q.    I'm not sure if we marked the
17 policy, the SOP 7.7, the one that we got two
18 days ago, the 031.
19       A.    I have it.
20       Q.    Had we marked that?  Okay.  What
21 number did we mark that as?
22       A.    Twenty-eight.
23       Q.    Okay.  And this policy was not
24 provided to you by Mr. Geraci, was it?

1        A.    No.
2        Q.    Okay.  Did you discuss this
3 policy with Mr. Geraci?
4        A.    It appears that this talks about
5 suspicious order, which we have one of the
6 policies that I handed you.  I'm not -- I can't
7 say for sure, but I think it's related to --
8 well, it is definitely related to the same
9 procedure, so we did talk about that.
10       Q.    Can -- what I'm trying to get a
11 handle on is when was the earliest date that
12 Purdue had a suspicious order monitoring policy?
13 And this one is dated 3/12/03, was that the
14 first time that Purdue had a suspicious order
15 monitoring policy?
16       A.    I'm not aware of the day it
17 started, the date it started.  There clearly was
18 one at this point, '03.
19       Q.    Okay.  And you don't know --
20 you're not prepared here today to answer the
21 question of whether Purdue had a written policy
22 on suspicious order monitoring prior to '03; is
23 that right?
24       A.    That's correct.

1        Q.    And this document that we
2 produced to you at the deposition, in number 4
3 identifies a "Procedure for Customer Service."
4        Who is customer service?
5        A.    It's part of -- it's a department
6 within Purdue that it's in the sales and
7 operations group who responds to customer
8 requests.
9        Q.    Okay.  This procedure for
10 customer service says, "They review each other
11 for unusual quantifies or any other deviation
12 from the customer's regular order pattern."
13       Do you see that?
14       A.    Yes.
15       Q.    Is there an SOP, a standard
16 operating procedure, for how customer service
17 goes about this?
18       A.    I don't know if there's an SOP.
19 I'm looking at our --
20       Q.    You don't know?
21       A.    The details are not in that
22 particular document.
23       Q.    And do you know if the details
24 exist in a document at Purdue?

1        A.    If you look at the one with the
2 reference 29, that the -- which is the one I
3 believe it's a similar topic -- well, it is
4 similar topic as that, there's a procedure in
5 terms of review, procedure number 1.
6        Q.    And Exhibit 29 is the policy that
7 went into effect in September of 2017; is that
8 right?
9        A.    Yes.
10       Q.    Okay.  For suspicious order
11 monitoring we have Exhibit 28, we have Exhibit
12 29, which is dated September 25th, 2017.  We
13 have Exhibit 31, which is dated February 29,
14 2016.
15       Are these three policies the
16 universe of Purdue's policies with respect to
17 suspicious order monitoring?
18       MR. SNAPP:  Objection, beyond the
19       scope.
20       THE WITNESS:  I'm not aware if
21       there are other procedures.
22 BY MS. DICKINSON:
23       Q.    Okay.  When you talked with
24 Mr. Geraci about the procedures that exist with

1  respect to interacting with the DEA, did you
2  talk about the universe of the specific
3  procedures and policies that exist? Was that
4  one of the topics of that conversation?
5      A.    That conversation was about the
6  individuals who interact with the DEA and how
7  information is exchanged with the DEA.
8      Q.    It was not about the policies and
9  procedures, correct? That topic, the policies
10  and procedures was not the topic of your
11  conversation with Mr. Geraci; is that correct?
12      A.    We talked about the procedures
13  and the policies, but not the -- you know,
14  specifically if we had all the particular SOPs.
15      Q.    Okay. I'm trying to figure out
16  how I find out from you what the universe of the
17  SOPs is with respect to interactions with the
18  DEA.
19          Are these documents that we've
20  marked as between Exhibit 28 and Exhibit I think
21  it's 31, is that the universe of the written
22  policies and procedures for interacting with the
23  DEA at Purdue?
24      A.    I believe it covers the -- all

1  the policies that deal with interacting with the
2  DEA. I'm not aware if there may be other
3  procedures. As we -- there are cases where
4  subparts for particular departments and I may
5  not be aware of those.
6      Q.    Okay. So you're not prepared to
7  address the topic in its entirety about the
8  policies and procedures for interacting with the
9  DEA; is that correct?
10          MR. SNAPP: Object to the form.
11          THE WITNESS: I'm prepared to as
12      -- to talk about the policies and
13      procedures, but you're correct, I don't
14      have the -- I'm not aware if I have the
15      whole universe of all those policies.
16  BY MS. DICKINSON:
17      Q.    And you're not aware so you can
18  tell me what that universe is, right?
19      A.    Correct.
20      Q.    Okay. I'm going to hand you what
21  has been marked as -- I'm going to hand you
22  what's been marked as Exhibit 32.
23          (Document marked for
24      identification as Exhibit

1      Purdue-Fanelli-32.)
2  BY MS. DICKINSON:
3      Q.    Exhibit 32 appears to be one of
4  the earlier versions of the policy that you did
5  bring with you today, which is SOP 1.7.1; is
6  that right?
7      A.    Correct.
8      Q.    Okay. So there was a policy that
9  we now just marked as Exhibit 32 that existed
10  prior to the policy that you brought with you
11  today from 2015; is that right?
12      A.    Yes.
13          MS. DICKINSON: And I'm going to
14      mark another policy as Exhibit 33.
15          (Document marked for
16      identification as Exhibit
17      Purdue-Fanelli-33.)
18  BY MS. DICKINSON:
19      Q.    And Exhibit 33 appears to be
20  another version of the 1.7.1 policy that we just
21  looked at, earlier version; is that right?
22      A.    Yes.
23      Q.    And you likewise did not review
24  this version of the policy in preparation for

1  your testimony today or bring it with you; is
2  that right?
3      A.    Correct.
4      Q.    Okay. And that's dated
5  November 1st, 2002.
6          Do you see that?
7      A.    Yes.
8      Q.    And do you know today whether
9  there is an earlier version of this policy,
10  earlier than 20 -- or 2002?
11      A.    I do not know.
12      Q.    Okay. I'm going to quickly ask
13  you a few questions about topics 37 and 38
14  before we go back to topic 30 quickly.
15      A.    Sure.
16      Q.    So topics 37 and 38 on Exhibit 1,
17  Topic 37 is your coordination, your being
18  Purdue, or communications with any defendant in
19  this action, including but not limited to your
20  participation in any industry groups or
21  professional societies or any defendant in this
22  matter as a member, referring to pain care, the
23  sale of opioids, the marketing or promotion of
24  opioids, regulations, rules or laws affecting

1 the sale, promotion and marketing of opioids and
2 the potential for abuse and diversion of
3 opioids.
4        You are not here today prepared
5 to testify on that entire topic, correct?
6     A.    Correct.
7     Q.    And in reading your counsel's
8 responses to the topic, your counsel has
9 designated Alan Must as the person who will
10 provide testimony regarding industry groups or
11 professional societies relating to pain care or
12 opioids.  You will not be providing testimony on
13 that subject, correct?
14    A.    Yes, that's correct.
15    Q.    Topic 38, the nature and scope of
16 any meetings, correspondence, communications,
17 documents, contracts or agreements between you
18 and Cephalon, Janssen, Endo, Mallinckrodt
19 concerning the manufacture, development,
20 formulation, marketing, advertising and the sale
21 of opioids or opioid products.
22        You will not be providing
23 testimony on that entire topic; is that correct?
24    A.    Yes.

1     Q.    Okay.  And for this topic Purdue
2 has not designated another witness; however,
3 they have said that you, Richard Fanelli, would
4 provide testimony regarding communications
5 between Purdue and any other opioid
6 manufacturers, including, as applicable,
7 Cephalon, Janssen, Endo or Mallinckrodt
8 concerning postmarketing studies relating to
9 opioid medications.
10        So you have only prepared for
11 this topic as it relates to postmarketing
12 studies; is that right?
13    A.    Correct.
14    Q.    And that is also true for topic
15 37, you have only prepared for that topic as it
16 relates to postmarketing studies; is that right?
17    A.    Correct.
18    Q.    Okay.  Is Purdue currently
19 working with other companies to conduct a
20 postmarketing study?
21    A.    Yes.
22    Q.    Okay.  What are they doing?
23    A.    There are -- we talked about this
24 briefly earlier.  There are postmarketing

1 required studies by FDA that are part of the FDA
2 amendment act.  FDA now can require
3 postmarketing studies when they believe safety
4 questions have arisen, they want additional
5 studies, so we're working with -- it's varied
6 over time, now there's 12 companies, the ones
7 you mentioned are included, to design, conduct
8 and report those studies.
9     Q.    Okay.  And what is the subject of
10 those postmarketing studies?
11    A.    So it's related to misuse, abuse,
12 addiction, overdose and death related to
13 prescription opioid and prescription -- in
14 patients taking prescription opioids and when --
15 if you look at the first five years ago, the
16 letter from FDA, there were five studies.  There
17 are currently 11 studies conducted based on
18 input, public meetings, protocols back and forth
19 with FDA, scientific advice, and now we have 11
20 studies.
21    Q.    Are you personally involved in
22 that effort?
23    A.    I am -- there are 11 studies, ten
24 of those are observational studies using

1 epidemiological data.  I am the regulatory lead
2 from -- for all the companies -- the FDA liaison
3 to the FDA for those -- ten of those studies.
4        I'm also Purdue's representative,
5 along with Marcelo Bigal, it's changed over
6 time, but Purdue's representative on the
7 steering committee as part of the -- I was going
8 to say OPC, the opiate postmarketing required
9 consortium.
10    Q.    Is that what the committee or the
11 group working on that is called?
12    A.    Yeah, yes.  Both FDA -- both FDA
13 and the group refer to it -- the opiate
14 postmarketing required consortium.
15    Q.    And are these the studies the FDA
16 required?
17    A.    Yes.
18    Q.    These were the studies we talked
19 about earlier in your deposition?
20    A.    Yes, they are.
21    Q.    Okay.  Are there any other
22 postmarketing studies that you were working with
23 the entities identified in these topics on?
24    A.    No.

Page 206

1  Q.  Okay.  We can go back to topic 30
2  briefly, and if you would look at topic 30,
3  Exhibit 1, please.
4       Topic 30 reads warning letters
5  sent to you, that's Purdue, by the FDA and the
6  DEA regarding your marketing of your opioid
7  products, response to these letters, all
8  subsequent actions you took in response to those
9  communications and all budgets for any such
10 actions by year.
11      Are you prepared to testify on
12 that topic on behalf of Purdue?
13      MR. SNAPP:  Just for the record,
14 Dr. Fanelli has been designated by
15 Purdue to testify on topic 30 as stated
16 in our November 15th supplemental
17 responses and objections, where we
18 defined his testimony as warning letters
19 sent to you by the FDA and the DEA
20 regarding your marketing of your opioid
21 products, your response to these
22 letters, all subsequent actions you took
23 in response to those communications and
24 all budgets for any such actions by

Page 207

1  year.  I'm sorry, I read the wrong
2  thing.
3       He's prepared to testify on
4  warning letters sent by the FDA or DEA
5  regarding Purdue's marketing of its
6  opioid medications and Purdue's response
7  to an action taken in response to the
8  letters.  My apologies.  I was reading
9  the wrong thing.
10 BY MS. DICKINSON:
11     Q.  Okay.  So you are not here today
12 prepared to testify on topic 30 as written in
13 Exhibit 1; is that correct?
14      MR. SNAPP:  Object to the form.
15      THE WITNESS:  Yes.
16 BY MS. DICKINSON:
17     Q.  And you are not going to be
18 providing information on the budget for the
19 responses to the warnings from FDA, correct?
20     A.  That's the part I'm prepared to
21 speak about all of it except for the budgets by
22 year.  It's not part of my responsibility,
23 budget.
24     Q.  And you didn't -- to prepare for

Page 208

1  the deposition, though, you didn't ask, even
2  though it wasn't part of your own personal
3  responsibility, you didn't ask anyone else at
4  the company about the budgets for the responses
5  to the FDA warnings; is that right?
6       MR. SNAPP:  Object to the form.
7       THE WITNESS:  That's correct.
8  BY MS. DICKINSON:
9      Q.  Were you told not to?
10      MR. SNAPP:  Object to the form.
11 I'm going to instruct you not to answer
12 to the extent the question calls for any
13 attorney-client privilege
14 communications, any communications
15 between you and a lawyer.
16 BY MS. DICKINSON:
17     Q.  Can you answer the question?
18     A.  I can't answer that question.
19     Q.  But, for the record, nonetheless,
20 Purdue is not providing a witness or has not
21 identified one in response to topic 30 on the
22 budgets for the responses to the DEA -- or the
23 FDA warning letters?
24      MR. SNAPP:  And, for the record,

Page 209

1  the plaintiffs have known that since
2  November 15th and never picked up the
3  phone or sent an e-mail to meet and
4  confer on that issue.
5  BY MS. DICKINSON:
6      Q.  All right.  Let's take the
7  warning letters.
8       MS. DICKINSON:  Where did we end
9  up on exhibits.  I think we're on 32; is
10 that right?  Thirty-three was the last
11 one?
12     (Document marked for
13 identification as Exhibit
14 Purdue-Fanelli-34.)
15 BY MS. DICKINSON:
16     Q.  I'm going to hand you what has
17 been marked as Exhibit 34.  Exhibit 34, is that
18 an FDA warning letter?
19     A.  Yes, it is.
20     Q.  And what's the date on the stamp
21 on that letter?
22     A.  November 20th, 1996.
23     Q.  Okay.  And this warning letter
24 concerns the Purdue Frederick Company's

1 promotional materials for the marketing of MS
2 Contin; is that right?
3     A.    Yes.
4     Q.    And does this appear to be a true
5 and correct copy of the warning letter that was
6 sent to Purdue by FDA?
7     A.    Yes.
8     Q.    Okay.  FDA in that letter says in
9 the middle of the first paragraph, "We have
10 concluded that Purdue is disseminating
11 promotional materials for MS Contin that contain
12 statements, suggestions or implications that are
13 false or misleading in violation of the Federal
14 Food, Drug and Cosmetic Act, Section 21 USC
15 352(a) and 331(a) and applicable regulations."
16         Do you see that?
17     A.    Yes.
18     Q.    That's what FDA was saying in its
19 letter about MS Contin in 1996; is that right?
20     A.    Correct.
21     Q.    Let's turn to the page 3, and
22 there's a section called "Repetitive Conduct,"
23 and in that section FDA says to Purdue,
24 "dissemination of these materials represents a

1 repetitive course of violative conduct by Purdue
2 in the promotion of MS Contin."
3         Do you see that?
4     A.    Yes.
5     Q.    And that is what -- that is what
6 FDA told Purdue in November of 1996, correct?
7     A.    Yes.
8     Q.    This section identifies one, two,
9 three, four -- five other letters and a meeting
10 with FDA between 1993 and 1994 on this subject,
11 correct?
12     A.    Yes, letters and a meeting, yes.
13     Q.    Do you know what the response by
14 Purdue was to that warning letter?
15     A.    I do not.
16     Q.    Okay.  You can put that one
17 aside.  So just to clear up, I just asked you if
18 you knew what the response was.  You did not
19 investigate or were not provided with any
20 information regarding the response to this
21 warning letter in preparing to testify on topic
22 30 about the warnings sent to Purdue by the FDA
23 and the responses; is that right?
24         MR. SNAPP:  Object to the form.

1         THE WITNESS:  Correct.
2 BY MS. DICKINSON:
3     Q.    Okay.  I hand you what's been
4 marked as Exhibit 35.
5         (Document marked for
6         identification as Exhibit
7         Purdue-Fanelli-35.)
8         MS. DICKINSON:  Oh, there's
9         copies here.  Sorry.  Just a minute.
10         Did I hand you the folder with the
11         copies?  I'm sorry.
12         THE WITNESS:  Yeah.
13         MS. DICKINSON:  It came your way.
14         All right.  I'm sorry.
15 BY MS. DICKINSON:
16     Q.    Okay.  Exhibit 35 is what?
17     A.    It's a untitled letter to Beth
18 Conley regarding OxyContin.
19     Q.    And the date on that is May 11th,
20 2000; is that right?
21     A.    Correct.
22     Q.    Okay.  Did you review this
23 document in preparation for your topic on topic
24 30?

1     A.    Yes.
2     Q.    Okay.  And in the first paragraph
3 FDA is telling Purdue that as part of its
4 routine monitoring and surveillance program, the
5 Division of Drug Marketing, Advertising, and
6 Communications has identified an advertisement
7 for OxyContin tablets, disseminated by Purdue
8 that violates the federal drug -- Federal Food,
9 Drug, and Cosmetic Act and its implementing
10 regulations.
11         Do you see that?
12     A.    Yes.
13     Q.    And it has two sections entitled
14 "Misleading Efficacy Presentation" and
15 "Misleading Safety Presentation."
16         Do you see that?
17     A.    Yes.
18     Q.    Okay.  And was there a written
19 response to this letter?
20     A.    Yes.
21     Q.    Okay.  Do you have that with you
22 today?
23     A.    I believe so.
24     Q.    And while your counsel is

1 looking, this letter dated May 11th, 2000, that
2 is a true and accurate copy of a communication
3 from the FDA to Beth Conley at Purdue Pharma,
4 correct?
5     MR. SNAPP: Object to the form.
6     THE WITNESS: I believe it is,
7 yes.
8     MR. SNAPP: Are you going to show
9 him a second untitled letter from May of
10 2000 also?
11     MS. DICKINSON: I don't know,
12 because it's sort of his job to identify
13 how many there were. I think I only
14 have this one. If there's another one,
15 we might as well get it out. I'd like
16 to mark all the warnings, if possible.
17     MR. SNAPP: This isn't a warning
18 letter. It's an untitled letter.
19     MS. DICKINSON: If you could give
20 me a copy, that would be great.
21     MR. SNAPP: Absolutely. I'll
22 send one over your way.
23     THE WITNESS: Do we have the
24 stickers?

1     MS. DICKINSON: Do you guys want
2 the stickers? Here, to make this go
3 faster, can we get a stack of the
4 letters he did review to prepare for
5 this?
6     MR. SNAPP: That's exactly what
7 I'm doing. You got it.
8     MS. DICKINSON: That would be
9 helpful.
10     MR. SNAPP: Absolutely.
11     MS. DICKINSON: We're going to
12 mark as Exhibit 36 -- this is 35.
13     MR. SNAPP: I think we're on 36.
14     MS. DICKINSON: We're on 36.
15     (Documents marked for
16 identification Exhibits
17 Purdue-Fanelli-36, 37 and 38.)
18 BY MS. DICKINSON:
19     Q.    Okay. Mr. Fanelli, are you
20 ready?
21     A.    Yes.
22     Q.    Okay. We marked 35, and then the
23 question was what was the response, the written
24 response, if there was any, to Exhibit 35, so

1 what was the written response?
2     A.    So Exhibit 36 shows that four
3 days later, FDA sent another untitled letter
4 where they say they've changed their opinion, so
5 they provided other information related to the
6 misleading efficacy. Do you see it there?
7     Q.    And is Exhibit 36 the letter that
8 --
9     A.    It's to Beth Conley.
10     Q.    To Beth Conley, okay, so Exhibit
11 --
12     A.    The same.
13     Q.    -- 36 is a document that has
14 Bates stamp PPLPC005000006728; is that right?
15     A.    Correct.
16     Q.    All right. And that is another
17 communication from FDA to Beth Conley; is that
18 right?
19     A.    That's correct.
20     Q.    And were there -- was there a
21 response by Purdue in between the time of the
22 letter that we just looked at in Exhibit 35 and
23 the letter that got sent in Exhibit 36?
24     A.    Not a formal response.

1     Q.    Was there an informal response?
2     A.    Not a response to the -- to the
3 issues. There...
4     Q.    Were there interactions with the
5 FDA on Purdue's behalf in between Exhibit 35 and
6 Exhibit 36?
7     A.    I believe there may have been,
8 but I'm not aware on this particular issue. I
9 know it resulted in Purdue response that's in
10 Exhibit 37.
11     Q.    So you don't know if anyone at
12 Purdue in between Exhibit 35 and Exhibit 36
13 communicated with FDA; is that right?
14     A.    That's correct.
15     Q.    And Exhibit 37 is a true and
16 correct copy of a letter to Spencer Salis at
17 FDA; is that right?
18     A.    Correct. That's the --
19     Q.    And that's from Beth Conley?
20     A.    Yes.
21     Q.    Okay. And was this the written
22 response to Exhibit 35 and 36?
23     A.    Yes.
24     Q.    Was there any other response that

1 we haven't already talked about to Exhibit 35
2 and 36?
3      A.   No.
4      Q.   All right.  Put that one aside.
5      A.   Written response, yeah.  This
6 one?
7      Q.   Okay.  I was going to go next to
8 a 2002 -- or, actually, it's been referred to as
9 a January 2003 warning letter.
10          Are there any other warning
11 letters that you reviewed, in preparation for
12 this topic, prior to 2002?
13     A.   No, that's the one I'm thinking
14 of.
15     Q.   All right.
16     A.   I looked at one.
17     Q.   Let's take a look.
18     A.   That's the only one I'm aware of.
19     Q.   Okay.  I'm going to mark as
20 Exhibit 39 -- 38 disappeared on me.
21          MR. SNAPP:  Thirty-eight is the
22     FDA's response.
23          MS. DICKINSON:  Okay, got it.
24     All right.  I'm going to mark as Exhibit

1 39, this.
2          THE WITNESS:  Thirty-eight was
3     FDA's acknowledgment of our response.
4          MS. DICKINSON:  Got it.
5          (Document marked for
6     identification as Exhibit
7     Purdue-Fanelli-39.)
8 BY MS. DICKINSON:
9      Q.   Take a minute, if you would, and
10 review Exhibit 39.  And what is Exhibit 39?
11     A.   Thirty-nine is a warning letter
12 sent to Purdue on December 24th, 2002.
13     Q.   Christmas Eve?
14     A.   Faxed on Christmas Eve.
15     Q.   Okay.  And this is a true and
16 correct copy of that warning letter that was
17 sent to Purdue and was addressed to Michael
18 Friedman; is that correct?
19          MR. SNAPP:  Object to the form.
20          THE WITNESS:  It's a copy of the
21     fax that was sent, yes.
22 BY MS. DICKINSON:
23     Q.   Okay.  And Mr. Friedman, he is --
24 was he an officer of Purdue at the time?

1      A.   Yes, he was chief operating
2 officer at the time.
3      Q.   Okay.  And he is no longer an
4 officer at Purdue, correct?
5      A.   That's correct.
6      Q.   Mr. Friedman is one of the
7 individuals who pled guilty in the US Department
8 of Justice case; is that right?
9          MR. SNAPP:  Objection, beyond the
10     scope.
11          THE WITNESS:  That's correct.
12 BY MS. DICKINSON:
13     Q.   Okay.  And this is another
14 warning letter from the FDA like the one we
15 looked at a few minutes ago; is that right?
16          MR. SNAPP:  Objection.
17          THE WITNESS:  No -- sorry.
18          MR. SNAPP:  Go ahead.
19          THE WITNESS:  This is the only
20     warning letter.  The letter -- prior
21     letter was an untitled letter.  You
22     notice it doesn't have warning written
23     on the top.
24          Untitled letters go to -- we

1     talked about project managers,
2     regulatory project managers.  So
3     untitled letters, you notice it went to
4     Beth Conley, she's -- we talked about
5     that she signs the letters and so forth
6     so -- but when FDA determines a warning
7     letter, they're writing a warning
8     letter, that goes then to a higher
9     official in the company, and that's
10    why -- so this is the warning letter.
11 BY MS. DICKINSON:
12     Q.   Okay.  And that warning letter
13 states in the first paragraph, "The Division of
14 Drug Marketing, Advertising, and Communications
15 (DDMAC) has reviewed these advertisements and
16 concluded that they are in violation of the
17 Federal Food, Drug and Cosmetic Act."
18          Is that correct?
19     A.   Yes.
20     Q.   And that's 2003, when OxyContin
21 had approximately been on the market for seven
22 years at that point, correct?
23     A.   Approximately.
24     Q.   Okay.  Do you have the written

1 response --
2     A.   Yes.
3     Q.   -- to this warning letter?
4          Is the written response the
5 letter dated January 24th, 2003?  Okay.
6     A.   Yes, it's part of the
7 correspondence.
8          MS. DICKINSON:  All right.  It
9 looks like we're going to mark a series
10 of exhibits here.  Okay.  I'm going to
11 hand you...
12          MR. SNAPP:  He's got a set that's
13 identical to your set.  Do you want us
14 to mark over here?
15          MS. DICKINSON:  That would be
16 great.  Let's do that.
17          THE WITNESS:  Are we starting
18 with 40?
19          MS. DICKINSON:  Yep.  You know
20 what, this one I'll give you 40 and then
21 the rest, if you can mark the rest after
22 that.
23          THE WITNESS:  Okay.  When we talk
24 about them, make sure we have the

1 same --
2          MS. DICKINSON:  Do you have
3 another copy of 40 or can I have the
4 clean copy from him?
5          MR. SNAPP:  What's the date on
6 40?
7          THE WITNESS:  I have 40.  That's
8 40.  You want to mark so we have the
9 same ones.  There's more than this.
10          (Documents marked for
11          identification as Exhibits
12          Purdue-Fanelli-40 through 46.)
13 BY MS. DICKINSON:
14     Q.   And we were just talking about
15 the response to the warning letter that Purdue
16 received from FDA that we had marked -- I'm
17 sorry, what was the warning letter that was?
18     A.   Thirty -- sorry.
19     Q.   What exhibit was the warning
20 letter?
21     A.   Thirty-nine.
22     Q.   Okay.  That we had marked as
23 Exhibit 39.
24          And Exhibit 39, if we could go

1 back to that for just one minute.
2     A.   Yeah.
3     Q.   At the bottom of the first page,
4 the FDA is telling Purdue that your
5 advertisements thus grossly overstate the safety
6 profile of OxyContin, by not referring in the
7 body of the advertisement to serious,
8 potentially fatal risks associated with
9 OxyContin, thereby potentially leading to the
10 prescribing of the product based on inadequate
11 consideration of risk.
12          Do you see that?
13     A.   Yes.
14     Q.   Okay.  Turn to page 5, please, of
15 that letter.  At the top, the first big
16 paragraph, the last sentence, FDA is telling
17 Purdue that "This implication is false or
18 misleading and raises significant public health
19 and safety concerns."
20          That's what FDA was telling
21 Purdue in this warning letter, correct?
22          MR. SNAPP:  Object to the form.
23          THE WITNESS:  This is at the end
24 of a discussion of minimization of risk

1     and information perceived, and that's
2     the conclusion to that part.
3 BY MS. DICKINSON:
4     Q.   Okay.  And then now let's talk
5 about the response.  Go ahead.
6     A.   Similar to the untitled letter,
7 the FDA reissued the warning letter after a
8 telephone conversation, and that's what the
9 document in between is, and Purdue.
10          So the January 14th is a letter
11 to Tom Abrams, who is the head of DDMAC, and Dan
12 Troy, chief counsel at FDA, written by outside
13 attorneys for Purdue, and it documents some of
14 those discussions.
15     Q.   And that's marked as Exhibit?
16     A.   40.
17     Q.   40?
18     A.   40.  And then --
19     Q.   Okay.  So on January 14th, after
20 receiving the warning letter, Purdue's outside
21 counsel wrote a letter in response to DDMAC
22 dated January 14th, 2003, and Exhibit 40 is that
23 letter; is that right?
24     A.   That's what the letter is.  There

1 was a meeting, a conversation prior to that. I
2 don't have the exact date of that.
3    Q.    Who was at that meeting?
4    A.    I don't have the attendees at
5 that either at this point.
6    Q.    So you were unaware of the
7 attendees at a meeting to address the warning
8 letter that we marked as Exhibit 39; is that
9 right?
10    A.    Correct.
11        MR. SNAPP:  Object to the form.
12 BY MS. DICKINSON:
13    Q.    Who would know the answer to that
14 question, who the attendees were?
15    A.    This was in 2000.  It would be in
16 our records.  We could find out.
17    Q.    In preparing for your testimony
18 on the response to warning letters in topic 30,
19 did you ask anyone who was in attendance at
20 those meetings, or did you look at your records
21 to find out who was in attendance at those
22 meetings?
23    A.    I did not look for that.
24    Q.    All right.  Let's move on.

1        What was the next event in the
2 response to the warning letter that is Exhibit
3 39?
4    A.    Forty-one is the reissue of that
5 letter to Purdue from FDA.  It's very similar,
6 but has some changes.
7    Q.    Okay.
8    A.    And the response is, I think you
9 mentioned it, January 24th.
10    Q.    Yes.
11    A.    Constitutes the detailed
12 response.
13    Q.    So what you've marked as Exhibit
14 42 --
15    A.    Uh-huh.
16    Q.    -- is the detailed response on
17 behalf of Purdue to the FDA's warning letter,
18 and this response is dated January 24th, 2003;
19 is that right?
20    A.    Correct.
21    Q.    This response is -- looks like
22 has a three-page cover letter and then a 15-page
23 detailed response with five exhibits; is that
24 right?

1    A.    Correct.
2    Q.    And does that response
3 accurately -- this exhibit we marked as Exhibit
4 42, accurately summarize Purdue's positions in
5 response to the FDA's 2003 warning letter?
6    A.    Yes.
7    Q.    Okay.  What was the next event in
8 the sequence of the response to the warning
9 letter marked as Exhibit 39?
10    A.    Let's look at the dates.
11 Purdue's response is January 24th, and Exhibit
12 43 is a letter from Tom Abrams, head of DDMAC,
13 back to Michael Friedman.
14    Q.    Okay.  And that letter
15 acknowledges the receipt of Purdue's response,
16 right?
17    A.    Yes.
18    Q.    Okay.  All right.  What was the
19 next event in the sequence of the response to
20 the FDA's warning letter that was Exhibit 39?
21        THE WITNESS:  Are these in order?
22        MR. SNAPP:  Mm-hmm.
23        THE WITNESS:  On -- looking for
24 the date.  Oh, here it is, January 28th,

1 so this is January 24th, a letter was
2 sent from Tom Abrams and Daniel Troy to
3 the outside counsels, Richard Morey and
4 Peter Mathers responding to their
5 response providing information.
6 BY MS. DICKINSON:
7    Q.    And that is what exhibit?
8    A.    Forty-four.
9    Q.    And is there a date on that
10 letter?
11    A.    I think I said, January 28th,
12 2003.  Well, it's a fax, I don't see a date.
13    Q.    Understood.  All right.  What was
14 the next event in the sequence of the responses
15 to FDA's warning letter that we marked as
16 Exhibit 39?
17    A.    There is a -- responses to FDA?
18    Q.    What was the next event in the
19 sequence of the responses?  We were talking
20 about the response --
21    A.    Correct.
22    Q.    -- to that warning letter.
23        Is there anything else other than
24 the exhibits that we've marked and the meeting

Page 230

1 that you talked about that were part of the
2 response to the warning letter?
3     A.    There was discussion about a
4 corrective ad to be placed in journals that's
5 mentioned in those letters, and Exhibit 46 is
6 a -- there was conversations with FDA about that
7 and, you know, that letter talks about, and it
8 was -- an example was sent to FDA for their
9 review.
10     Q.    Okay.  And this corrective ad,
11 was it run in this form?
12     A.    I believe so.
13     Q.    And do you know who it was
14 distributed to?
15     A.    There was a list in the response
16 of the publications.
17     Q.    Okay.  And do you know which
18 response it was -- the list is contained?
19     A.    It was produced the 24th, I
20 believe.  Let me check.  Sorry, I'm out of order
21 now.
22         There it is.  I guess I don't
23 have that list.  I thought it was part of this,
24 but it's not.

Page 231

1     Q.    Okay.  And then what was --
2 anything else that we've not talked about in the
3 sequence of the response to the warning letter
4 of 2003?
5     A.    The Exhibit 45 is a note to the
6 sales force about a response not to use any
7 materials, prior materials until revised ones
8 were produced.
9     Q.    And how did Purdue ensure that
10 that happened, that the sales reps were not
11 using prior materials?
12     A.    That's part of the compliance
13 group we talked about earlier, they monitor
14 sales force activity.
15     Q.    How did they go about doing that?
16 Is there a written policy for doing that?
17     A.    I'm not aware of those policies.
18     Q.    Do you know how they went about
19 monitoring that the sales force did not -- no
20 longer distributed these materials that are
21 referenced in Exhibit 45?
22         MR. SNAPP:  Objection, form.
23 Objection, beyond the scope.
24         THE WITNESS:  No, I'm not aware

Page 232

1 of the specific policy how those are --
2     how that occurred.
3 BY MS. DICKINSON:
4     Q.    Do you know what the process was
5 for redoing the promotional and marketing
6 materials that arose -- that's being mentioned
7 in this memo?
8     A.    Yes.
9     Q.    Okay.  What was it?
10     A.    We have a process for review and
11 approval of materials, and that -- that
12 procedure does not allow use of materials that
13 are not approved by a medical, regulatory and
14 law review committee, so that process was in
15 place with these revised materials.
16     Q.    Where is that process written
17 down?
18     A.    We have a standard operating
19 procedure that -- in place.
20     Q.    Which standard operating
21 procedure is that?
22     A.    We have it.  I don't have
23 stickers.
24         MR. SNAPP:  I have them.  Do you

Page 233

1 want us to mark it?
2         MS. DICKINSON:  I'm sorry.  Sure.
3         MR. SNAPP:  Would you like me to
4 mark it.
5         MS. DICKINSON:  Sure, sure.
6         MR. SNAPP:  It will be Exhibit
7 47.
8         (Document marked for
9 identification as Exhibit
10 Purdue-Fanelli-47.)
11 BY MS. DICKINSON:
12     Q.    And have you marked this as an
13 exhibit, which exhibit?
14     A.    Forty-seven.
15     Q.    Forty-seven.
16     A.    Sorry.
17     Q.    Okay.  What is Exhibit 47?
18     A.    It's a standard operating
19 procedure that describes -- did I call it an
20 MR -- MRL, material review process.  That
21 process has been in place ever since I've been
22 at Purdue and before, but it was put on paper,
23 and this gives a good description of how that
24 process occurs.

Page 234

1    Q.    When was that process first put
2  on paper?
3    A.    I don't remember the date of the
4  first one.  It was in -- the process was in
5  place, as I said, long before I got to Purdue,
6  but I don't know the exact date.
7    Q.    You may not know the exact date.
8  Do you have a rough idea of when the process was
9  put in place?
10    A.    I know the process has always
11  been in place.
12    Q.    On paper?
13    A.    Yeah, sorry.
14      I would think around 2002, in
15  that -- in the early 2000s, I believe.
16    Q.    Where would I go to find out?
17    A.    We could look back at earlier
18  versions of this document.  This is version 3.
19    Q.    Okay.  Are there any response or
20  any documents regarding the response to the
21  warning letter in 2003 that we have not yet
22  talked about?
23    A.    Not that I'm aware of.
24    Q.    Okay.  Are there any other

Page 235

1  responses to the warning letter that are not
2  summarized in these documents or that you
3  haven't testified about?  I'm trying to figure
4  out if there's anything else I need to know that
5  Purdue did in response to that warning letter.
6    A.    I don't believe so.  I mean, I
7  don't think there's other documents.
8    Q.    Okay.  I think we're going to
9  move on to topic 44 quickly.  This may be a
10  little bit of the same that we were just talking
11  about.
12      Topic 44 asks for the process for
13  determining the accuracy, completeness and
14  legality of any sales, marketing, promotional,
15  or educational information you made available to
16  medical professionals, patients, or the public
17  concerning any one or more opioid products in
18  any format, including printed materials, videos,
19  websites and in-person messaging or detailing by
20  sales representatives.
21      Are you here prepared to testify
22  on behalf of Purdue on that topic?
23      MR. SNAPP:  I'll just state for
24      the record that he's prepared to

Page 236

1  testify, as with all the topics in your
2  deposition notice, with respect to
3  OxyContin, Hysingla ER and Butrans.  As
4  we defined the topic, it's the process
5  for determining the accuracy,
6  completeness and legality of sales,
7  marketing, promotional, or educational
8  material -- I'm sorry -- educational
9  information Purdue made available to
10  medical professionals, patients, or the
11  public concerning OxyContin, Hysingla ER
12  and Butrans in any format.
13      And just so the record is clear,
14  in our objections to your definition of
15  opioids and opioid products I think it
16  was, we did specifically say that our
17  testimony was only going to pertain to
18  Hysingla, OxyContin and Butrans.
19  BY MS. DICKINSON:
20    Q.    Okay.  So, Dr. Fanelli, again,
21  you are not here prepared to testify on topic 44
22  as written; is that correct?
23    A.    Yes.
24    Q.    Okay.  What was the process at

Page 237

1  Purdue starting in 1995 for determining the
2  accuracy, completeness and legality of its
3  sales, marketing and promotional materials, for
4  OxyContin, let's start there?
5    A.    Sure.  As I mentioned, related to
6  Exhibit 47 and to the previous question, we had
7  review of material, always have had review of
8  material -- we call it MRL, medical, regulatory
9  and legal review, according to a process that
10  each of those disciplines review and sign off on
11  any materials.  It's presented by -- the piece
12  of material is -- and it's changed over time,
13  now it's electronic, but, you know, the
14  presentation by the material review is reviewed
15  and approved by those three different
16  disciplines.
17    Q.    Is that process -- was that
18  process written down anywhere in the time period
19  1995 to 2002?
20    A.    I'm not aware if it was written
21  down or not.
22    Q.    So in preparing for your
23  testimony today, did you ask anyone if that
24  process had been written down in the period 1995

Page 238

1 to 2002?
2     A.   I didn't ask if it was written
3 down. I asked what the process was, or I didn't
4 ask what the process was. I knew when I joined
5 what the process was, and it had been going as
6 long as I'm aware of.
7     Q.   Okay. You joined the company in
8 2000?
9     A.   Correct.
10     Q.   Correct?
11     And your testimony is that there
12 was no written policy at that time identifying
13 the process for determining the accuracy,
14 completeness and legality of sales and
15 promotional materials; is that right?
16     A.   Let me correct.
17     MR. SNAPP: Object to the form.
18     THE WITNESS: Sorry. I'm not
19 aware if it was written down at that
20 time.
21 BY MS. DICKINSON:
22     Q.   And you didn't ask anyone if it
23 was written down in preparation for this
24 deposition, correct?

Page 239

1     MR. SNAPP: Object to the form.
2     THE WITNESS: Correct.
3 BY MS. DICKINSON:
4     Q.   Did you talk to anyone in
5 preparation for topic 44, other than your
6 lawyers?
7     A.   No.
8     Q.   Did you review any documents in
9 preparation for this topic, other than Exhibit
10 47?
11     A.   No.
12     Q.   Is Exhibit 47 the process that
13 has been in place since -- for the entire time
14 period 1990 to the present?
15     A.   So --
16     MR. SNAPP: Just to make the
17 record clear, the judge ruled that the
18 relevant discovery period is '95 to the
19 present, not 1990.
20 BY MS. DICKINSON:
21     Q.   Okay. Can we -- I don't think it
22 matters much.
23     Does Exhibit --
24     MR. SNAPP: Well, there's been

Page 240

1 several questions about 1990 to the
2 present.
3     MS. DICKINSON: Well, it's what
4 the notice said, but we won't waste time
5 on it.
6     Is Exhibit 47 --
7     MR. SNAPP: Judge's order trumps
8 the notice, with all due respect. Go
9 ahead.
10 BY MS. DICKINSON:
11     Q.   Is Exhibit 47, the -- this
12 document.
13     A.   Got it.
14     Q.   -- the process that has been in
15 place from 1995 to the present?
16     A.   So this -- the main parts of this
17 process, yes, that I described about the three
18 reviews.
19     This goes into -- it's changed.
20 You know, it used to be in paper, those kinds of
21 things. So this goes into putting into the
22 electronic system, you know, and those kinds of
23 things.
24     So the -- the process of, you

Page 241

1 know, what documents go through approval, who
2 the reviewers are and the fact that these things
3 are reviewed periodically, if they're still in
4 existence, those main components of it have been
5 exist -- have been in existence.
6     Q.   And when was the first time that
7 those were in existence in written form?
8     MR. SNAPP: Object to the form.
9     THE WITNESS: Again, I don't know
10 when the first time was.
11 BY MS. DICKINSON:
12     Q.   So your basis for testifying
13 about the process from 1995 up until this
14 written document in 2016 is your personal
15 knowledge of the process; is that right?
16     A.   That's correct, yes. In 2000
17 when I joined, I was involved in the process as
18 well. Sorry.
19     Q.   What was the actual -- this
20 addresses print.
21     What was the actual process for
22 making sure the sales representatives accurately
23 and completely stated -- or I'm sorry, let's
24 just start over.

Page 242

1    This talks about in-person
2  messaging or detailing the topic.
3    What was the process for making
4  sure that statements made in in-person detailing
5  by sales representatives was accurate, complete
6  and legal?
7    MR. SNAPP:  Object to the form,
8    beyond the scope.
9    THE WITNESS:  So the approval of
10   the materials we've talked about require
11   the sign-off by those three
12   representatives.
13    Materials cannot be -- are not
14   even actually distributed prior to that,
15   but before there -- depends on the
16   material, of course, if it's a package
17   insert, it's not that complicated, but
18   there is training of the sales force,
19   and those materials are also reviewed by
20   that same group.  It's not a -- I think
21   it says that in here.  Anyway, so
22   there's training of the sales force and
23   review of compliance by the corporate
24   compliance group we talked about before,

Page 243

1    so those are the two ways they would be
2    monitored.
3  BY MS. DICKINSON:
4    Q.    So because of the process you
5  were describing is it fair to say that any
6  sales, marketing, promotional or educational
7  information that Purdue made available to the
8  medical professionals, patients or the public
9  were reviewed and signed off on by someone at
10 Purdue?
11   A.    Could you -- yes.  You're say --
12 our communication and marketing materials are
13 approved, yes.
14   Q.    And that's true from 1995 to the
15 present; is that right?
16   A.    Yes.
17   Q.    So someone approved the I got my
18 life back video that was shown in 2001; is that
19 right?
20    MR. SNAPP:  Object to the form.
21    THE WITNESS:  I'm not aware of
22   that.  Review materials that don't
23   describe a product, there are -- there
24   are exceptions.  I think it says it in

Page 244

1    the SOP, and I'm not sure what the scope
2    of those were.  For instance, product
3    labeling, I mentioned that about the
4    package insert, given to consultants
5    there were exceptions, but I'm not aware
6    of that particular piece.
7  BY MS. DICKINSON:
8    Q.    Did this process not apply to
9  unbranded marketing materials that didn't
10 mention a product specifically?
11    MR. SNAPP:  Object to the form.
12    THE WITNESS:  It does refer to
13   nonbranded materials in its current
14   form.
15 BY MS. DICKINSON:
16   Q.    Okay.  And the process applied to
17 each and every marketing material at Purdue,
18 right, the process you described and is in
19 Exhibit 47; is that right?
20   A.    As described in this, yes.  Now
21 -- yes.
22   Q.    So a video distributed to 20,000
23 doctors went through this process?
24    MR. SNAPP:  Object to the form.

Page 245

1    THE WITNESS:  Yeah.
2  BY MS. DICKINSON:
3    Q.    Yes?  Fair?
4    A.    I can't be sure that it did.
5    Q.    What happens if it didn't?
6    MR. SNAPP:  Object to the form.
7    THE WITNESS:  So policies and
8    procedures, as mentioned in FDA's
9    warning letter, changed over time, as
10   feedback from FDA is received and gained
11   an understanding of the rules and
12   regulations around -- around promotion,
13   and Purdue's policies have also changed
14   over time.
15 BY MS. DICKINSON:
16   Q.    What policies are you talking
17 about?
18   A.    The review of these materials
19 that you're talking about, the extent, whether
20 or not a price list is reviewed or a particular
21 video, those kinds of policies.
22   Q.    Was there a period of time where
23 certain marketing materials did not get reviewed
24 in this process we were talking about?

Page 246

1    A.    They would be assessed, but I
2  don't know -- I'm not aware that there were
3  times where they weren't reviewed.
4    Q.    I guess I'm confused.
5    A.    All branded material were always
6  reviewed. I'm not sure about nonbranded
7  materials, you know, how they fit into this
8  process.
9    Q.    And when you say brand --
10   A.    In the early -- yeah.
11   Q.    When you say "branded materials,"
12 that's something mentioning the product by name,
13 correct?
14   A.    Correct.
15   Q.    And so anything mentioning the
16 product by name, at all times from 1995 to
17 present were reviewed by the company; is that
18 right? Is that right?
19        MR. SNAPP: Object to the form.
20        THE WITNESS: I believe so.
21 BY MS. DICKINSON:
22   Q.    And you're not certain if the
23 unbranded materials were subject to that same
24 scrutiny; is that right?

Page 247

1    A.    The only thing I'm correct about
2  the unbranded. In terms of the branded, the
3  period of '95 to 2000, I'm not -- I don't have
4  the -- I'm not that familiar with that, the
5  details of that procedure.
6    Q.    And you didn't familiarize
7  yourself with the details of that procedure to
8  answer this question today on behalf of Purdue;
9  is that right?
10        MR. SNAPP: Object to the form.
11        THE WITNESS: That's right.
12        MS. DICKINSON: Take five
13 minutes. I might be wrapping up.
14        THE VIDEOGRAPHER: The time is
15 2:57 p.m., going off the record. Remove
16 your microphone.
17        (Brief recess.)
18        THE VIDEOGRAPHER: We are back on
19 the record. The time is 3:13 p.m.
20        MS. DICKINSON: Dr. Fanelli,
21 we're back on the record. I have
22 finished the questions I have on those
23 topics for you today. We have agreed to
24 do topic 29 tomorrow.

Page 248

1        So for now I'm going to turn it
2  over to some of the other counsel who I
3  know are going to ask questions, and
4  that's all I have for now. I appreciate
5  your time.
6        THE WITNESS: Okay, you're
7  welcome.
8        THE VIDEOGRAPHER: Go off the
9  record.
10        MS. DICKINSON: You want to just
11 go off for a second.
12        THE VIDEOGRAPHER: I can tell you
13 how much. So we used up four hours and
14 39 minutes. Should I go off the record?
15        MR. STEWART: Yeah.
16        THE VIDEOGRAPHER: The time is
17 3:14 p.m., off the record.
18        (Documents marked for
19 identification as Exhibit
20 Purdue-Fanelli-48, 49, 50, 51 and 52.)
21        THE VIDEOGRAPHER: All right. We
22 are back on the record. The time is
23 3:36 p.m.
24 BY MR. STEWART:

Page 249

1    Q.    Dr. Fanelli, I represent the
2  Tennessee plaintiffs in separate litigation.
3  Obviously, I know that there's certain rules
4  with respect to timing of 30(b)(6) depositions
5  in the federal cases. We're under Tennessee
6  rule 30.02(6) that does not have any timing
7  requirements, and none of that applies to our
8  cases. I'm planning to keep my questioning to
9  two hours, as I notified opposing counsel.
10        Also, discovery, at least with
11 respect to the Tennessee litigation, is in its
12 infancy. Obviously, we're going to probably
13 take our own 30.02(6) corporation deposition in
14 the Tennessee cases, notwithstanding our
15 presence here today.
16        Do you recall, Dr. Fanelli,
17 talking about the material approval process?
18   A.    Yes.
19   Q.    And that's the process whereby
20 Purdue would analyze materials that it was
21 putting out into the public or to medical
22 providers talking about OxyContin and other
23 drugs?
24   A.    Correct.

1  Q.   And I believe you testified that
2  it applied to nonbranded materials?
3      A.   Yes.
4      Q.   When you say "nonbranded
5  materials," did that include materials that
6  third parties in which Purdue was a member or a
7  funder produced?
8          MR. SNAPP:  Object to the form.
9          THE WITNESS:  Yeah, could you
10 repeat the question so --
11 BY MR. STEWART:
12     Q.   Yeah, I'm just asking when you
13 had an organization that Purdue is a part of or
14 a funder of and it was putting out materials
15 about pain management about drugs that Purdue
16 produced, would Purdue apply its material
17 approval process to those materials?
18     A.   So this is -- could you give
19 me -- so --
20     Q.   I'll give you a couple examples.
21 Maybe you can just tell me.
22     A.   That's good.
23     Q.   You've got in front of you
24 Exhibit 48.  I think it's called "Partners

1  Against Pain"?
2      A.   Sorry, yeah.
3      Q.   Why don't you just confirm for
4  the record, is that the right exhibit number?
5      A.   Yes, 48 it says visit our
6  website.
7      Q.   That's Partners Against Pain?
8      A.   Correct.
9      Q.   Do you see that?
10     A.   Yes.
11     Q.   Okay.  Can you look at that and
12 tell me whether this is the sort of information
13 that would be subject to Purdue's material
14 approval process that you've described in your
15 testimony?
16     A.   It is.
17     Q.   And now can you look at another
18 document, do you see Exhibit 49 is something
19 called "A Policymaker's Guide to Understanding
20 Pain & Its Management"?
21     A.   Forty-nine?
22     Q.   Perhaps.
23     A.   Sorry.
24     Q.   Do you have in front of you a

1  policy --
2      A.   I got it, yes, this document.
3      Q.   Is it, in fact, Exhibit 49?
4      A.   Yes, it is.
5      Q.   Okay.  And if you look at Exhibit
6  49, do you recognize that document?
7      A.   No, I do not recognize it.
8      Q.   Do you see that it's a document
9  produced by the American Pain Foundation?
10     A.   Yes.
11     Q.   Is that an organization you're
12 familiar with?
13     A.   I know of it.
14     Q.   What do you know about it?
15     A.   All I -- you know, it's not part
16 of my responsibility to deal with outside
17 organizations, but I understand it to be a
18 foundation, advocates for pain.
19     Q.   Was it funded by Purdue, the
20 American Pain Foundation?
21         MR. SNAPP:  Objection, beyond the
22 scope.
23         THE WITNESS:  I do not know.
24 BY MR. STEWART:

1      Q.   Do you know whether American Pain
2  Foundation -- strike that.
3          Do you know whether materials
4  produced by the American Pain Foundation would
5  be subject to Purdue's material approval
6  process?
7      A.   So production of this piece would
8  not be part of Purdue's review process.  It was
9  produced by the American Pain Foundation, as far
10 as I can tell.
11     Q.   Do you know whether anybody in
12 Purdue would typically review materials produced
13 by the American Pain Foundation?
14         MR. SNAPP:  Objection, beyond the
15 scope.
16         THE WITNESS:  I do not know that.
17 BY MR. STEWART:
18     Q.   Sir, if you could turn to Exhibit
19 50, it's a document entitled "Treatment Options:
20 A Guide for People Living with Pain."
21         Have you ever seen that document?
22     A.   Not that I recall.
23     Q.   Would this document be the sort
24 of document that was reviewed according to

1 Purdue's material approval process?

2     A.    No, it would not be reviewed for

3 creation of this document.

4     Q.    Sounds like anything that the

5 American Pain Foundation produced would not be

6 subject to Purdue's material approval process,

7 fair?

8     A.    Correct.

9     Q.    Just so the record is clear --

10     A.    As I understand.

11     Q.    Just so the record is clear,

12 earlier in your testimony you agreed to a

13 definition of Purdue that would encompass three

14 different entities.

15         Do you recall doing that?

16     A.    Yes.

17     Q.    And we can still agree that

18 that's what we're talking about when we say the

19 word Purdue?

20     A.    Yes.

21     Q.    You've got another exhibit, it's

22 Exhibit 51, and it is entitled "Complexities of

23 Caring for People in Pain."

24         Can you look at that and see

1 whether you're familiar with it?

2     A.    I'm not familiar with it.  Parts

3 of it.

4     Q.    What are you familiar with?

5     A.    Actually, I don't recognize this

6 piece itself.

7     Q.    If it's a Purdue presentation

8 that would have been given to physicians and

9 other prescribers outside the company, would it

10 have to go through the material approval

11 process?

12     A.    It says, yeah, produced by

13 Purdue.  Yes, it would have gone through that

14 process.

15     Q.    The point is if Purdue is

16 speaking to prescribers through its own branded

17 materials, whether it's a website, a PowerPoint

18 presentation, approved statements by salespeople

19 or a pamphlet, that all has to be approved

20 through this approval process, the material

21 approval process?

22     A.    That's correct.

23         MR. SNAPP:  Object to the form.

24 BY MR. STEWART:

1     Q.    I've got one final document in

2 front of you, and it's Exhibit 52 entitled "Exit

3 Wounds."

4         Do you see that?

5     A.    Yes.

6     Q.    Have you ever seen "Exit Wounds"

7 before?

8     A.    No, I have not.

9     Q.    Can you look at it and tell me

10 whether or not it is a document that would be

11 subject to Purdue's material approval process?

12     A.    I cannot -- I don't believe it

13 was, but I don't see the date.  September?  I

14 don't believe this was or would have been.

15     Q.    As part of the material approval

16 process, it's the standard that Purdue will not

17 produce materials that contain statements that

18 are not backed by medical science?

19     A.    Could you repeat that.  There

20 were a couple negatives in there.

21     Q.    The material approval process, is

22 one goal of Purdue's material approval process

23 to make sure that statements made about its

24 products are consistent with existing medical

1 science?

2     A.    Yes, that's part of it.

3     Q.    I take it as part of the material

4 approval process, if something is stated in a

5 document that is not backed by medical studies,

6 then the statement is removed from the

7 materials?

8     A.    So we talked about the MRL,

9 medical, regulatory and legal review.

10     Q.    I'm talking about the material

11 approval process, which I think you described as

12 the MRL process.

13     A.    Yes, yeah.  So the medical

14 information would be reviewed for support, you

15 know, is there other publications, is it part of

16 the information about the product and so forth.

17     Q.    So, for example, if -- and if the

18 US Food and Drug Administration told Purdue,

19 this is the science, then you would want to

20 adhere to the directives of the Food and Drug

21 Administration, fair?

22         MR. SNAPP:  Object to the form.

23         THE WITNESS:  That's correct.

24 BY MR. STEWART:

Page 258

1  Q.  I mean, you remember getting --
2  you discussed earlier in your testimony a
3  warning letter that Purdue received with respect
4  to some advertisements in the journal for the
5  American Medical Association.
6      Do you remember that?
7  A.  Yes.
8  Q.  And do you remember that the
9  warning letter -- in the warning letter the FDA
10 was concerned and warned Purdue that it was
11 failing to communicate -- to adequately
12 communicate the abuse risks related to
13 OxyContin?
14     MR. SNAPP:  Object to the form.
15     THE WITNESS:  I'd have to see --
16     which document were you referring to,
17     the warning letter?
18 BY MR. STEWART:
19 Q.  The warning letter.  Go ahead,
20 yeah.
21 A.  What number do you have on there?
22     MR. SNAPP:  What exhibit number
23 is it?
24     MR. STEWART:  I don't have the

Page 259

1  exhibit.
2      MS. DICKINSON:  I think it was
3  39.
4      THE WITNESS:  What's the date on
5  that one?  There were two versions, so
6  on the front page.  Is it December?
7      MR. SNAPP:  Here's the January.
8      THE WITNESS:  Is it the letter
9  from --
10 BY MR. STEWART:
11 Q.  I'm going to tell you, I don't
12 see a date.
13 A.  Who is it addressed to?  Sorry.
14 Q.  Michael Friedman.
15 A.  Okay.
16 Q.  Do you have a warning letter in
17 front of you?
18 A.  Yeah, I do.
19 Q.  What exhibit do you have on it?
20 A.  41.
21 Q.  And turn to page 2 of the warning
22 letter.  Do you see where the FDA says on the
23 second sentence from the top, "The combination
24 in these advertisements of suggesting such a

Page 260

1  broad use of this drug to treat pain without
2  disclosing a potential for abuse with the drug
3  and serious, potentially fatal risks associated
4  with its use, is especially egregious and
5  alarming in its potential impact on the public
6  health."
7      Do you see that?
8  A.  Yes.
9  Q.  Now, once the FDA tells you that,
10 at least at that point, doesn't Purdue have an
11 obligation to make sure that it does not repeat
12 the offending statements in future materials?
13 A.  Yes.  Purdue actually provided a
14 response and removed all the materials.
15 Q.  I guess my -- go ahead.
16 A.  That the FDA agreed with, yeah.
17 Q.  And my point is, though, it's not
18 just the warning letter doesn't just warn you
19 about a particular set of materials, it gives
20 you -- it gives Purdue, the company, notice that
21 there are certain statements that are not
22 acceptable, and that notice applies to all
23 future communications to providers, fair?
24     MR. SNAPP:  Object to the form.

Page 261

1      THE WITNESS:  It talks about --
2      yes, it's not just the materials that
3      are mentioned.
4  BY MR. STEWART:
5  Q.  I mean, you wouldn't then defy a
6  warning letter from the FDA in a future set of
7  materials?
8      MR. SNAPP:  Object to the form.
9      THE WITNESS:  We would follow the
10     recommendations of the FDA as part of
11     our procedure.
12 BY MR. STEWART:
13 Q.  And that's not just to a warning
14 letter, in general, when the FDA issues a
15 statement about science say, with respect to
16 OxyContin, then it's Purdue's duty to follow
17 that recommendation, fair?
18     MR. SNAPP:  Object to the form,
19 scope.
20     THE WITNESS:  We do have a -- we
21     collect those actually and have a guide
22     on how to address them in future
23     communication.
24 BY MR. STEWART:

Page 262

1    Q.    Because you want to make sure
2  that your communications with providers fulfill
3  Purdue's duty to not say things to providers
4  that are inconsistent with the guidance from the
5  FDA, fair?
6    A.    That's correct.
7    Q.    Tell me, what about the guilty
8  plea that Purdue and its executives entered into
9  in 2007, do you use the guilty plea as guidance
10 when determining what to say in Purdue materials
11 from 2007 forward?
12       MR. SNAPP:  Object to the form.
13       THE WITNESS:  We -- I'm not that
14       aware of -- it's not part of my
15       responsibility, the legal part of those,
16       the pleas and so forth, but we take all
17       messages that we have related to the
18       agency's view on messaging when we
19       review materials moving forward.  Sorry.
20 BY MR. STEWART:
21    Q.    I noticed earlier you said you'd
22 never seen the guilty plea.  Do you remember
23 testifying to that?
24    A.    Mm-hmm.

Page 263

1    Q.    My question is how can you
2  determine as part of the materials review
3  process that Purdue is not making false
4  statements if you don't know the false
5  statements articulated in the guilty plea?
6    A.    So we --
7        MR. SNAPP:  Object to the form.
8        THE WITNESS:  Sorry.  As I
9        mentioned, there is medical, regulatory
10       and law are part of that review, and the
11       law department is responsible for that
12       aspect of a review.
13 BY MR. STEWART:
14    Q.    So somewhere in the review
15 process if -- and you're welcome to look at
16 Exhibit 15, which is the Agreed Statement of
17 Facts for the guilty plea, but, you know, the
18 Agreed Statement of Facts states that beginning
19 on or about December 12th, 1995, and continuing
20 on for about June 30th, 2001, certain Purdue
21 supervisors and employees, with the intent to
22 defraud or mislead, marketed and promoted
23 OxyContin as less addictive, less subject to
24 abuse and diversion and less likely to cause

Page 264

1  tolerance and withdrawal than other pain
2  medications, and then it lists some examples.
3        Do you remember that?
4    A.    What page are you on?  Can I --
5    Q.    I'm on page 5 and 6.
6    A.    Yes.
7    Q.    The point is from the point that
8  Purdue pled guilty to misbranding, I take it
9  that it assumed a duty not to repeat these false
10 statements to providers, whether through
11 pamphlets, websites, salespersons or other
12 means?
13       MR. SNAPP:  Object to the form,
14       beyond the scope.
15 BY MR. STEWART:
16    Q.    You can answer.
17    A.    Yes, those while -- while --
18 again, I said that this is not, you know, a
19 document that we reviewed or I personally
20 reviewed.  There were changes that were made
21 based on that timing and those events on
22 messaging going forward, yes.
23    Q.    But the point is the system
24 should ensure the system for -- strike that.

Page 265

1        The system Purdue has for
2  reviewing materials before they're distributed
3  to prescribers should weed out statements that
4  repeat misstatements for which Purdue pled
5  guilty in its guilty plea, fair?
6        MR. SNAPP:  Object to the form.
7        THE WITNESS:  I would say that's
8        fair, yes.
9        (Document marked for
10       identification as Exhibit
11       Purdue-Fanelli-53.)
12 BY MR. STEWART:
13    Q.    Dr. Fanelli, you have in front of
14 you a document, can you tell me if it's marked
15 with an exhibit sticker?
16    A.    Exhibit 53.
17    Q.    And do you recognize the exhibit?
18    A.    Yes.
19    Q.    What is it?
20    A.    It's a submission to the FDA of a
21 review publication.
22    Q.    And --
23    A.    I'm sorry.  It was a reviewed
24 document.  I don't know if it was published.

Page 266

1 Q. Were you involved with the
2 submission?
3 A. Yes, I was the one, as the
4 regulatory liaison, who submitted it to FDA.
5 Q. And can you tell me briefly about
6 your process for getting something like this
7 approved before you submit it?
8 A. To submit to FDA?
9 Q. Sure. Before you got this
10 document that's Exhibit 53 and submit it to the
11 FDA, what sort of approvals did you get within
12 the company?
13 A. So this is authored by -- I have
14 to look and see -- what year is this? It's
15 2013. The contact for the content of the
16 review -- it's a literature review is Dr. Craig
17 Landau. I'm not sure of all of the individuals
18 who were involved in putting the material
19 together. The groups we talked about earlier
20 today, R&D and medical would have been involved
21 in producing it, and this is a general topic, so
22 it would have been -- you know, it's outside of
23 one individual product description, so it's not
24 part of a project team. It would have been

Page 267

1 reviewed and the determination for submission
2 would have been made by the groups of
3 individuals involved in that.
4 Q. Would it be the sort of thing
5 you'd review at regulatory affairs group staff
6 meetings?
7 A. This -- this is more outside of
8 that. It's more of a -- again, it's a review
9 article, so within regulatory, again, it's not
10 responding to an FDA request or a, you know,
11 development, for instance, a labeling change or
12 something like that. It was providing some
13 research that was done, so it would have been
14 discussed at regulatory affairs, but the
15 decision would have been outside of that, among
16 the authors and the executives on -- who were
17 putting that together, and I was -- I would be
18 part of that, of course.
19 Q. Would the CEO be involved in
20 reviewing this document before it went out to
21 the FDA?
22 A. Could have been. I'm not sure at
23 this time.
24 It raises to the level of

Page 268

1 executive committee for sure.
2 Q. And executive committee is made
3 up of?
4 A. Mostly the heads of the
5 departments.
6 Q. Do you see the last sentence in
7 the second paragraph in your routing letter to
8 Dr. Rappaport, you say, "The results of this
9 review indicated that for those patients who
10 choose to continue to take opioids beyond 3
11 months, efficacy and safety are generally
12 maintained through 52 weeks, and that beyond 52
13 weeks, limited data suggest a critical need for
14 additional studies to determine the long-term
15 safety and efficacy for durations of therapy
16 beyond 1 year."
17 Do you see that?
18 A. I do.
19 Q. Okay. And is that a statement
20 that reflects your understanding of science as
21 of May 28th, 2013?
22 MR. SNAPP: Objection, beyond the
23 scope.
24 THE WITNESS: Yes, it is.

Page 269

1 BY MR. STEWART:
2 Q. I take it, because you were
3 involved with this, you have individual
4 knowledge of this particular document, fair?
5 A. I was not an author, but I have
6 some knowledge, yes.
7 Q. As of May 28th, 2013 was Purdue
8 in a position using IMS data and other data to
9 determine the number of patients in the United
10 States that have been -- that were receiving
11 prescriptions and had been doing so for over a
12 year?
13 MR. SNAPP: Objection, beyond the
14 scope.
15 THE WITNESS: I was going to --
16 not part of my responsibility.
17 BY MR. STEWART:
18 Q. Do you know the answer?
19 A. Could you ask the question again.
20 Q. Sure. You know, Purdue looks at
21 IMS data for a variety of items of information
22 about prescribing, fair?
23 A. Yes.
24 Q. Can Purdue determine how many

1 people have been receiving a long-term opioid
2 medication for over a year through that data?
3         MR. SNAPP:  Object to the form.
4 Objection as beyond the scope.
5         THE WITNESS:  I'm not aware of
6     the -- the IMS data, you know, what the
7     details of -- can you follow -- can you
8     get information on an individual patient
9     across the year, for instance.  I think
10    that was what your question was.
11        MR. STEWART:  And, counsel, I'll
12    just say you're making scope objections,
13    and I'll just ask you, I mean, I'm happy
14    to continue this in his individual
15    deposition, if that's what you're
16    suggesting.
17        MR. SNAPP:  I just -- I'm having
18    a hard time understanding how IMS data
19    is related to any of the topics that
20    were noticed for this deposition, but if
21    you can identify it --
22        MR. STEWART:  I think it's
23    related --
24        MR. SNAPP:  -- I'll make my

1     objections, you can ask your questions.
2         MR. STEWART:  I'll tell you what,
3     I think it's related to topics 7 and 10,
4     and what I'll do is ask a certain number
5     of questions, and then I'll continue the
6     questioning tomorrow in your individual
7     deposition.
8 BY MR. STEWART:
9     Q.    Question, could you turn to page
10 6, which is marked with a Bates number 33091.
11    A.    Okay.
12    Q.    Do you see in the middle of the
13 page, section 2 it states, "The relative risk of
14 developing an addictive disorder in patients
15 with chronic non-cancer pain who are treated
16 with chronic opioid therapy remains unknown."
17        Do you see that?
18    A.    Yes.
19    Q.    Okay.  So that's a conclusion or
20 a statement that Purdue is making to the US Food
21 and Drug Administration?
22        MR. SNAPP:  Object to the form.
23        THE WITNESS:  It's part of a
24    report that was reviewing the literature

1     and it is -- was submitted to the FDA.
2 BY MR. STEWART:
3     Q.    And I take it one of the
4 policies, or among the policies and procedures
5 for interacting with the FDA, would be a policy
6 of not submitting a report with a statement that
7 Purdue didn't agree with?
8         MR. SNAPP:  Object to the form.
9         THE WITNESS:  That's correct.
10 BY MR. STEWART:
11    Q.    I mean, this is a statement by
12 Purdue to the US Food and Drug Administration,
13 fair?
14        MR. SNAPP:  Object to the form.
15        THE WITNESS:  It's a submission
16    of a literature review that was
17    submitted to the FDA, yes.
18 BY MR. STEWART:
19    Q.    So this is published in 2013.
20        If we were to look back prior to
21 2013 and see statements by Purdue or anyone else
22 suggesting knowledge of how much addictive
23 disorder would be associated with the
24 prescribing of chronic opioid therapy, those

1 statements wouldn't be consistent with science,
2 fair?
3         MR. SNAPP:  Object to the form,
4     scope.
5         THE WITNESS:  So this is talking
6     about the relative risk.  The science
7     around monitoring addictive disorder in
8     those patients has evolved over time.
9     So statements when they are made are
10    based on the science at that particular
11    time, and at this time we're still --
12    we're still studying it now, we talked
13    about the ten postmarketing commitment
14    studies.  Those are looking at the rates
15    of addictive behavior today, and FDA and
16    all the sponsors are continuing to
17    revise the science around that, and this
18    is -- was a statement at that particular
19    time.
20 BY MR. STEWART:
21    Q.    So here's my confusion: if
22 something is scientifically unknown in 2013,
23 can't we assume that it was scientifically
24 unknown in, say, 1996?

1    MR. SNAPP:  Object to the form.
2    THE WITNESS:  No, I wouldn't say
3  that -- we learned -- just because, you
4  know, a statement is made at one time
5  and it's revised later doesn't mean that
6  at that time someone wasn't making a
7  scientific conclusion based on the
8  information they had, it changes.
9  BY MR. STEWART:
10   Q.    Tell me then, Dr. Fanelli, when
11 specifically did this statement that you -- that
12 "the relative risk of developing an addictive
13 disorder in patients with chronic non-cancer
14 pain who are treated with chronic opioid therapy
15 remains unknown," when did that become a
16 statement consistent with current medical
17 science?
18   MR. SNAPP:  Object to the form,
19  beyond the scope.
20   THE WITNESS:  I don't know.  When
21  this was written and I don't know -- it
22  was submitted in 2013, that was a
23  statement made following review of the
24  literature at that time.

1  BY MR. STEWART:
2    Q.    Well, tell me any literature that
3  you are aware of, okay, that justified a
4  different conclusion with respect to chronic
5  opioid therapy and the risks of addiction?
6    MR. SNAPP:  Objection, beyond the
7  scope.
8    THE WITNESS:  So I'm not a
9  scientist in that area, the head of
10  regulatory affairs, and I don't have an
11  answer for that.
12 BY MR. STEWART:
13   Q.    Okay.  Would your policies and
14 procedures at Purdue for interacting with the
15 FDA include a policy for making sure that a
16 statement like this wasn't inconsistent with
17 some other study?
18   A.    The review of a document such as
19 this, a publication, although I don't think this
20 was published.  I can't say that or a summary
21 document is reviewed by -- it's outside of a
22 material review because this is not -- it's not
23 for publication or it's not for presentation,
24 it's for submission to FDA.  So that would be

1  reviewed by a different group of individuals,
2  but it would be reviewed for accuracy, for sure.
3    Q.    Who in Purdue could tell me or
4  put it this way: who would have reviewed this
5  document who could tell me whether Purdue ever
6  had justification for a different position,
7  other than the one that we're talking about with
8  respect to the risk of addiction?
9    MR. SNAPP:  Objection, beyond the
10  scope.
11   THE WITNESS:  We have a -- in our
12  medical affairs department, we have a
13  group of epidemiological scientists, and
14  that's part of their responsibility.
15 BY MR. STEWART:
16   Q.    Who -- if the FDA called Purdue
17 today and said, you know, we see that you have
18 said in 2013 that you can't predict the
19 likelihood of addiction in connection with
20 chronic opioid therapy, we'd like to know
21 whether you've taken a different position in the
22 past and what the basis was, who would they talk
23 to?
24   MR. SNAPP:  Object to the form.

1    THE WITNESS:  It depend -- you
2  know, FDA would -- in order to answer
3  that I'd need much more specific
4  statements about what the material was,
5  you know, how it was submitted and so
6  forth.
7  BY MR. STEWART:
8    Q.    Who in Purdue could detail
9  Purdue's evolving position over time, if it did
10 evolve, with respect to the risk of addiction
11 related to chronic opioid therapy?
12   MR. SNAPP:  Object to the form,
13  beyond the scope.
14   THE WITNESS:  Today that would be
15  our medical affairs or our -- and the
16  risk -- there's a group, the
17  epidemiologists I mentioned within
18  Purdue.
19 BY MR. STEWART:
20   Q.    And who's that?
21   A.    It's changed very recently.  It's
22 under Marcelo Bigal, who is our chief medical
23 officer.
24   Q.    And so OxyContin is one drug used

1 to provide chronic opioid therapy, fair?
2    A.    Yes.
3    Q.    And OxyContin has been marketed
4 by Purdue for over 20 years since 1996?
5    A.    Correct.
6    Q.    And what you're admitting in this
7 document that's before you is that Purdue
8 doesn't believe that it knows or has science to
9 support a rate of addiction stemming from
10 chronic opioid therapy with OxyContin, fair?
11         MR. SNAPP:  Object to the form,
12    beyond the scope.
13         THE WITNESS:  Could you repeat
14    the --
15 BY MR. STEWART:
16    Q.    Sure.
17         Is it -- when a jury or a judge
18 is looking at this document, I take it they
19 could conclude that Purdue has been marketing a
20 drug, OxyContin for chronic opioid therapy for
21 22 years and now admits that it has no idea what
22 the risk of developing addictive disorder from
23 that drug is, fair?
24         MR. SNAPP:  Object to the form,

1    beyond the scope.
2         THE WITNESS:  It says the
3    relative risk, so that's what it's
4    talking about, relative risk, not no
5    idea.
6 BY MR. STEWART:
7    Q.    Okay.  It doesn't know -- Purdue
8 is admitting here that 22 years into its
9 marketing of OxyContin for chronic opioid
10 therapy, it doesn't know the relative risk that
11 that therapy poses for developing an addictive
12 disorder?
13         MR. SNAPP:  Object to the form,
14    beyond the scope.
15         THE WITNESS:  That's correct.
16 BY MR. STEWART:
17    Q.    Turn back to the first page, your
18 routing letter in Exhibit 53.
19    A.    Mm-hmm.
20    Q.    Do you see that you state in the
21 second to last sentence in the second paragraph,
22 based upon -- a quote -- strike that.  Let's
23 make this clearer.
24         Do you see you state in your

1 routing letter, "Based upon the literature
2 reviewed, it is estimated that the prevalence of
3 aberrant drug behaviors and abuse of opioids
4 ranges from 0.08 to 32%, and the prevalence of
5 opioid use disorder ranges from 2.7 to 25.8% in
6 patients with CNCP treated with chronic opioid
7 therapy."
8         Do you see that?
9    A.    Yes.
10    Q.    That statement reflects the
11 company's understanding of the current science?
12    A.    No.  What it reflects is the
13 literature that was reviewed, and there's a
14 table here with all those publications and the
15 list, and if you review those publications, in
16 that review, it's talking about they state the
17 prevalence as you just described it.
18    Q.    So I take it your -- Purdue's
19 policies and procedures for interacting with the
20 FDA are such that you wouldn't include in your
21 analysis studies that you thought were without
22 any scientific basis?
23         MR. SNAPP:  Object to the form.
24         THE WITNESS:  That's correct, and

1    what this review is, looking at that
2    publication, providing it to FDA so
3    they're aware of what science is out
4    there at the current time about that.
5 BY MR. STEWART:
6    Q.    And some of the studies that
7 Purdue is bringing -- or is citing to the FDA
8 find that between a quarter and a third of the
9 people that have chronic opioid therapy develop
10 abuse of opioids or opioid use disorder, fair?
11         MR. SNAPP:  Object to the form.
12         THE WITNESS:  Can you point out
13    where you --
14 BY MR. STEWART:
15    Q.    Well, I'm just saying --
16    A.    Oh, I see.
17    Q.    -- your conclusion is that there
18 are studies that you cite that suggest that 32%
19 of people involved in chronic -- in chronic
20 opioid therapy show aberrant drug behaviors and
21 abuse of opioids, fair?
22    A.    What it says is the prevalence of
23 aberrant drug behaviors in these articles range
24 from 0.08 to 32%.

Page 282

1    Q.    And then the prevalence of opioid
2   abuse disorder ranges from 2.7 to 25.8%?
3    A.    That's correct.
4    Q.    And does -- has Purdue ever
5   evaluated the studies that show that nearly a
6   third of people that receive treatment -- that
7   receive chronic opioid therapy show behaviors,
8   aberrant drug behaviors and abuse of opioids?
9        MR. SNAPP:  Objection, beyond the
10   scope.
11       THE WITNESS:  What this
12   literature review shows is that the --
13   and I mentioned this before, the science
14   around prevalence of aberrant drug
15   behaviors, the science around opioid use
16   disorder is an evolving science.  It's
17   relatively new, and that's why there's
18   such a wide variety.  0.08 to 32%, 3% to
19   26%, 25.8.
20       And the point of that is to
21   say -- and the next sentence says it,
22   "these studies do not permit estimates
23   of incidence for either aberrant drug
24   behaviors or opioid use disorder since

Page 283

1   typically the history" -- anyway,
2   there's other issues related to the
3   patient studies.  There's not adequate
4   history, and that's why I mentioned
5   about the science continuing to evolve
6   and we're continuing to study this.
7   BY MR. STEWART:
8    Q.    Turn to page 36, sir.
9    A.    The Bates or --
10   Q.    Turn to page -- not the Bates, 36
11  of Exhibit 53.
12   A.    Okay.
13   Q.    And do you see that the Bates
14  number on that page ends in the number 3121?
15   A.    Yes.
16   Q.    Okay.  Do you see three sentences
17  down in section 5.1.1, the report states "all 20
18  studies described opioid abuse or aberrant
19  behaviors"?
20   A.    Starts with while?
21   Q.    Yes.  You see that?
22   A.    I see that, yeah.
23   Q.    Okay.  Every study that is
24  reviewed described that in patients that were on

Page 284

1   long-term opioid therapy, fair?
2        MR. SNAPP:  Object to the form.
3        THE WITNESS:  It says -- it
4   describes opiate abuse, but I'd have
5   to look at them to -- but that appears
6   to be what it says.
7   BY MR. STEWART:
8    Q.    I take it -- I mean, this study
9   right here, you've submitted it to the FDA,
10  given the policies and procedures of Purdue, a
11  Court can look at this document and see that
12  this is a statement that Purdue is making to a
13  federal body, trying to give its view about the
14  current state of the science in this area, fair?
15       MR. SNAPP:  Object to the form.
16       THE WITNESS:  Yes, that's fair.
17  BY MR. STEWART:
18   Q.    Do you see you've got three
19  studies that you -- that you highlight, an Adams
20  study, Naliboff study and a Reid study?  That's
21  on pages 36 and 37.
22   A.    Study one, Adams.  Study two, I
23  don't know how to say it, but, yes, I see those
24  three.

Page 285

1    Q.    Are you familiar with those
2   studies?
3    A.    No, not in --
4    Q.    We'd have to read the report to
5   determine --
6    A.    Yes.
7    Q.    -- how the company position on
8   those studies?
9    A.    Yes.
10       (Document marked for
11       identification as Exhibit
12       Purdue-Fanelli-54.)
13       MR. SNAPP:  Dr. Fanelli was just
14   saying we might need to take a break in
15   about 20 minutes
16
17       MR. STEWART:  That's fine.  We
18   can take it now, if you'd like.
19       THE WITNESS:  No, 20 minutes will
20   be good.
21       MR. STEWART:  Perfect.
22  BY MR. STEWART:
23   Q.    Dr. Fanelli, you have a document
24  in front of you, it's Exhibit 54?

Page 286

1    A.    Yes.
2    Q.    And have you recognize -- do you
3 recognize it?
4    A.    No, I do not.
5    Q.    Okay. It's not something you
6 were involved with?
7    A.    Well, it's an appendix. I don't
8 know what was in front of this.
9    Q.    Okay.
10    (Document marked for
11    identification as Exhibit
12    Purdue-Fanelli-55.)
13 BY MR. STEWART:
14    Q.    I've given you an Exhibit 55 that
15 I believe is a routing letter of the appendix.
16 Can you look at it and tell me whether I'm
17 correct?
18    A.    So this -- this cover letter from
19 October 25th, 2013 mentions, if you look at the
20 second paragraph, that we're providing FDA with
21 a courtesy copy of a submission to the FDA --
22 the docket containing a Citizen Petition with
23 exhibits. So this is Appendix C.
24    I'm not sure if this is all that

Page 287

1 went with this letter.
2    Q.    Let me ask you, could you turn --
3 go to Exhibit 54.
4    A.    Uh-huh.
5    Q.    Which is the larger exhibit, the
6 appendix, and turn to the Bates stamp page that
7 ends in 8177. It's about 100 pages in.
8    A.    I'm there.
9    Q.    Okay. Do you recognize that
10 PowerPoint?
11    A.    No, I do not.
12    Q.    So you have not -- you're not
13 familiar with the study described in the
14 PowerPoint?
15    A.    I know about it, but -- and I
16 have seen this, but it's been a while.
17    Q.    Okay. So you have seen this
18 PowerPoint?
19    A.    Let me -- can I look through the
20 whole thing?
21    Q.    Yes, absolutely.
22    A.    (Witness reviews document.)
23    Yes.
24    Q.    And what does it -- what does it

Page 288

1 involve? What does the PowerPoint tell the FDA?
2    A.    Well, so, again, this is --
3 without seeing the whole -- the other appendices
4 and all, it's part of showing FDA or providing
5 to FDA for their information part of a Citizen's
6 Petition about changes in prescriptions after
7 the introduction of the reformulation of
8 OxyContin.
9    Q.    And do you remember the study
10 being conducted that's described in this
11 PowerPoint presentation?
12    A.    I do not.
13    Q.    Do you remember that Purdue
14 compared physicians that were in its Region 0
15 program which its salespeople did not visit
16 against other -- other physicians that were not
17 in the Region 0 program?
18    A.    Yes, I know that we did that.
19    Q.    Okay.
20    A.    And it looks like that's part of
21 this.
22    Q.    What do you know about that
23 study?
24    MR. SNAPP: Objection, beyond the

Page 289

1    scope.
2    THE WITNESS: I don't recall the
3    findings or, you know, actually the
4    actual conduct.
5 BY MR. STEWART:
6    Q.    Let me ask you this: If this
7 PowerPoint was submitted to the FDA, I take it,
8 based on Purdue's procedures, it would contain
9 an accurate description of the study?
10    A.    That's correct.
11    Q.    You know, someone could look at
12 the PowerPoint and understand that this was
13 information that was designed to convey to the
14 FDA what Purdue had found with respect to this
15 study of comparative prescribing practices by
16 different groups of doctors?
17    MR. SNAPP: Object to the form.
18 BY MR. STEWART:
19    Q.    Fair?
20    A.    I'd have to read the study to
21 understand, but what -- again, it's looking at
22 changes in prescriptions from the title, but I'd
23 have to read the study, not only the
24 presentation, which is a summary of that, but,

1 again, it's part of a Citizen's Petition, and
2 I'd have to look back at the -- I'm not sure
3 what docket it was. So, yes, it's related to,
4 as it says in the letter, that it was abuse
5 deterrent science meeting by FDA, and it was
6 providing information, I assume, that was
7 relevant to that to the FDA.
8     Q.    At the time that this was
9 submitted, what was your role with respect to
10 dealings with the FDA?
11     A.    What day was that? Sorry.
12     Q.    It looks like it was October
13 2013?
14     A.    So I became head of regulatory
15 affairs the next year. At this time, 2013,
16 right before this, there were three different
17 groups in regulatory, and I was head of one of
18 those groups, which was all the FDA liaisons
19 reported in to me and the project manager. So a
20 regulatory person who was on a development
21 project would report in to me.
22     Q.    Would somebody that reported to
23 you have been involved with this study, where
24 doctors were compared with regard to their

1 prescribing of OxyContin?
2     A.    What do you mean by "involved
3 with this study"?
4     Q.    Well, I'm just trying to figure
5 out you sound -- you know, I've handed you the
6 PowerPoint that's part of Exhibit 54, and I'm
7 just trying to figure out if it fell within
8 your -- your responsibilities?
9     A.    So Beth Conley is -- reported to
10 me at the time. This is -- we filed to FD -- we
11 forward to FDA responses to things like Citizens
12 Petitions, to the FDA docket so they have the
13 information that Purdue has relative, so the
14 responsibility -- regulatory's responsibility is
15 to understand, you know, what the document is,
16 where it fits in correspondence with FDA and to
17 provide that to the FDA.
18     Q.    So it did fall within your
19 responsibility?
20     A.    Getting this to FDA did.
21     Q.    Okay.
22     A.    Conduct of the study and the
23 details of the study are outside of regulatory.
24     Q.    Who's responsible for what you

1 call the contents of the study?
2     A.    That particular study is the same
3 group we were talking about before. Two former
4 employees are listed on there from that group.
5 I don't have -- what page was that? Here it is.
6 Actually, three. Howard Chilcoat. I don't know
7 Sayee, I think he's a statistician, and Paul and
8 Robin Abrams is also listed on there, who is an
9 attorney. She was the lead -- part of the SOPs
10 we talked about earlier today, the ADD, which is
11 mentioned in this publication falls under the
12 law department, so that's why those would be the
13 responsible individuals.
14     Q.    You've got a document in front of
15 you marked Exhibit 56. It's a thick one. Do
16 you see it? It's coming.
17         (Document marked for
18         identification as Exhibit
19         Purdue-Fanelli-56.)
20         THE WITNESS: I put these out of
21     order sorry. Should I keep this one?
22         MR. STEWART: No. Move on to the
23     next.
24         THE WITNESS: Okay.

1 BY MR. STEWART:
2     Q.    Do you recognize Exhibit 56?
3     A.    From the title, but it doesn't
4 have the covering information, so I recognize it
5 as a response to FDA -- an information request,
6 call it an IR from FDA, so final IR questions.
7     Q.    And you're familiar with the
8 policies and procedures that Purdue would have
9 for responding to an information request from
10 the FDA?
11     A.    Yes.
12     Q.    Can you generally tell me what
13 Purdue's obligation is when you get an FDA
14 information request?
15     A.    So information requests come from
16 FDA mostly related to applications under review
17 or supplements under review or package insert
18 supplements and so forth. They come in the
19 form, either e-mail or a written form, and,
20 generally, in FDA's -- obviously they're not all
21 the same, depends on what the FDA is asking
22 about.
23         FDA provides comments, requests
24 related to some material and provides -- usually

1  FDA actually usually provides what their request
2  is in terms of timing of response and so forth,
3  so that's an information request.
4      Q.    When a comp -- when Purdue
5  responds to an FDA information request, I take
6  it its responses are intended to reflect its
7  understanding of the truth?
8      A.    Yes.
9      Q.    This is meant to be a reliable
10 document?
11     A.    Mm-hmm, yes.
12     Q.    You have procedures in place -- I
13 mean, you have procedures in place to ensure
14 that the FDA can read this document that's
15 Exhibit 56 and understand what Purdue's position
16 is with respect to its questions, fair?
17     A.    That's our intent.
18     Q.    Okay.  Can you turn to -- can you
19 turn to page Bates number 3819.  You see there's
20 a lengthy -- there's a question from the FDA
21 about the RADARS Drug Diversion Study?
22     A.    Yes, I see that.
23     Q.    Do you know what that is?  Do you
24 know what the RADARS Drug Diversion Study is?

1      A.    I know what RADARS is.  This
2  particular study -- RADARS is involved -- it's
3  actually a collection of detection sources to
4  detect abuse, overdose and death, misuse, that
5  was actually created at Purdue, but now it
6  resides in Colorado.  We have many studies,
7  including in the class postmarket realm, I'm not
8  sure, in each different products to use data
9  from RADARS to answer questions around drug
10 diversion and so forth.  So but this particular
11 study I'd have to -- I don't see a title.  I'd
12 have to go by what it says here.
13     Q.    Let me ask you, you say that
14 Purdue relies on RADARS to inform it about
15 diversion with respect to a number of its
16 products?
17     A.    So RADARS is only one part that
18 we talked about this earlier today.  That's why
19 there are 11 studies, ten of which are
20 epidemiological like this is getting data from
21 different sources.  RADARS is one of those
22 sources.  Each of those individual sources,
23 databases, if we're using Kaiser Permanente's
24 database on patient use and so forth, each has

1  their limitations based on where the data come
2  from and so forth.  RADARS, in fact, recently
3  FDA uses RADARS as well to get data, and
4  recently FDA identified an issue with one of the
5  sources and informed both RADARS and all the
6  sponsors that that data was going to be redone.
7  So anyway, sorry to go on for so long, but
8  that's what RADARS is all about.
9          So, yes, we rely on their data,
10 data from every -- different sources have
11 advantages and limitations, and I'll just stop
12 there.  Is that helpful?  Did it answer your
13 question?
14     Q.    Yeah, I think it does.
15          In this -- in this particular
16 response to the FDA, Purdue says, and it's the
17 fifth paragraph down, "Previous results indicate
18 that drug diversion data relate to real world
19 events.  Besides the apparent reduction in drug
20 diversion, the introduction of reformulated
21 OxyContin had similar decreases in the RADARS
22 Poison Control Center Program, Opioid Treatment
23 Program, Survey of Key Informants' Patients and
24 StreetRx."

1          Do you see that?
2      A.    Yes.
3      Q.    Okay.  First of all, it sounds
4  like you agree that drug diversion data from
5  RADARS does relate to real world events; it
6  shows what's going on on the street, fair?
7          MR. SNAPP:  Object to the form
8      and beyond the scope.
9          THE WITNESS:  It's part of the
10     picture, it provides data, yes.
11 BY MR. STEWART:
12     Q.    I mean, Purdue uses it to figure
13 out -- to measure diversion?
14     A.    As I say, it's part of -- it's
15 one of the things we look at.  There are many
16 different databases that we're currently trying
17 to look at.  We still have four -- after years
18 working with FDA, we're actually in the final
19 stages of finishing our postmarketing required
20 studies for OxyContin.  After working with FDA
21 the last revision on their protocol that they
22 asked us to revise was within the last year, but
23 we're near -- two of those four studies have
24 been submitted to the FDA, and there are two

1 THE WITNESS: So we have -- the
2 postmarketing studies that we're doing
3 and the industry is doing include, as I
4 said, up to ten studies. They measure
5 things such as doctor shopping, for
6 example. They measure things such as --
7 and actually, you know, again, I'm not
8 the scientists, the epidemiologists
9 there, but it's just from my experience
10 of interacting with FDA where my
11 knowledge comes from, looking at
12 databases from managed care
13 organizations, for instance, on adverse
14 events that are reported. So all
15 those -- all those information are
16 available and tools that are used to
17 assess.
18 BY MR. STEWART:
19 Q. Do you recall Purdue undergoing
20 an effort to measure whether or not the market
21 for diverted drugs declined after it introduced
22 reformulated OxyContin?
23 MR. SNAPP: Object to the form,
24 objection, beyond the scope.

1 THE WITNESS: We are -- those are
2 -- that is exactly what the
3 postmarketing studies continue to do.
4 We've been doing that since -- for
5 years, and we continue to study that.
6 BY MR. STEWART:
7 Q. And you, you're familiar with the
8 postmarketing study process, fair, in your
9 current --
10 A. Process, yes.
11 Q. If I wanted to talk to you, if I
12 wanted to get a document for you that would
13 allow you to provide as much knowledge as you
14 have about measurement of diversion with respect
15 to your postmarketing efforts, what document
16 would I be looking for?
17 MR. SNAPP: Object to the form.
18 THE WITNESS: So my -- again is
19 related to the process of how we deal
20 with FDA, how we submit the protocols,
21 how we get feedback from FDA on most
22 protocols, how we submit the results,
23 the timing. Each postmarketing
24 requirement has a state of what the

1 objectives are, we submit those in the
2 protocol. So my role and responsibility
3 is providing those to the scientists who
4 then conduct the studies and then
5 interact with FDA. All these studies
6 are done with contracting to
7 organizations such as RADARS,
8 institutions such as Columbia
9 University, they have a group there
10 that's studying questionnaires, and
11 we're designing them right now to assess
12 opiate -- risk of opiate abuse and so
13 forth. So that's the kind of
14 responsibility that's mine.
15 MR. STEWART: Why don't we take a
16 break.
17 THE WITNESS: Thanks.
18 THE VIDEOGRAPHER: Remove your
19 microphones. The time is 4:41 p.m., off
20 the record.
21 (Brief recess.)
22 THE VIDEOGRAPHER: We are back on
23 the record, the time is 4:54.
24 BY MR. STEWART:

1 Q. Sir, in reviewing materials
2 for -- that are sent to federal regulators, you
3 talked at times there's senior members of Purdue
4 management that are involved, fair?
5 A. Sometimes, yes.
6 Q. What are those times, how would
7 you define them?
8 A. Depends on what you mean.
9 Q. Yeah, when is it that, say, the
10 board of Purdue gets involved with submission of
11 things to federal regulator?
12 A. The board, when I say senior
13 management, I'm speaking of up to the CEO, the
14 board would rarely -- I can't think of an
15 incident -- get involved in a submission to the
16 FDA.
17 Q. So the highest level people would
18 be the CEO and other top executives, fair?
19 A. Yes.
20 Q. Okay. You've got in front of you
21 or you will an exhibit.
22 MR. STEWART: What number are we
23 on? 57.
24 (Document marked for

1     identification as Exhibit

2     Purdue-Fanelli-57.)

3 BY MR. STEWART:

4     Q.   Do you see it is an e-mail?

5     A.   Hold on.

6     Q.   It's a series of --

7     A.   Oh, I gave away the --

8     Q.   Okay. Do you see it's a series

9 of e-mails?

10     A.   That's what it appears to be,

11 yes.

12     Q.   And who's sending the e-mails? I

13 think you've already talked about.

14     A.   So it start -- are you on 154?

15     Q.   Right. Why don't you -- do you

16 see you have a series of e-mails in your hand?

17     A.   Yes.

18     Q.   They're a single exhibit?

19     A.   Yeah.

20     Q.   And the exhibit is 57; is that

21 correct?

22     A.   Yes.

23     Q.   Okay. Let's just go through the

24 e-mails front to back, fair?

1     A.   Okay.

2     Q.   Do you see you have an e-mail in

3 front of you that has the Bates Number 9154?

4     A.   Yes.

5     Q.   Okay. Do you see that -- and

6 you're the third line from the bottom that you

7 received the e-mail?

8     A.   Yes.

9     Q.   Okay. And do you see that the

10 e-mail is entitled "RA Staff Meeting"?

11     A.   Yes.

12     Q.   Okay. What's that?

13     A.   This one says International RA

14 Staff Meeting.

15     At the time and the individual is

16 the administrative assistant to Ron Hargreaves,

17 who is the first individual on this -- what year

18 was this? Sorry. This was sent -- do you know

19 what I see is this is a recurring notice of a

20 meeting that occurs every month, so I'm not --

21 well, it says 2002 to 2003.

22     Q.   I'm just wondering, do you

23 remember having meetings of that sort?

24     A.   Yeah, we would -- this one is the

1 international -- this particular e-mail goes to

2 the international regulatory affairs staff. I

3 was not a member of the international regulatory

4 affairs staff.

5     Oh, I know what this is now.

6 Sorry. I had to look at the entire -- so that's

7 for the entire regulatory department.

8     At that time, you know, we had an

9 international department and a US department. I

10 was always when I came a member of the US

11 regulatory affairs, but this looks like it's a

12 joint meeting of all, if I look at the

13 individuals.

14     Q.   And if you're getting an invite

15 to a meeting, are you going to attend, or how

16 does that work?

17     A.   It depends. I have three

18 meetings today that I could not attend, so I

19 usually would assign it to someone who works for

20 me or have it covered by one of my associates.

21     Q.   If you receive a meeting invite

22 like this in Purdue, does that mean that someone

23 is supposed to attend on your behalf?

24     A.   It really depends on the agenda

1 item. So if -- and also my role at the current

2 time. You know, it would really depend. So

3 there may -- let me further, you know, given the

4 list of attendees, there could be someone who

5 has a similar responsibility that I do who could

6 cover for me, and I wouldn't -- they were

7 already there, I wouldn't have to assign it.

8     Q.   Now, you look five down from the

9 top -- well, first of all, do you remember

10 actually attending any of these meetings of this

11 group?

12     MR. SNAPP: Objection, beyond the

13 scope.

14     THE WITNESS: Yes, I can -- I can

15 remember.

16 BY MR. STEWART:

17     Q.   What was the purpose of that

18 group, the international regulatory affairs

19 group?

20     MR. SNAPP: Objection, beyond the

21 scope.

22     THE WITNESS: So our -- it's a

23 department meeting where we would

24 discuss topics of interest to the entire

Page 310

1    department, generally.
2    BY MR. STEWART:
3        Q.    So you talk about reports, for
4    example, with respect to regulatory affairs?
5        MR. SNAPP:  Object to the form.
6        THE WITNESS:  We would generally
7    talk about different projects, according
8    to drug development products, marketed
9    products and so forth.  It could come up
10   that a submission would be discussed,
11   but it depends on the agenda and the
12   day.
13   BY MR. STEWART:
14       Q.    I noticed that five or four lines
15   down in this list of folks that are notified, do
16   you see there's a doctor, I think, Kathe
17   Sackler?
18       A.    Yes.
19       Q.    Is that how you pronounce that
20   Kathe?
21       A.    Yes.
22       Q.    Who is Kathe Sackler?
23       MR. SNAPP:  Objection, beyond the
24   scope.

Page 311

1        THE WITNESS:  Member of the Board
2    of Directors.
3    BY MR. STEWART:
4        Q.    Okay.  And is she also an officer
5    in the company?
6        MR. SNAPP:  Objection, beyond the
7    scope.
8        THE WITNESS:  I'm not sure how
9    that's defined.
10   BY MS. DICKINSON:
11       Q.    Well, does she have a title in
12   the company in an active role?
13       MR. SNAPP:  Objection, beyond the
14   scope.
15       THE WITNESS:  She's a member of
16   the Board of Directors.
17   BY MR. STEWART:
18       Q.    But outside of being a member of
19   the board, does she have an active role --
20       A.    Sort of like --
21       Q.    -- in the operations of the
22   company?
23       MR. SNAPP:  Objection, beyond the
24   scope.

Page 312

1        THE WITNESS:  Not that I'm aware
2    of.
3    BY MR. STEWART:
4        Q.    Do you know if she has an office
5    at Purdue?
6        MR. SNAPP:  Objection, beyond the
7    scope.
8        THE WITNESS:  I believe she does.
9    BY MR. STEWART:
10       Q.    Why would she be invited to a
11   meeting of this sort?  Is that pretty typical?
12       MR. SNAPP:  Object to the form,
13   beyond the scope.
14       THE WITNESS:  Not that I'm aware
15   of.  I don't know.
16   BY MR. STEWART:
17       Q.    Okay.  What about Dr. Richard
18   Sackler, who's that?
19       MR. SNAPP:  Objection.
20   BY MR. STEWART:
21       Q.    He's the next person on the list.
22       MR. SNAPP:  Beyond the scope.
23       THE WITNESS:  Another member of
24   the Board of Directors.

Page 313

1    BY MR. STEWART:
2        Q.    Did he also have a role as an
3    officer of the company?
4        MR. SNAPP:  Objection, beyond the
5    scope.
6        THE WITNESS:  He is a member of
7    the board.
8    BY MR. STEWART:
9        Q.    Has he ever had a role as
10   president or CEO or anything else?
11       A.    Oh, yes.
12       MR. SNAPP:  Objection, beyond the
13   scope.
14       THE WITNESS:  He was -- sorry, I
15   apologize.  You want to repeat it.
16   BY MR. STEWART:
17       Q.    Yeah, go ahead.  Richard Sackler,
18   what sort of roles has he played, other than
19   just being a member of the board?
20       MR. SNAPP:  Objection, beyond the
21   scope.
22       THE WITNESS:  He was the -- I'm
23   not sure of the exact title back then,
24   president, CEO, head of the --

BY MR. STEWART:

Q. He was the top executive of the company at this time, fair?

MR. SNAPP: Objection, beyond the scope.

THE WITNESS: Correct.

BY MR. STEWART:

Q. And do you remember a --

A. Can I -- I'm not exactly sure on this particular date, you know, when that changed.

Q. At some point he was the top executive in the company, correct?

MR. SNAPP: Objection, beyond the scope.

THE WITNESS: Correct.

BY MR. STEWART:

Q. Now, so do you remember attending a meeting with Kathe and Richard Sackler?

MR. SNAPP: Objection to the form.

BY MR. STEWART:

Q. Do you remember attending this particular meeting?

A. No, do not.

Q. Have you attended meetings with Kathe Sackler?

MR. SNAPP: Objection, beyond the scope.

THE WITNESS: I have attended board meetings, no -- besides -- the only meetings that I had that included Dr. Richard and Dr. Kathe Sackler were board meetings, where I was as the head of regulatory or even before then as the head of a particular project reporting to the board on development programs and items such as that.

BY MR. STEWART:

Q. How many times have you had a meeting with -- have you attended a Purdue board meeting?

MR. SNAPP: Objection, beyond the scope.

THE WITNESS: I -- it would have to be a very rough estimate, a handful, I'd say. I worked at Purdue 18 years, maybe a dozen of those times. Usually

those meetings are attended by the head of R&D, who I report to, and, again, I've only been the head of regulatory since 2014 so, you know...

BY MR. STEWART:

Q. Have most of your meetings with the board been since 2014 when you became head of regulatory?

A. No, they've been across the time. So when I first joined Purdue, I was on a couple of -- as the regulatory representative on a particular project. When that project came up for review, I might have gone to the board. A good example of that is Butrans or buprenorphine transdermal system, I was the lead as if you look at the approval letter, I'm the person who signed those letters and submitted those, and discussions of the plans for those studies took place -- this is just an example, took place at a board meeting.

Q. Typically, when there's a meeting at Purdue, is there a calendar entry sent around like this?

A. Calendar invite is how folks find

out about meetings.

Q. So if we wanted to know all the meetings that you've been invited to since 2002, the best way to do it would be to look at your calendar entries, fair?

MR. SNAPP: Object to the form. Objection, beyond the scope.

THE WITNESS: You could do that. It's not 100% accurate in terms of -- you know, it could be on my calendar, I might not have attended and so forth. It will definitely give you an idea of my day.

BY MR. STEWART:

Q. And that would be true for anybody on this e-mail right here, anybody that's been invited, fair?

MR. SNAPP: Object to the form.

THE WITNESS: So there are -- and this e-mail, again, is old, and I'm not sure, it doesn't look familiar to me either in terms of the formatting. Usually it has the name, but maybe that's how they were in 2002.

1    There are folks that are included
2  on invitations so they know they're
3  occurring but not expected to be there
4  so...
5  BY MR. STEWART:
6    Q.    The point is it shows you who's
7  invited to a meeting, not necessarily who
8  attends is what you're saying?
9    A.    It -- what it's indicating is
10  who's -- who's been informed about the meeting.
11  I'm not sure if they were all invited.
12          So, for instance, when I first
13  saw this and thought it was an international
14  regulatory, as I say, at different times there
15  was an international separate group that had
16  their own meetings, they would have let me know
17  about it in case, you know, I had part of the
18  agenda.  And as you notice, this is -- at least
19  it says here occurs every first Tuesday of every
20  month, so this is a repeat meeting, so it goes
21  on your calendar every month, and not all these
22  people, you know, might have been invited each
23  month.  It's just to let them know.  I think
24  this is more of a notification e-mail.

1    Q.    It's to tell, for example, you,
2  Dr. Kathe Sackler, Dr. Richard Sackler, this is
3  a standard meeting that you can come to that you
4  need to be aware of, fair?
5          MR. SNAPP:  Object to the form.
6          THE WITNESS:  So as long ago as
7      this was, I'm not exactly sure, you
8      know, why, you know, everyone was on
9      here, but that does occur, as you
10      described.
11  BY MR. STEWART:
12    Q.    I mean, what you do know is they
13  were all invited to this particular recurring
14  meeting?
15          MR. SNAPP:  Object to the form.
16          THE WITNESS:  All I know is they
17      were notified about this particular
18      meeting.
19  BY MR. STEWART:
20    Q.    Okay.  Why don't you turn to the
21  next page.  Do you see you have a document in
22  front of you marked 8153?
23    A.    Yes.
24    Q.    Okay.  Now, is this an e-mail

1  from Joyce Mulligan sending around a report?
2    A.    That's what it says in the body
3  of the e-mail.
4    Q.    Sending around something called a
5  Regulatory Agency Contact Report?
6    A.    Correct.
7    Q.    What's that?
8    A.    We refer to it as a RACR.  Any
9  time that there is a conversation with FDA, a
10  phone call, an e-mail, as we talked about
11  earlier, we might relate it to those information
12  requests, we might get an e-mail from FDA rather
13  than a paper.  We don't do anything with paper
14  anymore.  An e-mail with an attachment, for
15  instance, any time those occur they are sent --
16  they are recorded as a contact report, and over
17  the years it's been in different forms.
18    Q.    The point is --
19    A.    So that it's -- so that it's part
20  of the record.
21    Q.    -- when there's an FDA contact, a
22  report is sent around so everybody knows about
23  it that might have interest in it or need to
24  know; is that fair?

1    A.    That's fair.
2          MR. SNAPP:  Object to the form.
3  BY MR. STEWART:
4    Q.    Now, do you see here that in
5  addition to you, Dr. Kathe Sackler and
6  Dr. Richard Sackler got this RACR report?
7          MR. SNAPP:  Object to the form.
8  BY MR. STEWART:
9    Q.    It's the third line up from the
10  bottom.
11          MR. SNAPP:  Beyond the scope.
12          THE WITNESS:  I see them on
13      there, yes.
14  BY MR. STEWART:
15    Q.    Do you know one way or the other
16  whether that's typical for them to get all the
17  RACR reports?
18          MR. SNAPP:  Object to form,
19      beyond the scope.
20          THE WITNESS:  I believe it's not
21      typical for them to get all the RACR
22      reports.
23  BY MR. STEWART:
24    Q.    Why do you believe that?

Page 322

1    A.    Well, I can tell you since I've
2 been head of regulatory, I have not sent them
3 to -- I should be careful.  Board members.  The
4 only time that I communicate -- there have been
5 times I communicated to the board, the entire
6 board, and those would be events such as a drug
7 approval, you know, so -- so for me directly, it
8 would be announcement of something major.
9    Q.    In 2002 in the e-mail that is
10 Bates Number 8513 was sent, who is Joyce
11 Mulligan?  What did she do?
12    A.    She was an administrative
13 assistant, but I'm not sure who -- I know -- I
14 believe she was in regulatory affairs at the
15 time -- oh, and here it is, sorry.
16        If you look at the -- who
17 distributed this at the bottom, it's Chris Prue,
18 so he's -- Joyce was his administrative
19 assistant.
20    Q.    You see you have another
21 document, it's a very lengthy document that
22 starts at Bates stamp 1419 and ends at Bates
23 stamp 1421.
24    A.    Yes.

Page 323

1    Q.    I won't make you find your name
2 on here, but tell me is this a -- tell me what
3 this e-mail is designed to do?
4        MR. SNAPP:  Object to the form.
5        THE WITNESS:  So I don't have the
6    attachment that it's talking about.  It
7    looks like it's a calendar of the R&D --
8    international R&D meetings to inform
9    people when they are.
10 BY MR. STEWART:
11    Q.    Okay.  So this is just a calendar
12 that tells everyone when they can go to these
13 meetings, fair?
14        MR. SNAPP:  Object to the form.
15        THE WITNESS:  It's not inviting
16    them to the meeting, it's just showing
17    them when they occur providing further
18    information.
19 BY MR. STEWART:
20    Q.    Turn to the last page in this
21 group.  It's 8174.
22        Do you see that?
23    A.    Yes, sorry.
24    Q.    Do you see it's a distribution,

Page 324

1 e-mail distributing a January 2002 letter from
2 the FDA?
3    A.    Yep, yes.
4    Q.    And it's a letter approving the
5 labeling supplement for the OxyContin patient
6 package insert?
7    A.    Yes, that's what it says.
8    Q.    Here again, I notice that in
9 addition to you, Dr. Kathe Sackler and
10 Dr. Richard Sackler are copied.
11        Do you see that?
12        MR. SNAPP:  Object to the form.
13 BY MR. STEWART:
14    Q.    Second line up.
15        MR. SNAPP:  Beyond the scope.
16        THE WITNESS:  I see that, yes.
17 BY MR. STEWART:
18    Q.    Why were they receiving a routine
19 correspondence from the FDA?
20        MR. SNAPP:  Object to the form,
21    beyond the scope.
22        THE WITNESS:  This is more
23    than -- similar to what I mentioned
24    before, approvals of regulatory

Page 325

1    submissions have a wider distribution.
2 BY MR. STEWART:
3    Q.    And to figure out what
4 Dr. Richard Sackler was involved in, we just
5 have to -- we'd have to look at all the various
6 calendar entries and all the e-mails, fair?
7        MR. SNAPP:  Object to the form,
8    object as beyond the scope.
9        THE WITNESS:  I have no knowledge
10    of how to -- of that.
11 BY MR. STEWART:
12    Q.    You can speak to these e-mails
13 because you're on them, right?
14    A.    You've shown them to me, so I can
15 speak to that they are -- they are listed on
16 there.
17    Q.    Now, let me ask you something.
18 Have you ever had a conversation outside of a
19 board meeting with Dr. Richard Sackler?
20        MR. SNAPP:  Object to the form,
21    objection as beyond the scope.
22        THE WITNESS:  Very rare.  In the
23    hallway.  One I remember particularly,
24    I'm a Type I diabetic with an insulin

Page 326

1    pump, and Purdue was looking at an
2    inhaled insulin product, and Dr. Sackler
3    wanted to talk to me about it.
4 BY MR. STEWART:
5    Q.   Do you remember any conversations
6 with Dr. Sackler about regulatory matters?
7       MR. SNAPP: Objection as beyond
8    the scope.
9       THE WITNESS: Not that I
10    remember.
11 BY MR. STEWART:
12    Q.   How often would Dr. Sackler
13 contact you with respect to an issue involving
14 the safety of a Purdue product?
15       MR. SNAPP: Objection, beyond the
16    scope.
17       THE WITNESS: I have never had a
18    conversation with Dr. Sackler about
19    that. I wasn't head of regulatory until
20    2014, but, personally, I haven't had a
21    conversation about that.
22       MR. STEWART: It's our last
23    exhibit.
24       (Document marked for

Page 327

1    identification as Exhibit
2    Purdue-Fanelli-58.)
3       THE WITNESS: This looks -- oh,
4    it's different.
5       MR. SNAPP: Wait for a question.
6 BY MR. STEWART:
7    Q.   Do you have in front of you
8 Exhibit 58, sir?
9    A.   Yes, I do.
10    Q.   And do you see or do you
11 recognize the document?
12    A.   I have a vague recollection of
13 it. I'd have to look through it more carefully.
14    Q.   Well, it's a filing that you
15 provided to the Food and Drug Administration,
16 right?
17    A.   Mm-hmm.
18    Q.   Okay. Why don't you look at it,
19 and then I'll ask you some questions.
20    A.   Sure. (Witness reviews
21 document.) Okay.
22    Q.   Do you remember filing this?
23    A.   Vaguely, yes.
24    Q.   Okay. Why vaguely? It seems

Page 328

1 like a pretty extensive document.
2    A.   I don't remember all the details.
3    Q.   Okay.
4    A.   But I remember it.
5    Q.   Again, I take it this is a filing
6 with the FDA, so your intention would have been
7 to provide truthful information to the
8 regulator, fair?
9    A.   Yes.
10    Q.   Okay. Do you see on the second
11 page which is Bates stamped 6540, the first
12 complete sentence states, "This suggests that
13 the relationship between prescribed opioid dose
14 and the risk of opioid overdose is complex and
15 requires more careful scientific investigation."
16       Do you see that?
17    A.   Yes.
18    Q.   That's Purdue's understanding as
19 we -- at least as of 2013 of the relationship
20 between dose and the complication of overdose?
21       MR. SNAPP: Objection, beyond the
22    scope.
23       THE WITNESS: That's what's
24    stated there, yes.

Page 329

1 BY MR. STEWART:
2    Q.   Okay. And this would have all --
3 this material, because it's provided to the FDA,
4 this would have been subject to the review
5 process that you're here to discuss today as a
6 corporate representative?
7    A.   As we discussed, this is actually
8 the part of a series, and we've discussed
9 similarly on that other document, yes.
10    Q.   So if somebody, Purdue or anyone
11 else, has said in the past that increasing the
12 dose of opioids doesn't increase a risk of
13 overdose, that wouldn't be consistent with
14 Purdue's understanding; is that fair?
15       MR. SNAPP: Object to the form.
16    Objection as beyond the scope.
17       THE WITNESS: So like I mentioned
18    before, science around all of -- all of
19    the risks is continuing to evolve. So
20    at this time this -- that's a statement
21    related to this document.
22 BY MR. STEWART:
23    Q.   And could you remind us who the
24 human being is that could best describe the

## Page 330

1 evolution of Purdue's understanding of the
2 relationship between prescribed opioid dose and
3 the risk of overdose over time has been?
4       MR. SNAPP: Objection, beyond the
5 scope and form.
6       THE WITNESS: Again, it's changed
7 over time, the department. The author
8 here Paul Coplan was head of the group
9 of our epidemiological scientists at
10 this current time, and they reside in
11 the medical affairs group, the ones that
12 we've been talking about prior, not
13 research and development but medical
14 affairs.
15       MR. STEWART: Let's take a
16 two-minute break, and then we'll be
17 about done.
18       THE VIDEOGRAPHER: Stand by,
19 please. The time is 5:19 p.m., going
20 off the record.
21       (Brief recess.)
22       THE VIDEOGRAPHER: We are back on
23 the record. The time is 5:22 p.m.
24 BY MR. STEWART:

## Page 331

1       Q.    Dr. Fanelli, you talked about a
2 number of systems Purdue uses to, among other
3 things, measure diversion.
4       Do you remember that?
5       A.    Yes.
6       Q.    Is the Navippro, N-a-v-i-p-p-r-o,
7 system one of those?
8       MR. SNAPP: Objection, beyond the
9 scope.
10       THE WITNESS: Yes.
11 BY MR. STEWART:
12       Q.    And can you just tell me what
13 your understanding of Navippro is?
14       MR. SNAPP: Objection, beyond the
15 scope.
16       THE WITNESS: Without seeing the
17 protocol, I know it's one of the systems
18 used, but I'm not -- it's not part of my
19 expertise without seeing the protocol.
20 BY MR. STEWART:
21       Q.    You'd have to have the protocol
22 in front of you, and then you could speak to it?
23       A.    I would know more about what
24 we're talking about.

## Page 332

1       Q.    And that's -- I mean, it's part
2 of -- the Navippro is one of the systems that
3 informs some of your filings with the Food and
4 Drug Administration, fair?
5       MR. SNAPP: Objection, beyond the
6 scope.
7       THE WITNESS: There's protocols
8 related to that that have been submitted
9 to the FDA, yes.
10       (Document marked for
11 identification as Exhibit
12 Purdue-Fanelli-59.)
13 BY MR. STEWART:
14       Q.    By the way, do you happen to know
15 if Navippro -- if in Navippro it includes
16 information about where patients got the drugs
17 that they're abusing?
18       MR. SNAPP: Objection, beyond the
19 scope.
20       THE WITNESS: Without the
21 information about it, I would not know
22 or don't know.
23 BY MR. STEWART:
24       Q.    We'd have to look at the

## Page 333

1 protocol?
2       A.    Yeah.
3       Q.    I've got a document I've just
4 handed you, and it's Exhibit 59.
5       Do you see that?
6       A.    Yes.
7       Q.    Okay. Do you see it's an e-mail
8 from you to Raul Damas?
9       A.    Yes.
10       Q.    And you're going back and forth,
11 and what you've got is a -- you're commenting on
12 a comment by a David Haddox?
13       A.    I'm not -- I'm just forwarding
14 it. I don't see my comment.
15       Q.    Okay. Well, you're forwarding
16 this, these materials with David Haddox's
17 comment, right?
18       A.    So, yes, I forwarded along an
19 e-mail that I received from David Haddox along
20 with other individuals on to Raul Damas.
21       Q.    Who is David Haddox?
22       A.    Currently, he was head of our
23 health policy department, I believe.
24       Q.    What was his -- how did you

1 interact with David Haddox in your work?
2    A.    So and this is an example, if you
3 start -- the first e-mail from -- is a list of
4 an advisory committee and a science board
5 meeting.  Again, I don't remember the details of
6 this, but health policy, David might be --
7 provide comments.  He probably watched the
8 advisory committee, and he provided that
9 comment, but I don't know.  I can't remember
10 specifically.  So we might -- as regulatory
11 if -- especially advisory committees, we talked
12 about the playbook that falls under regulatory
13 in terms of monitoring and so forth, so that's
14 probably what that was about.
15    Q.    What is Haddox -- what is
16 Dr. Haddox commenting on here with his comment
17 in this e-mail that's the Exhibit 59 in front of
18 you?
19         MR. SNAPP:  Object to the form.
20         THE WITNESS:  First of all, I
21    don't -- without seeing the entire
22    materials for the advisory committee, I
23    don't know what question two was so --
24    and it's -- I don't recall the details

1    around this.
2 BY MR. STEWART:
3    Q.    But you say that what Haddox
4 takes issue is is this concept of "growing
5 epidemic of opioid abuse" and his comment is
6 "perhaps looking at the data instead of
7 parroting histrionic media and politicians might
8 be a good place to start toward improving our
9 understanding of the abuse of drugs used to
10 treat pain."
11    A.    I see that.
12    Q.    I mean, his view is that if you
13 talk about a growing epidemic of opioid abuse,
14 then you're parroting histrionic media and
15 politicians?
16         MR. SNAPP:  Object to the form.
17         THE WITNESS:  I don't know what
18    Dr. Haddox's intentions were, just
19    reading this.
20 BY MR. STEWART:
21    Q.    You just took his e-mail and
22 forwarded it then?
23         MR. SNAPP:  Object to the form.
24         THE WITNESS:  So I don't recall

1 the situation around this.
2 BY MR. STEWART:
3    Q.    You're not disputing the fact he
4 sent that e-mail, fair?
5    A.    Correct.
6    Q.    You just -- and I guess what you
7 did is you took his comment and you forwarded it
8 to Raul Damas, correct?
9    A.    Yes, I did.
10    Q.    And then he said, I saw it,
11 thanks.  I think this is best handled by others?
12    A.    Correct.
13    Q.    And you don't know what was done
14 with Dr. Haddox's view about parroting
15 histrionic media and politicians?
16         MR. SNAPP:  Objection, beyond the
17    scope.
18         THE WITNESS:  I do not know after
19    that.
20         MR. STEWART:  That's all I've
21    got.  Thank you.
22         MR. SNAPP:  For the record, we
23    are adjourned until tomorrow morning
24    when you're going to cover topic 29.

1         MS. DICKINSON:  Yes.
2         MR. SNAPP:  And then we'll go off
3    the record and restart as his fact
4    deposition.  Would that be the plan on
5    your side?
6         MS. DICKINSON:  That's the plan.
7         MS. POLLOCK:  Are you going to be
8    asking questions?
9         MR. SNAPP:  I will ask questions,
10    thank you.  Yes, I will ask questions,
11    some follow-up questions after you all
12    are done with topic 29, and then we can
13    close the record whenever.  Thank you.
14         THE VIDEOGRAPHER:  All right.
15    Standby.  The time is 5:29 p.m., going
16    off the record.
17    (Witness excused.)
18              --- ---
19
20
21
22
23
24

Page 338

C E R T I F I C A T I O N

I, MARGARET M. REIHL, a Registered Professional Reporter, Certified Realtime Reporter, Certified Shorthand Reporter, Certified LiveNote Reporter and Notary Public, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

-------------------------------

Margaret M. Reihl, RPR, CRR, CLR
CSR #XI01497  Notary Public

---

Page 340

ACKNOWLEDGMENT OF DEPONENT

I, RICHARD J. FANELLI, Ph.D., do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

RICHARD J. FANELLI, Ph.D.         DATE

Subscribed and sworn to before me this

_____ day of _____, 2018.

My commission expires:_____

_____

Notary Public

---

Page 339

- - - - - -

E R R A T A

- - - - - -

PAGE  LINE  CHANGE

____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____