Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
                          -  -  -
 3

      IN RE:  NATIONAL          : HON. DAN A. POLSTER
 4    PRESCRIPTION OPIATE        : MDL NO. 2804
      LITIGATION                 :
 5                               :
      APPLIES TO ALL CASES       : NO.
 6                               : 1:17-MD-2804
 7            - HIGHLY CONFIDENTIAL -
 8      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9                      -  -  -
                   December 7, 2018
10                      -  -  -
11            Videotaped sworn deposition of
12       RICHARD J. FANELLI, Ph.D. (FACT), taken
13       pursuant to notice, was held at DECHERT,
14       LLP, 1095 6th Avenue, New York, New
15       York, beginning at 1:02 p.m., on the
16       above date, before Margaret M. Reihl, a
17       Registered Professional Reporter,
18       Certified Shorthand Reporter, Certified
19       Realtime Reporter, and Notary Public.
20
                          -  -  -
21

              GOLKOW LITIGATION SERVICES
22       877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
23

24
```

```
 1   A P P E A R A N C E S :
 2
     CRUEGER DICKINSON, LLC
 3   BY:  ERIN DICKINSON, ESQUIRE
          CHARLES J. CRUEGER, ESQUIRE
 4   4532 N. Oakland Avenue
     Whitefish Bay, Wisconsin  53211
 5   (414) 210-3900
     cjc@cruegerdickinson.com
 6   Representing the Plaintiffs
 7
     SIMMONS HANLY CONROY, LLC
 8   BY:  JO ANNA POLLOCK, ESQUIRE
     One Court Street
 9   Alton, Illinois  62002
     (618) 259-6365
10   jpollock@simmonsfirm.com
     Representing the Plaintiffs
11
12   THE DUGAN LAW FIRM, LLC
     BY:  BONNIE A. KENDRICK, ESQUIRE
13   One Canal Place
     365 Canal Place, Suite 1000
14   New Orleans, Louisiana  70130
     (504) 648-0180
15   bonnie@dugan-lawfirm.com
     Representing the Plaintiffs
16
17   BRANSTETTER, STRANCH & JENNINGS, PLLC
     BY:  MICHAEL G. STEWART, ESQUIRE
18   The Freedom Center
     223 Rosa L. Parks Avenue
19   Suite 200
     Nashville, Tennessee  37203
20   (615) 254-8801
     mstewart@bsjfirm.com
21   Representing the Tennessee Plaintiffs
22
23
24
```

```
 1   A P P E A R A N C E S: (cont'd)
 2   DECHERT LLP
     BY:  ERIK W. SNAPP, ESQUIRE
 3   35 West Wacker Drive, Suite 3400
     Chicago, Illinois  60601-1634
 4   (312) 646-5828
     erik.snapp@dechert.com
 5      - AND -
     BY:  ALYSSA CLARK, ESQUIRE
 6   1095 Avenue of the Americas
     New York, New York  10036-6797
 7   (212) 641-5673
     alyssa.clark@dechert.com
 8   Representing the Defendant,
     Purdue and the witness
 9
10   WILLIAMS & CONNOLLY LLP
     BY:  COLLEEN MCNAMARA, ESQUIRE
11   725 Twelfth Street, N.W.
     Washington, D.C.  20005
12   (202) 434-5186
     cmcnamara@wc.com
13   Representing the Defendant,
     Cardinal Health
14
15   JONES DAY
     BY:  SARAH CONWAY, ESQUIRE
16   555 South Flower Street
     Fiftieth Floor
17   Los Angeles, California  90071-2300
     (213) 489-3939
18   sgconway@jonesday.com
     Representing the Defendant, Walmart
19
20   COVINGTON & BURLING LLP
     BY:  MADISON ARENT, ESQUIRE
21   The New York Times Building
     620 Eighth Avenue
22   New York, New York 10018-1405
     (212) 841-1285
23   marent@cov.com
     Representing the Defendant,
24   McKesson Corporation
```

```
 1    A P P E A R A N C E S: (cont'd)
 2

      ALLEGAERT BERGER & VOGEL LLP
 3    BY:  CHRISTOPHER ALLEGAERT, ESQUIRE
      111 Broadway, 20th Floor
 4    New York, New York  10006
      (212) 616-7050
 5    callegaert@abv.com
      Representing the Defendant,
 6    Rochester Drug Co-operative, Inc.
 7

 8    ARNOLD & PORTER KAYE SCHOLER LLP
      BY:  SAMUEL N. LONERGAN, ESQUIRE
 9    250 West 55th Street
      New York, New York  10019-9710
10    (212) 836-7591
      samuel.lonergan@arnoldporter.com
11    Representing the Defendants, Endo
      Health Solutions; Endo
12    Pharmaceuticals, Inc.; Par
      Pharmaceutical Companies, Inc. f/k/a
13    Par Pharmaceutical Holdings, Inc.
14

      ALSO PRESENT:  HENRY MARTE, VIDEOGRAPHER
15

16                         — — —
17
18
19
20
21
22
23
24
```

```
 1   TELEPHONIC APPEARANCES:
 2
     HUGHES HUBBARD & REED LLP
 3   BY:  TINA M. SCHAEFER, ESQUIRE
     2345 Grand Boulevard, Suite 2000
 4   Kansas City, Missouri 64108-2663
     (816) 709-4159
 5   tina.schaefer@hugheshubbard.com
     Representing the Defendant,
 6   UCB, Inc.
 7
     OFFICE OF THE SOUTH CAROLINA
 8   ATTORNEY GENERAL
     BY:  ANNEMARIE B. MATHEWS, ESQUIRE
 9       REBECCA MCCORMACK, ESQUIRE
     Assistant Attorney General
10   Consumer Protection and
     Antitrust Division
11   P.O. Box 11549
     Columbia, South Carolina 29211-1549
12   803-734-3679
     AMathews@scag.gov
13   Representing the State of South Carolina
14
     REED SMITH LLP
15   BY:  SUJEY S. HERRERA, ESQUIRE
     1001 Brickell Bay Drive, 9th Floor
16   Miami, Florida  33131
     (786) 747-0299
17   sherrera@reedsmith.com
     Representing the Defendant,
18   AmerisourceBergen Drug Corp.
19
     NELSON MULLINS
20   BY:  AMANDA S. KITTS, ESQUIRE
     Meridian, 17th Floor
21   1320 Main Street
     Columbia, South Carolina 29201
22   (803) 255-9594
     amanda.kitts@nelsonmullins.com
23   Representing the Defendants,
     Purdue Pharma L.P.; Purdue Pharma, Inc.;
24   and The Purdue Frederick Company
```

```
 1   TELEPHONIC APPEARANCES (cont'd)
 2

     ROPES & GRAY LLP
 3   BY:  SEAN B. KENNEDY, ESQUIRE
     Prudential Tower
 4   800 Boylston Street
     Boston, Massachusetts 02199
 5   sean.kennedy@ropesgray.com
     (617) 951-7282
 6   Representing the Defendant,
     Mallinckrodt
 7

 8   FOX ROTHSCHILD, LLP
     BY:  MAURA L. BURKE, ESQUIRE
 9   2000 Market Street
     20th Floor
10   Philadelphia, Pennsylvania 19103-3222
     mburke@foxrothschild.com
11   (215) 299-2872
     Representing the Defendant,
12   Validus Pharmaceuticals
13

     CLARK MICHIE LLP
14   BY:  BRUCE CLARK, ESQUIRE
          CHRISTOPHER J. MICHIE, ESQUIRE
15   220 Alexander Street
     Princeton, New Jersey  08540
16   (609) 423-2142
     Representing the Defendant,
17   Pernix Therapeutics Holdings, Inc.
18
19
20
21
22
23
24
```

```
 1                      I N D E X
 2   WITNESS                              PAGE
     RICHARD J. FANELLI, Ph.D.
 3           By Mr. Crueger             11
             By Mr. Stewart             144
 4           By Mr. Snapp               175
 5                    _ _ _
 6               E X H I B I T S
 7   NO.             DESCRIPTION          PAGE
 8   Fanelli-1       Second Amended Notice
                     of Deposition        12
 9
     Fanelli-2       Curriculum Vitae
10                   Richard J. Fanelli,
                     Ph.D.               13
11
     Fanelli-3       Compensation chart
12                   Richard Fanelli
                     PPLP004418086       24
13
     Fanelli-4       "3 Waves of the Rise in
14                   Opioid Overdose Deaths" 30
15   Fanelli-5       CDC Frequently Asked
                     Questions
16                   (no Bates)          33
17   Fanelli-6       E-mail dated 9/17/04
                     Subject, Language
18                   PPLPC005000012579   37
19   Fanelli-7       E-mail string, top one
                     dated 3/9/12 Subject,
20                   OxyContin labeling
                     PPLPC001000103302   58
21
     Fanelli-8       HSGAC Minority Staff Report
22                   Fueling an Epidemic
                     Report Two
23                   Exposing the Financial Ties
                     Between Opioid Manufacturers
24                   and Third Party Advocacy
```

```
 1                       E X H I B I T S
 2    NO.                DESCRIPTION                PAGE
 3    Fanelli-9          The Journal of Pain
                         Opioid Treatment Guidelines
 4                       Clinical Guidelines for the
                         Use of Chronic Opioid
 5                       Therapy in Chronic Noncancer
                         Pain
 6                       February 2009 (no Bates)    70
 7    Fanelli-10         Agreed Statement of Facts
                         United States of America
 8                       v. Purdue                   43
 9    Fanelli-11         E-mail dated 12/7/15
                         Subject, OxyContin dosing
10                       PPLPC001000221769           78
11    Fanelli-12         NAVIPPRO Surveillance Report
                         1/1/2013-3/31/2013
12                       PURCHl-001547793            82
13    Fanelli-13         E-mail dated 1/2/2012
                         Subject, TR IR Opioids
14                       PPLPC001000100299           90
15    Fanelli-14         Abuse Deterrent IR Opioids
                         PPLPC001000100301           94
16
      Fanelli-15         OxyContin® (oxycodone
17                       hydrochloride
                         controlled-release)
18                       Tablets
                         NDA 022272
19                       Overview and Interpretation
                         of the Post-Marketing
20                       Program to Assess the
                         Effects of Reformulated
21                       OxyContin on Opioid Abuse
                         in 3 Formal Studies, 1
22                       Drug Utilization Study,
                         and Contextual Studies
23                       September 2014
                         PPLPC034000945665           99
24
```

```
 1                    E X H I B I T S
 2   NO.              DESCRIPTION              PAGE
 3   Fanelli-16       FDA Briefing Document
                      Joint Meeting of the
 4                    Drug Safety and Risk
                      Management Advisory
 5                    Committee and the
                      Anesthetic and Analgesic
 6                    Drug Products Advisory
                      Committee
 7                    July 7th and 8th, 2015
                      PPLPC005000211723          103
 8
     Fanelli-17       E-mail dated 6/23/15
 9                    Subject, FDA Background
                      Package and Cover Letter
10                    PPLPC001000209699          104
11   Fanelli-18       E-mails dated 6/23/15
                      Subject, FDA AC on
12                    OxyContin and the FDA
                      Briefing document
13                    PPLPC005000211721          106
14   Fanelli-19       E-mail dated 6/26/15
                      Subject, Purdue's decision
15                    on OxyContin sNDA S-026
                      PPLPC002000219089          110
16
     Fanelli-20       E-mail dated 12/24/15
17                    Subject,Discussion of
                      Opioid Abuse Deterrence
18                    Policy with Purdue on
                      December 14th
19                    PPLPC001000222698          116
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   E X H I B I T S
 2   NO.            DESCRIPTION              PAGE
 3
     Fanelli-21     Branded Industry
 4                  Perspective on the
                    Generics ADF Guidance
 5                  FDA Public Meeting on
                    Pre-Market Evaluation
 6                  of Abuse-Deterrent
                    Properties of Opioid
 7                  Drug Products
                    31 October 2016
 8                  (no Bates)               126
 9   Fanelli-22     E-mail dated 3/27/09
                    Subject, Grunenthal and
10                  McGinity License
                    PPLPC026000046291        139
11
     Fanelli-23     E-mails 5/2/15
12                  Subject, Draft Briefing
                    Document for OxyContin
13                  Epi Ad Comm External
                    Mock Friday May 8th
14                  PPLPC001000204177        148
15   Fanelli-24     E-mails dated 6/26/03
                    Subject, Professional
16                  associations and the
                    potential FDA hearing
17                  PPLPC009000092514        161
18   Fanelli-25     E-mails dated 12/17/09
                    Subject, Providing Relief
19                  Preventing Abuse
                    Brochure (PPXX40)
20                  PPLPC002000066300        165
21                       — — —
22
23
24
```

```
 1              THE VIDEOGRAPHER:  All right.

 2        The time is 1:02 p.m.  We are on the

 3        record.  Will the court reporter please

 4        administer the oath to the witness.

 5              ... RICHARD J. FANELLI, Ph.D.,

 6        having been duly sworn as a witness, was

 7        examined and testified as follows:

 8              MR. SNAPP:  Could I just make a

 9        statement for the record and confirm

10        that everyone in the room and on the

11        phone agrees to be bound by the MDL

12        confidentiality protective order or the

13        confidentiality protective order in the

14        applicable state actions.  If that is

15        not the case, please speak up now.  No

16        one spoke up, so please proceed.  Thank

17        you.

18  BY MR. CRUEGER:

19        Q.    Good afternoon.

20        A.    Good afternoon.

21        Q.    So this is your fact deposition

22  after your 30(b)(6) deposition.  There's going

23  to be a little bit of overlap by necessity, but

24  we're trying to avoid that, and we will get
```

```
 1    started.

 2                    What did you do to prepare for

 3    your fact deposition, anything different?

 4           A.     No.

 5           Q.     We asked you before, this is not

 6    the first time you've been deposed, obviously,

 7    correct?

 8           A.     Correct.

 9           Q.     I think you said you were deposed

10    twice already?

11           A.     Yes.

12           Q.     Have you ever testified at trial?

13           A.     No.

14                  MR. CRUEGER:  Given our system of

15           the massive table, I'm just going to

16           hand exhibits around like we were doing

17           before.

18                  (Document marked for

19           identification as Exhibit Fanelli-1.)

20    BY MR. CRUEGER:

21           Q.     So Exhibit 1 is just the Second

22    Amended Notice of Deposition.

23                  Have you ever seen this?

24           A.     I don't believe so.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.

2          MR. SNAPP:  Could you hand around

3    a second copy when you hand them around,

4    please.

5          MR. CRUEGER:  Yeah, I just

6    noticed that.

7          I'm going to hand you what's

8    Exhibit 2, which is a copy of your CV.

9          (Document marked for

10   identification as Exhibit Fanelli-2.)

11  BY MR. CRUEGER:

12   Q.    Is this a true and accurate copy

13  of your CV, Dr. Fanelli?

14   A.    Yes.

15   Q.    Let's just make a quick record of

16  this.  How long have you worked at Purdue?

17   A.    Since December 2000.

18   Q.    And are you an employee?

19   A.    Yes.

20   Q.    Are you an employee of Purdue

21  Pharma, L.P.?

22   A.    Yes.

23   Q.    Are you an employee of any of the

24  other entities?

 1          A.      That's my legal employer.

 2          Q.      Do you work for any of the other

 3   Purdue entities?

 4          A.      Depending on -- as the head of

 5   regulatory, there are other entities.  For

 6   instance, we end licensed the product, and that

 7   was under Purdue Pharmaceutical Products, L.P.

 8   So that's an example.

 9          Q.      And just so that we speak in

10   clear English, end licensing means what?

11          A.      A product that another sponsor

12   had the legal or the regulatory responsibility

13   for that then became the regulatory and

14   ownership of Purdue.

15          Q.      A sponsor being -- is that

16   another Purdue affiliated company?

17          A.      No, no, that's an outside,

18   outside of the Purdue group of companies.

19          Q.      So is that just like licensing

20   and patent?

21          A.      Yes, or a product.

22          Q.      Okay.  Do you do any work for

23   Rhodes Pharmaceuticals?

24          A.      No.

1    Q.    Could you tell me what Rhodes

2  Pharmaceuticals is?

3    A.    Rhodes Pharmaceuticals, there's

4  -- yeah.  Rhodes Pharmaceuticals is -- has

5  generic products, you know, is my understanding.

6  I don't know the full -- as I say, I'm not part

7  of that company.  We do interact.

8    Q.    And what do you mean when you say

9  you interact, what do you do?

10    A.    An example is MS Contin, which

11  Purdue got approved, was -- they sell a generic

12  of that product, and they are currently, at

13  least as of today, they are commercializing the

14  product.

15    Q.    "They" being Rhodes?

16    A.    Rhodes Pharma -- or the firm you

17  said, sorry.

18    Q.    Rhodes Pharmaceutical?

19    A.    Yeah.

20    Q.    Or Rhodes Pharma?

21    A.    Yeah.

22    Q.    We can call it the same way.  We

23  don't have to say the long word all the time.

24    A.    Yes.

```
 1          Q.     Do they also sell an

 2   immediate-release Oxycodone product?

 3          A.     I believe they do.

 4          Q.     And they sell generics, correct?

 5          A.     Yes.

 6          Q.     And are they owned by the same

 7   owners of Purdue?

 8               MR. SNAPP:  Object to the form.

 9               THE WITNESS:  Ownership, I'm not

10          aware of the -- you know, the details of

11          the ownership.  I know that the Board of

12          Directors -- you know, it's been split

13          up.  There are common individuals on the

14          different boards, those boards.

15   BY MR. CRUEGER:

16          Q.     The different boards being the

17   boards of Rhodes Pharma and the boards of?

18          A.     Purdue Pharma.

19          Q.     Purdue Pharma?

20          A.     Correct.

21          Q.     Now, you have a Master's degree?

22          A.     I have a Ph.D.  I have a Master's

23   degree as well.

24          Q.     So, yes, you have a Master's
```

Highly Confidential - Subject to Further Confidentiality Review

1    degree?

2         A.    Yes, I do.  Sorry.

3         Q.    What is your Master's in?

4         A.    It's in -- I'm trying to remember

5    what we called it back then -- psychobiology or

6    physiological psychology.

7         Q.    Could you just explain very

8    briefly what that is?

9         A.    Sure.  It was -- when I was at

10   the State University of New York at Binghamton,

11   part of that, the Ph.D. program had a interim

12   Master's, where an area of research is defended

13   in a Master's thesis that is written, and that's

14   what that is.

15              Mine was looking at behavioral of

16   different animals in learning models.

17        Q.    And now we'll get to your Ph.D.

18              You have a Ph.D.?

19        A.    Yes, I do.

20        Q.    And what's your Ph.D. in?

21        A.    It's in physiological psychology

22   is the -- which I think I referred to earlier --

23   is similar to neuroscience today.

24        Q.    And to explain that to someone

Highly Confidential - Subject to Further Confidentiality Review

1    who is not a Ph.D. in those areas, what does

2    that actually mean?  Like, what is that a degree

3    in?

4          A.    So a Ph.D. is a -- requires a

5    thesis and a years of research, well, it can be

6    whatever it is with a novel test of a

7    hypothesis, and it's a course of study and

8    research to defend -- that is defended and a

9    degree is granted.

10         Q.    I was unclear.  What is the field

11   that you have a Ph.D. in?  Can you explain that

12   in less technical terms than the title?

13         A.    Okay, sorry.  I guess in terms of

14   the scientific area?

15         Q.    Yes.

16         A.    I guess the area of study would

17   be the functioning of certain brain regions in

18   different learning and memory models.

19         Q.    Now, you haven't always worked at

20   Purdue Pharma, correct?

21         A.    That's correct.

22         Q.    So I'm on your CV.  If you look

23   on page 2 it says from July of 1985 to April of

24   1988, you worked at the NIDA Addiction Research

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Center?
 2            A.      Yes.
 3            Q.      What did you do there?
 4            A.      Numbers of experiments across the
 5    time.  I was a staff fellow, which reported in
 6    to laboratory that was investigating the role --
 7    similar as in my Ph.D, but expanded
 8    neurochemical systems around the behavior and as
 9    it relates to addiction.
10            Q.      Addiction to what?
11            A.      On the project we were looking
12    at, it was on over the course of three years
13    multiple investigations that were of -- part of
14    the -- and, by the way, NIDA stands for the
15    National Institute on Drug Abuse, so that were a
16    part of the course of that.
17            Q.      Did any of your study involve
18    opioids?
19            A.      Yes.
20            Q.      What type of opioids?
21            A.      So I was looking at -- and
22    there's -- there are publications.  Again, I was
23    in Edy London's lab, and we looked at metabolic
24    glucose, it's similar to a PET imaging of the
```

Highly Confidential - Subject to Further Confidentiality Review

1   brain in animals, looking at areas of the brain

2   that were involved of substances of abuse, and

3   we looked at different types of opiates, B1

4   agonists, delta agonists, and looked for the

5   different areas of the brains that were

6   involved.

7           Q.      So you were studying the effect

8   on the brain?

9           A.      Yes.

10          Q.      Very quickly, you worked at

11  Bayer?

12          A.      Correct.

13          Q.      And then at Bayer you were

14  doing -- I guess we would call you're doing

15  science; you weren't always doing regulatory

16  work?

17          A.      Correct.  For the first -- from I

18  think -- well, it says on there.  Started in

19  '88 and moved into regulatory in '97, so almost

20  a decade.

21          Q.      And then from Bayer you came over

22  to Purdue Pharma in December of 2000, correct?

23          A.      Correct.

24          Q.      Now, do you have a role in the

1    approval of reformulated OxyContin?

2         A.    In the approval?  You mean in

3    terms of -- well --

4         Q.    Well, let's just talk about

5    reformulated OxyContin.

6         A.    Yes.

7         Q.    Can we agree that's supposedly

8    the abuse deterrent --

9         A.    Correct.

10        Q.    -- version of OxyContin?

11        A.    Correct.

12        Q.    Okay.  Just as a reminder, I have

13   to finish and you have to start; otherwise, the

14   court reporter gets angry.

15        A.    I apologize.

16        Q.    And now, the FDA approved

17   reformulated OxyContin, correct?

18        A.    Correct.

19        Q.    Did you have any role in

20   submitting those documents to the FDA?

21        A.    For the NDA for the reformulated?

22        Q.    Yes.

23        A.    I was not the -- we talked about

24   FDA liaisons.  Do you want me to -- anyway, I

```
 1    was not the FDA liaison on that submission.

 2            Q.      Who was?

 3            A.      It was either -- we could look at

 4    the submission letter.  I believe it might have

 5    been Beth Conley.

 6            Q.      Do you have a role now as --

 7            A.      Yes.

 8            Q.      -- working with the ADF and

 9    reformulated OxyContin?

10            A.      Yes.

11            Q.      And what is that role?

12            A.      I am now the FDA liaison on that

13    product, so I would be the prime person

14    communicating with FDA on that work.

15            Q.      And when did you take on that

16    role?

17            A.      Beth Conley left Purdue -- it's

18    within a year.  So when she left the company, I

19    took that over.

20            Q.      Just to talk quickly, how are --

21    you said you were an employee of Purdue Pharma,

22    correct?

23            A.      Yes.

24            Q.      How are you paid, a salary?
```

```
 1            A.      Yes.

 2            Q.      Do you receive a bonus?

 3            A.      Yes.

 4            Q.      How is your bonus calculated?

 5            A.      It's based on -- it's changed.

 6     You want today, 75% based on company performance

 7     and 25% on meeting my personal objectives.  It's

 8     actually company performance against the

 9     corporate objectives.

10            Q.      Just briefly explain what you

11     mean by that.  Is it tied to sales, or is it

12     tied to some pre -- your -- that part of your

13     bonus, or is it tied to some predetermined

14     metric?

15            A.      It's not tied to sales.  It's

16     tied to -- so I'm an R&D -- my personal is

17     beginning of the year we have objectives for

18     myself as the head of regulatory, and it's

19     dependent on -- the 25% is how well we do

20     against those objectives, and then the

21     corporation has objectives at the beginning of

22     the year and how well the corporation does

23     against those objectives.

24            Q.      And by "well," that's due --
```

```
 1    that's measured in revenue?

 2                   MR. SNAPP:  Object to the form.

 3                   THE WITNESS:  I don't -- that

 4            could be one of the objectives on there,

 5            but I think it may be one of the

 6            objectives.

 7    BY MR. CRUEGER:

 8            Q.    Can you tell me what the

 9    objectives are?

10            A.    No, I can't.

11                   (Document marked for

12            identification as Exhibit Fanelli-3.)

13    BY MR. CRUEGER:

14            Q.    I've just passed over what is

15    Exhibit 3.

16                   By the way, just on Exhibit 2, I

17    don't know if you know, your Social Security

18    number is on there.  You might want to --

19            A.    It's not on -- yeah.

20            Q.    You might want to delete that off

21    so...

22            A.    Thank you.

23            Q.    Exhibit 3 I just want to ask you

24    if this looks like a true and accurate report of
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    your salary from 2000 to obviously June of 2018?

2         A.    It appears to be.

3         Q.    Okay.

4         A.    Sorry, can I --

5         Q.    Sure.

6         A.    (Witness reviews document.)

7         Q.    Are you looking at Exhibit 3?

8         A.    Yes.  Sorry.

9         Q.    Okay.

10        A.    Oh, okay.  So 2018 must be part

11   year.

12        Q.    Yes, yes, it goes through June of

13   2018.

14        A.    Got it, thank you.  Then it's

15   accurate.

16        Q.    Mr. Fanelli, we're going to talk

17   a little bit about really kind of three general

18   areas, a little bit about your role in the

19   company and what you're doing, talk a little bit

20   about the ADF and what that is, the abuse

21   deterrent formula.

22              Is it a formula or formulation?

23        A.    Formulation.

24        Q.    And then we're just going to talk
```

```
 1    about the process of basically the history of

 2    where that -- where the abuse deterrent

 3    formulation started and then where is it going,

 4    okay?

 5          A.     Yes.

 6          Q.     So those would be the three

 7    general things.

 8                 So let's just, you know, lay a

 9    little background to some of this is Purdue

10    sells OxyContin, correct?

11          A.     Say it again.

12          Q.     Purdue sells OxyContin?

13          A.     Yes.

14          Q.     And OxyContin, the primary active

15    drug is -- ingredient is Oxycodone?

16          A.     Yes.

17          Q.     And that's an opioid, correct?

18          A.     Correct.

19          Q.     And it's a dangerous drug,

20    correct?

21          A.     It's a new opiate agonist that's

22    a Schedule II, which is the highest level of

23    approved agents that -- in that class for abuse

24    and diversion, yeah, with risks of abuse and
```

Highly Confidential - Subject to Further Confidentiality Review

1    diversion.

2            Q.     So it's dangerous, correct?

3            A.     Yes.

4            Q.     And it can kill you?

5                   MR. SNAPP:  Object to the form.

6                   THE WITNESS:  Yes, if -- yeah, go

7            ahead.

8    BY MR. CRUEGER:

9            Q.     And it can kill you by

10   overdosing, correct?

11           A.     There have been overdoses with

12   Oxycodone, yes.

13           Q.     But that's -- you take too much

14   of it and you overdose and then you die,

15   correct?

16                  MR. SNAPP:  Object to the form.

17                  THE WITNESS:  Yes.

18   BY MR. CRUEGER:

19           Q.     So and exactly how does it kill

20   someone?

21           A.     I'm not a physician.  What's

22   reported in the package insert are risks related

23   to the product.  The primary risk is respiratory

24   depression, and that's the prime risk around an

Highly Confidential - Subject to Further Confidentiality Review

```
 1    overdose with new agonists.

 2            Q.      So what is respiratory

 3    depression?

 4            A.      It's depression of the breathing,

 5    so there would be a slowing of the breathing

 6    rate.

 7            Q.      It slows down your breathing, and

 8    eventually your lungs fill up with liquid,

 9    correct?

10                    MR. SNAPP:  Object to the form.

11                    THE WITNESS:  I'm not aware of

12            the full -- it's not part of my

13            background.

14    BY MR. CRUEGER:

15            Q.      So you know it can kill you, but

16    you don't know exactly how?

17                    MR. SNAPP:  Object to the form.

18                    THE WITNESS:  I don't know.  You

19            asked about filling up the lungs.  As I

20            say, the primary risk is around

21            respiratory depression.

22    BY MR. CRUEGER:

23            Q.      What I'm just -- what I'm trying

24    to do is get rid of the sanitation we tend to
```

Highly Confidential - Subject to Further Confidentiality Review

1  put around these things.  We try to clean up the

2  whole process, and respiratory depression is a

3  very nice word to describe you stop breathing

4  and you die, correct?

5          MR. SNAPP:  Object to the form.

6          THE WITNESS:  It is talking about

7       the respiratory rate, if it falls too

8       low, it can result in death, yes.

9  BY MR. CRUEGER:

10      Q.    And so when we talk about people

11  overdosing, that's the actual thing that happens

12  to them, correct?

13          MR. SNAPP:  Object to the form.

14          THE WITNESS:  That's one of the

15       things, yes.

16  BY MR. CRUEGER:

17      Q.    And it's also -- OxyContin is

18  also dangerous because -- or opioids in general

19  are also dangerous because there's a risk of

20  addiction, correct?

21      A.    Yes, there is a risk of

22  addiction, it's part of the warnings, right,

23  listed in the black box warning as well.

24          MR. CRUEGER:  So I'm going to

1          hand you what's been labeled Exhibit 4.

2                    (Document marked for

3                    identification as Exhibit Fanelli-4.)

4     BY MR. CRUEGER:

5          Q.     Now, you're aware there's been a

6     rise in prescription overdose deaths over the

7     past ten years, correct?

8          A.     Yes.

9          Q.     Have you seen this graph before?

10         A.     It looks familiar.  I don't know

11    if it's the exact one, but I've seen versions of

12    this in the data.

13         Q.     And the purple line "Commonly

14    Prescribed Opioids," that would include

15    OxyContin, correct?

16         A.     Correct.

17         Q.     And it's grown pretty high since

18    1999, correct?

19                    MR. SNAPP:  Object to the form.

20                    THE WITNESS:  According to this

21         presentation, it has grown over this

22         time period.

23    BY MR. CRUEGER:

24         Q.     And in 1999 it was just a little

```
 1    over one death per 100,000 people, correct, just

 2    commonly prescribed opioids, not all of them, so

 3    the purple line?

 4           A.    That's what's on this graph.

 5    That's what it notes.

 6           Q.    And by 2007 it looks like it's a

 7    little bit over four people, four deaths per

 8    100,000 people, correct?

 9           A.    Yes.

10           Q.    And then by 2011 it seems to be

11    getting up to about almost five deaths per

12    100,000 people, correct?

13                 MR. SNAPP:  Object to the form.

14                 THE WITNESS:  That's what this

15           figure is showing, yes.

16    BY MR. CRUEGER:

17           Q.    And by 2015 it's still up, it

18    looks like it's even a little higher than five

19    deaths per 100,000 people, correct?

20                 MR. SNAPP:  Object to the form.

21                 THE WITNESS:  It looks to me like

22           it's a little lower but --

23    BY MR. CRUEGER:

24           Q.    It's a little tough to tell
```

```
 1    without the graphing, but it's --

 2         A.    Yes, and without the data.

 3         Q.    So -- and it's been growing as

 4    the number of prescriptions in the United States

 5    has been growing too, correct?

 6              MR. SNAPP:  Object to the form.

 7              THE WITNESS:  This graph is

 8         deaths per 100,000 prescriptions.

 9    BY MR. CRUEGER:

10         Q.    100,000 people?

11         A.    Oh, population, right.

12         Q.    So what I'm asking, do you know

13    whether the amount of -- the number of

14    prescriptions for opioids has increased from

15    1999 to 2016?

16         A.    It has increased since 1999.

17         Q.    And so has the number of deaths?

18              MR. SNAPP:  Object to the form.

19              THE WITNESS:  That's correct.

20    BY MR. CRUEGER:

21         Q.    Do you think, Mr. Fanelli, that

22    there's a correlation between the increase in

23    the number of prescriptions and the increase in

24    overdose deaths from prescription opioids?
```

```
 1                    MR. SNAPP:  Object to the form.

 2                    THE WITNESS:  There is -- there

 3           is an increase or at least the

 4           prescription opioids are -- as of today,

 5           there's a significant decrease since the

 6           time the graph you show here, but there

 7           has been a increase in both of them, but

 8           correlation does not indicate causation,

 9           but there has been a correlation in the

10           two.

11                    MR. CRUEGER:  I'll hand you

12           Exhibit 5.

13                    (Document marked for

14           identification as Exhibit Fanelli-5.)

15   BY MR. CRUEGER:

16           Q.    Do you know, Mr. Fanelli -- Dr.

17   Fanelli, between with the increase in

18   prescriptions for opioids and the increase of

19   number of deaths, has there been any decrease in

20   reported pain in the United States?

21           A.    I'm not aware of the numbers of

22   reporting pain.

23           Q.    So do you ever go on the CDC

24   website?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.      I have.

2              Q.      And do you ever go on the CDC

3     website and just see the information about the

4     prescription opioids?

5              A.      In the past I have done that.

6              Q.      So this is a copy of -- Exhibit 5

7     is a copy from the frequently asked question

8     section of the CDC website.

9                      Have you looked through the

10    frequently asked questions before?

11             A.      No, I have not.

12             Q.      So, according to here, it says,

13    the second sentence in the "Why is the guideline

14    needed in the United States?"

15                     Do you see that section?

16             A.      Yes.

17             Q.      So it says, "The amount of

18    opioids prescribed and sold in the United States

19    quadrupled since 1999, yet there has not been an

20    overall change in the amount of pain that

21    Americans report."

22                     Have I read that correctly?

23             A.      Yes.

24             Q.      Do you have any information to
```

1   dispute that?

2          A.     No, I don't have any different

3   information.

4          Q.     Do you know if Purdue has any

5   information to dispute that?

6          A.     I'm not aware of whether or not

7   Purdue has that information.

8          Q.     So who is Dr. Haddox or Haddox,

9   H-a-d-d --

10         A.     Haddox is correct.  Dr. David

11  Haddox is, was, I believe he still is head of

12  our health policy I think was the name of the

13  department.  He was on the org charts we talked

14  about yesterday.

15         Q.     What's his role at Purdue?

16         A.     I know that he was head of that

17  department.

18         Q.     But what does that department do?

19         A.     Health policy -- should I pass

20  this?

21         Q.     Just set that aside for a second.

22         A.     Yeah, okay, sorry.

23         Q.     It's just the process of getting

24  it around the large table to you.

```
1          A.      Understand.  So your question

2     again?

3          Q.      I mean, you said Dr. Haddox is in

4     health policy.

5                  What does he do, though, at

6     Purdue?

7          A.      So health policy group, it's

8     moved around in terms of it was a part of

9     medical affairs or an independent department, so

10    it's changed over time, but they work on and

11    address policy issues in the corporation around

12    healthcare.

13         Q.      Can you give me an example?

14         A.      So, for instance, if there are --

15    you know what, my interactions with Dr. Haddox

16    in that group are mostly around submissions to

17    FDA of -- if there was something they came up

18    with that was going to be submitted to the

19    agency.  So most of my interactions with

20    Dr. Haddox were in group discussions of those.

21    Whether or not, for instance, there were

22    guidelines around treatment of pain that were

23    being discussed and if we were -- there's one

24    example, if Purdue was going to provide some
```

Highly Confidential - Subject to Further Confidentiality Review

1    input into that public discussion.

2                 (Document marked for

3          identification as Exhibit Fanelli-6.)

4    BY MR. CRUEGER:

5          Q.    So if you look at what's been

6    labeled Exhibit 6 that was just passed to you.

7          A.    Yes.

8          Q.    This is an e-mail from Dr. Haddox

9    to you, correct?

10         A.    Yes.

11         Q.    And it's sent in September -- on

12   September 17th, 2004, correct?

13         A.    Yes.

14         Q.    And at this time I believe,

15   according to your resume, you were the senior

16   director of regulatory affairs?

17         A.    Correct.

18         Q.    So what was your job as a senior

19   director of regulatory affairs during this time?

20   You can take time to read the e-mail if you want

21   to.

22         A.    Yeah, could I do that? (Witness

23   reviews document.)  So I'm trying to remember --

24   you asked -- can you ask the question again.

Highly Confidential -- Subject to Further Confidentiality Review

1    Q.    I was asking what were your job

2    responsibilities as a senior director in this

3    time frame, 2004?

4    A.    So I'm trying to remember if I

5    was the head of the group, but I think that

6    happened in 2006.  So I would have been an

7    individual FDA liaison but one of the senior

8    ones at that time.

9    Q.    And he's sending you the subject

10   is language, so why is Dr. Haddox sending you

11   this, this e-mail?

12   A.    I don't recall why Dr. Haddox

13   sent it.  It has a D, it looks like it's --

14   well, I'm speculating.  It's taken from

15   something else.

16   Q.    And he's talking about -- well,

17   I'll let -- be curious in your understanding,

18   what is Dr. Haddox talking about in this e-mail?

19          MR. SNAPP:  Object to the form.

20          THE WITNESS:  Again, it's, you

21          know, seeing that number D in front of

22          it, it looks like he's taken this from

23          somewhere else and sent it to me, but

24          I -- and it just says language, so I'm

Highly Confidential - Subject to Further Confidentiality Review

```
 1              not sure.  You know, I don't recall

 2              back, you know, that long ago why he

 3              would have sent that to me.

 4      BY MR. CRUEGER:

 5              Q.     And what is this information that

 6      he's sending you?

 7              A.     He talks about data from the

 8      NASDUH, it's sometimes referred to, or SAMHSA,

 9      National Survey on Drug Use and Health.

10              Q.     And what is the data about?

11              A.     It's talking about nonmedical use

12      of prescription analgesics.

13              Q.     And the last sentence, can you

14      read that, please.

15              A.     "This fact can be used to

16      interpret the following data to make valid

17      inferences about the rate of iatrogenic

18      addiction."

19              Q.     And can you just briefly explain

20      what is iatrogenic addiction?

21              A.     It's a term that has been used

22      for addiction for increases in -- for instance,

23      increases in opiate requirements around pain

24      when -- with taking the medication is my
```

1    understanding.

2           Q.    Is it addiction that occurs when

3    a patient takes medicine, an opioid pursuant to

4    a prescription?

5                 MR. SNAPP:  Object to the form.

6                 THE WITNESS:  So as we talked

7           about, my experience and work at the

8           Addiction Research Center is on the

9           basic physiologic mechanisms.

10                This is a clinical definition,

11          but my understanding, I'm not the expert

12          in that area, but I don't have -- I

13          don't disagree with your conclusion.

14   BY MR. CRUEGER:

15          Q.    And they have some numbers in

16   here, one is for 2002 that 8.5% met the DSM-IV

17   criteria for dependence to pain relievers and

18   that number in 2003 was 8.7%, 8.07%, correct?

19          A.    That's what it says here, yes.

20          Q.    Are those numbers high?

21                MR. SNAPP:  Object to the form.

22   BY MR. CRUEGER:

23          Q.    In your opinion?

24          A.    I think we've talked about the --

Highly Confidential - Subject to Further Confidentiality Review

1  I have no scientific basis to know -- to qualify

2  that as such.

3          Q.     So what does that mean when you

4  say you have no scientific basis, that you just

5  don't know if that number is high or if it's

6  low?

7                 MR. SNAPP:  Object to the form.

8                 THE WITNESS:  How to rate those

9          numbers based on other factors in the

10         environment or in the -- yeah, just

11         leave it at that.

12 BY MR. CRUEGER:

13         Q.     And as of 2004, am I correct that

14 Purdue had no study about the risk of addiction

15 among patients treated with extended-release

16 opioids?

17                MR. SNAPP:  Object to the form.

18                THE WITNESS:  What do you mean by

19         "study"?

20 BY MR. CRUEGER:

21         Q.     Had Purdue done any study, a

22 controlled study, any type of study to get an

23 idea about the risk of addiction among patients

24 who were treated with extended-release opioids

```
 1    for chronic pain?

 2                   MR. SNAPP:  Object to the form.

 3                   THE WITNESS:  No.

 4    BY MR. CRUEGER:

 5         Q.     And you mentioned that you had

 6    talked to Dr. Haddox about guidelines?

 7         A.     (Witness shakes head.)

 8         Q.     Is that yes or no?  You just have

 9    to...

10         A.     Yes.  I don't remember the

11    details.  For instance, the CDC guideline, I

12    think we referred to it, I know I had a

13    conversation about that, but, again, it wouldn't

14    have been part of my function as the head of

15    regulatory to -- it would be more of, you know,

16    how do we interact with FDA about those, and

17    that would have been the role.

18         Q.     So Dr. Haddox, was he trying to

19    get the -- would he be talking to you about the

20    guidelines because he wanted the FDA to do

21    something about the guidelines?

22                   MR. SNAPP:  Object to the form.

23    BY MR. CRUEGER:

24         Q.     I'm trying to understand why
```

1    would he be talking to you about the guidelines?

2          A.     Guidelines from government agency

3    or physician groups or whatever would be

4    reviewed, and it probably wasn't a one-on-one.

5    It might have been in a discussion, does it have

6    any impact on our submissions.

7          Q.     And these are guidelines for the

8    treatment using opioids to treat chronic pain?

9          A.     It could be.

10         Q.     Now, I only have one copy of

11   this, but we've talked a little about -- it's

12   been mentioned a few times that Purdue pled

13   guilty, correct?

14         A.     We have talked about that, yes.

15         Q.     And they pled guilty to making

16   false and misleading statements about the risk

17   of addiction, correct?

18               MR. SNAPP:  Object to the form.

19               THE WITNESS:  Yes.

20               MR. CRUEGER:  I'm going to hand

21         you what's been labeled Exhibit 10.

22               (Document marked for

23         identification as Exhibit Fanelli-10.)

24   BY MR. CRUEGER:

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Dr. Fanelli, so let's just do a
 2     few background things before we move on to that.
 3                     So you know that Purdue pled
 4     guilty, correct?
 5              A.     Yes.
 6              Q.     And it was 2007, correct?  I'll
 7     represent to you it was 2007.
 8              A.     Yes.
 9              Q.     And you were working at Purdue at
10     the time, correct?
11              A.     Yes.
12              Q.     And you had a fairly high up
13     position in the company at the time, correct?
14                     MR. SNAPP:  Object to the form.
15                     THE WITNESS:  I was we say a
16              senior director at the time.
17     BY MR. CRUEGER:
18              Q.     Did you ever read the indictment,
19     the Information?
20              A.     No.
21              Q.     Did you ever read the Agreed
22     Statement of Facts?
23              A.     No.
24              Q.     Why not?
```

Highly Confidential -- Subject to Further Confidentiality Review

```
 1            A.      That was the responsibility of

 2     others.  I learned from them what was

 3     Purdue's -- Purdue's response as it relates to

 4     the interaction with the agency, the FDA.

 5            Q.      But aside from your

 6     responsibilities as an employee, it's not every

 7     day that your employer pleads guilty to a

 8     federal crime, is it?

 9                    MR. SNAPP:  Object to the form.

10                    THE WITNESS:  Can you repeat the

11            question.  Sorry.

12     BY MR. CRUEGER:

13            Q.      It's pretty unusual for your

14     employer to plead guilty to a federal crime,

15     correct?

16            A.      Yes.

17            Q.      And so my natural inclination

18     would be to figure out what my employer did that

19     was considered to be a federal crime, so I'm

20     wondering, did you do anything to figure out

21     what Purdue did that it pled guilty to a federal

22     crime?

23                    MR. SNAPP:  Object to the form.

24                    THE WITNESS:  I relied on my
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          colleagues who examined that,

 2          specifically members of the law

 3          department, but others, to be informed

 4          on it.

 5  BY MR. CRUEGER:

 6          Q.    And how did you learn of the --

 7  of the information and guilty plea?

 8          A.    I thought that -- that's what I

 9  just said, from my colleagues who had the

10  responsibility to review that.

11          Q.    But I'm asking, so was there an

12  e-mail that went around, or did some person come

13  and tell you, or did they have a meeting of all

14  the employees, or how did that message go around

15  the company?

16          A.    You know, I don't remember the

17  exact details.

18          Q.    And you said your colleagues, so

19  who were you talking to, like who talked to you

20  about the -- to explain the guilty plea to you?

21          A.    It would have been members of the

22  law department.

23          Q.    So really today is kind of like

24  the first day that you've -- today and yesterday
```

Highly Confidential - Subject to Further Confidentiality Review

1   are really the first days that you've looked at

2   the Agreed Statement of Facts and the

3   Information and the guilty plea?

4                MR. SNAPP:  Object to the form.

5                THE WITNESS:  Yes.

6   BY MR. CRUEGER:

7        Q.     Did you look at them -- you

8   didn't look at them to prepare for your --

9   either the 30(b)(6) or your fact deposition?

10       A.     I can't remember -- I can't

11  remember if I did or not.

12       Q.     So you've never looked through

13  the Agreed Statement of Facts and figured out

14  exactly what Purdue did to violate the law?

15               MR. SNAPP:  Object to the form.

16               THE WITNESS:  Correct.  I relied

17           on my colleagues to provide that

18           information.

19  BY MR. CRUEGER:

20       Q.     If you can go to page 5 of that

21  exhibit, the agreed statement of facts, so it's

22  paragraph 20.  And it says, "Beginning on or

23  about December 12th, 1995, and continuing until

24  on or about June 30th, 2001, certain Purdue

Highly Confidential - Subject to Further Confidentiality Review

```
 1   supervisors and employees, with the intent to

 2   defraud or mislead, marketed and promoted

 3   OxyContin as less addictive, less subject to

 4   abuse and diversion, and less likely to cause

 5   tolerance and withdrawal than other pain

 6   medications, as follows."

 7               And I would just like you to read

 8   out loud paragraph 20b.

 9               MR. SNAPP:  Object to the form.

10               THE WITNESS:  Told Purdue sales

11          representatives they could tell

12          healthcare providers that OxyContin

13          potentially causes less chance of

14          addiction than immediate-release

15          opioids.

16   BY MR. CRUEGER:

17          Q.    So did you know that Purdue had

18   done this?

19               MR. SNAPP:  Object to the form.

20               THE WITNESS:  Yes, I was aware of

21          that.

22   BY MR. CRUEGER:

23          Q.    And that statement that you just

24   read, when they tell sales -- when sales
```

 1    representatives would tell healthcare providers

 2    that OxyContin potentially creates less chance

 3    for addiction than immediate-release opioids,

 4    that is a false statement, correct?

 5                    MR. SNAPP:  Object to the form.

 6                    THE WITNESS:  So a statement that

 7              was in the original package insert about

 8              the long-acting nature compared to -- it

 9              doesn't say compared to

10              immediate-release, but the long-acting

11              had a less chance of addiction was in

12              the original package insert, but is no

13              longer in there, based on the lack of

14              scientific evidence.

15    BY MR. CRUEGER:

16         Q.    Well, first of all, I believe the

17    package insert, it was a little bit less

18    definitive in that, correct, it was believed,

19    correct?

20         A.    That's correct.

21         Q.    And it didn't actually say who

22    believed it, correct?

23         A.    It was part of the approved

24    label.

1    Q.    But it didn't say who believed

2  it, correct?

3    A.    It did not ascribe it.

4    Q.    And just because it's in the

5  package insert, that doesn't necessarily make it

6  true, correct?

7              MR. SNAPP:  Object to the form.

8              THE WITNESS:  It's approved based

9       on the scientific evidence as approved

10      by FDA.

11  BY MR. CRUEGER:

12   Q.    But just because it's approved,

13  if it's incorrect, it's incorrect?

14             MR. SNAPP:  Object to the form.

15             THE WITNESS:  If something is

16      incorrect, it is incorrect.

17  BY MR. CRUEGER:

18   Q.    And how you answer that actually

19  raises a question.

20             So if the label says -- an FDA

21  approved label says that extended-release

22  opioids are believed to reduce the risk of

23  addiction, but the company knows that's untrue,

24  should the company still tell the public that

1    extended-release opioids may reduce the risk of

2    addiction?

3                    MR. SNAPP:  Object to the form.

4                    THE WITNESS:  Purdue has, as

5              recently as within the six months,

6              worked with FDA to revise labeling based

7              on new data that's available.  I'll just

8              stop there.

9    BY MR. CRUEGER:

10         Q.    But that's not my question.

11               My question is because you seem

12   to say that if the FDA label says -- has a

13   statement, in this case, that it's believed that

14   extended-release opioids may reduce the risk of

15   addiction, that Purdue can market that, using

16   that statement, even if it knows it's untrue and

17   inaccurate?

18                    MR. SNAPP:  Is there a question?

19              Objection to form.

20   BY MR. CRUEGER:

21         Q.    Is that your belief?

22                    MR. SNAPP:  Object to the form.

23                    THE WITNESS:  No.

24   BY MR. CRUEGER:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  So if the company knows

2     the statement is untrue, even if it's in the

3     label, would you agree with me that the company

4     should not market that statement that it knows

5     it's untrue using -- should not -- let me strike

6     that.

7               If the company knows that the

8     statement in the label is untrue, then you would

9     agree with me that the company should not use

10    that statement to market the opioids to the

11    public, correct?

12               MR. SNAPP:  Object to the form.

13               THE WITNESS:  So this is --

14          statements -- we talked about that

15          earlier, statements in the label are

16          based on available evidence.

17               The statements that end up there

18          are a scientific evaluation by both the

19          sponsors and FDA.  FDA has reasons for

20          putting things in a label that the

21          company may not have, but it's all based

22          on the level of science at the time.

23    BY MR. CRUEGER:

24          Q.     But I'm asking you a slightly

1    different question, and I'm not even asking you

2    a legal liability question.  That's a different

3    question.

4                     I'm just asking you that if the

5    company knows that extended-release opioids do

6    not reduce the risk of addiction, should it

7    market that feature to the public just because

8    it's in the label?

9                     MR. SNAPP:  Object to the form.

10                    THE WITNESS:  There would be a

11         reason something is in the label, and

12         it's more complicated than that

13         hypothetical that you proposed.

14   BY MR. CRUEGER:

15         Q.    Guidelines I don't think it's --

16   what makes it more complicated if it's -- if the

17   company knows it's an untrue statement?

18                    MR. SNAPP:  Wait for the question

19         to come.

20   BY MR. CRUEGER:

21         Q.    What makes it complicated if the

22   company knows the statement in the label is

23   untrue or inaccurate, what makes it complicated

24   as to whether or not the company should use that

Highly Confidential - Subject to Further Confidentiality Review

```
 1   statement to market the opioids to the public?

 2                   MR. SNAPP:  Object to the form.

 3                   THE WITNESS:  In that

 4            hypothetical if it was untrue the

 5            company should not promote it.

 6   BY MR. CRUEGER:

 7            Q.    And by the way, nothing --

 8   nothing stops the company from withdrawing its

 9   own drug from the market, correct?

10                   MR. SNAPP:  Object to the form.

11                   THE WITNESS:  That's correct.

12   BY MR. CRUEGER:

13            Q.    Okay.  And nothing stops the

14   company from determining that its drug is

15   unsafe, correct?

16                   MR. SNAPP:  Object to the form.

17                   THE WITNESS:  The company is

18            required to continue to evaluate and we

19            talked about it, periodic reports at

20            least once a year if not more on the

21            benefit-risk of a product.

22   BY MR. CRUEGER:

23            Q.    Now, we talked about the

24   statement that's in the agreed statement of
```

1    facts in paragraph 20B and you made a reference

2    that originally in the label there was a

3    statement that it was believed that the

4    extended-release opioid may reduce the risk of

5    addiction, correct?

6          A.    Yes.

7          Q.    When did that come out of the

8    label?

9          A.    I don't remember the exact date.

10         Q.    Was it off -- did that come out

11   of the label by 2000, by the time you started at

12   Purdue?

13              MR. SNAPP:  Object to the form.

14              THE WITNESS:  I don't remember.

15         Again.

16   BY MR. CRUEGER:

17         Q.    It would have been out of the

18   label by 2007, when this plea agreement took

19   place, correct?

20         A.    Correct.

21         Q.    So in 2007 if a person told a

22   healthcare provider so if a Purdue

23   representative told a healthcare provider that

24   OxyContin creates less chance for addiction than

1    immediate release opioids that would be either a

2    false or misleading statement, correct?

3                    MR. SNAPP:  Object to the form.

4                    THE WITNESS:  Can you repeat the

5            question.

6    BY MR. CRUEGER:

7            Q.     If in 2007 a representative told

8    a healthcare provider that OxyContin potentially

9    creates less chance for addiction than immediate

10    release opioids, that would be a false or

11    misleading statement, correct?

12                    MR. SNAPP:  Object to the form.

13                    THE WITNESS:  Determining how --

14            the exact -- this is how reviews and

15            everything, it really depends on any

16            statement how it said what actual the

17            statement is and the context it

18            occurred.

19    BY MR. CRUEGER:

20            Q.     So let's just look at paragraph

21    20B in that statement.

22            A.     Which one?

23            Q.     Paragraph 20B, page six I believe

24    it is, the one that you read aloud.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    So that exact statement in

 2   paragraph 20B, that would be false and

 3   misleading, correct?

 4                    MR. SNAPP:  Object to the form.

 5                    THE WITNESS:  Again, it would

 6           depend on how it was stated.

 7   BY MR. CRUEGER:

 8           Q.    If it was stated just like that

 9   in 20B --

10           A.    That second part of the sentence?

11           Q.    Well, 20B is one sentence --

12   yeah, that OxyContin potentially creates less

13   chance for addiction than immediate release

14   opioids?

15           A.    That's correct.

16                    MR. SNAPP:  Object to the form.

17   BY MR. CRUEGER:

18           Q.    That's correct, that it would be

19   false and misleading?

20                    MR. SNAPP:  Object to the form.

21                    THE WITNESS:  Yes.

22                    MR. CRUEGER:  So I'm going to

23           hand you what's been labeled as Exhibit

24           7.
```

1                    (Document marked for

2              identification as Exhibit Fanelli-7.)

3    BY MR. CRUEGER:

4         Q.     If you could just take time to

5    read through the e-mail, Dr. Fanelli.

6         A.     (Witness reviews document.)

7         Q.     Just tell me when you're done.

8         A.     I've read it, looked through it.

9         Q.     Would you agree that this is a

10   true and accurate copy of the e-mail?

11        A.     Yes.

12        Q.     So if you look at the second page

13   that ends in the Bates number three confusingly?

14        A.     I see.

15        Q.     So starting with the e-mail

16   that's from you sent on -- sent in 2012 to Lisa

17   Basham, she works at the FDA, correct?

18        A.     Yes, I believe she still does.

19   It's Lisa Basham, who is a regulatory project --

20   was a regulatory project manager in the Division

21   of Anesthesia, Analgesia and Addiction Products.

22   She may no longer -- she may have moved, but I

23   believe she's still at FDA.

24        Q.     And the subject is about

1    OxyContin labeling?

2         A.    Correct.

3         Q.    And were you trying to get a

4    change in the label?

5         A.    This is discussing a change to

6    the OxyContin label, but I don't -- I'm not sure

7    where it initiated from.  As we talked before

8    suggestions for changes may come from the

9    sponsor, could come from FDA.  If you look at

10   the first e-mail, the first e-mail came from

11   Lisa Basham and says, we're all working on this,

12   we suggest the following, so I don't actually

13   recall who initiated the conversation.

14        Q.    And you're sending her a -- I

15   guess some proposed language for the label?

16        A.    So -- yes.

17        Q.    And because there's no color,

18   it's a little difficult to tell, but it looks

19   like the proposed -- of the language that you're

20   proposing is in the shaded area?

21        A.    Yeah, the first e-mail is FDA

22   says they're suggesting this, then we -- I

23   guess -- I have to --

24        Q.    But just quickly so the --

1           A.      The highlighted, it looks like

2    that's the grayish is what we proposed suggested

3    back.

4           Q.      So there's the -- just to read

5    the sentence, it says, "published relative

6    potency data are available" and then the -- you

7    would agree with me that then the proposal that

8    Purdue is asking for is "and may be referred to

9    in Clinical Practice Guidelines such as those

10   published by the Veterans Health Administration

11   Department of Defense and American Pain

12   Society," correct?

13          A.      Yes.

14          Q.      And then the FDA, her response is

15   on the first page, and her response is -- well,

16   actually, she has an e-mail it says "Sharon's

17   response."  Who is Sharon?

18          A.      That's Dr. Sharon Hertz, who's

19   the -- I don't recall if she was -- but

20   currently she is the division director at the

21   Division of Anesthesia, Analgesia, and Addiction

22   Products, Dr. Sharon Hertz.  I'm not aware, we

23   looked at letters yesterday, Bob Rappaport

24   was -- could have been the head at the time,

1    but, anyway, this is either a medical officer or

2    she might have been a deputy director at the

3    time.

4            Q.    So the short answer, she works at

5    the FDA?

6            A.    Correct.

7            Q.    So and this is her comment is,

8    "As I mentioned when we spoke, we don't like to

9    refer to specific guidelines in labeling because

10   they can change and then the labeling reference

11   may no longer be appropriate.  Therefore I

12   removed the reference to the VA and APS,"

13   correct?

14           A.    That's what it says, yes.

15           Q.    So they removed the reference to

16   the Veterans Health Administration, Department

17   of Defense guidelines and also the American Pain

18   Society guidelines, correct?

19           A.    Correct.

20           Q.    And then you forwarded the e-mail

21   to -- it must have been to Bridget Martell?

22                 MR. SNAPP:  Object to the form.

23                 THE WITNESS:  It doesn't -- well,

24           somehow she got this.  It doesn't show

Highly Confidential - Subject to Further Confidentiality Review

```
 1              my forwarding.
 2   BY MR. CRUEGER:
 3         Q.     Correct, but somehow it gets to
 4   her, correct?
 5         A.     Correct.
 6         Q.     Who is that?  Who is Bridget
 7   Martell?
 8         A.     She's no longer at the company.
 9   Obviously, she was there at this time.  She
10   was -- I don't remember her title.  She was in a
11   medical affairs department.
12         Q.     And she says "sad the strategy
13   and rationale did not work," correct?  So they
14   wanted the -- well, the next sentence is "It
15   seems we are left convincing legal that the
16   general reference allows us to detail
17   appropriate association guidelines," correct?
18   That's what it says?
19         A.     That's what it says, yes.
20         Q.     So Purdue was looking to change
21   the label so that it could detail doctors using
22   those two guidelines, correct?
23              MR. SNAPP:  Object to the form.
24              THE WITNESS:  I don't recall this
```

```
1              specifically, but that appears to be

2              what that says.  She's not in our sales

3              organization, so I'm not -- I don't know

4              how she's describing detail.

5    BY MR. CRUEGER:

6         Q.    But, clearly, someone at Purdue

7    wanted to use the American Pain Society

8    guidelines to sell OxyContin, correct?

9              MR. SNAPP:  Object to the form.

10             THE WITNESS:  I would not know if

11             it's relate -- with that intention.

12   BY MR. CRUEGER:

13        Q.    But you were proposing the change

14   to the FDA, correct?

15        A.    Correct.

16        Q.    By "you" I mean you, not Purdue,

17   you, Dr. Fanelli, were sending the change to the

18   FDA, correct?

19        A.    I was involved in the e-mail

20   correspondence back and forth with Lisa Basham,

21   who was a project manager with Dr. Hertz.

22        Q.    And who at Purdue, did you -- was

23   it your idea to include the reference to the

24   American Pain Society guidelines?
```

```
 1                    MR. SNAPP:  Object to the form.

 2                    THE WITNESS:  Not mine

 3            individually.  I mean, it would have

 4            been -- come from the medical affairs

 5            department.

 6   BY MR. CRUEGER:

 7            Q.    Do you recall who?

 8            A.    No, I do not.

 9            Q.    Did you talk to Dr. Haddox about

10   this change?

11            A.    I could not remember whether I

12   did or not.  It doesn't -- he's not on the list.

13            Q.    Do you know -- did you read the

14   guidelines, the American Pain Society

15   guidelines?

16            A.    Not in detail.

17            Q.    But you did read them?

18                    MR. SNAPP:  Object to the form.

19                    THE WITNESS:  I don't recall

20            reading those guidelines, no.

21   BY MR. CRUEGER:

22            Q.    Do you know who the American Pain

23   Society is, Dr. Fanelli?

24            A.    No, not in detail.  I mean, I've
```

```
 1    heard of them in correspondence such as this,

 2    but the actual makeup would just be a -- from my

 3    hearing about it, not an investigation of it.

 4           Q.     Do you know whether Purdue

 5    provides any support to the American Pain

 6    Society?

 7           A.     I do not know.

 8           Q.     Just to clean this up quickly, so

 9    I just want to be clear on this, so Purdue

10    wanted to change the label for a reason that's

11    really due to marketing, correct?

12                  MR. SNAPP:  Object to the form.

13                  THE WITNESS:  I would not agree

14           to that.

15    BY MR. CRUEGER:

16           Q.     How would you -- if they want to

17    use the American Pain Society guidelines to

18    detail doctors, that would be marketing,

19    correct?

20                  MR. SNAPP:  Object to the form.

21                  THE WITNESS:  Can you repeat the

22           question.

23    BY MR. CRUEGER:

24           Q.     If they wanted to use the
```

1    American Pain Society guidelines to detail

2    doctors, that is marketing, correct?

3                        MR. SNAPP:  Object to the form.

4                        THE WITNESS:  It could be

5             referred to as that, yes.

6    BY MR. CRUEGER:

7         Q.    And if you change the label in

8    the way that Purdue was proposing to change the

9    label, that would be marketing consistent with

10   the FDA label, correct?

11                       MR. SNAPP:  Object to the form.

12                       THE WITNESS:  Yes.  So could you

13            repeat it.  Sorry.  I want to make sure

14            I got the right --

15   BY MR. CRUEGER:

16        Q.    If the FDA approved the label

17   change that Purdue was proposing, then Purdue

18   could market or detail doctors using the

19   American Pain Society guidelines and claim that

20   they were marketing consistent with the label

21   for OxyContin, correct?

22                       MR. SNAPP:  Object to the form.

23                       THE WITNESS:  That is correct.

24                       MR. SNAPP:  Before we move on to

```
 1            another exhibit, can we take a

 2            five-minute break.  We've been going 66

 3            minutes.

 4                  MR. CRUEGER:  Let's just stop

 5            this and then we're at a stopping point.

 6                  THE WITNESS:  Finish this one?

 7                  MR. SNAPP:  Are you done with

 8      that one?

 9                  MR. CRUEGER:  We're done with

10      that one.

11                  MR. SNAPP:  So can we take a

12      break?

13                  MR. CRUEGER:  Sure, if you want

14      to take a quick break.

15                  THE VIDEOGRAPHER:  Stand by.

16      Remove your microphones.  The time is

17      2:09 p.m., off the record.

18                  (Brief recess.)

19                  THE VIDEOGRAPHER:  Okay.  We are

20      back on the record.  The time is

21      2:23 p.m.

22                  MR. CRUEGER:  I'm going to hand

23      you what I've labeled Exhibit 8, Dr.

24      Fanelli.
```

```
 1                    (Document marked for

 2             identification as Exhibit Fanelli-8.)

 3   BY MR. CRUEGER:

 4          Q.      Have you seen this document

 5   before?

 6          A.      I don't recall reviewing this

 7   document in this state.

 8          Q.      What was the last part that you

 9   said?

10          A.      As such, exactly like this.

11          Q.      But you've heard of this document

12   before?

13          A.      Yes.

14          Q.      Okay.  Again, you have to

15   remember that I have to be able to finish before

16   you can start talking.

17          A.      I apologize.

18          Q.      It's not a natural way of doing

19   conversation, so don't worry about it.

20                  If you go to page 4 of the

21   report.

22          A.      The page numbers on top?

23          Q.      The page numbers on the top,

24   correct.  There's a "Figure 1:  Manufacturer
```

```
 1    Payments to Selected Groups, 2012-2017," and

 2    there's an entry for Purdue.

 3                Do you see where I am in the

 4    first column -- the second column?

 5          A.    Yes.

 6          Q.    And if you go down, there's the

 7    American Pain Society?

 8          A.    Yes.

 9          Q.    And you see there's a little over

10    $542,000 paid to the American Pain Society?

11          A.    I see that.

12          Q.    Were you aware of Purdue's

13    contributions to the American Pain Society?

14          A.    No.

15          Q.    Were you aware of any of these

16    other companies' contributions to the American

17    Pain Society?

18          A.    No.

19          Q.    When you submitted the proposed

20    label change that referenced the American Pain

21    Society, did -- are you aware of anyone at

22    Purdue telling the FDA about the payments to

23    that society?

24                MR. SNAPP:  Object to the form.
```

1              THE WITNESS:  No, I'm not aware.

2              MR. CRUEGER:  So handing you

3         what's labeled Exhibit 9.

4              (Document marked for

5         identification as Exhibit Fanelli-9.)

6    BY MR. CRUEGER:

7         Q.    These are the American Pain

8    Society guidelines, correct?

9         A.    I believe it's discussing that.

10   I haven't seen it in this form that I recall.

11        Q.    Well, you said you had read

12   through the guidelines, correct?

13        A.    I had -- I didn't -- I don't

14   think I said I read through them.  I had seen

15   discussion of them, not from start to -- you

16   know what I mean, I think I said that.

17        Q.    I actually don't know what that

18   means.  Can you explain what that means?

19        A.    So either -- I have seen them,

20   yes.  I have seen them, I'll say that.

21        Q.    So is the distinction we're

22   drawing here you've seen them, but you have not

23   read them?

24        A.    Correct.  I had not done a

Highly Confidential - Subject to Further Confidentiality Review

 1    detailed reading through of the documents.

 2            Q.     But these are the guidelines that

 3    Purdue wanted to be referred to in the label so

 4    it could use them to detail doctors, correct?

 5                    MR. SNAPP:  Object to the form.

 6                    THE WITNESS:  I'd have to look

 7            back to -- I don't -- I'm not aware of

 8            the timing of this or if it's the full

 9            and complete listing of it in this form.

10    BY MR. CRUEGER:

11            Q.     And if you turn to page -- well,

12    the page numbers up in the right-hand corner,

13    it's page 117, 117.

14            A.     Yes.

15            Q.     In the second column, if you go

16    all the way down to the bottom, it's the last

17    sentence before the next section take starts as

18    methadone.

19                    Do you see where I am?

20            A.     On top of the --

21            Q.     On top of it.

22            A.     Yeah.

23            Q.     Starts with "proposed"?

24            A.     I see that.

```
 1              Q.     So it says, proposed benefits of
 2    transitioning to long-acting opioids with
 3    around-the-clock dosing include more consistent
 4    control of pain, improved adherence and lower
 5    risk of addiction or abuse through
 6    well-conducted studies -- though well-conducted
 7    studies have not examined these benefits.
 8                     That's what it says, correct?
 9              A.     Yes.
10              Q.     And these are the guidelines that
11    Purdue wanted to use to detail customers?
12                     MR. SNAPP:  Object to the form.
13                     THE WITNESS:  Again, I'm not sure
14              if this presentation is the exact
15              version that FDA -- we were referring to
16              at that time.
17    BY MR. CRUEGER:
18              Q.     And this statement in this
19    American Pain Society guideline, now we would
20    agree that that is incorrect, that the use of
21    long-acting opioids has a lower risk of
22    addiction or abuse?
23                     MR. SNAPP:  Object to the form.
24                     THE WITNESS:  It says
```

Highly Confidential - Subject to Further Confidentiality Review

1                 well-conducted studies have not been

2                 conducted or well-conducted studies have

3                 not examined these.

4     BY MR. CRUEGER:

5                 Q.     Do you know of any evidence to

6     support that statement?

7                 A.     Could you repeat -- the one on

8     front.

9                 Q.     This last sentence, the proposed

10    benefits of transitioning to long-acting opioids

11    with around-the-clock dosing include more

12    consistent control of pain, improved adherence

13    and lower risk of addiction or abuse.

14                MR. SNAPP:  Do you want to finish

15          the sentence.

16    BY MR. CRUEGER:

17                Q.     Though well-conducted studies

18    have not examined the benefits.

19                Do you know of any -- any

20    scientific evidence that supports the part of

21    that statement that says it lowers the risk of

22    addiction or abuse?

23                MR. SNAPP:  Object to the form.

24                THE WITNESS:  Those studies are

Highly Confidential - Subject to Further Confidentiality Review

1          being conducted as we speak.

2    BY MR. CRUEGER:

3          Q.    Did you know of any studies in

4    2012?

5          A.    I'm not aware of studies at that

6    time.

7          Q.    In 2012 was the time when you

8    were proposing to change the label with the FDA,

9    correct?

10              MR. SNAPP:  Object to the form.

11              THE WITNESS:  That we talked

12         about --

13    BY MR. CRUEGER:

14         Q.    In Exhibit 7, correct?

15         A.    Yes.

16         Q.    Dr. Fanelli, do you have any idea

17    what the risk to the patient is if a doctor

18    believes that the risk of addiction is lower if

19    you're using extended-release opioids?

20              MR. SNAPP:  Object to the form.

21              THE WITNESS:  I think we talked

22         about that the risk is still under

23         discussion and scientific evaluation.

24    BY MR. CRUEGER:

1      Q.     So you just -- it could be very

2    dangerous, it could be dangerous, it could be --

3      A.     Could you repeat the question.

4    What could be dangerous?

5      Q.     If a doctor believes that using

6    extended-release opioids to treat chronic pain,

7    there's a -- let me strike that.

8             If a doctor believes that there's

9    less risk of addiction and abuse if he

10   prescribes extended-release opioids to a patient

11   to treat chronic pain?

12             MR. SNAPP:  Object to the form.

13             THE WITNESS:  I have -- I don't

14        have any way to evaluate that.

15   BY MR. CRUEGER:

16      Q.     So if you have no way to evaluate

17   that, why was Purdue asking the FDA to change

18   the label to include those guidelines?

19             MR. SNAPP:  Object to the form.

20             THE WITNESS:  We were responding

21        to an FDA -- again, we don't -- I don't

22        have the whole history or remember that

23        every detail, but we were responding to

24        an FDA request, and I actually don't

Highly Confidential - Subject to Further Confidentiality Review

1          know the full rationale for including

2          those at that time.

3   BY MR. CRUEGER:

4          Q.     Certainly, you're not suggesting

5   that the FDA was proposing that you include the

6   reference to the American Pain Society

7   guidelines in the label?

8          A.     No.

9          Q.     It's Purdue that was proposing

10  it, correct?

11         A.     Correct.

12         Q.     And I believe you testified you

13  don't know who at Purdue proposed it?

14              MR. SNAPP:  Object to the form.

15              THE WITNESS:  I don't know, yes,

16         where it came from.

17  BY MR. CRUEGER:

18         Q.     If I wanted to answer that

19  question or if you wanted to answer that

20  question, how would you go about figuring it

21  out?

22              MR. SNAPP:  Object to the form.

23              THE WITNESS:  I would -- this

24         part of that, those guidelines are -- I

Highly Confidential - Subject to Further Confidentiality Review

1          would talk to folks in the medical

2          affairs department.

3   BY MR. CRUEGER:

4          Q.     Such as whom, who in particular?

5          A.     Probably the head of that group,

6   although Marcelo Bigal started recently, so I'd

7   probably talk to Monica Kwarcinski.

8          Q.     And does Purdue keep a record of

9   when it's proposing changes to labels of how

10  Purdue decided to propose lang -- let me strike

11  that.

12         Does Purdue keep a record of how

13  it came about to decide to propose certain

14  language in a label?

15         A.     We keep record of the --

16  depending on -- of course, it depends on exactly

17  what it is.  An example would be references if

18  when we submit a label for review, there are

19  annotations that reference where the evidence is

20  from and so forth, but it really depends on the

21  particular change.

22  BY MR. CRUEGER:

23         Q.     I was thinking more along the

24  lines is there a record of any -- a centralized

Highly Confidential - Subject to Further Confidentiality Review

```
1    record of any discussion or the decision-making

2    process within Purdue of we want to include this

3    language in the label?

4         A.    There is a record of all

5    correspondence with FDA, but within it would

6    depend on what that discussion is.

7              (Document marked for

8         identification as Exhibit Fanelli-11.)

9    BY MR. CRUEGER:

10        Q.    I'll hand you what's been marked

11   Exhibit 11.

12             If you can take time to just read

13   the e-mail and then tell me when you're done.

14        A.    (Witness reviews document.)

15             I've read it.

16        Q.    This is an e-mail, 2015, and it's

17   referring to the LA Times.  It's called LA Times

18   Fact Pattern, but it's referring to articles

19   that were in the LA Times.

20             Do you recall those articles?

21        A.    I recall that there were

22   articles, yes.

23        Q.    Did you read any of them?

24        A.    Yes.
```

1      Q.      And can you just summarize for me

2   so we don't have to go through the entire thing,

3   what they're asking -- well, let's just make

4   this clear, Robert Josephson, is that a --

5   that's a Purdue employee, correct?

6      A.      Yeah, Bob Josephson is in our

7   corporate communications group.

8      Q.      And the other people, the other

9   two people on here, these are also Purdue

10  employees, correct?

11     A.      Correct.

12     Q.      And then it's CCing you.  Did you

13  do any work in formulating Purdue's response to

14  the articles?

15     A.      No.

16     Q.      So you were just CC'd on the

17  e-mail?

18     A.      Correct.

19     Q.      So you can just put that to one

20  side.

21             So I just want to talk to you a

22  little bit about the abuse deterrent

23  formulation.

24     A.      Sure.

1          Q.     First, I just want to -- we

2    talked about it very briefly before, but you

3    said you were not the -- I can't remember the

4    exact term, is it the chief liaison with the

5    FDA --

6          A.     Right.

7          Q.     -- for the initial approval of

8    reformulated OxyContin?

9          A.     Correct.

10         Q.     And that -- so what role did you

11   play, if any, in between Purdue submitting the

12   NDA for reformulated OxyContin and then it

13   received approval in 2010, correct?

14         A.     So I would have provided

15   supervisory oversight to the prime regulatory

16   folks at that time.

17         Q.     Okay.  And so what does -- I just

18   want to get an idea of what that actually means.

19                Does that mean you review and

20   approve everything before it's filed?

21         A.     Not everything, but I would look

22   at important items, give advice.

23         Q.     Okay.  So I want to just quickly

24   talk about what abuse -- this means for

Highly Confidential -- Subject to Further Confidentiality Review

```
 1    OxyContin, what abuse deterrent formulation

 2    means.

 3                    It's really about -- is it about

 4    tamper resistance, correct?

 5         A.     Yes.

 6         Q.     So it's making the pill harder to

 7    crush, correct?

 8         A.     That's one part, yes.

 9         Q.     And another part is then it makes

10    it if you crush it, it's harder to either inhale

11    or melt and put it up in a syringe, correct?

12         A.     Correct.

13         Q.     Is there anything else that it

14    does?

15         A.     You said inhale, yes, that's

16    the -- that was the goals of the reformulation.

17         Q.     So it's addressed to deter people

18    from either inhaling it or injecting it,

19    correct?

20         A.     Yes.

21         Q.     And it doesn't deter you from --

22    you can abuse reformulated OxyContin just by

23    swallowing it, correct?

24         A.     That's correct.
```

1          Q.      Now, isn't it true, Dr. Fanelli,

2    that most people don't abuse OxyContin by either

3    inhaling it or injecting it?

4          A.      The -- I'm not aware of the

5    specific -- that's again part of that risk in

6    the epidemiology group.  I know we have data on

7    that, but the early discussions with FDA were

8    looking at ways to address, and this was one of

9    the -- a first step in reformulation.

10         Q.      But most people abuse OxyContin

11   by taking it orally, correct, the majority of

12   people do?

13                 MR. SNAPP:  Object to the form.

14                 THE WITNESS:  I don't know the

15         exact numbers.

16   BY MR. CRUEGER:

17         Q.      Have you ever looked at that

18   issue?

19         A.      Yes.

20                 MR. CRUEGER:  I'm going to hand

21         you what's been labeled Exhibit 12.

22                 (Document marked for

23         identification as Exhibit Fanelli-12.)

24   BY MR. CRUEGER:

Highly Confidential -- Subject to Further Confidentiality Review

1          Q.     And, Dr. Fanelli, this is a

2   surveillance report prepared by Navippro,

3   correct, or it's called a Navippro report?

4          A.     Navippro, yes.

5          Q.     And this one happens to be dated

6   June of 2013, correct?

7          A.     That's correct.

8          Q.     Just briefly explain for me why

9   Purdue was preparing or had these reports

10  prepared?

11              MR. SNAPP:  Object to the form.

12              THE WITNESS:  So I'm not sure

13          what this particular report was prepared

14          for.

15  BY MR. CRUEGER:

16          Q.     So let me ask it this way:  Do

17  you know why Purdue had this report prepared?

18          A.     Not specifically for this

19  particular report.  We have -- Navippro is one

20  of the studies in our postmarketing required

21  studies, and we have -- we talked about it

22  either today or yesterday, requirements to

23  provide interim reports, so this could be -- but

24  I'm not -- in this form without seeing cover

Highly Confidential -- Subject to Further Confidentiality Review

```
 1    letters, I'm not that familiar with this

 2    particular report.

 3          Q.     Well, let's go to --

 4    unfortunately they don't -- well, page 32 of 71

 5    and Table 8, you see where we are?

 6          A.     Yes.

 7          Q.     And this report is giving

 8    percentages of people who abuse OxyContin,

 9    reformulated OxyContin and actually original

10    OxyContin by different routes, oral, snorting,

11    smoking, injecting and then other.

12                 And this table would suggest that

13    most people, the majority, who abuse OxyContin

14    abuse it by just taking it orally, correct?

15                 MR. SNAPP:  Object to the form.

16                 THE WITNESS:  In the first column

17          that's what it appears, yes.

18    BY MR. CRUEGER:

19          Q.     Okay.  Are you familiar at all

20    with any of the patent litigation surrounding

21    the ADF reformulation?

22          A.     I know they exist, but I'm not

23    familiar with them.

24          Q.     Did you play any role in it
```

```
 1    whatsoever?

 2            A.      You know --

 3                    MR. SNAPP:  Object to the form.

 4                    THE WITNESS:  I gave a

 5            deposition, but I can't recall if it was

 6            specific to OxyContin or around some

 7            other patent issue.

 8    BY MR. CRUEGER:

 9            Q.      Were you involved at all in the

10    -- I'm trying to think of how to ask this

11    question so just --

12            A.      Okay.

13            Q.      Were you involved in how Purdue

14    licensed the patents that it used for the abuse

15    deterrent formulation in reformulated OxyContin?

16            A.      No.

17                    MR. CRUEGER:  Okay.  So let's

18            just take a quick break.

19                    THE VIDEOGRAPHER:  The time is

20            2:50 p.m., going off the record.

21                    (Brief recess.)

22                    THE VIDEOGRAPHER:  The time is

23            3:01 p.m., back on the record.

24    BY MR. CRUEGER:
```

Highly Confidential -- Subject to Further Confidentiality Review

1      Q.     So let's just talk a little bit

2   about the -- what happened after the FDA

3   approved reformulated OxyContin or actually also

4   when it approved it.

5             So the approval was -- if you

6   remember, it was April 16th, 2013, correct?

7      A.     I don't have it -- I believe

8   that's correct.

9             MR. SNAPP:  Did you say 2013?

10            THE WITNESS:  Was it '12?

11            MR. CRUEGER:  Well, approval --

12        I'm sorry.

13   BY MR. CRUEGER:

14       Q.     It was approved in 2010, correct?

15       A.     Yeah, yeah, sorry.

16       Q.     And then the FDA did not approve

17   a label change in 2010, correct?

18       A.     There was no label change at that

19   time.

20       Q.     And the FDA asked -- either asked

21   or required, I'm not sure which word you want to

22   use, that Purdue conduct further studies about

23   the abuse deterrent formulation and its

24   effectiveness, correct?

1          A.      Yes.

2          Q.      And Purdue did a series of

3    studies, correct?

4          A.      And continued to do those

5    studies, yes.

6          Q.      Right, but it did a series of

7    studies and it submitted it to the FDA, correct?

8          A.      Yes.

9          Q.      And then on April 16th, 2013 is

10   when the FDA approved the label change, correct?

11         A.      Correct.

12         Q.      And at the same time that it

13   approved the label change, it also withdrew the

14   approval for original OxyContin, correct?

15         A.      I don't -- subsequently, they

16   did, but I don't know if it was -- I don't

17   believe it was at the same time.

18         Q.      For our purposes, whether it was

19   the same day or not, it doesn't matter, but

20   after it approved the label change, it also

21   withdrew the approval for original OxyContin,

22   correct?

23         A.      That's correct.

24         Q.      And then it also stopped

1   accepting abbreviated new drug applications,

2   correct?

3               MR. SNAPP:  Object to the form.

4   BY MR. CRUEGER:

5        Q.     For original OxyContin?

6        A.     That's correct.

7        Q.     And that means that a generic

8   manufacturer could not file an abbreviated new

9   drug application to sell original OxyContin,

10  correct?

11       A.     Yes.

12       Q.     Okay.  Did the FDA approve any --

13  or grant any exclusivity period for reformulated

14  OxyContin?

15       A.     I'm not familiar with the

16  exclusivity based on that.

17       Q.     Does reformulated Oxycontin have

18  any exclusivity, FDA exclusivity, period?

19       A.     It's past the nonpatent

20  exclusivity for a -- that's a three-year, if

21  clinical trials are required, it would be patent

22  exclusivity.

23       Q.     And then the FDA also required

24  more -- that Purdue do additional studies on the

Highly Confidential - Subject to Further Confidentiality Review

1   effect of abuse deterrence -- of the abuse

2   deterrent formulation?

3           A.      Correct.

4           Q.      And it was trying -- to summarize

5   it all up, it was trying to -- what Purdue was

6   trying to demonstrate was that the abuse

7   deterrent formulation actually reduced abuse in

8   the communities, correct?

9           A.      Correct.

10          Q.      And Purdue then commissioned a

11  series of studies to be carried out to study

12  that, correct?

13          A.      Yes.

14          Q.      Okay.  By the way, I'm going to

15  ask you, so starting in 2010 Purdue Pharma or

16  Purdue was only selling reformulated OxyContin,

17  correct?

18          A.      There was a transition from the

19  original to the reformulated.

20          Q.      So as of, like, 2011 then, let's

21  say, as of 2011, Purdue is only selling

22  reformulated Oxycontin?

23          A.      Yes, we are distributing the

24  reformulated version.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Isn't distributing the same as

2  selling?

3    A.    Yes.

4         MR. CRUEGER:  Okay.  So I'm going

5         to give you what has been marked Exhibit

6         13.

7         (Document marked for

8         identification as Exhibit Fanelli-13.)

9  BY MR. CRUEGER:

10   Q.    And, again, just tell me when

11  you're done reading it.

12   A.    (Witness reviews document.)

13        I finished.

14   Q.    Okay.  So this is an e-mail to

15  you from Todd Baumgartner?

16   A.    Correct.

17   Q.    Who is that?

18   A.    Baumgartner, he was -- I have to

19  look at the year.  2012, he was -- I believe he

20  was the head of regulatory affairs at the time.

21  At one time he was head of regulatory affairs,

22  then he was the head of all of R&D, so I

23  reported to him in both capacities.

24   Q.    He worked for Purdue --

```
 1              A.      A couple times.

 2              Q.      He worked for Purdue Pharma?

 3              A.      Yes, sorry.

 4              Q.      Okay.  And the subject line TR IR

 5   opioids, can you explain what that means?

 6              A.      Tamper-resistant

 7   immediate-release opioids.

 8              Q.      And if you look at what he --

 9   after having my initial thoughts and then he has

10   like thought 5 and thought 7, I'm not sure what

11   happened to 1 through 4 or 6, but number 7 is

12   what I'm a little bit interested in, so it says

13   "recall we had actively discouraged Rhodes from

14   launching a generic IR Oxycodone."  I'm not

15   going to continue reading.

16                      Rhodes is Rhodes Pharmaceuticals?

17              A.      Correct.

18              Q.      And what is it referring to in

19   that you had -- when he says "we had actively

20   discouraged Rhodes from launching their generic

21   IR Oxycodone"?

22                      MR. SNAPP:  Object to the form.

23                      THE WITNESS:  I don't -- I don't

24              recall right now what that discussion
```

Highly Confidential - Subject to Further Confidentiality Review

1          was.

2    BY MR. CRUEGER:

3          Q.    So Rhodes Pharmaceuticals they --

4    IR -- strike that.

5                IR Oxycodone, that refers to

6    immediate release?

7          A.    Correct.

8          Q.    And Rhodes Pharmaceuticals is

9    selling immediate-release Oxycodone?

10               MR. SNAPP:  Object to the form.

11               THE WITNESS:  I believe they are,

12         yes.

13   BY MR. CRUEGER:

14         Q.    And they sell it as a generic,

15   correct?

16               MR. SNAPP:  Object to the form.

17               THE WITNESS:  Yes.

18   BY MR. CRUEGER:

19         Q.    And was there a concern about

20   Purdue selling a reformulated abuse deterrent

21   OxyContin and at the same time having a

22   Purdue-affiliated company selling an

23   immediate-release generic Oxycodone product?

24               MR. SNAPP:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  There were

 2          discussions about that.

 3   BY MR. CRUEGER:

 4          Q.     And what were the discussions?

 5          A.     We had a tamper-resistant project

 6   in development.  Unfortunately, we were

 7   unsuccessful in developing that project, but we

 8   felt that that was an important product, if we

 9   could meet the FDA's requirements, to get it on

10   the market, and that would be preferred.

11          Q.     Well, first of all, who is "we,"

12   Purdue Pharma?

13          A.     Yeah.

14          Q.     And when you say a

15   tamper-resistant product, are you talking about

16   a tamper-resistant, immediate-release?

17          A.     Yes, I'm sorry.

18          Q.     Yeah, a tamper-resistant,

19   immediate-release product, correct?

20          A.     Correct.

21          Q.     And you, Purdue, were trying to

22   develop that immediate-release, tamper-resistant

23   product for Rhodes Pharmaceuticals to sell?

24                    MR. SNAPP:  Object to the form.
```

 1                    THE WITNESS:  No.  I don't have

 2            the agenda for that meeting, it's not

 3            attached, but we were studying it and

 4            actually have submit -- did submit the

 5            application, the name was Ovreedy(ph.)

 6            for an abuse deterrent IR formulation.

 7    BY MR. CRUEGER:

 8            Q.    Of?

 9            A.    Of oxycodone, sorry.

10            Q.    Just to back up quickly, you said

11    you don't have the agenda that's attached.  Is

12    it just one page?

13            A.    Yeah.  Well, there's two --

14    there's nothing on this page.

15                    (Document marked for

16            identification as Exhibit Fanelli-14.)

17    BY MR. CRUEGER:

18            Q.    I only have one copy, obviously.

19    Is this the agenda for that e-mail, what's been

20    labeled Exhibit 14?

21            A.    (Witness reviews document.)  I've

22    reviewed it, so I see it.

23            Q.    I was just asking is that the

24    agenda that's supposed to be attached to Exhibit

```
 1    13?

 2           A.     It appears to be.

 3           Q.     Okay.  So back to Exhibit 13, in

 4    that paragraph 7 it says -- he writes, "But,

 5    now, if we clearly are trying to bring forward a

 6    TR IR formulation (and thus trying to address

 7    the problem), I see no reason why we need to be

 8    secretive."

 9                  What is he referring to there

10    about being secretive?

11                  MR. SNAPP:  Object to the form.

12                  THE WITNESS:  I don't recall.

13    BY MR. CRUEGER:

14           Q.     And is Rhodes Pharmaceuticals, is

15    it currently selling an immediate-release

16    Oxycodone product?

17                  MR. SNAPP:  Object to the form.

18                  THE WITNESS:  I believe they are.

19    BY MR. CRUEGER:

20           Q.     Do they have -- does Rhodes

21    Pharmaceuticals sell a tamper-resistant

22    Oxycodone product?

23           A.     No.

24           Q.     And, again, Rhodes
```

1    Pharmaceuticals, it's really owned by the same

2    family, the Sackler family, as Purdue, correct?

3                   MR. SNAPP:  Object to the form.

4                   THE WITNESS:  I'm not aware of

5            the ownership of the different

6            corporations.

7    BY MR. CRUEGER:

8            Q.    You think someone else other than

9    the Purdue family controls either directly or

10   indirectly Rhodes Pharmaceuticals?

11                  MR. SNAPP:  Object to the form.

12                  THE WITNESS:  Again, I don't know

13           the ownership.

14   BY MR. CRUEGER:

15           Q.    How long has Rhodes

16   Pharmaceutical existed?

17                  MR. SNAPP:  Object to the form.

18                  THE WITNESS:  I do not know.

19   BY MR. CRUEGER:

20           Q.    But you occasionally have e-mails

21   like this about Rhodes Pharmaceuticals, correct?

22           A.    Yes.

23           Q.    Did you just assume it was an

24   independent third company that had no

1    affiliation or association with Purdue?

2                    MR. SNAPP:  Object to the form.

3                    THE WITNESS:  No.  We consider it

4            an independent associated company is how

5            we term it.

6    BY MR. CRUEGER:

7            Q.    And what does that mean in

8    reality?  What is an independent associated

9    company?

10           A.    So, again, this would be more

11   details from our law department, but it's not

12   the same -- my understanding is it's not the

13   same company, different legal and corporate

14   entity, but I'm not -- I don't have that

15   background to address that.

16           Q.    Does Purdue sell any

17   immediate-release Oxycodone products?

18           A.    No.

19           Q.    Does Purdue sell any -- well,

20   answer if you --

21           A.    No, we don't currently, that's

22   correct.

23           Q.    Did Purdue at one time while

24   you've been at Purdue since 2000 sell an

```
 1    immediate-release Oxycodone product?

 2            A.     Oh, Dilaudid is hydromorphone, so

 3    no.

 4            Q.     Okay.  Does Purdue sell any of

 5    the drugs that are used to treat opioid

 6    addiction?

 7            A.     No.

 8            Q.     Purdue doesn't sell any drugs

 9    that are used to treat opioid addiction?

10            A.     Currently, no, that I'm aware of.

11            Q.     How about Rhodes Pharmaceuticals?

12            MR. SNAPP:  Object to the form.

13    BY MR. CRUEGER:

14            Q.     Does Rhodes Pharmaceuticals sell

15    any drugs that are used to treat opioid

16    addiction?

17            MR. SNAPP:  Object to the form.

18            THE WITNESS:  I don't know

19        Rhodes -- all of Rhodes' products.

20    BY MR. CRUEGER:

21            Q.     Okay.  So before we got on this

22    little tangent, we were talking about the ADF

23    and reformulated OxyContin.  We had just talked

24    about the April 16th, 2013 FDA approval of the
```

1    new label for the abuse deterrent formulation

2    and that the FDA had asked or required Purdue to

3    do additional studies about the abuse deterrent

4    formulation, correct?  You kind of remember

5    that's where we were?

6            A.     Yes.

7            Q.     Okay.  And Purdue did those

8    studies, correct?

9            A.     We're currently conducting those

10   studies.

11           Q.     And it would submit --

12                  (Document marked for

13                  identification as Exhibit Fanelli-15.)

14   BY MR. CRUEGER:

15           Q.     I'll just pass you what's been

16   labeled Exhibit 15.

17                  So Exhibit 15 is a document

18   entitled "Overview and Interpretation of the

19   Post-Marketing Program to Assess the Effects of

20   Reformulated OxyContin on Opioid Abuse in 3

21   Formal Studies, 1 Drug Utilization Study, and

22   Contextual Studies," and it's dated September

23   2014.

24                  Are you familiar with this study

1    or this -- this document, actually?

2         A.    I'd have to get -- I'm vaguely

3    familiar with it.  It appears to be -- we talked

4    about earlier postmarketing requirements have

5    update requirements, and this could be one of

6    those, but I'm not sure.  I'd have to look at

7    it.

8         Q.    Do you understand why Purdue

9    filed this document with the FDA?  Let's just

10   start, did Purdue file this document with the

11   FDA?

12        A.    This particular one?  I'd have

13   to -- if there was a cover letter that

14   accompanied this, I'd know whether this was the

15   version that went to FDA.  If you notice, it

16   says a study reported in July 2012 report.  This

17   appears to be the next update, but I'm not --

18   without seeing additional documentation, I'm not

19   certain, but that's what it appears to be.

20        Q.    Did you have any involvement

21   while you were at Purdue in submitting these

22   studies or these reports to the FDA?

23        A.    Yes.

24        Q.    Okay.  And assuming that this was

Highly Confidential - Subject to Further Confidentiality Review

```
1    submitted to the FDA, can you explain just at a

2    very general high overview Purdue's purpose for

3    submitting this 2014 report?

4          A.     Yeah, as I stated previously, the

5    postmarketing required studies, FDA gives time

6    months for submitting of the proposals, interim

7    reports and final study reports.  This would --

8    could satisfy submitting one of those interim

9    reports.

10         Q.     So but what -- what Purdue is

11   trying to do with this submission is report to

12   the FDA its view of what these studies are

13   showing on whether the abuse deterrent

14   formulation is effective at reducing abuse,

15   correct?

16               MR. SNAPP:  Object to the form.

17               THE WITNESS:  It's submitting an

18         interim report on the status of our

19         investigations.  It talks here about

20         three formal studies, a drug utilization

21         study and contextual study, so it's a

22         number of studies, and this is an update

23         report on the current status of those,

24         as required.
```

```
 1    BY MR. CRUEGER:

 2         Q.     And so if you look at page 5

 3    quickly --

 4         A.     Five by the report number.

 5         Q.     Five by the actual page numbers,

 6    yes.

 7         A.     Yeah.

 8         Q.     And there's a paragraph or

 9    Section 1.4 Conclusions.

10         A.     Yes.

11         Q.     And just the first sentence,

12    "These findings indicate that abuse of OxyContin

13    decreased substantially after reformulation and

14    that these decreases have persisted up to three

15    years post-reformulation," correct?  That's

16    what -- that's what that sentence says?

17         A.     Yes.

18         Q.     And that is what Purdue is

19    telling the FDA, correct?

20              MR. SNAPP:  Object to the form.

21              THE WITNESS:  That a conclusion

22         in an interim report about what the

23         findings indicate.

24              (Document marked for
```

```
 1              identification as Exhibit Fanelli-16.)

 2    BY MR. CRUEGER:

 3         Q.     So, Dr. Fanelli, what I've handed

 4    you is Exhibit 16.  Don't worry, we are not

 5    going to parse through and read this thing.

 6    I'm just ask -- actually, the only reason I'm

 7    even giving it to you is just to ask you if,

 8    first of all, if you can tell me, have you seen

 9    this document before?

10         A.     Yes.

11         Q.     And can you tell me what the

12    document is?

13         A.     This is a FDA briefing document

14    prepared prior to a scheduled advisory committee

15    meeting.

16         Q.     And what is the briefing document

17    about?

18         A.     The advisory committee -- it was

19    a joint advisory committee.  I think we talked

20    about this yesterday, DSaRM is the safety group,

21    and AADPAC is the anesthesia group, Sharon Hertz

22    is the head of that FDA division, but this is --

23    those are the advisory committees, and it was to

24    discuss whether the reformulated OxyContin --
```

```
 1    what the -- what the outcomes of those were, of

 2    the reformulation.

 3            Q.      And you received this document,

 4    correct?

 5            A.      Yes.

 6                    (Document marked for

 7             identification as Exhibit Fanelli-17.)

 8    BY MR. CRUEGER:

 9            Q.      So I'm going to hand you what is

10    17.

11                    MR. SNAPP:  Are we done with 16?

12                    MR. CRUEGER:  Yes.

13                    MR. SNAPP:  Thank you.

14    BY MR. CRUEGER:

15            Q.      And so that briefing document

16    that was Exhibit 16, obviously, you and other

17    people at Purdue had read through that document,

18    correct?

19            A.      Yes.

20            Q.      And you read through it because

21    you were going to have a meeting with the FDA on

22    July 7th and 8th of 2015, correct?

23            A.      Yes.

24            Q.      And just from reading this
```

```
 1    e-mail, is it safe to say that the FDA was not

 2    persuaded by the evidence that Purdue had

 3    produced so far that the reformulated OxyContin

 4    had reduced abuse in the community?

 5                  MR. SNAPP:  Object to the form.

 6                  THE WITNESS:  What I would say is

 7            briefing documents, and it says so, and

 8            FDA said so, are the views of the

 9            individual reviewers from the different

10            sections and that they're mentioned

11            here, the epidemiologic, the

12            statistician, and they're up for --

13            they're not a -- they're not a

14            conclusion of FDA, per se, but it's

15            providing reviews for the advisory

16            committee's view to look at.

17    BY MR. CRUEGER:

18            Q.    And these reviews, from Purdue's

19    standpoint, were generally negative, correct?

20                  MR. SNAPP:  Object to the form.

21                  THE WITNESS:  There were

22            statements in there, yes, that we

23            believed would require more work for us

24            to address.
```

1   BY MR. CRUEGER:

2         Q.    And that's this Exhibit 17, this

3   is an e-mail -- originally, it's actually two

4   e-mails.  Originally, there is an e-mail that

5   seems to be from you, although it doesn't say

6   who -- who exactly it went to, correct?  It

7   starts with the line that's on June 23rd, 2015?

8         A.    Yes.

9         Q.    So from that on downward, that's

10  the e-mail that you wrote, correct?

11        A.    Correct.

12        Q.    And without going through them,

13  you had just highlighted a few quotes that you

14  took out of what is Exhibit 16, correct?

15        A.    Yes.

16        Q.    And you sent them to Gail, if you

17  could pronounce her name correctly.

18        A.    Her name is Dr. Gail Cawkwell.

19        Q.    Okay.  And her reaction was

20  "sigh," correct?

21        A.    That's what it says.

22              (Document marked for

23              identification as Exhibit Fanelli-18.)

24  BY MR. CRUEGER:

```
1          Q.     I'll hand you what's Exhibit 18.

2    You don't actually have to read through this

3    document.  I'm not going to ask you about all

4    the contents.  I'm more interested in just a few

5    parts of it, okay.

6          A.     I just want to see what it is.

7          Q.     Sure.  Oh, feel free to read it.

8          A.     Okay.

9          Q.     I'm actually just more interested

10   in the first what is the -- it says, "dear EC

11   members."  Before we get into that, this is an

12   e-mail from Gail Cawkwell to various people, and

13   it CCs you and other Purdue employees, correct?

14         A.     Correct.

15         Q.     And it attached that FDA briefing

16   document, that would be Exhibit 16, correct?

17         A.     So it states there, yes.

18         Q.     And it says -- what I'm

19   interested it says, "dear EC members," what is

20   the EC?

21         A.     The executive committee -- stands

22   for the executive committee.

23         Q.     Okay.  And what is the executive

24   committee?
```

```
 1              A.     The to -- on the to line you see

 2      the members of the executive committee.

 3              Q.     Okay.  And but what does the

 4      executive committee do?

 5              A.     Oh, it's heads of departments.

 6              Q.     Okay.  Heads of departments in

 7      Purdue?

 8              A.     Across Purdue.

 9              Q.     Okay.  And who is Stuart Baker?

10              A.     Stuart Baker, I'm not sure of his

11      title, he was a member of the executive

12      committee.

13              Q.     Is he a Purdue employee?

14              A.     I'm not -- I believe he is.  I'm

15      not sure.  He is an executive.  Purdue has --

16      well, he's at Purdue.

17              Q.     He's at Purdue?

18              A.     Yes.

19              Q.     So I'm just a little -- I just

20      want to -- is everyone in this to line on the

21      executive committee, are they all Purdue

22      employees?

23              A.     I don't know if Stuart has -- is

24      an outside attorney or could be, I don't know
```

```
 1    him that well.

 2            Q.      Okay.

 3            A.      I was not a member of the

 4    committee, but I know Stuart and everyone else,

 5    yeah, on the to line, they make up the executive

 6    committee.

 7            Q.      So you know Stuart, but you're

 8    not quite sure if he's a Purdue employee?

 9            A.      Yes, I don't -- I don't know

10    his -- he works for the executives and the

11    board.  I don't know what his title.

12            Q.      Who does the executive committee

13    report to?

14            A.      The CEO, who is also listed on

15    here.  At the time it was Mark Timney.

16            Q.      Do you know if the briefing

17    document, if it was sent to any of the owners of

18    Purdue Pharma, the Sackler family?

19                    MR. SNAPP:  Object to the form.

20                    THE WITNESS:  I am not aware.

21    BY MR. CRUEGER:

22            Q.      I'm sorry.  I didn't under -- I

23    didn't hear your answer to the question.

24            A.      I apologize.  I do not know.
```

```
 1                    (Document marked for

 2            identification as Exhibit Fanelli-19.)

 3    BY MR. CRUEGER:

 4            Q.     Sir, you've been handed Exhibit

 5    19.  This is an e-mail from you to Matthew

 6    Sullivan, correct?

 7            A.     Yes.

 8            Q.     And it's June 26, 2015, correct?

 9            A.     Yes.

10            Q.     And the subject is Purdue's

11    decision on OxyContin SDNA?

12            A.     SNDA.

13            Q.     SNDA, and then it's a number,

14    S-026.

15                   Just can you just quickly explain

16    what an SNDA is?

17            A.     Sure.  It's a supplemental new

18    drug application.  Once a drug is approved the

19    first time, that's the NDA and any changes,

20    significant changes, of course, and this was

21    supplement -- FDA makes the identification

22    supplement number 26 for the OxyContin NDA.

23            Q.     And does supplement number 26

24    have anything to do with the abuse deterrent
```

1     formulation?

2          A.     It did.

3          Q.     And what was it?

4          A.     This supplement was a labeling

5     supplement to add the results that we've been

6     talking about of the postmarketing studies after

7     the change to the label with the data.

8          Q.     So Purdue wanted to change the

9     label to add information -- strike that.

10              Purdue wanted to change the label

11    to add a statement that reformulated OxyContin

12    reduced abuse in the community?

13              MR. SNAPP:  Object to the form.

14              THE WITNESS:  So that -- FDA has

15              a guidance on information about opioids

16              in a label.  I don't know if you want me

17              to go into this, I'll just very briefly.

18              The ones that you talked about first

19              approval with the labeling, those were

20              premarket studies, category 1 and

21              category 3, which are testing for

22              extraction, that's one.  Three is abuse

23              liability studies, and FDA guidance is

24              pretty clear, and there are now I don't

1          know how many current today opioids.

2          There are numbers of them.

3              The last category, there's no

4          drug yet approved with category 4 it's

5          called, which is the real world data,

6          and that's what this was.

7     BY MR. CRUEGER:

8          Q.    And what would that --

9     practically, how would that change the label for

10    the drug?

11         A.    So there's a section, section 9

12    which talks about the abuse liability and

13    evidence, especially on these -- well, it's in

14    many drugs, a lot of classes, but for the

15    opioids, especially the abuse deterrent ones, it

16    describes the results of those studies.

17         Q.    And that SNDA number 26 and the

18    studies, that's what we're referring to here in

19    this -- with this Exhibit 16, that FDA briefing

20    document, that's what that's talking about,

21    correct?

22         A.    Correct.

23         Q.    And to sum up this e-mail that

24    you're sending to Matthew Sullivan, Matthew is

1    at the -- Matthew Sullivan is an FDA employee?

2           A.     He's a project manager in

3    Dr. Hertz's division.

4           Q.     And it's canceling the meeting

5    that you were going to have with the FDA on I

6    guess July 7th and 8th, 2015?

7           A.     It's withdrawing the supplement

8    is what this is about.

9           Q.     Does that also cancel the meeting

10   then?

11          A.     Yes.

12          Q.     And who made the decision to

13   withdraw the supplement?

14          A.     It was a decision -- I think the

15   executive committee, maybe not all members.  I

16   don't remember who made -- you know, who was

17   involved in that but members of the executive

18   committee.

19          Q.     Was it your decision?

20          A.     Not alone.

21          Q.     Were you involved in the

22   decision?

23          A.     Yes.

24          Q.     Do you know what the basis for

Highly Confidential - Subject to Further Confidentiality Review

1    the decision was to withdraw the application?

2         A.    Yes.

3         Q.    What was it?

4         A.    Based on -- and you see it also

5    talks about having a discussion with Dr. Hertz

6    and Dr. Staffa at FDA.  Based on their review of

7    the data and it was clear that more work had to

8    be done prior to changing of the label.  So the

9    discussions were around continuing that work to

10   address those limitations that they pointed out.

11        Q.    Now, this -- Purdue's efforts on

12   this abuse deterrent formulation and working

13   with the FDA, is this a -- does Purdue view

14   abuse deterrent formulation as a way -- as a way

15   to keep out generics?

16        A.    The goal of the abuse deterrent

17   formulation is to address the abuse of the

18   product.

19        Q.    And Purdue would like to be able

20   to use the abuse deterrent formulation in its

21   marketing?

22             MR. SNAPP:  Object to the form.

23             THE WITNESS:  I'm not sure what

24        you mean by "marketing."

```
1    BY MR. CRUEGER:

2         Q.    Do you know whether Purdue wants

3    to use any of the abuse deterrent formulation --

4    strike that.

5              Do you know whether Purdue wants

6    to use the ADF in its marketing to sell

7    OxyContin?

8              MR. SNAPP:  Object to the form.

9              THE WITNESS:  Currently, we don't

10        have a sales force and we are not using

11        them in the promotion of our products.

12   BY MR. CRUEGER:

13        Q.    I guess my question is are you

14   using this abuse deterrent -- are you using the

15   abuse deterrent label in any way to sell the

16   product that you know of?

17             MR. SNAPP:  Object to the form.

18             THE WITNESS:  The abuse deterrent

19        was designed to address issues around

20        misuse/abuse, and that's the goal, and

21        that's why we're commercializing it as

22        an abuse deterrent.

23   BY MR. CRUEGER:

24        Q.    And are you aware whether Purdue
```

```
 1    is trying to use the abuse deterrent formulation

 2    to limit generic competition?

 3                    MR. SNAPP:  Object to the form.

 4                    THE WITNESS:  I'm not aware of

 5            anything like that.

 6                    MR. CRUEGER:  Just give you

 7            what's labeled Exhibit 20.

 8                    (Document marked for

 9            identification as Exhibit Fanelli-20.)

10    BY MR. CRUEGER:

11            Q.    By the way, Purdue sells what's

12    often referred to as branded drugs, correct?

13            A.    Yes.

14            Q.    So and what that means is

15    OxyContin is a branded drug, correct?

16            A.    I would -- yes.

17            Q.    And Purdue does not sell --

18    Purdue Pharma does not sell generics, correct?

19            A.    Correct, currently.

20            Q.    And as a branded -- a distributor

21    of a branded product, Purdue would like to limit

22    generic competition, correct?

23                    MR. SNAPP:  Object to the form.

24                    THE WITNESS:  I have no answer to
```

```
 1              that.

 2    BY MR. CRUEGER:

 3         Q.      Well, you were at Purdue in 2004

 4    when it lost patent protection on original

 5    OxyContin, correct?

 6         A.      Correct.

 7         Q.      And that had a substantial

 8    negative impact on Purdue, correct?

 9         A.      Correct.

10         Q.      Because it allowed generics to

11    come into the market and compete against Purdue,

12    correct?

13              MR. SNAPP:  Object to the form.

14              THE WITNESS:  It resulted in a

15         reduction in the sale of the branded

16         product, yes.

17    BY MR. CRUEGER:

18         Q.      Right, from generic competition,

19    correct?

20         A.      Yes.

21         Q.      And do you know what Purdue sales

22    of OxyContin, original formulated OxyContin were

23    prior to it losing patent protection?

24         A.      I don't know the numbers.
```

```
 1            Q.     Was it around $2 billion?

 2                   MR. SNAPP:  Object to the form.

 3                   THE WITNESS:  It might have been.

 4            It was something like that.

 5   BY MR. CRUEGER:

 6            Q.     And then it went down to -- with

 7   generic competition after about a year, it was

 8   down to about 6 or $700 million?

 9                   MR. SNAPP:  Object to the form.

10                   THE WITNESS:  I don't know the

11            exact number, but it was a significant

12            reduction.

13   BY MR. CRUEGER:

14            Q.     And it resulted in layoffs at

15   Purdue?

16            A.     Correct.

17            Q.     A reduction of the sales force,

18   correct?

19            A.     I'm not part of that business.  I

20   believe so, but I don't know what happened in

21   other areas outside of my area.

22            Q.     And just really the whole point

23   of this is generic competition doesn't really --

24   is something Purdue would like to avoid,
```

```
 1    correct?

 2                    MR. SNAPP:  Object to the form.

 3                    THE WITNESS:  It's not part of

 4          our business.

 5    BY MR. CRUEGER:

 6          Q.    Well, I don't think someone

 7    competing against you is part of anyone's

 8    business.

 9                    What I'm saying is you would --

10    you, Purdue, would not want generics to compete

11    against reformulated OxyContin, correct?

12                    MR. SNAPP:  Object to the form.

13                    THE WITNESS:  There are, based on

14          exclusivity, we would -- yes, that's

15          important that those are maintained, the

16          exclusivity.

17    BY MR. CRUEGER:

18          Q.    So going back to this Exhibit 20

19    that I handed you, it's a 2015 e-mail.

20          A.    Correct.  2015, yeah.

21          Q.    The e-mail that's interesting is

22    the one that you sent to Douglas Throckmorton.

23          A.    That's correct.

24          Q.    And he's at FDA, correct?
```

```
 1            A.      Correct.

 2            Q.      And the e-mail just summarizes --

 3    it sounds like a discussion and some points that

 4    you wanted to put in writing to convey to the

 5    FDA, correct?

 6            A.      Correct.

 7            Q.      And I just wondering a little bit

 8    about what some of those points are.

 9                    So one of them is the

10    clarification of the scope of ADF exclusivity,

11    it's the second point you make.

12                    Do you see that?

13            A.      Yes.

14            Q.      Can you explain what you're

15    really talking about there?

16            A.      Sure.  So this was a meeting

17    about opioid abuse deterrents with -- I can't

18    remember all the attendees from FDA side, but

19    Gail Cawkwell, Robin Abrams and myself with FDA,

20    including Dr. Throckmorton, and we discussed a

21    number of topics.

22                    That particular one, FDA has made

23    statements, recently as well, about the value of

24    abuse deterrents in this class of drugs and has
```

Highly Confidential -- Subject to Further Confidentiality Review

```
 1    made statements about exclusivity around those

 2    properties.

 3              Q.     In other words, to boil all that

 4    down when we're talking about exclusivity, that

 5    means the FDA would grant some sort of

 6    exclusivity to limit generic competition for an

 7    ADF formulation?

 8                    MR. SNAPP:  Object to the form.

 9                    THE WITNESS:  So products get --

10            we talked about that I think

11            yesterday -- get exclusivity based on

12            products, class and supplements, you

13            know, the nature of the data in order to

14            incentivize doing that work, and that's

15            what that discussion was.

16    BY MR. CRUEGER:

17              Q.     But again, I just want to make

18    sure I understand what you're saying, because I

19    think the -- isn't the perhaps more blunt but

20    concise way of saying it is you want exclusivity

21    for developing the abuse deterrent formulation?

22                    MR. SNAPP:  Object to the form.

23                    THE WITNESS:  Correct.

24    BY MR. CRUEGER:
```

 1          Q.      Well, the points aren't numbered,

 2    it's the point that starts with "class-wide."

 3                  You see where I am?  It's third

 4    from the bottom, third point from the bottom.

 5          A.      Correct.

 6          Q.      So it says, "Class-wide

 7    immediate-release opioid labeling to reflect

 8    demonstrated substantial abuse and addiction

 9    risk of such products."

10                  What did you mean by that?

11          A.      So I don't have the -- a

12    transcript of this, but these are some of the

13    discussions that we had.  I can't remember who

14    brought it up first, but FDA actually has taken

15    steps related to that.  All of the IRs now have

16    a boxed warning.  They all are, as of very

17    recently, changed the boxed warning and include

18    statements about the REMS, and they're now part

19    of the REMS, so that are the kinds of things

20    that were discussed.

21          Q.      And that's something that you

22    wanted, that boxed warning?

23          A.      We didn't get to specifics of,

24    you know, to that level, but to point out that

```
 1    there is substantial abuse of those

 2    immediate-release products.

 3         Q.     So what Purdue wanted and what

 4    you were conveying here is you wanted the label

 5    changed for immediate-release opioids to reflect

 6    a substantial abuse and addiction risk, correct?

 7         A.     No.  There was a discussion -- as

 8    I said, I don't remember who brought it up or

 9    how it was brought up.  This whole discussion,

10    we've had two or three of them now that I've

11    been involved in, meeting with FDA leadership

12    about actions we're taking or ways to address,

13    we talked about the opioid crisis, and that was

14    one that we talked about was by increasing those

15    warnings on IR products because of the amount of

16    abuse that's in that -- those group of products

17    would be beneficial to address that issue.

18         Q.     So -- and your extended-release

19    OxyContin product competes against the

20    immediate-release products, correct?

21              MR. SNAPP:  Object to the form.

22              THE WITNESS:  The actual -- the

23              labeling for OxyContin talks about a

24              limitations of use that -- and we could
```

1           read it, but after -- OxyContin is only

2           to be prescribed, at least as listed in

3           the limitations of use, after other

4           agents are tried and it includes

5           immediate release.

6    BY MR. CRUEGER:

7           Q.    Right, but after -- in the world

8    of the market, one of the drugs that OxyContin

9    extended-release or any extended-release product

10   competes against would be an immediate-release

11   product, correct?

12           MR. SNAPP:  Object to the form.

13           THE WITNESS:  So I don't know

14           what you mean by "competes."

15           You know, prescribers make a

16           determination whether an IR opiate is

17           appropriate or an extended-release.

18           They don't have the same indication, so

19           they're not in the same class.

20   BY MR. CRUEGER:

21           Q.    Well, would you agree, Dr.

22   Fanelli, when I -- when I read through all the

23   points that we're making, they all look like

24   points that Purdue is discussing with the FDA to

1    in one way or other restrict people from

2    competing with your reformulated OxyContin

3    product?

4         A.    No, that's not how --

5               MR. SNAPP:  Object to the form.

6               THE WITNESS:  Sorry.

7               These discussions with FDA did

8          not include commercial discussions.

9          They were all about addressing opiate

10         abuse and what steps we could take to

11         address that.

12   BY MR. CRUEGER:

13         Q.    So what -- what is the branded

14   industry working group?

15         A.    So that's not the -- I'm not

16   that -- I've heard of it, and without seeing

17   documents, I can't remember which exact project

18   that is.

19         Q.    Do you have more than one like

20   industry -- branded industry working group?

21         A.    Yes.

22         Q.    So what do they -- how many of

23   them are there?

24         A.    There -- the one that I'm -- the

1    regulatory representative for the branded

2    industry is related to the class-wide PMR

3    requirements, those 11 studies.  I am the

4    regulatory representative of all those companies

5    to the FDA, FDA liaison function.  So, as a

6    matter of fact, I got an FDA e-mail that they

7    want to talk to the brand -- but it -- so it

8    depends on what you're talking about and what

9    the timing is.

10              (Document marked for

11              identification as Exhibit Fanelli-21.)

12   BY MR. CRUEGER:

13        Q.    So this one seems to be about --

14   this Exhibit 21 that I've handed you --

15        A.    Yes.

16        Q.    -- this one is an evaluation of

17   abuse deterrent properties of opioid drug

18   products.

19              So that would be a different

20   industry working group?

21        A.    So -- yes.  And I attended, I

22   think I was on there, I know Purdue had

23   representation, I don't know if it was myself or

24   Todd, I know about it.

```
 1                    FDA had a public meeting about

 2     evaluation of the abuse deterrent properties of

 3     opiate drugs.  We talked about there are

 4     guidances that are out there about the different

 5     categories of studies.  This is looking at

 6     premarket evaluation, how those studies are

 7     conducted.  And, actually, the guidance for the

 8     branded products was already out there.  FDA had

 9     made public statements that they were going to

10     be providing abuse deterrent guidance for the

11     generic products as well so that to help those

12     products know what they needed to do to get

13     approval.

14            Q.     So I just noticed this isn't

15     Bates numbered, so it must have come from a

16     native file, so we'll have to get the Bates

17     number for it, but -- so if you go to I think

18     it's page 10 it says "OD Opioid Development:

19     Category 1 Studies" at the top.

20            A.     Yes, I'm on that page.

21            Q.     About -- it's closer to the

22     bottom, it's actually, it's a point that's above

23     formulation plus process equals AD

24     characteristics, there's a -- like a double
```

 1    indented subpoint there.

 2            A.      Yes.

 3            Q.      Do you see that?

 4            A.      I think so, yeah.  It starts with

 5    "risk."

 6            Q.      So "risk of approving generic AD

 7    products would non-equivalent abuse deterrent

 8    properties."

 9                    What risk is this referring to?

10                    MR. SNAPP:  Object to the form.

11                    THE WITNESS:  Again, we talked

12            about category 1 studies.  Those are

13            studies that in vitro testing, looking

14            at different solutions, whether in a

15            test tube, you could extract the agent

16            and although -- I believe although,

17            again, it's been a while, and I didn't

18            write this particular statement, but I

19            was -- I can't remember if I was at the

20            meeting or read the transcripts, but the

21            issue there was if a generic drug -- if

22            the branded drug has certain abuse

23            deterrent properties demonstrated by

24            those studies, it would be important

```
 1              that a generic of that drug had at least

 2              the same abuse deterrents, and FDA has

 3              now, as a matter of fact, in a recent

 4              advisory committee looking at not

 5              generics but branded products in a

 6              similar -- for a similar molecule and

 7              are evaluating the same.

 8                   It's difficult to do because, you

 9              know, these different studies and they

10              have different technologies, you talked

11              about hardness, and there's different

12              technologies, and there's -- there was a

13              statement that would be important that a

14              generic is at least as abuse deterrent

15              as the brand.

16         Q.    And so that would be a standard

17    that a generic would have to meet before it

18    could get approval, correct?

19                   MR. SNAPP:  Object to the form.

20                   THE WITNESS:  This was a

21              discussion of what should be in that

22              guidance, and that was talking about

23              that, yes.

24    BY MR. CRUEGER:
```

```
 1        Q.      And then if you go to the fifth

 2   page it says "Public Health Imperative."

 3        A.      Back to the front five, okay.

 4        Q.      And so just -- so this is the --

 5   an industry group presentation to the FDA,

 6   correct?

 7        A.      Correct.

 8        Q.      And it's Purdue and it's all the

 9   other companies that are listed on page 2.  I'm

10   not going to read them off.

11        A.      I see that, yes.

12        Q.      And on this page it talks about

13   the "opioid epidemic requires action from

14   multiple stakeholders to address the crisis,"

15   correct?

16        A.      Yeah, I'd like to point out on

17   page 2 there's a statement at the bottom, the

18   views expressed in this presentation represent

19   the best available consensus of the branded

20   industry working group as a whole.  So remember

21   this was a public meeting where there was

22   discussion of these topics.  These are views --

23   it's not each of those companies did not sign

24   off on each of these views, but just to put that
```

1    in context.

2              Q.      But there seems to be a consensus

3    at least on what's in this PowerPoint, correct?

4              A.      That's what -- yes, that's how it

5    was designed.

6              Q.      And so there's also then a

7    consensus on actions that are required to

8    address the crisis, correct?

9              A.      There are some statements in here

10   addressing that, but that wasn't the focus of

11   the meeting.

12             Q.      No, but they're in the

13   PowerPoint, correct?

14             A.      Yes.

15             Q.      And so there's a consensus on

16   what an FDA opioid action plan, correct?

17             A.      That's stated there, yes.

18             Q.      And then there's a consensus on

19   treating the problem, what's needed to treat the

20   problem, correct?

21             A.      Mm-hmm.

22             Q.      And this includes medicated --

23   medication assisted therapy for addiction,

24   correct?

```
 1          A.      Mm-hmm, yes.

 2          Q.      And then the third part, and

 3   so -- so just actually -- so does the FDA --

 4   there's treatment is another way to remedy the

 5   problem, correct?

 6          A.      Yes.

 7          Q.      And then the third part of this

 8   prong supposedly is abuse deterrent opioids,

 9   correct?

10          A.      That's the third listed here.

11          Q.      Right.  And that's just one -- it

12   even says in here it's just one component of

13   this multi-faceted approach, correct?

14          A.      Yes.

15                  MR. CRUEGER:  Just for the

16             record, so Exhibit 21 was produced to us

17             as Bates number PPLPC01600319013, and it

18             was labeled highly confidential, subject

19             to protective order.  If you just want

20             to take a quick break, and then we'll

21             come back and wrap it all up.

22                  THE VIDEOGRAPHER:  All right.

23             The time is 4:04 p.m., going off the

24             record.
```

```
 1                    (Brief recess.)

 2                    THE VIDEOGRAPHER:  We are back on

 3            the record.  The time is 4:22 p.m.

 4    BY MR. CRUEGER:

 5            Q.    Dr. Fanelli, we're looking at

 6    Exhibit 15.  You have that in front of you,

 7    correct?

 8            A.    I do.

 9            Q.    If you turn to page 45, and

10    before I ask you any questions, this document

11    is -- this was prepared by Purdue, correct?

12            A.    I believe so.  I don't see any

13    author, and we talked about that earlier, I

14    don't see the cover for this.  It has a

15    demarcation of our NDA, so either by Purdue or

16    for Purdue.

17            Q.    Okay.  If you go to page 45,

18    that's paragraph 3.13.  It's called "Prescribing

19    Patterns Among Potentially High Risk

20    Prescribers."

21                    Do you see me, where I'm at?

22            A.    Yes, I see.

23            Q.    The first sentence starts with

24    "using IMS Exponent data."
```

1            Do you know what IMS Exponent

2    data is?

3        A.    I do not.  I know what IMS is,

4    but I don't know what Exponent data are.

5        Q.    So what is IMS?

6        A.    It's a -- I guess it's a

7    business, I'm not even that aware of what their

8    -- my understanding is they provide to

9    prescription -- or to pharmaceutical companies

10   data about prescription of their products.

11       Q.    So but what can happen is a

12   company like Purdue can go to IMS and buy data

13   about prescriptions that are being written for

14   OxyContin, for example?

15       A.    That's my --

16            MR. SNAPP:  Object to the form.

17            THE WITNESS:  That's my

18       understanding.

19   BY MR. CRUEGER:

20       Q.    Okay.  And if you could quickly

21   read that section, so I can just ask you

22   questions about it, this page 45 to 46.

23       A.    (Witness reviews document.)

24            Those two pages, yeah.

Highly Confidential -- Subject to Further Confidentiality Review

1     Q.     Yes.

2     A.     So I finished.

3     Q.     So just to try to quickly

4  summarize what this is, this is Purdue is trying

5  to show a benefit of its reformulated OxyContin

6  drug, correct?

7              MR. SNAPP:  Object to the form.

8              THE WITNESS:  What we're

9         reporting on are data that we have.  I

10        don't even know -- results that we have

11        on investigations we were doing around

12        the abuse deterrence, and these are the

13        data.

14  BY MR. CRUEGER:

15     Q.     And so what Purdue did is it went

16  out and it purchased the data about the

17  prescription practices of 321 doctors who

18  they've identified as engaging in potentially

19  suspicious or questionable prescribing, correct?

20              MR. SNAPP:  Object to the form.

21              THE WITNESS:  I'm not -- this is

22        a summary.  I'm not that familiar with

23        the details to this level.  Oh, I see

24        where you quoted the number.  I see that

1             now, that's what it states, yes, 312.

2    BY MR. CRUEGER:

3             Q.    And it's -- what Purdue has done

4    is it's purchased the data to show the

5    prescribing practices of these 321 doctors in

6    prescribing 80-milligram OxyContin, correct, the

7    graph on page 46?

8                  MR. SNAPP:  Object to the form.

9                  THE WITNESS:  So what that

10            graph -- as I'm seeing this, I don't

11            remember seeing this report that we're

12            talking about.  It looks like reports

13            over time related to the OxyContin

14            reformulation, yes.

15   BY MR. CRUEGER:

16            Q.    And what Purdue is doing is

17   they're showing the change in prescriptions for

18   80-milligram OxyContin to prescriptions of

19   40-milligram Opana ER, correct?

20            A.    Those are the two graphs there,

21   yes.

22            Q.    And what it's showing is that

23   when Purdue introduced the reformulated

24   OxyContin, it showed a drop in prescriptions of

```
 1    80-milligram OxyContin by these identified --

 2    these 321 prescribers, correct?

 3            A.      Yes.

 4            Q.      And at the same time it shows an

 5    increase in prescriptions by these same

 6    prescribers of the Opana ER 40-milligram,

 7    correct?

 8            A.      That's what's shown on that

 9    graph, yes.

10            Q.      And the inference that is -- one

11    of the inferences, would you agree that Purdue

12    wants to be drawn from this -- these two graphs

13    is that these doctors stop prescribing

14    reformulated OxyContin because of the

15    reformulation, correct?

16                    MR. SNAPP:  Object to the form.

17                    THE WITNESS:  Again, this is an

18            interim report, but what it states

19            there, these reserve changes are

20            consistent with reduced diversion

21            following the introduction of the

22            reformulation.

23    BY MR. CRUEGER:

24            Q.      Well, that's what's interesting,
```

1    so it's showing -- these are really two graphs

2    about diversion; are they not?

3            A.     It's a trend of prescriptions.

4            Q.     But they're a trend of

5    prescriptions among prescribers that Purdue has

6    identified as engaging in suspicious or

7    questionable prescribing activities, correct?

8            A.     Correct.

9            Q.     And it shows a reduction in

10   OxyContin once reformulated OxyContin is

11   introduced, correct?

12           A.     Yes.

13           Q.     And it shows a corresponding

14   increase in Opana ER 40-milligram prescriptions,

15   correct?

16           A.     There is an increase of Opana.

17           Q.     And so isn't this just Purdue

18   showing how it can actually track, if it really

19   wants to, suspected diversion at the prescriber

20   level?

21                  MR. SNAPP:  Object to the form.

22                  THE WITNESS:  So, again, this

23           is -- there are a number of studies,

24           and, as we talked about a little while

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ago, each has their limitations, has to

 2              be interpreted based on those

 3              limitations, but this is part of the

 4              data that's presented and --

 5    BY MR. CRUEGER:

 6              Q.    Do you know if -- do you know if

 7    Purdue shared any of this data and information

 8    with state or federal law enforcement?

 9              A.    I'm not aware of that, whether or

10    not.

11                   (Document marked for

12              identification as Exhibit Fanelli-22.)

13    BY MR. CRUEGER:

14              Q.    I'll just hand you what's labeled

15    Exhibit 22.

16              A.    Oh, sorry, I got it.

17              Q.    So the e-mail, in general,

18    they're referring to Grunenthal, and that's a

19    German company that Purdue licensed patents that

20    cover some of the ADF technology, correct?

21              A.    Yes.  I'm not that familiar with

22    those patents, but I've -- that's my

23    understanding as well.

24              Q.    And McGinity, is that -- that's
```

Highly Confidential -- Subject to Further Confidentiality Review

```
 1    another patent that Purdue licensed, correct?

 2         A.      That's my understanding.

 3         Q.      It's referred to commonly as the

 4    University of Texas patent?

 5         A.      I'm not aware of that.

 6         Q.      What I'm interested in is they're

 7    talking about -- talking about maybe that Rhodes

 8    would also license the patents, correct?

 9         A.      So there's discussion of that.  I

10    have never -- I don't recall ever -- I'm not

11    copied on this e-mail and wouldn't be.  These

12    kinds of conversations, discussions are not part

13    of regulatory.

14         Q.      I'm actually not even going to

15    ask you about the licensing.

16         A.      Okay.

17         Q.      I'm actually going to ask you, it

18    says in the middle of this e-mail, it says, "I

19    encouraged them to talk to Jon Sackler before

20    they conclude."

21                 Do you see what I'm reading on

22    the cover page?

23         A.      On the first page, yeah.

24         Q.      Who is Jon Sackler?
```

```
 1                    MR. SNAPP:  Object to the form.

 2                    THE WITNESS:  He's, I believe,

 3            although has been, I think, a board

 4            member, but, again, I don't -- that's

 5            where I -- my interactions with Jon

 6            Sackler have been is at board meetings.

 7   BY MR. CRUEGER:

 8            Q.    So he's a member of the Sackler

 9   family?

10            A.    Yes.

11            Q.    Does he play an active role in

12   Purdue Pharma?

13                    MR. SNAPP:  Object to the form.

14   BY MR. CRUEGER:

15            Q.    That you're aware of?

16                    MR. SNAPP:  Object to the form.

17                    THE WITNESS:  He's at board

18            meetings where they make decisions, yes.

19   BY MR. CRUEGER:

20            Q.    Does he have an office at Purdue

21   Pharma?

22                    MR. SNAPP:  Object to the form.

23                    THE WITNESS:  I'm not sure.

24   BY MR. CRUEGER:
```

```
 1          Q.      In your role, you work with

 2   attorneys a lot at Purdue Pharma?

 3          A.      I don't know what you mean by "a

 4   lot," but we talked about MRL, so medical,

 5   regulatory and law, so there are law individuals

 6   on the teams reviewing material, for instance.

 7   There's a regulatory attorney who is part of

 8   project team, so I do work with the law

 9   department.

10          Q.      And I don't know if you would

11   know, but there's approximately 5,000 plus

12   e-mails of yours that have been designated as

13   confi -- as withheld under the attorney-client

14   privilege.

15               What's your understanding of the

16   attorney-client privilege?

17               MR. SNAPP:  Object to the form.

18               THE WITNESS:  I don't have a -- I

19          understand that it's related to

20          confidentiality between attorney and

21          client, but that's the extent of it.

22   BY MR. CRUEGER:

23          Q.      And when do you include an

24   attorney on an e-mail and when do you not?
```

```
 1                    MR. SNAPP:  Object to the form.
 2   BY MR. CRUEGER:
 3            Q.     Is there any sort of --
 4            A.     It would depend on the project.
 5            Q.     Did you have any guidance or
 6   training on when to include attorneys on e-mails
 7   and when not?
 8            A.     I would include attorneys -- for
 9   instance, we talked about it, if they're part of
10   the project that I'm dealing with.  They would
11   be included -- there are attorneys on the -- the
12   executive committee we talked about, so that's
13   when they would be included.
14            Q.     And do a lot of the attorneys
15   that you do work with, are they actually more in
16   the area of giving you business advice, or is it
17   legal advice, or is it a mix of the two?
18                    MR. SNAPP:  Object to the form.
19                    THE WITNESS:  Not business --
20            what do you mean by "business advice"?
21   BY MR. CRUEGER:
22            Q.     Well, what would you mean by
23   legal advice?  I mean, isn't -- you have to know
24   the difference between the two, don't you?
```

```
 1                    MR. SNAPP:  Object to the form.

 2                    THE WITNESS:  The advice that I

 3          get is related to laws and regulations

 4          around development and approval of

 5          products, so that's what it would be

 6          about.

 7                    MR. CRUEGER:  Okay.  I have no

 8          further questions.

 9                    THE VIDEOGRAPHER:  Off the

10          record?

11                    MR. CRUEGER:  Yes.

12                    THE VIDEOGRAPHER:  Stand by.  The

13          time is 4:38 p.m., off the record.

14                    (Pause.)

15                    THE VIDEOGRAPHER:  We are back on

16          the record.  The time is 4:45 p.m.

17   BY MR. STEWART:

18          Q.    Dr. Fanelli, you said moments ago

19   that you had interactions with Jon Sackler at

20   Purdue board meetings.

21                    Do you recall that?

22          A.    Jon Sackler was present at board

23   meetings, yes, that I would see --

24          Q.    That's when you would interact
```

Highly Confidential -- Subject to Further Confidentiality Review

```
 1    with him?

 2           A.     Yes.

 3           Q.     And how many Purdue board

 4    meetings do you think you've spoken at or

 5    presented at in your career at Purdue?

 6           A.     It would be a very rough guess, a

 7    dozen maybe.

 8           Q.     Do Purdue board meetings, do they

 9    take minutes?

10           A.     Do they --

11           Q.     Do they take minutes of

12    proceedings?

13                  MR. SNAPP:  Object to the form.

14                  THE WITNESS:  Not that I have

15           been given.

16    BY MR. STEWART:

17           Q.     Okay.  You just don't know?

18           A.     I don't know.

19           Q.     Are board meetings recorded that

20    you know?

21           A.     I don't know.

22           Q.     In some of the dozen -- estimated

23    dozen times you've been before the board, have

24    you given written presentations, brought
```

1  materials?

2          A.      A few times, slide decks.

3          Q.      Okay.  Have you given any

4  presentations to the board related to OxyContin?

5          A.      Not that I recall.

6          Q.      Do you think you'd recall that?

7          A.      I wouldn't have been specifically

8  OxyContin.  It might have been on talking about

9  something in general of our products.

10          Q.      Have you talked to the board --

11  well, tell me, what do you remember about the

12  times you attended board meetings and presented?

13          A.      I can give you a couple examples.

14          Q.      Sure.

15          A.      As the head of regulatory, Purdue

16  was looking at a biologic product, so that's a

17  typical thing.  The board was interested in what

18  are the requirements for approval of a biologic

19  product.  So I gave a presentation regarding

20  that.  And the other one I remember well was --

21  or at least that I remember is related to

22  buprenorphine development and the requirements.

23          Q.      Do you remember any board

24  meetings about addiction and abuse relating to

```
 1    OxyContin?

 2            A.      The general topic or --

 3            Q.      Yes.

 4            A.      Not that I recall.

 5            Q.      Do you remember any board meeting

 6    at which you were brought in to discuss a safety

 7    issue relating to OxyContin?

 8            A.      I don't recall being in the

 9    meeting or -- no.

10            Q.      What meeting are you referring to

11    when you say "being in the meeting"?

12            A.      So besides attending board

13    meetings, I would prepare documents, regulatory

14    portions, for instance, the head of R&D, who I

15    would report to, was giving a presentation, and

16    I would give portions.  For instance, we're

17    developing an abuse deterrent, the one I

18    mentioned about IR, there was an advisory

19    committee, and I presented what the plans were

20    to address that, those kinds of things.

21            Q.      Where if we wanted to give all of

22    the meetings and documents that you prepared for

23    presentation to the Purdue board, what's the

24    easiest way to get -- to assemble that material?
```

1    A.    Those -- the ones that I would

2    produce I believe are on my computer.

3         Q.    Do you know whether records are

4    kept of the materials that are brought before

5    the board of Purdue and its respective

6    committees?

7         A.    I don't know the handling of

8    those documents.

9              (Document marked for

10             identification as Exhibit Fanelli-23.)

11   BY MR. STEWART:

12        Q.    I'd like to turn your attention

13   to 23, which is a clipped group of documents.

14   And Bates numbers appear to be contiguous.

15   Could you turn -- well, first of all, could you

16   read the front page of Exhibit 23.  Tell me if

17   you recognize it.

18        A.    (Witness reviews document.)  I

19   recognize it, yes.

20        Q.    What is it?

21        A.    So this is dated -- hold on --

22   dated May 2015, part of preparing for any

23   advisory committee, as part of that, the SOP we

24   talked about yesterday, it's not really an SOP

1    but a planning document, there are practice

2    sessions, and looking at this, I don't recall

3    this specific document, but it says it's a draft

4    briefing document in preparation of that meeting

5    is what the author is saying.

6            Q.    And turn the page to the page

7    that's marked 4178.

8            A.    Mm-hmm.

9            Q.    Do you see that?  Do you see that

10   in this thread of e-mails is an e-mail that you

11   wrote?

12           A.    Mm-hmm.

13           Q.    And do you see that you're

14   talking about the preparation for the FDA

15   advisory committee?

16           A.    Yes.

17           Q.    And what were you all preparing

18   to do before the FDA advisory committee?

19           A.    So all advisory committees have

20   presentations by the sponsor, and that was what

21   we were preparing -- I think, hold on a second.

22   That's what we would be doing in a practice

23   session, practice, sorry.

24           Q.    And can you turn to the page

1    marked 4180.

2         A.    Yes.

3         Q.    And do you see that this is the

4    cover page of the document that you're routing

5    around entitled "Advisory Committee Briefing

6    Materials"?

7         A.    That's what it says, yes.

8         Q.    And is this a draft of materials

9    that ultimately would be provided to the FDA

10   advisory committee?

11        A.    That's what a draft briefing

12   document -- there's requirements by sponsors to

13   provide a briefing package to the committees, to

14   the FDA.

15        Q.    The point is you're pointing

16   something together that ultimately would be

17   given to the FDA advisory committee?

18        A.    Yes, this is a draft of that

19   piece.

20        Q.    Okay.  It's something that the

21   company is going to use to communicate with the

22   FDA?

23        A.    Yes.

24        Q.    And do you remember what the

1  advisory committee, the FDA advisory committee

2  meeting on July 7th, 8th, 2015 was going to be

3  discussing?

4      A.    Yes, the reformulated OxyContin

5  and this data related to it.  As we discussed,

6  that was related to a supplement we had

7  submitted to add the category 4 data to the

8  label, package insert.

9      Q.    I take it when you present

10 materials to an FDA advisory committee, you're

11 attempting to present truthful and accurate

12 materials?

13     A.    Yes.

14     Q.    Could you turn to page -- the

15 page marked 4267.

16     A.    It's in the second part.  4267?

17     Q.    Yeah.

18     A.    Okay.

19     Q.    And do you see there's a number

20 12, and next to the number 12 on page that's

21 marked 4267, there's a heading that says

22 "Supportive Study 9:  Changes in Doctor-Shopping

23 Rates for OxyContin and Comparator Opioids"?

24     A.    I see that, yes.

1    Q.    Does that describe a study that

2    Purdue conducted?

3    A.    It was part of the package of

4    studies, the data that were submitted at that

5    time.  Purdue conducted -- Purdue was involved

6    in it.  I'm not sure who conducted that study.

7    Q.    Was it -- put it this way, is

8    Purdue relying on the study in its presentation

9    to the FDA?

10    A.    We are showing these -- this is

11    a -- I don't have the final document, but this

12    is a draft of what was deemed might -- could end

13    up in that document to FDA.

14    Q.    Was there a final document that

15    was submitted to the FDA for the advisory

16    meeting that was held in 2015?

17    A.    There was.

18    Q.    So there was a final document, a

19    final version of the document that we're looking

20    at now produced to the FDA?

21    A.    I believe there was.

22    Q.    Okay.  So if we wanted to know

23    the final statement that Purdue made to the FDA,

24    we'd want to look at that final version and see

Highly Confidential - Subject to Further Confidentiality Review

1    if anything changed from this version, fair?

2          A.     Yes.

3          Q.     Okay.  Summarizing this study, is

4    this a study where Purdue is presenting

5    information from the IMS, a prescription

6    database, that calculates doctor shopping rates

7    for particular products?

8                MR. SNAPP:  Object to the form.

9                THE WITNESS:  It's stated, again,

10          these are -- there's many studies in

11          here, some pivotal -- not pivotal --

12          some prime, some supportive, that at the

13          time were under investigation.

14                This is -- the source is IMS

15          database, and it's one of the studies

16          that was ongoing.

17   BY MR. STEWART:

18          Q.     Do you see on page 4268 the last

19   paragraph on the page it says, "Product-specific

20   doctor-shopping rates were estimated for each

21   6-month calendar interval.  The prescriptions of

22   a specific product, (e.g. OxyContin) for each

23   patient were aligned by prescription start date

24   and number of days supply."

```
 1                    Do you see that?

 2          A.      Yes.

 3          Q.      I mean, what this paragraph sets

 4   out is the methodology of a measurement of

 5   doctor shopping; is that fair?

 6          A.      Yes.

 7          Q.      And then could you turn to page

 8   4271.

 9          A.      I'm sorry, 42?

10          Q.      71.

11          A.      Yes.

12          Q.      And do you see there's a graph on

13   the top of 4271 entitled "Change in

14   doctor-shopping rates for objection from

15   pre-to-post-reformulation, by number of doctors

16   and pharmacies with overlapping prescriptions"?

17          A.      Yes, I see that.

18          Q.      So what this study is showing

19   here is a measurement of the change in doctor

20   shopping that this study suggests occurred

21   between the pre -- the time when you had

22   preformulated OxyContin and then the

23   post-reformulated OxyContin; is that fair?

24          A.      Yes.
```

1        Q.      Okay.  Can you turn to page 4272.

2   And do you see on page 4272 there's a heading 13

3   entitled "Supportive Study 10: Changes in

4   OxyContin Diversion with Reformulation in the

5   RADARS Drug Diversion Program"?

6        A.      Yes.

7        Q.      And do you see -- do you recall

8   this study?

9        A.      No, I do not.

10       Q.      Okay.  I take it if it's being

11  reported to the FDA, then at least in the final

12  version, you're going to have an accurate

13  description of the study provided to the FDA

14  advisory committee?

15       A.      So, again, there are studies both

16  within Purdue and across Purdue about doctor

17  shopping.  This is a draft, an accurate draft of

18  the methodology that were conducted and at the

19  time what the results were, if that's what

20  you're asking.

21       Q.      That's correct.

22               And do you see -- turn to page

23  4274.  Do you see that there's a table 21 and it

24  shows "Changes in Rates of Diversion After

1   Reformulation of OxyContin in the RADARS Drug

2   Diversion Study"?

3                   Do you see that?

4           A.      Yes.

5           Q.      And do you see at the top line

6   it's got OxyContin and it shows the changing

7   rates of diversion over time?

8           A.      Yes.

9           Q.      And while this is a draft report,

10  I take it you'd agree that what Purdue presented

11  to the FDA advisory committee is an analysis of

12  changes in diversion over time of OxyContin,

13  among other information?

14                  MR. SNAPP:  Object to the form.

15                  THE WITNESS:  So it never went to

16          an advisory committee.  What we were --

17          this would have been a briefing document

18          to FDA, and as we talked earlier, that

19          advisory committee was postponed.

20  BY MR. STEWART:

21          Q.      It was submitted to the FDA, but,

22  ultimately, the advisory committee itself didn't

23  receive it is what you're saying?

24          A.      Correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Okay.  I think we've covered

 2    this, but could you turn back to page 4272.  Do

 3    you see there's a Section 13.2 Population that

 4    states, "individuals identified by law

 5    enforcement officers as engaging in diversion of

 6    prescription opioids.  In the 4th quarter 2013,

 7    there were 219 participating agencies in 49

 8    states covering 28% of the population."

 9              Do you see that?

10         A.     Yes.

11              Q.     That's a description of the

12    RADARS coverage?

13         A.     Yes.

14              Q.     Do you happen to know which state

15    is not included?

16         A.     I do not.

17              Q.     Do you know whether Tennessee is

18    the -- is included in the 49 states covered by

19    RADARS?

20         A.     I do not.

21              Q.     Turn to page 4276, and do you see

22    there's a paragraph 14 entitled "Supportive

23    Study 11: OxyContin Prescribing Patterns Among

24    Potentially High Risk Prescribers"?
```

1    A.    Yes.

2    Q.    Do you recall this study?

3    A.    No, not in detail -- well, no.  I

4  know that there was a study related to ADD that

5  was part of Paul's -- Dr. Coplan's write-up at

6  the time.  I don't remember the details.

7    Q.    Do you remember that prescribing

8  habits of doctors who had been identified as

9  potentially involved in diversion were compared

10  to the prescribing habits of doctors who had not

11  been so identified by Purdue?

12    A.    So we talked about that earlier.

13  I was not -- I do not recall prior to today what

14  the details were of that particular study.

15    Q.    We'd have to look in the study to

16  see the exact -- the best place to look to

17  figure out what the details were or a good place

18  would be in this report right here, fair?

19              MR. SNAPP:  Object to the form.

20              THE WITNESS:  This report is a

21        draft description of that study, yes.

22  BY MR. STEWART:

23    Q.    Right.  You would find that a

24  description of the study is reliable, assuming

```
 1    it didn't change between this draft and the

 2    final report, fair?

 3            A.      The final briefing document,

 4    correct.

 5            Q.      We could look at that to see the

 6    population endpoint methods, results of the

 7    study and so forth, fair?

 8                    MR. SNAPP:  Object to the form.

 9                    THE WITNESS:  Yes.

10    BY MR. STEWART:

11            Q.      Do you know if Purdue ever

12    conducted a study where they took these doctors

13    that had been identified as potentially involved

14    in diversion and compared their habits to other

15    doctors and then used that as a means of

16    determining other doctors that were probably

17    involved in diversion?

18            A.      I missed the --

19            Q.      Sure.  We just talked about a

20    study where Purdue compared the prescribing

21    habits of doctors that were potentially -- had

22    been identified as potentially involved in

23    diversion by Purdue and Purdue -- strike that.

24    Let's get this clear.
```

 1              We just talked about a study

 2    where Purdue took doctors in its Region 0

 3    program that it had already identified as

 4    potentially involved in diversion and compared

 5    them to the broader population of prescribers;

 6    is that what we just talked about?

 7                    MR. SNAPP:  Object to the form.

 8                    THE WITNESS:  Yes.

 9    BY MR. STEWART:

10         Q.    And there what Purdue is trying

11    to suggest is that diversion among these doctors

12    associated with diversion had gone down, fair?

13                    MR. SNAPP:  Object to the form.

14                    THE WITNESS:  We're showing

15              the -- what happens to the prescriptions

16              among those doctors after the

17              reformulation.  That's what we're

18              showing.

19    BY MR. STEWART:

20         Q.    So you've got these

21    characteristics of doctors that Purdue suspects

22    as being involved in diversion.

23                    Do you know if Purdue ever looked

24    at the other doctors in its population of

```
 1   prescribers to find out which ones met the same

 2   criteria in terms of cash payments, high levels

 3   of prescribing, prescribing high dose OxyContin

 4   to find other doctors that potentially should be

 5   investigated for diversion?

 6                  MR. SNAPP:  Object to form.

 7                  THE WITNESS:  So we have that ADD

 8            program, it continues to be on, but I'm

 9            not aware of whether or not that

10            particular study was done.

11   BY MR. STEWART:

12        Q.     The ADD program, you're talking

13   about the program that directs salespeople to

14   report people in certain instances, correct?

15        A.     Correct.

16               (Document marked for

17            identification as Exhibit Fanelli-24.)

18   BY MR. STEWART:

19        Q.     Turn to exhibit marked 24.  Do

20   you see that it's an e-mail and the Bates stamp

21   number is -- ends in the number 2514?

22        A.     I see that.

23        Q.     And do you recognize this e-mail?

24        A.     I need to look at it first.
```

1    (Witness reviews document.)

2         Q.    And I'd suggest you look at the

3    second page marked 2515.

4         A.    (Witness reviews document.)

5               I looked at that.

6         Q.    Do you see there's an e-mail and

7    you're on it dated June 26, 2003?

8         A.    Yes.

9         Q.    Do you see it's entitled -- the

10   subject is "professional associations and the

11   potential FDA hearing"?

12        A.    Yes.

13        Q.    Do you see that the third

14   paragraph outlines a series of organizations

15   that Purdue is going to coordinate with in

16   preparation for an FDA hearing?

17               MR. SNAPP:  Object to the form.

18               THE WITNESS:  That appears to be

19          what that is, although I don't recall

20          this e-mail.

21   BY MR. STEWART:

22        Q.    Okay.  And do you see at the

23   bottom in paragraph marked 5 it says, "Pamela

24   will work with Richard Fanelli who was

```
 1    identified as the 'holder of the information' to

 2    ensure that he has all the names/contact

 3    information for those who have been contacted."

 4              Do you see that?

 5    A.    I do.

 6    Q.    Is that a role you would

 7    typically play as kind of keep track of all of

 8    these organizations that were enlisted in the

 9    effort to communicate with the FDA?

10              MR. SNAPP:  Object to the form.

11              THE WITNESS:  No.  My role,

12         although I don't recall this, so, as I

13         read it, my -- if there is an FDA

14         meeting and we were communicating with

15         FDA about such organizations, I would

16         provide that communication to FDA.

17    BY MR. STEWART:

18    Q.    Okay.  So would you be

19    interacting with groups like the American

20    Academy of Family Practice, the American Pain

21    Foundation and so forth?

22    A.    Not at all.

23    Q.    Who would do that?

24    A.    Groups in our -- for instance,
```

```
 1    Pam Bennett, I don't remember what group she was

 2    in, health professional, like under Dr. Haddox.

 3             Q.     Is it -- is it typical for Purdue

 4    when it's presented with an FDA hearing to

 5    coordinate with a whole bunch of allied groups,

 6    such as the groups listed, to enhance the

 7    communications before the agency?

 8                   MR. SNAPP:  Object to the form.

 9                   THE WITNESS:  It depends on what

10            the purpose of the public meeting is.

11    BY MR. STEWART:

12             Q.     So at times Purdue will reach out

13    to allies and get them to come and participate

14    as is being organized in this document that's

15    before you?

16                   MR. SNAPP:  Object to the form.

17                   THE WITNESS:  Again, there are

18            times when we would -- we have outside

19            experts talking.  It depends on what

20            the -- for instance, in an advisory

21            committee, Rick Dart from RADARS, you

22            know, presented for us, those kinds of

23            things.  And I don't know what the --

24            I'm reading the title.  I don't know
```

```
 1           what the potential FDA was -- I don't

 2           recall this potential FDA hearing.

 3   BY MR. STEWART:

 4           Q.      I notice the American Pain

 5   Foundation is one of the groups listed.

 6                   Is that a group that you've --

 7   that Purdue, in your experience, has coordinated

 8   with more than once?

 9           A.      I don't know the details of our

10   coordination with the American Pain Foundation.

11           Q.      We'd have to talk to somebody in

12   the group run by Dr. Haddox probably to figure

13   out what sort of coordination was done?

14                   MR. SNAPP:  Object to the form.

15                   THE WITNESS:  I'm not sure where

16           that resides, we've had changes

17           recently, but that type of function.

18   BY MR. STEWART:

19           Q.      Dr. Haddox would head that up?

20           A.      Had in the past, I'm not sure if

21   he does today.

22                   (Document marked for

23           identification as Exhibit Fanelli-25.)

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. STEWART:

 2          Q.      Turn to Exhibit 25.

 3                  Do you see it's an e-mail from

 4    Beth Conley to you and your response dated

 5    December 17th, 2009?

 6          A.      Yes.

 7          Q.      And do you see she's forwarding

 8    comments to a document "Providing Relief

 9    Preventing Abuse" brochure?

10          A.      Yes.

11          Q.      And she says, "Do you want to

12    weigh in since nonbranded," and you say "nope."

13          A.      Correct.

14          Q.      And you didn't deal with

15    nonbranded items?

16                  MR. SNAPP:  Object to the form.

17                  THE WITNESS:  I have dealt with

18          nonbrand -- it depends on -- we talked

19          earlier, different projects have

20          different representations.  I believe --

21          when did Beth -- I think Beth reported

22          to me at this time.  We talked earlier,

23          as a supervisor, I might provide input.

24          I don't recall why I said no.  Was it
```

1          because Beth had already done it?  I

2          actually don't remember the details.

3   BY MR. STEWART:

4          Q.     So it might have fallen within

5   your area, you just don't know why, in this

6   particular case, you didn't feel the need?

7          A.     Correct.

8          Q.     Okay.  Let me ask you, could you

9   turn to page 1609.  Do you recognize the

10  document Providing Relief Preventing Abuse?

11         A.     I do not.

12         Q.     Do you see it says "Provided as

13  an educational service by Purdue"?

14         A.     Where is that?  Yeah, I see it on

15  the left side there.

16         Q.     Would that still be a nonbranded

17  document if it has that indicator on it with the

18  company logo?

19         A.     Definition, it's in the SOP, but

20  definition of brand, it's not exact, but

21  includes when a -- one of our prescription drugs

22  is mentioned in the piece.

23         Q.     So the point is if it doesn't

24  mention OxyContin by name, but merely talks

Highly Confidential - Subject to Further Confidentiality Review

```
 1    about pain and opioids, it would be nonbranded?

 2              A.      In general, yes.

 3              Q.      Turn to page 1607.

 4                      Do you have a Material Review

 5    Form like this for any document of this sort

 6    that the company is putting through the approval

 7    process?

 8              A.      Ask your question again.

 9              Q.      Well, do you see you have in

10    front of you a Material Review Form?

11              A.      Yes.

12              Q.      Okay.  What is the purpose of a

13    Material Review Form?

14              A.      So it's to -- now we do this

15    electronically, but it has -- it gives

16    identification of the products, who is going to

17    use the products, the target audience, and then

18    there's the individuals who review it with their

19    determination of whether they sign off, for

20    instance.

21              Q.      Okay.  And this is a way you can

22    look at one of these forms and see who has

23    looked at this document and what they've done;

24    is that fair?
```

```
1        A.      Yes, yes.

2        Q.      So you see JDH down here has

3   reviewed it, that's Haddox?

4        A.      Dr. Haddox, yes, I see that.

5        Q.      Question about the document

6   itself, could you turn to page 1615?

7        A.      Sorry, 16?

8        Q.      15.

9        A.      15.

10       Q.      Do you see that?

11       A.      Yes.

12       Q.      Do you see there are all sorts of

13   handwritten notes on the document?

14       A.      I see that.

15       Q.      Is this typical where people --

16   the people that review the document will mark it

17   up, provide notes and develop the final

18   language?

19       A.      Correct.

20       Q.      So any of these documents goes

21   through this formal process?

22       A.      Yes.

23       Q.      Do you see where someone has put

24   a bunch of Xs through the section that's
```

1    entitled "Pseudoaddiction"?

2           A.     Yeah, I see that.

3           Q.     Do you know why in 2009 someone

4    was putting a bunch of Xs through

5    pseudoaddiction?

6           A.     I do not know.

7           Q.     Okay.  Are you familiar with the

8    concept of pseudoaddiction?

9           A.     Yes.

10          Q.     Is it a scientifically recognized

11   concept?

12                 MR. SNAPP:  Object to the form.

13                 THE WITNESS:  I don't have an

14          answer for that.

15   BY MR. STEWART:

16          Q.     Why not?

17          A.     Pseudoaddiction is a -- was a

18   description of -- I think we talked about that

19   earlier too, of pharmacological and responses to

20   medicines, and it's -- I don't believe it's

21   being used today.

22          Q.     All right.  I mean, it's

23   something that Dr. Haddox came up with, right;

24   he's the father of that concept?

```
 1                    MR. SNAPP:  Object to the form.

 2                    THE WITNESS:  I'm not aware of

 3           that.

 4   BY MR. STEWART:

 5           Q.    As far as you know, as head of

 6   regulatory affairs for Purdue, there's never

 7   been an actual scientific study supporting the

 8   concept of pseudoaddiction, right?

 9                    MR. SNAPP:  Object to the form.

10                    THE WITNESS:  I'm not aware of

11           whether or not there has been one.

12   BY MR. STEWART:

13           Q.    You couldn't name one today, as

14   we're sitting here?

15           A.    That's correct.

16           Q.    And you're not aware, to make it

17   clear, that there has been such a study?

18           A.    Correct.

19           Q.    Could you turn to Exhibit 53,

20   which I think your counsel has pulled out of the

21   pile.

22           A.    I have 53 here.

23           Q.    We looked at this before.

24                    Could you turn to page 106?
```

```
 1                    MR. SNAPP:  I'm sorry, could we
 2           wait one second.  Just had to check his
 3           insulin pump.
 4                    THE WITNESS:  No problem, I did.
 5           So if we don't finish in the next 15
 6           minutes or so.
 7                    MR. STEWART:  We're going to
 8           finish in the next two minutes.
 9                    THE WITNESS:  Okay.  Sorry, so
10           where?
11  BY MR. STEWART:
12           Q.    Turn to page that's marked Bates
13  number 3106.
14                    Do you see this is one of a
15  number of pages in this document that lists a
16  study?
17           A.    Yes.
18           Q.    And this document, the overall
19  exhibit, is your routing letter and a study that
20  purports to gather and summarize a series of
21  studies on a particular topic, fair?
22           A.    It's a review of those, yes.
23           Q.    And I take it if a study is not
24  viewed as at least scientific, part of the
```

1  scientific inquiry, you wouldn't list it?

2        A.    I wouldn't characterize it that

3  way, so this --

4        Q.    How would you characterize it?

5        A.    This is a review of the

6  literature in order to, you know, provide

7  information related to the topic.  If you're

8  going to do a complete literature review would

9  include all the publications -- could include

10 all the publications with the description of the

11 limitations, plus and minuses.  So I'm not

12 aware, and I'd have to read it more carefully to

13 understand, is this a complete literature

14 description or did they select and so forth.

15       Q.    We'd have to look at the document

16 that would describe --

17       A.    Yes.

18       Q.    -- how that worked?

19             Here's a question, turn to page

20 3121.

21       A.    Got it.

22       Q.    Do you see that on the last -- in

23 the first section numbered 5.1.1, if you look at

24 the last -- second to last sentence it says,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    "Two studies highlighted below used randomized

 2    patient populations and higher quality design

 3    and methodologies compared to the other

 4    published studies."

 5              Do you see that?

 6         A.   Yes.

 7         Q.   And so I think would you agree

 8    it's referring to study 1, Adams and study 2,

 9    Naliboff?

10         A.   Yes.

11         Q.   Okay.  Are you familiar with the

12    Adams study?

13         A.   No, I am not.

14         Q.   Do you know who Adams is?

15         A.   No.

16         Q.   If I wanted to know whether the

17    authors of the Adams study had received money

18    from Purdue, how would I do that?

19         A.   I'm not aware -- there's the

20    Sunshine Act where, although it would depend on

21    if that person was a prescriber, so I'm not

22    aware of the details of how to find that out.

23         Q.   Who at Purdue would have -- would

24    be the person to ask whether the author of a
```

```
 1    particular study was on Purdue's payroll or had

 2    received money or something of value from

 3    Purdue?

 4                    MR. SNAPP:  Object to the form.

 5                    THE WITNESS:  That would be our

 6          compliance department.

 7    BY MR. STEWART:

 8          Q.    What human being today?

 9                    MR. SNAPP:  Object to the form.

10                    THE WITNESS:  Maggie Feltz is the

11          head of that group.

12                    MR. STEWART:  I've got nothing

13          further.  Thank you.

14                    THE VIDEOGRAPHER:  Off the

15          record?

16    BY MR. SNAPP:

17          Q.    Dr. Fanelli, I just have a few

18    follow-up questions.

19                    First of all, I just wanted to

20    clarify, I'm handing you what's been marked as

21    Deposition Exhibit 2, and I just want to clarify

22    for the record, does that Exhibit 2, which is

23    your CV, and I think you testified it's your

24    current CV, does it include your current
```

1    position?

2         A.    No, it does not.  I don't know if

3    I've updated it, but the only thing that's not

4    on here is my appointment in 2014 as the head of

5    regulatory affairs.

6         Q.    Thank you.

7               You were asked some questions by

8    counsel earlier this afternoon about Purdue

9    Pharma and Rhodes Pharma, and you gave some

10   testimony about the boards of directors.

11              Do you know, sitting here today,

12   who is on the boards of directors of Rhodes and

13   Purdue Pharma?

14        A.    I do not know the list.

15              MR. SNAPP:  I have no further

16        questions.

17              MR. CRUEGER:  Nothing here.

18              MR. SNAPP:  Off the record.

19              THE VIDEOGRAPHER:  Stand by.

20        Okay.  The time is 5:23 p.m., going off

21        the record.

22              (Witness excused.)

23                       - - -

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1         C E R T I F I C A T I O N

 2              I, MARGARET M. REIHL, a

 3         Registered Professional Reporter,

 4         Certified Realtime Reporter, Certified

 5         Shorthand Reporter, Certified LiveNote

 6         Reporter and Notary Public, do hereby

 7         certify that the foregoing is a true and

 8         accurate transcript of the testimony as

 9         taken stenographically by and before me

10         at the time, place, and on the date

11         hereinbefore set forth.

12                   I DO FURTHER CERTIFY that I

13         am neither a relative nor employee nor

14         attorney nor counsel of any of the

15         parties to this action, and that I am

16         neither a relative nor employee of such

17         attorney or counsel, and that I am not

18         financially interested in the action.

19

20

21    -------------------------------

      Margaret M. Reihl, RPR, CRR, CLR

22    CSR #XI01497  Notary Public

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -   -   -   -

 2                  E   R   R   A   T   A

 3                    -   -   -   -   -   -

 4    PAGE   LINE   CHANGE

 5    _____  _____  _____

 6    REASON:  _____

 7    _____  _____  _____

 8    REASON:  _____

 9    _____  _____  _____

10    REASON:  _____

11    _____  _____  _____

12    REASON:  _____

13    _____  _____  _____

14    REASON:  _____

15    _____  _____  _____

16    REASON:  _____

17    _____  _____  _____

18    REASON:  _____

19    _____  _____  _____

20    REASON:  _____

21    _____  _____  _____

22    REASON:  _____

23    _____  _____  _____

24    REASON:  _____
```

```
1               ACKNOWLEDGMENT OF DEPONENT

2

3               I, RICHARD J. FANELLI, Ph.D., do

4          hereby certify that I have read the

5          foregoing pages, and that the same is a

6          correct transcription of the answers

7          given by me to the questions therein

8          propounded, except for the corrections

9          or changes in form or substance, if any,

10          noted in the attached Errata Sheet.

11

12

13

     _____

14   RICHARD J. FANELLI, Ph.D.          DATE

15

     Subscribed and sworn to before me this

16

     _____ day of _____, 2018.

17

     My commission expires:_____

18

19   _____

     Notary Public

20

21

22

23

24
```