Scott Fishman, M.D.
February 26, 2019                                      1

1        IN THE DISTRICT COURT OF CLEVELAND COUNTY

2                     STATE OF OKLAHOMA

3    STATE OF OKLAHOMA, ex rel.
     MIKE HUNTER, ATTORNEY GENERAL
4    OF OKLAHOMA,
               Plaintiff,
5
          vs.                    Case No. CJ-2017-816
6
     PURDUE PHARMA, L.P.; PURDUE
7    PHARMA, INC.; THE PURDUE
     FREDERICK COMPANY; TEVA
8    PHARMACEUTICALS USA, INC.;
     CEPHALON, INC.; JOHNSON &
9    JOHNSON; JANSSEN PHARMACEUTICALS,
     INC.; ORTHO-McNEIL-JANSSEN
10   PHARMACEUTICALS, INC., n/k/a
     JANSSEN PHARMACEUTICALS, INC.;
11   JANSSEN PHARMACEUTICA, INC.;
     ALLERGAN, PLC, f/k/a ACTAVIS,
12   INC., f/k/a WATSON
     PHARMACEUTICALS, INC.; WATSON
13   LABORATORIES, INC.; ACTAVIS, LLC
     and ACTAVIS PHARMA, INC., f/k/a
14   WATSON PHARMA, INC.,
               Defendants.
15   _____

16      VIDEOTAPED DEPOSITION OF SCOTT FISHMAN, M.D.

17                   February 26, 2019

18                       9:43 a.m.

19

20             4860 Y Street, Suite 3020

21                 Sacramento, California

22

23   REPORTED BY:

24   MARYANN H. VALENOTI

25   CSR #11266, RPR, CRR

Confidential                                          JAN-MS-05485278

SCOTT Fishman, M.D.
February 26, 2019                                          2

```
 1                    A P P E A R A N C E S

 2

      FOR THE PLAINTIFF:
 3
              NIX, PATTERSON & ROACH, LLP
 4            LISA BALDWIN, ESQ.
              BROOKE CHURCHMAN, ESQ.
 5            512 NORTH BROADWAY AVENUE, SUITE 200
              OKLAHOMA CITY, OKLAHOMA 73102
 6            405.516.7800
              lbaldwin@nixlaw.com
 7            bchurchman@nixlaw.com

 8
      FOR JOHNSON & JOHNSON and JANSSEN:
 9
              O'MELVENY & MYERS, LLP
10            HOUMAN EHSAN, M.D., ESQ.
              RYAN SNYDER, ESQ. (TELEPHONICALLY)
11            400 SOUTH HOPE STREET
              LOS ANGELES, CALIFORNIA  90071
12            213.430.6000
              hehsan@omm.com
13            rsnyder@omm.com

14
      FOR TEVA PHARMACEUTICALS USA, INC.; and CEPHALON,
15    INC.:

16            MORGAN, LEWIS
              BRIAN M. ERCOLE, ESQ.
17            200 SOUTH BISCAYNE BOULEVARD, SUITE 5300
              MIAMI, FLORIDA  33131-2339
18            305.415.3416
              brian.ercole@morganlewis.com
19

20    FOR PURDUE DEFENDANTS:

21            DECHERT, LLP
              WILLIAM W. OXLEY, ESQ.
22            MARGARET O'CONNOR, ESQ. (TELEPHONICALLY)
              633 WEST 5TH STREET, SUITE 4900
23            LOS ANGELES, CALIFORNIA  90071
              213.808.5700
24            william.oxley@dechert.com
              margaret.o'connor@dechert.com
25
```

Confidential                                                    JAN-MS-05485279

Scott Fishman, M.D.
February 26, 2019                                           3

1                    (APPEARANCES CONTINUED)

2

    FOR THE WITNESS:
3
            GORDON, REES, SCULLY, MANSUKHANI
4           JOHN ROBINSON, ESQ.
            STEVEN ZAKRZEWSKI, ESQ.
5           HANNAH REED, ESQ. (TELEPHONICALLY)
            95 GLASTONBURY CONNECTICUT  06033
6           860.278.7448
            jrobinson@gordonrees.com
7           szakrzewski@gordonrees.com
            hreed@grsm.com
8
    ALSO PRESENT:
9
            KEIGO PAINTER, VIDEOGRAPHER
10          DAVID LEVINE, ESQ. (UC DAVIS)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential                                                        JAN-MS-05485280

Scott Fishman, M.D.
February 26, 2019                                    4

| | |
|---|---|
| 1 | INDEX TO EXAMINATION |
| 2 | WITNESS: SCOTT FISHMAN, M.D. |
| 3 | EXAMINATION                                    PAGE |
| 4 | By Ms. Baldwin                                  12 |
| 5 | By Mr. Ercole                                   279 |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Confidential                                    JAN-MS-05485281

Scott Fishman, M.D.
February 26, 2019                                                  5

```
1                         INDEX TO EXHIBITS

2                        SCOTT FISHMAN, M.D.

3        STATE OF OKLAHOMA v. PURDUE PHARMA, L.P., et al.

4                   Tuesday, February 26, 2019

5            Maryann Valenoti, RPR, CRR, CSR #11266

6
         MARKED                 DESCRIPTION              PAGE
7        Exhibit 1     Curriculum Vitae of Scott M.       24
                       Fishman, M.D.
8        Exhibit 2     Various Documents, top page        37
                       Program Detail-139651, with
9                      handwriting
         Exhibit 3     E-mail chain, top dated 8/23/10,   42
10                     from Takeshita Takashi, to
                       Scott Fishman
11       Exhibit 4     Memo, 1/25/07, from Cephalon, to   45
                       Legal Department, with attached
12                     Independent Educational Program
                       Grant Agreement
13       Exhibit 5     NUCYNTA & NUCYNTA ER 2012          49
                       Business Plan, 12/12/12
14       Exhibit 6     E-mail chain, top dated 1/5/07,    62
                       from Haya Taitel, to Gregory
15                     Imber, with attached Janssen
                       Duragesic KOL Mapping Analysis,
16                     2/18/04
         Exhibit 7     Key Opinion Leader (KOL)           93
17                     Development Plan for Cephalon
                       Pain Franchise, 2/4/05
18       Exhibit 8     Purdue Guidelines for             142
                       Non-Promotional Activities by
19                     Scientific and Medical
                       Personnel-Status Update
20       Exhibit 9     Purdue Pharma Corporate           146
                       Reputation and Visibility
21                     Strategic Plan, 1/21/11
         Exhibit 10    Summary of Payments by Name       154
22                     and Year (1997-May 8, 2012)
         Exhibit 11    Information provided by Teva      158
23                     re payments made to third-party
                       organizations
24       Exhibit 12    Summary of Payments Made In       162
                       Response to Senate Finance
25                     Committee dated 6/8/12
```

Confidential                                                    JAN-MS-05485282

Scott Fishman, M.D.
February 26, 2019                                         6

```
 1              INDEX OF EXHIBITS CONTINUED

 2    MARKED                 DESCRIPTION              PAGE
      Exhibit 13    HSGAC Minority Staff Report,       165
 3                  "Fueling an Epidemic"
      Exhibit 14    E-mail chain, top dated            171
 4                  12/6/11, to Will Rowe, from
                    Mary Vargas
 5    Exhibit 15    E-mail chain, top dated            177
                    11/22/11, from Will Rowe, to
 6                  Mary Vargas
      Exhibit 16    E-mail chain, top dated 1/15/12,   182
 7                  Scott Fishman, to Mary Vargas
      Exhibit 17    E-mail, 8/5/10, with attached      188
 8                  American Pain Foundation
                    Executive Summary
 9    Exhibit 18    E-mail chain, top dated 7/15/08,   196
                    from Burt Rosen, to Kimberly
10                  Tiller
      Exhibit 19    Document entitled "Exit Wounds"    203
11    Exhibit 20    Pain Brief Advocacy & Policy       210
                    Monthly, 2011
12    Exhibit 21    NUCENTA Immediate Release          215
                    (tepentadol) Launch Plan,
13                  Ketchum Public Relations, 7/8/09
      Exhibit 22    Partners Against Pain Magazine,    222
14                  Pain Matters, Issue 7
      Exhibit 23    Memorandum, 11/6/00, from Robin    224
15                  Hogan, to Mark Alfonso
      Exhibit 24    2012 Individual Objectives for     232
16                  Burt Rosen
      Exhibit 25    E-mail chain, top dated 5/29/97,   239
17                  from Michael Friedman, to
                    Michael Cullen
18    Exhibit 26    Excerpt from "Responsible Opioid   247
                    Prescribing, A Physician's
19                  Guide," by Scott Fishman, M.D.
      Exhibit 27    Letter, 6/8/12, from Federation    249
20                  of State Medical Board, to
                    Senators Baucus and Grassley
21    Exhibit 28    E-mail, 8/27/11, from Joshua       257
                    Horwitz, to Lisa A. Robin
22    Exhibit 29    Government's Memorandum for        266
                    Entry of Plea and sentencing,
23                  U.S. v. Cephalon
      Exhibit 30    Guilty Plea Agreement, U.S. v.     271
24                  Cephalon
      Exhibit 31    Incident Report Editing of         275
25                  Scott Fishman Pain Book
```

U.S. LEGAL SUPPORT
(877) 479-2484

Confidential                                                                JAN-MS-05485283

```
 1              SACRAMENTO, CALIFORNIA

 2           Tuesday, February 26, 2019 9:43 a.m.

 3

 4           THE VIDEOGRAPHER:  Good morning.  We are

 5     on the video record.  This is the recorded video

 6     deposition of Scott Fishman in the matter of State

 7     of Oklahoma versus Purdue Pharma, LP, et al.  It is

 8     being heard in the District Court of Cleveland

 9     County, State of Oklahoma.

10           The video is being taken on behalf of the

11     Plaintiffs.  The deposition is taking place at 4860

12     Y Street, Suite 3020, Sacramento, California, 95817

13     on February 26, 20019.  The time is 9:43.  My name

14     is Keigo Painter, I'm the videographer with U.S.

15     Legal Support located at 44 Montgomery Street,

16     Suite 550 in San Francisco, California.

17           Video and audio recording will be taking

18     place unless all counsel have agreed to go off the

19     record.  Would all present please present

20     themselves for the record beginning with the

21     witness.

22           THE WITNESS:  Scott Fishman.

23           MS. BALDWIN:  Lisa Baldwin for the State

24     of Oklahoma.

25           MS. CHURCHMAN:  Brooke Churchman with Nix,
```

Confidential                                                    JAN-MS-05485284

```
1    Patterson for the State.

2            MR. OXLEY:  Hi, Bill Oxley from Dechert.

3    I'm representing Purdue.

4            MR. ERCOLE:  Brian Ercole, Morgan Lewis on

5    behalf of the Teva defendant.

6            MR. EHSAN:  Houman Ehsan from O'Melveny &

7    Myers on behalf of the Johnson & Johnson

8    defendants.

9            MR. ZAKRZEWSKI:  Steve Zakrzewski of

10   Gordon & Reese for Scott Fishman.

11           MR. ROBINSON:  John Robinson of Gordon &

12   Rees for Dr. Fishman, accompanied Hannah Reed of

13   our Oakland office, also for Dr. Fishman on the

14   phone.

15           MS. REPORTER:  Would counsel on the phone

16   please state their appearance.

17           MR. SNYDER:  Ryan Snyder for O'Melveny &

18   Myers on behalf of Janssen.

19           MS. REED:  Hannah Reed from Gordon & Rees,

20   Oakland on behalf of Dr. Fisher.

21           MS. O'CONNOR:  Margaret O'Connor from

22   Dechert on behalf of Purdue.

23           THE VIDEOGRAPHER:  The certified court

24   reporter is Maryann Valenoti.  Would you please

25   swear in the witness.
```

Confidential                                                                    JAN-MS-05485285

SCOTT FISHMAN, M.D.
February 26, 2019                                          9

1                SCOTT FISHMAN, M.D.

2       having been first duly sworn, was examined and

3                 testified as follows:

4            MR. ROBINSON:  Just before we get going,

5    just for the record, there were efforts at a

6    document subpoena and a deposition subpoena for

7    Dr. Fishman served by the Purdue defendants in this

8    matter.

9            We have come to an agreement, which I will

10   not revisit in great detail.  It is the subject of

11   many e-mails which culminated in an agreement as it

12   relates to the deposition of Dr. Fishman continuing

13   beyond that as originally noticed and subpoenaed by

14   the Plaintiff in the State of Oklahoma, and we are

15   proceeding in accordance with that agreement.

16           My understanding is the State has up to

17   five hours of examination and that the collective

18   Defendants have up to six hours of examination

19   thereafter, based on our agreement.

20           There is certainly, at this point in time,

21   not a complete agreement as it relates to document

22   production, as it relates to a document subpoena

23   that was provided to counsel where service was

24   accepted, but the agreement as it relates to the

25   timing of the deposition and whether there would be

Confidential                                                    JAN-MS-05485286

1    ever any future attempts at deposition is in place.

2            MR. OXLEY:  Luckily, I'm blissfully

3    ignorant of the discussions about that, but I

4    totally accept your representations about what it

5    is.

6            MR. ROBINSON:  All right.  The only other

7    thing I'll say is neither Attorney Zakrzewski, nor

8    I are admitted in the state of Oklahoma, nor in the

9    state of California.  We have Hannah Reed, who is

10   admitted in the state of California, on the line.

11   We understand all parties agree there are no issues

12   with lack of Oklahoma or California admission by

13   those counsel in attendance.

14           MS. BALDWIN:  I agree.

15           MR. ERCOLE:  John, just for the record, I

16   know you mentioned the e-mail exchanges that we've

17   had regarding this particular agreement.  I think

18   they spell out some other issues regarding

19   potentially reopening the deposition, if you needed

20   it at a later date, depending on document-related

21   issues and subject to further discussions between

22   us.  But I just want to make sure that was clear,

23   and I think the e-mails will speak for themselves.

24   I just wanted to make sure.

25           MR. ROBINSON:  I agree there are

Confidential                                          JAN-MS-05485287

```
 1    conditions in the agreement that could allow
 2    potential for a future deposition after a dialogue
 3    among counsel.
 4         MS. BALDWIN:  And I will state for the
 5    record that I was not subject to any of these
 6    discussions, and I am not in agreement to keep the
 7    deposition open, but we can certainly visit about
 8    it at a later time.
 9         MR. ROBINSON:  Yeah, just for the record,
10    this has nothing to do with keeping this deposition
11    open.  It has to do with whether the three
12    defendants that are defending the Oklahoma case
13    will seek the deposition of this deponent in any
14    other case or elsewhere in the litigation.
15         MS. BALDWIN:  Okay.
16         MR. EHSAN:  Before we begin, can we agree
17    on the record that an objection by one of the
18    manufacturer Defendants will be considered an
19    objection by all of them, so we are not all
20    objecting while you are asking questions?
21         MS. BALDWIN:  For today's deposition, yes.
22         MR. ROBINSON:  Can we agree that an
23    objection by any party at all is good for all
24    parties so that we don't have to all -- all be
25    revisiting objections?
```

Confidential                                     JAN-MS-05485288

SCOTT Fishman, M.D.
February 26, 2019                                    12

1           MS. BALDWIN:  So you're saying you want to

2    agree that if you object, that preserves the

3    objection of the Defendant?

4           MR. ROBINSON:  If the Defendants object to

5    something, do you want me to -- if I happen to

6    object -- I mean, Dr. Fishman is a Defendant in

7    other cases, even though not a Defendant in this

8    case in the country.  So if a question is posed

9    that I want to object to, I need to preserve that.

10   But if they object on the same basis, are we in

11   agreement that once one party objects, it's

12   accomplished, and I don't need to revisit the same

13   objection?

14          MS. BALDWIN:  That's fine.  That's fine.

15          MR. ROBINSON:  Okay.  Thanks.

16                    EXAMINATION

17   BY MS. BALDWIN:

18      Q.   We just met previously, but can you please

19   state your name on the record for the judge and

20   jury?

21      A.   Scott Fishman.

22      Q.   And what is your current position?

23      A.   I'm professor and executive vice chair of

24   the Department of Anesthesiology.  I'm the

25   Fullerton endowed chair of Pain Medicine here at UC

Confidential                                                           JAN-MS-05485289

1    Davis and the director of the Center for Advancing

2    Pain Relief.

3        Q.   And how long have you been in that

4    position?

5        A.   Well, I've been here at UC Davis 20 years

6    and various amounts of time for those different

7    titles.

8        Q.   Is it correct to say that you've been a

9    professor of anesthesiology at the University of

10   California, Davis since 2003?

11       A.   Yes.

12       Q.   And is it correct to say that you -- prior

13   to that, you were an associate professor of

14   anesthesiology at the University of California

15   Davis?

16       A.   Correct.

17       Q.   And prior to 1999, you were at

18   Massachusetts General Hospital?

19       A.   Yes.

20            MS. BALDWIN:  Did you swear in the

21   witness?

22            MS. REPORTER:  Yes.

23   BY MS. BALDWIN:

24       Q.   You understand that you are here to tell

25   the truth today as best you know it?

Confidential                                                  JAN-MS-05485290

```
 1        A.    Yes.

 2        Q.    You understand that I represent the State

 3   of Oklahoma in a litigation against certain opioid

 4   manufacturers, including Janssen and Johnson &

 5   Johnson, Ortho-McNeil, Teva, Cephalon, and related

 6   entities?

 7        A.    I do.

 8        Q.    And you understand that their -- those

 9   entities, those drug companies, are represented by

10   counsel that are sitting here in this room?

11             MR. EHSAN:  Object to form.

12             THE WITNESS:  I do.

13   BY MS. BALDWIN:

14        Q.    Do you understand that Janssen and Johnson

15   & Johnson, Ortho-McNeil, and related entities'

16   counsel is -- is present here today?

17        A.    I do.

18        Q.    Okay.  And you understand Teva and

19   Cephalon's counsel is present here today?

20        A.    Yes.

21        Q.    And that Purdue entities' counsel is

22   present here today?

23        A.    Yes.

24        Q.    Okay.  You understand that you are not a

25   Defendant in this lawsuit; correct?
```

Confidential                                                                    JAN-MS-05485291

SCOTT Fishman, M.D.
February 26, 2019                                        15

1        A.    I do.

2        Q.    And I'll represent to you that the State

3    has no intention of bringing you into this lawsuit

4    as a Defendant.

5        A.    I appreciate that.

6             MR. ERCOLE:  Objection.

7    BY MS. BALDWIN:

8        Q.    You're represented by your own counsel

9    today?

10       A.    Yes.

11       Q.    Have you ever spoken to me prior to this

12   deposition?

13       A.    Not that I know of.

14       Q.    Have you spoken to any of the lawyers in

15   this litigation for the State of Oklahoma prior to

16   this deposition?

17       A.    Not that I am aware of.

18       Q.    Prior to your deposition today, have you

19   spoken to any of the lawyers for the defending

20   companies in this litigation?

21       A.    Not that I am aware of.

22       Q.    Prior to your deposition today, have you

23   spoken to anyone at any of the Defendant companies,

24   any employees of those companies, in preparation

25   for your deposition today?

Confidential                                                    JAN-MS-05485292

SCOTT Fishman, M.D.
February 26, 2019                                          16

```
 1        A.    No.

 2        Q.    Would you agree that over the course of

 3   your professional career, that you have been paid

 4   to speak on behalf of pharmaceutical companies at

 5   various times?

 6             MR. ROBINSON:  Objection, form.

 7             MR. ERCOLE:  Same objection.

 8             THE WITNESS:  Can you say that again?

 9   BY MS. BALDWIN:

10        Q.    Yes.  You've spoken as a member of a

11   speakers' bureau or speakers' program on behalf of

12   opioid manufacturers during the course of your

13   career at some period of time.  Is that fair to

14   say?

15             MR. ROBINSON:  Objection to form.

16             MR. ERCOLE:  Same objection.

17             THE WITNESS:  Well, again, I'm just -- I'm

18   hung up on the word "on behalf of."  You know, I've

19   received compensation for teaching, but I don't

20   recall I've -- I've spoken on behalf of a company.

21   I've spoken on behalf of myself regarding knowledge

22   about pain management.

23   BY MS. BALDWIN:

24        Q.    Have you -- so is it correct to say you've

25   received payments from pharmaceutical companies to
```

Confidential                                                              JAN-MS-05485293

```
1    speak at various speaking programs, whether they be

2    lectures, symposiums --

3         A.   Yes.

4              MR. ERCOLE:  Objection to form.

5              MS. REPORTER:  I'm sorry, who was that?

6              MR. ERCOLE:  Me.

7              MS. REPORTER:  Thank you.

8              MS. BALDWIN:  Can we not -- I'm sorry.

9    Just -- it's a little disruptive to the record if

10   you ask every time who objected, so I don't know

11   how we can resolve this, if y'all can --

12             MS. REPORTER:  Well, he can speak up

13   louder.

14             MR. ERCOLE:  I'm happy to speak up louder.

15             MS. REPORTER:  I appreciate that.  Thank

16   you.

17   BY MS. BALDWIN:

18        Q.   So you say that's correct that you

19   received payments from pharmaceutical companies to

20   speak at various programs, whether they be lectures

21   or medical education symposiums, those sorts of

22   activities; is that correct?

23             MR. ERCOLE:  Object to form.

24             MR. ROBINSON:  Object to form.

25
```

Confidential                                                                    JAN-MS-05485294

SCOTT FISHMAN, M.D.
February 26, 2019                                          18

1    BY MS. BALDWIN:

2        Q.   And would those companies include Purdue

3    Pharma?

4        A.   Yes.

5        Q.   And would those companies include Janssen?

6        A.   Yes.

7        Q.   And would those companies include

8    Cephalon?

9        A.   I believe so.

10       Q.   Would they include Johnson & Johnson?

11       A.   Well, I think Janssen and Johnson &

12   Johnson are the same, but I think -- I don't know

13   that I've spoken for Johnson & Johnson separate

14   from Janssen, but I may have.

15       Q.   And would that include Teva

16   Pharmaceuticals?

17            MR. ERCOLE:  Objection to form.

18            THE WITNESS:  I don't believe Teva, but I

19   have spoken for Cephalon, which became Teva, so

20   prior to that.

21   BY MS. BALDWIN:

22       Q.   Over the course of your professional

23   career, have you been paid to participate in an

24   advisory board by pharmaceutical companies?

25       A.   Yes.

Confidential                                                          JAN-MS-05485295

SCOTT Fishman, M.D
February 26, 2019                          19

1        Q.   And would those companies include Purdue

2    Pharma?

3        A.   Yes.

4        Q.   And would they include Janssen?

5        A.   I believe so.

6        Q.   Would they include Cephalon?

7        A.   I believe so.

8        Q.   And over the course of your professional

9    career, have you been paid fees to act as a

10   consultant for pharmaceutical companies?

11            MR. ROBINSON:  Objection, form.

12            MR. EHSAN:  Same.

13            THE WITNESS:  Not outside of the speak --

14   doing speaking or being on a advisory board.

15   BY MS. BALDWIN:

16       Q.   So those consulting fees that you received

17   from a pharmaceutical company would relate to

18   either speaking at a lecture or medical education

19   course or participating in advisory board.  Is that

20   fair to say?

21            MR. EHSAN:  Objection.

22            MR. ROBINSON:  Objection to form.

23            MR. EHSAN:  Objection to form.

24            THE WITNESS:  And they were -- they were

25   honoraria.

Confidential                                              JAN-MS-05485296

SCOTT Fishman, M.D.
February 26, 2019                                    20

1    BY MS. BALDWIN:

2        Q.   So I'm just going to repeat that question

3    again.  The consulting fees that you received from

4    pharmaceutical companies would relate to speak --

5    speaking at a lecture, or speaking at some other

6    program, or participating in an advisory board of a

7    pharmaceutical company.  Is that fair to say?

8            MR. ERCOLE:  Objection to form.

9            THE WITNESS:  The payment that I received

10   was typically honoraria for a speaking engagement

11   or participating in an advisory board.

12   BY MS. BALDWIN:

13       Q.   You were involved in a group called the

14   American Pain Society; is that correct?

15       A.   Yes.

16       Q.   And you were a member of the board of the

17   American Pain Society from 2000 to 2004; is that

18   correct?

19       A.   Yes.  I think for 2003.  I think it was a

20   three-year term.

21       Q.   Do you understand that the Defendants in

22   this litigation provided funding to the American

23   Pain Society?

24       A.   Yes.

25           MR. ERCOLE:  Objection to form.

Confidential                                                          JAN-MS-05485297

```
 1    BY MS. BALDWIN:

 2        Q.   And they also -- they provided that

 3    funding to the American Pain Society during the

 4    time that you were a member of the board; correct?

 5        A.   Yes.

 6             MR. ERCOLE:  Objection to form.

 7    BY MS. BALDWIN:

 8        Q.   And the American Pain Society, that's an

 9    influential group; correct?

10             MR. ERCOLE:  Same objection.

11             THE WITNESS:  I'm not sure what you mean.

12    BY MS. BALDWIN:

13        Q.   Do you consider it influential?

14        A.   It's a multidisciplinary interprofessional

15    group of people interested in pain.  I suppose it's

16    influential.

17        Q.   You were involved -- also involved with a

18    group called the American Pain Foundation; correct?

19        A.   Yes.

20        Q.   You served on the board of the American

21    Pain Foundation?

22        A.   Correct.

23        Q.   And you were vice chair of the board of

24    the American Pain Foundation in 2006; correct?

25        A.   Yes.
```

Confidential                                                        JAN-MS-05485298

```
 1        Q.   I'm sorry, was that a yes?  I talked over

 2   you.

 3        A.   Yes, I'm sorry.

 4        Q.   And you were chair of the American Pain

 5   Foundation board from 2008 to 2011; is that

 6   correct?

 7        A.   Yes.

 8        Q.   You understand -- are you aware that

 9   pharmaceutical companies, including the Defendants

10   in this litigation, provided funding to the

11   American Pain Foundation?

12            MR. ERCOLE:  Objection to form.

13            THE WITNESS:  Yes.

14   BY MS. BALDWIN:

15        Q.   And that they provided that funding during

16   the time that you were a board member; is that

17   correct?

18            MR. ERCOLE:  Same objection.

19            THE WITNESS:  Yes.

20   BY MS. BALDWIN:

21        Q.   They provided that funding when you were

22   chair of the board and vice chair of the board; is

23   that correct?

24            MR. ERCOLE:  Same objection.

25            THE WITNESS:  Yes.
```

Confidential                                                                                    JAN-MS-05485299

SCOTT Fishman, M.D.
February 26, 2019                                          23

```
 1    BY MS. BALDWIN:

 2        Q.    Would you agree that the American Pain

 3    Foundation was an influential organization?

 4            MR. ROBINSON:  Objection to form.

 5            MR. ERCOLE:  Objection to form.

 6            THE WITNESS:  Yeah, the term "influential"

 7    is the -- what I'm struggling to understand what

 8    you mean.  The -- the -- both -- the American Pain

 9    Foundation was a consumer education and advocacy

10    group, so in that respect, it was seeking to

11    influence people by educating them and advocating

12    for them.

13    BY MS. BALDWIN:

14        Q.    Influencing the pain patients and

15    consumers; correct?

16        A.    Through education.

17            MR. EHSAN:  Objection, form.

18    BY MS. BALDWIN:

19        Q.    You were also involved with a group called

20    the American Academy of Pain Medicine; is that

21    correct?

22        A.    Yes.

23        Q.    And is it correct that you were on the

24    board of the American Academy of Pain Medicine from

25    2002 to 2007?
```

Confidential                                                      JAN-MS-05485300

1        A.    I believe so.

2        Q.    You were president-elect of the American

3    Academy of Pain Medicine for the year 2004 to 2005;

4    is that correct?

5        A.    I believe so.

6        Q.    And you were the president of the American

7    Academy of Pain Medicine for the year 2005 to 2006;

8    correct?

9        A.    I believe so, yes.

10        Q.    And then you continued to be a member of

11    that board until 2012; is that correct?

12        A.    There was a period where I wasn't on the

13    board, but I was brought back on for some period.

14    And I don't know the exact dates.

15        Q.    Does 2009 to 2012 sound familiar to you?

16        A.    About right, yeah.

17        Q.    You prepared a resume; correct?

18        A.    Yes.

19        Q.    I'm going to provide you what I'm marking

20    as Plaintiff's Exhibit 1, and I'll represent to you

21    that this was a resume that was provided to the

22    State in the course of this litigation.

23            (Exhibit 1 marked.)

24    BY MS. BALDWIN:

25        Q.    You can take a minute to look through it,

Confidential                                                    JAN-MS-05485301

SCOTT FISHMAN, M.D.
February 26, 2019                          25

```
 1    if you need to.
 2            MR. OXLEY:  I'm sorry, are those the only
 3    copies you have?
 4            MS. BALDWIN:  I only have three copies.
 5            MR. OXLEY:  Okay.
 6            MS. BALDWIN:  Can you all share?
 7    BY MS. BALDWIN:
 8        Q.   Is this resume a fair summary of your
 9    professional experience and work that you've done
10    over the years?
11        A.   Roughly.  Yes, roughly.
12        Q.   Did you create this document?
13        A.   I believe I did.
14        Q.   So you have no reason to believe there's
15    anything false within that document?
16        A.   Correct.
17        Q.   Prior to today, you've treated pain
18    patients; correct?
19        A.   Yes.
20        Q.   And you still treat pain patients?
21        A.   I do.
22        Q.   You have a background in psychiatry?
23        A.   Amongst other trainings.
24        Q.   Are you board-certified in psychiatry?
25        A.   I am.
```

Confidential                                    JAN-MS-05485302

```
1        Q.    And you have a background in
2    anesthesiology; correct?
3        A.    It's a subspecialty background in
4    anesthesiology, yes.
5        Q.    Is that also a board certification?
6        A.    In pain medicine, in the pain medicine
7    part.
8        Q.    So you also have a background in pain
9    medicine?
10        A.    Correct.
11        Q.    Are there any other areas that I haven't
12    mentioned in psychiatry, anesthesiology, and pain
13    medicine --
14        A.    Internal medicine.  I completed residency
15    training in internal medicine as well and had
16    received board certification earlier in my career.
17        Q.    And you spend a large part of your career
18    dealing with the treatment of pain.  Is that fair
19    to say?
20        A.    Yes.
21        Q.    Chronic pain?
22        A.    Yes.
23        Q.    Palliative care?
24        A.    Yes.
25        Q.    Cancer care?
```

Confidential                                                JAN-MS-05485303

SCOTT Fishman, M.D.
February 26, 2019                                    27

```
 1        A.    Yes.

 2        Q.    Acute pain?

 3        A.    Uh-huh.

 4        Q.    You've done quite a bit of education and

 5   publication in those areas?

 6        A.    Yes.

 7        Q.    You understand that because of your

 8   professional experience and your education and

 9   publications that you've done, that you are

10   influential in the area of pain medicine?

11             MR. ROBINSON:  Objection to form.

12             MR. ERCOLE:  Objection to form.

13             THE WITNESS:  I suppose.

14   BY MS. BALDWIN:

15        Q.    Would you disagree with that?

16        A.    Well, to some degree, you know, I have

17   done a lot of work that many may have seen.  I'm

18   one of many people doing this work.

19        Q.    So you're -- based on all of your

20   professional experience and the speaking that

21   you've done and the publications that you've done,

22   other -- other physicians or other healthcare

23   providers would look to you as influential.  Would

24   you agree with that?

25             MR. ROBINSON:  Objection to form.
```

Confidential                                                    JAN-MS-05485304

```
1              MR. ERCOLE:  Objection to form.

2              THE WITNESS:  I'll accept that.

3    BY MS. BALDWIN:

4       Q.   And you were viewed by other healthcare

5    professionals as an influential speaker when you

6    talked at lectures and medical education programs

7    on issues of pain management.  Would you agree with

8    that?

9              MR. ROBINSON:  Objection to form.

10             THE WITNESS:  I don't know how they viewed

11   me.  I just can't say I know how they viewed me.

12   BY MS. BALDWIN:

13      Q.   You were asked to speak publicly and in

14   medical education activities with quite a bit of

15   frequency.  Would you -- wouldn't you agree with

16   that?

17             MR. ERCOLE:  Objection to form.

18             THE WITNESS:  At times, yes.

19   BY MS. BALDWIN:

20      Q.   And so you were someone that was sought

21   after as a specialist, as a person knowledgeable on

22   those topics.  Would you agree with that?

23             MR. ERCOLE:  Objection to form.

24             THE WITNESS:  Again, I don't know how --

25   I'm not trying to be argumentative.  I don't know
```

Confidential                                                              JAN-MS-05485305

```
 1    how sought after I was, but I was frequently

 2    invited to -- to educate and lecture.

 3    BY MS. BALDWIN:

 4        Q.   So we talked about your -- you testified

 5    that you received funding from opioid manufacturers

 6    during the course of your career; correct?

 7             MR. ROBINSON:  Objection, form.

 8             MR. EHSAN:  Objection, form.

 9             THE WITNESS:  Yes.

10    BY MS. BALDWIN:

11        Q.   And sometimes is it true that those

12    payments were made to you by the pharmaceutical

13    company directly?

14        A.   I believe so.  It was a long time ago.

15        Q.   There was a period of time where the

16    pharmaceutical company would pay you directly for

17    speaking or at advisory boards?

18             MR. ROBINSON:  Objection to form.

19             MR. ERCOLE:  Objection to form.

20             THE WITNESS:  Yes, I believe so.

21    BY MS. BALDWIN:

22        Q.   And sometimes the pharmaceutical companies

23    would pay your honoraria to the University of

24    California, Davis.  Is that fair to say?

25             MR. ERCOLE:  Objection.
```

Confidential                                                    JAN-MS-05485306

```
1              MR. ROBINSON:  Objection.

2              THE WITNESS:  I don't recall if they did

3      that or not.

4      BY MS. BALDWIN:

5          Q.   You have no recollection?

6          A.   I don't have a recollection of them paying

7      it to the university.  It's possible.  You know, I

8      can see the situation in which I was on business

9      time, not on my own time, and then they would pay

10     the university honoraria.  But I don't recall that

11     happening.  It could have.

12         Q.   Could you describe what -- to the jury --

13     what honoraria is?

14         A.   Describe --

15         Q.   -- what honoraria is.

16         A.   Honoraria is -- is -- you know, there is a

17     definition, and I don't know that I can give it to

18     you accurately, but honoraria is usually a symbolic

19     payment for efforts to help out where you're not

20     really -- you're not working for the company, but

21     you are asked to do something, or by university,

22     where you are asked to come and speak.  It's not

23     supposed to be intended to cover your time

24     completely, so it's a symbolic financial gesture.

25         Q.   For the time that you -- for travel, is
```

Confidential                                                    JAN-MS-05485307

```
 1    that something different, the travel expenses?

 2        A.   Well, sometimes --

 3             MR. EHSAN:  Objection, form.

 4             MR. ROBINSON:  Objection, form.

 5             THE WITNESS:  Sometimes it would be

 6    included.  It would cover travel.  And other times

 7    they would pay for travel and out-of-pocket

 8    expenses and provide an honoraria.

 9    BY MS. BALDWIN:

10        Q.   So an honoraria would be a fee for your --

11    the time that you take to speak on a particular

12    activity?

13             MR. ROBINSON:  Objection.

14             THE WITNESS:  But I think rather than

15    payment, it's a symbolic payment.  So, for

16    instance, there is a payment that we'll give

17    speakers here at the university if they come from

18    out of town, you know, to speak, but it's not --

19    it's not tied to the time that it really takes to

20    do that work, because that would be much more than

21    any of us could pay.

22    BY MS. BALDWIN:

23        Q.   But it's some compensation?

24        A.   It's some compensation, yes.

25        Q.   When you have spoke at medical education
```

Confidential                                                              JAN-MS-05485308

 1   activities, are there times during your career

 2   where the pharmaceutical company has paid you

 3   directly for speaking at those medical education

 4   activities?

 5          MR. ROBINSON:  Objection.

 6          MR. ERCOLE:  Objection to form.

 7          THE WITNESS:  You know, again, this is

 8   going back 25 years.  I believe in the early days,

 9   that might happen, where pharmaceutical

10   representatives would pay the honorarium directly.

11   In the early days, you know, I would go to give a

12   grand round at a community hospital and, you know,

13   usually the hospital would pay the honoraria, and

14   the pharmaceutical companies would support the

15   hospital in doing so.  But I believe there may have

16   been times where the payment was direct.

17   BY MS. BALDWIN:

18      Q.   Okay.

19      A.   And I think, you know, when I was

20   associated with speakers' bureaus, which I didn't

21   do very much of, and I didn't do for very long,

22   those payments may have been direct from the

23   company.

24      Q.   When you're talking about the early

25   period, are you talking about the mid- to late

Confidential                                                          JAN-MS-05485309

1    1990s, perhaps early 2000s as well?

2        A.    Yes.

3              MR. ROBINSON:  Objection to form.

4              MR. ERCOLE:  Objection to form.

5              THE WITNESS:  That's correct.

6    BY MS. BALDWIN:

7        Q.    Was there a time period where that changed

8    from you receiving payments directly from a

9    pharmaceutical company, to the pharmaceutical

10   company paying the institution or medical education

11   company who then paid you?

12             MR. EHSAN:  Objection to form.

13             THE WITNESS:  So there was a time, you

14   know, in -- you're right with your timing, that in

15   the early 2000s to mid-2000s, that I became

16   uncomfortable with the transactions.  By, I think,

17   2007, I had stopped doing any kind of formal work

18   with Pharma, largely because increasingly there

19   was -- the situation was set up where they were

20   asking me to use their educational materials,

21   rather than my own, and it became a increasingly

22   frequent battle that I would only use my materials

23   and speak from my information, even though I might

24   use graphics or things that were available as they

25   pertained to the education that I chose to provide.

Confidential                                                                JAN-MS-05485310

```
 1          So I think there was FDA rules that
 2   happened at the FDA that forced Pharma's hand, that
 3   speakers had to use certain slides.  And at that
 4   point I stopped accepting those roles.  So there
 5   was -- you know, there was a period where that
 6   gradually shifted.
 7   BY MS. BALDWIN:
 8      Q.   So in the 1990s, early 2000s, you would
 9   receive payment from a pharmaceutical company,
10   including opioid manufacturer, to give a talk, and
11   you would be required to use their slides that they
12   provided to you for those talks?
13          MR. ROBINSON:  Objection to form.
14          MR. ERCOLE:  Objection to form, vague.
15          MR. ROBINSON:  Mischaracterizes the
16   testimony.
17          MR. ERCOLE:  Mischaracterizes.
18          THE WITNESS:  No, I didn't -- I wouldn't
19   use other slides, and I don't know if there was
20   ever an exception to that, but in general, you
21   know, I was very clear that when I did this work,
22   it was my independent work that I was doing.  So --
23   but as it became a battle to continue to be able to
24   do that, I just stopped doing it and increasingly
25   did less and less.  I know that's a contradiction
```

Confidential                                                    JAN-MS-05485311

SCOTT Fishman, M.D.
February 26, 2019                                            35

1    there, but --

2    BY MS. BALDWIN:

3        Q.    And my question wasn't trying to trick

4    you.  I was responding to your comment that you

5    said that you were uncomfortable with the fact that

6    pharmaceutical companies were requiring you to use

7    their slides.

8        A.    Correct.

9        Q.    So my question to you was:  Did that ever

10   happen to you, in the earlier time period, that you

11   were required to use a slide of a pharmaceutical

12   company when giving a talk?

13          MR. ROBINSON:  Objection to form.

14          Can you read that question back?

15          (Record read.)

16          THE WITNESS:  Would you like me to answer

17   that question?

18   BY MS. BALDWIN:

19       Q.    Yes.

20       A.    So I don't recall.  You know, I can't say

21   with absolute certainty that I didn't capitulate on

22   some -- you know, I mean, this was a battle, you

23   know, where the pharmaceutical companies felt like

24   they were being forced to be -- to make sure that

25   nobody was going off the reservation, or whatever

Confidential                                                                    JAN-MS-05485312

SCOTT Fishman, M.D.
February 26, 2019                                          36

```
 1    the reasons were.  But I tried very hard to make
 2    sure that it was just my independent work.  And I
 3    didn't feel like you were trying to change what I
 4    was saying, by the way.
 5        Q.   And that made -- using the slide that a
 6    pharmaceutical presented to you made you
 7    uncomfortable because those slides would
 8    potentially have the messaging, certain messaging,
 9    that a pharmaceutical would want in there that you
10    perhaps wouldn't agree with or wouldn't reflect
11    your opinions; is that correct?
12            MR. ERCOLE:  Objection to form,
13    mischaracterizes the testimony.
14            MR. ROBINSON:  Objection to form.
15    Counsel, the prefatory statement of "using a
16    slide," he didn't say he ever did it, and that's
17    how you opened the question.
18            MS. BALDWIN:  Just make a -- please make a
19    concise objection for the record.
20            MR. ROBINSON:  Okay.  Form.
21    BY MS. BALDWIN:
22        Q.   Is the reason that you were uncomfortable
23    with using the slides that a pharmaceutical company
24    would present to a speaker receiving honoraria for
25    a speak because those slides may contain messaging
```

Confidential                                                          JAN-MS-05485313

1    from the pharmaceutical industry that perhaps

2    didn't reflect your own opinions?

3            MR. ERCOLE:  Objection to form, vague,

4    ambiguous.

5            MR. ROBINSON:  Objection to form.

6            THE WITNESS:  I strive to make my work

7    independent, so I didn't feel comfortable using

8    other people's materials, you know, unless I really

9    knew how those materials had been formed and that I

10   was part of developing the materials that I

11   presented.

12   BY MS. BALDWIN:

13      Q.   I'm handing you what I marked as

14   Plaintiff's Exhibit 2.

15           (Exhibit 2 marked.)

16   BY MS. BALDWIN:

17      Q.   This is a document that was produced by

18   Purdue in this litigation.  The Bates number is

19   PPLP 003465695.  If you look at the second page, it

20   states that it's the letter agreement -- Letter of

21   Agreement; is that correct?

22           MR. ROBINSON:  Take as long as you need to

23   acclimate yourself to the documents provided to

24   you.  Just for the record, it's Bates 3465695

25   through 3465714.

Confidential                                                      JAN-MS-05485314

SCOTT Fishman, M.D.
February 26, 2019                                   38

```
 1              MS. BALDWIN:  I usually just use the first
 2   Bates number.
 3              MR. ROBINSON:  That's fine, but --
 4              MS. BALDWIN:  I'm not trying to trick
 5   anybody here.  Just so everybody can go locate it
 6   when they need to locate it.
 7              THE WITNESS:  So I've reviewed it.
 8   BY MS. BALDWIN:
 9      Q.   If you turn to Page 2, it says at the top,
10   it says a "Letter of Agreement"; is that correct?
11      A.   Uh-huh.
12      Q.   It looks like it's from Purdue Pharma; is
13   that correct?
14      A.   Yes.
15      Q.   And it states, "This letter will serve as
16   an agreement between University of California,
17   Davis, (hereinafter 'Provider,') and Purdue Pharma,
18   (hereinafter 'Company,') whereby the Company will
19   provide funding to the Provider in support of the
20   following continuing medical education program:
21   University of California Davis/UCD Health System
22   Continuing Medical Education, The War on Pain
23   Review and Update of Pain and Palliative Medicine";
24   is that correct?
25      A.   Yes.
```

Confidential                                                                                     JAN-MS-05485315

1       Q.   And it also looks like, from this

2   document, that Purdue provided a grant to UC Davis

3   for $1500; is that correct?

4       A.   That's what it says.

5       Q.   If you turn to Bates number ending in

6   5710.

7       A.   5710?

8       Q.   Uh-huh.  It says, "UC Davis Review and

9   Update of Pain and Palliative Care Medicine."  Do

10  you see that?

11      A.   I do.

12      Q.   And it lists the chair as Scott Fishman,

13  M.D.; is that correct?

14      A.   The chair of one of the days, but yes.

15      Q.   The chair of --

16      A.   Saturday.

17      Q.   -- Saturday, June 10, 2006; is that

18  correct?

19      A.   Uh-huh.  Uh-huh.  Yes.

20      Q.   Is this an example of a situation where

21  Purdue would provide a grant to UC Davis for a

22  medical education program that you were involved

23  with?

24      A.   Yes.

25      Q.   Okay.  In the situation where Purdue

Confidential                                                    JAN-MS-05485316

SCOTT Fishman, M.D.
February 26, 2019                                    40

1    provides a grant to the University of California,

2    Davis for a medical education program that you are

3    involved in, what is that money used for?

4              MR. OXLEY:  Objection, form, overbroad.

5              THE WITNESS:  I'm happy to answer that.

6    So this is -- this is funding that's sought by our

7    CME office, not my office.  If you look at the

8    continuing medical education courses that are run

9    by universities throughout the country, they're all

10   seeking help, because it's hard to make -- it's

11   hard to make ends meet when you do a course like

12   this.  I don't know where this one was, but they're

13   expensive.

14             So I assume the money that was raised in

15   support of this course basically went to its bottom

16   line of, you know, hiring a hall, doing marketing

17   and, you know, covering the costs of putting on the

18   course.  This isn't money that's tied to me, and I

19   think previously you asked me about would there be

20   honorarium to me that would come to the university.

21   That wouldn't be the same thing as this.

22             I don't know if that happened, but this is

23   the CME office putting on a course.  We're doing

24   the teaching, and they're seeking funding to help

25   them fray the costs of putting on the course.

Confidential                                                          JAN-MS-05485317

SCOTT Fishman, M.D.
February 26, 2019                                           41

1    BY MS. BALDWIN:

2        Q.    So did UC Davis receive funding in the

3    form of grants from pharmaceutical companies,

4    including opioid manufacturers, to put on medical

5    education courses during your career, that you can

6    recall?

7              MR. ERCOLE:  Objection to form.

8              THE WITNESS:  Yes.

9    BY MS. BALDWIN:

10       Q.    Do you know how many times that occurred?

11             MR. EHSAN:  Same objection.

12             THE WITNESS:  How many times of what?

13   BY MS. BALDWIN:

14       Q.    How many times that situation would occur,

15   where the university would request from an opioid

16   manufacturer to put on a medical education program

17   that would receive funding from an opioid

18   manufacturer?

19             MR. ROBINSON:  Objection.

20             THE WITNESS:  Specifically from an opioid

21   manufacturer?

22             MR. ERCOLE:  Objection to form.

23             THE WITNESS:  I don't -- you know, we

24   probably stopped -- we didn't do as many courses

25   after 2006, and we completely stopped getting

Confidential                                      JAN-MS-05485318

```
 1    outside industry support for our courses.  Most

 2    other courses get industry funding.  So I can't

 3    tell you how many times that happened.

 4           In the past, prior to that, we would seek

 5    funding -- I think our CME office would seek

 6    funding by any company that would want to support

 7    the course.  So opioid manufacturers, other

 8    analgesic manufacturers, analgesic instrument

 9    device companies, et cetera.

10    BY MS. BALDWIN:

11        Q.   So that was a common practice, you would

12    say?

13        A.   Yes.

14             MR. ROBINSON:  Objection.

15             MR. EHSAN:  Join.

16    BY MS. BALDWIN:

17        Q.   I'm going to show you what I marked as

18    Exhibit 3.

19             (Exhibit 3 marked.)

20    BY MS. BALDWIN:

21        Q.   Exhibit 3 is Bates-stamped JAN-MS-00483184

22    through 85.  And it's an e-mail chain.  Just let me

23    know when you are finished reading it before I ask

24    you any questions.

25        A.   (Witness nods head.)
```

Confidential                                                     JAN-MS-05485319

1        Q.   If you turn to the second page, this is an

2    e-mail from you, Dr. Fishman, dated August 23,

3    2010; correct?

4        A.   Yes.  I'm sorry, yes.

5        Q.   It's to someone at Janssen; is that

6    correct?

7        A.   I believe so.

8        Q.   Okay.  And the subject is, "Contract from

9    Janssen Pharma Japan Invitation to Participate as

10   Expert in Ad Board in Montreal on August 30th";

11   correct?

12       A.   Yes.

13       Q.   And in the e-mail, you write, "I would ask

14   that you please make my honorarium payment to

15   either my university, Regents of the University of

16   California, or to the American Pain Foundation;

17   otherwise, I cannot accept the honorarium."  Did I

18   read that correctly?

19       A.   Yes.

20       Q.   Is this a situation where you were

21   participating in a Janssen advisory board, and you

22   asked that your honorarium be paid to the

23   university or the American Pain Foundation rather

24   than to you personally?

25       A.   Yes.  But I can give you some background

Confidential                                                                   JAN-MS-05485320

1    on that, if you'd like.  This is unusual, but yes.

2        Q.    That did occur here?

3        A.    That is correct, yes.

4        Q.    So there are instances where that did

5    occur --

6        A.    Yes.

7        Q.    -- correct?

8              And this was in 2010; correct?

9        A.    Correct.  This was a unique -- this was a

10   unique situation.

11       Q.    Are you familiar with the university's --

12   I believe it's the University of California, Davis'

13   Run for Pain?

14       A.    Yes.

15       Q.    Is that something that still occurs today?

16       A.    No.

17       Q.    Do you recall an opioid manufacturer

18   providing grant funding -- well, providing grant

19   funding to the University of California for that

20   program?

21       A.    There are many companies that provided

22   support.  I don't think they were grants, but there

23   was support.

24       Q.    I'm showing you what I've marked as

25   Plaintiff's Exhibit 4.

Confidential                                                                JAN-MS-05485321

1                (Exhibit 4 marked.)

2       BY MS. BALDWIN:

3           Q.    This is a Cephalon memo Bates-stamped TEVA

4       OK 01465610 through 01465625; correct?  Have you

5       had a chance to review the document?

6           A.    I have.

7           Q.    This is a memo to legal department from

8       Kimber Titus dated January 25, 2007; is that

9       correct?

10              MR. ERCOLE:  Objection to form,

11      foundation.

12              THE WITNESS:  Yes.

13      BY MS. BALDWIN:

14          Q.    And it's -- the subject is "Fully executed

15      agreements for archiving in central files."

16              MR. ERCOLE:  Same objection.

17      BY MS. BALDWIN:

18          Q.    Correct?  Is that correct, sir?

19              MR. ERCOLE:  Same objection.

20              THE WITNESS:  I accept that

21      representation.  I'm not sure.

22      BY MS. BALDWIN:

23          Q.    If you turn to Page 2, this is an

24      agreement between Cephalon and the University of

25      California, Davis to provide independent

Confidential                                                      JAN-MS-05485322

1    educational program; is that correct?

2        A.   Yes.

3             MR. ERCOLE:  Objection to form,

4    foundation.

5    BY MS. BALDWIN:

6        Q.   That was a medical education program?

7        A.   Correct.

8        Q.   And Cephalon provided a grant to the

9    University of California, Davis in the amount of

10   $9,500; is that correct?

11            MR. ERCOLE:  Objection to form,

12   foundation.

13            THE WITNESS:  Yes, that's what's here.

14   BY MS. BALDWIN:

15       Q.   This was for a conference entitled

16   "Review of Pain Medicine in Southern Nevada,

17   Virginia, and Surrounding Area Physicians

18   Clinicians, Las Vegas, Nevada"?

19       A.   Yes.

20       Q.   Is that correct?

21            Is this another example of a medical

22   education program that you spoke at where a grant

23   was provided to the University of California,

24   Davis?

25       A.   Yes.

Confidential                                          JAN-MS-05485323

```
 1        Q.   You said this was typical in the later

 2   2000s to the present?

 3            MR. ROBINSON:  Objection to form.

 4            MR. ERCOLE:  Objection to form,

 5   mischaracterizes testimony.

 6            THE WITNESS:  This is probably the tail

 7   end of that work that we did.

 8   BY MS. BALDWIN:

 9        Q.   That you did 2007?

10        A.   Around there, yeah.

11            MR. ROBINSON:  Objection, form.

12   BY MS. BALDWIN:

13        Q.   Is this how, generally speaking, just

14   based on your professional experience and you've

15   done a lot of medical education activities, is this

16   format for funding medical education, would you

17   call that pretty common?

18        A.   Yes.

19            MR. ERCOLE:  Objection to form.

20   BY MS. BALDWIN:

21        Q.   Where the pharmaceutical company pays an

22   institution or a medical education company a grant,

23   and then that medical education company pays a

24   speaker who presents the medical education?

25            MR. ERCOLE:  Objection to form.
```

Confidential                                                          JAN-MS-05485324

Scott Fishman, M.D.
February 26, 2019                                    48

1              MR. ROBINSON:  Objection, form.

2              THE WITNESS:  And an arm's length in

3      between.

4      BY MS. BALDWIN:

5          Q.   That's how it works?

6          A.   Yes.

7          Q.   I believe you testified that, in your

8      early years, you did participate on some speakers'

9      bureaus?

10         A.   I believe so.

11         Q.   Okay.  Did you participate on Purdue's

12     speaker bureau?

13         A.   So I've got to say that I can't be

14     certain, because I actually am not even sure what a

15     speaker bureau is.  There's that -- that title

16     sounds like a very formal group, where you would

17     have a contract and be part of something.  That --

18     that I was never part of, but I believe that they

19     viewed certain people as their speakers, and they

20     would come to them with programs.  I was one of

21     those people, and they would come to me with

22     speaking opportunities.

23         Q.   Okay.  I'm showing what I've marked as

24     Plaintiff's Exhibit 5.  Hold on.  I gave you the

25     wrong one.  I'm sorry.

Confidential                                                    JAN-MS-05485325

SCOTT Fishman, M.D.
February 26, 2019                                    49

1              (Exhibit 5 marked.)

2      BY MS. BALDWIN:

3          Q.   Have you had a chance to review the

4      document?

5          A.   Yes.

6               MR. ROBINSON:  Folks on the phone, can you

7      mute your phone?

8      BY MS. BALDWIN:

9          Q.   Have you had a chance to review it?

10         A.   (Witness nods head.)

11         Q.   This is a document titled "NUCYNTA and

12     NUCYNTA ER 2012 Business Plan, December 20, 2012";

13     is that correct?

14              MR. EHSAN:  Objection to form.

15              THE WITNESS:  That's what it says.

16     BY MS. BALDWIN:

17         Q.   Do you know what NUCYNTA is?

18         A.   I do.

19         Q.   What is NUCYNTA?

20         A.   NUCYNTA is a complex drug that has opioid

21     properties and other analgesic pharmacological

22     properties.

23         Q.   And do you know what NUCYNTA ER is?

24         A.   It's an extended release form of NUCYNTA.

25         Q.   If you turn to Page 2, you see the

Confidential                                    JAN-MS-05485326

1    objectives of this business plan are, "Review and

2    gain alignment in 2012 tactics that support

3    identified strategic imperatives."  Do you see

4    that?

5           MR. OXLEY:  Object to form.

6    BY MS. BALDWIN:

7       Q.   "Identify areas of opportunity for further

8    exploration"; is that correct?

9           MR. EHSAN:  Same objection.

10          THE WITNESS:  Yes.

11   BY MS. BALDWIN:

12      Q.   "Align on timing and roles, responsibility

13   of tactical execution."  Do you see that?

14          MR. EHSAN:  Object to form.

15          THE WITNESS:  Yes.

16   BY MS. BALDWIN:

17      Q.   And then if you turn to the next page, it

18   says "2012 Business Plan"; correct?

19          MR. EHSAN:  Same objection.

20          THE WITNESS:  Yes.

21   BY MS. BALDWIN:

22      Q.   And then if you turn forward a few pages

23   to Page 6, you see there is a NUCYNTA ER

24   prescription forecast?

25          MR. EHSAN:  Objection to form.

Confidential

JAN-MS-05485327

```
 1              MR. ROBINSON:  Page 6?

 2              THE WITNESS:  Yes.

 3   BY MS. BALDWIN:

 4       Q.   If you turn to Page 8, there is a slide

 5   called, "What We've Learned from Our Customers'

 6   Market Research, 2Q 2011."  Do you see that?

 7              MR. EHSAN:  Objection to form.

 8              THE WITNESS:  I do.

 9   BY MS. BALDWIN:

10       Q.   And there's -- there's three boxes:

11   "Mindset Perspective, Behavioral Characteristics,

12   and NUCYNTA Selling Efforts."  Do you see that?

13              MR. EHSAN:  Objection to form.

14              THE WITNESS:  I do.

15   BY MS. BALDWIN:

16       Q.   Can you read the second bullet point under

17   "NUCYNTA Selling Efforts"?

18       A.    "Speaker programs often trigger first

19   use."

20       Q.   Did you know that Janssen was using

21   speaker programs to trigger prescribing of

22   healthcare providers for NUCYNTA and NUCYNTA ER?

23              MR. ROBINSON:  Objection to form.

24              MR. EHSAN:  Objection to form.

25              THE WITNESS:  I did not.
```

Confidential                                                    JAN-MS-05485328

```
1    BY MS. BALDWIN:
2        Q.   Does that surprise you?
3             MR. EHSAN:  Same objection.
4             MR. ROBINSON:  Objection.
5             THE WITNESS:  You know, it doesn't please
6    me.  I'm sad to say it doesn't surprise me.  But,
7    yeah, it's a reason.
8    BY MS. BALDWIN:
9        Q.   Why doesn't it please you?
10       A.   You know, that's -- I think as I gradually
11   stopped doing speaker programs and wanting to use
12   pharma programming, their job is to sell drugs, and
13   my job is to educate.  And they're different.  So I
14   wouldn't want to be cross-fertilized in that -- you
15   know, in that field.
16       Q.   When you were speaking on behalf of
17   pharmaceutical companies earlier in your career,
18   did you know that the pharmaceutical companies'
19   goal in having you speak was to trigger first use
20   of their opioid prescription?
21            MR. ROBINSON:  Objection, form.
22            MR. ERCOLE:  Objection, form, vague,
23   overbroad.
24            THE WITNESS:  No.
25
```

Confidential                                           JAN-MS-05485329

1    BY MS. BALDWIN:

2       Q.   If you knew that, would you have done

3    those speaking programs?

4            MR. EHSAN:  Same objections.

5            MR. ERCOLE:  Same objections.

6            MR. ROBINSON:  Objection.

7            THE WITNESS:  You know, it's a tricky

8    question.  I always felt like my -- my education

9    was my independent beliefs, and I'm not sure

10   pharmaceutical companies agreed with what I taught.

11   So, you know, it's really -- it depends.  The

12   question depends.  But I think if I knew that I was

13   simply being paid to stimulate prescribing, I

14   probably wouldn't accept that, those roles.  My

15   belief was I was receiving compensation for -- for

16   education, independent education.

17   BY MS. BALDWIN:

18      Q.   But that was the goal of the

19   pharmaceutical company; correct?

20           MR. ROBINSON:  Objection.

21           MR. EHSAN:  Objection.

22           MR. ERCOLE:  Object to form, foundation.

23           MS. REPORTER:  Okay, wait.  Hold on.

24           MS. BALDWIN:  Okay.  I understand you

25   don't like my questions, but I'm asking the witness

Confidential                                                    JAN-MS-05485330

SCOTT Fishman, M.D.
February 26, 2019                                          54

1    questions.  The record needs to reflect his answers

2    without your objections interfering with my

3    questions or his answer.  So just state your

4    objection after I speak.  Please don't interrupt

5    him, and please don't interrupt me.

6            MR. ERCOLE:  We're interrupting you, and

7    the fact that you just now broke off script to give

8    some lecture about objecting and not objecting is

9    part of the problem here.

10           We're going to object, and we'll make sure

11   you get your question out before we object.

12           To the extent I stepped on your question,

13   I will -- it has nothing to do with liking your

14   questions or not liking your questions.

15           MS. BALDWIN:  I'm going to object to your

16   sidebar.  I'm going to go back and ask that

17   question again.

18   BY MS. BALDWIN:

19      Q.   Dr. Fishman, you stated, "I think if I

20   knew that I was simply being paid to stimulate

21   prescribing, I probably wouldn't accept those

22   roles."  And my question to you was:  "But that was

23   the goal of the pharmaceutical company; correct?"

24           MR. ROBINSON:  Objection to form.

25           MR. EHSAN:  Objection to form.

Confidential                                                          JAN-MS-05485331

SCOTT Fishman, M.D.
February 26, 2019                                    55

```
1              MR. ERCOLE:  Objection to form.

2              THE WITNESS:  That was never a goal that I

3      thought was the premise of the programs that I

4      participated in.

5      BY MS. BALDWIN:

6         Q.   But that's the goal as indicated in this

7      2012 business plan; correct?

8         A.   As indicated here --

9              MR. EHSAN:  Object to the form of the

10     question.

11             Again, Counsel, I have the right to object

12     to your questions, and I --

13             MS. BALDWIN:  Yes, you do.  Wait until my

14     question's finished.  Object --

15             MR. EHSAN:  I waited until your question

16     was finished.  I can't help it if Dr. Fishman

17     chooses to answer the question while I'm objecting

18     to that question.

19             MR. ROBINSON:  Doctor, as you are seeing,

20     it is common that objections are interposed after

21     the question.  So if you can, try to allow for a

22     pause to determine if there's going to be an

23     objection interposed before you provide your

24     response, and then we can get a clean record.

25
```

Confidential                                                                        JAN-MS-05485332

1    BY MS. BALDWIN:

2        Q.   Dr. Fishman, I apologize.  I'm going to

3    ask you this question again.  You stated, "I think

4    if I knew that I was simply being paid to stimulate

5    prescribing, I probably wouldn't accept those

6    roles."  My question to you was:  "But that was the

7    goal of the pharmaceutical company; correct?"

8            MR. EHSAN:  Objection to the form of the

9    question.

10           MR. ERCOLE:  Same objection.

11           THE WITNESS:  If your question is, is the

12   goal of pharmaceutical companies to sell their

13   drugs, I would say yes.  If the question is, was

14   the goal of the roles that I played in educating

15   clinicians to sell drugs, I would say no.

16   BY MS. BALDWIN:

17       Q.   I'm just asking you what the

18   pharmaceutical company's goals was, not what your

19   goals are, as indicated -- as reflected in this

20   Page 8 that you are reading from.

21           MR. ERCOLE:  Objection to form, calls for

22   speculation, lack of foundation.

23           THE WITNESS:  But I have no knowledge of

24   what their goals are, other than what you showed me

25   here on this page.

Confidential                                                        JAN-MS-05485333

1    BY MS. BALDWIN:

2        Q.   And here on this page, it says, "NUCYNTA

3    selling efforts:  Speaker programs often trigger

4    first use"; correct?

5             MR. EHSAN:  Same objections.

6             THE WITNESS:  Correct.

7    BY MS. BALDWIN:

8        Q.   And you said that didn't surprise you to

9    see that.  Can you explain what you meant when you

10   said that didn't surprise you?

11            MR. EHSAN:  Objection to the form.

12            MR. ROBINSON:  Objection.

13            THE WITNESS:  Well, I think that -- you

14   know, I don't know how deep you want me to go into

15   this.  I think we have a problem in America with

16   our -- how we -- how medicine interacts with

17   industry.  Industry's goal is to sell products, and

18   medicine's goal is to do the best we can for our

19   patients.  We can't do our job without industry

20   producing the drugs that we need to treat

21   patients -- in part, the drugs to treat patients.

22   So it's an uncomfortable alliance.

23            With that said, you know, I think that

24   pharmaceutical companies are in business, and

25   they're focused on their bottom line.  Our bottom

Confidential                                                                    JAN-MS-05485334

```
 1    line in medicine is to provide the best care

 2    possible for our patients, period, in trying to be

 3    blind to those other conflicts that might arise.

 4           But it doesn't surprise me that there are

 5    companies out there that are going to push that

 6    line and try to sell their drugs at any cost.

 7    There are examples of companies out there that --

 8    right now that aren't in this room or aren't

 9    represented here that have -- that it seems have

10    gone way over, over the line.

11           So I don't have any direct knowledge or

12    experience with how pharmaceutical companies market

13    their drugs, but it doesn't surprise me that

14    they're trying to find any advantage they can.

15    BY MS. BALDWIN:

16       Q.   In your professional experience working

17    with other physicians that were involved in

18    speaking programs at this time and received

19    honoraria from pharmaceutical companies,

20    specifically opioid manufacturers like Janssen and

21    Cephalon and Purdue, do you think, just in your

22    professional experience, that the speakers knew

23    that internally the goal for their speaker programs

24    was to trigger first use of opioid prescription?

25           MR. ERCOLE:  Objection to form.
```

Confidential                                                    JAN-MS-05485335

SCOTT FISHMAN, M.D.
February 26, 2019                               59

```
 1              MR. ROBINSON:  Objection to form.
 2              MR. ERCOLE:  Calls for speculation, lack
 3    of foundation, vague, ambiguous, probably every
 4    other objection, too.
 5              THE WITNESS:  I have no idea what they --
 6    what other speakers know.
 7    BY MS. BALDWIN:
 8       Q.   But at the time you were doing this, you
 9    didn't know?
10              MR. ERCOLE:  Same objection.
11              MR. EHSAN:  Same objection.
12              THE WITNESS:  No.
13    BY MS. BALDWIN:
14       Q.   And would you have been okay with that had
15    you known?
16              MR. EHSAN:  Same objection.
17              THE WITNESS:  I doubt it.
18    BY MS. BALDWIN:
19       Q.   We're talking about opioids, which are a
20    controlled substances as you know; correct?
21              MR. ERCOLE:  Objection to form.
22              THE WITNESS:  Correct.
23    BY MS. BALDWIN:
24       Q.   And paying a speaker to encourage a
25    physician to prescribe a controlled substance
```

Confidential                                                            JAN-MS-05485336

```
 1    solely to make money is inappropriate.  Do you

 2    agree with that?

 3            MR. ERCOLE:  Same objection.

 4            MR. ROBINSON:  Same objection.

 5            THE WITNESS:  It's inappropriate and

 6    unprofessional.

 7    BY MS. BALDWIN:

 8       Q.   When you were speaking at medical

 9    education activities, symposia, lectures, and

10    presenting education on pain treatment and pain

11    management, was it your intention to influence the

12    prescribing habits of the audience, particularly

13    the healthcare providers that were able to

14    prescribe controlled to -- narcotics?

15            MR. ROBINSON:  Objection.

16            MR. ERCOLE:  Same objection.  Object to

17    form.

18            THE WITNESS:  It was my intention to help

19    these providers, these clinicians, think through

20    the prescribing decisions they needed to make and,

21    you know, on both the side of not being afraid to

22    use them when the benefits outweigh the risk, but

23    also to be cautious about the risks and not use

24    them when, you know, the treatment's worse than the

25    disease.  So it's really both sides, but at some
```

Confidential                                                        JAN-MS-05485337

```
 1    point it was education around how to responsibly

 2    use these medications.

 3    BY MS. BALDWIN:

 4       Q.   But it was not your intention to influence

 5    prescribing habits in the sense of encouraging the

 6    audience members to prescribe more opioids; is that

 7    correct?

 8       A.   No, nor was it my intention for them to

 9    prescribe any specific opioid.

10       Q.   Is it your understanding, though, that

11    pharmaceutical companies paying, whether directly

12    or indirectly, key opinion leaders to provide

13    medical education, that they were intending that

14    those lectures and speeches would increase the

15    prescribing habits of physicians that were in the

16    audience listening to those programs?

17            MR. ROBINSON:  Objection to form.

18            MR. ERCOLE:  Objection to form, calls for

19    speculation.

20            THE WITNESS:  Again, I -- I don't know

21    that they did or not.  What I can tell you is that

22    my belief was that pharmaceutical companies should,

23    and I think do, recognize that it's of interest

24    that these drugs are used safely and effectively.

25    So the teaching that I would give, regardless of
```

Confidential                                    JAN-MS-05485338

```
1    whether it increased or decreased the prescribing

2    of their drugs, was in their interest, because

3    if -- if we were to use these treatments

4    inappropriately, we would have a bad outcome.  And,

5    unfortunately, that bad outcome occurred.

6    BY MS. BALDWIN:

7        Q.   In part because these opioids were

8    prescribed inappropriately?

9        A.   Correct, excessively.

10            MR. ERCOLE:  Objection.  Same objection to

11   form.

12   BY MS. BALDWIN:

13       Q.   You would agree there is a problem of

14   overprescribing of opioids?

15       A.   Absolutely.

16       Q.   I'm going to show you what I'm marking as

17   Exhibit 6.

18            (Exhibit 6 marked.)

19   BY MS. BALDWIN:

20       Q.   Exhibit 6 includes both an e-mail and the

21   attachments to that e-mail.  And there is no Bates

22   number on the attachment, because it was produced

23   natively, so I will tell you what it is.  I have it

24   written down.

25            MS. BALDWIN:  And, yes, you can have a
```

Confidential                                                    JAN-MS-05485339

SCOTT Fishman, M.D.
February 26, 2019                                          63

```
1    copy.

2              MR. ROBINSON:  Thanks.  Do you want to

3    keep the clip on it so it stays as one exhibit?

4    It's a whole bunch of stuff.

5              MS. BALDWIN:  These are actually more than

6    one, I believe.  I think I only have two copies.

7              MR. ROBINSON:  How about we take one of

8    those clips and put it on what you handed him so

9    the exhibit stays intact?

10             MR. ERCOLE:  I need to see a copy of that.

11             MS. BALDWIN:  I don't have a copy.

12             MR. ERCOLE:  Can we make a copy so we can

13   actually follow along in the deposition?  Could we

14   pause, go off the record, and make a copy?

15             MS. BALDWIN:  Sure.  We can go --

16             MR. ERCOLE:  We need to follow what's

17   taking place.

18             MS. BALDWIN:  Are you okay with that,

19   gentlemen?

20             THE WITNESS:  Are we going to have to do

21   that every time we have a --

22             MS. BALDWIN:  This is one document that

23   for some reason --

24             MR. ROBINSON:  If this is going to happen

25   once, let's just get a copy, or a couple copies,
```

Confidential                                                            JAN-MS-05485340

SCOTT Fishman, M.D.
February 26, 2019                                    64

1    but I don't want to do that every time she pulls

2    out an exhibit.

3           MR. EHSAN:  Understood.  But, Counsel, you

4    understood that Dr. Fishman was represented, and

5    there were going to be many types of Defendants in

6    these depositions.

7           MS. BALDWIN:  You also understand that

8    sometimes when you are preparing for a deposition,

9    things happen.  And when you are gathering your

10   documents, someone may forget to put an extra copy

11   in.  And it's inadvertent, and it happens --

12          MR. EHSAN:  Understood.  I'm asking for

13   the same consideration when it's the other way

14   around.

15          MS. BALDWIN:  And I -- we're both offering

16   you consideration by agreeing to go off the record,

17   so let's do that.

18          MR. EHSAN:  It's not a consideration to go

19   off the record, because you are actually obligated

20   to provide me a copy of the exhibit you plan to

21   introduce to the witness, as part of the rules.

22   But thank you for nevertheless going off the record

23   to make a copy.

24          MS. BALDWIN:  Well, I guess we're just not

25   all as perfect as you are, so I apologize.  Let's

Confidential                                                          JAN-MS-05485341

```
 1    go off the record.

 2              THE VIDEOGRAPHER:  Off the record at

 3    10:49.

 4              (Recess taken.)

 5              THE VIDEOGRAPHER:  Going back on the

 6    record.  The time is 11:05.

 7    BY MS. BALDWIN:

 8       Q.   Dr. Fishman, you understand you're still

 9    under oath?

10       A.   Yes.

11       Q.   Before we took a break, I handed you what

12    I marked as State's Exhibit 6.  Do you need a

13    minute to look through it?

14       A.   I do.

15              MR. ROBINSON:  It's two sides.

16              THE WITNESS:  Okay.

17    BY MS. BALDWIN:

18       Q.   Exhibit 6 is two documents.  The first is

19    an e-mail, and this is an e-mail from Stephen

20    Cornwell from Janssen; is that correct?

21       A.   I believe so.  I'm not familiar with this

22    e-mail or Stephen Cornwell.

23       Q.   Right.  It's the first message at the

24    bottom of the first page.  It's dated February 1,

25    2005; is that correct?
```

Confidential                                                                                    JAN-MS-05485342

```
 1        A.    Yes.

 2        Q.    And it's to presumably another employee at

 3   Janssen?

 4              MR. EHSAN:  Object to form.

 5   BY MS. BALDWIN:

 6        Q.    And some other Janssen employees are cc'd

 7   in this e-mail.  Do you see that?

 8        A.    I do.

 9              MR. EHSAN:  Object to form.

10   BY MS. BALDWIN:

11        Q.    Do you know Stephen Cornwell or Dennis

12   Fitzgerald?

13        A.    No.

14        Q.    And the e-mail is attaching an Excel

15   spreadsheet containing KOL information that was

16   discussed the previous day.  Do you see that?

17              MR. EHSAN:  Object to form.

18              THE WITNESS:  Are you referring to the

19   table on the back side?

20   BY MS. BALDWIN:

21        Q.    I'm referring to the first sentence of the

22   e-mail that starts, "Dennis."

23        A.    I see where it says, "Below is an Excel

24   spreadsheet."

25        Q.    "Containing the KOL info we discussed
```

Confidential                                                              JAN-MS-05485343

1     yesterday."  Do you see that?

2          A.    I do.

3          Q.    And then in the next paragraph, it says,

4     "There are four different sources of info:  Primary

5     MKT research at RES" -- which I think means market

6     research -- "sales force, medical affairs, review

7     of literature, resulting in seven different

8     outputs, rankings," and there are four different

9     summaries of the data?  Do you see that?

10         A.    I do.

11              MR. EHSAN:  Object to form.

12              THE WITNESS:  I do.

13    BY MS. BALDWIN:

14         Q.    If you turn to the second page of the

15    e-mail, it appears to list the summaries in the

16    attached spreadsheet that include KOL overlap, top

17    50 individuals identified in the three key sources,

18    KOL combined data, mentions green sales pain KOL

19    listing, medical affairs pain KOL listing, and

20    leadership and pain in medicine KOL listing.  Do

21    your see that?

22         A.    I do.

23              MR. EHSAN:  Objection to form.

24              THE WITNESS:  I do.

25

Confidential                                                          JAN-MS-05485344

SCOTT Fishman, M.D.
February 26, 2019                                    68

1      BY MS. BALDWIN:

2         Q.   If you turn to the PowerPoint that was

3      attached to this e-mail, along with that

4      spreadsheet, and the Bates stamp for this

5      PowerPoint is JAN-MS-02533811.  It's called

6      "Duragesic KOL Mapping Analysis."  Do you see that?

7         A.   I do.

8         Q.   And on the bottom, there is a company

9      listed.  Can you tell me what that company is?

10             MR. EHSAN:  Objection to form.

11             THE WITNESS:  It says "marketRX."

12     BY MS. BALDWIN:

13        Q.   And above that?

14        A.   Janssen Pharmaceutical.

15        Q.   So we talked a little bit about the word

16     "KOL" earlier.  Do you understand what that term

17     means?

18        A.   I -- I don't think I understand all the

19     dimensions of what it means, but it's an acronym

20     for key opinion leader.

21        Q.   And is it your understanding that you are

22     identified as a key opinion leader?

23        A.   Yes.

24             MR. EHSAN:  Object to form.

25

Confidential                                                    JAN-MS-05485345

1    BY MS. BALDWIN:

2         Q.   And you are identified as a key opinion

3    leader by a pharmaceutical company?

4              MR. ROBINSON:  Objection.

5              MR. ERCOLE:  Objection to form.

6              THE WITNESS:  I don't have -- you know, I

7    don't know that I'm identified by -- I don't have

8    any direct knowledge, but I believe I'm considered

9    a key opinion leader across my field.  That

10   includes pharmaceutical companies.

11   BY MS. BALDWIN:

12        Q.   And you are considered a key opinion

13   leader by your peers?

14        A.   Correct.  That's right.  Yes.

15        Q.   If you turn to the first page of the

16   PowerPoint, it's titled "Business Objective";

17   correct?

18             MR. EHSAN:  Objection to form.

19             THE WITNESS:  Yes.

20   BY MS. BALDWIN:

21        Q.   I'm sorry --

22        A.   Titled "Background."

23        Q.   If you go to the third page of the

24   PowerPoint -- actually, it's Page 4.

25        A.   Yes.  Yes.

Confidential                                                                    JAN-MS-05485346

SCOTT Fishman, M.D.
February 26, 2019                                      70

1      Q.   Do you see it's titled "Business

2   Objective"?

3      A.   Yes.

4      Q.   What is the first business objective

5   listed there?

6           MR. EHSAN:  Object to form.

7           THE WITNESS:  "In order to target the most

8   influential physicians is pain management and to

9   maximize Duragesic prescribing that's produced by

10  physicians who are influenced by thought leaders."

11  BY MS. BALDWIN:

12     Q.   There's one more sentence.

13     A.   "Janssen needs to identify key opinion

14  leaders in chronic pain market at national level

15  and regional level, and to understand the overall

16  pattern and relative influence of KOLs on physician

17  prescribing."  That's what's written here.

18     Q.   Are you surprised to see that Janssen is

19  identifying key opinion leaders' influence and

20  their influence on physician prescribing?

21          MR. EHSAN:  Objection.

22          MR. ROBINSON:  Objection to form.

23          THE WITNESS:  Again, I don't think I'm

24  surprised, no.

25

Confidential                                                    JAN-MS-05485347

1    BY MS. BALDWIN:

2         Q.   Why are you not surprised?

3         A.   Well, again, as I said before, I think

4    that these companies are going to do whatever they

5    can to maximize their market share.  That's their

6    job.

7         Q.   Including using key opinion leaders to

8    influence physician prescribing?

9              MR. ROBINSON:  Objection.

10             MR. ERCOLE:  Objection to form.

11             MR. ROBINSON:  Form.

12             THE WITNESS:  Again, I don't have any

13   direct knowledge of that, but it doesn't surprise

14   me that you are showing me evidence that they, in

15   fact, are doing that.

16   BY MS. BALDWIN:

17        Q.   And that's what this PowerPoint is

18   showing; correct?

19             MR. EHSAN:  Object to form.

20             THE WITNESS:  It's suggesting that that's

21   what they should do.

22   BY MS. BALDWIN:

23        Q.   When you were speaking as a key opinion

24   leader to your peers and educating them on pain

25   management and the use of opioids in treating pain,

Confidential                                                              JAN-MS-05485348

```
 1    was it your understanding that you were speaking to

 2    influence their prescribing patterns?

 3            MR. ROBINSON:  Objection, form.

 4            MR. EHSAN:  Objection to form.

 5            MR. ERCOLE:  Same objection.

 6            THE WITNESS:  No.  At the time it was not

 7    my belief that that was my role.

 8    BY MS. BALDWIN:

 9       Q.  So Janssen never told you that your role

10    was to influence physician prescribing when you

11    were speaking at medical education activities;

12    correct?

13            MR. EHSAN:  Object to form.

14            THE WITNESS:  Yes.  I'm sorry.  Yes.

15    Certainly Janssen never told me that my role was to

16    increase prescribing of their products.

17    BY MS. BALDWIN:

18       Q.  Is that something that you would have

19    wanted to know at the time?

20            MR. ROBINSON:  Objection, form.

21            MR. EHSAN:  Form.

22    BY MS. BALDWIN:

23       Q.  Let's say, for example, that you had --

24    were speaking at a medical education activity that

25    was sponsored by Janssen, or in which they had paid
```

Confidential                                                      JAN-MS-05485349

SCOTT Fishman, M.D.
February 26, 2019                                    73

```
 1    you an honoraria to speak, would you have wanted to
 2    know that their internal business objective for you
 3    as a KOL was to influence physician prescribing?
 4           MR. EHSAN:  Object to form.
 5           THE WITNESS:  You know, again, I remained
 6    independent and agnostic of what they wanted.  It
 7    wasn't part of -- it didn't matter to me what they
 8    wanted.  My job was to provide the education that I
 9    thought the audience needed.  And oftentimes I
10    thought that they would not like what I presented,
11    but in the total sphere of things, what I presented
12    was a balanced approach to being safe.  And because
13    of that, you know, I assumed that's what they
14    wanted from me, but it really didn't matter.  I was
15    going to present what I was going to present.
16    BY MS. BALDWIN:
17       Q.   Do you think that they would have paid --
18    strike that.
19           Let's just go through this PowerPoint a
20    little bit more.  You see this is -- this
21    PowerPoint, if you go to the next page, it talks
22    about a methodology.
23       A.   Yes.
24       Q.   And it looks like Janssen sent out a
25    questionnaire to survey 1,000 physicians.
```

Confidential                                                                    JAN-MS-05485350

SCOTT FISHMAN, M.D.
February 26, 2019                                          74

1            MR. EHSAN:  Object to the form.

2    BY MS. BALDWIN:

3        Q.   Do you see that?

4        A.   Yes, Page 8.

5        Q.   Page 5.

6            MR. ROBINSON:  Are there page numbers?

7            MS. BALDWIN:  There are.  This one's hard

8    to see.

9            MR. EHSAN:  It's center bottom.

10            THE WITNESS:  Yes, I see that on Page 5.

11    BY MS. BALDWIN:

12        Q.   And that the doctors they recruited were

13    from the top six deciles of Duragesic prescribing;

14    is that correct?

15            MR. EHSAN:  Object to the form.

16    BY MS. BALDWIN:

17        Q.   Second bullet point.

18        A.   I see that.  I'm not sure what that means,

19    if they mean that the speakers were high

20    prescribers.

21        Q.   Did you -- did you -- do you have any

22    understanding or did you know that Purdue and

23    Janssen and Teva ranked physicians based on their

24    prescribing habits?

25            MR. ERCOLE:  Objection to form.

Confidential                                                    JAN-MS-05485351

Scott Fishman, M.D.
February 26, 2019                                          75

```
 1              MR. EHSAN:  Objection to form.

 2              THE WITNESS:  I did not.

 3    BY MS. BALDWIN:

 4       Q.   And that the higher -- the more

 5    prescriptions for their products and drugs sold,

 6    the higher the decile they would be in?

 7              MR. ERCOLE:  Objection to form.

 8              MR. ROBINSON:  Objection to form.

 9              THE WITNESS:  I did not know that.

10    BY MS. BALDWIN:

11       Q.   And usually the deciles were ranked from 1

12    to 10, 10 meaning that was the highest prescriber

13    of their opioid products.  Did you know that?

14       A.   I did not know that.

15              MR. ERCOLE:  Objection to form.

16    BY MS. BALDWIN:

17       Q.   So this shows that the Respondents were

18    asked to allocate points to factors that influenced

19    their overall prescribing in order of importance on

20    a scale of 100; correct?

21              MR. EHSAN:  Objection to form.

22              THE WITNESS:  Yes.

23    BY MS. BALDWIN:

24       Q.   And those factors included opinion

25    leadership; correct?
```

Confidential                                          JAN-MS-05485352

```
 1              MR. EHSAN:  Objection to form.

 2              THE WITNESS:  Yes.

 3   BY MS. BALDWIN:

 4       Q.   Journal articles?

 5              MR. EHSAN:  Objection.

 6              THE WITNESS:  Yes.

 7   BY MS. BALDWIN:

 8       Q.   CME or other events?

 9       A.   Yes.

10              MR. EHSAN:  Form, same.

11   BY MS. BALDWIN:

12       Q.   Sales rep detailing?

13              MR. EHSAN:  Same objection.

14              THE WITNESS:  Yes.

15   BY MS. BALDWIN:

16       Q.   And other factors?

17              MR. EHSAN:  Same objection.

18              THE WITNESS:  "Other" is the same as et

19   cetera, yes.

20   BY MS. BALDWIN:

21       Q.   And if you look at the fourth bullet

22   point, it states, "Each Respondent was asked to

23   list three national and three regional KOLs;

24   correct?

25       A.   Yes.
```

Confidential                                                    JAN-MS-05485353

```
 1            MR. EHSAN:  Same objection.
 2   BY MS. BALDWIN:
 3       Q.   If you turn to Page 6, the second bullet
 4   point under "Methodology" states, "They were also
 5   asked to provide statistics on some of the
 6   influencing factors for each of these specific
 7   relationships, such as number of events attended
 8   where that specific KOL spoke, number of articles
 9   read that were written by that specific KOL,
10   influence rating of that KOL on the Respondent's
11   prescribing using a scale of 1 to 10"; is that
12   correct?
13            MR. EHSAN:  Objection to form.
14            MR. ERCOLE:  Objection to form.
15            THE WITNESS:  It's what I see.
16   BY MS. BALDWIN:
17       Q.   Did you know that when you were a key --
18   that as a key opinion leader, you were being rated
19   internally by Janssen on a scale of 1 to 7
20   regarding how influential you were on physicians
21   prescribing?
22            Objection to form.
23            MR. EHSAN:  Objection to form.
24            THE WITNESS:  I did not.  Sorry.  I tried
25   to wait.
```

Confidential                                    JAN-MS-05485354

1    BY MS. BALDWIN:

2        Q.   Does that trouble you?

3             MR. EHSAN:  Same objection.

4             MR. ROBINSON:  Objection.

5             THE WITNESS:  Well, you know, again, I'm

6    not surprised.  It's, in part, you know, in my

7    evolution why I no longer do that kind of work.

8    And I'm very careful about what work I do in that

9    realm.  Had I known now what I knew then, I

10   probably wouldn't have done that work.

11   BY MS. BALDWIN:

12       Q.   Do you think maybe other key opinion

13   leaders that Janssen was rating internally from 1

14   to 7 based on how influential they were to their

15   peers' prescribing habits also might have not

16   wanted to engage with Janssen had they known this

17   information at the time?

18            MR. ROBINSON:  Objection to form.

19            MR. EHSAN:  Objection to form.

20            THE WITNESS:  I don't know.  I don't know

21   if they would or not.

22   BY MS. BALDWIN:

23       Q.   You have colleagues that are in pain

24   management; correct?

25       A.   I do.

Confidential                                                JAN-MS-05485355

1      Q.   And you worked with them for many years?

2      A.   Yes.

3      Q.   Do you believe that had they known this,

4    they would have wanted to engage with Janssen as a

5    key opinion leader?

6          MR. EHSAN:  Objection, calls for

7    speculation.

8          THE WITNESS:  I -- yeah, I don't know what

9    they would do or what they were thinking.

10   BY MS. BALDWIN:

11     Q.   If you turn to Page 8, it looks like they

12   sampled consistent of the -- the sample of 1,000

13   physicians were from five different regions;

14   correct?

15         MR. EHSAN:  Objection to form.

16         THE WITNESS:  Yes.

17   BY MS. BALDWIN:

18     Q.   And they broke down the Respondents by

19   specialty, and the majority were primary care

20   physicians; is that correct?

21     A.   Yes.

22         MR. EHSAN:  Same objection.

23         THE WITNESS:  Yes.

24   BY MS. BALDWIN:

25     Q.   And then there's -- on the following page,

Confidential                                                          JAN-MS-05485356

```
 1    there is a table that shows the number and

 2    percentage of doctors by Duragesic decile in each

 3    region.  Do you see that?

 4            MR. EHSAN:  Objection to form.

 5            THE WITNESS:  Yes.  Can you tell me what a

 6    "Duragesic decile" means?

 7            MR. ROBINSON:  You can't ask questions.

 8            THE WITNESS:  Sorry.

 9    BY MS. BALDWIN:

10       Q.   Well, again, did you know -- you didn't

11    know until I told you today that -- correct, that

12    Janssen ranked physicians based on how often they

13    prescribed their products; correct?

14       A.   Correct.

15            MR. EHSAN:  Objection to form.

16    BY MS. BALDWIN:

17       Q.   And it's typically on a scale of 1 to 10?

18       A.   Yes.

19            MR. EHSAN:  Objection to form.

20    BY MS. BALDWIN:

21       Q.   You didn't know that prior to today?

22            MR. EHSAN:  Objection to form.

23            THE WITNESS:  I think it was a scale of 1

24    to 7.  On Page 6 it says 1 to 7, but I did not know

25    that until today.
```

Confidential                                                          JAN-MS-05485357

```
 1   BY MS. BALDWIN:
 2       Q.   Yeah, 1 to 7 is the influence of a key
 3   opinion leader on prescribing.
 4       A.   Oh, I see.  Got it.
 5            MR. EHSAN:  Objection to form.
 6   BY MS. BALDWIN:
 7       Q.   This is a pretty --
 8       A.   Yeah, involved.
 9       Q.   This PowerPoint is a pretty involved
10   analysis of the influence of key opinion leaders on
11   physicians prescribing.  Would you -- wouldn't you
12   say?
13            MR. EHSAN:  Objection to form.
14            MR. ROBINSON:  Objection to form.
15            THE WITNESS:  Yes.
16   BY MS. BALDWIN:
17       Q.   If you turn to Page 12, do you see that
18   they -- Janssen did a point allocation summary.
19   "Each Respondent was asked to assign points based
20   on the level of influence of these parameters on
21   his prescribing.  The most influential factor was
22   assigned 100 points, and no two factors were to be
23   assigned the same value by a Respondent.  A summary
24   of the response is as follows in the next two
25   slides:  First one with overall results, and the
```

Confidential                                              JAN-MS-05485358

```
 1    second one by specialty group of Respondent";

 2    correct?

 3              MR. EHSAN:  Objection to form.

 4              THE WITNESS:  Yes.

 5    BY MS. BALDWIN:

 6        Q.   Give you an example of Question 10:

 7    "Please consider the following specific factors

 8    that may influence your prescribing of opioids.  Of

 9    course many other factors will influence your

10    prescribing, but we are interested in the relative

11    influence of these particular factors"; correct?

12              MR. EHSAN:  Objection to form.

13              THE WITNESS:  Yes.

14    BY MS. BALDWIN:

15        Q.   And these factors include peer

16    interaction; correct?

17        A.   Yes.

18              MR. EHSAN:  Objection to form.

19    BY MS. BALDWIN:

20        Q.   Availability of coupons and/or vouchers?

21              MR. EHSAN:  Same objection.

22              THE WITNESS:  Yes.

23    BY MS. BALDWIN:

24        Q.   Patient request for specific drugs?

25              MR. EHSAN:  Same objection.
```

Confidential                                                                 JAN-MS-05485359

1                    THE WITNESS:  Yes.

2        BY MS. BALDWIN:

3            Q.   Sales representative messages?

4                    MR. EHSAN:  Same objection.

5                    THE WITNESS:  Yes.

6        BY MS. BALDWIN:

7            Q.   Influence of opinion leaders?

8                    MR. EHSAN:  Same objection.

9                    THE WITNESS:  Yes.

10       BY MS. BALDWIN:

11           Q.   Peer-reviewed journal articles or studies?

12                   MR. EHSAN:  Same objection.

13                   THE WITNESS:  Yes.

14       BY MS. BALDWIN:

15           Q.   Medical education?

16                   MR. EHSAN:  Same objection.

17                   THE WITNESS:  Yes.

18       BY MS. BALDWIN:

19           Q.   Formulary status?

20                   MR. EHSAN:  Same objection.

21                   THE WITNESS:  Yes.

22       BY MS. BALDWIN:

23           Q.   Regulatory liability concerns?

24           A.   Yes.

25                   MR. EHSAN:  Same objection.

Confidential                                                    JAN-MS-05485360

SCOTT Fishman, M.D.
February 26, 2019                                          84

```
 1    BY MS. BALDWIN:

 2        Q.    And these are all factors that Janssen is

 3    evaluating that may influence a physician's

 4    prescribing of opioids; correct?

 5            MR. EHSAN:  Objection to form.

 6            THE WITNESS:  That's what's reflected here

 7    in this -- in this PowerPoint.

 8    BY MS. BALDWIN:

 9        Q.    If you turn to Slide 13, it states, "Of

10    the nine parameters, three had the highest mean.

11    Of those three, peer-reviewed journal articles and

12    medical education were rated as 100 by about

13    30 percent of the Respondents"; is that correct?

14            MR. EHSAN:  Objection to form.

15            THE WITNESS:  Yes.

16    BY MS. BALDWIN:

17        Q.    And it looks like 30 percent of the

18    Respondents rated medical education 100 as being

19    the highest influencing factor on their prescribing

20    habits; is that correct?

21            MR. EHSAN:  Objection to form.

22            THE WITNESS:  Yes.

23    BY MS. BALDWIN:

24        Q.    And the second highest factor was

25    peer-reviewed journal articles; correct?
```

Confidential                                                              JAN-MS-05485361

```
1        A.    Yes.

2        Q.    And then influence of opinion leaders;

3    correct?

4              MR. EHSAN:  Objection to form.

5              MR. ROBINSON:  Objection form.

6              THE WITNESS:  Influence of peer --

7    BY MS. BALDWIN:

8        Q.    15 percent of Respondents --

9        A.    Would be third doing that, right.  Yes.

10       Q.    If you turn to Page 14, it says, "Medical

11   education is considered more important than journal

12   articles or studies by PC docs"; correct?

13             MR. EHSAN:  Objection to form.

14   BY MS. BALDWIN:

15       Q.    As one of the two most important

16   parameters common across all specialties.

17             MR. EHSAN:  Same objection.

18             THE WITNESS:  I just want to see what PC

19   doc means.

20   BY MS. BALDWIN:

21       Q.    I believe it means primary care.

22       A.    Primary care, got it.  Yes.

23             MR. EHSAN:  Objection to form.

24   BY MS. BALDWIN:

25       Q.    So it says, "The two most important
```

Confidential

JAN-MS-05485362

1    parameters are common across all specialties."

2    Medical education is considered more important than

3    journal articles or studies by primary care

4    doctors; correct?

5              MR. EHSAN:  Objection to form.

6              THE WITNESS:  Yes.

7    BY MS. BALDWIN:

8        Q.   If you look at the bottom underneath this

9    chart, it says, "All specialties rate sales

10   representative messages as relatively unimportant,

11   although statistical modeling of promotion response

12   will generally show it to have more effect than a

13   doctor realizes."  Do you see that?

14             MR. EHSAN:  Objection to form.

15   BY MS. BALDWIN:

16       Q.   Does that surprise you?

17       A.   No.

18             MR. ROBINSON:  Objection.

19             MR. EHSAN:  Objection to form.

20   BY MS. BALDWIN:

21       Q.   Pharmaceutical companies wouldn't spend

22   millions of dollars on detailing physicians if it

23   didn't influence their prescribing pattern;

24   correct?

25             MR. ERCOLE:  Objection to form.

Confidential                                                                    JAN-MS-05485363

BY MS. BALDWIN:

    Q.   That's just common sense.

    A.   Yes.

        MR. ERCOLE:  Objection to form.

BY MS. BALDWIN:

    Q.   And then below that, it says, "All

specialties rate peer interaction as relatively

important, only slightly below influence of opinion

leaders."  Do you see that?

        MR. EHSAN:  Objection to form.

        THE WITNESS:  I do.

BY MS. BALDWIN:

    Q.   So the results of this show -- this study

that Janssen did are showing that the opinions of

the opinion leaders and medical education are

pretty important factors in influencing the

prescribing of physicians; isn't that true?

        MR. EHSAN:  Objection to form.

        THE WITNESS:  That's what this shows.

That's what this states.

BY MS. BALDWIN:

    Q.   If you turn to Slide 19, it talks about

the results of this study.  And under "National key

opinion leaders," cited 10 and above, is your name,

Dr. Scott Fishman.  Do you see that?

Confidential                                                    JAN-MS-05485364

SCOTT FISHMAN, M.D.
February 26, 2019                                    88

```
 1        A.   I do.

 2             MR. EHSAN:  Objection to form.

 3   BY MS. BALDWIN:

 4        Q.   And if you turn to Page 23, "Common

 5   national key opinion leaders across all five

 6   regions," it says, "16 national KOLs are cited by

 7   Respondents across all five regions"; correct?

 8        A.   Yes.

 9        Q.   And your name is also there; correct?

10        A.   Yes.

11        Q.   Then if you turn to 25, this PowerPoint

12   went into such detail that it even indicated who

13   were KOLs of KOLs.  Do you see that?

14             MR. EHSAN:  Objection to form.

15             MR. ROBINSON:  Objection.

16             THE WITNESS:  I do.

17   BY MS. BALDWIN:

18        Q.   And it states, "A total of 31 doctors were

19   KOLs of other KOLs," and your name is listed there

20   as a national KOL of other KOLs; correct?

21        A.   Correct.

22        Q.   If you continue to peruse through this

23   PowerPoint, you can see that they go into quite a

24   bit of detail in analyzing the results of this

25   influence -- KOL influence study; correct?
```

Confidential                                                      JAN-MS-05485365

SCOTT Friedman, M.D.
February 26, 2019                                    89

```
 1              MR. EHSAN:  Objection to form.

 2              THE WITNESS:  Yes.

 3    BY MS. BALDWIN:

 4        Q.   And if you turn to Page 39, they have

 5    "Results on regional key opinion leaders"; correct?

 6        A.   Yes.

 7        Q.   And you are listed as one of the top 20

 8    KOLs for Citation Group 2.  Do you see that?

 9              MR. EHSAN:  Objection to form.

10              THE WITNESS:  I do.

11    BY MS. BALDWIN:

12        Q.   And here they have listed the average

13    number of events that you attended, average number

14    of articles you wrote, average influencing rating

15    for you.  Do you see that there?

16              MR. EHSAN:  Objection to form.

17              THE WITNESS:  I do.

18    BY MS. BALDWIN:

19        Q.   And what is your average influence rating?

20        A.   It says 4.9.

21        Q.   How do you feel about that?

22              MR. EHSAN:  Objection to form.

23              MR. ROBINSON:  Objection to form.

24              THE WITNESS:  I have no idea what that

25    means.
```

Confidential                                                          JAN-MS-05485366

SCOTT Fishman, M.D.
February 26, 2019                                    90

1    BY MS. BALDWIN:

2        Q.   How do you feel about the fact that you

3    are -- Janssen's attributing an influence rating to

4    you?

5              MR. EHSAN:  Objection to form.

6              MR. ROBINSON:  Objection to form.

7              THE WITNESS:  You know, I really just

8    don't know what they're doing with this

9    information.  It's hard for me to understand it.

10   Again, it makes me uncomfortable in that it might

11   appear that somehow I'm doing things that are tied

12   to supporting them.  And that's just not the case.

13             So, again, whatever I did to become this

14   was independent of their work.  It makes me

15   uncomfortable to be on this list.

16   BY MS. BALDWIN:

17       Q.   You didn't know they were doing this

18   in-depth study of your influence, did you?

19             MR. EHSAN:  Objection to form.

20             THE WITNESS:  No, I did not.

21   BY MS. BALDWIN:

22       Q.   But the purpose of the study was to, as

23   demonstrated by the business objective, is to

24   determine which KOLs have the most influence on

25   physicians' prescribing habits; correct?

Confidential                                                          JAN-MS-05485367

```
 1              MR. EHSAN:  Objection to form.

 2              MR. ROBINSON:  Objection.

 3              THE WITNESS:  I'm not sure.  These are --

 4       these are citations by other people who view me as

 5       being someone that, you know, they like my

 6       opinions, right.

 7       BY MS. BALDWIN:

 8          Q.   Right.  If you turn to Page 4, Janssen's

 9       business objective, not your objective, Janssen's

10       business objective is to analyze key opinion

11       leaders, including yourself, without your

12       knowledge, to understand their relative influence

13       on physician prescribing; correct?

14              MR. EHSAN:  Objection to form.

15              THE WITNESS:  Correct.  I think they

16       link -- they -- they link that as an important

17       influence.  But I don't think there's -- there's

18       cause and effect here with who people cite as their

19       opinion leaders as to what opinions that they

20       attribute that person to.

21              So, again, I'm not sure by being a

22       high-cited person, that that's because they like

23       that I'm telling them to prescribe more drugs.  It

24       may just be the opposite.

25
```

Confidential                                                                    JAN-MS-05485368

Scott Fishman, M.D.
February 26, 2019                                          92

1    BY MS. BALDWIN:

2         Q.    Right.   That's not what I'm asking you.

3    I'm just asking you about Page 4.   This is

4    Janssen's business objective.

5         A.    Yes.

6               MR. EHSAN:   Objection to form.

7               THE WITNESS:   So I agree that they're

8    linking that -- the KOLs with -- with helping with

9    marketing their product.

10   BY MS. BALDWIN:

11        Q.    And their objective is to target the most

12   influential physicians is pain management.   Did you

13   know you were a target?

14              MR. EHSAN:   Objection to form.

15              MR. ROBINSON:   Objection.

16              THE WITNESS:   I did not.

17   BY MS. BALDWIN:

18        Q.    Do you know that the physicians that the

19   sales representatives visit are called "targets"?

20              MR. EHSAN:   Objection to form.

21              THE WITNESS:   I did not.

22   BY MS. BALDWIN:

23        Q.    How does that make you feel to know that

24   you are a target of Janssen as a key opinion leader

25   to exert influence on physicians prescribing

Confidential                                                    JAN-MS-05485369

SCOTT Freshman, M.D.
February 26, 2019                                      93

 1   without your knowledge?

 2            MR. ROBINSON:  Objection.

 3            MR. EHSAN:  Objection to form.

 4            THE WITNESS:  You know I feel good that I

 5   didn't know it, and it didn't have any influence on

 6   me at all.  That they would do that doesn't

 7   surprise me, that they're in business to try to

 8   sell their products.

 9   BY MS. BALDWIN:

10       Q.   Even though they're dangerous narcotics?

11       A.   Yes.

12            MR. ROBINSON:  Objection to the form.

13            MR. EHSAN:  Objection to form.

14   BY MS. BALDWIN:

15       Q.   I'm going to show you what I marked as

16   Exhibit 7.

17            (Exhibit 7 marked.)

18            MS. BALDWIN:  I have an extra copy.

19            MR. EHSAN:  Is that 7?

20            MS. BALDWIN:  Yes.

21            MR. EHSAN:  Six was the e-mail and the

22   attachment?

23            MS. BALDWIN:  Correct.

24            MR. ROBINSON:  One exhibit.

25            (Cell phone interruption.)

Confidential                                                                    JAN-MS-05485370

```
 1              THE WITNESS:  Okay.

 2    BY MS. BALDWIN:

 3         Q.   So the Exhibit 7 I just handed to you is

 4    Bates-stamped TEVA OK 03063698.  This states -- the

 5    title of this PowerPoint states "Key Opinion Leader

 6    Development Plan for Cephalon Pain Franchise."  Do

 7    you see that?

 8         A.   I do.

 9         Q.   I stated that correctly?

10         A.   Yes.

11         Q.   It's dated February 4, 2005; correct?

12              MR. ERCOLE:  Objection to form,

13    foundation.

14              THE WITNESS:  Yes.

15    BY MS. BALDWIN:

16         Q.   And if you turn to the next page, the

17    overview of the PowerPoint, it lists the value of

18    key opinion leaders, KOL segmentation, KOL

19    validation, strategy objectives, critical issues,

20    action plan calendar, and budget process; correct?

21              MR. ERCOLE:  Objection to form.

22    BY MS. BALDWIN:

23         Q.   If you turn to Page 3, Cephalon has

24    created something called the "Influence Pyramid."

25    Do you see that?
```

Confidential                                                    JAN-MS-05485371

```
 1            MR. ERCOLE:  Objection to form, lacks of

 2    foundation.

 3            THE WITNESS:  I do.

 4    BY MS. BALDWIN:

 5       Q.   The title of this slide is "Value of KOLs;

 6    correct?

 7            MR. ERCOLE:  Same objection.

 8            THE WITNESS:  Yes.

 9    BY MS. BALDWIN:

10       Q.   And there is a period -- a pyramid here,

11    and at the top of the pyramid are opinion leaders;

12    correct?

13            MR. ERCOLE:  Same objection.

14            THE WITNESS:  Correct.

15    BY MS. BALDWIN:

16       Q.   And then the -- the -- there is an arrow

17    pointing down towards "Specialist."

18            MR. ERCOLE:  Objection to form.

19    BY MS. BALDWIN:

20       Q.   Correct?

21       A.   Correct.

22       Q.   And then the arrow points further down to

23    "Primary Care Physicians"; correct?

24            MR. ERCOLE:  Same objection.

25            THE WITNESS:  Yes.
```

Confidential                                                    JAN-MS-05485372

```
 1    BY MS. BALDWIN:

 2        Q.   If you turn to Page 4 titled "Value of

 3    KOLs Continued," it states, "Surveys of greater

 4    than 25 years have shown that the Number 1 reason

 5    an M.D. changes prescribing behavior is due to

 6    peers"; correct?

 7             MR. ERCOLE:  Objection to form.

 8             THE WITNESS:  Yes.

 9    BY MS. BALDWIN:

10        Q.   Turn to the next page.  The title of this

11    page is "Importance of KOLs"; correct?

12             MR. ERCOLE:  Objection to form.

13             THE WITNESS:  Yes.

14    BY MS. BALDWIN:

15        Q.   And one of the things that's listed under

16    "Importance of KOLs" is, "Critical to success of

17    new product launches"; correct?

18             MR. ERCOLE:  Objection to form, lack of

19    foundation.

20             THE WITNESS:  Yes.

21    BY MS. BALDWIN:

22        Q.   Then it says, "OLs help to shape clinical

23    drug development"; correct?

24        A.   Yes.

25        Q.   "Product positioning"; correct?
```

Confidential                                                        JAN-MS-05485373

1        A.    Yes.

2        Q.    "Brand development, life cycle

3    management"; correct?

4        A.    Yes.

5        Q.    "Prescribing practices"?

6        A.    Yes.

7        Q.    "i.e., $$$ --

8        A.    Yes.

9        Q.    -- signifying money; correct?

10            MR. ERCOLE:  Objection to form, lack of

11    foundation.

12            THE WITNESS:  Yes.

13    BY MS. BALDWIN:

14        Q.   Do you have any idea that this is how

15    Cephalon viewed the importance of KOLs for its pain

16    franchise?

17            MR. ROBINSON:  Objection to form.

18            MR. ERCOLE:  Objection to form, lack of

19    foundation, calls for speculation.

20            THE WITNESS:  I did not.

21    BY MS. BALDWIN:

22        Q.   Was this something that would have

23    surprised you?

24            MR. ERCOLE:  Objection to form.

25            MR. ROBINSON:  Objection to form.

Confidential                                                      JAN-MS-05485374

1            THE WITNESS:  Again, I don't know that it

2      would surprise me.  It's a hard question to answer,

3      but I think I was at this point skeptical enough to

4      not be surprised.

5      BY MS. BALDWIN:

6         Q.   This was not the importance of key opinion

7      leaders, in your mind; correct?

8            MR. ERCOLE:  Objection to form.

9            THE WITNESS:  That is correct.

10     BY MS. BALDWIN:

11        Q.   In your mind, the importance of the key

12     opinion leader was to educate other physicians on

13     pain management or the use of opioids in the

14     treatment of pain or other mechanisms for treating

15     pain; correct?

16            MR. ROBINSON:  Objection, form.

17            MR. ERCOLE:  Same objection.

18            THE WITNESS:  Correct, independent of any

19     of the wishes or needs of the pharmaceutical

20     company.

21     BY MS. BALDWIN:

22        Q.   If you turn to Page 6, there is a diagram.

23     And in the center of the diagram, it states "KOL

24     Activities"; correct?

25        A.   Yes.

Confidential                                                    JAN-MS-05485375

SCOTT FISHMAN, M.D.
February 26, 2019                                                99

1      Q.   And it lists some websites; correct?

2      A.   Yes.

3           MR. ERCOLE:  Objection to form.

4   BY MS. BALDWIN:

5      Q.   P and T committees; correct?

6      A.   Yes.

7      Q.   Do you know what P and T committees are?

8      A.   It's --

9           MR. ERCOLE:  Same objection.

10          THE WITNESS:  -- pharmacy and therapeutics

11  committees.

12  BY MS. BALDWIN:

13     Q.   And what do those committees do?

14     A.   They determine what drugs will be on the

15  pharmacy for a hospital or health system or health

16  plan.

17     Q.   And according to Cephalon, this is an

18  activity a key opinion leader might be involved in?

19          MR. ERCOLE:  Objection to form,

20  foundation, calls for speculation.

21          THE WITNESS:  Yes.

22  BY MS. BALDWIN:

23     Q.   Grand rounds, that's also listed as a KOL

24  activity; correct?

25          MR. ERCOLE:  Same objection.

Confidential                                                                        JAN-MS-05485376

1             THE WITNESS:  Yes.

2     BY MS. BALDWIN:

3        Q.   HQ visits; correct?

4             MR. ERCOLE:  Same objection.

5             THE WITNESS:  I'm trying to think of what

6     HQ is.  Something quality.  I don't know what that

7     is.

8     BY MS. BALDWIN:

9        Q.   Headquarters?  I'm guessing.

10            MR. ERCOLE:  Same objection.

11            THE WITNESS:  Yeah.

12    BY MS. BALDWIN:

13       Q.   You still don't know what that means?

14       A.   Health quality?  I don't know.

15       Q.   Advisory board, that's listed as a KOL

16    activity; correct?

17       A.   Yes.

18            MR. ERCOLE:  Objection to form.

19    BY MS. BALDWIN:

20       Q.   Teaching appointments, that's listed as a

21    KOL activity; correct?

22            MR. ERCOLE:  Same objection.

23            MR. ROBINSON:  Objection.

24            THE WITNESS:  Yes.

25

Confidential                                                    JAN-MS-05485377

Scott Fishman, M.D.
February 26, 2019                                    101

```
 1    BY MS. BALDWIN:

 2         Q.   Journal editors?

 3              MR. ERCOLE:  Same objection.

 4              MR. ROBINSON:  Objection.

 5              THE WITNESS:  Yes.

 6    BY MS. BALDWIN:

 7         Q.   Residency programs?

 8              MR. ERCOLE:  Same objection.

 9              MR. ROBINSON:  Objection.

10              THE WITNESS:  Yes.

11    BY MS. BALDWIN:

12         Q.   Guidelines?

13              MR. ERCOLE:  Same objection.

14              THE WITNESS:  Yes.

15    BY MS. BALDWIN:

16         Q.   Posters?

17              MR. ERCOLE:  Same objection.

18              THE WITNESS:  Yes.

19    BY MS. BALDWIN:

20         Q.   Consensus documents?

21              MR. ERCOLE:  Same objection.

22              THE WITNESS:  Yes.

23    BY MS. BALDWIN:

24         Q.   Lectures?

25              MR. ERCOLE:  Objection to form.
```

Confidential                                                                                      JAN-MS-05485378

```
 1              THE WITNESS:  Yes.

 2      BY MS. BALDWIN:

 3          Q.    Publications?

 4          A.    Yes.

 5          Q.    And trials?

 6              MR. ERCOLE:  Same objection.

 7              THE WITNESS:  Yes.

 8      BY MS. BALDWIN:

 9          Q.    If you turn to Page 13, this PowerPoint

10      discusses how to integrate KOLs into trials;

11      correct?

12              MR. ERCOLE:  Objection to form.

13              THE WITNESS:  Yes.

14      BY MS. BALDWIN:

15          Q.    And is it your understanding in your

16      professional experience that that's something key

17      opinion leaders are involved in, trials in an

18      advisory capacity?

19              MR. ERCOLE:  Objection to form, vague.

20              MR. ROBINSON:  Objection.

21              THE WITNESS:  Yes.

22      BY MS. BALDWIN:

23          Q.    The next slide talks about how to

24      recruit -- recruiting tips for KOLs for trials; is

25      that correct?
```

Confidential                                                   JAN-MS-05485379

Scott Fishman, M.D.
February 26, 2019                                      103

1              MR. ERCOLE:  Objection to form.

2    BY MS. BALDWIN:

3        Q.   On Page 14.

4        A.   Oh, 14, I'm sorry.  So Slide 14 looks like

5    it's how to recruit for a trial.

6        Q.   How to recruit a key opinion leader?

7        A.   I don't know if it's key opinion leaders.

8              MR. ERCOLE:  Objection to form.

9              THE WITNESS:  I don't -- I don't know how

10   this would recruit key opinion leaders.  To me this

11   looks like it's how you -- if you are going to do a

12   clinical trial, that this -- these are the kinds of

13   things you do to inform people that you're going to

14   do the trial to get engagement of potential

15   clinicians who would then recruit their patients

16   into the trial, I think.

17   BY MS. BALDWIN:

18       Q.   The next slide is headed "KOL

19   Segmentation."  Do you see that?

20       A.   Yes.

21       Q.   And it's segmented into three points:

22   Influence level?

23             MR. ERCOLE:  Objection to form, to the

24   extent that's a question.

25             THE WITNESS:  Yes.

Confidential                                                    JAN-MS-05485380

Scott Fishman, M.D.
February 26, 2019                              104

1   BY MS. BALDWIN:

2       Q.   And segmented under influence level -- KOL

3   segmentation is -- is, under influence level, is

4   broken down to national, regional, and local;

5   correct?

6           MR. ERCOLE:  Objection to form,

7   foundation.

8           THE WITNESS:  Yes.

9   BY MS. BALDWIN:

10      Q.   And specialties are broken down into

11  groups as well.  Do you see that?

12          MR. ERCOLE:  Same objection.

13          THE WITNESS:  Correct.

14  BY MS. BALDWIN:

15      Q.   And then there is a target number listed

16  for national, regional, and local key opinion

17  leaders?

18      A.   Yes.

19          MR. ERCOLE:  Objection to form.

20          MR. ROBINSON:  Objection.

21  BY MS. BALDWIN:

22      Q.   On Page 16, you will see it's titled "KOL

23  Validation"; correct?

24      A.   Yes.

25      Q.   And the first bullet point states, "Define

Confidential                                                                 JAN-MS-05485381

Scott Fishman, M.D.
February 26, 2019                                    105

```
 1    variables:  Publications, lectures, trials,

 2    editorial boards, society offices guidelines, FDA

 3    advisory committee, training program director,

 4    advisory boards, books, committees, academic

 5    appointments, et cetera."  Correct?

 6            MR. ERCOLE:  Objection to form.

 7            THE WITNESS:  Yes.

 8    BY MS. BALDWIN:

 9       Q.   And the next bullet point is "Establish

10    weighted importance"; correct?

11            MR. ERCOLE:  Objection to form.

12            THE WITNESS:  Yes.

13    BY MS. BALDWIN:

14       Q.   And then "Compare and contrast key opinion

15    leaders"; correct?

16            MR. ERCOLE:  Objection to form.

17            THE WITNESS:  Yes.

18    BY MS. BALDWIN:

19       Q.   If you turn to the next page, it shows an

20    example of how Cephalon's doing this KOL

21    validation; correct?

22            MR. ERCOLE:  Objection to form.

23            THE WITNESS:  Yes.

24    BY MS. BALDWIN:

25       Q.   And they have two key opinion leaders
```

Confidential                                    JAN-MS-05485382

```
 1    listed.  Do you see that?  Dr. --

 2              MR. ERCOLE:  Yes.

 3              THE WITNESS:  Yes.

 4    BY MS. BALDWIN:

 5         Q.   I believe that's Dr. Brennan and

 6    Dr. Portenoy; correct?

 7              MR. ERCOLE:  Same objection.

 8              THE WITNESS:  Yes.

 9    BY MS. BALDWIN:

10         Q.   And it assigns them a weight or a number

11    based on the various activities, the various

12    variables that we just went over; correct?

13         A.   Uh-huh.

14              MR. ERCOLE:  Objection to form.

15    BY MS. BALDWIN:

16         Q.   And then it compares them, compares their

17    scores in this chart.  Do you see that?

18         A.   I do.

19              MR. ERCOLE:  Objection to form.

20    BY MS. BALDWIN:

21         Q.   Did you know that key opinion leaders,

22    such as Portenoy or Brennan or yourself, were

23    subject to these validation variables and then

24    weighted and compared and contrasted against each

25    other in regards to your influence on your peers?
```

Confidential
JAN-MS-05485383

Scott Fishman, M.D.
February 26, 2019                                    107

```
1              MR. ROBINSON:  Objection to form.

2              MR. ERCOLE:  Objection to form.

3              THE WITNESS:  I was not.

4    BY MS. BALDWIN:

5       Q.   If you turn to the next slide, it says,

6    "Building long-term relationships."  And one of the

7    ways to do that is develop strategies and tactics

8    for long-term relationships.  Another way is who,

9    quote, "owns" the KOL relationship.  That's medical

10   science liaison versus sales rep, field personnel

11   versus HQ, primary versus secondary contact;

12   correct?

13             MR. ERCOLE:  Objection to form, calls for

14   speculation, lacks of foundation.

15             MR. ROBINSON:  Objection.

16             THE WITNESS:  Yes.

17   BY MS. BALDWIN:

18      Q.   Were you aware that there was an employee

19   at individual -- at Cephalon -- strike that.

20             Were you aware that there was an employee

21   at Cephalon who owned the relationship between you

22   and Cephalon?

23             MR. ERCOLE:  Objection, form.

24             MR. ROBINSON:  Objection, form.

25             THE WITNESS:  I was not aware.
```

Confidential                                                        JAN-MS-05485384

Scott Fishman, M.D.
February 26, 2019                                                    108

```
 1    BY MS. BALDWIN:

 2         Q.   Turn to the next slide.  It talks about

 3    Cephalon's pain franchise strategy.  Do you see

 4    that?

 5         A.   I do.

 6         Q.   Are you familiar with Cephalon's pain

 7    franchise?

 8         A.   No.

 9         Q.   Do you know the opioids that Cephalon

10    marketed?

11         A.   I can't recall it off the top of my head

12    right now.

13         Q.   Are you familiar with ACTIQ?

14         A.   I am.

15         Q.   Are you familiar with Fentora?

16         A.   I am.

17         Q.   And what is ACTIQ?

18         A.   It's a -- it's a transmucosal fentanyl

19    delivery system for rapid onset of analgesia.

20         Q.   Fentanyl is a highly potent opioid;

21    correct?

22              MR. ERCOLE:  Objection to form.

23              THE WITNESS:  Yes.

24    BY MS. BALDWIN:

25         Q.   It's around 75 to a hundred times as
```

Confidential                                                                    JAN-MS-05485385

1   potent as morphine; correct?

2           MR. ERCOLE:  Objection to form.

3           THE WITNESS:  I believe that's correct.

4   BY MS. BALDWIN:

5       Q.   Under -- so you see under "Cephalon pain

6   franchise strategy," it says, "Build long-term KOL

7   relationships, establish Cephalon as a leader in

8   pain management, understand the motivations of a

9   very diverse target audience to effectively

10  interact and engage"; correct?

11          MR. ERCOLE:  Objection to form,

12  foundation.

13          THE WITNESS:  Yes.

14  BY MS. BALDWIN:

15      Q.   On the next page, it lists Cephalon's

16  objectives:  "Identify top tier KOLs at national,

17  regional, and local levels, establish budget for

18  KOL development, understand the prescribing

19  behaviors and motivations of a very diverse target

20  audience to effectively deliver optimal messages,

21  identify current supporters and critics"; correct?

22          MR. ERCOLE:  Objection to form.

23          THE WITNESS:  That is what is on this

24  page.

25

Confidential                                    JAN-MS-05485386

Scott Fishman, M.D.
February 26, 2019                    110

```
1    BY MS. BALDWIN:
2        Q.   Did you know that Cephalon was trying to
3    identify the prescribing behaviors of audiences
4    that were listening to talks and education material
5    that were delivered by key opinion leaders such as
6    yourself?
7            MR. ERCOLE:   Sorry.  Were you done?
8    Objection to form, speculation, foundation.
9            MR. ROBINSON:   Objection.
10           THE WITNESS:   I did not.
11   BY MS. BALDWIN:
12       Q.   Does that surprise you?
13           MR. ERCOLE:   Same objection.
14           THE WITNESS:   It surprised me a little bit
15   more than some of the others.  But, you know,
16   again, I've got to say, it's hard to be completely
17   surprised.
18   BY MS. BALDWIN:
19       Q.   Does it concern you that they were trying
20   to understand the prescribing behaviors of the
21   audience that you lectured to in order to
22   effectively deliver optimal messages?
23           MR. ERCOLE:   Objection to form, lack of
24   foundation, mischaracterizes the document, calls
25   for speculation.
```

Confidential                                    JAN-MS-05485387

```
 1              THE WITNESS:  So, again, it wouldn't

 2    surprise me if they were, after the fact, trying to

 3    understand who was in the audience.  It would

 4    surprise me more if they were trying to select an

 5    audience for me to speak to, that were more

 6    manipulatable, et cetera.  That would -- that would

 7    surprise me.

 8    BY MS. BALDWIN:

 9        Q.   If you turn to Page 21, it's titled

10    "Critical Issues."  Do you see that?

11        A.   I do.

12        Q.   And the critical issues Cephalon lists are

13    "Small number of KOLs influence hundreds of

14    prescribers."  Do you see that?

15              MR. ERCOLE:  Objection to form,

16    foundation.

17              THE WITNESS:  I do.

18    BY MS. BALDWIN:

19        Q.   "A small number of prescribers generate

20    large dollar volume."  Did you know that?

21              MR. ERCOLE:  Objection to form.

22              THE WITNESS:  Did I know that?

23              MR. ROBINSON:  Objection to form.

24    BY MS. BALDWIN:

25        Q.   That's what it says; correct?
```

Confidential                                                                JAN-MS-05485388

Scott Fishman, M.D.
February 26, 2019                              112

```
 1              MR. ERCOLE:  Same objection.

 2              THE WITNESS:  That's what it says.

 3   BY MS. BALDWIN:

 4       Q.  Did you know that?

 5              MR. ERCOLE:  Same objection.

 6              THE WITNESS:  I didn't.

 7   BY MS. BALDWIN:

 8       Q.  Did you know that the Defendants in this

 9   litigation targeted a small number of prescribers

10   who prescribed the most opioids and generated the

11   largest dollar value from those limited pool of

12   prescribers?

13              MR. ERCOLE:  Objection to form, calls for

14   speculation, foundation.

15              THE WITNESS:  I have to say not only did I

16   not know that, but they wouldn't have targeted me

17   as a KOL if that were the fact.

18              MS. BALDWIN:  Do you want to go off -- we

19   need to change the disk.

20              THE VIDEOGRAPHER:  We are going off the

21   record at 11:53.

22              (Recess taken.)

23              THE VIDEOGRAPHER:  This is the start of

24   Disk 2, back on the record at 12:04.

25
```

Confidential                                                          JAN-MS-05485389

1     BY MS. BALDWIN:

2         Q.    Do you understand you're still under oath?

3         A.    I do.

4         Q.    Before we --

5               MR. ROBINSON:  Doctor, you understand you

6     are under oath throughout this deposition; correct?

7               THE WITNESS:  I do.

8     BY MS. BALDWIN:

9         Q.    Okay.

10              MS. BALDWIN:  Thanks for the help.

11    BY MS. BALDWIN:

12        Q.    So before we took a break, you were

13    looking at -- we were looking at the key opinion

14    leader Development Plan for Cephalon Pain

15    Franchise.  Do you recall that?

16              MR. ERCOLE:  Objection to form,

17    foundation.

18              THE WITNESS:  Yes.

19    BY MS. BALDWIN:

20        Q.    If you turn to Page 23, it talks about

21    "OVF critical success factors."  Do you see that?

22              MR. ERCOLE:  Objection to form.

23              THE WITNESS:  I do see that.

24    BY MS. BALDWIN:

25        Q.    And under this heading, "Some of these

Confidential                                                        JAN-MS-05485390

1    critical success factors include building KOL

2    society loyalty and relationships"; correct?

3           MR. ERCOLE:  Objection to form.

4           THE WITNESS:  I see that here.

5    BY MS. BALDWIN:

6       Q.   "Raising recognition of proper assessment

7    and TX of BTP and CA and nonCA."  Do you see that?

8       A.   I do.

9           MR. ERCOLE:  Objection to form.

10   BY MS. BALDWIN:

11      Q.   And I believe that means treatment of

12   breakthrough pain and cancer and noncancer.  Does

13   that look right to you?

14          MR. ERCOLE:  Objection to form, lack of

15   foundation, speculation.

16          THE WITNESS:  I believe the same.

17   BY MS. BALDWIN:

18      Q.   Okay.  We talked about how Cephalon

19   marketed ACTIQ and Fentora; correct?

20          MR. ERCOLE:  Same objection.

21          THE WITNESS:  I'm sorry, can you say that

22   again?

23   BY MS. BALDWIN:

24      Q.   We discussed earlier how Cephalon

25   manufactured ACTIQ and Fentora; correct?

Confidential                                                        JAN-MS-05485391

```
1              MR. ERCOLE:  Same objection.

2              THE WITNESS:  I don't recall talking about

3      how they manufactured --

4      BY MS. BALDWIN:

5         Q.   Okay.  You just said you were familiar

6      with ACTIQ and Fentora?

7         A.   I'm familiar with the products.

8         Q.   Did you know that Cephalon manufactured

9      those products?

10        A.   You know, again, I probably did at some

11     point.

12        Q.   Do you know -- do you recall the

13     indications for ACTIQ or Fentora?

14        A.   Yes.

15        Q.   And what are those indications?

16        A.   Breakthrough pain in a patient who is

17     opioid-tolerant, who needs rapid onset analgesia.

18        Q.   And in 2006 was that break -- breakthrough

19     cancer pain --

20             MR. ROBINSON:  Objection.

21     BY MS. BALDWIN:

22        Q.   -- only that that was indicated for?

23             MR. ERCOLE:  Objection to form.

24             THE WITNESS:  I don't recall if it was

25     only cancer pain or not.
```

Confidential                                                        JAN-MS-05485392

Scott Fishman, M.D.
February 26, 2019                                    116

1    BY MS. BALDWIN:

2        Q.   And the next bullet point says, "Establish

3    RAO term and link to BTP as appropriate TX";

4    correct?

5              MR. ERCOLE:  Same objection.

6              THE WITNESS:  I see that here.

7    BY MS. BALDWIN:

8        Q.   Do you understand that to mean establish

9    rapid opioid term and link to breakthrough pain as

10   appropriate treatment?

11             MR. ERCOLE:  Objection to form,

12   speculation, foundation.

13             THE WITNESS:  Yes.

14   BY MS. BALDWIN:

15       Q.   And the last bullet point, do you see,

16   "Key opinion leaders' and Pain Society's

17   endorsement of OVF"?

18             MR. ERCOLE:  Objection to form.

19   BY MS. BALDWIN:

20       Q.   That's one of the critical success factors

21   listed here; correct?

22             MR. ERCOLE:  Same objection.

23             THE WITNESS:  Can you say that -- I'm not

24   seeing the wording you just --

25

Confidential                                                                 JAN-MS-05485393

```
 1   BY MS. BALDWIN:

 2       Q.   The last bullet point, "KOL and Pain

 3   Society's endorsement of OVF"; correct?

 4       A.   Yes.  Yes.

 5       Q.   And the next slide has "Cephalon's action

 6   plan."  Do you see that?

 7            MR. ERCOLE:  Objection to form.

 8            THE WITNESS:  I did see that.

 9   BY MS. BALDWIN:

10       Q.   And part of that action plan is, "Analyze,

11   segment, and validate key opinion leaders";

12   correct?

13            MR. ERCOLE:  Same objection.

14            THE WITNESS:  Yes.

15   BY MS. BALDWIN:

16       Q.   And another part of the action plan is to

17   "Meet with executives of key professional

18   societies, including the AAPM"; correct?

19            MR. ERCOLE:  Objection to form.

20            THE WITNESS:  Yes.

21   BY MS. BALDWIN:

22       Q.   You were a board member of the AAPM --

23            MR. ROBINSON:  Objection.

24   BY MS. BALDWIN:

25       Q.   -- correct?
```

Confidential                                                   JAN-MS-05485394

Scott Fishman, M.D.
February 26, 2019                                118

1        A.    I was, yes.

2        Q.    And it also says "Meet with executives of

3    APS"; correct?

4              MR. ERCOLE:  Objection to form.

5              THE WITNESS:  Correct.

6    BY MS. BALDWIN:

7        Q.    You were a board member of APS; correct?

8        A.    Correct.  I should say I don't think

9    executives -- board members are considered

10   executives.

11       Q.    So are executives -- there is an executive

12   branch of the organization, and then there is the

13   board of directors?

14       A.    Executives are the --

15       Q.    -- officers?

16       A.    No.  The executives would be the -- well,

17   again, I don't know what they mean by -- the

18   executive director is a staff position and, you

19   know, the executive suite is the people who run the

20   organization, as opposed to the volunteers who are

21   on the board or serve other leadership roles.

22       Q.    The action plan does include meeting with

23   executives of AAPM and APS; correct?

24             MR. ERCOLE:  Objection to form.

25             THE WITNESS:  That's what it says here.

Confidential                                                                    JAN-MS-05485395

Scott Fishman, M.D.
February 26, 2019                                    119

1    BY MS. BALDWIN:

2        Q.   And you were -- and you were on the board

3    of both of those organizations?

4        A.   Correct.

5            MR. ERCOLE:  Objection.

6            MR. ROBINSON:  Asked and answered.

7    BY MS. BALDWIN:

8        Q.   The last bullet point of the action plan

9    that includes "Build relationships with patient

10   advocacy groups"; correct?

11       A.   Yes.

12       Q.   If you turn to the next page, this slide's

13   entitled "National Level KOLs"; correct?

14           MR. ERCOLE:  Same objection.

15           THE WITNESS:  Yes.

16   BY MS. BALDWIN:

17       Q.   And you are listed there, Scott Fishman,

18   M.D. --

19           MR. ERCOLE:  Objection to form.

20   BY MS. BALDWIN:

21       Q.   -- correct?

22       A.   Yes.

23       Q.   And if you turn to the next page, it says,

24   "Action Plan National KOLs," and the action plan

25   for the national KOLs include "Establish national

Confidential                                    JAN-MS-05485396

Scott Fishman, M.D.
February 26, 2019                                    120

```
 1    pain medicine executive advisory board and meet at

 2    least twice a year."  Do you see that?

 3            MR. ERCOLE:  Objection to form.

 4            THE WITNESS:  Yes, I see that.

 5    BY MS. BALDWIN:

 6        Q.   "Conduct advisory boards for managed care,

 7    pharmacy, nursing, risk management"; correct?

 8        A.   Yes, I see that.

 9        Q.   "Attend and conduct activities at key Pain

10    Society meetings, educational symposia, posters,

11    hospitality suites, investigator meetings, exhibit

12    booths, reporter interviews, highlight Cephalon

13    pain award, one-on-one meetings"; correct?

14            MR. ERCOLE:  Objection to form.

15            THE WITNESS:  Yes.

16    BY MS. BALDWIN:

17        Q.   And then it lists ESP booths; correct?

18        A.   I see that, yes.

19        Q.   Are you familiar with ESP booths?

20        A.   I'm not.

21        Q.   And then the action plan for national KOLs

22    continues on the next page, and that includes

23    "Maximizing breakthrough pain guidelines, follow-up

24    projects"; correct?

25            MR. ERCOLE:  Objection to form,
```

Confidential                                    JAN-MS-05485397

Scott Fishman, M.D.
February 26, 2019                                      121

```
1   mischaracterizes.

2              THE WITNESS:  That's what I see.

3   BY MS. BALDWIN:

4      Q.   "And involving national KOLs and pub

5   plan," which I take to mean publishing plan.  Does

6   that look correct to you?

7              MR. ERCOLE:  Objection to form.  Counsel's

8   telling the witness what the document he has never

9   seen supposedly means.

10             THE WITNESS:  That's what it says.

11  BY MS. BALDWIN:

12     Q.   The document says "involve national KOLs

13  and pub plan"; correct?

14     A.   Correct.

15     Q.   CME, ACPE, ANCE programs are listed as an

16  action plan for national KOLs; correct?

17             MR. ERCOLE:  Objection to form.

18             THE WITNESS:  They're listed, yes.

19  BY MS. BALDWIN:

20     Q.   "PR activities," the last bullet point,

21  that's also listed?

22     A.   Yes.

23     Q.   And then there is -- on the next page,

24  there is a slide for "Regional-level KOLs" that

25  lists what Cephalon believes are regional KOLs;
```

Confidential                                                JAN-MS-05485398

1   correct?

2          MR. ERCOLE:  Objection to form, calls for

3   speculation as to what Cephalon supposedly believes

4   based upon the document the witness has never seen

5   before.

6          THE WITNESS:  It lists names of

7   regional-level KOLs.

8   BY MS. BALDWIN:

9      Q.   And the next slide has an action plan for

10  regional KOLs; correct?

11     A.   Yes.

12     Q.   And the first bullet point states,

13  "Conduct consultant meetings"; correct?

14         MR. ERCOLE:  Objection to form.

15         THE WITNESS:  That's what it says.

16  BY MS. BALDWIN:

17     Q.   And under that bullet point, it says, "Use

18  national KOLs as speakers"; correct?

19         MR. ERCOLE:  Objection to form.

20         THE WITNESS:  That's what it says.

21  BY MS. BALDWIN:

22     Q.   And then if you go to Page 31, there is an

23  action plan for local KOLs; correct?

24     A.   Yes.

25     Q.   If you turn to the next page, they have

Confidential                                                                    JAN-MS-05485399

Scott Fishman, M.D.
February 26, 2019                           123

```
 1   society-specific plans; correct?

 2           MR. ERCOLE:  Objection to form.

 3           THE WITNESS:  Yes.

 4   BY MS. BALDWIN:

 5       Q.   And Cephalon gives the example of 2005

 6   AAPM; correct?

 7       A.   That's what it says.

 8           MR. ERCOLE:  Objection to form.

 9   BY MS. BALDWIN:

10       Q.   And you were the president of the AAPM at

11   that time; correct?

12       A.   That is correct.

13       Q.   And CFF -- CSF, critical success factors,

14   under this plan, "Society-specific plan for AAPM in

15   2005 include building KOL society, loyalty, and

16   relationships"; correct?

17           MR. ERCOLE:  Objection to form.

18           THE WITNESS:  That's what it says.

19   BY MS. BALDWIN:

20       Q.   "Raising recognition of proper assessment

21   and treatment of breakthrough pain and cancer and

22   noncancer"; correct?

23           MR. ERCOLE:  Objection to form,

24   mischaracterizes the document.

25           THE WITNESS:  That's what it says.
```

Confidential                                                                    JAN-MS-05485400

Scott Fishman, M.D.
February 26, 2019                                    124

1    BY MS. BALDWIN:

2        Q.   "Establish rapid-acting opioid term and

3    link to breakthrough pain as appropriate

4    treatment"; correct?

5            MR. ERCOLE:  Same objection.

6            THE WITNESS:  That is what it says.

7    BY MS. BALDWIN:

8        Q.   "Establish Cephalon as valued partner to

9    pain community"; correct?

10       A.   That's what it says.

11           MR. ERCOLE:  Same objection.

12   BY MS. BALDWIN:

13       Q.   "KOLs' and Pain Society's endorsements of

14   OVF"; correct?

15           MR. ERCOLE:  Objection to form.

16           THE WITNESS:  That's what it says.

17   BY MS. BALDWIN:

18       Q.   When you were president of the AAPM, did

19   you know at that time in 2005 that Cephalon had the

20   society-specific plan that involved all of these

21   critical success factors?

22       A.   I did not.

23           MR. ERCOLE:  Objection to form, calls for

24   speculation, plus the document is labeled "Draft"

25   on the front.

Confidential                                                                JAN-MS-05485401

```
 1    BY MS. BALDWIN:

 2        Q.   And you didn't intend as president of AAPM

 3    for Cephalon to carry out these critical success

 4    factors amongst AAPM's members at that time, did

 5    you?

 6             MR. ERCOLE:  Objection to form.

 7             THE WITNESS:  Can you say that again?  I'm

 8    sorry.

 9    BY MS. BALDWIN:

10        Q.   You didn't intend -- well, strike that.

11             You didn't intend, as president of AAPM at

12    this time, for Cephalon to carry out these key

13    opinion leader action plans that it lists here in

14    this PowerPoint; correct?

15             MR. ERCOLE:  Objection to form.

16             MR. ROBINSON:  Form.

17             THE WITNESS:  I had no role in this as

18    president, and I had no knowledge that it was

19    happening.  And there was certainly no intent on my

20    part for it to happen.

21    BY MS. BALDWIN:

22        Q.   This is not something that you intended;

23    correct?

24             MR. ERCOLE:  Same objection.

25             THE WITNESS:  Yes, this is -- this is not
```

Confidential                                                        JAN-MS-05485402

1    something that I intended.  I had no role in this.

2    BY MS. BALDWIN:

3        Q.   This is Cephalon's critical success factor

4    list; correct?

5            MR. ERCOLE:  Objection to form,

6    foundation.

7            THE WITNESS:  This is not familiar to me

8    or anything that I had a role in.

9    BY MS. BALDWIN:

10       Q.   And this is Cephalon's plan, as indicated

11   in this document; correct?

12           MR. ERCOLE:  Objection to form, lack of

13   foundation.

14           MR. ROBINSON:  Objection to form.

15           THE WITNESS:  Again, I see what you are

16   showing me as the plan, the Cephalon.  I mean, I

17   don't have any knowledge that Cephalon did this.

18   BY MS. BALDWIN:

19       Q.   But they had a plan to do it; you just

20   don't know if they actually implemented the plan?

21           MR. ERCOLE:  Objection to form.

22           MR. ROBINSON:  Objection to form.

23           MR. ERCOLE:  Calls for speculation, asked

24   and answered.  Plus, again, the document says

25   "Draft" on the front page.

Confidential                                                          JAN-MS-05485403

Scott Fishman, M.D.
February 26, 2019                                    127

```
 1            MS. BALDWIN:  You can object.  Concise
 2    objections, please.  You need to stop your speaking
 3    objections.  They're very disruptive to the
 4    deposition.  I'm going to ask you to stop doing
 5    that; okay?
 6            MR. ERCOLE:  You can ask.  They're not
 7    speaking objections.
 8            MS. BALDWIN:  Well, if you are going to
 9    continue to make speaking objections, and we're
10    going to have a problem, then I'm going to have to
11    call the judge; okay?  And I really don't want to
12    have to do that.
13            MR. ERCOLE:  You can do what you want to
14    do.  I am going to make my objections and make the
15    record.
16            MS. BALDWIN:  You can make your objections
17    without speaking and coaching a witness, who is
18    here represented by his own counsel.
19            MR. ERCOLE:  How -- how could I -- I don't
20    want to sidetrack, but how could I possibly coach a
21    witness if he's represented by his own counsel?
22            MS. BALDWIN:  You are making improper
23    speaking objections.  Please stop.
24            MR. ERCOLE:  We disagree.
25
```

Confidential                                                        JAN-MS-05485404

Scott Fishman, M.D.
February 26, 2019                              128

```
 1    BY MS. BALDWIN:
 2        Q.   I'm sorry, Dr. Fishman.  I don't recall if
 3    you were in the middle of answering a question.
 4             But Cephalon had a plan.  This was
 5    Cephalon's society-specific plan, as indicated in
 6    this document; correct?
 7             MR. ERCOLE:  Objection, form, lack of
 8    foundation.
 9             MR. ROBINSON:  Objection.
10             THE WITNESS:  You know, what I see here is
11    a -- is a plan, somebody's plan, for Cephalon.  I
12    don't know if this was Cephalon's plan or not.  I
13    don't really know anything about this other than
14    what I see on the pages that you gave me, which
15    lists Cephalon, the name Cephalon, but I don't
16    really know anything about what Cephalon did or
17    didn't do.
18    BY MS. BALDWIN:
19        Q.   Well, the title of this document is "Key
20    Opinion Leader Development Plan for Cephalon Pain
21    Franchise"; correct?
22             MR. ROBINSON:  Asked and answered.
23             MR. ERCOLE:  Objection to form, asked and
24    answered.
25             THE WITNESS:  Yes.
```

Confidential                                                      JAN-MS-05485405

Scott Fishman, M.D.
February 26, 2019                          129

1    BY MS. BALDWIN:

2        Q.   If you turn to the next page, there is a

3    KOL-specific plan, and you were given as an example

4    in this PowerPoint.  Do you see that?

5             MR. ERCOLE:  Objection to form,

6    foundation.

7             THE WITNESS:  I do see it.

8    BY MS. BALDWIN:

9        Q.   Did you know that Cephalon drafted a

10   specific plan to target you personally --

11            MR. ERCOLE:  Objection to form.

12   BY MS. BALDWIN:

13       Q.   -- as a key opinion leader?

14            MR. ROBINSON:  Objection to form.

15            MR. ERCOLE:  Sorry about that.  I didn't

16   mean to interrupt.  Objection to form, calls for

17   speculation, lack of foundation, mischaracterizes

18   the document.

19   BY MS. BALDWIN:

20       Q.   Let me ask the question again.

21            Did you know that Cephalon drafted a

22   specific plan to target you personally as a key

23   opinion leader?

24            MR. ERCOLE:  Objection to form, calls for

25   speculation, lack of foundation, mischaracterizes

Confidential                                    JAN-MS-05485406

1     the document.

2             MR. ROBINSON:  Object.

3             THE WITNESS:  I did not know.

4     BY MS. BALDWIN:

5         Q.   Does it trouble you that they did this?

6             MR. ERCOLE:  Objection to form.

7             MR. ROBINSON:  Objection.

8             THE WITNESS:  Not really that much,

9     because I feel like I was immune to whatever they

10    were trying to do.  You know, it wasn't my interest

11    to be involved in, you know, in perpetuating their

12    needs, you know.  My view was that it was an

13    independent organization.

14            So it troubles me that, you know,

15    pharmaceutical companies in general operate this

16    way, but in specific, you know, I had no control

17    over what people were trying to think about what

18    they do with me and why they were doing it.  I was

19    well aware that the companies were friendly, but

20    they weren't friends, you know, they were

21    colleagues.  They were professional contacts, and I

22    had to work with them carefully.

23    BY MS. BALDWIN:

24        Q.   You understand, and you've testified

25    today, I think several times, your dealings --

Confidential                                                                      JAN-MS-05485407

Scott Fishman, M.D.
February 26, 2019                                    131

1    through your dealings with the pharmaceutical

2    industry, you know that they advertise their

3    products; right?

4             MR. ERCOLE:  Objection to form.

5             THE WITNESS:  Yes.

6    BY MS. BALDWIN:

7        Q.   You know that the opioid manufacturers

8    including the Defendants in this room, advertise

9    their products; correct?

10            MR. ERCOLE:  Objection to form, vague.

11            THE WITNESS:  Yes.

12   BY MS. BALDWIN:

13       Q.   You know they market them?

14            MR. ERCOLE:  Objection to form.

15            THE WITNESS:  I do.

16   BY MS. BALDWIN:

17       Q.   You know they market them to healthcare

18   professionals; correct?

19            MR. ERCOLE:  Same objection.

20            THE WITNESS:  I assume I do know that,

21   yes.

22   BY MS. BALDWIN:

23       Q.   We've seen that today through these

24   PowerPoints?

25       A.   Yes.

Confidential                                                  JAN-MS-05485408

Scott Fishman, M.D.
February 26, 2019                                    132

1       Q.   You are aware that they send sales reps to

2    detail physicians?

3       A.   Yes.

4            MR. ERCOLE:  Objection to form, vague.

5    BY MS. BALDWIN:

6       Q.   You understand that some of the ways that

7    the drug companies marketed their opioids was to

8    have dinners and give presentations where doctors

9    spoke to other doctors; correct?

10           MR. ROBINSON:  Objection to form.

11           MR. ERCOLE:  Objection to form.

12           THE WITNESS:  Yes.

13   BY MS. BALDWIN:

14      Q.   You understand that the drug companies

15   created and utilized marketing materials; correct?

16           MR. ERCOLE:  Objection to form.

17           THE WITNESS:  I assume they do.  I really

18   don't have direct knowledge of them creating

19   marketing materials.  I wasn't involved in that, in

20   any way.  So I -- you know, specific answer would

21   be, no, I don't really know with any factual basis

22   that they create marketing materials and what's in

23   those marketing materials.

24   BY MS. BALDWIN:

25      Q.   You've never seen a sales representative

Confidential                                                    JAN-MS-05485409

1   leave behind -- what a sales representative would

2   leave in a doctor's office when they call on them?

3              MR. ROBINSON:  Objection, form.  Can you

4   read that back?

5              (Record read.)

6              MS. BALDWIN:  Strike that.  I'll ask the

7   question.

8   BY MS. BALDWIN:

9       Q.   You've never seen any materials -- and

10  sometimes they're called "leave-behinds" -- that a

11  sales representative would leave in a doctor's

12  office after they've stopped by on a call?

13             MR. ERCOLE:  Objection form.

14             THE WITNESS:  I've seen representatives

15  leave behind materials.  I didn't think that's what

16  you were asking me.

17  BY MS. BALDWIN:

18      Q.   Okay.  Yeah, that would include -- that

19  would be encompassed in my question.  You

20  understand that Defendant -- that the Defendants in

21  this litigation, pharmaceutical companies, opioid

22  manufacturers create marketing materials to sell

23  their products?

24             MR. ROBINSON:  Objection to form.

25             MR. ERCOLE:  Objection to form.

Confidential                                                                JAN-MS-05485410

```
1              THE WITNESS:  I am aware of marketing
2    materials.  I don't know much more of it than I've
3    seen -- I see the results of their marketing
4    efforts.
5    BY MS. BALDWIN:
6        Q.   You, in your professional career, are
7    familiar with opioid manufacturers partnering with
8    other organizations or professional societies to
9    hold seminars, symposia, continuing medical
10   education; correct?
11             MR. ROBINSON:  Objection.
12             MR. ERCOLE:  Same objection.
13             THE WITNESS:  I know that these
14   organizations work with industry.  The word
15   "partnering" can be understood in different ways.
16   So hopefully it's not partnering in, you know,
17   there's usually an arm's length and an independence
18   there that partner -- that would argue that
19   "partnering" is not the right word.
20   BY MS. BALDWIN:
21       Q.   So you understand that healthcare -- or
22   that pharmaceutical companies like opioid
23   manufacturers work with professional societies and
24   third-party advocacies to hold symposia, medical
25   education, and conferences, things of that nature;
```

Confidential                                                    JAN-MS-05485411

1    correct?

2            MR. ERCOLE:  Objection to form.

3            MR. ROBINSON:  Objection to form.

4            MR. ERCOLE:  Lumps everyone together.

5            THE WITNESS:  I understand that they

6    support the activities of those organizations.

7    BY MS. BALDWIN:

8        Q.   Okay.  And that includes Purdue Pharma?

9        A.   Yes.

10       Q.   And that includes Johnson & Johnson?

11       A.   Yes.

12       Q.   And Janssen?

13       A.   Yes.

14       Q.   And Cephalon?

15           MR. ERCOLE:  Objection to form.

16           THE WITNESS:  Yes.

17   BY MS. BALDWIN:

18       Q.   And Ortho-McNeil?

19       A.   Yes.

20       Q.   And Teva Pharmaceuticals?

21           MR. ERCOLE:  Objection to form.

22   BY MS. BALDWIN:

23       Q.   And you understand that because you are a

24   doctor yourself, that healthcare professionals,

25   including doctors and nurses, that when they have

Confidential                                                                                    JAN-MS-05485412

```
 1    all this information coming at them -- marketing

 2    materials, medical education, sales detailing, all

 3    of these things -- that some of this can influence

 4    how they practice.  Would you agree with that?

 5            MR. ROBINSON:  Objection to form.

 6            MR. ERCOLE:  Objection to form.

 7            THE WITNESS:  I would agree with that.

 8    BY MS. BALDWIN:

 9       Q.  They can form the basis of a physician's

10    knowledge in a certain area; for example, pain

11    management?

12            MR. ERCOLE:  Objection to form, vague.

13            MR. ROBINSON:  Objection to form.

14            THE WITNESS:  Again, they -- they can.  I

15    think it's, you know, an important responsibility

16    that we have as independent scientific clinicians

17    that we balance that.  But it's -- you know, again,

18    everybody does it differently.  So -- but it's

19    significant effort that needs to be put into

20    interpreting and understanding where that

21    information comes from and being discerning.

22    BY MS. BALDWIN:

23       Q.  And this -- you would agree that this

24    information, all this information that we talked

25    about previously, can form the basis, or part of
```

Confidential                                    JAN-MS-05485413

1    the basis, of a doctor's knowledge in a specific

2    area like pain management; correct?

3           MR. ERCOLE:  Objection to form, vague.

4           THE WITNESS:  Yes, I would agree.

5    BY MS. BALDWIN:

6       Q.    And you understand that once this

7    information forms a basis of, or a part of a basis

8    of a physician's knowledge about, for example, pain

9    management, that it can influence their

10   decision-making?

11          MR. ROBINSON:  Objection to form.

12          MR. ERCOLE:  Objection to form.

13   BY MS. BALDWIN:

14      Q.    Would you agree with that?

15          MR. EHSAN:  Same objection.

16          THE WITNESS:  I would agree with that.

17   BY MS. BALDWIN:

18      Q.    That's part of the intent of all of the

19   things we talked about -- the sales detailing, the

20   marketing material, and presenting -- or working

21   with third-party organizations on creating medical

22   education and all of these efforts that the

23   pharmaceutical companies spend millions of dollars

24   doing, the intent is that it will help form the

25   basis of the physician's knowledge and influence

Confidential                                                                JAN-MS-05485414

1     the decisions they make.  Would you agree with

2     that?

3              MR. ERCOLE:  Form, calls for speculation

4     about "intent."

5              THE WITNESS:  I honestly -- I don't know

6     what "intent" is, but I would agree that that

7     programming can affect what the clinicians

8     understand and how they make decisions in the

9     future.  I can't speak to the intent of the

10    supporters.

11    BY MS. BALDWIN:

12       Q.   Well, we've seen some -- you've seen some

13    documents today, so far.  You've see some very

14    intricate analysis of the opinion leaders and their

15    influence on prescribing.  You've seen use of

16    speaker bureaus to start a physician on

17    prescribing.  So based on the things that you've

18    seen today, in your professional experience, would

19    you agree that the intent of pharmaceutical

20    companies is to influence the decision-making of a

21    physician?

22              MR. ERCOLE:  Objection to form, calls for

23    speculation, lacks of foundation.

24              MR. ROBINSON:  Form.

25              THE WITNESS:  It's a difficult question to

Confidential                                                    JAN-MS-05485415

Scott Fishman, M.D.
February 26, 2019                                    139

 1    answer, because, you know, what you've shown me

 2    today is that these companies appear, based on what

 3    you showed me -- and, again, I don't know if they

 4    are -- they are strategies or programs that were

 5    adopted, or that these are the ways that they

 6    operated.  I just don't have knowledge of that.

 7          But the fact is that, for instance, they

 8    -- in one of these documents, they -- I think they

 9    choose key opinion leaders on pretty solid grounds,

10    you know, looking at people who have published and

11    are running journals and running studies.  I think

12    these are fair elements of what makes someone a

13    respectable opinion holder.

14          So with that, you know, again, in my mind,

15    if I was chosen to do programs for an opioid

16    company, I wasn't out there telling people to

17    prescribe more; I was telling them to prescribe

18    thoughtfully.  And my belief was that -- that

19    ultimately lines up with the interest of a company

20    that believes in their product, you know.

21          But, you know, my -- so I really don't

22    know the answer to that, to your question.

23    BY MS. BALDWIN:

24      Q.   Is it common sense, though, that a

25    pharmaceutical company wouldn't spend millions of

Confidential                                                    JAN-MS-05485416

1    dollars doing this kind of analysis of influence on

2    prescribing and detailing physicians and providing

3    funding for medical education if they didn't intend

4    that it was going to affect their bottom line --

5              MR. ERCOLE:  Objection to form.

6    BY MS. BALDWIN:

7        Q.    -- in a positive manner?

8              MR. ERCOLE:  Sorry.  I didn't mean to

9    interrupt you.  Objection to form, speculation.

10             THE WITNESS:  Yeah, I would have to agree

11   it is common sense that, you know, in their goals

12   as a business, that they support things that

13   support their business interests.

14   BY MS. BALDWIN:

15       Q.    And is it also common sense that an opioid

16   manufacturer or pharmaceutical company wouldn't

17   spend money on a medical education program or a

18   speaker program in which the message that was going

19   to be conveyed to the audience would be -- would

20   negatively impact the company itself?

21             MR. ERCOLE:  Objection to form.

22             MR. OXLEY:  I'm sorry to interrupt, but

23   I've been sitting her listening to these questions.

24   This is becoming outrageous.  I mean, he's not here

25   to talk about what's common sense.

Confidential

Scott Fishman, M.D.
February 26, 2019                               141

```
1           MS. BALDWIN:  Okay.  If you have an

2    objection, state it on the record.  Totally

3    improper.  Totally improper.  I'm moving on.

4           MR. OXLEY:  I think we need to get a judge

5    on the phone if you are going to keep doing this.

6           MS. BALDWIN:  Sure.  Please.  I'm sure

7    Judge Hetherington has plenty of time and would be

8    happy to sit here and listen to this deposition

9    today.

10          MR. OXLEY:  I'm sure he would as well.

11   BY MS. BALDWIN:

12     Q.   Okay.  I am going to ask that question

13   again.

14          Isn't it also common sense that a

15   manufacturer -- a pharmaceutical company wouldn't

16   spend money on a medical education program or a

17   speaker's program or sales -- sending sales

18   representatives to doctors with specific messages

19   if those -- if those programs or activities were

20   going to hurt the company's bottom line?

21          MR. ERCOLE:  Objection to form.

22          MR. ROBINSON:  Objection to form.

23          THE WITNESS:  I suppose that's common

24   sense.

25
```

U.S. LEGAL SUPPORT
(877) 479-2484

Confidential                                                    JAN-MS-05485418

```
 1    BY MS. BALDWIN:

 2        Q.   I'm showing what you I marked as Exhibit

 3    8.

 4             (Exhibit 8 marked.)

 5    BY MS. BALDWIN:

 6        Q.   Have you had time to look at the document?

 7        A.   Yes, I have.

 8        Q.   Exhibit 8 is Bates-stamped PPLPC

 9    04100029381.  This document is entitled "Guidelines

10    for Nonpromotional Activities by Scientific and

11    Medical Personnel Status Update"; correct?

12        A.   Yes, that's what it says.

13        Q.   And there is a company logo on the cover.

14    What company is that?

15        A.   Purdue.

16        Q.   And the date of this PowerPoint

17    presentation is March 19, 2013.  Do you see that?

18             MR. EHSAN:  Objection, foundation.

19             THE WITNESS:  Yes.

20    BY MS. BALDWIN:

21        Q.   And if you turn to the second page, it's

22    titled "Purpose."  Under the first bullet point, it

23    says, "Explain and define in a single comprehensive

24    document guiding principles for Purdue's

25    nonpromotional activities"; correct?
```

Confidential                                                        JAN-MS-05485419

Scott Fishman, M.D.
February 26, 2019                                    143

```
 1        A.    That's what it says.

 2        Q.    If you turn to Page 6, you will see some

 3   definitions, and there is a definition of key

 4   opinion leader.  Do you see that?

 5        A.    Yes.

 6        Q.    Can you read that definition?

 7        A.    "Key opinion leaders are individuals;

 8   e.g., physicians, who influence their peers'

 9   medical practice, including, but not limited to,

10   prescribing behavior.  KOL may or may not be HCP."

11   I don't know what HCP is.

12        Q.    Healthcare professional.

13              MR. OXLEY:  Objection.  Testimony by

14   counsel.

15   BY MS. BALDWIN:

16        Q.    Did you know when were you working with

17   Purdue -- when I say "working with Purdue," I'm

18   referring to your prior testimony where you talked

19   about the early days of your career, where you

20   participated in some speakers' programs, and in

21   your -- any work you've done with Purdue since that

22   time period in various capacities -- that Purdue

23   defined a key opinion leader as an individual who

24   influences their peers' medical practices including

25   prescribing bare?
```

Confidential                                                    JAN-MS-05485420

```
1              MR. ROBINSON:  Objection, form,

2      foundation.

3              MR. OXLEY:  Join.

4              THE WITNESS:  I did not.

5      BY MS. BALDWIN:

6          Q.   Does that trouble you that that's how they

7      viewed a key opinion leader, including yourself?

8              MR. ROBINSON:  Objection, form.

9              MR. OXLEY:  Objection, foundation.

10             THE WITNESS:  Not really.

11     BY MS. BALDWIN:

12         Q.   It doesn't surprise you?

13         A.   It doesn't surprise me, no.

14         Q.   Does that bother you?

15             MR. OXLEY:  Asked and answered.

16             THE WITNESS:  Yeah.  It -- it bothers

17     me -- you know, it would bother me depending on

18     what the meaning of "influence" is.  I'm happy to

19     be someone who influenced people to be responsible

20     with opioids, for instance.  So it really depends

21     on what is here.

22     BY MS. BALDWIN:

23         Q.   Do you think a pharmaceutical company that

24     markets dangerous controlled substances should be

25     influencing prescribing patterns of physicians?
```

Confidential                                                          JAN-MS-05485421

1          MR. ROBINSON:  Objection, form,

2     foundation.

3          THE WITNESS:  I mean, that's a different

4     question now that -- you know, I would have to

5     really think about that.  I don't know the answer

6     to that.  They have marketing responsibilities, so

7     I assume that they have to influence people.  They

8     -- they're allowed to do marketing, and I think it

9     requires great responsibility in doing -- in

10    providing that influence.  But I assume that they

11    have a role in influencing the use of their drugs.

12    BY MS. BALDWIN:

13       Q.   Do you know that Purdue's goals in

14    influencing prescribers were to -- for example, for

15    OxyContin -- were to start opioid-naive patients on

16    OxyContin, to have them on higher and higher doses

17    and to maintain them on OxyContin longer to

18    increase their sales profits?

19         MR. ROBINSON:  Objection, form,

20    foundation.

21         MR. ERCOLE:  Join.

22         MR. ROBINSON:  You can answer.

23         THE WITNESS:  I didn't know that.

24    BY MS. BALDWIN:

25       Q.   You weren't aware of that?

Confidential                                                              JAN-MS-05485422

Scott Fishman, M.D.
February 26, 2019                                    146

1        A.    No.

2        Q.    Purdue never told you that?

3        A.    No.

4        Q.    I'm showing you what I marked as

5   Plaintiff's Exhibit 9.

6              (Exhibit 9 marked.)

7              THE WITNESS:  Do you want me to read this

8   entire document?

9   BY MS. BALDWIN:

10       Q.    No, I don't.  I was going to ask you a

11  question about one part of one page.  But, again,

12  if you think you need to review it, I'm not going

13  to stop you.

14       A.    Let's see what you ask me.  Maybe I'll ask

15  for more time.

16       Q.    Okay.  This document is titled "Purdue

17  Pharma LP Corporate Reputation and Visibility

18  Strategic Plan"; correct?

19       A.    Yes, that's what it says.

20       Q.    And the date on it says, "Updated as of

21  January 21, 2011"; correct?

22       A.    Correct.

23       Q.    Can you please turn to Page 25?

24       A.    Yes.

25       Q.    Do you see where it says, "Maximizing

Confidential

JAN-MS-05485423

Scott Fishman, M.D.
February 26, 2019                                    147

1    external relationships creates/builds new ones"?

2         A.    I do.

3         Q.    It states, "Key opinion leaders, KOLs, and

4    professional associations can support or interfere

5    with a company's efforts to reach audiences."

6              Did I read that correctly?

7         A.    Yes.

8         Q.    "KOLs can influence healthcare

9    professionals' prescribing practices.  The

10   emergence of new competition, the 2005 corporate

11   downsizing, and the WDBA settlement agreement has a

12   negative impact on Purdue's relationships with

13   KOLs.  The company has an opportunity to capture

14   these positive relationships through coordinated

15   liaison and communication efforts."

16             Do you see that?

17        A.    Yes.

18        Q.    Did you know when you were working with

19   Purdue that he it believed that KOLs can support or

20   interfere with a company's efforts to reach key

21   audiences?

22             MR. OXLEY:  Objection, foundation.

23             MR. ROBINSON:  Objection, form.

24             THE WITNESS:  I did not know that.

25

Confidential                                                    JAN-MS-05485424

```
 1    BY MS. BALDWIN:

 2        Q.   Did you know that Purdue believed KOLs can

 3    influence healthcare professionals' prescribing

 4    practices?

 5        A.   I did not.

 6        Q.   Would you like to have known that at the

 7    time when you were working with Purdue?

 8            MR. ROBINSON:  Objection, form,

 9    foundation.

10            Go ahead.

11            THE WITNESS:  It didn't matter to me.

12    BY MS. BALDWIN:

13        Q.   It wouldn't have mattered to you that

14    Purdue wanted to influence physicians' prescribing

15    practices --

16            MR. ROBINSON:  Objection, asked and

17    answered.

18    BY MS. BALDWIN:

19        Q.   -- to improve its --

20        A.   Well, it wouldn't change what I did.

21        Q.   And I -- I understand that.  And I'm not

22    asking you -- you're saying it wouldn't have

23    changed what you did?

24        A.   Yeah.

25        Q.   But wouldn't you have wanted to know,
```

Confidential                                                    JAN-MS-05485425

Scott Fishman, M.D.
February 26, 2019                                        149

1    based on the PowerPoints that I've shown you today,

2    the internal use of key opinion leaders by these

3    companies that you did work with?

4         A.   Perhaps.

5              MR. ERCOLE:  Objection to form.

6    BY MS. BALDWIN:

7         Q.   Do you think that would have been

8    something you would have wanted in your arsenal of

9    knowledge that may have impacted whether or not you

10   would have continued to accept funding, either

11   directly or indirectly, from these companies for

12   medical education and speaking programs?

13             MR. ROBINSON:  Objection to form.

14             MR. ERCOLE:  Objection to form.

15             THE WITNESS:  I think it may have affected

16   my decisions.

17   BY MS. BALDWIN:

18        Q.   And if you had known that, you may have

19   decided that you didn't want to work with them.

20   Would you agree with that?

21             MR. ERCOLE:  Objection to form.

22             MR. ROBINSON:  Objection.

23             THE WITNESS:  Yes.

24   BY MS. BALDWIN:

25        Q.   Because you wouldn't want -- and why is

Confidential                                                        JAN-MS-05485426

Scott Fishman, M.D.
February 26, 2019                                    150

1   that?

2       A.   Well, I ultimately made that decision not

3   to -- not to work with them in those ways, because

4   I feel that there is an apparent conflict of

5   interest.  I don't know that there's an actual one

6   at the end of the day, when we do the work we do.

7   We try very hard to make sure there isn't, but I

8   think that I -- I -- I think I grew to realize that

9   there was just more of a conflict there than I

10  thought was tolerable or I could overcome.

11      Q.   And had you known that earlier in your

12  career, it probably would have changed -- you

13  probably wouldn't have interacted with the

14  companies in the same manner had you known that?

15          MR. ERCOLE:  Objection to form.

16          MR. ROBINSON:  Objection to form,

17  foundation.

18          THE WITNESS:  I suspect that's true.

19  BY MS. BALDWIN:

20      Q.   Okay.  So you testified earlier that you

21  were associated with the American Pain Society;

22  correct?

23      A.   Yes.

24      Q.   And the American Academy of Pain Medicine?

25      A.   Correct.

Confidential                                                    JAN-MS-05485427

Scott Fishman, M.D.
February 26, 2019                                    151

1        Q.   And the American Pain Foundation; correct?

2        A.   Correct.

3        Q.   And you testified that those organizations

4     received funding from opioid manufacturers;

5     correct?

6        A.   Yes.

7        Q.   Including the opioid manufacturers in this

8     litigation; correct?

9             MR. ERCOLE:  Objection to form.

10            MR. ROBINSON:  Objection, form,

11     foundation.

12            You can answer, if you know.

13            THE WITNESS:  Yes.

14     BY MS. BALDWIN:

15        Q.   Okay.  Do you recall in 2012 there was a

16     Senate Committee -- a U.S. Senate Committee inquiry

17     into the relationship between opioid manufacturers

18     and certain third-party organizations?

19        A.   I do.

20        Q.   And the American Pain Foundation was a

21     subject of that inquiry; correct?

22        A.   It was.

23        Q.   And --

24        A.   They were -- they were sent a letter

25     asking for information.  I don't know if that means

Confidential                                                                                    JAN-MS-05485428

Scott Fishman, M.D.
February 26, 2019                                        152

1    they're the subject of an inquiry, but yeah.

2        Q.   And American Pain Foundation received

3    substantial funding from industry; correct?

4            MR. ROBINSON:  Objection.

5            MR. ERCOLE:  Objection.

6            MR. ROBINSON:  Form.

7            THE WITNESS:  Could you say that one more

8    time?

9    BY MS. BALDWIN:

10       Q.   The American Pain Foundation received

11   substantial funding from industry.  Is that fair to

12   say?

13       A.   Yes.

14           MR. ERCOLE:  Same objection.

15   BY MS. BALDWIN:

16       Q.   And after the American Pain Foundation was

17   sent a letter from the Senate Finance Committee, I

18   believe it was, in 2012, sometime soon after that

19   it ceased operating; correct?

20       A.   Yes.

21       Q.   It dissolved?

22       A.   All I can say is it ceased operation.

23       Q.   And after that -- after that inquiry was

24   initiated, or letter was sent to the American Pain

25   Foundation regarding the potential connection

Confidential                                                                    JAN-MS-05485429

Scott Fishman, M.D.
February 26, 2019                                    153

1    between -- or financial connection between opioid

2    manufacturers and American Pain Foundation, is it

3    true to say that the American Pain Foundation

4    wasn't able to obtain any more industry funding at

5    that point?

6              MR. ROBINSON:  Objection to form.

7              MR. EHSAN:  Objection to form.

8              THE WITNESS:  I don't know.  I wasn't part

9    of the American Pain Foundation at that time.  So I

10   had left in 2011.  The American Pain Foundation had

11   significant financial problems well earlier than

12   that.

13             So I really don't know why they closed

14   their doors.  I know that there is a nexus between

15   the timing of the Senate Finance Committee and them

16   closing, but they were -- I can say that up until

17   the time that I left, they were near -- they were

18   pretty near to closing even then, at the end of

19   2011.

20   BY MS. BALDWIN:

21        Q.   Because they were having --

22        A.   Severe financial problems.

23        Q.   -- severe financial problems?

24        A.   Yeah.

25        Q.   I'm going to show you what I marked as

Confidential                                                                    JAN-MS-05485430

```
 1    Exhibit 10.

 2              (Exhibit 10 marked.)

 3              MS. BALDWIN:  Can you pass, if there is an

 4    extra one?

 5    BY MS. BALDWIN:

 6       Q.   So I represent to you this is Purdue

 7    Pharma's response to the Senate Finance Committee

 8    letter that was sent on May 8, 2012.  You see at

 9    the top left-hand corner, it states, "Response to

10    Request"; correct?

11       A.   Yes.

12       Q.   And then underneath that, it says "Summary

13    of Payments by Name and Year, 1997 through May 8,

14    2012"; correct?

15       A.   Yes.

16       Q.   The American Pain Foundation, between 1997

17    and 2011 -- or 2012, received $3,642,501 from

18    Purdue Pharma; is that correct?

19              MR. OXLEY:  Objection, foundation.  You

20    mean is that what this says?

21              THE WITNESS:  That is what this says.

22              MR. OXLEY:  Yes?

23              MS. BALDWIN:  My question was my question.

24    Can you just object, if you have an objection to my

25    question, and not offer a speaking objection?
```

Confidential                                                      JAN-MS-05485431

1          MR. OXLEY:  I assumed you were asking him

2     if it was true that that's what Purdue gave to the

3     American Pain Foundation.  So if that's your

4     question, then please ask it again.

5     BY MS. BALDWIN:

6         Q.  Dr. Fishman, you understand that there was

7     a Senate inquiry in 2012 into potential financial

8     relationships between certain opioid manufacturers,

9     including Purdue Pharma, and third-party

10    organizations; correct?

11        A.  I do.

12        Q.  Okay.  I'll represent to you that in

13    response to that inquiry, Purdue sent some

14    information to the Senate's Finance Committee that

15    was produced to the state in this litigation, and

16    that is what is on Exhibit 9 that I handed to you.

17             My question is --

18             MR. ROBINSON:  Exhibit 10, just for the

19    record; right?

20             THE WITNESS:  Exhibit 10.

21             MS. BALDWIN:  Oh, Exhibit 10.  I'm sorry.

22    BY MS. BALDWIN:

23        Q.  My question to you is:  Between 1997 --

24    1997 and 2012, Purdue gave $3,642,501 to the

25    American Pain Foundation; correct?

Confidential                                                      JAN-MS-05485432

```
 1            MR. OXLEY:  Objection, lacks foundation.

 2            MR. ROBINSON:  Objection, form.

 3            THE WITNESS:  That is what is stated here.

 4    I can't confirm that the numbers are correct, but

 5    it's correct that that's what I see here on the

 6    table.

 7    BY MS. BALDWIN:

 8       Q.   That's what Purdue told the U.S. Senate;

 9    correct?

10            MR. OXLEY:  Objection, foundation.

11            MR. ROBINSON:  Objection.

12            THE WITNESS:  Again, it's what's here, and

13    I trust you that you are representing what they

14    gave them.

15    BY MS. BALDWIN:

16       Q.   And between 1997 and 2012, Purdue Pharma

17    gave $2,035,519 to the American Academy of Pain

18    Medicine; correct?

19            MR. ROBINSON:  Objection.

20            MR. OXLEY:  Objection, foundation.

21            THE WITNESS:  Again, that's what's listed

22    here.

23    BY MS. BALDWIN:

24       Q.   And between 1997 and 2012, Purdue Pharma

25    gave $3,091,264 to the American Pain Society;
```

Confidential                                                                    JAN-MS-05485433

Scott Fishman, M.D.
February 26, 2019                                157

1    correct?

2              MR. OXLEY:  Same objection.

3              MR. ROBINSON:  Objection.

4              THE WITNESS:  That is what is here.

5    BY MS. BALDWIN:

6        Q.   You were also listed here on this

7    spreadsheet between -- in 1997, Purdue Pharma gave

8    you $24,750; correct?

9        A.   That's what's listed, yes.

10       Q.   And in 1998, Purdue Pharma gave you

11   $2,497; correct?

12       A.   Yes, that's what's listed.

13       Q.   And in 1999, Purdue Pharma gave you

14   $5,843; correct?

15       A.   Yes, that's what's listed.

16       Q.   And in 2000, Purdue Pharma gave you

17   $9,392; correct?

18       A.   Again, yes, as listed.

19       Q.   An that's a total, between 1997 and 2012,

20   of $42,482; correct?

21             MR. ROBINSON:  Objection.

22             THE WITNESS:  Correct, as listed.

23             MR. ROBINSON:  Between 1997 and 2000,

24   sure.

25

Confidential                                                                JAN-MS-05485434

Scott Fishman, M.D.
February 26, 2019                                    158

1    BY MS. BALDWIN:

2        Q.   I'll rephrase the question.  Between 1997

3    and 2000, Purdue Pharma gave you $42,482; correct?

4        A.   Again, that's what's listed.

5        Q.   I'm handing you what I marked as Exhibit

6    11.

7             (Exhibit 11 marked.)

8    BY MS. BALDWIN:

9        Q.   I'll represent to you that this is a

10   document that Teva produced to this date, in this

11   litigation, in a response to a request for

12   information regarding payments made to third-party

13   organizations.

14            On this first part, this first page, I'll

15   represent to you, because there was a tab that

16   wasn't printed with the spreadsheet that said AAPM

17   on it, but you can tell from some of the text that

18   references AAPM that these are the payments that

19   Teva made to the American Academy of Pain Medicine

20   between 2006 and 2011.

21            MR. ERCOLE:  Objection to form.

22            MR. ROBINSON:  Objection, form.

23            MR. ERCOLE:  Foundation.  No distinction

24   between Teva and other entities.

25            MS. BALDWIN:  This is a document that your

Confidential                                                        JAN-MS-05485435

Scott Fishman, M.D.
February 26, 2019                              159

```
 1    30 (b)(6) witness gave to us in response to a topic

 2    on this very issue.  So if you are going to object

 3    to it, because you didn't produce the information

 4    we requested in another form, that's ridiculous.

 5          MR. ERCOLE:  Are you done with your

 6    speaking objection?

 7          MS. BALDWIN:  Yeah, I'm done now.

 8          MR. ERCOLE:  The witness has never seen

 9    this particular document, plus you keep referring

10    to "Teva," as if Teva and Cephalon are the same

11    entity.  They're just not.  So if you want to reask

12    the question in a way that makes any sense, please

13    feel free to do so.

14    BY MS. BALDWIN:

15       Q.   Do you understand that Teva owns Cephalon,

16    Dr. Fishman?

17          MR. ERCOLE:  Objection to form.

18          MR. ROBINSON:  Objection.

19          THE WITNESS:  I accept that they do.

20    BY MS. BALDWIN:

21       Q.   I believe you testified earlier that you

22    thought that Teva had purchased Cephalon; correct?

23       A.   Yeah.

24          MR. ERCOLE:  Objection to form.

25
```

Confidential                                                      JAN-MS-05485436

Scott Fishman, M.D.
February 26, 2019                                    160

1    BY MS. BALDWIN:

2        Q.   So this is a compilation of payments that

3    Teva, Cephalon, and related entities have provided

4    to the AAPM between 2006 and 2011, and --

5            MR. ERCOLE:  Objection -- sorry.  I

6    thought you were finished.

7    BY MS. BALDWIN:

8        Q.   -- is it correct that between 2006 and

9    2011, Teva and its related entities gave

10   $507,377.50 to the American Academy of Pain

11   Medicine?

12           MR. ROBINSON:  Objection, form,

13   foundation.

14           MR. ERCOLE:  Objection, form, foundation,

15   mischaracterizes the document and entities in the

16   case.

17           MR. ROBINSON:  Objection, form,

18   foundation.

19           THE WITNESS:  I don't -- I can't say that

20   this is correct.  That number is here on this

21   spreadsheet.

22   BY MS. BALDWIN:

23       Q.   That's what this spreadsheet says?

24       A.   Yes.

25       Q.   If you turn to Page 2, is it correct that

Confidential                                                    JAN-MS-05485437

Scott Fishman, M.D.
February 26, 2019                                     161

1    between 2006 and 2011, Teva, Cephalon, and related

2    entities gave $412,100 to the American Pain

3    Foundation?

4            MR. ERCOLE:  Objection, form, calls --

5    lack of foundation, calls for speculation, improper

6    characterization.

7            MR. ROBINSON:  Objection, form,

8    foundation.

9            THE WITNESS:  Again, I don't know if it's

10   correct, but that's what's stated on the table.

11   BY MS. BALDWIN:

12      Q.   And if you turn to Page 3, is it true that

13   between 2006 and 2011 -- 2011, Teva, Cephalon, and

14   related entities gave $465,451.25 to the American

15   Pain Society?

16           MR. ROBINSON:  Objection, form,

17   foundation.

18           MR. ERCOLE:  Objection, form, lack of

19   foundation, calls for speculation, mischaracterizes

20   the document and the entities.

21           THE WITNESS:  So I can't say if it's

22   correct, but that's what's stated here on the

23   spreadsheet.

24   BY MS. BALDWIN:

25      Q.   I'm handing you what I marked as Exhibit

Confidential                                                                JAN-MS-05485438

1    12.

2           (Exhibit 12 marked.)

3    BY MS. BALDWIN:

4       Q.   Now, we discussed the 2012 U.S. Senate

5    inquiry into the opioid manufacturers' potential

6    financial relationships with third-party

7    organizations; correct?

8           MR. ERCOLE:  Objection to form.

9           THE WITNESS:  Yes.

10   BY MS. BALDWIN:

11      Q.   I represent to you that this document is

12   Johnson & Johnson's response to that Senate letter

13   that it received in 2012.

14           MR. EHSAN:  Object to form, lacks

15   foundation.

16   BY MS. BALDWIN:

17      Q.   Do you see on the top left corner, where

18   it says, "Summary of Payments Made 1997 to 2012"?

19      A.   I do.

20      Q.   And do you see below that, it states, "In

21   Response to Senate Finance Committee Request dated

22   5/8/12"?

23      A.   I do.

24      Q.   Is it true that between 2004 and 2012,

25   Johnson & Johnson gave $633,300 to the American

Confidential                                                        JAN-MS-05485439

```
 1   Pain Foundation?

 2           MR. EHSAN:  Object to form, lacks

 3   foundation.  The document speaks for itself.

 4           THE WITNESS:  Again, that's what's on this

 5   document.

 6   BY MS. BALDWIN:

 7      Q.   And as the chair of the American Pain

 8   Foundation for part of this time, does that -- does

 9   that seem right to you?

10           MR. ROBINSON:  Objection, form,

11   foundation.

12           MR. EHSAN:  Same.

13           THE WITNESS:  I don't know, other than I

14   would say, roughly, yes.

15   BY MS. BALDWIN:

16      Q.   And is it correct that between 1997 and

17   2012, Johnson & Johnson provided $562,674 to the

18   American Academy of Pain Medicine?

19           MR. ROBINSON:  Objection, form,

20   foundation.

21           MR. EHSAN:  Lacks foundation.  Document

22   speaks for itself.

23           THE WITNESS:  Again, that's what it says

24   on this paper.

25
```

Confidential                                                                    JAN-MS-05485440

Scott Fishman, M.D.
February 26, 2019                          164

1    BY MS. BALDWIN:

2        Q.   And is it true that between 1997 and 2012,

3    Johnson & Johnson gave 1.7 million to the American

4    Pain Society?

5             MR. ROBINSON:  Same objection.

6             MR. EHSAN:  Same objections.

7             MR. ROBINSON:  Form, foundation.

8             THE WITNESS:  That's what it says.

9    BY MS. BALDWIN:

10       Q.   And do you see that in 2008, Johnson &

11   Johnson gave $2,000 to you?

12            MR. EHSAN:  Same objections.

13            THE WITNESS:  I see that's what it says.

14   BY MS. BALDWIN:

15       Q.   And in 2009, Johnson & Johnson gave $2,000

16   to you; correct?

17            MR. EHSAN:  Same objection.

18            THE WITNESS:  That's what it says, yes.

19   I'm not sure if they did or not, if that came to me

20   or not, but I don't recall why.

21   BY MS. BALDWIN:

22       Q.   Turn to page ending 0000008.  Do you see

23   where it lists your name?

24       A.   I do.

25       Q.   Do you see where it says Johnson & Johnson

Confidential                                                    JAN-MS-05485441

```
 1    paid $2,898 to you for an advisory board?

 2        A.   I do.

 3             MR. EHSAN:  Object to form, lacks

 4    foundation.

 5    BY MS. BALDWIN:

 6        Q.   And do you see where it says Johnson &

 7    Johnson gave $2,000 to you for fee-for-services in

 8    2009?

 9             MR. EHSAN:  Object to form, lacks

10    foundation.

11             THE WITNESS:  I do.

12    BY MS. BALDWIN:

13        Q.   And the total that Johnson & Johnson,

14    according to this Senate Finance Committee response

15    to the U.S. Senate, paid to you in 2008 and 2009

16    was $4,898; is that correct?

17             MR. EHSAN:  Same objections.

18             MR. ROBINSON:  Objection.

19             THE WITNESS:  That's what it says.  I must

20    say, I don't know what "fee-for-service" means and

21    what services I would have provided them.

22    BY MS. BALDWIN:

23        Q.   I'm handing you what I marked as Exhibit

24    13.

25             (Exhibit 13 marked.)
```

Confidential                                                      JAN-MS-05485442

1    BY MS. BALDWIN:

2        Q.   Are you aware that the U.S. Senate

3    Homeland Security and Governmental Affairs

4    Committee issued a similar inquiry to opioid

5    manufacturers and third-party organizations in --

6    around 2017 regarding the relationship between

7    manufacturers and these third-party organizations?

8        A.   I am.

9        Q.   You are.  Have you ever seen this report

10   before?

11       A.   I have.

12       Q.   You have.  Can you turn to Page 4?

13   According to the information provided to the U.S.

14   Senate Committee and collected in this report, is

15   it correct that between 2012 and 2017, Purdue gave

16   $725,000 -- $725,584.95 to the American Academy of

17   Pain Medicine?

18            MR. OXLEY:  Objection, foundation.

19            MR. ROBINSON:  Objection, form,

20   foundation.

21            THE WITNESS:  Again, that's what it says

22   here.

23   BY MS. BALDWIN:

24       Q.   And during that same time period, Janssen

25   gave $83,975 to the AAPM; is that correct?

Confidential                                                    JAN-MS-05485443

Scott Fishman, M.D.
February 26, 2019                              167

```
 1            MR. EHSAN:  Object to form, foundation.
 2            MR. ROBINSON:  Objection.
 3            THE WITNESS:  That's what it says.
 4    BY MS. BALDWIN:
 5       Q.   And in total from all manufacturers that
 6    include Mylan, Insys, Depomed, Janssen, and Purdue,
 7    the AAPM received $1,199,409.95 between 2012 and
 8    2017?
 9            MR. EHSAN:  Object to form, lacks
10    foundation.
11            MR. ROBINSON:  Objection, form,
12    foundation.
13            THE WITNESS:  Again, that's what it says.
14    BY MS. BALDWIN:
15       Q.   Do you know what the AAPM foundation is?
16       A.   I do.
17       Q.   Can you explain what that is?
18       A.   Well, it's a foundation that was started
19    by the academy -- the American Academy of Pain
20    Medicine, I believe, as a charitable foundation
21    that could accept donations and do charitable work.
22    That's really all I know of it.  I donated to it.
23       Q.   Do you know when it started?
24       A.   I don't.
25       Q.   Did it exist when you were a member of the
```

Confidential                                                              JAN-MS-05485444

Scott Fishman, M.D.
February 26, 2019                                    168

1    board?

2        A.    I don't believe it did, and it certainly

3    didn't exist when I was president.

4        Q.    Is it correct that between 2012 and 2017,

5    Purdue gave -- I'm sorry -- Purdue gave 25 --

6    strike that.

7            Is it true that in 2012, Purdue gave

8    $25,000 to the American Pain Foundation?

9            MR. OXLEY:  Objection, foundation.

10           MR. ROBINSON:  Objection.

11           THE WITNESS:  Well, this, I think, states

12   that between 2012 and 2017, they gave $25,000 to

13   the American Pain Foundation, I think.

14   BY MS. BALDWIN:

15       Q.    Right, but I believe --

16       A.    I don't know in 2012 if they -- what they

17   did.  I don't know -- it's just what this says.

18       Q.    Right, but I believe you testified that

19   the APF dissolved around the time of the U.S.

20   Senate inquiry in 2012?

21       A.    Correct.

22       Q.    So they didn't exist after 2012; correct?

23           MR. ERCOLE:  Objection to form.

24           THE WITNESS:  That is correct.

25

Confidential                                        JAN-MS-05485445

1     BY MS. BALDWIN:

2          Q.    And is it true that Purdue -- between 2012

3     and 2017, Purdue gave $542,259.52 to the American

4     Pain Society?

5                MR. ROBINSON:  Objection, form,

6     foundation.

7                MR. OXLEY:  Objection, form.

8                THE WITNESS:  That's what it says.

9     BY MS. BALDWIN:

10         Q.    And Janssen gave 88,500 to the American

11    Pain Society during that same time period?

12               MR. EHSAN:  Objection to form, foundation.

13               MR. ROBINSON:  Objection to form,

14    foundation.

15               THE WITNESS:  Again, that's what it says.

16               MS. BALDWIN:  Did you want to break for

17    lunch?

18               MR. ROBINSON:  Yeah.  Good time.

19               THE WITNESS:  Up to you guys.

20               THE VIDEOGRAPHER:  Off the record at 1:09.

21               (Lunch recess taken.)

22               THE VIDEOGRAPHER:  Back on the record.

23    The time is 1:57.

24    BY MS. BALDWIN:

25         Q.    Dr. Fishman, do you recall earlier

Confidential                                                    JAN-MS-05485446

1    discussing the American Pain Foundation had some

2    financial problems in 2011?

3        A.    I do.

4        Q.    When the company was having financial

5    problems, it sought emergency funding; correct?

6             MR. ROBINSON:  Objection, form.

7             MR. EHSAN:  Objection, form.

8             THE WITNESS:  Yes.

9    BY MS. BALDWIN:

10       Q.    And the emergency funding it sought was

11   largely from opioid manufacturers; is that correct?

12            MR. ROBINSON:  Objection, foundation,

13   form.

14            THE WITNESS:  No.

15            MR. EHSAN:  Same.

16            THE WITNESS:  It was from anyone that

17   would give funding.  So there was a major campaign

18   to reach out to consumers, and then we reached out

19   to, you know, all industry and any that might be

20   interested in donating, including drug companies

21   that don't make opioids, and manufacturers of other

22   medical products.

23   BY MS. BALDWIN:

24       Q.    I'm showing you what I marked as Exhibit

25   14.

Confidential

JAN-MS-05485447

```
 1              (Exhibit 14 marked.)

 2     BY MS. BALDWIN:

 3         Q.   Exhibit 14 is Bates Number FISH 006241

 4     through 6244; correct?

 5              MR. ROBINSON:  6245.

 6              MS. BALDWIN:  I stand corrected.

 7              THE WITNESS:  Yes.

 8     BY MS. BALDWIN:

 9         Q.   Are you familiar with this e-mail chain?

10         A.   It's --

11              MR. ROBINSON:  Take your time and read it.

12              THE WITNESS:  It's from six years ago, but

13     it looks familiar.

14     BY MS. BALDWIN:

15         Q.   Okay.  And the first e-mail on the last

16     page was sent from you, I believe; is that correct?

17         A.   Yes.

18         Q.   And are those to other members of the

19     American Pain Foundation board?

20         A.   Correct.

21         Q.   And that e-mail is dated November 29,

22     2011; correct?

23         A.   Correct.

24         Q.   And under Number 3 there is an update on

25     budget status since the board meeting; correct?
```

Confidential                                                                      JAN-MS-05485448

Scott Fishman, M.D.
February 26, 2019                                    172

```
 1        A.    Yes.

 2              MR. EHSAN:  Object to form.

 3              MR. ROBINSON:  Object to form.

 4    BY MS. BALDWIN:

 5        Q.    The first bullet point talks about

 6    reviewing the current 2011 budget shortfall and

 7    emergency fundraising efforts; correct?

 8        A.    Yes.

 9        Q.    And if you look at the last e-mail, if you

10    look at the next -- the e-mail on the previous

11    page, it actually starts on the page before that

12    from Will Rowe to -- it looks like the members of

13    the American Pain Foundation board; do you see

14    that?

15        A.    Yes.

16              MR. ERCOLE:  Do you mind just giving the

17    Bates Number so I can follow along?

18              MS. BALDWIN:  6243 through 6244.

19              MR. ERCOLE:  Thanks.

20    BY MS. BALDWIN:

21        Q.    Do you see there is an update on emergency

22    funding status; correct?

23        A.    Uh-huh, yes.

24        Q.    And Number 1 is $150,000 from Purdue,

25    $60,000 from Janssen, totaling 210,000; correct?
```

Confidential                                    JAN-MS-05485449

Scott Fishman, M.D.
February 26, 2019                                    173

1        A.    Correct.

2        Q.    Then it talks about the committed funds,

3    50,000 from Purdue; 75,000 plus 75,000 from Endo;

4    10,000 from DJO; 25,000 dues Endo, and 15,000 DJO

5    in January for a total of 250,000; correct?

6        A.    That's what it says.

7        Q.    And it goes on to list the July date on

8    the funding status; correct?

9        A.    Yes.

10       Q.    And then there is an e-mail the following

11   day on Page ending 6243 from Will Rowe to the board

12   of the American Pain Foundation providing

13   additional update on emergency funding; correct?

14       A.    Yes.

15       Q.    And that looks like there's money

16   confirmed from Ortho-McNeil; correct?

17            MR. EHSAN:  Object to the form.

18            THE WITNESS:  Yes.

19   BY MS. BALDWIN:

20       Q.    And Teva and Cephalon?

21            MR. ERCOLE:  Objection to form.

22            THE WITNESS:  That's what it says, yes.

23   BY MS. BALDWIN:

24       Q.    Then several days later there is another

25   funding update from Will Rowe to the board;

Confidential                                    JAN-MS-05485450

Scott Fishman, M.D.
February 26, 2019                                      174

1    correct?

2         A.   Yes.

3         Q.   And it's talking about payment from Endo;

4    correct?

5         A.   Assigned a payment from Endo, from other

6    companies, including Boston Scientific, opioid and

7    nonopioid companies.

8         Q.   And then on the e-mail dated on the first

9    page dated December 6, 2011 from Will Rowe to the

10   board, there is a further update on funding

11   received; correct?

12        A.   Correct.

13        Q.   So the American Pain Foundation board was

14   actively seeking and receiving emergency funding

15   from Purdue, Janssen, Ortho-McNeil, Teva and

16   Cephalon; correct?

17             MR. ERCOLE:  Objection to form.

18             THE WITNESS:  They were, and other

19   entities.

20   BY MS. BALDWIN:

21        Q.   And the American Pain Foundation, is it

22   true to say that it wouldn't have lasted had it not

23   received this emergency funding?

24             MR. ROBINSON:  Objection to form.

25             MR. ERCOLE:  Objection, form.

Confidential                                                      JAN-MS-05485451

Scott Fishman, M.D.
February 26, 2019                    175

1          THE WITNESS:  I honestly can't say whether

2    they would have lasted or not.  They would have had

3    to contract.  I don't know that they would have

4    closed without this.  A lot of this funding was

5    funding that was already coming, it's confirming

6    funding, it's not new fundings, so just confirming

7    what was coming in.  Some of it is new.  So I don't

8    know.  I don't think I could answer that question

9    accurately.

10   BY MS. BALDWIN:

11       Q.   And on this e-mail dated December 6, 2011,

12   there is 50,000 from Washington State.  It says,

13   "Endo, 50,000 Washington state EOY"; correct?

14       A.   That's what it says.

15       Q.   Do you know what that funding was for in

16   Washington state?

17       A.   I suspect it was -- again, I don't know.

18   I don't know that I could tell you with complete

19   accuracy.  There were projects that were regional

20   and there was a regional effort in Washington state

21   to train consumers to be advocates and work with

22   what was a very active state legislator --

23   legislature at that time and a lot of active bills.

24   So there was a group that was working in Washington

25   state on those issues.  So it may have been to fund

Confidential                                                    JAN-MS-05485452

```
1    that project.
2            The APF worked by having projects that
3    then we could put out for others to fund.  So that
4    would be the project I believe that Endo may have
5    committed to and that was the end-of-year payment
6    that they were due.
7       Q.   And were one of those issues in Washington
8    related to opioid guidelines?
9       A.   Yes.
10      Q.   And there was I believe a Gary Franklin
11   who was supporting opioid guidelines that had some
12   ceilings on dosage and --
13      A.   Yes.
14      Q.   -- things of that nature?
15      A.   Correct.
16           MR. ERCOLE:  Objection, to form.
17   BY MS. BALDWIN:
18      Q.   And this money was in part efforts to
19   lobby against the state adopting those guidelines
20   or the state medical board adopting those
21   guidelines?
22           MR. ERCOLE:  Objection form.
23           MR. ROBINSON:  Objection, form.
24           THE WITNESS:  I think the funding was to
25   have groups work on those guidelines and improve
```

Confidential                                        JAN-MS-05485453

```
1    them.  So there was opposition to the guidelines
2    the way that they were formed, not opposition to
3    guidelines, but the opposition to the form of those
4    guidelines which actually have now gone through
5    many, many iterations.
6        Q.   And the American Pain Foundation opposed
7    those guidelines as they were?
8        A.   As they were.
9        Q.   And Endo opposed them as well?
10       A.   I have no idea if Endo did or not.
11       Q.   Well, Endo gave APF $50,000 related to the
12   Washington state initiative in support of APF's
13   efforts; correct?
14            MR. ROBINSON:  Objection, asked and
15   answered.
16            THE WITNESS:  I don't know if the two are
17   related.
18   BY MS. BALDWIN:
19       Q.   So you don't know whether Endo or Purdue
20   or Janssen opposed those guidelines that APF was
21   lobbying against?
22       A.   I don't know.
23       Q.   I'm showing you what I marked as Exhibit
24   15.
25            (Exhibit 15 marked.)
```

Confidential                                          JAN-MS-05485454

Scott Fishman, M.D.
February 26, 2019                                    178

1    BY MS. BALDWIN:

2         Q.   Do you recognize this e-mail chain?

3         A.   Not specifically, but, you know, it's

4    familiar, it was in that time that things were kind

5    of urgent financially with the APF.

6         Q.   And this e-mail relates to the emergency

7    funding that APF was trying to get in November of

8    2011 and December of 2011; correct?

9         A.   Yes.

10        Q.   And do you see the middle e-mail from Mary

11   Vargas dated November 22, 2011?

12        A.   Uh-huh.

13        Q.   And Mary Vargas was on the board of APF?

14        A.   That's correct.

15        Q.   You understand when I say APF, you know I

16   mean the American Pain Foundation?

17        A.   Yes.

18        Q.   And Mary was asking with respect to the

19   emergency funds that APF was receiving from Purdue

20   and Endo and Teva and Ortho-McNeil and Cephalon, if

21   there were any strings attached; do you see that?

22        A.   I do.

23             MR. ERCOLE:  Objection to form.

24   BY MS. BALDWIN:

25        Q.   And Will Rowe responds that Purdue --

Confidential                                                          JAN-MS-05485455

Scott Fishman, M.D.
February 26, 2019                                    179

1      "Both Purdue and Endo specified their grants cannot

2      be for general purpose and will design a grant for

3      the work being conducted by APF in 2011"; do you

4      see that?

5          A.    Yeah.

6          Q.    So that money did have strings attached;

7      correct?

8              MR. OXLEY:  Objection, form.

9              MR. ROBINSON:  Objection, form.

10             THE WITNESS:  No, I would not agree that

11     that implies that there's strings attached.  I

12     think what they're saying is they were going to

13     attach the funding that they give us to projects

14     that we were already doing and that would have been

15     the Washington state project.  I don't remember

16     exactly the details there, but there was a lot of

17     focus there on trying to help make a rational

18     legislative intervention, and again, it didn't mean

19     we imposed it, guidelines or intervention, we just

20     wanted them to be smart and effective.

21     BY MS. BALDWIN:

22         Q.    You said you can't recall whether or not

23     Endo or Purdue or Teva or Cephalon or Ortho-McNeil

24     shared your position with respect to those

25     guidelines?

Confidential                                                    JAN-MS-05485456

1      A.    I don't.

2            MR. ROBINSON:   Objection, form, asked and

3      answered.

4            THE WITNESS:   I would say no -- I don't

5      know where I would find out what their position was

6      on that, you know.

7      BY MS. BALDWIN:

8       Q.   So this e-mail says, "Both Purdue and Endo

9      specified their grants cannot be for general

10     purpose and will design a grant for the work being

11     conducted by APF in 2011."  Is that not saying that

12     Purdue's involved in designing the grant for that

13     work?

14      A.    I don't believe it is.

15            MR. ROBINSON:   Objection.

16            THE WITNESS:   I believe they're saying

17     that they will design a grant that would be

18     designed so that it could be attached to the work

19     that APF was already doing.

20     BY MS. BALDWIN:

21      Q.    Like coordinating efforts to implement the

22     IOM recommendations?

23      A.    Correct, correct.  That was a priority of

24     the American Pain Foundation.

25      Q.    Like coordinating efforts to promote

Confidential                                              JAN-MS-05485457

Scott Fishman, M.D.
February 26, 2019                                      181

```
 1    implementation of the IOM?

 2        A.    Correct.  Do you know what that is?

 3        Q.    Yes.

 4        A.    Okay.

 5        Q.    That's something the APF lobbied in favor

 6    of for many years --

 7             MR. ROBINSON:  Object to form.

 8             MR. OXLEY:  Objection.

 9    BY MS. BALDWIN:

10        Q.    Well, the National Pain Care Act that

11    created the statute for creating the IOM committee

12    that would make the report?

13             MR. EHSAN:  Objection to form.

14             MR. ROBINSON:  Objection.

15             THE WITNESS:  That is correct, they

16    supported the bill that never passed.  The bill

17    never actually passed, but part of it got put in

18    the Accountable Care Act and that is what

19    congressionally mandated the IOM, but they didn't

20    lobby for the IOM report.

21    BY MS. BALDWIN:

22        Q.    The legislation that --

23        A.    With the recommendations, because they had

24    nothing to do with the recommendations to the IOM

25    report.
```

Confidential                                    JAN-MS-05485458

Scott Fishman, M.D.
February 26, 2019                                    182

```
 1        Q.   They lobbied for the legislation that
 2   would create the committee to create the report;
 3   correct?
 4             MR. ERCOLE:  Objection to form.
 5             THE WITNESS:  That's true.
 6   BY MS. BALDWIN:
 7        Q.   I'm showing you what I'm marking as
 8   Exhibit 16.
 9             (Exhibit 16 marked.)
10   BY MS. BALDWIN:
11        Q.   Do you recognize this e-mail chain?
12        A.   It's somewhat vaguely familiar.
13        Q.   So you wrote on January 13, 2012 to Mary
14   Vargas; correct?
15        A.   Yes.
16        Q.   And this e-mail is Bates Number FISH
17   006877; correct?
18        A.   Yes.
19        Q.   And you wrote, "Mary, I spoke with Marlene
20   today.  I was very concerned to hear about the
21   situation with the funds that were discussed at the
22   Seattle board meeting related to Aaron Gilson.  I
23   recall our strong concern about how these funds
24   have been handled.  In fact, it was in this
25   discussion that we agreed to form the COI/Ethics
```

Confidential                                                                    JAN-MS-05485459

```
1    Committee.
2            "We explicitly directed Will to give the
3    money back.  Will reported to us that Purdue did
4    not want the funds band and agreed to allow us to
5    keep the funds for other projects.  I understand
6    not that Purdue may have had a different idea which
7    is very disturbing.  I am around this weekend if
8    you'd like to speak by phone."  Did I read that
9    correctly?
10           MR. ROBINSON:  Object to form.
11           THE WITNESS:  You read it correctly.
12   BY MS. BALDWIN:
13       Q.  What did Purdue want you to do with the
14   funds that you found very disturbing?
15       A.  So I'll tell you what I can remember of
16   all of this.  We had a board meeting -- so again,
17   the foundation of this is in my efforts and the
18   efforts of many on the board of directors of the
19   American Pain Foundation to make sure that we had
20   firewalls with industry money.  And that one of the
21   things that we wanted to make sure of is that we
22   weren't doing work for pharmaceutical companies.
23   They were supporting the work that we would do, and
24   it would work in that order, not the other way
25   around.
```

Confidential                                                                JAN-MS-05485460

Scott Fishman, M.D.
February 26, 2019                                   184

1              We set up a -- we set up a conflict of

2     interest program where we were trying to build a

3     different way of doing business.  At one of our

4     board meetings -- this one happened to be in

5     Seattle -- the board meetings would happen around

6     the country annually.  It became clear as we were

7     reviewing the grants -- and I was the chair at the

8     time -- that a grant came through the American Pain

9     Foundation to Dr. Aaron Gilson, who is a researcher

10    at the University of Wisconsin and also on the

11    board of directors.

12             I think at the time I recognized that they

13    weren't able to put a project with the grant, so we

14    started to ask questions about it.  What we found

15    is that for reasons I don't exactly remember, the

16    grant wasn't obtained appropriately, and we

17    shouldn't have had that grant.

18             So as a board, we decided that that grant

19    should be given back because it wasn't appropriate

20    in terms of the process that we had agreed on, that

21    the staff hadn't followed the process that we

22    agreed on for accepting industry money.

23             Again, this is actually happening after I

24    left the board.  I don't really know how I found

25    this out or why this came to my attention, but

Confidential                                                                          JAN-MS-05485461

Scott Fishman, M.D.
February 26, 2019                                    185

1    apparently Purdue didn't want the funds back, and

2    the APF kept the funds for other projects.

3          The statement, "I understand now that

4    Purdue may have had a different idea which is very

5    disturbing," I can't tell you what I was referring

6    to there.  I don't know what was "very disturbing,"

7    other than I think it was very disturbing to me

8    that we had instructed the staff to give this grant

9    back and that grant didn't go back and didn't leave

10   the APF funds.

11         So beyond that, I really don't know what

12   happened.

13      Q.   What was Aaron Gilson going to do with the

14   money?

15         MR. ROBINSON:  We need to take a quick

16   break.  I got to ask my client a question about

17   this document.

18         MS. BALDWIN:  And I have a pending

19   question.  Could he answer the question?

20         MR. ROBINSON:  It doesn't answer.  If I

21   think there's -- let me -- I'm going to ask my

22   client the question, I'm going to tell you why:  If

23   I think there's a potential for an attorney-client

24   communication that has been inadvertently disclosed

25   and that there might be a legitimate clawback

Confidential                                                    JAN-MS-05485462

1    reason, I will have the opportunity to consult my

2    client.  I may be wrong about that, but I need the

3    opportunity to consult my client.

4               MS. BALDWIN:  Is there an attorney on this

5    e-mail?

6               MR. ROBINSON:  I don't know, that's why I

7    need to consult my client.  Hang on a second.

8               THE VIDEOGRAPHER:  This is the end of Disc

9    2.  Off the record at 2:18.

10              (Recess taken.)

11              THE VIDEOGRAPHER:  This is the start of

12   Disc 3.  Back on the record at 2:21.

13              MR. ROBINSON:  You can continue.

14   BY MS. BALDWIN:

15      Q.   Do you know what Aaron Gilson was going to

16   be using this funding for?

17      A.   I don't recall, for some research purpose?

18      Q.   You don't know what purpose?

19      A.   I don't recall.

20      Q.   So it wasn't the -- your comment about it

21   being "very disturbing" had nothing to do with the

22   purpose of the funds, what the researcher, what

23   Aaron Gilson was going to do with those funds?

24              MR. ROBINSON:  Objection, form.

25              THE WITNESS:  I don't believe so.  I

Confidential                                                        JAN-MS-05485463

Scott Fishman, M.D.
February 26, 2019                              187

1    believe what was disturbing to me is that we didn't

2    give the money back.  At the direction of the

3    board, the staff didn't give that money back.

4    BY MS. BALDWIN:

5        Q.   Are you testifying that you don't know for

6    sure if that's the case?

7             MR. ROBINSON:  Objection.

8             MR. ERCOLE:  Objection.

9    BY MS. BALDWIN:

10       Q.   You said, I'm not sure but, so I'm just

11   clarifying.  Are you saying you don't really

12   remember?

13       A.   I don't remember if there is anything

14   else, but what I'm certain of is I was disturbed

15   that the board of directors instructed the staff to

16   give that grant back, and it didn't go back, and I

17   don't really know what happened with their

18   interplay with Purdue.  I suspect that it was that

19   they feel the like they, you know, Purdue said, You

20   could keep the money and use it for other projects,

21   and APF said, We could use it for other projects,

22   we'll keep it.  But that wasn't the direction they

23   were given from the board, so that was disturbing

24   to me.

25       Q.   I'm going to show you what I am marking as

Confidential                                                          JAN-MS-05485464

Scott Fishman, M.D.
February 26, 2019                                    188

1      Exhibit 17.

2                (Exhibit 17 marked.)

3      BY MS. BALDWIN:

4         Q.    This exhibit is an e-mail from Rebecca

5      Novak-Tibbitt@rodacreative [sic], to -- I'm sorry,

6      this is an e-mail from Rebecca Novak-Tibbitt to

7      management@rodacreative.com.  Do you know what that

8      is?

9         A.    I don't.

10        Q.    And James Heins is cc'd on this e-mail.

11     Do you know who James Heins is?

12        A.    I vaguely recall James Heins as a Purdue

13     person.

14        Q.    He was employed at Purdue as you said?

15        A.    I believe he is a Purdue person, worked at

16     Purdue.

17        Q.    And Rebecca writes, "Hi, Maria.  As

18     discussed, please see attached report from 2009-

19     '10.  APF total unique placement number was 485";

20     do you see that?

21        A.    I see it.

22        Q.    And it's attaching a Local Media Outreach

23     Media Report, 2009 Final; do you see that on the

24     front page, the subject of the e-mail?

25        A.    Yes.

Confidential                                                              JAN-MS-05485465

1        Q.   If you turn to the next page, this looks

2    like a document from the American Pain Foundation;

3    correct?

4        A.   It does.

5        Q.   It's entitled "2009 Local Market Media

6    Outreach, Final Report"; correct?

7        A.   Uh-huh.

8        Q.   It was submitted to Purdue; correct?

9        A.   That's what it says.

10       Q.   So is this a project that Purdue funded

11   APF for?

12            MR. ROBINSON:  Objection, form.

13            THE WITNESS:  I honestly don't know or

14   remember.

15   BY MS. BALDWIN:

16       Q.   But the APF was reporting to Purdue a

17   Market Media Outreach Report; correct?

18            MR. OXLEY:  Objection.

19            MR. ROBINSON:  Objection.

20            THE WITNESS:  I'm not sure what they were

21   trying to do with this.

22   BY MS. BALDWIN:

23       Q.   Well, the first sentence says, "More than

24   38.9 million people have been reached with key

25   messages about pain and overcoming barriers of

Confidential                                                    JAN-MS-05485466

Scott Fishman, M.D.
February 26, 2019                                          190

1    treatment through print, television, radio and

2    online placements as a part of Purdue's Local

3    Market Outreach Grant"; correct?

4        A.   Uh-huh.

5        Q.   Do you recall a Purdue local market media

6    outreach grant?

7        A.   I don't.

8        Q.   Then it goes on to list, "Total markets

9    reached to date, 18, 19 percent of goal"; do you

10   see that under Media Coverage Highlights on the

11   first page.

12       A.   Yup, I do see that.

13       Q.   "Total impressions to date, local media

14   3,538,100"; do you see that?

15       A.   Uh-huh.

16       Q.   "Total impressions to date, national and

17   online media, 35.4 million"; correct?

18       A.   I do.

19       Q.   And under Coverage Highlights, about the

20   third sentence down, it says, "New markets reached

21   include Eugene, Oregon; Lincoln, Nebraska; Tulsa,

22   Oklahoma and Santa Barbara/Los Angeles,

23   California"; do you see that?

24       A.   I do.

25       Q.   So Tulsa, Oklahoma was one of the new

Confidential                                                      JAN-MS-05485467

Scott Fishman, M.D.
February 26, 2019                                    191

1    markets reached in this media outreach report?

2            MR. OXLEY:  Objection, foundation.

3            MR. ROBINSON:  Objection.

4            THE WITNESS:  It's listed here.

5    BY MS. BALDWIN:

6       Q.   There's also a legislative target update;

7    do you see that?

8       A.   Uh-huh.

9       Q.   It says, "10 of the 20 markets in this

10   outreach include target senators.  Currently, we

11   have secured 22 placements in nine of the 10 target

12   legislative priority markets"; correct?

13      A.   Yes, that's what it says.

14      Q.   So under this project, media was targeting

15   certain markets, including Tulsa, Oklahoma, as well

16   as legislative -- as well as senators; correct?

17           MR. ROBINSON:  Objection, form.

18           MR. OXLEY:  Objection, foundation.

19           THE WITNESS:  It appears that they were

20   targeting -- they were seeking to target

21   legislators, including senators.

22   BY MS. BALDWIN:

23      Q.   If you could turn to Page 4, there is a

24   summary, "Influential Members of Senate Health

25   Subcommittee By Priority Market"; correct?

Confidential                                                    JAN-MS-05485468

1      A.   Yes.

2      Q.   And in the second column you see Tulsa,

3    Oklahoma, Tom Coburn?

4      A.   Yes.

5      Q.   And do you see an asterisk next to Tulsa,

6    Oklahoma?

7      A.   I do.

8      Q.   And if you look below that chart, it says

9    asterisk, "Target legislative market where APF has

10   secured coverage"; correct?

11     A.   That's what it says.

12     Q.   And if you turn to Page 6, at top it says,

13   "Key messages:  Scope of pain problem, unmanaged

14   and managed symptoms, barriers to care and right to

15   pain management"; correct?

16     A.   Yes.

17     Q.   And if you look at the second row on this

18   chart under, "Outlets/Market," you see, "Good

19   Morning, Tulsa, Tulsa, Oklahoma"; correct?

20     A.   Tell me again where that is?

21     Q.   Under the first column of the chart,

22   "Outlet/Market," two rows down.

23     A.   I do, I see it, yeah.

24     Q.   It says, "Good Morning, Tulsa, Tulsa,

25   Oklahoma"; correct?

Confidential                                                                    JAN-MS-05485469

Scott Fishman, M.D.
February 26, 2019                                    193

1        A.    Yes.

2        Q.    The headline is, "Pain Advocate Raises

3    Awareness"; correct?

4        A.    Uh-huh.

5        Q.    There is an advocate listed there, "Lisa

6    Rushing, Action Network Leader"; correct?

7        A.    Uh-huh, yes.

8        Q.    Do you know Lisa Rushing?

9        A.    I don't.

10       Q.    So one of the things that American Pain

11   Foundation did for industry sponsors like Purdue

12   was local media campaigns in which it updated

13   the -- in which it targeted certain markets and

14   legislators and updated Purdue on the success of

15   those campaigns?

16            MR. ROBINSON:  Objection to form.

17            MR. ERCOLE:  Objection to form,

18   foundation.

19            THE WITNESS:  So I want to say I'm not

20   sure that this is for Purdue.  It's maybe a report

21   back to Purdue, but I don't know that they did any

22   of this work for Purdue.  This is work I would

23   argue they would -- again, it's hard for me, I

24   wasn't -- I was the chair of the board, and we were

25   at a distance, but that this is work that would be

Confidential                                                    JAN-MS-05485470

1    done and that it would be available to be

2    supported, but this is work that was being done.

3            In fact, I'm not sure which of these even

4    discussed opioids or nonopioids or spinal cord

5    simulators or neuropathic analgesics, et cetera.

6    So it sounds like you are tying this to work that

7    the APF did for Purdue, but I'm not convinced

8    that's the case from what I've seen.

9    BY MS. BALDWIN:

10      Q.   Well, what I'm asking is APF did this work

11   pursuant to a grant that Purdue provided; correct?

12           MR. ROBINSON:  Objection, form,

13   foundation.

14           THE WITNESS:  I think it was the other way

15   around.  That the American Pain Foundation proposed

16   that they had work to do and then Purdue gave them

17   a grant for that work.

18   BY MS. BALDWIN:

19      Q.   That's what I was asking, Purdue gave them

20   a grant for this work?

21           MR. ROBINSON:  Objection, argumentative,

22   asked and answered, form, foundation.

23           MR. ERCOLE:  Same objection.

24   BY MS. BALDWIN:

25      Q.   The executive summary states Purdue's

Confidential                                                            JAN-MS-05485471

Scott Fishman, M.D.
February 26, 2019                                    195

1    local market media outreach grant; correct?

2            MR. ROBINSON:  Objection.

3            THE WITNESS:  I'm suspecting that they

4    gave a grant, like many companies gave grants to

5    the American Pain Foundation to support the work

6    the American Pain Foundation was doing.

7    BY MS. BALDWIN:

8        Q.   And that --

9        A.   Looks that way.

10       Q.   In the executive summary, Purdue's Local

11   Market Outreach Grant; correct?

12           MR. ROBINSON:  Objection, asked and

13   answered.

14   BY MS. BALDWIN:

15       Q.   And it says, "Submitted to Purdue Pharma"?

16           MR. ROBINSON:  Objection, asked and

17   answered, compound, form, foundation.

18           THE WITNESS:  Again, it's hard for me to

19   tell exactly how this rolled out in its full

20   context.  It would surprise me if the American Pain

21   Foundation was doing work for Purdue, and I think

22   it may sound like that, but I'm not sure that's

23   what was happening here, that they were giving a

24   report back to Purdue for work that they were going

25   to do that Purdue gave them -- for which Purdue

Confidential                                                            JAN-MS-05485472

Scott Fishman, M.D.
February 26, 2019                                      196

1    gave them a grant.

2    BY MS. BALDWIN:

3        Q.   My question was simply the 2009 Local

4    Market Outreach Final Report was submitted to

5    Purdue Pharma; correct?

6        A.   It appears that way.

7        Q.   And in the e-mail we see that it, in fact,

8    reads "Purdue Pharma"; correct?

9             MR. OXLEY:  Objection, foundation.

10            THE WITNESS:  Correct.

11   BY MS. BALDWIN:

12       Q.   Let me hand you what I marked as Exhibit

13   17?

14            MR. EHSAN:  18.

15            MS. BALDWIN:  Oh, is it 18?  Sorry, I

16   wrote "17" on it.

17            (Exhibit 18 marked.)

18   BY MS. BALDWIN:

19       Q.   Exhibit 18 is Bates stamped SFC 00009587

20   through 89, and, Dr. Fishman, this is an e-mail

21   chain from Pamela Bennett to several Purdue

22   employees; correct?

23       A.   The top --

24       Q.   The top of the last page, it starts the

25   first e-mail in the chain?

Confidential                                                    JAN-MS-05485473

Scott Fishman, M.D.
February 26, 2019                                    197

```
 1        A.    The last page appears to be from Kimberley

 2   Tiller.  So which page do you want me to be on?

 3        Q.    Okay, you are correct.  The first e-mail

 4   from Kimberley Tiller to several Purdue employees,

 5   correct, dated July 4, 2008?

 6              MR. OXLEY:  Objection, foundation, form.

 7              MR. ROBINSON:  Objection, form,

 8   foundation.

 9   BY MS. BALDWIN:

10        Q.    Do you recognize, are you familiar with

11   any of these Purdue employees, for example, Pamela

12   Bennett?

13        A.    Yes.

14        Q.    Burt Rosen?

15        A.    Yes.

16        Q.    Alan Must?

17        A.    I don't know that I -- I know who Alan

18   Must is in Purdue.

19        Q.    So you recognize he's a --

20        A.    The name.

21        Q.    -- Purdue employees?

22        A.    Yes, I do.  I know that I've never met

23   Alan Must, but I've met Pam Bennett and Burt Rosen.

24        Q.    When did you meet Burt Rosen?

25        A.    You know, I have known Burt Rosen for
```

Confidential                                                                 JAN-MS-05485474

Scott Fishman, M.D.
February 26, 2019                              198

```
 1    many, many years.  He's involved in a lot of the

 2    legislative work that we've all done in the field.

 3    I met him in passing in those ways.

 4         Q.   When you said "we've all done," who are

 5    you referring to?

 6         A.   Well, the work that I should say that I've

 7    done through the American Academy of Pain Medicine,

 8    through the American Pain Foundation, et cetera.

 9         Q.   You've worked through those organizations

10    with Burt Rosen?

11              MR. ROBINSON:  Objection.

12              THE WITNESS:  Not in those organizations,

13    but I've come to talk with him, and I've never

14    worked directly with Burt Rosen on any projects,

15    but I've met him in those settings.

16    BY MS. BALDWIN:

17         Q.   Kim Tiller writes, "Dear All.  Pam and I

18    have reviewed the attached document and recommend

19    partial support for the following items: A, 1, 2,

20    5, 6, 7, 8, B, 1, 2, 3, 6," and I'll represent to

21    you that it looks like someone in Purdue just

22    copied those items above.

23              MR. OXLEY:  Foundation, objection.

24    BY MS. BALDWIN:

25         Q.   Exactly.  And if you look at the prior
```

Confidential                                                      JAN-MS-05485475

```
 1    e-mail or the following e-mail from Pamela Bennett
 2    on July 14, 2008 to Purdue employees, it states,
 3    "Similar to last year, we would provide funding
 4    that would be distributed over these activities.
 5    Currently we have budgeted for $125,000 for APF, of
 6    that we have currently spent 10,000 on their gala
 7    event for October."  Did I read that correctly?
 8        A.   Yes.
 9        Q.   And if you look at the subsequent e-mail
10    on Page 1, Kimberley Tiller has copied and pasted,
11    "The APF projects we would like to provide partial
12    support.  Most of the projects require multiple
13    funders, so if we spread our $115,000 over several
14    projects, we will increase our visibility"; did I
15    read that correctly?
16        A.   Yes.
17        Q.   So the projects that they're going spread
18    their $115,000 over, include Speaking of Pain"; do
19    you see that under 1(c)?
20        A.   Uh-huh.
21        Q.   And this is a book that was written by
22    you?
23        A.   Yes.
24        Q.   It was called Listening to Pain?
25        A.   Correct.
```

Confidential                                                                JAN-MS-05485476

Scott Fishman, M.D.
February 26, 2019                                    200

1         Q.   So Purdue partially funded that book?

2         A.   No.

3         Q.   Or sponsored?

4         A.   I believe this relates to Purdue, and I

5    don't know that this ever happened, but this would

6    have been Purdue -- well, it says "production and

7    distribution."  I don't believe Purdue sponsored

8    that book.

9         Q.   So the $115,000 that they're discussing

10   here to be distributed over these activities,

11   didn't actually include this book?

12        A.   Well, this says 160, and I don't recall

13   that in terms of producing that book.  Again, it

14   was a long time ago.

15        Q.   So you just don't recall?

16        A.   It was at least 11, 12 years ago and that

17   book is about talking to people, and pain has

18   nothing to do with opioids or any drugs, and it

19   was -- you know, I don't recall.  I just have to go

20   back and look at kind of the foundation of how that

21   book came to be.

22        Q.   So you just don't recall one way or the

23   other?

24        A.   I didn't get paid to write the back, so

25   let me put it that way.

Confidential                                              JAN-MS-05485477

 1        Q.    But I don't recall if there was any money

 2    from Purdue or another pharmaceutical company --

 3        A.    I don't.

 4        Q.    -- that in any way helped produce or

 5    distribute the book?

 6        A.    You know, what I remember is actually that

 7    that book might have had a connection with a

 8    company Pfizer at its early stages, that they

 9    wanted something that they could give to doctors

10    and it was something that had no connection to any

11    of their products, any of their drugs, didn't

12    mention drugs.  So I think in the early days we

13    might have partnered with them to buy the book, but

14    this was through the publisher and not through me.

15        Q.    Who was the publisher?

16        A.    Waterford Life Sciences.

17        Q.    Did you cowrite that book with someone, or

18    was there like a medical writer that helped you

19    write that book?

20        A.    There was a writer that worked with me on

21    that book.

22        Q.    What was his name, if you recall?

23        A.    Stephen Braun.

24        Q.    And you worked with Stephen Braun on other

25    book projects as well?

Confidential                                                    JAN-MS-05485478

Scott Fishman, M.D.
February 26, 2019                          202

1        A.    Many projects.

2        Q.    And what projects would those be?

3        A.    Well, he worked with me on "Responsible

4    Opioid Prescribing."  He worked with me on a

5    project most recently looking at interprofessional

6    education and pain core competencies in a summit,

7    writing up a summit that we held at an

8    international conference.  I think those are the

9    big ones, there might have been some smaller ones

10   that we worked on together.

11       Q.    "Exit Wounds"?

12       A.    That was not my project.

13       Q.    And the American Pain Foundation?

14       A.    Yes, he worked with the American Pain

15   Foundation on that book.

16       Q.    Okay.

17       A.    With -- I think with Rollin Gallagher.

18       Q.    That's one of the initiatives -- if you

19   look under the Education Support, this is one of

20   the initiatives that Purdue is stating they're

21   going to spread their grant dollars over and

22   military veterans initiatives; correct?

23             MR. OXLEY:  Objection, foundation.

24             THE WITNESS:  That is what is suggested

25   here in print.

Confidential                                                      JAN-MS-05485479

```
 1    BY MS. BALDWIN:

 2        Q.   Okay.  And under "Two, Military/Veterans

 3    Initiative," Exit Wounds is included under that;

 4    correct?

 5        A.   Yes.

 6        Q.   And that was a book that the American Pain

 7    Foundation put out?

 8        A.   Yes.

 9             MR. ROBINSON:  Object to form.

10    BY MS. BALDWIN:

11        Q.   And Stephen Braun you said was also

12    involved in writing that book?

13        A.   Yes.

14        Q.   And Purdue did sponsor that book; correct?

15        A.   I don't know.

16        Q.   I'm going to offer this as Exhibit 19.  If

17    you look on the --

18             (Exhibit 19 marked.)

19    BY MS. BALDWIN:

20        Q.   So Exhibit 19 is a excerpt of Exit Wounds,

21    the book, this was the first page, is the cover

22    page.

23        A.   Yes.

24        Q.   And if you look at the second page, it

25    says this book was -- it says, "American Pain
```

Confidential

JAN-MS-05485480

Scott Fishman, M.D.
February 26, 2019                                    204

1     Foundation"; correct?

2          A.   Correct.

3          Q.   And the publisher is also Waterford Life

4     Sciences; correct?

5          A.   Correct.

6          Q.   And you mentioned they were the publisher

7     on --

8          A.   Listening to Pain.

9          Q.   Listening to Pain, and they were the

10    publisher on Responsible Prescribing too; correct?

11         A.   Yes.

12         Q.   And if you turn to the third page, you

13    will see a box in the middle, and it says, "The

14    development of Exit Wounds and its companion

15    website remain possible by the generous support of

16    the following organizations and companies"; do you

17    see that?

18         A.   Yes.

19         Q.   And who's listed there?

20         A.   Disabled American Veterans Charitable

21    Service Trust, Elan Pharmaceuticals, Purdue Pharma

22    and Wyeth Pharmaceuticals.

23         Q.   So does that refresh your memory that

24    Purdue did, in fact, provide some grant funds or

25    sponsorship for that book?

Confidential                                                                JAN-MS-05485481

```
 1              MR. ROBINSON:  Objection, form,

 2     foundation.

 3              MR. EHSAN:  Same.

 4              THE WITNESS:  I assume they did fund this.

 5     BY MS. BALDWIN:

 6        Q.    And another initiative they partially

 7     wanted to fund or provide a grant for on this,

 8     according to this e-mail is under, "Advocacy.  The

 9     POP Action Network is a growing regional and state

10     army of trained advocates and leaders."

11              MR. ROBINSON:  Objection, foundation.

12              MR. OXLEY:  Foundation.

13     BY MS. BALDWIN:

14        Q.    Is that correct?

15              MR. ROBINSON:  Where are you referring

16     him?

17              MS. BALDWIN:  Page ending 9588.

18              MR. ROBINSON:  Which section, are you

19     talking under B, Advocacy, then where?

20              THE WITNESS:  "Regional Power Over Pain."

21     BY MS. BALDWIN:

22        Q.    "One, Enhancement and Expansion of Power

23     Over Pain Action Network.  The POP Action Network

24     is a growing regional and state 'army' of trained

25     advocates and leaders."  Did I read that correctly?
```

Confidential                                                    JAN-MS-05485482

Scott Fishman, M.D.
February 26, 2019                                    206

```
 1        A.    Yes.
 2        Q.    Is this an initiative that Purdue provided
 3   some grant funding for?
 4        A.    You know, I don't know if they did or not.
 5        Q.    But it is --
 6        A.    It is a fundable project of the APF.
 7        Q.    It's represented in this e-mail, correct,
 8   that they intend --
 9        A.    It's represented.
10        Q.    -- that they provided funding.
11              MR. OXLEY:  Objection, foundation, move to
12   strike.
13              THE WITNESS:  It seems to be represented
14   that it's a possible source based on what I'm
15   seeing here.  Not that they are funding it.  It
16   seemed like they were saying they had to go through
17   further processes, you know.  They couldn't fund
18   everything.
19   BY MS. BALDWIN:
20        Q.    And two, under Advocacy, "Two, Targeted
21   Advocacy.  There will be a significant effort to
22   pass a newly introduced National Pain Care Policy
23   Act of 2007"; correct?
24        A.    That's what it says.
25        Q.    And that is an initiative that Purdue
```

Confidential                                                           JAN-MS-05485483

Scott Fishman, M.D.
February 26, 2019                                   207

1   internally was in favor of supporting with its

2   150 -- $115,000 grant; correct?

3          MR. OXLEY:  Objection, form.

4          MR. ROBINSON:  Objection, form,

5   foundation.

6          MR. OXLEY:  He does not know what Purdue

7   was doing internally.

8          MS. BALDWIN:  You do not need to coach the

9   witness.

10          MR. OXLEY:  I'm not, and I'm going to make

11   my objection, and I just did.  So you let me make

12   it, and then you could say whatever you are going

13   to say.

14          MS. BALDWIN:  That's an improper

15   objection.

16          MR. OXLEY:  There's been no foundation

17   that this witness has any idea --

18          MS. BALDWIN:  This is a deposition, we're

19   not in trial right now --

20          MR. OXLEY:  -- what Purdue was thinking

21   about internally.

22          MS. BALDWIN:  -- we certainly will be

23   soon, but we are not in trial right now.  All you

24   say is -- you could object.  You are improperly

25   coaching the witness.

Confidential                                                              JAN-MS-05485484

1          MR. OXLEY:  No, I'm not, I've made my

2    objection.

3          MR. EHSAN:  For the record, is it

4    counsel's position that this transcript will not be

5    used at trial in Oklahoma?

6          MS. BALDWIN:  It's absolutely not.

7          MR. EHSAN:  Okay, then, I think the

8    distinction between whether this --

9          MS. BALDWIN:  You could argue foundation

10   at the appropriate time.  But anyway, if you want

11   say, Objection, lack of foundation" --

12         MR. OXLEY:  I don't appreciate you trying

13   to trick the witness.

14         MS. BALDWIN:  I move to strike Purdue's

15   attorney's comments.

16         MR. OXLEY:  As I'm sure you know, my

17   comments won't be played for the jury, so there's

18   nothing to strike.

19         MS. BALDWIN:  They certainly may be.

20   BY MS. BALDWIN:

21      Q.   Dr. Fishman, I'm not trying to trick you.

22   I'm going to reask the question.

23         Under, "B, Advocacy, Number 2, Targeted

24   Advocacy," this document states, "There will be a

25   significant effort to pass the newly introduced

Confidential                                                                    JAN-MS-05485485

Scott Fishman, M.D.
February 26, 2019                                    209

1    National Pain Care Policy Act of 2007"; correct?

2        A.    That's what it says.

3        Q.    And that's one of the APF initiatives that

4    Purdue is contemplating in this e-mail internally

5    and stating that it would like to spread its

6    $115,000 over; is that true?

7            MR. OXLEY:  Objection, foundation.

8            THE WITNESS:  It appears that that's one

9    of the items that they're thinking about funding.

10   BY MS. BALDWIN:

11       Q.    Did you consider the pharmaceutical

12   companies -- and when I say you, I'm -- let me give

13   some context.  When you were chair of the American

14   Pain Foundation, did you consider Purdue, Janssen

15   Endo, Teva, Cephalon, these pharmaceutical

16   companies, APF's partner?

17           MR. ROBINSON:  Objection, form,

18   foundation.

19           MR. OXLEY:  Objection.

20           THE WITNESS:  No, not really.

21   BY MS. BALDWIN:

22       Q.    You did not?

23       A.    I think there was a tendency to, but we

24   were actually working very hard to make it clear

25   they weren't partners, they were supporters of the

Confidential                                              JAN-MS-05485486

1    work that we were going to do.

2        Q.   I'm going to show you what I marked as

3    Exhibit 20.

4            (Exhibit 20 marked.)

5    BY MS. BALDWIN:

6        Q.   This is a document that Janssen's produced

7    to us in this litigation Bates stamped

8    JAN-MS-00403640.  The title of this document is

9    "Pain Brief Advocacy and Policy Monthly 2011";

10   correct?

11       A.   Yes.

12       Q.   And at the top it says "Advocacy

13   Dashboard"; is that right?

14       A.   Correct.

15       Q.   If you go down a little further, it says,

16   "Advocacy Partners with Policy Committee Sections";

17   correct?

18           MR. EHSAN:  Object to form, foundation.

19           THE WITNESS:  Yes.

20   BY MS. BALDWIN:

21       Q.   It lists "Primary external partners"; do

22   you see that?

23           MR. EHSAN:  Same objection.

24           THE WITNESS:  Yes.

25

Confidential                                      JAN-MS-05485487

Scott Fishman, M.D.
February 26, 2019                                            211

```
 1    BY MS. BALDWIN:

 2        Q.    It says, "The American Pain

 3    Foundation/State Action Network 'Go to Partner'";

 4    do you see that?

 5              MR. EHSAN:  Same objection.

 6              THE WITNESS:  Yes.

 7    BY MS. BALDWIN:

 8        Q.    Janssen certainly considered, according to

 9    this document, APF its go-to partner?

10              MR. EHSAN:  Objection to form, foundation.

11              MR. ROBINSON:  Objection, form,

12    foundation.

13              THE WITNESS:  Yeah.  That's what it says

14    here.

15    BY MS. BALDWIN:

16        Q.    It also lists as its primary external

17    partner the American Pain Society; correct?

18              MR. EHSAN:  Same objections.

19              THE WITNESS:  Yes, this is American Pain

20    Society.

21    BY MS. BALDWIN:

22        Q.    And the American Academy of Pain Medicine;

23    correct?

24              MR. EHSAN:  Same objections.

25              THE WITNESS:  Correct.
```

Confidential                                                          JAN-MS-05485488

1    BY MS. BALDWIN:

2        Q.   If you turn to Page 2, if you look at the

3    bottom, it says, "Pain Tools Disseminated";

4    correct?

5        A.   Correct.

6        Q.   It talks about "Unbranded Programs"; do

7    you see that?

8            MR. EHSAN:  Object to form.

9            THE WITNESS:  Yes.

10   BY MS. BALDWIN:

11       Q.   And the third bullet point lists, "Let's

12   Talk Pain-Provider/Patient Communications";

13   correct?

14       A.   Yes.

15           MR. EHSAN:  Object to form.

16   BY MS. BALDWIN:

17       Q.   Are you familiar with the term

18   "unbranded"?

19           MR. EHSAN:  Object to form.

20           MR. ROBINSON:  Objection, form,

21   foundation.

22           THE WITNESS:  To some degree.

23   BY MS. BALDWIN:

24       Q.   What do you think "unbranded" means?

25       A.   Not related to a brand or a particular

Confidential                                                    JAN-MS-05485489

Scott Fishman, M.D.
February 26, 2019                                          213

1    product.

2        Q.   Were you involved -- by you -- well, I

3    mean, let's first -- in the context of American

4    Pain Foundation, was American Pain Foundation

5    involved in the Let's Talk Pain Coalition?

6        A.   I believe it was.

7             MR. EHSAN:  Form.

8    BY MS. BALDWIN:

9        Q.   Were you involved as a spokesperson or

10   physician expert or physician speaker in the --

11            MR. EHSAN:  Object to form.

12            THE WITNESS:  I've got to say I've seen my

13   name associated with it, I don't recall being

14   involved with it, but apparently I was on some

15   level.

16   BY MS. BALDWIN:

17       Q.   Did you at the time that the American Pain

18   Foundation was involved, and you were involved in

19   this Let's Talk Pain Coalition, did you understand

20   that it was an unbranded marketing campaign to

21   support the launch of NUCENTA?

22            MR. EHSAN:  Objection to form, foundation.

23            THE WITNESS:  No.

24   BY MS. BALDWIN:

25       Q.   That was not your understanding?

Confidential                                                                                      JAN-MS-05485490

Scott Fishman, M.D.
February 26, 2019                                        214

1        A.    No.

2        Q.    Janssen never told you that?

3              MR. EHSAN:  Same objections.

4              THE WITNESS:  I don't recall knowing that.

5   BY MS. BALDWIN:

6        Q.    Would that have affected your decision

7   whether or not to participate in the Let's Talk

8   Pain Coalition if you knew that it was a product to

9   help launch an opioid?

10             MR. EHSAN:  Object to form, foundation.

11             THE WITNESS:  You know, I really wasn't

12  involved in launching Let's Talk Pain.  It was work

13  -- the board of directors, we weren't at that level

14  at the ground.  I don't know how that was formed or

15  what its roots were.

16             Had you come to me and said, you know,

17  we're doing a product to help launch -- we're doing

18  a project to help launch a drug, I would oppose

19  that.

20  BY MS. BALDWIN:

21       Q.    So you didn't know that at all?

22       A.    No.

23       Q.    And so you would -- had you been told that

24  it was -- this program was part of it, the launch

25  of a drug, a specific drug, you wouldn't have

Confidential                                        JAN-MS-05485491

 1    wanted to be involved with that?

 2              MR. EHSAN:  Object to form, foundation.

 3              THE WITNESS:  If it was specifically for

 4    that purpose, I think I would have opposed doing

 5    that project.

 6              MS. BALDWIN:  Exhibit 21?

 7              MR. ROBINSON:  I think that's right.

 8    BY MS. BALDWIN:

 9        Q.   I'm handing what I marked as Exhibit 21.

10              (Exhibit 21 marked.)

11    BY MS. BALDWIN:

12        Q.   Exhibit 21 is a PowerPoint "NUCENTA

13    Immediate Release (tapentadol)."  Do you see that?

14        A.   Yes.

15        Q.   It's called a, "Launch Plan Ketchum Public

16    Relations, July 8, 2009"; do you see that?

17        A.   Yes.

18        Q.   If you look at Page 2, there is an

19    Overview.

20        A.   Do you think I could take a moment just to

21    go through this?

22        Q.   Yes.

23        A.   Okay.

24        Q.   If you turn to Page 2, do you see the

25    Overview?

Confidential                                                      JAN-MS-05485492

Scott Fishman, M.D.
February 26, 2019                                    216

1        A.    I do.

2        Q.    And the bottom bullet point you see,

3    "Leveraging Let's Talk Pain at launch"?

4        A.    Yes.

5        Q.    Does this surprise you that this was part

6    of the launch of NUCENTA?

7              MR. EHSAN:  Object to form, foundation.

8              MR. ROBINSON:  Objection.

9              THE WITNESS:  I don't think it surprises

10   me, but I wasn't aware of it.

11   BY MS. BALDWIN:

12       Q.    Do you wish you had been told?

13       A.    Yes.

14             MR. EHSAN:  Same objection.

15             THE WITNESS:  Yes.

16   BY MS. BALDWIN:

17       Q.    Are you uncomfortable with the fact that

18   you participated in this campaign when it was an

19   unbranded marketing campaign for a opioid product?

20             MR. EHSAN:  Object to form.

21             THE WITNESS:  Yes.

22   BY MS. BALDWIN:

23       Q.    Why are you uncomfortable -- why are you

24   uncomfortable?

25             MR. EHSAN:  Same objection.

Confidential                                                              JAN-MS-05485493

Scott Fishman, M.D.
February 26, 2019                                    217

 1              THE WITNESS:  Sorry.

 2              MR. EHSAN:  Go ahead.

 3              THE WITNESS:  You know, again, I'm going

 4       back, I don't remember when this was, 2008 or so.

 5       A long time.  I've got to say that I was part of

 6       this, but I don't know that I was ever part of

 7       developing this, and I think I was asked, Do you

 8       want to go and talk to the media about pain, which

 9       is always -- my answer is always yes.  I always

10       want to talk about pain and pain relief.  I don't

11       know that I ever really was -- I was aware that I

12       was doing this in the service of promoting a drug,

13       and I'm not sure that I was.

14              You know, I see what's here, but, you

15       know, I know that in accepting these speaking

16       engagements or opportunities, they were to

17       independently educate, you know, and probably work

18       with a patient and talk about things that I

19       normally talk about, which is there are a lot of

20       ways to treat the suffering associated with pain

21       and how to do that broadly.

22              So again, if there was an overarching plan

23       to use this to support a drug launch, you know, I

24       think I should have known that, and I might have

25       changed my decision about what I did.  I doubt I

Confidential                                              JAN-MS-05485494

1    would have done it differently, but I may not have

2    done it at all.

3    BY MS. BALDWIN:

4        Q.   Do you think that a pharmaceutical

5    company -- strike that.

6            So Let's Talk Pain was you were hoping to

7    educate pain patients with this coalition?

8        A.   Yes.

9        Q.   And you think that it's improper if a drug

10   company is trying to directly influence patients

11   through a campaign like this that's supporting a

12   branded -- you know, that's unbranded marketing

13   supporting an actual product without fully

14   disclosing that?

15           MR. EHSAN:  Objection.

16           MR. OXLEY:  Objection.

17           MR. ERCOLE:  Objection to form, compound,

18   vague, ambiguous.

19           THE WITNESS:  I think it depends on what

20   really happened, and I think there are ways in

21   which drug companies can find programs that are in

22   the public's interest, that are good programs, that

23   help people understand the diseases and the

24   conditions that they have, that will raise

25   awareness that they might find supportive of the

Confidential                                                    JAN-MS-05485495

Scott Fishman, M.D.
February 26, 2019                                    219

```
 1   products that they're marketing.  That's just --

 2   that would be just an innocent association with the

 3   work that I do.  That's what I suspect probably

 4   happened here because I don't ever recall anyone

 5   asking me to pitch NUCENTA.

 6   BY MS. BALDWIN:

 7       Q.   Well, that's the point of a unbranded

 8   marketing campaign; correct?

 9           MR. ERCOLE:  Objection, form.

10           MR. ROBINSON:  Objection.

11           THE WITNESS:  That is correct.

12   BY MS. BALDWIN:

13       Q.   It doesn't specifically mention the drug.

14           MR. ERCOLE:  Form objection.

15           THE WITNESS:  Or a drug.

16   BY MS. BALDWIN:

17       Q.   Or a drug, correct.  So you wouldn't know

18   unless you were told, that you were actually --

19   that the program that you were involved with was

20   supporting a drug.

21           MR. ERCOLE:  Objection.

22   BY MS. BALDWIN:

23       Q.   It's because there's no reference to a

24   specific drug, it's just unbranded marketing

25   generally for potentially a class of drugs, for
```

Confidential                                                    JAN-MS-05485496

```
 1   example.
 2           MR. ERCOLE:  Objection to form.  Counsel's
 3   testifying.
 4           THE WITNESS:  So again, it would depend.
 5   If I was -- I would need to know about what really
 6   happened and what I did and what role I was
 7   involved in.
 8   BY MS. BALDWIN:
 9      Q.   But let me go back because I'm not -- I'm
10   talking generally, okay, as a physician who you
11   have relationships with patients, correct, and you
12   would consider your doctor-patient relationship a
13   special relationship that you would -- tell me if
14   I'm wrong -- that you wouldn't believe a company
15   should be interfering in that relationship; would
16   you agree with that?
17           MR. ERCOLE:  Objection to form.
18           MR. EHSAN:  Objection to form.
19           THE WITNESS:  I would agree with that.
20   BY MS. BALDWIN:
21      Q.   So would you think it was improper for a
22   drug company to try to directly influence patients
23   going around, you know, a physician through a
24   campaign that may seemingly be neutral, but is
25   actually supporting the launch of a product?
```

Confidential                                          JAN-MS-05485497

Scott Fishman, M.D.
February 26, 2019                                    221

```
 1              MR. ERCOLE:  Objection to form.

 2              MR. ROBINSON:  Objection to form.

 3              THE WITNESS:  Again, it really -- I can

 4      imagine that there are things that I would feel

 5      independently completely appropriate for talking

 6      about in the public that are helpful to drug

 7      companies that have nothing to do with my working

 8      with the drug company to support their end game,

 9      and they might see it as helpful to them, that I am

10      indifferent to.

11              I don't know if anybody gave me

12      information that they asked me to speak on and to

13      talk on.  I suspect when did I this, I believed

14      that this was my own independent content and

15      whether it helped the drug company or not, I was

16      indifferent to that.

17      BY MS. BALDWIN:

18          Q.   Well, again, I'm asking you if you think

19      it's improper with respect to the doctor-patient

20      relationship, and a patient specifically, that

21      there's no disclosure to that patient that there is

22      a potential campaign that may be associated -- may

23      be funded by a pharmaceutical company or associated

24      with a drug, and so they don't have full disclosure

25      when they're reading the materials where it's
```

Confidential                                                    JAN-MS-05485498

1     coming from, and I'm asking if you think that's

2     improper or deceitful?

3           MR. ERCOLE:  Objection to form.

4           MR. ROBINSON:  Objection to form.

5           MR. OXLEY:  Incomplete hypothetical.

6           THE WITNESS:  You know, I think everyone

7     should have disclosure about who's funding what,

8     and again, I don't know if there was disclosure

9     about who funded Let's Talk Pain, but again, my

10    hope is that it was done in a way where we came up

11    with Let's Talk Pain and then a company said, "We

12    want to support that because that's consistent with

13    our mission," as opposed to the other way around.

14    BY MS. BALDWIN:

15        Q.   I'm going to show you what I'm marking as

16    Exhibit 22.

17           (Exhibit 22 marked.)

18    BY MS. BALDWIN:

19        Q.   Do you recognize this document?

20        A.   I don't.

21        Q.   Do you recall -- what is the logo on the

22    bottom of this document?

23        A.   The Partners Against Pain was something

24    that Purdue, a branding or a logo for Purdue.

25        Q.   You thought it was a logo for Purdue?

Confidential                                                              JAN-MS-05485499

```
1        A.    I think so.

2        Q.    And it looks like -- well, Exhibit 29

3    [sic] is called Pain Matters, correct?

4        A.    Uh-huh.

5        Q.    It says, "Partners Against Pain Magazine";

6    correct?

7        A.    Uh-huh.

8        Q.    If you turn to Page 2, it says, "Editor in

9    Chief Scott M. Fishman, M.D.; do you see that?

10       A.    Uh-huh.

11       Q.    Do you recall being editor in chief of

12   this publication?

13       A.    I don't.  I don't know what editor -- what

14   role that -- what role that had -- what I really

15   had to do with editor in chief, other than I

16   probably reviewed the articles that they put in

17   here, and it was -- these -- the regulatory issues

18   were of interest to me, great interest to me at the

19   time.  So...

20       Q.    You wrote one of the articles in here;

21   correct?

22       A.    Yes, yeah.

23       Q.    I'm going to show you what I marked as

24   Exhibit 22?

25             MR. EHSAN:  Aren't we on 23?
```

Confidential                                                    JAN-MS-05485500

Scott Fishman, M.D.
February 26, 2019                          224

1          MR. ROBINSON:   23.

2          (Exhibit 23 marked.)

3    BY MS. BALDWIN:

4       Q.   Twenty-three.   Exhibit 23 has two Bates

5    stamps, PDD1782004399, and this is an internal memo

6    dated November 6, 2000 from Robin Hogan to Mark

7    Alfonso; correct?

8       A.   Yes.

9       Q.   Do you know either Robin Hogan or Mark

10   Alfonso?

11      A.   I don't.

12      Q.   The subject is "Rationale for Partners

13   Against Pain Spinoff"; correct?

14      A.   Yes.

15      Q.   And this memo appears to be talking about

16   the rationale for creating Partners Against Pain as

17   a spinoff of Purdue; do you see that?

18          MR. ERCOLE:   Objection.

19          THE WITNESS:   I'm seeing it right now.

20   BY MS. BALDWIN:

21      Q.   And if you look under, "Objectives of

22   Establishing Partners Against Pain as a Nonprofit

23   Organization," it states, "The ultimate goal of

24   Partners Against Pain is to positively impact

25   Purdue Pharma's topline growth by creating

Confidential                                           JAN-MS-05485501

```
1    'pull-through' pain management products among the

2    45 million Americans living in pain today"; did I

3    read that correctly?

4         A.   Yes.

5         Q.   Did you know that the purpose behind

6    Partners Against Pain was to --

7         A.   I did not.

8         Q.   -- impact top line growth for Purdue?

9              MR. OXLEY:  Objection, foundation.

10             THE WITNESS:  No.

11   BY MS. BALDWIN:

12        Q.   Would you have liked to have known that

13   before you participated in the Partners Against

14   Pain program?

15        A.   Yes, I believe so.

16        Q.   And if you turn to the next page under

17   "Capabilities of partners against Pain Compared to

18   Purdue"; do you see that?

19        A.   Yes.

20        Q.   Could you read that second paragraph?

21        A.   "Though chronic pain patients contact the

22   company for information, advice and referrals,

23   Purdue cannot respond to these requests without

24   compromising the learned intermediary defense.

25   Patient outreach and the ability to create a
```

Confidential                                                                JAN-MS-05485502

1    community for chronic pain sufferers are impossible

2    given the liability risks."

3        Q.    And it goes on to say, "In addition, while

4    the public and medical establishment needs

5    continual education regarding the safety and

6    efficacy of opioids, these messages have greater

7    integrity coming from an entity that is not a

8    pharmaceutical company.  Partners Against Pain

9    creates a 'clean' platform for these messages"; do

10   you see that?

11       A.    I do.

12       Q.    So this document -- doesn't this document

13   show that Purdue is trying to go around the

14   physician to communicate directly to the patient,

15   while still preserving the defense that the doctor

16   is a learned intermediary between the

17   pharmaceutical company and the patient?

18            MR. OXLEY:  Objection, form.

19            MR. ROBINSON:  Objection.

20            THE WITNESS:  It looks to me like Purdue's

21   trying to create a shell to do things they can't do

22   as a company.

23   BY MS. BALDWIN:

24       Q.    Do you think that's deceitful?

25       A.    Yes.

Confidential                                                                    JAN-MS-05485503

Scott Fishman, M.D.
February 26, 2019                                    227

1          MR. OXLEY:  Same objection.

2     BY MS. BALDWIN:

3        Q.   Is that something that you wish that you

4     known before becoming involved in this program?

5        A.   Yes.

6        Q.   Do you believe that's interfering with the

7     doctor-patient relationship in an improper manner?

8          MR. OXLEY:  Objection, form.

9          MR. ROBINSON:  Objection, form.

10          MR. EHSAN:  Objection.

11          THE WITNESS:  You know, I'm not sure.  You

12     know, I look back at my -- you know, had I known

13     this, I probably wouldn't have participated in

14     the -- in this.  I think I did this with naive good

15     intentions.  I haven't sat down and read this, but

16     I bet I would stand by it today based on the facts

17     of the day.  They were rapidly changing after this

18     in terms of what we knew about opioids, but based

19     on the facts of the day, I think, you know, this

20     was a balanced presentation that didn't have any

21     influence by, you know, the company to do the

22     things they're talking about, but I probably

23     wouldn't have wanted to have been associated.

24          So again, I don't know about the

25     patient -- doctor-patient relationship, but I

Confidential                                    JAN-MS-05485504

Scott Fishman, M.D.
February 26, 2019                                228

```
 1    probably wouldn't have wanted to be associated with

 2    the organization.

 3    BY MS. BALDWIN:

 4       Q.   Do you think it's deceitful for patients

 5    to believe that they're receiving clean information

 6    and messages from an independent source, when in

 7    actuality it's a pharmaceutical company sending

 8    those messages to the patient?

 9           MR. ERCOLE:  Objection, form, foundation.

10           MR. ROBINSON:  Objection.

11           MR. OXLEY:  Objection.

12           THE WITNESS:  Yes.

13           MS. BALDWIN:  Can we just take a quick

14    break, we've been going about an hour or over an

15    hour?

16           MR. ROBINSON:  Yeah.

17           THE VIDEOGRAPHER:  Going off the record

18    the time is 3:11.

19           (Recess taken.)

20           THE VIDEOGRAPHER:  Back on the record at

21    3:27.

22    BY MS. BALDWIN:

23       Q.   Dr. Fishman, we were talking about this

24    e-mail, which I believe was Exhibit 19.

25       A.   I'm on 23.
```

Confidential                                                    JAN-MS-05485505

Scott Fishman, M.D.
February 26, 2019                    229

1        Q.    Yeah, I'm just going back on the list.

2        A.    Going back to 19.

3              MR. ROBINSON:  19 I believe was the Exit

4    Wounds.

5              THE WITNESS:  Exit Wounds.

6    BY MS. BALDWIN:

7        Q.    Then the one before that.

8        A.    17 is Rebecca Novak-Tibbitt.

9        Q.    No, the one after.  I think I'm one off.

10             MR. ROBINSON:  Eighteen?

11             THE WITNESS:  So 18.

12   BY MS. BALDWIN:

13       Q.    Yeah.  So we were going through the items

14   that the APF projects that Purdue was discussing in

15   this internal e-mail, and there's one more I wanted

16   to point out, which was Number 6, which is

17   Involvement and Leadership in the Pain Core Forum.

18   And the APF states, "A central role in the

19   activities of the Pain Care Forum, which has on the

20   2008 agenda, amongst other items, the passage of

21   the National Pain Care Policy Act"; did I read that

22   correctly?

23       A.    Yes.

24       Q.    Are you familiar with the Pain Care Forum?

25       A.    I am.

Confidential                                                    JAN-MS-05485506

Scott Fishman, M.D.
February 26, 2019                                              230

1        Q.    And it states here that APF played a

2    central role in the activities of the Pain Care

3    Forum; correct?

4        A.    Well, the Pain Care Forum I think was

5    probably just starting -- the idea that it was just

6    starting around this time.  The Pain Care Forum was

7    a collection of interests in pain advocates from

8    pharma companies to professional organizations, to

9    consumer advocacy groups.  The CEO of the American

10   Pain Foundation was a big supporter of it.  When I

11   came in as chair of the APF, I was opposed to us

12   being part of the Pain Care Forum.

13       Q.    Why were you opposed to?

14       A.    Because I felt there was -- there just

15   weren't clear boundaries in terms of what was

16   really being done with the pain forum.  It was

17   supposed to just be a forum for exchanging ideas,

18   but at times there were interests in the pain forum

19   that wanted to support projects and do things

20   together, and I felt like that was an inappropriate

21   alliance.  So it was a point of contention within

22   APF.  I don't know that they ever supported it.  I

23   honestly don't know what happened with that.  I

24   opposed it at APF and opposed it within other of my

25   other roles in other organizations like the Academy

Confidential                                        JAN-MS-05485507

Scott Fishman, M.D.
February 26, 2019                                        231

1    of Pain Medicine and others.

2        Q.   Were you concerned -- when you say

3    "inappropriate alliance," were you concerned that

4    there was industry influence in that organization?

5        A.   That there was -- that the ties with

6    industry were too close.

7        Q.   Including with the opioid manufacturers?

8        A.   Correct.

9        Q.   And do you have any understanding as to

10   who was the chair of the Pain Care Forum?

11       A.   Burt Rosen.

12       Q.   Okay.

13       A.   That's really how I know Burt Rosen is

14   through that.  And again, I don't want to imply

15   that the Pain Care Forum, I don't know that they

16   did anything inappropriate.  I just didn't think it

17   was the right way, it was the right process for us

18   as a consumer organization or for a professional

19   organizations to conduct our work and our projects.

20       Q.   Because of potential industry influence?

21            MR. ERCOLE:  Objection, form.

22            THE WITNESS:  And the optics, you know,

23   the apparent conflicts of interest in working that

24   closely without really clear boundaries.

25

Confidential                                                          JAN-MS-05485508

```
 1    BY MS. BALDWIN:

 2        Q.   I'm going to show you what I've marked as

 3    Exhibit 24.

 4             (Exhibit 24 marked.)

 5    BY MS. BALDWIN:

 6        Q.   Exhibit 24 is Bates stamped in PPLP

 7    004273776.  These are objectives for Burt Rosen, VP

 8    Federal Government Affairs at Purdue; correct?

 9        A.   That's what it says.

10             MR. OXLEY:  Objection, foundation.

11    BY MS. BALDWIN:

12        Q.   This is for the Department of Federal

13    Government Affairs at Purdue; correct?

14        A.   Again, that's what it says.

15        Q.   And it lists several corporate objectives

16    here.  Can you read the first one?

17        A.   "Utilize coalitions and policy to develop

18    and implement balance public policies affecting the

19    profitability of Purdue."

20        Q.   And do you see the Business Outcome next

21    to it?

22        A.   I do.

23        Q.   It says, "Seek pain care forum and task

24    force, support for influencing governmental

25    agencies and Congress through stakeholder's efforts
```

Confidential                                                      JAN-MS-05485509

Scott Fishman, M.D.
February 26, 2019                                    233

```
 1    to maintain a even playing field for Purdue"; do

 2    you see that?

 3        A.   I do.

 4        Q.   Did you know that the Pain Care Forum was

 5    being utilized to implement pain policies

 6    affecting -- or public policies affecting the

 7    profitability of Purdue?

 8            MR. ROBINSON:  Objection, form.

 9            MR. OXLEY:  Objection.

10            MR. ROBINSON:  Foundation.

11            THE WITNESS:  I did not know that.

12    BY MS. BALDWIN:

13        Q.   How do you feel about that?

14            MR. ROBINSON:  Objection.

15            MR. OXLEY:  Objection, form.

16            THE WITNESS:  I don't think it was an

17    appropriate forum for industry to -- it wasn't an

18    appropriate forum for the groups that I was working

19    with to be working on our public policies.

20            Whether it was appropriate for Purdue or

21    not, I mean, they're in business, and if it's legal

22    and they want to do that, I guess it's okay, but

23    again, I didn't see it as an appropriate place for

24    us to be working together with industry.

25
```

Confidential                                                                 JAN-MS-05485510

Scott Fishman, M.D.
February 26, 2019                                      234

1    BY MS. BALDWIN:

2        Q.    Well, do you think it's wrong for a

3    pharmaceutical company to use an organization as

4    internal leverage to increase profits without the

5    participating organizations knowing that that's its

6    intended purpose?

7              MR. ERCOLE:  Objection, form.

8              MR. ROBINSON:  Objection, form.

9              THE WITNESS:  It's hard for me to know.  I

10   think it's wrong for -- again, I can't speak for

11   pharma, if it's wrong for pharma to do that.  I

12   think it's wrong for consumer organizations and

13   professional organizations to be part of these

14   kinds of groups.

15   BY MS. BALDWIN:

16       Q.    Do you think it's wrong for a company like

17   Purdue to utilize other participants in an

18   organization unbeknownst to them, to promote public

19   policies that effect the profitability of their own

20   company without those participating organizations

21   knowing about it?

22             MR. ROBINSON:  Objection, form.

23             MR. ERCOLE:  Objection, form.

24             MR. ROBINSON:  Asked and answered.

25             THE WITNESS:  I think it's not surprising

Confidential                                                    JAN-MS-05485511

Scott Fishman, M.D.
February 26, 2019                              235

1    that all the companies there would have their own

2    hidden agendas.

3    BY MS. BALDWIN:

4        Q.   You don't think --

5        A.   I would expect that.

6        Q.   You don't think that's deceitful to the

7    other participating organizations of the Pain Care

8    Forum who had no knowledge that this was part of

9    Purdue's corporate objective to achieve 2012

10   OxyContin, Butrans, Intermezzo and laxative brand

11   budget targets for sales and profitability with

12   total Purdue net branded the sales exceeding

13   $2.426 billion?

14           MR. ERCOLE:  Objection, form.

15           MR. ROBINSON:  Objection, form.

16           THE WITNESS:  You know, again, I don't

17   really know what's right and wrong for a drug

18   company.  I know it's not right for independent

19   professional and consumer organizations to be

20   partnering in that kind of forum.

21   BY MS. BALDWIN:

22       Q.   Well, is it right for any company to

23   utilize an organization of other participants to

24   leverage their own profits without those other

25   participants that they're working with knowing

Confidential                                                    JAN-MS-05485512

1    about it?

2            MR. OXLEY:  Same objection.

3            MR. ROBINSON:  Objection, form, lacks

4    foundation.

5            THE WITNESS:  Right, I'm not sure.

6    BY MS. BALDWIN:

7       Q.  You're not sure; you don't know if that's

8    deceitful?

9            MR. ROBINSON:  Objection, asked and

10   answered.

11           MR. ERCOLE:  Objection, form.

12           THE WITNESS:  It's not transparent.

13   BY MS. BALDWIN:

14      Q.  And it's something that you very much

15   would have liked to know when you are on the board

16   of directors as an organization that was a

17   participant of the Pain Care Forum; correct?

18           MR. ERCOLE:  Objection to form.

19           MR. ROBINSON:  Objection.

20           THE WITNESS:  I think had I known this in

21   writing, it would have made my argument a stronger

22   one.

23   BY MS. BALDWIN:

24      Q.  You think this document supports the

25   concerns that you had?

Confidential                                    JAN-MS-05485513

Scott Fishman, M.D.
February 26, 2019                                    237

1          MR. OXLEY:  Objection, foundation.

2          THE WITNESS:  Yes.

3    BY MS. BALDWIN:

4       Q.   Dr. Fishman, you talked about this today,

5    but you have done a lot of education of your peers;

6    correct?

7       A.   Yes.

8       Q.   In the area of pain management?

9       A.   Correct.

10      Q.   And would you say that -- would you agree

11   that it's important to you that the physicians that

12   you teach and that you work with have all of the

13   adequate information about risks and benefits when

14   they're prescribing a drug in the treatment of pain

15   or for the treatment of any purpose?

16      A.   Yes.

17         MR. ERCOLE:  Objection, form.

18         THE WITNESS:  I would agree.

19   BY MS. BALDWIN:

20      Q.   That's something that you spent most of

21   your life working towards and working on is

22   properly educating physicians in respect to the use

23   of opioids and the treatment of pain?

24      A.   And particularly on balancing the risks

25   and the benefits, which you can't do unless you

Confidential                                                    JAN-MS-05485514

Scott Fishman, M.D.
February 26, 2019                                      238

1   know them.

2        Q.   You think it's important that a company

3   disclose all of the risks and benefits of a drug,

4   so that when a physician is prescribing a drug and

5   is determining whether or not they're doing a risk

6   benefit analysis, whether or not to prescribe that

7   drug for a patient, they have the full picture and

8   they are able to make an appropriate decision for

9   that patient; would you agree with that?

10            MR. ROBINSON:  Object to form.

11            THE WITNESS:  In principle, yes.

12   BY MS. BALDWIN:

13        Q.   Do you think it would be deceitful and, in

14   fact, harmful if a company that manufactured a drug

15   were, in fact, to omit risk information about that

16   drug or specifically lead physicians to believe

17   that a drug was less risky than it truly was?

18            MR. ROBINSON:  Objection, form.

19            MR. ERCOLE:  Objection, form.

20            THE WITNESS:  I think it would be

21   deceitful if that were truly known.

22        Q.   And it could result in harm to a patient

23   potentially because it would influence that risk

24   benefit analysis?

25            MR. EHSAN:  Objection, form.

Confidential                                                    JAN-MS-05485515

```
 1              MR. ERCOLE:  Objection, form.

 2              THE WITNESS:  Yes.

 3    BY MS. BALDWIN:

 4         Q.   I'm showing you what I marked as

 5    Plaintiff's Exhibit 5 [sic].

 6              MR. ROBINSON:  Twenty-five.

 7              MS. BALDWIN:  Twenty-five, thank you.

 8              (Exhibit 25 marked.)

 9              MS. BALDWIN:  It's stapled --

10              MR. ROBINSON:  Not stapled?

11              MS. BALDWIN:  No.

12              THE WITNESS:  Would you like me to read

13    this?

14    BY MS. BALDWIN:

15         Q.   We're going to talk about it, but yeah, if

16    you need to read it.

17         A.   Should I read this down or from the back?

18              MR. ROBINSON:  You could start --

19              MS. BALDWIN:  From the back, I think.

20              MR. ROBINSON:  From the back forward.  The

21    first one.

22              THE WITNESS:  In the middle, yeah.

23    BY MS. BALDWIN:

24         Q.   Dr. Fishman, this exhibit is an e-mail

25    chain between employees at Purdue Pharma; correct?
```

Confidential                                                          JAN-MS-05485516

1       A.   You know, I was wondering, I see that, you

2    know, Purdue at the bottom.  But yeah, I didn't

3    know.  I don't recognize these names.

4       Q.   Do you recognize the name Michael

5    Friedman?

6       A.   No.

7       Q.   Do you know that Purdue pled guilty to

8    felony misbranding of OxyContin in 2007?

9       A.   Yes.

10      Q.   Do you know that Michael Friedman pled

11   guilty to a misdemeanor of misbranding OxyContin in

12   2007?

13      A.   I don't know the names of the people that

14   pled guilty.  I know that executives --

15      Q.   I represent to you that Michael Friedman

16   is an individual who is the author of the first

17   e-mail at the bottom of this e-mail chain, and it's

18   dated May 28, 1997; correct?

19      A.   Yes.

20      Q.   And could you just read that second

21   paragraph?

22      A.   Of the e-mail --

23      Q.   The e-mail from Michael Friedman, yes.

24      A.   "We are all well aware," is that the

25   paragraph?

Confidential                                                              JAN-MS-05485517

Scott Fishman, M.D.
February 26, 2019                                    241

1        Q.    Yes.

2        A.    "We are well aware of the view held by

3   many physicians that oxycodone is weaker than

4   morphine.  We all know this is the result of their

5   association of oxycodone with less serious pain

6   syndromes.  This association arises from their

7   extensive experience with and use of oxycodone

8   combinations to treat pain arising from a diverse

9   set of causes, some serious, but most less serious.

10  This personality of oxycodone is an integral part

11  of the personalities of OxyContin."

12       Q.    Could you read the next paragraph as well?

13       A.    "When we launched OxyContin we

14  intentionally avoided a promotional theme that

15  would link Oxycontin to cancer pain.  We

16  specifically linked OxyContin to the oxycodone

17  combinations with our Old Way New Way campaign.  We

18  made sure that our initial detailed piece provided

19  reps with the opportunity to sell the product for a

20  number of different pain states.  With all of this,

21  we were still concerned that the drug would be

22  slotted for cancer pain and that we would encounter

23  resistance in the nonmalignant pain market."

24       Q.    Could you go on to read the last paragraph

25  on that page?

Confidential                                                                    JAN-MS-05485518

Scott Fishman, M.D.
February 26, 2019                                   242

1     A.    "Despite initial uncertainly, we have been

2  successful beyond our expectations in the

3  nonmalignant pain market.  Doctors use the drug in

4  nonmalignant pain because it is effective, and the

5  personality of OxyContin is less threatening to

6  them and their patients than that of morphine

7  alternatives.  I apologize for this unscientific

8  term, but I feel it captures the notion that there

9  are image-related attributes that influence drug

10  acceptance.

11         "While we might wish to see more of this

12  product sold for cancer pain, it would be extremely

13  dangerous at this early stage in life of the

14  product to tamper with this personality.  To make

15  physicians think the drug is stronger or equal to

16  morphine.  We are better off expanding use of

17  OxyContin in the nonmalignant pain states and

18  waiting for hydromorphone OD in 1999 to relaunch

19  into cancer pain."

20     Q.    Then it goes on to say, "For the time

21  being, I do not plan to try to change the

22  personality of OxyContin.  We will continue to

23  focus on expanding the nonmalignant pain usage.  In

24  this group of patients, morphine is not an

25  alternative and the price is correct."

Confidential                                                        JAN-MS-05485519

1              Do you think it's deceitful that Purdue

2     wanted or wanted doctors to believe or didn't want

3     to correct the mistaken belief that oxycodone was

4     not as strong as morphine, even though it's, in

5     fact, at least one and a half times stronger than

6     morphine?

7              MR. ROBINSON:  Objection, form.

8              MR. OXLEY:  Objection, form.

9              THE WITNESS:  Yeah, yes.  I think

10    that's -- again, I don't know how they may have

11    promulgated that idea that it's not -- that

12    oxycodone is weaker -- is a weaker opioid than

13    morphine, except I do understand why doctors might

14    presume that, and they explain it pretty well here

15    that morphine is a drug that you give really -- you

16    know, you give to people in serious pain who are

17    often dying.  And oxycodone is a drug that's

18    co-compounded with acetaminophen and you give for

19    molar extractions or, you know, a bone fracture

20    that's going to heal.  So I understand the roots of

21    that.

22              I don't know how they went about -- I

23    don't know if they just let that belief exist or

24    whether they actively promoted that it's less

25    potent and it's just a friendly form of our old

Confidential                                                          JAN-MS-05485520

Scott Fishman, M.D.
February 26, 2019                                    244

```
 1   friend Percocet, you know.

 2   BY MS. BALDWIN:

 3       Q.   They also didn't promote the drug

 4   aggressively to cancer patients who they admit

 5   might have actually needed the drug because of its

 6   potency; correct?

 7            MR. OXLEY:  Objection to form.

 8            MR. ROBINSON:  Objection, form.

 9            THE WITNESS:  Correct.

10   BY MS. BALDWIN:

11       Q.   Isn't this the type of information that

12   you would want physicians that you educated to

13   understand so that they could prescribe the drug to

14   the appropriate patients?

15       A.   I'm sure that I taught people that

16   oxycodone was more potent than morphine and it

17   needed to be used carefully, and that there was

18   really, you know -- it was one of the extended

19   release options.  It wasn't a unique extended

20   release option.  It was one of the extended release

21   options of all of the opioid group.

22       Q.   And you are very knowledgeable in this

23   area, but a primary care physician that was being

24   targeted by a pharmaceutical company for opioids

25   like OxyContin may not have that knowledge?
```

Confidential                                                              JAN-MS-05485521

Scott Fishman, M.D.
February 26, 2019                                    245

1        A.    May not have that.

2              MR. OXLEY:  Objection to form.

3              MR. ERCOLE:  Objection to form.

4    BY MS. BALDWIN:

5        Q.    Is that correct?

6              MR. ERCOLE:  Objection to form.

7              THE WITNESS:  I think that's correct.

8    BY MS. BALDWIN:

9        Q.    And so that is something that -- in your

10   opinion, do you believe that is something that is

11   problematic or deceitful or even harmful to

12   propagate this misinformation to a physician that

13   may not have an understanding that oxycodone is, in

14   fact, weaker than morphine?

15             MR. OXLEY:  Same objections.

16             MR. EHSAN:  Object to form.

17             THE WITNESS:  I think if Purdue

18   perpetuated these myths, then that's bad, that's

19   egregious.  Again, I don't know what they did.  I

20   see what they wrote.  I don't really have any

21   knowledge of what they did.

22   BY MS. BALDWIN:

23       Q.    But what they wrote, if they, in fact, did

24   that, that's egregious in your opinion?

25       A.    Sounds bad.

Confidential                                                        JAN-MS-05485522

```
1          MR. OXLEY:  Same objection.

2          THE WITNESS:  Yes.

3   BY MS. BALDWIN:

4      Q.  What about if they just understood that

5   physicians had this misperception, but they chose

6   not to correct it just to make more money, would

7   that also be deceitful and egregious?

8          MR. OXLEY:  Same objection.

9          THE WITNESS:  Again, it's hard to know

10  what that looks like, you know.  I'm not sure what

11  their expected role is for creating the education

12  that we give.  I certainly didn't give education

13  that was consistent with this, with what's said in

14  here.  That's why, you know, having independent

15  educators is a good thing and that's why I would

16  argue it was in Purdue's interest to have people

17  like me doing the education rather than them.

18  BY MS. BALDWIN:

19     Q.  Do you agree that if that myth was

20  perpetuated and that was not -- that misperception,

21  while known to Purdue, was not corrected in

22  physicians by them so that they could sell more of

23  their OxyContin, that would be deceitful; correct?

24         MR. ROBINSON:  Objection.

25         MR. OXLEY:  Objection, form.
```

Confidential                                        JAN-MS-05485523

1            THE WITNESS:  Yeah, I'm not sure what more

2    to say.

3    BY MS. BALDWIN:

4        Q.   That would be wrong?

5        A.   It depends on what it was.  I think there

6    is a level there where if they're perpetuating that

7    myth, that's a harmful myth and that's wrong.

8        Q.   You talked about this today, but you

9    authored a book called "Responsible Opioid

10   Prescribing"; correct?

11       A.   Yes, I did.

12       Q.   I'm going to mark this as Exhibit 26.  I'm

13   just going to talk about this briefly.

14            (Exhibit 26 marked.)

15   BY MS. BALDWIN:

16       Q.   On the second page of the -- and I have

17   the actual book, so it's on Page 3 of your sheet, I

18   think, there is a list of supporters; correct?

19       A.   Yes.

20       Q.   And some of these supporters provided

21   funding for the production or the distribution of

22   the book; is that correct?

23       A.   Yes.

24       Q.   And Purdue was one of the supporters who

25   provided funding for their production and

Confidential                                                    JAN-MS-05485524

Scott Fishman, M.D.
February 26, 2019                           248

1    distribution of the book; correct?

2        A.   You know --

3            MR. ERCOLE:  Objection, form.

4            MR. ROBINSON:  Objection.

5            MR. ERCOLE:  Just for the record, this is

6    an excerpt that you decided to pull from the book?

7            MS. BALDWIN:  I have the book right here.

8            MR. ERCOLE:  But you are using it as an

9    exhibit.

10           MS. BALDWIN:  Yes, it's an excerpt.  So I

11   didn't print off 137 pages.

12           MR. ERCOLE:  Fair enough.  It's an excerpt

13   of select pages that you guys at the State just

14   decided to print?

15           MS. BALDWIN:  Yes, I exhibited an excerpt

16   of pages from Responsible Opioid Prescribing.

17           THE WITNESS:  So I don't know who did

18   what, who sponsored what part.  That was worked out

19   through the Federation of State Medical Boards.

20   BY MS. BALDWIN:

21       Q.   So if they testified that Purdue and

22   Cephalon and King and Alpharma provided funding for

23   production or distribution of the book, that you

24   wouldn't have any reason to disagree with that?

25       A.   Correct.

Confidential                                                    JAN-MS-05485525

1              MR. ERCOLE:  Objection to form.

2              MR. EHSAN:  Objection.

3     BY MS. BALDWIN:

4         Q.   I'm going to mark this as Exhibit 27.

5              (Exhibit 27 marked.)

6     BY MS. BALDWIN:

7         Q.   I'm not trying to trick you.  This is

8     FSMB's response to the Senate Finance Committee in

9     2012.

10        A.   Right.

11        Q.   And if you turn to Page 14 -- actually, if

12    you turn to Page 11 -- it starts on Page 10 really,

13    but if you turn to Page 11, it shows FSMB's

14    responses to all payments/transfers received from

15    all organizations that developed, manufacture,

16    produce, market or promote the use of opioid based

17    drugs from 1997 to the present.

18             On Page 11, it indicates that Purdue

19    Pharma paid $878,895 for a grant project to update

20    the FSMB Model Guidelines; do you see that?

21        A.   That's on Page 11?

22        Q.   Uh-huh, second-to-last row.

23        A.   I see 87,000.

24        Q.   Yes.  Correct.  $87,895.

25             Let me ask that again.  On Page 11 of the

Confidential                                                  JAN-MS-05485526

Scott Fishman, M.D.
February 26, 2019                          250

1    FSMB response to the U.S. Senate inquiry in 2012,

2    FSMB represented that, "Purdue paid $87,895 for a

3    grant for the project to update the FSMB Model

4    Guidelines for the use of controlled substances in

5    the treatment of pain"; is that correct?

6        A.   That's what it says.

7             MR. OXLEY:  Could you read the rest of it

8    because it says more than that, I think.

9             MS. BALDWIN:  "Educate FSMB members boards

10   and assess changes in knowledge and attitudes of

11   FSMB member boards."  Okay, strike that.

12            I'm going to ask this question again, I

13   keep getting interrupted.

14            MR. OXLEY:  Thank you.

15   BY MS. BALDWIN:

16       Q.   Page 11 of the FSMB response to the U.S.

17   Senate Committee letter inquiring about the

18   relationship between opioid manufacturers and

19   third-party organizations states that, Purdue

20   Pharma paid FSMB $87,895 as a grant for projects to

21   update FSMB Model Guidelines, educate FSMB member

22   board -- member board and assess changes in

23   knowledge and attitudes of FSMB member boards as

24   assessed by surveys; do you see that?

25       A.   I do.

Confidential                                    JAN-MS-05485527

Scott Fishman, M.D.
February 26, 2019                                     251

```
 1        Q.   Did you know that Purdue funded the

 2   revision of the FSMB 1998 guidelines into the 2004

 3   model policy?

 4        A.   I may have.

 5             MR. OXLEY:  Objection, form.

 6             THE WITNESS:  I'm not sure, but if I --

 7   BY MS. BALDWIN:

 8        Q.   At one time?

 9        A.   Or not.

10        Q.   At one time you may have known, but you

11   can't recall?

12        A.   Yes, right.

13        Q.   If you turn to the next page, Page 12, it

14   states that Endo Pharmaceuticals in 2007 gave

15   $40,000 in grant in support of FSMB physician

16   education initiative on safe and effective

17   prescribing practices in pain management.  Do you

18   see that?

19             MR. EHSAN:  Object to form.

20             THE WITNESS:  I do.

21   BY MS. BALDWIN:

22        Q.   And I'm not trying to trick you here, but

23   on Page 14 that indicates support for the

24   production of responsible opioid prescribing.

25        A.   Okay.
```

Confidential                                                           JAN-MS-05485528

1        Q.   Is that correct?

2             MR. ERCOLE:  Objection to form.

3             MR. ROBINSON:  Yeah, objection, form.

4             THE WITNESS:  Okay.

5    BY MS. BALDWIN:

6        Q.   Is that correct?

7        A.   That's what it appears here, yes.

8        Q.   And Purdue Pharma gave a $58,000 grant in

9    support of the production of the book as well;

10   correct?

11            MR. ROBINSON:  Objection, form,

12   foundation.  Go ahead.

13            THE WITNESS:  You're saying that they gave

14   an additional grant?

15   BY MS. BALDWIN:

16       Q.   On Page 12, it says in 2007, Purdue gave a

17   grant in support of FSMB education initiative on

18   safe and effective prescribing practices and paid

19   management $58,000, correct?

20       A.   Uh-huh.

21       Q.   And that -- and Page 14 indicates that

22   that means production of the book Responsible

23   Opioid Prescribing; correct?

24            MR. OXLEY:  Object to the form.

25            MR. ROBINSON:  Form, foundation.  You

Confidential                                                            JAN-MS-05485529

1    could answer.

2              THE WITNESS:  Yeah, that's -- it's what it

3    states.  You know, I'm not sure what "production"

4    means and what all this money went to, but yes,

5    that's what it says.

6    BY MS. BALDWIN:

7         Q.   And Abbot Laboratories paid $30,000 for

8    the production of the book; correct?

9              MR. EHSAN:  Object to the form.

10             THE WITNESS:  Uh-huh.

11   BY MS. BALDWIN:

12        Q.   And then if you look back on Page 12, it

13   shows Alpharma gave a grant of a hundred thousand

14   dollars for the distribution of the book; correct?

15        A.   Yes.

16        Q.   Endo gave $100,000 for the distribution of

17   the book; correct?

18        A.   Uh-huh.

19        Q.   Cephalon gave a hundred thousand dollars

20   for the distribution of the book; correct?

21             MR. ERCOLE:  Objection to the form.

22             THE WITNESS:  Uh-huh.

23   BY MS. BALDWIN:

24        Q.   Purdue gave a hundred thousand dollars for

25   distribution of the book?

Confidential                                                    JAN-MS-05485530

1          A.    Yes.

2          Q.    King Pharmaceuticals gave a hundred

3    thousand dollars in 2009 for the distribution of

4    the book; correct?

5          A.    Yes.

6          Q.    And Endo Pharmaceuticals gave $100,000 in

7    2009 to support distribution of the book; correct?

8          A.    Yes.

9          Q.    Alpharma purchased 20 copies of the book;

10   do you see that there?

11         A.    Yes.

12         Q.    King Pharmaceuticals in 2009 gave another

13   $75,000 to support distribution of the book;

14   correct?

15         A.    Yes.

16         Q.    Mallinckrodt gave $100,000 to support

17   distribution of the book; correct?

18         A.    Yes.

19         Q.    Cephalon gave another $50,000 for

20   distribution of the book; correct?

21              MR. ERCOLE:  Objection to form.

22   BY MS. BALDWIN:

23         Q.    In 2011?  Yeah, in 2011.

24         A.    Are you talking about Mallinckrodt?

25         Q.    No, Cephalon.

Confidential                                                              JAN-MS-05485531

1       A.   Cephalon, yes.  Well, that looks like --

2   okay.  It was given in 2010 for 2011 for total for

3   2011.  Got it, yes.

4       Q.   And then this book was eventually

5   accredited as a CME activity; correct?

6       A.   Correct.

7       Q.   And you see that in 2011 Endo gave

8   $125,000 grant for proposed CME activity related to

9   FDA opioid REMS; do you see that?

10      A.   That's not the -- that's different than

11  the book.

12      Q.   That's not the book?

13      A.   That's not.

14      Q.   Okay.  You see that in 2012 Endo purchased

15  6,000 copies of the book?

16      A.   Correct.

17      Q.   Correct.  So -- that refreshes your

18  recollection, then, that there was pharmaceutical

19  support from some of the sponsors listed on this

20  page?

21      A.   Yes.  I'm sure that the folks listed on

22  this page contributed.  I just don't know who gave

23  what when for what.

24      Q.   Other than what we just --

25      A.   Seemed to indicate this.

Confidential                                                    JAN-MS-05485532

```
 1              MR. ROBINSON:  Objection, form,

 2     foundation.

 3              MR. EHSAN:  Same.

 4     BY MS. BALDWIN:

 5        Q.   Do you know if Janssen provided any

 6     funding in support of either the production or

 7     distribution of Responsible Opioid Prescribing to

 8     your recollection?

 9        A.   If it's not listed, they didn't.  We

10     should have listed everyone who did.

11        Q.   There was an edition that came out in

12     2007; correct?

13        A.   That was the first edition.

14        Q.   And that's the excerpt that's sitting in

15     front of you?

16        A.   Yes.

17        Q.   Then there was another edition that came

18     out in 2012; correct?

19        A.   Uh-huh.

20        Q.   Did you seek funds for the second edition

21     from Janssen?

22        A.   I honestly don't remember.  I think we

23     didn't, but I don't know.  I think you would know

24     better than me.  Again, it wasn't me seeking funds.

25     It was the FSMB.
```

Confidential                                                        JAN-MS-05485533

Scott Fishman, M.D.
February 26, 2019                                    257

```
1         Q.   I'm showing you what I marked as exhibit

2     27.

3              MR. EHSAN:  Twenty-eight.

4              (Exhibit 28 marked.)

5              MR. ROBINSON:  Is this another exhibit?

6              MS. BALDWIN:  Yeah, yeah, I'm sorry.  I

7     don't know where my copies went.

8              MR. OXLEY:  What is the time?

9              THE VIDEOGRAPHER:  Fifteen minutes

10    remaining.

11    BY MS. BALDWIN:

12        Q.   This e-mail is from Joshua Horwitz dated

13    August 27, 2011; correct?

14        A.   Yes.

15        Q.   Is that the publisher of the book?

16        A.   It's the -- yeah, the publisher, the

17    packager, he put the book together.

18        Q.   And the subject is "J&J's new ER opioid

19    approved."

20        A.   Uh-huh.

21        Q.   It's sent to Lisa Robin and you are cc'd

22    on this?

23        A.   Yes.

24        Q.   And Lisa Robin worked for the Federation

25    of State Medical Board?
```

Confidential                                                    JAN-MS-05485534

1        A.    Correct.

2        Q.    And the e-mail from Joshua states, "We're

3    overdue to raise money from J&J.  Lisa, do you have

4    any contact there?  Josh"; do you see that?

5        A.    Yes.

6        Q.    Do you recall if there was any efforts

7    made to solicit funds for the book from J&J?

8        A.    So, again, I don't have the --

9              MR. EHSAN:  Object to form.

10             THE WITNESS:  I'm sorry.

11             MR. EHSAN:  Please go ahead.

12             THE WITNESS:  I don't have the second

13   edition in front of me, but I don't think we got

14   money for the book from drug companies.  I think

15   this relates to the emerging FDA REMS and they --

16   and the FDA was trying to put -- or the Federation

17   of State Medical Boards was trying to put together

18   a REMS program around responsible opioid

19   prescribing, and we then used the book as the

20   centerpiece and then expand a REMS education

21   program and was working with different pharma

22   groups who were in a group called, if I remember,

23   it's like the Industry Work Group who were charged

24   by the FDA to figure out how this REMS would roll

25   out, and they would actually be the supporters of

Confidential                                                   JAN-MS-05485535

```
 1    it.  So I think that this is -- I would guess that

 2    that's what this is about, but again, I'm not

 3    certain.

 4    BY MS. BALDWIN:

 5        Q.   That work group was the IWG?

 6        A.   Industry Work Group.

 7        Q.   And the Industry Work Group, was Johnson &

 8    Johnson part of that Industry Work Group?

 9        A.   I don't know.

10             MR. EHSAN:  Objection.

11    BY MS. BALDWIN:

12        Q.   You do not know.  All the pharmaceuticals

13    companies --

14        A.   All the pharmaceutical companies that made

15    chronic opioid --

16        Q.   -- were that part of the IWG?

17        A.   Yes.

18             MR. EHSAN:  Same objection.

19    BY MS. BALDWIN:

20        Q.   Did you ever receive any payment for

21    writing the book or any grant funds for authoring

22    the book?

23        A.   I did.  I got -- I received initially -- I

24    don't remember the exact details, but there was an

25    initial grant for producing the book, and I don't
```

Confidential                                                          JAN-MS-05485536

Scott Fishman, M.D.
February 26, 2019                           260

1    know which company did it, which company sponsored

2    it or companies, but -- and I believe the money

3    came from the FSMB to me as kind of the oversight

4    for developing the framework for the book.  Then,

5    you know, for the first edition I did receive

6    payments through the publisher because -- as part

7    of monies that I was paid with this book and other

8    books that I had done with the publisher.  And I

9    stopped getting money from the publisher around the

10   second edition.

11          MS. BALDWIN:  Could we just go off the

12   record for a second?

13          THE VIDEOGRAPHER:  Off the record at 4:07.

14          (Discussion held off the record.)

15          THE VIDEOGRAPHER:  Back on the record, the

16   time is 4:16.

17   BY MS. BALDWIN:

18      Q.   So, Dr. Fishman, before we went off the

19   record we were talking about any payments you

20   received for authoring Responsible Opioid

21   Prescribing.  Do you know collectively how much

22   approximately that you've made in writing that

23   book?

24          MR. ROBINSON:  Objection, form,

25   foundation.

Confidential                                                    JAN-MS-05485537

Scott Fishman, M.D.
February 26, 2019                                261

```
 1              MR. EHSAN:  Objection, form.

 2              THE WITNESS:  I don't know the exact

 3      amount.

 4      BY MS. BALDWIN:

 5         Q.   Was the payment provided to you by -- who

 6      paid you to write the book; was it FSMB or another?

 7         A.    Payment came through the --

 8              MR. ERCOLE:  Objection to form.

 9              THE WITNESS:  And my payments came through

10      the publisher, and I believe I was paid from FSMB

11      through the early preparation of the project.

12      Small amounts from the FSMB as just part of those

13      projects for oversight.

14      BY MS. BALDWIN:

15         Q.   And so those -- you don't have a range, if

16      it was $30,000 or --

17         A.   I would estimate it's probably more like

18      $100,000 over the years.

19         Q.   Over the years.  That includes both

20      editions?

21         A.   Well, it includes the editions up until

22      the time I said this was just -- it just seemed

23      like when we wrote it, I didn't realize that we

24      were going to be in this hotly contested public

25      health crisis, and I just thought it would be best
```

Confidential                                                      JAN-MS-05485538

Scott Fishman, M.D.
February 26, 2019                                    262

1    if I didn't get paid anymore.  So up until the time

2    I stopped, I don't remember exactly when that was,

3    I think it was at the second edition.  So -- but

4    they could have overlapped, but I don't know.

5        Q.   You don't know whether the funds that you

6    received from FSMB through the publisher originated

7    from any of the grants that we went over?

8        A.   I'm sure that the funds from the FSMB, I

9    was part of those original staging grants, so there

10   was some money from me just in my role as having

11   some oversight of kind of the putting together the

12   strategy for the book.

13       Q.   So when FSMB requested -- strike that.

14            FSMB wrote grant proposals to, for

15   example, Endo or Purdue, part of the proposal for

16   the grant would include some form of payment for

17   the author of the book; is that correct?

18            MR. ROBINSON:  Objection, form.

19            MR. ERCOLE:  Objection, form.

20            THE WITNESS:  No, I don't think that's

21   correct.  When they wrote a grant for the -- prior

22   to the book being written where they did some kind

23   of -- so it was a very early grant, and I don't

24   know how much it was.  I don't think it was a big

25   amount, I got some payment early on before I even

Confidential                                                      JAN-MS-05485539

1    wrote the book from the FSMB, and I don't remember

2    how much.  I would estimate 5- to $10,000 and

3    that's it.

4            The other grants that they got I didn't

5    have any role in, and the payment that I got for

6    writing the book came through the publisher.

7    BY MS. BALDWIN:

8        Q.   From FSMB?

9        A.   Through the publisher, the Waterford Life

10   Sciences, who sold the book.

11       Q.   So the payments, were they based on sales

12   from the book?

13       A.   Yes, yes.

14       Q.   Other than that small amount that you

15   received initially --

16       A.   Right.

17       Q.   -- from writing the book at the beginning

18   stage --

19       A.   Correct.

20       Q.   -- the money received for the book was

21   from actual sales of the book?

22       A.   Yes, I believe so.

23       Q.   We discussed earlier that you were aware

24   that Purdue pled guilty to felony misbranding in

25   2007; correct?

Confidential                                                              JAN-MS-05485540

Scott Fishman, M.D.
February 26, 2019                                    264

1        A.    Yes.

2        Q.    You recall that.  After 2007 you still

3    received funding for the book from Purdue; is that

4    correct?

5             MR. ROBINSON:  Objection.  You could

6    answer.

7             THE WITNESS:  I didn't receive funding,

8    but Purdue helped fund the book.

9    BY MS. BALDWIN:

10       Q.    Helped fund the book after that point?

11       A.    Yeah.

12       Q.    Did you ever go to Purdue at any time and

13   says, you know, I don't feel comfortable taking

14   money from you, or I don't want to collaborate with

15   you at all because of your criminal activities?

16       A.    No.

17            MR. ROBINSON:  Objection.

18            THE WITNESS:  No, I didn't.

19   BY MS. BALDWIN:

20       Q.    Did any of the other funders of the book,

21   like Cephalon or Endo, come to you at any point and

22   say, If you are accepting any money from Purdue,

23   whether indirectly or directly, we don't want to

24   work with you because of or fund the book because

25   of Purdue's criminal activities?

Confidential                                                    JAN-MS-05485541

1              MR. OXLEY:  Objection to form.

2              THE WITNESS:  No.

3     BY MS. BALDWIN:

4         Q.   Okay.  And did any of those companies,

5     Cephalon or Janssen, come to you via at one of the

6     organizations that you worked for, like AAPM or APF

7     or American Pain Society, and tell you that they no

8     longer wanted to collaborate with you if you

9     continued to take funding from Purdue because of

10    Purdue's criminal activities?

11             MR. ERCOLE:  Objection to form.

12             THE WITNESS:  No.

13    BY MS. BALDWIN:

14        Q.   Are you aware that Cephalon pled guilty to

15    a crime of misbranding ACTIQ in 2008?

16             MR. ERCOLE:  I do not.

17             THE WITNESS:  I was not, I was not aware

18    of it.

19    BY MS. BALDWIN:

20        Q.   You were never aware of that?

21        A.   (Witness shakes head.)

22             MS. REPORTER:  Is that a no?

23             THE WITNESS:  That's a no.

24    BY MS. BALDWIN:

25        Q.   Well, I'll represent to you, and I have --

Confidential                                                              JAN-MS-05485542

Scott Fishman, M.D.
February 26, 2019                                                  266

```
 1    I'll just offer it as Exhibit 29, the Guilty Plea

 2    Agreement.  And if you look at the -- that's not

 3    it.

 4              (Exhibit 29 marked.)

 5              MR. ERCOLE:  Do you have one more copy?

 6              MS. BALDWIN:  Can you give that to him?

 7    That's all I have.  Sorry.

 8              MR. ERCOLE:  I mean, I want a copy of that

 9    exhibit if it's going to reference my client.

10              MS. BALDWIN:  I'm sure you've seen it.

11    It's the guilty plea.

12              MR. ERCOLE:  I would like a copy of the

13    guilty you are going to --

14              MS. BALDWIN:  Okay.  I will make a copy

15    for you when I'm done.

16              MR. ERCOLE:  I would like -- we took a

17    break before to make a copy.  I would like to do

18    the same here so the record is clear.

19              MR. ROBINSON:  Here, take this copy.

20    BY MS. BALDWIN:

21      Q.   Dr. Fishman, this is a public document;

22    correct?  It's a guilty -- it's a United States of

23    America versus Cephalon Guilty Plea Agreement;

24    correct?

25              MR. ERCOLE:  Objection to form.
```

Confidential                                              JAN-MS-05485543

```
 1              THE WITNESS:  That is what it says.

 2              MR. ERCOLE:  Lack of foundation.

 3   BY MS. BALDWIN:

 4       Q.  Could you turn to --

 5              MR. ROBINSON:  Wait, wait, wait a second.

 6              MS. BALDWIN:  Is that the wrong document?

 7              MR. ROBINSON:  I mean, you just defined

 8   it.

 9              THE WITNESS:  It's the same, these are two

10   copies of the same.

11              MS. BALDWIN:  It's the Guilty Plea

12   Agreement.

13              MR. ROBINSON:  That's the extra copy.

14              MS. BALDWIN:  That's a mistake.  Someone

15   put this in my folder.  It's not the guilty plea.

16   This is the exhibit for him.

17              MR. ROBINSON:  That wasn't another copy of

18   the same document?

19              MS. BALDWIN:  No.  Someone just put that

20   in there, it's different.

21              THE WITNESS:  It says the same criminal

22   number.

23              MS. BALDWIN:  It does.  It's titled

24   differently.

25              MR. ROBINSON:  No, it's titled the same as
```

Confidential                                                    JAN-MS-05485544

Scott Fishman, M.D.
February 26, 2019                                  268

```
 1    what you gave him.  I don't know what you are

 2    reading when you said guilty.

 3           MS. BALDWIN:  Mine's different.

 4           MR. ROBINSON:  Exactly, that's the point

 5    I'm making.  When you said guilty plea, that's not

 6    the document he had.  I don't know what that was.

 7           MR. ZAKRZEWSKI:  This one looks like the

 8    one she's holding, but then these two look

 9    different.

10           THE WITNESS:  Do you want this back?

11    BY MS. BALDWIN:

12       Q.   No, you could use that.

13           MS. BALDWIN:  Can one of you just please

14    give me one of those copies?

15           MR. EHSAN:  Just so the record is clear,

16    what is Exhibit 29?

17           MS. BALDWIN:  It is the guilty plea, it's

18    just that I have a different version.  I have a

19    different --

20           MR. ROBINSON:  No, no, no, no, no.  I'm

21    going to be clear about this for our record.

22           MR. EHSAN:  Thank you.

23           MR. ROBINSON:  Exhibit 29 is titled

24    "Government's Memorandum for Entry of Plea and

25    Sentencing" in the United States of America v.
```

Confidential                                                      JAN-MS-05485545

1    Cephalon matter pending in the Eastern District of

2    Pennsylvania.  That is a the title of this document

3    which has been marked as Exhibit 29, so I will give

4    you that back.

5             MS. BALDWIN:  Thank you.

6             MR. ERCOLE:  I mean, I'm going to object.

7    Can we -- we need -- I need a copy of the document

8    so that I could understand what's going on.

9    BY MS. BALDWIN:

10       Q.   Sir, can you please turn to Page 4, Dr.

11   Fishman.

12            MR. ERCOLE:  I'm going to object and ask

13   if we could make a copy of the document like we've

14   done before when counsel didn't provide enough

15   copies.

16   BY MS. BALDWIN:

17       Q.   Can you please turn to Page 4 of the

18   documentation.

19            MR. ERCOLE:  I'm going to object to this

20   entire line of questioning.

21            MS. BALDWIN:  Yeah, I took your copy back.

22            MR. ROBINSON:  No, that's the other

23   document.

24            MR. ERCOLE:  At a minimum, to create some

25   consistency and clarity of the record, could we at

Confidential                                                          JAN-MS-05485546

Scott Fishman, M.D.
February 26, 2019                    270

1    least pause so that the appropriate document could

2    be marked and copied?

3            MS. BALDWIN:  Let's go off the record for

4    a minute.

5            THE VIDEOGRAPHER:  Off the record at 4:25.

6            (Discussion held off the record.)

7            THE VIDEOGRAPHER:  Back on the record, at

8    4:28.  This is the end of Disc 3, off the record at

9    4:28.

10           (Recess taken.)

11           MS. REPORTER:  So who is ordering

12   transcripts today?

13           MR. EHSAN:  We have a standing order.

14           MR. ROBINSON:  We don't have a standing

15   order, but we will want a transcript.

16           MS. REPORTER:  Does that mean the two-day

17   expedite?

18           MR. EHSAN:  I don't know about a standing

19   order, but yes, we want a two-day expedite.

20           MS. CHURCHMAN:  Yes.

21           THE VIDEOGRAPHER:  This is the start of

22   Disc 4.  Back on the record at 4:35.

23   BY MS. BALDWIN:

24      Q.  Dr. Fishman, I'm going to hand you what I

25   marked as Plaintiff's Exhibit 30.

Confidential                                        JAN-MS-05485547

1              (Exhibit 30 marked.)

2      BY MS. BALDWIN:

3          Q.   Plaintiff's Exhibit 30 is the Guilty Plea

4      Agreement in the case United States of America

5      versus Cephalon, Inc.; is that correct?

6              MR. ERCOLE:  Objection to form, lack of

7      foundation.

8              THE WITNESS:  I don't see that on here,

9      but yes, I accept your representation of that.

10     BY MS. BALDWIN:

11         Q.   If you turn to -- well, if you read the

12     first sentence, it says, "Under Federal Rule of

13     Civil Procedure 11(c)(1)(C), the government, the

14     defendant Cephalon, Inc., (hereinafter 'Cephalon'),

15     and Cephalon's counsel enter into the following

16     Guilty Plea Agreement."  Have I read that

17     correctly?

18             MR. ERCOLE:  Objection to form.

19             THE WITNESS:  Yes.

20     BY MS. BALDWIN:

21         Q.   Do you see Subsection 8?

22         A.   Yes.

23         Q.   It states, "Between January 2001 and

24     October 1, 2001, Cephalon promoted ACTIQ for uses

25     not approved by the FDA, including for non-cancer

Confidential                                                    JAN-MS-05485548

Scott Fishman, M.D.
February 26, 2019                                     272

```
 1    pain uses, such as injuries and migraines.

 2    Cephalon's promotion of ACTIQ for the additional

 3    intended uses violated 21 USC Section 352(f)(1)

 4    because ACTIQ's labeling did not bear adequate

 5    directions for each of the drug's intended uses."

 6    Did I read that correctly?

 7         A.   You did.

 8              MR. ERCOLE:  Objection to form.

 9    BY MS. BALDWIN:

10         Q.   Until today, you had no knowledge that

11    Cephalon entered into this guilty plea?

12         A.   Not that I recall.

13              MR. ERCOLE:  Objection to form.

14    BY MS. BALDWIN:

15         Q.   Did Purdue ever come to you at anytime and

16    say they didn't want to work with you in the future

17    if you continued to work with Cephalon because of

18    its criminal activities?

19              MR. ERCOLE:  Objection to form.

20              THE WITNESS:  No.

21    BY MS. BALDWIN:

22         Q.   Did Purdue ever go to the APF or the AAPM

23    or APS and say they didn't want to work with those

24    organizations if those organizations worked with

25    Cephalon due to Cephalon's criminal activities?
```

Confidential                                                                      JAN-MS-05485549

1       A.    Not that I know of.

2             MR. ROBINSON:  Objection to form.

3             MR. EHSAN:  Objection.

4    BY MS. BALDWIN:

5       Q.    Do you ever recall Janssen or Johnson &

6    Johnson coming to you and saying that they didn't

7    want to do any work with you or any of -- or the

8    APS, AAPM or APF if you were or those organizations

9    were working with Cephalon because of Cephalon's

10   criminal activities?

11            MR. EHSAN:  Object to form.

12            THE WITNESS:  Not that I know of.

13   BY MS. BALDWIN:

14      Q.    Now, the pharmaceutical companies,

15   including opioid manufacturers, that sponsored or

16   supported, provided funding for Responsible Opioid

17   Prescribing, some of them edited the book before it

18   was published; correct?

19            MR. ERCOLE:  Objection to form.

20            MR. ROBINSON:  Objection, form,

21   foundation.

22            THE WITNESS:  The only person in the

23   pharmaceutical company that had, I think, edited

24   the book was David Haddox of Purdue, who was a

25   colleague.  And like many, many colleagues that I

Confidential                                                        JAN-MS-05485550

Scott Fishman, M.D.
February 26, 2019                                274

1   sent versions of the book to to get feedback, he

2   was one of them.

3   BY MS. BALDWIN:

4       Q.   And David Haddox did a line-by-line review

5   of the book?

6       A.   Again, it was a long time ago.  I don't

7   remember exactly, other than what I recall is that

8   he did a very precise edit of the grammar, more

9   than the content.  I was interested in his feedback

10  on the way that I represented some of the concepts

11  that he was integral in developing and had a lot of

12  knowledge of.  My sense was that he didn't want to

13  get into that.

14      Q.   I'm sorry, I interrupted you.  So is it

15  your testimony that his edits were mostly grammar?

16      A.   Mostly grammar from what I recall.

17      Q.   Did he edit of the content, specific

18  content, substantive suggestions?

19      A.   You know, I don't recall.  Again, I don't

20  recall that he had -- that he had anything

21  controversial or really material to offer other

22  than, you know, he caught a lot of little errors in

23  grammar.

24      Q.   I'm going to show you what I marked as

25  Exhibit 31.

Confidential                                                    JAN-MS-05485551

Scott Fishman, M.D.
February 26, 2019                                    275

```
1              (Exhibit 31 marked.)

2     BY MS. BALDWIN:

3         Q.   I'll represent to you Exhibit 31 was

4     produced to the State in this litigation by Purdue.

5     Does this look like an Incident Report against

6     David Haddox regarding the editing of your book?

7              MR. OXLEY:  Objection, foundation.

8              MR. ROBINSON:  Objection, form,

9     foundation.

10             THE WITNESS:  I'm trying to figure.  It

11    does look like an Incident Report.

12    BY MS. BALDWIN:

13        Q.   A Purdue Incident Report; correct?

14        A.   Yes.

15        Q.   The incident description says, "During a

16    discussion of objectives at a recent staff meeting

17    with his direct report, supervisor allegedly made a

18    statement that he had edited 'line by line' a text

19    on pain that was authored by Dr. Scott Fishman.

20    Supervisor implied that it was a 'off the record'

21    review of the book and that the editing was not

22    included in his objectives.

23             "The book is currently being distributed

24    to healthcare practitioners in multiple states by

25    the Federation of State Medical Boards.  This
```

Confidential                                                        JAN-MS-05485552

Scott Fishman, M.D.
February 26, 2019                                    276

1    distribution is partially supported by a $10,000

2    grant from Purdue made in 2007.

3          "The FSMB has asked for additional funding

4    from Purdue in 2008 and beyond to support this

5    initiative.  Caller raised this issue with M. Feltz

6    as presenting a potential conflict of interest."

7    Did I read that correctly?

8        A.   Yes.

9        Q.   Do you disagree in any way with what's

10   recited here in the report that Dr. Haddox did a

11   quote "off the record," quote "line-by-line" review

12   of your book before it was published?

13          MR. OXLEY:  Objection, form.

14          THE WITNESS:  I'm not sure what "off the

15   record" means.  Again, if I really thought it

16   through, I probably wouldn't have sent him a copy,

17   a draft, but I thought of Dave Haddox as a

18   colleague, that's someone I had worked with in my

19   early career who provided some mentorship for me

20   early in my career, and I sent it to him with that

21   idea in mind.  I think if he had come back with

22   substantive changes I didn't agree with, I wouldn't

23   have accepted them, but again, I sent copies -- I

24   sent copies or drafts of the book to people, you

25   know, in the office of the National Drug Control

Confidential                                                    JAN-MS-05485553

Scott Fishman, M.D.
February 26, 2019                          277

1    Policy and the DEA, to people at HHS, to other

2    people, to other colleagues who -- you know, again,

3    I wanted input.  And you could you see there was an

4    advisory board for the book as well and they all

5    reviewed drafts of the book as well, so I had a lot

6    of people look at it.  I wanted to make sure that

7    it was correct and from really all perspectives.

8              And I felt very good when we published

9    this book.  This book was initially supposed to be

10   titled Pharmacovigilance.  It was completely

11   focused on the need for greater vigilance and

12   safety with using these drugs.  So I felt very good

13   at the end of the day that we had accomplished

14   that, but I wanted to just make sure and see if,

15   you know, any objectors could voice objections for

16   me that I might be able to fix in advance if I

17   thought they had merit.  So that was the reason

18   that I sent it to Haddox.

19      Q.   And the book, the edition that we looked

20   at, and I don't believe any other edition doesn't

21   disclose that Dr. Haddox did a line-by-line edit of

22   the book; does it?

23              MR. ERCOLE:  Objection, form.

24              THE WITNESS:  Again, no, nor does it

25   disclose that I showed copies to a lot of different

Confidential                                                                JAN-MS-05485554

Scott Fishman, M.D.
February 26, 2019                                  278

 1    people like, you know, Chris Jones at the

 2    Whitehouse office of the National Drug Control

 3    Policy reviewed the book and other people.

 4            Again, it's my independent work.  They

 5    weren't in any kind of formal role.  So I guess it

 6    was an off the record -- I would say it was

 7    informal, but, you know, again, when he says "line

 8    by line," I'm not sure -- it wasn't offered to him

 9    to do a line-by-line edit of the grammar, but

10    that's kind of what he chose to do.  It was almost

11    like sending a paper to an English teacher and

12    that's what came back, as opposed to content that I

13    used to change any messaging in the book.

14    BY MS. BALDWIN:

15        Q.   But you can't recall if the line-by-line

16    changes included some substance -- some substantive

17    changes?

18            MR. ROBINSON:  Objection, form, asked and

19    answered, foundation, go ahead.

20            THE WITNESS:  I don't recall that it did.

21    You know, I recall that he caught me that I said,

22    you know, "National Institute of Health" instead of

23    "National Institutes of Health," that was the one

24    that I remembered particularly that -- you know,

25    that's his eye for things, and I think he felt like

Confidential                                                    JAN-MS-05485555

Scott Fishman, M.D.
February 26, 2019                                    279

1    that was -- that was the way for him to make a

2    contribution, as opposed to offering anything on

3    the content.  I remember thinking there wasn't much

4    here.

5    BY MS. BALDWIN:

6        Q.   So you just don't recall fully one way or

7    the other?

8        A.   I don't recall fully.

9            MR. ROBINSON:  Objection, asked and

10   answered.

11           MS. BALDWIN:  I'll pass the witness.

12           MR. ERCOLE:  Can we go off the record?

13           (Discussion held off the record.)

14           THE VIDEOGRAPHER:  Back on the record, the

15   time is 5 p.m.

16                      EXAMINATION

17   BY MR. ERCOLE:

18       Q.   Good late afternoon or good evening,

19   Doctor.  My name is Brian Ercole.  I represent a

20   couple of the Defendants in this particular case,

21   Teva Pharmaceuticals, USA; Cephalon, Inc.; Watson

22   Laboratories, Actavis, LLC and Actavis Pharma,

23   Inc..

24           You've talked today about work you've done

25   in the pain management space; is that correct?

Confidential                                                                    JAN-MS-05485556

```
 1            MS. BALDWIN:  Objection, leading.

 2            THE WITNESS:  Yes.

 3  BY MR. ERCOLE:

 4      Q.   And you referred to that type of work as

 5  education; is that fair to say?

 6            MS. BALDWIN:  Objection, leading.

 7            THE WITNESS:  Yeah, a lot of my work has

 8  been in education.

 9  BY MR. ERCOLE:

10      Q.   And before today, have we ever met before?

11      A.   Not that I know of.

12      Q.   And with respect to the education you've

13  done in the pain management space, that has

14  included articles that you've written; correct?

15            MS. BALDWIN:  Objection, leading.

16            THE WITNESS:  Yes.

17  BY MR. ERCOLE:

18      Q.   And it's included books that you've

19  written; is that fair to say?

20            MS. BALDWIN:  Objection, leading.

21            THE WITNESS:  Yes.

22  BY MR. ERCOLE:

23      Q.   And CME presentations that you've done?

24            MS. BALDWIN:  Objection, leading.

25            THE WITNESS:  Yes.
```

Confidential                                                      JAN-MS-05485557

Scott Fishman, M.D.
February 26, 2019                                    281

```
 1    BY MR. ERCOLE:

 2        Q.   And it's included other types of

 3    educational programs; is that fair to say?

 4            MS. BALDWIN:  Objection, leading.

 5            THE WITNESS:  Yes.

 6    BY MR. ERCOLE:

 7        Q.   With respect to all of that work, is it

 8    fair to say that's work that you independently

 9    created?

10            MS. BALDWIN:  Objection, leading.

11            THE WITNESS:  Yes.

12    BY MR. ERCOLE:

13        Q.   And the views expressed in that

14    educational work that you've done have always been

15    your independent views; correct?

16            MS. BALDWIN:  Objection, leading.

17            THE WITNESS:  Correct.

18    BY MR. ERCOLE:

19        Q.   And I think you, in fact, used the phrase

20    independent work, is that right, earlier today?

21            MS. BALDWIN:  Objection, leading.

22            THE WITNESS:  I did.

23    BY MR. ERCOLE:

24        Q.   When you say "independent work," what did

25    you mean by that exactly?
```

Confidential                                          JAN-MS-05485558

Scott Fishman, M.D.
February 26, 2019                                              282

1        A.    That the basis of my teachings and my

2    writing or from my understanding and my thought

3    process and my experiences assimilated within me

4    and not anyone else's.

5        Q.    And is it fair to say that -- is it fair

6    to say the work you're referring to would have been

7    created independent from pharmaceutical companies,

8    for instance?

9             MS. BALDWIN:   Objection, leading.

10            THE WITNESS:   I believe that my work has

11   been independent of the interactions that I've had

12   with pharmaceutical companies.

13   BY MR. ERCOLE:

14       Q.    And pharmaceutical companies have never

15   controlled your opinions; have they?

16            MS. BALDWIN:   Objection, leading.

17            THE WITNESS:   Not to my knowledge.

18   BY MR. ERCOLE:

19       Q.    Sitting here today you can't identify any

20   instance where a pharmaceutical company somehow

21   controlled an opinion you've given to a particular

22   pain-management-related issue; is that fair to say?

23            MS. BALDWIN:   Objection, leading.

24            THE WITNESS:   I think that's true.

25

Confidential                                                    JAN-MS-05485559

Scott Fishman, M.D
February 26, 2019                           283

1   BY MR. ERCOLE:

2       Q.   And in the work you've done in the pain

3   management space, has it always been your intent to

4   provide fair and balanced presentation of the

5   issues that you talk about or discuss?

6            MS. BALDWIN:   Objection, leading.

7            THE WITNESS:   Absolutely.

8   BY MR. ERCOLE:

9       Q.   With respect to the work you've done in

10  the pain management space, you used the word

11  "pharmacovigilance"; did I pronounce that

12  correctly?

13      A.   Pharmacovigilance, the original title of

14  the Responsible Opioid Prescribing book.

15      Q.   What is pharmacovigilance?

16      A.   It's basically using drugs with heightened

17  care and concern about risks.

18      Q.   With respect to the work you've done in

19  the pain management space, has that work touched

20  upon or involved issues of pharmacovigilance?

21      A.   Yes.

22      Q.   And has it -- has your work in the pain

23  management space involved issues of -- strike that.

24           Has your work in the pain management space

25  involved education about the risks of opioids?

Confidential                                                              JAN-MS-05485560

Scott Fishman, M.D.
February 26, 2019                                        284

1        A.    Yes.

2        Q.    Has it involved discussion of the risk of

3    addiction, for instance, associated with opioids?

4              MS. BALDWIN:   Objection, leading.

5              THE WITNESS:   Yes.

6    BY MR. ERCOLE:

7        Q.    Has it involved discussions or

8    presentations about the risk of misuse of opioids?

9              MS. BALDWIN:   Objection, leading.

10             THE WITNESS:   Yes.

11   BY MR. ERCOLE:

12       Q.    Has it involved discussions or

13   presentations about the risks of diversion

14   associated with opioids?

15             MS. BALDWIN:   Objection, leading.

16             THE WITNESS:   Yes.

17   BY MR. ERCOLE:

18       Q.    And from your perspective, the intent of

19   that work was always to educate physicians about

20   the risks associated with opioids; is that fair to

21   say?

22             MS. BALDWIN:   Objection, leading.

23             THE WITNESS:   The intent was to help

24   clinicians come to a understanding of how to use

25   treatments for pain in the best interests of their

Confidential                                                    JAN-MS-05485561

1    patients, which requires balancing risks and

2    benefits.

3    BY MR. ERCOLE:

4        Q.   That would include, for instance,

5    responsible opioid prescribing, for instance;

6    correct?

7            MS. BALDWIN:  Objection, leading.

8            THE WITNESS:  Absolutely.

9    BY MR. ERCOLE:

10       Q.   Pharmaceutical companies, as we've seen

11   today, have sponsored some of the presentations

12   that you've given; correct?

13           MS. BALDWIN:  Objection, leading.

14           THE WITNESS:  Yes.

15   BY MR. ERCOLE:

16       Q.   But those presentations --

17           THE WITNESS:  Indirectly.

18   BY MR. ERCOLE:

19       Q.   Indirectly; correct?

20           MS. BALDWIN:  Objection, leading.

21           THE WITNESS:  Correct.

22   BY MR. ERCOLE:

23       Q.   You objected to before when the State was

24   trying to say you spoke on behalf of pharmaceutical

25   companies, you said that wasn't correct; is that

Confidential                                                                 JAN-MS-05485562

Scott Fishman, M.D.
February 26, 2019                                286

1    fair, I don't want to misstate anything?

2            MS. BALDWIN:  Objection, leading,

3    misstates testimony.

4            THE WITNESS:  Definitely correct.

5    BY MR. ERCOLE:

6        Q.   When you say "definitely correct," what do

7    you mean by that?

8            MS. BALDWIN:  Objection.

9            THE WITNESS:  I don't recall a time that I

10   spoke for pharmaceutical companies, that I worked

11   for pharmaceutical companies and represented them.

12   Pharmaceutical companies may have supported the

13   programs that I participated in, but my

14   participation was my independent work and my

15   independent thoughts.

16   BY MR. ERCOLE:

17       Q.   Some of those programs that were supported

18   by pharmaceutical companies involved programs about

19   the risks of opioids; correct?

20       A.   Yes.

21       Q.   And some of those programs supported by

22   pharmaceutical companies involved programs about

23   responsible opioid prescribing; correct?

24           MS. BALDWIN:  Objection, leading.

25           THE WITNESS:  Yes.

Confidential                                                    JAN-MS-05485563

1     BY MR. ERCOLE:

2         Q.    And some of those programs sponsored by

3     pharmaceutical companies involved programs about

4     the risks of addiction associated with opioids;

5     correct?

6              MS. BALDWIN:  Objection, leading.

7              THE WITNESS:  Yes.

8     BY MR. ERCOLE:

9         Q.    And some of those programs that we've been

10    talking about that were supported indirectly by

11    pharmaceutical companies involved programs about

12    the risks of diversion of opioids; correct?

13             MS. BALDWIN:  Objection, leading.

14             THE WITNESS:  Correct.

15    BY MR. ERCOLE:

16        Q.    Did pharmaceutical companies, including

17    any of the Defendants here, ever control the

18    content of any publication or speech that you've

19    ever been involved with?

20             MS. BALDWIN:  Objection.

21             THE WITNESS:  Not that I know of.

22    BY MR. ERCOLE:

23        Q.    We've referred to the -- strike that.

24             Have you ever heard of the acronym CME?

25        A.    Yes.

Confidential                                                        JAN-MS-05485564

1      Q.   What is a CME?

2      A.   Continuing Medical Education, which is

3   credit that's required to maintain a state medical

4   license.

5      Q.   And we'll get into some of those issues

6   before, but you've provided CME presentations about

7   opioids; correct?

8      A.   Yes.

9           MS. BALDWIN:  Objection, leading.

10  BY MR. ERCOLE:

11     Q.   Have you also provided CME presentations

12  about nonopioids?

13     A.   Yes.

14     Q.   And were some of those CME presentations

15  about nonopioids also sponsored by pharmaceutical

16  company?

17          MS. BALDWIN:  Objection, leading.

18          THE WITNESS:  Yes, if you -- if I can

19  expand.

20  BY MR. ERCOLE:

21     Q.   Please.

22     A.   The thing about CME programs is that they

23  should be -- the speaker and the content by rule

24  should be separated from any funders.  So I often

25  have no idea who's funding a CME program that I

Confidential                                    JAN-MS-05485565

Scott Fishman, M.D.
February 26, 2019                                            289

```
 1    will give regardless of what the topic is.

 2        Q.    And to the best of your knowledge, that

 3    level of independence that you just described with

 4    respect to CMEs has always existed with respect to

 5    any of the articles or publications that you've

 6    presented?

 7        A.    It didn't always --

 8            MS. BALDWIN:  Sorry to interrupt, if you

 9    could just wait.

10            THE WITNESS:  I'm sorry.

11            MS. BALDWIN:  Objection, leading.

12            THE WITNESS:  Did you want -- I'm sorry,

13    I'll try to remember.

14            It didn't always exist, and it's evolved

15    over my career, from when I started there was

16    nothing.  There really were very few lines, and

17    there was a blurred overlap of pharmaceutical

18    companies, middle managing, kind of media companies

19    and speakers and academics who were teaching and

20    sharing information together in a way that wouldn't

21    be acceptable today.  So over the past, you know,

22    25, 30 years, I've seen this evolution where we are

23    in a better place, but we are still in a very

24    flawed place today.

25
```

Confidential                                                    JAN-MS-05485566

Scott Fishman, M.D.
February 26, 2019                              290

1    BY MR. ERCOLE:

2        Q.   Okay.  I'm just asking about with respect

3    to the CME presentations that you've provided,

4    okay.  Is it fair to say the CME presentations that

5    you've provided, have always reflected your

6    independent opinions?

7            MS. BALDWIN:  Objection to form.

8            THE WITNESS:  Yes, I think it's been

9    easier as times have changed to maintain that, but

10   yes, I think that they've always -- they've always

11   reflected my independent beliefs.  Even early in my

12   career I remember pharmaceutical companies coming

13   up to me after my talks and saying they didn't

14   agree with me and challenging some of the things

15   that I've said.

16   BY MR. ERCOLE:

17       Q.   And is it fair to say that if you

18   disagreed with anything that a pharmaceutical

19   company may have asked of you with respect to a

20   presentation, that you would have said, "I'm not

21   going to include that in my presentation"?

22           MS. BALDWIN:  Objection, leading.

23           THE WITNESS:  Correct.

24   BY MR. ERCOLE:

25       Q.   I think you mentioned now and you also

Confidential                                                                    JAN-MS-05485567

Scott Fishman, M.D.
February 26, 2019                                    291

1      mentioned earlier, it was your belief in some

2      instances pharmaceutical companies may not like

3      some of your opinions regarding opioids; is that

4      correct?

5              MS. BALDWIN:  Objection, leading.

6              THE WITNESS:  Well, I think at some times.

7          You know, my overall opinion is that I've

8      never been a proponent of opioids.  I've not been

9      an opponent of them.  You know, I don't think

10     anybody should be for or against them.  Personally,

11     I think we should be for them when the benefits

12     outweigh the risks, and against them otherwise.

13     Sometimes people have different views on, you know,

14     when that is and isn't.  But I've always been

15     clear, that's -- that's where I take a stand, that

16     opioids are just one tool, and they've been

17     excessively used because we've lost sight of that

18     risk benefit analysis largely because we -- the big

19     "we," you know, the education hasn't been there,

20     and other things have happened to drive this.

21         But in my presentations I feel like I've

22     always anchored in exactly that position, that you

23     need to understand the risks and the benefits to

24     know whether a treatment's appropriate, and if you

25     do that, you won't have used opioids like people

Confidential                                                    JAN-MS-05485568

Scott Fishman, M.D.
February 26, 2019                                    292

1    used them before.

2            We didn't use them excessively in my

3    practice, and we rarely use them at very high

4    doses.  So that's a long-winded yes.

5            You know, I think when I present, that

6    would be the basis that I would come from, and no

7    one would shift me, and some people disagreed with

8    my positions and other people agreed.

9            In the long run, I believe that the work

10   that I did would be embraced by pharmaceutical

11   companies, because in the long run, pharmaceutical

12   companies wouldn't have successful products unless

13   they were used safely.

14   BY MR. ERCOLE:

15       Q.   In fact, pharmaceutical companies did

16   sponsor, indirectly at least, presentations that

17   you've given on these very topics; correct?

18            MS. BALDWIN:  Objection, leading.

19            THE WITNESS:  I would say they sponsored

20   the book Responsible Opioid Prescribing, which if

21   you really read it, is basically a book that says

22   be careful.

23   BY MR. ERCOLE:

24       Q.   It's a book to physicians saying be

25   careful, these are the risks associated with

Confidential                                                     JAN-MS-05485569

Scott Fishman, M.D.
February 26, 2019                                    293

```
 1    opioids potentially; correct?
 2         A.    This is a dangerous group of drugs that we
 3    have to use carefully or we'll use the right to use
 4    them, which is something I say in the book.
 5         Q.    And the book you're referring to is
 6    Responsible Opioid Prescribing; is that correct?
 7         A.    Correct.
 8         Q.    Just we heard a lot of -- we'll get into
 9    some of the content of that book a little bit
10    later, but we had a lot of questions about
11    Responsible Opioid Prescribing.  Just to clarify,
12    the opinions expressed in that book are your
13    independent opinions and your independent opinions
14    only; correct?
15              MS. BALDWIN:  Objection, leading.
16              THE WITNESS:  They're my independent
17    opinions, but with that said, I wrote the book as a
18    commissioned production for the Federation of State
19    Medical Boards to articulate what I thought was an
20    important -- were important guiding principles from
21    the model policy, which gave medical boards
22    guidance on how to investigate physicians if they
23    were called out for their prescribing.  Does that
24    make sense?
25              So with that, that was really my
```

Confidential                                                                                      JAN-MS-05485570

Scott Fishman, M.D.
February 26, 2019                                           294

1    framework, and I built it -- I built the

2    Responsible Opioid Prescribing case out from there.

3    BY MR. ERCOLE:

4        Q.   Understand, and we'll get into some of

5    these topics a little bit later, but at least with

6    respect to the views expressed in Responsible

7    Opioid Prescribing, the book that you authored, is

8    it fair to say that those views were developed by

9    you independent from any pharmaceutical company

10   influence?

11            MS. BALDWIN:  Objection, leading.

12            THE WITNESS:  Independent of any direct

13   influence.  Again, it's all an amalgamation of all

14   the experiences and thoughts and ideas that I've

15   had, but they were in my independent views.

16   BY MR. ERCOLE:

17       Q.   And the book reflects your independent

18   views; correct?

19       A.   Correct.

20            MS. BALDWIN:  Objection, leading.

21            THE WITNESS:  I would say the book is

22   consistent with my views throughout, throughout its

23   evolution of editions.

24   BY MR. ERCOLE:

25       Q.   There have been -- with respect to that

Confidential                                                                        JAN-MS-05485571

Scott Fishman, M.D.
February 26, 2019                                    295

1    book and again we'll get into this a little bit, is

2    it fair to say there have been two editions?

3        A.   There have been three editions.  The first

4    two were called First and Second Edition.  The

5    third was called the Second Edition Expanded.

6        Q.   Dr. Fishman, you understand this case was

7    brought by the -- strike that.  Let me go back.

8             You mentioned before that you have no

9    direct knowledge, and I don't want to misquote you,

10   but this is what I wrote down.  You have no direct

11   knowledge of how any company in this case marketed

12   its drugs.  Do you recall saying that?

13           MS. BALDWIN:  Objection, leading.

14           THE WITNESS:  Yes.

15   BY MR. ERCOLE:

16       Q.   And is that accurate?

17       A.   Yes.

18       Q.   You understand that this case is -- strike

19   that.

20            With respect to your reference to drugs,

21   that would include opioid medicines; correct?

22           MS. BALDWIN:  Objection.

23           THE WITNESS:  Correct.

24   BY MR. ERCOLE:

25       Q.   You understand this case is brought by the

Confidential                                                    JAN-MS-05485572

```
 1     State of Oklahoma?
 2        A.   I do.
 3        Q.   Have you ever been licensed to practice
 4     medicine in Oklahoma?
 5        A.   No.
 6        Q.   Have you ever practiced medicine in
 7     Oklahoma?
 8        A.   No.
 9        Q.   Do you know whether you've treated
10     patients in Oklahoma?
11        A.   To the best of my knowledge, I've never
12     treated.  I don't know if I've -- I've driven
13     through Oklahoma.  I don't know that if I stopped
14     and set foot in the state, but I've driven through.
15        Q.   Okay.  Are you aware of any marketing done
16     by any of the Defendants in this case in Oklahoma?
17        A.   No.
18        Q.   Are you aware of any promotional materials
19     disseminated by any of the Defendants in this
20     particular case in Oklahoma?
21        A.   I'm not.
22        Q.   And the state didn't show you anything
23     like that; did it?
24        A.   No.
25        Q.   And in fact, the State in its examination
```

Confidential                                              JAN-MS-05485573

Scott Fishman, M.D.
February 26, 2019                                          297

1   of you didn't even show you any of your -- the

2   content of any of your publications; correct?

3           MS. BALDWIN:  Object to form.

4           THE WITNESS:  I believe they provided some

5   content from my book Responsible Opioid

6   Prescribing.

7   BY MR. ERCOLE:

8       Q.  Do you remember, it was they provided some

9   excerpts of that; correct?

10      A.  Copies of the early pages in the book.

11      Q.  Sure.  They never asked you any questions

12  about the content of that book; did they?

13          MS. BALDWIN:  Object to form.

14          THE WITNESS:  I guess they didn't.

15  BY MR. ERCOLE:

16      Q.  Doctor, are you aware of any false

17  statements made by -- strike that.

18          Do you understand that this is a false

19  marketing case that's brought by the State of

20  Oklahoma against various Defendants?

21      A.  I'm not.

22      Q.  Are you aware of any false statements made

23  by any of the Defendants in this case in the State

24  of Oklahoma?

25      A.  I'm not.

Confidential                                                      JAN-MS-05485574

Scott Fishman, M.D.
February 26, 2019                                              298

1        Q.    Are you aware of any misleading statements

2    by the Defendants in this case in the State of

3    Oklahoma?

4        A.    No.

5        Q.    You are not an expert on anything taking

6    place in Oklahoma; correct?

7        A.    That is correct.

8        Q.    Can you take a look at what's been marked

9    as Exhibit 1, which I believe is your CV, Doctor.

10   Do you see that?

11       A.    Yes.

12       Q.    Your CV reflects that you are Board

13   Certified in a number of different areas; is that

14   correct?

15       A.    Yes.

16       Q.    And can you just tell us what your -- what

17   areas you are Board Certified in?

18       A.    Well, I'm currently Board Certified in

19   psychiatry and pain medicine and palliative care

20   and hospice medicine.  I was Board Certified in

21   internal medicine and didn't continue to maintain

22   that certification because I don't practice in that

23   area.

24       Q.    In addition to teaching -- strike that.

25             Do you teach medicine?

Confidential                                                    JAN-MS-05485575

Scott Fishman, M.D.
February 26, 2019                    299

1        A.    Yes.

2        Q.    And how long have you taught medicine for?

3        A.    25 to 30 years.

4        Q.    Has that differed as to where you've

5    taught medicine?

6        A.    Has it -- well, probably about 25 and it's

7    between here and Harvard University, Harvard

8    Medical School.

9        Q.    During that time period, did you also

10   treat patients as a practicing physician?

11       A.    Yes.

12       Q.    Do you still continue to treat patients?

13       A.    Yes.

14       Q.    And during that time period have you

15   treated patients for pain management related

16   issues?

17       A.    Yes, in fact, that's my -- that's been my

18   focus throughout.

19       Q.    And when you say "throughout," how long

20   has that been your focus?

21       A.    Well, I'm looking here, I graduated

22   medical school in 1990, so that's 29 years ago, and

23   I think three years after that I started my pain

24   fellowship.  So I don't know, 15 years -- 20 --

25   excuse me, 25 years.

Confidential                                          JAN-MS-05485576

Scott Fishman, M.D.
February 26, 2019                                    300

```
 1        Q.   So about since say 1993 or so?

 2        A.   Correct.

 3        Q.   I'm not asking you an exact number, but

 4   since that time, do you have a sense of sort of how

 5   many pain management -- excuse me, how many

 6   patients you've treated for pain-management-related

 7   issues as a practicing physician on a weekly basis?

 8        A.   Well, it's varied on a weekly basis.  I

 9   don't know if it's acceptable, but just I've

10   treated thousands of patients over the years.

11        Q.   Have you prescribed opioids for those

12   patients?

13        A.   For some.

14        Q.   Yes.  Have you prescribed long-acting

15   opioids for some patients?

16        A.   Again, for some.

17        Q.   And have you provided -- prescribed

18   short-acting opioids for some patients?

19        A.   Yes.

20        Q.   And have you prescribed opioids for

21   noncancer pain?

22        A.   Yes.

23        Q.   And have you prescribed opioids for

24   chronic pain?

25        A.   Yes.
```

Confidential                                    JAN-MS-05485577

Scott Fishman, M.D.
February 26, 2019                                    301

```
 1        Q.   Do you still prescribe opioids today?

 2        A.   I do.

 3        Q.    Is it fair to say that as a -- as the sort

 4   of trained medical professional, you are the person

 5   responsible for making a prescribing decision with

 6   respect to any particular patient?

 7        A.    It's true in respect to my patients.

 8        Q.    All I'm asking is about your patients; is

 9   that true?

10        A.   Yes, if it's my patient, it's my decision.

11        Q.   You have the responsibility for making

12   that decision; correct?

13        A.   Yes.

14        Q.   You have -- as a trained medical

15   professional, you have the obligation to exercise

16   your independent medical judgment in making that

17   prescribing decision; is that fair to say?

18             MS. BALDWIN:  Objection, leading.

19             THE WITNESS:  Yes.

20   BY MR. ERCOLE:

21        Q.   With respect to prescriptions of opioids

22   that you've written, have you always exercised your

23   own independent medical judgment in deciding to

24   prescribe that opioid for a particular patient?

25        A.   Yes.
```

Confidential                                                              JAN-MS-05485578

Scott Fishman, M.D.
February 26, 2019                                    302

1       Q.    Is it important for prescribers to

2   exercise their own independent medical judgment

3   when making a prescribing decision regarding

4   opioids?

5           MS. BALDWIN:   Objection to form.

6           THE WITNESS:   It's not only important,

7   it's -- it would be beneath the standard of care to

8   do otherwise.

9   BY MR. ERCOLE:

10      Q.    And with respect to your practice, have

11  you ever -- strike that.

12          With respect to your pain management

13  practice, have you ever interacted with

14  pharmaceutical representatives who have come to

15  your practice?

16      A.    Yes.

17      Q.    Did those -- did some of those

18  pharmaceutical representatives ever detail you

19  about particular medicines?

20      A.    Yes.

21      Q.    And in writing opioid prescription, did

22  you ever rely blindly on anything a pharmaceutical

23  representative might say about a particular product

24  in that type of situation?

25          MS. BALDWIN:   Object to form.

Confidential                                                    JAN-MS-05485579

Scott Fishman, M.D.
February 26, 2019                                              303

1            THE WITNESS:  No.

2      BY MR. ERCOLE:

3         Q.   Is it fair to say it would be beneath the

4      standard of care to rely blindly on what a

5      pharmaceutical representative might say to a

6      particular physician at a particular time?

7            MS. BALDWIN:  Object to form.

8            THE WITNESS:  Sorry.

9            MS. BALDWIN:  Objection to form.

10           THE WITNESS:  I think that's a difficult

11     question to answer because there are some

12     circumstances where a industry representative might

13     actually have the most critical information about

14     delivering a drug, or in modern times today, on

15     implanting a medical device, et cetera.  So you

16     can't say always, but we have to be very, very

17     careful, you know, walking that road and that line,

18     and I don't know that I've ever been in that line

19     where I've needed an industry representative to

20     help me.

21           But I know that right now in every

22     hospital in America we're using new technologies

23     that we have no experience with, and unless we have

24     industry partners who are experienced because they

25     developed the tools, we would be unsafe in

Confidential                                                                JAN-MS-05485580

Scott Fishman, M.D.
February 26, 2019                                        304

1    delivering those devices or those technologies.

2    BY MR. ERCOLE:

3        Q.   With respect to opioid prescribing itself,

4    did you ever prescribe a opioid medicine because of

5    some marketing statement a pharmaceutical company

6    made, as opposed to exercising your own independent

7    medical judgment as to what was in the best needs

8    of the patient?

9            MS. BALDWIN:  Object to form.

10           THE WITNESS:  I did not.

11   BY MR. ERCOLE:

12       Q.   As a trained medical professional, did you

13   ever prescribe opioid medicine because of some

14   funding that you received indirectly from a

15   pharmaceutical company concerning a publication, as

16   opposed to making your own independent medical

17   judgment?

18           MS. BALDWIN:  Object to form.

19           THE WITNESS:  No.

20   BY MR. ERCOLE:

21       Q.   Did you ever write an opioid prescription

22   because a pharmaceutical representative, for

23   instance, dropped a lunch off in your office?

24           MS. BALDWIN:  Object to form.

25           MR. ROBINSON:  Object to form, foundation.

Confidential                                           JAN-MS-05485581

Scott Fishman, M.D.
February 26, 2019                                    305

1              THE WITNESS:  No.

2      BY MR. ERCOLE:

3         Q.   How about ever write opioid prescription

4      because were you invited for a dinner program by a

5      pharmaceutical company?

6              MS. BALDWIN:  Object to form.

7              THE WITNESS:  No.

8      BY MR. ERCOLE:

9         Q.   Were you ever -- did you ever write an

10     opioid prescription because of some offer to sit on

11     an advisory board by a pharmaceutical company?

12             MS. BALDWIN:  Object to form.

13             THE WITNESS:  Absolutely not.

14     BY MR. ERCOLE:

15        Q.   In fact, all of these -- this notion of

16     doctors exercising their own independent medical

17     judgment to prescribe opioids safely is precisely

18     what you've been teaching about since the late

19     '90s; is that fair to say?

20             MS. BALDWIN:  Objection, leading.

21             THE WITNESS:  Yes.

22     BY MR. ERCOLE:

23        Q.   How about was it even before the late

24     '90s?

25             MS. BALDWIN:  Same objection.

Confidential                                                    JAN-MS-05485582

Scott Fishman, M.D.
February 26, 2019                                    306

1              THE WITNESS:  Yes.  It's not about

2      opioids, but it's the foundation of my training.

3      You can't rely on any one piece of information, and

4      you certainly can't rely on information that comes

5      solely from conflicted sources.

6              I mean, it's ironic that that's, in fact,

7      what we did in a field in many ways to get into the

8      problems that we're in, but, yes, that's kind of

9      where -- those are the foundations of my training.

10     BY MR. ERCOLE:

11        Q.   When you say your "training," where would

12     you have -- where did you learn those?

13        A.    Well, I trained in internal medicine

14     through the Yale system in Greenwich Hospital in

15     Southern Connecticut, and then I trained and did my

16     anesthesia subspecialty training at Mass General at

17     Harvard, and my psychiatry training at Mass General

18     at Harvard.  I think those are particularly places

19     that were grounded in that solemn role of a

20     clinician to independently see each patient as an

21     individual and treat them based on their

22     presentation, rather than any other group of ideas

23     or beliefs and datasets, et cetera.

24        Q.   And, in fact, that's the standard of care

25     that physicians are obligated to perform; is that

Confidential                                                                  JAN-MS-05485583

```
 1    correct?

 2             MS. BALDWIN:  Objection, leading.

 3             THE WITNESS:  I believe that's true.

 4    BY MR. ERCOLE:

 5        Q.   With respect to your teaching, have you

 6    always taught that type of standard of care?

 7        A.   Yes.

 8        Q.   And does that date back to 1993 when you

 9    first started teaching?

10        A.   No, you know, I probably -- so the way

11    that my lineage worked is that I graduated medical

12    school in '90.  And then from '90 to '92 and a

13    half, I was doing internal medicine, and then it

14    was back in the day when you could actually overlap

15    different trainings.  So I actually was a internal

16    medicine resident, and went up to Boston, and I

17    became actually an internal medicine resident and

18    an anesthesia pain fellow at the same time doing

19    electives in one and training in the other.  And

20    then actually there was a time where I was a

21    psychiatry resident, internal medicine resident and

22    an anesthesia fellow for six months.  So, you know,

23    that was -- so, really, I became faculty -- I

24    technically became faculty at Harvard Medical

25    School in my fellowship, but I became formal
```

Confidential                                                                JAN-MS-05485584

Scott Fishman, M.D.
February 26, 2019                              308

```
 1    faculty after my psychiatry residency, which was I

 2    think at the end in 1995.  So that's really when my

 3    teaching career began.

 4        Q.   So I assume basically if you survived all

 5    of that, you could basically survive anything; is

 6    that fair to say?

 7        A.   I'm surprised I did it.

 8        Q.   At least since 1995 you've been teaching

 9    about -- about opioids; is that fair to say?

10             MR. ROBINSON:  Objection, form.

11             MS. BALDWIN:  Objection, form.

12    BY MR. ERCOLE:

13        Q.   I'll reask it.  You've been teaching

14    students at least as of since 1995; correct?

15             MS. BALDWIN:  Objection.

16             MR. ROBINSON:  Objection.

17             THE WITNESS:  Opioids have been an issue

18    since then.

19    BY MR. ERCOLE:

20        Q.   And pharmacovigilance has been an issue

21    sense then; is that fair to say?

22        A.   Yes.

23        Q.   And at least since 1995, have you trained

24    your students on the potential risks associated

25    with opioid?
```

Confidential                                                          JAN-MS-05485585

1       A.    Yes.

2       Q.    And since 1995, have you trained your

3  students on the potential for a risk of addiction

4  associated with opioids?

5       A.    Yeah.  You know, I have to say that I

6  was in that last cohort that was trained that if

7  you used opioid for pain, you had very minimal risk

8  of addiction, and that had to be unlearned over

9  many years.  So I'm not sure I would want to use my

10  training in 1995, my teaching in 1995 as a

11  reference standard for that.

12       Q.    Whatever teaching that you would have done

13  in 1995, would have been teaching that you sort of

14  independently developed; is that fair to say?

15            MS. BALDWIN:  Objection, leading.

16            THE WITNESS:  Yes.

17  BY MR. ERCOLE:

18       Q.    And since 1995, have you taught your

19  students that before prescribing a particular

20  medicine, they should read the label table of the

21  medicine?

22       A.    I don't know that I could tell you that

23  that's a specific thing I've advised students to

24  do.

25       Q.    Is it self-evident that before --

Confidential                                                    JAN-MS-05485586

Scott Fishman, M.D.
February 26, 2019                                    310

1       A.    Yes.

2       Q.    Let me just finish before you respond.

3       A.    Sorry.

4       Q.    Thank you.  Is it self-evident that before

5    prescribing a medicine, a provider needs to and

6    should understand the contents of the label of that

7    medicine?

8            MS. BALDWIN:  Objection, form, leading.

9            THE WITNESS:  Yes.

10   BY MR. ERCOLE:

11      Q.    And is it fair to say that before writing

12   a prescription of a medicine, that a provider

13   should understand the risks associated with that

14   medicine?

15           MS. BALDWIN:  Object to form, leading.

16           THE WITNESS:  Yes.

17   BY MR. ERCOLE:

18      Q.    And whether implicitly or explicitly, are

19   those concepts that have been made clear in

20   teaching that you've done since 1995?

21           MS. BALDWIN:  Object to form.

22           THE WITNESS:  They're consistent.

23   BY MR. ERCOLE:

24      Q.    Is it fair to say that with respect to the

25   labels of medicines, including opioids, the labels

Confidential                                                     JAN-MS-05485587

Scott Fishman, M.D.
February 26, 2019                              311

1    are there for a reason?

2              MS. BALDWIN:  Object to form.  Leading.

3              THE WITNESS:  Correct.

4    BY MR. ERCOLE:

5        Q.   And those labels for opioids disclose

6    risks associated with those medicines; correct?

7              MS. BALDWIN:  Objection, leading.

8              THE WITNESS:  Yes.

9    BY MR. ERCOLE:

10       Q.   And actually understanding and --

11   understanding the risks associated with opioids as

12   reflected in the label of those medicines, is

13   particularly important before writing a

14   prescription of those medicines; is that fair to

15   say?

16             MS. BALDWIN:  Objection, leading.

17             THE WITNESS:  Yes.

18   BY MR. ERCOLE:

19       Q.   Would you agree that training of medical

20   students can influence whether a -- whether a

21   prescriber -- strike that.

22             Do you agree how a prescriber is trained

23   in medical school may influence whether or not an

24   appropriate prescription is written or not written

25   for a particular patient?

Confidential                                                    JAN-MS-05485588

Scott Fishman, M.D.
February 26, 2019                                    312

```
1              MS. BALDWIN:  Object to form.

2              THE WITNESS:  Yes.

3    BY MR. ERCOLE:

4       Q.   And would that apply to opioids as well?

5              MS. BALDWIN:  Objection, same objection.

6              THE WITNESS:  Yes.

7    BY MR. ERCOLE:

8       Q.   And does the -- that training begins in

9    medical school; is that fair to say?

10             MS. BALDWIN:  Same objection.

11             THE WITNESS:  The training should begin in

12   medical school.

13             MS. BALDWIN:  Same objection in case you

14   didn't hear me.

15             THE WITNESS:  Sorry.

16   BY MR. ERCOLE:

17      Q.   Since 1995, have you trained your students

18   to obtain informed consent from a patient before

19   writing opioid prescription?

20             MS. BALDWIN:  Objection, leading.

21             THE WITNESS:  You know, I don't think that

22   we emphasized that -- I emphasized that or we as a

23   field emphasized that as much as we should and do

24   now.

25
```

Confidential                                                        JAN-MS-05485589

Scott Fishman, M.D.
February 26, 2019                                    313

```
1    BY MR. ERCOLE:
2         Q.   When you say "we as a field," what field
3    are you referring to?
4         A.   Pain medicine.
5         Q.   That is -- that's the medical community;
6    is that correct?
7         A.   Yes.
8         Q.   And we'll get into some of these
9    documents, but at least in the 1990s you were
10   publishing articles about opioid contracts; is that
11   fair to say?
12        A.   That's right.
13        Q.   What is an opioid contract?
14        A.   An opioid contract is a bilateral
15   agreement between a patient and a prescriber that
16   outlines the expectations and the procedure for
17   receiving an opioid and can serve as an informed
18   consent process.
19        Q.   Do you know, do you recall when you first
20   started using opioid contracts in your particular
21   practice, if you've done at all?
22        A.   Oh yeah.  From the beginning they were
23   used in my training.
24        Q.   And what -- when you say "from the
25   beginning," are you referring to 1995, for
```

Confidential                                                                    JAN-MS-05485590

Scott Fishman, M.D.
February 26, 2019                                              314

1    instance?

2        A.   Probably 1993 I think we were using opioid

3    contracts when I started my pain fellowship.

4        Q.   And those opioid contracts would have

5    disclosed the risks associated with using opioids;

6    is that fair to say, to the patient?

7            MS. BALDWIN:  Objection.

8            THE WITNESS:  So you seem to know about

9    the paper that I did.  We actually did a survey of

10   opioid contracts and most of them didn't and most

11   of them really didn't meet informed consent

12   criteria.  So I don't think in the early days it

13   did.  The contracts in the early days was really to

14   benefit the prescriber at the -- and putting the

15   patients in kind of the one-down position.

16   BY MR. ERCOLE:

17       Q.   With respect to the opioid contracts that

18   you utilized in your practice, did those contracts

19   disclose the risks associated with opioids?

20           MS. BALDWIN:  Objection.

21           THE WITNESS:  They ultimately did --

22   sorry, they ultimately did as they evolved in my

23   practice, but probably didn't in the early days.

24   BY MR. ERCOLE:

25       Q.   And you as a physician or your practice

Confidential                                                    JAN-MS-05485591

Scott Fishman, M.D.
February 26, 2019                              315

```
 1    would have controlled what went into an opioid

 2    contract and what didn't go into an opioid

 3    contract; is that fair to say?

 4            MS. BALDWIN:  Objection, leading.

 5            THE WITNESS:  Yes, yes.

 6    BY MR. ERCOLE:

 7       Q.   The pharmaceutical companies did not --

 8    did not control what you as a physician decided to

 9    put or not put into a particular opioid contract;

10    correct?

11            MS. BALDWIN:  Objection, leading.

12            THE WITNESS:  Well, I don't think they had

13    any binding input.  I do vaguely recall that some

14    companies actually, to be helpful, came up with

15    agreement language that they would put forward for

16    some period of time, but they didn't influence what

17    I put in my contract or we put in our contract in

18    my clinic.

19    BY MR. ERCOLE:

20       Q.   Is it fair to say that since 1995 you've

21    trained your students to utilize the opioid

22    contracts in connection with their contract?

23       A.   Yes.

24            MS. BALDWIN:  Objection, leading.

25
```

Confidential                                              JAN-MS-05485592

Scott Fishman, M.D.
February 26, 2019                                    316

```
1    BY MR. ERCOLE:

2        Q.   Dr. Fishman, we'll get into this in a

3    little bit more detail.  You are a defendant in

4    several lawsuits across the country concerning the

5    opioid litigation; is that fair to say?

6        A.   I'm not sure how many remain.

7        Q.   I'm not trying to trick you.

8        A.   I was.  I've been removed from most of

9    them, but there are some that still linger.

10       Q.   And you've been removed from most of them

11   because of a settlement agreement that you've

12   reached with plaintiffs in those cases; is that

13   correct?

14       A.   Yes.

15           MS. BALDWIN:  Object to form.

16           THE WITNESS:  Yes.

17   BY MR. ERCOLE:

18       Q.   And in connection with that settlement

19   agreement, you agreed to provide a proffer to those

20   particular plaintiffs in those cases?

21           MR. ROBINSON:  Objection, form,

22   foundation.

23           MS. BALDWIN:  Object to form.

24           THE WITNESS:  I agreed on a proffer that

25   was mutually -- was mutually agreed on.
```

Confidential                                                              JAN-MS-05485593

Scott Fishman, M.D.
February 26, 2019                                    317

1    BY MR. ERCOLE:

2       Q.   And you haven't settled with any of the

3    Defendants in this particular case; have you?

4            MS. BALDWIN:  Object to form.

5            THE WITNESS:  I'm not a party in this

6    particular case, so no, yeah.

7    BY MR. ERCOLE:

8       Q.   Fair enough.  With respect to Defendants,

9    you haven't entered into a settle agreement with

10   any particular --

11      A.   No, I have not.

12           MS. BALDWIN:  Object to form.

13           THE WITNESS:  Could I say more about that?

14           MR. ROBINSON:  Wait for a question.

15   BY MR. ERCOLE:

16      Q.   You've never -- to the best of your

17   knowledge, have you been sued by any opioid

18   manufacturers?

19      A.   No.

20      Q.   There are a variety of different

21   manufacturers of opioids; is that fair to say?

22           MS. BALDWIN:  Object to the relevance.

23           THE WITNESS:  There were manufacturers of

24   a variety of opioids, I would say that.

25

Confidential                                                           JAN-MS-05485594

Scott Fishman, M.D.
February 26, 2019                                    318

1    BY MR. ERCOLE:

2        Q.   And is it fair to say there are many

3    different manufacturing --

4        A.   There are many different manufacturers.  I

5    think they're all manufacturers.  So I'm not sure

6    that there are a variety of them.  They're all

7    manufacturers.

8        Q.   That's an excellent clarification.  I

9    appreciate that.

10            But different companies manufacture

11   opioids; correct?

12       A.   Yes.

13       Q.   And those manufacturers manufacture

14   different types of opioids; is that fair to say?

15       A.   Yes.

16       Q.   And opioid medicines are different; is

17   that correct?

18            MS. BALDWIN:  Object to form.

19            THE WITNESS:  Opioid medicines are, yeah,

20   an overarching group of different molecules and

21   different formulations.

22   BY MR. ERCOLE:

23       Q.   And different opioids may be approved by

24   the FDA at different times?

25       A.   Correct.

Confidential                                                              JAN-MS-05485595

1       Q.   And some of those medicines may be generic

2    medicines; is that true?

3            MS. BALDWIN:  Object to the form.

4            THE WITNESS:  Yes.

5    BY MR. ERCOLE:

6       Q.   And some may be branded medicines?

7            MS. BALDWIN:  Object to the form.

8            THE WITNESS:  Yes.

9    BY MR. ERCOLE:

10      Q.   And some may be short acting opioids?

11      A.   Yes.

12           MS. BALDWIN:  Objection, object to the

13   form.

14   BY MR. ERCOLE:

15      Q.   Some may be long acting opioids?

16           MS. BALDWIN:  Object to form.

17           THE WITNESS:  Yes.

18   BY MR. ERCOLE:

19      Q.   And may be different delivery systems with

20   respect to those opioid medicines?

21           MS. BALDWIN:  Object to form.

22           THE WITNESS:  Yes.

23   BY MR. ERCOLE:

24      Q.   And with respect to marketing, is it fair

25   to say that opioid manufacturers may engage in

Confidential                                                    JAN-MS-05485596

```
 1    different types of marketing, if any?
 2            MS. BALDWIN:  Object to form.
 3            THE WITNESS:  I assume so.
 4    BY MR. ERCOLE:
 5        Q.   For instance, generic manufacturers may
 6    not market their medicines at all?
 7            MS. BALDWIN:  Object to form.
 8    BY MR. ERCOLE:
 9        Q.   Is that fair to say?
10        A.   Yes.
11        Q.   Dr. Fishman, do you have -- do you recall
12    any communications that you've ever had with anyone
13    from a company known as Actavis Pharma?
14        A.   I don't recall.
15        Q.   Do you recall receiving directly or
16    indirectly any funding from a company called
17    Actavis Pharma?
18        A.   I don't.
19        Q.   Are you aware of any promotional or
20    marketing statements ever made about opioids by
21    such a company?
22        A.   I do not.
23        Q.   How about do you recall any communications
24    that you've ever had with a company by the name of
25    Watson Laboratories?
```

Confidential                                                                 JAN-MS-05485597

 1        A.    I don't.

 2        Q.    Are you aware of any funding that you

 3   received directly or indirectly from any company

 4   known as Watson Laboratories?

 5        A.    I don't.  I would not be surprised if the

 6   American Pain Foundation received funding from

 7   those or the American Academy of Pain Medicine or

 8   the American Pain Society, organizations I had a

 9   role in.  So when you say "indirectly," maybe there

10   is a connection there, but I don't recall working

11   with those companies or receiving anything from

12   them.

13        Q.    Sure.  Well, sitting here today, do you

14   recall any of those other entities that you've

15   just -- third-party entities you just described

16   ever receiving any funding from Watson

17   Laboratories?

18             MS. BALDWIN:  Object to form.

19             THE WITNESS:  I don't recall, but I

20   wouldn't be surprised if they did.

21   BY MR. ERCOLE:

22        Q.    Okay.  But sitting here today you don't

23   recall?  I just want to make sure.

24        A.    Correct, I do not recall.

25             MS. BALDWIN:  Object to form.

Confidential                                                    JAN-MS-05485598

Scott Fishman, M.D.
February 26, 2019                                    322

```
 1    BY MR. ERCOLE:

 2        Q.   Are you aware of any promotional or

 3    marketing statements made about opioids from Watson

 4    Laboratories?

 5        A.   No.

 6        Q.   Have you ever had any communications with

 7    a company known as Actavis, LLC, to the best of

 8    your understanding?

 9        A.   Not that I recall.

10        Q.   Do you ever -- were you ever aware of any

11    funding that you've received directly or indirectly

12    from a company known as Actavis, LLC?

13        A.   Not that I know of.

14        Q.   Are you aware of any promotional or

15    marketing statements about opioids made by Actavis,

16    LLC?

17        A.   Not that I am aware of.

18        Q.   Are you aware of what medicines, if any,

19    Actavis Pharma, Watson Laboratories or Actavis, LLC

20    manufactures?

21        A.   I am not.

22        Q.   Do you recall any documents that the State

23    showed you today about any of those entities?

24             MS. BALDWIN:  Object to form.

25             THE WITNESS:  I think there was one
```

Confidential                                    JAN-MS-05485599

```
1    document that listed Watson, and, I mean, it could

2    have even been in my book.  I think I saw the name

3    "Watson" somewhere.

4    BY MR. ERCOLE:

5        Q.   Sitting here today, can you

6    recall specifically about --

7        A.   I don't know if that happened today, no.

8            MS. BALDWIN:  Object to form.

9    BY MR. ERCOLE:

10       Q.   Are you aware of any -- Dr. Fishman, are

11   you aware of any -- you've heard of the company

12   Teva, USA; is that fair to say?

13       A.   Yes.

14       Q.   Are you aware of any false or misleading

15   statements that Teva USA has ever made about

16   opioids?

17       A.   No.

18       Q.   You've heard of the company Cephalon; is

19   that fair?

20       A.   Yes.

21       Q.   Are you aware of any -- strike that.

22           Do you have any personal knowledge of any

23   false or misleading statements that Cephalon has

24   ever made about opioids?

25           MS. BALDWIN:  Object to form.  I should
```

Confidential                                                    JAN-MS-05485600

Scott Fishman, M.D.
February 26, 2019                                    324

1    say I have a history with Cephalon in that they

2    made misleading statements about me.

3    BY MR. ERCOLE:

4        Q.   Okay.  With respect to making misleading

5    statements about you, do you recall what that issue

6    was?

7        A.   The issue was that I agreed to do a public

8    service announcement, and I think it was Cephalon

9    at the time, and then it became Teva, and I signed

10   an agreement that said that I wasn't getting paid,

11   and it would only be for public service, public

12   education.  It was actually a commentary that I

13   made at a professional meeting about the risk of

14   addiction and abuse in children.  They wound up

15   putting it up on their marketing website,

16   unbeknownst to me, something that they later took

17   off and apologized for.

18       Q.   So is it fair to say when that issue was

19   brought to your attention, that they immediately

20   took off the video from the website?

21       A.   Yes.

22            MS. BALDWIN:  Object to form.

23            THE WITNESS:  Yes.

24   BY MR. ERCOLE:

25       Q.   You said Cephalon also apologized to you.

Confidential                                    JAN-MS-05485601

1          A.    Teva did.

2          Q.    Teva Pharmaceutical did.  That video that

3     you just referenced talked about the risk of

4     addiction associated with opioids; is that correct?

5          A.    Abuse, yes.

6          Q.    When you say "abuse," what do you mean by

7     that?

8          A.    Abuse is a broader category than

9     addiction.

10         Q.    Was there anything -- that was a program

11    that you developed content-wise?

12         A.     It was my content that I was asked to --

13    if I would talk about that issue on camera for

14    about, I don't know, two minutes or something like

15    that.

16         Q.    Did you say -- in that two-minute

17    discussion, did you say anything false in there?

18         A.    No.

19               MS. BALDWIN:  Object to form.

20    BY MR. ERCOLE:

21         Q.    And, in fact, in that discussion, did you

22    highlight the risks of abuse associated with

23    opioids?

24               MS. BALDWIN:  Objection, leading.

25               THE WITNESS:  It was completely about the

Confidential
JAN-MS-05485602

Scott Fishman, M.D.
February 26, 2019                          326

1   risks of opioids.

2   BY MR. ERCOLE:

3       Q.   And then Cephalon went and put that,

4   actually, on its website; is that correct?

5           MS. BALDWIN:   Objection, leading.

6           THE WITNESS:   That is correct, or Teva

7   did.  I'm not sure.

8   BY MR. ERCOLE:

9       Q.   Fair enough.  Once you said, Hey, could

10  you take that down because there was an incorrect

11  attribution of some payment to you in there, they

12  immediately did that; is that fair to say?

13          MS. BALDWIN:   Objection, leading.

14          THE WITNESS:   They took it down because it

15  was never intended to be used in their marketing,

16  and there was also an inaccurate attribution of

17  payment to me.

18  BY MR. ERCOLE:

19      Q.   In connection with that particular video,

20  was there anything false or misleading other than

21  the attribution of payment to you that was

22  associated with that?

23          MS. BALDWIN:   Object to form.

24          THE WITNESS:   No.

25

Confidential                                      JAN-MS-05485603

Scott Fishman, M.D.
February 26, 2019                           327

1    BY MR. ERCOLE:

2        Q.    Other than that medication attribution of

3    you receiving a payment, anything false or

4    misleading that you can recall Cephalon making

5    about opioids?

6              MS. BALDWIN:  Object to form.

7              THE WITNESS:  No.

8    BY MR. ERCOLE:

9        Q.    With respect to the misattribution of

10   payment that you just described, that was disclosed

11   as part of the video; is that correct?

12             MR. ROBINSON:  Object to form.

13             MS. BALDWIN:  Objection.

14             THE WITNESS:  I actually don't know.  It

15   was somehow transmitted to media sources that I was

16   paid, so Cephalon made a statement that I wasn't --

17   in fact, reproduced this document I had them sign

18   that stated that I would not be paid.  These were

19   my own ideas.  This would only be used for a public

20   service announcement, and it would not be used for

21   marketing purposes or for corporate purposes.

22   BY MR. ERCOLE:

23       Q.    So we looked at and I asked you to look at

24   Exhibit 1 in your CV.  There are a number of

25   different categories in this particular document,

Confidential                                                    JAN-MS-05485604

```
 1    it's very extensive, very impressive.  If you look
 2    to, it looks like it's Bates marked as FISH 8; do
 3    you see that on the bottom right-hand corner?
 4    There is a section that says, "Teaching Lectures
 5    and Presentations"; do you see that?
 6        A.    Yes.
 7        Q.    And it looks like there are -- if you
 8    scroll through, it looks like there are 566 of
 9    them; do you see that?
10        A.    Yes, as of August 2017.
11        Q.    Sitting here today with respect to those
12    lectures and presentations, could you identify a
13    single one of those lectures or presentations that
14    did not reflect your own independent medical
15    opinion?
16        A.    No.
17        Q.    Because they all did reflect your own --
18            MS. BALDWIN:  Object to form.
19    BY MR. ERCOLE:
20        Q.    They all did reflect your own independent
21    medical opinion?
22            MS. BALDWIN:  Objection, leading.
23            THE WITNESS:  They did.
24    BY MR. ERCOLE:
25        Q.    And if you turn to the next category, it
```

Confidential                                    JAN-MS-05485605

1    says "Books"; do you see that?

2        A.   Yes.

3        Q.   It looks like there are 11 books that are

4    listed there.  With respect to those books, did

5    each of those reflect your own independent medical

6    opinion and content?

7        A.   Yes.

8        Q.   I know this is going to sound like a silly

9    question, but pharmaceutical companies didn't

10   control the content of those books that you

11   authored; correct?

12           MS. BALDWIN:  Objection, leading.

13           THE WITNESS:  Pharmaceutical companies

14   didn't control the content of any of these books;

15   however, some of these books are edited books that

16   include the independent -- what I believe to be the

17   independent thoughts and views of others.  So I'm

18   an editor rather than an author of several of these

19   books.

20   BY MR. ERCOLE:

21       Q.   Fair enough.  Thank you for that

22   distinction.  At least with respect to those books

23   that you authored.

24       A.   Yes.

25       Q.   You're not aware of a pharmaceutical

Confidential                                                              JAN-MS-05485606

1    company ever controlling the content of those

2    books; correct?

3            MS. BALDWIN:  Objection, leading.

4            THE WITNESS:  No.

5    BY MR. ERCOLE:

6       Q.   In fact, if the pharmaceutical company

7    would have asked you to include some piece of

8    information in your book that you disagreed with,

9    you would have said, Go pound sand; correct?

10           MS. BALDWIN:  Objection, leading.

11           THE WITNESS:  Yes.

12   BY MR. ERCOLE:

13      Q.   I used "go pound sand" as an euphemism for

14   saying no, would you not have included it; correct?

15           MS. BALDWIN:  Objection, leading.

16           THE WITNESS:  Yes.

17   BY MR. ERCOLE:

18      Q.   There are also -- if you go down to the

19   next category, it's Book Introduction, Forward,

20   Prefaces, Contributing Editor, Editorship; do you

21   see that?

22      A.   Yes.

23      Q.   Is it fair say that those Introductions,

24   Forwards, Prefaces listed there were all developed

25   content-wise independently by you?

Confidential                                                          JAN-MS-05485607

```
 1              MS. BALDWIN:  Objection.

 2              THE WITNESS:  Yes.

 3    BY MR. ERCOLE:

 4        Q.   Next category is Original Articles; do you

 5    see that?

 6        A.   Yes.

 7        Q.   It looks like there lists 114 original

 8    articles, were all of those articles -- strike

 9    that.

10              Did the content of those articles authored

11    by you reflect your own independent medical

12    opinion?

13        A.   Yes.

14        Q.   The content of those articles was not

15    controlled by pharmaceutical company either; is

16    that fair to say?

17              MS. BALDWIN:  Objection, leading.

18              THE WITNESS:  Yes.

19    BY MR. ERCOLE:

20        Q.   Would the same analysis also apply to the

21    next category Book Chapters on Page 37?

22        A.   Yes.

23              MS. BALDWIN:  Objection for, objection,

24    leading.

25
```

Confidential                                                                    JAN-MS-05485608

Scott Fishman, M.D.
February 26, 2019                                    332

1    BY MR. ERCOLE:

2        Q.    If you turn to 39, Other Educationally

3    Relevant Printed Publications; do you see that?

4        A.    Yes.

5        Q.    Would the same analysis we've been talking

6    about also apply to those -- that category of

7    publication?

8            MS. BALDWIN:  Same objections.

9            THE WITNESS:  Yes.

10   BY MR. ERCOLE:

11       Q.    So is it fair to say that at least with

12   respect to any of the publications, lectures, or

13   materials that you've authored in whole or in part

14   in this resume -- in your resume, that you

15   developed the content of those -- of those

16   documents independently?

17           MS. BALDWIN:  Object to form.

18           THE WITNESS:  I would say I controlled the

19   content of my parts of any of these.

20   BY MR. ERCOLE:

21       Q.    And controlled it free from in your view

22   the influence of pharmaceutical companies; correct?

23           MS. BALDWIN:  Objection, leading.

24           THE WITNESS:  Yes.

25           MR. ERCOLE:  It's 6 o'clock.  Do you want

Confidential                                                              JAN-MS-05485609

Scott Fishman, M.D.
February 26, 2019                          333

1    to stop?  What do you want to do?  I'm going to get

2    into another category.

3              MR. ROBINSON:  How long do you have?

4              MR. ERCOLE:  I'm probably going to have at

5    least another hour.

6              THE WITNESS:  Do you want to call it a

7    day?  I'm happy to keep going or stop.  Whatever

8    you guys feel like doing.

9              MR. ROBINSON:  You got another hour.  I

10   mean, are we still within the parameters of what we

11   were talking about earlier because you've been

12   going what, 45 minutes?

13             MR. OXLEY:  I think so.

14             MR. ROBINSON:  So a total of four hours

15   tomorrow?

16             MS. BALDWIN:  I'm sorry, what parameters?

17   Are we talking about the parameters that were --

18             MR. ROBINSON:  Time, time frame.

19             MS. BALDWIN:  I'm sorry, I'm just asking

20   for clarification of the parameters you're

21   referring to.  Is that what you put on the record

22   this morning or are there new parameters?

23             MR. ROBINSON:  No, these guys just told me

24   they thought they had about five hours of

25   examination, and they've done about an hour, so

Confidential                                                    JAN-MS-05485610

Scott Fishman, M.D.
February 26, 2019                                    334

1    that means we've got about four hours left.  And if

2    it that's the case, let's do it tomorrow.

3              MR. ERCOLE:  Okay.

4              MR. ROBINSON:  We are not going to finish

5    today.  I think we've gone to 6 o'clock.  His day

6    started at 6 o'clock this morning.  I think we've

7    gone long enough.

8              THE VIDEOGRAPHER:  This is the end of Disc

9    4.  We are off the record at 6 p.m.

10             (Deposition adjourned at 6:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential                                              JAN-MS-05485611

1

2          DECLARATION UNDER PENALTY OF PERJURY

3

4          I, SCOTT FISHMAN, M.D., do hereby certify

5     under penalty of perjury that I have read the

6     foregoing transcript of my deposition taken on

7     February 26, 2019; that I have made such

8     corrections as appear noted on the Deposition

9     Errata Page, attached hereto, signed by me; that my

10    testimony as contained herein, as corrected, is

11    true and correct.

12          Dated this _____ day of

13    _____, 2019 at _____,

14    California.

15

16                    _____

17                         SCOTT FISHMAN, M.D.

18

19

20

21

22

23

24

25

Confidential                                                    JAN-MS-05485612

Scott Fishman, M.D.
February 26, 2019                                    336

```
1                    DEPOSITION ERRATA SHEET

2      Page No._____ Line No._____

3      Change:_____

4      Reason for change:_____

5      Page No._____ Line No._____

6      Change:_____

7      Reason for change:_____

8      Page No._____ Line No._____

9      Change:_____

10     Reason for change:_____

11     Page No._____ Line No._____

12     Change:_____

13     Reason for change:_____

14     Page No._____ Line No._____

15     Change:_____

16     Reason for change:_____

17     Page No._____ Line No._____

18     Change:_____

19     Reason for change:_____

20     Page No._____ Line No._____

21     Change:_____

22     Reason for change:_____

23

24     _____        _____

25     SCOTT FISHMAN, M.D.                     DATED
```

Confidential                                    JAN-MS-05485613

Scott Fishman, M.D.
February 26, 2019                    337

```
 1    STATE OF CALIFORNIA      )
                               )    ss
 2    COUNTY OF SACRAMENTO     )

 3           I, MARYANN H. VALENOTI, a Registered

 4    Professional Reporter, a Certified Realtime

 5    Reporter and Certified Shorthand Reporter, do

 6    hereby certify:

 7           That prior to being examined, the witness

 8    in the foregoing proceedings was by me duly sworn

 9    to testify to the truth, the whole truth, and

10    nothing but the truth;

11           That said proceedings were taken before me

12    at the time and place therein set forth and were

13    taken down by me in shorthand and thereafter

14    transcribed into typewriting under my direction and

15    supervision;

16           I further certify that I am neither

17    counsel for, nor related to, any parties to said

18    proceedings, nor in anyway interested in the

19    outcome thereof.

20           In witness whereof, I have hereunto

21    subscribed my name.

22    Dated February 26, 2019

23    _____

24    Maryann Valenoti, RPR, CRR,

25    CSR No. 11266
```

Confidential                                                          JAN-MS-05485614

## Exhibits

EX 0001 Kenneth Fishman 022619 5:7 24:20,23 298:9 327:24
EX 0002 Kenneth Fishman 022619 5:8 37:14,15
EX 0003 Kenneth Fishman 022619 5:9 42:18, 19,21
EX 0004 Kenneth Fishman 022619 5:11 44:25 45:1
EX 0005 Kenneth Fishman 022619 5:13 48:24 49:1 239:5
EX 0006 Kenneth Fishman 022619 5:14 62:17, 18,20 65:12,18
EX 0007 Kenneth Fishman 022619 5:16 93:16, 17 94:3
EX 0008 Kenneth Fishman 022619 5:18 142:2, 3,4,8
EX 0009 Kenneth Fishman 022619 5:20 146:5,6 155:16
EX 0010 Kenneth Fishman 022619 5:21 154:1,2 155:18,20,21
EX 0011 Kenneth Fishman 022619 5:22 158:5, 6,7
EX 0012 Kenneth Fishman 022619 5:24 161:25 162:1,2
EX 0013 Kenneth Fishman 022619 6:2 165:23, 24,25
EX 0014 Kenneth Fishman 022619 6:3 170:24, 25 171:1,3
EX 0015 Kenneth Fishman 022619 6:5 177:23, 24,25
EX 0016 Kenneth Fishman 022619 6:6 182:8,9
EX 0017 Kenneth Fishman 022619 6:7 188:1,2 196:12,13

EX 0018 Kenneth Fishman 022619 6:9 196:17, 19
EX 0019 Kenneth Fishman 022619 6:10 203:16, 18,20 228:24
EX 0020 Kenneth Fishman 022619 6:11 210:3,4
EX 0021 Kenneth Fishman 022619 6:12 215:6, 9,10,12
EX 0022 Kenneth Fishman 022619 6:13 222:16, 17 223:24
EX 0023 Kenneth Fishman 022619 6:14 224:2,4
EX 0024 Kenneth Fishman 022619 6:15 232:3, 4,6
EX 0025 Kenneth Fishman 022619 6:16 239:8
EX 0026 Kenneth Fishman 022619 6:18 247:12, 14
EX 0027 Kenneth Fishman 022619 6:19 249:4,5 257:1,2
EX 0028 Kenneth Fishman 022619 6:21 257:4
EX 0029 Kenneth Fishman 022619 6:22 223:2 266:1,4 268:16,23 269:3
EX 0030 Kenneth Fishman 022619 6:23 270:25 271:1,3
EX 0031 Kenneth Fishman 022619 6:24 274:25 275:1,3

## $

$1,199,409.95 167:7
$10,000 263:2 276:1
$100,000 253:16 254:6,16 261:18
$115,000 199:13,18 200:9 207:2 209:6
$125,000 199:5 255:8
$150,000 172:24

$1500 39:3
$2,000 164:11,15 165:7
$2,035,519 156:17
$2,497 157:11
$2,898 165:1
$2.426 235:13
$24,750 157:8
$25,000 168:8,12
$3,091,264 156:25
$3,642,501 154:17 155:24
$30,000 253:7 261:16
$4,898 165:16
$40,000 251:15
$412,100 161:2
$42,482 157:20 158:3
$465,451.25 161:14
$5,843 157:14
$50,000 177:11 254:19
$507,377.50 160:10
$542,259.52 169:3
$562,674 163:17
$58,000 252:8,19
$60,000 172:25
$633,300 162:25
$725,000 166:16
$725,584.95 166:16
$75,000 254:13
$83,975 166:25
$87,895 249:24 250:2, 20
$878,895 249:19
$9,392 157:17
$9,500 46:10

## (

(b)(6) 159:1

## 0

0000008 164:22
00009587 196:19
003465695 37:19
004273776 232:7
006241 171:3
006877 182:17

Confidential
JAN-MS-05485615

01465610  45:4
01465625  45:4
03063698  94:4
04100029381  142:9

---

**1**

**1**  24:20,23 65:24
75:11 77:11,19 78:13
80:17,23,24 81:2
96:4 172:24 198:19,
20 199:10 271:24
298:9 327:24
**1(c)**  199:19
**1,000**  73:25 79:12
**1.7**  164:3
**10**  39:17 75:12 77:11
80:17 82:6 87:24
154:1,2 155:18,20,21
188:19 191:9,11
249:12
**10,000**  173:4 199:6
**100**  75:20 81:22
84:12,18
**10:49**  65:3
**11**  158:6,7 200:16
249:12,13,18,21,25
250:16 329:3
**11(c)(1)(c)**  271:13
**114**  331:7
**11:05**  65:6
**11:53**  112:21
**12**  81:17 162:1,2
200:16 251:13 252:16
253:12
**12:04**  112:24
**13**  84:9 102:9 165:24,
25 182:13
**137**  248:11
**14**  85:10 103:3,4
170:25 171:1,3 199:2
249:11 251:23 252:21
**15**  85:8 177:24,25
299:24
**15,000**  173:4
**150**  207:2
**16**  88:6 104:22 182:8,
9
**160**  200:12
**17**  188:1,2 196:13,16

229:8
**18**  190:9 196:14,15,
17,19 229:11
**19**  87:22 142:17 190:9
203:16,18,20 228:24
229:2,3
**1990**  299:22
**1990s**  33:1 34:8 313:9
**1993**  300:1 307:8
314:2
**1995**  308:2,8,14,23
309:2,10,13,18
310:20 312:17 313:25
315:20
**1997**  154:13,16
155:23,24 156:16,24
157:7,19,23 158:2
162:18 163:16 164:2
240:18 249:17
**1998**  157:10 251:2
**1999**  13:17 157:13
242:18
**1:09**  169:20
**1:57**  169:23

---

**2**

**2**  37:14,15 38:9 45:23
49:25 89:8 112:24
160:25 186:9 198:19,
20 208:23 212:2
215:18,24 223:8
**20**  13:5 49:12 89:7
191:9 210:3,4 254:9
299:24
**2000**  20:17 157:16,23
158:3 224:6
**2000s**  33:1,15 34:8
47:2
**2001**  271:23,24
**20019**  7:13
**2002**  23:25
**2003**  13:10 20:19
**2004**  20:17 24:3
162:24 251:2
**2005**  24:3,7 65:25
94:11 123:5,15
124:19 147:10
**2006**  21:24 24:7 39:17
41:25 115:18 158:20
160:4,8 161:1,13

**2007**  23:25 33:17 45:8
47:9 206:23 209:1
240:8,12 251:14
252:16 256:12 263:25
264:2 276:2
**2008**  22:5 164:10
165:15 197:5 199:2
217:4 229:20 265:15
276:4
**2009**  24:15 164:15
165:8,15 188:23
189:5 196:3 215:16
254:3,7,12
**2009-**  188:18
**2010**  43:3 44:8 255:2
**2011**  22:5 51:6 146:21
153:10,19 154:17
158:20 160:4,9
161:1,13 170:2
171:22 172:6 174:9
175:11 178:8,11
179:3 180:11 210:9
254:23 255:2,3,7
257:13
**2012**  24:11,15 49:12
50:2,18 55:7 151:15
152:18 154:8,14,17
155:7,24 156:16,24
157:19 162:4,13,18,
24 163:17 164:2
166:15 167:7 168:4,
7,12,16,20,22 169:2
182:13 235:9 249:9
250:1 255:14 256:18
**2013**  142:17
**2017**  166:6,15 167:8
168:4,12 169:3
328:10
**2019**  7:2
**21**  111:9 146:21
215:6,9,10,12 272:3
**210,000**  172:25
**22**  178:11 191:11
222:16,17 223:24
**23**  43:2 88:4 113:20
223:25 224:1,2,4
228:25
**24**  232:3,4,6
**25**  32:8 45:8 88:11
96:4 146:23 168:5
239:8 289:22 299:3,
6,25

Confidential

JAN-MS-05485616

25,000  173:4
250,000  173:5
26  7:2,13 247:12,14
27  249:4,5 257:2,13
28  240:18 257:4
29  171:21 223:2
  266:1,4 268:16,23
  269:3 299:22
2:18  186:9
2:21  186:12
2Q  51:6

3

3  42:18,19,21 94:23
  161:12 171:24 186:12
  198:20 247:17 270:8
3,538,100  190:14
30  84:13,17 159:1
  270:25 271:1,3
  289:22 299:3
3020  7:12
30th  43:10
31  88:18 122:22
  274:25 275:1,3
3465695  37:24
3465714  37:25
35.4  190:17
352(f)(1)  272:3
37  331:21
38.9  189:24
39  89:4 332:2
3:11  228:18
3:27  228:21

4

4  44:25 45:1 69:24
  91:8 92:3 94:11 96:2
  166:12 191:23 197:5
  269:10,17 270:22
  334:9
4.9  89:20
44  7:15
45  225:2 333:12
485  188:19
4860  7:11
4:07  260:13
4:16  260:16

4:25  270:5
4:28  270:8,9
4:35  270:22

5

5  48:24 49:1 74:5,10
  198:20 239:5 279:15
5-  263:2
5/8/12  162:22
50  67:17
50,000  173:3 175:12,
  13
550  7:16
566  328:8
5710  39:6,7

6

6  50:23 51:1 62:17,
  18,20 65:12,18 77:3
  80:24 98:22 143:2
  174:9 175:11 192:12
  198:20 224:6 229:16
  332:25 334:5,6,9
6,000  255:15
6243  172:18 173:11
6244  171:4 172:18
6245  171:5
6:00  334:10

7

7  77:19 78:14 80:24
  81:2 93:16,17,19
  94:3 198:20
75  108:25
75,000  173:3

8

8  51:4 56:20 74:4
  79:11 142:3,4,8
  154:8,13 198:20
  215:16 271:21 328:2
85  42:22
87,000  249:23
88,500  169:10
89  196:20

9

9  146:5,6 155:16
90  307:12
90s  305:19,24
92  307:12
95817  7:12
9588  205:17
9:43  7:2,13

A

a.m.  7:2
AAPM  117:18,22 118:23
  123:6,10,14 124:18
  125:2,11 158:16,18
  160:4 166:25 167:7,
  15 265:6 272:22
  273:8
AAPM's  125:4
Aaron  182:22 184:9
  185:13 186:15,23
Abbot  253:7
ability  225:25
absolute  35:21
absolutely  62:15
  208:6 283:7 285:8
  305:13
abuse  324:14 325:5,6,
  8,22
academic  105:4
academics  289:19
academy  23:20,24
  24:3,7 150:24 156:17
  158:19 160:10 163:18
  166:16 167:19 198:7
  211:22 230:25 321:7
accept  10:4 28:2
  43:17 45:20 53:14
  54:21 56:5 149:10
  159:19 167:21 271:9
acceptable  289:21
  300:9
acceptance  242:10
accepted  9:24 276:23
accepting  34:4 184:22
  217:15 264:22
acclimate  37:23

Confidential JAN-MS-05485617

accompanied  8:12
accomplished  12:12
  277:13
accordance  9:15
Accountable  181:18
accredited  255:5
accuracy  175:19
accurate  295:16
accurately  30:18
  175:9
acetaminophen  243:18
achieve  235:9
ACPE  121:15
acronym  68:19 287:24
act  19:9 181:10,18
  206:23 209:1 229:21
Actavis  279:22
  320:13,17 322:7,12,
  15,19
acting  319:10,15
action  94:20 117:5,
  10,16 118:22 119:8,
  24 120:21 121:16
  122:9,23 125:13
  193:6 205:9,23 211:3
ACTIQ  108:13,17
  114:19,25 115:6,13
  265:15 271:24 272:2
ACTIQ's  272:4
active  175:22,23
actively  174:14
  243:24
activities  17:22
  28:14 32:1,4 47:15
  60:9 72:11 98:24
  106:11 120:9 121:20
  135:6 141:19 142:10,
  25 199:4 200:10
  229:19 230:2 264:15,
  25 265:10 272:18,25
  273:10
activity  31:12 72:24
  99:18,24 100:16,21
  255:5,8
actual  150:5 218:13
  247:17 263:21
actuality  228:7
Acute  27:2
Ad  43:10
addiction  284:3 287:4
  309:3,8 324:14

325:4,9
addition  226:3 298:24
additional  173:13
  252:14 272:2 276:3
adequate  237:13 272:4
adjourned  334:10
admission  10:12
admit  244:4
admitted  10:8,10
adopted  139:5
adopting  176:19,20
advance  277:16
Advancing  13:1
advantage  58:14
advertise  131:2,8
advice  225:22
advised  309:23
advisory  18:24 19:14,
  19 20:6,11 29:17
  43:21 100:15 102:18
  105:3,4 120:1,6
  165:1 277:4 305:11
advocacies  134:24
advocacy  23:9 119:10
  205:8,19 206:20,21
  208:23,24 210:9,12,
  16 230:9
advocate  193:2,5
advocates  175:21
  205:10,25 230:7
advocating  23:11
affairs  67:6,19 166:3
  232:8,13
affect  138:7 140:4
affected  149:15 214:6
affecting  232:18
  233:6
afraid  60:21
afternoon  279:18
agencies  232:25
agenda  229:20
agendas  235:2
aggressively  244:4
agnostic  73:6
agree  10:11,14,25
  11:16,22 12:2 16:2
  23:2 27:24 28:7,15,
  22 36:10 60:2 62:13
  92:7 136:4,7,23
  137:4,14,16 138:1,6,

19 140:10 149:20
  179:10 220:16,19
  237:10,18 238:9
  246:19 276:22 290:14
  311:19,22
agreed  7:18 53:10
  182:25 183:4 184:20,
  22 292:8 316:19,24,
  25 324:7
agreeing  64:16
agreement  9:9,11,15,
  19,21,24 10:17 11:1,
  6 12:11 37:20,21
  38:10,16 45:24
  147:11 266:2,23
  267:12 271:4,16
  313:15 315:15
  316:11,19 317:9
  324:10
agreements  45:15
ahead  148:10 217:2
  252:12 258:11 278:19
Alan  197:16,17,23
Alfonso  224:7,10
Align  50:12
alignment  50:2
allegedly  275:17
alliance  57:22 230:21
  231:3
allocate  75:18
allocation  81:18
allowed  145:8
Alpharma  248:22
  253:13 254:9
alternative  242:25
alternatives  242:7
amalgamation  294:13
ambiguous  37:4 59:3
  218:18
America  57:15 266:23
  268:25 271:4 303:22
American  20:14,17,22
  21:3,8,18,20,24
  22:4,11 23:2,8,20,24
  24:2,6 43:16,23
  150:21,24 151:1,20
  152:2,10,16,24
  153:2,3,9,10 154:16
  155:3,25 156:17,25
  158:19 160:10 161:2,
  14 162:25 163:7,18

Confidential                                                        JAN-MS-05485618

SCOTT Fishman, M.D
February 26, 2019
5

164:3 166:16 167:19
168:8,13 169:3,10
170:1 171:19 172:13
173:12 174:13,21
177:6 178:16 180:24
183:19 184:8 189:2
193:10 194:15 195:5,
6,20 198:7,8 202:13,
14 203:6,25 204:20
209:13 211:2,17,19,
22 213:3,4,17 230:9
265:7 321:6,7,8
Americans  225:2
amount  46:9 261:3
262:25 263:14
amounts  13:6 261:12
analgesia  108:19
115:17
analgesic  42:8 49:21
analgesics  194:5
analysis  68:6 81:10
138:14 140:1 238:6,
24 291:18 331:20
332:5
analyze  91:10 117:10
analyzing  88:24
ANCE  121:15
anchored  291:22
and/or  82:20
anesthesia  306:16
307:18,22
anesthesiology  12:24
13:9,14 26:2,4,12
Angeles  190:22
announcement  324:8
327:20
annually  184:6
answering  128:3
answers  54:1
anymore  262:1
anytime  272:15
APF  168:19 176:2
177:11,20 178:5,7,
13,15,19 179:3
180:11,19 181:5
185:2,10 187:21
188:19 189:11,16
192:9 194:7,10
199:5,11 206:6 209:3
211:9 229:14,18
230:1,11,22,24 265:6

272:22 273:8
APF's  177:12 209:16
apologize  56:2 64:25
242:7
apologized  324:17,25
apparent  150:4 231:23
apparently  185:1
213:14
appearance  8:16
appears  67:15 191:19
196:6 197:1 209:8
224:15 252:7
apply  312:4 331:20
332:6
appointments  100:20
105:5
approach  73:12
appropriately  184:16
approved  257:19
271:25 318:23
approximately  260:22
APS  118:3,7,23 272:23
273:8
archiving  45:15
area  27:10 46:17
136:10 137:2 237:8
244:23 298:23
areas  26:11 27:5 50:7
298:13,17
argue  134:18 193:23
208:9 246:16
argument  236:21
argumentative  28:25
194:21
arise  58:3
arises  241:6
arising  241:8
arm's  48:2 134:17
army  205:10,24
arrow  95:16,22
arsenal  149:8
articles  76:4 77:8
83:11 84:11,25 85:12
86:3 89:14 223:16,20
280:14 289:5 313:10
331:4,8,10,14
articulate  293:19
assess  250:10,22
assessed  250:24

assessment  114:6
123:20
assign  81:19
assigned  81:22,23
174:5
assigns  106:10
assimilated  282:3
associate  13:13
association  219:2
241:5,6
associations  147:4
assume  40:14 131:20
132:17 145:7,10
205:4 308:4 320:3
assumed  73:13 155:1
asterisk  192:5,9
attach  179:13
attached  67:16 68:3
178:21 179:6,11
180:18 188:18 198:18
attaching  66:14
188:22
attachment  62:22
93:22
attachments  62:21
attempts  10:1
Attend  120:9
attendance  10:13
attended  77:7 89:13
attention  184:25
324:19
attitudes  250:10,23
attorney  10:7 186:4
attorney's  208:15
attorney-client
185:23
attribute  91:20
attributes  242:9
attributing  90:3
attribution  326:11,
16,21 327:2
audience  60:12 61:6,
16 73:9 109:9,20
110:21 111:3,5
140:19
audiences  110:3
147:5,21
audio  7:17
August  43:2,10 257:13
328:10

Confidential

JAN-MS-05485619

SCOTT Fishman, M.D
February 26, 2019

6

**author** 240:16 262:17
329:18
**authored** 247:9 275:19
294:7 329:11,23
331:10 332:13
**authoring** 259:21
260:20
**Availability** 82:20
**average** 89:12,13,14,
19
**avoided** 241:14
**award** 120:13
**aware** 15:17,21 22:8
107:18,20,25 130:19
132:1 134:1 145:25
166:2 216:10 217:11
240:24 241:2 263:23
265:14,17,20 296:15,
18 297:16,22 298:1
320:19 321:2 322:2,
10,14,17,18 323:10,
11,14,21 329:25
**awareness** 193:3
218:25

**B**

**back** 24:13 32:8 35:14
54:16 65:5 66:19
112:24 133:4 169:22
183:3 184:19 185:1,9
186:12 187:2,3,16
193:21 195:24
200:20,24 217:4
220:9 227:12 228:20
229:1,2 239:17,19,20
253:12 260:15 268:10
269:4,21 270:7,22
276:21 278:12 279:14
295:7 307:8,14
**background** 25:22
26:1,3,8 43:25 69:22
**bad** 62:4,5 245:18,25
**balance** 136:17 232:18
**balanced** 73:12 227:20
283:4
**balancing** 237:24
285:1
**Baldwin** 7:23 10:14
11:4,15,21 12:1,14,
17 13:20,23 14:13
15:7 16:9,23 17:8,17

18:1,21 19:15 20:1,
12 21:1,7,12 22:14,
20 23:1,13,18 24:24
25:4,6,7 27:14 28:3,
12,19 29:3,10,21
30:4 31:9,22 32:17
33:6 34:7 35:2,18
36:18,21 37:12,16
38:1,4,8 41:1,9,13
42:10,16,20 45:2,13,
17,22 46:5,14 47:8,
12,20 48:4 49:2,8,16
50:6,11,16,21 51:3,
9,15 52:1,8 53:1,17,
24 54:15,18 55:5,13
56:1,16 57:1,7 58:15
59:7,13,18,23 60:7
61:3 62:6,12,19,25
63:5,11,15,18,22
64:7,15,24 65:7,17
66:5,10,20 67:13
68:1,12 69:1,11,20
70:11 71:1,16,22
72:8,17,22 73:16
74:2,7,11,16 75:3,
10,16,23 76:3,7,11,
15,20 77:2,16 78:1,
11,22 79:10,17,24
80:9,16,20 81:1,6,16
82:5,14,19,23 83:2,
6,10,14,18,22 84:1,
8,16,23 85:7,14,20,
24 86:7,15,20 87:1,
5,12,21 88:3,17
89:3,11,18 90:1,16,
21 91:7 92:1,10,17,
22 93:9,14,18,20,23
94:2,15,22 95:4,9,
15,19 96:1,9,14,21
97:13,21 98:5,10,21
99:4,12,22 100:2,8,
12,19 101:1,6,11,15,
19,23 102:2,8,14,22
103:2,17 104:1,9,14,
21 105:8,13,18,24
106:4,9,15,20 107:4,
17 108:1,24 109:4,14
110:1,11,18 111:8,
18,24 112:3,7,18
113:1,8,10,11,19,24
114:5,10,17,23
115:4,21 116:1,7,14,
19 117:1,9,15,21,24
118:6 119:1,7,16,20

120:5,16 121:3,11,19
122:8,16,21 123:4,9,
19 124:1,7,12,17
125:1,9,21 126:2,9,
18 127:1,8,16,22
128:1,18 129:1,8,12,
19 130:4,23 131:6,
12,16,22 132:5,13,24
133:6,8,17 134:5,20
135:7,17,22 136:8,22
137:5,13,17 138:11
139:23 140:6,14
141:1,6,11 142:1,5,
20 143:15 144:5,11,
22 145:12,24 146:9
148:1,12,18 149:6,
17,24 150:19 151:14
152:9,15 153:20
154:3,5,23 155:5,21,
22 156:7,15,23 157:5
158:1,8,25 159:7,14,
20 160:1,7,22
161:11,24 162:3,10,
16 163:6,15 164:1,9,
14,21 165:5,12,22
166:1,23 167:4,14
168:14 169:1,9,16,24
170:9,23 171:2,6,8,
14 172:4,18,20
173:19,23 174:20
175:10 176:17 177:18
178:1,24 179:21
180:7,20 181:9,21
182:6,10 183:12
185:18 186:4,14
187:4,9 188:3
189:15,22 191:5,22
194:9,18,24 195:7,14
196:2,11,15,18 197:9
198:16,24 203:1,10,
19 205:5,13,17,21
206:19 207:8,14,18,
22 208:6,9,14,19,20
209:10,21 210:5,20
211:1,7,15,21 212:1,
10,16,23 213:8,16,24
214:5,20 215:6,8,11
216:11,16,22 218:3
219:6,12,16,22
220:8,20 221:17
222:14,18 224:3,20
225:11 226:23 227:2
228:3,13,22 229:6,12
232:1,5,11 233:12

Confidential
JAN-MS-05485620

234:1,15 235:3,21
236:6,13,23 237:3,19
238:12 239:3,7,9,11,
14,19,23 244:2,10
245:4,8,22 246:3,18
247:3,15 248:7,10,
15,20 249:3,6 250:9,
15 251:7,21 252:5,15
253:6,11,23 254:22
256:4 257:6,11
259:4,11,19 260:11,
17 261:4,14 263:7
264:9,19 265:3,13,
19,24 266:6,10,14,20
267:3,6,11,14,19,23
268:3,11,13,17
269:5,9,16,21 270:3,
23 271:2,10,20
272:9,14,21 273:4,13
274:3 275:2,12
278:14 279:5,11
280:1,6,15,20,24
281:4,10,16,21
282:9,16,23 283:6
284:4,9,15,22 285:7,
13,20 286:2,8,24
287:6,13,20 288:9,17
289:8,11 290:7,22
291:5 292:18 293:15
294:11,20 295:13,22
297:3,13 301:18
302:5,25 303:7,9
304:9,18,24 305:6,
12,20,25 307:2
308:11,15 309:15
310:8,15,21 311:2,7,
16 312:1,5,10,13,20
314:7,20 315:4,11,24
316:15,23 317:4,12,
22 318:18 319:3,7,
12,16,21 320:2,7
321:18,25 322:24
323:8,25 324:22
325:19,24 326:5,13,
23 327:6,13 328:18,
22 329:12 330:3,10,
15 331:1,17,23
332:8,17,23 333:16,
19
**band**  183:4
**Barbara/los**  190:22
**bare**  143:25
**barriers**  189:25

192:14
**based**  9:19 27:19
47:14 74:23 78:14
80:12 81:19 106:11
122:4 138:17 139:2
149:1 206:14 227:16,
18 249:16 263:11
306:21
**basically**  40:15
283:16 292:21 308:4,
5
**basis**  12:10 132:21
136:9,25 137:1,7,25
282:1 292:6 300:7,8
**Bates**  37:18,24 38:2
39:5 62:21 68:4
171:3 172:17 182:16
196:19 210:7 224:4
232:6 328:2
**Bates-stamped**  42:21
45:3 94:4 142:8
**battle**  33:22 34:23
35:22
**bear**  272:4
**began**  308:3
**begin**  11:16 312:11
**beginning**  7:20 263:17
313:22,25
**begins**  312:8
**behalf**  7:10 8:5,7,18,
20,22 16:4,11,18,20,
21 52:16 285:24
**behavior**  96:5 143:10
**Behavioral**  51:11
**behaviors**  109:19
110:3,20
**belief**  53:15 61:22
72:7 139:18 243:3,23
291:1
**beliefs**  53:9 290:11
306:23
**believed**  147:19 148:2
221:13
**believes**  121:25 122:3
139:20
**beneath**  302:7 303:3
**benefit**  238:6,24
291:18 314:14
**benefits**  60:22
237:13,25 238:3
285:2 291:11,23

**Bennett**  196:21
197:12,23 199:1
**bet**  227:16
**big**  202:9 230:10
262:24 291:18
**bilateral**  313:14
**bill**  8:2 181:16
**billion**  235:13
**bills**  175:23
**binding**  315:13
**bit**  27:4 28:14 68:15
73:20 88:24 110:14
293:9 294:5 295:1
316:3
**blind**  58:3
**blindly**  302:22 303:4
**blissfully**  10:2
**blurred**  289:17
**board**  18:24 19:14,19
20:6,11,16 21:4,20,
23 22:5,16,22 23:24
24:11,13 26:5,16
43:10,21 100:15
117:22 118:7,9,13,21
119:2 120:1 165:1
168:1 171:19,25
172:13 173:11,25
174:10,13 176:20
178:13 182:22
183:16,18 184:4,5,
11,18,24 187:3,15,23
193:24 214:13 236:15
250:22 257:25 277:4
298:12,17,18,20
305:11
**board-certified**  25:24
**boards**  29:17 105:2,4
120:6 248:19 250:9,
11,23 258:17 275:25
293:19,21
**bone**  243:19
**book**  199:21 200:1,8,
11,13,17,21 201:5,7,
13,17,19,21,25
202:15 203:6,12,14,
21,25 204:25 247:9,
17,22 248:1,6,7,23
252:9,22 253:8,14,
17,20,25 254:4,7,9,
13,17,20 255:4,11,
12,15 257:15,17
258:7,14,19 259:21,

Confidential
JAN-MS-05485621

22,25 260:4,7,23
261:6 262:12,17,22
263:1,6,10,12,17,20,
21 264:3,8,10,20,24
273:17,24 274:1,5
275:6,21,23 276:12,
24 277:4,5,9,19,22
278:3,13 283:14
292:20,21,24 293:4,
5,9,12,17 294:7,17,
21 295:1 297:5,10,12
323:2 330:8,19
331:21
**books**  105:4 260:8
280:18 329:1,3,4,10,
14,15,19,22 330:2
**booths**  120:12,17,19
**Boston**  174:6 307:16
**bother**  144:14,17
**bothers**  144:16
**bottom**  40:15 57:15
65:24 68:8 74:9 86:8
140:4 141:20 212:3
216:2 222:22 240:2,
17 328:3
**boundaries**  230:15
231:24
**box**  204:13
**boxes**  51:10
**branch**  118:12
**brand**  97:2 212:25
235:10
**branded**  218:12 235:12
319:6
**branding**  222:24
**Braun**  201:23,24
203:11
**break**  65:11 113:12
115:18 169:16 185:16
228:14 266:17
**breakthrough**  114:12
115:16,18 116:9
120:23 123:21 124:3
**Brennan**  106:5,22
**Brian**  8:4 279:19
**briefly**  247:13
**bringing**  15:3
**broader**  325:8
**broadly**  217:21
**broke**  54:7 79:18

**broken**  104:4,10
**Brooke**  7:25
**brought**  24:13 295:7,
25 297:19 324:19
**BTP**  114:7 116:3
**budget**  94:20 109:17
171:25 172:6 235:11
**budgeted**  199:5
**build**  109:6 119:9
184:2
**building**  107:6 114:1
123:15
**built**  294:1
**bullet**  51:16 74:17
76:21 77:3 104:25
105:9 116:2,15 117:2
119:8 121:20 122:12,
17 142:22 172:5
212:11 216:2
**bunch**  63:4
**bureau**  16:11 48:12,15
**bureaus**  32:20 48:9
138:16
**Burt**  197:14,23,24,25
198:10,14 231:11,13
232:7
**business**  30:8 49:12
50:1,18 55:7 57:24
69:16 70:1,4 73:2
90:23 91:9,10 92:4
93:7 140:12,13 184:3
232:20 233:21
**Butrans**  235:10
**buy**  201:13

---

### C

**CA**  114:7
**calendar**  94:20
**California**  7:1,12,16
10:9,10,12 13:10,14
29:24 38:16,21 40:1
43:16 44:12,19 45:25
46:9,23 190:23
**call**  47:17 127:11
133:2,12 333:6
**called**  20:13 21:18
23:19 51:5 68:5
92:19 94:24 133:10
199:24 215:15 223:3
247:9 258:22 293:23

295:4,5 320:16
**Caller**  276:5
**calls**  56:21 59:2
61:18 79:6 97:19
99:20 107:13 110:24
112:13 122:2 124:23
126:23 129:16,24
138:3,22 161:4,5,19
**camera**  325:13
**campaign**  170:17
213:20 216:18,19
218:11 219:8 220:24
221:22 241:17
**campaigns**  193:12,15
**cancer**  26:25 114:12
115:19,25 123:21
241:15,22 242:12,19
244:4
**Capabilities**  225:17
**capacities**  143:22
**capacity**  102:18
**capitulate**  35:21
**capture**  147:13
**captures**  242:8
**care**  26:23,25 39:9
58:1 79:19 85:21,22
86:3 95:23 120:6
181:10,18 192:14
206:22 209:1 229:19,
21,24 230:2,4,6,12
231:10,15 232:23
233:4 235:7 236:17
244:23 283:17 298:19
302:7 303:4 306:24
307:6
**career**  16:3,13 18:23
19:9 26:16,17 29:6
32:1 41:5 52:17
134:6 143:19 150:12
276:19,20 289:15
290:12 308:3
**careful**  78:8 292:22,
25 303:17
**carefully**  130:22
244:17 293:3
**carry**  125:3,12
**case**  11:12,14 12:8
90:12 160:16 187:6
194:8 271:4 279:20
294:2 295:6,11,18,25
296:16,20 297:19,23
298:2 312:13 317:3,6

Confidential                                                          JAN-MS-05485622

SCOTT Fishman, M.D.
February 26, 2019

9

334:2
cases 12:7 316:12,20
categories 327:25
category 325:8 328:25
 330:19 331:4,21
 332:6 333:2
caught 274:22 278:21
cautious 60:23
cc'd 66:6 188:10
 257:21
ceased 152:19,22
ceilings 176:12
cell 93:25
center 13:1 74:9
 98:23
centerpiece 258:20
central 45:15 229:18
 230:2
CEO 230:9
Cephalon 14:5 18:8,19
 19:6 45:3,24 46:8
 58:21 94:6,23 97:15
 99:17 107:19,21,22
 108:9 109:5,7 110:2
 111:12 113:14
 114:18,24 115:8
 120:12 121:25 122:3
 123:5 124:8,19
 125:3,12 126:16,17
 128:4,11,15,16,20
 129:9,21 135:14
 159:10,15,22 160:3
 161:1,13 173:20
 174:16 178:20 179:23
 209:15 248:22 253:19
 254:19,25 255:1
 264:21 265:5,14
 266:23 269:1 271:5,
 14,24 272:11,17,25
 273:9 279:21 323:18,
 23 324:1,8,25 326:3
 327:4,16
Cephalon' 271:14
Cephalon's 14:19
 105:20 108:3,6
 109:15 117:5 126:3,
 10 128:5,12 271:15
 272:2,25 273:9
certainty 35:21
certification 26:5,16
 298:22

certified 8:23
 298:13,17,18,20
cetera 42:9 76:19
 105:5 111:6 194:5
 198:8 303:15 306:23
CFF 123:13
chain 42:22 171:9
 178:2 182:11 196:21,
 25 239:25 240:17
chair 12:23,25 21:23
 22:4,22 39:12,14,15
 163:7 184:7 193:24
 209:13 230:11 231:10
challenging 290:14
chance 45:5 49:3,9
change 36:3 112:19
 148:20 242:21 278:13
changed 33:7 148:23
 150:12 217:25 290:9
changing 227:17
Chapters 331:21
Characteristics 51:11
characterization
 161:6
charged 258:23
charitable 167:20,21
 204:20
chart 86:9 106:17
 192:8,18,21
chief 223:9,11,15
children 324:14
choose 139:9
chooses 55:17
chose 33:25 246:5
 278:10
chosen 139:15
Chris 278:1
chronic 26:21 70:14
 225:21 226:1 259:15
 300:24
Churchman 7:25 270:20
circumstances 303:12
Citation 89:8
citations 91:4
cite 91:18
cited 87:24 88:6
Civil 271:13
clarification 318:8
 333:20

clarify 293:11
clarifying 187:11
clarity 269:25
class 219:25
clawback 185:25
clean 55:24 226:9
 228:5
clear 10:22 34:21
 184:6 209:24 230:15
 231:24 266:18
 268:15,21 291:15
 310:19
Cleveland 7:8
client 185:16,22
 186:2,3,7 266:9
clinic 315:18
clinical 96:22 103:12
clinician 306:20
clinicians 46:18
 56:15 60:19 103:15
 136:16 138:7 284:24
clip 63:3
clips 63:8
close 231:6
closed 153:13 175:4
closely 231:24
closing 153:16,18
CME 40:7,23 42:5 76:8
 121:15 255:5,8
 280:23 287:24 288:1,
 6,11,14,22,25 290:3,
 4
CMES 289:4
co-compounded 243:18
coach 127:20 207:8
coaching 127:17
 207:25
coalition 213:5,19
 214:8 218:7
coalitions 232:17
Coburn 192:3
cohort 309:6
COI/ETHICS 182:25
collaborate 264:14
 265:8
colleague 273:25
 276:18
colleagues 78:23
 130:21 273:25 277:2

Confidential

JAN-MS-05485623

collected  166:14
collection  230:7
collective  9:17
collectively  260:21
column  192:2,21
combinations  241:8,17
combined  67:18
comfortable  37:7
  264:13
comment  35:4 186:20
commentary  324:12
comments  208:15,17
commissioned  293:18
committed  173:2 176:5
committee  105:3
  151:16 152:17 153:15
  154:7 155:14 162:21
  165:14 166:4,14
  181:11 182:2 183:1
  210:16 249:8 250:17
committees  99:5,7,11,
  13 105:4
common  42:11 47:17
  55:20 85:16 86:1
  87:2 88:4 139:24
  140:11,15,25 141:14,
  23
communicate  226:14
communication  147:15
  185:24
communications  212:12
  320:12,23 322:6
community  32:12 124:9
  226:1 313:5
companies  14:9 15:20,
  23,24 16:4,25 17:19
  18:2,5,7,24 19:1,10
  20:4 22:9 29:22
  32:14 35:6,23 41:3
  42:9 44:21 52:17
  53:10 56:12 57:24
  58:5,7,12,19 61:11,
  22 69:10 71:4 86:21
  130:15,19 132:7,14
  133:21 134:22 137:23
  138:20 139:2 149:3,
  11 150:14 170:20
  174:6,7 183:22 195:4
  204:16 209:12,16
  218:21 221:7 230:8
  235:1 258:14 259:13,
  14 260:2 265:4

273:14 282:7,12,14
  285:10,25 286:10,11,
  12,18,22 287:3,11,16
  289:18 290:12 291:2
  292:11,12,15 315:7,
  14 318:10 321:11
  329:9,13 332:22
companies'  52:18
companion  204:14
company  16:20 19:17
  20:7 29:13,16 30:20
  32:2,23 33:9,10,11
  34:9 35:12 36:23
  38:18 42:6 47:21,22,
  23 53:19 54:23 56:7
  68:8,9 69:3 98:20
  139:16,19,25 140:16,
  20 141:15 142:13,14
  144:23 147:13 170:4
  201:2,8 218:5,10
  220:14,22 221:8,15,
  23 222:11 225:22
  226:8,17,22 227:21
  228:7 234:3,16,20
  235:18,22 238:2,14
  244:24 260:1 273:23
  282:20 288:16 290:19
  294:9 295:11 304:5,
  15 305:5,11 320:13,
  16,21,24 321:3
  322:7,12 323:11,18
  330:1,6 331:15
company's  56:18
  141:20 147:5,20
Company,'  38:18
Compare  105:14
compared  106:24
  225:17
compares  106:16
compensation  16:19
  31:23,24 53:15
competencies  202:6
competition  147:10
compilation  160:2
complete  9:21 175:18
completed  26:14
completely  30:24
  41:25 110:16 221:5
  277:10 325:25
complex  49:20
compound  195:17
  218:17

comprehensive  142:23
compromising  225:24
concepts  274:10
  310:19
concern  110:19 182:23
  283:17
concerned  182:20
  231:2,3 241:21
concerns  83:23 236:25
concise  36:19 127:1
conditions  11:1
  218:24
conduct  120:6,9
  122:13 231:19
conducted  179:3
  180:11
conference  46:15
  202:8
conferences  134:25
confirm  156:4
confirmed  173:16
confirming  175:5,6
conflict  150:4,9
  184:1 276:6
conflicted  306:5
conflicts  58:3 231:23
Congress  232:25
congressionally
  181:19
Connecticut  306:15
connection  152:25
  153:1 201:7,10
  315:22 316:1,18 321:10
  326:19
Consensus  101:20
consent  312:18 313:18
  314:11
consideration  64:13,
  16,18
considered  11:18
  69:8,12 85:11 86:2
  118:9 211:8
consistency  269:25
consistent  79:12
  222:12 246:13 294:22
  310:22
consult  186:1,3,7
consultant  19:10
  122:13
consulting  19:16 20:3

consumer  23:9 230:9
  231:18 234:12 235:19
consumers  23:15
  170:18 175:21
contact  107:11 225:21
  258:4
contacts  130:21
contemplating  209:4
content  221:14 274:9,
  17,18 278:12 279:3
  287:18 288:23 293:9
  297:2,5,12 325:12
  329:6,10,14 330:1
  331:10,14 332:15,19
content-wise  325:11
  330:25
contention  230:21
contents  310:6
contested  261:24
context  195:20 209:13
  213:3
continual  226:5
continue  34:23 88:22
  127:9 186:13 242:22
  298:21 299:12
continued  24:10 96:3
  149:10 265:9 272:17
continues  120:22
continuing  9:12
  38:20,22 40:8 134:9
  288:2
contract  43:8 48:17
  175:3 313:13,14
  315:2,3,9,17,22
contracts  313:10,20
  314:3,4,10,13,17,18
  315:22
contradiction  34:25
contrast  105:14
contrasted  106:24
contributed  255:22
Contributing  330:20
contribution  279:2
control  130:16 276:25
  278:2 287:17 315:8
  329:10,14
controlled  59:20,25
  60:14 144:24 250:4
  282:15,21 315:1
  331:15 332:18,21

controlling  330:1
controversial  274:21
conveyed  140:19
convinced  194:7
coordinated  147:14
coordinating  180:21,
  25
copied  198:22 199:10
  270:2
copies  25:3,4 63:6,25
  254:9 255:15 257:7
  267:10 268:14 269:15
  276:23,24 277:25
  297:10
copy  63:1,10,11,12,
  14,25 64:10,20,23
  93:18 266:5,8,12,14,
  17,19 267:13,17
  269:7,13,21 276:16
cord  194:4
core  202:6 229:17
corner  154:9 162:17
  328:3
Cornwell  65:20,22
  66:11
corporate  146:17
  147:10 232:15 235:9
  327:21
correct  13:8,12,16
  14:25 16:24 17:18,22
  20:14,18 21:4,9,18,
  22,24 22:6,17,23
  23:15,21,23 24:4,8,
  11,17 25:16,18 26:2,
  10 29:6 33:5 35:8
  36:11 37:21 38:10,
  13,24 39:3,13,18
  43:3,6,11 44:3,7,8,9
  45:4,9,18 46:1,7,10,
  20 49:13 50:8,18
  53:19 54:23 55:7
  56:7 57:4,6 59:20,22
  61:7 62:9 65:20,25
  69:14,17 71:18 72:12
  74:14 75:20,25 76:24
  77:12 78:24 79:14,20
  80:11,13,14 82:2,11,
  16 84:4,13,20,25
  85:3,12 86:4,24
  88:7,9,20,21,25 89:5
  90:25 91:13,15 93:23
  94:11,20 95:6,12,14,

20,21,23 96:6,11,17,
  23,25 97:3,9 98:7,9,
  15,18,24 99:1,5,24
  100:3,16,21 102:11,
  25 104:5,13,23
  105:5,10,15,21
  106:6,12 107:12
  108:21 109:1,3,10,21
  111:25 113:6 114:2,
  19,25 116:4,21
  117:3,12,18,25
  118:3,5,7,8,23
  119:4,10,13,21
  120:7,13,17,24
  121:6,13,14,16
  122:1,10,13,18,23
  123:1,6,11,12,16,22
  124:4,9,14 125:14,23
  126:4,11 128:6,21
  131:9,18 132:9,15
  134:10 135:1 137:2
  142:11,25 146:18,21,
  22 150:22,25 151:1,
  2,5,8,21 152:3,19
  154:10,14,18 155:10,
  25 156:4,5,9,18
  157:1,8,11,14,17,20,
  22 158:3 159:22
  160:8,20,25 161:10,
  22 162:7 163:16
  164:16 165:16
  166:15,25 168:4,21,
  22,24 170:5,11
  171:4,16,20,22,23,25
  172:7,22,25 173:1,5,
  8,13,16 174:1,4,11,
  12,16 175:13 176:15
  177:13 178:8,14
  179:7 180:23 181:2,
  15 182:3,14,17
  189:3,6,8,17 190:3,
  17 191:12,16,25
  192:10,15,19,25
  193:3,6 194:11
  195:1,11 196:5,8,10,
  22 197:3,5 199:25
  202:22 203:4,14
  204:1,2,4,5,10
  205:14 206:7,23
  207:2 209:1 210:10,
  14,17 211:17,23,25
  212:4,5,13 219:8,11,
  17 220:11 223:3,6,21
  224:7,13 230:3 231:8

Confidential                                                      JAN-MS-05485625

232:8,13 236:17
237:6,9 239:25
240:18 242:25 243:3
244:6,9 245:5,7
246:6,23 247:10,18,
22 248:1,25 249:24
250:5 252:1,6,10,19,
23 253:8,14,17,20
254:4,7,14,17,20
255:5,6,16,17
256:12,18 257:13
258:1 262:17,21
263:19,25 264:4
266:22,24 271:5
273:18 275:13 277:7
279:25 280:14
281:15,17 285:6,12,
19,21,25 286:4,6,19,
23 287:5,12,14 288:7
290:23 291:4 292:17
293:1,6,7,14 294:18,
19 295:21,23 297:2,9
298:6,7,14 300:2
301:12 307:1 308:14
311:3,6 313:6 315:10
316:13 318:11,17,25
321:24 325:4 326:4,6
327:11 329:11 330:2,
9,14 332:22
**corrected** 171:6
246:21
**correctly** 43:18 94:9
147:6 183:9,11
199:7,15 205:25
225:3 229:22 271:17
272:6 276:7 283:12
**cost** 58:6
**costs** 40:17,25
**counsel** 7:18 8:15
9:23 10:13 11:3
14:10,16,19,21 15:8
36:15 55:11 64:3
127:18,21 143:14
269:14 271:15
**counsel's** 121:7 208:4
220:2
**country** 12:8 40:9
184:6 316:4
**County** 7:9
**couple** 63:25 279:20
**coupons** 82:20
**courses** 40:8 41:5,24
42:1,2

**court** 7:8 8:23
**cover** 30:23 31:6
142:13 203:21
**coverage** 190:10,19
192:10
**covering** 40:17
**cowrite** 201:17
**create** 25:12 132:22
133:22 182:2 225:25
226:21 269:24
**created** 94:24 132:15
181:11 281:9 282:7
**creates** 226:9
**creates/builds** 147:1
**creating** 132:18
137:21 181:11
224:16,25 246:11
**credit** 288:3
**crime** 265:15
**criminal** 264:15,25
265:10 267:21
272:18,25 273:10
**crisis** 261:25
**criteria** 314:12
**critical** 94:19 96:16
111:10,12 113:21
114:1 116:20 123:13
124:21 125:3 126:3
303:13
**critics** 109:21
**cross-fertilized**
52:14
**CSF** 123:13
**culminated** 9:11
**current** 12:22 109:21
172:6
**Customers'** 51:5
**CV** 298:9,12 327:24
**cycle** 97:2

---

**D**

**dangerous** 93:10
144:24 242:13 293:2
**Dashboard** 210:13
**data** 67:9,18
**datasets** 306:23
**date** 10:20 142:16
146:20 158:10 173:7
190:9,13,16 307:8

**dated** 43:2 45:8 65:24
94:11 162:21 171:21
174:8,9 175:11
178:11 197:5 224:6
240:18 257:12
**dates** 24:14
**Dave** 276:17
**David** 273:24 274:4
275:6
**Davis** 13:1,5,10,15
29:24 38:17 39:2,8,
21 40:2 41:2 45:25
46:9,24
**Davis'** 44:12
**Davis/ucd** 38:21
**day** 66:16 150:6
173:11 227:17,19
277:13 307:14 333:7
334:5
**days** 32:8,11 39:14
143:19 173:24 201:12
314:12,13,23
**DEA** 277:1
**dealing** 26:18
**dealings** 130:25 131:1
**Dear** 198:17
**deceitful** 222:2
226:24 228:4 235:6
236:8 238:13,21
243:1 245:11 246:7,
23
**December** 49:12 174:9
175:11 178:8
**Dechert** 8:2,22
**decided** 149:19 184:18
248:6,14 315:8
**deciding** 301:23
**decile** 75:6 80:2,6
**deciles** 74:13 75:11
**decision** 150:2 214:6
217:25 238:8 301:5,
10,12,17 302:3
**decision-making**
137:10 138:20
**decisions** 60:20
138:1,8 149:16
**decreased** 62:1
**deep** 57:14
**defendant** 8:5 12:3,6,
7 14:25 15:4,23
133:20 271:14 316:3

Confidential

JAN-MS-05485626

defendants  8:8 9:7,18
  11:12,18 12:4 20:21
  22:9 64:5 112:8
  131:8 133:20 279:20
  287:17 296:16,19
  297:20,23 298:2
  317:3,8
defending  11:12 15:19
defense  225:24 226:15
define  104:25 142:23
defined  143:23 267:7
definition  30:17
  143:3,6
definitions  143:3
degree  27:16 212:22
deliver  109:20 110:22
delivered  110:5
delivering  303:14
  304:1
delivery  108:19
  319:19
demonstrated  90:23
Dennis  66:11,22
department  12:24 45:7
  232:12
depend  220:4
depending  10:20
  144:17
depends  53:11,12
  144:20 218:19 247:5
Depomed  167:6
deponent  11:13
deposition  7:6,11
  9:6,12,25 10:1,19
  11:2,7,10,13,21
  15:12,16,18,22,25
  63:13 64:8 113:6
  127:4 141:8 207:18
  334:10
depositions  64:6
describe  30:12,14
description  275:15
design  179:2 180:10,
  17
designed  180:18
designing  180:12
detail  9:10 88:12,24
  132:2 302:18 316:3
detailed  241:18
detailing  76:12 86:22
  136:2 137:19 140:2

details  179:16 259:24
determine  55:22 90:24
  99:14
determining  238:5
develop  107:7 232:17
developed  249:15
  294:8 303:25 309:14
  325:11 330:24 332:15
developing  37:10
  217:7 260:4 274:11
development  94:6
  96:23 97:2 109:18
  113:14 128:20 204:14
device  42:9 303:15
devices  304:1
diagram  98:22,23
dialogue  11:2
differed  299:4
differently  136:18
  218:1 267:24
difficult  138:25
  303:10
dimensions  68:19
dinner  305:4
dinners  132:8
direct  32:16,22 58:11
  69:8 71:13 132:18
  275:17 294:12 295:9,
  10
directed  183:2
direction  187:2,22
directions  272:5
directly  29:13,16
  32:3,10 33:8 61:11
  149:11 198:14 218:10
  220:22 226:14 264:23
  320:15 321:3 322:11
director  13:1 105:3
  118:18
directors  118:13
  183:18 184:11 187:15
  214:13 236:16
Disabled  204:20
disagree  27:15 127:24
  248:24 276:9
disagreed  290:18
  292:7 330:8
Disc  186:8,12 270:8,
  22 334:8
discerning  136:21

disclose  238:3
  277:21,25 311:5
  314:19
disclosed  185:24
  314:5 327:10
disclosing  218:14
disclosure  221:21,24
  222:7,8
discuss  283:5
discussed  66:16,25
  114:24 162:4 182:21
  188:18 194:4 263:23
discusses  102:10
discussing  170:1
  200:9 229:14
discussion  182:25
  260:14 270:6 275:16
  279:13 284:2 325:17,
  21
discussions  10:3,21
  11:6 284:7,12
disease  60:25
diseases  218:23
disk  112:19,24
disruptive  17:9 127:3
disseminated  212:3
  296:19
dissolved  152:21
  168:19
distance  193:25
distinction  158:23
  208:8 329:22
distribute  201:5
distributed  199:4
  200:10 275:23
distribution  200:7
  247:21 248:1,23
  253:14,16,20,25
  254:3,7,13,17,20
  256:7 276:1
District  7:8 269:1
disturbed  187:14
disturbing  183:7,14
  185:5,6,7 186:21
  187:1,23
diverse  109:9,19
  241:8
diversion  284:13
  287:12
DJO  173:4

Confidential                                                                           JAN-MS-05485627

doc  85:19
docs  85:12
doctor  55:19 86:13
  113:5 135:24 226:15
  279:19 297:16 298:9
doctor's  133:2,11
  137:1
doctor-patient  220:12
  221:19 227:7,25
doctors  74:12 80:2
  86:4 88:18 132:8,9
  135:25 141:18 201:9
  242:3 243:2,13
  305:16
document  9:6,21,22
  25:12,15 37:17 39:2
  45:5 49:4,11 63:22
  110:24 121:8,12
  122:4 123:24 124:24
  126:11,24 128:6,19
  129:18 130:1 142:6,
  9,24 146:8,16
  158:10,25 159:9
  160:15 161:20 162:11
  163:3,5,21 185:17
  189:2 198:18 208:24
  210:6,8 211:9
  222:19,22 226:12
  236:24 266:21 267:6,
  18 268:6 269:2,7,13,
  23 270:1 323:1
  327:17,25
document-related
  10:20
documentation  269:18
documents  37:23 64:10
  65:18 101:20 138:13
  139:8 313:9 322:22
  332:16
dollar  111:20 112:11
dollars  86:22 137:23
  140:1 202:21 253:14,
  19,24 254:3
donated  167:22
donating  170:20
donations  167:21
doors  153:14
dosage  176:12
doses  145:16 292:4
doubt  59:17 217:25
downsizing  147:11

draft  124:24 126:25
  276:17
drafted  129:9,21
drafts  276:24 277:5
drive  291:20
driven  296:12,14
dropped  304:23
drug  14:9 49:20 96:23
  132:7,14 170:20
  214:18,25 217:12,23
  218:9,21 219:13,15,
  17,20,24 220:22
  221:6,8,15,24 235:17
  237:14 238:3,4,7,14,
  16,17 241:21 242:3,
  9,15 243:15,17
  244:3,5,13 258:14
  276:25 278:2 303:14
drug's  272:5
drugs  52:12 56:13,15
  57:20,21 58:6,13
  61:24 62:2 75:5
  82:24 91:23 99:14
  145:11 200:18
  201:11,12 219:25
  249:17 277:12 283:16
  293:2 295:12,20
due  96:5 176:6 272:25
dues  173:4
duly  9:2
Duragesic  68:6 70:9
  74:13 80:2,6
dying  243:17

_____

E

e-mail  10:16 42:22
  43:2,13 62:20,21
  65:19,22 66:7,14,22
  67:15 68:3 93:21
  171:9,15,21 172:9,10
  173:10 174:8 175:11
  178:2,6,10 180:8
  182:11,16 186:5
  188:4,6,10,24 196:7,
  20,25 197:3 199:1,9
  205:8 206:7 209:4
  228:24 229:15 239:24
  240:17,22,23 257:12
  258:2
e-mails  9:11 10:23

e.g.  143:8
earlier  26:16 35:10
  52:17 68:16 114:24
  150:11,20 153:11
  159:21 169:25 263:23
  281:20 291:1 333:11
early  32:8,11,24
  33:1,15 34:8 48:8
  143:19 201:8,12
  242:13 261:11
  262:23,25 276:19,20
  290:11 297:10
  314:12,13,23
easier  290:9
Eastern  269:1
edit  274:8,17 277:21
  278:9
edited  273:17,23
  275:18 329:15
editing  275:6,21
edition  256:11,13,17,
  20 258:13 260:5,10
  262:3 277:19,20
  295:4,5
editions  261:20,21
  294:23 295:2,3
editor  223:8,11,13,15
  329:18 330:20
editorial  105:2
editors  101:2
Editorship  330:20
edits  274:15
educate  29:2 52:13
  98:12 217:17 218:7
  250:9,21 284:19
educated  244:12
educating  23:11 56:14
  71:24 237:22
education  17:21 19:18
  23:9,16 27:4,8 28:6,
  14 31:25 32:3 33:10,
  25 38:20,22 39:22
  40:2,8 41:5,16 46:6,
  22 47:15,16,22,23,24
  53:8,16 60:9,10
  61:1,13 72:11,24
  73:8 83:15 84:12,18
  85:11 86:2 87:15
  110:4 134:10,25
  136:2 137:22 140:3,
  17 141:16 149:12
  202:6,19 226:5 237:5

Confidential

JAN-MS-05485628

246:11,12,17 251:16
252:17 258:20 280:5,
8,12 283:25 288:2
291:19 324:12
**educational** 33:20
46:1 120:10 281:3,14
**Educationally** 332:2
**educators** 246:15
**effect** 86:12 91:18
234:19
**effective** 179:20
242:4 251:16 252:18
**effectively** 61:24
109:9,20 110:22
**efficacy** 226:6
**effort** 136:19 175:20
206:21 208:25
**efforts** 9:5 30:19
51:12,17 57:3 134:4
137:22 147:5,15,20
172:7 176:18 177:13
180:21,25 183:17,18
232:25 258:6
**egregious** 245:19,24
246:7
**Ehsan** 8:6 11:16 14:11
19:12,21,23 23:17
29:8 31:3 33:12
41:11 42:15 49:14
50:9,14,19,25 51:7,
13,24 52:3 53:4,21
54:25 55:9,15 56:8
57:5,11 59:11,16
64:3,12,18 66:4,9,17
67:11,23 68:10,24
69:18 70:6,21 71:19
72:4,13,21 73:4
74:1,9,15 75:1,21
76:1,5,10,13,17
77:1,13,23 78:3,19
79:6,15,22 80:4,15,
19,22 81:5,13 82:3,
12,18,21,25 83:4,8,
12,16,20,25 84:5,14,
21 85:4,13,17,23
86:5,14,19 87:10,18
88:2,14 89:1,9,16,22
90:5,19 91:1,14
92:6,14,20 93:3,13,
19,21 137:15 142:18
153:7 162:14 163:2,
12,21 164:6,12,17
165:3,9,17 167:1,9

169:12 170:7,15
172:2 173:17 181:13
196:14 205:3 208:3,7
210:18,23 211:5,10,
18,24 212:8,15,19
213:7,11,22 214:3,10
215:2 216:7,14,20,25
217:2 218:15 220:18
223:25 227:10 238:25
245:16 249:2 251:19
253:9 256:3 257:3
258:9,11 259:10,18
261:1 268:15,22
270:13,18 273:3,11
**Eighteen** 229:10
**Elan** 204:21
**electives** 307:19
**elements** 139:12
**else's** 282:4
**embraced** 292:10
**emergence** 147:10
**emergency** 170:5,10
172:7,21 173:13
174:14,23 178:6,19
**emerging** 258:15
**emphasized** 312:22,23
**employed** 188:14
**employee** 66:2 107:18,
20
**employees** 15:24 66:6
196:22 197:4,11,21
199:2 239:25
**encompassed** 133:19
**encounter** 241:22
**encourage** 59:24
**encouraging** 61:5
**end** 47:7 150:6 153:18
186:8 221:8 270:8
277:13 308:2 334:8
**end-of-year** 176:5
**ending** 39:5 164:22
173:11 205:17
**Endo** 173:3,4 174:3,5
175:13 176:4 177:9,
10,11,19 178:20
179:1,23 180:8
209:15 251:14 253:16
254:6 255:7,14
262:15 264:21
**endorsement** 116:17
117:3

**endorsements** 124:13
**endowed** 12:25
**ends** 40:11
**engage** 78:16 79:4
109:10 319:25
**engagement** 20:10
103:14
**engagements** 217:16
**English** 278:11
**Enhancement** 205:22
**enter** 271:15
**entered** 272:11 317:9
**entire** 146:8 269:20
**entities** 14:6,9
158:24 160:3,9,15
161:2,14,20 174:19
321:14,15 322:23
**entities'** 14:15,21
**entitled** 46:15 119:13
142:9 189:5
**entity** 159:11 226:7
**Entry** 268:24
**EOY** 175:13
**equal** 242:15
**ER** 49:12,23 50:23
51:22 257:18
**Ercole** 8:4 10:15 15:6
16:7,16 17:4,6,14,23
18:17 20:8,25 21:6,
10 22:12,18,24 23:5
27:12 28:1,17,23
29:19,25 32:6 33:4
34:14,17 36:12 37:3
41:7,22 45:10,16,19
46:3,11 47:4,19,25
52:22 53:5,22 54:6
55:1 56:10,21 58:25
59:2,10,21 60:3,16
61:18 62:10 63:10,
12,16 69:5 71:10
72:5 74:25 75:7,15
77:14 86:25 87:4
94:12,21 95:1,7,13,
18,24 96:7,12,18
97:10,18,24 98:8,17
99:3,9,19,25 100:4,
10,18,22 101:3,8,13,
17,21,25 102:6,12,19
103:1,8,23 104:6,12,
19 105:6,11,16,22
106:2,7,14,19 107:2,
13,23 108:22 109:2,

Confidential

JAN-MS-05485629

11,22 110:7,13,23
111:15,21 112:1,5,13
113:16,22 114:3,9,
14,20 115:1,23
116:5,11,18,22
117:7,13,19 118:4,24
119:5,14,19 120:3,
14,25 121:7,17
122:2,14,19 123:2,8,
17,23 124:5,11,15,23
125:6,15,24 126:5,
12,21,23 127:6,13,
19,24 128:7,23
129:5,11,15,24 130:6
131:4,10,14,19
132:4,11,16 133:13,
25 134:12 135:2,4,
15,21 136:6,12
137:3,12 138:3,22
140:5,8,21 141:21
145:21 149:5,14,21
150:15 151:9 152:5,
14 158:21,23 159:5,
8,17,24 160:5,14
161:4,18 162:8
168:23 172:16,19
173:21 174:17,25
176:16,22 178:23
182:4 187:8 193:17
194:23 218:17 219:9,
14,21 220:2,17 221:1
222:3 224:18 228:9
231:21 234:7,23
235:14 236:11,18
237:17 238:19 239:1
245:3,6 248:3,5,8,12
249:1 252:2 253:21
254:21 261:8 262:19
265:11,16 266:5,8,
12,16,25 267:2
269:6,12,19,24
271:6,18 272:8,13,19
273:19 277:23
279:12,17,19 280:3,
9,17,22 281:1,6,12,
18,23 282:13,18
283:1,8 284:6,11,17
285:3,9,15,18,22
286:5,16 287:1,8,15,
22 288:10,20 290:1,
16,24 292:14,23
294:3,16,24 295:15,
24 297:7,15 301:20
302:9 303:2 304:2,

11,20 305:2,8,14,22
306:10 307:4 308:12,
19 309:17 310:10,17,
23 311:4,9,18 312:3,
7,16 313:1 314:16,24
315:6,19 316:1,17
317:1,7,15 318:1,22
319:5,9,14,18,23
320:4,8 321:21 322:1
323:4,9 324:3,24
325:20 326:2,8,18
327:1,8,22 328:19,24
329:20 330:5,12,17
331:3,19 332:1,10,
20,25 333:4 334:3
**errors** 274:22
**ESP** 120:17,19
**establish** 105:9
109:7,17 116:2,8
119:25 124:2,8
**Establishing** 224:22
**establishment** 226:4
**estimate** 261:17 263:2
**et al** 7:7
**Eugene** 190:21
**euphemism** 330:13
**evaluating** 84:3
**evening** 279:18
**event** 199:7
**events** 76:8 77:7
89:13
**eventually** 255:4
**evidence** 71:14
**evolution** 78:7 289:22
294:23
**evolved** 289:14 314:22
**exact** 24:14 259:24
261:2 300:3
**examination** 9:17,18
12:16 279:16 296:25
333:25
**examined** 9:2
**examples** 58:7
**exceeding** 235:12
**Excel** 66:14,23
**excellent** 318:8
**exception** 34:20
**excerpt** 203:20 248:6,
10,12,15 256:14
**excerpts** 297:9

**excessively** 62:9
291:17 292:2
**exchanges** 10:16
**exchanging** 230:17
**excuse** 299:25 300:5
**executed** 45:14
**execution** 50:13
**executive** 12:23
118:11,18,19 120:1
194:25 195:10
**executives** 117:17
118:2,9,10,11,14,16,
23 240:14
**exercise** 301:15 302:2
**exercised** 301:22
**exercising** 304:6
305:16
**exert** 92:25
**exhibit** 24:20,23
37:14,15 42:18,19,21
44:25 45:1 48:24
49:1 62:17,18,20
63:3,9 64:2,20
65:12,18 93:16,17,24
94:3 120:11 142:2,4,
8 146:5,6 154:1,2
155:16,18,20,21
158:5,7 161:25 162:2
165:23,25 170:24
171:1,3 177:23,25
182:8,9 188:1,2,4
196:12,17,19 203:16,
18,20 210:3,4 215:6,
9,10,12 222:16,17
223:2,24 224:2,4
228:24 232:3,4,6
239:5,8,24 247:12,14
248:9 249:4,5 257:1,
4,5 266:1,4,9 267:16
268:16,23 269:3
270:25 271:1,3
274:25 275:1,3 298:9
327:24
**exhibited** 248:15
**exist** 167:25 168:3,22
243:23 289:14
**existed** 289:4
**Exit** 202:11 203:3,20
204:14 229:3,5
**expand** 258:20 288:19
**Expanded** 295:5

Confidential
JAN-MS-05485630

SCOTT Fishman, M.D

February 26, 2019                                                   17

expanding 242:16,23
Expansion 205:22
expect 235:5
expectations 242:2
  313:16
expected 246:11
expedite 270:17,19
expenses 31:1,8
expensive 40:13
experience 25:9 27:8,
  20 47:14 58:12,16,22
  102:16 138:18 241:7
  303:23
experienced 303:24
experiences 282:3
  294:14
expert 43:10 213:10
  298:5
explain 57:9 142:23
  167:17 243:14
explicitly 183:2
  310:18
exploration 50:8
expressed 281:13
  293:12 294:6
extended 49:24
  244:18,19,20
extensive 241:7 328:1
extent 54:12 103:24
external 147:1 210:21
  211:16
extra 64:10 93:18
  154:4 267:13
extractions 243:19
extremely 242:12
eye 278:25

F

fact 35:5 54:7 71:15
  90:2 111:2 112:17
  139:7 182:24 194:3
  196:7 204:24 216:17
  238:14,15 243:5
  245:14,23 281:19
  292:15 296:25 299:17
  305:15 306:6,24
  325:21 327:17 330:6
factor 81:21 84:19,24
  126:3

factors 75:18,24
  76:16 77:6 81:22
  82:7,9,11,15 84:2
  87:16 113:21 114:1
  116:20 123:13 124:21
  125:4
facts 227:16,19
factual 132:21
faculty 307:23,24
  308:1
fair 16:13 19:20 20:7
  25:8 26:18 29:24
  139:12 152:11 248:12
  280:5,19 281:3,8
  282:5,22 283:4
  284:20 286:1 290:4,
  17 294:8 295:2
  301:3,17 303:3
  305:19 308:6,9,21
  309:14 310:11,24
  311:14 312:9 313:11
  314:6 315:3,20 316:5
  317:8,21 318:2,14
  319:24 320:9 323:12,
  19 324:18 326:9,12
  329:21 330:23 331:16
  332:11
false 25:15 297:16,
  18,22 323:14,23
  325:17 326:20 327:3
familiar 24:15 44:11
  65:21 108:6,13,15
  115:5,7 120:19 126:7
  134:7 171:9,13 178:4
  182:12 197:10 212:17
  229:24
favor 181:5 207:1
FDA 34:1,2 105:2
  255:9 258:15,16,24
  271:25 318:24
February 7:2,13 65:24
  94:11
Federal 232:8,12
  271:12
Federation 248:19
  257:24 258:16 275:25
  293:18
fee 31:10
fee-for-service
  165:20
fee-for-services
  165:7

feedback 274:1,9
feel 36:3 37:7 89:21
  90:2 92:23 93:4
  130:9 150:4 159:13
  187:19 221:4 233:13
  242:8 264:13 291:21
  333:8
fees 19:9,16 20:3
fellow 307:18,22
fellowship 299:24
  307:25 314:3
felony 240:8 263:24
felt 35:23 53:8
  230:14,20 277:8,12
  278:25
Feltz 276:5
fentanyl 108:18,20
Fentora 108:15
  114:19,25 115:6,13
field 52:15 69:9
  107:10 198:2 233:1
  306:7 312:23 313:2
Fifteen 257:9
figure 258:24 275:10
files 45:15
Final 188:23 189:6
  196:4
Finance 152:17 153:15
  154:7 155:14 162:21
  165:14 249:8
financial 30:24
  153:1,11,22,23 155:7
  162:6 170:2,4
financially 178:5
find 58:14 180:5
  218:21,25
fine 12:14 38:3
finish 310:2 334:4
finished 42:23 55:14,
  16 160:6
firewalls 183:20
FISH 171:3 182:16
  328:2
Fisher 8:20
Fishman 7:6,22 8:10,
  12,13 9:1,7,12 12:6,
  21 39:12 43:2 54:19
  55:16 56:2 64:4 65:8
  87:25 119:17 128:2
  155:6 159:16 169:25
  196:20 208:21 223:9

Confidential                                                                          JAN-MS-05485631

228:23 237:4 239:24
260:18 266:21 269:11
270:24 275:19 295:6
316:2 320:11 323:10
**Fitzgerald** 66:12
**fix** 277:16
**flawed** 289:24
**focus** 179:17 242:23
299:18,20
**focused** 57:25 277:11
**folder** 267:15
**folks** 49:6 255:21
**follow** 63:13,16
172:17
**follow-up** 120:23
**foot** 296:14
**force** 67:6 232:24
**forced** 34:2 35:24
**forecast** 50:24
**forget** 64:10
**form** 14:11 16:6,15
17:4,23,24 18:17
19:11,22,23 20:8,25
21:6 22:12 23:4,5,17
27:11,12,25 28:1,9,
17,23 29:7,8,18,19
31:3,4 32:6 33:3,4,
12 34:13,14 35:13
36:12,14,20 37:3,5
40:4 41:3,7,22 45:10
46:3,11 47:3,4,11,
19,25 48:1 49:14,24
50:5,14,25 51:7,13,
23,24 52:21,22 53:22
54:24,25 55:1,9
56:8,21 57:11 58:25
59:1,21 60:17 61:17,
18 62:11 66:4,9,17
67:11,23 68:10,24
69:5,18 70:6,22
71:10,11,19 72:3,4,
13,20,21 73:4 74:1,
15,25 75:1,7,8,15,21
76:1,10 77:13,14,22,
23 78:18,19 79:15
80:4,15,19,22 81:5,
13,14 82:3,12,18
84:5,14,21 85:4,5,
13,23 86:5,14,19,25
87:4,10,18 88:2,14
89:1,9,16,22,23
90:5,6,19 91:1,14

92:6,14,20 93:3,12,
13 94:12,21 95:1,18
96:7,12,18 97:10,17,
18,24,25 98:8,16
99:3,19 100:18
101:25 102:12,19
103:1,8,23 104:6,19
105:6,11,16,22
106:14,19 107:1,2,
13,23,24 108:22
109:2,11,22 110:8,23
111:15,21,23 112:13
113:16,22 114:3,9,14
115:23 116:11,18
117:7,19 118:4,24
119:19 120:3,14,25
121:7,17 122:2,14,19
123:2,8,17,23
124:15,23 125:6,15,
16 126:5,12,14,21,22
128:7,23 129:5,11,
14,16,24 130:6
131:4,10,14 132:4,
10,11,16 133:3,13,
24,25 135:2,3,15,21
136:5,6,9,12,13,25
137:3,11,12,24
138:3,22,24 140:5,9,
21 141:21,22 144:1,8
145:1,19 147:23
148:8 149:5,13,14,21
150:15,16 151:9,10
152:6 153:6,7 156:2
158:21,22 159:4,17,
24 160:12,14,17
161:4,7,16,18 162:8,
14 163:2,10,19 164:7
165:3,9 166:19
167:1,9,11 168:23
169:5,7,12,13 170:6,
7,13 172:2,3 173:17,
21 174:17,24,25
176:16,22,23 177:3
178:23 179:8,9 180:2
181:7,13 182:4,25
183:10 186:24 189:12
191:17 193:16,17
194:12,22 195:17
197:6,7 203:9 205:1
207:3,4 209:17
210:18 211:10,11
212:8,15,19,20
213:7,11,22 214:10
215:2 216:7,20

218:17 219:9,14
220:2,17,18 221:1,2
222:3,4 226:18
227:8,9 228:9 231:21
233:8,15 234:7,8,22,
23 235:14,15 236:3,
11,18 237:17 238:10,
18,19,25 239:1
243:7,8,25 244:7,8
245:2,3,6,16 246:25
248:3 249:1 251:5,19
252:2,3,11,24,25
253:9,21 254:21
256:1 258:9 260:24
261:1,8 262:16,18,19
265:1,11 266:25
271:6,18 272:8,13,19
273:2,11,19,20 275:8
276:13 277:23 278:18
290:7 297:3,13
302:5,25 303:7,9
304:9,18,24,25
305:6,12 308:10,11
310:8,15,21 311:2
312:1 316:15,21,23
317:4,12 318:18
319:3,7,13,16,21
320:2,7 321:18,25
322:24 323:8,25
324:22 325:19 326:23
327:6,12 328:18
332:17
**formal** 33:17 48:16
278:5 307:25
**format** 47:16
**formed** 37:9 177:2
214:14
**forms** 137:7
**Formulary** 83:19
**formulations** 318:21
**forum** 229:17,19,24
230:3,4,6,12,16,17,
18 231:10,15 232:23
233:4,17,18 235:8,20
236:17
**forward** 50:22 239:20
315:15 330:19
**Forwards** 330:24
**found** 183:14 184:14,
24
**foundation** 21:18,21,
24 22:5,11 23:3,9
43:16,23 45:11 46:4,

Confidential                                                    JAN-MS-05485632

SCOTT FISHMAN, M.D
February 26, 2019                                                    19

12 53:22 56:22 59:3
94:13 95:2 96:19
97:11,19 99:20 104:7
107:14 109:12 110:8,
24 111:16 112:14
113:17 114:15 116:12
126:6,13 128:8
129:6,17,25 138:23
142:18 144:2,9
145:2,20 147:22
148:9 150:17 151:1,
11,20 152:2,10,16,25
153:2,3,9,10 154:16,
19 155:3,25 156:1,
10,20 158:23 160:13,
14,18 161:3,5,8,17,
19 162:15 163:1,3,8,
11,20,21 164:7
165:4,10 166:18,20
167:1,10,12,15,18,20
168:8,9,13 169:6,12,
14 170:1,12 171:19
172:13 173:12
174:13,21 177:6
178:16 180:24
183:17,19 184:9
189:2 191:2,18
193:11,18 194:13,15,
22 195:5,6,17,21
196:9 197:6,8 198:8,
23 200:20 202:13,15,
23 203:7 204:1
205:2,11,12 206:11
207:5,16 208:9,11
209:7,14,18 210:18
211:10,12 212:21
213:4,18,22 214:10
215:2 216:7 225:9
228:9 230:10 232:10
233:10 236:4 237:1
252:12,25 256:2
260:25 267:2 271:7
273:21 275:7,9
278:19 304:25 306:2
316:22 321:6
**Foundation/state**
211:3
**foundations**  306:9
**fourth**  76:21
**fracture**  243:19
**frame**  333:18
**framework**  260:4 294:1

**franchise**  94:6 97:16
108:3,7 109:6 113:15
128:21
**Francisco**  7:16
**Franklin**  176:10
**fray**  40:25
**free**  159:13 332:21
**frequency**  28:15
**frequent**  33:22
**frequently**  29:1
**Friedman**  240:5,10,15,
23
**friend**  244:1
**friendly**  130:19
243:25
**friends**  130:20
**front**  124:25 126:25
188:24 256:15 258:13
**FSMB**  249:20 250:1,2,
3,9,11,16,20,21,23
251:2,15 252:17
256:25 260:3 261:6,
10,12 262:6,8,13,14
263:1,8 276:3
**FSMB's**  249:8,13
**full**  195:19 221:24
238:7
**Fullerton**  12:25
**fully**  45:14 218:13
279:6,8
**fund**  175:25 176:3
205:4,7 206:17
264:8,10,24
**fundable**  206:6
**funded**  189:10 200:1
221:23 222:9 251:1
**funders**  199:13 264:20
288:24
**funding**  20:22 21:3
22:10,15,21 29:5
38:19 40:6,24 41:2,
17 42:2,5,6 44:18,19
47:16 140:3 149:10
151:4 152:3,11 153:4
170:5,10,17 172:22
173:8,13,25 174:10,
14,23 175:4,5,6,15
176:24 178:7 179:13
186:16 199:3 206:3,
10,15 209:9 222:7
247:21,25 248:22

256:6 264:3,7 265:9
273:16 276:3 288:25
304:14 320:16 321:2,
6,16 322:11
**fundings**  175:6
**fundraising**  172:7
**funds**  173:2 178:19
182:21,23 183:4,5,14
185:1,2,10 186:22,23
204:24 256:20,24
258:7 259:21 262:5,8
**future**  10:1 11:2
138:9 272:16

---

### G

**gain**  50:2
**gala**  199:6
**Gallagher**  202:17
**game**  221:8
**Gary**  176:10
**gathering**  64:9
**gave**  48:24 128:14
155:2,24 156:14,17,
25 157:7,10,13,16
158:3 159:1 160:9
161:2,14 162:25
164:3,11,15 165:7
166:15,25 168:5,7,12
169:3,10 177:11
194:16,19 195:4,25
196:1 221:11 251:14
252:8,13,16 253:13,
16,19,24 254:2,6,12,
16,19 255:7,22 268:1
293:21
**general**  13:18 34:20
130:15 179:2 180:9
306:16,17
**generally**  47:13 86:12
219:25 220:10
**generate**  111:19
**generated**  112:10
**generic**  319:1 320:5
**generous**  204:15
**gentlemen**  63:19
**gesture**  30:24
**Gilson**  182:22 184:9
185:13 186:15,23
**give**  30:17 31:16
32:11 34:10 43:25

Confidential                                                                        JAN-MS-05485633

54:7 61:25 82:6
132:8 170:17 179:13
183:2 185:8 187:2,3,
16 201:9 209:12
243:15,16,18 246:12
266:6 268:14 269:3
289:1
**giving**  35:12 172:16
195:23
**go-to**  211:9
**goal**  52:19 53:18
54:23 55:2,6 56:7,
12,14 57:17,18 58:23
190:9 224:23
**goals**  56:18,19,24
140:11 145:13
**good**  7:4 11:23 93:4
169:18 192:18,24
218:22 227:14 246:15
277:8,12 279:18
**Gordon**  8:10,11,19
**government**  232:8,13
271:13
**Government's**  268:24
**governmental**  166:3
232:24
**gradually**  34:6 52:10
**graduated**  299:21
307:11
**grammar**  274:8,15,16,
23 278:9
**grand**  32:12 99:23
**grant**  39:2,21 40:1
44:18 46:8,22 47:22
179:2 180:10,12,17
184:8,13,16,17,18
185:8,9 187:16
190:3,6 194:11,17,20
195:1,4,11 196:1
202:21 204:24 205:7
206:3 207:2 249:19
250:3,20 251:15
252:8,14,17 253:13
255:8 259:21,25
262:14,16,21,23
276:2
**grants**  41:3 44:22
179:1 180:9 184:7
195:4 262:7,9 263:4
**graphics**  33:24
**great**  9:10 145:9
223:18

**greater**  96:3 226:6
277:11
**green**  67:18
**Greenwich**  306:14
**grew**  150:8
**ground**  214:14
**grounded**  306:19
**grounds**  139:9
**group**  20:13 21:9,15,
18 23:10,19 48:16
82:1 89:8 175:24
242:24 244:21
258:22,23 259:5,6,7,
8 293:2 306:22
318:20
**groups**  104:11 119:10
176:25 230:9 233:18
234:14 258:22
**growing**  205:9,24
**growth**  224:25 225:8
**guess**  64:24 233:22
259:1 278:5 297:14
**guessing**  100:9
**guidance**  293:22
**guidelines**  101:12
105:2 120:23 142:9
176:8,11,19,21,25
177:1,3,4,7,20
179:19,25 249:20
250:4,21 251:2
**guiding**  142:24 293:20
**guilty**  240:7,11,14
263:24 265:14 266:1,
11,13,22,23 267:11,
15 268:2,5,17 271:3,
16 272:11
**guys**  169:19 248:13
333:8,23

---

**H**

---

**habits**  60:12 61:5,15
74:24 78:15 84:20
90:25
**Haddox**  273:24 274:4
275:6 276:10,17
277:18,21
**half**  243:5 307:13
**hall**  40:16
**hand**  34:2 196:12
270:24

**handed**  63:8 65:11
94:3 155:16
**handing**  37:13 158:5
161:25 165:23 215:9
**handled**  182:24
**Hang**  186:7
**Hannah**  8:12,19 10:9
**happen**  12:5 32:9
35:10 63:24 64:9
125:20 184:5
**happened**  34:2 40:22
42:3 184:4 185:12
187:17 200:5 218:20
219:4 220:6 230:23
291:20 323:7
**happening**  30:11
125:19 184:23 195:23
**happy**  17:14 40:5
141:8 144:18 333:7
**hard**  36:1 40:10,11
74:7 90:9 98:2
110:16 150:7 193:23
195:18 209:24 234:9
246:9
**harm**  238:22
**harmful**  238:14 245:11
247:7
**Harvard**  299:7 306:17,
18 307:24
**HCP**  143:10,11
**head**  42:25 49:10
108:11 265:21
**headed**  103:18
**heading**  113:25
**headline**  193:2
**Headquarters**  100:9
**heal**  243:20
**health**  38:21 99:15
100:14 191:24 261:25
278:22,23
**healthcare**  27:22 28:4
51:22 60:13 131:17
134:21 135:24 143:12
147:8 148:3 275:24
**hear**  182:20 312:14
**heard**  7:8 287:24
293:8 323:11,18
**heightened**  283:16
**Heins**  188:10,11,12
**held**  202:7 241:2
260:14 270:6 279:13

Confidential                                    JAN-MS-05485634

helped  201:4,18
  221:15 264:8,10
helpful  221:6,9
  315:14
helping  92:8
hereinafter  38:17,18
  271:14
Hetherington  141:7
Hey  326:9
HHS  277:1
hidden  235:2
high  74:19 292:3
high-cited  91:22
higher  75:4,6 145:16
highest  75:12 84:10,
  19,24
highlight  120:12
  325:22
Highlights  190:10,19
highly  108:20
hiring  40:16
history  324:1
Hogan  224:6,9
hold  48:24 53:23
  134:9,24
holder  139:13
holding  268:8
Homeland  166:3
honestly  138:5 175:1
  189:13 230:23 256:22
honoraria  19:25 20:10
  29:23 30:10,13,15,
  16,18 31:8,10 32:13
  36:24 58:19 73:1
honorarium  32:10
  40:19 43:14,17,22
hope  222:10
hoping  218:6
Horwitz  257:12
hospice  298:20
hospital  13:18 32:12,
  13,15 99:15 303:22
  306:14
hospitality  120:11
hotly  261:24
Houman  8:6
hour  228:14,15 333:5,
  9,25
hours  9:17,18 333:14,
  24 334:1

HQ  100:3,6 107:11
hundred  108:25
  253:13,19,24 254:2
hundreds  111:13
hung  16:18
hurt  141:20
hydromorphone  242:18
hypothetical  222:5

I

i.e.  97:7
idea  59:5 89:24 97:14
  177:10 183:6 185:4
  207:17 230:5 243:11
  276:21 288:25
ideas  230:17 294:14
  306:22 327:19
identified  50:3 67:17
  68:22 69:2,7
identify  50:7 70:13
  109:16,21 110:3
  282:19 328:12
identifying  70:19
ignorant  10:3
image-related  242:9
imagine  221:4
immediately  324:19
  326:12
immune  130:9
impact  140:20 147:12
  224:24 225:8
impacted  149:9
imperatives  50:3
implanting  303:15
implement  180:21
  232:18 233:5
implementation  181:1
implemented  126:20
implicitly  310:18
implied  275:20
implies  179:11
imply  231:14
importance  75:19
  96:11,16 97:15 98:6,
  11 105:10
important  85:11,15,25
  86:2 87:8,16 91:16
  136:15 237:11 238:2
  293:20 302:1,6

  311:13
imposed  179:19
impossible  226:1
impressions  190:13,16
impressive  328:1
improper  127:22 141:3
  161:5 207:14 218:9
  220:21 221:19 222:2
  227:7
improperly  207:24
improve  148:19 176:25
in-depth  90:18
inaccurate  326:16
inadvertent  64:11
inadvertently  185:24
inappropriate  60:1,5
  230:20 231:3,16
inappropriately  62:4,
  8
incident  275:5,11,13,
  15
include  18:2,5,7,10,
  15 19:1,4,6 67:16
  82:15 114:1 118:22
  119:25 123:15 133:18
  167:6 190:21 191:10
  199:18 200:11 262:16
  285:4 290:21 295:21
  329:16 330:7
included  31:6 75:24
  203:3 275:22 278:16
  280:14,18 281:2
  330:14
includes  62:20 69:10
  119:9 120:22 135:8,
  10 261:19,21
including  14:4 22:9
  34:10 41:4 71:7
  91:11 117:18 131:8
  135:25 143:9,24
  144:7 151:7 155:9
  170:20 174:6 191:15,
  21 231:7 271:25
  273:15 287:16 310:25
Incomplete  222:5
incorrect  326:10
increase  61:14 72:16
  145:18 199:14 234:4
increased  62:1
increasingly  33:18,21
  34:24

Confidential

JAN-MS-05485635

independence 134:17
  289:3
independent 34:22
  36:2 37:7 45:25
  53:9,16 73:6 90:14
  98:18 130:13 136:16
  221:14 228:6 235:18
  246:14 278:4 281:15,
  20,24 282:7,11
  286:14,15 290:6,11
  293:13,16 294:9,12,
  15,17 301:16,23
  302:2 304:6,16
  305:16 328:14,20
  329:5,16,17 331:11
independently 217:17
  221:5 281:8 306:20
  309:14 330:25 332:16
indications 115:13,15
indifferent 221:10,16
indirectly 61:12
  149:11 264:23
  285:17,19 287:10
  292:16 304:14 320:16
  321:3,9 322:11
individual 107:19
  143:23 240:16 306:21
individuals 67:17
  143:7
industry 37:1 42:1,2
  57:17,19 131:2
  134:14 152:3,11
  153:4 170:19 183:20
  184:22 193:11 231:4,
  6,20 233:17,24
  258:23 259:6,7,8
  303:12,19,24
Industry's 57:17
influence 23:11 60:11
  61:4 70:16,19,20
  71:8 72:2,10 73:3
  77:10 81:2,10,20
  82:8,9,11 83:7 84:3
  85:2,6 86:23 87:8
  88:25 89:19 90:3,18,
  24 91:12,17 92:25
  93:5 94:24 103:22
  104:2,3 106:25
  111:13 136:3 137:9,
  25 138:15,20 140:1
  143:8 144:18 145:7,
  10 147:8 148:3,14
  218:10 220:22 227:21

231:4,20 238:23
  242:9 294:10,13
  311:20,23 315:16
  332:22
influenced 70:10
  75:18 144:19
influences 143:24
influencing 23:14
  77:6 84:19 87:16
  89:14 144:25 145:11,
  14 232:24
influential 21:9,13,
  16 23:3,6 27:10,23
  28:5 70:8 77:20
  78:14 81:21 92:12
  191:24
info 66:25 67:4
inform 103:13
informal 278:7
information 33:23
  66:15 78:17 90:9
  136:1,21,24 137:7
  151:25 155:14 158:12
  159:3 166:13 221:12
  225:22 228:5 237:13
  238:15 244:11 289:20
  303:13 306:3,4 330:8
informed 312:18
  313:17 314:11
initial 241:18 242:1
  259:25
initially 259:23
  263:15 277:9
initiated 152:24
initiative 177:12
  203:3 205:6 206:2,25
  251:16 252:17 276:5
initiatives 202:18,
  20,22 209:3
injuries 272:1
innocent 219:2
input 277:3 315:13
inquiring 250:17
inquiry 151:16,21
  152:1,23 155:7,13
  162:5 166:4 168:20
  250:1
instance 31:16 139:7
  144:20 282:8,20
  284:3 285:4,5 304:23
  314:1 320:5

instances 44:4 291:2
Institute 278:22
Institutes 278:23
institution 33:10
  47:22
instructed 185:8
  187:15
instrument 42:8
Insys 167:6
intact 63:9
integral 241:10
  274:11
integrate 102:10
integrity 226:7
intend 125:2,10,11
  140:3 206:8
intended 30:23 125:22
  126:1 234:6 272:3,5
  326:15
intending 61:13
intent 125:19 137:18,
  24 138:4,6,9,19
  283:3 284:18,23
intention 15:3 60:11,
  18 61:4,8
intentionally 241:14
intentions 227:15
interact 109:10
interacted 150:13
  302:13
interaction 82:16
  87:7
interactions 282:11
interacts 57:16
interest 61:23 62:2
  130:10 139:19 150:5
  184:2 218:22 223:18
  231:23 246:16 276:6
interested 21:15
  82:10 170:20 274:9
interests 140:13
  230:7,18 284:25
interfere 147:4,20
interfering 54:2
  220:15 227:6
intermediary 225:24
  226:16
Intermezzo 235:10
internal 26:14,15
  73:2 149:2 224:5

Confidential                                            JAN-MS-05485636

229:15 234:4 298:21
306:13 307:13,15,17,
21
**internally** 58:23
77:19 78:13 207:1,7,
21 209:4
**international** 202:8
**interplay** 187:18
**interposed** 55:20,23
**interpreting** 136:20
**interprofessional**
21:14 202:5
**interrupt** 54:4,5
129:16 140:9,22
289:8
**interrupted** 250:13
274:14
**interrupting** 54:6
**interruption** 93:25
**intervention** 179:18,
19
**interviews** 120:12
**intricate** 138:14
**introduce** 64:21
**introduced** 206:22
208:25
**Introduction** 330:19
**Introductions** 330:23
**investigate** 293:22
**investigator** 120:11
**Invitation** 43:9
**invited** 29:2 305:4
**involve** 121:12
**involved** 20:13 21:17
23:19 39:22 40:3
58:17 81:8,9 99:18
102:17 124:20 130:11
132:19 180:12 198:1
203:12 213:2,5,9,14,
18 214:12 215:1
219:19 220:7 227:4
283:20,23,25 284:2,
7,12 286:18,22
287:3,11,19
**Involvement** 229:17
**involving** 121:4
**IOM** 180:22 181:1,11,
19,20,24
**ironic** 306:6
**issue** 159:2 276:5
282:22 308:17,20

324:5,7,18 325:13
**issued** 166:4
**issues** 10:11,18,21
28:7 94:19 111:10,12
175:25 176:7 223:17
283:5,20,23 288:5
299:16 300:7
**items** 198:19,22 209:9
229:13,20
**iterations** 177:5
**IWG** 259:5,16

J

**J&j** 258:3,7
**J&j's** 257:18
**James** 188:10,11,12
**JAN-MS-00403640** 210:8
**JAN-MS-00483184** 42:21
**JAN-MS-02533811** 68:5
**Janssen** 8:18 14:4,14
18:5,11,14 19:4
43:5,9,21 51:20
58:20 65:20 66:3,6
68:14 70:13,18 72:9,
15,25 73:24 74:23
77:19 78:13,16 79:4
80:12 81:18 84:2
87:14 92:24 135:12
166:24 167:6 169:10
172:25 174:15 177:20
209:14 211:8 214:2
256:12,21 265:5 273:5
**Janssen's** 90:3 91:8,9
92:4 210:6
**January** 45:8 146:21
173:5 182:13 271:23
**Japan** 43:9
**job** 52:12,13 57:19
71:6 73:8
**John** 8:11 10:15
**Johnson** 8:7 14:4,5,
14,15 18:10,11,12,13
135:10 162:12,25
163:17 164:3,10,11,
15,25 165:6,7,13
259:7,8 273:5,6
**Johnson's** 162:12
**Join** 42:15 144:3
145:21

**Jones** 278:1
**Josh** 258:4
**Joshua** 257:12 258:2
**journal** 76:4 83:11
84:11,25 85:11 86:3
101:2
**journals** 139:11
**judge** 12:19 127:11
141:4,7
**judgment** 301:16,23
302:2 304:7,17
305:17
**July** 173:7 197:5
199:2 215:16
**June** 39:17
**jury** 12:20 30:12
208:17

K

**keeping** 11:10
**Keigo** 7:14
**Ketchum** 215:15
**key** 61:12 67:17
68:20,22 69:2,9,12
70:13,19 71:7,23
77:17,18 78:12 79:5
81:2,10 87:23 88:5
89:5 91:10 92:24
94:5,18 98:6,11
99:18 102:16 103:6,
7,10 104:16 105:14,
25 106:21 110:5
113:13 116:16
117:11,17 120:9
125:12 128:19
129:13,22 139:9
143:3,7,23 144:7
147:3,20 149:2
189:24 192:13
**Kim** 198:17
**Kimber** 45:8
**Kimberley** 197:1,4
199:10
**kind** 33:17 78:7 140:1
178:4 200:20 235:20
260:3 262:11,22
278:5,10 289:18
306:8 314:15
**kinds** 103:12 234:14

Confidential

JAN-MS-05485637

SCOTT Fishman, M.D.
February 26, 2019
24

King  248:22 254:2,12
knew  37:9 53:2,12
  54:20 56:4 58:22
  78:9 214:8 227:18
knowing  214:4 234:5,
  21 235:25
knowledge  16:21 56:23
  58:11 69:8 71:13
  91:12 93:1 125:18
  126:17 132:18 136:10
  137:1,8,25 139:6
  149:9 235:8 244:25
  245:21 250:10,23
  272:10 274:12 282:17
  289:2 295:9,11
  296:11 317:17 323:22
knowledgeable  28:21
  244:22
KOL  66:15,25 67:16,
  18,19,20 68:6,16
  73:3 77:8,9,10
  88:20,25 94:18 98:23
  99:23 100:15,21
  103:18 104:2,22
  105:20 107:9 109:6,
  18 112:17 114:1
  117:2 123:15 143:10
KOL-SPECIFIC  129:3
KOLS  70:16 76:23
  88:6,13,19,20 89:8
  90:24 92:8 95:5
  96:3,11,16 97:15
  102:10,24 109:16
  111:13 119:13,24,25
  120:21 121:4,12,16,
  24,25 122:7,10,18,23
  147:3,8,13,19 148:2
KOLS'  124:13

L

label  309:20 310:6
  311:12
labeled  124:24
labeling  272:4
labels  310:25 311:5
Laboratories  253:7
  279:22 320:25 321:4,
  17 322:4,19
lack  10:12 56:22 59:2
  96:18 97:10,18
  110:23 114:14 126:12

128:7 129:17,25
  161:5,18 208:11
  267:2 271:6
lacks  95:1 107:14
  138:23 156:1 162:14
  163:2,21 165:3,9
  167:9 236:3
language  315:15
large  26:17 111:20
largely  33:18 170:11
  291:18
largest  112:11
Las  46:18
lasted  174:22 175:2
late  32:25 279:18
  305:18,23
launch  213:21 214:9,
  17,18,24 215:15
  216:3,6 217:23
  220:25
launched  241:13
launches  96:17
launching  214:12
lawsuit  14:25 15:3
lawsuits  316:4
lawyers  15:14,19
laxative  235:10
lead  238:16
leader  68:20,22 69:3,
  9,13 71:24 77:18
  79:5 81:3 92:24 94:5
  98:12 99:18 103:6
  109:7 113:14 125:13
  128:20 129:13,23
  143:4,23 144:7 193:6
leaders  61:12 70:10,
  14 71:7 78:13 81:10
  83:7 85:2 87:9,15,24
  88:5 89:5 91:11,19
  94:18 95:11 98:7
  102:17 103:7,10
  104:17 105:15,25
  106:21 110:5 117:11
  138:14 139:9 143:7
  147:3 149:2 205:10,
  25
leaders'  70:19 116:16
leadership  67:20
  75:25 118:21 229:17
leading  280:1,6,15,
  20,24 281:4,10,16,21

282:9,16,23 283:6
  284:4,9,15,22 285:7,
  13,20 286:2,24
  287:6,13 288:9,17
  289:11 290:22 291:5
  292:18 293:15
  294:11,20 295:13
  301:18 305:20 307:2
  309:15 310:8,15
  311:2,7,16 312:20
  315:4,11,24 325:24
  326:5,13 328:22
  329:12 330:3,10,15
  331:17,24 332:23
learn  306:12
learned  51:5 225:24
  226:16
leave  133:1,2,11,15
  185:9
leave-behinds  133:10
lecture  19:18 20:5
  29:2 54:8
lectured  110:21
lectures  17:2,20 28:6
  60:9 61:14 101:24
  105:1 328:4,12,13
  332:12
left  153:10,17 162:17
  184:24 334:1
left-hand  154:9
legal  7:15 45:7
  233:21
legislation  181:22
  182:1
legislative  179:18
  191:6,12,16 192:9
  198:2
legislator  175:22
legislators  191:21
  193:14
legislature  175:23
legitimate  185:25
length  48:2 134:17
letter  37:20 38:10,15
  151:24 152:17,24
  154:8 162:12 250:17
level  70:14,15 81:20
  103:22 104:2,3
  119:13 213:15 214:13
  247:6 289:3
levels  109:17

Confidential                                                          JAN-MS-05485638

leverage   234:4 235:24
Leveraging   216:3
Lewis   8:4
liability   83:23 226:2
liaison   107:10 147:15
license   288:4
licensed   296:3
life   97:2 201:16
  204:3 237:21 242:13
  263:9
liking   54:13,14
limited   112:11 143:9
Lincoln   190:21
line-by-line   274:4
  276:11 277:21 278:9,
  15
lineage   307:11
lines   139:19 289:16
linger   316:9
link   91:16 116:3,9
  124:3 241:15
linked   241:16
linking   92:8
Lisa   7:23 193:5,8
  257:21,24 258:3
list   67:15 76:23
  90:15 126:4 173:7
  190:8 229:1 247:18
listed   68:9 70:5
  88:19 89:7,12 96:15
  99:23 100:15,20
  104:15 106:1 116:21
  119:17 121:15,18,21
  156:21 157:6,9,12,
  15,18,22 158:4 191:4
  193:5 204:19 255:19,
  21 256:9,10 323:1
  329:4 330:24
listen   141:8
listening   61:16 110:4
  140:23 199:24 204:8,
  9
listing   67:19,20
lists   39:12 94:17
  99:1 109:15 111:12
  120:17 121:25 122:6
  125:13 128:15 164:23
  210:21 211:16 212:11
  232:15 331:7
literature   67:7

litigation   11:14 14:3
  15:15,20 20:22 22:10
  24:22 37:18 112:9
  133:21 151:8 155:15
  158:11 210:7 275:4
  316:5
living   225:2
LLC   279:22 322:7,12,
  16,19
lobbied   181:5 182:1
lobby   176:19 181:20
lobbying   177:21
local   104:4,16 109:17
  122:23 188:22 189:5
  190:2,5,13 193:12
  195:1,10 196:3
locate   38:5,6
located   7:15
logo   142:13 222:21,
  24,25
long   13:3 29:14 32:21
  37:22 200:14 217:5
  274:6 292:9,11
  299:2,19 319:15
  333:3 334:7
long-acting   300:14
long-term   107:6,8
  109:6
long-winded   292:4
longer   78:7 145:17
  265:8
looked   277:19 327:23
lost   291:17
lot   27:17 47:15
  175:4,23 179:16
  198:1 217:19 237:5
  274:11,22 277:5,25
  280:7 293:8,10
louder   17:13,14
loyalty   114:2 123:15
LP   7:7 146:17
Luckily   10:2
Lumps   135:4
lunch   169:17,21
  304:23

---

M

M.D.   9:1 39:13 96:5
  119:18 223:9

made   29:12 36:5,6
  150:2 158:12,19
  162:18 208:1 236:21
  241:18 258:7 259:14
  260:22 275:17 276:2
  297:17,22 304:6
  310:19 320:20 322:3,
  15 323:15,24 324:2,
  13 327:16
Magazine   223:5
maintain   145:17 233:1
  288:3 290:9 298:21
major   170:17
majority   79:19
make   10:22,24 35:24
  36:1,18 37:6 40:10,
  11 43:14 54:10 60:1,
  20 63:12,14 64:23
  92:23 127:9,14,16
  138:1,8 150:7 170:21
  179:17 181:12
  183:19,21 207:10,11
  209:24 238:8 242:14
  246:6 266:14,17
  269:13 277:6,14
  279:1 293:24 321:23
makes   90:10,14 139:12
  159:12
making   127:22 268:5
  301:5,11,16 302:3
  304:16 324:4 327:4
Mallinckrodt   254:16,
  24
managed   120:6 192:14
management   16:22 28:7
  60:11 70:8 71:25
  78:24 92:12 97:3
  98:13 109:8 120:7
  136:11 137:2,9
  192:15 225:1 237:8
  251:17 252:19 279:25
  280:13 283:3,10,19,
  23,24 299:15 300:5
  302:12
management@
rodacreative.com.
  188:7
managing   289:18
mandated   181:19
manipulatable   111:6
manner   140:7 150:14
  227:7

Confidential                                                                                      JAN-MS-05485639

manufacture  249:15
  318:10,13
manufactured  114:25
  115:3,8 238:14
manufacturer  11:18
  34:10 41:16,18,21
  44:17 140:16 141:15
manufacturers  14:4
  16:12 29:5 41:4
  42:7,8 58:20 131:7
  133:22 134:7,23
  151:4,7,17 153:2
  155:8 166:5,7 167:5
  170:11,21 231:7
  250:18 273:15
  317:18,21,23 318:4,
  5,7,13 319:25 320:5
manufacturers'  162:5
manufactures  322:20
manufacturing  318:3
Mapping  68:6
March  142:17
Margaret  8:21
Maria  188:17
mark  224:6,9 247:12
  249:4
marked  24:23 37:13,15
  42:17,19 44:24 45:1
  48:23 49:1 62:18
  65:12 93:15,17
  142:2,4 146:4,6
  153:25 154:2 158:5,7
  161:25 162:2 165:23,
  25 170:24 171:1
  177:23,25 182:9
  188:2 196:12,17
  203:18 210:2,4
  215:9,10 222:17
  223:23 224:2 232:2,4
  239:4,8 247:14 249:5
  257:1,4 266:4 269:3
  270:2,25 271:1
  274:24 275:1 298:8
  328:2
market  51:6 58:12
  67:5 70:14 71:5
  131:13,17 189:5,17
  190:3,5 191:25 192:9
  195:1,11 196:4
  241:23 242:3 249:16
  320:6

marketed  108:10
  114:19 132:7 295:11
marketing  40:16 92:9
  132:15,19,22,23
  133:22 134:1,3 136:1
  137:20 145:6,8
  213:20 216:19 218:12
  219:1,8,24 296:15
  297:19 304:5 319:24
  320:1,20 322:3,15
  324:15 326:15 327:21
marketrx  68:11
markets  144:24 190:8,
  20 191:1,9,12,15
  193:13
marking  24:19 62:16
  182:7 187:25 222:15
Marlene  182:19
Mary  178:10,13,18
  182:13,19
Maryann  8:24
Mass  306:16,17
Massachusetts  13:18
material  110:4 137:20
  274:21
materials  33:20,22
  37:8,9,10 132:15,19,
  22,23 133:9,15,22
  134:2 136:2 221:25
  296:18 332:13
matter  7:6 9:8 73:7,
  14 148:11 269:1
mattered  148:13
Matters  223:3
maximize  70:9 71:5
Maximizing  120:23
  146:25
meaning  75:12 144:18
means  67:5 68:17,19
  74:18 80:6 85:19,21
  89:25 100:13 114:11
  121:9 151:25 165:20
  212:24 252:22 253:4
  276:15 334:1
meant  57:9
mechanisms  98:14
media  188:22,23
  189:5,17 190:5,10,
  13,17 191:1,14
  193:12 195:1 217:8
  289:18 327:15

medical  17:21 19:18
  28:6,14 31:25 32:3
  33:10 38:20,22 39:22
  40:2,8 41:4,16 46:6,
  21 47:15,16,22,23,24
  60:8 61:13 67:6,19
  72:11,24 83:15
  84:12,18 85:10 86:2
  87:15 107:9 134:9,24
  136:2 137:21 140:3,
  17 141:16 142:11
  143:9,24 149:12
  170:22 176:20 201:18
  226:4 248:19 257:25
  258:17 275:25 288:2,
  3 293:19,21 299:8,22
  301:4,14,16,23 302:2
  303:15 304:7,12,16
  305:16 307:11,24
  311:19,23 312:9,12
  313:5 328:14,21
  329:5 331:11
medication  327:2
medications  61:2
medicine  12:25 23:20,
  24 24:3,7 26:6,9,13,
  14,15 27:10 38:23
  39:9 46:16 57:16
  58:1 67:20 120:1
  150:24 156:18 158:19
  160:11 163:18 166:17
  167:20 198:7 211:22
  231:1 296:4,6
  298:19,20,21,25
  299:2,5 304:4,13
  306:13 307:13,16,17,
  21 309:20,21 310:5,
  7,12,14 313:4 321:7
medicine's  57:18
medicines  295:21
  302:19 310:25 311:6,
  12,14 318:16,19
  319:1,2,6,20 320:6
  322:18
meet  40:11 117:17
  118:2 120:1 197:24
  314:11
meeting  118:22 171:25
  182:22 183:16 275:16
  324:13
meetings  120:10,11,13
  122:13 184:4,5

Confidential                                                    JAN-MS-05485640

member  16:10 20:16
  21:4 22:16 24:10
  117:22 118:7 167:25
  250:11,21,22,23
members  61:6 118:9
  125:4 171:18 172:12
  191:24 250:9
memo  45:3,7 224:5,15
Memorandum  268:24
memory  204:23
mention  201:12 219:13
mentioned  10:16 26:12
  204:6 290:25 291:1
  295:8
mentions  67:18
mentorship  276:19
merit  277:17
message  65:23 140:18
messages  83:3 86:10
  109:20 110:22 141:18
  189:25 192:13 226:6,
  9 228:6,8
messaging  36:8,25
  278:13
met  12:18 197:22,23
  198:3,15 280:10
methodology  73:22
  77:4
Michael  240:4,10,15,
  23
mid-  32:25
mid-2000s  33:15
middle  128:3 178:10
  204:13 239:22 289:18
migraines  272:1
military  202:22
Military/veterans
  203:2
million  164:3 189:24
  190:17 225:2
millions  86:22 137:23
  139:25
mind  98:7,11 139:14
  172:16 276:21
Mindset  51:11
Mine's  268:3
minimal  309:7
minimum  269:24
minute  24:25 65:13
  270:4

minutes  257:9 325:14
  333:12
misattribution  327:9
misbranding  240:8,11
  263:24 265:15
mischaracterizes
  34:15,17 36:13 47:5
  110:24 121:1 123:24
  129:17,25 160:15
  161:19
misdemeanor  240:11
misinformation  245:12
misleading  298:1
  323:14,23 324:2,4
  326:20 327:4
misperception  246:5,
  20
misquote  295:9
mission  222:13
misstate  286:1
misstates  286:3
mistake  267:14
mistaken  243:3
misuse  284:8
MKT  67:5
model  249:20 250:3,21
  251:3 293:21
modeling  86:11
modern  303:14
molar  243:19
molecules  318:20
moment  215:20
money  40:3,14,18 60:1
  97:9 140:17 141:16
  173:15 176:18 179:6
  183:3,20 184:22
  185:14 187:2,3,20
  201:1 246:6 253:4
  258:3,14 260:2,9
  262:10 263:20
  264:14,22
monies  260:7
Montgomery  7:15
Monthly  210:9
months  307:22
Montreal  43:10
Morgan  8:4
morning  7:4 192:19,24
  333:22 334:6
morphine  109:1 241:4

242:6,16,24 243:4,6,
  13,15 244:16 245:14
motivations  109:8,19
move  206:11 208:14
moving  141:3
multidisciplinary
  21:14
multiple  199:12
  275:24
mute  49:7
mutually  316:25
Myers  8:7,18
Mylan  167:6
myth  246:19 247:7
myths  245:18

_____

N

naive  227:14
names  122:6 240:3,13
narcotics  60:14 93:10
national  70:14 76:23
  87:23 88:5,6,20
  104:4,16 109:16
  119:13,24,25 120:21
  121:4,12,16 122:18
  181:10 190:16 206:22
  209:1 229:21 276:25
  278:2,22,23
natively  62:23
nature  134:25 176:14
Nebraska  190:21
needed  10:19 60:20
  73:9 244:5,17 303:19
negative  147:12
negatively  140:20
net  235:12
Network  193:6 205:9,
  23 211:3
neuropathic  194:5
neutral  220:24
Nevada  46:16,18
newly  206:22 208:25
nexus  153:14
Nix  7:25
nods  42:25 49:10
non-cancer  271:25
nonca  114:7
noncancer  114:12
  123:22 300:21

Confidential                                                          JAN-MS-05485641

nonmalignant 241:23
242:3,4,17,23
nonopioid 174:7
nonopioids 194:4
288:12,15
Nonprofit 224:22
nonpromotional
142:10,25
noticed 9:13
notion 242:8 305:15
Novak-tibbitt 188:6
229:8
Novak-tibbitt@
rodacreative 188:5
November 171:21
178:7,11 224:2
NUCENTA 213:21 215:12
216:6 219:5
NUCYNTA 49:11,12,17,
19,20,23,24 50:23
51:12,17,22 57:2
number 37:18 38:2
39:5 62:22 77:7,8
80:1 89:13 96:4
104:15 106:10
111:13,19 112:9
160:20 171:3,24
172:17,24 182:16
188:19 208:23 229:16
241:20 267:22 298:13
300:3 327:24
numbers 74:6 156:4
nurses 135:25
nursing 120:7

O

O'CONNOR 8:21
O'MELVENY 8:6,17
Oakland 8:13,20
oath 65:9 113:2,6
object 12:2,4,6,9,10
14:11 17:23,24 50:5,
14 53:22 54:10,11,15
55:9,11,14 60:16
66:4,9,17 67:11
68:24 70:6 71:19
72:13 73:4 74:1,15
127:1 130:2 154:24
159:2 162:14 163:2
165:3,9 167:1,9

172:2,3 173:17 181:7
183:10 203:9 207:17
210:18 212:8,15,19
213:11 214:10 215:2
216:7,20 238:10
245:16 251:19 252:24
253:9 258:9 269:6,
12,19 273:11 297:3,
13 302:25 303:7
304:9,18,24,25
305:6,12 310:15,21
311:2 312:1 316:15,
23 317:4,12,22
318:18 319:3,7,12,
16,21 320:2,7
321:18,25 322:24
323:8,25 324:22
325:19 326:23 327:6,
12 328:18 332:17
objected 17:10 285:23
objecting 11:20 54:8
55:17
objection 11:17,19,23
12:3,13 15:6 16:6,7,
15,16 17:4 18:17
19:11,21,22,23 20:8,
25 21:6,10 22:12,18,
24 23:4,5,17 27:11,
12,25 28:1,9,17,23
29:7,8,18,19,25 30:1
31:3,4,13 32:5,6
33:3,4,12 34:13,14
35:13 36:12,14,19
37:3,5 40:4 41:7,11,
19,22 42:14 45:10,
16,19 46:3,11 47:3,
4,11,19,25 48:1
49:14 50:9,19,25
51:7,13,23,24 52:3,
4,21,22 53:6,20,21
54:4,24,25 55:1,23
56:8,10,21 57:11,12
58:25 59:1,4,10,11,
16,21 60:3,4,15,16
61:17,18 62:10 67:23
68:10 69:4,5,18
70:21,22 71:9,10
72:3,4,5,20 74:25
75:1,7,8,15,21 76:1,
5,13,17 77:1,13,14,
22,23 78:3,4,18,19
79:6,15,22 80:4,15,
19,22 81:5,13,14
82:3,12,18,21,25

83:4,8,12,16,20,25
84:5,14,21 85:4,5,
13,17,23 86:5,14,18,
19,25 87:4,10,18
88:2,14,15 89:1,9,
16,22,23 90:5,6,19
91:1,2,14 92:6,14,
15,20 93:2,3,12,13
94:12,21 95:1,7,13,
18,24 96:7,12,18
97:10,17,18,24,25
98:8,16,17 99:3,9,
19,25 100:4,10,18,
22,23 101:3,4,8,9,
13,17,21,25 102:6,
12,19,20 103:1,8,23
104:6,12,19,20
105:6,11,16,22
106:7,14,19 107:1,2,
13,15,23,24 108:22
109:2,11,22 110:8,9,
13,23 111:15,21,23
112:1,5,13 113:16,22
114:3,9,14,20 115:1,
20,23 116:5,11,18,22
117:7,13,19,23
118:4,24 119:5,14,19
120:3,14,25 121:7,17
122:2,14,19 123:2,8,
17,23 124:5,11,15,23
125:6,15,24 126:5,
12,14,21,22 128:7,9,
23 129:5,11,14,16,24
130:6,7 131:4,10,14,
19 132:4,10,11,16
133:3,13,24,25
134:11,12 135:2,3,
15,21 136:5,6,12,13
137:3,11,12,15
138:22 140:5,9,21
141:2,21,22 142:18
143:13 144:1,8,9
145:1,19 147:22,23
148:8,16 149:5,13,
14,21,22 150:15,16
151:9,10 152:4,5,14
153:6,7 154:19,24,25
156:1,2,10,11,19,20
157:2,3,21 158:21,22
159:6,17,18,24
160:5,12,14,17
161:4,7,16,18 162:8
163:10,19 164:5,17
165:18 166:18,19

Confidential

JAN-MS-05485642

167:2,11 168:9,10,23
169:5,7,12,13 170:6,
7,12 173:21 174:17,
24,25 176:16,22,23
177:14 178:23 179:8,
9 180:2,15 181:8,13,
14 182:4 186:24
187:7,8 189:12,18,19
191:2,3,17,18
193:16,17 194:12,21,
23 195:2,12,16 196:9
197:6,7 198:11,23
202:23 205:1,11
206:11 207:3,4,11,15
208:2,11 209:7,17,19
210:23 211:5,10,11
212:20 213:22 216:8,
14,25 218:15,16,17
219:9,10,14,21
220:2,17,18 221:1,2
222:3,4 224:18 225:9
226:18,19 227:1,8,9,
10 228:9,10,11
231:21 232:10 233:8,
9,14,15 234:7,8,22,
23 235:14,15 236:2,
3,9,11,18,19 237:1,
17 238:18,19,25
239:1 243:7,8 244:7,
8 245:2,3,6 246:1,8,
24,25 248:3,4 249:1,
2 251:5 252:2,3,11
253:21 254:21 256:1
259:10,18 260:24
261:1,8 262:18,19
264:5,17 265:1,11
266:25 271:6,18
272:8,13,19 273:2,3,
19,20 275:7,8 276:13
277:23 278:18 279:9
280:1,6,15,20,24
281:4,10,16,21
282:9,16,23 283:6
284:4,9,15,22 285:7,
13,20 286:2,8,24
287:6,13,20 288:9,17
289:11 290:7,22
291:5 292:18 293:15
294:11,20 295:13,22
301:18 302:5 303:9
305:20,25 307:2
308:10,11,15,16
309:15 310:8 311:7,
16 312:5,10,13,20

314:7,20 315:4,11,24
316:21 319:12 325:24
326:5,13 327:13
328:22 329:12 330:3,
10,15 331:1,17,23
332:23
objections  11:25
53:4,5 54:2 55:20
57:5 127:2,3,7,9,14,
16,23 164:6,12
165:17 211:18,24
214:3 245:15 277:15
332:8
objective  69:16 70:2,
4 73:2 90:23 91:9,10
92:4,11 235:9
objectives  50:1 94:19
109:16 224:21 232:7,
15 275:16,22
objectors  277:15
objects  12:11
obligated  64:19
306:25
obligation  301:15
obtain  153:4 312:18
obtained  184:16
occur  41:14 44:2,5
occurred  41:10 62:5
occurs  44:15
October  199:7 271:24
OD  242:18
offer  154:25 203:16
266:1 274:21 305:10
offered  278:8
offering  64:15 279:2
office  8:13 40:7,23
42:5 133:2,12 276:25
278:2 304:23
officers  118:15
offices  105:2
oftentimes  73:9
Oklahoma  7:7,9,24
9:14 10:8,12 11:12
14:3 15:15 190:22,25
191:15 192:3,6,19,25
208:5 296:1,4,7,10,
13,16,20 297:20,24
298:3,6
OLS  96:22
omit  238:15

one's  74:7
one-down  314:15
one-on-one  120:13
online  190:2,17
onset  108:19 115:17
open  11:7,11
opened  36:17
operate  130:15
operated  139:6
operating  152:19
operation  152:22
opinion  61:12 68:20,
22 69:2,9,12 70:13,
19 71:7,23 75:24
77:18 78:12 79:5
81:3,10 83:7 85:2
87:8,15,24 88:5 89:5
91:10,19 92:24 94:5,
18 95:11 98:6,12
99:18 102:17 103:6,
7,10 104:16 105:14,
25 106:21 110:5
113:13 116:16 117:11
125:13 128:20
129:13,23 138:14
139:9,13 143:4,7,23
144:7 147:3 149:2
245:10,24 282:21
291:7 328:15,21
329:6 331:12
opinions  36:11 37:2
87:14 91:6,19 282:15
290:6 291:3 293:12,
13,17
opioid  14:3 16:12
29:5 34:10 41:4,15,
17,20 42:7 44:17
49:20 52:20 58:20,24
61:9 75:13 108:20
116:9 124:2 131:7
133:21 134:7,22
139:15 140:15 151:4,
7,17 153:1 155:8
162:5 166:4 170:11
174:6 176:8,11 202:4
214:9 216:19 231:7
243:12 244:21 247:9
248:16 249:16 250:18
251:24 252:23 255:9
256:7 257:18 258:18
259:15 260:20
273:15,16 283:14

Confidential                                                                     JAN-MS-05485643

285:5 286:23 292:20
293:6,11 294:2,7
295:21 297:5 301:24
302:21 304:3,4,13,21
305:3,10 308:25
309:7 312:19 313:10,
13,14,17,20 314:2,4,
10,17 315:1,2,9,21
316:5 317:17 318:16,
19 319:20,25
**opioid-naive** 145:15
**opioid-tolerant**
115:17
**opioids** 59:19 61:6
62:7,14 71:25 82:8
84:4 98:13 108:9
112:10 132:7 144:20
170:21 194:4 200:18
226:6 227:18 237:23
244:24 283:25 284:3,
8,14,20 286:19
287:4,12 288:7
291:3,8,16,25 293:1
300:11,15,18,20,23
301:1,21 302:4
305:17 306:2 308:9,
17 309:4 310:25
311:5,11 312:4
314:5,19 317:21,24
318:11,14,23 319:10,
15 320:20 322:3,15
323:16,24 325:4,23
326:1 327:5
**opponent** 291:9
**opportunities** 48:22
217:16
**opportunity** 50:7
147:13 186:1,3
241:19
**oppose** 214:18
**opposed** 118:20 177:6,
9,20 215:4 222:13
230:11,13,24 278:12
279:2 304:6,16
**opposite** 91:24
**opposition** 177:1,2,3
**optics** 231:22
**optimal** 109:20 110:22
**option** 244:20
**options** 244:19,21
**order** 70:7 75:19
110:21 183:24

270:13,15,19
**ordering** 270:11
**Oregon** 190:21
**organization** 23:3
118:12,20 130:13
224:23 228:2 231:4,
18 234:3,18 235:23
236:16
**organizations** 119:3
134:8,14 135:6
137:21 151:3,18
155:10 158:13 162:7
166:5,7 198:9,12
204:16 230:8,25
231:19 234:5,12,13,
20 235:7,19 249:15
250:19 265:6 272:24
273:8 321:8
**original** 262:9 283:13
331:4,7
**originally** 9:13
**originated** 262:6
**Ortho-mcneil** 14:5,15
135:18 173:16 174:15
178:20 179:23
**out-of-pocket** 31:7
**outcome** 62:4,5 232:20
**Outlet/market** 192:22
**Outlets/market** 192:18
**outlines** 313:16
**outputs** 67:8
**outrageous** 140:24
**outreach** 188:22
189:6,17 190:3,6
191:1,10 195:1,11
196:4 225:25
**outweigh** 60:22 291:12
**overarching** 217:22
318:20
**overbroad** 40:4 52:23
**overcome** 150:10
**overcoming** 189:25
**overdue** 258:3
**overlap** 67:16 289:17
307:14
**overlapped** 262:4
**overprescribing** 62:14
**oversight** 260:3
261:13 262:11
**overview** 94:17
215:19,25

**OVF** 113:21 116:17
117:3 124:14
**owned** 107:21
**owns** 107:9 159:15
**Oxley** 8:2 10:2 25:2,5
40:4 50:5 140:22
141:4,10 143:13
144:3,9,15 147:22
154:19,22 155:1
156:1,10,20 157:2
166:18 168:9 169:7
179:8 181:8 189:18
191:2,18 196:9 197:6
198:23 202:23 205:12
206:11 207:3,6,10,
16,20 208:1,12,16
209:7,19 218:16
222:5 225:9 226:18
227:1,8 228:11
232:10 233:9,15
236:2 237:1 243:8
244:7 245:2,15
246:1,8,25 250:7,14
251:5 252:24 257:8
265:1 275:7 276:13
333:13
**oxycodone** 241:3,5,7,
10,16 243:3,12,17
244:16 245:13
**Oxycontin** 145:15,16,
17 235:10 240:8,11
241:11,13,15,16
242:5,17,22 244:25
246:23

---

**P**

**p.m.** 279:15 334:9,10
**packager** 257:17
**pages** 50:22 128:14
248:11,13,16 297:10
**paid** 16:3 18:23 19:9
32:2 33:11 43:22
53:13 54:20 56:4
72:25 73:17 165:1,15
200:24 249:19 250:2,
20 252:18 253:7
260:7 261:6,10 262:1
324:10 327:16,18
**pain** 12:25 13:2 16:22
20:14,17,23 21:3,8,
15,18,21,24 22:4,11

Confidential

JAN-MS-05485644

23:2,8,14,20,24
24:3,7 25:17,20
26:6,8,12,18,21
27:2,10 28:7 38:22,
23 39:9 43:16,23
44:13 46:16 60:10
67:18,19,20 70:8,14
71:24,25 78:23 92:12
94:6 97:15 98:13,14,
15 108:3,6 109:5,8
113:14 114:12
115:16,19,25 116:9,
16 117:2 120:1,9,13,
23 123:21 124:3,9,13
128:20 136:10 137:2,
8 150:21,24 151:1,20
152:2,10,16,24
153:2,3,9,10 154:16
155:3,25 156:17,25
158:19 160:10 161:2,
15 163:1,7,18 164:4
166:17 167:19 168:8,
13 169:4,11 170:1
171:19 172:13 173:12
174:13,21 177:6
178:16 180:24 181:10
183:19 184:8 189:2,
25 192:13,15 193:2,
10 194:15 195:5,6,20
198:7,8 199:18,24
200:17 202:6,13,14
203:6,25 204:8,9
205:20,23 206:22
209:1,14 210:9
211:2,17,19,22 212:3
213:4,5,17,19 214:8,
12 216:3 217:8,10,20
218:6,7 222:9,11,23
223:3,5 224:13,16,
22,24 225:1,2,6,14,
17,21 226:1,8
229:17,19,21,24
230:2,4,6,7,10,12,
16,18 231:1,10,15
232:23 233:4,5 235:7
236:17 237:8,14,23
241:5,8,15,20,22,23
242:3,4,12,17,19,23
243:16 250:5 251:17
265:7 272:1 275:19
279:25 280:13 283:2,
10,19,22,24 284:25
298:19 299:15,23
300:5,21,24 302:12

307:18 309:7 313:4
314:3 321:6,7,8
pain-management-
related  282:22 300:6
Pain-provider/patient
212:12
Painter  7:14
palliative  26:23
38:23 39:9 298:19
Pam  197:23 198:17
Pamela  196:21 197:11
199:1
paper  163:24 278:11
314:9
paragraph  67:3 225:20
240:21,25 241:12,24
parameters  81:20
84:10 85:16 86:1
333:10,16,17,20,22
part  26:7,17 37:10
48:17,18 54:9 57:21
62:7 64:21 73:7 78:6
117:10,16 125:20
136:25 137:7,18
146:11 153:8 158:14
163:8 176:18 181:17
190:2 214:24 216:5
217:5,6 230:12
234:13 235:8 241:10
248:18 259:8,16
260:6 261:12 262:9,
15 327:11 332:13
partial  198:19 199:11
partially  200:1 205:6
276:1
participant  236:17
participants  234:17
235:23,25
participate  18:23
43:9 48:8,11 214:7
participated  55:4
143:20 216:18 225:13
227:13 286:13
participating  19:19
20:6,11 43:21 234:5,
20 235:7
participation  286:14
parties  10:11 11:24
partner  124:8 134:18
209:16 211:9,17
Partner'  211:3

partnered  201:13
partnering  134:7,15,
16,19 235:20
partners  209:25
210:16,21 222:23
223:5 224:12,16,22,
24 225:6,13,17 226:8
303:24
parts  332:19
party  11:23 12:11
317:5
pass  154:3 206:22
208:25 279:11
passage  229:20
passed  181:16,17
passing  198:3
past  42:4 289:21
pasted  199:10
patient  82:24 115:16
119:9 217:18 221:20,
21 225:25 226:14,17
227:25 228:8 238:7,
9,22 301:6,10,24
304:8 306:20 311:25
312:18 313:15 314:6
patients  23:14 25:18,
20 57:19,21 58:2
103:15 145:15 218:7,
10 220:11,22 225:21
228:4 242:6,24
244:4,14 285:1
296:10 299:10,12,15
300:6,10,12,15,18
301:7,8 314:15
pattern  70:16 86:23
patterns  72:2 144:25
Patterson  8:1
pause  55:22 63:14
270:1
pay  29:16,23 30:9
31:7,21 32:10,13
paying  30:6 33:10
59:24 61:11
payment  20:9 30:19
31:15,16 32:16 34:9
43:14 174:3,5 176:5
259:20 261:5,7
262:16,25 263:5
326:11,17,21 327:3,
10
payments  16:25 17:19
29:12 32:22 33:8

Confidential                                                                                    JAN-MS-05485645

Scott Fishman, M.D.
February 26, 2019

32

154:13 158:12,18
160:2 162:18 260:6,
19 261:9 263:11
**payments/transfers**
249:14
**pays** 47:21,23
**PC** 85:12,18
**PDD1782004399** 224:5
**peer** 82:15 85:6 87:7
**peer-reviewed** 83:11
84:11,25
**peers** 69:13 71:24
96:6 106:25 237:5
**peers'** 78:15 143:8,24
**pending** 185:18 269:1
**Pennsylvania** 269:2
**people** 21:15 23:11
27:18 48:19,21 91:4,
18 103:13 118:19
130:17 139:10,16
144:19 145:7 189:24
200:17 218:23 240:13
243:16 244:15 246:16
276:24 277:1,2,6
278:1,3 291:13,25
292:7,8
**people's** 37:8
**percent** 84:13,17 85:8
190:9
**percentage** 80:2
**Percocet** 244:1
**perfect** 64:25
**perform** 306:25
**period** 16:13 24:12,13
29:15 32:25 33:7
34:5 35:10 58:2
95:10 143:22 166:24
169:11 299:9,14
315:16
**perpetuated** 245:18
246:20
**perpetuating** 130:11
247:6
**person** 28:21 91:20,22
188:13,15 273:22
301:4
**personal** 323:22
**personalities** 241:11
**personality** 241:10
242:5,14,22

**personally** 43:24
129:10,22 291:10
**personnel** 107:10
142:11
**perspective** 51:11
284:18
**perspectives** 277:7
**pertained** 33:25
**peruse** 88:22
**Pfizer** 201:8
**pharma** 7:7 18:3 19:2
33:18 38:12,17 43:9
52:12 135:8 146:17
154:18 155:9 156:16,
24 157:7,10,13,16
158:3 195:15 196:5,8
204:21 230:8 234:11
239:25 249:19 250:20
252:8 258:21 279:22
320:13,17 322:19
**Pharma's** 34:2 154:7
224:25
**pharmaceutical** 16:4,
25 17:19 18:24
19:10,17 20:4,7 22:9
29:12,16,22 32:2,9,
14 33:9 34:9 35:6,
11,23 36:6,9,23 37:1
41:3 47:21 52:17,18
53:10,19 54:23 56:7,
12,18 57:24 58:12,19
61:11,22 68:14 69:3,
10 86:21 98:19
130:15 131:1 133:21
134:22 137:23 138:19
139:25 140:16 141:15
144:23 183:22 201:2
209:11,15 218:4
221:23 226:8,17
228:7 234:3 244:24
255:18 259:14
273:14,23 282:7,12,
14,20 285:10,24
286:10,11,12,18,22
287:3,11,16 288:15
289:17 290:12,18
291:2 292:10,11,15
294:9 302:14,18,22
303:5 304:5,15,22
305:5,11 315:7 325:2
329:9,13,25 330:6
331:15 332:22

**pharmaceuticals** 18:16
135:20 204:21,22
251:14 254:2,6,12
259:12 279:21
**pharmacological** 49:21
**pharmacovigilance**
277:10 283:11,13,15,
20 308:20
**pharmacy** 99:10,15
120:7
**phone** 8:14,15 49:6,7
93:25 141:5 183:8
**phrase** 281:19
**physician** 59:25
70:16,20 71:8 72:10
73:3 91:13 138:16,21
213:10 220:10,23
226:14 238:4 244:23
245:12 251:15 299:10
300:7 303:6 314:25
315:8
**physician's** 84:3
136:9 137:8,25
**physicians** 27:22
46:17 58:17 61:15
70:8,10 73:25 74:23
77:20 79:13,20 80:12
81:11 86:22 87:17
92:12,18,25 95:23
98:12 132:2 140:2
143:8 144:25 237:11,
22 238:16 241:3
242:15 244:12 246:5,
22 284:19 292:24
293:22 306:25
**physicians'** 90:25
148:14
**picture** 238:7
**piece** 241:18 306:3
330:7
**pitch** 219:5
**place** 7:11,18 10:1
63:17 233:23 289:23,
24 298:6
**placement** 188:19
**placements** 190:2
191:11
**places** 306:18
**Plaintiff** 9:14
**Plaintiff's** 24:20
37:14 44:25 48:24
146:5 239:5 270:25

Confidential

JAN-MS-05485646

271:3
**plaintiffs** 7:11
316:12,20
**plan** 49:12 50:1,18
55:7 64:20 94:6,20
99:16 113:14 117:6,
10,16 118:22 119:8,
24 120:21 121:5,13,
16 122:9,23 123:14
124:20 126:10,16,19,
20 128:4,5,11,12,20
129:3,10,22 146:18
215:15 217:22 242:21
**plans** 123:1 125:13
**platform** 226:9
**played** 56:14 208:17
230:1
**playing** 233:1
**plea** 266:1,11,23
267:11,15 268:5,17,
24 271:3,16 272:11
**pled** 240:7,10,14
263:24 265:14
**plenty** 141:7
**point** 9:20 34:4 51:16
61:1 74:17 76:22
77:4 81:18 98:3
104:25 105:9 115:11
116:2,15 117:2 119:8
121:20 122:12,17
142:22 153:5 172:5
212:11 216:2 219:7
229:16 230:21
264:10,21 268:4
**pointing** 95:17
**points** 75:18 81:19,22
95:22 103:21
**policies** 232:18
233:5,6,19 234:19
**policy** 206:22 209:1
210:9,16 229:21
232:17 251:3 277:1
278:3 293:21
**pool** 112:11
**POP** 205:9,23
**Portenoy** 106:6,22
**posed** 12:8
**position** 12:22 13:4
118:18 179:24 180:5
208:4 291:22 314:15
**positioning** 96:25

**positions** 292:8
**positive** 140:7 147:14
**positively** 224:24
**possibly** 127:20
**posters** 101:16 120:10
**potency** 244:6
**potent** 108:20 109:1
243:25 244:16
**potential** 11:2 103:14
152:25 155:7 162:5
185:23 221:22 231:20
276:6 308:24 309:3
**potentially** 10:19
36:8 219:25 238:23
293:1
**pound** 330:9,13
**Power** 205:20,22
**Powerpoint** 68:2,5
69:16,24 71:17
73:19,21 81:9 84:7
88:11,23 94:5,17
102:9 125:14 129:4
142:16 215:12
**Powerpoints** 131:24
149:1
**PPLP** 37:19 232:6
**PPLPC** 142:8
**PR** 121:20
**practice** 42:11 136:4
143:9 292:3 296:3
298:22 302:10,13,15
313:21 314:18,23,25
**practiced** 296:6
**practices** 97:5 143:24
147:9 148:4,15
251:17 252:18
**practicing** 299:10
300:7
**practitioners** 275:24
**precise** 274:8
**precisely** 305:17
**Prefaces** 330:20,24
**prefatory** 36:15
**premise** 55:3
**preparation** 15:24
261:11
**prepared** 24:17
**preparing** 64:8
**prescribe** 59:25 60:14
61:6,9 91:23 139:17
238:6 244:13 301:1,

24 304:4,13 305:17
**prescribed** 62:8 80:13
112:10 300:11,14,17,
20,23
**prescriber** 75:12
311:21,22 313:15
314:14
**prescribers** 74:20
111:14,19 112:9,12
145:14 302:1
**prescribing** 51:21
53:13 54:21 56:5
60:12,20 61:5,15
62:1 70:9,17,20 71:8
72:2,10,16 73:3
74:13,24 75:19
77:11,21 78:15 81:3,
11,21 82:8,10 84:4,
19 86:23 87:17 90:25
91:13 92:25 96:5
97:5 109:18 110:3,20
138:15,17 140:2
143:10,25 144:25
147:9 148:3,14 202:4
204:10 237:14 238:4
247:10 248:16
251:17,24 252:18,23
256:7 258:19 260:21
273:17 283:14 285:5
286:23 292:20 293:6,
11,23 294:2,7 297:6
301:5,17 302:3 304:3
309:19 310:5
**prescription** 50:24
52:20 58:24 302:21
304:21 305:3,10
310:12 311:14,24
312:19
**prescriptions** 75:5
301:21
**present** 7:19 14:16,
19,22 36:24 47:2
73:15 249:17 292:5
**presentation** 142:17
227:20 283:4 290:20,
21 306:22
**presentations** 132:8
280:23 284:8,13
285:11,16 288:6,11,
14 290:3,4 291:21
292:16 328:5,12,13
**presented** 36:6 37:11
73:10,11 289:6

Confidential                                                 JAN-MS-05485647

presenting  60:10
  137:20 276:6
presents  47:24
preserve  12:9
preserves  12:2
preserving  226:15
president  24:6 123:10
  124:18 125:2,11,18
  168:3
president-elect  24:2
presume  243:14
pretty  47:17 81:7,9
  87:16 139:9 153:18
  243:14
previous  66:16 172:10
previously  12:18
  40:19 136:25
price  242:25
primary  67:4 79:19
  85:21,22 86:3 95:23
  107:11 210:21 211:16
  244:23
principle  238:11
principles  142:24
  293:20
print  190:1 202:25
  248:11,14
printed  158:16 332:3
prior  13:12,17 15:11,
  15,18,22 18:20 25:17
  42:4 80:21 143:18
  198:25 262:21
priority  180:23
  191:12,25
problem  54:9 57:15
  62:13 127:10 192:13
problematic  245:11
problems  153:11,22,23
  170:2,5 306:8
procedure  271:13
  313:16
proceeding  9:15
process  94:20 184:20,
  21 231:17 282:3
  313:18
processes  206:17
produce  159:3 201:4
  249:16
produced  37:17 62:22
  70:9 155:15 158:10
  210:6 275:4

producing  57:20
  200:13 259:25
product  92:9 96:17,25
  139:20 213:1 214:8,
  17 216:19 218:13
  220:25 241:19
  242:12,14 302:23
production  9:22 200:6
  247:21,25 248:23
  251:24 252:9,22
  253:3,8 256:6 293:18
products  57:17 72:16
  75:5,13 80:13 93:8
  115:7,9 131:3,9
  133:23 170:22 201:11
  219:1 225:1 292:12
professional  16:3
  18:22 19:8 25:9
  27:8,20 47:14 58:16,
  22 102:16 117:17
  130:21 134:6,8,23
  138:18 143:12 147:4
  230:8 231:18 234:13
  235:19 301:4,15
  304:12 324:13
professionals  28:5
  131:18 135:24
professionals'  147:9
  148:3
professor  12:23 13:9,
  13
proffer  316:19,24
profitability  232:19
  233:7 234:19 235:11
profits  145:18 234:4
  235:24
program  16:11 20:6
  38:20 39:22 40:2
  41:16 44:20 46:1,6,
  22 105:3 140:17,18
  141:16,17 184:2
  214:24 219:19 225:14
  227:4 258:18,21
  288:25 305:4 325:10
programming  52:12
  138:7
programs  17:1,20 28:6
  48:20 51:18,21 52:11
  53:3 55:3 57:3
  58:18,23 61:16 101:7
  121:15 139:4,15
  141:19 143:20 149:12

212:6 218:21,22
  281:3 286:13,17,18,
  21,22 287:2,3,9,11
  288:22
project  176:1,4
  179:15 184:13 189:10
  191:14 202:5,12
  206:6 214:18 215:5
  249:19 250:3 261:11
projects  120:24
  175:19 176:2 179:13
  183:5 185:2 187:20,
  21 198:14 199:11,12,
  14,17 201:25 202:1,2
  229:14 230:19 231:19
  250:20 261:13
promote  180:25 234:18
  244:3 249:16
promoted  243:24
  271:24
promoting  217:12
promotion  86:11 272:2
promotional  241:14
  296:18 320:19 322:2,
  14
promulgated  243:11
pronounce  283:11
propagate  245:12
proper  114:6 123:20
properly  237:22
properties  49:21,22
proponent  291:8
proposal  262:15
proposals  262:14
proposed  194:15 255:8
provide  24:19 31:8
  33:25 38:19 39:21
  45:25 55:23 58:1
  61:12 64:20 73:8
  77:5 199:3,11 204:24
  205:7 269:14 283:4
  316:19
provided  9:23 20:22
  21:2 22:10,15,21
  24:21 34:12 37:23
  39:2 44:21 46:8,23
  160:3 163:17 165:21
  166:13 194:11 206:2,
  10 241:18 247:20,25
  248:22 256:5 261:5
  273:16 276:19 288:6,
  11 290:3,5 297:4,8

Confidential                                                         JAN-MS-05485648

300:17
**provider** 38:19 310:5, 12
**Provider,'** 38:17
**providers** 27:23 51:22 60:13,19
**providing** 44:18 140:2 145:10 173:12
**psychiatry** 25:22,24 26:12 298:19 306:17 307:21 308:1
**pub** 121:4,13
**public** 215:15 221:6 226:4 232:18 233:6, 19 234:18 261:24 266:21 324:7,11 327:19
**public's** 218:22
**publication** 27:5 223:12 287:18 304:15 332:7
**publications** 27:9,21 102:3 105:1 289:5 297:2 332:3,12
**publicly** 28:13
**published** 139:10 273:18 276:12 277:8
**publisher** 201:14,15 204:3,6,10 257:15,16 260:6,8,9 261:10 262:6 263:6,9
**publishing** 121:5 313:10
**pull** 248:6
**pull-through** 225:1
**pulls** 64:1
**purchased** 159:22 254:9 255:14
**Purdue** 7:7 8:3,22 9:7 14:21 18:2 19:1 37:18 38:12,17 39:2, 21,25 58:21 74:22 135:8 142:15 143:17, 21,22 146:2,16 147:19 148:2,7,14 154:6,18 155:2,9,13, 24 156:8,16,24 157:7,10,13,16 158:3 166:15 167:6 168:5,7 169:2,3 172:24 173:3 174:15 177:19 178:19,25 179:1,23

180:8 183:3,6,13 185:1,4 187:18,19 188:12,14,15,16 189:8,10,16 190:5 193:11,14,20,21,22 194:7,11,16,19 195:15,21,24,25 196:5,8,21 197:4,11, 18,21 198:21 199:2 200:1,4,6,7 201:2 202:20 203:14 204:21,24 206:2,25 207:6,20 209:4,14 222:24,25 224:17,25 225:8,18,23 226:13 229:14 232:8,13,19 233:1,7,20 234:17 235:12 239:25 240:2, 7 243:1 245:17 246:21 247:24 248:21 249:18 250:2,19 251:1 252:8,16 253:24 262:15 263:24 264:3,8,12,22 265:9 272:15,22 273:24 275:4,13 276:2,4
**Purdue's** 48:11 142:24 145:13 147:12 180:12 190:2 194:25 195:10 208:14 226:20 235:9 246:16 264:25 265:10
**purpose** 90:22 142:22 179:2 180:10 186:17, 18,22 215:4 225:5 234:6 237:15
**purposes** 327:21
**pursuant** 194:11
**push** 58:5
**put** 41:4,16 63:8 64:10 136:19 176:3 181:17 184:13 200:25 203:7 223:16 257:17 258:16,17 267:15,19 315:9,15,17 326:3 333:21
**putting** 40:17,23,25 262:11 314:14 324:15
**pyramid** 94:24 95:10, 11

**Q**

**quality** 100:6,14
**question** 12:8 20:2 35:3,9,14,17 36:17 53:8,12 54:11,12,17, 22 55:10,15,17,18,21 56:3,6,9,11,13 82:6 98:2 103:24 128:3 129:20 133:7,19 138:25 139:22 141:12 145:4 146:11 154:23, 25 155:4,17,23 158:2 159:12 175:8 185:16, 19,22 196:3 208:22 250:12 303:11 317:14 329:9
**question's** 55:14
**questioning** 269:20
**questionnaire** 73:25
**questions** 11:20 42:24 53:25 54:1,3,14 55:12 80:7 140:23 184:14 293:10 297:11
**quick** 185:15 228:13
**quote** 107:9 276:11

**R**

**radio** 190:1
**raise** 218:24 258:3
**raised** 40:14 276:5
**Raises** 193:2
**Raising** 114:6 123:20
**range** 261:15
**ranked** 74:23 75:11 80:12
**rankings** 67:8
**RAO** 116:3
**rapid** 108:19 115:17 116:9
**rapid-acting** 124:2
**rapidly** 227:17
**rarely** 292:3
**rate** 86:9 87:7
**rated** 77:18 84:12,18
**rating** 77:10 78:13 89:14,19 90:3
**rational** 179:17

Confidential                                                                JAN-MS-05485649

SCOTT Fishman, M.D
February 26, 2019                                        36

rationale 224:12,16
reach 147:5,20 170:18
reached 170:18 189:24
  190:9,20 191:1
  316:12
read 35:14,15 43:18
  51:16 77:9 133:4,5
  143:6 146:7 147:6
  171:11 183:8,11
  199:7,15 205:25
  225:3,20 227:15
  229:21 232:16
  239:12,16,17 240:20
  241:12,24 250:7
  271:11,16 272:6
  276:7 292:21 309:20
reading 42:23 56:20
  221:25 268:2
reads 196:8
realize 150:8 261:23
realizes 86:13
realm 78:9
reask 159:11 208:22
  308:13
reason 25:14 36:22
  52:7 63:23 96:4
  186:1 248:24 277:17
  311:1
reasons 36:1 184:15
Rebecca 188:4,6,17
  229:8
recall 16:20 30:2,10
  35:20 41:6 44:17
  108:11 113:15 115:2,
  12,24 128:2 151:15
  164:20 169:25 179:22
  182:23 186:17,19
  188:12 190:5 200:12,
  15,19,22 201:1,22
  213:13 214:4 219:4
  222:21 223:11 251:11
  258:6 264:2 272:12
  273:5 274:7,16,19,20
  278:15,20,21 279:6,8
  286:9 295:12 313:19
  315:13 320:11,14,15,
  23 321:10,14,19,23,
  24 322:9,22 323:6
  324:5 327:4
receive 34:9 41:2,17
  259:20 260:5 264:7

received 16:19,25
  17:19 19:16 20:3,9
  26:16 29:5 58:18
  151:4 152:2,10
  154:17 162:13 167:7
  174:11,23 249:14
  259:23 260:20 262:6
  263:15,20 264:3
  304:14 321:3,6
  322:11
receiving 33:8 36:24
  53:15 174:14 178:19
  228:5 313:17 320:15
  321:11,16 327:3
recent 275:16
recently 202:5
recess 65:4 112:22
  169:21 186:10 228:19
  270:10
recited 276:10
recognition 114:6
  123:20
recognize 61:23 178:2
  182:11 197:10,19
  222:19 240:3,4
recognized 184:12
recollection 30:5,6
  255:18 256:8
recommend 198:18
recommendations
  180:22 181:23,24
record 7:5,19,20 9:5
  10:15 11:5,9,17
  12:19 17:9 35:15
  36:19 37:24 54:1
  55:24 63:14 64:16,
  19,22 65:1,2,6
  112:21,24 127:15
  133:5 141:2 155:19
  169:20,22 186:9,12
  208:3 228:17,20
  248:5 260:12,13,14,
  15,19 266:18 268:15,
  21 269:25 270:3,5,6,
  7,8,22 275:20
  276:11,15 278:6
  279:12,13,14 333:21
  334:9
recorded 7:5
recording 7:17
recruit 102:24 103:5,
  6,10,15

recruited 74:12
recruiting 102:24
Reed 8:12,19 10:9
Rees 8:12,19
Reese 8:10
reference 219:23
  266:9 295:20 309:11
referenced 325:3
references 158:18
referrals 225:22
referred 280:4 287:23
referring 66:18,21
  143:18 159:9 185:5
  198:5 205:15 282:6
  293:5 313:3,25
  333:21
reflect 36:10 37:2
  54:1 328:14,17,20
  329:5 331:11
reflected 56:19 84:6
  290:5,11 311:12
reflects 294:17
  298:12
refresh 204:23
refreshes 255:17
Regents 43:15
region 80:3
regional 70:15 76:23
  89:5 104:4,16 109:17
  121:25 122:10
  175:19,20 205:9,20,
  24
regional-level 121:24
  122:7
regions 79:13 88:6,7
regulatory 83:23
  223:17
relate 19:17 20:4
related 14:5,15
  160:3,9 161:1,14
  176:8 177:11,17
  182:22 212:25 255:8
  299:15
relates 9:12,21,22,24
  178:6 200:4 258:15
Relations 215:16
relationship 107:9,21
  151:17 166:6 220:12,
  13,15 221:20 227:7,
  25 250:18

Confidential                                                              JAN-MS-05485650

relationships  77:7
  107:6,8 109:7 114:2
  119:9 123:16 147:1,
  12,14 155:8 162:6
  220:11
relative  70:16 82:10
  91:12
relaunch  242:18
release  49:24 215:13
  244:19,20
relevance  317:22
Relevant  332:3
relief  13:2 217:10
rely  302:22 303:4
  306:3,4
remain  204:15 316:6
remained  73:5
remaining  257:10
remember  179:15
  183:15 184:15
  187:12,13 189:14
  201:6 217:4 256:22
  258:22 259:24 262:2
  263:1 274:7 279:3
  289:13 290:12 297:8
remembered  278:24
removed  316:8,10
REMS  255:9 258:15,18,
  20,24
reopening  10:19
rep  76:12 107:10
repeat  20:2
rephrase  158:2
report  166:9,14
  181:12,20,25 182:2
  188:18,23 189:6,17
  191:1 193:20 195:24
  196:4 275:5,11,13,17
  276:10
reported  183:3
reporter  8:15,24
  13:22 17:5,7,12,15
  53:23 120:12 265:22
  270:11,16
reporting  189:16
represent  14:2 15:2
  24:20 154:6 155:12
  158:9,15 162:11
  198:20 240:15 265:25
  275:3 279:19

representation  45:21
  271:9
representations  10:4
representative  83:3
  86:10 132:25 133:1,
  11 302:23 303:5,12,
  19 304:22
representatives  32:10
  92:19 133:14 141:18
  302:14,18
represented  14:9 15:8
  58:9 64:4 127:18,21
  206:7,9,13 250:2
  274:10 286:11
representing  8:3
  156:13
reproduced  327:17
reps  132:1 241:19
Reputation  146:17
request  41:15 82:24
  154:10 158:11 162:21
requested  159:4
  262:13
requests  225:23
require  199:12
required  34:11 35:11
  288:3
requires  145:9 285:1
requiring  35:6
RES  67:5
research  51:6 67:5,6
  186:17
researcher  184:9
  186:22
reservation  35:25
residency  26:14 101:7
  308:1
resident  307:16,17,21
resistance  241:23
resolve  17:11
respect  23:10 178:18
  179:24 221:19 237:22
  280:12 281:7 283:9,
  18 289:4 290:2,19
  294:6,25 295:20
  301:6,7,21 302:10,12
  304:3 307:5 310:24
  314:17 317:8 319:20,
  24 324:4 327:7
  328:11 329:4,22
  332:12

respectable  139:13
respond  225:23 310:2
Respondent  76:22
  81:19,23 82:1
Respondent's  77:10
Respondents  75:17
  79:18 84:13,18 85:8
  88:7
responding  35:4
responds  178:25
response  55:24 81:24
  86:11 154:7,9 155:13
  158:11 159:1 162:12,
  21 165:14 249:8
  250:1,16
responses  249:14
responsibilities
  145:6
responsibility  50:12
  136:15 145:9 301:11
responsible  144:19
  202:3 204:10 247:9
  248:16 251:24 252:22
  256:7 258:18 260:20
  273:16 283:14 285:5
  286:23 292:20 293:6,
  11 294:2,6 297:5
  301:5
responsibly  61:1
rest  250:7
result  238:22 241:4
resulting  67:7
results  81:25 87:13,
  23 88:24 89:5 134:3
resume  24:17,21 25:8
  332:14
review  38:23 39:8
  45:5 46:16 49:3,9
  50:1 67:6 146:12
  274:4 275:21 276:11
reviewed  38:7 198:18
  223:16 277:5 278:3
reviewing  172:6 184:7
revision  251:2
revisit  9:10 12:12
revisiting  11:25
ridiculous  159:4
right-hand  328:3
risk  60:22 120:7
  238:5,15,23 284:2,8
  291:18 309:3,7

Confidential                                                                  JAN-MS-05485651

324:13 325:3
**risks** 60:23 226:2
237:13,24 238:3
283:17,25 284:13,20
285:1 286:19 287:4,
12 291:12,23 292:25
308:24 310:13 311:6,
11 314:5,19 325:22
326:1
**risky** 238:17
**road** 303:17
**Robin** 224:6,9 257:21,
24
**Robinson** 8:11 9:4
10:6,25 11:9,22
12:4,15 16:6,15
17:24 19:11,22 23:4
27:11,25 28:9 29:7,
18 30:1 31:4,13 32:5
33:3 34:13,15 35:13
36:14,20 37:5,22
38:3 41:19 42:14
47:3,11 48:1 49:6
51:1,23 52:4,21
53:6,20 54:24 55:19
57:12 59:1 60:4,15
61:17 63:2,7,24
65:15 69:4 70:22
71:9,11 72:3,20 74:6
75:8 78:4,18 80:7
81:14 85:5 86:18
88:15 89:23 90:6
91:2 92:15 93:2,12,
24 97:17,25 98:16
100:23 101:4,9
102:20 104:20 107:1,
15,24 110:9 111:23
113:5 115:20 117:23
119:6 125:16 126:14,
22 128:9,22 129:14
130:2,7 132:10
133:3,24 134:11
135:3 136:5,13
137:11 138:24 141:22
144:1,8 145:1,19,22
147:23 148:8,16
149:13,22 150:16
151:10 152:4,6 153:6
155:18 156:2,11,19
157:3,21,23 158:22
159:18 160:12,17
161:7,16 163:10,19
164:5,7 165:18

166:19 167:2,11
168:10 169:5,13,18
170:6,12 171:5,11
172:3 174:24 176:23
177:14 179:9 180:2,
15 181:7,14 183:10
185:15,20 186:6,13,
24 187:7 189:12,19
191:3,17 193:16
194:12,21 195:2,12,
16 197:7 198:11
203:9 205:1,11,15,18
207:4 209:17 211:11
212:20 215:7 216:8
219:10 221:2 222:4
224:1 226:19 227:9
228:10,16 229:3,10
233:8,10,14 234:8,
22,24 235:15 236:3,
9,19 238:10,18
239:6,10,18,20 243:7
244:8 246:24 248:4
252:3,11,25 256:1
257:5 260:24 262:18
264:5,17 266:19
267:5,7,13,17,25
268:4,20,23 269:22
270:14 273:2,20
275:8 278:18 279:9
304:25 308:10,16
316:21 317:14 327:12
333:3,9,14,18,23
334:4
**role** 72:7,9,15 125:17
126:1,8 145:11 220:6
223:14 229:18 230:2
246:11 262:10 263:5
278:5 306:19 321:9
**roles** 34:4 50:12
53:14 54:22 56:6,14
118:21 230:25
**roll** 258:24
**rolled** 195:19
**Rollin** 202:17
**room** 14:10 58:8 131:8
**roots** 214:15 243:20
**Rosen** 197:14,23,24,25
198:10,14 231:11,13
232:7
**roughly** 25:11 163:14
**round** 32:12
**rounds** 99:23

**row** 192:17 249:22
**Rowe** 172:12 173:11,25
174:9 178:25
**rows** 192:22
**rule** 271:12 288:23
**rules** 34:1 64:21
**run** 40:8 44:13 118:19
292:9,11
**running** 139:11
**Rushing** 193:6,8
**Ryan** 8:17

**S**

**Sacramento** 7:1,12
**sad** 52:6
**safe** 73:12 251:16
252:18
**safely** 61:24 292:13
305:17
**safety** 226:5 277:12
**sales** 67:6,18 76:12
83:3 86:9 92:19
107:10 132:1,25
133:1,11 136:2
137:19 141:17 145:18
235:11,12 263:11,21
**sample** 79:12
**sampled** 79:12
**San** 7:16
**sand** 330:9,13
**Santa** 190:22
**sat** 227:15
**Saturday** 39:16,17
**scale** 75:20 77:11,19
80:17,23
**school** 299:8,22
307:12,25 311:23
312:9,12
**science** 107:10
**Sciences** 201:16 204:4
263:10
**scientific** 136:16
142:10 174:6
**Scope** 192:13
**scores** 106:17
**Scott** 7:6,22 8:10 9:1
12:21 39:12 87:25
119:17 223:9 275:19

Confidential JAN-MS-05485652

SCOTT Fishman, M.D
February 26, 2019
39

script  54:7
scroll  328:8
Seattle  182:22 184:5
second-to-last  249:22
secondary  107:11
section  205:18 272:3
  328:4
Sections  210:16
secured  191:11 192:10
Security  166:3
seek  11:13 42:4,5
  232:23 256:20
seeking  23:10 40:10,
  24 174:14 191:20
  256:24
seemingly  220:24
segment  117:11
segmentation  94:18
  103:19 104:3
segmented  103:21
  104:2
select  111:4 248:13
self-evident  309:25
  310:4
sell  52:12 56:12,15
  57:17 58:6 93:8
  133:22 241:19 246:22
selling  51:12,17 57:3
seminars  134:9
Senate  151:16 152:17
  153:15 154:7 155:7
  156:8 162:4,12,21
  165:14,15 166:2,14
  168:20 191:24 249:8
  250:1,17
Senate's  155:14
senators  191:10,16,21
send  132:1
sending  141:17 228:7
  278:11
sense  61:5 87:2
  139:24 140:11,15,25
  141:14,24 159:12
  274:12 293:24 300:4
  308:21
sentence  66:21 70:12
  189:23 190:20 271:12
Sentencing  268:25
separate  18:13
separated  288:24

serve  38:15 118:21
  313:17
served  9:7 21:20
service  9:23 204:21
  217:12 324:8,11
  327:20
services  165:21
set  33:19 184:1 241:9
  296:14
settings  198:15
settle  317:9
settled  317:2
settlement  147:11
  316:11,18
severe  153:22,23
SFC  196:19
shakes  265:21
shape  96:22
share  25:6 71:5
shared  179:24
sharing  289:20
sheet  247:17
shell  226:21
shift  292:7
shifted  34:6
short  319:10
short-acting  300:18
shortfall  172:6
show  42:17 62:16
  86:12 87:13 93:15
  153:25 187:25 210:2
  222:15 223:23 226:13
  232:2 274:24 296:22
  297:1
showed  56:24 139:3
  277:25 322:23
showing  44:24 48:23
  71:14,18 87:14
  126:16 142:2 146:4
  170:24 177:23 182:7
  239:4 257:1
shown  96:4 139:1
  149:1
shows  75:17 80:1
  87:19 105:19 249:13
  253:13
sic  188:5 223:3 239:5
side  60:21 66:19
sidebar  54:16

sides  60:25 65:15
sidetrack  127:20
sight  291:17
sign  327:17
signed  324:9
significant  136:19
  153:11 206:21 208:25
signifying  97:9
silly  329:8
similar  166:4 199:3
simply  53:13 54:20
  56:4 196:3
simulators  194:5
single  142:23 328:13
sir  45:18 269:10
sit  141:8 305:10
sitting  14:10 140:23
  256:14 282:19
  321:13,22 323:5
  328:11
situation  30:8 33:19
  39:20,25 41:14 43:20
  44:10 182:21 302:24
skeptical  98:3
slide  35:11 36:5,16
  51:4 84:9 87:22 95:5
  102:23 103:4,18
  107:5 108:2 117:5
  121:24 122:9
slide's  119:12
slides  34:3,11,19
  35:7 36:7,23,25
  81:25
slightly  87:8
slotted  241:22
small  111:13,19 112:9
  261:12 263:14
smaller  202:9
smart  179:20
Snyder  8:17
societies  117:18
  134:8,23
society  20:14,17,23
  21:3,8 105:2 114:2
  120:10 123:15 150:21
  156:25 161:15 164:4
  169:4,11 211:17,20
  265:7 321:8
Society's  116:16
  117:3 124:13

Confidential

JAN-MS-05485653

SCOTT Fishman, M.D
February 26, 2019
40

society-specific
 123:1,14 124:20
 128:5
sold 75:5 242:12
 263:10
solely 60:1 306:5
solemn 306:19
solicit 258:7
solid 139:9
somebody's 128:11
sort 300:4 301:3
 309:13
sorts 17:21
sought 28:20 29:1
 40:6 170:5,10
sound 24:15 195:22
 329:8
sounds 48:16 194:6
 245:25
source 206:14 228:6
sources 67:4,17 306:5
 327:15
Southern 46:16 306:15
space 279:25 280:13
 283:3,10,19,23,24
speak 10:23 16:4
 17:1,12,14,20 19:13
 20:4 28:13 30:22
 31:11,18 33:23 36:25
 52:19 54:4 73:1
 111:5 138:9 183:8
 221:12 234:10
speaker 28:5 36:24
 47:24 48:12,15
 51:18,21 52:11 57:3
 58:23 59:24 138:16
 140:18 213:10 288:23
speaker's 141:17
speakers 31:17 34:3
 48:19 58:22 59:6
 74:19 122:18 289:19
speakers' 16:11 32:20
 48:8 143:20
speaking 17:1 19:14,
 18 20:5,10 27:20
 29:17 32:3 47:13
 48:22 52:16 53:3
 58:18 60:8 71:23
 72:1,11,24 127:2,7,
 9,17,23 149:12
 154:25 159:6 199:18

217:15
speaks 163:3,22
special 220:13
specialist 28:21
 95:17
specialties 85:16
 86:1,9 87:7 104:10
specialty 79:19 82:1
specific 61:9 77:6,8,
 9 82:7,24 129:10,22
 130:16 132:20 137:1
 141:18 214:25 219:24
 274:17 309:23
specifically 41:20
 58:20 178:3 215:3
 219:13 221:20 238:16
 241:16 323:6
speculation 56:22
 59:2 61:19 79:7
 97:19 99:20 107:14
 110:8,25 112:14
 114:15 116:12 122:3
 124:24 126:23
 129:17,25 138:3,23
 140:9 161:5,19
speech 287:18
speeches 61:14
spell 10:18
spend 26:17 86:21
 137:23 139:25 140:17
 141:16
spent 199:6 237:20
sphere 73:11
spinal 194:4
spinoff 224:13,17
spoke 31:25 46:22
 77:8 132:9 182:19
 285:24 286:10
spoken 15:11,14,19,23
 16:10,20,21 18:13,19
spokesperson 213:9
sponsor 203:14 292:16
sponsored 72:25
 200:3,7 248:18 260:1
 273:15 285:11 287:2
 288:15 292:19
sponsors 193:11
 255:19
sponsorship 204:25
spread 199:13,17
 202:21 209:5

spreadsheet 66:15,24
 67:16 68:4 157:7
 158:16 160:21,23
 161:23
staff 118:18 184:21
 185:8 187:3,15
 275:16
stage 242:13 263:18
stages 201:8
staging 262:9
stakeholder's 232:25
stamp 68:4
stamped 196:19 210:7
 232:6
stamps 224:5
stand 171:6 227:16
 291:15
standard 302:7 303:4
 306:24 307:6 309:11
standing 270:13,14,18
stapled 239:9,10
start 112:23 138:16
 145:15 186:11 239:18
 270:21
started 167:18,23
 184:14 289:15 299:23
 307:9 313:20 314:3
 334:6
starting 230:5,6
starts 66:22 172:11
 196:24 249:12
state 7:6,9,23 8:1,16
 9:14,16 10:8,9,10
 11:4 12:19 14:2
 15:2,15 24:22 54:3
 141:2 155:15 175:12,
 13,16,20,22,25
 176:19,20 177:12
 179:15 205:9,24
 248:13,19 257:25
 258:17 275:4,25
 285:23 288:3 293:18
 296:1,14,22,25
 297:19,23 298:2
 322:22
State's 65:12
stated 54:19 56:3
 94:9 156:3 161:10,22
 327:18
statement 36:15 185:3
 275:18 304:5 327:16

Confidential
JAN-MS-05485654

statements 297:17,22
 298:1 320:20 322:3,
 15 323:15,23 324:2,5
states 37:20 38:15
 76:22 77:4 84:9
 87:20 88:18 94:4,5
 96:3 98:23 104:25
 122:12 147:3 154:9
 162:20 168:11 194:25
 199:2 208:24 224:23
 229:18 230:1 241:20
 242:17 250:19 251:14
 253:3 258:2 266:22
 268:25 271:4,23
 275:24
stating 202:20 209:5
statistical 86:11
statistics 77:5
status 83:19 142:11
 171:25 172:22 173:8
statute 181:11
stays 63:3,9
Stephen 65:19,22
 66:11 201:23,24
 203:11
stepped 54:12
Steve 8:9
stimulate 53:13 54:20
 56:4
stop 127:2,4,23
 146:13 333:1,7
stopped 33:17 34:4,24
 41:24,25 52:11
 133:12 260:9 262:2
 296:13
strategic 50:3 146:18
strategies 107:7
 139:4
strategy 94:19 108:3
 109:6 262:12
Street 7:12,15
strike 73:18 107:19
 125:10 133:6 168:6
 206:12 208:14,18
 218:5 250:11 262:13
 283:23 287:23 295:7,
 18 297:17 298:24
 302:11 311:21 323:21
 331:8
strings 178:21 179:6,
 11

strive 37:6
strong 182:23 243:4
stronger 236:21
 242:15 243:5
struggling 23:7
students 308:14,24
 309:3,19,23 311:20
 312:17 315:21
studies 83:11 85:12
 86:3 139:11
study 87:13,23 88:25
 90:18,22
stuff 63:4
Subcommittee 191:25
subject 9:10 10:21
 11:5 43:8 45:14
 106:23 151:21 152:1
 188:24 224:12 257:18
submitted 189:8
 195:15 196:4
subpoena 9:6,22
subpoenaed 9:13
Subsection 271:21
subsequent 199:9
subspecialty 26:3
 306:16
substance 59:25
 278:16
substances 59:20
 144:24 250:4
substantial 152:3,11
substantive 274:18
 276:22 278:16
success 96:16 113:21
 114:1 116:20 123:13
 124:21 125:3 126:3
 193:14
successful 242:2
 292:12
sued 317:17
sufferers 226:1
suffering 217:20
suggested 202:24
suggesting 71:20
suggestions 274:18
suite 7:12,16 118:19
suites 120:11
summaries 67:9,15
summary 25:8 81:18,23
 154:12 162:18 191:24

 194:25 195:10
summit 202:6,7
supervisor 275:17,20
support 7:15 32:14
 38:19 40:15 42:1,6
 44:22,23 50:2 135:6
 140:12,13 147:4,19
 177:12 195:5 198:19
 199:12 202:19 204:15
 213:21 217:23 221:8
 222:12 230:19 232:24
 251:15,23 252:9,17
 254:7,13,16 255:19
 256:6 276:4
supported 181:16
 194:2 230:22 273:16
 276:1 286:12,17,21
 287:10
supporter 230:10
supporters 109:21
 138:10 209:25
 247:18,20,24 258:25
supporting 90:12
 176:11 183:23 207:1
 218:11,13 219:20
 220:25
supportive 218:25
supports 236:24
suppose 21:15 27:13
 141:23
supposed 30:23 230:17
 277:9
supposedly 121:9
 122:3
surprise 52:2,6 57:8,
 10 58:4,13 71:13
 86:16 93:7 98:2
 110:12 111:2,4,7
 144:12,13 195:20
 216:5
surprised 70:18,24
 71:2 78:6 97:23 98:4
 110:14,17 308:7
 321:5,20
surprises 216:9
surprising 234:25
Surrounding 46:17
survey 73:25 314:9
surveys 96:3 250:24
survive 308:5
survived 308:4

Confidential                                                    JAN-MS-05485655

suspect  150:18 175:17
 187:18 219:3 221:13
suspecting  195:3
swear  8:25 13:20
sworn  9:2
symbolic  30:18,24
 31:15
symposia  60:9 120:10
 134:9,24
symposiums  17:2,21
symptoms  192:14
syndromes  241:6
system  38:21 99:15
 108:19 306:14
systems  319:19

              T

tab  158:15
table  66:19 80:1
 156:6 161:10 309:20
tactical  50:13
tactics  50:2 107:7
tail  47:6
takes  31:19
taking  7:11,17 63:17
 264:13 298:5
talk  34:10 35:12
 140:25 198:13 212:12
 213:5,19 214:7,12
 216:3 217:8,10,18,19
 218:6 221:13 222:9,
 11 239:15 247:13
 283:5 325:13
talked  22:1 28:6 29:4
 68:15 114:18 136:24
 137:19 143:18 237:4
 247:8 279:24 325:3
talking  32:24,25
 59:19 115:2 174:3
 200:17 205:19 220:10
 221:5 224:15 227:22
 228:23 254:24 260:19
 287:10 332:5 333:11,
 17
talks  34:12 73:21
 87:22 102:23 108:2
 110:4 113:20 172:5
 173:2 212:6 290:13
tamper  242:14

tapentadol  215:13
target  70:7 92:11,13,
 24 104:15 109:9,19
 129:10,22 191:6,10,
 11,20 192:9
targeted  112:9,16
 193:13 206:20 208:23
 244:24
targeting  191:14,20
targets  92:19 235:11
task  232:23
taught  53:10 244:15
 299:2,5 307:6 309:18
teach  237:12 298:25
teacher  278:11
teaching  16:19 40:24
 61:25 100:20 289:19
 298:24 305:18 307:5,
 9 308:3,8,13 309:10,
 12,13 310:20 328:4
teachings  282:1
technically  307:24
technologies  303:22
 304:1
television  190:1
telling  91:23 121:8
 139:16,17
tendency  209:23
term  20:20 23:6 68:16
 116:3,9 124:2 212:17
 242:8
terms  184:20 200:13
 227:18 230:15
testified  9:3 29:4
 48:7 130:24 150:20
 151:3 159:21 168:18
 248:21
testifying  187:5
 220:3
testimony  34:16 36:13
 47:5 143:13,18
 274:15 286:3
Teva  8:5 14:5,18
 18:15,18,19 45:3
 74:23 94:4 135:20
 158:10,19,24 159:10,
 15,22 160:3,9 161:1,
 13 173:20 174:15
 178:20 179:23 209:15
 279:21 323:12,15
 324:9 325:1,2 326:6

text  158:17 275:18
theme  241:14
therapeutics  99:10
thing  10:7 40:21
 246:15 288:22 309:23
things  33:24 64:9
 73:11 90:11 96:15
 103:13 134:25 136:3
 137:19 138:17 140:12
 176:14 178:4 183:21
 193:10 217:18 221:4
 226:21 227:22 230:19
 278:25 290:14 291:20
thinking  79:9 207:20
 209:9 279:3
third-party  134:24
 137:21 151:18 155:9
 158:12 162:6 166:5,7
 250:19 321:15
thought  55:3 70:10
 73:9,10 150:10
 159:22 160:6 222:25
 261:25 276:15,17
 277:17 282:2 293:19
 333:24
thoughtfully  139:18
thoughts  286:15
 294:14 329:17
thousand  253:13,19,24
 254:3
thousands  300:10
threatening  242:5
three-year  20:20
tied  31:19 40:18
 90:11
tier  109:16
ties  231:5
Tiller  197:2,4 198:17
 199:10
time  7:13 9:20 11:8
 13:6 16:13 17:10
 21:4 22:16 29:14,15
 30:9,23,25 31:11,19
 33:7,13 35:10 58:18
 59:8 63:21 64:1 65:6
 72:6,19 78:17 123:11
 124:19 125:4,12
 141:7 142:6 143:22
 146:15 148:7 152:8
 153:9,17 163:8
 166:24 168:19
 169:11,18,23 171:11

Confidential   JAN-MS-05485656

175:23 178:4 184:8,
12 200:14 208:10
213:17 217:5 223:19
228:18 230:6 242:20
251:8,10 257:8
260:16 261:22 262:1
264:12 274:6 279:15
286:9 299:9,14 300:4
303:6 307:18,20
315:16 324:9 333:18
**times** 16:5 28:18 31:6
32:1,16 41:10,12,14
42:3 108:25 130:25
230:18 243:5 290:9
291:6 303:14 318:24
**timing** 9:25 33:14
50:12 153:15
**tips** 102:24
**title** 48:15 94:5 95:5
96:10 128:19 210:8
269:2 283:13
**titled** 49:11 69:16,22
70:1 96:2 104:22
111:9 142:22 146:16
267:23,25 268:23
277:10
**titles** 13:7
**Titus** 45:8
**today** 13:25 14:16,19,
22 15:9,18,22,25
25:17 44:15 80:11,
21,25 130:25 131:23
138:13,18 139:2
141:9 149:1 182:20
225:2 227:16 237:4
247:8 270:12 272:10
279:24 280:10 281:20
282:19 285:11
289:21,24 301:1
303:14 321:13,22
322:23 323:5,7
328:11 334:5
**today's** 11:21
**told** 72:9,15 80:11
146:2 156:8 214:2,23
216:12 219:18 333:23
**tolerable** 150:10
**Tom** 192:3
**tomorrow** 333:15 334:2
**tool** 291:16
**tools** 212:3 303:25

**top** 38:9 67:16 74:13
89:7 95:11 108:11
109:16 154:9 162:17
192:12 196:23,24
210:12 225:8
**topic** 159:1 289:1
**topics** 28:22 292:17
294:5
**topline** 224:25
**total** 73:11 88:18
157:19 165:13 167:5
173:5 188:19 190:8,
13,16 235:12 255:2
333:14
**totaling** 172:25
**totally** 10:4 141:2,3
**touched** 283:19
**town** 31:18
**train** 175:21
**trained** 205:10,24
301:4,14 304:12
306:13,15 308:23
309:2,6 311:22
312:17 315:21
**training** 26:15 105:3
306:2,9,11,16,17
307:19 309:10 311:19
312:8,11 313:23
**trainings** 25:23
307:15
**transactions** 33:16
**transcript** 208:4
270:15
**transcripts** 270:12
**transmitted** 327:15
**transmucosal** 108:18
**transparent** 236:12
**travel** 30:25 31:1,6,7
**treat** 25:20 57:20,21
217:20 241:8 299:10,
12 306:21
**treated** 25:17 296:9,
12 299:15 300:6,10
**treating** 71:25 98:14
**treatment** 26:18 60:10
98:14 114:11 116:10
123:21 124:4 190:1
237:14,15,23 250:5
**treatment's** 60:24
291:24

**treatments** 62:3
284:25
**trial** 103:5,12,14,16
207:19,23 208:5
**trials** 102:5,10,17,24
105:1
**trick** 35:3 38:4
208:13,21 249:7
251:22 316:7
**tricky** 53:7
**trigger** 51:18,21
52:19 57:3 58:24
**trouble** 78:2 130:5
144:6
**troubles** 130:14
**true** 29:11 87:17
150:18 153:3 155:2
161:12 162:24 164:2
168:7 169:2 174:22
182:5 209:6 282:24
301:7,9 307:3 319:2
**trust** 156:13 204:21
**truth** 13:25
**Tuesday** 7:2
**Tulsa** 190:21,25
191:15 192:2,5,19,24
**turn** 38:9 39:5 43:1
45:23 49:25 50:17,22
51:4 67:14 68:2
69:15 77:3 79:11
81:17 84:9 85:10
87:22 88:4,11 89:4
91:8 94:16,23 96:2,
10 98:22 102:9
105:19 107:5 108:2
111:9 113:20 119:12,
23 122:25 129:2
142:21 143:2 146:23
160:25 161:12 164:22
166:12 189:1 191:23
192:12 204:12 212:2
215:24 223:8 225:16
249:11,12,13 251:13
267:4 269:10,17
271:11 328:25 332:2
**Twenty-eight** 257:3
**Twenty-five** 239:6,7
**Twenty-three** 224:4
**two-day** 270:16,19
**two-minute** 325:16
**TX** 114:7 116:3

Confidential

JAN-MS-05485657

SCOTT FISHMAN, M.D
February 26, 2019
44

tying  194:6
type  244:11 280:4
  302:24 307:6
types  64:5 281:2
  318:14 320:1
typical  47:1
typically  20:10 80:17

---

**U**

U.S.  7:14 151:16
  156:8 162:4 165:15
  166:2,13 168:19
  250:1,16
UC  12:25 13:5 39:2,8,
  21 41:2
Uh-huh  27:3 38:11
  39:8,19 106:13
  172:23 178:12 189:7
  190:4,15 191:8
  193:4,7 199:20
  223:4,7,10 249:22
  252:20 253:10,18,22
  256:19 257:20
ultimate  224:23
ultimately  139:19
  150:2 314:21,22
unbeknownst  234:18
  324:16
unbranded  212:6,18,24
  213:20 216:19 218:12
  219:7,24
uncertainly  242:1
uncomfortable  33:16
  35:5 36:7,22 57:22
  90:10,15 216:17,23,
  24
underneath  86:8
  154:12
understand  10:11
  13:24 14:2,8,14,18,
  24 20:21 22:8 23:7
  27:7 53:24 64:7 65:8
  68:16,18 70:15 90:9
  91:12 109:8,18
  110:20 111:3 113:2,5
  116:8 130:24 132:6,
  14 133:20 134:21
  135:5,23 137:6 138:8
  148:21 155:6 159:15
  178:15 183:5 185:3
  213:19 218:23

243:13,20 244:13
  269:8 291:23 294:4
  295:6,18,25 297:18
  310:6,13
understanding  9:16
  61:10 68:21 72:1
  74:22 102:15 136:20
  213:25 231:9 245:13
  282:2 284:24 311:10,
  11 322:8
understood  64:3,4,12
  134:15 246:4
unimportant  86:10
unique  44:9,10 188:19
  244:19
United  266:22 268:25
  271:4
universities  40:9
university  13:9,14
  29:23 30:7,10,21
  31:17 38:16,21 40:1,
  20 41:15 43:15,23
  44:12,19 45:24 46:9,
  23 184:10 299:7
university's  44:11
unlearned  309:8
unmanaged  192:13
unprofessional  60:6
unsafe  303:25
unscientific  242:7
unusual  44:1
update  38:23 39:9
  142:11 171:24 172:21
  173:13,25 174:10
  191:6 249:19 250:3,
  21
updated  146:20
  193:12,14
urgent  178:5
USA  279:21 323:12,15
usage  242:23
USC  272:3
utilize  232:17 234:17
  235:23 315:21
utilized  132:15 233:5
  314:18

---

**V**

vague  34:14 37:3
  52:22 59:3 102:19

131:10 132:4 136:12
  137:3 218:18
vaguely  182:12 188:12
  315:13
Valenoti  8:24
validate  117:11
validation  94:19
  104:23 105:21 106:23
valued  124:8
Vargas  178:11,13
  182:14
variables  105:1
  106:12,23
varied  300:8
variety  317:20,24
  318:6
Vegas  46:18
version  268:18
versions  274:1
versus  7:7 107:10,11
  266:23 271:5
veterans  202:22
  204:20
vice  12:23 21:23
  22:22
video  7:5,10,17
  324:20 325:2 326:19
  327:11
view  91:4 130:12
  241:2 332:21
viewed  28:4,10,11
  48:19 97:15 144:7
views  281:13,15
  291:13 294:6,8,15,
  18,22 329:17
vigilance  277:11
violated  272:3
Virginia  46:17
visibility  146:17
  199:14
visit  11:7 92:19
visits  100:3
voice  277:15
volume  111:20
volunteers  118:20
vouchers  82:20
VP  232:7

Confidential

JAN-MS-05485658

Scott Fishman, M.D
February 26, 2019                                                           45

---

## W

**wait**  53:23 55:13
  77:25 267:5 289:9
  317:14
**waited**  55:15
**waiting**  242:18
**walking**  303:17
**wanted**  10:24 72:19
  73:1,6,8,14 78:16
  79:4 148:14,25 149:8
  179:20 183:21 201:9
  205:7 215:1 227:23
  228:1 229:15 230:19
  243:2 265:8 277:3,6,
  14
**wanting**  52:11
**War**  38:22
**Washington**  175:12,13,
  16,20,24 176:7
  177:12 179:15
**Waterford**  201:16
  204:3 263:9
**Watson**  279:21 320:25
  321:4,16 322:3,19
  323:1,3
**ways**  107:7 132:6
  134:15 139:5 150:3
  198:3 217:20 218:20
  306:7
**WDBA**  147:11
**weaker**  241:3 243:12
  245:14
**website**  204:15
  324:15,20 326:4
**websites**  99:1
**weekend**  183:7
**weekly**  300:7,8
**weight**  106:10
**weighted**  105:10
  106:24
**Whitehouse**  278:2
**Wisconsin**  184:10
**wishes**  98:19
**wondering**  240:1
**word**  16:18 68:15
  134:14,19 283:10
**wording**  116:24
**work**  25:9 27:17,18
  31:20 33:17 34:21,22

36:2 37:6 47:7 78:7,
8,10 90:14 130:22
134:14,23 143:21
149:3,19 150:3,6
167:21 175:21 176:25
179:3 180:10,13,18
183:22,23,24 193:22,
25 194:2,6,10,16,17,
20 195:5,21,24
198:2,6 210:1 214:12
217:17 219:3 231:19
237:12 258:23 259:5,
6,7,8 264:24 272:16,
17,23 273:7 278:4
279:24 280:4,7
281:7,8,14,20,24
282:6,10 283:2,9,18,
19,22,24 284:19
286:14 292:9
**worked**  79:1 176:2
  188:15 198:9,14
  201:20,24 202:3,4,
  10,14 248:18 257:24
  265:6 272:24 276:18
  286:10 307:11
**working**  30:20 58:16
  137:20 143:16,17
  147:18 148:7 175:24
  209:24 221:7 231:23
  233:18,19,24 235:25
  237:21 258:21 273:9
  321:10
**works**  48:5
**worse**  60:24
**wound**  324:14
**Wounds**  202:11 203:3,
  20 204:14 229:4,5
**write**  43:13 200:24
  201:19 261:6 304:21
  305:3,9
**writer**  201:18,20
**writes**  188:17 198:17
**writing**  202:7 203:12
  236:21 259:21 260:22
  263:6,17 282:2
  302:21 310:11 311:13
  312:19
**written**  62:24 70:17
  77:9 199:21 262:22
  280:14,19 301:22
  311:24
**wrong**  48:25 186:2

220:14 234:2,10,11,
12,16 235:17 247:4,7
267:6
**wrote**  89:14 182:13,19
  196:16 223:20
  245:20,23 261:23
  262:14,21 263:1
  293:17 295:10
**Wyeth**  204:22

---

## Y

**y'all**  17:11
**Yale**  306:14
**year**  24:3,7 120:2
  154:13 199:3
**years**  13:5 25:10 32:8
  48:8 79:1 96:4
  171:12 181:6 198:1
  200:16 261:18,19
  289:22 299:3,22,23,
  24,25 300:10 309:9
**yesterday**  67:1
**Yup**  190:12

---

## Z

**Zakrzewski**  8:9 10:7
  268:7

---

Confidential                                                                JAN-MS-05485659