Page 1

1          IN THE DISTRICT COURT OF CLEVELAND COUNTY
                      STATE OF OKLAHOMA

2

3   STATE OF OKLAHOMA, ex rel.,
    MIKE HUNTER, ATTORNEY GENERAL
4   OF OKLAHOMA,

5              Plaintiff,

6   vs.                          No. CJ-2017-816

7   PURDUE PHARMA L.P.;
    PURDUE PHARMA, INC.;
8   THE PURDUE FREDERICK
    COMPANY;
9   TEVA PHARMACEUTICALS
    USA, INC.;
10  CEPHALON, INC.;
    JOHNSON & JOHNSON;
11  JANSSEN PHARMACEUTICALS, INC.;
    ORTHO-McNEIL-JANSSEN
12  PHARMACEUTICALS, INC., n/k/a
    JANSSEN PHARMACEUTICALS, INC.;
13  JANSSEN PHARMACEUTICA,
    INC., n/k/a JANSSEN
14  PHARMACEUTICALS, INC.;
    ALLERGAN, PLC, f/k/a
15  ACTAVIS PLC, f/k/a ACTAVIS, INC.,
    f/k/a WATSON PHARMACEUTICALS, INC.;
16  WATSON LABORATORIES, INC.;
    ACTAVIS LLC; and
17  ACTAVIS PHARMA, INC.,
    f/k/a WATSON PHARMA, INC.,

18

19  _____/

20

21      VIDEOTAPED DEPOSITION OF SCOTT FISHMAN, M.D.
                 Sacramento, California
22             Wednesday, February 27, 2019
                      Volume II

23

24  Reported by:
    Carrie Pederson
25  CSR No. 4373, RMR, CRR

Confidential                                          JAN-MS-05485660

Page 2

```
1          IN THE DISTRICT COURT OF CLEVELAND COUNTY
                     STATE OF OKLAHOMA
2
3    STATE OF OKLAHOMA, ex rel.,
     MIKE HUNTER, ATTORNEY GENERAL
4    OF OKLAHOMA,
5              Plaintiff,
6    vs.                            No. CJ-2017-816
7    PURDUE PHARMA L.P.;
     PURDUE PHARMA, INC.;
8    THE PURDUE FREDERICK
     COMPANY;
9    TEVA PHARMACEUTICALS
     USA, INC.;
10   CEPHALON, INC.;
     JOHNSON & JOHNSON;
11   JANSSEN PHARMACEUTICALS, INC.;
     ORTHO-McNEIL-JANSSEN
12   PHARMACEUTICALS, INC., n/k/a
     JANSSEN PHARMACEUTICALS, INC.;
13   JANSSEN PHARMACEUTICA,
     INC., n/k/a JANSSEN
14   PHARMACEUTICALS, INC.;
     ALLERGAN, PLC, f/k/a
15   ACTAVIS PLC, f/k/a ACTAVIS, INC.,
     f/k/a WATSON PHARMACEUTICALS, INC.;
16   WATSON LABORATORIES, INC.;
     ACTAVIS LLC; and
17   ACTAVIS PHARMA, INC.,
     f/k/a WATSON PHARMA, INC.,
18
              Defendants.
19   _____/
20          Videotaped Deposition of SCOTT FISHMAN,
21   M.D., Volume II, taken on behalf of the defendants,
22   at 4860 Y Street, Sacramento, California, beginning
23   at 9:03 a.m. and ending at 4:48 p.m. on Wednesday,
24   February 27, 2019, before Carrie Pederson, Certified
25   Shorthand Reporter No. 4373.
```

Confidential JAN-MS-05485661

Page 3

```
1    APPEARANCES:

2

3    For Plaintiff:

4              NIX PATTERSON, LLP

5              BY:  LISA BALDWIN

6              Attorney at Law

7              3600 N. Capital of Texas Highway

8              Suite 350B

9              Austin, Texas  78746

10             512-328-5333

11             lbaldwin@nixlaw.com

12                   And

13             NIX PATTERSON, LLP

14             BY:  BROOKE CHURCHMAN

15             Attorney at Law

16             3600 N. Capital of Texas Highway

17             Suite 350B

18             Austin, Texas  78746

19             bchurchman@nixlaw.com

20

21

22

23

24

25
```

Confidential                                                                                     JAN-MS-05485662

Page 4

1    APPEARANCES: (Continued)

2

3   For Teva Defendants:

4              MORGAN LEWIS

5              BY:  BRIAN M. ERCOLE

6              Attorney at Law

7              200 South Biscayne Boulevard

8              Suite 5300

9              Miami, Florida 33131-2339

10             305-415-3416

11             brian.ercole@morganlewis.com

12

13   For Janssen and Johnson & Johnson Defendants:

14             O'MELVENY & MYERS LLP

15             BY:  HOUMAN EHSAN M.D.

16             Attorney at Law

17             400 South Hope Street

18             Los Angeles, California  90071

19             213-430-6000

20             hehsan@omm.com

21

22

23

24

25

Confidential                                                                                    JAN-MS-05485663

Page 5

```
 1   APPEARANCES: (Continued)

 2

 3   For Purdue Pharma L.P.:

 4           DECHERT LLP

 5           BY:  WILLIAM W. OXLEY

 6           Attorney at Law

 7           US Bank Tower

 8           633 West 5th Street

 9           Suite 4900

10           Los Angeles, California  90071

11           213-808-5700

12           william.oxley@dechert.com

13

14   For Scott Fishman, M.D.:

15           GORDON & REES SCULLY MANSUKHANI

16           BY:  STEVEN J. ZAKRZEWSKI

17               JOHN ROBINSON

18           Attorneys at Law

19           95 Glastonbury Boulevard

20           Suite 206

21           Glastonbury, Connecticut  06033

22           860-278-7448

23           szakrzewski@gordonrees.com

24           jjrobinson@gordonrees.com

25
```

Confidential                                                                          JAN-MS-05485664

```
                                              Page 6
1    APPEARANCES: (Continued)

2

3    Present via conference call:

4              Ryan Snyder

5              Attorney at Law

6              O'Melveny & Myers LLP

7

8              Hannah Reed

9              Attorney at Law

10             Gordon & Rees Scully Mansukhani

11

12   Videographer:  John Macdonell

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential     JAN-MS-05485665

Page 7

1                          INDEX

WITNESS:

2

3    SCOTT FISHMAN, M.D.

4    Volume II

5

                                              PAGE

6

7        Examination By Mr. Ercole              11

8        Examination By Mr. Ehsan              134

9        Examination By Mr. Oxley              207

10       Examination By Ms. Baldwin            263

11       Examination By Mr. Oxley              283

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential                                                    JAN-MS-05485666

Page 8

EXHIBITS

DEFENDANT'S

| | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 32 | August 1, 2018 Settlement Agreement and Mutual General Release | 16 |
| Exhibit 33 | January 11, 2012 letter to Scott Fishman, MD from Stacey Beckhardt | 28 |
| Exhibit 34 | Prescription Opioid Forgery: Reporting to Law Enforcement and HIPAA | 35 |
| Exhibit 35 | Responsible Opioid Prescribing, A Physician's Guide | 39 |
| Exhibit 36 | Unrestricted Educational Grant Agreement | 61 |
| Exhibit 37 | Responsible Opioid Prescribing, A Clinician's Guide | 67 |
| Exhibit 38 | Medscape, Advances in Assessing and Managing Breakthrough Pain | 117 |
| Exhibit 39 | Special Article, The Opioid Contract in the Management of Chronic Pain | 136 |
| Exhibit 40 | Duragesic Label | 164 |
| Exhibit 41 | August 1, 2018 Settlement Agreement and Mutual General Release | 208 |
| Exhibit 42 | Dollars for Doctors, Two Leaders in Pain Treatment Have Long Ties to Drug Industry | 219 |
| Exhibit 43 | December 26, 2011 email to SMF111@gmail.com from Lonnie Zeltzer, M.D. | 220 |

Confidential                                                                                                      JAN-MS-05485667

Page 9

1    Exhibit 44    Response to Charles Ornstein    225
                   from Scott Fishman, December 15,
2                  2011
3    Exhibit 45    Exit Wounds                      228
4    Exhibit 46    Chapter 1, The Clinician's       240
                   Dilemma: Under-Treated Pain
5                  Versus Prescription Drug Misuse
6    Exhibit 47    Responsible Opioid Prescribing,  247
                   A Physician's Guide
7
     Exhibit 48    February 26, 2012 email to Scott 255
8                  Fishman from Mary Vargas
9    Exhibit 49    June 17, 2007 email to           283
                   smfishman@ucdavis.edu from Dr.
10                 J. David Haddox
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Confidential    JAN-MS-05485668

Page 10

1                PREVIOUSLY MARKED EXHIBITS

2                                                    PAGE

3     Exhibit 1                                       13

4     Exhibit 26                                      40

5     Exhibit 4                                       91

6     Exhibit 7                                      132

7     Exhibit 21                                     193

8     Exhibit 5                                      195

9     Exhibit 6                                      197

10    Exhibit 3                                      201

11    Exhibit 31                                     205

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential                                                    JAN-MS-05485669

Page 11

1    Sacramento, California, Wednesday, February 27, 2019

2                    9:03 a.m. - 4:48 p.m.

3

4                    SCOTT FISHMAN, M.D.,

5    having been administered an oath, was examined and

6    testified as follows:

7                        EXAMINATION

8         VIDEO OPERATOR:  We're on the record.

9         It's 9:03 a.m. on February 27th, 2019.

10        This is the deposition of Scott Fishman,

11   Volume II.

12        We're here in the matter of State of

13   Oklahoma versus Purdue Pharma, et al.

14        We're located at 4860 Y Street in

15   Sacramento, California.

16        I'm John Macdonell, the videographer, with

17   Veritext.  I'm not related to any party in this

18   action, nor am I a notary public or financially

19   interested.

20        If all parties agree to proceed, would

21   counsel please identify themselves for the record.

22        MR. ERCOLE:  Sure.  Brian Ercole from Morgan

23   Lewis on behalf of Teva defendants.

24        MR. EHSAN:  Houman Ehsan, O'Melveny & Myers,

25   on behalf of Janssen and Johnson & Johnson

Confidential

JAN-MS-05485670

Page 12

1    defendants.

2          MR. OXLEY:  Bill Oxley from Dechert on

3    behalf of Purdue.

4          MS. CHURCHMAN:  Brooke Churchman of Nix

5    Patterson on behalf of the State.

6          MR. BALDWIN:  Lisa Baldwin for the State of

7    Oklahoma.

8          MR. ZAKRZEWSKI:  Steve Zakrzewski for

9    Dr. Scott Fishman.

10          MR. ROBINSON:  John Robinson, Gordon & Rees

11    Scully Mansukhani, on behalf of Dr. Fishman.

12          We need to dial in.  We haven't dialed in

13    for the telephone participants.

14          MR. ERCOLE:  Could we just go off the

15    record?

16          VIDEO OPERATOR:  Sure.  We're off the

17    record.  It's 9:04.

18          (Recess).

19          VIDEO OPERATOR:  Okay.  We're back on the

20    record.  It's 9:07 a.m.

21          We're just continuing the introductions on

22    the telephone.

23          MR. ZAKRZEWSKI:  Okay.  Those on the phone,

24    go ahead and make your appearance.

25          MR. SNYDER:  Good morning.  This is Ryan

Confidential                                                          JAN-MS-05485671

1   Snyder from O'Melveny & Myers appearing on behalf of

2   Johnson & Johnson.

3          MS. REED:  Good morning.  This is Hannah

4   Reed from Gordon & Reese appearing on behalf of

5   Dr. Fishman.

6          MR. ERCOLE:  Anyone else?

7          Okay.  I think we're ready to begin.

8   BY MR. ERCOLE:

9      Q.   Dr. Fishman, you realize you're still under

10  oath; correct?

11     A.   I do.

12     Q.   Okay.  We talked yesterday about the

13  materials reference in Exhibit 1 of your deposition

14  which is your resume.  Do you recall that?

15     A.   I do.

16     Q.   And there have been various objections that

17  were made by the State's counsel to certain

18  questions.  Do you recall some of those?

19     A.   Vaguely.

20     Q.   Okay.

21     A.   Trying to forget.

22     Q.   Fair enough.  Let me just ask a couple of

23  wrap-up questions which is did you independently

24  create the content of the articles, books,

25  presentations and other publications listed on your

Confidential                                              JAN-MS-05485672

1   resume that you authored or coauthored?

2           MS. BALWDIN:  Object to form.

3           THE WITNESS:  All of the work is independent

4   as far as my component of these works.  Many of them

5   are collaborative efforts, so the parts that are my

6   work are my work independently.

7   BY MR. ERCOLE:

8     Q.   And were the -- the work that you did

9   independently, was that free from the control of

10  pharmaceutical companies?

11    A.   Yes.

12          MS. BALDWIN:  Objection.

13  BY MR. ERCOLE:

14    Q.   And the work that you did independently, was

15  that free from the influence of pharmaceutical

16  companies?

17          MS. BALDWIN:  Objection.  Leading.

18          THE WITNESS:  Yes.

19  BY MR. ERCOLE:

20    Q.   And you've heard the State has made certain

21  objections about -- called leading; right?

22    A.   (Moves head up and down).

23    Q.   Were you sued by the State in this case?

24    A.   I was not.

25    Q.   Okay.  Do you have any interest in being

Confidential                                                                    JAN-MS-05485673

```
                                              Page 15
 1   sued by the State in this case?
 2           MR. ZAKRZEWSKI:  Objection.
 3           MS. BALDWIN:  Objection.
 4           MR. ZAKRZEWSKI:  Form and foundation.
 5           THE WITNESS:  I don't.
 6   BY MR. ERCOLE:
 7      Q.   Right.  Fair to say you don't want to be
 8   sued by the State in this case?
 9           MR. ZAKRZEWSKI:  Objection.
10           MS. BALDWIN:  Objection.
11           THE WITNESS:  Yes, I don't want to be sued.
12   BY MR. ERCOLE:
13      Q.   And you're here pursuant to a subpoena?
14      A.   I am.
15      Q.   And is there anything that prevents you from
16   saying anything adverse to my clients here today?
17      A.   Not that I can think of.
18      Q.   Do my clients have any control over you?
19      A.   Not that I can think of.
20      Q.   In fact, you've settled with other
21   plaintiffs bringing other opioid cases across the
22   country; correct?
23           MR. ZAKRZEWSKI:  Objection.
24           MS. BALDWIN:  Objection.
25           THE WITNESS:  Should I answer the question?
```

Confidential                                                    JAN-MS-05485674

Page 16

```
 1          MR. ZAKRZEWSKI:  Sure.
 2    BY MR. ERCOLE:
 3       Q.   You can answer.
 4       A.   I think "settled" -- "settled" isn't a word
 5    that I think is really what we did.  We agreed that
 6    they would drop the cases in a formal matter, and in
 7    return, I agreed that I would continue to tell the
 8    truth and be available to them if they want me to
 9    tell them the truth about any experiences that I've
10    had.
11       Q.   Fair enough.  And the "them" that you're
12    referring to are plaintiffs?
13       A.   Plaintiff.
14       Q.   Plaintiffs' counsel?
15       A.   Plaintiffs' counsel, yes.
16       Q.   Okay.
17          MR. ZAKRZEWSKI:  Well, objection.  Form,
18    vague.
19    BY MR. ERCOLE:
20       Q.   Okay.  Let's mark this as Exhibit 32.
21          (Exhibit 32 marked)
22          THE WITNESS:  Do I get one?
23    BY MR. ERCOLE:
24       Q.   It's right here.
25       A.   Oh, I'm sorry.  Yes.
```

Confidential                                                    JAN-MS-05485675

1      Q.    Dr. Fishman, have you seen this document

2    before?

3      A.    I believe I have.  Yes, I have.

4      Q.    And you've signed this document; is that

5    correct?

6      A.    Yes.

7      Q.    And it's a document that says "Settlement

8    Agreement" on the front of it?

9      A.    Yes.

10     Q.    And is it fair to say that this as a

11   Settlement Agreement that you reached with various

12   plaintiffs in opioid cases across the country?

13           MS. BALDWIN:  Object to form.

14           MR. ZAKRZEWSKI:  Objection.  Form.

15           THE WITNESS:  Yes.

16   BY MR. ERCOLE:

17     Q.    Okay.  And if you read the "Recitals"

18   language, it says -- if you go down, it says "Whereas

19   plaintiffs' firms have commenced legal actions

20   against several pharmaceutical companies, distributor

21   companies and individual physicians."  Do you see

22   that?

23     A.    Uh-huh.

24           MS. BALDWIN:  Object to form.

25           THE WITNESS:  Yes.

Confidential                                                      JAN-MS-05485676

Page 18

1   BY MR. ERCOLE:

2       Q.    And so the cases in which you settled,

3   pharmaceutical companies were also named as

4   defendants in those cases too; correct?

5       A.    Correct.

6           MR. ZAKRZEWSKI:  Objection.

7           Question for you:  Can I have a continuing

8   objection to your line of questioning as it relates

9   to the Settlement Agreement?  Because I don't think

10  it bears any relevance to the Oklahoma matter as it

11  was never sued in the Oklahoma matter, and I just

12  want a continuing objection throughout the

13  questioning if you want to give it to me.  Otherwise,

14  I'll object every question.

15          MS. BALDWIN:  I'm going to join in asking

16  for that continuing objection.

17          MR. ERCOLE:  So as has been the process here

18  in other depositions, there has not been an allowance

19  for continuing objections.

20          MR. ZAKRZEWSKI:  Okay.

21          MR. ERCOLE:  So feel free to pose any

22  objections.

23          MR. ZAKRZEWSKI:  I only ask since I've heard

24  you ask for it, so you must have thought it was a

25  good idea.  Apparently not, so I'll just object.

Confidential                                                      JAN-MS-05485677

1          MR. EHSAN:  Just for clarification, also

2     realizing that my understanding is you want to

3     perhaps use this transcript in other cases, so these

4     questions may go to alleviate other people's concerns

5     regarding the use of this transcript and others.

6          MR. ERCOLE:  Feel free to object whenever

7     you want to.

8          MR. ZAKRZEWSKI:  I understand the response

9     to the objection.  It depends on where it's going to

10    be used and how it's going to be used and whether the

11    objection makes sense admittedly.

12         MR. EHSAN:  Exactly.

13    BY MR. ERCOLE:

14    Q.   And then if you go down, there's a "Whereas"

15    clause where it says "Whereas Dr. Fishman has

16    satisfied the terms of his April 9, 2018 Proffer

17    Agreement with plaintiffs' firms."  Do you see that?

18    A.   I do.

19         MS. BALDWIN:  Object to form.

20         MR. ZAKRZEWSKI:  Objection.

21    BY MR. ERCOLE:

22    Q.   Did you enter into a Proffer Agreement with

23    plaintiffs' firms?

24         MS. BALDWIN:  Object to form.

25         MR. ZAKRZEWSKI:  Objection.

Confidential                                                          JAN-MS-05485678

Page 20

```
 1            THE WITNESS:  Yes.
 2    BY MR. ERCOLE:
 3      Q.    Okay.  And pursuant to that Proffer
 4    Agreement, did you speak with plaintiffs' counsel in
 5    those other cases?
 6            MS. BALDWIN:  Object to form.
 7            THE WITNESS:  Yes.
 8    BY MR. ERCOLE:
 9      Q.    And if you turn to paragraph two where it
10    says "Settlement Stipulation" on page two of the
11    document.  Do you see that?
12      A.    I do.
13      Q.    And then if you turn to little letter C.  Do
14    you see that?
15      A.    "Dr. Fishman agrees"?
16      Q.    Yes.
17      A.    Uh-huh.
18      Q.    And it says "Dr. Fishman agrees that he will
19    cooperate with plaintiffs' firms in the pending and
20    anticipated litigation as follows."  Did I read that
21    correctly?
22      A.    That's correct.
23            MS. BALDWIN:  Object to form.
24            MR. ZAKRZEWSKI:  Objection.
25            (Discussion off the record)
```

Confidential                                                                    JAN-MS-05485679

Page 21

1          THE WITNESS:  It's hard to know if they will

2     or not and how much time they need, but --

3          MR. ERCOLE:  And I'll do my best not to

4     speak over you, too, and allow for time.

5          THE WITNESS:  Yeah.

6     BY MR. ERCOLE:

7       Q.   And so in connection with this Settlement

8     Agreement with plaintiffs' counsel and plaintiffs in

9     other opioid cases, you agreed to cooperate with

10    those firms in connection with that pending and

11    anticipated litigation; right?

12         MS. BALDWIN:  Object to form, and I'm just

13    going to state for the record I've never seen the

14    Settlement Agreement before.  I don't know anything

15    about this Settlement Agreement.  This has nothing to

16    do with the current case that's at issue in this

17    deposition.

18         MR. ERCOLE:  Well, we'll disagree.  Okay.

19         THE WITNESS:  Can you restate your question?

20    BY MR. ERCOLE:

21      Q.   Sure.  In connection with this Settlement

22    Agreement with plaintiffs' counsel and plaintiffs in

23    other opioid cases, you agree to cooperate with those

24    firms in connection with that pending and anticipated

25    litigation; right?

Confidential                                                                    JAN-MS-05485680

```
                                             Page 22
 1      A.    I agree to --
 2            MR. ZAKRZEWSKI:  Objection.
 3            THE WITNESS:  I agree to continue to
 4    cooperate by telling you the truth.
 5    BY MR. ERCOLE:
 6      Q.    And, again, you met with -- how many times
 7    did you meet with plaintiffs' counsel in those other
 8    cases?
 9            MR. ZAKRZEWSKI:  Objection.  Form.
10            MS. BALDWIN:  Object to form.
11            THE WITNESS:  Well, I'd have to say twice.
12    BY MR. ERCOLE:
13      Q.    Do you recall when those times were?
14      A.    Once was several years ago with -- prior to
15    being sued, and once was -- the second time was
16    about, I'd say, six, eight months ago.
17      Q.    And the time you met six or eight months
18    ago, was that after a Proffer Agreement had been
19    entered into?
20      A.    Yes.
21            MS. BALDWIN:  Object to form.
22            THE WITNESS:  Sorry.  Yes.
23    BY MR. ERCOLE:
24      Q.    And how long did you meet with plaintiffs'
25    counsel at that time?
```

Confidential                                                                    JAN-MS-05485681

```
                                                    Page 23
1       A.    About --
2             MS. BALDWIN:  Object to form.
3             THE WITNESS:  -- four or five hours.
4    BY MR. ERCOLE:
5       Q.    Were any of the -- were any representatives
6    from any pharmaceutical companies there?
7       A.    Not that I was aware of.
8       Q.    Were any lawyers for any defendants there to
9    the best of your knowledge?
10      A.    No.
11            MR. ZAKRZEWSKI:  Objection.
12            MS. BALDWIN:  Form.
13            THE WITNESS:  Well, yes, they were.
14   BY MR. ERCOLE:
15      Q.    Okay.  Other than your counsel?
16      A.    No.
17            MR. OXLEY:  That's good.
18   BY MR. ERCOLE:
19      Q.    And in connection with -- you said you met
20   with plaintiffs' counsel about six or eight months
21   ago for about four or five hours; is that fair to
22   say?
23            MS. BALDWIN:  Object to form.
24            THE WITNESS:  Yes.
25   BY MR. ERCOLE:
```

Confidential                                                          JAN-MS-05485682

Page 24

1      Q.    And did they ask you questions?

2            MS. BALDWIN:   Object to form.

3            THE WITNESS:   Yes.

4    BY MR. ERCOLE:

5      Q.    And did you provide answers to those

6    questions?

7      A.    Yes.

8            MS. BALDWIN:   Object to form.

9    BY MR. ERCOLE:

10     Q.    And this Settlement Agreement, what's been

11   marked as Exhibit 32, reflects aspects of your

12   continued cooperation in connection with those

13   particular cases; correct?

14           MR. ZAKRZEWSKI:   Objection.

15           MS. BALDWIN:   Objection.   Form.

16           MR. ZAKRZEWSKI:   Form.   You mean aspects of

17   what, at the time, he agreed he would do or things

18   that have happened?

19           MR. ERCOLE:   So if you have an objection,

20   feel free to state it.   I'll try and clarify a little

21   bit more.

22   BY MR. ERCOLE:

23     Q.    The Settlement Agreement, what's been marked

24   as Exhibit 32, you looked at it; right?   It says

25   "Dr. Fishman agrees that he will cooperate with

Confidential                                                      JAN-MS-05485683

Page 25

1    plaintiffs' firms in the pending and anticipated

2    litigation as follows."  I read that correctly;

3    right?

4            MS. BALDWIN:  Object to form.

5            THE WITNESS:  Yes.

6    BY MR. ERCOLE:

7       Q.   And there are ongoing obligations in

8    connection with that cooperation provision; correct?

9            MR. ZAKRZEWSKI:  Objection.  Form.

10           MS. BALDWIN:  Object to form.

11           MR. ZAKRZEWSKI:  Vague, lacks foundation.

12           THE WITNESS:  Actually, I think that the --

13   my belief is that there's actually no more ongoing

14   obligations, the timing of it has run out, but --

15   BY MR. ERCOLE:

16      Q.   Okay.  Why don't you take a look at that

17   paragraph 2(c) and then (v).  So you if can look

18   at --

19      A.   2(c)(v)?

20      Q.   Yeah.

21      A.   Five?

22           MR. ZAKRZEWSKI:  Five?

23           MR. ERCOLE:  Yes.

24   BY MR. ERCOLE:

25      Q.   And there, that provision is just an example

Confidential                                                        JAN-MS-05485684

Page 26

1    of when "Dr. Fishman agrees to cooperate with

2    plaintiffs' firms to provide sworn written proffers,

3    statements, affidavits and declarations to supplement

4    and reinforce Dr. Fishman's oral testimony."  Do you

5    see that?

6           MS. BALDWIN:  Object to form.

7           THE WITNESS:  I do.

8    BY MR. ERCOLE:

9       Q.   And that would be an ongoing commitment; is

10   that fair?

11          MS. BALDWIN:  Object to form.

12          THE WITNESS:  It's based on -- I'm sorry.

13   It's based on other commitments where the time has

14   run out on, so I would think that that ends as well,

15   but I'm just a doctor.

16   BY MR. ERCOLE:

17      Q.   Okay.  And as a result of providing that

18   information to plaintiffs' counsel in those other

19   cases, you were -- strike that.

20          In connection with agreeing to enter into

21   the Proffer Agreement and the Settlement Agreement,

22   the plaintiffs' counsel in those other cases agree to

23   release you or dismiss you from those cases; is that

24   fair to say?

25      A.   Correct.

Confidential                                                                                              JAN-MS-05485685

Page 27

1           MS. BALDWIN:  Object to form.
2    BY MR. ERCOLE:
3      Q.   And you wanted to be dismissed from those
4    cases; is that fair to say?
5           MS. BALDWIN:  Object to form.
6           THE WITNESS:  Any which way we could.
7    BY MR. ERCOLE:
8      Q.   Sure.  And, in fact, you have been dismissed
9    from a number of cases as a result of entering into
10   this Settlement Agreement; is that fair to say?
11          MS. BALDWIN:  Object to form.
12          THE WITNESS:  Correct.
13   BY MR. ERCOLE:
14     Q.   Yesterday, you mentioned a program where
15   Cephalon indicated that you had been paid for
16   providing some commentary, but in reality, you had
17   not been paid.  Do you recall that?
18          MS. BALDWIN:  Object to form.
19          THE WITNESS:  I recall it, but the emphasis
20   on being paid isn't the right emphasis.  It was that
21   it was -- that I -- that I had agreed I wasn't paid
22   and that it was only going to be used as a public
23   service announcement for public education, and they
24   used it on their media page.  That, I know they did.
25   BY MR. ERCOLE:

Confidential                                                      JAN-MS-05485686

Page 28

1     Q.    Uh-huh.

2     A.    The media reported I had been paid.  I

3   wasn't.  I never confirmed that they had said that I

4   had been paid.

5     Q.    Okay.

6     A.    Just want to be clear about that.

7     Q.    Can we mark this as Exhibit 33?

8           (Exhibit 33 marked)

9   BY MR. ERCOLE:

10    Q.    Dr. Fishman, is this a letter that you

11  received from Teva USA on -- strike that.

12          Is this a letter from Teva USA to you?

13    A.    Yes.

14    Q.    And did you receive this letter?

15    A.    Yes.

16    Q.    And the public education program was titled

17  "When Good Medicines Become Bad Drugs."  Is that fair

18  to say?

19    A.    Yes.

20    Q.    Okay.  And if you read the last sentence in

21  the first paragraph, it says "Your taped commentary

22  for this program highlighted the risks associated

23  with inappropriate use of opioids."  Did I read that

24  correctly?

25    A.    You did.

Confidential                                          JAN-MS-05485687

```
                                                Page 29
 1            MS. BALDWIN:  Object to form.
 2    BY MR. ERCOLE:
 3        Q.   And did your commentary do that?
 4            MS. BALDWIN:  Object to form.
 5            THE WITNESS:  Yes, it did.
 6    BY MR. ERCOLE:
 7        Q.   And do you recall what exactly you said in
 8    connection with that --
 9        A.   I don't recall exactly what I said, but my
10    comments were about inappropriate use of opioids and
11    the effect on adolescents.
12        Q.   And Teva asked for you to provide that
13    commentary; is that correct?
14            MS. BALDWIN:  Object to form.
15            THE WITNESS:  They asked me to participate
16    in this public service announcement program that they
17    were filming at a professional meeting somewhat on
18    the fly, and based on their request as a PSA and the
19    content that I felt particularly passionate about and
20    wanted to get the word out, I agreed.
21    BY MR. ERCOLE:
22        Q.   Was there anything false or misleading in
23    that -- in any of the commentary that you provided
24    for that video?
25            MS. BALDWIN:  Object to form.
```

Confidential                                                   JAN-MS-05485688

```
                                                    Page 30
 1              MR. ZAKRZEWSKI:  Objection.
 2              THE WITNESS:  No.
 3    BY MR. ERCOLE:
 4       Q.   Was there anything false or misleading
 5    associated with the program itself, at least with
 6    respect to opioid prescribing?
 7              MS. BALDWIN:  Object to form.
 8              MR. ZAKRZEWSKI:  Object.
 9              THE WITNESS:  Certainly not as it relates to
10    my participation.
11    BY MR. ERCOLE:
12       Q.   Well, sitting here today, can you identify
13    anything false or misleading about any other aspect
14    of that video other than the payment issue that
15    you've identified?
16              MS. BALDWIN:  Object to form.
17              THE WITNESS:  So I think you just asked me
18    two different questions.  One is -- all I know about
19    is what I said.  I don't know if there's other
20    programming they created in addition, so I don't know
21    what full program they made around "When Good
22    Medicines Become Bad Drugs," but in terms of what I
23    provided, there was nothing false about that.
24              Secondly, what was problematic with the
25    outcome was that they had agreed to use the material
```

Confidential                                          JAN-MS-05485689

Page 31

1    solely for consumer education public service

2    announcements, and they wound up putting it with my

3    name on their marketing website which I was then

4    called out for.  I didn't know they had done it, by

5    the media as an example of how I was a shill for

6    pharmaceutical companies.

7    BY MR. ERCOLE:

8        Q.    And do you believe you are a shill for

9    pharmaceutical companies?

10            MR. ZAKRZEWSKI:  Objection.  Form.

11            MS. BALDWIN:  Objection to form.

12            THE WITNESS:  I can assure you that I'm not

13   and have never been.

14   BY MR. ERCOLE:

15       Q.    And do you find such allegations offensive?

16            MS. BALDWIN:  Object to form.

17            THE WITNESS:  I find them offensive and

18   reacted immediately, and that's why I raised it with

19   Teva.

20   BY MR. ERCOLE:

21       Q.    And then if you take a look at that last

22   paragraph -- well, second to last paragraph, it says

23   "Once you brought the error to our attention,

24   Cephalon immediately had the version of the video

25   pulled by PR Newswire and from the Cephalon corporate

Confidential                                                    JAN-MS-05485690

Page 32

1    site."  Do you see that?

2        A.    I do.

3            MS. BALDWIN:  Object to the form.

4    BY MR. ERCOLE:

5        Q.    Was that accurate?

6            MS. BALDWIN:  Objection to the form.

7            THE WITNESS:  Yes.

8    BY MR. ERCOLE:

9        Q.    And it also goes on to say "We sent you an

10   email communication apologizing for distributing

11   video which incorrectly stated you were compensated."

12   Is that accurate?

13       A.    Correct.

14           MS. BALDWIN:  Object to form.

15   BY MR. ERCOLE:

16       Q.    And it also goes on to say "We informed you

17   at that time that all video footage related to this

18   program would be removed."  Did I read that

19   correctly?

20       A.    Yes.

21           MS. BALDWIN:  Object to form.

22   BY MR. ERCOLE:

23       Q.    And did Cephalon remove all video footage of

24   that program?

25       A.    To the best of my knowledge.

Confidential                                                          JAN-MS-05485691

Page 33

```
 1            MS. BALDWIN:  Object to form.
 2    BY MR. ERCOLE:
 3       Q.   Okay.  And so is it fair to say that at
 4    least in this instance, with respect to Teva USA,
 5    when you raised an issue with them concerning one of
 6    their programming pieces, they immediately responded
 7    and remedied any mistake or error associated with
 8    that?
 9            MS. BALDWIN:  Object to form.
10            THE WITNESS:  Well, they were quick to
11    reverse the wrongdoing.  I don't know that they
12    remedied it, but, you know, the injury had already
13    occurred, and it's not something that's going to ever
14    leave the Internet, so --
15    BY MR. ERCOLE:
16       Q.   Sir, at least with respect to the piece that
17    you provided, it was all about the risks associated
18    with inappropriate use of opioids; right?
19            MR. ZAKRZEWSKI:  Objection to form.
20            MS. BALDWIN:  Objection.
21            MR. ZAKRZEWSKI:  Argumentative.
22            THE WITNESS:  Yes.
23    BY MR. ERCOLE:
24       Q.   Okay.  And --
25       A.   I'm just reacting to the word "remedy."
```

Confidential                                                                JAN-MS-05485692

```
                                                Page 34
 1      Q.   Okay.

 2      A.   I mean they did what they could.  I was

 3   pleased that they were responsive.  It didn't remedy

 4   the problem that they caused --

 5      Q.   Okay.

 6      A.   -- for me.

 7      Q.   Fair enough.  And the problem that you're

 8   describing is a problem that impacted you; correct?

 9      A.   Correct.

10           MS. BALDWIN:  Object to the form.

11           THE WITNESS:  And created a false impression

12   of me in the media.

13   BY MR. ERCOLE:

14      Q.   Okay.  And that false impression was that

15   you were somehow a shill for pharmaceutical

16   companies?

17      A.   That's how it was framed by, you know,

18   reporters.

19           MS. BALDWIN:  Object to form.

20   BY MR. ERCOLE:

21      Q.   And that's clearly not true; right?

22           MS. BALDWIN:  Object to form.

23           THE WITNESS:  That is not true.

24   BY MR. ERCOLE:

25      Q.   We talked yesterday a bit about the
```

Confidential                                                    JAN-MS-05485693

1   responsibility of prescribers to make appropriate

2   decisions regarding opioids.  Do you recall some of

3   that discussion?

4       A.   I do.

5       Q.   And is it fair to say that prescribers bear

6   responsibility for making an appropriate decision as

7   to whether or not to prescribe opioids?

8           MS. BALDWIN:  Objection.  Leading.

9           THE WITNESS:  There are a lot of variables

10  that go into appropriate prescribing, and prescribers

11  bear a great deal of the responsibility in that

12  process.

13  BY MR. ERCOLE:

14      Q.   And we'll mark this as Exhibit 34.

15          (Exhibit 34 marked)

16  BY MR. ERCOLE:

17      Q.   Dr. Fishman, is this an article that you

18  wrote on prescription opioid -- strike that.

19          What is this document?

20      A.   This is a manuscript that was published

21  regarding issues around reporting a forged

22  prescription of an opioid.

23      Q.   And would you agree that forged

24  prescriptions of opioids are a problem?

25          MS. BALDWIN:  Objection.  Leading.

Confidential                                                                    JAN-MS-05485694

Page 36

1          THE WITNESS:  Yes.

2     BY MR. ERCOLE:

3          Q.   Would you agree that forged prescriptions of

4     opioids are a significant problem?

5          MS. BALDWIN:  Objection.  Leading.

6          THE WITNESS:  You know, I honestly don't

7     know how widespread a problem it is.

8     BY MR. ERCOLE:

9          Q.   Okay.

10         A.   But it's problematic for a number of

11    reasons.  One is we don't really -- this article

12    relates to the fact that there's confusion about how

13    to handle the finding of a forged prescription

14    relative to HIPAA requirements.

15         Q.   And if you'd take a look at page -- what's

16    marked as 941 on the bottom.  It's page nine of that

17    document.  Do you see that?

18         A.   I do.

19         Q.   And it says "Where does the responsibility

20    lie?"  Do you see that?

21         A.   Can you just orient me to it?

22         MS. BALDWIN:  Object to form.

23    BY MR. ERCOLE:

24         Q.   Yeah.  Sure.  It's at the bottom of the

25    document.  It should be on page nine.  Says "Where

Confidential                                                        JAN-MS-05485695

```
                                                      Page 37
 1    does" --
 2       A.    Is this the same as -- it's my page nine.
 3       Q.    Yeah.
 4       A.    Oh, I'm sorry.  Yeah.  Right in front of me.
 5    Sorry.  I was looking in the body.
 6       Q.    I need my glasses to be able to see that
 7    far.
 8       A.    Okay.  Yes.  "Where does the responsibility
 9    lie?"
10       Q.    Yeah.  And it says -- this is in the article
11    that you coauthored, it says "The DEA and the Code of
12    Federal Regulations places responsibility on both the
13    practitioner and pharmacist for appropriate
14    prescribing and dispensing."
15       A.    Right.
16             MS. BALDWIN:  Object to form.
17    BY MR. ERCOLE:
18       Q.    Is that an accurate statement, doctor?
19             MS. BALDWIN:  Object to form.
20             THE WITNESS:  Yes.
21    BY MR. ERCOLE:
22       Q.    And you have a number of sort of -- looks
23    like citations in quotations afterwards to support
24    that proposition?
25             MS. BALDWIN:  Object to form.
```

Confidential                                                     JAN-MS-05485696

Page 38

1           THE WITNESS:  Well, and a quote from the

2    DEA.

3    BY MR. ERCOLE:

4       Q.    Sure.

5       A.    Yeah.

6       Q.    Okay.  And yesterday, we talked about a --

7    let me go back.

8           With respect to this particular article,

9    what's been now marked as Exhibit 34, was this an

10   article that you and your coauthors developed

11   independent of pharmaceutical company influence?

12          MS. BALDWIN:  Object to form.

13          THE WITNESS:  Yes.

14   BY MR. ERCOLE:

15      Q.    We talked yesterday a lot about your book

16   "Responsible Opioid Prescribing, A Physician's

17   Guide."  Do you recall that?

18      A.    Yes.

19          MS. BALDWIN:  Object to form.

20          THE WITNESS:  Yes.

21   BY MR. ERCOLE:

22      Q.    Is that the title of the book?

23      A.    Yes.

24      Q.    Okay.  Could we mark this as Exhibit 35?

25   Thanks.

Confidential                                                                    JAN-MS-05485697

Page 39

1              (Exhibit 35 marked)

2     BY MR. ERCOLE:

3        Q.    Dr. Fishman, is this a copy of the book

4     "Responsible Opioid Prescribing" that you authored?

5        A.    This appears to be one of the early proofs.

6        Q.    Okay.

7        A.    So not a final version of the book.

8        Q.    Okay.  And if you turn the page to the

9     second -- to the -- Responsible Opioid -- this the

10    third page of that document, it -- titled

11    "Responsible Opioid Prescribing, A Physician's

12    Guide."  It's 514201.

13       A.    Uh-huh.

14       Q.    Do you see that?

15       A.    I do.

16       Q.    And it indicates that the book is

17    copyrighted 2007 by you?

18       A.    Yes.

19       Q.    Okay.

20             MS. BALDWIN:  I'm just going to clarify for

21    the record that this excerpt that you -- is this an

22    entire copy of the book?

23             MR. ERCOLE:  This is -- yeah, that's my

24    understanding, yes.

25             MS. BALDWIN:  Okay.  I'm just going to

Confidential                                                                JAN-MS-05485698

1   represent for the record that this is a different

2   version of the book than I introduced into the record

3   yesterday.

4           MR. ERCOLE:  Fine.  I'll tell you what:  Why

5   don't we -- with respect to the version, why don't we

6   pull that one out.  Do you have a --

7   BY MR. ERCOLE:

8       Q.    Turn to -- put that aside for a second, if

9   you don't mind, and then why don't you turn to

10   page -- Exhibit 26.  And this is a copy -- this is

11   excerpts that the State -- of your book that the

12   State introduced yesterday.  Do you recall that?

13      A.    I do.

14      Q.    Okay.  If you turn to the -- it's not Bates

15   marked, but if you turn to the third page of that

16   document --

17      A.    Uh-huh.

18      Q.    -- it has a copyright of 2007.  Do you see

19   that?

20      A.    I do.

21      Q.    Okay.  And is that your copyright?

22      A.    It is.

23      Q.    Okay.  And then the document goes on to list

24   the number of supporters of this particular book.  Do

25   you see that?

Confidential                                                                    JAN-MS-05485699

Page 41

1    A.    I do.

2    Q.    Okay.  And the language in this book is your

3    language; right?  You looked at the book, you

4    reviewed the root book, it's your independent

5    authorship for the book; correct?

6              MS. BALDWIN:  Object to form and leading.

7              THE WITNESS:  Yes.

8    BY MR. ERCOLE:

9    Q.    Okay.  And so some of the supporters

10   underneath the sort of category supporters, it says

11   "This book has been supported by a consortium of

12   organizations with a common interest in promoting

13   safe and effective pain management."  Did I read that

14   correctly?

15   A.    Yes.

16   Q.    Okay.  And so in your book, and this is the

17   2007 version at least, you were indicating that the

18   companies that helped support this book had a common

19   interest in promoting safe and effective pain

20   management; is that fair to say?

21             MS. BALDWIN:  Object to form.  Leading.

22             THE WITNESS:  I fully believe that as a

23   foundation for writing the book and why

24   pharmaceutical companies would be a potential

25   purchaser of the book, because it would be in their

Confidential                                                          JAN-MS-05485700

Page 42

1    interest to support safe use of their drugs.

2    BY MR. ERCOLE:

3    Q.    And when you say that, can you elaborate

4    upon that a little bit more?

5    A.    You know, I felt like -- at the time, you

6    know, this book was written in 2006, well before the

7    media took hold of what was happening in terms of the

8    excessive use of opioids and the trends that were

9    starting to be seen with unintended overdose deaths.

10          This book was one of the first to actually

11   focus on the fact that we needed to apply greater

12   vigilance, we needed to take this drug group more

13   seriously and give it more -- give it more vigilance

14   in our using of these drugs and patients.

15          My belief was that pharmaceutical companies

16   would support that because they realized what I

17   realized at the time, which is we're heading down a

18   road, and I think I say this in this book, that we're

19   heading down a road where, if we continue down this

20   road, we're going to be prohibited from using this

21   class of drugs, so it's in everyone's interest that

22   we do it right, we do it safely so that there's --

23   the industry could protect its market and, you know,

24   I could protect patients from the harms that could

25   come from excessive use or inappropriate use of

Confidential                                                                    JAN-MS-05485701

Page 43

1    drugs.

2        Q.    And, in fact, for a number of years prior to

3    the publication of this book, you had been giving CME

4    presentations about responsible opioid prescribing

5    that were sponsored indirectly by pharmaceutical

6    companies; is that fair to say?

7            MS. BALDWIN:  Objection.  Leading.

8            THE WITNESS:  Mostly indirectly, but yes.

9    Yes.

10   BY MR. ERCOLE:

11       Q.    And in connection with the supporters of

12   this book, there are a number of different companies

13   that are listed; is that correct?

14       A.    Uh-huh.

15       Q.    And Cephalon is identified as a supporter

16   that had an interest in promoting safe and effective

17   pain management?

18            MS. BALDWIN:  Object to form.

19   BY MR. ERCOLE:

20       Q.    Is that correct?

21       A.    Yes.

22       Q.    Okay.  And --

23       A.    As stated here.

24       Q.    Yeah.  And Purdue Pharma LP is also

25   identified there?

Confidential                                                                                    JAN-MS-05485702

Page 44

1      A.    It is.

2      Q.    Okay.  And in addition, there are other

3   companies listed there that supported your book as

4   well too; right?

5      A.    There's some that supported the CME

6   activity.

7      Q.    And with respect to some of the other

8   entities, it looks like they're -- the American

9   Cancer Society is listed.

10      A.    Correct.

11      Q.    What is the American Cancer Society?

12      A.    American Cancer Society is a nonprofit -- a

13   large nonprofit organization interested in advancing

14   the care of patients with cancer.

15      Q.    And they also supported the Responsible

16   Opioid Prescribing book that you authored?

17           MS. BALDWIN:  Objection.  Leading.

18           THE WITNESS:  I believe they supported this

19   book because responsible opioid prescribing is a

20   important element of optimal cancer care.

21   BY MR. ERCOLE:

22      Q.    Sure.  And it looks like there's -- one of

23   the other supporters was the Candlelighters Childhood

24   Cancer Foundation.  What is that?  Do you know?

25      A.    I don't know.

Confidential                                                                    JAN-MS-05485703

Page 45

1     Q.    There's another listing here for the

2   International Association for Pain and Chemical

3   Dependency.  Do you see that?

4     A.    Yes, I do.

5     Q.    Do you know what that entity does?

6     A.    Again, that's a -- to my knowledge, that's

7   an international professional organization that was

8   dealing with issues around pain management and

9   addiction, chemical dependency.

10     Q.    And there's also a reference here to the

11   Lance Armstrong Foundation.

12     A.    Uh-huh.

13     Q.    Do you know what the Lance Armstrong

14   Foundation is?

15     A.    Again, a nonprofit that was interested -- I

16   believe their focus was largely in the area of

17   wellness.  As you may know, Lance Armstrong had

18   cancer, and there was interest in cancer pain

19   management as well, and I think that's where the

20   connection came.  I think they were -- they

21   participated in conjunction with the American Cancer

22   Society.

23     Q.    So is it fair to say, then, that this book

24   that you authored, Responsible Opioid Prescribing,

25   was supported by a number of organizations apart from

Confidential                                                                    JAN-MS-05485704

Page 46

1    the pharmaceutical industry?

2            MS. BALDWIN:  Objection.  Leading.

3            THE WITNESS:  I think the listing of, you

4    know, partners suggests this was a very broad

5    coalition, including the Department of Health and

6    Human Services, represented by the Substance Use and

7    Mental Health Services Administration, which, you

8    know, is directly entrusted with dealing with health

9    issues around addiction in America.

10   BY MR. ERCOLE:

11       Q.    And you mentioned yesterday that there were

12   drafts of the book that you circulated to various

13   entities; is that correct?

14       A.    Individuals.

15       Q.    Okay.  And were some of those individuals

16   associated with the federal government?

17       A.    Yes.

18       Q.    Can you sort of describe what you did there

19   a little bit?

20       A.    Well, you know, there are people that I

21   worked with in the DEA and the Office of the National

22   Job Control Strategy, the White House drug czar's

23   office and elsewhere, who were respected colleagues

24   in this area, of what was happening with drug abuse,

25   and I asked them for advice on how to characterize or

Confidential                                                                                    JAN-MS-05485705

Page 47

1  how I characterize the ensuing epidemic.

2          Again, when this was written, the word

3  "epidemic" was not in the national vernacular.  Now

4  we look back, and clearly it was happening at this

5  time, but nobody was talking about it.  So, you know,

6  I asked -- I can't even remember who -- I know one

7  person is Chris Jones, who's been a very prominent

8  participant in the federal oversight of the

9  prescription drug abuse problem in America, and he

10  was at the ONDCP at the time, then went to CDC, was

11  at HSS, and I actually think -- I think he's actually

12  back at ONDCP now, but probably one of the most --

13  maybe, in my opinion, the most informed person in the

14  country on what's happening with the opioid crisis

15  and the opioid epidemic.

16          You know, he was someone who looked at the

17  book.  I think he's actually listed in this next

18  edition by name.  But there was someone who was the

19  undersecretary of -- or the associate director of the

20  ONDCP, and I don't remember her name.  She was a

21  psychiatrist from Harvard, and she reviewed the book,

22  this book for us to give us feedback.

23          And then there are other colleagues in the

24  field, you know, like David Haddox that I mentioned

25  from Purdue.  Again, I didn't send him the book

Confidential                                                                                          JAN-MS-05485706

Page 48

```
 1   because -- or I didn't send him parts of the book,
 2   and I didn't expect him to do a line review of the
 3   book.  I just wanted to get his reaction and to, just
 4   like everyone else, just get a sense of whether what
 5   was being said would be viewed as controversial from
 6   people on one side or the other.  So I sent it out,
 7   you know, widely once it was pretty much complete.
 8       Q.   Right.  And, for instance, using --
 9            MS. BALDWIN:  I'm going to object to that as
10   nonresponsive.
11   BY MR. ERCOLE:
12       Q.   Okay.  You mentioned Chris Jones; right?
13       A.    (Moves head up and down).
14       Q.   When you sent the, I guess -- was it a
15   manuscript you would have sent out?
16       A.   I don't remember if I sent him a manuscript.
17   I sent him just passages.
18       Q.   Okay.
19       A.   I don't remember.  Or sat down with him and
20   discussed it in meetings.
21       Q.   Did he ever come to you and say, "Hey, this
22   book is riddled with misrepresentations" in some way,
23   shape or form?
24            MS. BALDWIN:  Objection.  Leading.
25            THE WITNESS:  No.  He was kind to me in that
```

Confidential                                                      JAN-MS-05485707

Page 49

1    he was willing to review the interpretations of data

2    that could be looked at a lot of different ways, and,

3    again, the first time I met Chris, it wasn't clear

4    what kind of catastrophe we were in.  Later on, it

5    was much clearer, and he was very helpful in really

6    stating the data for the second edition where -- you

7    know, I would argue the difference between the first

8    edition and the second edition is that we had the

9    data for the second edition.

10        Really, the premise of the book didn't

11   change and the foundation positions of the book

12   didn't change.  What changed is we had hard data that

13   we didn't have in 2006 to really base our beliefs on.

14        So he was much -- he was very, very helpful

15   on the second edition, and I think we name him in the

16   book as such.  But, you know, he, you know, kind of

17   just gave me reactions.  I don't know that I really

18   gave anybody the opportunity to be a editor of the

19   book.  So --

20   BY MR. ERCOLE:

21      Q.   And you controlled that editing process?

22      A.   I did.

23           MS. BALDWIN:  Object to form.  Leading.

24   BY MR. ERCOLE:

25      Q.   And if you turn to Exhibit 35, which

Confidential                                                    JAN-MS-05485708

Page 50

1   actually --

2       A.   We're back to this?

3       Q.   Yes.  Which actually has the text of the

4   book in there.  I don't want to walk through every

5   paragraph with you, but if you can just turn to the

6   "Forward" page, it looks like page one.  Do you see

7   that?

8       A.   Yeah.  I just want to say that, again, you

9   have a -- this is a -- what you produced was

10  uncorrected page proofs, and I believe, in the first

11  edition of the book, the forward was by Regina

12  Benjamin who -- Regina Benjamin, Dr. Regina Benjamin

13  who would go on to become the Surgeon General.

14      Q.   Okay.  So you can put Exhibit 35 -- then put

15  that aside.

16           With respect to the book itself, does the

17  book discuss the risks associated with the use and

18  prescribing of opioids?

19      A.   Yes.

20      Q.   Okay.  And what does it say about those

21  risks?

22      A.   That -- again, I'm not sure how much depth

23  you want me to go into that because that's really

24  the -- that's the main body of the book, that there

25  are substantial risks that need to be understood and

Confidential                                                          JAN-MS-05485709

Page 51

1    considered when these drugs are prescribed, and they

2    need to be considered, not just when they're

3    prescribed, but when they're renewed, refilled and

4    doses are changed.

5       Q.    And do you describe in the book what those

6    risks are?

7       A.    Yes.

8       Q.    And what are some of those risks?

9       A.    Well, the risk that I think is most feared

10   is respiratory depression, but there are other risks

11   around addiction; dependence, constipation, sedation,

12   other substantial -- endocrine effects, etc.

13      Q.    And does your book lay out all those risks

14   for any physician who was willing to read it?

15            MS. BALDWIN:  Object to form.

16            THE WITNESS:  The book was intended as a

17   very readable primer, so -- and I think it says there

18   that it was not intended as a exhaustive review of

19   everything about opioids and opioid prescribing.  It

20   wouldn't be possible to do that, particularly in

21   this -- in such a -- you know, a handbook.

22            The hope was that this would be enough to

23   convince prescribers that there's a lot they need to

24   know about prescribing and get them started in a very

25   readable format that we felt most primary care

Confidential                                                    JAN-MS-05485710

Page 52

 1   doctors and other clinicians could read in an

 2   evening.

 3   BY MR. ERCOLE:

 4      Q.   And does your book lay out various steps

 5   doctors can take to prescribe opioids responsibly?

 6      A.   It does.

 7           MS. BALDWIN:  Object to form.  Leading.

 8   BY MR. ERCOLE:

 9      Q.   Okay.  And is one of those steps screening

10   patients for addiction?

11      A.   Yes.

12           MS. BALDWIN:  Objection to form.  Leading.

13   BY MR. ERCOLE:

14      Q.   And can the failure to screen patients for

15   addiction result in inappropriate opioid prescribing?

16           MS. BALDWIN:  Object to form.  Leading.

17           THE WITNESS:  Yes.

18   BY MR. ERCOLE:

19      Q.   Is another one of those steps that doctors

20   can take making sure to spend an appropriate amount

21   of time with each particular patient before writing

22   an opioid prescription?

23           MS. BALDWIN:  Object to form.  Leading.

24           THE WITNESS:  I would say that the

25   expectation is that histories and physical exams

Confidential                                                    JAN-MS-05485711

Page 53

1    would be obtained, and they would take time.

2    BY MR. ERCOLE:

3        Q.    And is that the expectation before writing

4    an opioid prescription?

5        A.    Correct.

6            MS. BALDWIN:  Object to form.

7    BY MR. ERCOLE:

8        Q.    And the failure to take the time to do

9    histories and physical examinations by a physician

10   could result in an inappropriate prescription of

11   opioids; is that correct?

12           MS. BALDWIN:  Object to form.  Leading.

13           THE WITNESS:  It could be -- it could lead

14   to inappropriate prescribing, and it would be seen as

15   practice beneath the standard of care.

16   BY MR. ERCOLE:

17       Q.    And when you say "take a" -- when you

18   reference the word -- the term "histories," what do

19   you mean by that?

20       A.    Acquiring the information about the

21   patient's past medical experiences and their illness,

22   their record of illnesses, their medical,

23   psychological, social information that would be

24   necessary to have a sense of who you're treating,

25   what they have and what would be safe to give them,

Confidential                                                          JAN-MS-05485712

Page 54

1   you know, in the face of their complaints.

2      Q.   And is that essential for physicians to do

3   before writing an opioid prescription?

4      A.   It is.

5          MS. BALDWIN:  Object to form.  Leading.

6   BY MR. ERCOLE:

7      Q.   And the failure to do so may result in an

8   inappropriate prescription; is that fair to say?

9          MS. BALDWIN:  Object to form.  Leading.

10          THE WITNESS:  It may.

11   BY MR. ERCOLE:

12      Q.   And it may not too; correct?

13          MS. BALDWIN:  Object to form.  Leading.

14          THE WITNESS:  Yes.

15   BY MR. ERCOLE:

16      Q.   Another step you identified for

17   appropriate -- strike that.

18          Is coming up with a treatment plan for a

19   patient another step you identify for physicians to

20   prescribe opioids responsibly?

21          MS. BALDWIN:  Object to form.  Leading.

22          THE WITNESS:  Yes.

23   BY MR. ERCOLE:

24      Q.   And what does that mean when coming up with

25   a treatment plan?

Confidential                                                        JAN-MS-05485713

1      A.    It means that rather than just reacting with

2    a treatment, that clinicians need to think about a

3    plan for how they're going to use a treatment, which

4    involves understanding why they're using it, what the

5    outcome of the treatment would be that would

6    designate that the treatment is successful or a

7    failure, and how the treatment would be delivered,

8    either in one step or incrementally, etc., and how

9    the treatment would be discontinued if there was a

10    problem.

11      Q.    And would the failure to come up with a

12    treatment plan for -- strike that.

13            Would a physician's failure to come up with

14    a treatment plan for a particular patient before

15    writing an opioid prescription fall beneath the

16    appropriate standard of care in your view?

17            MS. BALDWIN:  Object to the form.  Leading.

18            THE WITNESS:  Not in and of itself, but it

19    would be -- potentially be part of that determination

20    because it would be an expected part of good care,

21    but, again, it's a part.

22    BY MR. ERCOLE:

23      Q.    How about was another step you identify for

24    physicians to prescribe opioids appropriately making

25    sure to listen to what the patient has to say about

Confidential                                                                JAN-MS-05485714

```
                                         Page 56
 1   his or her pain?
 2          MS. BALDWIN:  Object to form.  Leading.
 3          THE WITNESS:  Yes.
 4   BY MR. ERCOLE:
 5      Q.   And is it fair to say that the failure to do
 6   so could result in an inappropriate prescription of
 7   opioids being written by that particular physician?
 8          MS. BALDWIN:  Object to form.  Leading.
 9          THE WITNESS:  It could.
10   BY MR. ERCOLE:
11      Q.   How about was another step that you identify
12   in your book for appropriate opioid prescribing
13   making sure that physicians monitor their patients
14   after writing an opioid prescription?
15          MS. BALDWIN:  Object to form.  Leading.
16          THE WITNESS:  Yes.
17   BY MR. ERCOLE:
18      Q.   And why is that important?
19      A.   It's important to monitor your patients
20   because if adversity comes and you're not --
21   adversity occurs and you're not monitoring the
22   patients, you may miss it, and the patients may be
23   injured.
24      Q.   And when you say "adversity," what are you
25   referring to there?
```

Confidential                                                    JAN-MS-05485715

Page 57

```
 1     A.    Adverse effects from the treatment, you
 2   know.
 3     Q.    And can the failure to monitor a patient
 4   after writing an opioid prescription lead to the
 5   inappropriate prescribing of subsequent opioid
 6   prescriptions for that patient?
 7           MS. BALDWIN:  Object to form.  Leading.
 8           THE WITNESS:  Yes.
 9   BY MR. ERCOLE:
10     Q.    These are all the -- all the things we're
11   discussing are all steps that physicians can take to
12   ensure opioid prescribing, proper opioid prescribing;
13   is that fair to say?
14           MS. BALDWIN:  Object to form.  Leading.
15           THE WITNESS:  They're steps that are
16   described in the book as expected parts of care of
17   patients who are responsibly prescribed opioids.
18   BY MR. ERCOLE:
19     Q.    And when you say "expected parts of care,"
20   what are you referring to there?
21     A.    Well, you know, again, this book was written
22   for physicians in response to the Federation of State
23   Medical Board's model policy on opioid prescribing
24   which is a policy that wasn't intended for
25   physicians.  It's intended for medical boards as
```

Confidential                                                                    JAN-MS-05485716

1    guidance in reviewing the practice of physicians if

2    their practice is called into question.

3         So one of the main -- a main premise of this

4    book is that physicians should know -- or prescribers

5    should know what's expected of them if they are

6    investigated, and when I say "expect," you know, this

7    would be expected, it would be expected by a medical

8    board, or I think investigator said if they look at

9    their practice and they see that they are prescribing

10   opioids, that, for instance, they have a plan for how

11   they're using the opioids that is fairly transparent

12   in the patient's documentation and they have a --

13   there's a record of following up with their patients

14   to see how they're doing, whether they're doing well

15   or doing poorly, particularly if you're going to be

16   changing the dose or refilling those opioids.

17   Q.   And you reference in here the model policy

18   on -- strike that.

19        In your last answer, you reference the model

20   policy on opioid prescribing.

21   A.   Yes.

22   Q.   And who authored that policy?

23   A.   It was a policy that was created by the

24   Federation of State Medical Boards and, I think,

25   signed off by their full congress of representatives

Confidential                                                                    JAN-MS-05485717

Page 59

1   from state medical boards across the country, I think

2   all of the state medical boards in the United States.

3       Q.    To the best of your knowledge, did

4   pharmaceutical companies control the content of that

5   policy by the Federal and State Medical Board?

6           MS. BALDWIN:  Object to form.

7           THE WITNESS:  The Federation of State

8   Medical Boards?

9   BY MR. ERCOLE:

10      Q.    Yes.

11      A.    To my knowledge, the pharmaceutical

12  companies did not control, but they did contribute to

13  the funding of several of the older editions of the

14  model policy or the versions of the model policy.

15      Q.    And so in your -- if I refer to "the

16  federation," can we agree that I'm referring to the

17  FSMB?

18      A.    Yes.

19      Q.    Okay.  You mentioned that the FSMB received

20  funding from pharmaceutical companies; is that

21  correct?

22      A.    I believe so.

23          MS. BALDWIN:  Object to form.

24  BY MR. ERCOLE:

25      Q.    Do you know one way or the other?

Confidential                                                      JAN-MS-05485718

1    A.    Again, I don't know with certainty what they

2    received or what it was for, but I'm pretty sure that

3    they received funding from pharmaceutical companies

4    to support the process of developing their model

5    policy.  I don't think they have done that recently

6    but in the past.

7    Q.    And the model -- when was the first model

8    policy?

9    A.    I want to say in the late 1990's.

10   Q.    Okay.  And did the -- to the best of your

11   knowledge, did the FSMB or the federation develop

12   that policy -- strike that.

13          Did the FSMB develop that policy

14   content-wise independently from pharmaceutical

15   companies?

16          MS. BALDWIN:  Object to form.  Leading.

17          THE WITNESS:  I don't know.  I wasn't part

18   of that first iteration of the policy.

19   BY MR. ERCOLE:

20   Q.    Sitting here today, do you have any

21   knowledge that any pharmaceutical company had any

22   influence on the development -- strike that.

23          Sitting here today, do you have any

24   knowledge of any influence that pharmaceutical

25   companies had on the development of the content of

Confidential                                                                                              JAN-MS-05485719

Page 61

1   that first policy?

2          MS. BALDWIN:  Object to form.

3          THE WITNESS:  No.

4   BY MR. ERCOLE:

5      Q.   Okay.  Was there -- we'll get into the

6   federation in a little bit, but with respect to the

7   Responsible Opioid Prescribing book that you

8   authored, let's mark this as Exhibit 36.

9          (Exhibit 36 marked)

10  BY MR. ERCOLE:

11     Q.   Dr. Fishman, this is a document titled

12  "Unrestricted Educational Grant Agreement."  Do you

13  see that?

14     A.   I do.

15     Q.   And it's an agreement between Cephalon and

16  the Federation of State Medical Boards

17  Research & Education Foundation?  Am I reading that

18  correctly?

19     A.   Right.  You are.

20     Q.   Okay.  And what was the Federation of State

21  Medical Boards Research & Education Foundation to the

22  best of your knowledge?

23     A.   You know, I think --

24          MS. BALDWIN:  Object to form.

25          THE WITNESS:  I'm sorry.  I think it's a

Confidential                                                                    JAN-MS-05485720

Page 62

1   nonprofit arm of the federation to do educational

2   work, I believe.

3   BY MR. ERCOLE:

4       Q.   And we talked about the federation.  What

5   exactly was or what exactly is the federation?

6       A.   Again, I'm not a member of the federation.

7   My sense of the federation is that it's a -- truly a

8   federation of the state medical boards in the United

9   States with the House of Delegates that has a system

10  of representation for all the state medical boards to

11  support the issues that they have to deal with in a

12  collective manner rather than with each existing

13  individually.

14      Q.   And does the federation consist of

15  independent medical professionals to the best of your

16  knowledge?

17          MS. BALDWIN:  Objection.  Leading.

18          THE WITNESS:  They're independent medical

19  professionals who work with state medical boards and

20  are part of the federation, but I believe that other

21  than the staff of the federation or the FSMB, the

22  individual physicians are clinicians who are

23  associated with their state medical boards and then

24  seek to have a role in the federation --

25  BY MR. ERCOLE:

Confidential                                                    JAN-MS-05485721

Page 63

1    Q.    Okay.

2    A.    -- representing a specific statement, I

3  believe.

4    Q.    Thank you for that clarification.  If you

5  take a look at this agreement, it states in the first

6  paragraph "Educational grant of the amount of

7  $100,000 to support the dissemination of the book

8  Responsible Opioid Prescribing, a Physician's Guide."

9  Did I read that correctly?

10    A.    Yes.

11    Q.    Okay.  And can you go to the first -- and

12  the Responsible Opioid Prescribing, a Physician's

13  Guide is your book; correct?

14    A.    Yes.

15    Q.    Okay.  And if you go to paragraph one,

16  "Statement of Purpose," it says "Cephalon and the

17  organization agree that any and all materials

18  developed for this program are for educational

19  purposes and not to promote any Cephalon products,

20  and that any discussion of Cephalon products that may

21  occur in relation to this grant will be objective and

22  balanced."  Do you see that?

23    A.    I do.

24         MS. BALDWIN:  Object to form.

25  BY MR. ERCOLE:

Confidential                                                                                     JAN-MS-05485722

Page 64

1     Q.   And to the best of your knowledge, does this
2     agreement, then, reflect the fact that any materials
3     developed in connection with this grant were not
4     allowed to promote any Cephalon products?
5            MS. BALDWIN:  Object to form.
6            THE WITNESS:  I would go further and say
7     that this grant was to support dissemination of the
8     book, not the content of the book or anything about
9     what was in the book.  So I don't think this
10    product -- this project in any way was anything that
11    touched me.
12    BY MR. ERCOLE:
13    Q.   Okay.  And your book Responsible Opioid
14    Prescribing didn't mention any Cephalon products; is
15    that fair to say?
16           MS. BALDWIN:  Object to form.
17           THE WITNESS:  You know, again, I don't
18    remember.  I don't think so, and I don't even
19    remember exactly what Cephalon made at the time.  I
20    believe it was -- and it may have been the rapid
21    onset opioids which weren't a part of the discussion
22    of Responsible Opioid Prescribing.
23    BY MR. ERCOLE:
24    Q.   And when you say weren't a part of that
25    discussion, why do you say that?

Confidential                                                    JAN-MS-05485723

Page 65

```
 1      A.   Because Responsible Opioid Prescribing was
 2   really about chronic pain and that those drugs,
 3   particularly at the time, were really limited to the
 4   use in cancer patients who needed really urgent onset
 5   analgesia.
 6      Q.   And so you would distinguish, then, sort of
 7   rapid onset opioids from long-acting opioids in that
 8   sense?
 9         MS. BALDWIN:  Object to form.
10         THE WITNESS:  I would distinguish them
11   clearly, and I would also distinguish that their use
12   was, at this time, in my mind, controversial, and I
13   was concerned about them and didn't use them.  I
14   didn't feel that there was a role for them in chronic
15   pain.
16   BY MR. ERCOLE:
17      Q.   And that was an independent medical
18   determination that you made; correct?
19      A.   Correct.
20      Q.   And when you say "them," you mean --
21      A.   These rapid onset, usually transmucosal
22   fentanyl products.
23      Q.   Okay.  And if you turn to paragraph eight of
24   this particular document, do you see where it says
25   "Focus of the Materials"?
```

Confidential                                                                    JAN-MS-05485724

Page 66

```
 1    A.    Uh-huh.
 2    Q.    "The organization is to create educational
 3  materials that are free from commercial influence or
 4  bias."  Did I read that correctly?
 5    A.    Yes.
 6          MS. BALDWIN:  Form.
 7  BY MR. ERCOLE:
 8    Q.    And that was, at least according to this
 9  document, a paragraph in the educational grant that
10  was given to the federation in connection with the
11  dissemination of your book?
12          MS. BALDWIN:  Object to the form.
13          THE WITNESS:  Correct.
14  BY MR. ERCOLE:
15    Q.    And just with respect to grants generally,
16  have you -- strike that.
17          With respect to grants sought by the
18  federation concerning your book, were you involved
19  with preparing any of those requests?
20    A.    Not that I remember.
21    Q.    Okay.
22    A.    In fact, I'm not a signatory to this.  I
23  don't know that I was involved in this.
24    Q.    Sure.  And if you look at page four of this
25  document, is it fair to say that at least in
```

Page 67

1    connection with this document, that the federation

2    was affirmatively reaching out to Cephalon to request

3    a grant for this project?

4              MS. BALDWIN:  Object to form.

5              THE WITNESS:  Yes.  I think they were

6    looking to find funding to give a book that medical

7    boards wanted, but the medical boards didn't have

8    funding -- don't have the funding for these kinds of

9    programs.

10             MR. ERCOLE:  Could we mark this as

11   Exhibit 37?

12             (Exhibit 37 marked)

13   BY MR. ERCOLE:

14      Q.    Dr. Fishman, do you know, have you seen the

15   document that's been marked as Exhibit 37 before?

16      A.    I have.

17      Q.    Okay.  And what is that document?

18      A.    It's the "Second Edition, Revised and

19   Expanded, of Responsible Opioid Prescribing,

20   Clinician's Guide."

21      Q.    And were you responsible for the content of

22   this book?

23      A.    Yes.

24             MS. BALDWIN:  Object to form.  Leading.

25   BY MR. ERCOLE:

Confidential                                                    JAN-MS-05485726

1     Q.   And if you'd turn to the second page of this

2    document, at least -- let's just use the Bates

3    number, 6904 on the bottom.

4     A.   Yes.

5     Q.   And has a copyright of 2012.  Do you see

6    that at the top?

7     A.   I do.

8     Q.   And is that your copyright?

9     A.   Yes.

10    Q.   Okay.  And -- do you need to take a break,

11   sir?

12    A.   No.  I'm sorry.  I'm just getting a text on

13   patients.

14    Q.   Okay.

15    A.   Sorry about that.

16    Q.   I'm happy to take a break for you.

17    A.   No.  I'm fine.

18    Q.   Okay.

19    A.   Just turning it off.

20    Q.   Thank you.  So there's also a list of

21   supporters of the second edition of this book.  Do

22   you see that?

23    A.   Yes.

24    Q.   Okay.  And, again, this is in 2012.  There's

25   a statement right upfront that "This book has been

Confidential                                                                      JAN-MS-05485727

Page 69

1    supported by a consortium of organizations with a

2    common interest in promoting safe and effective pain

3    management."  Do you see that?

4        A.    I do.

5             MS. BALDWIN:  Object to form.

6    BY MR. ERCOLE:

7        Q.    Okay.  And Cephalon is listed as one of

8    those supporters who was interested in promoting safe

9    and effective pain management?

10            MS. BALDWIN:  Object to form.  Leading.

11            THE WITNESS:  Yes.

12   BY MR. ERCOLE:

13       Q.    Okay.  But there are also a number of other

14   companies listed here again too; correct?

15            MS. BALDWIN:  Object to form.  Leading.

16            THE WITNESS:  Correct.

17   BY MR. ERCOLE:

18       Q.    And many of those companies are not opioid

19   manufacturers; is that fair to say?

20            MS. BALDWIN:  Object to form.  Leading.

21            THE WITNESS:  Yes.

22   BY MR. ERCOLE:

23       Q.    And with respect to the second edition of

24   your book, did you also send sort of a -- you know,

25   whether a manuscript or a draft of the book, to

Confidential                                                    JAN-MS-05485728

Page 70

1    individuals affiliated with the federal government

2    before its publication?

3         A.    Yes.

4         Q.    And who did you send those two?

5         A.    You know, I don't remember exactly, but, you

6    know, again, Chris Jones was helpful in this edition.

7    There's a different administration.  We'd gone from

8    the George W. Bush Administration to the Obama

9    Administration at this point.

10              Yeah, I don't remember the names of -- I

11   don't recall the names of people, but, you know, I

12   sought input on -- I was less concerned about the

13   reactions to the positions because the positions

14   really hadn't changed.  What changed in this is

15   the -- largely the data, and I wanted to make sure I

16   was representing the data correctly because it's very

17   complicated.

18        Q.    The data is?

19        A.    Yeah.

20        Q.    And in the second edition of the book, this

21   is going to sound overly simplistic, but do you also

22   outline steps that providers can take to ensure

23   appropriate prescribing of opioids?

24              MS. BALDWIN:  Object to form.  Leading.

25              THE WITNESS:  Yes.

Confidential                                                                    JAN-MS-05485729

```
                                                    Page 71
 1   BY MR. ERCOLE:
 2      Q.   And do you outline the risks associated with
 3   prescribing of opioids in this book?
 4           MS. BALDWIN:  Object to form.  Leading.
 5           THE WITNESS:  Yes.
 6   BY MR. ERCOLE:
 7      Q.   And do you outline the risks associated with
 8   the prescribing of opioids for long-term chronic
 9   pain?
10           MS. BALDWIN:  Object to form.  Leading.
11           THE WITNESS:  Yes.
12   BY MR. ERCOLE:
13      Q.   Okay.  And is is fair to say that if a
14   prescriber was to read either your -- the first
15   edition of this book in 2007 or the second edition of
16   this book in 2012, he or she would be informed about
17   the risks associated with prescribing opioids?
18           MS. BALDWIN:  Object to form.  Leading.
19           MR. ZAKRZEWSKI:  Objection.  Form.
20           You can answer.
21           THE WITNESS:  My intent was that anyone who
22   read this book would hear the message, "Be careful
23   with these drugs," and here is a lot of information
24   that would back up why you'd need to be careful
25   including the risks.
```

Confidential                                                    JAN-MS-05485730

Page 72

1    BY MR. ERCOLE:

2       Q.    Do you know whether the Responsible Opioid

3    Prescribing book is still in print?

4       A.    I don't believe it is.

5       Q.    Okay.  Was there ever another edition of

6    that book?

7       A.    Yes.

8       Q.    And so there have been three editions?

9       A.    Correct.

10      Q.    And with respect to all three of those

11   editions, did you independently create the content of

12   those editions?

13          MS. BALDWIN:  Object to form.

14          THE WITNESS:  I independently oversaw the

15   content.  Some of it was -- for instance, the third

16   edition -- really, the only difference between the

17   second edition and that third one, which is just --

18   it's a second edition expanded or some other

19   terminology -- is that it included guidelines that

20   didn't exist at the time that this -- the second

21   edition was published, so it's a much more robust

22   appendix of materials that didn't exist at the time

23   that the second edition was published but I felt were

24   absolutely crucial for readers to have in this

25   compendium.

Confidential                                                JAN-MS-05485731

Page 73

1    BY MR. ERCOLE:

2        Q.    And did all of your books include an

3    appendix?

4        A.    They did.

5        Q.    And what did the appendix have for those

6    books?

7            MR. ZAKRZEWSKI:   Objection.

8            You can answer.

9            THE WITNESS:  The appendix were resource

10    materials that would -- like, for instance, they

11    had -- the FSMB model policy was part of the

12    appendix, and I think it had been updated between the

13    first book and the second book and other, you know,

14    general resources that would be helpful.   Again, it

15    wasn't an exhaustive volume.

16    BY MR. ERCOLE:

17        Q.    And you've referred to -- so we've been

18    talking about the federation or the FSMB.   We spoke

19    about a -- strike that.

20            In 1998, did the FSMB publish model

21    guidelines?

22        A.    In 1998?

23        Q.    Yes.

24        A.    I believe so.  I suspect that was the first

25    edition of the guidelines.

Confidential                                                    JAN-MS-05485732

Page 74

1     Q.    Okay.   And were you involved in that process

2   at all?

3     A.    No.

4     Q.    And at some point, were those guidelines

5   updated to a policy?

6     A.    Well, you know, I don't know when it was --

7   the name was created as the model policy.  I thought

8   it was in '98, but it may have been in 2004.  I was

9   involved with the creation of the 2004 model policy.

10  I was a member of a large committee.

11    Q.    In connection with the 2004 model policy,

12  are you aware of -- strike that.

13          With respect to the 2004 model policy, did

14  pharmaceutical companies control the content of that

15  policy?

16          MS. BALDWIN:   Object to the form.   Leading.

17          THE WITNESS:   I don't believe they

18  controlled the content, but, again, there was -- you

19  know, David Haddox was part of that process, and I

20  believe he was at Purdue at that time, so it was a

21  point of contention, I suppose, that he was part of

22  that.

23  BY MR. ERCOLE:

24    Q.    Do you know whether Cephalon had any role

25  whatsoever in creating the content of the 2004 model

Confidential                                                                    JAN-MS-05485733

Page 75

1   policy?

2          MS. BALDWIN:  Object to form.

3          THE WITNESS:  I don't know whether Cephalon

4   was involved or not involved at all, and, therefore,

5   I have no idea what their role could be.

6   BY MR. ERCOLE:

7      Q.   Sitting here today, you're not aware of any

8   influence that Cephalon ever exercised in connection

9   with the 2004 model policy by the federation?

10     A.   No.

11         MS. BALDWIN:  Object to the form.

12  BY MR. ERCOLE:

13     Q.   And sitting here today, you're not aware of

14  any influence that Cephalon ever had regarding the

15  1998 model guidelines that were published by the

16  FSMB; is that fair to say?

17         MS. BALDWIN:  Object to form.

18         THE WITNESS:  I certainly know of none.

19  BY MR. ERCOLE:

20     Q.   And concerning the 2004 model policy, can

21  you describe how that process worked in terms of

22  actually coming up with and ratifying that policy?

23     A.   Well, I was on the advisory committee that

24  helped look at, you know, what are the issues that

25  medical boards need to be concerned about when

Confidential                                                                                              JAN-MS-05485734

Page 76

1    they're reviewing prescribers' behavior and

2    activities, so it was kind of a consensus process of

3    trying to come up with the most important points that

4    boards would need to know, and then I believe that

5    content was written up and then brought to the

6    federation, to their committees, and then they

7    brought it to their House of Delegates, and it -- you

8    know, it was a full voting process where every board

9    got to vote on it, and it was ultimately passed or

10   ratified.

11       Q.   And sounds like there was a significant

12   review process associated with those particular

13   guidelines.

14       A.   I believe --

15            MS. BALDWIN:  Objection.  Leading.

16            THE WITNESS:  I believe so.

17   BY MR. ERCOLE:

18       Q.   And sitting here today, you're not aware of

19   any sort of improper influence that pharmaceutical

20   companies would have had in the creation of those

21   particular policies; is that fair to say?

22            MS. BALDWIN:  Object to form and leading.

23            THE WITNESS:  Yes.

24   BY MR. ERCOLE:

25       Q.   And was there also a policy that was issued

Confidential                                                          JAN-MS-05485735

Page 77

1    by the federation in 2012 regarding opioid
2    prescribing?
3        A.    Yes.
4        Q.    Were you involved in the creation of that
5    policy?
6        A.    No.
7        Q.    Sitting here today, do you have any
8    knowledge or evidence -- strike that.
9             Sitting here today, do you have any
10   knowledge of any improper influence that
11   pharmaceutical companies had regarding the
12   development of that 2012 policy?
13            MS. BALDWIN:  Object to form.
14            THE WITNESS:  No.
15   BY MR. ERCOLE:
16       Q.    Dr. Fishman, you've been on the board of
17   directors of various third party consumer advocacy
18   and professional associations; is that correct?
19       A.    Yes.
20       Q.    And the State's counsel asked you a number
21   of questions about the American Pain Foundation.
22       A.    Correct.
23       Q.    Do you recall?
24       A.    Yes.
25       Q.    And what is the American Pain Foundation?

Confidential                                                          JAN-MS-05485736

Page 78

1     A.    Well, it was a nonprofit that was focused on
2   advocating and educating consumers around pain
3   control.
4     Q.    Okay.  And do you recall when you were on
5   the board of directors of that particular
6   association?
7     A.    I think I was on from 2006 to 2011.
8     Q.    And when you say -- you mentioned that the
9   nonprofit was focused on advocating and educating
10  consumers.  When you're referring to consumers, who
11  are you referring to?
12          MS. BALDWIN:  Object to form.
13          THE WITNESS:  People affected by pain and
14  those who -- either people affected directly or
15  indirectly by having pain.
16  BY MR. ERCOLE:
17    Q.    And did the American Pain Foundation
18  actually help those consumers?
19          MS. BALDWIN:  Objection.  Leading.
20          THE WITNESS:  I believe they did.
21  BY MR. ERCOLE:
22    Q.    And if you didn't believe the American Pain
23  Foundation was helping consumers, is it fair to say
24  that you wouldn't have been on the board of directors
25  for the time that you were?

Confidential                                                                      JAN-MS-05485737

Page 79

1          MS. BALDWIN:  Objection.  Leading.

2          THE WITNESS:  I would absolutely agree with

3    that.

4    BY MR. ERCOLE:

5     Q.   Was the American Pain Foundation made up of

6    medical professionals?

7          MS. BALDWIN:  Objection.  Leading.

8          THE WITNESS:  Well, the board of directors

9    of the American Pain Foundation started as a group of

10   medical professionals and evolved into a mixed group

11   of consumers, patients in pain, consumers and medical

12   professionals, and it was trending to evolve toward

13   medical -- towards consumers taking over the American

14   Pain Foundation as their concern rather than being

15   run by medical professionals as it had been in its

16   earlier form.

17   BY MR. ERCOLE:

18    Q.   Are you aware of -- strike that.

19         Did the American Pain Foundation put forward

20   publications of any sort?

21    A.   Yes.

22    Q.   With respect to those publications, did the

23   American Pain Foundation, in your view, independently

24   create those publications?

25         MS. BALDWIN:  Object to form.

Confidential                                                           JAN-MS-05485738

Page 80

```
 1            THE WITNESS:  Well, I think so.  You know, I
 2    was on the board of directors and for a time was the
 3    chair of the board, and it was our goal that they
 4    were completely independent.  I wasn't on the ground
 5    working with staff preparing these products, this
 6    work product, so it's hard for me to say with
 7    certainty they were completely independent, but that
 8    was certainly the intent.
 9    BY MR. ERCOLE:
10       Q.   Sure.  Well, sitting here today, can you
11    identify any publication from the American Pain
12    Foundation that was not created independently?
13       A.   No.
14            MS. BALDWIN:  Object to form.
15    BY MR. ERCOLE:
16       Q.   And by "independently," do you understand
17    I'm referring to sort of independent from the
18    influence of the pharmaceutical industry?
19       A.   Correct.
20            MS. BALDWIN:  Object to form.
21    BY MR. ERCOLE:
22       Q.   You've also referenced before the American
23    Academy of Pain Medicine -- or at least do you recall
24    the discussion you had with the State about the
25    American Academy of Pain Medicine?
```

Confidential                                                                                    JAN-MS-05485739

Page 81

1     A.    Yes.

2     Q.    Okay.  And were you the president of the

3  American Academy of Pain Medicine?

4     A.    Yes, from 2005 to 2006.

5     Q.    Were you then on the board of directors of

6  the American Academy of Pain Medicine too?

7     A.    Yes.  I was on the board prior to being

8  president and after.

9     Q.    Did pharmaceutical companies control the

10  opinions of the board of directors for the American

11  Academy of Pain Medicine?

12          MS. BALDWIN:  Object to form.

13          MR. ZAKRZEWSKI:  Form.

14          THE WITNESS:  No.

15  BY MR. ERCOLE:

16     Q.    Did pharmaceutical companies dictate the

17  opinions of the board of directors for the American

18  Academy of Pain Medicine?

19          MS. BALDWIN:  Object to form.

20          MR. ZAKRZEWSKI:  Object to form.

21          MS. BALDWIN:  Leading.

22          THE WITNESS:  I can't speak to what -- the

23  opinions of other members of the board.  My

24  experience was that the board was not controlled by

25  pharmaceutical company influences.

Confidential                                                                                    JAN-MS-05485740

Page 82

1    BY MR. ERCOLE:

2       Q.    And was that the same for the American Pain

3    Foundation, too, at least to the best of your

4    knowledge?

5            MS. BALDWIN:  Object to form.  Leading.

6            THE WITNESS:  Yes.

7    BY MR. ERCOLE:

8       Q.    And what was the American -- or what is the

9    American Academy of Pain Medicine?

10      A.    It's a professional organization of

11   clinicians working in the area of pain management.

12      Q.    And does it have a mission statement?

13      A.    It does.

14      Q.    Do you know generally what that mission

15   statement is?

16      A.    You know, I would imagine it states that

17   it's an organization that supports the practice of

18   pain medicine and the safe and effective provision of

19   pain relief.

20      Q.    And did the American Academy of Pain

21   Medicine create publications regarding pain

22   management?

23      A.    Yes.

24      Q.    Did they create publications regarding

25   opioids?

Confidential                                                                          JAN-MS-05485741

1      A.    They did.

2      Q.    Is it fair to say that if you thought the

3   American Academy of Pain Medicine was somehow

4   improperly influenced by pharmaceutical companies,

5   you would not have been on the board of directors for

6   that organization?

7           MS. BALDWIN:  Object to form.  Leading.

8           THE WITNESS:  Yes.

9   BY MR. ERCOLE:

10     Q.    Is is fair to say that if you thought the

11  American Academy of Pain Medicine was somehow

12  improperly influenced by pharmaceutical companies,

13  you would not have been the president of that

14  organization?

15     A.    Correct.

16          MS. BALDWIN:  Object to form.  Leading.

17  BY MR. ERCOLE:

18     Q.    Sitting here today, can you identify any

19  publication put forward by the American Academy of

20  Pain Medicine that was not independently created by

21  that particular organization?

22          MS. BALDWIN:  Object to form.

23          THE WITNESS:  Again, the academy probably

24  has done many publications that are in consortium

25  with others that they don't independently produce

Confidential                                                      JAN-MS-05485742

Page 84

1    that they're collaborators on, but I believe their

2    parts are always independent.

3    BY MR. ERCOLE:

4        Q.    Okay.  Sitting here today, can you identify

5    any publication from the American Academy of Pain

6    Medicine that was somehow improperly influenced by --

7            MS. BALDWIN:  Object to form.

8    BY MR. ERCOLE:

9        Q.    -- by pharmaceutical company?

10           MS. BALDWIN:  Sorry.  Object to form.

11           THE WITNESS:  No.

12   BY MR. ERCOLE:

13       Q.    You also, sir, served on the board of

14   directors for the American Pain Society?

15       A.    Yes.

16       Q.    Is the American Pain Society still in

17   existence today?

18       A.    It is.

19       Q.    What is the American Pain Society?

20       A.    It's again another professional group of

21   clinicians engaged with the focus on pain relief.

22       Q.    And would the American Pain Society sponsor

23   certain projects to help with pain relief?

24       A.    Yes.

25       Q.    Okay.  Can you give me an example of some of

Confidential                                                                          JAN-MS-05485743

Page 85

1    those projects?

2        A.    Well, they would hold conferences and

3    produce materials, publications that would be in the

4    realm of pain management.

5        Q.    And is is fair to say that if you thought

6    the American Pain Society was being improperly

7    influenced by pharmaceutical companies, you would not

8    have been on the board of directors of that

9    organization?

10           MS. BALDWIN:   Object to form and leading.

11           THE WITNESS:   Correct.

12   BY MR. ERCOLE:

13       Q.    Sitting here today, can you identify --

14   strike that.

15           Sitting here today, are you aware of any

16   publications put forward by the American Pain Society

17   that were somehow improperly influenced by

18   pharmaceutical companies?

19           MS. BALDWIN:   Object to form.

20           THE WITNESS:   No.

21   BY MR. ERCOLE:

22       Q.    Are you aware of any instance where a

23   pharmaceutical company dictated the content of any

24   publication put forward by the American Pain Society?

25       A.    No.

Confidential                                                    JAN-MS-05485744

Page 86

1           MS. BALDWIN:  Object to form.

2     BY MR. ERCOLE:

3        Q.   And I'll ask that just generally as to the

4     various associations that you've been involved with.

5     Are you familiar with -- are you aware of any

6     instance where any pharmaceutical company dictated

7     the content of any publication put forward by the

8     American Pain Society, the American Academy of Pain

9     Medicine or the American Pain Foundation?

10          MS. BALDWIN:  Object to form.

11          THE WITNESS:  Well, you're asking me a very

12    broad question.

13    BY MR. ERCOLE:

14       Q.   Sure.

15       A.   There's one area where I think there's

16    influence in drug companies.  I don't have a specific

17    one, not your company or any other specific ones

18    here, but in the -- working with these medical

19    education companies that put on a lot of the CME

20    activities, you know, my concern is that there's

21    influence from pharmaceutical companies who sponsor

22    programs, and that influence gets translated to the

23    educators in the program subtly as if it's -- as if

24    it's not messaging, as if it's independent of the

25    sponsor.

Confidential                                                    JAN-MS-05485745

1        So that would be the one area where, you

2   know, all of these groups participate with medical

3   education companies because they come with funding to

4   help them put on conferences that otherwise they

5   wouldn't be able to put on for their members, they

6   wouldn't be able to afford, and they do these

7   marketing-type trainings, and I think that there's a

8   line there that often gets crossed, and, you know,

9   frankly, I think pharmaceutical companies know that

10  that's a permeable wall that they can work with.

11       So that would be my one place where I do

12  think that the professional organizations like the

13  Academy of Pain Medicine and the American Pain

14  Society and many, many other groups, not limited to

15  pain -- this is a widespread problem across medicine

16  where there's permeability of the influence of

17  industry to the educators of medical education

18  programming.

19    Q.    Okay.  And sitting here today, are you aware

20  of any instance where Cephalon has ever influenced

21  the content of any CME program as you're describing?

22    A.    No.

23        MS. BALDWIN:  Object to form.

24  BY MR. ERCOLE:

25    Q.    Sitting here today, are you aware of any

Confidential                                                                    JAN-MS-05485746

Page 88

1    instance where Teva USA has ever influenced the

2    content of any CME program like what you're

3    describing?

4            MS. BALDWIN:  Object to form.

5            THE WITNESS:  No.

6    BY MR. ERCOLE:

7      Q.   Sitting here today, are you aware if any of

8    the defendants in this particular case has influenced

9    the content of any CME program?

10           MS. BALDWIN:  Object to form.

11           THE WITNESS:  I don't know of any specific

12   program, no.

13   BY MR. ERCOLE:

14     Q.   Well, with respect to the programs -- and

15   you say -- or CME programs, did the American Academy

16   of Pain Medicine, the American Pain Society and the

17   American Pain Foundation -- did they put on CME

18   programs?

19     A.   Well, this really applies to the

20   professional organizations, and they don't have to be

21   CME programs.

22     Q.   Okay.

23     A.   You know, they're basically marketing

24   programs that have a middle man in the form of these

25   media companies who are hired by -- I believe are

Confidential                                                                    JAN-MS-05485747

Page 89

1    hired by or get their funding from industry and then

2    are supposed to be arm's length in the middle with

3    the educational speakers, but there's an overlap

4    there that, you know, I've always found uncomfortable

5    and a permeability that I spoke to that I think we

6    have to address.

7         Again, it's not endemic to opioid

8    manufacturers, opioid programs.  It's endemic to

9    medical education across the board.  So you asked me

10   a very broad question.

11       Q.   Sure.

12       A.   I feel like I have to say that.

13       Q.   Sure.  And with respect to the -- when you

14   were at the -- when you were -- strike that.

15         When you were on the board of directors of

16   the American Pain Society, the American Pain Society

17   put on presentations; is that fair to say?

18       A.   Yes.

19       Q.   Okay.  And with respect to any of those

20   presentations, are you aware of any improper

21   influence that pharmaceutical companies exercised

22   over those presentations?

23         MS. BALDWIN:  Object to form.

24         THE WITNESS:  I'm not aware of any specific

25   programs.

Confidential                                                    JAN-MS-05485748

Page 90

1   BY MR. ERCOLE:

2       Q.    Okay.  And with respect to the American

3   Academy of Pain Medicine, when you were on the board

4   of directors there as the president, are you aware of

5   any specific programs that pharmaceutical companies

6   improperly influenced there?

7             MS. BALDWIN:  Object to form.

8             THE WITNESS:  No specific programs.

9   BY MR. ERCOLE:

10      Q.    Okay.  And with respect to the American Pain

11  Foundation, are you aware of any presentations that

12  the pharmaceutical company improperly influenced in

13  some way?

14      A.    No.

15            MS. BALDWIN:  Object to form.

16  BY MR. ERCOLE:

17      Q.    Okay.  How about with respect to those three

18  organizations, are you aware of any statements made

19  in any presentations by those organizations that were

20  false?

21            MS. BALDWIN:  Object to form.

22            THE WITNESS:  No.

23  BY MR. ERCOLE:

24      Q.    Okay.  And so is it fair to say you're not

25  aware of any statements made in any of those

Confidential                                                    JAN-MS-05485749

Page 91

1    presentations -- strike that.

2            Is it fair to say, then, that with respect

3    to those organizations, you're not aware of any

4    statements made about opioids in any presentations

5    that were false?

6            MS. BALDWIN:  Object to form.

7            THE WITNESS:  No.

8    BY MR. ERCOLE:

9      Q.   And, in fact, is it fair to say that if you

10   were involved -- strike that.

11           Is it fair to say that you would not have

12   been on the board of directors or been involved with

13   those particular organizations if you thought they

14   were putting out false statements in their

15   presentations?

16           MS. BALDWIN:  Object to form.  Leading.

17           THE WITNESS:  Yes.

18   BY MR. ERCOLE:

19     Q.   And if you'd take a look -- can you turn to

20   Exhibit 4 of your -- of the exhibits?

21           (Discussion off the record)

22           MS. BALDWIN:  I'm sorry.  I'm really

23   confused by your question.  What exhibit are you

24   referring to?

25           MR. ERCOLE:  It's Exhibit 4 in the documents

Confidential                                                    JAN-MS-05485750

Page 92

1    that were used yesterday.

2              MS. BALDWIN:  Okay.  Thank you.

3              MR. ZAKRZEWSKI:  There's no question yet.

4    He just said refer to Exhibit 4.

5              MS. BALDWIN:  And can you tell me the name

6    of the document?  Because the court reporter took

7    them all.

8              MR. ERCOLE:  Sure.  It's -- has "Cephalon"

9    on the top of it.

10             MS. BALDWIN:  Okay.

11             MR. ERCOLE:  And it's a fully executed

12   agreement.

13             MS. BALDWIN:  Thank you.

14   BY MR. ERCOLE:

15     Q.   Dr. Fishman, this is a document that the

16   State showed you yesterday as an exhibit.  Do you

17   recall that?

18     A.   I do.

19     Q.   Okay.  And if you'd turn to the second page,

20   it refers to an Independent Educational Program Grant

21   Agreement.  Do you see that?

22     A.   I do.

23     Q.   And this particular grant agreement

24   involves -- is between Cephalon and the University of

25   California, Davis?

Page 93

1    A.    Yes.

2    Q.    And do you recall the State using this

3  agreement as a basis to show that Cephalon funded

4  certain programs put on by the University of

5  California, Davis?

6          MS. BALDWIN:  Object to form.

7          THE WITNESS:  Yes.

8  BY MR. ERCOLE:

9    Q.    And if you'd turn -- the State didn't ask

10  you to actually look at the content of what's in this

11  particular agreement, did it?

12          MS. BALDWIN:  Object to form.

13          I allowed the witness to review every

14  document yesterday at his leisure if he requested to

15  do so.

16          THE WITNESS:  I'm sorry.  Can you restate

17  the question?

18  BY MR. ERCOLE:

19    Q.    Sure.  The State didn't ask you any

20  questions about the content of this particular

21  Educational Grant Agreement, did it?

22          MS. BALDWIN:  Object to form.

23          THE WITNESS:  I don't recall them asking me

24  about the content.

25  BY MR. ERCOLE:

Confidential                                                                    JAN-MS-05485752

Page 94

1      Q.   Okay.  And so can you turn to paragraph six

2   of this document?

3      A.   "Program Purpose"?

4      Q.   Yes.  And do you see where it says "This

5   program is for scientific and educational purposes

6   only and is not intended to promote a Cephalon

7   product, directly or indirectly"?

8           MS. BALDWIN:  Object to form.

9   BY MR. ERCOLE:

10      Q.   Do you see that?

11      A.   Yes, I do.

12      Q.   Is that consistent with your understanding

13   of what sort of independent programs were being put

14   forth by University of California, Davis?

15           MS. BALDWIN:  Object to form.  Leading.

16           THE WITNESS:  Yes.  And I think it's

17   supported if you look at the actual content of the

18   program that they supported.

19   BY MR. ERCOLE:

20      Q.   And if you'd turn to paragraph eight of this

21   document, do you see that there's a provision that

22   says "The IEP provider," and the IEP provider is the

23   University of California at Davis?  Do you understand

24   that?

25      A.   I do.

Confidential                                                                                JAN-MS-05485753

1      Q.    Okay.  And it says "The IEP provider shall

2    retain full responsibility for control of the content

3    of the program and shall ensure that the following

4    requirements are met."  Do you see that?

5      A.    I do.

6      Q.    And that was, at least according to this

7    document, a condition that Cephalon required in order

8    to give a grant for purposes of this presentation; is

9    that correct?

10          MS. BALDWIN:  Object to form.  Leading.

11          THE WITNESS:  Yes.

12   BY MR. ERCOLE:

13     Q.    And was that consistent with your

14   understanding of the presentation that was actually

15   put forward?

16          MS. BALDWIN:  Object to form.

17          THE WITNESS:  Are you asking me if the

18   presentation that we put forward was consistent with

19   what I think the spirit of this is?

20   BY MR. ERCOLE:

21     Q.    Yes.

22     A.    Yeah.

23          MS. BALDWIN:  Object to form.

24          THE WITNESS:  This is under "Objectivity and

25   Balance," and if you look at the program, it doesn't

Confidential                                                                    JAN-MS-05485754

Page 96

1    even have content that would discuss Cephalon's

2    products.

3    BY MR. ERCOLE:

4        Q.    And if you'd look at 8-B where it says "IEP

5    provider agrees that neither Cephalon nor its agents

6    shall control the content of the program."  Do you

7    see that?

8        A.    I do.

9            MS. BALDWIN:  Object to form.

10   BY MR. ERCOLE:

11       Q.    And was that that requirement that neither

12   Cephalon nor its agents shall control the content of

13   the program, consistent with the various CME programs

14   that you put on that were supported directly or

15   indirectly by Cephalon?

16           MS. BALDWIN:  Object to form and leading.

17           THE WITNESS:  We always controlled the

18   content of our CME programs, and no outside

19   influences would change that.

20   BY MR. ERCOLE:

21       Q.    And if you'd turn to paragraph nine of this

22   document, it refers to something called a Risk

23   Minimization Action Plan.

24       A.    Uh-huh.

25       Q.    Do you know what a Risk Minimization Action

Confidential                                                      JAN-MS-05485755

Page 97

1   Plan is?

2       A.    It's a -- to my knowledge, a post-marketing

3   intervention by the FDA to transparently document how

4   these drugs, these dangerous drugs -- the strategies

5   for how the risks would be minimized in using these

6   dangerous drugs.

7       Q.    And if you turn to paragraph nine, it says

8   "A risk map."  Have you heard -- have you heard that

9   phrase before, "risk map"?

10      A.    Yes.

11            MS. BALDWIN:  Objection to form.

12  BY MR. ERCOLE:

13      Q.    Is that the same as a Risk Minimization

14  Action Plan?

15      A.    Correct.

16      Q.    It says "A risk map is a strategic safety

17  program designed to meet specific goals and

18  objectives in minimizing known risks of a product

19  while preserving its benefits.  Do you see that?

20      A.    I do.

21            MS. BALDWIN:  Object to form.

22  BY MR. ERCOLE:

23      Q.    And with respect to the risks of a product,

24  would that include, at least for opioid medicines,

25  the risks for addiction and abuse?

Confidential                                                        JAN-MS-05485756

```
                                                    Page 98
 1              MS. BALDWIN:  Object to form.

 2              THE WITNESS:  Yes.

 3              MS. BALDWIN:  Leading.

 4     BY MR. ERCOLE:

 5         Q.   And those were FDA -- strike that.

 6              To the best of your knowledge, was a risk

 7     map an FDA required program?

 8         A.   I believe so.

 9              MS. BALDWIN:  Object to form.

10     BY MR. ERCOLE:

11         Q.   And if you'd turn to the last two pages of

12     this document.

13         A.   Uh-huh.  Yeah.

14         Q.   There's a reference on Exhibit B --

15         A.   Uh-huh.

16         Q.   -- to the Actiq Risk Management Program,

17     A-c-t-i-q, Risk Management Program.  Do you see that?

18         A.   I do.

19         Q.   And underneath that, there's a paragraph,

20     says "Provider is aware that Actiq was approved

21     subject to a Risk Management Program."

22         A.   Yes.

23              MS. BALDWIN:  Object to form.

24     BY MR. ERCOLE:

25         Q.   And it goes on to say "The RMP includes key
```

Confidential                                                      JAN-MS-05485757

Page 99

1   safety messages that are essential to the safe use of

2   a product"?

3       A.    Yes.

4             MS. BALDWIN:   Object to form.

5   BY MR. ERCOLE:

6       Q.    So in connection with this particular

7   program that Cephalon provided a grant for, Cephalon

8   was informing the provider that Actiq comes with an

9   FDA-approved Risk Management Program; is that

10  correct?

11            MS. BALDWIN:   Object to form.  Leading.

12            THE WITNESS:   I'm not sure that's exactly

13  correct.  They attach to their agreement that

14  information.  I'm not sure what the purpose of them

15  matching that here is.  I think they probably felt

16  like they wanted to be as complete as they could be

17  to make sure that if their product -- if this type of

18  opioid had been part of the content, that we would

19  potentially include this, but it was irrelevant

20  because we didn't talk about transmucosal fentanyl.

21  BY MR. ERCOLE:

22      Q.    And if you turn to Exhibit -- turn to the

23  following page, there's a reference to the Fentora

24  Risk Management Program.

25      A.    Right.

Confidential                                                    JAN-MS-05485758

Page 100

1     Q.    And is it fair to say that Fentora also came

2    with an FDA-approved Risk Management Program?

3     A.    Exactly.   And both are transmucosal rapid

4    onset opioids.

5     Q.    Okay.   And one or two final questions before

6    we take a break.

7          If you turn back to paragraph nine of the

8    agreement, do you see the last sentence there?

9     A.    "Any product marketed by Cephalon that is

10   approved with a risk map and the key safety-related

11   health outcome, as outlined in the risk map, are

12   listed in Exhibit B."  Oh.  "The IEP provider agrees

13   that it is aware of the risk map and the key safety

14   messages."

15    Q.    Sure.   And so at least for projects that

16   were being sponsored by Cephalon, it wanted providers

17   to know that its products came with these

18   FDA-approved risk maps; correct?

19          MS. BALDWIN:  Object to form and leading.

20          THE WITNESS:  I think this demonstrates that

21   Cephalon wanted the risks to be fully known in giving

22   this grant.

23   BY MR. ERCOLE:

24    Q.    Sure.   And if you turn to the last page,

25   Exhibit B again, some of the key safety messages that

Confidential                                                    JAN-MS-05485759

Page 101

1    are listed there includes the indication for the

2    particular medicine; is that true?

3        A.    Correct.

4             MS. BALDWIN:  Object to form.

5             THE WITNESS:  The limited indication.

6    BY MR. ERCOLE:

7        Q.    Limited indication; correct?  And it also

8    includes some of the contraindications of the

9    medicine too?

10       A.    Yes.

11       Q.    And it includes some of the risks associated

12   with prescribing this medicine; correct?

13            MS. BALDWIN:  Object to form.

14            THE WITNESS:  Yes.

15   BY MR. ERCOLE:

16       Q.    Okay.  Let's take a break.  Thanks.

17            VIDEO OPERATOR:  Okay.  We're off the

18   record.  It's 10:48.

19            (Recess)

20            VIDEO OPERATOR:  Okay.  We're back on the

21   record.  It's 11:07.

22   BY MR. ERCOLE:

23       Q.    Dr. Fishman, before we broke, took a break,

24   we were speaking about the risk maps for Actiq and

25   Fentora.  Do you recall that?

Confidential                                                                                      JAN-MS-05485760

```
                                            Page 102
 1     A.    Yes.
 2     Q.    In your view, should a prescriber be aware
 3   that a product comes -- or is subject to a risk map
 4   before writing a prescription for that product?
 5           MS. BALDWIN:  Objection.  Form.
 6           THE WITNESS:  Yes.
 7   BY MR. ERCOLE:
 8     Q.    And should --
 9     A.    At least to the content of that risk map.
10     Q.    Fair enough.  And if a provider or
11   prescriber is not aware of the content of that risk
12   map for some reason, that could lead to inappropriate
13   prescribing of medicine; is that fair to say?
14     A.    Yes.
15           MS. BALDWIN:  Objection.  Leading.
16   BY MR. ERCOLE:
17     Q.    Dr. Fishman, the State yesterday -- strike
18   that.
19           Yesterday, the State asked you a number of
20   questions about the intent of the defendants in this
21   case.  Do you recall some of those questions?
22           MS. BALDWIN:  Object to form.
23           THE WITNESS:  Not generally about the intent
24   of, but perhaps I --
25   BY MR. ERCOLE:
```

Confidential                                                                    JAN-MS-05485761

Page 103

1      Q.   Okay.  You have no knowledge one way or the

2   other about the intent of any pharmaceutical company

3   regarding marketing practices, do you?

4           MS. BALDWIN:  Object to form and leading.

5           THE WITNESS:  I have no knowledge of the

6   intent of any of the pharmaceutical companies or

7   their marketing.

8   BY MR. ERCOLE:

9      Q.   Do you have any knowledge about the intent

10   of any pharmaceutical companies in this case that are

11   named as defendants regarding their marketing?

12           MS. BALDWIN:  Object to form and leading.

13           THE WITNESS:  No.

14   BY MR. ERCOLE:

15      Q.   And you're not giving an opinion on what any

16   defendant in this case intended or didn't intend, are

17   you?

18           MS. BALDWIN:  Object to form and leading.

19           THE WITNESS:  I have no knowledge of intent,

20   and I couldn't give an opinion.

21   BY MR. ERCOLE:

22      Q.   And you're here as a fact witness; is that

23   fair?

24           MR. ZAKRZEWSKI:  Objection.

25           MS. BALDWIN:  Object to form.

Confidential                                                                 JAN-MS-05485762

```
                                                    Page 104
 1            MR. ZAKRZEWSKI:  Form.
 2            THE WITNESS:  I'm not sure what a fact
 3     witness -- I was subpoenaed to be here, and I'm here
 4     giving you my truthful opinions.
 5     BY MR. ERCOLE:
 6        Q.   Fair enough.  Sir, have you ever prescribed
 7     opioids for cancer pain?
 8        A.   Yes.
 9        Q.   And have you ever prescribed opioids for
10     noncancer pain?
11        A.   Yes.
12        Q.   Do you continue to prescribe opioids for
13     noncancer pain?
14        A.   Yes.
15        Q.   With respect to noncancer pain, can you give
16     me a -- sort of a list of some of the conditions for
17     which you've prescribed them?
18            MS. BALDWIN:  Object to form.
19            THE WITNESS:  Are you asking me what kinds
20     of conditions would I use an opioid for in a
21     noncancer pain, patient with noncancer pain?
22     BY MR. ERCOLE:
23        Q.   Sure.  That's exactly what I'm asking.
24        A.   It's rare that I would use an opioid for
25     chronic noncancer pain other than a short-term
```

Confidential

JAN-MS-05485763

Page 105

1    exposure.  The cases where you would potentially

2    think of and use an opioid are where the benefits

3    would have to outweigh the risks.  Today, we know

4    risks that we didn't know ten years ago based on much

5    more solid data.

6          In fact, the data on the benefits of opioids

7    is weak and really not very convincing.  The data on

8    risk is growing and increasingly convincing of the

9    risks that are involved.

10         So the decisions that I would make today

11    about giving an opioid, the process would be exactly

12    the same, but since the elements of the risk benefit

13    equation have now changed, that the outcome of that

14    equation would be different today.

15         So there are very few cases where I find

16    that the benefits outweigh the risks, but there are

17    cases, and I can give you an example of one.

18    Q.    Sure.

19    A.    You know, a patient -- and this is a real

20    case:  A patient who has a disease called spinal

21    stenosis, which is where the opening in the middle of

22    the spine that houses the spinal cord becomes

23    degenerated and becomes narrower and narrower because

24    of the deposition of calcium and other elements of

25    degeneration of the spine.

Confidential                                                                                    JAN-MS-05485764

Page 106

1        It's a mechanical problem that basically

2   suffocates the spinal cord or the spinal roots, and

3   patients get pain when they stand up and they start

4   walking because it essentially increases that

5   compression on the nerves or the cord.

6        Patients who get this problem largely are

7   older and get it because of years and years of

8   deconditioning and degeneration.  These are the same

9   people who often have many comorbidities that might

10  limit them from being able to treat them, the

11  mechanical problem with the mechanical solution they

12  need, which is surgical decompression, so many of

13  those patients can't have surgery that they

14  absolutely need, is maybe the only option to reverse

15  the condition because they wouldn't survive the

16  surgery because of the other diseases that they have

17  that aren't actually independent of the spinal

18  stenosis itself.

19        So with that, there are, you know, rare

20  cases where a patient might need a small dose of an

21  opioid after trying all the other options that are

22  less risky to maintain their ability to walk and

23  function and have a life that I would believe would

24  have quality to it.  Those cases don't occur very

25  much, and I work in a clinic where we tend to select

Confidential                                                                JAN-MS-05485765

Page 107

1    for patients like that, and it's even rare in a

2    clinic like that.

3           So, again, I want to stress it's not common

4    that we would prescribe opioids for chronic pain, but

5    there are cases in which the benefits -- the benefits

6    would be perceived to outweigh the risks on careful

7    examination, and these are patients who we might

8    prescribe an opioid chronically.

9      Q.    And with respect to the patient that you

10   gave an example of, has that patient benefited from

11   the opioid prescriptions you've written?

12          MS. BALDWIN:  Object to form.

13          THE WITNESS:  I believe that patient has,

14   and, in fact, it's a case of a patient who came to me

15   because they were benefiting from the opioids, and

16   their physicians were afraid that they shouldn't be

17   on opioids, so they took them off, and their function

18   greatly deteriorated, and then we were able to come

19   up with a plan that everyone was agreeable to, the

20   prescribers and the specialists and the patient, and

21   we had an agreement around how much would be used,

22   etc., so that, you know, the patient could go back to

23   their level of previous function.

24   BY MR. ERCOLE:

25     Q.    And whether or not the -- strike that.

Confidential                                                          JAN-MS-05485766

Page 108

1          In determining whether or not the risks of

2     opioids outweigh the benefits or the benefits

3     outweigh the risks, is that an individualized

4     determination by patient?

5          MS. BALDWIN:  Object to form.

6          MR. ZAKRZEWSKI:  Objection.

7          THE WITNESS:  Absolutely an individualized

8     decision, and it's also individually based on what

9     the treatment is as well.  So, for instance, you

10    might accept using a treatment at low dose but not at

11    high dose.  So this was -- the case that I gave you

12    was a patient who did very well on a very moderate

13    amount of medication that was ultimately acceptable

14    for long-term use.

15    BY MR. ERCOLE:

16    Q.    And have you prescribed opioids for other

17    noncancer-related pain conditions in your career

18    other than the example that you just identified?

19    A.    Yes.

20    Q.    Okay.  And what are some of those instances

21    where you prescribed opioids for noncancer pain?

22    A.    Well, they're too numerous to mention to

23    list it all, but they were all cases where, again,

24    opioids were not the first option, they were a late

25    option, and they were viewed as having less risk than

Confidential                                                                                        JAN-MS-05485767

Page 109

1    many of the other options that we had at hand.

2         So, for instance, a patient who has kidney

3    disease and can't take any inflammatories or is on an

4    anticoagulant medication and can't take any

5    inflammatory medications, patients who really don't

6    have any other options for many different chronic

7    conditions and don't have any other ways of

8    maintaining their function, I think it's appropriate

9    to at least consider an opioid as one of the options.

10   Again, these are rare.

11        If I can add, I should also emphasize that

12   it's even more -- it's even rarer to need high doses

13   of these opioids.

14   Q.   And with respect to the cases where you've

15   prescribed opioids for noncancer or related

16   conditions, I know you've now indicated that there

17   was an instance where you prescribed -- strike that.

18        You indicated that the instances where you

19   prescribed opioids for noncancer pain are too

20   numerous to mention.  Did I read that -- is that

21   accurate?

22        MS. BALDWIN:  Object to form.

23        THE WITNESS:  The kind of cases that would

24   be appropriate are too numerous.

25   BY MR. ERCOLE:

Confidential                                                                    JAN-MS-05485768

1    Q.   Right.  And in determining whether or not an

2    opioid prescription is appropriate for noncancer

3    pain, do you exercise your own independent medical

4    judgment in making that determination?

5    A.   Absolutely.

6    Q.   And is the age of the patient a factor that

7    you consider in making that determination?

8    A.   It would definitely be a factor.

9    Q.   Is whether or not the patient tried other

10   alternatives to opioids a factor that you would

11   consider in making that determination?

12   A.   Yes.

13   Q.   The risks of opioids -- strike that.

14        The risk of the particular opioid that's

15   being contemplated, is that something that you would

16   consider?

17   A.   Yes.

18   Q.   Medical history of the patient, is that

19   something you would consider?

20   A.   Yes.

21   Q.   Medical literature out there, is that

22   something you would consider in making a

23   determination as to what would be -- whether or not

24   an opioid would be appropriate for a patient?

25   A.   Yes.

Confidential

JAN-MS-05485769

1      Q.    Your history prescribing opioids, is that

2   something that you would consider in making a

3   determination?

4      A.    My --

5            MS. BALDWIN:  Object to form.

6            MR. ERCOLE:  Sure.  I'll rephrase it.

7   BY MR. ERCOLE:

8      Q.    Your prior clinical experience with the

9   particular medicine at issue, is that something that

10   you would consider?

11      A.    Yes.

12      Q.    How about the patient's pain level?  Is that

13   something you would consider?

14      A.    Yes.

15      Q.    Nature of the pain, is that something that

16   you would consider?

17      A.    Absolutely.

18      Q.    Patient's -- any history of abuse or

19   addiction with that patient, is that something you

20   would consider?

21      A.    Absolutely.

22      Q.    All of these are individualized factors that

23   go into a prescribing decision; is that fair to say?

24            MS. BALDWIN:  Object to form.

25            THE WITNESS:  They're some of the factors

Confidential                                                    JAN-MS-05485770

Page 112

1  that go into the decision to treat or not treat.

2  BY MR. ERCOLE:

3      Q.   And what are some of the other factors that

4  you would consider in making a determination as to

5  whether or not to prescribe an opioid for a

6  particular patient?

7      A.   Well, it would include the contraindications

8  of the drugs, the patient's -- you know, other

9  comorbidities, the patient's ability to take the drug

10  safely, to store the medication safely, the patient's

11  ability to modulate their own use, you know,

12  functional assessments because you asked me about

13  pain -- the pain level.

14          The pain is completely subjective, to we'd

15  want to look at objective measures around, you know,

16  asking questions like, "What is it that you can't do

17  now that you'd want to be able to do?" and being able

18  to feel comfortable, that we've set up a paradigm in

19  which we could see a function improved or declined

20  with the medications.  That's just some examples.

21      Q.   Any other factors that you can think of?

22      A.   I'm sure there are others, but I can't think

23  of them off the top of my head.

24      Q.   And how about whether or not the medicine is

25  subject to a risk map, for instance?  That impact

Confidential                                                                  JAN-MS-05485771

Page 113

1    your -- could impact your decision making?

2           MS. BALDWIN:  Object to form.

3           THE WITNESS:  Well, you know, there's

4    something called a REMS, a risk evaluation mitigation

5    strategy, that some opioids have mandatory processes

6    that you're going to attend to if you're going to use

7    the drugs, and some of the transmucosal drugs have a

8    mandatory REMS, so you'd need to address that risk

9    map directly with those drugs.

10          You know, again, I hate to use the word

11   "risk map" because clinicians might not know the risk

12   map, but they should know the content within the risk

13   map.

14   BY MR. ERCOLE:

15      Q.   And you mentioned REMS program.

16      A.   Uh-huh.

17      Q.   Do you know whether or not Actiq and

18   Fentora -- strike that.

19          Have you ever heard the phrase "TIRF REMS"?

20      A.   Yes.

21      Q.   And what is "TIRF REMS"?

22      A.   They're the risk evaluation mitigation

23   program that has a mandatory education component for

24   transmucosal fentanyl products.

25      Q.   And do you know what that mandatory

Confidential                                                    JAN-MS-05485772

Page 114

1  educational program requires before writing a
2  prescription of a TIRF medicine?
3      A.   I believe it requires an online training.
4      Q.   Sorry.  I'm just pulling out a document.  I
5  don't mean to be --
6      A.   Okay.
7      Q.   -- rude.  And have you -- we talked about
8  Actiq and Fentora.  Are those medicines subject to
9  the TIRF REMS program?
10     A.   I believe so.
11     Q.   And Actiq and Fentora are rapid onset
12 opioids?
13     A.   Correct.
14     Q.   Okay.  And have you ever prescribed Actiq
15 before?
16     A.   You know, I don't believe I have.
17     Q.   Have you ever prescribed Fentora before?
18     A.   I don't recall prescribing it.
19     Q.   Are you enrolled in the TIRF REMS program?
20     A.   No.
21     Q.   Okay.  Are you familiar with the concept of
22 breakthrough pain?
23     A.   I am.
24     Q.   And what is breakthrough pain?
25     A.   Breakthrough pain is pain that rises above a

Confidential                                      JAN-MS-05485773

Page 115

1   steady level of pain, so separate from -- you know,

2   kind of pain that spikes through a steady level of

3   pain.

4       Q.   Is breakthrough pain a public health problem

5   for patients?

6           MS. BALDWIN:  Object to form.

7   BY MR. ERCOLE:

8       Q.   Strike that.

9           Is breakthrough pain a problem for patients?

10          MS. BALDWIN:  Object to form.

11          THE WITNESS:  For some patients.

12  BY MR. ERCOLE:

13      Q.   And what are some of the consequences of

14  breakthrough pain --

15          MS. BALDWIN:  Object to form.

16  BY MR. ERCOLE:

17      Q.   -- for patients?

18      A.   Suffering, decreased function, diminished

19  health.

20      Q.   Any other functional limitations?

21      A.   There can be a myriad of problems that fall

22  from those.

23      Q.   And Actiq and Fentora are indicated for the

24  treatment of breakthrough pain in cancer patients

25  that are opioid tolerant; is that your understanding?

Confidential                                                    JAN-MS-05485774

Page 116

1    A.    Correct.

2    Q.    And in your view, is there a difference

3  between breakthrough cancer pain and breakthrough

4  noncancer pain?

5         MS. BALDWIN:  Object to form.

6         THE WITNESS:  Well, I mean, it's different

7  in its nature, but ultimately, you know, there's a

8  lot of commonality to it.

9  BY MR. ERCOLE:

10   Q.    And when you say "a lot of commonality,"

11 what do you mean by that?

12   A.    Well, you know, breakthrough pain in people

13 with chronic pain, you know, there are different

14 etiologies, different reasons why they have pain, but

15 ultimately, it meets the same criteria of pain that

16 spikes through a basic level of steady, constant

17 pain.

18   Q.    With respect to the TIRF REMS program that

19 you were referring to earlier, is it your

20 understanding that before a prescriber can write a

21 prescription of Actiq and Fentora, they have to go

22 through a mandatory educational program?

23   A.    I believe so.

24         MS. BALDWIN:  Object to form.

25 BY MR. ERCOLE:

Confidential                                      JAN-MS-05485775

Page 117

1    Q.   And is it your understanding that that

2   mandatory educational program would highlight the

3   indications of those particular medicines?

4            MS. BALDWIN:   Object to form.

5            THE WITNESS:   Yes.

6   BY MR. ERCOLE:

7    Q.   And would that mandatory educational program

8   highlight the risks associated with prescribing those

9   medicines?

10            MS. BALDWIN:   Object to form.

11            THE WITNESS:   Yes.

12   BY MR. ERCOLE:

13    Q.   Is it your understanding that before a

14   prescription of Actiq or Fentora is written as a

15   result of the TIRF REMS program, that a doctor and

16   patient have to sign a actual formal agreement before

17   a prescription is written?

18            MS. BALDWIN:   Object to form.

19            THE WITNESS:   I'm not sure about that.

20   BY MR. ERCOLE:

21    Q.   Doctor, with respect to breakthrough pain,

22   do you believe that -- let me show you.  Let's mark

23   this as 38.

24            (Exhibit 38 marked)

25   BY MR. ERCOLE:

Confidential                                                                JAN-MS-05485776

Page 118

1     Q.    Dr. Fishman, is this a CME program that you

2     authored?

3     A.    Yes.

4     Q.    And it's "Advances in Assessing and Managing

5     Breakthrough Pain"?  Is that the title of it?

6     A.    Correct.

7     Q.    And if you'd turn to the -- what's marked as

8     Fish 80 on the bottom.  Do you see that page?

9     A.    Yeah.

10    Q.    And if you'd look at the first sentence on

11    that page, the full sentence, it says "Current

12    studies suggest that BPT" -- is that referring to

13    breakthrough pain?

14    A.    Uh-huh.

15    Q.    -- "occurs in as many as 95 percent of all

16    patients treated for pain, depending on the

17    population surveyed and the definition of

18    breakthrough pain used in investigation."

19          MS. BALDWIN:  Object to form.

20    BY MR. ERCOLE:

21    Q.    Is that -- did I read that accurately?

22          MS. BALDWIN:  Object to form.

23          THE WITNESS:  It states that "Current

24    studies suggest that breakthrough pain occurs in as

25    many as 95 percent of all patients treating pain,

Confidential

JAN-MS-05485777

Page 119

1  depending on the population surveyed and the

2  definition of breakthrough pain used in the

3  investigation."

4  BY MR. ERCOLE:

5     Q.    And then it goes on to talk about the public

6  health consequences of breakthrough pain.  Do you see

7  that?

8     A.    I do.

9     Q.    And it says "Breakthrough pain is a major

10  component of the public health problem related to the

11  undertreatment of pain."  Do you see that?

12     A.    I do.

13          MS. BALDWIN:  Object to form.

14  BY MR. ERCOLE:

15     Q.    And it goes on to say "which has become a

16  national quality of care issue and is a priority

17  concern."

18          MS. BALDWIN:  Object to form.

19  BY MR. ERCOLE:

20     Q.    Is that accurate?

21     A.    Yes.

22     Q.    And do you agree that breakthrough pain is

23  a -- remains a major component of the undertreatment

24  of pain in the United States?

25          MS. BALDWIN:  Object to form.

Confidential                                                                                          JAN-MS-05485778

Page 120

1          THE WITNESS:  It's a continuing problem.

2     It's a -- I've got to say it's an area that I think

3     we maybe have -- we overreacted to and that, you

4     know, we -- sometimes we -- the treatment was worse

5     than the disease in this area.  So I'm looking at

6     this and thinking, you know, we probably would

7     rewrite this differently today.

8     BY MR. ERCOLE:

9          Q.   But, sir, you authored this document in

10    2005; is that correct?

11         A.   Yeah.

12         Q.   And this was your independent work; true?

13         A.   Correct.  I said "we."

14              MS. BALDWIN:  Object to form.

15    BY MR. ERCOLE:

16         Q.   Sure.

17         A.   I used the term "we."

18         Q.   Okay.

19         A.   This was done -- you know, I was the lead

20    author of this but in conjunction, you'll see, with

21    others.

22         Q.   Okay.

23         A.   Other leaders in the field.

24         Q.   And at least in 2005, if you look at the

25    public health consequences, on the page, it talks

Confidential                                                    JAN-MS-05485779

```
                                          Page 121
 1   about how breakthrough -- if you turn to the
 2   paragraph on page 80, "Breakthrough pain
 3   significantly adds to healthcare costs."  Do you see
 4   that sentence?
 5           MS. BALDWIN:  Object to form.
 6           THE WITNESS:  I do.
 7   BY MR. ERCOLE:
 8      Q.   Okay.  And is that -- was that a fair and
 9   accurate statement in 2005, that breakthrough pain
10   significantly adds to healthcare costs?
11      A.   Yes.
12           MS. BALDWIN:  Objection to form and leading.
13   BY MR. ERCOLE:
14      Q.   And it goes on to say "significantly adds to
15   healthcare costs because it often leads to patient
16   utilization of healthcare resources."  Is that
17   accurate then?
18           MS. BALDWIN:  Object to form and leading.
19           THE WITNESS:  I believe so.
20   BY MR. ERCOLE:
21      Q.   And does it continue to be accurate today,
22   that breakthrough pain can add to healthcare costs?
23      A.   I think it can.
24           MS. BALDWIN:  Object to form.
25           Sorry, Dr. Fishman.  I know it's hard.
```

Confidential                                                          JAN-MS-05485780

Page 122

1          THE WITNESS:  It's all right.  My fault.

2    I'll wait.

3    BY MR. ERCOLE:

4      Q.   And at least with respect to Actiq and

5    Fentora, they are designed to address breakthrough

6    pain in opioid-tolerant noncancer patients; correct?

7          MS. BALDWIN:  Objection.  Leading.

8          THE WITNESS:  My sense were that they were

9    developed for cancer patients.

10   BY MR. ERCOLE:

11     Q.   Sure.  No.  And I apologize for -- yeah.

12   Let me re-correct that.  That they were designed to

13   address and indicated for breakthrough pain in

14   opioid-tolerant cancer patients; correct?

15     A.   That is correct.

16     Q.   And would you agree that Actiq and Fentora

17   can play a significant role in reducing healthcare

18   costs associated with breakthrough pain in

19   opioid-tolerant patients, at least when prescribed

20   appropriately?

21         MS. BALDWIN:  Objection.  Leading.

22         THE WITNESS:  Can you ask that again?

23   BY MR. ERCOLE:

24     Q.   Sure.  Would you agree that Actiq and

25   Fentora can play a significant role in reducing

Confidential                                                          JAN-MS-05485781

Page 123

1    healthcare costs by treating breakthrough pain in

2    opioid-tolerant patients, at least when prescribed

3    appropriately?

4            MS. BALDWIN:  Same objection.

5            THE WITNESS:  There's a role for rapid onset

6    opioids in cancer patients, although I think it's a

7    very limited role.  How much that they would affect

8    healthcare costs, I think, is a questionable entity.

9    I'm not sure that I would fully support what you

10   said.  I guess the answer is I'm not absolutely

11   certain of that.

12   BY MR. ERCOLE:

13       Q.   Okay.

14       A.   Because these are not inexpensive drugs.

15       Q.   You're not absolutely certain one way or the

16   other?

17       A.   Yeah.

18       Q.   But at least as of 2005, you were

19   highlighting the healthcare costs that are associated

20   with breakthrough pain; correct?

21           MS. BALDWIN:  Objection to form and leading.

22           MR. ZAKRZEWSKI:  Objection.

23           THE WITNESS:  Right.  But there's a

24   different between the problem of breakthrough pain

25   and treatment with Fentora and Actiq.

Confidential                                                        JAN-MS-05485782

```
                                          Page 124
 1   BY MR. ERCOLE:
 2      Q.   Sure.  And at least in this article, you are
 3   highlighting that breakthrough pain can be treated
 4   with rapid onset opioids; correct?
 5      A.   Right.
 6           MS. BALDWIN:  Object to form.
 7           THE WITNESS:  I can tell you where, if you
 8   want to know where my concern is with this debate --
 9   BY MR. ERCOLE:
10      Q.   Sure.
11      A.   -- is that I think that the whole
12   breakthrough pain initiative is the right initiative,
13   but it was used by some to look at patients who
14   unwittingly would get more and more opioids because
15   there wasn't really fine-tuned understanding of what
16   was breakthrough pain and why it was breaking
17   through, and it became an excuse to continue to up
18   the doses of opioids.
19           So I'm uncomfortable, and I would have --
20   had I known now what I didn't know then, I would have
21   been more cautious with the way that they crafted the
22   statements here.
23      Q.   But, again, the statements here reflect your
24   independent opinions; correct?
25      A.   Right, and my lack of knowledge at the time.
```

Confidential                                                      JAN-MS-05485783

Page 125

1     Q.    And when you refer to "used by some to look

2   at patients," you were referring to some physicians;

3   correct?

4           MS. BALDWIN:   Object to form.

5           THE WITNESS:   I refer to people who use

6   opioids and are looking at breakthrough pain, and

7   rather than, you know, looking at it critically and

8   asking, "How can we address this without increasing

9   the overarching amount of opioid the patient's taking

10  per day?" they used it as an excuse, and I would say

11  unwitting primary care clinicians say, "Okay.  Well,

12  you're having breakthrough pain.  I'll add a

13  short-acting opioid on top of a long-acting opioid,

14  and then on the next visit, I'll consolidate them."

15          So the long-acting opioid now went up by,

16  you know, 50 percent or something like that, and then

17  the cycle replayed itself until these patients were

18  on huge amounts of opioids without the clinicians

19  really going back and looking, "What are we doing,

20  and what's the ultimate impact of the patient?"

21  largely based on knowledge that we only really

22  supported by clear data within the last ten years

23  that risk goes up with dose.

24          So the risk benefit analysis changes with

25  every dose increase that occurs, and that was not

Confidential                                                                    JAN-MS-05485784

Page 126

1   emphasized here, and it should have been.  So I'm

2   just happy I could -- I appreciate your indulging me

3   to be able to say that.

4   BY MR. ERCOLE:

5       Q.   Sure.  And sitting here today, are you aware

6   of -- well, with respect to the physicians who write

7   prescriptions of Actiq or Fentora, as we talked about

8   before they can write a prescription of Actiq and

9   Fentora, they need to pass an educational test saying

10  that they're aware of the risks of those medicines;

11  correct?

12      A.   Yes, I believe that is the case.

13      Q.   Right.

14      A.   It wasn't early on with the introduction of

15  Actiq and Fentora in the market.

16      Q.   Sure.  But at least, as we looked at

17  earlier, when Actiq and Fentora were passed, they

18  were passed with risk maps.

19      A.   Correct.

20      Q.   FDA-mandated risk maps; correct?

21      A.   Correct.

22          MS. BALDWIN:  Object to form.

23  BY MR. ERCOLE:

24      Q.   And those risk maps would have highlighted

25  to physicians the risks associated with those

Confidential                                                                                    JAN-MS-05485785

```
                                              Page 127

 1   medicines; correct?

 2      A.    Yes.

 3      Q.    Okay.  I just have a couple more questions.

 4           Are you aware of any instance where any

 5   Oklahoma -- strike that.

 6           This is a case, we've talked about, brought

 7   by the State of Oklahoma; correct?

 8      A.    Yes.

 9      Q.    Okay.  And are you aware of any instance

10   where an Oklahoma doctor has been misled in some way

11   into writing a inappropriate prescription of opioids?

12           MS. BALDWIN:  Object to form.

13           THE WITNESS:  No.

14   BY MR. ERCOLE:

15      Q.   Are you aware of any instance where any

16   Oklahoma doctor has been misled by a pharmaceutical

17   company into writing an inappropriate prescription of

18   opioids?

19           MS. BALDWIN:  Object to form.

20           THE WITNESS:  No.

21   BY MR. ERCOLE:

22      Q.   Are you aware of any instance where any

23   Oklahoma doctor has been misled by any of the

24   defendants here into writing a inappropriate

25   prescription of Actiq or Fentora?
```

Confidential                                                    JAN-MS-05485786

Page 128

1          MS. BALDWIN:  Object to form.

2          THE WITNESS:  No.  And can I just add?  I

3     don't know any Oklahoma doctors.

4     BY MR. ERCOLE:

5      Q.   Okay.  Thank you.  I just have one or two

6     final questions, and then I will pass.

7          We've talked about the -- at length about

8     the risks of opioid medicines; right?

9      A.   Yes.

10     Q.   Okay.  I just want to walk through some of

11     the sources by which those risks are disclosed to the

12     medical community if that's okay with you.  Is it

13     fair to say in that the -- well, do the labels of

14     opioid medicines disclose the risks?

15     A.   Yes.

16          MS. BALDWIN:  Object to form.  Leading.

17     BY MR. ERCOLE:

18     Q.   And those are FDA-approved labels?

19          MS. BALDWIN:  Object to form.  Leading.

20          THE WITNESS:  Yes.

21     BY MR. ERCOLE:

22     Q.   And is it expected that physicians would be

23     knowledgeable about the risks in the labels of those

24     medicines before writing a prescription?

25          MS. BALDWIN:  Object to form and leading.

Confidential                                                                                JAN-MS-05485787

```
                                              Page 129

 1              THE WITNESS:  Yes.
 2    BY MR. ERCOLE:
 3        Q.   We've also talked about FDA REMS programs
 4    and risk management programs.  Are those some of the
 5    sources by which the risks of opioids were
 6    communicated to the medical community?
 7              MS. BALDWIN:  Object to form and leading.
 8              THE WITNESS:  It could be.
 9    BY MR. ERCOLE:
10        Q.   We also looked at some of your books;
11    correct?
12        A.   (Moves head up and down).
13        Q.   Was that a source by which the risks of
14    opioids were communicated to the medical community?
15              MS. BALDWIN:  Object to form.
16              THE WITNESS:  For those who read them.
17    BY MR. ERCOLE:
18        Q.   CME programs that you put on, are those some
19    of the sources by which the risks of opioids were
20    communicated to the medical community?
21        A.   Yes.
22              MS. BALDWIN:  Object to form.
23    BY MR. ERCOLE:
24        Q.   Articles that you published, was that
25    another source by which opioids -- excuse me.
```

Confidential                                                              JAN-MS-05485788

1          Was that another source by which the risks

2     of opioids were communicated to the medical

3     community?

4          MS. BALDWIN:  Object to form and leading.

5          THE WITNESS:  Yes.

6     BY MR. ERCOLE:

7       Q.   I believe you mentioned you've been a

8     teacher of medical students for many years now; is

9     that accurate?

10      A.   Yes.

11      Q.   Okay.  Did your teaching communicate to

12    those students the risks of opioid medicine?

13          MS. BALDWIN:  Object to form.

14          THE WITNESS:  Yes.

15    BY MR. ERCOLE:

16      Q.   And is it fair to say that at least if a

17    prescriber wanted to be educated about the risks of

18    opioids, that there were -- and there have been

19    numerous independent sources that have disclosed

20    those risks to providers?

21          MS. BALDWIN:  Object to form and leading.

22          THE WITNESS:  Yes.  I just would add that

23    I'm not sure that there's one place where they all

24    were exhaustively presented, which I think is a --

25    you know, is a shortfall of, you know, everybody

Confidential

Page 131

1    involved in trying to do this, you know, that we've

2    really evolved over the last 20 years, mostly in the

3    last ten years, of really understanding what those,

4    you know, risks to making the decision to -- that

5    would go into the decision to prescribe an opioid

6    should be.

7            So with that, you know, there are -- a lot

8    of the risks are well available.  Some of them are

9    more subtle and harder for people to find, like the

10   data on benefit for opioids is weak to inadequate,

11   and that's a -- I would say that's a risk that would

12   go into the decision making but not one that was

13   articulated in many places.  In fact, not in my book.

14   BY MR. ERCOLE:

15     Q.   But at least is it fair to say that if a

16   prescriber had an interest in understanding the risks

17   associated with opioid medicines before writing such

18   a prescription, there were many sources that that

19   provider could turn to to understand those risks?

20            MS. BALDWIN:  Object to form and leading.

21            THE WITNESS:  I think that's fair.

22   BY MR. ERCOLE:

23     Q.   And I know the -- one second.

24            (Pause)

25   BY MR. ERCOLE:

Confidential                                                                JAN-MS-05485790

```
                                            Page 132

 1      Q.    The State asked you yesterday a number of

 2   questions about Exhibit 7, if you don't mind turning

 3   to that document.  This will be very quick.  Yes.

 4           MS. BALDWIN:  I'm sorry.  Can I just see the

 5   document?

 6           MR. ERCOLE:  Yeah.  It's the Key Opinion

 7   Leader Development Plan.

 8   BY MR. ERCOLE:

 9      Q.    Have you ever seen this document before,

10   Dr. Fishman?

11      A.    I don't believe so.

12      Q.    Do you have any idea of how it was created?

13      A.    I don't.

14      Q.    Do you have any idea who created it?

15      A.    Well, it says these two people here, but I

16   don't even know if they work for -- they work for the

17   company or not, and I don't know if this was really a

18   company.  This is something that was enacted, so I

19   don't know anything about it.

20      Q.    And do you see the word "Draft" on the

21   front?

22      A.    I do.

23      Q.    And do you have any idea whether or not

24   anything in this document was finalized at the

25   company?
```

Confidential                                                    JAN-MS-05485791

Page 133

1          MS. BALDWIN:  Object to form.

2          THE WITNESS:  I do not.

3   BY MR. ERCOLE:

4     Q.   Do you have any idea whether anything in

5   this document was actually implemented by the

6   company?

7          MS. BALDWIN:  Object to form.

8          THE WITNESS:  I do not.

9   BY MR. ERCOLE:

10    Q.   And is it fair to say that at least with

11  respect to the internal -- company-specific internal

12  documents that the State showed you yesterday, you

13  have no idea how those documents were developed?

14         MS. BALDWIN:  Object to form.

15         THE WITNESS:  That is correct.

16  BY MR. ERCOLE:

17    Q.   And you have no idea whether or not any of

18  the companies actually implemented what was listed in

19  there or didn't implement them?

20         MS. BALDWIN:  Object to form.

21         THE WITNESS:  I have no knowledge of how

22  anything was -- whether it was implemented or how it

23  was implemented.

24  BY MR. ERCOLE:

25    Q.   No personal knowledge of any of the internal

Confidential                                                                      JAN-MS-05485792

```
                                          Page 134
 1   corporate documents that you were shown yesterday by
 2   the State; is that fair to say?
 3           MS. BALDWIN:  Object to form.
 4           THE WITNESS:  I believe that's true.
 5   BY MR. ERCOLE:
 6       Q.  Okay.
 7           MR. EHSAN:  Do you want to stop, or do you
 8   want to --
 9           MR. ZAKRZEWSKI:  Let's use the time, please.
10           THE WITNESS:  So we should stop a few
11   minutes before noon.
12           MR. ZAKRZEWSKI:  Okay.  So they can get in
13   here, yeah.
14           THE WITNESS:  And we'll need to clear the
15   table.  If you can take your stuff, put it just in
16   the back.
17                       EXAMINATION
18   BY MR. EHSAN:
19       Q.  Good morning, Dr. Fishman.  My name is
20   Houman Ehsan.  We met yesterday, but I just wanted to
21   introduce myself again on the record.
22           Before yesterday's deposition, have we ever
23   met?
24       A.  I don't believe so.
25       Q.  I did mention that I had some connection
```

Confidential                                                    JAN-MS-05485793

Page 135

1    with U.C. Davis Medical School, but I'm -- also,

2    likewise, don't ever recall meeting you in person,

3    but I just wanted to have that question on the

4    record.

5            And for your benefit, doctor, I represent

6    the Janssen/Johnson & Johnson defendants in this

7    litigation.  Do you have an understanding one way or

8    the other about the distinction between Janssen and

9    Johnson & Johnson?

10    A.    Just that Janssen was an independent company

11    that was purchased by J&J and is a subdivision now of

12    J&J.

13    Q.    So to the extent you were asked questions

14    whether a document that may have borne Janssen's logo

15    reflected Johnson & Johnson's thinking, do you have

16    an independent understanding of whether that could be

17    true or not true?

18    A.    I do not.

19            MS. BALDWIN:  Objection.

20    BY MR. EHSAN:

21    Q.    More generally, to the extent that you

22    testified on corporate documents and what the words

23    on those documents may have meant, in any of those

24    instances, did you have an independent understanding

25    of those words beyond what was written on those

Confidential                                                                JAN-MS-05485794

Page 136

1    pages?

2         MS. BALDWIN:  Object to form.

3         THE WITNESS:  It's hard to know, to review

4    in my mind every one of them, but my recollection is

5    that they -- I'd not seen them before, and I really

6    didn't have any context for them.

7    BY MR. EHSAN:

8    Q.   And fair to say you're not a mind reader;

9    correct?

10         MS. BALDWIN:  Object to form.

11         THE WITNESS:  I knew you were going to ask

12    that.  No, I am not a mind reader.

13    BY MR. EHSAN:

14    Q.   So you have no independent ability to read

15    what someone may have meant if you had never seen a

16    document before, never spoken to them and had no

17    other basis other than the words written on that

18    page; correct?

19         MS. BALDWIN:  Object to form and leading.

20         THE WITNESS:  Correct.

21         (Exhibit 39 marked)

22    BY MR. EHSAN:

23    Q.   Dr. Fishman, I've handed you what's been

24    marked as Exhibit 39.  Do you recognize this

25    document?

Confidential                                                                    JAN-MS-05485795

Page 137

1      A.    Yes.

2      Q.    And how do you recognize it?

3      A.    It's a publication of mine from -- published

4   in 1998 -- or accepted for publication in 1998, work

5   that was produced, was conducted in 1997 at Mass

6   General Hospital.

7      Q.    And it was published in 1999; correct?

8      A.    Correct.  It appeared in print in 1999.

9      Q.    And what is the subject of this particular

10  publication?

11     A.    It's a study of how the opioid contract is

12  used amongst academic centers in the United States.

13     Q.    Were opioid contracts used of these by some

14  academic centers in 1997 when you were conducting

15  this research?

16     A.    Yes.

17     Q.    And that fact is reflected by -- under

18  Table 1 where you list 39 academic centers have

19  submitted such a contract; correct?

20     A.    Correct.

21     Q.    If you'd look at Table 3, which is on

22  page 31 of the publication as paginated, and let me

23  know when you're there.

24     A.    I'm there.

25     Q.    Can you explain what Table 3 was attempting

Confidential                                                                    JAN-MS-05485796

Page 138

1   to do?

2       A.    Table 3 was a attempt to extract -- to

3   assimilate all the contracts we had received and to

4   look at what the most common statements were within

5   the contracts.

6       Q.    So just looking at -- and it's a long list.

7   I'm just going to focus your attention on a few

8   examples.  If you look at item five, it is identified

9   as "Submit to random drug screen."  Do you see that?

10      A.    I do.

11      Q.    And it states that 27 contracts had that;

12  correct?

13      A.    Correct.

14      Q.    That represented 69 percent of the contracts

15  you reviewed as part of this study; correct?

16          MS. BALDWIN:  Object to form.

17          THE WITNESS:  Correct.

18  BY MR. EHSAN:

19      Q.    So my interpretation of that is

20  approximately two-thirds of academic medical center

21  opioid contracts had patients submit to random drug

22  screens; correct?

23          MS. BALDWIN:  Object to form.

24          THE WITNESS:  Correct.

25  BY MR. EHSAN:

Confidential                                                                 JAN-MS-05485797

Page 139

1      Q.    Likewise, under number eight, certain
2    percentage of contracts included limits on drug
3    refills; is that correct?
4            MS. BALDWIN:  Object to form.
5            THE WITNESS:  Correct.
6    BY MR. EHSAN:
7      Q.    Number 11, certain percentage of contracts
8    had educational addiction risks and behaviors;
9    correct?
10     A.    Yes.
11     Q.    Is it fair to say that this publication was
12   available in 1999 to anyone with access to PubMed to
13   review?
14           MS. BALDWIN:  Object to form and leading.
15           THE WITNESS:  Yeah.
16   BY MR. EHSAN:
17     Q.    The question is once the article is
18   published, doctor, is it your understanding that it
19   is readily available to anyone to access through the
20   National Institutes of Health Public Medicine
21   Library?
22           MS. BALDWIN:  Object to form.
23           THE WITNESS:  Yes.
24   BY MR. EHSAN:
25     Q.    And, in fact -- back up and ask it this way:

Confidential                                                                          JAN-MS-05485798

Page 140

1   What was your goal in identifying these facets of

2   various patient contracts at academic medical centers

3   in a publication?

4       A.   Well, this is work that I think demonstrates

5   a very early commitment to pharmacovigilance and

6   again, you know, well before anyone was -- you know,

7   that this was in any way in the public media.  In

8   fact, we were criticized for doing this work because

9   it was felt that these opioid contracts were somehow

10  in conflict with the doctor-patient trust

11  relationship, so -- but we did it because we felt

12  that these were going to be more and more required;

13  and I think we were prescient about that, that this

14  could have the potential to do a lot of good, but we

15  were worried that there might be elements that might

16  be viewed as harmful as well, and there had never

17  been an attempt to get consensus on what should be in

18  these agreements even though they were in fact widely

19  used.

20          So this is really the first time opioid

21  contracts, which were widely used in academic centers

22  and we believe probably widely used in private

23  centers as well, had been looked at with any kind of

24  scrutiny.

25      Q.   So by 1997 when you began doing this work,

Confidential                                                                 JAN-MS-05485799

Page 141

1    it is your understanding that there were opioid

2    contracts widely in use within the academic medical

3    centers?

4              MS. BALDWIN:  Object to form.

5              THE WITNESS:  I believe that to be true.

6    And in the public sector as well.

7    BY MR. EHSAN:

8       Q.   And, likewise, in 1997 when you were

9    conducting this research for this publication, your

10   understanding is that there were opioid contracts

11   widely in use within the private sector?

12      A.   Correct.

13             MS. BALDWIN:  Object to form.

14   BY MR. EHSAN:

15      Q.   So if someone wanted to design an opioid

16   contract, this publication would provide a blueprint

17   upon which one could start the process; would that be

18   a fair statement?

19             MS. BALDWIN:  Object to form.  Leading.

20             THE WITNESS:  Again, I would frame it that

21   this would help support the content that they could

22   use and, you know, essentially give them content that

23   they could decide to add or reject in their

24   contracts.  I think we state in here that contract's

25   very individual and that, in fact, the contract -- I

Confidential                                                                 JAN-MS-05485800

Page 142

1    don't know if we said this, I think I might have,

2    that, you know, there's never been a case where a

3    physician sued a patient for breaking the contract,

4    but patients have actually sued their physicians for

5    breaking their own contract.  So it's important to

6    tailor it to your practice and then adhere to the

7    contract that you sign.

8    BY MR. EHSAN:

9        Q.   Were some of the facets that were identified

10   in this publication in 1999 about patient contracts

11   been widely accepted in 2019 as best practices?

12       A.   I believe so.

13            MS. BALDWIN:  Object to form.

14   BY MR. EHSAN:

15       Q.   Do you think that if -- strike that.  Ask

16   the question differently.

17            Do you think that an adoption of a contract

18   like this, like -- strike that.

19            Do you believe that the adoption of

20   contracts such as those that you identified in this

21   paper would be helpful in reducing the potential risk

22   of abuse, misuse and addiction in patients prescribed

23   long-term opioid therapy?

24            MS. BALDWIN:  Object to form.

25            THE WITNESS:  Well, I'd like to say that at

Confidential                                                      JAN-MS-05485801

Page 143

1   the time that this was conducted, this study was

2   conducted, I don't know that you could support that a

3   contract was part of the standard of care.  It now is

4   because it's recommended by the national and many,

5   many state guidelines for prescribing opioids.

6           Particularly, it's called for out of the CDC

7   guidelines, and it's called for in the FSMB

8   guidelines as well, so I'd go further, that it's

9   almost a required part of the safe process of

10  prescribing opioids.

11  BY MR. EHSAN:

12     Q.   And that the requirement in 2019 was

13  available in the public domain, at least through your

14  publication, back in 1999; correct?

15          MS. BALDWIN:  Object to form.

16          THE WITNESS:  I don't think the requirement

17  was, but the resources were available to produce an

18  agreement that would have these elements.

19  BY MR. EHSAN:

20     Q.   I am told that we have to stop here, so why

21  don't we take a break.

22     A.   All right.

23          VIDEO OPERATOR:  Okay.  We're off the record

24  at 11:57.

25          (Noon recess taken)

Confidential                                                      JAN-MS-05485802

Page 144

1       VIDEO OPERATOR:  Okay.  We're back on the
2  record.  It's 1:13.
3  BY MR. EHSAN:
4     Q.    Dr. Fishman, before we went on break, we
5  were talking about your 1999 article regarding
6  various patient contracts in use at academic centers.
7  Do you recall that testimony?
8     A.    I do.
9     Q.    I think you testified that it has now become
10  standard of care to have patient contracts when
11  prescribing opioids.  Did I recall that testimony
12  correctly?
13     A.    Well, they're -- yes.  They're often
14  referred to as agreements now or other euphimisms,
15  but they're, in my opinion, still contracts.
16     Q.    To use your term, these patient agreements,
17  at least in California, how did they become the
18  standard of care if you know?
19     A.    Well, I think that they became the standard
20  of -- well, the standard of care is -- as I
21  understand it from medical boards that have to
22  determine the standard of care, come from state and
23  national guidelines that -- from experts in the field
24  in which the standard would be derived, so over the
25  last ten years or so, there's been a steady growth of

Confidential                                                    JAN-MS-05485803

Page 145

1   guidelines around what is appropriate for pain

2   management, and I don't think there's been a

3   guideline that hasn't cited the use of the formal

4   agreement as a recognized part of a responsible

5   interaction or an interaction that would support

6   responsible opioid prescribing.

7       Q.   So the states, in connection with consulting

8   with these experts, would have a part to play in

9   setting the standard of care for appropriate opioid

10  prescribing?

11          MS. BALDWIN:  Object to the form.

12          THE WITNESS:  I think they would argue they

13  don't set it, they determine it.

14  BY MR. EHSAN:

15      Q.   So the states, in consultation with these

16  experts, would determine the standard of care for

17  practice of doctors; is that correct?

18          MS. BALDWIN:  Object to the form and

19  leading.

20          THE WITNESS:  Essentially.  The board would

21  have to determine what the standard is, and they

22  determine that from experts as well as guidelines and

23  consensus materials that may have been developed.

24  BY MR. EHSAN:

25      Q.   Talked about these state medical boards.  Do

Confidential                                                JAN-MS-05485804

Page 146

1    you recall that testimony?

2        A.    To some degree.

3        Q.    And these state medical boards, they are, at

4    least in California, part of the State of California;

5    is that correct?

6             MS. BALDWIN:  Object to the form.

7             THE WITNESS:  The medical board of

8    California is the only medical board of California

9    for M.D. physicians, and they're part of the state

10   government.

11   BY MR. EHSAN:

12       Q.    Right.  So to ask the question even more

13   generally, in order to prescribe -- I'll step back

14   again.  Strike that.

15            In order to practice medicine in the State

16   of California, you need a license; correct?

17       A.    In the vast majority of cases.  There are

18   circumstances where you don't.

19       Q.    And the person who bestows that license upon

20   a healthcare professional is the State of California;

21   correct?

22       A.    That is correct.

23            MS. BALDWIN:  Object to the form.  Leading.

24   BY MR. EHSAN:

25       Q.    And that's actually embodied in state

Confidential                                                                    JAN-MS-05485805

```
                                           Page 147

 1    regulations; correct?

 2          MS. BALDWIN:  Object to the form.  Leading.

 3          THE WITNESS:  It's the law.

 4    BY MR. EHSAN:

 5       Q.   And part of the practice of medicine is the

 6    ability to prescribe medications; correct?

 7          MS. BALDWIN:  Object to the form.  Leading.

 8          THE WITNESS:  Correct.

 9    BY MR. EHSAN:

10       Q.   So the State of California not only empowers

11    you, Dr. Fishman, to practice medicine, but it also

12    empowers you to prescribe medications; correct?

13          MS. BALDWIN:  Object to the form.  Leading.

14          THE WITNESS:  I could not prescribe

15    medications without a state medical license.

16    BY MR. EHSAN:

17       Q.   So the State can put certain restrictions on

18    how to practice medicine; correct?

19          MS. BALDWIN:  Object to the form and

20    leading.

21          THE WITNESS:  They can and they do.

22    BY MR. EHSAN:

23       Q.   What kind of restrictions are on your

24    ability to practice medicine put forth by the State

25    of California?
```

Confidential                                                      JAN-MS-05485806

Page 148

1     A.    Well, there are many different rules I have

2   to follow.  Just the ones that come to mind around

3   opioids that I have to check are prescription

4   monitoring program.  They can put limits on how much

5   I can prescribe over a limited amount of time. The

6   kind of paper I have to use to be able to write a

7   prescription has been something that's been required

8   in California for many, many years and has changed

9   over the years, things of that sort.

10    Q.    Is it your understanding that the State of

11  California had this power over your -- to determine

12  how you practice medicine from the time you became

13  licensed in the State of California?

14    A.    Again, I think it would be controversial to

15  use that language, that they have a power over the

16  way I practice medicine, but they do place limits and

17  parameters on my practice, and I did know that from

18  the time I entered the state and got my state

19  license.

20    Q.    When did you get your license, medical

21  license in the State of California?

22    A.    I think it was 1999.

23    Q.    Was your experience in Massachusetts

24  different than your experience in California in terms

25  of the State having the ability to place limits on

Confidential                                                        JAN-MS-05485807

Page 149

1   your practice of medicine?

2       A.    No.

3       Q.    Is it fair to say in every state you

4   practice, the State has had some ability to limit how

5   you practice medicine?

6           MS. BALDWIN:  Object to the form.

7           Are you talking about the states that he's

8   practiced?

9   BY MR. EHSAN:

10      Q.    Answer the question if you understand.

11      A.    So, yes, I think you're referring to states

12  I practice, and I would say yes.  I'd also add that I

13  think that's true of every state medical board.

14      Q.    Do you have any requirements in the State of

15  California to attend continuing medical education

16  programs?

17      A.    Yes.

18      Q.    And who determines the specifics of those

19  requirements?

20      A.    So is your question about whether I'm

21  required by the state medical board to attend CME or

22  other -- there are many different requirements for

23  CME.

24      Q.    Let's start with does the State of

25  California place any requirements for you to maintain

Confidential                                                                    JAN-MS-05485808

Page 150

1    your medical license that involve attending

2    continuing medical education programs?

3        A.    Yes.  I have to have a number of CME credits

4    of certain kinds.  There's also a requirement in pain

5    management in our state for new licensees to have --

6    I think it's 12 hours of pain and end of life

7    training.

8        Q.    You anticipated my next question.  Has the

9    State of California made any specific requirements as

10   it relates to continuing medical educations for those

11   who are prescribing opioids?

12       A.    They have, but that was awhile ago, and it

13   was really in response to a concern about underuse of

14   opioids as opposed to overuse of opioids.

15       Q.    Nevertheless, the State determined and put

16   in effect requirements for physicians to get educated

17   regarding opioids; is that correct?

18            MS. BALDWIN:  Object to the form and

19   leading.

20            THE WITNESS:  Again, not specific to opioids

21   but specific to pain and end of life care.

22   BY MR. EHSAN:

23       Q.    Thank you for the clarification.  So the

24   State put in continuing education requirements for

25   physicians related to pain management and end of life

Confidential                                                                JAN-MS-05485809

Page 151

1   care; correct?

2        MS. BALDWIN:  Object to the form.

3        THE WITNESS:  Yes.

4   BY MR. EHSAN:

5     Q.   Are you aware of any reason why the State

6   couldn't put requirements for continuing medical

7   education programs related to the risks of opioids?

8        MS. BALDWIN:  Object to the form.

9        THE WITNESS:  I believe that they have

10  every -- they have the opportunity to do that.  They

11  could do that.

12  BY MR. EHSAN:

13    Q.   And do you think that would be helpful in

14  educating physicians about the risks of opioids in

15  their prescribing decisions?

16       MS. BALDWIN:  Object to the form.

17       THE WITNESS:  I think it would be helpful.

18  BY MR. EHSAN:

19    Q.   Have you ever advocated for the State to

20  adopt formal education requirements related to the

21  risks of opioids like the ones you have provided to

22  your colleagues over the years?

23    A.   I have.

24    Q.   And has the State responded to any of that?

25    A.   They have not adopted that practice.

Confidential                                                          JAN-MS-05485810

Page 152

1     Q.    And your CME education programs highlighting
2   the risk of opioids, those go back to the '90's; is
3   that correct?
4          MS. BALDWIN:  Object to the form.
5          THE WITNESS:  Yes.
6   BY MR. EHSAN:
7     Q.    When you prescribe medications for your
8   patients in clinic, and I'm talking about any
9   medication, are you sometimes limited in your options
10  by the particular coverage that the patient has?  And
11  by "coverage," I mean insurance coverage.
12    A.    Absolutely.
13    Q.    So it would be fair to say that insurance
14  coverage can impact the options you have as a
15  prescriber in addressing your patient's concerns?
16         MS. BALDWIN:  Object to the form.
17         THE WITNESS:  Yes.
18  BY MR. EHSAN:
19    Q.    Have you ever found it frustrating, in the
20  treatment of your patients who suffer from chronic
21  pain, that their insurance coverage wasn't as robust
22  as you would have liked it to be?
23         MS. BALDWIN:  Object to the form.
24         THE WITNESS:  Absolutely.
25  BY MR. EHSAN:

Confidential                                                                JAN-MS-05485811

Page 153

1     Q.    Are there certain types of -- strike that.

2           Do you have any examples of those instances?

3     A.    I would argue that I'm probably frustrated

4     by those limitations in most cases, largely because

5     people in chronic pain have much more than just pain.

6     They have years and years of deconditioning that have

7     occurred because of the effect of kind of having this

8     alarm that won't turn off, and that limits their

9     ability to function and stay conditioned physically,

10    psychologically, socially, etc.  There are very few

11    insurance plans that cover the reconditioning that

12    most people need.

13          So I would say I'm intrinsically frustrated

14    almost in every case that people don't have the

15    resources they need, and I would argue that those

16    resources would be economically optimal relative to

17    the things that they -- the resources they wind up

18    wasting.  You know, we would cost recover those

19    resources if we gave them to patients, but they're

20    usually not available.

21    Q.    You mentioned that you had to check the

22    prescription drug monitoring program as part of your

23    prescribing of opioids.  Do I recall that testimony

24    correctly?

25    A.    Yes.

Confidential                                                                    JAN-MS-05485812

Page 154

1      Q.    What is a prescription drug monitoring

2    program?

3      A.    Prescription drug monitoring program is a

4    state-based program that keeps track of the

5    controlled substances that are being prescribed from

6    the point of care of the prescriber to the pharmacy

7    and tries to give -- well, they're used for two

8    purposes; one for law enforcement purposes and the

9    other for clinical purposes.

10            On the clinical side, it offers a view for

11    the clinician to see where their patient -- what

12    medications -- what controlled substances their

13    patients are getting and where they're getting them

14    from, and then it offers a database for law

15    enforcement to use that data for whatever purposes

16    they want to use it for.

17      Q.    Do you know when California's prescription

18    drug monitoring program went into effect?

19      A.    Well, I wrote a long article on that

20    subject, but it's debated that California is the

21    oldest prescription drug monitoring system in the

22    country.  It's contentious between California and

23    Texas, but I think it went into effect a long time

24    ago, and I want to say in the '40's.  It was the

25    first paper-based prescription drug monitoring

Confidential                                                                 JAN-MS-05485813

Page 155

1    system.  So we've had a system here for a long time.

2    I can't give you the exact date.

3        Q.    Certainly by the 1990's, that prescription

4    drug monitoring program was in place in California;

5    is that correct?

6        A.    Well, it was still the same -- by the

7    1990's, it was still the same triplicate-based,

8    paper-based system, and then it changed in the early

9    2000's to an electronic-based system that was, I

10   think, much more rational.

11       Q.    So it digitized -- or went digital sometime

12   in the 2000's?

13       A.    Correct.

14       Q.    Do you have a more precise date in mind?

15       A.    I don't.  I actually did the -- I did the

16   press conference with Jerry Brown announcing that,

17   and I would argue it may have been 2006, 2007 if I --

18   and we spent a lot of time arguing in the state

19   legislature that it was a better system.

20            It took a lot of work to sway law

21   enforcement to give up this triplicate system that we

22   had that we thought was nonoptimal if not

23   deleterious.

24       Q.    I want to hand -- if I could have you look

25   at what was previously marked Exhibit 26 to your

Confidential                                                                JAN-MS-05485814

Page 156

1    deposition.

2        A.    It's the excerpt --

3        Q.    You have good memory, recall.  Thank you.

4    Because multiple copies have been spoke of, now gone

5    into the record, I just want to clean up some facts

6    here.

7        A.    Uh-huh.

8        Q.    If you look at what was marked as

9    Exhibit 26, which was an excerpt of your book that

10   the State put in front of you, do you see that it

11   bears the copyright of 2007 on page three of the

12   exhibit?

13       A.    I do.

14       Q.    Now you mentioned somewhere along the way

15   that the actual copy of the book had a forward by

16   someone who then went on to become attorney general

17   of the State; correct?  Or sorry.  Surgeon General

18   of the United States.

19       A.    Correct.

20       Q.    Do you know, can you tell if this is that

21   copy or a different copy of the book?

22       A.    The first forward was by Regina Benjamin.

23       Q.    Okay.

24       A.    And she went on to be Obama's first Surgeon

25   General.

Confidential                                                    JAN-MS-05485815

Page 157

1     Q.    Yeah.

2     A.    And --

3     Q.    So if I have you look at the third page from

4   the back of the exhibit, you will see there is a

5   contents list.

6     A.    Yeah.

7     Q.    And on the forward, it says "By Homan

8   Chaudhry, DO FACP."  Do you see that?

9     A.    Dr. Chaudhry --

10    Q.    Okay.  Sorry.

11    A.    -- went on to become president/CFO of the

12  FSMB, so she wrote the first forward.  This is not

13  actually -- this is the first edition, but this is

14  not the first printed of the first edition.  Okay.

15        So when she became Surgeon General and was

16  no longer -- Regina Benjamin was chair of the

17  Federation of State Medical Boards, we had the

18  president/CEO take over that writing of the forward.

19    Q.    Okay.  So I think you may have clarified my

20  confusion.  So this is the first edition but not the

21  first printing of the first edition?

22    A.    That's what it appears to me.  And

23  Dr. Chaudhry was not actually president/CEO at the

24  time that the book was written or the first

25  publication was made.

Confidential                                                                JAN-MS-05485816

Page 158

1    Q.   Very good.  I just wanted to clarify why

2    this forward was by a different person than you had

3    mentioned --

4    A.   Got it.

5    Q.   -- before.  Now in focusing on this book in

6    2007, I think you had said that part of the impetus

7    for the book was to impart upon the physician

8    community that a greater vigilance was needed in

9    terms of use of opioids.  Do you recall that

10   testimony?

11   A.   I do.

12   Q.   Now is that greater vigilance, just in your

13   mind, restricted to only the prescribers, or did you

14   think that that vigilance needed to be also exercised

15   by the state medical boards?

16        MS. BALDWIN:  Object to form.

17        THE WITNESS:  I think the vigilance is

18   required by the prescribers, but I think there's a

19   lot of nuance that the medical boards need to

20   understand when they review physicians who are --

21   have their practices contested and are -- come

22   under -- trying to find the word -- when they're

23   charged with something by the medical board.

24        So my worry is that medical boards wouldn't

25   understand what's really required and maybe would

Confidential                                                                 JAN-MS-05485817

Page 159

1    miss prescribers who really are practicing beneath

2    the standard of care, or they would see that there

3    were problems with prescriptions but really

4    understand that some physicians are out there trying

5    to do the very best they can in following these --

6    this kind of guidance which is imperfect.  You know,

7    it's not a perfect science.  And understand their

8    practices in that light.

9           So while the pharmacovigilance is really for

10   the physicians, I think it still helped education the

11   medical boards.

12   BY MR. EHSAN:

13     Q.   Do you think pharmacovigilance was also

14   useful to be exercised by P&T committees?

15           (Discussion off the record)

16           THE WITNESS:  By pharmacy and therapeutic --

17           MR. EHSAN:  That's correct.

18           THE WITNESS:  -- committees who determine

19   what drugs are going to put on.

20           (Discussion off the record)

21           MS. BALDWIN:  Objection to the form.

22           THE WITNESS:  So this is pharmacy and

23   therapeutic committees that determine the drug

24   contents of hospital formularies or health system

25   formularies.  You know, I'm not sure, but I can only

Confidential                                                              JAN-MS-05485818

Page 160

1    imagine it would inform them on some level about the
2    appropriate use of drugs.
3    BY MR. EHSAN:
4        Q.   You mentioned that the insurance coverage
5    can sometimes be a frustration for you.  Can the
6    formulary options available to you for a given
7    patient also cause you consternation under some
8    circumstances?
9            MS. BALDWIN:  Object to the form.
10           THE WITNESS:  Absolutely.  There are, you
11   know, really good examples where clinicians have had
12   to choose less than optimal, less safe options for
13   their patients because the safer options aren't
14   covered or weren't under formulary.
15           Probably the best example is methadone which
16   is, you know, an effective opioid for pain but is
17   probably the most lethal of all of our opioids.
18   Problem is it's the least expensive of all of our
19   opioids as well, so it would always be the last
20   opioid standing on the formulary, and many physicians
21   had to choose it because they didn't have other
22   choices.
23   BY MR. EHSAN:
24       Q.   Are you aware of the fact that methadone
25   causes disproportionate number of deaths related to

Confidential                                                                    JAN-MS-05485819

Page 161

1  opioids relative to the number of prescriptions

2  written for it?

3           MS. BALDWIN:  Object to the form.  Leading.

4           THE WITNESS:  I'm aware that it accounts for

5  about two to three percent of the prescriptions and

6  somewhere around 25 to 30 percent of the unintended

7  overdose deaths.

8  BY MR. EHSAN:

9     Q.  Is it your understanding that was maintained

10  on many formularies because of the fact it was cheap?

11    A.  Yes.  I think that's what I'd said.

12    Q.  You can put that exhibit aside.  Thank you

13  for the clarification, Doctor.

14          Earlier today, you were asked some questions

15  about the sources of information that prescribers use

16  in understanding the risks and benefit of the

17  medications that they prescribed.  Do you recall that

18  testimony?

19    A.  I do.

20    Q.  And I think you said that there were

21  multiple sources available to the physician; is that

22  correct?

23    A.  Yes.

24    Q.  And would one of those sources be the

25  prescribing information or drug label for the

Confidential                                                    JAN-MS-05485820

Page 162

```
 1    medication?
 2       A.    Absolutely.
 3       Q.    And I believe you testified, but I'll ask
 4    you the question anyway, and you agree, doctor, that
 5    at a minimum, a doctor should be aware of what's in
 6    the drug label the medication he or she is going to
 7    prescribe?
 8       A.    Yes.
 9            MS. BALDWIN:  Object to the form.  Leading.
10            THE WITNESS:  Yes.
11    BY MR. EHSAN:
12       Q.    Have you ever prescribed scheduled drug for
13    which you hadn't read the label?
14       A.    It's hard to answer that.  Probably.
15       Q.    Let me strike it and ask the question
16    slightly differently because the question was broad.
17            Is it your practice to read the label of
18    medications that you're going to prescribe to your
19    patients?
20       A.    Yes.
21       Q.    Specific as to opioid, was it your practice
22    to read the labeling for those medications when you
23    prescribed that for your patients?
24            MR. ZAKRZEWSKI:  Objection to form.
25            MR. ERCOLE:  I'll reask the question.
```

Confidential                                              JAN-MS-05485821

```
                                                    Page 163
 1    BY MR. EHSAN:
 2        Q.   As specific to opioid, was it your practice
 3    to be aware of the contents of the label for
 4    medicines, opioid medicines that you prescribed to
 5    your patients?
 6              MS. BALDWIN:  Object to the form.
 7              THE WITNESS:  Yes.
 8    BY MR. EHSAN:
 9        Q.   And would you consider that to be good
10    clinical practice?
11        A.   I would say it's good clinical practice.
12    There are many ways to know the content of the label
13    rather than the label itself, but yes.
14        Q.   Yes, and I appreciated that in my broad
15    question, that you may be aware of the contents of
16    the label without having read the label itself;
17    correct?
18        A.   Correct.
19              MS. BALDWIN:  Object to the form.
20    BY MR. EHSAN:
21        Q.   And, in fact, the label is based on
22    scientific data gathered by the company and submitted
23    to the Food and Drug Administration; correct?
24              MS. BALDWIN:  Object to the form.
25              THE WITNESS:  Correct.
```

Confidential                                                    JAN-MS-05485822

Page 164

1   BY MR. EHSAN:

2       Q.   And that underlying data, for the most part,

3   is available within the medical literature; is that

4   correct?

5            MS. BALDWIN:  Object to the form.

6            THE WITNESS:  Correct.  And many of us use

7   secondary resources that clearly incorporate the

8   label.

9   BY MR. EHSAN:

10      Q.   And especially more recently, there has been

11  lots of other third parties that have collected that

12  information from the label into more readily

13  accessible format; is that correct?

14           MS. BALDWIN:  Object to the form.

15           THE WITNESS:  Absolutely.

16           (Exhibit 40 marked)

17  BY MR. EHSAN:

18      Q.   Dr. Fishman, I've handed you what's been

19  marked Exhibit 40.  I'll ask you if you've ever seen

20  this document before, maybe not in this exact format,

21  but the content of the document.

22      A.   I've seen a label for the Duragesic product

23  before.

24      Q.   And I will represent to you that this is the

25  Duragesic label approved by the Food and Drug

Confidential                                                          JAN-MS-05485823

Page 165

1    Administration in 2005, and if you look at the very

2    last page of the exhibit, you will see that it was

3    electronically signed for Bob Rappaport, who was at

4    the FDA, on February 4th, 2005.  Do you know who

5    Dr. Rappaport is?

6        A.    I do.

7        Q.    Was he at the FDA?

8        A.    Yes.

9        Q.    Okay.  Realizing that this is a label for a

10   medication, I understand that aspect, but I want to

11   ask you some questions generally about the labels for

12   opioid medication using this particular label as an

13   example.  Are you aware of what a black box is?

14       A.    I am.

15       Q.    And what is a black box?

16       A.    Black box is a highly-emphasized

17   contraindication.  It's a full stop.

18       Q.    And you notice in the beginning of this

19   particular label, there is literally a dark box

20   surrounded by bolded text; is that correct?

21       A.    Yes.

22       Q.    And that would be consistent, it's your

23   understanding, of what a black box warning looks

24   like?

25       A.    Yes.

Confidential                                                                    JAN-MS-05485824

Page 166

1     Q.    Now looking at the box warning, this is the

2     first thing you see when you actually look at the

3     label for this particular drug; is that correct?

4           MS. BALDWIN:  Object to the form.

5           THE WITNESS:  Yes.

6     BY MR. EHSAN:

7     Q.    And it's intended to have a prominent view

8     when the physician looks at the label.  Is that

9     consistent with your understanding?

10          MS. BALDWIN:  Object to the form.

11          THE WITNESS:  It's the equivalent of a big

12    exclamation sign.

13    BY MR. EHSAN:

14    Q.    Now looking specifically at this box

15    warning, can you read the first paragraph inside the

16    box warning, please?

17    A.    "Duragesic contains a high concentration of

18    potent Schedule II opioid agonist, fentanyl.

19    Schedule II opioid substances, which include

20    fentanyl, hydromorphone, methadone, morphine,

21    oxycodone and oxymorphone, have the highest potential

22    for abuse and associated risk of fatal overdose due

23    to respiratory depression.  Fentanyl can be abused

24    and is subject to criminal diversion.  A high content

25    of fentanyl in the patches may be a particular target

Confidential                                                                  JAN-MS-05485825

Page 167

1   for abuse and diversion."

2       Q.    Thank you, Doctor.  Is there anything

3   inaccurate about the statement that you just read?

4       A.    No.

5       Q.    Do you think it adequately --

6             MS. BALDWIN:  Object to the form.

7   BY MR. EHSAN:

8       Q.    Based on your understanding of the risks

9   associated with fentanyl, do you think it adequately

10  reflects the potential risk for abuse associated with

11  a fentanyl-based product?

12            MS. BALDWIN:  Object to the form.

13            THE WITNESS:  Yes.

14  BY MR. EHSAN:

15      Q.    And it goes beyond just fentanyl.  It

16  identifies several other types of opioid substances;

17  is that correct?

18      A.    That is correct.

19      Q.    It includes oxycodone; correct?

20      A.    Yes.

21      Q.    Do you recall yesterday you were shown some

22  material that suggested -- or excuse me -- an

23  internal Purdue email that suggested that somehow

24  some people think of oxycodone as a weak opioid?

25            MS. BALDWIN:  Object to the form,

Confidential                                                                JAN-MS-05485826

```
                                                    Page 168
 1   mischaracterizes the email.
 2   BY MR. EHSAN:
 3       Q.    Do you recall that testimony?
 4       A.    I do.
 5       Q.    This particular label doesn't identify
 6   oxycodone as a weak opioid, does it?
 7       A.    No.
 8             MS. BALDWIN:  Object to the form.
 9   BY MR. EHSAN:
10       Q.    And, in fact, it says both fentanyl and
11   oxycodone have the highest potential for abuse; is
12   that correct?
13       A.    Yes.
14       Q.    And also the highest potential for
15   associated risk of fatal overdoses; correct?
16             MS. BALDWIN:  Object to the form.
17             THE WITNESS:  Yes.
18   BY MR. EHSAN:
19       Q.    Now if a physician were to look at the label
20   for this particular product, he or she would have the
21   opportunity to read that for him or herself; correct?
22       A.    That is correct.
23       Q.    Now if you go down to -- by the next bullet
24   that has two sub bullets, but the paragraphs below
25   that, we're still in the box warning, you see there
```

Confidential                                                    JAN-MS-05485827

Page 169

1    that it states that "Duragesic should only be used

2    for patients who are already receiving opioid therapy

3    and have demonstrated opioid tolerance and who

4    require total daily dose at least equivalent to

5    Duragesic at 25 micrograms per hour"?

6        A.   I do see that.

7        Q.   So, doctor, would it be fair to say that

8    patients who are receiving Duragesic would be

9    patients who are --

10            (Discussion off the record)

11   BY MR. EHSAN:

12       Q.   As a clinician who prescribes -- strike

13   that.  Let me back up.

14            Have you prescribed Duragesic before in your

15   career?

16       A.   I have.

17       Q.   As a physician who's prescribed Duragesic in

18   the past, would you interpret that statement to mean

19   that patients who are going to be receiving Duragesic

20   would have already been on an opioid medication prior

21   to their Duragesic prescription?

22            MS. BALDWIN:  Object to the form.

23            THE WITNESS:  Not only that they would have

24   been on an opioid, but they would have to have been

25   on a substantial amount of an opioid, substantial

Confidential                                                                          JAN-MS-05485828

Page 170

1    dose.

2    BY MR. EHSAN:

3        Q.   So in that way, those patients have

4    already -- strike that.  Let me ask the question

5    differently.

6            Duragesic would not be the first line opioid

7    therapy for a patient; is that correct?

8            MS. BALDWIN:  Object to the form.

9            THE WITNESS:  Correct.

10   BY MR. EHSAN:

11       Q.   And presumably, if those patients were

12   already on a substantial dose of opioids, a physician

13   had determined some point in the past that opioid

14   medications were an appropriate choice for that

15   patient; is that correct?

16           MS. BALDWIN:  Object to the form and

17   leading.

18           THE WITNESS:  Yes.

19   BY MR. EHSAN:

20       Q.   And would it be fair to say that if you had

21   a patient on an opioid medication for where the

22   opioid medication wasn't helping the patient, you

23   would not switch them to Duragesic but rather try to

24   discontinue the opioid medication?

25           MS. BALDWIN:  Object to the form.

Confidential                                                                                    JAN-MS-05485829

Page 171

1          THE WITNESS:  Well, I think there might be

2     some cases where the opioid's not helping for

3     idiosyncratic reasons related to the individual

4     properties of an opioid; say they had an intolerance,

5     you know, morphine caused a rash and they were on

6     enough morphine that it would warrant changing to

7     options that might include the fentanyl patch, then

8     possibly.

9          Fentanyl has -- the fentanyl patch has some

10    advantages, but it has many disadvantages as well,

11    and those would need to be, you know, carefully

12    considered in an individual patient.  So there might

13    be a case where in fact that's not true.  Most of the

14    time, what you said is true.

15    BY MR. EHSAN:

16    Q.   And I appreciate the nuance, the

17    consideration.  I think I can ask this question more

18    simply.

19          If a patient is maintained on a substantial

20    dose of opioid therapy, thus qualifying them to meet

21    the requirements in the Duragesic label, it'd be a

22    fair assumption to say that the opioid medication

23    they're on has been working for them; is that

24    correct?

25          MS. BALDWIN:  Object to the form.

Confidential                                                                        JAN-MS-05485830

Page 172

1              THE WITNESS:  Yes, but usually if the opioid
2      medication they're on is working for them, we keep
3      them on the medicine that's working for them, so
4      that -- yeah.
5      BY MR. EHSAN:
6          Q.    Understood.
7          A.    Yes.
8          Q.    And there may be specific patient factors
9      that may warrant switching them from one opioid to
10     the Duragesic patch; correct?
11         A.    Correct.
12              MS. BALDWIN:  Object to the form.
13              THE WITNESS:  Yes, correct.
14     BY MR. EHSAN:
15         Q.    And the Duragesic patch has a different
16     delivery mechanism than oral opioid medications;
17     correct?
18         A.    Yes.
19         Q.    What is the delivery mechanism for the
20     Duragesic patch?
21         A.    It's a transdermal system where the
22     medication passes through the skin into the fat
23     tissue and then slowly is absorbed into the
24     circulation through that depot of opioid.
25         Q.    And that represents certain advantages and

Confidential                                                                                    JAN-MS-05485831

Page 173

1    certain disadvantages; correct?

2       A.    Yes.

3             MS. BALDWIN:  Object to the form.

4             THE WITNESS:  Exactly.

5    BY MR. EHSAN:

6       Q.    And depending on the specific needs of the

7    patient, those advantages may be attractive, or those

8    disadvantages may be preclusive of prescribing a

9    Duragesic patch for a patient; correct?

10            MS. BALDWIN:  Object to the form.

11            THE WITNESS:  Absolutely.

12   BY MR. EHSAN:

13      Q.    Now if you go to the next section, still the

14   same page, first page of the box warning, this one is

15   now the underlying material, so it's bolded and

16   underlined, and it says "Because serious or

17   life-threatening hypoventilation can occur, Duragesic

18   fentanyl transdermal system is contraindicated,"

19   colon.  Do you see that?

20      A.    Yes.

21      Q.    And could you read those contraindications?

22      A.    "In patients who are not opioid-tolerant; in

23   the management of acute pain or in patients who

24   require opioid analgesia for a short period of time;

25   in the management of postoperative pain, including

Confidential                                                                                    JAN-MS-05485832

Page 174

1    use after outpatient or day surgeries; in the

2    management of mild pain; in the management of

3    intermittent pain, e.g., use on an as needed basis or

4    prn."

5        Q.    Would it be fair to say, doctor, that if a

6    prescriber prescribed Duragesic patch for any of the

7    conditions listed here, that they would be

8    prescribing the medication contrary to what the label

9    recommends?

10       A.    Or what we would call off label, yes.

11       Q.    In the case of prescribing a medication off

12   label, is it even more important for the physician to

13   understand the risks and benefits of the medication

14   he or she is prescribing?

15       A.    I would say if you're going to prescribe a

16   medicine off label, you have to understand the risks

17   and benefits very, very well and make a very clear,

18   transparent risk benefit analysis-based decision.

19       Q.    Go to the next page.  You see that the box

20   warning continues on the second page; is that

21   correct?

22       A.    I do.

23       Q.    About halfway down, there's a -- there's a

24   lot of underlining here, too, but it begins with the

25   underlined statement "Duragesic is only for use in

Confidential                                                                                      JAN-MS-05485833

Page 175

1    patients."  Do you see that?

2        A.    Yes.

3        Q.    Do you see the -- can you read the

4    underlined two sentences and the sentence that comes

5    after it, please?

6        A.    "Duragesic is only for use in patients who

7    are already tolerant to opioid therapy of comparable

8    potency.  Use in nonopioid-tolerant patients may lead

9    to fatal respiratory depression.  Overestimating the

10   Duragesic dose when converting patients from another

11   opioid medication can result in fatal overdose with

12   the first dose."

13       Q.    Fair to say that's a pretty stern warning

14   that you have to know what you're doing with this

15   medication before you prescribe it?

16       A.    Yes.

17       Q.    And did you treat the patients you

18   prescribed Duragesic for with the same amount of

19   caution as this label indicates?

20       A.    I believe I did.

21       Q.    Nevertheless, there were patients for whom

22   you thought Duragesic was appropriate even in light

23   of these risks identified in this label; correct?

24       A.    Yes.

25       Q.    Will you read the next paragraph, please?

Confidential                                                                                          JAN-MS-05485834

Page 176

1      A.    "Duragesic can be abused"?

2      Q.    Yes, sir.

3      A.    "Duragesic can be abused in a manner similar

4    to other opioid agonists, legal or illicit.  The

5    risks should be considered when administering,

6    prescribing or dispensing Duragesic in situations

7    where the healthcare professional is concerned about

8    increased risk of misuse, abuse and diversion."

9      Q.    Does that language clearly identify that the

10   abuse, misuse and diversion are risks associated with

11   the fentanyl patch?

12          MS. BALDWIN:  Object to form.

13          THE WITNESS:  I think it's a strong

14   statement and countermands a common belief that

15   because the -- it's a patch, it may be safer than a

16   pill.

17   BY MR. EHSAN:

18     Q.    So focusing on this language here, this

19   label, this 2005 label predates the first edition of

20   your book; correct?

21     A.    Yes.

22     Q.    So would it be fair to say at least as of

23   the time you wrote your book, the drug labels for

24   these medications also reflected the level of caution

25   that you were espousing related to opioid medications

Confidential                                                                              JAN-MS-05485835

Page 177

1    in your book?

2          MS. BALDWIN:  Object to form and leading.

3          THE WITNESS:  Yes.

4    BY MR. EHSAN:

5       Q.   Going to the next paragraph, could you read

6    that, please?  And I apologize.  This will be the

7    last time I ask you to read something.

8       A.   "Persons at increased risks for opioid abuse

9    include those with a personal or family history of

10   substance abuse, including drug or alcohol abuse or

11   addiction or mental illness; e.g., major depression.

12   Patients should be assessed for their clinical risks

13   for opioid abuse or addiction prior to being

14   prescribed opioids.  All patients receiving opioids

15   should be routinely monitored for signs of misuse,

16   abuse and addiction.  Patients at increased risk of

17   opioid abuse may still be appropriately treated with

18   modified release opioid formulations.  However, these

19   patients will require intensive monitoring for signs

20   of misuse, abuse and addiction."

21      Q.   Thank you, Doctor.  That paragraph from

22   2005, is that still good advice today?

23      A.   It is.

24      Q.   Specifically, that language there doesn't

25   relate specifically to Duragesic, it talks about

Confidential                                                      JAN-MS-05485836

Page 178

1  opioids more generally; correct?

2     A.    I think it applies to all opioids.

3     Q.    So you would agree, then, even today, it

4  applies to all opioid-prescribing physicians?

5          MS. BALDWIN:  Object to the form and

6  leading.

7          THE WITNESS:  Yes.

8  BY MR. EHSAN:

9     Q.    Would you agree, doctor, that personal or

10 family history of substance abuse is a key factor to

11 consider in the risk assessment for a particular

12 patient who might be prescribed opioids?

13         MS. BALDWIN:  Object to the form.

14         THE WITNESS:  Yes.

15 BY MR. EHSAN:

16    Q.    In fact, having a personal family history of

17 substance abuse can greatly increase the individual's

18 potential risk for running into trouble with opioid

19 medication; correct?

20         MS. BALDWIN:  Objection.  Leading.

21         THE WITNESS:  Yes.

22 BY MR. EHSAN:

23    Q.    Likewise, a history of mental illness is a

24 factor that can change a particular patient risk

25 profile for developing a substance use disorder with

Confidential                                                          JAN-MS-05485837

Page 179

1   opioid medications; correct?

2         MS. BALDWIN:  Objection.  Leading.

3         THE WITNESS:  Yes.

4   BY MR. EHSAN:

5      Q.   And, obviously, these risks would have to be

6   assessed on a patient-by-patient -- sorry.  Strike

7   that.

8         And these risks would have to be assessed on

9   a patient-by-patient assessment; correct?

10        MS. BALDWIN:  Objection.  Leading.

11        THE WITNESS:  They would need to be assessed

12  individually patient by patient.

13  BY MR. EHSAN:

14     Q.   No two patients are going to be alike;

15  correct?

16        MS. BALDWIN:  Object to the form.

17        THE WITNESS:  I agree.

18  BY MR. EHSAN:

19     Q.   Do you think -- I think you mentioned that

20  risk benefit assessment is inherently a personal or

21  individualized decision, so thinking about that, do

22  you think that one can come up with a white line list

23  of diagnoses for which opioid medications would be

24  unnecessary?

25        MS. BALDWIN:  Object to the form.

Confidential                                                    JAN-MS-05485838

Page 180

1           THE WITNESS:  I want to clarify.  It's a

2    personal decision for the patient, not for the

3    prescriber, and I don't know if there's a absolutely

4    single diagnosis that would exclude using an opioid

5    under some circumstance.

6    BY MR. EHSAN:

7       Q.   And that was my question, so let me try also

8    asking it slightly different, in a slightly different

9    way.

10          When you assess a patient for pain therapy,

11   you are taking that patient in front of you and

12   assessing their individualized need exclusive of any

13   other -- strike that.  Let me ask the question

14   slightly differently.

15          I think you said that you prescribe opioids

16   for a vast number of conditions.  You recall that

17   testimony?

18      A.   Yes.

19          MS. BALDWIN:  Object to the form.

20   BY MR. EHSAN:

21      Q.   So be fair to say that going into seeing a

22   patient, you do not have a preconceived notion

23   whether opioids are appropriate or inappropriate just

24   based on the diagnosis with which the patient

25   presents?

Confidential                                                          JAN-MS-05485839

Page 181

1          MS. BALDWIN:  Object to the form and

2     leading.

3          THE WITNESS:  Well, there's certain -- I

4     think what I said yesterday is I don't think anyone

5     should be for or against opioids, so -- but there are

6     certain conditions in which you'd have to reach a

7     very, very high bar to give an opioid to a patient,

8     so there's certain conditions where you'd walk in

9     thinking, "I'd really have to have proof here to use

10    an opioid" or, "I'd have to go through pretty

11    extraordinary pathway of reasoning to get to an

12    opioid as a possibility," you know, patients who have

13    had addiction, patients have pulmonary disease,

14    patients with severe mental illness.  You're really

15    looking for every other option that would yield a

16    possible benefit, you know, outside of a palliative

17    care-type setting.

18    BY MR. EHSAN:

19    Q.   And I appreciate that.  So do I understand

20    you correctly you're saying that even in patients who

21    may have an opioid use disorder, you should not

22    blanketly exclude the possibility of using the

23    opioid, but the threshold for considering it would be

24    substantially higher?  Is that correct?

25          MS. BALDWIN:  Object to the form.

Confidential                                                          JAN-MS-05485840

Page 182

1          THE WITNESS:  And many of these cases, an

2    opioid is indicated as maintenance therapy for their

3    opioid abuse problem.

4    BY MR. EHSAN:

5      Q.   And, in fact, there are some opioids that

6    are used for the treatment of opioid use disorder;

7    correct?

8          MS. BALDWIN:  Object to the form.

9          THE WITNESS:  Correct.  Better stated, yes.

10   BY MR. EHSAN:

11     Q.   But my question was slightly difference, and

12   I apologize for not being clear about this.

13          Are there pain diagnoses that you could say,

14   based on the patient's pain diagnosis, "I am not

15   going to prescribe that patient an opioid"?

16          MS. BALDWIN:  Object to the form.

17          THE WITNESS:  I doubt it, but there are many

18   that I would be very, very hard-pressed, like, for

19   instance, migraine, to use an opioid because there's

20   evidence that suggests that while they may make

21   people feel better, they don't make them better, you

22   know, things of that sort, but there might be

23   extenuating circumstances in a given patient where

24   you might use it.  It would be extraordinary, in my

25   practice, to give an opioid to someone with

Confidential                                                              JAN-MS-05485841

Page 183

1    migraines.

2    BY MR. EHSAN:

3       Q.   Right.   And that was the decision -- or my

4    attempt at the question was you wouldn't, just based

5    on that pain diagnosis, say, "There's no way I'm

6    going to prescribe you an opioid" but rather assess

7    the patient realizing that there may be much more

8    appropriate options for a particular patient for a

9    particular condition; correct?

10           MS. BALDWIN:   Object to the form and

11   leading.

12           THE WITNESS:   So I think what you're getting

13   at is that each patient needs an individualized

14   assessment, and I don't walk in the room with a --

15   simply based on knowing a diagnosis with a conclusion

16   about what they need or don't need.

17   BY MR. EHSAN:

18      Q.   And thinking about patients who have cancer

19   versus patients who have chronic noncancer pain, do

20   you believe that the pain experienced by cancer

21   patients is somehow more appropriate for therapy

22   versus the pain suffered by patients with chronic

23   noncancer pain?

24           MS. BALDWIN:   Object to the form.

25           THE WITNESS:   Well, this is a very profound

Confidential                                                                    JAN-MS-05485842

Page 184

1    question you ask.  I believe that there's no

2    difference between the pain in cancer and the pain in

3    other diseases.  What's different about cancer is

4    that -- well, really two major things:  Many patients

5    with cancer have terminal illnesses, so the risk

6    benefit analysis in those patients shift because of

7    the looming short lifespan that they might have.  So

8    the urgency to treat might push you to take more

9    risks with your treatment than you would otherwise.

10   I think that's the key difference in how we treat

11   cancer.

12        But with that said, there's a social

13   difference as well in that there's not a single

14   guideline on the prescribing of opioids that

15   addresses dealing with cancer patients.  They all

16   exclude them because it's almost a tabu subject.  So

17   we actually are dealing with drug abuse in our cancer

18   population.

19        I just wrote an article on this subject this

20   year which is very concerning because cancer

21   patients, by virtue of having cancer and the meaning

22   that it has in society, are viewed by the medical

23   community as being a special population that doesn't

24   require the same amount of vigilance and potentially

25   a lower threshold for engaging with an opioid.

Confidential                                                                JAN-MS-05485843

Page 185

1            In fact, I've seen cancer patients who are

2    on opioids because their doctor thought they might

3    need them down the road, so they might as well get

4    them started, things that are crazy like that.  Does

5    that answer your question?

6    BY MR. EHSAN:

7      Q.    I think you answered the question, that you

8    need to be vigilant irrespective of whether a patient

9    is a cancer patient versus a chronic noncancer

10   patient, but my question was that -- and I think you

11   addressed it at the beginning, but my question was

12   the pain doesn't discriminate based on whether the

13   patient has cancer or noncancer pain; correct?

14            MS. BALDWIN:  Object to the form and

15   leading.

16            THE WITNESS:  It's pain.  Patient has pain.

17   The context is what's different.

18   BY MR. EHSAN:

19     Q.    Understood.  And pain doesn't discriminate

20   based on the patient's socioeconomic status; correct?

21            MS. BALDWIN:  Object to the form.

22            THE WITNESS:  That is correct.

23   BY MR. EHSAN:

24     Q.    And pain doesn't discriminate based on age,

25   although you may have comorbidities, depending on

Confidential                                                                JAN-MS-05485844

```
                                           Page 186
 1    your specific age, that may complicate the process;
 2    correct?
 3              MS. BALDWIN:  Object to the form and
 4    leading.
 5              THE WITNESS:  That's a harder one.  There is
 6    data that suggests that as we get older, we perceive
 7    pain differently, but in general, I would say I
 8    agree.
 9    BY MR. EHSAN:
10       Q.   So just as a intellectual proposition, there
11    is no reason, both in terms of willingness to treat
12    and need to be vigilant, between cancer and noncancer
13    pain; is that correct?
14              MS. BALDWIN:  Object to the form and
15    leading.
16              THE WITNESS:  Correct.
17    BY MR. EHSAN:
18       Q.   Dr. Fishman, do you know what the word
19    "doctor" means in Latin?
20       A.   I do not.
21       Q.   Okay.  Would it surprise you to -- for me to
22    tell you that in Latin, the word means teacher?
23       A.   Means teacher?
24       Q.   Yes.  That was my -- would that surprise
25    you, doctor?
```

Confidential                                                  JAN-MS-05485845

Page 187

1     A.   Doesn't surprise me, but I didn't know that.

2   It's impressive.

3     Q.   In fact, you've dedicated most, if not all,

4   your academic life to teaching; is that correct?

5     A.   Yes.

6     Q.   You've taught medical students?

7     A.   Yes.

8     Q.   You've taught residents?

9     A.   Yes.

10    Q.   You've taught fellows?

11    A.   Yes.

12    Q.   Just so that the record is clear, fellows

13  are people -- are doctors who have finished their

14  residency and doing additional educational training;

15  is that correct?

16    A.   Yes.

17        MS. BALDWIN:  Object to the form.  Leading.

18  BY MR. EHSAN:

19    Q.   And you teach fellow doctors; is that

20  correct?

21        MS. BALDWIN:  Object to the form.  Leading.

22        THE WITNESS:  Practicing clinicians, yes.

23  BY MR. EHSAN:

24    Q.   And throughout all of that education, has it

25  been your endeavor to ground your teachings in the --

Confidential                                                JAN-MS-05485846

Page 188

1    strike that.

2         In your educational endeavors, have you

3    attempted to ground your teachings in science?

4    A.    Yes.

5    Q.    And obviously -- strike that.

6         Do you agree with the concept that science

7    evolves over time?

8         MS. BALDWIN:  Object to the form.

9         THE WITNESS:  Yes.

10   BY MR. EHSAN:

11   Q.    For example, when penicillin was discovered

12   a hundred years ago, it had much broader applications

13   in the treatment of infections than it does today;

14   correct?

15   A.    Yes.

16        MS. BALDWIN:  Object to the form.  Leading.

17   BY MR. EHSAN:

18   Q.    However, today, we have scientific evidence

19   to judge a prescribing decision going back 50 or

20   60 years; correct?

21        MS. BALDWIN:  Object to the form.  Leading.

22        THE WITNESS:  I'm sorry.  Can you restate

23   that?

24   BY MR. EHSAN:

25   Q.    Sure.  Would it be fair to say that you

Confidential                                                                    JAN-MS-05485847

```
                                            Page 189
 1   can't judge a medical decision made 50 years ago
 2   based on the current state of science?
 3          MS. BALDWIN:  Object to the form.  Leading.
 4          THE WITNESS:  I think you can.  It wouldn't
 5   be appropriate.
 6   BY MR. EHSAN:
 7     Q.   You could do it, but it wouldn't be
 8   appropriate?
 9     A.   Think it happens more than we like.
10     Q.   So it is important that whenever one is
11   looking at historical educational programs, to tie
12   those back to the science that was available at the
13   time; correct?
14          MS. BALDWIN:  Object to the form and
15   leading.
16          THE WITNESS:  I agree.
17   BY MR. EHSAN:
18     Q.   So you may have said some things differently
19   20 years ago that you said today, but regardless,
20   those have always been consistent with the science
21   available at the time; correct?
22          MS. BALDWIN:  Object to the form and
23   leading.
24          THE WITNESS:  I would say that there's much
25   that I would do differently now based on what I know
```

Confidential                                                    JAN-MS-05485848

Page 190

1  now that wasn't known then and that I still would

2  stand by what I've said and done based on my goal to

3  use what we have at hand to improve safety and

4  efficacy in practice.

5  BY MR. EHSAN:

6      Q.   When you were in medical school, did you

7  take a pharmacology class?

8      A.   I did.

9      Q.   Were you taught about the mechanism of

10  action for opioid medications?

11      A.   Very briefly.

12      Q.   Did you understand them to affect the

13  mu receptor in the brain and spinal cord?

14      A.   I did.

15      Q.   Were you aware that opioid medications fall

16  into -- at the time, fell into the category of full

17  mu agonists and partial mu agonist?

18          MS. BALDWIN:  Object to the form.

19          THE WITNESS:  I did at the time.

20  BY MR. EHSAN:

21      Q.   And a full mu agonist could reach the

22  maximal potency, you just have to change up the dose,

23  whereas a partial mu agonist had a cap on the effect

24  on the mu receptor; correct?

25      A.   Yes.

Confidential

JAN-MS-05485849

```
                                              Page 191

  1            MS. BALDWIN:  Object to the form and

  2   leading.

  3   BY MR. EHSAN:

  4      Q.   Did you understand oxycodone to be a full

  5   mu agonist?

  6      A.   Yes.

  7      Q.   Did you understand morphine to be a full

  8   mu agonist?

  9      A.   Yes.

 10      Q.   Did you understand fentanyl to be a full

 11   mu agonist?

 12      A.   Yes.

 13      Q.   So all those medications could reach full

 14   potency just by increasing the dose; correct?

 15            MS. BALDWIN:  Object to the form and

 16   leading.

 17            THE WITNESS:  Correct.

 18   BY MR. EHSAN:

 19      Q.   Did you understand that the mu receptor also

 20   played a role in the brain dopamine pathways?

 21      A.   Not as a medical student.

 22      Q.   When you were going through medical school,

 23   what was the general attitude towards the prescribing

 24   of opioids to pain patients regardless of whether

 25   they were cancer or noncancer patients?
```

Confidential                                                                    JAN-MS-05485850

1     A.   I went to medical school in the second half

2   of the '80's, and it was a time where there was a

3   Renaissance in using opioids for cancer, and then

4   this period of extrapolation to that experience and

5   the experience of people with chronic pain.

6          So it was a transitional time where I think

7   some people thought it was -- they were drugs that

8   were tabu, and others thought that it was a fantastic

9   opportunity to give them to anyone who said, "Ouch."

10    Q.   So there were certainly folks -- strike

11   that.

12          There were certainly practicing physicians

13   who you interacted with, when you were a medical

14   student, who believed that opioids should not be used

15   in the treatment of pain unless in rare

16   circumstances; is that correct?

17    A.   Yes.

18    Q.   And that was one source of teaching you

19   received while you were in medical school; is that

20   correct?

21    A.   Yes.

22    Q.   I'm going to show you what's been --

23          MR. OXLEY:  Could we just have a quick time

24   check?

25          MR. ZAKRZEWSKI:  Yeah.  Sure.

Confidential                                                                                    JAN-MS-05485851

```
                                              Page 193
 1            VIDEO OPERATOR:  Oh.

 2            MR. EHSAN:  Yeah.  Go ahead.  How long have

 3     we been on the record?

 4            VIDEO OPERATOR:  On the record?

 5            THE WITNESS:  While we're doing that, could

 6     I just grab some water?

 7            MR. EHSAN:  Sure.  Go off the record.

 8            MR. ZAKRZEWSKI:  Let's take a break.

 9            VIDEO OPERATOR:  Two hours and 38 minutes.

10            (Discussion off the record)

11            VIDEO OPERATOR:  We're off the record.  It's

12     2:08.

13            (Recess)

14            VIDEO OPERATOR:  Okay.  Back on the record.

15     It's 2:28.

16     BY MR. EHSAN:

17        Q.   Dr. Fishman, you've been handed what's been

18     previously marked as Exhibit 21.  Do you recall

19     talking about or being asked about questions about

20     this document yesterday?

21        A.   I do.

22        Q.   I just want to draw your attention to the

23     second page which is the first page with any

24     substantive content.  Do you see that it's a Nucynta

25     Immediate Release Tapentadol Launch Plan?
```

Confidential
JAN-MS-05485852

Page 194

1      A.    Yes.

2      Q.    Do you appreciate that the word -- that

3    "Nucynta" is misspelled?

4           MS. BALDWIN:  Object to form.

5           THE WITNESS:  I didn't.

6    BY MR. EHSAN:

7      Q.    You didn't appreciate that?

8      A.    I did not.

9      Q.    Did you also see below it, it says

10   "Confidential Draft for Internal Review"?

11     A.    Yes.

12          MS. BALDWIN:  Object to form.

13   BY MR. EHSAN:

14     Q.    When you were asked questions about this,

15   did you appreciate that this was a draft document?

16          MS. BALDWIN:  Object to form.  Leading.

17          THE WITNESS:  I think I mentioned it at the

18   time.  I really don't know the context of what this

19   is or how it would be used.

20   BY MR. EHSAN:

21     Q.    Would you agree with me, doctor, that you

22   weren't shown any final version of this document?  Is

23   that correct?

24          MS. BALDWIN:  Object to form.  Leading.

25          THE WITNESS:  It appears that way.

Confidential                                                              JAN-MS-05485853

```
                                                    Page 195
 1    BY MR. EHSAN:
 2        Q.    And based on a draft, you have no way of
 3    knowing what, if any, final draft would have
 4    contained the same or different language as contained
 5    in this document; correct?
 6            MS. BALDWIN:  Object to the form.  Leading.
 7            THE WITNESS:  Yes.
 8    BY MR. EHSAN:
 9        Q.    You can put that one aside.
10            If you could take a look at Exhibit 5.
11            MR. ZAKRZEWSKI:  5?
12            MR. EHSAN:  Yes.  Thank you.
13            MS. BALDWIN:  Would you mind?  Thank you.
14    BY MR. EHSAN:
15        Q.    Do you remember being shown this document
16    yesterday?
17        A.    Yes.
18        Q.    You notice "Nucynta" is spelled differently
19    in this document than the prior one we looked at;
20    right?
21        A.    Yes.
22            MS. BALDWIN:  Object to form.
23            THE WITNESS:  Has a "Y."
24    BY MR. EHSAN:
25        Q.    Yes.  And I'll represent to you that's the
```

Confidential                                                    JAN-MS-05485854

Page 196

1    correct spelling of the branded medication.

2            MS. BALDWIN:  Object to form.

3    BY MR. EHSAN:

4       Q.    Do you know -- or strike that.

5            Are you aware that Nucynta has a dual

6    mechanism action?

7       A.    I am.

8       Q.    It's a opioid agonist as well as a

9    norepinephrine reuptake inhibitor; correct?

10           MS. BALDWIN:  Object to the form.  Leading.

11           THE WITNESS:  I'm aware of that.

12   BY MR. EHSAN:

13      Q.    So would it be fair to say that education

14   related to that particular dual mechanism of action

15   may allow certain physicians to consider prescribing

16   it as opposed to just thinking it's another "me too"

17   opioid?

18           MS. BALDWIN:  Object to form.  Leading.

19           THE WITNESS:  I think it's critical to know,

20   to understand the dual mechanism that distinguishes

21   this drug from almost all other opioids.

22   BY MR. EHSAN:

23      Q.    And specifically, there was some suggestion

24   that physician education, if you look at page eight

25   of that document -- wait till you're there.

Confidential                                                                                        JAN-MS-05485855

Page 197

1      A.    I'm there.

2      Q.    "Physician speaker programs often trigger

3    first use."  Do you see that?

4      A.    Yes.

5      Q.    And would it be fair to say that if you are

6    educating someone about the dual mechanism of

7    Nucynta, it may allow that physician to consider that

8    in making that prescribing decision for other

9    patients?  Correct?

10           MS. BALDWIN:  Object to form and leading.

11           THE WITNESS:  I think I mentioned this

12    yesterday, that I think prescriber decisions based on

13    speaker's program may be good or bad, and there are

14    times where the decisions are made because they now

15    have the full information appropriately.

16    BY MR. EHSAN:

17      Q.    Correct.  And so it's not necessarily bad

18    that an education program will allow a physician to

19    make a prescribing decision for a new drug that has a

20    different mechanism action; correct?

21           MS. BALDWIN:  Object on form and leading.

22           THE WITNESS:  Correct.

23    BY MR. EHSAN:

24      Q.    If you could take a look at Exhibit 6.  This

25    is an email and an attachment that was provided with

Confidential                                                                    JAN-MS-05485856

Page 198

1   the email.  Do you recall being asked questions about

2   this exhibit yesterday?

3       A.   I do.

4       Q.   I think you testified that the KOLs were

5   classified based on their -- based on their

6   publication as one factor.  Do you recall that?

7       A.   Yes.

8       Q.   And there were also surveys of other

9   physicians to identify which specialists were

10  considered influential within the prescribing

11  community.  Do you recall that?

12      A.   I do.

13           MS. BALDWIN:  Object to the form.

14  BY MR. EHSAN:

15      Q.   And is it true that your -- strike that.

16           Is it true that a physician's volume of

17  prescribing can provide a source of information about

18  practical experience with a drug that may be of

19  benefit to other practicing physicians?

20           MS. BALDWIN:  Object to form and leading.

21           THE WITNESS:  I'm not sure I would agree

22  with that.

23  BY MR. EHSAN:

24      Q.   Do you agree that someone who is published

25  within a field may have information that he or she

Confidential                                                    JAN-MS-05485857

Page 199

1    can share with fellow prescribing physicians?

2            MS. BALDWIN:  Object to the form and

3    leading.

4            THE WITNESS:  "May" is the key word, but

5    yes.

6    BY MR. EHSAN:

7       Q.  There is nothing inherently problematic with

8    identifying physicians who may have clinical

9    experience, publication experience or other

10   experience with a particular medication to serve as

11   educators for other prescribing physicians.  Would

12   you agree with that?

13           MS. BALDWIN:  Object to the form and

14   leading.

15           THE WITNESS:  I think that people who are

16   published, people who are in the academic arena,

17   people who are teaching and known to others, these

18   are all sources of respect that is engendered and why

19   people would think of them as knowledge leaders, so I

20   think those are all appropriate.  I'm not sure about

21   number of prescriptions.

22   BY MR. EHSAN:

23      Q.  Well, do you agree with me that part of the

24   information you draw upon in assessing the risk and

25   benefit of any particular medication is your personal

Confidential                                                                JAN-MS-05485858

Page 200

1    history with that medication in your patient

2    population?

3        A.    Yes.

4            MS. BALDWIN:  Object to the form and

5    leading.

6    BY MR. EHSAN:

7        Q.    So that form is a source of information for

8    you in making a prescribe --

9            MS. BALDWIN:  Object to the form and

10   leading.

11           THE WITNESS:  Yes.

12   BY MR. EHSAN:

13       Q.    And would you see anything inherently wrong

14   with sharing that experience with the caveat that

15   it's your personal experience with other prescribers?

16           MS. BALDWIN:  Object to the form.

17           THE WITNESS:  I don't see anything wrong

18   with sharing it in that direction.  I do find

19   something wrong with looking for high prescribers to

20   become -- to be put on a pedestal and viewed by

21   others.

22   BY MR. EHSAN:

23       Q.    Understood.  I may have misspoken.

24       A.    Yeah.

25       Q.    My sense was that the number of

Confidential                                                                      JAN-MS-05485859

Page 201

1   prescriptions as a surrogate for how many times

2   you've seen patients get prescribed that medication

3   having information about how the particular

4   prescription's turned out in those patients.

5           MS. BALDWIN:  Object to the form.

6   BY MR. EHSAN:

7       Q.   Does that make sense?

8       A.   Yes.  Agree.

9           MS. BALDWIN:  And leading.

10  BY MR. EHSAN:

11      Q.   So would you agree with me that doctors who

12  have prescribed significant number of prescriptions

13  may have a broader clinical experience with a

14  particular drug based on the number of prescriptions

15  than may allow for a broader set of experiences to

16  share with other prescribers?

17          MS. BALDWIN:  Object to the form and

18  leading.

19          THE WITNESS:  Yes.

20  BY MR. EHSAN:

21      Q.   And lastly, I want to show you what's been

22  marked as Exhibit 3.

23          If you don't mind, John.

24          MR. ZAKRZEWSKI:  3?

25          MR. EHSAN:  Yes.  Thank you.

Confidential                                                                                     JAN-MS-05485860

Page 202

```
 1            MR. ZAKRZEWSKI:  That one there.
 2            MS. CHURCHMAN:  What is the --
 3            MR. EHSAN:  3 is the email with the funky
 4     graphics in the middle.
 5            MS. BALDWIN:  You produced a lot of
 6     documents with those funky graphics.
 7            MR. EHSAN:  I don't know what that language
 8     is, but --
 9            MS. BALDWIN:  I think that's the secret
10     code.
11     BY MR. EHSAN:
12       Q.   Dr. Fishman, you were shown this document
13     yesterday.  Do you recall?
14       A.   Yes.
15       Q.   And I think you mentioned there was an
16     interesting back story to this particular email,
17     which you weren't asked about and during while we
18     were on the record, so I was going to give you that
19     chance to provide that story on the record if you
20     would like.
21            MS. BALDWIN:  Object to the form.
22            THE WITNESS:  Well, this was a -- you know,
23     again, I'm a little embarrassed because I've tried to
24     hold myself to not being part of advisory boards,
25     only because of the optics of those boards, and I
```

Confidential                                                    JAN-MS-05485861

Page 203

1    must say that by not being part of those boards, I

2    feel like I've been disadvantaged in learning a lot

3    about medications and the science behind the drugs

4    that we use, but I feel it's important that I --

5    particularly in the roles that I've been in, that I

6    draw those lines.

7         This was an opportunity that came up during

8    the World Congress of Pain that was held in Montreal,

9    and it was a very large international forum where

10   many of the leading pain specialists from Japan were

11   meeting in a conference room, and this company was

12   bringing them together, and I had agreed that I would

13   meet with them.  And then later, I was confronted

14   with this need to have me receive -- or to give me an

15   honorarium for participating in an advisory board

16   which this wasn't.

17        This was me meeting with a group of Japanese

18   pain specialists to discuss the problem of opioid

19   abuse in Japan and Asia, and I think in my enthusiasm

20   to take that opportunity to talk with these folks

21   about a problem that I knew of that rarely gets

22   discussed, I overlooked really the problem that was

23   presented in terms of the optics here, but I did

24   refuse to take money, and I offered the option that

25   they could give that money to the university or to a

Confidential                                                                 JAN-MS-05485862

Page 204

1    nonprofit.

2    BY MR. EHSAN:

3        Q.   So you were basically doing it because you

4    wanted to do it and had no intention of having any

5    remuneration attached to it; correct?

6            MS. BALDWIN:  Object to the form and

7    leading.

8            THE WITNESS:  That's what I'm saying.

9    BY MR. EHSAN:

10       Q.   And you were perfectly fine with the money

11   going to a worthy cause?

12       A.   Correct.

13           MS. BALDWIN:  Object to the form and

14   leading.

15   BY MR. EHSAN:

16       Q.   And then aside from this -- well, this was

17   in -- what year was this?

18       A.   This was in 2010.

19       Q.   2010.  Have you had any interaction as a

20   speaker or a presenter on behalf of Janssen since

21   2010?

22       A.   No.

23       Q.   How about with Johnson & Johnson?

24       A.   No.

25       Q.   How about with Ortho-McNeil?

Confidential                                                                    JAN-MS-05485863

Page 205

1     A.    No.

2     Q.    You recall you were shown a Teva plea

3   agreement that was dated 2016?

4          MS. BALDWIN:  Object to the form.

5          THE WITNESS:  Plea agreement?

6   BY MR. EHSAN:

7     Q.    Yes.  Guilty plea agreement.

8     A.    I think it was earlier than that if my

9   memory serves me.

10    Q.    What was the date?  Well, can we just real

11  quick -- sorry.  I apologize.  I told you that was

12  the last document.  Exhibit 31.

13         MS. BALDWIN:  It's dated 2008.

14         THE WITNESS:  Yeah.  Yes, I recall that.

15  BY MR. EHSAN:

16    Q.    So aside from this particular email in which

17  you participated in something in Japan, did you have

18  any interaction with Janssen or Johnson & Johnson

19  before -- after 2008?

20         MS. BALDWIN:  Object to the form.

21         THE WITNESS:  With Johnson & Johnson or

22  Teva?

23  BY MR. EHSAN:

24    Q.    With Johnson & Johnson.

25    A.    I just want to clarify.  The interaction

Confidential                                                                    JAN-MS-05485864

Page 206

1   with the Japanese physicians was in Montreal and not

2   in Japan, and I don't actually -- didn't realize that

3   Johnson & Johnson was even involved.  There was

4   one -- I did attend a Nucynta advisory board at some

5   point, and I did it because I didn't realize it was

6   an opioid, and, again, this was this dual mechanism.

7          So -- and I think that was 2008, 2009, so

8   that would probably be -- and that was a J&J event

9   that was, I think, in Las Vegas while I was there or

10  something of that sort.

11     Q.   So besides this 2008-2009 event relating to

12  Nucynta and the 2010 meeting in Montreal that was

13  discussed in that email, you didn't have interactions

14  with Johnson & Johnson or Janssen since 2007; is that

15  right?

16     A.   Correct.

17          MS. BALDWIN:  Object to the form.

18          MR. EHSAN:  Thank you, doctor.

19          I'll pass the witness.

20          MR. OXLEY:  Can we go off the record so we

21  can swap spots?

22          VIDEO OPERATOR:  Sure.  We're off the

23  record.  It's 2:41.

24          (Recess)

25          VIDEO OPERATOR:  Okay.  We're back on the

Confidential                                                              JAN-MS-05485865

Page 207

1   record.  It's 2:44.

2                    EXAMINATION

3   BY MR. OXLEY:

4       Q.   And, doctor, we met off the record, but my

5   name is Bill Oxley, and I represent Purdue.

6            Doctor, you talked earlier about the

7   lawsuits that had been filed against you by various

8   plaintiffs.  Do you recall that?

9       A.   Yes.

10      Q.   And one of the things that you were shown

11  was a copy of the Settlement Agreement that you

12  entered into; right?

13      A.   Correct.

14      Q.   Do you remember that in the Settlement

15  Agreement that you entered into, one of the things

16  that happened was that you put together an exhibit

17  that lists -- you or your counsel put together an

18  exhibit that listed all of the lawsuits that you had

19  been sued in?  Do you recall that?

20          MR. ZAKRZEWSKI:  Objection.

21          You can answer that as it relates to

22  anything you know personally about it absent your

23  communications with your lawyers.

24          THE WITNESS:  I don't recall that chart.

25  BY MR. OXLEY:

Confidential                                          JAN-MS-05485866

Page 208

1     Q.    Let me have marked as the next exhibit in

2   order, which is 41 --

3          (Exhibit 41 marked)

4   BY MR. OXLEY:

5     Q.    -- a -- this is another copy of a Settlement

6   Agreement that you were talking about earlier today;

7   right?

8     A.    Yes.

9     Q.    And you'll notice that under the "Recitals,"

10  there's the first, second, third, fourth "Whereas"

11  clause.

12    A.    Uh-huh.

13    Q.    And, actually, let me go to the first

14  recital, the first whereas clause where it says,

15  Dr. Fishman, that there's "a complete list of all

16  claims currently known by Dr. Fishman as of July 31,

17  2018, attached hereto as Exhibit A."  Do you see

18  that?

19    A.    I do.

20    Q.    And then if you flip --

21         MR. ZAKRZEWSKI:  Just for the record, I

22  don't know about your copy, but my copy, it's --

23         THE WITNESS:  There are two copies, yeah.

24         MR. ZAKRZEWSKI:  It's a double print of the

25  same thing, just so we know what we're dealing with.

Confidential                                                                JAN-MS-05485867

1          MR.  OXLEY:   Thank you.   I appreciate it.

2          MR.  ZAKRZEWSKI:   Okay.

3    BY MR.  OXLEY:

4      Q.    And then if you go to Exhibit A --

5      A.    Yes.

6      Q.    -- you'll see that there is an Excel

7    spreadsheet or some sort of spreadsheet that was put

8    together, and it lists all of the lawsuits that were

9    filed in which you were named as a defendant; right?

10     A.    Yes.

11     Q.    And that starts at Fish 17 and goes all the

12   way through to Fish 24; is that right?

13     A.    Yes.

14     Q.    And I counted them and came up with about a

15   little bit more than 250 lawsuits that have been

16   filed against you.  Does that sound about right?

17         MR.  ZAKRZEWSKI:  Objection.  Form.

18         You can answer to whatever extent you know

19   the number.  No communications with counsel.

20         THE WITNESS:  I don't know the number.  It

21   sounds a little high, but I've been sued in a lot of

22   venues.

23   BY MR.  OXLEY:

24     Q.    Okay.  And all of those lawsuits in which

25   you have been sued were by plaintiffs that alleged

Confidential                                                                                    JAN-MS-05485868

Page 210

1    that you, along with others, including the

2    organizations that you were involved with, worked

3    with opioid manufacturers to spread false information

4    about the benefits and the risks of opioids; is that

5    right?

6        A.    Essentially.

7        Q.    And were those allegations against you true?

8            MS. BALDWIN:  Objection to form.

9            THE WITNESS:  Patently false.

10   BY MR. OXLEY:

11       Q.    Okay.  Tell the jury why an allegation

12   against you that you were part of a front group that

13   worked with opioid manufacturers to spread lies about

14   opioids is false, please.

15       A.    Well, you know, it's hard to prove the

16   negative, but my work has always been to do just the

17   opposite, to highlight the risks, the real risks and

18   the benefits of opioids as a limited option in the

19   treatment of pain, but all I can say is it appears to

20   me that you can sue anyone for anything, and you

21   don't have to actually provide any proof; and in this

22   case, just, you know, you're removed from these

23   cases, and no one ever really cares about the fact

24   that there really were no grounds to support those

25   charges at all and plenty of evidence that would

Confidential                                                                JAN-MS-05485869

Page 211

1   refute them.

2       Q.   Is it also false that you worked as a key

3   opinion leader individually with opioid manufacturers

4   in an effort to spread lies about the benefits and

5   risks of opioids?

6           MS. BALDWIN:  Object to the form and

7   leading.

8           THE WITNESS:  It's --

9   BY MR. OXLEY:

10      Q.   The question was whether that was a false

11  allegation against you.

12          MS. BALDWIN:  Same objection.

13          THE WITNESS:  So that is a false allegation.

14  I never sought to be a key opinion leader.  My

15  opinions were respected, and I was sought after for

16  them, and that was, I think, you know, conflated and

17  twisted into some role of being a servant and a shill

18  for the companies that profited on the drugs.

19  BY MR. OXLEY:

20      Q.   Conflated and twisted by whom?

21      A.   By the plaintiffs who, for some reason,

22  wanted to name me in these -- name me in one case and

23  then have those cases essentially photocopied,

24  Xeroxed word-for-word in hundreds of venues.

25      Q.   In this case -- let me just read something

Confidential                                                                                    JAN-MS-05485870

Page 212

1    to you from some papers that the plaintiffs filed in

2    this case, and I'm going to ask you to let the jury

3    know if this is true or false; okay?

4            MS. BALDWIN:  Object to form and leading.

5    BY MR. OXLEY:

6      Q.   And I'll represent to you that what I'm

7    reading from you is from an opposition brief that the

8    plaintiffs filed, that the State filed in opposition

9    to a motion to dismiss that Purdue filed in the

10   Oklahoma case, and what it says is that people like

11   you and the organizations that you worked with

12   conspired with Purdue to change the historical form

13   of --

14           MS. BALDWIN:  Object to the form.  Are you

15   reading the --

16           MR. ZAKRZEWSKI:  Wait.

17           MS. BALDWIN:  I need a clarification here.

18           Are you reading?

19           MR. OXLEY:  Yes.

20           MS. BALDWIN:  Are you -- okay.  You can

21   reask.  I didn't know if you were reading or you were

22   paraphrasing.

23           MR. OXLEY:  I said I was reading.

24           MR. ZAKRZEWSKI:  But for the court reporter,

25   finish the question, then do your objection.

Confidential                                                                                        JAN-MS-05485871

Page 213

1            (Discussion off the record)

2            MR. OXLEY:  Sure.  Let me try it again.

3    BY MR. OXLEY:

4      Q.    So in opposition to a brief that Purdue

5    filed, the plaintiff said that you and other KOLs,

6    key opinion leaders, and your front groups, quote,

7    "conspired to change the historical perception of

8    opioids as highly addictive in harmful last resort

9    medications and that that conspiracy supposedly took

10   place with Purdue."  Is that true?

11           MS. BALDWIN:  Object to the form of the

12   question.  I don't believe that you're even reading

13   from the document itself, and if you want to ask him

14   questions about a pleading filed in this case, it's

15   publicly available.  Please provide it to the witness

16   and show him what it actually says.  You're reading

17   off of your computer.  He can't even look at it, and

18   you're representing to the judge and jury that this

19   is what it says, and I don't have it in front of me,

20   I can't look at it.  I don't know if that's what it

21   says.

22           So I'm objecting to this whole line of

23   questioning until he has a copy and he can actually

24   read what's written in that document.

25   BY MR. OXLEY:

Confidential                                          JAN-MS-05485872

Page 214

1      Q.    Is that allegation correct, sir?

2            MS. BALDWIN:   Object to the form, lacks

3      foundation.

4            THE WITNESS:   Can I answer that?

5            MR. ZAKRZEWSKI:   (Moves head up and down).

6            THE WITNESS:   It's patently false.

7      BY MR. OXLEY:

8      Q.    For the same reasons that you described

9      previously, or would you like to add anything to your

10     previous answer?

11     A.    I don't even know where to start to argue

12     why that's false.  Again, proving the negative is

13     hard, but the fact is that this term "KOL" has

14     become -- they've -- people have framed it as a bad

15     thing to be viewed as someone who has knowledge and

16     respected leader.

17            The fact that some may exploit it doesn't

18     imply that I exploited it.  I didn't seek to be a

19     respected -- or a knowledge leader.  I sought to do

20     fair and honest work, and there's no evidence that I

21     ever conspired or colluded with drug companies to

22     really do anything, particularly on the level of how

23     they would market their drugs, because I never did

24     any marketing work with these companies.

25            So, again, it appears to me that these are

Confidential                                                                    JAN-MS-05485873

Page 215

1    ideas, at least as they relate to me, that are pulled

2    out of thin air that can't be proven, and there

3    really hadn't been any evidence that I've ever seen

4    that would support any of these accusations.

5        Q.    If someone were to stand up in court and

6    tell this jury that you, in writing Responsible

7    Opioid Prescribing, were spreading lies that came

8    from the model guidelines and model policy, would

9    that be true?

10            MS. BALDWIN:  Object to the form.

11            THE WITNESS:  Again, it's not true, and my

12    retort is please read the book.

13   BY MR. OXLEY:

14       Q.    If someone were to stand up and tell this

15   jury that the American Academy of Pain Medicine, the

16   American Pain Foundation or any other organization

17   that you were a part of was a front group for opioid

18   manufacturers, would that be true?

19            MS. BALDWIN:  Object to the form.

20            THE WITNESS:  It would be false and --

21   BY MR. OXLEY:

22       Q.    Why?

23       A.    Well, I know these organizations, and I know

24   the work they do, and, again, I think that for very

25   selective reasons, being that, I think, lawyers have

Confidential                                                                    JAN-MS-05485874

Page 216

1   in these partisan dealings, it's convenient to see

2   that an organization that is doing work and takes

3   money from industry is just simply working for

4   industry, and, unfortunately, it requires someone who

5   understands how consumer and medical education works

6   across the board.

7           Has nothing to do specifically with opioids

8   or pain, how it works in America where professional

9   groups and consumer groups are forced to get funding

10  to do the good work they do from industry because

11  industry is the only source that actually is making

12  money from the therapeutic endeavors that we're

13  trying to educate on.

14          So I think this is a very selective attempt

15  to sway opinions of people who don't have enough

16  knowledge to really understand that these are groups

17  that are trying to do great good, they're very

18  dedicated people, and, unfortunately, they can't do

19  their work without funding.

20     Q.   And in your view, is it a good thing, a bad

21  thing or something else for industry to support the

22  goals of those organizations that you just described

23  who are out there trying to do good work?

24          MS. BALDWIN:  Object to the form and

25  leading.

Confidential

JAN-MS-05485875

Page 217

1           THE WITNESS:  I think it's an unfortunate

2    reality that we have to have this uncomfortable

3    alliance.  My hope is that it changes across the

4    board, but to date, otherwise, there's really -- you

5    know, most of the continuing medical education in

6    America is funded through industry, and if you stop

7    those relationships today, we'd stop that education.

8           So we've got to figure out something in

9    America that allows us to do it better, but it's the

10   best we have, and it's the system that we have, and

11   those of us who want to make sure that clinicians and

12   consumers are educated have to work with industry.

13   BY MR. OXLEY:

14     Q.   And I think you said before that you never

15   allowed funding, regardless of where it came from, to

16   influence any of your work; is that right?

17           MS. BALDWIN:  Object to the form and

18   leading.

19           MR. OXLEY:  It's foundational.

20   BY MR. OXLEY:

21     Q.   Is that right?

22     A.   I work very hard to keep my work

23   independent.

24     Q.   One of the things, I think, that you said

25   that you try to avoid was an apparent conflict of

Confidential                                                    JAN-MS-05485876

Page 218

1    interest.  You said that yesterday, and you may have

2    said it today.  Do you remember that?

3        A.    I do.

4              MS. BALDWIN:  Object to the form.

5    BY MR. OXLEY:

6        Q.    When you said you were trying to avoid an

7    apparent conflict of interest, can you please tell

8    the jury what you meant by an "apparent conflict"?

9        A.    Well, highlight the "apparent conflict of

10   interest" because I know it's not a conflict of

11   interest.  I know that I'm not being influenced, but

12   others don't know that.

13             So in leadership roles, as I ascended to

14   leadership roles in the field, I felt less

15   comfortable having apparent conflicts of interest and

16   have ultimately excluded as many of them as I can,

17   even when it's detrimental to my own learning or

18   advantages to the work that I do.

19       Q.    And one of the ways that you experienced

20   that problem for you of having an apparent conflict

21   of interest was when ProPublica published an article

22   about you; correct?

23       A.    Correct.

24             MS. BALDWIN:  Object to the form.

25   BY MR. OXLEY:

Confidential                                                      JAN-MS-05485877

Page 219

1      Q.   And can you tell the jury what happened in

2   that scenario with the ProPublica article?

3           MS. BALDWIN:   Object to the form.

4           THE WITNESS:   They just published an article

5   that, you know, essentially cast me as a -- you know,

6   as someone in the pocket of or a shill for

7   pharmaceutical companies because -- by association

8   with organizations that accepted funding from

9   industry and other roles that I had, like inaccurate

10   information about the video that I did for the public

11   service announcement on opioid addiction in

12   adolescents that happened to go on a marketing

13   website, unbeknownst to me, that I wasn't paid for,

14   but it was represented that I did, etc.  So I

15   thought -- you know, it was character assassination

16   by association.

17   BY MR. OXLEY:

18      Q.   Let me have marked as the next document in

19   order an article that we printed out that's called

20   "Dollars for Doctors, Two Leaders in Pain Treatment

21   Have Long Ties to Drug Industry," and it's a

22   ProPublica article.

23           (Exhibit 42 marked)

24   BY MR. OXLEY:

25      Q.   And my question, doctor, is if Exhibit 42 is

Confidential                                                        JAN-MS-05485878

Page 220

1    the article that you were just talking with the jury

2    about.

3        A.    Yes.

4        Q.    Let me have marked as the next document in

5    order an email chain that appears in -- or let me try

6    that again.  An email chain on or around December 26,

7    2011.  It bears production numbers Fish 6389 through

8    Fish 6391.

9             (Exhibit 43 marked)

10   BY MR. OXLEY:

11       Q.    And my question, doctor, is if Exhibit 43 is

12   an email exchange that you were a part of, including

13   parts that you wrote, on or around December 26, 2001.

14       A.    I'm sorry.  Can you restate that?

15       Q.    Sure.

16            MR. ZAKRZEWSKI:  The date.

17   BY MR. OXLEY:

18       Q.    Did I mess up the date?  Is Exhibit 43 a

19   copy of an email exchange that you were a part of

20   dated on or around December 26, 2011?

21       A.    Yes.

22       Q.    And at the time that you prepared this

23   email, were you attempting to be accurate in the

24   events that you described in the email?

25       A.    I believe so.  I was pretty upset.

Confidential                                      JAN-MS-05485879

Page 221

1   Q.   And do you believe that you did accurately

2   describe the events and the way that you were feeling

3   about them in or around December 26, 2011?

4   A.   If you want to give me a chance to read

5   this, I'll try to read it.

6   Q.   Sure.

7   A.   I haven't read it in a long time, probably

8   eight years.

9   Q.   Sure.  And I don't have very many questions

10  about it.  I'm just trying to establish a foundation

11  that this is actually a document that you prepared at

12  or around this time.

13  A.   This is an email that I sent to the board of

14  directors for the American Pain Foundation, so these

15  were my thoughts.

16  Q.   Okay.  Thank you.  One of the things that

17  you said in the third sentence of your email, which

18  appears in the top quarter of the page, is "In my

19  specific case, I believe the reporters intended to

20  defame my reputation by publishing false, incomplete

21  and conflated facts."  Is that correct?  Did I read

22  that correctly?

23  A.   Yes.

24  Q.   And that's an accurate statement of what you

25  believed at the time?

Confidential                                                                          JAN-MS-05485880

Page 222

1     A.    And what I still believe.

2     Q.    In the second full paragraph, you say -- in

3   about the -- toward the end of the second full

4   paragraph, you say, quote, "It is unsophisticated,

5   simplistic and misleading for ProPublic to present a

6   unidimensional picture that portrays APF as a pawn in

7   the opioid industry."

8         Did I read that correctly?

9     A.    Yes.

10    Q.    And is that what you believed then and what

11  you believe now?

12    A.    Yes.

13    Q.    You go on to say that "Such a story belies

14  the basic facts that, one, opioids are an essential

15  drug group in medicine that can be safe and effective

16  when prescribed by well-educated and trained

17  physicians; that chronic pain patients have a

18  legitimate right to organize and advocate for access

19  to pain relief, including opioids; and that there is

20  a paucity of nonindustry funding sources for patient

21  education and prescriber education," close quote.

22        Did I read that correctly?

23    A.    You did.

24    Q.    Do you believe those statements that you

25  made -- or did you believe those statements that you

Confidential                                        JAN-MS-05485881

Page 223

1    made when you wrote them, and do you believe them

2    now?

3        A.    I do.

4        Q.    In the next paragraph, you say, quote,

5    "Everyone acknowledges that America is facing a

6    time-sensitive need for education in safe and

7    effective opioid prescribing, including the APF, DEA

8    and FDA.  It is therefore specious reasoning to fault

9    industry funding for education in this area if there

10   are not alternative funders prepared to take on this

11   role.  Even Congress and the FDA are requiring

12   industry to pay for physician education, and they

13   have made consumer education a high priority," close

14   quote.

15            Did I read that correctly?

16       A.    You did.

17       Q.    Did you believe that when you wrote it, and

18   do you believe it today?

19       A.    Yes, on both fronts.

20       Q.    APF was the American Pain Foundation?  Is

21   that who you're referring to?

22       A.    Yes.

23       Q.    DEA is?

24       A.    The Drug Enforcement Agency.

25       Q.    And the FDA?

Confidential                                                                 JAN-MS-05485882

Page 224

1    A.    The Food and Drug Administration.

2    Q.    And in the previous paragraph, you refer to

3    a "paucity," I can't say it right, "of nonindustry

4    funding."  What did you mean when you said "paucity"?

5    A.    "Paucity" is a lack of.

6    Q.    So there was a lack of funding?

7    A.    Yes.

8          MS. BALDWIN:  Object to the form.

9    BY MR. OXLEY:

10   Q.    One of the things that you said in your

11   email and that you criticize ProPublica for was its

12   failure to publish more of the details in your

13   responses to specific written questions that

14   ProPublica had asked you; is that right?

15         MS. BALDWIN:  Object to the form.

16         THE WITNESS:  Correct.

17   BY MR. OXLEY:

18   Q.    Let me hand you, which we'll have marked as

19   Exhibit 44, a document that appears to be your

20   response to the reporters from ProPublica.  I'll note

21   for the record that for some reason, this was printed

22   with stuff that I had highlighted in it, and at the

23   time of trial, we'll be more than happy to replace

24   clean versions of this for the ones that have this

25   highlighting.

Confidential                                                      JAN-MS-05485883

```
                                              Page 225
 1           (Exhibit 44 marked)
 2    BY MR. OXLEY:
 3       Q.   My question -- my first question,
 4    Dr. Fishman, is if the document that we've had marked
 5    as Exhibit 44 is in fact a copy of your response to
 6    the questions that were proposed by ProPublica
 7    authors Charles Ornstein -- well, Charles Ornstein
 8    dated December 15th, 2011.
 9       A.   These are my responses to written questions
10    that were posed to me prior to publishing their
11    article.
12       Q.   And when you prepared your written responses
13    to the questions that were posed before ProPublica
14    wrote its article, did you make sure that your
15    written responses were accurate and reflected what
16    you believed at the time you wrote those answers?
17           MS. BALDWIN:  Object to the form.
18           THE WITNESS:  Yes.
19    BY MR. OXLEY:
20       Q.   In the response on the first page to
21    question number one, you say "Your characterization
22    of my presentations and articles on opioids as being
23    upbeat is incorrect.  I would not say that I am
24    upbeat at all about the current environment in which
25    too many people are using opioids inappropriately."
```

Confidential                                                        JAN-MS-05485884

Page 226

1          Did you believe that at the time, and do you
2   believe it today?
3      A.   Yes.
4          MS. BALDWIN:  Object to the form.
5   BY MR. OXLEY:
6      Q.   On the next page, the first full paragraph,
7   you say "Opioids are addictive, but I doubt that most
8   medical leaders would agree that they are only to be
9   used as a last resort."  Did you believe that at the
10  time you wrote it?
11     A.   Yes.
12     Q.   Do you believe it today?
13     A.   Yes.
14     Q.   The last two sentences of that same
15  paragraph says "Medicine is all about risk
16  management.  Physicians always have to balance risks
17  with benefits.  Unfortunately, until recently, this
18  was never emphasized around the use of opioids or
19  controlled substances in general."
20          Did you believe those statements when you
21  wrote them, and do you believe them today?
22     A.   Yes.
23     Q.   One of the things that you wrote on page
24  four, carrying over to page five, is you're talking
25  about the number of people in America that suffer

Confidential                                                                JAN-MS-05485885

1    from chronic pain, and you can see that at the top of

2    page four where you say that "we need to treat the

3    116 million Americans (per the recent Institute of

4    Medicine report) in chronic pain and the many more

5    millions in other forms of pain every day."

6          Do you see that?

7          MR. ZAKRZEWSKI:  Where are you?

8    BY MR. OXLEY:

9      Q.   It's at the top of page four.

10         MR. ZAKRZEWSKI:  You said four.

11   BY MR. OXLEY:

12     Q.   Yeah.  The sentence started on four but

13   carried over to five.  Sorry.

14         MR. ZAKRZEWSKI:  Okay.

15         THE WITNESS:  Yeah.

16   BY MR. OXLEY:

17     Q.   Is that a statement that you believed at the

18   time when you wrote it?

19     A.   I think so.  I think I've given more thought

20   to the -- number one, since I wrote it, the 116 has

21   been revised to 100 million by the Institute of

22   Medicine, or now the National Academy of Medicine,

23   and, again, understanding that population, it's

24   probably not all that 100 million need to be treated

25   but need to be considered, so that would hold to

Confidential                                                                    JAN-MS-05485886

Page 228

1    that.

2        Q.    But when you wrote it back in 2011 --

3        A.    Yes.

4        Q.    -- there's no doubt that you believed it;

5    right?

6        A.    Correct.

7        Q.    And the fact that your thinking about that

8    has changed, is that part of what you were talking

9    about earlier when you talked about how science

10   evolves and people's views of what the science is

11   telling us evolves with it?

12           MS. BALDWIN:  Object to the form and

13   leading.

14           THE WITNESS:  Yes.

15   BY MR. OXLEY:

16       Q.    One of the documents that you talked about

17   yesterday -- or one of the manuscripts that you

18   talked about yesterday was a book by Derek McGinnis

19   called "Exit Wounds," and I have a copy of it here

20   that I would like to have marked as Exhibit 45.

21           (Exhibit 45 marked)

22   BY MR. OXLEY:

23       Q.    And, doctor, you prepared the forward to the

24   book Exit Wounds; is that right?

25       A.    Yes.

Confidential                                                                    JAN-MS-05485887

Page 229

```
 1      Q.   And when you prepared the forward to Exit
 2   Wounds, you were attempting to write something that
 3   you believe; is that true?
 4      A.   Yes, absolutely.
 5           MS. BALDWIN:  Object to form.
 6   BY MR. OXLEY:
 7      Q.   Am I correct that Exit Wounds was developed
 8   by the American Pain Foundation?
 9      A.   Yes.
10      Q.   And you were the president of the American
11   Pain Foundation; correct?
12      A.   I was the chairman of the board, but yes.  I
13   had the title president, but it had no -- it didn't
14   have any role.
15      Q.   Okay.
16      A.   Yeah.
17      Q.   And you were the president and chairman of
18   the American Pain Foundation at the time Exit Wounds
19   was published?
20      A.   Correct.
21      Q.   So can you tell the jury, based on your
22   involvement in writing this and your work for the
23   American Pain Foundation at the time Exit Wounds was
24   funded, if Exit Wounds was an attempt to spread lies
25   about the use of opioids?
```

Confidential                                                              JAN-MS-05485888

Page 230

1          MS. BALDWIN:  Object to the form.

2          THE WITNESS:  Exit Wounds was a book I wrote

3    a preface or forward for.  I wasn't involved in

4    writing the book, but the American Pain Foundation

5    had become connected with Derek McGinnis, who was a

6    war veteran who had a traumatic limb amputation due

7    to stepping on a mine and went through a horrendous

8    experience of overcoming acute and chronic pain; and

9    the foundation felt that it was a very compelling

10   story to tell and used its resources to put together

11   this book that tells Derek McGinnis's story of his

12   path of being a normal adult to a traumatized -- both

13   physically and mentally traumatized veteran.

14          There was, in my estimation, no connection

15   to drugs or pharmaceutical companies in this book.

16   The fact that they sought pharmaceutical money to

17   print the book and get the book out reflects the need

18   for money, reflects the need for support to be able

19   to get projects like this completed.

20          And I can understand why some people might

21   say, "Well, if they're taking money from

22   pharmaceutical companies, they must be doing

23   pharmaceutical companies' work," but there were

24   firewalls involved in this work, and, again, as the

25   American Pain Foundation did its work, we put our

Confidential                                          JAN-MS-05485889

Page 231

1    projects out onto anyone who wanted to fund it, and I

2    think Purdue and others chose to fund this project.

3    BY MR. OXLEY:

4        Q.    When you said that they were seeking

5    funding, you mean the American Pain Foundation was

6    seeking funding?

7        A.    American Pain Foundation was seeking

8    funding, correct, for a project that the American

9    Pain Foundation chose to do.  I wasn't on the ground

10   doing projects with the group.  Again, my role was

11   with the board of directors, you know, at a very high

12   level.

13       Q.    You said that you understood why someone

14   might see that there's funding from a pharmaceutical

15   company and then make the assumption that there was

16   influence.

17       A.    Correct.

18       Q.    In the case of Exit Wounds, is that

19   assumption true or false?

20       A.    The assumption is false, and I think if you

21   met Derek McGinnis, you would understand that

22   viscerally.

23       Q.    Why is that?

24       A.    Because he's such a compelling example of

25   what we have to learn about how pain takes over your

Confidential                                                                                    JAN-MS-05485890

Page 232

1  life, and this story is about that.  Again, you know,

2  my retort is always read the book.  Before you make a

3  judgment, read the book.  The book's not about drugs.

4  The book's about a story of coming back to life from

5  this enormously traumatic experience that many people

6  would have folded from.

7     Q.   And if opioids are able to help someone come

8  back to life, as you put it, is that something that

9  you would support for that particular patient under

10  those particular circumstances?

11          MS. BALDWIN:  Object to the form.

12          MR. ZAKRZEWSKI:  Objection.  Form.

13          You can answer.

14          THE WITNESS:  I honestly don't know the

15  circumstances under which Derek received his

16  treatment, and I couldn't say in that case.

17  BY MR. OXLEY:

18     Q.   I didn't mean Derek in particular.

19     A.   But in a case of someone in which all things

20  that would have potential to help with less risk have

21  been tried, it's urgent that you help somebody

22  recover from injuries like this, and I think if Derek

23  didn't get the help that he needed in time, his life

24  would have been forever injured further than it was.

25     Q.   One of the things that you said in the

Page 233

1    forward that you prepared is that, quote, "Chronic
2    pain, whether suffered by individuals in the civilian
3    or military community, is a special kind of hell,"
4    close quote.  Is that something that you believed
5    then and that you believe now?
6              MS. BALDWIN:  Object to the form.
7              THE WITNESS:  Both, yes.
8    BY MR. OXLEY:
9       Q.   We've talked a lot about chronic pain, and
10   I'd like to give you a chance to tell the jury what
11   that means.  What have you observed in patients who
12   are in chronic pain, and how does chronic pain -- why
13   is it a special kind of hell as you described in the
14   preface?
15             MS. BALDWIN:  Object to the form.
16             THE WITNESS:  Well, chronic pain is a
17   special kind of hell because it's the aberrant
18   activation of an adaptive alarm system that's meant
19   to keep us safe which, when broken, makes our lives
20   miserable by virtue of the fact that it's an alarm --
21   the pain alarm is meant to grab our attention, and
22   when it grabs our attention, it's due to potential
23   harm, real harm and the process of healing.
24             The alarm is designed to turn off once we
25   start that healing process or the threat is gone.

Confidential                                                                                    JAN-MS-05485892

Page 234

1    When that alarm will be turned off, it constantly

2    signals us that we need to focus on only the alarm

3    and remove our focus from all the other things that

4    make life worth living, and you can see this in how

5    it would be adaptive in history, that you've injured

6    yourself, and you need to stop collecting food in the

7    field, or whatever you're doing, and pay attention,

8    and your behavior attracts others to understand

9    what's happening to you, and you can get support to

10   survive and advance the species.

11          When that alarm is constantly ringing, it's

12   telling you to stop.  It's like having mental

13   handcuffs all the time.  And there are ways that many

14   people can deal with that, which involve drugs,

15   non-drugs, many different adaptations that can be

16   helpful, but overall, if you can imagine having to

17   wear a full body cast or handcuffs on your feet and

18   your hands and go through life, that would seem like

19   hell, and that's what these patients go through

20   because it's unremitting, and they don't have the

21   opportunities the rest of us have to have

22   full-quality lives.

23   BY MR. OXLEY:

24       Q.   On the next page, you write, quote, "The

25   goal of Exit Wounds is to arm veterans and their

Confidential                                                  JAN-MS-05485893

Page 235

1    families with the information and resources they need

2    to advocate for the quality of pain treatment they

3    deserve," close quote.  Is that a true statement?

4           MS. BALDWIN:  Object to the form.

5           THE WITNESS:  Yes.

6    BY MR. OXLEY:

7       Q.   You meant it when you wrote it?

8       A.   And mean it today.

9       Q.   One of the things that -- let me ask you

10   this:  In looking at your writing, one of the things

11   that -- and my question is whether what I'm about to

12   say is right or wrong:  One of my take-aways was that

13   not only are you passionate about helping people with

14   pain, but that you are looking for ways to talk with

15   patients about pain in a way so that they can get the

16   best help possible.  Is that a true or false

17   statement?

18          MS. BALDWIN:  Object to the form and leading

19   and testifying.

20          THE WITNESS:  Yes.

21   BY MR. OXLEY:

22      Q.   True?

23      A.   True.

24      Q.   And what, in your -- do you ever use any

25   visual aids in your practice to help patients

Confidential                                                    JAN-MS-05485894

Page 236

1    describe their levels of pain?

2        A.    I don't.

3        Q.    Have you ever -- but you have written an

4    article before, we were looking at it earlier,

5    Exhibit 38, in which you had a picture of a visual

6    aid; right?

7            MS. BALDWIN:  Object to the form.

8            THE WITNESS:  The scale with faces.

9    BY MR. OXLEY:

10       Q.    Yes.  And let's take a look, if we could,

11   which is page --

12           MR. ZAKRZEWSKI:  Got to get it for you.

13   BY MR. OXLEY:

14       Q.    -- eight.  Thank you.  And I'm looking at

15   the page numbers at the top where it says page --

16   it's at the top right-hand side.  Right.  And,

17   actually, could you hold that up to the camera so the

18   jury can take a look?  These are -- what the jury's

19   looking at right now is something from Wong-Baker; is

20   that right?

21       A.    Correct.

22       Q.    And what the jury's looking at right now is

23   the depiction of the faces from Wong-Baker that you

24   put in the article that you wrote that is Exhibit 38;

25   right?

Confidential                                                                                                    JAN-MS-05485895

Page 237

1      A.    Correct.

2      Q.    And one of the things that -- am I right

3    that in your article, you were using that as an

4    example of a way to get people to talk about their

5    levels of pain?

6            MS. BALDWIN:  Object to the form.

7            THE WITNESS:  Well, it's one of the tools

8    that's commonly used, and some people like to use

9    that.  I don't use it in my practice, but this is the

10   work I do every day with almost every patient.  So I

11   feel particularly comfortable talking with patients

12   about their pain, and I feel that I get a better

13   sense from having a more detailed conversation that

14   may take longer.

15           Some doctors or clinicians might not have

16   the time that I have.  So this is a very quick way to

17   get a patient to kind of give you a sense of where

18   you are, where they are.  It also may be

19   oversimplifying where they are and how they're

20   feeling.

21   BY MR. OXLEY:

22     Q.    And one of the things that you said in your

23   article is, quote, "The Wong-Baker scale in Figure 1

24   is suitable for patients of all ages except the very

25   young, those of all cultures and those who are

Confidential                                                                                    JAN-MS-05485896

Page 238

1    cognitively impaired."  And do you believe that
2    today, and did you believe it then?
3              MS. BALDWIN:  Object to the form.
4              THE WITNESS:  I believe it as far as there's
5    data that suggests that that's true.
6    BY MR. OXLEY:
7       Q.   Great.  Thank you.  What would you think of
8    a lawyer who would stand up in court and make fun of
9    the Wong-Baker faces chart as being an example of
10   some pharmaceutical company that's making light of
11   opioids and people who are in pain?
12             MS. BALDWIN:  Object to the form.
13             MR. ZAKRZEWSKI:  Objection.  Form.
14             MS. BALDWIN:  That has never happened.
15             THE WITNESS:  Should I answer that?
16             MR. ZAKRZEWSKI:  Answer it if you know.
17             THE WITNESS:  Well, I think it would be an
18   example of someone who doesn't understand the
19   complexity of pain and particularly doesn't
20   understand how difficult it is to put markers on the
21   pain that someone's feeling.
22             I think people are very surprised to learn
23   that we don't have a pain meter, we can't measure how
24   much someone has pain, so it's an easy target to say
25   that our imperfect means of trying to put some

Confidential                                                              JAN-MS-05485897

Page 239

1   measure on pain is so inadequate that maybe it's just

2   being done as a ruse to support the, you know, profit

3   mongers who we're conspiring with, but, frankly, I

4   think they're missing what is actually happening

5   which is that pain is a subjective experience.

6          You can't prove whether anyone does or

7   doesn't have it, and you can't prove that anyone does

8   or doesn't have pain relief.  So these are ways in

9   which we're trying to get partial information that we

10  know is subjective from individuals in some unified

11  way, in some way that is reproducible so that we can

12  try to have pathways that help guide us in our

13  decision making.

14  BY MR. OXLEY:

15     Q.   Based on your research and understanding of

16  the data, is the use of the Wong-Baker faces chart

17  something that's designed to help get a conversation

18  started about a patient's level of pain?

19          MS. BALDWIN:  Object to the form.

20          THE WITNESS:  Right.  It's designed to

21  appeal to someone who would recognize the emotional

22  attributes of the different faces and maybe be able

23  to put themselves on that spectrum.  Not every

24  patient wants to do that, and you've got to shift to

25  the patient as we said.  It's always got to be

Confidential                                                                                    JAN-MS-05485898

Page 240

1    individualized, but sometimes that's the one that

2    works best with the patient.

3            Again, I always do it with words, but it's a

4    more involved intervention than just showing them a

5    zero to ten scale where ten's the worst pain and

6    zero's none or the Wong-Baker faces, and there are

7    other tools out there as well.  They're all, frankly,

8    inadequate.

9    BY MR. OXLEY:

10       Q.   Thank you.  And I'm sorry to keep turning.

11       A.   No, no problem.

12       Q.   I'm not trying to be rude.

13       A.   No, no problem.

14       Q.   I'm just trying -- somebody's telling me I'm

15   running out of time soon.

16            Doctor, let me have marked as the next

17   exhibit in order which --

18            (Exhibit 46 marked)

19   BY MR. OXLEY:

20       Q.   And Exhibit 46 is entitled "Chapter 1, The

21   Clinician's Dilemma: Undertreated Pain Versus

22   Prescription Drug Misuse," and it bears production

23   numbers Fish 609 through 619, and the copyright date

24   is 2012, and my question, doctor, is if the document

25   that has been marked as Exhibit 46, which I'll call

Confidential                                                    JAN-MS-05485899

Page 241

1    Chapter 1, is a chapter that was written by you.

2        A.    It is.

3        Q.    At the time that you wrote Chapter 1, did

4    you believe that the statements that you were making

5    in Chapter 1 were supported by the science that was

6    available to you at the time?

7        A.    I think that the statements that I make in

8    Chapter 1 are proportionate to the science that was

9    available at the time.  There wasn't science to

10   support all of the things -- science is inadequate,

11   unfortunately, so I think, you know, what we do is we

12   do the best with the inadequate science that we have,

13   and that's the case with this chapter.

14       Q.    And with respect to this chapter -- and I

15   appreciate what you said.  With respect to this

16   chapter, the statements that are made in Chapter 1,

17   were they statements that you believed at the time

18   you wrote them?

19       A.    Yes.  I was hoping we could read most of

20   this.

21       Q.    I sense that there's a little bit of

22   sarcasm.

23       A.    No.  No.  I'm all for what this says.

24            MR. ZAKRZEWSKI:  I think quite the contrary.

25            THE WITNESS:  Yeah.

Confidential                                                    JAN-MS-05485900

Page 242

1   BY MR. OXLEY:

2       Q.   Was there any particular part of it that you

3   would like the jury to know about?

4       A.   Well, I would ask the jury to read it if

5   they feel that they have a question about where my

6   perspective is.  It's all about safety.

7       Q.   Okay.  And what we'll do is if we have time,

8   we can come back to it when I'm done with this other

9   stuff if that's all right.

10      A.   Yes.

11      Q.   Thank you.  One of the things that you

12  talked about previously involved questions about the

13  prescription of opioids for a long term.  Do you

14  recall that?

15           MS. BALDWIN:  Object to form.

16           THE WITNESS:  Can you say that again?

17  BY MR. OXLEY:

18      Q.   I'm going to try to say it better.

19      A.   Yeah.

20      Q.   Okay.  One of the things that you were asked

21  questions about earlier was whether today, you would

22  prescribe opioids for long-term use.

23      A.   Uh-huh.

24      Q.   Do you recall that?

25      A.   I do.

Confidential                                                          JAN-MS-05485901

Page 243

1     Q.   When you use the phrase "long-term use"
2   today, what do you mean by that?
3     A.   I consider long-term use of opioids that are
4   prescribed without an end date.
5     Q.   Thank you.  If you were asked to make a
6   determination about whether a patient had been
7   prescribed an opioid that was medically unnecessary,
8   would you be able to -- what information would you
9   need to be able to make that determination?
10          MS. BALDWIN:  Object to form.
11   BY MR. OXLEY:
12     Q.   And to put it the flip side, to determine if
13   something was medically necessary, what would you
14   need?  What information would you want?
15          MR. ZAKRZEWSKI:  Object to form.
16          THE WITNESS:  So you're asking what
17   information would I use if I was to make a
18   determination that a medical decision to prescribe an
19   opioid was inappropriate or appropriate?
20   BY MR. OXLEY:
21     Q.   That's so much better.  Thank you, doctor.
22     A.   Just wanted to be sure.  Again, there's very
23   clear guidance on this that clinicians need to get a
24   full history, do a particularly focused history, to
25   do a appropriate physical examination, to consider

Confidential                                                    JAN-MS-05485902

Page 244

1    the past history, to do screening that is consistent

2    with potentially stratifying risk and to consider all

3    of the other parts of the complaint and the patient's

4    presentation, their psychosocial behavioral history

5    in making a determination whether the benefits

6    outweigh the risks.

7        Q.    When you said that there was clear guidance,

8    where is that clear guidance?

9        A.    I think the two most prominent guiding

10   documents or provisions for clinicians are the CDC

11   guidelines on opioid prescribing and the FSMB model

12   policy.

13           MS. BALDWIN:  I'm going to object to this

14   whole line of questioning as attempting to elicit

15   expert testimony from an individual who is not

16   disclosed by defendants as an expert in this case.

17           MR. OXLEY:  Noted.  Thank you.

18   BY MR. OXLEY:

19       Q.    Would you feel comfortable -- let me strike

20   that.

21           Would it be proper, in your view, based on

22   what you've done for the last many years, to make a

23   determination about whether or not an opioid

24   prescription was proper or improper if you never saw

25   the patient and never looked at the medical records

Confidential                                                           JAN-MS-05485903

Page 245

1  for the patient?

2          MS. BALDWIN:  Object to the form.  Same

3  objection.

4          THE WITNESS:  I mean it would be difficult,

5  you know, if, you know, you came to me and said,

6  "Here's a doctor who prescribed opioids for a patient

7  and was paid cash and they had sex, you know, at the

8  time," I would say, you know, I don't need to see the

9  record if those are the facts, you know.  They're

10  egregious lines that are clearly unprofessional

11  behaviors, but, you know, if it's more nuanced than

12  that, I'd probably have to see records and

13  potentially see the patient.

14  BY MR. OXLEY:

15     Q.   One of the things that you talk about in

16  some of your writing is the concept of

17  pseudoaddiction.  Are you familiar with that term?

18     A.   I am.

19     Q.   And what does that mean?

20     A.   Pseudoaddiction means that the patient has

21  signs or the appearance of addiction but in fact is

22  not.

23     Q.   And that's something that you wrote about in

24  Responsible Opioid Prescribing; right?

25     A.   Yes.

Confidential                                                    JAN-MS-05485904

```
                                            Page 246
 1     Q.   Based on your knowledge and based on your
 2   research, is pseudoaddiction something that was made
 3   up by pharmaceutical companies in order to sell
 4   opioids?
 5          MS. BALDWIN:  Object to form.
 6          MR. ZAKRZEWSKI:  Object to form.
 7          You can answer.
 8          MS. BALDWIN:  Leading.
 9          THE WITNESS:  In my opinion, it was not made
10   up by pharmaceutical companies.  It's a real entity.
11   I don't know how common it is, but, unfortunately,
12   it's a concept that's been misunderstood and misused
13   to justify giving people more opioids than they
14   should get and not having vigilance around whether
15   they are or are not potentially abusing drugs, of
16   which addiction is only a small part.
17   BY MR. OXLEY:
18     Q.   And so because of the objection, let me ask
19   a slightly different question.
20          Is pseudoaddiction a real thing?
21     A.   Oh, yes.
22          MS. BALDWIN:  Object to form.
23          THE WITNESS:  There are patients who appear
24   to be addicted who aren't.
25   BY MR. OXLEY:
```

Confidential                                                    JAN-MS-05485905

Page 247

1      Q.    Thank you.  Yet another copy of Responsible

2   Opioid Prescribing which I'll have -- whoops -- I'm

3   sorry.  Which I'll have marked as -- I think we're on

4   47.

5           (Exhibit 47 marked)

6   BY MR. OXLEY:

7      Q.    And I will represent to you, doctor, that

8   one of the associates in my office purchased this on

9   Amazon as a used book, and this is a copy of what was

10  purchased.

11     A.    This is an early edition.

12     Q.    An actual book that was published, though,

13  and sold; right?

14     A.    Yes.

15     Q.    Because where we are on time -- you know

16  what?  I'll just leave it at that.  Let's move on to

17  the next one for now.

18           You were asked some questions yesterday

19  about comments that you received from Dr. Haddox.  Do

20  you recall that?

21     A.    I do.

22     Q.    And comments on Responsible Opioid

23  Prescribing; right?

24     A.    Correct.

25     Q.    Okay.  And I think you went into that in a

Confidential                                                                JAN-MS-05485906

Page 248

1   fair amount of detail yesterday, so I won't go over

2   much of it again today, but I just wanted to ask you

3   the question if in any way you felt pressured or

4   required to make any of the changes that Dr. Haddox

5   suggested.

6           MS. BALDWIN:  Object to form.

7           THE WITNESS:  I only felt pressured to make

8   the grammar changes that he, unfortunately, found.  I

9   don't recall there being any real substantive content

10  changes, but at no point did I feel obligated to make

11  any changes that he would have suggested.

12  BY MR. OXLEY:

13     Q.   The Settlement Agreement that we talked

14  about earlier refers to a Proffer Agreement.  Is that

15  a written agreement?

16     A.   I believe it is.

17     Q.   And did you get a copy of that?

18     A.   I probably did.

19     Q.   You talked about the proffer session that

20  you had with the plaintiffs' lawyers --

21     A.   Uh-huh.

22     Q.   -- as part of your settlement; right?

23     A.   Yes.

24           MS. BALDWIN:  Object to form.

25  BY MR. OXLEY:

Confidential                                                                JAN-MS-05485907

Page 249

1      Q.    How many plaintiffs' lawyers were in the

2   room when you had that meeting?

3          MS. BALDWIN:  Object to form.

4          THE WITNESS:  I believe it was six.

5   BY MR. OXLEY:

6      Q.    Were there any people on the phone or

7   appearing by videoconference?

8      A.    Not that I recall.

9      Q.    Was your proffer meeting -- as far as you

10  know, was it videotaped or audio recorded or anything

11  like that?

12     A.    It was not.

13     Q.    Did you prepare -- have you prepared any

14  affidavits or declarations or any other statements

15  under oath for any plaintiffs' lawyer?

16     A.    No.

17     Q.    Doctor, I have a couple questions about

18  exhibits.  I'm going to try to do it all at once

19  because of where we are.

20     A.    Okay.

21     Q.    So I'm going to ask your lawyer to put in

22  front of you exhibits, which were internal Purdue

23  documents that you were shown yesterday, and they are

24  Exhibits 8, 9, 18, 23, 24, 25 and 31.

25          MR. ZAKRZEWSKI:  It would be helpful --

Confidential                                                                          JAN-MS-05485908

Page 250

1    anybody have a paper clip?  Hand me that little

2    binder clip.  This one kind of came apart, so I'm

3    putting it together.  I got 25, I got 24, 23, got 31

4    first.

5    BY MR. OXLEY:

6        Q.    And my general question, Dr. Fishman, about

7    those documents is whether you played any role at all

8    in the preparation of any of those Purdue documents.

9        A.    I don't believe I did.

10       Q.    Do you have any personal knowledge about

11   whether any of the events that you were asked about

12   when you were looking at those documents --

13            MR. ZAKRZEWSKI:  Can I pause?

14            MR. OXLEY:  Sure.

15            MR. ZAKRZEWSKI:  He just responded, "I don't

16   believe I did."

17            I want you to look at those documents before

18   you give the actual answer to the question.

19            MR. OXLEY:  Do you mind if we go off the

20   record while he takes a look?

21            MR. ZAKRZEWSKI:  That's fine.

22            MR. OXLEY:  Thank you.

23            MR. ZAKRZEWSKI:  I want a clear answer on

24   this.

25            VIDEO OPERATOR:  Sure.  We're off the

Confidential                                                                                          JAN-MS-05485909

Page 251

1    record.  It's 3:42.

2           (Recess)

3           VIDEO OPERATOR:  Okay.  We're back on the

4    record.  It's 3:43.

5    BY MR. OXLEY:

6       Q.   Dr. Fishman, while we were off the record,

7    did you have an opportunity to review the documents

8    that your counsel put in front of you?

9       A.   Yes.

10      Q.   And my question is whether you had any

11   involvement in the preparation of any of the internal

12   Purdue documents that you were shown yesterday and

13   asked questions about.

14      A.   No, I did not.

15      Q.   Thank you.  From your own personal

16   knowledge, do you have any information about whether

17   anything that was discussed in any of those

18   documents, the internal Purdue documents, actually

19   took place?

20           MS. BALDWIN:  Object to the form.

21           THE WITNESS:  I don't.  I'm assuming that

22   they're real documents and they took place, but I

23   have no specific knowledge of really their context or

24   how they were used or how they came to exist.

25   BY MR. OXLEY:

Confidential                                                                                    JAN-MS-05485910

Page 252

1      Q.   And what I'm asking you -- I'm not asking

2   you about whether they're actual documents or not

3   actual documents.  You were asked some questions

4   yesterday about if it makes sense, in reading the

5   document, if this happened --

6      A.   Uh-huh.

7      Q.   -- or would it surprise you if this happened

8   or if this happened, is it something that you would

9   have wanted to know about, and what my question is is

10  whether you know if any of those things that were the

11  "if this happened" in those questions actually

12  happened.

13          MS. BALDWIN:  Object to form.

14          THE WITNESS:  I don't believe I know that

15  any of those things happened.

16  BY MR. OXLEY:

17     Q.   Thank you.  One of the documents that you

18  were shown yesterday -- well, never mind.  I won't

19  ask about that one.

20          You said that -- when did you first start --

21  when did you first prescribe an opioid for a patient?

22     A.   When I was an internal medicine resident

23  early after graduating medical school.

24     Q.   And you said that that's something that you

25  still do today; right?

Confidential

JAN-MS-05485911

Page 253

1    A.    Correct.

2    Q.    And you also said at some point today that

3    the benefits of opioid medications are not well

4    established.  Do you recall saying something like

5    that?

6    A.    The benefits of chronic opioids for chronic

7    pain is weak and inadequate to really understand who

8    we should give them to and to justify the benefits on

9    their face.

10    Q.    And today, do you still, from time to time,

11    prescribe opioids for patients with chronic pain?

12    A.    I do.

13    Q.    Why?

14    A.    Because the risk benefit analysis supports

15    taking that risk, and it's as simple as that.  It's

16    hard to get to that point, and it's not common.  It's

17    less and less common because the data is mounting,

18    that there's greater risk than we knew and that when

19    an opioid fails at low dose, that going to high dose

20    actually increases the risk.

21          This is information we didn't have when I

22    was an internal medicine resident, so the outcome of

23    that decision process changes, has changed as our

24    understanding has evolved.

25    Q.    But today, if the risk benefit analysis

Confidential                                                    JAN-MS-05485912

Page 254

1    weighs in favor, in your medical judgment, of

2    prescribing an opioid to a patient with chronic pain,

3    what would you do?

4        A.    I would share that determination with the

5    patient, and we'd make a shared decision about

6    whether they want to try an opioid, and I would have

7    to educate them on what we're doing and where we're

8    going with it and what the opportunity is, and they

9    would have to make an informed decision to try it,

10   but I would be willing to partner with them, with

11   prescribing that opioid.

12       Q.    And if they made that informed decision that

13   that is something that they would like to try, would

14   you then write a prescription for the opioid assuming

15   again that, in your medical judgment, it would be

16   beneficial to a patient with chronic pain?

17            MS. BALDWIN:  Object to form.

18            THE WITNESS:  And assuming that we did all

19   the things that we would be required to do it safely,

20   yes, I would write a prescription.

21   BY MR. OXLEY:

22       Q.    Like to show you -- we talked earlier about

23   the article from ProPublica that was written that

24   involved you.  Do you remember that?

25       A.    I do.

Confidential                                                      JAN-MS-05485913

```
                                          Page 255
 1     Q.    And do you know a Mary Vargas?
 2     A.    I do.
 3     Q.    Was an article that talked about her and a
 4   connection with industry funding and the like also
 5   published at some point?
 6     A.    I believe so.
 7     Q.    Let me have marked as Exhibit 48 an email
 8   chain.
 9           (Exhibit 48 marked)
10   BY MR. OXLEY:
11     Q.    And this is a document that was produced by
12   you, and it bears production numbers Fish 007069
13   through 00707, and my first question is if Exhibit 48
14   is a true and correct copy of an email exchange that
15   you were a part of on February 25th and
16   February 26th, 2012.
17     A.    I believe it is.
18     Q.    All right.  And can you tell the jury what
19   the issue was that led to this email exchange,
20   please?
21     A.    I learned that there was an article titled
22   "Pharma Liars" that came out with Mary Vargas, an
23   interview Mary Vargas had done with Anderson Cooper,
24   and Mary Vargas was the vice chair and then the --
25   succeeded me as chair of the board at APF.  She's an
```

Confidential JAN-MS-05485914

Page 256

1   attorney with chronic pain who I think publicly

2   disclosed she had a spinal cord stimulator and she

3   used opioids, and I -- you know, again, we don't have

4   the article here.  I don't think the actual article

5   is here.  I don't know if you have that.

6          But I think that she was slammed again as

7   someone who was painted as telling her story to

8   support the interests of pharmaceutical companies as

9   opposed to telling her story because she wanted

10  people to understand her pathway and the suffering

11  that she's endured and that people would understand

12  the treatments that she's needed to get through her

13  life and be a functional attorney.

14     Q.   And in your -- so she wrote this to you, an

15  email to you talking about this, and then your

16  response to her is dated Sunday, February 26, 2012;

17  is that right?

18     A.   Yeah.

19     Q.   And the first thing that you say is "Mary, I

20  am all too familiar with this."  Did I read that

21  right?

22     A.   Yes.

23     Q.   Was that a reference to what we talked about

24  before where you felt that you had been falsely

25  accused of some things based on the industry funding?

Confidential                                                    JAN-MS-05485915

Page 257

1     A.    Yes.

2     Q.    And then you go on to say that "I do believe

3   that the correct and just story will come out.   My

4   assessment is this is akin to a witch-hunt.   Andrew

5   Kolodny has become a modern-day Joe McCarthy, and he

6   and those that wish to argue his position largely as

7   a matter of attacking character and integrity rather

8   than on the merits of the issues will ultimately be

9   seen as having poor character and even less

10  integrity."

11        Did I read that correctly?

12    A.    You did.

13    Q.    Is that something --

14        MS. BALDWIN:   Object to the form.

15  BY MR. OXLEY:

16    Q.    Is that something that you believed when you

17  wrote it?

18    A.    Yes.

19    Q.    Do you believe it today?

20    A.    Yes.

21    Q.    When you referred to something that is "akin

22  to a witch-hunt," what did you mean?

23    A.    I mean that there are people who have such

24  strong feelings about the harms of opioids that

25  rather than arguing about the harms of opioids, they

Confidential                                                    JAN-MS-05485916

Page 258

1    attack the character of individuals who are engaged

2    in trying to find a balance place where we can

3    balance safety and help people at the same time, and

4    they exploit the crisis by engaging a media that's

5    all too happy to tell a very bias story.

6        Q.   And who is --

7             MS. BALDWIN:  I'm going to object to this

8    line of questioning and several of your questions in

9    which you attempt to align plaintiffs' counsel, my

10   colleague and an expert in this case, Andrew Kolodny,

11   who you know is a disclosed expert, and I believe

12   that that's what you're doing with your line of

13   questioning.

14            To the extent you're trying to denigrate the

15   reputation of plaintiffs' expert and counsel, I

16   object to all of these questions.

17   BY MR. OXLEY:

18       Q.   Who is Andrew Kolodny?

19       A.   Dr. Kolodny is a psychiatrist who has had a

20   substantial role in the public discourse around the

21   excessive use of opioids and the abuse of opioids and

22   the role of pharmaceutical companies in perpetuating

23   the crisis.

24       Q.   And he shares his opinions and views about

25   those issues; right?

Confidential                                                    JAN-MS-05485917

Page 259

1      A.    He does.

2            MS. BALDWIN:  Object to the form.

3   BY MR. OXLEY:

4      Q.    You also refer to Joe McCarthy.  Who was Joe

5   McCarthy?  Can you please tell the jury?

6            MS. BALDWIN:  Object to the form.  Same

7   objection.  This is an attempt to denigrate

8   plaintiffs' expert.

9            THE WITNESS:  Joe McCarthy was, I believe, a

10  senator who used tactics of character assassination

11  to -- or guilt by association to assassinate the

12  character of people who were somehow associated with

13  any movement that would be assumed to be part of the

14  communist movement back in the '50's.

15  BY MR. OXLEY:

16     Q.    And what ultimately happened with Joe

17  McCarthy in terms of those positions he was taking?

18           MS. BALDWIN:  Object to the entire line of

19  questioning, attempting to equate Joe McCarthy to

20  Dr. Andrew Kolodny.

21           THE WITNESS:  I think it was ultimately

22  found that the truth was -- that character -- that

23  guilt by association as a form of character

24  assassination to perpetuate one's ultimate goals of,

25  in his case, eradicating communism from America is

Confidential                                                      JAN-MS-05485918

Page 260

1   not a healthy ethical practice, and I think he

2   ultimately -- I don't know what happened to Senator

3   McCarthy, but we didn't hear much from him soon

4   thereafter.

5   BY MR. OXLEY:

6       Q.   And when you said that Andrew Kolodny has

7   become a modern-day Joe McCarthy, what did you mean

8   by that?

9       A.   Well, you know --

10          MS. BALDWIN:  Objection.  Same objection.

11          THE WITNESS:  Again, Dr. Kolodny has very

12   strong opinions and shares those opinions.  He's in

13   most of the media stories that come out on this

14   subject matter, and he has chosen -- he chose to

15   attack me personally as someone who was associated

16   with organizations that did take money from

17   pharmaceutical companies and really clearly used that

18   association to indict my character as a shill for

19   pharmaceutical companies rather than someone who was

20   trying very hard to perpetuate greater safety and

21   effective use of these drugs.

22          I would argue that Dr. Kolodny's views on

23   the use of opioids and my views are actually much

24   closer than the dialogue in the media would suggest.

25   BY MR. OXLEY:

Confidential                                                      JAN-MS-05485919

Page 261

1       Q.   And what you were objecting to and

2    commenting on were not -- were really his attempts at

3    character assassination as you described it; is that

4    what you're saying?

5            MS. BALDWIN:  Object to the form.  Same

6    objection.

7            THE WITNESS:  Right.  I said here that he

8    and those that wish to argue his position largely as

9    a matter of attacking character and integrity rather

10   than the merits of the issues will ultimately be seen

11   as having poor character and less integrity, and I

12   believe that, and I actually don't think Dr. Kolodny

13   would do it the same way again had we to start this

14   whole crisis over again.

15   BY MR. OXLEY:

16      Q.   You --

17      A.   He's apologized, I think, even in public,

18   for some of the ways that he's gone about advocating

19   for his position.

20      Q.   Did he ever apologize to you?

21      A.   No.

22      Q.   Did he ever apologize, to your knowledge, to

23   Ms. Vargas?

24      A.   No.

25            MS. BALDWIN:  Objecting to all these

Confidential

JAN-MS-05485920

Page 262

1    questions.

2         MR. OXLEY:  I understand.  You can have a

3    continuing objection to the questions about this

4    email.  I hope I'm not violating some law of the case

5    rule, but you may.

6         THE WITNESS:  You know what?  I should note

7    this is a personal email that was never intended to

8    be a public statement.

9    BY MR. OXLEY:

10    Q.  And although it was never intended to become

11   a public statement, you wrote it -- you wrote what

12   you wrote because you believed it?

13        MS. BALDWIN:  Object to form.

14        THE WITNESS:  That is true.

15   BY MR. OXLEY:

16    Q.  I think I'm at my time, so I will go ahead

17   and stop.  Thank you very much.  I very much

18   appreciate your time.

19    A.  Thank you.

20        VIDEO OPERATOR:  Off the record?

21        MS. BALDWIN:  Can we take a break?

22        MR. ZAKRZEWSKI:  Sure.  Like, five minutes,

23   though.

24        MS. BALDWIN:  Well, I have to go to the

25   bathroom and collect myself.

Confidential                                                                JAN-MS-05485921

Page 263

1          MR. ZAKRZEWSKI:  That's fine.

2          VIDEO OPERATOR:  Okay.  We're off the

3     record.  It's 3:59.

4          (Recess)

5          VIDEO OPERATOR:  Okay.  We're back on the

6     record.  It's 4:19.

7                    EXAMINATION

8     BY MS. BALDWIN:

9      Q.   Dr. Fishman, good afternoon.  We spoke

10    yesterday, and I think you mentioned earlier today in

11    your testimony that you were a respected and

12    sought-after speaker on the treatment of pain and the

13    use of opioids; would that be a fair statement?

14          MR. ZAKRZEWSKI:  Objection to form.

15          You can answer.

16          MR. ERCOLE:  Same objection.

17          THE WITNESS:  I think I said -- and I can

18    look back and see exactly what I said, but I think

19    I've been asked to continue to present and give

20    talks, and people read my work, and they view me as a

21    respected leader.

22    BY MS. BALDWIN:

23     Q.   And yesterday, we discussed the different

24    publications you've done, just generally speaking,

25    the things that you've done as a professional in your

Confidential                                                      JAN-MS-05485922

Page 264

1    line of work as medical education publications,

2    you've authored some books, you've given speeches,

3    and is is fair to say that when you engaged in those

4    activities, that they weren't -- the distribution or

5    the audience for those activities wasn't limited to

6    one specific geographical region?

7            MR. ERCOLE:  Objection to form.

8            THE WITNESS:  Yes.

9    BY MS. BALDWIN:

10   Q.    Okay.  So if you publish a book, for

11   example, as most authors would expect, you would hope

12   that your book would be published, distributed

13   broadly; is that fair to say?

14           MR. OXLEY:  Objection.  Improper redirect.

15           THE WITNESS:  You know, I didn't really

16   think of where it would be distributed.  It's

17   available, yeah.

18   BY MS. BALDWIN:

19   Q.    I don't mean to talk over you.

20           When you author a book, you expect or hope

21   that people will read it; isn't that fair to say?

22   A.    That's true.

23   Q.    Okay.  So the book that you wrote, for

24   example, Responsible Opioid Prescribing, that wasn't

25   just distributed in one specific geographical region,

Confidential                                                    JAN-MS-05485923

Page 265

1   was it?

2         MR. ERCOLE:  Objection to form.

3         MR. ZAKRZEWSKI:  Objection.  Lacks

4   foundation.

5              You can answer if you know.

6         THE WITNESS:  Well, I wrote the book for it

7   to be read, and I didn't focus on any one region.

8   BY MS. BALDWIN:

9     Q.   And you wrote the book and intended that

10  book to be read by healthcare practitioners

11  throughout the country; is that fair to say?

12        MR. ZAKRZEWSKI:  Objection to form,

13  foundation.

14             You can answer.

15        MR. OXLEY:  I also objected that it was

16  beyond the scope of cross.

17             THE WITNESS:  I could, yes.

18  BY MS. BALDWIN:

19    Q.   Okay.  And if the FSMB -- I represent to you

20  that the FSMB testified, and it's also in the

21  document we looked at yesterday -- the FSMB's

22  response to the U.S. Senate Finance Committee's

23  inquiry of the relations, potential conflict of

24  interest between industry and third party

25  organizations, that Responsible Opioid Prescribing

Confidential                                                                          JAN-MS-05485924

Page 266

1   was distributed in the State of Oklahoma.  Do you

2   have any reason to disagree with that?

3           MR. ZAKRZEWSKI:  Objection to form.

4           MR. ERCOLE:  Objection to form.

5           MR. ZAKRZEWSKI:  Foundation.

6           THE WITNESS:  No.

7   BY MS. BALDWIN:

8       Q.   Okay.  And is it your understanding that it

9   was the FSMB -- and when I say "FSMB," do you

10  understand that to mean Federation of State Medical

11  Boards?

12      A.   I do.

13      Q.   Would it be fair to say that you understood

14  that the FSMB intended to distribute that book to

15  state medical boards across the country?

16          MR. ZAKRZEWSKI:  Objection.  Form.

17  Foundation.

18          MR. ERCOLE:  Same objection.

19          THE WITNESS:  Yes.

20  BY MS. BALDWIN:

21      Q.   And when you participated in a program that

22  we discussed yesterday such as, for example,

23  Janssen's program, "Let's Talk Pain," you understood

24  that that would be distributed, or the material that

25  you engaged in with respect to that activity would be

Confidential                                                                                        JAN-MS-05485925

Page 267

1    put on a website; is that fair to say?

2          MR. ERCOLE:  Objection to form.

3          MR. ZAKRZEWSKI:  Objection to form,

4    foundation, beyond the scope.

5          THE WITNESS:  I honestly don't remember my

6    participation, and my suspicion is that I was asked

7    to do some -- give some interviews or talks that I'm

8    not sure where they were supposed to go.

9    BY MS. BALDWIN:

10     Q.   And would it be fair to say that any

11   activities that you did with partners against pain or

12   Let's Talk Pain coalition, the audience would have

13   not been specific to one regional area in the

14   country?

15         MR. ZAKRZEWSKI:  Objection.  Form,

16   foundation and scope.

17         MR. ERCOLE:  Same objection.

18         THE WITNESS:  I don't know.  I don't

19   remember, for each one of those, where it was

20   intended.  I certainly don't recall it being intended

21   to be limited.

22   BY MS. BALDWIN:

23     Q.   Okay.  So is it fair to say that someone in

24   New York, for example, might be able to see some of

25   the material in Let's Talk Pain?  Is that fair to

Confidential                                                                    JAN-MS-05485926

Page 268

1  say?

2      MR. ZAKRZEWSKI: Objection. Calls for

3  speculation.

4      MR. ERCOLE: Same objections.

5      THE WITNESS: Yeah.

6  BY MS. BALDWIN:

7    Q. And that wouldn't be any different for

8  Oklahoma either, would it?

9      MR. ZAKRZEWSKI: Objection.

10     MR. ERCOLE: Same objection.

11     THE WITNESS: I suspect so. I don't know.

12  BY MS. BALDWIN:

13    Q. Okay. And when you publish an article

14  related to the treatment of pain or the use of

15  opioids, is it fair to say that that article may be

16  read by healthcare practitioners or researchers or

17  any individual in the country or even outside the

18  country?

19    A. Quite possible.

20     MR. ZAKRZEWSKI: Objection. Form,

21  foundation. Scope.

22     Go.

23     MR. ERCOLE: Same objection.

24     THE WITNESS: Quite possibly.

25  BY MS. BALDWIN:

Veritext Legal Solutions
www.veritext.com
212-279-9424      212-490-3430

Confidential      JAN-MS-05485927

Page 269

1      Q.    And is is fair to say that if you give a

2    presentation or a speech at the symposia or

3    specifically, for example, the American Academy of

4    Pain Medicine, that there's people in the audience

5    that may be from diverse geographical areas?

6      A.    Yes.

7      Q.    Okay.  And there could be members of the APN

8    from the State of Oklahoma; is that possible?

9            MR. ZAKRZEWSKI:  Objection.

10           MR. ERCOLE:  Same objection.

11           MR. OXLEY:  Objection.  Also, we really are

12   beyond the scope of what was asked and --

13           MS. BALDWIN:  Disagree.  There was --

14   disagree.

15           MR. OXLEY:  I'm not talking to you right

16   now, but thank you.

17           MS. BALDWIN:  Oh.

18           MR. OXLEY:  And so I feel like there's a lot

19   more that I could ask and cut myself off to fit the

20   time limits that we agreed on, and I just don't think

21   it's right to be able to go through things that are

22   not redirect.

23           MS. BALDWIN:  I'm not going to respond to

24   that.  Three different defendants asked questions,

25   and there was a specific line of questioning about

Confidential                                                                JAN-MS-05485928

Page 270

1  what was exposed to the State of Oklahoma.  This is

2  absolutely within the scope of their examination.

3          MR. ZAKRZEWSKI:  I'm not a judge.

4          MS. BALDWIN:  So I'm just -- sorry if you

5  don't like my questions, but I'm going to keep asking

6  them.

7          MR. OXLEY:  It's the content of your

8  questions.

9  BY MS. BALDWIN:

10    Q.   Is it fair to say that the organizations,

11  professional organizations that you're a member of

12  and other -- not just you but other physicians or

13  healthcare providers are a member of, that there may

14  be members from the State of Oklahoma?  Is that fair

15  to say?

16          MR. ZAKRZEWSKI:  Objection.  Form,

17  foundation, scope.

18          But, I mean, you can answer with respect to

19  your personal knowledge.

20          MR. OXLEY:  Join.

21          MR. ERCOLE:  Same objection.

22          THE WITNESS:  I mean you're asking me if

23  they might have members?  Yes, they might.  I have no

24  idea if they do or not.

25  BY MS. BALDWIN:

Confidential                                                                JAN-MS-05485929

Page 271

1    Q.  And if an individual, a key opinion leader

2  or a speaker gives a speech at an event held or

3  sponsored by the American Academy of Pain Medicine or

4  the American Pain Foundation or the American Pain

5  Society, that material may be distributed to

6  individuals outside of wherever that conference is

7  held; is that fair to say?

8        MR. ZAKRZEWSKI:  Same objection.

9        You can answer on personal knowledge.

10        MR. ERCOLE:  Objection to form.

11        THE WITNESS:  Wouldn't be impossible.  I

12  have no idea if it really happens, but --

13  BY MS. BALDWIN:

14    Q.  And we saw yesterday that the American Pain

15  Foundation was involved in various advocacy

16  activities; correct?

17    A.  Yes.

18    Q.  Okay.  And one of the documents that we

19  discussed indicated that some of those advocacy

20  activities took place in Oklahoma.  Do you recall

21  that?

22        MR. ERCOLE:  Objection to form.

23        THE WITNESS:  Oklahoma is listed on the

24  pages that you showed me.

25  BY MS. BALDWIN:

Confidential    JAN-MS-05485930

Page 272

1    Q.   And when the American Pain Foundation

2    created materials, any materials, and with the

3    purpose of carrying out their various agenda, those

4    materials were distributed broadly; is that fair to

5    say?

6         MR. ERCOLE:  Objection to form.

7         MR. ZAKRZEWSKI:  Objection.  Same objection.

8         THE WITNESS:  I don't know.

9    BY MS. BALDWIN:

10   Q.   Well, you said the American Pain Foundation,

11   I believe, was a foundation for patients.  Is that to

12   address --

13   A.   Consumers.

14   Q.   And consumers.  Is that fair to say?

15   A.   Uh-huh.

16   Q.   And patients and consumers -- that event

17   that organization was seeking to address was not

18   limited to one specific geographic area?

19   A.   It was not.

20   Q.   Okay.  So someone in California could have

21   read materials that were created and distributed by

22   the American Pain Foundation?

23        MR. ERCOLE:  Objection to form.  Foundation.

24        MR. ZAKRZEWSKI:  Objection to form.

25        THE WITNESS:  Correct.

Confidential                                                JAN-MS-05485931

```
                                                    Page 273
 1    BY MS. BALDWIN:
 2        Q.   Okay.  And these questions, I've asked some
 3    specifically with respect to work you've done or with
 4    respect to work these -- the APF or APM or APS have
 5    done, but would that be fair to say for publications
 6    that another physician has written regarding chronic
 7    pain management or the use of opioids?
 8              MR. ERCOLE:  Objection to form.  Foundation.
 9              MR. ZAKRZEWSKI:  Objection to form.
10              THE WITNESS:  I don't know how to answer
11    that.  It depends.  People have written things that,
12    you know, they've written them, but they didn't do
13    anything with them, they've had limited distribution,
14    they've had wide distribution.  It really depends.
15    BY MS. BALDWIN:
16        Q.   Fair enough.  I have a few questions about
17    Exhibit 32.  This Settlement Agreement that you
18    talked about earlier, you understand that the State
19    of Oklahoma is not a party to this Settlement
20    Agreement?
21        A.   I do.
22        Q.   Okay.  And you understand that during that
23    line of questioning about this Settlement Agreement,
24    that any statements that referred to plaintiffs'
25    counsel referred to only the plaintiffs' counsel
```

Confidential

JAN-MS-05485932

Page 274

1   involved in the litigation specifically referenced in

2   this Settlement Agreement; correct?

3       A.   I do.

4            MR. ZAKRZEWSKI:  Objection.  Form.

5            THE WITNESS:  And don't reflect the

6   plaintiffs' attorneys here in this room.

7   BY MS. BALDWIN:

8       Q.   Okay.

9            MR. ZAKRZEWSKI:  Wait a minute.

10           Can you read back the question?

11           (Record read as follows:  "And you

12           understand that during that line of

13           questioning about this Settlement Agreement,

14           that any statements that referred to

15           plaintiffs' counsel referred to only the

16           plaintiffs' counsel involved in the

17           litigation specifically referenced in this

18           Settlement Agreement; correct?")

19           MR. ZAKRZEWSKI:  I don't recall him

20   testifying about any plaintiffs' counsel other than

21   the fact that they are the plaintiffs' counsel that

22   are party to that agreement.

23           MS. BALDWIN:  That was not my question.  My

24   question was when the drug company attorneys were

25   referring to plaintiffs' counsel, when they were

Confidential                                    JAN-MS-05485933

Page 275

1    referencing Exhibit 32, that they were referring to

2    the attorneys representing the plaintiffs

3    specifically referred in that Settlement Agreement.

4          MR. ZAKRZEWSKI:  Fine.  As long as we're

5    not --

6          MR. ERCOLE:  Objection to form.

7          MR. ZAKRZEWSKI:  That's fine.  As long as

8    we're attributing the question to who the agreement

9    was with, that's fine.  He's made no comment about

10   any lawyers.

11         THE WITNESS:  That was my understanding.

12   BY MS. BALDWIN:

13     Q.   Okay.  And any comments made by the drug

14   company attorneys about the plaintiffs in relation to

15   discussing this Settlement Agreement concerned only

16   those plaintiffs that are specifically referenced in

17   that Settlement Agreement; is that fair to say?

18         MR. ERCOLE:  Objection to form.

19         THE WITNESS:  Yes.

20   BY MS. BALDWIN:

21     Q.   And, again, the State of Oklahoma is not a

22   plaintiff that is a party to this Settlement

23   Agreement?

24         MR. OXLEY:  Objection.  Form, asked and

25   answered.

Confidential                                                                    JAN-MS-05485934

Page 276

1    BY MS. BALDWIN:

2        Q.    Do you understand that?

3        A.    Yes.

4        Q.    You understand that the plaintiff the State

5    of Oklahoma had absolutely nothing to do with the

6    creation or execution of this Settlement Agreement?

7              MR. OXLEY:  Objection.  Form.

8              THE WITNESS:  I do.

9    BY MS. BALDWIN:

10       Q.    And you understand that the State of

11   Oklahoma is not bound by this Settlement Agreement?

12       A.    I don't know why I would think it would.

13       Q.    Now this Settlement Agreement references --

14   I don't know the exact number.  There's a lot of

15   litigation listed here.  So is it fair to say over a

16   hundred lawsuits?

17             MR. ZAKRZEWSKI:  Objection.

18             If you know.

19             THE WITNESS:  I don't know.  I think it's

20   more than a hundred.

21   BY MS. BALDWIN:

22       Q.    More than a hundred?  And is there other --

23   there is other litigation throughout the country in

24   which you are named as a defendant; is that correct?

25       A.    Other than listed there?

Confidential                                                    JAN-MS-05485935

Page 277

1    Q.   Yes.

2    A.   Yeah.  Not many, but some.

3    Q.   Okay.

4    A.   Is that fair?

5    Q.   Do you know the names of those cases?

6    A.   I don't.

7    Q.   Okay.  And in those cases where you are --

8  you are named as a defendant not covered by the

9  Settlement Agreement, are there other defendants in

10  that litigation as well?

11         MR. ZAKRZEWSKI:  Objection.

12         You can answer these questions to the extent

13  you actually know and have personal knowledge.  Do

14  not answer anything that you've learned from your

15  discussions with counsel.

16         THE WITNESS:  Yeah.  No, I don't know.  I

17  don't keep -- there have been so many, I don't keep

18  track of them.

19  BY MS. BALDWIN:

20    Q.   Do you know if Purdue is a defendant in any

21  of the litigations in which you have been named as a

22  defendant?

23    A.   Again, Purdue seems to be a defendant in all

24  the cases, so I suspect so, but I don't know

25  specifically.

Confidential                                                                 JAN-MS-05485936

Page 278

1        Q.    And is Johnson & Johnson and Janssen a

2    defendant in any of the lawsuits in which you are a

3    defendant?

4            MR. ZAKRZEWSKI:  Same objection.

5            Whatever you recall from your personal

6    knowledge.

7            THE WITNESS:  I don't know specifically.

8    BY MS. BALDWIN:

9        Q.    Do you know if Cephalon's a defendant in any

10   of the lawsuits in which you've been named as a

11   defendant?

12           MR. ZAKRZEWSKI:  Same objection.

13           MR. ERCOLE:  Objection to form.

14           MR. ZAKRZEWSKI:  Answer only with respect to

15   personal knowledge, not from communications with

16   counsel.

17           THE WITNESS:  I don't know.

18   BY MS. BALDWIN:

19       Q.    You're aware that other opioid manufacturers

20   are named as defendants --

21       A.    Yes.

22       Q.    -- in lawsuits in which you are also named

23   as a defendant?

24       A.    Yes.

25       Q.    Do you understand that?

Confidential                                                                                    JAN-MS-05485937

```
                                              Page 279

 1              MR. ZAKRZEWSKI:  Pushing 15 minutes here,

 2      so --

 3      BY MS. BALDWIN:

 4         Q.    Do you know who coined the term

 5      "pseudoaddiction," Dr. Fishman?

 6         A.    You know, it's attributed to -- in my

 7      memory, to Dr. Joan Dahl and Dr. David Haddox.

 8         Q.    Okay.  And Dr. Haddox was an executive at

 9      Purdue Pharma?

10              MR. ZAKRZEWSKI:  Objection.  Form and

11      foundation.

12              You mean at the time of pseudoaddiction or

13      later?

14              MS. BALDWIN:  Fair question.  I'll rephrase

15      my question.

16      BY MS. BALDWIN:

17         Q.    David Haddox was, for many years, an

18      executive at Purdue Pharma; is that fair to say?

19              MR. ZAKRZEWSKI:  Objection.

20              You can answer.

21              THE WITNESS:  Yes.

22      BY MS. BALDWIN:

23         Q.    Okay.

24         A.    He was a practicing pain physician at the

25      time that he worked on that concept.
```

Confidential                                                    JAN-MS-05485938

Page 280

1      Q.   Did you know that he was also a member of

2   Purdue Speakers Bureau when he coined that term?

3      A.   I did not.

4      Q.   But did you know he was an executive of

5   Purdue Pharma for a long period of time?

6      A.   Yes.

7           MR. OXLEY:  Objection.  Vague as to time.

8   BY MS. BALDWIN:

9      Q.   And he also -- David Haddox also did a

10  line-by-line edit of Responsible Opioid --

11          MR. ZAKRZEWSKI:  Objection.

12          So now you're going back into something you

13  questioned him in detail about yesterday, and that

14  was specifically asked and answered.  He explained

15  that he had no idea about line-by-line.

16          MS. BALDWIN:  Can you just state your

17  objection?  I'm wrapping up here.  Can you just state

18  your objection?

19          MR. ZAKRZEWSKI:  I mean my objection is

20  shortly going to be we're done if we're going to go

21  back over stuff that you covered.

22  BY MS. BALDWIN:

23     Q.   And the David Haddox that coined the term

24  "pseudoaddiction" is the same David Haddox that did a

25  line-by-line edit of the possible opioid document; is

Confidential                                                          JAN-MS-05485939

```
                                            Page 281
 1   that true?
 2           MR. ZAKRZEWSKI:  Same objection.
 3   Argumentative.
 4           MR. EHSAN:  Same objection.
 5           THE WITNESS:  I saw the words "line-by-line"
 6   on paper.  I don't really know what that means.  He
 7   did some editing of the book, and I had asked him
 8   some questions, and he basically came back with
 9   grammatical changes as I recall.
10   BY MS. BALDWIN:
11     Q.   Okay.  And I recall you saying that you
12   couldn't recall whether or not he made any
13   substantive changes.
14           MR. ZAKRZEWSKI:  Objection.  Form.
15           MR. ERCOLE:  Objection.
16           THE WITNESS:  What I recall is he said he
17   made grammatical changes and not substantive ones,
18   but I don't recall.  It was a long time ago.
19   BY MS. BALDWIN:
20     Q.   So you can't recall?
21           MR. ZAKRZEWSKI:  Objection.
22           MR. OXLEY:  Objection.  Asked and answered.
23           THE WITNESS:  I don't recall what I said.
24   BY MS. BALDWIN:
25     Q.   And did David Haddox review the section on
```

Confidential                                                                JAN-MS-05485940

Page 282

1  pseudoaddiction in Responsible Opioid Prescribing?

2      A.   I don't recall.  I suspect he did.  I don't

3  know that he commented on it.

4      Q.   Well, if he reviewed the entire book, it's

5  fair to say that he reviewed every section of the

6  book?

7          MR. ERCOLE:  Objection to form.

8          MR. ZAKRZEWSKI:  Objection.  Asked and

9  answered, form, foundation.

10          THE WITNESS:  I doubt that he commented on

11  it.

12  BY MS. BALDWIN:

13      Q.   You said you don't recall, but you doubt?

14      A.   Well, I -- simply by fact, I think I would

15  recall had he made those kinds of comments, and my

16  vague recollection is that he commented on very

17  little other than grammar.

18      Q.   Okay.  But you don't know for sure?

19      A.   I don't.

20      Q.   And he suggested or he informed in the

21  incident report that we looked at yesterday that he

22  had done a line-by-line edit; correct?

23          MR. ZAKRZEWSKI:  Objection.  Form,

24  foundation.  Asked and answered four times.

25          We're done.

Confidential                                                    JAN-MS-05485941

Page 283

1    BY MS. BALDWIN:

2        Q.    Correct?

3        A.    Yes.

4        Q.    Okay.  Pass the witness.

5                        EXAMINATION

6    BY MR. OXLEY:

7        Q.    Dr. Fishman, I'd just like to hand you -- or

8    have the court reporter mark and hand you a document

9    that we'll have marked as Exhibit 49.

10            (Exhibit 49 marked)

11    BY MR. OXLEY:

12       Q.    And I'll represent to you that this is a

13   document that was used as an exhibit that counsel

14   should have from Dr. Haddox's deposition, and my

15   question to you is just does Exhibit 49 reflect the

16   email from Dr. Haddox and the comments that

17   Dr. Haddox made on the Responsible Prescribing of

18   Opioids book that you drafted?

19       A.    (Moves head up and down).

20       Q.    Yes?

21       A.    Are you asking me is that what I have in

22   hand?

23       Q.    Yes.

24       A.    Yes, it is.

25       Q.    You were asked some questions about

Confidential                                                    JAN-MS-05485942

Page 284

1    pseudoaddiction, and I think you said that Dr. Haddox

2    and another academic wrote a paper that talked about

3    pseudoaddiction; right?

4        A.    I believe so.

5        Q.    And who was that other author?

6        A.    I think it was Dr. June Dahl.

7        Q.    At the time, was that paper published in the

8    peer review literature?

9             MS. BALDWIN:  Object to form.

10            THE WITNESS:  I believe so.  They were both

11   at the University -- or the Wisconsin Medical

12   College.  They were in academic practice.

13   BY MR. OXLEY:

14       Q.    And do you know when that was published?

15       A.    I don't.  I would estimate it was late

16   '90's, somewhere around there.

17       Q.    Okay.  You were asked some followup

18   questions about the Settlement Agreement that you

19   entered into and the more than a hundred lawsuits

20   that had been filed against you.  What impact would

21   it have had on you personally if you had continued to

22   litigate those cases as opposed to settling them?

23            MS. BALDWIN:  Object to form.

24            MR. ZAKRZEWSKI:  Objection.

25            THE WITNESS:  Can I answer?

Confidential                                                    JAN-MS-05485943

Page 285

1          MR. ZAKRZEWSKI:  You can answer.

2          THE WITNESS:  Again, it's reputational

3     assassination.  They're perpetuating charges against

4     me that they don't have to -- not a single case has

5     had to actually support with any facts.  It's

6     incredible, you know, financial stress.  It's a

7     stress on my time.  It takes me away from my

8     professional work, my family.  It's emotionally

9     disturbing, you know.  It's been like getting a bad

10    virus and, you know, losing your hair and all that.

11    BY MR. OXLEY:

12       Q.  Well, some of us lost our hair naturally, so

13    it wasn't from a virus, unfortunately.  Or maybe

14    fortunately.

15          And, doctor, in the settlement that you

16    entered into with those plaintiffs who had made all

17    those allegations against you in more than a hundred

18    cases, the resolution was basically they said, "Case

19    dismissed"; right?

20          MS. BALDWIN:  Object to form.

21          THE WITNESS:  That's correct.  And I should

22    add, if I can fill that out, that what I agreed to

23    was that I would continue to tell the truth and that

24    I'd be happy to have them ask me more questions under

25    oath as a witness for a circumscribed period of time,

Confidential                                                    JAN-MS-05485944

Page 286

1    that I would make myself available to continue to
2    simply tell the truth.  I didn't agree to really
3    anything else other than simply to be available to
4    continue to tell them the truth as I know it.
5    BY MR. OXLEY:
6       Q.   And in the research and the publications
7    that you have devoted your life to since you began
8    pain medicine, working in the field of pain medicine,
9    is that something that you always strive to do, to
10   tell the truth and to tell things the way they were
11   and the way that you believed them at the time you
12   published your papers or gave your presentations?
13           MS. BALDWIN:  Object to form and leading.
14           THE WITNESS:  I do.
15   BY MR. OXLEY:
16      Q.   You saw some documents yesterday that showed
17   what the plaintiff in this case was saying were
18   payments that were made to you by different
19   pharmaceutical companies.  Do you remember that?  Do
20   you remember looking at that document?
21      A.   Yes.
22      Q.   Is there any amount of money that could have
23   been paid to you to get you to lie?
24      A.   That's good question.
25           MS. BALDWIN:  Object to form.

Confidential                                                    JAN-MS-05485945

Page 287

1          THE WITNESS:  I think the answer is no.  I

2    make a good salary.  I support my family.  If I

3    wanted to make more money, I would simply get a

4    different job.

5    BY MR. OXLEY:

6        Q.    Thank you, doctor.

7        A.    Thank you.  Done?

8          MR. EHSAN:  Read and sign?

9          MR. ZAKRZEWSKI:  Yes.  We're done.

10          VIDEO OPERATOR:  We're off the record.  It's

11    4:44.

12          THE REPORTER:  Do you want a rough or copy?

13          MR. ZAKRZEWSKI:  We don't need a rough.

14          THE REPORTER:  Just a copy?

15          MR. ZAKRZEWSKI:  Yeah.  We've got to read

16    and sign.

17          THE REPORTER:  Mr. Oxley, do you want a

18    rough too?

19          MR. OXLEY:  Yes.

20          THE REPORTER:  And, Brian, you want a rough?

21          MR. ERCOLE:  Yes.  Thank you.

22          MS. BALDWIN:  I want a rough.

23          MR. EHSAN:  I would like a rough and a copy.

24    It's not in the standing order, but I want a rough

25    anyway.

Confidential                                                                                    JAN-MS-05485946

Page 288

1          ACKNOWLEDGMENT OF DEPONENT

2          I, SCOTT FISHMAN, M.D., do hereby certify

3    that I have read the foregoing transcript of my

4    testimony taken on 2/27/19, and further certify

5    that it is a true and accurate record of my

6    testimony (with the exception of the corrections

7    listed below):

8    Page    Line                    Correction

9    _____|_____|_____|_____

10   _____|_____|_____|_____

11   _____|_____|_____|_____

12   _____|_____|_____|_____

13   _____|_____|_____|_____

14   _____|_____|_____|_____

15   _____|_____|_____|_____

16   _____|_____|_____|_____

17   _____|_____|_____|_____

18   _____|_____|_____|_____

19   _____|_____|_____|_____

20   _____|_____|_____|_____

21                   _____

                     SCOTT FISHMAN, M.D.

22

     SUBSCRIBED AND SWORN TO BEFORE ME

23   THIS _____ DAY OF _____, 20____.

24

     _____    _____

25   (NOTARY PUBLIC)         MY COMMISSION EXPIRES:

Confidential                                              JAN-MS-05485947

Page 289

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were duly sworn; that a record

8     of the proceedings was made by me using machine

9     shorthand which was thereafter transcribed under my

10    direction; that the foregoing transcript is a true

11    record of the testimony given.

12          Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review of

15    the transcript [   ] was [   ] was not requested.

16          I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or party to this action.

19          IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: March 6, 2019

23

24                    _____

                      CARRIE PEDERSON

25                    CSR No. 4373

Confidential                                                            JAN-MS-05485948

[& - 4]

| & | |
|---|---|
| **&** 1:10 2:10 4:13 4:14 5:15 6:6,10 11:24,25 12:10 13:1,2,4 61:17,21 135:6,9,15 204:23 205:18,21,24 206:3,14 278:1 | |

| 0 | |
|---|---|
| **007069** 255:12 | |
| **00707** 255:13 | |
| **06033** 5:21 | |

| 1 | |
|---|---|
| **1** 8:4,19 9:4 10:3 13:13 137:18 237:23 240:20 241:1,3,5,8,16 | |
| **100** 227:21,24 | |
| **100,000** 63:7 | |
| **10:48** 101:18 | |
| **11** 7:7 8:6 139:7 | |
| **116** 227:3,20 | |
| **117** 8:14 | |
| **11:07** 101:21 | |
| **11:57** 143:24 | |
| **12** 150:6 | |
| **13** 10:3 | |
| **132** 10:6 | |
| **134** 7:8 | |
| **136** 8:16 | |
| **15** 9:1 279:1 | |
| **15th** 225:8 | |
| **16** 8:4 | |
| **164** 8:18 | |
| **17** 9:9 209:11 | |
| **18** 249:24 | |
| **193** 10:7 | |
| **195** 10:8 | |
| **197** 10:9 | |

**1990's** 60:9 155:3 155:7
**1997** 137:5,14 140:25 141:8
**1998** 73:20,22 75:15 137:4,4
**1999** 137:7,8 139:12 142:10 143:14 144:5 148:22
**1:13** 144:2

| 2 | |
|---|---|
| **2** 25:17,19 | |
| **2/27/19** 288:4 | |
| **20** 131:2 189:19 288:23 | |
| **200** 4:7 | |
| **2000's** 155:9,12 | |
| **2001** 220:13 | |
| **2004** 74:8,9,11,13 74:25 75:9,20 | |
| **2005** 81:4 120:10 120:24 121:9 123:18 165:1,4 176:19 177:22 | |
| **2006** 42:6 49:13 78:7 81:4 155:17 | |
| **2007** 9:9 39:17 40:18 41:17 71:15 155:17 156:11 158:6 206:14 | |
| **2008** 205:13,19 206:7 | |
| **2008-2009** 206:11 | |
| **2009** 206:7 | |
| **201** 10:10 | |
| **2010** 204:18,19,21 206:12 | |
| **2011** 8:23 9:2 78:7 220:7,20 221:3 225:8 228:2 | |

**2012** 8:6 9:7 68:5 68:24 71:16 77:1 77:12 240:24 255:16 256:16
**2016** 205:3
**2017-816** 1:6 2:6
**2018** 8:4,19 19:16 208:17
**2019** 1:22 2:24 11:1,9 142:11 143:12 289:22
**205** 10:11
**206** 5:20
**207** 7:9
**208** 8:19
**21** 10:7 193:18
**213-430-6000** 4:19
**213-808-5700** 5:11
**219** 8:21
**220** 8:23
**225** 9:1
**228** 9:3
**23** 249:24 250:3
**24** 209:12 249:24 250:3
**240** 9:4
**247** 9:6
**25** 161:6 169:5 249:24 250:3
**250** 209:15
**255** 9:7
**25th** 255:15
**26** 8:23 9:7 10:4 40:10 155:25 156:9 220:6,13,20 221:3 256:16
**263** 7:10
**26th** 255:16
**27** 1:22 2:24 11:1 138:11

**27th** 11:9
**28** 8:6
**283** 7:11 9:9
**2:08** 193:12
**2:28** 193:15
**2:41** 206:23
**2:44** 207:1

| 3 | |
|---|---|
| **3** 10:10 137:21,25 138:2 201:22,24 202:3 | |
| **30** 161:6 | |
| **305-415-3416** 4:10 | |
| **31** 10:11 137:22 205:12 208:16 249:24 250:3 | |
| **32** 8:4 16:20,21 24:11,24 273:17 275:1 | |
| **33** 8:6 28:7,8 | |
| **33131-2339** 4:9 | |
| **34** 8:8 35:14,15 38:9 | |
| **35** 8:8,10 38:24 39:1 49:25 50:14 | |
| **350b** 3:8,17 | |
| **36** 8:11 61:8,9 | |
| **3600** 3:7,16 | |
| **37** 8:13 67:11,12 67:15 | |
| **38** 8:14 117:23,24 193:9 236:5,24 | |
| **39** 8:10,16 136:21 136:24 137:18 | |
| **3:42** 251:1 | |
| **3:43** 251:4 | |
| **3:59** 263:3 | |

| 4 | |
|---|---|
| **4** 10:5 91:20,25 92:4 | |

Confidential JAN-MS-05485949

40   8:18 10:4
  164:16,19
40's   154:24
400   4:17
41   8:19 208:2,3
42   8:21 219:23,25
43   8:23 220:9,11
  220:18
4373   1:25 2:25
  289:25
44   9:1 224:19
  225:1,5
45   9:3 228:20,21
46   9:4 240:18,20
  240:25
47   9:6 247:4,5
48   9:7 255:7,9,13
4860   2:22 11:14
49   9:9 283:9,10,15
4900   5:9
4:19   263:6
4:44   287:11
4:48   2:23 11:2
4th   165:4

**5**

5   10:8 195:10,11
50   125:16 188:19
  189:1
50's   259:14
512-328-5333   3:10
514201   39:12
5300   4:8
5th   5:8

**6**

6   10:9 197:24
  289:22
60   188:20
609   240:23
61   8:11

619   240:23
633   5:8
6389   220:7
6391   220:8
67   8:13
69   138:14
6904   68:3
6995   289:24

**7**

7   10:6 132:2
78746   3:9,18

**8**

8   96:4 249:24
80   118:8 121:2
80's   192:2
860-278-7448   5:22

**9**

9   19:16 249:24
90's   152:2 284:16
90071   4:18 5:10
91   10:5
941   36:16
95   5:19 118:15,25
98   74:8
9:03   2:23 11:2,9
9:04   12:17
9:07   12:20

**a**

a.m.   2:23 11:2,9
  12:20
aberrant   233:17
ability   106:22
  112:9,11 136:14
  147:6,24 148:25
  149:4 153:9
able   37:6 87:5,6
  106:10 107:18
  112:17,17 126:3
  148:6 230:18

232:7 239:22
  243:8,9 267:24
  269:21
absent   207:22
absolutely   72:24
  79:2 106:14 108:7
  110:5 111:17,21
  123:10,15 152:12
  152:24 160:10
  162:2 164:15
  173:11 180:3
  229:4 270:2 276:5
absorbed   172:23
abuse   46:24 47:9
  97:25 111:18
  142:22 166:22
  167:1,10 168:11
  176:8,10 177:8,10
  177:10,13,16,17
  177:20 178:10,17
  182:3 184:17
  203:19 258:21
abused   166:23
  176:1,3
abusing   246:15
academic   137:12
  137:14,18 138:20
  140:2,21 141:2
  144:6 187:4
  199:16 284:2,12
academy   80:23,25
  81:3,6,11,18 82:9
  82:20 83:3,11,19
  83:23 84:5 86:8
  87:13 88:15 90:3
  215:15 227:22
  269:3 271:3
accept   108:10
acceptable   108:13
accepted   137:4
  142:11 219:8

access   139:12,19
  222:18
accessible   164:13
accounts   161:4
accurate   32:5,12
  37:18 109:21
  119:20 121:9,17
  121:21 130:9
  220:23 221:24
  225:15 288:5
accurately   118:21
  221:1
accusations   215:4
accused   256:25
acknowledges
  223:5
acknowledgment
  288:1
acquiring   53:20
actavis   1:15,15,16
  1:17 2:15,15,16,17
acting   65:7 125:13
  125:13,15
action   11:18 96:23
  96:25 97:14
  190:10 196:6,14
  197:20 289:17,18
actions   17:19
actiq   98:16,20
  99:8 101:24
  113:17 114:8,11
  114:14 115:23
  116:21 117:14
  122:4,16,24
  123:25 126:7,8,15
  126:17 127:25
activation   233:18
activities   76:2
  86:20 264:4,5
  267:11 271:16,20

Confidential

JAN-MS-05485950

**activity** 44:6
266:25
**actual** 94:17
117:16 156:15
247:12 250:18
252:2,3 256:4
**acute** 173:23
230:8
**adaptations**
234:15
**adaptive** 233:18
234:5
**add** 109:11 121:22
125:12 128:2
130:22 141:23
149:12 214:9
285:22
**addicted** 246:24
**addiction** 45:9
46:9 51:11 52:10
52:15 97:25
111:19 139:8
142:22 177:11,13
177:16,20 181:13
219:11 245:21
246:16
**addictive** 213:8
226:7
**addition** 30:20
44:2
**additional** 187:14
**address** 89:6
113:8 122:5,13
125:8 272:12,17
**addressed** 185:11
**addresses** 184:15
**addressing** 152:15
**adds** 121:3,10,14
**adequately** 167:5
167:9

**adhere** 142:6
**administered** 11:5
**administering**
176:5
**administration**
46:7 70:7,8,9
163:23 165:1
224:1
**admittedly** 19:11
**adolescents** 29:11
219:12
**adopt** 151:20
**adopted** 151:25
**adoption** 142:17
142:19
**adult** 230:12
**advance** 234:10
**advances** 8:14
118:4
**advancing** 44:13
**advantages** 171:10
172:25 173:7
218:18
**adverse** 15:16
57:1
**adversity** 56:20,21
56:24
**advice** 46:25
177:22
**advisory** 75:23
202:24 203:15
206:4
**advocacy** 77:17
271:15,19
**advocate** 222:18
235:2
**advocated** 151:19
**advocating** 78:2,9
261:18
**affect** 123:7
190:12

**affidavits** 26:3
249:14
**affiliated** 70:1
**affirmatively** 67:2
**afford** 87:6
**afraid** 107:16
**afternoon** 263:9
**age** 110:6 185:24
186:1
**agency** 223:24
**agenda** 272:3
**agents** 96:5,12
**ages** 237:24
**ago** 22:14,16,18
23:21 105:4
150:12 154:24
188:12 189:1,19
281:18
**agonist** 166:18
190:17,21,23
191:5,8,11 196:8
**agonists** 176:4
190:17
**agree** 11:20 21:23
22:1,3 26:22
35:23 36:3 59:16
63:17 79:2 119:22
122:16,24 162:4
178:3,9 179:17
186:8 188:6
189:16 194:21
198:21,24 199:12
199:23 201:8,11
226:8 286:2
**agreeable** 107:19
**agreed** 16:5,7 21:9
24:17 27:21 29:20
30:25 203:12
269:20 285:22
**agreeing** 26:20

**agreement** 8:4,12
8:19 17:8,11 18:9
19:17,22 20:4
21:8,14,15,22
22:18 24:10,23
26:21,21 27:10
61:12,15 63:5
64:2 92:12,21,23
93:3,11,21 99:13
100:8 107:21
117:16 143:18
145:4 205:3,5,7
207:11,15 208:6
248:13,14,15
273:17,20,23
274:2,13,18,22
275:3,8,15,17,23
276:6,11,13 277:9
284:18
**agreements**
140:18 144:14,16
**agrees** 20:15,18
24:25 26:1 96:5
100:12
**ahead** 12:24 193:2
262:16
**aid** 236:6
**aids** 235:25
**air** 215:2
**akin** 257:4,21
**al** 11:13
**alarm** 153:8
233:18,20,21,24
234:1,2,11
**alcohol** 177:10
**align** 258:9
**alike** 179:14
**allegation** 210:11
211:11,13 214:1
**allegations** 31:15
210:7 285:17

Confidential

JAN-MS-05485951

alleged  209:25
allergan  1:14 2:14
alleviate  19:4
alliance  217:3
allow  21:4 196:15
　197:7,18 201:15
allowance  18:18
allowed  64:4
　93:13 217:15
allows  217:9
alternative  223:10
alternatives
　110:10
amazon  247:9
america  46:9 47:9
　216:8 217:6,9
　223:5 226:25
　259:25
american  44:8,11
　44:12 45:21 77:21
　77:25 78:17,22
　79:5,9,13,19,23
　80:11,22,25 81:3,6
　81:10,17 82:2,8,9
　82:20 83:3,11,19
　84:5,14,16,19,22
　85:6,16,24 86:8,8
　86:9 87:13 88:15
　88:16,17 89:16,16
　90:2,10 215:15,16
　221:14 223:20
　229:8,10,18,23
　230:4,25 231:5,7,8
　269:3 271:3,4,4,14
　272:1,10,22
americans  227:3
amount  52:20
　63:6 108:13 125:9
　148:5 169:25
　175:18 184:24
　248:1 286:22

amounts  125:18
amputation  230:6
analgesia  65:5
　173:24
analysis  125:24
　174:18 184:6
　253:14,25
anderson  255:23
andrew  257:4
　258:10,18 259:20
　260:6
angeles  4:18 5:10
announcement
　27:23 29:16
　219:11
announcements
　31:2
announcing
　155:16
answer  15:25 16:3
　58:19 71:20 73:8
　123:10 149:10
　162:14 185:5
　207:21 209:18
　214:4,10 232:13
　238:15,16 246:7
　250:18,23 263:15
　265:5,14 270:18
　271:9 273:10
　277:12,14 278:14
　279:20 284:25
　285:1 287:1
answered  185:7
　275:25 280:14
　281:22 282:9,24
answers  24:5
　225:16
anticipated  20:20
　21:11,24 25:1
　150:8

anticoagulant
　109:4
anybody  49:18
　250:1
anyway  162:4
　287:25
apart  45:25 250:2
apf  222:6 223:7,20
　255:25 273:4
apm  273:4
apn  269:7
apologize  122:11
　177:6 182:12
　205:11 261:20,22
apologized  261:17
apologizing  32:10
apparent  217:25
　218:7,8,9,15,20
apparently  18:25
appeal  239:21
appear  246:23
appearance  12:24
　245:21
appearances  3:1
　4:1 5:1 6:1
appeared  137:8
appearing  13:1,4
　249:7
appears  39:5
　157:22 194:25
　210:19 214:25
　220:5 221:18
　224:19
appendix  72:22
　73:3,5,9,12
applications
　188:12
applies  88:19
　178:2,4
apply  42:11

appreciate  126:2
　171:16 181:19
　194:2,7,15 209:1
　241:15 262:18
appreciated
　163:14
appropriate  35:1
　35:6,10 37:13
　52:20 54:17 55:16
　56:12 70:23 109:8
　109:24 110:2,24
　145:1,9 160:2
　170:14 175:22
　180:23 183:8,21
　189:5,8 199:20
　243:19,25
appropriately
　55:24 122:20
　123:3 177:17
　197:15
approved  98:20
　99:9 100:2,10,18
　128:18 164:25
approximately
　138:20
april  19:16
aps  273:4
area  45:16 46:24
　82:11 86:15 87:1
　120:2,5 223:9
　267:13 272:18
areas  269:5
arena  199:16
argue  49:7 145:12
　153:3,15 155:17
　214:11 257:6
　260:22 261:8
arguing  155:18
　257:25
argumentative
　33:21 281:3

Confidential　　　　　　　　　　　　　　　　　　　　　　　　JAN-MS-05485952

**arm** 62:1 234:25
**arm's** 89:2
**armstrong** 45:11
45:13,17
**article** 8:16 35:17
36:11 37:10 38:8
38:10 124:2
139:17 144:5
154:19 184:19
218:21 219:2,4,19
219:22 220:1
225:11,14 236:4
236:24 237:3,23
254:23 255:3,21
256:4,4 268:13,15
**articles** 13:24
129:24 225:22
**articulated** 131:13
**ascended** 218:13
**asia** 203:19
**aside** 40:8 50:15
161:12 195:9
204:16 205:16
**asked** 29:12,15
30:17 46:25 47:6
77:20 89:9 102:19
112:12 132:1
135:13 161:14
193:19 194:14
198:1 202:17
224:14 242:20
243:5 247:18
250:11 251:13
252:3 263:19
267:6 269:12,24
273:2 275:24
280:14 281:7,22
282:8,24 283:25
284:17
**asking** 18:15
86:11 93:23 95:17

104:19,23 112:16
125:8 180:8
243:16 252:1,1
270:5,22 283:21
**aspect** 30:13
165:10
**aspects** 24:11,16
**assassinate** 259:11
**assassination**
219:15 259:10,24
261:3 285:3
**assess** 180:10
183:6
**assessed** 177:12
179:6,8,11
**assessing** 8:14
118:4 180:12
199:24
**assessment** 178:11
179:9,20 183:14
257:4
**assessments**
112:12
**assimilate** 138:3
**associate** 47:19
**associated** 28:22
30:5 33:7,17
46:16 50:17 62:23
71:2,7,17 76:12
101:11 117:8
122:18 123:19
126:25 131:17
166:22 167:9,10
168:15 176:10
259:12 260:15
**associates** 247:8
**association** 45:2
78:6 219:7,16
259:11,23 260:18
**associations** 77:18
86:4

**assumed** 259:13
**assuming** 251:21
254:14,18
**assumption**
171:22 231:15,19
231:20
**assure** 31:12
**attach** 99:13
**attached** 204:5
208:17
**attachment**
197:25
**attack** 258:1
260:15
**attacking** 257:7
261:9
**attempt** 138:2
140:17 183:4
216:14 229:24
258:9 259:7
**attempted** 188:3
**attempting** 137:25
220:23 229:2
244:14 259:19
**attempts** 261:2
**attend** 113:6
149:15,21 206:4
**attending** 150:1
**attention** 31:23
138:7 193:22
233:21,22 234:7
**attitude** 191:23
**attorney** 1:3 2:3
3:6,15 4:6,16 5:6
6:5,9 156:16
256:1,13 289:18
**attorneys** 5:18
274:6,24 275:2,14
**attractive** 173:7
**attracts** 234:8

**attributed** 279:6
**attributes** 239:22
**attributing** 275:8
**audience** 264:5
267:12 269:4
**audio** 249:10
**august** 8:4,19
**austin** 3:9,18
**author** 120:20
264:20 284:5
**authored** 14:1
39:4 44:16 45:24
58:22 61:8 118:2
120:9 264:2
**authors** 225:7
264:11
**authorship** 41:5
**available** 16:8
131:8 139:12,19
143:13,17 153:20
160:6 161:21
164:3 189:12,21
213:15 241:6,9
264:17 286:1,3
**avoid** 217:25
218:6
**aware** 23:7 74:12
75:7,13 76:18
79:18 85:15,22
86:5 87:19,25
88:7 89:20,24
90:4,11,18,25 91:3
98:20 100:13
102:2,11 126:5,10
127:4,9,15,22
151:5 160:24
161:4 162:5 163:3
163:15 165:13
190:15 196:5,11
278:19

Confidential

JAN-MS-05485953

**[aways - baldwin]**

**aways**  235:12
**awhile**  150:12

**b**

**b**  96:4 98:14
  100:12,25
**back**  12:19 38:7
  47:4,12 50:2
  71:24 100:7
  101:20 107:22
  125:19 134:16
  139:25 143:14
  144:1 146:13
  152:2 157:4
  169:13 188:19
  189:12 193:14
  202:16 206:25
  228:2 232:4,8
  242:8 251:3
  259:14 263:5,18
  274:10 280:12,21
  281:8
**bad**  28:17 30:22
  197:13,17 214:14
  216:20 285:9
**baker**  236:19,23
  237:23 238:9
  239:16 240:6
**balance**  95:25
  226:16 258:2,3
**balanced**  63:22
**baldwin**  3:5 7:10
  12:6,6 14:12,17
  15:3,10,24 17:13
  17:24 18:15 19:19
  19:24 20:6,23
  21:12 22:10,21
  23:2,12,23 24:2,8
  24:15 25:4,10
  26:6,11 27:1,5,11
  27:18 29:1,4,14,25
  30:7,16 31:11,16

32:3,6,14,21 33:1
33:9,20 34:10,19
34:22 35:8,25
36:5,22 37:16,19
37:25 38:12,19
39:20,25 41:6,21
43:7,18 44:17
46:2 48:9,24
49:23 51:15 52:7
52:12,16,23 53:6
53:12 54:5,9,13,21
55:17 56:2,8,15
57:7,14 59:6,23
60:16 61:2,24
62:17 63:24 64:5
64:16 65:9 66:6
66:12 67:4,24
69:5,10,15,20
70:24 71:4,10,18
72:13 74:16 75:2
75:11,17 76:15,22
77:13 78:12,19
79:1,7,25 80:14,20
81:12,19,21 82:5
83:7,16,22 84:7,10
85:10,19 86:1,10
87:23 88:4,10
89:23 90:7,15,21
91:6,16,22 92:2,5
92:10,13 93:6,12
93:22 94:8,15
95:10,16,23 96:9
96:16 97:11,21
98:1,3,9,23 99:4
99:11 100:19
101:4,13 102:5,15
102:22 103:4,12
103:18,25 104:18
107:12 108:5
109:22 111:5,24
113:2 115:6,10,15

116:5,24 117:4,10
117:18 118:19,22
119:13,18,25
120:14 121:5,12
121:18,24 122:7
122:21 123:4,21
124:6 125:4
126:22 127:12,19
128:1,16,19,25
129:7,15,22 130:4
130:13,21 131:20
132:4 133:1,7,14
133:20 134:3
135:19 136:2,10
136:19 138:16,23
139:4,14,22 141:4
141:13,19 142:13
142:24 143:15
145:11,18 146:6
146:23 147:2,7,13
147:19 149:6
150:18 151:2,8,16
152:4,16,23
158:16 159:21
160:9 161:3 162:9
163:6,19,24 164:5
164:14 166:4,10
167:6,12,25 168:8
168:16 169:22
170:8,16,25
171:25 172:12
173:3,10 176:12
177:2 178:5,13,20
179:2,10,16,25
180:19 181:1,25
182:8,16 183:10
183:24 185:14,21
186:3,14 187:17
187:21 188:8,16
188:21 189:3,14
189:22 190:18

191:1,15 194:4,12
194:16,24 195:6
195:13,22 196:2
196:10,18 197:10
197:21 198:13,20
199:2,13 200:4,9
200:16 201:5,9,17
202:5,9,21 204:6
204:13 205:4,13
205:20 206:17
210:8 211:6,12
212:4,14,17,20
213:11 214:2
215:10,19 216:24
217:17 218:4,24
219:3 224:8,15
225:17 226:4
228:12 229:5
230:1 232:11
233:6,15 235:4,18
236:7 237:6 238:3
238:12,14 239:19
242:15 243:10
244:13 245:2
246:5,8,22 248:6
248:24 249:3
251:20 252:13
254:17 257:14
258:7 259:2,6,18
260:10 261:5,25
262:13,21,24
263:8,22 264:9,18
265:8,18 266:7,20
267:9,22 268:6,12
268:25 269:13,17
269:23 270:4,9,25
271:13,25 272:9
273:1,15 274:7,23
275:12,20 276:1,9
276:21 277:19
278:8,18 279:3,14

Confidential                                                      JAN-MS-05485954

**[baldwin - boards]**

279:16,22 280:8
280:16,22 281:10
281:19,24 282:12
283:1 284:9,23
285:20 286:13,25
287:22
**balwdin** 14:2
**bank** 5:7
**bar** 181:7
**base** 49:13
**based** 26:12,13
29:18 105:4 108:8
125:21 154:4,25
155:7,8,9 163:21
167:8,11 174:18
180:24 182:14
183:4,15 185:12
185:20,24 189:2
189:25 190:2
195:2 197:12
198:5,5 201:14
229:21 239:15
244:21 246:1,1
256:25
**basic** 116:16
222:14
**basically** 88:23
106:1 204:3 281:8
285:18
**basis** 93:3 136:17
174:3
**bates** 40:14 68:2
**bathroom** 262:25
**bchurchman** 3:19
**bear** 35:5,11
**bears** 18:10
156:11 220:7
240:22 255:12
**beckhardt** 8:7
**began** 140:25
286:7

**beginning** 2:22
165:18 185:11
**begins** 174:24
**behalf** 2:21 11:23
11:25 12:3,5,11
13:1,4 204:20
**behavior** 76:1
234:8
**behavioral** 244:4
**behaviors** 139:8
245:11
**belief** 25:13 42:15
176:14
**beliefs** 49:13
**belies** 222:13
**believe** 17:3 31:8
41:22 44:18 45:16
50:10 59:22 62:2
62:20 63:3 64:20
72:4 73:24 74:17
74:20 76:4,14,16
78:20,22 84:1
88:25 98:8 106:23
107:13 114:3,10
114:16 116:23
117:22 121:19
126:12 130:7
132:11 134:4,24
140:22 141:5
142:12,19 151:9
162:3 175:20
183:20 184:1
213:12 220:25
221:1,19 222:1,11
222:24,25 223:1
223:17,18 226:1,2
226:9,12,20,21
229:3 233:5 238:1
238:2,4 241:4
248:16 249:4
250:9,16 252:14

255:6,17 257:2,19
258:11 259:9
261:12 272:11
284:4,10
**believed** 192:14
221:25 222:10
225:16 227:17
228:4 233:4
241:17 257:16
262:12 286:11
**beneath** 53:15
55:15 159:1
**beneficial** 254:16
**benefit** 105:12
125:24 131:10
135:5 161:16
174:18 179:20
181:16 184:6
198:19 199:25
253:14,25
**benefited** 107:10
**benefiting** 107:15
**benefits** 97:19
105:2,6,16 107:5,5
108:2,2 174:13,17
210:4,18 211:4
226:17 244:5
253:3,6,8
**benjamin** 50:12
50:12,12 156:22
157:16
**best** 21:3 23:9
32:25 59:3 60:10
61:22 62:15 64:1
82:3 98:6 142:11
159:5 160:15
217:10 235:16
240:2 241:12
**bestows** 146:19
**better** 155:19
182:9,21,21 217:9

237:12 242:18
243:21
**beyond** 135:25
167:15 265:16
267:4 269:12
**bias** 66:4 258:5
**big** 166:11
**bill** 12:2 207:5
**binder** 250:2
**biscayne** 4:7
**bit** 24:21 34:25
42:4 46:19 61:6
209:15 241:21
**black** 165:13,15
165:16,23
**blanketly** 181:22
**blueprint** 141:16
**board** 58:8 59:5
76:8 77:16 78:5
78:24 79:8 80:2,3
81:5,7,10,17,23,24
83:5 84:13 85:8
89:9,15 90:3
91:12 145:20
146:7,8 149:13,21
158:23 203:15
206:4 216:6 217:4
221:13 229:12
231:11 255:25
**board's** 57:23
**boards** 57:25
58:24 59:1,2,8
61:16,21 62:8,10
62:19,23 67:7,7
75:25 76:4 144:21
145:25 146:3
157:17 158:15,19
158:24 159:11
202:24,25 203:1
266:11,15

Confidential
JAN-MS-05485955

**[bob - case]** Page 8

**bob** 165:3
**body** 37:5 50:24
　234:17
**bolded** 165:20
　173:15
**book** 38:15,22
　39:3,7,16,22 40:2
　40:11,24 41:2,3,4
　41:5,11,16,18,23
　41:25 42:6,10,18
　43:3,12 44:3,16,19
　45:23 46:12 47:17
　47:21,22,25 48:1,3
　48:22 49:10,11,16
　49:19 50:4,11,16
　50:17,24 51:5,13
　57:16,21 58:4
　61:7 63:7,13 64:8
　64:8,9,13 66:11,18
　67:6,22 68:21,25
　69:24,25 70:20
　71:3,15,16,22 72:3
　72:6 73:13,13
　131:13 156:9,15
　156:21 157:24
　158:5,7 176:20,23
　177:1 215:12
　228:18,24 230:2,4
　230:11,15,17,17
　232:2,3 247:9,12
　264:10,12,20,23
　265:6,9,10 266:14
　281:7 282:4,6
　283:18
**book's** 232:3,4
**books** 13:24 73:2,6
　129:10 264:2
**borne** 135:14
**bottom** 36:16,24
　68:3 118:8

**boulevard** 4:7
　5:19
**bound** 276:11
**box** 165:13,15,16
　165:19,23 166:1
　166:14,16 168:25
　173:14 174:19
**bpt** 118:12
**brain** 190:13
　191:20
**branded** 196:1
**break** 68:10,16
　100:6 101:16,23
　143:21 144:4
　193:8 262:21
**breaking** 124:16
　142:3,5
**breakthrough**
　8:15 114:22,24,25
　115:4,9,14,24
　116:3,3,12 117:21
　118:5,13,18,24
　119:2,6,9,22 121:1
　121:2,9,22 122:5
　122:13,18 123:1
　123:20,24 124:3
　124:12,16 125:6
　125:12
**brian** 4:5 11:22
　287:20
**brian.ercole** 4:11
**brief** 212:7 213:4
**briefly** 190:11
**bringing** 15:21
　203:12
**broad** 46:4 86:12
　89:10 162:16
　163:14
**broader** 188:12
　201:13,15

**broadly** 264:13
　272:4
**broke** 101:23
**broken** 233:19
**brooke** 3:14 12:4
**brought** 31:23
　76:5,7 127:6
**brown** 155:16
**bullet** 168:23
**bullets** 168:24
**bureau** 280:2
**bush** 70:8

**c**

**c** 20:13 25:17,19
　98:17
**calcium** 105:24
**california** 1:21
　2:22 4:18 5:10
　11:1,15 92:25
　93:5 94:14,23
　144:17 146:4,4,8,8
　146:16,20 147:10
　147:25 148:8,11
　148:13,21,24
　149:15,25 150:9
　154:20,22 155:4
　272:20 289:2
**california's** 154:17
**call** 6:3 174:10
　240:25
**called** 14:21 31:4
　58:2 96:22 105:20
　113:4 143:6,7
　219:19 228:19
**calls** 268:2
**camera** 236:17
**cancer** 44:9,11,12
　44:14,20,24 45:18
　45:18,21 65:4
　104:7 115:24
　116:3 122:9,14

　123:6 183:18,20
　184:2,3,5,11,15,17
　184:20,21 185:1,9
　185:13 186:12
　191:25 192:3
**candlelighters**
　44:23
**cap** 190:23
**capital** 3:7,16
**care** 44:14,20
　51:25 53:15 55:16
　55:20 57:16,19
　119:16 125:11
　143:3 144:10,18
　144:20,22 145:9
　145:16 150:21
　151:1 154:6 159:2
　181:17
**career** 108:17
　169:15
**careful** 71:22,24
　107:6
**carefully** 171:11
**cares** 210:23
**carrie** 1:24 2:24
　289:24
**carried** 227:13
**carrying** 226:24
　272:3
**case** 14:23 15:1,8
　21:16 88:8 102:21
　103:10,16 105:20
　107:14 108:11
　126:12 127:6
　142:2 153:14
　171:13 174:11
　210:22 211:22,25
　212:2,10 213:14
　221:19 231:18
　232:16,19 241:13
　244:16 258:10

Confidential　　　　　　　　　　　　　　　　　　　　　　　　　JAN-MS-05485956

[case - clear]                                                      Page 9

259:25 262:4
285:4,18 286:17
289:14
**cases** 15:21 16:6
17:12 18:2,4 19:3
20:5 21:9,23 22:8
24:13 26:19,22,23
27:4,9 105:1,15,17
106:20,24 107:5
108:23 109:14,23
146:17 153:4
171:2 182:1
210:23 211:23
277:5,7,24 284:22
285:18
**cash** 245:7
**cast** 219:5 234:17
**catastrophe** 49:4
**category** 41:10
190:16
**cause** 160:7
204:11
**caused** 34:4 171:5
**causes** 160:25
**caution** 175:19
176:24
**cautious** 124:21
**caveat** 200:14
**cdc** 47:10 143:6
244:10
**center** 138:20
**centers** 137:12,14
137:18 140:2,21
140:23 141:3
144:6
**ceo** 157:18,23
**cephalon** 1:10
2:10 27:15 31:24
31:25 32:23 43:15
61:15 63:16,19,20
64:4,14,19 67:2

69:7 74:24 75:3,8
75:14 87:20 92:8
92:24 93:3 94:6
95:7 96:5,12,15
99:7,7 100:9,16,21
**cephalon's** 96:1
278:9
**certain** 13:17
14:20 84:23 93:4
123:11,15 139:1,7
147:17 150:4
153:1 172:25
173:1 181:3,6,8
196:15
**certainly** 30:9
75:18 80:8 155:3
192:10,12 267:20
**certainty** 60:1
80:7
**certified** 2:24
289:1
**certify** 288:2,4
289:3,16
**cfo** 157:11
**chain** 220:5,6
255:8
**chair** 80:3 157:16
255:24,25
**chairman** 229:12
229:17
**chance** 202:19
221:4 233:10
**change** 49:11,12
96:19 178:24
190:22 212:12
213:7
**changed** 49:12
51:4 70:14,14
105:13 148:8
155:8 228:8
253:23

**changes** 125:24
217:3 248:4,8,10
248:11 253:23
281:9,13,17
**changing** 58:16
171:6
**chapter** 9:4
240:20 241:1,1,3,5
241:8,13,14,16,16
**character** 219:15
257:7,9 258:1
259:10,12,22,23
260:18 261:3,9,11
**characterization**
225:21
**characterize** 46:25
47:1
**charged** 158:23
**charges** 210:25
285:3
**charles** 9:1 225:7
225:7
**chart** 207:24
238:9 239:16
**chaudhry** 157:8,9
157:23
**cheap** 161:10
**check** 148:3
153:21 192:24
**chemical** 45:2,9
**childhood** 44:23
**choice** 170:14
**choices** 160:22
**choose** 160:12,21
**chose** 231:2,9
260:14
**chosen** 260:14
**chris** 47:7 48:12
49:3 70:6
**chronic** 8:17 65:2
65:14 71:8 104:25

107:4 109:6
116:13 152:20
153:5 183:19,22
185:9 192:5
222:17 227:1,4
230:8 233:1,9,12
233:12,16 253:6,6
253:11 254:2,16
256:1 273:6
**chronically** 107:8
**churchman** 3:14
12:4,4 202:2
**circulated** 46:12
**circulation** 172:24
**circumscribed**
285:25
**circumstance**
180:5
**circumstances**
146:18 160:8
182:23 192:16
232:10,15
**citations** 37:23
**cited** 145:3
**civilian** 233:2
**cj** 1:6 2:6
**claims** 208:16
**clarification** 19:1
63:4 150:23
161:13 212:17
**clarified** 157:19
**clarify** 24:20
39:20 158:1 180:1
205:25
**class** 42:21 190:7
**classified** 198:5
**clause** 19:15
208:11,14
**clean** 156:5 224:24
**clear** 28:6 49:3
125:22 134:14

Confidential                                                      JAN-MS-05485957

**[clear - completed]**

174:17 182:12
187:12 243:23
244:7,8 250:23
**clearer** 49:5
**clearly** 34:21 47:4
65:11 164:7 176:9
245:10 260:17
**cleveland** 1:1 2:1
**clients** 15:16,18
**clinic** 106:25
107:2 152:8
**clinical** 111:8
154:9,10 163:10
163:11 177:12
199:8 201:13
**clinician** 154:11
169:12
**clinician's** 8:13
9:4 67:20 240:21
**clinicians** 52:1
55:2 62:22 82:11
84:21 113:11
125:11,18 160:11
187:22 217:11
237:15 243:23
244:10
**clip** 250:1,2
**close** 222:21
223:13 233:4
235:3
**closer** 260:24
**cme** 43:3 44:5
86:19 87:21 88:2
88:9,15,17,21
96:13,18 118:1
129:18 149:21,23
150:3 152:1
**coalition** 46:5
267:12
**coauthored** 14:1
37:11

**coauthors** 38:10
**code** 37:11 202:10
**cognitively** 238:1
**coined** 279:4
280:2,23
**collaborative** 14:5
**collaborators** 84:1
**colleague** 258:10
**colleagues** 46:23
47:23 151:22
**collect** 262:25
**collected** 164:11
**collecting** 234:6
**collective** 62:12
**college** 284:12
**colluded** 214:21
**colon** 173:19
**come** 42:25 48:21
55:11,13 76:3
87:3 107:18
144:22 148:2
158:21 179:22
232:7 242:8 257:3
260:13
**comes** 56:20 99:8
102:3 175:4
**comfortable**
112:18 218:15
237:11 244:19
**coming** 54:18,24
75:22 232:4
**commenced** 17:19
**comment** 275:9
**commentary**
27:16 28:21 29:3
29:13,23
**commented** 282:3
282:10,16
**commenting** 261:2
**comments** 29:10
247:19,22 275:13

282:15 283:16
**commercial** 66:3
**commission**
288:25
**commitment** 26:9
140:5
**commitments**
26:13
**committee** 74:10
75:23
**committee's**
265:22
**committees** 76:6
159:14,18,23
**common** 41:12,18
69:2 107:3 138:4
176:14 246:11
253:16,17
**commonality**
116:8,10
**commonly** 237:8
**communicate**
130:11
**communicated**
129:6,14,20 130:2
**communication**
32:10
**communications**
207:23 209:19
278:15
**communism**
259:25
**communist** 259:14
**community**
128:12 129:6,14
129:20 130:3
158:8 184:23
198:11 233:3
**comorbidities**
106:9 112:9
185:25

**companies** 14:10
14:16 17:20,21
18:3 23:6 31:6,9
34:16 41:18,24
42:15 43:6,12
44:3 59:4,12,20
60:3,15,25 69:14
69:18 74:14 76:20
77:11 81:9,16
83:4,12 85:7,18
86:16,19,21 87:3,9
88:25 89:21 90:5
103:6,10 133:18
211:18 214:21,24
219:7 230:15,22
230:23 246:3,10
256:8 258:22
260:17,19 286:19
**company** 1:8 2:8
38:11 60:21 81:25
84:9 85:23 86:6
86:17 90:12 103:2
127:17 132:17,18
132:25 133:6,11
135:10 163:22
203:11 231:15
238:10 274:24
275:14
**comparable** 175:7
**compelling** 230:9
231:24
**compendium**
72:25
**compensated**
32:11
**complaint** 244:3
**complaints** 54:1
**complete** 48:7
99:16 208:15
**completed** 230:19

Confidential                                                                                 JAN-MS-05485958

completely  80:4,7
  112:14
completion  289:14
complexity  238:19
complicate  186:1
complicated  70:17
component  14:4
  113:23 119:10,23
compression
  106:5
computer  213:17
concentration
  166:17
concept  114:21
  188:6 245:16
  246:12 279:25
concern  79:14
  86:20 119:17
  124:8 150:13
concerned  65:13
  70:12 75:25 176:7
  275:15
concerning  33:5
  66:18 75:20
  184:20
concerns  19:4
  152:15
conclusion  183:15
condition  95:7
  106:15 183:9
conditioned  153:9
conditions  104:16
  104:20 108:17
  109:7,16 174:7
  180:16 181:6,8
conducted  137:5
  143:1,2
conducting  137:14
  141:9
conference  6:3
  155:16 203:11

271:6
conferences  85:2
  87:4
confidential
  194:10
confirmed  28:3
conflated  211:16
  211:20 221:21
conflict  140:10
  217:25 218:7,8,9
  218:10,20 265:23
conflicts  218:15
confronted  203:13
confused  91:23
confusion  36:12
  157:20
congress  58:25
  203:8 223:11
conjunction  45:21
  120:20
connected  230:5
connecticut  5:21
connection  21:7
  21:10,21,24 23:19
  24:12 25:8 26:20
  29:8 43:11 45:20
  64:3 66:10 67:1
  74:11 75:8 99:6
  134:25 145:7
  230:14 255:4
consensus  76:2
  140:17 145:23
consequences
  115:13 119:6
  120:25
consider  109:9
  110:7,11,16,19,22
  111:2,10,13,16,20
  112:4 163:9
  178:11 196:15
  197:7 243:3,25

244:2
consideration
  171:17
considered  51:1,2
  171:12 176:5
  198:10 227:25
considering
  181:23
consist  62:14
consistent  94:12
  95:13,18 96:13
  165:22 166:9
  189:20 244:1
consolidate  125:14
consortium  41:11
  69:1 83:24
conspiracy  213:9
conspired  212:12
  213:7 214:21
conspiring  239:3
constant  116:16
constantly  234:1
  234:11
consternation
  160:7
constipation  51:11
consultation
  145:15
consulting  145:7
consumer  31:1
  77:17 216:5,9
  223:13
consumers  78:2
  78:10,10,18,23
  79:11,11,13
  217:12 272:13,14
  272:16
contained  195:4,4
contains  166:17
contemplated
  110:15

content  13:24
  29:19 59:4 60:14
  60:25 64:8 67:21
  72:11,15 74:14,18
  74:25 76:5 85:23
  86:7 87:21 88:2,9
  93:10,20,24 94:17
  95:2 96:1,6,12,18
  99:18 102:9,11
  113:12 141:21,22
  163:12 164:21
  166:24 193:24
  248:9 270:7
contention  74:21
contentious
  154:22
contents  157:5
  159:24 163:3,15
contested  158:21
context  136:6
  185:17 194:18
  251:23
continue  16:7 22:3
  42:19 104:12
  121:21 124:17
  263:19 285:23
  286:1,4
continued  4:1 5:1
  6:1 24:12 284:21
continues  174:20
continuing  12:21
  18:7,12,16,19
  120:1 149:15
  150:2,10,24 151:6
  217:5 262:3
contract  8:16
  137:11,19 141:16
  141:25 142:3,5,7
  142:17 143:3
contract's  141:24

Confidential                                                        JAN-MS-05485959

[contracts - cover]                                                    Page 12

contracts  137:13
138:3,5,11,14,21
139:2,7 140:2,9,21
141:2,10,24
142:10,20 144:6
144:10,15
contraindicated
173:18
contraindication
165:17
contraindications
101:8 112:7
173:21
contrary  174:8
241:24
contribute  59:12
control  14:9 15:18
46:22 59:4,12
74:14 78:3 81:9
95:2 96:6,12
controlled  49:21
74:18 81:24 96:17
154:5,12 226:19
controversial  48:5
65:12 148:14
convenient  216:1
conversation
237:13 239:17
converting  175:10
convince  51:23
convincing  105:7
105:8
cooper  255:23
cooperate  20:19
21:9,23 22:4
24:25 26:1
cooperation  24:12
25:8
copies  156:4
208:23

copy  39:3,22
40:10 156:15,21
156:21 207:11
208:5,22,22
213:23 220:19
225:5 228:19
247:1,9 248:17
255:14 287:12,14
287:23
copyright  40:18
40:21 68:5,8
156:11 240:23
copyrighted  39:17
cord  105:22 106:2
106:5 190:13
256:2
corporate  31:25
134:1 135:22
correct  13:10
15:22 17:5 18:4,5
20:22 24:13 25:8
26:25 27:12 29:13
32:13 34:8,9 41:5
43:13,20 44:10
46:13 53:5,11
54:12 59:21 63:13
65:18,19 66:13
69:14,16 72:9
77:18,22 80:19
83:15 85:11 95:9
97:15 99:10,13
100:18 101:3,7,12
114:13 116:1
118:6 120:10,13
122:6,12,14,15
123:20 124:4,24
125:3 126:11,19
126:20,21 127:1,7
129:11 133:15
136:9,18,20 137:7
137:8,19,20

138:12,13,15,17
138:22,24 139:3,5
139:9 141:12
143:14 145:17
146:5,16,21,22
147:1,6,8,12,18
150:17 151:1
152:3 155:5,13
156:17,19 159:17
161:22 163:17,18
163:23,25 164:4,6
164:13 165:20
166:3 167:17,18
167:19 168:12,15
168:21,22 170:7,9
170:15 171:24
172:10,11,13,17
173:1,9 174:21
175:23 176:20
178:1,19 179:1,9
179:15 181:24
182:7,9 183:9
185:13,20,22
186:2,13,16 187:4
187:15,20 188:14
188:20 189:13,21
190:24 191:14,17
192:16,20 194:23
195:5 196:1,9
197:9,17,20,22
204:5,12 206:16
207:13 214:1
218:22,23 221:21
224:16 228:6
229:7,11,20 231:8
231:17 236:21
237:1 247:24
253:1 255:14
257:3 271:16
272:25 274:2,18
276:24 282:22

283:2 285:21
correction  288:8
corrections  288:6
correctly  20:21
25:2 28:24 32:19
41:14 61:18 63:9
66:4 70:16 144:12
153:24 181:20
221:22 222:8,22
223:15 257:11
cost  153:18
costs  121:3,10,15
121:22 122:18
123:1,8,19
counsel  11:21
13:17 16:14,15
20:4 21:8,22 22:7
22:25 23:15,20
26:18,22 77:20
207:17 209:19
251:8 258:9,15
273:25,25 274:15
274:16,20,21,25
277:15 278:16
283:13
counted  209:14
countermands
176:14
country  15:22
17:12 47:14 59:1
154:22 265:11
266:15 267:14
268:17,18 276:23
county  1:1 2:1
couple  13:22
127:3 249:17
court  1:1 2:1 92:6
212:24 215:5
238:8 283:8
cover  153:11

Confidential                                                          JAN-MS-05485960

**coverage** 152:10
152:11,11,14,21
160:4
**covered** 160:14
277:8 280:21
**crafted** 124:21
**crazy** 185:4
**create** 13:24 66:2
72:11 79:24 82:21
82:24
**created** 30:20
34:11 58:23 74:7
80:12 83:20
132:12,14 272:2
272:21
**creating** 74:25
**creation** 74:9
76:20 77:4 276:6
**credits** 150:3
**criminal** 166:24
**crisis** 47:14 258:4
258:23 261:14
**criteria** 116:15
**critical** 196:19
**critically** 125:7
**criticize** 224:11
**criticized** 140:8
**cross** 265:16
**crossed** 87:8
**crr** 1:25
**crucial** 72:24
**csr** 1:25 289:25
**cultures** 237:25
**current** 21:16
118:11,23 189:2
225:24
**currently** 208:16
**cut** 269:19
**cycle** 125:17
**czar's** 46:22

**d**

**dahl** 279:7 284:6
**daily** 169:4
**dangerous** 97:4,6
**dark** 165:19
**data** 49:1,6,9,12
70:15,16,18 105:5
105:6,7 125:22
131:10 154:15
163:22 164:2
186:6 238:5
239:16 253:17
**database** 154:14
**date** 155:2,14
205:10 217:4
220:16,18 240:23
243:4 289:19
**dated** 205:3,13
220:20 225:8
256:16 289:22
**david** 9:10 47:24
74:19 279:7,17
280:9,23,24
281:25
**davis** 92:25 93:5
94:14,23 135:1
**day** 125:10 174:1
227:5 237:10
257:5 260:7
288:23
**dea** 37:11 38:2
46:21 223:7,23
**deal** 35:11 62:11
234:14
**dealing** 45:8 46:8
184:15,17 208:25
**dealings** 216:1
**deaths** 42:9
160:25 161:7
**debate** 124:8

**debated** 154:20
**december** 8:23 9:1
220:6,13,20 221:3
225:8
**dechert** 5:4 12:2
**dechert.com** 5:12
**decide** 141:23
**decision** 35:6
108:8 111:23
112:1 113:1 131:4
131:5,12 174:18
179:21 180:2
183:3 188:19
189:1 197:8,19
239:13 243:18
253:23 254:5,9,12
**decisions** 35:2
105:10 151:15
197:12,14
**declarations** 26:3
249:14
**declined** 112:19
**decompression**
106:12
**deconditioning**
106:8 153:6
**decreased** 115:18
**dedicated** 187:3
216:18
**defame** 221:20
**defendant** 103:16
209:9 276:24
277:8,20,22,23
278:2,3,9,11,23
**defendant's** 8:2
**defendants** 1:18
2:18,21 4:3,13
11:23 12:1 18:4
23:8 88:8 102:20
103:11 127:24
135:6 244:16

269:24 277:9
278:20
**definitely** 110:8
**definition** 118:17
119:2
**degenerated**
105:23
**degeneration**
105:25 106:8
**degree** 146:2
**delegates** 62:9
76:7
**deleterious** 155:23
**delivered** 55:7
**delivery** 172:16,19
**demonstrated**
169:3
**demonstrates**
100:20 140:4
**denigrate** 258:14
259:7
**department** 46:5
**dependence** 51:11
**dependency** 45:3
45:9
**depending** 118:16
119:1 173:6
185:25
**depends** 19:9
273:11,14
**depiction** 236:23
**deponent** 288:1
**deposition** 1:21
2:20 11:10 13:13
21:17 105:24
134:22 156:1
283:14 289:13
**depositions** 18:18
**depot** 172:24
**depression** 51:10
166:23 175:9

Confidential                                                                 JAN-MS-05485961

[depression - distinguishes]                                                    Page 14

177:11
depth  50:22
derek  228:18
  230:5,11 231:21
  232:15,18,22
derived  144:24
describe  46:18
  51:5 75:21 221:2
  236:1
described  57:16
  214:8 216:22
  220:24 233:13
  261:3
describing  34:8
  87:21 88:3
description  8:3
deserve  235:3
design  141:15
designate  55:6
designed  97:17
  122:5,12 233:24
  239:17,20
detail  248:1
  280:13
detailed  237:13
details  224:12
deteriorated
  107:18
determination
  55:19 65:18 108:4
  110:4,7,11,23
  111:3 112:4 243:6
  243:9,18 244:5,23
  254:4
determine  144:22
  145:13,16,21,22
  148:11 159:18,23
  243:12
determined
  150:15 170:13

determines  149:18
determining  108:1
  110:1
detrimental
  218:17
develop  60:11,13
developed  38:10
  63:18 64:3 122:9
  133:13 145:23
  229:7
developing  60:4
  178:25
development
  60:22,25 77:12
  132:7
devoted  286:7
diagnoses  179:23
  182:13
diagnosis  180:4,24
  182:14 183:5,15
dial  12:12
dialed  12:12
dialogue  260:24
dictate  81:16
dictated  85:23
  86:6
difference  49:7
  72:16 116:2
  182:11 184:2,10
  184:13
different  30:18
  40:1 43:12 49:2
  70:7 105:14 109:6
  116:6,13,14
  123:24 148:1,24
  149:22 156:21
  158:2 172:15
  180:8,8 184:3
  185:17 195:4
  197:20 234:15
  239:22 246:19

263:23 268:7
269:24 286:18
287:4
differently  120:7
  142:16 162:16
  170:5 180:14
  186:7 189:18,25
  195:18
difficult  238:20
  245:4
digital  155:11
digitized  155:11
dilemma  9:4
  240:21
diminished  115:18
direction  200:18
  289:10
directly  46:8
  78:14 94:7 96:14
  113:9
director  47:19
directors  77:17
  78:5,24 79:8 80:2
  81:5,10,17 83:5
  84:14 85:8 89:15
  90:4 91:12 221:14
  231:11
disadvantaged
  203:2
disadvantages
  171:10 173:1,8
disagree  21:18
  266:2 269:13,14
disclose  128:14
disclosed  128:11
  130:19 244:16
  256:2 258:11
discontinue
  170:24
discontinued  55:9

discourse  258:20
discovered  188:11
discriminate
  185:12,19,24
discuss  50:17 96:1
  203:18
discussed  48:20
  203:22 206:13
  251:17 263:23
  266:22 271:19
discussing  57:11
  275:15
discussion  20:25
  35:3 63:20 64:21
  64:25 80:24 91:21
  159:15,20 169:10
  193:10 213:1
discussions  277:15
disease  105:20
  109:3 120:5
  181:13
diseases  106:16
  184:3
dismiss  26:23
  212:9
dismissed  27:3,8
  285:19
disorder  178:25
  181:21 182:6
dispensing  37:14
  176:6
disproportionate
  160:25
dissemination
  63:7 64:7 66:11
distinction  135:8
distinguish  65:6
  65:10,11
distinguishes
  196:20

Confidential                                                                    JAN-MS-05485962

distribute 266:14
distributed 264:12
  264:16,25 266:1
  266:24 271:5
  272:4,21
distributing 32:10
distribution 264:4
  273:13,14
distributor 17:20
district 1:1 2:1
disturbing 285:9
diverse 269:5
diversion 166:24
  167:1 176:8,10
doctor 26:15
  37:18 117:15,21
  127:10,16,23
  135:5 139:18
  140:10 161:13
  162:4,5 167:2
  169:7 174:5
  177:21 178:9
  185:2 186:19,25
  194:21 206:18
  207:4,6 219:25
  220:11 228:23
  240:16,24 243:21
  245:6 247:7
  249:17 285:15
  287:6
doctors 8:21 52:1
  52:5,19 128:3
  145:17 187:13,19
  201:11 219:20
  237:15
document 17:1,4,7
  20:11 35:19 36:17
  36:25 39:10 40:16
  40:23 61:11 65:24
  66:9,25 67:1,15,17
  68:2 92:6,15

93:14 94:2,21
95:7 96:22 97:3
98:12 114:4 120:9
132:3,5,9,24 133:5
135:14 136:16,25
164:20,21 193:20
194:15,22 195:5
195:15,19 196:25
202:12 205:12
213:13,24 219:18
220:4 221:11
224:19 225:4
240:24 252:5
255:11 265:21
280:25 283:8,13
286:20
documentation
  58:12
documents 91:25
  133:12,13 134:1
  135:22,23 202:6
  228:16 244:10
  249:23 250:7,8,12
  250:17 251:7,12
  251:18,18,22
  252:2,3,17 271:18
  286:16
doing 58:14,14,15
  125:19 140:8,25
  175:14 187:14
  193:5 204:3 216:2
  230:22 231:10
  234:7 254:7
  258:12
dollars 8:21
  219:20
domain 143:13
dopamine 191:20
dose 58:16 106:20
  108:10,11 125:23
  125:25 169:4

170:1,12 171:20
175:10,12 190:22
191:14 253:19,19
doses 51:4 109:12
  124:18
double 208:24
doubt 182:17
  226:7 228:4
  282:10,13
dr 9:9 12:9,11
  13:5,9 17:1 19:15
  20:15,18 24:25
  26:1,4 28:10
  35:17 39:3 50:12
  61:11 67:14 77:16
  92:15 101:23
  102:17 118:1
  121:25 132:10
  134:19 136:23
  144:4 147:11
  157:9,23 164:18
  165:5 186:18
  193:17 202:12
  208:15,16 225:4
  247:19 248:4
  250:6 251:6
  258:19 259:20
  260:11,22 261:12
  263:9 279:5,7,7,8
  283:7,14,16,17
  284:1,6
draft 69:25 132:20
  194:10,15 195:2,3
drafted 283:18
drafts 46:12
draw 193:22
  199:24 203:6
drop 16:6
drug 8:22 9:5
  42:12 46:22,24
  47:9 86:16 112:9

138:9,21 139:2
153:22 154:1,3,18
154:21,25 155:4
159:23 161:25
162:6,12 163:23
164:25 166:3
176:23 177:10
184:17 196:21
197:19 198:18
201:14 214:21
219:21 222:15
223:24 224:1
240:22 274:24
275:13
drugs 28:17 30:22
  42:1,14,21 43:1
  51:1 65:2 71:23
  97:4,4,6 112:8
  113:7,7,9 123:14
  159:19 160:2
  192:7 203:3
  211:18 214:23
  230:15 232:3
  234:14,15 246:15
  260:21
dual 196:5,14,20
  197:6 206:6
due 166:22 230:6
  233:22
duly 289:7
duragesic 8:18
  164:22,25 166:17
  169:1,5,8,14,17,19
  169:21 170:6,23
  171:21 172:10,15
  172:20 173:9,17
  174:6,25 175:6,10
  175:18,22 176:1,3
  176:6 177:25

Confidential                                                              JAN-MS-05485963

[e.g. - enforcement]                                                    Page 16

| e |
| --- |

**e.g.**  174:3 177:11
**earlier**  79:16
  116:19 126:17
  161:14 205:8
  207:6 208:6 228:9
  236:4 242:21
  248:14 254:22
  263:10 273:18
**early**  39:5 126:14
  140:5 155:8
  247:11 252:23
**easy**  238:24
**economically**
  153:16
**edit**  280:10,25
  282:22
**editing**  49:21
  281:7
**edition**  47:18 49:6
  49:8,8,9,15 50:11
  67:18 68:21 69:23
  70:6,20 71:15,15
  72:5,16,17,18,21
  72:23 73:25
  157:13,14,20,21
  176:19 247:11
**editions**  59:13
  72:8,11,12
**editor**  49:18
**educate**  216:13
  254:7
**educated**  130:17
  150:16 217:12
  222:16
**educating**  78:2,9
  151:14 197:6
**education**  27:23
  28:16 31:1 61:17
  61:21 86:19 87:3
  87:17 89:9 113:23

149:15 150:2,24
  151:7,20 152:1
  159:10 187:24
  196:13,24 197:18
  216:5 217:5,7
  222:21,21 223:6,9
  223:12,13 264:1
**educational**  8:11
  61:12 62:1 63:6
  63:18 66:2,9 89:3
  92:20 93:21 94:5
  114:1 116:22
  117:2,7 126:9
  139:8 187:14
  188:2 189:11
**educations**  150:10
**educators**  86:23
  87:17 199:11
**effect**  29:11
  150:16 153:7
  154:18,23 190:23
**effective**  41:13,19
  43:16 69:2,9
  82:18 160:16
  222:15 223:7
  260:21
**effects**  51:12 57:1
**efficacy**  190:4
**effort**  211:4
**efforts**  14:5
**egregious**  245:10
**ehsan**  4:15 7:8
  11:24,24 19:1,12
  134:7,18,20
  135:20 136:7,13
  136:22 138:18,25
  139:6,16,24 141:7
  141:14 142:8,14
  143:11,19 144:3
  145:14,24 146:11
  146:24 147:4,9,16

147:22 149:9
  150:22 151:4,12
  151:18 152:6,18
  152:25 159:12,17
  160:3,23 161:8
  162:11 163:1,8,20
  164:1,9,17 166:6
  166:13 167:7,14
  168:2,9,18 169:11
  170:2,10,19
  171:15 172:5,14
  173:5,12 176:17
  177:4 178:8,15,22
  179:4,13,18 180:6
  180:20 181:18
  182:4,10 183:2,17
  185:6,18,23 186:9
  186:17 187:18,23
  188:10,17,24
  189:6,17 190:5,20
  191:3,18 193:2,7
  193:16 194:6,13
  194:20 195:1,8,12
  195:14,24 196:3
  196:12,22 197:16
  197:23 198:14,23
  199:6,22 200:6,12
  200:22 201:6,10
  201:20,25 202:3,7
  202:11 204:2,9,15
  205:6,15,23
  206:18 281:4
  287:8,23
**eight**  22:16,17
  23:20 65:23 94:20
  139:1 196:24
  221:8 236:14
**either**  55:8 71:14
  78:14 268:8
**elaborate**  42:3

**electronic**  155:9
**electronically**
  165:3
**element**  44:20
**elements**  105:12
  105:24 140:15
  143:18
**elicit**  244:14
**email**  8:23 9:7,9
  32:10 167:23
  168:1 197:25
  198:1 202:3,16
  205:16 206:13
  220:5,6,12,19,23
  220:24 221:13,17
  224:11 255:7,14
  255:19 256:15
  262:4,7 283:16
**embarrassed**
  202:23
**embodied**  146:25
**emotional**  239:21
**emotionally**  285:8
**emphasis**  27:19,20
**emphasize**  109:11
**emphasized**  126:1
  165:16 226:18
**employee**  289:17
**empowers**  147:10
  147:12
**enacted**  132:18
**endeavor**  187:25
**endeavors**  188:2
  216:12
**endemic**  89:7,8
**endocrine**  51:12
**ends**  26:14
**endured**  256:11
**enforcement**  8:8
  154:8,15 155:21
  223:24

Confidential                                                                JAN-MS-05485964

engaged   84:21
   258:1 264:3
   266:25
engaging   184:25
   258:4
engendered
   199:18
enormously   232:5
enrolled   114:19
ensuing   47:1
ensure   57:12
   70:22 95:3
enter   19:22 26:20
entered   22:19
   148:18 207:12,15
   284:19 285:16
entering   27:9
enthusiasm
   203:19
entire   39:22
   259:18 282:4
entities   44:8 46:13
entitled   240:20
entity   45:5 123:8
   246:10
entrusted   46:8
environment
   225:24
epidemic   47:1,3
   47:15
equate   259:19
equation   105:13
   105:14
equivalent   166:11
   169:4
eradicating
   259:25
ercole   4:5 7:7
   11:22,22 12:14
   13:6,8 14:7,13,19
   15:6,12 16:2,19,23

17:16 18:1,17,21
19:6,13,21 20:2,8
21:3,6,18,20 22:5
22:12,23 23:4,14
23:18,25 24:4,9,19
24:22 25:6,15,23
25:24 26:8,16
27:2,7,13,25 28:9
29:2,6,21 30:3,11
31:7,14,20 32:4,8
32:15,22 33:2,15
33:23 34:13,20,24
35:13,16 36:2,8,23
37:17,21 38:3,14
38:21 39:2,23
40:4,7 41:8 42:2
43:10,19 44:21
46:10 48:11 49:20
49:24 52:3,8,13,18
53:2,7,16 54:6,11
54:15,23 55:22
56:4,10,17 57:9,18
59:9,24 60:19
61:4,10 62:3,25
63:25 64:12,23
65:16 66:7,14
67:10,13,25 69:6
69:12,17,22 71:1,6
71:12 72:1 73:1
73:16 74:23 75:6
75:12,19 76:17,24
77:15 78:16,21
79:4,17 80:9,15,21
81:15 82:1,7 83:9
83:17 84:3,8,12
85:12,21 86:2,13
87:24 88:6,13
90:1,9,16,23 91:8
91:18,25 92:8,11
92:14 93:8,18,25
94:9,19 95:12,20

96:3,10,20 97:12
97:22 98:4,10,24
99:5,21 100:23
101:6,15,22 102:7
102:16,25 103:8
103:14,21 104:5
104:22 107:24
108:15 109:25
111:6,7 112:2
113:14 115:7,12
115:16 116:9,25
117:6,12,20,25
118:20 119:4,14
119:19 120:8,15
121:7,13,20 122:3
122:10,23 123:12
124:1,9 126:4,23
127:14,21 128:4
128:17,21 129:2,9
129:17,23 130:6
130:15 131:14,22
131:25 132:6,8
133:3,9,16,24
134:5 162:25
263:16 264:7
265:2 266:4,18
267:2,17 268:4,10
268:23 269:10
270:21 271:10,22
272:6,23 273:8
275:6,18 278:13
281:15 282:7
287:21
error   31:23 33:7
especially   164:10
espousing   176:25
essential   54:2 99:1
   222:14
essentially   106:4
   141:22 145:20
   210:6 211:23

219:5
establish   221:10
established   253:4
estimate   284:15
estimation   230:14
et   11:13
ethical   260:1
etiologies   116:14
euphimisms
   144:14
evaluation   113:4
   113:22
evening   52:2
event   206:8,11
   271:2 272:16
events   220:24
   221:2 250:11
everybody   130:25
everyone's   42:21
evidence   77:8
   182:20 188:18
   210:25 214:20
   215:3
evolve   79:12
evolved   79:10
   131:2 253:24
evolves   188:7
   228:10,11
ex   1:3 2:3
exact   155:2 164:20
   276:14
exactly   19:12 29:7
   29:9 62:5,5 64:19
   70:5 99:12 100:3
   104:23 105:11
   173:4 263:18
examination   7:7,8
   7:9,10,11 11:7
   107:7 134:17
   207:2 243:25
   263:7 270:2 283:5

Confidential

JAN-MS-05485965

examinations 53:9
examined 11:5
example 25:25
  31:5 84:25 105:17
  107:10 108:18
  160:15 165:13
  188:11 231:24
  237:4 238:9,18
  264:11,24 266:22
  267:24 269:3
examples 112:20
  138:8 153:2
  160:11
exams 52:25
excel 209:6
exception 288:6
excerpt 39:21
  156:2,9
excerpts 40:11
excessive 42:8,25
  258:21
exchange 220:12
  220:19 255:14,19
exclamation
  166:12
exclude 180:4
  181:22 184:16
excluded 218:16
exclusive 180:12
excuse 124:17
  125:10 129:25
  167:22
executed 92:11
execution 276:6
executive 279:8,18
  280:4
exercise 110:3
exercised 75:8
  89:21 158:14
  159:14

exhaustive 51:18
  73:15
exhaustively
  130:24
exhibit 8:4,6,8,10
  8:11,13,14,16,18
  8:19,21,23 9:1,3,4
  9:6,7,9 10:3,4,5,6
  10:7,8,9,10,11
  13:13 16:20,21
  24:11,24 28:7,8
  35:14,15 38:9,24
  39:1 40:10 49:25
  50:14 61:8,9
  67:11,12,15 91:20
  91:23,25 92:4,16
  98:14 99:22
  100:12,25 117:24
  132:2 136:21,24
  155:25 156:9,12
  157:4 161:12
  164:16,19 165:2
  193:18 195:10
  197:24 198:2
  201:22 205:12
  207:16,18 208:1,3
  208:17 209:4
  219:23,25 220:9
  220:11,18 224:19
  225:1,5 228:20,21
  236:5,24 240:17
  240:18,20,25
  247:5 255:7,9,13
  273:17 275:1
  283:9,10,13,15
exhibits 8:1 10:1
  91:20 249:18,22
  249:24
exist 72:20,22
  251:24

existence 84:17
existing 62:12
exit 9:3 228:19,24
  229:1,7,18,23,24
  230:2 231:18
  234:25
expanded 67:19
  72:18
expect 48:2 58:6
  264:11,20
expectation 52:25
  53:3
expected 55:20
  57:16,19 58:5,7,7
  128:22
expensive 160:18
experience 81:24
  111:8 148:23,24
  192:4,5 198:18
  199:9,9,10 200:14
  200:15 201:13
  230:8 232:5 239:5
experienced
  183:20 218:19
experiences 16:9
  53:21 201:15
expert 244:15,16
  258:10,11,15
  259:8
experts 144:23
  145:8,16,22
expires 288:25
explain 137:25
explained 280:14
exploit 214:17
  258:4
exploited 214:18
exposed 270:1
exposure 105:1
extent 135:13,21
  209:18 258:14

277:12
extenuating
  182:23
extract 138:2
extraordinary
  181:11 182:24
extrapolation
  192:4

f

f 1:14,15,15,17
  2:14,15,15,17
face 54:1 253:9
faces 236:8,23
  238:9 239:16,22
  240:6
facets 140:1 142:9
facing 223:5
facp 157:8
fact 15:20 27:8
  36:12 42:11 43:2
  64:2 66:22 91:9
  103:22 104:2
  105:6 107:14
  131:13 137:17
  139:25 140:8,18
  141:25 160:24
  161:10 163:21
  168:10 171:13
  178:16 182:5
  185:1 187:3
  210:23 214:13,17
  225:5 228:7
  230:16 233:20
  245:21 274:21
  282:14
factor 110:6,8,10
  178:10,24 198:6
factors 111:22,25
  112:3,21 172:8
facts 156:5 221:21
  222:14 245:9

Confidential                                                                          JAN-MS-05485966

285:5
**fails**  253:19
**failure**  52:14 53:8
  54:7 55:7,11,13
  56:5 57:3 224:12
**fair**  13:22 15:7
  16:11 17:10 23:21
  26:10,24 27:4,10
  28:17 33:3 34:7
  35:5 41:20 43:6
  45:23 54:8 56:5
  57:13 64:15 66:25
  69:19 71:13 75:16
  76:21 78:23 83:2
  83:10 85:5 89:17
  90:24 91:2,9,11
  100:1 102:10,13
  103:23 104:6
  111:23 121:8
  128:13 130:16
  131:15,21 133:10
  134:2 136:8
  139:11 141:18
  149:3 152:13
  169:7 170:20
  171:22 174:5
  175:13 176:22
  180:21 188:25
  196:13 197:5
  214:20 248:1
  263:13 264:3,13
  264:21 265:11
  266:13 267:1,10
  267:23,25 268:15
  269:1 270:10,14
  271:7 272:4,14
  273:5,16 275:17
  276:15 277:4
  279:14,18 282:5
**fairly**  58:11

**fall**  55:15 115:21
  190:15
**false**  29:22 30:4,13
  30:23 34:11,14
  90:20 91:5,14
  210:3,9,14 211:2
  211:10,13 212:3
  214:6,12 215:20
  221:20 231:19,20
  235:16
**falsely**  256:24
**familiar**  86:5
  114:21 245:17
  256:20
**families**  235:1
**family**  177:9
  178:10,16 285:8
  287:2
**fantastic**  192:8
**far**  14:4 37:7
  238:4 249:9
**fat**  172:22
**fatal**  166:22
  168:15 175:9,11
**fault**  122:1 223:8
**favor**  254:1
**fda**  97:3 98:5,7
  99:9 100:2,18
  126:20 128:18
  129:3 165:4,7
  223:8,11,25
**feared**  51:9
**february**  1:22
  2:24 9:7 11:1,9
  165:4 255:15,16
  256:16
**federal**  37:12
  46:16 47:8 59:5
  70:1 289:13
**federation**  57:22
  58:24 59:7,16

60:11 61:6,16,20
  62:1,4,5,6,7,8,14
  62:20,21,24 66:10
  66:18 67:1 73:18
  75:9 76:6 77:1
  157:17 266:10
**feedback**  47:22
**feel**  18:21 19:6
  24:20 65:14 89:12
  112:18 182:21
  203:2,4 237:11,12
  242:5 244:19
  248:10 269:18
**feeling**  221:2
  237:20 238:21
**feelings**  257:24
**feet**  234:17
**fell**  190:16
**fellow**  187:19
  199:1
**fellows**  187:10,12
**felt**  29:19 42:5
  51:25 72:23 99:15
  140:9,11 218:14
  230:9 248:3,7
  256:24
**fentanyl**  65:22
  99:20 113:24
  166:18,20,23,25
  167:9,11,15
  168:10 171:7,9,9
  173:18 176:11
  191:10
**fentora**  99:23
  100:1 101:25
  113:18 114:8,11
  114:17 115:23
  116:21 117:14
  122:5,16,25
  123:25 126:7,9,15
  126:17 127:25

**field**  47:24 120:23
  144:23 198:25
  218:14 234:7
  286:8
**figure**  217:8
  237:23
**filed**  207:7 209:9
  209:16 212:1,8,8,9
  213:5,14 284:20
**fill**  285:22
**filming**  29:17
**final**  39:7 100:5
  128:6 194:22
  195:3
**finalized**  132:24
**finance**  265:22
**financial**  285:6
**financially**  11:18
  289:16
**find**  31:15,17 67:6
  105:15 131:9
  158:22 200:18
  258:2
**finding**  36:13
**fine**  40:4 68:17
  124:15 204:10
  250:21 263:1
  275:4,7,9
**finish**  212:25
**finished**  187:13
**firewalls**  230:24
**firms**  17:19 19:17
  19:23 20:19 21:10
  21:24 25:1 26:2
**first**  28:21 42:10
  49:3,7 50:10 60:7
  60:18 61:1 63:5
  63:11 71:14 73:13
  73:24 108:24
  118:10 140:20
  154:25 156:22,24

Confidential                                                                    JAN-MS-05485967

**[first - form]**

157:12,13,14,14
157:20,21,21,24
166:2,15 170:6
173:14 175:12
176:19 193:23
197:3 208:10,13
208:14 225:3,20
226:6 250:4
252:20,21 255:13
256:19
**fish** 118:8 209:11
209:12 220:7,8
240:23 255:12
**fishman** 1:21 2:20
5:14 7:3 8:6 9:1,8
11:4,10 12:9,11
13:5,9 17:1 19:15
20:15,18 24:25
26:1 28:10 35:17
39:3 61:11 67:14
77:16 92:15
101:23 102:17
118:1 121:25
132:10 134:19
136:23 144:4
147:11 164:18
186:18 193:17
202:12 208:15,16
225:4 250:6 251:6
263:9 279:5 283:7
288:2,21
**fishman's** 26:4
**fit** 269:19
**five** 23:3,21 25:21
25:22 138:8
226:24 227:13
262:22
**flip** 208:20 243:12
**florida** 4:9
**fly** 29:18

**focus** 42:11 45:16
65:25 84:21 138:7
234:2,3 265:7
**focused** 78:1,9
243:24
**focusing** 158:5
176:18
**folded** 232:6
**folks** 192:10
203:20
**follow** 148:2
**following** 58:13
95:3 99:23 159:5
**follows** 11:6 20:20
25:2 274:11
**followup** 284:17
**food** 163:23
164:25 224:1
234:6
**footage** 32:17,23
**forced** 216:9
**foregoing** 288:3
289:4,6,10,12
**forever** 232:24
**forged** 35:21,23
36:3,13
**forgery** 8:8
**forget** 13:21
**form** 14:2 15:4
16:17 17:13,14,24
19:19,24 20:6,23
21:12 22:9,10,21
23:2,12,23 24:2,8
24:15,16 25:4,9,10
26:6,11 27:1,5,11
27:18 29:1,4,14,25
30:7,16 31:10,11
31:16 32:3,6,14,21
33:1,9,19 34:10,19
34:22 36:22 37:16
37:19,25 38:12,19

41:6,21 43:18
48:23 49:23 51:15
52:7,12,16,23 53:6
53:12 54:5,9,13,21
55:17 56:2,8,15
57:7,14 59:6,23
60:16 61:2,24
63:24 64:5,16
65:9 66:6,12 67:4
67:24 69:5,10,15
69:20 70:24 71:4
71:10,18,19 72:13
74:16 75:2,11,17
76:22 77:13 78:12
79:16,25 80:14,20
81:12,13,19,20
82:5 83:7,16,22
84:7,10 85:10,19
86:1,10 87:23
88:4,10,24 89:23
90:7,15,21 91:6,16
93:6,12,22 94:8,15
95:10,16,23 96:9
96:16 97:11,21
98:1,9,23 99:4,11
100:19 101:4,13
102:5,22 103:4,12
103:18,25 104:1
104:18 107:12
108:5 109:22
111:5,24 113:2
115:6,10,15 116:5
116:24 117:4,10
117:18 118:19,22
119:13,18,25
120:14 121:5,12
121:18,24 123:21
124:6 125:4
126:22 127:12,19
128:1,16,19,25
129:7,15,22 130:4

130:13,21 131:20
133:1,7,14,20
134:3 136:2,10,19
138:16,23 139:4
139:14,22 141:4
141:13,19 142:13
142:24 143:15
145:11,18 146:6
146:23 147:2,7,13
147:19 149:6
150:18 151:2,8,16
152:4,16,23
158:16 159:21
160:9 161:3 162:9
162:24 163:6,19
163:24 164:5,14
166:4,10 167:6,12
167:25 168:8,16
169:22 170:8,16
170:25 171:25
172:12 173:3,10
176:12 177:2
178:5,13 179:16
179:25 180:19
181:1,25 182:8,16
183:10,24 185:14
185:21 186:3,14
187:17,21 188:8
188:16,21 189:3
189:14,22 190:18
191:1,15 194:4,12
194:16,24 195:6
195:22 196:2,10
196:18 197:10,21
198:13,20 199:2
199:13 200:4,7,9
200:16 201:5,17
202:21 204:6,13
205:4,20 206:17
209:17 210:8
211:6 212:4,12,14

Confidential

JAN-MS-05485968

213:11 214:2
215:10,19 216:24
217:17 218:4,24
219:3 224:8,15
225:17 226:4
228:12 229:5
230:1 232:11,12
233:6,15 235:4,18
236:7 237:6 238:3
238:12,13 239:19
242:15 243:10,15
245:2 246:5,6,22
248:6,24 249:3
251:20 252:13
254:17 257:14
259:2,6,23 261:5
262:13 263:14
264:7 265:2,12
266:3,4,16 267:2,3
267:15 268:20
270:16 271:10,22
272:6,23,24 273:8
273:9 274:4 275:6
275:18,24 276:7
278:13 279:10
281:14 282:7,9,23
284:9,23 285:20
286:13,25
**formal** 16:6
117:16 145:3
151:20
**format** 51:25
164:13,20
**forms** 227:5
**formularies**
159:24,25 161:10
**formulary** 160:6
160:14,20
**formulations**
177:18

**forth** 94:14 147:24
289:5
**fortunately**
285:14
**forum** 203:9
**forward** 50:6,11
79:19 83:19 85:16
85:24 86:7 95:15
95:18 156:15,22
157:7,12,18 158:2
228:23 229:1
230:3 233:1
**found** 89:4 152:19
248:8 259:22
**foundation** 15:4
25:11 41:23 44:24
45:11,14 49:11
61:17,21 77:21,25
78:17,23 79:5,9,14
79:19,23 80:12
82:3 86:9 88:17
90:11 214:3
215:16 221:10,14
223:20 229:8,11
229:18,23 230:4,9
230:25 231:5,7,9
265:4,13 266:5,17
267:4,16 268:21
270:17 271:4,15
272:1,10,11,22,23
273:8 279:11
282:9,24
**foundational**
217:19
**four** 23:3,21 66:24
226:24 227:2,9,10
227:12 282:24
**fourth** 208:10
**frame** 141:20
**framed** 34:17
214:14

**frankly** 87:9 239:3
240:7
**frederick** 1:8 2:8
**free** 14:9,15 18:21
19:6 24:20 66:3
**front** 17:8 37:4
132:21 156:10
180:11 210:12
213:6,19 215:17
249:22 251:8
**fronts** 223:19
**frustrated** 153:3
153:13
**frustrating** 152:19
**frustration** 160:5
**fsmb** 59:17,19
60:11,13 62:21
73:11,18,20 75:16
143:7 157:12
244:11 265:19,20
266:9,9,14
**fsmb's** 265:21
**full** 30:21 58:25
76:8 95:2 118:11
165:17 190:16,21
191:4,7,10,13
197:15 222:2,3
226:6 234:17,22
243:24
**fully** 41:22 92:11
100:21 123:9
**fun** 238:8
**function** 106:23
107:17,23 109:8
112:19 115:18
153:9
**functional** 112:12
115:20 256:13
**fund** 231:1,2
**funded** 93:3 217:6
229:24

**funders** 223:10
**funding** 59:13,20
60:3 67:6,8,8 87:3
89:1 216:9,19
217:15 219:8
222:20 223:9
224:4,6 231:5,6,8
231:14 255:4
256:25
**funky** 202:3,6
**further** 64:6 143:8
232:24 288:4
289:12,16

**g**

**gathered** 163:22
**general** 1:3 2:3 8:4
8:19 50:13 73:14
137:6 156:16,17
156:25 157:15
186:7 191:23
226:19 250:6
**generally** 66:15
82:14 86:3 102:23
135:21 146:13
165:11 178:1
263:24
**geographic** 272:18
**geographical**
264:6,25 269:5
**george** 70:8
**getting** 68:12
154:13,13 183:12
285:9
**give** 18:13 42:13
42:13 47:22 53:25
67:6 84:25 95:8
103:20 104:15
105:17 141:22
154:7 155:2,21
181:7 182:25
192:9 202:18

Confidential

JAN-MS-05485969

[give - happening]

203:14,25 221:4
233:10 237:17
250:18 253:8
263:19 267:7
269:1
**given** 66:10 160:6
182:23 227:19
264:2 289:11
**gives** 271:2
**giving** 43:3 100:21
103:15 104:4
105:11 246:13
**glasses** 37:6
**glastonbury** 5:19
5:21
**gmail.com** 8:23
**go** 12:14,24 17:18
19:4,14 35:10
38:7 50:13,23
63:11,15 64:6
107:22 111:23
112:1 116:21
131:5,12 143:8
152:2 168:23
173:13 174:19
181:10 193:2,7
206:20 208:13
209:4 219:12
222:13 234:18,19
248:1 250:19
257:2 262:16,24
267:8 268:22
269:21 280:20
**goal** 80:3 140:1
190:2 234:25
**goals** 97:17 216:22
259:24
**goes** 32:9,16 40:23
98:25 119:5,15
121:14 125:23
167:15 209:11

**going** 18:15 19:9
19:10 21:13 27:22
33:13 39:20,25
42:20 48:9 55:3
58:15 70:21 113:6
113:6 125:19
136:11 138:7
140:12 159:19
162:6,18 169:19
174:15 177:5
179:14 180:21
182:15 183:6
188:19 191:22
192:22 202:18
204:11 212:2
242:18 244:13
249:18,21 253:19
254:8 258:7
269:23 270:5
280:12,20,20
**good** 12:25 13:3
18:25 23:17 28:17
30:21 55:20
134:19 140:14
156:3 158:1
160:11 163:9,11
177:22 197:13
216:10,17,20,23
263:9 286:24
287:2
**gordon** 5:15 6:10
12:10 13:4
**gordonrees.com**
5:23,24
**government** 46:16
70:1 146:10
**grab** 193:6 233:21
**grabs** 233:22
**graduating** 252:23
**grammar** 248:8
282:17

**grammatical**
281:9,17
**grant** 8:11 61:12
63:6,21 64:3,7
66:9 67:3 92:20
92:23 93:21 95:8
99:7 100:22
**grants** 66:15,17
**graphics** 202:4,6
**great** 35:11 216:17
238:7
**greater** 42:11
158:8,12 253:18
260:20
**greatly** 107:18
178:17
**ground** 80:4
187:25 188:3
231:9
**grounds** 210:24
**group** 42:12 79:9
79:10 84:20
203:17 210:12
215:17 222:15
231:10
**groups** 87:2,14
213:6 216:9,9,16
**growing** 105:8
**growth** 144:25
**guess** 48:14
123:10
**guidance** 58:1
159:6 243:23
244:7,8
**guide** 8:10,13 9:6
38:17 39:12 63:8
63:13 67:20
239:12
**guideline** 145:3
184:14

**guidelines** 72:19
73:21,25 74:4
75:15 76:13 143:5
143:7,8 144:23
145:1,22 215:8
244:11
**guiding** 244:9
**guilt** 259:11,23
**guilty** 205:7

h

**haddox** 9:10 47:24
74:19 247:19
248:4 279:7,8,17
280:9,23,24
281:25 283:16,17
284:1
**haddox's** 283:14
**hair** 285:10,12
**half** 192:1
**halfway** 174:23
**hand** 109:1 155:24
190:3 224:18
236:16 250:1
283:7,8,22
**handbook** 51:21
**handcuffs** 234:13
234:17
**handed** 136:23
164:18 193:17
**handle** 36:13
**hands** 234:18
**hannah** 6:8 13:3
**happened** 24:18
207:16 219:1,12
238:14 252:5,7,8
252:11,12,15
259:16 260:2
**happening** 42:7
46:24 47:4,14
234:9 239:4

Confidential     JAN-MS-05485970

[happens - illness]  Page 23

happens  189:9
  271:12
happy  68:16 126:2
  224:23 258:5
  285:24
hard  21:1 49:12
  80:6 121:25 136:3
  162:14 182:18
  210:15 214:13
  217:22 253:16
  260:20
harder  131:9
  186:5
harm  233:23,23
harmful  140:16
  213:8
harms  42:24
  257:24,25
harvard  47:21
hate  113:10
head  14:22 48:13
  112:23 129:12
  214:5 283:19
heading  42:17,19
healing  233:23,25
health  46:5,7,8
  100:11 115:4,19
  119:6,10 120:25
  139:20 159:24
healthcare  121:3
  121:10,15,16,22
  122:17 123:1,8,19
  146:20 176:7
  265:10 268:16
  270:13
healthy  260:1
hear  71:22 260:3
heard  14:20 18:23
  97:8,8 113:19
hehsan  4:20

held  203:8 271:2,7
hell  233:3,13,17
  234:19
help  78:18 84:23
  87:4 141:21 232:7
  232:20,21,23
  235:16,25 239:12
  239:17 258:3
helped  41:18
  75:24 159:10
helpful  49:5,14
  70:6 73:14 142:21
  151:13,17 234:16
  249:25
helping  78:23
  170:22 171:2
  235:13
hereto  208:17
hey  48:21
high  108:11
  109:12 166:17,24
  181:7 200:19
  209:21 223:13
  231:11 253:19
higher  181:24
highest  166:21
  168:11,14
highlight  117:2,8
  210:17 218:9
highlighted  28:22
  126:24 224:22
highlighting
  123:19 124:3
  152:1 224:25
highly  165:16
  213:8
highway  3:7,16
hipaa  8:9 36:14
hired  88:25 89:1
historical  189:11
  212:12 213:7

histories  52:25
  53:9,18
history  110:18
  111:1,18 177:9
  178:10,16,23
  200:1 234:5
  243:24,24 244:1,4
hold  42:7 85:2
  202:24 227:25
  236:17
homan  157:7
honest  214:20
honestly  36:6
  232:14 267:5
honorarium
  203:15
hope  4:17 51:22
  217:3 262:4
  264:11,20
hoping  241:19
horrendous  230:7
hospital  137:6
  159:24
houman  4:15
  11:24 134:20
hour  169:5
hours  23:3,21
  150:6 193:9
house  46:22 62:9
  76:7
houses  105:22
hss  47:11
huge  125:18
huh  17:23 20:17
  28:1 39:13 40:17
  43:14 45:12 66:1
  96:24 98:13,15
  113:16 118:14
  156:7 208:12
  242:23 248:21
  252:6 272:15

human  46:6
hundred  188:12
  276:16,20,22
  284:19 285:17
hundreds  211:24
hunt  257:4,22
hunter  1:3 2:3
hydromorphone
  166:20
hypoventilation
  173:17

i

idea  18:25 75:5
  132:12,14,23
  133:4,13,17
  270:24 271:12
  280:15
ideas  215:1
identified  30:15
  43:15,25 54:16
  108:18 138:8
  142:9,20 175:23
identifies  167:16
identify  11:21
  30:12 54:19 55:23
  56:11 80:11 83:18
  84:4 85:13 168:5
  176:9 198:9
identifying  140:1
  199:8
idiosyncratic
  171:3
iep  94:22,22 95:1
  96:4 100:12
ii  1:22 2:21 7:4
  11:11 166:18,19
illicit  176:4
illness  53:21
  177:11 178:23
  181:14

Confidential                                                                JAN-MS-05485971

illnesses 53:22
  184:5
imagine 82:16
  160:1 234:16
immediate 193:25
immediately 31:18
  31:24 33:6
impact 112:25
  113:1 125:20
  152:14 284:20
impacted 34:8
impaired 238:1
impart 158:7
imperfect 159:6
  238:25
impetus 158:6
implement 133:19
implemented
  133:5,18,22,23
imply 214:18
important 44:20
  56:18,19 76:3
  142:5 174:12
  189:10 203:4
impossible 271:11
impression 34:11
  34:14
impressive 187:2
improper 76:19
  77:10 89:20
  244:24 264:14
improperly 83:4
  83:12 84:6 85:6
  85:17 90:6,12
improve 190:3
improved 112:19
inaccurate 167:3
  219:9
inadequate 131:10
  239:1 240:8
  241:10,12 253:7

inappropriate
  28:23 29:10 33:18
  42:25 52:15 53:10
  53:14 54:8 56:6
  57:5 102:12
  127:11,17,24
  180:23 243:19
inappropriately
  225:25
incident 282:21
include 73:2 97:24
  99:19 112:7
  166:19 171:7
  177:9
included 72:19
  139:2
includes 98:25
  101:1,8,11 167:19
including 46:5
  71:25 173:25
  177:10 210:1
  220:12 222:19
  223:7
incomplete 221:20
incorporate 164:7
incorrect 225:23
incorrectly 32:11
increase 125:25
  178:17
increased 176:8
  177:8,16
increases 106:4
  253:20
increasing 125:8
  191:14
increasingly 105:8
incredible 285:6
incrementally
  55:8
independent 14:3
  38:11 41:4 62:15

62:18 65:17 80:4
  80:7,17 84:2
  86:24 92:20 94:13
  106:17 110:3
  120:12 124:24
  130:19 135:10,16
  135:24 136:14
  217:23
independently
  13:23 14:6,9,14
  60:14 72:11,14
  79:23 80:12,16
  83:20,25
index 7:1
indicated 27:15
  109:16,18 115:23
  122:13 182:2
  271:19
indicates 39:16
  175:19
indicating 41:17
indication 101:1,5
  101:7
indications 117:3
indict 260:18
indirectly 43:5,8
  78:15 94:7 96:15
individual 17:21
  62:22 141:25
  171:3,12 244:15
  268:17 271:1
individual's
  178:17
individualized
  108:3,7 111:22
  179:21 180:12
  183:13 240:1
individually 62:13
  108:8 179:12
  211:3

individuals 46:14
  46:15 70:1 233:2
  239:10 258:1
  271:6
indulging 126:2
industry 8:22
  42:23 46:1 80:18
  87:17 89:1 216:3
  216:4,10,11,21
  217:6,12 219:9,21
  222:7 223:9,12
  255:4 256:25
  265:24
inexpensive
  123:14
infections 188:13
inflammatories
  109:3
inflammatory
  109:5
influence 14:15
  38:11 60:22,24
  66:3 75:8,14
  76:19 77:10 80:18
  86:16,21,22 87:16
  89:21 217:16
  231:16
influenced 83:4,12
  84:6 85:7,17
  87:20 88:1,8 90:6
  90:12 218:11
influences 81:25
  96:19
influential 198:10
inform 160:1
information 26:18
  53:20,23 71:23
  99:14 161:15,25
  164:12 197:15
  198:17,25 199:24
  200:7 201:3 210:3

Confidential                                                                                  JAN-MS-05485972

219:10 235:1
239:9 243:8,14,17
251:16 253:21
**informed**  32:16
47:13 71:16 254:9
254:12 282:20
**informing**  99:8
**inherently**  179:20
199:7 200:13
**inhibitor**  196:9
**initiative**  124:12
124:12
**injured**  56:23
232:24 234:5
**injuries**  232:22
**injury**  33:12
**input**  70:12
**inquiry**  265:23
**inside**  166:15
**instance**  33:4 48:8
58:10 72:15 73:10
85:22 86:6 87:20
88:1 108:9 109:2
109:17 112:25
127:4,9,15,22
182:19
**instances**  108:20
109:18 135:24
153:2
**institute**  227:3,21
**institutes**  139:20
**insurance**  152:11
152:13,21 153:11
160:4
**integrity**  257:7,10
261:9,11
**intellectual**  186:10
**intend**  103:16
**intended**  51:16,18
57:24,25 94:6
103:16 166:7

221:19 262:7,10
265:9 266:14
267:20,20
**intensive**  177:19
**intent**  71:21 80:8
102:20,23 103:2,6
103:9,19
**intention**  204:4
**interacted**  192:13
**interaction**  145:5
145:5 204:19
205:18,25
**interactions**
206:13
**interest**  14:25
41:12,19 42:1,21
43:16 45:18 69:2
131:16 218:1,7,10
218:11,15,21
265:24
**interested**  11:19
44:13 45:15 69:8
289:17
**interesting**  202:16
**interests**  256:8
**intermittent**  174:3
**internal**  133:11,11
133:25 167:23
194:10 249:22
251:11,18 252:22
253:22
**international**  45:2
45:7 203:9
**internet**  33:14
**interpret**  169:18
**interpretation**
138:19
**interpretations**
49:1
**intervention**  97:3
240:4

**interview**  255:23
**interviews**  267:7
**intolerance**  171:4
**intrinsically**
153:13
**introduce**  134:21
**introduced**  40:2
40:12
**introduction**
126:14
**introductions**
12:21
**investigated**  58:6
**investigation**
118:18 119:3
**investigator**  58:8
**involve**  150:1
234:14
**involved**  66:18,23
74:1,9 75:4,4 77:4
86:4 91:10,12
105:9 131:1 206:3
210:2 230:3,24
240:4 242:12
254:24 271:15
274:1,16
**involvement**
229:22 251:11
**involves**  55:4
92:24
**irrelevant**  99:19
**irrespective**  185:8
**issue**  21:16 30:14
33:5 111:9 119:16
255:19
**issued**  76:25
**issues**  35:21 45:8
46:9 62:11 75:24
257:8 258:25
261:10

**it'd**  171:21
**item**  138:8
**iteration**  60:18

**j**

**j**  5:16 9:10
**j&j**  135:11,12
206:8
**janssen**  1:11,11,12
1:13,13 2:11,11,12
2:13,13 4:13
11:25 135:6,8,10
204:20 205:18
206:14 278:1
**janssen's**  135:14
266:23
**january**  8:6
**japan**  203:10,19
205:17 206:2
**japanese**  203:17
206:1
**jerry**  155:16
**jjrobinson**  5:24
**joan**  279:7
**job**  46:22 287:4
**joe**  257:5 259:4,4
259:9,16,19 260:7
**john**  5:17 6:12
11:16 12:10
201:23
**johnson**  1:10,10
2:10,10 4:13,13
11:25,25 13:2,2
135:6,6,9,9,15
204:23,23 205:18
205:18,21,21,24
205:24 206:3,3,14
206:14 278:1,1
**johnson's**  135:15
**join**  18:15 270:20
**jones**  47:7 48:12
70:6

Confidential                                                                            JAN-MS-05485973

[judge - language]                                                              Page 26

judge  188:19
  189:1 213:18
  270:3
judgment  110:4
  232:3 254:1,15
july  208:16
june  9:9 284:6
jury  210:11 212:2
  213:18 215:6,15
  218:8 219:1 220:1
  229:21 233:10
  236:18 242:3,4
  255:18 259:5
jury's  236:18,22
justify  246:13
  253:8

          k

k  1:12,13,14,15,15
  1:17 2:12,13,14,15
  2:15,17
keep  172:2 217:22
  233:19 240:10
  270:5 277:17,17
keeps  154:4
key  98:25 100:10
  100:13,25 132:6
  178:10 184:10
  199:4 211:2,14
  213:6 271:1
kidney  109:2
kind  48:25 49:4,16
  76:2 109:23 115:2
  140:23 147:23
  148:6 153:7 159:6
  233:3,13,17
  237:17 250:2
kinds  67:8 104:19
  150:4 282:15
knew  136:11
  203:21 253:18

know  21:1,14
  27:24 30:18,19,20
  31:4 33:11,12
  34:17 36:6,7 42:5
  42:6,23 44:24,25
  45:5,13,17 46:4,8
  46:20 47:5,6,16,24
  48:7 49:7,16,16,17
  51:21,24 54:1
  57:2,21 58:4,5,6
  59:25 60:1,17
  61:23 64:17 66:23
  67:14 69:24 70:5
  70:6,11 72:2
  73:13 74:6,6,19,24
  75:3,18,24 76:4,8
  80:1 82:14,16
  86:20 87:2,8,9
  88:11,23 89:4
  96:25 100:17
  105:3,4,19 106:19
  107:22 109:16
  112:8,11,15 113:3
  113:10,11,12,17
  113:25 114:16
  115:1 116:7,12,13
  120:4,6,19 121:25
  124:8,20 125:7,16
  128:3 130:25,25
  131:1,4,7,23
  132:16,17,19
  136:3 137:23
  140:6,6 141:22
  142:1,2 143:2
  144:18 148:17
  153:18 154:17
  156:20 159:6,25
  160:11,16 163:12
  165:4 171:5,11
  175:14 180:3
  181:12,16 182:22

186:18 187:1
  189:25 194:18
  196:4,19 202:7,22
  207:22 208:22,25
  209:18,20 210:15
  210:22 211:16
  212:3,21 213:20
  214:11 215:23,23
  217:5 218:10,11
  218:12 219:5,5,15
  231:11 232:1,14
  238:16 239:2,10
  241:11 242:3
  245:5,5,7,8,9,11
  246:11 247:15
  249:10 252:9,10
  252:14 255:1
  256:3,5 258:11
  260:2,9 262:6
  264:15 265:5
  267:18 268:11
  272:8 273:10,12
  276:12,14,18,19
  277:5,13,16,20,24
  278:7,9,17 279:4,6
  280:1,4 281:6
  282:3,18 284:14
  285:6,9,10 286:4
knowing  183:15
  195:3
knowledge  23:9
  32:25 45:6 59:3
  59:11 60:11,21,24
  61:22 62:16 64:1
  77:8,10 82:4 97:2
  98:6 103:1,5,9,19
  124:25 125:21
  133:21,25 199:19
  214:15,19 216:16
  246:1 250:10
  251:16,23 261:22

270:19 271:9
  277:13 278:6,15
knowledgeable
  128:23
known  97:18
  100:21 124:20
  190:1 199:17
  208:16
kol  214:13
kolodny  257:5
  258:10,18,19
  259:20 260:6,11
  261:12
kolodny's  260:22
kols  198:4 213:5

          l

l.p.  1:7 2:7 5:3
label  8:18 161:25
  162:6,13,17 163:3
  163:12,13,16,16
  163:21 164:8,12
  164:22,25 165:9
  165:12,19 166:3,8
  168:5,19 171:21
  174:8,10,12,16
  175:19,23 176:19
  176:19
labeling  162:22
labels  128:13,18
  128:23 165:11
  176:23
laboratories  1:16
  2:16
lack  124:25 224:5
  224:6
lacks  25:11 214:2
  265:3
lance  45:11,13,17
language  17:18
  41:2,3 148:15
  176:9,18 177:24

Confidential                                                              JAN-MS-05485974

195:4 202:7
**large** 44:13 74:10
203:9
**largely** 45:16
70:15 106:6
125:21 153:4
257:6 261:8
**las** 206:9
**lastly** 201:21
**late** 60:9 108:24
284:15
**latin** 186:19,22
**launch** 193:25
**law** 3:6,15 4:6,16
5:6,18 6:5,9 8:8
147:3 154:8,14
155:20 262:4
**lawsuits** 207:7,18
209:8,15,24
276:16 278:2,10
278:22 284:19
**lawyer** 238:8
249:15,21
**lawyers** 23:8
207:23 215:25
248:20 249:1
275:10
**lay** 51:13 52:4
**lbaldwin** 3:11
**lead** 53:13 57:4
102:12 120:19
175:8
**leader** 132:7 211:3
211:14 214:16,19
263:21 271:1
**leaders** 8:21
120:23 199:19
213:6 219:20
226:8
**leadership** 218:13
218:14

**leading** 14:17,21
35:8,25 36:5 41:6
41:21 43:7 44:17
46:2 48:24 49:23
52:7,12,16,23
53:12 54:5,9,13,21
55:17 56:2,8,15
57:7,14 60:16
62:17 67:24 69:10
69:15,20 70:24
71:4,10,18 74:16
76:15,22 78:19
79:1,7 81:21 82:5
83:7,16 85:10
91:16 94:15 95:10
96:16 98:3 99:11
100:19 102:15
103:4,12,18
121:12,18 122:7
122:21 123:21
128:16,19,25
129:7 130:4,21
131:20 136:19
139:14 141:19
145:19 146:23
147:2,7,13,20
150:19 161:3
162:9 170:17
177:2 178:6,20
179:2,10 181:2
183:11 185:15
186:4,15 187:17
187:21 188:16,21
189:3,15,23 191:2
191:16 194:16,24
195:6 196:10,18
197:10,21 198:20
199:3,14 200:5,10
201:9,18 203:10
204:7,14 211:7
212:4 216:25

217:18 228:13
235:18 246:8
286:13
**leads** 121:15
**learn** 231:25
238:22
**learned** 255:21
277:14
**learning** 203:2
218:17
**leave** 33:14 247:16
**led** 255:19
**legal** 17:19 176:4
**legislature** 155:19
**legitimate** 222:18
**leisure** 93:14
**length** 89:2 128:7
**lethal** 160:17
**letter** 8:6 20:13
28:10,12,14
**level** 107:23
111:12 112:13
115:1,2 116:16
160:1 176:24
214:22 231:12
239:18
**levels** 236:1 237:5
**lewis** 4:4 11:23
**liars** 255:22
**library** 139:21
**license** 146:16,19
147:15 148:19,20
148:21 150:1
**licensed** 148:13
**licensees** 150:5
**lie** 36:20 37:9
286:23
**lies** 210:13 211:4
215:7 229:24
**life** 106:23 150:6
150:21,25 173:17

187:4 232:1,4,8,23
234:4,18 256:13
286:7
**lifespan** 184:7
**light** 159:8 175:22
238:10
**liked** 152:22
**likewise** 135:2
139:1 141:8
178:23
**limb** 230:6
**limit** 106:10 149:4
**limitations** 115:20
153:4
**limited** 65:3 87:14
101:5,7 123:7
148:5 152:9
210:18 264:5
267:21 272:18
273:13
**limits** 139:2 148:4
148:16,25 153:8
269:20
**line** 18:8 48:2 87:8
170:6 179:22
213:22 244:14
258:8,12 259:18
264:1 269:25
273:23 274:12
280:10,10,15,15
280:25,25 281:5,5
282:22,22 288:8
**lines** 203:6 245:10
**lisa** 3:5 12:6
**list** 40:23 68:20
104:16 108:23
137:18 138:6
157:5 179:22
208:15
**listed** 13:25 43:13
44:3,9 47:17 69:7

Confidential

JAN-MS-05485975

[listed - marked]                                                    Page 28

69:14 100:12
101:1 133:18
174:7 207:18
271:23 276:15,25
288:7
**listen** 55:25
**listing** 45:1 46:3
**lists** 207:17 209:8
**literally** 165:19
**literature** 110:21
164:3 284:8
**litigate** 284:22
**litigation** 20:20
21:11,25 25:2
135:7 274:1,17
276:15,23 277:10
**litigations** 277:21
**little** 20:13 24:20
42:4 46:19 61:6
202:23 209:15,21
241:21 250:1
282:17
**lives** 233:19
234:22
**living** 234:4
**llc** 1:16 2:16
**llp** 3:4,13 4:14 5:4
6:6
**located** 11:14
**logo** 135:14
**long** 8:21 22:24
65:7 71:8 108:14
125:13,15 138:6
142:23 154:19,23
155:1 193:2
219:21 221:7
242:13,22 243:1,3
275:4,7 280:5
281:18
**longer** 157:16
237:14

**lonnie** 8:23
**look** 25:16,17
31:21 36:15 47:4
58:8 63:5 66:24
75:24 91:19 93:10
94:17 95:25 96:4
112:15 118:10
120:24 124:13
125:1 137:21
138:4,8 155:24
156:8 157:3 165:1
166:2 168:19
195:10 196:24
197:24 213:17,20
236:10,18 250:17
250:20 263:18
**looked** 24:24 41:3
47:16 49:2 126:16
129:10 140:23
195:19 244:25
265:21 282:21
**looking** 37:5 67:6
120:5 125:6,7,19
138:6 166:1,14
181:15 189:11
200:19 235:10,14
236:4,14,19,22
250:12 286:20
**looks** 37:22 44:8
44:22 50:6 165:23
166:8
**looming** 184:7
**los** 4:18 5:10
**losing** 285:10
**lost** 285:12
**lot** 35:9 38:15 49:2
51:23 71:23 86:19
116:8,10 131:7
140:14 155:18,20
158:19 174:24
202:5 203:2

209:21 233:9
269:18 276:14
**lots** 164:11
**low** 108:10 253:19
**lower** 184:25
**lp** 43:24

**m**

**m** 4:5
**m.d.** 1:21 2:21
4:15 5:14 7:3 8:24
11:4 146:9 288:2
288:21
**macdonell** 6:12
11:16
**machine** 289:8
**main** 50:24 58:3,3
**maintain** 106:22
149:25
**maintained** 161:9
171:19
**maintaining** 109:8
**maintenance**
182:2
**major** 119:9,23
177:11 184:4
**majority** 146:17
**making** 35:6 52:20
55:24 56:13 110:4
110:7,11,22 111:2
112:4 113:1 131:4
131:12 197:8
200:8 216:11
238:10 239:13
241:4 244:5
**man** 88:24
**management** 8:16
41:13,20 43:17
45:8,19 69:3,9
82:11,22 85:4
98:16,17,21 99:9
99:24 100:2 129:4

145:2 150:5,25
173:23,25 174:2,2
226:16 273:7
**managing** 8:15
118:4
**mandated** 126:20
**mandatory** 113:5
113:8,23,25
116:22 117:2,7
**manner** 62:12
176:3
**mansukhani** 5:15
6:10 12:11
**manufacturers**
69:19 89:8 210:3
210:13 211:3
215:18 278:19
**manuscript** 35:20
48:15,16 69:25
**manuscripts**
228:17
**map** 97:8,9,16
98:7 100:10,11,13
102:3,9,12 112:25
113:9,11,12,13
**maps** 100:18
101:24 126:18,20
126:24
**march** 289:22
**mark** 16:20 28:7
35:14 38:24 61:8
67:10 117:22
283:8
**marked** 10:1
16:21 24:11,23
28:8 35:15 36:16
38:9 39:1 40:15
61:9 67:12,15
117:24 118:7
136:21,24 155:25
156:8 164:16,19

Confidential                                                    JAN-MS-05485976

[marked - members]

193:18 201:22
208:1,3 219:18,23
220:4,9 224:18
225:1,4 228:20,21
240:16,18,25
247:3,5 255:7,9
283:9,10
markers 238:20
market 42:23
126:15 214:23
marketed 100:9
marketing 31:3
87:7 88:23 97:2
103:3,7,11 214:24
219:12
mary 9:8 255:1,22
255:23,24 256:19
mass 137:5
massachusetts
148:23
matching 99:15
material 30:25
167:22 173:15
266:24 267:25
271:5
materials 13:13
63:17 64:2 65:25
66:3 72:22 73:10
85:3 145:23 272:2
272:2,4,21
matter 11:12 16:6
18:10,11 257:7
260:14 261:9
maximal 190:22
mccarthy 257:5
259:4,5,9,17,19
260:3,7
mcginnis 228:18
230:5 231:21
mcginnis's 230:11

mcneil 1:11 2:11
204:25
md 8:6
mean 24:16 34:2
53:19 54:24 65:20
114:5 116:6,11
152:11 169:18
224:4 231:5
232:18 235:8
243:2 245:4,19
257:22,23 260:7
264:19 266:10
270:18,22 279:12
280:19
meaning 184:21
means 55:1 186:19
186:22,23 233:11
238:25 245:20
281:6
meant 135:23
136:15 218:8
233:18,21 235:7
measure 238:23
239:1
measures 112:15
mechanical 106:1
106:11,11
mechanism
172:16,19 190:9
196:6,14,20 197:6
197:20 206:6
media 27:24 28:2
31:5 34:12 42:7
88:25 140:7 258:4
260:13,24
medical 53:21,22
57:23,25 58:7,24
59:1,2,5,8 61:16
61:21 62:8,10,15
62:18,19,23 65:17
67:6,7 75:25 79:6

79:10,11,13,15
86:18 87:2,17
89:9 110:3,18,21
128:12 129:6,14
129:20 130:2,8
135:1 138:20
140:2 141:2
144:21 145:25
146:3,7,8 147:15
148:20 149:13,15
149:21 150:1,2,10
151:6 157:17
158:15,19,23,24
159:11 164:3
184:22 187:6
189:1 190:6
191:21,22 192:1
192:13,19 216:5
217:5 226:8
243:18 244:25
252:23 254:1,15
264:1 266:10,15
284:11
medically 243:7
243:13
medication 108:13
109:4 112:10
152:9 162:1,6
165:10,12 169:20
170:21,22,24
171:22 172:2,22
174:8,11,13
175:11,15 178:19
196:1 199:10,25
200:1 201:2
medications 109:5
112:20 147:6,12
147:15 152:7
154:12 161:17
162:18,22 170:14
172:16 176:24,25

179:1,23 190:10
190:15 191:13
203:3 213:9 253:3
medicine 80:23,25
81:3,6,11,18 82:9
82:18,21 83:3,11
83:20 84:6 86:9
87:13,15 88:16
90:3 101:2,9,12
102:13 111:9
112:24 114:2
130:12 139:20
146:15 147:5,11
147:18,24 148:12
148:16 149:1,5
172:3 174:16
215:15 222:15
226:15 227:4,22
227:22 252:22
253:22 269:4
271:3 286:8,8
medicines 28:17
30:22 97:24 114:8
117:3,9 126:10
127:1 128:8,14,24
131:17 163:4,4
medscape 8:14
meet 22:7,24
97:17 171:20
203:13
meeting 29:17
135:2 203:11,17
206:12 249:2,9
meetings 48:20
meets 116:15
member 62:6
74:10 270:11,13
280:1
members 81:23
87:5 269:7 270:14
270:23

Confidential

JAN-MS-05485977

[memory - need]                                                    Page 30

memory 156:3
 205:9 279:7
mental 46:7
 177:11 178:23
 181:14 234:12
mentally 230:13
mention 64:14
 108:22 109:20
 134:25
mentioned 27:14
 46:11 47:24 48:12
 59:19 78:8 113:15
 130:7 153:21
 156:14 158:3
 160:4 179:19
 194:17 197:11
 202:15 263:10
merits 257:8
 261:10
mess 220:18
message 71:22
messages 99:1
 100:14,25
messaging 86:24
met 22:6,17 23:19
 49:3 95:4 134:20
 134:23 207:4
 231:21
meter 238:23
methadone 160:15
 160:24 166:20
miami 4:9
micrograms 169:5
middle 88:24 89:2
 105:21 202:4
migraine 182:19
migraines 183:1
mike 1:3 2:3
mild 174:2
military 233:3

million 227:3,21
 227:24
millions 227:5
mind 40:9 65:12
 132:2 136:4,8,12
 148:2 155:14
 158:13 195:13
 201:23 250:19
 252:18
mine 137:3 230:7
minimization
 96:23,25 97:13
minimized 97:5
minimizing 97:18
minimum 162:5
minute 274:9
minutes 134:11
 193:9 262:22
 279:1
mischaracterizes
 168:1
miserable 233:20
misleading 29:22
 30:4,13 222:5
misled 127:10,16
 127:23
misrepresentatio...
 48:22
missing 239:4
mission 82:12,14
misspelled 194:3
misspoken 200:23
mistake 33:7
misunderstood
 246:12
misuse 9:5 142:22
 176:8,10 177:15
 177:20 240:22
misused 246:12
mitigation 113:4
 113:22

mixed 79:10
model 57:23 58:17
 58:19 59:14,14
 60:4,7,7 73:11,20
 74:7,9,11,13,25
 75:9,15,20 215:8,8
 244:11
moderate 108:12
modern 257:5
 260:7
modified 177:18
modulate 112:11
money 203:24,25
 204:10 216:3,12
 230:16,18,21
 260:16 286:22
 287:3
mongers 239:3
monitor 56:13,19
 57:3
monitored 177:15
monitoring 56:21
 148:4 153:22
 154:1,3,18,21,25
 155:4 177:19
months 22:16,17
 23:20
montreal 203:8
 206:1,12
morgan 4:4 11:22
morganlewis.com
 4:11
morning 12:25
 13:3 134:19
morphine 166:20
 171:5,6 191:7
motion 212:9
mounting 253:17
move 247:16
movement 259:13
 259:14

moves 14:22 48:13
 129:12 214:5
 283:19
mu 190:13,17,17
 190:21,23,24
 191:5,8,11,19
multiple 156:4
 161:21
mutual 8:4,19
myers 4:14 6:6
 11:24 13:1
myriad 115:21

n

n 1:12,13 2:12,13
 3:7,16
name 31:3 47:18
 47:20 49:15 74:7
 92:5 134:19 207:5
 211:22,22 289:20
named 18:3
 103:11 209:9
 276:24 277:8,21
 278:10,20,22
names 70:10,11
 277:5
narrower 105:23
 105:23
national 46:21
 47:3 119:16
 139:20 143:4
 144:23 227:22
naturally 285:12
nature 111:15
 116:7
necessarily 197:17
necessary 53:24
 243:13
need 12:12 21:2
 37:6 50:25 51:2
 51:23 55:2 68:10
 71:24 75:25 76:4

Confidential                                                    JAN-MS-05485978

[need - object]                                                                    Page 31

106:12,14,20
109:12 113:8
126:9 134:14
146:16 153:12,15
158:19 171:11
179:11 180:12
183:16,16 185:3,8
186:12 203:14
212:17 223:6
227:2,24,25
230:17,18 234:2,6
235:1 243:9,14,23
245:8 287:13
**needed** 42:11,12
65:4 158:8,14
174:3 232:23
256:12
**needs** 173:6
183:13
**negative** 210:16
214:12
**neither** 96:5,11
289:16
**nerves** 106:5
**never** 18:11 21:13
28:3 31:13 136:15
136:16 140:16
142:2 211:14
214:23 217:14
226:18 238:14
244:24,25 252:18
262:7,10
**nevertheless**
150:15 175:21
**new** 150:5 197:19
267:24
**newswire** 31:25
**nine** 36:16,25 37:2
96:21 97:7 100:7
**nix** 3:4,13 12:4

**nixlaw.com** 3:11
3:19
**non** 234:15
**noncancer** 104:10
104:13,15,21,21
104:25 108:17,21
109:15,19 110:2
116:4 122:6
183:19,23 185:9
185:13 186:12
191:25
**nonindustry**
222:20 224:3
**nonopioid** 175:8
**nonoptimal**
155:22
**nonprofit** 44:12
44:13 45:15 62:1
78:1,9 204:1
**nonresponsive**
48:10
**noon** 134:11
143:25
**norepinephrine**
196:9
**normal** 230:12
**notary** 11:18
288:25
**note** 224:20 262:6
**noted** 244:17
**notice** 165:18
195:18 208:9
**notion** 180:22
**nuance** 158:19
171:16
**nuanced** 245:11
**nucynta** 193:24
194:3 195:18
196:5 197:7 206:4
206:12

**number** 27:9
36:10 37:22 40:24
43:2,12 45:25
68:3 69:13 77:20
102:19 132:1
139:1,7 150:3
160:25 161:1
180:16 199:21
200:25 201:12,14
209:19,20 225:21
226:25 227:20
276:14
**numbers** 220:7
236:15 240:23
255:12
**numerous** 108:22
109:20,24 130:19

**o**

**o'melveny** 4:14
6:6 11:24 13:1
**oath** 11:5 13:10
249:15 285:25
**obama** 70:8
**obama's** 156:24
**object** 14:2 17:13
17:24 18:14,25
19:6,19,24 20:6,23
21:12 22:10,21
23:2,23 24:2,8
25:4,10 26:6,11
27:1,5,11,18 29:1
29:4,14,25 30:7,8
30:16 31:16 32:3
32:14,21 33:1,9
34:10,19,22 36:22
37:16,19,25 38:12
38:19 41:6,21
43:18 48:9 49:23
51:15 52:7,16,23
53:6,12 54:5,9,13
54:21 55:17 56:2

56:8,15 57:7,14
59:6,23 60:16
61:2,24 63:24
64:5,16 65:9
66:12 67:4,24
69:5,10,15,20
70:24 71:4,10,18
72:13 74:16 75:2
75:11,17 76:22
77:13 78:12 79:25
80:14,20 81:12,19
81:20 82:5 83:7
83:16,22 84:7,10
85:10,19 86:1,10
87:23 88:4,10
89:23 90:7,15,21
91:6,16 93:6,12,22
94:8,15 95:10,16
95:23 96:9,16
97:21 98:1,9,23
99:4,11 100:19
101:4,13 102:22
103:4,12,18,25
104:18 107:12
108:5 109:22
111:5,24 113:2
115:6,10,15 116:5
116:24 117:4,10
117:18 118:19,22
119:13,18,25
120:14 121:5,18
121:24 124:6
125:4 126:22
127:12,19 128:1
128:16,19,25
129:7,15,22 130:4
130:13,21 131:20
133:1,7,14,20
134:3 136:2,10,19
138:16,23 139:4
139:14,22 141:4

Confidential                                                                    JAN-MS-05485979

**[object - okay]**                                                    Page 32

| | | | |
|---|---|---|---|
| 141:13,19 142:13 | 235:4,18 236:7 | 262:3 263:14,16 | **offers**   154:10,14 |
| 142:24 143:15 | 237:6 238:3,12 | 264:7,14 265:2,3 | **office**   46:21,23 |
| 145:11,18 146:6 | 239:19 242:15 | 265:12 266:3,4,16 | 247:8 |
| 146:23 147:2,7,13 | 243:10,15 244:13 | 266:18 267:2,3,15 | **oh**   16:25 37:4 |
| 147:19 149:6 | 245:2 246:5,6,22 | 267:17 268:2,9,10 | 100:12 193:1 |
| 150:18 151:2,8,16 | 248:6,24 249:3 | 268:20,23 269:9 | 246:21 269:17 |
| 152:4,16,23 | 251:20 252:13 | 269:10,11 270:16 | **okay**   12:19,23 |
| 158:16 160:9 | 254:17 257:14 | 270:21 271:8,10 | 13:7,12,20 14:25 |
| 161:3 162:9 163:6 | 258:7,16 259:2,6 | 271:22 272:6,7,7 | 16:16,20 17:17 |
| 163:19,24 164:5 | 259:18 261:5 | 272:23,24 273:8,9 | 18:20 20:3 21:18 |
| 164:14 166:4,10 | 262:13 284:9,23 | 274:4 275:6,18,24 | 23:15 25:16 26:17 |
| 167:6,12,25 168:8 | 285:20 286:13,25 | 276:7,17 277:11 | 28:5,20 33:3,24 |
| 168:16 169:22 | **objected**   265:15 | 278:4,12,13 | 34:1,5,14 36:9 |
| 170:8,16,25 | **objecting**   213:22 | 279:10,19 280:7 | 37:8 38:6,24 39:6 |
| 171:25 172:12 | 261:1,25 | 280:11,17,18,19 | 39:8,19,25 40:14 |
| 173:3,10 176:12 | **objection**   14:12,17 | 281:2,4,14,15,21 | 40:21,23 41:2,9,16 |
| 177:2 178:5,13 | 15:2,3,9,10,23,24 | 281:22 282:7,8,23 | 43:22 44:2 46:15 |
| 179:16,25 180:19 | 16:17 17:14 18:6 | 284:24 | 48:12,18 50:14,20 |
| 181:1,25 182:8,16 | 18:8,12,16 19:9,11 | **objections**   13:16 | 52:9 59:19 60:10 |
| 183:10,24 185:14 | 19:20,25 20:24 | 14:21 18:19,22 | 61:5,20 63:1,11,15 |
| 185:21 186:3,14 | 22:2,9 23:11 | 268:4 | 64:13 65:23 66:21 |
| 187:17,21 188:8 | 24:14,15,19 25:9 | **objective**   63:21 | 67:17 68:10,14,18 |
| 188:16,21 189:3 | 30:1 31:10,11 | 112:15 | 68:24 69:7,13 |
| 189:14,22 190:18 | 32:6 33:19,20 | **objectives**   97:18 | 71:13 72:5 74:1 |
| 191:1,15 194:4,12 | 35:8,25 36:5 43:7 | **objectivity**   95:24 | 78:4 81:2 84:4,25 |
| 194:16,24 195:6 | 44:17 46:2 48:24 | **obligated**   248:10 | 87:19 88:22 89:19 |
| 195:22 196:2,10 | 52:12 62:17 71:19 | **obligations**   25:7 | 90:2,10,17,24 92:2 |
| 196:18 197:10,21 | 73:7 76:15 78:19 | 25:14 | 92:10,19 94:1 |
| 198:13,20 199:2 | 79:1,7 97:11 | **observed**   233:11 | 95:1 100:5 101:16 |
| 199:13 200:4,9,16 | 102:5,15 103:24 | **obtained**   53:1 | 101:17,20 103:1 |
| 201:5,17 202:21 | 108:6 121:12 | **obviously**   179:5 | 108:20 114:6,14 |
| 204:6,13 205:4,20 | 122:7,21 123:4,21 | 188:5 | 114:21 120:18,22 |
| 206:17 211:6 | 123:22 135:19 | **occur**   63:21 | 121:8 123:13 |
| 212:4,14 213:11 | 159:21 162:24 | 106:24 173:17 | 125:11 127:3,9 |
| 214:2 215:10,19 | 178:20 179:2,10 | **occurred**   33:13 | 128:5,10,12 |
| 216:24 217:17 | 207:20 209:17 | 153:7 | 130:11 134:6,12 |
| 218:4,24 219:3 | 210:8 211:12 | **occurs**   56:21 | 143:23 144:1 |
| 224:8,15 225:17 | 212:25 232:12 | 118:15,24 125:25 | 156:23 157:10,14 |
| 226:4 228:12 | 238:13 245:3 | **offensive**   31:15,17 | 157:19 165:9 |
| 229:5 230:1 | 246:18 259:7 | **offered**   203:24 | 186:21 193:14 |
| 232:11 233:6,15 | 260:10,10 261:6 | | 206:25 209:2,24 |

Confidential                                                                                   JAN-MS-05485980

**[okay - opportunities]** Page 33

210:11 212:3,20
221:16 227:14
229:15 242:7,20
247:25 249:20
251:3 263:2,5
264:10,23 265:19
266:8 267:23
268:13 269:7
271:18 272:20
273:2,22 274:8
275:13 277:3,7
279:8,23 281:11
282:18 283:4
284:17
**oklahoma** 1:1,3,4
2:1,3,4 11:13 12:7
18:10,11 127:5,7
127:10,16,23
128:3 212:10
266:1 268:8 269:8
270:1,14 271:20
271:23 273:19
275:21 276:5,11
**older** 59:13 106:7
186:6
**oldest** 154:21
**omm.com** 4:20
**once** 22:14,15
31:23 48:7 139:17
233:24 249:18
**ondcp** 47:10,12,20
**one's** 259:24
**ones** 86:17 148:2
151:21 224:24
281:17
**ongoing** 25:7,13
26:9
**online** 114:3
**onset** 64:21 65:4,7
65:21 100:4
114:11 123:5

124:4
**opening** 105:21
**operator** 11:8
12:16,19 101:17
101:20 143:23
144:1 193:1,4,9,11
193:14 206:22,25
250:25 251:3
262:20 263:2,5
287:10
**opinion** 47:13
103:15,20 132:6
144:15 211:3,14
213:6 246:9 271:1
**opinions** 81:10,17
81:23 104:4
124:24 211:15
216:15 258:24
260:12,12
**opioid** 8:8,10,13
8:16 9:6 15:21
17:12 21:9,23
30:6 35:18,22
38:16 39:4,9,11
43:4 44:16,19
45:24 47:14,15
51:19 52:15,22
53:4 54:3 55:15
56:12,14 57:4,5,12
57:12,23 58:20
61:7 63:8,12
64:13,22 65:1
67:19 69:18 72:2
77:1 89:7,8 97:24
99:18 104:20,24
105:2,11 106:21
107:8,11 109:9
110:2,14,24 112:5
115:25 122:6,14
122:19 123:2
125:9,13,13,15

128:8,14 130:12
131:5,17 137:11
137:13 138:21
140:9,20 141:1,10
141:15 142:23
145:6,9 160:16,20
162:21 163:2,4
165:12 166:18,19
167:16,24 168:6
169:2,3,20,24,25
170:6,13,21,22,24
171:4,20,22 172:1
172:9,16,24
173:22,24 175:7
175:11 176:4,25
177:8,13,17,18
178:4,18 179:1,23
180:4 181:7,10,12
181:21,23 182:2,3
182:6,15,19,25
183:6 184:25
190:10,15 196:8
196:17 203:18
206:6 210:3,13
211:3 215:7,17
219:11 222:7
223:7 243:7,19
244:11,23 245:24
247:2,22 252:21
253:3,19 254:2,6
254:11,14 264:24
265:25 278:19
280:10,25 282:1
**opioid's** 171:2
**opioids** 28:23
29:10 33:18 35:2
35:7,24 36:4 42:8
50:18 51:19 52:5
53:11 54:20 55:24
56:7 57:17 58:10
58:11,16 64:21

65:7,7 70:23 71:3
71:8,17 82:25
91:4 100:4 104:7
104:9,12 105:6
107:4,15,17 108:2
108:16,21,24
109:13,15,19
110:10,13 111:1
113:5 114:12
123:6 124:4,14,18
125:6,18 127:11
127:18 129:5,14
129:19,25 130:2
130:18 131:10
143:5,10 144:11
148:3 150:11,14
150:14,17,20
151:7,14,21 152:2
153:23 158:9
160:17,19 161:1
170:12 177:14,14
178:1,2,12 180:15
180:23 181:5
182:5 184:14
185:2 191:24
192:3,14 196:21
210:4,14,18 211:5
213:8 216:7
222:14,19 225:22
225:25 226:7,18
229:25 232:7
238:11 242:13,22
243:3 245:6 246:4
246:13 253:6,11
256:3 257:24,25
258:21,21 260:23
263:13 268:15
273:7 283:18
**opportunities**
234:21

Confidential                                                      JAN-MS-05485981

**opportunity** 49:18
151:10 168:21
192:9 203:7,20
251:7 254:8
**opposed** 150:14
196:16 256:9
284:22
**opposite** 210:17
**opposition** 212:7,8
213:4
**optics** 202:25
203:23
**optimal** 44:20
153:16 160:12
**option** 106:14
108:24,25 181:15
203:24 210:18
**options** 106:21
109:1,6,9 152:9,14
160:6,12,13 171:7
183:8
**oral** 26:4 172:16
**order** 95:7 146:13
146:15 208:2
219:19 220:5
240:17 246:3
287:24
**organization**
44:13 45:7 63:17
66:2 82:10,17
83:6,14,21 85:9
215:16 216:2
272:17
**organizations**
41:12 45:25 69:1
87:12 88:20 90:18
90:19 91:3,13
210:2 212:11
215:23 216:22
219:8 260:16
265:25 270:10,11

**organize** 222:18
**orient** 36:21
**original** 289:13
**ornstein** 9:1 225:7
225:7
**ortho** 1:11 2:11
204:25
**ouch** 192:9
**outcome** 30:25
55:5 100:11
105:13 253:22
**outline** 70:22 71:2
71:7
**outlined** 100:11
**outpatient** 174:1
**outside** 96:18
181:16 268:17
271:6
**outweigh** 105:3,16
107:6 108:2,3
244:6
**overall** 234:16
**overarching** 125:9
**overcoming** 230:8
**overdose** 42:9
161:7 166:22
175:11
**overdoses** 168:15
**overestimating**
175:9
**overlap** 89:3
**overlooked** 203:22
**overly** 70:21
**overreacted** 120:3
**oversaw** 72:14
**oversight** 47:8
**oversimplifying**
237:19
**overuse** 150:14
**oxley** 5:5 7:9,11
12:2,2 23:17

192:23 206:20
207:3,5,25 208:4
209:1,3,23 210:10
211:9,19 212:5,19
212:23 213:2,3,25
214:7 215:13,21
217:13,19,20
218:5,25 219:17
219:24 220:10,17
224:9,17 225:2,19
226:5 227:8,11,16
228:15,22 229:6
231:3 232:17
233:8 234:23
235:6,21 236:9,13
237:21 238:6
239:14 240:9,19
242:1,17 243:11
243:20 244:17,18
245:14 246:17,25
247:6 248:12,25
249:5 250:5,14,19
250:22 251:5,25
252:16 254:21
255:10 257:15
258:17 259:3,15
260:5,25 261:15
262:2,9,15 264:14
265:15 269:11,15
269:18 270:7,20
275:24 276:7
280:7 281:22
283:6,11 284:13
285:11 286:5,15
287:5,17,19
**oxycodone** 166:21
167:19,24 168:6
168:11 191:4
**oxymorphone**
166:21

**p**
**p&t** 159:14
**p.m.** 2:23 11:2
**page** 7:5 8:3 10:2
20:10 27:24 36:15
36:16,25 37:2
39:8,10 40:10,15
50:6,6,10 66:24
68:1 92:19 99:23
100:24 118:8,11
120:25 121:2
136:18 137:22
156:11 157:3
165:2 173:14,14
174:19,20 193:23
193:23 196:24
221:18 225:20
226:6,23,24 227:2
227:9 234:24
236:11,15,15
288:8
**pages** 98:11 136:1
271:24
**paginated** 137:22
**paid** 27:15,17,20
27:21 28:2,4
219:13 245:7
286:23
**pain** 8:15,17,21
9:4 41:13,19
43:17 45:2,8,18
56:1 65:2,15 69:2
69:9 71:9 77:21
77:25 78:2,13,15
78:17,22 79:5,9,11
79:14,19,23 80:11
80:23,25 81:3,6,11
81:18 82:2,9,11,18
82:19,20,21 83:3
83:11,20 84:5,14
84:16,19,21,22,23

Confidential                                                                JAN-MS-05485982

**[pain - patient]**

85:4,6,16,24 86:8
86:8,9 87:13,13,15
88:16,16,17 89:16
89:16 90:3,10
104:7,10,13,15,21
104:21,25 106:3
107:4 108:17,21
109:19 110:3
111:12,15 112:13
112:13,14 114:22
114:24,25,25
115:1,2,3,4,9,14
115:24 116:3,4,12
116:13,14,15,17
117:21 118:5,13
118:16,18,24,25
119:2,6,9,11,22,24
121:2,9,22 122:6
122:13,18 123:1
123:20,24 124:3
124:12,16 125:6
125:12 145:1
150:4,6,21,25
152:21 153:5,5
160:16 173:23,25
174:2,3 180:10
182:13,14 183:5
183:19,20,22,23
184:2,2 185:12,13
185:16,16,19,24
186:7,13 191:24
192:5,15 203:8,10
203:18 210:19
215:15,16 216:8
219:20 221:14
222:17,19 223:20
227:1,4,5 229:8,11
229:18,23 230:4,8
230:25 231:5,7,9
231:25 233:2,9,12
233:12,16,21

235:2,14,15 236:1
237:5,12 238:11
238:19,21,23,24
239:1,5,8,18 240:5
240:21 253:7,11
254:2,16 256:1
263:12 266:23
267:11,12,25
268:14 269:4
271:3,4,4,14 272:1
272:10,22 273:7
279:24 286:8,8
**painted** 256:7
**palliative** 181:16
**paper** 142:21
148:6 154:25
155:8 250:1 281:6
284:2,7
**papers** 212:1
286:12
**paradigm** 112:18
**paragraph** 20:9
25:17 28:21 31:22
31:22 50:5 63:6
63:15 65:23 66:9
94:1,20 96:21
97:7 98:19 100:7
121:2 166:15
175:25 177:5,21
222:2,4 223:4
224:2 226:6,15
**paragraphs**
168:24
**parameters**
148:17
**paraphrasing**
212:22
**part** 55:19,20,21
60:17 62:20 64:21
64:24 73:11 74:19
74:21 99:18

138:15 143:3,9
145:4,8 146:4,9
147:5 153:22
158:6 164:2
199:23 202:24
203:1 210:12
215:17 220:12,19
228:8 242:2
246:16 248:22
255:15 259:13
**partial** 190:17,23
239:9
**participant** 47:8
**participants** 12:13
**participate** 29:15
87:2
**participated** 45:21
205:17 266:21
**participating**
203:15
**participation**
30:10 267:6
**particular** 24:13
38:8 40:24 52:21
55:14 56:7 65:24
76:12,21 78:5
83:21 88:8 91:13
92:23 93:11,20
99:6 101:2 110:14
111:9 112:6 117:3
137:9 152:10
165:12,19 166:3
166:25 168:5,20
178:11,24 183:8,9
196:14 199:10,25
201:3,14 202:16
205:16 232:9,10
232:18 242:2
**particularly** 29:19
51:20 58:15 65:3
143:6 203:5

214:22 237:11
238:19 243:24
**parties** 11:20
164:11
**partisan** 216:1
**partner** 254:10
**partners** 46:4
267:11
**parts** 14:5 48:1
57:16,19 84:2
220:13 244:3
**party** 11:17 77:17
265:24 273:19
274:22 275:22
289:18
**pass** 126:9 128:6
206:19 283:4
**passages** 48:17
**passed** 76:9
126:17,18
**passes** 172:22
**passionate** 29:19
235:13
**patch** 171:7,9
172:10,15,20
173:9 174:6
176:11,15
**patches** 166:25
**patently** 210:9
214:6
**path** 230:12
**pathway** 181:11
256:10
**pathways** 191:20
239:12
**patient** 52:21
54:19 55:14,25
57:3,6 104:21
105:19,20 106:20
107:9,10,13,14,20
107:22 108:4,12

Confidential

JAN-MS-05485983

[patient - pharmacovigilance]                                                    Page 36

109:2 110:6,9,18
110:24 111:19
112:6 117:16
121:15 125:20
140:2,10 142:3,10
144:6,10,16
152:10 154:11
160:7 170:7,15,21
170:22 171:12,19
172:8 173:7,9
178:12,24 179:6,6
179:9,9,12,12
180:2,10,11,22,24
181:7 182:15,23
183:7,8,13 185:8,9
185:10,13,16
200:1 222:20
232:9 237:10,17
239:24,25 240:2
243:6 244:25
245:1,6,13,20
252:21 254:2,5,16
**patient's** 53:21
58:12 111:12,18
112:8,9,10 125:9
152:15 182:14
185:20 239:18
244:3
**patients** 42:14,24
44:14 52:10,14
56:13,19,22,22
57:17 58:13 65:4
68:13 79:11 106:3
106:6,13 107:1,7
109:5 115:5,9,11
115:17,24 118:16
118:25 122:6,9,14
122:19 123:2,6
124:13 125:2,17
138:21 142:4,22
152:8,20 153:19

154:13 160:13
162:19,23 163:5
169:2,8,9,19 170:3
170:11 173:22,23
175:1,6,8,10,17,21
177:12,14,16,19
179:14 181:12,13
181:14,20 183:18
183:19,21,22
184:4,6,15,21
185:1 191:24,25
197:9 201:2,4
222:17 233:11
234:19 235:15,25
237:11,24 246:23
253:11 272:11,16
**patterson** 3:4,13
12:5
**paucity** 222:20
224:3,4,5
**pause** 131:24
250:13
**pawn** 222:6
**pay** 223:12 234:7
**payment** 30:14
**payments** 286:18
**pederson** 1:24
2:24 289:24
**pedestal** 200:20
**peer** 284:8
**pending** 20:19
21:10,24 25:1
**penicillin** 188:11
**people** 46:20 48:6
70:11 78:13,14
106:9 116:12
125:5 131:9
132:15 153:5,12
153:14 167:24
182:21 187:13
192:5,7 199:15,16

199:17,19 212:10
214:14 216:15,18
225:25 226:25
230:20 232:5
234:14 235:13
237:4,8 238:11,22
246:13 249:6
256:10,11 257:23
258:3 259:12
263:20 264:21
269:4 273:11
**people's** 19:4
228:10
**perceive** 186:6
**perceived** 107:6
**percent** 118:15,25
125:16 138:14
161:5,6
**percentage** 139:2
139:7
**perception** 213:7
**perfect** 159:7
**perfectly** 204:10
**period** 173:24
192:4 280:5
285:25
**permeability**
87:16 89:5
**permeable** 87:10
**perpetuate** 259:24
260:20
**perpetuating**
258:22 285:3
**person** 47:7,13
135:2 146:19
158:2
**personal** 133:25
177:9 178:9,16
179:20 180:2
199:25 200:15
250:10 251:15

262:7 270:19
271:9 277:13
278:5,15
**personally** 207:22
260:15 284:21
**persons** 177:8
**perspective** 242:6
**pertains** 289:12
**pharma** 1:7,7,17
1:17 2:7,7,17,17
5:3 11:13 43:24
255:22 279:9,18
280:5
**pharmaceutica**
1:13 2:13
**pharmaceutical**
14:10,15 17:20
18:3 23:6 31:6,9
34:15 38:11 41:24
42:15 43:5 46:1
59:4,11,20 60:3,14
60:21,24 74:14
76:19 77:11 80:18
81:9,16,25 83:4,12
84:9 85:7,18,23
86:6,21 87:9
89:21 90:5,12
103:2,6,10 127:16
219:7 230:15,16
230:22,23 231:14
238:10 246:3,10
256:8 258:22
260:17,19 286:19
**pharmaceuticals**
1:9,11,12,12,14,15
2:9,11,12,12,14,15
**pharmacist** 37:13
**pharmacology**
190:7
**pharmacovigila...**
140:5 159:9,13

Confidential                                                              JAN-MS-05485984

[pharmacy - practices]                                                                     Page 37

pharmacy   154:6
  159:16,22
phone   12:23 249:6
photocopied
  211:23
phrase   97:9
  113:19 243:1
physical   52:25
  53:9 243:25
physically   153:9
  230:13
physician   51:14
  53:9 56:7 142:3
  158:7 161:21
  166:8 168:19
  169:17 170:12
  174:12 196:24
  197:2,7,18 223:12
  273:6 279:24
physician's   8:10
  9:6 38:16 39:11
  55:13 63:8,12
  198:16
physicians   17:21
  54:2,19 55:24
  56:13 57:11,22,25
  58:1,4 62:22
  107:16 125:2
  126:6,25 128:22
  142:4 146:9
  150:16,25 151:14
  158:20 159:4,10
  160:20 178:4
  192:12 196:15
  198:9,19 199:1,8
  199:11 206:1
  222:17 226:16
  270:12
picture   222:6
  236:5

piece   33:16
pieces   33:6
pill   176:16
place   87:11 130:23
  148:16,25 149:25
  155:4 213:10
  251:19,22 258:2
  271:20 289:5
places   37:12
  131:13
plaintiff   1:5 2:5
  3:3 16:13 213:5
  275:22 276:4
  286:17
plaintiffs   15:21
  16:12,14,15 17:12
  17:19 19:17,23
  20:4,19 21:8,8,22
  21:22 22:7,24
  23:20 25:1 26:2
  26:18,22 207:8
  209:25 211:21
  212:1,8 248:20
  249:1,15 258:9,15
  259:8 273:24,25
  274:6,15,16,20,21
  274:25 275:2,14
  275:16 285:16
plan   54:18,25 55:3
  55:12,14 58:10
  96:23 97:1,14
  107:19 132:7
  193:25
plans   153:11
play   122:17,25
  145:8
played   191:20
  250:7
plc   1:14,15 2:14
  2:15

plea   205:2,5,7
pleading   213:14
please   11:21 134:9
  166:16 175:5,25
  177:6 210:14
  213:15 215:12
  218:7 255:20
  259:5
pleased   34:3
plenty   210:25
pocket   219:6
point   70:9 74:4,21
  154:6 170:13
  206:5 248:10
  253:2,16 255:5
points   76:3
policies   76:21
policy   57:23,24
  58:17,20,22,23
  59:5,14,14 60:5,8
  60:12,13,18 61:1
  73:11 74:5,7,9,11
  74:13,15 75:1,9,20
  75:22 76:25 77:5
  77:12 215:8
  244:12
poor   257:9 261:11
poorly   58:15
population   118:17
  119:1 184:18,23
  200:2 227:23
portrays   222:6
pose   18:21
posed   225:10,13
position   257:6
  261:8,19
positions   49:11
  70:13,13 259:17
possibility   181:12
  181:22

possible   51:20
  181:16 235:16
  268:19 269:8
  280:25
possibly   171:8
  268:24
post   97:2
postoperative
  173:25
potency   175:8
  190:22 191:14
potent   166:18
potential   41:24
  140:14 142:21
  166:21 167:10
  168:11,14 178:18
  232:20 233:22
  265:23
potentially   55:19
  99:19 105:1
  184:24 244:2
  245:13 246:15
power   148:11,15
pr   31:25
practical   198:18
practice   53:15
  58:1,2,9 82:17
  142:6 145:17
  146:15 147:5,11
  147:18,24 148:12
  148:16,17 149:1,4
  149:5,12 151:25
  162:17,21 163:2
  163:10,11 182:25
  190:4 235:25
  237:9 260:1
  284:12
practiced   149:8
practices   103:3
  142:11 158:21
  159:8

Confidential                                                              JAN-MS-05485985

[practicing - prior]                                                    Page 38

practicing  159:1
  187:22 192:12
  198:19 279:24
practitioner  37:13
practitioners
  265:10 268:16
precise  155:14
preclusive  173:8
preconceived
  180:22
predates  176:19
preface  230:3
  233:14
premise  49:10
  58:3
preparation  250:8
  251:11
prepare  249:13
prepared  220:22
  221:11 223:10
  225:12 228:23
  229:1 233:1
  249:13
preparing  66:19
  80:5
prescient  140:13
prescribe  35:7
  52:5 54:20 55:24
  104:12 107:4,8
  112:5 131:5
  146:13 147:6,12
  147:14 148:5
  152:7 162:7,18
  174:15 175:15
  180:15 182:15
  183:6 200:8
  242:22 243:18
  252:21 253:11
prescribed  51:1,3
  57:17 104:6,9,17
  108:16,21 109:15

109:17,19 114:14
  114:17 122:19
  123:2 142:22
  154:5 161:17
  162:12,23 163:4
  169:14,17 174:6
  175:18 177:14
  178:12 201:2,12
  222:16 243:4,7
  245:6
prescriber  71:14
  102:2,11 116:20
  130:17 131:16
  152:15 154:6
  174:6 180:3
  197:12 222:21
prescribers  35:1,5
  35:10 51:23 58:4
  76:1 107:20
  158:13,18 159:1
  161:15 200:15,19
  201:16
prescribes  169:12
prescribing  8:10
  8:13 9:6 30:6
  35:10 37:14 38:16
  39:4,11 43:4
  44:16,19 45:24
  50:18 51:19,24
  52:15 53:14 56:12
  57:5,12,12,23 58:9
  58:20 61:7 63:8
  63:12 64:14,22
  65:1 67:19 70:23
  71:3,8,17 72:3
  77:2 101:12
  102:13 111:1,23
  114:18 117:8
  143:5,10 144:11
  145:6,10 150:11
  151:15 153:23

161:25 173:8
  174:8,11,14 176:6
  178:4 184:14
  188:19 191:23
  196:15 197:8,19
  198:10,17 199:1
  199:11 215:7
  223:7 244:11
  245:24 247:2,23
  254:2,11 264:24
  265:25 282:1
  283:17
prescription  8:8
  9:5 35:18,22
  36:13 47:9 52:22
  53:4,10 54:3,8
  55:15 56:6,14
  57:4 102:4 110:2
  114:2 116:21
  117:14,17 126:8
  127:11,17,25
  128:24 131:18
  148:3,7 153:22
  154:1,3,17,21,25
  155:3 169:21
  240:22 242:13
  244:24 254:14,20
prescription's
  201:4
prescriptions
  35:24 36:3 57:6
  107:11 126:7
  159:3 161:1,5
  199:21 201:1,12
  201:14
present  6:3 222:5
  263:19
presentation  95:8
  95:14,18 244:4
  269:2

presentations
  13:25 43:4 89:17
  89:20,22 90:11,19
  91:1,4,15 225:22
  286:12
presented  130:24
  203:23
presenter  204:20
presents  180:25
preserving  97:19
president  81:2,8
  83:13 90:4 157:11
  157:18,23 229:10
  229:13,17
press  155:16
pressed  182:18
pressured  248:3,7
presumably
  170:11
pretty  48:7 60:2
  175:13 181:10
  220:25
prevents  15:15
previous  107:23
  214:10 224:2
previously  10:1
  155:25 193:18
  214:9 242:12
primary  51:25
  125:11
primer  51:17
print  72:3 137:8
  208:24 230:17
printed  157:14
  219:19 224:21
printing  157:21
prior  22:14 43:2
  81:7 111:8 169:20
  177:13 195:19
  225:10 289:7

Confidential                                                    JAN-MS-05485986

priority   119:16
  223:13
private   140:22
  141:11
prn   174:4
probably   47:12
  83:23 99:15 120:6
  140:22 153:3
  160:15,17 162:14
  206:8 221:7
  227:24 245:12
  248:18
problem   34:4,7,8
  35:24 36:4,7 47:9
  55:10 87:15 106:1
  106:6,11 115:4,9
  119:10 120:1
  123:24 160:18
  182:3 203:18,21
  203:22 218:20
  240:11,13
problematic   30:24
  36:10 199:7
problems   115:21
  159:3
proceed   11:20
proceedings   289:4
  289:6,8,14
process   18:17
  35:12 49:21 60:4
  74:1,19 75:21
  76:2,8,12 105:11
  141:17 143:9
  186:1 233:23,25
  253:23
processes   113:5
produce   83:25
  85:3 143:17
produced   50:9
  137:5 202:5
  255:11

product   64:10
  80:6 94:7 97:18
  97:23 99:2,17
  100:9 102:3,4
  164:22 167:11
  168:20
production   220:7
  240:22 255:12
products   63:19,20
  64:4,14 65:22
  80:5 96:2 100:17
  113:24
professional   29:17
  45:7 77:18 82:10
  84:20 87:12 88:20
  146:20 176:7
  216:8 263:25
  270:11 285:8
professionals
  62:15,19 79:6,10
  79:12,15
proffer   19:16,22
  20:3 22:18 26:21
  248:14,19 249:9
proffers   26:2
profile   178:25
profit   239:2
profited   211:18
profound   183:25
program   27:14
  28:16,22 29:16
  30:5,21 32:18,24
  63:18 86:23 87:21
  88:2,9,12 92:20
  94:3,5,18 95:3,25
  96:6,13 97:17
  98:7,16,17,21 99:7
  99:9,24 100:2
  113:15,23 114:1,9
  114:19 116:18,22
  117:2,7,15 118:1

148:4 153:22
  154:2,3,4,18 155:4
  197:13,18 266:21
  266:23
programming
  30:20 33:6 87:18
programs   67:9
  86:22 88:14,15,18
  88:21,24 89:8,25
  90:5,8 93:4 94:13
  96:13,18 129:3,4
  129:18 149:16
  150:2 151:7 152:1
  189:11 197:2
prohibited   42:20
project   64:10 67:3
  231:2,8
projects   84:23
  85:1 100:15
  230:19 231:1,10
prominent   47:7
  166:7 244:9
promote   63:19
  64:4 94:6
promoting   41:12
  41:19 43:16 69:2
  69:8
proof   181:9
  210:21
proofs   39:5 50:10
proper   57:12
  244:21,24
properties   171:4
proportionate
  241:8
proposed   225:6
proposition   37:24
  186:10
propublic   222:5
propublica   218:21
  219:2,22 224:11

224:14,20 225:6
  225:13 254:23
protect   42:23,24
prove   210:15
  239:6,7
proven   215:2
provide   24:5 26:2
  29:12 141:16
  198:17 202:19
  210:21 213:15
provided   29:23
  30:23 33:17 99:7
  151:21 197:25
provider   94:22,22
  95:1 96:5 98:20
  99:8 100:12
  102:10 131:19
providers   70:22
  100:16 130:20
  270:13
providing   26:17
  27:16
proving   214:12
provision   25:8,25
  82:18 94:21
provisions   244:10
psa   29:18
pseudoaddiction
  245:17,20 246:2
  246:20 279:5,12
  280:24 282:1
  284:1,3
psychiatrist   47:21
  258:19
psychological
  53:23
psychologically
  153:10
psychosocial
  244:4

Confidential                                                                  JAN-MS-05485987

**[public - rarely]**                                                                                     Page 40

**public**  11:18 27:22
27:23 28:16 29:16
31:1 115:4 119:5
119:10 120:25
139:20 140:7
141:6 143:13
219:10 258:20
261:17 262:8,11
288:25
**publication**  43:3
70:2 80:11 83:19
84:5 85:24 86:7
137:3,4,10,22
139:11 140:3
141:9,16 142:10
143:14 157:25
198:6 199:9
**publications**  13:25
79:20,22,24 82:21
82:24 83:24 85:3
85:16 263:24
264:1 273:5 286:6
**publicly**  213:15
256:1
**publish**  73:20
224:12 264:10
268:13
**published**  35:20
72:21,23 75:15
129:24 137:3,7
139:18 198:24
199:16 218:21
219:4 229:19
247:12 255:5
264:12 284:7,14
286:12
**publishing**  221:20
225:10
**pubmed**  139:12
**pull**  40:6

**pulled**  31:25 215:1
**pulling**  114:4
**pulmonary**  181:13
**purchased**  135:11
247:8,10
**purchaser**  41:25
**purdue**  1:7,7,8 2:7
2:7,8 5:3 11:13
12:3 43:24 47:25
74:20 167:23
207:5 212:9,12
213:4,10 231:2
249:22 250:8
251:12,18 277:20
277:23 279:9,18
280:2,5
**purpose**  63:16
94:3 99:14 272:3
**purposes**  63:19
94:5 95:8 154:8,8
154:9,15
**pursuant**  15:13
20:3
**push**  184:8
**pushing**  279:1
**put**  40:8 50:14,14
79:19 83:19 85:16
85:24 86:7,19
87:4,5 88:17
89:17 93:4 94:13
95:15,18 96:14
129:18 134:15
147:17,24 148:4
150:15,24 151:6
156:10 159:19
161:12 195:9
200:20 207:16,17
209:7 230:10,25
232:8 236:24
238:20,25 239:23
243:12 249:21

251:8 267:1
**putting**  31:2 91:14
250:3

**q**

**qualifying**  171:20
**quality**  106:24
119:16 234:22
235:2
**quarter**  221:18
**question**  15:25
18:7,14 21:19
58:2 86:12 89:10
91:23 92:3 93:17
135:3 139:17
142:16 146:12
149:10,20 150:8
162:4,15,16,25
163:15 170:4
171:17 180:7,13
182:11 183:4
184:1 185:5,7,10
185:11 211:10
212:25 213:12
219:25 220:11
225:3,3,21 235:11
240:24 242:5
246:19 248:3
250:6,18 251:10
252:9 255:13
274:10,23,24
275:8 279:14,15
283:15 286:24
**questionable**
123:8
**questioned**  280:13
**questioning**  18:8
18:13 213:23
244:14 258:8,13
259:19 269:25
273:23 274:13

**questions**  13:18,23
19:4 24:1,6 30:18
77:21 93:20 100:5
102:20,21 112:16
127:3 128:6 132:2
135:13 161:14
165:11 193:19
194:14 198:1
213:14 221:9
224:13 225:6,9,13
242:12,21 247:18
249:17 251:13
252:3,11 258:8,16
262:1,3 269:24
270:5,8 273:2,16
277:12 281:8
283:25 284:18
285:24
**quick**  33:10 132:3
192:23 205:11
237:16
**quite**  241:24
268:19,24
**quotations**  37:23
**quote**  38:1 213:6
222:4,21 223:4,14
233:1,4 234:24
235:3 237:23

**r**

**raised**  31:18 33:5
**random**  138:9,21
**rapid**  64:20 65:7
65:21 100:3
114:11 123:5
124:4
**rappaport**  165:3,5
**rare**  104:24
106:19 107:1
109:10 192:15
**rarely**  203:21

Confidential                                                                              JAN-MS-05485988

**rarer** 109:12
**rash** 171:5
**ratified** 76:10
**ratifying** 75:22
**rational** 155:10
**reach** 181:6
190:21 191:13
**reached** 17:11
**reaching** 67:2
**reacted** 31:18
**reacting** 33:25
55:1
**reaction** 48:3
**reactions** 49:17
70:13
**read** 17:17 20:20
25:2 28:20,23
32:18 41:13 51:14
52:1 63:9 66:4
71:14,22 109:20
118:21 129:16
136:14 162:13,17
162:22 163:16
166:15 167:3
168:21 173:21
175:3,25 177:5,7
211:25 213:24
215:12 221:4,5,7
221:21 222:8,22
223:15 232:2,3
241:19 242:4
256:20 257:11
263:20 264:21
265:7,10 268:16
272:21 274:10,11
287:8,15 288:3
**readable** 51:17,25
**reader** 136:8,12
**readers** 72:24
**readily** 139:19
164:12

**reading** 61:17
212:7,15,18,21,23
213:12,16 252:4
**ready** 13:7
**real** 105:19 205:10
210:17 233:23
246:10,20 248:9
251:22
**reality** 27:16
217:2
**realize** 13:9 206:2
206:5
**realized** 42:16,17
**realizing** 19:2
165:9 183:7
**really** 16:5 36:11
49:5,10,13,17
50:23 65:2,3,4
70:14 72:16 88:19
91:22 105:7 109:5
124:15 125:19,21
131:2,3 132:17
136:5 140:20
150:13 158:25
159:1,3,9 160:11
181:9,14 184:4
194:18 203:22
210:23,24 214:22
215:3 216:16
217:4 251:23
253:7 260:17
261:2 264:15
269:11 271:12
273:14 281:6
286:2
**realm** 85:4
**reask** 162:25
212:21
**reason** 102:12
151:5 186:11
211:21 224:21

266:2
**reasoning** 181:11
223:8
**reasons** 36:11
116:14 171:3
214:8 215:25
**recall** 13:14,18
22:13 27:17,19
29:7,9 35:2 38:17
40:12 70:11 77:23
78:4 80:23 92:17
93:2,23 101:25
102:21 114:18
135:2 144:7,11
146:1 153:23
156:3 158:9
161:17 167:21
168:3 180:16
193:18 198:1,6,11
202:13 205:2,14
207:8,19,24
242:14,24 247:20
248:9 249:8 253:4
267:20 271:20
274:19 278:5
281:9,11,12,16,18
281:20,23 282:2
282:13,15
**receive** 28:14
203:14
**received** 28:11
59:19 60:2,3
138:3 192:19
232:15 247:19
**receiving** 169:2,8
169:19 177:14
**receptor** 190:13
190:24 191:19
**recess** 12:18
101:19 143:25
193:13 206:24

251:2 263:4
**recital** 208:14
**recitals** 17:17
208:9
**recognize** 136:24
137:2 239:21
**recognized** 145:4
**recollection** 136:4
282:16
**recommended**
143:4
**recommends**
174:9
**reconditioning**
153:11
**record** 11:8,21
12:15,17,20 20:25
21:13 39:21 40:1
40:2 53:22 58:13
91:21 101:18,21
134:21 135:4
143:23 144:2
156:5 159:15,20
169:10 187:12
193:3,4,7,10,11,14
202:18,19 206:20
206:23 207:1,4
208:21 213:1
224:21 245:9
250:20 251:1,4,6
262:20 263:3,6
274:11 287:10
288:5 289:7,11
**recorded** 249:10
**records** 244:25
245:12
**recover** 153:18
232:22
**redirect** 264:14
269:22

**[reducing - requirements]** Page 42

**reducing** 122:17
122:25 142:21
**reed** 6:8 13:3,4
**rees** 5:15 6:10
12:10
**reese** 13:4
**refer** 59:15 92:4
125:1,5 224:2
259:4
**reference** 13:13
45:10 53:18 58:17
58:19 98:14 99:23
256:23
**referenced** 80:22
274:1,17 275:16
**references** 276:13
**referencing** 275:1
**referred** 73:17
144:14 257:21
273:24,25 274:14
274:15 275:3
**referring** 16:12
56:25 57:20 59:16
78:10,11 80:17
91:24 116:19
118:12 125:2
149:11 223:21
274:25 275:1
**refers** 92:20 96:22
248:14
**refilled** 51:3
**refilling** 58:16
**refills** 139:3
**reflect** 64:2 124:23
274:5 283:15
**reflected** 135:15
137:17 176:24
225:15
**reflects** 24:11
167:10 230:17,18

**refuse** 203:24
**refute** 211:1
**regarding** 19:5
35:2,21 75:14
77:1,11 82:21,24
103:3,11 144:5
150:17 273:6
**regardless** 189:19
191:24 217:15
**regina** 50:11,12,12
156:22 157:16
**region** 264:6,25
265:7
**regional** 267:13
**regulations** 37:12
147:1
**reinforce** 26:4
**reject** 141:23
**rel** 1:3 2:3
**relate** 177:25
215:1
**related** 11:17
32:17 100:10
108:17 109:15
119:10 150:25
151:7,20 160:25
171:3 176:25
196:14 268:14
**relates** 18:8 30:9
36:12 150:10
207:21
**relating** 206:11
**relation** 63:21
275:14
**relations** 265:23
**relationship**
140:11
**relationships**
217:7
**relative** 36:14
153:16 161:1

289:17
**release** 8:5,20
26:23 177:18
193:25
**relevance** 18:10
**relief** 82:19 84:21
84:23 222:19
239:8
**remains** 119:23
**remedied** 33:7,12
**remedy** 33:25 34:3
**remember** 47:6,20
48:16,19 64:18,19
66:20 70:5,10
195:15 207:14
218:2 254:24
267:5,19 286:19
286:20
**remove** 32:23
234:3
**removed** 32:18
210:22
**rems** 113:4,8,15
113:19,21 114:9
114:19 116:18
117:15 129:3
**remuneration**
204:5
**renaissance** 192:3
**renewed** 51:3
**rephrase** 111:6
279:14
**replace** 224:23
**replayed** 125:17
**report** 227:4
282:21
**reported** 1:24 28:2
**reporter** 2:25 92:6
212:24 283:8
287:12,14,17,20
289:2

**reporters** 34:18
221:19 224:20
**reporting** 8:8
35:21
**represent** 40:1
135:5 164:24
195:25 207:5
212:6 247:7
265:19 283:12
**representation**
62:10
**representatives**
23:5 58:25
**represented** 46:6
138:14 219:14
**representing** 63:2
70:16 213:18
275:2
**represents** 172:25
**reproducible**
239:11
**reputation** 221:20
258:15
**reputational** 285:2
**request** 29:18 67:2
**requested** 93:14
289:15
**requests** 66:19
**require** 169:4
173:24 177:19
184:24
**required** 95:7 98:7
140:12 143:9
148:7 149:21
158:18,25 248:4
254:19
**requirement**
96:11 143:12,16
150:4
**requirements**
36:14 95:4 149:14

Confidential    JAN-MS-05485990

[requirements - risks]                                                      Page 43

149:19,22,25
150:9,16,24 151:6
151:20 171:21
**requires**   114:1,3
216:4
**requiring**   223:11
**research**   61:17,21
137:15 141:9
239:15 246:2
286:6
**researchers**
268:16
**residency**   187:14
**resident**   252:22
253:22
**residents**   187:8
**resolution**   285:18
**resort**   213:8 226:9
**resource**   73:9
**resources**   73:14
121:16 143:17
153:15,16,17,19
164:7 230:10
235:1
**respect**   30:6 33:4
33:16 38:8 40:5
44:7 50:16 61:6
66:15,17 69:23
72:10 74:13 79:22
88:14 89:13,19
90:2,10,17 91:2
97:23 104:15
107:9 109:14
116:18 117:21
122:4 126:6
133:11 199:18
241:14,15 266:25
270:18 273:3,4
278:14
**respected**   46:23
211:15 214:16,19

263:11,21
**respiratory**   51:10
166:23 175:9
**respond**   269:23
**responded**   33:6
151:24 250:15
**response**   9:1 19:8
57:22 150:13
224:20 225:5,20
256:16 265:22
**responses**   224:13
225:9,12,15
**responsibility**
35:1,6,11 36:19
37:8,12 95:2
**responsible**   8:10
8:13 9:6 38:16
39:4,9,11 43:4
44:15,19 45:24
61:7 63:8,12
64:13,22 65:1
67:19,21 72:2
145:4,6 215:6
245:24 247:1,22
264:24 265:25
280:10 282:1
283:17
**responsibly**   52:5
54:20 57:17
**responsive**   34:3
**rest**   234:21
**restate**   21:19
93:16 188:22
220:14
**restricted**   158:13
**restrictions**
147:17,23
**result**   26:17 27:9
52:15 53:10 54:7
56:6 117:15
175:11

**resume**   13:14 14:1
**retain**   95:2
**retort**   215:12
232:2
**return**   16:7
**reuptake**   196:9
**reverse**   33:11
106:14
**review**   48:2 49:1
51:18 76:12 93:13
136:3 139:13
158:20 194:10
251:7 281:25
284:8 289:14
**reviewed**   41:4
47:21 138:15
282:4,5
**reviewing**   58:1
76:1
**revised**   67:18
227:21
**rewrite**   120:7
**riddled**   48:22
**right**   14:21 15:7
16:24 21:11,25
24:24 25:3 27:20
33:18 34:21 37:4
37:15 41:3 42:22
44:4 48:8,12
61:19 68:25 99:25
110:1 122:1
123:23 124:5,12
124:25 126:13
128:8 143:22
146:12 183:3
195:20 206:15
207:12 208:7
209:9,12,16 210:5
217:16,21 222:18
224:3,14 228:5,24
235:12 236:6,16

236:16,19,20,22
236:25 237:2
239:20 242:9
245:24 247:13,23
248:22 252:25
255:18 256:17,21
258:25 261:7
269:15,21 284:3
285:19
**ringing**   234:11
**rises**   114:25
**risk**   51:9 96:22,25
97:8,9,13,16 98:6
98:16,17,21 99:9
99:24 100:2,10,11
100:13,18 101:24
102:3,9,11 105:8
105:12 108:25
110:14 112:25
113:4,8,11,11,12
113:22 125:23,24
126:18,20,24
129:4 131:11
142:21 152:2
166:22 167:10
168:15 174:18
176:8 177:16
178:11,18,24
179:20 184:5
199:24 226:15
232:20 244:2
253:14,15,18,20
253:25
**risks**   28:22 33:17
50:17,21,25 51:6,8
51:10,13 71:2,7,17
71:25 97:5,18,23
97:25 100:21
101:11 105:3,4,9
105:16 107:6
108:1,3 110:13

Confidential                                                              JAN-MS-05485991

**[risks - see]**                                                                 Page 44

117:8 126:10,25
128:8,11,14,23
129:5,13,19 130:1
130:12,17,20
131:4,8,16,19
139:8 151:7,14,21
161:16 167:8
174:13,16 175:23
176:5,10 177:8,12
179:5,8 184:9
210:4,17,17 211:5
226:16 244:6
**risky** 106:22
**rmp** 98:25
**rmr** 1:25
**road** 42:18,19,20
185:3
**robinson** 5:17
12:10,10
**robust** 72:21
152:21
**role** 62:24 65:14
74:24 75:5 122:17
122:25 123:5,7
191:20 211:17
223:11 229:14
231:10 250:7
258:20,22
**roles** 203:5 218:13
218:14 219:9
**room** 183:14
203:11 249:2
274:6
**root** 41:4
**roots** 106:2
**rough** 287:12,13
287:18,20,22,23
287:24
**routinely** 177:15
**rude** 114:7 240:12

**rule** 262:5
**rules** 148:1
**run** 25:14 26:14
79:15
**running** 178:18
240:15
**ruse** 239:2
**ryan** 6:4 12:25

**s**

**sacramento** 1:21
2:22 11:1,15
**safe** 41:13,19 42:1
43:16 53:25 69:2
69:8 82:18 99:1
143:9 160:12
222:15 223:6
233:19
**safely** 42:22
112:10,10 254:19
**safer** 160:13
176:15
**safety** 97:16 99:1
100:10,13,25
190:3 242:6 258:3
260:20
**salary** 287:2
**sarcasm** 241:22
**sat** 48:19
**satisfied** 19:16
**saw** 244:24 271:14
281:5 286:16
**saying** 15:16 126:9
181:20 204:8
253:4 261:4
281:11 286:17
**says** 17:7,18,18
19:15 20:10,18
24:24 28:21 31:22
36:19,25 37:10,11
41:10 51:17 63:16
65:24 94:4,22

95:1 96:4 97:7,16
98:20 118:11
119:9 132:15
157:7 168:10
173:16 194:9
208:14 212:10
213:16,19,21
226:15 236:15
241:23
**scale** 236:8 237:23
240:5
**scenario** 219:2
**schedule** 166:18
166:19
**scheduled** 162:12
**school** 135:1 190:6
191:22 192:1,19
252:23
**science** 159:7
188:3,6 189:2,12
189:20 203:3
228:9,10 241:5,8,9
241:10,12
**scientific** 94:5
163:22 188:18
**scope** 265:16
267:4,16 268:21
269:12 270:2,17
**scott** 1:21 2:20
5:14 7:3 8:6 9:1,7
11:4,10 12:9
288:2,21
**screen** 52:14 138:9
**screening** 52:9
244:1
**screens** 138:22
**scrutiny** 140:24
**scully** 5:15 6:10
12:11
**second** 22:15
31:22 39:9 40:8

49:6,8,9,15 67:18
68:1,21 69:23
70:20 71:15 72:17
72:18,20,23 73:13
92:19 131:23
174:20 192:1
193:23 208:10
222:2,3
**secondary** 164:7
**secondly** 30:24
**secret** 202:9
**section** 173:13
281:25 282:5
**sector** 141:6,11
**sedation** 51:11
**see** 17:21 19:17
20:11,14 26:5
32:1 36:17,20
37:6 39:14 40:18
40:25 45:3 50:6
58:9,14 61:13
63:22 65:24 68:5
68:22 69:3 92:21
94:4,10,21 95:4
96:7 97:19 98:17
100:8 112:19
118:8 119:6,11
120:20 121:3
132:4,20 138:9
154:11 156:10
157:4,8 159:2
165:2 166:2
168:25 169:6
173:19 174:19
175:1,3 193:24
194:9 197:3
200:13,17 208:17
209:6 216:1 227:1
227:6 231:14
234:4 245:8,12,13
263:18 267:24

Confidential                                                                 JAN-MS-05485992

**[seeing - solely]**

seeing 180:21
seek 62:24 214:18
seeking 231:4,6,7
  272:17
seen 17:1 21:13
  42:9 53:14 67:14
  132:9 136:5,15
  164:19,22 185:1
  201:2 215:3 257:9
  261:10
select 106:25
selective 215:25
  216:14
sell 246:3
senate 265:22
senator 259:10
  260:2
send 47:25 48:1
  69:24 70:4
sense 19:11 48:4
  53:24 62:7 65:8
  122:8 200:25
  201:7 237:13,17
  241:21 252:4
sensitive 223:6
sent 32:9 48:6,14
  48:15,16,17
  221:13
sentence 28:20
  100:8 118:10,11
  121:4 175:4
  221:17 227:12
sentences 175:4
  226:14
separate 115:1
serious 173:16
seriously 42:13
servant 211:17
serve 199:10
served 84:13

serves 205:9
service 27:23
  29:16 31:1 219:11
services 46:6,7
session 248:19
set 112:18 145:13
  201:15 289:5
setting 145:9
  181:17
settled 15:20 16:4
  16:4 18:2
settlement 8:4,19
  17:7,11 18:9
  20:10 21:7,14,15
  21:21 24:10,23
  26:21 27:10
  207:11,14 208:5
  248:13,22 273:17
  273:19,23 274:2
  274:13,18 275:3
  275:15,17,22
  276:6,11,13 277:9
  284:18 285:15
settling 284:22
severe 181:14
sex 245:7
shape 48:23
share 199:1
  201:16 254:4
shared 254:5
shares 258:24
  260:12
sharing 200:14,18
shift 184:6 239:24
shill 31:5,8 34:15
  211:17 219:6
  260:18
short 104:25
  125:13 173:24
  184:7

shortfall 130:25
shorthand 2:25
  289:1,9
shortly 280:20
show 93:3 117:22
  192:22 201:21
  213:16 254:22
showed 92:16
  133:12 271:24
  286:16
showing 240:4
shown 134:1
  167:21 194:22
  195:15 202:12
  205:2 207:10
  249:23 251:12
  252:18
side 48:6 154:10
  236:16 243:12
sign 117:16 142:7
  166:12 287:8,16
signals 234:2
signatory 66:22
signature 289:24
signed 17:4 58:25
  165:3
significant 36:4
  76:11 122:17,25
  201:12
significantly 121:3
  121:10,14
signs 177:15,19
  245:21
similar 176:3
simple 253:15
simplistic 70:21
  222:5
simply 171:18
  183:15 216:3
  282:14 286:2,3
  287:3

single 180:4
  184:13 285:4
sir 33:16 68:11
  84:13 104:6 120:9
  176:2 214:1
site 32:1
sitting 30:12 60:20
  60:23 75:7,13
  76:18 77:7,9
  80:10 83:18 84:4
  85:13,15 87:19,25
  88:7 126:5
situations 176:6
six 22:16,17 23:20
  94:1 249:4
skin 172:22
slammed 256:6
slightly 162:16
  180:8,8,14 182:11
  246:19
slowly 172:23
small 106:20
  246:16
smf111 8:23
smfishman 9:9
snyder 6:4 12:25
  13:1
social 53:23
  184:12
socially 153:10
society 44:9,11,12
  45:22 84:14,16,19
  84:22 85:6,16,24
  86:8 87:14 88:16
  89:16,16 184:22
  271:5
socioeconomic
  185:20
sold 247:13
solely 31:1

Confidential                                                                                      JAN-MS-05485993

**[solid - statement]**

**solid**  105:5
**solution**  106:11
**somebody**  232:21
**somebody's**
 240:14
**someone's**  238:21
**somewhat**  29:17
**soon**  240:15 260:3
**sorry**  16:25 22:22
 26:12 37:4,5
 61:25 68:12,15
 84:10 91:22 93:16
 114:4 121:25
 132:4 156:17
 157:10 179:6
 188:22 205:11
 220:14 227:13
 240:10 247:3
 270:4
**sort**  37:22 41:10
 46:18 65:6 69:24
 76:19 79:20 80:17
 94:13 104:16
 148:9 182:22
 206:10 209:7
**sought**  66:17
 70:12 211:14,15
 214:19 230:16
 263:12
**sound**  70:21
 209:16
**sounds**  76:11
 209:21
**source**  129:13,25
 130:1 192:18
 198:17 200:7
 216:11
**sources**  128:11
 129:5,19 130:19
 131:18 161:15,21
 161:24 199:18

222:20
**south**  4:7,17
**speak**  20:4 21:4
 81:22
**speaker**  197:2
 204:20 263:12
 271:2
**speaker's**  197:13
**speakers**  89:3
 280:2
**speaking**  101:24
 263:24
**special**  8:16
 184:23 233:3,13
 233:17
**specialists**  107:20
 198:9 203:10,18
**species**  234:10
**specific**  63:2 86:16
 86:17 88:11 89:24
 90:5,8 97:17
 133:11 150:9,20
 150:21 162:21
 163:2 172:8 173:6
 186:1 221:19
 224:13 251:23
 264:6,25 267:13
 269:25 272:18
**specifically**  166:14
 177:24,25 196:23
 216:7 269:3 273:3
 274:1,17 275:3,16
 277:25 278:7
 280:14
**specifics**  149:18
**specious**  223:8
**spectrum**  239:23
**speculation**  268:3
**speech**  269:2
 271:2

**speeches**  264:2
**spelled**  195:18
**spelling**  196:1
**spend**  52:20
**spent**  155:18
**spikes**  115:2
 116:16
**spinal**  105:20,22
 106:2,2,17 190:13
 256:2
**spine**  105:22,25
**spirit**  95:19
**spoke**  73:18 89:5
 156:4 263:9
**spoken**  136:16
**sponsor**  84:22
 86:21,25
**sponsored**  43:5
 100:16 271:3
**spots**  206:21
**spread**  210:3,13
 211:4 229:24
**spreading**  215:7
**spreadsheet**  209:7
 209:7
**stacey**  8:6
**staff**  62:21 80:5
**stand**  106:3 190:2
 215:5,14 238:8
**standard**  53:15
 55:16 143:3
 144:10,18,19,20
 144:22,24 145:9
 145:16,21 159:2
**standing**  160:20
 287:24
**start**  106:3 141:17
 149:24 214:11
 233:25 252:20
 261:13

**started**  51:24 79:9
 185:4 227:12
 239:18
**starting**  42:9
**starts**  209:11
**state**  1:1,3 2:1,3
 11:12 12:5,6
 14:20,23 15:1,8
 21:13 24:20 40:11
 40:12 57:22 58:24
 59:1,2,5,7 61:16
 61:20 62:8,10,19
 62:23 80:24 92:16
 93:2,9,19 102:17
 102:19 127:7
 132:1 133:12
 134:2 141:24
 143:5 144:22
 145:25 146:3,4,9
 146:15,20,25
 147:10,15,17,24
 148:10,13,18,18
 148:21,25 149:3,4
 149:13,14,21,24
 150:5,9,15,24
 151:5,19,24 154:4
 155:18 156:10,17
 157:17 158:15
 189:2 212:8 266:1
 266:10,15 269:8
 270:1,14 273:18
 275:21 276:4,10
 280:16,17 289:2
**state's**  13:17 77:20
**stated**  32:11 43:23
 182:9
**statement**  37:18
 63:2,16 68:25
 82:12,15 121:9
 141:18 167:3
 169:18 174:25

Confidential                JAN-MS-05485994

[statement - supported]                                                      Page 47

176:14 221:24
227:17 235:3,17
262:8,11 263:13
**statements** 26:3
90:18,25 91:4,14
124:22,23 138:4
222:24,25 226:20
241:4,7,16,17
249:14 273:24
274:14
**states** 59:2 62:9
63:5 82:16 118:23
119:24 137:12
138:11 145:7,15
149:7,11 156:18
169:1
**stating** 49:6
**status** 185:20
**stay** 153:9
**steady** 115:1,2
116:16 144:25
**stenosis** 105:21
106:18
**step** 54:16,19 55:8
55:23 56:11
146:13
**stepping** 230:7
**steps** 52:4,9,19
57:11,15 70:22
**stern** 175:13
**steve** 12:8
**steven** 5:16
**stimulator** 256:2
**stipulation** 20:10
**stop** 134:7,10
143:20 165:17
217:6,7 234:6,12
262:17
**store** 112:10
**stories** 260:13

**story** 202:16,19
222:13 230:10,11
232:1,4 256:7,9
257:3 258:5
**strategic** 97:16
**strategies** 97:4
**strategy** 46:22
113:5
**stratifying** 244:2
**street** 2:22 4:17
5:8 11:14
**stress** 107:3 285:6
285:7
**strike** 26:19 28:11
35:18 54:17 55:12
58:18 60:12,22
66:16 73:19 74:12
77:8 79:18 85:14
89:14 91:1,10
98:5 102:17
107:25 109:17
110:13 113:18
115:8 127:5
142:15,18 146:14
153:1 162:15
169:12 170:4
179:6 180:13
188:1,5 192:10
196:4 198:15
244:19
**strive** 286:9
**strong** 176:13
257:24 260:12
**student** 191:21
192:14
**students** 130:8,12
187:6
**studies** 118:12,24
**study** 137:11
138:15 143:1

**stuff** 134:15
224:22 242:9
280:21
**sub** 168:24
**subdivision**
135:11
**subject** 98:21
102:3 112:25
114:8 137:9
154:20 166:24
184:16,19 260:14
**subjective** 112:14
239:5,10
**submit** 138:9,21
**submitted** 137:19
163:22
**subpoena** 15:13
**subpoenaed** 104:3
**subscribed** 288:22
289:20
**subsequent** 57:5
**substance** 46:6
177:10 178:10,17
178:25
**substances** 154:5
154:12 166:19
167:16 226:19
**substantial** 50:25
51:12 169:25,25
170:12 171:19
258:20
**substantially**
181:24
**substantive**
193:24 248:9
281:13,17
**subtle** 131:9
**subtly** 86:23
**succeeded** 255:25
**successful** 55:6

**sue** 210:20
**sued** 14:23 15:1,8
15:11 18:11 22:15
142:3,4 207:19
209:21,25
**suffer** 152:20
226:25
**suffered** 183:22
233:2
**suffering** 115:18
256:10
**suffocates** 106:2
**suggest** 118:12,24
260:24
**suggested** 167:22
167:23 248:5,11
282:20
**suggestion** 196:23
**suggests** 46:4
182:20 186:6
238:5
**suitable** 237:24
**suite** 3:8,17 4:8
5:9,20
**sunday** 256:16
**supplement** 26:3
**support** 37:23
41:18 42:1,16
60:4 62:11 63:7
64:7 123:9 141:21
143:2 145:5
210:24 215:4
216:21 230:18
232:9 234:9 239:2
241:10 256:8
285:5 287:2
**supported** 41:11
44:3,5,15,18 45:25
69:1 94:17,18
96:14 125:22
241:5

Confidential                                                      JAN-MS-05485995

supporter 43:15
supporters 40:24
　41:9,10 43:11
　44:23 68:21 69:8
supports 82:17
　253:14
suppose 74:21
supposed 89:2
　267:8
supposedly 213:9
sure 11:22 12:16
　16:1 21:21 27:8
　36:24 38:4 44:22
　50:22 52:20 55:25
　56:13 60:2 66:24
　70:15 80:10 86:14
　89:11,13 92:8
　93:19 99:12,14,17
　100:15,24 104:2
　104:23 105:18
　111:6 112:22
　117:19 120:16
　122:11,24 123:9
　124:2,10 126:5,16
　130:23 159:25
　188:25 192:25
　193:7 198:21
　199:20 206:22
　213:2 217:11
　220:15 221:6,9
　225:14 243:22
　250:14,25 262:22
　267:8 282:18
surgeon 50:13
　156:17,24 157:15
surgeries 174:1
surgery 106:13,16
surgical 106:12
surprise 186:21,24
　187:1 252:7

surprised 238:22
surrogate 201:1
surrounded
　165:20
surveyed 118:17
　119:1
surveys 198:8
survive 106:15
　234:10
suspect 73:24
　268:11 277:24
　282:2
suspicion 267:6
swap 206:21
sway 155:20
　216:15
switch 170:23
switching 172:9
sworn 26:2 288:22
　289:7
symposia 269:2
system 62:9
　154:21 155:1,1,8,9
　155:19,21 159:24
　172:21 173:18
　217:10 233:18
szakrzewski 5:23

**t**

t 98:17
table 134:15
　137:18,21,25
　138:2
tabu 184:16 192:8
tactics 259:10
tailor 142:6
take 25:16 31:21
　36:15 42:12 52:5
　52:20 53:1,8,17
　57:11 63:5 68:10
　68:16 70:22 91:19
　100:6 101:16

109:3,4 112:9
　134:15 143:21
　157:18 184:8
　190:7 193:8
　195:10 197:24
　203:20,24 223:10
　235:12 236:10,18
　237:14 260:16
　262:21
taken 2:21 143:25
　288:4 289:4
takes 216:2 231:25
　250:20 285:7
talk 99:20 119:5
　203:20 235:14
　237:4 245:15
　264:19 266:23
　267:12,25
talked 13:12 34:25
　38:6,15 62:4
　114:7 126:7 127:6
　128:7 129:3
　145:25 207:6
　228:9,16,18 233:9
　242:12 248:13,19
　254:22 255:3
　256:23 273:18
　284:2
talking 47:5 73:18
　144:5 149:7 152:8
　193:19 208:6
　220:1 226:24
　228:8 237:11
　256:15 269:15
talks 120:25
　177:25 263:20
　267:7
taped 28:21
tapentadol 193:25
target 166:25
　238:24

taught 187:6,8,10
　190:9
teach 187:19
teacher 130:8
　186:22,23
teaching 130:11
　187:4 192:18
　199:17
teachings 187:25
　188:3
telephone 12:13
　12:22
tell 16:7,9 40:4
　92:5 124:7 156:20
　186:22 210:11
　215:6,14 218:7
　219:1 229:21
　230:10 233:10
　255:18 258:5
　259:5 285:23
　286:2,4,10,10
telling 22:4 228:11
　234:12 240:14
　256:7,9
tells 230:11
ten 105:4 125:22
　131:3 144:25
　240:5
ten's 240:5
tend 106:25
term 53:18 71:8
　104:25 108:14
　120:17 142:23
　144:16 214:13
　242:13,22 243:1,3
　245:17 279:4
　280:2,23
terminal 184:5
terminology 72:19
terms 19:16 30:22
　42:7 75:21 148:24

Confidential　　　　　　　　　　　　　　　　　　　　　　　　　JAN-MS-05485996

[terms - time]                                                                                    Page 49

158:9 186:11
203:23 259:17
test 126:9
testified 11:6
135:22 144:9
162:3 198:4
265:20
testifying 235:19
274:20 289:7
testimony 26:4
144:7,11 146:1
153:23 158:10
161:18 168:3
180:17 244:15
263:11 288:4,6
289:11
teva 1:9 2:9 4:3
11:23 28:11,12
29:12 31:19 33:4
88:1 205:2,22
texas 3:7,9,16,18
154:23
text 50:3 68:12
165:20
thank 63:4 68:20
92:2,13 128:5
150:23 156:3
161:12 167:2
177:21 195:12,13
201:25 206:18
209:1 221:16
236:14 238:7
240:10 242:11
243:5,21 244:17
247:1 250:22
251:15 252:17
262:17,19 269:16
287:6,7,21
thanks 38:25
101:16

therapeutic
159:16,23 216:12
therapy 142:23
169:2 170:7
171:20 175:7
180:10 182:2
183:21
thin 215:2
thing 166:2 208:25
214:15 216:20,21
246:20 256:19
things 24:17 57:10
148:9 153:17
182:22 184:4
185:4 189:18
207:10,15 217:24
221:16 224:10
226:23 232:19,25
234:3 235:9,10
237:2,22 241:10
242:11,20 245:15
252:10,15 254:19
256:25 263:25
269:21 273:11
286:10
think 13:7 15:17
15:19 16:4,5 18:9
25:12 26:14 30:17
42:18 45:19,20
46:3 47:11,11,17
49:15 51:9,17
55:2 58:8,24 59:1
60:5 61:23,25
64:9,18 67:5
73:12 78:7 80:1
86:15 87:7,9,12
89:5 94:16 95:19
99:15 100:20
105:2 109:8
112:21,22 120:2
121:23 123:6,8

124:11 130:24
131:21 140:4,13
141:24 142:1,15
142:17 143:16
144:9,19 145:2,12
148:14,22 149:11
149:13 150:6
151:13,17 154:23
155:10 157:19
158:6,14,17,18
159:10,13 161:11
161:20 167:5,9,24
171:1,17 176:13
178:2 179:19,19
179:22 180:15
181:4,4 183:12
184:10 185:7,10
189:4,9 192:6
194:17 196:19
197:11,12 198:4
199:15,19,20
202:9,15 203:19
205:8 206:7,9
211:16 215:24,25
216:14 217:1,14
217:24 227:19,19
231:2,20 232:22
238:7,17,22 239:4
241:7,11,24 244:9
247:3,25 256:1,4,6
259:21 260:1
261:12,17 262:16
263:10,17,18
264:16 269:20
276:12,19 282:14
284:1,6 287:1
thinking 120:6
135:15 179:21
181:9 183:18
196:16 228:7

third 39:10 40:15
72:15,17 77:17
157:3 164:11
208:10 221:17
265:24
thirds 138:20
thought 18:24
74:7 83:2,10 85:5
91:13 155:22
175:22 185:2
192:7,8 219:15
227:19
thoughts 221:15
threat 233:25
threatening
173:17
three 72:8,10
90:17 156:11
161:5 269:24
threshold 181:23
184:25
tie 189:11
ties 8:21 219:21
till 196:25
time 21:2,4 22:15
22:17,25 24:17
26:13 32:17 42:5
42:17 47:5,10
49:3 52:21 53:1,8
64:19 65:3,12
72:20,22 74:20
78:25 80:2 124:25
134:9 140:20
143:1 148:5,12,18
154:23 155:1,18
157:24 171:14
173:24 176:23
177:7 188:7
189:13,21 190:16
190:19 192:2,6,23
194:18 220:22

Confidential                                                                                    JAN-MS-05485997

**[time - twice]**

221:7,12,25 223:6
224:23 225:16
226:1,10 227:18
229:18,23 232:23
234:13 237:16
240:15 241:3,6,9
241:17 242:7
245:8 247:15
253:10,10 258:3
262:16,18 269:20
279:12,25 280:5,7
281:18 284:7
285:7,25 286:11
289:5
**times**  22:6,13
197:14 201:1
282:24
**timing**  25:14
**tirf**  113:19,21
114:2,9,19 116:18
117:15
**tissue**  172:23
**title**  38:22 118:5
229:13
**titled**  28:16 39:10
61:11 255:21
**today**  15:16 30:12
60:20,23 75:7,13
76:18 77:7,9
80:10 83:18 84:4
84:17 85:13,15
87:19,25 88:7
105:3,10,14 120:7
121:21 126:5
161:14 177:22
178:3 188:13,18
189:19 208:6
217:7 218:2
223:18 226:2,12
226:21 235:8
238:2 242:21

243:2 248:2
252:25 253:2,10
253:25 257:19
263:10
**told**  143:20 205:11
**tolerance**  169:3
**tolerant**  115:25
122:6,14,19 123:2
173:22 175:7,8
**tools**  237:7 240:7
**top**  68:6 92:9
112:23 125:13
221:18 227:1,9
236:15,16
**total**  169:4
**touched**  64:11
**tower**  5:7
**track**  154:4
277:18
**trained**  222:16
**training**  114:3
150:7 187:14
**trainings**  87:7
**transcribed**  289:9
**transcript**  19:3,5
288:3 289:10,13
289:15
**transdermal**
172:21 173:18
**transitional**  192:6
**translated**  86:22
**transmucosal**
65:21 99:20 100:3
113:7,24
**transparent**  58:11
174:18
**transparently**
97:3
**traumatic**  230:6
232:5

**traumatized**
230:12,13
**treat**  106:10 112:1
112:1 175:17
184:8,10 186:11
227:2
**treated**  9:4 118:16
124:3 177:17
227:24
**treating**  53:24
118:25 123:1
**treatment**  8:21
54:18,25 55:2,3,5
55:6,7,9,12,14
57:1 108:9,10
115:24 120:4
123:25 152:20
182:6 184:9
188:13 192:15
210:19 219:20
232:16 235:2
263:12 268:14
**treatments**  256:12
**trending**  79:12
**trends**  42:8
**trial**  224:23
**tried**  110:9 202:23
232:21
**tries**  154:7
**trigger**  197:2
**triplicate**  155:7,21
**trouble**  178:18
**true**  34:21,23
101:2 120:12
134:4 135:17,17
141:5 149:13
171:13,14 198:15
198:16 210:7
212:3 213:10
215:9,11,18 229:3
231:19 235:3,16

235:22,23 238:5
255:14 262:14
264:22 281:1
288:5 289:10
**truly**  62:7
**trust**  140:10
**truth**  16:8,9 22:4
259:22 285:23
286:2,4,10
**truthful**  104:4
**try**  24:20 170:23
180:7 213:2
217:25 220:5
221:5 239:12
242:18 249:18
254:6,9,13
**trying**  13:21 76:3
106:21 131:1
158:22 159:4
216:13,17,23
218:6 221:10
238:25 239:9
240:12,14 258:2
258:14 260:20
**tuned**  124:15
**turn**  20:9,13 39:8
40:8,9,14,15 49:25
50:5 65:23 68:1
91:19 92:19 93:9
94:1,20 96:21
97:7 98:11 99:22
99:22 100:7,24
118:7 121:1
131:19 153:8
233:24
**turned**  201:4
234:1
**turning**  68:19
132:2 240:10
**twice**  22:11

Confidential                                                                JAN-MS-05485998

twisted 211:17,20
two 8:21 20:9,10
  30:18 70:4 98:11
  100:5 128:5
  132:15 138:20
  154:7 161:5
  168:24 175:4
  179:14 184:4
  193:9 208:23
  219:20 226:14
  244:9
type 87:7 99:17
  181:17
types 153:1 167:16

**u**

u.c. 135:1
u.s. 265:22
ucdavis.edu 9:9
uh 17:23 20:17
  28:1 39:13 40:17
  43:14 45:12 66:1
  96:24 98:13,15
  113:16 118:14
  156:7 208:12
  242:23 248:21
  252:6 272:15
ultimate 125:20
  259:24
ultimately 76:9
  108:13 116:7,15
  218:16 257:8
  259:16,21 260:2
  261:10
unbeknownst
  219:13
uncomfortable
  89:4 124:19 217:2
uncorrected 50:10
underlined 173:16
  174:25 175:4

underlining
  174:24
underlying 164:2
  173:15
underneath 41:10
  98:19
undersecretary
  47:19
undersigned 289:1
understand 19:8
  80:16 94:23
  131:19 144:21
  149:10 158:20,25
  159:4,7 165:10
  174:13,16 181:19
  190:12 191:4,7,10
  191:19 196:20
  216:16 230:20
  231:21 234:8
  238:18,20 253:7
  256:10,11 262:2
  266:10 273:18,22
  274:12 276:2,4,10
  278:25
understanding
  19:2 39:24 55:4
  94:12 95:14
  115:25 116:20
  117:1,13 124:15
  131:3,16 135:7,16
  135:24 139:18
  141:1,10 148:10
  161:9,16 165:23
  166:9 167:8
  227:23 239:15
  253:24 266:8
  275:11
understands 216:5
understood 50:25
  172:6 185:19
  200:23 231:13

266:13,23
undertreated
  240:21
undertreatment
  119:11,23
underuse 150:13
unfortunate 217:1
unfortunately
  216:4,18 226:17
  241:11 246:11
  248:8 285:13
unidimensional
  222:6
unified 239:10
unintended 42:9
  161:6
united 59:2 62:8
  119:24 137:12
  156:18
university 92:24
  93:4 94:14,23
  203:25 284:11
unnecessary
  179:24 243:7
unprofessional
  245:10
unremitting
  234:20
unrestricted 8:11
  61:12
unsophisticated
  222:4
unwitting 125:11
unwittingly
  124:14
upbeat 225:23,24
updated 73:12
  74:5
upfront 68:25
upset 220:25

urgency 184:8
urgent 65:4
  232:21
usa 1:9 2:9 28:11
  28:12 33:4 88:1
use 19:3,5 28:23
  29:10 30:25 33:18
  42:1,8,25,25 46:6
  50:17 55:3 65:4
  65:11,13 68:2
  99:1 104:20,24
  105:2 108:14
  112:11 113:6,10
  125:5 134:9 141:2
  141:11,22 144:6
  144:16 145:3
  148:6,15 154:15
  154:16 158:9
  160:2 161:15
  164:6 174:1,3,25
  175:6,8 178:25
  181:9,21 182:6,19
  182:24 190:3
  197:3 203:4
  226:18 229:25
  235:24 237:8,9
  239:16 242:22
  243:1,1,3,17
  258:21 260:21,23
  263:13 268:14
  273:7
useful 159:14
usually 65:21
  153:20 172:1
utilization 121:16

**v**

v 25:17,19
vague 16:18 25:11
  280:7 282:16
vaguely 13:19

Confidential                                                                   JAN-MS-05485999

[vargas - widely]                                                                                    Page 52

**vargas** 9:8 255:1
255:22,23,24
261:23
**variables** 35:9
**various** 13:16
17:11 46:12 52:4
77:17 86:4 96:13
140:2 144:6 207:7
271:15 272:3
**vast** 146:17 180:16
**vegas** 206:9
**venues** 209:22
211:24
**veritext** 11:17
**vernacular** 47:3
**version** 31:24 39:7
40:2,5 41:17
194:22
**versions** 59:14
224:24
**versus** 9:5 11:13
183:19,22 185:9
240:21
**veteran** 230:6,13
**veterans** 234:25
**vice** 255:24
**video** 11:8 12:16
12:19 29:24 30:14
31:24 32:11,17,23
101:17,20 143:23
144:1 193:1,4,9,11
193:14 206:22,25
219:10 250:25
251:3 262:20
263:2,5 287:10
**videoconference**
249:7
**videographer** 6:12
11:16
**videotaped** 1:21
2:20 249:10

**view** 55:16 79:23
102:2 116:2
154:10 166:7
216:20 244:21
263:20
**viewed** 48:5
108:25 140:16
184:22 200:20
214:15
**views** 228:10
258:24 260:22,23
**vigilance** 42:12,13
158:8,12,14,17
184:24 246:14
**vigilant** 185:8
186:12
**violating** 262:4
**virtue** 184:21
233:20
**virus** 285:10,13
**viscerally** 231:22
**visit** 125:14
**visual** 235:25
236:5
**volume** 1:22 2:21
7:4 11:11 73:15
198:16
**vote** 76:9
**voting** 76:8
**vs** 1:6 2:6

---

**w**

**w** 5:5 70:8
**wait** 122:2 196:25
212:16 274:9
**walk** 50:4 106:22
128:10 181:8
183:14
**walking** 106:4
**wall** 87:10
**want** 15:7,11 16:8
18:12,13 19:2,7

28:6 50:4,8,23
60:9 107:3 112:15
112:17 124:8
128:10 134:7,8
154:16,24 155:24
156:5 165:10
180:1 193:22
201:21 205:25
213:13 217:11
221:4 243:14
250:17,23 254:6
287:12,17,20,22
287:24
**wanted** 27:3 29:20
48:3 67:7 70:15
99:16 100:16,21
130:17 134:20
135:3 141:15
158:1 204:4
211:22 231:1
243:22 248:2
252:9 256:9 287:3
**wants** 239:24
**war** 230:6
**warning** 165:23
166:1,15,16
168:25 173:14
174:20 175:13
**warrant** 171:6
172:9
**wasting** 153:18
**water** 193:6
**watson** 1:15,16,17
2:15,16,17
**way** 27:6 48:22
59:25 64:10 90:13
103:1 123:15
124:21 127:10
135:7 139:25
140:7 148:16
156:14 170:3

180:9 183:5
194:25 195:2
209:12 221:2
235:15 237:4,16
239:11,11 248:3
261:13 286:10,11
**ways** 49:2 109:7
163:12 218:19
234:13 235:14
239:8 261:18
**we've** 73:17
112:18 127:6
128:7 129:3 131:1
155:1 217:8 225:4
233:9 287:15
**weak** 105:7 131:10
167:24 168:6
253:7
**wear** 234:17
**website** 31:3
219:13 267:1
**wednesday** 1:22
2:23 11:1
**weighs** 254:1
**wellness** 45:17
**went** 47:10 125:15
144:4 154:18,23
155:11 156:16,24
157:11 192:1
230:7 247:25
**west** 5:8
**whatsoever** 74:25
**whereof** 289:19
**white** 46:22
179:22
**whoops** 247:2
**wide** 273:14
**widely** 48:7
140:18,21,22
141:2,11 142:11

Confidential                                                                          JAN-MS-05486000

[widespread - working]                                                      Page 53

widespread  36:7
 87:15
william  5:5
william.oxley  5:12
willing  49:1 51:14
 254:10
willingness  186:11
wind  153:17
wisconsin  284:11
wise  60:14
wish  257:6 261:8
witch  257:4,22
witness  7:1 14:3
 14:18 15:5,11,25
 16:22 17:15,25
 20:1,7 21:1,5,19
 22:3,11,22 23:3,13
 23:24 24:3 25:5
 25:12 26:7,12
 27:6,12,19 29:5,15
 30:2,9,17 31:12,17
 32:7 33:10,22
 34:11,23 35:9
 36:1,6 37:20 38:1
 38:13,20 41:7,22
 43:8 44:18 46:3
 48:25 51:16 52:17
 52:24 53:13 54:10
 54:14,22 55:18
 56:3,9,16 57:8,15
 59:7 60:17 61:3
 61:25 62:18 64:6
 64:17 65:10 66:13
 67:5 69:11,16,21
 70:25 71:5,11,21
 72:14 73:9 74:17
 75:3,18 76:16,23
 77:14 78:13,20
 79:2,8 80:1 81:14
 81:22 82:6 83:8
 83:23 84:11 85:11

85:20 86:11 88:5
88:11 89:24 90:8
90:22 91:7,17
93:7,13,16,23
94:16 95:11,17,24
96:17 98:2 99:12
100:20 101:5,14
102:6,23 103:5,13
103:19,22 104:2,3
104:19 107:13
108:7 109:23
111:25 113:3
115:11 116:6
117:5,11,19
118:23 120:1
121:6,19 122:1,8
122:22 123:5,23
124:7 125:5
127:13,20 128:2
128:20 129:1,8,16
130:5,14,22
131:21 133:2,8,15
133:21 134:4,10
134:14 136:3,11
136:20 138:17,24
139:5,15,23 141:5
141:20 142:25
143:16 145:12,20
146:7 147:3,8,14
147:21 150:20
151:3,9,17 152:5
152:17,24 158:17
159:16,18,22
160:10 161:4
162:10 163:7,25
164:6,15 166:5,11
167:13 168:17
169:23 170:9,18
171:1 172:1,13
173:4,11 176:13
177:3 178:7,14,21

179:3,11,17 180:1
181:3 182:1,9,17
183:12,25 185:16
185:22 186:5,16
187:22 188:9,22
189:4,16,24
190:19 191:17
193:5 194:5,17,25
195:7,23 196:11
196:19 197:11,22
198:21 199:4,15
200:11,17 201:19
202:22 204:8
205:5,14,21
206:19 207:24
208:23 209:20
210:9 211:8,13
213:15 214:4,6
215:11,20 217:1
219:4 224:16
225:18 227:15
228:14 230:2
232:14 233:7,16
235:5,20 236:8
237:7 238:4,15,17
239:20 241:25
242:16 243:16
245:4 246:9,23
248:7 249:4
251:21 252:14
254:18 259:9,21
260:11 261:7
262:6,14 263:17
264:8,15 265:6,17
266:6,19 267:5,18
268:5,11,24
270:22 271:11,23
272:8,25 273:10
274:5 275:11,19
276:8,19 277:16
278:7,17 279:21

281:5,16,23
282:10 283:4
284:10,25 285:2
285:21,25 286:14
287:1 289:19
witnesses  289:6
wong  236:19,23
 237:23 238:9
 239:16 240:6
word  16:4 29:20
 33:25 47:2 53:18
 113:10 132:20
 158:22 186:18,22
 194:2 199:4
 211:24,24
words  135:22,25
 136:17 240:3
 281:5
work  14:3,6,6,8,14
 62:2,19 80:6
 87:10 106:25
 120:12 132:16,16
 137:4 140:4,8,25
 155:20 210:16
 214:20,24 215:24
 216:2,10,19,23
 217:12,16,22,22
 218:18 229:22
 230:23,24,25
 237:10 263:20
 264:1 273:3,4
 285:8
worked  46:21
 75:21 210:2,13
 211:2 212:11
 279:25
working  80:5
 82:11 86:18
 171:23 172:2,3
 216:3 286:8

Confidential                                                                JAN-MS-05486001

[works - zero's]                                                    Page 54

works   14:4 216:5
  216:8 240:2
world   203:8
worried   140:15
worry   158:24
worse   120:4
worst   240:5
worth   234:4
worthy   204:11
wound   31:2
wounds   9:3
  228:19,24 229:2,7
  229:18,23,24
  230:2 231:18
  234:25
wrap   13:23
wrapping   280:17
write   116:20 126:6
  126:8 148:6 229:2
  234:24 254:14,20
writing   41:23
  52:21 53:3 54:3
  55:15 56:14 57:4
  102:4 114:1
  127:11,17,24
  128:24 131:17
  157:18 215:6
  229:22 230:4
  235:10 245:16
written   26:2 42:6
  47:2 56:7 57:21
  76:5 107:11
  117:14,17 135:25
  136:17 157:24
  161:2 213:24
  224:13 225:9,12
  225:15 236:3
  241:1 248:15
  254:23 273:6,11
  273:12

wrong   200:13,17
  200:19 235:12
wrongdoing   33:11
wrote   35:18
  154:19 157:12
  176:23 184:19
  220:13 223:1,17
  225:14,16 226:10
  226:21,23 227:18
  227:20 228:2
  230:2 235:7
  236:24 241:3,18
  245:23 256:14
  257:17 262:11,11
  262:12 264:23
  265:6,9 284:2

              x

xeroxed   211:24

              y

y   2:22 11:14
  195:23
yeah   21:5 25:20
  36:24 37:3,4,10
  38:5 39:23 43:24
  50:8 70:10,19
  95:22 98:13 118:9
  120:11 122:11
  123:17 132:6
  134:13 139:15
  157:1,6 172:4
  192:25 193:2
  200:24 205:14
  208:23 227:12,15
  229:16 241:25
  242:19 256:18
  264:17 268:5
  277:2,16 287:15
year   184:20
  204:17

years   22:14 43:2
  105:4 106:7,7
  125:22 130:8
  131:2,3 144:25
  148:8,9 151:22
  153:6,6 188:12,20
  189:1,19 221:8
  244:22 279:17
yesterday   13:12
  27:14 34:25 38:6
  38:15 40:3,12
  46:11 92:1,16
  93:14 102:17,19
  132:1 133:12
  134:1,20 167:21
  181:4 193:20
  195:16 197:12
  198:2 202:13
  218:1 228:17,18
  247:18 248:1
  249:23 251:12
  252:4,18 263:10
  263:23 265:21
  266:22 271:14
  280:13 282:21
  286:16
yesterday's
  134:22
yield   181:15
york   267:24
young   237:25

              z

zakrzewski   5:16
  12:8,8,23 15:2,4,9
  15:23 16:1,17
  17:14 18:6,20,23
  19:8,20,25 20:24
  22:2,9 23:11
  24:14,16 25:9,11
  25:22 30:1,8
  31:10 33:19,21

71:19 73:7 81:13
  81:20 92:3 103:24
  104:1 108:6
  123:22 134:9,12
  162:24 192:25
  193:8 195:11
  201:24 202:1
  207:20 208:21,24
  209:2,17 212:16
  212:24 214:5
  220:16 227:7,10
  227:14 232:12
  236:12 238:13,16
  241:24 243:15
  246:6 249:25
  250:13,15,21,23
  262:22 263:1,14
  265:3,12 266:3,5
  266:16 267:3,15
  268:2,9,20 269:9
  270:3,16 271:8
  272:7,24 273:9
  274:4,9,19 275:4,7
  276:17 277:11
  278:4,12,14 279:1
  279:10,19 280:11
  280:19 281:2,14
  281:21 282:8,23
  284:24 285:1
  287:9,13,15
zeltzer   8:24
zero   240:5
zero's   240:6

Confidential                                                    JAN-MS-05486002

```
                    Oklahoma
                  Rule 12-3230
          Depositions Upon Oral Examination
```

F.   Review By Witness; Changes; Signing.


The deponent shall have the opportunity to review

the transcript of the deposition unless such

examination and reading are waived by the deponent

and by the parties.  After being notified by the

officer that the transcript is available, the

deponent shall have thirty (30) days in which to

review it and, if there are changes in form or

substance, to sign a statement reciting such

changes and the reasons given by the deponent for

making them.  The officer shall indicate in the

certificate prescribed by paragraph 1 of subsection

G of this section whether any review was requested

and, if so, shall append any changes made by the

deponent during the period allowed.



DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,

2016.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

Confidential
JAN-MS-05486003

### VERITEXT LEGAL SOLUTIONS
#### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.