Page 1

1                UNITED STATES DISTRICT COURT
2                NORTHERN DISTRICT OF OHIO
3                     EASTERN DIVISION
4                ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~
5    IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
     OPIATE LITIGATION
6                                    Case No.
                                     17-md-2804
7

                                     Judge Dan Aaron
8                                    Polster
9

     This document relates to:
10

11

     The County of Cuyahoga, et al. v. Purdue Pharma
12   L.P., et al., Case No. 1:17-OP-45004 (N.D.
     Ohio)

13

14                ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~
15

16

17              Videotaped Deposition of
18                  DEBORAH FORKAS
19

                  January 23, 2019
20                   10:03 a.m.
21

                     Taken at:
22

                Napoli Shkolnik PLLC
23          55 Public Square, Suite 2100
               Cleveland, Ohio 44113
24

              Stephen J. DeBacco, RPR
25

```
 1    APPEARANCES:
 2
          On behalf of the Plaintiffs:
 3
                  Kelley & Ferraro, by
 4                MATT McMONAGLE, ESQ.
                  950 Main Avenue, Suite 1300
 5                Cleveland, Ohio
                  (216) 367-1979
 6                mmcmonagle@kelley-ferraro.com
 7
          On behalf of Stark County, Ohio; and
 8        Summit County, Ohio:
 9                Motley Rice, LLC, by
                  NATALIE DEYNEKA, ESQ.
10                28 Bridge Boulevard
                  Mt. Pleasant, South Carolina 29464
11                (843) 216-9343
                  ndeyneka@motleyrice.com
12
13        On behalf of AmerisourceBergen Drug
          Corporation:
14
                  Reed Smith, LLP, by
15                ERIC L. ALEXANDER, ESQ.
                  LINDSAY A. DEFRANCESCO, ESQ.
16                1301 K Street Northwest, Suite 1000
                  East Tower
17                Washington, D.C., 20005
                  (202) 414-9403
18                ealexander@reedsmith.com
                  (202) 414-9286
19                ldefrancesco@reedsmith.com
20
          On behalf of McKesson Corporation, via
21        teleconference:
22                Covington & Burling, LLP, by
                  DELBERT TRAN
23                One Front Street
                  San Francisco, CA 94111-5356
24                (415) 591-6000
                  dtran@cov.com
25                        ~ ~ ~ ~ ~
```

Page 3

1    APPEARANCES, Continued:

2
        On behalf of Walmart, Inc.:

3
                Jones Day, by
4               CHRISTOPHER LOVRIEN, ESQ.
                555 South Flower Street
5               Fiftieth Floor
                Los Angeles, California 90071
6               (213) 243-2316
                cjlovrien@jonesday.com

7

8       On behalf of Endo Pharmaceuticals, Inc.,
        Endo Health Solutions, Inc., Par
9       Pharmaceuticals, Inc. and Par
        Pharmaceutical Companies, Inc., via
10      teleconference:
11              Arnold & Porter Kaye Scholer, by
                NICOLE R. LEIBOW, ESQ.
12              250 West 55th Street
                New York, New York 10019-9710
13              (212) 836-7838
                nicole.leibow@arnoldporter.com

14

15      On behalf of Insys Therapeutics:
16              Holland & Knight, LLP, by
                JESSICA L. FARMER, ESQ.
17              800 17th Street Northwest
                Suite 1100
18              Washington, D.C. 20006
                (202) 469-5222
19              jessica.farmer@hklaw.com
20                      ~ ~ ~ ~ ~

21
     ALSO PRESENT:

22
                Joe VanDetta, Legal Videographer
23
                        ~ ~ ~ ~ ~

24

25

1                        TRANSCRIPT INDEX

2

3     APPEARANCES................................     2

4

5     INDEX OF EXHIBITS .........................     5

6

7     EXAMINATION OF DEBORAH FORKAS

8     By Mr. Alexander..........................     9

9     By Ms. Deyneka............................   249

10    By Mr. Alexander..........................   253

11    By Ms. Deyneka............................   262

12    By Mr. Alexander..........................   263

13

14    REPORTER'S CERTIFICATE....................   266

15

16    EXHIBIT CUSTODY

17    EXHIBITS RETAINED BY THE COURT REPORTER

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXHIBITS
 2      NUMBER          DESCRIPTION               MARKED
 3      Exhibit 1    12/14/2010 Letter from ...... 108
                     Deborah Forkas to Ed
 4                   FitzGerald Re: Position of
                     Deputy Director of Children
 5                   and Family Services,
                     CUYAH_012151317 to 012151320
 6
        Exhibit 2    February 2010 Plain Dealer ... 115
 7                   Article, "Deaths of Arshon
                     Baker and Alexandria
 8                   Hamilton Raise Questions
                     About Abuse Prevention"
 9
        Exhibit 3    3/14/2010 Plain Dealer Guest . 129
10                   Column Titled "Cuyahoga
                     County Department of
11                   Children and Family Services
                     Needs Community's Help to
12                   Save Kids: Deborah Forkas"
13      Exhibit 4    8/15/2010 Plain Dealer ....... 157
                     Article Titled, Cuyahoga
14                   Children Services is Due a
                     Thorough Inquiry, But That
15                   Would Require a Panel That's
                     Truly Independent:
16                   Editorial"
17      Exhibit 5    10/14/2010 Plain Dealer ...... 165
                     Article Titled
18                   "Child-Welfare Panel Says
                     Cuyahoga County Agency Needs
19                   to Improve Services and
                     Practices"
20
        Exhibit 6    6/22/2009 E-Mail from James .. 174
21                   McCafferty Re: 2009 Budget
                     Incentive, with Attachment,
22                   CUYAH_002794109 to 002794111
23      Exhibit 7    10/13/2010 E-Mail from ....... 178
                     Regina Thigpen Re: Message
24                   to All DCFS Employees, with
                     Attachment, CUYAH_003428644
25                   to 003428669
```

Page 6

```
 1    Exhibit 8    10/23/2018 E-Mail Chain Re: .. 192
                   Final Recommendations,
 2                 Report and Letter from the
                   Chair, CUYAH_012558835 to
 3                 012558836
 4    Exhibit 9    1/3/2011 E-Mail from Valeria . 196
                   Harper Re: Minutes from Dec.
 5                 16 Meeting, with Attachment,
                   CUYAH_012681169 to 012681171
 6
      Exhibit 10   2/11/2011 E-Mail from ........ 202
 7                 Valeria Harper Re: Final -
                   Meeting Summary, with
 8                 Attachment, CUYAH_012677697
                   to 012677699
 9
      Exhibit 11   2/1/2011 E-Mail from Janet ... 208
10                 Carr Re: CUYAH_002794832 to
                   002794850
11
      Exhibit 12   Native Spreadsheet, .......... 227
12                 CUYAH_002442182
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          INDEX OF VIDEO OBJECTION

2     OBJECT                                    PAGE

3     objection................................   18

4     objection................................   25

5     objection................................   34

6     objection................................   54

7     objection................................   55

8     objection................................   66

9     objection................................   81

10    objection................................  250

11    objection................................  251

12    objection................................  252

13    object...................................  259

14    object...................................  260

15    objection................................  262

16

17

18

19

20

21

22

23

24

25

```
                                                      Page 8
 1               THE VIDEOGRAPHER:  We are now on
 2   the record.
 3               The date is January 23, 2019.  The
 4   time is 10:03.
 5               The caption of this case is In Re:
 6   National Prescription Opiate Litigation.
 7               The name of the witness is Deborah
 8   Forkas.
 9               At this time, the attorneys present
10   and those attending remotely will identify
11   themselves and the parties they represent.
12               MR. McMONAGLE:  Matt McMonagle on
13   behalf of Plaintiff.
14               MS. DEYNEKA:  Natalie Deyneka on
15   behalf of Stark County.
16               MR. ALEXANDER:  Eric Alexander from
17   Reed Smith for AmerisourceBergen Drug
18   Corporation.
19               MS. DEFRANCESCO:  Lindsay
20   DeFrancesco from Reed Smith on behalf of
21   AmerisourceBergen Drug Corporation.
22               MS. FARMER:  Jessica Farmer from
23   Holland & Knight on behalf of Insys
24   Therapeutics, Inc.
25               MR. LOVRIEN:  Chris Lovrien, Jones
```

Page 9

1   Day, on behalf of Walmart.

2              THE VIDEOGRAPHER:  Those on the

3   phone?

4              MS. LEIBOW:  Nicole Leibow from

5   Arnold & Porter on behalf of Defendants Endo

6   and Par.

7              MR. TRAN:  Delbert Tran from

8   Covington & Burling on behalf of Defendant

9   McKesson.

10             THE VIDEOGRAPHER:  Will the court

11  reporter please swear in the witness.

12       DEBORAH FORKAS, of lawful age, called for

13  examination as provided by the Federal Rules of

14  Civil Procedure, being by me first duly sworn,

15  as hereinafter certified, deposed and said as

16  follows:

17             EXAMINATION OF DEBORAH FORKAS

18  BY MR. ALEXANDER:

19       Q.    State your full name for the

20  record, please.

21       A.    My name is Deborah Forkas.

22       Q.    And who is your current employer,

23  ma'am?

24       A.    My current employer is Stark County

25  Commissioners.

1          Q.     In what capacity are you employed?

2          A.     I'm the executive director of Job

3     and Family Services.

4          Q.     Have you ever been deposed before?

5          A.     No, I don't -- I don't believe so.

6          Q.     Let me just go over some -- some

7     ground rules, because you are quick to answer,

8     and I want to make sure that doesn't get to be

9     a problem with the record.

10               The court reporter to my right and

11    your left is typing down everything everybody

12    says.  That will be the official record, even

13    though we're also being videotaped.  Because of

14    that, we need to make sure that your answers

15    are representative of what you know, think, and

16    can remember, with real words, not just

17    gestures, and that we take pains to not speak

18    over one another, either my questions with your

19    answers or me beginning my next question before

20    you finish your answer or if anybody else in

21    the room talks at the same time, we try to make

22    sure the court reporter doesn't have to try to

23    interpret it and type down two people talking

24    at the same time.

25               Does that makes sense?

Page 11

1        A.    Makes sense.

2        Q.    If you don't understand my

3   questions, let me know.  I'll see about fixing

4   them.

5              If you need to take breaks, let us

6   know; we'll take a break.

7              Does that make sense?

8        A.    Yes.

9        Q.    Okay.  There may be other kind of

10  rules or instructions that come up as we go,

11  but I wanted to make sure that was clear before

12  we kind of get going too much.

13       A.    Thank you.

14       Q.    When was the last time you were

15  employed by Cuyahoga County in any capacity?

16       A.    From 2009 to 2011.

17       Q.    And what was your position at that

18  last time?

19       A.    I was the director of the agency.

20       Q.    Have you had any kind of

21  contractual relationship as a consultant or

22  anything else with Cuyahoga County since 2011?

23       A.    No.

24       Q.    Have you ever been employed by the

25  City of Cleveland?

1        A.    No.

2        Q.    Have you ever been employed by

3   Summit County?

4        A.    Yes.

5        Q.    In what capacity?

6        A.    I was the assistant director in

7   2000- and -- I'm sorry.  I was the assistant

8   director.

9        Q.    Okay.  And what years?

10       A.    Let's see.  2005 to 2009.

11       Q.    And when you've said director or

12   assistant director, do you mean of Children and

13   Family Services?

14       A.    Of Children and Family Services.

15       Q.    Okay.  And is that true for your

16   current position, as well, in Stark County?

17       A.    Yes.

18       Q.    All right.  Have you ever been

19   employed by the City of Akron in any capacity?

20       A.    No.

21       Q.    I understand there are two lawyers

22   present who do not represent Defendants in this

23   case.  One is with your employer, Stark County.

24             Are you represented by her --

25       A.    Yes.

1          Q.      -- in connection with the

2     deposition?   Okay.

3                  There's also somebody here who said

4     he's on behalf of Plaintiffs.  I -- I don't

5     know which particular Plaintiffs he might mean,

6     but are you represented by that individual as

7     well?

8          A.     Yes, I believe so.

9          Q.     Have you reached out to somebody on

10    behalf of one or more of the Plaintiffs in this

11    litigation to ask for representation?

12         A.     No.

13         Q.     Have you paid money or agreed to

14    pay money for representation?

15         A.     No.

16         Q.     Have you had what you believe to be

17    private conversations with a lawyer other than

18    for Stark County about this deposition?

19         A.     No.

20         Q.     Okay.  So do you know what it means

21    to be represented by a lawyer?

22         A.     I believe so.

23         Q.     Okay.  And I'm not going to pry

24    into details of your personal life, but have

25    you ever, like, retained a lawyer for any

                                                        Page 14

1    purpose?  You know, it could be, like, a real

2    estate thing, a personal dispute, contracts,

3    anything like that?  Have you ever retained a

4    lawyer?

5            A.    Yes.

6            Q.    Okay.  So in connection with this

7    deposition or this case, have you retained a

8    lawyer?

9            A.    No.

10           Q.    Okay.  So have you had any meetings

11   with anybody on behalf of the Plaintiffs in

12   this case?

13           A.    No.

14           Q.    Did you get any documents from

15   anybody to review in preparation for the

16   deposition?

17           A.    Yes.

18           Q.    Okay.  Who'd you get those from?

19           A.    Mr. Gallucci.

20           Q.    Okay.  And is Mr. Gallucci present?

21           A.    No.

22           Q.    Okay.  And he didn't represent you

23   either, correct?

24           A.    No.

25           Q.    No, he did not represent you?  I

1   ended with the word "correct."

2           A.    I'm -- I'm not sure.  I'm not sure

3   I understand.  Can you clarify what you're

4   asking me?

5           Q.    Mr. Gallucci --

6           A.    Yes.

7           Q.    -- did he represent you personally

8   in connection with this deposition or this

9   litigation?

10          A.    No.

11          Q.    Okay.  When did you get materials

12  from Mr. Gallucci?

13          A.    Can I ask a clarifying question?

14          Q.    Sure.

15          A.    When you say when did I get, do you

16  mean he physically handed me --

17          Q.    Yeah, when did you receive any

18  documents or materials from Mr. Gallucci?

19          A.    I didn't receive any documents or

20  materials.  He reviewed some things with me.

21          Q.    Ah.  So when did you meet with

22  Mr. Gallucci?

23          A.    I met with him this morning.  I met

24  with him on -- I had a phone call with him a

25  couple of days ago, and I met with him when I

1   first met him a couple of weeks ago.

2           Q.    Okay.  So three meetings:  once by

3   phone and twice in person; is that correct?

4           A.    That's correct.

5           Q.    Have you had meetings with anybody

6   else -- and I'm not going to ask you about the

7   details of a meeting that you had where just a

8   lawyer for Stark County was present, because

9   that would be your lawyer.  Does that make

10  sense?

11          A.    Yes.

12          Q.    Okay.  So with that in mind, have

13  you had any other meetings or conversations

14  before the deposition got started about the

15  deposition or the litigation?

16          A.    Yes.

17          Q.    With -- with who, other than

18  Mr. Gallucci?  Or with whom, I guess.

19          A.    With Matt.

20          Q.    And who is --

21          A.    And with Natalie.

22          Q.    So Natalie is the lawyer for your

23  current employer, Stark County --

24          A.    Yes.

25          Q.    -- and she's your lawyer, correct?

1      A.    Yes.

2      Q.    And Matt is not your lawyer; we

3  went over that, correct?

4      A.    That's true.

5      Q.    Okay.  When did you meet with Matt?

6      A.    Just this morning.

7      Q.    Okay.  Did you see any new

8  documents that you hadn't seen with

9  Mr. Gallucci?

10     A.    No.

11     Q.    Do you recall what documents you

12  were shown at any of these meetings?

13     A.    Appeared to be e-mails.

14     Q.    Were they e-mails that you were on

15  or e-mails you were not on?

16     A.    I'm not 100 percent sure.

17     Q.    Were they documents you had ever

18  seen before?

19     A.    No.

20     Q.    Do you have copies of those

21  documents?

22     A.    No.

23     Q.    Did they refresh you about any

24  information or give you any new information

25  compared to what you already had in your head?

Page 18

1         A.    I don't really know.

2         Q.    Do you recall anything about the

3    discussions that you had this morning with Matt

4    or Mr. Gallucci?

5              MR. McMONAGLE:  And I am just going

6    to place an objection there based on privilege.

7              MR. ALEXANDER:  There's -- Counsel,

8    there's no privilege.  You know that.  That's

9    been established.  And I will -- just to cut to

10   the chase, you should give us the documents

11   that she was shown, because clearly you don't

12   have any work product or protection on them.

13             MR. McMONAGLE:  I don't have any

14   documents.

15             MR. ALEXANDER:  The lawyer sitting

16   to your right has a binder that says "Napoli

17   Shkolnik, Forkas deposition prep."  I assume

18   that's the documents that she was shown, and we

19   would be entitled to get a copy of that.

20             MR. McMONAGLE:  I don't know about

21   that.

22             MR. ALEXANDER:  You have a

23   third-party witness you're -- you've met with

24   or you or your colleagues have met with on

25   three occasions.  You've shown her documents to

Page 19

1    try to, I guess, do something.

2                    MS. DEYNEKA:  Counsel --

3                    MR. McMONAGLE:  I -- I personally

4    don't know what documents she's been shown.

5                    MS. DEYNEKA:  -- it is my

6    understanding that there were no documents

7    shown from the binder that I have.

8                    MR. ALEXANDER:  Okay.

9                    MS. DEYNEKA:  And I'll add that I

10   understand that there were no documents to be

11   shown in general.

12                   MR. ALEXANDER:  Okay.  So the

13   witness has testified that she was shown

14   documents.  Does nobody in this room on behalf

15   of either Stark County or some -- one or more

16   the Plaintiffs have the documents that were

17   shown to this witness?

18                   MS. DEYNEKA:  No, and I'll go ahead

19   and repeat what I said previously, which is my

20   understanding is there were no documents shown.

21                   MR. ALEXANDER:  So the witness has

22   already testified under oath to the contrary,

23   so I'm just trying to get to the bottom of

24   that.  Maybe I -- let me ask a couple of

25   clarifying questions before we get too bogged

Page 20

1   down with all of this.

2              I didn't get your name.  Who do you

3   represent?

4              MR. McMONAGLE:  Matt McMonagle on

5   behalf of Cuyahoga County.  And then I'm here

6   on behalf of the Napoli firm.

7              MR. ALEXANDER:  Okay.  But not with

8   the Napoli firm?

9              MR. McMONAGLE:  I don't work for

10  the Napoli firm directly, but on this case I'm

11  working for them.

12             MR. ALEXANDER:  Got it.

13             Was your meeting this morning with

14  the witness with Mr. Gallucci present?  Because

15  she said Gallucci is who showed her reco- --

16  documents.

17             MR. McMONAGLE:  That's what she

18  said.

19             MR. ALEXANDER:  Okay.

20  BY MR. ALEXANDER:

21       Q.   About how many documents were you

22  shown this morning?  Before the deposition

23  got -- got started.

24       A.   Can I clarify something, please?

25       Q.   Yes.

1          A.    So you referred -- I guess there's

2     a matter of -- difference being referred to

3     something -- referring to something as opposed

4     to physically showing me something.  I didn't

5     physically see the documents.  He had them.  He

6     was going through them, and he was referring to

7     them.

8          Q.    Ah.

9          A.    So can I make a clarifica-

10         Q.    Sure.

11         A.    Thank you for letting me make a

12    clarification.

13         Q.    What about in connection with your

14    prior in-person meeting with Mr. Gallucci?  Did

15    you actually see any documents with your own

16    eyes?

17         A.    No.

18         Q.    Okay.  Were -- were there any other

19    documents where the content of them was

20    revealed to you by Mr. Gallucci or somebody

21    else at that meeting reading them or

22    characterizing them?

23         A.    I'm not sure.

24         Q.    Did you understand the question?

25         A.    I believe I do.

1          Q.     So -- like, so, this morning, as

2     you've related, Mr. Gallucci had documents in

3     front of him and read or characterized

4     something about the documents to you instead of

5     letting you look at them yourself.

6               Is that right so far?

7          A.     That's true.

8          Q.     And do you remember anything he

9     said about the content of those documents?

10         A.     It was pretty vague.  Not really.

11         Q.     Okay.  So on your phone call that

12    you had, in between the two in-person meetings

13    with Mr. Gallucci, did he tell you about the

14    content of any documents?

15         A.     In between, are you asking me?

16         Q.     Yeah.  You said there was a

17    telephone call too --

18         A.     Yeah.

19         Q.     -- with Mr. Gallucci.

20         A.     Yeah.

21         Q.     Did that involve him telling you

22    about the content of any documents?

23         A.     No, not the content.

24         Q.     Let me ask in general, and we can

25    go one by one with the meetings or take them

Page 23

1    together.  Do you remember anything that any

2    representative of the Plaintiffs in this

3    litigation told you about the allegations in

4    the litigation, or any facts at issue in the

5    litigation, anything at all about those

6    meetings?

7            A.    Let me just think back.  I'm sorry.

8    I just need a minute.

9                  He -- he did talk a little -- a

10   little historically about some things related

11   to this.  I mean, it was very vague, though.

12           Q.    Did any of it relate to opioids or

13   opiates?

14           A.    I believe so, yes.

15           Q.    Do you recall any representations

16   he made to you about the facts or the

17   allegations?

18           A.    Not -- not particularly, no.

19           Q.    Did he tell you anything you didn't

20   know?

21           A.    Yes, he told me some things that I

22   didn't know.  Just, I -- I wasn't -- well, yes.

23   Just say that.

24           Q.    Like what?

25           A.    I didn't know the extent of what

1  the lawsuit -- I didn't know the extent of the

2  lawsuit.  Some of that very vague information.

3  I was not, you know, privy to some of that.

4      Q.    What do you mean by the extent of

5  the lawsuit, information that you weren't privy

6  to before the conversation?

7      A.    Well, I didn't -- there were a lot

8  of things that I -- I was not up -- up to speed

9  on.  Not a lot of things, but I didn't know

10  things that, you know, how long that there was

11  a lawsuit.  I knew there was a lawsuit, but I

12  didn't know any details.  He didn't give me

13  many details, but he was just -- he was vague

14  about things.

15      Q.    Did Mr. Gallucci or anybody else on

16  behalf of the Plaintiffs give you any

17  information about what the Plaintiffs were

18  claiming that any of the Defendants did wrong

19  in this case or what any of their damages were?

20      A.    No, no.

21      Q.    Did he tell you anything about what

22  the underlying facts were as it relates to

23  anything about substance abuse in Cuyahoga

24  County?

25      A.    No.  No, mostly questions for me.

Page 25

1    They were more questions.

2         Q.    Do you remember any of the

3    questions that Mr. Gallucci asked you?

4         A.    He --

5               THE WITNESS:  It's okay to answer?

6               MR. McMONAGLE:  I mean, I'll still

7    place an objection to it, but go ahead and

8    answer --

9               THE WITNESS:  Okay.

10              MR. McMONAGLE:  -- if you remember.

11        A.    Well, some of the things, just one

12   of the things that I recall was he asked me

13   about, you know, my time in -- in Cuyahoga.

14        Q.    Okay.  So --

15        A.    Those kinds of things related to --

16   sorry I interrupted you.

17        Q.    No, no.  I interrupted you.

18   Continue, please.

19        A.    I'm done.

20        Q.    What was just pointed out here is

21   actually one of the basic rules of deposition

22   is that in general, you're not supposed to

23   confer while a question is pending, but you can

24   confer if it relates to whether you're allowed

25   to answer a question because of an applicable

Page 26

1   privilege.  Does that make sense?

2          A.     Yes.

3          Q.     And so --

4          A.     Thank you.

5          Q.     -- only the counsel here on behalf

6   of Stark County can instruct you not to answer,

7   because that's somebody with whom you have a

8   privilege relationship.

9          A.     Okay.

10          Q.     Otherwise the lawyers for the

11   Plaintiffs can't tell you whether to answer a

12   question or not, because they don't represent

13   you and you don't have any privilege with them,

14   and only privilege is a basis for not answering

15   a question, according to the rules of the Court

16   in this case.

17          A.     I understand.

18          Q.     Does that make sense?

19          A.     I understand.

20          Q.     And -- and I'm trying to be very

21   fair with you to make sure --

22          A.     I appreciate it.

23          Q.     -- this is not an uncomfortable

24   process.

25          A.     Thank you.  I appreciate it.

Page 27

1          Q.    So what do you recall relaying to

2    Mr. Gallucci or any of the Plaintiffs' counsel

3    before the deposition got started about your

4    recollection of your time as director of

5    Cuyahoga County Division of Children and Family

6    Services?

7          A.    Well, the primary thing that I

8    recall saying is, is that my memory isn't as

9    great.  It's been almost a decade since I was

10   in Cuyahoga, and I don't have a lot of -- very

11   little -- it's mostly non- -- non-specific

12   information.  And those were the kind of things

13   that, you know, I told him.

14         Q.    Okay.  Do you recall any of what

15   you said?

16         A.    I just told you that.

17         Q.    Do you recall the specifics of what

18   you said about what you recalled?

19         A.    Oh, about when I was in Cuyahoga?

20         Q.    Yes, ma'am.

21         A.    I just told him that, you know, it

22   was, A, a long time ago; B, memory is not what

23   it used to be.  You know, I was trying to --

24   we -- I didn't recall things about cases.  If

25   you were going to ask me specific things about

Page 28

1   cases, I -- I don't have recollection that

2   I'm -- that I'm aware of at this -- at this

3   point.  Things like that.

4         Q.    Okay.  We'll go through the

5   detail of -- in detail of what you recall, and

6   try to do it chronologically.  That might help.

7         A.    That's fine.

8         Q.    So let me just make sure I

9   understand a couple of basics.

10             Do you currently reside in Cuyahoga

11  County?

12        A.    I do.

13        Q.    Okay.  Do you intend to relay, as

14  part of any testimony you give here or at

15  trial, any personal experience you've had,

16  outside of a government position you may have

17  held, relating to opioids or opiates or any

18  other drug abuse in connection with the impacts

19  on the community or specifically Children and

20  Family Services?

21        A.    I could.

22        Q.    Okay.  And for Summit County, for

23  the period of time from 2005 to 2009 when you

24  were an assistant director, have you been asked

25  by anybody in this litigation to give them your

1   recollection of what was going on back then?

2        A.    No.

3        Q.    Have you been asked to testify at

4   trial on behalf of either Summit County or

5   Cuyahoga County?

6        A.    No.

7        Q.    Have you been contacted by anybody

8   from Summit County in connection with this

9   deposition?

10       A.    No.

11       Q.    Including outside lawyers?

12       A.    No.

13       Q.    And -- and I'm not trying to

14   violate any privilege that you may have with

15   Stark County.

16            Have -- are you participating at

17   all in anything relating to litigation that

18   Stark County may be pursuing relating to

19   anything about opioids or opiates?

20       A.    Could you repeat the question,

21   please?

22       Q.    Sure.  So when you left Cuyahoga

23   County in 2011, was that a voluntary departure?

24       A.    Yes.  Yes and no.

25       Q.    What do you mean by that?

                                                    Page 30

1          A.     Well, do you want me to explain?

2          Q.     Yes.

3          A.     Okay.  When I left, new county

4    government had come in and I lost my job, so I

5    was terminated, but knew that it was coming.

6    Everybody was terminated.

7          Q.     And your successor was Patricia

8    Rideout?

9          A.     Yes.

10         Q.     Did you help her with the

11   transition?

12         A.     Yes.

13         Q.     Is she somebody you've known

14   professionally over the years?

15         A.     I've known her forever.

16         Q.     Including when she was at the Annie

17   E. Casey Foundation?

18         A.     Absolutely.

19         Q.     All right.  So at that time in

20   2011, what was your next position after leaving

21   Cuyahoga County?

22         A.     When I left Cuyahoga County, I went

23   to Fairfax, Virginia, and I was the

24   child-welfare director there for three years.

25         Q.     And are you involved at all in any

1    litigation that Fairfax County in Virginia may

2    be pursuing relating to opioids or opiates?

3        A.    No.

4        Q.    And then, after Fairfax, Virginia,

5    did you come back to Ohio?

6        A.    Yes.

7        Q.    What year was that?

8        A.    2014.

9        Q.    And what was your position at that

10   time?

11       A.    I returned -- I came back to Stark

12   County and -- I went to Stark County, not came

13   back.  Went to Stark County.  And I'm the

14   director of Jobs and Family Services, which is

15   a triple-combined agency.

16       Q.    And have you had that position

17   continuously since 2014?

18       A.    Yes, I'm still -- I'm presently

19   still employed there.

20       Q.    Okay.  But it's been the same

21   position as director?

22       A.    Same.

23       Q.    And for Stark County, does that

24   encompass what was essentially the same sort of

25   function as Children and Family Services that

Page 32

```
 1   you had in Cuyahoga County?
 2         A.    That's one of the functions.
 3         Q.    All right.  Are you involved for
 4   Stark County at all with any litigation that
 5   Stark County may be pursuing relating to
 6   opioids or opiates?
 7         A.    Not -- not -- no, not right now.
 8         Q.    And I've used the term "opioids"
 9   and "opiates."  Do you know what either of
10   those terms mean?
11         A.    Well, I know, for example, when
12   you're referring to opioids, it could be drugs
13   like Vicodin.  It could be drugs like heroin.
14   It could be a whole laundry list of OxyContins,
15   those types of drugs.
16         Q.    Meaning prescription drugs --
17         A.    Prescription --
18         Q.    -- as well as street drugs?
19         A.    Or -- or fentanyl.  Or fentanyl,
20   which is --
21         Q.    So when you -- when you use the
22   term "opioids," as you understand it, you would
23   be including both prescriptions drugs and drugs
24   that somebody may take -- may obtain illegally,
25   either a prescription drug that they don't have
```

1   a prescription for or a completely illegal drug

2   that is obtained through overly -- you know,

3   illegal routes?

4           A.     Yes.

5           Q.     Okay.  And what about the term

6   "opiate"?  How do you understand that?

7           A.     I don't know that I under- --

8   understand that.

9           Q.     Okay.  Do you use the term "opioid"

10  to cover all of these --

11          A.     Yes.

12          Q.     Okay.  And do you count cocaine,

13  PCP, marijuana, methamphetamine, do you count

14  those as opioids or not?

15          A.     Yes.

16          Q.     And do you know if this is the same

17  sort of definition that you were using when you

18  had the position with Cuyahoga County from 2009

19  to 2011 as director of the Division of Children

20  and Family Services?

21          A.     I'm not sure.

22          Q.     Okay.  So this may be hard to do,

23  but before you had the conversations with the

24  Plaintiffs' lawyers, as just a resident of

25  Cuyahoga County, did you have an understanding

1   of what the basic allegations were in this

2   litigation against the various Defendants who

3   are being sued?

4         A.    Before?

5         Q.    Yes, before.

6         A.    No, I did not.

7         Q.    And so, now, based upon the

8   conversations that you had on these three

9   occasions with the Plaintiffs' lawyers for

10  Cuyahoga County, do you have an understanding

11  of what -- what they're suing over, what their

12  allegations are?

13              MR. McMONAGLE:  I'm going to note

14  our objection again.

15        A.    Not really.

16        Q.    Do you know what any -- so let me

17  break it up.  Do you know who's being sued,

18  either by name or description?

19        A.    I -- I think drug companies and

20  manufacturers and the people that --

21  distributors.

22        Q.    Okay.

23        A.    I believe I know that.  But --

24        Q.    Do you know if any doctors or

25  health care providers or health care entities

Page 35

1  are being sued?

2       A.    I don't know that.

3       Q.    What about any pharmacies, either

4  like a local pharmacy or a chain of pharmacies

5  that might dispense drugs?  Do you know if

6  they're being sued?

7       A.    I don't know that either.

8       Q.    So what about anybody involved in,

9  like, the illegal drug trade, either diverting

10 ethical prescription drugs or bringing in or

11 creating illegal drugs like methamphetamine or

12 heroin?  Do you know if they're being sued?

13      A.    I don't know that.

14      Q.    Okay.  In terms of the -- we'll

15 break it up.  So there are manufacturers of

16 prescription pharmaceuticals that have been

17 sued in this case and in this litigation.  Do

18 you know the names of any of the ones who have

19 been sued?

20      A.    No.

21      Q.    That wasn't provided by --

22      A.    No.

23      Q.    -- the Plaintiffs' counsel?

24      A.    No, that was not.

25      Q.    And just, if you can, if you could

Page 36

1    just wait until I'm done with my question --

2           A.    I'm sorry.

3           Q.    -- before giving your answer.

4    You're doing a pretty good job, but --

5           A.    Not good enough.

6           Q.    -- I just -- just like that, yeah.

7                 So we're not in a huge rush.  I

8    really don't think it will take terribly long,

9    so a little extra pause just makes for a

10   cleaner record, and I want to make sure that

11   the record, at the end of the day, is accurate

12   in terms of what you actually know and think

13   and doesn't get confused by the dynamic of this

14   artificial process.

15                Does that make sense?

16          A.    Yes.

17          Q.    So the manufacturers of

18   prescription pharmaceuticals that have been

19   sued, do you know what any of them are supposed

20   to have done wrong?

21          A.    I'm not sure.

22          Q.    Did the Plaintiffs' lawyers tell

23   you anything about they were supposed to have

24   done -- you know, the manufacturers were

25   supposed to have made too many drugs, marketed

Page 37

1   them a certain way, sold them a certain way,

2   anything at all about what they're supposed to

3   have done?

4          A.    The only thing that I know is that

5   the drugs were very addictive.

6          Q.    Do you know anything about the

7   labeling for any of the prescription drugs at

8   issue, in terms of what they said about the

9   potential for addiction, what any officially --

10  official, approved materials from FDA said

11  about any of that?

12         A.    No.

13         Q.    Do you know what any branch of the

14  government, like CDC or any other part of the

15  federal government that's involved in the

16  providing information about drugs or treatment

17  of health conditions like pain, has ever said

18  about the potential for addiction with

19  prescription opioid medications?

20         A.    Not specifically that.

21         Q.    Okay.  What do you think you know?

22         A.    Well, I know that -- well, I don't

23  know this.  I can't say I know this.  I think

24  this.  Is that there was -- let me think about

25  what I want to say.  I want to be clear.  That

1  there were times when the focus was on pain

2  management, and that with that focus came, you

3  know, addition- -- more or specific drugs and

4  specific prescriptions to -- to manage the --

5  the pain that people were in.

6        Q.    Is -- is that information you had

7  from your own experience, from work in

8  government, or from something the Plaintiffs

9  told you?

10        A.    All -- all the above.

11        Q.    Okay.  What did the Plaintiffs tell

12  you about that?

13        A.    That -- just what I said, that

14  there was a time where it was -- the focus was

15  on pain management.

16        Q.    Do you know if any of the

17  allegations about what any of the prescription

18  drug manufacturers did are true or not true?

19        A.    No.

20        Q.    Do you have any personal knowledge

21  from interaction with any manufacturers of

22  prescription drugs that have been sued in this

23  case that would relate on any of these issues?

24        A.    No.

25        Q.    So there're also, as you'd

```
 1   identified, distributors who have been sued.
 2   Do you know the names of any of those
 3   companies?
 4        A.    No.
 5        Q.    Do you know what any of the
 6   allegations are about what they did or didn't
 7   do?
 8        A.    No.
 9        Q.    Do you know if any of those
10   allegations are correct?
11        A.    No.
12        Q.    Have you ever had any personal
13   interaction with any of the drug distributors,
14   whether it be Cardinal or McKesson or
15   AmerisourceBergen or anybody else?
16        A.    No.
17        Q.    Do you have any knowledge from your
18   work, either with Summit County or Cuyahoga
19   County, that bears on that at all?
20        A.    No.
21        Q.    So there're also retail pharmacies
22   that have been sued.  So setting aside your
23   personal knowledge of anything relating to --
24   to pharmacies for now, do you know anything
25   about what the allegations are about what those
```

Page 40

1  Defendants in this litigation are supposed to

2  have done or didn't do?

3       A.    No.

4       Q.    And do you know if any of those

5  allegations are correct or incorrect?

6       A.    I don't know that.

7       Q.    From your personal knowledge, based

8  upon your work experience or anything else, do

9  you have any knowledge relating to the

10 treatment of any of these Defendants as it

11 relates to prescription opioid drugs or

12 diversion or any of the issues in this case?

13      A.    No.  Ask for class- -- clarifying,

14 are you referring to clients or are you just

15 referring to -- who are you referring to?

16      Q.    Well, I'm talking about the

17 Defendants.

18      A.    No.

19      Q.    The companies that have been sued.

20      A.    No.

21      Q.    Okay.  And so we'll get -- get to

22 the clients part of it.

23      A.    Okay.

24      Q.    When you use the term "clients,"

25 that's anybody who is essentially a participant

Page 41

1  in a public welfare function relating to

2  Children and Family Services?  Is that how you

3  use the term?

4      A.    Yes.

5      Q.    And from the way it was when you

6  were at Summit County from '05 to '09, were

7  there files maintained on each, essentially,

8  case that had clients?

9      A.    Yes.

10     Q.    Was your understanding that those

11  files get maintained essentially in perpetuity,

12  forever, according to the state law that you

13  were aware of?

14     A.    Yes.

15     Q.    Same deal at Cuyahoga County?

16     A.    Same deal.

17     Q.    Okay.  So there's a case file on

18  every case, so, like, let's say -- well, let me

19  break it up.

20          Children and Family Services for

21  Summit County and Cuyahoga County, in terms of

22  those total of six years where you were either

23  the assistant director or director, what were

24  the -- the basic functions of Children and

25  Family Services divisions that those counties

1   had?

2          A.     That you want me to tell you the

3   basic function?  All right.

4          Q.     The basic function.

5          A.     Well, protect children, to keep

6   children safe, to work with parents on their

7   case plans, to follow all the rules and

8   regulations of the State; that's our oversight

9   body.  To make sure that there are -- the

10  appropriate services that are offered and -- to

11  our -- the parents or the clients, whoever they

12  may be.  Children, making sure that children

13  are safe.

14         Q.     Did -- we can break it up if need

15  be, but did either of those counties, in terms

16  of the way the divisions were organized, have

17  the responsibility for child support within

18  Children and Family Services, or was that

19  separate?

20         A.     That was separate.  Right now,

21  though, I might just add, I -- child support is

22  part of my duty.

23         Q.     At Stark?

24         A.     At Stark.

25         Q.     And we're -- we're working --

1       A.    I know you're not interested in

2   Stark, but --

3       Q.    I wouldn't say that, but we're --

4   we're setting aside Stark, because at some

5   point we're going to need to make sure whether

6   if you were called to testify about anything

7   relating to what happened in Summit or Cuyahoga

8   County at any point in time, you're not going

9   to basically talk about something from Stark,

10  which -- so I'm trying to focus in my questions

11  on the point in time when you held the

12  positions at either Summit County or Cuyahoga

13  County.

14          Does that make sense?

15      A.    Yes.

16      Q.    Okay.  So you said that for those

17  counties, the way that they had Children and

18  Family Services organized, that child support

19  was separate, correct?

20      A.    Correct.

21      Q.    And what about, like, adoption,

22  foster care placement, kinship placement, those

23  sorts of things?  Was that part of it or

24  separate?

25      A.    Part of what?

Page 44

1      Q.    Part of Children and Family

2  Services?

3      A.    Yes, part of.  Of course.

4      Q.    Okay.  So there's a part where

5  essentially you get an intake call or a report

6  through a hotline or through a school or

7  whatever of a question of child abuse or some

8  situation that puts a child at risk, and a case

9  may be opened if the criteria are established?

10      A.    That is true.

11      Q.    Okay.  So there's, like, an intake

12  process, deciding whether to do an

13  investigation and open a case?

14      A.    Yes.

15      Q.    Okay.  And at that point, a file

16  is -- if -- if a case is opened, there's a file

17  that's maintained, and that that file has a

18  specific kind of unique identifying number and

19  is maintained as a separate record; is that the

20  way it worked?

21      A.    That's the way it worked.

22      Q.    For both counties?

23      A.    Yes.

24      Q.    And ultimately there may be data

25  from those or some parts of data from those

1    case files entered in a state database, like

2    the SACWIS system, once that got up and

3    running; is that right?

4          A.    I believe so.

5          Q.    But even if SACWIS has data in it

6    on an individual case, the case file still

7    exists within the County's control?

8          A.    Yes.

9          Q.    And you're sure that that's the way

10   it worked when you were there, that there was a

11   file that got maintained and it was the

12   property, essentially, of the County?

13         A.    There was a file.  Do want to

14   correct you, though.  I don't believe that we

15   own -- if I was working in Cuyahoga or whether

16   it was -- that those files were our files.  The

17   State was very clear on telling us that they

18   own the data and they own the files.

19         Q.    They owned the data that was in

20   SACWIS?  Is that what you mean?

21         A.    Uh-huh, yes.

22         Q.    Okay.  But the -- the file, when

23   you get an intake call and you opened up a

24   file, you have a caseworker assigned to it

25   and -- and people start, like, writing notes

1   and creating a paper file, whose file was that?

2   The County's?

3          A.    The County's file.

4          Q.    Okay.   The same thing for Summit

5   and for Cuyahoga?

6          A.    Yes.

7          Q.    Okay.   I -- I just want to make

8   clear.  A database for something got entered

9   that belonged to the State, and that was the

10  State's, the actual underlying case file that

11  may have had more information or just

12  additional handwritten information, whatever,

13  that's the County's file?

14         A.    Uh-huh.  Well, generally speaking,

15  everything -- everything should be in SACWIS.

16  Everything should be entered in -- into it.

17         Q.    And so not to jump ahead too much,

18  but you know that there have been questions

19  raised at different points in time about the

20  adequacy of how often information was being

21  entered into SACWIS, whether it was being

22  entered consistently, and that there were

23  efforts to try to improve the entry into SACWIS

24  over time; is that a fair characterization?

25         A.    I'm not sure.

Page 47

1        Q.    Does that not ring a bell for you

2   that there were issues of the case files would

3   have information that didn't go into SACWIS,

4   maybe because there weren't appropriate fields

5   or pull-down options --

6        A.    Yes.

7        Q.    -- in SACWIS?

8        A.    Yes, that's true.

9        Q.    So, like -- so, like, for instance,

10  there's a -- there's an issue in all of this

11  that's called "drug of choice."  In terms of

12  individual cases and the SACWIS information

13  during those periods of time when you were at

14  Summit County from '05 to '09 and with Cuyahoga

15  County from '09 to 2011, the rules and options

16  for how you enter drug of choice was not

17  terribly rigorous.

18            Is that a fair statement?

19        A.    That's a fair statement.

20        Q.    And did you hear later through,

21  like, PCSAO or other statewide entities that

22  there was, like, a later time period where

23  there was a data blitz and they tried to

24  improve the way that, like, drug of choice got

25  entered into the database for SACWIS?

Page 48

1          A.     I believe that's true.

2          Q.     So let me go a little bit further

3    back before we return to where we were.

4                 You've been in -- in this field,

5    Children Protective Services or Children and

6    Family Services for couple decades now?

7          A.     More than that.

8          Q.     When did you start?

9          A.     When did I start my career?

10         Q.     Yes, ma'am.

11         A.     I started my career in -- well, in

12   child-welfare with -- well, this is hard to

13   explain because I did things -- multiple things

14   at the same time.

15         Q.     So what --

16         A.     Worked for different agencies.

17         Q.     Why don't we do it this way.  So

18   back at least in, like, to the '90s, a lot of

19   this was called children's welfare, and then

20   there was kind of a renaming of some of these

21   entities and re-division within the various

22   governmental entities.

23         A.     I didn't work in child-welfare

24   then.

25         Q.     Okay.  So when did you graduate

1  from college?

2         A.    I graduated in 1979.

3         Q.    And where was that?

4         A.    University of Toledo.

5         Q.    And what was your first job after

6  graduating from college?

7         A.    I worked for a personnel agency.

8         Q.    And did you ultimately pursue

9  additional --

10        A.    Yes.

11        Q.    -- education, get another degree?

12        A.    I got a master's degree in

13  educational psychology.

14        Q.    From John Carroll?

15        A.    From John Carroll University.

16        Q.    When did you get that?

17        A.    Oh, wow.  I don't know.  I'd have

18  to -- a long time ago.

19        Q.    Was that, like, the '80s, the '90s?

20        A.    It was in the '80s.

21        Q.    So setting aside completely

22  unrelated jobs like working in personnel, when

23  was the first time you had a job that was in

24  the Children and Family Services or welfare or

25  Children Protective Services field?

Page 50

1          A.    I worked part-time for five years

2     on the hotline at Children's Services.  At the

3     same time, I worked at the juvenile court as a

4     deputy director.

5          Q.    What year was that that you started

6     the position?

7          A.    For part-time -- it was a part-time

8     job, and then I took a job, full-time job,

9     which was -- let me see.  I'm sorry.  I've just

10    got to think about this.

11         Q.    And I'm just -- I don't need the

12    exact year.  I'm trying to get the id- -- the

13    time frame for when we say it's been more than

14    a few decades that you've been in this field,

15    when was it that it started?

16         A.    I started my career in -- I just --

17    I can't think of it.  I'm sorry.  I'm just --

18    my mind's blank.

19         Q.    So what county were you employed by

20    back then?

21         A.    I was employed at Cuyahoga County.

22         Q.    And the work for the hotline, was

23    that a work -- was that the sort of hotline

24    we've mentioned for intake calls about children

25    safety issues?

Page 51

1          A.     Yes.  I worked part-time.

2          Q.     But you don't know what decade that

3     was?

4          A.     I'm trying to think of what decade

5     it is.  I'm a little -- it was in -- 2005 -- I

6     want to say -- can we move on and could I come

7     back to that?

8          Q.     Sure.

9          A.     I'm sorry, I'm just --

10          Q.     So the position with the courts,

11     was that also in Cuyahoga County?

12          A.     That was in Cuyahoga County.

13          Q.     And what did that have to do with?

14     What -- what sort of role did you have there?

15          A.     I was a probation officer when I

16     started the position.  I started as a probation

17     officer.  Then I was a contracts manager.  From

18     a contracts manager, I was a deputy director.

19          Q.     Did you do anything relating to the

20     drug court?

21          A.     No.

22          Q.     Did you do anything relating to the

23     court proceedings that relate to, like, custody

24     or whether to take a child into protective

25     custody?

Page 52

1          A.    That would usually be Children

2    Services that would do that.

3          Q.    Uh-huh.

4          A.    We worked -- as a probation

5    officer, we worked with, you know,

6    child-welfare dir- -- child-welfare staff, but

7    we didn't take children into custody when we

8    were probation officers.  We didn't --

9          Q.    So after the time when you were a

10   probation officer and the positions that you

11   talked about that related to -- to that side of

12   legal proceedings, when did you transition in

13   or shift over to something relating to

14   children's welfare?

15         A.    Well, that's the year I'm trying to

16   come up with, and I can't seem to come up with

17   it.

18         Q.    Okay.  Do you know who your

19   employer was when you first took a position in

20   children's welfare?

21         A.    Oh, sure.  I mean, I worked for

22   Jerry Blake.  I worked for Cuyahoga County

23   Department of Children and Family Services.

24   Jerry Blake was my supervisor.  Jim McCafferty,

25   I reported to, I can tell you.

1          Q.     So that was all before you went

2     over to Summit County as assistant director?

3          A.     All before.

4          Q.     Okay.  All right.  So going back to

5     this time period, whether it's -- we're talking

6     about the 1990s?

7          A.     That's about right.

8          Q.     Okay.  So even back in the 1990s,

9     was there an issue that substance abuse in the

10     community, whether it be alcohol or cocaine or

11     marijuana, or whatever substance people were

12     abusing, had an impact on the provision of

13     services for Children and Family Services?

14          A.     Yes, that's true.

15          Q.     I mean, the -- the issue of

16     substance abuse has been an issue that either

17     increases the number of cases or makes the

18     cases harder to manage, keeps them open longer,

19     additional resources, as long as you've been

20     involved in the field?

21          A.     Yes, that's true.

22          Q.     Okay.  And I'm -- and I'm not

23     trying to put words in your mouth.  I --

24          A.     No, I agree with it.

25          Q.     These are basic principles, right?

Page 54

1          A.     Yeah, yeah.

2          Q.     And so because of that, as long as

3     you've been in the field, at least in

4     management positions, there's been an attention

5     paid to, like, trends of, what are we seeing in

6     terms of substance abuse?  We're seeing a lot

7     more case of a certain type of drug or

8     substance.  We're seeing a spike in terms of,

9     for instance, when the cocaine epidemic was

10    going on or the crack epidemic was going on in

11    Northeast Ohio, that that was driving the

12    burden on staff and funding for Children and

13    Family Services, correct?

14              MR. McMONAGLE:  Objection to form.

15         A.     Could you repeat that, please?

16         Q.     Yeah.  I could probably break it

17    up.  That would make a little more sense.

18              Do you remember when there was a

19    cocaine or crack epidemic in Northeast Ohio?

20         A.     Yes.

21         Q.     And were you in Children and Family

22    Services at that time?

23         A.     Yes.

24         Q.     So back then, using that as just

25    kind of an example, was there attention paid by

Page 55

1   management for Cuyahoga County Children and

2   Family Services, and broad -- more broadly,

3   within the health and human services

4   department, to the impact of abuse of cocaine

5   or crack on Children and Family Services?

6        A.    Yes.

7        Q.    And did you also pay attention,

8   through statistics that were generated or

9   gathered by the County or State, to things like

10  how prevalent the drug use was, how often it

11  was appearing in individual cases as a driver

12  of the need for the County to get involved in

13  an individual case?

14            MR. McMONAGLE:  Objection.  Form.

15       A.    Could you repeat that again?

16       Q.    Sure.  I can repeat them and --

17       A.    Keep re- -- I'm just trying to --

18       Q.    I'll try to make it smaller bites.

19            So when you ultimately went into

20  management positions in Children's and Family

21  Services, did you get statistics presented or

22  trend data presented on a regular basis so you

23  could think about the impact on staffing or

24  budgeting needs?

25       A.    Not -- not the way you're citing

Page 56

1   it.  Not that way.

2         Q.    Did you --

3         A.    There was -- there was data that

4   was available, and a lot of it was, you know,

5   based on cases.  There was some aggregate

6   information, but there was not, you know, loads

7   of reports.

8         Q.    All right.  And did the type of

9   information that was available improve over

10  time as you got into the 2005, the assistant

11  director position with Summit County, and then

12  2009 with Cuyahoga County, was there more and

13  more sophisticated data and reporting available

14  to you that looked at, like, social factors

15  that would drive the need for Children and

16  Family Services and impact budgeting and

17  staffing?

18        A.    I don't know that I saw that kind

19  of data.  It's -- it can be developed.  I know

20  that, you know, it can be developed as it's --

21  you're doing -- but I can't say that I saw that

22  kind of data.

23        Q.    So let me ask it this way.  Like,

24  when there was a drug epidemic going on, when

25  there was the cocaine epidemic or crack

Page 57

1    epidemic, and then later increased use of

2    methamphetamine, how would you guys know about

3    that?  Would you just see it in individual

4    cases, or would you analyze it on a collective

5    basis?

6         A.    I would -- I can't -- I cannot -- I

7    don't know.  I don't recall that, to be honest

8    with you, that specifics.

9         Q.    Do you remember there was a time

10   when the -- the crack epidemic was increasing

11   the burden on Children and Family Services in

12   Cuyahoga County?

13        A.    I do recall that.

14        Q.    And it put a strain on the ability

15   for the number of workers you had with the

16   resources they had to do their job well; is

17   that fair?

18        A.    I don't know that that's fair.  I

19   think that the employees worked very hard, and

20   we have to work very differently when there's

21   budget -- you know, we have budget issues or

22   we -- money has been taken away from us, we

23   have to work differently.  We work differently,

24   you know, by -- depends on what's going on,

25   but --

1          Q.    All right.  So at any given time,

2     whatever the budget is, whatever the staffing

3     levels you can achieve given the budget

4     restraints, and whatever the social factors are

5     that drive the need for Children and Family

6     Services, all factor into how management gives

7     direction to people to do their job?

8          A.    Yes.

9          Q.    Okay.  And that has always, as long

10    as you've been involved in the field, looked

11    at, like, trends in substance abuse and whether

12    there was a spike of one type of substance or

13    another that was impacting the community?

14         A.    We -- we're aware of that.

15         Q.    Okay.  Do you remember a time when

16    methamphetamine use rose in this part of the

17    country?

18         A.    Yes.

19         Q.    Okay.  And did that impact, as you

20    recall, the burden on Children and Family

21    Services, the need for additional staffing,

22    money, that sort of thing?

23         A.    Well, yes, it was needed.

24         Q.    And coming out of that experience

25    from crack and methamphetamine, was the

Page 59

```
 1   approach that you had during this time period
 2   of '05 to '11 such that you were -- you were
 3   looking to see if there was anything coming
 4   along that would also have an impact in terms
 5   of substance abuse?
 6          A.    I can't answer that question.  I
 7   don't know.
 8          Q.    Do you recall if you were paying
 9   attention to, like, hey, are there things that
10   are going to affect how we do our job going
11   forward, whether they be trends in substance
12   abuse, nationwide economic trends, mental
13   health trends?  Did you pay attention to trends
14   that would drive the need for services?
15          A.    We paid attention to some of those
16   things, yes.  You know, we worked with the
17   mental health board, for example.  You
18   mentioned that.  We worked -- you know, there
19   were some things that we did do.
20          Q.    And I don't want to make it too
21   simplistic, but anything that happens in the
22   community that can affect the ability of
23   families to function cohesively and to have a
24   kind of a safe family unit can have an impact
25   on Children and Family Services?
```

Page 60

1          A.     Yes.

2          Q.     So that can be the economy, that

3    can be, like, foreign wars, that can be drug

4    abuse, that can be a wide range of things?

5          A.     I suppose.

6          Q.     I mean, I don't want to come up

7    with the list.  I'm wondering what you might

8    have, since you're the one who's spent a lot of

9    time in this area.

10              So what -- what are the things that

11   you would identify as kind of significant

12   drivers of the need for Children and Family

13   Services or the overall burden on Children and

14   Family Services an any given time?

15         A.     Well, the need would be to look at

16   programming.  The need would be to look at new

17   programming, evidence-based programs that work.

18   We would be looking at those kinds of things.

19   Obviously, our budgets are our budgets.  You

20   know, they can change.  But I would say it was

21   mostly programming and services and how we

22   relate to our clients.

23         Q.     And do you remember any

24   initiatives, in terms of programming, that you

25   were involved with, first during your time at

Page 61

1   Summit County, that were all directed towards

2   anything going on with substance abuse trends,

3   including any trends relating to opioids or

4   opiates?

5         A.    I don't recall while I was in

6   Summit.

7               In Cleveland, yes.

8         Q.    So for Cuyahoga County, from 2009

9   to 2011 when you were the director, do you

10  recall any programs that were going on, whether

11  you initiated them or not, that were intended

12  to address something about substance abuse

13  including --

14        A.    Our S.T.A.R.T. program.

15        Q.    Okay.

16        A.    That's what you're getting at,

17  so --

18        Q.    Is that the only one that you can

19  think of?

20        A.    That's the major one.

21        Q.    Okay.  And what, from your

22  perspective, drove the initiative, the -- the

23  start of the S.T.A.R.T. program, if you will.

24        A.    Well, it was a new program that was

25  developed.  You know, and I believe it was

Page 62

1   developed in Cuyahoga, as I recall it.  And --
2        Q.    Toledo.
3        A.    Was it Toledo first?  All right.
4        Q.    Well, let's go --
5        A.    All right.
6        Q.    -- off of your memory.
7        A.    All right.  We had -- we had the
8   S.T.A.R.T. program.  We started the S.T.A.R.T.
9   program, and it was a very positive program as
10  I recall.
11       Q.    And did S.T.A.R.T. get its start
12  because of any particular substance that was
13  being abused or trend in substance abuse, as
14  you recall it?
15       A.    I don't recall that.
16       Q.    Okay.  Were there any other
17  programs that, while you were director, that
18  you pushed for increased funding or staffing on
19  because you thought they would help address any
20  of the burdens of substance abuse in the
21  community?
22       A.    That was the primary one.
23       Q.    Okay.  So going back a little bit,
24  and we're kind of straddling two employers.
25  Back in, like, 2008, 2009, do you remember that

1   there was a general decrease in staffing and

2   budgeting in Cuyahoga County and Summit County

3   for Children and Family Services?

4           A.    I don't recall that.

5           Q.    Okay.  So what about when you --

6   when you came in as director for Cuyahoga

7   County in 2009, were you aware that they

8   were -- you were just coming off of major cuts

9   to staffing, including slashing the -- the

10  number of advocates in the S.T.A.R.T. program?

11          A.    What year was it?  Can you -- can

12  you clarify what year that was?

13          Q.    2009?

14          A.    In 2009?  My memory is not very

15  good.  I can't say that I do recall that.

16          Q.    Do you remember there was a

17  national economic downturn in 2008 and 2009?

18          A.    I do remember that.

19          Q.    Do you remember there was a --

20  there were major budget cuts across the state

21  in 2009?

22          A.    Don't recall that.

23          Q.    Okay.  Do you remember that there

24  were -- that the S.T.A.R.T. program, back when

25  it had been established, had, for Cuyahoga

Page 64

1  County, like, 35 advocates who were people who

2  had specialized experience of having been

3  substance abusers themselves, and they were

4  intended to serve as kind of liaisons with

5  families with substance abuse as a way to kind

6  of improve the interaction with the families?

7          A.    I do remember that.

8          Q.    You've heard of an advocate for

9  S.T.A.R.T.?

10          A.    Yes.

11          Q.    Do you remember that when you came

12  in as director, there weren't 35 advocates on

13  staff anymore; the budget was such that you

14  only had a handful?

15          A.    I do recall that.

16          Q.    Like three or four?  Does that ring

17  a bell?

18          A.    It rings a bell.

19          Q.    And do you remember that during the

20  two-year time period that you were involved,

21  that one of the things that was discussed was,

22  hey, it would help us deal with substance abuse

23  of various kinds, including whatever trend is

24  coming next on substance abuse, if we had more

25  advocates?

Page 65

1          A.      I don't recall that.

2          Q.      Do you recall any efforts that you

3    made to -- or that you asked to be made to try

4    to get more money for Cuyahoga County Children

5    and Family Services to address anything about

6    substance abuse?

7          A.      I don't recall specifically.  I

8    mean, I know that we worked with the mental

9    health board very closely.  We did training

10   with them.  I remember some of those things.

11   But I don't recall -- I don't really recall, to

12   be honest with you.

13         Q.      And is that sometimes called the

14   ADAMHS Board?  That's what you're referencing?

15         A.      Yes, yes.

16         Q.      So there were joint programs with

17   the ADAMHS Board that were initiated during

18   your time, and we have some documents about

19   that.

20         A.      Uh-huh.

21         Q.      What I'm asking is, do you recall

22   whether there were other efforts where, through

23   the budgeting process, as cumbersome or

24   difficult as that may have been, you said, hey,

25   department or county or whatever board it was

Page 66

1    that was making budgeting decisions, we need

2    more money to hire people to do our job?  Did

3    any of that happen?

4         A.    Well, we were constantly requesting

5    more money.

6         Q.    Uh-huh.

7         A.    But our budget was our budget, and

8    there was clarity there, as I recall it.

9         Q.    Was any of the money that you were

10   requesting to provide additional support for

11   the impacts of substance abuse in Cuyahoga

12   County?

13        A.    I can't say specifically.

14        Q.    Okay.  Do you recall when it was

15   that you first noticed that were there reports

16   coming in that, where in the past there had

17   been a lot of, you know, alcoholism and alcohol

18   abuse at any given time, and that there'd been

19   a period of time when cocaine was prevalent and

20   methamphetamine was prevalent, that started

21   seeing an uptick on abuse of various kinds of

22   what you called opioids, including heroin?

23             MR. McMONAGLE:  Objection to form.

24        A.    I -- I think that was a slow

25   progression, and, over time, it came to our

Page 67

1    attention that, wow, it appears that there are

2    more and more people that are overdosing or

3    more and more people that are addicted.

4              But I -- I don't -- I don't recall

5    it as, you know, it -- it was a slow kind of

6    thing that came upon us, so to speak.  That's

7    the way I recall it.

8         Q.   Do you recall, before you took the

9    Cuyahoga County position, so when you were in

10   the assistant director position in Summit

11   County, if there was attention being paid at

12   that time to this sort of uptick in abuse of

13   prescription opioids or heroin or any of the

14   other drugs you characterized as opioids?

15        A.   Well, the meth -- you know, the

16   methamphetamines, those drugs were -- and I'm

17   referring to Summit County -- that they were --

18   it was rampant there, more so than other

19   places.

20        Q.   What about when you started

21   specifically seeing more heroin?  Was that --

22   was that happening when you were still with

23   Summit County through '09?

24        A.   Heroin was not as prevalent as meth

25   was.  Meth was the drug of choice back then.

1      Q.    Did you see an uptick on heroin

2  during your time with Summit County, though,

3  even if it hadn't passed meth?

4      A.    Yes.

5      Q.    And do you remember discussions

6  about that back in 2009 or --

7      A.    I can't --

8      Q.    -- 2008?

9      A.    I don't recall the discussions, to

10  be frank.

11      Q.    But it was something that one way

12  or another came to your attention as assistant

13  director, hey, there's an impact of not just

14  meth these days, but now we're seeing heroin,

15  and that may factor into how we can provide

16  services in Summit County; is that correct?

17      A.    I don't know.

18      Q.    Does that ring a bell at all, those

19  sorts of discussions?

20      A.    Some.

21      Q.    Okay.  But you don't know the

22  details --

23      A.    I can't recall the details.  If I

24  could, I would say.

25      Q.    And you don't recall any

1    initiatives coming out of it or getting

2    additional funding back then, do you?

3         A.    I don't recall.

4         Q.    Is that the sort of thing you'd

5    recall if you started a new program and got

6    some more money for it?

7         A.    I would think I would recall that.

8         Q.    Okay.  So when you started with

9    Cuyahoga County again as the director in 2009,

10   by that point in time, you already had in your

11   head, at least from Summit County, you know,

12   down to the -- the southeast, essentially,

13   we're already seeing a shift from

14   methamphetamine being the big thing to heroin

15   is on the uprise; is that correct?

16        A.    That's correct.

17        Q.    Okay.  And when you came into your

18   position with Cuyahoga County and you had it

19   for roughly two years, did you see, over that

20   time, an increase in heroin and the other sorts

21   of what you called opioids being abused and

22   impacting the provision of services from

23   Children and Family Services?

24        A.    I believe so.

25        Q.    And do you remember any discussions

Page 70

1   you had about that with people above you on the

2   chain, so to speak, at Health and Human

3   Services or otherwise within the county?

4          A.    Well, I can tell you with Bill

5   Denihan, we had lots of discussions about --

6   about it.

7          Q.    What was his position?

8          A.    He was the director of the ADAMHS

9   Board.

10         Q.    And was it specific to, hey, we're

11  seeing opioids and opiates and heroin all being

12  abused in our community and this is a

13  particular burden on us?

14         A.    We -- we had -- yes, he was -- he

15  was aware of the burden, and we had lots of

16  discussions about it, met routinely on it.

17         Q.    And would that have been 2009

18  through 2011?

19         A.    Not '9.  I would say probably '10

20  and '11, to the best of my knowledge.

21         Q.    Would any of those discussions be

22  memorialized in any way, as far as you know,

23  either by --

24         A.    I don't know that.  I don't know

25  that.

Page 71

1       Q.    Let -- let me take a step back.

2       A.    I'm sorry.

3       Q.    Did you have meetings where, when

4   you met with, like, the ADAMHS Board or you met

5   with him, in any kind of context, any group

6   meetings that, there'd be minutes prepared of

7   meetings that at least summarized what went on?

8       A.    I'm not sure.

9       Q.    So we do have some minutes of some

10  meetings you attended.  Not a lot.

11      A.    Uh-huh.

12      Q.    But was it practice for certain

13  types of meetings that you had that were, like,

14  monthly meetings with a group, you'd get an

15  agenda circulated before a meeting and get a

16  copy of the minutes from the last meeting

17  distributed?

18      A.    That would be practice, I would

19  think.

20      Q.    Pretty standard government

21  practice?

22      A.    I would think that's a standard

23  government practice that's been...

24      Q.    And do you think that any of these

25  meetings you had with Bill Denihan in 2010 and

Page 72

1    2011 would have been memorialized in these

2    sorts of minutes?

3         A.    I don't know that, but I would

4    think so.

5         Q.    Okay.  And do you remember around

6    this exact same time, 2010, 2011, there were

7    already statewide efforts that the governor's

8    office was initiating conferences and doing

9    things on a statewide basis to look at the

10   impact of opioid or opiate abuse on various

11   aspects of the state and government services?

12        A.    I don't recall them.

13        Q.    Does that ring a bell at all, that

14   there were statewide efforts going on?

15        A.    It rings a bell, but I don't recall

16   specifics.

17        Q.    What about any task forces that

18   were set up, either by Cuyahoga County across

19   disciplines or by anything on a statewide

20   basis?

21        A.    I'm sorry.  I just don't recall.

22        Q.    Okay.  The conversations you had

23   with Bill Denihan of the ADAMHS Board, do you

24   recall anything coming out of that that led to

25   a specific proposal for more money, more

Page 73

1   staffing, or a change of policy specific to

2   Children and Family Services?

3        A.    I don't recall.

4        Q.    But any -- anything relating to a

5   policy change would have to be memorialized in

6   documents proposing policy changes and, like,

7   redlining --

8        A.    Yes, yes.  If there are policies

9   that we were changing.

10       Q.    And -- and if you set up any kind

11  of new program, like a new version of

12  S.T.A.R.T. or some change to how S.T.A.R.T. was

13  done, that would be memorialized too, right?

14       A.    I would think so.

15       Q.    And all of the budgeting

16  discussions, those get memorialized too, right?

17       A.    Should have been.

18       Q.    So sitting here today, do you -- do

19  you remember ever getting, during this time

20  period when everybody was recognizing there was

21  this uptick in the impact on governmental

22  services from this new trend in drug abuse

23  relating to specifically, like, heroin and

24  other opiates, did anything change in terms of

25  how Children and Family Services did its work,

1   got its people, got its money?

2          A.     I don't know that.

3          Q.     You don't recall any changes?

4          A.     I don't -- I just don't know.

5          Q.     There may have been changes, but

6   you don't remember them?

7          A.     I just don't know.

8                 MR. McMONAGLE:  Is this a good time

9   for a break?

10                MR. ALEXANDER:  In a couple more

11  seconds I think we can bring it up.

12                Are you okay?

13                THE WITNESS:  Yeah.  I'd like a --

14  I'd like a break, but okay.

15                MR. ALEXANDER:  Okay.  Well, let me

16  just make sure we -- we wrap up this --

17                THE WITNESS:  Sure.

18                MR. ALEXANDER:  -- part of the

19  discussion.

20                THE WITNESS:  Sure.

21          Q.     Are you aware of any initiatives

22  that you or your staff were part of during this

23  time period with Cuyahoga County from 2009 to

24  2011 that actually came to fruition, where

25  there actually was some new -- new program

1  launched, some additional funding for an

2  existing program, anything like that to try to

3  address at all what you'd recognized as an

4  additional impact on Children and Family

5  Services from the increasing abuse of opioids

6  or opiates, including heroin?

7        A.    I just don't recall it.  I just

8  don't recall.

9        Q.    And do you think that's because

10  there wasn't anything that ever came to

11  fruition, or because, you know, there may or

12  may not have been and you just don't remember

13  10 years later?

14        A.    I -- I just don't remember 10 years

15  later.

16        Q.    Okay, fair enough.

17              MR. ALEXANDER:  Now is a good time

18  for a break if you want one.

19              THE WITNESS:  Yep, I'd like one.

20              THE VIDEOGRAPHER:  Off the record,

21  11:04.

22                (A recess was taken.)

23              THE VIDEOGRAPHER:  On the record,

24  11:19.

25  BY MR ALEXANDER:

Page 76

1        Q.    Ms. Forkas, do you have any of your
2   testimony thus far you need to change or
3   supplement in any way?
4        A.    No.
5        Q.    Did you talk with Plaintiffs'
6   counsel during the break?
7        A.    Yes, I...
8        Q.    So I just want to make sure I'm
9   clear, because I don't want to break it, create
10  any issues.  So I'm not asking about any
11  conversations that you had with counsel for
12  Stark County when Plaintiffs' counsel wasn't
13  present.  But if Plaintiffs's counsel was
14  present during any conversations, that's what I
15  want to know about, okay?
16       A.    Uh-huh.
17       Q.    So did you have conversations where
18  Plaintiffs' counsel was present at all during
19  the break?
20       A.    Did we have conversations?
21       Q.    Yes.
22       A.    Yes.
23       Q.    Did you talk about anything
24  substantive in terms of the deposition thus
25  far?

Page 77

1           A.    No.  It was about me, how was I

2    feeling, how was I doing, that kind of thing.

3           Q.    Were you given any new information

4    or any instructions?

5           A.    No instruction.  No information.

6           Q.    Any -- I asked you earlier about

7    whether you had any information about whether

8    any of the allegations against any of the

9    Defendants were correct or incorrect.  Do you

10   remember those questions?

11          A.    Vaguely.

12          Q.    Do -- do you know if any of the

13   allegations are correct about what the impact

14   on the Plaintiffs has been relating to anything

15   about opioids or opiates in terms of damages

16   they claim or injuries that they claim?

17          A.    No.

18          Q.    Okay.  Do you have any personal

19   knowledge about the damages, if any, sustained

20   by Cuyahoga County relating to anything about

21   opioid or opiate abuse?

22          A.    Relating to the agency?  In

23   general?

24          Q.    Related to the county.

25          A.    To the -- to the county?

Page 78

1          Q.     Yes, ma'am.

2          A.     Could you please define county,

3     what you -- what do you mean by that?

4          Q.     Sure.  So the county that's suing

5     is the governmental entity, and they're made up

6     a bunch of branches and they have various

7     allegations and claims about the impact, not

8     just on Children and Family Services, but

9     Health and Human Services more broadly, and

10    various other branches of government and

11    impacts on governmental services.

12              Does that make since so far?

13         A.     Yes.

14         Q.     And Summit County has similar

15    claims.  Does that make sense?

16         A.     Makes sense.

17         Q.     Do you have any personal knowledge

18    about whether there are any damages sustained

19    by Cuyahoga County, and if so, how much?

20         A.     No idea.

21         Q.     Same thing for Summit County?

22         A.     Same thing.  No idea.

23         Q.     And while you were director of

24    Children and Family Services, did you have your

25    staff or participate in any analyses that

1    looked at, like, the financial impact of any

2    aspect of substance abuse on Children and

3    Family Services?

4         A.    I don't recall that.

5         Q.    Okay.  What about, like, budgeting

6    demands, like, we should have this many more

7    people in these different positions because of

8    this uprise in alcoholism or methamphetamine or

9    cocaine or something else?

10        A.    I don't recall.

11        Q.    What -- what about anything

12   relating to how much additional money it would

13   take or money for staffing it would take to

14   allow you to keep up with the demands that were

15   put on the division because of any aspect of

16   substance abuse, including opiates or opiates

17   [sic]?

18        A.    I don't recall those conversations.

19        Q.    Or analyses like that?

20        A.    Or analyses.

21        Q.    And the same thing for Summit

22   County.  Do you recall any analyses like that

23   or --

24        A.    No.

25        Q.    -- discussions about financial

Page 80

```
 1    impact?

 2          A.    I don't recall.  I'm sorry.  I just

 3    don't recall.

 4          Q.    So let me -- let me make sure we're

 5    on the same page about this.

 6                Given what you said about that

 7    there's -- substance abuse is one of the main

 8    drivers of Children and Family Services, and

 9    that various other things, including economic

10    downturn and other societal factors impact the

11    need for Children and Family Services, is it

12    also your belief that there's a central

13    financial impact from any of those drivers as

14    well?

15          A.    I believe so.

16          Q.    And that could be expressed by,

17    like, this much of our existing budget is

18    devoted to addressing this particular type of

19    issue, or we would need this amount of

20    additional money to be able to keep up with the

21    demands caused by, you know, meth epidemic or

22    crack epidemic or, you know, mental health

23    crisis or whatever?

24          A.    I just don't recall those

25    conversations.
```

1      Q.    Okay.  But -- but is that what you

2  think happens, is that at any point in time,

3  some portion of the money that's being spent or

4  the money that could be spent on Children and

5  Family Services could be attributed to the

6  impact of the, you know, mental health crisis

7  or crack epidemic or meth epidemic?

8      A.    I don't know that.

9      Q.    Was -- was that part of discussions

10 that you're aware of while you were there of,

11 hey, you know, a large part of our budget is

12 taken up by addressing these sorts of trends

13 and, you know, maybe we should quantify it in

14 some way?

15     A.    I don't know that.

16     Q.    Okay.  Like in connection with

17 budgeting proposals, do you recall anything

18 where people would say, as maybe making a more

19 persuasive claim for we need more money to

20 fulfill our function, we should say, listen,

21 there's a big impact of this thing or that

22 thing that's going on locally or nationally or

23 statewide to try to get more money to do our

24 job?

25              MR. McMONAGLE:  Objection to form.

Page 82

```
 1        A.    I don't know that.  I can't answer
 2   your question.
 3        Q.    And did you participate in making
 4   those sorts of pitches for more money in the
 5   budget process?
 6        A.    I'm not sure.
 7        Q.    Do -- do you think that Cuyahoga
 8   County Division of Children and Family Services
 9   did a good job under the time period, under
10   you, during the time period when you were the
11   director?
12        A.    I did the best job I could.
13        Q.    And do you think the division did a
14   good job?
15        A.    I think the division did the best
16   job that they could considering the
17   circumstances of things that were going on in
18   the agency at the time.
19        Q.    And what were those things going on
20   in the agency at the time that --
21        A.    Well --
22        Q.    -- make it harder?
23        A.    --we had --
24        Q.    Made it harder?
25        A.    Well, we -- you know, from -- we
```

1    had fatalities, which is very difficult.  We

2    were in the media.  I mean, there were just a

3    lot of things that were going on from the time

4    that I started working there to the time that I

5    left.

6         Q.    Okay.  So I have the media reports,

7    and we know about the --

8         A.    Sure.

9         Q.    -- deaths that were in the media.

10   But I want to make sure that you can give us

11   what the list is in your head of the lot of

12   things that were going on that make it -- made

13   it harder for Children and Family Services to

14   do its job well.

15           Can you give us that list of what

16   it was, other than the media attention to the

17   deaths?

18        A.    Well, it was the -- about the work.

19   And about the volume of the work.

20        Q.    Can you explain that please?

21        A.    Well, we had all kinds of things

22   going on in the agency.  When I came back to

23   the agency, it was a very different agency than

24   what -- when I had left.  I can tell you

25   that -- that communication wasn't very good.

Page 84

1    There were problems between management.  We

2    were working on those kinds of things.

3              We needed -- we did need more

4    services.  We did do a blue-ribbon panel, which

5    I'm sure you read about, to try to develop the

6    programs.  We brought experts in to try to

7    figure out what are the things we can -- you

8    know, that we can work on, why is this

9    happening.  We did a lot of things.  There were

10   lots of problems.

11        Q.    Okay.  So we'll talk about the

12   panel.  We do have that.  That was led by a

13   professor from Case Western, correct?

14        A.    Yes, David.

15        Q.    So that's kind of on the "steps to

16   fix it" side, if you will.

17        A.    Uh-huh.

18        Q.    I want to make sure we have your

19   list of what the problems were, what the

20   impediments were.

21              So you talked about communications

22   within management.

23        A.    Uh-huh.

24        Q.    Correct?

25        A.    Uh-huh.

Page 85

1          Q.      Is that a yes?

2          A.      Yes.

3          Q.      That's one of those --

4          A.      Sorry.

5          Q.      -- things where --

6          A.      That's -- got it.

7          Q.      -- you got to use words where you

8   can.  Okay.

9          A.      Yes.

10          Q.      And that wasn't an issue of how

11   much funding you had or anything relating to

12   drug abuse; the management communication issue

13   was just a structural problem?

14          A.      It was a structural problem.

15          Q.      Okay.  And there was also an issue,

16   I think, from what you've said, about the way

17   that different parts of the government

18   communicated, the interaction between different

19   divisions of Health and Human Services or

20   interaction with things like the ADAMHS Board

21   or the courts, there's intragovernmental

22   communication issues as well, correct?

23          A.      That's true.

24          Q.      I think you mentioned something

25   about the volume of cases.  The volume of cases

Page 86

1  during this time period was going up, but

2  you're staffing and your budgeting was not; is

3  that right?

4       A.    That's true, I believe.

5       Q.    Which meant that the caseload was

6  going up for every worker?

7       A.    Caseloads do go up.

8       Q.    All right.  So budgeting issues,

9  staffing issues, internal structural

10  communication issues, communication issues

11  within the government but outside of Children

12  and Family Services, increased staffing needs.

13            What else, please?

14       A.    More programming, more services

15  needed.

16       Q.    And what were the additional

17  services and programming needed that you recall

18  identifying during this time period of 2009 to

19  2011?

20       A.    I don't recall.  I don't recall

21  exactly what they were.

22       Q.    But in general, there was just more

23  stuff to do?

24       A.    There was lots of things to do,

25  lots of services that were needed.

1        Q.    Okay.  And these -- all of these

2    things added up to make it hard to run a

3    division at the level of performance that you

4    would want in terms of protecting the safety of

5    children of Cuyahoga County?

6        A.    Repeat your question, please.

7        Q.    The things that you've been

8    identifying that made your life more difficult

9    or made the job of the division harder, those

10   impacted the ability of the division to fulfill

11   it's primary mission of protecting the safety

12   of the children of Cuyahoga County, correct?

13       A.    Well, I'd like -- I'd like to

14   believe that, you know, there's -- that

15   people were -- children and families were still

16   receiving services.  They were receiving

17   services all the way through.  Now, were they

18   receiving the services that we previously had?

19   No, those were reduced.

20       Q.    So the level of services that were

21   provided, from your perspective, reduced during

22   2009 to 2011, compared to your historic

23   experience?

24       A.    Correct.

25       Q.    And that was not driven by the

Page 88

1  abuse of opioids or opiates in the community,

2  was it?  That trend?

3       A.    I can't answer that question.

4       Q.    From what you've said, there were a

5  bunch of other factors that impacted that as

6  well, correct?

7       A.    There were factors.

8       Q.    And is it true that one of the big

9  factors was that the overall budget was less in

10 2009 than it had been a couple years earlier?

11      A.    I don't recall that, numbers.

12      Q.    What about from the state's

13 financial contribution to Children and Family

14 Services.  Do you recall that Ohio was last in

15 the nation --

16      A.    I do.

17      Q.    -- in terms of how much was

18 contributed by the state to the county

19 provision of services?

20      A.    I do.

21      Q.    Okay.  And that they were less, by

22 a fair margin, that they were -- it was often

23 quoted they could double the amount that the

24 state gave to each county and they'd still be

25 last in the country?

Page 89

1          A.      It's true.

2          Q.      Okay.  And how did that impact

3     things?

4          A.      As you can imagine, cause- -- it

5     was difficult.

6          Q.      And that meant that a lot of the

7     money that was going to go to anything for

8     Children and Family Services had to come from

9     private sources, federal funds, or a local

10    levy; is that correct?

11         A.      That's correct.

12         Q.      And in terms of federal funds, do

13    you recall during this time period when you

14    were director, doing anything to try to get

15    additional federal funds because of anything

16    relating to increasing abuse of opioids or

17    opiates?

18         A.      I don't recall.

19         Q.      What about private funding?  Did

20    you recall efforts to try to get more private

21    funding during this time?

22         A.      I don't recall.  I -- not certain.

23         Q.      Okay.  And let me ask it more

24    generally.  Did you do anything during this

25    time to try to get more federal funding for any

Page 90

1   purpose?

2        A.    I don't recall.

3        Q.    Okay.  And did you do anything or

4   participate in anything about trying to

5   increase the local levy?

6        A.    No, not that I recall.

7        Q.    As a resident of Cuyahoga County

8   and somebody in this field, including somebody

9   who's participated in statewide entities like

10  PCSAO over the years, do you know anything

11  about what's gone on with the levy for Cuyahoga

12  County to try to get money for Children and

13  Family Services?

14       A.    Currently right now?

15       Q.    Yeah.

16       A.    No, not right now.

17       Q.    Do you know that essentially, for

18  many years after you left the director

19  position, they still didn't increase the levy

20  and that the funding remained essentially flat

21  or decreasing?

22       A.    No, I didn't know that.

23       Q.    We talked that you knew Ms. Rideout

24  and that you talked to her in connection with

25  the succession of her taking over your

```
 1   position, correct?
 2          A.     Somewhat.
 3          Q.     Okay.  Did you talk to your
 4   predecessor at all?
 5          A.     No.
 6          Q.     Who was your predecessor?
 7          A.     I don't recall.
 8          Q.     Have you talked to any of the
 9   people who've had the director position since
10   Ms. Rideout?
11          A.     Anybody -- repeat the question,
12   please.
13          Q.     Have you had any dealings with
14   Cuyahoga County Division of Children and Family
15   Services since Ms. Rideout stopped being
16   director?
17          A.     No.
18          Q.     Okay.
19          A.     I think it was Tom Pristow, wasn't
20   it?
21          Q.     Yes.  Did you ever deal with him?
22          A.     Very indirectly.
23          Q.     And have you had -- do you have any
24   personal knowledge of what's gone on in the
25   division in terms of funding or staffing or
```

1  programs, anything like that?

2      A.    None.

3      Q.    You've focused on Fairfax County

4  and now Stark County since then?

5      A.    Yes.

6      Q.    Okay.  So you don't have personal

7  knowledge of how any trends may have changed in

8  terms of the impact of different types of drug

9  abuse or substance abuse on Cuyahoga County

10 Children and Family Services after you were

11 director, correct?

12     A.    Correct.

13     Q.    Do you know if any of the

14 discussions that you had with Ms. Rideout when

15 she was taking over had anything to do with the

16 impact of substance abuse?

17     A.    No.  It was more just about the

18 agency.  Very, very vague.  You know, we didn't

19 talk about specifics.  It was more about, you

20 know, when she was thinking about taking the

21 job, actually.

22     Q.    Did you counsel her against taking

23 the job?

24     A.    No.  I li- -- I listened to her.

25 That was it.

Page 93

1          Q.    Did you apply for the job at the
2     end of 2010 when --
3          A.    No.
4          Q.    -- she ended up getting it?
5          A.    No.
6          Q.    Do you -- do you know if you had
7     any discussions about the importance of the
8     S.T.A.R.T. program or kind of ramping up the
9     S.T.A.R.T. program to get its staffing levels
10    up?
11         A.    I don't recall anything.
12         Q.    Do you recall anything during your
13    time as director about the impact on
14    performance from having, you know, a tenth,
15    roughly, of S.T.A.R.T. funding that you were
16    supposed to have for advocates?
17         A.    No, I don't recall that.  I don't
18    recall those conversations.
19         Q.    Do you recall any conversations
20    about the importance of the advocates for the
21    S.T.A.R.T. program?
22         A.    I don't recall it.
23         Q.    When you were director of Children
24    and Family Services for Cuyahoga County, did
25    you have an e-mail account there?

1      A.    Yes.

2      Q.    Okay.  And did you conduct most of

3 your business through e-mail or telephone,

4 in-person meetings?

5      A.    All of the above.

6      Q.    Okay.  And did you -- were there

7 certain types of documents you would create

8 back then, in terms of you would write up your

9 own memos or were you somebody, you were like,

10 hey --

11      A.    No.

12      Q.    -- dictate it and have somebody

13 type it up?

14      A.    Dictate it.  I had an

15 administrative assistant that did that.

16      Q.    What was her name?

17      A.    Regina Thigpen.

18      Q.    We've seen some documents from her.

19 I just need to --

20      A.    Yeah.  Regina Thigpen.

21      Q.    Okay.  What other sorts of

22 documents would you ever create under your own

23 name, besides e-mails?

24      A.    I don't know.

25      Q.    Would you, like, edit memos that

Page 95

1    somebody else prepared in, like, a Word file or

2    a -- look at a spreadsheet somebody did for --

3    with Excel, add comments or change it?

4         A.    Not in general.  We did those in

5    meetings.  Budget meetings, for example.

6         Q.    And what sort of documents would

7    come out of a budget meeting or be generated in

8    connection with a budget --

9         A.    Audrey would -- you know, Excel

10   spreadsheets, she'd -- things like that.  You

11   know, the -- the last quarter, the last month,

12   where we were with the budget in general.

13   Those kinds of things.

14        Q.    Did you have some sort of

15   specialist who would deal with budgets or

16   statistics?

17        A.    Audrey Beasley.

18        Q.    Did you keep hard copy files from

19   your time as director, or was it all

20   electronic?

21        A.    Electronic.

22        Q.    You mentioned earlier something

23   called case files where we had a little

24   discussion about that.

25             Would you ever have an occasion to

1   actually look at a case file when you were

2   director?

3        A.    I did on occasion.  Depends on, you

4   know, like, for example we had a few fatalities

5   when -- and I would look at the case files.

6   It's been a long time since I thought about

7   that.

8        Q.    Was there a reason to look at a

9   case file other than when there was a

10  particular case that was, like, in the press or

11  where there was a death?

12       A.    It was just good to see everything

13  that was in the file to redo- -- to review.  We

14  did reviews.

15       Q.    So we have mentioned SACWIS.  Would

16  you ever ask for reports to be run out of

17  SACWIS, either by asking your staff or

18  communicating directly with the state to have

19  it run?

20       A.    There were SACWIS reports that

21  were -- you know, there were canned reports

22  that we would -- that we would get.

23       Q.    And did -- was the way it worked

24  that you had somebody that could run the report

25  out of SACWIS, or you had to ask somebody at

Page 97

1   the state to run it for you?

2       A.   No, we -- out of -- we could -- we

3   could run -- I believe we could run reports out

4   of SACWIS.  I believe -- I believe so.

5       Q.   Were there some reports that you

6   could run yourselves and other reports that had

7   to be run by the state?

8       A.   I'm not sure.  I can't answer that

9   question.  I don't know that.

10      Q.   And you said there were canned

11  reports.  Were there specific reports that you

12  would have had the ability to be request be

13  run?

14      A.   There -- there were things, the

15  canned reports.  You know, there were reports

16  about placements and about dollars with

17  placements, and, you know, those kinds of --

18  those kinds of things.

19      Q.   And do you recall ever asking for

20  any new or different type of report to be run?

21      A.   I don't recall.

22      Q.   And why was it important to know

23  dollars with placements?

24      A.   Well, it's always good to know how

25  much money you're spending so that you can move

1   money around if you need to.

2        Q.    Would you ever ask that it be,

3   like, cross-referenced to say, okay, here's

4   much -- how much we're spending on placements

5   and here's how much relates to, you know, cases

6   where the placement is attributed to, you know,

7   alcohol abuse or attributed to, you know, a

8   mental health issue or something else?

9        A.    I don't know that we had that data

10  in an aggregate format.

11       Q.    That may not have been within the

12  system's capabilities back when you were

13  director?

14       A.    It was a long -- well, I'm not

15  sure.

16       Q.    Okay.  Other than SACWIS, were

17  there other databases or data sources that you

18  or your staff would utilize to get information

19  you would use?

20       A.    We still had FACS at the same time,

21  because there were problems with SACWIS.

22       Q.    What was that?

23       A.    Well, there were -- you know, it

24  was -- there was just -- just some things got

25  brought on at different points in time with --

Page 99

1    with SACWIS, so --

2          Q.    I'm sorry.  What -- what was FACS?

3          A.    FACS was the previous system.  So

4    there was dual entry on finance for a -- for a

5    short period of time, so there was FACS and

6    then there was SACWIS.

7          Q.    Do you know what "FACS" stood for?

8          A.    I used know.

9          Q.    Who maintained that?

10         A.    The state.

11         Q.    Okay.  And -- but the data entry

12   would be done on the county level?

13         A.    Uh-huh.

14         Q.    Yes?

15         A.    It was loaded down -- yes.  It was

16   loaded down every night and sent to the state.

17         Q.    Was there also a time when you

18   noticed that there was an increasing burden on

19   your staff, the caseworkers, because of how

20   much time they had to spend entering data into

21   SACWIS or FACS?

22         A.    It was dual entry, and it was

23   cumbersome, but we needed to be sure that it

24   was accurate.

25         Q.    And what kind of reports could you

Page 100

```
 1  get out of the FACS database?
 2       A.    Well, I didn't run anything out of
 3  FACS.
 4       Q.    You had staff that could do that?
 5       A.    There was -- there was IT staff
 6  that could do that if needed.  I don't recall
 7  it, reports or what the reports were.
 8       Q.    Okay.  Other than SACWIS and FACS,
 9  were there other databases that were used to
10  look at data collectively or run reports of any
11  sort?
12       A.    Possibly Excel.  Excel
13  spreadsheets, you know, everybody's using Excel
14  spreadsheets --
15       Q.    What sort --
16       A.    -- but no real --
17       Q.    Sorry.
18       A.    You're interrupting me now.
19             That's it.  Go ahead.
20       Q.    I'm sorry.
21       A.    That's all right.
22       Q.    What sorts of reports or analyses
23  would you or your staff do through Excel?
24       A.    They would track certain costs, I
25  believe.  It was really more of a finance --
```

Page 101

1    handling finance.  And we would review --

2    review them.

3         Q.    And did you have particular staff

4    who was responsible for tracking financing and

5    spending?

6         A.    Yes.

7         Q.    Who was that?

8         A.    Audrey Beasley.

9         Q.    Do you have in your mind, as you

10   sit here today, a wish list of things that you

11   would have wanted to initiate if you'd had

12   additional money back then?

13        A.    I don't know.  I can't answer that

14   question.

15        Q.    And have you ever thought about we

16   really needed more money back then to address

17   any aspect of substance abuse in Cuyahoga

18   County?

19        A.    I think we always needed more money

20   for everything.

21        Q.    Okay.  Not specific to substance

22   abuse?

23        A.    Could be.  Could be.  Could have

24   been all the -- all the problems that we had.

25        Q.    Okay.  Let me ask it this way.

Page 102

1   When you say we could have used more money all

2   the time for all sorts of things, that is not

3   saying, oh, we specifically needed money just

4   to address opioid or opiate abuse?

5           A.    We needed money for that.  We

6   needed money for all different kinds of things

7   at the agency.  If we would have -- could have

8   had it, we would have developed some things.

9   We did develop some things, you know, but we

10  did the very best we could with -- with what we

11  had.

12          Q.    Okay.  And do you think that you

13  made adequate efforts to try to get increased

14  funding when you were director?

15          A.    I tried.  I tried.

16          Q.    And you couldn't get more money?

17          A.    We got some, but it was not what we

18  needed.

19          Q.    Like, I mean, you didn't get

20  millions of extra dollars during your time;

21  the --

22          A.    No.

23          Q.    -- budget was pretty flat?

24          A.    It was a flat budget, but we got

25  some money.  So money that was not spent, for

```
 1   example, on placements, we were able to move
 2   some of that money so that we could do it --
 3   use it for programming.  You know, same money,
 4   but where we underspent a little, we could move
 5   some of that money.
 6        Q.    So during this time period when you
 7   were director and the budget was flat, your
 8   needs were not flat; they were increasing,
 9   correct?
10        A.    They were increasing.
11        Q.    And that is not just because of
12   opioid or opiate abuse in the community; that's
13   because of a bunch of things?
14        A.    Bunch of things.
15        Q.    And in your mind, can you -- can
16   you weigh that of how much of that has anything
17   to do with what you'd recognize at the time was
18   an increase in the use of or abuse of opioids
19   or opiates versus all of the other things?
20        A.    To be honest with you, I can't.
21        Q.    Okay.  Which one's more of a
22   driver?
23        A.    It's hard to say.
24        Q.    Okay.  So the -- all the other
25   things that were leading to increased burden
```

1    during 2009 to 2011, can -- can you list those,

2    of what you think was -- why it was that was

3    every year you had more and more need for

4    Children and Protective Services or Children

5    and Family Services, staffing, spending

6    programs, all of that?

7          A.    I can't say.

8          Q.    I mean, it's a lot of things,

9    right?

10         A.    It was a lot of things.

11         Q.    And during this time period you're

12   coming right out of the economic downturn from

13   2008 and 2009, correct?

14         A.    I suppose.

15         Q.    Do you recall -- well, let me ask

16   this.  Do you remember a time in Cuyahoga

17   County when there was massive investigation and

18   prosecution of public corruption?

19         A.    Do I remember that time?

20         Q.    Yes.

21         A.    Yes.

22         Q.    And sound right that, like, 60-plus

23   people were indicted or convicted back then for

24   various types of public corruption?

25         A.    I recall that.

Page 105

1        Q.    And did that impact the ability to
2   get funding when you were director, or the
3   ability to do your job well?
4        A.    I can't say that.
5        Q.    I mean, it wasn't like all of the
6   sudden coming out of a period of time with
7   massive embezzlement that there was more money
8   in the budget available for Children and Family
9   Services, right?
10       A.    I don't believe so.
11       Q.    That -- that wouldn't make sense,
12  would it?
13       A.    Doesn't seem to.
14       Q.    Was there also a change in the
15  process for getting funding during the time you
16  were director?
17       A.    I don't believe there was, but I'm
18  not 100 percent.  I don't really recall that.
19       Q.    In general, did you find it -- find
20  that whoever it was, was controlling the
21  pursestrings, if you will, of getting money for
22  Children and Family Services when you were
23  director, was tight on the money or were
24  they -- they lenient in terms of giving you
25  money that you could justify that you needed?

1       A.    No, there wasn't leniency.  We'll

2   just say that.

3       Q.    And do you wish you had more money?

4       A.    Always.

5       Q.    Have you ever kind of quantified

6   that of, you know, I wish we had another $20

7   million a year for our budget, $30 million a

8   year, anything like that?

9       A.    I can't say.  I don't recall.

10      Q.    Would you have needed a lot more

11  money to do a better job?

12      A.    I think so.

13      Q.    Were you able to fill positions

14  when you had them open?

15      A.    No.  Not all.

16      Q.    Why not?

17      A.    Well, there were -- just not the --

18  the money wasn't there, as I recall it.

19      Q.    Do you also recall that there were

20  issues with the HR department for the county in

21  terms of them processing paperwork and setting

22  up trainings and doing all of the steps so that

23  you could actually fill positions that were

24  open to be filled?

25      A.    I don't recall that.

1      Q.    What about turnover?  Do you recall

2  having an unacceptable rate of turnover from

3  your perspective?

4      A.    Turnover, initially, when I first

5  got there, was a problem, but we had focused on

6  improving the turnover rate.  It was -- it was

7  fairly low, but then I can't speak over time.

8      Q.    And turnover was particularly an

9  issue among new hires, so people tend to leave

10  within roughly their first year, particularly

11  in intake?

12      A.    I don't recall that, but that would

13  make sense.

14      Q.    And so when you have a problem of

15  it's hard to hire people and then you have

16  people leaving faster than you hope, you end up

17  with not enough people to fill the positions

18  that you have budget -- you have money

19  allocated for; is that what happens?

20      A.    I can't say that.

21      Q.    Okay.  Did you ascertain, during

22  this time period, that the lack of full

23  staffing was a problem for the provision of

24  services?

25      A.    No.

Page 108

```
 1                    -  -  -  -  -
 2              (Thereupon, Deposition Exhibit 1,
 3              12/14/2010 Letter from Deborah
 4              Forkas to Ed FitzGerald Re: Position
 5              of Deputy Director of Children and
 6              Family Services, CUYAH_012151317 to
 7              012151320, was marked for purposes
 8              of identification.)
 9                    -  -  -  -  -
10         Q.    I've marked as Exhibit 1 -- there's
11    a copy for you.  I'll identify the document for
12    the record, and then there's a copy for the
13    Plaintiffs' counsel and counsel for Stark
14    County.  So you get the one with the sticker on
15    it, on top.  That's -- so it's going to be with
16    the exhibits.  And then down there.
17              So Exhibit 1 is a document that was
18    produced by Cuyahoga County in this litigation,
19    bearing Bates number CUYAH_012151317 through
20    20.
21              Those little numbers in the bottom
22    right are called Bates numbers.  Do you see
23    that?
24         A.    (Witness nodding head.)
25         Q.    I may refer to that to help you
```

Page 109

1    focus on a particular page or something.  Does

2    that make sense?

3         A.    Yes.

4         Q.    Okay.  So Exhibit 1 says that it's

5    from you, as director of Cuyahoga County

6    Children and Family Services, from December 14,

7    2010.  And was that your title at that time?

8         A.    I'm sorry.

9         Q.    Were you the director as of

10   December 14th --

11        A.    Yes.

12        Q.    -- 2010?

13        A.    Yes.

14        Q.    And it attaches a copy of what it

15   says is your CV or resume, which is a

16   three-page document after the cover letter.  Do

17   you see that?

18        A.    Uh-huh.

19        Q.    Does that look like that was a

20   current resume or CV at that time?

21        A.    It looks like the real thing.

22        Q.    Do you see anything in here that

23   you know to be inaccurate?

24        A.    I am not sure about the $184

25   million budget.

1      Q.    And that's the first bullet under

2  what you've listed for Cuyahoga County

3  Department of Children and Family Services?

4      A.    Uh-huh.

5      Q.    The time when you were director.

6            So can you just explain what it is,

7  why were you writing a letter -- here it's

8  directed to Mr. FitzGerald, which -- who would

9  have been the county executive at the time,

10  correct?

11     A.    Uh-huh.

12     Q.    Yes?

13     A.    Yes.

14     Q.    So why was it after you had already

15  had the job for close to two years that you

16  were sending a letter attaching your CV to

17  apply for the position that you had?

18     A.    I don't really know.  I don't

19  recall this.

20     Q.    So let's -- let's go through it a

21  little more -- in a little more detail, then.

22            It starts off as being sent to

23  Cuyahoga County executive-elect transition

24  office.  Do you see that?

25     A.    I see that.

Page 111

1          Q.    And, "Dear Mr. FitzGerald."  That's

2     who had just been elected as the exec- --

3     county executive and had not yet assumed --

4     been sworn into office.  That's the time period

5     we're talking about, right?

6          A.    Yes.

7          Q.    And so that's -- that goes along

8     with saying that this is the executive-elect

9     transition office.  Do you see that?

10         A.    Uh-huh, I see it.

11         Q.    And your first sentence says, "I am

12    writing in response to your posting for the

13    position of deputy director of Children and

14    Family Services."  And then you continue on

15    with a description of your experience, and

16    attaching a copy of your CV.

17         A.    I think this was -- well, never

18    mind.  You don't have a question.

19         Q.    So what do you think is going on

20    here?  At this point in time, did you already

21    know that you weren't going to have the

22    director position after Mr. FitzGerald assumed

23    office and that you wanted to get some other

24    position, like the deputy director?

25         A.    No, no.

1      Q.    What do you think is going on with

2  this application?

3      A.    Do you have -- do you have the

4  sign -- do you have a signature for me?

5      Q.    This is how we got it produced to

6  us.

7      A.    I just find this interesting.  The

8  only thing that I can think of is I believe we

9  were told each of the -- the deputy directors

10  or -- they call it deputy director; I think

11  that was our new title, actually -- is that we

12  had to reapply for our positions.  This is the

13  14th of 2010 -- December 14, 2010 -- we had to

14  reapply for our positions, is what I think this

15  is.

16      Q.    Do you think you actually

17  ultimately reapplied for your position to try

18  to keep the same position?

19      A.    I don't know that.

20      Q.    Okay.  But in any event, you did

21  not keep it once the new --

22      A.    No.

23      Q.    -- administration took --

24      A.    No.

25      Q.    So let's just go to where the

Page 113

1   bullets that you have on your CV, starting on

2   the second page under the period of time as

3   director, from January '09 to present.

4           A.    Uh-huh.

5           Q.    This is where you identified that

6   there might be some number that you're not sure

7   is correct.  The first bullet says,

8   "Responsible for leading and directing the

9   largest child-welfare agency in the state of

10  Ohio.  Oversight of 900 staff and $184 million

11  budget."

12              Do you see that?

13          A.    Yes, I see it.

14          Q.    And you think that's all accurate,

15  but you're not sure if the $184 million budget

16  is exactly right?

17          A.    We had a very large budget as I

18  recall, but I don't -- I can't -- I can't

19  comment on the number.  I'm not sure.

20          Q.    It says, "Providing management of

21  client services (hotline intake, family

22  services, foster care, and adoption)."  Then it

23  says, "Supportive services (fiscal information

24  services and training and legal services and

25  purchase services)."

1           Do you see that?

2      A.    Yes.

3      Q.    So is that a fair summary of what

4   your responsibility was as director?

5      A.    Well, some of it.  It's fair.

6      Q.    And then the third bullet down

7   below says, "Initiated and implemented a

8   30-member panel of local, state, and national

9   experts in child-welfare to review and evaluate

10  past practices of the agency."

11          Do you see that?

12     A.    Yes.

13     Q.    And you referred to that earlier,

14  correct?

15     A.    Yes.

16     Q.    And do you know if any of their

17  practices actually have been -- their practice

18  recommendations had been implemented before you

19  left your position as director?

20     A.    They weren't before.  The weren't

21  before.  I was gone when they were supposedly

22  implementing, but I know that there were -- I

23  had heard that they hadn't -- there were lots

24  of recommendations.

25     Q.    Right.

1      A.    And I had heard that many of them
2  were not implemented.
3      Q.    There were, like, 72
4  recommendations?
5      A.    It was a big list, as I recall.
6      Q.    Why don't I finish the question.
7      A.    Oh, sorry.
8      Q.    Just about two months before this,
9  in October of 2010, the panel came out with
10  about 72 recommendations, and you think very
11  few of those were actually implemented?
12      A.    I don't know that as a fact.
13  I'm --
14      Q.    How about this one.  None of them
15  had been implemented while you were still
16  director?
17      A.    I'm aware of that.
18      Q.    Okay.
19                    -  -  -  -  -
20              (Thereupon, Deposition Exhibit 2,
21              February 2010 Plain Dealer Article,
22              "Deaths of Arshon Baker and
23              Alexandria Hamilton Raise Questions
24              About Abuse Prevention", was marked
25              for purposes of identification.)

1                      -  -  -  -  -

2          Q.     The same deal.  There are three

3      copies.  This is Exhibit 2.  And I think we've

4      referred to this as --

5                   THE WITNESS:  Bless you.

6                   MR. ALEXANDER:  Gesundheit.

7          Q.     -- referred to this as well.  This

8      is a news story from the Plain Dealer from

9      February of 2010, posted February 21st, updated

10     February 22nd, that concerned two deaths of

11     children who were the offspring of clients of

12     Children and Family Services.

13                   Is that an accurate description?

14         A.     Yes.

15         Q.     So this is the sort of thing that

16     you mentioned earlier that made your life --

17     made your job difficult, that during the time

18     when you were director during these two-year

19     periods, there were a number of news stories

20     talking about deaths of children that ended up

21     being in the press and that were fairly high

22     profile in the community, correct?

23         A.     That's true.

24         Q.     And I'm not going to spend much

25     time with this, but I just want to make sure we

1   can orient this, including some of the

2   statements in here that are from you.  Does

3   that make sense?

4           A.    Uh-huh, yes.

5           Q.    And over time, part of your job was

6   to give statements to the press; is that

7   correct?

8           A.    Sometimes.

9           Q.    And did you try to be accurate when

10  you did so?

11          A.    I tried.

12          Q.    And are you aware of any times that

13  you were misquoted or there was a

14  misattribution of something that you said in

15  any of the press?

16          A.    Many times.

17          Q.    And did you ever take legal action

18  about that, saying that, you know, they were

19  misquoting you or they were doing something

20  improper about how they were repres- --

21          A.    We took action.  We took action.

22  We -- they were aware of that we were very

23  upset about it.  There were some that were

24  recanted, actually, with -- that dealt with one

25  of the courts.

Page 118

1          Q.    Okay.  So if any documents I show

2     you from the press, there's something in there

3     where you say, you know, "I know that they had

4     to take this back or change it," and it's not

5     reflected in what we have, please point out.  I

6     think what you'll see is the way that we get

7     these, we only get what's available, which if

8     they pulled it down, we don't have it.

9          A.    Right.

10         Q.    Does that make sense?

11         A.    Uh-huh, yes.

12         Q.    So the first sentence of this

13    story, Exhibit 2, says, "Two children in four

14    months, both mothers accused of murder, both

15    well known to children welfare workers in

16    Cuyahoga County."

17               Do you see that?

18         A.    Yes.

19         Q.    And then it goes forward and -- and

20    talks about the unfortunate details of these

21    cases, including, for the first one that's

22    being discussed, about Arshon Glass, who was a

23    five-year-old boy who died.  It says that --

24    this is the bottom of the second page -- "A

25    disquieting picture has emerged."

1           Do you see that paragraph?

2      A.    Yes.

3      Q.    It says, "The Plain Dealer, through

4  records and interviews, found that

5  child-welfare workers discontinued service for

6  the family."

7           Do you know if that is correct?

8      A.    I don't know.

9      Q.    When they're discussing here about

10  records, were there times when actually case

11  files were made available to the press?

12      A.    Absolutely not.

13      Q.    "The sheriff's office didn't arrest

14  Arshon's mother when it had the chance.  The

15  school stopped training teachers to spot

16  abuse."

17           So there are two things there.  The

18  first part, do you know if that's correct that

19  the sheriff's office didn't arrest the mother

20  who ultimately was charged with murdering her

21  son?

22      A.    I don't recall that.

23      Q.    Okay.  Did you have interaction

24  with the sheriff's office in connection with

25  this role?

1      A.     I don't recall that.

2      Q.     What about the thing about the

3  school stopped training teachers to spot abuse?

4  Do you know what the story is there?

5      A.     No.

6      Q.     I think there's some references

7  later to the details there, but was part of how

8  you got reports of suspected child endangerment

9  or abuse through schools?

10      A.     Schools make referrals.

11      Q.     Was there a special system set up

12  to train them, train teachers or school staff

13  to be able to report this sort of problem?

14      A.     We routinely would go and train.

15      Q.     Do you recall there being a change

16  in policy or practice around this time relating

17  to school training?

18      A.     No, I don't recall that.

19      Q.     On the fourth page, if you can go

20  there, near the bottom, it says, "Research

21  shows that between 24 and 45 percent of

22  children killed by abuse are in families

23  already known to children protective agencies."

24          Do you see that?

25      A.     Yes.

Page 121

1        Q.    Was that consistent with your

2    experience?

3        A.    I don't know.

4        Q.    And then below that, it says, "Of

5    the nine children murdered in Cuyahoga County

6    in 2009, six were in families that had at some

7    point received help from Children and Family

8    Services, according to Deborah Forkas, director

9    of the Cuyahoga County Department of Children

10   and Family Services."

11            Have they quoted you accurately

12   there or characterized what you said

13   accurately?

14       A.    I don't recall.

15       Q.    This is -- this is, then, the first

16   year when you were director?

17       A.    I was -- I see that.

18       Q.    And is that about right, that you

19   recall there being nine deaths of children and

20   two-thirds of them were in your system, so to

21   speak?

22       A.    I don't recall that.

23       Q.    You're quoted at the top of the

24   next page a couple of times, and it says, the

25   third paragraph, "If we reacted the way people

Page 122

1    suggest that we should have done in hindsight,

2    there would such an overload of taking kids

3    into custody that people would be outraged."

4              Do you see that?

5         A.    I see it.

6         Q.    Is that an accurate quote?

7         A.    I don't believe so.  I don't know.

8         Q.    What do you think you actually

9    said?

10        A.    I have no idea what I actually

11   said.

12        Q.    Was there --

13        A.    I don't recall it.

14        Q.    I'm sorry, I didn't --

15        A.    I don't recall it.

16        Q.    I didn't mean to step on your

17   answer.  I'm sorry.  Were you done?

18        A.    I'm done.

19        Q.    Was there some change in policy or

20   practice around this time that led to you

21   taking in less kids into custody?

22        A.    Never, no.  We never took less kids

23   into custody intentionally, no.

24        Q.    Was there a change that led to a

25   higher percentage of cases resulting in a child

Page 123

1   being taken into protective custody?

2        A.    Well, it's hard to say.  Any -- any

3   time you have, you know, media, it's -- it

4   has -- it certainly impacts what goes on in

5   child-welfare.  I mean -- we -- we use our

6   tools that we have that the state tells us we

7   have to use.  We have ways we do our business,

8   and we follow those, those rules and those -- I

9   can't -- I can't really speak to that.

10       Q.    So whether the policy comes from

11  the county level, state directive, or federal

12  directive, or some other source, there can be

13  policies or practices that can affect how often

14  a child is take or how frequently a child is

15  taken into custody, correct?

16       A.    Say that again.

17       Q.    There are guidelines or principles

18  that determine when a children would be taken

19  into custody, right?

20       A.    There's gui- -- we have guidelines

21  that we follow.

22       Q.    Okay.  And do you recall any change

23  to those guidelines that led to more or less

24  children being taken into custody at this time?

25       A.    I don't recall that.  It's hard to

Page 124

1   go back after a decade almost.

2        Q.    Can you go to page 9, please?  The

3   middle paragraph says, "But Forkas said

4   Children and Family Services would have

5   continued supervising her," referring to the

6   mother of Arshon -- Baker?

7        A.    Baker.

8        Q.    -- Ms. Glass, "if they'd known

9   about the charge.  The agency, however, doesn't

10  have the staff to check if the parents it

11  supervises have gotten into trouble with the

12  law," she said.

13            Do you see that?

14       A.    I see that.

15       Q.    Does that sound like they

16  accurately characterized what you said?

17       A.    No.  I don't know what I said, but

18  I can tell you I didn't say that.

19       Q.    Was there some procedure in place

20  for communication with other parts of the

21  government about criminal charges or warrants

22  out for a client of your system?

23       A.    We had an agreement with the

24  sheriff at the time where we -- he could run

25  reports for us if we needed -- we needed them.

1  And that was -- I can't remember.  I don't

2  know -- I don't know what -- I can't -- I can't

3  cite the year that that went into place.  I

4  just don't know.  But I do know --

5      Q.    We talked earlier about

6  communication problems that?

7      A.    Uh-huh.

8      Q.    -- between parts of the

9  government --

10      A.    Yes.

11      Q.    -- that made your job more

12  difficult.  Was this one of those that you

13  didn't always get information from the

14  sheriff's department that maybe you -- you and

15  your staff would have wanted to know?

16      A.    I'm not sure.  It's hard for me to

17  go back.  When I don't know, I -- I have to say

18  I don't know.

19      Q.    Go to the -- well, let's continue

20  over so we have context.  The bottom paragraph

21  of page 9, continuing to the top paragraph of

22  page 10, it says, "'That agencies don't share

23  information is a national problem,' said

24  Dr. Bruce Perry, a senior fellow at the

25  nonprofit ChildTrauma Academy in Houston."

1                And it's a quote from him.  "When

2    law enforcement arrests someone, that should

3    automatically alert somebody in the child

4    protective services.  It's just that very,

5    very, very, few government agencies have the

6    will or the foresight to do it."

7                Do you see that?

8         A.    I see it.

9         Q.    And was there something in place

10   that you got automatic alerts for child

11   protective services if somebody was arrested

12   who was a client or --

13        A.    I don't recall automatic --

14        Q.    -- otherwise in your system?

15        A.    I don't recall automatic alerts.

16        Q.    Going down the page, there's a

17   paragraph, which is the sixth paragraph.  It

18   says, "Spokesman John Hairston said that while

19   Cleveland schools offered training in how to

20   spot physical abuse in the past, they no longer

21   provide it districtwide."

22                Do you see that?

23        A.    I see it.

24        Q.    And does that square with your

25   recollection about changes in training

1    practices?

2          A.    I don't know.

3          Q.    The next page, there's a quote from

4    you, under the line on page 11.  It says,

5    "Forkas doesn't fault the schools, the legal

6    system or the child-welfare system.  Those who

7    want to place blame, she said, should look to

8    the same two things failing so many of the rest

9    of the us: health care and the economy."

10              Do you see that?

11         A.    I see it.

12         Q.    Is that an accurate

13   characterization?

14         A.    No, that is not an accurate -- I

15   do -- I don't recall saying this.

16         Q.    What do you think you actually said

17   about any of this?

18         A.    I can't -- I can't -- I can't even

19   begin to tell you, but I did not say that.  I

20   don't believe I did.

21         Q.    What was the impact, at this time,

22   of the economy as you recall it?

23         A.    No idea.

24         Q.    What was the impact, at this time,

25   of health care?

Page 128

1          A.     I don't know.

2          Q.     There's an example right below for

3     Ms. Glass, the woman accused of murdering her

4     son that's described in the story, one of the

5     two, that says she had been on medication for

6     depression, but went off of her medication

7     because she didn't have mental health support

8     and couldn't get in for at least six months.

9               Do you see that?

10         A.     Uh-huh.

11         Q.     Yes?

12         A.     Yes.

13         Q.     Okay.  Is that the sort of thing

14    that you were aware of where issues with health

15    care coverage, including mental health

16    coverage, impacted the provision of services by

17    the Division of Children and Family Services at

18    that time?

19         A.     No.

20         Q.     I'm sorry?

21         A.     No.

22         Q.     I mean, what was the sort of impact

23    of health care being available or not available

24    that impacted Children and Family Services

25    during the time you were the director?

Page 129

1          A.     I can't say.  I don't know.

2                       -   -   -   -   -

3                 (Thereupon, Deposition Exhibit 3,

4                 3/14/2010 Plain Dealer Guest Column

5                 Titled "Cuyahoga County Department

6                 of Children and Family Services

7                 Needs Community's Help to Save Kids:

8                 Deborah Forkas", was marked for

9                 purposes of identification.)

10                      -   -   -   -   -

11         Q.     Here's Exhibit 3.

12                MR. McMONAGLE:  Before we get to

13   Exhibit 3, does everybody want to take a lunch

14   break now or --

15                THE WITNESS:  I'm fine --

16                MR. McMONAGLE:  -- do you have a

17   preference?

18                THE WITNESS:  -- if we take lunch

19   break.

20                MR. ALEXANDER:  What time is it?

21                MR. McMONAGLE:  It's, like, 10

22   after 12:00.

23                MR. ALEXANDER:  I think we'll --

24   it's 12:08.  I think we've been going well less

25   than an hour.  I -- if -- unless it's a problem

                                                    Page 130

1    for the witness or health, I would suggest we

2    go, like, at least another 20 minutes, get

3    through a couple documents, and then take a

4    lunch break at that time.

5              MR. McMONAGLE:  Are you okay with

6    that?

7              THE WITNESS:  No.  I'd like to

8    leave.  I'd like to have lunch.

9              MR. McMONAGLE:  Okay.  Well, let's

10   take a break now, and we'll resume after lunch.

11             MR. ALEXANDER:  Okay.  How long do

12   you want for lunch, then?

13             MR. McMONAGLE:  Come back at a

14   little before one, 1:00?

15             MR. ALEXANDER:  Yeah, I don't know

16   about the options or anything.  I mean --

17             MR. McMONAGLE:  They have -- I

18   think -- we can get off the record here if you

19   want.

20             MR. ALEXANDER:  Well --

21             THE VIDEOGRAPHER:  Off the record,

22   12:09.

23             MR. ALEXANDER:  -- yeah, actually

24   we need to agree before you go off the record,

25   and that's the federal rule.  But it's fine; we

                                    Page 131

1   can do this off the record.

2               MR. McMONAGLE:  Yeah.

3                   (Luncheon recess.)

4               THE VIDEOGRAPHER:  On the record

5   12:43.

6   BY MR. ALEXANDER:

7        Q.    Ms. Forkas, do you have any of your

8   testimony thus far you need to change or

9   supplement in any way?

10       A.    No.

11       Q.    Did you talk with any counsel

12  during the break?

13       A.    No.

14       Q.    Did you review any documents or

15  look at any information about anything related

16  to the substance of your testimony?

17       A.    No.

18              MR. ALEXANDER:  Okay.  Counsel who

19  appeared on behalf of Stark County said

20  something during the break that she wanted to

21  make a statement.

22              MS. DEYNEKA:  Yeah, I just wanted

23  to clarify for the record that I'm entering an

24  appearance for Summit County as well.

25              MR. ALEXANDER:  Okay.  And I don't

Page 132

1   remember you identifying a law firm.  You might

2   want to add that to your appearance as well.

3           MS. DEYNEKA:  Sure.  Natalie

4   Deyneka with Motley Rice.

5           MR. ALEXANDER:  Yeah.  I think we

6   were under the impression, from the way the

7   appearances was stated initially, not that it

8   was done in an intentionally misleading

9   fashion, that you were an employee of Stark

10  County and were appearing in the capacity in

11  relation to this witness because she's an

12  employee of Stark County, so that was my

13  misimpression.  I don't know that it changes

14  anything that's happened so far, so we'll see

15  if there's some implications with any of that.

16          MS. DEYNEKA:  I don't believe it

17  does.  And I do believe that I introduced

18  myself accordingly at the very beginning, but

19  that's a moot point regardless, and I apologize

20  for any -- any confusion on that point.

21  BY MR. ALEXANDER:

22      Q.    So, Ms. Forkas, before we go on

23  from Exhibit 2, you mentioned earlier that

24  there would have been times that you looked at

25  individual case files because of things like

Page 133

1    cases that were in the press or cases where

2    there were deaths.

3         A.    Uh-huh.

4         Q.    Would -- would the two cases

5    discussed in Exhibit 2 be the sort of cases

6    where you looked at the case files?

7         A.    On -- yes.

8         Q.    And is that because the case files

9    maintained by the County are the most accurate

10   and up-to-date source of information about a

11   case?

12        A.    Not necessarily.  We review all --

13   every -- all information that we have from --

14   if it was -- if -- whether it was SACWIS.  I

15   mean, we review everything.  Not because it's

16   most the up to date.  I don't know.

17        Q.    Where would -- where would there be

18   information about a case?

19        A.    Well, there wouldn't be.  It would

20   be in the case file, but --

21        Q.    Okay.  So let -- let me break it

22   up, then.  Okay.  When you have a case that's

23   opened and you said there's a case file that's

24   opened that is maintained by the County,

25   correct?

Page 134

1          A.     Correct.

2          Q.     And that there is also entry of

3    data, over time, into the fields that are

4    available for SACWIS, or for the predecessor

5    system, FACS, correct?

6          A.     That's true.

7          Q.     Okay.  So let's just focus on the

8    case file versus SACWIS.

9                 There wouldn't be anything in

10   SACWIS about a case that was not also in the

11   case file, correct?

12         A.     I don't know that as a fact.

13         Q.     Okay.  Is -- would there be

14   information --

15         A.     There's scanned information.

16         Q.     Okay.  Would there be information

17   in the case file itself that might not also be

18   in SACWIS?

19         A.     Shouldn't be.

20         Q.     But in terms of the way it was back

21   in 2010?

22         A.     I can't -- I -- hard for me to

23   know.

24         Q.     Okay.  Do you have any reason to

25   believe that the information on a case in

Page 135

1   SACWIS would have stuff about the case that was

2   not also in the case file maintained by the

3   County?

4          A.    I don't know that.

5          Q.    So when you looked at the case

6   file, as opposed to just looking at the data

7   entry in SACWIS, was that because you expected

8   that the most complete information on a case

9   would be in the case file?

10         A.    No.

11         Q.    Why did you look at the case file,

12  then?

13         A.    We -- we just generally -- we --

14  everything that's in the case file, we

15  looked -- we would look at on a fatality, and

16  the same goes with anything that was in SACWIS.

17  They would all be read and they would be

18  printed out, anything that we felt that we

19  needed.

20         Q.    Would you look somewhere else

21  besides the case file and SACWIS?

22         A.    Well, we'd also interview workers.

23  We'd do -- it was a comprehensive, deep dive

24  that we would take, so there would be lots of

25  interviews.

Page 136

1      Q.    The interviews that would be done

2    in a situation like this, where would those be

3    memorialized?

4      A.    Should be in -- well, it's a good

5    question.  I'm not sure where.

6      Q.    So like --

7      A.    I don't know that I recall that.

8      Q.    -- on the Arshon Baker case?

9      A.    Yeah.

10     Q.    Maybe it's under the mother's name

11   for the Glass case, one of the two in

12   Exhibit 2.  For that one, when interviews were

13   done of people involved in handling the case,

14   would there be memos written up on those

15   interviews and then put into the case file?

16     A.    It's possible.

17     Q.    Was there any place in SACWIS for

18   putting in memos like that?

19     A.    You know, I don't recall that.  I'm

20   sorry.  I just don't re- -- I don't recall back

21   then.

22     Q.    But if there was further

23   investigation, including an internal

24   investigation or some sort of --

25     A.    Yes.

1          Q.     -- periodic evaluation of the

2     function, that would have to go into the case

3     file and be maintained in that way, correct?

4          A.     It would.

5          Q.     And it may or may not have been

6     entered into SACWIS?

7          A.     Potentially.

8          Q.     And sitting here today, you're not

9     aware of anything that required that sort of

10    information, a memo of an interview with an

11    employee to be entered into SACWIS?

12         A.     I don't know that.

13         Q.     Okay.  In this case, neither of

14    these deaths were related to opioid or opiate

15    abuse, correct?

16         A.     To my knowledge, yes.

17         Q.     Okay.  There's, I mean, fairly

18    extensive discussions of these, and there was a

19    lot of media attention to these particular

20    deaths, and there's nothing in any of them that

21    says that these had anything to do with anybody

22    being addicted or abusing opioids or opiates,

23    correct?

24         A.     I don't know that.  I don't recall.

25         Q.     Sitting here today, you have no

1   reason to believe that either of these deaths

2   had anything to do with opioids or opiates

3   correct?  The child deaths?

4        A.    Again, I don't know that.

5        Q.    Okay.  Do you know if any of the

6   nine deaths in the first year where you were

7   director of Cuyahoga County Children and Family

8   Services had anything to do with opioids or

9   opiates?

10        A.    I don't recall.

11        Q.    Exhibit 3, again there's a -- there

12   are two copies for the various Plaintiffs'

13   counsel as well -- is another piece that

14   appeared in the Plain Dealer, March 14, 2010,

15   and you're described as the author, said to be

16   a guest columnist.

17              Do you see that?

18        A.    I do see that.

19        Q.    Do you remember writing a -- a

20   letter to the paper, some sort of statement

21   that was going to be published under your name

22   back in March of 2010?

23        A.    I do.

24        Q.    Do you remember that going through

25   some sort of internal screening process with

1    lawyers and staff of Cuyahoga County before it

2    got published in the paper?

3          A.    I don't remember.

4          Q.    Did you just do it on your own and

5    nobody knew about it or --

6          A.    No.

7          Q.    -- was this an official thing?

8          A.    I don't recall.  I just don't

9    recall.

10          Q.    Okay.  But you remember doing this?

11          A.    I -- well, I remember talking about

12    this, yes.

13          Q.    Okay.  So these are your words and

14    they printed them verbatim?

15          A.    It's possible.

16          Q.    And if something appeared under

17    your name as a guest columnist and said that

18    you were the director of the Cuyahoga County

19    Department of Children and Family Services and

20    had been inaccurate, don't you think there

21    would have been some followup on that?

22          A.    I would hope.  I think it was a

23    letter to the editor.

24          Q.    Okay.  Have you done other letters

25    to the editor to discuss any other cases?

Page 140

1        A.    Not in Cuyahoga.

2        Q.    Okay.  You have in other

3   capacities?

4        A.    I don't believe so.

5        Q.    So is this the only time you wrote

6   a letter to the editor?

7        A.    I think it may be.

8        Q.    Do you recall anything about how

9   this came to be finalized before it was

10  submitted?

11       A.    No.

12       Q.    Okay.  So Exhibit 3 starts off with

13  your name, "Special to The Plain Dealer," and

14  then it says, "Over that the past few weeks,

15  Cleveland media have been focusing on two

16  recent child deaths and the role of the

17  Cuyahoga County Department of Children and

18  Family Services, an agency that I oversee."

19            Do you see that?

20       A.    I see it.

21       Q.    "At times, the coverage has been

22  fair and accurate, but some was also

23  misinformed, biased, and sensational."

24            Do you see that?

25       A.    I see it.

Page 141

1      Q.    "Much about our agency's work has

2   been misunderstood in recent news coverage.

3   First, children's safety is our top priority,

4   but our workers don't have crystal balls.  We

5   rely on calls and tips from the police or

6   neighbors, teachers, or family members to learn

7   of children in trouble.  If we find clear and

8   imminent danger, we seek an immediate order

9   from the juvenile court to remove the children

10  from abusive parents and place them in child

11  protective services."

12            Do you see that?

13      A.    Yes.

14      Q.    Did I read that right?

15      A.    Yes.

16      Q.    I'm not going to go through the

17  whole part of it, the whole, you know, line by

18  line.  But the gist here is that it is

19  difficult to do children's services to make

20  sure that every child is protected as you would

21  want them to be, and that there are a number of

22  factors going on, in general, and at this time

23  in history in particular, that made the job

24  more difficult, correct?

25            A.    Correct.

Page 142

1          Q.    So there's a description at the
2    bottom of the second page.  It says, "Last
3    year, nearly 32,000 calls came into our hotline
4    alone.  We launched more than 9,300
5    investigations.  We served more than 70,000
6    children, about as many people as Cleveland
7    Browns Stadium holds."
8                Do you see that?
9          A.    I see it.
10         Q.    And do you know where those stats
11   would have come from?
12         A.    I don't recall.
13         Q.    And was that typical that less than
14   a third of calls would result in an
15   investigation?
16         A.    It's po- -- it's possible.
17         Q.    And this 70,000 children in a year,
18   was that high or low for the division?
19         A.    I couldn't tell you.  I don't know
20   that answer.
21         Q.    Did you look at factors or trends
22   that might drive the numbers of calls, the
23   numbers of investigations, the number of
24   children per investigation, that sort of thing?
25         A.    You know, to be honest with you, I

Page 143

1    don't really recall.  This was eight years ago.

2    I don't really recall.

3         Q.    Okay.  The next paragraph says,

4    "More than 75 percent of our caseload involves

5    single mothers.  Both of the mothers arrested

6    in the two recent child deaths had just lost

7    their jobs.  One suffered from depression and

8    could no longer afford her medication, so she

9    stopped taking it.  She went to a mental health

10   clinic, but was told she would have to wait six

11   months to get help.  In both cases, the city's

12   social safety net failed."

13             Do you see that?

14        A.    I see it.

15        Q.    The first part about 75 percent of

16   the caseload involves single mothers, why was

17   that relevant to point out?

18        A.    Because I thought it was relevant,

19   I guess.

20        Q.    And is that high or low, in your

21   experience, compared to other parts of the

22   country?

23        A.    I think it's about average.  Not

24   sure.

25        Q.    And what about this thing about

Page 144

1   people losing their job?  What, in your

2   experience, does it have to do with the burden

3   on Children and Family Services, having parents

4   lose their jobs?

5           A.    Well, if they lose their jobs, they

6   lose their way to support themselves.  I mean,

7   for obvious reasons, you know, they -- they

8   don't have the money to support themselves or

9   their children.  So they always -- they

10  don't -- we won't always know what's going on

11  in the household, nor do we know that they've

12  lost their job.

13          Q.    So at times of high unemployment in

14  the county, there tends to be a high burden on

15  Children and Family Services?

16          A.    I suspect that.  I don't know that

17  as a fact.  I haven't seen the data to prove

18  that.

19          Q.    And there's a discussion here about

20  mental health clinic.  We went over that a

21  little bit in the prior article.

22          A.    Right.

23          Q.    And is it your experience that

24  there are times when it's hard for parents to

25  get -- collectively, get mental health support

Page 145

1    or other health care, and that that affects the

2    burden on Children -- Children and Family

3    Services?

4          A.    I would say yes.

5          Q.    The next paragraph says, "Mental

6    illness and substance abuse are our biggest

7    challenges.  If a neglectful mother is a drug

8    user, her children are usually sent to another

9    family member or into foster care while she

10   gets help."

11              "When a mother can demonstrate that

12   she has completed a treatment program and has

13   her life together, you can then focus on

14   reunification, along with several months of

15   monitoring by our workers.  Only if she is

16   fully drug free and there are no instances of

17   abuse or neglect can the case be closed."

18              Did I read that right?

19         A.    Yes.

20         Q.    The statement in here about

21   substance abuse and mothers who were drug

22   users, was -- was that focused on any

23   particular substance or drug or all drugs and

24   substances?

25         A.    I think it was in general.

1          Q.    And over this time, were you and
2    your department also tracking the --
3    essentially the burden in individual cases or
4    across your cases of the types of drugs that
5    people were abusing or the substance of abuse
6    that was most prevalent?
7          A.    I don't know if we at that time --
8    during this time when this was written.  I
9    don't know.  I don't recall.
10         Q.    What about overall when you were
11   director of Cuyahoga County Children and Family
12   Services?  Were you looking at, essentially
13   the -- which drugs of choice or substance of
14   abuse were most common?
15         A.    Well, we -- how we were tracking
16   that, you were saying?
17         Q.    Yes.
18         A.    Well, I don't know that we were --
19   were tracking it in a -- in a very good way.
20         Q.    Over your -- over your time in the
21   field, has there been better tracking of things
22   like which drug or substance is driving a case
23   or a participant, a client, is actually
24   abusing?
25         A.    Well, now, it's better.  I mean, we

1    have places in SACWIS to document things.  We

2    can document things in different ways.  There's

3    been more roles that have been promulgated to

4    how we are supposed to document.  We didn't

5    have a lot of that at the time.

6          Q.    And that's changed over time?

7          A.    That's changed over time.

8          Q.    So there's better documentation in

9    general of which substances involved in a case,

10   were driving the need for Children and Family

11   Services now, than there was back in 2010?

12         A.    I would say yes.  I mean, it's not

13   a perfect system though.

14         Q.    So one of the things that you get

15   when you have a change in how often drug of

16   choice is or how well drug of choice is tracked

17   is you can make it look like there's a new

18   problem with a drug that is just because

19   they're tracking it better, right?

20         A.    Right, correct.

21         Q.    And so when we look back at any of

22   the historic data from SACWIS about drug trends

23   or, you know, drugs being involved in a

24   different Children and Family Services case, we

25   have to take into account that how they tracked

Page 148

1    the drug of choice or substance of choice, may

2    have changed over time, right?

3         A.    I don't know that as a fact, but it

4    may be true.  It may not be.  I don't know.

5         Q.    I mean, given your position as

6    director of or assistant director of three

7    different Ohio counties over the time period

8    when SACWIS has been in place, that's your

9    experience, right?

10        A.    I have some experience with that,

11   but I don't know if that's true on all these

12   cases.

13        Q.    If you could just look through to

14   the next page, it's page 4, first full

15   paragraph says, "But we face terrific odds.  In

16   2008, even before the recession hit, 42 percent

17   of Cleveland children lived in poverty and 65

18   percent were in single-parent families.  Among

19   50 American cities, only Detroit was worse.

20   Now, the recession, state budget cuts, high

21   unemployment, rising homelessness and poverty,

22   and a shortage of support services such as

23   mental health care mean it's harder every day

24   for our agency alone to protect children."

25               Did I read that right?

Page 149

1        A.    You read it right.

2        Q.    Is there any part of that that you

3   disagree with?

4        A.    No.

5        Q.    And can you explain why you thought

6   that the percentage of children in poverty was

7   relevant to the burden on Children and Family

8   Services?

9        A.    I can't explain that.

10       Q.    What -- why is the percentage of

11  children in single-parent homes relevant to the

12  burden on Children and Family Services?

13       A.    I can't say.

14       Q.    Why was it important that Cleveland

15  was 49 out of 50 in terms of these parameters

16  of percentage of children living in poverty and

17  single-family homes?

18       A.    I don't know that.

19       Q.    I mean, are those good or are those

20  bad numbers?

21       A.    I can't respond to your question.

22  I'm sorry.  I don't know.

23       Q.    Do you want the percentage of

24  children living in poverty to be lower than 42

25  percent or higher?

Page 150

1        A.    I like children not to live in
2    poverty.
3        Q.    Okay.  So the impact of the
4    recession, state budget cuts, and high
5    unemployment, can you explain what you thought
6    those were on Children and Family Services for
7    Cuyahoga County?
8        A.    I can't explain it.
9        Q.    What about rising homelessness and
10   poverty and a shortage of support services,
11   such as mental health care?  Why did you think
12   those were relevant to an impact on Children
13   and Family Services of Cuyahoga County?
14       A.    Well, the people that need mental
15   health care and they can't -- and they're
16   having difficulty getting it, obviously it's
17   important --
18       Q.    What about --
19       A.    -- for them to get services.
20       Q.    What about rising homelessness and
21   poverty?  Why were those relevant?
22       A.    Well, people that are
23   homeless sometimes -- it depends.  But
24   sometimes they're -- you know, they're
25   obviously living in poverty at the same time if

Page 151

1    they're homeless, generally speaking.  And

2    there's a shortage of services.

3        Q.    And how does -- how does

4    homelessness play into how easy it is or

5    difficult it is to fulfill the mission of

6    Children and Family Services in an individual

7    case?

8        A.    Well, it makes it difficult to

9    track parents, where they are, if they're

10   active with us, because they move, they surf

11   from place to place, so it's difficult to -- to

12   track them and know where they are and who

13   they're -- what they're doing, you know.

14            It's -- it's more work, because we

15   can't -- we have to check at the schools to see

16   if the kids are in school.  We have to, you

17   know, there's duplicate work, trying to find

18   them.  Are children being taken care of?  Who

19   are they with.  There's lots of reasons.

20       Q.    These issues identified here, of

21   children living in poverty, state budget cuts,

22   overall economic conditions, high unemployment,

23   rising homelessness, shortage of support

24   services, were those only present in 2009 and

25   early 2010, or were those present throughout

Page 152

1    the time that you were director?

2         A.    Well, I think that there're --

3    there're always -- yeah, let me -- just, can I

4    have the question again, will you, please?

5         Q.    Sure.

6         A.    I just want --

7         Q.    The factors that we just went

8    over --

9         A.    Yeah, I understand.

10        Q.    -- in this paragraph, children

11   living in poverty, increasing homelessness,

12   budget crisis, unemployment, et cetera, can you

13   explain if those were just a problem at the

14   time that you wrote this or if those continued

15   to be a problem in Cuyahoga County, going

16   forward, throughout the time that you were

17   director?

18        A.    I think that they continued and

19   moved forward.  I mean, I -- I think that these

20   are problems that people have that are

21   universal and in most places.

22        Q.    And your experience is those

23   continued to be a problem in Cuyahoga County

24   for several years after you wrote this?

25        A.    I believe that was the case.

Page 153

1          Q.    And so the -- to do -- before you
2     did this letter to the editor, you would have
3     read those case files, correct?  On the
4     individual cases, of deaths?
5          A.    Yes.
6          Q.    Okay.  Maybe this is -- is obvious,
7     but the way it works is when information comes
8     in, as a file is being opened, the first place
9     it goes, the first place something is written
10    down or memorialized, is in the case file,
11    correct?
12         A.    Uh-huh.
13         Q.    That's the most --
14         A.    Yes.
15         Q.    -- contemporaneous --
16         A.    Yes.
17         Q.    -- information?
18               And SACWIS may be entered with some
19    kind of lag?
20         A.    Maybe.  Maybe not.  Depends on the
21    worker.
22         Q.    Right.
23         A.    It's really worker-focused, so
24    there could be a plethora of information.
25         Q.    And the variability, in terms of

1    data entry practices that you're aware of when

2    you held the position of director for Cuyahoga

3    County, was something that was discussed and

4    tried to be addressed through additional

5    training and practice modification, correct?

6            A.    We tried.  We tried.

7            Q.    I mean, in general, you want as

8    contemporaneous data entry as possible, because

9    the later data gets entered, including years

10   later from some sort of retrospect review of

11   the case file, you create problems of accuracy,

12   correct?

13           A.    I don't know that to be the case.

14           Q.    That's why you --

15           A.    I mean, you say that, but I don't

16   know if --

17           Q.    Well, isn't that why you encourage

18   contemporaneous or close-in-time recording of

19   data into databases as opposed to just going

20   back years later and trying to pull out

21   information and add it in?

22           A.    Well, I don't know that's what we

23   did.

24           Q.    I -- I know.  That's why you -- let

25   me ask it this way.  The reason why one would

1   prefer contemporaneous data entry is because

2   it's most likely to be accurate as opposed to

3   relying on periodic retrospective, maybe even a

4   year or years later, adding of information,

5   right?

6        A.   I don't know that.

7        Q.   Did you ever ask people to go back

8   and add data that hadn't been added before?

9        A.   No.

10       Q.   Did you ever --

11       A.   Well, that's not true.  There were

12   times where there were things that were missing

13   in files where we had the workers go back

14   and -- and -- and write what had occurred

15   and -- with notes in the files.

16       Q.   So during --

17       A.   I think -- I think there -- I think

18   there was a case or two where there were --

19   there was some glaring things that were

20   missing.

21       Q.   Were you with Stark County when the

22   statewide case splits happened?

23       A.   No.

24       Q.   Was that when --

25       A.   With Stark?

1          Q.     Yes.

2          A.     Well, when did it happen?

3          Q.     A couple of years ago.

4          A.     Well, yeah, I guess I would have

5     been, because I've been there five years.

6     We're going on five years, so.

7          Q.     Do you ever remember a time when

8     there was an effort across the state to

9     basically update information in SACWIS, focused

10    on drug of choice?

11         A.     No.

12         Q.     Okay.  Do you remember ever -- any

13    times when there were kind of initiatives or

14    blitzes to try to improve the accuracy --

15         A.     Yes.

16         Q.     -- of information in SACWIS?

17         A.     Yes.

18         Q.     Okay.  And that sometimes involves

19    going back to old files and adding information

20    that was not added contemporaneously, right?

21         A.     It could be.

22         Q.     And if people were always adding

23    the information contemporaneously, you would

24    never need to do that?

25         A.     True.

Page 157

1        Q.    So the fact that there have been

2   these statewide blitzes and initiatives means

3   that contemporaneous data entry has not always

4   been so good in SACWIS?

5        A.    Could be.

6        Q.    That makes sense, right?

7        A.    I don't know.

8        Q.    Okay.

9                    -   -   -   -   -

10               (Thereupon, Deposition Exhibit 4,

11               8/15/2010 Plain Dealer Article

12               Titled, Cuyahoga Children Services

13               is Due a Thorough Inquiry, But That

14               Would Require a Panel That's Truly

15               Independent: Editorial", was marked

16               for purposes of identification.)

17                    -   -   -   -   -

18        Q.    Exhibit 4 is another Plain Dealer

19   article, this one from the editorial board,

20   from August 15, 2010.  And it's title is,

21   "Cuyahoga Children Services is due a thorough

22   inquiry, but that would require a panel that's

23   truly independent."

24               Do you see that?

25        A.    Yep.

1      Q.    And this is referring to a panel of

2    specialists that you had convened to try to

3    address some of the issues that were going on

4    under you, correct?

5      A.    Myself and Case Western Reserve and

6    a number of other entities.

7      Q.    But are you the one who came up

8    with the idea of convening a panel?

9      A.    Actually Jim McCafferty and I did.

10     Q.    And what was his position?

11     A.    He was the county administrator at

12   the time.

13     Q.    Do you recall any discussions that

14   led to this, between you and Mr. McCafferty?

15     A.    No.

16     Q.    Were there documents memorializing

17   those conversations?

18     A.    No.  It was a conversation.  But we

19   had been -- we had done blue ribbon panels

20   prior on this --

21     Q.    On what?

22     A.    -- historically, as an agency.

23          On these kind of issues, I believe.

24     Q.    What about any blue-ribbon panels

25   to look at anything about substance abuse or

Page 159

1   the way that Children and Family Services

2   addressed issues of substance abuse in the

3   community?

4        A.    Not that I'm aware of.

5        Q.    Do you remember this editorial?

6        A.    I do not.

7        Q.    Exhibit 4?

8        A.    I do not.  Oh, yes, I do remember

9   this.

10       Q.    Yeah, I --

11       A.    Yeah.

12       Q.    -- think you will.

13       A.    I will.  I remember it.

14       Q.    So it says that -- it describes the

15  process of appointing a panel as a

16  quote-unquote stacked process.

17             Do you see that?

18       A.    Uh-huh.  Uh-huh, yes.

19       Q.    And that's not a nice description,

20  right?

21       A.    No.

22       Q.    It continues below, then, and

23  talking about the six deaths of children in the

24  system, meaning -- it's describing them as

25  killed, not accidental deaths, but children

1   where it was some degree of homicide, "has sent

2   up a red flag.  So have mandated budget cuts

3   and the changes in internal procedures that

4   have caused the county Department of Children

5   and Family Services to narrow its protections

6   by placing fewer children in foster care."

7               Do you see that?

8        A.    I don't see that.

9        Q.    Bottom paragraph on the first page,

10  ma'am.

11       A.    Sorry.  I got ahead of myself.

12  Yes.

13       Q.    Do you see what I've just read?

14       A.    Yep.

15       Q.    Okay.  Do you know what's being

16  discussed here about mandated budget cuts?

17       A.    I can read it.

18       Q.    But do you know what it's

19  referencing?  What mandated budget cuts

20  affected your department?

21       A.    Well, I don't know exactly what

22  they're referring to.

23       Q.    What about changes in policies that

24  caused you to narrow protections by placing

25  fewer children in foster care?

Page 161

1          A.     That's untrue.  Completely untrue.

2     Every child that needed to be in foster care

3     was in foster care.

4          Q.     Were there any changes in policies

5     that affected the frequency of --

6          A.     No.

7          Q.     -- placing kids?

8          A.     No, there were not.

9          Q.     The second page, "The scope of the

10    problem suggests just -- not just isolated

11    mistakes but systemic dysfunction, managerial

12    myopia, and lax oversight.  Case in point:

13    Children services chief Deborah Forkas'

14    ill-thought-out order to fingerprint adults in

15    homes from which children are removed - an

16    order that the department is just as hastily

17    reconsidering."

18              Any idea what that's about?

19         A.     No idea.

20         Q.     In any way -- event, this

21    description of you is not flattering, correct?

22         A.     No, it's not flattering.

23         Q.     It says, "This page has been

24    calling since May for the well-meaning but

25    overwhelmed Forkas to be replaced, for the good

Page 162

1    of the children and the department."

2                 Is that a fair characterization of

3    what was going on in the press over the prior

4    five months?

5         A.    I don't believe so, but they have

6    their opinions.

7         Q.    "Her supervisors repeatedly have

8    ducked that step, saying they first want the

9    expert task force to complete its review,

10   expected in mid-September."

11                Do you see that?

12        A.    I see it.

13        Q.    And so it actually -- it was

14   completed in mid-Dec- -- mid-October, and that

15   the decision was made to replace you within a

16   month or two after that, correct?

17        A.    Correct.

18        Q.    The next paragraph talks -- the

19   last sentence in the next paragraph says, "The

20   30-member panel was basically pulled together

21   by Forkas, her staff, and supervisors."

22                Do you think that's an accurate

23   statement?

24        A.    No, I do not think that's an

25   accurate statement.

Page 163

1           Q.     "No wonder the task force's interim
2     findings outlined last week identified not a
3     single deep-seated problem requiring
4     significant changes in policies and procedures,
5     and no wonder the department itself has found
6     no safety problems so far in its internal
7     review of 122 cases in which young children in
8     custody were reunited with their families."
9                 Do you see that?
10          A.     I see it.
11          Q.     Do you know what this internal
12    review about 122 cases was about?
13          A.     I don't recall.
14          Q.     Was that something where there was
15    some documentation generated?
16          A.     I'm not -- I don't know.  I'm not
17    sure.
18          Q.     Would that have looked at the role
19    of any substance abuse in connection with any
20    of these 122 cases?
21          A.     I don't know.
22          Q.     To do that kind of internal review
23    of 122 cases, somebody would have had to have
24    looked at the case files, right?
25          A.     It would appear.

Page 164

 1          Q.    Next sentence says, "On Friday came

 2    news that the task force has not been allowed

 3    to see the files on the very cases that

 4    triggered its formation."

 5               Do you see that?

 6          A.    I see it.

 7          Q.    Is that true?

 8          A.    I don't believe so.

 9          Q.    So the task force was allowed to

10    look at the confidential case files --

11          A.    I believe they were.

12          Q.    -- on the deaths in --

13          A.    I believe --

14          Q.    -- article two?

15          A.    I believe we opened them up.  I

16    thought we did.  David Crampton was the

17    professor that over-looked this.

18          Q.    It would make sense, from your

19    perspective, if anybody wanted to get the full

20    information about what went on in any given

21    case, including the role of substance abuse or

22    mental health care being provided or whatever,

23    they would need to look at the case files?

24          A.    I would imagine.

25                         -  -  -  -  -

```
                                              Page 165

 1                  (Thereupon, Deposition Exhibit 5,

 2                  10/14/2010 Plain Dealer Article

 3                  Titled "Child-Welfare Panel Says

 4                  Cuyahoga County Agency Needs to

 5                  Improve Services and Practices", was

 6                  marked for purposes of

 7                  identification.)

 8                       -  -  -  -  -

 9        Q.     This is the last article.

10   Exhibit 5 is from October 14, 2010, again from

11   the Plain Dealer.  It's titled, "Child-welfare

12   panel says Cuyahoga County agency needs to

13   improve services and practices."

14            There's a picture of you on the

15   first page, right?

16        A.     Yep.

17        Q.     A couple of years ago?

18        A.     A couple of years ago.

19        Q.     And do you recall this article,

20   Exhibit 5?

21            I'm sorry.  I don't know if I got

22   an answer.  Do you recall this article at all?

23        A.     I -- I believe I do.  Parts of it.

24   It looks familiar.

25        Q.     It says, "A review panel Wednesday
```

Page 166

1    called on the Cuyahoga County child-welfare

2    department to improve the way it manages

3    high-risk families, but it also put

4    responsibility on the community and the next

5    county government to keep children safer."

6              Do you see that?

7         A.    I see it.

8         Q.    Top of the second page, it says,

9    "The panel appointed by Director Deborah Forkas

10   issued 12 pages of recommendations, which deal

11   in large part with beefing up services to

12   combat threats to children from domestic

13   violence, substance abuse, and mental illness."

14             Do you see that?

15        A.    Yes.

16        Q.    And we'll go over their

17   recommendations, but your testimony is that you

18   don't recall this leading to any changes with

19   regards to anything about substance abuse,

20   correct?

21        A.    I don't know that it did.

22        Q.    Didn't while you were in charge?

23        A.    Right.

24        Q.    "The presentation to an audience of

25   nonprofit social services providers contained

Page 167

```
 1   criticisms that the agency has not done enough
 2   to address children" -- I'm sorry -- "risks to
 3   children, such as engaging mental health and
 4   addiction experts in cases.  But the event was
 5   also part pep rally to solicit help from
 6   outside the county bureaucracy."
 7               Do you see that?
 8        A.    I see it.
 9        Q.    Were you at that meeting, the
10   presentation to an audience?
11        A.    I think I may have been.  I'm not
12   sure.
13        Q.    Then there's a quote attributed --
14   I'm sorry.  There's a quoted attributed to
15   David Crampton about you.  It says, "'It's not
16   about the department.  It's not about Deborah
17   Forkas,' said David Crampton, the panel
18   chairman and an associate professor of social
19   work at Case Western Reserve University.  'It's
20   about all of us working together to protect our
21   children.'"  Do you see that?
22        A.    Yes.
23        Q.    Does that sound like the sort of
24   thing that Mr. Crampton was saying at the time?
25        A.    I don't know.
```

Page 168

1          Q.     "Since" --

2          A.     No idea.

3          Q.     It continues, "Since early this

4    year, Forkas and her department have come under

5    question after two children were killed and two

6    others were starved nearly to death despite

7    involvement by the county agency."

8                 Do you know what's mentioned here

9    about two children almost starving to death?

10         A.     Two brothers, yes.

11         Q.     And did that having anything to do

12   with substance abuse, that case?

13         A.     I don't remember.

14         Q.     Did you look at the records on that

15   case?

16         A.     I don't recall.

17         Q.     "In addition to these highly

18   publicized cases, at least four other children

19   known to the department were killed since

20   2009."

21                And would you have looked at the

22   case files on each of those cases involving a

23   child death?

24         A.     Possibility yes.

25         Q.     But the -- the case file itself is

Page 169

1    where you would look for information?

2         A.    SACWIS and the case file.

3         Q.    Never just SACWIS alone?

4         A.    No.

5         Q.    The article continues, "Fingers

6    weren't pointed at Forkas at the meeting, but

7    instead at economic conditions that have

8    heightened family problems and risks to

9    children."

10             Do you see that statement?

11        A.    I see it.

12        Q.    And is that consistent with your

13   recollection that economic conditions were a

14   major driver of the problems?

15        A.    I don't recall that.

16        Q.    "Forkas herself acknowledged in

17   prepared remarks that problems for parents and

18   children, 'are much more serious than we

19   assumed - and that includes myself, other

20   county managers, our staff and contract

21   agencies.'"

22             Do you see that?

23        A.    I see it.

24        Q.    Sound like something you said at

25   that conference?

Page 170

1        A.     Possibly.

2        Q.     So I guess you were there?

3        A.     I guess I was.

4        Q.     If you were giving remarks, you had

5   to be there, right?

6        A.     I assume so.

7        Q.     It looks, from context, like this

8   is a continuation of a quote from you.  "I

9   believe we all underestimated the toll that the

10  economy has taken on children and families in

11  Cuyahoga County."

12       A.     Uh-huh.

13       Q.     Is that a quote that you gave?

14       A.     I don't --

15       Q.     A statement that you gave?

16       A.     I don't know.  I don't recall it.

17       Q.     Do you recall having the belief

18  that the county, including the Department of

19  Children and Family Services, underestimated

20  the toll the economy has taken on children and

21  families in Cuyahoga County?

22       A.     Say it again.  I'm sorry.  Would

23  you repeat it, your question?

24       Q.     Do you recall having the belief, at

25  that time, that the county, including the

```
                                      Page 171
 1    Department of Children and Family Services, had

 2    underestimated the toll that the economy has

 3    taken on children and familes in Cuyahoga

 4    County?

 5            A.     It's possible.

 6            Q.     It continues, "Forkas drew a

 7    comparison of herself to John Mattingly, the

 8    child-welfare director in New York who dealt

 9    with a series of child deaths soon after taking

10    the job."  And then there's some further quote

11    from you about that.

12              Does that ring any bells for you?

13            A.     No.

14            Q.     And it talks about this individual

15    in New York, "'successfully weathered the

16    storm' after adopting recommendations from a

17    panel similar to the Cuyahoga group."

18              Does that ring a bell?

19            A.     No.

20            Q.     It doesn't do much good to have a

21    group make a bunch of recommendations and not

22    adopt them then, does it?

23            A.     No.

24            Q.     I'm sorry.  I didn't hear your

25    answer.
```

Page 172

1           A.     No.

2           Q.     "Forkas noted the tragedies in

3     Cuyahoga began a few weeks after she became

4     director in January 2009.  She said she would

5     enact all of the panel's 72 recommendations to

6     improve services and practices."

7                  Do you see that?

8           A.     I see it.

9           Q.     Do you recall saying that?

10          A.     I don't.

11          Q.     "But some, such enhanced services

12    after children are returned to their parents'

13    custody, will take money the department doesn't

14    have.  A number of services have been lost to

15    budget cuts over the past few years."

16                 Does that sound like a discussion

17    that was being had at the time?

18          A.     I don't recall it.

19          Q.     When the panel made its

20    recommendations, do you recall any discussions

21    that you had within your staff or within the

22    county government about how this would take

23    additional funding that you guys didn't have?

24          A.     I don't remember.

25          Q.     It continues on the top of the next

Page 173

1  page, "Participants Wednesday," meaning the

2  presentation we were just going over, "were

3  clearly trying to send a message to candidates

4  for county executive, one of whom will assume

5  the new office in January."

6             That ended up being Mr. FitzGerald,

7  correct?

8      A.      Uh-huh, yes.

9      Q.      "Mary Boyle, a former county

10  commission and member of the task force, urged

11  the audience to press hopefuls on whether they

12  will increase money for child-welfare

13  services."

14             Do you see that?

15      A.      I see it.

16      Q.      And is it your understanding that

17  money for child-welfare services did not

18  increase in early 2011 or 2012 or '13 or '14 or

19  '15 or '16, for years after this?

20      A.      I don't -- I don't know.  I don't

21  think that happened.

22      Q.      I'm sorry?

23      A.      It did not happen.

24      Q.      All right.  And -- and the details

25  of whether money ever came through, your

Page 174

1   successors, like Ms. Rideout, would know more

2   about that, right?

3        A.    I would assume so.

4                    -  -  -  -  -

5              (Thereupon, Deposition Exhibit 6,

6              6/22/2009 E-Mail from James

7              McCafferty Re: 2009 Budget

8              Incentive, with Attachment,

9              CUYAH_002794109 to 002794111, was

10             marked for purposes of

11             identification.)

12                   -  -  -  -  -

13        Q.    So going back to some documents

14   that were produced by Cuyahoga County that have

15   your name on them, this is Exhibit 6.  There

16   are two copies there for the Plaintiffs'

17   lawyers.

18             THE WITNESS:  Sorry.

19        Q.    Exhibit 6 is a document with the

20   Bates range CUYAH_002794109 through 111, and it

21   is an e-mail with attachments from June 29,

22   2009.  The sender is James McCafferty, the

23   Cuyahoga County administrator.

24             And you just mentioned him, right?

25        A.    I did.

Page 175

1       Q.    Okay.  In terms -- your mention of

2    him was about discussions about --

3       A.    The panel.

4       Q.    -- enacting the panel and --

5       A.    Yes.

6       Q.    -- what we're to do with it,

7    correct?

8       A.    Yes.

9       Q.    And do you see on, like, the fourth

10   line -- I'm sorry, the fifth line of

11   recipients, that you're one of the recipients

12   of this e-mail?

13      A.    I see it.

14      Q.    And the subject is "2009 Budget

15   Incentive," correct?

16      A.    Correct.

17      Q.    And then there is a memo attached

18   to this from Mr. McCafferty to, quote, "Elected

19   Officials and Department Directors," with the

20   same subject line, 2009 Budget Incentive.

21            Do you see that?

22      A.    Yes.

23      Q.    It says here that, "In 2008,

24   agencies were notified that an incentive may be

25   awarded to those agencies that were able to end

1   the year with a budget surplus.  Despite the

2   $27.3 million deficit in the General Fund

3   (including the levies) that was projected at

4   1st quarter, we are committed to providing

5   these incentives to reward those agencies that

6   were able to identify a cost saving measure in

7   2008."

8              Does this ring a bell at all of

9   what was going on in terms of budget?

10          A.    Yes.

11          Q.    Can you characterize what was going

12  on?

13          A.    Mr. McCafferty was incentivizing

14  people who had additional money that wasn't

15  spent in their budgets, or -- and he gave an

16  incentive if people could come up with ways to

17  work smarter, better.  He would -- he was

18  planning on incentivizing.

19          Q.    So at the time there's an overall

20  major budget deficit, he's saying if individual

21  departments can somehow show a surplus, they

22  will get some sort of benefit going forward?

23          A.    I referred to this before when I

24  was talking to you, if you'll recall, about the

25  placements.  That was an area.

Page 177

```
 1        Q.    The --
 2        A.    I'm sorry.
 3        Q.    I'm sorry.  Go ahead.
 4        A.    I was going to say something else,
 5   but I'm not going to.
 6        Q.    So the end of the first paragraph
 7   says, "Attached, please find a list of agencies
 8   that earned the incentive."
 9              If you go to the next page, do you
10   see the list?  Is -- is your agency there?
11        A.    Yes.
12        Q.    Is that list --
13        A.    Oh, sorry.  Sorry.  No.  Sorry.
14        Q.    It says "Child Support."
15        A.    I was looking at the wrong sheet.
16        Q.    You see "Child Support" listed.  Is
17   that your agency?
18        A.    No, uh-uh.
19        Q.    So you -- you guys didn't get the
20   incentive from 2008?
21        A.    This is interesting.  We did get
22   some money.
23        Q.    Okay.  So go back to the -- the
24   first page of the memo --
25        A.    I'm there.
```

1          Q.     -- where the memo --

2                 It says, "Given the current fiscal

3    climate and in light of the fact that we don't

4    yet know what the full impact of the State's

5    budget crisis will be on the County, it is

6    uncertain whether the incentive program will

7    continue in 2009."

8                 Do you see that?

9          A.     Yes.

10         Q.     Do you recall what was going on in

11   terms of the state budget crisis in 2009?

12         A.     I don't.

13         Q.     Do you recall that there was a

14   state budget crisis?

15         A.     I don't recall that.

16         Q.     As you understand the terms, would

17   a state budget crisis have an impact on the

18   money that was available for Children and

19   Family Services to carry out its function?

20         A.     I would think so, but I don't know

21   that as a fact.

22         Q.     Okay.

23                      -  -  -  -  -

24                 (Thereupon, Deposition Exhibit 7,

25                 10/13/2010 E-Mail from Regina

Page 179

1           Thigpen Re: Message to All DCFS

2           Employees, with Attachment,

3           CUYAH_003428644 to 003428669, was

4           marked for purposes of

5           identification.)

6                   -  -  -  -  -

7        Q.    Do you have other testimony about

8    that document?

9        A.    No.

10       Q.    Okay.  Exhibit 7, this is an e-mail

11   with attachments, CUYAH_003428644 through 69.

12   And the original e-mail in here is October 13,

13   2010, from Regina Thigpen, who was your

14   administrative assistant or secretary?

15       A.    Yes, she was.  Yes.

16       Q.    To a variety of people, essentially

17   on your behalf, correct?

18       A.    Uh-huh, yes.

19       Q.    And so this is a message to all

20   DCFS employees; is that correct?

21       A.    That's correct.

22       Q.    And so this is, like, a -- some

23   sort of distribution list?  That's what's on

24   the "to" line here?

25       A.    Must be.

1          Q.    And so the attached document, if

2     you go to the second page, is a memo that is

3     from the Cuyahoga County Department of Children

4     and Family Services, with you as the director,

5     to all DCFS employees, again dated October 13,

6     2010.  Do you see that?

7          A.    I see that.

8          Q.    And this essentially talks about

9     that the panel report has come out and is being

10    circulated, correct?

11         A.    Correct.

12         Q.    So this squares with the media

13    account that we were just going over --

14         A.    Yes.

15         Q.    -- in an exhibit a little bit ago

16    that talks about a presentation on Wednesday

17    that was right before the article came out?

18         A.    Yes.

19         Q.    Okay.  And so then there is a

20    document that's attached here that starts on

21    the Bates range ending in 46 that's entitled

22    "Final Report from the Practice Review and

23    Improvement Panel."

24              Do you see that?

25         A.    I see it.

1      Q.    And then, if you go forward to the

2  Bates number starting with 58, there is another

3  document that says, "Practice review and

4  improvement panel, David Crampton, Ph.D.,

5  chair, recommendations for Cuyahoga County

6  Department of Children & Family Services," with

7  the same date, October 13, 2010.

8            Do you see that?

9      A.    No.

10     Q.    Are you there?

11     A.    Got it.

12     Q.    So do you know the difference

13  between the first attachment that's described

14  as the final report versus the document of the

15  same date that says that it comes from

16  Mr. Crampton?

17            Do you have my question in mind,

18  ma'am?

19     A.    No, I'm trying to just read it.

20     Q.    Okay.  Do you know what the

21  difference is between the two attachments?  Are

22  they both generated by the panel, or is one

23  generated by -- generated by your --

24     A.    Well, it looks like one's --

25     Q.    -- group?

Page 182

1          A.    -- generated from David Crampton.

2     And I'm not sure.

3          Q.    So why don't we go back, then, to

4     the start of the first report and try to go

5     through that quickly.  Like the other ones, it

6     all has the date of October 13, 2010.  Do you

7     see that --

8          A.    Yes.

9          Q.    -- on page 46?

10         A.    Yes.

11         Q.    On the second page, after kind of

12    talking about the history of the panel, it

13    says, the second paragraph, "In addition to

14    high profile cases, CCDCFS" -- that's your --

15         A.    Cuyahoga County --

16         Q.    -- position at the time?

17         A.    -- Department of Family Services,

18    yes.

19         Q.    -- "reviewed the files of 122

20    children whose custody was terminated between

21    January 2009 and March 31, 2010, but whose

22    cases were still open."

23              And, again, we talked about 122

24    cases before in a prior document.

25         A.    Uh-huh.

Page 183

1      Q.    Do you know where there would be

2  any documents relating to this analysis or

3  review of cases?

4      A.    I -- do I know where it would be

5  now?  Is that what you're asking?  Or --

6      Q.    Yeah.

7      A.    -- what happened to it?

8      Q.    Yeah.

9      A.    No, I don't know what happened to

10  it.

11      Q.    Would there have been documents

12  generated memorializing the results of that

13  review?

14      A.    I would think so.  David Crampton

15  did them.  I would think so.

16      Q.    Somewhere in the county should

17  have --

18      A.    Somewhere they should.

19      Q.    -- those records?

20            Would you have received a copy of a

21  report on that by e-mail or --

22      A.    I have no idea.

23      Q.    Any idea who would have had it for

24  the County?

25      A.    You could ask -- I don't know.

Page 184

1          Q.    Okay.  If you go to the next page,

2     after it walks through what the panel was asked

3     to do, the panel's charge, selection of the

4     members of the panel, do you see those

5     sections?

6          A.    Are you on 648?

7          Q.    Yes, ma'am.

8          A.    Okay.

9          Q.    So it runs through what the panel

10    was asked to do, the panel's charge, selection

11    of members of the panel, and then guiding the

12    work of the panel.  Do you see that?

13         A.    I see it.

14         Q.    And the first sentence under

15    "Guiding the Work of the Panel," it says, "To

16    prepare the panel for its work, CCDCFS staff

17    first presented key policies, procedures,

18    reports, and data."

19               How was that presentation done?

20         A.    I'm not sure.  I don't recall.

21         Q.    Were -- were there documents

22    generated in connection with that?

23         A.    I -- I believe there probably would

24    have been.

25         Q.    Any idea where those would be?

Page 185

1       A.    I'm sorry.  Eight years later, I

2  can't say where they'd be.

3       Q.    Would you have had a copy of

4  whatever was generated back then?

5       A.    No, nev- -- yes, I would imagine.

6       Q.    Like maybe a PowerPoint where --

7       A.    Something.

8       Q.    Okay.  Any idea who was involved in

9  that presentation, in terms of giving it or

10 preparing it?

11      A.    I imagine it would have been David.

12 I -- I don't know if I was involved in this or

13 not.

14      Q.    Well, it wouldn't have been David,

15 because he was the person who received it.  It

16 says that it was -- your staff presented

17 policies, procedures, reports, and data --

18      A.    It was --

19      Q.    -- correct?

20      A.    Any -- yes.  I'm just trying to

21 think back.

22      Q.    Can you think of anybody who would

23 have been involved in that presentation?

24      A.    I would imagine these part of

25 the -- parts of the executive team.

Page 186

```
 1        Q.    Do you know names of anybody, other
 2   than you, who would have been involved?
 3        A.    I would think -- you have the names
 4   of the people, I believe.  That -- they're
 5   still there.
 6        Q.    Can you give me a name of who would
 7   have been involved in the presentation, other
 8   than you?
 9        A.    I'm not sure who it was, but I'm --
10   I can't -- I don't want to bet on who it is.  I
11   don't -- I don't know.
12        Q.    Okay.
13        A.    But I know that there's -- there
14   were many people involved in this, in putting
15   together reports.
16        Q.    So there's some other sections of
17   this, including an overview of what was done,
18   and then if you go to page -- the Bates number
19   ends in 51, "Critical Considerations and
20   Overarching Themes."  Do you see that page?
21        A.    Yes.  Yes.
22        Q.    So the -- I'm not going to take too
23   much time with this, but the first one, in
24   terms of a bullet, says, "Positive outcomes
25   will be achieved through effective internal
```

1    procedures and quality audit-" -- "external

2    practices."

3              Do you see that?

4         A.    Are you on the last paragraph?

5         Q.    No.  The first bullet on page 52.

6         A.    I'm sorry.

7         Q.    It says "Positive outcomes" --

8         A.    Got it.

9         Q.    -- "will be achieved through

10   effective internal procedures and quality

11   external practices."

12             Do you see that?

13        A.    Yes.

14        Q.    Do you know of any changes in

15   internal procedures as a result of anything

16   from the panel?

17        A.    I don't know.

18        Q.    It continues on with a number of

19   other bullets.  The one at the bottom of that

20   page is that, "The division needs to update and

21   sharpen its tools to fulfill its responsibility

22   as a member of the family's team."

23             Do you see that?

24        A.    Uh-huh.

25        Q.    Was that something you agreed with,

Page 188

1    in general?

2         A.    I don't know.

3         Q.    Next page, the second bullet on the

4    page says, "There is a need to strengthen

5    partnerships at all levels across the multiple

6    systems responsible for serving Cuyahoga

7    County's children and families."

8              Do you see that?

9         A.    I see it.

10        Q.    And that's consistent with one of

11   your overall -- your personal observations

12   about structural impediments to the division

13   doing a good job, correct?

14        A.    Correct.

15        Q.    The second paragraph under that

16   bullet starts with the sentence that says,

17   "Specifically the potential for children to be

18   re-abused is substantially increased in those

19   homes where parents or caregivers are

20   struggling with mental health or substance

21   abuse."

22              Do you see that?

23        A.    I see it.

24        Q.    And was that consistent with your

25   experience?

Page 189

```
 1          A.    Yes.
 2          Q.    And that was true for all
 3    substances of abuse, not just opioids or
 4    opiates, correct?
 5          A.    Yes.
 6          Q.    If you go to next page, there's a
 7    bullet that says, "Intersystem
 8    collaboration/access to services is critical to
 9    success."
10                Do you see that?
11          A.    Yes.
12          Q.    In the middle of that paragraph, it
13    says, "However, at important organizational and
14    clinical/service levels, significant
15    disconnects remain among the systems that serve
16    children and their families."
17                Do you see that?
18          A.    I see that.
19          Q.    And that was, again, one of your
20    observations about an overarching problem,
21    correct?
22          A.    Yes.
23          Q.    If you go to next page, the second
24    bullet says, "'On-site' mental health and
25    substance abuse resources are needed at
```

Page 190

1   CCDCFS."

2              Do you see that?

3        A.    Sorry.  I lost you.  You on 55?

4        Q.    I am.

5        A.    Which -- which bullet?  I missed

6   the bullet.

7        Q.    The second bullet says, "'On-site'

8   mental health and substance abuse resources are

9   needed at CCDCFS."

10       A.    Yes.

11       Q.    And you never got those on-site

12  resources, did you?

13       A.    No.  I don't know.  I don't know if

14  they did or didn't.  I was gone by then.

15       Q.    I mean --

16       A.    By the time this was implemented or

17  if -- if any of it was.

18       Q.    The three months that you were the

19  director after this document was generated, you

20  didn't get on-site support added, correct?

21       A.    I don't know if we did or didn't,

22  to be honest with you.

23       Q.    And so if you can just go to the

24  next document, the one that has Mr. Crampton's

25  name on it from the same date, there are a

Page 191

1    number of things here that are identified as

2    recommendations.

3            A.    Page?

4            Q.    It starts on the page ending --

5    with the Bates number ending in 58 and goes to

6    the rest of the time document.  These are all a

7    series of recommendations broken up by number

8    and then with subparts.  Do you see that?

9            A.    Yes.

10           Q.    And was it your view that all of

11   these recommendations should have been

12   followed?

13           A.    I --

14           Q.    To improve the performance of

15   Children and Family Services?

16           A.    Well, it sounds like I said that,

17   all 72.

18           Q.    And you don't know if any of them

19   ever were?

20           A.    I don't know that.

21           Q.    But you know that none of 72

22   were -- none of 72 were implemented in the

23   three months or so that you were director after

24   the report came out, correct?

25           A.    Correct.

Page 192

```
 1                   -  -  -  -  -
 2              (Thereupon, Deposition Exhibit 8,
 3              10/23/2018 E-Mail Chain Re: Final
 4              Recommendations, Report and Letter
 5              from the Chair, CUYAH_012558835 to
 6              012558836, was marked for purposes
 7              of identification.)
 8                   -  -  -  -  -
 9         Q.    Okay.  Exhibit 8, this is a much
10    shorter document.  It's an e-mail with a
11    one-page attachment, Bates range is
12    CUYAH_012558835336.  The e-mail that starts it
13    is October 13, 2010, the same date we were just
14    going over.  This is from Patrick -- Kanary or
15    Kanary?
16         A.    Kanary.
17         Q.    -- to a bunch of people, including
18    you.  Do you see that?
19         A.    I see it.
20         Q.    And Mr. Kanary is identified as the
21    director of the Center for Innovative Practices
22    at Kent State University.  Do you see that?
23         A.    I see that.
24         Q.    And what was his role on the panel?
25         A.    He was one of the facilitators who
```

Page 193

1    helped facilitate some of the sessions.

2         Q.    So the document that we have, the

3    way it was put together, we have one document

4    that is just the cover letter.  We don't have

5    the narratives and other versions that are

6    referenced here.  Actually, let me go back.

7              So the e-mail from Mr. Kanary says,

8    "Attached, please find," it says, "Final

9    versions of the Recommendations," and then,

10   "Final version of the narrative report."  Do

11   you see that on the first page?

12             The -- one is described as the

13   recommendations and one is described as the

14   narrative report.  Do you see that?

15        A.    No, I don't see that.  I'm sorry.

16        Q.    The bullets in the middle of the

17   page --

18        A.    Oh.

19        Q.    -- where it says, "Attached --

20        A.    Okay.  Sorry.

21        Q.    -- "please find" --

22        A.    I got distracted.

23        Q.    The last exhibit we were going

24   over, Exhibit 7, where we had two separate

25   reports, was one of those the recommendations

1   and one was the narrative report?

2          A.     I don't know that.

3          Q.     Have you ever seen other versions

4   of any of these reports?

5          A.     I don't believe so.  I don't know.

6          Q.     Have you ever seen any updates to

7   the report that may have been issued after you

8   were dir- -- after you stopped --

9          A.     No.

10         Q.     -- being director?

11         A.     No.  Never.

12         Q.     Then let's just go to the

13  attachment here, the cover letter from

14  Dr. Crampton that would have accompanied the

15  report.  So this is on the Bates number ending

16  in 36, and it's dated October 12, 2010.  It's

17  addressed to the Cuyahoga County Board of

18  Commissioners and all residents of Cuyahoga

19  County.

20             Do you see that?

21         A.     Yes.

22         Q.     And it gives some of the history

23  we've gone over about stories in the Plain

24  Dealer and the convening of the panel.

25             And it says, "Your staff concluded

1  that there were a number of risk factors in

2  these families," meaning the ones with the high

3  profile deaths, "that needed greater attention:

4  children who were removed from home at young

5  ages resulting in poor attachment and bonding

6  with their parents, families with serious

7  mental health challenges, partner violence, and

8  drug/alcohol addiction and other social

9  stressors such as inadequate income, housing,

10  and health care.  Director Forkas recognized

11  that these issues require consideration and

12  support from the entire community, and so, on

13  her own initiative, she formed a panel of

14  community members to review these risk factors

15  and make suggestions for improving our

16  community's response to helping vulnerable

17  children and their families."

18          Did I read that right?

19      A.    You read it.

20      Q.    It's quite a mouthful, but is that

21  an accurate characterization of how that panel

22  came to be created?

23      A.    No.  It wasn't just me.

24      Q.    And so it's described as being you,

25  but it really was you and the county executive

Page 196

1   at the time?

2        A.    Uh-huh.  There were a lot of other

3   people that helped with the panel, helped us

4   get experts.

5        Q.    At the end of this time, after the

6   panel came out, do you remember any discussions

7   at all about what would be done to implement

8   the panel's recommendations or get money for

9   that?

10       A.    I don't recall.

11                   -  -  -  -  -

12            (Thereupon, Deposition Exhibit 9,

13            1/3/2011 E-Mail from Valeria Harper

14            Re: Minutes from Dec. 16 Meeting,

15            with Attachment, CUYAH_012681169 to

16            012681171, was marked for purposes

17            of identification.)

18                   -  -  -  -  -

19       A.    But I'm sure you're going to give

20   me something that's going to help me.

21       Q.    Well, we only have what documents

22   we have, so that's part of the thing, is would

23   there have been meetings or memos or documents

24   that were created that we don't have?  Because

25   we, frankly, don't have many documents with

Page 197

1    your name on them.

2          A.    Do you have any documents from the

3    existing staff?  Have you asked?

4          Q.    Yeah.  There was a lot of documents

5    from staff, but relatively few have your name

6    on them, and relatively few go back to 2010.

7          A.    That's interesting.

8          Q.    It is.

9                Here is Exhibit 9, with two copies.

10   So this is an e-mail with attachment,

11   CUYAH_012681169 through 71.

12               The e-mail is from Valeria Harper,

13   the chief operating officer of the ADAMHS Board

14   of Cuyahoga County.

15         A.    She was at the time.

16         Q.    To you and others.  Do you see

17   that?

18         A.    Yes.

19         Q.    And the subject is minutes of the

20   December 16th meeting, which are basically

21   being provided in anticipation of the upcoming

22   meeting that's going to happen in January,

23   right?

24         A.    Right.

25         Q.    And that's why this is sent January

1    3, 2011, right before the -- the next meeting

2    takes place?

3         A.    Uh-huh.

4         Q.    Does that make sense?

5         A.    Yes.

6         Q.    If you look at the meeting minutes

7    from December 16th -- I'm sorry; on the second

8    page -- it says the attendees were you, Cynthia

9    Weiskittel.  What was her position at the time?

10        A.    She was a deputy over ongoing

11   services I believe.

12        Q.    And do you know what position she

13   subsequently had in Cuyahoga County after this?

14        A.    She's director.

15        Q.    She's the current director?

16        A.    Yeah.

17        Q.    Have you had any interaction with

18   her?

19        A.    No.

20        Q.    Did she used to work for you?

21        A.    She did.

22        Q.    Jacqueline McCray, do you know what

23   her position was then?

24        A.    Deputy director.

25        Q.    Of what?

Page 199

1          A.    Of adoption and foster care.

2          Q.    Tamara Chapman-Wagner, do you know

3    what her position was then?

4          A.    She was the deputy director over, I

5    think it was in- -- intake or ongoing services.

6    I can't recall.

7          Q.    Okay.  So these are all County --

8          A.    These are all County employees.

9          Q.    And then --

10         A.    Well, on the top.

11         Q.    -- Mr. Denihan we've already

12   mentioned, he was -- was he the -- the CEO --

13         A.    CEO --

14         Q.    -- of the ADAMHS Board?

15         A.    He was the CEO on the ADAMHS Board.

16         Q.    And then Ms. Harper, who sent this,

17   we said she is the COO of the ADAMHS Board?

18         A.    She was.  She's deceased.

19         Q.    Mr. Osiecki?  Do you know what his

20   position was then?

21         A.    He was, like, a public relations

22   person.

23         Q.    For whom?

24         A.    For Bill Denihan.

25         Q.    Christina Delos Reyes?

Page 200

1          A.     I don't remember Christina.  I'm
2     not sure.
3          Q.     What about Linda Torbert?
4          A.     The name sounds familiar, but I
5     don't remember what she did.
6          Q.     And then there's -- the -- the
7     subject of this meeting minutes says,
8     "Recommendations of practice review and
9     improvement panel for DCFS."
10             Does that seem to refer back to the
11    documents we were just going over?
12         A.     I believe so.
13         Q.     And there's various things
14    discussed here, including, if you get the next
15    steps, there was going to be a memorandum of
16    understanding between Children and Family
17    Services and the ADAMHS Board.  Do you remember
18    that?
19         A.     I don't remember it, but...
20         Q.     You said that there were
21    contractual relationships between the two
22    entities, right?
23         A.     I believe so.
24         Q.     And were -- were those changed
25    because of something in that report?

Page 201

1        A.    I don't believe so.

2        Q.    Okay.  From looking at the

3   discussion on this December meeting and the

4   next steps, did anything change as a result of

5   the report that we've been going over?

6        A.    I don't know.

7        Q.    This -- this meeting of the

8   department with the ADAMHS Board obviously you

9   were having one in January.  You'd had one in

10  December.  Was the meeting in December of 2010

11  the first meeting you had with them?

12       A.    I don't remember.

13       Q.    Would -- should there have been

14  meetings in October and November as well?

15       A.    Might have been.

16       Q.    What about after January?  Should

17  there have been other meetings?

18       A.    I don't -- I don't know.  I can't

19  answer that question.  I don't know.

20       Q.    Does this refresh you at all on

21  anything that happened as a result of the

22  report, including trying to get more money or

23  change staffing or policies, anything?

24       A.    Under 1.2, the Hitchcock Center for

25  Women with the AOD assessments and getting

Page 202

1   CARES Plus in there.

2        Q.    That was as a result of the panel?

3        A.    No.  No, I don't -- I don't believe

4   so.

5        Q.    Okay.  So my question was, was

6   anything --

7        A.    Oh, I see.

8        Q.    -- here because of anything about

9   the panel's recommendations?

10        A.    I don't -- well, Bill Denihan was

11   on the panel.  I mean, he was -- you know, he

12   was at all those meetings and he was part of

13   the panel.  I don't -- but I don't -- I don't

14   know that.  I don't know that to be true.

15        Q.    Okay.

16        A.    You got one more in there?

17        Q.    One more --

18        A.    One more?

19        Q.    -- set of minutes.

20                     -  -  -  -  -

21             (Thereupon, Deposition Exhibit 10,

22             2/11/2011 E-Mail from Valeria Harper

23             Re: Final - Meeting Summary, with

24             Attachment, CUYAH_012677697 to

25             012677699, was marked for purposes

Page 203

```
 1               of identification.)

 2                    -  -  -  -  -

 3       Q.    Exhibit 10 -- thank you -- is an

 4   e-mail with attachment, and it's

 5   CUYAH_012677697 through 99.  The e-mail is

 6   again from Ms. Harper to you and others.  This

 7   is an e-mail from February 11, 2011.  So, like,

 8   very near the end of your stay, correct?

 9       A.    Yeah.

10       Q.    And it's referring back to the

11   minutes of a meeting that happened on January

12   4th, which would be the day after the last

13   document we looked at --

14       A.    Right.

15       Q.    -- correct?

16       A.    Uh-huh.

17       Q.    Okay.  So it said, on January 4,

18   2011, you attended this meeting, along with, it

19   looks like the exact same people with one

20   addition, and that's Cindy Chaytor --

21       A.    Yeah.

22       Q.    -- C-h-a-y-t-o-r.

23             Do you know who she is?

24       A.    No, I don't.

25       Q.    And so by this time in January 4 of
```

Page 204

1    2011, did -- did you know that you were not

2    going to be the director any longer?

3          A.    Oh, I knew.

4          Q.    Okay.  So it starts off by saying,

5    "Summary from meeting held on December 16,

6    2010, was disseminated and reviewed."

7                And then under "Services and

8    Supports," it says, "Discussion:  ADAMHS Board

9    staff shared brief overview of the central

10   intake/assessment/linkage and referral program

11   scale for uninsured adults with mental illness.

12   Copy of brochure shared.  DCFS acknowledged

13   that there are some programmatic concerns

14   related to the Hitchcock Center for Women as

15   DCFS's on-site assessment entity for accessing

16   AOD treatment services.  Follow-up planned with

17   Cindy Chaytor taking the lead to arrange a

18   meeting with DCFS, designated staff, and HCFW."

19               Do you have any idea what that's

20   talking about?

21         A.    I do not.  I don't know what the

22   concerns were.

23         Q.    And Hitchcock Center for Women,

24   what did it -- what did that do?

25         A.    I think it was -- I'm not sure.  I

Page 205

1   don't want to misspeak.

2         Q.    Was it a contractor for your

3   department?

4         A.    I don't recall.

5         Q.    The abbreviation "AOD" where it

6   says "accessing AOD treatment services," what

7   did "AOD" mean?

8         A.    I don't know.

9         Q.    "Alcohol or drug"?

10        A.    "Alcohol or drug" is what I think

11  it means, but I don't know that as a fact.

12        Q.    Does "SCALE" ring any bells for you

13  at all?

14        A.    SCALE, uh-uh.

15        Q.    I didn't hear your answer.

16        A.    I -- I'm sorry.  I don't have an

17  answer for you.

18        Q.    Okay.  The next part talks about

19  "cross system training" for staff.  Do you

20  remember any training program that was

21  initiated at this time?

22        A.    Well, I know what they're talking

23  about.  They're talking about our TDM, our team

24  decision-making meetings, on how we make

25  decisions on cases.

Page 206

1          Q.    Do you know if anything changed?

2          A.    I don't.

3          Q.    Next page please.  Section IV,

4    "Memorandum of Understanding Suggested

5    Language."  Do you remember what was going on

6    with the memorandum of understanding between

7    the ADAMHS Board and your department?

8          A.    I don't know.  I may -- no, no.

9          Q.    Five says, "Family and Children

10   First Council - Service Coordination Team."  It

11   says, "It was decided and supported that

12   Deborah Forkas will speak privately with Robin

13   Martin, director of FCFC, as part of an already

14   scheduled meeting to share concerns regarding

15   the current SCT process/practice."

16               Does that ring any bell for you at

17   all?

18          A.    No.

19          Q.    I'm sorry?

20          A.    No.

21          Q.    What did Family and Children First

22   Council do?

23          A.    It was a big coun- -- it was a --

24   it was a council where we all put money in for

25   service coordination and services.  And Robin

1  Martin was the director there.

2        Q.    Is that a private entity?

3        A.    No.  Government.  But I'm not

4  sure -- I don't know what this means, what I

5  was supposed to share with her.

6        Q.    So Section VI, first bullet, if

7  that's what that little symbol is called, says,

8  "ADAMH Board staff to invite DCFS

9  representatives to the next all providers'

10  meeting."

11          Any idea what the all providers'

12  meeting was?

13        A.    I don't.  It must be all the

14  providers that Denihan used.

15        Q.    And so who would have gone, for

16  your group, to that?

17        A.    Who would have gone?

18        Q.    Yeah.

19        A.    Probably -- I would think Tammy

20  Chapman-Wagner may have been the person to go.

21  I don't -- I'm not sure.

22        Q.    So the Section VII says, "Next

23  meeting February 8, 2011."

24          Were you still director by then?

25        A.    I think I was -- well, in March I

```
 1   was gone.

 2        Q.    Okay.  Do you know if you attended

 3   the next meeting?

 4        A.    I don't believe I did, but I don't

 5   know that as a fact.

 6        Q.    Okay.

 7        A.    Do have another sheet in there --

 8        Q.    No.

 9        A.    -- showing that?

10                    -  -  -  -  -

11             (Thereupon, Deposition Exhibit 11,

12             2/1/2011 E-Mail from Janet Carr Re:

13             CUYAH_002794832 to 002794850, was

14             marked for purposes of

15             identification.)

16                    -  -  -  -  -

17        Q.    Exhibit 11.  This is about the last

18   document we have with your name on it from

19   Cuyahoga County.  February 11, 2011, an e-mail

20   with the Bates range CUYAH_002794832, and then

21   with attachments going through 50.  And the

22   e-mail is from Janet Carr to you and various

23   others.

24             Ms. Carr is identified as coming

25   from the Office of Health and Human Services.
```

1   Do you know what her position was?

2       A.    I think she's an administrative

3   assistant.

4       Q.    Okay.  And she's actually, like,

5   forwarding something from your administrative

6   assistant.  Do you see that?

7       A.    Uh-huh.

8       Q.    Yes?

9       A.    Yes.

10      Q.    Okay.

11      A.    Sorry, yes.

12      Q.    And this whole thing is described

13  as the "DCFS CountyStat Presentation" that

14  "Rick referred to at Friday's meeting."

15            Do you see that?

16      A.    Rick who?

17      Q.    I don't know.  That's my question

18  is for you.  Do you know --

19      A.    It would be Rick Werner.

20      Q.    Rick Werner is one of the

21  recipients from the e-mail from Ms. Carr.  Do

22  you see that?

23      A.    Yeah -- yes.  Yeah, it would have

24  to be Rick Werner.  I don't know --

25      Q.    What was his position?

Page 210

1          A.     He -- I reported to him.

2          Q.     And what was CountyStat?

3          A.     CountyStat was something that

4     actually Ed FitzGerald started, so Ed

5     FitzGerald was in by then.  And it was

6     CountyStat, and he wanted a quick flash of

7     statistics that we used, and so we had to

8     prepare reports that he was interested in.

9          Q.     So this was going on during your

10    last month or so on the job?

11         A.     Must have been my last couple weeks

12    or so.

13         Q.     But this was, like, an ongoing

14    thing?  Every month --

15         A.     Well, when did he --

16         Q.     -- there would be some sort of

17    presentation?

18         A.     Well, I was at a few of them.  But

19    I don't know when he -- I don't recall when he

20    started them or how long they were --

21         Q.     So were they every --

22         A.     -- going on.

23         Q.     -- month or every week?

24         A.     I don't recall.  I really don't

25    recall.

Page 211

1          Q.    Okay.  Let's go to the attachment
2     here, starting on Bates number ending in 34.
3     It says, "CountyStats, December 2010,
4     Department of Children and Family Services,
5     Deborah Forkas, Director."
6               Do you see that?
7          A.    33, 32, 34 -- yeah, I see it.
8          Q.    And if you go to, like, the third
9     slide, it says, "Number of Children in
10    Placement 'Point in Time'"
11         A.    Uh-huh.
12         Q.    Can you explain what "Point in
13    Time" is?
14         A.    Just that.  It's a point in time.
15    It's a -- we'd look at an aggregate report, and
16    it's a point in time.  We pick a date, and
17    12/26/2010 was the date.
18         Q.    Okay.  So if you look at the --
19    page 3, which is the Bates number ending in 36,
20    it shows that the number of children in
21    placement from 2002 through the end of 2010 had
22    dropped by about 70 percent.
23               Do you see that?
24         A.    I see that.
25         Q.    Do you know why there were such a

Page 212

1   big drop?

2         A.    I do.

3         Q.    Why?

4         A.    Because there were children that

5   were being kept in placements way, way too long

6   and were not being returned home in a

7   reasonable amount of time.  And this came

8   from -- Jim McCafferty started this in 2002,

9   and the idea was to review the cases and see

10  were there children that were lingering in the

11  system and if they were lingering and not --

12  you know, and should have been reunified or

13  could have -- could have been potentially

14  reunified or adopted or, depending on what kind

15  of types of custody we had, that we would try

16  to find them adoptive homes or try to find --

17  do more work on the cases.

18        Q.    You want this number to be

19  dropping?

20        A.    Do I want this number to be

21  dropping?  Well, at one point it was 8,000 --

22  it was a ridiculous amount of children, which

23  was not a good situation.  So it's -- what's

24  the right number is really, you know, is there

25  a right number or -- or more so important, who

Page 213

1   are the children that are ready to go be

2   reunified with their parents or if they're not

3   going to be reunified with their parents, do

4   we -- do we move towards PC because -- that

5   they could be adopted.  So it could -- it's a

6   number of things.

7           Q.    So if you go to page 5 of this

8   presentation, which is Bates number ending in

9   38, it says, "Agency Specific Measures," and

10  number one is, "Reduce the number of youth

11  aging out of Permanent Custody and Permanent

12  Planned Living Arrangements."

13          A.    Right.

14          Q.    Do you see that?

15          A.    Yes.

16          Q.    Number two is, "Reduce the Number

17  of Youth in Residential Placements."

18          A.    Yes.

19          Q.    So that was a -- a measure that was

20  taken to reduce the numbers?

21          A.    Right.

22          Q.    And then three says, "Increase

23  Compliance on Worker Visits on Substitute Care

24  cases."

25                Can you explain what that means?

Page 214

1       A.    Increase compliance on worker's

2    visits on substitute care cases, I'm not sure

3    what that means.

4       Q.    Okay.

5       A.    But do you un- -- do you understand

6    what PPLA is?

7       Q.    Enough.

8       A.    Okay.  I mean, it's important to --

9       Q.    Feel free to explain it, then.

10       A.    Well, it's -- it's just -- it's --

11    we don't have it anymore in the state.  They've

12    gotten rid of it since then because -- but it

13    keeps kids in limbo, where they can't -- they

14    can't leave.  They -- they can't go back to

15    their homes, but they can't -- we don't have PC

16    of them.  And it's a status type of legal

17    custody.

18            And so the issue is, is can we get

19    PC of the child, permanent custody, so that we

20    can find them a place where they can live and a

21    family that will adopt them, and that's what

22    we're working on.  I mean, it's a -- that's --

23    that's something that is a positive thing.

24       Q.    Why don't you go to Slide 16,

25    please, ma'am, which is the Bates number ending

Page 215

1    in 49.

2         A.    "Challenges and Barriers"?

3         Q.    Yes, ma'am.

4         A.    Okay.

5         Q.    And so this was intended, kind of

6    very late in your -- or at the very end of your

7    term as director, to accurately state what your

8    challenges and barriers were to the department

9    doing a good job.

10        A.    Uh-huh.

11        Q.    Is that a fair statement?

12        A.    I guess.  I don't know.

13        Q.    Well, who would have prepared this?

14   It's all under your name.

15        A.    May be under my name.

16        Q.    Well, it says Mickey Groomers?

17        A.    Groomes.

18        Q.    Well, and so did he work for you?

19        A.    She.

20        Q.    Did Mickey Groomes work for you at

21   this time?

22        A.    I think she worked for Cindy for a

23   while.  She did report to me for a short --

24   short time.  She got switched over to me.

25        Q.    So somebody probably prepared these

Page 216

1  slides and you've had a chance to review them
2  before they were finalized, right?
3      A.    I would expect that's probably what
4  happened.
5      Q.    Okay.  So "Challenges and
6  Barriers," the first one says, "The new ODJFS
7  SACWIS system offers no management reports."
8            Is that true?  At the time.
9      A.    At the time, it pro- -- it could
10  have been true.  I don't know if it was true or
11  not, but it could have been true.  I mean, it
12  was still not -- not where it was supposed to
13  be.
14      Q.    Second one says, "The social worker
15  SACWIS data entry requirement has reduced the
16  amount of time staff has -- have to spend with
17  their families.  Hotline data entry time has
18  increased by 50%.  Direct service data entry
19  time has increased by 40%."
20            Do you see that?
21      A.    I see that.
22      Q.    And -- and you would have tried to
23  be accurate there too, right?
24      A.    Say it again.  I --
25      Q.    You would have tried to be accurate

Page 217

1    there too?

2         A.    What do you mean accurate?

3         Q.    When you're giving data on --

4         A.    Oh, we -- oh, just the agency.

5         Q.    Yes.

6         A.    Sorry.  Yes.

7         Q.    Okay.  So --

8         A.    I mean, I -- I know this was a

9    problem, because it was very, very difficult to

10   get your information into SACWIS at the time.

11   There were lots of problems with the system

12   that they built, the state built.

13        Q.    That hurt your performance?

14        A.    Hurt our performance.

15        Q.    Third bullet says, "Staffing levels

16   have decreased from 1,100 in 2009 to 850

17   December of 2010."

18        A.    Yes.  And that was Mr. FitzGerald

19   who we can thank for that, because he -- there

20   was a freeze and he wouldn't allow us to hire.

21        Q.    Did that hurt performance too?

22        A.    It did.

23        Q.    Losing 250 people over the course

24   of less than two years --

25        A.    Of course it did.

Page 218

1      Q.    And those numbers, the 1,100
2  itself, was down from what it had been in the
3  past, right?
4      A.    Yes.
5      Q.    "Intake caseloads are increasing.
6  October 2010 caseload numbers were 19.1,
7  compared to 8.9 in October 2009."
8            Can you explain that?
9      A.    Can't explain it.
10     Q.    So but --
11     A.    But, I mean, I would assume it.
12     Q.    Your staffing is dropping and your
13  caseload is increasing.
14     A.    Well, increasing, yeah, I mean, of
15  course.
16     Q.    So the burden on caseworkers is
17  increasing?
18     A.    Yes, that's true.
19     Q.    And the performance is affected.
20     A.    True.
21     Q.    Negatively?
22     A.    True.
23     Q.    Okay.  Next one says, "Ongoing
24  caseloads are on the rise.  October caseloads
25  were 12.8, compared to 11.0 in October 2009."

Page 219

1              How -- how are those numbers
2    different?  Ongoing versus intake.
3         A.    The same thing.  I mean, they're
4    increasing.
5         Q.    But they're different staffing --
6         A.    They're different --
7         Q.    -- for intake?
8         A.    Yeah, they're different -- yeah,
9    intake is front door.  Ongoing is halfway
10   through the system.
11        Q.    So the burden on the system was not
12   just at the intake level; it was at multiple
13   levels?
14        A.    It was at multiple levels.
15        Q.    Okay.  The next bullet says, "The
16   economic crisis in the county has affected our
17   client base - serious mental illness, substance
18   abuse, and domestic violence.  Many of our
19   clients present with 2 or more of these
20   issues."
21        A.    True.
22        Q.    That was something that you and
23   your colleagues had noted, correct?
24        A.    Yes.  I don't know about the
25   economic crisis, but that's what -- that's what

Page 220

1   we said.

2          Q.    And by this time with this

3   presentation to the county executive in early

4   2011, you weren't intending to pull any

5   punches, were you?

6          A.    No.

7          Q.    And had you noticed, by that time,

8   if the rising issues with substance abuse were

9   starting to include an uptick in opioids and

10  opiates?

11         A.    It was an uptick, but I don't know.

12  I don't remember -- honestly, I don't know.

13         Q.    Do you know if there were any

14  questions posed back to you by the county

15  executive, or anybody working with him, when

16  this stat presentation happened to say, hey,

17  what are the drugs at issue, what are -- what's

18  the issue with substance abuse, why does that

19  matter?

20         A.    I don't think so.

21         Q.    I mean, by this point in time it

22  was pretty well known that there were trends in

23  substance abuse that were straining the

24  provision of governmental services, including

25  Children and Family Services, correct?

Page 221

1        A.     I don't know if I can say that or
2    not.  You can say that.  I mean, I...
3        Q.     Was it well known to you at this
4    time?
5        A.     Well, I was seeing what was
6    happening.
7        Q.     And you were part of meetings of
8    high-level government officials talking about
9    this sort of thing, correct?
10       A.     Talking about it.
11       Q.     And you said --
12       A.     Talking.
13       Q.     -- part of what's going on is, hey,
14   we have -- we're being burdened by economic
15   downturn, mental illness, substance abuse,
16   domestic violence, all of these things are
17   increasing the burden on our system and making
18   it harder for us to do our job; is that right?
19       A.     That's right, I believe.
20       Q.     And part of the fix for that would
21   be needing more money, right?
22       A.     That would be the only fix, but
23   when you can't get staff and you can't get
24   money...
25       Q.     So this would have been a meeting,

Page 222

1  what we were just going over, that

2  Mr. FitzGerald attended, correct?

3       A.    Yes.

4       Q.    Him and people working directly

5  with him at that time, like maybe Mr. Merriman

6  would have attended a meeting and had been told

7  this presentation that specifically

8  identified --

9       A.    Yeah, he was --

10       Q.    -- these trends?

11       A.    He was part of that upper echelon,

12  I believe.

13       Q.    And if anybody --

14       A.    I believe.

15       Q.    -- if anybody asked any question

16  about what are you seeing with substance abuse,

17  you would have said, well, you know, part of

18  it, at least, is we're starting to see, you

19  know, heroin seep into -- seep into the

20  community in parts of the community that we're

21  not used to seeing it in and in numbers beyond

22  what we were used to?

23       A.    At that point in time, people were

24  worried that we were meeting with Denihan and

25  we have had -- we're having ongoing meetings

1  talking about what can we do.

2       Q.    Okay.  So the answer to my question

3  is yes?

4       A.    Yes.

5       Q.    Okay.  And that would have

6  included, for heroin and opioids, opiates, the

7  way you defined it earlier, that they weren't

8  just in one specific geographic or cultural

9  part of Cuyahoga County; it was expanding to

10  other parts of the county and affecting the

11  provision of services across the county?

12      A.    I don't know if that's -- I don't

13  know if that's accurate, to be honest with you.

14  I mean, I don't know that, you know, it was

15  only -- it -- it was not -- it had expanded

16  out.  I'm not sure.  I don't know.  I don't

17  have that data.  I haven't seen that data to

18  look at it for me to say -- it's real easy for

19  me to say, oh, yeah, that's true, but, you

20  know, it's eight years later, and I'm trying to

21  think back on it, so --

22      Q.    Fair -- fair enough.  At this time,

23  you knew it was going on, but you can't say, in

24  your head right now, if you were aware of the

25  geographic expansion or expansions across

```
                                        Page 224
 1   different socioeconomic groups?
 2        A.    At that point in time that we did
 3   that report, I don't know that.
 4        Q.    Okay.  That's certainly known now?
 5        A.    It's known now.
 6        Q.    Yeah.  Let me ask you --
 7             MR. McMONAGLE:  Excuse me.  I don't
 8   mean to interrupt you, but we've been going for
 9   about an hour and a half since the last break.
10             Ms. Forkas, do you need a break?
11             THE WITNESS:  Yeah, I'd like some
12   water.  I'm kind of thirsty.
13             MR. ALEXANDER:  Great.  And I'll
14   look and see how quickly we can finish up.
15             THE WITNESS:  Okay.  Are we close,
16   or do you have more exhibits?
17             MR. ALEXANDER:  We're close.
18             THE VIDEOGRAPHER:  Off the record,
19   2:12.
20                  (A recess was taken.)
21             THE VIDEOGRAPHER:  On the record,
22   2:26.
23   BY MR. ALEXANDER:
24        Q.    Ms. Forkas, is there any of your
25   testimony thus far you need to change or
```

Page 225

1    supplement in any way?

2        A.    I don't think so.

3        Q.    Earlier in the deposition, I asked

4    you some questions about personal experience

5    and whether you would relay those, if asked at

6    trial.

7        A.    Uh-huh.

8        Q.    Do you intend to offer, if called

9    at trial, any personal experience in terms of

10   you, your family members or personal friends,

11   with anything about opioids or opiates,

12   including treatment or addiction?

13       A.    I'm not sure at this juncture.  I

14   don't know.

15       Q.    Some other witnesses have had

16   issues of when they relay some anecdote or some

17   story of where to draw the line on revealing

18   personal information, like the names and --

19       A.    Right.

20       Q.    -- details and --

21       A.    Oh, no.

22       Q.    -- and whatever.  So sitting here

23   today, you don't intend to reveal personal

24   information --

25       A.    No.

1       Q.      -- about anybody in your family or
2   friends --
3       A.      No.
4       Q.      -- or whatever --
5       A.      No.
6       Q.      -- correct?  Okay.
7               And if -- it kind of goes hand-in-
8   hand that if you would need to reveal personal
9   information to be able to talk about this sort
10  of thing, personal experience or anecdotal
11  experience, then you wouldn't talk about it at
12  trial --
13      A.      That's correct.
14      Q.      -- is that correct?
15              In terms of instances of individual
16  cases that involve opioids or opiates that were
17  cases or clients of Cuyahoga County Children
18  Family Services while you were the director,
19  are there any specific cases that you would
20  intend to talk about?
21      A.      No.
22      Q.      And are there any specific cases of
23  the clients of any county's Children and Family
24  Services department or equivalent name for the
25  department, that you would talk about at trial?

```
                                                Page 227
 1          A.     No.
 2          Q.     Okay.  As a member of -- as
 3    somebody who lives in the county, do you have
 4    anecdotal knowledge, like from the press or
 5    friends of friends of friends, that relates in
 6    any way to people who have had experiences,
 7    positive or negative, with opioids or opiates?
 8          A.     Yes.
 9          Q.     Okay.  You've heard things?
10          A.     Yes.
11          Q.     Okay.  And you don't intend to talk
12    about any of that at trial if there's --
13          A.     Oh, no -- well, like I told you, I
14    don't know.  I'm not planning on it.
15          Q.     But you wouldn't do it if you would
16    have to reveal personal information?
17          A.     Yeah.
18          Q.     Okay.
19                        -  -  -  -  -
20                 (Thereupon, Deposition Exhibit 12,
21                 Native Spreadsheet, CUYAH_002442182,
22                 was marked for purposes of
23                 identification.)
24                        -  -  -  -  -
25          Q.     Handing you what we marked as
```

Page 228

1   Exhibit 12 here.  Two copies.

2              Ms. Forkas, let me represent to you

3   that Exhibit 12, which is a native file

4   attachment to a Bates number of

5   CUYAH_002442182, it's a long document with

6   little blue dividers indicating the tabs of

7   what was an Excel spreadsheet printout.

8              Do you see that?  Have you ever --

9   have you ever seen documents printed out like

10  this with all of these columns and tabs,

11  depending on which --

12      A.    Yeah, I think I have.

13      Q.    -- tabs they are from a

14  spreadsheet?

15      A.    I may have.

16      Q.    Okay.  So it was represented to us

17  that this was a printout from the SACWIS

18  database that was run by an employee of Ohio,

19  that was done at the request of somebody at

20  Cuyahoga County to run a ser- -- a report and

21  generate the data included on the four tabs

22  within Exhibit 12.

23      A.    You said an employee of the State

24  of Ohio --

25      Q.    Yes.

Page 229

1           A.      -- did this?

2           Q.      So somebody at the -- at Ohio ran

3      this report and generated this, and in response

4      to a request from Cuyahoga.  Okay?

5           A.      Really?

6           Q.      That's what we were told.  So I'm

7      not going to belabor it, because this is not,

8      obviously, a document that was generated back

9      when you were with Cuyahoga County.

10          A.      Thank you.

11          Q.      But if you look at the -- the dates

12     of the -- the cases in here, they start in 2006

13     and go forward.  Do you see that?

14          A.      I see that.

15          Q.      And do you know when SACWIS first

16     started to be used?

17          A.      Oh, I don't remember.

18          Q.      And have you ever seen reports that

19     are in -- generally of this format from SACWIS?

20          A.      Generally.

21          Q.      And -- and to run a report from

22     SACWIS, you have to pick which fields to

23     include and which parameters, and you have to

24     define a search using, you know, Boolean

25     operators or some sort of specifics of

Page 230

1  programming, right?

2        A.    Yes.

3        Q.    So whatever is in this report

4  doesn't necessarily mean that's all of what is

5  in SACWIS, let alone the underlying case files

6  for any individual case referenced here,

7  correct?

8        A.    I don't know that.  I assume.

9        Q.    It may or may not be all?

10       A.    Right, may or may not.  I don't

11  know.

12       Q.    But there are more fields than

13  these, what, eight fields or something, in

14  SACWIS, aren't there?

15       A.    Yeah, I believe there are.  I'm not

16  a SACWIS guru, to be honest with you.

17       Q.    And if you go forward, keeping in

18  mind that this goes back to 2006, and if you

19  were to flip through, you'd see that -- that

20  this includes cases from the time period when

21  you were the director, from '09 to early '11.

22             You -- do you see that, that this

23  involves cases from the time period when you

24  were director of Cuyahoga County --

25       A.    Yes.

1        Q.     -- Children and Family Services?

2        A.     Yes.

3        Q.     Okay.  So if you could go to, then,

4   the -- the second tab, which is, luckily,

5   smaller paper, less fields, a little easier to

6   follow.  It's --

7        A.     The second blue tab or the

8   second -- just the second tab?

9        Q.     The second tab, so the first blue

10  tab on the --

11       A.     Okay.

12       Q.     -- smaller paper.

13       A.     Got it.

14       Q.     You got it?

15       A.     I got it.

16       Q.     So this report has year-by-year

17  data on abandonment, count, percentage, and

18  then it says, "Alcohol Abuse of child,"

19  "Alcohol Abuse of parent."

20              Do you see that?

21       A.     I see it.

22       Q.     And then, in later ones, it talks

23  about substance abuse, disability, desertion,

24  dependency.  There are a bunch of these

25  columns, according to what was run in an

Page 232

1   individual report.

2            Do you see that?

3       A.   Uh-huh.

4       Q.   Did you have reports run like this

5   when you were --

6       A.   No.

7       Q.   -- director?

8       A.   No.

9       Q.   Did you receive reports like this,

10  even if you didn't ask for them?

11      A.   No.

12      Q.   Did the reports you had available

13  to you back then have the level of information

14  where you could get down to which particular

15  drug it was that a parent might be abusing

16  or --

17      A.   I don't believe so.  I --

18      Q.   I mean, you -- you actually know

19  that, right?  That you generally didn't have --

20      A.   Yeah, we didn't have --

21      Q.   -- specificity?

22      A.   No.  We didn't have specificity out

23  of SACWIS originally.

24      Q.   Yeah.  It would say "drug abuse" or

25  "alcohol abuse."

Page 233

1          A.    No.

2          Q.    It wouldn't say this person's a

3   cocaine addict or a --

4          A.    Uh-huh.

5          Q.    -- you know, PCP addict or

6   whatever, right?  Is that correct?

7          A.    That's correct.

8          Q.    So any kind of data that was added

9   later to allow specificity on drug of choice or

10  the specific drug somebody was abusing that

11  covers a period of time of 2009 or 2010 would

12  need to have been added later, correct?

13         A.    It seems so.  I'm not an expert,

14  but I would think so.

15         Q.    From what you know, that

16  information, that level of information was not

17  in the database --

18         A.    Correct.

19         Q.    -- on a realtime basis back when

20  you were a director --

21         A.    No.

22         Q.    -- correct?

23         A.    Cor- -- correct.

24         Q.    So if you go through to Tab 3, you

25  see some of the things are highlighted in here,

Page 234

1   and I'll represent to you the highlighting was

2   in the original.  We didn't add it.  That's how

3   we got the document.  And so it specifically

4   mentions, like, barbiturates, three different

5   categories of barbiturates.  It has

6   buprenorphine.  It has codeine, multiple

7   categories.  It has methadone.  It has opiate,

8   morphine.  It has a bunch of different drugs

9   that have been highlighted.

10              Do you see that?

11        A.    No, I don't see that.  I'm sorry.

12   I'm having a hard time.

13        Q.    In Tab 3.

14        A.    One --

15        Q.    The first page looks like this,

16   ma'am.

17              MR. McMONAGLE:  That's it.

18        Q.    There.

19        A.    Thank you, sir.

20        Q.    So if you just flip through the

21   highlighted parts that were in the original as

22   we got it, a numbers of -- a number of names of

23   specific drugs or facts related to drugs are

24   highlighted in here, including, like I said,

25   specific drugs like hydromorphone, morphine,

Page 235

1  and then there are categories related to drugs

2  like prenatal drug exposure, positive

3  toxicology screen at birth.

4           Do you see those?

5       A.    I'm still working on it.

6       Q.    Okay.

7       A.    Yeah, I see it.

8       Q.    These specific -- this level of

9  detail relating to drug abuse or the way in

10 which somebody was identifi- -- a case was

11 identified as involving drugs --

12      A.    Uh-huh.

13      Q.    -- that wasn't in SACWIS back in

14 2009, 2010, and early 2011, was it?

15      A.    I don't think so.

16      Q.    Because one of the things that

17 we've seen from a lot of the documents from

18 even a couple of years after you is people

19 saying, you know, we can't really drill down to

20 what drug is really driving this because SACWIS

21 just doesn't have that data.

22      A.    Uh-huh.

23      Q.    Does that sound right --

24      A.    When was this --

25      Q.    -- to you?

Page 236

1          A.    It could be.  When -- when -- may I

2     ask a question?  When was this ra- -- ran?

3     When was --

4          Q.    Aug- --

5          A.    -- this run?

6          Q.    August of 2018.

7          A.    '18 it was run, okay.

8          Q.    Late August of 2018.

9                So if you look, then, to the fourth

10    tab, there's a report where there's a case ID,

11    a person ID, an age, characteristic code,

12    characteristic description, and substance flag.

13               Do you see that?  Those are the

14    column headings?

15         A.    Yes.

16         Q.    What's the difference between a

17    case ID and a person ID?

18         A.    I don't know.  I have no idea.  I

19    didn't deal with their co- -- those codes --

20         Q.    Okay.

21         A.    -- in SACWIS.  So I just -- I don't

22    know.  I have no idea.

23         Q.    But this --

24         A.    I mean, all cases had person IDs.

25    That's -- I do know that, but I don't know what

Page 237

1    the char- -- I don't know.

2         Q.    This sort of information about

3    characteristic code and characteristic

4    description to get down to detailed information

5    about opiate addiction or methadone-involved or

6    heroin addiction or morphine abuse, those sorts

7    of very specific phrases that you see on the

8    first page --

9         A.    Uh-huh.

10        Q.    -- that was not in SACWIS back in

11   2009-2010, correct?

12        A.    Correct.

13        Q.    So any work that was done to add

14   that sort of coding to SACWIS to cover cases

15   from the time period when you were director and

16   before would have had to involve some sort of

17   retrospective review done years later, correct?

18        A.    I don't know that.  I would

19   imagine.  I don't know how else they'd get in

20   there.

21        Q.    Well, I mean, we know that the

22   cases in here started in '06, right?

23        A.    Right.

24        Q.    And if it isn't in there for '06,

25   '07, '08, '09, 2010, and your time period

Page 238

1    through early 2011, but it's now in there by

2    the end of August of 2018, it wasn't added

3    contemporaneous with the opening or the workup

4    of the case, correct?

5           A.    Correct.

6           Q.    It had to have been added later,

7    either by just completely making it up or going

8    to the underlying case file and extracting data

9    and adding it, right?

10          A.    I don't know that.

11          Q.    Can you think of any other

12   way that --

13          A.    I can't think --

14          Q.    -- it could have been added?

15          A.    -- of any other way, but I don't

16   know that as a fact.

17          Q.    And the only place you can think of

18   that somebody would look to pull out

19   information on specifics of drug involvement

20   from a case that was active back when you were

21   in charge of the division in 2009-2010 would

22   have been to go to the underlying case file?

23          A.    It's possible.  I don't know how

24   else it would get there.

25          Q.    Okay.  And those --

Page 239

1          A.     I don't -- I don't know that as a

2    fact.

3          Q.     And those case files continue to

4    exist to allow people to go back and look at

5    them if need be to pull out data, to do any

6    kind of analysis that might be important?

7          A.     I -- I -- I sup- -- I don't know.

8          Q.     Well --

9          A.     I assume so.

10         Q.     -- I mean you're the direct-

11         A.     There's --

12         Q.     You're --

13         A.     I --

14         Q.     You're the director of Stark

15   County --

16         A.     Well, we scan everything.

17   Everything's scanned into the system.

18         Q.     They weren't doing that in 2009,

19   right?

20         A.     I -- in -- I don't know.  I wasn't

21   there in 2009.

22         Q.     In Cuyahoga in 2009 --

23         A.     Oh, I was at Cuyahoga.

24         Q.     -- you weren't scanning everything?

25         A.     We scanned.

Page 240

```
 1        Q.    Every --
 2        A.    Yes, we scanned.
 3        Q.    -- piece of paper?
 4        A.    We scanned the -- because the files
 5   got scanned in Cuyahoga.
 6        Q.    And was there, like, optical
 7   character recognition that converted
 8   handwritten notes into --
 9        A.    Oh, yes, all of those things we
10   had.
11        Q.    Okay.
12        A.    We were very dynamic.
13              No, no, I don't -- I don't
14   know what --
15        Q.    Sarcasm doesn't --
16        A.    -- I don't know --
17        Q.    -- come across on the record, so --
18        A.    Yeah, I -- you know, I have no
19   idea.  But all I know is that all the cases
20   were scanned.  All new cases that came in were
21   scanned.
22        Q.    Okay.  Right.  So I'm -- I'm
23   talking about populating actual fields in
24   SACWIS.
25        A.    Right.
```

1      Q.    Back in 2009, 2010, the sort of

2  information that we see in Tab 4 of Exhibit

3  12 --

4      A.    I don't -- uh-huh.

5      Q.    -- to your knowledge, as the

6  director of the division at that time, your

7  staff wasn't putting this sort of information

8  in SACWIS?

9      A.    I don't believe so.

10     Q.    And these fields may not have even

11  existed as options in SACWIS?

12     A.    They may nay -- they may not have.

13  I don't know.

14     Q.    Okay.

15     A.    I don't know what I don't know.

16     Q.    And the case files that exist,

17  regardless of what's been scanned into them and

18  how they exist, the -- the actual file that the

19  county maintains, separate and apart from

20  SACWIS, as you understand the rules, those have

21  to still exist now, correct?

22     A.    They have to exist.

23     Q.    Okay.  If it was gener- -- opened

24  in '06 or '09 or '12 or '15, those case files

25  still exist and the counties have to keep them?

Page 242

1          A.    They have to keep them, yes.

2          Q.    And as the director of a

3    governmental entity for Stark County, that

4    includes Children and Family Services,

5    currently, you're familiar with the general

6    parameters of data entry in SACWIS now,

7    correct?

8          A.    General.

9          Q.    And you're familiar with the

10   general requirements of record retention

11   relating --

12         A.    Oh, absolutely.

13         Q.    -- to case files?

14         A.    Absolutely.

15         Q.    It's a major issue --

16         A.    It's -- yes.

17         Q.    -- right?

18               And you're familiar with the

19   general continuing issues of data limitations

20   that make it hard to do retrospective analyses

21   about what did the data show years ago when you

22   may not have had as good of data entry

23   practices?

24         A.    It's a problem.

25         Q.    All right.  I mean, that -- that's

Page 243

1    kind of, like, a no-brainer thing, right?

2           A.    Yep.

3           Q.    Okay.  So sitting here today, are

4    you aware of -- well, let me ask it this way.

5                 In 2019 in Northeast Ohio, is there

6    still a problem of Children and Family Services

7    are burdened by substance abuse of members of

8    the community?

9           A.    Yes.

10          Q.    Okay.  And have you seen things

11   where, like, some of the drugs that were at a

12   peak a couple of years ago have dropped and new

13   drugs and combinations of drugs have come up as

14   being more of a problem?

15          A.    Well, I mean fentanyl is --

16   fentanyl with marijuana, you know, we see

17   combinations of things, we see all kind of

18   things now.

19          Q.    And, like, meth has made a comeback

20   in the last couple of years?

21          A.    Yeah.

22          Q.    And cocaine has had a comeback,

23   right?

24          A.    Right.

25          Q.    Heroin's actually dropped for the

Page 244

1   last couple of years?

2        A.    Has it?  I don't know that.

3        Q.    Okay.  But you've seen increases in

4   things like meth?

5        A.    Yes.

6        Q.    Have you seen things where, like,

7   people are now combining meth with wasp spray

8   or bug killers --

9        A.    No, I haven't seen that.

10       Q.    -- to do that?

11       A.    No, I haven't -- I'm not aware of

12  that.

13       Q.    But this dynamic that the drug of

14  abuse and the trends of drugs and abuse are

15  always changing, is that something that you've

16  seen over your career?

17       A.    Yes.

18       Q.    Okay.  And at any given time, you

19  have roughly a third or more of the cases in

20  the system are going to involve substance abuse

21  of one sort or another, whether it's alcohol,

22  illegal drugs, prescription drugs, or homemade

23  drugs or combinations of drugs --

24       A.    That's acc-

25       Q.    -- is that --

Page 245

1          A.     That's accurate.

2          Q.     Okay.  And has there ever been a

3     time in your career where it was substantially

4     less than a third?

5          A.     I don't know that.  I --

6          Q.     Has there ever been a time when it

7     was substantially more than a third?

8          A.     I don't know that.

9          Q.     Okay.  So the drugs and the

10    substance may change, but the basic dynamic is

11    always in play?

12         A.     People always have addiction

13    issues.

14         Q.     And regardless of what they're

15    addicted to, that puts a burden on the system?

16         A.     Yeah.

17         Q.     Okay.

18         A.     Especially if it kills them.

19         Q.     Have you seen any data at all about

20    deaths related to overdose from prescription

21    opioids being taken legally?

22         A.     I don't know.

23         Q.     What about deaths from heroin or

24    fentanyl?  Have you seen any data like that for

25    Northeast Ohio?

Page 246

1      A.    I haven't seen the Northeast Ohio

2   data recently.

3      Q.    What about Cuyahoga County or any

4   other --

5      A.    No.

6      Q.    -- particular counties?

7      A.    I don't keep up with Cuyahoga that

8   much.

9      Q.    Okay.  And for -- for Stark, and

10  I'm not trying to get into the specifics, are

11  you seeing people dying from overdose of

12  prescription opioids taken legally?

13     A.    I don't -- I don't know where we

14  are with that.  It's more heroin -- it's -- we

15  seem to have a heroin issue.

16     Q.    Fentanyl and --

17     A.    Fentanyl and --

18     Q.    -- carfentanil?

19     A.    Yeah.

20     Q.    And -- and what's carfentanil, to

21  your knowledge?

22     A.    I don't know what carfentanil is,

23  but I know what fentanyl is.

24     Q.    Have you heard of something called

25  a fentanyl antol- -- analogue that may come

Page 247

1    into the country illegally, typically

2    originally from China?  Like, it was in the

3    news the other day that there was a seizure of

4    110 pounds' worth --

5           A.    Wow.

6           Q.    -- at a port in Philadelphia?

7           A.    No, I didn't -- I didn't see that

8    in the news.

9           Q.    Okay.  Do you know how the fentanyl

10   analogues coming from China play into

11   deaths or --

12          A.    I do not.

13          Q.    -- issues in Northeast Ohio?

14          A.    No, I do not.

15          Q.    Okay.  It wouldn't be fair to leap

16   to the conclusion that any death from fentanyl

17   or heroin started with a legal prescription of

18   a prescription opioid, would it?

19          A.    I think there's a possibility

20   there.  Personally I feel it's possible.

21          Q.    Yeah, I'm saying each and every

22   one that would --

23          A.    Oh, every one?  Well, that would be

24   unreasonable, every one.  But there certainly

25   are deaths.

1          Q.    Okay.  And do you know any of the

2    data about when people end up dying of heroin

3    or fentanyl or some combination of drugs

4    involving heroin or fentanyl or a fentanyl

5    analogue, like, what the actual data shows on

6    how those people are getting started with their

7    addiction?

8          A.    Marijuana.

9               MR. ALEXANDER:  All right.  Thank

10   you very much.

11              THE WITNESS:  Thank you.

12              MR. ALEXANDER:  I don't have any

13   further questions.

14              Obviously, I'll say this for the

15   record, we think there are a number of

16   documents issues, but we will deal with those

17   through letter writing outside of the record

18   here, as we have done otherwise, and, you know,

19   obviously we make our reservations, on behalf

20   of AmerisourceBergen Drug Corporation, about

21   those.

22              With that I pass the witness to the

23   other Defendants and potentially the

24   Plaintiffs.

25              MS. FARMER:  Nothing further from

Page 249

1   me.

2              MR. LOVRIEN:  Nothing further from

3   me.

4              MR. ALEXANDER:  On the phone?

5              Guess not.

6              MR. McMONAGLE:  I don't have any

7   questions.

8              MS. DEYNEKA:  I may have some

9   followup, but I -- I want a second to review

10  the realtime real quick.  Do you mind if we go

11  off the record for just a moment?

12             MR. ALEXANDER:  I don't mind, as

13  long as you don't, like, break and talk to the

14  witness about the questions you're going to ask

15  her.  That would be a problem.

16             MS. DEYNEKA:  Sure.  I don't mind

17  going off the record and staying here.

18             MR. ALEXANDER:  All right.

19             THE VIDEOGRAPHER:  Off the record,

20  2:47.

21                  (A recess was taken.)

22             THE VIDEOGRAPHER:  On the record

23  2:50.

24          EXAMINATION OF DEBORAH FORKAS.

25  BY MS. DEYNEKA:

1      Q.    Ms. Forkas, this is Natalie Deyneka

2   from Motley Rice.  I just have a few follow-up

3   questions for you.

4      A.    Okay.

5      Q.    So earlier you had a -- a comment

6   that you made about how drugs can certainly

7   impact the kinds of cases that you see,

8   especially if the drugs in question are killing

9   people.  Do you recall saying something along

10  those lines?

11     A.    Something like that.

12     Q.    Before that particular line of

13  testimony, you had also been asked about the

14  ways in which you saw different kinds of drugs,

15  like methamphetamines and crack cocaine, affect

16  your cases and clients.  Do you recall that as

17  well?

18     A.    Somewhat.

19     Q.    Would you draw any distinction

20  between the way that the opioid epidemic has

21  affected your line of work and the kinds of

22  drugs that you discussed previously?

23          MR. ALEXANDER:  Objection to form.

24     Q.    And, I'm sorry.  Let me clarify my

25  question.

Page 251

1          Would you draw any kind of

2   distinction between the way that the opioid

3   epidemic has affected the kind of work that you

4   do and the way that, say, methamphetamines or

5   crack cocaine affected the work in the past?

6          MR. ALEXANDER:  Objection to form.

7      Q.   Oh, you can go ahead and answer.

8      A.   Okay.  I -- I think it's -- you

9   know, it's very similar in many ways, when

10  people are abusing the drugs.

11     Q.   Would you say that the impact on

12  the people involved is similar, or in the sense

13  that people have substance abuse problems?

14     A.   In the sense of addictiveness and

15  being addicted to drugs.

16     Q.   What did you mean earlier when you

17  said, "especially if it kills them"?  What were

18  you referring to?

19     A.   I was referring to the opioids, as

20  well as heroin and fentanyl.

21     Q.   And that's something --

22     A.   That's what I was --

23     Q.   -- that you've seen specific to

24  opioids?

25     A.   Yes.

                                                    Page 252

1          Q.    Okay.  And that's had a significant

2     impact?

3          A.    I believe so.  It kills people.

4          Q.    You also talked a little bit

5     earlier about the database SACWIS; is that

6     correct?

7          A.    Yes.

8          Q.    And you mentioned that you were not

9     a specialist on SACWIS?

10          A.    I'm not.

11          Q.    Do you feel confident enough in

12     SACWIS to be able to say what data fields were

13     available at what particular time?

14          A.    To be honest with you, not really.

15     I mean, I --

16          Q.    Okay.  So you don't know either way

17     if --

18          A.    I don't know one way or the other.

19          Q.    -- something was or was not a field

20     in a particular year?

21               MR. ALEXANDER:  Objection to form.

22               MS. DEYNEKA:  I think those are all

23     the questions I have.

24               THE WITNESS:  Okay.

25          EXAMINATION OF DEBORAH FORKAS

Page 253

1   BY MR. ALEXANDER:

2          Q.    A little bit of followup.

3                When you answered Plaintiffs'

4   counsel's questions about opioids and the

5   opioid epidemic --

6          A.    Uh-huh.

7          Q.    -- versus other drugs, were you

8   using the same definition at the beginning of

9   the deposition of what you considered to be an

10  opioid?

11         A.    I don't know.

12         Q.    I mean, at the beginning of the

13  deposition, you said --

14         A.    I'm trying to remember what I said.

15         Q.    You said you considered

16  methamphetamine and cocaine and PCP to be

17  opioids?

18         A.    Yes.

19         Q.    Is that how you were answering the

20  question?

21         A.    Yes, but I expanded it.

22         Q.    Okay.

23         A.    Because I couldn't remember.

24         Q.    So --

25         A.    At the time some of the other

Page 254

1    drugs.

2          Q.    During the crack epidemic --

3          A.    Uh-huh.

4          Q.    -- people died, right?

5          A.    Yeah, people died.

6          Q.    During the meth epidemic people

7    died, right?

8          A.    Yes.

9          Q.    And you've seen people die with any

10   number of substance of abuse, including

11   alcohol, right?  People die with alcohol abuse?

12         A.    Well, sure.

13         Q.    Have you ever seen anything

14   indicating that the deaths with heroin or

15   fentanyl, how those compare in terms of an

16   impact on Cuyahoga County Children and Family

17   Services compared to deaths with other

18   substance of abuse, including alcohol?

19         A.    No, I've never seen data.

20         Q.    You just know that --

21         A.    That data.

22         Q.    -- there are deaths with --

23         A.    I -- I --

24         Q.    -- all of those substances?

25         A.    I know that there's deaths, but I

Page 255

1   know that, you know, we -- we always say, you

2   know, her- -- heroin and fentanyl, I mean,

3   you're either going to get off it or it's going

4   to kill you.  It's just one of two things

5   that's going to happen.

6           Q.    And something similar used to be

7   said about that for crack, too, right?

8           A.    Mmm -- I --

9           Q.    Maybe a third option --

10          A.    Maybe a third --

11          Q.    -- send you to jail, right?

12          A.    Well, maybe so.

13                MS. DEYNEKA:  Can we make sure that

14  the record reflects that the witness shook head

15  in response to counsel's question just now.

16                MR. ALEXANDER:  Yeah, the -- the

17  court reporter doesn't put down head shakes.

18                MS. DEYNEKA:  Well, that's why I

19  wanted to make sure it was noted, since it was

20  a non-verbal response.

21                MR. ALEXANDER:  But that's just you

22  saying it.  That doesn't count as anything.  So

23  I'm actually asking questions, and under the

24  rules here, you can't do anything but object to

25  form, so, fine.  Let's go on, because we're

1    almost done.

2         Q.    In addition to death, a parent or

3    somebody else involved in a children's [sic]

4    care going to jail can have a significant

5    impact, correct?

6         A.    Yes.

7         Q.    Somebody going to, like, an

8    inpatient -- inpatient residential treatment

9    center can have a significant impact, right?

10        A.    Can.

11        Q.    Death is not the only impact,

12   correct?

13        A.    Well, it's not the only impact, but

14   it's certainly permanent when it happens.

15        Q.    Now, in terms of the questions

16   about SACWIS, there's been a number of

17   questions throughout the day about what your

18   staff was doing or not doing when you were

19   director, correct?

20        A.    Correct.

21        Q.    And when you were assistant

22   director for Summit County before you became

23   director of -- for Cuyahoga County, you also

24   had people working under you who were involved

25   in data entry into SACWIS and the predecessor

1   system, correct?

2         A.    Yes.

3         Q.    And every time there was something

4   going out to the broader group that talked

5   about here's how we're going to change our data

6   entry practices or here's what we're going to

7   try to do in terms of a blitz or some

8   initial -- some increased effort, you would

9   send it or you would be copied on it, right?

10        A.    When you're talking about -- the

11  blitz was PCSAO doing that --

12        Q.    Yeah, and --

13        A.    -- is that what you're talking

14  about?  That blitz?

15        Q.    It filtered through all of the

16  directors, didn't it?

17        A.    The directors received it.

18        Q.    Yeah.  So in terms of these issues

19  about not necessarily the name of every field,

20  but the fact that there had been efforts at

21  time to increase the number of fields in

22  SACWIS, give more pull-down options for

23  diagnostic codes and things like that, you may

24  not be able to give the specific dates or the

25  names of each field, but you know that this has

1    been a trend over the last 10-plus years,

2    correct?

3           A.    I think more recent than that.

4           Q.    Okay.  So over the last, let's say

5    five years, so post- your time as director of

6    Cuyahoga County, there have been fields added

7    to SACWIS --

8           A.    Yes.

9           Q.    -- and pull-down options added to

10   SACWIS --

11          A.    That's --

12          Q.    -- correct?

13          A.    Yes, that's correct.

14          Q.    And they largely relate to things

15   like substance abuse, diagnosis of substance

16   abuse, and other ways that basically tie to

17   what we were just going over in the fourth tab

18   for Exhibit 12, right?

19          A.    Yes.

20          Q.    Okay.  So even though you're not

21   the one, because of the stage of your career,

22   typing into SACWIS for an individual case file,

23   you know that there are fields relating to

24   substance abuse and trying to provide

25   specificity about what substance is being

Page 259

1   abused, that have only been added after you

2   stopped being director of Cuyahoga County

3   Children and Family Services, correct?

4       A.    Yes.

5       Q.    Okay.  So the testimony you gave

6   earlier about what was being done when you were

7   director, you feel confident about that, don't

8   you?

9       A.    As confident as one can be.

10      Q.    And the --

11      A.    I don't --

12      Q.    -- question about when specifically

13  something was added after that time, you don't

14  necessarily know whether it was -- something

15  was added in '15 or '16 or which month, but you

16  know whatever it was, it wasn't being done when

17  you were director back in 2009 through early

18  2011, correct?

19          MS. DEYNEKA:  Object to form.

20      A.    I don't know that.

21      Q.    Okay.

22      A.    I don't really know that.

23      Q.    Okay.  The specificity about the

24  drug of abuse and the diagnostic code relating

25  to abuse and how it was detected at birth and

Page 260

1   tox screens and all of this stuff that we see

2   in Tab 4 of Exhibit 12, you know that that

3   wasn't in SACWIS in a way that your staff was

4   using it consistently back when you were

5   director of Cuyahoga County, correct?

6               MS. DEYNEKA:  Object to form.

7        A.   I would say that it -- that what we

8   see now was not being used in the same format

9   that we see now.

10       Q.   Okay.  So the information that led

11  to the creation of Tab 4 in Exhibit 12, that

12  last thing after the blue sheet --

13       A.   Yep, I know --

14       Q.    -- that we went over, that

15  information, those pull-downs, those fields,

16  however that was -- that's being done now, that

17  was not being done back when you were director,

18  correct?

19       A.   That wasn't not being done.

20       Q.   That was not being done?

21       A.   Correct.

22       Q.   If I added an extra "not," I'm

23  sorry.

24       A.   That's all right.  That's correct.

25       Q.   Okay.  And when you answered

1   Plaintiffs' counsel's questions about how

2   confident you are and whether you know the

3   details, you're talking about exactly when,

4   after 2011, changes happened to SACWIS,

5   correct?

6          A.    Changes happened, uh-huh.

7          Q.    You just know that they happened

8   after 2011, right?

9          A.    I know I wasn't there.  That's how

10  I know.  And I was -- I was in Virginia, so.

11         Q.    And after you came back to Ohio and

12  you became director of --

13         A.    Stark.

14         Q.    -- Stark County of the entity that

15  covers this and other issues, you know that

16  they -- the data entry in SACWIS that goes on

17  now is much more detailed than it was back in

18  2009 and '11 --

19         A.    Yes, that's true.

20         Q.    -- particularly as it relates to

21  drugs and substance of abuse?

22         A.    It's true.  That is true.

23              MR. ALEXANDER:  Okay.  Thank you.

24              MS. DEYNEKA:  One more follow-up

25  question.

Page 262

1          EXAMINATION OF DEBORAH FORKAS

2    BY MS. DEYNEKA:

3          Q.    Do you know if any data fields were

4    added prior to the time period that counsel has

5    just given you, the after-2011 time period?

6          A.    After 2011, do I know that they

7    were --

8          Q.    Let me rephrase.  So you just said

9    that you know that there were some data fields

10   that were added after 2011?

11         A.    Correct.

12         Q.    Doesn't that mean that there were

13   still possibly data fields added before that as

14   well?

15              MR. ALEXANDER:  Objection to form.

16         A.    Could have been.

17         Q.    And you don't know --

18         A.    I don't --

19         Q.    -- one way or the other --

20         A.    I don't know one way or the other

21   that way.

22         Q.    And do you remember exactly which

23   data fields were missing or added after 2011?

24         A.    Not really.

25         Q.    Do you remember which data fields

Page 263

1  would have been added prior to 2011?

2       A.    I don't know that --

3             MS. DEYNEKA:  All right.  That's

4  all I have.

5       A.    -- specifically.

6             MR. ALEXANDER:  Sorry to prolong

7  this a smidge more.

8          EXAMINATION OF DEBORAH FORKAS

9  BY MR. ALEXANDER:

10      Q.    There was a time when SACWIS was

11 rolled out, right?

12      A.    Many, many moons ago, yes.

13      Q.    And so originally it had at least

14 one data field, right?

15      A.    Virtually nothing.

16      Q.    Yeah.  So this thing about adding

17 it, by the time you got to be the director in

18 2000 -- I'm sorry, in 2009 for --

19      A.    Nine.

20      Q.    -- Cuyahoga County, there were more

21 data fields than at the very beginning,

22 correct?  Of SACWIS?

23      A.    Not orig- -- not initially.  It

24 took a long time.

25      Q.    By 2009, there were -- SACWIS had

Page 264

1   more capabilities than at its initial launch,

2   correct?

3          A.    Yes, that's true.

4          Q.    Okay.  Are you aware of any changes

5   that happened between 2009 and 2011 when you

6   left the position of director for Cuyahoga

7   County?

8          A.    I was gone now.  I don't -- don't

9   know what I don't know.

10         Q.    Okay.  But you know that there have

11  been a number of changes after that?

12         A.    I am aware of that.

13              MR. ALEXANDER:  Okay.  Thank you.

14              MS. DEYNEKA:  That's it.

15              MR. ALEXANDER:  We're done, subject

16  to our prior reservations.  I don't think

17  anybody else has further questions.  I think

18  the witness is done.

19              THE WITNESS:  I'm done.  Thank you.

20              THE VIDEOGRAPHER:  Off the record,

21  3:02.

22       (Deposition concluded at 3:02 p.m.)

23                    ~ ~ ~ ~ ~

24

25

Page 265

1  Whereupon, counsel was requested to give

2  instructions regarding the witness's review of

3  the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6  Transcript review was requested pursuant to the

7  applicable Rules of Civil Procedure.

8

9                 TRANSCRIPT DELIVERY:

10  Counsel was requested to give instructions

11  regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 266

1                    REPORTER'S CERTIFICATE

2     The State of Ohio,    )

3                                    SS:

4     County of Cuyahoga.  )

5

6              I, Stephen J. DeBacco, a Notary

7     Public within and for the State of Ohio, duly

8     commissioned and qualified, do hereby certify

9     that the within named witness, DEBORAH FORKAS,

10    was by me first duly sworn to testify the

11    truth, the whole truth and nothing but the

12    truth in the cause aforesaid; that the

13    testimony then given by the above-referenced

14    witness was by me reduced to stenotypy in the

15    presence of said witness; afterwards

16    transcribed, and that the foregoing is a true

17    and correct transcription of the testimony so

18    given by the above-referenced witness.

19              I do further certify that this

20    deposition was taken at the time and place in

21    the foregoing caption specified and was

22    completed without adjournment.

23

24

25

Page 267

1          I do further certify that I am not

2    a relative, counsel or attorney for either

3    party, or otherwise interested in the event of

4    this action.

5          IN WITNESS WHEREOF, I have hereunto

6    set my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 28th day of

8    January, 2019.

9

10

11

12

13

14          Stephen J. DeBacco, Notary Public

15          within and for the State of Ohio

16

17   My commission expires September 30, 2022.

18

19

20

21

22

23

24

25

Page 268

1                    Veritext Legal Solutions
                        1100 Superior Ave
2                          Suite 1820
                      Cleveland, Ohio 44114
3                     Phone: 216-523-1313
4

   January 28, 2019
5

   To: Mr. McMonagle
6

   Case Name: In Re: National Prescription Opiate Litigation v.
7

   Veritext Reference Number: 3202803
8

   Witness:  Deborah Forkas       Deposition Date:  1/23/2019
9

10  Dear Sir/Madam:

11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 269

1          DEPOSITION REVIEW
           CERTIFICATION OF WITNESS

2

     ASSIGNMENT REFERENCE NO: 3202803
3     CASE NAME: In Re: National Prescription Opiate Litigation v.
     DATE OF DEPOSITION: 1/23/2019
4     WITNESS' NAME: Deborah Forkas

5     In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7     I have made no changes to the testimony
as transcribed by the court reporter.

8

 _____    _____
9 Date             Deborah Forkas

10     Sworn to and subscribed before me, a
Notary Public in and for the State and County,
11 the referenced witness did personally appear
and acknowledge that:

12

     They have read the transcript;
13     They signed the foregoing Sworn
        Statement; and
14     Their execution of this Statement is of
        their free act and deed.

15

     I have affixed my name and official seal
16
this _____ day of_____, 20_____.
17

     _____
18     Notary Public
19     _____
     Commission Expiration Date
20
21
22
23
24
25

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 3202803
 3      CASE NAME: In Re: National Prescription Opiate Litigation v.
        DATE OF DEPOSITION: 1/23/2019
 4      WITNESS' NAME: Deborah Forkas
 5          In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7          I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9          I request that these changes be entered
    as part of the record of my testimony.
10
            I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____       _____
    Date                    Deborah Forkas
14
            Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18          in the appended Errata Sheet;
        They signed the foregoing Sworn
19          Statement; and
        Their execution of this Statement is of
20          their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of_____, 20____.
23          _____
            Notary Public
24
            _____
25          Commission Expiration Date
```

Page 271

1                    ERRATA SHEET
               VERITEXT LEGAL SOLUTIONS MIDWEST
2                 ASSIGNMENT NO: 1/23/2019
3    PAGE/LINE(S) /        CHANGE        /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____       _____
20   Date                    Deborah Forkas
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24

25                    _____
                      Commission Expiration Date

**&**

**&**   2:3,22 3:11,16
   8:23 9:5,8 181:6

**0**

**002442182**   6:12
   227:21 228:5
**002794109**   5:22
   174:9,20
**002794111**   5:22
   174:9
**002794832**   6:10
   208:13,20
**002794850**   6:10
   208:13
**003428644**   5:24
   179:3,11
**003428669**   5:25
   179:3
**012151317**   5:5
   108:6,19
**012151320**   5:5
   108:7
**012558835**   6:2
   192:5
**012558835336**
   192:12
**012558836**   6:3
   192:6
**012677697**   6:8
   202:24 203:5
**012677699**   6:8
   202:25
**012681169**   6:5
   196:15 197:11
**012681171**   6:5
   196:16
**05**   41:6 47:14 59:2
**06**   237:22,24
   241:24

**07**   237:25
**08**   237:25
**09**   41:6 47:14,15
   67:23 113:3
   230:21 237:25
   241:24

**1**

**1**   5:3 108:2,10,17
   109:4
**1,100**   217:16 218:1
**1.2**   201:24
**1/23/2019**   268:8
   269:3 270:3 271:2
**1/3/2011**   6:4
   196:13
**10**   6:6 70:19 75:13
   75:14 125:22
   129:21 202:21
   203:3 258:1
**10/13/2010**   5:23
   178:25
**10/14/2010**   5:17
   165:2
**10/23/2018**   6:1
   192:3
**100**   17:16 105:18
**1000**   2:16
**10019-9710**   3:12
**108**   5:3
**10:03**   1:20 8:4
**11**   6:9 59:2 70:20
   127:4 203:7
   208:11,17,19
   230:21 261:18
**11.0**   218:25
**110**   247:4
**1100**   3:17 268:1
**111**   174:20
**11472**   267:13
**115**   5:6

**11:04**   75:21
**11:19**   75:24
**12**   6:11 166:10
   194:16 227:20
   228:1,3,22 241:3
   241:24 258:18
   260:2,11
**12.8**   218:25
**12/14/2010**   5:3
   108:3
**12/26/2010**   211:17
**122**   163:7,12,20,23
   182:19,23
**129**   5:9
**12:00**   129:22
**12:08**   129:24
**12:09**   130:22
**12:43**   131:5
**13**   173:18 179:12
   180:5 181:7 182:6
   192:13
**1300**   2:4
**1301**   2:16
**14**   109:6 112:13
   138:14 165:10
   173:18
**14th**   109:10
   112:13
**15**   157:20 173:19
   241:24 259:15
**157**   5:13
**16**   6:5 173:19
   196:14 204:5
   214:24 259:15
**165**   5:17
**16th**   197:20 198:7
**17**   1:6
**174**   5:20
**178**   5:23
**17th**   3:17

**18**   7:3 236:7
**1820**   268:2
**184**   109:24 113:10
   113:15
**19.1**   218:6
**192**   6:1
**196**   6:4
**1979**   49:2
**1990s**   53:6,8
**1:00**   130:14
**1:17**   1:12
**1st**   176:4

**2**

**2**   4:3 5:6 115:20
   116:3 118:13
   132:23 133:5
   136:12 219:19
**2/1/2011**   6:9
   208:12
**2/11/2011**   6:6
   202:22
**20**   106:6 108:20
   130:2 269:16
   270:22 271:22
**2000**   12:7 263:18
**20005**   2:17
**20006**   3:18
**2002**   211:21 212:8
**2005**   12:10 28:23
   51:5 56:10
**2006**   229:12
   230:18
**2008**   62:25 63:17
   68:8 104:13
   148:16 175:23
   176:7 177:20
**2009**   5:21 11:16
   12:10 28:23 33:18
   56:12 61:8 62:25
   63:7,13,14,17,21
   68:6 69:9 70:17

74:23 86:18 87:22
88:10 104:1,13
121:6 151:24
168:20 172:4
174:7,22 175:14
175:20 178:7,11
182:21 217:16
218:7,25 233:11
235:14 239:18,21
239:22 241:1
259:17 261:18
263:18,25 264:5
**2009-2010**  237:11
238:21
**2010**  5:6 71:25
72:6 93:2 109:7
109:12 112:13,13
115:9,21 116:9
134:21 138:14,22
147:11 151:25
157:20 165:10
179:13 180:6
181:7 182:6,21
192:13 194:16
197:6 201:10
204:6 211:3,21
217:17 218:6
233:11 235:14
237:25 241:1
**2011**  11:16,22
29:23 30:20 33:19
47:15 61:9 70:18
72:1,6 74:24
86:19 87:22 104:1
173:18 198:1
203:7,18 204:1
207:23 208:19
220:4 235:14
238:1 259:18
261:4,8 262:5,6,10
262:23 263:1

264:5
**2012**  173:18
**2014**  31:8,17
**2018**  236:6,8 238:2
**2019**  1:19 8:3
243:5 267:8 268:4
**202**  2:17,18 3:18
6:6
**2022**  267:17
**208**  6:9
**2100**  1:23
**212**  3:13
**213**  3:6
**216**  2:5
**216-523-1313**
268:3
**216-9343**  2:11
**21st**  116:9
**227**  6:11
**22nd**  116:10
**23**  1:19 8:3
**24**  120:21
**243-2316**  3:6
**249**  4:9
**25**  7:4
**250**  3:12 7:10
217:23
**251**  7:11
**252**  7:12
**253**  4:10
**259**  7:13
**260**  7:14
**262**  4:11 7:15
**263**  4:12
**266**  4:14
**27.3**  176:2
**28**  2:10 268:4
**2804**  1:5,6
**28th**  267:7
**29**  174:21

**29464**  2:10
**2:12**  224:19
**2:26**  224:22
**2:47**  249:20
**2:50**  249:23

### 3

**3**  5:9 129:3,11,13
138:11 140:12
198:1 211:19
233:24 234:13
**3/14/2010**  5:9
129:4
**30**  106:7 114:8
162:20 267:17
**31**  182:21
**32**  211:7
**32,000**  142:3
**3202803**  268:7
269:2 270:2
**33**  211:7
**34**  7:5 211:2,7
**35**  64:1,12
**36**  194:16 211:19
**367-1979**  2:5
**38**  213:9
**3:02**  264:21,22

### 4

**4**  5:13 148:14
157:10,18 159:7
203:17,25 241:2
260:2,11
**40**  216:19
**414-9286**  2:18
**414-9403**  2:17
**415**  2:24
**42**  148:16 149:24
**44113**  1:23
**44114**  268:2
**45**  120:21

**45004**  1:12
**46**  180:21 182:9
**469-5222**  3:18
**49**  149:15 215:1
**4th**  203:12

### 5

**5**  4:5 5:17 165:1
165:10,20 213:7
**50**  148:19 149:15
208:21 216:18
**51**  186:19
**52**  187:5
**54**  7:6
**55**  1:23 7:7 190:3
**555**  3:4
**55th**  3:12
**58**  181:2 191:5
**591-6000**  2:24

### 6

**6**  5:20 174:5,15,19
**6/22/2009**  5:20
174:6
**60**  104:22
**648**  184:6
**65**  148:17
**66**  7:8
**69**  179:11

### 7

**7**  5:23 178:24
179:10 193:24
**70**  211:22
**70,000**  142:5,17
**71**  197:11
**72**  115:3,10 172:5
191:17,21,22
**75**  143:4,15

### 8

**8**  6:1 192:2,9
207:23

**[8,000 - additional]**

**8,000**  212:21
**8.9**  218:7
**8/15/2010**  5:13
  157:11
**800**  3:17
**80s**  49:19,20
**81**  7:9
**836-7838**  3:13
**843**  2:11
**850**  217:16

**9**

**9**  4:8 6:4 70:19
  124:2 125:21
  196:12 197:9
**9,300**  142:4
**900**  113:10
**90071**  3:5
**90s**  48:18 49:19
**94111-5356**  2:23
**950**  2:4
**99**  203:5

**a**

**a.m.**  1:20
**aaron**  1:7
**abandonment**
  231:17
**abbreviation**
  205:5
**ability**  57:14 59:22
  87:10 97:12 105:1
  105:3
**able**  80:20 103:1
  106:13 120:13
  175:25 176:6
  226:9 252:12
  257:24
**absolutely**  30:18
  119:12 242:12,14
**abuse**  5:8 24:23
  28:18 44:7 53:9

53:16 54:6 55:4
58:11 59:5,12
60:4 61:2,12
62:13,20 64:5,22
64:24 65:6 66:11
66:18,21 67:12
72:10 73:22 75:5
77:21 79:2,16
80:7 85:12 88:1
89:16 92:9,9,16
98:7 101:17,22
102:4 103:12,18
115:24 119:16
120:3,9,22 126:20
137:15 145:6,17
145:21 146:5,14
158:25 159:2
163:19 164:21
166:13,19 168:12
188:21 189:3,25
190:8 219:18
220:8,18,23
221:15 222:16
231:18,19,23
232:24,25 235:9
237:6 243:7
244:14,14,20
251:13 254:10,11
254:18 258:15,16
258:24 259:24,25
261:21
**abused**  62:13
  69:21 70:12
  188:18 259:1
**abusers**  64:3
**abusing**  53:12
  137:22 146:5,24
  232:15 233:10
  251:10
**abusive**  141:10

**academy**  125:25
**acc**  244:24
**access**  189:8
**accessing**  204:15
  205:6
**accidental**  159:25
**accompanied**
  194:14
**account**  93:25
  147:25 180:13
**accuracy**  154:11
  156:14
**accurate**  36:11
  99:24 113:14
  116:13 117:9
  122:6 127:12,14
  133:9 140:22
  155:2 162:22,25
  195:21 216:23,25
  217:2 223:13
  245:1
**accurately**  121:11
  121:13 124:16
  215:7
**accused**  118:14
  128:3
**achieve**  58:3
**achieved**  186:25
  187:9
**acknowledge**
  269:11 270:16
**acknowledged**
  169:16 204:12
**act**  269:14 270:20
**action**  117:17,21
  117:21 267:4
**active**  151:10
  238:20
**actual**  46:10
  240:23 241:18
  248:5

**adamh**  207:8
**adamhs**  65:14,17
  70:8 71:4 72:23
  85:20 197:13
  199:14,15,17
  200:17 201:8
  204:8 206:7
**add**  19:9 42:21
  95:3 132:2 154:21
  155:8 234:2
  237:13
**added**  87:2 155:8
  156:20 190:20
  233:8,12 238:2,6
  238:14 258:6,9
  259:1,13,15
  260:22 262:4,10
  262:13,23 263:1
**addict**  233:3,5
**addicted**  67:3
  137:22 245:15
  251:15
**addiction**  37:9,18
  167:4 195:8
  225:12 237:5,6
  245:12 248:7
**addictive**  37:5
**addictiveness**
  251:14
**adding**  155:4
  156:19,22 238:9
  263:16
**addition**  38:3
  168:17 182:13
  203:20 256:2
**additional**  46:12
  49:9 53:19 58:21
  66:10 69:2 75:1,4
  79:12 80:20 86:16
  89:15 101:12
  154:4 172:23

176:14
**address**  61:12
62:19 65:5 75:3
101:16 102:4
158:3 167:2
268:15
**addressed**  154:4
159:2 194:17
**addressing**  80:18
81:12
**adequacy**  46:20
**adequate**  102:13
**adjournment**
266:22
**administration**
112:23
**administrative**
94:15 179:14
209:2,5
**administrator**
158:11 174:23
**adopt**  171:22
214:21
**adopted**  212:14
213:5
**adopting**  171:16
**adoption**  43:21
113:22 199:1
**adoptive**  212:16
**adults**  161:14
204:11
**advocate**  64:8
**advocates**  63:10
64:1,12,25 93:16
93:20
**affect**  59:10,22
123:13 250:15
**affixed**  267:6
269:15 270:21
**afford**  143:8

**aforesaid**  266:12
**age**  9:12 236:11
**agencies**  48:16
120:23 125:22
126:5 169:21
175:24,25 176:5
177:7
**agency**  5:18 11:19
31:15 49:7 77:22
82:18,20 83:22,23
83:23 92:18 102:7
113:9 114:10
124:9 140:18
148:24 158:22
165:4,12 167:1
168:7 177:10,17
213:9 217:4
**agency's**  141:1
**agenda**  71:15
**ages**  195:5
**aggregate**  56:5
98:10 211:15
**aging**  213:11
**ago**  15:25 16:1
27:22 49:18 143:1
156:3 165:17,18
180:15 242:21
243:12 263:12
**agree**  53:24
130:24
**agreed**  13:13
187:25
**agreement**  124:23
**ah**  15:21 21:8
**ahead**  19:18 25:7
46:17 100:19
160:11 177:3
251:7
**akron**  12:19
**al**  1:11,12

**alcohol**  53:10
66:17 98:7 195:8
205:9,10 231:18
231:19 232:25
244:21 254:11,11
254:18
**alcoholism**  66:17
79:8
**alert**  126:3
**alerts**  126:10,15
**alexander**  2:15 4:8
4:10,12 8:16,16
9:18 18:7,15,22
19:8,12,21 20:7,12
20:19,20 74:10,15
74:18 75:17,25
116:6 129:20,23
130:11,15,20,23
131:6,18,25 132:5
132:21 224:13,17
224:23 248:9,12
249:4,12,18
250:23 251:6
252:21 253:1
255:16,21 261:23
262:15 263:6,9
264:13,15
**alexandria**  5:7
115:23
**allegations**  23:3
23:17 34:1,12
38:17 39:6,10,25
40:5 77:8,13 78:7
**allocated**  107:19
**allow**  79:14
217:20 233:9
239:4
**allowed**  25:24
164:2,9
**american**  148:19

**amerisourceberg...**
2:13 8:17,21
39:15 248:20
**amount**  80:19
88:23 212:7,22
216:16
**analogue**  246:25
248:5
**analogues**  247:10
**analyses**  78:25
79:19,20,22
100:22 242:20
**analysis**  183:2
239:6
**analyze**  57:4
**anecdotal**  226:10
227:4
**anecdote**  225:16
**angeles**  3:5
**annie**  30:16
**answer**  10:7,20
25:5,8,25 26:6,11
36:3 59:6 82:1
88:3 97:8 101:13
122:17 142:20
165:22 171:25
201:19 205:15,17
223:2 251:7
**answered**  253:3
260:25
**answering**  26:14
253:19
**answers**  10:14,19
**anticipation**
197:21
**antol**  246:25
**anybody**  10:20
14:11,15 16:5
24:15 28:25 29:7
35:8 39:15 40:25
91:11 137:21

164:19 185:22
186:1 220:15
222:13,15 226:1
264:17
**anymore**  64:13
214:11
**aod**  201:25 204:16
205:5,6,7
**apart**  241:19
**apologize**  132:19
**appear**  163:25
269:11 270:15
**appearance**
131:14 132:2
**appearances**  2:1
3:1 4:3 132:7
**appeared**  17:13
131:19 138:14
139:16
**appearing**  55:11
132:10
**appears**  67:1
**appended**  270:11
270:18
**applicable**  25:25
265:7
**application**  112:2
**apply**  93:1 110:17
**appointed**  166:9
**appointing**  159:15
**appreciate**  26:22
26:25
**approach**  59:1
**appropriate**  42:10
47:4
**approved**  37:10
**area**  60:9 176:25
**arnold**  3:11 9:5
**arnoldporter.com**
3:13

**arrange**  204:17
**arrangements**
213:12
**arrest**  119:13,19
**arrested**  126:11
143:5
**arrests**  126:2
**arshon**  5:7 115:22
118:22 124:6
136:8
**arshon's**  119:14
**article**  5:7,13,17
115:21 144:21
157:11,19 164:14
165:2,9,19,22
169:5 180:17
**artificial**  36:14
**ascertain**  107:21
**aside**  39:22 43:4
49:21
**asked**  25:3,12
28:24 29:3 65:3
77:6 184:2,10
197:3 222:15
225:3,5 250:13
**asking**  15:4 22:15
65:21 76:10 96:17
97:19 183:5
255:23
**aspect**  79:2,15
101:17
**aspects**  72:11
**assessment**  204:10
204:15
**assessments**
201:25
**assigned**  45:24
**assignment**  269:2
270:2 271:2
**assistant**  12:6,7,12
28:24 41:23 53:2

56:10 67:10 68:12
94:15 148:6
179:14 209:3,6
256:21
**associate**  167:18
**assume**  18:17
170:6 173:4 174:3
218:11 230:8
239:9
**assumed**  111:3,22
169:19
**attached**  175:17
177:7 180:1,20
193:8,19 270:7
**attaches**  109:14
**attaching**  110:16
111:16
**attachment**  5:21
5:24 6:5,8 174:8
179:2 181:13
192:11 194:13
195:5 196:15
197:10 202:24
203:4 211:1 228:4
**attachments**
174:21 179:11
181:21 208:21
**attended**  71:10
203:18 208:2
222:2,6
**attendees**  198:8
**attending**  8:10
**attention**  54:4,25
55:7 59:9,13,15
67:1,11 68:12
83:16 137:19
195:3
**attorney**  267:2
**attorneys**  8:9
**attributed**  81:5
98:6,7 167:13,14

**audience**  166:24
167:10 173:11
**audit**  187:1
**audrey**  95:9,17
101:8
**aug**  236:4
**august**  157:20
236:6,8 238:2
**author**  138:15
**authorize**  270:11
**automatic**  126:10
126:13,15
**automatically**
126:3
**available**  56:4,9
56:13 105:8 118:7
119:11 128:23,23
134:4 178:18
232:12 252:13
**ave**  268:1
**avenue**  2:4
**average**  143:23
**awarded**  175:25
**aware**  28:2 41:13
58:14 63:7 70:15
74:21 81:10
115:17 117:12,22
128:14 137:9
154:1 159:4
223:24 243:4
244:11 264:4,12

**b**

**b**  27:22
**back**  23:7 29:1
31:5,11,13 48:3,18
50:20 51:7 53:4,8
54:24 62:23,25
63:24 67:25 68:6
69:2 71:1 83:22
94:8 98:12 101:12
101:16 104:23

118:4 124:1
125:17 130:13
134:20 136:20
138:22 147:11,21
154:20 155:7,13
156:19 174:13
177:23 182:3
185:4,21 193:6
197:6 200:10
203:10 214:14
220:14 223:21
229:8 230:18
232:13 233:19
235:13 237:10
238:20 239:4
241:1 259:17
260:4,17 261:11
261:17 268:15
**bad** 149:20
**baker** 5:7 115:22
124:6,7 136:8
**balls** 141:4
**barbiturates**
234:4,5
**barriers** 215:2,8
216:6
**base** 219:17
**based** 18:6 34:7
40:7 56:5 60:17
**basic** 25:21 34:1
41:24 42:3,4
53:25 245:10
**basically** 43:9
156:9 162:20
197:20 258:16
**basics** 28:9
**basis** 26:14 55:22
57:5 72:9,20
233:19
**bates** 108:19,22
174:20 180:21

181:2 186:18
191:5 192:11
194:15 208:20
211:2,19 213:8
214:25 228:4
**bearing** 108:19
**bears** 39:19
**beasley** 95:17
101:8
**beefing** 166:11
**began** 172:3
**beginning** 10:19
132:18 253:8,12
263:21
**behalf** 2:2,7,13,20
3:2,8,15 8:13,15
8:20,23 9:1,5,8
13:4,10 14:11
19:14 20:5,6
24:16 26:5 29:4
131:19 179:17
248:19
**belabor** 229:7
**belief** 80:12
170:17,24
**believe** 10:5 13:8
13:16,22 21:25
23:14 34:23 45:4
45:14 48:1 61:25
69:24 80:15 86:4
87:14 97:3,4,4
100:25 105:10,17
112:8 122:7
127:20 132:16,17
134:25 138:1
140:4 152:25
158:23 162:5
164:8,11,13,15
165:23 170:9
184:23 186:4
194:5 198:11

200:12,23 201:1
202:3 208:4
221:19 222:12,14
230:15 232:17
241:9 252:3
**bell** 47:1 64:17,18
68:18 72:13,15
171:18 176:8
206:16
**bells** 171:12
205:12
**belonged** 46:9
**benefit** 176:22
**best** 70:20 82:12
82:15 102:10
**bet** 186:10
**better** 106:11
146:21,25 147:8
147:19 176:17
**beyond** 222:21
**biased** 140:23
**big** 69:14 81:21
88:8 115:5 206:23
212:1
**biggest** 145:6
**bill** 70:4 71:25
72:23 199:24
202:10
**binder** 18:16 19:7
**birth** 235:3 259:25
**bit** 48:2 62:23
144:21 180:15
252:4 253:2
**bites** 55:18
**blake** 52:22,24
**blame** 127:7
**blank** 50:18
**bless** 116:5
**blitz** 47:23 257:7
257:11,14

**blitzes** 156:14
157:2
**blue** 84:4 158:19
158:24 228:6
231:7,9 260:12
**board** 59:17 65:9
65:14,17,25 70:9
71:4 72:23 85:20
157:19 194:17
197:13 199:14,15
199:17 200:17
201:8 204:8 206:7
207:8
**body** 42:9
**bogged** 19:25
**bonding** 195:5
**boolean** 229:24
**bottom** 19:23
108:21 118:24
120:20 125:20
142:2 160:9
187:19
**boulevard** 2:10
**boy** 118:23
**boyle** 173:9
**brainer** 243:1
**branch** 37:13
**branches** 78:6,10
**break** 11:6 34:17
35:15 41:19 42:14
54:16 74:9,14
75:18 76:6,9,19
129:14,19 130:4
130:10 131:12,20
133:21 224:9,10
249:13
**breaks** 11:5
**bridge** 2:10
**brief** 204:9
**bring** 74:11

**bringing** 35:10
**broad** 55:2
**broader** 257:4
**broadly** 55:2 78:9
**brochure** 204:12
**broken** 191:7
**brothers** 168:10
**brought** 84:6
  98:25
**browns** 142:7
**bruce** 125:24
**budget** 5:21 57:21
  57:21 58:2,3
  63:20 64:13 66:7
  66:7 80:17 81:11
  82:5 88:9 95:5,7,8
  95:12 102:23,24
  103:7 105:8 106:7
  107:18 109:25
  113:11,15,17
  148:20 150:4
  151:21 152:12
  160:2,16,19
  172:15 174:7
  175:14,20 176:1,9
  176:20 178:5,11
  178:14,17
**budgeting** 55:24
  56:16 63:2 65:23
  66:1 73:15 79:5
  81:17 86:2,8
**budgets** 60:19,19
  95:15 176:15
**bug** 244:8
**built** 217:12,12
**bullet** 110:1 113:7
  114:6 186:24
  187:5 188:3,16
  189:7,24 190:5,6,7
  207:6 217:15
  219:15

**bullets** 113:1
  187:19 193:16
**bunch** 78:6 88:5
  103:13,14 171:21
  192:17 231:24
  234:8
**buprenorphine**
  234:6
**burden** 54:12
  57:11 58:20 60:13
  70:13,15 99:18
  103:25 144:2,14
  145:2 146:3 149:7
  149:12 218:16
  219:11 221:17
  245:15
**burdened** 221:14
  243:7
**burdens** 62:20
**bureaucracy**
  167:6
**burling** 2:22 9:8
**business** 94:3
  123:7

### c

**c** 203:22
**ca** 2:23 268:25
**california** 3:5
**call** 15:24 22:11,17
  44:5 45:23 112:10
**called** 9:12 43:6
  47:11 48:19 65:13
  66:22 69:21 95:23
  108:22 166:1
  207:7 225:8
  246:24
**calling** 161:24
**calls** 50:24 141:5
  142:3,14,22
**candidates** 173:3

**canned** 96:21
  97:10,15
**capabilities** 98:12
  264:1
**capacities** 140:3
**capacity** 10:1
  11:15 12:5,19
  132:10
**caption** 8:5 266:21
**cardinal** 39:14
**care** 34:25,25
  43:22 113:22
  127:9,25 128:15
  128:23 145:1,9
  148:23 150:11,15
  151:18 160:6,25
  161:2,3 164:22
  195:10 199:1
  213:23 214:2
  256:4
**career** 48:9,11
  50:16 244:16
  245:3 258:21
**caregivers** 188:19
**cares** 202:1
**carfentanil** 246:18
  246:20,22
**carolina** 2:10
**carr** 6:10 208:12
  208:22,24 209:21
**carroll** 49:14,15
**carry** 178:19
**case** 1:6,12 8:5
  12:23 14:7,12
  20:10 24:19 26:16
  35:17 38:23 40:12
  41:8,17,18 42:7
  44:8,13,16 45:1,6
  45:6 46:10 47:2
  54:7 55:13 84:13
  95:23 96:1,5,9,10

  119:10 132:25
  133:6,8,11,18,20
  133:22,23 134:8
  134:10,11,17,25
  135:1,2,5,8,9,11
  135:14,21 136:8
  136:11,13,15
  137:2,13 145:17
  146:22 147:9,24
  151:7 152:25
  153:3,10 154:11
  154:13 155:18,22
  158:5 161:12
  163:24 164:10,21
  164:23 167:19
  168:12,15,22,25
  169:2 230:5,6
  235:10 236:10,17
  238:4,8,20,22
  239:3 241:16,24
  242:13 258:22
  268:6 269:3 270:3
**caseload** 86:5
  143:4,16 218:6,13
**caseloads** 86:7
  218:5,24,24
**cases** 27:24 28:1
  47:12 53:17,18
  55:11 56:5 57:4
  85:25,25 98:5
  118:21 122:25
  133:1,1,4,5 139:25
  143:11 146:3,4
  148:12 153:4
  163:7,12,20,23
  164:3 167:4
  168:18,22 182:14
  182:22,24 183:3
  205:25 212:9,17
  213:24 214:2
  226:16,17,19,22

229:12 230:20,23
236:24 237:14,22
240:19,20 244:19
250:7,16
**caseworker** 45:24
**caseworkers**
99:19 218:16
**casey** 30:17
**categories** 234:5,7
235:1
**cause** 89:4 266:12
**caused** 80:21
160:4,24
**ccdcfs** 182:14
184:16 190:1,9
**cdc** 37:14
**center** 192:21
201:24 204:14,23
256:9
**central** 80:12
204:9
**ceo** 199:12,13,15
**certain** 37:1,1 54:7
71:12 89:22 94:7
100:24
**certainly** 123:4
224:4 247:24
250:6 256:14
**certificate** 4:14
266:1 270:11
**certification** 269:1
270:1
**certified** 9:15
**certify** 266:8,19
267:1
**cetera** 152:12
**chain** 6:1 35:4
70:2 192:3
**chair** 6:2 181:5
192:5

**chairman** 167:18
**challenges** 145:7
195:7 215:2,8
216:5
**chance** 119:14
216:1
**change** 60:20 73:1
73:5,12,24 76:2
95:3 105:14 118:4
120:15 122:19,24
123:22 131:8
147:15 201:4,23
224:25 245:10
257:5 268:13,14
270:8 271:3
**changed** 92:7
147:6,7 148:2
200:24 206:1
**changes** 73:6 74:3
74:5 126:25
132:13 160:3,23
161:4 163:4
166:18 187:14
261:4,6 264:4,11
268:12 269:7
270:7,9
**changing** 73:9
244:15
**chapman** 199:2
207:20
**char** 237:1
**character** 240:7
**characteristic**
236:11,12 237:3,3
**characterization**
46:24 127:13
162:2 195:21
**characterize**
176:11
**characterized**
22:3 67:14 121:12

124:16
**characterizing**
21:22
**charge** 124:9
166:22 184:3,10
238:21
**charged** 119:20
**charges** 124:21
**chase** 18:10
**chaytor** 203:20
204:17
**check** 124:10
151:15
**chief** 161:13
197:13
**child** 5:18 30:24
42:17,21 43:18
44:7,8 48:12,23
51:24 52:6,6
113:9 114:9 119:5
120:8 122:25
123:5,14,14 126:3
126:10 127:6
138:3 140:16
141:10,20 143:6
161:2 165:3,11
166:1 168:23
171:8,9 173:12,17
177:14,16 214:19
231:18
**children** 5:4,11,14
12:12,14 27:5
28:19 31:25 33:19
41:2,20,24 42:5,6
42:12,12,18 43:17
44:1 48:5,5 49:24
49:25 50:24 52:1
52:7,23 53:13
54:12,21 55:1,5
56:15 57:11 58:5
58:20 59:25 60:12

60:13 63:3 65:4
69:23 73:2,25
75:4 78:8,24 79:2
80:8,11 81:4 82:8
83:13 86:11 87:5
87:12,15 88:13
89:8 90:12 91:14
92:10 93:23 104:4
104:4 105:8,22
108:5 109:6 110:3
111:13 116:11,12
116:20 118:13,15
120:22,23 121:5,7
121:9,19 123:18
123:24 124:4
128:17,24 129:6
138:7 139:19
140:17 141:7,9
142:6,17,24 144:3
144:9,15 145:2,2,8
146:11 147:10,24
148:17,24 149:6,7
149:11,12,16,24
150:1,6,12 151:6
151:18,21 152:10
157:12,21 159:1
159:23,25 160:4,6
160:25 161:13,15
162:1 163:7 166:5
166:12 167:2,3,21
168:5,9,18 169:9
169:18 170:10,19
170:20 171:1,3
172:12 178:18
180:3 181:6
182:20 188:7,17
189:16 191:15
195:4,17 200:16
206:9,21 211:4,9
211:20 212:4,10
212:22 213:1

[children - compared]                                                    Page 9

220:25 226:17,23
231:1 242:4 243:6
254:16 259:3
**children's**  48:19
50:2 52:14,20
55:20 141:3,19
256:3
**childtrauma**
125:25
**china**  247:2,10
**choice**  47:11,16,24
67:25 146:13
147:16,16 148:1,1
156:10 233:9
**chris**  8:25
**christina**  199:25
200:1
**christopher**  3:4
**chronologically**
28:6
**cindy**  203:20
204:17 215:22
**circulated**  71:15
180:10
**circumstances**
82:17
**cite**  125:3
**cities**  148:19
**citing**  55:25
**city**  11:25 12:19
**city's**  143:11
**civil**  9:14 265:3,7
269:5 270:5
**cjlovrien**  3:6
**claim**  77:16,16
81:19
**claiming**  24:18
**claims**  78:7,15
**clarifica**  21:9
**clarification**  21:12

**clarify**  15:3 20:24
63:12 131:23
250:24
**clarifying**  15:13
19:25 40:13
**clarity**  66:8
**class**  40:13
**cleaner**  36:10
**clear**  11:11 37:25
45:17 46:8 76:9
141:7
**clearly**  18:11
173:3
**cleveland**  1:23 2:5
11:25 61:7 126:19
140:15 142:6
148:17 149:14
267:7 268:2
**client**  113:21
124:22 126:12
146:23 219:17
**clients**  40:14,22,24
41:8 42:11 60:22
116:11 219:19
226:17,23 250:16
**climate**  178:3
**clinic**  143:10
144:20
**clinical**  189:14
**close**  110:15
154:18 224:15,17
**closed**  145:17
**closely**  65:9
**cocaine**  33:12
53:10 54:9,19
55:4 56:25 66:19
79:9 233:3 243:22
250:15 251:5
253:16
**code**  236:11 237:3
259:24

**codeine**  234:6
**codes**  236:19
257:23
**coding**  237:14
**cohesively**  59:23
**collaboration**
189:8
**colleagues**  18:24
219:23
**collective**  57:4
**collectively**  100:10
144:25
**college**  49:1,6
**column**  5:10 129:4
236:14
**columnist**  138:16
139:17
**columns**  228:10
231:25
**combat**  166:12
**combination**
248:3
**combinations**
243:13,17 244:23
**combined**  31:15
**combining**  244:7
**come**  11:10 30:4
31:5 51:6 52:16
52:16 60:6 89:8
95:7 130:13
142:11 168:4
176:16 180:9
240:17 243:13
246:25
**comeback**  243:19
243:22
**comes**  123:10
153:7 181:15
**coming**  30:5 58:24
59:3 63:8 64:24
66:16 69:1 72:24

104:12 105:6
208:24 247:10
**comment**  113:19
250:5
**comments**  95:3
**commission**
173:10 267:17
269:19 270:25
271:25
**commissioned**
266:8
**commissioners**
9:25 194:18
**committed**  176:4
**common**  146:14
**communicated**
85:18
**communicating**
96:18
**communication**
83:25 85:12,22
86:10,10 124:20
125:6
**communications**
84:21
**community**  28:19
53:10 58:13 59:22
62:21 70:12 88:1
103:12 116:22
159:3 166:4
195:12,14 222:20
222:20 243:8
**community's**  5:11
129:7 195:16
**companies**  3:9
34:19 39:3 40:19
**compare**  254:15
**compared**  17:25
87:22 143:21
218:7,25 254:17

comparison  171:7
complete  135:8
    162:9
completed  145:12
    162:14 266:22
    268:15
completely  33:1
    49:21 161:1 238:7
compliance
    213:23 214:1
comprehensive
    135:23
concerned  116:10
concerns  204:13
    204:22 206:14
concluded  194:25
    264:22
conclusion  247:16
conditions  37:17
    151:22 169:7,13
conduct  94:2
confer  25:23,24
conference  169:25
conferences  72:8
confident  252:11
    259:7,9 261:2
confidential
    164:10
confused  36:13
confusion  132:20
connection  13:1
    14:6 15:8 21:13
    28:18 29:8 81:16
    90:24 95:8 119:24
    163:19 184:22
consideration
    195:11
considerations
    186:19
considered  253:9
    253:15

considering  82:16
consistent  121:1
    169:12 188:10,24
consistently  46:22
    260:4
constantly  66:4
consultant  11:21
contacted  29:7
contained  166:25
contemporaneous
    153:15 154:8,18
    155:1 157:3 238:3
contemporaneou...
    156:20,23
content  21:19 22:9
    22:14,22,23
context  71:5
    125:20 170:7
continuation
    170:8
continue  25:18
    111:14 125:19
    178:7 239:3
continued  3:1
    124:5 152:14,18
    152:23
continues  159:22
    168:3 169:5 171:6
    172:25 187:18
continuing  125:21
    242:19
continuously
    31:17
contract  169:20
contractor  205:2
contracts  14:2
    51:17,18
contractual  11:21
    200:21
contrary  19:22

contributed  88:18
contribution
    88:13
control  45:7
controlling  105:20
convened  158:2
convening  158:8
    194:24
conversation  24:6
    158:18
conversations
    13:17 16:13 33:23
    34:8 72:22 76:11
    76:14,17,20 79:18
    80:25 93:18,19
    158:17
converted  240:7
convicted  104:23
coo  199:17
coordination
    206:10,25
copied  257:9
copies  17:20 116:3
    138:12 174:16
    197:9 228:1
copy  18:19 71:16
    95:18 108:11,12
    109:14 111:16
    183:20 185:3
    204:12
cor  233:23
corporation  2:13
    2:20 8:18,21
    248:20
correct  14:23 15:1
    16:3,4,25 17:3
    39:10 40:5 43:19
    43:20 45:14 54:13
    68:16 69:15,16
    77:9,13 84:13,24
    85:22 87:12,24

88:6 89:10,11
    91:1 92:11,12
    103:9 104:13
    110:10 113:7
    114:14 116:22
    117:7 119:7,18
    123:15 133:25
    134:1,5,11 137:3
    137:15,23 138:3
    141:24,25 147:20
    153:3,11 154:5,12
    158:4 161:21
    162:16,17 166:20
    173:7 175:7,15,16
    179:17,20,21
    180:10,11 185:19
    188:13,14 189:4
    189:21 190:20
    191:24,25 203:8
    203:15 219:23
    220:25 221:9
    222:2 226:6,13,14
    230:7 233:6,7,12
    233:18,22,23
    237:11,12,17
    238:4,5 241:21
    242:7 252:6 256:5
    256:12,19,20
    257:1 258:2,12,13
    259:3,18 260:5,18
    260:21,24 261:5
    262:11 263:22
    264:2 266:17
corrections  268:12
    270:17
corruption  104:18
    104:24
cost  176:6
costs  100:24
coun  206:23

**council** 206:10,22
206:24
**counsel** 18:7 19:2
26:5 27:2 35:23
76:6,11,12,13,18
92:22 108:13,13
131:11,18 138:13
262:4 265:1,10
267:2
**counsel's** 253:4
255:15 261:1
**count** 33:12,13
231:17 255:22
**counties** 41:25
42:15 43:17 44:22
148:7 241:25
246:6
**country** 58:17
88:25 143:22
247:1
**county** 1:11 2:7,8
5:10,18 8:15 9:24
11:15,22 12:3,16
12:23 13:18 16:8
16:23 19:15 20:5
24:24 26:6 27:5
28:11,22 29:4,5,8
29:15,18,23 30:3
30:21,22 31:1,12
31:12,13,23 32:1,4
32:5 33:18,25
34:10 39:18,19
41:6,15,21,21 43:8
43:12,13 45:12
47:14,15 50:19,21
51:11,12 52:22
53:2 55:1,9,12
56:11,12 57:12
61:1,8 63:2,2,7
64:1 65:4,25
66:12 67:9,11,17

67:23 68:2,16
69:9,11,18 70:3
72:18 74:23 76:12
77:20,24,25 78:2,4
78:14,19,21 79:22
82:8 87:5,12
88:18,24 90:7,12
91:14 92:3,4,9
93:24 99:12
101:18 104:17
106:20 108:14,18
109:5 110:2,9,23
111:3 118:16
121:5,9 123:11
129:5 131:19,24
132:10,12 133:9
133:24 135:3
138:7 139:1,18
140:17 144:14
146:11 150:7,13
152:15,23 154:3
155:21 158:11
160:4 165:4,12
166:1,5 167:6
168:7 169:20
170:11,18,21,25
171:4 172:22
173:4,9 174:14,23
178:5 180:3 181:5
182:15 183:16,24
194:17,19 195:25
197:14 198:13
199:7,8 208:19
219:16 220:3,14
223:9,10,11
226:17 227:3
228:20 229:9
230:24 239:15
241:19 242:3
246:3 254:16
256:22,23 258:6

259:2 260:5
261:14 263:20
264:7 266:4
269:10 270:15
**county's** 45:7 46:2
46:3,13 188:7
226:23
**countystat** 209:13
210:2,3,6
**countystats** 211:3
**couple** 15:25 16:1
19:24 28:9 48:6
74:10 88:10
121:24 130:3
156:3 165:17,18
210:11 235:18
243:12,20 244:1
**course** 44:3
217:23,25 218:15
**court** 1:1 4:17
9:10 10:10,22
26:15 50:3 51:20
51:23 141:9
255:17 269:7
**courts** 51:10 85:21
117:25
**cov.com** 2:24
**cover** 33:10
109:16 193:4
194:13 237:14
**coverage** 128:15
128:16 140:21
141:2
**covers** 233:11
261:15
**covington** 2:22 9:8
**crack** 54:10,19
55:5 56:25 57:10
58:25 80:22 81:7
250:15 251:5
254:2 255:7

**crampton** 164:16
167:15,17,24
181:4,16 182:1
183:14 194:14
**crampton's**
190:24
**create** 76:9 94:7
94:22 154:11
**created** 195:22
196:24
**creating** 35:11
46:1
**creation** 260:11
**criminal** 124:21
**crisis** 80:23 81:6
152:12 178:5,11
178:14,17 219:16
219:25
**criteria** 44:9
**critical** 186:19
189:8
**criticisms** 167:1
**cross** 98:3 205:19
**crystal** 141:4
**cultural** 223:8
**cumbersome**
65:23 99:23
**current** 9:22,24
12:16 16:23
109:20 178:2
198:15 206:15
**currently** 28:10
90:14 242:5
**custody** 4:16
51:23,25 52:7
122:3,21,23 123:1
123:15,19,24
163:8 172:13
182:20 212:15
213:11 214:17,19

[cut - dec]                                                          Page 12

cut   18:9
cuts   63:8,20
    148:20 150:4
    151:21 160:2,16
    160:19 172:15
cuyah   5:5,22,24
    6:2,5,8,10,12
    108:6,19 174:9,20
    179:3,11 192:5,12
    196:15 197:11
    202:24 203:5
    208:13,20 227:21
    228:5
cuyahoga   1:11
    5:10,13,18 11:15
    11:22 20:5 24:23
    25:13 27:5,10,19
    28:10 29:5,22
    30:21,22 32:1
    33:18,25 34:10
    39:18 41:15,21
    43:7,12 45:15
    46:5 47:14 50:21
    51:11,12 52:22
    55:1 56:12 57:12
    61:8 62:1 63:2,6
    63:25 65:4 66:11
    67:9 69:9,18
    72:18 74:23 77:20
    78:19 82:7 87:5
    87:12 90:7,11
    91:14 92:9 93:24
    101:17 104:16
    108:18 109:5
    110:2,23 118:16
    121:5,9 129:5
    138:7 139:1,18
    140:1,17 146:11
    150:7,13 152:15
    152:23 154:2
    157:12,21 165:4

    165:12 166:1
    170:11,21 171:3
    171:17 172:3
    174:14,23 180:3
    181:5 182:15
    188:6 194:17,18
    197:14 198:13
    208:19 223:9
    226:17 228:20
    229:4,9 230:24
    239:22,23 240:5
    246:3,7 254:16
    256:23 258:6
    259:2 260:5
    263:20 264:6
    266:4
cv   109:15,20
    110:16 111:16
    113:1
cynthia   198:8

## d

d.c.   2:17 3:18
damages   24:19
    77:15,19 78:18
dan   1:7
danger   141:8
data   44:24,25 45:5
    45:18,19 47:23
    55:22 56:3,13,19
    56:22 98:9,17
    99:11,20 100:10
    134:3 135:6
    144:17 147:22
    154:1,8,9,19 155:1
    155:8 157:3
    184:18 185:17
    216:15,17,18
    217:3 223:17,17
    228:21 231:17
    233:8 235:21
    238:8 239:5 242:6

    242:19,21,22
    245:19,24 246:2
    248:2,5 252:12
    254:19,21 256:25
    257:5 261:16
    262:3,9,13,23,25
    263:14,21
database   45:1
    46:8 47:25 100:1
    228:18 233:17
    252:5
databases   98:17
    100:9 154:19
date   8:3 133:10,16
    181:7,15 182:6
    190:25 192:13
    211:16,17 265:11
    268:8 269:3,9,19
    270:3,13,25
    271:20,25
dated   180:5
    194:16
dates   229:11
    257:24
david   84:14
    164:16 167:15,17
    181:4 182:1
    183:14 185:11,14
day   3:3 9:1 36:11
    148:23 203:12
    247:3 256:17
    267:7 269:16
    270:22 271:22
days   15:25 68:14
    268:18
dcfs   5:24 179:1,20
    180:5 200:9
    204:12,18 207:8
    209:13
dcfs's   204:15

deal   41:15,16
    64:22 91:21 95:15
    116:2 166:10
    236:19 248:16
dealer   5:6,9,13,17
    115:21 116:8
    119:3 129:4
    138:14 140:13
    157:11,18 165:2
    165:11 194:24
dealings   91:13
dealt   117:24 171:8
dear   111:1 268:10
death   96:11 168:6
    168:9,23 247:16
    256:2,11
deaths   5:7 83:9,17
    115:22 116:10,20
    121:19 133:2
    137:14,20 138:1,3
    138:6 140:16
    143:6 153:4
    159:23,25 164:12
    171:9 195:3
    245:20,23 247:11
    247:25 254:14,17
    254:22,25
debacco   1:25
    266:6 267:14
deborah   1:18 4:7
    5:3,12 8:7 9:12,17
    9:21 108:3 121:8
    129:8 161:13
    166:9 167:16
    206:12 211:5
    249:24 252:25
    262:1 263:8 266:9
    268:8 269:4,9
    270:4,13 271:20
dec   6:4 162:14
    196:14

[decade - difficult]                                                           Page 13

decade  27:9 51:2,4
  124:1
decades  48:6
  50:14
deceased  199:18
december  109:6
  109:10 112:13
  197:20 198:7
  201:3,10,10 204:5
  211:3 217:17
decided  206:11
deciding  44:12
decision  162:15
  205:24
decisions  66:1
  205:25
decrease  63:1
decreased  217:16
decreasing  90:21
deed  269:14
  270:20
deemed  268:19
deep  135:23 163:3
defendant  9:8
defendants  9:5
  12:22 24:18 34:2
  40:1,10,17 77:9
  248:23
deficit  176:2,20
define  78:2 229:24
defined  223:7
definition  33:17
  253:8
defrancesco  2:15
  8:19,20
degree  49:11,12
  160:1
delbert  2:22 9:7
delivery  265:9,11
delos  199:25

demands  79:6,14
  80:21
demonstrate
  145:11
denihan  70:5
  71:25 72:23
  199:11,24 202:10
  207:14 222:24
department  5:10
  52:23 55:4 65:25
  106:20 110:3
  121:9 125:14
  129:5 139:19
  140:17 146:2
  160:4,20 161:16
  162:1 163:5 166:2
  167:16 168:4,19
  170:18 171:1
  172:13 175:19
  180:3 181:6
  182:17 201:8
  205:3 206:7 211:4
  215:8 226:24,25
  268:22
departments
  176:21
departure  29:23
dependency
  231:24
depending  212:14
  228:11
depends  57:24
  96:3 150:23
  153:20
deposed  9:15 10:4
deposition  1:17
  13:2,18 14:7,16
  15:8 16:14,15
  18:17 20:22 25:21
  27:3 29:9 76:24
  108:2 115:20

129:3 157:10
  165:1 174:5
  178:24 192:2
  196:12 202:21
  208:11 225:3
  227:20 253:9,13
  264:22 266:20
  268:8,11 269:1,3
  270:1,3
depression  128:6
  143:7
deputy  5:4 50:4
  51:18 108:5
  111:13,24 112:9
  112:10 198:10,24
  199:4
described  128:4
  138:15 181:13
  193:12,13 195:24
  209:12
describes  159:14
describing  159:24
description  5:2
  34:18 111:15
  116:13 142:1
  159:19 161:21
  236:12 237:4
desertion  231:23
designated  204:18
despite  168:6
  176:1
detail  28:5,5
  110:21 235:9
detailed  237:4
  261:17
details  13:24 16:7
  24:12,13 68:22,23
  118:20 120:7
  173:24 225:20
  261:3

detected  259:25
determine  123:18
detroit  148:19
develop  84:5
  102:9
developed  56:19
  56:20 61:25 62:1
  102:8
devoted  80:18
deyneka  2:9 4:9
  4:11 8:14,14 19:2
  19:5,9,18 131:22
  132:3,4,16 249:8
  249:16,25 250:1
  252:22 255:13,18
  259:19 260:6
  261:24 262:2
  263:3 264:14
diagnosis  258:15
diagnostic  257:23
  259:24
dictate  94:12,14
die  254:9,11
died  118:23 254:4
  254:5,7
difference  21:2
  181:12,21 236:16
different  46:19
  48:16 79:7 83:23
  85:17,18 92:8
  97:20 98:25 102:6
  147:2,24 148:7
  219:2,5,6,8 224:1
  234:4,8 250:14
differently  57:20
  57:23,23
difficult  65:24
  83:1 87:8 89:5
  116:17 125:12
  141:19,24 151:5,8
  151:11 217:9

difficulty 150:16
dir 52:6 194:8
direct 216:18
  239:10
directed 61:1
  110:8
directing 113:8
direction 58:7
directive 123:11
  123:12
directly 20:10
  96:18 222:4
director 5:4 10:2
  11:19 12:6,8,11,12
  27:4 28:24 30:24
  31:14,21 33:19
  41:23,23 50:4
  51:18 53:2 56:11
  61:9 62:17 63:6
  64:12 67:10 68:13
  69:9 70:8 78:23
  82:11 89:14 90:18
  91:9,16 92:11
  93:13,23 95:19
  96:2 98:13 102:14
  103:7 105:2,16,23
  108:5 109:5,9
  110:5 111:13,22
  111:24 112:10
  113:3 114:4,19
  115:16 116:18
  121:8,16 128:25
  138:7 139:18
  146:11 148:6,6
  152:1,17 154:2
  166:9 171:8 172:4
  180:4 190:19
  191:23 192:21
  194:10 195:10
  198:14,15,24
  199:4 204:2

206:13 207:1,24
  211:5 215:7
  226:18 230:21,24
  232:7 233:20
  237:15 239:14
  241:6 242:2
  256:19,22,23
  258:5 259:2,7,17
  260:5,17 261:12
  263:17 264:6
directors 112:9
  175:19 257:16,17
disability 231:23
disagree 149:3
disciplines 72:19
disconnects
  189:15
discontinued
  119:5
discuss 139:25
discussed 64:21
  118:22 133:5
  154:3 160:16
  200:14 250:22
discussing 119:9
discussion 74:19
  95:24 144:19
  172:16 201:3
  204:8
discussions 18:3
  68:5,9,19 69:25
  70:5,16,21 73:16
  79:25 81:9 92:14
  93:7 137:18
  158:13 172:20
  175:2 196:6
dispense 35:5
dispute 14:2
disquieting 118:25
disseminated
  204:6

distinction 250:19
  251:2
distracted 193:22
distributed 71:17
distribution
  179:23
distributors 34:21
  39:1,13
district 1:1,2
districtwide
  126:21
dive 135:23
diversion 40:12
diverting 35:9
dividers 228:6
division 1:3 27:5
  33:19 48:21 79:15
  82:8,13,15 87:3,9
  87:10 91:14,25
  128:17 142:18
  187:20 188:12
  238:21 241:6
divisions 41:25
  42:16 85:19
doctors 34:24
document 1:9
  108:11,17 109:16
  147:1,2,4 174:19
  179:8 180:1,20
  181:3,14 182:24
  190:19,24 191:6
  192:10 193:2,3
  203:13 208:18
  228:5 229:8 234:3
documentation
  147:8 163:15
documents 14:14
  15:18,19 17:8,11
  17:17,21 18:10,14
  18:18,25 19:4,6,10
  19:14,16,20 20:16

20:21 21:5,15,19
  22:2,4,9,14,22
  65:18 73:6 94:7
  94:18,22 95:6
  118:1 130:3
  131:14 158:16
  174:13 183:2,11
  184:21 196:21,23
  196:25 197:2,4
  200:11 228:9
  235:17 248:16
doing 36:4 56:21
  72:8 77:2 89:14
  106:22 117:19
  139:10 151:13
  188:13 215:9
  239:18 256:18,18
  257:11
dollars 97:16,23
  102:20
domestic 166:12
  219:18 221:16
door 219:9
double 88:23
downs 260:15
downturn 63:17
  80:10 104:12
  221:15
dr 125:24 194:14
draw 225:17
  250:19 251:1
drew 171:6
drill 235:19
drive 56:15 58:5
  59:14 142:22
driven 87:25
driver 55:11
  103:22 169:14
drivers 60:12 80:8
  80:13

**[driving - entering]**

**driving** 54:11
146:22 147:10
235:20
**drop** 212:1
**dropped** 211:22
243:12,25
**dropping** 212:19
212:21 218:12
**drove** 61:22
**drug** 2:13 8:17,21
28:18 32:25 33:1
34:19 35:9 38:18
39:13 47:11,16,24
51:20 54:7 55:10
56:24 60:3 67:25
73:22 85:12 92:8
145:7,16,21,23
146:22 147:15,16
147:18,22 148:1
156:10 195:8
205:9,10 232:15
232:24 233:9,10
235:2,9,20 238:19
244:13 248:20
259:24
**drugs** 32:12,13,15
32:16,18,23,23
35:5,10,11 36:25
37:5,7,16 38:3,22
40:11 67:14,16
145:23 146:4,13
147:23 220:17
234:8,23,23,25
235:1,11 243:11
243:13,13 244:14
244:22,22,23,23
245:9 248:3 250:6
250:8,14,22
251:10,15 253:7
254:1 261:21

**dtran** 2:24
**dual** 99:4,22
**ducked** 162:8
**due** 5:14 157:13
157:21
**duly** 9:14 266:7,10
**duplicate** 151:17
**duty** 42:22
**dying** 246:11
248:2
**dynamic** 36:13
240:12 244:13
245:10
**dysfunction**
161:11

**e**

**e** 5:20,23 6:1,4,6,9
17:13,14,15 30:17
93:25 94:3,23
174:6,21 175:12
178:25 179:10,12
183:21 192:3,10
192:12 193:7
196:13 197:10,12
202:22 203:4,5,7
208:12,19,22
209:21
**ealexander** 2:18
**earlier** 77:6 88:10
95:22 114:13
116:16 125:5
132:23 223:7
225:3 250:5
251:16 252:5
259:6
**early** 151:25 168:3
173:18 220:3
230:21 235:14
238:1 259:17
**earned** 177:8

**easier** 231:5
**east** 2:16
**eastern** 1:3
**easy** 151:4 223:18
**echelon** 222:11
**economic** 59:12
63:17 80:9 104:12
151:22 169:7,13
219:16,25 221:14
**economy** 60:2
127:9,22 170:10
170:20 171:2
**ed** 5:3 108:4 210:4
210:4
**edit** 94:25
**editor** 139:23,25
140:6 153:2
**editorial** 5:16
157:15,19 159:5
**education** 49:11
**educational** 49:13
**effective** 186:25
187:10
**effort** 156:8 257:8
**efforts** 46:23 65:2
65:22 72:7,14
89:20 102:13
257:20
**eight** 143:1 185:1
223:20 230:13
**either** 10:18 14:23
19:15 29:4 32:9
32:25 34:18 35:3
35:7,9 39:18
41:22 42:15 43:12
53:16 70:23 72:18
96:17 138:1 238:7
252:16 255:3
267:2
**elect** 110:23 111:8

**elected** 111:2
175:18
**electronic** 95:20
95:21
**email** 268:17
**embezzlement**
105:7
**emerged** 118:25
**employed** 10:1
11:15,24 12:2,19
31:19 50:19,21
**employee** 132:9,12
137:11 228:18,23
**employees** 5:24
57:19 179:2,20
180:5 199:8
**employer** 9:22,24
12:23 16:23 52:19
**employers** 62:24
**enact** 172:5
**enacting** 175:4
**enclosed** 268:11
**encompass** 31:24
**encourage** 154:17
**endangerment**
120:8
**ended** 15:1 93:4
116:20 173:6
**endo** 3:8,8 9:5
**ends** 186:19
**enforcement**
126:2
**engaging** 167:3
**enhanced** 172:11
**enter** 47:16
**entered** 45:1 46:8
46:16,21,22 47:25
137:6,11 153:18
154:9 270:9
**entering** 99:20
131:23

entire 195:12
269:5 270:5
entities 34:25
47:21 48:21,22
90:9 158:6 200:22
entitled 18:19
180:21
entity 78:5 204:15
207:2 242:3
261:14
entry 46:23 99:4
99:11,22 134:2
135:7 154:1,8
155:1 157:3
216:15,17,18
242:6,22 256:25
257:6 261:16
epidemic 54:9,10
54:19 56:24,25
57:1,10 80:21,22
81:7,7 250:20
251:3 253:5 254:2
254:6
equivalent 226:24
eric 2:15 8:16
errata 268:13,18
270:7,10,18 271:1
especially 245:18
250:8 251:17
esq 2:4,9,15,15 3:4
3:11,16
essentially 31:24
40:25 41:7,11
44:5 45:12 69:12
90:17,20 146:3,12
179:16 180:8
established 18:9
44:9 63:25
estate 14:2
et 1:11,12 152:12

ethical 35:10
evaluate 114:9
evaluation 137:1
event 112:20
161:20 167:4
267:3
everybody 10:11
30:6 73:20 129:13
everybody's
100:13
everything's
239:17
evidence 60:17
exact 50:12 72:6
203:19
exactly 86:21
113:16 160:21
261:3 262:22
examination 4:7
9:13,17 249:24
252:25 262:1
263:8
example 32:11
54:25 59:17 95:5
96:4 103:1 128:2
excel 95:3,9
100:12,12,13,23
228:7
excuse 224:7
exec 111:2
executed 270:10
execution 269:14
270:19
executive 10:2
110:9,23 111:3,8
173:4 185:25
195:25 220:3,15
exhibit 4:16 5:3,6
5:9,13,17,20,23
6:1,4,6,9,11 108:2
108:10,17 109:4

115:20 116:3
118:13 129:3,11
129:13 132:23
133:5 136:12
138:11 140:12
157:10,18 159:7
165:1,10,20 174:5
174:15,19 178:24
179:10 180:15
192:2,9 193:23,24
196:12 197:9
202:21 203:3
208:11,17 227:20
228:1,3,22 241:2
258:18 260:2,11
exhibits 4:5,17 5:1
108:16 224:16
exist 239:4 241:16
241:18,21,22,25
existed 241:11
existing 75:2
80:17 197:3
exists 45:7
expanded 223:15
253:21
expanding 223:9
expansion 223:25
expansions 223:25
expect 216:3
expected 135:7
162:10
experience 28:15
38:7 40:8 58:24
64:2 87:23 111:15
121:2 143:21
144:2,23 148:9,10
152:22 188:25
225:4,9 226:10,11
experiences 227:6
expert 162:9
233:13

experts 84:6 114:9
167:4 196:4
expiration 269:19
270:25 271:25
expires 267:17
explain 30:1 48:13
83:20 110:6 149:5
149:9 150:5,8
152:13 211:12
213:25 214:9
218:8,9
exposure 235:2
expressed 80:16
extensive 137:18
extent 23:25 24:1
24:4
external 187:1,11
extra 36:9 102:20
260:22
extracting 238:8
eyes 21:16

f

face 148:15
facilitate 193:1
facilitators 192:25
facs 98:20 99:2,3,5
99:7,21 100:1,3,8
134:5
fact 115:12 134:12
144:17 148:3
157:1 178:3,21
205:11 208:5
238:16 239:2
257:20
factor 58:6 68:15
factors 56:14 58:4
80:10 88:5,7,9
141:22 142:21
152:7 195:1,14
facts 23:4,16 24:22
234:23

failed  143:12
failing  127:8
fair  26:21 46:24
  47:18,19 57:17,18
  75:16 88:22 114:3
  114:5 140:22
  162:2 215:11
  223:22,22 247:15
fairfax  30:23 31:1
  31:4 92:3
fairly  107:7
  116:21 137:17
familiar  165:24
  200:4 242:5,9,18
families  59:23
  64:5,6 87:15
  120:22 121:6
  148:18 163:8
  166:3 170:10,21
  171:3 188:7
  189:16 195:2,6,17
  216:17
family  5:5,11 10:3
  12:13,14 27:5
  28:20 31:14,25
  33:20 41:2,20,25
  42:18 43:18 44:1
  48:6 49:24 52:23
  53:13 54:13,21
  55:2,5,20 56:16
  57:11 58:5,20
  59:24,25 60:12,14
  63:3 65:5 69:23
  73:2,25 75:4 78:8
  78:24 79:3 80:8
  80:11 81:5 82:8
  83:13 86:12 88:13
  89:8 90:13 91:14
  92:10 93:24 104:5
  105:8,22 108:6
  109:6 110:3

111:14 113:21
116:12 119:6
121:7,10 124:4
128:17,24 129:6
138:7 139:19
140:18 141:6
144:3,15 145:2,9
146:11 147:10,24
149:7,12,17 150:6
150:13 151:6
159:1 160:5 169:8
170:19 171:1
178:19 180:4
181:6 182:17
191:15 200:16
206:9,21 211:4
214:21 220:25
225:10 226:1,18
226:23 231:1
242:4 243:6
254:16 259:3
family's  187:22
far  22:6 70:22
  76:2,25 78:12
  131:8 132:14
  163:6 224:25
farmer  3:16 8:22
  8:22 248:25
fashion  132:9
faster  107:16
fatalities  83:1 96:4
fatality  135:15
fault  127:5
fcfc  206:13
fda  37:10
february  5:6
  115:21 116:9,9,10
  203:7 207:23
  208:19
federal  9:13 37:15
  89:9,12,15,25

123:11 130:25
feel  214:9 247:20
  252:11 259:7
feeling  77:2
fellow  125:24
felt  135:18
fentanyl  32:19,19
  243:15,16 245:24
  246:16,17,23,25
  247:9,16 248:3,4,4
  251:20 254:15
  255:2
ferraro  2:3
ferraro.com  2:6
fewer  160:6,25
field  48:4 49:25
  50:14 53:20 54:3
  58:10 90:8 146:21
  252:19 257:19,25
  263:14
fields  47:4 134:3
  229:22 230:12,13
  231:5 240:23
  241:10 252:12
  257:21 258:6,23
  260:15 262:3,9,13
  262:23,25 263:21
fifth  175:10
fiftieth  3:5
figure  84:7
file  41:17 44:15,16
  44:17 45:6,11,13
  45:22,24 46:1,1,3
  46:10,13 95:1
  96:1,9,13 133:20
  133:23 134:8,11
  134:17 135:2,6,9
  135:11,14,21
  136:15 137:3
  153:8,10 154:11
  168:25 169:2

228:3 238:8,22
241:18 258:22
files  41:7,11 45:1
  45:16,16,18 47:2
  95:18,23 96:5
  119:11 132:25
  133:6,8 153:3
  155:13,15 156:19
  163:24 164:3,10
  164:23 168:22
  182:19 230:5
  239:3 240:4
  241:16,24 242:13
fill  106:13,23
  107:17
filled  106:24
filtered  257:15
final  6:1,7 180:22
  181:14 192:3
  193:8,10 202:23
finalized  140:9
  216:2
finance  99:4
  100:25 101:1
financial  79:1,25
  80:13 88:13
financing  101:4
find  105:19,19
  112:7 141:7
  151:17 177:7
  193:8,21 212:16
  212:16 214:20
  268:11
findings  163:2
fine  28:7 129:15
  130:25 255:25
fingerprint  161:14
fingers  169:5
finish  10:20 115:6
  224:14

**firm** 20:6,8,10
  132:1
**first** 9:14 16:1
  49:5,23 52:19
  60:25 62:3 66:15
  107:4,10 110:1
  111:11 113:7
  118:12,21 119:18
  121:15 138:6
  141:3 143:15
  148:14 153:8,9
  160:9 162:8
  165:15 177:6,24
  181:13 182:4
  184:14,17 186:23
  187:5 193:11
  201:11 206:10,21
  207:6 216:6
  229:15 231:9
  234:15 237:8
  266:10
**fiscal** 113:23 178:2
**fitzgerald** 5:4
  108:4 110:8 111:1
  111:22 173:6
  210:4,5 217:18
  222:2
**five** 50:1 118:23
  156:5,6 162:4
  206:9 258:5
**fix** 84:16 221:20
  221:22
**fixing** 11:3
**flag** 160:2 236:12
**flash** 210:6
**flat** 90:20 102:23
  102:24 103:7,8
**flattering** 161:21
  161:22
**flip** 230:19 234:20

**floor** 3:5
**flower** 3:4
**focus** 38:1,2,14
  43:10 109:1 134:7
  145:13
**focused** 92:3 107:5
  145:22 153:23
  156:9
**focusing** 140:15
**follow** 42:7 123:8
  123:21 204:16
  231:6 250:2
  261:24
**followed** 191:12
**follows** 9:16
**followup** 139:21
  249:9 253:2
**force** 162:9 164:2
  164:9 173:10
**force's** 163:1
**forces** 72:17
**foregoing** 266:16
  266:21 269:13
  270:18
**foreign** 60:3
**foresight** 126:6
**forever** 30:15
  41:12
**forkas** 1:18 4:7 5:3
  5:12 8:8 9:12,17
  9:21 18:17 76:1
  108:4 121:8 124:3
  127:5 129:8 131:7
  132:22 161:13,25
  162:21 166:9
  167:17 168:4
  169:6,16 171:6
  172:2 195:10
  206:12 211:5
  224:10,24 228:2
  249:24 250:1

252:25 262:1
  263:8 266:9 268:8
  269:4,9 270:4,13
  271:20
**form** 54:14 55:14
  66:23 81:25
  250:23 251:6
  252:21 255:25
  259:19 260:6
  262:15
**format** 98:10
  229:19 260:8
**formation** 164:4
**formed** 195:13
**former** 173:9
**forward** 59:11
  118:19 152:16,19
  176:22 181:1
  229:13 230:17
  268:15
**forwarding** 209:5
**foster** 43:22
  113:22 145:9
  160:6,25 161:2,3
  199:1
**found** 119:4 163:5
**foundation** 30:17
**four** 64:16 118:13
  168:18 228:21
**fourth** 120:19
  175:9 236:9
  258:17
**frame** 50:13
**francisco** 2:23
**frank** 68:10
**frankly** 196:25
**free** 145:16 214:9
  269:14 270:20
**freeze** 217:20
**frequency** 161:5

**frequently** 123:14
**friday** 164:1
**friday's** 209:14
**friends** 225:10
  226:2 227:5,5,5
**front** 2:23 22:3
  219:9
**fruition** 74:24
  75:11
**fulfill** 81:20 87:10
  151:5 187:21
**full** 9:19 50:8
  107:22 148:14
  164:19 178:4
**fully** 145:16
**function** 31:25
  41:1 42:3,4 59:23
  81:20 137:2
  178:19
**functions** 32:2
  41:24
**fund** 176:2
**funding** 54:12
  62:18 69:2 75:1
  85:11 89:19,21,25
  90:20 91:25 93:15
  102:14 105:2,15
  172:23
**funds** 89:9,12,15
**further** 48:2
  136:22 171:10
  248:13,25 249:2
  264:17 266:19
  267:1

### g

**gallucci** 14:19,20
  15:5,12,18,22
  16:18 17:9 18:4
  20:14,15 21:14,20
  22:2,13,19 24:15
  25:3 27:2

gathered 55:9
gener 241:23
general 19:11
22:24 25:22 63:1
77:23 86:22 95:4
95:12 105:19
141:22 145:25
147:9 154:7 176:2
188:1 242:5,8,10
242:19
generally 46:14
89:24 135:13
151:1 229:19,20
232:19
generate 228:21
generated 55:8
95:7 163:15
181:22,23,23
182:1 183:12
184:22 185:4
190:19 229:3,8
geographic 223:8
223:25
gestures 10:17
gesundheit 116:6
getting 61:16 69:1
73:19 93:4 105:15
105:21 150:16
201:25 248:6
gist 141:18
give 17:24 18:10
24:12,16 28:14,25
83:10,15 117:6
186:6 196:19
257:22,24 265:1
265:10
given 58:1,3 60:14
66:18 77:3 80:6
148:5 164:20
178:2 244:18
262:5 266:13,18

gives 58:6 194:22
giving 36:3 105:24
170:4 185:9 217:3
glaring 155:19
glass 118:22 124:8
128:3 136:11
go 10:6 11:10
19:18 22:25 25:7
28:4 47:3 48:2
62:4 86:7 89:7
100:19 110:20
112:25 120:14,19
124:1,2 125:17,19
130:2,24 132:22
137:2 141:16
155:7,13 166:16
177:3,9,23 180:2
181:1 182:3,4
184:1 186:18
189:6,23 190:23
193:6 194:12
197:6 207:20
211:1,8 213:1,7
214:14,24 229:13
230:17 231:3
233:24 238:22
239:4 249:10
251:7 255:25
goes 111:7 118:19
123:4 135:16
153:9 191:5 226:7
230:18 261:16
going 11:12 13:23
16:6 18:5 21:6
27:25 29:1 34:13
43:5,8 53:4 54:10
54:10 56:24 57:24
59:10,10 61:2,10
62:23 72:14 81:22
82:17,19 83:3,12
83:22 86:1,6 89:7

108:15 111:19,21
112:1 116:24
126:16 129:24
138:21,24 141:16
141:22 144:10
152:15 154:19
156:6,19 158:3
162:3 173:2
174:13 176:9,11
176:22 177:4,5
178:10 180:13
186:22 192:14
193:23 196:19,20
197:22 200:11,15
201:5 204:2 206:5
208:21 210:9,22
213:3 221:13
222:1 223:23
224:8 229:7 238:7
244:20 249:14,17
255:3,3,5 256:4,7
257:4,5,6 258:17
good 36:4,5 63:15
74:8 75:17 82:9
82:14 83:25 96:12
97:24 136:4
146:19 149:19
157:4 161:25
171:20 188:13
212:23 215:9
242:22
gotten 124:11
214:12
government 28:16
30:4 37:14,15
38:8 71:20,23
72:11 78:10 85:17
86:11 124:21
125:9 126:5 166:5
172:22 207:3
221:8

governmental
48:22 73:21 78:5
78:11 220:24
242:3
governor's 72:7
graduate 48:25
graduated 49:2
graduating 49:6
great 27:9 224:13
greater 195:3
groomers 215:16
groomes 215:17
215:20
ground 10:7
group 71:5,14
171:17,21 181:25
207:16 257:4
groups 224:1
guess 16:18 19:1
21:1 143:19 156:4
170:2,3 215:12
249:5
guest 5:9 129:4
138:16 139:17
gui 123:20
guidelines 123:17
123:20,23
guiding 184:11,15
guru 230:16
guys 57:2 172:23
177:19

| h |
| --- |

h 203:22
hairston 126:18
half 224:9
halfway 219:9
hamilton 5:8
115:23
hand 226:7,8
267:6

handed 15:16
handful 64:14
handing 227:25
handling 101:1
 136:13
handwritten
 46:12 240:8
happen 66:3 156:2
 173:23 197:22
 255:5
happened 43:7
 132:14 155:22
 173:21 183:7,9
 201:21 203:11
 216:4 220:16
 261:4,6,7 264:5
happening 67:22
 84:9 221:6
happens 59:21
 81:2 107:19
 256:14
hard 33:22 48:12
 57:19 87:2 95:18
 103:23 107:15
 123:2,25 125:16
 134:22 144:24
 234:12 242:20
harder 53:18
 82:22,24 83:13
 87:9 148:23
 221:18
harper 6:4,7
 196:13 197:12
 199:16 202:22
 203:6
hastily 161:16
hcfw 204:18
head 17:25 69:11
 83:11 108:24
 223:24 255:14,17

headings 236:14
health 3:8 34:25
 34:25 37:17 55:3
 59:13,17 65:9
 70:2 78:9 80:22
 81:6 85:19 98:8
 127:9,25 128:7,14
 128:15,23 130:1
 143:9 144:20,25
 145:1 148:23
 150:11,15 164:22
 167:3 188:20
 189:24 190:8
 195:7,10 208:25
hear 47:20 171:24
 205:15
heard 64:8 114:23
 115:1 227:9
 246:24
heightened 169:8
held 28:17 43:11
 154:2 204:5
help 5:11 28:6
 30:10 62:19 64:22
 108:25 121:7
 129:7 143:11
 145:10 167:5
 196:20
helped 193:1
 196:3,3
helping 195:16
hereinafter 9:15
hereunto 267:5
heroin 32:13
 35:12 66:22 67:13
 67:21,24 68:1,14
 69:14,20 70:11
 73:23 75:6 222:19
 223:6 237:6
 245:23 246:14,15
 247:17 248:2,4

251:20 254:14
 255:2
heroin's 243:25
hey 59:9 64:22
 65:24 68:13 70:10
 81:11 94:10
 220:16 221:13
high 116:21
 142:18 143:20
 144:13,14 148:20
 150:4 151:22
 166:3 182:14
 195:2 221:8
higher 122:25
 149:25
highlighted
 233:25 234:9,21
 234:24
highlighting 234:1
highly 168:17
hindsight 122:1
hire 66:2 107:15
 217:20
hires 107:9
historic 87:22
 147:22
historically 23:10
 158:22
history 141:23
 182:12 194:22
hit 148:16
hitchcock 201:24
 204:14,23
hklaw.com 3:19
holds 142:7
holland 3:16 8:23
home 195:4 212:6
homeless 150:23
 151:1
homelessness
 148:21 150:9,20

151:4,23 152:11
homemade 244:22
homes 149:11,17
 161:15 188:19
 212:16 214:15
homicide 160:1
honest 57:7 65:12
 103:20 142:25
 190:22 223:13
 230:16 252:14
honestly 220:12
hope 107:16
 139:22
hopefuls 173:11
hotline 44:6 50:2
 50:22,23 113:21
 142:3 216:17
hour 129:25 224:9
household 144:11
housing 195:9
houston 125:25
hr 106:20
huge 36:7
huh 45:21 46:14
 52:3 65:20 66:6
 71:11 76:16 84:17
 84:23,25 99:13
 109:18 110:4,11
 111:10 113:4
 117:4 118:11
 125:7 128:10
 133:3 153:12
 159:18,18 170:12
 173:8 179:18
 182:25 187:24
 196:2 198:3
 203:16 209:7
 211:11 215:10
 225:7 232:3 233:4
 235:12,22 237:9
 241:4 253:6 254:3

261:6
**human** 55:3 70:2
78:9 85:19 208:25
**hurt** 217:13,14,21
**hydromorphone**
234:25

**i**

**idea** 78:20,22
122:10 127:23
158:8 161:18,19
168:2 183:22,23
184:25 185:8
204:19 207:11
212:9 236:18,22
240:19
**identifi** 235:10
**identification**
108:8 115:25
129:9 157:16
165:7 174:11
179:5 192:7
196:17 203:1
208:15 227:23
**identified** 39:1
113:5 151:20
163:2 191:1
192:20 208:24
222:8 235:11
**identify** 8:10
60:11 108:11
176:6
**identifying** 44:18
86:18 87:8 132:1
**ids** 236:24
**illegal** 33:1,3 35:9
35:11 244:22
**illegally** 32:24
247:1
**illness** 145:6
166:13 204:11
219:17 221:15

**imagine** 89:4
164:24 185:5,11
185:24 237:19
**immediate** 141:8
**imminent** 141:8
**impact** 53:12 55:4
55:23 56:16 58:19
59:4,24 68:13
72:10 73:21 75:4
77:13 78:7 79:1
80:1,10,13 81:6,21
89:2 92:8,16
93:13 105:1
127:21,24 128:22
150:3,12 178:4,17
250:7 251:11
252:2 254:16
256:5,9,11,13
**impacted** 87:10
88:5 128:16,24
**impacting** 58:13
69:22
**impacts** 28:18
66:11 78:11 123:4
**impediments**
84:20 188:12
**implement** 196:7
**implemented**
114:7,18 115:2,11
115:15 190:16
191:22
**implementing**
114:22
**implications**
132:15
**importance** 93:7
93:20
**important** 97:22
149:14 150:17
189:13 212:25
214:8 239:6

**impression** 132:6
**improper** 117:20
**improve** 5:19
46:23 47:24 56:9
64:6 156:14 165:5
165:13 166:2
172:6 191:14
**improvement**
180:23 181:4
200:9
**improving** 107:6
195:15
**inaccurate** 109:23
139:20
**inadequate** 195:9
**incentive** 5:21
174:8 175:15,20
175:24 176:16
177:8,20 178:6
**incentives** 176:5
**incentivizing**
176:13,18
**include** 220:9
229:23
**included** 223:6
228:21 268:13
**includes** 169:19
230:20 242:4
**including** 29:11
30:16 32:23 61:3
61:13 63:9 64:23
66:22 75:6 79:16
80:9 90:8 117:1
118:21 128:15
136:23 154:9
164:21 170:18,25
176:3 186:17
192:17 200:14
201:22 220:24
225:12 234:24
254:10,18

**income** 195:9
**incorporated**
270:12
**incorrect** 40:5
77:9
**increase** 69:20
90:5,19 103:18
173:12,18 213:22
214:1 257:21
**increased** 57:1
62:18 86:12
102:13 103:25
188:18 216:18,19
257:8
**increases** 53:17
244:3
**increasing** 57:10
75:5 89:16 99:18
103:8,10 152:11
218:5,13,14,17
219:4 221:17
**independent** 5:15
157:15,23
**index** 4:1,5 5:1 7:1
**indicating** 228:6
254:14 268:13
**indicted** 104:23
**indirectly** 91:22
**individual** 17:24
45:6 47:12 55:11
55:13 57:3 132:25
146:3 151:6 153:4
171:14 176:20
226:15 230:6
232:1 258:22
**information** 17:24
17:24 24:2,5,17
27:12 37:16 38:6
46:11,12,20 47:3
47:12 56:6,9 77:3
77:5,7 98:18

113:23 125:13,23
131:15 133:10,13
133:18 134:14,15
134:16,25 135:8
137:10 153:7,17
153:24 154:21
155:4 156:9,16,19
156:23 164:20
169:1 217:10
225:18,24 226:9
227:16 232:13
233:16,16 237:2,4
238:19 241:2,7
260:10,15
**initial** 257:8 264:1
**initially** 107:4
132:7 263:23
**initiate** 101:11
**initiated** 61:11
65:17 114:7
205:21
**initiating** 72:8
**initiative** 61:22
195:13
**initiatives** 60:24
69:1 74:21 156:13
157:2
**injuries** 77:16
**innovative** 192:21
**inpatient** 256:8,8
**inquiry** 5:14
157:13,22
**instance** 47:9 54:9
**instances** 145:16
226:15
**instruct** 26:6
**instruction** 77:5
**instructions** 11:10
77:4 265:2,10
**insys** 3:15 8:23

**intake** 44:5,11
45:23 50:24
107:11 113:21
199:5 204:10
218:5 219:2,7,9,12
**intend** 28:13 225:8
225:23 226:20
227:11
**intended** 61:11
64:4 215:5
**intending** 220:4
**intentionally**
122:23 132:8
**interaction** 38:21
39:13 64:6 85:18
85:20 119:23
198:17
**interested** 43:1
210:8 267:3
**interesting** 112:7
177:21 197:7
**interim** 163:1
**internal** 86:9
136:23 138:25
160:3 163:6,11,22
186:25 187:10,15
**interpret** 10:23
**interrupt** 224:8
**interrupted** 25:16
25:17
**interrupting**
100:18
**intersystem** 189:7
**interview** 135:22
137:10
**interviews** 119:4
135:25 136:1,12
136:15
**intragovernmental**
85:21

**introduced** 132:17
**investigation**
44:13 104:17
136:23,24 142:15
142:24
**investigations**
142:5,23
**invite** 207:8
**involve** 22:21
226:16 237:16
244:20
**involved** 30:25
32:3 35:8 37:15
53:20 55:12 58:10
60:25 64:20
136:13 147:9,23
185:8,12,23 186:2
186:7,14 237:5
251:12 256:3,24
**involvement** 168:7
238:19
**involves** 143:4,16
156:18 230:23
**involving** 168:22
235:11 248:4
**isolated** 161:10
**issue** 23:4 37:8
47:10 53:9,15,16
80:19 85:10,12,15
98:8 107:9 214:18
220:17,18 242:15
246:15
**issued** 166:10
194:7
**issues** 38:23 40:12
47:2 50:25 57:21
76:10 85:22 86:8
86:9,10,10 106:20
128:14 151:20
158:3,23 159:2
195:11 219:20

220:8 225:16
242:19 245:13
247:13 248:16
257:18 261:15
**iv** 206:3

**j**

**j** 1:25 266:6
267:14
**jacqueline** 198:22
**jail** 255:11 256:4
**james** 5:20 174:6
174:22
**janet** 6:9 208:12
208:22
**january** 1:19 8:3
113:3 172:4 173:5
182:21 197:22,25
201:9,16 203:11
203:17,25 267:8
268:4
**jerry** 52:22,24
**jessica** 3:16 8:22
**jessica.farmer**
3:19
**jim** 52:24 158:9
212:8
**job** 10:2 30:4 36:4
49:5,23 50:8,8,8
57:16 58:7 59:10
66:2 81:24 82:9
82:12,14,16 83:14
87:9 92:21,23
93:1 105:3 106:11
110:15 116:17
117:5 125:11
141:23 144:1,12
171:10 188:13
210:10 215:9
221:18
**jobs** 31:14 49:22
143:7 144:4,5

**joe** 3:22
**john** 49:14,15
  126:18 171:7
**joint** 65:16
**jones** 3:3 8:25
**jonesday.com** 3:6
**judge** 1:7
**jump** 46:17
**juncture** 225:13
**june** 174:21
**justify** 105:25
**juvenile** 50:3
  141:9

**k**

**k** 2:16
**kanary** 192:14,15
  192:16,20 193:7
**kaye** 3:11
**keep** 42:5 55:17
  79:14 80:20 95:18
  112:18,21 166:5
  241:25 242:1
  246:7
**keeping** 230:17
**keeps** 53:18
  214:13
**kelley** 2:3,6
**kent** 192:22
**kept** 212:5
**key** 184:17
**kids** 5:12 122:2,21
  122:22 129:7
  151:16 161:7
  214:13
**kill** 255:4
**killed** 120:22
  159:25 168:5,19
**killers** 244:8
**killing** 250:8
**kills** 245:18
  251:17 252:3

**kind** 11:9,12,20
  27:12 44:18 48:20
  54:25 56:18,22
  59:24 60:11 62:24
  64:4,5 67:5 71:5
  73:10 77:2 84:15
  93:8 99:25 106:5
  153:19 156:13
  158:23 163:22
  182:11 212:14
  215:5 224:12
  226:7 233:8 239:6
  243:1,17 251:1,3
**kinds** 25:15 60:18
  64:23 66:21 83:21
  84:2 95:13 97:17
  97:18 102:6 250:7
  250:14,21
**kinship** 43:22
**knew** 24:11 30:5
  90:23 139:5 204:3
  223:23
**knight** 3:16 8:23
**know** 10:15 11:3,6
  13:5,20 14:1 18:1
  18:8,20 19:4
  23:20,22,25 24:1,3
  24:9,10,12 25:13
  27:13,21,23 32:9
  32:11 33:2,7,16
  34:16,17,23,24
  35:2,5,7,12,13,18
  36:12,19,24 37:4,6
  37:13,21,22,23,23
  38:3,16 39:2,5,9
  39:24 40:4,6 43:1
  46:18 49:17 51:2
  52:5,18 56:4,6,18
  56:19,20 57:2,7,18
  57:21,24 59:7,16
  59:18 60:20 61:25

  65:8 66:17 67:5
  67:15 68:17,21
  69:11 70:22,24,24
  72:3 74:2,4,7
  75:11 76:15 77:12
  80:21,22 81:6,8,11
  81:13,15 82:1,25
  83:7 84:8 87:14
  90:10,17,22 92:13
  92:18,20 93:6,14
  94:24 95:9,11
  96:4,21 97:9,15,17
  97:22,24 98:5,6,7
  98:9,23 99:7,8
  100:13 101:13
  102:9 103:3 106:6
  109:23 110:18
  111:21 112:19
  114:16,22 115:12
  117:18 118:3,3
  119:7,8,18 120:4
  121:3 122:7 123:3
  124:17 125:2,2,4,4
  125:15,17,18
  127:2 128:1 129:1
  130:15 132:13
  133:16 134:12,23
  135:4 136:7,19
  137:12,24 138:4,5
  141:17 142:10,19
  142:25 144:7,10
  144:11,16 146:7,9
  146:18 147:23
  148:3,4,11 149:18
  149:22 150:24
  151:12,13,17
  154:13,16,22,24
  155:6 157:7
  160:15,18,21
  163:11,16,21
  165:21 166:21

  167:25 168:8
  170:16 173:20
  174:1 178:4,20
  181:12,20 183:1,4
  183:9,25 185:12
  186:1,11,13
  187:14,17 188:2
  190:13,13,21
  191:18,20,21
  194:2,5 198:12,22
  199:2,19 201:6,18
  201:19 202:11,14
  202:14 203:23
  204:1,21 205:8,11
  205:22 206:1,8
  207:4 208:2,5
  209:1,17,18,24
  210:19 211:25
  212:12,24 215:12
  216:10 217:8
  219:24 220:11,12
  220:13 221:1
  222:17,19 223:12
  223:13,14,14,16
  223:20 224:3
  225:14 227:14
  229:15,24 230:8
  230:11 232:18
  233:5,15 235:19
  236:18,22,25,25
  237:1,18,19,21
  238:10,16,23
  239:1,7,20 240:14
  240:16,18,19
  241:13,15,15
  243:16 244:2
  245:5,8,22 246:13
  246:22,23 247:9
  248:1,18 251:9
  252:16,18 253:11
  254:20,25 255:1,1

255:2 257:25 258:23 259:14,16 259:20,22 260:2 260:13 261:2,7,9 261:10,15 262:3,6 262:9,17,20 263:2 264:9,9,10
**knowledge** 38:20 39:17,23 40:7,9 70:20 77:19 78:17 91:24 92:7 137:16 227:4 241:5 246:21
**known** 30:13,15 118:15 120:23 124:8 168:19 220:22 221:3 224:4,5

**l**

**l** 2:15 3:16
**l.p.** 1:12
**labeling** 37:7
**lack** 107:22
**lag** 153:19
**language** 206:5
**large** 81:11 113:17 166:11
**largely** 258:14
**largest** 113:9
**late** 215:6 236:8
**launch** 264:1
**launched** 75:1 142:4
**laundry** 32:14
**law** 41:12 124:12 126:2 132:1
**lawful** 9:12
**lawsuit** 24:1,2,5 24:11,11
**lawyer** 13:17,21 13:25 14:4,8 16:8

16:9,22,25 17:2 18:15
**lawyers** 12:21 26:10 29:11 33:24 34:9 36:22 139:1 174:17
**lax** 161:12
**ldefrancesco** 2:19
**lead** 204:17
**leading** 103:25 113:8 166:18
**leap** 247:15
**learn** 141:6
**leave** 107:9 130:8 214:14
**leaving** 30:20 107:16
**led** 72:24 84:12 122:20,24 123:23 158:14 260:10
**left** 10:11 29:22 30:3,22 83:5,24 90:18 114:19 264:6
**legal** 3:22 52:12 113:24 117:17 127:5 214:16 247:17 268:1 271:1
**legally** 245:21 246:12
**leibow** 3:11 9:4,4
**leniency** 106:1
**lenient** 105:24
**letter** 5:3 6:2 108:3 109:16 110:7,16 138:20 139:23 140:6 153:2 192:4 193:4 194:13 248:17 268:19

**letters** 139:24
**letting** 21:11 22:5
**level** 87:3,20 99:12 123:11 219:12 221:8 232:13 233:16 235:8
**levels** 58:3 93:9 188:5 189:14 217:15 219:13,14
**levies** 176:3
**levy** 89:10 90:5,11 90:19
**li** 92:24
**liaisons** 64:4
**life** 13:24 87:8 116:16 145:13
**light** 178:3
**limbo** 214:13
**limitations** 242:19
**linda** 200:3
**lindsay** 2:15 8:19
**line** 127:4 141:17 141:18 175:10,10 175:20 179:24 225:17 250:12,21 268:13 270:7 271:3
**lines** 250:10
**lingering** 212:10 212:11
**linkage** 204:10
**list** 32:14 60:7 83:11,15 84:19 101:10 104:1 115:5 177:7,10,12 179:23
**listed** 110:2 177:16 270:7,17
**listen** 81:20
**listened** 92:24

**listing** 270:7
**litigation** 1:5 8:6 13:11 15:9 16:15 23:3,4,5 28:25 29:17 31:1 32:4 34:2 35:17 40:1 108:18 268:6 269:3 270:3
**little** 23:9,10 27:11 36:9 48:2 51:5 54:17 62:23 95:23 103:4 108:21 110:21,21 130:14 144:21 180:15 207:7 228:6 231:5 252:4 253:2
**live** 150:1 214:20
**lived** 148:17
**lives** 227:3
**living** 149:16,24 150:25 151:21 152:11 213:12
**llc** 2:9
**llp** 2:14,22 3:16
**loaded** 99:15,16
**loads** 56:6
**local** 35:4 89:9 90:5 114:8
**locally** 81:22
**long** 24:10 27:22 36:8 49:18 53:19 54:2 58:9 96:6 98:14 130:11 210:20 212:5 228:5 249:13 263:24
**longer** 53:18 126:20 143:8 204:2
**look** 22:5 60:15,16 72:9 95:2 96:1,5,8

100:10 109:19
127:7 131:15
135:11,15,20
142:21 147:17,21
148:13 158:25
164:10,23 168:14
169:1 198:6
211:15,18 223:18
224:14 229:11
236:9 238:18
239:4
**looked**  56:14
58:10 79:1 132:24
133:6 135:5,15
163:18,24 164:17
168:21 203:13
**looking**  59:3 60:18
135:6 146:12
177:15 201:2
**looks**  109:21
165:24 170:7
181:24 203:19
234:15
**los**  3:5
**lose**  144:4,5,6
**losing**  144:1
217:23
**lost**  30:4 143:6
144:12 172:14
190:3
**lot**  24:7,9 27:10
48:18 54:6 56:4
60:8 66:17 71:10
83:3,11 84:9 89:6
104:8,10 106:10
137:19 147:5
196:2 197:4
235:17
**lots**  70:5,15 84:10
86:24,25 114:23
135:24 151:19

217:11
**lovrien**  3:4 8:25,25
249:2
**low**  107:7 142:18
143:20
**lower**  149:24
**luckily**  231:4
**lunch**  129:13,18
130:4,8,10,12
**luncheon**  131:3

**m**

**ma'am**  9:23 27:20
48:10 78:1 160:10
181:18 184:7
214:25 215:3
234:16
**madam**  268:10
**mail**  5:20,23 6:1,4
6:6,9 93:25 94:3
174:6,21 175:12
178:25 179:10,12
183:21 192:3,10
192:12 193:7
196:13 197:10,12
202:22 203:4,5,7
208:12,19,22
209:21
**mails**  17:13,14,15
94:23
**main**  2:4 80:7
**maintained**  41:7
41:11 44:17,19
45:11 99:9 133:9
133:24 135:2
137:3
**maintains**  241:19
**major**  61:20 63:8
63:20 169:14
176:20 242:15
**making**  42:12 66:1
81:18 82:3 205:24

221:17 238:7
**manage**  38:4
53:18
**management**  38:2
38:15 54:4 55:1
55:20 58:6 84:1
84:22 85:12
113:20 216:7
**manager**  51:17,18
**managerial**
161:11
**managers**  169:20
**manages**  166:2
**mandated**  160:2
160:16,19
**manufacturers**
34:20 35:15 36:17
36:24 38:18,21
**march**  138:14,22
182:21 207:25
**margin**  88:22
**marijuana**  33:13
53:11 243:16
248:8
**marked**  5:2 108:7
108:10 115:24
129:8 157:15
165:6 174:10
179:4 192:6
196:16 202:25
208:14 227:22,25
**marketed**  36:25
**martin**  206:13
207:1
**mary**  173:9
**massive**  104:17
105:7
**master's**  49:12
**materials**  15:11,18
15:20 37:10

**matt**  2:4 8:12
16:19 17:2,5 18:3
20:4
**matter**  21:2
220:19
**mattingly**  171:7
**mccafferty**  5:21
52:24 158:9,14
174:7,22 175:18
176:13 212:8
**mccray**  198:22
**mckesson**  2:20 9:9
39:14
**mcmonagle**  2:4
8:12,12 18:5,13,20
19:3 20:4,4,9,17
25:6,10 34:13
54:14 55:14 66:23
74:8 81:25 129:12
129:16,21 130:5,9
130:13,17 131:2
224:7 234:17
249:6 268:5
**md**  1:6
**mdl**  1:5
**mean**  12:12 13:5
15:16 23:11 24:4
25:6 29:25 32:10
45:20 52:21 53:15
60:6 65:8 78:3
83:2 102:19 104:8
105:5 122:16
123:5 128:22
130:16 133:15
137:17 144:6
146:25 147:12
148:5,23 149:19
152:19 154:7,15
190:15 202:11
205:7 214:8,22
216:11 217:2,8

218:11,14 219:3
220:21 221:2
223:14 224:8
230:4 232:18
236:24 237:21
239:10 242:25
243:15 251:16
252:15 253:12
255:2 262:12
**meaning** 32:16
159:24 161:24
173:1 195:2
**means** 13:20 157:2
205:11 207:4
213:25 214:3
**meant** 86:5 89:6
**measure** 176:6
213:19
**measures** 213:9
**media** 83:2,6,9,16
123:3 137:19
140:15 180:12
**medication** 128:5
128:6 143:8
**medications** 37:19
**meet** 15:21 17:5
**meeting** 6:5,7 16:7
20:13 21:14,21
71:15,16 95:7
167:9 169:6
196:14 197:20,22
198:1,6 200:7
201:3,7,10,11
202:23 203:11,18
204:5,18 206:14
207:10,12,23
208:3 209:14
221:25 222:6,24
**meetings** 14:10
16:2,5,13 17:12
22:12,25 23:6

71:3,6,7,10,13,14
71:25 94:4 95:5,5
196:23 201:14,17
202:12 205:24
221:7 222:25
**member** 114:8
145:9 162:20
173:10 187:22
227:2
**members** 141:6
184:4,11 195:14
225:10 243:7
**memo** 137:10
175:17 177:24
178:1 180:2
**memorandum**
200:15 206:4,6
**memorialized**
70:22 72:1 73:5
73:13,16 136:3
153:10
**memorializing**
158:16 183:12
**memory** 27:8,22
62:6 63:14
**memos** 94:9,25
136:14,18 196:23
**mental** 59:12,17
65:8 80:22 81:6
98:8 128:7,15
143:9 144:20,25
145:5 148:23
150:11,14 164:22
166:13 167:3
188:20 189:24
190:8 195:7
204:11 219:17
221:15
**mention** 175:1
**mentioned** 50:24
59:18 85:24 95:22

96:15 116:16
132:23 168:8
174:24 199:12
252:8
**mentions** 234:4
**merriman** 222:5
**message** 5:23
173:3 179:1,19
**met** 15:23,23,25
16:1 18:23,24
70:16 71:4,4
**meth** 67:15,24,25
68:3,14 80:21
81:7 243:19 244:4
244:7 254:6
**methadone** 234:7
237:5
**methamphetamine**
33:13 35:11 57:2
58:16,25 66:20
69:14 79:8 253:16
**methamphetami...**
67:16 250:15
251:4
**mickey** 215:16,20
**mid** 162:10,14,14
**middle** 124:3
189:12 193:16
**midwest** 268:17
271:1
**million** 106:7,7
109:25 113:10,15
176:2
**millions** 102:20
**mind** 16:12 101:9
103:15 111:18
181:17 230:18
249:10,12,16
**mind's** 50:18
**minute** 23:8

**minutes** 6:4 71:6,9
71:16 72:2 130:2
196:14 197:19
198:6 200:7
202:19 203:11
**misattribution**
117:14
**misimpression**
132:13
**misinformed**
140:23
**misleading** 132:8
**misquoted** 117:13
**misquoting** 117:19
**missed** 190:5
**missing** 155:12,20
262:23
**mission** 87:11
151:5
**misspeak** 205:1
**mistakes** 161:11
**misunderstood**
141:2
**mmcmonagle** 2:6
**mmm** 255:8
**modification**
154:5
**moment** 249:11
**money** 13:13,14
57:22 58:22 65:4
66:2,5,9 69:6
72:25 74:1 79:12
79:13 80:20 81:3
81:4,19,23 82:4
89:7 90:12 97:25
98:1 101:12,16,19
102:1,3,5,6,16,25
102:25 103:2,3,5
105:7,21,23,25
106:3,11,18
107:18 144:8

172:13 173:12,17
173:25 176:14
177:22 178:18
196:8 201:22
206:24 221:21,24
**monitoring**  145:15
**month**  95:11
162:16 210:10,14
210:23 259:15
**monthly**  71:14
**months**  115:8
118:14 128:8
143:11 145:14
162:4 190:18
191:23
**moons**  263:12
**moot**  132:19
**morning**  15:23
17:6 18:3 20:13
20:22 22:1
**morphine**  234:8
234:25 237:6
**mother**  119:14,19
124:6 145:7,11
**mother's**  136:10
**mothers**  118:14
143:5,5,16 145:21
**motley**  2:9 132:4
250:2
**motleyrice.com**
2:11
**mouth**  53:23
**mouthful**  195:20
**move**  51:6 97:25
103:1,4 151:10
213:4
**moved**  152:19
**mt**  2:10
**multiple**  48:13
188:5 219:12,14
234:6

**murder**  118:14
**murdered**  121:5
**murdering**  119:20
128:3
**myopia**  161:12

**n**

**n.d.**  1:12
**name**  8:7 9:19,21
20:2 34:18 94:16
94:23 136:10
138:21 139:17
140:13 174:15
186:6 190:25
197:1,5 200:4
208:18 215:14,15
226:24 257:19
268:6 269:3,4,15
270:3,4,21
**named**  266:9
**names**  35:18 39:2
186:1,3 225:18
234:22 257:25
**napoli**  1:22 18:16
20:6,8,10
**narrative**  193:10
193:14 194:1
**narratives**  193:5
**narrow**  160:5,24
**natalie**  2:9 8:14
16:21,22 132:3
250:1
**nation**  88:15
**national**  1:5 8:6
63:17 114:8
125:23 268:6
269:3 270:3
**nationally**  81:22
**nationwide**  59:12
**native**  6:11 227:21
228:3

**nay**  241:12
**ndeyneka**  2:11
**near**  120:20 203:8
**nearly**  142:3 168:6
**necessarily**  133:12
230:4 257:19
259:14
**need**  10:14 11:5
23:8 42:14 43:5
50:11 55:12 56:15
58:5,21 59:14
60:12,15,16 66:1
76:2 80:11,19
81:19 84:3 94:19
98:1 104:3 130:24
131:8 147:10
150:14 156:24
164:23 188:4
224:10,25 226:8
233:12 239:5
**needed**  58:23 84:3
86:15,17,25 99:23
100:6 101:16,19
102:3,5,6,18
105:25 106:10
124:25,25 135:19
161:2 189:25
190:9 195:3
**needing**  221:21
**needs**  5:11,18
55:24 86:12 103:8
129:7 165:4,12
187:20
**negative**  227:7
**negatively**  218:21
**neglect**  145:17
**neglectful**  145:7
**neighbors**  141:6
**neither**  137:13
**net**  143:12

**nev**  185:5
**never**  111:17
122:22,22 156:24
169:3 190:11
194:11 254:19
**new**  3:12,12 16:7
17:24 30:3 60:16
61:24 69:5 73:11
73:11,22 74:25,25
77:3 97:20 107:9
112:11,21 147:17
171:8,15 173:5
216:6 240:20
243:12
**news**  116:8,19
141:2 164:2 247:3
247:8
**nice**  159:19
**nicole**  3:11 9:4
**nicole.leibow**  3:13
**night**  99:16
**nine**  121:5,19
138:6 263:19
**nodding**  108:24
**non**  27:11,11
255:20
**nonprofit**  125:25
166:25
**northeast**  54:11
54:19 243:5
245:25 246:1
247:13
**northern**  1:2
**northwest**  2:16
3:17
**notarized**  268:14
**notary**  266:6
267:14 268:25
269:10,18 270:15
270:23 271:23

| | | | |
|---|---|---|---|
| **note** 34:13 268:12 | 34:14 54:14 55:14 | **officially** 37:9 | 68:21 69:8,17 |
| **noted** 172:2 | 66:23 81:25 | **officials** 175:19 | 72:5,22 74:12,14 |
| 219:23 255:19 | 250:23 251:6 | 221:8 | 74:15 75:16 76:15 |
| **notes** 45:25 155:15 | 252:21 262:15 | **offspring** 116:11 | 77:18 79:5 81:1 |
| 240:8 | **observations** | **oh** 27:19 49:17 | 81:16 83:6 84:11 |
| **noticed** 66:15 | 188:11 189:20 | 52:21 102:3 115:7 | 85:8,15 87:1 |
| 99:18 220:7 | **obtain** 32:24 | 159:8 177:13 | 88:21 89:2,23 |
| **notified** 175:24 | **obtained** 33:2 | 193:18 202:7 | 90:3 91:3,18 92:6 |
| **november** 201:14 | **obvious** 144:7 | 204:3 217:4,4 | 94:2,6,21 98:3,16 |
| **number** 5:2 44:18 | 153:6 | 223:19 225:21 | 99:11 100:8 |
| 53:17 57:15 63:10 | **obviously** 60:19 | 227:13 229:17 | 101:21,25 102:12 |
| 108:19 113:6,19 | 150:16,25 201:8 | 239:23 240:9 | 103:21,24 107:21 |
| 116:19 141:21 | 229:8 248:14,19 | 242:12 247:23 | 109:4 112:20 |
| 142:23 158:6 | **occasion** 95:25 | 251:7 | 115:18 118:1 |
| 172:14 181:2 | 96:3 | **ohio** 1:2,12,23 2:5 | 119:23 123:22 |
| 186:18 187:18 | **occasions** 18:25 | 2:7,8 31:5 54:11 | 128:13 130:5,9,11 |
| 191:1,5,7 194:15 | 34:9 | 54:19 88:14 | 131:18,25 133:21 |
| 195:1 211:2,9,19 | **occurred** 155:14 | 113:10 148:7 | 133:22 134:7,13 |
| 211:20 212:18,20 | **october** 115:9 | 228:18,24 229:2 | 134:16,24 137:13 |
| 212:24,25 213:6,8 | 162:14 165:10 | 243:5 245:25 | 137:17 138:5 |
| 213:10,10,16,16 | 179:12 180:5 | 246:1 247:13 | 139:10,13,24 |
| 214:25 228:4 | 181:7 182:6 | 261:11 266:2,7 | 140:2,12 143:3 |
| 234:22 248:15 | 192:13 194:16 | 267:7,15 268:2 | 150:3 153:6 |
| 254:10 256:16 | 201:14 218:6,7,24 | **okay** 11:9 12:9,15 | 156:12,18 157:8 |
| 257:21 264:11 | 218:25 | 13:2,20,23 14:6,10 | 160:15 175:1 |
| 268:7,13 | **odds** 148:15 | 14:18,20,22 15:11 | 177:23 178:22 |
| **numbers** 88:11 | **odjfs** 216:6 | 16:2,12 17:5,7 | 179:10 180:19 |
| 108:21,22 142:22 | **offer** 225:8 | 19:8,12 20:7,19 | 181:20 184:1,8 |
| 142:23 149:20 | **offered** 42:10 | 21:18 22:11 25:5 | 185:8 186:12 |
| 213:20 218:1,6 | 126:19 | 25:9,14 26:9 | 192:9 193:20 |
| 219:1 222:21 | **offers** 216:7 | 27:14 28:4,13,22 | 199:7 201:2 202:5 |
| 234:22 270:7 | **office** 72:8 110:24 | 30:3 31:20 33:5,9 | 202:15 203:17 |
| | 111:4,9,23 119:13 | 33:12,22 34:22 | 204:4 205:18 |
| **o** | 119:19,24 173:5 | 35:14 37:21 38:11 | 208:2,6 209:4,10 |
| | 208:25 267:6 | 40:21,23 41:17 | 211:1,18 214:4,8 |
| **o** 203:22 | **officer** 51:15,17 | 43:16 44:4,11,15 | 215:4 216:5 217:7 |
| **oath** 19:22 | 52:5,10 197:13 | 45:22 46:4,7 | 218:23 219:15 |
| **object** 7:2,13,14 | **officers** 52:8 | 48:25 52:18 53:4 | 223:2,5 224:4,15 |
| 255:24 259:19 | **official** 10:12 | 53:8,22 58:9,15,19 | 226:6 227:2,9,11 |
| 260:6 | 37:10 139:7 | 61:15,21 62:16,23 | 227:18 228:16 |
| **objection** 7:1,3,4,5 | 269:15 270:21 | 63:5,23 66:14 | 229:4 231:3,11 |
| 7:6,7,8,9,10,11,12 | | | |
| 7:15 18:6 25:7 | | | |

235:6 236:7,20 238:25 240:11,22 241:14,23 243:3 243:10 244:3,18 245:2,9,17 246:9 247:9,15 248:1 250:4 251:8 252:1 252:16,24 253:22 258:4,20 259:5,21 259:23 260:10,25 261:23 264:4,10 264:13

old  118:23 156:19

once  16:2 45:2 112:21

one's  103:21 181:24

ones  35:18 182:5 195:2 231:22

ongoing  198:10 199:5 210:13 218:23 219:2,9 222:25

op  1:12

open  44:13 53:18 106:14,24 182:22

opened  44:9,16 45:23 133:23,24 153:8 164:15 241:23

opening  238:3

operating  197:13

operators  229:25

opiate  1:5 8:6 33:6 72:10 77:21 102:4 103:12 137:14 234:7 237:5 268:6 269:3 270:3

opiates  23:13 28:17 29:19 31:2 32:6,9 61:4 70:11

73:24 75:6 77:15 79:16,16 88:1 89:17 103:19 137:22 138:2,9 189:4 220:10 223:6 225:11 226:16 227:7

opinions  162:6

opioid  33:9 37:19 40:11 72:10 77:21 102:4 103:12 137:14 247:18 250:20 251:2 253:5,10

opioids  23:12 28:17 29:19 31:2 32:6,8,12,22 33:14 61:3 66:22 67:13 67:14 69:21 70:11 75:5 77:15 88:1 89:16 103:18 137:22 138:2,8 189:3 220:9 223:6 225:11 226:16 227:7 245:21 246:12 251:19,24 253:4,17

opposed  21:3 135:6 154:19 155:2

optical  240:6

option  255:9

options  47:5,15 130:16 241:11 257:22 258:9

order  141:8 161:14,16

organizational  189:13

organized  42:16 43:18

orient  117:1

orig  263:23

original  179:12 234:2,21

originally  232:23 247:2 263:13

osiecki  199:19

outcomes  186:24 187:7

outlined  163:2

outraged  122:3

outside  28:16 29:11 86:11 167:6 248:17

overall  60:13 88:9 146:10 151:22 176:19 188:11

overarching  186:20 189:20

overdose  245:20 246:11

overdosing  67:2

overload  122:2

overly  33:2

oversee  140:18

oversight  42:8 113:10 161:12

overview  186:17 204:9

overwhelmed  161:25

owned  45:19

oxycontins  32:14

**p**

p.m.  264:22

page  7:2 80:5 109:1,16 113:2 118:24 120:19 121:24 124:2 125:21,22 126:16 127:3,4 142:2

148:14,14 160:9 161:9,23 165:15 166:8 173:1 177:9 177:24 180:2 182:9,11 184:1 186:18,20 187:5 187:20 188:3,4 189:6,23 191:3,4 192:11 193:11,17 198:8 206:3 211:19 213:7 234:15 237:8 268:13,15 270:7 271:3

pages  166:10

paid  13:13 54:5,25 59:15 67:11

pain  37:17 38:1,5 38:15

pains  10:17

panel  5:15,18 84:4 84:12 114:8 115:9 157:14,22 158:1,8 159:15 162:20 165:3,12,25 166:9 167:17 171:17 172:19 175:3,4 180:9,23 181:4,22 182:12 184:2,4,9 184:11,12,15,16 187:16 192:24 194:24 195:13,21 196:3,6 200:9 202:2,11,13

panel's  172:5 184:3,10 196:8 202:9

panels  158:19,24

paper  46:1 138:20 139:2 231:5,12 240:3

**paperwork** 106:21
**par** 3:8,9 9:6
**paragraph** 119:1
 121:25 124:3
 125:20,21 126:17
 126:17 143:3
 145:5 148:15
 152:10 160:9
 162:18,19 177:6
 182:13 187:4
 188:15 189:12
**parameters**
 149:15 229:23
 242:6
**parent** 148:18
 149:11 231:19
 232:15 256:2
**parents** 42:6,11
 124:10 141:10
 144:3,24 151:9
 169:17 172:12
 188:19 195:6
 213:2,3
**part** 28:14 37:14
 40:22 42:22 43:23
 43:25 44:1,3,4
 50:1,7,7 51:1
 58:16 74:18,22
 81:9,11 117:5
 119:18 120:7
 141:17 143:15
 149:2 166:11
 167:5 185:24
 196:22 202:12
 205:18 206:13
 221:7,13,20
 222:11,17 223:9
 270:9
**participant** 40:25
 146:23

**participants** 173:1
**participate** 78:25
 82:3 90:4
**participated** 90:9
**participating**
 29:16
**particular** 13:5
 62:12 70:13 80:18
 96:10 101:3 109:1
 137:19 141:23
 145:23 232:14
 246:6 250:12
 252:13,20
**particularly** 23:18
 107:8,10 261:20
**parties** 8:11
**partner** 195:7
**partnerships**
 188:5
**parts** 44:25 85:17
 124:20 125:8
 143:21 165:23
 185:25 222:20
 223:10 234:21
**party** 18:23 267:3
**pass** 248:22
**passed** 68:3
**patricia** 30:7
**patrick** 192:14
**pause** 36:9
**pay** 13:14 55:7
 59:13
**paying** 59:8
**pc** 213:4 214:15,19
**pcp** 33:13 233:5
 253:16
**pcsao** 47:21 90:10
 257:11
**peak** 243:12
**pending** 25:23

**people** 10:23
 34:20 38:5 45:25
 53:11 58:7 64:1
 66:2 67:2,3 70:1
 74:1 79:7 81:18
 87:15 91:9 104:23
 107:9,15,16,17
 121:25 122:3
 136:13 142:6
 144:1 146:5
 150:14,22 152:20
 155:7 156:22
 176:14,16 179:16
 186:4,14 192:17
 196:3 203:19
 217:23 222:4,23
 227:6 235:18
 239:4 244:7
 245:12 246:11
 248:2,6 250:9
 251:10,12,13
 252:3 254:4,5,6,9
 254:11 256:24
**pep** 167:5
**percent** 17:16
 105:18 120:21
 143:4,15 148:16
 148:18 149:25
 211:22
**percentage** 122:25
 149:6,10,16,23
 231:17
**perfect** 147:13
**performance** 87:3
 93:14 191:14
 217:13,14,21
 218:19
**period** 28:23
 47:22 53:5 59:1
 64:20 66:19 73:20
 74:23 82:9,10

**86:1,18 89:13
 99:5 103:6 104:11
 105:6 107:22
 111:4 113:2 148:7
 230:20,23 233:11
 237:15,25 262:4,5
**periodic** 137:1
 155:3
**periods** 47:13
 116:19
**permanent** 213:11
 213:11 214:19
 256:14
**perpetuity** 41:11
**perry** 125:24
**person** 16:3 21:14
 22:12 94:4 185:15
 199:22 207:20
 236:11,17,24
**person's** 233:2
**personal** 13:24
 14:2 28:15 38:20
 39:12,23 40:7
 77:18 78:17 91:24
 92:6 188:11 225:4
 225:9,10,18,23
 226:8,10 227:16
**personally** 15:7
 19:3 247:20
 269:11 270:15
**personnel** 49:7,22
**perspective** 61:22
 87:21 107:3
 164:19
**persuasive** 81:19
**ph.d.** 181:4
**pharma** 1:11
**pharmaceutical**
 3:9
**pharmaceuticals**
 3:8,9 35:16 36:18

**pharmacies** 35:3,4
39:21,24
**pharmacy** 35:4
**philadelphia**
247:6
**phone** 9:3 15:24
16:3 22:11 249:4
268:3
**phrases** 237:7
**physical** 126:20
**physically** 15:16
21:4,5
**pick** 211:16
229:2
**picture** 118:25
165:14
**piece** 138:13 240:3
**pitches** 82:4
**place** 18:6 25:7
124:19 125:3
126:9 127:7
136:17 141:10
148:8 151:11,11
153:8,9 198:2
214:20 238:17
266:20
**placement** 43:22
43:22 98:6 211:10
211:21
**placements** 97:16
97:17,23 98:4
103:1 176:25
212:5 213:17
**places** 67:19 147:1
152:21
**placing** 160:6,24
161:7
**plain** 5:6,9,13,17
115:21 116:8
119:3 129:4
138:14 140:13

157:11,18 165:2
165:11 194:23
**plaintiff** 8:13
**plaintiffs** 2:2 13:4
13:5,10 14:11
19:16 23:2 24:16
24:17 26:11 27:2
33:24 34:9 35:23
36:22 38:8,11
76:5,12,18 77:14
108:13 138:12
174:16 248:24
253:3 261:1
**plaintiffs's** 76:13
**planned** 204:16
213:12
**planning** 176:18
227:14
**plans** 42:7
**play** 151:4 245:11
247:10
**pleasant** 2:10
**please** 9:11,20
20:24 25:18 29:21
54:15 78:2 83:20
86:13 87:6 91:12
118:5 124:2 152:4
177:7 193:8,21
206:3 214:25
268:11,11
**plethora** 153:24
**pllc** 1:22
**plus** 104:22 202:1
258:1
**po** 142:16
**point** 28:3 43:5,8
43:11 44:15 69:10
81:2 111:20 118:5
121:7 132:19,20
143:17 161:12
211:10,12,14,16

212:21 220:21
222:23 224:2
**pointed** 25:20
169:6
**points** 46:19 98:25
**police** 141:5
**policies** 73:8
123:13 160:23
161:4 163:4
184:17 185:17
201:23
**policy** 73:1,5,6
120:16 122:19
123:10
**polster** 1:8
**poor** 195:5
**populating** 240:23
**port** 247:6
**porter** 3:11 9:5
**portion** 81:3
**posed** 220:14
**position** 5:4 11:17
12:16 28:16 30:20
31:9,16,21 33:18
50:6 51:10,16
52:19 56:11 67:9
67:10 69:18 70:7
90:19 91:1,9
108:4 110:17
111:13,22,24
112:17,18 114:19
148:5 154:2
158:10 182:16
198:9,12,23 199:3
199:20 209:1,25
264:6
**positions** 43:12
52:10 54:4 55:20
79:7 106:13,23
107:17 112:12,14

**positive** 62:9
186:24 187:7
214:23 227:7
235:2
**possibility** 168:24
247:19
**possible** 136:16
139:15 142:16
154:8 171:5
238:23 247:20
**possibly** 100:12
170:1 262:13
**post** 258:5
**posted** 116:9
**posting** 111:12
**potential** 37:9,18
188:17
**potentially** 137:7
212:13 248:23
**pounds** 247:4
**poverty** 148:17,21
149:6,16,24 150:2
150:10,21,25
151:21 152:11
**powerpoint** 185:6
**ppla** 214:6
**practice** 71:12,18
71:21,23 114:17
120:16 122:20
154:5 180:22
181:3 200:8
206:15
**practices** 5:19
114:10,17 123:13
127:1 154:1 165:5
165:13 172:6
187:2,11 192:21
242:23 257:6
**predecessor** 91:4
91:6 134:4 256:25

prefer  155:1
preference  129:17
prenatal  235:2
prep  18:17
preparation  14:15
prepare  184:16
  210:8
prepared  71:6
  95:1 169:17
  215:13,25
preparing  185:10
prescription  1:5
  8:6 32:16,17,25
  33:1 35:10,16
  36:18 37:7,19
  38:17,22 40:11
  67:13 244:22
  245:20 246:12
  247:17,18 268:6
  269:3 270:3
prescriptions
  32:23 38:4
presence  266:15
present  3:21 8:9
  12:22 14:20 16:8
  20:14 76:13,14,18
  113:3 151:24,25
  219:19
presentation
  166:24 167:10
  173:2 180:16
  184:19 185:9,23
  186:7 209:13
  210:17 213:8
  220:3,16 222:7
presented  55:21
  55:22 184:17
  185:16
presently  31:18
press  96:10 116:21
  117:6,15 118:2

119:11 133:1
  162:3 173:11
  227:4
pretty  22:10 36:4
  71:20 102:23
  220:22
prevalent  55:10
  66:19,20 67:24
  146:6
prevention  5:8
  115:24
previous  99:3
previously  19:19
  87:18 250:22
primary  27:7
  62:22 87:11
principles  53:25
  123:17
printed  135:18
  139:14 228:9
printout  228:7,17
prior  21:14 144:21
  158:20 162:3
  182:24 262:4
  263:1 264:16
priority  141:3
pristow  91:19
private  13:17 89:9
  89:19,20 207:2
privately  206:12
privilege  18:6,8
  26:1,8,13,14 29:14
privy  24:3,5
pro  216:9
probably  54:16
  70:19 184:23
  207:19 215:25
  216:3
probation  51:15
  51:16 52:4,8,10

problem  10:9
  85:13,14 107:5,14
  107:23 120:13
  125:23 129:25
  147:18 152:13,15
  152:23 161:10
  163:3 189:20
  217:9 242:24
  243:6,14 249:15
problems  84:1,10
  84:19 98:21
  101:24 125:6
  152:20 154:11
  163:6 169:8,14,17
  217:11 251:13
procedure  9:14
  124:19 265:7
  269:5 270:5
procedures  160:3
  163:4 184:17
  185:17 187:1,10
  187:15
proceedings  51:23
  52:12
process  26:24
  36:14 44:12 65:23
  82:5 105:15
  138:25 159:15,16
  206:15
processing  106:21
produced  108:18
  112:5 174:14
product  18:12
production  268:15
  268:17,22
professionally
  30:14
professor  84:13
  164:17 167:18
profile  116:22
  182:14 195:3

program  61:14,23
  61:24 62:8,9,9
  63:10,24 69:5
  73:11 74:25 75:2
  93:8,9,21 145:12
  178:6 204:10
  205:20
programmatic
  204:13
programming
  60:16,17,21,24
  86:14,17 103:3
  230:1
programs  60:17
  61:10 62:17 65:16
  84:6 92:1 104:6
progression  66:25
projected  176:3
prolong  263:6
promulgated
  147:3
property  45:12
proposal  72:25
proposals  81:17
proposing  73:6
prosecution
  104:18
protect  42:5
  148:24 167:20
protected  141:20
protecting  87:4,11
protection  18:12
protections  160:5
  160:24
protective  48:5
  49:25 51:24 104:4
  120:23 123:1
  126:4,11 141:11
prove  144:17
provide  66:10
  68:15 126:21

258:24
**provided**  9:13
35:21 87:21
164:22 197:21
**providers**  34:25
166:25 207:9,11
207:14
**providing**  37:16
113:20 176:4
**provision**  53:12
69:22 88:19
107:23 128:16
220:24 223:11
**pry**  13:23
**psychology**  49:13
**public**  1:23 41:1
104:18,24 199:21
266:7 267:14
269:10,18 270:15
270:23 271:23
**publicized**  168:18
**published**  138:21
139:2
**pull**  47:5 154:20
220:4 238:18
239:5 257:22
258:9 260:15
**pulled**  118:8
162:20
**punches**  220:5
**purchase**  113:25
**purdue**  1:11
**purpose**  14:1 90:1
**purposes**  108:7
115:25 129:9
157:16 165:6
174:10 179:4
192:6 196:16
202:25 208:14
227:22

**pursestrings**
105:21
**pursuant**  265:3,6
**pursue**  49:8
**pursuing**  29:18
31:2 32:5
**pushed**  62:18
**put**  53:23 57:14
79:15 136:15
166:3 193:3
206:24 255:17
**puts**  44:8 245:15
**putting**  136:18
186:14 241:7

**q**

**qualified**  266:8
**quality**  187:1,10
**quantified**  106:5
**quantify**  81:13
**quarter**  95:11
176:4
**question**  10:19
15:13 21:24 25:23
25:25 26:12,15
29:20 36:1 44:7
59:6 82:2 87:6
88:3 91:11 97:9
101:14 111:18
115:6 136:5
149:21 152:4
168:5 170:23
181:17 201:19
202:5 209:17
222:15 223:2
236:2 250:8,25
253:20 255:15
259:12 261:25
**questions**  5:8
10:18 11:3 19:25
24:25 25:1,3
43:10 46:18 77:10

115:23 220:14
225:4 248:13
249:7,14 250:3
252:23 253:4
255:23 256:15,17
261:1 264:17
**quick**  10:7 210:6
249:10
**quickly**  182:5
224:14
**quite**  195:20
**quote**  122:6 126:1
127:3 159:16
167:13 170:8,13
171:10 175:18
**quoted**  88:23
121:11,23 167:14

**r**

**r**  3:11 203:22
**ra**  236:2
**raise**  5:8 115:23
**raised**  46:19
**rally**  167:5
**rampant**  67:18
**ramping**  93:8
**ran**  229:2 236:2
**range**  60:4 174:20
180:21 192:11
208:20
**rate**  107:2,6
**reached**  13:9
**reacted**  121:25
**read**  22:3 84:5
135:17 141:14
145:18 148:25
149:1 153:3
160:13,17 181:19
195:18,19 269:5,6
269:12 270:5,6,17
**reading**  21:21
268:19

**ready**  213:1
**real**  10:16 14:1
100:16 109:21
223:18 249:10
**really**  18:1 22:10
34:15 36:8 65:11
100:25 101:16
105:18 110:18
123:9 143:1,2
153:23 195:25
210:24 212:24
229:5 235:19,20
252:14 259:22
262:24
**realtime**  233:19
249:10
**reapplied**  112:17
**reapply**  112:12,14
**reason**  96:8
134:24 138:1
154:25 268:14
270:8 271:3
**reasonable**  212:7
**reasons**  144:7
151:19
**recall**  17:11 18:2
23:15 25:12 27:1
27:8,14,17,24 28:5
57:7,13 58:20
59:8 61:5,10 62:1
62:10,14,15 63:4
63:15,22 64:15
65:1,2,7,11,11,21
66:8,14 67:4,7,8
68:9,23,25 69:3,5
69:7 72:12,15,21
72:24 73:3 74:3
75:7,8 79:4,10,18
79:22 80:2,3,24
81:17 86:17,20,20
88:11,14 89:13,18

89:20,22 90:2,6
91:7 93:11,12,17
93:18,19,22 97:19
97:21 100:6
104:15,25 105:18
106:9,18,19,25
107:1,12 110:19
113:18 115:5
119:22 120:1,15
120:18 121:14,19
121:22 122:13,15
123:22,25 126:13
126:15 127:15,22
136:7,19,20
137:24 138:10
139:8,9 140:8
142:12 143:1,2
146:9 158:13
163:13 165:19,22
166:18 168:16
169:15 170:16,17
170:24 172:9,18
172:20 176:24
178:10,13,15
184:20 196:10
199:6 205:4
210:19,24,25
250:9,16
**recalled** 27:18
**recanted** 117:24
**receipt** 268:18
**receive** 15:17,19
232:9
**received** 121:7
183:20 185:15
257:17
**receiving** 87:16,16
87:18
**recess** 75:22 131:3
224:20 249:21

**recession** 148:16
148:20 150:4
**recipients** 175:11
175:11 209:21
**reco** 20:15
**recognition** 240:7
**recognize** 103:17
**recognized** 75:3
195:10
**recognizing** 73:20
**recollection** 27:4
28:1 29:1 126:25
169:13
**recommendations**
6:1 114:18,24
115:4,10 166:10
166:17 171:16,21
172:5,20 181:5
191:2,7,11 192:4
193:9,13,25 196:8
200:8 202:9
**reconsidering**
161:17
**record** 8:2 9:20
10:9,12 36:10,11
44:19 75:20,23
108:12 130:18,21
130:24 131:1,4,23
224:18,21 240:17
242:10 248:15,17
249:11,17,19,22
255:14 264:20
270:9
**recording** 154:18
**records** 119:4,10
168:14 183:19
**red** 160:2
**redlining** 73:7
**redo** 96:13
**reduce** 213:10,16
213:20

**reduced** 87:19,21
216:15 266:14
**reed** 2:14 8:17,20
**reedsmith.com**
2:18,19
**refer** 108:25
200:10
**reference** 268:7
269:2 270:2
**referenced** 98:3
193:6 230:6
266:13,18 269:11
270:15
**references** 120:6
**referencing** 65:14
160:19
**referral** 204:10
**referrals** 120:10
**referred** 21:1,2
114:13 116:4,7
176:23 209:14
**referring** 21:3,6
32:12 40:14,15,15
67:17 124:5 158:1
160:22 203:10
251:18,19
**reflected** 118:5
**reflects** 255:14
**refresh** 17:23
201:20
**regarding** 206:14
265:2,11
**regardless** 132:19
241:17 245:14
**regards** 166:19
**regina** 5:23 94:17
94:20 178:25
179:13
**regular** 55:22
**regulations** 42:8

**relate** 23:12 38:23
51:23 60:22
258:14
**related** 22:2 23:10
25:15 52:11 77:24
131:15 137:14
204:14 234:23
235:1 245:20
**relates** 1:9 24:22
25:24 40:11 98:5
227:5 261:20
**relating** 28:17
29:17,18 31:2
32:5 39:23 40:9
41:1 43:7 51:19
51:22 52:13 61:3
73:4,23 77:14,20
77:22 79:12 85:11
89:16 120:16
183:2 235:9
242:11 258:23
259:24
**relation** 132:11
**relations** 199:21
**relationship** 11:21
26:8
**relationships**
200:21
**relative** 267:2
**relatively** 197:5,6
**relay** 28:13 225:5
225:16
**relaying** 27:1
**relevant** 143:17,18
149:7,11 150:12
150:21
**rely** 141:5
**relying** 155:3
**remain** 189:15
**remained** 90:20

[remarks - reviewed]

**remarks** 169:17
170:4
**remember** 10:16
22:8 23:1 25:2,10
54:18 57:9 58:15
60:23 62:25 63:16
63:18,19,23 64:7
64:11,19 65:10
68:5 69:25 72:5
73:19 74:6 75:12
75:14 77:10
104:16,19 125:1
132:1 138:19,24
139:3,10,11 156:7
156:12 159:5,8,13
168:13 172:24
196:6 200:1,5,17
200:19 201:12
205:20 206:5
220:12 229:17
253:14,23 262:22
262:25
**remotely** 8:10
**remove** 141:9
**removed** 161:15
195:4
**renaming** 48:20
**repeat** 19:19 29:20
54:15 55:15,16
87:6 91:11 170:23
**repeatedly** 162:7
**rephrase** 262:8
**replace** 162:15
**replaced** 161:25
**report** 6:2 44:5
96:24 97:20
120:13 180:9,22
181:14 182:4
183:21 191:24
192:4 193:10,14
194:1,7,15 200:25

201:5,22 211:15
215:23 224:3
228:20 229:3,21
230:3 231:16
232:1 236:10
**reported** 52:25
210:1
**reporter** 4:17 9:11
10:10,22 255:17
269:7
**reporter's** 4:14
266:1
**reporting** 56:13
**reports** 56:7 66:15
83:6 96:16,20,21
97:3,5,6,11,11,15
97:15 99:25 100:7
100:7,10,22 120:8
124:25 184:18
185:17 186:15
193:25 194:4
210:8 216:7
229:18 232:4,9,12
**repres** 117:20
**represent** 8:11
12:22 14:22,25
15:7 20:3 26:12
228:2 234:1
**representation**
13:11,14
**representations**
23:15
**representative**
10:15 23:2
**representatives**
207:9
**represented** 12:24
13:6,21 228:16
**request** 97:12
228:19 229:4
270:9,11

**requested** 265:1,6
265:10
**requesting** 66:4,10
**require** 5:15
157:14,22 195:11
**required** 137:9
268:25
**requirement**
216:15
**requirements**
242:10
**requiring** 163:3
**research** 120:20
**reservations**
248:19 264:16
**reserve** 158:5
167:19
**reside** 28:10
**resident** 33:24
90:7
**residential** 213:17
256:8
**residents** 194:18
**resources** 53:19
57:16 189:25
190:8,12
**respond** 149:21
**response** 111:12
195:16 229:3
255:15,20
**responsibility**
42:17 114:4 166:4
187:21
**responsible** 101:4
113:8 188:6
**rest** 127:8 191:6
**restraints** 58:4
**result** 142:14
187:15 201:4,21
202:2

**resulting** 122:25
195:5
**results** 183:12
**resume** 109:15,20
130:10
**retail** 39:21
**retained** 4:17
13:25 14:3,7
**retention** 242:10
**retrospect** 154:10
**retrospective**
155:3 237:17
242:20
**return** 48:3
**returned** 31:11
172:12 212:6
268:18
**reunification**
145:14
**reunified** 212:12
212:14 213:2,3
**reunited** 163:8
**reveal** 225:23
226:8 227:16
**revealed** 21:20
**revealing** 225:17
**review** 14:15
96:13 101:1,2
114:9 131:14
133:12,15 154:10
162:9 163:7,12,22
165:25 180:22
181:3 183:3,13
195:14 200:8
212:9 216:1
237:17 249:9
265:2,6 268:12
269:1 270:1
**reviewed** 15:20
182:19 204:6

**reviews** 96:14
**reward** 176:5
**reyes** 199:25
**ribbon** 84:4
158:19,24
**rice** 2:9 132:4
250:2
**rick** 209:14,16,19
209:20,24
**rid** 214:12
**rideout** 30:8 90:23
91:10,15 92:14
174:1
**ridiculous** 212:22
**right** 10:10 12:18
18:16 22:6 30:19
32:3,7 42:3,20
45:3 53:4,7,25
56:8 58:1 62:3,5,7
73:13,16 86:3,8
90:14,16 100:21
104:9,12,22 105:9
108:22 111:5
113:16 114:25
118:9 121:18
123:19 128:2
141:14 144:22
145:18 147:19,20
148:2,9,25 149:1
153:22 155:5
156:20 157:6
159:20 163:24
165:15 166:23
170:5 173:24
174:2,24 180:17
195:18 197:23,24
198:1 200:22
203:14 212:24,25
213:13,21 216:2
216:23 218:3
221:18,19,21

223:24 225:19
230:1,10 232:19
233:6 235:23
237:22,23 238:9
239:19 240:22,25
242:17,25 243:1
243:23,24 248:9
249:18 254:4,7,11
255:7,11 256:9
257:9 258:18
260:24 261:8
263:3,11,14
**rigorous** 47:17
**ring** 47:1 64:16
68:18 72:13
171:12,18 176:8
205:12 206:16
**rings** 64:18 72:15
**rise** 218:24
**rising** 148:21
150:9,20 151:23
220:8
**risk** 44:8 166:3
195:1,14
**risks** 167:2 169:8
**robin** 206:12,25
**role** 51:14 119:25
140:16 163:18
164:21 192:24
**roles** 147:3
**rolled** 263:11
**room** 10:21 19:14
**rose** 58:16
**roughly** 69:19
93:15 107:10
244:19
**routes** 33:3
**routinely** 70:16
120:14
**rpr** 1:25

**rule** 130:25
**rules** 9:13 10:7
11:10 25:21 26:15
42:7 47:15 123:8
241:20 255:24
265:3,7 269:5
270:5
**run** 87:2 96:16,19
96:24 97:1,3,3,6,7
97:13,20 100:2,10
124:24 228:18,20
229:21 231:25
232:4 236:5,7
**running** 45:3
**runs** 184:9
**rush** 36:7

**s**

**s** 268:15 270:8,8
271:3
**s.t.a.r.t.** 61:14,23
62:8,8,11 63:10,24
64:9 73:12,12
93:8,9,15,21
**sacwis** 45:2,5,20
46:15,21,23 47:3,7
47:12,25 96:15,17
96:20,25 97:4
98:16,21 99:1,6,21
100:8 133:14
134:4,8,10,18
135:1,7,16,21
136:17 137:6,11
147:1,22 148:8
153:18 156:9,16
157:4 169:2,3
216:7,15 217:10
228:17 229:15,19
229:22 230:5,14
230:16 232:23
235:13,20 236:21
237:10,14 240:24

241:8,11,20 242:6
252:5,9,12 256:16
256:25 257:22
258:7,10,22 260:3
261:4,16 263:10
263:22,25
**safe** 42:6,13 59:24
**safer** 166:5
**safety** 50:25 87:4
87:11 141:3
143:12 163:6
**san** 2:23
**sarcasm** 240:15
**save** 5:12 129:7
**saving** 176:6
**saw** 56:18,21
250:14
**saying** 27:8 102:3
111:8 117:18
127:15 146:16
162:8 167:24
172:9 176:20
204:4 235:19
247:21 250:9
255:22
**says** 5:18 10:12
18:16 109:4,15
111:11 113:7,20
113:23 114:7
118:13,23 119:3
120:20 121:4,24
124:3 125:22
126:18 127:4
128:5 137:21
140:14 142:2
143:3 145:5
148:15 159:14
161:23 162:19
164:1 165:3,12,25
166:8 167:15
175:23 177:7,14

178:2 181:3,15
182:13 184:15
185:16 186:24
187:7 188:4,16
189:7,13,24 190:7
193:7,8,19 194:25
198:8 200:7 204:8
205:6 206:9,11
207:7,22 211:3,9
213:9,22 215:16
216:6,14 217:15
218:23 219:15
231:18
**scale**  204:11
205:12,14
**scan**  239:16
**scanned**  134:15
239:17,25 240:2,4
240:5,20,21
241:17
**scanning**  239:24
**scheduled**  206:14
**scholer**  3:11
**school**  44:6 119:15
120:3,12,17
151:16
**schools**  120:9,10
126:19 127:5
151:15
**scope**  161:9
**screen**  235:3
**screening**  138:25
**screens**  260:1
**sct**  206:15
**seal**  267:6 269:15
270:21
**search**  229:24
**seated**  163:3
**second**  113:2
118:24 142:2
161:9 166:8 180:2

182:11,13 188:3
188:15 189:23
190:7 198:7
216:14 231:4,7,8,8
231:9 249:9
**seconds**  74:11
**secretary**  179:14
**section**  206:3
207:6,22
**sections**  184:5
186:16
**see**  11:3 12:10
17:7 21:5,15 50:9
57:3 59:3 68:1
69:19 96:12
108:22 109:17,22
110:24,25 111:9
111:10 113:12,13
114:1,11 118:6,17
119:1 120:24
121:17 122:4,5
124:13,14 126:7,8
126:22,23 127:10
127:11 128:9
132:14 138:17,18
140:19,20,24,25
141:12 142:8,9
143:13,14 151:15
157:24 159:17
160:7,8,13 162:11
162:12 163:9,10
164:3,5,6 166:6,7
166:14 167:7,8,21
169:10,11,22,23
172:7,8 173:14,15
175:9,13,21
177:10,16 178:8
180:6,7,24,25
181:8 182:7 184:4
184:12,13 186:20
187:3,12,23 188:8

188:9,22,23
189:10,17,18
190:2 191:8
192:18,19,22,23
193:11,14,15
194:20 197:16
202:7 209:6,15,22
211:6,7,23,24
212:9 213:14
216:20,21 222:18
224:14 228:8
229:13,14 230:19
230:22 231:20,21
232:2 233:25
234:10,11 235:4,7
236:13 237:7
241:2 243:16,17
247:7 250:7 260:1
260:8,9
**seeing**  54:5,6,8
66:21 67:21 68:14
69:13 70:11 221:5
222:16,21 246:11
**seek**  141:8
**seen**  17:8,18 94:18
144:17 194:3,6
223:17 228:9
229:18 235:17
243:10 244:3,6,9
244:16 245:19,24
246:1 251:23
254:9,13,19
**seep**  222:19,19
**seizure**  247:3
**selection**  184:3,10
**send**  173:3 255:11
257:9
**sender**  174:22
**sending**  110:16
**senior**  125:24

**sensational**  140:23
**sense**  10:25 11:1,7
16:10 26:1,18
36:15 43:14 54:17
78:15,16 105:11
107:13 109:2
117:3 118:10
157:6 164:18
198:4 251:12,14
**sent**  99:16 110:22
145:8 160:1
197:25 199:16
**sentence**  111:11
118:12 162:19
164:1 184:14
188:16
**separate**  42:19,20
43:19,24 44:19
193:24 241:19
**september**  162:10
267:17
**ser**  228:20
**series**  171:9 191:7
**serious**  169:18
195:6 219:17
**serve**  64:4 189:15
**served**  142:5
**service**  119:5
189:14 206:10,25
216:18
**services**  5:5,11,14
5:19 10:3 12:13
12:14 27:6 28:20
31:14,25 33:20
41:2,20,25 42:10
42:18 43:18 44:2
48:5,6 49:24,25
50:2 52:2,23
53:13,13 54:13,22
55:2,3,5,21 56:16
57:11 58:6,21

59:14,25 60:13,14
60:21 63:3 65:5
68:16 69:22,23
70:3 72:11 73:2
73:22,25 75:5
78:8,9,11,24 79:3
80:8,11 81:5 82:8
83:13 84:4 85:19
86:12,14,17,25
87:16,17,18,20
88:14,19 89:8
90:13 91:15 92:10
93:24 104:4,5
105:9,22 107:24
108:6 109:6 110:3
111:14 113:21,22
113:23,24,24,25
116:12 121:8,10
124:4 126:4,11
128:16,17,24
129:6 138:8
139:19 140:18
141:11,19 144:3
144:15 145:3
146:12 147:11,24
148:22 149:8,12
150:6,10,13,19
151:2,6,24 157:12
157:21 159:1
160:5 161:13
165:5,13 166:11
166:25 170:19
171:1 172:6,11,14
173:13,17 178:19
180:4 181:6
182:17 189:8
191:15 198:11
199:5 200:17
204:7,16 205:6
206:25 208:25
211:4 220:24,25

223:11 226:18,24
231:1 242:4 243:6
254:17 259:3
**serving** 188:6
**sessions** 193:1
**set** 72:18 73:10
120:11 202:19
267:6
**setting** 39:22 43:4
49:21 106:21
**shakes** 255:17
**share** 125:22
206:14 207:5
**shared** 204:9,12
**sharpen** 187:21
**she'd** 95:10
**sheet** 177:15 208:7
260:12 268:13
270:7,10,18 271:1
**sheriff** 124:24
**sheriff's** 119:13,19
119:24 125:14
**shift** 52:13 69:13
**shkolnik** 1:22
18:17
**shook** 255:14
**short** 99:5 215:23
215:24
**shortage** 148:22
150:10 151:2,23
**shorter** 192:10
**show** 118:1 176:21
242:21
**showed** 20:15
**showing** 21:4
208:9
**shown** 17:12 18:11
18:18,25 19:4,7,11
19:13,17,20 20:22
268:16

**shows** 120:21
211:20 248:5
**sic** 79:17 256:3
**side** 52:11 84:16
**sign** 112:4
**signature** 112:4
265:5 267:13
268:14
**signed** 269:13
270:18
**significant** 60:11
163:4 189:14
252:1 256:4,9
**signing** 268:19
**similar** 78:14
171:17 251:9,12
255:6
**simplistic** 59:21
**sincerely** 268:21
**single** 143:5,16
148:18 149:11,17
163:3
**sir** 234:19 268:10
**sit** 101:10
**site** 189:24 190:7
190:11,20 204:15
**sitting** 18:15 73:18
137:8,25 225:22
243:3
**situation** 44:8
136:2 212:23
**six** 41:22 121:6
128:8 143:10
159:23
**sixth** 126:17
**slashing** 63:9
**slide** 211:9 214:24
**slides** 216:1
**slow** 66:24 67:5
**smaller** 55:18
231:5,12

**smarter** 176:17
**smidge** 263:7
**smith** 2:14 8:17,20
**social** 56:14 58:4
143:12 166:25
167:18 195:8
216:14
**societal** 80:10
**socioeconomic**
224:1
**sold** 37:1
**solicit** 167:5
**solutions** 3:8
268:1 271:1
**somebody** 13:3,9
21:20 26:7 30:13
32:24 90:8,8 94:9
94:12 95:1,2
96:24,25 126:3,11
163:23 215:25
227:3 228:19
229:2 233:10
235:10 238:18
256:3,7
**somewhat** 91:2
250:18
**son** 119:21 128:4
**soon** 171:9
**sophisticated**
56:13
**sorry** 12:7 23:7
25:16 36:2 50:9
50:17 51:9 71:2
72:21 80:2 85:4
99:2 100:17,20
109:8 115:7
122:14,17 128:20
136:20 149:22
160:11 165:21
167:2,14 170:22
171:24 173:22

174:18 175:10
177:2,3,13,13,13
185:1 187:6 190:3
193:15,20 198:7
205:16 206:19
209:11 217:6
234:11 250:24
260:23 263:6,18
sort  31:24 33:17
50:23 51:14 58:22
67:12 69:4 95:6
95:14 100:11,15
116:15 120:13
128:13,22 133:5
136:24 137:9
138:20,25 142:24
154:10 167:23
176:22 179:23
210:16 221:9
226:9 229:25
237:2,14,16 241:1
241:7 244:21
sorts  43:23 68:19
69:20 72:2 81:12
82:4 94:21 100:22
102:2 237:6
sound  104:22
124:15 167:23
169:24 172:16
235:23
sounds  191:16
200:4
source  123:12
133:10
sources  89:9 98:17
south  2:10 3:4
southeast  69:12
speak  10:17 67:6
70:2 107:7 121:21
123:9 206:12

speaking  46:14
151:1
special  120:11
140:13
specialist  95:15
252:9
specialists  158:2
specialized  64:2
specific  27:11,25
38:3,4 44:18
70:10 72:25 73:1
97:11 101:21
213:9 223:8
226:19,22 233:10
234:23,25 235:8
237:7 251:23
257:24
specifically  28:19
37:20 65:7 66:13
67:21 73:23 102:3
188:17 222:7
234:3 259:12
263:5
specificity  232:21
232:22 233:9
258:25 259:23
specifics  27:17
57:8 72:16 92:19
229:25 238:19
246:10
specified  266:21
speed  24:8
spend  99:20
116:24 216:16
spending  97:25
98:4 101:5 104:5
spent  60:8 81:3,4
102:25 176:15
spike  54:8 58:12
splits  155:22

spokesman  126:18
spot  119:15 120:3
126:20
spray  244:7
spreadsheet  6:11
95:2 227:21 228:7
228:14
spreadsheets
95:10 100:13,14
square  1:23
126:24
squares  180:12
ss  266:3
stacked  159:16
stadium  142:7
staff  52:6 54:12
64:13 74:22 78:25
96:17 98:18 99:19
100:4,5,23 101:3
113:10 120:12
124:10 125:15
139:1 162:21
169:20 172:21
184:16 185:16
194:25 197:3,5
204:9,18 205:19
207:8 216:16
221:23 241:7
256:18 260:3
staffing  55:23
56:17 58:2,21
62:18 63:1,9 73:1
79:13 86:2,9,12
91:25 93:9 104:5
107:23 201:23
217:15 218:12
219:5
stage  258:21
standard  71:20,22
stark  2:7 8:15 9:24
12:16,23 13:18

spokesman  16:8,23 19:15
26:6 29:15,18
31:11,12,13,23
32:4,5 42:23,24
43:2,4,9 76:12
92:4 108:13
131:19 132:9,12
155:21,25 239:14
242:3 246:9
261:13,14
start  45:25 48:8,9
61:23 62:11 182:4
229:12
started  16:14
20:23 27:3 48:11
50:5,15,16 51:16
51:16 62:8 66:20
67:20 69:5,8 83:4
210:4,20 212:8
229:16 237:22
247:17 248:6
starting  113:1
181:2 211:2 220:9
222:18
starts  110:22
140:12 180:20
188:16 191:4
192:12 204:4
starved  168:6
starving  168:9
stat  220:16
state  9:19 41:12
42:8 45:1,17 46:9
55:9 63:20 72:11
88:18,24 96:18
97:1,7 99:10,16
113:9 114:8 123:6
123:11 148:20
150:4 151:21
156:8 178:11,14
178:17 192:22

214:11 215:7
217:12 228:23
266:2,7 267:15
269:10 270:15
**state's** 46:10 88:12
178:4
**stated** 132:7
**statement** 47:18
47:19 131:21
138:20 145:20
162:23,25 169:10
170:15 215:11
269:13,14 270:19
270:19
**statements** 117:2
117:6
**states** 1:1
**statewide** 47:21
72:7,9,14,19 81:23
90:9 155:22 157:2
**statistics** 55:8,21
95:16 210:7
**stats** 142:10
**status** 214:16
**stay** 203:8
**staying** 249:17
**stenotypy** 266:14
**step** 71:1 122:16
162:8
**stephen** 1:25
266:6 267:14
**steps** 84:15 106:22
200:15 201:4
**sticker** 108:14
**stood** 99:7
**stopped** 91:15
119:15 120:3
143:9 194:8 259:2
**stories** 116:19
194:23

**storm** 171:16
**story** 116:8 118:13
120:4 128:4
225:17
**straddling** 62:24
**strain** 57:14
**straining** 220:23
**street** 2:16,23 3:4
3:12,17 32:18
**strengthen** 188:4
**stressors** 195:9
**structural** 85:13
85:14 86:9 188:12
**struggling** 188:20
**stuff** 86:23 135:1
260:1
**subject** 175:14,20
197:19 200:7
264:15
**submitted** 140:10
**subparts** 191:8
**subscribed** 269:10
270:14 271:21
**subsequently**
198:13
**substance** 24:23
53:9,11,16 54:6,8
58:11,12 59:5,11
61:2,12 62:12,13
62:20 64:3,5,22,24
65:6 66:11 79:2
79:16 80:7 92:9
92:16 101:17,21
131:16 145:6,21
145:23 146:5,13
146:22 148:1
158:25 159:2
163:19 164:21
166:13,19 168:12
188:20 189:25
190:8 219:17

220:8,18,23
221:15 222:16
231:23 236:12
243:7 244:20
245:10 251:13
254:10,18 258:15
258:15,24,25
261:21
**substances** 145:24
147:9 189:3
254:24
**substantially**
188:18 245:3,7
**substantive** 76:24
**substitute** 213:23
214:2
**success** 189:9
**successfully**
171:15
**succession** 90:25
**successor** 30:7
**successors** 174:1
**sudden** 105:6
**sued** 34:3,17 35:1
35:6,12,17,19
36:19 38:22 39:1
39:22 40:19
**suffered** 143:7
**suggest** 122:1
130:1
**suggested** 206:4
**suggestions**
195:15
**suggests** 161:10
**suing** 34:11 78:4
**suite** 1:23 2:4,16
3:17 268:2
**summarized** 71:7
**summary** 6:7
114:3 202:23
204:5

**summit** 2:8 12:3
28:22 29:4,8
39:18 41:6,21
43:7,12 46:4
47:14 53:2 56:11
61:1,6 63:2 67:10
67:17,23 68:2,16
69:11 78:14,21
79:21 131:24
256:22
**sup** 239:7
**superior** 268:1
**supervises** 124:11
**supervising** 124:5
**supervisor** 52:24
**supervisors** 162:7
162:21
**supplement** 76:3
131:9 225:1
**support** 42:17,21
43:18 66:10 128:7
144:6,8,25 148:22
150:10 151:23
177:14,16 190:20
195:12
**supported** 206:11
**supportive** 113:23
**supports** 204:8
**suppose** 60:5
104:14
**supposed** 25:22
36:19,23,25 37:2
40:1 93:16 147:4
207:5 216:12
**supposedly** 114:21
**sure** 10:8,14,22
11:11 15:2,2,14
17:16 21:10,23
26:21 28:8 29:22
33:21 36:10,21
42:9,12 43:5 45:9

46:25 51:8 52:21
55:16 71:8 74:16
74:17,20 76:8
78:4 80:4 82:6
83:8,10 84:5,18
97:8 98:15 99:23
109:24 113:6,15
113:19 116:25
125:16 132:3
136:5 141:20
143:24 152:5
163:17 167:12
182:2 184:20
186:9 196:19
200:2 204:25
207:4,21 214:2
223:16 225:13
249:16 254:12
255:13,19
**surf** 151:10
**surplus** 176:1,21
**suspect** 144:16
**suspected** 120:8
**sustained** 77:19
78:18
**swear** 9:11
**switched** 215:24
**sworn** 9:14 111:4
266:10 269:10,13
270:14,18 271:21
**symbol** 207:7
**system** 45:2 99:3
120:11 121:20
124:22 126:14
127:6,6 134:5
147:13 159:24
205:19 212:11
216:7 217:11
219:10,11 221:17
239:17 244:20
245:15 257:1

**system's** 98:12
**systemic** 161:11
**systems** 188:6
189:15

**t**

**t** 203:22
**tab** 231:4,7,8,9,10
233:24 234:13
236:10 241:2
258:17 260:2,11
**tabs** 228:6,10,13
228:21
**take** 10:17 11:5,6
22:25 32:24 36:8
51:24 52:7 71:1
79:13,13 117:17
118:4 123:14
129:13,18 130:3
130:10 135:24
147:25 172:13,22
186:22
**taken** 1:21 57:22
75:22 81:12 123:1
123:15,18,24
151:18 170:10,20
171:3 213:20
224:20 245:21
246:12 249:21
266:20
**takes** 198:2
**talk** 23:9 43:9 76:5
76:23 84:11 91:3
92:19 131:11
226:9,11,20,25
227:11 249:13
**talked** 52:11 84:21
90:23,24 91:8
125:5 182:23
252:4 257:4
**talking** 10:23
40:16 53:5 111:5

116:20 139:11
159:23 176:24
182:12 204:20
205:22,23 221:8
221:10,12 223:1
240:23 257:10,13
261:3
**talks** 10:21 118:20
162:18 171:14
180:8,16 205:18
231:22
**tamara** 199:2
**tammy** 207:19
**task** 72:17 162:9
163:1 164:2,9
173:10
**tdm** 205:23
**teachers** 119:15
120:3,12 141:6
**team** 185:25
187:22 205:23
206:10
**teleconference**
2:21 3:10
**telephone** 22:17
94:3
**tell** 22:13 23:19
24:21 26:11 36:22
38:11 42:2 52:25
70:4 83:24 124:18
127:19 142:19
**telling** 22:21 45:17
**tells** 123:6
**tend** 107:9
**tends** 144:14
**tenth** 93:14
**term** 32:8,22 33:5
33:9 40:24 41:3
215:7
**terminated** 30:5,6
182:20

**terms** 32:10 35:14
36:12 37:8 41:21
42:15 47:11 54:6
54:8 59:4 60:24
73:24 76:24 77:15
87:4 88:17 89:12
91:25 92:8 94:8
105:24 106:21
134:20 149:15
153:25 175:1
176:9 178:11,16
185:9 186:24
225:9 226:15
254:15 256:15
257:7,18
**terribly** 36:8
47:17
**terrific** 148:15
**testified** 19:13,22
**testify** 29:3 43:6
266:10
**testimony** 28:14
76:2 131:8,16
166:17 179:7
224:25 250:13
259:5 266:13,17
269:6,7 270:6,9,12
**thank** 11:13 21:11
26:4,25 203:3
217:19 229:10
234:19 248:9,11
261:23 264:13,19
**themes** 186:20
**therapeutics** 3:15
8:24
**thigpen** 5:23 94:17
94:20 179:1,13
**thing** 14:2 27:7
37:4 46:4 58:22
67:6 69:4,14 77:2
78:21,22 79:21

81:21,22 109:21
112:8 116:15
120:2 128:13
139:7 142:24
143:25 167:24
196:22 209:12
210:14 214:23
219:3 221:9
226:10 243:1
260:12 263:16
**things**   15:20 23:10
23:21 24:8,9,10,14
25:11,12,15 27:12
27:24,25 28:3
43:23 48:13,13
55:9 59:9,16,19
60:4,10,18 64:21
65:10 72:9 80:9
82:17,19 83:3,12
83:21 84:2,7,9
85:5,20 86:24
87:2,7 89:3 95:10
95:13 97:14,18
98:24 101:10
102:2,6,8,9 103:13
103:14,19,25
104:8,10 119:17
127:8 132:25
146:21 147:1,2,14
155:12,19 191:1
200:13 213:6
221:16 227:9
233:25 235:16
240:9 243:10,17
243:18 244:4,6
255:4 257:23
258:14
**think**   10:15 23:7
34:19 36:8,12
37:21,23,24 50:10
50:17 51:4 55:23

57:19 61:19 66:24
69:7 71:19,22,24
72:4 73:14 74:11
75:9 81:2 82:7,13
82:15 85:16,24
91:19 101:19
102:12 104:2
106:12 111:17,19
112:1,8,10,14,16
113:14 115:10
116:3 118:6 120:6
122:8 127:16
129:23,24 130:18
132:5 139:20,22
140:7 143:23
145:25 150:11
152:2,18,19
155:17,17,17
159:12 162:22,24
167:11 173:21
178:20 183:14,15
185:21,22 186:3
199:5 204:25
205:10 207:19,25
209:2 215:22
220:20 223:21
225:2 228:12
233:14 235:15
238:11,13,17
247:19 248:15
251:8 252:22
258:3 264:16,17
**thinking**   92:20
**third**   18:23 114:6
121:25 142:14
211:8 217:15
244:19 245:4,7
255:9,10
**thirds**   121:20
**thirsty**   224:12

**thirty**   268:18
**thorough**   5:14
157:13,21
**thought**   62:19
96:6 101:15
143:18 149:5
150:5 161:14
164:16
**threats**   166:12
**three**   16:2 18:25
30:24 34:8 64:16
109:16 116:2
148:6 190:18
191:23 213:22
234:4
**tie**   258:16
**tight**   105:23
**time**   8:4,9 10:21
10:24 11:14,18
25:13 27:4,22
28:23 30:19 31:10
38:14 43:8,11
46:19,24 47:13,22
48:14 49:18,23
50:1,3,7,7,8,13
51:1 52:9 53:5
54:22 56:10 57:9
58:1,15 59:1 60:9
60:14,25 64:20
65:18 66:18,19,25
67:12 68:2 69:10
69:20 72:6 73:19
74:8,23 75:17
81:2 82:9,10,18,20
83:3,4 86:1,18
89:13,21,25 93:13
95:19 96:6 98:20
98:25 99:5,17,20
102:2,20 103:6,17
104:11,16,19
105:6,15 107:7,22

109:7,20 110:5,9
111:4,20 113:2
116:17,25 117:5
120:16 122:20
123:3,24 124:24
127:21,24 128:18
128:25 129:20
130:4 134:3 140:5
141:22 146:1,7,8
146:20 147:5,6,7
148:2,7 150:25
152:1,14,16
154:18 156:7
158:12 167:24
170:25 172:17
176:19 182:16
186:23 190:16
191:6 196:1,5
197:15 198:9
203:25 205:21
211:10,13,14,16
212:7 215:21,24
216:8,9,16,17,19
217:10 220:2,7,21
221:4 222:5,23
223:22 224:2
230:20,23 233:11
234:12 237:15,25
241:6 244:18
245:3,6 252:13
253:25 257:3,21
258:5 259:13
262:4,5 263:10,17
263:24 266:20
**times**   38:1 117:12
117:16 119:10
121:24 132:24
140:21 144:13,24
155:12 156:13
**tips**   141:5

**title** 109:7 112:11
 157:20
**titled** 5:10,13,17
 129:5 157:12
 165:3,11
**today** 73:18
 101:10 137:8,25
 225:23 243:3
**told** 23:3,21 27:13
 27:16,21 38:9
 112:9 143:10
 222:6 227:13
 229:6
**toledo** 49:4 62:2,3
**toll** 170:9,20 171:2
**tom** 91:19
**tools** 123:6 187:21
**top** 108:15 121:23
 125:21 141:3
 166:8 172:25
 199:10
**torbert** 200:3
**total** 41:22
**tower** 2:16
**tox** 260:1
**toxicology** 235:3
**track** 100:24
 151:9,12
**tracked** 147:16,25
**tracking** 101:4
 146:2,15,19,21
 147:19
**trade** 35:9
**tragedies** 172:2
**train** 120:12,12,14
**training** 65:9
 113:24 119:15
 120:3,17 126:19
 126:25 154:5
 205:19,20

**trainings** 106:22
**tran** 2:22 9:7,7
**transcribed**
 266:16 269:7
**transcript** 4:1
 265:3,6,9,11
 268:11,12 269:5
 269:12 270:5,11
 270:17
**transcription**
 266:17
**transition** 30:11
 52:12 110:23
 111:9
**treatment** 37:16
 40:10 145:12
 204:16 205:6
 225:12 256:8
**trend** 55:22 62:13
 64:23 73:22 88:2
 258:1
**trends** 54:5 58:11
 59:11,12,13,13
 61:2,3 81:12 92:7
 142:21 147:22
 220:22 222:10
 244:14
**trial** 28:15 29:4
 225:6,9 226:12,25
 227:12
**tried** 47:23 102:15
 102:15 117:11
 154:4,6,6 216:22
 216:25
**triggered** 164:4
**triple** 31:15
**trouble** 124:11
 141:7
**true** 12:15 17:4
 22:7 38:18,18
 44:10 47:8 48:1

53:14,21 85:23
 86:4 88:8 89:1
 116:23 134:6
 148:4,11 155:11
 156:25 164:7
 189:2 202:14
 216:8,10,10,11
 218:18,20,22
 219:21 223:19
 261:19,22,22
 264:3 266:16
**truly** 5:15 157:14
 157:23
**truth** 266:11,11,12
**try** 10:21,22 19:1
 28:6 46:23 55:18
 65:3 75:2 81:23
 84:5,6 89:14,20,25
 90:12 102:13
 112:17 117:9
 156:14 158:2
 182:4 212:15,16
 257:7
**trying** 19:23 26:20
 27:23 29:13 43:10
 50:12 51:4 52:15
 53:23 55:17 90:4
 151:17 154:20
 173:3 181:19
 185:20 201:22
 223:20 246:10
 253:14 258:24
**turnover** 107:1,2,4
 107:6,8
**twice** 16:3
**two** 10:23 12:21
 22:12 62:24 64:20
 69:19 110:15
 115:8 116:10,18
 118:13 119:17
 121:20 127:8

128:5 133:4
 136:11 138:12
 140:15 143:6
 155:18 162:16
 164:14 168:5,5,9
 168:10 174:16
 181:21 193:24
 197:9 200:21
 213:16 217:24
 228:1 255:4
**type** 10:23 54:7
 56:8 58:12 80:18
 94:13 97:20
 214:16
**types** 32:15 71:13
 92:8 94:7 104:24
 146:4 212:15
**typical** 142:13
**typically** 247:1
**typing** 10:11
 258:22

**u**

**uh** 45:21 46:14
 52:3 65:20 66:6
 71:11 76:16 84:17
 84:23,25 99:13
 109:18 110:4,11
 111:10 113:4
 117:4 118:11
 125:7 128:10
 133:3 153:12
 159:18,18 170:12
 173:8 177:18,18
 179:18 182:25
 187:24 196:2
 198:3 203:16
 205:14,14 209:7
 211:11 215:10
 225:7 232:3 233:4
 235:12,22 237:9
 241:4 253:6 254:3

261:6
**ultimately** 44:24
49:8 55:19 112:17
119:20
**un** 214:5
**unacceptable**
107:2
**uncertain** 178:6
**uncomfortable**
26:23
**underestimated**
170:9,19 171:2
**underlying** 24:22
46:10 230:5 238:8
238:22
**underspent** 103:4
**understand** 11:2
12:21 15:3 19:10
21:24 26:17,19
28:9 32:22 33:6,8
152:9 178:16
214:5 241:20
**understanding**
19:6,20 33:25
34:10 41:10
173:16 200:16
206:4,6
**unemployment**
144:13 148:21
150:5 151:22
152:12
**unfortunate**
118:20
**uninsured** 204:11
**unique** 44:18
**unit** 59:24
**united** 1:1
**universal** 152:21
**university** 49:4,15
167:19 192:22

**unquote** 159:16
**unreasonable**
247:24
**unrelated** 49:22
**untrue** 161:1,1
**upcoming** 197:21
**update** 156:9
187:20
**updated** 116:9
**updates** 194:6
**upper** 222:11
**uprise** 69:15 79:8
**upset** 117:23
**uptick** 66:21 67:12
68:1 73:21 220:9
220:11
**urged** 173:10
**use** 32:21 33:9
40:24 41:3 55:10
57:1 58:16 85:7
98:19 103:3,18
123:5,7
**user** 145:8
**users** 145:22
**usually** 52:1 145:8
**utilize** 98:18

| v |
| --- |

**v** 1:11 268:6 269:3
270:3
**vague** 22:10 23:11
24:2,13 92:18
**vaguely** 77:11
**valeria** 6:4,7
196:13 197:12
202:22
**vandetta** 3:22
**variability** 153:25
**variety** 179:16
**various** 34:2 48:21
64:23 66:21 72:10
78:6,10 80:9

104:24 138:12
200:13 208:22
**verbal** 255:20
**verbatim** 139:14
**veritext** 268:1,7
271:1
**veritext.com.**
268:17
**version** 73:11
193:10
**versions** 193:5,9
194:3
**versus** 103:19
134:8 181:14
219:2 253:7
**vi** 207:6
**vicodin** 32:13
**video** 7:1
**videographer** 3:22
8:1 9:2,10 75:20
75:23 130:21
131:4 224:18,21
249:19,22 264:20
**videotaped** 1:17
10:13
**view** 191:10
**vii** 207:22
**violate** 29:14
**violence** 166:13
195:7 219:18
221:16
**virginia** 30:23
31:1,4 261:10
**virtually** 263:15
**visits** 213:23 214:2
**volume** 83:19
85:25,25
**voluntary** 29:23
**vulnerable** 195:16

| w |
| --- |

**wagner** 199:2
207:20
**wait** 36:1 143:10
**waived** 268:19
**walks** 184:2
**walmart** 3:2 9:1
**want** 10:8 30:1
36:10 37:25,25
42:2 45:13 46:7
51:6 59:20 60:6
75:18 76:8,9,15
83:10 84:18 87:4
116:25 127:7
129:13 130:12,19
132:2 141:21
149:23 152:6
154:7 162:8
186:10 205:1
212:18,20 249:9
**wanted** 11:11
101:11 111:23
125:15 131:20,22
164:19 210:6
255:19
**warrants** 124:21
**wars** 60:3
**washington** 2:17
3:18
**wasp** 244:7
**water** 224:12
**way** 37:1,1 41:5
42:16 43:17 44:20
44:21 45:9 47:24
48:17 55:25 56:1
56:23 64:5 67:7
68:11 70:22 76:3
81:14 85:16 87:17
96:23 101:25
118:6 121:25
131:9 132:6

134:20 137:3
144:6 146:19
153:7 154:25
159:1 161:20
166:2 193:3 212:5
212:5 223:7 225:1
227:6 235:9
238:12,15 243:4
250:20 251:2,4
252:16,18 260:3
262:19,20,21
**ways** 123:7 147:2
176:16 250:14
251:9 258:16
**we've** 50:24 94:18
116:3 129:24
194:23 199:11
201:5 224:8
235:17
**weathered** 171:15
**wednesday** 165:25
173:1 180:16
**week** 163:2 210:23
**weeks** 16:1 140:14
172:3 210:11
**weigh** 103:16
**weiskittel** 198:9
**welfare** 5:18 30:24
41:1 48:12,19,23
49:24 52:6,6,14,20
113:9 114:9
118:15 119:5
123:5 127:6 165:3
165:11 166:1
171:8 173:12,17
**went** 17:3 30:22
31:12,13 53:1
55:19 71:7 125:3
128:6 143:9
144:20 152:7
164:20 260:14

**werner** 209:19,20
209:24
**west** 3:12
**western** 84:13
158:5 167:19
**whereof** 267:5
**who've** 91:9
**wide** 60:4
**wish** 101:10 106:3
106:6
**witness** 8:7 9:11
18:23 19:13,17,21
20:14 25:5,9
74:13,17,20 75:19
108:24 116:5
129:15,18 130:1,7
132:11 174:18
224:11,15 248:11
248:22 249:14
252:24 255:14
264:18,19 266:9
266:14,15,18
267:5 268:8,11
269:1,4,11 270:1,4
270:15
**witness's** 265:2
**witnesses** 225:15
**witness'** 268:14
**woman** 128:3
**women** 201:25
204:14,23
**wonder** 163:1,5
**wondering** 60:7
**word** 15:1 95:1
**words** 10:16 53:23
85:7 139:13
**work** 18:12 20:9
38:7 39:18 40:8
42:6 48:23 50:22
50:23 57:20,23,23
60:17 73:25 83:18

83:19 84:8 141:1
151:14,17 167:19
176:17 184:12,15
184:16 198:20
212:17 215:18,20
237:13 250:21
251:3,5
**worked** 44:20,21
45:10 48:16 49:7
50:1,3 51:1 52:4,5
52:21,22 57:19
59:16,18 65:8
96:23 215:22
**worker** 86:6
153:21,23 213:23
216:14
**worker's** 214:1
**workers** 57:15
118:15 119:5
135:22 141:4
145:15 155:13
**working** 20:11
42:25 45:15 49:22
83:4 84:2 167:20
214:22 220:15
222:4 235:5
256:24
**works** 153:7
**workup** 238:3
**worried** 222:24
**worse** 148:19
**worth** 247:4
**wow** 49:17 67:1
247:5
**wrap** 74:16
**write** 94:8 155:14
**writing** 45:25
110:7 111:12
138:19 248:17
**written** 136:14
146:8 153:9

**wrong** 24:18 36:20
177:15
**wrote** 140:5
152:14,24

**y**

**y** 203:22
**yeah** 15:17 22:16
22:18,20 36:6
54:1,1,16 74:13
90:15 94:20
130:15,23 131:2
131:22 132:5
136:9 152:3,9
156:4 159:10,11
183:6,8 197:4
198:16 203:9,21
207:18 209:23,23
211:7 218:14
219:8,8 222:9
223:19 224:6,11
227:17 228:12
230:15 232:20,24
235:7 240:18
243:21 245:16
246:19 247:21
254:5 255:16
257:12,18 263:16
**year** 31:7 50:5,12
52:15 63:11,12
64:20 104:3 106:7
106:8 107:10
116:18 118:23
121:16 125:3
138:6 142:3,17
155:4 168:4 176:1
231:16,16 252:20
**years** 12:9 30:14
30:24 41:22 50:1
69:19 75:13,14
88:10 90:10,18
110:15 143:1

**[years - youth]**

152:24 154:9,20
155:4 156:3,5,6
165:17,18 172:15
173:19 185:1
217:24 223:20
235:18 237:17
242:21 243:12,20
244:1 258:1,5
**yep**  75:19 157:25
160:14 165:16
243:2 260:13
**york**  3:12,12
171:8,15
**young**  163:7 195:4
**youth**  213:10,17

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.